# **ANEXO K**

ÚLTIMOS ESTADOS FINANCIEROS AUDITADOS DE LOS DEUDORES

# ELA DE PUERTO RICO

Estados Financieros Básicos
e Información Adicional Requerida

30 de junio de 2016

(Con el Informe de los Auditores Independientes sobre los mismos)

# ESTADOS FINANCIEROS BÁSICOS E INFORMACIÓN ADICIONAL REQUERIDA

### Año Fiscal Finalizado el 30 de junio de 2016



### ELA de Puerto Rico

### Honorable Ricardo Rosselló Nevares

### Gobernador

*Preparado por:*

### Departamento de Hacienda de Puerto Rico

**Raúl Maldonado Gautier, Contador Público Certificado, Abogado**
*Secretario de Hacienda*

**Francisco Peña Montañez**
*Subsecretario de Hacienda*

**Omar E. Rodríguez Pérez**
*Subsecretario de Contabilidad Central*

**ELA DE PUERTO RICO**

**Índice**

| | Página(s) |
|---|---|
| Informe de los Auditores Independientes | 1–10 |
| Debate y Análisis de la Gerencia (No Auditado) | 11–33 |
| Estados Financieros Básicos: | |
| Estados Financieros de todo el Gobierno: | |
| Estado de Resultados Netos | 34-35 |
| Estado de Actividades | 36–37 |
| Estados Financieros de Fondos: | |
| Fondos del Gobierno: | |
| Balance | 38 |
| Conciliación del Balance de los Fondos Gubernamentales con el Estado de Resultados Netos | 39 |
| Estado de Ingresos, Gastos y Cambios en el Balance de Fondos | 40 |
| Conciliación del Estado de Ingresos, Gastos y Cambios en el Balance de Fondos Gubernamentales en el Estado de Actividades | 41 |
| Fondos de Propiedad Exclusiva: | |
| Estado de Resultados Netos | 42 |
| Estado de Ingresos, Gastos y Cambios en los Resultados Netos de los Fondos | 43 |
| Estado de Flujos de Efectivos | 44 |
| Fondos Fiduciarios: | |
| Estado de Resultados Netos Fiduciarios | 45 |
| Estado de Cambios en los Resultados Netos Fiduciarios - Fondos Fiduciarios de Pensión (y otros Beneficios del Empleado) | 46 |
| Unidades de Componentes de Presentación Discreta: | |
| Estado Combinado de Resultados Netos | 47-48 |

**ELA DE PUERTO RICO**

**Índice**

| | Página(s) |
|---|---|
| Estado Combinado de Actividades | 49 |
| Notas a los Estados Financieros Básicos | 50-330 |
| Información Adicional Requerida (No Auditada): | |
| Esquema de Cambios en el Pasivo Neto de Pensiones para Planes de Pensión de un Solo Patrono - SRM | 331 |
| Esquema de Cambios en los Pasivos Netos de Pensiones para Planes de Pensión de un Solo Patrono-IRS | 332 |
| Esquema de Participación Proporcional de los Pasivos Netos de Pensiones de un Plan de Pensión de Patronos Múltiples de Costos Compartidos - SRE | 333 |
| Esquema de Contribuciones de los Patronos - Todos los Planes de Pensión | 334 |
| Esquema de Progreso de los Fondos para los Planes de Salud Posteriores al Empleo | 335 |
| Esquema de Contribuciones de los Patronos para los Planes de Salud Posteriores al Empleo | 336 |
| Esquema de Ingresos y Gastos – Presupuesto y Real - Base Presupuestaria – Fondo General | 337 |
| Notas de la Información Adicional Requerida | 338–342 |
| Estados Financieros Combinados y de Fondo Individuales y Esquemas del Fondo General: | |
| Fondo General | 343 |
| Esquema de Gastos por Agencia – Presupuesto y Real - Base Presupuestaria – Fondo General | 344–346 |
| Fondos No Mayores del Gobierno: | |
| Fondos No Mayores del Gobierno | 347–349 |
| Balance Combinado | 350 |
| Estado Combinado de Ingresos, Gastos y Cambios en el Balance de Fondos | 351 |
| Fondos Exclusivos No Mayores: | |
| Fondos Exclusivos No Mayores | 352 |

**ELA DE PUERTO RICO**

**Índice**

|  | **Página(s)** |
|---|---|
| Estado Combinado de Resultados Netos | 353 |
| Estado Combinado de Ingresos, Gastos y Cambios en los Resultados Netos de Fondos | 354 |
| Estado Combinado de Flujos de Efectivos | 355 |
| Fondos Fiduciarios: | |
| Fondos Fiduciarios | 356–357 |
| Declaración Combinada de Resultados Fiduciarios Netos - Fondos Fiduciarios de Pensiones | 358 |
| Estado Combinado de Cambios en los Resultados Netos Fiduciarios - Fondos Fiduciarios (y otros Beneficios del Empleado) | 359 |
| Estado Combinado de Cambios en Activos y Pasivos - Fondos de Agencias | 360 |
| Unidades de Componentes No Mayores de Presentación Discreta: | |
| Unidades de Componentes No Mayores de Presentación Discreta | 361 |
| Estado Combinado de Resultados Netos | 362-368 |
| Estado Combinado de Actividades | 369 |



KPMG LLP
American International Plaza
Suite 1100
250 Muñoz Rivera Avenue San
Juan, PR 00918-1819

**Informe de los Auditores Independientes**

El Honorable Gobernador y Legislatura del
   Estado Libre Asociado de Puerto Rico
   San Juan, Puerto Rico

Hemos auditado los estados financieros adjuntos de las Actividades Gubernamentales, las Actividades de Tipo Comercial, las Unidades de Componentes Agregados de Presentación Discreta, cada fondo mayor y la Información del Fondo Agregado Restante del Estado Libre Asociado de Puerto Rico (el ELA) a partir de y para el año finalizado el 30 de junio de 2016, y las notas relacionadas con los estados financieros básicos que, en conjunto, comprenden los estados financieros básicos del Estado Libre Asociado que figuran en el índice.

**Responsabilidad de la Gerencia sobre los Estados Financieros**

La gerencia es responsable de la preparación y presentación justa de estos estados financieros de acuerdo con los principios contables generalmente aceptados de los Estados Unidos; esto incluye el diseño, la implementación y el mantenimiento del control interno relevante para la preparación y presentación justa de estados financieros libres de errores materiales, ya sea debido a fraude o error.

**Responsabilidad de los Auditores**

Nuestra responsabilidad es expresar opiniones sobre estos estados financieros con base en nuestra auditoría. No auditamos los estados financieros de las siguientes entidades y fondos:

- *Actividades del Gobierno*

   – Corporación de Industrias de Ciegos, Personas Mentalmente Retardadas y Otras Personas Incapacitadas de Puerto Rico, Oficina de Servicios Legislativos, Oficina para el Mejoramiento de las Escuelas Públicas, Superintendencia del Capitolio, Cámara de Representantes de Puerto Rico, Senado de Puerto Rico, Administración de Vivienda Pública de Puerto Rico, Departamento de Financiamiento de la Vivienda de Puerto Rico - Fondo de Compras y Ventas, Departamento de Desarrollo Económico y Comercio de Puerto Rico, que en conjunto representan el 18.95% y el 2.49% del total de activos e ingresos, respectivamente, del Fondo General.

   – Autoridad de Transporte Marítimo de Puerto Rico, Fondos Especiales para el Fideicomiso Perpetuo de las Comunidades Especiales, fondos de servicio de la deuda, Autoridad de Edificios Públicos, Centro Comprensivo de Cáncer de la Universidad de Puerto Rico, Autoridad de Financiamiento de la Infraestructura de Puerto Rico, Fideicomiso de los Niños, Autoridad del Puerto de las Américas que son fondos no mayores del gobierno, que representan el 12.84% y el 3.04% de los activos e ingresos totales, respectivamente, de la Información del Fondo Acumulado Restante.

   Estas entidades y fondos representan colectivamente el 56.02% y el 4.11% de los activos e ingresos totales, respectivamente, de las Actividades del Gobierno.

- *Actividades de Tipo Comerciales*

   – Fondo de Seguro por Desempleo, que es un fondo empresarial mayor.

   – El Sistema de Lotería Tradicional, que representa el 68.02% y el 55.17% de los activos e ingresos totales, respectivamente, del Fondo de Loterías, que es un fondo empresarial mayor.

   – Administración del Seguro de Salud de Puerto Rico, que es un fondo empresarial mayor.

KPMG LLP es una sociedad de responsabilidad limitada de Delaware y una empresa miembro en EE. UU. de la red KPMG de empresas miembro independientes afiliadas a KPMG International Cooperative ("KPMG International"), una entidad suiza.



- – Administración de Servicios Médicos de Puerto Rico, que es un fondo empresarial mayor.

- – Fondo Recurrente para el Control de la Contaminación del Agua de Puerto Rico, que es un fondo empresarial mayor

- – El Fondo de Préstamos Recurrentes para el Tratamiento de Agua Potable Segura de Puerto Rico, la Junta de Gobierno del Servicio 9-1-1, el Fondo de Seguro por Discapacidad, el Fondo de Seguro de Conductores y la Autoridad de Puertos de Ponce, que son fondos empresariales no mayores que representan colectivamente 3.54% y 3.20% del total de activos e ingresos, respectivamente, de la Información del Fondo Acumulado Restante.

- • *Otras Entidades y Fondos*

  El Sistema de Anualidades y Pensiones para Maestros de Puerto Rico, que representa el 19.35% y el 21.53% de los activos e ingresos totales, respectivamente, de la Información del Fondo Acumulado Restante.

- • *Unidades de Componentes Acumulados de Presentación Discreta:*

  Las unidades de componentes de presentación discreta que se incluyen en la nota 1(c) de los estados financieros básicos, con excepción de las consideradas sin auditar como se analiza en la sección "Base para opiniones calificadas (limitación del alcance) para actividades gubernamentales, actividades de tipo comercial, unidades de componentes acumulados de presentación discreta, e información del fondo acumulado fondo restante".

  Estas entidades representan colectivamente el 89.95% y el 93.48% de los activos e ingresos totales, respectivamente, de las Unidades de Componentes Acumulados de Presentación Discreta.

Esos estados financieros fueron auditados por otros auditores, cuyos informes al respecto nos han sido proporcionados, y nuestras opiniones, en la medida en que se relacionan con los montos incluidos para las entidades y los fondos indicados anteriormente, se basan únicamente en los informes de los otros auditores.

Realizamos nuestra auditoría de acuerdo con las normas de auditoría generalmente aceptadas en los Estados Unidos de América. Dichas normas exigen que planifiquemos y ejecutemos la auditoría con el fin de obtener una seguridad razonable sobre si los estados financieros están libres de desviaciones materiales.

Una auditoría incluye ejecutar procedimientos para obtener evidencia de auditoría acerca de los montos y revelaciones en los estados financieros básicos. Los procedimientos seleccionados dependen del juicio de los auditores, que incluye la evaluación de los riesgos de declaraciones erróneas significativas en los estados financieros, ya sea debido a fraude o a error. Al efectuar esas evaluaciones de riesgos, el auditor considera el control interno existente en la entidad, en lo que sea relevante para la preparación y presentación razonable de los estados financieros, a fin de diseñar procedimientos de auditoría que sean apropiados en las circunstancias, pero no con el propósito de expresar una opinión sobre la efectividad del control interno de la entidad. En consecuencia, no expresamos tal opinión. Una auditoría también incluye evaluar lo apropiado de las políticas contables utilizadas y la razonabilidad de los estimados contables significativos realizados por la gerencia, y evaluar la presentación de los estados financieros tomados en su conjunto.

Consideramos que la evidencia de auditoría que hemos obtenido es suficiente y apropiada para proporcionar una base para nuestra opinión de auditoría.

**Resumen de opiniones**

| Unidad de Opinión | Tipo de opinión |
|---|---|
| Actividades del Gobierno | Calificada |
| Actividades de Tipo Comerciales | Calificada |



| Unidad de opinión | Tipo de opinión |
|---|---|
| Unidades de Componentes Acumulados de Presentación Discreta: | Calificada |
| Fondo General | No modificado |
| Fondo de Servicio de la Deuda | No modificado |
| Fondo de Ingresos Especiales de COFINA | No modificado |
| Fondo de Servicio de la Deuda de COFINA | No modificado |
| Fondo de Seguro por Desempleo | No modificado |
| Fondo de Loterías | No modificado |
| Fondo de Administración de Servicios Médicos de Puerto Rico | No modificado |
| Fondo Recurrente de Control de Contaminación del Agua de Puerto Rico | No modificado |
| Fondo de Administración del Seguro de Salud de Puerto Rico | Calificada |
| Información del Fondo Acumulado Restante | Calificada |

**Base para Opiniones Calificadas (Limitación del Alcance) para Actividades del Gobierno, Actividades de Tipo Comercial, Unidades de Componentes Acumulados de Presentación Discreta e Información Acumulada del Fondo Restante**

*Base para Opiniones Calificadas - Entidades y Fondos no Auditados*

Tal como se analizó en la nota 6 de los estados financieros básicos, el ELA determinó que una pérdida crediticia por custodia de depósitos en el Banco Gubernamental de Fomento para Puerto Rico (BGF) debería haberse reconocido al 30 de junio de 2015. Las siguientes entidades y fondos, que fueron auditados por otros auditores, no evaluaron el potencial de pérdida de crédito de custodia de depósitos en el BGF en sus respectivos estados financieros emitidos por separado en 2015 y tampoco reconocieron una pérdida de crédito de custodia en 2015, ni reconocieron una pérdida de crédito de custodia en 2016 sin tener en cuenta el impacto en los resultados netos iniciales/balance del fondo. Debido a que dicha pérdida podría haber sido material para esos estados financieros, no pudimos basarnos en los informes de otros auditores. En consecuencia, consideramos que los montos de los estados financieros para las siguientes entidades y fondos incluidos en los estados financieros de las Actividades del Gobierno, Actividades de Tipo Comercial, Unidades de Componentes Acumulados de Presentación Discreta, e Información del Fondo Acumulado Restante del ELA no fueron auditados.

- *Actividades del Gobierno*
  - Oficina para el Mejoramiento de las Escuelas Públicas
  - Departamento de Financiamiento de la Vivienda de Puerto Rico - Fondo de Ventas y Compras
  - Fideicomiso de los Niños

Estas entidades y fondos representan colectivamente el 1.62% y el 0.03% de los activos e ingresos totales, respectivamente, de las Actividades del Gobierno.



- *Actividades de Tipo Comerciales*

  – El Fondo de Seguro por Discapacidad

  – El Fondo de Seguro de Conductores

Estos fondos representan colectivamente el 8.86% y el 0.56% de los activos e ingresos totales, respectivamente, de las Actividades de Tipo Comercial.

- *Unidades de Componentes Acumulados de Presentación Discreta:*

  – Corporación de Seguros Agrícolas de Puerto Rico

  – Autoridad de Tierras de Puerto Rico

  – Consejo de Educación de Puerto Rico

  – Comisión de Energía de Puerto Rico

  – Autoridad para el Financiamiento de la Vivienda de Puerto Rico

  – Compañía de Fomento Industrial de Puerto Rico

  – Autoridad de Transporte Integrado de Puerto Rico

  – Administración de Tierras de Puerto Rico

  – Agencia de Finanzas Municipales de Puerto Rico

  – Escuela de Artes Plásticas de Puerto Rico

  – Fideicomiso para Ciencia, Tecnología e Investigación de Puerto Rico

  – Autoridad Telefónica de Puerto Rico

  – Compañía de Comercio y Exportación de Puerto Rico

  – Autoridad de Depósitos Sólidos

Estas entidades representan colectivamente el 16.41% y el 9.46% de los activos e ingresos totales, respectivamente, de las Unidades de Componentes Acumulados de Presentación Discreta.

- *Información del Fondo Acumulado Restante*

  – Fideicomiso de los Niños

  – El Fondo de Seguro por Discapacidad

  – El Fondo de Seguro de Conductores

Estas entidades y fondos representan colectivamente el 5.73% y el 1.20% de los activos e ingresos totales, respectivamente, de la Información del Fondo Restante Acumulado.

*Base para Opiniones Calificadas - Montos de Pensión no Auditados*

Los fondos que se mencionan a continuación, que fueron auditados por otros auditores, no aplicaron las disposiciones de la Declaración GASB Núm. 68 en sus respectivos estados financieros emitidos por separado. De acuerdo con la Declaración GASB Núm. 68, estos fondos deberían haber registrado su parte proporcional de los montos de las pensiones colectivas relacionadas con el Sistema de Retiro de los Empleados del ELA de Puerto Rico, que incluyen los pasivos netos de pensiones, las salidas diferidas de recursos, los fondos diferidos entradas de recursos y gastos de pensiones. Sin embargo, el ELA registró dentro de las Actividades del Gobierno esa participación proporcional de los montos de pensión colectiva,



que no estaban sujetos a nuestros procedimientos de auditoría, o los procedimientos de auditoría de los otros auditores. En consecuencia, no podemos obtener evidencia de auditoría suficiente y adecuada sobre los montos de las pensiones de los siguientes fondos que se incluyen en los estados financieros de las Actividades del Gobierno del ELA.

- Oficina de Servicios Legislativos
- Superintendencia del Capitolio
- Cámara de Representantes de Puerto Rico
- Senado de Puerto Rico
- Administración de Vivienda Pública de Puerto Rico

Además, el ELA registró los montos de las pensiones dentro de las Actividades del Gobierno relacionadas con el Sistema de Anualidades y Pensiones para Maestros de Puerto Rico, que incluyen los pasivos netos de pensiones, las salidas diferidas de recursos, las entradas diferidas de recursos y los gastos de pensiones. Tales montos de pensión no han sido auditados, ni nos comprometimos a auditar los montos de pensión como parte de nuestra auditoría de los estados financieros básicos del ELA.

El pasivo neto de pensiones agregado, las salidas diferidas de recursos, las entradas diferidas de recursos y los gastos de pensión relacionados con estos fondos y con el Sistema de Anualidades y Pensiones para Maestros de Puerto Rico que se incluyen en los estados financieros de las Actividades del Gobierno del ELA fueron de $15,109 millones, $1,543 millones, $82.5 millones, y $936 millones, respectivamente.

Las entidades que se mencionan a continuación, que fueron auditadas por otros auditores, aplicaron las disposiciones de la Declaración GASB Núm. 68 en sus respectivos estados financieros emitidos por separado. Sin embargo, debido a la falta de disponibilidad de montos de pensión auditados del Sistema de Retiro de los Empleados del ELA de Puerto Rico al momento de la emisión respectiva de sus estados financieros, los otros auditores calificaron sus opiniones debido a la falta de evidencia de auditoría suficiente y adecuada sobre los montos de pensión, que incluyen los pasivos netos de pensiones, salidas diferidas de recursos, entradas diferidas de recursos y gastos de pensión. En consecuencia, no pudimos obtener evidencia de auditoría suficiente y adecuada sobre los montos de pensión incluidos en los estados financieros para las siguientes entidades que están incluidas en los estados financieros de las Unidades de Componentes Acumulados de Presentación Discreta del ELA.

- *Unidades de Componentes Acumulados de Presentación Discreta:*

  - Corporación del Fondo del Seguro del Estado
  - Administración para el Desarrollo de Empresas Agropecuarias
  - Administración de Compensación por Accidentes de Automóviles
  - Autoridad de Conservación y Desarrollo de Culebra
  - Autoridad de Tierras de Puerto Rico
  - Escuela de Artes Plásticas de Puerto Rico

  El pasivo neto de pensiones, las salidas diferidas de recursos, las entradas diferidas de recursos y los gastos de pensiones incluidos para estas entidades en los estados financieros de las Unidades de Componentes Acumulados de Presentación Discreta del ELA fueron de $1,854.5 millones, $117.9 millones, $14.3 millones y $104.6 millones, respectivamente.



**Base para Opiniones Calificadas (Desviación de los Principios Contables Generalmente Aceptados de EE. UU.) para las Actividades del Gobierno, Unidades de Componentes Agregados de Presentación Discreta y Fondo de Administración de Seguros de Salud de Puerto Rico**

*Base para Opiniones Calificadas - Montos de Pensión no Registrados*

Tal como se analizó en la nota 18 de los estados financieros básicos, las entidades y los fondos que se mencionan a continuación, que fueron auditados por otros auditores, no aplicaron las disposiciones de la Declaración GASB Núm. 68 en sus respectivos estados financieros emitidos por separado. De acuerdo con la Declaración GASB Núm. 68, las siguientes entidades y fondos deberían haber registrado su parte proporcional de los montos de las pensiones colectivas relacionadas con el Sistema de Retiro de los Empleados del ELA de Puerto Rico, que incluyen los pasivos netos de pensiones, las salidas diferidas de recursos, los fondos diferidos entradas de recursos y gastos de pensiones. En consecuencia, los montos incluidos en los estados financieros de las Actividades del Gobierno, las Unidades de Componentes Acumulados de Presentación Discreta y el Fondo de Administración de Seguros de Salud del ELA no incluyen los montos de las pensiones para las siguientes entidades y fondos según lo requerido por la Declaración GASB Núm. 68. El estimado no auditado de la administración de pasivos netos de pensiones no registrados para cada unidad de opinión se revela en las notas 18(g) y 18(h) de los estados financieros básicos.

- *Actividades del Gobierno*

  - Autoridad de Edificios Públicos
  - Autoridad para el Financiamiento de la Infraestructura de Puerto Rico
  - Autoridad de Transporte Marítimo de Puerto Rico

- *Unidades de Componentes Acumulados de Presentación Discreta:*

  - Banco Gubernamental de Fomento para Puerto Rico
  - Autoridad de Acueductos y Alcantarillas de Puerto Rico
  - Autoridad de Carreteras y Transportación de Puerto Rico
  - Compañía para el Desarrollo Integral de la "Península de Cantera"
  - Corporación para el Proyecto Enlace del "Caño Martín Peña"
  - Banco de Desarrollo Económico de Puerto Rico
  - Corporación de Seguros Agrícolas de Puerto Rico
  - Corporación del Centro de Bellas Artes
  - Fideicomiso Institucional de la Guardia Nacional de Puerto Rico
  - Instituto de Cultura Puertorriqueña
  - Corporación para las Artes Musicales
  - Corporación Pública para la Supervisión y Seguro de Cooperativas de Puerto Rico
  - Autoridad de Financiamiento de Instalaciones de Control Industrial, Turístico, Educativo, Médico y Ambiental de Puerto Rico
  - Autoridad de Transporte Marítimo de Puerto Rico y las Islas Municipio
  - Corporación del Conservatorio de Música de Puerto Rico
  - Consejo de Educación de Puerto Rico
  - Compañía de Fomento Industrial de Puerto Rico



- Administración de Tierras de Puerto Rico
- Autoridad Metropolitana de Autobuses de Puerto Rico
- Autoridad de los Puertos de Puerto Rico
- Corporación de Puerto Rico para la Difusión Pública
- Autoridad para Alianzas Público-Privadas de Puerto Rico
- Compañía de Turismo de Puerto Rico
- Compañía de Comercio y Exportación de Puerto Rico
- Autoridad de Depósitos Sólidos

- *Fondo de Administración del Seguro de Salud de Puerto Rico*

**Opiniones Calificadas**

En nuestra opinión, de acuerdo con nuestra auditoría y los informes de otros auditores, con excepción de los posibles efectos de los asuntos que se describen en los párrafos "Base para las Opiniones Calificadas (Limitación del Alcance) para Actividades del Gobierno, Actividades de Tipo Comercial, Unidades de Componentes Acumulados de Presentación Discreta agregadas discretamente presentadas e Información del Fondo Restante Acumulado" y con excepción de los efectos de los asuntos que se describen en los párrafos de "Base para Opiniones Calificadas (Desviación de los Principios Contables Generalmente Aceptados de EE. UU.) para Actividades del Gobierno, Unidades de Componentes Acumulados de Presentación Discreta y el Fondo de Administración de Seguros de Salud de Puerto Rico", los estados financieros mencionados anteriormente presentan, de manera justa, en todos los aspectos materiales, la posición financiera de las Actividades del Gobierno, las Actividades de Tipo Comercial, las Unidades de Componentes Acumulados de Presentación Discreta, el Fondo de Administración de Seguros de Salud de Puerto Rico y la Información del Fondo Restante Acumulado al 30 de junio de 2016, y los cambios respectivos en la posición financiera y, si corresponde, los flujos de efectivo de los mismos para el año finalizado de acuerdo con los principios de contabilidad generalmente aceptados en los Estados Unidos.

**Opiniones No Modificadas**

En nuestra opinión, de acuerdo con nuestra auditoría y los informes de otros auditores, los estados financieros mencionados anteriormente presentan de manera justa, en todos los aspectos materiales, la posición financiera respectiva del Fondo General, Fondo de Servicio de la Deuda, Fondo de Ingresos Especiales de COFINA, el Fondo de Servicio de la Deuda de COFINA, el Fondo de Seguro por Desempleo, el Fondo de Loterías, el Fondo de Administración de Servicios Médicos de Puerto Rico y el Fondo Recurrente para el Control de la Contaminación del Agua de Puerto Rico al 30 de junio de 2016, y los cambios respectivos en la posición financiera y, en su caso, los flujos de efectivo de los mismos para el año finalizó de acuerdo con los principios contables generalmente aceptados en los Estados Unidos.

**Énfasis de Cuestiones**

*Incertidumbre sobre la Capacidad de Continuar como una Empresa en Marcha - Gobierno Primario*

Los estados financieros básicos adjuntos han sido preparados asumiendo que el ELA seguirá siendo una empresa en marcha. Como se analizó en la nota 2(a) de los estados financieros básicos, el ELA ha incurrido en déficits recurrentes, tiene una posición financiera negativa, ha experimentado un mayor deterioro de su condición económica, no ha podido acceder a los mercados crediticios y ha declarado que existe una duda sustancial sobre la capacidad del ELA para continuar como una empresa en marcha. Adicionalmente, el 3 de mayo de 2017, la Junta de Supervisión y Administración Financiera (la Junta de Supervisión) a solicitud del Gobernador, radicó una solicitud de reparación en virtud del Título III de la Ley de Supervisión, Administración y Estabilidad Económica del Congreso de los Estados Unidos (PROMESA) en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. La evaluación de la gerencia de los eventos y condiciones y los planes de la gerencia con respecto a estos asuntos también se describen en la nota 2(a) de los estados financieros básicos. Los estados financieros básicos no incluyen ningún ajuste que pueda resultar del resultado de esta incertidumbre. Nuestras opiniones sobre los estados financieros básicos no se modifican con respecto a este asunto.



*Incertidumbre sobre la Capacidad de Continuar como una Empresa en Marcha - Sistemas de Retiro*

Los estados financieros básicos adjuntos han sido preparados asumiendo que los sistemas de retiro del ELA seguirán siendo una empresa en marcha. Tal como se analizó en la nota 2(b) a los estados financieros básicos, el Sistema de Retiro de los Empleados del ELA de Puerto Rico, el Sistema de Retiro de la Judicatura del Estado Libre Asociado de Puerto Rico y el Sistema de Anualidades y Pensiones para Maestros de Puerto Rico carecen de fondos suficientes. En el año fiscal 2018, cada uno de los sistemas de retiro vendió la mayor parte de sus inversiones y comenzó a operar sobre la base de pago por uso. Asimismo, el 3 de mayo de 2017 y 21 de mayo de 2017, la Junta de Supervisión inició casos para el ELA y el Sistema de Retiro de los Empleados del ELA de Puerto Rico, respectivamente, mediante la radicación de solicitudes de reparación en virtud del Título III de PROMESA. En consecuencia, el ELA ha declarado en la nota 2(b) a los estados financieros básicos que existe una duda sustancial sobre la capacidad de cada uno de los sistemas de retiro para continuar como una empresa en marcha. Los estados financieros básicos no incluyen ningún ajuste que pueda resultar del resultado de estas incertidumbres. Nuestras opiniones sobre los estados financieros básicos no se modifican con respecto a estos asuntos.

*Incertidumbre sobre la Capacidad de Continuar como una Empresa en Marcha - Unidades de Componentes Mayores de Presentación Discreta*

Los estados financieros básicos adjuntos han sido preparados asumiendo que las unidades de componentes mayores de presentación discreta del ELA seguirán siendo una empresa en marcha. Tal como se analizó en la nota 2(c) de los estados financieros básicos, el ELA ha declarado que existen dudas sustanciales para que las siguientes unidades de componentes mayores de presentación discreta como una empresa en marcha. La evaluación de la gerencia de los eventos y condiciones y los planes de la gerencia con respecto a estas cuestiones también se describen en la nota 2(c) de los estados financieros básicos. Los estados financieros básicos no incluyen ningún ajuste que pueda resultar del resultado de estas incertidumbres. Nuestras opiniones sobre los estados financieros básicos no se modifican con respecto a estos asuntos.

- *Banco Gubernamental de Fomento para Puerto Rico (BGF)*

  El ELA y sus unidades de componentes no han podido pagar sus préstamos del BGF, lo que ha afectado significativamente la liquidez y la capacidad del BGF para pagar sus obligaciones. Además, el 23 de marzo de 2018, el BGF cesó sus operaciones y actualmente se está liquidando de manera ordenada en virtud del Título VI de PROMESA. Estas cuestiones generan dudas sustanciales sobre la capacidad del BGF (incluidas sus unidades de componentes combinados) de continuar como una empresa en marcha.

- *Autoridad de Carreteras y Transportación de Puerto Rico (ACT)*

  Los estados financieros de la ACT al 30 de junio de 2016 y para el año finalizado fueron auditados por otros auditores, cuyo informe al respecto, con fecha del 6 de abril de 2018, incluía un párrafo sobre material relevante relacionado con la capacidad de la ACT para continuar como empresa en marcha. Tal como se indica en el informe de los auditores independientes de la ACT, la ACT ha tenido pérdidas recurrentes significativas de las operaciones y no tiene suficientes fondos disponibles para pagar completamente sus diversas obligaciones al momento de su vencimiento. Asimismo, el 21 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para ACT al presentar una solicitud de radicación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico.

- *Autoridad de Energía Eléctrica de Puerto Rico (AEE)*

  Los estados financieros de la AEE al 30 de junio de 2016 y para el año finalizado fueron auditados por otros auditores, cuyo informe al respecto, con fecha del 12 de diciembre de 2018, incluía un párrafo sobre material relevante relacionado con la capacidad de la AEE para continuar como empresa en marcha. Como se indica en el informe de los auditores independientes de la AEE, la AEE tiene un déficit acumulado de $5,000 millones al 30 de junio de 2016 y debido a restricciones de liquidez, durante el año finalizado el 30 de junio de 2016, la AEE no realizó los depósitos necesarios al Fondo de Amortización de Deudas.
  Además, el 2 de julio de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III



Para la AEE mediante una solicitud de radicación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico.

- *Autoridad de Acueductos y Alcantarillas de Puerto Rico (AAA)*

  Los estados financieros de la AAA al 30 de junio de 2016 y para el año finalizado fueron auditados por otros auditores, cuyo informe al respecto, con fecha del 7 de marzo de 2017, incluía un párrafo sobre material relevante relacionado con la capacidad de la AAA para continuar como empresa en marcha. Tal como se indica en el informe de los auditores independientes de la AAA, la AAA ha tenido pérdidas operativas recurrentes significativas, deficiencias de capital de trabajo, rebajas de crédito, grandes requisitos de gastos de capital no discrecionales, incertidumbre sobre el cumplimiento total de sus obligaciones, supervisión fiscal y no ha podido acceder a los mercados de capitales.

- *Universidad de Puerto Rico (UPR)*

  Los estados financieros de la UPR al 30 de junio de 2016 y para el año finalizado fueron auditados por otros auditores, cuyo informe al respecto, con fecha del 29 de marzo de 2018, incluía un párrafo sobre material relevante relacionado con la capacidad de la UPR para continuar como empresa en marcha. Tal como se indica en el informe de los auditores independientes de la UPR, la UPR depende en gran medida de las asignaciones del ELA para financiar sus operaciones.

*Nuevo Estado de Resultados Netos y Balance del Fondo*

Tal como se analizó en la nota 4 de los estados financieros básicos, los resultados netos/balance del fondo de las Actividades de Tipo Comercial, las Unidades de Componentes Acumulados de Presentación Discreta, el Fondo de Servicio de la Deuda de COFINA, el Fondo de Administración de Servicios Médicos de Puerto Rico y el Fondo Recurrente para el Control de la Contaminación del Agua de Puerto Rico se ha reformulado al 1 de julio de 2015 para corregir errores. Nuestras opiniones sobre los estados financieros básicos no se modifican con respecto a estos asuntos.

**Otras Cuestiones**

*Información Adicional Requerida*

Los principios contables generalmente aceptados en los Estados Unidos requieren que el debate y el análisis de la gerencia en las páginas 11 a 33; los esquemas de cambios en los pasivos netos de pensiones del ELA para los planes de pensión de un solo patrono en las páginas 331 y 332; el esquema de la participación proporcional del ELA en los pasivos netos de pensiones del plan de pensiones de patronos múltiples de costo compartido en la página 333; el esquema de las contribuciones de los patronos para todos los planes de pensiones en la página 334; el esquema de progreso de financiamiento para los planes de atención médica posteriores al empleo en la página 335; el esquema de las contribuciones de los patronos para los planes de atención médica posteriores al empleo en la página 336; y el esquema de ingresos y gastos - presupuesto y base presupuestaria real - Fondo General en la página 337, se presenten para complementar los estados financieros básicos. Tal información, aunque no forma parte de los estados financieros básicos, es requerida por la Junta de Normas de Contabilidad del Gobierno, que considera que es una parte esencial de la información financiera para ubicar los estados financieros básicos en un contexto operativo, económico o histórico apropiado.

No pudimos aplicar ciertos procedimientos limitados al debate y análisis de la gerencia de acuerdo con los estándares de auditoría generalmente aceptados en los Estados Unidos, debido a los asuntos descritos en los párrafos "Base para las Opiniones Calificadas (Limitación del Alcance) para Actividades del Gobierno, Actividades de Tipo Comercial, Unidades de Componentes Acumulados de Presentación Discreta e Información de Fondos Acumulados Restantes" y en los párrafos "Base para Opiniones Calificadas (Desviación de los Principios Contables Generalmente Aceptados de los EE. UU.) para Actividades del Gobierno, Unidades de Componentes Acumulados de Presentación Discreta y el Fondo de Administración de Seguros de Salud de Puerto Rico". Adicionalmente, aunque nuestras opiniones sobre los estados financieros básicos no se ven afectadas, los montos de los estados financieros incluidos en el debate y análisis de la gerencia contienen desviaciones importantes de los principios contables generalmente aceptados en los Estados Unidos porque no incluyen montos de pensiones para ciertas entidades y fondos que no se aplicaron las disposiciones de la



Declaración GASB Núm. 68. No expresamos una opinión ni brindamos ninguna garantía sobre la información.

Nosotros y los otros auditores hemos aplicado ciertos procedimientos limitados a los esquemas de cambios en los pasivos netos de pensiones del ELA para los planes de pensión de un solo empleador, el esquema de la participación proporcional del ELA en los pasivos netos de pensiones del plan de pensión de patronos múltiples de costos compartidos, el esquema de contribuciones de los patronos para todos los planes de pensiones, el esquema de progreso de financiamiento para los planes de atención médica posteriores al empleo, el esquema de contribuciones de los patronos para los planes de atención médica posteriores al empleo y el esquema de ingresos y gastos - presupuesto y base presupuestaria real- Fondo General, de conformidad con las normas de auditoría generalmente aceptadas en los Estados Unidos de América, que consistieron en consultas de la gerencia sobre los métodos para preparar la información y comparar la información para que sea coherente con las respuestas de la gerencia a nuestras consultas, los estados financieros básicos y otros conocimiento que obtuvimos durante nuestra auditoría de los estados financieros básicos. Si bien nuestras opiniones sobre los estados financieros básicos no se ven afectadas, los montos incluidos en el esquema de la participación proporcional del ELA en los pasivos netos de pensiones del plan de pensiones de patronos múltiples de costos compartidos y el esquema de las contribuciones del patrono para todos los planes de pensiones contienen desviaciones materiales de los principios de contabilidad generalmente aceptados en los EE. UU. porque no incluyen los montos de las pensiones para ciertas entidades y fondos que no aplicaron las disposiciones de la Declaración GASB Núm. 68. No expresamos una opinión ni brindamos ninguna garantía sobre la información.

*Información Adicional*

Nuestra auditoría se realizó con el propósito de formar opiniones sobre los estados financieros que colectivamente comprenden los estados financieros básicos del ELA. Los estados financieros y esquemas de fondos combinados e individuales que figuran en el índice adjunto se presentan con el propósito de un análisis adicional y no son una parte requerida de los estados financieros básicos. Los estados financieros y esquemas de fondos combinados e individuales son responsabilidad de la gerencia y se derivaron y se relacionan directamente con los registros contables subyacentes y otros registros utilizados para preparar los estados financieros básicos. Tal información ha sido sometida a los procedimientos de auditoría aplicados en la auditoría de los estados financieros básicos y ciertos procedimientos adicionales, incluida la comparación y conciliación de dicha información directamente con la contabilidad subyacente y otros registros utilizados para preparar los estados financieros básicos o con los estados financieros básicos y otros procedimientos adicionales de acuerdo con los estándares de auditoría generalmente aceptados en los Estados Unidos de América. En nuestra opinión, con excepción del efecto sobre la información adicional sobre los asuntos que se describen anteriormente en los párrafos "Bases para Opiniones Calificadas (Limitación del Alcance) para Actividades del Gobierno, Actividades de Tipo Comercial, Unidades de Componentes Acumulados de Presentación Discreta e Información Acumulada de Fondos Restantes" y los párrafos "Base para Opiniones Calificadas (Desviación de Principios Contables Generalmente Aceptados en los EE. UU.) para las Actividades del Gobierno, las Unidades de Componentes Acumulados de Presentación Discreta y los Fondos de Administración de Seguros de Salud de Puerto Rico", la información se presenta de manera justa en todos los aspectos materiales en relación con los estados financieros en su conjunto.

*KPMG LLP*

3 de mayo de 2019

El sello Núm. E363832 de la Sociedad de
Contadores Públicos Certificados de Puerto Rico
se colocó en la copia registrada de este informe.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

La sección de debate y análisis de la gerencia (MD&A) proporciona una descripción general y un análisis narrativo de las actividades financieras del Estado Libre Asociado de Puerto Rico (el ELA) para el año fiscal que finalizó el 30 de junio de 2016. El MD&A está destinado a servir como una introducción a los estados financieros básicos del ELA, que tienen los siguientes componentes: (1) estados financieros de todo el gobierno, (2) estados financieros de fondos y (3) notas a los estados financieros básicos. El MD&A está destinado a (a) ayudar al lector a enfocarse en asuntos importantes, (b) proporcionar una visión general de las actividades financieras del ELA, (c) presentar una visión general de los resultados para el Fondo General sobre una base presupuestaria, y (d) resaltar asuntos de fondos individuales. La siguiente presentación está, por necesidad, muy resumida y, por lo tanto, para obtener una comprensión profunda de la condición financiera del ELA, los estados financieros, las notas y la información complementaria requerida deben revisarse en su totalidad.

**Aspectos financieros destacados**

- El Gobierno Primario del ELA, que abarca las Actividades del Gobierno y de Tipo Comercial del ELA, informó, en los estados financieros de todo el gobierno, resultados netos (déficit) de aproximadamente $70,300 millones al 30 de junio de 2016, compuesta por aproximadamente $14,100 millones en activos totales y aproximadamente $4,900 millones en salidas diferidas de recursos, menos aproximadamente $88,100 millones en pasivos totales y aproximadamente $1,200 millones en entradas diferidas de recursos.

- Los resultados netos (déficit) del Gobierno Primario del ELA aumentaron en aproximadamente $2,500 millones durante el año fiscal 2016. Los resultados netos (déficit) para Actividades del Gobierno aumentaron en aproximadamente $1,900 millones y los resultados netos (déficit) para Actividades de Tipo Comercial aumentaron en aproximadamente $591 millones durante el año fiscal 2016.

- Las Actividades del Gobierno del ELA tuvieron ingresos totales de aproximadamente $18,300 millones para el año fiscal 2016, lo que representa un aumento de aproximadamente $1,300 millones en comparación con el año fiscal 2015. Las Actividades de Tipo Comercial del ELA tuvieron ingresos totales de aproximadamente $3,400 millones para el año fiscal 2016, lo que representó un aumento de aproximadamente $72 millones en comparación con el año fiscal 2015.

- El Gobierno Primario del ELA tuvo gastos totales de aproximadamente $24,200 millones en el año fiscal 2016, lo que representó un aumento de aproximadamente $2,500 millones en comparación con los gastos totales incurridos durante el año fiscal 2015 (según la actualización).

- Para el año fiscal 2016, el exceso total de ingresos sobre los gastos y los pagos del servicio de la deuda de obligación general en el Fondo General (base presupuestaria) fue de aproximadamente $439 millones. Consistió en la diferencia entre los ingresos reales totales de aproximadamente $9,000 millones (sin incluir otras fuentes de financiamiento), menos la suma de los gastos reales totales de aproximadamente $8,300 millones y los pagos del servicio de la deuda de la obligación general de aproximadamente $287 millones (sin incluir otros usos de financiamiento). La variación entre los principios contables generalmente aceptados de los EE. UU. (PCGA de EE. UU.) y los déficits de la base presupuestaria son el resultado de las diferencias de contabilidad, entidad y diferencias de perspectiva entre los informes presupuestarios frente a los establecidos por los PCGA de EE. UU. y seguidos en estos estados financieros.

La gerencia del ELA cree que existen dudas sustanciales sobre la capacidad del Gobierno Primario para continuar como empresa en marcha de acuerdo con la Declaración Núm. 56 de la Junta de Normas de Contabilidad Gubernamental (GASB), la *Codificación de la Guía de Contabilidad e Información Financiera Contenida en la Declaración de AICPA Sobre Normas de Auditoría*. Asimismo, los fondos fiduciarios de pensiones del ELA, incluidos como parte de los fondos fiduciarios, estaban seriamente subfinanciados al 30 de junio de 2016. Como resultado de las dificultades fiscales que enfrenta el ELA, el 3 de mayo de 2017, la Junta de Supervisión y Administración Financiera para Puerto Rico (Junta de

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

Supervisión), por solicitud del Gobernador, presentó un caso en virtud del Título III para el ELA, mediante la radicación de una solicitud de reparación conforme al Título III de la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico (PROMESA) en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. Para obtener información adicional sobre la empresa negocio en marcha, las incertidumbres y el riesgo de liquidez, consulte la Nota 2 y la Nota 3.

**Informe del ELA en su totalidad**

La entidad de informes financieros del ELA consta de todos los departamentos, agencias, fondos, funciones y corporaciones públicas que se ha determinado que cumplen con los requisitos para su inclusión en los estados financieros básicos del ELA. El ELA ha considerado todas las unidades de componentes potenciales de las que es financieramente responsable y otras organizaciones cuya naturaleza y significado de su relación con el ELA es tal que la exclusión causaría que los estados financieros básicos del ELA sean engañosos o incompletos. Como se señaló anteriormente, los estados financieros básicos del ELA constan de tres componentes: (i) estados financieros de todo el gobierno, (ii) estados financieros de fondos y (iii) notas a los estados financieros básicos. Los estados financieros del fondo incluyen tipos de fondos del gobierno, de propiedad exclusiva y fiduciarios que se describirán más adelante en este MD&A. Las notas a los estados financieros básicos proporcionan explicaciones o detalles adicionales para todos los tipos de estados financieros anteriores y se consideran parte integral de los estados financieros.

La siguiente tabla resume las principales características de los estados financieros básicos.

| | Estados Financieros de todo el Gobierno | Fondos del Gobierno | | |
|---|---|---|---|---|
| | | Fondos del Gobierno | Fondos de Propiedad Exclusiva | Fondos Fiduciarios |
| Alcance | Actividades del gobierno, actividades de tipo comercial y unidades de componentes de presentación discreta. | Las actividades del ELA que no son de propiedad exclusiva o fiduciarias, que incluyen educación, salud, servicios de seguridad pública, entre otros. | Actividades el ELA que funcionan de forma similar a empresas privadas, que incluyen Loterías. | Instancias en que el ELA es el fideicomisario o agente de los recursos de terceros, como planes de retiro de empleados públicos. |
| Estados financieros requeridos | Estado de resultados netos y estado de actividades. | Balance y estado de ingresos, gastos y cambios en el balance de los fondos. | Estado de resultados netos; estado de ingresos, gastos y cambios en los resultados netos del fondo; y estado de flujos de efectivo. | Estado de resultados netos fiduciarios y estado de cambios en los resultados netos fiduciarios. |
| Base contable y enfoque de medición | Base de devengo y enfoque de medición de recursos económicos. | Base de devengo modificada y enfoque de medición de recursos financieros actuales. | Base de devengo y enfoque de medición de recursos económicos. | Base de devengo y enfoque de medición de recursos económicos. |

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

| | Estados Financieros de todo el Gobierno | Estados Financieros del Fondo | | |
| --- | --- | --- | --- | --- |
| | | Fondos del Gobierno | Fondos de Propiedad Exclusiva | Fondos Fiduciarios |
| Información sobre el tipo de activo/pasivo | Todos los activos y pasivos, financieros y de capital, y de corto plazo y largo plazo. | Solo activos que se espera que se agoten y pasivos que se vencen durante el año o poco después, no se incluyen activos no obligaciones de largo plazo. | Todos los activos y pasivos, financieros y de capital, y de corto plazo y largo plazo. | Todos los activos y pasivos, financieros y de capital, y de corto plazo y largo plazo. |
| Tipo de información de entrada/salida | Todos los ingresos y gastos durante el año, independientemente de cuándo se recibe o paga el efectivo. | Ingresos por los que se recibe efectivo durante el año o poco después de fin de año; gastos cuando se han recibido bienes o servicios y el pago vence durante el año o poco después. | Todos los ingresos y gastos durante el año, independientemente de cuándo se recibe o paga el efectivo. | Todos los ingresos y gastos durante el año, independientemente de cuándo se recibe o paga el efectivo. |

**Estados Financieros de Todo el Gobierno**

Los estados financieros de todo el gobierno brindan a los lectores una visión amplia de las operaciones del ELA de manera similar a una empresa del sector privado. Los estados proporcionan información de corto y largo plazo sobre los resultados financieros del ELA, que ayuda a evaluar la condición económica del ELA al final del año fiscal 2016. Estos estados se preparan utilizando el enfoque de medición de recursos económicos y la base contable de devengo completo. Esto significa que siguen métodos similares a los utilizados por la mayoría de las empresas privadas. Toman en cuenta todos los ingresos y gastos relacionados con el año fiscal, incluso si el efectivo involucrado no ha sido recibido o pagado.

Los estados financieros de todo el gobierno incluyen dos estados:

- ***Estado de resultados netos:*** este estado presenta todos los activos, pasivos y salidas y entradas de recursos diferidos del gobierno. Los resultados netos son la diferencia entre (a) activos y salidas diferidas de recursos y (b) pasivos y entradas diferidas de recursos. Con el paso del tiempo, los aumentos o disminuciones en los resultados netos del ELA pueden servir como un indicador útil de la posición financiera del ELA está mejorando o empeorando.

- ***Estado de actividades:*** estos estados presentan información que muestra cómo cambiaron los resultados netos del Gobierno Primario y sus Unidades de Componentes durante el año fiscal más reciente. Todos los cambios en los resultados netos se informan tan pronto como se produce el evento subyacente que da lugar al cambio, independientemente del momento de los flujos de efectivo relacionados. Entonces, los ingresos y gastos se informan en estos estados para algunos elementos que no generarán flujos de efectivo hasta futuros períodos fiscales (como impuestos no recaudados y vacaciones acumuladas pero no utilizadas). Estos estados también presentan una comparación entre los gastos directos y los ingresos del programa para cada función del ELA.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

Aunque se puede pensar en los resultados netos del ELA como una forma de medir si la condición financiera del ELA está mejorando o empeorando, también es posible que se tengan que considerar otros factores no financieros, como los cambios en la estructura tributaria del ELA, la población, el empleo, los niveles de deuda, condiciones fiscales, factores económicos, disponibilidad para los mercados externos y el estado de las carreteras, puentes y edificios del ELA, para evaluar la condición general del ELA.

En el estado de resultados netos y el estado de actividades, las operaciones del ELA se dividen en las siguientes actividades:

- *Actividades del gobierno:* aquí se informa sobre la mayoría de los servicios básicos del ELA, como educación, salud, vivienda pública y bienestar, seguridad pública, desarrollo económico, gobierno general e intereses sobre la deuda a largo plazo. Las subvenciones federales (intergubernamentales), los impuestos sobre la renta, los impuestos sobre las ventas y el uso y otros impuestos, las transferencias de los ingresos de la lotería y los ingresos de los bonos o préstamos financian la mayoría de estas actividades. Las Actividades del Gobierno también incluyen nueve unidades integradas combinadas, que son entidades que, aunque están legalmente separadas del ELA, cumplen con los criterios de combinación según la guía GASB para ser informadas como parte del Gobierno Primario.

- *Actividades de tipo comercial:* normalmente, estas actividades están destinada a recuperar la totalidad o una parte significativa de sus costos a través de tarifas de usuario y cargos a usuarios externos de bienes y servicios. Estas Actividades de Tipo Comercial del ELA incluyen las operaciones de los siguientes fondos mayores: el Fondo Fiduciario de Seguro por Desempleo, el Fondo de Loterías, la Administración de Seguros de Salud de Puerto Rico (PRHIA), la Administración de Servicios Médicos de Puerto Rico (PRMeSA) y el Fondo Recurrente contra la Contaminación del Agua de Puerto Rico (PRWPCRF).

- *Unidades de componentes de presentación discreta:* aunque legalmente separadas del ELA, las unidades de componentes de presentación discreta son importantes para el ELA porque el ELA es financieramente responsable de ellas o la naturaleza y la importancia de su relación con el ELA son tales que su exclusión causaría que los estados financieros del ELA sean engañosos o incompletos. Las unidades de componentes de presentación discreta, presentadas en una columna separada en estos estados financieros básicos, se presentan de forma discreta principalmente debido a la naturaleza de los servicios que prestan, la capacidad del ELA para imponer su voluntad (principalmente a través del nombramiento de sus autoridades de gobierno) y porque dichas unidades de componentes proporcionan beneficios financieros específicos o imponen cargas financieras al ELA. El ELA clasifica 44 entidades legales separadas como unidades de componentes de presentación discreta, como se indica en la Nota 1 de los estados financieros básicos.

Los estados financieros de todo el gobierno se pueden encontrar inmediatamente después de este MD&A.

**Estados Financieros de Fondos del Gobierno y de Propiedad Exclusiva**

Los estados financieros preparados a nivel del fondo brindan detalles adicionales sobre los resultados financieros y las actividades del ELA. Un fondo es una agrupación de cuentas relacionadas que se utiliza para mantener el control sobre los recursos que se han segregado para actividades u objetivos específicos. El ELA utiliza la contabilidad de fondos para ayudar a garantizar y demostrar el cumplimiento de los requisitos legales relacionados con las finanzas. Los estados financieros del fondo se centran en partes individuales del gobierno del ELA, e informan las operaciones del ELA con más detalle que los estados financieros de todo el gobierno. Los tipos de fondos gubernamentales y de propiedad exclusiva del ELA utilizan diferentes perspectivas y bases contables. Los fondos presentados en los estados financieros del fondo se

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

clasifican como fondos mayores o no mayores, según los requisitos de las GAAP de los EE. UU. Todos los fondos del ELA se pueden dividir en las siguientes categorías:

- ***Fondos del gobierno:*** la mayoría de los servicios básicos provistos por el ELA se financian con fondos del gobierno. Los fondos del gobierno se utilizan para dar cuenta esencialmente de las mismas funciones informadas como actividades del gobierno en los estados financieros de todo el gobierno. Sin embargo, a diferencia de los estados financieros de todo el gobierno que utilizan la base contable de devengo completo, los estados financieros de fondos del gobierno utilizan una base contable modificada de devengo, que se centra en las entradas y salidas de recursos prescindibles de corto plazo. Esta información puede ser útil para evaluar los requisitos de financiamiento de corto plazo del gobierno. Estos estados proporcionan una visión detallada de corto plazo de las finanzas del ELA y ayudan a determinar si habrá recursos financieros adecuados disponibles para cumplir con las necesidades actuales del ELA. Dado que el enfoque de los fondos del gobierno es más estrecho que el de los estados financieros de todo el gobierno, es útil comparar la información presentada para los fondos del gobierno con información similar presentada para las Actividades del Gobierno en los estados financieros de todo el gobierno. Al comparar los estados financieros de los fondos del gobierno con las actividades del gobierno en los estados financieros de todo el gobierno, los lectores pueden comprender mejor el impacto a largo plazo de las decisiones financieras a corto plazo del gobierno. Tanto el balance de fondos del gobierno como el estado de ingresos, gastos y cambios en los balances de fondos de los fondos del gobierno proporcionan una conciliación para facilitar la comparación entre los fondos el gobierno y las actividades del gobierno. Estas conciliaciones se presentan en la página siguiente, inmediatamente después de cada estado financiero de los fondos del gobierno.

El ELA tiene cuatro fondos mayores del gobierno. Es decir, cada fondo mayor se presenta en una columna separada en el balance de fondos del gobierno y en el estado de ingresos, gastos y cambios en el balance de fondos de los fondos del gobierno. Los cuatro fondos mayores del gobierno del ELA son:

- Fondo General[1]
- Fondo de Servicio de la Deuda
- Fondo de Ingresos Especiales de COFINA
- Fondo de Servicio de la Deuda de COFINA

El resto de los fondos no mayores del gobierno, que consisten en fondos de la combinación de la Autoridad del Puerto de las Américas (PAA), la Autoridad de Edificios Públicos (AEP), la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico (AAFAF), la Autoridad de Financiamiento de la Infraestructura de Puerto Rico (PRIFA), la Autoridad de Transporte Marítimo de Puerto Rico (PRMSA), el Fondo a Perpetuidad de Comunidades Especiales (SCPT), el Fideicomiso de los Niños, el Centro Comprensivo de Cáncer de la Universidad de Puerto Rico (UPRCCC) y los fondos de proyectos de capital del ELA, se agrupan y presentan en una sola columna en los estados financieros de los fondos del gobierno. Los estados financieros de fondos básicos del gobierno se pueden encontrar inmediatamente después de los estados financieros de todo el gobierno.

---

[1] El Fondo General es el fondo principal de operación del ELA. Los recursos financieros recibidos y utilizados en el Fondo General incluyen principalmente: los recursos presupuestados del Fondo General, según lo aprobado por la Asamblea Legislativa de Puerto Rico (la Legislatura) y ajustados por el tiempo y la base de las diferencias contables, y otros recursos financieros fuera del presupuesto de Fondos Generales tales como: fondos federales, fondos pignorados, recursos que de otro modo se contabilizarían en fondos de ingresos especiales y agencias con tesorerías independientes.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

- ***Fondos de propiedad exclusiva:*** estos fondos se utilizan para mostrar actividades que operan de forma más similar a las empresas comerciales. Como estos fondos cobran tarifas por los servicios prestados a los clientes externos, que incluyen los gobiernos locales, también se conocen como fondos empresariales. Los fondos de propiedad exclusiva proporcionan el mismo tipo de información que las actividades de tipo empresarial en los estados financieros de todo el gobierno, pero con mayor detalle. Al igual que con los estados financieros de todo el gobierno, los estados financieros de fondos de propiedad exclusiva utilizan la base contable de devengo completo. No es necesaria una conciliación entre los estados financieros de todo el gobierno para las actividades de tipo comercial y los estados financieros de los fondos de propiedad exclusiva.

El ELA tiene cinco fondos mayores de propiedad exclusiva.

- Fondo de Seguro por Desempleo

- Fondo de Loterías, que incluye la Lotería de Puerto Rico y el Sistema de Lotería Tradicional

- Administración del Seguro de Salud de Puerto Rico (PRHIA)

- Administración de Servicios Médicos de Puerto Rico (PRMeSA)

- Fondo Recurrente de Control de Contaminación del Agua de Puerto Rico (PRWPCRF)

Otros fondos no mayores de propiedad exclusiva consisten en el Fondo del Seguro por Discapacidad, el Fondo del Seguro de Conductores, el Fondo del Préstamo Recurrente para el Tratamiento del Agua Potable Segura de Puerto Rico (PRSDWRLF), la Autoridad de Puertos de Ponce (PPA) y la Junta de Gobierno del Servicio 9-1-1 que se agrupan y presentan en una columna separada en los estados financieros de los fondos de propiedad exclusiva. Los estados financieros básicos de los fondos de propiedad exclusiva se pueden encontrar inmediatamente después de los estados financieros de los fondos del gobierno.

**Fondos Fiduciarios**

El ELA es un fideicomisario o fiduciario para los planes de pensiones de sus empleados. También es responsable por otros activos con capacidad de agente para personas, organizaciones privadas y otras entidades del gobierno. Todas las actividades fiduciarias del ELA se informan en una declaración separada de los resultados netos fiduciarios y de los cambios en los resultados netos fiduciarios. El ELA excluyó estas actividades de sus estados financieros a nivel gubernamental porque no puede usar estos activos para financiar sus operaciones. El ELA es responsable de garantizar que los activos informados en estos fondos se utilicen para los fines previstos.

*Nuevo Plan de Contribuciones Definidas para Empleados Públicos*

El 23 de agosto de 2017, se promulgó la Ley Núm. 106 de 2017 (Ley Núm. 106 de 2017) para garantizar el pago a los pensionados y establecer un nuevo plan de contribuciones definidas para los empleados públicos, se reformaron las pensiones del ELA mediante el reemplazo de las juntas de gobierno de los Sistemas de Retiro por una sola Junta de Retiro del Estado Libre Asociado de Puerto Rico (Junta de Retiro) y se estableció una "cuenta para el pago de las pensiones devengadas" para implementar un método de "pago por uso" (PayGo) para los Sistemas de Retiro. La Ley Núm. 106 de 2017 creó el marco legal para que el ELA pueda garantizar los pagos a los pensionados a través del sistema PayGo. Para obtener información adicional sobre el sistema PayGo, consulte las Notas 2, 3 y 23.

16

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

**Notas a los Estados Financieros Básicos**

Las notas proporcionan información adicional que es esencial para una comprensión completa de los datos proporcionados en los estados financieros de todo el gobierno y del fondo. Las notas a los estados financieros básicos se pueden encontrar inmediatamente después de la combinación de los estados financieros de las unidades de componentes mayores.

**Información Adicional Requerida/Información Adicional y Otra Información (Sin Auditar)**

Los estados financieros básicos incluyen una sección de información adicional requerida y otra información que sigue inmediatamente a sus notas. Esta sección incluye información sobre el progreso del financiamiento y las contribuciones del patrono para los tres sistemas de retiro separados del ELA, que incluyen los beneficios de atención médica posteriores al empleo, el esquema de ingresos y gastos -presupuesto y base presupuestaria real- Fondo General, esquema complementario de gastos por agencia -presupuesto y base presupuestaria real- Fondo general, y esquemas combinados de fondos no mayores del gobierno, fondos no mayores de propiedad exclusiva, fondos fiduciarios y unidades de componentes no mayores de presentación discreta.

**Posición Financiera General y Resultados de Operaciones (en Todo el Gobierno)**

A continuación, se incluye un análisis de la posición financiera y los cambios en la posición financiera de las Actividades del Gobierno y las Actividades Comerciales del ELA para el año fiscal 2016.

**Posición Financiera**

La información financiera condensada del estado resultados netos al 30 de junio de 2016 y 2015 es la siguiente (en miles):

| | Actividades del Gobierno | | Actividades de Tipo Comercial | | Gobierno Primario | |
|---|---|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 | 2016 | 2015 |
| | | (Según la reformulación) | (Según la reformulación) | | (Según la reformulación) | |
| **Activos:** | | | | | | |
| Activos no pertenecientes al capital: | | | | | | |
| Efectivo e inversiones | $ 1,651,681 | 2,686,669 | 793,954 | 786,553 | 2,445,635 | 3,473,222 |
| Cuentas por cobrar, netas | 2,371,864 | 2,433,357 | 332,490 | 980,264 | 2,704,354 | 3,413,621 |
| Otros | 103,161 | 106,797 | 46,877 | 53,493 | 150,038 | 160,290 |
| Total de activos no pertenecientes al capital | 4,126,706 | 5,226,823 | 1,173,321 | 1,820,310 | 5,300,027 | 7,047,133 |
| Activos de capital | 8,701,112 | 8,823,439 | 93,170 | 97,070 | 8,794,282 | 8,920,509 |
| Activos totales | 12,827,818 | 14,050,262 | 1,266,491 | 1,917,380 | 14,094,309 | 15,967,642 |
| **Salidas diferidas de** | | | | | | |
| **recursos** | 4,736,911 | 2,252,947 | 136,118 | 90,928 | 4,873,029 | 2,343,875 |
| **Pasivos:** | | | | | | |
| Pasivos a largo plazo | 82,674,133 | 78,282,969 | 1,587,252 | 1,621,772 | 84,261,385 | 79,904,741 |
| Otros pasivos | 3,519,587 | 4,985,591 | 277,170 | 264,892 | 3,796,757 | 5,250,483 |
| Total de pasivos | 86,193,720 | 83,268,560 | 1,864,422 | 1,886,664 | 88,058,142 | 85,155,224 |
| **Entradas diferidas de** | | | | | | |
| **recursos** | 1,192,697 | 943,173 | 11,304 | 3,378 | 1,204,001 | 946,551 |
| **Resultados netos:** | | | | | | |
| Inversión neta en | | | | | | |
| activos de capital | 3,203,987 | 3,444,760 | 75,020 | 80,760 | 3,279,007 | 3,525,520 |
| Restringido | 346,399 | 509,458 | 536,152 | 1,209,359 | 882,551 | 1,718,817 |
| No restringidos (déficit) | (73,372,074) | (71,862,742) | (1,084,289) | (1,171,853) | (74,456,363) | (73,034,595) |
| **Resultados Netos Totales (déficit)** $ | **(69,821,688)** | **(67,908,524)** | **(473,117)** | **118,266** | **(70,294,805)** | **(67,790,258)** |

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

Las GAAP de EE. UU. requieren que las entidades del gobierno informen sus resultados netos. El estado de resultados netos presenta el valor de todos los activos del ELA y las salidas diferidas de recursos, pasivos y entradas diferidas de recursos, con la diferencia entre ellos informada como resultados netos.

Los resultados netos pueden servir con el tiempo como un indicador útil de la posición financiera de un gobierno. El monto total acumulado de activos más las salidas diferidas de recursos y los pasivos totales más las entradas diferidas de recursos del Gobierno Primario al 30 de junio de 2016 ascendieron a aproximadamente $19,000 millones y $89,300 millones, respectivamente, para un déficit neto de aproximadamente $70,300 millones a partir de 30 de junio de 2016, en comparación con un déficit neto de aproximadamente $67,800 millones al 30 de junio de 2015 (según la reformulación).

Los resultados netos (déficit) para las Actividades del Gobierno aumentó en aproximadamente $1,900 millones durante el año fiscal 2016, a aproximadamente $69,8000 millones al 30 de junio de 2016 de aproximadamente $67,9000 millones al 30 de junio de 2015 (según la reformulación). El déficit sin restricciones para las actividades del gobierno, la porción de los resultados netos que se pueden utilizar para financiar las operaciones diarias del gobierno sin las restricciones establecidas por los convenios de deuda, la legislación habilitadora u otros requisitos legales, tenía un déficit de aproximadamente $73,400 millones al 30 de junio de 2016. El déficit sin restricciones en las actividades del gobierno, que aumentó en aproximadamente $1,500 millones, existe principalmente debido a gastos operativos excesivos que no corresponden a los ingresos reales. Se puede esperar que este déficit continúe mientras el ELA continúe teniendo obligaciones pendientes para fines distintos a la adquisición de activos de capital del gobierno. El estado de resultados netos en Actividades del Gobierno refleja bonos y pagarés en circulación por aproximadamente $40,200 millones y pasivos netos por pensiones por aproximadamente $36,900 millones al 30 de junio de 2016, en comparación con los bonos y pagarés en circulación que ascienden aproximadamente a $40,300 millones y pasivos netos por pensiones que ascienden a aproximadamente $33,000 millones al 30 de junio de 2015.

Una parte de los resultados netos (déficit) del ELA refleja su inversión en activos de capital como tierras, edificios y equipos, menos cualquier deuda relacionada utilizada para adquirir esos activos. El ELA utiliza estos activos de capital para proporcionar servicios a sus residentes; en consecuencia, estos activos no están disponibles para gastos futuros y, a excepción de ciertos activos dentro de las Actividades de Tipo Comercial, no generan ingresos directos para el ELA. Sin embargo, representan una obligación por parte del ELA de mantener estos activos en el futuro. Aunque la inversión del ELA en sus activos de capital se informa neta de la deuda relacionada, debe tenerse en cuenta que los recursos necesarios para pagar esta deuda deben ser provistos de otras fuentes, ya que la mayoría de los activos de capital en sí no pueden utilizarse para liquidar estos pasivos.

Los resultados netos (déficit) en las actividades de tipo comercial disminuyeron en aproximadamente $591 millones en el año fiscal 2016 en comparación con el año fiscal 2015, de aproximadamente resultados netos por $118 millones al 30 de junio de 2015 (según la reformulación) a aproximadamente resultados netos por $473 millones (déficit) al 30 de junio de 2016. La razón principal de la disminución de los resultados netos (déficit) se relaciona con una pérdida por deterioro agregada en préstamos por cobrar de aproximadamente $573 millones reconocidos en 2016 sobre el PRWPCRF y el PRSDWRLF, denominados colectivamente Fondos Recurrentes del Estado.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

## Resultados de Operaciones

La información financiera condensada de los estados de actividades para los años terminados el 30 de junio de 2016 y 2015 es la siguiente (en miles):

| | | Actividades del Gobierno | | Actividades de Tipo Comercial | | Gobierno Primario | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2016 | 2015 | 2016 | 2015 | 2016 | 2015 |
| | | | (Según la reformulación) | | (Según la reformulación) | (Según la reformulación) | |
| Ingresos: | | | | | | | |
| Ingresos del programa: | | | | | | | |
| Cargos por servicios | $ | 821,092 | 852,708 | 1,621,440 | 1,597,467 | 2,442,532 | 2,450,175 |
| Subsidios y contribuciones operativas | | 6,446,731 | 6,355,255 | 1,739,479 | 1,682,071 | 8,186,210 | 8,037,326 |
| Subsidios y contribuciones de capital | | 73,189 | 80,753 | — | — | 73,189 | 80,753 |
| | | 7,341,012 | 7,288,716 | 3,360,919 | 3,279,538 | 10,701,931 | 10,568,254 |
| Ingresos generales: | | | | | | | |
| Impuestos | | 10,314,767 | 9,085,898 | — | — | 10,314,767 | 9,085,898 |
| Ingresos del acuerdo global | | | | | | | |
| de liquidación del tabaco | | 70,665 | 66,192 | — | — | 70,665 | 66,192 |
| Ingresos de unidades de componentes | | 265,357 | 152,635 | — | — | 265,357 | 152,635 |
| Otros, incluidas las pérdidas de inversión | | 302,569 | 355,184 | 16,956 | 26,457 | 319,525 | 381,641 |
| | | 10,953,358 | 9,659,909 | 16,956 | 26,457 | 10,970,314 | 9,686,366 |
| **Ingresos totales** | | **18,294,370** | **16,948,625** | **3,377,875** | **3,305,995** | **21,672,245** | **20,254,620** |
| Gastos: | | | | | | | |
| Gobierno General | | 3,675,139 | 2,251,979 | — | — | 3,675,139 | 2,251,979 |
| Seguridad pública | | 2,071,961 | 1,828,596 | — | — | 2,071,961 | 1,828,596 |
| Salud | | 3,080,551 | 2,327,012 | — | — | 3,080,551 | 2,327,012 |
| Vivienda pública y bienestar | | 3,314,500 | 3,279,564 | — | — | 3,314,500 | 3,279,564 |
| Educación | | 3,724,041 | 3,599,979 | — | — | 3,724,041 | 3,599,979 |
| Desarrollo económico | | 1,026,935 | 1,525,337 | — | — | 1,026,935 | 1,525,337 |
| Intergubernamental | | 554,429 | 344,594 | — | — | 554,429 | 344,594 |
| Intereses y otros | | 2,086,720 | 2,499,411 | — | — | 2,086,720 | 2,499,411 |
| Seguro por desempleo | | — | — | 139,993 | 161,312 | 139,993 | 161,312 |
| Loterías | | — | — | 654,355 | 634,336 | 654,355 | 634,336 |
| Administración del Seguro de Salud | | — | — | 2,867,938 | 2,805,897 | 2,867,938 | 2,805,897 |
| Administración de Servicios Médicos | | — | — | 279,976 | 225,230 | 279,976 | 225,230 |
| Fondo Recurrente de Control de Contaminación del Agua | | — | — | 424,778 | 114,720 | 424,778 | 114,720 |
| Fondos No Mayores de Propiedad Exclusiva | | — | — | 275,476 | 52,916 | 275,476 | 52,916 |
| **Gastos Totales** | | **19,534,276** | **17,656,472** | **4,642,516** | **3,994,411** | **24,176,792** | **21,650,883** |
| **Aumento (reducción) en los resultados** | | | | | | | |
| **netos antes de transferencias** | | **(1,239,906)** | **(707,847)** | **(1,264,641)** | **(688,416)** | **(2,504,547)** | **(1,396,263)** |
| **Transferencias** | | **(673,258)** | **(664,363)** | **673,258** | **664,363** | **0** | **0** |
| **Cambios en los resultados netos** | | **(1,913,164)** | **(1,372,210)** | **(591,383)** | **(24,053)** | **(2,504,547)** | **(1,396,263)** |
| **Resultados netos (déficit), comienzo del año,** | | | | | | | |
| **según ajuste (nota 4)** | | **(67,908,524)** | **(66,536,314)** | **118,266** | **142,319** | **(67,790,258)** | **(66,393,995)** |
| **Resultados netos (déficit), fin de año** | $ | **(69,821,688)** | **(67,908,524)** | **(473,117)** | **118,266** | **(70,294,805)** | **(67,790,258)** |

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

Como se describió anteriormente, los resultados netos (déficit) de las Actividades del Gobierno aumentaron de aproximadamente $67,9000 millones al 30 de junio de 2015 (según la reformulación) a aproximadamente $69,800 millones al 30 de junio de 2016, un aumento de aproximadamente $1,900 millones. El aumento en los resultados netos del déficit total se debe principalmente a un aumento en la contingencia de pérdidas reconocida por la pérdida de los Fondos Recurrentes del Estado en depósitos y préstamos garantizados por el ELA de aproximadamente $627,400 y un gasto de pensión relacionado con cambios en los pasivos netos de pensiones, la entrada y salida diferida de recursos de aproximadamente $1,600 millones. Aproximadamente el 56.4% de los ingresos de las Actividades del gobierno provino de impuestos, mientras que aproximadamente el 35.6% resultó de subsidios y contribuciones (principalmente asistencia financiera federal). Los cargos por servicios representaron aproximadamente el 4.5% de los ingresos totales. Los gastos de las actividades del gobierno cubren una variedad de servicios del gobierno. Los mayores gastos fueron para educación, 18.4% de los gastos totales, gobierno general, 18.2% de los gastos totales, vivienda pública y asistencia social, 16.5% de los gastos totales, salud, 15.2% de los gastos totales y seguridad pública, 10.3% de los gastos totales. En el año fiscal 2016, los gastos de las Actividades del Gobierno, que ascendieron a aproximadamente $19,500 millones, fueron financiados por aproximadamente $11,000 millones en ingresos generales y aproximadamente $7,300 millones en ingresos del programa (compuesto principalmente de asistencia financiera federal). Asimismo, la implementación de la Ley Núm. 66 de 2014 "Ley Especial de Sostenibilidad Fiscal y Operacional del ELA de Puerto Rico" contribuyó a la reducción de gastos en áreas tales como:

- Nómina y gastos y relacionados.

- Congelar las asignaciones del ELA, basadas en fórmulas, a la Universidad de Puerto Rico, el Poder Judicial del ELA y los municipios.

- Reducción en los gastos del Departamento de Educación del ELA, tales como una reducción en los servicios de transporte escolar, ahorros en la nómina a causa del sistema de retiro para maestros y no contratación para cubrir vacantes.

- Reducción de las asignaciones especiales.

- Eliminación de ciertos subsidios a programas u operaciones de unidades componentes.

Los ingresos totales de las Actividades del gobierno para el año fiscal 2016 aumentaron en aproximadamente $1,300 millones en comparación con el año fiscal 2015. Este aumento se relacionó principalmente con un aumento en la base impositiva sobre las ventas y el uso del 4.5%, que resultó en un aumento de aproximadamente $1,000 millones.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

**Ingresos - Actividades del Gobierno**



**Gastos – Actividades del Gobierno**



**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

Los resultados netos totales de las Actividades de Tipo Comercial disminuyeron en aproximadamente $591 millones con respecto a los resultados netos totales al 30 de junio de 2015. Aproximadamente el 48% de los ingresos de las Actividades de Tipo Comercial provino de cargos por servicios, mientras que aproximadamente el 52% resultó de subsidios y contribuciones (principalmente asistencia financiera federal). Los gastos de las Actividades de Tipo Comercial cubren una variedad de servicios. Los mayores gastos fueron para loterías y Administración de Seguros de Salud. En el año fiscal 2016, los gastos totales de las Actividades de Tipo Comercial excedieron los ingresos en aproximadamente $1,300 millones. El exceso de gastos sobre los ingresos en el año fiscal 2016 se redujo por transferencias netas de Actividades del Gobierno, que ascendieron a aproximadamente $673 millones. Los gastos totales aumentaron en aproximadamente $648 millones en comparación con los gastos del año anterior principalmente por el reconocimiento de una pérdida crediticia de custodia y un deterioro de las cuentas por cobrar de aproximadamente $627.4 millones.

**Fondos del Gobierno**

Los estados financieros de los fondos del gobierno proporcionan información sobre entradas, salidas y balances a corto plazo de recursos prescindibles. Esta información es útil para evaluar los requisitos de financiamiento del ELA. En particular, el balance de fondos no asignados puede servir como una medida útil de los recursos netos de un gobierno disponibles para gastar al final del año fiscal. Al 30 de junio de 2016, los fondos del gobierno del ELA informaron un déficit final combinado de aproximadamente $299.5 millones. En el año fiscal 2016, los ingresos de estos fondos del gobierno excedieron los gastos en aproximadamente $1,400 millones. Sin embargo, este exceso de ingresos sobre los gastos fue compensado por otros usos de financiamiento por un total de aproximadamente $576 millones en fondos del gobierno. Para el año fiscal 2016, el exceso de gastos sobre los ingresos disminuyó en aproximadamente $2,500 millones en comparación con el año anterior, principalmente como resultado de una disminución de los pagos del servicio de la deuda a largo plazo en la suma total de $1,000 millones con vencimiento en julio 1, 2016 y un aumento en los ingresos por impuestos a las ventas y al uso de $1,000 millones en comparación con las cifras del año anterior.

El Fondo General (tal como se describe en la nota 1 anterior) es el principal fondo de operación del ELA. Al final del año fiscal 2016, el Fondo General, que abarca otros recursos financieros fuera del presupuesto del Fondo General, como fondos federales, fondos pignorados, fondos de ingresos especiales y agencias con tesorerías independientes, tenía un déficit total de fondos de aproximadamente $1,200 millones. El déficit de fondos del Fondo General del ELA disminuyó en aproximadamente $1,200 millones como resultado del cambio en la posición financiera del año fiscal. El déficit también muestra la acumulación de gastos operativos significativamente más altos que los ingresos proyectados y reales necesarios para proporcionar servicios esenciales a los ciudadanos. Durante el año fiscal 2016, un impuesto sobre ventas y uso del 4.5% y un impuesto del 4% por los servicios prestados entre comerciantes redundaron en un aumento de $1,000 millones. Además, la amortización de aproximadamente $ 300 millones en 2016 de impuestos pagados previamente durante el año fiscal 2015 contribuyó al aumento de los ingresos.

El fondo de servicio de la deuda es el fondo en el que el ELA acumula los recursos para el pago de la deuda de obligaciones generales a largo plazo. El cambio neto en el balance del fondo del servicio de la deuda disminuyó en aproximadamente $18 millones en el año fiscal 2016, y el balance del fondo al final del año disminuyó a aproximadamente $202 millones al 30 de junio de 2016. Los bonos e intereses pagaderos durante el año fiscal 2016 disminuyeron aproximadamente en $767 millones en comparación con el año fiscal 2015 como resultado de la falta de pago de los bonos de obligación general con vencimiento el 1 de julio de 2016.

El Fondo de Ingresos Especiales de COFINA se utiliza para contabilizar e informar todos los recursos financieros de la Corporación del Fondo de Interés Apremiante de Puerto Rico (COFINA). El balance del fondo de ingresos especiales de COFINA disminuyó en aproximadamente $5 millones en el año fiscal 2016, a un déficit de aproximadamente $29,000 al 30 de junio de 2016. El Fondo de Servicio de la Deuda de COFINA se utiliza para contabilizar los ingresos del impuesto sobre ventas del ELA que se depositan en el Fondo Dedicado del Impuesto sobre Ventas para el pago de intereses y capital sobre las obligaciones a largo plazo de COFINA. El balance del fondo de servicio

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

de la deuda de COFINA aumentó en aproximadamente $16 millones durante el año fiscal 2016, a aproximadamente $448 millones al 30 de junio de 2016.

**Aspectos Destacados Presupuestarios del Fondo General**

La Constitución del ELA requiere que el Gobernador presente anualmente para la aprobación de la Legislatura del ELA un presupuesto equilibrado que contenga un plan de gastos para el año fiscal siguiente e identifique los ingresos anticipados y otros recursos suficientes para cubrir los gastos propuestos. El ELA adopta un presupuesto anual de asignaciones para su Fondo General. Se ha proporcionado un esquema de comparación presupuestaria como información adicional requerida para que el Fondo General demuestre el cumplimiento de este presupuesto. El esquema de ingresos y gastos-presupuesto y real-base presupuestaria-Fondo General presenta solo la información para el Fondo General para la que existe un presupuesto legalmente adoptado, según lo requerido por las GAAP de EE. UU.

Los ingresos reales totales del Fondo General sobre una base presupuestaria para el año fiscal 2016 fueron de aproximadamente $9,000 millones (sin incluir otras fuentes de financiamiento), lo que representa una disminución de aproximadamente $642 millones, o 7%, de los ingresos presupuestados originales, y un aumento de aproximadamente $240 millones o 3% de ingresos reales de aproximadamente $8,800 millones para el año fiscal 2015.

Los gastos reales totales del Fondo General sobre una base presupuestaria para el año fiscal 2016 fueron de aproximadamente $8,300 millones, lo que representa una disminución de $495 millones o 6% de los gastos presupuestados originales y una disminución de aproximadamente $359 millones o 4% de los gastos reales de aproximadamente $8,700 millones para el año fiscal 2015.

Para el año fiscal 2016, el exceso presupuestado de ingresos sobre gastos (base presupuestaria) fue de aproximadamente $726 millones, que consiste en la diferencia entre los ingresos reales totales de aproximadamente $9,000 millones y los gastos reales totales de aproximadamente $8,300 millones. Para el año fiscal 2015, el exceso de ingresos sobre gastos (base presupuestaria) fue de aproximadamente $126 millones, que consiste en la diferencia entre los ingresos reales totales de aproximadamente $8,800 millones y los gastos reales totales de aproximadamente $8,700 millones. El exceso presupuestado de ingresos sobre gastos (base presupuestaria) para el año fiscal 2016 aumentó en aproximadamente $600 millones en comparación con el superávit del año fiscal 2015 y aumentó en aproximadamente $1,200 millones en comparación con la deficiencia de ingresos bajo gastos (base presupuestaria) de aproximadamente $440 millones en el año fiscal 2014.

Para el año fiscal 2016, el exceso total de ingresos sobre los gastos y los pagos del servicio de la deuda de obligación general en el Fondo General (base presupuestaria) fue de aproximadamente $439 millones. Consistió en la diferencia entre los ingresos reales de aproximadamente $9,000 millones (sin incluir otras fuentes de financiamiento), menos la suma de los gastos totales de aproximadamente $8,300 millones y los pagos del servicio de la deuda de la obligación general de aproximadamente $287 millones (sin incluir otros usos de financiamiento). Este superávit de aproximadamente $439 millones en el Fondo General (base presupuestaria) difiere del exceso de ingresos sobre los gastos en el Fondo General sobre una base devengada modificada (US GAAP) de aproximadamente $2,8 millones, que fue compensado por aproximadamente $1,600 millones en otro financiamiento usos, que consisten principalmente en transferencias a otros fondos, para un aumento neto resultante en los balances de fondos de aproximadamente $1,200 millones para el año fiscal 2016. La variación entre las GAAP de EE. UU. y la deficiencia de la base presupuestaria resulta de las diferencias en la base contable y las diferencias de perspectiva entre los informes presupuestarios versus los establecidos por las GAAP de EE. UU. y seguidos en estos estados financieros. Algunos ejemplos de tales diferencias incluyen: (i) reconocimiento del producto de la deuda a largo plazo emitida como otras fuentes de financiamiento, (ii) reconocimiento de cuentas por cobrar (ingresos) para reembolsos de gastos asignados a fondos federales, (iii) reconocimiento de ingresos y gastos de entidades con tesorerías independientes, (iv) gastos incurridos en fondos no presupuestarios (fondos de ingresos especiales, fondos internos y otros fondos) que no se incluyeron en el Presupuesto del Fondo General, y (v) diferencias de tiempo

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

en la base de la contabilidad, tales como (a) el reconocimiento de cuentas por cobrar sobre la renta y los impuestos corporativos y (b) el reconocimiento de los gastos devengados. En la página 359 se presenta una conciliación en las notas a la sección de información adicional requerida. La capacidad del ELA para continuar reduciendo el déficit dependerá en parte de su capacidad para continuar aumentando los ingresos y reduciendo los gastos ante el aumento del servicio de la deuda y las obligaciones de pensiones, que a su vez depende de una serie de factores, incluidas las mejoras en las condiciones económicas generales.

La siguiente información se presenta para ayudar al lector a comparar el presupuesto final modificado y los resultados reales.

**Ingresos Reales – Fondo General**
Base Presupuestaria del Año
terminado el 30 de junio de 2016
(en miles)



**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

**Gastos Reales – Fondo General**
Base Presupuestaria del Año terminado
30 de junio de 2016
(en miles)



Durante más de una década, el ELA tuvo importantes deficiencias en los ingresos por concepto de gastos (incluidos los servicios de la deuda) que se financiaron principalmente mediante la emisión de bonos y líneas de crédito.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

**Activos de Capital y Administración de la Deuda**

*Activos de Capital*

A continuación, se incluye un esquema resumido de los activos de capital del Gobierno Primario (en miles):

Activos de Capital del ELA – Gobierno Primario

30 de junio de 2016 y 2015

(Neto de depreciación, expresado en miles)

| | Actividades del Gobierno | | Actividades de Tipo Comercial | | Total Gobierno Primario | |
|---|---|---|---|---|---|---|
| | **2016** | **2015** | **2016** | **2015** | **2016** | **2015** |
| | | | | (Según la reformulación) | | (Según la reformulación) |
| Terrenos | $ 936,891 | 937,124 | 36,005 | 36,005 | 972,896 | 973,129 |
| Construcción en progreso | 1,345,319 | 1,350,084 | 3,339 | 3,282 | 1,348,658 | 1,353,366 |
| Edificios y mejoras en edificios, neto | 5,806,027 | 5,922,261 | 39,081 | 40,523 | 5,845,108 | 5,962,784 |
| Equipos, muebles, accesorios, vehículos y software, neto | 205,239 | 194,103 | 14,745 | 17,260 | 219,984 | 211,363 |
| Infraestructura, neto | 407,636 | 419,867 | — | — | 407,636 | 419,867 |
| Total de activos de capital | $ 8,701,112 | 8,823,439 | 93,170 | 97,070 | 8,794,282 | 8,920,509 |

El monto total acumulado de la inversión del ELA en activos de capital para sus Actividades del gobierno y Actividades de Tipo Comercial al 30 de junio de 2016 ascendió a aproximadamente $14,000 millones, menos la depreciación acumulada y la amortización de aproximadamente $5,200 millones, lo que resultó en un valor en libros de aproximadamente $8,800 millones. Los activos de capital incluyen terrenos, construcciones en progreso, edificios, mejoras de edificios, equipos e infraestructura. Los activos de capital incluidos en la columna de Actividades del Gobierno son principalmente propiedad de unidades de componentes combinados (por ejemplo, la Autoridad de Edificios Públicos y la Autoridad de Financiamiento de la Infraestructura de Puerto Rico) y son principalmente de valor solo para el ELA, como escuelas públicas, carreteras y edificios utilizados para los servicios del gobierno. El monto total acumulado del gasto de depreciación y amortización del ELA para sus Actividades del Gobierno y Actividades de Tipo Comercial ascendió a aproximadamente $318 millones para el año finalizado el 30 de junio de 2016.

Otros activos de infraestructura, como autopistas, puentes, instalaciones de peajes, sistemas de agua y alcantarillado, sistemas de producción, transmisión y distribución de electricidad, y activos similares, son propiedad de las unidades de componentes de presentación discreta.

Se puede encontrar información adicional sobre los activos de capital del ELA en la Nota 11 de los estados financieros básicos que acompañan a este informe.

*Administración de la Deuda - Gobierno Primario*

El ELA ha incurrido en financiamiento de deuda a largo plazo y otras obligaciones, incluidas las de arrendamiento/compra y obligaciones contractuales donde la obligación legal del Estado de realizar pagos generalmente está sujeta y es pagada por las asignaciones anuales establecidas por la Asamblea Legislativa de Puerto Rico (la Legislatura) del ELA. Por ejemplo, las deudas informadas por la mayoría de las unidades combinadas integradas, por Actividades de Tipo Comercial y ciertas unidades de componentes de presentación discreta están respaldadas, directa o indirectamente, por pagos de recursos de las Actividades del Gobierno del ELA.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

Al 30 de junio de 2016, el monto total acumulado de (i) los bonos y pagarés en circulación del Gobierno Primario ascendía a aproximadamente $40,300 millones, (ii) los bonos y pagarés en circulación de las unidades de componentes de presentación discreta ascendían a aproximadamente $24,300 millones, y (iii) los bonos en circulación de los fondos fiduciarios ascendieron a aproximadamente $3,100 millones.

Los bonos de obligación general están respaldados por la plena fe, crédito y poder impositivo del ELA. La Constitución del ELA autoriza la contratación de deudas según lo determine la Legislatura. Sin embargo, la Sección 2, Artículo VI de la Constitución del ELA establece que las obligaciones directas del ELA evidenciadas por bonos o pagarés y respaldadas por la plena fe, crédito y poder impositivo del ELA no deben emitirse si las cantidades del capital e intereses sobre dichos bonos y pagarés y sobre todos los bonos y pagarés emitidos a partir de entonces, pagaderos en cualquier año fiscal, junto con cualquier cantidad pagada por el ELA en el año fiscal anterior de dicha emisión propuesta a cuenta de bonos o pagarés garantizados por el ELA, exceda el 15% de los ingresos anuales promedio recaudados de conformidad con las disposiciones de la legislación del ELA y depositados en Hacienda (en adelante, los ingresos internos) en los dos años fiscales anteriores al año fiscal de dicha emisión propuesta. La Sección 2, Artículo VI de la Constitución del ELA no limita el monto de la deuda que el ELA puede garantizar siempre que el ELA cumpla con la limitación del 15% al momento de la emisión de dicha deuda garantizada. Los ingresos internos consisten principalmente en impuestos sobre la renta, impuestos sobre ventas y uso, impuestos sobre la propiedad e impuestos especiales. Para obtener información adicional sobre el estado actual de los casos del Título III, consulte la Nota 3. Para obtener información adicional relacionada con litigios en curso, consulte la Nota 17.

El 13 de septiembre de 2017, la Junta de Supervisión anunció que su comité especial de investigación (el Comité Especial de Investigación) contrató a un investigador independiente para realizar una revisión de la deuda del ELA y su conexión con la crisis financiera actual. El Comité de Investigación Especial considera que esta investigación es una parte integral de la misión de la Junta de Supervisión de restablecer el equilibrio fiscal y las oportunidades económicas y promover el reingreso del ELA a los mercados de capitales. El 20 de agosto de 2018, el investigador independiente publicó el informe final, que presentó una serie de hallazgos y recomendaciones sobre las siguientes áreas:

- Banco Gubernamental de Fomento (BGF)
- Servicios Públicos de Puerto Rico (Autoridad de Energía Eléctrica de Puerto Rico (AEE) y Autoridad de Acueductos y Alcantarillas de Puerto Rico (AAA))
- COFINA
- Sistema de Retiro de los Empleados
- Presupuesto, Informes Externos y Funciones Contables de Puerto Rico
- Cálculo del Límite Constitucional de la Deuda
- Agencias de Clasificación Crediticia (CRA)
- Prácticas de Venta para Bonos Relacionados con Puerto Rico
- Marco de Ética del Gobierno de Puerto Rico
- Uso de Intercambio de Tasa de Interés de los Emisores
- Falta de un Mecanismo Claro de Puerto Rico para Validar los Bonos Relacionados con Puerto Rico Antes de su Emisión
- Crédito Fiscal a la Posesión

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

Finalmente, el Investigador Independiente presentó una visión general de las posibles causas radicadas. El informe completo se puede encontrar en el sitio web de la Junta de Supervisión.

La deuda de ciertas unidades de componentes de presentación discreta (que no sean pagarés en anticipación de bonos) como la AEE y AAA está respaldada por los ingresos de dichas unidades de componentes de las tarifas cobradas por servicios o productos. Sin embargo, la deuda de ciertas unidades combinadas de componentes y unidades de componentes de presentación discreta está respaldada, en todo o en parte, directa o indirectamente, por asignaciones o impuestos del ELA.

Se puede encontrar información adicional sobre la deuda a largo plazo del ELA en la Nota 13 de los estados financieros básicos que acompañan a este informe.

Como resultado directo de la profunda crisis económica que enfrenta el ELA, el ELA promulgó la Ley Núm. 21 de 2016, conocida como la Ley de Moratoria y Rehabilitación de Emergencia de Puerto Rico (según enmienda, la Ley de Moratoria) el 6 de abril de 2016. En virtud de la Ley de Moratoria, el Gobernador emitió una serie de órdenes ejecutivas declarando un período de emergencia, una moratoria y varias otras medidas con respecto a ciertas obligaciones del ELA y varios de sus organismos. De conformidad con estas órdenes ejecutivas, ciertas entidades del ELA: (i) no realizó pagos del servicio de la deuda, (ii) realizó pagos del servicio de la deuda con fondos depositados en los fideicomisarios de sus bonos, o (iii) no recibió ni transfirió ciertos ingresos. Después de la radicación del caso del Título III del ELA el 3 de mayo de 2017, tales pagos no se realizaron debido a la paralización automática en virtud del Título III de PROMESA.

Los siguientes párrafos detallan el monto del servicio de la deuda no pagado:

*Bonos de PFC*

El 15 de julio de 2015, PFC radicó una notificación ante el Acceso Electrónico al Mercado Municipal (EMMA) indicando que la Legislatura no había incluido en el presupuesto aprobado para el año fiscal 2016 los fondos necesarios para pagar el capital y los intereses de todos los bonos pendientes de PFC. Tal asignación es la única fuente de pago del capital e intereses sobre los bonos de PFC. El primer pago del servicio de la deuda de los bonos de PFC para el año fiscal 2016 venció el 3 de agosto de 2015, fecha en que PFC realizó un pago parcial de intereses por un monto de $628,000 (del pago de aproximadamente $58 millones adeudado en esa fecha) de los fondos en poder de PFC que representa fondos restantes de asignaciones legislativas anteriores. Desde el 3 de agosto de 2015 hasta el 31 de marzo de 2019, PFC no realizó los pagos de deuda adicionales de sus bonos por un monto total de aproximadamente $346.1 millones.

*Bonos de Obligación General (GO)*

El 1 de julio de 2016, se adeudaban aproximadamente $1,100 millones en pagos de capital e intereses sobre los bonos de obligación general del ELA. De este monto, el ELA pagó aproximadamente $351.9 millones (dejando aproximadamente $778.8 millones sin pagar). El pago de $351.9 millones consistió en fondos mantenidos en cuentas de depósito en garantía ($314.4 millones en montos de capital más $37.5 millones de intereses capitalizados existentes al respecto). Desde el 1 de julio de 2016 hasta el 31 de marzo de 2019, el ELA no realizó los pagos de deuda adicionales por sus bonos de obligación general por un monto total de aproximadamente $3,000 millones.

*Bonos de COFINA*

El 30 de mayo de 2017, la juez Swain ordenó no realizar pagos a los tenedores de bonos de COFINA. De los requisitos de servicio de la deuda de bonos en circulación que vencen desde el 1 de junio de 2017 hasta el 31 de marzo de 2019, COFINA no realizó los pagos de deuda pendiente por aproximadamente $1,392 millones.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

*Bonos de AEP*

El 1 de julio de 2016, de los aproximadamente $186.9 millones de servicio de la deuda vencidos en los bonos en circulación de la AEP (que consisten en aproximadamente $86.1 millones en capital y $100.9 millones en intereses), todos fueron pagados, con excepción del capital de $25.3 millones. De los requisitos de servicio de la deuda de bonos en circulación que vencen desde el 1 de agosto de 2016 hasta el 31 de marzo de 2019, AEP no realizó pagos adicionales de deuda pendiente por aproximadamente $706.1 millones, excepto el capital de $3.5 millones y los intereses de $64.3 millones que se pagaron.

*Bonos de PRIFA*

El 1 de enero de 2016, del servicio de la deuda de aproximadamente $35.9 millones (todos los intereses) adeudados por los bonos PRIFA, casi todos quedaron sin pagar, excepto $14,400. Desde el 1 de enero de 2016, PRIFA ha perdido pagos de deuda pendientes adicionales por aproximadamente $455.8 millones, con excepción del capital $100,000 y los intereses de $1.1 millones.

*Acuerdo de compra de bonos del Puerto de las Américas (PAA) con el BGF*

El 1 de agosto de 2016, del servicio de la deuda de aproximadamente $28.7 millones adeudado en el Acuerdo de Compra de Bonos de PAA con el BGF (que consiste en aproximadamente $7.8 millones en capital y $20.9 millones en intereses), todos quedaron sin pagar. El 1 de agosto de 2018, de los pagos de la deuda de aproximadamente $58.5 millones adeudado en el Acuerdo de Compra de Bonos de PAA con el BGF (que consiste en aproximadamente $15.6 millones en capital y $42.9 millones en intereses), todos quedaron sin pagar.

**Empresa en Marcha, Riesgo de Liquidez y Plan Fiscal**

*Empresa en Marcha y Riesgo de Liquidez*

El ELA se encuentra en medio de una profunda crisis fiscal, económica y de liquidez, la culminación de muchos años de déficits gubernamentales significativos, una recesión económica prolongada (que comenzó en 2006), un alto desempleo, un descenso de la población y altos niveles de deuda y obligaciones de pensiones. A medida que la base imponible del ELA se reduce y sus ingresos se ven afectados por las condiciones económicas imperantes, los costos de la atención médica, las pensiones y el servicio de la deuda se han convertido en una parte cada vez mayor del presupuesto del Fondo General, lo que ha resultado en una reducción de los fondos disponibles para otros servicios esenciales. El nivel muy alto de deuda y pasivos de pensiones no financiados del ELA y la asignación de ingresos requerida como resultado del pago de la deuda y las obligaciones de pensiones contribuyeron a déficits presupuestarios significativos durante varios años, déficit que el ELA ha financiado, aumentando aún más el monto de su deuda. Estos asuntos, y las restricciones de liquidez del ELA, entre otros factores, han afectado negativamente sus calificaciones crediticias y su capacidad para obtener financiamiento a tasas de interés razonables. Como resultado, el ELA había dependido en mayor medida de financiamientos a corto plazo y préstamos provisionales del BGF, y otros organismos del ELA, cuya dependencia ha limitado la liquidez del ELA en general y del BGF y ha aumentado el riesgo de refinanciamiento a corto plazo. Estos factores también resultaron en demoras en el reembolso por parte del ELA y sus unidades de componentes de líneas de crédito pendiente del BGF, lo que retrasó la capacidad limitada del BGF para continuar proporcionando liquidez al ELA y ocasionó que el BGF no hiciera un pago del capital de sus obligaciones de deuda. Del mismo modo, y de conformidad con una serie de legislaciones y órdenes ejecutivas durante el año fiscal 2016, el ELA y algunas otras corporaciones públicas también retrasaron los pagos del servicio de la deuda de algunas de sus deudas, incluidos los bonos de obligación general del ELA.

Durante el año fiscal 2016, las medidas de liquidez incluyeron: (i) exigir que los dos sistemas de retiro más grandes del ELA financiaran anticipadamente el pago de los beneficios de retiro actuales a los participantes (en años fiscales anteriores, dichos montos fueron pagados en su totalidad por la Cuenta de Concentración de efectivo única del Departamento de Hacienda, conocida como la "Cuenta Única de Hacienda" o "TSA", y solo fueron reembolsados

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

posteriormente a la TSA por los sistemas de retiro), (ii) suspender las reservas del ELA requeridas por la Ley Núm. 39 de 13 de mayo de 1976, según enmienda, (iii) retrasar el pago de cuentas a pagar o montos de terceros a empresas públicas, (iv) diferir el desembolso de ciertas asignaciones presupuestarias y (v) retrasar el pago de las devoluciones del impuesto sobre la renta. Durante décadas, los recibos de la TSA se habían depositado principalmente en el BGF. En abril de 2016, como resultado del deterioro de la situación de liquidez del BGF, el ELA comenzó a depositar recibos de TSA en un banco comercial. Los balances de efectivo restantes en la TSA mantenidos en el BGF estaban sujetos a las limitaciones sobre los retiros de fondos impuestos por la Ley de Moratoria.

Otras medidas de liquidez también se habían reforzado mediante la colocación de un Pagaré en Anticipación de Contribuciones e Ingresos "intragubernamental" de emergencia (TRAN) con el Fondo de Seguro del Estado (SIFC), la Administración de Compensación de Accidentes de Automóviles (AACA) y el Fondo de Seguro por Discapacidad. Durante el año fiscal 2016, el ELA obtuvo fondos adicionales mediante la emisión de TRAN con el SIFC, la AACA y el Fondo de Seguro por Discapacidad por un monto de $335 millones, $50 millones y $ 15 millones, respectivamente.

Adicionalmente, para el año fiscal que finalizó el 30 de junio de 2016, la Legislatura no asignó aproximadamente $94 millones para el pago de los bonos de la Corporación de Finanzas Públicas (PFC) que son obligaciones de ciertas unidades de componentes del ELA que son pagaderas únicamente con tales asignaciones. PFC no realizó pagos del servicio de la deuda de sus bonos por un monto total de aproximadamente $90.2 millones y $87.3 millones para los años fiscales 2016 y 2017, respectivamente.

El 1 de diciembre de 2015, se firmó la Orden Ejecutiva Núm. 46, que ordenaba al Secretario de Hacienda retener ciertos ingresos en base a las estimados de ingresos revisados para el año fiscal 2016 y el deterioro de la situación de liquidez del ELA. De conformidad con la Orden Ejecutiva Núm. 46, se retuvieron ciertos recursos disponibles del ELA se asignaron condicionalmente a la Autoridad de Carreteras y Transportación de Puerto Rico (ACT), la Autoridad de Financiamiento de la Infraestructura de Puerto Rico (PRIFA), la Corporación de Finanzas Públicas del Distrito del Centro de Convenciones de Puerto Rico (PRCCDA) y la Autoridad Metropolitana de Autobuses de Puerto Rico (PRMBA) para pagar el servicio de la deuda de sus obligaciones, y aún son retenidas por el ELA (comúnmente conocido como "recuperación"), de conformidad con el Artículo VI, Sección 8 de la Constitución del ELA y la ley disposiciones en virtud de las que dichos ingresos se asignaron a las corporaciones públicas correspondientes.

Incluso con los recursos adicionales proporcionados por la implementación de la recuperación antes mencionada, el 6 de abril de 2016, el ELA promulgó la Ley de Moratoria. De acuerdo con las disposiciones de la Ley de Moratoria, el ELA y algunos de sus instrumentos suspendieron el pago del servicio de la deuda de sus respectivas deudas. En particular, el ELA suspendió el pago de $779 millones en servicio de la deuda de bonos de obligación general con vencimiento el 1 de julio de 2016 (neto de $352 millones de fondos de intereses capitalizados y cuentas de depósito en garantía) porque no tenía fondos suficientes en su TSA para realizar dicho pago.

El ELA también se enfrentó al desafío de reemplazar los ingresos producidos por el impuesto indirecto temporal a las ventas de la Ley Núm. 154 del 25 de octubre de 2010 (que se describe en la Nota 1(j) a continuación) si su período de vigencia no se extiende (se programó para vencer el 31 de diciembre de 2017) o si el Servicio de Impuestos Internos de EE. UU. elimina su crédito contra el pasivo del impuesto sobre la renta federal de una entidad. La Ley Núm. 154 actualmente representa aproximadamente el 20% de los ingresos presupuestados del Fondo General y aproximadamente 10 empresas representan aproximadamente el 90% de dichos ingresos de la Ley Núm. 154. Si bien la Ley Núm. 154 impone una regla de fuente de ingresos modificada al vencimiento del impuesto indirecto temporal, el ELA actualmente estima que los ingresos de la regla de fuente de ingreso modificada serían materialmente más bajos que los ingresos recaudados por el impuesto indirecto temporal. En la medida en que el ELA no pueda reemplazar los ingresos generados por el impuesto indirecto temporal, la brecha de financiamiento del ELA aumentará materialmente y se verá comprometida la capacidad del ELA para continuar financiando sus operaciones actuales y proporcionar servicios esenciales.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

El 23 de enero de 2017, el ELA promulgó la Ley Núm. 3 de 2017 que, entre varias disposiciones, estableció una extensión de 10 años de la Ley Núm. 154 al impuesto indirecto sobre las adquisiciones de corporaciones extranjeras, eliminando así temporalmente el precipicio fiscal relacionado con la Ley 154 del impuesto indirecto.

El 29 de enero de 2017, se promulgó la Ley Núm. 5 de 2017, conocida como la Ley de Emergencia Financiera y Responsabilidad Fiscal de Puerto Rico (según enmienda, Ley Núm. 5), que derogó ciertas disposiciones de la Ley de Moratoria y autorizó medidas de emergencia adicionales. Sin embargo, de conformidad con la Ley Núm. 5, las órdenes ejecutivas emitidas en virtud de la Ley de Moratoria continuarán vigentes hasta que se modifiquen, rescindan o reemplacen. El período de emergencia en virtud de la Ley Núm. 5, según enmienda, caducará el 30 de junio de 2019, a menos que el Gobernador lo extienda. Algunas facultades adicionales otorgados al Gobernador mediante la Ley Núm. 5 incluyen: autoridad para (i) ejercer poderes de liquidación de bienes para rectificar la emergencia financiera, (ii) ejercer control general de supervisión sobre las funciones y actividades de todas las entidades gubernamentales dentro del Poder Ejecutivo, y (iii) emitir órdenes ejecutivas para implementar y exigir el cumplimiento de la Ley Núm. 5. El 30 de abril de 2017, el Gobernador del ELA emitió la orden ejecutiva OE-2017-031, que extendió el período de emergencia de la Ley Núm. 5 hasta el 1 de agosto de 2017. El 19 de julio de 2017, la Legislatura promulgó la Ley Núm. 46 (Ley Núm. 46), que extendió aún más el período de emergencia de la Ley Núm. 5 hasta el 31 de diciembre de 2017. La Ley Núm. 46 permitió al Gobernador firmar órdenes ejecutivas para extender el período de emergencia por períodos sucesivos de seis meses, siempre que la Junta de Supervisión permanezca establecida para Puerto Rico en virtud de PROMESA. El 27 de diciembre de 2018, el Gobernador emitió la orden ejecutiva OE-2018-053, que extendió el período de emergencia de la Ley Núm. 5 hasta el 30 de junio de 2019.

El ELA no ha incluido las asignaciones para el pago del servicio de la deuda en su presupuesto del fondo general desde el año fiscal 2017, ya que el pago de tales obligaciones se ha suspendido de conformidad con la Ley de Moratoria, la Ley Núm. 5 y el comienzo del Título III del caso del ELA del 3 de mayo de 2017.

El 30 de junio de 2016, el presidente Barack Obama promulgó la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico (codificada bajo 48 U.S.C.§§ 2101-2241) (PROMESA). En términos generales, PROMESA busca proporcionar al ELA disciplina fiscal y económica a través de, entre otras cosas: (i) el establecimiento de la Junta de Supervisión, cuyas responsabilidades incluyen la certificación de planes y presupuestos fiscales para el ELA y sus entidades relacionadas; (ii) una paralización temporal de todas las demandas de acreedores; y (iii) dos métodos alternativos para ajustar la deuda insostenible: (a) un proceso voluntario de modificación de deuda en virtud del Título VI de PROMESA, que establece un proceso de reestructuración de deuda en gran medida extrajudicial mediante la que una supermayoría de acreedores puede aceptar modificaciones a la deuda financiera; y (b) un procedimiento de quiebra en virtud del Título III de PROMESA, que establece un proceso de reestructuración de la deuda en el tribunal sustancialmente basado en las disposiciones incorporadas del Código de Quiebras de los EE. UU. (11 U.S.C.§§ 101, et seq.). Para obtener información adicional sobre los elementos clave de PROMESA y los casos del Título III, consulte la Nota 23. Para obtener información adicional sobre las acciones civiles relacionadas con los casos del Título III y otras contingencias de litigios, consulte la Nota 17.

*Plan Fiscal*

De acuerdo con PROMESA y los requisitos impuestos por la Junta de Supervisión, el 23 de octubre de 2018, la Junta de Supervisión certificó su propio plan fiscal para el ELA (el Plan Fiscal de la Junta). El Plan Fiscal de la Junta se compromete con la responsabilidad fiscal e implementa mejoras específicas en los ingresos y reducciones específicas de gastos para devolver a Puerto Rico a la estabilidad fiscal y al crecimiento económico. El 18 de enero de 2019, la Junta de Supervisión solicitó al Gobernador que presentara un nuevo plan fiscal del ELA para reemplazar el Plan Fiscal de la Junta. El 10 de marzo de 2019, el Gobernador presentó una nueva propuesta para el plan fiscal del ELA. Conforme al cronograma indicado por la Junta de Supervisión, la Junta de Supervisión anticipa la certificación de un nuevo plan fiscal del ELA el 26 de abril de 2019. Para obtener información adicional relacionada con el Plan Fiscal de la Junta, consulte la Nota 2.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

**Hechos Conocidos Actualmente**

A continuación, se incluye una descripción resumida de los hechos, debates y condiciones actualmente conocidos que han tenido, o se espera que tengan, un efecto significativo en la posición financiera y los resultados de las operaciones del ELA. Para obtener información adicional y más detalles, consulte la Nota 23.

*Pagarés en Anticipación de Contribuciones e Ingresos y otros Pagarés y Bonos Emitidos Después de Fin de Año*

(a)  Pagarés en Anticipación de Contribuciones e Ingresos de 2017

El 6 de septiembre de 2016, el ELA renovó las TRAN "intragubernamentales" de emergencia para el año fiscal 2017, por un monto total de capital de $400 millones con SIFC, ACAA y los Bonos de Seguro por Discapacidad, también a una tasa de interés del 6%. El 28 de abril de 2017, el ELA reconoció que no podría realizar los pagos de capital e intereses por los pagarés de TRAN en el momento de su vencimiento, y firmó un acuerdo de indulgencia con SIFC, ACAA y SINOT. El período de tolerancia finalizó el 30 de junio de 2018. El reembolso no se ha realizado y el período de tolerancia no se ha extendido, pero la paralización automática en virtud del Título III de PROMESA sigue vigente.

(b)  Pagarés en Anticipación de Bonos de PRIFA

El 24 de junio de 2016, el Gobernador firmó una orden ejecutiva, EO-2016-027, que suspendió todas las obligaciones de transferir dinero a PRIFA con respecto a los BAN de PRIFA, tal como se describe en la Nota 13(c).

*Legislación Significativa y Otros Eventos después de Fin de Año*

(a)  Impuesto sobre ventas y uso

El 8 de noviembre de 2017, el Gobernador emitió la orden ejecutiva OE-2017-068, que estableció un reembolso del 10% para ciertas pequeñas y medianas empresas en sus presentaciones SUT desde agosto de 2017 hasta noviembre de 2017. Debido a los apagones tras el huracán María que dejaron a muchas personas sin acceso a refrigeradores y hornos, el Gobernador renunció temporalmente a los cobros de SUT en los alimentos preparados hasta diciembre de 2017 para permitir que las organizaciones de ayuda y las familias maximicen sus recursos.

El 7 y 8 de noviembre de 2018, respectivamente, se aprobó en la Cámara de Representantes de Puerto Rico y el Senado de Puerto Rico una nueva legislación para enmendar y reformular la Ley Núm. 91 de 2006 para establecer el marco legal para la reestructuración de los bonos emitidos y en circulación de COFINA. El 15 de noviembre de 2018, el Gobernador promulgó la nueva legislación como Ley Núm. 241 de 2018. La Ley Núm. 241 de 2018 estableció el marco legal para la reestructuración de los bonos emitidos y en circulación de COFINA, entre otras cosas, autorizando la emisión de nuevos bonos de COFINA necesarios para completar las transacciones contempladas en el Tercer Plan de Ajuste Enmendado de COFINA. Para ver un análisis adicional de la Ley Núm. 241 de 2018, consulte la discusión del Tercer Plan de Ajuste Enmendado en la Nota 3 y la Nota 17(c) a continuación.

(b)  Leyes para Atender la Crisis Fiscal y la Recuperación Económica

La Ley Núm. 3 del 23 de enero de 2017, la Ley para Atender la Crisis Fiscal, se promulgó para extender la mayoría de las medidas fiscales que se habían adoptado en virtud de la Ley Núm. 66 de 2014 hasta el 1 de julio de 2021, incluida una extensión de 10 años del impuesto indirecto sobre las adquisiciones de corporaciones extranjeras en virtud de la Ley Núm. 154.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2016

La Ley Núm. 9 del 8 de febrero de 2017 (Ley Núm. 9 de 2017) y la Ley Núm. 14 del 21 de febrero de 2017 (Ley Núm. 14 de 2017) introdujo una serie de enmiendas fiscales para proporcionar incentivos a los profesionales para que se queden en Puerto Rico al promover y facilitar la creación y gestión de planes de retiro y otros fideicomisos para promover la estabilidad financiera y la creación de empleo.

*Reducción de la Calificación Crediticia de los Bonos*

Poco después de los pagos omitidos del 1 de julio de 2016, impuestos por la Ley de Moratoria y las órdenes ejecutivas relacionadas, S&P redujo al nivel más bajo de "D" los bonos de obligación general del ELA, los Bonos de Ingresos Fiscales Especiales de PRIFA y los bonos de AEP, mientras que Fitch también lo hizo con los bonos de obligación general del ELA y los bonos de la AEP. El 6 de abril de 2017, Moody's redujo la calificación de los Bonos de Ingresos Fiscales Especiales y los bonos del SRE de PRIFA a una calificación de nivel C de sus calificaciones anteriores de Ca y Ca, respectivamente. En esa misma fecha, Moody's reafirmó la calificación de Caa3 de los bonos de obligación general del ELA. El 7 de junio de 2017, S&P redujo la calificación de los bonos de gravámenes sénior y junior de COFINA a la calificación de incumplimiento de D, en respuesta a la orden del Tribunal Título III de realizar el servicio de la deuda de COFINA programado para el 1 de junio, 1 de julio y 1 de agosto de 2017, pero de mantener dichos fondos en una cuenta de fideicomiso hasta una nueva orden judicial.  A la fecha del presente, de conformidad con los términos del plan de ajuste de COFINA, los fondos se han distribuido a los tenedores de bonos de COFINA, los antiguos bonos de COFINA se han cancelado y se han emitido los nuevos bonos de COFINA.

**Solicitudes de Información**

Este informe financiero está destinado para proporcionar una visión general de las finanzas del ELA para todos los residentes, contribuyentes, clientes, inversores y acreedores del ELA. Este informe financiero busca demostrar la responsabilidad del ELA por el dinero que recibe. Las preguntas relacionadas con la información proporcionada en este informe o las solicitudes de información adicional deben dirigirse a: Departamento de Hacienda del ELA de Puerto Rico, Área de Contabilidad Central, P.O. Box 9024140, San Juan, PR 00902.

**ELA DE PUERTO RICO**

Estado de Resultados Netos

30 de junio de 2016

(En miles)

| | | Gobierno principal | | | |
| --- | --- | --- | --- | --- | --- |
| | | Actividades de gobierno | Actividades de Tipo comercial | Totales del gobierno primario | Unidades de componentes |
| Activos: | | | | | |
| Efectivo y equivalentes de efectivo en bancos comerciales | $ | 426,733 | 244,543 | 671,276 | 1,411,430 |
| Efectivo y equivalentes de efectivo en bancos gubernamentales | | 4,369 | 719 | 5,088 | 48,714 |
| Inversiones | | 14,591 | — | 14,591 | 1,185,350 |
| Garantía de transacciones de préstamos de valores | | — | — | — | 38,436 |
| Cuentas por cobrar - neto: | | | | | |
| Impuestos a la renta y a las ventas | | 1,236,829 | — | 1,236,829 | — |
| Prima de seguros | | — | 4,088 | 4,088 | 39,396 |
| Intergubernamental | | 374,919 | 119,297 | 494,216 | 117,077 |
| Cuentas | | 31,396 | 95,788 | 127,184 | 618,855 |
| Préstamos | | 39 | — | 39 | 3,183,891 |
| Interés devengado | | 3,088 | 465 | 3,553 | 137,891 |
| Otros | | 148,608 | 16,889 | 165,497 | 42,191 |
| Adeudado de - neto: | | | | | |
| Gobierno primario | | — | — | — | 189,776 |
| Unidades de componentes | | 80,019 | — | 80,019 | 519,727 |
| Otras entidades del gobierno | | 314,940 | 1,533 | 316,473 | 460,860 |
| Balances internos | | (24,111) | 24,111 | — | — |
| Inventarios | | 12,443 | — | 12,443 | 228,109 |
| Gastos pagados por adelantado | | 31,866 | — | 31,866 | 57,567 |
| Otros activos | | 13,514 | 25,672 | 39,186 | 24,988 |
| Activos restringidos: | | | | | |
| Efectivo y equivalentes de efectivo en bancos comerciales | | 540,567 | 24,258 | 564,825 | 529,270 |
| Efectivo y equivalentes de efectivo en bancos gubernamentales | | 6,935 | 2,983 | 9,918 | 10,373 |
| Equivalentes al efectivo en PRGITF | | 56,178 | — | 56,178 | — |
| Efectivo y equivalentes de efectivo en custodia del Tesoros de los EE. UU. | | — | 496,906 | 496,906 | — |
| Impuesto sobre ventas y uso por cobrar | | 188,666 | — | 188,666 | — |
| Primas de seguro - neto | | — | 62,384 | 62,384 | — |
| Intergubernamental por cobrar | | 17,471 | — | 17,471 | — |
| Interés devengado | | — | 14 | 14 | — |
| Préstamos por cobrar de unidades de componentes | | — | 7,935 | 7,935 | — |
| Inversiones | | 602,308 | 24,545 | 626,853 | 1,953,613 |
| Otros | | 1,127 | 21,191 | 22,318 | 62,356 |
| Bienes inmuebles en venta o desarrollo futuro | | 44,211 | — | 44,211 | 243,005 |
| Activos de capital: | | | | | |
| Terrenos y otros activos no depreciables | | 2,282,210 | 39,344 | 2,321,554 | 4,777,754 |
| Depreciables, neto | | 6,418,902 | 53,826 | 6,472,728 | 23,893,174 |
| Activos totales | | 12,827,818 | 1,266,491 | 14,094,309 | 39,773,803 |
| Salidas diferidas de recursos: | | | | | |
| Disminución acumulada del valor razonable de derivados de cobertura | | 87,728 | — | 87,728 | 68,910 |
| Pérdida por reembolso de bonos | | 421,099 | — | 421,099 | 201,689 |
| Relacionado con pensiones | | 4,228,084 | 136,118 | 4,364,202 | 1,435,132 |
| Entradas diferidas de recursos | | 4,736,911 | 136,118 | 4,873,029 | 1,705,731 |

(Continuaci

**ELA DE PUERTO RICO**

Estado de Resultados Netos

30 de junio de 2016

(En miles)

| | Gobierno principal | | | |
| | Actividades de gobierno | Actividades de Tipo comercial | Totales del gobierno primario | Unidades de componentes |
|---|---|---|---|---|
| Pasivos: | | | | |
| Cuentas a pagar y pasivos devengados | 1,560,987 | 156,401 | 1,717,388 | 2,151,343 |
| Depósitos y pasivos en custodia | — | — | — | 3,955,142 |
| Reembolsos de impuestos a pagar | 690,652 | — | 690,652 | — |
| Adeudado a: | | | | |
| Gobierno primario | — | — | — | 726,139 |
| Unidades de componentes | 234,769 | 41,468 | 276,237 | 3,490,472 |
| Otras entidades del gobierno | 192,453 | 2,227 | 194,680 | 151,755 |
| Obligaciones de préstamo de valores y acuerdos de recompra inversa | — | — | — | 38,436 |
| Intereses por pagar | 704,952 | 52,174 | 757,126 | 725,473 |
| Adelantos de subsidios | 6,538 | — | 6,538 | — |
| Ingresos no devengados | 127,536 | 24,900 | 152,436 | 119,417 |
| Pagarés adeudados al BGF | 1,700 | — | 1,700 | — |
| Pasivos pagaderos dentro de un año: | | | | |
| Bonos de asignación del ELA | 46,520 | — | 46,520 | 19,096 |
| Obligaciones generales y bonos de ingresos | 717,236 | — | 717,236 | 586,851 |
| Acuerdo de compra de bonos con el BGF | 7,839 | — | 7,839 | — |
| Pagarés adeudados a las unidades de componentes | 173,820 | 62,000 | 235,820 | — |
| Pagarés adeudados a la institución financiera | 4,753 | — | 4,753 | 1,421,324 |
| Arrendamiento de capital | 8,864 | — | 8,864 | 1,277 |
| Ausencias compensadas | 635,654 | 11,866 | 647,520 | 158,590 |
| Pasivos netos de pensiones | 152,044 | — | 152,044 | — |
| Obligación por premios no pagados de lotería | — | 70,847 | 70,847 | — |
| Beneficios de rescisión voluntaria | 74,220 | 1,382 | 75,602 | 24,006 |
| Pasivos por el seguro de accidentes automovilísticos y compensación del trabajador | — | — | — | 795,360 |
| Pasivos por el seguro por desempleo, invalidez y de salud | — | 170,051 | 170,051 | — |
| Otros pasivos a largo plazo | 267,576 | 71,160 | 338,736 | 95,692 |
| Pasivos pagaderos después de un año: | | | | |
| Bonos de asignación del ELA | 523,644 | — | 523,644 | 509,372 |
| Obligaciones generales y bonos de ingresos | 36,279,613 | — | 36,279,613 | 18,223,396 |
| Acuerdo de compra de bonos con el BGF | 217,695 | — | 217,695 | — |
| Pagarés adeudados a las unidades de componentes | 2,339,490 | 424,559 | 2,764,049 | — |
| Pagarés adeudados a instituciones financieras | 19,011 | — | 19,011 | 3,578,107 |
| Pasivos en virtud de obligaciones garantizadas | 360,739 | — | 360,739 | — |
| Arrendamiento de capital | 335,231 | — | 335,231 | 27,670 |
| Ausencias compensadas | 703,567 | 10,722 | 714,289 | 324,037 |
| Obligación de pensiones netas | — | — | — | 18,240 |
| Pasivos netos de pensiones | 36,698,109 | 651,651 | 37,349,760 | 7,406,662 |
| Instrumentos derivados de cobertura - intercambios de tasas de interés | 87,728 | — | 87,728 | 68,910 |
| Otra obligación de beneficios posteriores al empleo | 265,012 | 1,834 | 266,846 | — |
| Obligación por premios no pagados de lotería | — | 101,314 | 101,314 | — |
| Beneficios de rescisión voluntaria | 608,530 | 7,566 | 616,096 | 135,613 |
| Otros pasivos a largo plazo | 2,147,238 | 2,300 | 2,149,538 | 701,475 |
| Total de pasivos | 86,193,720 | 1,864,422 | 88,058,142 | 45,453,875 |
| Entradas diferidas de recursos: | | | | |
| Acuerdos de concesión de servicio | — | — | — | 1,896,720 |
| Ganancia por reembolso de bonos | 118,614 | — | 118,614 | — |
| Relacionado con pensiones | 1,074,083 | 11,304 | 1,085,387 | 376,751 |
| Entradas totales diferidas de recursos | 1,192,697 | 11,304 | 1,204,001 | 2,273,471 |
| Resultados netos: | | | | |
| Inversión neta en activos de capital | 3,203,987 | 75,020 | 3,279,007 | 6,237,873 |
| Restringido para: | | | | |
| Proyectos de capital | 101,683 | — | 101,683 | 252,635 |
| Servicio de la deuda | 139,382 | — | 139,382 | 514,050 |
| Servicios de emergencia | — | 6,268 | 6,268 | — |
| Actividades de préstamos | — | 9,260 | 9,260 | — |
| Pago de beneficios del seguro | — | 520,624 | 520,624 | — |
| Vivienda pública y bienestar | — | — | — | 112,599 |
| Préstamos estudiantiles y otros propósitos educativos | — | — | — | 107,251 |
| Otros | 105,334 | — | 105,334 | 173,700 |
| No restringidos (déficit) | (73,372,074) | (1,084,289) | (74,456,363) | (13,645,920) |
| Resultados netos totales (déficit) | $ (69,821,688) | (473,117) | (70,294,805) | (6,247,812) |

Ver notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Estado de Actividades del Año finalizado

30 de junio de 2016

(En miles)

| Funciones | Gastos | Ingresos del programa | | | Ingresos (gastos) netos y cambios en los resultados netos | | | Unidades de componentes |
| | | Cargos por servicios | Subsidios y contribuciones de operación | Subsidios y contribuciones de capital | Gobierno primario | | | |
| | | | | | Actividades del gobierno | Actividades de tipo comercial | Total | |
| Gobierno primario | | | | | | | | |
| Actividades del gobierno: | | | | | | | | |
| Gobierno General | $ 3,675,139 | 230,749 | 65,937 | — | (3,378,453) | — | (3,378,453) | — |
| Seguridad pública | 2,071,961 | 135,218 | 71,711 | — | (1,865,032) | — | (1,865,032) | — |
| Salud | 3,080,551 | 256,457 | 2,393,345 | — | (430,749) | — | (430,749) | — |
| Vivienda pública y bienestar | 3,314,500 | 13,689 | 2,845,782 | 73,189 | (381,840) | — | (381,840) | — |
| Educación | 3,724,041 | 1,546 | 1,065,112 | — | (2,657,383) | — | (2,657,383) | — |
| Desarrollo económico | 1,026,935 | 183,433 | 4,844 | — | (838,658) | — | (838,658) | — |
| Intergubernamental | 554,429 | — | — | — | (554,429) | — | (554,429) | — |
| Intereses y otros | 2,086,720 | — | — | — | (2,086,720) | — | (2,086,720) | — |
| Total de actividades del gobierno | 19,534,276 | 821,092 | 6,446,731 | 73,189 | (12,193,264) | — | (12,193,264) | — |
| Actividades de Tipo Comercial: | | | | | | | | |
| Seguro por desempleo | 139,993 | 221,600 | 1,725 | — | — | 83,332 | 83,332 | — |
| Loterías | 654,355 | 873,714 | — | — | — | 219,359 | 219,359 | — |
| Administración del Seguro de Salud de Puerto Rico | 2,867,938 | 348,768 | 1,706,686 | — | — | (812,484) | (812,484) | — |
| Administración de Servicios Médicos de Puerto Rico | 279,976 | 131,486 | — | — | — | (148,490) | (148,490) | — |
| Fondo Recurrente de Control de Contaminación del Agua de Puerto Rico | 424,778 | 4,188 | 12,624 | — | — | (407,966) | (407,966) | — |
| Fondos No Mayores de Propiedad Exclusiva | 275,476 | 41,684 | 18,444 | — | — | (215,348) | (215,348) | — |
| Total de Actividades de Tipo Comercial | 4,642,516 | 1,621,440 | 1,739,479 | — | — | (1,281,597) | (1,281,597) | — |
| Total del gobierno primario | $ 24,176,792 | 2,442,532 | 8,186,210 | 73,189 | (12,193,264) | (1,281,597) | (13,474,861) | — |

(Continuaci

**ELA DE PUERTO RICO**

Estado de Actividades del Año finalizado

30 de junio de 2016

(En miles)

| Funciones | Gastos | Ingresos del programa | | | Ingresos (gastos) netos y cambios en los resultados netos | | | Unidades de componentes |
| | | Cargos por servicios | Subsidios y contribuciones de operación | Subsidios y contribuciones de capital | Gobierno primario | | | |
| | | | | | Actividades del gobierno | Actividades de tipo comercial | Total | |
|---|---|---|---|---|---|---|---|---|
| Unidades de componentes: | | | | | | | | |
| Banco Gubernamental de Fomento para Puerto Rico | $  386,086 | 356,614 | 184,521 | — | — | — | — | 155,049 |
| Autoridad de Carreteras y Transportación de Puerto Rico | 994,632 | 258,555 | 24,416 | 126,001 | — | — | — | (585,660) |
| Autoridad de Energía Eléctrica de Puerto Rico | 4,301,816 | 2,994,893 | — | 8,243 | — | — | — | (1,298,680) |
| Autoridad de Acueductos y Alcantarillas de Puerto Rico | 1,245,245 | 978,718 | — | 18,257 | — | — | — | (248,270) |
| Universidad de Puerto Rico | 1,280,432 | 185,113 | 288,169 | — | — | — | — | (807,150) |
| Corporación del Fondo del Seguro del Estado | 568,010 | 538,431 | — | — | — | — | — | (29,579) |
| Unidades de componentes no mayores | 1,974,380 | 733,897 | 273,307 | 21,490 | — | — | — | (945,686) |
| Total de unidades de componentes | $  10,750,601 | 6,046,221 | 770,413 | 173,991 | | | | (3,759,976) |
| Ingresos generales: | | | | | | | | |
| Impuestos sobre la renta | | | | | $  4,557,727 | — | 4,557,727 | — |
| Impuesto sobre ventas y uso | | | | | 2,301,143 | — | 2,301,143 | — |
| Impuestos a las ventas | | | | | 3,304,800 | — | 3,304,800 | 132,940 |
| Otros impuestos | | | | | 151,097 | — | 151,097 | — |
| Ingresos del acuerdo global de liquidación del tabaco | | | | | 70,665 | — | 70,665 | — |
| Ingresos de la Corporación del Fondo del Seguro del Estado | | | | | 157,407 | — | 157,407 | — |
| Ingresos de la Compañía de turismo de Puerto Rico | | | | | 20,790 | — | 20,790 | — |
| Ingresos de la Administración de Compensación de Accidentes Automovilísticos | | | | | 7,360 | — | 7,360 | — |
| Ingresos de la Autoridad de Carreteras y Transportación de Puerto Rico | | | | | 79,800 | — | 79,800 | — |
| Subsidios y contribuciones no restringidos a programas específicos | | | | | 116,635 | — | 116,635 | 4,611 |
| Ingresos del gobierno primario | | | | | — | — | — | 1,036,414 |
| Ganancias de inversiones (pérdidas) no restringidas– neto | | | | | 15,140 | 16,458 | 31,598 | 135,602 |
| Otros | | | | | 170,794 | 498 | 171,292 | — |
| Transferencias | | | | | (673,258) | 673,258 | — | — |
| Ingresos y transferencias totales generados | | | | | 10,280,100 | 690,214 | 10,970,314 | 1,309,567 |
| Cambio en los resultados netos | | | | | (1,913,164) | (591,383) | (2,504,547) | (2,450,409) |
| Resultados Netos: | | | | | | | | |
| Al comienzo del año, según la información anterior | | | | | (67,692,485) | 654,563 | (67,037,922) | (4,151,633) |
| Corrección de errores y adopción de nuevos pronunciamientos contables (nota 4) | | | | | (216,039) | (536,297) | (752,336) | 354,230 |
| Resultados netos (déficit) – comienzo del año, según ajuste y reformulación | | | | | (67,908,524) | 118,266 | (67,790,258) | (3,797,403) |
| Resultados netos (déficit) - fin de año | | | | | $ (69,821,688) | (473,117) | (70,294,805) | (6,247,812) |

Ver notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Balance – Fondos del Gobierno

30 de junio de 2016

(En miles)

| | General | Servicio de la deuda | COFINA ingresos especiales | COFINA servicio de la deuda | No mayores del gobierno | Total del gobierno |
|---|---|---|---|---|---|---|
| Activos: | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | $ 394,393 | — | — | — | 32,340 | 426,733 |
| Efectivo y equivalentes al efectivo en bancos gubernamentales | 2,361 | — | 82 | — | 1,926 | 4,369 |
| Inversiones | — | — | 166 | — | 14,425 | 14,591 |
| Cuentas por cobrar - neto: | | | | | | |
| Impuestos a la renta y a las ventas | 1,236,829 | — | — | — | — | 1,236,829 |
| Intergubernamental | 372,405 | — | — | — | 2,514 | 374,919 |
| Cuentas | 28,310 | — | — | — | 3,086 | 31,396 |
| Préstamos | — | — | — | — | 39 | 39 |
| Intereses devengados | 3,087 | — | — | — | 1 | 3,088 |
| Otros | 108,771 | — | — | — | 39,837 | 148,608 |
| Adeudado de - neto: | | | | | | |
| Otros fondos | 19,855 | — | — | — | 5,739 | 25,594 |
| Unidades de componentes | 69,772 | — | — | — | 10,247 | 80,019 |
| Otras entidades del gobierno | 310,877 | — | — | — | 4,063 | 314,940 |
| Otros activos | 12,477 | — | — | — | 1,037 | 13,514 |
| Activos restringidos: | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | 22,863 | 224,116 | — | 33,331 | 260,257 | 540,567 |
| Efectivo y equivalentes al efectivo en bancos gubernamentales | 1,703 | — | — | — | 5,232 | 6,935 |
| Equivalentes al efectivo en PRGITF | 4,279 | — | — | — | 51,899 | 56,178 |
| Impuesto sobre ventas y uso por cobrar | 80,383 | — | — | 108,283 | — | 188,666 |
| Intergubernamental por cobrar | — | 17,471 | — | — | — | 17,471 |
| Inversiones | 51,395 | — | — | 437,766 | 113,147 | 602,308 |
| Deudas de otros fondos | — | — | — | — | 140,178 | 140,178 |
| Otros activos | — | — | — | 670 | 457 | 1,127 |
| Bienes inmuebles en venta o desarrollo futuro | — | — | — | — | 1,854 | 1,854 |
| **Activos totales** | $ 2,719,760 | 241,587 | 248 | 580,050 | 688,278 | 4,229,923 |
| Pasivos, entrada diferida de recursos y saldos de fondos (déficit): | | | | | | |
| Pasivos: | | | | | | |
| Cuentas a pagar y pasivos devengados | $ 1,425,371 | — | 277 | 90 | 135,249 | 1,560,987 |
| Reembolsos de impuestos a pagar | 690,652 | — | — | — | — | 690,652 |
| Adeudado a: | | | | | | |
| Otros fondos | 51,309 | — | — | 132,051 | 6,523 | 189,883 |
| Unidades de componentes | 224,519 | — | — | — | 10,250 | 234,769 |
| Otras entidades del gobierno | 186,476 | — | — | — | 5,977 | 192,453 |
| Intereses a pagar | 35,703 | 37,499 | — | — | 143,623 | 216,825 |
| Anticipos de subsidios | 6,538 | — | — | — | — | 6,538 |
| Ingresos no obtenidos | 123,144 | 1,727 | — | — | 2,665 | 127,536 |
| Pagarés adeudados al BGF | 134,234 | — | — | — | 1,700 | 135,934 |
| Bonos de asignación del ELA | 25,578 | — | — | — | — | 25,578 |
| Obligaciones generales y bonos de ingresos | 716 | — | — | — | 60,852 | 60,852 |
| Beneficios pagaderos por rescisión voluntaria | 716 | — | — | — | — | 716 |
| Pasivos netos de pensiones | 152,044 | — | — | — | — | 152,044 |
| Otros pasivos | 49,000 | — | — | — | — | 49,000 |
| **Total de pasivos** | 3,105,284 | 39,226 | 277 | 132,141 | 366,839 | 3,643,767 |
| Entradas diferidas de recursos: | | | | | | |
| Impuestos sobre la renta no disponibles | 723,598 | — | — | — | — | 723,598 |
| Subsidios y contribuciones intergubernamentales | 41,266 | — | — | — | — | 41,266 |
| Honorarios de desarrolladores | 83,997 | — | — | — | — | 83,997 |
| Acuerdo global de la liquidación del tabaco | — | — | — | — | 36,765 | 36,765 |
| **Entradas totales diferidas de recursos** | 848,861 | — | — | — | 36,765 | 885,626 |
| Saldos del fondo: | | | | | | |
| No gastable | 63 | — | — | — | — | 63 |
| Gastable: | | | | | | |
| Restringido | 78,001 | 202,361 | — | 447,909 | 330,511 | 1,058,782 |
| Comprometido | 256 | — | — | — | 26,078 | 26,334 |
| Asignado | 17,913 | — | — | — | 4,012 | 21,925 |
| No asignado (déficit) | (1,330,618) | — | (29) | — | (75,927) | (1,406,574) |
| **Saldos totales del fondo (déficit)** | (1,234,385) | 202,361 | (29) | 447,909 | 284,674 | (299,470) |
| **Pasivos totales, entradas diferidas de recursos y saldos totales del fondo (déficit)** | $ 2,719,760 | 241,587 | 248 | 580,050 | 688,278 | 4,229,923 |

Ver notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Conciliación del Balance de los Fondos Gubernamentales con el

Estado de Resultados Netos

30 de junio de 2016

(En miles)

| | | |
|---|---|---:|
| Saldos totales del fondo (déficit) de fondos del gobierno | $ | (299,470) |
| Los montos informados para actividades del gobierno en el estado de resultados neos son diferentes a los montos informados en los fondos del gobierno porque: | | |
| Inventarios y gastos prepagos que no se informan en fondos del gobierno y se informan en el estado de resultados netos | | 44,309 |
| Salidas diferidas de recursos informados en actividades del gobierno pero no en fondos del gobierno | | |
| Disminución acumulada del valor razonable de derivados de cobertura | | 87,728 |
| Pérdida por reembolso de bonos | | 421,099 |
| Relacionado con pensiones | | 4,228,084 |
| Los activos de capital utilizados en actividades del gobierno no son recursos financieros y, por lo tanto, no se informan en los fondos | | 8,701,112 |
| Los bienes inmuebles mantenidos para la venta o el desarrollo futuro no son recursos financieros actuales y, en consecuencia, no se informan en los fondos del gobierno | | 42,357 |
| Las entradas diferidas de recursos informadas en los fondos del gobierno se reconocen como ingresos en las actividades del gobierno | | 885,626 |
| Entradas diferidas de recursos informados en actividades del gobierno pero no en fondos del gobierno | | |
| Ganancia por reembolso de bonos | | (118,614) |
| Relacionado con pensiones | | (1,074,083) |
| Los pasivos a largo plazo no deben pagarse en el período actual y, por lo tanto, no se informan en los fondos: | | |
| Intereses a pagar | | (488,127) |
| Bonos de asignación del ELA | | (544,586) |
| Obligaciones generales y bonos de ingresos | | (36,935,997) |
| Acuerdo de compra de bonos con el BGF | | (225,534) |
| Pagarés adeudados a las unidades de componentes | | (2,379,076) |
| Pagarés adeudados a instituciones financieras | | (23,764) |
| Pasivos en virtud de obligaciones garantizadas | | (360,739) |
| Arrendamientos de capital | | (344,095) |
| Ausencias compensadas | | (1,339,221) |
| Pasivos netos de pensiones | | (36,698,109) |
| Instrumentos derivados de cobertura - intercambios de tasas de interés | | (87,728) |
| Otra obligación de beneficios posteriores al empleo | | (265,012) |
| Beneficios por rescisión voluntaria | | (682,034) |
| Otros pasivos a largo plazo | | (2,365,814) |
| Resultados netos totales (déficit) de actividades del gobierno | $ | (69,821,688) |

Ver notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Estado de Ingresos, Gastos y Cambios en los Saldos de Fondos –

Fondos del Gobierno Año finalizado el 30 de junio de 2016

(En miles)

| | General | Servicio de la deuda | COFINA ingresos especiales | COFINA servicio de la deuda | No mayores del gobierno | Total del gobierno |
|---|---|---|---|---|---|---|
| Ingresos: | | | | | | |
| Impuestos: | | | | | | |
| Impuestos sobre la renta | $ 4,762,831 | — | — | — | — | 4,762,831 |
| Impuesto sobre ventas y uso | 1,626,943 | — | — | 674,200 | — | 2,301,143 |
| Impuestos a las ventas | 3,304,800 | — | — | — | — | 3,304,800 |
| Impuestos a la propiedad | 11,197 | — | — | — | — | 11,197 |
| Otros impuestos | 139,900 | — | — | — | — | 139,900 |
| Cargos por servicios | 821,092 | — | — | — | — | 821,092 |
| Ingreso del acuerdo global | | | | | | |
| de liquidación del tabaco | 70,771 | — | — | — | — | 70,771 |
| Ingresos de unidades de componentes | 265,357 | — | — | — | — | 265,357 |
| Intergubernamental | 6,468,836 | 116,635 | — | — | 37,957 | 6,623,428 |
| Ganancias por intereses e inversiones | 6,357 | 33 | — | 2,275 | 6,475 | 15,140 |
| Otros | 155,444 | — | — | — | 11,971 | 167,415 |
| Ingresos totales | 17,633,528 | 116,668 | — | 676,475 | 56,403 | 18,483,074 |
| Gastos: | | | | | | |
| Corrientes: | | | | | | |
| Gobierno general | 1,393,824 | — | 60 | 56 | 176,017 | 1,569,957 |
| Seguridad pública | 2,040,770 | — | — | — | 46 | 2,040,816 |
| Salud | 2,901,391 | — | — | — | 10,275 | 2,911,666 |
| Vivienda pública y bienestar | 3,341,010 | — | — | — | 5,835 | 3,346,845 |
| Educación | 3,567,855 | — | — | — | 794 | 3,568,649 |
| Desarrollo económico | 873,472 | — | — | — | 30,683 | 904,155 |
| Intergubernamental | 538,711 | — | — | — | 15,619 | 554,330 |
| Desembolsos de capital | 96,633 | — | — | — | 135,866 | 232,499 |
| Servicio de la deuda: | | | | | | |
| Capital | 78,012 | — | — | 11,300 | 291,291 | 380,603 |
| Intereses y otros | 77,875 | 421,355 | — | 643,890 | 383,788 | 1,526,908 |
| Gastos totales | 14,909,553 | 421,355 | 60 | 655,246 | 1,050,214 | 17,036,428 |
| Exceso (deficiencia) de ingresos sobre (por debajo de) los gastos | 2,723,975 | (304,687) | (60) | 21,229 | (993,811) | 1,446,646 |
| Otras fuentes de financiamiento (usos): | | | | | | |
| Transferencias entrantes | 254,121 | 286,507 | — | 5,123 | 688,998 | 1,234,749 |
| Transferencias salientes | (1,892,781) | — | (5,123) | (10,103) | — | (1,908,007) |
| Ganancias de la deuda emitida a largo plazo | 43,163 | — | — | — | 53,485 | 96,648 |
| Ganancias de la venta de activos de capital | 778 | — | — | — | — | 778 |
| Total de otras fuentes de financiamiento (usos) | (1,594,719) | 286,507 | (5,123) | (4,980) | 742,483 | (575,832) |
| Cambio neto en los saldos del fondo | 1,129,256 | (18,180) | (5,183) | 16,249 | (251,328) | 870,814 |
| Saldos del fondo (déficit) – comienzo del año, según reformulación (nota 4) | (2,363,641) | 220,541 | 5,154 | 431,660 | 536,002 | (1,170,284) |
| Saldos del fondo (déficit) – fin de año | $ (1,234,385) | 202,361 | (29) | 447,909 | 284,674 | (299,470) |

Ver notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Conciliación del Estado de Ingresos, Gastos y Cambios

en los Balances de Fondos del Gobierno con el Estado de Actividades

Año finalizado el 30 de junio de 2016

(En miles)

| | | | | |
|---|---|---|---|---|
| Cambio neto en los balances de los fondos: fondos del gobierno totales | | | $ | 870,814 |
| Los montos informados para las actividades del gobierno en el estado de actividades son diferentes porque: | | | | |
| Los fondos del gobierno informan los desembolsos de capital como gastos. Sin embargo, en el estado de actividades, el costo de esos activos se asigna a lo largo de sus vidas útiles estimadas y se informan como gastos de depreciación y amortización. En el período actual, estos montos son: | | | | |
| Desembolsos de capital | $ | 232,499 | | |
| Menos gastos de depreciación y amortización | | (311,683) | | |
| Pérdida por disposición de activos | | (43,143) | | |
| Subtotal | | | | (122,327) |
| La emisión de deuda a largo plazo (por ejemplo, bonos y pagarés) proporciona recursos financieros actuales a fondos del gobierno, mientras que el reembolso del capital de la deuda a largo plazo consume los recursos financieros actuales de los fondos del gobierno. Sin embargo, ninguna de las transacciones tiene ningún efecto en los resultados netos. Además, los fondos del gobierno informan el efecto de las primas, descuentos y partidas similares cuando se emite la deuda por primera vez, mientras que estos montos se difieren y amortizan en el estado de actividades. Este monto es el efecto neto de estas diferencias en el tratamiento de la deuda a largo plazo y los elementos relacionados: | | | | |
| Pagos del capital de la deuda a largo plazo | | 380,603 | | |
| Ganancias de la deuda emitida a largo plazo | | (96,648) | | |
| Subtotal | | | | 283,955 |
| Algunos ingresos en el estado de actividades no proporcionan recursos financieros actuales y, por lo tanto, se difieren en fondos del gobierno. Además, los ingresos relacionados con períodos anteriores que estuvieron disponibles durante el período actual se informan en los fondos del gobierno pero se eliminan en el estado de actividades. Este monto es el ajuste neto. | | | | (188,704) |
| Algunos gastos informados en el estado de actividades no requieren el uso de recursos financieros corrientes y, en consecuencia, no se informan como gastos en los fondos del gobierno. | | | | (2,754,800) |
| En general, el inventario y los pagos anticipados se registran como gastos en los fondos del gobierno cuando se compran en lugar de capitalizarse como un activo. Sin embargo, estos activos se capitalizan en el estado de resultados netos. Este monto es la disminución neta en los inventarios totales y gastos pagados por adelantado. | | | | (2,102) |
| Cambio en los resultados netos de las actividades del gobierno | | | | $ (1,913,164) |

Ver notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Estado de Resultados Netos - Fondos de Propiedad Exclusiva

30 de junio de 2016

(En miles)

| | Seguro por Desempleo | Loterias | Administración del Seguro de Salud de Puerto Rico | Administración de Servicios Médicos de Puerto Rico | Fondo Recurrente para el Control de la Contaminación del Agua de Puerto Rico | No Mayores de Propiedad Exclusiva | Total de Propiedad Exclusiva |
|---|---|---|---|---|---|---|---|
| | | | Actividades de Tipo Comercial - Fondos Empresariales | | | | |
| **Activos:** | | | | | | | |
| Activos corrientes: | | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | $      — | 119,785 | 67,575 | 560 | — | 56,623 | 244,543 |
| Efectivo y equivalentes al efectivo en bancos gubernamentales | — | — | 719 | — | — | — | 719 |
| Cuentas por cobrar - neto: | | | | | | | |
| Primas de seguro | — | — | — | — | — | 4,088 | 4,088 |
| Intergubernamentales | — | — | 116,597 | 2,700 | — | — | 119,297 |
| Cuentas | — | 6,205 | 61,034 | 18,924 | — | 9,625 | 95,788 |
| Intereses devengados por cobrar | — | — | 307 | — | — | 158 | 465 |
| Otros | — | — | — | 58 | — | 59 | 117 |
| Adeudado de otros fondos | — | — | — | 26,250 | — | 7,428 | 33,678 |
| Adeudado de otras entidades del gobierno | — | — | — | 1,533 | — | — | 1,533 |
| Otros activos | — | — | 21,563 | 4,078 | — | 31 | 25,672 |
| Activos restringidos: | | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | 1,090 | — | 1,321 | — | — | 18,510 | 20,921 |
| Efectivo y equivalentes al efectivo en bancos gubernamentales | — | — | — | — | 460 | 2,523 | 2,983 |
| Efectivo y equivalentes de efectivo bajo custodia del | | | | | | | |
| Tesoro de los EE. UU. | 496,906 | — | — | — | — | — | 496,906 |
| Primas de seguro | 62,384 | — | — | — | — | — | 62,384 |
| Otros | 60 | — | — | — | 131 | — | 191 |
| Intereses devengados | — | — | — | — | 14 | — | 14 |
| Préstamos de unidades de componentes | — | — | — | — | 163 | 81 | 244 |
| Total de activos corrientes | 560,440 | 125,990 | 269,116 | 54,103 | 768 | 99,126 | 1,109,543 |
| Activos no corrientes: | | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales– restringido | — | — | — | 3,337 | — | — | 3,337 |
| Cuentas por cobrar – neto: | | | | | | | |
| Préstamos de unidades de componentes – restringido | — | — | — | — | 5,506 | 2,185 | 7,691 |
| Adeudado de otros fondos | — | — | — | — | — | 7,761 | 7,761 |
| Otros | — | — | 16,772 | — | — | — | 16,772 |
| Inversiones restringidas | — | — | — | — | — | 24,545 | 24,545 |
| Otros activos restringidos | — | 20,377 | — | — | 623 | — | 21,000 |
| Tierras y otros no depreciables | — | — | — | 6,872 | — | 32,472 | 39,344 |
| Depreciables, neto | — | 1,136 | 575 | 49,410 | — | 2,705 | 53,826 |
| Activos totales | 560,440 | 147,503 | 286,463 | 113,722 | 6,897 | 168,794 | 1,283,819 |
| Salidas diferidas de recursos: | | | | | | | |
| Relacionado con pensiones | — | 14,386 | — | 121,732 | — | — | 136,118 |
| **Pasivos:** | | | | | | | |
| Pasivos corrientes: | | | | | | | |
| Cuentas a pagar y pasivos devengados | — | 11,624 | 93,945 | 42,513 | 1,054 | 7,265 | 156,401 |
| Deudas a otros fondos | 10,089 | 7,239 | — | — | — | — | 17,328 |
| Adeudado a unidades de componentes | — | — | — | 41,468 | — | — | 41,468 |
| Adeudado a otras entidades del gobierno | — | — | — | 2,120 | — | 107 | 2,227 |
| Intereses por pagar | — | — | 19,713 | 30,091 | — | 2,370 | 52,174 |
| Ingresos no devengados | 16,443 | 5,752 | — | — | — | 2,705 | 24,900 |
| Pagarés adeudados a las unidades de componentes | — | — | 62,000 | — | — | — | 62,000 |
| Ausencias compensadas | — | 653 | 500 | 9,256 | — | 1,457 | 11,866 |
| Obligación por premios no pagados de lotería | — | 70,847 | — | — | — | — | 70,847 |
| Beneficios pagaderos por rescisión voluntaria | — | 552 | 720 | — | — | 110 | 1,382 |
| Pasivos por el seguro por desempleo, invalidez y de salud | 53,288 | — | 115,961 | — | — | 802 | 170,051 |
| Otros pasivos a largo plazo | — | — | — | 71,160 | — | — | 71,160 |
| Total de pasivos corrientes | 79,820 | 96,667 | 292,839 | 196,608 | 1,054 | 14,816 | 681,804 |
| Pasivos no corrientes: | | | | | | | |
| Pagarés adeudados a las unidades de componentes | — | — | 121,251 | 282,445 | — | 20,863 | 424,559 |
| Ausencias compensadas | — | 2,607 | 320 | 5,867 | — | 1,928 | 10,722 |
| Pasivos netos de pensiones | — | 42,574 | — | 609,077 | — | — | 651,651 |
| Otra obligación de beneficios posteriores al empleo | — | — | — | 1,834 | — | — | 1,834 |
| Obligación por premios no pagados de lotería | — | 101,314 | — | — | — | — | 101,314 |
| Beneficios pagaderos por rescisión voluntaria | — | 3,807 | 3,460 | — | — | 299 | 7,566 |
| Otros pasivos a largo plazo | — | — | — | 2,300 | — | — | 2,300 |
| Total de pasivos | 79,820 | 246,969 | 417,870 | 1,098,131 | 1,054 | 37,906 | 1,881,750 |
| Entradas diferidas de recursos: Relacionando con pensiones | — | 739 | — | 10,565 | — | — | 11,304 |
| **Resultados Netos:** | | | | | | | |
| Inversión neta en activos de capital | — | 1,136 | 575 | 56,282 | — | 17,027 | 75,020 |
| Restringido para servicios de emergencia | — | — | — | — | — | 6,268 | 6,268 |
| Restringido para actividades de préstamos | — | — | — | — | 5,843 | 3,417 | 9,260 |
| Restringido por el pago de beneficios de seguro | 480,620 | — | — | — | — | 40,004 | 520,624 |
| No restringidos (déficit) | — | (86,955) | (131,982) | (929,524) | — | 64,172 | (1,084,289) |
| Resultados netos totales (déficit) | 5,480,620 | (85,819) | (131,407) | (873,242) | 5,843 | 130,888 | (473,117) |

Ver notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Estado de Ingresos, Gastos y Cambios en los Resultados Netos de Fondos - Fondos Exclusivos

Año finalizado el 30 de junio de 2016

(En miles)

| | Actividades de Tipo Comercial - Fondos Empresariales | | | | | | |
|---|---|---|---|---|---|---|---|
| | Seguro por desempleo | Loterías | Administración del Seguro de Salud de Puerto Rico | Administración de Servicios Médicos de Puerto Rico | Fondo Recurrente para el Control de la Contaminación del Agua de Puerto Rico | No Mayores de Propiedad Exclusiva | Total de Propiedad Exclusiva |
| **Ingresos operativos:** | | | | | | | |
| Administración del Seguro de Salud | $ — | — | 348,768 | — | — | — | 348,768 |
| Primas de seguros | 221,600 | — | — | — | — | 17,099 | 238,699 |
| Ventas de boletos de lotería | — | 873,664 | — | — | — | — | 873,664 |
| Servicio al paciente, neto de la provisión para deudas incobrables | — | — | — | 131,486 | — | — | 131,486 |
| Cargos del servicio telefónico de emergencias | — | — | — | — | — | 22,739 | 22,739 |
| Intereses | — | 50 | — | — | 4,188 | 1,845 | 6,033 |
| Otros | — | 50 | — | — | — | 1 | 51 |
| Ingresos operativos totales | 221,600 | 873,714 | 348,768 | 131,486 | 4,188 | 41,684 | 1,621,440 |
| **Gastos operativos:** | | | | | | | |
| Beneficios del seguro | 139,993 | — | — | — | — | 2,480 | 142,473 |
| Primas y reclamos médicos | — | — | 2,829,171 | — | — | — | 2,829,171 |
| Premios de lotería | — | 559,618 | — | — | — | — | 559,618 |
| Servicios al paciente | — | — | — | 161,436 | — | — | 161,436 |
| Generales, administrativos y otros gastos operativos | — | 94,737 | 27,745 | 96,162 | 34,649 | 85,096 | 338,389 |
| Pérdida por deterioro de préstamos por cobrar | — | — | — | — | 388,272 | 184,938 | 573,210 |
| Gastos operativos totales | 139,993 | 654,355 | 2,856,916 | 257,598 | 422,921 | 272,514 | 4,604,297 |
| Ingresos (pérdidas) operativos | 81,607 | 219,359 | (2,508,148) | (126,112) | (418,733) | (230,830) | (2,982,857) |
| **Ingresos (gastos) no operativos:** | | | | | | | |
| Subvenciones del gobierno de EE. UU. | 1,725 | — | 1,706,686 | — | 12,624 | 18,444 | 1,739,479 |
| Contribuciones a unidades de componentes | — | — | — | — | (1,857) | (1,522) | (3,379) |
| Intereses y ganancias por inversiones | 9,154 | 432 | 5,120 | — | — | 1,752 | 16,458 |
| Gastos por intereses | — | — | (11,022) | (22,378) | — | (1,440) | (34,840) |
| Otros | — | — | — | — | — | 498 | 498 |
| Ingresos no operativos totales (gastos) | 10,879 | 432 | 1,700,784 | (22,378) | 10,767 | 17,732 | 1,718,216 |
| Utilidad (pérdida) antes de transferencias | 92,486 | 219,791 | (807,364) | (148,490) | (407,966) | (213,098) | (1,264,641) |
| Transferencias de otros fondos | — | — | 892,070 | 27,770 | 2,225 | 4,084 | 926,149 |
| Transferencias a otros fondos | (45,133) | (196,147) | — | — | — | (11,611) | (252,891) |
| Cambio neto en los resultados netos | 47,353 | 23,644 | 84,706 | (120,720) | (405,741) | (220,625) | (591,383) |
| Resultados netos (déficit), comienzo del año, según ajuste (nota 4) | 433,267 | (109,463) | (216,113) | (752,522) | 411,584 | 351,513 | 118,266 |
| Resultados netos (déficit) - fin de año | $ 480,620 | (85,819) | (131,407) | (873,242) | 5,843 | 130,888 | (473,117) |

Ver notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Estado de Flujo de Efectivo – Fondos Exclusivos

Año finalizado el 30 de junio de 2016

(En miles)

| | Seguro por desempleo | Loterías | Administración del Seguro de Salud de Puerto Rico | Administración de Servicios Médicos de Puerto Rico | Fondo Recurrente de Control de Contaminación del Agua de Puerto Rico | No Mayores de Propiedad Exclusiva | Total de Propiedad Exclusiva |
|---|---|---|---|---|---|---|---|
| | | | **Actividades de Tipo Comercial - Fondos Empresariales** | | | | |
| Flujos de efectivo por actividades operativas: | | | | | | | |
| Recibos de clientes y usuarios | $ 217,309 | 871,365 | 278,750 | 117,674 | — | 37,953 | 1,523,051 |
| Otros recibos | — | 50 | 171,289 | — | — | — | 171,339 |
| Pagos a organizaciones de atención médica y terceros administradores | — | — | (2,976,506) | — | — | — | (2,976,506) |
| Pagos a proveedores | — | (84,474) | (27,584) | (17,546) | (34,415) | (64,276) | (228,295) |
| Pagos a empleados | — | (4,412) | (4,813) | (105,964) | — | (18,041) | (133,230) |
| Pagos de premios de loterías | — | (608,951) | — | — | — | — | (608,951) |
| Pagos de beneficios del seguro | (144,388) | — | — | — | — | (2,330) | (146,718) |
| Efectivo neto provisto por (utilizado en) actividades operativas | 72,921 | 173,578 | (2,558,864) | (5,836) | (34,415) | (46,694) | (2,399,310) |
| Flujos de efectivo de actividades de financiamiento no relacionadas con el capital: | | | | | | | |
| Subvenciones del gobierno de EE. UU. | 1,725 | — | 1,706,686 | — | 12,625 | 18,444 | 1,739,480 |
| Contribuciones a unidades de componentes | — | — | — | — | (1,857) | (1,522) | (3,379) |
| Anticipos de la línea de crédito | — | — | (27) | (5,432) | — | 1,763 | 1,763 |
| Intereses pagados | — | — | — | — | — | (5,459) | (5,459) |
| Transferencias de otros fondos | — | — | 885,000 | 14,076 | 2,225 | 7,196 | 908,497 |
| Transferencias a otros fondos | (43,537) | (185,032) | — | — | — | (11,604) | (240,173) |
| Efectivo neto provisto por (utilizado en) actividades no relacionadas con el capital y actividades relacionadas de financiamiento | (41,812) | (185,032) | 2,591,659 | 8,644 | 12,993 | 14,277 | 2,400,729 |
| Flujos de efectivo de capital y actividades financieras relacionadas: | | | | | | | |
| Transferencias de otros fondos | — | — | 7,070 | — | — | — | 7,070 |
| Adelantos a otros fondos | — | — | — | — | — | (1,366) | (1,366) |
| Gastos de capital | — | (169) | (88) | (1,831) | — | (181) | (2,269) |
| Efectivo neto provisto por (utilizado) por capital y otras actividades relacionadas de financiamiento | — | (169) | 6,982 | (1,831) | — | (1,547) | 3,435 |
| Flujos de efectivo de actividades de inversión: | | | | | | | |
| Intereses cobrados por depósitos, inversiones y préstamos | 9,153 | 432 | 4,873 | — | 7,786 | 13,134 | 35,378 |
| Préstamos originados | — | — | — | — | (26,634) | (24,853) | (51,487) |
| Capital cobrado en préstamos | — | — | — | — | 17,700 | 8,158 | 25,858 |
| Ganancias por ventas y vencimientos de inversiones | — | — | 6,512 | — | — | 13,822 | 20,334 |
| Compras de inversiones | — | — | — | — | — | (7,452) | (7,452) |
| Efectivo neto provisto por (utilizado en) actividades de inversión | 9,153 | 432 | 11,385 | — | (1,148) | 2,809 | 22,631 |
| Cambio neto del efectivo y equivalentes de efectivo | 40,262 | (11,191) | 51,162 | 977 | (22,570) | (31,155) | 27,485 |
| Efectivo y equivalentes de efectivo al comienzo del año, reformulado (nota 4) | 457,734 | 130,976 | 18,453 | 2,920 | 23,030 | 108,811 | 741,924 |
| Efectivo y equivalentes de efectivo al fin del año, reformulado (nota 4) | $ 497,996 | 119,785 | 69,615 | 3,897 | 460 | 77,656 | 769,409 |
| Conciliación del ingreso (pérdida) operativo con el efectivo neto provisto por (utilizado en) las actividades operativas: | | | | | | | |
| Ingresos operativos (pérdidas) | $ 81,607 | 219,359 | (2,508,148) | (126,112) | (418,733) | (230,830) | (2,982,857) |
| Ajustes para conciliar el ingreso (pérdida) operativo con el efectivo neto provisto por (utilizado en) las actividades operativas: | | | | | | | |
| Intereses devengados por depósitos, préstamos e inversiones | — | — | — | — | (4,188) | (1,846) | (6,034) |
| Depreciación | — | 128 | 214 | 5,054 | — | 854 | 6,250 |
| Provisión para deudas incobrables | — | — | — | 16,223 | — | 10 | 16,233 |
| Pérdida por disposición de activos de capital | — | — | — | (92) | — | — | (92) |
| Pérdida por deterioro de préstamos por cobrar | — | — | — | — | 388,272 | 184,938 | 573,210 |
| Cambios en los activos y pasivos operativos: | | | | | | | |
| Disminución (aumento) de cuentas y préstamos por cobrar | (8,280) | (2,225) | 101,270 | (14,492) | — | (1,829) | 74,444 |
| Aumento en las deudas de unidades de componentes | — | — | — | 1,446 | — | — | 1,446 |
| Reducción en las deudas de otras entidades del gobierno | — | — | — | (734) | — | — | (734) |
| Reducción (aumento) en otros activos | — | 2,761 | 1,057 | (32) | — | 17 | 3,803 |
| Aumento en la salida diferida de recursos (45,190) | — | (9,320) | — | (35,870) | — | — | |
| Aumento (disminución) en cuentas por pagar y pasivos devengados | — | 2,568 | (29,067) | 25,122 | 234 | 1,824 | 681 |
| Aumento en las deudas a unidades de componentes | — | — | — | 9,182 | — | — | 9,182 |
| Aumento (reducción) en las deudas a otras entidades del gobierno | — | — | — | (432) | — | (1) | (433) |
| Aumento en ingresos no obtenidos | 3,989 | (2,835) | — | — | — | (56) | 1,098 |
| Aumento (reducción) en ausencias compensadas | — | 129 | (3) | 2,617 | — | 233 | 2,976 |
| Aumento en la entrada diferida de recursos | — | 547 | — | 7,380 | — | — | 7,927 |
| Aumento en los pasivos de préstamos netas | — | 12,221 | — | 104,904 | — | — | 117,125 |
| Aumento en las obligaciones de premios de lotería no pagados | — | (49,333) | — | — | — | — | (49,333) |
| Reducción en los beneficios a pagar por rescisión voluntaria | — | (422) | 5 | — | — | (159) | (576) |
| Reducción en los pasivos por el seguro por desempleo, discapacidad y salud | (4,395) | — | (124,192) | — | — | 151 | (128,436) |
| Ajustes totales | (8,686) | (45,781) | (50,716) | 120,276 | 384,318 | 184,136 | 583,547 |
| Efectivo neto provisto por (utilizado en) actividades operativas | $ 72,921 | 173,578 | (2,558,864) | (5,836) | (34,415) | (46,694) | (2,399,310) |
| Capital no monetario y actividades de financiamiento: | | | | | | | |
| Retiro de activos de capital | $ — | — | 932 | 187 | — | — | 1,119 |

Ver notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Estado de Resultados Netos Fiduciarios - Fondos Fiduciarios

30 de junio de 2016

(En miles)

| | Fondo de pensión (y otros beneficios del empleado) | Agencia |
|---|---|---|
| **Activos:** | | |
| Efectivo y equivalentes al efectivo en bancos comerciales: | | |
| No restringido | $ 314,736 | 664,397 |
| Restringido | 139,136 | — |
| Efectivo y equivalentes al efectivo en bancos gubernamentales: | | |
| No restringido | 165,435 | 897 |
| Restringido | 48,611 | — |
| Cuentas por cobrar - neto: | | |
| Patronos - neto | 258,801 | — |
| Intereses y dividendos devengados | 8,536 | — |
| Inversiones vendidas | 988 | — |
| Otros | 29,322 | — |
| Garantía de transacciones de préstamos de valores | 21,592 | — |
| Inversiones a valor de mercado: | | |
| Bonos y pagarés | 466,893 | — |
| Fondos de fideicomisos mixtos no cotizados en bolsa | 729,821 | — |
| Acciones | 23,333 | — |
| Inversiones en asociaciones limitadas | 53,035 | — |
| Préstamos a miembros e intereses por cobrar - netos | 964,071 | — |
| Activos de capital - neto | 25,675 | — |
| Otros activos | 1,147 | — |
| Total activos | 3,251,132 | 665,294 |
| **Pasivos:** | | |
| Cuentas a pagar y pasivos devengados | 119,810 | 665,294 |
| Intereses por pagar | 14,094 | — |
| Cuentas a paga por títulos comprados de inversiones | 1,821 | — |
| Obligaciones de préstamos de títulos | 21,592 | — |
| Adeudado al Estado Libre Asociado de Puerto Rico | 102,789 | — |
| Otros pasivos | 191,724 | — |
| Bonos a pagar | 3,134,902 | — |
| Pasivos totales | 3,586,732 | 665,294 |
| **Resultados Netos:** | | |
| Restringidos para pensiones a ser provistos por SRM | 895,455 | — |
| Restringidos para pensiones a ser provistos por IRS | 34,830 | — |
| No restringidos (déficit) del SRE | (1,265,885) | — |
| Resultados netos totales (déficit) | $ (335,600) | — |

Ver notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Estado de Cambios en los Resultados Netos Fiduciarios - Fondos Fiduciarios de Pensiones

Año Finalizado el 30 de junio de 2016

(En miles)

| | | |
|---|---|---:|
| Agregados: | | |
| Contribuciones: | | |
| Contribuciones del empleador: | | |
| Beneficios básicos, netos de provisiones para la asignación de $233,615 | $ | 741,654 |
| Beneficios especiales | | 398,296 |
| Contribuciones de los miembros | | 438,184 |
| Contribuciones totales | | 1,578,134 |
| Ingresos por inversiones y gastos en inversiones: | | |
| Apreciación neta en el valor razonable de las inversiones | | 3,743 |
| Intereses | | 103,874 |
| Dividendos | | 1,147 |
| Gastos de inversión, que no sean préstamos de títulos | | (3,851) |
| Ingresos netos de inversión, que no sean préstamos de títulos | | 104,913 |
| Ingresos por préstamos de títulos | | 178 |
| Gastos de préstamos de títulos | | (16) |
| Ingresos netos de préstamos de títulos | | 162 |
| Ingresos netos de inversiones | | 105,075 |
| Otros ingresos | | 54,157 |
| Total de agregados | | 1,737,366 |
| Descuentos: | | |
| Beneficios pagados a los participantes | | 2,425,781 |
| Reembolsos de contribuciones | | 49,127 |
| Intereses sobre bonos a pagar | | 196,211 |
| Gastos generales y administrativos | | 75,267 |
| Otros gastos | | 9,561 |
| Total de descuentos | | 2,755,947 |
| Reducción neta en los resultados netos | | (1,018,581) |
| Resultados netos: | | |
| Comienzo del año | | 682,981 |
| Fin del año | $ | (335,600) |

Ver notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Estado Combinado de Resultados Netos – Unidades de Componentes de Presentación Discreta

30 de junio de 2016

(En miles)

| | Banco de Desarrollo del Gobierno de Puerto Rico | Autoridad de Carreteras y Transportación de Puerto Rico | Autoridad de Energía Eléctrica de Puerto Rico | Autoridad de Acueductos y Alcantarillas de Puerto Rico | Universidad de Puerto Rico | Corporación de Fondos de Seguros del Estado Fidçciarios | Total de Unidades de Componentes Mayores | Total de Unidades de Componentes No Mayores | Totales de Unidades de Todos los Componentes |
|---|---|---|---|---|---|---|---|---|---|
| **Activos:** | | | | | | | | | |
| Efectivo y equivalentes de efectivo en bancos comerciales | $ 140,540 | 11,581 | 307,346 | 106,079 | 197,475 | 368,736 | 1,131,757 | 279,673 | 1,411,430 |
| Efectivo y equivalentes al efectivo en bancos gubernamentales | — | 1,525 | — | — | — | — | 1,525 | 47,189 | 48,714 |
| Inversiones | 76,250 | — | — | — | 2,632 | 631,434 | 710,316 | 475,034 | 1,185,350 |
| Garantía de transacciones de préstamos de valores | — | — | — | — | — | 38,436 | 38,436 | — | 38,436 |
| Cuentas por cobrar - neto: | | | | | | | | | |
| Primas de seguros | — | — | — | — | — | 37,663 | 37,663 | 1,733 | 39,396 |
| Intergubernamental | — | 23,187 | 6,144 | 18,519 | 33,924 | — | 81,774 | 35,303 | 117,077 |
| Cuentas | — | 9,551 | 339,456 | 157,285 | 25,655 | — | 531,947 | 86,908 | 618,855 |
| Préstamos y adelantos | 2,816,065 | — | — | — | 6,232 | 100,000 | 2,922,297 | 261,594 | 3,183,891 |
| Interés devengado | 125,580 | 1,296 | 2,048 | — | 1,543 | — | 130,467 | 7,424 | 137,891 |
| Otros | 12,961 | — | 15,588 | 176 | 1,098 | 6,629 | 36,452 | 5,739 | 42,191 |
| Adeudado de - neto: | | | | | | | | | |
| Gobierno primario | — | 13,196 | 87,827 | 17,407 | 4,955 | 5,976 | 129,361 | 60,415 | 189,776 |
| Unidades de componentes | 388,042 | — | 90,606 | 4,983 | 5,192 | — | 488,823 | 30,904 | 519,727 |
| Otras entidades del gobierno | — | — | 417,711 | 1,803 | 11,854 | — | 431,368 | 29,492 | 460,860 |
| Inventarios | — | — | 175,599 | 27,800 | 3,272 | 4,255 | 210,926 | 17,183 | 228,109 |
| Gastos pagados por adelantado | 1,147 | 6,172 | 19,783 | 4,346 | 4,425 | 31 | 34,757 | 22,810 | 57,567 |
| Otros activos | — | 889 | — | — | — | — | 2,036 | 22,952 | 24,988 |
| Activos restringidos: | | | | | | | | | |
| Efectivo y equivalentes de efectivo en bancos comerciales | 113,871 | 1,548 | 127,328 | 241,094 | 8,861 | — | 492,702 | 36,568 | 529,270 |
| Efectivo y equivalentes al efectivo en bancos gubernamentales | — | — | — | 4,625 | 500 | — | 5,125 | 5,248 | 10,373 |
| Inversiones | 225,051 | 400,427 | — | — | 256,686 | — | 882,164 | 1,071,449 | 1,953,613 |
| Otros activos restringidos | 8,478 | — | — | — | — | — | 8,478 | 53,878 | 62,356 |
| Bienes inmuebles mantenidos para la venta o desarrollo futuro | 61,957 | — | — | — | — | — | 61,957 | 181,048 | 243,005 |
| Activos de capital: | | | | | | | | | |
| Terrenos y otros activos no depreciables | 25,825 | 2,261,570 | 627,560 | 484,185 | 58,000 | 46,131 | 3,503,271 | 1,274,483 | 4,777,754 |
| Depreciables - neto | 2,198 | 8,045,297 | 6,074,650 | 6,776,601 | 848,591 | 74,850 | 21,822,187 | 2,070,987 | 23,893,174 |
| Activos totales | 3,997,965 | 10,776,239 | 8,291,646 | 7,844,903 | 1,469,352 | 1,315,684 | 33,695,789 | 6,078,014 | 39,773,803 |
| Salidas diferidas de recursos: | | | | | | | | | |
| Disminución acumulada del valor razonable de derivados de cobertura | — | — | 68,910 | — | — | — | 68,910 | — | 68,910 |
| Pérdida por reembolso de bonos | 2,376 | 104,284 | 48,423 | 27,452 | 2,225 | — | 184,760 | 16,929 | 201,689 |
| Relacionado con pensiones | — | — | 1,181,691 | — | 102,379 | 79,027 | 1,363,097 | 72,035 | 1,435,132 |
| Entradas diferidas de recursos: | 2,376 | 104,284 | 1,299,024 | 27,452 | 104,604 | 79,027 | 1,616,767 | 88,964 | 1,705,731 |

(Continuaci

**ELA DE PUERTO RICO**

Estado Combinado de Resultados Netos – Unidades de Componentes de Presentación Discreta

30 de junio de 2016

(En miles)

| | Unidades de componentes principales | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Banco de Desarrollo del Gobierno de Puerto Rico | Autoridad de Carreteras y Transportación de Puerto Rico | Autoridad de Energía Eléctrica de Puerto Rico | Autoridad de Acueductos y Alcantarillas de Puerto Rico | Universidad de Puerto Rico | Corporación de Fondos de Seguros del Estado | Total de Unidades de Componentes Mayores | Total de Unidades de Componentes No Mayores | Totales de Unidades de Todos los Componentes |
| **Pasivos:** | | | | | | | | | |
| Cuentas a pagar y pasivos devengados | $ 89,850 | 113,923 | 1,077,838 | 356,061 | 71,372 | 86,276 | 1,795,320 | 356,023 | 2,151,343 |
| Depósitos y pasivos en custodia | 3,419,482 | — | 191,436 | 86,393 | — | — | 3,697,311 | 257,831 | 3,955,142 |
| Adeudado a: | | | | | | | | | |
| Gobierno primario | 1,418 | 9,945 | — | 580,012 | 1,537 | 19,834 | 612,746 | 113,393 | 726,139 |
| Unidades de componentes | — | 1,992,013 | 39,299 | 105,405 | 102,983 | — | 2,239,700 | 1,250,772 | 3,490,472 |
| Otras entidades del gobierno | — | — | — | — | 15,424 | 7,290 | 22,714 | 129,041 | 151,755 |
| Obligaciones de préstamo de valores y acuerdos de recompra inversa | | | | | | 38,436 | 38,436 | — | 38,436 |
| Intereses por pagar | 33,355 | 430,605 | 10,493 | 135,252 | — | — | 609,705 | 115,768 | 725,473 |
| Ingresos no devengados | 3,459 | — | 12,351 | 20,199 | — | 18,525 | 54,534 | 64,883 | 119,417 |
| Pasivos pagaderos dentro de un año: | | | | | | | | | |
| Bonos de asignación del ELA | 84 | — | — | 13,251 | — | — | 13,335 | 5,761 | 19,096 |
| Bonos de ingresos | 38,595 | 117,940 | 240,320 | 58,291 | 23,280 | — | 478,426 | 108,425 | 586,851 |
| Pagarés adeudados a instituciones financieras | 669,195 | — | 698,683 | 4,153 | 452 | 5,966 | 1,378,449 | 42,875 | 1,421,324 |
| Arrendamientos de capital | — | — | — | — | — | 938 | 938 | 339 | 1,277 |
| Ausencias compensadas | — | 9,583 | 68,632 | 11,548 | 27,816 | 4,480 | 122,059 | 36,531 | 158,590 |
| Beneficios de rescisión voluntaria | — | 8,487 | — | — | — | — | 8,487 | 15,519 | 24,006 |
| Pasivos por el seguro de accidentes automovilísticos y compensación del trabajador | — | — | — | — | — | 727,998 | 727,998 | 67,362 | 795,360 |
| Otros pasivos a largo plazo | 7,669 | 19,356 | — | 6,883 | 2,494 | 48,112 | 84,514 | 11,178 | 95,692 |
| Pasivos pagaderos después de un año: | | | | | | | | | |
| Bonos de asignación del ELA | 3,250 | — | — | 403,069 | — | — | 406,319 | 103,053 | 509,372 |
| Bonos de ingresos | 113,202 | 4,222,119 | 8,126,433 | 3,971,812 | 492,892 | — | 16,926,458 | 1,296,938 | 18,223,396 |
| Pagarés adeudados a instituciones financieras | 3,170,708 | — | 16,886 | — | 261 | 9,379 | 3,197,234 | 380,873 | 3,578,107 |
| Arrendamientos de capital | — | — | — | — | — | 26,729 | 26,729 | 941 | 27,670 |
| Ausencias compensadas | — | 15,662 | 98,291 | 31,886 | 127,755 | 30,398 | 303,992 | 20,045 | 324,037 |
| Obligación de pensiones netas | — | — | — | — | — | — | — | 18,240 | 18,240 |
| Pasivos netos de pensiones | — | — | 3,603,802 | — | 1,796,727 | 1,417,963 | 6,818,492 | 588,170 | 7,406,662 |
| Instrumentos derivados de cobertura - intercambios de tasas de interés | — | — | 68,910 | — | — | — | 68,910 | — | 68,910 |
| Beneficios de rescisión voluntaria | — | 61,373 | — | — | — | — | 61,373 | 74,260 | 135,633 |
| Otros pasivos a largo plazo | 183,785 | 107,648 | 117,053 | 33,652 | 117,465 | 58,407 | 618,010 | 83,465 | 701,475 |
| Pasivos totales | 7,734,052 | 7,108,654 | 14,370,427 | 5,817,867 | 2,780,458 | 2,500,731 | 40,312,189 | 5,141,686 | 45,453,875 |
| Entradas diferidas de recursos: | | | | | | | | | |
| Acuerdos de concesión de servicio | — | 1,201,986 | — | — | — | — | 1,201,986 | 694,734 | 1,896,720 |
| Relacionado con pensiones | — | — | 58,309 | — | 301,418 | 11,347 | 371,074 | 5,677 | 376,751 |
| Entradas totales diferidas de recursos | — | 1,201,986 | 58,309 | — | 301,418 | 11,347 | 1,573,060 | 700,411 | 2,273,471 |
| **Resultados netos:** | | | | | | | | | |
| Inversión neta en activos de capital | 19,383 | 2,810,878 | (1,328,918) | 2,442,040 | 393,762 | 77,968 | 4,415,113 | 1,822,760 | 6,237,873 |
| Restringido para: | | | | | | | | | |
| Proyectos de capital | — | 12,076 | — | — | 10,960 | — | 23,036 | 229,599 | 252,635 |
| Servicio de la deuda | 22,511 | 300,813 | — | — | 56,210 | — | 379,534 | 134,516 | 514,050 |
| Programas de vivienda accesible y seguros de préstamos relacionados | 112,599 | — | — | — | — | — | 112,599 | — | 112,599 |
| Préstamos estudiantiles y otros propósitos educativos | — | — | — | — | 101,453 | — | 101,453 | 5,798 | 107,251 |
| Otro | — | — | — | 5,364 | 13,793 | — | 19,157 | 154,543 | 173,700 |
| No restringido (déficit) | (3,888,204) | (553,884) | (3,509,148) | (392,916) | (2,084,098) | (1,195,335) | (11,623,585) | (2,022,335) | (13,645,920) |
| Resultados netos totales (déficit) | $ (3,733,711) | 2,569,883 | (4,838,066) | 2,054,488 | (1,507,920) | (1,117,367) | (6,572,693) | 324,881 | (6,247,812) |

Ver notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Combinación del Estado de Actividades: Unidades de Componentes de Presentación Discreta

Año Finalizado el 30 de junio de 2016

(En miles)

| | Gastos | Ingresos del programa | | | Ingreso netos (gastos) y cambios en los resultados netos | Ingresos generales | | | | | | Resultados Netos (déficit) - Comienzo del año, según el informe anterior | Corrección de errores y adopción de nuevos pronunciamientos (nota 4) | Resultados Netos (déficit) - Comienzo del año, según ajuste y reformulación | Resultados netos (déficit) - fin de año |
| | | Cargos por servicios | Subsidios y contribuciones operativas | Subsidios y contribuciones de capital | | Pagos del (al) gobierno primario | Pagos de (a) otras unidades de componentes | Subsidios y contribuciones no restringidas a programas específicos | Ganancias por intereses e inversiones | Impuestos a las ventas y otros impuestos | Cambios en los resultados netos | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unidades de componentes mayores: | | | | | | | | | | | | | | | |
| Banco Gubernamental de Fomento para Puerto Rico | $ 386,086 | 356,614 | 184,521 | — | 155,049 | — | — | — | — | — | 155,049 | (3,888,760) | — | (3,888,760) | (3,733,711) |
| Autoridad de Carreteras y Transportación de Puerto Rico | 994,632 | 258,555 | 24,416 | 126,001 | (585,660) | 108,215 | — | — | 20,699 | 189 | (456,557) | 3,026,440 | — | 3,026,440 | 2,569,883 |
| Autoridad de Energía Eléctrica de Puerto Rico | 4,301,816 | 2,994,993 | — | 8,243 | (1,298,680) | — | (5,800) | — | 44,315 | — | (1,260,165) | (4,054,940) | 477,039 | (3,577,901) | (4,838,066) |
| Autoridad de Acueductos y Alcantarillas de Puerto Rico | 1,245,245 | 978,718 | — | 18,257 | (248,270) | — | — | — | 3,372 | 6,482 | (238,416) | 2,292,904 | — | 2,292,904 | 2,054,488 |
| Universidad de Puerto Rico | 1,280,432 | 185,113 | 288,169 | — | (807,150) | 870,132 | 62,371 | — | 5,873 | 9,966 | 141,192 | (1,649,112) | — | (1,649,112) | (1,507,920) |
| Corporación del Fondo del Seguro del Estado | 568,010 | 538,431 | — | — | (29,579) | (137,407) | — | — | — | 38 | (186,948) | (930,419) | — | (930,419) | (1,117,367) |
| Unidades de componentes no mayores | 1,974,380 | 733,897 | 273,307 | 21,490 | (945,686) | 215,474 | (56,571) | 4,611 | 61,343 | 116,265 | (604,564) | 1,052,254 | (122,809) | 929,445 | 324,881 |
| | $ 10,750,601 | 6,046,221 | 770,413 | 173,991 | (3,759,976) | 1,036,414 | — | 4,611 | 135,602 | 132,940 | (2,450,409) | (4,151,633) | 354,230 | (3,797,403) | (6,247,812) |

Ver notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

**(1) Resumen de las Principales Políticas Contables**

El Estado Libre Asociado de Puerto Rico (el ELA) fue constituido el 25 de julio de 1952, conforme a las disposiciones de la Constitución del ELA, aprobada por el pueblo de Puerto Rico y el Congreso de los EE. UU. La Constitución del ELA establece la separación de poderes de la rama ejecutiva, legislativa y judicial del gobierno. El ELA asume la responsabilidad del gobierno general, la seguridad pública, la salud, la vivienda pública y el bienestar, la educación y el desarrollo económico. Sin embargo, recientemente, como resultado de la actual crisis fiscal que afecta al ELA (como se describe más adelante en la Nota 2 y la Nota 3), el Congreso de los Estados Unidos promulgó una ley que establece una Junta de Supervisión con amplios poderes para ejercer el presupuesto y los controles financieros sobre los asuntos fiscales del ELA, y revisión y aprobación sobre ciertas responsabilidades gubernamentales. Esta ley se conoce como la "Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico" (PROMESA).

Los estados financieros básicos adjuntos del ELA se presentan de conformidad con los Principios Contables Generalmente Aceptados de los EE. UU. (GAAP de EE. UU.) para los gobiernos según las indicaciones de la Junta de Estándares Contables del Gobierno (GASB).

Los estados financieros básicos adjuntos presentan la posición financiera del ELA y sus diversos fondos y unidades de componentes, los resultados de las operaciones del ELA y sus diversos fondos y unidades de componentes, y los flujos de efectivo de los fondos de propiedad exclusiva.

*(a) Entidad de Informes Financieros*

Tal como lo requieren las GAAP de los EE. UU., la entidad de informes financieros del ELA incluye todos los departamentos, agencias, fondos, funciones y corporaciones públicas que se ha determinado que cumplen con los requisitos para su inclusión en la entidad de informes financieros del ELA. El ELA ha considerado todas las unidades de componentes potenciales de las que es financieramente responsable y otras organizaciones cuya naturaleza y significado de su relación con el ELA es tal que la exclusión causaría que los estados financieros básicos del ELA sean engañosos o incompletos. La GASB ha establecido criterios para su consideración al determinar la responsabilidad financiera. Estos criterios incluyen cuando el ELA designa una mayoría con derecho a voto del órgano de gobierno de una organización y tiene (i) la capacidad de imponer su voluntad a esa organización o (ii) la posibilidad de que la organización brinde beneficios financieros específicos o imponga cargas sobre el ELA. En situaciones donde el ELA no ha designado a la mayoría con derecho a voto del órgano de gobierno de una organización, la GASB ha proporcionado, como criterio para la rendición de cuentas financiera, la dependencia fiscal de dichas organizaciones del ELA y cuándo existe la posibilidad de que la organización brinde beneficios financieros específicos o imponer cargas financieras específicas al ELA.

*(b) Unidades de Componentes*

Los estados financieros de las unidades de componentes que se analizan a continuación se han incluido en la entidad de información financiera como unidades de componentes combinadas o como unidades componentes de presentación discreta de acuerdo con las Declaraciones Estados de GASB Núm. 14, *Entidad de Información Financiera*, según enmienda por las Declaraciones de GASB Núm. 39, *Determinar si ciertas organizaciones son unidades de componentes, una enmienda de la Declaración de GASB Núm. 14* y Núm.

50

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

61, *Entidad de Información Financiera: Ómnibus—una enmienda de las Declaraciones de GASB Núm. 14 y Núm. 34.*

*(i)   Unidades Mixtas de Componentes*

Las siguientes entidades, aunque están legalmente separadas del ELA, cumplen con los criterios de combinación que se informarán como parte del Gobierno Primario de la siguiente manera:

*Agencia Fiscal Rico y Autoridad de Asesoramiento Financiero (AAFAF) de Puerto Rico:* el 6 de abril de 2016, se aprobó la Ley Núm. 21 (Ley Núm. 21) creando la AAFAF como una corporación pública independiente y una instrumentalidad gubernamental con existencia legal separada, autonomía fiscal y administrativa e independencia del ELA. La AAFAF se creó con el propósito de actuar como agente fiscal, asesor financiero y agente de informes del Gobierno de Puerto Rico, sus agencias, organismos, subdivisiones, corporaciones públicas o municipios, y para ayudar a dichas entidades a enfrentar la emergencia fiscal y económica. que Puerto Rico está experimentando. La AAFAF asumió las responsabilidades de agencia fiscal y asesoría financiera que anteriormente tenía el Banco de Desarrollo del Gobierno (BGF). El 18 de enero de 2017, el Gobernador promulgó la Ley de habilitación de la Agencia Fiscal y la Autoridad de Asesoramiento Financiero, Ley Núm. 2 de 2017. Esta nueva ley modificó y reemplazó secciones de la ley anterior que estableció la AAFAF. La Ley Núm. 2 de 2017 amplió los poderes de la AAFAF para incluir, entre otras cosas, la responsabilidad exclusiva de renegociar, reestructurar o llegar a un acuerdo con los acreedores sobre todo o parte de la deuda pública o cualquier otra deuda emitida por cualquier entidad del gobierno. Además, la AAFAF es la entidad a cargo de los esfuerzos de colaboración, comunicación y cooperación entre el Gobierno de Puerto Rico y la Junta de Supervisión, creada bajo la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico, Ley Pública 114-187 (PROMESA).

La Junta de Directores de AAFAF estaba compuesta inicialmente por un solo miembro designado por el Gobernador, pero tras la promulgación de la Ley Núm. 2 de 2017, la Junta ahora está compuesta por cinco miembros:
(1) El Director Ejecutivo de la AAFAF designado por el Gobernador, (2) un representante del Senado de Puerto Rico, y (3) un representante de la Cámara de Representantes de Puerto Rico que será designado por el Presidente de cada Cuerpo Legislativo, y (4) dos miembros nombrados por el Gobernador. Los miembros solo pueden ser reemplazados o removidos por la entidad que los nombró. Los miembros de la Junta Directiva seleccionarán un Presidente, un Vicepresidente y un Secretario entre ellos. La AAFAF no tiene autoridad legal para emitir bonos, pagarés o cualquier otro instrumento de deuda; sin embargo, será el principal asesor financiero en futuras emisiones de deuda de cualquier instrumentalidad del ELA. El presupuesto de la AAFAF será asignado por la Asamblea Legislativa y se originará en el Fondo General, asignaciones especiales o cualquier otro ingreso identificado.

*Autoridad de Puertos de Ponce (PPA):* el 12 de diciembre de 2011, se aprobó la Ley Núm. 240 (Ley Núm. 240) que crea la PPA, una unidad de componente del ELA, con una junta de siete miembros que debe estar compuesta por el Secretario de Desarrollo Económico y Comercio, el director del Puerto de Ponce, tres miembros que serán nombrados por el Gobernador con el consentimiento del Senado y dos miembros que serán nombrados por el alcalde de Ponce con el consentimiento de la asamblea legislativa de Ponce. La PPA se creó para continuar con el desarrollo de la terminal de contenedores que antes realizaba la Autoridad del Puerto de las Américas (PAA) y manejar las operaciones futuras de dichas instalaciones; por lo tanto, todos los activos, derechos y deberes de PAA (con la excepción de su deuda existente) serían transferidos a la PPA. A partir del año fiscal 2015, se formó la junta de la PPA y comenzaran las operaciones; aunque los

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

activos de la PAA no se transfirieron hasta el 30 de junio de 2016. El 19 de diciembre de 2013, se aprobó la Ley Núm. 156 para enmendar la Ley Núm. 240, entre otras cosas, para autorizar a la PPA a solicitar una línea de crédito de hasta $60 millones al BGF para comenzar a financiar las operaciones para las cuales fue creada y para establecer que para el año fiscal efectivo 2015, el servicio de dicha deuda se realice mediante las asignaciones legislativas anuales del ELA. Como el total de la deuda pendiente de la PPA al 30 de junio de 2015 se paga mediante las asignaciones legislativas del ELA, los estados financieros de la PPA se combinaron con los estados financieros de los fondos del ELA como un fondo empresarial efectivo a partir del 1 de julio de 2015.

*Autoridad del Puerto de las Américas (PAA):* la PAA está gobernada por una junta de once miembros que incluye al Secretario del Departamento de Transporte y Obras Públicas (DTPW), el Secretario de Desarrollo Económico y Comercio, el Director Ejecutivo de PRIDCO, los Alcaldes de los municipios de Ponce, Peñuelas y Guayanilla y cinco ciudadanos privados designados por el Gobernador con el consentimiento del Senado. El objetivo principal de la PAA fue la planificación, desarrollo y construcción de una terminal de contenedores a gran escala en la ciudad de Ponce, Puerto Rico. El ELA en general brindó apoyo financiero a la PAA mediante asignaciones legislativas, y su deuda corriente actual está garantizada por el ELA de acuerdo con las disposiciones de la Ley Núm. 409 del 22 de septiembre de 2004 (Ley Núm. 409 de 2004). Con el comienzo de las operaciones de la PPA en el año fiscal 2015, como se describe en el párrafo anterior, las operaciones de la PAA se han limitado al procesamiento de los requisitos legales restantes resultantes después de la transferencia de todos los derechos y deberes a la PPA. Dichos requisitos legales consisten principalmente en pagar la deuda a largo plazo de la PAA. La Ley Núm. 49 de 2004 también establece que el ELA debe asignar fondos anualmente en su presupuesto operativo general para el pago del capital y los intereses de dicha deuda, que es la deuda total pendiente. En consecuencia, los estados financieros de la PAA se combinaron con los estados financieros de los fondos del ELA Commonwealth como un fondo especial de ingresos y un fondo de servicio de la deuda a partir del 1 de julio de 2015.

*Autoridad de Edificios Públicos (AEP):* la AEP está gobernada por una junta de siete miembros compuesta por el Secretario del DTPW, el Secretario del Departamento de Educación del ELA, el Presidente del BGF y cuatro miembros nombrados por el Gobernador de Puerto Rico con el consejo y consentimiento del Senado. Conforme a las disposiciones de la Ley Núm. 2 de 2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF a partir del 18 de enero de 2017. La AEP es una entidad legalmente separada, cuyas actividades se combinan dentro del Gobierno Primario porque existe con el propósito de construir, comprar o arrendar oficinas, escuelas, centros de salud, correccionales, bienestar social y otras instalaciones para arrendar a los departamentos, unidades de componentes y organismos del ELA. Los bonos emitidos por la AEP para financiar tales instalaciones son pagaderos a partir del pago de alquileres de ciertas instalaciones del gobierno arrendadas por la AEP y están respaldados por una garantía del ELA. Por lo tanto, los estados financieros de la AEP se combinan en los estados financieros de los fondos del ELA como un fondo especial de ingresos, servicio de la deuda y proyecto de capital.

*Administración de Seguros de Salud de Puerto Rico (PRHIA):* la PRHIA está gobernada por una junta directiva que, por ley, está compuesta por once miembros (seis miembros obligatorios y cinco miembros optativos). Los miembros obligatorios son el Secretario de Salud del ELA, el Secretario de Hacienda del ELA, el Director de la Oficina de Gerencia y Presupuesto del ELA (OGP), el Presidente del BGF, el Comisionado

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

de Seguros de Puerto Rico, y el Administrador de la Administración de Servicios de Salud Mental y Adicciones. Los cinco miembros opcionales son nombrados por el Gobernador, con el consejo y consentimiento del Senado. El Gobernador designa al presidente de la junta directiva y todos los miembros opcionales de la junta son ejecutivos en una posición de confianza. Conforme a las disposiciones de la Ley Núm. 2 de 2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF a partir del 18 de enero de 2017. La PRHIA se creó para implementar, administrar y negociar un sistema de seguros de salud mediante contratos con reaseguradores de seguros para proporcionar atención médica y hospitalaria de calidad a personas de bajos ingresos (a través del programa Medicaid administrado y financiado por los Centros de Servicios de Medicare y Medicaid a través de un memorando de entendimiento con el Departamento de Salud); y también a los empleados del ELA, municipios y policías que se suscriben voluntariamente al plan médico de seguros de salud de Puerto Rico a cambio de una tarifa que ellos pagan mediante deducciones de nómina. La PRHIA también recupera sus costos operativos a través de los cargos realizados a los municipios y un programa de reembolso con farmacias donde la PRHIA retiene el 100% de los ingresos derivados de este programa. Desde 2015, el ELA debería asignar fondos anualmente de su presupuesto operativo general para proporcionar el pago del capital y los intereses de la línea de crédito de la PRHIA, que es la deuda total pendiente de la PRHIA. Por lo tanto, los estados financieros de la PRHIA se combinan con los estados financieros de los fondos del ELA como un fondo empresarial efectivo a partir del 1 de julio de 2015.

*Autoridad de Financiamiento de la Infraestructura de Puerto Rico (PRIFA)*: la PRIFA está gobernada por una junta de siete miembros compuesta por cinco miembros nombrados por la junta de directores del BGF, el Secretario de Hacienda del ELA y un miembro designado por el Gobernador. Conforme a las disposiciones de la Ley Núm. 2 de 2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF a partir del 18 de enero de 2017. Los miembros de la junta de directores de la PRIFA son ejecutivos en puestos de confianza, nombrados y supervisados por el Gobernador. El Presidente es designado por el Gobernador entre sus miembros. La PRIFA es una autoridad financiera cuyas responsabilidades son proporcionar asistencia financiera, administrativa, de consultoría, técnica, asesoría y de otro tipo a otras unidades de componentes y organismos del gobierno del ELA, autorizados para desarrollar instalaciones de infraestructura y establecer medios alternativos para su financiamiento. El total de la deuda pendiente de pago de la PRIFA, en su mayoría Bonos de ingresos fiscales especiales que comprenden más del 95% de su deuda total, se paga con los impuestos especiales federales gravados sobre el ron y otros artículos producidos en Puerto Rico y vendidos en los Estados Unidos, cuyos impuestos son recaudados por el Tesoro de los EE. UU. y regresados al ELA. La deuda restante de PRIFA, aparte de los Bonos de Ingresos Fiscales Especiales, se paga con las asignaciones legislativas del ELA. Por lo tanto, los estados financieros de la PRIFA se combinan con los estados financieros de los fondos del ELA como un fondo especial de ingresos, servicio de la deuda y proyecto de capital.

*Autoridad de Transporte Marítimo de Puerto Rico (PRMSA):* la PRMSA está gobernada por el Presidente del BGF. Conforme a las disposiciones de la Ley Núm. 2 de 2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF a partir del 18 de enero de 2017. Las operaciones de la PRMSA se han limitado al procesamiento de los requisitos legales restantes resultantes de la venta de ciertas operaciones marítimas que anteriormente eran propiedad y operadas por la PRMSA. Dichos requisitos legales consisten exclusivamente en pagar la deuda a largo plazo de la PRMSA después de la venta. El ELA debe asignar fondos anualmente en su presupuesto operativo general para el pago del capital y los intereses de dicha deuda, que es la deuda total pendiente.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Por lo tanto, los estados financieros de la PRMSA se combinan con los estados financieros de los fondos del ELA como un fondo para el servicio de la deuda.

*Administración de Servicios Médicos de Puerto Rico (PRMeSA)*: la PRMeSA está gobernada por una junta de diez miembros que comprende el Secretario del Departamento de Salud del ELA, que es el Presidente, el Decano de la Facultad de Ciencias Médicas de la Universidad de Puerto Rico (UPR) , el presidente de la junta directiva de la Liga contra el Cáncer de Puerto Rico, el alcalde de la municipalidad de San Juan, el administrador de la Corporación del Fondo del Seguro del Estado, el administrador de la Administración de Servicios de Salud Mental y Adicciones, el presidente de la Comité de Política y Administración Médica, el Secretario del Departamento de Familia y dos miembros nombrados por el Secretario del Departamento de Salud del ELA. Su propósito es planificar, organizar, operar y administrar los servicios de salud centralizados, proporcionados en apoyo del hospital y otras funciones, ofrecidos por las instituciones miembros y los usuarios del complejo médico conocido como el Centro Médico de Puerto Rico. El ELA debe asignar fondos anualmente de su presupuesto operativo general para el pago del capital y los intereses de dicha deuda, que es la deuda total pendiente de la PRMeSA. Por lo tanto, los estados financieros de la PRMeSA se combinan con los estados financieros de los fondos del ELA como un fondo empresarial.

*Corporación del Fondo de Interés Apremiante de Puerto Rico (conocida como COFINA, su sigla en español)*: COFINA fue creada por la Ley Núm. 91 aprobada el 13 de mayo de 2006, enmendada por la Legislatura. COFINA se creó originalmente con el propósito de financiar el pago, el retiro o la anulación de ciertas obligaciones de deuda del ELA pendientes al 30 de junio de 2006 (la deuda de asignación de 2006). Durante 2009, la Legislatura amplió los propósitos de COFINA para ayudar a financiar los gastos operativos del ELA para 2009 hasta 2011 y para 2012, en la medida incluida en el presupuesto anual del ELA. Al 30 de junio de 2016, el directorio de la junta de COFINA estaba compuesto por los mismos miembros que el directorio de la junta del BGF. Como consecuencia de la Ley Núm. 241 de 2018 y la efectividad del Tercer Plan de Ajuste Enmendado de COFINA como se describe en la Nota 17(c), la junta de directores de COFINA está compuesta actualmente por tres miembros nombrados por el Gobernador. Debido a que las obligaciones de los Bonos de Impuesto sobre Ventas sobre los Ingresos de COFINA se han pagado históricamente con los impuestos sobre las ventas y el uso del ELA como se describe en la Nota 13, sus estados financieros se combinan en los estados financieros de fondos del ELA como un fondo especial de servicio de ingresos y deudas. Como se analiza en la Nota 3 y la Nota 17 a continuación, COFINA ha completado con éxito su reestructuración de conformidad con un plan de ajuste confirmado por el tribunal en virtud del Título III de PROMESA, que entró en vigencia el 12 de febrero de 2019.

*Fideicomiso Perpetuo de Comunidades Especiales (SCPT)*: el SCPT está gobernado por una junta de directores compuesta por once miembros: el Secretario del Departamento de Vivienda del ELA, el Secretario de DTPW del ELA, el Coordinador para el Financiamiento Social y Económico de las comunidades especiales, un alcalde de un municipio de Puerto Rico, un líder comunitario residente en una comunidad especial, cuatro ciudadanos privados que representan el interés público y dos empleados públicos. Todos los miembros de la junta de directores son designados por el Gobernador. El objetivo principal del SCPT es financiar proyectos de desarrollo que aborden las necesidades de infraestructura y vivienda de las comunidades marginadas. A lo largo de los años desde su creación, el SCPT ha visto disminuir sus fuentes de ingresos a medida que sus activos principales, los préstamos hipotecarios, son completamente reservados. SCPT ha acumulado deuda con el BGF, que se paga con las asignaciones legislativas del ELA. Por lo tanto,

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

los estados financieros del SCPT se combinan con los estados financieros de los fondos del ELA como un fondo especial de ingresos y servicio de la deuda.

*El Fideicomiso de los Niños:* el Fideicomiso de los Niños está gobernado por una junta de siete miembros compuesta por el Gobernador, que designa al presidente de la junta, el Presidente del BGF, el Director del OGP, el Secretario de Justicia del ELA y tres ciudadanos privados designados por el Gobernador con el consejo y consentimiento del Senado. Conforme a las disposiciones de la Ley Núm. 2 de 2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF a partir del 18 de enero de 2017. La única operación del Fideicomiso de los Niños consiste en proporcionar asistencia financiera principalmente a los departamentos del ELA para realizar proyectos destinados a promover el bienestar de las familias, niños y jóvenes de Puerto Rico, especialmente en las áreas de educación, recreación y salud. La operación del fideicomiso de los Niños se financia con el dinero que recibe el ELA de un acuerdo de conciliación global (GSA) del 23 de noviembre de 1998 entre ciertas compañías tabacaleras y ciertos estados, territorios y otras jurisdicciones de los Estados Unidos de América, que incluyen el ELA. El GSA exige pagos anuales hasta el año 2025, que variarán debido a ajustes inflacionarios y de volumen. Después de 2025, las compañías tabacaleras deberían continuar haciendo contribuciones a perpetuidad. Como el Fideicomiso de los Niños brinda asistencia financiera total o casi total a los departamentos del ELA y su deuda total pendiente se está pagando con los recursos del GSA recibidos por el ELA, sus estados financieros se combinan con los estados financieros de los fondos del ELA como un fondo especial de ingresos y servicio de la deuda.

*Centro Comprensivo de Cáncer de la Universidad de Puerto Rico (UPRCCC)*: el UPRCCC está gobernado por una junta de nueve miembros que consta de cuatro miembros *ex officio*: el Presidente de la UPR, el Canciller de Ciencias Médicas del Campus de la UPR, el Secretario del Departamento de Salud del ELA y el decano de la Escuela de Medicina de la UPR. Los cinco (5) miembros restantes deben ser ciudadanos de Puerto Rico que hayan demostrado su compromiso con la lucha contra el cáncer y sean nombrados por el Gobernador con la aprobación del Senado del ELA con los siguientes criterios: dos miembros de los estudios de investigación o la comunidad de tratamiento del cáncer; un miembro con experiencia en administración, finanzas o administración de empresas, o con experiencia previa en la administración de hospitales o clínicas de investigación médica; un miembro que sea un paciente con cáncer; y un miembro que forme parte de la "Liga contra el Cáncer del Puerto Rico". El ELA brinda apoyo financiero al UPRCCC mediante asignaciones legislativas. El UPRCCC se creó por la Ley Núm. 230 del 26 de agosto de 2004 (Ley Núm. 230), para ser la entidad gubernamental principalmente responsable de ejecutar las políticas públicas relacionadas con la prevención, orientación, investigación y tratamiento del cáncer en Puerto Rico. El 31 de octubre de 2013, se aprobó la Ley Núm. 128 (Ley Núm. 128) que modifica la Ley Núm. 230 para establecer específicamente que a partir del año fiscal 2015, las asignaciones legislativas anuales del ELA de $15 millones podrían estar disponibles para cubrir el servicio de la deuda de las obligaciones contraídas por el UPRCCC en sus proyectos relacionados con el capital, particularmente la construcción de sus instalaciones médicas y hospitalarias. Antes de la Ley Núm. 128, la Ley Núm. 230 no era concluyente en cuanto a la fuente de ingresos para el servicio de la deuda que se menciona anteriormente. Como la deuda total pendiente del UPRCCC al 30 de junio de 2015 se paga mediante las asignaciones legislativas del ELA, los estados financieros del UPRCCC se combinaron con los estados financieros de los fondos del ELA como un fondo de ingresos especiales a partir del 1 de julio de 2015; pero las operaciones médicas y hospitalarias no han comenzado.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El Fondo de servicio de la deuda de COFINA y el Fondo de ingresos especiales de COFINA se presentan como principales mayores del gobierno, mientras que PRMeSA y PRHIA se presentan como fondos empresariales mayores. Todas las demás unidades de componentes combinados se informan en la columna de fondos no mayores del gobierno, con excepción de la PPA, que se informa en la columna de fondos empresariales no mayores. Los estados financieros completos de las unidades de componentes combinados se pueden obtener directamente contactando a sus respectivas oficinas administrativas en:

| | |
|---|---|
| Autoridad de Puertos de Ponce<br>P.O. Box 7051<br>Ponce, PR 00752 | Autoridad de Puertos de las Américas<br>P.O. Box 195534<br>San Juan, PR 00919-5534 |
| Autoridad de Edificios Públicos<br>P.O. Box 41029 - Minillas Station<br>San Juan, PR 00940-1029 | Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico<br>P.O. Box 42001<br>San Juan, PR 00940-2001 |
| Administración de Seguros de Salud de Puerto Rico<br>Puerto Rico<br>P.O. Box 195661<br>San Juan, PR 00919-5661 | Autoridad para el Financiamiento de la Infraestructura de<br><br>P.O. Box 41207 Minillas Station<br>San Juan, PR 00940 |
| Autoridad de Transporte Marítimo de Puerto Rico<br>P.O. Box 42001<br>San Juan, PR 00940-2001 | Administración de Servicios Médicos de Puerto Rico<br>P.O. Box 2129<br>San Juan, PR 00922-2129 |
| Corporación del Fondo de Interés Apremiante de Puerto Rico<br>P.O. Box 42001<br>San Juan, PR 00940-2001 | Fondo Perpetuo de Comunidades Especiales<br>P.O. Box 42001<br>San Juan, PR 00940-2001 |
| Centro Comprensivo de Cáncer de la<br>Universidad de Puerto Rico<br>PMB 711, 89 De Diego Ave., Suite 105<br>San Juan, PR 00927-6346 | El Fideicomiso de los Niños<br>P.O. Box 42001<br>San Juan, PR 00940-2001 |

*(ii)   Unidades de Componentes de Presentación Discreta*

Las unidades de componentes que se describen a continuación, todas las entidades legalmente separadas, de conformidad con la Declaración GASB Núm. 14, enmendada por las Declaraciones GASB Núm. 39 y 61, se presentan de forma discreta en los estados financieros básicos principalmente debido a la naturaleza de los servicios que prestan. La capacidad del ELA de imponer su voluntad, principalmente a través del nombramiento de sus autoridades de gobierno, y porque las unidades de componentes proporcionan beneficios financieros específicos o imponen cargas financieras al ELA (con la excepción de la Autoridad de Conservación y Desarrollo de Culebra y el Fideicomiso para Ciencia, Tecnología e Investigación de Puerto Rico, que no cumplen con todos estos criterios, pero el ELA ha determinado que sería engañoso excluirlos de la entidad de información financiera del ELA). Estas unidades de componentes no se combinan con el Gobierno Primario porque no brindan servicios por completo, o casi por completo, al Gobierno Primario, su junta de gobierno no es sustancialmente igual a la del Gobierno Primario, el Gobierno Primario no tiene ninguna responsabilidad operativa sobre ellos, y no tienen una deuda total pendiente de reembolso total o casi total con recursos del Gobierno Primario. Han sido clasificados por la gerencia como unidades de

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

componentes mayores y no mayores. El ELA determina una unidad de componentes mayores de presentación discreta en función de la naturaleza y la importancia de su relación con el Gobierno Primario. Esta determinación se basa en la evaluación de los siguientes factores: a) los servicios prestados por la unidad de componentes a la ciudadanía son tales que los informes separados como una unidad de componentes mayores se consideran esenciales para los usuarios de los estados financieros, b) hay transacciones significativas con el Gobierno Primario, o c) existe una relación de beneficio o carga financiera significativa con el Gobierno Primario. Si se espera que una unidad de componentes cumpla con algunas de estas consideraciones para su inclusión como unidad de componente mayores en un año futuro, el ELA puede optar por informarla como una unidad de componentes mayores.

*(iii)   Unidades de Componentes Mayores*

*Banco Gubernamental de Fomento para Puerto Rico (BGF)*: antes de su decisión, el 23 de marzo de 2018, de suspender las operaciones y cerrar en virtud del Título VI de PROMESA, el BGF estaba gobernado por una junta de siete miembros nombrados por el Gobernador. Los miembros de la junta de directores del BGF eran ejecutivos en una posición confiable, nombrados y supervisados por el Gobernador. En sus operaciones hasta el 23 de marzo de 2018, el BGF actuó como agente fiscal, depositario de fondos, agente de desembolso, inversor y asesor financiero del ELA, sus corporaciones públicas y municipios en relación con la emisión de bonos y pagarés; y también emitió garantías de terceros, otorgó préstamos y adelantó fondos principalmente a los departamentos, unidades de componentes y municipios del ELA.

La Ley Núm. 21 de 2016, conocida como la "Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" (la Ley de Moratoria), creó la AAFAF para asumir el papel del BGF como agente fiscal, asesor financiero y agente de informes para el ELA, sus organismos y municipios. Esta nueva agencia fiscal y autoridad asesora comenzó sus funciones como se describe anteriormente inmediatamente después de la promulgación de la Ley de Moratoria. La Ley de Moratoria no tuvo un impacto en la designación del BGF como una unidad de componentes mayores de presentación discreta para el año fiscal 2016. El alcance de las facultades de la AAFAF se amplió sustancialmente en virtud de la Ley Núm. 2 de 2017, como se analiza en la Nota 3 y la Nota 23. Para obtener información adicional sobre la Ley de Moratoria, consulte la Nota 3 y la Nota 23.

*Autoridad de Carreteras y Transportación de Puerto Rico (ACT)*: la ACT está gobernada por una junta de siete miembros que comprende el Secretario del Departamento de Transporte y Obras Públicas (DTPW) (que actúa como Presidente de la junta), el Presidente de la Junta de Planificación, el secretario de Hacienda, el presidente del BGF y otros tres miembros del sector privado nombrados por el Gobernador con el consejo y consentimiento del Senado. Conforme a las disposiciones de la Ley Núm. 2 de 2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF a partir del 18 de enero de 2017. La ACT tiene amplias facultades para cumplir con sus responsabilidades de acuerdo con las políticas generales de transporte de DTPW. Estas facultades incluyen, entre otras cosas, el control y la supervisión completa de las instalaciones de autopistas construidas, de propiedad u operación de la ACT, la capacidad de establecer peajes por el uso de las instalaciones de autopistas y la facultad de emitir bonos, pagarés u otras obligaciones La ACT planifica y gestiona la construcción de todos los proyectos importantes relacionados con el sistema de autopistas de peaje del ELA, realiza reparaciones importantes y mantiene las vías de peaje. El ELA tiene la capacidad de influir significativamente en las tarifas de peaje cobradas por la ACT.

*Autoridad de Energía Eléctrica de Puerto Rico (AEE):* la AEE está gobernada por una junta de siete miembros, tres de los cuales son miembros independientes nombrados por el Gobernador con el consejo y

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

consentimiento del Senado. Los miembros son seleccionados de una lista de diez candidatos presentados al Gobernador luego de una búsqueda de talento ejecutivo por parte de una firma reconocida. La AEE es responsable de conservar, desarrollar y utilizar los recursos de energía para promover el bienestar general de Puerto Rico y posee y opera el sistema de generación, transmisión y distribución de energía eléctrica del ELA. El ELA tiene derecho a recibir contribuciones en lugar de impuestos de la AEE.

*Autoridad de Acueductos y Alcantarillas de Puerto Rico (AAA):* la AAA está gobernada por una junta de nueve miembros compuesta por seis miembros nombrados por el Gobernador con el consejo y consentimiento del Senado (incluido el Presidente de la Junta de Planificación de Puerto Rico), el Presidente Ejecutivo de AEE, el Director Ejecutivo de la Federación de Alcaldes y el Director Ejecutivo de la Asociación de Alcaldes). La AAA posee y opera el sistema de suministro público de agua y alcantarillado sanitario del ELA. La AAA está autorizada, entre otras cosas, a tomar dinero en préstamo y emitir bonos de ingresos para cualquiera de sus propósitos corporativos. El ELA garantiza los pagos de capital e intereses de ciertos bonos en circulación y de todos los bonos futuros emitidos para refinanciar esos bonos en circulación en la fecha del refinanciamiento. La Ley Núm. 45 del 28 de julio de 1994 fue enmendada posteriormente para incluir otros préstamos en virtud del Programa de Fondos Recurrentes del Estado (SRFP) y el Programa de Desarrollo Rural del USDA. El ELA históricamente proporcionó cierto apoyo financiero a la AAA mediante asignaciones legislativas para el servicio de la deuda de sus pagarés de la Corporación de Finanzas Públicas (PFC).

*Universidad de Puerto Rico (UPR):* la UPR está gobernada por una Junta de Gobierno de trece miembros, nueve de los cuales son nombrados por el Gobernador de Puerto Rico y confirmados por el Senado de Puerto Rico. Los miembros restantes de la Junta de Gobierno consisten en dos profesores titulares y dos estudiantes de tiempo completo. El Secretario del Departamento de Educación del ELA es miembro *ex officio* de la junta de gobierno. El ELA brinda apoyo financiero a la UPR mediante asignaciones legislativas.

*Corporación de Fondos de Seguros del Estado (SIFC):* la SIFC está gobernada por una junta de siete miembros nombrados por el Gobernador con el consejo y consentimiento del Senado. La junta está compuesta por el Comisionado de Seguros de Puerto Rico, un funcionario del Departamento del Trabajo y Recursos Humanos del ELA, un funcionario del Departamento de Salud del ELA, un representante de los intereses de los patronos, un representante de los intereses de los empleados y dos miembros sin ninguno de estos intereses. El Gobernador nombra a uno de estos miembros como presidente de la junta por un período de seis años. Los tres funcionarios públicos son nombrados por un período de cinco años, y el resto de los miembros por cuatro, tres, dos y un año, respectivamente. El SIFC proporciona compensación de trabajadores y seguro por discapacidad a empleados públicos y privados. El ELA tiene acceso a los recursos de SIFC.

*(iv)* *Unidades de Componentes No Mayores*

*Administración para el Desarrollo de Empresas Agropecuarias (AEDA)*: la AEDA está gobernada por el Secretario de Agricultura del ELA. El propósito de la AEDA es proporcionar una amplia variedad de servicios e incentivos al sector agrícola. El ELA puede imponer su voluntad a la AEDA. El ELA brinda apoyo financiero a la AEDA mediante asignaciones legislativas.

*Administración de Compensación de Accidentes de Automóviles (AACA):* la AACA está gobernada por un miembro del gabinete y una junta de cuatro miembros nombrados por el Gobernador con el consejo y consentimiento del Senado. La AACA opera un sistema de cobertura de seguro obligatorio para todos los

58

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

automotores registrados y compensa a los ciudadanos por lesiones derivadas de accidentes automovilísticos. El ELA tiene la capacidad de influir significativamente en las tarifas cobradas por la AACA. El ELA tiene acceso a los recursos de la AACA.

*Corporación de Centros Cardiovasculares de Puerto Rico y el Caribe (CCCPRC):* la CCCPRC está gobernada por una junta de siete miembros que comprende el Secretario de Salud del ELA, el Director del Campus de Ciencias Médicas de la UPR, el Director Ejecutivo de PRMeSA y cuatro miembros adicionales nombrados por el Gobernador con el consejo y consentimiento del Senado, uno de los cuales debe ser de la Sociedad de Cardiología de Puerto Rico y otro miembro de una fundación de cardiología debidamente registrada en el Departamento de Estado del ELA. El propósito de la CCCPRC es proporcionar un tratamiento especial a los pacientes que padecen enfermedades cardiovasculares. El ELA brinda apoyo financiero a la CCCPRC mediante asignaciones legislativas.

*Compañía para el Desarrollo Integral de la "Península de Cantera" (CIDPC):* la CIDPC está gobernada por una junta de once miembros, de los cuales seis miembros son nombrados por el Gobernador y cinco miembros son nombrados por el Alcalde de la Municipalidad de San Juan. La CIDPC fue creada para establecer e implementar un plan integral de desarrollo para el área de la Península de Cantera. Su función principal es supervisar y coordinar los esfuerzos del gobierno y también promover y gestionar iniciativas del sector privado para las mejoras y la rehabilitación del área antes mencionada. El ELA en general proporciona apoyo financiero a la CIDPC.

*Corporación para el Proyecto "Caño Martín Peña" ENLACE (CPECMP)*: la CPECMP se creó con el propósito de coordinar la política pública relacionada con la rehabilitación del área de Caño Martín Peña. La CPECMP está gobernada por una junta de directores de trece miembros, de los cuales siete son nombrados por el Gobernador y seis miembros nombrados por el alcalde de la municipalidad de San Juan. El ELA en general brinda apoyo financiero a la CPECMP mediante asignaciones legislativas.

*Autoridad para la Conservación y el Desarrollo de Culebra (CCDA)*: la CCDA se creó para formular y administrar el programa y el plan para la conservación, el uso y el desarrollo de los recursos naturales del municipio de Culebra. La CCDA se administra a través de una junta de directores compuesta por cinco miembros, incluido el alcalde del municipio de Culebra y cuatro miembros adicionales nombrados por el alcalde del municipio de Culebra y confirmados por la legislatura municipal. La administración y las operaciones de la CCDA están a cargo de un director ejecutivo elegido por la junta de directores. El ELA brinda apoyo financiero a la CCDA mediante asignaciones legislativas. Aunque la junta de directores de la CCDA no es nombrada por el ELA y no depende fiscalmente del ELA, el ELA cree que sería engañoso excluirla de su entidad de informe, debido al apoyo financiero proporcionado por el ELA.

*Banco de Desarrollo Económico para Puerto Rico (EDB):* el EDB está gobernado por una junta de nueve miembros que comprende al Presidente del BGF, quien es el Presidente, el Secretario de Agricultura del ELA, el Secretario del Departamento de Desarrollo Económico y Comercio del ELA, el Director Ejecutivo de la Compañía de Fomento Industrial de Puerto Rico (PRIDCO), el Director Ejecutivo de la PRTC (Compañía de Turismo de Puerto Rico) y cuatro miembros que representan al sector privado y nombrados por el Gobernador con el consejo y consentimiento del Senado. Los miembros del sector privado son nombrados por un período máximo de tres años. Conforme a las disposiciones de la Ley Núm. 2 de 2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

el Director Ejecutivo de la AAFAF a partir del 18 de enero de 2017. El EDB es responsable de la promoción y el desarrollo de la economía del sector privado del ELA. Este propósito se debe cumplir mediante el otorgamiento de préstamos directos, garantías de préstamos, participación en préstamos o inversiones directas a cualquier persona u organización comercial dedicada a la manufactura, agricultura, comercio, turismo u otras empresas de servicios con preferencia, entre otras, por actividades económicas que pueden tener el efecto de sustituir importaciones. El ELA puede imponer su voluntad al EDB.

*Corporación de Seguros Agrícolas de Puerto Rico (FICPR):* la FICPR está gobernada por una junta de cinco miembros que consiste en el Secretario de Agricultura del ELA, el Decano de la Facultad de Ciencias Agrícolas del Campus Mayagüez de la UPR, un representante del BGF y dos agricultores de buena fe designados por el Gobernador con el consejo y consentimiento del Senado. Conforme a las disposiciones de la Ley Núm. 2 de 2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF a partir del 18 de enero de 2017. El propósito de la FICPR es proporcionar un seguro a los agricultores contra las pérdidas en sus granjas causadas por los desastres naturales. El ELA puede imponer su voluntad a la FICPR.

*Corporación del Centro de Bellas Artes (FACC):* la FACC está gobernada por una junta de nueve miembros que comprende el Presidente de la Corporación de Artes Musicales (MAC) y ocho miembros nombrados por el Gobernador. La fue se creó con el propósito de administrar el Centro de Bellas Artes. El ELA brinda apoyo financiero a la FACC mediante asignaciones legislativas.

*Oficina Independiente de Protección del Consumidor (ICPO)*: el Director designado por el Gobernador supervisa a la ICPO con el consejo y consentimiento del Senado. La ICPO también cuenta con el apoyo de un director ejecutivo que trabaja junto con la Administración de Asuntos Energéticos de Puerto Rico y brinda asesoramiento técnico a los comisionados. La ICPO será el componente clave para la ejecución fiel y transparente de la Reforma Energética de Puerto Rico. La Comisión de Energía de Puerto Rico brinda apoyo financiero a la ICPO, equivalente al 10% de las contribuciones recibidas de la AEE.

*Instituto de Cultura Puertorriqueña (IPRC):* el IPRC está gobernado por una junta de nueve miembros que comprende al Presidente de MAC y ocho miembros nombrados por el Gobernador con el consejo y consentimiento del Senado. El IPRC es responsable de implementar la política pública relacionada con el desarrollo de las artes, las humanidades y la cultura de Puerto Rico. El ELA brinda apoyo financiero al IPRC mediante asignaciones legislativas.

*Fideicomiso Institucional de la Guardia Nacional de Puerto Rico (ITNGPR):* el ITNGPR está gobernado por una junta de siete miembros que comprende el Ayudante General de la Guardia Nacional de Puerto Rico, el Presidente del BGF, el Secretario de Justicia del ELA, tres militares de la Guardia Nacional de Puerto Rico y un representante de la comunidad designado por el Gobernador. Conforme a las disposiciones de la Ley Núm. 2 de 2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF a partir del 18 de enero de 2017. El propósito del ITNGPR es proporcionar un seguro de vida, beneficios de retiro y asistencia económica a los miembros activos de la Guardia Nacional de Puerto Rico y sus familias. El ELA en general brinda apoyo financiero al ITNGPR mediante asignaciones legislativas y puede imponer su voluntad al ITNGPR.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*Autoridad de Tierras de Puerto Rico (LAPR)*: la LAPR está gobernada por una junta de cinco miembros compuesta por el Secretario de Agricultura del ELA y cuatro miembros nombrados por el Gobernador. La LAPR se creó para cumplir con las disposiciones de la Ley de Tierras de Puerto Rico, principalmente orientada al desarrollo agrícola de Puerto Rico. La LAPR mantiene una deuda pagadera de las asignaciones y fondos del ELA generados por las operaciones de la LAPR.

*Autoridad de Reurbanización Local de las Tierras e Instalaciones de la Estación Naval Roosevelt Roads (LRA):* la LRA se está gobernada una junta de nueve miembros que comprende el Secretario de Desarrollo Económico y Comercio del ELA, que es el Presidente, dos miembros nombrados por el Alcalde del Municipio de Ceiba, un miembro designado por el Alcalde del Municipio de Naguabo, un miembro designado por el Presidente del Senado, un miembro designado por el Presidente de la Cámara de Representantes y tres miembros adicionales nombrados por el Gobernador, todos con interés y experiencia reconocida en las áreas de planificación; desarrollo comercial, turístico, residencial e institucional; bienes raíces; administración de instalaciones turísticas y recreativas; y gestión de proyectos de infraestructura. La LRA es responsable de la implementación del plan de reutilización y reurbanización de la antigua Estación Naval de Roosevelt Roads ubicada en Ceiba, Puerto Rico. Algunas de las actividades involucradas en estos planes de reurbanización incluyen la dirección, supervisión, regulación y mantenimiento del desarrollo económico en la tierra y las instalaciones anteriormente ocupadas por la Marina de los EE. UU. El ELA en general brinda apoyo financiero a la LRA mediante asignaciones legislativas.

*Corporación para las Artes Musicales (MAC):* la MAC está gobernada por una junta de siete miembros nombrados por el Gobernador con el consejo y consentimiento del Senado. La MAC se creó para promover el desarrollo de los programas artísticos y culturales del ELA. El ELA brinda apoyo financiero a la MAC mediante asignaciones legislativas.

*Corporación Pública para la Supervisión y Seguro de Cooperativas de Puerto Rico (PCSDIPRC):* la PCSDIPRC está gobernada por una junta de nueve miembros que comprende el Administrador de la Administración de Desarrollo Cooperativo, el Comisionado de Instituciones Financieras de Puerto Rico, el Secretario de Hacienda del ELA, el Inspector de Cooperativas, tres ciudadanos que representan el movimiento cooperativo, un representante de la Liga de Cooperativas de Puerto Rico y un ciudadano privado que representa el interés público. La PCSDIPRC es responsable de proporcionar a todas las cooperativas y a la Federación de Cooperativas de Puerto Rico una cobertura de seguro sobre las existencias y depósitos, y de supervisar la situación financiera de las cooperativas aseguradas y las cooperativas no aseguradas cuando así lo solicite el Inspector de Cooperativas. El ELA puede imponer su voluntad a la PCSDIPRC.

*Corporación del Conservatorio de Música de Puerto Rico (PRCMC):* la PRCMC está gobernada por una junta de siete miembros nombrados por el Gobernador, con el consejo y consentimiento del Senado. La PRCMC es responsable de proporcionar a la comunidad de Puerto Rico y, especialmente a sus jóvenes, las instalaciones necesarias para educar y perfeccionar sus habilidades musicales, que incluyen los programas de educación secundaria para el desarrollo de las artes musicales. Prepara el elemento artístico que nutre a la Orquesta Sinfónica de Puerto Rico y otras organizaciones musicales, y coordina los esfuerzos del gobierno para las industrias interesadas, empresas privadas y ciudadanos particulares. El ELA ocasionalmente brinda apoyo financiero a la PRCMC mediante asignaciones legislativas.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*Autoridad del Distrito del Centro de Convenciones de Puerto Rico (PRCCDA):* la PRCCDA está gobernada por una junta de directores de nueve miembros compuesta por tres miembros del sector público y seis miembros del sector privado. Los miembros del sector público comprenden el Secretario de Desarrollo Económico y Comercio del ELA, que es el Presidente, el Director Ejecutivo de la PRTC y el presidente del BGF. Conforme a las disposiciones de la Ley Núm. 2 de 2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF a partir del 18 de enero de 2017. Los miembros del sector privado son personas que tienen experiencia en las áreas de operaciones hoteleras, turismo, bienes raíces, centros de convenciones, y al menos un miembro con experiencia financiera, y son nombrados por el Gobernador con el consejo y consentimiento del Senado. La PRCCDA se creó creado responsabilizarse por mejorar, desarrollar, administrar y operar la propiedad y las mejoras dentro del área geográfica del Distrito de Centros de Convenciones de Puerto Rico (el Distrito). La PRCCDA tiene la facultad de financiar todas las mejoras que se desarrollarán mediante la emisión de bonos y la imposición de evaluaciones contra los propietarios o arrendatarios de tierras dentro del Distrito que se benefician del Centro de Convenciones y otras mejoras. Asimismo, la PRCCDA promueve el desarrollo, la construcción, la expansión y la mejora del Centro de Convenciones de Puerto Rico (Centro de Convenciones), la Bahía Urbana y el Coliseo José Miguel Agrelot (el Coliseo). La administración, operación y gestión del Centro de Convenciones y el Coliseo están a cargo de una entidad privada independiente, bajo la responsabilidad de la PRCCDA. La gerencia de la PRCCDA administra Bahía Urbana. El ELA brinda apoyo financiero a la PRCCDA mediante asignaciones legislativas.

*Consejo de Educación de Puerto Rico (PRCE):* el PRCE está gobernado por una junta compuesta por nueve miembros nombrados por el Gobernador con el consentimiento del Senado. Su propósito es desarrollar la educación superior, administrar la licencia y certificación de instituciones de educación superior y administrar fondos de becas. El ELA brinda apoyo financiero al PRCE mediante asignaciones legislativas.

*Comisión de Energía de Puerto Rico (PREC):* la PREC está gobernada por una junta de directores compuesta por un comisionado Presidente y dos comisionados asociados, todos nombrados por el Gobernador con el consejo y consentimiento del Senado. El primer presidente comisionado y dos comisionados asociados nombrados ocuparán sus cargos durante seis años, cuatro años y dos años, respectivamente, y los comisionados siguientes serán nombrados por un período de seis años. La PREC se creó el 27 de mayo de 2014 de conformidad con la Ley Núm. 57, también conocida como la Ley de Alivio y Transformación Energética de Puerto Rico. En virtud de las disposiciones de la Ley Núm. 57, la PREC funciona como una entidad independiente del gobierno encargada de regular, supervisar y garantizar el cumplimiento de la política pública sobre energía del ELA y con la facultad de aprobar las tarifas eléctricas propuestas por la AEE, entre otras responsabilidades. La Ley Núm. 57 requiere que la AEE asigne anualmente $5.8 millones para las operaciones de la PREC, que se remitirán a la PREC a través de cuentas especiales establecidas en el Departamento de Hacienda del ELA. El ELA puede imponer su voluntad a la PREC. En virtud de una reestructuración de la PREC en 2018, la PREC ahora se conoce como el Negociado de Energía de Puerto Rico (NEPR).

*Fondo Fiduciario de Inversión del Gobierno de Puerto Rico (PRGITF):* el PRGITF está gobernado por el Secretario de Hacienda del ELA. Antes de la decisión del BGF del 23 de marzo de 2018 de cesar sus operaciones y cerrar en virtud del Título VI de PROMESA, el BGF era el fideicomisario, custodio y administrador del PRGITF, una función que la AAFAF asume actualmente. El principal objetivo del PRGITF es proporcionar oportunidades de inversión en una cartera de mercado monetario administrada profesionalmente invirtiendo en títulos de alta calidad con un mínimo riesgo de crédito. Los inversores

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

calificados incluyen el gobierno central del ELA, sus corporaciones públicas, organismos y agencias, y los municipios de Puerto Rico. De conformidad con la Declaración GASB Núm. 31, *Informes contables y financieros para ciertas inversiones y para grupos de inversiones externas,* los estados financieros del PRGITF no se incluyen en los estados financieros básicos adjuntos porque el Gobierno Primario y cada inversionista de la unidad de componentes ya se presenta como efectivo o inversión su parte correspondiente de los activos del PRGITF.

*Compañía de Fomento Industrial de Puerto Rico (PRIDCO):* la PRIDCO está gobernada por una junta de siete miembros que comprende el Secretario de Desarrollo Económico y Comercio del ELA, que es el Presidente, el Secretario de Hacienda del ELA, el Presidente del BGF, El Presidente de la Junta de Planificación de Puerto Rico, y tres miembros del sector privado designados por el Gobernador con el consejo y consentimiento del Senado. Conforme a las disposiciones de la Ley Núm. 2 de 2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF a partir del 18 de enero de 2017. Los miembros del sector privado son nombrados por un período máximo de cuatro años. La PRIDCO administra el programa de desarrollo económico patrocinado por el ELA mediante la provisión de instalaciones, asistencia general y subsidios de incentivos especiales a las empresas manufactureras que operan en Puerto Rico. La PRIDCO ha emitido pagarés provisionales y bonos de ingresos para financiar plantas de fabricación y otras instalaciones.  Los alquileres derivados del arrendamiento de instalaciones específicas de la PRIDCO se utilizan para el pago de los bonos de ingresos de la PRIDCO. La PRIDCO mantiene la deuda pagadera de las asignaciones del ELA. El ELA en general brinda apoyo financiero a la PRIDCO mediante asignaciones legislativas y puede imponer su voluntad a la PRIDCO.

*Autoridad de Financiamiento de Instalaciones de Control Industrial, Turístico, Educativo, Médico y Ambiental de Puerto Rico (conocida como AFICA):* la AFICA está gobernada por una junta de siete miembros que comprende el Director Ejecutivo de la PRIDCO, el Presidente del BGF, el Director Ejecutivo de la PRIFA, el Director Ejecutivo de la PRTC, el Presidente de la Junta de Calidad Ambiental y dos ciudadanos privados designados por el Gobernador. Conforme a las disposiciones de la Ley Núm. 2 de 2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF a partir del 18 de enero de 2017. La AFICA está autorizada a emitir bonos de ingresos para financiar instalaciones de control industrial, turístico, ambiental, médico y educativo en Puerto Rico y los Estados Unidos de América para su uso por empresas privadas, entidades sin fines de lucro o agencias gubernamentales. Los bonos son pagaderos exclusivamente de cobros de tales compañías privadas, entidades sin fines de lucro o agencias del gobierno, y no constituyen deuda del ELA o de cualquiera de sus otras unidades de componentes. El ELA puede imponer su voluntad a la AFICA.

*Autoridad de Transporte Integrado de Puerto Rico (PRITA):* la PRITA está gobernada por una junta de nueve miembros que comprende el Secretario de DTPW, que se desempeña como Presidente, el Director Ejecutivo de la ACT, el Presidente de la Junta de Planificación de Puerto Rico, el Director de la OGP, el Presidente del BGF, dos miembros adicionales del sector privado nombrados por el Gobernador con el consejo y consentimiento del Senado y otros dos miembros que representan a las entidades dentro de la Organización de Planificación Metropolitana, que son seleccionados mediante el voto de su propia Junta de Directores. Conforme a las disposiciones de la Ley Núm. 2 de 2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF a partir del 18 de enero de 2017. La PRITA se creó creada por la Ley Núm. 123 del 3 de agosto de 2014 con el propósito de implementar una política pública uniforme en materia de transporte colectivo, terrestre y marítimo, y la

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

integración de las operaciones, activos, derechos, obligaciones y fondos del tren urbano de la ACT, la Autoridad Metropolitana de Autobuses de Puerto Rico (PRMBA) y la Autoridad de Transporte Marítimo de Puerto Rico e Islas Municipales (PRMIMTA). Al 30 de junio de 2016, la PRITA aún estaba en proceso de obtener las aprobaciones requeridas de las autoridades locales y federales para integrar y oficializar la fusión del tren urbano, PRMBA y PRMIMTA en PRITA. El ELA generalmente proporciona apoyo financiero a la PRITA mediante asignaciones legislativas y la PRITA transferirá los fondos necesarios a la ACT, PRMBA y PRMIMTA, cuando se dediquen a la construcción, operaciones y mantenimiento de instalaciones de transporte masivo, ferroviario y marítimo.

*Administración de Tierras de Puerto Rico (PRLA):* la PRLA está gobernada por una junta de once miembros que comprende el Secretario de Desarrollo Económico y Comercio del ELA, que se desempeña como Presidente, el Presidente de la Junta de Planificación de Puerto Rico, que se desempeña como Vicepresidente, el Secretario de Hacienda del ELA, el Secretario de Agricultura del ELA, el Secretario de DTPW del ELA, el Secretario de Vivienda del ELA, el Director Ejecutivo de la PRIDCO y cuatro miembros designados por el Gobernador con el asesoramiento y el consentimiento del Senado. La PRLA adquiere parcelas de tierra en nombre de los organismos del gobierno a través de la negociación o expropiación para el desarrollo futuro o para la reserva. El ELA brinda apoyo financiero a la PRLA mediante asignaciones legislativas.

*Autoridad de Transporte Marítimo de Puerto Rico y las Islas Municipales (PRMIMTA)*: la PRMIMTA está gobernada por una junta de cinco miembros que comprende al Secretario de DTPW, que se desempeña como Presidente, el Director Ejecutivo de la Autoridad de Puertos de Puerto Rico, los Alcaldes de Vieques y Culebra, y un miembro adicional designado por el Gobernador. Las operaciones de la PRMIMTA consisten en administrar y operar los servicios de transporte marítimo entre San Juan, Fajardo, Vieques y Culebra. El ELA en general brinda apoyo financiero a la PRMIMTA mediante asignaciones legislativas. La Ley Núm. 123 del 3 de agosto de 2014, que creó la PRITA, establecía la integración en la PRITA de las operaciones de la PRMIMTA; sin embargo, al 30 de junio de 2016, las operaciones, activos, derechos, obligaciones y fondos de la PRMIMTA no habían sido transferidos.

*Autoridad Metropolitana de Autobuses de Puerto Rico (PRMBA)*: la PRMBA está gobernada por el Secretario de DTPW del ELA. La PRMBA ofrece transporte en autobús a los pasajeros dentro del área metropolitana de San Juan. El ELA brinda apoyo financiero a la PRMBA mediante la transferencia de ciertos impuestos al consumo de gasolina y diésel recaudados por el ELA. La Ley Núm. 123 del 3 de agosto de 2014, que creó la PRITA, establecía la integración en la PRITA de las operaciones de la PRMBA; sin embargo, al 30 de junio de 2016, las operaciones, activos, derechos, obligaciones y fondos de la PRMBA no habían sido transferidos.

*Agencia de Finanzas Municipales de Puerto Rico (PRMFA):* la PRMFA está gobernada por una junta de cinco miembros que comprende al Presidente del BGF, que es el Presidente, el Comisionado de Asuntos Municipales y tres miembros adicionales nombrados por el Gobernador, uno de los cuales debe ser ya sea el alcalde o el director financiero de un municipio. Conforme a las disposiciones de la Ley Núm. 2 de 2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF a partir del 18 de enero de 2017. La PRMFA se organizó para crear un mercado de capitales para ayudar a los municipios de Puerto Rico a financiar sus programas de mejora pública. El ELA debe cubrir cualquier deficiencia potencial que pueda existir en las cuentas de reserva de la MFA establecidas para el servicio de la deuda.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*Corporación Financiera Municipal de Puerto Rico (conocida como COFIM):* la COFIM está gobernada por una junta de siete miembros que comprende tres miembros de la Junta de Directores del BGF, tres alcaldes de municipios en Puerto Rico (dos de ellos de la política partido que controla la mayoría de los municipios y el resto restante elegido por el resto de los municipios) y un miembro que representa el interés público recomendado por todos los alcaldes de los municipios y ratificado por el Gobernador. Conforme a las disposiciones de la Ley Núm. 2 de 2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF a partir del 18 de enero de 2017. La COFIM se creó por la Ley Núm. 19 del 24 de enero de 2014 para emitir bonos y usar otros mecanismos de financiamiento para pagar o refinanciar, directa o indirectamente, todas o una parte de las obligaciones de deuda de los municipios pagaderas del impuesto municipal sobre las ventas y el uso. El ELA debe cubrir cualquier deficiencia potencial que pueda existir en las cuentas de reserva de la COFIM establecidas para el servicio de la deuda. La COFIM comenzó sus operaciones durante el año fiscal 2015.

*Autoridad de Puertos de Puerto Rico (PRPA):* la PRPA está gobernada por una junta de cinco miembros que consiste en el Secretario de DTPW del ELA, que es el Presidente, el Secretario de Desarrollo Económico y Comercio del ELA, el Director Ejecutivo del PRTC, el Director Ejecutivo de la Compañía de Fomento Industrial de Puerto Rico y un ciudadano privado designado por el Gobernador con el consentimiento del Senado. El propósito de la PRPA es administrar todos los puertos de propiedad y las instalaciones de transporte de aviación del ELA y prestar otros servicios relacionados, incluida la supervisión y el control del acuerdo de concesión de servicios del Aeropuerto Internacional Luis Muñoz Marín, como se describe en la Nota 17. El ELA en general brinda apoyo financiero a la PRPA mediante asignaciones legislativas.

*Corporación de Puerto Rico para la Difusión Pública (PRPBC):* la PRPBC está gobernada por una junta de directores de once miembros que comprende al Secretario del Departamento de Educación del ELA, el Presidente de la UPR, el Director Ejecutivo del IPRC y ocho ciudadanos privados nombrados por el Gobernador con el consejo y consentimiento del Senado. Al menos tres de estos ciudadanos privados deben haber demostrado interés, conocimiento y experiencia en educación, cultura, arte, ciencia o radio y televisión. La PRPBC se creó con el propósito de integrar, desarrollar y operar las instalaciones de radio, televisión y comunicación electrónica que pertenecen al ELA. El ELA brinda apoyo financiero a la PRPBC mediante asignaciones legislativas.

*Autoridad para Alianzas Público-Privadas de Puerto Rico (PPPA):* la PPPA está gobernada por una junta de directores de cinco miembros que comprende al Presidente del BGF, el Secretario de Hacienda del ELA, el Presidente de la Junta de Planificación y dos miembros nombrados por el Gobernador, un miembro seleccionado por el Presidente del Senado de Puerto Rico y otro miembro, por el Presidente de la Cámara de Representantes de Puerto Rico. Conforme a las disposiciones de la Ley Núm. 2 de 2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF a partir del 18 de enero de 2017. La PPPA es la única entidad del gobierno autorizada y responsable de implementar políticas públicas sobre asociaciones público-privadas establecidas por la Ley Núm. 29 del 8 de junio de 2009, según enmendada, y determinar las funciones, servicios o instalaciones para las cuales se establecerán dichas asociaciones.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*Escuela de Artes Plásticas de Puerto Rico (PRSPA):* la PRSPA está gobernada por una junta de siete miembros. La junta de directores de la IPRC designa a cuatro miembros, que representan los intereses públicos educativos y culturales. Los miembros de la junta no pueden ser empleados de la PRSPA. Los tres miembros restantes son elegidos entre los miembros de la junta de directores de la IPRC, uno de los cuales se desempeña como presidente. La PRSPA se creó para desarrollar, promover, planificar y coordinar programas de estudio en educación superior orientados a las artes plásticas, la enseñanza, las técnicas artísticas y para ayudar a los estudiantes a desarrollar valores humanísticos. El ELA en general brinda apoyo financiero a la PRSPA mediante asignaciones legislativas.

*Fideicomiso para Ciencia, Tecnología e Investigación de Puerto Rico (PRSTRT):* el PRSTRT está gobernado por una junta de fideicomisarios de once miembros que comprende cinco miembros *ex officio* que representan a ciertas agencias del Gobierno Primario y corporaciones públicas: el Secretario del Departamento de Desarrollo Económico y Comercio, el Presidente de la UPR, el Director del OGP, el Presidente del BGF y el Director Ejecutivo de la PRIDCO; y seis fideicomisarios adicionales nombrados por la junta de fideicomisarios. Conforme a las disposiciones de la Ley Núm. 2 de 2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF a partir del 18 de enero de 2017. El PRSTRT se creó por la Ley Núm. 214 del 18 de agosto de 2004, según enmienda, para fomentar y financiar proyectos de investigación, desarrollo e infraestructura relacionados con la ciencia y la tecnología para promover el desarrollo económico, social o educativo del ELA y operar exclusivamente para fines caritativos, educativos y científicos. Inicialmente, el PRSTRT recibió apoyo financiero a través de diversas fuentes, incluido el dinero de ciertos fondos del EPU, donaciones privadas y asignaciones legislativas que no se han repetido durante los últimos años. Pero recientemente, la mayoría de los fondos provienen indirectamente de las contribuciones del ELA a varios fondos gestionados y administrados por la PRIDCO, lo que a su vez pone dichos fondos a disposición del PRSTRT. La junta de fideicomisarios del PRSTRT no es nombrada por el ELA. El ELA cree que sería engañoso excluirlo de su entidad informante, dado el apoyo financiero indirecto sustancial proporcionado por el ELA y el hecho de que el PRSTRT se creó por ley para implementar y ejecutar la misión de investigación científica del ELA y puede eliminarse mediante acciones del ELA.

*Autoridad Telefónica de Puerto Rico (PRTA):* la PRTA está gobernada por una junta de cinco miembros que comprende al Presidente del BGF y cuatro miembros que son nombrados por la junta de directores del BGF de entre los miembros de la junta del BGF, todos nombrados por el Gobernador. Conforme a las disposiciones de la Ley Núm. 2 de 2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF a partir del 18 de enero de 2017. La PRTA es la entidad legal responsable de contabilizar la participación accionaria en Telecommunications de Puerto Rico, Inc. Actualmente, la PRTA está inactiva y en espera de un proceso legislativo para organizar su liquidación.

*Compañía de Turismo de Puerto Rico (PRTC):* la PRTC se rige por una junta de siete miembros compuesta por representantes de diferentes sectores relacionados con el turismo designados por el Gobernador con el consentimiento del Senado. Al menos un miembro debe representar el turismo interno y dos no deben ser residentes del área metropolitana. Su propósito es promover la industria turística de Puerto Rico. El ELA generalmente brinda apoyo financiero a la PRTC a través de asignaciones legislativas.

*Compañía de Comercio y Exportación de Puerto Rico (PRTEC):* la PRTEC está gobernada por una junta de nueve miembros compuesta por el Secretario del Departamento de Desarrollo Económico y Comercio, que es el Presidente, el Director Ejecutivo de la PRPA, el Secretario del Departamento de Agricultura, el

66

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Presidente de la EDB, el Director Ejecutivo de la PRIDCO, el Director de la División Legal del PRTEC y tres ciudadanos privados. La PRTEC tiene la responsabilidad de promover la más alta eficiencia en los servicios prestados al sector comercial, con énfasis en las pequeñas y medianas empresas, al tiempo que promueve la exportación de productos y servicios de Puerto Rico a otros países. El ELA puede imponer su voluntad a la PRTEC.

*Autoridad de Depósitos Sólidos (SWA):* la SWA está gobernada por una junta nombrada por el Secretario del Departamento de Recursos Naturales, donde el Secretario y el Director Ejecutivo de la SWA se reúnen periódicamente. La SWA ofrece alternativas para el procesamiento de depósitos sólidos y fomenta el reciclado, la reutilización y la recuperación de los recursos de los residuos. El ELA brinda apoyo financiero a la SWA mediante asignaciones legislativas.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Los estados financieros completos de las unidades de componentes de presentación discreta se pueden obtener directamente contactando a sus oficinas administrativas:

Administración de Desarrollo de
Agrícolas
P.O. Box 9200
Santurce, PR 00908-0200

Corporación del Centro Cardiovascular de
Puerto Rico y el Caribe
P.O. Box 366528
San Juan, PR 00936-6528

Corporación para el proyecto ENLACE
"Caño Martín Peña"
P.O. Box 41308
San Juan, PR 00940-1308

Banco de Desarrollo Económico para Puerto Rico
P.O. Box 2134
San Juan, PR 00922-2134

Corporación del Centro de Bellas Artes
P.O. Box 41287 - Minillas Station
San Juan, PR 00940-1287

Oficina Independiente de Protección al Consumidor
268 Muñoz Rivera Ave Suite 204
San Juan, PR 00918

Instituto de Cultura Puertorriqueña
P.O. Box 9024184
San Juan, PR 00902-4184

Autoridad de Tierras de Puerto Rico
P.O. Box 9745
Santurce, PR 00908-9745

Corporación para las Artes Musicales
P.O. Box 41227
San Juan, PR 00940-1227

Administración de Compensación de Empresas
Accidentes de Automóviles
P.O. Box 364847
San Juan, PR 00936-4847

Compañía para el Desarrollo Integral de
"Península de Cantera"
P.O. Box 7187
Santurce, PR 00916-7187

Autoridad de Conservación y Desarrollo de
Culebra
P.O. Box 217
Culebra, PR 00775-0217

Corporación de Seguros Agrícolas de Puerto Rico
P.O. Box 9200
Santurce, PR 00908

Banco Gubernamental de Fomento para Puerto Rico
P.O. Box 42001
San Juan, PR 00940-2001

Fideicomiso Institucional de la Guardia Nacional
de Puerto Rico
P.O. Box 9023786
San Juan, PR, 00902-3786

Autoridad de Reurbanización Local de las Tierras
e instalaciones de la estación naval Roosevelt Roads
400 Calaf Street, PMB 456
San Juan, PR 00918-1314

Corporación Pública para la Supervisión y
Seguros de Depósito de las Cooperativas de Puerto Rico
P.O. Box 195449
San Juan, PR 00919-5449

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Autoridad de Acueductos y Alcantarillado de Puerto Rico
P.O. Box 7066
San Juan, PR 00916-7066

Corporación del Conservatorio de Música de Puerto Rico
951 Ponce de León Ave.
San Juan, PR 00907-3373

Autoridad del Distrito del Centro de Convenciones de Puerto Rico
P.O. Box 19269,
San Juan, Puerto Rico, 00910-1269

Consejo de Educación de Puerto Rico
P.O. Box 19900
San Juan, PR 00910-1900

Comisión de Energía de Puerto Rico
268 Muñoz Rivera Avenue
San Juan, PR 00918

Autoridad de Energía Eléctrica de Puerto Rico
P.O. Box 364267
San Juan, PR 00936-4267

Fondo Fiduciario de Inversión del Gobierno de Puerto Rico
P.O. Box 42001, Millas Station
San Juan, Puerto Rico 00940-2001

Autoridad de Carreteras y Transportación de Puerto Rico
P.O. Box 42007
San Juan, PR 00940-2007

Compañía de Fomento Industrial de Puerto Rico
P.O. Box 362350
San Juan, PR 00936-2350

Autoridad para el Financiamiento de Instalaciones
de Control Industrial, Turístico, Educativo,
Médico y Ambiental de Puerto Rico
P.O. Box 42001
San Juan, PR 00940-2001

Autoridad de Transporte Integrado de Puerto Rico
P.O. Box 41267
San Juan, PR 00940

Administración de Tierras de Puerto Rico
P.O. Box 363767
San Juan, PR 00936-3767

Autoridad de Transporte Marítimo de Puerto Rico e
Islas Municipales
P.O. Box 4305
Puerto Real, PR 00740

Autoridad Metropolitana de Autobuses
P.O. Box 195349
San Juan, PR 00919-5349

Agencia de Finanzas Municipales de Puerto Rico
P.O. Box 42001
San Juan, PR 00940-2001

Corporación de Finanzas Municipales de Puerto Rico
P.O. Box 42001
San Juan, PR 00940-2001

Autoridad de Puertos de Puerto Rico
P.O. Box 362829
San Juan, PR 00936-2829

Corporación de Puerto Rico para la Difusión Pública
P.O. Box 190909
San Juan, PR 00919-0909

Autoridad para Alianzas Público-Privadas de Puerto Rico
P.O. Box 42001
San Juan, PR 00940-2001

Escuela de Artes Plásticas de Puerto Rico
P.O. Box 9021112
San Juan, PR 00902-1112

Fideicomiso para Ciencia, Tecnología e Investigación
de Puerto Rico
P.O. Box 363475
San Juan, PR 00936-3475

Autoridad Telefónica de Puerto Rico
P.O. Box 42001
San Juan, PR 00940-2001

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Compañía de Turismo de Puerto Rico
Calle Tanca #500, Edificio Ochoa, 3er Piso
Old San Juan, PR 00902-3960

Compañía de Comercio y Exportación de Puerto Rico
P.O. Box 195009
San Juan, PR 00919-5009

Autoridad de Depósitos Sólidos
P.O. Box 40285
San Juan, PR 00940-0285

Corporación del Fondo del Seguro del Estado
P.O. Box 365028
San Juan, PR 00936-5028

Universidad de Puerto Rico
Jardín Botánico Sur
1187 Street Flamboyán
San Juan, PR 00916-1117

Los estados financieros de las unidades de componentes de presentación discreta finalizan su año fiscal el 30 de junio de 2016.

(v)  *Fondos Fiduciarios de Pensiones*

Los tres sistemas de retiro de empleados que se describen en los siguientes párrafos (los Sistemas de Retiro) administraron los fondos de pensiones y otros beneficios de atención médica posteriores al empleo para el ELA y sus subdivisiones políticas hasta la promulgación de la Ley para garantizar el pago a los pensionados y establecer un nuevo plan de contribuciones definidas para los Empleados Públicos (Ley Núm. 106) del 23 de agosto de 2017. Estos sistemas de retiro están sujetos a controles legislativos y ejecutivos, y sus gastos administrativos están sujetos a controles presupuestarios legislativos. Cumplen los criterios de las unidades de componentes y se combinan en los fondos fiduciarios del ELA.  Se han omitido de los estados financieros de todo el gobierno, ya que sus recursos anteriores al 23 de agosto de 2017 no estaban disponibles para financiar las operaciones del ELA.  Los Sistemas de Retiro, como planes de retiro del gobierno, están excluidos de las disposiciones de la Ley de Seguridad de Ingresos de Retiro de Empleados de 1974 (ERISA).

*Sistema de Retiro de Empleados del ELA de Puerto Rico (SRE): el* SRE es un plan de pensiones de beneficios definidos por múltiples patronos con costos compartidos, que cubre a todos los empleados regulares del ELA y sus instrumentos y de ciertos municipios y unidades de componentes están cubiertos por sus propios sistemas de retiro. Antes del 23 de agosto de 2017, el SRE estaba gobernado por una junta de fideicomisarios de once miembros, compuesta por el Secretario de Hacienda del ELA (que se desempeña como Presidente del SRE), el Presidente del BGF, el Comisionado de Asuntos Municipales, el Director de la Oficina de Recursos Humanos del ELA, tres empleados y dos pensionados, que fueron nombrados por el Gobernador. Los otros dos miembros fueron el Presidente de la Federación de Alcaldes y el Presidente de la Asociación de Alcaldes. Antes del 23 de agosto de 2017, el SRE fue administrado por la Administración de Sistemas de Retiro Judicial y de Empleados del Gobierno de Puerto Rico (la Administración del SRE y SRJ) que también administró el Sistema de Retiro de Empleados del Gobierno de Puerto Rico y su Contribución al Plan de Seguro Médico de Organismos (SRE MIPC). SRE MIPC es un plan de beneficios de atención médica posterior al empleo, sin financiamiento, de costos compartidos, de patronos múltiples, y de otros beneficios definidos proporcionado por el ELA a los miembros retirados del plan.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*Sistema de Retiro de la Judicatura del Estado Libre Asociado de Puerto Rico (SRJ)*: el SRJ es un plan de beneficios definidos de un solo patrono que cubre a todos los jueces activos o jueces retirados de la rama judicial del ELA. Antes del 23 de agosto de 2017, el SRJ estaba gobernado por la misma junta de administración del SRE y era administrado por la Administración del SRE y el SRJ.

*Sistema de Anualidades y Pensiones para Maestros de Puerto Rico (SRM):* el SRM brinda beneficios de retiro a todos los maestros del Departamento de Educación del ELA, a todos los maestros pensionados, a todos los maestros transferidos a un puesto administrativo en el Departamento de Educación del ELA y a quienes trabajan en instituciones privadas acreditadas por el Departamento de Educación del ELA que eligen ser miembros. El SRM proporciona beneficios de retiro, muerte y discapacidad. Antes del 23 de agosto de 2017, el SRM estaba gobernado por una junta de nueve miembros formada por tres miembros *ex oficio*, el Secretario del Departamento de Educación del ELA, el Secretario de Hacienda del ELA, el Presidente del BGF y un miembro que era representante de una organización de maestros designada por el Gobernador; tres maestros nombrados por el Gobernador, uno de los cuales representaba a maestros certificados en servicio activo, y dos que representaban a maestros retirados; un miembro que era un representante de la entidad que representaba la unidad apropiada según la Ley Núm. 45 del 25 de febrero de 1998, según enmienda; y un miembro adicional, como representante del interés público, con conocimiento y experiencia en la administración y operación de sistemas financieros, designado por el Gobernador. El ELA informa el SRM como un plan de pensiones de patrono único. El SRM fue administrado por el Sistema de Retiro para Maestros (Administración de SRM) que también administró el Sistema de Anualidades y Pensiones para Maestros de Puerto Rico para la Contribución del Plan de Seguro Médico (SRM MIPC). El SRM MIPC es un plan de beneficios no financiado, de costos compartidos, de beneficios definidos por patronos múltiples, otro plan de beneficios de atención médica posterior al empleo proporcionado por el ELA a maestros retirados del Departamento de Educación del ELA y empleados retirados de la Administración del SRM.

El 23 de agosto de 2017, el Gobernador promulgó la Ley Núm. 106. La Ley Núm. 106 reformó el SRE, el SRJ y el SRM sustituyendo las juntas directivas de los Sistemas de Retiro por la Junta de Retiro del Gobierno de Puerto Rico (la Junta de Retiro) y estableciendo una "Cuenta de Retiro para el Pago de Pensiones Acumuladas" separada para implementar un Método de "pago por uso" para los sistemas de jubilación. Para obtener información adicional sobre la transición al método PayGo, consulte la Nota 23.

Los estados financieros completos de estas unidades de componentes se pueden obtener directamente contactando a sus respectivas oficinas administrativas en:

Sistema de Retiro de Empleados del Gobierno        Sistema de Retiro de la Judicatura del ELA
de Puerto Rico                                     de Puerto Rico
P.O. Box 42003 - Minillas Station                  P.O. Box 42003 - Minillas Station
San Juan, PR 00940-2203                            San Juan, PR 00940-2203

Sistema de Anualidades y Pensiones para Maestros de Puerto Rico
P.O. Box 191879
San Juan, PR 00919-1879

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*(c) Unidades de Componentes Auditadas Por Separado*

Los estados financieros básicos del ELA incluyen los estados financieros de las siguientes unidades de componentes que fueron auditadas por otros auditores:

*(i)  Unidades Mixtas de Componentes*

Autoridad de Puertos de Ponce
Autoridad del Puerto de las Américas
Autoridad de Edificios Públicos
Administración de Seguros de Salud de Puerto Rico
Autoridad de Financiamiento de la Infraestructura de Puerto Rico
Autoridad de Transporte Marítimo de Puerto Rico
Administración de Servicios Médicos de Puerto Rico
Fideicomiso Perpetuo de Comunidades Especiales
Fideicomiso de los Niños
Centro Comprensivo de Cáncer de la Universidad de Puerto Rico

*(ii)  Unidades de Componentes de Presentación Discreta*

Administración para el Desarrollo de Empresas Agropecuarias

Administración de Compensación de Accidentes de Automóviles
Corporación del Centro Cardiovascular de Puerto Rico y el Caribe
Compañía para el Desarrollo Integral de la "Península de Cantera"
Corporación para el Proyecto ENLACE "Caño Martín Peña"
Autoridad de Conservación y Desarrollo de Culebra
Banco de Desarrollo Económico para Puerto Rico
Corporación de Seguros Agrícolas de Puerto Rico
Corporación del Centro de Bellas Artes
Oficina de Protección al Consumidor Independiente
Instituto de Cultura Puertorriqueña
Fideicomiso Institucional de la Guardia Nacional de Puerto Rico
Autoridad de Tierras de Puerto Rico
Autoridad de Reurbanización Local de las Tierras e Instalaciones de la Estación Naval Roosevelt Roads
Corporación para las Artes Musicales
Corporación Pública para la Supervisión y Seguro las Cooperativas de Puerto Rico
Autoridad de Acueductos y Alcantarillas de Puerto Rico
Corporación del Conservatorio de Música de Puerto Rico
Autoridad del Distrito del Centro de Convenciones de Puerto Rico
Consejo de Educación de Puerto Rico
Autoridad de Energía Eléctrica de Puerto Rico
Comisión de Energía de Puerto Rico
Fondo Fiduciario de Inversión del Gobierno de Puerto Rico
Autoridad de Carreteras y Transportación de Puerto Rico
Empresa de Desarrollo Industrial de Puerto Rico
Autoridad para el Financiamiento de Instalaciones de Control Industrial, Turístico, Educativo, Médico y Ambiental de Puerto Rico
Autoridad de Transporte Integrado de Puerto Rico

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Administración de Tierras de Puerto Rico
Autoridad de Transporte Marítimo de Puerto Rico e Islas Municipales
Autoridad de Transporte Metropolitano de Puerto Rico
Agencia de Finanzas Municipales de Puerto Rico
Corporación de Finanzas Municipales de Puerto Rico
Autoridad de Puertos de Puerto Rico
Corporación de Puerto Rico para la Difusión Pública
Autoridad para Alianzas Público-Privadas de Puerto Rico
Escuela de Artes Plásticas de Puerto Rico
Fideicomiso para Ciencia, Tecnología e Investigación de Puerto Rico
Autoridad Telefónica de Puerto Rico
Compañía de Turismo de Puerto Rico
Compañía de Comercio y Exportación de Puerto Rico
Autoridad de Depósitos Sólidos
Corporación del Fondo del Seguro del Estado
Universidad de Puerto Rico

(iii)   *Fondos Fiduciarios de Pensiones*

Sistema de Anualidades y Pensiones para Maestros de Puerto Rico

**(d)** *Bases de Presentación*

(i)   *Estados Financieros de Todo el Gobierno*

Los estados financieros de todo el gobierno (el estado de resultados netos y el estado de actividades) presentan información de todas las actividades no fiduciarias del ELA Commonwealth y sus unidades de componentes. En su mayor parte, el efecto de la actividad entre fondos se ha eliminado de estos estados financieros de todo el gobierno. Las Actividades del Gobierno, que normalmente están respaldadas por impuestos e ingresos intergubernamentales, se informan por separado de las actividades de Tipo Comercial, que dependen en gran medida de las tarifas y cargos por servicios o que se financian y operan de manera similar a las empresas comerciales privadas. Del mismo modo, el Gobierno Primario se informa por separado de las unidades de componentes legalmente separadas y de presentación discreta, de las que el Gobierno Primario es financieramente responsable. El estado de posición resultados netos presenta los activos no fiduciarios de las entidades informadas, las salidas diferidas de recursos, los pasivos y las entradas diferidas de recursos, con la medida residual informada como resultados netos. Los resultados netos se informan en tres categorías:

- *Inversión Neta en Activos de Capital:* este componente de los resultados netos consiste en activos de capital netos de depreciación acumulada y reducidos por el saldo pendiente de cualquier bono, hipoteca, pagarés u otros préstamos que sean directamente atribuibles a la adquisición, construcción o mejora de esos activos. Las salidas diferidas de recursos y las entradas diferidas de recursos que son atribuibles a la adquisición, construcción o mejora de esos activos o deuda relacionada también deben incluirse en este componente de los resultados netos. Si al finalizar el año hay importantes ingresos de deuda no gastados relacionados o entradas diferidas de recursos, la porción de la deuda o entradas diferidas de recursos atribuibles al monto no gastado no se incluye en el cálculo de este componente de los resultados netos. Por el contrario, esa porción de la deuda o entradas diferidas de recursos se incluye en el mismo componente de los resultados netos (restringidos o no restringidos) que el monto no gastado.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

- *Resultados Netos Restringidos:* este componente de los resultados netos consiste en activos restringidos y salidas diferidas de recursos reducidos por pasivos relacionados y entradas diferidas de recursos. En general, un pasivo se relaciona con activos restringidos si el activo resulta de un flujo de recursos que también resulta en el reconocimiento de un pasivo o si el pasivo se liquidará con los activos restringidos informados. Los activos restringidos resultan cuando las restricciones impuestas al uso de esos activos son impuestas externamente por acreedores, otorgantes, contribuyentes y similares, o son impuestas por ley a través de disposiciones constitucionales o la legislación habilitadora.

- *Resultados Netos No restringidos:* este componente de los resultados netos es el monto neto de los activos, las salidas diferidas de recursos, los pasivos y las entradas diferidas de recursos que no se incluyen en la determinación de la inversión neta en activos de capital o el componente restringido de los resultados netos.

   Cuando los recursos restringidos y no restringidos están disponibles para su uso, por lo general, es política del ELA utilizar primero los recursos restringidos y luego los recursos no restringidos según se necesiten.

El estado de actividades demuestra el grado en que los gastos directos de una determinada función, segmento o unidad de componente se compensan con los ingresos del programa. Los gastos directos son aquellos que son claramente identificables con una función específica, segmento o unidad de componentes. El ELA no asigna gastos del gobierno general (indirectos) a otras funciones. Los ingresos del programa incluyen cargos a los clientes que compran, usan o se benefician directamente de los bienes o servicios proporcionados por una función, segmento o unidad de componente determinada. Los ingresos del programa también incluyen subsidios y contribuciones que se limitan a cumplir con los requisitos operativos o de capital de una función, segmento o unidad de componente en particular. Los ingresos que no se clasifican como ingresos del programa, incluidos todos los impuestos, se presentan como ingresos generales. Los recursos que se dedican internamente se informan como ingresos generales en lugar de como ingresos del programa.

*(ii)   Estados Financieros del Fondo*

El ELA informa su posición financiera y los resultados de las operaciones en fondos, que se consideran entidades contables separadas, incluidas las unidades de componentes, que deben combinarse. Las operaciones de cada fondo se contabilizan dentro de un conjunto de cuentas de equilibrio automático. La contabilidad de fondos segrega los fondos conforme a su propósito previsto y se utiliza para ayudar a la administración a demostrar el cumplimiento de las disposiciones legales, financieras y contractuales. Los fondos mayores se determinan utilizando un porcentaje predefinido de los activos, salidas diferidas de recursos, pasivos, entradas diferidas de recursos, ingresos o gastos/gastos de la categoría del fondo o de los fondos del gobierno y de propiedad exclusiva combinados. Los fondos no mayores se combinan en una sola columna en los estados financieros del fondo.

*(iii)   Fondos del Gobierno*

Los fondos del gobierno se centran en las fuentes y usos de los fondos y proporcionan información sobre las entradas, salidas y balances a corto plazo de los recursos disponibles. El ELA informa los siguientes fondos del gobierno:

- *Fondo General:* el Fondo General es el principal fondo operativo del ELA. Se utiliza para contabilizar e informar todos los recursos financieros recibidos y utilizados para aquellos servicios tradicionalmente proporcionados por un gobierno, excepto aquellos que deben contabilizarse e informarse en otro

74

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

fondo. El Fondo General incluye transacciones para servicios tales como gobierno general, seguridad pública, salud, vivienda pública y asistencia social, educación y desarrollo económico. Los recursos financieros recibidos y utilizados en el Fondo General incluyen principalmente: recursos presupuestados (como impuestos y cargos por servicios), según lo aprobado por la Legislatura y ajustados por el tiempo y la base de las diferencias contables, y otros recursos financieros fuera del presupuesto del Fondo General tales como: fondos federales, fondos pignorados, otros ingresos especiales y fondos de tipo general, y agencias con tesorerías independientes.

- *Fondo de Servicio de la Deuda:* el fondo de servicio de la deuda contabiliza e informa los recursos financieros que están restringidos, comprometidos o asignados a gastos para el capital, los intereses y los costos relacionados de los bonos generales a largo plazo distintos de los bonos pagaderos de las operaciones de tipos de fondos de propiedad exclusiva, fondos fiduciarios de pensiones y unidades de componentes, ya sea combinadas o de presentación discreta. La deuda e intereses a largo plazo que vencen el 1 de julio del año fiscal siguiente se contabilizan como un pasivo del fondo si los recursos están disponibles al 30 de junio para su pago.

- *Fondo de Ingresos Especiales de COFINA:* el fondo de ingresos especiales de la Corporación del Fondo de Interés Apremiante de Puerto Rico (COFINA) se utilizó para contabilizar e informar todos los recursos financieros de COFINA, excepto aquellos que deben contabilizarse e informarse en el fondo del Servicio de la Deuda de COFINA.

- *Fondo de Servicio de la Deuda de COFINA:* el fondo de servicio de la deuda de COFINA se utilizó para contabilizar los ingresos por impuestos a las ventas del ELA que se depositaban en el Fondo Dedicado de Impuestos a las Ventas para el pago de intereses y capital sobre obligaciones a largo plazo.

- *Fondos No Mayores del Gobierno:* el ELA informa las siguientes unidades de componentes combinados dentro de los fondos no mayores del gobierno: AEP, el Fideicomiso de los Niños, PRIFA, PRMSA, PAA, SCPT y UPRCCC. Los fondos no mayores del gobierno también incluyen el fondo del proyecto de capital del ELA.

Si una unidad de componentes se combina, debe combinarse con esos fondos del Gobierno Primario e incluirlos en la categoría de fondos asignados del Gobierno Primario. Aunque el Fondo General del Gobierno Primario suele ser el principal fondo operativo de la entidad que informa, el Fondo General de una unidad de componentes combinados debe informarse como un fondo especial de ingresos. Los fondos de ingresos especiales se utilizan para contabilizar e informar los ingresos de fuentes de ingresos específicos que están restringidos o comprometidos a gastos para fines específicos distintos al servicio de la deuda o proyectos de capital.

Los fondos del proyecto de capital se utilizan para contabilizar e informar recursos financieros que están restringidos, comprometidos o asignados a gastos para desembolsos de capital, incluida la adquisición o construcción de instalaciones de capital y otros activos de capital. Estos gastos de capital pueden estar destinados al Gobierno Primario directamente o a las unidades de componentes de presentación discreta y organizaciones y gobiernos externos como los municipios del ELA y otras entidades correspondientes. Los fondos de proyectos de capital excluyen esos tipos de salidas relacionadas con capital financiadas por fondos de propiedad exclusiva o por activos que se mantendrán en fideicomiso para individuos, organizaciones privadas u otros gobiernos.

De acuerdo con la Declaración GASB Núm. 54, *Informes de Balance de Fondos y Definiciones de Tipo de Fondo del Gobierno*, la clasificación del balance del fondo se basa en la medida en que el ELA tiene la

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

obligación de observar las restricciones impuestas sobre el uso de recursos en los fondos del gobierno. Las clasificaciones son las siguientes:

- *No Gastable:* montos que no están en una forma gastable o que deben mantenerse intactos por una obligación legal o contractual.

- *Restringido:* montos que están restringidos legalmente por terceros, disposiciones constitucionales o legislación habilitadora para un propósito específico.

- *Comprometido:* montos que están restringidos para fines específicos que son impuestos internamente por la acción formal del gobierno al más alto nivel de autoridad para tomar decisiones y que no caducan al final del año. El nivel más alto de autoridad de decisión para el ELA es la Legislatura y el Gobernador, y la acción formal es la aprobación de una ley que especifica los propósitos para los cuales se pueden usar los montos.

- *Asignado:* incluye los importes de saldo de fondos que están restringidos por el ELA y están destinados a ser utilizados para fines específicos que no se consideran restringidos o comprometidos. El Director de la OGP del ELA está autorizado a asignar un monto para un propósito específico mediante la aprobación de certificados de presupuesto según lo requerido por el estatuto.

- *No asignado:* es la clasificación residual para el Fondo General. En un fondo del gobierno que no sea el Fondo General, un monto negativo indica que los gastos incurridos para un propósito específico excedieron los montos en el fondo que están restringidos, comprometidos y asignados a ese propósito.

El ELA utiliza montos restringidos primero cuando hay disponibles saldos de fondos restringidos y no restringidos, a menos que existan documentos/contratos legales que prohíban hacerlo, como un acuerdo de subvención que requiera un gasto dólar por dólar. Además, a menos que lo exija la ley o el acuerdo, el ELA utilizaría primero los montos comprometidos, luego asignados y, por último, no asignados de saldo de los fondos sin restricciones cuando se realicen los gastos.

El ELA no tiene una política formal de saldo mínimo de fondos.

*(iv)   Fondos de Propiedad Exclusiva*

Estos fondos representan esas actividades, que se financian y operan de manera similar a las empresas comerciales privadas. La gerencia tiene la intención de recuperar, principalmente a través de los cargos de los usuarios, el costo de proporcionar bienes o servicios al público en general.

El ELA informa los siguientes fondos mayores de propiedad no exclusiva:

- *Fondo de Seguro por Desempleo:* este fondo representa los montos solicitados para el Fondo Fiduciario del Seguro por Desempleo de Puerto Rico en poder del Tesoro de los Estados Unidos para el pago de beneficios de desempleo y cargos aplicados a patronos individuales.

- *Fondo de Loterías:* este fondo representa los activos y las operaciones de dos sistemas de lotería administrados por el ELA.

- *Administración de Seguros de Salud de Puerto Rico:* este fondo, una unidad de componentes combinados, representa un sistema de seguro de salud operado a través de contratos con reaseguradoras de seguros para proporcionar atención médica y hospitalaria de calidad para personas de bajos ingresos,

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

empleados del ELA y policías que se suscriben voluntariamente al plan médico de seguro de salud de Puerto Rico.

- *Administración de Servicios Médicos de Puerto Rico*: este fondo, una unidad de componentes combinados, representa las operaciones de los servicios de salud centralizados, prestados en apoyo de hospitales y otras funciones ofrecidas por las instituciones miembros y los consumidores del complejo conocido como Centro Médico de Puerto Rico.

- *Fondo Recurrente para el Control de la Contaminación del Agua en Puerto Rico (PRWPCRF)*: este fondo, administrado por la Junta de Calidad Ambiental de Puerto Rico (EQB), está autorizado para celebrar acuerdos operativos y acuerdos de subvención de capitalización con la Agencia de Protección Ambiental de EE. UU. (EPA), principalmente para proyectos de infraestructura de agua, bajo un acuerdo de cooperación conjunta entre la EQB, la PRIFA, la AAA y el BGF, donde cada entidad acordó asumir sus responsabilidades correspondientes.

El ELA informa los siguientes fondos no mayores de propiedad exclusiva: Fondo de Seguro por Discapacidad, Fondo de Seguro de Conductores, Fondo Recurrente de Préstamos para el Tratamiento del Agua Potable Segura de Puerto Rico (PRSDWTRLF), Autoridad de Puertos de Ponce y la Junta de Gobierno del Servicio 9-1-1.

*(v)   Fondos Fiduciarios*

Los fondos fideicomisarios se utilizan para contabilizar los fondos mantenidos por el ELA en calidad de fideicomisario, o como agente para individuos, organizaciones y otras unidades del gobierno. Los siguientes son los fondos fiduciarios del ELA:

- *Fondos Fiduciarios de Pensiones (y Otros Beneficios para Empleados)*: se utilizan para contabilizar los activos, pasivos y los resultados netos mantenidos en fideicomiso para los beneficios de pensión y los beneficios de atención médica posteriores al empleo en fideicomiso para los sistemas de retiro de los empleados públicos.

- *Fondos de Agencia:* son de naturaleza de custodia (activos igual a pasivos) y no implican la medición de los resultados de las operaciones.

**(e)** *Enfoque de Medición y Bases de Contabilidad*

*Estados Financieros de Todo el Gobierno:* los estados financieros de todo el gobierno se informan utilizando el enfoque de medición de recursos económicos y la base contable de devengo. Los ingresos se registran cuando se ganan y los gastos se registran cuando se incurre en un pasivo, independientemente del momento de los flujos de efectivo relacionados.

*Estados Financieros de Fondos del Gobierno:* los estados financieros de los fondos del gobierno se informan utilizando el enfoque actual de medición de recursos financieros y la base contable acumulada modificada. Los ingresos se reconocen tan pronto como son medibles y están disponibles, y netos de los pagos excesivos estimados (según corresponda) y los montos considerados no cobrables. Se considera que los ingresos están disponibles cuando son cobrables dentro del período actual o lo suficientemente pronto para pagar los pasivos del período actual (consulte la Nota 1(j) para obtener una descripción más detallada sobre el período de disponibilidad para las principales fuentes de ingresos en las Actividades del Gobierno).

Las principales fuentes de ingresos consideradas susceptibles de acumulación incluyen los impuestos a las ganancias personales y corporativas (reconocidos a medida que los contribuyentes obtienen los ingresos subyacentes), los impuestos a las ventas y a los usos (reconocidos a medida que se realizan las ventas subyacentes), los impuestos especiales (a medida que se realiza la importación subyacente o la actividad

77

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

relacionada), impuestos a la propiedad (impuestos sobre los valores de las propiedades inmobiliarias, según su definición), ingresos intergubernamentales (típicamente, cuando se incurre en gastos relacionados) y otros impuestos y cargos por servicios (típicamente, a medida que se recibe dinero en efectivo).

Los gastos generalmente se registran cuando se incurre en un pasivo, según la base contable de devengo. Las modificaciones a la base contable de devengo incluyen lo siguiente:

- Las vacaciones anuales conferidas por los empleados y las licencias por enfermedad se registran como gastos en su vencimiento. El monto no vencido de vacaciones anuales acumuladas y licencia por enfermedad sin pagar al 30 de junio de 2016 se informa solo en los estados financieros de todo el gobierno.

- Los intereses y el capital sobre las obligaciones generales a largo plazo y los intereses sobre los acuerdos de intercambio de tasas de interés se registran cuando vencen, con excepción de los intereses y el capital que vencen el 1 de julio del siguiente año fiscal, si hay recursos disponibles para su pago al 30 de junio.

- Los gastos del servicio de la deuda, las desestimaciones de costos de los fondos federales, otras obligaciones a largo plazo y los montos sujetos a juicios por litigio se registran en los fondos del gobierno solo cuando se vence el pago; y en el caso de sentencias en litigio, cuando se ha llegado a un acuerdo y en espera de pago. Hasta que se cumplan estos criterios, estos pasivos se han registrado solo en los estados financieros de todo el gobierno.

Una conciliación resumida de la diferencia entre el balance total de fondos (déficit) se refleja en el balance de fondos del gobierno y los resultados netos de las Actividades del Gobierno tal como se muestra en el estado de resultados netos de todo el gobierno se presenta en una conciliación del balance de fondos del gobierno con el estado de resultados netos.

Una conciliación resumida de la diferencia entre el cambio neto en el balance de los fondos (déficit) se refleja en el estado de ingresos, gastos y cambios en el balance de los fondos (déficit) de los fondos del gobierno y el cambio en los resultados netos neta en el estado de actividades de todo el gobierno. Los estados financieros se presentan en la conciliación de ingresos, gastos y cambios en el balance de fondos (déficit) de fondos del gobierno que acompañan al estado de actividades.

*Estados Financieros de Fondos de Propiedad Exclusiva, Fondos Fiduciarios y Unidades de Componentes de Presentación Discreta:* los estados financieros de los fondos de propiedad exclusiva, los fondos fiduciarios y las unidades de componentes de presentación discreta se informan utilizando el enfoque de medición de los recursos económicos y la base acumulativa de contabilidad, similar a los estados financieros a nivel del gobierno que se describen anteriormente.

Los fondos de propiedad exclusiva distinguen los ingresos y gastos operativos de los elementos no operativos. Los ingresos y gastos operativos generalmente resultan de la prestación de servicios y la producción y entrega de bienes en relación con las principales operaciones continuas de un fondo de propiedad exclusiva. Los ingresos y gastos que no cumplen con esta definición se informan como ingresos y gastos no operativos. Las principales fuentes de ingresos de los principales fondos de propiedad exclusiva del ELA son las siguientes:

- *Fondo de Seguro por Desempleo:* primas de seguro cobradas a patronos individuales.

- *Fondo de Loterías:* montos recaudados por la venta de boletos de lotería tradicionales y juegos electrónicos de lotería.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

- *Administración de Seguros de Salud de Puerto Rico:* montos recibidos a través del Departamento de Salud del ELA que representan pagos del Programa Medicaid en virtud del Título XIX de la Ley de Seguro Social y el Plan Estatal, contribuciones del ELA para cubrir la participación local para cumplir con los requisitos de correspondencia del Programa Medicaid y montos aplicados y cobrados a los patronos y municipios por servicios de salud directos prestados a sus miembros.

- *Administración de Servicios Médicos de Puerto Rico:* montos aplicados y cobrados a ciudadanos particulares, instituciones miembro y municipios por los servicios prestados a los pacientes.

- *Fondo Recurrente para el Control de la Contaminación del Agua en Puerto Rico:* ingresos por intereses de la concesión de préstamos para infraestructura y construcción.

**(f)** *Efectivo, Equivalentes al Efectivo e Inversiones a Corto Plazo*

El ELA sigue la práctica de agrupar efectivo. Los saldos en efectivo de los fondos mantenidos en Hacienda del ELA se combinan en una cuenta corriente general y varias cuentas bancarias con saldo cero para fines especiales. El saldo de efectivo disponible en la cuenta corriente general más allá de la necesidad inmediata se agrupaba en cuentas que devengan intereses en el BGF y el PRGITF al 30 de junio de 2015. Después de marzo de 2016, se crearon nuevas cuentas que generan intereses con los bancos comerciales asegurados con la Corporación Federal de Seguros de Depósitos (FDIC). Estas nuevas cuentas son utilizadas por el ELA para seguir la práctica de agrupar su efectivo.

El efectivo y sus equivalentes incluyen inversiones con vencimientos originales de 90 días o menos desde la fecha de adquisición. Las inversiones a corto plazo se registran al costo.

El Comisionado de Instituciones Financieras de Puerto Rico exige que las instituciones financieras privadas de Puerto Rico depositen valores en garantía para cubrir los depósitos del ELA y todas las demás entidades gubernamentales en cada una de estas instituciones. El monto de los valores en garantía a ser pignorados para la seguridad de los depósitos públicos debe ser establecido por las reglas y regulaciones promulgadas por el Comisionado de Instituciones Financieras.

El Fondo Fiduciario de Seguro por Desempleo de Puerto Rico se mantiene para cubrir la recaudación de las contribuciones al seguro por desempleo de los patronos y el pago de los beneficios de desempleo a los reclamantes elegibles. Como lo exige la ley federal, todos los recursos que no sean necesarios para el pago de los beneficios actuales se depositan en el Tesoro de los EE. UU. Los intereses ganados sobre dicho depósito se retienen en el fondo.

El efectivo y las inversiones a corto plazo y los equivalentes de efectivo de las unidades de componentes y ciertos fondos del Gobierno Primario se mantienen en cuentas bancarias, separadas de las del resto del Gobierno Primario, en sus propios nombres. Una parte importante de estos instrumentos financieros se invierte en depósitos del BGF. Para obtener información adicional sobre el efectivo depositado en el BGF al 30 de junio de 2016, consulte la Nota 6.

El ELA evalúa continuamente el riesgo de crédito de custodia, la disponibilidad y la capacidad de recuperación del efectivo y las inversiones a corto plazo. Consulte la Nota 6 para ver la pérdida de crédito de custodia registrada en ciertas inversiones en efectivo y a corto plazo. La pérdida de crédito de custodia de efectivo y las inversiones a corto plazo mantenidas al 30 de junio de 2016 se determinaron en la utilización real posterior de dichos activos.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

**(g)** *Valores Comprados/Vendidos en virtud de Acuerdos de Reventa/Recompra*

Ciertas unidades de componentes del ELA realizan compras de títulos con acuerdos simultáneos para revenderlos (acuerdos de reventa) y realizan la venta de títulos mediante acuerdos de recompra (acuerdos de recompra). Los montos adelantados o recibidos en virtud de estos acuerdos generalmente representan préstamos a corto plazo y se reflejan como un activo en el caso de los acuerdos de reventa y como un pasivo en el caso de los acuerdos de recompra. Los valores subyacentes a estos acuerdos consisten principalmente en obligaciones del gobierno de EE. UU., valores respaldados por hipotecas y depósitos que devengan intereses con otros bancos. Los acuerdos de reventa y recompra son transacciones autorizadas en virtud de su respectiva legislación habilitadora o autorizadas por el agente fiscal del ELA.

**(h)** *Transacciones de Préstamos de Títulos*

Ciertas unidades de componentes y fondos fiduciarios de pensiones del ELA realizan transacciones de préstamos de títulos donde las entidades del gobierno (prestamistas) transfieren sus títulos a corredores de bolsa y otras entidades (prestatarios) para obtener garantías con un acuerdo simultáneo para devolver la garantía de los mismos valores en el futuro. El efectivo recibido como garantía en las transacciones de préstamos de valores y las inversiones realizadas con ese efectivo se reflejan como inversiones. Los valores recibidos como garantía se informan como inversiones si la unidad de componentes tiene la capacidad de comprometerse o venderlos sin incumplimiento del prestatario. Los pasivos resultantes de estas transacciones de préstamo de títulos también se informan en el estado de resultados netos.  Las transacciones de préstamos de títulos garantizadas mediante cartas de crédito o valores que la unidad de componentes no tiene la capacidad de comprometer o vender, salvo en caso de incumplimiento del prestatario, no se informan como activos y pasivos en el estado de resultados netos.

**(i)** *Inversiones*

Las inversiones incluyen principalmente las obligaciones del gobierno y las agencias de los EE. UU., valores respaldados por hipotecas, acuerdos de recompra, papeles comerciales, obligaciones del gobierno local, contratos de inversión y obligaciones corporativas de deuda y capital. Las inversiones y los contratos de inversión se contabilizan a su valor razonable, excepto las inversiones en el mercado monetario y los contratos de inversión participantes con un vencimiento restante al momento de la compra de un año o menos y los contratos de inversión no participativos (contratos de inversión garantizados), que se contabilizan al costo; y posiciones de inversión en grupos de inversión externos, que se realizan al precio de las acciones del grupo. El valor razonable se determina en función de los precios de mercado cotizados y las cotizaciones recibidas de corredores/distribuidores independientes u organizaciones de servicios de fijación de precios. Los ingresos por inversiones, incluidos los cambios en el valor razonable de las inversiones, se presentan como ganancias de inversiones en el estado de actividades, el estado de ingresos, gastos y cambios en los saldos de los fondos (déficit) - fondos del gobierno, y el estado de ingresos, gastos, y cambios en los resultados netos - fondos de propiedad exclusiva. Las ganancias y pérdidas realizadas por la venta de inversiones y los cambios no realizados en el valor razonable de las inversiones pendientes se incluyen dentro de las ganancias por intereses e inversiones.

El PRGITF se considera como un grupo de inversión externa y, como tal, informa sus inversiones o inversiones a corto plazo a costo amortizado. Para obtener información adicional, consulte la Nota 5.

La Declaración GASB Núm. 72, *Medición y Aplicación del Valor Razonable*, define el valor razonable como el precio que se recibiría por vender un activo o se pagaría por transferir un pasivo en una transacción ordenada entre participantes del mercado en la fecha de medición. Esta Declaración requería que un gobierno utilizara técnicas de valoración que sean apropiadas bajo las circunstancias y para las cuales haya suficientes datos disponibles para medir el valor razonable. Las técnicas deben ser consistentes con uno o más de los siguientes enfoques: (i) el mercado enfoque, (ii) el enfoque de costos, o (iii) el enfoque de ingresos. Esta Declaración

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

también establece una jerarquía de entradas para las técnicas de valoración utilizadas para medir el valor razonable. La divulgación de los estimados del valor razonable en la jerarquía se basa en si las entradas significativas en las valoraciones son observables. Al determinar el nivel de jerarquía en el que se revela la estimación, el nivel más alto, el Nivel 1, se otorga a los precios cotizados no ajustados en los mercados activos y el nivel más bajo, el Nivel 3, a los insumos no observables.

Nivel 1: insumos cuyos valores se basan son precios cotizados (no ajustados) en mercados activos para activos o pasivos idénticos.

Nivel 2: insumos cuyos valores se basan en precios cotizados para instrumentos similares en mercados activos; precios cotizados para instrumentos idénticos o similares en mercados no activos; y valoraciones derivadas del modelo en las que todas las entradas significativas son observables.

Nivel 3: entradas son entradas no observables para activos o pasivos y pueden requerir un cierto grado de juicio profesional.

En los casos en que las entradas utilizadas para medir el valor razonable caen en diferentes niveles en la jerarquía del valor razonable, las mediciones del valor razonable en su totalidad se clasifican en función del nivel de entrada más bajo que sea significativo para la valoración. La evaluación del ELA sobre la importancia de los aportes particulares a estas mediciones del valor razonable requiere sentencia y considera factores específicos de cada inversión. Las inversiones medidas al valor del activo neto (NAV) para el valor razonable no están sujetas a clasificación de nivel.

*(j)* *Cuentas por Cobrar, Préstamos, Ingresos Generales e Ingresos No Devengados*

Los impuestos a las ganancias por cobrar, tanto en el Fondo General como en el estado de resultados netos, incluyen predominantemente una estimación de los montos adeudados por los contribuyentes por los impuestos a las ganancias individuales y corporativas, netos de las cantidades incobrables estimadas. Los impuestos a las ganancias por cobrar en el Fondo General se reconocen como ingresos cuando son medibles y están disponibles en función de los cobros reales durante los 120 días posteriores al final del año fiscal actual y cuando están relacionados con años imponibles de períodos anteriores. Los impuestos a las ganancias por cobrar también incluyen los montos adeudados por los contribuyentes sobre los ingresos obtenidos antes del 30 de junio de 2016, que se estima que son cobrables pero que actualmente no están disponibles y, por lo tanto, se informan como entradas diferidas de recursos en el Fondo General; tales entradas diferidas se consideran ingresos en el estado de actividades ya que los criterios de disponibilidad no son aplicables en los estados financieros a nivel del gobierno para el reconocimiento de ingresos.

La Ley Núm. 44 del 30 de marzo de 2016 permitió a los ciudadanos pagar por adelantado los impuestos sobre su retiro individual, cuentas de ahorro educativo, contratos de anualidades y sobre el valor incremental de los bienes sujetos a ganancias de capital. Los impuestos sobre la renta cobrados por adelantado se reconocen como ingresos no devengados en los fondos gubernamentales del balance y se reconocerán como ingresos cuando se produce la transacción subyacente.

Las cuentas por cobrar del impuesto sobre ventas y uso se reconocen como ingresos en los fondos del gobierno cuando son medibles y están disponibles en función de las recaudaciones reales durante los 30 días posteriores al final del año fiscal actual relacionado con las transacciones de ventas y uso que vencen antes o al final del año. El mismo tratamiento se aplica en los estados financieros de todo el gobierno dado su corto período de disponibilidad.

Los impuestos indirectos por cobrar se reconocen como ingresos en los fondos del gobierno cuando son mensurables y están disponibles en función de las recaudaciones reales durante los 30 días posteriores al final del año fiscal actual en relación con las transacciones que ocurrieron antes de que finalice el año. El mismo tratamiento se aplica en los estados financieros de todo el gobierno dado su corto período de disponibilidad. La Ley Núm. 154 del 25 de octubre de 2010 impuso un impuesto indirecto temporal sobre la adquisición de ciertos

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

bienes personales fabricados o producidos total o parcialmente en Puerto Rico y sobre la adquisición de ciertos servicios de fabricación realizados en Puerto Rico por personas extranjeras no residentes, corporaciones extranjeras y sociedades extranjeras. La Ley Núm. 154 se aplica a los ingresos realizados y las adquisiciones ocurridas después del 31 de diciembre de 2010. Inicialmente, el impuesto indirecto se aplicaría hasta el año 2017. El impuesto indirecto se basa en el valor de los bienes personales o los servicios adquiridos, y fue del 4% para el año calendario 2011, del 3.75% en 2012 y del 2.75% para porciones de 2013 hasta el 28 de febrero de 2013. El 28 de febrero de 2013, se promulgó la Ley Núm. 2 que aumentó la tasa de impuesto indirecto vigente del 2.75% al 4%, vigente de inmediato, y mantuvo dicha tasa fija en 4% hasta el año 2017. El 23 de enero de 2017, se promulgó la Ley Núm. 3 de 2017 que aumenta la tasa fija del 4% por diez años adicionales. Para obtener información adicional sobre la Ley Núm. 3 de 2017, consulte la Nota 2 y la Nota 23.

Para los fines de los estados financieros del fondo del gobierno, los ingresos por impuestos a la propiedad representan los pagos recibidos durante el año y los pagos recibidos (contra el año fiscal actual y los gravámenes de años anteriores) dentro de los primeros 90 días del siguiente año fiscal, reducidos por reembolsos de impuestos, si corresponde. Además, los estados financieros de todo el gobierno reconocen los ingresos por impuestos sobre bienes inmuebles (netos de reembolsos), que no están disponibles para los fondos del gobierno en el año fiscal para el que se recaudan los impuestos. La Ley Núm. 7 de 9 de marzo de 2009, según enmendada, aplicó un impuesto a los bienes inmuebles, además del ya establecido para los municipios del ELA a través del Centro de Recaudación de Ingresos Municipales (CRIM), sobre bienes inmuebles residenciales y comerciales con propiedades por un valor tasado superior a aproximadamente $210,000. Este impuesto se aplicó durante los años fiscales 2010 a 2012 y ascendió a 0.591% del valor de tasación de tales propiedades según lo determinado por el CRIM. La Ley Núm. 1 de 31 de enero de 2011 eliminó este impuesto adicional sobre bienes inmuebles que comenzó con el trimestre finalizado el 30 de junio de 2011. Las recaudaciones de este impuesto, que vencen el 1 de septiembre de 2012 y el 1 de marzo de 2013, todavía se recibieron durante el año fiscal 2016, como resultado de que los contribuyentes morosos actualicen sus cuentas o aprovechen los programas de amnistía ofrecidos por el Departamento de Hacienda. El ELA aplica un período de disponibilidad de 90 días, en lugar del período tradicional de 60 días después del final del año, para cubrir un período en el que se realizan la mayoría de los pagos de extensión de impuestos. Esto se ha aplicado constantemente a lo largo de los años.

Las cuentas por cobrar entre gobiernos se declaran netas de las previsiones estimadas para cuentas incobrables, que se determinan en función de la experiencia de cobro pasada y las condiciones económicas actuales. Las cuentas por cobrar entre gobiernos representan principalmente montos adeudados al ELA por el reembolso de los gastos incurridos de conformidad con los programas financiados por el gobierno federal. Estas cuentas por cobrar entre gobiernos se reconocen como ingreso en los fondos del gobierno cuando son mensurables y están disponibles en función de los cobros reales durante un año después del final del año fiscal relacionado con las transacciones que ocurrieron antes de que finalice el año. Las cuentas por cobrar entre gobiernos que no se esperan cobrar dentro del período de un año antes mencionado se registran como entradas diferidas de recursos. Al aplicar el concepto susceptible de acumulación a las subvenciones federales, los ingresos se reconocen cuando se cumplen todos los requisitos de elegibilidad de aplicación (por lo general, cuando se incurre en gastos relacionados) y los recursos están disponibles. Los recursos recibidos antes de que se cumplan los requisitos de elegibilidad, aparte del tiempo, se consideran ingresos no devengados. Los recursos recibidos antes de que se cumplan los requisitos de tiempo se consideran entradas de recursos diferidos.

Las cuentas por cobrar entre gobiernos también incluyen impuestos que el CRIM está obligado a remitir al ELA para ser utilizados por el fondo de servicio de la deuda del ELA para el pago del servicio de la deuda de las obligaciones generales del ELA. El monto a remitir se basa en el impuesto especial del 1.03% del valor tasado de todos los bienes inmuebles y personales no eximidos de impuestos, que se aplica por el CRIM, de conformidad

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

con la Ley Núm. 83 de 1991. Estas cuentas por cobrar de CRIM se reconocen como ingreso en los fondos del gobierno cuando son mensurables y están disponibles en base a cobros reales durante 180 días posteriores al final del año fiscal actual que en relación con las transacciones que ocurrieron antes de que finalice el año. Los montos del CRIM que no se espera cobrar dentro del período de 180 días antes mencionado se registran como entradas diferidas de recursos.

Las cuentas por cobrar por desempleo, discapacidad, seguro de conducir y otros servicios reconocidos en los fondos de propiedad exclusiva se declaran netos de las asignaciones estimadas para cuentas incobrables.

Las cuentas por cobrar a clientes no gubernamentales de las unidades de componentes son netas de los montos incobrables estimados. Estas cuentas por cobrar surgen principalmente de los cargos por servicio a los usuarios. Las cuentas por cobrar del Gobierno primario y otras unidades de componentes que surgen de los cargos por servicios, se evalúan para su cobro.

Los préstamos del Fondo General son netos de los montos incobrables estimados. Estas cuentas por cobrar surgen de montos adeudados por corporaciones públicas y municipios por seguros públicos y alquileres pagados por el Fondo General en su nombre.

Los préstamos de los fondos fiduciarios de pensiones se presentan netos de las previsiones estimadas para ajustes y pérdidas en la realización. Sin embargo, la mayoría de los préstamos están garantizados por títulos hipotecarios, contribuciones de los miembros del plan y cualquier monto no restringido que quede en custodia. Los préstamos de las unidades de componentes consisten principalmente en préstamos al Gobierno Primario, otras unidades de componentes y municipios, y se presentan netos de las provisiones para cuentas incobrables. Los préstamos restantes de las unidades de componentes son para pequeñas y medianas empresas, agrícolas y préstamos para viviendas de bajos ingresos de clientes no gubernamentales, y se presentan netos de pérdidas estimadas en tales carteras.

### (k) *Inventarios*

En general, los inventarios se valoran al costo y predominantemente por orden de entrada. Los inventarios de fondos del gobierno se registran como gastos cuando se compran en lugar de capitalizarse como un activo. Solo los montos importantes de inventario al final del año se capitalizan en los fondos del gobierno. Sin embargo, los inventarios siempre se capitalizan en el estado de resultados netos de las actividades del gobierno.

### (l) *Activos Restringidos*

Los fondos apartados para el pago y la garantía de pagarés e intereses pagaderos y para otros fines específicos se clasifican como activos restringidos, ya que su uso está limitado para este propósito por los acuerdos aplicables o requerido por la ley. Los activos restringidos en los fondos de propiedad exclusiva incluyen principalmente montos reservados para el pago de beneficios de seguros y actividades de préstamo.

### (m) *Bienes inmuebles en venta o desarrollo futuro*

Los bienes inmuebles mantenidos para la venta o desarrollo futuro se contabilizan al menor valor razonable o costo, que se establece mediante la evaluación profesional de un tercero o en base a una tasación, menos los costos estimados de venta. Las disminuciones posteriores en el valor de los bienes inmuebles disponibles para la venta se cargan a gastos/salidas.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*(n)* *Activos de Capital*

Los activos de capital incluyen terrenos, edificios, mejoras en la construcción, equipos (incluido el software), vehículos, construcción en proceso y activos de infraestructura, y se informan en las Actividades del Gobierno correspondientes, Actividades de Tipo Comercial y columnas de unidades de componentes en los estados financieros de todo el gobierno y en los estados financieros de fondos de propiedad exclusiva. El Gobierno Primario del ELA define los activos de capital como activos que (i) tienen un costo inicial individual de $25,000 o más en la fecha de adquisición y (ii) tienen una vida útil de más de un año. Los activos de capital se registran al costo histórico o al costo histórico estimado, si el costo histórico real no está disponible.

Los activos de capital donados por terceros se registran al valor razonable en el momento de la donación. Los activos de capital donados por partes relacionadas se registran al valor nominal existente en los registros del cedente. Los desembolsos mayores para bienes de capital y mejoras se capitalizan a medida que se construyen los proyectos. Los costos por intereses se capitalizan durante el período de construcción solo para actividades de tipo comercial y la mayoría de las unidades de componentes. Los costos de mantenimiento y reparaciones normales que no agregan valor a los activos o extienden materialmente la vida útil de los activos no se capitalizan.

Los activos de capital utilizados en los fondos del gobierno se registran como gastos en los estados financieros de los fondos del gobierno. Los gastos de depreciación se registran en los estados financieros de todo el gobierno, así como en los estados financieros de fondos de propiedad exclusiva y unidades de componentes.

Los activos de capital del Gobierno Primario se deprecian por el método lineal durante la vida útil estimada de los activos. No hay depreciación registrada para terrenos y construcción en progreso. La vida útil estimada de los activos de capital es la siguiente:

|  | Años |
|---|---|
| Edificios y mejoras de edificios | 20–50 |
| Equipos, muebles, accesorios, vehículos y software | 5–15 |
| Infraestructura | 50 |

Los activos de capital de las unidades de componentes se registran de acuerdo con los estándares aplicables de las unidades de componentes y según sus propios umbrales de capitalización individual, que incluyen la capitalización de intereses. La depreciación se ha registrado cuando lo requieren estos estándares en función de los tipos de activos, el uso y la vida útil estimada de los respectivos activos, y de la naturaleza de cada una de las operaciones de la unidad de componentes.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Las vidas útiles estimadas de los activos de capital informados por las unidades de componentes son las siguientes:

|  | **Años** |
|---|---|
| Edificios y mejoras de edificios | 3–50 |
| Equipos, muebles, accesorios, vehículos y software | 3-20 |
| Intangibles, que no sean software | 3–5 |
| Infraestructura | 10–50 |

En el caso de activos de capital en virtud de acuerdos de concesión de servicios de conformidad con la Declaración GASB Núm. 60, *Informes Contables y Financieros para acuerdos de Concesión de Servicios* (principalmente atribuido a la PRPA y la ACT), se mantienen en sus libros y también se presentan al costo o al costo histórico estimado. La construcción en progreso realizada por los operadores externos en virtud de estos acuerdos de concesión de servicios no se registra en las unidades de componentes antes mencionadas mientras dicha construcción aún está en progreso y no está lista para su uso y operación; en ese momento dichos activos construidos y mejoras serán reconocidos a su valor razonable correspondiente. Estos activos de capital no se deprecian después de la fecha de cierre de sus respectivos acuerdos de concesión de servicios porque dichos acuerdos requieren que los operadores externos devuelvan las instalaciones relacionadas a estas unidades de componentes en su condición original o mejorada. Dichos activos de capital continúan aplicando la guía de activos de capital existente, incluida la depreciación hasta la fecha de cierre de los respectivos acuerdos de concesión de servicios. En virtud de estos acuerdos de concesión de servicios, las unidades de componentes antes mencionadas han recibido del operador externo una tarifa de compensación inicial o activos de capital (o el compromiso de construirlos según el acuerdo) o ambos. Estos recursos, netos de cualquier obligación contractual de las unidades de componentes, se consideran una entrada diferida de recursos, que se reconoce en ingresos bajo el método de línea recta durante el plazo de los respectivos acuerdos.

El ELA sigue las disposiciones de la Declaración GASB Núm. 42, *Informes Contables y Financieros por Deterioro de Activos de Capital y por Recuperaciones de Seguros*, una enmienda a la Declaración GASB Núm. 34. Esta declaración establece una guía para contabilizar e informar el deterioro de los activos de capital y las recuperaciones de seguros. De acuerdo con estas disposiciones, los gobiernos deben evaluar eventos importantes o cambios en las circunstancias que afectan los activos de capital para determinar si ha ocurrido un deterioro de un activo de capital. Tales eventos o cambios en circunstancias que pueden ser indicativos de deterioro incluyen evidencia de daño físico, promulgación o aprobación de leyes o reglamentaciones u otros cambios en factores ambientales, cambios tecnológicos o evidencia de obsolescencia, cambios en la manera o duración del uso de un activo de capital y detención en la construcción, entre otros. El ELA y sus unidades de componentes evaluaron sus activos de capital según lo requerido por la Declaración GASB Núm. 42 y se identificó un deterioro de aproximadamente $3.2 millones y $14 millones a nivel del Gobierno Primario y unidades de componentes de presentación discreta, respectivamente, durante el año terminado el 30 de junio de 2016 Los deterioros de $3.2 millones a nivel del Gobierno Primario relacionados con las escuelas públicas se identificaron para el cierre. A nivel de la Unidad de Componentes de Presentación Discreta, se identificó el deterioro de aproximadamente $14 millones en la cuenta de construcción en progreso para la ACT presentada en la línea de reparación y mantenimiento de caminos y puentes.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

(o) *Devoluciones de Impuestos a la Renta a Pagar*

Durante el año calendario, el ELA recauda impuestos sobre la renta individual y corporativa a través de retenciones y pagos de los contribuyentes. Al 30 de junio, el ELA estima el monto adeudado a los contribuyentes por sobrepagos de impuestos sobre la renta durante la primera mitad del año calendario. Estos montos estimados y los reembolsos reales de impuestos a las ganancias individuales y corporativas reclamados por años anteriores pero no pagados al final del año se registran como reembolsos por impuestos a las ganancias a pagar y como una reducción de los ingresos fiscales tanto en los Fondos del Gobierno como en las Actividades del Gobierno.

(p) *Salidas/Entradas Diferidas de Recursos*

Además de los activos, el estado de resultados netos en ocasiones informa una sección separada para las salidas diferidas de recursos. Este elemento de estado financiero separado, salidas diferidas de recursos, representa un consumo de resultados netos que se aplica a un período o períodos futuros y, por lo tanto, no se reconocerá como una salida de recursos (gastos/salidas) hasta entonces. El Gobierno Primario y las unidades de componentes tienen tres subtítulos principales que califican para informar en esta categoría: (i) el balance no amortizado de pérdidas en el reembolso de bonos, (ii) la disminución acumulada en el valor razonable de los derivados de cobertura y (iii) varias partidas relacionadas con pensiones, las tres informaron en el estado de resultados netos de todo el gobierno. Una pérdida en el reembolso de bonos resulta de la diferencia en el valor nominal de la deuda reembolsada y su precio de readquisición. Este monto se capitaliza y amortiza a lo largo de la vida útil de la deuda reembolsada o reembolsada. Puede encontrar más información sobre los balances de las pérdidas por reembolso diferido no amortizadas en la Nota 13. Con respecto a los derivados de cobertura, las pérdidas acumuladas en sus valores razonables también se difieren y amortizan a medida que el instrumento cubierto subyacente (en este caso, la deuda) se paga o reembolsa, o cuando finaliza el derivado de cobertura. Puede encontrar más información sobre los instrumentos derivados del Gobierno Primario en la Nota 21 De las partidas relacionadas con las pensiones (que se describen más adelante en la Nota 2(s) y la Nota 18), los cambios en la parte proporcional de las contribuciones y las diferencias entre la experiencia esperada y la experiencia real, se capitalizan y reconocen durante un período igual a la vida útil restante de participantes activos e inactivos Las diferencias netas entre las ganancias proyectadas y las reales de las inversiones del plan de pensiones se difieren y reconocen durante un período de cinco años. Las contribuciones de pensiones realizadas con posterioridad a la fecha de medición se reconocerán como una reducción del pasivo neto de pensiones después de la próxima fecha de medición. No hubo salidas diferidas de recursos a nivel de fondos del gobierno.

Además de los pasivos, el estado de resultados netos y el balance de los fondos del gobierno en ocasiones informan una sección separada para las entradas diferidas de recursos. Este elemento de estado financiero separado, entradas diferidas de recursos, representa una adquisición de resultados netos y recursos que se aplica a un período o períodos futuros y, por lo tanto, no se reconocerá como una entrada de recursos (ingresos) hasta ese momento. El Gobierno Primario solo tiene un tipo de epígrafe que surge en virtud de la base contable acumulada modificada que reúne los requisitos para informar en esta categoría, y es el ingreso no disponible. Los ingresos diferidos de recursos a nivel de fondos del gobierno surgen cuando los ingresos potenciales no cumplen con los criterios "disponibles" para el reconocimiento de ingresos en el período actual bajo la base contable de devengo acumulado. En períodos posteriores, cuando los recursos aplicables estén disponibles, la entrada diferida de recursos se elimina del balance general y se reconocen los ingresos. El Gobierno Primario y las unidades de componentes también tienen dos subtítulos elegibles para informar en esta categoría en el estado de resultados netos de todo el gobierno, que son el balance no amortizado de ganancias en el reembolso de bonos y varios elementos relacionados con las pensiones. Se obtiene una ganancia en el reembolso de un bono cuando el valor nominal de la deuda reembolsada es mayor que su precio de readquisición. Este monto se capitaliza y amortiza

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

a lo largo de la vida útil de la deuda pagada o reembolsada. Puede encontrar más información sobre los balances de las ganancias por reembolso diferido no amortizadas en la Nota 13. De las partidas relacionadas con las pensiones (que se describen más adelante en la Nota 2(s) y la Nota 18), los cambios en la parte proporcional de las contribuciones, las diferencias entre la experiencia esperada y real y los cambios en los supuestos actuariales, se difieren y reconocen durante un período igual al resto esperado vida laboral de los participantes activos e inactivos. Las diferencias netas entre las ganancias proyectadas y las reales de las inversiones del plan de pensiones se difieren y reconocen durante un período de cinco años. Las unidades de componentes también tienen un elemento adicional elegible para informar en esta categoría en el estado de resultados netos de todo el gobierno, que son los balances no amortizados de los montos iniciales recibidos y los ajustes relacionados con los Acuerdos de Concesión de Servicios de la PRPA y la ACT, que se describen más detalladamente en la Nota 17.

*(q) Deuda a Largo Plazo*

Los pasivos informados en los estados financieros de todo el gobierno incluyen la obligación general del ELA y bonos de ingresos y pagarés a largo plazo, pasivos en virtud de obligaciones garantizadas, obligaciones en virtud de contratos de arrendamiento/compra, obligaciones por beneficios de rescisión voluntaria y pasivos a largo plazo que incluyen vacaciones, licencia por enfermedad, pasivos a largo plazo con otras entidades del gobierno, pasivo neto por pensiones, reclamos legales y desestimaciones de costos de fondos federales no corrientes relacionadas con gastos de subvenciones federales. Las obligaciones a largo plazo financiadas por tipos de fondos de propiedad exclusiva y unidades de componentes se registran como pasivos en esos fondos y en la columna de unidades de componentes de presentación discreta.

En los estados financieros de todo el gobierno, las primas y los descuentos en la deuda a largo plazo y otras obligaciones a largo plazo se presentan en las columnas para Actividades del Gobierno y de Tipo Comercial. Lo mismo se presenta en los estados financieros del fondo de propiedad exclusiva. Las primas y descuentos de bonos y pagarés se difieren y amortizan durante la vida de la deuda bajo un método que se aproxima al método de interés efectivo. Los bonos y pagarés se informan netos de la prima o descuento de bonos aplicable. Los costos de emisión de bonos, distintos del seguro prepago, se informan como gastos. En los estados financieros de fondos del gobierno, los fondos del gobierno reconocen las primas y descuentos de bonos, así como los costos de emisión de bonos, durante el período actual. El monto nominal de la deuda emitida se informa como otras fuentes de financiamiento. Las primas recibidas por la emisión de deuda se informan como otras fuentes de financiamiento, mientras que los descuentos se informan como otros usos de financiamiento. Los costos de emisión, retenidos o no de los ingresos reales de la deuda recibidos, se informan como gastos.

*(r) Instrumentos Derivados*

El ELA contabiliza los instrumentos derivados de acuerdo con la Declaración GASB Núm. 53, *Informes Contables y Financieros para Instrumentos Derivados*. Los gobiernos suscriben los instrumentos como inversiones; como coberturas de riesgos financieros identificados asociados con activos o pasivos, o transacciones esperadas (es decir, partidas con cobertura); para reducir los costos de los préstamos; para fijar efectivamente los flujos de efectivo o fijar sintéticamente los precios; o para compensar los cambios en el valor razonable de las partidas cubiertas. Ciertos instrumentos derivados, con la excepción de los contratos de inversión garantizados sintéticos que responden plenamente a los beneficios, se informan al valor razonable en los estados financieros de todo el gobierno. Los cambios en el valor razonable de los instrumentos derivados de cobertura efectivos se informan como entradas diferidas o salidas diferidas de recursos. Los cambios en el valor razonable de los instrumentos derivados de inversión (que incluyen instrumentos derivados de cobertura ineficaces) se informan como parte de los ingresos de inversión en el período de presentación actual. La efectividad se determina considerando si los cambios en los flujos de efectivo o los valores razonables del derivado de cobertura potencial

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El instrumento compensa sustancialmente los cambios en los flujos de efectivo o los valores razonables de la partida con cobertura. Para obtener información adicional sobre la cobertura y los instrumentos derivados de inversión, consulte la Nota 21.

*(s) Contabilización de los Costos de Pensión*

El ELA contabiliza los costos de pensión según las disposiciones de la Declaración GASB Núm. 68, *Informes Contables y Financieros para Pensiones, una enmienda de la Declaración GASB Núm. 27*, y la Declaración GASB Núm. 71, *Transiciones de Pensiones para Contribuciones Posteriores a la Fecha de Medición, una enmienda de la Declaración GASB Núm. 68*, adoptadas por una parte del Gobierno Primario y parcialmente por las unidades de componentes a partir del 1 de julio de 2014. La Declaración GASB Núm. 68 reemplazó la Declaración GASB Núm. 27, *Contabilización de las Pensiones de los Patronos de los Gobiernos Estatales y Locales*, y requiere que los patronos informen un pasivo neto por pensiones y cuentas de pensiones relacionadas, como gastos de pensiones y salidas/entradas diferidas de recursos según lo determinado por los Sistemas de Retiro, según corresponda, según los requisitos contenidos en la Declaración GASB Núm. 67, *Informes Financieros para Planes de Pensiones, una enmienda de la Declaración GASB Núm. 25*. El cambio fundamental más importante en la Declaración GASB Núm. 67 fue cambiar del modelo contable "basado en fondos" existente en ese momento, donde la Contribución Anual Requerida (ARC) se comparó con los pagos efectuados y esa diferencia determinó la obligación de pensión neta; a un modelo de "base acumulativa", donde la obligación de pensión total (determinada actuarialmente) se compara con los resultados netos del plan y la diferencia representa el pasivo de pensión neto En esencia, la Declaración GASB Núm. 68 aplica el efecto de la Declaración GASB Núm. 67 en los registros contables del Gobierno Primario y cada una de las unidades componentes y municipios, cuyos empleados participan en los Sistemas de Retiro.

El Gobierno Primario del ELA, así como sus unidades de componentes y las municipalidades, se consideran patronos de "costo compartido" del SRE; por lo tanto, informan su participación asignada en el pasivo por pensiones neto del SRE y los montos de pensiones relacionados teniendo en cuenta lo siguiente, al 30 de junio de 2016:

- La proporción individual del pasivo colectivo neto de pensiones de todos los gobiernos participantes

- La parte proporcional de cada patrono del gobierno participante fue consistente con la forma en que se determinaron las contribuciones y debe reflejar el esfuerzo de contribución patronal proyectado a largo plazo del patrono del gobierno participante en relación con el de todos los patronos del gobierno participante. Las contribuciones que financiaron por separado pasivos específicos de un patrono individual participante del gobierno al SRE (tales como los incentivos de retiro anticipado de patrono del gobierno participante local) no se incluyeron en la determinación de la parte proporcional del esfuerzo de contribución patronal global a largo plazo proyectado.

- Las contribuciones patronales que reflejan el esfuerzo de contribución a largo plazo proyectado de cada patrono del gobierno participante son la Ley Núm. 116 de 2011 contribución legal basada en nómina, la Ley Núm. 3 de 2013 de contribución suplementaria, otras contribuciones especiales y la Ley Núm. 32 de 2013, Contribución Uniforme Adicional (AUC). Otras contribuciones que no reflejaron el esfuerzo de contribución patronal a largo plazo proyectado por el patrono del gobierno participante fueron excluidas del cálculo proporcional de la participación.

- El AUC requirió una contribución patronal que se determina en conjunto y el SRE luego asignó el monto total a cada patrono del gobierno participante en función de la nómina de dicho patrono del gobierno participante. Sin embargo, debido a un historial de impago de las AUC por parte de muchos patronos del gobierno participantes y la esperada falta continua de pago de tales contribuciones, se determinó que los

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

montos de AUC recaudados se excluirían de la determinación de participación proporcional, a fin de evitar una sobreasignación de los montos de responsabilidad neta de pensión a aquellos patronos del gobierno participantes que pagaron su AUC (o se espera que lo hagan) y una subasignación de pensión neta la responsabilidad asciende a los patronos del gobierno participantes que no pagaron su AUC (o que no se espera que lo hagan).

El SRM es un plan de pensión de un solo patrono para los fines de la declaración GASB Núm. 68, ya que cubre a aquellos participantes elegibles que son maestros dentro del sistema de educación pública del ELA y están empleados por el Departamento de Educación del ELA, que es un patrono del gobierno único. Del mismo modo, el SRJ es un plan de pensión de un solo patrono para los fines de la declaración GASB Núm. 68, ya que cubre a aquellos participantes elegibles que son jueces dentro del sistema judicial del ELA y están empleados por la Oficina de Administración de los Tribunales del ELA.

Ni las Declaraciones GASB Núm. 68 ni Núm. 71 afectan la forma en que el ELA puede elegir financiar sus obligaciones de pensión.

Para los fines de los estados financieros independientes de cada una de las unidades de componentes combinados y de presentación discreta, cuyos informes de auditoría para el año fiscal 2016 ya se habían emitido antes de la emisión de los estados financieros adjuntos del ELA, el SRE no proporcionó oportunamente información necesaria para aplicar las Declaraciones GASB Núm. 68 y Núm. 71. Por lo tanto, la mayoría de las unidades de componentes no pudieron aplicar estos pronunciamientos contables, y ciertas unidades de componentes los aplicaron en base a información no auditada. Como resultado, la mayoría de las unidades de componentes han mantenido la contabilidad de los costos de pensión de acuerdo con la Declaración GASB Núm. 27, también desde el punto de vista de un participante en un plan de costos compartidos de múltiples patronos. En consecuencia, los costos de pensión reconocidos para la mayoría de las unidades de componentes fueron principalmente iguales a las contribuciones requeridas por ley o contractualmente, con un pasivo registrado por cualquier contribución requerida no pagada. Las unidades de componentes no registraron los activos o pasivos relacionados con las pensiones porque aportaron las contribuciones requeridas por ley; a excepción de aquellos que aplicaron la Declaración GASB Núm. 68 basada en la información no auditada recibida del SRE. Para obtener información adicional, consulte las Notas 18(g) y 18(h).

**(t)** *Otros Beneficios Posteriores al Empleo*

Además de los beneficios de pensión descritos en la Nota 18, el ELA proporcionó, antes del 23 de agosto de 2017, otros beneficios de retiro, como bonificaciones de verano y Navidad, y beneficios de atención médica posteriores al empleo (denominados colectivamente otros beneficios posteriores al empleo u OPEB) para sus empleados retirados de acuerdo con la ley local. Sustancialmente, todos los empleados pueden ser elegibles para estos beneficios si alcanzan la edad normal de retiro mientras trabajan para el ELA. El ELA contabiliza los OPEB en virtud de las disposiciones de la Declaración GASB Núm. 45, *Informes Contables y Financieros de Patronos para Beneficios Posteriores al Empleo que no sean Pensiones*. Esta declaración requiere una medición sistemática y basada en el devengo y el reconocimiento del costo (gasto) de OPEB durante un período que se aproxima a los años de servicio de los empleados y proporciona información sobre los pasivos acumulados actuariales asociados con OPEB y si se está progresando en el financiamiento del plan. El costo de los beneficios anuales posteriores al empleo debe ser igual a la contribución patronal anual requerida a los planes, calculada de acuerdo con ciertos parámetros. Para obtener información adicional sobre OPEB, consulte la Nota 19.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

La bonificación de Navidad y los beneficios de la bonificación de verano se establecen en los estatutos del ELA. La bonificación de Navidad y la bonificación de verano pagadas por el ELA a los empleados retirados durante el año que finalizó el 30 de junio de 2016 fue de $600 por persona retirada, excepto para los pensionados del SRE, que eliminaron su bonificación de verano y la bonificación de Navidad se redujo $600 por persona retirada a $200 por persona retirada de conformidad con la Ley Núm. 3 del 4 de abril de 2013, que reformó el SRE. El monto total de las bonificaciones de Navidad y verano pagadas durante el año fiscal 2016 fue de aproximadamente $30.1 millones. Estos beneficios se registran como gastos cuando se pagan en el Fondo General.

Los estatutos del ELA también otorgan bonificaciones por medicamentos a las personas retiradas. La cantidad total de este bono pagado durante el año fiscal 2016 fue de aproximadamente $15.4 millones. Estos beneficios se registran como gastos cuando se pagan en el Fondo General.

### (u) *Ausencias Compensadas*

La política de vacaciones del ELA generalmente prevé la acumulación de 2.5 días por mes, a excepción de los maestros que acumulan 4 días por mes, hasta un máximo anual de 40 días. El tiempo de vacaciones acumulado es totalmente otorgado por los empleados desde el primer día de trabajo hasta un máximo de 60 días. Los empleados generalmente acumulan licencia por enfermedad a razón de 1.5 días por mes hasta un máximo anual de 18 días y un máximo acumulado de 90 días. En el momento del retiro, un empleado recibe una compensación por todas las vacaciones acumuladas no pagadas a la tasa actual, independientemente de los años de servicio; y para todas las licencias por enfermedad no pagadas acumuladas si el empleado tiene al menos 10 años de servicio en el ELA. La responsabilidad por las ausencias compensadas informadas en los estados financieros de fondos privados y de propiedad exclusiva del gobierno se ha calculado utilizando el método de adjudicación (excepto para los empleados del departamento de policía), donde se incluyen los montos de licencia para los empleados que actualmente son elegibles para recibir pagos de rescisión y otros empleados que se espera que sean elegibles en el futuro para recibir dichos pagos al finalizar. La responsabilidad se ha calculado en función del nivel salarial actual de los empleados e incluye los costos relacionados con el salario (por ejemplo, seguro social e impuestos de Medicare). La responsabilidad por las ausencias compensadas de los empleados del departamento de policía se estima en función de los pagos de rescisión reales realizados y proyectados estadísticamente, que es un híbrido entre los métodos de concesión y rescisión. Los estados financieros de los fondos del gobierno registran los gastos cuando a los empleados se les paga por la licencia, o cuando el balance adeudado se acumula a partir del despido del empleado. Las políticas de acumulación de ausencia compensada para las unidades de componentes combinados y las unidades de componentes de presentación discreta varían de una entidad a otra según los acuerdos negociados y otros factores acordados entre la administración de estas entidades y sus empleados.

### (v) *Beneficios de rescisión*

El ELA contabiliza los beneficios por rescisión de acuerdo con la Declaración GASB Núm. 47, *Contabilización de los Beneficios por Rescisión*. De conformidad con las disposiciones de la Declaración GASB Núm. 47, en los estados financieros preparados sobre la base contable de devengo, los patronos deben reconocer un pasivo y gasto por beneficios de rescisión voluntaria (por ejemplo, incentivos de retiro anticipado) cuando se acepta la oferta y se puede estimar el monto Se deben reconocer pasivos y gastos por beneficios de rescisión involuntaria (por ejemplo, beneficios por indemnización) en los estados financieros de todo el gobierno cuando: (i) un plan de rescisión se ha aprobado por las personas con autoridad para comprometer al gobierno con el plan, (ii) el plan ha sido comunicado a los empleados, y (iii) el monto puede estimarse. En los estados financieros preparados sobre la base contable modificada de devengo, los pasivos y los gastos por beneficios por rescisión deben reconocerse en la medida en que normalmente se espera que los pasivos se liquiden con los recursos financieros disponibles prescindibles.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

### (w) *Gravámenes*

La contabilidad de gravámenes, en virtud de la que se registran las órdenes de compra, los contratos y otros compromisos de gastos para reflejar el uso de las asignaciones de gastos aplicables, es utilizada por el Fondo General durante el año fiscal para controlar los gastos. El saldo no gravado de cualquier apropiación del Fondo General al final del año fiscal caduca inmediatamente. Las asignaciones no pertenecientes al Fondo General son cuentas continuas para las que la Legislatura ha autorizado que un balance no gastado del año anterior se transfiera y esté disponible para gastos corrientes.

### (x) *Actividades entre Fondos y Transacciones dentro de la Entidad*

El ELA tenía las siguientes actividades entre fondos y transacciones dentro de la entidad:

*Transferencia entre Fondos:* las transferencias legalmente requeridas se informan cuando el fondo receptor incurre en ellas y el fondo que desembolsa, con las cuentas por cobrar y por pagar presentadas como montos adeudados y pagaderos de otros fondos. Los anticipos entre fondos también se presentan como importes adeudados y pagaderos de otros fondos. Sin embargo, estos anticipos, transferencias y montos relacionados por cobrar y pagar se consideran saldos internos y actividades que se han eliminado en los estados financieros de todo el gobierno. Las cuentas por cobrar entre fondos se declaran netas de las previsiones estimadas para cuentas incobrables, que se determinan en función de la experiencia de cobro pasada y las condiciones económicas actuales.

*Transacciones dentro de la Entidad:* hay dos tipos de transacciones dentro de la entidad: primero, el flujo de recursos entre el Gobierno Primario y sus unidades de componentes, y entre las unidades de componentes. Este flujo de recursos y los saldos pendientes relacionados se informan como si fueran transacciones externas. Sin embargo, el flujo de recursos entre el Gobierno Primario y las unidades de componentes combinados se clasifican como actividad entre fondos, como se describió anteriormente. En segundo lugar, los balances dentro de la entidad entre el Gobierno Primario y las unidades de componentes de presentación discreta son equivalentes al financiamiento de deuda a largo plazo. Los pasivos del Gobierno Primario se informan en el estado de resultados netos, los ingresos en el estado de ingresos, gastos y cambios en los fondos del gobierno del balance de fondos del Gobierno Primario, y el activo en el estado de resultados netos de las unidades de componentes de presentación discreta. Los montos adeudados de las unidades de componentes se declaran netos de las provisiones estimadas para cuentas incobrables, que se determinan por la experiencia de cobro pasada y las condiciones económicas actuales.

### (y) *Ingresos y Premios de Lotería*

Los ingresos, gastos y premios otorgados por la Lotería de Puerto Rico y el Sistema de Lotería Adicional, informados dentro del fondo empresarial de loterías, se reconocen a medida que se llevan a cabo los sorteos. Los fondos recaudados antes del 30 de junio para boletos relacionados con sorteos que se realizarán después del 30 de junio se informan como ingresos no ganados. Los premios impagos otorgados al 30 de junio se informan como obligación por los premios de lotería impagos. Los premios no reclamados caducan después de seis meses y se transfieren al Fondo General.

### (z) *Gestión de Riesgos*

El ELA adquiere un seguro comercial que cubre siniestros, robos, demandas por daños y otras pérdidas para el Gobierno Primario, la mayoría de las unidades de componentes y los municipios. El ELA recibe un reembolso por pagos de primas realizados en nombre de las unidades de componentes y los municipios. Las pólizas de seguro actuales no se han cancelado ni rescindido. Para la compensación de los trabajadores, el ELA tiene una unidad componente presentada discretamente, el SIFC, que proporciona la compensación del trabajador a los

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

empleados públicos y privados. Las unidades de componentes combinados del ELA son responsables de garantizar que su propiedad esté debidamente asegurada. Anualmente, estas unidades de componentes combinados compilan la información de todas las propiedades y su respectivo valor de reemplazo y adquieren sus pólizas de seguro de propiedad y accidentes. La cobertura de seguro para el año fiscal 2016 se mantuvo similar a la de años anteriores. En los últimos tres años, los acuerdos de seguro del ELA o de las unidades de componentes no han excedido el monto de la cobertura.

Ciertas unidades de componentes de presentación discreta y combinados utilizan seguros comerciales y fondos internos de autoseguro que cubren riesgos específicos relacionados con sus operaciones especializadas. Los fondos de autoseguro más importantes residen en el nivel de la unidad de componentes de presentación discreta y se describen en detalle en la Nota 16.

**(aa)** *Acuerdo sobre Tabaco*

El ELA sigue el Boletín Técnico GASB Núm. 2004 1, *Problema de Reconocimiento de Acuerdo de Tabaco y Entidad de Informe Financiero*, según enmienda de la Declaración GASB Núm. 48, *Ventas y Promesas de Cuentas por Cobrar e Ingresos Futuros y Transferencias dentro de la Entidad de Activos e Ingresos Futuros*, (el TB), que proporciona orientación contable para las entidades creadas para obtener los derechos de todos o una parte de los recursos futuros de acuerdos del tabaco y para los gobiernos que crean dichas entidades.

El TB indica que la entidad creada para obtener los derechos, generalmente conocida como Autoridad de Acuerdo del Tabaco (en el caso del ELA, el Fideicomiso de los Niños), debe considerarse una unidad de componentes combinados del gobierno que la creó. El TB también establece que el gobierno que recibe los pagos de las compañías tabacaleras en virtud del acuerdo, denominado gobierno del acuerdo, debe reconocer una cuenta por cobrar e ingresos por los recursos de liquidación de tabaco cuando ocurre un evento. El evento que resulta en el reconocimiento de un activos e ingresos por parte del gobierno del acuerdo es el envío nacional de cigarrillos. El TB indica que el gobierno del acuerdo y las autoridades del cuerdo del tabaco deben realizar devengos para los envíos estimados desde el 1 de enero hasta el final de su año fiscal respectivo, ya que los pagos anuales se basan en un año calendario. Sin embargo, en virtud de la base contable modificada de devengo a nivel del fondo, los ingresos deben reconocerse solo en la medida en que los recursos estén disponibles.

**(bb)** *Uso de Estimados*

La preparación de los estados financieros básicos de conformidad con las GAAP de EE. UU. requiere que la gerencia haga estimados y supuestos que afecten los montos reportados de activos y pasivos, la divulgación de activos y pasivos contingentes a la fecha de los estados financieros básicos y los montos informados de ingresos y gastos durante el período de informe. Los resultados reales pueden diferir de estos estimados.

**(cc)** *Nuevos Estándares Contables Adoptados*

El ELA adoptó los siguientes nuevos estándares contables a partir del 1 de julio de 2015:

- Declaración GASB Núm. 72, *Medición y Aplicación del Valor Razonable.* Esta declaración requiere que un gobierno utilice técnicas de valoración que sean apropiadas bajo las circunstancias y para las cuales haya suficientes datos disponibles para medir el valor razonable. Las técnicas deben ser consistentes con uno o más de los siguientes enfoques; el enfoque de mercado, el enfoque de costos o el enfoque de ingresos. Esta declaración también establece una jerarquía de entrada de tres niveles para las técnicas de valoración utilizadas para medir el valor razonable. Los insumos de nivel 1 son precios cotizados (sin ajustar) en mercados activos para idénticos activos o pasivos. Las entradas de Nivel 2 son entradas, distintas de los

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

precios cotizados, incluidas en el Nivel 1 que son observables para los activos o pasivos, ya sea directa o indirectamente. Finalmente, las entradas de Nivel 3 son entradas no observables, como los supuestos de la administración de la tasa de incumplimiento entre las hipotecas subyacentes de una garantía respaldada por hipotecas. No hubo impacto material en los estados financieros del ELA como resultado de la implementación de la Declaración GASB Núm. 72.

- Declaración GASB Núm. 73, *Informes Contables y Financieros para Pensiones y Activos Relacionados Fuera del Alcance de la Declaración GASB Núm. 68, y Enmiendas a Ciertas Disposiciones de las Declaraciones GASB Núm. 67 y Núm. 68.* Esta declaración establece los requisitos para las pensiones de beneficios definidos fuera del alcance de la Declaración GASB Núm. 68, *Informes Contables y Financieros para Pensiones*, así como para los activos acumulados con el fin de proporcionar esas pensiones. Además, establece requisitos para pensiones de contribuciones patronales definidas fuera del alcance de la Declaración GASB Núm. 68. También modifica ciertas disposiciones de la Declaración GASB Núm. 67, *Informes Financieros para Planes de Pensiones*, y Declaración GASB Núm. 68 para planes de pensiones y pensiones que están dentro de sus respectivos alcances. Las disposiciones de esta declaración que abordan los informes contables y financieros de los patronos y las entidades del gobierno que no son patronos que contribuyen a las pensiones fuera del alcance de la Declaración GASB Núm. 68 son efectivas para los estados financieros para los años fiscales que comiencen después del 15 de junio de 2016, y las disposiciones de esta declaración que aborda la información financiera para los activos acumulados con el fin de proporcionar esas pensiones son efectivas para los años fiscales que comienzan después del 15 de junio de 2015. Las disposiciones de esta declaración para planes de pensiones dentro del alcance de la Declaración GASB Núm. 67 o para pensiones dentro del alcance de la Declaración GASB Núm. 68 son efectivas para los años fiscales que comiencen después del 15 de junio de 2015. No hubo un impacto material en los estados financieros del ELA como resultado de la implementación de las partes aplicables de la Declaración GASB Núm. 73.

- Declaración GASB Núm. 76, *La Jerarquía de Principios Contables Generalmente Aceptados para los Gobiernos Estatales y Locales*. Esta declaración identifica en el contexto del entorno actual de información financiera del gobierno la jerarquía de los principios contables generalmente aceptados (GAAP). La "jerarquía de GAAP" consiste en las fuentes de principios contables utilizados para preparar los estados financieros de las entidades gubernamentales estatales y locales de conformidad con los GAAP y el marco para seleccionar esos principios. Esta declaración reduce la jerarquía de GAAP a dos categorías de GAAP autorizados y aborda el uso de literatura autorizada y no autorizada en el caso de que el tratamiento contable para una transacción u otro evento no se especifique dentro de una fuente autorizada de GAAP. Esta declaración reemplaza la Declaración GASB Núm. 55, *La Jerarquía de Principios Contables Generalmente Aceptados para los Gobiernos Estatales y Locales*. La adopción de esta declaración no tuvo impacto en los estados financieros del ELA.

- Declaración GASB Núm. 79, *Ciertas Agrupaciones de Inversión Externa y Participantes de Agrupaciones*. Esta declaración aborda los informes contables y financieros para ciertos grupos de inversión externa y participantes del grupo. Específicamente, establece criterios para que un grupo de inversión externa sea elegible para realizar la elección de medir todas sus inversiones al costo amortizado para fines de información financiera. Un grupo de inversión externa es elegible para ese informe si cumple con todos los criterios aplicables establecidos en esta declaración. Los criterios específicos abordan (1) cómo el grupo de inversión externa realiza transacciones con los participantes; (2) requisitos de vencimiento, calidad, diversificación y liquidez de la cartera; y (3) cálculo y requisitos de un precio sombra. El incumplimiento significativo evita que el grupo de inversión externa mida todas sus inversiones al costo amortizado para los fines de la información financiera. Se requiere sentencia  profesional para determinar si los casos de

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

incumplimiento de los criterios establecidos por esta declaración durante el período del informe, individualmente o en conjunto, fueron significativos. Si un grupo de inversión externa no cumple con los criterios establecidos en esta declaración, ese grupo debe aplicar las disposiciones del párrafo 16 de la Declaración GASB Núm. 31, *Informes Contables y Financieros para Ciertas Inversiones y para Grupos de Inversión Externa*, según enmienda. Si un grupo de inversión externa cumple con los criterios de esta declaración y mide todas sus inversiones al costo amortizado, los participantes del grupo también deben medir sus inversiones en ese grupo de inversión externa al costo amortizado para fines de información financiera. Si un grupo de inversión externo no cumple con los criterios de esta declaración, los participantes del grupo deben medir sus inversiones en ese grupo al valor razonable, según lo dispuesto en el párrafo 11 de la Declaración GASB Núm. 31, según enmienda. Esta declaración establece requisitos adicionales de divulgación de notas al pie de página para grupos de inversión externa elegibles que miden todas sus inversiones al costo amortizado para fines de información financiera y para los gobiernos que participan en esos grupos. Esas divulgaciones para los grupos de inversión externa elegibles y para sus participantes incluyen información sobre cualquier limitación o restricción en los retiros de los participantes. Esta declaración es efectiva para el año fiscal 2016, a excepción de ciertas disposiciones sobre calidad de cartera, riesgo de crédito de custodia y fijación de precios sombra. Esas disposiciones no son efectivas hasta el año fiscal 2017. No hubo un impacto material en los estados financieros del ELA como resultado de la implementación de las partes aplicables de la Declaración GASB Núm. 79.

**(dd)** *Pronunciamientos Contables Emitidos pero Aún No Efectivos*

Se han emitido los siguientes nuevos estándares contables, pero aún no son efectivos:

- Declaración GASB Núm. 74, *Informes Financieros para Planes de Beneficios Posteriores al Empleo que no sean Planes de Pensiones*. Esta declaración reemplaza las declaraciones de GASB Núm. 43, *Informes Financieros para Planes de Beneficios Posteriores al Empleo que No Sean Planes de Pensiones*, según enmienda, y la Declaración GASB Núm. 57, *Mediciones de OPEB por Patronos Agentes y Planes de Múltiples Patronos Agentes*. También incluye requisitos para planes OPEB de contribución patronal definida que reemplazan los requisitos para esos planes de OPEB en la Declaración GASB Núm. 25, *Informes Financieros para Planes de Pensiones de Beneficios Definidos y Divulgaciones de Notas para Planes de Contribuciones Patronales Definidas*, según enmienda, Declaración GASB Núm. 43, y Declaración GASB Núm. 50, *Divulgaciones de Pensiones*. El alcance de esta declaración incluye los beneficios definidos de los planes de OPEB y la contribución patronal definida administrada a través de fideicomisos que cumplen con los siguientes criterios:

  – Las contribuciones de los patronos y las entidades contribuyentes que no son patronos al plan de OPEB y las ganancias de esas contribuciones son irrevocables.

  – Los activos del plan de OPEB están dedicados a proporcionar OPEB a los miembros del plan de acuerdo con los términos de los beneficios.

  – Los activos del plan de OPEB están legalmente protegidos de los acreedores de los patronos, las entidades contribuyentes que no son patronos y el administrador del plan de OPEB. Si el plan es un plan de OPEB de beneficios definidos, los activos del plan también están legalmente protegidos de los acreedores de los miembros del plan.

Esta declaración también incluye los requisitos para abordar la información financiera para los activos acumulados con el fin de proporcionar beneficios definidos de OPEB a través de planes de OPEB que no se administran a través de fideicomisos que cumplen con los criterios especificados. Las disposiciones de esta declaración son efectivas para los años fiscales que comienzan después del 15 de junio de 2016.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

- Declaración GASB Núm. 75, *Informes Contables y Financieros para Beneficios Posteriores al Empleo que No Sean Pensiones*. Esta Declaración reemplaza los requisitos de las Declaraciones GASB Núm. 45, *Informes Contables y Financieros de Patronos para Beneficios Posteriores al Empleo que No Sean Pensiones*, según enmienda, y la Declaración GASB Núm. 57, *Mediciones de OPEB por Empleadores Agentes y el Planes de Múltiples Patronos Agentes*, para OPEB. La Declaración GASB Núm. 74, *Informes Financieros para Planes de Beneficios Posteriores al Empleo que No Sean Planes de Pensiones*, establece nuevos requisitos de información contable y financiera para los planes de OPEB. El alcance de esta declaración aborda los informes contables y financieros para OPEB que se proporcionan a los empleados de patronos de gobiernos estatales y locales. Esta declaración establece estándares para reconocer y medir pasivos, salidas diferidas de recursos, entradas diferidas de recursos y gastos/salidas. Para el OPEB de beneficio definido, esta declaración identifica los métodos y supuestos que se requieren para proyectar los pagos de beneficios, descontar los pagos de beneficios proyectados a su valor presente actuarial y atribuir ese valor presente a los períodos de servicio a los empleados. También se incluye la divulgación de la nota al pie de página y los requisitos de información complementaria requeridos sobre el beneficio definido de OPEB. Además, esta declaración detalla los requisitos de reconocimiento y divulgación para patronos con cuentas por pagar a planes de OPEB de beneficios definidos que se administran a través de fideicomisos que cumplen con los criterios especificados y para patronos cuyos empleados reciben OPEB de contribución patronal definida. Esta declaración también aborda ciertas circunstancias en las que una entidad que no es patrono brinda apoyo financiero para OPEB a los empleados de otra entidad. Las disposiciones de esta declaración son efectivas para los años fiscales que comienzan después del 15 de junio de 2017.

- Declaración GASB Núm. 77, *Divulgaciones de Reducción de Impuestos*. Esta declaración establece estándares de información financiera para los acuerdos de reducción de impuestos celebrados por los gobiernos estatales y locales. Las divulgaciones requeridas por esta declaración abarcan las reducciones de impuestos resultantes de (a) acuerdos suscritos por el gobierno informante y (b) acuerdos suscritos por otros gobiernos y que reducen los ingresos fiscales del gobierno informante. Las disposiciones de esta declaración deben aplicarse a todos los gobiernos estatales y locales sujetos a dichos acuerdos de reducción de impuestos. Para fines de información financiera, una reducción de impuestos se define como una reducción en los ingresos fiscales que resulta de un acuerdo entre uno o más gobiernos y una persona o entidad en la que (a) uno o más gobiernos prometen renunciar a los ingresos fiscales a los que de otra manera tienen derecho y (b) el individuo o entidad se compromete a tomar una acción específica después de que se haya firmado el acuerdo que contribuya al desarrollo económico o que de otra manera beneficie a los gobiernos o los ciudadanos de esos gobiernos. La sustancia de una transacción, no su forma o título, es un factor clave para determinar si la transacción cumple con la definición de reducción de impuestos para los efectos de esta Declaración. Las disposiciones de esta declaración son efectivas para los estados financieros para períodos que comiencen después del 15 de diciembre de 2015.

- Declaración GASB Núm. 78, *Pensiones Proporcionadas a través de Ciertos Planes de Beneficios Definidos por Múltiples Patronos*. Esta Declaración aborda un problema de práctica con respecto al alcance y la aplicación de la Declaración GASB Núm. 68. Este problema está asociado con las pensiones proporcionadas a través de ciertos planes de pensiones de beneficios definidos de patronos múltiples y con patronos de gobiernos estatales o locales cuyos empleados reciben dichas pensiones. Antes de la emisión de esta declaración, los requisitos de la Declaración GASB Núm. 68 se aplicaban a los estados financieros de todos los patronos de gobiernos estatales y locales cuyos empleados reciben pensiones a través de planes de pensiones administrados a través de fideicomisos que cumplen con los criterios del párrafo 4 de esa declaración. Esta declaración modifica el alcance y la aplicación de la Declaración GASB Núm. 68 para excluir las pensiones otorgadas a los empleados de patronos gubernamentales estatales o locales a través de un plan de pensiones de un plan de pensiones de beneficios definidos por costos compartidos de múltiples

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

patronos que (1) no sea un plan de pensión de un gobierno estatal o local, (2) se utilice para proporcionar pensiones de beneficios definidos tanto a empleados de patronos de gobiernos estatales o locales como a empleados de patronos que no son patronos de gobiernos estatales o locales y (3) no tenga un patrono de un gobierno estatal o local predominante (ya sea individual o colectivamente con otros patronos de gobiernos estatales o locales que proporcionan pensiones a través del plan de pensiones). Esta declaración establece los requisitos para el reconocimiento y la medición de los gastos, salidas y pasivos de pensiones; divulgaciones de notas; y la información complementaria requerida para las pensiones que tienen las características que se describen anteriormente. Esta declaración no es efectiva hasta el año fiscal 2017.

- Declaración GASB Núm. 80, *Requisitos de Combinación para Ciertas Unidades de Componentes*. Esta declaración mejora la información financiera al aclarar los requisitos de presentación de los estados financieros para ciertas unidades de componentes. Esta declaración modifica los requisitos de mezcla establecidos en el párrafo 53 de la Declaración GASB Núm. 14, *La Entidad de Información Financiera*, según enmendada. El criterio adicional requiere la combinación de una unidad de componentes constituida como una corporación sin fines de lucro en la cual el Gobierno Primario es el único miembro corporativo. El criterio adicional no se aplica a las unidades de componentes incluidas en la entidad de información financiera de conformidad con las disposiciones de la Declaración GASB Núm. 39, *Determinar si Ciertas Organizaciones son Unidades de Componentes*. Esta declaración no es efectiva hasta el año fiscal 2017.

- Declaración GASB Núm. 81, *Acuerdos de Intereses Divididos Irrevocables*. Esta declaración mejora la información contable y financiera para acuerdos de intereses divididos irrevocables al proporcionar reconocimiento y guía de medición para situaciones en las que un gobierno es el beneficiario del acuerdo. Los acuerdos de intereses divididos son un tipo de acuerdo de donación utilizado por los donantes para proporcionar recursos a dos o más beneficiarios, incluidos los gobiernos. Los acuerdos de intereses divididos se pueden crear a través de fideicomisos u otros acuerdos legalmente exigibles con características que son equivalentes a los acuerdos de intereses divididos, en los que un donante transfiere recursos a un intermediario para mantenerlos y administrarlos en beneficio de un gobierno y al menos otro beneficiario. Los ejemplos de este tipo de acuerdos incluyen fideicomisos principales de caridad, fideicomisos de remanentes de caridad e intereses de la vida en bienes raíces. Esta declaración requiere que un gobierno que recibe recursos de conformidad con un acuerdo de interés dividido irrevocable reconozca los activos, pasivos y entradas diferidas de recursos al inicio del acuerdo. Además, esta declaración requiere que un gobierno reconozca los activos que representan sus intereses en beneficios de acuerdos de intereses divididos irrevocables administrados por un tercero, si el gobierno controla la capacidad de servicio actual de los intereses de beneficio. Esta declaración requiere que un gobierno reconozca los ingresos cuando los recursos se vuelvan aplicables al período de informe. Esta declaración no es efectiva hasta el año fiscal 2018.

- Declaración GASB Núm. 82, *Pensión Emite una Enmienda de las Declaraciones GASB Núm. 67, Núm. 68 y Núm. 73*. Esta declaración aborda ciertas cuestiones que se han planteado con respecto a las Declaraciones GASB Núm. 67, Núm. 68 y Núm. 73. La declaración está destinada a mejorar la coherencia en la aplicación de los estándares de pensiones al aclarar o enmendar áreas relacionadas de la orientación existente. Específicamente, esta declaración aborda cuestiones relacionadas con (1) la presentación de medidas relacionadas con la nómina en la información complementaria requerida, (2) la selección de supuestos y el tratamiento de las desviaciones de la guía en un estándar de práctica actuarial para fines de información financiera, y (3) la clasificación de los pagos realizados por los patronos para cumplir con los requisitos de contribución patronal de los empleados (miembros del plan). Antes de la emisión de esta declaración, las Declaraciones GASB Núm. 67 y Núm. 68 requerían la presentación de la nómina de empleados cubiertos, que es la nómina de los empleados que reciben pensiones a través del plan de pensiones, y las proporciones que usan esa medida, en programas de información suplementaria requerida. Esta declaración modifica las declaraciones GASB Núm. 67 y Núm. 68 para exigir, en cambio, la presentación de la nómina cubierta,

96

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

definida como la nómina en la que se basan las contribuciones a un plan de pensiones, así como las proporciones que utilizan esa medida. Esta declaración aclara que una desviación, como el término se usa en las Normas de Prácticas Actuariales emitidas por la Junta de Normas Actuariales, de la guía en una Norma de Prácticas Actuariales no se considera conforme a los requisitos de la Declaración GASB Núm. 67, Declaración GASB Núm. 68, o Declaración GASB Núm. 73 para la selección de supuestos utilizados para determinar el pasivototal por pensiones y las medidas relacionadas. Esta declaración aclara que los pagos realizados por un patrono para cumplir con los requisitos de contribución patronal identificados por los términos del plan de pensiones como requisitos de contribución patronal del miembro del plan deben clasificarse como contribuciones del miembro del plan para los fines de la Declaración GASB Núm. 67 y como contribuciones de los empleados para los fines de la Declaración GASB Núm. 68. También requiere que el gasto y las salidas de un patrono por esos montos se reconozcan en el período para el cual se evalúa la contribución patronal y se clasifiquen de la misma manera que el patrono clasifica una compensación similar distinta de las pensiones (por ejemplo, como sueldos y salarios o beneficios adicionales).  Esta declaración no es efectiva hasta el año fiscal 2017, con excepción de los requisitos de esta declaración para la selección de supuestos en una circunstancia donde los pasivos de la pensión de un patrono se miden a partir de una fecha distinta al final del año fiscal más reciente del patrono. En esa circunstancia, los requisitos para la selección de supuestos son efectivos para ese patrono en el primer período de informe en el que la fecha de medición del pasivo de pensiones es el 15 de junio de 2017 o después.

- Declaración GASB Núm. 83, *Ciertas Obligaciones de Retiro de Activos*. Esta declaración aborda los informes contables y financieros para ciertas obligaciones de retiro de activos (ARO). Una ARO es un pasivo legalmente exigible asociado con el retiro de un activo de capital tangible. Un gobierno que tiene obligaciones legales para realizar futuras actividades de retiro de activos relacionadas con sus activos de capital tangible debe reconocer un pasivo basado en la guía de esta declaración. Esta declaración establece criterios para determinar el momento y el patrón de reconocimiento de un pasivo y una salida diferida de recursos correspondiente para las ARO. Esta declaración requiere que el reconocimiento ocurra cuando se incurre en el pasivo y es razonablemente estimable. La determinación de cuándo se incurre en el pasivo debe basarse en la ocurrencia de leyes, regulaciones, contratos o sentencias judiciales externas, junto con la ocurrencia de un evento interno que obliga a un gobierno a realizar actividades de retiro de activos. Las leyes y reglamentaciones pueden requerir que los gobiernos tomen medidas específicas para retirar ciertos activos de capital tangible al final de la vida útil de esos activos de capital, como el desmantelamiento de reactores nucleares y el desmantelamiento y desecho de plantas de tratamiento de aguas residuales. Otras obligaciones para retirar activos de capital tangible pueden surgir de contratos o sentencias judiciales. Los eventos internos obligatorios incluyen la ocurrencia de contaminación, la puesta en operación de un activo de capital tangible que debe ser retirado, el abandono de un activo de capital tangible antes de que se ponga en operación o la adquisición de un activo de capital tangible que tenga una ARO existente.

Esta declaración requiere que la medición de una ARO se base en la mejor estimación del valor actual de los desembolsos que se espera incurrir. La mejor estimación debe incluir la ponderación de probabilidad de todos los resultados potenciales, cuando dicha información esté disponible o pueda obtenerse a un costo razonable. Si la ponderación de probabilidades no es viable a un costo razonable, se debe usar la cantidad más probable. Esta declaración requiere que una salida diferida de recursos asociados con una ARO se mida al monto del pasivo correspondiente en la medición inicial.

Esta declaración requiere que el valor actual de las ARO de un gobierno se ajuste por los efectos de la inflación o deflación general al menos anualmente. Asimismo, requiere que un gobierno evalúe todos los factores relevantes al menos una vez al año para determinar si se espera que los efectos de uno o más de los

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

factores cambie significativamente los desembolsos estimados de retiro de activos. Un gobierno debería volver a medir una ARO solo si el resultado de la evaluación indica que hay un cambio significativo en los desembolsos estimados. Las salidas diferidas de recursos deben reducirse y reconocerse como salidas de recursos (por ejemplo, como un gasto) de manera sistemática y racional durante la vida útil estimada del activo de capital tangible.

Los requisitos de esta declaración son efectivos para los períodos de informe que comienzan después del 15 de junio de 2018.

- Declaración GASB Núm. 84, *Actividades Fiduciarias*. El objetivo de esta declaración es mejorar la orientación con respecto a la identificación de actividades fiduciarias para fines de informes contables y financieros y cómo se deben informar esas actividades. Esta declaración establece los criterios para identificar las actividades fiduciarias de todos los gobiernos estatales y locales. El enfoque de los criterios generalmente está en (1) si un gobierno controla los activos de la actividad fiduciaria y (2) los beneficiarios con quienes existe una relación fiduciaria. Se incluyen criterios separados para identificar unidades de componentes fiduciarios y acuerdos de beneficios posteriores al empleo que son actividades fiduciarias. Una actividad que cumpla los criterios debe informarse en un fondo fiduciario en los estados financieros básicos. Los gobiernos con actividades que cumplen con los criterios deben presentar un estado de resultados netos fiduciarios y un estado de cambios en los resultados netos fiduciarios. Se proporciona una excepción a ese requisito para una actividad de tipo comercial que normalmente espera mantener activos de custodia durante tres meses o menos. Esta declaración describe cuatro fondos fiduciarios que deben informarse, si corresponde: (1) fondos fiduciarios de pensiones (y otros beneficios para empleados), (2) fondos fiduciarios de inversión, (3) fondos fiduciarios de uso privado y (4) fondos de custodia. Los fondos de custodia generalmente deben informar actividades fiduciarias que no se mantienen en un fideicomiso o acuerdo equivalente que cumpla con criterios específicos. Esta declaración también establece el reconocimiento de un pasivo para los beneficiarios en un fondo fiduciario cuando ha ocurrido un evento que obliga al gobierno a desembolsar recursos fiduciarios.

Los eventos que obliga a un gobierno a desembolsar recursos fiduciarios ocurren cuando se genera una demanda de los recursos o cuando el beneficiario no debe tomar o cumplir ninguna otra acción, aprobación o condición para liberar los activos. Los requisitos de esta declaración son efectivos para los períodos de informe que comienzan después del 15 de diciembre de 2018.

- Declaración GASB Núm. 85, *Ómnibus 2017*. El objetivo de esta declaración es abordar los problemas de práctica que se han identificado durante la implementación y aplicación de ciertas Declaraciones GASB. Esta declaración aborda una variedad de temas que incluyen temas relacionados con las unidades de componentes combinados, el fondo de comercio, la medición y aplicación del valor razonable y los beneficios posteriores al empleo (pensiones y otros beneficios posteriores al empleo [OPEB]). Específicamente, esta declaración aborda los siguientes temas:

  – Combinar una unidad de componentes en circunstancias en las que el Gobierno Primario es una actividad de Tipo Comercial que informa en una sola columna para la presentación de estados financieros.

  – Informar montos previamente informados como fondo de comercio y fondo de comercio "negativo".

  – Clasificar bienes inmuebles en poder de entidades aseguradoras.

  – Medir ciertas inversiones en el mercado monetario y contratos de inversión que generan intereses participantes a costo amortizado.

  – Momento de la medición de los pasivos y gastos de pensiones o de OPEB reconocidos en los estados financieros preparados utilizando el enfoque actual de medición de recursos financieros.

98

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

- Reconocer en nombre de los pagos de pensiones o de OPEB en los estados financieros del empleador.

- Presentar medidas relacionadas con la nómina en la información complementaria requerida para fines de informes de los planes de OPEB y los patronos que proporcionan OPEB.

- Clasificar las contribuciones pagadas por el patrono para OPEB.

- Simplificar ciertos aspectos del método de medición alternativo para OPEB.

- Informes contables y financieros para OPEB proporcionados a través de ciertos planes de OPEB de beneficios definidos por múltiples patronos.

Los requisitos de esta declaración son efectivos para los períodos de informe que comienzan después del 15 de junio de 2017. Se alienta la aplicación anticipada.

- Declaración GASB Núm. 86, *Ciertos Problemas con la Extinción de la Deuda*. Esta declaración mejora la consistencia en los informes contables y financieros para la defensa sustancial de la deuda al proporcionar orientación para las transacciones en las que el efectivo y otros activos monetarios adquiridos solo con recursos existentes (recursos que no sean el producto del reembolso de la deuda) se colocan en un fideicomiso irrevocable para el único propósito de extinguir la deuda. Esta declaración también mejora los informes contables y financieros para el seguro prepago de la deuda que se extingue y las notas a los estados financieros para la deuda que se vence en sustancia. Los requisitos de esta declaración son efectivos para los años fiscales que comienzan después del 15 de junio de 2017.

- Declaración GASB Núm. 87, *Arrendamientos*. El objetivo de esta declaración es cumplir mejor las necesidades de información de los usuarios de los estados financieros mejorando la información contable y financiera para los arrendamientos de los gobiernos. Esta declaración aumenta la utilidad de los estados financieros de los gobiernos al exigir el reconocimiento de ciertos activos y pasivos de arrendamiento para arrendamientos que anteriormente se clasificaron como arrendamientos operativos y reconocidos como entradas de recursos o salidas de recursos en función de las disposiciones de pago del contrato. Establece un modelo único para la contabilidad de arrendamientos basado en el principio fundamental de que los arrendamientos son financiamientos del derecho a usar un activo subyacente. Según esta declaración, se requiere que un arrendatario reconozca un pasivo por arrendamiento y un derecho intangible a usar el activo por arrendamiento, y se requiere que un arrendador reconozca un crédito por arrendamiento y una entrada diferida de recursos, mejorando así la relevancia y la consistencia de la información sobre las actividades de arrendamiento de los gobiernos. Los requisitos de esta declaración son efectivos para los períodos de informe que comienzan después del 15 de diciembre de 2019.

- Declaración GASB Núm. 88, *Ciertas Divulgaciones Relacionadas con la Deuda, Incluidos los Empréstitos Directos y las Colocaciones Directas*. El objetivo principal de esta declaración es mejorar la información que se divulga en las notas a los estados financieros del gobierno relacionados con la deuda, incluidos los empréstitos directos y las colocaciones directas. También aclara qué pasivos deberían incluir los gobiernos al divulgar información relacionada con la deuda. Esta declaración define la deuda para los fines de divulgación en las notas a los estados financieros como un pasivo que surge de una obligación contractual de pagar efectivo (u otros activos que pueden usarse en lugar de efectivo) en uno o más pagos para liquidar un monto que es fijo en la fecha en que se establece la obligación contractual. Esta declaración requiere que se divulgue información esencial adicional relacionada con la deuda en notas a los estados financieros, incluidas las líneas de crédito no utilizadas; activos pignorados como garantía de la deuda; y los términos especificados en los acuerdos de deuda relacionados con eventos de incumplimiento significativos con consecuencias relacionadas con las finanzas, eventos de rescisión significativos con consecuencias relacionadas con las finanzas y cláusulas de aceleración subjetiva significativas. Para ver las notas a los estados financieros relacionados con la deuda, esta declaración también requiere que se incluya la información existente

99

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

adicional para empréstitos directos y colocaciones directas de deuda por separado de las otras deudas. Los requisitos de esta declaración son efectivos para los períodos de informe que comienzan después del 15 de junio de 2018.

- Declaración GASB Núm. 89, *Contabilidad de Costos de Intereses Incurridos Antes del Fin de un Período de Construcción*. Esta declaración establece los requisitos contables para los costos por intereses incurridos antes del final de un período de construcción. Tales costos de intereses incluyen todos los intereses que anteriormente se contabilizaron de acuerdo con los requisitos de los párrafos 5 a 22 de la Declaración GASB Núm. 62, *Codificación de la Guía de Informes Contables y Financieros Contenida en los Pronunciamientos FASB y AICPA Anteriores al 30 de Noviembre de 1989*, que son reemplazados por esta declaración. Esta declaración requiere que el costo de intereses incurrido antes del final de un período de construcción se reconozca como un gasto en el período en que se incurre en el costo de los estados financieros preparados utilizando el enfoque de medición de recursos económicos. Como resultado, el costo de intereses incurrido antes del final de un período de construcción no se incluirá en el costo histórico de un activo de capital informado en una actividad de tipo comercial o un fondo empresarial. Esta declaración también reitera que en los estados financieros preparados utilizando el enfoque actual de medición de recursos financieros, el costo de intereses incurrido antes del final de un período de construcción debe reconocerse como un gasto de acuerdo con los principios de contabilidad de fondos del gobierno. Los requisitos de esta declaración son efectivos para los períodos de informe que comienzan después del 15 de diciembre de 2019.

- Declaración GASB Núm. 90, *Interés Mayoritario en el Capital*. Los objetivos principales de esta Declaración son mejorar la consistencia y la comparabilidad de informar la participación mayoritaria en el capital o parte de un gobierno en una organización legalmente separada y mejorar la relevancia de la información de los estados financieros para ciertas unidades de componentes. Define un interés mayoritario en el capital y especifica que un interés mayoritario en el capital en una organización legalmente separada debe informarse como una inversión si la participación de un gobierno en el interés en el capital cumple con la definición de inversión. Un interés mayoritario en el capital que cumpla con la definición de una inversión debe medirse utilizando el método de la participación, a menos que sea mantenido por un gobierno de propósito especial dedicado solo a actividades fiduciarias, un fondo fiduciario o una dotación (incluidas las dotaciones permanentes y a plazo) o un fondo permanente. Esos gobiernos y fondos deben medir el interés mayoritario en el capital a valor razonable. Para todas las demás tenencias de un interés mayoritario en el capital en una organización legalmente separada, un gobierno debe informar la organización legalmente separada como una unidad de componentes, y el gobierno o fondo que posee el interés en el capital debe informar un activo relacionado con el interés mayoritario en el capital utilizando el método del capital. Esta Declaración establece que la propiedad de un interés mayoritario en el capital de una organización legalmente separada da como resultado que el gobierno sea financieramente responsable de la organización legalmente separada y, por lo tanto, el gobierno debe informar esa organización como una unidad de componentes. Esta Declaración también requiere que una unidad de componentes en la que un gobierno tenga una cuenta de interés de capital del 100 por ciento para sus activos, salidas diferidas de recursos, pasivos e ingresos de recursos diferidos al valor de adquisición en la fecha en que el gobierno adquirió un interés de capital del 100 por ciento en la unidad de componentes. Las transacciones presentadas en los estados de flujos de la unidad de componentes en esa circunstancia deben incluir solo las transacciones que ocurrieron después de la adquisición. Los requisitos de esta declaración son efectivos para los períodos de informe que comienzan después del 15 de diciembre de 2018.

La gerencia está evaluando el impacto que estas declaraciones pueden tener en los estados financieros básicos del ELA luego de su adopción.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

**(2) Empresa en Marcha, Incertidumbres y Riesgo de Liquidez**

El debate siguiente cubre en detalle los riesgos e incertidumbres de liquidez del ELA y planes detallados establecidos para abordar los complejos desafíos en el futuro.

*(a) Empresa en Marcha: Gobierno Primario*

La gerencia cree que hay dudas sustanciales sobre la capacidad del ELA de continuar como una empresa en marcha debido a lo siguiente:

- El ELA se encuentra en medio de una profunda crisis fiscal, económica y de liquidez, la culminación de muchos años de déficits gubernamentales significativos, una recesión económica prolongada, un alto desempleo, un descenso de la población y altos niveles de deuda y obligaciones de pensiones. La vulnerabilidad de los flujos de ingresos en tiempos de grandes recesiones económicas y grandes costos de servicios de salud, pensiones y deudas destaca aún más la liquidez del ELA. A medida que la base imponible del ELA se reduce y sus ingresos se ven afectados por las condiciones económicas imperantes, los costos de la atención médica, las pensiones y el servicio de la deuda se han convertido en una parte cada vez mayor del presupuesto del Fondo General, lo que ha resultado en una reducción de los fondos disponibles para otros servicios esenciales. El nivel alto de deuda y pasivos de pensiones no financiados del ELA y la asignación de ingresos requerida como resultado del pago de la deuda y las obligaciones de pensiones contribuyeron a déficits presupuestarios significativos durante varios años, déficit que el ELA ha financiado, aumentando aún más el monto de su deuda. Estos asuntos, y las restricciones de liquidez del ELA, entre otros factores, han afectado negativamente sus calificaciones crediticias y su capacidad para obtener financiamiento a tasas de interés razonables, si existen.

- Desde el 30 de junio de 2014, las principales agencias de calificación han continuado bajando su calificación de los bonos de obligaciones generales del ELA, que ya habían sido colocados en una calificación de incumplimiento de "D". También bajaron de manera similar a una calificación de incumplimiento en sus calificaciones. los bonos de la AEP y el BGF, mientras que las calificaciones de los bonos de COFINA se han reducido múltiples niveles a un nivel de grado de no inversión actual de Ca, CC y D (según la agencia de calificación particular), pero ciertos bonos de COFINA se han colocado en perspectiva positiva como resultado de la evolución de los casos del Título III.

- El Gobierno Primario refleja un déficit neto de aproximadamente $70,300 millones al 30 de junio de 2016. El Fondo General del ELA muestra un déficit de fondos de aproximadamente $1,200 millones al 30 de junio de 2016.

- Para el año fiscal que finalizó el 30 de junio de 2016, la Legislatura de Puerto Rico no asignó aproximadamente $94 millones para el pago del servicio de la deuda de los bonos de PFC, que son obligaciones de ciertas unidades de componentes del ELA que se pagan únicamente con dichas asignaciones.

- El 6 de abril de 2016 se promulgó la Ley de Moratoria, según la que el ELA y algunas de sus unidades de componentes suspendieron sus respectivos pagos del servicio de la deuda. En particular, el ELA suspendió el pago de aproximadamente $779 millones en servicio de la deuda de bonos de obligaciones generales con vencimiento el 1 de julio de 2016 (neto de aproximadamente $352 millones de intereses capitalizados y cuentas de depósito en garantía). Para obtener información adicional sobre la Ley de Moratoria y otra legislación relevante, consulte las Notas 3 y 23.

- El 1 de mayo de 2017, la paralización en virtud del Título IV de PROMESA caducó, permitiendo que se reanude el litigio sustancial presentado por los tenedores de bonos y otros acreedores contra el ELA y sus unidades de componentes. Como resultado, el 3 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso del Título III para el ELA al presentar una solicitud de radicación en virtud del

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Título III de PROMESA. El Título III de PROMESA incorpora las disposiciones de paralización automática de las secciones 362 y 922 del Código de Quiebras, que se aplican a los casos del Título III de conformidad con la sección 301(a) de PROMESA.

*Plan de Remediación: Gobierno Primario*

El 13 de marzo de 2017, la Junta de Supervisión certificó el plan fiscal inicial para el ELA. El plan fiscal ha sido objeto de varias revisiones. El 23 de octubre de 2018, la Junta de Supervisión certificó su propio nuevo plan fiscal para el ELA (el Plan Fiscal de la Junta), que incluía las siguientes categorías de reformas estructurales y medidas fiscales:

(i)    *Reforma de Capital Humano y Bienestar*

(ii)   *Reforma para Facilidad de Hacer Negocios*

(iii)  *Reforma Regulatoria de Energía y Electricidad*

(iv)   *Reforma de Inversión de Infraestructura y Capital*

(v)    *Establecimiento de la Oficina del CFO*

(vi)   *Medidas de Eficiencia de la Agencia*

(vii)  *Reforma de Atención Médica*

(viii) *Mejora de Cumplimiento y Tarifas Fiscales*

(ix)   *Reducción en Asignaciones de UPR y la Municipalidad*

(x)    *Reforma de Pensión*

(xi)   *Controles y Transparencia Fiscal*

El 18 de enero de 2019, la Junta de Supervisión solicitó al Gobernador que presentara un nuevo plan fiscal del ELA para reemplazar el Plan Fiscal de la Junta. Conforme al cronograma indicado por la Junta de Supervisión, la Junta de Supervisión anticipa la certificación de un nuevo plan fiscal del ELA el 26 de abril de 2019.

No hay certeza de que el Plan Fiscal de la Junta (tal como está certificado actualmente o se haya enmendado y recertificado posteriormente) se implementará por completo, o si se implementa en última instancia, que proporcione los resultados previstos. Todos estos planes y medidas, y la capacidad del ELA de reducir su déficit y lograr un presupuesto equilibrado en los años fiscales futuros dependen de una serie de factores y riesgos, algunos de los cuales no están totalmente bajo su control.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*(b) Empresa en Marcha: Sistemas de Retiro*

El ELA ha conservado históricamente tres sistemas de retiro: (i) SRE; (ii) SRJ; y (iii) SRM, (colectivamente, los Sistemas de Retiro).

Los Sistemas de Retiro tienen graves deficiencias de fondos. En el caso del SRE, que es el más grande de los tres Sistemas de Retiro, su relación de capitalización (resultados netos fiduciarios como porcentaje del pasivo total por pensiones) al 30 de junio de 2016, era negativo en 3.47%, porque sus resultados netos fiduciarios eran negativos a dicha fecha, y su pasivo neto por pensiones fue de aproximadamente $37,700 millones.

En el caso del SRM y SRJ, su relación de capitalización era del 4.93% y 5.36%, respectivamente, y su pasivo neto por pensiones era de aproximadamente $17,300 millones y $615 millones, respectivamente, al 30 de junio de 2016. Posteriormente, SRM y SRJ agotaron todos los activos líquidos para fines del año fiscal 2018.

El 21 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para el SRE al presentar una solicitud de radicación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. El 15 de junio de 2017, el Fideicomisario de los Estados Unidos nombró al Comité Oficial de Empleados Retirados de Puerto Rico (el Comité de Personas Retiradas) en los casos del Título III del ELA.

*Plan de Remediación: Sistemas de Retiro*

El 23 de agosto de 2017, el Gobernador promulgó la "Ley para Garantizar el Pago a Nuestros Pensionistas y Establecer un Nuevo Plan de Contribuciones Definidas para los Empleados Públicos (Ley Núm. 106-2017). A partir de la fecha de vigencia de la Ley Núm. 106-2017, los participantes del plan no acumularán beneficios adicionales en los Sistemas de Retiro. La Ley Núm. 106-2017 estableció el mecanismo PayGo a partir del 1 de julio de 2017 y reformó los Sistemas de Retiro para que sus participantes activos depositaran sus contribuciones individuales en un nuevo Plan de Contribución Definida, similar a un plan 401(k), que sería administrado por una entidad privada.

La información detallada sobre los problemas de liquidez y solvencia de los Sistemas de Retiro y los planes de remediación correspondientes se revelan en las notas de los estados financieros auditados independientes del año fiscal 2016 para cada uno de los Sistemas de Retiro.

*(c) Empresa en Marcha: Unidades de Componentes de Presentación Discreta*

Se ha identificado que las siguientes unidades de componentes mayores de presentación discreta tienen dudas sustanciales sobre su capacidad para continuar como empresa en marcha. A continuación, se describen las circunstancias y el plan de remediación de las unidades de componentes mayores de presentación discreta.

*(i)   BGF*

Los estados financieros auditados independientes del BGF revelan que existen dudas sustanciales sobre la capacidad del BGF de continuar como empresa en marcha debido a lo siguiente:

- El BGF tradicionalmente se desempeñó como prestamista interino del ELA, sus unidades de componentes y municipios en previsión de la emisión de bonos y pagarés a largo plazo por dichas entidades en el mercado de bonos municipales. El BGF también proporcionó financiamiento al ELA y sus unidades de componentes para financiar sus respectivos déficits presupuestarios, requisitos de garantía en virtud de los acuerdos de intercambio y para cumplir con los pagos obligatorios de las obligaciones. Como resultado, la liquidez y la condición financiera del BGF dependían en gran medida

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

del pago de los préstamos otorgados al ELA y sus unidades de componentes. Las condiciones que afectan negativamente la capacidad del ELA y sus unidades de componentes para recaudar efectivo (incluido el acceso limitado a los mercados de capital) y reembolsar sus préstamos provisionales y otros préstamos al BGF tuvieron un efecto adverso sobre la liquidez y la situación financiera del BGF.

- El 23 de marzo de 2018, el BGF cesó sus operaciones y decidió liquidarse de manera ordenada en virtud del Título VI de PROMESA (como se analiza a continuación).

- Según la Ley de Moratoria (enmendada por la Ley Núm. 2 de 2017), se creó la AAFAF, como una corporación pública independiente para asumir el papel del BGF como agente fiscal, asesor financiero y agente de informes para el ELA, sus unidades de componentes y municipios. También se le han asignado a la AAFAF las tareas de supervisar asuntos relacionados con la reestructuración o el ajuste de los pasivos financieros del ELA, coordinar la gestión de pasivos u otras transacciones con respecto a tales obligaciones, y garantizar el cumplimiento de los planes y presupuestos fiscales aprobados por la Junta de Supervisión de conformidad con PROMESA.

*Plan de Remediación: BGF*

Tras el establecimiento de la AAFAF, el papel del BGF se redujo para actuar como agente en (i) recaudar en su cartera de préstamos y (ii) desembolsar fondos de acuerdo con estrictas pautas de prioridad. En consecuencia, teniendo en cuenta el escenario descrito anteriormente, dados los servicios reducidos que el BGF estaba proporcionando y dado que no se destinaron asignaciones al BGF para el año fiscal 2018, la gerencia del BGF inició un proceso de liquidación ordenado que consiste en un acuerdo de apoyo de reestructuración suscrito por la AAFAF y el BGF con una porción significativa de los principales accionistas del BGF sujetos a diferentes hitos.

*(ii)* *ACT*

Los estados financieros auditados independientes de la ACT revelan que existen dudas sustanciales sobre la capacidad de la ACT de continuar como empresa en marcha debido a lo siguiente:

- La ACT ha experimentado pérdidas recurrentes significativas de las operaciones y se enfrenta a una serie de dificultades comerciales que se han exacerbado por la recesión económica del ELA y el hecho de que la ACT no ha aumentado los ingresos para cubrir los efectos de sus crecientes costos.

- La ACT no tiene suficientes fondos disponibles para pagar completamente sus diversas obligaciones a medida que vencen o las que están actualmente en mora.

- Además, el ELA y sus unidades de componentes, incluido el BGF, han brindado un apoyo y financiamiento significativos para las obligaciones de la ACT. El ELA y esas entidades están experimentando dificultades financieras significativas y no pueden continuar extendiendo, refinanciando o de otra manera proporcionar la liquidez necesaria a la ACT cuando sea necesario. Como tal, las moras actuales no se pueden subsanar y no se pueden evitar moras futuras de las obligaciones de la ACT.

- El 21 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para la ACT al presentar una solicitud de radicación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. La ACT actualmente opera bajo la protección del Tribunal Título III.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*Plan de Remediación: ACT*

El 28 de abril de 2017, la Junta de Supervisión aprobó un plan fiscal para la ACT recomendando ciertas enmiendas. El plan fiscal ha sido objeto de varias revisiones. Conforme a su cronograma actual, la Junta de Supervisión prevé certificar un nuevo plan fiscal de la ACT antes del 28 de mayo de 2018.

En las notas de los estados financieros auditados independientes del año fiscal 2016 de la PHRTA se divulga información detallada sobre las condiciones y los eventos de la ACT que generan dudas sobre su capacidad para continuar como empresa en marcha y los planes de remediación correspondientes.

(iii)   AEE

Los estados financieros auditados independientes de la AEE revelan que existen dudas sustanciales sobre la capacidad de la AEE de continuar como empresa en marcha debido a lo siguiente:

- La AEE ha dejado de cumplir varias obligaciones de deuda y actualmente no tiene suficientes fondos disponibles para pagar completamente sus diversas obligaciones a medida que vencen.

- El ELA y sus unidades de componentes también están experimentando dificultades financieras significativas y no han podido reembolsar las cantidades adeudadas a la AEE ni extender, refinanciar o proporcionar la liquidez necesaria a la AEE cuando fue necesario.

- El 2 de julio de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para la AEE al presentar una solicitud de radicación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. La AEE actualmente opera bajo la protección del Tribunal Título III.

*Plan de Remediación: AEE*

El 28 de abril de 2017, la Junta de Supervisión aprobó un plan fiscal para la AEE pero sugirió ciertas enmiendas. El plan fiscal ha sido objeto de varias revisiones. El 11 de marzo de 2019, la Junta de Supervisión solicitó a la AEE que presentara un nuevo plan fiscal. Según su cronograma actual, la Junta de Supervisión prevé certificar un nuevo plan fiscal de la AEE antes del 28 de mayo de 2019.

En las notas de los estados financieros auditados independientes del año fiscal 2016 de la AEE se divulga información detallada sobre las condiciones y los eventos de la AEE que generan dudas sobre su capacidad para continuar como empresa en marcha y los planes de remediación correspondientes.

(iv)   AAA

Los estados financieros auditados independientes de la AAA revelan que existen dudas sustanciales sobre la capacidad de la AAA de continuar como empresa en marcha debido a lo siguiente:

- La AAA está experimentando dificultades de flujo de efectivo y financiamiento. Los resultados netos de la AAA disminuyeron en aproximadamente $238.4 millones durante el año finalizado el 30 de junio de 2016, y la AAA tenía una deficiencia de capital de trabajo de aproximadamente $347 millones al 30 de junio de 2016.

- Al 30 de junio de 2016, la AAA ha tenido pérdidas recurrentes significativas, deficiencias de capital de trabajo, rebajas de crédito y grandes gastos de capital no discrecionales.

- Como resultado de la incapacidad de la AAA para obtener financiamiento a largo plazo, la AAA no pudo pagar durante el año fiscal 2016 ciertas obligaciones del contratista relacionadas con su Programa de Mejora de Capital (CIP).

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

- El 30 de junio de 2016, la AAA, con el reconocimiento y el apoyo de la Agencia de Protección Ambiental de los Estados Unidos (EPA), celebró un Acuerdo de Tolerancia con el Departamento de Salud del ELA, administrador del Fondo de Agua Potable, la Junta de Calidad Ambiental (EQB), administrador del Fondo de Agua Limpia y la PRIFA, como agente operativo de los fondos rotativos estatales, autorizados para ayudar al DOH y EQB en las actividades administrativas, financieras y contables de los Fondos Recurrentes del Estado. En virtud del Acuerdo de Tolerancia, ciertos pagos adeudados en virtud de los préstamos de los Fondos Recurrentes del Estado se aplazaron mediante una serie de enmiendas.

- La AAA también solicitó que el Programa de Desarrollo Rural de la USDA proporcionara un período de indulgencia a corto plazo, que incluía el aplazamiento de ciertos pagos, durante el cual se abstendrían de ejercer sus derechos y recursos en virtud de los documentos de Bonos de Desarrollo Rural o subvenciones o acuerdos de préstamo. Para tal fin, la AAA y el Programa de Desarrollo de la USDA emitió un documento de indulgencia el 30 de junio de 2016 y otorgó un período de indulgencia de tres (3) meses. Se han otorgado períodos de tolerancia adicionales posteriores.

- La AAA no es un deudor en virtud de un caso del Título III.

*Plan de Remediación: AAA*

El 28 de abril de 2017, la Junta de Supervisión aprobó un plan fiscal para la AAA pero sugirió ciertas enmiendas. El plan fiscal ha sido objeto de varias revisiones. El 11 de marzo de 2019, la Junta de Supervisión solicitó a la AAA que presentara un nuevo plan fiscal. Conforme a su cronograma actual, la Junta de Supervisión prevé certificar un nuevo plan fiscal de la AAA antes del 28 de mayo de 2019.

En las notas de los estados financieros auditados independientes del año fiscal 2016 de la AAA se divulga información detallada sobre las condiciones y los eventos de la AAA que generan dudas sobre su capacidad para continuar como empresa en marcha y los planes de remediación correspondientes.

(v)  *UPR*

Los estados financieros auditados independientes de la UPR revelan que existen dudas sustanciales sobre la capacidad de la UPR de continuar como empresa en marcha debido a lo siguiente:

- La UPR tenía una posición deficitaria sin restricciones de $ 1,500 millones al 30 de junio de 2016.

- La UPR ha tenido pérdidas operativas recurrentes significativas, ha sido altamente dependiente de las asignaciones del ELA para financiar sus operaciones e históricamente ha dependido del BGF para obtener liquidez. Aproximadamente, el 68% de los ingresos totales de la UPR se derivaron de las asignaciones del ELA para el año finalizado el 30 de junio de 2016. La capacidad de la UPR para continuar recibiendo un apoyo operativo similar del ELA y obtener financiamiento externo es incierta.

- La Ley Núm. 66-2016 congeló los beneficios de las asignaciones basadas en fórmulas de la UPR en aproximadamente $833.9 millones hasta los años fiscales que terminaron el 30 de junio de 2017.

- La UPR tiene una capacidad limitada para aumentar los ingresos operativos debido a los desafíos económicos y políticos relacionados con el mantenimiento de las inscripciones y el aumento de la matrícula.

- La UPR no es un deudor en virtud de un caso del Título III.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*Plan de Remediación: UPR*

El 23 de octubre de 2018, la Junta de Supervisión certificó la última versión de su propio plan fiscal de la UPR. Sin embargo, el 11 de marzo de 2019, la Junta de Supervisión solicitó a la UPR que presentara un nuevo plan fiscal. Conforme a su cronograma actual, la Junta de Supervisión prevé certificar un nuevo plan fiscal de la UPR antes del 28 de mayo de 2019.

En las notas de los estados financieros auditados independientes del año fiscal 2016 de la UPR se divulga información detallada sobre las condiciones y los eventos de la UPR que generan dudas sobre su capacidad para continuar como empresa en marcha y los planes de remediación correspondientes.

*(vi)    Otras Unidades de Componentes No Mayores*

Existen otras unidades de componentes no mayores que tienen déficit acumulados y otras que, incluso sin déficit, tienen deudas importantes pagaderas al BGF o deudas sujetas a la Ley de Moratoria y órdenes ejecutivas relacionadas (como PRPA, PRMBA, PRIDCO y PRCCDA). De manera similar a las razones presentadas anteriormente para el Gobierno Primario y las unidades de componentes mayores de presentación discreta, la incertidumbre en cuanto a la capacidad de las otras unidades de componentes no mayores para cumplir con sus obligaciones cuando vencen plantea dudas sustanciales sobre su capacidad para continuar como empresa en marcha.

Además, existen otras unidades de componentes de presentación discreta que, aunque no tienen una posición deficitaria, o préstamos pendientes con el BGF al 30 de junio de 2016, y no se han visto afectadas por la Ley de Moratoria y las órdenes ejecutivas relacionadas se financian principalmente con ingresos no operativos principalmente de las asignaciones del ELA y dependen en gran medida del ELA y del BGF para el apoyo de liquidez y gestión financiera. Estas asignaciones dependen de la disponibilidad de fondos del ELA y su asignación legislativa. Una reducción en el monto de estas asignaciones podría resultar en dificultades financieras para estas entidades, incluida la incertidumbre en cuanto a su capacidad para cumplir plenamente con sus obligaciones cuando vencen, lo que genera dudas sustanciales sobre su capacidad para continuar como empresa en marcha. Para obtener información adicional sobre la Ley de Moratoria, consulte la Nota 3 y la Nota 23.

**(3)  PROMESA y Otra Legislación Relacionada con la Reestructuración de la Deuda**

Como se analizó en la Nota 2, el ELA y muchas de sus unidades de componentes se encuentran en medio de una profunda crisis económica y de liquidez, que ha provocado, entre otras cosas, el inicio de medidas financieras dirigidas a restablecer la estabilidad fiscal y financiera, como varias leyes estatales y federales que se han aprobado en los últimos años. Como se analiza más adelante, el 30 de junio de 2016, el Congreso de los Estados Unidos promulgó la "Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico" (PROMESA), que permitió la disciplina fiscal y económica, que incluye las alternativas de reestructuración de la deuda. Durante los años fiscales posteriores al 30 de junio de 2016, el ELA y otras entidades gubernamentales como COFINA, AEE, SRE, ACT y el BGF han iniciado procedimientos de reestructuración de su deuda existente. A continuación, se mencionan las leyes estatales y federales más relevantes promulgadas para abordar la crisis fiscal e iniciar la recuperación económica:

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

## (a) *Medidas Fiscales antes de PROMESA*

(i) *Retención por parte del gobierno de los ingresos tributarios asignados condicionalmente a ciertas corporaciones públicas y disposiciones de prioridad de pago*

El 1 de diciembre de 2015, el Gobernador firmó la Orden Ejecutiva Núm. 46 (Orden Ejecutiva Núm. 46). La Orden ejecutiva Núm. 46 ordenó al Secretario de Hacienda retener ciertos recursos disponibles del ELA a la luz de las estimados revisados de ingresos para el año fiscal 2016 y la situación deteriorada de liquidez del ELA. En virtud de tal orden ejecutiva, el Secretario de Hacienda retuvo los ingresos asignados condicionalmente a la ACT, PRIFA, PRCCDA y PRMBA para el pago del servicio de la deuda de sus bonos durante el año fiscal 2016 y separó dichos fondos para el pago de la deuda pública del ELA. Desde el año fiscal 2017, el ELA retiene dichos ingresos para el pago de servicios gubernamentales esenciales de conformidad con (a) la Ley de Moratoria y la Ley Núm. 5 (que se analizan a continuación) y (b) debido a la paralización automática en virtud del Título III de PROMESA.

(ii) *Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico, Ley de Emergencia Financiera y Responsabilidad Fiscal de Puerto Rico y órdenes ejecutivas relacionadas*

El 6 de abril de 2016, el ELA promulgó la Ley de Moratoria. En virtud de la Ley de Moratoria, el Gobernador emitió una serie de órdenes ejecutivas declarando un período de emergencia, una moratoria y varias otras medidas con respecto a ciertas obligaciones del ELA de Puerto Rico y varios de sus organismos. De conformidad con estas órdenes ejecutivas, ciertas entidades del ELA: (i) no realizó pagos del servicio de la deuda, (ii) realizó pagos del servicio de la deuda con fondos depositados en los fideicomisarios de sus bonos, o (iii) no recibió ni transfirió ciertos ingresos. Dichas órdenes ejecutivas también impusieron restricciones significativas al desembolso de fondos depositados en el BGF y suspendieron el desembolso de préstamos por parte del BGF.

## (b) *PROMESA y Otra Legislación de Puerto Rico*

(i) *PROMESA*

En términos generales, PROMESA busca proporcionar al ELA disciplina fiscal y económica a través de, entre otras cosas: (i) el establecimiento de la Junta de Supervisión, cuyas responsabilidades incluyen la certificación de planes y presupuestos fiscales para el ELA y sus entidades relacionadas; (ii) una paralización temporal de todas las demandas de acreedores en virtud del Título IV de PROMESA; y (iii) dos métodos alternativos para ajustar la deuda insostenible: (a) un proceso voluntario de modificación de deuda en virtud del Título VI de PROMESA, que establece un proceso de reestructuración de deuda en gran medida extrajudicial mediante la cual una supermayoría de acreedores puede aceptar modificaciones a la deuda financiera; y (b) un procedimiento de cuasi quiebra en virtud del Título III de PROMESA, que establece un proceso de reestructuración de la deuda en el tribunal sustancialmente basado en las disposiciones incorporadas del Título 11 del Código de los Estados Unidos (Código de Quiebras de los Estados Unidos). Cada uno de estos elementos se divide entre los siete títulos de PROMESA, como se describe brevemente a continuación.

(a) *Título I - Establecimiento de la Junta de Supervisión y Asuntos Administrativos*

Tras la promulgación de PROMESA, se estableció la Junta de Supervisión para Puerto Rico. Como se indica en PROMESA, "el propósito de la Junta de Supervisión es proporcionar un método para que un territorio cubierto logre la responsabilidad fiscal y el acceso a los mercados de capitales". El 31 de agosto de 2016, el Presidente de los Estados Unidos anunció el nombramiento de los miembros de la Junta de Supervisión. Cada miembro de la Junta de

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Supervisión debe tener "conocimiento y experiencia en finanzas, mercados de bonos municipales, administración, leyes u organización u operación de negocios o gobierno". La Junta de Supervisión fue "creada como una entidad dentro del gobierno territorial para el cual fue establecida" y expresamente no es una entidad del gobierno federal, pero también fue establecida para actuar independientemente del gobierno del ELA, de forma tal que ni el Gobernador ni la Legislatura pueden "(i) ejercer cualquier control, vigilancia, supervisión o revisión sobre la Junta de Supervisión o sus actividades; o (ii) promulgar, implementar o exigir el cumplimiento de cualquier estatuto, resolución, política o regla que perjudique o anule los propósitos de [PROMESA], según lo determine la Junta de Supervisión.

*(b)  Título II - Plan Fiscal y Proceso de Certificación Presupuestaria y Cumplimiento*

El Título II establece los requisitos para proponer y certificar planes y presupuestos fiscales para el ELA y sus instrumentos. "Cada plan fiscal sirve como piedra angular para las reformas estructurales que la Junta de Supervisión considera necesarias para garantizar que el territorio, o la instrumentalidad, se encaminen hacia la responsabilidad fiscal y el acceso a los mercados de capitales. De acuerdo con la historia legislativa, un plan fiscal debería "proporcionar un nivel sostenible de deuda, mejorar la gobernanza, proporcionar gastos de capital que prometan crecimiento económico y respetar las prioridades relativas que las diferentes clases de tenedores de bonos tienen entre sí en virtud de la ley de Puerto Rico".

Solo después de que la Junta de Supervisión haya certificado un plan fiscal, el Gobernador puede presentar a la Legislatura un presupuesto del año fiscal del ELA y presupuestos del año fiscal para ciertos instrumentos del ELA (según lo aprobado por la Junta de Supervisión).

En cumplimiento de los deberes anteriores, PROMESA contiene una disposición que otorga facultades a la Junta de Supervisión para supervisar el cumplimiento de los planes y presupuestos fiscales certificados y emprender ciertas acciones, incluidas las reducciones de gastos y la presentación de acciones recomendadas al Gobernador que promuevan el cumplimiento presupuestario. Consulte el texto de PROMESA para obtener una descripción completa de las facultades de la Junta de Supervisión relacionados con el plan fiscal y el cumplimiento presupuestario.

*(c)  Título III – Proceso de Restructuración en el Tribunal*

El Título III de PROMESA establece un proceso en el tribunal para la reestructuración de las deudas de Puerto Rico y otros territorios de los Estados Unidos que se basa en el proceso del Capítulo 9 del Código de Quiebras de los Estados Unidos.

La Junta de Supervisión tiene la autoridad exclusiva para presentar una petición voluntaria de protección en virtud del Título III de PROMESA.

En un caso del Título III, la Junta de Supervisión actúa como representante del deudor y está autorizada a tomar las medidas necesarias para procesar el caso del Título III. Inmediatamente después de radicar la petición del Título III, la sección 362 del Código de Quiebras (que se incorpora a los casos del Título III bajo PROMESA) aplica para paralizar automáticamente todos los litigios contra el deudor (la Paralización del Título III). Un caso del Título III culmina en la confirmación de un plan de ajuste de las deudas del deudor. La Junta de Supervisión tiene la autoridad exclusiva de presentar y modificar un plan de ajuste antes de la confirmación.

*(d)  Título IV - Paralización Temporal de Litigios, Informes Gubernamentales y Otras Disposiciones Varias*

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El Título IV de PROMESA contiene varias disposiciones diversas, que incluyen una paralización temporal de litigios relacionados con "Reclamos de pasivos", alivio de ciertas leyes salariales y por hora, el establecimiento de un Grupo de trabajo del Congreso sobre crecimiento económico en Puerto Rico (el Grupo de trabajo), el requisito de que la Oficina del Contralor General de los Estados Unidos presente dos informes al Congreso sobre los niveles de deuda pública de los territorios estadounidenses y la expansión del programa HUBZone de pequeñas empresas del gobierno federal en Puerto Rico.

De conformidad con la sección 405 de PROMESA, la promulgación de PROMESA impuso de forma inmediata y automática una paralización temporal (la Paralización del Título IV desde el 30 de junio de 2016 (la fecha de promulgación de PROMESA) hasta el 15 de febrero de 2017 de todos los litigios de "Reclamo de pasivos" iniciados contra el ELA de Puerto Rico y sus instrumentos después del 18 de diciembre de 2015. Un "Reclamo de Pasivos" se define como cualquier derecho de pago o remedio equitativo por incumplimiento de desempeño relacionado con "un bono, préstamo, carta de crédito, otro título de préstamo, obligación de seguro u otra deuda financiera por dinero prestado, incluidos los derechos, derechos u obligaciones, ya sea que dichos derechos u obligaciones surjan de un contrato, estatuto o cualquier otra fuente de ley relacionada [a la misma] "para la cual el ELA o uno de sus instrumentos fue el emisor, el deudor o el garante y se incurrió en tales responsabilidades antes del 30 de junio de 2016. La Paralización del Título IV estaba sujeta a una extensión de 75 días por la Junta de Supervisión o una extensión de 60 días por el Tribunal de Distrito de los Estados Unidos. El 28 de enero de 2017, la Junta de Supervisión extendió la Paralización del Título IV por 75 días hasta el 1 de mayo de 2017, momento en el cual la Paralización del Título IV expiró.

El Título IV de PROMESA también requirió varios informes del gobierno federal. En primer lugar, PROMESA estableció la Fuerza de Tarea dentro de la rama legislativa del gobierno federal de los Estados Unidos. El Grupo de Trabajo presentó su informe al Congreso el 20 de diciembre de 2016.

En segundo lugar, PROMESA requirió que la Oficina del Contralor General de los EE. UU., a través de la Oficina de Responsabilidad del Gobierno (GAO), presente un informe a la Cámara y al Senado antes del 30 de diciembre de 2017 con respecto a: (i) las condiciones que llevaron al nivel actual de deuda de Puerto Rico; (ii) cómo las acciones del gobierno mejoraron o deterioraron su condición financiera; y (iii) recomendaciones sobre nuevas acciones o políticas fiscales que el ELA podría adoptar. La GAO publicó este informe el 9 de mayo de 2018.

En tercer lugar, PROMESA requirió que el Oficina del Contralor General de los EE. UU., a través de la GAO, presentara al Congreso antes del 30 de junio de 2017 un informe sobre la deuda pública de los territorios de los EE. UU. Además de su informe inicial, la GAO debe presentar al Congreso informes actualizados sobre la deuda pública al menos una vez cada dos años. La GAO publicó este informe el 2 de octubre de 2017.

*(e)  Título V - Revitalización de Infraestructura*

El Título V de PROMESA establece el puesto de Coordinador de Revitalización bajo la Junta de Supervisión y proporciona un marco para la revitalización de la infraestructura a través de un proceso de autorización acelerado para "proyectos críticos" según lo identificado por el Coordinador de Revitalización.

*(f)  Título VI - Proceso de Modificación de Deuda Extrajudicial Consensual*

El Título VI de PROMESA establece un proceso extrajudicial para modificar las deudas de Puerto Rico. Según la sección 601 (d) de PROMESA, la Junta de Supervisión está autorizada a establecer "grupos" de bonos emitidos por cada emisor relacionado con el gobierno de Puerto Rico en función de las prioridades relativas.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Después de establecer los grupos, el emisor del gobierno o cualquier tenedor de bonos o grupo de tenedores de bonos pueden proponer una modificación a una o más series de bonos del emisor del gobierno. Si existe un acuerdo voluntario, la Junta de Supervisión debe emitir una certificación y ejecutar una serie de procesos adicionales para calificar la modificación.

Finalmente, el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico debe emitir una orden para aprobar la Modificación Calificante y otorgar al emisor todos los bienes libres de reclamos con respecto a cualquier bono.

El proceso del Título VI se implementó con éxito para reestructurar las deudas del BGF. El proceso del Título VI del BGF se trata a continuación en unidades de componentes: BGF, modificación de calificación y proceso de aprobación del Título VI.

(g) *Título VII: Sentido del Congreso*

El Título VII de PROMESA establece el sentido del Congreso de que "cualquier solución duradera para la crisis fiscal y económica de Puerto Rico debe incluir reformas fiscales permanentes y favorables al crecimiento que presenten, entre otros elementos, un flujo libre de capital entre las posesiones de los Estados Unidos y el resto de los Estados Unidos".

(ii) *Legislación de Puerto Rico y Otras Medidas Fiscales*

La Ley Núm. 2 del 18 de enero de 2017 (Ley Núm. 2 de 2017), la Ley de la Autoridad Fiscal y de Asesoramiento Financiero de Puerto Rico, se promulgó para ampliar los poderes y la autoridad de la AAFAF (como se estableció inicialmente en virtud de la Ley de Moratoria) para que la AAFAF tenga la responsabilidad exclusiva de negociar, reestructurar y llegar a acuerdos con los acreedores sobre la totalidad o parte de la deuda pública o cualquier otra deuda emitida por cualquier entidad del ELA. La AAFAF también es responsable de los esfuerzos de colaboración, comunicación y cooperación entre el ELA y la Junta de Supervisión en virtud de PROMESA. Además, la Ley Núm. 2 de 2017 estableció a la AAFAF como la entidad del ELA responsable de llevar a cabo las funciones heredadas del BGF junto con deberes y poderes adicionales, que incluyen, entre otras actividades: (i) supervisión del presupuesto del ELA; (ii) una presencia administrativa en cada junta o comité donde el presidente del BGF es actualmente miembro; (iii) autoridad para realizar auditorías e investigaciones; y (iv) autoridad para congelar partidas presupuestarias, nombrar fideicomisarios, redistribuir recursos humanos y cambiar los procedimientos.

La Ley Núm. 3 del 23 de enero de 2017 (Ley Núm. 3 de 2017), la Ley para Atender la Crisis Fiscal, se promulgó para extender la mayoría de las medidas fiscales que se habían adoptado en virtud de la Ley Núm. 66 de 2014 hasta el 1 de julio de 2021, incluida una extensión de 10 años del impuesto indirecto sobre las adquisiciones de corporaciones extranjeras en virtud de la Ley Núm. 154.

La Ley Núm. 5 del 29 de enero de 2017 (Ley Núm. 5 de 2017), la Ley de Responsabilidad Fiscal y Emergencia Financiera de Puerto Rico, se promulgó para mantener la moratoria sobre el pago de la deuda existente en virtud de la Ley de Moratoria; sin embargo, permitió al ELA segregar fondos que eventualmente se utilizarían para financiar el pago de la deuda pública. La Ley Núm. 5 de 2017 establece que el Gobernador puede pagar el servicio de la deuda siempre que el ELA pueda continuar financiando servicios esenciales, como la salud, la seguridad y el bienestar de la gente de Puerto Rico, incluido el suministro de su educación y asistencia a los residentes. La Ley Núm. 5 de 2017 continuó la declaración del ELA en estado de emergencia y aumentó los poderes del Gobernador para administrar las finanzas del ELA. El período de emergencia en virtud de la Ley Núm. 5 de 2017, expiraba el 1 de mayo de 2017 para coincidir con el vencimiento de la paralización del Título IV (como se explicó anteriormente), a menos que se extienda por tres meses adicionales por orden ejecutiva.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El 30 de abril de 2017, el Gobernador emitió la orden ejecutiva OE2017031, que extendió el período de emergencia de la Ley Núm. 5 de 2017 al 1 de agosto de 2017. El 19 de julio de 2017, la Legislatura promulgó la Ley Núm. 46 de 2017 (Ley Núm. 46 de 2017), que extendió aún más el período de emergencia de la Ley Núm. 5 de 2017 hasta el 31 de diciembre de 2017. La Ley Núm. 46 de 2017 permitió al Gobernador firmar órdenes ejecutivas para extender el período de emergencia por períodos sucesivos de seis meses, siempre que la Junta de Supervisión permanezca establecida para Puerto Rico en virtud de PROMESA. El 27 de diciembre de 2018, el Gobernador emitió la orden ejecutiva EO-2018-053, que extendió el período de emergencia hasta el 30 de junio de 2019.

La Ley Núm. 106 de 23 de agosto de 2017 (Ley Núm. 106 de 2017), la Ley para Garantizar el Pago a Nuestros Pensionistas y Establecer un Nuevo Plan de Contribuciones Definidas para los Empleados públicos, reformó las pensiones del ELA reemplazando las juntas de gobierno de los Sistemas de Retiro con una sola Junta de Retiro del Estado Libre Asociado de Puerto Rico (Junta de jubilación) y estableció una "Cuenta para el Pago de las Pensiones Acumuladas" para implementar un método PayGo para los Sistemas de Retiro. La Ley Núm. 106 de 2017 creó el marco legal para que el ELA pueda garantizar los pagos a los pensionados a través del sistema PayGo.

La Ley Núm. 109 de 24 de agosto de 2017 (Ley Núm. 109 de 2017), la Ley de Reestructuración de la Deuda del Banco Gubernamental de Fomento para Puerto Rico (Ley de Reestructuración del BGF), efectuó el Plan Fiscal del BGF y proporcionó un camino para la implementación del RSA del BGF para cubrir los reclamos del ELA y sus organismos contra el BGF. La Ley Núm. 109 de 2017 creó dos entidades de propósito especial, la Autoridad de Recuperación de la Deuda del BGF y el Fideicomiso de Entidades Públicas, donde el BGF dividiría y transferiría irrevocablemente sus activos. Como se analiza a continuación, estas entidades se utilizaron para completar las transacciones en la Modificación de Calificación del BGF, según lo aprobado por el Tribunal de Distrito en virtud del Título VI de PROMESA.

La Ley Núm. 241 del 15 de noviembre de 2018 (Ley Núm. 241 de 2018), la Ley de la Corporación del Fondo de Interés Apremiante de Puerto Rico, modificó y reformuló la Ley Núm. 91 de 2006 para establecer el marco legal para la reestructuración de los bonos emitidos y en circulación de COFINA mediante, entre otras cosas, autorizar la emisión de nuevos bonos de COFINA necesarios para completar las transacciones contempladas en el Tercer Plan de Ajuste Enmendado de COFINA, como se analiza a continuación y en la Nota 17(c).

*(c) Casos del Título III de PROMESA*

*(i) Inicio de Casos del Título III de la Junta de Supervisión*

El 1 de mayo de 2017, la Paralización del Título IV expiró, lo que permitió que se reanudaran los litigios sustanciales presentados por los tenedores de bonos y otros acreedores contra el ELA y sus organismos. El 3 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para el ELA al presentar una solicitud de radicación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (el Tribunal Título III). El 5 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso de Título III para COFINA mediante la radicación de una petición similar de desagravio en virtud del Título III de PROMESA en el Tribunal Título III.

El 21 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició casos del Título III para ACT y el SRE radicando peticiones similares de alivio en virtud del Título III de PROMESA en el Tribunal Título III. El 2 de julio de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso de Título III para AEE mediante la radicación de una petición similar de desagravio en virtud del Título III de PROMESA en el Tribunal Título III. Todos los casos anteriores del Título III se han consolidado solo con fines de procedimiento

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

y se administran conjuntamente en virtud del Caso Núm. 17-3283-LTS en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico.

Los casos del Título III comenzaron en parte debido a la expiración del 1 de mayo de 2017 de la Paralización del Título IV. El Título III de PROMESA incorpora las disposiciones de paralización automática de las secciones 362 y 922 del Código de Quiebras, que se aplican a los casos del Título III de conformidad con la sección 301(a) de PROMESA. En consecuencia, tras la radicación de los casos del Título III, la Paralización del Título III entró en vigencia inmediatamente para paralizar el litigio de acreedores. Todos los reclamos contra cualquier deudor en virtud del Título III que surgieron antes de la radicación del caso del Título III (ya sea discutido o no en este documento) pueden estar sujetos a las leyes que rigen el Título III.

El 7 de agosto de 2017, un grupo de tenedores de bonos GO liderados por Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC y Lex Claims, LLC (colectivamente, Aurelius) radicaron una moción para desestimar las peticiones del Título III. En la moción, Aurelius argumentó que el nombramiento de los miembros de la Junta de Supervisión violó la "Cláusula de Nombramientos" de la Constitución de los Estados Unidos, que requiere que los "funcionarios principales" de los Estados Unidos sean nombrados por el Presidente y confirmados por el Senado. El Tribunal Título III negó la moción de desestimación de Aurelius, y Aurelius apeló ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito. El 15 de febrero de 2019, el Primer Circuito revocó el Tribunal Título III, sosteniendo que el proceso de nombramiento de los miembros de la Junta de Supervisión violó la Cláusula de Nombramientos. El Primer Circuito paralizó su decisión durante 90 días para permitir que el Presidente y el Senado designen a la Junta de Supervisión de acuerdo con la Constitución de los Estados Unidos. También validó expresamente todas las acciones pasadas de la Junta de Supervisión, incluidas las acciones tomadas por la Junta de Supervisión durante el período de paralización de 90 días. La Junta de Supervisión ha anunciado su intención de apelar la decisión del Primer Circuito ante el Tribunal Supremo. Aunque el Primer Circuito paralizó su decisión durante 90 días, el enjuiciamiento continuo de los casos del Título III puede ser incierto si la Junta de Supervisión no se vuelve a nombrar adecuadamente durante el período de 90 días, a menos que dicha paralización se extienda.

*(ii) Mediación en los Casos del Título III*

El 23 de junio de 2017, el Tribunal Título III designó un equipo de cinco jueces federales para facilitar las negociaciones de solución de todos los asuntos y procedimientos que surjan en los casos del Título III. La mediación de varias disputas relacionadas con los casos del Título III sigue en curso.

*(iii) Caso del Título III del ELA*

El 5 de mayo 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para COFINA al presentar una solicitud de radicación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. El plazo para la presentación por parte de los acreedores de sus comprobantes de reclamo contra COFINA venció el 29 de junio de 2018.

Después del comienzo del caso del Título III del ELA, se radicaron numerosas mociones y procedimientos adversos tanto por el ELA como contra los derechos de los acreedores sobre los activos del ELA. El resultado de estos procedimientos y su impacto en cualquier plan de ajuste para el ELA no se puede determinar en este momento. Para obtener una descripción detallada de estas contingencias legales, consulte la Nota 17.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*(iv)  Caso del Título III de COFINA*

El 5 de mayo 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para COFINA al presentar una solicitud de radicación en virtud del Título III de PROMEA [sic] en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico.

Las preguntas sobre los intereses de propiedad respectivos del ELA y COFINA en los ingresos por impuestos sobre las ventas y el uso pignorados como garantía para los bonos existentes de COFINA han estado en el centro de los casos del Título III de Puerto Rico desde su comienzo en mayo de 2017. La resolución de este problema (la Disputa del ELA-COFINA) fue esencial para que la reestructuración de la deuda de Puerto Rico siguiera adelante.

Para acelerar la resolución de la disputa del ELA-COFINA, la Junta de Supervisión propuso el nombramiento de representantes para el ELA y la COFINA. El 10 de agosto de 2017, el Tribunal Título III emitió una orden (la Orden de Procedimientos) para aprobar un protocolo para resolver las disputas entre el ELA y la COFINA. La Orden de Procedimientos define la Disputa del ELA-COFINA como "si, después de considerar todas las defensas y contrademandas procesales y sustantivas, incluidas las cuestiones constitucionales, los impuestos sobre las ventas y el uso supuestamente pignorados por COFINA para garantizar la deuda son propiedad del ELA o la COFINA según la ley aplicable". La Orden de Procedimientos preveía el nombramiento de (1) un agente de la Junta de Supervisión como representante del ELA en su Caso del Título III (el Agente del ELA); y (2) un agente de la Junta de Supervisión como representante de COFINA en su Caso del Título III (el Agente de COFINA).

El 8 de septiembre de 2017, el Agente del ELA radicó una demanda afirmando que los ingresos de SUT pignorados por la deuda de bonos de COFINA son "propiedad exclusiva del ELA". La demanda alega que la legislación habilitadora de COFINA "no transfirió a COFINA la propiedad actual de los ingresos futuros del IVU" y no asignó a COFINA el derecho del ELA a recibir dichos ingresos. La demanda argumentaba que la transferencia a COFINA de los ingresos de SUT era, a lo sumo, una promesa no segura de transferir ingresos en el futuro. Además, la demanda alegaba que incluso si la transferencia de futuros ingresos del IVU a COFINA tuviera algún efecto legal, tales transferencias eran simplemente una concesión de un derecho de garantía en bienes adquiridos regidos por el Artículo 9 del Código Comercial Uniforme. La demanda alegaba que cualquier derecho de garantía de COFINA en los ingresos de SUT no era ejecutable contra el ELA o, como alternativa, no estaba perfeccionado y, por lo tanto, era evitable y de otro modo subordinado a los derechos de la Junta de Supervisión como fideicomisario. La demanda afirmó además que el caso del Título III del ELA corta cualquier derecho de garantía.

La demanda también alegó que la estructura de COFINA era inconstitucional porque elude las limitaciones de la deuda de la Constitución del ELA.

Después de extensos procedimientos legales, el 29 de agosto de 2018, COFINA, AAFAF, la Junta de Supervisión y varios tenedores y aseguradores de los bonos de COFINA (las Partes del Acuerdo) celebraron ese cierto Acuerdo de Apoyo al Plan con fecha del 29 de agosto de 2018 (el PSA Original) , que contempla, entre otras cosas, (i) el compromiso y la solución de la Disputa del ELA-COFINA, de conformidad con el Acuerdo de Principio, otorgando a COFINA una participación en la propiedad de un monto de hasta el 53.65% del Monto base del impuesto sobre las ventas pignoradas; y (ii) la aprobación del Tribunal Título III del compromiso y el acuerdo al mismo tiempo a través de un plan de ajuste en el caso del Título III de COFINA y una moción de acuerdo en el caso del Título III del ELA.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El 19 de octubre de 2018, la Junta de Supervisión radicó el Plan de Ajuste del Título III de la Corporación del Fondo de Interés Apremiante de Puerto Rico (el Plan de Ajuste), junto con otros documentos relacionados con la quiebra, como se detalla en la Nota 17(c).

El 7 y 8 de noviembre de 2018, respectivamente, se aprobó en la Cámara de Representantes de Puerto Rico y el Senado de Puerto Rico una nueva legislación para enmendar y reformular la Ley Núm. 91 de 2006 para establecer el marco legal para la reestructuración de los bonos emitidos y en circulación de COFINA. El 15 de noviembre de 2018, el Gobernador de Puerto Rico promulgó la nueva legislación como Ley Núm. 241 de 2018.

Después de varias enmiendas, el 9 de enero de 2019, la Junta de Supervisión radicó su Tercer Plan de Ajuste del Título III Enmendado, como se discutió en la Nota 17(c). El Tercer Plan de Ajuste Enmendado propuso, entre otras cosas, liberar al ELA de toda responsabilidad de reclamos y causas radicadas en poder de cualquier acreedor de COFINA (únicamente en su calidad de acreedor de COFINA) que surja de o esté relacionado con la relación del ELA y COFINA.

El Tribunal Título III celebró una vista sobre la Moción de Acuerdo y la confirmación del Tercer Plan de Ajuste Enmendado el 16 de enero de 2019 y el 17 de enero de 2019. El 4 de febrero de 2019, el Tribunal Título III otorgó la Moción del Acuerdo y confirmó el Tercer Plan de Ajuste Enmendado.

El 5 de febrero de 2019, el Tribunal Título III modificó los hallazgos y conclusiones y la orden de confirmación. De conformidad con los hallazgos y las conclusiones enmendadas y la orden de confirmación modificada, que sustituyen a los hallazgos y las conclusiones y la orden de confirmación, el Tribunal Título III confirmó el tercer plan de ajuste enmendado de COFINA, que entró en vigencia el 12 de febrero de 2019. Para obtener información adicional, consulte la Nota 17(c).

Ciertas partes cuyas objeciones fueron anuladas al confirmar el Tercer Plan de Ajuste Enmendado radicaron notificaciones de apelación ante el Tribunal Título III. Las apelaciones han sido enviadas al Tribunal de Apelaciones de Estados Unidos para el Primer Circuito con los números de caso 19-1181 (también discutido en relación con el procedimiento del adversario, subtitulado Manuel Natal-Albelo, et al. V. Junta de Supervisión y Administración Financiera de Puerto Rico, et al.) y 19-1182. La fecha límite para presentar los Avisos de Apelación fue el 7 de marzo de 2019. Para obtener información adicional, consulte la Nota 17(c).

*(v)   Caso del Título III de la ACT*

El 21 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para la ACT al presentar una solicitud de radicación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. El plazo para la presentación por parte de los acreedores de sus comprobantes de reclamo contra la ACT venció el 29 de junio de 2018.

Después del comienzo del caso del Título III de la ACT, se radicaron numerosas mociones y procedimientos adversos tanto por la ACT como contra los derechos de los acreedores sobre los activos de la ACT. El resultado de estos procedimientos y su impacto en cualquier plan de ajuste para la ACT no se puede determinar en este momento. Para obtener una descripción detallada de estas contingencias legales, consulte la Nota 17.

*(vi)   Caso del Título III del SRE*

El Título IV Paralización caducó el 1 de mayo de 2017. El 21 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso de Título III para el SRE mediante la radicación de una petición de desagravio en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Distrito de Puerto Rico. El plazo para la presentación por parte de los acreedores de sus comprobantes de reclamo contra el SRE venció el 29 de junio de 2018.

El 31 de mayo de 2017, ciertos tenedores de bonos de fondos de pensiones senior y subordinados emitidos por el SRE de conformidad con la Resolución de Bonos de Financiamiento de Pensiones, adoptada el 24 de enero de 2008 (los tenedores de bonos del SRE) radicaron una moción para solicitar una exención de la paralización automática impuesta al comienzo del caso del Título III. El ELA, el SRE y los tenedores de bonos del SRE presentaron una estipulación para resolver la moción de paralización, que fue aprobada por orden del Tribunal Título III el 17 de julio de 2017.

El 13 de julio de 2018, los tenedores de bonos del SRE renovaron su moción de alivio de la paralización automática. El 17 de agosto de 2018, el Tribunal de Distrito emitió una opinión y ordenó que los intereses sobre títulos afirmados por los tenedores de bonos del SRE no se perfeccionaron adecuadamente y, por lo tanto, no eran válidos ni ejecutables contra el SRE. El 21 de agosto de 2018, el Tribunal Título III denegó la moción de paralización renovada de los tenedores de los Bonos del SRE debido a que los titulares de los Bonos del SRE no tenían derecho a reparación a la luz de la decisión del Tribunal Título III con respecto a la validez y aplicabilidad de los gravámenes de los Titulares de los Bonos del SRE. Los tenedores de bonos del SRE apelaron al dictamen y orden del Tribunal Título III y el 31 de enero de 2019, el Primer Circuito revocó el Tribunal Título III, encontrando que los titulares de los bonos del SRE tienen un derecho de garantía válido que es exigible contra el SRE.

El 12 de marzo de 2019, el Comité de Acreedores radicó una objeción general a todos los reclamos radicados contra el SRE en base a los aproximadamente $3,100 millones de bonos en circulación emitidos por el SRE en 2008 (la Objeción de Reclamos de Bonos del SRE). La Objeción de Reclamos de Bonos del SRE argumenta que el SRE solo estaba autorizado a emitir una "colocación directa de deudas", que según el Comité de Acreedores se entiende comúnmente como una "colocación privada, no una oferta pública". Debido a que los bonos del SRE se emitieron en una oferta pública, el Comité de Acreedores afirma que los bonos del SRE se emitieron ilegalmente como ultra vires y, por lo tanto, son "nulos". Como resultado, el Comité de Acreedores busca una orden que rechace todos los reclamos de bonos del SRE en su totalidad. Además, el 12 de marzo de 2019, el Comité de Acreedores radicó una moción de procedimientos relacionados con la adjudicación de la objeción de reclamos de bonos del SRE. Cualquier objeción a la moción de procedimientos debe presentarse el 9 de abril de 2019 y se programa una vista para el 24 de abril de 2019. No se han establecido plazos de objeción ni fecha de vista sobre la objeción de reclamos de bonos del SRE.

Después del comienzo del caso del Título III del SRE, se radicaron numerosas mociones y procedimientos adversos tanto por el SRE como contra los derechos de los acreedores sobre los activos del SRE. El resultado de estos procedimientos y su impacto en cualquier plan de ajuste para el SRE no se puede determinar en este momento. Para obtener una descripción detallada de estas contingencias legales, consulte la Nota 17.

*(vii)  Caso del Título III de la AEE*

El 2 de julio de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para la AEE al presentar una solicitud de radicación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico.

El 18 de julio de 2017, un grupo ad hoc de acreedores de la AEE y ciertas aseguradoras de línea única de bonos de la AEE radicaron una moción para levantar la paralización automática en el caso del Título III de la AEE, para permitir que las aseguradoras DE LÍNEA ÚNICA soliciten el nombramiento de un SÍNDICO para la AEE para supervisar las operaciones de la empresa de servicios públicos y buscar un aumento en las tarifas. El 15 de septiembre de 2017, el Tribunal Título III negó la moción que buscaba levantar la paralización de la ley PROMESA. El 8 de agosto de 2018, el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito

116

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

revocó la determinación del Tribunal Título III de que PROMESA prohibió el nombramiento de un síndico y, en cambio, sostuvo que el Tribunal Título III puede designar un síndico si es necesario. El 18 de octubre de 2018, las aseguradoras de línea única radicaron una moción para designar un síndico para instalar una administración prudente y sólida en la AEE, pero no buscaron autorización para que un síndico aumente las tarifas o ejerza control sobre la planificación o los presupuestos energéticos. La vista sobre la moción para nombrar un síndico está programada para el 8 de mayo de 2019.

*(viii)  Modificación de Calificación del BGF y Proceso de Aprobación del Título VI*

El 29 de noviembre de 2018, el BGF completó una reestructuración de parte de su endeudamiento de conformidad con una Modificación de Calificación en virtud del Título VI de PROMESA (la Modificación de Calificación). Conforme a la Modificación de Calificación, los titulares de ciertos bonos y reclamos de depósitos contra el BGF intercambiaron sus reclamos por bonos emitidos por un organismo público recientemente creado, la Autoridad de Recuperación de la Deuda del BGF, y el BGF transfirió a dicha entidad su cartera de préstamos municipales, una parte de su entidad pública cartera de préstamos, sus activos inmobiliarios y su efectivo no gravado. Además, de conformidad con la Ley de Reestructuración del BGF, los reclamos a cuenta de depósitos mantenidos por el ELA y otras entidades públicas se canjearon por intereses en un fideicomiso recién creado de conformidad con la Ley de Reestructuración del BGF, denominado Fideicomiso de Entidad Pública (PET).

De conformidad con la Ley de Reestructuración del BGF, el saldo de los pasivos adeudados entre el ELA y sus agentes, organismo y filiales, incluida la Autoridad (cada una de las Entidades Gubernamentales No Municipales) y el BGF se determinaron aplicando el saldo pendiente de los depósitos mantenidos en el BGF en el nombre de una Entidad Gubernamental No Municipal contra el saldo pendiente de cualquier préstamo de dicha Entidad Gubernamental No Municipal adeudado al BGF o de cualquier bono o pagaré de dicha Entidad Gubernamental No Municipal en poder del BGF a esa fecha. Las Entidades Gubernamentales No Municipales que tienen reclamos netos contra el BGF, después de dar efecto al ajuste anterior, recibieron su parte proporcional de intereses en el PET, lo que se consideró como la plena satisfacción de todos y cada uno de los reclamos que tal Entidad Gubernamental No Municipal pueda tener contra el BGF.

Los activos del PET (los Activos del PET) consisten, entre otros elementos, en un reclamo contra el ELA por un total de no más de $905 millones, que es el sujeto de una prueba de reclamo radicado en el caso del ELA pendiente en virtud del Título III de PROMESA. La recuperación de la Autoridad a causa de su interés en el PET dependerá de la recuperación que finalmente reciba el PET a causa de los Activos de PET. Los reclamos que el ELA y otras entidades gubernamentales pueden haber tenido contra el BGF se han liberado de conformidad con la Modificación de Calificación (a excepción de lo establecido en el mismo), y el BGF ha reducido la cantidad de cualquier reclamo permitido contra el ELA que pueda recibir como se establece en dicha Modificación de Calificación.

El 6 de noviembre de 2018, el Tribunal de Distrito aprobó la Modificación de Calificación del BGF en virtud del Título VI de PROMESA y la Modificación de Calificación entró en vigencia a partir del 29 de noviembre de 2018.

*(ix)  Acuerdo de Apoyo a la Reestructuración de Puertos de PRIFA*

El 10 de abril de 2019, AAFAF, en nombre de PRIFA y PRPA, celebró un acuerdo de apoyo de reestructuración ("RSA") con el Grupo Ad Hoc de tenedores de ciertos bonos de la Serie 2011 emitidos por la PRIFA (los "Bonos de puertos la PRIFA"). La reestructuración contemplada por la RSA tiene dos componentes principales. En primer lugar, los miembros del Grupo Ad Hoc, que poseen más del 90% de los Bonos en circulación de la

117

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

PRIFA-Puertos licitarán todas sus tenencias de Bonos de PRIFA-Puertos por su participación prorrateada de (i) la distribución realizada a la PRIFA en virtud del Tercer Plan de Ajuste del Título III Enmendado de la Corporación del Fondo de Interés Apremiante de Puerto Rico a causa de $91.5 millones en Reclamos de Bonos COFINA Junior (como se define en el plan COFINA) en poder de PRIFA; y (ii) un pagaré de $40 millones emitido por la PRPA. En segundo lugar, la operación de carga y logística de Puerto Nuevo en la Bahía de San Juan (la "Propiedad") se revitalizará a través de la contribución del Grupo Ad Hoc a una subsidiaria recién formada de PRPA de (i) al menos $11 millones, (ii) el pagaré y (iii) hasta el 10% de los ingresos brutos de alquiler generados por la Propiedad. A su vez, AFICA emitirá nuevos bonos para el Grupo Ad Hoc en una cantidad nominal igual a los flujos de efectivo proyectados de la Propiedad.

La transacción propuesta sigue sujeta a la aprobación de la Junta de Supervisión y Administración Financiera para Puerto Rico y al acuerdo sobre otra documentación definitiva.

*(d) Mora del Pago del Capital e Intereses de los Bonos*

Como resultado directo de la Ley de Moratoria y la retención de ciertos ingresos asignados condicionalmente a las corporaciones públicas y las disposiciones de prioridad de pago, el ELA y tales corporaciones públicas no han podido realizar los pagos del servicio de la deuda a medida que vencen.

La siguiente tabla resume el saldo vencido del capital y los intereses de los bonos al 31 de marzo de 2019:

| | | Capital | Intereses | Saldo vencido |
|---|---|---|---|---|
| Actividades del gobierno: | | | | |
| ELA | $ | 832,970 | 2,172,210 | 3,005,180 |
| COFINA | | 66,696 | 1,325,429 | 1,392,125 |
| AEP | | 178,948 | 484,613 | 663,561 |
| PRIFA | | 206,495 | 249,304 | 455,799 |
| PAA | | 23,363 | 63,840 | 87,203 |
| Total de actividades del gobierno | | 1,308,472 | 4,295,396 | 5,603,868 |
| Bonos de asignación del PFC | | 127,760 | 218,344 | 346,104 |
| Fondos fiduciarios: | | | | |
| SRE | | — | 222,025 | 222,025 |
| Unidades de componentes principales | | | | |
| ACT | | 222.318 | 369,861 | 592,179 |
| AEE | | 534.400 | 782,624 | 1,317,024 |
| AAA | | 18.759 | 35,938 | 54,697 |
| Total de unidades de componentes mayores | | 775,477 | 1,188,423 | 1,963,900 |
| Total de unidades de componentes no mayores | 36,867 | 41,674 | 78,541 | |
| Total | $ | 2,248,576 | 5,965,862 | 8,214,438 |

118

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

**(4) Corrección de Errores**

Durante 2016, el ELA identificó varios errores relacionados con los estados financieros del año anterior, incluido el hecho de que algunas de sus unidades de componentes aplicaron la guía en las Declaraciones GASB Núm. 68 y Núm. 71, lo que resultó en la reexpresión de los resultados netos iniciales de los estados financieros de todo el gobierno del ELA. El impacto de los ajustes relacionados a los resultados netos iniciales/saldo del fondo es el siguiente:

**Actividades del Gobierno y de Tipo Comercial**

La siguiente tabla resume los cambios en los resultados netos al comienzo del año como se informó anteriormente para las Actividades del Gobierno y de Tipo Comercial en los estados financieros de todo el gobierno (en miles):

| | Actividades del Gobierno | Actividades de Tipo Comercial |
|---|---|---|
| Resultados netos (déficit) - 1 de julio de 2015, como se informó anteriormente | $(67,692,485) | 654,563 |
| Aplicación de las declaraciones GASB Núm. 68 y Núm. 71: (a) | | |
| Reconocimiento de pasivos netos de pensiones | — | (504,172) |
| Reconocimiento de la salida diferida de recursos para contribuciones de pensiones hechas después de la fecha de medición (1 de julio de 2014) | — | 85,862 |
| Reconocimiento de entrada diferida de recursos | — | (3,186) |
| Sobreexpresión de efectivo y equivalentes de efectivo en bancos gubernamentales (b) | — | (120,048) |
| Sobreexpresión de cuentas por cobrar (c) | — | (3,176) |
| Subexpresión de activos de capital (d) | — | 12,411 |
| Subexpresión de pasivos (e) | — | (3,988) |
| Corrección de errores no materiales (f) y (g) | (216,039) | — |
| Resultados netos (déficit) – 1 de julio de 2015, según reexpresión | $ (67,908,524) | 118,266 |

Corrección de Errores Materiales - Actividades de Tipo Comercial

La corrección de errores materiales en los resultados netos iniciales de las actividades de tipo comercial incluye una combinación de lo siguiente:

(a)  El impacto de aplicar la guía en las Declaraciones GASB Núm. 68 y Núm. 71. La corrección de errores consistió en reconocer los efectos netos de la participación proporcional de PRMeSA en el pasivo de pensión neto inicial del SRE, las salidas diferidas de recursos para contribuciones de pensión realizadas después de la fecha de medición del pasivo de pensión neto inicial y las entradas diferidas de recursos debido a las diferencias entre las proyecciones y las ganancias reales de inversión del plan de pensiones en diferentes períodos de medición.

(b)  Una sobreexpresión del efectivo y equivalentes de efectivo en bancos gubernamentales por aproximadamente $120 millones. El PRWPCRF (un fondo propietario importante) y el PRSDWTRLF (un fondo propietario no

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

importante) reconocieron la pérdida crediticia de custodia en 2015 de aproximadamente $106.5 millones y $13.6 millones, respectivamente, en depósitos mantenidos en el BGF.

(c)  Una sobreexpresión neta en las cuentas por cobrar de aproximadamente $3.2 millones debido al efecto de una sobreexpresión de las cuentas por cobrar por aproximadamente $8.6 corregida por PRHIA, y una subexpresión por aproximadamente $5.4 millones corregida por la Junta de Gobierno del Servicio 9-1-1 para reconocer las cuentas por cobrar de dos empresas de telecomunicaciones.

(d)  Una subexpresión de los activos de capital corregidos por PPA por aproximadamente $12.4 millones relacionados con una contribución de capital recibida de PAA.

(e)  Una subexpresión de aproximadamente $4 millones corregida por el Sistema de Lotería Adicional en la reserva de premios para la Asociación de Lotería de varios Estados debido a errores matemáticos.

*Correcciones de Errores No Materiales - Actividades del Gobierno*

La corrección de errores no materiales en los resultados netos iniciales de las Actividades del Gobierno incluye una combinación de lo siguiente:

(f)  Una sobreexpresión de las cuentas a pagar por aproximadamente $32.3 millones.

(g)  Los saldos previamente reconocidos como ingresos por impuestos a las ganancias se reclasificaron como ingresos no ganados por aproximadamente $248.3 millones, ya que los saldos estaban relacionados con los pagos anticipados del impuesto a las ganancias.

**Fondos del Gobierno**

La siguiente tabla resume los cambios en los saldos de fondos (déficit) al comienzo de los años previamente informados para los fondos del gobierno (en miles):

| | Fondo general | Pago de la deuda de COFINA | Fondos No Mayores del Gobierno |
|---|---|---|---|
| Saldos de fondos (déficit) - 1 de julio de 2015, según se informó anteriormente | $ (2,115,324) | 336,433 | 598,951 |
| Sobreexpresión del saldo debido a PRIFA (a) | — | 95,227 | — |
| Corrección de errores inmateriales (b) - (d) | (248,317) | — | (62,949) |
| Saldos del fondo (déficit) - 1 de julio de 2015, según reexpresión | $ (2,363,641) | 431,660 | 536,002 |

*Corrección de error material - Fondo de servicio de la deuda de COFINA*

(a)  PRIFA, en sus estados financieros independientes, informa una inversión en bonos de COFINA. Como resultado de la presentación combinada de PRIFA y COFINA, la inversión de PRIFA se presenta en el balance adjunto como un préstamo interfondo con vencimiento del Fondo de Servicio de la Deuda de COFINA. Después de una evaluación de la capacidad de pago de COFINA desde años anteriores, la porción incobrable estimada del saldo entre fondos por aproximadamente $95.2 millones se canceló contra el saldo inicial del fondo. La corrección del error fue material para el Fondo de Servicio de la Deuda de COFINA.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*Corrección de error no material - Fondo general y fondos no mayores del gobierno*

(b) Después de una evaluación de la capacidad de pago de COFINA desde años anteriores, la porción incobrable estimada del saldo entre fondos por aproximadamente $95.2 millones se canceló contra el saldo inicial del fondo. La corrección del error se consideró irrelevante para los fondos no mayores del gobierno.

(c) Las cuentas a pagar en el Fondo de Proyectos de Capital se sobreexpresaron en aproximadamente $32.3 millones.

(d) Los saldos previamente reconocidos como ingresos por impuestos a las ganancias se reclasificaron como ingresos no ganados por aproximadamente $248.3 millones, ya que los saldos estaban relacionados con los pagos anticipados del impuesto a las ganancias.

**Fondos de Propiedad Exclusiva**

La siguiente tabla resume los cambios en los resultados netos al comienzo del año como se informó anteriormente para los fondos de propiedad exclusiva (en miles):

| | Loterías | Administración de Seguros de Salud de Puerto Rico | Administración de Servicios Médicos de Puerto Rico | Fondo Recurrente para el Control de la Contaminación del Agua de Puerto Rico | Fondos No Mayores de Propiedad Exclusiva |
|---|---|---|---|---|---|
| Resultados netos (déficit) – 1 de julio de 2015, como se informó anteriormente $ | | (105,475) | (207,505) | (331,026) | 518,079 | 347,223 |
| Aplicación de la Declaración GASB Núm. 68 y Núm. 71: (a) | | | | | | |
| Reconocimiento del pasivo neto por pensiones Reconocimiento del flujo de salida diferido de recursos para contribuciones de pensiones después de la fecha de medición (1 de julio de 2014) | | — | — | (504,172) | — | — |
| | | — | — | 85,862 | — | — |
| Reconocimiento de entrada diferida de recursos | | — | — | (3,186) | — | — |
| Sobreexpresión de efectivo y equivalentes de efectivo en bancos gubernamentales (b) | | — | — | — | (106,495) | — |
| Corrección de errores no materiales (c) - (g) | | (3,988) | (8,608) | — | — | 4,290 |
| Resultados netos (déficit) – 1 de julio de 2015, según la reformulación $ | | (109,463) | (216,113) | (752,522) | 411,584 | 351,513 |

*Corrección de Errores Materiales – Fondos PRMeSA[sic] y PRWPCR*

La corrección de errores materiales en los resultados netos de fondos de propiedad exclusiva incluye una combinación de lo siguiente:

(a) El impacto de aplicar la orientación en la Declaración GASB Núm. 68 y Núm. 71 al reconocer los efectos netos de la participación proporcional de PRMeSA en el pasivo de pensión neto inicial, las salidas diferidas de recursos para contribuciones de pensión realizadas después de la fecha de medición del pasivo de pensión neto inicial y las entradas diferidas de recursos debido a las diferencias entre las proyecciones y las ganancias reales de inversión del plan de pensiones en diferentes períodos de medición.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

(b) Una sobreexpresión de efectivo y equivalentes de efectivo en bancos gubernamentales por aproximadamente $106.5 millones corregido en el PRWPCRF por una pérdida de crédito de custodia en depósitos mantenidos en el BGF.

*Corrección de errores no materiales: loterías, PRHIA y fondos no mayores de propiedad exclusiva*

La corrección de errores no materiales en los resultados netos de fondos de propiedad exclusiva incluye una combinación de lo siguiente:

(c) Una subexpresión de aproximadamente $4 millones corregida por el Sistema de Lotería Tradicional en la reserva de premios para la Asociación de Lotería de varios Estados debido a errores matemáticos.

(d) Una sobreexpresión en las cuentas por cobrar de aproximadamente $8.6 millones en PRHIA

(e) Una sobreexpresión corregida de efectivo y equivalentes de efectivo en bancos gubernamentales por aproximadamente $13.6 millones en el Fondo Recurrente de Préstamos para el Tratamiento del Agua Potable Segura de Puerto Rico (un fondo no mayor de propiedad exclusiva) por una pérdida crediticia de custodia en depósitos mantenidos en el BGF.

(f) Una subexpresión de cuentas por cobrar por aproximadamente $5.4 millones corregida por el la Junta de Administración del Servicio 9-1-1 (un fondo no mayor de propiedad exclusiva) para reconocer las cuentas por cobrar de dos compañías de telecomunicaciones que no remitieron los cargos mensuales del servicio telefónico de emergencia.

Una subexpresión de los activos de capital corregidos por PPA (un fondo no mayor de propiedad exclusiva) por aproximadamente $12.4 millones en relación de una contribución de capital recibida de PAA.

La siguiente tabla resume los cambios en efectivo y equivalentes de efectivo al comienzo del año como se informó previamente en el estado de flujos de efectivo de los fondos de propiedad exclusiva (expresados en miles):

| | Fondo Recurrente para el Control de la Contaminación del Agua de Puerto Rico | Fondos No Mayores de Propiedad Exclusiva |
|---|---|---|
| Efectivo y equivalentes de efectivo - 1 de julio de 2015, tal como se informó anteriormente | $ 129,525 | 122,363 |
| Corrección de error: | | |
| Sobreexpresión de efectivo y equivalentes de efectivo en bancos gubernamentales | (106,495) | (13,552) |
| Efectivo y equivalentes de efectivo - 1 de julio de 2015, según reformulación | $ 23,030 | 108,811 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

**Unidades de Componentes de Presentación Discreta**

La siguiente tabla resume los cambios en los resultados netos iniciales para ciertas unidades de componentes de presentación discreta (en miles):

|  | Unidades de Componentes de Presentación Discreta |
|---|---|
| Resultados netos - 1 de julio de 2015, como se informó anteriormente | $ (4,151,633) |
| Aplicación de las declaraciones GASB Núm. 68 y Núm. 71: (a) | |
| Reconocimiento de pasivos netos de pensiones | (102,996) |
| Reconocimiento de la salida diferida de recursos para contribuciones de pensiones hechas después de la fecha de medición (1 de julio de 2014) | 3,818 |
| Subexpresión neta de activos de capital (b) | 348,460 |
| Sobreexpresión neta de activos que no sean activos de capital (c) | (936,514) |
| Sobreexpresión neta de pasivos (d) | 1,041,462 |
| Resultados netos – 1 de julio de 2015, según reformulación | $ (3,797,403) |

*Corrección de Errores Materiales*

La corrección de errores materiales en los resultados netos iniciales de unidades de componentes de presentación discreta incluye una combinación de lo siguiente:

(a)  El impacto de adoptar la aplicación de la orientación en las Declaraciones GASB Núm. 68 y Núm. 71 al reconocer los efectos netos de la participación proporcional de AEDA, CCCPRC, LAPR y PRSPA en el pasivo neto de pensiones inicial y las salidas diferidas de recursos para contribuciones de pensiones realizadas después de la fecha de medición del pasivo neto de pensión inicial, en función de los resultados netos iniciales. Estas unidades de componentes aplicaron las disposiciones de las Declaraciones GASB Núm. 68 y Núm. 71 basadas en información no auditada, mientras que el resto de las unidades de componentes no mayores no adoptaron las Declaraciones GASB Núm. 68 y Núm. 71, como se indica en las Notas 1(s), 18(g) y 18(h).

(b)  Una subexpresión de los activos de capital por aproximadamente $367.1 millones en los estados financieros de la AEE, y una sobreexpresión identificada por PRTEC por aproximadamente $20 millones relacionados con la cancelación de activos de capital para los cuales no hay evidencia de existencia y de activos que fueron transferidos o vendidos en años anteriores, pero no se eliminaron de los registros contables, y una subexpresión de los activos de capital de aproximadamente $1.3 millones corregidos por LAPR.

(c)  Una sobreexpresión en las cuentas por cobrar por aproximadamente $909.8 millones relacionadas con contribuciones en lugar de impuestos de los municipios, una sobreexpresión de otros activos de aproximadamente $29 millones corregida por la AEE, y una subexpresión de efectivo en el banco por aproximadamente $2.3 millones corregida por el IPRC.

(d)  Una sobreexpresión de las cuentas por pagar por aproximadamente $1,019.1 millones relacionadas con contribuciones en lugar de impuestos por pagar a los municipios y una sobreexpresión de los ingresos no devengados de aproximadamente $29.7 corregida por AEE, una subexpresión de los pasivos contingentes corregidos por LAPR por aproximadamente $6.8 millones, una subexpresión de los gastos devengados por

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

aproximadamente $350,000 corregidos por PRPBC, y una subexpresión de pasivos por aproximadamente $140,000 corregidos por MAC.

**(5) Fondo Fiduciario de Inversión del Gobierno de Puerto Rico (PRGITF)**

El PRGITF se creó por la Ley Núm. 176, del 11 de agosto de 1995, y comenzó a funcionar el 4 de diciembre de 1995. El PRGITF es un fideicomiso de inversión colectiva diversificado sin carga administrado por el BGF, y creado para proporcionar a los inversores gubernamentales elegibles de Puerto Rico una forma conveniente y económica de invertir en una cartera del mercado monetario administrada profesionalmente. El PRGITF no es una compañía de inversión o un fondo mutuo y no está sujeto a regulación o registro según la Ley de Compañía de Inversión de 1940. Las unidades emitidas por el PRGITF no están sujetas a regulación o registro según la Ley de Valores e Intercambio de 1933, según enmienda, porque las unidades son emitidas por una entidad gubernamental. Los depósitos disponibles y las inversiones compradas no están garantizados, avaladas o cubiertas por el ELA o cualquiera de sus agencias, organismo o subdivisiones políticas.

El PRGITF se considera un grupo de inversión externa similar a 2a7 y, como tal, informa su inversión al costo amortizado, que se aproxima al valor razonable. Además, el Fondo Fiduciario de Inversión del Gobierno de Puerto Rico sigue la Declaración GASB Núm. 31, *Informes contables y financieros para ciertas inversiones y para fondos de inversiones externas*; sin embargo, como se indica en la Nota (1)(b), dichos estados financieros no se incluyen en los estados financieros básicos adjuntos porque el Gobierno Primario y cada Unidad de Componente ya presentan su parte correspondiente de los activos del PRGITF como equivalentes de efectivo o inversiones.

Los valores de inversión disponibles al 30 de junio de 2016 consistían en certificados de depósito y depósitos a plazo, fondos del mercado monetario, valores adquiridos en virtud de acuerdos de reventa, obligaciones corporativas, papel comercial y obligaciones del gobierno de EE. UU. y agencias patrocinadas, que pueden considerarse altamente líquidos. Sin embargo, las inversiones de los participantes están sujetas a la capacidad del PRGITF de recibir el pago del emisor de los valores cuando vencen. La liquidez de ciertas inversiones y los cambios en las tasas de interés pueden afectar el rendimiento de PRGITF y el valor razonable de sus inversiones.

El ELA clasificó aproximadamente $56.2 millones de inversiones presentadas en el PRGITF (ver Nota 6) como efectivo y equivalentes de efectivo. Las inversiones en el PRGITF con un vencimiento original de 90 días o menos desde la fecha de adquisición se consideran equivalentes de efectivo.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El monto en dólares de las inversiones al 30 de junio de 2016 a $1.00 por unidad de participación se informó en los estados financieros individuales de cada uno de los participantes, y se combinó en los estados financieros básicos de la siguiente manera (en miles):

|  |  | Saldo pendiente | Porcentaje del total |
|---|---|---|---|
| Gobierno primario |  |  |  |
| Fondo General y Fondo de Proyectos de Capital | $ | 56,178 | 33.11% |
| El Fideicomiso de los Niños (1) |  | 14,425 | 8.51 |
| COFINA (1) |  | 166 | 0.10 |
| Total del Gobierno Primario |  | 70,769 | 41.72 |
| Unidades de componentes mayores de presentación discreta: |  |  |  |
| BGF (1) |  | 55,089 | 32.47 |
| SIFC (1) |  | 1,043 | 0.61 |
| ACT |  | 171 | 0.10 |
| Total de unidades de componentes mayores de presentación discreta |  | 56,303 | 33.18 |
| Unidades de componentes no mayores (1) |  | 42,025 | 24.78 |
| Otros participantes |  | 549 | 0.32 |
| Total de todos los participantes | $ | 169,646 | 100.00% |

(1) Se informa como inversiones en el estado de resultados netos adjunto.

Los depósitos al 30 de junio de 2016 se invirtieron en valores con un costo que se aproxima al valor razonable, más los intereses devengados, por aproximadamente $169.6 millones. La porción externa del PRGITF no se consideró significativa para informes separados en los estados financieros básicos adjuntos.

Al 30 de junio de 2016, Standard & Poor's calificó las inversiones del PRGITF como "A1" o "AAA".
Los valores del gobierno de los Estados Unidos tienen la garantía explícita del gobierno de los Estados Unidos.

A continuación, se presenta una tabla de las inversiones mantenidas por el PRGITF al 30 de junio de 2016, presentada al costo amortizado (en miles):

| | | |
|---|---|---|
| Papeles comerciales | $ | 85,868 |
| Obligaciones del gobierno de los EE. UU. agencias patrocinadas | | 44,486 |
| Certificados de depósitos y depósitos a plazo | | 6,892 |
| Mercado monetario | | 32,400 |
| | | $ 169,646 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

(6)  **Depósitos e Inversiones**

**Gobierno Primario**

El Gobierno Primario puede invertir en diferentes tipos de valores, incluidos valores nacionales, internacionales y de renta fija, entre otros.

El Gobierno Primario mantiene un fondo de efectivo e inversión que está disponible para el uso de todos los fondos, incluidos algunos de los fondos fiduciarios. La porción de cada fondo de este grupo se informa en el estado de resultados netos como efectivo y equivalentes de efectivo. Las inversiones de los fondos fiduciarios se mantienen y administran por separado de las de otros fondos del Gobierno Primario.

*Efectivo y Equivalentes de Efectivo*

El riesgo de crédito de custodia para depósitos es el riesgo de que, en caso de quiebra bancaria, el depósito del ELA no se pueda recuperar. El ELA exige que los fondos públicos depositados en bancos comerciales en Puerto Rico estén totalmente garantizados por la cantidad depositada en exceso del seguro de depósito federal. Todos los valores pignorados como garantía son mantenidos por los bancos a nombre del ELA. No existe una política formal de riesgo de crédito de custodia para cuentas de efectivo abiertas con bancos comerciales fuera de Puerto Rico.

Los depósitos en bancos gubernamentales representan el saldo de intereses y cuentas sin intereses en el BGF y EDB. La obligación de depósito en el BGF y el EDB está sustancialmente relacionada con los depósitos del Departamento de Hacienda del ELA, sus unidades de componentes y sus municipios.

Los depósitos mantenidos en el BGF, EDB y bancos comerciales establecidos fuera de Puerto Rico están exentos del requisito de garantía establecido por el ELA y, por lo tanto, representan un riesgo de crédito de custodia, porque en el caso de que estas instituciones financieras quiebren, el ELA no podrá recuperar estos depósitos Como se señala en este documento, el ELA actualmente no mantiene depósitos en el BGF.

El importe registrado de los depósitos del Gobierno Primario al 30 de junio de 2016 consiste en lo siguiente (en miles):

|  | Importe registrado | | | Saldo bancario |
|---|---|---|---|---|
|  | **No restringido** | **Restringido** | **Total** | **bancario** |
| Actividades del gobierno: |  |  |  |  |
| Bancos comerciales | $    426,733 | 540,567 | 967,300 | 1,331,822 |
| Bancos gubernamentales | 4,369 | 6,935 | 11,304 | 669,958 |
| Total | $    431,102 | 547,502 | 978,604 | 2,001,780 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

| | | Importe registrado | | Saldo |
| | | No restringido | Restringido | Total | bancario |
|---|---|---|---|---|---|
| Actividades de tipo comercial: | | | | | |
| Bancos comerciales | $ | 244,543 | 24,258 | 268,801 | 214,487 |
| Banco gubernamental | | 719 | 2,983 | 3,702 | 231,182. |
| En custodia del Tesoro de los EE. UU. | | — | 496,906 | 496,906 | 497,060 |
| | | 719 | 499,889 | 500,608 | 728,242 |
| Total | $ | 245,262 | 524,147 | 769,409 | 942,729 |

Al 30 de junio de 2016, el monto total agregado del saldo bancario de depósitos del Gobierno Primario en bancos comerciales era de aproximadamente $ 1,500 millones, cubierto por la FDIC o por una garantía del agente del ELA a nombre del ELA. Los depósitos de aproximadamente $497 millones con el Tesoro de los Estados Unidos representan las primas de seguro por desempleo cobradas a los patronos que se transfieren al Fondo Fiduciario de Seguro por Desempleo Federal en el Tesoro de los Estados Unidos. Estos depósitos no tienen seguro o garantía. El saldo bancario de depósitos del Gobierno Primario en bancos gubernamentales que, al 30 de junio de 2016, sumaba aproximadamente $901.1 millones, tampoco está asegurado ni garantizado.

El Gobierno Primario clasificó aproximadamente $56.2 millones de inversiones en el PRGITF como equivalentes de efectivo, no presentados en la tabla anterior; pero incluido en una partida separada en el estado de resultados netos adjunto (Nota 5).

*Pérdida de Crédito de Custodia en Depósitos Mantenidos en el BGF y EDB*

El BGF enfrentó una situación crítica y económica al 30 de junio de 2016 como se describe en la Nota 2. Por lo tanto, los depósitos mantenidos en el BGF estaban sujetos a restricciones y limitaciones estrictas durante el año fiscal 2016 y los períodos posteriores. El BGF sirvió como el principal agente depositario del ELA, sus instrumentos y fondos municipales; el efectivo y los equivalentes de efectivo de los depositantes con el BGF estaban sujetos al riesgo de crédito de custodia. En el caso de EDB, debido a la espiral de deterioro económico que afecta al ELA, las rebajas en las calificaciones crediticias de los bonos del ELA llevaron al sector privado a retirar depósitos de EDB. Además, la crisis financiera y de liquidez del BGF hizo que las agencias y corporaciones gubernamentales públicas trasladaran sus depósitos de EDB al BGF, reduciendo la capacidad de EDB para emitir préstamos comerciales o realizar inversiones en instrumentos financieros. Además de estas situaciones, las inversiones mantenidas por EDB habían disminuido en valor y EDB solo se ejecutaba con los ingresos por intereses generados por la cartera de su préstamo. Esto planteó una situación de liquidez difícil para EDB, porque debido a la alta tasa de incumplimiento en su cartera de préstamos, la capacidad de recaudar efectivo a través de los reembolsos de préstamos es limitada. La gerencia determinó que existía una pérdida crediticia de custodia al 30 de junio de 2016 para los depósitos mantenidos en el BGF y EDB. Basado en una evaluación de la disponibilidad y recuperabilidad de tales depósitos, una pérdida

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

de crédito de custodia en estos depósitos se ha registrado en los estados financieros del Gobierno Primario de la siguiente manera (en miles):

|  | **Monto** |
|---|---|
| Actividades del gobierno: | |
| Valor registrado antes de la pérdida | $ 669,958 |
| Pérdida de créditos en custodia | (658,654) |
| Valor registrado neto | $ 11,304 |

|  | **Monto** |
|---|---|
| Actividades de tipo comercial: | |
| Valor registrado antes de la pérdida | $ 231,182 |
| Pérdida de créditos en custodia | (227,480) |
| Valor registrado neto | $ 3,702 |

Una pérdida de crédito de custodia de aproximadamente $363.6 millones fue reconocida en 2016 como gastos del gobierno general de las Actividades del Gobierno y pertenece sustancialmente a las cuentas del Departamento de Hacienda y a las unidades o agencias combinadas que emitieron sus estados financieros independientes considerando el impacto de la pérdida de créditos en custodia. Sin embargo, ciertas unidades o agencias de componentes combinados que son auditadas por otros auditores emitieron sus estados financieros independientes de 2016 sin una evaluación o reconocimiento de pérdida de créditos en custodia. En consecuencia, los saldos de efectivo y equivalentes de efectivo informados en los estados financieros de tales unidades o agencias de componentes combinados y del Gobierno Primario se sobreexpresaron al 30 de junio de 2016.

Se reconoció una pérdida de créditos en custodia de aproximadamente $107.4 millones en 2016 como gastos generales y administrativos de las Actividades de Tipo Comercial.

Como se señala en la Nota 2(c), el 29 de noviembre de 2018, el BGF completó una reestructuración de parte de su endeudamiento de conformidad con una Modificación de Calificación en virtud del Título VI de PROMESA. De conformidad con la Modificación de Calificación y la Ley de Reestructuración del BGF, el saldo de los pasivos adeudados entre el ELA y cada Entidad Gubernamental No Municipal y el BGF, se determinó aplicando el saldo pendiente de los depósitos mantenidos en el BGF en el nombre de una Entidad Gubernamental No Municipal contra el saldo pendiente de cualquier préstamo de dicha Entidad Gubernamental No Municipal adeudado al BGF o de cualquier bono o pagaré de dicha Entidad Gubernamental No Municipal en poder del BGF a esa fecha. Como resultado de este ajuste anterior, todos los depósitos del ELA en el BGF se extinguieron como resultado de la Modificación de Calificación.

El EDB está en proceso de desarrollar una estrategia para reestructurar sus obligaciones y operaciones. Tras la eventual reestructuración de las obligaciones y operaciones de EDB, la pérdida crediticia de custodia registrada y no registrada en el efectivo y equivalentes de efectivo revelados anteriormente puede cambiar.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*Inversiones*

*Riesgo de créditos en custodia*: el riesgo de créditos en custodia para inversiones es el riesgo de que, en caso de incumplimiento de la contraparte de la transacción, el ELA no pueda recuperar el valor de la inversión o los valores colaterales que están en posesión de un tercero externo.

*Riesgo de crédito:* es el riesgo de pérdida del capital o de una recompensa financiera derivada del incumplimiento por parte del prestatario de pagar un préstamo o de no cumplir con una obligación contractual. Los inversores reciben una compensación por asumir el riesgo de crédito por medio de pagos de intereses del prestatario o emisor de una obligación de deuda.

El riesgo de crédito está estrechamente relacionado con el rendimiento potencial de una inversión, siendo el más notable que los rendimientos de los bonos se correlacionan fuertemente con su riesgo de crédito percibido.

La política general de inversión del ELA es aplicar la regla del "inversor prudente", que establece que las inversiones deben realizarse con criterio y cuidado en las circunstancias prevalecientes, que las personas prudentes, discrecionales y de inteligencia ejercen en la gestión de sus propios asuntos, no para especulación, pero para la inversión, y considerando la seguridad probable de su capital, así como los ingresos probables que se derivarán. La regla del inversor prudente debe aplicarse en el contexto de la gestión de una cartera general.

Los fondos a corto plazo de las agencias, incluidos los fondos operativos, pueden invertirse en letras del Tesoro de los Estados Unidos; Bonos del Tesoro de EE. UU. o bonos con vencimientos a corto plazo; obligaciones a corto plazo de agencias e instrumentos del gobierno de EE. UU. clasificados dentro de la categoría de calificación más alta de Standard & Poor's Rating Services (S&P) y Moody's Investors Service (Moody's); certificados de depósito totalmente asegurados o colateralizados de instituciones financieras elegibles designadas por el Comisionado de Instituciones Financieras y el Secretario de Hacienda del ELA; papel comercial principal calificado como A1/P1 por S&P y Moody's o garantizado por una línea de crédito irrevocable de una institución calificada dentro de la categoría de calificación más alta de S&P y Moody's o garantizada por valores gubernamentales; aceptaciones bancarias (como alternativas a los certificados de depósito) de instituciones financieras elegibles que hacen negocios en Puerto Rico siempre que se hayan pignorado garantías adecuadas; el PRGITF; obligaciones del ELA y sus organismos con una tasa de rendimiento esperada similar a otros valores con el mismo perfil de riesgo.

Los fondos a más largo plazo también pueden invertirse en valores del gobierno y de agencias de EE. UU. en la categoría de calificación más alta de S&P y Moody's. Esto incluye los Bonos Municipales Gravables de los gobiernos estatales y locales en los Estados Unidos clasificados dentro de las tres (3) categorías más altas de al menos dos de los principales servicios de calificación; obligaciones municipales imponibles del Gobierno Primario y sus unidades de componentes; inversiones estructuradas (pagarés y otros tipos de valores en el balance emitidos por una Agencia del Gobierno de EE. UU. u otras instituciones financieras en la categoría de calificación más alta de al menos dos de los principales servicios de calificación); y cualquier instrumento respaldado por hipotecas emitido por una agencia del gobierno de EE. UU. en la categoría de calificación más alta de S&P y Moody's.

*Riesgo de concentración de crédito*: es el riesgo de pérdida atribuido a la magnitud de la inversión de un gobierno en un solo emisor. La política del ELA sobre carteras más grandes con posiciones en valores que tienen un riesgo potencial de incumplimiento es limitar el tamaño de las inversiones para que, en caso de incumplimiento, el ingreso anual de la inversión de la cartera supere una pérdida en los valores de un solo emisor.

*Riesgo de tasa de interés:* es la política del ELA que un mínimo del 10% de la cartera total se mantenga en letras del Tesoro de EE. UU. altamente negociables o instrumentos de inversión a un día. Las carteras más grandes no deberían contener más del 30% de la cartera en instrumentos comercializables con vencimientos superiores a un mes.

129

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Esta política debe seguirse siempre que no reduzca los rendimientos de inversión.

**Actividades del Gobierno**

Las inversiones de Actividades del Gobierno consistieron en aproximadamente $87.5 millones en contratos de inversión no participativos (contratos de inversión garantizados) que estuvieron expuestos al riesgo de custodia como no asegurados, no registrados y mantenidos por las contrapartes o por sus departamentos o agentes fiduciarios, pero no a nombre del Gobierno Primario.

Al 30 de junio de 2016, el valor razonable de las inversiones de las Actividades del Gobierno basadas en la jerarquía de insumos era el siguiente:

| Tipo de inversión | | Nivel 1 | Nivel 2 | Nivel 3 | Total |
|---|---|---|---|---|---|
| Títulos del gobierno de los EE. UU. | $ | 35,737 | | — | 35,737 |
| Títulos de agencias patrocinadas por los EE. UU. | | — | 420 | — | 420 |
| Bonos corporativos y pagarés de los EE. UU. | | — | 367,984 | — | 367,984 |
| Grupos de inversión interna - títulos de ingresos fijos: | | | | | |
| PRGITF | | — | 14,907 | — | 14,907 |
| Grupos de inversión externa - títulos de ingresos fijos: | | | | | |
| Gestión de Dreyfus de Efectivo del Gobierno | | — | 33,309 | — | 33,309 |
| Contratos de inversión no participativos del mercado monetario de bancos de los EE. UU.: | | 25,696 | — | — | 25,696 |
| UniCredit Bank AG - Garantizado Contrato de inversión | | — | — | 83,684 | 83,684 |
| Total de inversiones medidas a valor de mercado | $ | 25,696 | 452,357 | 83,684 | 561,737 |
| Inversiones medidas al costo amortizado: | | | | | |
| Fondos del mercado de dinero | | | | | 28,266 |
| Certificado de depósitos negociables | | | | | 21,537 |
| Contratos de inversiones no participantes | | | | | 3,767 |
| Otros | | | | | 1,592 |
| Total de inversiones | | | | $ | 616,899 |

La siguiente tabla resume el tipo y los vencimientos de las inversiones mantenidas por las Actividades del Gobierno al 30 de junio de 2016 (en miles). Las inversiones por tipo en cualquier emisor que represente el 5% o más de las inversiones totales se informan por separado. Los vencimientos esperados diferirán de los vencimientos contractuales debido a que las contrapartes pueden tener el derecho de llamar o pagar obligaciones con o sin penalización por llamada o pago anticipado.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

| Tipo de inversión | En un año | Después de uno a cinco años | Después de diez años | Total |
|---|---|---|---|---|
| Títulos del gobierno de los EE. UU. | $ 35,737 | — | — | 35,737 |
| Títulos de agencias patrocinadas por los EE. UU. | 420 | — | — | 420 |
| Bonos corporativos y pagarés de los EE. UU. | 367,984 | — | — | 367,984 |
| Fondos del mercado de dinero | 28,266 | — | — | 28,266 |
| Certificado de depósitos negociables | 2,302 | 19,235 | — | 21,537 |
| Otros | — | 1,592 | — | 1,592 |
| Grupos de inversión interna - títulos de ingresos fijos: | | | | |
| PRGITF | 14,907 | — | — | 14,907 |
| Grupos de inversión externa - títulos de ingresos fijos: | | | | |
| Gestión de Dreyfus de Efectivo del Gobierno | 33,309 | — | — | 33,309 |
| Contratos de inversión no participativos del mercado monetario de bancos de los EE. UU.: | — | — | 25,696 | 25,696 |
| Unicredit Bank AG-Contrato garantizado de inversión | — | — | 83,684 | 83,684 |
| Calyon | — | — | 3,767 | 3,767 |
| Total de títulos de deuda y contratos de inversiones de ingresos fijos | $ 482,925 | 20,827 | 113,147 | 616,899 |
| Reconciliación con el estado de resultados netos de todo el gobierno: | | | | |
| Inversiones no restringidas | | | $ | 14,591 |
| Inversiones restringidas | | | $ | 602,308 |
| Total | | | $ | 616,899 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Las calificaciones de calidad crediticia (S&P) y el valor razonable por tipo de inversión para las inversiones informadas por las Actividades del Gobierno al 30 de junio de 2016 consistieron en lo siguiente (en miles):

| | | Calificación | | | |
|---|---|---|---|---|---|
| Tipo de inversión | AAA | A+ a A- | BBB+ a B- | No calificado | Total |
| Títulos de agencias patrocinadas por los EE. UU. | $ 420 | — | — | — | 420 |
| Bonos corporativos y pagarés de los EE. UU. | 367,984 | — | — | — | 367,984 |
| Fondos del mercado monetario | 28,266 | — | — | — | 28,266 |
| Certificado de depósitos negociables | 21,537 | — | — | — | 21,537 |
| Otros | 1,592 | — | — | — | 1,592 |
| Grupos de inversión interna - títulos de ingresos fijos: | | | | | |
| PRGITF | 14,425 | — | — | 482 | 14,907 |
| Grupos de inversión externa - títulos de ingresos fijos: | | | | | |
| Gestión de Dreyfus de Efectivo del Gobierno | 33,309 | — | — | — | 33,309 |
| Contratos de inversión no participativos del mercado monetario de bancos de los EE. UU.: | — | 25,696 | — | — | 25,696 |
| Unicredit Bank AG-Contrato garantizado de inversión | — | — | 83,684 | — | 83,684 |
| Calyon | — | 3,767 | — | — | 3,767 |
| Total de títulos de deuda y contratos de inversiones fijas | $ 467,533 | 29,463 | 83,684 | 482 | 581,162 |

Aproximadamente $35.7 millones del total de las inversiones de Actividades del Gobierno consisten en instrumentos del Tesoro de los Estados Unidos, que no conllevan riesgo de crédito y, por lo tanto, no están incluidos en la tabla anterior.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

**Actividades de Tipo Comerciales**

Al 30 de junio de 2016, el valor razonable de las inversiones de las Actividades de Tipo Comercial basadas en la jerarquía de insumos era el siguiente:

| Tipo de inversión | Nivel 1 | Nivel 2 | Nivel 3 | Total |
|---|---|---|---|---|
| Títulos del gobierno de los EE. UU. y agencias patrocinadas | $ — | 5,005 | — | 5,005 |
| Hipotecas y títulos respaldados por activos: | | | | |
| Asociación Nacional de Hipotecas del Gobierno (GNMA) | — | 3,666 | — | 3,666 |
| Hipotecas comerciales | — | 279 | — | 279 |
| Títulos respaldados por activos | — | 974 | — | 974 |
| Bonos corporativos y pagarés de los EE. UU. | — | 5,433 | — | 5,433 |
| Bonos y pagarés corporativos y de Gobiernos extranjeros | — | 889 | — | 889 |
| Pagarés municipales de los EE. UU. | — | 595 | — | 595 |
| Grupos de inversión externa - títulos de capital | — | 7,704 | — | 7,704 |
| Inversiones totales medidas al valor de mercado | $ — | **24,545** | — | **24,545** |

La siguiente tabla resume el tipo y los vencimientos de las inversiones mantenidas por las Actividades de Tipo Comercial al 30 de junio de 2016 (en miles). Las inversiones por tipo en cualquier emisor que represente el 5% o más de las inversiones totales se informan por separado. Los vencimientos esperados diferirán de los vencimientos contractuales debido a que las contrapartes pueden tener el derecho de llamar o pagar obligaciones con o sin penalización por llamada o pago anticipado.

| | | Vencimiento (en años) | | | |
|---|---|---|---|---|---|
| Tipo de inversión | Dentro de un año | Después de uno a cinco años | Después de cinco a diez años | Después de diez años | Total |
| Títulos del gobierno de los EE. UU. agencias patrocinadas | $ — | 757 | 2,992 | 1,256 | 5,005 |
| Hipotecas y títulos respaldados por activos | | | | | |
| Asociación Nacional de Hipotecas del Gobierno (GNMA) | — | 31 | 556 | 3,079 | 3,666 |
| Hipotecas comerciales | — | — | — | 279 | 279 |
| Títulos respaldados por activos | — | 805 | 169 | — | 974 |
| Bonos corporativos y pagarés de los EE. UU. | 275 | 2,143 | 1,918 | 1,097 | 5,433 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

| | Vencimiento (en años) | | | | |
|---|---|---|---|---|---|
| Tipo de inversión | En un año | Después de uno a cinco años | Después de cinco a diez años | Después de diez años | Total |
| Bonos y pagarés corporativos y de gobiernos extranjeros | $ 290 | 528 | 71 | — | 889 |
| Pagarés municipales de los EE. UU. | = | | 61 | 534 | 595 |
| Total de títulos de deuda | $ 565 | 4,264 | 5,767 | 6,245 | 16,841 |
| Grupos de inversión externa - títulos de capital: | | | | | |
| SPDR S&P 500 ETF Trust | | | | | 6,136 |
| MFC ISHARES TR Russell 2000 Index Fund | | | | | 762 |
| MFC Vanguard FTSE Emergency MKTS ETF | | | | | 806 |
| Total | | | | $ | 24,545 |
| Reconciliación con el estado de resultados netos de todo el gobierno: | | | | | |
| Inversiones no restringidas | | | | $ | — |
| Inversiones restringidas | | | | | 24,545 |
| Total | | | | $ | 24,545 |

Las calificaciones de calidad crediticia (S&P) y el valor razonable por tipo de inversión para las inversiones informadas por las Actividades de Tipo Comercial al 30 de junio de 2016 consisten en lo siguiente (en miles):

| | Calificación | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Tipo de inversión | AAA | AA+ a AA- | A+ a A- | BBB+ a BBB- | BB+ a BB- | CCC+ a CCC- | No calificado | Total |
| Hipotecas y títulos respaldados por activos | | | | | | | | |
| Hipotecas comerciales | $ 101 | — | — | — | — | — | 178 | 279 |
| Títulos respaldados por activos | 890 | — | — | — | — | — | 84 | 974 |
| Bonos corporativos y pagarés de los EE. UU. | — | 960 | 2,031 | 2,367 | — | 75 | — | 5,433 |
| Bonos y pagarés corporativos y de gobiernos extranjeros | — | — | 685 | 151 | 53 | — | — | 889 |
| Pagarés municipales de los EE. UU. | 300 | 263 | — | 32 | — | — | — | 595 |
| Total de títulos de deuda | $ 1,291 | 1,223 | 2,716 | 2,550 | 53 | 75 | 262 | 8,170 |

Aproximadamente $8.7 millones del total de las inversiones de Actividades de Tipo Comercial consisten en $3.7 millones en los valores de la Asociación Nacional de Hipotecas del Gobierno de los Estados Unidos (GNMA) y $5.0 millones en instrumentos del Tesoro de los Estados Unidos, que no conllevan riesgo de crédito y, por lo tanto, no están incluidos en la tabla anterior.

134

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

**Fondos Fiduciarios**

*Efectivo y Equivalentes de Efectivo*

El efectivo y equivalentes de efectivo de los Fondos Fiduciarios al 30 de junio de 2016 consistió en lo siguiente (en miles):

| | Importe registrado | | | Saldo |
| | No restringido | Restringido | Total | bancario |
|---|---|---|---|---|
| Bancos comerciales | $    979,133 | 139,136 | 1,118,269 | 1,113,332 |
| Bancos gubernamentales (todos con el BGF), neto | 166,332 | 48,611 | 214,943 | 251,395 |
| Total | $    1,145,465 | 187,747 | 1,333,212 | 1,364,727 |

El efectivo y equivalentes de efectivo consisten en depósitos en bancos comerciales, depósitos en el BGF e inversiones a corto plazo. Las inversiones a corto plazo incluyen fondos del mercado monetario y otros equivalentes de efectivo. El efectivo en bancos comerciales y bancos gubernamentales también incluye fondos depositados en bancos privados (aproximadamente $664.8 millones) y el BGF (aproximadamente $0.9 millones) en poder del fondo de la agencia del ELA en nombre de terceros fuera de la entidad de informe del ELA.

El monto total de efectivo restringido y equivalentes de efectivo ascendió a aproximadamente $187.7 millones al 30 de junio de 2016 y consistió en lo siguiente:

- Aproximadamente $85.4 millones en fondos restringidos para el servicio de la deuda de los bonos del SRE pagaderos, de los cuales el 100% de dichos fondos fueron depositados en un fideicomisario en fondos del mercado monetario.

- Aproximadamente $102.3 millones en fondos restringidos para reembolsos de préstamos hipotecarios y personales, para cheques vencidos no reclamados por los miembros del plan y para otros fines, de los cuales aproximadamente se depositaron $83.3 millones en un fideicomisario en cuentas del mercado monetario, aproximadamente $6.3 millones se depositaron en el BGF y aproximadamente $12.6 millones se depositaron en bancos comerciales.

La garantía recibida para las transacciones de préstamo de valores de los fondos fiduciarios de pensiones al 30 de junio de 2016 que ascendieron a aproximadamente $21.6 millones se invirtió en fondos de inversión a corto plazo patrocinados por el banco depositario de los fondos fiduciarios de pensiones (ver Nota 7).

Riesgo de créditos en custodia: al 30 de junio de 2016, los fondos fiduciarios tenían aproximadamente $237.7 millones en efectivo y equivalentes de efectivo y garantías de transacciones de préstamos de valores, que estaban expuestos al riesgo de créditos en custodia como no asegurados y sin garantía. La garantía en efectivo recibida de las transacciones de préstamo de valores invertidas en fondos de inversión a corto plazo patrocinados por el banco custodio de los fondos fiduciarios de pensiones también están exentos del cumplimiento del requisito de garantía.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*Pérdida de Crédito de Custodia en Depósitos Mantenidos en el BGF y EDB*

Basado en una evaluación de la disponibilidad y recuperabilidad de los depósitos, se ha registrado una pérdida de créditos en custodia en los estados financieros de los fondos fiduciarios dentro de otros gastos de la siguiente manera (en miles):

| | Depósitos mantenidos en el BGF al 30 de junio de 2016 | | |
| --- | --- | --- | --- |
| | Valor registrado antes de la pérdida de créditos en custodia | Pérdida de créditos en custodia | Valor registrado |
| Efectivo y Equivalentes de Efectivo | $ 251,395 | (36,452) | 214,943 |

La pérdida de crédito de custodia anterior pertenece a los Sistemas de Retiro que emitieron sus estados financieros independientes considerando el impacto de la pérdida de créditos en custodia. El saldo realizable de los depósitos mantenidos con el BGF al 30 de junio de 2016 se determinó con base en los cobros reales correspondientes recibidos del BGF sobre dichos depósitos después del final del año del 30 de junio de 2016. No había fondos depositados en EDB al 30 de junio de 2016.

*Inversiones*

Al 30 de junio de 2016, el valor razonable de las inversiones de los fondos fiduciarios de pensiones basadas en la jerarquía de insumos era el siguiente:

| Tipo de inversión | Nivel 1 | Nivel 2 | Nivel 3 | Total |
| --- | --- | --- | --- | --- |
| Títulos del gobierno de los EE. UU.   $ | 46,924 | — | — | 46,924 |
| Pagarés de agencias patrocinadas por el gobierno de los EE. UU. | 13,222 | — | — | 13,222 |
| Hipotecas y títulos respaldados por activos: | | | | |
| GNMA | 3.987 | — | — | 3,987 |
| FNMA | 8,875 | — | — | 8,875 |
| FHLMC | 4,129 | — | — | 4,129 |
| Hipotecas comerciales | — | 1,533 | — | 1,533 |
| Bonos corporativos y pagarés de los EE. UU. | — | 237,980 | — | 237,980 |
| Bonos y pagarés corporativos no pertenecientes a los EE. UU. | — | 53,070 | — | 53,070 |
| Acciones corporativas de los EE. UU. | 1,277 | — | — | 1,277 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

| Tipo de inversión | | Nivel 1 | Nivel 2 | Nivel 3 | Total |
|---|---|---|---|---|---|
| Acciones corporativas no pertenecientes a los EE. UU. | $ | 22,056 | — | — | 22,056 |
| Bonos y pagarés municipales de los EE. UU. | | — | 3,689 | — | 3,689 |
| Bonos de COFINA | | — | 93,484 | — | 93,484 |
| Inversiones a valor de mercado: | $ | **100,470** | **389,756** | — | **490,226** |
| Inversiones medidas en NAV: | | | | | |
| Fondos de fideicomisos mixtos no cotizados en bolsa: | | | | | |
| Fondos de ingresos fijos | | | | | 417,430 |
| Otros fondos | | | | | 312,391 |
| Inversiones en asociaciones limitadas | | | | | 53,035 |
| Total de inversiones | | | | | $  1,273,082 |

La siguiente tabla resume el tipo y los vencimientos de las inversiones mantenidas por los fondos fiduciarios de pensiones al 30 de junio de 2016 (en miles). Las inversiones por tipo en cualquier emisor que represente el 5% o más de las inversiones totales se informan por separado. Los vencimientos esperados diferirán de los vencimientos contractuales debido a que las contrapartes pueden tener el derecho de llamar o pagar obligaciones con o sin penalización por llamada o pago anticipado.

| | | Vencimiento (en años) | | | |
|---|---|---|---|---|---|
| Tipo de inversión | | Dentro de un año | Después de uno a cinco años | Después de cinco a diez años | Después de diez años | Total |
| Títulos del gobierno de los EE. UU. | | | | | | |
| Pagarés del Tesoro de los EE. UU. | $ | 10,537 | 31,329 | — | — | 41,866 |
| Letras del Tesoro de los EE. UU. | | — | 2,832 | — | — | 2,832 |
| Letras del Tesoro de los EE. UU. Protegidos contra inflación (TIPS) | | 1,667 | 559 | — | — | 2,226 |
| Pagarés de agencias patrocinadas por el gobierno de EE. UU.: | | | | | | |
| Federal Home Loan Bank (FHLB) | | — | 2,908 | — | — | 2,908 |
| FNMA | | — | 4,117 | — | — | 4,117 |
| FHLMC | | — | 2,519 | — | — | 2,519 |
| Federal Farm Credit Bank (FFCB) | | 1,945 | 1,733 | — | — | 3,678 |
| Hipotecas y títulos respaldados por activos: | | | | | | |
| GNMA | | 1,213 | 2,774 | — | — | 3,987 |
| FNMA | | 3,373 | 5,502 | — | — | 8,875 |
| FHLMC | | 1,979 | 2,150 | — | — | 4,129 |
| Hipotecas comerciales | | — | 1,533 | — | — | 1,533 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

| Tipo de inversión | | Dentro de un año | Después de uno a cinco años | Después de cinco a diez años | Después de diez años | Total |
|---|---|---|---|---|---|---|
| | | | **Vencimiento (en años)** | | | |
| Bonos corporativos y pagarés de los EE. UU. | $ | 23,754 | 200,287 | 11,851 | 2,088 | 237,980 |
| Bonos corporativos y pagarés no pertenecientes a los EE. UU. | | 4,644 | 38,986 | 7,306 | 2,134 | 53,070 |
| Bonos y pagarés municipales de los EE. UU. | | 611 | 3,078 | — | — | 3,689 |
| Bonos de COFINA | | — | — | — | 93,484 | 93,484 |
| Total bonos y pagarés | | 49,723 | 300,307 | 19,157 | 97,706 | 466,893 |
| Fondos de fideicomiso mixto no cotizados en bolsa: | | | | | | |
| Fondo de ingresos fijos - SSgA | | | | | | |
| Fondo intermedio: | | | | | | |
| EE. UU. | | 12,758 | 355,626 | | | 368,384 |
| No perteneciente a los EE. UU. | | — | 49,046 | — | — | (49,046) |
| Total de bonos y pagarés y fondos fiduciarios de ingresos fijos mixtos no cotizados en bolsa | $ | 62,481 | 704,979 | 19,157 | 97,706 | 884,323 |

| | | |
|---|---|---|
| Acciones y capital y otros fondos fiduciarios mixtos no cotizados en bolsa: | | |
| Acciones corporativas de los EE. UU. | $ | 1,277 |
| Acciones corporativas no pertenecientes a los EE. UU. | | 22,056 |
| Fondos de fideicomisos mixtos no cotizados en bolsa: | | |
| Fondos de capital y de otro tipo: | | |
| EE. UU. – Fondo SSgA Russell 3000 | | 234,251 |
| EE. UU. – Fondo SSgA S&P 500 | | 8,296 |
| Fuera de EE. UU. – SSgA MSCI | | |
| Fondo ACWI Ex USA | | 69,844 |
| Total de acciones y capital y otros fondos fideicomisarios mixtos no cotizados en bolsa | | 335,724 |
| Inversiones en asociaciones limitadas | | 53,035 |
| Total | $ | 1,273,082 |

Las inversiones del fondo fiduciario de pensiones están expuestas al riesgo de créditos en custodia, riesgo de crédito, concentración de riesgo de crédito, riesgo de moneda extranjera y riesgo de tasa de interés. A continuación, se incluye una descripción de estos riesgos al 30 de junio de 2016:

*Riesgo de crédito de custodia:* al 30 de junio de 2016, las inversiones en valores se registraron a nombre del fondo fiduciario de pensiones y se mantuvieron en posesión de los bancos custodios del fondo fiduciario de pensiones, State Street Bank and Trust y Bank of New York Mellon, con excepción de los títulos en préstamo. Los títulos en préstamo no están expuestos al riesgo de crédito de custodia (ver Nota 7).

*Riesgo de crédito:* todos los valores de renta fija en el momento de la compra deben ser de calidad de grado de inversión. Todas las emisiones deben ser calificadas como grado de inversión por al menos dos de las agencias de calificación reconocidas a nivel nacional. Se espera que la cartera mantenga una calidad crediticia promedio ponderada mínima de "A" o mejor utilizando las calificaciones crediticias de S&P o Moody's. Las pautas de inversión

138

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

de SRM prohíben las inversiones en títulos con fechas esperadas de vencimiento posteriores a 30 años. Las posiciones por debajo del grado de inversión deben informarse a un representante de la gerencia de SRM y monitorearse cuidadosamente. No se espera que la cartera de SRM tenga más del 5% invertido en valores que se han desviado después de la compra por debajo de la calidad de grado de inversión. La política de inversión del SRJ limita la inversión en valores de deuda corporativa a las calificaciones más altas emitidas por organizaciones de calificación estadística reconocidas a nivel nacional.

Las calificaciones de calidad crediticia para las inversiones mantenidas por los fondos fiduciarios de pensiones al 30 de junio de 2016 son las siguientes (en miles):

| Tipo de inversión | AAA | AA+ a AA- | A+ a A- | BBB+ a BBB- | BB+ a BB- | CCC- | No calificado | Total |
|---|---|---|---|---|---|---|---|---|
| | | | **Calificación (1)** | | | | | |
| Bonos y pagarés: | | | | | | | | |
| Obligaciones de agencias del gobierno de los | | | | | | | | |
| EE. UU.: FHLB | $ — | 2,908 | — | — | — | — | — | 2,908 |
| FNMA | — | 4,117 | — | — | — | — | — | 4,117 |
| FHLMC | — | 2,519 | — | — | — | — | — | 2,519 |
| FFCB | — | 3,678 | — | — | — | — | — | 3,678 |
| Hipotecas y títulos respaldados por activos: | | | | | | | | |
| FNMA | 4,963 | 3,662 | — | — | — | — | 250 | 8,875 |
| FHLMC | 2,482 | 1,647 | — | — | — | — | — | 4,129 |
| Hipotecas comerciales | — | — | — | — | — | — | 1,533 | 1,533 |
| Bonos corporativos y pagarés de los EE. UU. | 8,829 | 37,691 | 88,129 | 89,899 | 5,984 | 224 | 7,224 | 237,980 |
| Bonos corporativos y pagarés no pertenecientes a los EE. UU. | 660 | 2,181 | 23,651 | 17,918 | 6,779 | — | 1,891 | 53,070 |
| Bonos y pagarés municipales de los | 1,108 | 1,424 | — | 1,157 | — | — | — | 3,689 |
| EE. UU. Bonos de COFINA | — | — | — | — | — | 93,484 | — | 93,484 |
| Total de bonos y pagarés | 18,032 | 59,827 | 111,780 | 108,974 | 12,763 | 93,708 | 10,898 | 415,982 |
| Fondos de fideicomisos mixtos no cotizados en bolsa: | | | | | | | | |
| Fondo de ingresos fijos - SSgA | | | | | | | | |
| Fondo intermedio | 270,858 | 23,026 | 56,411 | 67,095 | 40 | — | — | 417,430 |
| Total de títulos de deuda y fondo fideicomisario mixto no cotizado en bolsa de ingresos fijos | $ 288,890 | 82,853 | 168,191 | 176,069 | 12,803 | 93,708 | 10,898 | 833,412 |

(1) Calificación obtenida de Standard and Poor's o calificación equivalente de Moody's Investor Service o Fitch Ratings.

Aproximadamente $50.9 millones del total de las inversiones de los fondos fiduciarios al 30 de junio de 2016 consisten en GNMA y títulos del Tesoro de EE. UU., que no conllevan ningún riesgo y, por lo tanto, no están incluidos en la tabla anterior.

*Riesgo de concentración de crédito:* al 30 de junio de 2016, ninguna de las inversiones del SRE y SRJ en valores negociables en ninguna organización representaba el 5% o más de los activos netos del SRE y SRJ en fideicomiso para beneficios de pensión. No hubo inversiones de SRM en ningún emisor que representara el 5% o más de las inversiones totales al 30 de junio de 2016. Las pautas de inversión de SRM especifican que no más del 5% de los activos de un administrador en el mercado pueden invertirse en los valores de un solo emisor.

*Riesgo de tasa de interés:* de acuerdo con su política de inversión, el SRE y SRJ manejan su exposición a la disminución de los valores razonables al estructurar la cartera de inversiones de modo que los valores caduquen para cumplir con los requisitos de efectivo para el pago de beneficios, evitando así la necesidad de vender valores en el mercado abierto antes del vencimiento. Se espera que el Fondo Fiduciario de Pensiones logre la preservación del capital y la generación de ingresos invirtiendo en una cartera diversificada de valores de renta fija básicos de grado de inversión comercializables. Las pautas de inversión de SRM especifican que se espera que la duración de la cartera varíe no más de entre 75% y 125% de la duración del índice de referencia respectivo.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Al 30 de junio de 2016, los vencimientos de inversión como porcentaje del total de los títulos de deuda y los fondos mutuos negociados de renta fija que no se intercambian fueron los siguientes:

| Vencimiento | Vencimiento máximo |
|---|---|
| Dentro de un año | 7% |
| Después de uno a cinco años | 80 |
| Después de cinco a diez años | 2 |
| Después de diez años | 11 |
| Total | 100% |

*Riesgo de moneda extranjera:* es el riesgo de que los cambios en los tipos de cambio afecten negativamente el valor razonable de una inversión o un depósito. SRE y SRJ no tienen inversiones con exposición al riesgo cambiario. Se espera que la cartera internacional de SRM logre una apreciación agresiva del capital a largo plazo invirtiendo en valores Core EAFE (Europa, Australasia y el Lejano Oriente). Se espera que la cartera esté ampliamente diversificada con respecto a las exposiciones a países, sectores económicos, industrias y acciones individuales. No se espera que una emisión única supere el 5% (en el mercado) de la cartera.

Las inversiones y depósitos de SRM expuestos al riesgo cambiario al 30 de junio de 2016 fueron los siguientes:

| Tipo de inversión | Moneda local | Valor de mercado |
|---|---|---|
| | | (En miles) |
| Efectivo y equivalentes de efectivo | Dólar de Hong Kong | $ 37 |
| Efectivo y equivalentes de efectivo | Yen japonés | 4 |
| Total de efectivo y equivalentes de efectivo | | 41 |
| Acciones corporativas no pertenecientes a los EE. UU. | Dólar australiano | 1,539 |
| Acciones corporativas no pertenecientes a los EE. UU. | Libra esterlina | 4,518 |
| Acciones corporativas no pertenecientes a los EE. UU. | Corona danesa | 1,381 |
| Acciones corporativas no pertenecientes a los EE. UU. | Euro | 2,378 |
| Acciones corporativas no pertenecientes a los EE. UU. | Dólar de Hong Kong | 470 |
| Acciones corporativas no pertenecientes a los EE. UU. | Yen japonés | 5,204 |
| Acciones corporativas no pertenecientes a los EE. UU. | Rand de Sudáfrica | 505 |
| Acciones corporativas no pertenecientes a los EE. UU. | Dólar de Singapur | 383 |
| Acciones corporativas no pertenecientes a los EE. UU. | Won de Corea del Sur | 135 |
| Acciones corporativas no pertenecientes a los EE. UU. | Corona sueca | 1,607 |
| Acciones corporativas no pertenecientes a los EE. UU. | Franco suizo | 1,658 |
| Total de acciones comunes | | 19,778 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

| Tipo de inversión | Moneda local | Valor de mercado |
|---|---|---|
| | | (En miles) |
| Fondos de fideicomisos mixtos no cotizados en bolsa – Ssga [sic] MCSI ACWI Ex USA | $ | 69,845 |
| Total de efectivo y equivalentes de efectivo y títulos expuestos al riesgo de moneda extranjera | $ | 89,664 |

En julio de 2017, los Sistemas de Retiro vendieron todas las inversiones mantenidas por aproximadamente $297 millones y comenzó a operar en una base de "pago por uso". Para obtener información adicional sobre la transición a una estructura PayGo para los Sistemas de Retiro, consulte la Nota 23.

*Fondos de fideicomisos mixtos no cotizados en bolsa*

Los fondos fiduciarios de pensiones invierten en acciones de los siguientes fondos de capital de State Street Global Advisor: SsgA S&P Fondo de Préstamo de Títulos 500 Flagship (el Fondo SsgA S&P 500), el Fondo sin Préstamo SsgA Russell 3000 1qIndex (Fondo SsgA Russell 3000), y el Fondo sin Préstamo SsgA MSCI ACWI Ex USA (Fondo SsgA MSCI ACWI Ex USA). Los objetivos de inversión del Fondo SsgA S&P 500, el Fondo SsgA Russell 3000 y el Fondo SsgA MSCI ACWI Ex USA son coincidir con el rendimiento del Índice Standard & Poor's 500, el Índice Russell 3000 y el Índice MSCI ACWI Ex USA, respectivamente, a largo plazo. Las acciones del Fondo SsgA S&P 500 y del Fondo SsgA Russell 3000 pueden canjearse diariamente al valor liquidativo (NAV) y no tienen restricciones de reembolso. Las acciones del Fondo SsgA MSCI ACWI Ex USA pueden canjearse semestralmente en NAV y no tienen restricciones de canje. La inversión de los fondos fiduciarios de pensiones en estos fondos se incluye como parte de los fondos fiduciarios mixtos sin intercambio.

Al 30 de junio de 2016, las inversiones subyacentes al Fondo SsgA S&P 500, el Fondo SsgA Russell 3000 y el Fondo SsgA MSCI ACWI Ex USA tenían las siguientes asignaciones sectoriales:

| Sector | Fondo SSgA S&P 500 | Fondo SSgA Russell 3000 | Fondo Ex USA SSgA MSCI ACWI |
|---|---|---|---|
| Tecnología de la información | 20% | 18% | 8% |
| Financiero | 16 | 18 | 28 |
| Atención médica | 15 | 14 | 9 |
| Productos no esenciales | 12 | 13 | 12 |
| Productos industriales | 10 | 10 | 11 |
| Productos esenciales | 10 | 9 | 10 |
| Energía | 7 | 7 | 7 |
| Materiales | 3 | 4 | 7 |
| Servicios | 4 | 5 | 3 |
| Servicios de telecomunicaciones | 3 | 2 | 5 |
| Total | **100%** | **100%** | **100%** |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Además, los fondos fiduciarios de pensiones invierten en acciones del fondo no crediticio del índice de crédito intermedio de State Street Global Advisor (el fondo intermedio SsgA). El objetivo de inversión del Fondo Intermedio SsgA es replicar el Índice de Bonos de Crédito Intermedio de Barclays a largo plazo invirtiendo exclusivamente en títulos de renta fija. Las acciones del Fondo Intermedio SsgA pueden canjearse diariamente en su NAV y no tienen restricciones de canje. La inversión de los fondos fiduciarios de pensiones en el Fondo Intermedio SsgA se incluye como parte de los fondos fiduciarios mixtos sin intercambio.

Al 30 de junio de 2016, las inversiones subyacentes al Fondo Intermedio SsgA tenían las siguientes asignaciones sectoriales:

| Sector | Porcentaje |
|--------|-----------|
| Hacienda | 53% |
| Corporativo - Industrial | 20 |
| Corporativo - Finanzas | 13 |
| No corporativo | 7 |
| Agencia | 4 |
| Corporativo - Servicios | 3 |
| Total | 100% |

Al 30 de junio de 2016, la composición de las inversiones subyacentes en el Fondo SsgA MSCI ACWI Ex USA y en el Fondo Intermedio SsgA por país era la siguiente:

| País y Ex USA | Fondo SSgA MSCI ACWI |
|---------------|----------------------|
| Japón | 17% |
| Reino Unido | 14 |
| Canadá | 7 |
| Francia | 7 |
| Suiza | 7 |
| Alemania | 6 |
| Australia | 5 |
| China | 6 |
| Corea | 3 |
| España | 2 |
| Taiwán | 3 |
| Hong Kong | 2 |
| India | 2 |
| Suecia | 2 |
| Otros | 17 |
| Total | 100% |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

**Inversiones en asociaciones limitadas**

De conformidad con la Política general de inversión del ELA, los fondos fiduciarios de pensiones invirtieron aproximadamente $ 3.2 millones en asociaciones limitadas durante el año terminado el 30 de junio de 2016.

El valor de marcado de las inversiones en sociedades limitadas al 30 de junio de 2016 ascendía a aproximadamente $53 millones. Las asignaciones de ganancias y pérdidas netas a socios limitados se basan en ciertos porcentajes, según lo establecido en los acuerdos de asociación limitada. Las inversiones en asociaciones limitadas no son calificadas por una organización de calificación estadística reconocida a nivel nacional. El riesgo de crédito relacionado se mide a través de análisis de crédito, revisiones periódicas de los resultados de las operaciones y reuniones de la administración de las compañías sujetas.

Al 30 de junio de 2016, los fondos fiduciarios de pensiones tenían compromisos de capital con asociaciones limitadas y contribuciones relacionadas de la siguiente manera (en miles):

| | Compromisos del Sector público | Contribuciones del año fiscal | Contribuciones acumuladas | Valor de mercado |
|---|---|---|---|---|
| Guayacán Fund of Funds II, L.P.: | | | | |
| Sistema de Retiro de los Empleados del Gobierno del ELA de Puerto Rico | $ 25,000 | — | 23,681 | 1,744 |
| Sistema de Anualidades y Pensiones para Maestros de Puerto Rico | 25,000 | — | 2,3,681 | 1,743 |
| Subtotal | 50,000 | — | 47,362 | 3,487 |
| Guayacán Private Equity Fund, L.P.: | | | | |
| Sistema de Retiro de los Empleados del Gobierno del ELA de Puerto Rico | 5,000 | — | 4,645 | 2,161 |
| Sistema de Anualidades y Pensiones para Maestros de Puerto Rico | 5,000 | — | 4,645 | 2,156 |
| Subtotal | 10,000 | — | 9,290 | 4,317 |
| Guayacán Private Equity Fund II, L.P.: | | | | |
| Sistema de Retiro de los Empleados del Gobierno del ELA de Puerto Rico | 25,000 | 3,196 | 24,547 | 25,701 |
| Subtotal | 25,000 | 3,196 | 24,547 | 25,701 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

| | Compromisos del sector público | Contribuciones del año fiscal | Contribuciones acumuladas | Valor de mercado |
|---|---|---|---|---|
| Otros fondos: | | | | |
| Sistema de Retiro de los Empleados del Gobierno del ELA de Puerto Rico | $ 27,596 | — | 28,389 | 17,856 |
| Sistema de Anualidades y Pensiones Para Maestros de Puerto Rico | 28,714 | — | 26,498 | 1,674 |
| Subtotal | 56,310 | — | 54,887 | 19,530 |
| Total | $ 141,310 | 3,196 | 136,086 | 53,035 |

**Unidades de Componentes de Presentación Discreta**

*Depósitos*

El efectivo y sus equivalentes consisten en depósitos a la vista, cuentas que devengan intereses, certificados de depósito y contratos de inversión bancaria. El efectivo y equivalentes de efectivo de las unidades de componentes al 30 de junio de 2016 consistían en (en miles):

*Unidades de Componentes*  **Mayores**

| | Importe registrado | | | Saldo bancario |
|---|---|---|---|---|
| | No restringido | Restringido | Total | |
| Bancos comerciales | $ 1,131,757 | 492,702 | 1,624,459 | 2,764,329 |
| Bancos gubernamentales | 1,525 | 5,125 | 6,650 | 300,514. |
| Total | $ 1,133,282 | 497,827 | 1,631,109 | 3,064,843 |

Al 30 de junio de 2016, las unidades de componentes mayores tenían aproximadamente $301 millones de efectivo y equivalentes de efectivo que estaban expuestos al riesgo de crédito de custodia como no asegurados y sin garantía.

Las principales unidades componentes clasificaron aproximadamente $171 mil de inversiones en el PRGITF como efectivo y equivalentes de efectivo presentados en la tabla anterior.

*Unidades de componentes no mayores*

| | Importe registrado | | | Saldo bancario |
|---|---|---|---|---|
| | No restringido | Restringido | Total | |
| Bancos comerciales | $ 279,673 | 36,568 | 316,241 | 304,564 |
| Bancos gubernamentales | 47,189 | 5,248 | 52,437 | 419,376 |
| Total | $ 326,862 | 41,816 | 368,678 | 723,940 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Al 30 de junio de 2016, las unidades de componentes no mayores tenían aproximadamente $419 millones de efectivo y equivalentes de efectivo que estaban expuestos al riesgo de crédito de custodia como no asegurados y sin garantía.

*Pérdida de Crédito de Custodia en Depósitos Mantenidos en el BGF y EDB*

La gerencia determinó que existía una pérdida crediticia de custodia al 30 de junio de 2016 para los depósitos mantenidos en el BGF y EDB. Según una evaluación de la disponibilidad y recuperabilidad de dichos depósitos, se ha registrado una pérdida de crédito de custodia en estos depósitos en los estados financieros de las unidades de componentes dentro de los gastos generales de la siguiente manera (en miles):

|  | Monto |
|---|---|
| Unidades de componentes mayores: | |
| Valor registrado antes de la pérdida de créditos en custodia | $ 300,514 |
| Pérdida de créditos en custodia | (293,864) |
| Valor neto registrado | $ 6,650 |

|  | Monto |
|---|---|
| Unidades de componentes no mayores: | |
| Valor registrado antes de la pérdida de créditos en custodia | $ 419,376 |
| Pérdida de créditos en custodia | (366,939) |
| Valor neto registrado | $ 52,437 |

Las pérdidas de créditos en custodia antes mencionadas se relacionaron sustancialmente con las unidades de componentes de presentación discreta que emitieron sus estados financieros independientes considerando el impacto de la pérdida de créditos en custodia. Sin embargo, algunas de las unidades de componentes de presentación discreta emitieron sus estados financieros independientes de 2016 sin realizar una evaluación de pérdida de créditos en custodia. En consecuencia, los montos de efectivo y equivalentes de efectivo informados por dichas unidades de componentes de presentación discreta se sobreexpresaron al 30 de junio de 2016.

Se reconoció una pérdida de créditos en custodia de aproximadamente $518.9 millones como gastos generales y administrativos de las unidades de componentes de presentación discreta durante el año fiscal 2016.

El ELA evaluó la disponibilidad y la capacidad de recuperación de los depósitos mantenidos en el BGF y EDB para las entidades que no evaluaron la pérdida de créditos en custodia en sus respectivos estados financieros independientes de 2016, y determinó que debería haberse producido una pérdida adicional de créditos en custodia de aproximadamente $97 millones, registrada al 30 de junio de 2016 en el efectivo y equivalentes de efectivo de las unidades de componentes no mayores de presentación discreta. Estos montos adicionales de pérdida de créditos en custodia que deberían haberse reconocido al 30 de junio de 2016 se consideraron no auditados porque se relacionan con entidades y fondos, que fueron auditados por otros auditores, que no evaluaron la posible pérdida de crédito en custodia de depósitos en el BGF y EDB en sus respectivos estados financieros emitidos por separado.

Como se señala en la Nota 2(c), el 29 de noviembre de 2018, el BGF completó una reestructuración de parte de su endeudamiento de conformidad con una Modificación de Calificación en virtud del Título VI de PROMESA. De

145

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

conformidad con la Modificación de Calificación y la Ley de Reestructuración del BGF, el saldo de los pasivos adeudados entre el ELA y cada Entidad Gubernamental No Municipal y el BGF, se determinó aplicando el saldo pendiente de los depósitos mantenidos en el BGF en el nombre de una Entidad Gubernamental No Municipal contra el saldo pendiente de cualquier préstamo de dicha Entidad Gubernamental No Municipal adeudado al BGF o de cualquier bono o pagaré de dicha Entidad Gubernamental No Municipal en poder del BGF a esa fecha. Como resultado de este ajuste anterior, todos los depósitos del ELA en el BGF se extinguieron como resultado de la Modificación de Calificación.

El EDB está en proceso de desarrollar una estrategia dirigida para reestructurar sus obligaciones y operaciones. Tras la eventual reestructuración de las obligaciones y operaciones de EDB, la pérdida crediticia de custodia registrada y no registrada en el efectivo y equivalentes de efectivo revelados anteriormente puede cambiar.

*Riesgo de crédito*: además de las inversiones permitidas para el Gobierno Primario, las políticas de inversión de las unidades de componentes permiten a la gerencia invertir en lo siguiente: certificados de depósito o billetes en euros emitidos por instituciones financieras en los EE. UU. donde el emisor se clasifica en el nivel más alto categoría de calificación para obligaciones a corto plazo y en la categoría de calificación más alta para obligaciones a largo plazo clasificadas por S&P y Moody's: notas corporativas y bonos clasificados en las categorías más altas de al menos dos de los principales servicios de calificación; deuda corporativa imponible emitida a través de AFICA dentro de las dos (2) categorías de calificación más altas de al menos dos de los principales servicios de calificación; certificados de confianza (sujeto a consulta previa por escrito con el BGF); y títulos respaldados por hipotecas y activos calificados como AAA por S&P o AAA por Moody's que no deben exceder el 5% del fideicomiso subyacente en ningún momento.

Las políticas de inversión de las unidades de componentes establecen limitaciones y otras pautas sobre los montos a invertir en las categorías de inversión antes mencionadas y por emisor/contraparte y sobre la exposición por país. Además, dichas políticas proporcionan pautas sobre las instituciones con las que se pueden realizar transacciones de inversión.

Las políticas de inversión de las unidades de componentes estipulan que las transacciones de inversión deben realizarse con contrapartes que tengan una calificación BBB +/A1 o mejor según S&P's o una calificación equivalente de Fitch Ratings o Moody's, dependiendo del tipo y vencimiento de la inversión y la contraparte de transacción.

*Riesgo de concentración de crédito:* asimismo, la política de inversión especifica que no más del 5% de los activos de un administrador en el mercado deben invertirse en los valores de un solo emisor. La siguiente tabla resume el tipo y los vencimientos de las inversiones mantenidas por las unidades de componentes al 30 de junio de 2016 (en miles). Las inversiones por tipo en cualquier emisor que represente el 5% o más de las inversiones totales se informan por separado. Los vencimientos esperados diferirán de los vencimientos contractuales debido a que las contrapartes pueden tener el derecho de llamar o pagar obligaciones con o sin penalización por llamada o pago anticipado.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

**Unidades de componentes**

Al 30 de junio de 2016, el valor razonable de las inversiones de las unidades de componentes de pensiones basadas en la jerarquía de insumos era el siguiente:

| Tipo de inversión | Nivel 1 | Nivel 2 | Nivel 3 | Total |
|---|---|---|---|---|
| Títulos del gobierno de los EE. UU. | $ 8,651 | 81,051 | — | 89,702 |
| Pagarés de agencias del gobierno de EE. UU .: | | | | |
| FHLB | 24,630 | 8,847 | — | 33,477 |
| FNMA | - | 12,777 | — | 12,777 |
| FHLMC | - | 1,196 | — | 1,196 |
| FFCB | - | 12,884 | — | 12,884 |
| Otros | - | 1,980 | — | 1,980 |
| Hipotecas y títulos respaldados por activos | | | | |
| GNMA | 99,924 | 6,760 | - | 106,684 |
| FNMA | 19,872 | 33,496 | - | 53,368 |
| FHLMC | - | 14,421 | - | 14,421 |
| Hipotecas comerciales | - | 537 | - | 537 |
| Títulos respaldados por activos | - | 6,189 | - | 6,189 |
| Otros | 179 | 272 | - | 451 |
| Bonos corporativos y pagarés de los EE. UU. | 24,989 | 95,053 | - | 120,042 |
| Bonos y pagarés de gobiernos extranjeros | 49,831 | 2,626 | - | 52,457 |
| Pagarés municipales de los EE. UU. | - | 7,869 | - | 7,869 |
| Bonos y pagarés de agencias del ELA Fondos de inversión externa - títulos de renta fija | - 17,438 | 67,386 — | - | 67,386 17,438 |
| Grupos de inversión externa - títulos de capital | 30,715 | | 59,974 | 90,689 |
| Acciones corporativas de los EE. UU. | 238,091 | — | | 238,091 |
| Acciones corporativas no pertenecientes a los EE. UU. | 24,172 | - | — | 24,172 |
| Otros | - | - | 3,524 | 3,524 |
| Inversiones a valor de mercado: | $ 538,492 | 353,344 | 63,498 | 955,334 |
| Inversiones valuadas en NAV o costo amortizado | | | | |
| Equivalente de efectivo - fondo del mercado monetario | | | | 178,390 |
| Certificados de depósitos negociables | | | | 161 |
| Fondos mutuos | | | | 98,612 |
| PRGITF | | | | 55,816 |
| Contratos de inversiones garantizadas | | | | 204,876 |
| Grupos de inversión externa - títulos de capital | | | | 55,278 |
| Capital de asociaciones limitadas/privado | | | | 44,013 |
| Total de unidades de componentes mayores | | | | 1,592,480 |
| Total de unidades de componentes no mayores | | | | 1,546,483 |
| Inversiones totales | | | | $ 3,138,963 |

147

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

La siguiente tabla resume el tipo y los vencimientos de las inversiones mantenidas por las unidades de componentes mayores al 30 de junio de 2016 (en miles). Las inversiones por tipo en cualquier emisor que represente el 5% o más de las inversiones totales se informan por separado. Los vencimientos esperados diferirán de los vencimientos contractuales debido a que las contrapartes pueden tener el derecho de llamar o pagar obligaciones con o sin penalización por llamada o pago anticipado.

| Tipo de inversión | En un año | Después de uno a cinco años | Después de cinco a diez años | Después de diez años | Total |
|---|---|---|---|---|---|
| Títulos del gobierno de los EE. UU. | $ 61,556 | 7,742 | 17,577 | 2,827 | 89,702 |
| Pagarés de agencias patrocinadas por el gobierno de los EE. UU. | | | | | |
| FHLB | 7.739 | 19,732 | 6,006 | — | 33,477 |
| FNMA | 6.159 | 6,618 | — | — | 12,777 |
| FHLMC | — | 772 | 424 | — | 1,196 |
| FFCB | — | 5,289 | 7,595 | — | 12,884 |
| Otros | — | 576 | 1,404 | — | 1,980 |
| Hipotecas y títulos respaldados por activos | | | | | |
| GNMA | — | — | 30,424 | 76,260 | 106,684 |
| FNMA | 25.589 | 87 | 8,369 | 19,323 | 53,368 |
| FHLMC | — | 6 | 1,406 | 13,009 | 14,421 |
| Hipotecas comerciales | — | — | — | 537 | 537 |
| Títulos respaldados por activos | 112 | 6,077 | — | — | 6,189 |
| Otros | — | — | — | 451 | 451 |
| Bonos corporativos y pagarés de los EE. UU. | 16,760 | 54,000 | 43,163 | 6,119 | 120,042 |
| Bonos y pagarés de gobiernos extranjeros | 8,063 | 39,900 | 4,305 | 189 | 52,457 |
| Pagarés municipales de los EE. UU. | — | 5,368 | 1,434 | 1,067 | 7,869 |
| Bonos y pagarés de agencias del ELA | — | 67,386 | — | — | 67,386 |
| Fondos del mercado de dinero | 150,636 | 27,754 | — | — | 178,390 |
| Certificados de depósitos negociables | 161 | — | — | — | 161 |
| PRGITF | 55,816 | — | — | — | 55,816 |
| Grupos de inversión externa - títulos de ingresos fijos | 11,968 | 316 | 76 | 5,078 | 17,438 |
| Contratos de inversiones no participantes | 83,654 | 47,618 | — | 73,604 | 204,876 |
| Otros | 98,612 | — | — | — | 98,612 |
| Total de títulos de deuda y contratos de inversiones | | | | | |
| Contratos de inversión | $ 526,825 | 289,241 | 122,183 | 198,464 | 1,136,713 |
| Títulos de capital: | | | | | |
| Acciones corporativas de los EE. UU. | | | | $ | 238,091 |
| Acciones corporativas no pertenecientes a los EE. UU. | | | | | 24,172 |
| Grupos de inversión externa - títulos de capital | | | | | 149,491 |
| Capital de asociaciones limitadas/privado | | | | | 44,013 |
| Total de unidades de componentes mayores | | | | | 1,592,480 |
| Total de unidades de componentes no mayores | | | | | 1,546,483 |
| Total | | | | $ | 3,138,963 |

148

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

| | Vencimiento (en años) | | | | |
|---|---|---|---|---|---|
| **Tipo de inversión** | **En un año** | **Después de uno a cinco años** | **Después de cinco a diez años** | **Después de diez años** | **Total** |
| Reconciliación con el estado de resultados netos de todo el gobierno: | | | | | |
| Inversiones no restringidas | | | | $ | 1,185,350 |
| Inversiones restringidas | | | | | 1,953,613 |
| Total | | | | $ | 3,138,963 |

ACT, una unidad componentes mayores, clasificó aproximadamente $171,000 en inversiones presentadas en el PRGITF como equivalentes de efectivo.

*Riesgo de crédito de custodia*: las unidades de componentes tenían aproximadamente $129.8 millones (aproximadamente $0.1 millones y $129.7 millones en unidades de componentes mayores y no mayores, respectivamente) en varios tipos de valores del gobierno y de agencias de EE. UU., valores respaldados por hipotecas y otras inversiones que estaban expuestas al riesgo de créditos en custodia como no aseguradas, no registradas y retenidas por las contrapartes o por sus departamentos o agentes de confianza, pero no a nombre de las unidades de componentes.

*Riesgo de moneda extranjera:* SIFC (una unidad de componentes mayores) limita su exposición al riesgo de moneda extranjera al limitar el monto total invertido al 10% de la cartera. Al 30 de junio de 2016, el SIFC tenía las siguientes inversiones denominadas en moneda extranjera (en miles):

| Descripción | Moneda | Valor de mercado | |
|---|---|---|---|
| Acciones comunes | Dólar australiano | $ | 427 |
| | Dólar canadiense | | 1,092 |
| | Franco suizo | | 2,184 |
| | Corona danesa | | 227 |
| | Euro | | 6,406 |
| | Libra esterlina | | 3,804 |
| | Dólar de Hong Kong | | 648 |
| | Rupia de Indonesia | | 290 |
| | Yen japonés | | 6,556 |
| | Peso mexicano | | 253 |
| | Corona de Noruega | | 502 |
| | Corona sueca | | 495 |
| | Dólar de Singapur | | 435 |
| | Rand de Sudáfrica | | 309 |
| Acciones preferidas y otros títulos | Euro | | 544 |
| Total | | $ | 24,172 |

149

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*Pérdida de Crédito de Custodia en Depósitos Mantenidos en el BGF y EDB*

Ciertos certificados de depósitos negociables presentados en las tablas de inversión anteriores eran depósitos en el BGF. Como el BGF sirvió como agente depositario de estos depósitos, dichos certificados de depósitos en el BGF estaban sujetas a riesgo de créditos en custodia. La gerencia determinó que existía una pérdida crediticia de custodia al 30 de junio de 2016 para los depósitos mantenidos en el BGF. Con base en una evaluación de la disponibilidad y la capacidad de recuperación de dichos depósitos, se ha registrado una pérdida de créditos en custodia en estos depósitos en los estados financieros de las unidades de componentes correspondientes de la siguiente manera (en miles):

| | | Certificados de depósitos mantenidos en bancos gubernamentales al 30 de junio de 2016 | | |
| --- | --- | --- | --- | --- |
| | | **Valor registrado antes de la pérdida de créditos en custodia** | **Pérdida de créditos en custodia** | **Valor registrado neto** |
| Unidades de componentes mayores: | | | | |
| UPR | $ | 91,475 | (91,475) | — |
| Unidades de componentes no mayores | | 185,385 | (100,781) | 84,604 |
| Total de unidades de componentes | $ | 276,860 | (192,256) | 84,604 |

Las pérdidas de créditos en custodia antes mencionadas se relacionaron principalmente con las unidades de componentes de presentación discreta que emitieron sus estados financieros independientes de 2016 considerando el impacto de la pérdida de créditos en custodia. Sin embargo, algunas de las unidades de componentes de presentación discreta emitieron sus estados financieros independientes sin realizar una evaluación de pérdida de créditos en custodia. En consecuencia, los montos de los certificados de depósito informados por dichas unidades de componentes de presentación discreta se sobreexpresaron al 30 de junio de 2016.

El ELA evaluó la disponibilidad y la capacidad de recuperación de los fondos mantenidos en el BGF que no han estado sujetos a consideraciones de pérdida de créditos en custodia en sus respectivos estados financieros independientes de 2016 y concluyó que una pérdida de créditos en custodia adicional de aproximadamente $83.5 millones debería haberse registrado a partir del 30 de junio de 2016 sobre los certificados de depósito mantenidos en el BGF de las unidades de componentes de presentación discreta. Estos montos adicionales de pérdida de créditos en custodia que deberían haberse reconocido al 30 de junio de 2016 se consideraron no auditados porque se relacionan con entidades y fondos, que fueron auditados por otros auditores, que no evaluaron la posible pérdida de crédito en custodia de depósitos en el BGF en sus respectivos estados financieros emitidos por separado. No había certificados de depósito en EDB al 30 de junio de 2016.

Como se señala en la Nota 2(c), el 29 de noviembre de 2018, el BGF completó una reestructuración de parte de su endeudamiento de conformidad con una Modificación de Calificación en virtud del Título VI de PROMESA. De conformidad con la Modificación de Calificación y la Ley de Reestructuración del BGF, el saldo de los pasivos adeudados entre el ELA y cada Entidad Gubernamental No Municipal y el BGF, se determinó aplicando el saldo pendiente de los depósitos mantenidos en el BGF en el nombre de una Entidad Gubernamental No Municipal contra el saldo pendiente de cualquier préstamo de dicha Entidad Gubernamental No Municipal adeudado al BGF o de cualquier bono o pagaré de dicha Entidad Gubernamental No Municipal en poder del BGF a esa fecha. Como resultado de este ajuste anterior, todos los depósitos del ELA en el BGF se extinguieron como resultado de la Modificación de Calificación.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El EDB está en proceso de desarrollar una estrategia dirigida para reestructurar sus obligaciones y operaciones. Tras la eventual reestructuración de las obligaciones y operaciones de EDB, la pérdida crediticia de custodia registrada y no registrada en el efectivo y equivalentes de efectivo revelados anteriormente puede cambiar.

*Reducción posterior en las calificaciones crediticias de los bonos del ELA*

Como se explica en la Nota 23, comenzando en el año fiscal 2015, varios bonos del ELA y sus organismos recibieron una reducción en su calificación en múltiples ocasiones y por segmentos por las principales agencias de calificación crediticia en los Estados Unidos.  Sin embargo, la mayoría de las inversiones existentes en las tablas anteriores no se vieron afectadas. En general, las políticas de inversión del ELA requieren que sus agencias y organismo mantengan solo títulos de deuda con calificación de grado de inversión en su cartera de inversiones. Con más del 85% y el 75% de las inversiones a nivel del Gobierno Primario y de la unidad de componentes, respectivamente, con calificaciones crediticias no inferiores a "A" o sin riesgos al 30 de junio de 2016, las calificaciones crediticias promedio generales en toda la cartera de inversiones se han mantenido dentro de las políticas de inversión requeridas del ELA, incluso después de la reducción en la calificación. El porcentaje restante de las inversiones se califica en todo el espectro B o no se califica, a excepción de una inversión SIFC (unidad de componentes mayores) en bonos del BGF de aproximadamente $67.4 millones y las inversiones de cuatro unidades de componentes no mayores en el BGF, Bonos del Gobierno Primario y Bonos de Municipios del ELA de aproximadamente $595 millones, que sufrieron una reducción en su calificación a D después del 30 de junio de 2016.

**(7) Préstamo de valores y transacciones de acuerdos de recompra**

Durante el año fiscal que finalizó el 30 de junio de 2016, los fondos fiduciarios de pensiones (incluidos dentro de los fondos fiduciarios), BGF, EDB y SIFC (todas las unidades de componentes de presentación discreta) realizaron transacciones que involucran préstamos de valores y la venta de valores con acuerdos de recompra. Estas transacciones se explican a continuación:

*Fondos Fiduciarios de Pensiones*

Los Sistemas de Retiro participan en un programa de préstamo de valores, mediante el cual los valores de inversión se transfieren a un corredor o agente independiente a cambio de garantías en forma de efectivo, valores gubernamentales o cartas de crédito bancarias irrevocables equivalentes a aproximadamente el 102% del valor de mercado de los valores nacionales en préstamo y el 105% del valor de mercado de los valores internacionales en préstamo, con un acuerdo simultáneo para devolver la garantía de los mismos valores en el futuro. La garantía está marcada para comercializarse diariamente, y el agente hace una solicitud de garantía adicional de los corredores, si es necesario. El banco custodio es el agente del programa de préstamo de valores.

Al final del año, los Sistemas de Retiro no tenían exposición al riesgo de crédito a los prestatarios porque los montos que los Sistemas de Retiro debían a los prestatarios (la garantía) excedían los montos que los prestatarios debían a los Sistemas de Retiro. Al 30 de junio de 2016, la garantía recibida representaba el 105.5% del valor de mercado de los valores nacionales en préstamo. Los valores en préstamo para los cuales se recibió garantía al 30 de junio de 2016 consistieron en lo siguiente (en miles):

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

| Descripción | | Valor de mercado de los valores subyacentes |
|---|---|---|
| Títulos del gobierno de los EE. UU. | | |
| Letras del Tesoro de los EE. UU. | $ | 110 |
| Pagarés del Tesoro de los EE. UU. | | 2,351 |
| Letras del Tesoro de los EE. UU. | | 1,043 |
| Bonos corporativos y pagarés de los EE. UU. | | 14,634 |
| Bonos corporativos y pagarés no pertenecientes a los EE. UU. | | 1,940 |
| Acciones corporativas de los EE. UU. | | 246 |
| Acciones corporativas no pertenecientes a los EE. UU. | | 185 |
| Total | $ | 20,509 |

La garantía subyacente para estos valores tenía un valor de mercado de aproximadamente $21.6 millones al 30 de junio de 2016. La garantía recibida se invirtió en un fondo de inversión a corto plazo patrocinado por el banco custodio y se presenta como garantía de las transacciones de préstamo de valores en el estado de resultados netos fiduciarios adjunto.

Al 30 de junio de 2016, la distribución del fondo de inversión a corto plazo por tipo de inversión es la siguiente (en miles):

| Tipo de inversión | | Valor de mercado de los valores subyacentes |
|---|---|---|
| Valores comprados en virtud de acuerdos de reventa | $ | 20,514 |
| Certificados de depósito | | 1,078 |
| Total | $ | 21,592 |

Según los términos del acuerdo de préstamo de valores, el Sistema de Retiro está totalmente indemnizado por el incumplimiento por parte de los prestatarios de devolver los valores en préstamo (en la medida en que la garantía sea inadecuada para reemplazar los valores en préstamo) o la falta de pago del Sistema de Retiro por las distribuciones de ingresos mediante los emisores de valores mientras los valores están en préstamo. Además, el Sistema de Retiro es indemnizado por pérdidas en caso de que el agente de préstamos no exija garantías adecuadas y apropiadas de manera oportuna.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*Unidades de Componentes de Presentación Discreta*

BGF – A continuación, se incluye información seleccionada sobre valores vendidos según acuerdos de recompra (en miles):

| | | |
|---|---|---:|
| Monto registrado el 30 de junio de 2016 | $ | — |
| Monto máximo pendiente en cualquier fin de mes | | 188,076 |
| Monto promedio pendiente durante el año. | | 148,079 |
| Tasa de interés promedio ponderada para el año | | 0.21% |
| Tasa de interés ponderada a fin de año | | — |

A continuación, se resume la actividad de los valores vendidos según acuerdos de recompra para el año finalizado el 30 de junio de 2016 (en miles):

| | Saldo inicial | Emisiones | Vencimientos | Saldo final |
|---|---|---|---|---|
| Fondo operativo del BGF | $ 267,207 | 876,720 | 1,143,927 | — |

Todas las ventas de inversiones según acuerdos de recompra son por plazos fijos. Al invertir las ganancias de los valores vendidos según acuerdos de recompra, la política del BGF establecía que el plazo hasta el vencimiento de las inversiones fuera igual o anterior al vencimiento de los acuerdos de recompra relacionados.

SIFC: los estatutos del ELA y las políticas de la junta directiva de SIFC le permiten a SIFC utilizar sus inversiones para realizar transacciones de préstamo de valores, mediante las cuales los valores se transfieren a un corredor o agente independiente a cambio de garantías en forma de efectivo, valores o carta de crédito bancaria irrevocable. El custodio de valores del SIFC, JP Morgan Chase Bank, N.A., como agente del SIFC, administra el programa de préstamos de valores y recibe garantías en efectivo, valores o cartas de crédito bancarias irrevocables como garantía. Los valores en garantía no pueden ser pignorados ni vendidos por el SIFC a menos que el prestatario no cumpla. El requisito de garantía es igual al 102% para los valores emitidos en los Estados Unidos de América y el 105% para los valores emitidos fuera de los Estados Unidos de América, del valor de mercado de los valores prestados. La garantía debe complementarse con el siguiente día hábil si su valor razonable cae a menos del 100% del valor razonable de los valores en préstamo.  Todos los préstamos de seguridad pueden rescindirse a pedido del SIFC o del prestatario. En los préstamos de valores, el plazo hasta el vencimiento de los préstamos de valores se corresponde con el plazo hasta el vencimiento de la inversión de la garantía en efectivo. Tal correspondencia existía a fin de año. Al final del año, el SIFC no tiene exposición al riesgo de crédito a los prestatarios porque los montos que el SIFC adeuda a los prestatarios exceden los montos que los prestatarios adeudan al SIFC. Los contratos con los agentes de crédito requieren que indemnicen al SIFC si los prestatarios no devuelven los valores (y si la garantía es inadecuada para reemplazar los valores en préstamo) o no pagan al SIFC por la distribución de ingresos por parte de los emisores de valores mientras los valores están en calidad de préstamo.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Los valores en préstamo al 30 de junio de 2016 tenían un valor de mercado de aproximadamente $43.8 millones y estaban garantizados con garantías por un valor razonable de aproximadamente $44.8 millones. Los valores en préstamo para los que se recibió dinero efectivo como garantía al 30 de junio de 2016 consisten en lo siguiente (en miles):

| Tipo de inversión | Valor de mercado de los valores subyacentes |
|---|---|
| Títulos de capital | $ 33,002 |
| Bonos y pagarés corporativos | 4,579 |
| Bonos corporativos y de gobiernos extranjeros | 10 |
| Total | $ 37,591 |

La garantía en efectivo recibida al 30 de junio de 2016 ascendió a aproximadamente $38.4 millones y se invirtió de la siguiente manera (en miles):

| Tipo de inversión | Valor de mercado de los valores subyacentes |
|---|---|
| Certificados de depósito en otros bancos | $ 14,006 |
| Acuerdos de reventa | 14,398 |
| Fondos del mercado de dinero | 10,032 |
| Total | $ 38,436 |

Además, el SIFC tenía las siguientes obligaciones crediticias al 30 de junio de 2016 por las cuales los valores se recibían como garantía (en miles):

| Descripción | Valor de mercado | |
|---|---|---|
| | Valores en préstamo | Garantía de inversión recibida |
| Bonos y pagarés del Tesoro de los EE. UU. | $ 4,269 | 4,362 |
| Bonos y pagarés de agencias patrocinadas por los EE.UU. FHLMC | 428 | 437 |
| Títulos de capital | 1,473 | 1,518 |
| | $ 6,170 | 6,317 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

EDB: las políticas de inversión de EDB, según lo autorizado por la Ley Núm. 22 del 24 de julio de 1985, Artículo 3, permiten a la gerencia vender valores según acuerdos de recompra. La siguiente tabla resume cierta información sobre valores vendidos según acuerdos de recompra (en miles):

| | |
|---|---:|
| Monto registrado el 30 de junio de 2016 | $ — |
| Monto promedio pendiente durante el año | |
| Monto máximo pendiente en cualquier fin de mes | 9,324 |
| | 24,406 |
| Tasa de interés promedio ponderada para el año | 0.56% |
| Tasa de interés ponderada a fin de año | — |

La actividad de los valores vendidos según acuerdos de recompra durante 2016 fue la siguiente (en miles):

| | Saldo inicial | Emisiones | Vencimientos | Saldo final |
|---|---:|---:|---:|---:|
| Valores vendidos en virtud de acuerdos de recompra | $ 28,756 | 85,186 | (113,942) | — |

## (8) Cuentas por cobrar y a pagar

*Fondos del gobierno y de propiedad exclusiva*

Las cuentas por cobrar en los fondos gubernamentales incluyen aproximadamente $1,400 millones de ingresos acumulados, impuestos especiales, impuestos sobre ventas y uso. Las cuentas por cobrar entre gobiernos incluyen aproximadamente $374.9 millones del gobierno federal y $17.5 millones del CRIM. Además, los fondos de propiedad exclusiva incluyen $66.5 millones en cuentas por cobrar por desempleo, discapacidad y primas de seguro de conductor; aproximadamente $23.2 millones de cuentas por cobrar de ciudadanos privados, instituciones miembros y municipios por servicios para pacientes proporcionados por PRMeSA [sic]; y aproximadamente $177.6 millones por cobrar del Departamento de Salud de los EE. UU., municipios y ciudadanos privados y farmacias para los servicios de cobertura de seguro de salud proporcionados por las operaciones de PRHIA. Las cuentas a pagar en los fondos del gobierno incluyen aproximadamente $1,600 millones de cuentas comerciales adeudadas a proveedores por la compra de mercancías y servicios prestados, aproximadamente $373.7 millones en beneficios salariales adeudados a agentes policiales elegibles por aumentos salariales anuales, premios y otros beneficios monetarios otorgados a través de varias leyes que datan de 1954, y aproximadamente $690.7 millones en reembolsos de impuestos por pagar.

De acuerdo con el Boletín Técnico GASB Núm. 2004 1, *Emisión de Reconocimiento de Tabaco y Emisión de Entidades de Información Financiera*, según enmendada (TB), se registró una cuenta por cobrar de $36.8 millones como otra cuenta por cobrar en los estados financieros de todo el gobierno y en los fondos no mayores del gobierno para envíos estimados del 1 de enero al 30 de junio de 2016, que se aplicarán al servicio de la deuda al momento del cobro. Además, el TB indicó que el fideicomiso designado como la Autoridad de Liquidación de Tabaco (el Fideicomiso de los Niños en el caso del ELA) debería reconocer pasivos por los bonos pagaderos y un gasto (y pasivos si no se paga) en el mismo período en los estados financieros independientes. El gasto (y el pasivo si no se paga) reconoce la obligación contractual de remitir el producto del bono vendido al gobierno que realiza el pago

155

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

(el ELA). Dado que Fideicomiso de los Niños se informa como una unidad de componentes combinados, el TB indica que estas remesas deben informarse como transferencias al fondo que recibe los ingresos y transferencias del fondo que representa las actividades de la Autoridad de Liquidación de Tabaco.  Como el Fideicomiso de los Niños no tiene la obligación contractual, de conformidad con su legislación habilitadora o en cualquier otro lugar, de remitir todos los ingresos de los bonos o activos relacionados con la Autoridad de Liquidación de Tabaco al gobierno que realiza el pago (el ELA), el Fideicomiso de los Niños no ha reconocido un gasto y pasivos por ganancias impagas de los bonos, ya que registra el gasto a medida que los montos se desembolsan como subvenciones al gobierno que realiza el pago (incluidos sus organismos) o terceros.

*Fondos Fiduciarios de Pensiones*

Antes de la promulgación de la Ley Núm. 106 de 2017 el 23 de agosto de 2017, los préstamos por cobrar a los miembros del plan estaban garantizados por las contribuciones de los miembros del plan y por otras fuentes, incluidas las escrituras hipotecarias y cualquier cantidad no restringida restante en los fondos de garantía. Además, los cobros de préstamos por cobrar se recibieron mediante retenciones de nómina. Para el año finalizado el 30 de junio de 2016, la cantidad máxima de préstamos a los miembros del plan para préstamos hipotecarios fue de $100,000 para el SRE y SRJ y $125,000 para SRM, y $5,000 para préstamos de viajes personales y culturales para los tres sistemas. Durante el año finalizado el 30 de junio de 2014 y 2013, se vendieron préstamos personales del SRE con saldos de capital de aproximadamente $100 millones y $88 millones, respectivamente, a dos instituciones financieras. Según el acuerdo de servicio, el SRE estará a cargo del servicio, administración y cobro de préstamos y saldos de capital pendientes al final de la fecha de cierre por una tarifa de servicio del 2%. Después del 23 de agosto de 2017, los beneficios de pensión se pagarán del Fondo General del Gobierno Primario (como se menciona en la Nota 23), y a partir de la fecha del presente, los fondos fiduciarios de pensión ya no son aplicables.

La reserva para ajustes y pérdidas en la realización se considera una reserva general para todas las categorías de préstamos e intereses por cobrar, excepto los préstamos hipotecarios, que es una reserva específica para los saldos de préstamos del proyecto especial de cobranza.

Al 30 de junio de 2016, la composición de los préstamos e intereses por cobrar a los miembros del plan se resume de la siguiente manera (en miles):

| | | |
|---|---|---:|
| Préstamos por cobrar de los miembros del plan: | | |
| Personal | $ | 372,465 |
| Hipotecas | | 515,045 |
| Viajes culturales | | 47,491 |
| Total de préstamos a miembros del plan | | 935,001 |
| Intereses devengados por cobrar | | 34,187 |
| Total de préstamos e intereses por cobrar a los miembros del plan | | 969,188 |
| Menos margen para ajustes y pérdidas en la realización | | (5,117) |
| Total de préstamos e intereses por cobrar a los miembros del plan - neto | $ | **964,071** |

156

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Al 30 de junio de 2016, las cuentas por cobrar a los patronos, incluidas las cuentas por cobrar de los estados de resultados netos fiduciarios adjuntos, consistían en lo siguiente (en miles):

| | | |
|---|---|---:|
| Programa de retiro temprano | $ | 2,733 |
| Contribuciones del patrono según leyes especiales | | 64,012 |
| Contribuciones del patrono y del empleado | | 395,989 |
| Intereses por pagos retrasados | | 59,001 |
| Total de cuentas por cobrar a patronos | | 521,735 |
| Menos reserva para cuentas por cobrar dudosas | | (262,934) |
| Cuentas por cobrar a patronos - neto | $ | **258,801** |

Conforme a la Ley Núm. 447 de 1991, cada patrono debe pagar, mensualmente, los montos correspondientes a contribuciones y reembolsos de préstamos, a más tardar el decimoquinto día del mes siguiente. Después de esa fecha, los intereses se cobran según lo establecido por el Fondo Fiduciario de Pensiones.

El ELA y muchos de sus organismos y municipios, que son patronos a los efectos del SRE y SRJ, han enfrentado a importantes desafíos fiscales y económicos. Asimismo, en los últimos meses, la reducción en la calificación y la ampliación de los diferenciales de crédito para la deuda del sector público de Puerto Rico, incluidas las corporaciones públicas, ha puesto más presión sobre la liquidez y las fuentes de financiamiento para los patronos. En consecuencia, la mayoría de las cuentas por cobrar de los patronos están atrasadas con fechas de pago establecidas o fechas de vencimiento del plan de pagos. En otros casos, los importes vencidos se siguen renegociando para fechas posteriores.

Al 30 de junio de 2016, el SRE y SRJ registraron una asignación de aproximadamente $250.8 millones y $12.1 millones respectivamente, para ajustes y pérdidas en la realización relacionados con la cobranza incierta de las contribuciones uniformes adicionales adeudadas por el ELA.

Si bien se tomaron ciertas medidas para mejorar el cobro de dichas cuentas por cobrar, el momento en que se cobran a los patronos afecta las necesidades de liquidez del SRE y SRJ. La gerencia dictamina que, a excepción de las contribuciones uniformes adicionales del ELA de aproximadamente $250.8 millones adeudados al SRE para los años fiscales 2015 y 2016 y aproximadamente $12.1 millones adeudados al SRJ para el año fiscal 2016, se pueden cobrar otros montos adeudados por los patronos; sin embargo, esta situación podría afectar en última instancia el pago de beneficios a los miembros o el reembolso de los bonos por pagar del SRE, en caso de que dichos montos se vuelvan incobrables en el futuro.

Al 30 de junio de 2016, las cuentas por cobrar a los patronos incluyen montos adeudados por PRMeSA [sic] de aproximadamente $71.2 millones (registrados dentro del SRE), de la siguiente manera (en miles):

| | | |
|---|---|---:|
| Contribuciones del patrono y del empleado | $ | 38,786 |
| Retenciones de préstamos de empleados | | 1,934 |
| Intereses | | 30,440 |
| Total de cuentas por cobrar de PRMeSA | $ | **71,160** |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Los montos adeudados por PRMeSA [sic] al 30 de junio de 2016 consisten principalmente en los costos de pensión acumulados correspondientes a los años fiscales 2013 a 2016 que ascienden a aproximadamente $68.2 millones, que no tienen un plan de pago y los relacionados con el año fiscal 2011 según el plan de pago mencionado a continuación que asciende a aproximadamente $3 millones

El 1 de noviembre de 2011, PRMeSA [sic] y el SRE celebraron un acuerdo de plan de pago (el Acuerdo) para el reembolso de una deuda que asciende a aproximadamente $15.3 millones, en esa fecha, correspondiente al año fiscal 2011. A partir del 15 de noviembre de 2011, el acuerdo exige sesenta (60) cuotas mensuales de $255,677 sin intereses. Los pagos por mora de menos de un año en mora devengarán intereses al 9% y 12% para los que excedan de un año.

*Unidades de Componentes de Presentación Discreta - BGF*

Al 30 de junio de 2016, los préstamos del BGF a corporaciones públicas y agencias del ELA (excluyendo municipios) por un monto de $6,500 millones fueron reembolsables de las siguientes fuentes (en miles):

|  |  | **Monto** |
|---|---|---:|
| Fuente de devolución: | | |
| Ganancias de futuras emisiones de bonos | $ | 1,504,300 |
| Asignaciones del fondo general o legislativas | | 3,497,642 |
| Ingresos operativos | | 1,141,690 |
| Otros | | 347,924 |
| Total | $ | **6,491,556** |

Para el año finalizado el 30 de junio de 2016, los desembolsos y cobros del capital de los préstamos del sector público pagaderos por futuras emisiones de bonos ascendieron a aproximadamente $20.8 millones y $4.5 millones, respectivamente. Los préstamos del sector público pagaderos por el Fondo General o las asignaciones del ELA tuvieron desembolsos y cobros de capital por aproximadamente $647.1 millones y $970.8 millones, respectivamente, durante el año que terminó el 30 de junio de 2016. Los préstamos del sector público pagaderos por ingresos operativos y otras fuentes de reembolso tuvieron desembolsos y cobros de capital por aproximadamente $240 millones y $172.4 millones, respectivamente, durante el año finalizado el 30 de junio de 2016.

Al 30 de junio de 2016, aproximadamente $3,500 millones de los préstamos del sector público eran pagaderos de asignaciones legislativas o futuros ingresos fiscales del ELA. En consecuencia, el pago de estos préstamos puede verse afectado por restricciones presupuestarias y la situación fiscal general que afecta a Puerto Rico.

Al 30 de junio de 2016, la ACT tenía un máximo autorizado de aproximadamente $2,000 millones en financiamiento con el BGF, con un saldo pendiente de aproximadamente $1,700 millones en capital. Históricamente, estas facilidades se reembolsaron con el producto de la emisión de bonos. Todas estas facilidades se han extendido repetidamente y no se han pagado según lo programado. El 1 de diciembre de 2015, el ELA anunció su intención de retener ciertos impuestos e ingresos que se asignaron condicionalmente a ciertas corporaciones y agencias públicas, incluida la ACT.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

La ACT se encuentra actualmente en un proceso de reestructuración de la deuda según el Título III de PROMESA y actualmente no tiene suficientes fondos disponibles para pagar completamente sus diversas obligaciones, incluidas las adeudadas al BGF, a medida que vencen o que están actualmente en mora.

Al 30 de junio de 2016, la mayoría de los préstamos a corporaciones y agencias públicas por un total aproximado de $6,500 millones se clasificaron como de no devengo. Los ingresos por intereses que se habrían registrado si el plazo original de estos préstamos ascendiera a aproximadamente $379.5 millones en el año fiscal 2016. Los intereses reales cobrados durante el año fiscal 2016 sobre estos préstamos ascendieron a aproximadamente $112.6 millones.

El BGF considera que la cartera de préstamos del sector público está deteriorada según la información y los eventos actuales, incluidas las demoras significativas en la recepción del pago programado del servicio de la deuda mencionado anteriormente. La gerencia dictamina que es muy probable que el BGF no pueda cobrar todos los montos adeudados conforme con los términos contractuales originales del préstamo, particularmente a la luz de los casos del Título III de ciertos prestatarios. La evaluación de los préstamos deteriorados por parte del BGF consistió en identificar qué préstamos del sector público tienen fuentes de pago confiables o poco confiables, respectivamente. Los préstamos con fuentes confiables de reembolso con buen cumplimiento se evaluaron colectivamente. Los préstamos con fuentes de pago poco confiables se evaluaron individualmente para clasificar su deterioro. Los préstamos deteriorados se miden individualmente con base en el valor presente de los flujos de efectivo futuros esperados descontados a la tasa de interés efectiva del préstamo, o si el préstamo depende de la garantía, el valor razonable de la garantía.

Durante el año fiscal 2016, el BGF reconoció una liberación en la provisión para pérdidas crediticias de aproximadamente $76.5 millones en su cartera de préstamos de corporaciones y agencias públicas. Al 30 de junio de 2016, la cartera de préstamos del sector público tenía una reserva para pérdidas crediticias por un monto de $5,800 millones. Antes del año fiscal 2014, el BGF no había registrado ninguna cancelación en su cartera de préstamos del sector público.

Los préstamos a los municipios ascendían a aproximadamente $2,300 millones al 30 de junio de 2016. Para el año finalizado el 30 de junio de 2016, los desembolsos y cobros de préstamos del sector municipal ascendieron a aproximadamente $92.4 millones y $131.8 millones, respectivamente. Estos préstamos incluyen aproximadamente $1,400 millones al 30 de junio de 2016, que están garantizados por una parte de las evaluaciones de impuestos a la propiedad de cada municipio. Los préstamos pignorados con las evaluaciones del impuesto a la propiedad incluyen bonos y pagarés emitidos por municipios de Puerto Rico que son originados por el BGF como financiamiento puente. Aproximadamente $512 millones en préstamos a municipios al 30 de junio de 2016 están garantizados por una prenda de una porción del impuesto municipal sobre las ventas depositado en cuentas especialmente designadas con el BGF. Los fondos disponibles en dichas cuentas aumentan la capacidad de endeudamiento del municipio correspondiente. Se otorgaron aproximadamente $421 millones en préstamos a municipios al 30 de junio de 2016, principalmente como préstamos provisionales para financiar gastos de capital pagaderos de ingresos que se generarán a partir de un proyecto generador de ingresos específico asociado con el préstamo o para cubrir pérdidas operativas. Una vez que se aprueban los préstamos operativos y si el municipio no paga la deuda con sus propios fondos, el BGF informa al CRIM para retener los ingresos por impuestos a la propiedad y remitirlos directamente al BGF antes de que se distribuyan a los municipios. Se identificaron aproximadamente $7.2 millones en préstamos municipales como morosos al 30 de junio de 2016. No se cobraron intereses por estos préstamos durante el año finalizado el 30 de junio de 2016.

Durante el año fiscal 2016, el BGF reconoció una liberación en la provisión para pérdidas crediticias de aproximadamente $131.3 millones en su cartera de préstamos municipales para terminar con una reserva para pérdidas crediticias de aproximadamente $77.4 millones al 30 de junio de 2016.

Los préstamos al sector privado incluyen el saldo del capital pendiente de las líneas de crédito otorgadas por el BGF y sus diferentes subsidiarias a empresas privadas en Puerto Rico, cuyas actividades se considera que fomentan

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

el desarrollo económico y turístico de Puerto Rico. Los préstamos al sector privado también incluyen el saldo del capital pendiente de préstamos hipotecarios otorgados a familias de ingresos bajos y moderados para la adquisición de unidades de vivienda unifamiliar y para desarrolladores de unidades de vivienda multifamiliar de ingresos bajos y moderados en Puerto Rico. Estas facilidades crediticias, netas de la reserva para pérdidas crediticias, ascendieron aproximadamente a $241 millones al 30 de junio de 2016, de los cuales aproximadamente $206 millones son préstamos hipotecarios para unidades de viviendas de ingresos bajos y moderados, aproximadamente $34 millones son para proyectos turísticos y aproximadamente $1 millón está destinado a préstamos para fabricación. Los préstamos del sector privado clasificados como no acumulados ascendieron aproximadamente a $164 millones al 30 de junio de 2016 y tenían una provisión correspondiente por pérdidas crediticias de $135 millones al 30 de junio de 2016. Los ingresos por intereses que se habrían registrado si estos préstamos hubieran estado funcionando de acuerdo con sus términos originales fueron de aproximadamente $12.6 millones en 2016.

**(9)** **Cuentas por cobrar asignadas condicionalmente e ingresos futuros**

**(a)** *Ingresos de COFINA*

Antes de la promulgación de la Ley Núm. 241 de 2018 y la confirmación del Tercer Plan de Ajuste Enmendado de COFINA en febrero de 2019, la Ley Núm. 91 de 2006 estableció el Fondo Dedicado de Impuestos a las Ventas, un fondo de ingresos especiales en poder de COFINA. La Ley Núm. 91 requirió que el mayor de los siguientes montos se depositara en el Fondo Dedicado del Impuesto sobre Ventas cada año fiscal para el pago de los bonos de COFINA: (i) un monto fijo mínimo, denominado Monto Base del Impuesto sobre las Ventas Pignoradas y (ii) los ingresos generados por hasta el 2.75% del impuesto sobre las ventas y el uso del ELA.

El 9 de octubre de 2013, se promulgó una enmienda a la Ley Núm. 91 de 2006 que aumentó del 2.75% al 3.50% la porción del Impuesto sobre las Ventas Pignoradas depositado en el Fondo Dedicado de Impuestos a las Ventas.

El Monto Base del Impuesto sobre las Ventas Pignoradas en el año fiscal terminado el 30 de junio de 2016 ascendió a aproximadamente $696.3 millones Para el año fiscal 2016, el servicio de la deuda pagado por COFINA ascendió aproximadamente a $655.2 millones

**(b)** *Ingresos asignados de la PRIFA*

Los siguientes ingresos (colectivamente, los Ingresos Asignados de la PRIFA) han sido asignados condicionalmente por el ELA a la PRIFA, sujeto a las disposiciones del Artículo VI, Sección 8, de la Constitución del ELA. Tal como se analiza con mayor detalle en la Nota 2 y la Nota 23, los Ingresos Asignados de la PRIFA están siendo retenidos actualmente por el ELA.

*(i)* *Impuesto Federal a las Ventas*

El ron fabricado en Puerto Rico está sujeto a impuestos federales a las ventas una vez exportado a los Estados Unidos; sin embargo, los ingresos generados por dichos impuestos especiales son devueltos por el IRS al ELA. La Ley Núm. 44 del 21 de junio de 1988, según enmienda (la Ley PRIFA), requiere que los primeros $117 millones de ciertos impuestos federales a las ventas recibidos por el ELA se transfieran a la PRIFA, una unidad de componentes combinados del ELA, cada año fiscal. Dichos impuestos consisten en los impuestos federales a las ventas de ron y otros artículos producidos en Puerto Rico y vendidos en los Estados Unidos. La PRIFA aplica estos impuestos al reembolso de los Bonos de Ingresos Fiscales Especiales de la PRIFA. La recepción de los impuestos federales a las ventas que aseguran los bonos está sujeta a una serie de factores, que incluyen la imposición continua y el envío de dichos impuestos al ELA y las condiciones que afectan a la industria del ron de Puerto Rico.  Actualmente se espera que el monto de los impuestos federales a las ventas que recibe el ELA disminuya, aunque no se puede determinar la cantidad exacta. Si los impuestos federales a las ventas recibidos por el ELA en cualquier año fiscal son inferiores

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

a $117 millones, la Ley PRIFA requiere que la solicitud de PRIFA y el Director de la OGP del ELA incluyan en el presupuesto del ELA para el año fiscal correspondiente, un crédito suficiente para cubrir dicha deficiencia. Sin embargo, la Legislatura no tiene la obligación de realizar tal asignación. Para el año finalizado el 30 de junio de 2016, la Legislatura asignó originalmente los $117 millones requeridos por la Ley Núm. 44-1988, pero posteriormente se modificó para disminuir dicha asignación a un monto total de $4 millones.

*(ii)*   *Impuesto a Productos del Petróleo*

La Ley PRIFA y el Código de Ingresos Internos de Puerto Rico de 2011, según enmienda (el Código de Puerto Rico) fueron enmendados por la Ley Núm. 1 de 2015, según enmienda, para imponer un nuevo impuesto a los productos derivados del petróleo para los productos que no sean diésel ($6.25 inicialmente) y para asignar tales ingresos a la PRIFA para asegurar el pago de algunos de sus bonos y pagarés, en particular, los Pagarés en Anticipación de Bonos de Ingresos del Fondo Dedicado de Impuestos emitidos el 16 de marzo de 2015 para canjear ciertos Bonos de Ingresos Especiales de la ACT, los Pagarés de Anticipación de Bonos 2013A. Para el año fiscal 2016, el servicio de la deuda pagada en los Pagarés de Anticipación de Bonos de Ingresos del Fondo Dedicado de Impuestos emitidos por la PRIFA ascendió a $169 millones, compuesta por $155 millones en capital y $14 millones en intereses.

*(c)*   *Ingresos asignados de la ACT*

Los siguientes ingresos (colectivamente, los Ingresos Asignados a la ACT) han sido asignados condicionalmente por el ELA a la ACT, sujeto a las disposiciones del Artículo VI, Sección 8 de la Constitución del ELA. Como se analizó con mayor detalle en la Nota 2 y la Nota 23, antes del 3 de mayo de 2017, el ELA retuvo los Ingresos Asignados a la ACT de conformidad con el Artículo VI, Sección 8 de la Constitución del ELA. Con posterioridad a la radicación del caso del Título III del ELA el 3 de mayo de 2017, los Ingresos Asignados a la ACT fueron retenidos por el ELA debido a la paralización automática según el Título III de PROMESA.

*(i)*   *Impuestos a la Gasolina y el Gasoil*

El Código de Puerto Rico actualmente impone un impuesto de $0.16 por galón a la gasolina y un impuesto de $0.04 por galón al gasoil y el combustible diésel. Por ley, el ELA ha asignado condicionalmente el impuesto total de $0.16 a la gasolina y el impuesto de $0.04 al gasoil y el combustible diésel a la ACT como fuente de ingresos.

*(ii)*   *Aranceles de Licencia*

Según la Ley Núm. 22 de 2000, según enmienda, conocida como la "Ley de Vehículos y Tráfico", el ELA impone tarifas anuales de licencia a varias clases de vehículos automotores. Se asignaron quince dólares ($15) de cada arancel de licencia anual condicionalmente a la ACT para ser utilizados como fuente de ingresos. La Ley Núm. 30 de 2013 asignó condicionalmente los restantes veinticinco dólares ($25) de cada uno de dichos aranceles de la licencia anual a la ACT.

*(iii)*   *Impuesto a Productos del Petróleo*

El Código de Puerto Rico también asigna a la ACT $9.50 por barril o fracción del impuesto al consumo de productos derivados del petróleo (que incluyen petróleo crudo, petróleo sin terminar y productos derivados). El impuesto se aplica a cualquier producto de petróleo introducido, consumido, vendido o transferido en el ELA.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

(iv)  *Impuesto a los Cigarrillos*

Una parte de los ingresos del impuesto al cigarrillo impuesto por la Sección 3020.05 del Código de Puerto Rico (aproximadamente $20 millones) se ha asignado condicionalmente a la ACT.

**(d)** *Ingresos asignados a la PRCCDA*

El Artículo 24 de la Ley Núm. 272 de 2003, según enmienda, aplica un impuesto de ocupación hotelera a todos los hoteles y alojamientos de motel en la isla (el Impuesto de Ocupación Hotelera). Una parte de los ingresos del Impuesto de Ocupación Hotelera (los Ingresos asignados a la PRCCDA) se ha asignado condicionalmente a la PRCCDA para el pago de los bonos de la PRCCDA, sujeto a las disposiciones del Artículo VI, Sección 8 de la Constitución del ELA. Tal como se analiza con mayor detalle en la Nota 2 y la Nota 23, los Ingresos Asignados de la PRCCDA están siendo retenidos actualmente por el ELA.

**(e)** *Ingresos asignados a la PRMBA*

Una parte de los ingresos del impuesto al cigarrillo impuesto por la Sección 3020.05 del Código de Puerto Rico (los Ingresos Asignados a la PRMBA) se ha asignado condicionalmente a la PRMBA para el pago de ciertas obligaciones de deuda de la PRMBA, sujeto a las disposiciones del Artículo 8, Sección 8, de la Constitución del ELA. Tal como se analiza con mayor detalle en la Nota 2 y la Nota 23, los Ingresos Asignados de la PRMBA están siendo retenidos actualmente por el ELA.

**(f)** *Ingresos del Fideicomiso de los Niños*

El fideicomiso de los Niños es un fideicomiso público adscrito al BGF, creado de conformidad con la Ley Núm. 173 de 1999 (Ley Núm. 173). Mediante la Ley Núm. 173, el ELA asignó y transfirió condicionalmente al Fideicomiso de los Niños todos sus derechos, títulos e intereses en un acuerdo de conciliación suscrito por el ELA, los 46 estados y varios fabricantes de cigarrillos (el Acuerdo de Liquidación del Tabaco), incluido el derecho del ELA a recibir ciertos pagos anuales de dichos fabricantes de cigarrillos (los TSR). Los TSR, que de otro modo se entregarían al Fondo General, se asignaron condicionalmente al Fideicomiso de los Niños en consideración de la emisión de bonos por parte del Fideicomiso de los Niños y la aplicación del producto de los mismos para financiar ciertos programas sociales.

**(g)** *Orden Ejecutiva OE–2015-046 (Recuperación)*

El 1 de diciembre de 2015, se firmó la Orden Ejecutiva Núm. 46, que ordenaba al Secretario de Hacienda retener ciertos ingresos en base a los estimados de ingresos revisadas para el año fiscal 2016 y el deterioro de la situación de liquidez del ELA. En virtud de la Orden Ejecutiva Núm. 46, ciertos recursos disponibles del ELA asignados condicionalmente a la PRIFA, la ACT, la PRMBA y la PRCCDA para el servicio de la deuda de sus obligaciones y proporcionar apoyo operativo continúan siendo retenidos por el ELA (comúnmente conocido como " "recuperación"), de conformidad con el Artículo VI, Sección 8 de la Constitución del ELA y las disposiciones legales en virtud de las cuales dichos ingresos se asignaron a las corporaciones públicas aplicables. En el presente documento se incluye más información sobre la recuperación.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

**(10) Actividad Entre Fondos y Dentro de la Entidad**

Las cuentas por cobrar y a pagar entre fondos al 30 de junio de 2016 se resumen de la siguiente manera (en miles):

| Fondo por cobrar | Fondo a pagar | |
|---|---|---|
| Gubernamental no mayor | Servicio de la Deuda de COFINA | $ 132,051 |
| Administración de Servicios Médicos de Puerto Rico | General | 26,250 |
| Gubernamental no mayor | General | 13,866 |
| No Mayores de Propiedad Exclusiva | General | 11,193 |
| General | Seguro por desempleo | 10,089 |
| General | Loterías | 7,239 |
| No Mayores de Propiedad Exclusiva | Gubernamental no mayor | 3,996 |
| General | Gubernamental no mayor | 2,527 |
| | | $ 207,211 |

Las transferencias de (a) otros fondos para el año finalizado el 30 de junio de 2016 se resumen de la siguiente manera (en miles):

| Fondo de destino | Fondo de origen | |
|---|---|---|
| Administración del Seguro de Salud de Puerto Rico (a) | General | $ 892,070 |
| Servicio de la deuda (b) | General | 286,507 |
| Gubernamental no mayor (c) | General | 680,125 |
| General (d) | Loterías | 196,147 |
| Administración de Servicios Médicos de Puerto Rico (e) | General | 27,770 |
| General (f) | Seguro por desempleo | 45,133 |
| General (g) | No Mayores de Propiedad Exclusiva | 11,611 |
| Servicio de la deuda de COFINA (h) | Ingresos Especiales de COFINA | 5,123 |
| Gubernamental no mayor (i) | Servicio de la deuda de COFINA | 8,873 |
| No mayor de propiedad exclusiva (j) | General | 4,084 |
| General (k) | Servicio de la deuda de COFINA | 1,230 |
| Fondo Recurrente de Préstamos para el Control de Contaminación del Agua de Puerto Rico (l) | General | 2,225 |
| | | $ 2,160,898 |

Los propósitos principales de las transferencias entre fondos son (en miles):

(a) Transferencia de $892,070 del Fondo General a la Administración de Seguros de Salud de Puerto Rico para proporcionar fondos para cubrir los gastos operativos.

(b) Transferencia de $286,507 del Fondo General al fondo del servicio de la deuda para que los fondos estén disponibles para el servicio de la deuda.

(c) Reconocer como transferencias los pagos de alquiler realizados por las agencias del ELA en propiedades arrendadas por la AEP, una unidad de componentes combinados del ELA ($ 346,592); ($ 70,771) en relación con

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

los ingresos recibidos del Acuerdo de Liquidación del Tabaco administrado por el Fideicomiso de los Niños, una unidad de componentes combinados del ELA; ($180,363) a la PRIFA para el pago de proyectos de deuda y capital; ($38,033) a UPRCCC para proporcionar fondos para cubrir gastos operativos; ($18,377) a PAA para el pago de la deuda y ($25,989) al fondo de proyectos de capital para cubrir gastos relacionados con el capital.

(d) Transferencia de $196,147 de las Loterías al Fondo General para distribuir el aumento en los activos netos de las Loterías para el uso del Fondo General, según lo requerido por la legislación de habilitación de las Loterías.

(e) Transferencia de $27,770 del Fondo General a la Administración de Servicios Médicos de Puerto Rico, un fondo mayor de propiedad exclusiva, para poner a disposición fondos para el servicio de la deuda, proyectos de capital y gastos operativos.

(f) Transferencia de $45,133 del Fondo de Seguro por Desempleo relacionado con la distribución del excedente de efectivo correspondiente al Fondo General para el pago de gastos administrativos.

(g) Transferencia de los Fondos de Seguro por Discapacidad y de Conductores relacionados con la distribución del excedente de efectivo al fondo general ($4,993) y de la Junta de Gobierno del Servicio 9-1-1 ($6,618) para reembolsar al fondo general los gastos de asistencia brindados en servicios de llamadas de emergencia.

(h) Transferencia de $5,123 del Fondo de Ingresos Especiales de COFINA al Fondo de Servicio de la Deuda de COFINA que se transferirá al Fondo General para que los fondos estén disponibles para los pagos de la deuda.

(i) Reconoce como transferencias de $8,873, los ingresos por intereses devengados por la PRIFA, una unidad de componentes combinados, en su inversión en bonos emitidos por COFINA, otra unidad de componentes combinados, donde se incurre en un gasto de intereses por la misma cantidad.

(j) Transferencia de $4,084 para proporcionar fondos locales de contrapartida del Fondo General al Fondo Recurrente de Préstamos para el Tratamiento del Agua Potable Segura de Puerto Rico, un fondo empresarial no mayor del ELA.

(k) Transferencia de $1,230 del Fondo de Servicio de la Deuda de COFINA al Fondo General para financiar los gastos operativos del Fondo General.

(l) Transferencia de$ 2,225 para proporcionar fondos locales equivalentes del Fondo General al Fondo Recurrente para el Control de la Contaminación del Agua de Puerto Rico, un fondo empresarial mayor del ELA.

Las cuentas por cobrar y a pagar entre fondos representan las liquidaciones pendientes de las transferencias o transacciones antes mencionadas de años actuales y anteriores.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Los montos adeudados al Gobierno Primario de las unidades de componentes fueron los siguientes (en miles):

| Entidad Receptora | | Entidad receptora | | | |
|---|---|---|---|---|---|
| | Fondo General | Gubernamental no mayor | Fondo Recurrente para el Control de la Contaminación del Agua de Puerto Rico | No mayor de de Prop. Exclusiva | Total Adeudado de Unidades de Componentes |
| Unidades de componentes mayores: | | | | | |
| Autoridad de Acueductos y Alcantarillas de Puerto Rico | $ — | — | 392,807 | 187,205 | 580,012 |
| Autoridad de Carreteras y Transportación de Puerto Rico | — | 9,945 | — | — | 9,945 |
| Universidad de Puerto Rico | — | 1,537 | — | — | 1,537 |
| Corporación del Fondo del Seguro del Estado | 17,000 | 2,834 | — | — | 19,834 |
| Banco de Desarrollo del Gobierno | — | 1,418 | — | — | 1,418 |
| Unidades de componentes no mayores | 88,239 | 25,154 | — | — | 113,393 |
| Subtotal adeudado de unidades de componentes | 105,239 | 40,888 | 392,807 | 187,205 | 726,139 |
| Subsidio ara saldos no cobrables | (35,467) | (30,641) | (392,807) | (187,205) | (646,120) |
| | $ 69,772 | 10,247 | — | — | 80,019 |

El monto adeudado por la AAA de aproximadamente $580 millones representa préstamos de construcción otorgados por el Fondo Recurrente para el Control de la Contaminación del Agua de Puerto Rico y el Fondo Recurrente de Préstamos para el Tratamiento del Agua Potable de Puerto Rico, fondos de propiedad exclusiva no mayores, para financiar la construcción de activos de capital para la AAA. La AAA no ha realizado los pagos requeridos según el acuerdo de deuda relacionado con esta deuda (ver Nota 2).

Los montos adeudados a las unidades de componentes del Gobierno Primario fueron los siguientes (en miles):

| Entidad de destino | | Entidad de origen | | | | |
|---|---|---|---|---|---|---|
| | Fondo general | Fondos gubernamentales no mayores | Administración de Servicios Médicos de Puerto Rico | Total adeudado a unidades de componentes | Reserva para saldo incobrable | Total adeudado a unidades de componentes |
| Unidades de componentes mayores: | | | | | | |
| Autoridad de Energía Eléctrica de Puerto Rico | $ 82,776 | 6,496 | 25,247 | 114,519 | (26,692) | 87,827 |
| Autoridad de Acueductos y Alcantarillas de Puerto Rico | 27,261 | 1,321 | 4,216 | 32,798 | (15,391) | 17,407 |
| Universidad de Puerto Rico | 20,145 | 2,433 | 12,005 | 34,583 | (29,628) | 4,955 |
| Autoridad de Carreteras y Transportación de Puerto Rico | 13,196 | — | — | 13,196 | — | 13,196 |
| Corporación del Fondo del Seguro del Estado | 5,976 | — | — | 5,976 | — | 5,976 |
| Unidades de componentes no mayores | 75,165 | — | — | 75,165 | (14,750) | 60,415 |
| | $ 224,519 | 10,250 | 41,468 | 276,237 | (86,461) | 189,776 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Los montos adeudados de (a) las unidades de componentes fueron los siguientes (en miles):

| Entidad de origen | | Entidad de destino | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Unidades de componentes mayores | | | | | | |
| | | Banco de Desarrollo del Gobierno de Puerto Rico | Autoridad de Carreteras y Transportación de Puerto Rico | Autoridad de Energía Eléctrica de Puerto Rico | Autoridad de Acueductos y Alcantarillas de Puerto Rico | Universidad de Puerto Rico | Unidades de componentes no mayores | Total adeudado a unidades de componentes |
| Unidades de componentes mayores: | | | | | | | | |
| Autoridad de Carreteras y Transportación de Puerto Rico | $ | 1,933,698 | — | 47,653 | — | — | 10,662 | 1,992,013 |
| Universidad de Puerto Rico | | 88,629 | — | 14,354 | | | — | 102,983 |
| Autoridad de Energía Eléctrica de Puerto Rico | | — | | 39,855 | 3,453 | — | | 105,405 |
| Autoridad de Acueductos y Alcantarillas de Puerto Rico | | 65,550 | | | | | | |
| Unidades de componentes no mayores | | 1,083,505 | 34,379 | 47,908 | 19,243 | 5,192 | 60,545 | 1,250,772 |
| Subtotal adeudado de unidades de componentes | | 3,207,228 | 34,379 | 149,770 | 22,696 | 5,192 | 71,207 | 3,490,472 |
| Reserva para balances incobrables | | (2,819,186) | (34,379) | (59,164) | (17,713) | — | (40,303) | (2,970,745) |
| Total adeudado de unidades de componentes | $ | 388,042 | — | 90,606 | 4,983 | 5,192 | 30,904 | 519,727 |

El monto adeudado por las unidades componentes presentadas por el BGF de aproximadamente $3,200 millones (antes de la reserva para cuentas incobrables) representa los saldos de préstamos adeudados al BGF por otras unidades de componentes del ELA. El resto de los préstamos por cobrar informados por el BGF se compone de lo siguiente (en miles):

| | | |
|---|---|---|
| Gobierno Primario - actividades del gobierno | $ | 2,515,011 |
| Gobierno Primario - actividades de tipo comercial | | 486,562 |
| Otras entidades y municipalidades del gobierno | | 2,595,971 |
| Sector privado neto de reserva para pérdidas de préstamos | | 241,463 |
| Total de préstamos por cobrar informados por el BGF | | 5,839,007 |
| Menos reserva para préstamos del sector público | | (3,022,942) |
| | $ | 2,816,065 |

Los préstamos al Gobierno Primario son presentados por el ELA en pagarés en el estado de resultados netos.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Los gastos del Gobierno Primario incluyen contribuciones de capital y operativas realizadas por el Gobierno Primario a las unidades de componentes de la siguiente manera (en miles):

|  |  |  |
|---|---|---:|
| Universidad de Puerto Rico | $ | 870,132 |
| Autoridad de Carreteras y Transportación de Puerto Rico | | |
| | | 108,215 |
| Unidades de componentes no mayores | | 246,980 |
| Total de contribuciones realizadas por el gobierno primario a las unidades de componentes | $ | **1,225,327** |

## (11) Activos de Capital

La actividad de los activos de capital para el año finalizado el 30 de junio de 2016 fue la siguiente (en miles):

*Gobierno primario*

| | | Saldo inicial | Aumentos | Reducciones | Saldo final |
|---|---|---:|---:|---:|---:|
| Actividades del gobierno: | | | | | |
| Terrenos y otros activos no depreciables: | | | | | |
| Terrenos | $ | 937,124 | 859 | 1,092 | 936,891 |
| Construcción en progreso | | 1,350,084 | 159,495 | 164,260 | 1,345,319 |
| Total de terrenos y otros activos no depreciables | | 2,287,208 | 160,354 | 165,352 | 2,282,210 |
| Edificios y mejoras en edificios | | 9,970,125 | 175,251 | 40,698 | 10,104,678 |
| Equipos, muebles, accesorios, vehículos y software | | 724,819 | 45,583 | 5,214 | 765,188 |
| Infraestructura | | 599,682 | — | — | 599,682 |
| Total de otros activos de capital, depreciados y amortizados | | **11,294,626** | **220,834** | **45,912** | **11,469,548** |
| Menos depreciación y amortización acumulada para: | | | | | |
| Edificios y mejoras en edificios | | 4,047,864 | 265,292 | 14,505 | 4,298,651 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

| | | Saldo inicial | Aumentos | Reducciones | Saldo final |
|---|---|---|---|---|---|
| Equipos, muebles, accesorios, vehículos y software | $ | 530,716 | 34,160 | 4,927 | 559,949 |
| Infraestructura | | 179,815 | 12,231 | — | 192,046 |
| Total de depreciación y amortización acumulada | | 4,758,395 | 311,683 | 19,432 | 5,050,646 |
| Total de otros activos de capital, neto de depreciación y amortización | | 6,536,231 | (90,849) | 26,480 | 6,418,902 |
| Actividades del gobierno activos de capital, neto | $ | 8,823,439 | 69,505 | 191,832 | 8,701,112 |

| | Saldo inicial (reformulado) | Aumentos | Reducciones | Saldo final |
|---|---|---|---|---|
| Actividades de Tipo Comercial: | | | | |
| Terrenos y otros activos no depreciables: | | | | |
| Terrenos $ | 36,005 | — | — | 36,005 |
| Construcción en progreso | 3,282 | 57 | — | 3,339 |
| Total de activos de capital, no depreciados | 39,287 | 57 | — | 39,344 |
| Edificios y mejoras en edificios | 107,733 | 827 | - | 108,560 |
| Equipos | 93,633 | 1,387 | 252 | 94,768 |
| Total de otros activos de capital depreciados y amortizados | **201,366** | **2,214** | **252** | **203,328** |
| Menos depreciación y amortización acumulada para: | | | | |
| Edificios y mejoras en edificios | 67,210 | 2,365 | 96 | 69,479 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

| | Balance inicial (reformulado) | Aumentos | Reducciones | Balance final |
|---|---|---|---|---|
| Equipos | $      76,373 | 3,886 | 236 | 80,023 |
| Total de depreciación y amortización acumulada | 143,583 | 6,251 | 332 | 149,502 |
| Total de actividades de tipo comercial de otros activos de capital, netos de depreciación y amortización | 57,783 | (4,037) | (80) | 53,826 |
| Total de activos de capital de actividades de tipo comercial, neto | $      97,070 | (3,980) | (80) | 93,170 |

Los gastos de depreciación y amortización se cargaron a las funciones/programas del Gobierno Primario para el año finalizado el 30 de junio de 2016 de la siguiente manera (en miles):

| | |
|---|---|
| Actividades del gobierno: | |
| Gobierno General | $      104,637 |
| Seguridad pública | 31,745 |
| Salud | 9,641 |
| Vivienda pública y bienestar | 117,983 |
| Educación | 30,983 |
| Desarrollo económico | 16,694 |
| Total gastos de depreciación y amortización - actividades del gobierno | $      **311,683** |

El ELA realiza anualmente un análisis de deterioro de sus activos de capital de acuerdo con las disposiciones de la Declaración GASB Núm. 42. El análisis del año actual identificó aproximadamente $3.2 millones en deterioro, reconocidos por las Actividades del Gobierno en los estados de Actividades del Gobierno para el año terminado el 30 de junio de 2016.

Los activos de infraestructura general incluyen $427 millones que representan los costos de los activos transferidos al Departamento de Recursos Naturales y Ambientales (DNER) del ELA (al costo) en 1997 al finalizar la presa y el embalse de Cerrillos y los proyectos del río Portugués y el río Bucaná (Proyecto de represas y embalses de Cerrillos) por el Cuerpo de Ingenieros del Ejército de los Estados Unidos (EE. UU.). Estos activos de infraestructura se informan dentro de las actividades gubernamentales e incluyen presas, instalaciones de admisión y artículos similares construidos para el control de inundaciones, el suministro de agua y fines recreativos. La depreciación se calcula utilizando el método de línea recta durante una vida útil estimada de 50 años a partir de la fecha de transferencia de la propiedad. A fines de abril de 2011, el ELA recibió un acuerdo de deuda final del Cuerpo de Ingenieros del Ejército de los EE. UU. que estableció un cronograma de reembolso para su parte asignada de los costos de construcción asociados con el Proyecto de Presa y Embalse de Cerrillos, excluyendo aquellos costos para artículos construidos con fines recreativos, por un valor de $214 millones.

169

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El 21 de marzo de 2014, el acuerdo de deuda con el Cuerpo de Ingenieros del Ejército de EE. UU. se modificó para reducir la tasa de interés y el pago anual por el plazo restante de la deuda. (Ver la Nota 13(p)).

El 24 de febrero de 2012, la PRIFA, una unidad de componentes combinados, celebró un Acuerdo de Asistencia con el Departamento de Justicia de Puerto Rico (PRDOJ) y el BGF para adquirir, renovar y operar una propiedad que se utilizará para la reubicación de las oficinas principales de PRDOJ. En relación con el Acuerdo de Asistencia, el BGF proporcionó una línea de crédito de $35 millones a la PRIFA para la adquisición y administración de esta propiedad y administrar la fase inicial de la rehabilitación y restauración de la propiedad. El 8 de marzo de 2012, la PRIFA adquirió la propiedad por aproximadamente $27 millones. La reubicación de las oficinas principales del PRDOJ nunca se materializó, pero la PRIFA ha estado trabajando para asegurar gradualmente acuerdos de arrendamiento con otras entidades gubernamentales y terceros. La línea de crédito está asegurada por un gravamen hipotecario sobre la propiedad, y se paga a partir de las futuras asignaciones del ELA y de la asignación de contratos de arrendamiento actuales y futuros.

La PRIFA también ha emitido ciertos bonos y pagarés para financiar la construcción de ciertos proyectos de capital en beneficio de la AAA, los municipios y otras agencias y organismos del ELA. Los proyectos de capital incluyen la construcción de infraestructura y edificios para ser utilizados en las operaciones y ser administrados por la AAA, los municipios y otras agencias en sus respectivas operaciones. Los proyectos de capital, incluidos los terrenos adquiridos, se incluyen como parte de los activos de capital de la PRIFA hasta que se complete la construcción y se cumplan las condiciones para las transferencias a los beneficiarios finales. Durante el año finalizado el 30 de junio de 2016, la PRIFA incurrió en aproximadamente $4.7 millones en costos de construcción en beneficio de otros organismos del ELA.

En octubre de 2010, la PRIFA celebró un memorando de entendimiento con la PPPA, la AEP, el Departamento de Educación de Puerto Rico, el DTPW y el BGF para la administración de las Escuelas para el Programa del siglo XXI (el Programa del siglo XXI). La construcción en proceso al 30 de junio de 2016 incluye $39.2 millones relacionados con este programa. El programa consiste en la remodelación de más de 100 escuelas en todo Puerto Rico. Para financiar el programa, la AEP emitió bonos de ingresos gubernamentales por un monto de $878 millones durante el año fiscal que finalizó el 30 de junio de 2012, de los cuales $15.7 millones se depositan en fondos de construcción, dentro del fondo de proyecto de capital de la AEP, al 30 de junio de 2016.

*Unidades de Componentes de Presentación Discreta*

La actividad de los activos de capital de las unidades de componentes de presentación discreta para el año finalizado el 30 de junio de 2016 fue la siguiente (en miles):

|  | Saldo inicial | Aumentos | Reducciones | Saldo final |
|---|---|---|---|---|
| Unidades de componentes mayores: | | | | |
| Terrenos y otros activos no depreciables: | | | | |
| Terrenos | $  2,163,643 | 49,207 | 35 | 2,212,815 |
| Construcción en progreso | 1,718,190 | 464,813 | 892,547 | 1,290,456 |
| Total de activos de capital, no depreciados y amortizados | 3,881,833 | 514,020 | 892,582 | 3,503,271 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

| | Saldo inicial | Aumentos | Reducciones | Saldo final |
|---|---|---|---|---|
| Otros activos de capital depreciados/amortizados: | | | | |
| Edificios y mejoras en edificios | $ 1,570,164 | 54,622 | 26,805 | 1,597,981 |
| Equipos, muebles, accesorios, vehículos y software | 2,205,583 | 134,090 | 56,611 | 2,283,062 |
| Infraestructura | 40,431,311 | 721,233 | 160,348 | 40,992,196 |
| Intangibles, que no sean software | — | — | — | — |
| Total de otros activos de capital, depreciados y amortizados | 44,207,058 | 909,945 | 243,764 | 44,873,239 |
| Menos depreciación y amortización acumulada para: | | | | |
| Edificios y mejoras de edificios | 3,631,355 | 316,440 | 13,775 | 3,934,020 |
| Equipos, muebles, accesorios vehículos y software | 902,177 | 81,280 | 13,504 | 969,953 |
| Infraestructura | 17,321,638 | 905,808 | 80,367 | 18,147,079 |
| Total de depreciación y amortización acumulada | 21,855,170 | 1,303,528 | 107,646 | 23,051,052 |
| Total de otros activos de capital, neto de depreciación y amortización | 22,351,888 | (393,583) | 136,118 | 21,822,187 |
| Unidades de componentes no mayores | 3,361,739 | 71,487 | 87,756 | 3,345,470 |
| Activos de capital (neto) | $ 29,595,460 | 191,924 | 1,116,456 | 28,670,928 |

## (12) Obligaciones a corto plazo

Las obligaciones a corto plazo al 30 de junio de 2016 y los cambios para el año finalizado fueron los siguientes (en miles):

| | Saldo al 30 de junio de 2015 | Deuda emitida | Deuda pagada | Saldo al 30 de junio de 2016 | Adeudado dentro de un año |
|---|---|---|---|---|---|
| Actividades del gobierno: | | | | | |
| Pagarés adeudados al BGF | $ 1,700 | — | — | 1,700 | 1,700 |
| Pagarés por anticipación de ingresos por impuestos | 300,000 | 975,000 | (1,275,000) | — | — |
| | $ 301,700 | 975,000 | (1,275,000) | 1,700 | 1,700 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

### (a) *Pagarés adeudados al BGF*

El ELA ha celebrado una línea de crédito a corto plazo con el BGF (todo dentro de Actividades Gubernamentales) que consiste en lo siguiente al 30 de junio de 2016 (en miles):

| Agencia | Propósito | Tasa de interés | Línea de crédito | Saldo pendiente |
|---|---|---|---|---|
| Autoridad del Puerto de las Américas | Financiar los términos del acuerdo de decreto de consentimiento | 150 pb sobre PRIME con piso del 6% y techo del 12% | 1,700 | 1,700 |
| | | | $ 1,700 | 1,700 |

### (b) *Pagarés por anticipación de ingresos por impuestos*

La Ley Núm. 1 de la Legislatura del ELA, aprobada el 26 de junio de 1987 (Ley Núm. 1), autoriza al Secretario del Departamento de Hacienda a emitir pagarés a instituciones privadas y gubernamentales, en previsión de impuestos e ingresos (Pagarés por anticipación de ingresos fiscales o TRAN) como un medio alternativo de proporcionar liquidez para cubrir cualquier escasez temporal de efectivo proyectada para un año fiscal. La Ley Núm. 139, aprobada el 9 de noviembre de 2005, modificó la Sección 2(g) de la Ley Núm. 1 para establecer que el monto total principal de los pagarés emitidos según las disposiciones de la Ley Núm. 1 y pendientes en cualquier momento por cualquier año fiscal no puede exceder el menor de dieciocho por ciento (18%) de los ingresos netos del Fondo General para el año fiscal anterior al año fiscal en el que se emiten los pagarés notas o mil quinientos millones de dólares ($1,500 millones).

El 10 de octubre de 2014, el BGF celebró un Acuerdo de Compra de Pagarés, Crédito Recurrente y Préstamo a Plazo que prevé la emisión de un monto total de capital de hasta $900 millones de Bonos Senior Serie B de 2015 garantizados por el ELA (los Bonos del BGF). Las ganancias de los Bonos del BGF se utilizaron para otorgar un préstamo al ELA evidenciado por un monto total de capital de $900 millones de Pagarés en Anticipación de Contribuciones e Ingresos del Estado Libre Asociado de Puerto Rico, Serie B (2015) (los TRAN Serie B 2015). El BGF también compró un monto de capital agregado adicional de $300 millones de Pagarés en Anticipación de Contribuciones e Ingresos del ELA de Puerto Rico, Serie C (2015) (las TRAN Serie C de 2015 y, colectivamente con los TRAN de la Serie B de 2015, los TRAN de 2015). Por lo tanto, los TRAN 2015 emitidos durante el año fiscal 2015 ascendieron a $1,200 millones a tasas de interés que van desde la tasa preferencial más 625 puntos básicos (7,75% al 30 de junio de 2015) a 8.30%. Las ganancias de los TRAN se utilizaron para cubrir las deficiencias temporales de efectivo resultantes de las diferencias temporales entre la recaudación de impuestos y los pagos de los gastos corrientes. Los TRAN se refinanciaron durante el año para aprovechar las tasas de interés. El monto máximo de TRAN pendientes en cualquier momento durante el año fue de $1,500 millones. Al 30 de junio de 2016, no existía un saldo pendiente de TRAN. Los TRAN de la Serie C de 2015 se pagaron por completo durante julio de 2015.

Durante el año fiscal 2016, el ELA emitió los TRAN del BGF de 2016 por un importe total de $575 millones para obtener fondos y cumplir con ciertos requisitos de efectivo. Asimismo, y de conformidad con la Ley 102-2015, el ELA obtuvo fondos adicionales mediante la emisión de un TRANS "intragubernamental" con el SIFC, la AACA y el Fondo de Seguro por Discapacidad por el monto de $335 millones, $50 millones, y $15 millones, respectivamente. Las TRAN del BGF de 2016 y los TRANS "intragubernamentales" (colectivamente los TRAN de 2016) tenían una tasa de interés anual del 6%. Los TRAN de 2016 se pagaron por completo durante el año fiscal 2016.

172

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El 6 de septiembre de 2016, el ELA renovó las TRAN "intragubernamentales" para el año fiscal 2017, por un monto total de capital de $400 millones con SIFC, AACA y el Fondo de Seguro por Discapacidad, también a una tasa de interés del 6%. El 28 de abril de 2017, el ELA reconoció que no podría realizar los pagos de capital e intereses por los pagarés de TRAN en el momento de su vencimiento, y firmó un acuerdo de indulgencia con SIFC, AACA y el Fondo de Seguro por Discapacidad. El período de tolerancia finalizó el 30 de junio de 2018. El reembolso no se ha realizado y el período de tolerancia no se ha extendido.

**(13) Obligaciones a largo plazo**

*Gobierno primario*

Las obligaciones a largo plazo al 30 de junio de 2016 y los cambios para el año finalizado fueron los siguientes (en miles):

| | Saldo al 30 de junio de 2015 según reformulación | Deuda emitida | Deuda pagada | Otros aumentos | Otras (reducciones) | Saldo al 30 de junio de 2016 | Adeudado dentro de un año |
|---|---|---|---|---|---|---|---|
| Actividades del gobierno: | | | | | | | |
| Bonos de asignación del ELAS | 570,654 | — | — | — | (490) | 570,164 | 46,520 |
| Bonos de obligaciones e ingresos generales | 37,373,667 | — | (753,095) | 394,526 | (18,249) | 36,996,849 | 717,236 |
| Acuerdo de compra de bonos con el BGF | 233,270 | — | (7,736) | — | — | 225,534 | 7,839 |
| Pagarés adeudados a las unidades de componentes: BGF | 2,322,589 | 94,669 | (5,948) | — | — | 2,411,310 | 173,820 |
| Otros | 102,000 | — | — | — | — | 102,000 | — |
| Pagarés adeudados a la institución financiera | 28,517 | — | (4,753) | — | — | 23,764 | 4,753 |
| Arrendamientos de capital | 350,354 | 1,979 | (8,238) | — | — | 344,095 | 8,864 |
| Total de bonos, pagarés y arrendamientos de capital a pagar | 40,981,051 | 96,648 | (779,770) | 394,526 | (18,739) | 40,673,716 | 959,032 |
| Pasivos en virtud de obligaciones garantizadas | 337,257 | — | — | 23,482 | — | 360,739 | — |
| Ausencias compensadas | 1,341,809 | — | — | 582,571 | (585,159) | 1,339,221 | 635,654 |
| Pasivos de pensiones netos | 33,044,676 | — | — | 4,448,340 | (642,863) | 36,850,153 | 152,044 |
| Otra obligación de beneficios posteriores al empleo | 263,335 | — | — | 135,037 | (133,360) | 265,012 | — |
| Beneficios pagaderos por rescisión voluntaria | 735,774 | — | — | 28,611 | (81,635) | 682,750 | 74,220 |
| Otros pasivos a largo plazo | 1,639,295 | 78,361 | (198,811) | 901,744 | (5,775) | 2,414,814 | 267,576 |
| Total de actividades del gobierno | 78,343,197 | 175,009 | (978,581) | 6,514,311 | (1,467,531) | 82,586,405 | 2,088,526 |
| Actividades de Tipo Comercial: | | | | | | | |
| Pagarés adeudados al BGF | 484,796 | 1,763 | — | — | — | 486,559 | 62,000 |
| Ausencias compensadas | 19,614 | — | — | 11,884 | (8,910) | 22,588 | 11,866 |
| Pasivos de pensiones netos | 534,526 | — | — | 117,125 | — | 651,651 | — |
| Otra obligación de beneficios posteriores al empleo | 1,834 | — | — | — | — | 1,834 | — |
| Obligación de premios de lotería impagos | 221,494 | — | — | 559,628 | (608,961) | 172,161 | 70,847 |
| Beneficios de rescisión voluntaria | 9,525 | — | — | 132 | (709) | 8,948 | 1,382 |
| Pasivos por el seguro por desempleo, discapacidad y salud | 298,487 | — | — | 228,914 | (357,350) | 170,051 | 170,051 |
| Otros pasivos a largo plazo | 51,497 | — | — | 22,126 | (163) | 73,460 | 71,160 |
| Total de Actividades de Tipo Comercial: | 1,621,773 | 1,763 | — | 939,809 | (976,093) | 1,587,252 | 387,306 |
| Total del gobierno primario | $ 79,964,970 | 176,772 | 978,581 | 7,454,120 | (2,443,624) | 84,173,657 | 2,475,832 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El saldo del capital de la obligación general y los bonos de ingresos pagados se informan como gastos en el estado de ingresos, gastos y cambios en los saldos de los fondos (déficit); los fondos del gobierno no coinciden con los montos informados como deuda pagada en la tabla anterior. El saldo pagado incluye el capital pagado el 1 de julio de 2015 sobre obligaciones generales y bonos de ingresos por aproximadamente $510.9 millones, que se acumuló al 30 de junio de 2015 como un pasivo del fondo. Las GAAP de los EE. UU. permiten la acumulación de pasivos y gastos del servicio de la deuda si un gobierno ha proporcionado recursos financieros a un fondo de servicio de la deuda para el pago de pasivos que vencerán dentro de un mes en el siguiente año fiscal. Como resultado de los desafíos económicos y de liquidez que enfrentó el ELA durante el año fiscal 2016, el ELA tenía fondos disponibles limitados al 30 de junio de 2016 para el pago del servicio de la deuda que vence el 1 de julio de 2016. El ELA solo proporcionó recursos para el pago de intereses; en consecuencia, aproximadamente $37.5 millones relacionados con intereses se acumularon como pasivo del fondo al 30 de junio de 2016 y posteriormente se pagaron el 1 de julio de 2016 y no se acumuló ningún capital como pasivo del fondo al 30 de junio de 2016.

Consulte la Nota 13(e) y la Nota 14(a) para obtener información detallada sobre los pasivos de obligación garantizada. La otra disminución de $7.7 millones en el Acuerdo de Compra de Bonos con el BGF representa pagos del Gobierno Primario que reduce el saldo del capital de dichos bonos. El saldo restante de los otros aumentos (disminuciones) en bonos y pagarés consiste en la capitalización de intereses en bonos de apreciación de capital (aumentos) y la amortización de primas (disminuciones) y la acumulación de descuentos (aumentos) en bonos. Estos ajustes no requirieron ninguna fuente o uso de efectivo.

Los ajustes devengados para el año fiscal 2016 se realizaron para conciliar varias obligaciones con los nuevos saldos estimados al 30 de junio de 2016, y otras disminuciones resultantes de los pagos de estas obligaciones realizados durante el año fiscal. Estas obligaciones incluyen ausencias compensadas, pasivos por pensiones netos, otras obligaciones por beneficios posteriores al empleo, beneficios por rescisión voluntaria, otros pasivos a largo plazo, obligaciones por premios de lotería impagos y pasivos por reclamos por beneficios de seguros. Estos pagos, en relación con las actividades gubernamentales, se incluyen no como pagos del capital en el estado de ingresos, gastos y cambios en los saldos de los fondos (déficit) - fondos del gobierno, sino como gastos dentro de sus funciones correspondientes.

### (a) *Limitación de la deuda y arbitraje*

La Constitución del ELA autoriza la contratación de deudas según lo determine la Legislatura. Sin embargo, la Sección 2, Artículo VI de la Constitución del ELA establece que las obligaciones directas del ELA evidenciadas por bonos o pagarés y respaldadas por la plena fe, crédito y poder impositivo del ELA no deben emitirse si las cantidades del capital e intereses sobre dichos bonos y pagarés y sobre todos los bonos y pagarés emitidos a partir de entonces, pagaderos en cualquier año fiscal, junto con cualquier cantidad pagada por el ELA en el año fiscal anterior de dicha emisión propuesta a cuenta de bonos o pagarés garantizados por el ELA, exceda el 15% de los ingresos anuales promedio recaudados de conformidad con las disposiciones de la legislación del ELA y depositados en la Hacienda (en adelante, los ingresos internos) en los dos años fiscales anteriores al año fiscal de dicha emisión propuesta. La Sección 2, Artículo VI de la Constitución del ELA no limita el monto de la deuda que el ELA puede garantizar siempre que el ELA cumpla con esta limitación del 15% al momento de la emisión de dicha deuda garantizada. Durante el período finalizado el 30 de junio de 2016, el ELA no emitió obligaciones directas.

Los litigios sobre si ciertas emisiones de bonos del ELA y la AEP violaron la limitación constitucional de la deuda del ELA son constantes en el caso del Título III del ELA. Para obtener información adicional sobre el caso

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

del Título III del ELA, consulte la Nota 3. Para obtener información adicional sobre los litigios constantes relacionados con el caso del Título III del ELA, consulte la Nota 17.

Los bonos pagaderos del ELA están sujetos a las regulaciones de arbitraje emitidas por el Servicio de Ingresos Internos de los Estados Unidos de América, que requieren un reembolso al gobierno federal de las ganancias por inversiones excesivas sobre los ingresos de la deuda exenta de impuestos si el rendimiento de esas ganancias excede el rendimiento efectivo de la deuda exenta de impuestos relacionada emitida. Las ganancias excedentes deben reembolsarse cada cinco años o al vencimiento de la deuda, lo que ocurra primero. Los cálculos de arbitraje no generaron pasivos al 30 de junio de 2016.

*(b) Bonos a Pagar*

La Constitución del ELA establece que la deuda pública constituirá un primer reclamo sobre los ingresos disponibles del ELA. La deuda pública incluye bonos de obligación general y deuda garantizada por el ELA. La plena fe, crédito y poder impositivo del ELA se pignora irrevocablemente para el pago inmediato del capital y los intereses de los bonos de obligación general. El 6 de abril de 2016, el Gobernador promulgó la Ley de Moratoria. Para obtener información adicional sobre la Ley de Moratoria, consulte la Nota 3 y la Nota 23. Para obtener información adicional sobre las contingencias de litigios relacionados con la Ley de Moratoria, consulte la Nota 17. Los desarrollos en los casos del Título III, tal como se analiza en la Nota 3, han afectado la aplicación de la Ley de Moratoria y pueden afectar las prioridades que cualquier parte reclame con respecto a su derecho al reembolso de la deuda.

La Ley Núm. 83 de 30 de agosto de 1991, según enmienda, establece el gravamen de un impuesto especial anual del 1.03% del valor tasado de todos los bienes muebles e inmuebles no exentos de impuestos. El gravamen es aplicado por CRIM, una corporación municipal, no una unidad de componente del ELA. Se requiere que CRIM remita el 1.03% del impuesto a la propiedad recaudado por el ELA para el servicio de la deuda de los bonos de obligación general. Durante el año finalizado el 30 de junio 2016, los ingresos totales y las cuentas por cobrar informadas por el ELA ascendieron a aproximadamente $116.6 millones y $17.5 millones, respectivamente, que se incluyen en el fondo del servicio de la deuda.

Para fines de información financiera, el monto pendiente de los bonos representa el monto total del capital pendiente, más las primas no amortizadas y los intereses acumulados en los bonos de apreciación de capital, menos los descuentos no acumulados. Los bonos a pagar al 30 de junio de 2016, incluidos los intereses acumulados en bonos de apreciación de capital, fueron los siguientes (en miles):

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

| | Bonos de obligación general | Bonos de ingresos | Total |
|---|---|---|---|
| Bonos a plazo pagaderos hasta 2042; intereses pagaderos mensualmente o semestralmente a tasas que van del 3.00% al 8.00% | $ 8,258,803 | 8,189,470 | 16,448,273 |
| Bonos en serie pagaderos hasta 2042; intereses pagaderos mensualmente o semestralmente a tasas que van del 3.00% al 6.75% | 4,163,140 | 1,651,092 | 5,814,232 |
| Bonos de tasa fija pagaderos hasta 2057; intereses pagaderos a tasas que van del 3.38% al 6.50% | — | 5,530,046 | 5,530,046 |
| Bonos de apreciación de capital pagaderos hasta 2056; sin tasa de interés, el rendimiento va del 4.93% al 7.48%. (1) | 119,660 | 5,864,443 | 5,984,103 |
| Bonos de ingresos fiscales especiales pagaderos hasta 2045; intereses pagaderos o acumulados mensualmente y semestralmente a tasas que van del 4.00% al 8.25% | — | 1,872,026 | 1,872,026 |
| Bonos de Ingresos de Infraestructura de Salud Mental pagaderos hasta 2038; intereses a pagar semestralmente a tasas que van del 5.60% al 6.50% | — | 35,700 | 35,700 |
| Los bonos respaldados por activos del Acuerdo del Tabaco del Fondo Fiduciario de los Niños pagaderos hasta 2057; intereses pagaderos o acumulados semestralmente a tasas que van del 5.38% al 8.38% | — | 1,438,655 | 1,438,655 |
| Bonos del Programa del Fondo de Capital, con vencimiento en varias fechas pagaderas hasta 2025; intereses a pagar semestralmente que van del 2.00% al 5.00% | — | 129,347 | 129,347 |
| Bonos con tasa ajustable según LIBOR con vencimiento el 1 de agosto de 2057; intereses a pagar trimestralmente (1.36% el 30 de junio de 2016) | — | 136,000 | 136,000 |
| Total | 12,541,603 | 24,846,779 | 37,388,382 |
| Prima no amortizada | 78,705 | 182,773 | 261,478 |
| Descuento no amortizado | (268,023) | (150,850) | (418,873) |
| Subtotal de bonos a pagar | 12,352,285 | 24,878,702 | 37,230,987 |
| Eliminación de la entrada de bonos de COFINA emitidos a la PRIFA | — | (234,138) | (234,138) |

1 Los bonos de ingresos incluyen bonos de apreciación de capital de $969 millones convertibles en bonos de interés a tasa fija el 1 de agosto de 2031; 1 de agosto de 2032; y el 1 de agosto de 2033.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Al 30 de junio de 2016, los requisitos de servicio de la deuda para obligaciones generales y bonos de ingresos pendientes, incluidos los intereses acumulados de los bonos de apreciación de capital son los siguientes (en miles):

| Año finalizado el 30 de junio | Capital | Interés | Subsidio de Intereses (1) | Total |
|---|---|---|---|---|
| 2017 | $ 717,236 | 1,746,535 | 3,835 | 2,467,606 |
| 2018 | 560,770 | 1,716,926 | 3,835 | 2,281,531 |
| 2019 | 524,885 | 1,721,643 | 3,835 | 2,250,363 |
| 2020 | 603,500 | 1,703,204 | 3,835 | 2,310,539 |
| 2021 | 677,940 | 1,612,020 | 3,835 | 2,293,795 |
| 2022-2026 | 3,805,445 | 7,960,984 | 19,173 | 11,785,602 |
| 2027-2031 | 6,831,394 | 7,047,286 | 19,173 | 13,897,853 |
| 2032-2036 | 8,938,835 | 4,674,982 | 19,173 | 13,632,990 |
| 2037-2041 | 9,715,940 | 2,609,980 | 19,173 | 12,345,093 |
| 2042-2046 | 8,945,806 | 633,075 | 4,793 | 9,583,674 |
| 2047-2051 | 6,603,296 | 316,882 | — | 6,920,178 |
| 2052-2056 | 5,090,170 | 313,365 | — | 5,403,535 |
| 2057-2061 | 10,913,849 | 86,516 | — | 11,000,365 |
| Total | 63.929.066 | 32,143,398 | 100,660 | 96,173,124 |
| Menos interés no acumulado | (26,540,684) | | | |
| Más primas no amortizadas | 261,478 | | | |
| Menos descuento no amortizado | (418,873) | | | |
| Subtotal | 37,230,987 | | | |
| Eliminación de bonos de COFINA emitidos a la PRIFA | (234,138) | | | |
| Total | $ 36,996,849 | | | |

El cronograma anterior se presentó de acuerdo con los términos originales de los bonos por pagar y no refleja los efectos, si los hay, que puedan resultar de los procedimientos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda. En consecuencia, los efectos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda pueden afectar los importes en libros, las tasas de interés y los términos de reembolso. Consulte la Nota 3 y la Nota 23 para obtener información adicional.

(1) Los Bonos de Impuesto sobre Ventas, Primera Serie Subordinada 2010D y 2010E se emitieron como Bonos Build America. COFINA recibirá un pago de subsidio del gobierno federal equivalente al 35% y al 45%, respectivamente, del monto de cada pago de intereses. El 24 de junio de 2013, el IRS envió un aviso de que el 8.7% del pago del subsidio en los Bonos Build America será confiscado debido a ajustes del presupuesto del gobierno federal.

El 16 de marzo de 2015, la PRIFA emitió $245.9 millones en pagarés en anticipación de bonos (divulgadas como Bonos de Ingresos Fiscales Especiales) pagaderos por el aumento en el impuesto a los productos derivados del petróleo aplicado por la Ley Núm. 1 de 2015 (los BAN PRIFA), cuyo producto fue usado para refinanciar pagarés en anticipación de bonos de la ACT pendientes y gastos relacionados con los pagos. Originalmente, se

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

esperaba que los BAN PRIFA fueran refinanciados mediante una emisión de bonos a largo plazo por parte de la PRIFA. Sin embargo, esta transacción propuesta fue descartada. Los BAN PRIFA tenían una fecha de vencimiento del 1 de mayo de 2017 (que no se cumplió), con una tasa de interés del 8.25% pagadera mensualmente el primer día hábil de cada mes, a partir del 1 de abril de 2015. Los ingresos mencionados que apoyan el pago de los BAN PRIFA podrían aplicarse para pagar la deuda de obligación general del ELA si sus recursos disponibles no son suficientes para cubrir todas las asignaciones aprobadas. Los BAN PRIFA están garantizados por la buena fe, el crédito y el poder impositivo del ELA (ver la Nota 14(a)). El 24 de junio de 2016, el Gobernador firmó una orden ejecutiva, EO 2016 027, que suspendió todas las obligaciones de transferir dinero a la PRIFA con el fin de realizar los pagos de BAN PRIFA.

La tabla siguiente presenta los pagos del servicio de la deuda de Actividades del Gobierno de ciertos bonos de tasa variable de ingresos y los pagos netos de los instrumentos derivados de cobertura asociados (ver Nota 21) al 30 de junio de 2016 (todos relacionados con COFINA). Aunque las tasas de interés sobre la deuda a tasa variable y las tasas de referencia actuales de los instrumentos derivados de cobertura cambian con el tiempo, los cálculos incluidos en la tabla siguiente se basan en el supuesto de que la tasa variable y las tasas de referencia actuales de los instrumentos derivados de cobertura al 30 de junio, 2016 se mantendrán constante.

| | Bonos de tasa variable | | Instrumentos derivados de cobertura, neto | Total |
|---|---|---|---|---|
| | Capital | Intereses | | |
| | | (En miles) | | |
| Año que termina el 30 de junio: | | | | |
| 2017 | $    — | 1,845 | 4,846 | 6,691 |
| 2018 | — | 1,845 | 4,846 | 6,691 |
| 2019 | — | 1,845 | 4,846 | 6,691 |
| 2020 | — | 1,845 | 4,846 | 6,691 |
| 2021 | — | 1,845 | 4,846 | 6,691 |
| 2022-2026 | — | 9,224 | 24,232 | 33,456 |
| 2027-2031 | — | 9,224 | 24,232 | 33,456 |
| 2032-2036 | — | 9,224 | 24,232 | 33,456 |
| 2037-2041 | — | 9,224 | 24,232 | 33,456 |
| 2042-2046 | — | 9,224 | 24,232 | 33,456 |
| 2047-2051 | — | 9,224 | 24,232 | 33,456 |
| 2052-2056 | — | 9,225 | 24,232 | 33,457 |
| 2057-2058 | 136,000 | 2,002 | 5,247 | 143,249 |
| Total | $   136,000 | 75,796 | 199,101 | 410,897 |

El cronograma anterior se presentó de acuerdo con los términos originales de los bonos por pagar y no refleja los efectos, si los hay, que puedan resultar de los procedimientos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda. En consecuencia, los efectos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda pueden afectar los importes en libros, las tasas de

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

interés y los términos de reembolso. Consulte la Nota 3 y la Nota 23 para obtener información adicional.

Los bonos en circulación de COFINA antes de la consumación de su plan de ajustes del Título III se pagaban de las cantidades depositadas en el Fondo Dedicado del Impuesto sobre Ventas en cada año fiscal. El monto mínimo que se depositará fue el Monto base del impuesto pignorado a las ventas, que para el año fiscal que finalizó el 30 de junio de 2016 fue de aproximadamente $696.3 millones. El monto base del impuesto pignorado a las ventas aumenta cada año fiscal a partir de entonces a una tasa legal del 4% hasta $1,850 millones.

Al 30 de junio de 2016, el Monto base del impuesto pignorado a las ventas, por año, era el siguiente (en miles):

|  | Monto |
|---|---|
| Año que termina el 30 de junio: | |
| 2017 | $ 724,110 |
| 2018 | 753,074 |
| 2019 | 783,197 |
| 2020 | 814,525 |
| 2021 | 847,106 |
| 2022-2026 | 4,771,728 |
| 2027-2031 | 5,805,537 |
| 2032-2036 | 7,063,323 |
| 2037-2041 | 8,587,499 |
| 2042-2046 | 9,250,000 |
| 2047-2051 | 9,250,000 |
| 2052-2056 | 9,250,000 |
| 2057-2058 | 3,700,000 |
| Total | $ 61,600,099 |

El cronograma anterior se presentó de acuerdo con los términos originales de los bonos por pagar y no refleja los efectos, si los hay, que puedan resultar de los procedimientos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda. En consecuencia, los efectos del Título III de PROMESA o de cualquier otro procedimiento de reestructuración de la deuda pueden afectar el cálculo de la Base del impuesto pignorado a las ventas. Consulte la Nota 3 y la Nota 23 para obtener información adicional.

*(c)* *Acuerdo de Asociación con el Departamento de Vivienda del ELA*

Vivienda Modernization 1, LLC (la LLC) es una compañía de responsabilidad limitada creada según las leyes del ELA cuyo único miembro es Vivienda Modernization Holdings 1, S.E. (la Asociación), una sociedad civil creada según las leyes del ELA y de conformidad con un Acuerdo de Asociación relacionado. La Asociación se creó el 1 de agosto de 2008 con el Departamento de Vivienda del ELA (DOH del ELA), como socio general (el Socio General) y Hudson SLP XL LLC, una compañía de responsabilidad limitada de Delaware (el Socio Limitado Especial) y Hudson Housing Tax Credit Fund XL LP, una sociedad limitada de Delaware (la Sociedad de Inversión); como socios limitados (colectivamente, los socios limitados). La asociación se creó para adquirir,

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

desarrollar, rehabilitar, poseer, mantener y operar treinta y tres desarrollos residenciales de viviendas de alquiler destinados a inquilinos de ingresos bajos y moderados. Las ganancias, pérdidas y créditos fiscales se asignan de acuerdo con el Acuerdo de Asociación. Las ganancias y pérdidas de las operaciones y los créditos impositivos para viviendas de bajos ingresos en cualquier año deben asignarse 99.98% a la Asociación de Inversión, 0.01% al Socio Limitado Especial y 0.01% al Socio General. Como se define en el Acuerdo de Asociación, ciertas transacciones y sucesos justifican asignaciones especiales de ganancias y pérdidas. Todas las demás pérdidas deben asignarse en la medida permitida por la Sección 704(b) del Código de Ingresos Internos de los EE. UU.

De conformidad con el Acuerdo de Asociación, los Socios Limitados deben proporcionar contribuciones de capital por un total de aproximadamente $235 millones a la Asociación (el Patrimonio Inicial Proyectado), sujeto a ajustes basados en la cantidad de créditos de vivienda de bajos ingresos finalmente asignados a los desarrollos, además de otros sucesos potenciales como se explica con mayor detalle en el Acuerdo de Asociación. Al 30 de junio de 2016, los Socios Limitados han proporcionado contribuciones de capital por un total de aproximadamente $126.6 millones.

De conformidad con el Acuerdo de Asociación, el Socio General debe proporcionar contribuciones de capital por un total de aproximadamente $10 millones a la Asociación. En caso de que la Asociación no tenga suficientes fondos disponibles para pagar el saldo pendiente de la tarifa del desarrollador de la misma, según se define, el Socio General debe proporcionar contribuciones de capital adicionales a la Sociedad por un monto suficiente para que la Sociedad pague dicho saldo en su totalidad. El Socio General no debe tener derecho u obligación de hacer ninguna otra contribución de capital. Al 30 de junio de 2016, el Socio General no había proporcionado contribuciones de capital. Además, el DOH del ELA como Socio General debe establecer el Fondo de Reserva de Garantía al cierre inicial por el monto de la contribución de capital inicial menos aproximadamente $4 millones (más cualquier contribución de capital inicial con respecto a los complejos de apartamentos). Los montos en el Fondo de Reserva de Garantía deben ser utilizados, (i) a solicitud del Socio General, sujeto al consentimiento del Socio Limitado Especial o (ii) según las instrucciones del Socio Limitado Especial, para cumplir con las obligaciones financieras del General Socio, aparte de los costos de desarrollo excesivos, según lo dispuesto en el Acuerdo de Asociación. Al 30 de junio de 2016, dicha reserva se mantuvo en la Asociación.

El 7 de agosto de 2008, la LLC celebró un Acuerdo Maestro de Desarrolladores con el DOH del ELA para realizar servicios en relación con el desarrollo, rehabilitación y modernización de ciertos proyectos de vivienda (el Acuerdo Maestro de Desarrolladores). De conformidad con el Acuerdo Maestro de Desarrolladores, el DOH del ELA recibirá una tarifa de desarrollador por un monto de aproximadamente $75.1 millones por dichos servicios. El pago de la tarifa del desarrollador debe estar sujeto a los términos y condiciones de la Sección 6(a)(iv) del Acuerdo Maestro de Desarrolladores. Al 30 de junio de 2016, se registraron aproximadamente $73.7 millones en otras cuentas por cobrar en el Fondo General relacionadas con el Acuerdo Maestro de Desarrollo (incluyendo aproximadamente $16.6 millones relacionados con el Fondo de Reserva de Garantía).

Además, el 7 de agosto de 2008, la LLC y el DOH del ELA celebraron un Acuerdo de Compra y Venta por el que la LLC adquirió los derechos de superficie de una propiedad (la Propiedad) y la mejora erigida en dicha propiedad que consiste en edificios y construcción en progreso con un valor nominal neto y un costo de aproximadamente $45.9 millones y $110 millones, respectivamente, del DOH del ELA. Esta compra está sujeta a ciertas escrituras de la Constitución de Derechos de Superficie y Transferencia de Mejoras con fecha del 7 de agosto de 2008, que requieren que la LLC rehabilite o construya en la Propiedad cuatro mil ciento treinta y dos (4,132) unidades residenciales de alquiler (las Unidades o colectivamente el Desarrollo), que recibirán el beneficio de un subsidio operativo y créditos fiscales para viviendas de bajos ingresos según la Sección 42 del Código de Ingresos Internos de los Estados Unidos de 1986, según enmienda. Ochenta y cuatro (84) de las

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

unidades, que ubicarán en el sitio Brisas de Cayey II, serán de nueva construcción. Las unidades restantes serán modernizadas.

Además, el 7 de agosto de 2008, el DOE del ELA celebró un acuerdo de préstamo con la LLC por un monto de aproximadamente $102.9 millones para la adquisición de las 33 propiedades de alquiler residencial (el pagaré de precio de compra diferido). La LLC debe realizar pagos equivalentes al monto de las contribuciones netas de capital disponibles, según lo definido, para el trimestre calendario anterior.

Los siguientes son los términos del pagaré de precio de compra diferido: compromiso $102,889,957; tasa de interés 3.55%; y fecha de vencimiento posterior a (i) el financiamiento de la última cuota de la contribución de capital o (ii) 7 de agosto de 2013. El pagaré debe ser un pasivo de recurso total de la LLC; sin embargo, ninguno de los miembros de la LLC tiene pasivos personales. Al 30 de junio de 2016, el saldo de capital pendiente en el pagaré de precio de compra diferido fue de aproximadamente $8.8 millones y el interés acumulado fue de aproximadamente $1.6 millones, y ambos montos se registraron dentro de la entrada diferida de recursos-aranceles de desarrolladores en el Fondo General.

PHA ha celebrado un Acuerdo Interagencial con fecha del 7 de agosto de 2008, con el DOH del ELA, según la capacidad del DOH del ELA de socio general de la Asociación, para delegar las tareas administrativas y operativas relacionadas con el Desarrollo a PHA según lo establecido en el Acuerdo Interagencial. La LLC y la PHA también tienen la intención de que las unidades se desarrollen, operen y administren para asegurar que la LLC reciba los beneficios económicos y fiscales antes mencionados en toda la extensión disponible para la LLC.

*(d)* *Bonos de asignación del ELA*

A lo largo de los años, el BGF, como agente fiscal y banco del ELA, había extendido líneas de crédito, anticipos y préstamos a varias agencias y unidades componentes del ELA para financiar sus proyectos de mejora de capital y cubrir sus déficits operativos en el tiempo. En diferentes momentos, estos préstamos se reembolsaron mediante la emisión de bonos de asignación del ELA emitidos por la Corporación de Finanzas Públicas de Puerto Rico (PFC), una unidad de componentes combinados del BGF, que sirve solo como un conducto para la emisión de los bonos. El ELA ha reconocido un efecto espejo de estos reembolsos de PFC a lo largo de los años en su propia deuda en proporción a la parte de los pagarés del ELA incluidos en dichos reembolsos de PFC. Además, durante los últimos años, COFINA, a través de la emisión de bonos, se ha utilizado para pagar otros préstamos y bonos de asignación existentes. COFINA es una unidad de componentes combinados del ELA creada en 2007 con la capacidad de emitir bonos para pagar o reembolsar anticipos del BGF, los bonos de asignación mencionados anteriormente y otras obligaciones de deuda, colectivamente denominadas deuda constitucional adicional. No hubo nuevas actividades de bonos de asignación del ELA durante el año fiscal 2016, aparte de la amortización anual de las primas correspondientes y sus entradas y salidas diferidas de recursos relacionadas en forma de ganancias y pérdidas por reembolso diferido.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Al 30 de junio de 2016, el saldo pendiente de los bonos de asignación del ELA pertenecientes al Gobierno Primario (es decir, excluyendo el saldo perteneciente a unidades de componentes de presentación discreta), consistía en las siguientes obligaciones (en miles):

|  |  |  |
|---|---|---|
| Ley Núm. 164 que reestructura la Autoridad de Transporte Marítimo de Puerto Rico | $ | 438,470 |
| (PRMSA) | | 131,694 |
| Total de bonos de asignación del ELA | $ | 570,164 |

**Ley Núm. 164 Reestructuración:** el 17 de diciembre de 2001, se aprobó la Ley Núm. 164, que autorizó a ciertas agencias gubernamentales y unidades de componentes de presentación discreta a reembolsar aproximadamente $2,400 millones de sus obligaciones pendientes con el BGF, para las que no existía una fuente de reembolso, durante un período que no exceda la 30 años, y que se reembolsen con asignaciones anuales del ELA que no excedan $225 millones Este reembolso se ejecutó originalmente con bonos de asignación del ELA a través de varias series de bonos emitidos por PFC durante el período comprendido entre diciembre de 2001 y junio de 2002.

Posteriormente, se realizaron reembolsos adicionales (actuales y anticipados) o reembolsos de la reestructuración de la Ley Núm. 164 a través de emisiones de bonos PFC y COFINA.

Aproximadamente $438 millones de los bonos de asignación del ELA vigentes al 30 de junio de 2016 pertenecen al Gobierno Primario en virtud de la Ley Núm. 164, que consiste en el Departamento de Salud del ELA (financiamiento de la reforma de salud y otros costos), el Departamento de Hacienda del ELA (originalmente el déficit financiero del año fiscal 2001 y la obligación asumida por gravámenes fiscales defectuosos), y el atribuido a PRIFA, una unidad de componentes combinados del ELA. El saldo pendiente de los bonos de asignación del ELA relacionados con la Ley Núm. 164 devenga intereses a tasas que van del 3.10% al 6.50%. Los requisitos del servicio de la deuda, sujetos a asignaciones legislativas, en años futuros fueron los siguientes (en miles):

|  |  | **Capital** | **Intereses** | **Total** |
|---|---|---|---|---|
| Año que termina el 30 de junio: | | | | |
| 2017 | $ | 46,520 | 42,827 | 89,347 |
| 2018 | | 21,554 | 20,254 | 41,808 |
| 2019 | | 22,361 | 19,374 | 41,735 |
| 2020 | | 23,257 | 18,421 | 41,678 |
| 2021 | | 24,219 | 17,382 | 41,601 |
| 2022-2026 | | 82,634 | 73,142 | 155,776 |
| 2027-2031 | | 215,689 | 31,620 | 247,309 |
| Total | | 436,234 | 223,020 | 659,254 |
| Más prima no amortizada | | 2,236 | | |
| Total | $ | **438,470** | | |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El cronograma anterior se presentó de acuerdo con los términos originales de los bonos por pagar y no refleja los efectos, si los hay, que puedan resultar de los procedimientos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda. En consecuencia, los efectos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda pueden afectar los importes en libros, las tasas de interés y los términos de reembolso. Consulte la Nota 3 y la Nota 23 para obtener información adicional.

**Autoridad de Transporte Marítimo de Puerto Rico (PRMSA):** el ELA asumió un pagaré pagadero por PRMSA al BGF en relación con la venta de las operaciones marítimas de PRMSA. Los bonos de asignación del ELA, Serie B 2003 y Serie B 2004 se emitieron para reembolsar este pasivo, que se reembolsó más recientemente en junio de 2012 con la emisión de bonos PFC Serie A de 2012. El saldo de los bonos devenga intereses a una tasa variable que varía de 3.10% a 5.35%. Los requisitos del servicio de la deuda en años futuros fueron los siguientes (en miles):

|  | Capital | Interés | Total |
|---|---|---|---|
| Año que termina el 30 de junio: |  |  |  |
| 2017 | $            — | 6,837 | 6,837 |
| 2018 | — | 6,837 | 6,837 |
| 2019 | — | 6,837 | 6,837 |
| 2020 | — | 6,837 | 6,837 |
| 2021 | — | 6,837 | 6,837 |
| 2022-2026 | 62,514 | 27,852 | 90,366 |
| 2027-2031 | 20,870 | 13,100 | 33,970 |
| 2032-2036 | 48,310 | 431 | 48,741 |
| Total | $    131,694 | 75,568 | 207,262 |

El cronograma anterior se presentó de acuerdo con los términos originales de los bonos por pagar y no refleja los efectos, si los hay, que puedan resultar de los procedimientos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda. En consecuencia, los efectos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda pueden afectar los importes en libros, las tasas de interés y los términos de reembolso. Consulte la Nota 3 y la Nota 23 para obtener información adicional.

*(e)* *Acuerdo de compra de bonos con el BGF*

En varios momentos durante los años fiscales que terminaron en 2005 y 2006, la PAA, una unidad de componentes combinados del ELA, celebró acuerdos de compra de bonos con el BGF, por lo que el BGF acordó desembolsar el PAA de cada cierto tiempo, el capital de los bonos avanza hasta un monto total máximo de capital de $70 millones (Bono de la Serie A de la Autoridad del Puerto de las Américas 2005), $40 millones (Bono de la Serie B de la Autoridad del Puerto de las Américas 2005) y $140 millones (Bono de la Autoridad del Puerto de las Américas Serie C de 2005). Estos bonos están garantizados por el ELA mediante la Ley Núm. 409 del 22 de septiembre de 2004 (Ley Núm. 409), que autorizó la emisión de estos acuerdos de financiamiento y el ELA los consideró como un pasivo bajo obligación de garantía. El ELA había pagado el servicio de la deuda de estos bonos bajo su garantía de conformidad con la Ley Núm. 409. Para obtener información adicional, consulte la Nota 14(a).

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Las ganancias de los bonos se utilizaron para financiar el costo de desarrollo y construcción de las instalaciones de PAA. Estos bonos, con un vencimiento original de enero de 2015, se refinanciaron el 31 de diciembre de 2014 en un solo bono por un período de 30 años, con el primer pago de capital e intereses que comenzará el 1 de agosto de 2015, con tasas de interés basadas en las tasas asumidas por la obligación general del ELA. Estas tasas deben revisarse trimestralmente, siempre que el interés nunca sea inferior al 7% ni superior al 12%. El capital y los intereses del bono refinanciado continúan cubiertos por la garantía del ELA. Tras el refinanciamiento mencionado anteriormente en el saldo pendiente de $224.8 millones, los intereses devengados hasta la fecha del refinanciamiento por un monto aproximado de $8.8 millones se capitalizaron en el saldo del capital y luego en circulación por un monto refinanciado de aproximadamente $233.3 millones. El saldo pendiente al 30 de junio de 2016 es de $225.5 millones. La siguiente tabla representa los pagos futuros del servicio de la deuda sobre el monto refinanciado. Aunque las tasas de interés en el refinanciamiento cambian con el tiempo, los cálculos incluidos en la tabla a continuación se basan en el supuesto de que la tasa variable en ese momento y en la fecha de refinanciamiento (7.18%) permanecerá igual durante el resto del plazo.

|  | | Capital | Intereses | Total |
|---|---|---|---|---|
| Año que termina el 30 de junio: | | | | |
| 2017 | $ | 7,839 | 16,216 | 24,055 |
| 2018 | | 7,788 | 15,656 | 23,444 |
| 2019 | | 7,788 | 15,097 | 22,885 |
| 2020 | | 7,788 | 14,538 | 22,326 |
| 2021-2025 | | 38,938 | 64,303 | 103,241 |
| 2026-2030 | | 38,938 | 50,324 | 89,262 |
| 2031-2035 | | 38,938 | 36,435 | 75,373 |
| 2036-2040 | | 38,938 | 22,366 | 61,304 |
| 2041-2045 | | 38,579 | 8,387 | 46,966 |
| Total | $ | 225,534 | 243,322 | 468,856 |

La deuda de PAA puede pagarse de cualquiera de las siguientes formas: (i) una emisión de bonos a largo plazo, una vez que se completen los proyectos o (ii) asignaciones legislativas, según lo establecido por la Ley Núm. 409, que cumple el acuerdo mencionado anteriormente. Durante el año anterior, se registró un pasivo bajo obligación garantizada tras la adopción de la Declaración GASB Núm. 70, *Informes Contables y Financieros para Garantías Financieras No Cotizadas en Bolsa*, con respecto a esta garantía de la obligación de bonos del PAA dado que el ELA ha pagado el servicio de la deuda sobre estos bonos según las disposiciones de la Ley Núm. 409. Tales pasivos se midieron según el valor presente descontado de la mejor estimación de las salidas futuras que se espera incurrir como resultado de la garantía. Durante 2015, la PAA se convirtió en una unidad de componentes combinados del Gobierno Primario y, como consecuencia del cambio en la entidad de informe, el ELA anuló el reconocimiento del pasivo bajo obligación garantizada previamente registrado. Si PAA deja de ser una unidad de componentes combinados del ELA, el ELA puede registrar pasivos bajo obligación de garantía relacionada con las obligaciones garantizadas de la PAA.

La Ley Núm. 409, según enmienda, no indica si hay arreglos establecidos para recuperar cualquier pago potencial del BGF por pagos de garantía realizados; sin embargo, no existe intención del ELA de solicitar una recuperación de posibles pagos.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*(f)* *Reembolso Anticipado, Defensa y Reembolso de Bonos del ELA*

En años anteriores, el ELA anuló ciertas obligaciones generales y otros bonos al colocar las ganancias de los bonos en un fideicomiso irrevocable para proporcionar todos los pagos futuros del servicio de la deuda de los bonos reembolsados. En consecuencia, los activos y pasivos de la cuenta fiduciaria para los bonos anulados no se incluyen en los estados financieros básicos. Al 30 de junio de 2016, aproximadamente $306.5 millones en bonos pendientes de reembolso anticipado de años anteriores se consideran anulados.

AEP, una unidad de componentes combinados, ha diferido ciertos bonos de ingresos en años anteriores al colocar los ingresos de los nuevos bonos en un fideicomiso irrevocable para proporcionar todos los pagos futuros del servicio de la deuda de las antiguas deudas. En consecuencia, los activos y pasivos de las cuentas fiduciarias para los bonos anulados no se incluyen en el estado de resultados netos. Al 30 de junio de 2016, aproximadamente $660.0 millones de bonos de AEP se consideran anulados.

Durante años anteriores, COFINA, una unidad de componentes combinados, emitió ciertos bonos de reembolso, cuyo producto se colocó en un fideicomiso irrevocable para proporcionar todos los servicios de la deuda futuros de los bonos reembolsados de COFINA de la serie 2009A y 2009B. El saldo pendiente de los bonos reembolsados por adelantado era de aproximadamente $48.3 millones al 30 de junio de 2016.

*(g)* **Pagarés pagaderos al BGF, otras unidades de componentes e institución financiera**

El ELA financió ciertos pasivos a largo plazo a través del BGF y otras unidades de componentes, tanto en actividades del gobierno como de tipo comercial.  El saldo pendiente al 30 de junio de 2016 sobre el financiamiento previsto por el BGF y otras unidades de componentes presentadas dentro de los pagarés en el estado de resultados netos -Actividades del Gobierno, comprende lo siguiente (en miles):

| | | |
|---|---|--:|
| Pagarés adeudados al BGF: | | |
| Departamento de Hacienda | $ | 884,872 |
| Fondo Perpetuo de Comunidades Especiales | | 345,841 |
| Oficina de Administración y Presupuesto | | 265,471 |
| Autoridad de Edificios Públicos | | 182,160 |
| Departamento de Educación | | 106,308 |
| Departamento de Transporte y Obras Públicas | | 82,870 |
| Departamento de Corrección y Salud Mental | | 82,489 |
| UPRCCC | | 120.482 |
| Departamento de Agricultura | | 65,225 |
| Junta de Calidad Ambiental | | 2,225 |
| Departamento de Justicia | | 49,846 |
| Departamento de Salud | | 44,158 |
| Autoridad para el Financiamiento de la Infraestructura de Puerto Rico | | 49,337 |
| Departamento de Policía | | 31,679 |
| Departamento de Vivienda | | 18,657 |
| Oficina del Superintendente del Capitolio | | 27,489 |
| Oficina de Administración de los Tribunales de Puerto Rico | | 34,033 |
| Departamento de Recreación y Deportes | | 18,168 |
| | | $ 2,411,310 |
| | | |
| Pagarés adeudados a las unidades de componentes: | | |
| Corporación del Fondo del Seguro del Estado | | 100,000 |
| Administración de Compensación por Accidentes de Automóviles | | 2,000 |
| | | $ 102,000 |
| | | |
| Pagarés adeudados a la institución financiera | | $ 23,764 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*Pagarés adeudados al BGF*

(i)   *Actividades del Gobierno*

El ELA ha celebrado la siguiente línea de acuerdos de crédito con el BGF (todos dentro de Actividades del Gobierno) que vencen y se registran como un pasivo del fondo en el Fondo General al 30 de junio de 2016 (en miles):

| Agencia | Propósito | Tasa de interés | Vencimiento original | Línea de crédito | Saldo Pendiente |
|---|---|---|---|---|---|
| Departamento de Hacienda | Pagar la deuda de varias agencias centrales del gobierno | 125 bp sobre tres meses LIBOR | 9/30/2012 | $   100,000 | 75,342 |
| Departamento de Hacienda | Cubrir necesidades operativas del | 125 bp sobre tres meses LIBOR | 9/30/2013 - | | |
| Departamento de Hacienda | Fondos de desastres catastróficos | | 9/30/2015 | 79,930 | 42,543 |
| | Financiar el proyecto de tecnología de la información | 125 bp sobre la tasa comercial del BGF | 6/30/2008 | 14,782 | 13,601 |
| Departamento de Hacienda | Compra de máquinas móviles de rayos X | 125 bp sobre tres meses LIBOR | 6/30/2008 | 12,000 | 2,456 |
| Oficina del Defensor de Veteranos | Financiar mejoras a las instalaciones para veteranos | 6% | 3/31/2015 | 7,500 | 292 |
| | | | | $   214,212 | 134,234 |

Al 30 de junio de 2016, el Departamento de Hacienda del ELA había celebrado varias líneas de acuerdos de crédito con el BGF por aproximadamente $2,800 millones para diferentes propósitos, con tasas de interés fijas y variables, y varias fechas de vencimiento como se resume a continuación (en miles):

| Propósito | Tasa de interés | Vencimiento | Líneas de crédito | Saldo pendiente |
|---|---|---|---|---|
| Financiar la nómina y los gastos operativos del ELA del año fiscal 2006. Pagar juicios contra el ELA y asignar | 7.00% | 30 de junio de 2040 | $   741,000 | 164,515 |
| $15.3 millones a la Administración de Desarrollo del trabajo para gastos operativos | 6.00% | 30 de junio de 2018 | 160,000 | 145,270 |
| Recursos para cumplir con las asignaciones créditos en el presupuesto anual del ELA (año fiscal 2004) y gastos de programas federales | 125 bp sobre 3meses LIBOR 150 bp sobre tasa de documentos comerciales del BGF | 30 de junio de 2040 | 640,000 | 111,205 |
| Financiar mejoras de capital proyectos de agencias y municipalidades | | 30 de junio de 2019 | 130,000 | 83,548 |
| Financiar mejoras de capital de varias agencias del gobierno | 7.00% | 30 de junio de 2040 | 105,000 | 68,834 |
| Financiar parcialmente los depósitos mensuales de capital e intereses requeridos para el servicio de la deuda de 2013 de bonos generales de obligaciones e ingresos | 150 bp sobre PRIME, pero no menos del 6% | 30 de junio de 2042 | 384,496 | 63,135 |
| Financiar los depósitos mensuales de capital e intereses requeridos para el pago de la deuda de 2014 de los bonos de obligaciones generales e ingresos | 6.00% | 30 de junio de 2043 | 319,645 | 50,419 |
| Financiar ciertos proyectos de mejora de capital | 150 bp sobre PRIME, pero no menos del 6% | 30 de junio de 2043 | 100,000 | 34,789 |
| Financiar ciertos proyectos de mejora de capital | 150 bp sobre PRIME, pero no menos del 6% | 30 de junio de 2041 | 215,000 | 21,095 |
| Adquisición del Centro Correccional de Salinas | 125 bp sobre 3 meses LIBOR | 30 de junio de 2040 | 15,000 | 7,141 |

186

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

| Propósito | Tasa de interés | Vencimiento | Líneas de crédito | Saldo pendiente |
|---|---|---|---|---|
| Pagar las facturas presentadas al Departamento de Hacienda en relación con la Ley Núm. 171 "Ley de Manejo de Neumáticos" | 6.00% | 30 de junio de 2019 | $ 22,100 | 687 |
| Total | | | $ 2,832,241 | 750,638 |

El 21 de noviembre de 2002, la Resolución Núm. 1028 de la Legislatura autorizó al BGF a proporcionar una línea de crédito por $500 millones al Fideicomiso Perpetuo de Comunidades Especiales para la construcción y rehabilitación de viviendas, construcción y mejoras de sistemas eléctricos, de agua y alcantarillado; reparación y mejoras de calles y aceras; construcción y mejora de instalaciones recreativas, y para desarrollar iniciativas de autosuficiencia económica para los residentes de un grupo seleccionado de comunidades desplazadas y económicamente desfavorecidas, todo incluido en el Programa de Comunidades Especiales iniciado con la creación del SCPT por la Ley Núm. 271 del 21 de noviembre de 2002. Esta línea de crédito no recurrente, originalmente por un plazo de diez años, se extendió el 30 de junio de 2012 hasta la fecha de vencimiento del 30 de junio de 2040. A partir de octubre de 2009, la tasa de interés en esta línea se estableció en 7%. Los pagos anuales en la línea se determinan utilizando una tabla de amortización de 30 años basada en el saldo de capital e intereses al 31 de diciembre de cada año, y se aplica una multa de interés del 4% por pagos atrasados. La Resolución Legislativa Núm. 1762 del 18 de septiembre de 2004 estableció que el capital más los intereses devengados de esta línea se pagarían con las asignaciones legislativas del ELA según lo establecido por la OGP del ELA. El saldo pendiente de esta línea al 30 de junio de 2016 ascendió a aproximadamente $345.8 millones.

El 23 de mayo de 2012, la OGP del ELA celebró un acuerdo de línea de crédito de $100 millones (modificado durante el año fiscal 2016 a un máximo de $178 millones) con el BGF para cubrir los costos de la implementación de la tercera fase de la Ley Núm. 70 de 2010. Los préstamos según esta línea de crédito devengan intereses a tasa preferencial más 1.50% con un piso de 6%. La línea de crédito modificada vence el 31 de julio de 2037. Al 30 de junio de 2016, aproximadamente $115.5 millones estaban pendientes. El 5 de junio de 2006, la OGP del ELA celebró un acuerdo de línea de crédito de $150 millones con el BGF para proporcionar asistencia económica en caso de desastres y emergencias. Los préstamos en virtud de este acuerdo de línea de crédito devengan intereses a tasas variables basadas en 125 puntos básicos durante la tasa LIBOR a tres meses y se pagan al vencimiento original de la línea de crédito el 30 de septiembre de 2011. El 22 de julio de 2011, la OGP y el BGF modificaron el acuerdo de línea de crédito de $150 millones para extender su fecha de vencimiento al 30 de julio de 2022. Además, el acuerdo se convirtió en una línea de crédito recurrente con intereses a 150 puntos básicos sobre la tasa preferencial, pero en ningún caso dicha tasa puede ser inferior al 6% anual. Al 30 de junio de 2016, aproximadamente $150 millones estaban pendientes. Ambas líneas de crédito pendientes se pagan de las asignaciones legislativas del ELA.

El 18 de agosto de 2010, el BGF proporcionó a la AEP una línea de crédito no recurrente por un monto máximo de capital de aproximadamente $93.6 millones con una tasa de interés anual fluctuante igual a Prime más 1.50%, siempre que dicho interés no pueda ser inferior al 6% u otra tasa determinada por el BGF. Los ingresos de la instalación se utilizaron para el desarrollo de proyectos de construcción. La línea vence el 30 de junio de 2044 y se paga con el producto de la futura emisión de bonos de reembolso de ingresos de AEP. Al 30 de junio de 2016, aproximadamente $51.0 millones estaban pendientes. La AEP también mantiene un acuerdo de línea de crédito

187

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

de $75 millones con el BGF para el pago de gastos operativos. Los préstamos según esta línea de crédito generan intereses a una tasa fija del 7% y son pagaderos al vencimiento el 30 de junio de 2018. Al 30 de junio de 2016, aproximadamente $64.7 millones estaban pendientes. Además, el 2 de mayo de 2008, AEP ejecutó dos Acuerdos de Préstamo con el BGF para el financiamiento provisional de su Programa de Mejora de Capital por un monto que no exceda aproximadamente $226 millones, con intereses del 6%. Los préstamos y los intereses devengados vencen el 30 de junio de 2044 y se pagarán con el producto de la futura emisión de bonos de reembolso de ingresos de AEP. Los préstamos se dividen en aproximadamente $209 millones exentos de impuestos y aproximadamente $6.9 millones sujetos a impuestos. Al 30 de junio de 2016, aproximadamente $66.4 millones seguían pendientes.

El 6 de febrero de 2003, el Departamento de Educación del ELA celebró un acuerdo de línea de crédito de $25 millones con el BGF para la compra de equipos y mejoras escolares. Los préstamos en virtud de este acuerdo de línea de crédito devengan intereses a tasas variables basadas en 125 puntos básicos durante la tasa LIBOR a tres meses y se pagan al vencimiento de la línea de crédito el 30 de junio de 2018. Al 30 de junio de 2016, aproximadamente $4.6 millones estaban pendientes. El 4 de agosto de 2002, el Departamento de Educación del ELA celebró un acuerdo de línea de crédito adicional de $140 millones con el BGF para reembolsar al Departamento de Hacienda del ELA los pagos realizados en su nombre por los fondos estatales utilizados para financiar los gastos del programa federal. Los préstamos en virtud de este acuerdo de línea de crédito devengan intereses a tasas variables basadas en 125 puntos básicos durante la tasa LIBOR a tres meses y se pagan al vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2016, aproximadamente $101.7 millones estaban pendientes, que se pagan con las futuras asignaciones legislativas del ELA.

El Departamento de Transporte y Obras Públicas del ELA celebró cinco acuerdos de línea de crédito con el BGF por un monto de $104 millones para mejoras y mantenimiento de carreteras alrededor de la isla. Los préstamos bajo estas líneas de crédito devengan intereses a una tasa del 7% y se pagan al vencimiento de la línea de crédito el 30 de junio de 2018. Al 30 de junio de 2016, había aproximadamente $82.9 millones pendientes, pagaderos con las asignaciones legislativas del ELA. El 12 de mayo de 2004, la Administración de Corrección del ELA celebró un acuerdo de línea de crédito de $60 millones con el BGF para mejorar ciertas instalaciones correccionales. Los préstamos bajo este acuerdo de línea de crédito devengan intereses a una tasa fija del 7% y se pagan al vencimiento de la línea de crédito el 30 de junio de 2018. Al 30 de junio de 2016, había aproximadamente $18.1 millones pendientes, pagaderos con las asignaciones legislativas del ELA. Además, el 24 de noviembre de 2010, la Administración de Corrección del ELA celebró un acuerdo de línea de crédito de $80 millones con el BGF para la construcción de un nuevo centro médico correccional. Los préstamos en virtud de este acuerdo de línea de crédito devengan intereses a una tasa anual igual a la tasa preferencial, más 150 puntos básicos, pero en ningún caso dicha tasa puede ser inferior al 6% anual ni superior al 12% anual y se pagaron originalmente en el vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2016, había aproximadamente $64.4 millones pendientes, pagaderos con las asignaciones legislativas del ELA.

El 22 de agosto de 2007, UPRCCC celebró un acuerdo de línea de crédito no renovable de $18 millones con el BGF para construir las oficinas administrativas y las instalaciones de investigación de UPRCCC. El 29 de mayo de 2008, se modificó el acuerdo, principalmente para aumentar el monto máximo del préstamo a $75 millones, para extender la fecha de vencimiento hasta el 31 de octubre de 2021 y para financiar la construcción del hospital y las instalaciones de radioterapia. El saldo se pagará con futuras asignaciones legislativas anuales del ELA que comenzarán en el año fiscal 2015. La línea no recurrente genera intereses a una tasa fija del 6%. Al 30 de junio de 2016, aproximadamente $31.9 millones estaban pendientes. El 18 de noviembre de 2013, la UPRCCC celebró otra línea de crédito no recurrente con el BGF por hasta un monto de capital agregado que no excederá

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

$196 millones, para la construcción y el desarrollo de un hospital de noventa y seis camas, una clínica ambulatoria multidisciplinaria, un centro de diagnóstico por imágenes y una unidad de infusión de oncología médica en un terreno de UPRCCC ubicado en San Juan. La línea de crédito, que incluye intereses a una tasa fija de 6.5%, se paga en 28 cuotas anuales consecutivas de futuras asignaciones legislativas del ELA, a partir del último día hábil de diciembre de 2016. Al 30 de junio de 2016, aproximadamente $88.5 millones estaban pendientes.

El 9 de agosto de 1999, el Departamento de Agricultura del ELA celebró un acuerdo de línea de crédito no recurrente $125 millones con el BGF para proporcionar asistencia económica al sector agrícola, que sufrió daños severos causados por el huracán Georges en 1998. Al 24 de febrero de 2004, la línea de crédito aumentó en $50 millones, lo que resultó en un monto total de $175 millones. Los préstamos según este acuerdo de línea de crédito devengan intereses a una tasa fija del 7% y son pagaderos al vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2016, había aproximadamente $65.2 millones pendientes, pagaderos con las asignaciones legislativas del ELA.

El 2 de octubre de 2002, el Departamento de Justicia del ELA celebró un acuerdo de línea de crédito de $90 millones con el BGF para financiar 12 proyectos de mejora pública para el Municipio de Ponce de conformidad con una orden judicial. Los préstamos bajo este acuerdo de línea de crédito devengan intereses a una tasa variable y se pagan al vencimiento de la línea de crédito el 30 de junio de 2018. El 8 de agosto de 2005, el Departamento de Justicia del ELA celebró un acuerdo modificado para aumentar la línea de crédito antes mencionada de $90 millones a $110 millones para cubrir varios proyectos adicionales en Ponce, de conformidad con la misma orden judicial. Los préstamos según el nuevo acuerdo de línea de crédito modificado generan intereses a una tasa del 7% y son pagaderos al vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2016, el saldo agregado pendiente bajo este acuerdo de línea de crédito enmendado ascendió a $49.8 millones, que se paga con las asignaciones legislativas del ELA.

El 18 de febrero de 2005, la PRIFA celebró un acuerdo de crédito de $40 millones con el BGF para la construcción de un auditorio para el Centro de Bellas Artes Luis A. Ferré. Los préstamos según este acuerdo de línea de crédito devengan intereses a una tasa fija del 7% y son pagaderos al vencimiento del acuerdo de crédito el 30 de junio de 2040. Los pagos de capital e intereses se pagan con las asignaciones legislativas del ELA. Al 30 de junio de 2016, aproximadamente $4.8 millones relacionados con este acuerdo de crédito estaban pendientes. El 1 de junio de 2009, PRIFA celebró un acuerdo de línea de crédito recurrente adicional con el BGF para proporcionar financiamiento para los costos incurridos por la PRIFA según ciertos Programas de la Ley de Recuperación y Reinversión de América (los programas ARRA). Los préstamos según esta línea de crédito generan intereses a tasas variables basadas en 150 puntos básicos sobre la tasa preferencial y son pagaderos al vencimiento de la línea de crédito el 31 de enero de 2016. Esta línea se está pagando con las asignaciones legislativas del ELA. Al 30 de junio de 2016, el saldo pendiente de este acuerdo de línea de crédito ascendía a aproximadamente $7.1 millones El 8 de marzo de 2012, la PRIFA también celebró un acuerdo de línea de crédito de $35 millones con el BGF para la adquisición, remodelación y mantenimiento de ciertas propiedades inmobiliarias que en su mayoría están ocupadas por varias agencias gubernamentales. Esta línea de crédito está garantizada por un gravamen hipotecario sobre la propiedad y se paga con futuras asignaciones del ELA. Esta línea de crédito vence el 30 de junio de 2017 y devenga intereses a 150 puntos básicos sobre la tasa preferencial, con una tasa de interés mínima del 6%. Al 30 de junio de 2016, el saldo pendiente de este acuerdo de línea de crédito ascendía a aproximadamente $37.4 millones.

En agosto de 2003, el Departamento de Salud del ELA celebró un acuerdo de línea de crédito de $30 millones con el BGF para pagar ciertas deudas pendientes que PRMeSA tenía con otras agencias y proveedores.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Los préstamos según este acuerdo de línea de crédito devengan intereses a una tasa fija del 7% y son pagaderos al vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2016, aproximadamente $21.3 millones relacionados con esta línea de crédito estaban pendientes. El 8 de noviembre de 2004, el Departamento de Salud celebró un acuerdo adicional de línea de crédito de $58.5 millones con el BGF para el financiamiento de un proyecto del Departamento de Salud y PRMeSA. Los préstamos bajo esta línea de crédito generan intereses a tasas variables basadas en 150 puntos básicos sobre la tasa de documentos comerciales del BGF y son pagaderos al vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2016, el saldo pendiente de este acuerdo de línea de crédito ascendía a aproximadamente $19.6 millones, que se paga con las asignaciones legislativas del ELA. El 14 de febrero de 2008, el Departamento de Salud también celebró un acuerdo de línea de crédito adicional de $8 millones con el BGF para cubrir los costos de tratamiento, diagnóstico y gastos complementarios durante el año fiscal 2008 de conformidad con la Ley Núm. 150 de 1996. Los préstamos en virtud de este acuerdo de línea de crédito devengan intereses a tasas variables basadas en 125 puntos básicos durante la tasa LIBOR a tres meses y se pagan al vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2016, el saldo pendiente de este acuerdo de línea de crédito ascendía a aproximadamente
$3.3 millones, que se paga con las asignaciones legislativas del ELA.

El 29 de julio de 2004, el Departamento de Policía del ELA celebró un acuerdo de línea de crédito de $45 millones con el BGF para la adquisición de vehículos y equipos de alta tecnología. Los préstamos en virtud de este acuerdo de línea de crédito devengan intereses basados en el costo de interés total incluido de los Bonos de mediano plazo, Serie B, más un margen de beneficio del 1.25%, y se pagan al vencimiento de la línea de crédito el 30 de junio de 2040. El saldo pendiente de este acuerdo de línea de crédito ascendía a aproximadamente $ 31.7 millones al 30 de junio de 2016, pagaderos con las asignaciones legislativas del ELA.

El 15 de febrero de 2002, la Oficina del Superintendente del Capitolio firmó un acuerdo de línea de crédito de $35 millones con el BGF para la construcción del estacionamiento de la Oficina del Superintendente del Capitolio. Los préstamos según este acuerdo de línea de crédito devengan intereses a una tasa fija del 7% y son pagaderos al vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2016, quedaban pendientes aproximadamente $15.5 millones del acuerdo de línea de crédito, que se paga con las asignaciones legislativas del ELA. El 9 de febrero de 2012, la Oficina del Superintendente del Capitolio celebró un acuerdo adicional de línea de crédito de $15 millones con el BGF para mejoras permanentes de los edificios existentes. Los préstamos en virtud de este acuerdo de línea de crédito devengan intereses a 150 puntos básicos sobre la tasa preferencial y no pueden ser inferiores al 6% ni superiores al 12% anual y son pagaderos al vencimiento de la línea de crédito el 30 de junio de 2018. Al 30 de junio de 2016, había aproximadamente $6.5 millones pendientes, pagaderos con las asignaciones legislativas del ELA. El 17 de diciembre de 2014, la Oficina del Superintendente del Capitolio celebró otro acuerdo de línea de crédito de $15 millones con el BGF para mejoras permanentes en el Distrito del Capitolio. Los préstamos según este acuerdo de línea de crédito devengan intereses a una tasa fija del 5.8% y son pagaderos al vencimiento de la línea de crédito el 30 de junio de 2024. Al 30 de junio de 2016, aproximadamente $5.5 millones estaban pendientes.

El 8 de marzo de 2007, el DOE del ELA celebró un acuerdo de línea de crédito de $19 millones con el BGF, para reembolsar a la Autoridad de Financiamiento de la Vivienda de Puerto Rico, una unidad de componentes combinados del BGF, por ciertos avances realizados para un proyecto de revitalización. Los préstamos según este acuerdo de línea de crédito devengan intereses a una tasa variable LIBOR a tres meses más 1.25%, sin exceder el 5%, y son pagaderos al vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2016, la línea de crédito tiene un saldo pendiente de aproximadamente $5.2 millones, que se paga con el producto de la venta de propiedades. El 3 de diciembre de 2007, el DOH del ELA celebró un acuerdo de línea de crédito adicional de

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

$30 millones con el BGF por la compra del edificio Juan C. Cordero Dávila. Los préstamos en virtud de este acuerdo de línea de crédito devengan intereses basados en 75 puntos básicos durante la tasa LIBOR a tres meses y se pagan al vencimiento de la línea de crédito el 28 de febrero de 2038. Al 30 de junio de 2016, aproximadamente $13.4 millones relacionados con este acuerdo de línea de crédito estaban pendientes de pago, que se pagarán con los ingresos por alquileres futuros.

El 18 de enero de 2005, el Departamento de Recreación y Deportes del ELA (DRS) celebró un acuerdo de línea de crédito de $17.2 millones con el BGF para el desarrollo de una serie de proyectos recreativos en diferentes municipios. Los préstamos bajo esta línea de crédito generan intereses basados en 150 puntos básicos sobre la tasa de documentos comerciales del BGF y son pagaderos al vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2016, aproximadamente $0.5 millones estaban pendientes. Además, el 9 de febrero de 2004, el DRS celebró un acuerdo de línea de crédito de $16 millones con el BGF para el desarrollo y mejora de instalaciones recreativas. Los préstamos en virtud de este acuerdo de línea de crédito devengan intereses sobre el monto del principal impago de cada anticipo a una tasa fija del 7% y se pagan al vencimiento de la línea de crédito el 30 de junio de 2018. Al 30 de junio de 2016, había aproximadamente $0.6 millones pendientes, pagaderos con las asignaciones legislativas del ELA. Se suscribió un acuerdo de línea de crédito adicional entre el BGF y el DRS por un monto máximo de capital de $13.028 millones con intereses sobre el monto de capital impago de cada adelanto a una tasa fija del 7% y se paga al vencimiento de la línea de crédito en 30 de junio de 2040.  Los ingresos de la línea de crédito se utilizaron para el desarrollo y la mejora de las instalaciones recreativas. Al 30 de junio de 2016, había aproximadamente $8.2 millones pendientes, pagaderos con las asignaciones legislativas del ELA. El 23 de julio de 2014, se aprobó la Ley Núm. 107, que crea el Programa de Parques Nacionales del ELA (NPP), que, entre otras disposiciones, fusionó NPCPR, luego una unidad componente presentada discretamente, en un programa dentro del DRS, NPCPR luego cesó de existir como una entidad legal separada. Con esta transacción, el programa generó tres acuerdos de línea de crédito separados entre el BGF y el DRS. El 17 de agosto de 2007, NPP ingresó en una línea de crédito de $10 millones para financiar un programa de retiro anticipado en respuesta a la Ley Núm. 70 del 30 de junio de 2007. Los préstamos bajo esta línea de crédito generan intereses basados en una tasa fija del 7%, y el principal y los intereses se pagan el 31 de octubre de cada año hasta el 31 de diciembre de 2018. La fuente del reembolso proviene de los ingresos recaudados por NPP durante los primeros cuatro meses del año y posteriormente hasta 2018. Al 30 de junio de 2016, aproximadamente $3.2 millones estaban pendientes. El 6 de febrero de 2003, NPP ingresó una línea de crédito de $9.3 millones para financiar las mejoras de ciertos parques, instalaciones costeras y edificios de NPP. Los préstamos según esta línea de crédito generan intereses basados en una tasa variable (7% al 30 de junio de 2016). El capital y los intereses se pagan anualmente hasta el 30 de junio de 2040 y la fuente del reembolso proviene de las asignaciones legislativas.  Al 30 de junio de 2016, aproximadamente $1.1 millones estaban pendientes. Durante 2003, NPP suscribió una línea de crédito de $12 millones para financiar la adquisición de un terreno. Los préstamos según esta línea de crédito generan intereses basados en una tasa variable (7% al 30 de junio de 2016). El capital y los intereses se pagan anualmente hasta el 30 de junio de 2040 y la fuente del reembolso proviene de las asignaciones legislativas futuras del ELA. Al 30 de junio de 2016, aproximadamente $4.5 millones estaban pendientes.

El 27 de febrero de 2014, la Oficina celebró un acuerdo de línea de crédito adicional de $50 millones con el BGF para el desarrollo de varios proyectos prioritarios de conformidad con su plan estratégico y para financiar compromisos operativos adicionales. Los préstamos en virtud de este acuerdo de línea de crédito devengan intereses a 150 puntos básicos sobre la tasa preferencial y no pueden ser inferiores al 6% ni superiores al 12% anual y son pagaderos al vencimiento de la línea de crédito el 31 de julio de 2027. Al 30 de junio de 2016, había aproximadamente $34 millones pendientes, pagaderos con los impuestos de aranceles aduaneros futuros.

191

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El 18 de septiembre de 2003, el EQB celebró un acuerdo de línea de crédito de $11 millones con el BGF para los requisitos de igualación de fondos federales relacionados con el Fondo Recurrente de Agua Limpia del Estado. Los préstamos según este acuerdo de línea de crédito devengan intereses a una tasa variable de 150 puntos básicos sobre la tasa preferencial calculada trimestralmente con un piso del 6% y se pagan anualmente hasta el 31 de marzo de 2017. Si hay algún monto de capital impago después de la fecha de vencimiento, la tasa de interés aumentará un 200% de la tasa de interés aplicable en dicha fecha. Los intereses pagaderos se devengarán diariamente. Al 30 de junio de 2016, aproximadamente quedaban pendientes $2.2 millones del acuerdo de línea de crédito, que se paga con las asignaciones legislativas del ELA.

*Pagarés adeudados a las unidades de componentes*

La Ley Núm. 80 de 2015 fue aprobada con el objetivo de abordar las deficiencias de flujo de efectivo proyectadas por el ELA para el año fiscal 2015. Esta Ley, entre otras disposiciones, autorizó específicamente a SIFC, PRTC, AACA, EDB, PRIDCO y al Departamento de Desarrollo Económico y Comercio para otorgar préstamos o contribuciones especiales al Departamento de Hacienda, por un monto total de $125 millones. El 5 y 9 de junio de 2015, SIFC y AACA otorgaron préstamos al Departamento de Hacienda en virtud de las disposiciones de esta Ley por un monto de $100 millones y $2 millones, respectivamente, que se paga con las asignaciones legislativas del ELA. Estos préstamos devengan intereses a una tasa del 1%, y el principal y los intereses se pagarán anualmente, a partir del 31 de julio de 2017. El préstamo otorgado por ACAA vence el 31 de julio de 2022 y el otorgado por SIFC vence el 31 de julio de 2032.

*Pagarés adeudados a instituciones financieras*

El 26 de diciembre de 2013, la Administración de Servicios Generales (GSA) celebró un acuerdo de línea de crédito no recurrente de $33.3 millones con una institución financiera para la compra de cuatro helicópteros para ser utilizados por el Departamento de Policía de Puerto Rico, a través de un contrato de arrendamiento entre ambas agencias del gobierno. Dicho contrato de arrendamiento se ha asignado como la fuente de pago de la línea de crédito, que a su vez se sostendrá con futuras asignaciones legislativas del ELA en los montos necesarios para cubrir el servicio de la deuda requerido de la línea de crédito. Esta obligación se paga en siete cuotas iguales, anuales y consecutivas que comienzan el 15 de julio de 2014, más intereses pagaderos el 15 de julio y el 15 de enero de cada año a partir del 15 de julio de 2014, a una tasa de interés basada en el costo de los fondos de la institución financiera, tal como se define, más 0.25 puntos básicos. La tasa de interés al 30 de junio de 2016 fue del 3.0204%. La buena fe, el crédito y el poder impositivo del ELA están irrevocablemente pignorados para el pronto pago del capital e intereses sobre esta obligación. Al 30 de junio de 2016, aproximadamente $23.8 millones estaban pendientes. Los requisitos del servicio de la deuda en años futuros fueron los siguientes (en miles):

|  | Capital | Interés | Total |
|---|---|---|---|
| Año que termina el 30 de junio: |  |  |  |
| 2017 | 4,753 | 656 | 5,409 |
| 2018 | 4,753 | 509 | 5,262 |
| 2019 | 4,753 | 363 | 5,116 |
| 2020 | 4,753 | 218 | 4,971 |
| 2021 | 4,752 | 73 | 4,825 |
| Exclusivos | $ 23,764 | 1,819 | 25,583 |

192

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*(ii)*   Actividades de tipo comercial (en miles):

| | | |
|---|---|---:|
| Administración de Servicios Médicos de Puerto Rico | | |
| | $ | 282,445 |
| Administración del Seguro de Salud de Puerto Rico | | 183,251 |
| Autoridad de Puertos de Ponce | | 20,863 |
| Pagarés adeudados al BGF | $ | 486,559 |

El 14 de octubre de 2010, la Legislatura aprobó un nuevo artículo 9A de la Ley Núm. 66 de 22 de junio de 1978, mediante el cual autorizó a PRMeSA, una unidad de componentes combinados como un fondo de empresa del ELA, a incurrir en una obligación de hasta $285 millones para depositar en una cuenta especial del BGF y para asignar al pago de deudas a proveedores, agencias y un fondo de reserva para el seguro propio de PRMeSA, y para proporcionar liquidez operativa para aliviar la situación fiscal de PRMeSA. El BGF fue nombrado agente fiscal para administrar y supervisar el uso de estos fondos. Se requiere que el ELA cumpla con el pago de esta obligación con futuras asignaciones legislativas que se realizarán cada año hasta el año fiscal 2023-2024. Los préstamos según esta línea de crédito generan intereses a tasas variables basadas en 150 puntos básicos sobre la tasa preferencial. No se hicieron asignaciones legislativas en 2015 y 2016 para cubrir el primer pago principal programado de aproximadamente $31.5 millones. Al 30 de junio de 2016, aproximadamente $282.4 millones estaban pendientes.

El 14 de marzo de 2011, la PRHIA, una unidad de componentes combinados, celebró un acuerdo de crédito con el BGF para pagar sus obligaciones a las aseguradoras de atención médica contraídas antes del año fiscal 2010. El monto del capital agregado de la línea de crédito no renovable fue de $186 millones. Esta línea se paga en nueve pagos de $20.7 millones cada uno con vencimiento el 14 de marzo de los años 2015 a 2023, a través de futuras asignaciones legislativas anuales del ELA. Los intereses se devengan a una tasa de interés anual fluctuante igual al mayor de 150 puntos básicos sobre la tasa preferencial y 6%.  No se realizaron asignaciones legislativas en 2015 y 2016 para cubrir los pagos de capital programados para el 14 de marzo de 2015 y 2016. Al 30 de junio de 2016, el saldo del capital pendiente era de aproximadamente $183.3 millones

El 29 de agosto de 2014, la PPA celebró un acuerdo de línea de crédito de $60 millones con el BGF para cubrir los costos operativos, de mantenimiento, adquisición de equipos y mejoras permanentes de los Puertos de las Américas Rafael Cordero Santiago, de conformidad con las disposiciones de la Ley Núm. 240 de 2011, que creó la PPA (los activos son propiedad de PAA al 30 de junio de 2016). Los préstamos según esta línea de acuerdo de crédito devengan intereses basados en las tasas asumidas por la obligación general del ELA. Estas tasas deben revisarse trimestralmente, siempre que el interés no sea inferior al 7% ni superior al 12%. El interés durante el año fiscal 2016 fue de 7.78%. La línea de crédito tiene un vencimiento al 30 de junio de 2044, y su capital e intereses se pagan mediante asignaciones legislativas anuales. Al 30 de junio de 2016, el saldo de capital pendiente era aproximadamente $ 20.9 millones, que se paga con las futuras asignaciones legislativas del ELA.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*(h) Obligaciones según acuerdos de arrendamiento de capital*

El ELA tiene obligaciones en virtud de arrendamientos de capital con terceros que vencen hasta 2044 para terrenos, edificios y equipos.

El valor presente de los pagos futuros de arrendamiento de capital mínimo al 30 de junio de 2016 informados en el estado de resultados netas adjunto a nivel gubernamental fue el siguiente (en miles):

| Año que termina el 30 de junio: | | |
|---|---|---:|
| 2017 | $ | 35,994 |
| 2018 | | 34,972 |
| 2019 | | 33,894 |
| 2020 | | 33,782 |
| 2021 | | 33,410 |
| 2022-2026 | | 166,669 |
| 2027-2031 | | 162,816 |
| 2032-2036 | | 118,375 |
| 2037-2041 | | 88,048 |
| 2042-2046 | | 42,558 |
| Total de pagos mínimos de arrendamiento futuros | | 750,518 |
| Menos cantidad que representa los costos por intereses | | (406,423) |
| Valor presente de los pagos mínimos de arrendamiento | $ | 344,095 |

Los terrenos, edificios y equipos arrendados según el arrendamiento de capital incluidos en los activos de capital al 30 de junio de 2016 incluyen lo siguiente (en miles):

| | | |
|---|---|---:|
| Terrenos | $ | 7,960 |
| Edificios | | 438,784 |
| Equipos | | 3,674 |
| Subtotal | | 450,418 |
| Menos amortización acumulada | | (90,994) |
| Total | $ | 359,424 |

La amortización aplicable a los arrendamientos de capital e incluida dentro del gasto de depreciación de los activos de capital ascendió a aproximadamente $12.8 millones en 2016.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

**(i) *Pasivos netos de pensiones***

El monto informado como pasivo de pensión neto en los estados financieros de todo el gobierno de aproximadamente $37,500 millones de los cuales aproximadamente $152 millones se vencen dentro de un año al 30 de junio de 2016, representa la parte proporcional del Gobierno Primario en el cálculo del SRE del pasivo de pensión neto medido como el pasivo de pensión total menos el monto de los resultados netos fiduciarios del SRE, más la suma de la medida completa de SRM y SRJ de su pasivo de pensión total menos el monto de sus resultados netos fiduciarios correspondientes (ver Nota 18).

**(j) *Otra obligación de beneficios posteriores al empleo***

El monto informado como otra obligación de beneficios posteriores al empleo en las Actividades del Gobierno y Actividades de Tipo Comercial de aproximadamente $265 millones y $1.8 millones, respectivamente, al 30 de junio de 2016 representa el monto acumulado adeudado por el ELA por los años actuariales requeridos no financiados otras contribuciones de beneficios posteriores al empleo al SRE MIPC, SRJ MIPC y SRM MIPC (ver Nota 19) en el caso de Actividades del Gobierno, y a otros planes posteriores a empleo en el caso de Actividades de Tipo Comercial.

**(k) *Ausencias Compensadas***

Los pasivos a largo plazo incluyen aproximadamente $1.3 mil millones y $22.6 millones de ausencias compensadas acumuladas registradas como Actividades del gobierno y de Tipo Comercial, respectivamente, al 30 de junio de 2016.

**(l) *Obligación por premios no pagados de lotería***

El monto informado como premios no pagados de lotería representa los premios de lotería pagaderos de la Lotería de Puerto Rico (comúnmente conocida como Lotería Tradicional) y el Sistema de Lotería Adicional (comúnmente conocido como Lotto) conjuntamente conocidos como las Loterías al 30 de junio de 2016. Los pagos anuales mínimos relacionados con los premios impagos de ambas loterías fueron los siguientes (en miles):

|  |  | **Capital** | **Interés** | **Total** |
|---|---|---|---|---|
| Año que termina el 30 de junio: | | | | |
| 2017 | $ | 70,847 | 10,135 | 80,982 |
| 2018 | | 15,239 | 9,734 | 24,973 |
| 2019 | | 13,063 | 8,982 | 22,045 |
| 2020 | | 11,363 | 8,364 | 19,727 |
| 2021 | | 9,725 | 7,512 | 17,237 |
| 2022-2026 | | 33,299 | 27,699 | 60,998 |
| 2027-2031 | | 15,243 | 11,032 | 26,275 |
| 2032-2036 | | 3,382 | 2,518 | 5,900 |
| Total | $ | 172,161 | 85,976 | 258,137 |

Los pagos mínimos anuales relacionados con los premios impagos de Lotto incluyen un pasivo por premios no reclamados (no caducados) de aproximadamente $6.1 millones al 30 de junio de 2016, que se informa como premios pagaderos-porción actual.

195

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Los pasivos por los premios no pagados de lotería se informan en las Actividades de Tipo Comercial del estado de resultados netos adjunto y el estado de resultados netos de los fondos de propiedad exclusiva.

### (m) *Beneficios pagaderos por rescisión voluntaria*

El 2 de julio de 2010, el ELA promulgó la Ley Núm. 70 para establecer un programa que proporcione beneficios de retiro anticipado o incentivos económicos para la rescisión del empleo a los empleados elegibles, según se define. La Ley Núm. 70 se aplica a las agencias y unidades de componentes cuyos presupuestos están financiados total o parcialmente por el Fondo General.

La Ley Núm. 70 estableció que los beneficios de retiro anticipado (programa de retiro anticipado) se proporcionarán a los empleados elegibles que hayan completado entre 15 y 29 años de servicios acreditados en el Sistema de Retiro y que consistirán en beneficios quincenales que van del 37.5% al 50% del salario de cada empleado, según su definición. De conformidad con la Ley Núm. 70, el ELA, como empleador, continuará haciendo las contribuciones correspondientes del patrono al Sistema de Retiro, así como también cubrirá los pagos de anualidades a los empleados que opten por el retiro anticipado, hasta los años de servicio y los requisitos de edad para se habría producido una adquisición total, en cuyo momento el Sistema de Retiro aplicable continuará haciendo los pagos de la anualidad.

Los incentivos económicos están disponibles para los empleados elegibles que tienen menos de 15 años de servicio acreditado en el Sistema de Retiro (programa de renuncia incentivada) o que tienen al menos 30 años de servicio acreditado en el Sistema de Retiro y que tienen la edad de retiro (programa de retiro incentivado). Los incentivos económicos consistirán en un pago total que oscilará entre un mes y seis meses de salario basado en años de empleo.

Además, los empleados elegibles que deciden participar en el programa de retiro anticipado o en el programa de renuncia incentivada son elegibles para recibir cobertura del plan de salud por hasta 12 meses en un plan de salud seleccionado por la administración del ELA.

La Ley Núm. 70 permite que ciertas unidades de componentes del ELA que operan con sus propios recursos implementen un programa similar que brinde beneficios para el retiro anticipado o incentivos económicos para la rescisión voluntaria del empleo a los empleados elegibles, según su definición. Los beneficios y los requisitos son los mismos que establece la Ley Núm. 70, excepto lo siguiente: en el programa de beneficios de retiro anticipado, la unidad de componente realizará las contribuciones del empleado y del patrono al Sistema de Retiro y pagará la pensión correspondiente hasta que el empleado cumpla con los requisitos de edad y 30 años de servicio acreditado en el Sistema de Retiro; y en el programa de retiro incentivado, la unidad de componentes exigirá al empleado y el patrono que contribuyan al Sistema de Retiro por un período de cinco años.

Al 30 de junio de 2016, los beneficios a largo plazo no pagados otorgados en la Ley Núm. 70 se descontaron a tasas de interés que oscilaron entre 1.84% y 3.00% a nivel del Gobierno Primario y de 1.38% a 3.34% a nivel de unidades de componentes.

### (n) *Pasivos por reclamos por beneficios de seguro de salud*

El ELA, a través de la PRHIA (una unidad de componentes combinados), es responsable de implementar, administrar y negociar un sistema de seguro de salud, a través de contratos con aseguradores de seguros, para proporcionar atención médica y hospitalaria de calidad a los residentes del ELA, independientemente de su situación financiera.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

y capacidad de pago. La PRHIA paga una prima mensual a dichos reaseguradores de seguros en función de una prima contratada y el número de miembros suscritos en el plan de salud. Los fondos para pagar dichas primas se solicitan al ELA, neto de los fondos disponibles para tales fines de todas las demás fuentes.

De conformidad con las disposiciones de la Ley Núm. 105 del 19 de julio de 2002, que modifica la Ley Núm. 72 de 1993, la PRHIA estaba autorizada a negociar directamente con los proveedores de salud en un programa piloto. Desde entonces, la PRHIA ha celebrado diferentes contratos directos para cubrir a la población asegurada de diferentes regiones y municipios. Desde el 1 de noviembre de 2006 hasta el 1 de septiembre de 2010, la PRHIA contrató directamente a proveedores que atendieron aproximadamente 190,000 vidas de la región metropolitana del norte. Al 30 de junio de 2011, la PRHIA tiene proyectos de contratación directa con los municipios de Vieques y Guaynabo, y a partir del 1 de octubre de 2011, los proyectos se expandieron para cubrir el oeste, el metro norte, el norte, San Juan, el noreste y las regiones virtuales según un nuevo acuerdo con un nuevo suscriptor de seguros como administrador externo. Además, la PRHIA implementó ciertas estrategias de contención de costos para controlar los costos, como establecer un copago que se aplica por el uso injustificado de salas de emergencia, detección y control del uso excesivo de medicamentos recetados, implementación de un programa de manejo de enfermedades para afecciones respiratorias, modificación de tarifas de proveedores y una mejor coordinación de beneficios para los miembros de la población que tienen otro seguro médico.

La PRHIA establece una responsabilidad para cubrir el monto estimado a pagar a los proveedores en función de la experiencia y los datos estadísticos acumulados en virtud de uno de los proyectos piloto de contratación directa. Los estimados de reclamos médicos incurridos pero no informados y otros pagos de gastos médicos se desarrollan utilizando métodos actuariales y supuestos basados en patrones de pago, inflación de costos médicos, desarrollos históricos y otros factores relevantes. La siguiente tabla proporciona una conciliación de los pasivos iniciales y finales de los gastos médicos y de ajuste de beneficios incurridos pero no pagados para el período terminado el 30 de junio de 2016 (en miles):

| | | |
|---|---|---|
| Pasivos por beneficios incurridos pero no pagados y gastos por ajuste de beneficios al 1 de julio | $ | 240,153 |
| Beneficios totales incurridos | | 86,440 |
| Total de pagos de beneficios | | (210,632) |
| Pasivos por beneficios incurridos pero no pagados y gastos por ajuste de beneficios al 30 de junio | $ | 115,961 |

Los pasivos por reclamos de beneficios de salud se informan como pasivos por el seguro de salud en las Actividades de Tipo Comercial del estado de resultados netos adjunto y en el estado de resultados netos los fondos de propiedad exclusiva. Los pasivos al 30 de junio de 2016 ascienden a aproximadamente $116 millones.

*(o) Pasivos por reclamos por beneficios del seguro por desempleo y discapacidad*

El ELA ofrece compensación por desempleo, discapacidad laboral y cobertura de seguro para conductores a empleados públicos y privados a través de diversos programas de seguros administrados por el Departamento del Trabajo y Recursos Humanos del ELA. Estos programas de seguro cubren a los trabajadores contra el desempleo, la incapacidad temporal o la muerte por accidentes laborales o relacionados con el empleo o por enfermedades sufridas como consecuencia de su empleo. La siguiente tabla proporciona una conciliación de la responsabilidad

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

inicial y final por los beneficios incurridos pero no pagados y los gastos por el ajuste de beneficios para el año finalizado el 30 de junio de 2016:

| | | Seguro por desempleo | Otros fondos no mayores de propiedad exclusiva | Totales |
|---|---|---|---|---|
| | | (En miles) | | |
| Pasivos por beneficios incurridos pero no pagados y pagos por ajuste de beneficios al 1 de julio | $ | 57,683 | 651 | 58,334 |
| Beneficios totales incurridos | | 139,993 | 2,481 | 142,474 |
| Total de pagos de beneficios | | (144,388) | (2,330) | (146,718) |
| Pasivos por beneficios incurridos pero no pagados y gastos por ajuste de beneficios al 30 de junio | $ | 53,288 | 802 | 54,090 |

El ELA establece pasivos por los beneficios incurridos pero no pagados y gastos por ajuste de beneficios basados en el costo final de liquidar los beneficios. Los pasivos por reclamos de beneficios del seguro se reevalúan periódicamente para tener en cuenta los reclamos recientemente liquidados, la frecuencia de los reclamos y otros factores económicos y sociales. Los pasivos por los reclamos de beneficios del seguro se informan como pasivos por el seguro por desempleo y discapacidad en las Actividades de Tipo Comercial del estado de resultados netos adjunto y el estado de resultados netos de los fondos de propiedad exclusiva. El pasivo al 30 de junio de 2016 asciende a aproximadamente $54.1 millones.

*(p) Otros pasivos a largo plazo*

Los pasivos a largo plazo restantes de las Actividades del Gobierno al 30 de junio de 2016 incluyen (en miles):

| | | |
|---|---|---|
| Pasivos por reclamos legales y sentencias (nota 17) | $ | 1,268,256 |
| Pasivos con el Cuerpo del Ingenieros del Ejército de EE. UU. (nota 11) | | 218,442 |
| Pasivos por pérdida de riesgo de créditos en custodia y préstamos por cobrar incobrables de fondos recurrentes estatales | | 760,673 |
| Bonificación de Navidad devengada de los empleados | | 78,361 |
| Pasivos por desestimaciones de costos federales (nota 17) | | 65,182 |
| Otro | | 23,900 |
| Total | $ | 2,414,814 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Como se describe en la Nota 11, el ELA tiene una obligación de deuda con el Cuerpo de Ingenieros del Ejército de los EE. UU. en relación con su parte asignada estimada de los costos de construcción asociados con el Proyecto de Presa y Embalse de Cerrillos. A fines de abril de 2011, el ELA recibió un acuerdo final de deuda del Cuerpo de Ingenieros del Ejército de los EE. UU. que establece un cronograma de reembolso para su parte asignada de los costos de construcción asociados con el Proyecto de Presa y Embalse de Cerrillos, que asciende a $214 millones, sin incluir los costos para artículos construidos con fines recreativos. El 10 de octubre de 2012, el Cuerpo de Ingenieros del Ejército de EE. UU. colocó dicha deuda en el Programa de Compensación del Departamento del Tesoro de EE. UU. (El Programa de Compensación) hasta mayo de 2013 (el mes en que se paralizó el Programa de Compensación). El 21 de marzo de 2014, el Cuerpo de Ingenieros del Ejército de EE. UU. otorgó ciertas concesiones sobre esta obligación del ELA al condonar el saldo adeudado y pagadero por un monto de $35.4 millones y aprobar un nuevo plan de pago propuesto por el Secretario de Hacienda para la obligación de deuda restante. Este nuevo plan de pago redujo la tasa de interés de 6.063% a 1.50% y renunció a todas las multas e intereses acumulados, lo que redujo el pago anual de aproximadamente $12.9 millones a aproximadamente $7.1 millones para el plazo restante de la deuda. El nuevo plan de pago consta de 33 pagos anuales de $7,1 millones, incluidos los intereses, desde el 7 de junio de 2014 hasta el 7 de junio de 2046. Estas concesiones calificaron como una reestructuración de la deuda problemática, donde el total de los pagos futuros en efectivo especificados por los nuevos términos excedieron el valor nominal de la deuda anterior, incluido el saldo acumulado vencido y pagadero de $35.4 millones. En tales circunstancias, los efectos de los nuevos términos se contabilizan prospectivamente sin modificar el importe nominal de la deuda en el estado de resultados netos.

La parte asignada no pagada de los costos de construcción asociados con el Proyecto Cerrillos ascendía a aproximadamente $170 millones al 30 de junio de 2016. Los requisitos del servicio de la deuda de esta obligación de deuda al 30 de junio de 2016 fueron los siguientes (en miles):

|  | | **Capital** | **Interés** | **Total** |
|---|---|---|---|---|
| Año(s) que termina(n) el 30 de junio: | | | | |
| 2017 | $ | 4,527 | 2,550 | 7,077 |
| 2018 | | 4,595 | 2,482 | 7,077 |
| 2019 | | 4,664 | 2,413 | 7,077 |
| 2020 | | 4,734 | 2,342 | 7,076 |
| 2021 | | 4,805 | 2,271 | 7,076 |
| 2022-2026 | | 25,129 | 10,254 | 35,383 |
| 2027-2031 | | 27,071 | 8,312 | 35,383 |
| 2032-2036 | | 29,164 | 6,220 | 35,384 |
| 2037-2041 | | 31,418 | 3,966 | 35,384 |
| 2042-2046 | | 33,846 | 1,538 | 35,384 |
| Total | $ | **169,953** | **42,348** | **212,301** |

Además, el ELA tiene una obligación de deuda de aproximadamente $48.5 millones con el Cuerpo de Ingenieros del Ejército de los EE. UU. en relación con su parte asignada estimada de los costos de construcción asociados con la parte recreativa del Proyecto de la Presa y Embalse de Cerrillos, incluidos los intereses acumulados de aproximadamente $6.1 millones, al 30 de junio de 2016. El acuerdo de deuda final con el Cuerpo de Ingenieros del Ejército de EE. UU. para la parte recreativa del Proyecto de Presa y Embalse de Cerrillos no se ha finalizado y, por lo tanto, los términos y condiciones podrían diferir de los estimados. Se espera que la deuda relacionada sea

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

pagadero en cuotas anuales durante un período de 35 años. Sin embargo, la deuda se ha presentado como una deuda pagadera a largo plazo después de un año en el estado de resultados netos adjunto desde la fecha de inicio del reembolso aún no se ha determinado.

El ELA registró un pasivo contingente por la pérdida por riesgo de créditos en custodia en depósitos mantenidos en el BGF por el Fondo Recurrente para el Control de la Contaminación del Agua de Puerto Rico y el Fondo Recurrente de Préstamos para el Tratamiento del Agua Potable de Puerto Rico por aproximadamente $187.5 millones y la parte incobrable de los préstamos por cobrar de AAA que el ELA garantiza aproximadamente en $573.2 millones

Los otros pasivos a largo plazo restantes dentro de las Actividades de Tipo Comercial al 30 de junio de 2016 están compuestos por los costos de pensión acumulados y una reserva de seguro propio por aproximadamente $71.1 millones y $2.4 millones, respectivamente, correspondientes a la PRMeSA.

### *Fondos Fiduciarios*

El 31 de enero de 2008, el SRE emitió su primera de tres series de bonos (colectivamente, Bonos del SRE), que consistía en aproximadamente $1,589 millones de monto total de capital de Bonos Senior de Fondos de Pensiones, Serie A (los Bonos de la Serie A). El 2 de junio de 2008, el SRE emitió su segunda serie de Bonos del SRE, que consistía en un monto total de capital de aproximadamente $1,059 millones de Bonos Senior de Fondos de Pensiones, Serie B (los Bonos de la Serie B). Finalmente, el 30 de junio de 2008, el SRE emitió su tercera y última serie de Bonos del SRE, que consistía en un monto de capital de aproximadamente $300 millones de Bonos de Financiamiento de Pensiones Senior, Serie C (los Bonos de la Serie C).

Los Bonos del SRE son obligaciones limitadas y sin recurso del SRE, pagaderos únicamente de las contribuciones del patrono realizadas después de la fecha de emisión de la primera serie de Bonos SRE, y de los fondos depositados en el Banco de Nueva York Mellon (el Agente Fiscal). Los Bonos del SRE no se pagan por las contribuciones realizadas al SRE por los empleados participantes, o por los activos adquiridos con los ingresos de los Bonos del SRE, o por las contribuciones del patrono liberadas por el Agente Fiscal al SRE después del financiamiento de las reservas requeridas, o de cualquier otro activo del SRE. El SRE invirtió los ingresos de los Bonos del SRE y utilizó estas inversiones y las ganancias obtenidas para proporcionar beneficios de pensión a sus beneficiarios.

El 12 de marzo de 2019, el Comité de Acreedores radicó la Objeción de Reclamo de Bonos del SRE para rechazar todos los reclamos radicados contra el SRE en base a los aproximadamente $3,1 mil millones de bonos en circulación emitidos por el SRE en 2008. Para obtener información adicional sobre la Objeción de Reclamo de Bonos del SRE, consulte la Nota 3.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Al 30 de junio de 2016, el saldo de capital pendiente de los Bonos del SRE es el siguiente (en miles):

| Descripción | | |
|---|---|---|
| Bonos de la serie A: | | |
| Bonos de Apreciación de Capital, con vencimiento en 2028, con intereses al 6.20% | $ | 75,302 |
| Bonos a plazo, con vencimiento en 2023, con intereses al 5.85% | | 200,000 |
| Bonos a plazo, con vencimiento desde 2031 hasta 2038, con intereses al 6.15% | | 679,000 |
| Bonos a plazo, con vencimiento desde 2039 hasta 2042, con intereses al 6.20% | | 332,770 |
| Bonos a plazo, con vencimiento desde 2055 hasta 2058, con intereses al 6.45% | | 332,000 |
| Total de Bonos de la Serie A en circulación | | 1,619,072 |
| Bonos de la serie B: | | |
| Bonos de Apreciación de Capital, con vencimiento desde 2028 hasta 2030, con Intereses al 6.40% | | 234,706 |
| Bonos de Apreciación de Capital, con vencimiento desde 2031 hasta 2034, con Intereses al 6.45% | | 169,479 |
| Bonos a plazo, con vencimiento en 2031, con intereses al 6.25% | | 117,100 |
| Bonos a plazo, con vencimiento desde 2036 hasta 2039, con intereses al 6.30% | | 270,000 |
| Bonos a plazo, con vencimiento desde 2055 hasta 2058, con intereses al 6.55% | | 429,000 |
| Total de Bonos de la Serie B Bonds en circulación | | 1,220,285 |
| Bonos de la Serie C: | | |
| Bonos de Apreciación de Capital, con vencimiento en 2030, con intereses al 6.50% | | 3,678 |
| Bonos a plazo, con vencimiento en 2028, con intereses al 6.15% | | 110,000 |
| Bonos a plazo, con vencimiento en 2038, con intereses al 6.25% | | 45,000 |
| Bonos a plazo, con vencimiento en 2043, con intereses al 6.30% | | 143,000 |
| Total de Bonos de la Serie C en circulación | | 301,678 |
| Total de Bonos en circulación | | 3,141,035 |
| Menos descuento de bonos | | (6,133) |
| Bonos por pagar - neto | | $ 3,134,902 |

Bonos de la Serie A: el monto del capital total de los Bonos de la Serie A emitidos ascendió a aproximadamente $1,589 millones de los cuales aproximadamente $1,544 millones se emitieron como bonos a plazo (los Bonos a Plazo de la Serie A) y $45 millones se emitieron como bonos de apreciación de capital (los Bonos de Apreciación del Capital de la Serie A). Los intereses de los Bonos a plazo de la Serie A se pagan mensualmente el primer día de cada mes. Los intereses sobre los Bonos de Apreciación de Capital de la Serie A no se pagan de forma actual, pero se agregan al principal de los Bonos de Apreciación de Capital cada 1 de enero y 1 de julio (Fechas de capitalización), y se tratan como si se acumularan en cantidades diarias iguales entre Fechas de capitalización, hasta que se paguen al vencimiento o al momento del canje. Los intereses deben calcularse en función de un año de 360 días que consta de doce meses de 30 días. Los Bonos de la Serie A están sujetos a redención a opción del SRE de cualquier fuente, en su totalidad o en parte en cualquier momento a partir del 1 de julio de 2018, a un precio de redención igual al monto del capital (en el caso de los Bonos de apreciación de capital de la Serie A, el monto acumulado) de los Bonos de la Serie A, más los intereses acumulados a la fecha de reembolso y sin prima.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Además, los siguientes Bonos a Plazo de la Serie A están sujetos a redención obligatoria, comenzando en parte a partir del 1 de julio de 2021 en la medida del requisito del fondo de amortización para dichos bonos establecidos a continuación a un precio de redención igual al 100% del monto del capital más intereses devengados de la siguiente manera (en miles):

| Período de redención | Bonos sujetos | Monto |
|---|---|---|
| 1 de julio de 2021 | Bonos a plazo con vencimiento el 1 de julio de 2023 | $ 50,000 |
| 1 de julio de 2022 | Bonos a plazo con vencimiento el 1 de julio de 2023 | 70,000 |
| 1 de julio de 2023 | Bonos a plazo con vencimiento el 1 de julio de 2023 | 80,000 |
| | Subtotal | 200,000 |
| 1 de julio de 2031 | Bonos a plazo con vencimiento el 1 de julio de 2023 | 3,000 |
| 1 de julio de 2032 | Bonos a plazo con vencimiento el 1 de julio de 2023 | 4,500 |
| 1 de julio de 2033 | Bonos a plazo con vencimiento el 1 de julio de 2023 | 4,000 |
| 1 de julio de 2034 | Bonos a plazo con vencimiento el 1 de julio de 2023 | 133,500 |
| 1 de julio de 2035 | Bonos a plazo con vencimiento el 1 de julio de 2023 | 133,500 |
| 1 de julio de 2036 | Bonos a plazo con vencimiento el 1 de julio de 2023 | 133,500 |
| 1 de julio de 2037 | Bonos a plazo con vencimiento el 1 de julio de 2023 | 133,500 |
| 1 de julio de 2038 | Bonos a plazo con vencimiento el 1 de julio de 2023 | 133,500 |
| | Subtotal | 679,000 |
| | Total | $ 879,000 |

**Bonos de la Serie B** - el monto del capital total de los Bonos de la Serie B emitidos ascendió a aproximadamente $1,059 millones de los cuales aproximadamente $816 millones se emitieron como bonos a plazo (los Bonos a plazo de la Serie B) y Se emitieron $243 millones como bonos de apreciación de capital (los Bonos de Apreciación de Capital Serie B). Los intereses de los Bonos a plazo de la Serie B se pagan mensualmente el primer día de cada mes. Los intereses sobre los Bonos de Apreciación de Capital de la Serie B no se pagan de forma actual, pero se agregan al principal de los Bonos de Apreciación de Capital cada 1 de enero y 1 de julio (Fechas de capitalización), y se tratan como si se acumularan en cantidades diarias iguales entre Fechas de capitalización, hasta que se paguen al vencimiento o en el momento del canje. Los intereses deben calcularse en función de un año de 360 días que consta de doce meses de 30 días. Los Bonos de la Serie B están sujetos a redención a opción del SRE de cualquier fuente, en su totalidad o en parte en cualquier momento a partir del 1 de julio de 2018, a un precio de redención igual al monto del capital (en el caso de los Bonos de apreciación de capital de la Serie B de reconocimiento, el monto acumulado) de los Bonos de la Serie B, más los intereses acumulados a la fecha de reembolso y sin prima.

**Bonos de la Serie C** - el monto del capital total de los Bonos de la Serie C emitidos ascendió a aproximadamente $300 millones de los cuales aproximadamente $298 millones se emitieron como bonos a plazo (los Bonos a plazo de Serie C) y Se emitieron $2 millones como bonos de apreciación de capital (los Bonos de Apreciación de Capital de la Serie C). Los intereses de los Bonos a Plazo de la Serie C se pagan mensualmente el primer día de cada mes. Los intereses sobre los Bonos de Apreciación de Capital de la Serie C no se pagan de forma actual, pero se agregan al principal de los Bonos de Apreciación de Capital cada 1 de enero y 1 de julio (Fechas de capitalización), y se tratan como si se acumularan en cantidades diarias iguales entre Fechas de capitalización, hasta que se paguen al vencimiento o en el momento del canje. Los intereses deben calcularse en función de un año de 360 días que consta de doce meses de 30 días. Los Bonos de la Serie C están sujetos a redención a opción del SRE de cualquier fuente, en su totalidad o en parte en cualquier momento a partir del 1 de julio de 2018, a un precio de redención igual al monto del capital (en el caso de los bonos de apreciación de capital de la C de reconocimiento, el monto acumulado) de los Bonos de la Serie C, más los intereses acumulados a la fecha de reembolso y sin prima.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Además, los siguientes Bonos a Plazo de la Serie C están sujetos a redención obligatoria, comenzando en parte a partir del 1 de julio de 2024 en la medida del requisito del fondo de amortización para dichos bonos establecidos a continuación a un precio de redención igual al 100% del monto del capital más intereses devengados de la siguiente manera (en miles):

| Período de redención | Bonos sujetos | Monto |
|---|---|---|
| 1 de julio de 2024 | Bonos a plazo con vencimiento el 1 de julio de 2028 | $ 18,700 |
| 1 de julio de 2025 | Bonos a plazo con vencimiento el 1 de julio de 2028 | 22,000 |
| 1 de julio de 2026 | Bonos a plazo con vencimiento el 1 de julio de 2028 | 29,150 |
| 1 de julio de 2027 | Bonos a plazo con vencimiento el 1 de julio de 2028 | 36,300 |
| 1 de julio de 2028 | Bonos a plazo con vencimiento el 1 de julio de 2028 | 3,850 |
| | Subtotal | 110,000 |
| 1 de julio de 2029 | Bonos a plazo con vencimiento el 1 de julio de 2038 | 100 |
| 1 de julio de 2030 | Bonos a plazo con vencimiento el 1 de julio de 2038 | 540 |
| 1 de julio de 2031 | Bonos a plazo con vencimiento el 1 de julio de 2038 | 100 |
| 1 de julio de 2032 | Bonos a plazo con vencimiento el 1 de julio de 2038 | 3,420 |
| 1 de julio de 2033 | Bonos a plazo con vencimiento el 1 de julio de 2038 | 4,320 |
| 1 de julio de 2034 | Bonos a plazo con vencimiento el 1 de julio de 2038 | 100 |
| 1 de julio de 2035 | Bonos a plazo con vencimiento el 1 de julio de 2038 | 11,940 |
| 1 de julio de 2036 | Bonos a plazo con vencimiento el 1 de julio de 2038 | 2,160 |
| 1 de julio de 2037 | Bonos a plazo con vencimiento el 1 de julio de 2038 | 7,920 |
| 1 de julio de 2038 | Bonos a plazo con vencimiento el 1 de julio de 2038 | 14,400 |
| | Subtotal | 45,000 |
| 1 de julio de 2039 | Bonos a plazo con vencimiento el 1 de julio de 2043 | 28,600 |
| 1 de julio de 2040 | Bonos a plazo con vencimiento el 1 de julio de 2043 | 28,600 |
| 1 de julio de 2041 | Bonos a plazo con vencimiento el 1 de julio de 2043 | 28,600 |
| 1 de julio de 2042 | Bonos a plazo con vencimiento el 1 de julio de 2043 | 28,600 |
| 1 de julio de 2043 | Bonos a plazo con vencimiento el 1 de julio de 2043 | 28,600 |
| | Subtotal | 143,000 |
| | Total | $ 298,000 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El SRE cumplió con los requisitos del fondo de amortización al 30 de junio de 2016. Los requisitos del servicio de la deuda en los años futuros de los bonos del SRE al 30 de junio de 2016 fueron los siguientes (en miles):

| | Capital | Interés | Total |
|---|---|---|---|
| Año(s) que termina(n) el 30 de junio: | | | |
| 2017 | $ — | 166,519 | 166,519 |
| 2018 | — | 166,519 | 166,519 |
| 2019 | — | 166,519 | 166,519 |
| 2019 | — | 166,519 | 166,519 |
| 2021 | — | 166,519 | 166,519 |
| 2022-2026 | 200,000 | 797,495 | 997,495 |
| 2027-2031 | 808,280 | 753,800 | 1,562,080 |
| 2032-2036 | 613,560 | 739,532 | 1,353,092 |
| 2037-2041 | 1,240,170 | 520,143 | 1,760,313 |
| 2042-2046 | 218,100 | 305,430 | 523,530 |
| 2047-2051 | — | 285,084 | 285,084 |
| 2052-2056 | 183,200 | 273,171 | 456,371 |
| 2057-2061 | 577,800 | 77,838 | 655,638 |
| | 3,841,110 | $ 4,585,088 | 8,426,198 |
| Menos interés no acumulado | (700,075) | | |
| Menos descuento no amortizado | (6,133) | | |
| Total | $ 3,134,902 | | |

**Uso de las Contribuciones del Empleador:** el SRE celebró un Acuerdo de Seguridad con el Agente Fiscal en beneficio de los tenedores de bonos, según el que el SRE se pignoró con el Agente Fiscal y le otorgó al Agente Fiscal un derecho de garantía sobre las contribuciones del patrono realizadas después del 31 de enero de 2008, que era la fecha de emisión de la primera serie de bonos, y los fondos depositados en el Agente Fiscal en las diversas cuentas establecidas en virtud de la Resolución de Bonos de Financiamiento de Pensiones (la Resolución).

Las contribuciones anuales del patrono que se realizaron después del 31 de enero de 2008, que fue la fecha de emisión de la primera Serie de bonos, de conformidad con la Ley y los montos depositados en las diferentes cuentas creadas de conformidad con la Resolución para los beneficios de los propietarios de los bonos se utilizaron para los requisitos de servicio de la deuda anual según lo establecido.

El 23 de agosto de 2017, el ELA promulgó la Ley Núm. 106 de 2017 que instituyó un sistema PayGo para los Sistemas de Retiro, incluido el SRE, y eliminó las obligaciones de los patronos de contribuir al SRE. Para obtener información adicional sobre el sistema PayGo, consulte las Notas 2, 3 y 23.

*Unidades de Componentes de Presentación Discreta*

Los pagarés, bonos y bonos de asignación pagaderos son aquellos pasivos que se pagan con los recursos propios de las unidades de componentes. Estas obligaciones no constituyen un pasivo o deuda del Gobierno Primario.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

### *(a)   Pagarés adeudados a instituciones financieras*

El saldo pendiente de pagarés adeudados a instituciones financieras al 30 de junio de 2016 es el siguiente (en miles):

| Unidad de componentes | Tasas de interés | Vencimiento en | Saldo al 30 de junio de 2015 | Agregados | Reducciones | Saldo al 30 de junio de 2016 | Adeudado en un año |
|---|---|---|---|---|---|---|---|
| Unidades de componentes mayores: | | | | | | | |
| BGF | 3.375%–8.00% | 2042 | $ 4,049,987 | 39,990 | 250,074 | 3,839,903 | 669,195 |
| AEE | 3.25%–7.25% | 2023 | 718,476 | 4,087 | 6,994 | 715,569 | 698,683 |
| AAA | 8.75% | 2017 | 96,553 | — | 92,400 | 4,153 | 4,153 |
| UPR | 4.00% - 5.95% | 2017 | 1,319 | — | 606 | 713 | 452 |
| SIFC | Variable | 2028 | 232,261 | — | 216,916 | 15,345 | 5,966 |
| Subtotal | | | 5,098,596 | 44,077 | 566,990 | 4,575,683 | 1,378,449 |
| Unidades de componentes no mayores | 1.83%-8.45% | 2033 | | | | | |
| | Variable | | 812,264 | 108,792 | 497,308 | 423,748 | 42,875 |
| Total | | | $ 5,910,860 | 152,869 | 1,064,298 | 4,999,431 | 1,421,324 |

Los requisitos del servicio de la deuda de los pagarés de las unidades de componentes pagaderos con vencimientos fijos al 30 de junio de 2016 fueron los siguientes (en miles):

| Año(s) que termina(n) el 30 de junio: | | Capital | Interés | Total |
|---|---|---|---|---|
| 2017 | $ | 1,421,324 | 182,839 | 1,604,163 |
| 2018 | | 307,933 | 159,357 | 467,290 |
| 2019 | | 861,721 | 141,754 | 1,003,475 |
| 2020 | | 444,383 | 98,281 | 542,664 |
| 2021 | | 456,469 | 74,148 | 530,617 |
| 2022-2026 | | 1,126,178 | 219,511 | 1,345,689 |
| 2027-2031 | | 324,613 | 52,013 | 376,626 |
| 2032-2036 | | 27,353 | 14,535 | 41,888 |
| 2037-2041 | | 26,434 | 5,744 | 32,178 |
| 2042 | | 3,023 | 105 | 3,128 |
| Total | | $ 4,999,431 | 948,287 | 5,947,718 |

El cronograma anterior se ha presentado de acuerdo con los términos originales de los pagarés adeudados y no refleja los efectos, si los hay, que puedan resultar de los procedimientos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda, incluido el efecto de la Modificación de Calificación del BGF. En consecuencia, los efectos del Título III de PROMESA o cualquier otro procedimiento

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

de reestructuración de la deuda pueden afectar los importes nominales, las tasas de interés y los términos de reembolso. Consulte la Nota 3 y la Nota 23 para obtener información adicional.

**(b)** *Bonos de asignación del ELA*

Los bonos de asignación del ELA pagaderos al 30 de junio de 2016 fueron los siguientes (en miles):

| Unidad de componentes | Tasas de interés | Vencimiento a | Saldo al 30 de junio de 2015 | Agregados | Reducciones | Saldo al 30 de junio de 2016 | Importes adeudados en un año |
|---|---|---|---|---|---|---|---|
| Unidades de componentes mayores: AAA | 3.10% - 6.50% | 2032 | $ 416,566 | — | 246 | 416,320 | 13,251 |
| BGF | 3.10% - 6.50% | 2032 | 3,434 | — | 100 | 3,334 | 84 |
| Subtotal | | | 420,000 | — | 346 | 419,654 | 13,335 |
| Unidades de componentes no mayores | 3.10% - 6.50% | 2032 | 108,872 | — | 58 | 108,814 | 5,761 |
| Total | | | $ 528,872 | — | 404 | 528,468 | 19,096 |

Los requisitos del servicio de la deuda de los bonos de asignación del ELA pagaderos con vencimientos fijos al 30 de junio de 2016 fueron los siguientes (en miles):

| | | Capital | Interés | Total |
|---|---|---|---|---|
| Año(s) que termina(n) el 30 de junio: | | | | |
| 2017 | $ | 19,096 | 48,479 | 67,575 |
| 2018 | | 8,895 | 28,296 | 37,191 |
| 2019 | | 9,229 | 27,940 | 37,169 |
| 2020 | | 9,598 | 27,554 | 37,152 |
| 2021 | | 9,995 | 27,134 | 37,129 |
| 2022-2026 | | 51,509 | 128,709 | 180,218 |
| 2027-2031 | | 380,435 | 70,116 | 450,551 |
| 2032 | | 33,950 | 1,867 | 35,817 |
| | | **522,707** | $ **360,095** | **882,802** |
| Prima | | 5,825 | | |
| Descuento | | (64) | | |
| Total | $ | 528,468 | | |

El cronograma anterior se presentó de acuerdo con los términos originales de los bonos por pagar y no refleja los efectos, si los hay, que puedan resultar de los procedimientos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda. En consecuencia, los efectos del Título III de PROMESA o

206

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

cualquier otro procedimiento de reestructuración de la deuda pueden afectar los importes en libros, las tasas de interés y los términos de reembolso. Consulte la Nota 3 y la Nota 23 para obtener información adicional.

*(c)* *Bonos de ingresos*

Los bonos por pagar pendientes al 30 de junio de 2016 fueron los siguientes (en miles):

| Unidad de componentes | Tasas de interés | Vencimiento a | Saldo al 30 de junio de 2015 | Agregados | Reducciones | Saldo al 30 de junio de 2016 | Importes adeudados dentro de un año |
|---|---|---|---|---|---|---|---|
| Unidades de componentes mayores: BGF | 2.96%-6.56% | 2040 | $ 424,180 | — | 272,383 | 151,797 | 38,595 |
| ACT | 2.25%-6.50% | 2046 | 4,458,152 | 5,736 | 123,829 | 4,340,059 | 117,940 |
| AEE | 4.00%-10.00% | 2043 | 8,448,926 | 504,849 | 587,022 | 8,366,753 | 240,320 |
| AAA | 2.0%-6.15% | 2056 | 4,070,634 | 85,600 | 126,131 | 4,030,103 | 58,291 |
| UPR | 5.00%-5.63% | 2036 | 540,112 | — | 23,940 | 516,172 | 23,280 |
| Subtotal | | | 17,942,004 | 596,185 | 1,133,305 | 17,404,884 | 478,426 |
| Unidades de componentes no mayores | 2.75%-6.75% | 2036 | 1,521,730 | 533 | 116,900 | 1,405,363 | 108,425 |
| Total | | | $ 19,463,734 | 596,718 | 1,250,205 | 18,810,247 | 586,851 |

La AEE, una unidad de componentes mayores, y PRIDCO, una unidad de componentes no mayores, tienen bonos que pueden tener disposiciones de aceleración contenidas en los Acuerdos de Fideicomiso. Debido al hecho de que la AEE es actualmente una deudora en un procedimiento del Título III según PROMESA, cualquier acción que se tome para acelerar los bonos está sujeta a la paralización automática de dicho procedimiento. Por lo tanto, la disposición de aceleración no es relevante a pesar del hecho de que posiblemente exista un evento de incumplimiento según el Acuerdo de Fideicomiso. En cuanto a PRIDCO, el fideicomisario no ha enviado un aviso de incumplimiento ni ha declarado el capital impago de todos los bonos pendientes y pagaderos inmediatamente sujetos a las disposiciones de aceleración aplicables.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Los requisitos del servicio de la deuda de los pagarés de las unidades de componentes adeudados con vencimientos fijos al 30 de junio de 2016 fueron los siguientes (en miles):

|  | Capital | Interés | Total |
|---|---|---|---|
| Años que terminan el 30 de junio: | | | |
| 2017 | $ 586,851 | 953,339 | 1,540,190 |
| 2018 | 664,978 | 926,030 | 1,591,008 |
| 2019 | 720,492 | 891,340 | 1,611,832 |
| 2020 | 697,841 | 854,671 | 1,552,512 |
| 2021 | 685,082 | 820,193 | 1,505,275 |
| 2022-2026 | 3,525,139 | 3,574,847 | 7,099,986 |
| 2027-2031 | 3,740,395 | 2,658,760 | 6,399,155 |
| 2032-2036 | 3,209,130 | 1,746,187 | 4,955,317 |
| 2037-2041 | 3,070,028 | 850,184 | 3,920,212 |
| 2042-2046 | 1,240,582 | 216,246 | 1,456,828 |
| 2047-2051 | 299,424 | 18,174 | 317,598 |
| 2052-2056 | 5,524 | 204 | 5,728 |
| Total | 18,445,466 | $ 13,510,175 | 31,955,641 |
| Prima | 423,741 | | |
| Descuento | (58,960) | | |
| | $ 18,810,247 | | |

El cronograma anterior se presentó de acuerdo con los términos originales de los bonos por pagar y no refleja los efectos, si los hay, que puedan resultar de los procedimientos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda. En consecuencia, los efectos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda pueden afectar los importes en libros, las tasas de interés y los términos de reembolso. Consulte la Nota 3 y la Nota 23 para obtener información adicional.

Los cambios en las salidas diferidas de recursos relacionados con pérdidas en el reembolso de algunos de los bonos mencionados en la tabla anterior son los siguientes (en miles):

| Unidad de componentes | Saldo al 30 de junio de 2015 | Reducciones | Saldo al 30 de junio de 2016 |
|---|---|---|---|
| Unidades de componentes mayores: | | | |
| ACT | $ 116,947 | 12,663 | 104,284 |
| AEE | 66,354 | 17,931 | 48,423 |
| AAA | 31,638 | 4,186 | 27,452 |
| UPR | 2,517 | 292 | 2,225 |
| BGF | 2,568 | 192 | 2,376 |
| Unidades de componentes no mayores | 18,670 | 1,741 | 16,929 |
| Total | $ 238,694 | 37,005 | 201,689 |

208

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

La siguiente tabla presenta los pagos del servicio de la deuda de los bonos de tasa variable de la AEE y los pagos netos de los instrumentos derivados de cobertura asociados al 30 de junio de 2016 (en miles). Dichos bonos de tasa variable se incluyen dentro de los bonos pagaderos en la columna de unidades de componentes de presentación discreta. Aunque las tasas de interés sobre la deuda a tasa variable y la tasa de referencia actual de los instrumentos derivados de cobertura cambian con el tiempo, los cálculos incluidos en la tabla a continuación se basan en el supuesto de que la tasa variable y la tasa de referencia actual del instrumento derivado de cobertura al 30 de junio, 2016 seguirán siendo iguales para su mandato (en miles).

| | Bonos de tasa variable | | Instrumentos derivados de cobertura, neto | Total |
|---|---|---|---|---|
| | Capital | Interés | | |
| Años que terminan el 30 de junio: | | | | |
| 2017 | $ 2,374 | | 7,943 | 10,317 |
| 2018 | — | 2,374 | 7,943 | 10,317 |
| 2019 | — | 2,374 | 7,943 | 10,317 |
| 2020 | — | 2,374 | 7,943 | 10,317 |
| 2021 | — | 2,374 | 7,943 | 10,317 |
| 2022-2026 | — | 11,870 | 39,716 | 51,586 |
| 2027-2031 | 252,875 | 7,122 | 23,829 | 283,826 |
| Total | $ 252,875 | 30,862 | 103,260 | 386,997 |

Varias unidades de componentes han diferido ciertos bonos de ingresos colocando los ingresos de los nuevos bonos en fideicomisos irrevocables para proporcionar todos los pagos futuros del servicio de la deuda de las deudas antiguas. En consecuencia, los activos y pasivos de las cuentas fiduciarias para los bonos anulados no se incluyen en el estado de resultados netos. Al 30 de junio de 2016, los siguientes bonos se consideran anulados (en miles):

| Unidad componente | Monto pendiente |
|---|---|
| AEE | $ 147,700 |
| ACT | 664,995 |
| PRMFA | 196,900 |
| Total | $ **1,009,595** |

Desde 2014, la AEE ha celebrado ciertos acuerdos de indulgencia con ciertas aseguradoras y ciertos propietarios beneficiarios de Power Revenue Bonds, bancos que proporcionan líneas de crédito de combustible y el BGF (colectivamente, los Acreedores Tolerantes). Según lo dispuesto en los Acuerdos de Tolerancia, los Acreedores Tolerantes acordaron no ejercer ciertos derechos y recursos en virtud de sus acuerdos de financiamiento. Según los Acuerdos de Tolerancia, continuaron las obligaciones de la AEE de realizar todos los pagos de capital e intereses de los Bonos de Ingresos de Energía. El Acuerdo de Tolerancia caducó el 5 de noviembre de 2015, pero por el acuerdo de los Acreedores Tolerantes de abstenerse de ejercer ciertos derechos y recursos se extendió según el RSA de la AEE. Los Acreedores Tolerantes prestaron su consentimiento para que la AEE no hiciera

209

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

transferencias al Fondo de Ingresos o al Fondo de Amortización de deudas, retrasara la realización de ciertos pagos que se hicieron debido a los Prestamistas de la Línea de Combustible, utilizara aproximadamente $280 millones en su fondo de construcción para el pago de gastos corrientes además de mejoras de capital, aumentara los umbrales requeridos para el ejercicio de recursos según el Contrato de Fideicomiso, permitió la emisión de $130.7 millones en Bonos a las Aseguradoras de Bonos de Línea Única (los Bonos 2015A) que vencieron el 1 de enero de 2016 y se pagaron de acuerdo con sus términos.

Desde enero de 2016 hasta enero de 2017, la AEE pudo realizar el pago de capital e intereses de sus Bonos en el momento de su vencimiento. Posteriormente, la AEE no cumplió con pagos de capital e intereses adeudados por los Bonos el 3 de julio de 2017, el 1 de enero de 2018 y el 3 de julio de 2018.

**(14) Deuda garantizada y de asignación**

**(a) Deuda garantizada**

El ELA puede proporcionar garantías para el reembolso de ciertos préstamos de unidades de componentes para llevar a cabo proyectos designados. Las garantías están respaldadas por la plena fe y crédito del ELA. Las garantías se contabilizan siguiendo la orientación proporcionada por la Declaración GASB Núm. 70 - *Informes Contables y Financieros para Garantías Financieras No Cotizadas en Bolsa.* La Declaración GASB Núm. 70 requiere que las garantías financieras no cotizadas en bolsa se registren cuando los factores cualitativos y los datos históricos, si los hay, indiquen que es más probable que el ELA tenga que pagar la garantía. El monto del pasivo a reconocer debe ser el valor presente descontado de la mejor estimación de las salidas futuras que se espera incurrir como resultado de la garantía.

| | | Garantía máxima | Saldo pendiente pendiente | Obligación garantizada registrada del ELA |
|---|---|---|---|---|
| Unidades Mixtas de Componentes: | | | | |
| Autoridad de Edificios Públicos | $ | 4,721,000 | 4,073,314 | N/A |
| Autoridad del Puerto de las Américas | | 250,000 | 225,534 | N/A |
| Autoridad para el Financiamiento de la Infraestructura de Puerto Rico | | 245,955 | 90,845 | N/A |
| Unidades de Componentes de Presentación Discreta: | | | | |
| Banco Gubernamental de Fomento para Puerto Rico | | 2,000,000 | 110,000 | 109,271 |
| Autoridad de Acueductos y Alcantarillas de Puerto Rico | | 1,258,978 | 1,258,978 | 251,468 |
| Total | $ | 8,475,933 | 5,758,671 | 360,739 |

**Autoridad de Edificios Públicos (AEP)**: la AEP, una unidad de componentes combinados, utiliza los pagos de alquileres de ciertas instalaciones gubernamentales como departamentos, agencias, organismos y municipios del ELA en virtud de varios contratos de arrendamiento ejecutados de conformidad con la Ley de habilitación que lo creó (Ley Núm. 56 del 19 de junio de 1958, según enmienda) para el pago del capital e intereses sobre su propia

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Deuda. La Ley Núm. 56 también establece que el Departamento de Hacienda del ELA realizará adelantos a la AEP por cualquier porción impaga de la renta pagadera a la AEP por parte de cualquier departamento, agencia, organismo o municipalidad del ELA en virtud de un contrato de arrendamiento con la AEP. Dichos anticipos se registran como reducciones de las cuentas por cobrar de alquiler, ya que la responsabilidad del reembolso corresponde a la agencia u organismo correspondiente conforme la Ley de habilitación.

El 21 de diciembre de 2018, la Junta de Supervisión y el Comité de Acreedores comenzaron un proceso adverso denominado Junta de Supervisión y Administración Financiera para Puerto Rico c. la Autoridad de Edificios Públicos de Puerto Rico, Caso Núm. 18-00149-LTS (D.P.R. 21 de diciembre de 2018), solicitando un alivio declarativo y el rechazo de reclamos administrativos de alquiler. El procedimiento contrario alega que los arrendamientos de la AEP no son verdaderos arrendamientos, sino más bien "transacciones financieras encubiertas". Múltiples partes han radicado mociones para intervenir.  El 28 de enero de 2019, la AEP respondió a la demanda.

La deuda de la AEP está respaldada por una garantía del ELA de que si los ingresos o las ganancias de la AEP no son suficientes para el pago del capital y los intereses cuando vencen, el Departamento de Hacienda del ELA los retirará de los fondos disponibles según sea necesario para cubrir la deficiencia. La deuda de la AEP está respaldada por una garantía del ELA. La Ley Núm. 56 no indica si existen arreglos establecidos para recuperar los pagos de la AEP si se ejerce la garantía; sin embargo, no existe intención del ELA de solicitar una recuperación de dichos pagos eventuales.

Los ingresos por alquileres de los fondos de la AEP ascendieron a aproximadamente $206 millones durante el año finalizado el 30 de junio de 2016, que se utilizaron para cubrir las obligaciones del servicio de la deuda.

A partir del 1 de julio de 2016, una parte del servicio de la deuda de la AEP que vence en esa fecha y programada para el servicio en períodos posteriores hasta la fecha de estos estados financieros no se pagó, incluidos los pagos de intereses. Algunos de los intereses que se pagaron después del 1 de julio de 2016 reflejaron los montos recibidos de los programas de subsidios aplicables.

**Autoridad del Puerto de las Américas (PAA):** en varios momentos durante los años fiscales que terminaron en 2005 y 2006, la PAA, una unidad de componentes combinados del ELA, celebró acuerdos de compra de bonos con el BGF, por lo que el BGF acordó pagar al PAA de cada cierto tiempo, el capital de los bonos avanza hasta un monto total máximo de capital de $70 millones (Bono de la Serie A de la Autoridad del Puerto de las Américas de 2005), $40 millones (Bono de la Serie B de la Autoridad del Puerto de las Américas de 2005) y $140 millones (Bono de la Serie C de la Autoridad del Puerto de las Américas de 2005). Estos bonos están garantizados por el ELA mediante la Ley Núm. 409 del 22 de septiembre de 2004 (Ley Núm. 409), que autorizó la emisión de estos acuerdos de financiamiento y el ELA los consideró como un pasivo bajo obligación de garantía. Las ganancias de los bonos se utilizaron para financiar el costo de desarrollo y construcción de las instalaciones de la PAA. El ELA había pagado el servicio de la deuda de estos bonos bajo su garantía de conformidad con la Ley Núm. 409.

**Autoridad de Financiamiento de la Infraestructura de Puerto Rico (PRIFA):** el 17 de marzo de 2015, la PRIFA, una unidad de componentes combinados del ELA, emitió $245.9 millones de Notas de Anticipación de Bonos de Ingresos del Fondo Dedicado de Impuestos (los BAN PRIFA o los BAN Serie 2015A), cuyo producto fuer utilizado para refinanciar ciertos pagarés en anticipación de bonos de ACT pendientes y pagar gastos relacionados. Los BAN PRIFA son pagaderos y están respaldados por un Patrimonio Fiduciario que comprende ciertos activos e ingresos de PRIFA, que incluyen: (i) un impuesto de $6.25/barril a los productos derivados del petróleo sobre productos que no sean diésel; (ii) cualquier fondo recibido por la PRIFA de conformidad con los

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

términos de un acuerdo de asistencia financiera entre la PRIFA y la ACT; y (iii) cualquier ingreso adicional pignorado a la PRIFA de conformidad con el Acuerdo de Fideicomiso. Los BAN PRIFA están garantizados por el ELA. El acuerdo de BAN PRIFA y el Acuerdo de Fideicomiso subyacente no mencionan si existen acuerdos establecidos para recuperar los pagos de la PRIFA si la garantía fuera reclamada; sin embargo, no existe intención del ELA de solicitar una recuperación de dichos pagos eventuales. A la fecha de estos estados financieros básicos, todavía no se han realizado pagos en cumplimiento de la garantía antes mencionada.

Del servicio de la deuda mensual vencida en los BAN PRIFA desde el 1 de agosto de 2016 hasta el 1 de febrero de 2019, todos permanecen sin pagar.

**Banco de Desarrollo del Gobierno (BGF)**: el 13 de febrero de 2014, el ELA promulgó la Ley Núm. 24 que, entre otras disposiciones, aumentó de $500 millones a $2,000 millones la cantidad de obligaciones del BGF que pueden garantizarse con la plena fe y crédito del ELA.

El ELA garantizó los Bonos de reembolso remarcados, Serie 1985, emitidos por el BGF. El saldo pendiente de estos bonos ascendía a $267 millones al 30 de junio de 2015. Estos bonos fueron reembolsados en su totalidad al vencimiento el 1 de diciembre de 2015.

El 13 de diciembre de 2013, el BGF emitió los Pagarés Senior Garantizados de 2013 Serie B (garantizados por el ELA). Los Pagarés de la Serie B de 2013 consisten en pagarés a plazo con vencimiento en varias fechas del 1 de diciembre de 2017 al 1 de diciembre de 2019, y tienen una tasa de interés del 8.00% pagadera mensualmente el primer día de cada mes. Al 30 de junio de 2016, el saldo pendiente de estas notas ascendía a $110 millones. SIFC, una unidad componente principal del ELA, es el único titular de estos bonos. Con base en los riesgos de liquidez e incertidumbre discutidos en la Nota 2, el BGF ha mostrado todos los indicadores para concluir que existen dudas sustanciales sobre la capacidad del BGF para continuar como una empresa en marcha. Estos riesgos y eventos que afectan al BGF causaron que la gerencia del ELA reconozca un pasivo por esta obligación garantizada por un monto de aproximadamente $109 millones basado en el valor presente descontado de la mejor estimación de las salidas futuras esperadas en ese momento, como un resultado de la garantía. La Ley Núm. 24, mencionada anteriormente, no dice nada sobre si hay arreglos establecidos para recuperar cualquier pago potencial del BGF por pagos de garantía realizados; sin embargo, no existe intención del ELA de solicitar una recuperación de posibles pagos. A la fecha de estos estados financieros básicos, todavía no se han realizado pagos en cumplimiento de la garantía antes mencionada. El BGF realizó sus pagos mensuales de intereses hasta julio de 2016, pero a partir del 1 de agosto de 2016, el BGF comenzó a omitir dichos pagos.

Como se analizó en la Nota 2, el BGF ha realizado un cierre ordenado de sus operaciones y ha entrado en una Modificación de Calificación de sus deudas de conformidad con el Título VI de PROMESA.

El ELA reconoció un pasivo sobre esta obligación garantizada por un monto aproximado de $109.3 millones al 30 de junio de 2016. Esta medición se basó en el valor presente descontado de la mejor estimación de las salidas futuras que se espera incurrir como resultado de la garantía.

**Autoridad de Acueductos y Alcantarillas de Puerto Rico (AAA):** la Ley Núm. 45 del 28 de julio de 1994, según enmienda, establece que el ELA garantiza el pago del capital e intereses de todos los bonos en circulación en la fecha en que se promulgó la ley y de todos los bonos futuros emitidos para refinanciar los bonos en circulación de AAA, una unidad de componentes de presentación discreta. La Ley Núm. 140 del 3 de agosto de 2000 modificó la Ley Núm. 45 para extender la garantía del ELA para incluir los pagos de capital e intereses

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

de los Bonos Seriales de Desarrollo Rural y los préstamos del Programa del Fondo Recurrente del Estado (SRFP) pendientes en la fecha de vigencia de la Ley Núm. 140, y de todos los futuros bonos y préstamos que emita el SRFP hasta el 30 de junio de 2005. La Ley Núm. 386 del 21 de septiembre de 2004 extendió la garantía del ELA al 30 de junio de 2010. La Ley Núm. 75 del 12 de julio de 2010 modificó la Sección 1 de la Ley Núm. 45 del 28 de julio de 1994 para extender la garantía del ELA sobre los bonos emitidos según el Programa de Desarrollo Rural del Departamento de Agricultura de los Estados Unidos (USDA) y los préstamos del SRFP hasta el 30 de junio de 2015. De conformidad con la Ley Núm. 96 de 30 de junio de 2015, la garantía del ELA sobre el pago de capital e intereses sobre la mayoría de los préstamos pendientes del Fondo Recurrente otorgados a AAA se extendió para cubrir dichos préstamos emitidos hasta el 30 de junio de 2020.  Cada una de estas leyes, según enmienda, no menciona si existen acuerdos establecidos para recuperar los posibles pagos de la AAA si se ejecuta la garantía; sin embargo, no existe intención del ELA de solicitar una recuperación de dichos pagos eventuales.

El Programa de Desarrollo Rural de la USDA ayuda a la AAA en el financiamiento y la construcción de instalaciones de acueductos y alcantarillas en áreas rurales mediante la compra de bonos de ingresos de la AAA, cuyos beneficios son utilizados por la AAA para financiar tales proyectos. Al 30 de junio de 2016, los Bonos del Programa de Desarrollo Rural de la USDA consistían en veintiséis (26) series separadas, emitidas desde 1983 hasta 2016 y que devengan intereses del 2% al 5% en cuotas semestrales hasta 2055. El saldo pendiente de los Bonos en Serie del Programa de Desarrollo Rural de la USDA al 30 de junio de 2016 fue de aproximadamente $394.2 millones. Los Bonos en Serie del Programa de Desarrollo Rural de la USDA están garantizados por el ELA de conformidad con la Ley Núm. 140 de 2000, según enmienda, y los ingresos netos de la AAA se pignoran realizar el servicio de la deuda de los Bonos del Programa de Desarrollo Rural de la USDA. Los Bonos del Programa de Desarrollo Rural de la USDA están subordinados a todas las deudas sénior y subordinadas sénior.

El PRWPCRF y el PRSDWTRLF (colectivamente, los Fondos Recurrentes) fueron creados por la Ley Núm. 44 del 21 de junio de 1988 y la Ley Núm. 32 de 7 de julio de 1997, respectivamente, del ELA. El PRWPCRF se administra, de conformidad con la Ley Núm. 44 y la Ley Núm. 9 de 21 de junio de 1988 y 18 de junio de 1970, respectivamente, según enmienda, por EQB. El PRSDWTRLF es administrado, de conformidad con la Ley Núm. 5 de 21 de junio de 1977, según enmendada, por el Departamento de Salud del ELA.  De conformidad con estas leyes, la JCA y el Departamento de Salud del ELA, en nombre del ELA, están autorizados a celebrar acuerdos operativos y acuerdos de subvención de capitalización con la Agencia de Protección Ambiental de los EE. UU. (EPA). La PRIFA, la AAA y el BGF suscribieron un memorando de entendimiento según el cual cada parte acordó asumir responsabilidades específicas en relación con las operaciones de los Fondos Recurrentes. La AAA ha celebrado acuerdos de préstamos recurrentes para financiar ciertas mejoras de capital. Al 30 de junio de 2016, la AAA tenía pendientes aproximadamente $580 millones en virtud de estos acuerdos de préstamo, que devengan intereses a una tasa anual del 2% pagadera semestralmente y deben pagarse en su totalidad dentro de los 20 años posteriores a la fecha de finalización del proyecto. La AAA ha pignorado sus ingresos netos sobre una base subordinada en todos los aspectos a los bonos en circulación de la AAA. Si los ingresos pignorados de AAA no son suficientes para el pago del capital y los intereses, los pagos están garantizados por el ELA según la Ley Núm. 45 del 28 de julio de 1994, según enmienda, que obliga al ELA a pagar el capital y los intereses sobre los pagarés.

El 18 de marzo de 2008, la AAA emitió aproximadamente $284.8 millones en Bonos de Reembolso de Ingresos, Serie A y B (los Bonos de Reembolso de Ingresos de 2008) que fueron garantizados por el ELA y utilizados principalmente para reembolsar los Bonos de Reembolso de Ingresos pendientes de la AAA, Serie 1995 (que también fueron garantizado por el ELA) por un monto aproximado de $262.8 millones. Los Bonos de Reembolso

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

de ingresos de 2008 devengan intereses a tasas del 5.80% al 6.10% anual con fechas de vencimiento que van del 1 de julio de 2021 al 1 de julio de 2034. El saldo pendiente de los Bonos de Reembolso de Ingresos de 2008 al 30 de junio de 2016 ascendió a $284.8 millones.

Como resultado de la declaración de divulgación voluntaria emitida por la AAA el 4 de marzo de 2016 con respecto a la expectativa de que podría no tener fondos suficientes para financiar completamente el servicio de la deuda de algunas de sus deudas garantizadas del ELA, la gerencia concluyó que sería más probable que el ELA deba realizar un pago solo en la garantía de los Bonos en Serie del Programa de Desarrollo Rural de la USDA. Como resultado, al 30 de junio de 2016 se reconoció un pasivo sobre la obligación garantizada de los Bonos de Desarrollo Rural por un monto de aproximadamente $251.5 millones. Esta medición se basó en el valor presente descontado de la mejor estimación de las salidas futuras que se espera incurrir, en ese momento, como resultado de la garantía. A la fecha de estos estados financieros básicos, todavía no se han realizado pagos en cumplimiento de la garantía antes mencionada. Los Bonos de Reembolso de Ingresos de 2008 y los préstamos de SRFP se excluyeron de esta conclusión porque: (a) los Bonos de Reembolso de Ingresos de 2008 se consideran deuda subordinada sénior y no se verán afectados por los apartados mencionados anteriormente; y (b) los Fondos Recurrentes son fondos de propiedad exclusiva del ELA y no una entidad legal separada, y por lo tanto no hay pasivos de garantía separada.

*Acuerdo de Tolerancia*

El 30 de junio de 2016, la AAA firmó un acuerdo de tolerancia con el Departamento de Salud del ELA, administrador del Fondo Recurrente del Estado del Agua Potable (DW SRF), la Junta de Calidad Ambiental de Puerto Rico (EQB), administrador del Fondo Recurrente del Estado del Agua Limpia (CW SRF), y PRIFA, como agente operativo de los SRF, autorizada para ayudar al Departamento de Salud del ELA y EQB en las actividades administrativas, financieras y contables de los SRF. Según el Acuerdo de Tolerancia, los pagos adeudados desde el 1 de julio de 2016 en virtud de los Préstamos de SRF se difieren y las partes acordaron abstenerse de ejercer o consentir el ejercicio de cualquier cumplimiento de los derechos o recursos disponibles para cada uno de ellos bajo los Préstamos de SRF.

La PRIFA, el DOH y la EQB, con el reconocimiento y el apoyo de la Agencia de Protección Ambiental de los Estados Unidos (EPA), otorgaron dicha tolerancia, sujeto a los términos y condiciones establecidos en el Acuerdo de Tolerancia, por un período de seis meses, que puede extenderse por seis meses adicionales si se cumplen ciertas condiciones. Durante dicho período de tolerancia, la Garantía del ELA tampoco se aplicará. La PRIFA, la EQB y el Departamento de Salud del ELA, con el apoyo de la EPA, contemplan que durante el período de tolerancia las partes negociarán nuevos términos y condiciones para los préstamos de SRF según una reestructuración de dichos préstamos y una revisión de los acuerdos subyacentes entre la AAA, la PRIFA, la EQB, el Departamento de Salud del ELA y, cuando corresponda, la EPA. Después de vencimiento del período inicial de seis meses de tolerancia según el Acuerdo de Tolerancia, dicho período se extendió por seis meses adicionales hasta el 30 de junio de 2017, y posteriormente se extendió hasta el 31 de mayo de 2019.

Con respecto a los Bonos de Desarrollo Rural (Bonos RD), la AAA ha solicitado que el Programa de Desarrollo Rural de la USDA proporcione un período de tolerancia a corto plazo, durante el cual se abstendrá de ejercer sus derechos y recursos, incluida la ejecución de la Garantía del ELA, según los documentos del Bono RD. A tal efecto, la AAA y el Programa de Desarrollo Rural de la USDA celebraron un documento de tolerancia, en vigencia a partir del 30 de junio de 2016 (el Acuerdo de Tolerancia de la USDA). El Programa de Desarrollo Rural de la USDA otorgó a la AAA un período de tolerancia de tres meses, hasta el 30 de septiembre de 2016, sujeto a los términos y condiciones establecidos en el Acuerdo de Tolerancia de la USDA para proporcionar

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

tiempo adicional para examinar todas las opciones disponibles para corregir las deficiencias de la AAA y restablecer el reembolso del préstamo. De conformidad con el Acuerdo de Tolerancia de la USDA, los pagos adeudados desde el 1 de julio de 2016 en virtud de los documentos de los Bonos RD también fueron diferidos por la duración del período de tolerancia y el Programa de Desarrollo Rural de la USDA acordó abstenerse de ejercer o consentir el ejercicio de cualquier ejecución de derechos o recursos disponibles en virtud de los documentos de los Bonos RD o cualquier documento de subvención o préstamo en relación con los mismos. Después del vencimiento del período de tolerancia inicial de tres meses, el Acuerdo de Tolerancia de la USDA se ha extendido varias veces, y el último vencimiento es el 17 de julio de 2019.

*(b) Deuda respaldada por asignaciones del ELA*

Al 30 de junio de 2016, los saldos de capital pendientes de deuda pagaderos por las asignaciones del ELA y los impuestos a las ventas y al uso (bonos PFC y pagarés, como se describe en la Nota 13 (d), y pagarés al BFG y otros, como se describe en la Nota 13(e)), que se incluyen en los estados financieros individuales de las siguientes unidades de componentes de presentación discreta, fueron las siguientes (en miles):

| Unidades de componentes | Bonos de PFC y pagarés | Pagarés adeudados al BFG y otros | Total |
|---|---|---|---|
| Unidades de Componentes Mayores | | | |
| AAA | $ 411,229 | — | 411,229 |
| BGF | 3,334 | 13,340 | 16,674 |
| UPR | — | 48,286 | 48,286 |
| AEE | — | 713 | 713 |
| Subtotal | 414,563 | 62,339 | 476,902 |
| Unidades de componentes no mayores | 108,814 | 388,252 | 497,066 |
| Total | $ 523,377 | 450,591 | 973,968 |

*(c) Otras garantías*

Seguro de préstamo hipotecario: la Autoridad de Financiamiento de la Vivienda de Puerto Rico (Autoridad de Financiamiento de la Vivienda), una unidad de componentes combinados del BFG, proporciona seguro de crédito hipotecario a familias de ingresos bajos y moderados a través de su programa de seguro de préstamo hipotecario. El ELA garantiza hasta $75 millones del capital asegurado por el programa de seguro de préstamos hipotecarios. Al 30 de junio de 2016, el programa de seguro de préstamos hipotecarios cubría préstamos que sumaban aproximadamente $576 millones. Actualmente, no se ha solicitado al ELA que realice ningún pago directo de conformidad con estas garantías y no hay eventos desencadenantes que indiquen que es más probable que sea necesario que realice los pagos de estas garantías.

**(15) Obligaciones de deuda de conducto y deuda sin compromiso**

Oportunamente, algunas de las unidades de componentes del ELA emiten bonos de ingresos para proporcionar asistencia financiera a entidades del sector privado para la adquisición y construcción de instalaciones de transporte, ambientales, industriales, turísticas, educativas y comerciales, que se consideran de interés público y que se

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

espera que brinden beneficios a Puerto Rico. Estos bonos son respaldados por la propiedad financiada y son pagaderos únicamente de los pagos recibidos en los préstamos hipotecarios subyacentes. Tras el reembolso de los bonos, la propiedad del servicio adquirido queda retenida por la entidad del sector privado que atiende la emisión de los bonos. Ni el ELA ni ninguna subdivisión política o unidad de componentes de la misma están obligados de ninguna manera a pagar los bonos. En consecuencia, los bonos no se informan como pasivos en los estados financieros básicos de las entidades emisoras. Al 30 de junio de 2016, las obligaciones de deuda de conducto consistían en los siguientes bonos emitidos por unidades de componentes (en miles):

| Entidad emisora | | Emitido desde la fecha de inicio | Monto pendiente |
|---|---|---|---|
| Unidades de componentes mayores: | | | |
| BGF | $ | 1,047,500 | 414,300 |
| ACT | | 270,000 | 146,300 |
| Subtotal | | 1,317,500 | 560,600 |
| Unidades de componentes no mayores | | 6,508,410 | 974,210 |
| Total | $ | 7,825,910 | 1,534,810 |

*(a)* *BGF*

En diciembre de 2003, el BGF, a través de su Autoridad para el Financiamiento de la Vivienda, emitió aproximadamente $663 millones en la Serie de Bonos del Programa del Fondo de Capital de 2003 para prestar los ingresos de la misma a la Administración de Vivienda Pública, una agencia del ELA, en su financiamiento de mejoras a varios bajos públicos y proyectos de vivienda de ingresos moderados. La Serie de Bonos del Programa del Fondo de Capital de 2003 son obligaciones limitadas de la Autoridad de Financiamiento de la Vivienda, que se pagarán únicamente de una asignación anual de fondos de capital de vivienda pública cuando se reciban del Departamento de Vivienda y Desarrollo Urbano de los EE. UU. (HUD de EE. UU.) y otros fondos disponibles según el contrato de fianza. En consecuencia, estos bonos se consideran deuda de conducto y se excluyen, junto con los activos relacionados en fideicomiso, de los estados financieros básicos adjuntos. El saldo pendiente de estos bonos ascendía a aproximadamente $129.3 millones al 30 de junio de 2016.

El 1 de agosto de 2008, la Autoridad de Financiamiento de la Vivienda emitió los Bonos Subordinados del Programa de Modernización del Fondo de Capital por aproximadamente $384.5 millones. Los ingresos de la emisión se utilizaron principalmente para financiar un préstamo a una compañía de responsabilidad limitada y pagar los costos de la emisión. Los bonos de $384.5 millones son obligaciones limitadas de la Autoridad para el Financiamiento de la Vivienda, pagaderos principalmente mediante una prenda y asignación de pagos federales de asistencia para la vivienda puestos a disposición por el HUD de los EE. UU., con un saldo pendiente de aproximadamente $285 millones al 30 de junio de 2016. El pago del capital de los Bonos de Ingresos de Vivienda también se garantizó mediante una carta de crédito standby irrevocable emitida por el BGF.

*(b)* *ACT*

En marzo de 1992, la ACT emitió Bonos de Ingresos de Instalaciones Especiales, Series A, B y C de 1992 por aproximadamente $117 millones para la construcción de un puente de peaje. Los beneficios de la venta de estos bonos fueron transferidos por la ACT a una entidad privada, Autopistas de Puerto Rico & Compañía, S.E.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

(Autopistas), de conformidad con un acuerdo de concesión firmado para el diseño, construcción, operación y mantenimiento del puente. El 30 de octubre de 2003, la ACT emitió Bonos de Reembolso de Ingresos de Instalaciones Especiales, Serie A de 2004, por un monto aproximado de $153 millones con el propósito de reembolsar los Bonos de Ingresos de Instalaciones Especiales de la ACT, Series A, B y C de 1992, que se emitieron para financiar la construcción del puente, y para pagar el costo de emisión de los bonos. Los beneficios de la venta de los bonos fueron transferidos por la ACT a Autopistas de conformidad con un nuevo acuerdo de préstamo entre Autopistas y la ACT. Los bonos deben pagarse con los ingresos recibidos por Autopistas de la operación del puente.

En determinadas circunstancias, el acuerdo de concesión puede rescindirse y la ACT está obligada a asumir la obligación total de Autopistas de pagar el capital y los intereses de los bonos en circulación que, de conformidad con el acuerdo firmado, se pagarán de los ingresos netos de uso y operación del puente. La ACT actualmente no espera que el acuerdo de concesión termine. Los bonos en circulación (incluidos los intereses devengados) al 30 de junio de 2016 ascendían a aproximadamente a $146.3 millones

**(16) Gestión de Riesgos**

*Gobierno primario*

Las políticas de gestión de riesgos del Gobierno Primario del ELA se analizan en la Nota 1(z).

*Unidades de Componentes de Presentación Discreta*

A continuación, se describen los programas de gestión de riesgos administrados por separado por ciertas unidades de componentes de presentación discreta, incluidas todas las unidades de componentes mayores y ciertas unidades de componentes no mayores que tienen reservas de riesgo autofinanciadas:

**(a) BGF**

Como se señaló anteriormente, el BGF cesó sus operaciones a partir del 23 de marzo de 2018 y completó una reestructuración de la deuda de conformidad con una Modificación de Calificación según el Título VI de PROMESA, que entró en vigencia el 29 de noviembre de 2018. Para obtener información adicional sobre la modificación de calificación del BGF según el Título VI de PROMESA, consulte la Nota 3(g).

Antes de estos desarrollos y durante el año fiscal 2016, para minimizar el riesgo de pérdida, el BGF compró cobertura de seguro para responsabilidad civil, riesgo, automóvil, crimen y fianza, así como seguro de compensación para trabajadores para empleados. La selección de la aseguradora debía ser aprobada por la Oficina de Seguros Públicos del Departamento de Hacienda. La cobertura de seguro se actualizó anualmente para tener en cuenta los cambios en el riesgo operativo. Durante los tres años anteriores al 30 de junio de 2016, los acuerdos de seguro no excedieron el monto de la cobertura. Otras políticas de gestión de riesgos del BGF involucraban sus servicios de hipotecas y préstamos y actividades de seguros. Ciertas carteras de préstamos de la Autoridad de Financiamiento de la Vivienda fueron administradas por administradores privados que deben mantener una póliza de seguro de errores y omisiones. La Autoridad de Financiamiento de la Vivienda tenía un programa para administrar el riesgo de pérdida en sus actividades de préstamos y seguros de préstamos hipotecarios.

**(b) ACT**

La ACT cuenta con un seguro comercial para cubrir siniestros, robos, reclamos y otras pérdidas. La ACT no ha resuelto ningún reclamo que exceda su cobertura de seguro en ninguno de los últimos tres años.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*(c)* *AEE*

La AEE compra seguros comerciales que cubren siniestros, robos, demandas por daños, desastres naturales y otros reclamos que cubren todos los bienes de riesgo (excluyendo las líneas de transmisión y distribución), calderas y maquinaria, y responsabilidad pública. Además, la AEE cuenta con un fondo autoasegurado para pagar el costo de reparar, reemplazar o reconstruir cualquier propiedad dañada o destruida, o gastos extraordinarios incurridos como resultado de una causa.

La AEE tiene un programa de seguro de salud con costo adicional que cubre sustancialmente a todos los empleados. La AEE contrató a un administrador para el procesamiento, aprobación y pago de reclamos más una tarifa administrativa. La acumulación para el plan de salud de los empleados incluye pasivos por los reclamos procesados y una estimación de los reclamos incurridos pero no informados.

Los cambios en los saldos del programa de seguro de salud y otros riesgos de autoseguro durante el año fiscal 2016 fueron los siguientes (en miles):

| | | |
|---|---|---:|
| Reclamos por pagar - 1 de julio | $ | 5,147 |
| Reclamos incurridos | | 54,173 |
| Reclamos pagados | | (55,204) |
| Reclamos a pagar - 30 de junio | $ | 4,116 |

Estos reclamos a pagar se presentan como un componente de las cuentas a pagar y los pasivos acumulados en el estado combinado adjunto de resultados netos de las unidades de componentes mayores.

*(d)* *AAA*

La AAA ha adquirido un seguro comercial para mitigar su exposición a ciertas pérdidas que involucran bienes inmuebles y personales (incluidos los daños por tormentas de viento, inundaciones y terremotos) y reclamos generales y de automóviles. La AAA también tiene un Programa de Seguro controlado por el Propietario (OCIP) en virtud del cual la cobertura por responsabilidad general comercial, responsabilidad general excedente, riesgo del constructor y responsabilidad de contaminación de los contratistas se obtiene o proporciona según el proyecto para los contratistas y subcontratistas de cualquier nivel, que están debidamente inscritos, mientras realizan operaciones en el sitio del proyecto correspondiente. Cada póliza de seguro comercial mantenida por la AAA contiene límites y deducibles específicos de la póliza. Los reclamos liquidados que resultan de estos riesgos no han excedido la cobertura de seguro comercial en ninguno de los últimos tres años fiscales.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*(e)* **UPR**

La UPR está expuesta a varios riesgos de pérdida relacionados con daños; robo, daño y destrucción de activos; errores y omisiones; lesiones a los empleados; y desastres naturales. Hasta enero de 1993, la UPR estaba asegurado por pólizas de seguro de reclamos con respecto a riesgos de negligencia médica por $250,000 por ocurrencia hasta un total anual de $500,000. Con posterioridad a dicha fecha, la UPR no pudo obtener un seguro a un costo que se considerar económicamente justificable; en consecuencia, la UPR ahora está autoasegurada para tales riesgos. Según la Ley Núm. 98 del 24 de agosto de 1994, la responsabilidad de la UPR se limita a una cantidad máxima de $75,000 por persona, o $150,000 si involucra acciones por daños a más de una persona o cuando una sola persona lesionada tiene derecho a varias causas radicadas. Los pasivos de riesgo autoasegurados se informan cuando es probable que se haya producido una pérdida y el monto de la pérdida pueda estimarse razonablemente. Los pasivos incluyen un monto por reclamos que se han incurrido pero que no se informaron. El proceso utilizado en el cálculo de los pasivos por reclamos no necesariamente resulta en una cantidad exacta porque los pasivos por reclamos reales dependen de factores tan complejos como la inflación, los cambios en las doctrinas legales y las indemnizaciones por daños. Los pasivos por reclamos se reevalúan periódicamente para tener en cuenta los reclamos recientemente liquidados, la frecuencia de los reclamos y otros factores económicos y sociales.

Los cambios en el monto de los pasivos por reclamos por negligencia médica en el año fiscal 2016 fueron los siguientes (en miles):

| | | |
|---|---|---:|
| Reclamos por pagar - 1 de julio | $ | 8,565 |
| Reclamos incurridos y cambios en los estimados | | 792 |
| Pagos por reclamos y gastos por ajustes | | (418) |
| Reclamos a pagar - 30 de junio | $ | 8,939 |

Además, la UPR ha sido demandada en varios juicios por negligencia médica que surgen del curso normal de los negocios. La gerencia ha registrado una acumulación de $7.6 millones al 30 de junio de 2016 para cubrir reclamos y demandas que pueden ser exigidas contra la UPR. La UPR continúa con seguros comerciales para estos riesgos de pérdida.

Estos reclamos a pagar se presentan como un componente de las cuentas a pagar y los pasivos acumulados en el estado combinado adjunto de resultados netos de las unidades de componentes mayores. La UPR continúa con seguros comerciales para otros riesgos de pérdida.

*(f)* **SIFC**

El SIFC proporciona compensación de trabajadores y seguro a empleados públicos y privados. Este seguro cubre a los trabajadores contra lesiones, discapacidad o muerte causadas por accidentes laborales o relacionados con el empleo, o por enfermedades sufridas como consecuencia de su empleo. El SIFC establece pasivos por los beneficios incurridos pero no pagados y los gastos por ajuste de beneficios basados en el costo final de liquidar los beneficios. Los pasivos incluyen estimados para casos informados que no han sido adjudicados y casos incurridos pero no informados.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

La siguiente tabla proporciona una conciliación de los pasivos iniciales y finales de los beneficios incurridos pero no pagados y los gastos por ajuste de beneficios para el año fiscal más reciente (en miles):

| | | |
|---|---|---:|
| Pasivos por beneficios incurridos pero no pagados y gastos por ajuste de beneficios al 1 de julio | $ | 760,149 |
| Beneficios totales incurridos | | 368,727 |
| Total de pagos de beneficios | | (400,879) |
| Pasivos por beneficios incurridos pero no pagados y gastos por ajuste de beneficios al 30 de junio | $ | 727,997 |

Los pasivos por los beneficios incurridos pero no pagado y los gastos de ajuste de beneficios se basan en datos históricos de experiencia de reclamos, supuestos y proyecciones en cuanto a eventos futuros, que incluyen la frecuencia, gravedad, persistencia y tendencias inflacionarias de los reclamos determinados por un estudio actuarial independiente. Este pasivo ha sido descontado al 3.54% en 2016. La gerencia de SIFC cree que descontar tal pasivo resulta en una mejor correspondencia de costos e ingresos ya que los beneficios de compensación tienen un ciclo de pago largo. Los supuestos utilizados para estimar y establecer el pasivo se revisan anualmente en función de las circunstancias y tendencias actuales.

La gerencia de SIFC cree que los pasivos por beneficios incurridos pero no pagados y los gastos de ajuste de beneficios, determinados actuarialmente al 30 de junio de 2016, son una estimación razonable del costo neto final de la liquidación de los beneficios y gastos de beneficios incurridos. Debido a que los costos reales de los beneficios dependen de factores tales como la duración de la incapacidad del trabajador, las tendencias de los costos médicos, las enfermedades profesionales, la inflación y otros factores sociales y económicos, el proceso utilizado para calcular el costo final de liquidar los beneficios y los gastos para administrar los beneficios se basa necesariamente en estimados. El monto finalmente pagado puede ser superior o inferior a dichos estimados. Los ajustes resultantes de los cambios en los estimados de estos pasivos se cargan o acreditan a las operaciones en el período en que ocurren.

Los pasivos por beneficios incurridos pero no pagados y los gastos por ajuste de beneficios se informan como pasivos por el seguro de accidentes automovilísticos y la compensación de los trabajadores en los estados combinados adjuntos de resultados netos de las unidades de componentes mayores.

**(17) Compromisos y contingencias**

### Gobierno primario

*Contingencias legales*

#### (a) Litigios previos al inicio de los casos del Título III relacionados con operaciones gubernamentales

El ELA ha sido demandado en numerosos procedimientos legales relacionados con asuntos relacionados con el desempeño de operaciones gubernamentales de rutina. En virtud de la Ley Núm. 104 de 29 de junio de 1955, según enmienda, las personas están autorizadas a demandar al ELA solo por causas de acciones establecidas en dicha Ley hasta un monto máximo de $75,000 o $150,000 si involucra acciones por daños a más de una persona. o cuando una sola parte lesionada tiene derecho a varias causas radicadas. En ciertas circunstancias, según lo dispuesto en la Ley Núm. 9 de 26 de noviembre de 1975, según enmienda, el ELA puede proporcionar a sus funcionarios

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

y empleados representación legal, y asumir el pago de cualquier sentencia que se pueda presentar contra ellos. No hay limitación en el pago de dichas sentencias. En la medida en que los reclamos surgieron antes del comienzo del caso del Título III del ELA, su estado y prioridad pueden verse afectados por el caso del Título III.

Con respecto a los litigios pendientes y amenazados que involucran las Actividades del Gobierno del ELA, sin incluir los litigios mencionados en los párrafos siguientes, el ELA informó aproximadamente $326.3 millones como un monto para cubrir las sentencias desfavorables adjudicadas y anticipadas al 30 de junio de 2016. Este monto se incluyó como otros pasivos a largo plazo en el estado adjunto de resultados netos, y representa el monto estimado como un pasivo probable o un pasivo con una fecha de vencimiento fija o esperada que requerirá recursos financieros futuros disponibles para este pago. La gerencia cree que los pasivos finales que excedan los montos provistos, si los hubiera, no serían significativos.

El ELA ha sido demandado en procedimientos paralelos relacionados con una supuesta retención inapropiada de fondos de Medicaid, un caso radicado en el tribunal estatal y dos en el tribunal federal. Los demandantes son varios centros de atención primaria de la salud que buscan recuperar del ELA aproximadamente $800 millones de fondos de Medicaid retenidos por el Departamento de Salud del ELA desde 1997. En febrero de 2005, el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito determinó que el ELA debe devolver los fondos retenidos debido al incumplimiento de una ley federal. El ELA todavía está apelando varias disposiciones de esta determinación, y los montos a devolver y los métodos del plan de pago aún están en proceso de estimación. Al 30 de junio de 2016, el ELA acumuló aproximadamente $173 millones para esta contingencia legal

El ELA ha sido demandado en un procedimiento colectivo presentado por padres de estudiantes de educación especial en las áreas de educación y atención médica. En octubre de 2006, el Tribunal de Apelaciones del Estado decidió a favor de la solicitud de los padres de incluir reclamos por daños de conformidad con el mismo caso de acción colectiva, aunque no como un remedio en la acción colectiva en sí. El tribunal ahora puede otorgar daños a los miembros de la demanda colectiva y, para hacerlo, puede examinar los reclamos dividiéndolos en grupos o considerar cada caso individualmente. Esto requerirá que los padres prueben los daños sufridos de manera individual. El 26 de junio de 2016, el tribunal ordenó la publicación de un edicto público que describiera en detalle el proceso a seguir para presentar reclamos por daños sufridos. Dicho edicto se publicó y abrió un período de reclamos efectivo desde el 14 de agosto de 2016 hasta el 31 de octubre de 2016. El ELA planea defender vigorosamente cada caso individual. El ELA ha acumulado aproximadamente $650 millones para esta contingencia legal al 30 de junio de 2016.

En el caso Vaquería Tres Monjitas, Inc. et al c. Ramírez et al., algunos demandantes alegaron que las tarifas establecidas por el Administrador de la Oficina de Regulación de la Industria Láctea (ORIL) no permitían a los procesadores locales de lácteos de Suiza Dairy y Vaquería Tres Monjitas tuvieron la oportunidad de obtener el beneficio razonable al que tenían derecho constitucional. Las partes llegaron a un acuerdo de solución el 29 de octubre de 2013. Entre otras cosas, el ELA, a través de algunos de sus organismos, acordó contribuir con los siguientes montos a ciertos pagos de acumulación regulatoria que se realizarán de conformidad con el acuerdo de conciliación: $50 millones al 31 de diciembre de 2014, $15 millones al 31 de diciembre de 2015, $15 millones al 31 de diciembre de 2016 y $15 millones al 31 de diciembre de 2017, por un monto original total acumulado por el ELA durante el año fiscal 2014 de $95 millones. El caso ahora está cerrado, pero el tribunal mantendrá la jurisdicción para atender cualquier asunto de cumplimiento o incumplimiento del acuerdo de conciliación. Durante el año fiscal 2015, el ELA pagó $16 millones, de los $50 millones requeridos que vencen el 31 de diciembre de 2014. Al 30 de junio de 2016, el ELA ha acumulado $79 millones para esta contingencia legal,

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

de los cuales $49 millones, correspondientes a las porciones no pagadas al 31 de diciembre de 2015 y 2014, se registran como vencidas y pagaderas dentro del fondo general.

El 2 de diciembre de 2014 y el 16 de enero de 2015, la Comisión de Bolsa y Valores de los Estados Unidos (SEC) solicitó información sobre ciertas emisiones de bonos del ELA y sus unidades de componentes. El ELA está cooperando en la investigación, lo que incluye proporcionar a la SEC documentos e información. La SEC ha informado que las solicitudes de información no deben interpretarse como una indicación de que se ha producido una violación de las leyes federales de valores. Durante abril de 2018, la SEC comunicó que no tienen la intención de recomendar una acción de ejecución contra el ELA.

La AEP, una unidad de componentes combinados como actividad gubernamental, es un demandado o codemandado en varios juicios por presuntos daños e incumplimientos de contratos en casos relacionados con proyectos de construcción. Además, la AEP es un acusado o codemandado en otros casos relacionados con responsabilidad civil y asuntos laborales. La AEP, con base en asesoría legal, ha registrado una acumulación de aproximadamente $17.9 millones al 30 de junio de 2016 para cubrir las probables pérdidas en estos reclamos. En opinión del asesor legal, cualquier pasivo que exceda la cobertura del seguro o la acumulación registrada que pueda surgir de tales reclamos no sería significativa para afectar la posición financiera de la AEP o los resultados de las operaciones.

El SCPT, una unidad de componentes combinados como actividad del gobierno, es un demandado y una parte en numerosos procedimientos legales y demandas extrajudiciales relacionadas con asuntos relacionados con el desempeño de sus operaciones normales. El SCPT ha reconocido aproximadamente $12.7 millones para cubrir juicios desfavorables adjudicados y anticipados al 30 de junio de 2016.

La PHA actúa como demandada y una parte en numerosos procedimientos legales y demandas extrajudiciales relacionadas con asuntos relacionados con el desempeño de sus operaciones normales, incluidos los casos que surgen de presuntos agravios, presuntos incumplimientos de contratos, presuntas infracciones de la ley, discriminación contra empleados, despido ilegal, y procedimientos de condena, entre otros. La PHA ha reconocido aproximadamente $6.0 millones para cubrir los juicios desfavorables adjudicados y anticipados al 30 de junio de 2016.

Del total de la responsabilidad por reclamos legales y juicios reconocidos en las Actividades del Gobierno, aproximadamente $189.2 millones se consideran pagaderos dentro de un año, según los pagos realizados posteriores al 30 de junio de 2016 al 30 de junio de 2017.

La PRMeSA, una unidad de componentes combinados como Actividad de Tipo Comercial, es parte en ciertas acciones legales y reclamos relacionados con negligencia médica que surgen en la conducta ordinaria de su negocio. Aunque la PRMeSA aparece como demandado en los reclamos, muchos de ellos involucran al personal médico de las instituciones miembro y, en efecto, estos reclamos son contra dichas instituciones. Como resultado de la deficiencia de fondos disponibles en el Fondo de Autoseguro al 30 de junio de 2016, cualquier resultado desfavorable puede tener un efecto significativo en la condición financiera de la PRMeSA. Sobre la base de una revisión de los hechos y circunstancias actuales, la gerencia de la PRMeSA ha proporcionado lo que se cree que es una estimación razonable de la exposición a la pérdida asociada a un litigio. La PRMeSA ha establecido una acumulación por pérdidas por reclamos por un monto de aproximadamente $2.3 millones al 30 de junio de 2016 en Actividades de Tipo Comercial en el estado de resultados netos y en el estado de fondos de resultados netos de propiedad exclusiva.

Se le solicitó a la PRHIA, una unidad de componentes combinados como Actividad de Tipo Comercial, que reembolse al Departamento de Hacienda del ELA aproximadamente $103 millones que representan transferencias

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

excedentes de dinero del gobierno central durante los años fiscales 2001–2003. Después de consultar con un asesor legal externo, la PRHIA es de la opinión de que el dinero no tiene que devolverse y cree que la probabilidad de un resultado desfavorable es remota. Por lo tanto, no se ha reconocido ninguna reserva para dicha solicitud en los estados financieros de la PRHIA. La PRHIA también es demandada y codemandada en procedimientos legales relacionados con el desempeño de sus operaciones. Con respecto a los litigios pendientes y amenazados, la PRHIA, en consulta con un asesor legal, ha informado que en esta etapa del procedimiento no pueden ofrecer una opinión sobre el resultado probable. En consecuencia, la gerencia no considera necesario incluir ninguna disposición en sus libros para estos casos y tiene la intención de impugnarlos enérgicamente.

El 21 de diciembre de 2012, el gobierno federal, a través del Departamento de Justicia de los Estados Unidos (USDOJ), radicó una demanda para exigir al ELA y su Departamento de Policía, el cumplimiento de la acción y el plan de remediación radicado el 8 de septiembre de 2011 por el División de Derechos Civiles del USDOJ de conformidad con una investigación que reveló un patrón de violaciones de derechos civiles por parte del Departamento de Policía. Conforme con esta investigación y el informe resultante, el patrón o la práctica de actividad ilegal es el producto de una falla continua por parte del ELA y su Departamento de Policía para proporcionar a los oficiales la orientación, capacitación y herramientas necesarias para participar en la aplicación de la ley constitucional y efectiva. El gobierno federal buscaba un alivio declarativo y equitativo para eliminar este patrón ilegal y al solicitar al ELA y su Departamento de Policía que adoptaran e implementaran políticas y procedimientos en las áreas de reclutamiento, contratación, promociones, políticas, capacitación, supervisión, investigación, disciplina y para evitar que los oficiales de policía priven a las personas de los derechos, privilegios o inmunidades garantizados y protegidos por la Constitución o las leyes de los Estados Unidos. Aunque el reclamo no incluye daños, el plan de acción y remediación propuesto requeriría una inversión de aproximadamente $600 millones, que se espera incurrir en un período de 10 años, a partir del año fiscal 2015. El Secretario de Justicia del ELA todavía está negociando las determinaciones finales de las medidas que implementará el Departamento de Policía en términos de costos finales y plazos. El 17 de julio de 2013, se llegó a un acuerdo definitivo entre el USDOJ y el ELA, que se radicó ante el Tribunal. Según el acuerdo de conciliación, el tribunal desestimó el reclamo, pero retuvo la jurisdicción para garantizar el cumplimiento del acuerdo, mediante el nombramiento de un Asesor de Cumplimiento Técnico. No se requiere ninguna provisión por pasivos en este momento para este plan de remediación. Los gastos y pasivos relacionados se reconocerán como costos durante la ejecución del plan de remediación que comenzó en el año fiscal 2015.

El ELA recibe asistencia financiera del gobierno federal en forma de subvenciones y derechos. La recepción de subvenciones generalmente está condicionada al cumplimiento de los términos y condiciones de los acuerdos de subvención y las leyes y reglamentaciones federales aplicables, incluido el gasto de recursos para fines elegibles. Sustancialmente, todas las subvenciones están sujetas a auditoría según la Circular A 133 de la Oficina de Administración y Presupuesto de los Estados Unidos de América (Circular OGP A 133), todas las cuales se realizan a nivel de departamento o agencia individual. La anulación como resultado de estas auditorías puede convertirse en responsabilidad del ELA. Al 30 de junio de 2016, con base en una evaluación de las desestimaciones federales pendientes, el ELA ha registrado aproximadamente $65.2 millones como otros pasivos a largo plazo en el estado adjunto de resultados netos. Los gastos que aún están sujetos a auditoría podrían no ser permitidos, pero la gerencia cree que dichas futuras no serán importantes para los estados financieros básicos.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*(b)* *Acciones civiles radicadas por varios grupos de tenedores de bonos y otros acreedores contra el ELA antes del comienzo de los casos del Título III.*

Varios grupos de tenedores de bonos, aseguradoras de línea única y fideicomisarios han radicado reclamos que impugnan la constitucionalidad de la Ley de Moratoria. Sin embargo, estas demandas se paralizaron desde el 30 de junio de 2016 hasta el 1 de mayo de 2017 según la paralización del Título IV y se paralizaron al comienzo de los casos del Título III. Para obtener información adicional sobre la Ley de Moratoria, consulte la Nota 3 y la Nota 23.

- *Assured Guar. Corp. c. García Padilla*, Caso Núm. 16-1037-FAB (D.P.R. 7 de enero de 2016)

  El 7 de enero de 2016, un grupo de aseguradoras de línea única de bonos emitidos por la ACT, la PRCCDA y la PRIFA radicaron una demanda en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (el Tribunal de Distrito, y con jurisdicción sobre los Casos del Título III y procedimientos relacionados que se analizan a continuación, el Tribunal Título III) para solicitar (i) una declaración de que EO-2015-46 y EO-2015-49, que priorizaron el pago de los gastos generales sobre el pago de la deuda pública sujeta a ingresos pignorados, violan la cláusula contractual, la cláusula de toma de control y la cláusula de debido proceso de la Constitución de los EE. UU. y la Constitución del ELA son inválidas, nulas y sin efecto, y (ii) un interdicto que prohíbe a los demandados tomar o hacer que se tomen medidas de conformidad con las órdenes ejecutivas. El 17 de mayo de 2017, el Tribunal de Distrito emitió una orden confirmando la paralización. El 8 de agosto de 2017, el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito desestimó la apelación interlocutoria de los demandantes. El 9 de agosto de 2018, el secretario cerró el caso administrativamente hasta que el Tribunal de Distrito ordene su reapertura. No ha habido otra actividad relevante en el expediente.

- *Fin. Guar. Ins. Co. c. García Padilla*, Caso Núm. 16-1095-FAB (D.P.R. 19 de enero de 2016)

  El 19 de enero de 2016, una aseguradora de línea única para los bonos emitidos por la ACT, la PRCCDA y la PRIFA radicó demanda (similar a la del Caso Núm. 16-1037 que se presenta en el párrafo anterior), para solicitar un interdicto que establezca que la Constitución de los EE. UU. tiene prioridad sobre la Sección 8 del Artículo VI de la Constitución del ELA, la Ley OGP y EO-2015-46 y EO-2015-49. El 16 de mayo de 2017, el Departamento de Justicia de Puerto Rico radicó un aviso de paralización según el Título III de PROMESA. El 17 de mayo de 2017, el Tribunal de Distrito emitió una orden confirmando la paralización. También el 17 de mayo de 2017, el Tribunal de Distrito otorgó una moción radicada por Ingrid Rivera-Rocafort, Directora Ejecutiva de la Compañía de Turismo de Puerto Rico. El 9 de agosto de 2018, el secretario cerró el caso administrativamente hasta que el Tribunal de Distrito ordene su reapertura. No ha habido otra actividad relevante en el expediente.

- *Brigade Leveraged Capital Structures Fund Ltd. c. García Padilla*, Caso Núm. 16-1610-FAB (D.P.R. 4 de abril de 2016)

  El titular de una cantidad sustancial de bonos emitidos por el BGF radicó una reclamación para solicitar una declaración de que la Ley de Moratoria, y las órdenes ejecutivas emitidas de conformidad con la Ley, violan las Constituciones de los Estados Unidos y el ELA, y alegó que la Ley de Moratoria (i) reescribe el derechos contractuales y legales y derechos de los acreedores del BGF; (ii) toma, sin el debido proceso o justa compensación, los bienes a los que los acreedores del BGF tienen derecho en beneficio del ELA, otras entidades gubernamentales de Puerto Rico y sus respectivos acreedores; (iii) discrimina abiertamente contra el comercio interestatal al proporcionar un trato preferencial a los tenedores institucionales residentes de Puerto Rico de bonos del BGF sobre los tenedores no residentes de bonos del BGF de igual rango; (iv) establece una ley de quiebras dentro de las facultades del Congreso de los Estados Unidos y el ejercicio

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

del Congreso de estas facultades tiene prioridad; y (v) busca inconstitucionalmente impedir a los acreedores del BGF demandar en un tribunal federal.

El 8 de julio de 2016, los demandados radicaron una petición de paralización de la acción, que el Tribunal de Distrito otorgó el 22 de agosto de 2016. El 15 de noviembre de 2016, el Tribunal de Distrito denegó la moción de los demandantes para anular la paralización, así como la moción de la Junta de Supervisión para intervenir. El 11 de enero de 2017, el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito confirmó la decisión del Tribunal de Distrito y solicitó procedimientos adicionales. El 16 de mayo de 2017, el Departamento de Justicia de Puerto Rico radicó un aviso de paralización según el Título III de PROMESA. El 17 de mayo de 2017, el Tribunal de Distrito emitió una orden confirmando la paralización. El 1 de agosto de 2017, el Tribunal de Distrito *sua sponte* desestimó el caso con perjuicio. El 29 de agosto de 2017, los demandantes radicaron una moción informativa objetando la orden de desestimación. No ha habido más actividad en el expediente.

- *Ambac Assurance Corp. c. Autoridad de Carreteras y Transportación de Puerto Rico*, Caso Núm. 16-1893-FAB (D.P.R. 10 de mayo de 2016)

  Ambac, una aseguradora de línea única de bonos de la ACT, radicó una demanda alegando incumplimiento de contrato e incumplimiento del deber fiduciario basado en la mala gestión de la ACT y la falta de transparencia. La demanda busca, entre otras cosas, (i) un interdicto preliminar que ordene al Banco de Desarrollo Económico para Puerto Rico transferir las ganancias de los ingresos por peajes a cualquier entidad que no sea la ACT, (ii) el descubrimiento acelerado de la condición financiera de la ACT, y (iii) la designación de un síndico provisional para la ACT.

  El 1 de julio de 2016, la ACT radicó una petición de paralización de la acción. El 23 de agosto de 2016, el Tribunal de Distrito otorgó la petición de paralización. El 23 de mayo de 2017, el Departamento de Justicia de Puerto Rico radicó un aviso de paralización según el Título III de PROMESA. El 24 de mayo de 2017, el Tribunal de Distrito emitió una orden confirmando la paralización. No ha habido más actividad en el expediente.

- *Nat'l Pub. Fin. Guar. Corp. c. García Padilla*, Caso Núm. 16-2101-FAB (D.P.R. 15 de junio de 2016)

  El 15 de junio de 2016, un grupo de aseguradoras de línea única radicó una demanda en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico, alegando que la Ley de Moratoria y sus órdenes ejecutivas relacionadas violaron la Constitución de los Estados Unidos y la Constitución del ELA y solicitó varias formas de alivio declaratorio.

  El 7 de julio de 2016, radicó una petición de paralización de la acción. El 22 de agosto de 2016, el Tribunal de Distrito otorgó la petición de paralización. El 15 de noviembre de 2016, el Tribunal de Distrito rechazó las solicitudes del demandante de desestimar la paralización y la moción de la Junta de Supervisión de intervenir. El 15 de mayo de 2017, el Departamento de Justicia de Puerto Rico radicó un aviso de paralización según el Título III de PROMESA. El 17 de mayo de 2017, el Tribunal de Distrito emitió una orden confirmando la paralización. El 1 de agosto de 2017, el Tribunal de Distrito sua sponte desestimó el caso con perjuicio. El 28 de agosto de 2017, el demandante radicó una moción de reconsideración objetando la orden de desestimación. No ha habido más actividad en el expediente.

- *Jacana Holdings I LLC c. Puerto Rico*, Caso Núm. 16-4702-GHW (S.D.N.Y. 21 de junio de 2016)

  El 21 de junio de 2016, un grupo de cuatro fondos de cobertura, cada uno con los bonos de obligación general del ELA, radicó una demanda en el Tribunal de Distrito de los Estados Unidos para el Distrito Sur de

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Nueva York apelando la Ley de Moratoria y cuestionando la estructura de deuda de COFINA para hacer que las ventas y el uso de los recursos fiscales de COFINA no estén disponibles para pagar bonos de obligación general, que los demandantes sostienen que deberían tener prioridad constitucional. Los demandantes solicitan medidas cautelares y declarativas.

El 22 de julio de 2016, los demandantes radicaron una petición de paralización de la acción. El 6 de febrero de 2017, el Tribunal de Distrito emitió una orden para paralizar el caso. El 8 de mayo de 2017, las partes radicaron una carta conjunta notificando al Tribunal de Distrito que la acción se paralizó en virtud del Título III de PROMESA. No ha habido otra actividad relevante en el expediente.

- *Trigo González c. García Padilla*, Caso Núm. 16-2257-FAB (D.P.R. 30 de junio de 2016)

El 30 de junio de 2016, un grupo de residentes de Puerto Rico que poseen bonos emitidos por el BGF o PFC radicaron una demanda impugnando la Ley de Moratoria por motivos constitucionales, alegando que (i) usurpa los poderes conferidos por el Congreso al Tribunal de Quiebras y contenidos en el Código de Bancarrota "(ii) el Código de Quiebras tiene prioridad; y (iii) afecta los derechos de los acreedores sin consentimiento y da preferencia a un acreedor sobre otro en violación de los derechos de los demandantes según la Cláusula Contractual; y (iv) priva a los demandantes de su derecho de propiedad al financiamiento existente y futuro para el reembolso de sus bonos en violación de la Cláusula sobre Expropiaciones. La demanda solicitó una sentencia declaratoria de que ciertas secciones de la Ley de Moratoria, y cualquier acción ejecutiva o gubernamental basada en esas secciones, son nulas y sin efecto.

El 7 de julio de 2016, radicó una petición de paralización de la acción. El 22 de agosto de 2016, el Tribunal de Distrito otorgó la petición de paralización. El 11 de noviembre de 2016, el Tribunal de Distrito denegó la moción de los demandantes para suspender la paralización y la moción del FOMB para intervenir.  El 17 de mayo de 2017, el Departamento de Justicia de Puerto Rico radicó un aviso de paralización según el Título III de PROMESA. El Tribunal de Distrito emitió una orden confirmando la paralización el mismo día. El 18 de mayo de 2017, el Tribunal de Distrito desestimó el caso sin perjuicio de lo dispuesto en un aviso de desestimación voluntaria. Este asunto ya está concluido.

- *Lex Claims, LLC c. García Padilla*, Caso Núm. 16-2374-FAB (D.P.R. 20 de julio de 2016)

El 20 de julio de 2016, ciertos tenedores de bonos de obligación general emitidos por el ELA (GO Bonds) iniciaron una acción en el Tribunal de Distrito contra el ELA y varios de sus funcionarios, incluido el Gobernador, para solicitar (a) un alivio declaratorio que la Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico, Ley Núm. 21-2016, que autorizó al Gobernador a, entre otras cosas, declarar una moratoria temporal en el servicio de la deuda y paralizar los acreedores, y una orden ejecutiva emitida de conformidad con la Ley Núm. 21 que anunció la moratoria sobre el pago de los Bonos GO del ELA, está sujeta por la sección 204(c)(3) de PROMESA y (b) un interdicto para evitar ciertas medidas tomadas por el ELA que permiten transferencias fuera del curso ordinario. El 4 de noviembre de 2016, los demandantes radicaron una segunda demanda enmendada, agregando a COFINA como demandada en su acción contra los funcionarios del ELA. La Segunda Demanda Enmendada solicitó dos sentencias declarativas que apelan la validez legal de COFINA: (1) una declaración de que el Impuesto sobre las ventas pignorado constituye "recursos disponibles" en virtud del Artículo VI, Sección 8 de la Constitución del ELA y que dichos fondos no pueden depositarse en COFINA o sus Titulares de Bonos; y (2) una declaración de que el ELA está obligado a otorgar la prioridad absoluta de la deuda de Obligación General, incluida la prioridad sobre los depósitos requeridos con COFINA y sus Tenedores de Bonos. El 17 de mayo de 2017, después de que se iniciara el caso del Título III de COFINA, el Tribunal Título III paralizó el Litigio de Lex Claims hasta una nueva orden judicial.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El 7 de junio de 2017, la Familia de Fondos de UBS y la Familia de Fondos de Puerto Rico (colectivamente, los Fondos de Puerto Rico) y los fondos mutuos administrados por Oppenheimer Funds, Inc., Franklin Advisers, Inc. y la Primera Familia de Puerto Rico de Fondos (colectivamente, los Demandantes) radicaron la Moción de Alivio de la Paralización Automática del Grupo de Fondos y Fondos Mutuos de Puerto Rico en el caso del Título III de COFINA [ECF Núm. 270] (la Moción de Lex Claims) y solicitaron orden para suspender esa paralización automática para el Litigio de Lex Claims, ante el Tribunal de Distrito, para que el Tribunal de Distrito decida la moción de los Fondos de Puerto Rico para certificar la cuestión de la constitucionalidad de COFINA ante el Tribunal Supremo de Puerto Rico (la Moción de Certificación), y si se otorgaron Mociones de Certificación, para permitir que el Tribunal Supremo de Puerto Rico considere y decida las preguntas certificadas. Como alternativa, los Demandantes solicitaron que el Litigio de Lex Claims se transfiriera de conformidad con la sección 306(d)(3) de PROMESA a los casos del Título III del ELA y COFINA como un procedimiento adversario.

El Tribunal Título III denegó la Moción de Reclamos Legales sin perjuicio, y sostuvo que (1) los Demandantes no demostraron que suspender la paralización resultaría en una resolución parcial o completa de los problemas donde no estaba claro que el Tribunal de Distrito otorgaría la certificación si la paralización se suspende o, si se concede la Moción de Certificación, que el Tribunal Supremo de Puerto Rico aceptaría la certificación; (2) la economía judicial no se lograría mediante la anulación de la paralización automática porque el Tribunal Título III tuvo ante sí varios procedimientos adversos pendientes para abordar las mismas cuestiones planteadas en las preguntas certificadas; (3) la certificación no se había informado completamente en el Litigio de Lex Claims, y las partes en el Litigio de Lex Claims no estaban mejor posicionadas para litigar los problemas en las preguntas certificadas que las partes en los procedimientos del Título III; y (4) los Demandantes no han demostrado un daño particular que puedan sufrir en ausencia del alivio de paralización automática.

El 5 de febrero de 2019, El Tribunal Título III emitió una orden de confirmación enmendada (que se analiza a continuación), confirmando el tercer plan de ajuste enmendado (que también se analiza a continuación). El 12 de febrero de 2019, el Tercer Plan de Ajuste Enmendado fue sustancialmente consumado y entró en vigencia. De conformidad con el art. 1.4 del Tercer Plan de Ajuste Enmendado, el Litigio de Lex Claims se define como una de varias "Acciones"; y de conformidad con el art. 2.1(c), "[e]n la Fecha de entrada en vigencia, de conformidad con la Orden de Acuerdo y la Orden de Confirmación, las Acciones serán desestimadas, con perjuicio, y los Reclamos y causas radicadas alegadas por cualquiera de las partes en las Acciones se considerarán desestimadas, con perjuicio".

- *U.S. Bank Trust Nat'l Ass'n c. García Padilla*, Caso Núm. 16-2510-FAB (D.P.R. 19 de agosto de 2016)

El 19 de agosto de 2016, un fideicomisario sucesor de un acuerdo de fideicomiso que autorizó los bonos de ingresos de UPR radicó una demanda argumentando que OE 2016 31, que suspendió la obligación de UPR de transferir los ingresos pignorados al Banco de EE. UU. era inapropiada y solicitó una medida cautelar y declarativa según PROMESA para evitar que el ELA desvíe los ingresos de la UPR.

El 1 de septiembre de 2016, el Tribunal de Distrito paralizó el asunto. El 21 de julio de 2017, el Tribunal de Distrito aprobó en la estipulación de las partes para paralizar el litigio de conformidad con el Título III de PROMESA en relación con el ELA y el Gobernador, pero no con respecto a la Universidad de Puerto Rico y su presidente. El 1 de agosto de 2017, el Tribunal de Distrito denegó una moción para reabrir el registro como discutible a la luz de la estipulación. No ha habido más actividad en el expediente.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

- *Voya Inst'l Tr. Co. c. Univ. de Puerto Rico*, Caso Núm. 16-2519-FAB (D.P.R. 22 de agosto de 2016)

El 22 de agosto de 2016, el fideicomisario del plan de compensación diferida de la UPR radicó una demanda alegando que, desde abril de 2016, la UPR ha ordenado a Voya que realice distribuciones de emergencia por aproximadamente $33 millones a los participantes del plan. Debido a la insolvencia conocida de la UPR, Voya negó estas solicitudes y paralizó aún más los retiros de emergencia. Debido a esto, la UPR notificó a Voya que la UPR tenía la intención de eliminar a Voya como fideicomisario del plan. En su demanda, Voya reconoció que la UPR tiene el derecho de eliminar a Voya como fideicomisario, pero afirmó que el cumplimiento de la solicitud de la UPR puede exponer a Voya a la responsabilidad por violar la paralización de PROMESA y las restricciones de transferencia si luego se descubre que la UPR es actualmente insolvente. A través de la demanda, Voya solicitó sentencias declarativas de que puede transferir los activos del plan a un fideicomisario sucesor de conformidad con las instrucciones de la UPR sin incurrir en responsabilidad en virtud de PROMESA.

Después de la radicación del caso del Título III del ELA, este caso se convirtió en un procedimiento adverso según Adv. Proc. Núm. 17-00216-LTS en el Título III. Este caso se resolvió en relación con un procedimiento adversario relacionado denominado Univ. de Puerto Rico c. Voya Inst'l Tr. Co., Caso Núm. 17- 00217-LTS (D.P.R. 26 de julio de 2017), como se analiza a continuación.

- *Scotiabank de Puerto Rico c. García Padilla*, Caso Núm. 16-2736-FAB (D.P.R. 28 de septiembre de 2016)

El 28 de septiembre de 2016, Scotiabank de Puerto Rico (un banco con base en Puerto Rico) radicó una demanda contra el ELA. En su demanda enmendada, Scotiabank alegó que un préstamo de $37.5 millones otorgado a la PRMBA estaba asegurado por gravámenes sobre ciertos ingresos tributarios a las ventas de cigarrillos asignados condicionalmente a la PRMBA y que el préstamo estaba en mora desde diciembre de 2015. En esta acción, Scotiabank buscó una medida cautelar y declarativa para evitar que el ELA desviara y expropiara los ingresos tributarios a las ventas de cigarrillos.

El 11 de noviembre de 2016, radicó una petición de paralización de la acción. El 16 de diciembre de 2016, radicó una moción para desestimar. El 31 de enero de 2017, los demandantes radicaron una oposición a la moción de los acusados. Esa moción está pendiente. El 16 de mayo de 2017, el Departamento de Justicia de Puerto Rico radicó un aviso de paralización según el Título III de PROMESA. El 17 de mayo de 2017, el Tribunal de Distrito emitió una orden confirmando la paralización. No ha habido más actividad en el expediente.

- *Servidores Públicos Unidos c. Junta de Supervisión y Administración Financiera para Puerto Rico*, Caso Núm. 17-1483-FAB (D P.R. 12 de abril de 2017)

El 12 de abril de 2017, un sindicato laboral de Puerto Rico radicó una demanda contra la Junta de Supervisión y el ELA, afirmando que el plan fiscal del ELA, certificado por la Junta de Supervisión el 13 de marzo de 2017, violó PROMESA tanto procesal como sustantivamente al exigir el ELA perjudicará inconstitucionalmente los derechos contractuales de los pensionistas y utilizará incorrectamente los fondos de las cuentas de ahorro para el retiro individual de los empleados. La demanda también afirma que la Junta de Supervisión aprobó indebidamente el plan fiscal propuesto por el Gobernador al agregar enmiendas al mismo en lugar de aprobarlo sin enmiendas, lo que el sindicato reclama es el procedimiento adecuado según PROMESA. Como resultado, la demanda busca una medida cautelar y declarativa relacionada para evitar la implementación del plan fiscal del ELA.

228

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El 3 de mayo de 2017, la Junta de Supervisión radicó un aviso de paralización en virtud del Título III de PROMESA. El 4 de mayo de 2017, el Tribunal de Distrito emitió una orden confirmando la paralización. No ha habido otra actividad relevante en el expediente.

- *Rodríguez Perelló c. Rosselló Nevares*, Caso Núm. 17-1566 (D.P.R. 1 de mayo de 2017)

El 2 de mayo de 2017, ciertos tenedores de bonos de COFINA iniciaron una acción en el Tribunal de Distrito para una medida cautelar y declarativa contra COFINA, la AAFAF, el BGF, el Gobernador Rosselló y otros funcionarios gubernamentales. Los demandantes afirmaron que su interés en los valores de COFINA les proporcionaba derechos contractuales y de propiedad protegidos por las Constituciones de los Estados Unidos y el ELA, así como los estatutos federales y de Puerto Rico. Los demandantes afirmaron además que los demandados habían vulnerado estos derechos contractuales de manera ilegal e inconstitucional y se habían apoderado de los bienes de los demandantes. En la acción, los demandantes buscaron protección y vindicación de sus supuestos derechos a través de una sentencia declaratoria de que los demandados habían incumplido las obligaciones constitucionales, estatutarias y contractuales de los demandantes con los tenedores de bonos de COFINA, y una medida cautelar contra la continuación de esas infracciones por parte de los demandados.

Tras el comienzo del caso de Título III de COFINA, el Tribunal Título III emitió una orden el 17 de mayo de 2017, paralizando el litigio. No ha habido otra actividad en esta acción desde el comienzo del caso del Título III de COFINA.

El 5 de febrero de 2019, el Tribunal Título III emitió una Orden de Confirmación Enmendada, confirmando el Tercer Plan de Ajuste Enmendado (como se analiza en la Nota 3 y la Nota 17(c) a continuación). El 12 de febrero de 2019, el Tercer Plan de Ajuste Enmendado fue sustancialmente consumado y entró en vigencia. De conformidad con el Artículo 1.4 del Tercer Plan de Ajuste Enmendado, Rodriguez-Perello, et al. c. Rosselló-Nevares se define como una de varias "Acciones"; y de conformidad con el Artículo 2.1(c), "[e]n la fecha de vigencia, de conformidad con la Orden de Acuerdo y la Orden de Confirmación, las Acciones serán desestimadas, con perjuicio, y los Reclamos y causas radicadas alegadas por cualquiera de las partes en las Acciones se considerarán desestimadas, con perjuicio".

- *Ambac Assurance Corp. c. El ELA de Puerto Rico*, Caso Núm. 17-1567 (D.P.R. 1 de mayo de 2017)

Ambac, una aseguradora de bonos de COFINA, radicó una acción solicitando al Tribunal de Distrito del Distrito de Puerto Rico que invalide el plan fiscal del ELA, según lo certificado por la Junta de Supervisión el 13 de marzo de 2017, y la Ley Núm. 26. Ambac afirma que ambos son inconstitucionales y violan PROMESA. A través de esta demanda, Ambac está tratando de evitar que el ELA use los fondos de SUT utilizados para el pago de la deuda de COFINA.

El 15 de mayo de 2017, la Junta de Supervisión radicó un aviso de paralización en virtud del Título III de PROMESA. El 17 de mayo de 2017, el Tribunal de Distrito emitió una orden confirmando la paralización. No ha habido más actividad en el expediente.

- *Ambac Assurance Corp. c. El ELA de Puerto Rico*, Caso Núm. 17-1568 (D.P.R. 2 de mayo de 2017)

Ambac radicó una acción solicitando al Tribunal de Distrito que invalide toda la legislación de moratoria y las órdenes relacionadas vigentes desde fines de 2015. A través de la legislación y las órdenes de moratoria, Ambac alega que el ELA retiene ciertas fuentes de ingresos: peajes de autopista, tasas de licencia e

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

impuestos sobre productos del tabaco, gasolina y habitaciones de hotel, entre otros, que se utilizan para el pago de la deuda contraída por la PRIFA, la ACT y la PRCCDA. Ambac afirma que las órdenes relacionadas también son inconstitucionales y contrarias a PROMESA.

El 15 de mayo de 2017, la Junta de Supervisión radicó un aviso de paralización en virtud del Título III de PROMESA. El 17 de mayo de 2017, el Tribunal de Distrito emitió una orden confirmando la paralización. No ha habido más actividad en el expediente.

- *Ambac Assurance Corp. c. Departamento del Tesoro de los Estados Unidos*, Caso Núm. 17-0809 (D.D.C. 2 de mayo de 2017)

Ambac demandó al Departamento del Tesoro de los Estados Unidos en relación con el dinero transferido al ELA del impuesto indirecto federal sobre la venta de ron. El ELA ha retenido esta fuente de ingresos, que se utiliza para el pago de ciertos bonos de la PRIFA. La aseguradora solicita que el Tesoro de los EE. UU. deje de transferir estos fondos al ELA hasta que se resuelva la disputa o, como alternativa, que un síndico retenga estos fondos en una cuenta separada.

- *Aurelius Investment, LLC c. El ELA de Puerto Rico*, Índice Núm. 652357/2017 (N.Y. Sup. Ct. 2 de mayo de 2017)

Un grupo de fondos de cobertura, que incluía a Aurelius, Autonomy y Monarch, demandó en el tribunal del estado de Nueva York, exigiendo que el ELA pague casi $243 millones en servicio de la deuda GO, más intereses. Los demandantes poseen aproximadamente $1.4 mil millones en bonos GO emitidos por el ELA en 2014. La demanda afirma que los tenedores de bonos GO tienen derecho a todos los fondos en poder del Departamento de Hacienda para pagar el capital y los intereses restantes de los bonos GO y solicita un interdicto y daños monetarios para dar cuenta de todos los intereses vencidos.

*(c)* *Acciones civiles clave radicadas contra el ELA después del comienzo de los casos del Título III*

- *Assured Guar. Corp. y otros c. El ELA de Puerto Rico, y otros*, Adv. Pro. Núm. 17-00125-LTS (D.P.R. 11 de mayo de 2017)

El 11 de mayo de 2017, ciertas aseguradoras de bonos GO de línea única radicaron un procedimiento contradictorio alegando que el plan fiscal del ELA, según lo certificado por la Junta de Supervisión el 13 de marzo de 2017, era "ilegal" según PROMESA debido a su presunto (i) "incumplimiento de las prioridades legales y gravámenes establecidos por la constitución de Puerto Rico"; (ii) "no diferenciar entre gastos no esenciales y gastos esenciales; (iii) "elevación de todo el gasto no relacionado con deudas por encima del servicio de la deuda"; y (iv) "supuestos económicos inexplicables". Los demandantes cuestionan la legalidad de la Ley Núm. 26 de 2017 alegando que "efectúa los deterioros del contrato y las expropiaciones ilegales de bienes supuestamente autorizados por el Plan Fiscal Ilegal".

A raíz del huracán María, los demandantes radicaron una desestimación voluntaria sin perjuicio el 6 de octubre de 2017, y el Tribunal Título III desestimó el caso el 10 de octubre de 2017.

- *Peaje Investment LLC c. Autoridad de Carreteras y Transportación de Puerto Rico y otros.*, Caso Núm. 17-00151-LTS, 17-00152-LTS (D.P.R. 31 de mayo de 2017)

El 31 de mayo de 2017, el demandante radicó una demanda contra la ACT, el Director Ejecutivo de la ACT en su capacidad oficial, el ELA, el Gobernador, el secretario de Hacienda del

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

ELA, el Director de la Oficina de Gerencia y Presupuesto, la AAFAF, y el Director Ejecutivo de la AAFAF en su calidad oficial. O'Melveny & Myers representa a la AAFAF y su Director Ejecutivo. El demandante alega que (i) posee bonos garantizados por gravámenes sobre ingresos especiales pignorados; (ii) el ELA y la ACT evadieron ilegalmente el pago de esos bonos al desviar ingresos especiales pignorados a usos no autorizados; y (iii) los demandados pagaron ilegalmente bonos de ACT casi exclusivamente de fondos de cuentas de reserva y que esos fondos son propiedad de los tenedores de bonos. El demandante afirma que tiene derecho a ciertos ingresos de peaje de la ACT en el pago de sus bonos, alegando gravámenes legales y consensuales. A través de esta demanda, el demandante busca evitar que el ELA, la AAFAF y sus respectivos funcionarios interfieran con (1) la obligación de la ACT y su Director Ejecutivo de depositar los ingresos de peaje con el agente fiscal; (2) la ejecución de cualquier sentencia que indique a la ACT y su Director Ejecutivo que reanuden el depósito de los ingresos por peajes; y (3) la ejecución de cualquier fallo que ordene a la ACT y su Director Ejecutivo depositar fondos suficientes en el agente fiscal antes de las fechas semestrales del servicio de la deuda. El demandante solo busca una medida cautelar y declarativa.

El 8 de septiembre de 2017, el Tribunal Título III denegó la moción del demandante para un interdicto preliminar, cuya decisión fue apelada ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito. El 8 de agosto de 2018, el Primer Circuito emitió un dictamen afirmando la orden negando la moción de Peaje para un interdicto preliminar y protección adecuada, encontrando que Peaje no tiene un derecho de retención legal. El 26 de octubre de 2018, el demandante radicó una orden de *certiorari*, que el Tribunal Supremo negó el 19 de febrero de 2019.

El 10 de octubre de 2017, el demandante radicó una demanda enmendada, que los demandados respondieron el 17 de noviembre de 2017. El 14 de noviembre de 2018, las partes radicaron un informe de estado conjunto. En el informe de estado, las partes solicitaron la emisión de una orden que les ordenara informar al Tribunal Título III sobre el estado del documento de demanda de *certiorari* y las apelaciones relacionadas de Assured Guaranty Corporation, et al. (Caso Núm. 18-1165, 18-1166) y Ambac Assurance Corporation (Caso Núm. 18-1214). Las partes deben presentar un informe de estado conjunto antes del 29 de abril de 2019.

- *Assured Guaranty Corp., et al. c. El ELA de, et al.,* Caso Núm. 17-00155-LTS, 17-00156-LTS (D.P.R. 4 de junio de 2017)

El 4 de junio de 2017, los demandantes, que aseguran los bonos de la ACT, radicaron una demanda alegando que el ELA y la ACT han participado en un patrón de evasión ilegal del pago de sus deudas al desviar ciertos ingresos especiales pignorados del pago de los bonos de la ACT a otros usos no autorizados. Los demandantes afirman que tienen derecho a los ingresos por peaje de la ACT, los impuestos especiales sobre el combustible y las tarifas de licencia de vehículos motorizados en el pago de sus bonos, y alegan gravámenes legales y consensuales. Los demandantes buscaron diversas formas de alivio declarativo, que incluyen (i) los ingresos que respaldan los bonos de la ACT son ingresos especiales pignorados según el Código de Quiebras, y (ii) todos los fondos mantenidos en las cuentas de reserva son propiedad de los tenedores de los Bonos de la HTA. El 30 de enero de 2018, el Tribunal Título III otorgó las mociones para desestimar y cerró el caso. El 9 de febrero de 2018, el demandante radicó una apelación ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito. El 26 de marzo de 2019, el Primer Circuito confirmó la decisión del Tribunal de Distrito, encontrando que no cometió un error cuando desestimó la demanda enmendada con el argumento de que ni la Sección 922(d) ni la Sección 928(a) del Código de Quiebras dan derecho a los demandantes al alivio solicitado. El Primer Circuito sostuvo que estas secciones "permiten, pero no requieren, el pago continuo durante la tramitación de los procedimientos de quiebra" y "representan la premisa de que cualquier embargo preventivo consensual garantizado por ingresos especiales sobrevivirá al período de quiebra municipal, y, en consecuencia, los municipios pueden elegir continuar con el pago voluntario de estas deudas durante el curso de los procedimientos de quiebra para no

231

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

retrasarse y, por lo tanto, correr el riesgo de no poder obtener financiamiento en el futuro".

- *Ambac Assurance Corp. c. El ELA de Puerto Rico, et al.,* Caso Núm. 17-00159-LTS (D.P.R. 8 de junio de 2017)

  El 8 de junio de 2017, el demandante radicó una demanda contra el ELA, la Junta de Supervisión, la AAFAF, la ACT, el Gobernador Rosselló Nevares, Raúl Maldonado Gautier, José Iván Marrero Rosado, Gerardo José Portela Franco, José B. Carrión III, Andrew G. Biggs, Carlos M. García, Arthur J. González, José R. González, Ana J. Matosantos, David A. Skeel, Jr., Elías Sánchez Sifonte y John Does 1-12, alegando que ciertas leyes y órdenes de moratoria son inconstitucionales e ilegales. El 21 de noviembre de 2017, el tribunal celebró una vista sobre la moción de desestimación. El 28 de noviembre de 2017, según lo indicado en la vista, las partes radicaron escritos complementarios que abordan la aplicabilidad de la sección 544(a) del Código de Quiebras a PROMESA, así como las disposiciones del Código Comercial Uniforme relacionadas con gravámenes no perfeccionados. El 27 de febrero de 2018, el tribunal otorgó la moción de desestimación. El 9 de marzo de 2018, el demandante apeló la desestimación despido ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito. El 15 de enero de 2019, el Primer Circuito realizó una audiencia y emitió una decisión reservada.

- *ACP Master, Ltd., et al. c. El ELA de Puerto Rico, et al.*, Adv. Pro. Núm. 17-00189-LTS (D.P.R. 29 de junio de 2017)

  El 29 de junio de 2017, un grupo de tenedores de bonos GO radicó una demanda alegando que la Junta de Supervisión y el ELA han asignado incorrectamente los ingresos retenidos y los ingresos tributarios a la propiedad a los gastos que no sean el pago de los Bonos GO. Los demandantes solicitaron sentencias declaratorias e interdictos que ordenaran a los acusados segregar y preservar los ingresos para el pago de los Bonos GO.

  El 30 de enero de 2018, el Tribunal de Distrito otorgó la moción de los demandados para desestimar, y desestimó el caso con perjuicio debido a que (i) carecía de jurisdicción sobre el tema para emitir opiniones consultivas sobre los derechos respectivos de las partes a los ingresos sujetos sin una disputa actual y concreta, (ii) el reclamo de la Cláusula sobre Expropiaciones no estaba completo porque el ELA no había tomado una decisión final con respecto al tratamiento de los ingresos sujetos, y (iii) la reparación solicitada restringiría el uso de los ingresos y el ejercicio del ELA de facultades políticas y gubernamentales en violación de la sección 305 de PROMESA. El 1 de febrero de 2018, los demandantes radicaron un aviso de apelación ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito (Caso Núm. 18-1108). El 5 de noviembre de 2018, el Primer Circuito realizó una audiencia y emitió una decisión reservada. El 26 de marzo de 2019, el Primer Circuito confirmó la decisión del Tribunal de Distrito, encontrando que el Tribunal de Distrito desestimó correctamente los motivos apropiados de la demanda.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

- *Asociación de Profesoras y Profesores del Recinto Universitario de Mayagüez, Inc. (APRUM) c. El ELA de Puerto Rico, et al.*, Adv. Pro. Núm. 17-00197-LTS (D.P.R. 9 de julio de 2017)

  El 9 de julio de 2017, una asociación de profesores de la UPR radicó un procedimiento contradictorio alegando que la UPR "es el principal catalizador para el desarrollo económico sostenible" y, por lo tanto, es un servicio esencial en virtud de la sección 201 de PROMESA. La demanda argumenta que el plan fiscal del ELA, tal como lo certificó la Junta de Supervisión el 13 de marzo de 2017, no logró diferenciar "entre los servicios 'esenciales' de mayor prioridad y los 'servicios no esenciales' de menor prioridad" e "inflar artificialmente los gastos del ELA al incluir el llamado' Ajuste de Reconciliación' de $585 millones".

  El 6 de noviembre de 2017, APRUM radicó una demanda enmendada en lugar de responder a la moción de desestimación de los demandados. El 8 de diciembre de 2017, la juez Dein otorgó la moción de las partes para suspender este caso hasta que se certificaran los planes fiscales revisados para el ELA y la UPR. APRUM radicó una segunda demanda enmendada el 11 de mayo de 2018, para apelar el nuevo plan fiscal del ELA certificado por la Junta de Supervisión el 19 de abril de 2018. El 21 de agosto de 2018, los demandantes radicaron una moción de desestimación voluntaria y el Tribunal Título III desestimó el caso.

- *Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico c. Altair Global Credit Opportunities Fund (A), LLC, y otros,* Caso Núm. 17-00213 (D.P.R. 21 de julio de 2017)

  El 21 de julio de 2017, la Junta de Supervisión radicó esta demanda en nombre del SRE de conformidad con una estipulación entre ciertos Tenedores de Bonos del SRE, por un lado, y la Junta de Supervisión, el SRE y la AAFAF por el otro. Ver la causa Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico, Caso Núm. 17- 03566, [ECF Núm. 170] (D.P.R. 14 de julio de 2017) (la Estipulación). De conformidad con la Estipulación, el FOMB, en nombre del SRE, solicitó una reparación declaratoria que cuestionara la validez, prioridad, alcance y exigibilidad de los gravámenes previos y posteriores a la petición y los intereses de seguridad afirmados por los demandados con respecto a los bonos emitidos por el SRE. La demanda alegaba que los supuestos gravámenes e intereses de seguridad de los demandados no se perfeccionan porque las declaraciones de financiamiento requeridas por el UCC y las enmiendas posteriores eran defectuosas. SRE también cuestionó, entre otras cosas, el supuesto derecho de garantía de los tenedores de bonos del SRE en las contribuciones de los patronos posteriores a la petición. Los demandados presentaron contrademandas relacionadas con las mismas cuestiones.

  En la Estipulación, las partes también acordaron que el SRE haría los pagos de intereses adeudados el 1 de octubre de 2017 de la Cuenta Segregada Prepetición del SRE (que se creó de conformidad con una estipulación y una orden fechada el 17 de enero de 2017) y que estos pagos constituirían una protección adecuada para los acreedores hasta el 31 de octubre de 2017 con respecto a la paralización automática. El 28 de noviembre de 2017, ciertos Tenedores de Bonos del SRE (los Fondos de Puerto Rico) radicaron una moción para exigir al SRE que continúe haciendo pagos desde la Cuenta Segregada de Prepetición hasta que el Tribunal Título III dictaminó sobre la moción de sentencia sumaria de las partes. En la causa The Financial Oversight and Management Board for Puerto Rico, como representante del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico, Caso Núm. 17-03566, [ECF No. 222] (D.P.R. 28 de noviembre de 2017). El 28 de diciembre de 2017, el Tribunal Título III otorgó la moción en parte. Id. [ECF Núm. 248] (D.P.R. 28 de diciembre de 2017). El Tribunal Título III ordenó al SRE transferir los pagos de intereses de diciembre de 2017 y enero de 2018 de conformidad con la Estipulación, y luego transferir el pago de intereses antes del día 20 de cada mes hasta lo que suceda primero, la orden del Tribunal Título III sobre la moción de sentencia sumaria, o (ii) el agotamiento de los fondos de la cuenta Segregada Previa a la Petición. Id.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El 13 de diciembre de 2017 tuvo lugar una vista sobre las mociones de sentencia sumaria de las partes. El 17 de agosto de 2018, el Tribunal Título III otorgó una sentencia sumaria parcial a favor del SRE, encontrando que los gravámenes de los tenedores de bonos no estaban perfeccionados y eran evitables según la sección 544 del Código de Quiebras, tal como se incorporó a PROMESA por la sección 301(a), 11 U.S.C. § 2161(a). El 5 de septiembre de 2018, el tribunal emitió una orden desestimando las causas restantes y las contrademandas. Esta decisión fue apelada ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito.

El 30 de enero de 2019, el Primer Circuito (i) afirmó que el Tribunal Título III sostenía que las declaraciones de financiamiento de 2018 relacionadas con los bonos del SRE no perfeccionaban el derecho de garantía de los titulares de bonos del SRE en bienes pignorados, (ii) afirmaban la desestimación del reclamo de los titulares de bonos del SRE sobre una estipulación de enero de 2017, y (iii) revirtió el Tribunal Título III al encontrar que los tenedores de bonos del SRE cumplieron con el requisito de perfección a partir del 17 de diciembre de 2015.

- *Altair Global Credit, et al. c. El ELA de Puerto Rico, et al.*, Caso Núm. 17-00219-LTS (D.P.R. 27 de julio de 2017)

El 27 de julio de 2018, los demandantes, los tenedores de bonos del SRE, iniciaron una demanda contra el ELA, la Junta de Supervisión, la AAFAF, el SRE, el Gobernador y el Secretario de Hacienda, Raúl Maldonado Gautier. La demanda busca una declaración de que la Resolución Conjunta 188 y la Ley Núm. 106 de 2017 (conjuntamente, la Legislación PayGo), son nulas ab initio debido a que viola la paralización automática del Código de Quiebras y viola las cláusulas de toma de control y de contrato de la Constitución de los EE. UU. El 17 de noviembre de 2017, la Junta de Supervisión, la AAFAF y otros demandados solicitaron la desestimación de la demanda en su totalidad. El 2 de febrero de 2018, el Tribunal Título III consideró las mociones de desestimación presentadas. El 9 de septiembre de 2018, el tribunal suspendió el caso hasta que el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito emitiera una decisión con respecto a la apelación de sentencia sumaria en el SRE c. Altair Global Credit Opportunities Fund (A), LLC, et al., Adv. Proc. Núm. 17-00213-LTS (D.P.R. 21 de julio de 2017), que se presentó el 30 de enero de 2019. Ninguna de las partes solicitó la anulación de la paralización.

El 1 de marzo de 2019, el Tribunal de Distrito desestimó este caso sin perjuicio de Altair Global Credit Opportunities Fund (A), LLC and Nokota Capital Master Fund, L.P. Como resultado, el caso se denominó *Andalusian Global Designated Activity Co., et al. c. El ELA de Puerto Rico, et al.*, Adv. Proc. Núm. 17-00219, 17-00220 (D.P.R.).

- *Univ. de Puerto Rico c. Voya Inst'l Tr. Co.*, Caso Núm. 17-00217-LTS (D.P.R. 26 de julio de 2017)

El 28 de diciembre de 2016, la UPR radicó en el Estado Libre Asociado de Puerto Rico, Tribunal de Primera Instancia, Sala Superior de San Juan, una demanda verificada contra Voya, y una moción de interdicto preliminar, para solicitar una orden que obligue a Voya a cumplir con la demanda de la UPR de transferir los activos de los Fideicomisos. El 4 de enero de 2017, Voya retiró la acción de la UPR dla juez Besosa del Tribunal de Distrito de los Estados Unidos para presentarla en el Distrito de Puerto Rico. El 21 de julio de 2017, la juez Besosa transfirió el caso denominado *Voya Inst'l Tr. Co. c. Univ. de Puerto Rico*, Caso Núm. 16-2519 FAB (D.P.R. 22 de agosto de 2016) y la acción de la UPR a la juez Swain en el Tribunal Título III. El 18 de agosto de 2017, las acciones fueron remitidas a la juez Auxiliar Judith G. Dein para la gestión previa al juicio.

El 19 de junio de 2018, Voya y la UPR mediaron con la Honorable Roberta A. Colton del Tribunal de Quiebras de los Estados Unidos para el Distrito Medio de Florida. En la mediación, Voya y la UPR acordaron en principio un acuerdo para resolver sus acciones respectivas. El 30 de julio de 2018, la juez

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Swain transfirió las acciones de Voya y la UPR a la juez Besosa; en la misma fecha, la juez Besosa ordenó que las acciones permanecieran remitidas a la juez Auxiliar Dein. El 3 de enero de 2019, Voya y la UPR celebraron un acuerdo de solución en virtud del cual las partes acordaron que la UPR presentaría una moción sin oposición solicitando la emisión de una orden (i) estableciendo que la UPR no es insolvente en el sentido de los acuerdos de confianza y (ii) autorizando a Voya a cumplir prospectivamente con las instrucciones de la UPR con respecto al desembolso de fondos de los Fideicomisos. El 9 de enero de 2019, la UPR radicó su moción sin oposición para sentencia sumaria parcial; la implementación del acuerdo de conciliación depende de que el de Tribunal Distrito otorgue la moción de la UPR. El 15 de enero de 2019, el Tribunal de Distrito ordenó que Voya respondiera a la moción de la UPR antes del 31 de enero de 2019. El 29 de enero de 2019, Voya radicó una respuesta en apoyo de la moción de la UPR, afirmando que "no se opone a la reparación solicitada por la UPR en su moción". El 30 de enero de 2019, el Tribunal de Distrito emitió una orden otorgando la moción de la UPR, y el 31 de enero de 2019 emitió una sentencia parcial consistente con su orden.

- *Asociación de Salud Primaria de Puerto Rico et al. c. El ELA de Puerto Rico et al.*, Adv. Pro. Núm. 17-00227-LTS (D.P.R. 2 de agosto de 2017)

El 2 de agosto de 2017, los demandantes, un grupo de centros de salud sin fines de lucro en Puerto Rico, retiraron a el Tribunal Título III ciertos reclamos pendientes desde 2002 en el Tribunal de Primera Instancia de Puerto Rico (la Acción del Tribunal de Puerto Rico de 2002) alegando que el ELA y sus funcionarios no han cumplido con sus deberes ministeriales con los demandantes para complementar los pagos por servicios de Medicaid a pacientes indigentes. Los demandantes solicitan un recurso de mandamus y una sentencia declarativa de que el ELA debe reembolsar los gastos incurridos por prestar servicios a los beneficiarios de Medicaid.

El 14 de noviembre de 2017, el Departamento de Justicia de Puerto Rico, en nombre del ELA, radicó una moción de abstención para que el caso fuera remitido al Tribunal de Primera Instancia de Puerto Rico. El 11 de diciembre de 2017, el Tribunal Título III emitió una orden enmendada remitiendo el caso a la juez Auxiliar Dein para la gestión general previa al juicio y para un informe y recomendación sobre la moción de abstención del ELA. El 2 de abril de 2018, la juez Dein recomendó que el Tribunal Título III remitiera el procedimiento del adversario al Tribunal de Primera Instancia de Puerto Rico. Los demandantes radicaron objeciones al informe y la recomendación de la Juez Dein. El 10 de julio de 2018, el Tribunal Título III anuló estas objeciones y adoptó el informe y la recomendación de la Juez Dein de abstenerse del procedimiento. El 16 de febrero de 2019, los demandantes radicaron una apelación ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, que actualmente está pendiente.

- *Unión de Trabajadores de la Industria Eléctrica y Riego (UTIER) c. Autoridad de Energía Eléctrica de Puerto Rico y otros*, Caso Núm. 17-00228-LTS (D.P.R. 7 de agosto de 2017)

Aurelius radicó una moción para desestimar todos los casos del Título III, argumentando que el nombramiento de los miembros de la Junta de Supervisión violó la Cláusula de Nombramientos de la Constitución de los Estados Unidos y, en consecuencia, que los actos de la Junta de Supervisión, incluida la emisión de la certificación de reestructuración y el inicio de los casos del Título III, son nulos.  UTIER radicó este procedimiento de oposición con el mismo efecto.

El 13 de julio de 2018, el Tribunal Título III negó la moción de desestimación de Aurelius. El 17 de julio de 2018, Aurelius radicó un aviso de apelación ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito. El 3 de diciembre de 2018, el Primer Circuito realizó una audiencia y emitió una decisión reservada. El 15 de febrero de 2019, el Primer Circuito sostuvo que el método de nombramiento de

235

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

PROMESA para la Junta de Supervisión es inconstitucional. El tribunal no desestimó las peticiones del Título III solicitadas por los demandantes, sino que, por el contrario, validó expresamente los actos pasados de la Junta de Supervisión y mantuvo el mandato del Primer Circuito durante 90 días. El 1 de marzo de 2019, UTIER radicó una moción para solicitar una audiencia de panel o en audiencia, argumentando que los actos pasados de la Junta de Supervisión no pueden ser validados y que la Junta de Supervisión está actuando sin autoridad legal. El 28 de febrero de 2019, la Junta de Supervisión anunció que apelará la decisión del Primer Circuito ante la Corte Suprema de los EE. UU. y que solicitará una paralización del mandato del Primer Circuito hasta que el Tribunal Supremo considere la petición de la Junta de Supervisión para una orden de certiorari. El último día para presentar una petición de una orden de certiorari es el 16 de mayo de 2019.

- *Unión de Trabajadores de la Industria Eléctrica y Riego (UTIER) c. Autoridad de Energía Eléctrica de Puerto Rico y otros*, Caso Núm. 17-00229-LTS (D.P.R. 7 de agosto de 2017)

  El demandante UTIER cuestiona la constitucionalidad de cuatro estatutos del ELA y los Planes y Presupuestos Fiscales del ELA y la AEE de 2017 que supuestamente "adoptan" y "implementan" esos estatutos, argumentando que violan los términos de un acuerdo de negociación colectiva entre UTIER y la AEE. La moción para desestimar se informó por completo el 28 de marzo de 2018. El 26 de septiembre de 2018, el Tribunal Título III emitió una orden otorgando en parte y negando en parte las mociones para desestimar la demanda enmendada. El 17 de diciembre de 2018, los demandados restantes respondieron la demanda enmendada.

- *American Federation of State, County & Municipal Employees, AFL-CIO c. Junta de Supervisión y Administración Financiera para Puerto Rico y otros,* Cas Núm. 17-00242, 17-00243 (D.P.R. 22 de agosto de 2017)

  El 22 de agosto de 2017, la Federación Estadounidense de Empleados Estatales, del Condado y Municipales (AFSCME) radicó una demanda para apelar el plan fiscal de 2017 de la Junta de Supervisión para el ELA como inapropiado según PROMESA. AFSCME solicita (1) una declaración de que las enmiendas de la Junta de Supervisión al plan fiscal eran ilegales o no formaban parte de dicho plan fiscal, y que las contribuciones propias de los empleados a sus cuentas de retiro deben pagarse en su totalidad y no pueden verse perjudicadas por un plan de ajuste y (2) una orden que imponga un fideicomiso y prohíba la venta de activos de fondos de pensiones atribuibles a las contribuciones de los empleados. El 23 de octubre de 2017, el tribunal otorgó la petición de paralización de AFSCME para suspender el procedimiento en espera de otros tribunales adicionales. El 13 de diciembre de 2018, AFSCME radicó una notificación de desestimación voluntaria sin perjuicio. El 14 de diciembre de 2018, el Tribunal de Distrito cerró el caso.

- *Comité Oficial de Acreedores no Asegurados del Estado Libre Asociado de Puerto Rico como Agente del Estado Libre Asociado de Puerto Rico c. Bettina Whyte como Agente de COFINA (En la causa: Junta de Supervisión y Administración Financiera para Puerto Rico)*, Adv. Pro. Núm. 17-00257-LTS (D. P.R. 8 de septiembre de 2017)

  El 10 de agosto de 2017, el Tribunal Título III emitió una orden (la Orden de Procedimientos) para aprobar un protocolo para resolver las disputas entre el ELA y la COFINA. La Orden de Procedimientos define la Disputa del ELA-COFINA como "si, después de considerar todas las defensas y contrademandas procesales y sustantivas, incluidas las cuestiones constitucionales, los impuestos sobre las ventas y el uso supuestamente pignorados por COFINA para garantizar la deuda son propiedad del ELA o la COFINA según la ley aplicable. . ." La Orden de Procedimientos preveía el nombramiento de (1) un agente de la Junta de Supervisión como representante del ELA en su Caso del Título III (el Agente del ELA); y (2) un agente de la Junta de Supervisión como representante de COFINA en su Caso del Título III (el Agente de COFINA).

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El 8 de septiembre de 2017, el Agente del ELA radicó una demanda afirmando que los ingresos de SUT pignorados por COFINA para asegurar la deuda de bonos son "propiedad exclusiva del ELA". La demanda alega que la legislación habilitadora de COFINA "no transfirió a COFINA la propiedad actual de los ingresos futuros del IVU" y no asignó a COFINA el derecho del ELA a recibir dichos ingresos. La demanda argumentaba que la transferencia a COFINA de los ingresos de SUT era, a lo sumo, una promesa no segura de transferir ingresos en el futuro. Además, la demanda alegaba que incluso si la transferencia de futuros ingresos del IVU a COFINA tuviera algún efecto legal, tales transferencias son un derecho de garantía sobre bienes adquiridos regidos por el Artículo 9 del Código Comercial Uniforme. La demanda alegaba que cualquier derecho de garantía de COFINA en los ingresos de SUT no es ejecutable contra el ELA o, como alternativa, no estaba perfeccionado y, por lo tanto, era evitable y de otro modo subordinado a los derechos de la Junta de Supervisión como fideicomisario. La demanda afirmó además que el caso del Título III del ELA corta cualquier derecho de garantía.

La demanda también alegó que la estructura de COFINA era inconstitucional porque elude las limitaciones de la deuda de la Constitución del ELA.

El 15 de septiembre de 2017, el Agente de COFINA radicó su respuesta a la Demanda (la Respuesta y las Contrademandas) disputando los reclamos del Agente del ELA, afirmando varias reconvenciones y solicitando sentencias declarativas que: (a) la legislación habilitadora de COFINA es constitucional y, por lo tanto, hizo que el Impuesto sobre las ventas pignorado transferido a COFINA sea propiedad de COFINA y no un "recurso disponible" del ELA; (b) COFINA tiene un derecho de retención perfeccionado e inevitable en el Impuesto sobre las ventas pignorado, o existe un acuerdo de subordinación exigible por el cual el ELA ha acordado subordinar cualquier interés que pueda tener sobre el Impuesto sobre las ventas pignorado al interés de COFINA, o el Impuesto sobre las ventas pignorado mantiene en un fideicomiso constructivo en beneficio de COFINA; (c) la apropiación indebida por parte del ELA del Impuesto sobre ventas pignorado viola las Constituciones de los Estados Unidos y el ELA; (d) la ley de cumplimiento del plan fiscal viola PROMESA; (e) La Ley Núm. 84-2016, que modificó la legislación que permite a COFINA reducir el monto de los ingresos del SUT que COFINA recibe del 6.0% al 5.5%, viola PROMESA, y COFINA tiene derecho al 6.0% de los ingresos del SUT hasta que el monto de la base imponible del impuesto sobre ventas pignorado se alcance cada año; y (f) cualquier deuda que no sea de COFINA, incluidos los bonos de obligación general del ELA emitidos en violación de las disposiciones de límite de deuda en la Constitución de Puerto Rico, no tienen derecho a prioridad según las disposiciones de prioridad de deuda de la Constitución del ELA. La Respuesta y Contrademandas del Agente de COFINA también solicitaron un interdicto, que incluyen que: (y) el Tribunal Título III imponga un fideicomiso constructivo en el favor de COFINA sobre el Impuesto sobre ventas pignorado para evitar la supuesta interferencia y fraude del ELA con respecto a dichos ingresos; y (z) el Tribunal Título III ingrese una orden que prohíba permanentemente al ELA desviar o transferir los ingresos del Impuesto sobre ventas pignorado fuera de COFINA, designando dichos ingresos como "recursos disponibles" y tomando cualquier acción para violar, revocar o rechazar la transferencia de dichos ingresos a COFINA o interferir de otro modo con los derechos de COFINA a dichos ingresos.

Además de los reclamos alegados por el Agente del ELA y el Agente de COFINA, múltiples grupos de tenedores de bonos de COFINA y el ELA, así como otras partes a las que se les permitió intervenir en el procedimiento de oposición, radicaron contrademandas y reclamos cruzados con respecto a la propiedad de la porción aplicable del SUT.

El 21 de diciembre de 2017, el Tribunal Título III emitió una orden desestimando, sin perjuicio, varios de los reclamos del Agente del ELA y del Agente de COFINA por estar fuera del alcance de la

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Disputa ELA-COFINA, así como varios reclamos presentados por las partes intervinientes (los Reclamos Desestimados). El Tribunal Título III determinó que el alcance de la Disputa ELA-COFINA, según se define en la Orden de Procedimientos, se limita a si el ELA o COFINA poseen el Impuesto sobre ventas pignorado. Con respecto a los Reclamos Desestimados, el Tribunal Título III encontró que, estaban fuera del alcance de la Disputa ELA-COFINA porque presumían la propiedad del ELA o de COFINA del Impuesto sobre ventas pignorado o abordaban otros asuntos que no estaban relacionados con la cuestión de la propiedad. Tras la orden del Tribunal Título III y la orden posterior que permitía al Agente del ELA enmendar su demanda, lo que hizo el 16 de enero de 2018, los únicos reclamos restantes del Agente del ELA afirmaron que (a) la Ley 91 no transfirió la propiedad actual de los Ingresos futuros del SUT a COFINA (b) la Ley 91 no asignó a COFINA ningún "derecho a recibir" ingresos futuros del SUT; y (c) la Ley 91 fue diseñada para violar las disposiciones de la deuda y el presupuesto equilibrado de la Constitución de Puerto Rico, y lo hizo. Los únicos reclamos restantes del Agente de COFINA afirmaron que la Ley 91 es constitucional y que el Impuesto sobre ventas pignorado y el Fondo de impuesto dedicado a las ventas son propiedad de COFINA.

El 21 de febrero de 2018, el Agente del ELA, el Agente de COFINA y varias de las partes intervinientes radicaron mociones cruzadas para una sentencia sumaria. En su moción, el Agente del ELA afirmó que (a) la Ley 91 no transfirió a COFINA un interés de propiedad actual en posibles ingresos fiscales futuros porque no existe tal propiedad para ser transferida; (b) no hubo una "venta real" de ingresos tributarios futuros a COFINA porque el ELA retuvo la facultad de sustituir, reducir o incluso eliminar esos ingresos, y el ELA y COFINA representaron la transacción en cuestión como un "préstamo colateralizado" "por el ELA en lugar de una "venta" de ingresos a COFINA; (c) la Ley 91 no transfirió a COFINA el "derecho a recibir" ingresos tributarios futuros del ELA porque la Ley no dice nada al respecto, y el ELA no tiene "derecho a recibir" ingresos tributarios hasta que se produzca una transacción imponible; y (d) la Ley 91 y la supuesta transferencia de ingresos del SUT son inconstitucionales porque la Asamblea Legislativa no puede crear estructuras financieras que operen como una evasión de la deuda y disposiciones presupuestarias equilibradas de la Constitución del ELA. Las partes intervinientes que radicaron mociones cruzadas a favor del ELA Commonwealth afirmaron, entre otras cosas, que (a) el alcance del Procedimiento de Oposición se limita a la propiedad de los ingresos posteriores a la petición y futuros del SUT que no pueden haber sido transferidos a COFINA debido a la paralización automática (b) según el Código Civil de Puerto Rico, el ELA no transfirió la propiedad de futuros ingresos del SUT a COFINA; (c) según el Código de Quiebras, un "derecho a recibir" ingresos futuros del SUT no es un activo que pueda transferirse; (d) el Impuesto sobre ventas pignorado sigue siendo propiedad del ELA porque es un "recurso disponible" según la Constitución del ELA; y (e) La Ley 56 no transfirió la propiedad del Impuesto sobre ventas pignorado a COFINA. Por el contrario, el Agente de COFINA afirmó que la Asamblea Legislativa tiene el poder de transferir, y lo hizo, el Impuesto sobre ventas pignorado a COFINA a través de la Ley 91. Las partes intervinientes que radicaron mociones cruzadas a favor de COFINA afirmaron, entre otras cosas, que (a) la transferencia del Impuesto sobre ventas pignorado del ELA a COFINA era válida según la Constitución del ELA; (b) el Impuesto sobre ventas pignorado no es un "recurso disponible" según la Constitución del ELA; (c) no es "legalmente imposible" transferir futuros ingresos del SUT; y (d) los términos claros de la legislación habilitadora de COFINA transfirieron claramente la propiedad del Impuesto sobre ventas pignorado a COFINA. El 10 de abril de 2018 se celebró una vista sobre las mociones cruzadas.

Simultáneamente con el litigio en el proceso de oposición, los agentes participaron en una mediación sancionada por el tribunal para resolver la disputa ELA-COFINA. A través de los auspicios de un equipo de mediación designado por el tribunal, los Agentes llegaron a un entendimiento establecido en ese

238

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Acuerdo de Principio (el Acuerdo de Principio) sobre una solución de la disputa ELA-COFINA. El 5 de junio de 2018, los Agentes radicaron una moción conjunta (Moción de Tolerancia) para suspender la decisión del Tribunal Título III sobre las mociones pendientes de sentencia sumaria en suspenso durante sesenta (60) días debido a su acuerdo en principio para resolver la disputa ELA-COFINA. El 7 de junio de 2018, los Agentes anunciaron públicamente los términos de su Acuerdo en Principio.

De conformidad con el Acuerdo de Principio, una parte de los ingresos del 5.5% del SUT actualmente asignados condicionalmente a COFINA, que se denomina Monto Base del Impuesto sobre Ventas (PSTBA), se compartiría entre COFINA y el ELA. El PSTBA es el monto base de los ingresos del Impuesto sobre Ventas del 5.5% asignado a COFINA que COFINA debe recibir bajo la Ley Núm. 91 generalmente antes de que el balance del Impuesto sobre Ventas del 5.5% pueda ponerse a disposición del ELA. A la fecha del Acuerdo en Principio, el PSTBA fue de aproximadamente $783.2 millones para el año fiscal 2019 y creció un 4% anual hasta alcanzar aproximadamente $1,850 millones en el año fiscal 2041. El Acuerdo de Principio propuso, entre otras cosas, dividir el PSTBA para que COFINA recibiera el 53.65% del PSTBA a partir del año fiscal 2019, mientras que el ELA recibiría el otro 46.35%, sujeto a ciertas restricciones y excepciones. El balance de los ingresos por impuestos a las ventas del 5.5% asignados a COFINA continuaría fluyendo al ELA. Esta descripción del Acuerdo en Principio se proporciona para la conveniencia del lector y se califica en su totalidad por referencia a las disposiciones del Acuerdo de Principio. En la medida en que exista alguna discrepancia entre la descripción aquí contenida y los términos establecidos en el Acuerdo de Principio, los términos establecidos en el Acuerdo de Principio prevalecerán. Se recomienda a los lectores que consulten el Acuerdo de Principio, que es un documento público.

El 29 de agosto de 2018, COFINA, AAFAF, la Junta de Supervisión y varios tenedores y aseguradores de los bonos de COFINA (las Partes del Acuerdo) celebraron ese cierto Acuerdo de Apoyo al Plan con fecha del 29 de agosto de 2018 (el PSA Original) , que contempla, entre otras cosas, (i) el compromiso y la solución de la Disputa del ELA-COFINA, de conformidad con el Acuerdo de Principio, otorgando a COFINA una participación en la propiedad de un monto de hasta el 53.65% del Monto base del impuesto sobre las ventas pignorado (los Ingresos de COFINA); y (ii) la aprobación del Tribunal Título III del compromiso y el acuerdo al mismo tiempo a través de un plan de ajuste en el caso del Título III de COFINA y una moción de acuerdo en el caso del Título III del ELA.

El 20 de septiembre de 2018, el PSA original se modificó y reformuló de conformidad con ese Acuerdo de apoyo al plan enmendado y reexpresado con fecha del 20 de septiembre de 2018 (el PSA enmendado), para incluir a ciertos tenedores adicionales de los bonos de COFINA, que también tenían una participación significativa monto de los bonos de obligación general del ELA y se encontraban entre los demandantes en el Litigio de Reclamos Legales. Entre otras cosas, el PSA enmendado establece que (i) Aurelius Capital Master, Ltd. y Six PRC Investments LLC, y cada una de sus entidades aplicables, solicitarán la desestimación, sin perjuicio, de sus reclamos y causas radicadas en el Litigio de Lex Claims, vigente a partir de la emisión de una orden que aprueba la moción de acuerdo y la confirmación de un plan de ajuste consistente con el PSA enmendado, y (ii) las partes en el PSA enmendado generalmente no se opondrán a la aprobación de la moción de acuerdo en el caso del Título III del ELA.

Esta descripción del PSA original y el PSA enmendado se proporciona para la conveniencia del lector y se califica en su totalidad por referencia a las disposiciones del PSA original y el PSA enmendado, respectivamente. En la medida en que exista alguna discrepancia entre la descripción contenida en este documento y los términos establecidos en el PSA original y el PSA enmendado, los términos establecidos en el PSA original y el PSA enmendado prevalecerán, respectivamente. Se recomienda a lectores están que

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016 consulten el PSA original y el PSA enmendado, que son documentos públicos.

El 19 de octubre de 2018, la Junta de Supervisión radicó (i) el Plan de Ajuste del Título III de la Corporación del Fondo de Interés Apremiante de Puerto Rico [Caso Núm. 17-3283, Expediente Núm. 4072] (el Plan de Ajuste), la Declaración de Divulgación para el Plan de Ajuste del Título III de las Deudas de la Corporación del Fondo de Interés Apremiante de Puerto Rico [Caso Núm. 17-3283, Expediente Núm. 4073] (la Declaración de Divulgación), y la Moción de Pedido de la Corporación del Fondo de Interés Apremiante de Puerto Rico (i) que aprueba la Declaración de Divulgación, fija la fecha del registro de votación, (iii) aprueba del aviso de vista de confirmación, (iv) aprueba paquetes de solicitud y procedimientos de distribución, (v) aprueba de formularios de boletas y avisos electorales, y procedimientos de votación y elección, (vi) aprueba el aviso de estado de no votación, (vii) fija los plazos de votación y elección, y (viii) aprueba los procedimientos de tabulación de votos [Caso Núm. 17-3283, Expediente Núm. 4075] (la Moción de Declaración de Divulgación) en el caso del Título III de COFINA y (ii) la moción del Estado Libre Asociado de Puerto Rico de conformidad con la Regla de Quiebra 9019 para la orden de aprobación de un acuerdo entre el Estado Libre Asociado de Puerto Rico y la Corporación del Fondo de Interés Apremiante de Puerto Rico [Caso Núm. 17- 3283, Expediente Núm. 4067] (la Moción del Acuerdo) en el caso del Título III del ELA. El Plan de Ajuste establece la emisión de bonos recién emitidos por el monto de capital aproximado de $12,000 millones por COFINA (los Nuevos Bonos de COFINA, definidos en el Plan de Ajuste como "[los valores que serán emitidos por COFINA Reorganizada en la Fecha Efectiva de conformidad con el Plan") y la distribución de efectivo a los tenedores de los bonos existentes de COFINA.

Esta descripción del Plan de Ajuste y Declaración de Divulgación se proporciona para la conveniencia del lector y se califica en su totalidad por referencia a las disposiciones del Plan de Ajuste y Declaración de Divulgación, respectivamente. En la medida en que haya alguna discrepancia entre la descripción contenida en este documento y los términos establecidos en el Plan de Ajuste y la Declaración de Divulgación, los términos establecidos en el Plan de Ajuste y la Declaración de Divulgación prevalecerán, respectivamente. Se recomienda a lectores están que consulten el Plan de Ajuste y la Declaración de Divulgación, que son documentos públicos.

El 16 de noviembre de 2018, la Junta de Supervisión radicó el Plan de Ajuste enmendado del Título III de la Corporación del Fondo de Interés Apremiante de Puerto Rico [Caso Núm. 17-3283, Expediente Núm. 4296] (el Plan de Ajuste Enmendado) y la Declaración de Divulgación para el Plan Enmendado del Título III de Ajuste de las Deudas de la Corporación del Fondo de Interés Apremiante de Puerto Rico [Caso Núm. 17-3283, Expediente Núm. 4299] (la Declaración de Divulgación Modificada).

El 20 de noviembre de 2018, el Tribunal Título III celebró una vista sobre la Moción de Declaración de Divulgación y dictaminó que ingresaría una orden aprobando una versión modificada de la Declaración de Divulgación Modificada.

El 26 de noviembre de 2018, la Junta de Supervisión radicó un Segundo Plan de Ajuste del Título III Enmendado de la Corporación del Fondo de Interés Apremiante de Puerto Rico [Caso Núm. 17-3283, Expediente Núm. 4363] (el Segundo Plan de Ajuste Enmendado), y la Divulgación Declaración para el Segundo Plan Enmendado de Ajuste del Título III de las Deudas de la Corporación del Fondo de Interés Apremiante de Puerto Rico [Caso Núm. 17-3283, Expediente Núm. 4364] (la Segunda Declaración de Divulgación Modificada), y una forma revisada de orden propuesta que aprueba la Segunda Declaración de Divulgación modificada y los procedimientos de solicitud relacionados.

El 29 de noviembre de 2018, el Tribunal Título III emitió una orden aprobando la Segunda Declaración de Divulgación Modificada y los procedimientos de solicitud relacionados.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El 9 de enero de 2019, la Junta de Supervisión radicó un Tercer Plan de Ajuste del Título III Enmendado de la Corporación del Fondo de Interés Apremiante de Puerto Rico [Caso Núm. 17-3283, Expediente Núm. 4652] (el Tercer Plan de Ajuste Enmendado). El Tercer Plan de Ajuste Enmendado propone, entre otras cosas, liberar al ELA de toda responsabilidad de reclamos y causas radicadas en poder de cualquier acreedor de COFINA (únicamente en su calidad de acreedor de COFINA) que surja de o esté relacionado con la relación del ELA y COFINA.

Esta descripción del Tercer Plan de Ajuste Enmendado y la Segunda Declaración de Divulgación Modificada se proporciona para la conveniencia del lector y se califica en su totalidad por referencia a las disposiciones del Tercer Plan de Ajuste Enmendado y la Segunda Declaración de Divulgación Modificada, respectivamente. En la medida en que haya alguna discrepancia entre la descripción contenida en este documento y los términos establecidos en el Tercer Plan de Ajuste Enmendado y la Segunda Declaración de Divulgación Modificada, los términos establecidos en el Plan de Ajuste Enmendado y la Segunda Declaración de Divulgación Modificada prevalecerán, respectivamente. Se recomienda a lectores están que consulten el Tercer Plan de Ajuste Enmendado y la Segunda Declaración de Divulgación Modificada, que son documentos públicos.

El Tribunal Título III celebró una vista sobre la Moción de Acuerdo y la confirmación del Tercer Plan de Ajuste Enmendado el 16 de enero de 2019 y 17 de enero de 2019. El 4 de febrero de 2019, el Tribunal Título III otorgó la Moción del Acuerdo y confirmó el Tercer Plan de Ajuste Enmendado mediante la emisión de (i) la opinión del Memorando y el Acuerdo de Aprobación de la Orden entre el Estado Libre Asociado de Puerto Rico y la Corporación del Plan de Interés Apremiante de Puerto Rico [Caso Núm. 17-3283, Expediente Núm. 5045] (la Orden de Acuerdo), (ii) el Memorando de Hallazgos de Hecho y las Conclusiones de la Ley en Conexión con la Confirmación del Tercer Plan de Ajuste del Título III Enmendado de la Corporación del Fondo de Interés Apremiante de Puerto Rico [Caso Núm. 17-3283, Expediente Núm. 5047] (los Resultados y Conclusiones), y la Orden y la sentencia que confirman el tercer plan de ajuste del Título III enmendado de la Corporación del Fondo de Interés Apremiante de Puerto Rico [Caso Núm. 17-3283, Expediente Núm. 5048] (la Orden de Confirmación).

El 5 de febrero de 2019, el Tribunal Título III modificó los hallazgos y conclusiones y la orden de confirmación mediante la emisión de (i) el Memorando de hallazgos de hecho y las conclusiones de la ley en relación con la confirmación del tercer Plan de Ajuste Enmendado del Título III de la Corporación del Fondo de Interés Apremiante de Puerto Rico [Caso Núm. 13-3283, Expediente Núm. 5053] (Conclusiones y conclusiones enmendadas) y (ii) Orden y Sentencia enmendadas que confirman el Tercer Plan de Ajuste Enmendado del Título III de la Corporación del Fondo de Interés Apremiante de Puerto Rico [Caso Núm. 17-3283, Expediente Núm. 5055] (la Orden de Confirmación Modificada). De conformidad con los hallazgos y las conclusiones enmendadas y la orden de confirmación modificada, que sustituyen a los hallazgos y las conclusiones y la orden de confirmación, el Tribunal Título III confirmó el tercer plan de ajuste enmendado de COFINA, y la fecha de vigencia fue el 12 de febrero de 2019.

De conformidad con la Moción del Acuerdo aprobada en el caso del Título III del ELA por la Orden de Acuerdo y mediante el Plan de Ajuste confirmado en el Caso del Título III, el Tribunal Título III determinó la división del Impuesto sobre ventas pignorado en una porción del 53.65% (es decir, los Ingresos de COFINA), que recibe COFINA, y una porción del 46.35%, que recibe el ELA, para ser coherente con el Acuerdo de Principio. Asimismo, como se describe con más detalle en esta Nota, de conformidad con los artículos 1.4 y 2.1(c) del Tercer Plan de Ajuste Enmendado, varias acciones de litigio y reclamos y causas radicadas afirmadas en este se han desestimado sin perjuicio de la fecha de entrada en vigencia del Plan de Ajuste (12 de febrero de 2019) de conformidad con la Orden de acuerdo y la Orden de confirmación.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El 15 de noviembre de 2018, el Gobernador Rosselló Nevares promulgó la Ley Núm. 241, que modificó y reformuló la Ley Núm. 91, y que entró en vigencia en la Fecha de entrada en vigencia del Plan de Ajuste, para establecer el marco legal para la reestructuración de los bonos en circulación de COFINA en ese momento. Con tal fin, la Ley Núm. 241 establece: (i) la modificación de la estructura de gobierno corporativo de COFINA, incluido el requisito de que cada miembro de la Junta Directiva debe cumplir con los estándares de independencia y calificación establecidos en el Contrato y los estatutos de COFINA (incluido que ningún miembro de la Junta Directiva puede ser un funcionario, empleado o director de cualquier entidad del gobierno que no sea COFINA); (ii) la autorización para que COFINA emita los Nuevos Bonos de COFINA y establezca los términos de dichos bonos; (iii) confirmación de la propiedad de COFINA de los ingresos de COFINA; (iv) la creación de un derecho de retención legal para asegurar los Nuevos Bonos COFINA; y (v) convenios para asegurar un mayor reembolso de los bonos de COFINA, como los ingresos de COFINA que se financian con los primeros fondos, un convenio sin impedimentos y convenios que permiten al ELA modificar el Impuesto sobre ventas pignorado una vez que se cumplan ciertos requisitos.

La Orden de Confirmación Modificada y los Resultados y Conclusiones Modificados confirmaron el Tercer Plan de Ajuste Enmendado, que autorizó la emisión de aproximadamente $12,000 millones por el monto del capital de los Nuevos Bonos de COFINA, canceló los bonos en circulación de COFINA en ese momento y canceló los pasivos relacionados. La Orden de Confirmación Modificada y los Resultados y Conclusiones Modificados también proporcionaron las siguientes protecciones enumeradas para los Nuevos Bonos COFINA. Específicamente, las disposiciones de la Orden de Confirmación Modificada incluyen: (i) los Nuevos Bonos de COFINA "constituyen obligaciones válidas, vinculantes, legales y exigibles de" COFINA; (ii) los Ingresos de COFINA son propiedad del nuevo emisor "libre de todos los gravámenes, reclamos, embargos y cualquier otro interés de los acreedores del antiguo emisor, el nuevo emisor, el ELA o cualquier organismo del ELA, que no sean los gravámenes otorgados "a continuación; (iii) los ingresos de COFINA no serán "recursos disponibles" o "ingresos disponibles" del ELA; y (iv) retención de la jurisdicción del TribunalIII para garantizar la protección y el cumplimiento del marco legal y las prendas de títulos.

El Tercer Plan de Ajuste Enmendado y la Ley Núm. 241 de 2018 prevén la reducción del monto del capital de los bonos de COFINA y aclaran la propiedad de COFINA de los Ingresos de COFINA. Además, proporcionan la independencia financiera y operativa de COFINA del ELA Commonwealth al establecer una posición independiente para las operaciones de COFINA.

La descripción anterior se proporciona para la conveniencia del lector y se califica en su totalidad por referencia a las disposiciones del Tercer Plan de Ajuste Enmendado, la Ley Núm. 241 de 2018, los Resultados y Conclusiones Modificados, y la Orden de Confirmación Modificada, respectivamente. En la medida en que exista alguna discrepancia entre la descripción contenida en este documento y los términos establecidos en cada uno de estos documentos, los términos establecidos en ellos prevalecerán, respectivamente. Se recomienda a los lectores que consulten el Tercer Plan de Ajuste Enmendado, la Ley Núm. 241 de 2018, los Resultados y Conclusiones Modificados, y la Orden de Confirmación Modificada, que son documentos públicos.

Ciertas partes cuyas objeciones fueron anuladas al confirmar el Tercer Plan de Ajuste Enmendado radicaron notificaciones de apelación ante el Tribunal Título III. Las apelaciones han sido enviadas al Tribunal de Apelaciones de los Estados Unidos del Primer Circuito con los números de caso 19-1181 (también discutido a continuación en relación con el procedimiento del adversario, subtitulado Manuel Natal-Albelo, et al. V. Junta de Supervisión y Administración Financiera para Puerto Rico, et al.) y 19-1182. La fecha límite para presentar los Avisos de Apelación fue el 7 de marzo de 2019.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Como se analizó en la Nota 21, COFINA rechazó el Acuerdo de Intercambio de conformidad con el Tercer Plan de Ajuste Enmendado, y el reclamo de cancelación del pago fue desestimado.

- *Atlantic Medical Center, Inc. et al., c. El ELA de Puerto Rico*, Adv. Pro. Núm. 17-00278-LTS (D.P.R. 17 de noviembre de 2017).

El 17 de noviembre de 2017, un grupo de corporaciones nacionales sin fines de lucro radicó una demanda de oposición alegando que el ELA tiene la obligación de pagar los servicios prestados en apoyo del programa Medicaid del ELA. Los demandantes alegan que la ley federal requiere que el ELA realice ciertos pagos a los demandantes, y el Congreso otorgó a los demandantes un derecho exigible según 42 U.S.C. § 1983 para obligar al ELA a realizar esos pagos.

Los demandantes solicitan una sentencia declaratoria de que sus reclamos por todos los pagos suplementarios por servicios de Medicaid adeudados por el ELA Asociado durante los años desde 1997, y que son objeto del Procedimiento de Oposición 17-0227 (LTS), no son cancelables bajo PROMESA y por lo demás no están afectados por la radicación de un caso del Título III del ELA. Los demandantes se basan en la sección 7 de PROMESA (48 USC § 2016), que establece que PROMESA "no debe interpretarse como perjudicial o de ninguna manera relevar a un gobierno territorial del cumplimiento de las leyes o requisitos federales o las leyes y requisitos territoriales que implementan una autorización federal o federal programa delegado que protege la salud, la seguridad y el medio ambiente de las personas en dicho territorio" y PROMESA, la sección 304 (h) (48) U.S.C. § 2164(h)), que impide el cumplimiento de las obligaciones derivadas de la política federal o las leyes reguladoras, incluidas las relacionadas con la seguridad pública.

El 2 de febrero de 2018, el Tribunal Título III otorgó la moción sin oposición del ELA Commonwealth para consolidar este procedimiento de oposición con *Corporación de Servicios Integrales de Salud del Área de Barranquitas, Comerío, Corozal, Naranjito y Orocovis c. ELA* (Adv.   Pro. Núm. 17-00298-LTS), para consolidar los casos en Adv. Proc. Núm. 17-00278. El 22 de febrero de 2018, el ELA radicó una moción para desestimar la demanda consolidada, que ha sido completamente informada. El 7 de agosto de 2018, la juez Dein presentó una orden recomendando al Tribunal del Título III que otorgue la moción del ELA para desestimar las demandas consolidadas. Las partes radicaron objeciones al informe y la recomendación del Juez Dein.   El 27 de noviembre de 2018, el Tribunal Título III anuló estas objeciones, adoptó el informe y la recomendación de la Juez Dein, y desestimó los procedimientos de oposición consolidados. El 13 de diciembre de 2018, los demandantes radicaron una apelación ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, que actualmente está pendiente.

- *Corporación de Servicios Integrales de Salud del Área de Barranquitas, Comerío, Corozal, Naranjito y Orocovis (Corporación de Servicios) c. El ELA de Puerto Rico*, Caso Núm. 17-00292-LTS (D.P.R. 2017)

El 17 de diciembre de 2017, la Corporación de Servicios Integrales de Salud del Área de Barranquitas, Comerío, Corozal, Naranjito y Orocovis (CSI) radicó un procedimiento de oposición para solicitar una sentencia declarativa que determinara que sus reclamos en Salud Primaria no se pueden desestimar según PROMESA y no se verán afectados por la radicación del ELA de su caso del Título III. El 2 de febrero de 2018, el Tribunal de Distrito consolidó este procedimiento de oposición con *Atlantic Medical* según Adv. Proc. Expediente Núm. 17-00278. El 7 de agosto de 2018, de la Juez Dein presentó una orden recomendando a el Tribunal Título III que otorgue la moción del ELA para desestimar las demandas consolidadas. Las partes radicaron objeciones al informe y la recomendación de la Juez Dein. El 27 de noviembre de 2018, el Tribunal

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Tribunal Título III anuló estas objeciones, adoptaron el informe y la recomendación de la Juez Dein, y desestimaron los procedimientos consolidados de oposición. El 13 de diciembre de 2018, los demandantes radicaron una apelación ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, que actualmente está pendiente.

- *Corporación de Servicios Integrales de Salud del Área de Barranquitas, Comerío, Corozal, Naranjito y Orocovis c. El ELA de Puerto Rico*, Caso Núm. 17-00298 (D.P.R. 28 de diciembre de 2017).

El 28 de diciembre de 2017, CSI radicó un procedimiento de oposición para solicitar una sentencia declaratoria (1) que estableciera que las secciones 28 y 29 de la Ley Núm. 66 de 2014 violan los derechos procesales sustantivos y procesales de CSI, así como también violan la cláusula de contratos y la cláusula sobre expropiaciones, y están sujetas por la sección 903 del Código de Quiebras, la sección 202 de PROMESA y la ley de Medicaid; y (2) que declarara que ninguna parte de PROMESA permite el incumplimiento de las obligaciones federales por parte del ELA y que PROMESA en realidad requiere el pago de las obligaciones contractuales del ELA con el demandante y las sentencias judiciales estatales asociadas. El 28 de marzo de 2018, el ELA radicó una moción para desestimar, que ha sido completamente informada. El asunto queda pendiente hasta el resultado de la revisión del Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito de *Asociación de Salud Primaria de Puerto Rico, et al. c. El ELA de Puerto Rico, et al.*, Caso Núm. 17-00227-LTS (D.P.R. 2017), como se indica más arriba.

- *Cooperativa de Ahorro y Crédito Abraham Rosa, et al. c. El ELA de Puerto Rico, et al.*, Adv. Pro. Núm. 18-00028-LTS (D. P.R. 22 de marzo de 2018)

El 22 de marzo de 2018, varias cooperativas de crédito constituidas según la ley de Puerto Rico radicaron una demanda contra el ELA, la Junta de Supervisión y otros organismos del ELA (incluidos COFINA, ACT, SRE y AEE), en busca de una sentencia declaratoria de que su Puerto Rico las tenencias de deuda se pueden desestimar y en busca de daños monetarios por presunto fraude en la emisión y alientan a las cooperativas de crédito locales a comprar instrumentos de servicio de la deuda de Puerto Rico. El 6 de agosto de 2018, la Junta de Supervisión, por sí misma y como representante de COFINA, el ELA y ciertos otros organismos, presentaron una moción para desestimar la demanda. También, el 6 de agosto de 2018, el BGF radicó una moción separada para desestimar. Además, varias partes radicaron solicitudes de desestimación o se les otorgó permiso del Tribunal Título III para presentar solicitudes.

El 5 de febrero de 2019, el Tribunal Título III emitió una orden de confirmación enmendada (que se analiza a continuación), confirmando el tercer plan de ajuste enmendado (que también se analiza a continuación). El 12 de febrero de 2019, el Tercer Plan de Ajuste Enmendado fue sustancialmente consumado y entró en vigencia. De conformidad con el párrafo 30 de la Orden de Confirmación Modificada, "los demandantes en ese procedimiento de oposición ante el Tribunal Título III, denominado Cooperativa de Ahorro y Crédito Abraham Rosa, et al. c. *El ELA de* Puerto Rico, et al., Adv. Proc. Núm. 18-00028, tendrá derecho a continuar la búsqueda de dicho litigio contra todas las partes que no sean COFINA y COFINA reorganizada, sujeto a todos los derechos y defensas disponibles con respecto a los reclamos y causas radicadas afirmadas en el mismo".

El 19 de marzo de 2019, el Tribunal Título III emitió una orden de programación modificada que requería que cualquier objeción a las mociones de desestimación y cualquier afiliación a las mismas se radiquen antes del 1 de abril de 2019, y cualquier respuesta debe radicarse antes del 31 de mayo de 2019. Posteriormente, el Tribunal Título III aceptará las mociones para desestimar la presentación a menos que se determine lo contrario. Este caso se encuentra en sus primeras etapas y no se han determinado decisiones sobre los temas sustantivos hasta la fecha del presente.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

- *Pinto-Lugo, et al. c. United States, et al.*, Adv. Pro. Núm. 18-00041-LTS (D. P.R. 24 de abril de 2018)

  El 24 de abril de 2018, los demandantes, un grupo de sindicatos, organizaciones sin fines de lucro y un individuo, radicaron una demanda contra el gobierno de los EE. UU., La Junta de Supervisión y el Gobernador Rosselló en busca de medidas cautelares y declaratorias, que incluyen la determinación de que ciertas disposiciones de PROMESA, incluido el establecimiento de la Junta de Supervisión, viola los derechos fundamentales de los demandantes protegidos por la Primera, Quinta y Decimocuarta Enmienda de la Constitución de los Estados Unidos. Los demandantes también solicitaron una auditoría forense de la deuda pública, que según ellos es fundamental para la transparencia y constituye un deber fiduciario y estatutario esencial de la Junta de Supervisión y el ELA. El 25 de abril de 2018, el Tribunal Título III remitió el caso a la Juez Auxiliar Dein para la gestión general previa al juicio. Los demandados radicaron mociones para desestimar el 23 de agosto de 2018, y después de una moción exitosa en contra de la oposición inicial del demandante y después de que el demandante no pudo presentar oportunamente su oposición revisada, el demandante radicó su oposición el 4 de enero de 2019. Los demandados radicaron sus escritos de respuesta el 18 de marzo de 2019. El Tribunal Título III tiene la intención de considerar las mociones para desestimar las presentaciones y una vista no está programada actualmente.

- *Junta de Supervisión y Administración para Puerto Rico c. Autoridad de Energía Eléctrica de Puerto Rico y otros*, Adv. Pro. Núm. 18-00047 (D. P.R. 27 de abril de 2018)

  El 27 de abril de 2018, la Junta de Supervisión radicó una notificación de destitución de *José Ramón Rivera, et al., c. El ELA de Puerto Rico, et al*., Caso civil Núm. SJ2018cv01670 radicada en el Tribunal de Primera Instancia del ELA de Puerto Rico, Tribunal Superior de San Juan el 27 de marzo de 2018. La acción retirada solicita, entre otras cosas, una medida cautelar y declarativa siempre que (i) el Sistema de Retiro de Empleados de la AEE sea un fideicomiso separado e independiente de la AEE y el ELA, y (ii) La Orden Ejecutiva OE-2018-012 interfiere con la independencia y las facultades del Sistema de Retiro y es nula y sin efecto. El 28 de mayo de 2018, las partes informaron a el Tribunal Título III que los demandantes tenían la intención de presentar una moción para una orden de reenvío de la acción a los tribunales del ELA y si esa moción era denegada, los demandantes tenían la intención de presentar una demanda enmendada.  La moción de devolución de los demandantes fue denegada y el 6 de febrero de 2019, los demandantes radicaron una demanda enmendada. Según el cronograma actual, la fecha límite de los demandados para responder, presentar una moción o responder de otra manera a la demanda enmendada es el 4 de abril de 2019.

- *PFZ Properties Inc. c. El ELA de Puerto Rico*, Adv. Pro. Núm. 18-00056-LTS (D. P.R. 14 de mayo de 2018)

  El 14 de mayo de 2018, PFZ Properties, Inc. radicó una demanda contra el ELA alegando que el ELA tomó su propiedad frente a la playa sin una compensación justa. El demandante busca, entre otras cosas, (i) declaraciones de que el Deudor ha efectuado una toma regulatoria de la propiedad y ha violado los derechos constitucionales de PFZ y (ii) una sentencia contra el ELA por el monto de $75,550,000 proporcionando una compensación justa por la propiedad al demandante. El 14 de mayo de 2018, PFZ Properties Inc. radicó una declaración de divulgación corporativa. Se emitieron citaciones al ELA el 16 de mayo de 2018. El 27 de julio de 2018, PFZ radicó una moción de desestimación voluntaria y el Tribunal Título III otorgó la moción y desestimó el caso el 30 de julio de 2018.

245

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

- *Assured Guaranty Corp., et al. c. El ELA de Puerto Rico, et al.*, Caso Núm. 18-00059-LTS (D.P.R. 23 de mayo de 2018)

  El 23 de mayo de 2018, los demandantes radicaron una demanda contra el ELA, FOMB, AAFAF, el Gobernador Rosselló Nevares, Gerardo Portela Franco y Raúl Maldonado Gautier. La demanda solicita catorce formas diferentes de alivio declaratorio, que solicitan sentencias declaratorias que (1) el Plan Fiscal Revisado y la Ley de Cumplimiento violan varias secciones de PROMESA; (2) el Plan Fiscal Revisado viola la sección 928 del Código de Quiebras; (3) no se puede confirmar ningún plan de ajuste basado en el Plan Fiscal Revisado, y el tribunal no celebrará una vista de confirmación; (4) la Ley de Moratoria, las Órdenes de Moratoria, el Plan Fiscal Revisado y la Ley de Cumplimiento son nulas porque (a) violan la Cláusula del Contrato, (b) violan las cláusulas de Obtención y Debido Proceso, y (c) son reemplazadas por las Secciones 303 ( 1 ) y 303 (3) de PROMESA; y (5) en la medida en que el tribunal determine que PROMESA prohíbe la revisión del plan fiscal del ELA, PROMESA viola la Cláusula de Debido Proceso y constituye una delegación inconstitucional del poder legislativo. Los demandados aún no han respondido a la demanda. El 13 de agosto de 2018, el tribunal suspendió el litigio y ordenó que la fecha límite para presentar una moción de desestimación sea 30 días después de que el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito emita una opinión en la apelación de *Ambac Assurance Corporation c. El ELA de Puerto Rico, et al.*, Núm. 17-00159-LTS (D.P.R. 8 de junio de 2017) La respuesta a la demanda se deberá presentar dentro de los 30 días de la decisión del Primer Circuito.

- *Unión de Empleados de la Corporación del Fondo del Seguro del Estado c. United States, et al.*, Caso Núm. 18-00066-LTS (D.P.R. 30 de mayo de 2018)

  El 30 de mayo de 2018, la Unión de Empleados de la Corporación del Fondo del Seguro del Estado (UECFSE), la Asociación de Empleados Gerenciales del Fondo del Seguro del Estado Corp. (AEGFSE) y la Unión de Médicos de la Corporación del Fondo del Seguro del Estado Corp. (UMCFSE) radicó una demanda contra el gobierno de los EE. UU., el ELA, la Junta de Supervisión y el Gobernador Rosselló Nevares en busca de un interdicto y sentencia declaratoria. Los demandantes alegan que PROMESA priva al ELA de sus estatutos de autogobierno y constituye una privación de derechos de los miembros de los demandantes y el pueblo de Puerto Rico. Los demandantes radicaron una demanda enmendada el 17 de agosto de 2018 y radicaron una segunda demanda enmendada el 5 de octubre de 2018. Los demandados radicaron mociones para desestimar la segunda demanda enmendada el 19 de diciembre de 2018, a la que los demandantes se opusieron el 1 de marzo de 2019. Los demandados deben responder antes del 8 de abril de 2019.

- *Rosselló-Nevares c. Junta de Supervisión y Administración Financiera para Puerto Rico y otros*, Caso Núm. 18-00080- LTS (D.P.R. 5 de julio de 2018)

  El 5 de julio de 2018, el Gobernador Ricardo Rosselló Nevares y la AAFAF radicaron una demanda contra la Junta de Supervisión, cada miembro individual de la Junta de Supervisión y el director ejecutivo de la Junta de Supervisión, solicitando declaraciones de que (i) la Junta de Supervisión carece de la autoridad para imponer iniciativas de política a través de un plan fiscal o presupuesto, incluido el plan fiscal del ELA de la Junta de Supervisión certificado el 29 de junio de 2018 y el presupuesto del ELA de la Junta de Supervisión para el año fiscal 2019 tal como se certificó el 29 de junio de 2018; (ii) los mandatos de política sustantivos contenidos en el plan fiscal del ELA del 29 de junio de 2018, y rechazados por el Gobernador de conformidad con la sección 205 de PROMESA, son nulos; y (iii) los mandatos de política sustantivos contenidos en el presupuesto del año fiscal 2019 de la Junta de Supervisión exceden los poderes de la Junta de Supervisión y son nulos y sin efecto. Los demandantes también solicitaron un interdicto que impida a los acusados implementar y hacer cumplir las recomendaciones de política

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

rechazadas por la Junta de Supervisión (incluidas o no como recomendaciones) contenidas en el plan fiscal del ELA del 29 de junio de 2018 y el presupuesto del ELA del año fiscal 2019.

El 7 de agosto de 2018, el tribunal emitió una orden que desestimaba (1) reclamos relacionados con la consolidación de la agencia y reducciones de compensación/congelaciones de contratación porque no hay un caso vigente o una controversia dadas las concesiones ya realizadas por la Junta de Supervisión y (2) el reclamo con respecto a la reprogramación presupuestaria como inconsistente con la declaración de PROMESA de que el presupuesto certificado por la Junta está en pleno vigor y efecto, por lo que su titularidad está sujeto a la sección 4 de PROMESA. El tribunal no desestimó los reclamos relacionados con reducciones automáticas de presupuesto y medidas correctivas. La Junta de Supervisión respondió a la demanda el 2 de noviembre de 2018. El 10 de septiembre de 2018, los demandantes radicaron una moción urgente solicitando la certificación del dictamen del tribunal el 7 de agosto de 2018 y la orden de apelación inmediata según la sección 306(e)(3) - (4) de PROMESA. El 9 de octubre de 2018, el tribunal emitió una orden de memorando que certifica ciertos aspectos del dictamen del tribunal del 27 de agosto de 2018 y una orden de apelación interlocutoria.  Los demandantes radicaron una petición de apelación interlocutoria el 19 de octubre de 2018; la Junta de Supervisión radicó una respuesta el 29 de octubre de 2018.

El 20 de noviembre de 2018, el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito emitió una sentencia, con la conclusión de que la revisión de la decisión del Tribunal Título III está justificada. El 4 de marzo de 2019, los apelantes radicaron su escrito. El escrito del apelado debe presentarse el 3 de mayo de 2019, y el escrito de respuesta del apelante debe presentarse el 24 de mayo de 2019.

- *Hernández-Montanez y otros c. Junta de Supervisión y Administración Financiera para Puerto Rico y otros*, Caso Núm. 18-00090-LTS (D.P.R. 25 de julio de 2018)

El 25 de julio de 2018, los miembros del Partido Popular Democrático radicaron una demanda solicitando una sentencia declaratoria que sostenga que las disposiciones de nombramiento de la Junta de Supervisión contenidas en PROMESA violan la Cláusula de Nombramientos, decrete la delegación de autoridad ejecutiva y legislativa a la Junta de Supervisión. en violación de la doctrina de la separación de poderes o, decrete que el ejercicio de autoridad de la Junta de Supervisión sobre el presupuesto para obligar a la adopción de su política pública constituye una interferencia inadmisible con la autonomía legislativa protegida por el gobierno federal. Este asunto queda pendiente a la moción de cualquiera de las partes para cancelar la paralización después de la decisión del Primer Circuito en las apelaciones de la Cláusula de Nombramientos.

- *Hermandad de Empleados del Fondo del Seguro del Estado, Inc. et al. c. El ELA de Puerto Rico*, Caso Núm. 18-00091-LTS (D.P.R. 25 de julio de 2018)

El 25 de julio de 2018, Hermandad de Empleados del Fondo del Seguro del Estado, Inc. (UECFSE) y Unión de Médicos de la Corporación del Fondo del Seguro del Estado Corp. (UMCFSE) radicaron una demanda contra el ELA, la Junta de Supervisión, la Corporación del Fondo del Seguro del Estado, Jesús M. Rodríguez Rosa, el Gobernador Rosselló Nevares, Gerardo Portela Franco, Hon. Raúl Maldonado Gautier, José Iván Marrero Rosado y Natalie A. Jaresko buscan una orden de que CFSE es un servicio público esencial protegido, que cuatro leyes de la Legislatura del ELA violan la Cláusula contractual de la Constitución de los Estados Unidos, que cuatro leyes de la Legislatura del ELA violan los Derechos de negociación colectiva de la Constitución del ELA y una orden que declara inconstitucional el plan fiscal del ELA (según lo certificado el 29 de junio de 2018) y en violación de la Cláusula contractual de la Constitución de los Estados Unidos y el ELA. Los demandantes radicaron una demanda enmendada el 29 de octubre de 2018, solicitando alivio solo en lo que respecta a las cuatro leyes de la Legislatura del ELA (leyes 66-2014, 3-2017, 8-2017 y 26-

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

2017) supuestamente violan las constituciones de los Estados Unidos y el ELA. El 25 de enero de 2019, los demandados radicaron respuestas a la primera demanda enmendada. El 7 de marzo de 2019, los demandantes radicaron una objeción general a las mociones de los demandados para desestimar.

- *Am. Fed. of Teachers, AFL-CIO, y otros c. Estado Libre Asociado de Puerto Rico*, Caso Núm. 18-00134-LTS (D.P.R. 15 de noviembre de 2018).

  El 15 de noviembre de 2018, la Federación Estadounidense de Maestros, AFL-CIO y la Federación Estadounidense de Empleados Estatales, del Condado y Municipales, y AFL-CIO radicaron una demanda contra el ELA, el Gobernador Rosselló Nevares, Raúl Maldonado Gautier, Teresa Fuentes, Junta de Retiro de Puerto Rico y sus miembros con derecho a voto, la AAFAF, el Banco Popular, la Junta de Supervisión y varias personas 1-10 alegando tomas inconstitucionales de control por parte del Banco Popular y el ELA, en busca de un interdicto y sentencia declaratoria junto con daños y restitución. La Junta de Supervisión radicó una moción para desestimar el 8 de enero de 2019; El demandante debe responder antes del 16 de abril de 2019, y la respuesta de la Junta de Supervisión debe presentarse el 7 de mayo de 2019. Todos los demás demandados deben responder a la demanda antes del 16 de abril de 2019.

- *Junta de Supervisión y Administración Financiera para Puerto Rico c. Autoridad de Edificios Públicos de Puerto Rico*, Caso Núm. 18- 00149-LTS (D.P.R. 21 de diciembre de 2018).

  El 21 de diciembre de 2018, la Junta de Supervisión y el Comité de Acreedores radicaron esta acción en busca de alivio declarativo y rechazo de reclamos administrativos de renta, alegando que los arrendamientos de AEP no son verdaderos arrendamientos, sino más bien "transacciones financieras encubiertas". Múltiples partes han radicado mociones para intervenir. El 28 de enero de 2019, la fAEP respondió a la demanda. No ha habido más actividad en el expediente.

- *Manuel Natal-Albelo y otros c. Junta de Supervisión y Administración Financiera para Puerto Rico*, Caso Núm. 19-00003- LTS (D.P.R. 14 de enero de 2019)

  El 6 de diciembre de 2018, Manuel Natal Abelo, representante independiente en general en la Cámara de Representantes de Puerto Rico, René Pinto-Lugo y otros, incluido el Movimiento de Concertación Ciudadana Inc., (VAMOS) y varios sindicatos, radicaron una demanda (la Demanda) en el Tribunal de Primera Instancia del ELA de Puerto Rico, el Tribunal Superior de San Juan (el Tribunal Superior) (Caso Civil Núm. SJ2018cv01569), contra el ELA de Puerto Rico y Carlos Méndez Núñez, en su calidad oficial de Presidente de la Cámara de Representantes de Puerto Rico (la Acción Civil).

  El 17 de diciembre de 2018, la Demanda fue notificada en el Departamento de Justicia de Puerto Rico. La Demanda contiene dos causas radicadas. La primera causas radicadas alega que el proceso legislativo que condujo a la aprobación del Proyecto de Ley 1837 de la Cámara de Puerto Rico y la promulgación de la Ley 241-2018, que creó la estructura legal necesaria para ejecutar la reestructuración de COFINA, fue defectuoso y violó las regulaciones de la Cámara de Puerto Rico como así como los derechos constitucionales y civiles de Natal en virtud de las Constituciones de Puerto Rico y Estados Unidos porque no se le permitió participar en el debate antes de la aprobación del proyecto de ley. La primera causa radicada busca una declaración de que la Ley 241 es inconstitucional. La segunda causa radicada alega que la Ley 91-2006 (la legislación COFINA, según enmienda) y la Ley 241 (que es una enmienda a la legislación COFINA, y que fue promulgada por el Gobernador de Puerto Rico el 15 de noviembre de 2018), violan las disposiciones de la Constitución del ELA sobre el límite de deuda y el presupuesto equilibrado.

248

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El 14 de enero de 2019, la Junta de Supervisión, en nombre del ELA y COFINA, radicó un aviso de remoción de la Acción Civil ante el Tribunal Título III, donde se convirtió en el Procedimiento de Oposición Núm. 19-00003-LTS (D.P.R.), denominado Manuel Natal-Albelo y otros c. Junta de Supervisión y Administración Financiera para Puerto Rico y otros (El Procedimiento de Oposición). El 15 de enero de 2019, el Tribunal Título III remitió el Procedimiento Adversario a la juez Auxiliar Judith Dein para la gestión general previa al juicio.

El 5 de febrero de 2019, el Tribunal Título III emitió la Orden de Confirmación Modificada, confirmando el Tercer Plan de Ajuste Enmendado de COFINA, y los Resultados y Conclusiones Modificados. En el Párrafo 3 de los Resultados y Conclusiones Modificados, el Tribunal Título III tomó nota judicial de la Ley 241 (definido como la Legislación de Nuevos Bonos; ver Exposición A de los Resultados y Conclusiones Enmendados) y determinó que la Ley "ha sido debidamente promulgada". Ver también el Párrafo 120 de los Resultados y Conclusiones Modificadas (que concluye que "[l] a Asamblea Legislativa del ELA aprobó, y su Gobernador firmó, la Legislación de Nuevos Bonos" y que "[p] de conformidad con la jurisprudencia de Puerto Rico, la legislación del ELA se presume válida si es promulgada por la Asamblea Legislativa de Puerto Rico y firmada por el Gobernador"); Núm. 14 de los hallazgos y conclusiones modificados (que anula las objeciones de Manuel Natal-Albelo y sus coobjetores a la constitucionalidad de la Legislación de Nuevos Bonos según las Constituciones de los Estados Unidos y del ELA). El 12 de febrero de 2019, el Tercer Plan de Ajuste Enmendado fue sustancialmente consumado y entró en vigencia.

El 18 de febrero de 2019, Manuel Natal-Albelo, Rene Pinto-Lugo y otros, que incluyen a VAMOS y varios sindicatos, radicaron una Notificación de Apelación en el Tribunal Título III [Caso Núm. 17-03283, ECF No. 5155]. El 22 de febrero de 2019, la apelación fue admitida en Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito bajo el caso número 19-1181; la apelación sigue pendiente.

El 21 de marzo de 2019, los demandantes radicaron una moción para devolver este caso al Tribunal Superior, afirmando que el Tribunal Título III carece de jurisdicción sobre la Demanda porque se refiere únicamente a violaciones de la Constitución del ELA y la ley estatutaria de Puerto Rico, no la ley federal, que no implica derechos creados por el Título III de PROMESA. Como resultado, los demandantes afirman que la demanda solo puede ser tratada por un tribunal local de Puerto Rico.

*Compromisos*

El 23 de noviembre de 1998, ciertas compañías tabacaleras y ciertos estados, territorios y otras jurisdicciones de los Estados Unidos de América, incluido el ELA, celebraron un acuerdo de conciliación global (el Acuerdo Global). El Acuerdo Global exige pagos anuales hasta el año 2025, que variarán debido a ajustes inflacionarios y de volumen. Los pagos estimados que se recibirán en virtud del Acuerdo Global hasta el año que finaliza el 30 de junio de 2025 ascienden a aproximadamente $884 millones. Después de 2025, las compañías tabacaleras continuarán haciendo contribuciones a perpetuidad. De conformidad con la Ley Núm. 173 del 30 de julio de 1999, que creó el Fideicomiso de los Niños (una unidad de componentes combinados), el ELA asignó y transfirió condicionalmente al Fideicomiso de los Niños las contribuciones que el ELA tiene derecho a recibir en virtud del Acuerdo Global. Los pagos recibidos en virtud del Acuerdo Global y reconocidos como ingresos durante el año finalizado el 30 de junio de 2016 ascendieron a aproximadamente $70.7 millones. Todos los ingresos que se recibirán en virtud del Acuerdo Global y las ganancias de inversión en ciertas cuentas bajo contratos de bonos se pignoran como garantía para los Bonos respaldados por activos del acuerdo del tabaco, Series 2002, 2005 y 2008. Al 30 de junio de 2016, el monto aproximado del compromiso es de $1,400 millones, que representa el capital restante y los intereses aproximados de las emisiones de bonos mencionadas, que se han comprometido hasta el

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

15 de mayo de 2057. En consecuencia, hasta el 15 de mayo de 2057, dichos ingresos no están disponibles para otros fines.

El 23 de noviembre de 2010, la Legislatura aprobó un nuevo artículo 9A a la Ley Núm. 66 del 22 de junio de 1978 (el Artículo), autorizando a PRMeSA, una unidad de componentes combinados, a incurrir en obligaciones de hasta $285 millones, conforme a los términos y condiciones aprobados. por la Junta de Instituciones Miembros de PRMeSA y BGF, como agente fiscal del ELA y sus organismos. Estos fondos adicionales deben depositarse en una cuenta especial en el BGF y solo pueden usarse para los siguientes propósitos:

(a) pago de deudas a proveedores, agencias, instituciones y fondos de reserva para el autoseguro (responsabilidad profesional y deuda entre fondos) de PRMeSA; y

(b) proporcionar liquidez operativa para aliviar la situación fiscal de PRMeSA, según lo determinado por el acuerdo con el BGF.

A partir de los ahorros generados como resultado de las renegociaciones de deuda con las agencias e instituciones, PRMeSA creará un fondo para cubrir los gastos operativos relacionados con el mantenimiento, la revisión y el reacondicionamiento de la planta física. El BGF, en su función de Agente Fiscal, puede poseer los mecanismos administrativos que considere necesarios para garantizar que estos fondos se utilizarán única y exclusivamente para los fines establecidos en el Artículo. La cuenta bancaria especial y los fondos depositados en ella no pueden ser incautados, sindicados, congelados, gravados o afectados por decisiones, sentencias, órdenes o fallos emitidos por los tribunales de justicia del ELA o sus agencias o corporaciones públicas durante cualquier procedimiento de naturaleza administrativa o judicial, independientemente de si fueron iniciados por particulares o instituciones públicas. Se requirió que PRMeSA desarrollara e implementara dentro de los ciento ochenta (180) días desde la aprobación del Artículo, un plan agresivo de cobro para la recuperación de sus cuentas por cobrar. Los Directores deben informar periódicamente al BGF sobre la implementación de ese plan, e informar anualmente a la Junta de Instituciones Miembros y al BGF los ingresos de la recaudación derivados de la ejecución del plan. El BGF fue autorizado como agente fiscal para tomar las medidas necesarias para, dentro de un período razonable de tiempo, ayudar a PRMeSA a convertirse y operar como un organismo fiscal independiente. Sin embargo, una vez que el plan de cobro funcione como se espera y proporcione a PRMeSA los recursos necesarios, y una vez que PRMeSA se convierta en una institución financieramente independiente según lo determine el BGF, se requerirá que PRMeSA asuma las obligaciones establecidas restantes.

La industria del cuidado de la salud, bajo la cual opera PRMeSA, está sujeta a numerosas leyes y regulaciones, que incluyen, entre otros, asuntos tales como los requisitos de participación del gobierno en el cuidado de la salud, varias licencias y acreditaciones, reembolsos por servicios a pacientes y fraude y abuso de Medicare y Medicaid. La acción del gobierno ha aumentado con respecto a las investigaciones o denuncias sobre posibles violaciones de fraude y abuso y estatutos o regulaciones de reclamos falsos por parte de los proveedores de atención médica. Los proveedores que hayan violado estas leyes y regulaciones pueden estar sujetos a multas o sanciones. Si bien la gerencia de PRMeSA cree que sus políticas, procedimientos y prácticas cumplen con las regulaciones gubernamentales, no se puede garantizar que la Administración no estará sujeta a consultas o acciones gubernamentales.

La Ley de Responsabilidad y Portabilidad del Seguro de Salud (HIPAA) se promulgó en agosto de 1996 para asegurar la portabilidad del seguro de salud, reducir el fraude y el abuso de la atención médica, garantizar la seguridad y la privacidad de la información de salud y hacer cumplir los estándares de información de salud. Se requiere que las organizaciones cumplan con las disposiciones de HIPAA. Las organizaciones están sujetas a multas y sanciones significativas si se determina que no cumplen con las disposiciones descritas en los

250

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

reglamentos. La gerencia de PRMeSA cree que cumplen.

La Ley de Tecnología de la Información de Salud para la Salud Económica y Clínica estableció el uso significativo de la adopción interoperable de Registros Electrónicos de Salud (EHR) en el sistema de salud como un objetivo nacional crítico e incentivó la adopción de EHR. Su objetivo no es solo la adopción, sino el uso significativo de los EHR, es decir, su uso por parte de los proveedores para lograr mejoras significativas en la atención. Se requiere un cumplimiento de uso significativo antes del año fiscal federal 2016, de lo contrario, el hospital incurrirá en sanciones por incumplimiento que pueden reducir los pagos futuros de Medicare y posiblemente los pagos del programa Medicare Advantage. Los Centros de Servicios de Medicare y Medicaid (CMS) administran y han implementado un programa de incentivos para aquellos hospitales que implementan EHR y cumplen con ciertos requisitos específicos. Los programas de incentivos de EHR de CMS brindan pagos de incentivos a los hospitales elegibles a medida que adoptan, implementan, actualizan o demuestran el uso significativo, según lo definido por CMS, de la tecnología de EHR certificada. Al 30 de junio de 2016, PRMeSA está bajo la implementación de su sistema EHR.

El SCPT tiene acuerdos de asistencia financiera con varios municipios del ELA para proporcionar fondos para la construcción, mejora y rehabilitación de ciertos proyectos de las Comunidades Especiales. Al 30 de junio de 2016, los balances presupuestados acumulados por el SCPT en estos acuerdos ascendían a aproximadamente $1,092 millones, de los cuales se había desembolsado un total de aproximadamente $1,027 millones.

Al 30 de junio de 2016, las siguientes unidades de componentes combinados mantuvieron varios compromisos de construcción y asistencia no gastados de la siguiente manera (en miles):

| Entidad | | Monto |
|---|---|---|
| Administración de Vivienda Pública de | | |
| Puerto Rico | $ | 138,200 |
| UPRCCC | | 8,583 |
| AEP | | 4,800 |
| PRIFA | | 32,200 |
| Total | $ | 183,783 |

El ELA también está comprometido en virtud de numerosos contratos de arrendamiento operativo no cancelables a largo plazo, que caducan hasta 2033, que cubren terrenos, instalaciones de oficinas y equipos. Los gastos de alquiler dentro de los fondos gubernamentales para el año terminado el 30 de junio de 2016 en virtud de dichos arrendamientos operativos fueron de aproximadamente $129 millones.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Los pagos mínimos de arrendamiento futuros para estos arrendamientos fueron los siguientes (en miles):

| Años que terminan el 30 de junio: | | |
|---|---|---|
| 2017 | $ | 87,030 |
| 2018 | | 69,721 |
| 2019 | | 56,489 |
| 2020 | | 39,566 |
| 2021 | | 26,745 |
| 2022-2026 | | 68,137 |
| 2027-2031 | | 23,751 |
| 2032-2033 | | 2,394 |
| Total de pagos futuros mínimos de Arrendamiento | $ | 373,833 |

*Compromisos y contingencias ambientales*

El ELA contabiliza las obligaciones de remediación de la contaminación de acuerdo con la Declaración GASB Núm. 49, *Informes Contables y Financieros para las Obligaciones de Remediación de la Contaminación.* Esta Declaración aborda los estándares de informes contables y financieros para las obligaciones de remediación de la contaminación (incluida la polución), que son obligaciones para abordar los efectos perjudiciales actuales o potenciales de la contaminación existente al participar en actividades de remediación de la contaminación, tales como evaluaciones del sitio y limpiezas. El alcance excluye la prevención de la contaminación o las obligaciones de control con respecto a las operaciones actuales y las futuras actividades de remediación de la contaminación que se requieren al retirar un activo, como el cierre de vertederos y la atención posterior al cierre.

Una vez que ocurra cualquiera de los cinco eventos obligatorios especificados, se requiere que un gobierno calcule los componentes de los desembolsos esperados de remediación de contaminación y determine si los desembolsos para esos componentes deben acumularse como un pasivo o, si corresponde, capitalizarse cuando se adquieren bienes y servicios. Los eventos obligatorios incluyen lo siguiente:

- El gobierno se ve obligado a tomar medidas para remediar la contaminación debido a un peligro inminente.

- El gobierno viola un permiso o licencia relacionado con la prevención de la contaminación.

- El gobierno es nombrado, o la evidencia indica que será nombrado por un regulador como parte responsable o parte potencialmente responsable (PRP) de la remediación, o como un gobierno responsable de compartir los costos.

- Se nombra al gobierno, o la evidencia indica que se nombrará, en una demanda para obligar a la participación en la reparación de la contaminación.

- El gobierno comienza o se obliga legalmente a comenzar la remediación de la contaminación.

El 16 de junio de 2014, el USDOJ, actuando en nombre de la Agencia de Protección Ambiental de los Estados Unidos (EPA), radicó una demanda alegando descargas no autorizadas de contaminantes de los sistemas de alcantarillado pluvial de propiedad u operación de por la Municipalidad de San Juan (MSJ), el Departamento de Transporte y Obras Públicas (DTPW) y la ACT a través de ciertas estaciones de bombeo de control de inundaciones de propiedad y operación del Departamento de Recursos Naturales y Ambientales (DNER),

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

en aguas de los Estados Unidos, en violación de la Ley Federal de Agua Limpia. La demanda busca la evaluación de sanciones civiles contra MSJ, DTPW / ACT, DNER y el ELA (colectivamente, los Demandados de Puerto Rico) por violaciones pasadas y presentes de hasta $32,500 por día por violación, por aquellas violaciones que ocurrieron entre el 5 de febrero, 2007 y 12 de enero de 2009; y $37,500 por día por violación, para aquellas violaciones que ocurrieron desde el 13 de enero de 2009 hasta el presente. La demanda solicita además un interdicto para que los acusados cumplan con el Permiso municipal de sistemas separados de alcantarillado pluvial. MSJ, DNER y DTPW / ACT resolvieron individualmente la demanda mediante la firma de tres decretos de consentimiento por separado con USDOJ/EPA. De conformidad con las negociaciones del acuerdo, y teniendo en cuenta el impacto económico de una sanción civil y la incapacidad documentada de los Demandados de Puerto Rico de pagar una sanción, el USDOJ/EPA acordó renunciar a la sanción civil monetaria asociada con las disposiciones alegadas en la demanda. Por lo tanto, los tres decretos de consentimiento se centran en un interdicto para permitir que los Demandados de Puerto Rico cumplan con las disposiciones legales y reglamentarias aplicables. El decreto de consentimiento de MSJ fue presentado ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (Tribunal de Distrito) el 26 de octubre de 2015. Los decretos de consentimiento de DNER y DTPW / ACT fueron presentados ante el Tribunal de Distrito el 23 de diciembre de 2015. En este momento, el USDOJ aún no ha radicado una moción ante el Tribunal de Distrito para la emisión de los decretos de consentimiento, ya que el USDOJ/EPA está evaluando los comentarios públicos recibidos durante el período público obligatorio de conformidad con 28 C.F.R. s 50.7.

**Fondos Fiduciarios**

El SRE es el demandado en un procedimiento que cuestiona la constitucionalidad de la Ley Núm. 3 de 2013 y en otra demanda que cuestiona la constitucionalidad de la Ley Núm. 3 y la Ley Núm. 32 de 2013. En la primera demanda, los demandantes solicitaron al SRE otorgar a los participantes de un patrono del SRE, los beneficios disponibles para ellos en virtud de la Ley Núm. 447 que fueron afectados por la Ley Núm. 3 de 2013, con las consecuencias económicas que esto conllevaría. El 13 de febrero de 2015, el Tribunal Supremo de Puerto Rico negó el recurso del demandante. El 6 de marzo de 2014, los demandantes radicaron una demanda enmendada, que incluyó a la Junta de Síndicos del SRE como demandada e incluyó un reclamo de agravio contra la Administración del SRE y su Junta de Síndicos. En la segunda demanda, los demandantes solicitaron la anulación de las disposiciones de la ley que imponen obligaciones económicas a los municipios a favor del SRE. La Ley Núm. 3 de 2013 impuso una contribución de $2,000 a todos los municipios y corporaciones públicas para cada persona retirada al 30 de junio de 2013 y la Ley Núm. 32 de 2013 impuso una contribución uniforme adicional conforme con la proporción correspondiente de las contribuciones del empleador. El 5 de mayo de 2015, el Tribunal de Primera Instancia de Puerto Rico emitió una sentencia desestimando el caso. El 27 de julio de 2015, los demandantes radicaron una apelación ante el Tribunal de Apelaciones de Puerto Rico. El 5 de enero de 2016, el Tribunal de Apelaciones de Puerto Rico confirmó la decisión sobre la desestimación del caso. El 5 de abril de 2016, los demandantes radicaron un documento de Certiorari ante el Tribunal Supremo de Puerto Rico. El Tribunal Supremo de Puerto Rico aún tiene que emitir una sentencia al respecto. Si bien no se solicitó compensación económica en este segundo caso, si el Tribunal Supremo de Puerto Rico emite un fallo que declara la invalidez de los artículos cuestionados, el SRE no recibirá los pagos impuestos por la Ley Núm. 3 y la Ley Núm. 32 de 2013 al municipio y el SRE probablemente tendrá que devolver los pagos ya realizados en virtud de esas disposiciones legales. Con respecto a estas demandas, el SRE, en consulta con un asesor legal, ha informado que en esta etapa del procedimiento no pueden ofrecer una opinión sobre el resultado probable. En consecuencia, la gerencia no considera necesario incluir ninguna disposición en sus libros para estos casos y tiene la intención de impugnarlos enérgicamente.

SRE también es demandado en una causa presentada por pensionistas del SRE. Radicaron el reclamo en nombre del SRE contra los suscriptores de ciertos bonos de pensión del SRE y algunos de los ex miembros de la

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Junta de Fideicomisarios del SRE. La demanda solicitó $800 millones en daños resultantes de la emisión de bonos por $3,000 millones en 2008 que, conforme a los demandantes, comprometieron la solvencia del SRE. Al 30 de junio de 2016, este caso se encontraba en sus etapas iniciales; por lo tanto, el SRE no ha registrado ninguna provisión para cualquier pasivo que pueda resultar de la adjudicación de esta demanda en sus fondos fiduciarios para el año fiscal 2016. A partir del 21 de mayo de 2017, SRE es un deudor en un caso de Título III bajo PROMESA y, como resultado, este caso se suspendió durante la tramitación del caso de Título III del SRE.

El SRM es demandado en una demanda radicada por varios grupos que representan a los maestros alegando que, dado que el Tribunal Supremo de Puerto Rico declaró inconstitucional la subsección en la Ley Núm. 160 de 2013 que estableció la tasa de interés que debe pagar un miembro por la acreditación de servicios prestados pero no acreditados, el SRM no puede cobrar un interés del 9,5% a cuenta del crédito de servicio. Antes de la adopción de la Ley Núm. 160 de 2013, la tasa de interés aplicable con respecto a dicha acreditación era del 2% según la Resolución de la Junta. El SRM cree que las alegaciones del demandante no son legalmente sostenibles, y la tasa de interés del 9.5% es válida dado que el porcentaje de interés no es un derecho contractual de los miembros activos; ya que no se estableció en la Ley 91 de 2004, ley anterior de SRM. Es la opinión de SRM, en consulta con un asesor legal, que lo que el Tribunal Supremo de Puerto Rico dictaminó como inconstitucional es que los participantes activos solo pueden pagar los servicios no acreditados hasta el 31 de julio de 2014. Con el fallo del Tribunal Supremo de Puerto Rico, los participantes activos pueden continuar pagando por servicios no acreditados y el interés a cobrar se define en el Artículo 1, que no se declaró inconstitucional. La Junta de Fideicomisarios del SRM abordó el tema administrativamente al aprobar por unanimidad una resolución, retroactiva al 24 de diciembre de 2013, por la cual determinó que la tasa de interés que debe pagar un miembro por la acreditación de los servicios prestados pero no acreditados será del 9.5%.

El 21 de octubre de 2016, el Tribunal Supremo de Puerto Rico resolvió en contra de la petición de reconsideración solicitada por el SRM con respecto a la aplicación retroactiva de la tasa de interés del 9.5% en servicios no acreditados como se explicó anteriormente. El Tribunal Supremo resolvió que la tasa de interés aplicable para los servicios no acreditados para todos los participantes es del 2% hasta el 2 de septiembre de 2015 y el 9.5% en adelante, en lugar de aplicar la tasa de interés del 9.5% desde el 24 de diciembre de 2013. Con base en esta determinación, es probable que el SRM deba devolver los montos ya recaudados en exceso del 2% y cumplir el 2% para todos los casos pendientes y las nuevas solicitudes presentadas. El impacto real y actuarial de otorgar dicha acreditación no se ha determinado a la fecha de este informe. El SRM está contemplando una solicitud de reconsideración del Tribunal Supremo. La Junta de Fideicomisarios de SRM, en consulta con un asesor legal, no puede evaluar la probabilidad de una resolución adversa del caso. En este momento, no es posible determinar el impacto financiero de dicho resultado.

Asimismo, cada uno de los Sistemas de Retiro es demandado o codemandado en varios juicios resultantes de la conducción habitual de sus operaciones. Con base en el asesoramiento de un asesor legal y considerando las coberturas de seguros, la gerencia dictamina que la responsabilidad final, si la hubiera, no tendrá un efecto significativo en el estado financiero de cada uno de los Sistemas de Retiro.

**Unidades de Componentes de Presentación Discreta**

El 28 de junio de 2014, el ELA promulgó la Ley 71 2014, conocida como la Ley de Recuperación y Aplicación de la Deuda de la Corporación Pública de Puerto Rico (Ley de Recuperación). La Ley de Recuperación tenía la intención de llenar el vacío que existe actualmente con respecto a un proceso legal ordenado que rige el cumplimiento y la reestructuración de las deudas y otras obligaciones de una corporación pública, debido a la inaplicabilidad general de los Capítulos 9 y 11 del Código de Quiebras de los Estados Unidos para corporaciones públicas que son organismos gubernamentales del ELA. El propósito de la Ley de Recuperación era crear un

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

marco legal que: (1) permita a las corporaciones públicas ajustar sus deudas de una manera que proteja los intereses de todos los acreedores afectados; (2) proporcione procedimientos para la ejecución y reestructuración ordenadas de la deuda de una corporación pública de manera consistente con la Constitución de los Estados Unidos y el ELA; y (3) maximice el retorno a las partes interesadas de la corporación pública.

La Ley de Recuperación no se aplica al ELA. Se aplica únicamente a las corporaciones públicas, que no sean las siguientes: el Fideicomiso de los Niños; el SRE; el BGF y sus subsidiarias, afiliadas y cualquier entidad adscrita al BGF; SRJ AMF; la Corporación Financiera Municipal; PFC; PRIDCO, AFICA; PRIFA COFINA SRM; y UPR.

El 6 de febrero de 2015, el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico emitió un dictamen y una orden declarando inconstitucional la Ley de Recuperación y declarando que el Código de Quiebras de los Estados Unidos tiene precedencia. La decisión del Tribunal de Distrito fue confirmada por el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito (el Primer Circuito) y posteriormente confirmada por el Tribunal Supremo de los Estados Unidos (el Tribunal Supremo).

En el curso normal de sus operaciones, varias Unidades de Componentes también están sujetas a garantías y otras acciones iniciadas por terceros que buscan daños o contraen compromisos. Dichas acciones se divulgan en los informes emitidos por separado de las unidades de componentes mayores, que se incluyen a continuación. Con respecto a los compromisos relacionados con las garantías, también se incluyeron ciertas unidades de componentes no mayores dedicadas a la industria de servicios financieros con fines informativos. Estos compromisos y garantías se resumen a continuación:

*(a) BGF*

Al 30 de junio de 2016, el BGF tenía garantías financieras para el sector privado de aproximadamente $330 millones. Además, al 30 de junio de 2016, las cartas de crédito standby para el sector público eran de aproximadamente $1,300 millones. Los compromisos para extender el crédito al sector público fueron de aproximadamente $1,400 millones, mientras que no hubo compromisos para extender el crédito al sector privado.

El 24 de julio de 2013, Aerostar Airport Holdings, LLC (Aerostar) y PRPA celebraron un contrato de arrendamiento del Aeropuerto Internacional Luis Muñoz Marín (LMMIA), por un período de 40 años. En relación con el arrendamiento de LMMIA, el BGF ejecutó una garantía de pago a favor de Aerostar por los daños por terminación debidos y pagaderos en efectivo por PRPA en virtud del contrato de arrendamiento. De acuerdo con la garantía de del BGF, Aerostar tiene el derecho de rescindir el contrato de arrendamiento principalmente en tres escenarios diferentes de incumplimiento por parte de PRPA. El monto de los Daños por Rescisión consiste principalmente, entre otros componentes, en el Valor de Arrendamiento de la Instalación LMMIA y la Compensación de Arrendamiento tal como se define en el acuerdo.

El 22 de septiembre de 2011, Autopistas Metropolitanas de Puerto Rico, LLC (Metropistas) y ACT celebraron un acuerdo de concesión (el Acuerdo de Concesión) para la administración de las autopistas PR-22 y PR-5, que la ACT recibió a cambio de un pago total $1,100 millones y un compromiso para realizar mejoras inmediatas en las carreteras de peaje que ascienden a $56 millones y cumplir con los estándares operativos de clase mundial, lo que puede requerir invertir más de $600 millones durante la vigencia de la concesión. En relación con el cierre del Contrato de Concesión, el BGF ejecutó una garantía de pago a favor de Metropistas según la que el BGF actúa como garante de los Daños por Rescisión, según se define en el Contrato de Concesión, debidos y pagaderos en efectivo por la ACT en virtud del Contrato de Concesión. El monto de los Daños por Rescisión consiste, entre otros componentes, en el valor de mercado del interés de Metropistas en los caminos con peaje. Al mismo tiempo,

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

en relación con la garantía de pago, el BGF y la ACT también celebraron un Acuerdo de Reembolso por el cual la ACT acordó reembolsar al BGF cualquier monto pagado en virtud de la garantía.

El 18 de agosto de 2002, la Legislatura aprobó la Ley Núm. 198, que creó el Fondo de Inversión para el Desarrollo Cooperativo (Fondo de Desarrollo). El propósito de este fondo es promover el desarrollo de entidades cooperativas. Este fondo se capitalizará a través de contribuciones que proporcionará el BGF hasta $25 millones, que serán equiparados por entidades cooperativas. Al 30 de junio de 2016, el BGF aportó $23.4 millones para el Fondo de Inversión para el Desarrollo Cooperativo, de los cuales $1.5 millones fueron aportados durante el año finalizado el 30 de junio de 2016.

El 19 de enero de 2012, las Juntas Directivas del BGF y el Fondo de Desarrollo aprobaron un programa de garantía de préstamos (el Programa de Garantía) para estimular los préstamos de bancos privados a empresas en Puerto Rico para promover la creación de empleo y el desarrollo económico en Puerto Rico. El 3 de abril de 2012, el BGF, el Fondo de Desarrollo y ciertos bancos participantes celebraron acuerdos de garantía y compromiso y financiamiento en los cuales el Fondo de Desarrollo garantizará préstamos elegibles otorgados por esos bancos a empresas elegibles hasta un máximo del 30% del monto del capital de los préstamos, de acuerdo con los criterios establecidos en el Programa de Garantía. El BGF se había comprometido a proporcionar hasta $200 millones al Fondo de Desarrollo para permitirle cumplir con los pagos relacionados con las garantías emitidas bajo el Programa de Garantía. El Programa de Garantía tenía un plazo de un año y finalizó el 2 de abril de 2013. Al 30 de junio de 2016, el balance total del préstamo en virtud del Programa de Garantía ascendió a aproximadamente $43.4 millones. La garantía emitida para cada préstamo tiene vigencia por un plazo máximo de siete años. Se ha determinado que la mejor estimación del valor presente descontado de las salidas futuras previstas para el programa de garantía de préstamos del Fondo de Desarrollo es de aproximadamente $1.5 millones al 30 de junio de 2016, lo que refleja una disminución durante el año fiscal 2016 de aproximadamente $1.7 millones, principalmente como resultado de préstamos eliminados del programa de garantía por el banco privado correspondiente.

El Fondo de Desarrollo ha celebrado un acuerdo (el Acuerdo) con EDB por el cual el Fondo de Desarrollo garantizaría una parte de los préstamos otorgados por EDB en virtud de un programa gubernamental llamado The Key for Your Business (el Programa). Según el Acuerdo, el Fondo de Desarrollo asignaría $15 millones de su capital para el programa. El Fondo de Desarrollo garantiza un tercio del balance de capital pendiente de cada préstamo más los intereses devengados y otros cargos. El Fondo de Desarrollo cobra el uno por ciento del monto del préstamo como una tarifa de garantía y ningún préstamo puede exceder los $50,000. Al 30 de junio de 2016, el balance pendiente de estos préstamos garantizados por el Fondo de Desarrollo ascendió a aproximadamente $1.7 millones. Se ha determinado que la mejor estimación del valor presente descontado de las salidas futuras que se espera incurrir bajo el Programa Key for Your Business del Fondo de Desarrollo es de aproximadamente $444,000 al 30 de junio de 2016, lo que refleja una disminución de aproximadamente $20,000, principalmente debido a pagos de garantía realizados durante el año.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

La Autoridad para el Financiamiento de la Vivienda actúa como administrador de una serie de préstamos hipotecarios de otros inversores. El servicio generalmente se subcontrata con un tercero. Al 30 de junio de 2016, el balance del capital de los préstamos hipotecarios cobrados por terceros es aproximadamente el siguiente (en miles):

| Entidad | | Monto |
|---|---|---|
| Desarrollo de la Comunidad de Puerto Rico Fondo I | $ | 29,301 |
| Oficina de Administración de los Activos de la Corporación de Renovación Urbana y Vivienda o su sucesor sin pagos garantizados de préstamos hipotecarios | | 20 |
| Total | $ | 29,321 |

La Oficina del Inspector General de los Estados Unidos (OIG) ha realizado varios exámenes del Programa HOME que cubren los años fiscales terminados antes del 1 de julio de 2010. Estos exámenes cubrieron períodos en los cuales el Programa HOME estuvo bajo la administración del Departamento de Vivienda del ELA. Estos exámenes identificaron casos de incumplimiento de los términos y condiciones de los acuerdos de subvención, la ley federal aplicable y las regulaciones del Programa HOME, que incluyen, entre otros, el gasto de recursos para fines no elegibles. La OIG identificó en sus exámenes costos no permitidos que ascienden a aproximadamente $18.3 millones. La Autoridad de Financiamiento de la Vivienda registró una contingencia por dichos costos no permitidos, y montos adicionales identificados internamente como posibles desautorizaciones, que ascienden a aproximadamente $20.4 millones. El 1 de octubre de 2013, la Autoridad para el Financiamiento de la Vivienda celebró un plan de pago de tres años, a partir del 1 de febrero de 2016, para reembolsar al Programa HOME a partir del 15 de octubre de 2013 aproximadamente $1.8 millones que se determinaron como costos no permitidos dentro de los $18.3 millones que se mencionan anteriormente.

El 31 de julio de 2014, el Gobernador firmó el Acuerdo de Liquidación de Pago Voluntario de HOME (el Acuerdo del HUD) con el HUD. El Acuerdo del HUD establece el reembolso al Programa HOME de $14.2 millones, de fondos no federales, para gastos no permitidos en relación con proyectos financiados por el HUD, como se define y describe en el Acuerdo, en dos cuotas de $10 millones y $4.2 millones que vencen el 1 de octubre, 2014 y 1 de octubre de 2015, respectivamente. La Autoridad de Financiamiento de la Vivienda ya ha cumplido con estas cuotas.

Otros programas federales también están sujetos a auditorías. Dichas auditorías podrían dar lugar a reclamos contra los recursos de la Autoridad para el Financiamiento de la Vivienda. No se han establecido provisiones para los pasivos que puedan surgir de tales montos ya que el monto, si lo hay, no puede determinarse en esta fecha.

El BGF y algunas de sus unidades de componentes están sujetos a varias demandas que surgen del curso normal de los negocios. La gerencia, con base en el asesoramiento de un asesor legal, es de la opinión de que la responsabilidad final, si la hubiera, resultante de estos procedimientos pendientes no tendrá un efecto material adverso en la posición financiera y los resultados de las operaciones de del BGF o sus unidades de componentes.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*(b)* *ACT*

La ACT es demandada o codemandada en varios juicios por supuestos daños en casos relacionados principalmente con proyectos de construcción. Estos generalmente están total o parcialmente cubiertos por el seguro. Los contactores están obligados, de conformidad con los términos de los acuerdos de construcción, a contratar un seguro de responsabilidad civil adecuado y a eximir de responsabilidad a la ACT de los juicios presentados a causa de los daños relacionados con la construcción de los proyectos. Al 30 de junio de 2016, la ACT, de acuerdo con la asesoría legal, ha registrado un pasivo de aproximadamente $127 millones por pérdidas probables en aquellos reclamos no cubiertos completamente por el seguro. En la opinión del asesor legal, que cualquier responsabilidad que exceda la responsabilidad registrada que pueda surgir por tales reclamos no será significativa para la posición financiera o los resultados de las operaciones de la ACT. A partir del 21 de mayo de 2017, la ACT es deudora en un caso de Título III según PROMESA y, como resultado, estos casos se suspenden durante la tramitación del caso de Título III de la ACT.

La ACT celebró un Contrato de Sistema y Pista de Prueba Preconfigurada (Contrato STTT) con Siemens Transportation Partnership Puerto Rico, S.E. (Siemens) y otros contratistas con el propósito de operar y mantener el Tren Urbano. Durante 2005, el Contrato STTT entró en vigencia luego de la ejecución del contrato por un período inicial de cinco años con la opción de ACT de extender el plazo por cinco años adicionales. La compensación se basa en un cronograma incluido en el acuerdo maestro, que se aproxima a $4.0 millones mensualmente. El costo total anual de operación y mantenimiento, incluido el costo de emisión y electricidad, para el año fiscal 2016 fue de aproximadamente $56.6 millones.

*(c)* *AEE*

La AEE es demandada o codemandada en varios juicios relacionados con su negocio, algunos con montos sustanciales. En esos casos, la gerencia y el asesor legal creen que el resultado del litigio será desfavorable para la AEE, se ha establecido una provisión para cubrir los pasivos estimados. La administración de la AEE, basada en las consultas con el asesor legal, cree que los pasivos adicionales, si los hubiere, que resulten de la resolución final de estos asuntos no tendrá un efecto material en la posición financiera o los resultados de las operaciones de la AEE. A partir del 2 de julio de 2017, la AEE es deudora en un caso del Título III según PROMESA y, como resultado, estos casos se suspenden durante la tramitación del caso del Título III de la AEE.

El 18 de mayo de 2000, Abengoa, Puerto Rico, S.E. (Abengoa), contratista de la AEE para el repotenciamiento de las unidades 5 y 6 de la planta de vapor de San Juan, declaró unilateralmente la rescisión del contrato con la AEE y radicó una demanda por incumplimiento del contrato. Este litigio se dividió en una fase de responsabilidad y daños. El juicio en la primera fase para determinar el incumplimiento del contrato comenzó el 22 de enero de 2015 y concluyó durante el mismo año. El juicio en la segunda fase para determinar los daños y los términos económicos estaba programado para comenzar en 2016; pero luego se pospuso hasta el 16 de enero de 2018. Los reclamos económicos se han reservado para esta segunda fase del juicio por daños. La AEE está preparada para probar los daños directos derivados de la rescisión indebida de Abengoa (es decir, los costos directos para completar el alcance del trabajo de Abengoa, la renovación del equipo, etc.). por un monto de al menos $250 millones. Si el Tribunal permite la recuperación de daños indirectos o resultantes, la AEE ha reclamado más de $400 millones (que incluyen los reclamos por costos diferenciales de combustible, pérdida de créditos de la EPA, etc.).

El límite de responsabilidad según el Contrato EPC es del 150% del Precio del Contrato. Esto representa un rango de entre $276 millones y $310.5 millones dependiendo de qué valor se considere el Precio del Contrato al momento de la rescisión La suma penal de todos los Bonos de Rendimiento emitidos por la garantía en conjunto es de aproximadamente $190 millones.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

La AEE entiende que tiene probabilidades significativas de prevalecer sobre los méritos o su reconvención por rescisión injusta contra Abengoa y su compañía de seguros. La evidencia mostrará que Abengoa eligió rescindir el Contrato con conocimiento o sin tener en cuenta el daño financiero que dicha rescisión causaría.

En 2009, un gran incendio en una granja de tanques propiedad de Caribbean Petroleum Corporation (CAPECO) causó daños importantes en las áreas circundantes. La AEE almacenaba parte de su combustible en esta instalación. A raíz del incendio, se radicaron numerosos reclamos contra CAPECO. Algunos de los demandantes incluyeron a la AEE como demandada en estas demandas, alegando que la AEE no cumplió con su deber (como propietario del combustible almacenado en el sitio) de supervisar adecuadamente las operaciones de CAPECO en el depósito de tanques. Todos los casos se encuentran en las etapas iniciales y la AEE tiene la intención de defenderse vigorosamente contra estos reclamos. El 12 de agosto de 2010, CAPECO se declaró en quiebra. Como resultado, se han paralizado todos los procedimientos contra CAPECO. Posteriormente, finalizó el procedimiento de quiebra de CAPECO. Continúan los procedimientos contra la AEE.

En 2011, varios consumidores radicaron demandas separadas contra la AEE en reclamo de daños supuestamente causados por prácticas de facturación incorrectas e ilegales. Las demandas han sido consolidadas y certificadas como litigios complejos, según lo solicitado por la AEE. Los consumidores reclaman daños por más de $100 millones y solicitaron que el caso sea certificado como una demanda colectiva. La AEE radicó su respuesta en oposición a la solicitud de certificación de demanda colectiva. Todavía se están llevando a cabo procedimientos de descubrimiento en aquellos casos que aún no se han desestimado. El 7 de diciembre de 2016, se celebró una Conferencia sobre el estado y se asignó un nuevo juez. El 23 de marzo de 2017, se realizó una conferencia y, como resultado, se programó una vista para la certificación de demanda colectiva el 16 de agosto de 2017. Sin embargo, el 2 de julio de 2017, la AEE se declaró en quiebra según el Título III de PROMESA. La AEE radicó el aviso de paralización ante el tribunal estatal el 12 de julio de 2017 y la sentencia correspondiente para suspender el caso se radicó el 11 de agosto de 2017. La AEE defenderá enérgicamente estos casos y sostiene que no hay causas radicadas contra la AEE.

En 2011, ocho personas privadas y una corporación privada local radicaron una demanda civil contra la AEE y sus directores en un tribunal federal de Puerto Rico, alegando violaciones de la Ley de Organizaciones Corruptas e Influenciadas por Asociación Ilícita (Ley RICO), que incluye el uso ilegal de una empresa para lavar dinero generado por un patrón de actividad de crimen organizado, la manipulación ilegal de una empresa con el fin de participar, ocultar o beneficiarse de un patrón de actividad de crimen organizado, conspiración ilegal para violar la Ley RICO y conspiración para avanzar en un plan de lavado de dinero. Ni el gobierno federal de los Estados Unidos ni el gobierno del ELA forman parte en esta demanda civil. No se ha especificado el monto reclamado. Los demandantes también han solicitado al tribunal federal que les permita ser representantes de una demanda colectiva formada por todos los consumidores de la electricidad vendida por la AEE desde 2007 hasta el presente. La AEE se opuso a la certificación de la demanda colectiva y recibió el rechazo del tribunal. El 25 de septiembre de 2012, el tribunal federal desestimó todos los reclamos anteriores, excepto aquellos relacionados con la conspiración para avanzar en un esquema de lavado de dinero y conspiración para adquirir un interés en una empresa. La AEE cree que los reclamos no rechazados de la Ley RICO carecen de fundamento porque los demandantes no podrán probar los elementos necesarios de esos reclamos, en particular los que pretenden demostrar que la AEE conspiró a través de sus empleados para violar la Ley RICO, o que sus directores o Junta los miembros obtuvieron algún interés en la AEE (que no sea su puesto en la Junta). La AEE continuará defendiendo enérgicamente este caso.

En 2009, la AEE radicó una demanda en el tribunal del ELA contra Vitol, Inc. y algunas de sus afiliadas y subsidiarias que buscaban una sentencia declarativa sobre la nulidad de un acuerdo de suministro de combustible de $2,000 millones debido a que Vitol no divulgó ciertos casos de corrupción por los cuales aceptó responsabilidad. Vitol retiró esta demanda ante un tribunal federal y presentó una reconvención alegando que la

259

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

AEE le debía aproximadamente $45 millones para combustible entregado e impuestos a las ventas relacionados. El 28 de noviembre de 2012, la AEE radicó una segunda demanda contra Vitol en el Tribunal de Primera Instancia del ELA de Puerto Rico buscando esencialmente los mismos remedios solicitados en la primera acción, pero en cuanto a otros cuatro contratos, después del descubrimiento reveló la fecha en que Vitol se tomó conocimiento de las investigaciones en los casos de corrupción. Vitol también retiró esta acción ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. La AEE reclama aproximadamente $3,500 millones en total. Vitol ha resuelto el reclamo por los $17 millones en impuestos a las ventas y ha declarado que modificará su reconvención para desestimar ese reclamo. Se ha cerrado el descubrimiento en el caso. Las partes han presentado mociones de sentencia sumaria entre ellas y están en proceso de radicar sus respectivas oposiciones a las mismas. Las mociones están pendientes de adjudicación por el tribunal.

Cincuenta y cuatro demandantes, antiguos y actuales empleados de la AEE, afirman que tienen problemas de salud debido al incumplimiento intencional de la AEE de las leyes federales y locales con respecto a los materiales con asbesto. En particular, los demandantes afirman que, durante un período de tiempo determinado, en el que la AEE tenía la obligación de tomar medidas con respecto a los materiales con asbesto en sus instalaciones, la AEE no cumplió con su deber de proteger a los demandantes contra la exposición al asbesto. Los demandantes reclaman aproximadamente $321 millones en daños. La AEE alega la inmunidad del patrono según la Ley de Compensación de Trabajadores. Se llevó a cabo una vista probatoria sobre el tema. Después del juicio, el Tribunal emitió una sentencia desestimando los reclamos en su totalidad. Los demandantes radicaron una apelación ante el Tribunal de Apelaciones de Puerto Rico. La AEE radicó una moción para desestimar la apelación. El Tribunal de Apelaciones negó la moción de la AEE para desestimar y la AEE radicó su escrito de apelación. El caso está pendiente de resolución por parte del Tribunal de Apelaciones.

El 21 de noviembre de 2013, Tropical Solar Farms, LLC; Nuevo Horizon Solar, LLC; Jonas Solar Energy, LLC; y Roberto Torres (colectivamente, los Demandantes) radicaron una demanda en el Tribunal de Primera Instancia del ELA de Puerto Rico, Sección Ponce, contra 29 demandados y varias personas desconocidas. La demanda contiene una gran cantidad de reclamos contra múltiples demandados que surgen de una supuesta multiplicidad de fuentes de obligaciones: contractuales, extracontractuales y en incumplimiento de los deberes fiduciarios y la ley. Abarca entidades privadas, una corporación pública, la AEE y ex funcionarios públicos, entre otros. La demanda reclama una compensación monetaria superior a $705 millones. La demanda alega que los demandados negociaron varios Acuerdos de Compra de Energía Renovable para suministrar hasta 40 megavatios a la AEE, que fueron asignados por los demandantes a otros demandados. Los Demandantes alegan que los demandados nunca tuvieron la intención de cumplir con sus obligaciones según los acuerdos, y solo estaban comprando tiempo para avanzar en sus otros proyectos de energía renovable con la AEE.

La AEE radicó una moción para desestimar y el 2 de octubre de 2015, se emitió una sentencia parcial desestimando todos los reclamos en el caso contra la AEE con perjuicio. Tropical Solar apeló la desestimación ante el Tribunal de Apelaciones de Puerto Rico. En la apelación, los Tribunales de Apelaciones de Puerto Rico modificaron la desestimación de los reclamos contra la AEE de una desestimación con perjuicio a una desestimación sin perjuicio. Cualquier reclamo posterior presentado por Tropical Solar contra AEE se abordará en el procedimiento de Título III de AEE.

Además de estos casos, la AEE forma parte de otros litigios típicos para una empresa de energía eléctrica, pero la gerencia estima que los montos de tales reclamos no son materiales y no afectarán negativamente las operaciones de la AEE. Estos otros casos permanecen en etapas de descubrimiento y la AEE los defenderá enérgicamente.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Investigación de la Comisión de Mercados y Valores

La Comisión de Mercados y Valores de los Estados Unidos (SEC) solicitó información sobre la emisión de bonos de la AEE desde 2012 y 2013. La AEE está cooperando en la investigación, lo que incluye proporcionar a la SEC documentos e información. La SEC también envió lo que se conoce como notificaciones de cartas de Wells a la AEE, y a los banqueros de inversión, asesores financieros y asesores legales que ayudaron a estructurar todas las emisiones de bonos relacionadas bajo el alcance de su investigación. Las cartas de Wells notifican al destinatario que está siendo investigado por la SEC y presentan una oportunidad para que todos los destinatarios de dichas notificaciones respondan a cualquier denuncia de la SEC. La SEC ha informado que las solicitudes de información no deben interpretarse como una indicación de que se ha producido una violación de las leyes federales de valores. La AEE continúa cooperando con la SEC con respecto a su investigación de estas emisiones de bonos. Este asunto está en curso y no se puede predecir cuándo se concluirá o su resultado.

*(d)* *AAA*

La AAA es demandada en un juicio presentado por los clientes alegando que la AAA ha facturado en exceso debido a la metodología utilizada para estimar el consumo. Hay un caso en el que los demandantes solicitaron una certificación de la demanda como demanda colectiva y solicitan daños por recuperación y un interdicto que prohíbe a la AAA continuar facturando con la metodología actual. La vista de certificación de demanda colectiva se realizó en junio de 2011, se emitió una certificación para una demanda colectiva. AAA apeló la certificación de demanda colectiva y espera la decisión del Tribunal sobre la solicitud. La exposición potencial de la AAA de estas demandas es poco probable y, como tal, no se informan pasivos en los estados financieros básicos adjuntos.

La AAA es demandada o codemandada en varios otros juicios. El resultado final de las demandas no se puede determinar actualmente. Sin embargo, la gerencia de la AAA, basada en el asesoramiento de los asesores legales, es de la opinión de que estas demandas no tendrán un impacto material en sus estados financieros independientes.

*Compromisos ambientales y decreto de consentimiento*

El 15 de septiembre de 2015, el USDOJ, por solicitud del Administrador de la EPA, radicó una demanda contra la AAA y el ELA, como parte requerida bajo la Ley de Agua Limpia (definida a continuación), en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. La demanda solicita un interdicto y la evaluación de sanciones civiles contra la AAA por presuntas violaciones de la Ley Federal de Control de la Contaminación del Agua promulgada en 1956, enmendada por las Enmiendas de la Ley Federal de Control de la Contaminación del Agua de 1972, la Ley de Agua Limpia de 1977 y el Agua Ley de Calidad de 1987, según enmienda (la Ley de Agua Limpia). Simultáneamente con la radicación de la demanda, el USDOJ también radicó un decreto de consentimiento (el Decreto de Consentimiento de la EPA de 2015) celebrado entre la EPA, la AAA y el ELA que resolvió los asuntos cubiertos en la demanda, en los términos acordados por la AAA y la EPA. El Decreto de Consentimiento de la EPA de 2015 es el resultado de un extenso proceso de negociación destinado, entre otras cosas, a resolver los reclamos cubiertos en la demanda y los requisitos de varios decretos de consentimiento existentes ingresados en 2003, 2006 y 2010 (colectivamente los Decretos de Consentimiento de la EPA) relacionados con las alegaciones incluidas en la demanda. La EPA y la AAA reconocieron en el Decreto de Consentimiento de la EPA de 2015 que el trabajo que se llevará a cabo a continuación permitirá a la AAA comprender mejor sus sistemas de alcantarillado, pero no resolverá todas las obligaciones de la Ley de Agua Limpia de la AAA con respecto a dichos sistemas. El ELA incurrirá en un pasivo según el Decreto de Consentimiento de la EPA de 2015 solo en la medida en que las leyes del ELA eviten que la AAA recaude los ingresos necesarios para cumplir con el Decreto de Consentimiento de la EPA de 2015. El ELA ha declarado en virtud del Decreto de Consentimiento de la EPA de 2015 que sus leyes actuales no impiden que la AAA aumente los ingresos necesarios para cumplir con las obligaciones que ha contraído en virtud del mismo.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

La AAA comenzó las negociaciones que condujeron a la ejecución del Decreto de Consentimiento de la EPA de 2015 para mitigar los altos costos de construcción en progreso exigidos por los Decretos de Consentimiento Existentes, que representan el 60% del costo de construcción en progreso y un costo aproximado de $1,400 millones durante los años fiscales 2006–2014. Se requerirían otros $1,700 millones de proyectos de cumplimiento obligatorio según los Decretos de Consentimiento Existentes, en su forma actual, hasta el año fiscal 2025. A pesar de estar en cumplimiento material con los requisitos del proyecto de mejora de capital de los Decretos de Consentimiento Existentes, la AAA inició negociaciones con el USDOJ, en nombre de la EPA, la EPA y el Departamento de Salud del ELA, para enmendar los Decretos de Consentimiento Existentes, con el propósito de: (i) reducir los gastos anuales requeridos del proyecto y extender los plazos de cumplimiento, (ii) incorporar otros proyectos regulatorios incluidos en la construcción en progreso de la AAA que actualmente no están cubiertos por los Decretos de Consentimiento Existentes, e (iii) incluir los requisitos de operación, mantenimiento y mejora de capital del programa relacionados con el sistema de recolección de aguas residuales de Puerto Nuevo, que incluyen supuestos desbordamientos combinados de alcantarillado. Se espera que el Decreto de Consentimiento de la EPA de 2015 resultante ajuste el costo de estos proyectos y actividades con la actual situación financiera y las perspectivas económicas de la AAA.

El 23 de mayo de 2016, el Tribunal de Distrito emitió una sentencia aprobando el Decreto de Consentimiento de la EPA 2015 presentado el 10 de mayo de 2016. Se desestimó la demanda y se cerró el caso civil número 15-2283. AAA espera que con la aprobación final del Decreto de Consentimiento de la EPA 2015, podrá finalizar la enmienda propuesta al Acuerdo de Liquidación de Agua Potable de 2006 en términos sustancialmente similares a los que se están negociando actualmente con el DOH. El acuerdo estableció un sistema de priorización para administrar y cumplir con los proyectos de mejoras de capital requeridos basados en la capacidad de financiamiento de la AAA, sin afectar los requisitos regulatorios y de cumplimiento.

En diciembre de 2016, la AAA solicitó una extensión de tiempo a la EPA de conformidad con la Sección XIII - Modificación/Priorización de medidas correctivas para ciertos proyectos del Decreto de Consentimiento que incluye las medidas correctivas para abordar las descargas de aguas residuales en plantas de tratamiento de agua y aguas residuales.

*(e) UPR*

La UPR participa en varios programas federales de asistencia financiera. Estos programas están sujetos a auditorías de acuerdo con las disposiciones de la Circular A 133 de OGP, *Auditorías de Estados, Gobiernos Locales y Organizaciones Sin Fines de Lucro*, o auditorías de cumplimiento por parte de las agencias otorgantes. El monto, si corresponde, de los gastos que las agencias otorgantes pueden rechazar no se puede determinar en este momento. La gerencia cree que el impacto no será material para los estados financieros de la UPR.

Se han presentado reclamo por negligencia médica contra el hospital de la UPR y actualmente se encuentran en varias etapas de litigio. El asesor legal y la gerencia del hospital la UPR dictaminan que las acumulaciones registradas son adecuadas para proporcionar pérdidas potenciales resultantes de litigios pendientes o amenazados, así como reclamos de incidentes desconocidos que pueden afirmarse como resultado de los servicios prestados a los pacientes. Según la Ley Núm. 98 del 24 de agosto de 1994, la pérdida máxima de reclamos contra el hospital de la UPR se limita a $75,000 por persona, o $150,000 si involucra acciones por daños a más de una persona o cuando una sola persona lesionada tiene derecho a varias causas radicadas. La gerencia del hospital la UPR y su asesor legal dictaminan que el resultado de estos reclamos no tendría un efecto material en la UPR o las operaciones del hospital.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*Compromisos y contingencias ambientales*

Las siguientes operaciones de unidades de componentes de presentación discreta realizan cabo actividades específicas que están sujetas a las regulaciones ambientales estatales y federales:

**(a)  *AEE***

Las instalaciones y operaciones de la AEE están sujetas a regulaciones de numerosas leyes ambientales federales y del ELA, que incluyen la Ley de Aire Limpio, la Ley de Agua Limpia, la Ley de Contaminación por Petróleo (OPA), la Ley de Recuperación de Conservación de Recursos (RCRA), la Ley de Respuesta Ambiental Integral, Compensación y Responsabilidad (CERCLA), y Tanques de Almacenamiento Subterráneos, entre otras.

En febrero de 1992, la Agencia de Protección Ambiental (EPA) realizó una inspección multimedia de las instalaciones de la AEE e identificó varios supuestos casos de incumplimiento relacionados con el control de prevención de derrames de aire, agua y petróleo de la AEE y los programas de cumplimiento de contramedidas. La AEE y la EPA negociaron para resolver los problemas relacionados con las deficiencias observadas durante la inspección y para garantizar el cumplimiento futuro de todas las leyes y regulaciones aplicables. Como resultado de las negociaciones, la AEE y la EPA llegaron a un acuerdo que resultó en un decreto de consentimiento (el Decreto de Consentimiento) aprobado por el tribunal federal de los Estados Unidos en marzo de 1999. Según los términos y condiciones del Decreto de Consentimiento, la AEE pagó una multa civil de $1.5 millones e implementó medidas de cumplimiento adicionales por un valor de $4.5 millones. Asimismo, el Decreto de Consentimiento requiere que la AEE mejore e implemente programas y operaciones de cumplimiento para asegurar el cumplimiento de las leyes y regulaciones ambientales.

En 2004, el tribunal federal de los Estados Unidos aprobó una modificación al Decreto de Consentimiento acordado por la AEE y la EPA en virtud del cual la AEE redujo, en dos pasos, el contenido de azufre en el combustible Núm. 6 utilizado en ciertas unidades generadoras de su Costa Sur y las plantas de energía de Aguirre (a 0.75% o menos para el 1 de marzo de 2005 y a 0.5% o menos para el 1 de marzo de 2007), y gasolina Núm. 6 con un contenido de azufre de no más de 0.5% hasta el 18 de julio de 2009 a sus centrales eléctricas de Palo Seco y San Juan.  Además, la AEE ha completado un programa de reducción de emisiones de óxido de nitrógeno y modificado los rangos óptimos de operación para todas sus unidades según el Decreto de Consentimiento. La AEE también pagó una multa civil de $300,000 y reservó $200,000 para financiar ciertos proyectos y programas ambientales complementarios según el Decreto de Consentimiento.

La AEE ha sido auditada varias veces para verificar el cumplimiento de los programas del Decreto de Consentimiento, y entiende que un número considerable de ellas puede cerrarse ya que se han completado sus requisitos. El 22 de julio de 2014, representantes de la AEE, la EPA y el USDOJ se reunieron para comenzar las negociaciones hacia la finalización de algunos de los programas. Como resultado, la EPA y el USDOJ solicitaron a la AEE que envíe información sobre el cumplimiento de la AEE con los Programas para su revisión y evaluación. El 25 de septiembre de 2014, la AEE se reunió nuevamente con representantes de la EPA y el USDOJ y presentó la información solicitada, junto con una carta en la que la AEE solicitó formalmente a la EPA que revise y apruebe la finalización de las disposiciones de dichos programas del Decreto de Consentimiento y su Modificación presentada en 2004, y comenzó el proceso para radicar conjuntamente en el Tribunal una estipulación para la rescisión parcial de dichos programas. Para lograr este objetivo, la AEE sugirió nombrar un grupo de trabajo compuesto por representantes de la EPA y la AEE para programar y reunirse para abordar los detalles, lo que fue aceptado por la EPA. Los días 27 y 28 de mayo de 2015, los representantes legales de la AEE, la EPA y el USDOJ se reunieron para comenzar las negociaciones sobre los reclamos de rescisión de la AEE, así como para definir cualquier documentación adicional solicitada para apoyar y demostrar la determinación de la AEE del cumplimiento de las diferentes obligaciones de los programas. Los representantes de la EPA, la AEE y el USDOJ continúan con una evaluación exhaustiva y un proceso de negociación sobre este asunto. A partir de

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

mayo de 2018, se realizaron reuniones del grupo de trabajo entre la AEE y la EPA y la EPA y el DOJ están revisando un borrador del documento. Una vez que el documento sea definitivo, debe pasar por un proceso público para su aprobación final.

Desde septiembre de 2004, no ha habido ninguna acción legal en los tribunales federales de los Estados Unidos ni ningún procedimiento administrativo contra la AEE con respecto al Decreto de Consentimiento o su modificación. El Decreto de Consentimiento incluye sanciones estipuladas para ciertos eventos de incumplimiento. Los eventos de incumplimiento deben divulgarse a la EPA en el informe correspondiente. Normalmente, cuando ocurre un evento de incumplimiento cubierto, la AEE paga la multa estipulada por adelantado para beneficiarse de un descuento del 50% de la multa estipulada aplicable.

En 2002, la AEE recibió un "Aviso especial sobre investigación de recuperación/Estudio de viabilidad del suelo" en el sitio del Superfondo de eliminación de depósitos sólidos de Vega Baja. La EPA ha identificado a la AEE y otras seis entidades como "partes potencialmente responsables", tal como se define en la CERCLA. En 2003, la AEE acordó unirse con otras partes potencialmente responsables en una Orden Administrativa de Consentimiento (AOC) para un Estudio de Investigación/Viabilidad de Remediación (RI/FS), con el entendimiento de que dicho acuerdo no constituía una aceptación o responsabilidad. Según el AOC, la AEE comprometió hasta $250,000 como su contribución para financiar parcialmente el RI/FS. En este momento, se ha completado el RI/FS. El trabajo se realizó de acuerdo con el cronograma establecido por la AEE y los demás designados (PRP). En julio de 2010, se emitió un plan propuesto que identifica la Alternativa preferida para abordar la contaminación del suelo en el Sitio de eliminación de depósitos sólidos de Vega Baja. La EPA realizó una vista pública el 3 de agosto de 2010 para analizar las alternativas para abordar la contaminación del suelo.

El Registro de Decisión (ROD) fue publicado según la programación de la EPA el 30 de septiembre de 2011. Se seleccionó la Alternativa Núm. 2, Remoción con consolidación en el sitio y cobertura en el área no residencial. A partir de este momento, la EPA reanudó las negociaciones con los PRP, tanto privados como públicos, para firmar un Decreto de Consentimiento mediante el que los PRP contribuirían con fondos suficientes para cubrir los costos de la acción correctiva y el mantenimiento del sitio. La AEE ya aprobó una contribución de $1.0 millón mediante la Resolución 3804, del 1 de abril de 2011. Sin embargo, a través de negociaciones adicionales, la EPA requirió una contribución adicional de $300,000. Esta contribución adicional fue aprobada por la Junta de Gobierno de la AEE.

El 4 de diciembre de 2012, el Departamento Federal de Justicia presentó ante el Tribunal el Decreto de Consentimiento de Acción Civil Núm. 3:12 cv 01988, que requiere que la AEE pague a la EPA los costos de respuesta anteriores de la agencia las cantidades de $300,000 dentro de los 30 días de la fecha de vigencia; $300,000 a más tardar el 15 de agosto de 2013 y $300,000 a más tardar el 15 de agosto de 2014. El 10 de abril de 2013, el BGF participó en una Cuenta de Fideicomiso Ambiental, como agente de custodia, PRLA, el Departamento de Vivienda de Puerto Rico y la AEE; y los Estados Unidos de América en nombre de la Agencia de Protección Ambiental. El 24 de junio de 2013, la AEE depositó $400,000 en el depósito en garantía según lo dispuesto en el Decreto de Consentimiento.

La AEE continúa desarrollando e implementando un programa integral para mejorar el cumplimiento ambiental en todos los medios ambientales aplicables. Este programa ha sido y continúa siendo actualizado para cumplir con los nuevos requisitos reglamentarios.

*(b)* *AAA*

El 1 de julio de 2003, la AAA celebró un acuerdo (Acción Civil Núm. 01 1709) con la EPA para lograr el cumplimiento de la Ley de Agua Limpia en relación con las estaciones de bombeo de aguas residuales (WWPS) de la AAA en respuesta a un número significativo de desviaciones de alcantarillado sanitario de estos lugares. La

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Ley de Agua Limpia prohíbe la descarga de aguas residuales desde cualquier punto del sistema de recolección y tratamiento que no sea el punto autorizado en la planta de tratamiento. AAA completó todos los proyectos de mejora requeridos por la EPA para estos WWPS para las fechas de finalización establecidas en el acuerdo. Este acuerdo también requería que AAA invirtiera $1 millón en el desarrollo e implementación de un Proyecto Ambiental Suplementario (SEP). Este proyecto consistió en la conexión de tres comunidades ajenas a la AAA con el sistema de agua potable de la AAA. La conexión se ha completado y espera la finalización de los sistemas adyacentes para integrar completamente estos sistemas al servicio de la AAA. El acuerdo también requería la implementación del Programa de Mantenimiento Preventivo (PMP) para todos los WWPS de la AAA. Esto se completó por completo en diciembre de 2010 y todavía está vigente. Como parte del acuerdo, la AAA paga las multas estipuladas por eventos de desviación de estaciones de bombeo trimestralmente.

Los cálculos de penalización se basan en la capacidad de bombeo de la estación de bombeo y el tiempo necesario para corregir la deficiencia que causa el evento de desviación. El monto pagado durante el año fiscal 2016 fue de aproximadamente $100,000.

El 22 de junio de 2006, la AAA celebró un decreto de consentimiento (Acción Civil Núm. 06 1624) con la EPA que exige que la AAA implemente medidas correctivas de todo el sistema en todas las plantas de tratamiento de aguas residuales operadas por la AAA. El decreto establece plazos para el cumplimiento de las condiciones establecidas en el acuerdo y estipula sanciones por la violación de cualquiera de esos plazos. Se aplicó a la AAA una multa civil estipulada de $1 millón, que se pagó durante el año fiscal 2008. Esta multa fue aplicada por el Tribunal como pago por las violaciones del permiso de descarga de varias instalaciones de tratamiento a la Ley de Aguas Limpias. El acuerdo también requería que la AAA depositara en una cuenta de depósito en garantía en el BGF una multa civil adicional de $3 millones. Estos fondos deben utilizarse para proporcionar servicios de alcantarillado a una comunidad que no se ha conectado al sistema de alcantarillado sanitario de la AAA. La AAA y la EPA decidieron seleccionar la comunidad de Lago La Plata para este proyecto. Como parte del acuerdo, la AAA paga multas estipuladas anualmente por excedentes a cada una de las instalaciones de la AAA a sus permisos de descarga individuales. Los cálculos de penalización se basan en la frecuencia de los excedentes, así como en el porcentaje de los excedentes con su respectivo límite.  El monto pagado durante el año fiscal 2016 fue de aproximadamente $600,000. Estos pagos de multas se depositan en una cuenta de depósito en garantía de la cual una fracción del monto depositado se puede reembolsar a la AAA en función de la finalización de proyectos e iniciativas específicos.

El 25 de mayo de 2006, la AAA celebró un acuerdo de declaración de culpabilidad con el Departamento de Justicia de los EE. UU. relacionado con violaciones de la Ley de Agua Limpia, según enmienda, Título 33, USC, Secciones 1131(a) y 1319(c)(2)(A) Como parte del acuerdo (Caso Penal Núm. 06 CR 00202 001), la AAA pagó una multa de $9 millones. Esta multa fue aplicada por el Tribunal como pago por las violaciones del permiso de descarga de varias instalaciones de tratamiento a la Ley de Aguas Limpias. La AAA estuvo en un período de prueba de cinco años. Como parte del período de prueba, la AAA tuvo que cumplir con varias condiciones especiales, tales como: (i) actualizar el sistema de recolección y tratamiento de aguas residuales en el área de la avenida Ponce de León de San Juan por un costo no menor a $10 millones para evitar descargas directas al canal Martín Peña; (ii) actualizar nueve plantas de tratamiento de aguas residuales por un costo no menor de $109 millones; y (iii) cumplir con el decreto de consentimiento firmado por la AEE con el gobierno de los Estados Unidos el 22 de junio de 2006. El acuerdo de culpabilidad también estableció sanciones estipuladas por la violación de cualquiera de los plazos de los estándares de desempeño establecidos en el acuerdo. Actualmente, la AAA cumple con los plazos y requisitos de esta orden de consentimiento y no se han pagado multas.

El 15 de diciembre de 2006, se firmó un acuerdo (Caso Civil Núm. KPE 2006 0858) entre la AAA y el Departamento de Salud del ELA relacionado con violaciones de la Ley de Agua Potable Segura (SDWA),

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

según enmienda. El acuerdo se aprobó de forma preliminar por el tribunal supervisor el 15 de marzo de 2007 y fue modificado y finalmente aprobado por ese tribunal el 20 de junio de 2008. La AAA acordó implementar un plan de trabajo para corregir las violaciones, establecer medidas preventivas y de mitigación y ejecutar un programa de mantenimiento preventivo con el fin de cumplir con los requisitos de la SDWA. Esta Ley requiere el cumplimiento de los parámetros de calidad del agua y técnicas de tratamiento en los sistemas de agua de la AAA. Como parte del acuerdo, la AAA pagó una multa civil de $1 millón durante el año fiscal que finalizó el 30 de junio de 2007. La sanción civil fue estipulada por el tribunal por supuestos problemas de incumplimiento a la SDWA que se cubren en este decreto. En este Decreto de Consentimiento, la AAA debe pagar las sanciones estipuladas por no cumplir con los plazos de las medidas correctivas, por no presentar los entregables o por exceder los niveles máximos de contaminantes. Durante el año fiscal que finalizó el 30 de junio de 2008 y de acuerdo con la modificación y aprobación final del acuerdo, la AAA acumuló aproximadamente $2.7 millones por multas por incumplimiento según lo estipulado en el acuerdo final, que se pagaron durante el año fiscal 2009. Asimismo, como parte de las sanciones por incumplimiento de las medidas correctivas del acuerdo con el Departamento de Salud durante el año fiscal 2009, se depositaron $1.3 millones en una cuenta de depósito en garantía del BGF para ser utilizados para un SEP. El SEP cubría tres proyectos: (1) control monitoreo químico de 67 sistemas no pertenecientes a la AAA, la instalación de un sistema de desinfección en seis sistemas no pertenecientes a la AAA y (3) la conexión de escuelas que tienen sus propios sistemas de agua deficientes al sistema de agua de la AAA. Durante el año fiscal que terminó el 30 de junio de 2016, las multas ascendieron a aproximadamente $500,000. La AAA depositó $100,000 en una cuenta de depósito en garantía por exceso de parámetros que se utilizarán para proyectos de cumplimiento con la aprobación del Departamento de Salud.

En noviembre de 2007, la AAA comenzó la negociación de un decreto de consentimiento (Acción Civil Núm. 10 1365) con la EPA que requiere que la AAA implemente medidas correctivas en todos los sistemas de tratamiento de lodos en las plantas de tratamiento de agua, de propiedad y operación de la AAA. El decreto de consentimiento se presentó el 3 de mayo de 2010 y su fecha de emisión fue el 24 de agosto de 2010. Esta orden de consentimiento reemplaza a las órdenes de consentimiento anteriores conocidas como AAA II (Acción Civil Núm. 92 1511) y AAA III (Acción Civil Núm. 00 2554). Esta orden de consentimiento establece plazos para el cumplimiento de las condiciones establecidas en el acuerdo propuesto y estipula sanciones por la violación de cualquiera de esos plazos.

A AAA se le impuso una multa civil de aproximadamente $3.2 millones, de los cuales $1 millón se pagó al Tesorero de los Estados Unidos de América como multa civil, y $2.2 millones se depositaron en una cuenta de depósito en garantía del BGF para el diseño y construcción de un SEP. Este SEP consistió en la instalación de un sistema de aireación en el lago Toa Vaca. El sistema de aireación se terminó y se puso en funcionamiento en noviembre de 2012. El monto total de las multas pagadas en función de este acuerdo durante el año fiscal 2016 fue de aproximadamente $200,000. La AAA debe pagar las sanciones estipuladas por no cumplir con los plazos de las medidas correctivas, permitir excedentes de límites o no presentar entregas o informes de control de descargas.

La AAA se encuentra en proceso de renegociación de todos los decretos y compromisos de consentimiento mencionados anteriormente. El objetivo de esta renegociación es establecer un sistema de priorización que suavizará el impacto económico de los proyectos de mejora de capital anualmente.

El 15 de septiembre de 2015, el USDOJ, por solicitud del Administrador de la EPA, radicó una demanda (la Demanda) contra la AAA y el ELA, como parte requerida (de conformidad con la Sección 309(e)) en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (el Tribunal de Distrito). La Demanda solicita un interdicto y la evaluación de sanciones civiles contra la AAA por presuntas violaciones de la Ley de Agua Limpia. Específicamente, la Demanda alega que la AAA violó la Sección 301(a) de la Ley de Agua Limpia,

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

al descargar contaminantes, por no cumplir con los términos de los permisos del Sistema Nacional de Eliminación de Descargas de Contaminantes (NPDES) emitidos a las instalaciones de la AAA según la Sección 402 de la Ley de Agua Limpia, por no informar descargas no autorizadas requeridas por tales permisos, y no cumplir requisitos de operación y mantenimiento para ciertas plantas de tratamiento de agua y plantas de tratamiento de aguas residuales de la AAA.

Simultáneamente con la radicación de la Demanda, el USDOJ también radicó un Decreto de Consentimiento de la EPA de 2015 celebrado entre la EPA, la AAA y el ELA que resolvió los asuntos cubiertos en la Demanda, en los términos acordados por la AAA, el USDOJ y la EPA. El Decreto de Consentimiento de la EPA de 2015 es el resultado de un extenso proceso de negociación dirigido, entre otras cosas, a resolver los reclamos cubiertos en la Demanda y los requisitos de los decretos de consentimiento previos relacionados con las alegaciones incluidas en la Demanda, específicamente con el objetivo de implementar un Plan de cumplimiento de permisos de NPDES en todo el sistema, continuar con la implementación de planes operativos y de mantenimiento en todas las instalaciones de la AAA, implementando medidas correctivas para abordar las descargas y las presuntas violaciones a la Ley de Agua Limpia que ocurren dentro del Sistema de Alcantarillado de Puerto Nuevo en el municipio de San Juan.

La AAA comenzó las negociaciones que condujeron a la celebración del Decreto de Consentimiento de la EPA de 2015 para mitigar los costos del programa de mejora de capital elevado (CIP) exigido por los decretos de consentimiento existentes. A pesar de estar en cumplimiento material con los requisitos del proyecto de mejora de capital de los Decretos de Consentimiento Existente, la AAA inició negociaciones con el USDOJ, en nombre de la EPA y el Departamento de Salud de los Estados Unidos, para enmendar los decretos de consentimiento existentes, con el propósito de: (i) reducir los gastos anuales requeridos del proyecto y extender los plazos de cumplimiento, (ii) incorporar otros proyectos regulatorios incluidos en la CIP de la AAA que actualmente no están cubiertos por los Decretos de Consentimiento Existentes, e (iii) incluir los requisitos de operación, mantenimiento y mejora de capital del programa relacionados con el sistema de recolección de aguas residuales de Puerto Nuevo, que incluyen supuestos desbordamientos combinados de alcantarillado.

El 23 de mayo de 2016, el Tribunal de Distrito emitió una sentencia aprobando el Decreto de Consentimiento de la EPA 2015 presentado el 10 de mayo de 2016. Se desestimó la Demanda y se cerró el caso civil número 152283. La AAA espera que con la aprobación final del Decreto de Consentimiento de la EPA 2015, podrá finalizar la enmienda propuesta al Acuerdo de Liquidación de Agua Potable de 2006 en términos sustancialmente similares a los que se están negociando actualmente con el Departamento de Salud de los EE. UU.

*Compromisos de construcción*

Al 30 de junio de 2016, las siguientes unidades de componentes de presentación discreta mantuvieron varios acuerdos de construcción no gastados de la siguiente manera (en miles):

La AEE ha celebrado ciertos acuerdos de indulgencia con ciertas aseguradoras y ciertos propietarios beneficiarios de Power Revenue Bonds, bancos que proporcionan líneas de crédito de combustible y el BGF (colectivamente, los Acreedores Tolerantes). Según lo dispuesto en los Acuerdos de Tolerancia, los Acreedores Tolerantes acordaron no ejercer ciertos derechos y recursos en virtud de sus acuerdos de financiamiento. Según los Acuerdos de Tolerancia, continuaron las obligaciones de la AEE de realizar todos los pagos de capital e intereses de los Bonos de Ingresos de Energía. Los Acreedores Tolerantes consintieron permitir que la AEE no realizara transferencias al Fondo de Ingresos o al Fondo de Amortización de Deudas, demorando la realización de ciertos pagos que se debieron a los Prestamistas de la Línea de Combustible, que usara aproximadamente $280 millones de su fondo de construcción para el pago de gastos corrientes además de las mejoras de capital, que aumentara los umbrales necesarios para la

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Aplicación de los recursos en virtud del Acuerdo de Fideicomiso, que permitiera emisión de $130.7 millones en Bonos que vencen el 1 de enero de 2016 y pagara los montos de capital e intereses pendientes de los Bonos 2015A.

Desde enero de 2016 hasta enero de 2017, la AEE pudo realizar el pago de capital e intereses de sus Bonos en el momento de su vencimiento. Posteriormente, la AEE no cumplió con pagos de capital e intereses adeudados por los Bonos el 3 de julio de 2017, el 1 de enero de 2018 y el 3 de julio de 2018.

| Unidades de componentes | Monto |
|---|---|
| Unidades de componentes principales | |
| ACT | $ 158,200 |
| AAA | 5,600 |
| AEE | 198,000 |
| UPR | 58,000 |
| SIFC | 13,601 |
| Subtotal | 433,401 |
| Unidades de componentes no mayores | 54,571 |
| Total | $ 487,972 |

*Acuerdos de concesión de servicio (SCA)*

**(c)** *ACT*

El 22 de septiembre de 2011, la ACT celebró un acuerdo de concesión de autopistas con peaje (el Contrato de concesión de servicios de autopistas) con Autopistas Metropolitanas Puerto Rico, LLC (el Concesionario), donde la ACT otorgó al Concesionario el derecho a financiar, operar y mantener las autopistas PR-5 y PR-22 (las autopistas con peaje) por un período de 40 años. Durante el plazo de 40 años, el Concesionario tendrá derecho a cobrar y recaudar los peajes impuestos en las Autopistas con Peaje. La ACT recibió un pago inicial de la tarifa de concesión de aproximadamente $1,100 millones, de los cuales se usaron aproximadamente $873 millones para canjear o cancelar ciertos bonos emitidos y pendientes asociados con las autopistas. De conformidad con las disposiciones de la Declaración GASB Núm. 60, *Informes Contables y Financieros para Acuerdos de Concesión de Servicios*, la ACT reconoció una entrada diferida de recursos de aproximadamente $1,100 millones, que se amortizarán y reconocerán como ingresos durante el plazo de 40 años del acuerdo. La ACT reconocerá aproximadamente $28.4 millones anualmente hasta el año fiscal 2052 como resultado de la amortización de la entrada diferida de recursos reconocidos. Las Autopistas con Peaje continuarán presentándose como un activo de la ACT, que al 30 de junio de 2016 ascendía a aproximadamente $131.5 millones, pero no se deprecian desde el 22 de septiembre de 2011 hasta el final del acuerdo en 2052, como el acuerdo de concesión requirió que el Concesionario devolviera las Autopistas con Peaje a la ACT en su estado original o mejorado. Las mejoras en las Concesiones de Autopistas con Peaje se reconocen en los registros de la ACT en cuanto se completan y se ponen en funcionamiento.

El 19 de abril de 2016, la ACT celebró una enmienda al Acuerdo de Concesión de Servicios de Autopistas con Peaje para extender el plazo original por 10 años adicionales y crear cinco puntos de peaje bidireccionales en las autopistas PR-5 y PR-22. La ACT recibió un pago inicial de la tarifa de concesión de $100 millones, que se

268

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

utilizaron para pagar $18.2 millones de las deudas actuales de la ACT y $79.8 millones de las deudas del ELA en el año fiscal 2016.

El 20 de diciembre de 1992, la ACT y Autopistas de Puerto Rico y Compañía S.E. (Autopistas) celebró un acuerdo de concesión de servicios (modificado en 2004 y 2009, el Acuerdo de Concesión de Servicios de Puente, y junto con el Acuerdo de Concesión de Servicios de Autopistas, el Acuerdo de Concesión de Servicios) para el diseño, construcción, operación y mantenimiento del Puente Teodoro Moscoso (el Puente), un puente de peaje que cruza la laguna de San José entre los municipios de San Juan y Carolina. El plazo inicial de este acuerdo fue de 35 años, que caduca el 3 de abril de 2027, pero se ha modificado posteriormente al 9 de septiembre de 2009 para extender el plazo a 50 años hasta 2044. Además, de conformidad con las disposiciones de GASB Núm. 60, al 30 de junio de 2013, la ACT reconoció el Puente a su valor justo de mercado estimado de $109.5 millones, amortizado durante una vida útil estimada de 59 años, y una entrada diferida de recursos, también de $109.5 millones que se amortizarán y reconocerán como ingresos durante el plazo restante del acuerdo.

Las concesiones de autopistas con peaje y puentes en virtud de los acuerdos de concesión de servicios, netas al 30 de junio de 2016, consistieron en (en miles):

| | | |
|---|---|---:|
| Concesión de autopistas con peaje | $ | 90,740 |
| Mejoras en la concesión de autopistas con peaje | | 37,985 |
| Concesión de puentes | | 64,496 |
| Total | $ | 193,221 |

Las entradas diferidas de recursos al 30 de junio de 2016 consistieron en (en miles):

| | | |
|---|---|---:|
| Concesión de autopistas con peaje | $ | 1,140,666 |
| Concesión de puentes | | 61,320 |
| Total | $ | 1,201,986 |

## (18) Sistemas de retiro

Los Sistemas de Retiro emiten informes financieros, que están disponibles públicamente e incluyen los estados financieros básicos, la información de tendencias requerida y cualquier otra información complementaria requerida. Cada sistema es independiente; por lo tanto, sus activos o pasivos no pueden transferirse de un sistema a otro ni usarse para ningún otro propósito que no sea beneficiar a los participantes de cada sistema.

### (a) SRE

Después del 30 de junio de 2016, el ELA promulgó una legislación que cambió la estructura de los beneficios de pensión administrados por el SRE. Para obtener más información sobre dicha legislación de pensiones, consulte la Nota 3 y la Nota 23.

*Descripción del plan:* antes del 23 de agosto de 2017, el SRE implementó un plan de pensión de beneficios definidos, de patronos múltiples y de beneficios definidos administrado por los empleados del gobierno de Puerto Rico y la Administración de Sistemas Judiciales de Retiro (SRE y Administración de SRJ).

269

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Es un fideicomiso creado por la Ley Núm. 447 el 15 de mayo de 1951 (Ley Núm. 447), según enmienda, para proporcionar pensiones y otros beneficios a los empleados retirados del ELA, sus corporaciones públicas y los municipios de Puerto Rico. El SRE comenzó a operar el 1 de enero de 1952, cuando comenzaron las contribuciones de los patronos y los empleados participantes. El SRE es un fondo fiduciario de pensiones del ELA.

Antes del 23 de agosto de 2017, el SRE administraba diferentes estructuras de beneficios de conformidad con la Ley Núm. 447, que incluía un programa de beneficios definidos y de patronos múltiples, un programa de contribución definida (programa System 2000) y un programa de contribuciones híbridas. Las disposiciones de beneficios varían según la fecha de contratación del miembro. Sustancialmente, todos los empleados de tiempo completo del ELA y sus organismos (73 agencias del ELA, 78 municipios y 55 corporaciones públicas, incluido el SRE) estaban cubiertos por el SRE. La membresía era obligatoria para todos los empleados regulares, nombrados y temporales del ELA en la fecha de empleo. La membresía es opcional para el Gobernador del ELA, los secretarios del ELA, el jefe de las agencias y organismos públicos, entre otros.

Los beneficios proporcionados a los miembros del SRE fueron establecidos por la ley del ELA y solo pueden ser modificados por la Legislatura con la aprobación del Gobernador. La Ley Núm. 3 del 4 de abril de 2013 (Ley Núm. 3 de 2013), junto con otros cambios recientes de financiamiento y diseño, estableció una reforma integral del SRE. Este resumen detalla las disposiciones de la Ley Núm. 3 de 2013, que estaban vigentes antes del 23 de agosto de 2017.

Ciertas disposiciones son diferentes para los tres grupos de miembros que ingresaron al SRE antes del 1 de julio de 2013 como se describe a continuación:

- Los miembros de la Ley Núm. 447 son generalmente los miembros contratados antes del 1 de abril de 1990 (programa contributivo de beneficios definidos).

- Los miembros de la Ley Núm. 1 del 16 de febrero de 1990 (Ley Núm. 1) son generalmente los miembros contratados a partir del 1 de abril de 1990 o antes del 31 de diciembre de 1999 (programa contributivo de beneficios definidos).

- Los miembros de la Ley Núm. 305 del 24 de septiembre de 1999 (Ley Núm. 305 o Sistema 2000) son generalmente los miembros contratados a partir del 1 de enero de 2000 o antes del 30 de junio de 2013 (programa de contribución definida).

Todos los empleados regulares contratados por primera vez el 1 de julio de 2013 o después, y los ex empleados que participaron en el programa de beneficios definidos y el programa System 2000, y fueron recontratados a partir del 1 de julio de 2013, se unieron al Programa de contribuciones híbridas como condición para su empleo. Asimismo, los empleados que al 30 de junio de 2013 participaban en programas anteriores se unieron al Programa de Contribuciones Híbridas el 1 de julio de 2013.

Cada miembro tenía un derecho firme sobre el valor de su cuenta. Los miembros tenían tres opciones para invertir sus contribuciones. Los ingresos por inversiones se acreditaban en la cuenta del miembro semestralmente. El ELA no garantizó los beneficios a la edad del retiro.

El SRE reunió e invirtió los activos del programa de beneficios definidos, el programa de contribuciones definidas y el Programa de contribuciones híbridas. Los pagos de beneficios futuros se pagaron del mismo grupo de activos.

270

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Este resumen de las disposiciones del plan del SRE está destinado a describir las características esenciales del plan. Todos los requisitos de elegibilidad y los montos de los beneficios deben determinarse estrictamente de acuerdo con el documento del plan.

*(a) Retiros de Servicio*

(a) *Elegibilidad para los miembros de la Ley Núm. 447:* Los miembros de la Ley Núm. 447 que eran elegibles para el retiro al 30 de junio de 2013 continuarían siendo elegibles para el retiro en cualquier momento. Antes del 1 de julio de 2013, los miembros de la Ley Núm. 447 podían retirarse cuando (1) cumplieran 55 años con 25 años de servicio acreditado, (2) cumplieran 58 años con 10 años de servicio acreditado, (3) cualquier edad con 30 años de servicio acreditado, (4) para funcionarios públicos en puestos de alto riesgo (Cuerpo de Policía y Bomberos del ELA, Cuerpo de Policía y Bomberos Municipales y Cuerpo de la Oficina de Custodia), al cumplir 50 años con 25 años de servicio acreditado, y (5 ) para alcaldes de municipios, que cumplen 50 años con 8 años de servicio acreditado como alcalde. Asimismo, los miembros de la Ley Núm. 447 que alcanzarían 30 años de servicio acreditado antes del 31 de diciembre de 2013 serían elegibles para el retiro en cualquier momento.

Los miembros de la Ley Núm. 447 que no eran elegibles para retirarse al 30 de junio de 2013 y que no cumplieron 30 años de servicio acreditado antes del 31 de diciembre de 2013 son elegibles para el retiro al alcanzar la edad de elegibilidad para el retiro que se muestra en la tabla a continuación con 10 años de servicio acreditado.

| Fecha de nacimiento | Edad cumplida al 30 de junio de 2013 | Edad de elegibilidad para el retiro |
|---|---|---|
| 1 de julio de 1957 o más tarde | 55 o menos | 61 |
| 1 de julio de 1956 al 30 de junio de 1957 | 56 | 60 |
| Antes del 1 de julio de 1956 | A partir de 57 | 59 |

Además de los requisitos en la tabla anterior, la Ley Núm. 447 de Funcionarios Públicos en Puestos de Alto Riesgo que no eran elegibles el retiro retirarse al 30 de junio de 2013 y que no alcanzaron 30 años de servicio acreditado al 31 de diciembre de 2013 son elegibles para el retiro directamente del servicio activo al cumplir 55 años con 30 años de servicio acreditado.

(b) *Elegibilidad para los miembros de la Ley Núm. 1:* los miembros de la Ley Núm. 1 que eran elegibles para el retiro al 30 de junio de 2013 continúan siendo elegibles para el retiro en cualquier momento. Antes del 1 de julio de 2013, los miembros de la Ley Núm. 1 podían retirarse al (1) cumplir 55 años con 25 años de servicio acreditado, (2) cumplir 65 años con 10 años de servicio acreditado, (3) para Funcionarios Públicos en Puestos de alto riesgo, cualquier edad con 30 años de servicio acreditado y (4) para alcaldes, al cumplir 50 años con 8 años de servicio acreditado como alcalde.

Los miembros de la Ley Núm. 1 que no eran elegibles para el retiro al 30 de junio de 2013 son elegibles para el retiro al cumplir los 65 años con 10 años de servicio acreditado. Asimismo, los funcionarios públicos de la Ley Núm. 1 en puestos de alto riesgo que no eran elegibles para el retiro al 30 de junio de 2013 son elegibles para el retiro directamente del servicio activo al cumplir los 55 años con 30 años de servicio acreditado.

(c) *Elegibilidad para los miembros de System 2000:* los miembros de System 2000 que eran elegibles para el retiro al 30 de junio de 2013 continúan siendo elegibles para el retiro en cualquier momento. Antes del

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

1 de julio de 2013, los miembros de System 2000 podían retirarse al cumplir los 55 años de edad para funcionarios públicos en puestos de alto riesgo o, de otro modo, al cumplir 60 años.

Los miembros de System 2000 que no eran elegibles para el retiro al 30 de junio de 2013 son elegibles para el retiro al cumplir 55 años para los funcionarios públicos en puestos de alto riesgo y al alcanzar la edad de elegibilidad para el retiro que se muestra en la tabla a continuación.

| Fecha de nacimiento | Edad cumplida al 30 de junio de 2013 | Edad de elegibilidad para el retiro |
|---|---|---|
| 1 de julio de 1957 o más tarde | 55 o menos | 65 |
| 1 de julio de 1956 al 30 de junio de 1957 | 56 | 64 |
| 1 de julio de 1955 al 30 de junio de 1956 | 57 | 63 |
| 1 de julio de 1954 al 30 de junio de 1955 | 58 | 62 |
| Antes del 1 de julio de 1954 | A partir de 59 | 61 |

(d) *Elegibilidad para los miembros contratados después del 30 de junio de 2013:* al cumplir 58 años si es funcionario público en un puesto de alto riesgo o, de otro modo, al cumplir 67 años.

*(2) Beneficios de anualidades de retiro del servicio*

Una anualidad pagadera durante la vida del miembro igual al valor anualizado del balance en la cuenta de contribuciones híbridas al momento del retiro, más, para los miembros de la Ley Núm. 447 y la Ley Núm. 1, el beneficio acumulado determinado al 30 de junio 2013. Si el saldo en la cuenta de contribución híbrida es de $10,000 o menos, se pagaría como una suma total en lugar de una anualidad.

(a) *Beneficio acumulado al 30 de junio de 2013 para los miembros de la Ley Núm. 447:* El beneficio acumulado al 30 de junio de 2013 se determinó con base en la compensación promedio, según su definición, para los miembros de la Ley Núm. 447, los años de servicio acreditado y la edad del miembro al 30 de junio de 2013. Para los Alcaldes de la Ley Núm. 447, la mayor compensación como alcalde, según su definición, determinada al 30 de junio de 2013.

Si el miembro de la Ley Núm. 447 tenía al menos 30 años de servicio acreditado al 30 de junio de 2013, el beneficio acumulado equivale al 65% de la compensación promedio si el miembro tenía menos de 55 años al 30 de junio de 2013 o el 75% de la compensación promedio si el miembro tenía al menos 55 años de edad al 30 de junio de 2013. Para los participantes que seleccionaron el Plan de Coordinación, el beneficio se recalculó en la Edad de Retiro del Seguro Social (SSRA), según su definición, como 1.5% de la compensación promedio hasta $6,600 multiplicado por los años de servicio acreditado, hasta 30 años, más 65% (75% si el miembro tenía al menos 55 años de edad al 30 de junio de 2013) de una compensación promedio superior a $6,600.

Si el miembro de la Ley Núm. 447 tenía menos de 30 años de servicio acreditado al 30 de junio de 2013 y cumplió 30 años de servicio acreditado al 31 de diciembre de 2013, el beneficio acumulado equivalía al 55% de la compensación promedio si el miembro era menor de 55 años. al 30 de junio de 2013 o el 60% de la compensación promedio si el miembro tenía al menos 55 años de edad al 30 de junio de 2013. Para los participantes que seleccionaron el Plan de Coordinación, el beneficio se recalculó en SSRA como 1.5% de la compensación promedio hasta $6,600 multiplicado por los años de servicio acreditado,

272

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

hasta 30 años, más el 55% (60% si el miembro tenía al menos 55 años de edad al 30 de junio de 2013) de una compensación promedio superior a $6,600. Las contribuciones de los miembros recibidas de la Ley Núm. 447 miembros elegibles para este beneficio transitorio durante el período que comienza el 1 de julio de 2013 y que finaliza al cumplir 30 años de servicio acreditado se consideraron contribuciones anteriores al 1 de julio de 2013; las contribuciones a la cuenta de contribución híbrida comienzan después de que el miembro alcanza los 30 años de servicio acreditado.

Si el miembro de la Ley Núm. 447 tenía menos de 30 años de servicio acreditado al 31 de diciembre de 2013, el beneficio acumulado equivalía al 1.5% de la compensación promedio multiplicado por años de servicio acreditado hasta 20 años, más el 2% de la compensación promedio multiplicado por años de servicio acreditado en exceso de 20 años. El beneficio máximo es el 75% de la compensación promedio. A excepción de la Policía del ELA y los Bomberos del ELA, el beneficio se redujo actuarialmente por cada año que comienza el pago antes de los 58 años. Para los participantes que seleccionan el Plan de Coordinación, el beneficio básico se recalcula en la SSRA como 1% de la compensación promedio hasta $6,600 multiplicado por años de servicio acreditado hasta 20 años, más 1.5% de la compensación promedio hasta $6,600 multiplicado por años de servicio acreditado en exceso de 20 años, más el 1.5% de la compensación promedio en exceso de $6,600 multiplicado por años de servicio acreditado hasta 20 años, más el 2.0% de la compensación promedio en exceso de $6,600 multiplicado por años de servicio acreditado en exceso de 20 años. A excepción de la Policía y los Bomberos, el beneficio se redujo actuarialmente por cada año que comienza el pago antes de los 58 años.

Según la Ley Núm. 447, para los Alcaldes con al menos 8 años de servicio acreditado como Alcalde, el beneficio acumulado no debía ser inferior al 5% de la compensación más alta, según su definición, como Alcalde por cada año de servicio acreditado como Alcalde hasta 10 años, más el 1.5% de la compensación más alta como Alcalde por cada año de servicio acreditado no como Alcalde hasta 20 años, más el 2.0% de la compensación más alta como Alcalde por cada año de servicio acreditado no como Alcalde en exceso de 20 años. El servicio acreditado no como alcalde incluyó el servicio prestado como Alcalde por más de 10 años. El beneficio máximo fue del 90% de la mayor compensación como Alcalde.

(b) *Beneficio acumulado al 30 de junio de 2013 para los miembros de la Ley Núm. 1:* el beneficio acumulado al 30 de junio de 2013 se determina con base en la compensación promedio para los miembros de la Ley Núm. 1, los años de servicio acreditado y la edad del miembro al 30 de junio de 2013. Para los Alcaldes de la Ley Núm. 1, la mayor compensación como alcalde determinada al 30 de junio de 2013.

Si el miembro de la Ley Núm. 1 es un oficial de policía o bombero que tenía al menos 30 años de servicio acreditado al 30 de junio de 2013, el beneficio acumulado equivale al 65% de la compensación promedio si el miembro tenía menos de 55 años al 30 de junio de 2013 o el 75% de la compensación promedio si el miembro tenía al menos 55 años de edad al 30 de junio de 2013.

Para todos los demás miembros de la Ley Núm. 1, el beneficio acumulado equivalía al 1.5% de la compensación promedio multiplicado por años de servicio acreditado. El beneficio se redujo actuarialmente por cada año que comienza el pago antes de los 65 años.

Según la Ley Núm. 1, para los Alcaldes con al menos 8 años de servicio acreditado como Alcalde, el beneficio acumulado no debía ser inferior al 5% de la compensación más alta como Alcalde por cada año de servicio acreditado como Alcalde hasta 10 años, más el 1.5% de la compensación más alta como Alcalde por cada año de servicio acreditado no como Alcalde hasta 20 años, más el 2.0% de la compensación más alta como Alcalde

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

por cada año de servicio acreditado no como Alcalde en exceso de 20 años. El servicio acreditado no como alcalde incluyó el servicio prestado como Alcalde por más de 10 años. El beneficio máximo es del 90% de la mayor compensación como Alcalde.

*(3) Retiro Obligatorio*

Todos los funcionarios públicos de la Ley Núm. 447 y la Ley Núm. 1 en puestos de alto riesgo debían retirarse al cumplir 58 y 30 años de servicio acreditado. El miembro del Superintendente de la Policía de Puerto Rico, el Jefe del Cuerpo de Bomberos o la autoridad supervisora puede solicitar una extensión de dos años, según corresponda.

*(4) Beneficios de rescisión*

*(a) Retiro Total*

*Elegibilidad*: un miembro era elegible al finalizar el servicio antes de 5 años de servicio o si el balance en la cuenta de contribuciones híbridas es de $10,000 o menos.

*Beneficio:* el beneficio era equivalente a un pago total del balance en la cuenta de contribuciones híbridas a la fecha de la rescisión permanente del servicio.

*(b) Retiro Diferido*

*Elegibilidad*: un miembro era elegible después de la rescisión del servicio con 5 o más años de servicio (10 años de servicio acreditado para los miembros de la Ley Núm. 447 y la Ley Núm. 1) antes de la elegibilidad para el retiro correspondiente, siempre que el miembro no haya retirado una suma global de las contribuciones acumuladas y la cuenta de contribuciones híbridas.

*Beneficio:* una anualidad pagadera durante la vida del miembro a partir de la edad de elegibilidad para el retiro correspondiente igual al valor anualizado del balance en la cuenta de contribuciones híbridas al momento del retiro, más, para los miembros de la Ley Núm. 447 y la Ley Núm. 1, el beneficio acumulado determinado al 30 de junio de 2013.

*(5) Beneficios por Fallecimiento*

*(a) Beneficio por Fallecimiento Previo al Retiro*

*Elegibilidad*: cualquier miembro actual no retirado era elegible.

*Beneficio:* un reembolso de la cuenta de contribuciones híbridas, más las contribuciones acumuladas para los miembros de la Ley Núm. 447 y la Ley Núm. 1.

*(b) Beneficio por Muerte de Alto Riesgo según la Ley Núm. 127*

*Elegibilidad*: la policía, los bomberos y otros empleados en puestos específicos de alto riesgo que mueren en la línea de trabajo debido a razones especificadas en la Ley Núm. 127 de 1958, según enmienda.

*Beneficio del Cónyuge:* 50% de la compensación del participante en la fecha de fallecimiento, pagadera como una anualidad hasta la muerte o el nuevo matrimonio.

*Beneficio de los Hijos:* 50% de la compensación del participante en la fecha de fallecimiento, pagadera como una anualidad y asignada de forma prorrateada entre los hijos elegibles. La anualidad se pagaba de por vida para hijos discapacitados, hasta los 18 años para un hijo no discapacitado que no está

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

estudiando, y hasta los 25 años para un hijo no discapacitado que está estudiando.

*Beneficio en Ausencia de Cónyuge o Hijos:* los padres del miembro deben recibir cada uno el 50% de la compensación del participante en la fecha de fallecimiento, pagadera como una anualidad de por vida.

*Aumentos Posteriores al Fallecimiento:* a partir del 1 de julio de 1996 y posteriormente cada tres años, los beneficios anteriores al fallecimiento se incrementan en un 3% siempre que el(los) beneficiario(s) haya(n) recibido pagos durante al menos tres años.

El costo de estos beneficios era pagado por el Fondo General del ELA.

*(c) Beneficio por Fallecimiento Posterior al Retiro para Miembros que se Retiraron antes del 1 de julio de 2013*

*Elegibilidad*: cualquier miembro retirado o discapacitado que reciba un beneficio mensual que no haya elegido una anualidad reversible y cuyos beneficios comenzaron antes del 1 de julio de 2013.

*Beneficio:* el beneficio es el siguiente (Ley Núm. 105, según enmienda por la Ley Núm. 4):

(i) Para los miembros casados o con hijos dependientes al momento del fallecimiento, el ingreso anual para una viuda, viudo o hijos dependientes es igual al 60% (50% si está en el Plan de Coordinación - 30%, antes del 1 de enero de 2004) del beneficio de retiro pagadero de por vida para un cónyuge supérstite o hijos discapacitados y pagadero hasta los 18 años (25 años si cursa estudios) para hijos no discapacitados. Si en el Plan de Coordinación, el beneficio para el cónyuge supérstite no comienza hasta que el cónyuge cumple 60 años y el cónyuge supérstite debe haber estado casado con el miembro durante al menos 10 años para ser elegible para este beneficio. El aumento en el porcentaje del 30% al 50% si pertenece al Plan de Coordinación es pagado por el Fondo General del ELA para ex empleados del gobierno o por la empresa pública o municipalidad para sus ex empleados.

(ii) El beneficio, cuando no existe una relación como se indicó anteriormente, es igual al balance restante de las contribuciones acumuladas en el momento del retiro después de la deducción del ingreso anual pagado de por vida y se paga a un beneficiario o a la sucesión del Miembro. En ningún caso el beneficio puede ser inferior a $1,000. El Fondo General del ELA para ex empleados del gobierno o la empresa pública o municipalidad para sus ex empleados paga la diferencia, hasta $250, entre (1) las contribuciones acumuladas menos el ingreso anual pagado de por vida y (2) $1,000. El SRE paga el resto.

*(d) Beneficio por Fallecimiento Posterior al Retiro para Miembros que se Retiraron después del 30 de junio de 2013*

*Elegibilidad*: cualquier miembro retirado o discapacitado que comenzó a recibir un beneficio mensual después del 30 de junio de 2013.

*Beneficio:* si el miembro eligió al momento del retiro transferir una parte de la anualidad a un beneficiario seleccionando una forma opcional de pago actuarialmente equivalente, el beneficio del sobreviviente correspondiente.

Para todos los miembros, el exceso, en su caso, de la cuenta de contribuciones híbridas, más las contribuciones acumuladas para los miembros de la Ley Núm. 447 y la Ley Núm. 1, al momento del retiro la jubilación sobre el total de pagos de anualidades pagadas al miembro y a cualquier beneficiario

275

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

según los términos de la forma de pago opcional debe pagarse al beneficiario o a la sucesión del miembro.

(e) *Los beneficiarios que reciben beneficios por muerte ocupacional al 30 de junio de 2013 continúan siendo elegibles para recibir dichos beneficios*

(6) *Beneficios por discapacidad*

(a) *Discapacidad*

*Elegibilidad*: todos los miembros son elegibles al ocurrir una discapacidad.

*Beneficio:* el balance de la cuenta de contribuciones híbridas pagadera como distribución de suma global, una anualidad inmediata o una anualidad diferida a elección del participante. Los miembros de la Ley Núm. 447 y la Ley Núm. 1 siguen siendo elegibles para recibir el beneficio acumulado al 30 de junio de 2013 a partir de la edad de elegibilidad para el retiro correspondiente.

(b) *Discapacidad de Alto Riesgo según la Ley Núm. 127*

*Elegibilidad*: la policía, los bomberos y otros empleados en puestos específicos de alto riesgo que sufren una discapacidad en la línea de trabajo debido a razones especificadas en la Ley Núm. 127 de 1958, según enmienda.

*Beneficio:* 80% (100% para los miembros de la Ley Núm. 447) de compensación a partir de la fecha de incapacidad, pagadera como una anualidad. Si el miembro falleció mientras aún estaba discapacitado, este beneficio de anualidad continúa para sus beneficiarios. Los beneficiarios incluyen el cónyuge supérstite o los hijos discapacitados (de por vida), los hijos no discapacitados hasta los 18 años (25 años si cursan estudios) y los padres si no hay otros beneficiarios. A partir del 1 de julio de 1996 y, posteriormente, cada tres años, el beneficio por discapacidad se incrementó en un 3% siempre que el miembro (o beneficiario) haya recibido pagos durante al menos tres años (Ley Núm. 127 de 1958, según enmienda). El costo de estos beneficios era pagado por el Fondo General del ELA.

(c) *Los miembros elegibles calificaron para beneficios por discapacidad ocupacional o no ocupacional al 30 de junio de 2013 continúan siendo elegibles para recibir dichos beneficios*

(7) *Beneficios especiales*

(a) *Beneficios mínimos*

(i) Aumentos anteriores ad hoc: la Legislatura, oportunamente, aumentó las pensiones para ciertos retirados tal como se describe en la Ley Núm. 124 aprobada el 8 de junio de 1973 y la Ley Núm. 23 aprobada el 23 de septiembre de 1983. Los beneficios se pagaron en un 50% del Fondo General del ELA y el 50% del SRE.

(ii) Beneficio mínimo para los miembros que se retiraron antes del 1 de julio de 2013 (Ley Núm. 156 de 2003, Ley Núm. 35 de 2007 y Ley Núm. 3 de 2013): el ingreso mínimo mensual de por vida para los miembros que se retiraron o quedaron discapacitados antes del 1 de julio de 2013 es de $500 por mes a partir del 1 de julio de 2013 ($400 por mes a partir del 1 de julio de 2007 y $300 por mes hasta el 30 de junio de 2007). El aumento en el beneficio mensual mínimo de $200 por mes a $300 por mes fue pagado por el Fondo General del ELA para el gobierno anterior y ciertas corporaciones públicas sin sus propios empleados de Hacienda o por ciertas corporaciones públicas con sus propios tesoros o municipios para sus ex empleados. El aumento en el beneficio mensual mínimo

276

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

de $300 por mes a $400 por mes debía ser pagado por el SRE para el gobierno anterior y ciertas corporaciones públicas sin sus propios empleados de Hacienda o por ciertas corporaciones públicas con sus propios tesoros o municipios para sus ex empleados.

(iii) Beneficio mínimo del plan de coordinación: se pagaba un beneficio mensual mínimo al obtener la SSRA, de modo que el beneficio, cuando se agregó al Beneficio del Seguro Social, no fue inferior al beneficio pagadero antes de la SSRA.

(b) *Ajustes del costo de vida (COLA) a los beneficios de pensión:* la Legislatura, oportunamente, aumenta las pensiones en un 3% para los miembros retirados y discapacitados. Los beneficiarios no tenían derecho a los COLA otorgados después del fallecimiento de la persona retirada. El primer aumento fue otorgado por la Ley Núm. 10 de 1992. Se otorgaron aumentos posteriores del 3% cada tres años desde 1992, con el último aumento del 3% establecido el 24 de abril de 2007 y efectivo el 1 de julio de 2007 (retroactivo al 1 de enero de 2007) para los miembros retirados y discapacitados que recibían un beneficio mensual el 1 de enero de 2004 o antes (Ley Núm. 35). Asimismo, a partir del 1 de julio de 2008, cualquier miembro retirado o discapacitado que recibiera una anualidad mensual antes del 1 de enero de 2004 de menos de $1,250 por mes recibió un aumento de hasta el 3% sin exceder el límite de $1,250 por mes (Ley Núm. 35). SRE pagará los COLA otorgados en 1992 a todos los miembros retirados y en 1998 a los miembros retirados que hayan sido empleados gubernamentales o municipales. Todos los demás COLA otorgados en 1995 y posteriores debían ser pagados del Fondo General del ELA para el gobierno anterior y ciertas corporaciones públicas sin sus propios empleados de tesorería o por ciertas corporaciones públicas con sus propias tesorerías o municipios para sus ex empleados.

(c) *Beneficios de "bonificaciones" especiales*

(i) *Bonificación de Navidad (Ley Núm. 144, enmendada por la Ley Núm. 3 de 2013):* históricamente, en diciembre se ha pagado una bonificación anual de $200 por cada miembro retirado, beneficiario y discapacitado, siempre que el miembro se haya retirado antes del 1 de julio de 2013. Este beneficio se paga de las contribuciones complementarias recibidas del Fondo General del ELA para el gobierno anterior y ciertas corporaciones públicas sin sus propias tesorerías o por ciertas corporaciones públicas con sus propias tesorerías o municipios para sus ex empleados.

(ii) *Bonificación de Medicamentos (Ley Núm. 155, enmendada por la Ley Núm. 3 de 2013):* una bonificación anual d$100 por cada miembro retirado, beneficiario y discapacitado para cubrir los costos de salud, pagado en julio, siempre que el miembro se haya retirado antes del 1 de julio de 2013. No se requiere evidencia de cobertura. El monto se prorratea si existen múltiples beneficiarios. Este beneficio se paga de las contribuciones complementarias recibidas del Fondo General del ELA para el gobierno anterior y ciertas corporaciones públicas sin sus propias tesorerías o por ciertas corporaciones públicas con sus propias tesorerías o municipios para sus ex empleados.

Las contribuciones de beneficios especiales de aproximadamente $197 millones en el año fiscal 2016 representan principalmente contribuciones del Fondo General del ELA, corporaciones públicas y municipios para los beneficios especiales identificados anteriormente otorgados por leyes especiales. Antes del 23 de agosto de 2017, los fondos de los beneficios especiales se otorgaron al SRE mediante asignaciones legislativas cada 1 de julio por el Fondo General del ELA para el gobierno anterior y ciertas corporaciones públicas sin sus propias tesorerías y por corporaciones

277

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

públicas con sus propias tesorerías o municipios para sus ex empleados. Las asignaciones legislativas se consideraron esimados de los pagos que debe realizar el SRE por los beneficios especiales. Las deficiencias en las asignaciones legislativas se cubrieron con fondos propios del SRE hasta que se recuperaron mediante futuras asignaciones legislativas. Cualquier excedente de las asignaciones legislativas recaudadas sobre los beneficios especiales pagados se combinó con los activos en fideicomiso para el pago de otros beneficios de pensión.

*(8) Contribuciones*

El requisito de contribución al SRE está establecido por ley y no se determina actuarialmente.

(a) *Contribuciones de los miembros:* a partir del 1 de julio de 2013, las contribuciones de los miembros representan el 10% de la compensación. Sin embargo, para los miembros de la Ley Núm. 447 que seleccionaron el Plan de Coordinación, las contribuciones de los miembros son el 7% de la compensación hasta $6,600 más el 10% de la compensación que exceda los $6,600 durante el año fiscal 2013 2014 y el 8.5% de la compensación hasta $6,600 más 10% de compensación superior a $6,600 durante el año fiscal 2014-2015. Los miembros pueden hacer contribuciones adicionales voluntariamente a su cuenta de contribuciones híbridas.

Antes del 1 de julio de 2013, las contribuciones de los miembros de la Ley Núm. 447 que seleccionaron el Plan de Coordinación fueron del 5.775% de la compensación hasta $6,600 más el 8.275% de la compensación en exceso de $6,600. Las contribuciones de todos los demás miembros fueron del 8.275% de la compensación. Los miembros de System 2000 también podrían haber realizado contribuciones voluntarias de hasta el 1.725% de la compensación antes del 1 de julio de 2013.

(b) *Contribuciones de los patronos (Artículo 2 116, según enmienda por la Ley Núm. 116 de 2010 y la Ley Núm. 3 de 2013):* antes del 1 de julio de 2011, las contribuciones del patrono representaban el 9.275% de la compensación. A partir del 1 de julio de 2011, las contribuciones del patrono representan el 10.275% de la compensación. Durante los próximos cuatro años fiscales a partir del 1 de julio de 2012, las contribuciones de los patronos aumentarán anualmente en un 1% de la compensación. Durante los próximos cinco años fiscales, las contribuciones patronales aumentarán anualmente en un 1.25% de la compensación, alcanzando una tasa de contribución del patrono del 20.525% de la compensación a partir del 1 de julio de 2020. Según la Ley Núm. 106 de 2017, se eliminaron las obligaciones de los patronos de contribuir al SRE.

(c) *Contribuciones complementarias del Fondo General del ELA, ciertas corporaciones públicas y municipios (Ley Núm. 3 de 2013):* a partir del 1 de julio de 2013, el SRE recibirá una contribución complementaria de $2,000 cada año por cada miembro que recibe una pensión (que incluye a los beneficiarios que reciben beneficios de sobrevivientes) que anteriormente se otorgaba a un miembro de la Ley Núm. 447 o la Ley Núm. 1 mientras era un empleado activo. Esta contribución complementaria se pagará del Fondo General del ELA para el gobierno anterior y ciertas corporaciones públicas sin sus propias tesorerías o por ciertas corporaciones públicas con sus propias tesorerías o municipios para sus ex empleados.

(d) *Contribución Uniforme Adicional (Ley Núm. 32 de 2013, según enmienda):* la contribución uniforme adicional será certificada por el actuario externo del SRE cada año fiscal desde el año fiscal 2015 hasta 2033 según sea necesario para evitar que los activos brutos proyectados del SRE caigan por debajo de $1,000 millones durante cualquier año fiscal posterior. La Contribución Uniforme Adicional debe pagarse del Fondo General del ELA, corporaciones públicas con sus propias tesorerías y municipios. La contribución uniforme adicional determinada para los años fiscales 2014, 2015 y 2016

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

fue de $120 millones. La contribución uniforme adicional determinada para el año fiscal 2017 es de $596 millones, pagadera al fin del año fiscal. Para obtener información adicional sobre el estado de estas contribuciones, consulte la Nota 2.

*(9) Programa de retiro anticipado*

La JCA implementó un programa de retiro anticipado para sus empleados en virtud de la Ley 224 Ley Núm. 7 del 9 de agosto de 2008. El EQB ya realizó el pago inicial y reembolsaría el balance restante de las anualidades y otros beneficios pagados por el SRE en cuatro cuotas cada 31 de julio a partir de 2009 hasta 2012. El EQB estaba en mora en el pago del plan de retiro, por lo que solicitó un nuevo plan de pago. La Junta de Fideicomisarios del SRE aprobó un plan de pago para el balance de la deuda del programa de retiro por 24 meses a partir de marzo de 2014.

El 2 de julio de 2010, el ELA promulgó la Ley Núm. 70 que establece un programa que brinda beneficios para el retiro anticipado o incentivos económicos para la rescisión voluntaria del empleo para los empleados elegibles, según su definición. La Ley Núm. 70 también estableció que los beneficios de retiro anticipado se proporcionarán a los empleados elegibles que hayan completado entre 15 y 29 años de servicios acreditables y consistirán en beneficios mensuales que van del 37.5% al 50.0% del salario mensual de cada empleado. Los beneficios de este programa serán pagados por el Fondo General del ELA (el Fondo General) y por las corporaciones públicas, cubriendo a sus respectivos empleados hasta que el miembro del plan cumpla más de 55 años para los miembros de la Ley Núm. 447 ó 65 años para miembros de la Ley Núm. 1, o la fecha en que el miembro del plan habría completado 30 años de servicio si el miembro hubiera continuado su empleo. Asimismo, las corporaciones públicas también deberán continuar haciendo las contribuciones requeridas de los empleados y patronos al SRE. El Fondo General deberá continuar realizando las contribuciones requeridas por el empleador. El SRE posteriormente será responsable de los pagos de beneficios.

*(b)* SRJ

*Descripción del plan:* antes del 23 de agosto de 2017, el SRJ implementó un plan de pensiones de beneficios definidos para un solo patrono administrado por el SRE y la Administración del SRJ. Se trata de un fideicomiso creado por la Ley Núm. 12 de 19 de octubre de 1954 (Ley Núm. 12 de 1954), según enmienda, para proporcionar beneficios de pensiones y otros beneficios a los jueces retirados de la Rama Judicial del ELA, a través de la Oficina de la Administración de Instalaciones Judiciales (el Empleador). El SRJ es un fondo fiduciario de pensiones del ELA y no es un empleador.

El SRE y la Administración del SRJ asignaron el 97.93% y el 2.08% de sus gastos generales y administrativos durante el año fiscal que terminó el 30 de junio de 2016 a los sistemas del SRJ y SRE, respectivamente. La metodología utilizada para determinar la asignación de los gastos del SRE y la Administración del SRJ se basa en el total de las contribuciones de los patronos y los participantes al SRE y al SRJ, combinadas.

Antes del 23 de agosto de 2017, el SRJ consistía en dos estructuras de beneficios de conformidad con la Ley Núm. 12 de 1954, según enmienda por la Ley Núm. 162 de 2013. Las disposiciones de beneficios varían según la fecha de contratación del miembro, a saber:

- Jueces contratados el 30 de junio de 2014 o antes, con ciertas distinciones para los jueces contratados del 24 de diciembre de 2013 al 30 de junio de 2014 (programa de contribución de beneficios definidos).

- Los jueces contratados el 1 de julio de 2014 o posteriormente (programa de contribuciones híbridas).

Todos los jueces de la rama judicial del ELA son miembros del SRJ. Los miembros incluyen a todas las personas que ocupan un puesto como Juez del Tribunal Supremo de Puerto Rico, Juez del Tribunal de Apelaciones,

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Jueces Superiores del Tribunal de Primera Instancia y Jueces Municipales del Tribunal de Primera Instancia del ELA.

Los beneficios proporcionados a los miembros del SRJ son establecidos por la ley del ELA y solo pueden ser modificados por la Legislatura con la aprobación del Gobernador.

Este resumen de las disposiciones del plan del SRJ está destinado a describir las características esenciales del plan. Todos los requisitos de elegibilidad y los montos de los beneficios deben determinarse estrictamente de acuerdo con el documento del plan.

**Disposiciones del plan de pensión aplicables a los jueces contratados el 30 de junio de 2014 o antes (miembros anteriores a la Ley Núm. 162)**

*(1) Beneficios de anualidades de retiro del servicio*

Una anualidad pagadera durante la vida del miembro igual al beneficio aplicable que se detalla a continuación.

*(a) Retiro normal*

*Elegibilidad básica:* 60 años con 10 años de servicio acreditado.

Beneficio básico: 25% del salario más alto, según su definición, más 5% del salario más alto, según su definición, por cada año de servicio acreditado en exceso de 10 años, sujeto a un máximo del 75% del salario más alto si es contratado antes del 24 de diciembre de 2013 y 60% del salario más alto si es contratado entre el 24 de diciembre de 2013 y el 30 de junio de 2014.

*Elegibilidad para los jueces que desempeñan funciones sin un cargo fijo:* 10 años de servicio acreditado. Esta elegibilidad mejorada no está disponible para los jueces designados después del 28 de junio de 2007 por un período ilimitado.

*Beneficio para los jueces que desempeñan funciones sin un cargo fijo:* 25% del salario correspondiente al cargo durante el período de retiro, más 5% de dicho salario por cada año de servicio acreditado que exceda los 10 años, sujeto a un máximo del 100% de dicho salario. Si la juez ocupó un puesto sin un cargo fijo durante un total de al menos 8 años, el 25% aumenta al 50% en la fórmula anterior. Este beneficio mejorado no está disponible para los jueces designados después del 28 de junio de 2007 por un período ilimitado.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Elegibilidad opcional: edad y servicio acreditado como se muestra en la tabla a continuación, siempre que se hayan cumplido al menos 8 años de servicio acreditado en el cargo como juez.

| Edad | Años de servicios acreditados |
|---|---|
| Menos de 60 | 30 |
| 62 | 20 |
| 61 | 21 |
| 60 | 22 |
| 59 | 23 |
| 58 | 24 |
| 57 | 25 |
| 56 | 26 |
| 55 | 27 |

*Beneficio opcional:* 75% del salario más alto si se contrata antes del 24 de diciembre de 2013 y 60% del salario más alto si se contrata entre el 24 de diciembre de 2013 y el 30 de junio de 2014.

*Elegibilidad mejorada:* cualquier juez que haya desempeñado funciones sin un cargo fijo durante al menos 3 años y tenga al menos 25 años de servicio acreditado. Este beneficio mejorado no está disponible para los jueces designados después del 28 de junio de 2007 por un período ilimitado.

*Beneficio mejorado:* 75% del salario obtenido en el momento del retiro.

*Retiro obligatorio:* todos los jueces deben retirarse antes de los 70 años. Si la juez tiene menos de 10 años de servicio acreditado, puede elegir un reembolso de las contribuciones acumuladas o una parte proporcional del beneficio básico en función de los años y meses de servicio acreditado.

(b) *Retiro anticipado:*

*Elegibilidad básica:* 20 años de servicio acreditado antes de los 60 años.

*Beneficio básico:* el beneficio básico pagadero en virtud del Retiro normal, reducido en una base actuarial equivalente por cada mes que la fecha de retiro anticipado precede a los 60 años. Sin embargo, no se aplica ninguna reducción actuarial a los jueces que desempeñan funciones sin un cargo fijo.

*Elegibilidad opcional:* 20 años de servicio acreditado, siempre que se hayan cumplido al menos 8 años de servicio acreditado en el cargo como juez.

*Beneficio opcional:* 75% del salario más alto si es contratado antes del 24 de diciembre de 2013 y 60% del salario más alto si es contratado entre el 24 de diciembre de 2013 y el 30 de junio de 2014, reducido en una base actuarial equivalente por cada mes en que la fecha de retiro anticipado precede a la edad especificada en la tabla en la sección Elegibilidad opcional en Retiro normal para los años aplicables de servicio acreditado.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

(2) *Beneficios de rescisión*

   (a) *Retiro Total*

     *Elegibilidad*: un miembro es elegible en el momento de rescisión del servicio.

     *Beneficio:* el beneficio es equivalente a un reembolso de las contribuciones acumuladas.

   (b) *Retiro Diferido*

     *Elegibilidad*: un miembro es elegible al finalizar el servicio antes de los 60 años y después de 10 años de servicio acreditado, siempre que el miembro no haya realizado un retiro de suma total.

     *Beneficio:* el beneficio, que comienza a los 60 años, es igual al beneficio pagadero al Retiro normal.

(3) *Beneficios por Fallecimiento*

   (a) *Beneficio por fallecimiento ocupacional*

     *Elegibilidad:* los beneficiarios de cualquier participante activo que fallezca por una causa relacionada con el empleo según la Ley de Compensación de Accidentes Laborales.

     *Beneficio del Cónyuge:* 50% del salario del participante en la fecha de fallecimiento, pagadera como una anualidad hasta la muerte o el nuevo matrimonio.

     *Beneficio de los Hijos:* $10 ($20 si es está completamente huérfano) por cada niño pagadero mensualmente hasta la edad de 18 años o la finalización de los estudios, si es posterior. El beneficio familiar máximo es el 75% del salario del participante en la fecha de fallecimiento.

     *Beneficio en Ausencia de Cónyuge o Hijos:* reembolso de las contribuciones acumuladas, más un monto igual a un año de compensación, según su definición, vigente al momento del fallecimiento.

   (b) *Beneficio por Fallecimiento Previo al Retiro*

     *Elegibilidad*: cualquier miembro actual no retirado es elegible, siempre que no sea elegible para el Beneficio por Muerte Ocupacional.

     *Beneficio:*

     (i)  Durante el servicio activo, el beneficio equivale a un reembolso de las contribuciones acumuladas, más un monto igual a un año de compensación vigente al momento del fallecimiento.

     (ii)  Mientras no se encuentra en servicio activo, el beneficio equivale a un reembolso de las contribuciones acumuladas.

   (c) *Beneficio por Fallecimiento Previo al Retiro*

     *Elegibilidad*: un participante activo que era elegible para retirarse en la fecha del fallecimiento con un cónyuge supérstite o hijos dependientes.

     *Beneficio:* los beneficios por fallecimiento posteriores al retiro se describen a continuación suponiendo que el participante activo se retiró el día anterior a la fecha de fallecimiento.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

(d) *Beneficio por Fallecimiento Posterior al Retiro*

*Elegibilidad*: cualquier miembro retirado o discapacitado que recibe un beneficio mensual.

*Beneficio:*

(i) Para los miembros casados o con hijos dependientes al momento del fallecimiento, un ingreso anual igual al 60% del beneficio de retiro al momento del fallecimiento, pagadero de por vida para un cónyuge supérstite o hijos discapacitados, y pagadero hasta los 18 años o hasta la finalización de estudios, si son posteriores, para hijos no discapacitados.

(1) El beneficio, cuando no existe una relación como se indicó anteriormente, es igual al balance restante de las contribuciones acumuladas en el momento del retiro después de la deducción del ingreso anual pagado de por vida y se paga a un beneficiario o a la sucesión del Miembro. En ningún caso el beneficio puede ser inferior a $1,000. El Fondo General del ELA paga la diferencia, hasta $500, entre (1) los aranceles acumulados, según su definición, con intereses menos el ingreso anual de por vida pagado y (2) $1,000. El SRJ paga el resto.

(4) *Beneficios por discapacidad*

(a) *Discapacidad no ocupacional*

*Elegibilidad*: todos los miembros son elegibles para discapacidad no ocupacional luego de 10 años de servicio acreditado y la ocurrencia de discapacidad.

*Beneficio:* 30% de la compensación promedio, más 1% de la compensación promedio por cada año de servicio acreditado en exceso de 10 años, pagadero como una anualidad; sujeto a un máximo del 50% de la compensación promedio.

(b) *Discapacidad ocupacional*

*Elegibilidad*: todos los miembros discapacitados durante el curso y como consecuencia de su trabajo, según la certificación de dos médicos designados por el Administrador del Plan, y siempre que el miembro reciba una compensación de la Ley de Compensación de Accidentes Laborales.

*Beneficio:* 50% del salario a la fecha de discapacidad, pagadero como una anualidad, reducido por cualquier pago recibido de la Corporación del Fondo del Seguro del Estado en virtud de la Ley de Compensación de Accidentes Laborales.

(5) *Beneficios especiales*

(a) *Ajustes del costo de vida (COLA) a los beneficios de pensión:* a partir del 1 de enero de 2001, comenzando el 1 de enero de 2002 y posteriormente cada tres años a partir de entonces, el beneficio anual se incrementa en un 3% para los miembros retirados y los miembros discapacitados, siempre que el miembro haya estado recibiendo pagos durante al menos tres años.

Estos COLA se pagan del Fondo General del ELA. Asimismo, se otorgó un COLA ad hoc del 3% a partir del 1 de enero de 1999, pagado por el SRJ.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

(b) *Beneficios de "bonificaciones" especiales*

(i) Bonificación de Navidad (Ley Núm. 144): una bonificación anual de $600 por cada miembro retirado, beneficiario y miembro discapacitado pagada en diciembre, siempre que la juez haya sido contratado antes del 24 de diciembre de 2013. El SRJ paga $150 por miembro retirado, beneficiario y miembro discapacitado y el balance es pagado por el Fondo General del ELA.

(ii) Bonificación de Verano (Ley Núm. 37): una bonificación anual de $100 por cada miembro retirado, beneficiario y miembro discapacitado pagada en julio, siempre que la juez haya sido contratado antes del 24 de diciembre de 2013. El monto se prorratea si existen múltiples beneficiarios. Este beneficio se paga del Fondo General del ELA.

(iii) Bonificación de Medicamentos (Ley Núm. 155): una bonificación anual de $100 por cada miembro retirado, beneficiario y miembro discapacitado para cubrir los costos de atención médica, pagada en julio, siempre que la juez haya sido contratado antes del 24 de diciembre de 2013. No se requiere evidencia de cobertura. El monto se prorratea si existen múltiples beneficiarios. Este beneficio se paga del Fondo General del ELA.

Los jueces contratados el 24 de diciembre de 2013 y posteriormente no son elegibles para estos beneficios de "bonos" especiales.

Las contribuciones de beneficios especiales de aproximadamente $4.9 millones en el año fiscal 2016 representan contribuciones del Fondo General del ELA para los beneficios especiales identificados anteriormente otorgados por leyes especiales. Antes del 23 de agosto de 2017, los fondos para los beneficios especiales se entregaban al SRJ a través de asignaciones legislativas cada 1 de julio. Las asignaciones legislativas se consideraron estimados de los pagos que debe realizar el SRJ por los beneficios especiales. Las deficiencias en las asignaciones legislativas se cubrieron con fondos propios del SRJ hasta que se recuperaron mediante futuras asignaciones legislativas. Cualquier excedente de las asignaciones legislativas recaudadas sobre los beneficios especiales pagados se combinó con los activos en fideicomiso para el pago de otros beneficios de pensión.

**Disposiciones del plan de pensión aplicables a los jueces contratados el 1 de julio de 2014 o posteriormente (miembros de la Ley Núm. 162)**

Antes del 23 de agosto de 2017, los miembros contratados a partir del 1 de julio de 2014 estaban cubiertos por un plan de contribuciones híbridas con beneficios definidos y componentes de contribución definidos de la siguiente manera:

*(1) Beneficios de anualidades de retiro del servicio*

Una anualidad pagadera durante la vida del miembro igual al beneficio aplicable que se detalla a continuación.

*(a) Retiro normal*

*Elegibilidad*: 65 años con 12 años de servicio acreditado.

Beneficio básico: 1.5% de la compensación promedio, según su definición, por cada año de servicio acreditado, más el valor anualizado del balance en la cuenta del programa de contribuciones híbridas al momento del retiro.

*Retiro obligatorio:* todos los jueces deben retirarse antes de los 70 años. Si la juez tiene menos de 12 años de servicio acreditado, recibirá un reembolso de la cuenta del programa de contribuciones híbridas.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

(b) *Retiro anticipado:*

*Elegibilidad básica:* 55 años de edad con 12 años de servicio acreditado antes de los 65 años. *Beneficio básico:* 1.5% de la compensación promedio, según su definición, por cada año de servicio acreditado, reducido en 1/180 por cada uno durante los primeros 60 meses y en 1/360 por cada mes por los próximos 60 meses en los que la fecha de retiro anticipado precede a los 65 años, más el valor anualizado del balance en la cuenta del programa de contribuciones híbridas al momento del retiro.

(2) *Beneficios de rescisión*

(a) *Retiro Total*

*Elegibilidad*: un miembro es elegible al finalizar el servicio con menos de 12 años de servicio acreditado.

*Beneficio:* el beneficio es equivalente a un reembolso de la cuenta del programa de contribuciones híbridas.

(b) *Retiro Diferido*

*Elegibilidad*: un miembro es elegible al finalizar el servicio antes de los 65 años y después de 12 años de servicio acreditado, siempre que el miembro no haya realizado un retiro de suma total.

*Beneficio:* el beneficio, que comienza a los 65 años, es igual al beneficio pagadero al Retiro normal. El beneficio puede comenzar a partir de los 55 años, sujeto a las reducciones descritas en el retiro anticipado.

(3) *Beneficios por Fallecimiento*

(a) *Beneficio por Fallecimiento Previo al Retiro*

*Elegibilidad*: cualquier miembro actual no retirado es elegible.

*Beneficio:* el beneficio es equivalente a un reembolso de la cuenta del programa de contribuciones híbridas.

(b) *Beneficio por Fallecimiento Posterior al Retiro*

*Elegibilidad*: cualquier miembro retirado o discapacitado.

*Beneficio:* si un miembro eligió al momento del retiro transferir una parte de la anualidad a un beneficiario seleccionando una forma opcional de pago actuarialmente equivalente, los beneficios correspondientes del sobreviviente.

Para todos los miembros, el excedente, si corresponde, de la cuenta del programa de contribuciones híbridas al momento del retiro sobre el total de los pagos de la anualidad del programa híbrido entregados al miembro y a cualquier beneficiario según los términos de la forma opcional de pago, se paga a un beneficiario o a la sucesión del miembro.

(4) *Beneficios por discapacidad*

*Elegibilidad*: todos los miembros son elegibles después de 5 años de servicio acreditado y la ocurrencia de discapacidad antes de los 65 años.

*Beneficio:* 1.5% de la compensación promedio, según su definición, por cada año de servicio acreditado más el valor anualizado del balance en la cuenta del programa de contribuciones híbridas en el momento de la discapacidad, pagadero como una anualidad; sujeto a un máximo del 33% de la compensación promedio, según su definición.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*(5)  Beneficios especiales*

*(a)  Ajustes del costo de vida (COLA) a los beneficios de pensión*

A partir del 1 de enero de 2017 y posteriormente cada tres años a partir de entonces, el beneficio anual se incrementa en un 3% para los miembros retirados y los miembros discapacitados, siempre que el miembro haya estado recibiendo pagos durante al menos tres años.

Estos COLA se pagan del Fondo General del ELA.

**Contribuciones**

El requisito de contribución al SRJ está establecido por ley y no se determina actuarialmente.

*(1)  Contribuciones de los miembros:* las contribuciones de los miembros representan el 8.0% de la compensación si son contratados antes del 24 de diciembre de 2013, el 10.0% de la compensación si son contratados entre el 24 de diciembre de 2013 y el 30 de junio de 2014 y el 12.0% de la compensación si son contratados a partir del 1 de julio de 2014.

*(2)  Contribuciones del empleador:*

(a)  Contribuciones del patrono basadas en nómina: las contribuciones del ELA son el 30.34% de la compensación. Antes del 1 de julio de 2008, la tasa de las contribuciones patronales era del 20.0% de la compensación.

(b)  Contribución Uniforme Adicional (Ley Núm. 162 de 2013): a partir del año fiscal 2015, el SRJ recibirá una contribución uniforme adicional según sea necesario para evitar que los activos brutos proyectados del SRJ, durante cualquier año fiscal posterior, caigan por debajo de $20 millones. La Contribución Adicional Anual será financiada por el Fondo General del ELA desde el año fiscal 2015 hasta el año fiscal 2046. Las contribuciones uniformes adicionales determinadas para los años fiscales 2015, 2016 y 2017 fueron de $11.6 millones, $12.1 millones y $13.5 millones, respectivamente. La contribución uniforme adicional se paga al final del año fiscal correspondiente. Para obtener información adicional sobre el estado de las contribuciones, consulte la Nota 2.

*(c)  SRM*

Descripción del plan: antes del 23 de agosto de 2017, el Sistema de Anualidades y Pensiones para Maestros (SRM) de Puerto Rico era un plan de pensión de beneficios definidos por un solo patrono administrado por el Sistema de Retiro para Maestros de Puerto Rico. Se trataba de un fideicomiso creado por la Ley Núm. 218 del 6 de mayo de 1951, reemplazada por la Ley Núm. 91 del 29 de marzo de 2004, para proporcionar pensiones y otros beneficios principalmente a los maestros retirados del Departamento de Educación de Puerto Rico (Departamento de Educación), una agencia del ELA y los empleados de SRM.

Antes del 23 de agosto de 2017, el SRM administró dos estructuras de beneficios de conformidad con la Ley Núm. 160 del 24 de diciembre de 2013 (Ley Núm. 160 de 2013), enmendada por la decisión del 11 de abril de 2014 del Tribunal Supremo de Puerto Rico. Las disposiciones de beneficios varían según la fecha de contratación del miembro, a saber:

- Miembros contratados el 31 de julio de 2014 o antes, con ciertas distinciones para los miembros que se retiran el 1 de agosto de 2014 o posterior (programa de contribución de beneficios definidos).

- Miembros contratados el 1 de agosto de 2014 o posteriormente (programa de contribuciones híbridas).

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Todos los maestros activos del Departamento de Educación y los empleados del SRM se convirtieron en miembros del plan del SRM en la fecha de su empleo. Los maestros con licencia que trabajan en escuelas privadas u otras organizaciones educativas tenían la opción de convertirse en miembros del SRM siempre que se cumplieran las contribuciones requeridas del patrono y del empleado.

Los beneficios proporcionados a los miembros del SRM son establecidos por la ley del Estado Libre Asociado de Puerto Rico y solo pueden ser modificados por la Legislatura con la aprobación del Gobernador.

Este resumen de la descripción del plan del SRM está destinado a describir las características esenciales del plan. Todos los requisitos de elegibilidad y los montos de los beneficios deben determinarse estrictamente de acuerdo con el documento del plan.

Como parte de la información de descripción del plan, los aspectos más importantes de la Ley Núm. 160 de 2013, enmendada por la decisión del 11 de abril de 2014 del Tribunal Supremo de Puerto Rico, son los siguientes: (i) los participantes activos al 31 de julio de 2014 continuarán participando en el programa de pensión de beneficios definidos; (ii) a partir del 1 de agosto de 2014, el programa de pensiones de beneficios definidos se cerrará para futuros participantes y contribuirán a un programa de contribuciones híbridas; (iii) la edad de retiro de los empleados contratados a partir del 1 de agosto de 2014 aumentará a 62 años; (iv) la contribución de los empleados contratados a partir del 1 de agosto de 2014 aumentará al 10% del 1 de agosto de 2014 al 30 de junio de 2017, 13.12% a partir del 1 de julio de 2017 al 30 de junio de 2020 y 14.02% desde el 1 de julio de 2020 en adelante; (v) se reducirán los beneficios especiales pagaderos a los participantes activos que se retiren el 31 de julio de 2014 o antes, y (vi) se eliminarán los beneficios especiales y los beneficios de atención médica posteriores al empleo para futuros miembros retirados.

**Programa de pensión de beneficios definidos**

Antes del 23 de agosto de 2017, los miembros del SRM contratados el 31 de julio de 2014 o antes eran elegibles para los beneficios que se describen a continuación:

*(1) Anualidad de retiro*

Los miembros eran elegibles para pagos de beneficios mensuales determinados por la aplicación de las proporciones de beneficios estipuladas a la compensación promedio del miembro. La compensación promedio se calculó con base en los 36 meses más altos de compensación reconocidos por el SRM. La anualidad mensual para la que un miembro era elegible se limitó a un mínimo de $400 por mes y un máximo del 75% de la compensación promedio.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Los miembros eran elegibles para los beneficios de anualidad de retiro al cumplir con lo siguiente:

| Edad | Años de servicios acreditables | Compensación de la anualidad de retiro |
|------|-------------------------------|----------------------------------------|
| 55 | 30 o más | 75% de la compensación promedio |
| 50 | 30 o más | 75% de la compensación promedio |
| Menos de 50 | 30 o más | 65% de la compensación promedio |
| 50 | Al menos 25, pero menos de 30 | 1.8% del promedio de compensación por años de servicio |
| 47, pero menos de 50 | Al menos 25, pero menos de 30 | 95% del 1.8% de la compensación promedio por años de servicio |
| 60 o más | Al menos 10, pero menos de 25 | 1.8% de la compensación promedio por años de servicio |

*(2) Anualidad de retiro diferida*

Un empleado participante que finalizó el servicio antes de los 60 años, después de haber acumulado un mínimo de 10 años de servicio acreditable, es elegible para una anualidad de retiro diferida pagadera a partir de los 60 años. Un empleado participante que completó 25 o más años de servicio acreditable y tiene menos de 47 años de edad en el momento de la rescisión es elegible calificó para una anualidad de retiro diferida pagadera a partir de los 47 años. Los derechos adquiridos descritos anteriormente se proporcionaron si sus contribuciones al SRM se dejan en el SRM hasta la edad de retiro respectiva.

*(3) Anualidad por discapacidad ocupacional*

Un empleado participante, que como resultado directo del desempeño de su ocupación quedó discapacitado, era elegible para una anualidad del 1.8% de la compensación promedio basada en los 60 meses más altos o la cantidad de meses de servicio acreditable, si es inferior a 5 años, reconocido por el SRM, multiplicado por años de servicio acreditable, pero no menos de $400 por mes.

*(4) Beneficios por Fallecimiento*

Antes del retiro: los beneficiarios reciben las contribuciones de los miembros realizadas más el 2% de interés acumulado a la fecha del fallecimiento (después de descontar las deudas con SRM). Adicionalmente, para los beneficiarios de miembros que fallecieron el 31 de julio de 2014 o antes, recibirán una cantidad igual a la compensación anual del miembro al momento del fallecimiento.

Después del retiro: para miembros que se retiran el 31 de julio de 2014 o antes: el cónyuge supérstite recibe el 50% de la pensión del miembro y el otro 50% se comparte entre los hijos del miembro (si corresponde) y solo si dichos hijos son menores de 22 años o están discapacitados (hasta que cese la discapacidad). Si no hay un cónyuge supérstite o hijos elegibles, los beneficiarios reciben el excedente, si lo hay, de las contribuciones acumuladas al momento del retiro sobre los beneficios de anualidades totales recibidos antes del fallecimiento. El beneficio incluye la pensión completa del mes en que falleció el miembro pensionado más un período de pago

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

adicional de quince días pagadero a los beneficiarios elegibles del miembro, pero en ningún caso, el beneficio puede ser inferior a $1,000 por mes (antes de descontar cualquier deuda con el SRM).

Después del retiro: para miembros que se retiran después del 1 de agosto de 2014: si el miembro eligió al momento del retiro transferir una parte de la anualidad a un beneficiario seleccionando una forma opcional de pago actuarialmente equivalente, se otorgará el beneficio del sobreviviente correspondiente. De lo contrario, el excedente, si lo hubiera, de las contribuciones acumuladas al momento del retiro sobre los beneficios de la anualidad total recibidos antes del fallecimiento se pagará a los beneficiarios o a la sucesión del miembro.

*(5) Reembolsos*

Un empleado participante que cesa su empleo en el ELA el 31 de julio de 2014 o antes sin derecho a una anualidad de retiro tiene derecho a un reembolso de las contribuciones de los empleados pagadas al SRM, más cualquier interés devengado al respecto.

*(6) Programa de retiro anticipado*

El 27 de enero de 2000, se aprobó la Ley Núm. 44, que disponía que, a partir del 9 de marzo de 2000, los miembros eran elegibles para el retiro anticipado al cumplir los 50 y 28 años de servicio en el primer año de implementación y a los 50 y 25 años de servicio en los años siguientes. Aquellos que seleccionaron el retiro anticipado en estas condiciones reciben beneficios mensuales equivalentes al 75% de su compensación promedio, que se calculó con base en los 36 meses más altos de compensación reconocida por el SRM. A partir del 31 de julio de 2001, se cerró la opción de retiro anticipado. El 27 de enero de 2001, se aprobó la Ley Núm. 45, que estableció 50 años como requisito de edad mínima para obtener un beneficio de pensión equivalente al 75% de la compensación promedio con 30 años de servicio. En estos casos, el miembro retirado paga la contribución del empleado participante hasta los 55 años de edad. La Ley Núm. 160 de 2013 impuso la misma obligación al empleador.

**Programa de contribuciones híbridas**

Un plan híbrido, como un plan de balance de efectivo, (i) determina el monto del beneficio basado en una fórmula que utiliza contribuciones y gana créditos, (ii) tiene cuentas individuales nocionales para los miembros y (iii) proporciona beneficios de anualidades de por vida. Antes del 23 de agosto de 2017, cada miembro tenía una cuenta de contribución definida que se acreditaba con las contribuciones de los miembros y el rendimiento de la inversión. En el momento del retiro, el balance en la cuenta se pagó como una anualidad de por vida. El programa se definió como híbrido porque contenía algunas características que se encuentran comúnmente en los planes de beneficios definidos (DB) y otras características que se encuentran comúnmente en los planes de contribución definida (DC), como:

- Los miembros contribuyen con un porcentaje fijo de nómina a su cuenta. En los planes DB, el porcentaje generalmente es fijo. En los planes de DC, el porcentaje generalmente es elegido por el miembro.

- La cuenta de contribución definida se acredita cada semestre con la tasa neta de rendimiento de la cartera de inversiones del SRM. El rendimiento fue determinado por la Junta y no será inferior al 80% de la tasa neta de rendimiento de la cartera de inversiones del SRM. El crecimiento de la cuenta mediante la aplicación de ganancias de inversión es una característica común de los planes de DC.

- El SRM invierte activos. Esta característica se observa con mayor frecuencia en los planes de DB. Por el contrario, los planes de DC comúnmente permiten a los miembros elegir sus inversiones de manera individual y las contribuciones de los miembros se invierten en las opciones seleccionadas por el miembro.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

- En el momento del retiro, el balance de la cuenta se paga al miembro en forma de una anualidad de por vida con beneficios opcionales para sobrevivientes. El SRM era responsable del riesgo de inversión y longevidad durante el retiro. Esta característica anual es común en los planes de DB.

Antes del 23 de agosto de 2017, los miembros del SRM contratados el 1 de agosto de 2014 o posteriormente eran elegibles para los beneficios que se describen a continuación:

*(1) Anualidad de retiro*

Los miembros con cinco o más años de servicio y $10,000 o más en contribuciones a la edad de 62 años calificarán para una anualidad del porcentaje adquirido por contribuciones basado en la fórmula actuarial.

La pensión de cada miembro se calcula al momento del retiro de la siguiente manera: (i) el balance acumulado de las contribuciones de los miembros a la cuenta de contribución definida en la fecha de retiro, dividido por (ii) un factor, establecido por la Junta del SRM en consulta con sus actuarios y que se determinará en función de la esperanza de vida actuarial del participante y una tasa de interés específica.

*(2) Anualidad de retiro diferida*

Los miembros con cinco o más años de servicio y $10,000 o más en contribuciones serán elegibles para una anualidad calculada con base en el balance de la cuenta de contribución definida. Si deja el servicio con los requisitos pero con menos de 62 años de edad, la anualidad se diferirá hasta que cumpla 62 años.

*(3) Anualidad por discapacidad*

Cualquier miembro que se inscribió en el SRM después del 1 de agosto de 2014 y después de cinco años en el servicio público sufre una discapacidad, ya sea relacionada con el trabajo o no, el SRM le otorga una pensión por discapacidad calculada sobre la base de las contribuciones individuales de dichos miembros, según lo declarado por el SRM a través de las regulaciones.

*(4) Beneficios por Fallecimiento*

Antes del 23 de agosto de 2017, había dos opciones de beneficios por fallecimiento para los beneficiarios de nuevos miembros que se unieran a partir del 1 de agosto de 2014 después del retiro y fallecimiento de dichos miembros:

(a) continuar recibiendo los pagos mensuales de la anualidad hasta que se agote el balance, si corresponde, de las contribuciones a la cuenta de contribución definida o

(b) solicitar el reembolso en un pago total del balance, si lo hubiera.

*(5) Reembolsos*

Antes del 23 de agosto de 2017, un miembro con menos de cinco años de servicio o menos de $10,000 en contribuciones era elegible para un reembolso. Específicamente, un reembolso de contribuciones y ganancias en la cuenta de contribución definida de dicho miembro.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

**Beneficios especiales**

La Ley Núm. 160 de 2013 establece una reducción en las leyes especiales para los pensionados al 31 de julio de 2014 y la eliminación de leyes especiales para futuros pensionados que se retiren a partir del 1 de agosto de 2014. Los beneficios especiales incluyen:

*(1) Bonificación de Navidad*

Una bonificación anual de $600 por cada miembro retirado y discapacitado pagada cada diciembre. El SRM paga $150 por miembro retirado y el bono restante es pagado por el Fondo General del ELA. Despúes del 1 de agosto de 2014, para los participantes activos que se retiraron el 31 de julio de 2014 o antes, el bono será de $200 y se pagará del Fondo General del ELA.

*(2) Bonificación de medicamentos*

Una bonificación anual de $100 por cada miembro retirado, beneficiario y miembro discapacitado pagada cada julio para cubrir los costos de atención médica. No se requiere evidencia de cobertura. Este beneficio se paga del Fondo General del ELA. La Ley Núm. 160 de 2013 mantuvo este beneficio para los participantes activos que se retiraron el 31 de julio de 2014 o antes.

*(3) Bonificación de verano*

Antes de la Ley Núm. 160 de 2013, se pagaba una bonificación anual de $100 por cada miembro retirado, beneficiario y miembro discapacitado cada julio. Este beneficio se prorrateó si había múltiples beneficiarios y se paga del Fondo General del ELA. La Ley Núm. 160 de 2013 eliminó este beneficio para todos los miembros retirados.

*(4) Ajustes del costo de vida*

La Ley Núm. 62 de 4 de septiembre de 1992 preveía, sujeto a la aprobación de la Legislatura, aumentos del 3% cada tres años en las pensiones a aquellos miembros con tres o más años de retiro. En los años 1995, 1998, 2001, 2004 y 2007, la Legislatura replicó el beneficio otorgado por la Ley Núm. 62 del 4 de septiembre de 1992. Este beneficio se paga del Fondo General del ELA. La Ley Núm. 160 de 2013 no alteró este beneficio.

*(5) Otras leyes para el aumento de la pensión*

La Ley Núm. 128 del 10 de junio de 1967 y la Ley Núm. 124 del 8 de junio de 1973, establecieron un aumento de la pensión (del 2% al 10%) en función de la pensión mensual. La Ley Núm. 47 del 1 de junio de 1984 preveía un aumento de las pensiones basado en el servicio acreditado trabajado. Estos aumentos se pagan del Fondo General del ELA. La Ley Núm. 160 de 2013 no alteró este beneficio.

*(6) Préstamos culturales*

La Ley Núm. 22 de 14 de junio de 1965 establece un reembolso del 50% de los intereses que pagarían los maestros activos y los miembros retirados. Este beneficio se paga del Fondo General del ELA. La Ley Núm. 160 de 2013 no alteró este beneficio.

*(7) Beneficio por Fallecimiento*

La Ley Núm. 272 del 29 de marzo de 2004 aumentó el beneficio por fallecimiento de $500 a $1,000. Este aumento de $500 se paga del Fondo General del ELA. Según la Ley Núm. 160 de 2013, este beneficio se aplicará solo a la muerte de los miembros que se unieron al SRM el 31 de julio de 2014 o antes.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Las contribuciones de beneficios especiales de aproximadamente $65.1 millones en 2016 representan contribuciones del Fondo General del ELA para los beneficios especiales otorgados por leyes especiales. Los fondos para los beneficios especiales se entregaban al SRM a través de asignaciones legislativas cada 1 de enero y 1 de julio. Las asignaciones legislativas se consideran estimados de los pagos que debe realizar el SRM por los beneficios especiales. Las deficiencias en las asignaciones legislativas se cubren con fondos propios del SRM hasta que se recuperaron mediante futuras asignaciones legislativas. Cualquier excedente de las asignaciones legislativas recaudadas sobre los beneficios especiales pagados se combina con los activos en fideicomiso para el pago de otros beneficios de pensión.

**Contribuciones**

El requisito de contribución al SRM está establecido por ley y no se determina actuarialmente.

*(1) Contribuciones de los miembros:*

   (a) Las contribuciones de los miembros contratados el 31 de julio de 2014 o antes representan el 9% de la compensación.

   (b) Las contribuciones de los miembros contratados el 31 de julio de 2014 o antes representan el 9% de la compensación. (i) 10% de la compensación para los años fiscales 2015 a 2017, (ii) 13.12% de la compensación para los años fiscales 2018 a 2020, y (iii) 14.02% de la compensación para el año fiscal 2021 y cada año posterior.

*(2) Contribuciones del empleador*

   (a) Contribuciones del em patrono pleador basadas en nómina: las contribuciones del ELA y el SRM, según corresponda, representan el 9.5% de la compensación para el año fiscal que comienza el 1 de julio de 2011. Para los próximos cuatro años fiscales (1 de julio de 2012 hasta el 1 de julio de 2015), las contribuciones de los patronos aumentarán anualmente en un 1%. Para los próximos cinco años fiscales, (1 de julio de 2016 a 1 de julio de 2020) las contribuciones patronales aumentarán anualmente en un 1.25%, alcanzando una tasa de contribución del patrono de 19.75% a partir del 1 de julio de 2020. A partir del 1 de julio de 2021 y años fiscales posteriores, la tasa de contribución patronal será del 20.525%.

   (b) Contribuciones complementarias: desde el año fiscal 2015 y cada año fiscal posterior, el Fondo General del ELA proporcionará al SRM una contribución complementaria de $1,675 por pensionado, independientemente de si el pensionista se retiró antes o después del 1 de agosto de 2014, para pagar beneficios especiales (es decir, bonificaciones de Navidad y medicamentos) y contribución al plan de seguro médico.

   (c) Contribución Uniforme de Justicia de Maestros: la contribución anual a realizar al SRM es igual a $30 millones en el año fiscal 2017, $30 millones en el ejercicio fiscal 2018 y $60 millones en cada año fiscal desde el año fiscal 2019 hasta el año fiscal 2042. La contribución uniforme de justicia de maestros se paga del Fondo General del ELA.

   (d) Contribución anual adicional: la contribución anual certificada por el actuario externo de SRM según sea necesario para evitar que el valor de los activos brutos proyectados del SRM caiga por debajo de $300 millones durante cualquier año fiscal posterior. La contribución anual adicional se paga del Fondo General del ELA para cada año fiscal desde el año fiscal 2019 hasta el año fiscal 2042. Para obtener información adicional sobre el estado de estas contribuciones, consulte la Nota 2.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

### (d) *Membresía al 1 de julio de 2014*

| | JRS | TRS |
|---|---|---|
| Miembros retirados, beneficiarios y miembros discapacitados que actualmente reciben beneficios | 431 | 41,661 |
| Empleados participantes actuales | 365 | 37,700 |
| Participantes con contrato terminados que aún no reciben beneficios | 41 | 527 |
| Total | 837 | 79,888 |

### (e) *Pasivos netos de pensiones*

El pasivo por pensiones neto del ELA al 30 de junio de 2016 se midió al 30 de junio de 2015, y el pasivo por pensiones total utilizado para calcular el pasivo por pensiones neto se determinó mediante una valoración actuarial con datos del censo al inicio del año al 1 de julio de 2014 que se actualizó para adelantar el pasivo total de pensiones al 30 de junio de 2015, suponiendo que no haya ganancias ni pérdidas. Después del 30 de junio de 2016, el ELA promulgó una legislación que cambió la estructura de los beneficios de pensión administrados por el SRE. Para obtener más información sobre dicha legislación de pensiones, consulte la Nota 3 y la Nota 23.

### (i) *Métodos y supuestos actuariales*

El total de pasivos por pensiones en las valoraciones actuariales del 30 de junio de 2015 se determinó utilizando los siguientes métodos y supuestos actuariales, aplicados a todos los períodos incluidos en la medición:

| | SRE | SRJ | SRM |
|---|---|---|---|
| Método de costo actuarial | Edad de ingreso normal | Edad de ingreso normal | Edad de ingreso normal |
| Método de valuación de activos | Valor de mercado de los activos | Valor de mercado de los activos | Valor de mercado de los activos |
| Supuestos actuariales | | | |
| Inflación | 2.5% | 2.5% | 2.5% |
| Tasa de retorno de Inversión, neta de gastos de inversión, incluida la inflación | 6.5 | 5.5 | 6.7 |
| Índice de bonos municipales | 3.8 | 3.8 | 3.8 |
| Tasa de descuento | 3.8 | 3.8 | 3.8 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

| | SRE | SRJ | SRM |
|---|---|---|---|
| Aumentos salariales proyectados por año | 3.0% por año. No se asumen aumentos de compensación hasta el 1 de julio de 2017 como resultado de la Ley Núm. 66 y la economía general actual. | 3.0% por año. No se asumen aumentos de compensación hasta el 1 de julio de 2017 como resultado de la Ley Núm. 66 y la economía general actual. | 2.5% inflación general salarial por año más aumentos por mérito basados en servicio. No se asumen aumentos de compensación hasta el 1 de julio de 2017 como resultado de la Ley Núm. 66 y la economía general actual |
| Ajustes del costo de vida | No se asume ninguno. | No se sume ninguno. | No se sume ninguno. |

Las tablas de mortalidad utilizadas en las valoraciones actuariales del 30 de junio de 2015 fueron las siguientes:

- Mortalidad previa al retiro: para los empleados generales del SRE no cubiertos por la Ley Núm. 127 y para los miembros del SRM, las tasas de mortalidad de empleados RP-2014 para hombres y mujeres ajustadas para reflejar la Escala de mejora de la mortalidad MP-2015 desde el año base 2006 y proyectadas hacia el futuro mediante MP-2015 en una base generacional. Para los miembros del SRE cubiertos por la Ley Núm. 127, las tasas de mortalidad de empleados de RP 2014 se suponen con ajustes manuales para hombres y mujeres, ajustados para reflejar la Escala de Mejora de Mortalidad MP-2015 desde el año base 2006, y proyectados hacia el futuro mediante MP-2015 en un base generacional. Como tablas generacionales, reflejan las mejoras de mortalidad tanto antes como después de la fecha de medición.

- Para el SRE, se supone que el 100% de las muertes durante el servicio activo son ocupacionales solo para los miembros cubiertos por la Ley Núm. 127. Para el SRJ, entre los fallecimientos durante el servicio activo, se supone que el 50% son ocupacionales y el 50% son no ocupacionales.

- Mortalidad de miembros saludables después del retiro Para el SRE y el SRM, se supone que las tasas que varían según el género para los miembros retirados y beneficiarios saludables se basan en un estudio de la experiencia del plan de 2007 a 2012 igual al 92% de las tasas de la Tabla de Mortalidad para Hombres UP 1994 y el 95% (SRE) u 87% (SRM) de las tasas de la Tabla de Mortalidad UP 1994 para Mujeres. Las tasas se proyectan sobre una base generacional utilizando la Escala de Mejora de Mortalidad MP-2015 sobre una base generacional. Como tabla generacional, refleja las mejoras de mortalidad tanto antes como después de la fecha de medición.

- Para el SRJ, se asumen las tasas de mortalidad anual saludable de RP 2014 con ajustes de cuello blanco para hombres y mujeres, ajustados para reflejar la Escala de Mejora de Mortalidad MP-2015 desde el año base 2006, y proyectados hacia adelante usando MP-2015 sobre una base generacional. Como tablas generacionales, refleja las mejoras de mortalidad tanto antes como después de la fecha de medición.

- Mortalidad de miembros discapacitados después del retiro. Para el SRE, se supone que las tasas que varían según el género para los miembros retirados discapacitados se basan en un estudio de la experiencia del plan de 2007 a 2012 igual al 105% de las tasas de la Tabla de Mortalidad de UP 1994 para Hombres y 115% de las tasas de la UP 1994 Tabla de mortalidad para mujeres. Las tasas base se proyectan utilizando la Escala de Mejora de la Mortalidad MP-2015 sobre una base generacional. No se establecieron previsiones para mejorar la mortalidad futura de los miembros retirados discapacitados.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Para el SRM, se supone que las tasas que varían según el género para los miembros retirados discapacitados se basan en un estudio de la experiencia del plan de 2007 a 2012 igual a las tasas en la Tabla de Mortalidad UP 1994 para Hombres y Mujeres. Las tasas base se proyectan utilizando la Escala de Mejora de la Mortalidad MP-2015 sobre una base generacional. No se establecieron previsiones para mejorar la mortalidad futura de los miembros retirados discapacitados.

- Para el SRJ, las Tasa de mortalidad anual de personas discapacitadas de RP 2014 para hombres y mujeres se asumen ajustadas para reflejar la Escala de mejora de la mortalidad MP-2015 del año base 2006 y se proyecta hacia el futuro mediante MP-2015 con una base generacional. No se establecieron previsiones para mejorar la mortalidad futura de los miembros retirados discapacitados.

*(ii)*   *Tasa esperada a largo plazo de retorno sobre la inversión*

La tasa de rendimiento esperada a largo plazo de las inversiones en beneficios de pensiones se determinó de acuerdo con la asignación de activos de cartera adoptada por las juntas correspondientes de los Sistemas de Retiro durante diciembre de 2013 para el SRE, diciembre de 2010 para el SRM y octubre de 2014 para el SRJ y los supuestos actuariales del mercado de capitales al 30 de junio de 2015. La tasa de rendimiento esperada a largo plazo de las inversiones en beneficios de pensiones al 30 de junio de 2015 y 2014 fue de 6.55% y 6.75% para el SRE, 6.65% para ambos años para el SRM, y 5.50% y 5.35% para el SRJ, respectivamente. En el caso del SRE, la tasa de rendimiento esperada a largo plazo de las inversiones en beneficios de pensiones fue ligeramente mayor que el servicio de la deuda de los bonos de fondos de pensiones senior pagaderos, que oscilaron entre 5.85% por año y 6.55% por año.  Después del 30 de junio de 2016, el ELA promulgó una legislación que cambió la estructura de los beneficios de pensión administrados por el SRE. Para obtener más información sobre dicha legislación de pensiones, consulte la Nota 3 y la Nota 23.

Las políticas de los Sistemas de Retiro con respecto a la asignación de activos invertidos están establecidas y pueden ser modificadas por la Junta del Sistema de Retiro correspondiente. Los activos del plan se administran sobre una base de rendimiento total con el objetivo a largo plazo de lograr y mantener un impacto positivo en cada una de las condiciones financieras de los Sistemas de Retiro para los beneficios proporcionados a través de los programas de pensiones. A continuación, se incluyen siguientes son las políticas de asignación de activos adoptadas por la Junta del Sistema de Retiro al 30 de junio de 2015:

| | SRE | | SRM | | SRJ | |
|---|---|---|---|---|---|---|
| | Asignación objetivo | Tasa de retorno esperada a largo plazo | Asignación objetivo | Tasa de retorno esperada a largo plazo | Asignación objetivo | Tasa de retorno esperada a largo plazo |
| Clase de activo: | | | | | | |
| Capital nacional | 25% | 6.4% | 25% | 6.8% | 18% | 6.4% |
| Capital internacional | 10 | 6.7 | 10 | 7.6 | 7 | 6.7 |
| Ingresos fijos | 64 | 6.3 | 64 | 3.9 | 74 | 4.9 |
| Dinero en efectivo | 1 | 3.0 | 1 | 2.9 | 1 | 3.0 |
| Total | 100% | | 100% | | 100% | |

Las tasas de rendimiento esperadas a largo plazo de las inversiones en beneficios de pensiones se determinaron utilizando un método básico en el que se desarrollaron los mejores rangos estimados de las tasas de rendimiento reales futuras esperadas (rendimientos esperados, neto del gasto de inversión del plan de pensiones e inflación) para cada activo importante clase. Estos rangos se combinaron para producir la tasa de rendimiento esperada a largo plazo al ponderar las tasas de rendimiento reales futuras esperadas por el porcentaje de asignación de activos objetivo y al agregar la inflación esperada.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*(iii)*   *Fecha de agotamiento y tasa de descuento*

La base del activo para la fecha de proyección de agotamiento es cada uno de los resultados netos fiduciarios de los Sistemas de Retiro (los activos brutos más las salidas diferidas de recursos menos los pasivos brutos, incluidos los bonos de fondos de pensiones sénior pagaderos, más las entradas diferidas de recursos). Sobre esta base, los resultados netos fiduciarios del SRE se agotaron en el año fiscal 2015. Se espera que los resultados netos fiduciarios del SRM y SRJ se agoten en los años fiscales 2019 y 2018, respectivamente. Las proyecciones suponen que ciertos activos no líquidos (que consisten principalmente en préstamos a miembros), de aproximadamente $762 millones, $444 millones y $477,000 al 30 de junio de 2015 para el SRE, SRM y SRJ, respectivamente, se convertirán en efectivo cuando sea necesario.

La tasa de descuento utilizada para medir el pasivo total por pensiones disminuyó de 4.29% anual al 30 de junio de 2014 a 3.80% anual el 30 de junio de 2015, para el SRE, de 4.33% y 4.30% anual al 30 de junio de 2014 para SRM y SRJ, respectivamente, a 3.82% anual al 30 de junio de 2015.

No se proyectó que los resultados netos fiduciarios del SRE estuvieran disponible para realizar todos los pagos de beneficios futuros proyectados de los empleados activos e inactivos actuales. La fecha de proyección de agotamiento en el informe actuarial no incluye ningún monto de la contribución uniforme adicional requerida por la Ley Núm. 32 debido a dificultades financieras fiscales y presupuestarias reales, déficits presupuestarios continuos y riesgos de liquidez del ELA y sus municipios, y el riesgo que la situación financiera del ELA y sus municipios no mejora a corto plazo. En consecuencia, se aplicó el índice de bonos municipales libres de impuestos (Obligación General del Comprador de Bonos 20 - Índice de Bonos Municipales) a todos los períodos de pagos de beneficios proyectados para determinar el pasivo total por pensiones. La tasa de descuento para el SRE era del 3.80% al 30 de junio de 2015. Después del 30 de junio de 2016, el ELA promulgó una legislación que cambió la estructura de los beneficios de pensión administrados por el SRE. Para obtener más información sobre dicha legislación de pensiones, consulte la Nota 3 y la Nota 23.

No se espera que los resultados netos fiduciarios del SRM y SRJ estén disponibles para realizar todos los pagos de beneficios futuros proyectados de los miembros activos e inactivos actuales. Por lo tanto, la tasa de descuento para calcular el pasivo de pensión total es igual a la tasa equivalente única que resulta en el mismo valor presente actuarial que la tasa de rendimiento esperada a largo plazo aplicada a los pagos de beneficios, en la medida en que los resultados netos fiduciarios del plan de pensiones se proyecta que sean suficientes para realizar los pagos de beneficios proyectados, y la tasa de índice de bonos municipales libres de impuestos (Obligación General del Comprador de Bonos 20 - Índice de Bonos Municipales de Bonos) se aplica a los pagos de beneficios, en la medida en que no se proyecte que los resultados netos fiduciarios del plan de pensiones sean suficientes. La tasa de descuento del SRM y el SRJ era de 3.82% al 30 de junio de 2015.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

(iv) *Cambios en los pasivos netos de pensiones del SRM y SRJ*

Los cambios en los pasivos netos de pensiones del ELA del SRM y el SRJ al período del 30 de junio de 2016 (usando una fecha de medición del 30 de junio de 2015) fueron los siguientes (en miles):

| | SRM | | | SRJ | | |
|---|---|---|---|---|---|---|
| | Pasivo total de pensiones | Resultados netos fiduciarios del plan | Pasivo neto de pensiones | Pasivo total de pensiones | Resultados netos fiduciarios del plan | Pasivo neto de pensiones |
| Balance al 1 de julio de 2014 | $ 14,807,703 | 1,703,779 | 13,103,924 | 502,075 | 46,067 | 456,008 |
| Cambios para el año: | | | | | | |
| Costo de servicio | 273,754 | — | 273,754 | 16,375 | — | 16,375 |
| Intereses sobre pasivos totales de pensiones | 637,849 | — | 637,849 | 21,861 | — | 21,861 |
| Cambios en los términos de beneficios | — | — | — | — | — | — |
| Diferencias entre la experiencia esperada y real en la medición de los pasivos totales de pensiones | 88,544 | — | 88,544 | (4,670) | — | (4,670) |
| Cambios en los supuestos | 1,235,988 | — | 1,235,988 | 72,805 | — | 72,805 |
| Contribuciones - empleador | — | 194,541 | (194,541) | — | 12,337 | (12,337) |
| Contribuciones - empleados | — | 105,120 | (105,120) | — | 3,676 | (3,676) |
| Contribuciones - transferencias | — | 2,345 | (2,345) | — | — | — |
| Ingresos de inversiones netas del plan de pensiones | — | 59,921 | (59,921) | — | 899 | (899) |
| Otros ingresos | — | 1,057 | (1,057) | — | 873 | (873) |
| Pagos de beneficios, que incluyen reembolsos de contribuciones | (736,107) | (736,300) | 193 | (23,134) | (23,134) | — |
| Gastos administrativos netos del plan de pensiones | — | (19,382) | 19,382 | — | (546) | 546 |
| Cambios netos | 1,500,028 | (392,698) | 1,892,726 | 83,237 | (5,895) | 89,132 |
| Balance al 30 de junio de 2015 | $  16,307,731 | 1,311,081 | 14,996,650 | 585,312 | 40,172 | 545,140 |

Los pasivos netos de pensiones para el SRM y el SRJ de aproximadamente $15,000 millones y $545 millones, respectivamente, al 30 de junio de 2016 se incluyen como parte de las Actividades Gubernamentales del Gobierno Primario en el estado de resultados netos.

Los supuestos actuariales se revisan periódicamente para reflejar más de cerca tanto la experiencia futura real como la anticipada. Debido al cambio en la fecha de recopilación del censo al comienzo del año fiscal en lugar de al final del año fiscal, la ganancia/pérdida demográfica durante el año se limita a la diferencia entre los pagos de beneficios reales y esperados, que surgen de las diferencias en la rescisión y actividad de retiro y mortalidad frente a las expectativas.

La valoración actuarial del 30 de junio de 2015 para SRM refleja los aumentos en el total de pasivos por pensiones de la siguiente forma: (i) pérdida de aproximadamente $1,200 millones como resultado de los cambios en los supuestos, y (ii) pérdida de aproximadamente $89 millones como resultado de la actualización de los datos del censo para reflejar una actividad de retiro no común durante el año fiscal 2015, más la diferencia entre los pagos de beneficios reales y esperados, que surgen de las diferencias en la actividad de retiro y la mortalidad real frente a las expectativas .

La valoración actuarial del 30 de junio de 2015 para el SRJ refleja un aumento de aproximadamente $73 millones en el pasivo total de pensiones debido a cambios en los supuestos relacionados con el cambio

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

en la tasa de descuento según lo requerido por la Declaración GASB Núm. 67 del 4.30% en el año fiscal 2014 al 3.82% en el año fiscal 2015 y una disminución de aproximadamente $4.7 millones en el pasivo total por pensiones debido a las diferencias entre la experiencia esperada y la experiencia real. No se suponen aumentos de compensación hasta el 1 de julio de 2017 como resultado de la Ley Núm. 66 de 2014.

*(v)   Sensibilidad de los pasivos de resultados netos a los cambios en la tasa de descuento*

La siguiente tabla presenta el pasivo neto por pensiones del ELA para el SRM y el SRJ calculado de la siguiente manera (en miles): (i) utilizando la tasa de descuento del 382%, así como cuál sería dicha tasa si se calcula utilizando una tasa de descuento del 1% menos (2.82%) o 1% porcentual más (4.82%) que la tasa actual:

| | SRM | | | SRJ | | |
|---|---|---|---|---|---|---|
| | Reducción del 1% (2.82%) | Tasa actual de descuento (3.82%) | Aumento del 1% (4.82%) | Reducción del 1% (2.82%) | Tasa actual de descuento (3.82%) | Aumento del 1% (4.82%) |
| Pasivos de pensiones netos $ | 17,426,298 | 14,996,650 | 13,013,440 | 630,010 | 545,140 | 476,106 |

La siguiente tabla presenta la participación proporcional del ELA en el pasivo por pensiones neto para el SRE calculada utilizando la tasa de descuento del 3.80%, así como también cuál sería la participación proporcional del ELA en el pasivo por pensiones neto si se calcula utilizando una tasa de descuento del 1% menos (2.80%) o 1% más (4.80%) que la tasa actual (en miles):

| | Reducción del 1% (2.80%) | Tasa actual de descuento (3.80%) | Aumento del 1% (4.80) | Base de información |
|---|---|---|---|---|
| Participación proporcional del ELA de los pasivos de pensión netos | $  24,906,720 | 21,848,093 | 19,342,037 | Auditado |
| Participación proporcional del ELA de los pasivos de pensión netos | $      127,589 | 111,921 | 99,083 | No auditado |

298

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*(vi)*  *Proporción del ELA en los pasivos de pensiones netos del SRE*

La siguiente tabla presenta la participación proporcional del ELA en los pasivos por pensiones netos del SRE al 30 de junio de 2016, y el porcentaje proporcional del pasivo por pensiones neto agregado del SRE asignado al ELA (en miles):

| | Actividades del Gobierno | Actividades de Tipo Comercial | Totales Gobierno Primario | Base de Información |
|---|---|---|---|---|
| Participación proporcional del ELA en los pasivos por pensiones netos | 63.58% | 1.95% | 65.53% | Auditado |
| Participación proporcional del ELA en los pasivos de pensiones netos | $ 21,196,442 | 651,651 | 21,848,093 | Auditado |
| Participación proporcional del ELA en los pasivos por pensiones netos | 0.34% | — | 0.34% | No auditado |
| Participación proporcional del ELA de los pasivos de pensión netos | | | | |
| | $ 111,921 — | | 111,921 | No auditado |

La proporción del ELA en los pasivos por pensiones netas del SRE se basó en las contribuciones requeridas reales de cada uno de los patronos participantes que reflejan el esfuerzo de contribución a largo plazo proyectado de cada empleador. Las contribuciones que reflejan el esfuerzo de contribución a largo plazo proyectado de cada patrono incluido en el cálculo de la participación proporcional son: (1) Ley Núm. 116 de 2010 sobre contribución legal basada en la nómina, (2) Ley Núm. 3 de 2013 sobre contribución complementaria, y (3) otras contribuciones de la ley especial. Se requirieron contribuciones al SRE de aproximadamente $501 millones durante el período posterior a la fecha de medición o durante el período finalizado el 30 de junio de 2016. Otras contribuciones al SRE que no reflejan el esfuerzo de contribución a largo plazo proyectado de un empleador, como las contribuciones que financian por separado las responsabilidades específicas de un patrono individual al SRE (es decir, incentivos de retiro anticipado del patrono local), se excluyeron del cálculo proporcional de la participación.

Asimismo, la Ley Núm. 32 de 2013 Contribución Uniforme Adicional (AUC), que es una contribución que refleja el esfuerzo de contribución a largo plazo proyectado de cada empleador, fue excluida del cálculo proporcional de la participación porque su cobro de varios patronos, incluido el ELA, es incierto en este momento. Esto evita una sobreasignación de la Declaración GASB Núm. 68 a los patronos que han pagado su AUC (o se espera que lo hagan) y una subasignación de la Declaración GASB Núm. 68 a los patronos que no han pagado su AUC (o no esperaba que lo hagan).

*(vii)*  *Cambios en los supuestos*

Los supuestos actuariales se revisan periódicamente para reflejar más de cerca tanto la experiencia futura real como la anticipada. Debido al cambio en la fecha de recolección del censo al comienzo del año fiscal, en lugar de al final del año fiscal, la ganancia/pérdida demográfica durante el año se limita a la

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

diferencia entre los pagos de beneficios reales y esperados, que surgen de diferencias en la actividad de rescisión y retiro y mortalidad frente a expectativas.

La valuación actuarial del 30 de junio de 2015 para el SRE refleja un aumento de aproximadamente $2,800 millones en el pasivo total de pensiones debido a los cambios en los supuestos relacionados con el cambio en la tasa de descuento como lo requiere la Declaración GASB Núm. 67 y un aumento de aproximadamente $464 millones en el pasivo total por pensiones debido a las diferencias entre la experiencia esperada y la real. Con la promulgación de la Ley Núm. 3 de 2013, se agregaron las tasas de rescisión, retiro y discapacidad para los nuevos miembros de la Ley Núm. 3. Además, el supuesto de aumento de la compensación fue revisado debido a la Ley Núm. 66 de 2014.

Después del 30 de junio de 2016, el ELA promulgó una legislación que cambió la estructura de los beneficios de pensión administrados por el SRE. Para obtener más información sobre dicha legislación de pensiones, consulte la Nota 3 y la Nota 23.

*(f)* ***Gastos de pensiones y salidas diferidas de recursos y entradas diferidas de recursos de actividades de pensiones***

Los gastos de pensión reconocidos por el ELA para el año terminado el 30 de junio de 2016 relacionados con los Sistemas de Retiro fueron los siguientes (en miles):

| Sistemas de retiro | | Actividades del Gobierno | Actividades de Tipo Comercial | Totales Gobierno Primario | Base de Información |
|---|---|---|---|---|---|
| SRE | $ | 1,239,917 | 52,488 | 1,292,405 | Auditado |
| SRE | | (5,010) | — | (5,010) | No auditado |
| SRM | | 941,124 | — | 941,124 | No auditado |
| SRJ | | 49,447 | — | 49,447 | Auditado |
| Total | $ | 2,225,478 | 52,488 | 2,277,966 | |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Las salidas diferidas y las entradas diferidas de recursos de las actividades de pensiones por fuente informada por el ELA en el estado de resultados netos al 30 de junio de 2016 para cada uno de los Sistemas de Retiro fueron los siguientes (en miles):

| Sistema de retiro | Fuente | Actividades del gobierno | | Actividades de tipo comercial | | Base de de información |
| | | Salidas diferidas de recursos | Entradas diferidas de recursos | Salidas diferidas de recursos | Entradas diferidas de recursos | |
|---|---|---|---|---|---|---|
| SRE | Diferencias entre la experiencia esperada y real en la medición de los pasivos totales de pensiones | $ 24,496 | 245,794 | 753 | 7,557 | Auditada |
| | Cambios en los supuestos | 2,017,769 | — | 62,033 | — | Auditada |
| | Diferencias netas entre las ganancias proyectadas y reales en las inversiones del plan de pensiones | — | 121,884 | — | 3,747 | Auditada |
| | Cambios en la proporción y diferencias entre las contribuciones reales y la participación proporcional | 53,979 | 613,981 | 59,365 | — | Auditada |
| | Contribuciones de empleados realizadas después de la fecha de medición | 503,264 | — | 13,967 | — | Auditada |
| | Total SRE | 2,599,508 | 981,659 | 136,118 | 11,304 | |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

| Sistema de retiro | Fuente | Actividades del gobierno | | Actividades de tipo comercial | | Base de de información |
|---|---|---|---|---|---|---|
| | | Salidas diferidas de recursos | Entradas diferidas de recursos | Salidas diferidas de recursos | Entradas diferidas de recursos | |
| SRE | Diferencias entre la experiencia esperada y real en la medición de los pasivos totales de pensiones | $   129 | 1,298 | — | — | No auditada |
| | Cambios en los supuestos | 10,654 | — | — | — | No auditada |
| | Diferencia neta entre las ganancias proyectadas y reales en las inversiones del plan de pensiones | — | 644 | — | — | No auditada |
| | Cambios en la proporción y diferencias entre las contribuciones reales y la participación proporcional | — | 59,843 | — | — | No auditada |
| | Contribuciones de empleados realizadas después de la fecha de medición | 1,904 | — | — | — | No auditada |
| | Total SRE | 12,687 | 61,785 | — | — | |
| | Total SRE | 2,612,195 | 1,043,444 | 136,118 | 11,304 | |
| SRM | Diferencias entre la experiencia esperada y real en la medición de los pasivos totales de pensiones | 197,383 | — | — | — | No auditada |
| | Cambios en los supuestos | 1,119,104 | — | — | — | No auditada |
| | Diferencia neta entre las ganancias proyectadas y reales en las inversiones del plan de pensiones | — | 20,656 | — | — | No auditada |
| | Cambios en la proporción y diferencias entre las contribuciones reales y la participación proporcional | | — | — | — | No auditada |
| | Contribuciones del empleador realizadas después de la fecha de medición | 213,675 | — | — | — | No auditada |
| | Total TRS | 1,530,162 | 20,656 | — | — | |

302

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

| Sistema de retiro | Fuente | Actividades del gobierno | | Actividades de tipo comercial | | Base de información |
|---|---|---|---|---|---|---|
| | | Salidas diferidas de recursos | Entradas diferidas de recursos | Salidas diferidas de recursos | Entradas diferidas de recursos | |
| SRJ | Diferencias entre la experiencia esperada y real en la medición de los pasivos totales de pensiones | $ — | 6,057 | — | — | Auditada |
| | Cambios en los supuestos | 58,404 | — | — | — | Auditada |
| | Diferencia neta entre las ganancias proyectadas y reales en las inversiones del plan de pensiones | — | 3,926 | — | — | Auditada |
| | Cambios en la proporción y diferencias entre las contribuciones reales y la participación proporcional | — | — | — | — | Auditada |
| | Contribuciones de empleados realizadas después de la fecha de medición | 27,323 | — | — | — | Auditada |
| | Total SRJ | 85,727 | 9,983 | | — | |
| | | | | — | | |
| Total | Diferencias entre la experiencia esperada y real | 222,008 | 253,149 | 753 | 7,557 | |
| | Cambios en los supuestos | 3,205,931 | — | 62,033 | — | |
| | Diferencia neta entre las ganancias proyectadas y reales en las inversiones del plan de pensiones | — | 147,110 | — | 3,747 | |
| | Cambios en la proporción y diferencias entre las contribuciones reales y la participación proporcional | 53,979 | 673,824 | 59,365 | — | |
| | Contribuciones del empleador realizadas después de la fecha de medición | 746,166 | — | 13,967 | — | |
| | **Total** | **$ 4,228,084** | **1,074,083** | **136,118** | **11,304** | |

Los montos reportados como salidas/entradas diferidas de recursos de actividades de pensiones al 30 de junio de 2016 se reconocerán en los gastos de pensiones de la siguiente manera (en miles):

| | SRE | SRM | SRJ | Total |
|---|---|---|---|---|
| Año que termina el 30 de junio: | | | | |
| 2017 | $ 332,829 | 216,064 | 16,603 | 565,496 |
| 2018 | 332,829 | 216,064 | 16,603 | 565,496 |
| 2019 | 332,829 | 216,064 | 15,117 | 564,010 |
| 2020 | 364,188 | 232,944 | 98 | 597,230 |
| 2021 | 372,236 | 225,448 | — | 597,684 |
| Posteriormente | — | 189,247 | — | 189,247 |
| Total | $ 1,734,911 | 1,295,831 | 48,421 | 3,079,163 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Las salidas diferidas de recursos relacionados con las pensiones resultantes de las contribuciones requeridas por el ELA posteriores a la fecha de medición fueron de aproximadamente $505.2 millones, $213.7 millones y $27.3 millones al 30 de junio de 2016 para la parte proporcional correspondiente del SRE, para el SRM y para el SRJ, respectivamente, y se reconocerá como una reducción del pasivo neto por pensiones en el año finalizado el 30 de junio de 2017. Este monto no se incluye en la tabla anterior

Después del 30 de junio de 2016, el ELA promulgó una legislación que cambió la estructura de los beneficios de pensión administrados por el SRE. Para obtener más información sobre dicha legislación de pensiones, consulte la Nota 3 y la Nota 23.

*(g)* ***Montos de pensión no registrados - Gobierno primario***

Estos montos adicionales (en miles) de la Declaración GASB Núm. 68 y Núm. 71 deberían haberse reconocido al 30 de junio de 2016 y se consideran no auditados porque se relacionan con unidades de componentes combinados del ELA, informados como parte del Gobierno primario, que son auditados por otros auditores que no implementaron los requisitos de las Declaraciones GASB Núm. 68 y Núm. 71 en sus respectivos estados financieros emitidos por separado.

Después del 30 de junio de 2016, el ELA promulgó una legislación que cambió la estructura de los beneficios de pensión administrados por el SRE. Para obtener más información sobre dicha legislación de pensiones, consulte la Nota 3 y la Nota 23.

| | No auditado | | |
| Epígrafe de FS | Actividades del gobierno | Actividades de tipo comercial | Total gobierno primario |
|---|---|---|---|
| Pasivos netos de pensiones | $ 495,453 | 77,052 | 572,505 |
| Gasto de pensiones | 38,615 | 6,662 | 45,277 |
| Salidas diferidas de recursos | 95,642 | 18,058 | 113,700 |
| Entradas diferidas de recursos: | 8,742 | 1,337 | 10,079 |

*(h)* ***Información de pasivos de pensiones netos para unidades de componentes de presentación discreta***

Tal como se menciona en la Nota 1(s) para los fines de los estados financieros independientes de cada una de las unidades de componentes de presentación discreta, cuyos informes de auditoría para el año fiscal 2016 ya se habían emitido antes de la emisión de los estados financieros adjuntos del ELA, el SRE no proporcionó oportunamente información necesaria para aplicar las Declaraciones GASB Núm. 68 y Núm. 71. Por lo tanto, la mayoría de las unidades de componentes no pudieron aplicar estos pronunciamientos contables. De las unidades de componentes que aplicaron las declaraciones GASB Núm. 68 y Núm. 71 en sus estados financieros auditados independientes, la mayoría se basó en información no auditada (excepto AEE y UPR que pudieron usar información auditada porque cada una tiene su propia información separada de los sistemas de retiro). Como resultado, la mayoría de las unidades de componentes han mantenido la contabilidad de los costos de pensión de acuerdo con la Declaración GASB Núm. 27, también desde el punto de vista de un participante en un plan de costos compartidos de múltiples patronos. En consecuencia, los costos de pensión reconocidos para la mayoría de las unidades de componentes fueron principalmente iguales a las contribuciones requeridas

304

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

legalmente o contractualmente, con un pasivo registrado por cualquier contribución requerida no pagada.

Después del 30 de junio de 2016, el ELA promulgó una legislación que cambió la estructura de los beneficios de pensión administrados por el SRE. Para obtener más información sobre dicha legislación de pensiones, consulte la Nota 3 y la Nota 23.

*(i) Descripción y membresía del plan*

**Sistema de retiro de la Universidad de Puerto Rico**

El Sistema de Retiro de la Universidad de Puerto Rico (Sistema de Retiro de UPR) es un plan de pensión de beneficios definidos para un solo empleador que cubre a todos los empleados de la UPR con la excepción de los empleados por hora, temporales, a tiempo parcial, con contrato y sustitutos, y profesores visitantes. Es elegible y está exento de los impuestos sobre la renta de Puerto Rico y Estados Unidos. El Sistema de Retiro de UPR no está sujeto a los requisitos de la Ley de Seguridad de Ingresos de Retiro de los Empleados de 1974 (ERISA). El Sistema de Retiro de UPR emite un informe financiero disponible públicamente que incluye información financiera adicional, otras divulgaciones requeridas e información complementaria requerida para el plan. Ese informe puede obtenerse escribiendo al Sistema de Retiro de la Universidad de Puerto Rico en P.O. Box 21769, San Juan, Puerto Rico 00931-1769.

**Sistema de Retiro de la Autoridad de Energía Eléctrica de Puerto Rico**

El Sistema de Retiro de la Autoridad de Energía Eléctrica de Puerto Rico (Sistema de Retiro de la AEE) es un plan de pensión de beneficios definidos para un solo empleador que cubre a todos los empleados permanentes de la AEE a tiempo completo administrados por el Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica de Puerto Rico. Es elegible y está exento de los impuestos sobre la renta de Puerto Rico y Estados Unidos. El Sistema de Retiro de la AEE no está sujeto a los requisitos de la Ley de Seguridad de Ingresos de Retiro de los Empleados de 1974 (ERISA). El Sistema de Retiro de la AEE emite un informe financiero disponible públicamente que incluye información financiera adicional, otras divulgaciones requeridas e información complementaria requerida para el plan. Puede obtener ese informe escribiendo al Sistema de Retiro de la Autoridad de Energía Eléctrica de Puerto Rico, PO Box 13978, San Juan, Puerto Rico 00908-3978.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*(ii)   Reconocimiento de importes de pensión*

Para aquellas unidades de componentes que sí aplicaron las Declaraciones GASB Núm. 68 y Núm. 71, a continuación, se incluye el pasivo neto de pensiones y el gasto de pensión reconocido en los estados financieros básicos adjuntos bajo la unidad de opinión de unidades de componentes (en miles):

|  | | Pasivos netos de pensiones | Gastos de pensiones | Base de información |
|---|---|---|---|---|
| Unidades de componentes mayores: | | | | |
| AEE | $ | 3,603,802 | 528,000 | Auditada |
| UPR | | 1,796,727 | (49,350) | Auditada |
| SIFC | | 1,417,963 | 81,300 | No auditada |
| Total de unidades de componentes mayores | | 6,818,492 | 559,950 | |
| Unidades de componentes no mayores: | | | | |
| CCCPRC | | 151,604 | 12,386 | Auditada |
| Varios | | 436,566 | 23,306 | No auditada |
| Total de unidades de componentes no mayores | | 588,170 | 35,692 | |
| Total de unidades de componentes | $ | 7,406,662 | 595,642 | |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

A continuación, se incluyen las salidas diferidas y las entradas diferidas de recursos de las actividades de pensiones por fuente informadas al 30 de junio de 2016 por las unidades de componentes mencionadas (en miles):

| Unidad de componentes mayores | Fuente | Salidas diferidas de recursos | Entradas diferidas de recursos |
|---|---|---|---|
| AEE (Auditado) | Contribuciones del empleador realizadas después de la fecha de medición | $  113,315 | — |
| | Diferencias entre la experiencia esperada y real en la medición de los pasivos totales de pensiones | 36,113 | — |
| | Cambios en los supuestos | 1,032,263 | 46,362 |
| | Diferencia neta entre las ganancias proyectadas y reales en inversiones del plan de pensión | — | 11,947 |
| | Total AEE | 1,181,691 | 58,309 |
| UPR (Auditado) | Contribuciones del empleador realizadas después de la fecha de medición | 77,811 | — |
| | Diferencias entre la experiencia esperada y real en la medición de los pasivos totales de pensiones | — | 246,653 |
| | Cambios en los supuestos | 24,568 | 5,546 |
| | Diferencia neta entre las ganancias proyectadas y reales en las inversiones del plan de pensión | — | 49,219 |
| | Total UPR | 102,379 | 301,418 |
| SIFC (No auditado) | Contribuciones del empleador realizadas después de la fecha de medición | 30,629 | — |
| | Diferencias entre la experiencia esperada y real en la medición de los pasivos totales de pensiones | — | 11,347 |
| | Cambios en los supuestos | 48,398 | — |
| | Total SIFC | 79,027 | 11,347 |
| Total | Contribuciones del empleador realizadas después de la fecha de medición | 221,755 | — |
| | Diferencias entre la experiencia esperada y real en la medición de los pasivos totales de pensiones | 36,113 | 258,000 |
| | Cambios en los supuestos | 1,105,229 | 51,908 |
| | Diferencia neta entre las ganancias proyectadas y reales en inversiones del plan de pensión | — | 61,166 |
| | Total de unidades de componentes mayores | $ 1,363,097 | 371,074 |

307

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

| Unidades de componentes no mayores | Fuente | Salidas diferidas de recursos | Entradas diferidas de recursos |
|---|---|---|---|
| Auditado | Contribuciones del empleador realizadas después de la fecha de medición | $ 3,684 | — |
| Auditado | Diferencias entre la experiencia esperada y real en la medición pasivos totales de pensiones | 175 | 1,758 |
| Auditado | Cambios en los supuestos | 14,432 | — |
| Auditado | Diferencia neta entre las ganancias proyectadas y reales en inversiones del plan de pensión | — | 872 |
| Auditado | Cambios en la proporción y diferencias entre las contribuciones reales y la participación proporcional | 14,798 | — |
| | Total de unidades de componentes no mayores | 33,089 | 2,630 |
| No auditado | Contribuciones del empleador realizadas después de la fecha de medición | 17,496 | 1,341 |
| No auditado | Diferencias entre la experiencia esperada y real en la medición de los pasivos totales de pensiones | 204 | 840 |
| No auditado | Cambios en los supuestos | 28,888 | — |
| No auditado | Diferencia neta entre las ganancias proyectadas y reales en las inversiones del plan de pensión Cambios en la proporción y diferencias entre | (7,696) | 866 |
| No auditado | las contribuciones reales y la participación proporcional | 54 | — |
| | Total de unidades de componentes no mayores | 38,946 | 3,047 |
| Total | Contribuciones del empleador realizadas después de la fecha de medición | 21,180 | 1,341 |
| | Diferencias entre la experiencia esperada y real en la medición de los pasivos totales de pensiones | 379 | 2,598 |
| | Cambios en los supuestos | 43,320 | — |
| | Diferencia neta entre las ganancias proyectadas y reales en inversiones del plan de pensión | (7,696) | 1,738 |
| | Cambios en la proporción y diferencias entre las contribuciones reales y la participación proporcional | 14,852 | — |
| | Total de unidades de componentes no mayores | $ 72,035 | 5,677 |

(iii)  *Montos de pensión no registrados*

Los siguientes montos de pensiones (en miles) de la Declaración GASB Núm. 68 y Núm. 71 deberían haberse reconocido al 30 de junio de 2016 y se consideran no auditados porque se relacionan con unidades de componentes del ELA de presentación discreta que son auditadas por otros auditores que no implementan

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

los requisitos de las Declaraciones GASB Núm. 68 y Núm. 71 en sus respectivos estados financieros emitidos por separado.

| Total de unidades de componentes de | | Pasivos netos de pensiones | Gastos de pensiones | Salidas diferidas de recursos | Entradas diferidas de recursos |
|---|---|---|---|---|---|
| presentación discreta | $ | 3,392,479 | 272,887 | 797,792 | 129,543 |

*(i) Pagadero a los sistemas de retiro*

Los montos pagaderos a los Sistemas de Retiro informados por el ELA al 30 de junio de 2016 relacionados con contribuciones no pagadas para cada uno de los Sistemas de Retiro fueron los siguientes (en miles):

| Sistemas de retiro | | Monto |
|---|---|---|
| SRE | $ | 277,143 |
| SRM | | — |
| SRJ | | 23,200 |
| Total | $ | 300,343 |

Al 30 de junio de 2016, el SRE tenía una obligación con el ELA de aproximadamente $304 millones. Las cuentas por cobrar y las cuentas por pagar al SRE se presentan en el estado de resultados netos como parte del vencimiento de otras entidades gubernamentales. Después del 30 de junio de 2016, el ELA promulgó una legislación que cambió la estructura de los beneficios de pensión administrados por el SRE. Para obtener más información sobre dicha legislación de pensiones, consulte la Nota 3 y la Nota 23.

**(19) Otros beneficios posteriores al empleo**

Como se describe con más detalle en la Nota 1(t), el ELA ofrece beneficios de atención médica posteriores al empleo a través de los siguientes planes de beneficios definidos que son administrados por la Administración del SRE y del SRJ o por la Administración del SRM:

- Sistema de Retiro de Empleados del Gobierno de Puerto Rico y sus Contribuciones al Plan de Seguro Médico de Organismos (SRE MIPC)

- Sistema de Retiro de la Judicatura del Estado Libre Asociado de Puerto Rico de la Contribución del Plan de Seguro Médico (SRJ MIPC)

- Sistema de Anualidades y Pensiones para Maestros de Puerto Rico Contribución al Plan de Seguro Médico (SRM MIPC)

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Después del 30 de junio de 2016, el ELA promulgó una legislación que cambió la estructura de los beneficios de pensión administrados por la Administración del SRE y el SRJ. Para obtener más información sobre dicha legislación de pensiones, consulte la Nota 3 y la Nota 23.

### (a) *Descripciones de los planes*

SRE MIPC es un plan posterior al empleo de costos compartidos y patronos múltiples de beneficios definidos (OPEB) patrocinado por el ELA. SRJ MIPC y SRM MIPC son planes OPEB de beneficios definidos por un solo empleador y sin fondos patrocinados por el ELA. Estos planes OPEB se crearon por Ley Núm. 95 aprobada el 29 de junio de 1963. Los beneficios de atención médica se ofrecen a través de compañías de seguros cuyas primas son pagadas por el miembro retirado y el ELA aporta una parte correspondiente. SRE MIPC cubre sustancialmente a todos los empleados a tiempo completo de (1) el Gobierno Primario y (2) ciertos municipios de Puerto Rico y ciertas unidades de componentes del ELA que no tienen sus propios planes de beneficios posteriores al empleo. El SRJ MIPC cubre a todos los jueces de la Rama Judicial del ELA.  SRM MIPC cubre a todos los maestros activos del Departamento de Educación del ELA y a los empleados de la Administración del SRM.

Para SRE MIPC y SRM MIPC, los empleados del ELA se unieron al plan a partir de su fecha de empleo. Los miembros del plan eran elegibles para beneficios al alcanzar la edad de retiro para los beneficios de pensión correspondientes. La Ley Núm. 3 de 2013 eliminó este beneficio de atención médica para los miembros del SRE MIPC retirados después del 30 de junio de 2013. La Ley Núm. 160 de 2013 eliminó este beneficio de atención médica para los miembros del SRE MIPC retirados después del 31 de julio de 2014.

Para el SRJ MIPC, los jueces de la Rama Judicial del ELA se unen al plan a partir de su fecha de empleo. Los miembros del plan son elegibles para los beneficios al cumplir 60 años con 10 años de servicio.

Política de fondos: el requisito de contribución de SRE MIPC, SRJ MIPC y SRM MIPC se establece en la Ley Núm. 95 aprobada el 29 de junio de 1963. Su beneficio consiste en un máximo de $100 por mes por miembro retirado o miembro discapacitado. Cada uno de estos planes OPEB es financiado por el ELA y sus corporaciones públicas y municipios sobre la base de un pago por uso. Los fondos de los beneficios de OPEB se proporcionan a SRE MIPC, SRJ MIPC y SRM MIPC a través de asignaciones legislativas cada 1 de julio por (i) el Fondo General del ELA para el gobierno anterior y (ii) ciertas corporaciones públicas sin sus propias tesorerías, (iii) ciertas corporaciones públicas con sus propias tesorerías y municipios para sus ex empleados. Las asignaciones legislativas se consideran estimados de los pagos que deben realizar el SRE MIPC, SRJ MIPC y SRM MIPC para los beneficios de atención médica durante todo el año. No existe un requisito de contribución para los miembros del plan durante el empleo activo.

Los miembros retirados contribuyen con el monto de la prima del seguro de salud no cubierto por la contribución del ELA.

### (b) *Membresía al 1 de julio de 2015*

| | SRE | JRS | TRS | Total |
|---|---|---|---|---|
| Miembros retirados, discapacitados y que actualmente reciben beneficios | $    110,423 | 386 | 38,488 | 149,297 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*(c) Costos anuales de OPEB y obligación neta de OPEB*

El costo anual de OPEB y la contribución anual requerida (ARC) se calcularon como parte de una valoración actuarial de acuerdo con los parámetros de la Declaración GASB Núm. 45 con base en los datos del censo (demográfico) de inicio de año al 1 de julio de 2015, según el ajuste. Las evaluaciones actuariales del año anterior se realizaron utilizando datos del censo de fin de año.

El costo anual de OPEB del ELA y la obligación neta de OPEB para los planes de beneficios de atención médica posteriores al empleo a partir del 30 de junio de 2016 fueron los siguientes (en miles):

| | SRE MIPC | SRJ MIPC | SRM MIPC | Total |
|---|---|---|---|---|
| Costo anual de OPEB: | | | | |
| ARC | $ 107,739 | 923 | 38,049 | 146,711 |
| Interés sobre las obligaciones netas de OPEB | 6,242 | 68 | 1,855 | 8,165 |
| Ajuste a la contribución requerida anual | (15,416) | (208) | (4,215) | (19,839) |
| Costo anual de OPEB | 98,565 | 783 | 35,689 | 135,037 |
| Contribuciones legales realizadas por el patrocinador | (93,728) | (317) | (37,481) | (131,526) |
| Aumento (reducción) en la obligación neta de OPEB | 4,837 | 466 | (1,792) | 3,511 |
| Obligación neta de OPEB al comienzo del año | 201,347 | 2,140 | 59,848 | 263,335 |
| Obligación neta de OPEB a fin del año | $ 206,184 | 2,606 | 58,056 | 266,846 |

La obligación neta de OPEB al 30 de junio de 2016 para el SRE MIPC, SRJ MIPC y SRM MIPC era de aproximadamente $265 millones y $1.8 millones registrados en las Actividades del Gobierno y Actividades de Tipo Comercial, respectivamente, en el estado de resultados netos adjunto.

*(d) Métodos y supuestos actuariales*

El estado financiado por OPEB al 30 de junio de 2016 se determinó mediante la valoración actuarial con datos del censo al inicio del año a partir del 1 de julio de 2015, que se actualizó para adelantar el estado financiado al 30 de junio de 2016 y no asumió ganancias o pérdidas por pasivos.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Los siguientes son los métodos y supuestos actuariales más significativos utilizados para estimar la obligación neta de OPEB al 30 de junio de 2016 y la contribución anual requerida de OPEB para el año finalizado el 30 de junio de 2016:

|  | SRE MIPC | SRJ MIPC | SRM MIPC |
|---|---|---|---|
| Método de costo actuarial | Edad de ingreso normal | Edad de ingreso normal | Edad de ingreso normal |
| Método de amortización | 18 años cerrado (a partir del 1 de julio de 2014), nivel dólar | 30 años cerrado, nivel porcentaje de nómina | 20 años cerrado (a partir del 1 de julio de 2014), nivel dólar |
| Período de amortización restante | 18 años | 11 años | 18 años |
| Tasa de descuento | 3.10% | 3.20% | 3.00% |
| Crecimiento proyectado de la nómina | N/A | 0% hasta el 30 de junio de 2021; posteriormente 3% | N/A |
| Aumentos salariales proyectados | N/A | N/A | N/A |
| Inflación | N/A | N/A | N/A |

N/A = No corresponde.

Las contribuciones legales del SRE MIPC, SRJ MIPC y SRM MIPC como porcentaje de la contribución anual requerida para el año en curso y cada uno de los dos años anteriores fueron las siguientes:

|  | SRE MIPC | SRJ MIPC | SRM MIPC |
|---|---|---|---|
| Año finalizado el 30 de junio de 2016 | 89.5% | 34.4% | 98.5% |
| Año finalizado el 30 de junio de 2015 | 93.7 | 36.3 | 104.1 |
| Año finalizado el 30 de junio de 2014 | 115.3 | 44.1 | 77.3 |

Las valoraciones actuariales de un plan en curso implican estimados del valor neto de los montos informados y supuestos sobre la probabilidad de ocurrencia de eventos en el futuro. Se incluyen, por ejemplo, supuestos sobre el empleo futuro y la mortalidad. Los montos determinados con respecto al estado financiado del plan y el ARC del empleador están sujetos a una revisión continua porque los resultados reales se comparan con las expectativas pasadas y se realizan nuevos estimados sobre el futuro.

Los cálculos se basan en los tipos de beneficios proporcionados según los términos del plan sustantivo en el momento de cada valoración y el patrón de distribución de costos entre el empleador y los miembros del plan en el momento de cada valoración. Las proyecciones de beneficios para fines de información financiera no incorporan explícitamente los efectos potenciales de las limitaciones de financiamiento legales o contractuales en el patrón de costos compartidos entre el empleador y los miembros del plan en el futuro.

Los cálculos actuariales reflejan una perspectiva a largo plazo. De acuerdo con esa perspectiva, los métodos y supuestos actuariales utilizados incluyen técnicas diseñadas para reducir la volatilidad a corto plazo en los pasivos acumulados actuariales y el valor actuarial de los activos.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*(e) Información de tendencias de tres años*

La información de tendencias de tres años es la siguiente (en miles):

|  |  | SRE MIPC | SRJ MIPC | SRM MIPC |
|---|---|---|---|---|
| Costo anual de OPEB: |  |  |  |  |
| Año finalizado el 30 de junio de 2016 | $ | 98,565 | 783 | 35,689 |
| Año finalizado el 30 de junio de 2015 |  | 95,267 | 745 | 33,946 |
| Año finalizado el 30 de junio de 2014 |  | 82,222 | 617 | 45,902 |
| Porcentaje aportado del costo anual de OPEB |  |  |  |  |
| Año finalizado el 30 de junio de 2016 |  | 95.1% | 40.5% | 105.0% |
| Año finalizado el 30 de junio de 2015 |  | 102.2 | 41.2 | 111.3 |
| Año finalizado el 30 de junio de 2014 |  | 124.2 | 48.9 | 78.2 |
| Obligación neta de OPEB: |  |  |  |  |
| Al 30 de junio de 2016 | $ | 206,184 | 2,606 | 58,056 |
| Al 30 de junio de 2015 |  | 201,347 | 2,140 | 59,848 |
| Al 30 de junio de 2014 |  | 203,454 | 1,702 | 63,678 |

*(f) Estado de los fondos*

El estado de los fondos de los planes de beneficios de atención médica posteriores al empleo al 30 de junio de 2016, la fecha de valoración actuarial más reciente, es el siguiente (en miles):

|  |  | SRE MIPC | SRJ MIPC | SRM MIPC | Total |
|---|---|---|---|---|---|
| Pasivos actuariales devengados (AAL) | $ | 1,349,503 | 6,985 | 523,230 | 1,879,718 |
| Valor actuarial de los activos |  | — | — | — | — |
| Pasivos devengados actuariales no financiados | $ | 1,349,503 | 6,985 | 523,230 | 1,879,718 |

|  |  | SRE MIPC | SRJ MIPC | SRM MIPC | Total |
|---|---|---|---|---|---|
| Relación de financiamiento |  | —% | —% | —% | —% |
| Nómina cubierta | $ | 3,344,382 | 32,204 | 1,101,896 | 4,478,482 |
| Pasivos devengados actuariales no financiados como porcentaje de la nómina cubierta |  | 40.4% | 21.7% | 47.5% | 42.0% |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El esquema del progreso de financiamiento presentado como información complementaria requerida después de las notas a los estados financieros básicos, presenta información de tendencias de varios años sobre si el valor actuarial de los activos del plan aumenta o disminuye con el tiempo en relación con el pasivo actuarial acumulado por los beneficios.

**(20) Acuerdos de depósito de servicio de la deuda**

El 26 de mayo de 2005, el ELA, el PFC y el BGF (conjuntamente las Entidades del ELA) y Lehman Brothers Special Financing Inc. (Lehman) celebraron Acuerdos de Depósito del Servicio de la Deuda (Acuerdos DSD) vigentes el 1 de julio de 2005. El objetivo del Acuerdo DSD era que las Entidades del ELA aseguraran un pago por adelantado a cambio de otorgarle a Lehman los derechos a las ganancias generadas por ocho de sus fondos de servicio de la deuda. El 25 de septiembre de 2008, como resultado de que Lehman iniciara un caso en el Tribunal de Quiebras de los Estados Unidos para el Distrito Sur de Nueva York bajo el Capítulo 11 del Título 11 del Código de los Estados Unidos, Lehman seleccionó a Hexagon Securities LLC para actuar como el Distribuidor Calificado según los acuerdos DSD y los valores calificados entregados según lo permitido por el acuerdo DSD. Siete de los fondos están asociados con los bonos PFC del ELA, presentados en los estados financieros básicos adjuntos como bonos de asignación del ELA, y un fondo está asociado con los bonos de obligación general del ELA. El 26 de mayo de 2005, las Entidades del ELA recibieron el pago inicial de aproximadamente $82.7 millones, lo que representa el valor presente de los ingresos de ganancias proyectados ajustados por los riesgos de tiempo crediticio, así como una cantidad adecuada de compensación para Lehman.

Con el pago por adelantado realizado como se explicó anteriormente, las Entidades del ELA entregaron a Lehman los depósitos de servicio de la deuda requeridos y programados y Lehman entregó obligaciones gubernamentales calificadas, que vencerán antes de la próxima fecha de pago del servicio de la deuda por un monto aproximado al próximo pago del servicio de la deuda. Lehman intentará obtener fondos suficientes sobre los montos de depósito del servicio de la deuda, menos su costo para las obligaciones gubernamentales calificadas, para recuperar los $82.7 millones con el tiempo.  Al mismo tiempo, las Entidades del ELA administrarán sus préstamos e inversiones aumentando la previsibilidad de sus flujos de efectivo a partir de las ganancias de sus inversiones y no con fines de especulación. Las Entidades del ELA reconocen que, a cambio del pago inicial recibido, renuncian a sus derechos de recibir ganancias de inversión sobre los montos de depósito mencionados anteriormente en el futuro y que, al aceptar el pago inicial, las Entidades del ELA han minimizado los riesgos resultantes debido a las fluctuaciones en las tasas de interés durante la vigencia de los Acuerdos DSD, pero también se ha renunciado a la posibilidad de recibir mayores rendimientos de dichos montos por dichas fluctuaciones.

Según los Acuerdos DSD, las Entidades del ELA estarán expuestas al pago a Lehman de un Monto de Rescisión, como se define en el acuerdo, principalmente cuando ocurra la redención o la anulación de los bonos relacionados en la fecha de depósito programada o antes. El importe del Monto de Rescisión variará dependiendo de las diversas condiciones del mercado, tal como se define en los acuerdos DSD. En ciertas condiciones del mercado, el Monto de Rescisión a Lehman por el ELA puede exceder el monto del pago inicial original recibido.

El pago inicial de $82.7 millones recibido por las Entidades del ELA fue reconocido como otros ingresos para propósitos presupuestarios en 2005; sin embargo, según los PCGA de EE. UU., dicho pago inicial se aplazó y se reconoce proporcionalmente en los períodos futuros que las Entidades del ELA de otro modo habrían devengado tales intereses. El balance no amortizado ascendió a aproximadamente $15.9 millones y es un componente de los ingresos no devengados al 30 de junio de 2016. Durante el año fiscal 2016, aproximadamente $3.1 millones se amortizaron en otros ingresos en las Actividades del Gobierno del estado de actividades adjunto. Para obtener información

314

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

adicional sobre posibles reclamos con respecto a los acuerdos de depósito del servicio de la deuda, consulte la Nota 23.

**(21) Instrumentos Derivados**

*Instrumentos Derivados de Cobertura*

El único instrumento derivado de cobertura en el Gobierno Primario al 30 de junio de 2016 residía en COFINA, que ha celebrado un acuerdo de intercambio de tasa de interés (swap) con una contraparte en relación con la emisión de bonos de tasa ajustable basados en LIBOR de $136 millones dentro de las Ventas Serie de Bonos de Ingresos Fiscales 2007A (los Bonos de Tasa Ajustable) con vencimiento el 1 de agosto de 2057. Los Bonos de Tasa Ajustable exponen a COFINA a la variabilidad en los pagos de intereses debido a cambios en las tasas de interés. La gerencia cree que es prudente limitar la variabilidad de los pagos de intereses sobre los Bonos de Tasa Ajustable. Para cumplir con este objetivo, la gerencia celebró un acuerdo de intercambio de tasa de interés de $136 millones para gestionar las fluctuaciones en los flujos de efectivo resultantes del riesgo de tasa de interés. Este canje cambia efectivamente la exposición de flujo de efectivo de tasa variable en los Bonos de tasa ajustable a flujos de efectivo fijos. Según los términos del canje de tasas de interés, COFINA recibe pagos de tasa de interés variable igual al pago de intereses de los Bonos de tasa ajustable, y realiza pagos de tasa de interés fija en 4.92% hasta el 1 de agosto de 2057, creando así el equivalente de una deuda de tasa fija. Al 30 de junio de 2016, la calificación crediticia de la contraparte de este acuerdo de intercambio era BBB+ de Standard & Poor's.

COFINA rechazó el Acuerdo de Swap en su caso del Título III, y el reclamo por el pago por rescisión fue anulado en virtud del Tercer Plan de Ajuste Enmendado.

El valor de mercado y el monto nocional del instrumento derivado (pagar swap de tasa de interés fija) al 30 de junio de 2016, designado como cobertura de flujo de efectivo, fue el siguiente (en miles):

| Importe nacional | Valor de mercado | Cambio en el valor de mercado del 30 de junio de 2015 | Fecha de vigencia | Indicador de tarifa flotante | Fecha de vencimiento | Recibe | | Paga | | Calificación crediticia de la contraparte **Moody's** |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | Tipo | Tarifa | Tipo | Tarifa | |
| | | | | 67% de 3 m | | | | | | |
| $ 136,000 | (86,745) | (33,545) | 7/31/2007 | LIBOR +0.93% | 8/1/2057 | Variable | 1.357% | Fija | 4.92% | Ba3 |

El valor de mercado del swap de tasa de interés clasificado en el Nivel 2 de la jerarquía del valor razonable se estimó utilizando el método de cupón cero. Este método calcula los pagos netos futuros de liquidación requeridos por el swap, suponiendo que la tasa a plazo actual implícita en la curva de rendimiento anticipa correctamente las tasas de interés spot futuras. Luego, estos pagos se descuentan utilizando las tasas spot implícitas en la curva de rendimiento actual para bonos hipotéticos de cupón cero con vencimiento en la fecha de cada liquidación neta futura de los swaps.

El swap de COFINA no tiene opciones integradas.

*Riesgos de Instrumentos Derivados de Cobertura*

Al utilizar un instrumento financiero derivado para cubrir la exposición a cambios en las tasas de interés, COFINA se expone al riesgo de tasa de interés, riesgo de crédito y riesgo de rescisión.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Riesgo de crédito o de contraparte: el riesgo de crédito es el incumplimiento de la contraparte (o su garante) de conformidad con los términos del contrato de derivados. Cuando el valor razonable de un contrato de derivados es positivo, la contraparte le debe a COFINA, lo que crea un riesgo de crédito para COFINA. Cuando el valor razonable de un contrato de derivados es negativo, COFINA adeuda a la contraparte y, por lo tanto, no posee riesgo de crédito. COFINA minimiza el riesgo de crédito en instrumentos derivados al realizar transacciones con contrapartes cuya calificación crediticia es aceptable bajo las políticas de inversión de COFINA. Al 30 de junio de 2016, no existía riesgo de crédito porque el valor de mercado del instrumento derivado era negativo.

Riesgo de tasa de interés: el riesgo de tasa de interés es el efecto adverso sobre el valor de un instrumento financiero que resulta de un cambio en las tasas de interés. COFINA está expuesta al riesgo de tasa de interés en su pago fijo, recibe swap variable; a medida que disminuye la tasa LIBOR, aumenta el pago neto de COFINA en el swap. Al mismo tiempo, disminuyen los pagos de intereses sobre los bonos de tasa ajustable cubiertos. El riesgo de tasa de interés asociado con los contratos de swap de tasa de interés se gestiona mediante el establecimiento y monitoreo de parámetros que limitan los tipos y el grado de riesgo de tasa de interés que se puede emprender.

Riesgo de rescisión: el riesgo de rescisión es la posibilidad de que el final no programado de un instrumento derivado de cobertura afecte la estrategia de pasivos de COFINA o presente a COFINA con pagos de rescisión no programados potencialmente significativos a la contraparte. COFINA o su contraparte pueden rescindir un instrumento derivado si la otra parte no cumple con los términos del contrato. COFINA está en riesgo de que la contraparte rescinda un swap en un momento en que COFINA adeude un pago de rescisión. COFINA ha mitigado este riesgo al especificar que la contraparte tiene el derecho de rescindir solo como resultado de ciertos eventos, incluido un incumplimiento de pago por parte de COFINA; insolvencia de COFINA (o eventos similares); o una reducción en la calificación crediticia de COFINA por debajo de BBB+ o Baa1. Si al momento de la rescisión, un instrumento derivado de inversión se encuentra en una posición de pasivo, COFINA será responsable ante la contraparte por un pago igual al pasivo, sujeto a acuerdos de compensación.

*Instrumentos Derivados de Inversión*

En relación con el acuerdo de intercambio de COFINA, el 1 de julio de 2014, Moody's informó una reducción en los Bonos LIBOR 2007A a una calificación de Ba3. El 24 de septiembre de 2014, en lugar de rescindir el Acuerdo de Swap, COFINA y la contraparte firmaron un nuevo anexo crediticio (el Anexo de Apoyo Crediticio 2014), así como una Enmienda al Acuerdo Maestro ISDA (la Enmienda ISDA 2014) para permitir a COFINA Garantizar sus obligaciones en virtud del Acuerdo de swap y modificar sus eventos de rescisión. El impacto del nuevo acuerdo fue que COFINA registró $12 millones en garantía a la contraparte, y creó una cuenta restringida en la que una parte de la garantía se depositaría en beneficio de la contraparte. Además, COFINA se ha comprometido a registrar hasta $15 millones anuales en garantías adicionales antes del 15 de marzo de cada año hasta el año fiscal 2018. Con el tiempo, la cantidad máxima que COFINA tendría que registrar es de $60 millones. En enero de 2015 y 2016, COFINA registró $15 millones y $6.3 millones en garantías adicionales con vencimiento el 31 de marzo de 2015 y 2016, respectivamente. Al 30 de junio de 2016, el monto de la garantía de la contraparte es de $33.3 millones.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

**(22) Balances del fondo (déficit)**

A continuación se incluye el detalle incluido en las clasificaciones de balance de fondos (déficit) para los fondos gubernamentales al 30 de junio de 2016 (en miles):

| | General | Servicio de la deuda | Ingresos especiales de COFINA | Servicio de la deuda de COFINA | Gobierno No mayores | Total del gobierno |
|---|---|---|---|---|---|---|
| No gastable: | | | | | | |
| Inventario | $ 63 | — | — | — | — | 63 |
| | 63 | — | — | — | — | 63 |
| Gastable: | | | | | | |
| Restringido para: | | | | | | |
| Gobierno general | 7,917 | — | — | — | — | 7,917 |
| Vivienda y bienestar público | 66,057 | — | — | — | — | 66,057 |
| Educación | 1,549 | — | — | — | — | 1,549 |
| Proyectos de capital | 2,478 | — | — | — | 215,160 | 217,638 |
| Servicio de la deuda | — | 202,361 | — | 447,909 | 115,351 | 765,621. |
| Subtotal | 78,001 | 202,361 | — | 447,909 | 330,511 | 1,058,782 |
| Comprometido a: | | | | | | |
| Gobierno general | 256 | — | — | — | — | 256 |
| Vivienda y bienestar público | — | — | — | — | 25,487 | 25,487 |
| Proyectos de capital | — | — | — | — | 591 | 591 |
| Subtotal | 256 | — | — | — | 26,078 | 26,334 |
| Asignado a: | | | | | | |
| Gobierno general | 11,309 | — | — | — | — | 11,309 |
| Vivienda y bienestar público | 6,604 | — | — | — | 2,851 | 9,455 |
| Proyectos de capital | — | — | — | — | 1,161 | 1,161 |
| Subtotal | 17,913 | — | — | — | 4,012 | 21,925 |
| No asignado | (1,330,618) | — | (29) | — | (75,927) | (1,406,574) |
| Balance total del fondo (déficit) | $ (1,234,385) | 202,361 | (29) | 447,909 | 284,674 | (299,470) |

317

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

**(23) Eventos posteriores**

Los eventos posteriores se evaluaron hasta el 3 de mayo de 2019 para determinar si dichos eventos deberían reconocerse o divulgarse en los estados financieros básicos de 2016. Los eventos posteriores que se divulgan a continuación están principalmente los relacionados con actividades de deuda, incluidos los eventos de reducción en calificación crediticia, otros asuntos relacionados con ingresos o presupuesto y eventos fiscales y legislación relacionada, tanto local como federal, que la gerencia cree que son de interés público para la divulgación.

**Gobierno primario**

*(a)* *Reducción de la Calificación Crediticia de los Bonos*

Poco después del 30 de junio de 2016, S&P redujo la calificación de los bonos de obligación general del ELA, los Bonos de Ingresos Fiscales Especiales de la PRIFA y los bonos de la AEP; a la calificación de nivel D más baja, mientras que Fitch hizo lo mismo con los bonos de obligación general del ELA y los bonos de la AEP. El 6 de abril de 2017, Moody's redujo la calificación de los Bonos de Ingresos Fiscales Especiales y los bonos del SRE de la PRIFA a una calificación de nivel C de sus calificaciones anteriores de Ca y Ca, respectivamente. En esa misma fecha, Moody's reafirmó la calificación de Caa3 de los bonos de obligación general del ELA. El 7 de junio de 2017, S&P redujo la calificación de los bonos de gravámenes senior y junior de COFINA a la calificación de incumplimiento de D.

*(b)* *Informe de Investigación de la Deuda*

El 2 de agosto de 2017, la Junta de Supervisión anunció su intención, de conformidad con su autoridad en virtud de PROMESA, de realizar una investigación para revisar la crisis fiscal y sus contribuyentes, y examinar la deuda de Puerto Rico y su emisión, incluidas las prácticas de divulgación y venta. Con ese fin, la Junta de Supervisión nombró un comité especial de investigación (el Comité Especial de Investigación) y realizó un proceso competitivo para identificar y seleccionar una empresa independiente para realizar la investigación. El 13 de septiembre de 2017, la Junta de Supervisión anunció que el Comité Especial de Investigación contrató a un investigador independiente para realizar una revisión de la deuda del ELA y su conexión con la crisis financiera actual. El Comité de Investigación Especial considera que esta investigación es una parte integral de la misión de la Junta de Supervisión de restablecer el equilibrio fiscal y las oportunidades económicas y promover el reingreso del ELA a los mercados de capitales. El trabajo del investigador independiente concluyó, y la Junta de Supervisión publicó el informe final del investigador independiente el 20 de agosto de 2018 (el Informe de Investigación de Deuda). El Informe de Investigación de Deuda proporciona un análisis de los factores macroeconómicos y políticos históricos y más recientes que contribuyen directa e indirectamente a la crisis fiscal y económica del ELA, el proceso de emisión de bonos municipales del ELA y los esfuerzos legislativos para reestructurar la deuda, así como los hallazgos de investigación de la Junta de Supervisión, recomendaciones de políticas e identificación de posibles reclamos y asuntos para atención regulatoria.

El Informe de Investigación de Deuda presentó hallazgos y recomendaciones en las siguientes áreas:

- BGF
- Servicios Públicos de Puerto Rico (AEE y AAA)
- COFINA
- SRE
- Presupuesto, Informes Externos y Funciones Contables de Puerto Rico
- Cálculo del Límite Constitucional de la Deuda
- Agencias de Clasificación Crediticia (CRA)

318

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

- Prácticas de Venta para Bonos Relacionados con Puerto Rico
- Marco de Ética del Gobierno de Puerto Rico
- Uso de Intercambio de Tasa de Interés de los Emisores
- Falta de un Mecanismo Claro de Puerto Rico para Validar los Bonos Relacionados con Puerto Rico Antes de su Emisión
- Crédito Fiscal a la Posesión

Finalmente, el investigador independiente presentó una visión general de las posibles causas radicadas. El informe de investigación de deuda se puede encontrar en el sitio web de la Junta de Supervisión.

El 28 de agosto de 2018, la Junta de Supervisión designó a su Comité de Reclamos Especiales y delegó en el Comité de Reclamos Especiales cualquier autoridad de la Junta de Supervisión para revisar los hallazgos en el Informe de Investigación de Deuda y tomar las medidas apropiadas, incluyendo, entre otras. recomendar o iniciar la negociación o el enjuiciamiento de reclamos con base en los hallazgos en el Informe de Investigación de Deuda en nombre de los deudores del Título III para el beneficio de todos los acreedores y participantes en los casos del Título III. El Comité de Reclamos Especiales tiene derecho, a su exclusivo criterio, a determinar el alcance de cualquier acción adicional, que incluye, entre otras, la investigación adicional, así como los reclamos a seguir, y contratar a los asesores, consultores, abogados u otros asesores como lo considere conveniente a su exclusivo criterio. El 25 de octubre de 2018, la Junta de Supervisión solicitó propuestas de asesoramiento para ayudar al Comité de Reclamos Especiales con respecto a la consideración de posibles reclamos descritos en el Informe de Investigación de Deuda. El 28 de noviembre de 2018, el Comité de Reclamos Especiales firmó el contrato con la empresa que proporcionará esos servicios. El ELA está cooperando con esta investigación.

El 14 de enero de 2019, el Comité de Reclamos Especiales y el Comité de Acreedores radicaron una objeción general conjunta (la Objeción de Reclamos de GO) solicitando la anulación de más de $6 mil millones de reclamos relacionados con los bonos GO del ELA emitidos a partir de marzo de 2012, incluyendo (a) Bonos de Refinamiento de Mejoras Públicas de $2,300 millones, Serie 2012 A emitidos en abril de 2012; (b) $415.27 millones en Bonos de Refinamiento de Mejoras Públicas, Serie 2012 B emitidos en marzo de 2012; y (c) $3,500 millones en Bonos de Obligación General de 2014, Serie A emitidos en marzo de 2014 (colectivamente, los Bonos GO impugnados). Conforme con la Objeción de reclamos de GO, los Bonos de GO impugnados son "inválidos" porque, entre otras cosas, se emitieron en violación de: (i) el límite del servicio de la deuda de la Constitución del ELA, que debería haber incluido el servicio de la deuda de los bonos emitidos por la AEP que la Objeción de Reclamos de GO caracteriza como una estructura "falsa"; (ii) la cláusula de presupuesto equilibrado constitucional del ELA, que debería haber incluido $425 millones de intereses excluidos; y (iii) la cláusula del presupuesto constitucional equilibrado del ELA porque las ganancias de los Bonos GO impugnados se utilizaron para financiar el gasto deficitario. El 15 de febrero de 2019, el Tribunal Título III emitió una orden de procedimientos relacionada con la Objeción de reclamos de GO, que otorga a las partes hasta el 16 de abril de 2019 para notificar su participación en los procedimientos relacionados con la Objeción de reclamos de GO.

Este asunto está en curso y el ELA no puede predecir cuándo se concluirá o su resultado.

**Sistema de Retiro del ELA**

El ELA ha conservado históricamente tres sistemas de retiro: (i) SRE; (ii) SRJ; y (iii) SRM (colectivamente, los Sistemas de Retiro).

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Ante la eventual insolvencia del SRE y la imposibilidad de llegar a un acuerdo de reestructuración consensuado con los acreedores del SRE, el 21 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para el SRE al presentar una solicitud de radicación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. El 15 de junio de 2017, el Fideicomisario de los Estados Unidos nombró al Comité de Miembros Retirados en los casos consolidados del Título III.

El 23 de junio de 2017, la Legislatura aprobó ciertas otras asignaciones para la Resolución Conjunta del año fiscal 2018, que, entre otras cosas, ordenó a al SRE, al SRJ y al SRM liquidar sus activos y pasar los ingresos netos al Departamento de Hacienda. El 20 de julio de 2017, el SRE, el SRJ y el SRM vendieron inversiones por aproximadamente $297 millones.

El 27 de junio de 2017, el Departamento de Hacienda emitió la Carta Circular Núm. 1300 46 17 para transmitir a las agencias del Gobierno Primario, corporaciones públicas y municipios los nuevos procedimientos de implementación para adoptar, efectivo, el 1 de julio de 2017, el nuevo mecanismo PayGo para todos los sistemas de retiro del ELA. Con el inicio del año fiscal 2018, las contribuciones de los patronos, las contribuciones ordenadas por leyes especiales y la Contribución Uniforme Adicional fueron eliminadas y reemplazadas por un cargo mensual de PayGo que se recaudará de las entidades gubernamentales antes mencionadas para pagar a los miembros retirados. Los Sistemas de Retiro determinarán y administrarán el monto de pago por miembro retirado que se cobrará a cada agencia, corporación pública y municipio. El cargo de PayGo debe enviarse al Departamento de Hacienda antes del día 15 de cada mes junto con las contribuciones individuales retenidas de los empleados activos. A medida que se agoten los fondos de jubilación retiro, se espera que aumente el cargo de PayGo.

Además del establecimiento del mecanismo PayGo, el 23 de agosto de 2017, el Gobernador promulgó la Ley Núm. 106 de 2017, que reformó los Sistemas de Retiro, para que sus participantes activos depositaran sus contribuciones individuales en un nuevo Plan de Contribución Definida que será administrado por una entidad privada. La Ley Núm. 106 de 2017 crea el marco legal para que el ELA pueda garantizar los pagos a los pensionados a través del sistema PayGo. Según el sistema PayGo, el ELA realiza pagos de pensión del Fondo General, en la medida en que haya dinero disponible, y los municipios y las corporaciones públicas reembolsarán al ELA los pagos realizados en nombre de sus empleados. Se asignaron aproximadamente $2,000 millones para estos fines en el presupuesto del año fiscal 2018. La Ley Núm. 106 de 2017 también creó un Plan de Contribución Definida, similar a un plan 401(k), que garantiza las contribuciones de los empleados públicos, porque los Sistemas de Retiro no pagarán beneficios futuros. Sin embargo, según el sistema PayGo, los municipios de Puerto Rico seguirán obligados a cumplir con sus obligaciones de pensión.

El 12 de marzo de 2019, el Comité de Acreedores radicó la Objeción de Reclamo de Bonos del SRE para rechazar todos los reclamos radicados contra el SRE en base a los aproximadamente $3,1 mil millones de bonos en circulación emitidos por el SRE en 2008. Para obtener información adicional sobre la Objeción de Reclamo de Bonos del SRE, consulte la Nota 3.

**Unidades de componentes**

El 30 de septiembre de 2016, la Junta de Supervisión designó las unidades de componentes iniciales del ELA sujetas a PROMESA. Estas entidades incluyen, entre otras, AAA, UPR, AEE y ACT.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

A continuación, se detallan eventos posteriores específicos para las unidades de componentes mayores de presentación discreta:

**(a)** *ACT*

El 1 de julio de 2016, el fideicomisario de los Bonos de la Serie Subordinada de la Resolución de 1998 de la ACT notificó a la ACT que no realizó una parte del pago del capital e intereses al fideicomisario el 1 de julio de 2016 y que un incumplimiento en virtud del acuerdo de fideicomiso constituye un evento de incumplimiento en función del Acuerdo de Fideicomiso de Bonos Subordinados de Resolución de 1998. Como tal, la ACT está en incumplimiento de esta obligación.

El 21 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para la ACT al presentar una solicitud de radicación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico.

El 30 de junio de 2017, la Junta de Supervisión aprobó y certificó el Presupuesto de la ACT para el año fiscal 2018.

El 3 de julio de 2017, el fideicomisario de la ACT notificó a la ACT que no realizó el pago del capital los intereses por aproximadamente $107.2 millones y $116.9 millones, respectivamente, según las Resoluciones de Bonos de 1968 y 1998. Del monto total en mora de la ACT, aproximadamente $76.5 millones y $66.7 millones de capital e intereses, respectivamente, se pagaron por la compañía de seguros en virtud de la póliza de seguro de garantía financiera.

Durante septiembre de 2017, los huracanes Irma y María azotaron la isla de Puerto Rico causando daños generalizados en toda la isla. A la fecha de los estados financieros, la administración de la ACT está en el proceso de determinar la cantidad de daños sufridos por los caminos, puentes, sistema de transporte público y otros activos de capital de la ACT. La gerencia de la ACT no ha podido determinar la cantidad de daños a la fecha de los estados financieros, pero una evaluación preliminar de los daños físicos a sus caminos y puentes asciende aproximadamente a $437 millones. La ACT está en proceso de evaluar los daños físicos sufridos por su sistema de tren urbano. Además, el huracán María causó una interrupción en el sistema de peaje electrónico de la ACT y la operación del tren, lo que resultó en una pérdida de ingresos. La ACT tiene pólizas de seguro vigentes en el momento de ambos huracanes y espera recuperar parte de dichos daños con la asistencia de la Agencia Federal para el Manejo de Emergencias (FEMA).

El 29 de junio de 2018, la Junta de Supervisión aprobó un plan fiscal revisado para proporcionar una hoja de ruta para transformar no solo la ACT, sino también la infraestructura en todo Puerto Rico para catalizar el crecimiento económico. La ACT tiene cuatro objetivos alineados con este objetivo: (a) proyectos de seguridad de tránsito, (b) mejora de la infraestructura de transporte existente, (c) completar sistemas de caminos y (d) reducción de tráfico.

**(b)** *AEE*

*Acuerdo de Apoyo de Reestructuración*

El 1 de agosto de 2018, la Junta de Supervisión aprobó un plan fiscal revisado para proporcionar un marco para la negociación y aprobación de la transformación de la AEE. El plan fiscal de la AEE incluye un conjunto de objetivos de tasa de aspiración y fiabilidad que establecen los parámetros para los procesos de financiamiento y transformación que ya no pueden retrasarse, que incluyen: (i) inversiones a corto plazo en restauración, generación y flexibilidad; (ii) el alcance y el enfoque del financiamiento federal; y (iii) el financiamiento o el tamaño del cargo de transición disponible para la reestructuración de la deuda y los pasivos por pensiones.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*Tasa Provisional*

El 27 de mayo de 2016, la AEE radicó una petición ante la Comisión de Energía solicitando la aprobación de un ajuste a las tarifas base cobradas a los clientes de la AEE. La petición también solicitó la aprobación del ajuste de tarifa base propuesto de manera temporal hasta que la Comisión de Energía considere el ajuste de tarifa solicitado. El 24 de junio de 2016, la Comisión de Energía emitió una orden autorizando a la AEE a aumentar sus tarifas base, de manera temporal, en aproximadamente 1.3 centavos por kWh, vigentes a partir de los treinta días posteriores a la emisión de la orden, sujeto a ciertas condiciones. Se estimó que el ajuste de la tasa base generaría ingresos adicionales por un monto aproximado de $220 millones anuales.

El 10 de enero de 2017, la Comisión de Energía emitió una Resolución Final y una Orden que redujo el aumento solicitado en el requisito de ingresos de la tasa base de la AEE a $177 millones, lo que resultó en un aumento de la tasa base promedio aprobado de aproximadamente 1.025 centavos por kWh. Sin embargo, el 20 de enero de 2017, la AEE radicó una moción de aclaración con respecto, entre otras cosas, al cálculo del requisito de ingresos de la tasa base. El 8 de marzo de 2017, la Comisión emitió una Resolución que aprobó un aumento revisado de los requisitos de ingresos de tasa base de aproximadamente $171.8 millones. El 25 de abril de 2017, la AEE radicó sus Tarifas base de radicación de cumplimiento basándose en el cálculo de los requisitos de ingresos actualizados, que se aprobó mediante pedidos ingresados el 10 de mayo de 2017 y el 31 de mayo de 2017 (sujeto a ciertas modificaciones), aunque las nuevas tarifas no se aplicaron. La AEE está obligada a acreditar las facturas de los clientes sobre la base de una conciliación de la tasa provisional y la tasa final aprobada de acuerdo con esas órdenes y los requisitos de la Ley Núm. 83 de 1941, según enmienda por la Ley Núm. 4 de 2016.

Debido al huracán María, la Comisión de Energía suspendió temporalmente, a partir del 19 de septiembre de 2017, todos los procedimientos administrativos, incluidos los problemas de implementación de la tarifa provisional y final. El 1 de noviembre de 2017, en el expediente del caso de tarifas, la Comisión de Energía otorgó en parte y rechazó en parte la moción de la AEE para posponer la implementación de la tarifa permanente. Específicamente, la Comisión de Energía accedió a la solicitud de la AEE para la extensión temporal de la tarifa provisional y de todos los demás plazos bajo la orden de la tarifa y las órdenes subsiguientes sobre la implementación de la tarifa permanente y el suministro de información sobre conciliaciones y supervisión presupuestaria y aprobaciones, conforme a la Sección 6A de la Ley Núm. 83 de 1941 y artículo 6.25 de la Ley Núm. 57 de 2014. La Comisión de Energía también ordenó que emitiera un nuevo cronograma para el cumplimiento y los plazos de radicación cuando las operaciones de la AEE estén normalizadas.

El 28 de septiembre de 2018, en la lista de tarifas, la NEPR renombrada negó la petición de la AEE de realizar una modificación única a la Cláusula de Ajuste, la tarifa que hace ajustes de costos de combustible y energía comprada. La petición involucró la acumulación de combustible y los ajustes de energía comprados debido a los huracanes de 2017. En cambio, la NEPR agregó este tema al cálculo de conciliación de la tasa de provisión que se realizará más adelante. La orden también ordenó a la AEE que implemente las tarifas permanentes antes del 1 de diciembre de 2018, entre otras disposiciones.

Hubo pedidos adicionales sobre la línea de tiempo, incluido un pedido de la NEPR con fecha del 27 de noviembre de 2018 y entregado el 28 de noviembre de 2018 que ordenó a la AEE presentar un plan de cumplimiento antes del 14 de diciembre de 2018; ordenó a la AEE que emita avisos de los clientes sobre las nuevas tarifas en enero de 2019; que establezca audiencias de cumplimiento para el 14 de diciembre de 2018 y el 18 de enero, 15 de febrero y 15 de marzo de 2019; y ordenó que las tarifas permanentes se implementaran el 1 de abril de 2019.

La AEE radicó el plan de cumplimiento y emitió los avisos. Las audiencias de cumplimiento programadas hasta la fecha se han celebrado, más una reunión de trabajo adicional celebrada el 27 de febrero de 2019 a solicitud de la AEE.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

El 25 de febrero de 2019, la NEPR emitió una orden aplazando las conciliaciones hasta al menos el 1 de julio de 2019.

La AEE y el interventor del ICSE-PR radicaron una revisión judicial de las órdenes finales y de audiencia de la NEPR de 2017. Esas revisiones judiciales fueron enviadas al Tribunal Título III.

*Acciones y Litigio de la Junta de Supervisión*

Como se señaló anteriormente, la AEE RSA estaba sujeta a la aprobación de la Junta de Supervisión según PROMESA. Después de considerar los términos de la AEE RSA, la Junta de Supervisión finalmente rechazó aprobar la AEE RSA el 27 de junio de 2017, y la AEE RSA caducó y finalizó conforme a sus términos el 29 de junio de 2017. El 2 de julio de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para la AEE en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico.

El 26 de octubre de 2017, después del huracán María, la Junta de Supervisión radicó una moción para solicitar la emisión de una orden que confirma el nombramiento y la autoridad de un Director de Transformación para la AEE, que el Tribunal Título III finalmente denegó.

El 4 de marzo de 2018, la Comisión de Energía de Puerto Rico (PREC) radicó una demanda de oposición y una moción de interdicto preliminar contra la Junta de Supervisión y la AEE, para solicitar una orden que prohíba a la Junta de Supervisión ordenar o autorizar "acciones sustantivas de electricidad" por parte de la AEE, incluida la certificación de un plan fiscal, sin el permiso y la aprobación previa del PREC, que prohíba a la AEE tomar ciertas medidas en una supuesta infracción de la autoridad del PREC. El 28 de marzo de 2018, el Tribunal Título III denegó la solicitud de un interdicto preliminar, alegando que el PREC solicitaba una opinión consultiva. El 10 de abril de 2018, el PREC desestimó voluntariamente la demanda por oposición, sin perjuicio.

*Acuerdo de Préstamo de Crédito Recurrente de Superprioridad Posterior a la Petición*

El 16 de febrero de 2018, la Junta de Supervisión y la AEE radicaron conjuntamente una solicitud urgente para obtener la aprobación de un préstamo de superprioridad no garantizado de $300 millones del ELA a la AEE (el Préstamo de Crédito Recurrente), que se otorgó por orden con fecha del 19 de febrero de 2018. Según lo autorizado por el Tribunal Título III el 22 de febrero de 2018, la AEE (como prestatario) y el ELA (como prestamista) celebraron un Acuerdo de Préstamo de Crédito Recurrente, en el que el ELA acordó otorgar el Préstamo de Crédito Recurrente consistente en facilidad de crédito de superprioridad posterior a la petición por un monto de capital total que no exceda los $300 millones disponibles para la AEE hasta el 30 de junio de 2018, a menos que se extienda por acción gubernamental necesaria por parte del ELA. El Préstamo de Crédito Recurrente tendrá un interés del 5%, siempre que, en el caso de que el ELA financie o refinancie el Préstamo de Crédito Recurrente con el producto de un financiamiento del ELA, la tasa de interés de dicho Préstamo de Crédito Recurrente financiado o refinanciado automáticamente acumulará intereses la tasa igual a la tasa de interés del Préstamo de Crédito Recurrente no financiado o refinanciado, sin financiamiento del ELA. A la fecha del presente, la AEE ha realizado una serie de pagos al ELA para reembolsar el Préstamo de Crédito Recurrente y el balance pendiente del capital actualmente es de aproximadamente $60 millones.

*Junta de Gobierno de la AEE*

El 26 de junio de 2017, el Gobernador promulgó la Ley Núm. 37 de 2017 (Ley Núm. 37 de 2017) para revisar la estructura de la junta de gobierno existente de la AEE. Después de la promulgación de la Ley Núm. 37 de 2017, la junta gobierno de la AEE está compuesta por siete miembros. De su junta de siete miembros, seis miembros son designados por el Gobernador (tres de los cuales requieren aprobación del Senado) y un miembro es un representante electo del consumidor.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

*Impacto de los Huracanes Irma y María*

El sistema eléctrico de la AEE sufrió daños significativos como resultado de los huracanes Irma y María. Los daños se exacerbaron por el hecho de que la infraestructura de la AEE estaba en mal estado antes de los huracanes debido a años de inversión limitada y falta de mantenimiento. El huracán María tocó tierra en Puerto Rico el 20 de septiembre de 2017, con vientos sostenidos de 155 millas por hora y precipitaciones significativas durante un período de 30 horas. El huracán María cruzó Puerto Rico en diagonal, entrando por el sudeste y saliendo por la región noroeste. El huracán causó una destrucción catastrófica en Puerto Rico, que incluyó daños severos al sistema de energía eléctrica, y dejó a la isla completamente sin electricidad. Solo dos semanas antes del huracán María, el huracán Irma, uno de los huracanes más fuertes jamás registrados en el Atlántico, pasó por la costa norte de Puerto Rico, afectando sustancialmente una infraestructura ya débil.

Después de que el huracán María pasara por la isla, y cuando era seguro para el personal regresar al campo, la AEE desplegó equipos de evaluación para realizar una evaluación preliminar de daños e intentó restablecer las comunicaciones con los diversos componentes clave de la AEE. Esta evaluación inicial confirmó que toda la red de la AEE sufrió daños graves. La infraestructura fue diseñada para soportar vientos de hasta 140 millas por hora, pero el huracán María trajo vientos sostenidos de aproximadamente 155 millas por hora. Esto resultó en un daño directo masivo y fatiga mecánica y estrés que requerirán un reemplazo y reparación significativos. Algunos daños incluyeron, por ejemplo:

- Transmisión: cientos de las principales estructuras de transmisión resultaron dañadas, y en ese momento también se identificaron cientos de fallas de hardware, conductores y aisladores.

- Distribución: muchos miles de líneas de distribución individuales, postes y transformadores cayeron o sufrieron daños, lo que requerirá la eliminación de escombros y la reconstrucción y reparación de líneas.

Comunicaciones y TI: los sistemas de comunicaciones y TI en gran parte del sistema de la AEE no funcionaron inmediatamente después del huracán María. El centro de datos de la AEE, que aloja los activos de TI críticos de la AEE, estuvo desconectado durante semanas. La comunicación por Internet fue inexistente durante las dos primeras semanas e intermitente a partir de entonces. La mayoría de las antenas de comunicación sufrieron daños graves. Durante las semanas posteriores al huracán María, la AEE tuvo que depender de varias radios de onda corta y teléfonos satelitales para sus capacidades limitadas de comunicación.

Basado en la evaluación de daños, la AEE comenzó a implementar sus procedimientos de comunicación y restauración de emergencia. La AEE estableció cinco iniciativas clave de estabilización esenciales para la respuesta de emergencia: (1) restablecer las comunicaciones y los sistemas de TI, (2) reconstruir los sistemas de distribución y transmisión, (3) subestaciones energizantes, (4) adquisiciones y liquidez, y (5) planificación de operaciones.

Las acciones de recuperación inicial de la AEE se centraron en restablecer el poder a los clientes más críticos, que incluyen: (i) hospitales e instalaciones para el cuidado de ancianos; (ii) aeropuertos; (iii) puertos; (iv) plantas de tratamiento de agua y alcantarillado; (v) agencias que prestan servicios esenciales; (vii) instalaciones de alojamiento; (viii) edificios industriales; (ix) instituciones financieras; y (x) plantas de fabricación de hielo.

El 15 de agosto de 2018, la AEE publicó su panel de control de indicadores clave de desempeño para la gestión de emergencias final, que indicaba que la electricidad se había restablecido a todos sus clientes de manera efectiva. La AEE continúa trabajando para implementar medidas para mejorar las operaciones, mejorar la resistencia de la red, fortalecer la red de la AEE contra futuras emergencias e interrupciones y facilitar el

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

desarrollo y la utilización de recursos renovables para reducir el impacto ambiental de la generación en Puerto Rico.

*Reducción en la calificación de los bonos*

El 6 de julio de 2017, Moody's redujo su calificación para los bonos de la AEE a Ca de Caa3, con una perspectiva negativa. Esta última reducción refleja que la AEE ha comenzado un procedimiento en virtud del Título III de PROMESA. En la misma fecha, Fitch también redujo calificación para los bonos de AEE a D.

*Privatización*

El 22 de enero de 2018, el Gobernador anunció que el ELA comenzará la transformación de la AEE. El propósito de la transformación es asegurar que el sistema sea moderno y confiable y que las tarifas de energía sean accesibles para los residentes de Puerto Rico. La transformación contemplada implicará (a) propiedad privada y operación de activos de generación y (b) un operador del sistema de transmisión y distribución a través de un modelo de concesión. El proceso de transformación probablemente demorará entre 18 meses y dos años en completarse. El 31 de octubre de 2018, la Autoridad P3, en colaboración con la AEE emitió una solicitud de calificaciones (RFQ) para los sistemas de transmisión y distribución. La AEE recibió cinco respuestas a la RFQ y seleccionó a cuatro proponentes con la experiencia necesaria para administrar y operar todos los aspectos de los sistemas de transmisión y distribución de la AEE. La solicitud de propuestas se emitió el 1 de febrero de 2019 con un cierre selectivo a fines de 2019.

*(c)* *AAA*

El 12 de julio de 2016, el Gobernador de Puerto Rico promulgó la Ley Núm. 68 de 2016 (Ley Núm. 68 de 2016), que establece la creación de una nueva corporación pública que se conocerá como la Corporación para la Revitalización de la Autoridad de Acueductos y Alcantarillados de Puerto Rico (PRASARC) como una entidad remota de quiebra de propósito único. La PRASARC está autorizada a fijar y cobrar los cargos de titulización con el propósito de emitir bonos cuyos beneficios pueden ser utilizados por la AAA para su Programa de Mejora de Capital (CIP), el refinanciamiento de los pagarés en anticipación de bonos y la cancelación, anulación o refinanciamiento de sus bonos, entre otros costos financieros aprobados. La Ley Núm. 68 de 2016 limita el cargo de titulización que puede imponer a la PRASARC a un monto equivalente al 20% de los ingresos de la AAA y establece que la PRASARC puede emitir hasta un máximo de $900 millones en bonos con el fin de financiar el desarrollo del CIP de la AAA. La diferencia entre los $900 millones que se pueden usar para financiar el CIP y el monto máximo que se puede financiar con el 20% de los ingresos de la AAA se puede usar para retirar, cancelar (cancelar) o refinanciar los bonos de la AAA, sujeto a ciertas condiciones.

El 1 de agosto de 2018, la Junta de Supervisión aprobó un plan fiscal revisado para permitir que la AAA continúe proporcionando suministros seguros y confiables de agua potable y tratamiento de aguas residuales. Además, la AAA podrá invertir en la infraestructura necesaria para restaurar el sistema y garantizar el cumplimiento de los estándares requeridos, al tiempo que promueve el crecimiento económico que tanto se necesita en toda la isla.

El 18 de diciembre de 2018, el Departamento de Recursos Naturales y Ambientales de Puerto Rico, como sucesor del EQB, y el Banco Popular de Puerto Rico, como fideicomisario del Fondo para el Agua Limpia (Fideicomiso de Agua Limpia) suscribieron una Escritura de Fideicomiso para crear un fideicomiso para mantener todos los fondos relacionados con el Fondo para el Agua Limpia en fideicomiso separados de los activos del ELA, sus agencias y organismos (el Fideicomiso del Fondo de Agua Limpia) y se firmó una Escritura de Fideicomiso, por y entre la PRIFA, el Departamento de Salud del ELA y el Banco Popular de Puerto Rico, como fideicomisario del Fondo de Agua Potable (el Fideicomiso del Agua Potable), para mantener todos los fondos relacionados con

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

el Fondo de Agua Potable en un fideicomiso separado de los activos del ELA, sus agencias y organismos (el Fondo de Agua Potable, y junto con el Fondo de Agua Limpia, los Fideicomisos SRF).

Durante el mes de febrero de 2019, el ELA transfirió la cantidad de $194.5 millones a los Fideicomisos SRF. Específicamente, se transfirieron aproximadamente $141.2 millones al Fondo de Agua Limpia y aproximadamente $53.3 millones al Fondo de Agua Potable. Estos fondos fueron transferidos a los Fideicomisos SRF para proteger la viabilidad futura de los Fondos Recurrentes del Estado para garantizar la asistencia continua a las comunidades con problemas críticos de infraestructura de agua y aguas residuales.

*Reducción en la calificación de los bonos*

El 2 de mayo de 2017, la calificación de Fitch sobre los bonos AAA se redujo a C de CC.

*(d)* **UPR**

El 1 de julio de 2015, Moody's redujo sus calificaciones de los bonos de ingresos de UPR de Caa3 a Ca, que luego redujo a una calificación C el 17 de octubre de 2017. Estas reducciones de calificación generalmente han seguido a cada reducción realizada en los bonos de obligación general del ELA y ciertos otros bonos de corporaciones públicas dada la dependencia significativa de la UPR de las asignaciones del ELA y su capacidad limitada para aumentar la matrícula y otros ingresos auxiliares suficientes para mitigar los recortes. En el momento de estas reducciones, la UPR dependía en gran medida del ELA para los ingresos operativos y del BGF para el apoyo de liquidez y gerencia financiera.

El 11 de mayo de 2016, la mayoría de los participantes del plan (96.9%) del Plan de Compensación Diferida de Atención Médica del Campus de Ciencias Médicas de la UPR recomendó la rescisión del Plan de Compensación Diferida de Atención Médica de UPR, que la junta de gobierno de la UPR ratificó. El 30 de junio de 2016, la Junta de Gobierno de la UPR ratificó la rescisión de Voya Institutional Trust Company como Fideicomisario del Fideicomiso del Plan de Compensación Diferida de Atención Médica de la UPR. Los miembros de la Junta de Gobierno de la UPR fueron designados como Fideicomisarios Sucesores de la Junta de Gobierno del Plan de Compensación Diferida de Atención Médica de la UPR. Además, la Junta de Gobierno de la UPR aprobó la disolución del Plan de Compensación Diferida de Atención Médica de la UPR y la distribución de los fondos diferidos a sus participantes. El 22 de agosto de 2016, Voya radicó una demanda en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico contra el Gobernador del ELA, la UPR y el Presidente de la UPR. La demanda solicita un alivio del Tribunal en relación con su administración del Fideicomiso a la luz de la crisis financiera en Puerto Rico y su efecto en la UPR. Específicamente, la demanda solicita un alivio declaratorio para la revisión judicial federal de los problemas derivados de PROMESA, los Acuerdos de Fideicomiso y otras leyes relevantes, a la luz de la condición financiera de la UPR y sus esfuerzos para distribuir todos los activos del plan. Voya aún no ha transferido los activos del plan a UPR hasta que se resuelva la demanda. El Tribunal de Distrito emitió una orden para suspender el caso hasta el 14 de diciembre de 2017 para dar a las partes la oportunidad de resolver la disputa por consenso. Para esa fecha, se ordenó a las partes que presentaran un informe de estado conjunto suplementario informando al tribunal sobre el estado de las negociaciones y las resoluciones propuestas sobre todas las mociones radicadas en el caso (tanto sustantivas como procesales).

El 30 de junio de 2016, la Junta de Gobierno de la UPR restableció el aumento anual por clase entrante (aumento de aproximadamente 2%) en el costo de la matrícula por crédito para el año académico 2016-2017.

El 30 de junio de 2016, el Gobernador de Puerto Rico firmó la Orden Ejecutiva Núm. 31 (EO 31) que declaró a la UPR en estado de emergencia de conformidad con la Ley Núm. 21. En cumplimiento de EO 31, la UPR

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

suspendió los pagos mensuales al fideicomisario del Acuerdo de Fideicomiso que rige los Bonos de Ingresos del Sistema de la UPR y los pagos mensuales del Acuerdo de Arrendamiento con "Desarrollos Universitarios Inc" (DUI) a partir de julio de 2016.

En julio de 2016, la UPR radicó la Escritura de Confirmación y Reconocimiento del Fideicomiso del Sistema de Retiro de la UPR donde la UPR (como Fideicomitente Original) y la Junta de Gobierno de la UPR (como Fideicomisario Original) confirmaron, reexpresaron y reconocieron el inicio del Plan de Pensión y su Fondo Fideicomisario de conformidad con las disposiciones de las leyes del ELA, específicamente, las disposiciones de la Ley Núm. 219 de 2012.

El 5 de agosto de 2016, el fideicomisario de los Bonos AFICA de DUI notificó a la UPR que no realizó el pago básico del arrendamiento al fideicomisario el 25 de julio de 2016 y que un incumplimiento en el contrato de arrendamiento con DUI constituye un evento de incumplimiento según los DUI Acuerdo de fideicomiso de bonos de AFICA. En este momento, el fideicomisario no buscó cobrar ni recuperar ningún endeudamiento de, hacer cumplir ninguna sentencia contra, u obtener la posesión, o ejercer control sobre, cualquier propiedad de ELA o cualquiera de sus organismos, incluidos el DUI y la UPR o ejercer cualquier acto suspendido por PROMESA, la Ley de Moratoria o cualquier Orden Ejecutiva relacionada con la misma.  Para obtener información adicional sobre la Ley de Moratoria, consulte la Nota 3 y la Nota 23. Alrededor de la fecha en que caducó la paralización del Título IV de PROMESA, el fideicomisario notificó nuevamente a la UPR que estaba en incumplimiento por no haber realizado los pagos de arrendamiento pendientes. Posteriormente, en mayo de 2017, la UPR realizó los pagos de arrendamiento pendientes y lo hace mensualmente desde ese momento. Como resultado, el acuerdo de arrendamiento y el Acuerdo de Fideicomiso de Bonos DUI AFICA no están en incumplimiento.

El 19 de agosto de 2016, la Asociación Nacional de Fideicomisos del Banco de los EE. UU., en su calidad de Fideicomisario para los Bonos de Ingresos del Sistema de la UPR, radicó una demanda civil ante el Tribunal de los Estados Unidos, el Distrito de Puerto Rico contra el ELA, el Gobernador, la UPR y el Presidente de la UPR. La moción solicitaba el alivio de la paralización del Título IV en virtud de PROMESA para reclamos relacionados con la Ley de Moratoria y las órdenes ejecutivas relacionadas con la misma, y un interdicto preliminar contra la desviación y expropiación de ingresos pignorados del ELA, que el fideicomisario alega que constituyen una garantía que respalda los bonos de ingresos del sistema de la UPR. El 1 de mayo de 2017, caducó el Título IV Paralización según PROMESA. Sin embargo, de conformidad con el Acuerdo de Suspensión (definido a continuación), la demanda no está actualmente activa.

El 29 de junio de 2017, el Fideicomisario de los Bonos de Ingresos del Sistema de la UPR celebró un acuerdo de suspensión (el Acuerdo de Suspensión) con la UPR, según el que la UPR acordó transferir a una cuenta segregada, en beneficio de los titulares de los bonos de ingresos ciertos montos con respecto a los ingresos pignorados con la condición de que durante el período cubierto del Acuerdo de Suspensión el fideicomisario no instituya, inicie o continúe ningún procedimiento legal contra la UPR, el ELA de Puerto Rico o cualquier otra agencia, organismo o municipio del mismo para exigir los derechos relacionados con los bonos de ingresos. Según el Acuerdo de suspensión inicial, que expiró el 31 de agosto de 2017, la UPR realizó dos pagos de $20 millones en una cuenta segregada. La UPR y el Fideicomisario acordaron extender el Acuerdo de Suspensión en varias ocasiones, y el período de suspensión actualmente vence el 31 de marzo de 2018. Durante el plazo en que el Acuerdo de suspensión permanezca vigente, la UPR acordó transferir $4 millones al mes (el monto aproximado requerido para cubrir los pagos del servicio de la deuda durante dicho período) a una cuenta segregada a cambio de que el acuerdo del fideicomisario no comience o continúe procedimiento legal relacionado con los bonos de ingresos. Los ingresos pignorados incluyen principalmente los aranceles de matrícula de los estudiantes.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

La UPR y la AAFAF proporcionarán al fideicomisario planes detallados y especificaciones para reparar, reemplazar o reconstruir su propiedad que fue dañada o destruida por el huracán María a medida que se aprueben estos planes. La UPR depositará todas las ganancias de las pólizas de seguro de accidentes en una cuenta separada y de ayuda federal directa (los Fondos de Reparación) en una o más cuentas separadas en un banco comercial para facilitar la auditoría del gasto de dichas cuentas. Todos los fondos de reparación en exceso de $1,000,000 se utilizarán de conformidad con una solicitud por escrito. La UPR presentará las solicitudes del mes anterior al fideicomisario en o antes del decimoquinto día calendario de cada mes. De conformidad con el acuerdo de carta extendida, los tenedores de bonos mayoritarios ampliaron su dirección para indicarle al fideicomisario que no llame a un incumplimiento durante la pendencia del nuevo Período de Cumplimiento si la UPR envía al fideicomisario copias de las solicitudes del mes anterior, como se establece anteriormente. La UPR y la AAFAF proporcionarán, o harán que las agencias relevantes proporcionen, al fideicomisario con todas las solicitudes de proyectos, avances u otros informes proporcionados por FEMA o cualquier compañía de seguros contra accidentes con respecto al gasto de los Fondos de Reparación durante el mes anterior.

El 23 de octubre de 2018, la Junta de Supervisión aprobó un plan fiscal revisado de la UPR. La UPR desempeña un papel esencial como motor de la isla para el desarrollo económico y laboral. En muchos sentidos, el futuro de Puerto Rico depende de una UPR vibrante y sostenible. El plan fiscal de la UPR devuelve el sistema a un modelo de "centro" de tres campus, por el cual se reduce la huella de los campus secundarios y se confía cada vez más en los servicios compartidos para reducir los gastos operativos. Asimismo, el plan fiscal de la UPR intenta minimizar el aumento de la matrícula y las tarifas que podrían poner en peligro la accesibilidad y el acceso a una educación superior de calidad en la isla. Lo hace maximizando primero las oportunidades para aumentar los ingresos de fuentes que no son de matrícula, tales como: (i) subvenciones y premios federales, (ii) propiedad intelectual y monetización de patentes, y (iii) tarifas de servicios auxiliares para proporcionar capacitación a instituciones externas.

*(e) Ciertos exámenes del Servicio de Ingresos Internos de los EE. UU.*

El Servicio de Ingresos Internos de los Estados Unidos (el "IRS") emitió varias cartas fechadas del 7 de febrero de 2019 al 28 de marzo de 2019 a la AEP, AEE, COFINA, MFA para informar que el IRS está realizando ciertas investigaciones. Las investigaciones están relacionadas con ciertos Formularios 8038-CP (devolución de pagos de crédito a emisores de bonos calificados, según lo define el IRS) y algunas emisiones de bonos.

La AEP, AEE, COFINA y MFA tienen la intención de responder a todas las correspondencias del IRS y tienen la intención de seguir cooperando con el IRS en relación con los exámenes mencionados anteriormente y están trabajando con sus representantes para responder a estos exámenes del IRS de manera oportuna.

**Consecuencias del Huracán María**

El 20 de septiembre de 2017, Puerto Rico se vio directamente afectado por el huracán María, dejando a su paso la destrucción de miles de hogares, cortando el suministro eléctrico en toda la isla e inundando muchas calles y caminos. Como resultado del impacto masivo del huracán, se han tomado una serie de acciones y eventos. Algunas de estas acciones, eventos y consideraciones se analizan en los párrafos siguientes.

El 20 de septiembre de 2017, el mismo día en que el huracán María tocó tierra en Puerto Rico, el Gobernador solicitó fondos de las categorías A y B del programa de asistencia pública de FEMA para abordar el estado de emergencia, que fueron aprobados de inmediato.  Poco después, el Gobernador solicitó fondos de las categorías C a G del programa de asistencia pública de FEMA, que son las categorías que se ocupan de proyectos de infraestructura permanente como carreteras, puentes, infraestructura de electricidad y agua, edificios públicos, parques y espacios de recreación.

328

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

Después del procesamiento de FEMA de las solicitudes de financiamiento de las categorías C a G, el 1 de noviembre de 2017, el Presidente de los EE. UU. aprobó el uso de dichos fondos para proyectos permanentes el 1 de noviembre de 2017. Al hacerlo, la participación federal en estos fondos también aumentó del 75% al 90%, dado el gran desastre causado por el huracán María en Puerto Rico.

El 21 de septiembre de 2017, de conformidad con su autoridad según PROMESA y la sección 3 de las resoluciones del presupuesto del año fiscal 2018, la Junta de Supervisión anunció su aprobación para que el ELA reasigne hasta $1,000 millones de su presupuesto para el año fiscal 2018 que se utilizarán para fondos de emergencia después del huracán María.

El 23 de octubre de 2017, el Gobernador emitió la orden ejecutiva EO 2017 065, para crear la Oficina Central de Recuperación y Reconstrucción de Puerto Rico (CRRO) de conformidad con la Ley Núm. 211 de 1999, la Ley Núm. 5 de 2017 y la Ley Núm. 20 de 2017. La CRRO se crea como una división dentro de la Autoridad de Asociaciones Público Privadas (Autoridad P3) con el propósito de (i) identificar, obtener y administrar recursos para invertir en la recuperación de Puerto Rico, (ii) coordinar y canalizar los esfuerzos del ELA en relación con la recuperación de Puerto Rico, (iii) financiamiento, ejecución o ejecución de obras y proyectos de infraestructura relacionados con la recuperación de Puerto Rico, y (iv) asesorar al Gobernador y proporcionar asistencia técnica y asesoramiento a otras entidades gubernamentales con respecto a cualquier asunto relacionado a la recuperación de Puerto Rico. El 10 de noviembre de 2017, el Gobernador emitió la orden ejecutiva EO 2017 069, que modificó EO 2017 065.

El 26 de octubre de 2017, el Presidente de los Estados Unidos promulgó la Ley de Asignaciones Adicionales para los Requisitos de Socorro en Desastres de 2017, que proporciona $36.5 mil millones de fondos de socorro en casos de desastre para Texas, Florida, Puerto Rico y las Islas Vírgenes de los Estados Unidos (USVI) relacionadas al daño de los huracanes Harvey, Irma y María. La ley incluyó $4,900 millones en préstamos directos de asistencia por desastre para mantener la liquidez para Puerto Rico y las Islas Vírgenes de los Estados Unidos. Se espera que Puerto Rico reciba una mayoría sustancial de estos préstamos, y que USVI reciba solo entre $200 millones y $400 millones.

El 8 de noviembre de 2017, el Gobernador emitió la orden ejecutiva EO 2017 066 de conformidad con su autoridad en virtud de la Ley Núm. 5 de 2017. EO 2017 066 delega los poderes de liquidación de bienes del Gobernador bajo la Sección 206 (a) de la Ley Núm. 5 de 2017 a AAFAF para que pueda actuar como síndico de la división de adquisiciones de la AEE y cualquier otra división u oficina cuyas obligaciones afecten los procesos de adquisición de bienes y servicios de la AEE para supervisar y reformar los procesos de adquisición. EO 2017 066 también creó dentro de la AEE la Oficina de Cumplimiento de Contratos y Adquisiciones, que depende de la AAFAF.

El 8 de noviembre de 2017, el Gobernador también emitió la orden ejecutiva EO 2017 068, que estableció un reembolso del 10% para ciertas pequeñas y medianas empresas en sus declaraciones de impuestos sobre las ventas y el uso desde agosto de 2017 hasta noviembre de 2017.

El 27 de noviembre de 2017, el Gobernador anunció una serie de controles que se impondrán en la administración de fondos federales para los proyectos de infraestructura a largo plazo necesarios después de los huracanes Irma y María, y que el ELA espera alcanzar los $94,400 millones solicitados por el Gobernador el 14 de noviembre de 2017 al Congreso de los Estados Unidos. Además de la creación de la CRRO mencionada anteriormente, otra medida de control sería el papel que desempeñará FEMA. Además de la supervisión sobre el uso del dinero federal, FEMA preautorizará cada proyecto de trabajo permanente para que antes de su inicio, el ELA pueda estar seguro de que recibirá fondos federales para ayudar a pagarlo. Para proyectos de reconstrucción de infraestructura a largo plazo, el ELA utilizará la sección 428 de la Ley Stafford, que proporciona cierta flexibilidad en los requisitos para obtener la cantidad máxima de fondos federales para estos esfuerzos. Por ejemplo, según esa sección, presentada después de la Supertormenta Sandy, el gobierno estatal no está obligado a reconstruir exactamente al estado previo al desastre,

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2016

como lo requiere el proceso de FEMA según la sección 406. En esencia, la sección 428 permitiría al ELA realizar mejoras en la infraestructura existente sin perder el acceso a la cantidad máxima de fondos federales que podría obtener a través del reembolso. Actualmente, el gobierno federal de los Estados Unidos cubrirá hasta el 90% del costo de los proyectos de trabajo permanente, mientras que el resto debe provenir de los fondos del gobierno local. En virtud de la sección 428, tanto el ELA como la FEMA analizarán el daño por separado y, si hay algún desacuerdo, un tercero validará una sola estimación de daños.  Sin estas evaluaciones, la FEMA no podrá desembolsar fondos para pagar el proyecto respectivo.

El 9 de febrero de 2018, el Congreso de los EE. UU. aprobó y el Presidente de los EE. UU. firmó una enmienda de la Ley de Asignaciones Continuas de 2018 para proporcionar asignaciones continuas para el año fiscal 2018 a la mayoría de las agencias federales hasta el 23 de marzo de 2018. La Ley de Asignaciones Continuas asigna asignaciones presupuestarias adicionales de aproximadamente $15,000 millones al Cuerpo de Ingenieros de los EE. UU. para las gastos necesarios para abordar proyectos de situaciones de emergencia y para construir, rehabilitar y reparar daños causados por desastres naturales. Del monto total de $15,000 millones, no menos de $10,400 millones estarán disponibles para tales proyectos dentro de los estados y áreas insulares que fueron impactados por los huracanes Harvey, Irma y María y todas las reparaciones, rehabilitación, estudio, diseño y construcción de los proyectos del Cuerpo de Ingenieros de los EE. UU. en Puerto Rico y las Islas Vírgenes de los Estados Unidos se llevarán a cabo con fondos federales. Además, asigna aproximadamente $28,000 millones al Fondo de Desarrollo de la Comunidad para cubrir los gastos necesarios relacionados con el socorro en casos de desastre, la recuperación a largo plazo, la restauración de infraestructura y vivienda, la revitalización económica y la mitigación en las áreas más afectadas y angustiadas como resultado de un desastre mayor declarado eso ocurrió en 2017; de los montos disponibles bajo esta disposición, no menos de $11,000 millones se asignarán a los estados y unidades del gobierno local afectados por el huracán María, y de esos montos asignados a dichos beneficiarios afectados por el huracán María, se usarán $2,000 millones para proporcionar sistemas de energía eléctrica mejorados o actualizados. Además, la asignación presupuestaria incluye $4,800 millones en fondos de Medicaid para Puerto Rico, $39 millones para actividades de Aduanas y Protección Fronteriza en el año fiscal 2018 en Puerto Rico y las Islas Vírgenes de los Estados Unidos, $30.9 millones para construcción, rehabilitación y adquisición de Centros de Cuerpos de Trabajo en Puerto Rico, $64 millones para reparar las instalaciones del Servicio de Inmigración y Control de Aduanas (ICE) en Puerto Rico, USVI, Texas y Florida, $1,370 millones para el Programa de Recuperación de Emergencia de la Administración Federal de Carreteras del cual Puerto Rico recibirá una contribución federal del 100 por ciento para reparar los daños causados por los huracanes Irma y María, $14 millones para el Programa Especial de Nutrición Suplementaria para Mujeres, Bebés y Niños (conocido como PAN en español) para subvenciones de infraestructura a Puerto Rico y las Islas Vírgenes de EE. UU. para ayudar en la reparación y restauración de edificios, equipos, tecnología y otras infraestructuras dañadas como consecuencia de los huracanes Irma y María y $24 millones para el Programa de Asistencia de Productos Básicos para el programa de asistencia alimentaria de emergencia para cubrir los gastos necesarios relacionados con las consecuencias de los huracanes Harvey, Irma y María o debido a incendios forestales en 2017.

# INFORMACIÓN ADICIONAL REQUERIDA

**ELA DE PUERTO RICO**

Información Adicional Requerida (No Auditada):

Esquema de Cambios en el Pasivo Neto de Pensiones para Planes de Pensión de un Solo

Empleador - SRM (importes en miles)

El esquema de cambios en los pasivos de pensiones netos para planes de pensión de un solo empleador presenta los cambios en la responsabilidad de pensión neta para el Sistema de Anualidades y Pensiones para Maestros (SRM) al 30 de junio de 2016:

| | | SRM | | |
|---|---|---|---|---|
| | | **2016** | **2015** | **2014** |
| Total de pasivos de pensiones: | | | | |
| Costo de servicio | $ | 294,692 | 273,754 | 354,159 |
| Interés | | 648,407. | 637,849 | 690,742 |
| Cambios en los términos de beneficios | | — | — | (599,560) |
| Diferencias entre la experiencia esperada y anual | | 43,202. | 88,544 | 169,851 |
| Cambios en los supuestos | | 1,621,712. | 1,235,988 | 83,560 |
| Pagos de beneficios, que incluyen el reembolso de contribuciones | | (750,172) | (736,107) | (683,698) |
| Cambio neto en los pasivos totales de pensiones | | 1,857,841 | 1,500,028 | 15,054 |
| Pasivos totales de pensiones - inicial | | 16,307,731 | 14,807,703 | 14,792,649 |
| Pasivos totales de pensiones - final (a) | | 18,165,572 | 16,307,731 | 14,807,703 |
| Resultados netos fiduciarios del plan: | | | | |
| Contribuciones - patrons, neto de provisión | | 213,724 | 194,541 | 189,367 |
| Contribuciones - empleados participantes | | 99,557 | 105,120 | 115,461 |
| Contribuciones - transferencias | | 1,804 | 2,345 | 4,131 |
| Ingresos por inversión neta | | 45,060 | 59,921 | 190,023 |
| Otros ingresos | | 1,350 | 1,057 | 1,416 |
| Pagos de beneficios, que incluyen las contribuciones de los miembros | | (751,245) | (736,300) | (683,698) |
| Gastos administrativos | | (22,568) | (19,382) | (19,803) |
| Pérdida de créditos en custodia en depósitos mantenidos en el BGF | | (3,308) | — | — |
| Cambios netos en los resultados netos fiduciarios del plan | | (415,626) | (392,698) | (203,103) |
| Resultados netos fiduciarios del plan - inicial | | 1,311,081 | 1,703,779 | 1,906,882 |
| Resultados netos fiduciarios del plan - final (b) | | 895,455 | 1,311,081 | 1,703,779 |
| Pasivos de pensiones netos del empleador - final (a)-(b) | $ | 17,270,117 | 14,996,650 | 13,103,924 |
| Resultados netos fiduciarios como porcentaje de los pasivos totales de pensiones | | 4.93% | 8.04% | 11.51% |
| Nómina de empleados cubiertos | $ | 1,101,896 | 1,127,500 | 1,171,154 |
| Pasivos de pensiones netos del empleador como porcentaje de su nómina de empleados cubiertos | | 1,567.31% | 1,330.08% | 1,118.89% |

Notas:

La obligación de pensión neta del ELA al 30 de junio de 2016 se midió al 30 de junio de 2015, y los pasivos totales de pensiones utilizados para calcular el pasivo neto por pensiones se determinó mediante una valoración actuarial con datos del censo de inicio de año al 1 de julio de 2014 que se actualizó para adelantar el pasivo total por pensiones al 30 de junio de 2015 y suponiendo que no haya ganancias ni pérdidas. Debido a la gran actividad de retiro en el SRM durante el año fiscal 2013-2014, se reflejaron 2,234 retiros informados.

Los esquemas están destinados a mostrar información durante diez años. Se mostrarán años adicionales a medida que estén disponibles.

Consulte las notas adjuntas a la información complementaria requerida y el informe de los auditores independientes.

**ELA DE PUERTO RICO**

Información Adicional Requerida (No Auditada):

Esquema de Cambios en los Pasivos Netos de Pensiones para Planes de Pensión de un Solo

Empleador - SRM (importes en miles)

El esquema de cambios en los pasivos de pensiones netos para planes de pensión de un solo empleador presenta los cambios en los pasivos de pensiones netos para el Sistema de Retiro de la Judicatura del ELA de Puerto Rico (SRJ) al 30 de junio de 2016:

| | | SRJ | |
|---|---|---|---|
| | **2016** | **2015** | **2014** |
| Total de pasivos de pensiones: | | | |
| Costo de servicio | $ 19,155 | 16,375 | 16,764 |
| Interés | 22,630 | 21,861 | 22,620 |
| Cambios en los términos de beneficios | — | — | — |
| Diferencias entre la experiencia esperada y anual | (3,064) | (4,670) | (1,658) |
| Cambios en los supuestos | 51,960 | 72,805 | 7,601 |
| Pagos de beneficios, que incluyen el reembolso de contribuciones | (24,327) | (23,134) | (22,667) |
| Cambio neto en los pasivos totales de pensiones | 66,354 | 83,237 | 22,660 |
| Pasivos totales de pensiones - inicial | 583,012 | 502,075 | 481,715 |
| Pasivos totales de pensiones - final (a) | 649,366 | 585,312 | 504,375 |
| Resultados netos fiduciarios del plan: | | | |
| Contribuciones - patronos, neto de provisión | 15,223 | 12,337 | 11,992 |
| Contribuciones – empleados participantes | 3,190 | 3,676 | 3,804 |
| Contribuciones – transferencias | — | — | — |
| Ingresos por inversión neta | | | 9,713 |
| | 1,751 | 899 | |
| Otros ingresos | — | 873 | 59 |
| Pagos de beneficios, que incluyen las contribuciones de los miembros | (24,560) | (23,134) | (22,667) |
| Gastos administrativos | (946) | (546) | (2,150) |
| Cambios netos en los resultados netos fiduciarios del plan | (5,342) | (5,895) | 751 |
| Resultados netos fiduciarios del plan - inicial | 40,172 | 46,067 | 45,316 |
| Resultados netos fiduciarios del plan - final (b) | 34,830 | 40,172 | 46,067 |
| Pasivos de pensiones netos del patrono - final (a)-(b) | $ 614,536 | 545,140 | 458,308 |
| Resultados netos fiduciarios como porcentaje de los pasivos totales de pensiones | 5.36% | 6.86% | 9.17% |
| Nómina de empleados cubiertos | $ 32,204 | 31,917 | 31,707 |
| Pasivos de pensiones netos del patrono como porcentaje de su nómina de empleados cubiertos | 1,908.26% | 1,707.99% | 1,438.19% |

Consulte las notas adjuntas a la información complementaria requerida y el informe de los auditores independientes.

**ELA DE PUERTO RICO**

Información complementaria requerida (sin auditar)

Esquema de la parte proporcional de los pasivos de pensiones netos de un plan de pensiones de patronos múltiples para costos compartidos – SER

(Cantidades en miles)

El siguiente Anexo de la Parte Proporcional de los Pasivos de Pensiones Netos presenta la parte proporcional de los montos de pensión del ELA sobre el Sistema de Retiro de los Empleados del ELA de Puerto Rico (SRE), un Plan de Pensión de Costos Compartidos para Patronos Múltiples, al 30 de junio de 2016:

| | | SRE | |
| --- | --- | --- | --- |
| | | **2016** | **2015** |
| Proporción del pasivo de pensiones netos del ELA | | 65.87% | 64.74% |
| Participación proporcional del ELA en los pasivos de pensiones netos | $ | 21,960,015 | 19,512,798 |
| Nómina de empleados cubiertos del ELA | | 2,186,540 | 2,258,946 |
| Participación proporcional del ELA en los pasivo de pensiones netos como porcentaje de su nómina de empleados cubiertos | | 1.000,32% | 864,00% |
| Resultados netos fiduciarios como porcentaje de los pasivos totales de pensiones | | (2.05) | 0.27 |

Notas:

La obligación de pensión neta del ELA al 30 de junio de 2016 se midió al 30 de junio de 2015, y los pasivos totales de pensiones utilizados para calcular el pasivo neto por pensiones se determinó mediante una valoración actuarial con datos del censo de inicio de año al 1 de julio de 2014 que se actualizó para adelantar el pasivo total por pensiones al 30 de junio de 2015 y suponiendo que no haya ganancias ni pérdidas.

Los esquemas están destinados a mostrar información durante diez años. Se mostrarán años adicionales a medida que estén disponibles.

Consulte las notas adjuntas a la información complementaria requerida y el informe de los auditores independientes.

**ELA DE PUERTO RICO**

Información complementaria requerida (sin auditar)

Lista de contribuciones de los patronos para todos los planes de pensiones

(Cantidades en miles)

| | | 2016 (fecha de medición 30 de junio de 2015) | 2015 (fecha de medición 30 de junio de 2014) |
|---|---|---|---|
| **SRE:** | | | |
| Contribuciones requeridas legalmente | $ | 535,664 | 492,972 |
| Contribuciones (a) | | 460,659 | 415,933 |
| Deficiencia de contribución | $ | 75,005 | 77,039 |
| Nómina de empleados cubiertos (b) | $ | 2,244,829 | 2,307,688 |
| Contribuciones como porcentaje de la nómina de empleados cubiertos (a)/(b) | | 20.52% | 18.02% |
| **SRM:** | | | |
| Contribuciones requeridas legalmente | $ | 194,541 | 189,367 |
| Contribuciones (a) | | 194,541 | 189,367 |
| Deficiencia de contribución | $ | — | — |
| Nómina de empleados cubiertos (b) | $ | 1,127,500 | 1,171,154 |
| Contribuciones como porcentaje de la nómina de empleados cubiertos (a)/(b) | | 17.25% | 16.17% |
| **SRJ:** | | | |
| Contribuciones requeridas legalmente | $ | 24,437 | 23,592 |
| Contribuciones (a) | | 12,337 | 11,992 |
| Deficiencia de contribución | $ | 12,100 | 11,600 |
| Nómina de empleados cubiertos (b) | $ | 31,917 | 31,707 |
| Contribuciones como porcentaje de la nómina de empleados cubiertos (a)/(b) | | 38.65% | 37.82% |

Notas:

El requisito de contribución a cada sistema de retiro está establecido por ley y no se determina actuarialmente.

Los esquemas están destinados a mostrar información durante diez años. Se mostrarán años adicionales a medida que estén disponibles.

Consulte las notas adjuntas a la información complementaria requerida y el informe de los auditores independientes.

**ELA DE PUERTO RICO**

Información Adicional Requerida (No Auditada):

Esquema de Progreso de los Fondos para los Planes de Salud Posteriores al Empleo

El Programa de Progreso de Financiamiento para los Planes de Atención Médica Posterior al Empleo del ELA presenta los resultados de las valoraciones distintas a las prestaciones de pensiones posteriores al empleo (OPEB) de los últimos ocho años. El esquema proporciona una tendencia de información de ocho años sobre si los valores actuariales de los activos del plan aumentan o disminuyen con el tiempo en relación con los pasivos actuariales acumulados por los beneficios. Toda la información determinada actuarialmente se ha calculado de acuerdo con los supuestos actuariales y los métodos reflejados en las valoraciones actuariales a la fecha de valoración actuarial indicada.

**SRE:**

| Fecha actuarial de Valuación (1) | Valor actuarial de los pasivos | Pasivos actuariales devengados (AAL) | Pasivos actuariales devengados sin fondos (UAAL) | Relación de fondos | Nómina cubierta | UAAL como porcentaje de la nómina cubierta |
|---|---|---|---|---|---|---|
| 30 de junio de 2016 | $ — | 1,349,503 | 1,349,503 | —% $ | 3,344,382 | 40% |
| 30 de junio de 2015 | — | 1,428,788 | 1,428,788 | — | 3,319,280 | 43% |
| 30 de junio de 2014 | — | 1,438,475 | 1,438,475 | — | 3,489,096 | 41 |
| 30 de junio de 2013 | — | 1,482,879 | 1,482,879 | — | 3,489,096 | 43 |
| 30 de junio de 2012 | — | 2,120,970 | 2,120,970 | — | 3,570,339 | 59 |
| 30 de junio de 2011 | — | 1,758,389 | 1,758,389 | — | 3,666,402 | 48 |
| 30 de junio de 2010 | — | 1,699,373 | 1,699,373 | — | 3,818,332 | 45 |
| 30 de junio de 2009 | — | 1,633,159 | 1,633,159 | — | 4,292,552 | 38 |
| 30 de junio de 2008 | — | N/D | N/D | — | N/D | N/D |

**SRM:**

| Fecha actuarial de Valuación (1) | Valor actuarial de los pasivos | Pasivos actuariales devengados (AAL) | Pasivos actuariales devengados sin fondos (UAAL) | Relación de fondos | Nómina cubierta | UAAL como porcentaje de la nómina cubierta |
|---|---|---|---|---|---|---|
| 30 de junio de 2016 | $ — | 523,300 | 523,300 | —% | 1,101,896 | 48% |
| 30 de junio de 2015 | — | 548,518 | 548,518 | — | 1,127,500 | 49% |
| 30 de junio de 2014 | — | 543,205 | 543,205 | — | 1,171,154 | 46 |
| 30 de junio de 2013 | — | 792,875 | 792,875 | — | 1,248,674 | 64 |
| 30 de junio de 2012 | — | 797,332 | 797,332 | — | 1,292,975 | 62 |
| 30 de junio de 2011 | — | 706,069 | 706,069 | — | 1,320,400 | 54 |
| 30 de junio de 2010 | — | 694,230 | 694,230 | — | 1,370,344 | 51 |
| 30 de junio de 2009 | — | 750,382 | 750,382 | — | 1,418,304 | 53 |
| 30 de junio de 2008 | — | N/D | N/D | — | N/D | N/D |

**SRJ:**

| Fecha actuarial de Valuación (1) | Valor actuarial de los pasivos | Pasivos actuariales devengados (AAL) | Pasivos actuariales devengados sin fondos (UAAL) | Relación de fondos | Nómina cubierta | UAAL como porcentaje de la nómina cubierta |
|---|---|---|---|---|---|---|
| 30 de junio de 2016 | $ — | 6,985 | 6,985 | —% | 32,204 | 22% |
| 30 de junio de 2015 | — | 6,917 | 6,917 | — | 31,917 | 22% |
| 30 de junio de 2014 | — | 6,540 | 6,540 | — | 31,707 | 21 |
| 30 de junio de 2013 | — | 6,705 | 6,705 | — | 32,138 | 21 |
| 30 de junio de 2012 | — | 6,592 | 6,592 | — | 33,066 | 20 |
| 30 de junio de 2011 | — | 5,810 | 5,810 | — | 31,811 | 18 |
| 30 de junio de 2010 | — | 5,808 | 5,808 | — | 32,061 | 18 |
| 30 de junio de 2009 | — | 5,643 | 5,643 | — | 30,587 | 19 |
| 30 de junio de 2008 | — | N/D | N/D | — | N/D | N/D |

N/D=No determinado.

(1) El estado financiado por OPEB del Sistema al 30 de junio de 2016 y 2015 se determinó mediante la valoración actuarial al comienzo del año que se actualizó para adelantar el estado de financiamiento al 30 de junio de 2016 y 2015 y suponiendo que no haya ganancias o pérdidas por pasivos. Las valoraciones actuariales del año anterior se realizaron utilizando datos del censo de fin de año.

Consulte las notas adjuntas a la información complementaria requerida y el informe de los auditores independientes.

**ELA DE PUERTO RICO**

Información Adicional Requerida (No Auditada):

Esquema de Progreso de los Fondos para los Planes de Salud Posteriores al Empleo

El esquema de contribuciones de los patronos para los Planes de atención médica posterior al empleo del ELA proporciona información sobre las contribuciones anuales requeridas (ARC) para OPEB y la medida en que las contribuciones se hicieron para cubrir el ARC para OPEB durante los últimos ocho años. La ARC es la contribución anual requerida para el año calculada de acuerdo con ciertos parámetros, que incluyen métodos actuariales y supuestos.

| | SRE | | SRM | | SRJ | |
|---|---|---|---|---|---|---|
| Año fiscal finalizado (1) | Contribución anual requerida | Porcentaje aportado | Contribución anual requerida | Porcentaje aportado | Contribución anual requerida | Porcentaje aportado |
| 30 de junio de 2016 | 107,739 | 87% | 38,049 | 100% | 923 | 34% |
| 30 de junio de 2015 | 103,878 | 94 | 36,292 | 104 | 847 | 36 |
| 30 de junio de 2014 | 88,508 | 115 | 46,403 | 77 | 684 | 44 |
| 30 de junio de 2013 | 154,999 | 59 | 45,669 | 75 | 643 | 45 |
| 30 de junio de 2012 | 133,654 | 71 | 41,069 | 84 | 554 | 53 |
| 30 de junio de 2011 | 129,395 | 73 | 39,925 | 84 | 529 | 48 |
| 30 de junio de 2010 | 128,294 | 69 | 42,487 | 71 | 488 | 52 |
| 30 de junio de 2009 | 111,683 | 77 | 38,015 | 77 | 425 | 55 |
| 30 de junio de 2008 | 110,650 | 72 | 36,836 | 77 | 408 | 55 |

(1) El estado financiado por OPEB del Sistema al 30 de junio de 2016 y 2015 se determinó mediante la valoración actuarial al comienzo del año que se actualizó para adelantar el estado de financiamiento al 30 de junio de 2016 y 2015 y suponiendo que no haya ganancias o pérdidas por pasivos. Las valoraciones actuariales del año anterior se realizaron utilizando datos del censo de fin de año.

Consulte las notas adjuntas a la información complementaria requerida y el informe de los auditores independientes.

**ELA DE PUERTO RICO**

Información complementaria requerida - Programa de ingresos

y gastos no auditados - Presupuesto y real -

Base presupuestaria - Fondo general

Año terminado el 30 de junio de 2016

(En miles)

| | Presupuesto original | Presupuesto modificado | Real |
|---|---|---|---|
| Ingresos: | | | |
| Impuestos sobre la renta | $ 4,791,000 | 4,617,000 | 4,486,543 |
| Impuestos a la ventas y el uso | 1,738,000 | 1,566,000 | 1,545,210 |
| Impuestos a las ventas | 2,695,000 | 2,553,000 | 2,613,568 |
| Impuestos a la propiedad | 5,000 | 10,000 | 11,305 |
| Otros impuestos | 24,000 | 23,000 | 20,870 |
| Cargos por servicios | 104,000 | 93,000 | 90,399 |
| Ingresos de unidades de componentes | 22,000 | 17,000 | 20,922 |
| Intergubernamental | 186,000 | 198,000 | 201,152 |
| Otros | 97,000 | 71,000 | 29,806 |
| Ingresos totales | 9,662,000 | 9,148,000 | 9,019,775 |
| Gastos - corriente: | | | |
| Gobierno General | 1,334,724 | 1,092,766 | 1,158,835 |
| Seguridad pública | 1,980,324 | 1,951,119 | 1,904,186 |
| Salud | 1,341,970 | 1,330,939 | 1,315,911 |
| Vivienda pública y bienestar | 452,172 | 436,743 | 443,888 |
| Educación | 2,976,379 | 2,955,585 | 2,760,968 |
| Desarrollo económico | 336,621 | 207,938 | 199,329 |
| Intergubernamental | 366,600 | 365,700 | 510,661 |
| Gastos totales | 8,788,790 | 8,340,790 | 8,293,778 |
| Excedente de ingresos sobre gastos | 873,210 | 807,210 | 725,997 |
| Otras fuentes de financiamiento (usos): | | | |
| Transferencia desde el Fondo de Loterías | 138,000 | 144,000 | 124,121 |
| Transferencia para servicios de la deuda | (1,011,210) | (951,210) | (286,507) |
| Total de otras fuentes de financiamiento | (873,210) | (807,210) | (162,386) |
| Exceso de ingresos y otras fuentes de financiamiento. sobre gastos y otros usos de financiamiento $ | — | — | 563,611 |

Consulte las notas adjuntas a la información complementaria requerida y el informe de los auditores independientes.

**ELA DE PUERTO RICO**

Notas a la información complementaria requerida (sin auditar)

30 de junio de 2016

**(1) Esquema del progreso de financiamiento**

El esquema del progreso del financiamiento proporciona información sobre el estado financiado de los Planes de atención médica posteriores al empleo y el progreso realizado en la acumulación de activos suficientes para pagar los beneficios cuando vencen. La información se obtuvo del último informe actuarial al 30 de junio de 2016.

**(2) Lista de contribuciones de los patronos**

El esquema de las contribuciones de los patronos proporciona información sobre las contribuciones anuales requeridas (ARC) y la medida en que las contribuciones se hicieron para cubrir la ARC. La ARC es la contribución anual requerida para el año calculada de acuerdo con ciertos parámetros, que incluyen métodos actuariales y supuestos.

El esquema de las contribuciones de los patronos de los Sistemas de Retiro y los Planes de Atención Médica Posterior al Empleo incluye las contribuciones del ELA y de los empleados participantes porque, en última instancia, las contribuciones del ELA deberían cubrir cualquier deficiencia entre las contribuciones de los empleados participantes, los beneficios de pensión y los costos de administración de los Sistemas de Retiro

La información se obtuvo del último informe actuarial al 30 de junio de 2016.

**(3) Cambios de términos y supuestos de beneficios**

*(a) SRE:*

Para los fines de la valoración actuarial de 2016 del SRE, la escala de mejora de mortalidad proyectada se actualizó de la Escala AA a la Escala MP-2015, que fue publicada por la Sociedad de Actuarios en octubre de 2015. Además, como la Escala MP-2015 es una escala bidimensional de mejora de la mortalidad, las tasas de mortalidad base para el supuesto de mortalidad posterior al retiro jubilación se establecieron en las tasas de 2010, el año central del estudio de experiencia del SRE de 2007 a 2012 en el que se establecieron las tasas.

El supuesto de retorno de la inversión refleja una disminución de 6.75% por año a 6.55% por año. El supuesto del 6.55% refleja la asignación de activos para la porción de la cartera que no es de préstamo que fue adoptada por el SRE durante el 31 de diciembre de 2013 y los supuestos del mercado de capitales al 30 de junio de 2015. Tenga en cuenta que este nuevo supuesto de tasa de interés del 6.55% por año es igual al servicio de la deuda más alto de los Bonos de Obligación de Pensión del SRE. La deuda de los Bonos de Obligación de Pensión oscila entre 5.85% y 6.55%. Además, el supuesto refleja que los préstamos a los miembros comprenden aproximadamente el 20% de la cartera y tienen un rendimiento aproximado del 9.1% sin volatilidad.

*(b) SRJ:*

Las tasas de mortalidad antes del retiro se actualizaron de las Tasas de mortalidad de empleados RP 2000 a las Tasas de mortalidad de empleados RP 2014 (ambas con ajustes de empleados administrativos), que fueron publicadas por la Sociedad de Actuarios en octubre de 2014. Las tasas de mortalidad antes del retiro se actualizaron de las Tasas de mortalidad de empleados RP 2000 a las Tasas de mortalidad de empleados RP 2014 (ambas con ajustes de empleados administrativos), que fueron publicadas por la Sociedad de actuarios en octubre de 2014. Las tasas de mortalidad por discapacidad se actualizaron a partir de las Tasas de mortalidad de personas discapacitadas con discapacidad del RP 2000, publicadas por la Sociedad de Actuarios en octubre de 2014.

**ELA DE PUERTO RICO**

Notas a la información complementaria requerida (sin auditar)

30 de junio de 2016

Para los miembros activos y miembros retirados sanos, la escala proyectada de mejora de la mortalidad se actualizó de la Escala MP-2015 a la Escala MP 2016, publicada por la Sociedad de Actuarios en octubre de 2016. La mejora de la mortalidad proyectada se implementó para los miembros retirados discapacitados utilizando la Escala MP 2016.

El supuesto de retorno de la inversión se incrementó de 5.50% por año en el año fiscal 2015 a 5.70% por año en el año fiscal 2016. En consecuencia, el rendimiento de la inversión asumido en la cuenta de contribución del programa de contribuciones híbridas y contribuciones definidas (80% del supuesto de rendimiento de inversión neto) se incrementó de 4.40% por año en el año fiscal 2015 a 4.56% por año en el año fiscal 2016.

*(c)* SRM:

Para los fines de la valoración actuarial, la fecha de recopilación del censo se modificó al comienzo del año fiscal, en lugar de al final del año fiscal. Por lo tanto, la ganancia/pérdida demográfica durante el año se limita a la actualización de los datos del censo para reflejar una actividad de retiro desmesurada durante el año, más la diferencia entre los pagos de beneficios reales y esperados, que surgen de las diferencias en la actividad de retiro y también la mortalidad real frente a las expectativas. Durante el año fiscal 2016, estas diferencias resultaron en una pérdida de $43 millones.

La valoración refleja un supuesto de retorno de la inversión del 5.85% al 30 de junio de 2016. En virtud de las Declaraciones GASB Núm. 25 y Núm. 27, el supuesto de retorno de la inversión se utilizó para descontar todos los Beneficios de pensión del sistema básico proyectados y los Beneficios de pensión administrados del sistema para determinar los pasivos actuariales devengados.

El índice seleccionado para el Sistema es el índice de bonos municipales del Bono 20 de Obligaciones generales del comprador de bonos. La tasa del índice disminuyó de 3.80% al 30 de junio de 2015 a 2.85% al 30 de junio de 2016. Por lo tanto, las tasas de descuento utilizadas para determinar las contribuciones anuales requeridas y el pasivo total por pensiones disminuyeron de 3.82% al 30 de junio de 2015 a 2.86% al 30 de junio de 2016, de acuerdo con la Declaración GASB Núm. 67.

**(4) Control presupuestario**

El Gobernador tiene la obligación constitucional de presentar a la Legislatura un presupuesto anual equilibrado del ELA para el año fiscal subsiguiente. El presupuesto anual es preparado por la Oficina de Administración y Presupuesto del ELA (OGP del ELA) y considera el asesoramiento brindado por la Junta de Planificación de Puerto Rico (pronósticos de crecimiento económico anual y plan de mejoras de capital a cuatro años), el Departamento de Hacienda del ELA (estimados de ingresos, registros contables y el informe financiero anual completo), el BGF (el agente fiscal) y otras oficinas y agencias gubernamentales. La Sección 7 del Artículo VI de la Constitución de Puerto Rico establece que "las asignaciones realizadas cualquier año fiscal no excederán los ingresos totales, incluido el excedente disponible, estimado para dicho año fiscal, a menos que la imposición de impuestos sea suficiente para cubrir dichas asignaciones está previsto por la ley".

El presupuesto anual, que se desarrolla utilizando elementos del presupuesto del programa, incluye una estimación de ingresos y otros recursos para el año fiscal siguiente en: (i) las leyes existentes en el momento en que se presenta el presupuesto y (ii) las medidas legislativas propuestas por el Gobernador y presentadas con el presupuesto propuesto, así como las recomendaciones del Gobernador en cuanto a las asignaciones que a su juicio son necesarias, convenientes y conformes con el plan de cuatro años de mejoras de capital adoptado por la Junta de Planificación de Puerto Rico

**ELA DE PUERTO RICO**

Notas a la información complementaria requerida (sin auditar)

30 de junio de 2016

La Legislatura puede enmendar el presupuesto presentado por el Gobernador pero no puede aumentar ninguna partida para causar un déficit sin imponer impuestos o identificar otras fuentes de ingresos para cubrir dicho déficit. Una vez aprobado por la Legislatura, el presupuesto se remite al Gobernador, quien puede disminuir o eliminar cualquier línea de pedido pero no puede aumentar o insertar ninguna línea de pedido nueva en el presupuesto. El Gobernador también puede vetar el presupuesto en su totalidad y devolverlo a la Legislatura con sus objeciones. La Legislatura, por mayoría de dos tercios en cada cámara, puede anular el veto del Gobernador. Si no se adopta un presupuesto antes del final del año fiscal, el presupuesto anual para el año fiscal anterior, según lo aprobado por la Legislatura y el Gobernador, se renueva automáticamente para el año fiscal siguiente hasta que la Legislatura apruebe un nuevo presupuesto y el Gobernador Esto permite que el ELA continúe realizando pagos por sus gastos operativos y otros hasta que se apruebe el nuevo presupuesto. El presupuesto anual apropiado para el año fiscal 2016 (incluidos otros usos de financiamiento) ascendió a aproximadamente $9,800 millones, incluidas varias asignaciones presupuestarias especiales al Fondo General realizadas por la Legislatura durante todo el año que ascendieron a aproximadamente a $5.6 billones.

La OGP del ELA tiene autoridad para enmendar el presupuesto dentro de un departamento, agencia o unidad gubernamental sin aprobación legislativa.

Para fines presupuestarios, se utiliza la contabilidad de gravámenes. Los gravámenes (es decir, órdenes de compra y contratos) se consideran gastos cuando se establece un compromiso. Por los fines de la presentación de informes GAAP de los EE. UU., los gravámenes pendientes al final del año se informan dentro de las clasificaciones de balance de fondos restringidos, comprometidos, asignados y no asignados y no constituyen gastos o pasivos según los GAAP de los EE. UU. porque los compromisos se cumplirán durante el año siguiente. El balance no gravado de cualquier apropiación del Fondo General al final del año fiscal caduca inmediatamente. Las asignaciones, que no sean del Fondo General, son cuentas continuas para las cuales la Legislatura ha autorizado que un balance no gastado del año anterior se transfiera y esté disponible para gastos corrientes. Asimismo, para fines presupuestarios, los ingresos se registran cuando se recibe efectivo.

Durante cualquier año fiscal en el que los recursos disponibles para el ELA sean insuficientes para cubrir las asignaciones aprobadas para dicho año, el Gobernador puede tomar medidas administrativas para reducir los gastos y presentar a ambas cámaras de la Legislatura un informe detallado de cualquier ajuste necesario para equilibrar el presupuesto, o hacer recomendaciones a la Legislatura para nuevos impuestos o autorizar préstamos bajo las disposiciones de la legislación vigente o tomar cualquier otra medida necesaria para cubrir la deficiencia estimada. Cualquier ajuste propuesto debe dar efecto a las "normas de prioridad" establecidas por ley para el desembolso de fondos públicos en el siguiente orden de prioridad: (i) el pago de los requisitos de intereses y amortización de la deuda pública (obligaciones generales del ELA y deuda garantizada para la cual se ha ejercido la garantía del ELA); (ii) el cumplimiento de las obligaciones derivadas de contratos legalmente vinculantes, decisiones judiciales sobre el dominio eminente y otras obligaciones inevitables para proteger el nombre, el crédito y la plena fe del ELA; (iii) gastos corrientes en las áreas de salud, protección de personas y propiedad, educación, bienestar y sistemas de retiro; y (iv) todos los demás fines.

Además, la Legislatura puede ordenar que ciertos ingresos se retengan y estén disponibles para gastos dentro de una cuenta de apropiación específica. En general, los gastos no pueden exceder el nivel de gasto autorizado para un departamento individual. Sin embargo, el ELA está legalmente obligado al servicio de la deuda, independientemente de si tales cantidades son asignadas. Se consignan asignaciones para ciertos departamentos, agencias y unidades gubernamentales incluidas en el Fondo General.

**ELA DE PUERTO RICO**

Notas a la información complementaria requerida (sin auditar)

30 de junio de 2016

Para estos fondos, se incluye un cronograma de ingresos y gastos - presupuesto y base presupuestaria real - Fondo general. Las asignaciones para proyectos de capital se hacen para cada emisión de bonos y la autorización continúa para el período de construcción esperado.

La OGP del ELA tiene la responsabilidad de garantizar que el control del gasto presupuestario se mantenga por departamento individual. La OGP puede transferir parte o la totalidad de cualquier balance no gravado dentro de un departamento a otro departamento sujeto a aprobación legislativa. El control presupuestario se ejerce a través del Sistema Integrado de Contabilidad Financiera de Puerto Rico (PRIFAS). El PRIFAS asegura que los gravámenes o gastos no se procesen si exceden la autorización de gasto total disponible del departamento, que se considera su presupuesto. El nivel legal de control presupuestario es a nivel de departamento individual para gastos del Fondo General, capital e intereses adeudados para el año para el fondo de servicio de la deuda, y mediante autorización de bonos para gastos de capital.

No obstante lo anterior, la promulgación de PROMESA (como se analiza en la Nota 3) creó una Junta de Supervisión con el poder de revisar y aprobar los presupuestos del ELA y sus organismos. Según PROMESA, la Junta de Supervisión debe certificar un plan fiscal para cada entidad cubierta antes de que el ELA pueda proponer cualquier presupuesto para el año fiscal. Todos los presupuestos propuestos después de la promulgación de PROMESA deben ser certificados por la Junta de Supervisión como consistentes con el plan fiscal certificado aplicable. Para obtener información adicional sobre el proceso de certificación presupuestaria según PROMESA, consulte la Nota 3.

**(5) Contabilidad estatutaria (presupuestaria)**

El presupuesto del ELA se adopta de acuerdo con una base legal de contabilidad, que no está de acuerdo con las GAAP de los EE. UU. Los ingresos generalmente se reconocen cuando se recibe efectivo. Los ingresos tributarios sobre la renta se reducen por la cantidad de reembolsos del impuesto sobre la renta pagados durante el año y reclamados pero no pagados al final del año. Los préstamos a corto y largo plazo pueden utilizarse para financiar el exceso presupuestario de los gastos sobre los ingresos. Los gastos generalmente se registran cuando se incurre o grava el gasto relacionado. Los gravámenes generalmente caducan el año siguiente al final del año fiscal en que se estableció el gravamen, según lo establecido por la Ley Núm. 123 del 17 de agosto de 2001. Las asignaciones sin gravámenes caducan al final del año. Los montos requeridos para resolver reclamos y juicios contra el ELA y otros pasivos determinados no se reconocen hasta que se gravan o se procesen para el pago.

Según la base legal de la contabilidad, el ELA utiliza la contabilidad de gravámenes para registrar la cantidad total de órdenes de compra, contratos y otros compromisos de recursos asignados como deducciones de la asignación antes del gasto real. En los fondos gubernamentales, la contabilidad de gravámenes es un aspecto importante del control presupuestario.

El esquema de ingresos y gastos - presupuesto y real - base presupuestaria - Fondo General solo presenta la información para el Fondo General para la que existe un presupuesto legalmente adoptado, según lo requerido por GAAP de EE. UU. Para una conciliación del estado de ingresos y gastos - presupuesto y actual - base presupuestaria - Fondo General con el estado de ingresos, gastos y cambios en los balances(déficit) del fondo general, consulte la Nota 6 a la información complementaria requerida. Los fondos de ingresos especiales no tienen un presupuesto legalmente obligatorio.

**ELA DE PUERTO RICO**

Notas a la información complementaria requerida (sin auditar)

30 de junio de 2016

**(6) Reconciliación entre el presupuesto/GAAP de los EE. UU.**

El esquema siguiente presenta comparaciones del presupuesto legalmente adoptado con datos reales sobre una base presupuestaria. Debido a que los principios contables aplicados con el propósito de desarrollar datos sobre una base presupuestaria difieren significativamente de los utilizados para presentar los estados financieros de conformidad con los las GAAP de los EE. UU., una conciliación de la entidad, el momento y las diferencias básicas en el exceso (deficiencia) de ingresos y otras fuentes de financiamiento sobre los gastos y otros usos de financiamiento para el año terminado el 30 de junio de 2016 se presenta a continuación para el Fondo General (en miles):

| | |
|---|---:|
| Exceso de ingresos y otras fuentes de financiamiento bajo gastos y otros usos de financiamiento - base presupuestaria | $ 563,611 |
| Diferencias de entidad - exceso de ingresos y otras fuentes de financiamiento sobre gastos y otros usos de financiamiento para: | |
| Fondos no presupuestados | 839,475 |
| Inclusión de agencias con tesorerías independientes | (23,094) |
| Diferencias de tiempo: | |
| Ajuste por gravámenes | 176,132 |
| Gastos del año actual contra gravámenes del año anterior | (229,196) |
| Base de las diferencias contables: | |
| Ajuste devengado de ingresos | 432,295 |
| Ajustes de gastos devengados | (629,967) |
| Deficiencia de ingresos y otras fuentes de financiamiento bajo gastos y otros usos de financiamiento - GAAP de EE. UU. | $ 1,129,256 |

Ver el informe de los auditores independientes adjunto.

# ESTADOS FINANCIEROS Y ESQUEMAS DE FONDOS COMBINADOS E INDIVIDUALES

**ELA DE PUERTO RICO**

Fondo General

Año finalizado el 30 de junio de 2016

(En miles)

El Fondo General es el principal fondo operativo del ELA. El Fondo General se utiliza para contabilizar e informar todos los recursos financieros recibidos y utilizados para aquellos servicios tradicionalmente proporcionados por un gobierno, que no están obligados legalmente o por una buena gestión financiera a contabilizarse en otro fondo. Se incluyen transacciones de servicios como gobierno general, seguridad pública, salud, vivienda pública y bienestar, educación y desarrollo económico. A continuación, se incluye el cronograma suplementario de gastos - presupuesto y real - Fondo General (base presupuestaria).

**ELA DE PUERTO RICO**

Esquema Adicional de Gastos por Agencia – Presupuesto y Base

Presupuestaria Real – Fondo General

Año finalizado el 30 de junio de 2016

(En miles)

| | Presupuesto original | Presupuesto enmendado | Real |
|---|---|---|---|
| Gastos - corrientes: | | | |
| Gobierno general | | | |
| Senado de Puerto Rico | $ 40,204 | 40,204 | 40,204 |
| Cámara de Representantes de Puerto Rico | 47,646 | 47,665 | 47,665 |
| Oficina del Contralor | 39,690 | 39,690 | 39,690 |
| Oficina del Gobernador | 18,147 | 18,518 | 17,799 |
| Oficina de Administración y Presupuesto (1) | 119,917 | 119,510 | 44,259 |
| Junta de Planificación | 15,458 | 15,055 | 11,803 |
| Departamento de Estado | 5,276 | 5,328 | 5,937 |
| Departamento de Hacienda (1) | 492,553 | 261,060 | 425,422 |
| Oficina Central de Administración de Personal | 3,778 | 3,632 | 3,727 |
| Comisión de Elecciones del ELA | 53,741 | 50,841 | 49,993 |
| Administración de Asuntos Federales | 4,064 | 4,048 | 4,083 |
| Administración de Servicios Generales | 5,360 | 2,426 | 144 |
| Comisión Municipal de Vistas de Demandas | 10,179 | 9,945 | 10,451 |
| Comisión de Derechos Civiles | 1,089 | 1,089 | 1,191 |
| Oficina del Defensor del Ciudadano | 4,000 | 4,000 | 4,544 |
| Junta de Ética del Gobierno | 9,278 | 9,278 | 9,278 |
| Oficina de Asuntos Legislativos | 19,508 | 17,545 | 17,545 |
| Oficina del Superintendente del Capitolio | 18,854 | 15,513 | 17,513 |
| Comisión Conjunta de Informes Especiales de la Oficina del Contralor | 662 | 662 | 636 |
| Comisión de Donación Legislativa | 1,307 | 1,161 | 1,272 |
| Corporación "Enlace" Caño Martín Peña | 1,333 | 1,281 | 1,314 |
| Instituto de Estadística de Puerto Rico | 2,739 | 2,521 | 2,555 |
| Oficina de Gerencia de Permisos | 5,582 | 5,311 | 6,634 |
| Sistema de Retiro de Empleados del ELA de Puerto Rico | 304,633 | 304,633 | 282,669 |
| Sistema de Anualidades y Pensiones para Maestros de Puerto Rico | 102,586 | 102,586 | 102,586 |
| Contribuciones a partidos políticos | — | 2,400 | 2,400 |
| Autoridad de Edificios Públicos | 300 | 165 | 44 |
| Oficina del Contralor de Elecciones | 3,574 | 3,574 | 4,344 |
| Junta de Apelaciones de la Administración del Sistema de Personal | 3,266 | 3,125 | 3,133 |
| Total Gobierno General | 1,334,724 | 1,092,766 | 1,158,835 |
| Seguridad Pública: | | | |
| Tribunal General de Justicia de Puerto Rico | 322,967 | 322,967 | 315,109 |
| Defensa Civil | 10,517 | 9,462 | 7,013 |
| Comisión de la Junta de Investigación, Procesamiento y Apelaciones | 450 | 436 | 421 |
| Departamento de Justicia | 142,377 | 136,945 | 119,251 |
| Departamento de Policía de Puerto Rico | 825,838 | 810,604 | 789,704 |
| Cuerpo de Bomberos de Puerto Rico | 65,794 | 64,378 | 63,997 |
| Guardia Nacional de Puerto Rico | 11,901 | 11,518 | 11,753 |
| Comisión de Servicio Público | 5,464 | 5,283 | 5,118 |
| Departamento de Asuntos del Consumidor | 9,588 | 9,363 | 7,395 |
| Administración de Recursos Naturales | 33,215 | 31,913 | 29,556 |
| Oficina del Bosque Modelo | 55 | 55 | 500 |
| Departamento de Corrección y Rehabilitación | 433,870 | 425,794 | 432,907 |
| Junta de Libertad Condicional | 2,355 | 2,278 | 2,367 |
| Instituto de Ciencias Forenses | 17,861 | 17,391 | 18,904 |
| Panel de Fiscales Especiales | 2,614 | 2,614 | 2,604 |
| Salud Correccional | 72,616 | 75,988 | 72,739 |
| Servicio de Emergencias Médicas | 22,842 | 24,130 | 24,848 |
| Total Seguridad Pública | 1,980,324 | 1,951,119 | 1,904,186 |

344                                                                                      (Continuación)

**ELA DE PUERTO RICO**

Esquema Adicional de Gastos por Agencia – Presupuesto y Base

Presupuestaria Real – Fondo General

Año finalizado el 30 de junio de 2016

(En miles)

| | Presupuesto original | Presupuesto enmendado | Real |
|---|---|---|---|
| Salud: | | | |
| Junta de Calidad Ambiental | $ 8,454 | 8,203 | 7,850 |
| Departamento de Salud | 280,514 | 268,076 | 256,130 |
| Fondo de Administración de Servicios Médicos de Puerto Rico | 27,536 | 27,536 | 27,288 |
| Administración de Servicios de Salud Mental y Drogadicción | 90,981 | 99,381 | 95,127 |
| Autoridad de Depósitos Sólidos de Puerto Rico | 4,453 | 4,380 | 6,370 |
| Administración del Seguro de Salud de Puerto Rico | 892,690 | 892,487 | 892,270 |
| Centro Comprensivo de Cáncer de la Universidad de Puerto Rico | 37,342 | 30,876 | 30,876 |
| | 1,341,970 | 1,330,939 | 1,315,911 |
| Vivienda y Bienestar Público: | | | |
| Oficina de Asuntos de la Juventud | — | — | 1,512 |
| Departamento del Trabajo y Recursos Humanos | 13,714 | 12,369 | 18,147 |
| Junta de Relaciones Laborales | 832 | 807 | 801 |
| Departamento de Vivienda | 20,458 | 19,113 | 19,766 |
| Departamento de Recreación y Deportes | 54,870 | 51,910 | 55,253 |
| Administración para el Deporte e Industria de las Carreras de Caballos | 1,841 | 2,206 | 2,227 |
| Comisión de Asuntos de la Mujer | 4,846 | 3,616 | 3,691 |
| Administración de Vivienda Pública | 500 | 450 | 450 |
| Oficina del Defensor de los Veteranos | 2,545 | 2,367 | 2,718 |
| Departamento de Familia | 38,277 | 37,578 | 32,463 |
| Administración de Familias y Niños | 181,607 | 183,057 | 188,306 |
| Administración de Apoyo a Menores | 13,277 | 12,807 | 12,597 |
| Administración de Rehabilitación Vocacional | 17,782 | 16,708 | 16,234 |
| Administración de Desarrollo Económico Social | 75,138 | 68,091 | 64,541 |
| Oficina del Defensor de Personas con Discapacidades | 1,708 | 1,597 | 1,590 |
| Oficina de Asuntos de la Tercera Edad | 2,976 | 2,771 | 2,401 |
| Compañía para el Desarrollo Integral de la "Península de Cantera" | 813 | 784 | 484 |
| Defensor del Paciente | 2,882 | 2,766 | 2,160 |
| Administración para el Cuidado y Desarrollo de la Infancia | 14,084 | 13,945 | 15,466 |
| Fideicomiso de Comunidades Especiales | 4,022 | 3,801 | 3,081 |
| | 452,172 | 436,743 | 443,888 |
| Educación: | | | |
| Departamento de Educación | 2,030,425 | 2,023,875 | 1,823,731 |
| Instituto de Cultura Puertorriqueña | 21,109 | 18,420 | 19,767 |
| Escuela de Artes Plásticas de Puerto Rico | 2,375 | 2,309 | 2,225 |
| Oficina Estatal de Preservación Histórica | 1,690 | 1,648 | 2,008 |
| Universidad de Puerto Rico | 873,477 | 869,696 | 869,696 |
| Corporación para las Artes Musicales | 7,572 | 7,160 | 7,334 |
| Corporación del Centro de Bellas Artes | 4,032 | 3,785 | 4,878 |
| Corporación de Puerto Rico para la Difusión Pública | 11,352 | 10,869 | 12,530 |
| Ateneo de Puerto Rico | 350 | 271 | 271 |
| Corporación del Conservatorio de Música de Puerto Rico | 6,464 | 6,212 | 7,188 |
| Consejo de Educación de Puerto Rico | 17,533 | 11,340 | 11,340 |
| | 2,976,379 | 2,955,585 | 2,760,968 |

(Continuaci

**ELA DE PUERTO RICO**

Esquema Adicional de Gastos por Agencia – Presupuesto y Base

Presupuestaria Real – Fondo General

Año finalizado el 30 de junio de 2016

(En miles)

| | Presupuesto original | Presupuesto enmendado | Real |
|---|---|---|---|
| Desarrollo Económico | | | |
| Departamento de Transporte y Obras Públicas | $ 65,727 | 63,925 | 63,459 |
| Departamento de Recursos Naturales y Ambientales | 5,019 | 4,321 | 5,623 |
| Departamento de Agricultura | 14,877 | 15,621 | 14,605 |
| Administración de Desarrollo de Empresas Cooperativas | 2,773 | 2,548 | 2,075 |
| Departamento de Desarrollo Económico y Comercio | 5,876 | 4,623 | 4,666 |
| Administración para el Desarrollo de Empresas Agropecuarias | 82,651 | 71,494 | 67,145 |
| Administración de Asuntos Energéticos | 1,000 | 961 | 922 |
| Autoridad para el Financiamiento de la Infraestructura de Puerto Rico | 117,000 | 4,000 | 4,000 |
| Autoridad de Transporte Integrado de Puerto Rico | 34,000 | 34,000 | 29,000 |
| Administración de Tierras de Puerto Rico | 500 | 225 | 325 |
| Centro de Diabetes de Puerto Rico | 500 | 450 | 225 |
| Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico | 250 | 250 | — |
| Autoridad Metropolitana de Autobuses de Puerto Rico | — | — | 260 |
| Autoridad de Asociación Pública de Puerto Rico | 4,300 | 3,490 | 990 |
| Compañía de Turismo de Puerto Rico | 275 | 275 | 275 |
| Autoridad de Conservación y Desarrollo de Culebra | 281 | 270 | 274 |
| Autoridad de Puertos de las Américas | 300 | 270 | 270 |
| Autoridad de Reurbanización Local de las Tierras e Instalaciones de la Estación Naval Roosevelt Roads | 1,292 | 1,215 | 1,215 |
| Autoridad de Transporte Marítimo de Puerto Rico | — | — | 4,000 |
| Total Desarrollo Económico | 336,621 | 207,938 | 199,329 |
| Intergubernamental - Administración de Servicios Municipales | 366,600 | 365,700 | 510,661 |
| Gastos totales | $ 8,788,790 | 8,340,790 | 8,293,778 |
| Transferencia operativa a otros fondos: | | | |
| Departamento de Hacienda - transferencia al Fondo del Servicio de la Deuda y otros fondos | $ 1,011,210 | 951,210 | 286,507 |

(1) Como departamento y agente fiscal.

Ver el informe de los auditores independientes adjunto.

**ELA DE PUERTO RICO**

Fondos gubernamentales no mayores

Año finalizado el 30 de junio de 2016

**Fondos de ingresos especiales**

Los fondos de ingresos especiales se utilizan para contabilizar e informar los ingresos de fuentes de ingresos específicos que están restringidos o comprometidos a gastos para fines específicos distintos al servicio de la deuda o proyectos de capital. Otros recursos (ganancias de inversión y transferencias de otros fondos, por ejemplo) también pueden informarse en el fondo si esos recursos están restringidos, comprometidos o asignados al propósito especificado del fondo.

*(1) Fondo de Ingresos Especiales de la Autoridad de Edificios Públicos*

El fondo operativo de la Autoridad de Edificios Públicos, una unidad de componentes combinados, utilizada para contabilizar la operación, mantenimiento, reemplazo de equipos y otros costos extraordinarios de operación y mantenimiento de los edificios e instalaciones que, cuando se construyen, se arriendan a agencias del Gobierno Primario del ELA.

*(2) Fondo de Ingresos Especiales de la Autoridad de Financiamiento de la Infraestructura de Puerto Rico*

El fondo especial de ingresos de la Autoridad de Financiamiento de la Infraestructura de Puerto Rico, una unidad de componentes combinados, se utiliza para contabilizar principalmente el dinero recibido por el ELA, hasta $117 millones, de ciertos impuestos especiales federales gravados sobre el ron y otros artículos producidos en Puerto Rico y vendido en los Estados Unidos, que son recaudados por el Tesoro de los Estados Unidos y devueltos al ELA. Según la Ley Núm. 44 del 21 de junio de 1988, según enmienda, el ELA asigna condicionalmente a este fondo los primeros $117 millones de estos impuestos federales reembolsables, que posteriormente se transfieren al Fondo de Servicio de la Deuda de la Autoridad de Financiamiento de la Infraestructura de Puerto Rico para proporcionar servicio de la deuda de sus bonos fiscales especiales. Este fondo especial de ingresos también recibe fondos ARRA para el programa de climatización destinado a convertir ciertos edificios del gobierno en lugares ecológicos.

*(3) Fondo de Ingresos Especiales de la Autoridad del Puerto de las Américas*

El fondo especial de ingresos de la Autoridad del Puerto de las Américas, una unidad de componentes combinados, se utiliza para dar cuenta de los requisitos legales y otros requisitos administrativos restantes que resultan de la transferencia de todos los derechos y deberes a la PPA El objetivo principal de la PAA fue la planificación, desarrollo y construcción de una terminal de contenedores a gran escala en la ciudad de Ponce, Puerto Rico.

*(4) Fondo de ingresos especiales del Fideicomiso perpetuo de comunidades especiales*

El fondo de ingresos especiales del Fideicomiso perpetuo de comunidades especiales, una unidad de componentes combinados, se utiliza para contabilizar el dinero recibido del Banco de Desarrollo del Gobierno, a través de una línea de financiamiento crediticio y contribuciones en efectivo, al inicio del Fideicomiso perpetuo de comunidades especiales. Los recursos financieros recibidos por este fondo se utilizan para llevar a cabo proyectos de desarrollo que abordan las necesidades de infraestructura y vivienda de ciertas comunidades desfavorecidas.

*(5) Fondo de ingresos especiales del Fideicomiso de los Niños*

El fondo de ingresos especiales del Fideicomiso de los Niños, una unidad de componentes combinados, se utiliza para contabilizar el dinero recibido por el ELA de un acuerdo de conciliación global de fecha 23 de noviembre de 1998 entre ciertas compañías tabacaleras y ciertos estados, territorios y otras jurisdicciones de los Estados Unidos de América, incluido el ELA. Los recursos financieros recibidos por este fondo se utilizan para llevar a cabo proyectos destinados a promover el bienestar de los niños y jóvenes de Puerto Rico.

**ELA DE PUERTO RICO**

Fondos gubernamentales no mayores

Año finalizado el 30 de junio de 2016

**(6)** *Fondo de Ingresos Especiales del Centro Comprensivo de Cáncer de la Universidad de Puerto Rico*

El fondo especial de ingresos de la UPRCCC, una unidad de componentes combinados, se utiliza para contabilizar el dinero recibido del ELA y ciertas otras subvenciones tanto del sector privado como del gobierno federal, para ejecutar políticas públicas relacionadas con la prevención, orientación e investigación. y tratamiento del cáncer en Puerto Rico.

**Fondo de Servicio de la Deuda**

Los fondos de servicio de la deuda se utilizan para contabilizar e informar recursos financieros que están restringidos, comprometidos o asignados a gastos de capital e intereses, y costos relacionados que no sean bonos pagaderos de operaciones de tipos de fondos de propiedad exclusiva, fondos fiduciarios de pensiones y unidades de componentes de presentación discreta. La deuda e intereses a largo plazo con vencimiento el 1 de julio del año siguiente se contabilizan como un pasivo del fondo si los recursos están disponibles al 30 de junio para su pago.

**(1)** *Fondo de Servicio de la Deuda de la Autoridad de Edificios Públicos*

Una unidad de componentes combinados dedicada a la construcción o adquisición de instalaciones de edificios para arrendar principalmente a las agencias del gobierno primario del ELA. Su fondo de servicio de la deuda se utiliza para contabilizar los recursos financieros que están restringidos, comprometidos o asignados a gastos para el pago de bonos de ingresos y otros pasivos incurridos para financiar la construcción de los edificios e instalaciones.

**(2)** *Fondo de Servicios de la Deuda de la Autoridad de Financiamiento de la Infraestructura de Puerto Rico*

El fondo de servicio de la deuda de la Autoridad de Financiamiento de la Infraestructura de Puerto Rico representa los recursos financieros que están restringidos a los gastos para el pago de intereses y capital en sus bonos especiales de ingresos fiscales. Estos recursos se reciben de transferencias operativas del Fondo de Ingresos Especiales de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico.

**(3)** *Fondo de Servicios de la Deuda de la Autoridad del Puerto de las Américas*

El fondo de servicio de la deuda de la Autoridad del Puerto de las Américas se utiliza para contabilizar los recursos financieros que están restringidos para el pago de la deuda a largo plazo que quedó en la PAA después de la transferencia de sus operaciones a la PPA. Este fondo está subsidiado principalmente por asignaciones y transferencias operativas del Fondo General.

**(4)** *Fondo de Servicio de la Deuda de la Autoridad Marítima de Puerto Rico*

Este es el resto de una antigua compañía naviera propiedad del ELA. Su fondo de servicio de la deuda se utiliza para contabilizar los recursos financieros que están restringidos para el pago de pasivos a largo plazo resultantes de la venta de sus operaciones marítimas. Este fondo está subsidiado principalmente por asignaciones y transferencias operativas del Fondo General.

**(5)** *Fondo de Servicios de la Deuda del Fideicomiso Perpetuo de Comunidades Especiales*

El fondo de servicio de la deuda del Fideicomiso Perpetuo de las Comunidades Especiales representa los recursos financieros que están restringidos a gastos para el pago de intereses y capital en su línea de crédito con el BGF, financiados con dinero que recibirá el ELA de las asignaciones legislativas generales.

**ELA DE PUERTO RICO**

Fondos gubernamentales no mayores

Año finalizado el 30 de junio de 2016

**(6)** *Fondo de Servicios de la Deuda del Fideicomiso de los Niños*

El fondo de servicio de la deuda del Fideicomiso de los Niños representa los recursos financieros que están restringidos, comprometidos o asignados a gastos para el pago de intereses y capital sobre obligaciones a largo plazo financiadas con dinero que recibirá el ELA del acuerdo de conciliación global firmado por ciertas compañías tabacaleras.

**Fondos de proyectos de capital**

Los fondos de proyectos de capital se utilizan para contabilizar e informar recursos financieros que están restringidos, comprometidos o asignados a gastos para desembolsos de capital, incluida la adquisición o construcción de instalaciones de capital y otros activos de capital que no están financiados por el Fondo de Proyectos de Capital de la Autoridad de Edificios Públicos, el Fondo para Proyectos de Capital de la Autoridad de Financiamiento de la Infraestructura de Puerto Rico, fondos de propiedad exclusiva, fondos fiduciarios de pensiones y unidades de componentes de presentación discreta.

**(1)** *Fondo de Proyectos de Capital del Estado Libre Asociado de Puerto Rico*

Estos fondos presentan las actividades del programa de mejoras de capital del ELA, financiado con el producto de los bonos de obligación general.

**(2)** *Fondo de Pago de la Deuda de la Autoridad de Edificios Públicos*

El fondo de proyectos de capital de la Autoridad de Edificios Públicos se utiliza para contabilizar e informar recursos financieros que están restringidos, comprometidos o asignados a gastos para desembolsos de capital, incluida la adquisición o construcción de instalaciones de capital y otros activos de capital no financiados por fondos de propiedad exclusiva, fondos fiduciarios de pensiones y unidades de componentes de presentación.

**(3)** *Fondo de Ingresos Especiales de la Autoridad de Financiamiento de la Infraestructura de Puerto Rico*

El fondo de proyectos de capital de la Autoridad de Financiamiento de la Infraestructura de Puerto Rico se utiliza para contabilizar e informar recursos financieros que están restringidos, comprometidos o asignados para la adquisición o construcción de activos de capital y mejoras de capital, no financiados por fondos de propiedad exclusiva, fondos fiduciarios de pensiones y unidades de componentes de presentación discreta.

**ELA DE PUERTO RICO**

Balance general combinado - Fondos gubernamentales mayores

30 de junio de 2016

(En miles)

| | Autoridad de Edificios Públicos | Autoridad para el Financiamiento de la Infraestructura de Puerto Rico | Autoridad del Puerto de las Américas | Ingresos especiales: Fideicomiso perpetuo de comunidades especiales | Fideicomiso de los Niños | Centro Autoridad para el financiamiento del Cáncer de la Universidad de Puerto Rico | Autoridad de Edificios Públicos | Autoridad para el Financiamiento de la Infraestructura de Puerto Rico | Servicio de la deuda: Autoridad de Transporte Marítimo de Puerto Rico | Autoridad del Puerto de las Américas | Fideicomiso perpetuo de comunidades especiales | Fideicomiso de los Niños | ELA de Puerto Rico | Proyectos de capital: Autoridad de Edificios Públicos | Autoridad para el Financiamiento de la Infraestructura de Puerto Rico | Total de fondos gubernamentales mayores |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Activos:** | | | | | | | | | | | | | | | | |
| Efectivo y equivalentes de efectivo en bancos comerciales | $ 11,699 | 1,609 | — | — | — | 18,592 | — | — | — | — | — | — | 440 | — | — | 32,340 |
| Efectivo y equivalentes de efectivo en bancos gubernamentales | — | 1,547 | — | — | 277 | — | — | — | 102 | — | — | — | — | — | — | 1,926 |
| Inversiones | — | — | — | — | 14,425 | — | — | — | — | — | — | — | — | — | — | 14,425 |
| Cuentas por cobrar - neto: | | | | | | | | | | | | | | | | |
| Intergubernamental | — | — | — | — | — | 682 | — | — | — | — | — | — | — | — | 1,832 | 2,514 |
| Cuentas | — | 1,462 | — | — | — | 953 | — | — | — | — | — | — | 671 | — | — | 3,086 |
| Préstamos | — | — | — | — | — | — | — | — | — | — | — | — | 39 | — | — | 39 |
| Interés acumulado | — | — | — | — | 1 | — | — | — | — | — | — | — | — | — | — | 1 |
| Otras | 2,451 | 387 | — | — | — | 234 | — | — | — | — | — | 36,765 | — | — | — | 39,837 |
| Adeudados de: | | | | | | | | | | | | | | | | |
| Otros fondos | — | — | — | — | — | — | — | — | — | — | — | — | — | — | 5,739 | 5,739 |
| Unidades de componentes | 5,876 | — | — | — | — | — | — | — | — | — | — | — | — | — | 4,371 | 10,247 |
| Otras entidades gubernamentales | — | 2,039 | — | 1,076 | — | — | — | — | — | — | — | — | — | — | 948 | 4,063 |
| Otros activos | 1,010 | — | — | 5 | — | 22 | — | — | — | — | — | — | — | — | — | 1,037 |
| Activos restringidos: | | | | | | | | | | | | | | | | |
| Efectivo y equivalentes de efectivo en bancos comerciales | — | — | — | 5 | — | 384 | 167,232 | 12,990 | — | — | — | — | 20,538 | 23,904 | 35,204 | 260,257 |
| Efectivo y equivalentes de efectivo en bancos gubernamentales | — | 603 | — | 2,484 | — | 207 | — | — | 37 | — | — | — | — | — | 1,901 | 5,232 |
| Equivalentes de efectivo en PRGITF | — | — | — | — | — | — | — | — | — | — | — | — | 51,899 | — | — | 51,899 |
| Inversiones | — | — | — | — | — | — | — | 3,139 | — | — | — | 109,380 | — | — | 628 | 113,147 |
| Adeudado de otros fondos | — | 140,176 | — | — | — | — | — | — | — | — | — | — | — | — | — | 140,178 |
| Otros | — | — | — | — | — | — | — | — | — | — | — | — | 457 | — | — | 457 |
| Total de activos | $ 21,036 | 147,825 | — | 3,570 | 14,703 | 21,074 | 167,232 | 16,129 | 139 | — | — | 146,602 | 75,441 | 23,904 | 50,623 | 688,278 |
| **Pasivos, salida diferida de recursos y balance de fondos (déficit):** | | | | | | | | | | | | | | | | |
| Cuentas por pagar y pasivos acumulados adeudados a: | $ 7,845 | 12,845 | 429 | 21,666 | 305 | 25,535 | — | — | 49 | — | — | — | 7,832 | 14,807 | 43,936 | 135,249 |
| Otros fondos | 2,527 | — | 3,996 | — | — | — | — | — | — | — | — | — | — | — | — | 6,523 |
| Unidades de componentes | 7,817 | — | — | — | — | 2,433 | — | — | — | — | — | — | — | — | — | 10,250 |
| Otras entidades gubernamentales | 2,664 | — | 12 | 88 | — | — | — | — | — | — | — | — | — | — | 3,213 | 5,977 |
| Pagarés adeudados al BGF | — | — | 1,700 | — | — | — | — | — | — | — | — | — | — | — | — | 1,700 |
| Intereses de bonos de obligaciones generales y bonos de ingreso a pagar | — | — | — | — | — | — | 60,862 | — | — | — | — | — | — | — | — | 60,862 |
| Ingresos no devengados | — | — | — | — | — | — | 100,866 | 35,920 | 6,837 | — | — | — | — | — | — | 143,623 |
| Total pasivos | 2,665 | — | — | — | — | — | — | — | — | — | — | — | — | — | — | 2,665 |
| Entrada diferida de recursos: | 23,518 | 12,845 | 6,137 | 21,754 | 305 | 27,968 | 161,718 | 35,920 | 6,886 | — | — | — | 7,832 | 18,020 | 43,936 | 366,830 |
| Total entrada diferida de recursos | — | — | — | — | — | — | — | — | — | — | — | 36,765 | — | — | — | 36,765 |
| Acuerdo diferido de liquidación de tabaco: | — | — | — | — | — | — | — | — | — | — | — | 36,765 | — | — | — | 36,765 |
| Balance de fondos: | | | | | | | | | | | | | | | | |
| Restringido para: | | | | | | | | | | | | | | | | |
| Servicio de la deuda | — | — | — | — | — | — | 5,514 | — | — | — | — | 109,837 | — | — | — | 115,351 |
| Proyectos de capital | — | 134,980 | — | — | — | — | — | — | — | — | — | — | 67,609 | 5,884 | 6,687 | 215,160 |
| Comprometido a: | | | | | | | | | | | | | | | | |
| Vivienda y bienestar público | — | — | — | — | 25,487 | — | — | — | — | — | — | — | — | — | — | 25,487 |
| Proyectos de capital | — | — | — | — | — | 591 | — | — | — | — | — | — | — | — | — | 591 |
| Asignado a: | | | | | | | | | | | | | | | | |
| Vivienda y bienestar público | | | | | | | | | | | | | | | | |
| Proyectos de capital | — | — | — | — | 2,851 | — | — | — | — | — | — | — | — | — | — | 2,851 |
| No asignado (déficit) | — | — | — | — | — | 1,161 | — | — | — | — | — | — | — | — | — | 1,161 |
| Balances totales del fondo (déficit) | (2,482) | 134,980 | (6,137) | (18,184) | (13,940) | (8,646) | — | (19,791) | (6,747) | — | — | — | — | — | — | (75,927) |
| Pasivos totales, entrada diferida de recursos y balance de fondos (déficit) | $ 21,036 | 147,825 | (6,137) | 3,570 | 14,703 | 21,074 | 167,232 | 16,129 | 139 | — | — | 146,602 | 75,441 | 23,904 | 50,623 | 688,278 |

Ver el informe de los auditores independientes adjunto.

**ELA DE PUERTO RICO**

Combinación del estado de ingresos, gastos y cambios en el balance de fondos - Fondos gubernamentales no mayores

Año terminado el 30 de junio de 2016

(En miles)

| | Autoridad de Edificios Públicos | Autoridad para el Financiamiento de la Infraestructura de Puerto Rico | Autoridad del Puerto de las Américas | Ingresos especiales — Fideicomiso perpetuo de comunidades especiales | Fideicomiso de los Niños | Centro Comprensivo de Cáncer de la Universidad de Puerto Rico | Autoridad de Edificios Públicos | Autoridad para el Financiamiento de la Infraestructura de Puerto Rico | Servicio de la deuda — Autoridad de Transporte Marítimo de Puerto Rico | Autoridad del Puerto de las Américas | Fideicomiso perpetuo de comunidades especiales | Fideicomiso de los Niños | ELA de Puerto Rico | Autoridad de Edificios Públicos | Proyectos de capital — Autoridad para el Financiamiento de la Infraestructura de Puerto Rico | Total de fondos gubernamentales no mayores |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ingresos | | | | | | | | | | | | | | | | |
| Intergubernamentales | $ — | — | — | — | — | 1,822 | 36,135 | — | — | — | — | — | — | — | — | 37,957 |
| Intereses e ingreso por inversiones | 342 | 9 | 1 | 2,362 | 55 | 14 | — | 156 | 1 | — | — | 3,416 | — | — | 120 | 6,475 |
| Otros | 347 | 6,460 | — | 304 | — | 1,833 | — | 2,577 | 86 | — | — | — | 26 | — | 338 | 11,971 |
| Total de ingresos | 689 | 6,468 | 1 | 2,666 | 55 | 3,669 | 36,135 | 2,733 | 87 | — | — | 3,416 | 26 | — | 458 | 56,403 |
| Gastos: Corrientes: | | | | | | | | | | | | | | | | |
| Gobierno general | | | | | | | | | | | | | | | | |
| Seguridad pública | 108,047 | 18,750 | — | 2,235 | 16,968 | — | 797 | — | — | — | — | — | 2,070 | 1,382 | 27,768 | 178,017 |
| Salud | — | — | — | — | — | — | — | — | — | — | — | — | — | — | 46 | 46 |
| Vivienda pública y bienestar | — | — | — | 397 | 9,430 | — | — | — | — | — | — | — | 448 | — | — | 10,275 |
| Educación | — | — | — | 3,614 | — | — | — | — | — | — | — | — | 1,466 | — | 755 | 5,835 |
| Desarrollo económico | — | — | — | — | 58 | — | — | — | — | — | — | — | — | — | 736 | 794 |
| Desembolsos de capital | — | — | 1,617 | — | 80 | — | — | — | 87 | — | — | — | 25,687 | — | 3,212 | 30,683 |
| intergubernamental | — | — | — | — | 193 | — | — | — | — | — | — | — | 15,426 | — | — | 15,619 |
| Servicio de la deuda: | | | | | | | | | | | | | | | | |
| Capital | — | 2,481 | 198 | — | — | 58,934 | — | — | — | — | — | — | 16,031 | 36,629 | 21,593 | 135,866 |
| Intereses y otros | — | — | — | — | 2,913 | 60,852 | 194,840 | — | 7,736 | — | 24,950 | — | — | — | — | 291,291 |
| Otros - costos de emisión de deuda | — | 231 | — | — | 4,245 | 224,191 | 90,072 | 6,837 | 10,155 | — | 48,057 | — | — | — | — | 383,788 |
| Gastos totales | 108,047 | 19,462 | 1,815 | 5,849 | 17,696 | 75,922 | 285,840 | 284,912 | 6,924 | 17,891 | — | 73,007 | 61,128 | 38,011 | 54,110 | 993,811 |
| Deficiencia de ingresos bajo gastos | (107,358) | (12,994) | (1,814) | (3,183) | (17,641) | (72,853) | (249,705) | (282,179) | (6,837) | (17,891) | — | (69,591) | (61,102) | (38,011) | (53,652) | (993,811) |
| Otras fuentes de financiamiento (usos): | | | | | | | | | | | | | | | | |
| Transferencias entrantes | 346,592 | 16,954 | 486 | — | 13 | 38,033 | 249,667 | 142,549 | — | 17,891 | — | 70,771 | 25,989 | 11,562 | 29,733 | 688,998 |
| Transferencias salientes | (261,229) | — | — | — | — | — | — | — | — | — | — | (13) | — | — | (261,242) | 261,242 |
| Ganancias de la deuda emitida a largo plazo | — | — | — | — | — | 46,932 | — | — | — | — | — | — | 2,451 | 3,976 | (26 | 53,485 |
| Total otras fuentes de financiamiento | 85,363 | 16,954 | 486 | — | 13 | 84,965 | 249,667 | 142,549 | — | 17,891 | — | 70,758 | 28,440 | 15,538 | 29,859 | 742,483 |
| Cambio neto en balance de fondos | (21,995) | 3,960 | (1,328) | (3,183) | (17,628) | 13,112 | (38) | (139,630) | (6,837) | — | — | 1,167 | (32,662) | (22,473) | (23,793) | (251,328) |
| Balance de fondos (déficit) - comienzo de año (según reformulación) (nota 4 a los estados financieros) | 19,513 | 151,020 | (4,809) | (15,001) | 32,026 | (20,006) | 5,552 | 119,839 | 90 | — | — | 108,670 | 100,271 | 28,357 | 30,480 | 536,002 |
| Balance de fondos - fin de año | $ (2,482) | 154,980 | (6,137) | (18,184) | 14,398 | (6,894) | 5,514 | (19,791) | (6,747) | — | — | 109,837 | 67,609 | 5,884 | 6,687 | 284,674 |

Ver el informe de los auditores independientes adjunto.

**ELA DE PUERTO RICO**

Fondos de propiedad exclusiva no mayores

Año finalizado el 30 de junio de 2016

Los fondos de propiedad exclusiva se utilizan para contabilizar las operaciones que se financian y operan de manera similar a las empresas comerciales privadas donde la intención del gobierno es que los costos de proporcionar bienes o servicios al público en general de manera continua se financien o recuperen principalmente a través de cargos de usuario.

**Junta de Gobierno del Servicio 9-1-1 (Servicio 9-1-1)**

Este fondo se creó mediante la Ley Núm. 144 el 22 de diciembre de 1994 El Servicio 9-1-1 es responsable de proporcionar un servicio eficiente de respuesta rápida a las llamadas de emergencia a través del número 9-1-1 y transferirlos a las agencias de respuesta apropiadas.

*Seguros por Discapacidad*

Este fondo se creó por la Ley Núm. 139 el 26 de junio de 1968 Se utiliza para contabilizar los beneficios por discapacidad para remediar temporalmente la pérdida de ingresos como resultado de la discapacidad causada por enfermedad o accidente no relacionado con el empleo.

*Seguro de Conducir*

Este fondo se creó por la Ley Núm. 428 el 15 de mayo de 1950 Se utiliza para contabilizar las contribuciones realizadas por los conductores y sus patronos para proporcionar un plan de seguro social en beneficio de los conductores en Puerto Rico. El plan también incluye el pago de beneficios para el seguro de salud y de vida.

*Autoridad de Puertos de Ponce*

Este fondo se creó por la Ley Núm. 240 el 12 de diciembre de 2011 Se utiliza para dar cuenta del desarrollo de la terminal de contenedores anteriormente realizada por la PAA y administrar tales instalaciones en futuras operaciones.

*Fondo de Préstamo Recurrente para el Tratamiento de Agua Potable Segura de Puerto Rico*

Este fondo se creó por la Ley Núm. 32 el 7 de julio de 1997 Es administrado, de conformidad con la Ley Núm. 9 del 18 de junio de 1970, según enmienda, por el Departamento de Salud del ELA. De conformidad con dicha ley, el Departamento de Salud del ELA, en nombre del ELA, está autorizado a celebrar acuerdos de subvención de operación y capitalización con la EPA para actividades de préstamo.

**ELA DE PUERTO RICO**

Declaración combinada de resultados netos - Fondos de propiedad exclusiva no mayores

30 de junio de 2016

(En miles)

| | Actividades de tipo comercial - Fondos empresariales no mayores | | | | | |
|---|---|---|---|---|---|---|
| | Junta de Gobierno del Servicio 9-1-1 | Seguros por Discapacidad | Seguro de Conducir | Autoridad de Puertos de Ponce | Fondo de Préstamo Recurrente para el Tratamiento de Agua Potable Segura de Puerto Rico | Total |
| **Activos:** | | | | | | |
| Activos corrientes: | | | | | | |
| Efectivo y equivalentes de efectivo en bancos comerciales $ | — | 49,196 | 7,427 | — | — | 56,623 |
| Cuentas por cobrar - neto: | | | | | | |
| Primas de seguro | | 3,027 | 1,061 | — | — | 4,088 |
| Cuentas | 9,625 | — | — | — | — | 9,625 |
| Interés devengado | — | 158 | — | — | — | 158 |
| Otro | 11 | 48 | — | — | — | 59 |
| Adeudado de otros fondos | — | — | 3,432 | 3,996 | — | 7,428 |
| Otros activos | 31 | — | — | — | — | 31 |
| Activos restringidos: | | | | | | |
| Efectivo y equivalentes de efectivo en bancos comerciales | 3,051 | 15,459 | — | — | — | 18,510 |
| Efectivo y equivalentes de efectivo en bancos gubernamentales | 1,005 | — | — | — | 1,518 | 2,523 |
| Cuentas por cobrar - neto: | | | | | | |
| Interés devengado | — | — | — | — | — | — |
| Préstamos de unidades de componentes | — | — | — | — | 81 | 81 |
| Total de activos corrientes | 13,723 | 67,888 | 11,920 | 3,996 | 1,599 | 99,126 |
| Activos no corrientes: | | | | | | |
| Cuentas por cobrar - neto: | | | | | | |
| Préstamos de unidades de componentes - restringido | — | — | — | — | 2,185 | 2,185 |
| Adeudado de otros fondos | — | — | 7,761 | — | — | 7,761 |
| Inversiones restringidas | — | 24,545 | — | — | — | 24,545 |
| Terrenos y otros activos no depreciables | 3,829 | — | — | 28,643 | — | 32,472 |
| Activos depreciables | 2,666 | 39 | — | — | — | 2,705 |
| Total de activos | 20,218 | 92,472 | 19,681 | 32,639 | 3,784 | 168,794 |
| **Pasivos y resultados netos:** | | | | | | |
| Pasivos corrientes: | | | | | | |
| Cuentas por pagar y pasivos devengados | 4,680 | 1,367 | 363 | 488 | 367 | 7,265 |
| Adeudado a otras entidades gubernamentales | 101 | 1 | 5 | — | — | 107 |
| Intereses a pagar | — | — | — | 2,370 | — | 2,370 |
| Ingresos no devengados | — | 2,692 | 13 | — | — | 2,705 |
| Ausencias compensadas | 754 | 449 | 254 | — | — | 1,457 |
| Beneficios pagaderos de rescisión voluntaria | 110 | — | — | — | — | 110 |
| Pasivos por beneficios de desempleo y discapacidad | — | 553 | 249 | — | — | 802 |
| Total pasivos corrientes | 5,645 | 5,062 | 884 | 2,858 | 367 | 14,816 |
| Pasivos no corrientes: | | | | | | |
| Pagos pagaderos a unidades componentes | — | — | — | 20,863 | — | 20,863 |
| Ausencias compensadas | 875 | 673 | 380 | — | — | 1,928 |
| Beneficios pagaderos de rescisión voluntaria | 299 | — | — | — | — | 299 |
| Total de pasivos | 6,819 | 5,735 | 1,264 | 23,721 | 367 | 37,906 |
| Resultados netos: | | | | | | |
| Inversión neta en activos de capital | 6,445 | 39 | — | 10,543 | — | 17,027 |
| Restringido para servicios de emergencia | 6,268 | — | — | — | — | 6,268 |
| Restringido para actividades de préstamo | — | — | — | — | 3,417 | 3,417 |
| Restringido para el pago de los beneficios del seguro | — | 40,004 | — | — | — | 40,004 |
| Irrestricto | 686 | 46,694 | 18,417 | (1,625) | — | 64,172 |
| Resultados netos totales $ | 13,399 | 86,737 | 18,417 | 8,918 | 3,417 | 130,888 |

Ver el informe de los auditores independientes adjunto.

**ELA DE PUERTO RICO**

Combinación del estado de ingresos, gastos y cambios en los resultados netos del fondo - Fondos de propiedad exclusiva no mayores

Año terminado el 30 de junio de 2016

(En miles)

| | Junta de Gobierno del Servicio 9-1-1 | Actividades de tipo comercial - Fondos empresariales no mayores | | | | Total |
|---|---|---|---|---|---|---|
| | | Seguros por Discapacidad | Seguro de Conducir | Autoridad de Puertos de Ponce | Fondo de Préstamo Recurrente para el Tratamiento de Agua Potable Segura de Puerto Rico | |
| **Ingresos operativos:** | | | | | | |
| Primas de seguros | $ — | 12,694 | 4,405 | — | — | 17,099 |
| Cargos del servicio telefónico de emergencias | 22,739 | — | — | — | — | 22,739 |
| Interés | — | — | — | — | 1,845 | 1,845 |
| Otros | — | — | — | 1 | — | 1 |
| Ingresos operativos totales | 22,739 | 12,694 | 4,405 | 1 | 1,845 | 41,684 |
| **Gastos operativos:** | | | | | | |
| Beneficios del seguro | — | 1,756 | 724 | — | — | 2,480 |
| gastos | 24,706 | 9,350 | 15,868 | 819 | 34,353 | 85,096 |
| Pérdida por deterioro de préstamos por cobrar | — | — | — | — | 184,938 | 184,938 |
| Gastos operativos totales | 24,706 | 11,106 | 16,592 | 819 | 219,291 | 272,514 |
| Ingresos (pérdidas) operativos | (1,967) | 1,588 | (12,187) | (818) | (217,446) | (230,830) |
| **Ingresos (gastos) no operativos:** | | | | | | |
| Subvenciones del gobierno de EE. UU. | — | — | — | — | 18,444 | 18,444 |
| Contribuciones a unidades de componentes | — | — | — | — | (1,522) | (1,522) |
| Intereses y ganancias por inversiones | 14 | 1,409 | 329 | — | — | 1,752 |
| Gastos por intereses | — | — | — | (1,440) | — | (1,440) |
| Otros | 498 | — | — | — | — | 498 |
| Ingresos no operativos totales | 512 | 1,409 | 329 | (1,440) | 16,922 | 17,732 |
| Ingresos (pérdidas) antes de las transferencias | (1,455) | 2,997 | (11,858) | (2,258) | (200,524) | (213,098) |
| Transferencias de otros fondos | — | — | — | — | 4,084 | 4,084 |
| Transferencias a otros fondos | (6,618) | (4,986) | (7) | — | — | (11,611) |
| Cambio neto en los resultados netos | (8,073) | (1,989) | (11,865) | (2,258) | (196,440) | (220,625) |
| Resultados netos - comienzo de año, según ajuste (ver nota 4 del estado financiero) | 21,472 | 88,726 | 30,282 | 11,176 | 199,857 | 351,513 |
| Resultados netos - fin de año | $ 13,399 | 86,737 | 18,417 | 8,918 | 3,417 | 130,888 |

Ver el informe de los auditores independientes adjunto.

Operaciones generales, administrativas y de otro tipo.

(Continuación)

**ELA DE PUERTO RICO**

Estado combinado de flujos de efectivo - Fondos de propiedad exclusiva no mayores

Año terminado el 30 de junio de 2016

(En miles)

**Actividades de tipo comercial - Fondos empresariales no mayores**

| | Junta de Gobierno del Servicio 9-1-1 | Seguros por Discapacidad | Seguro de Conducir | Autoridad de Puertos de Ponce | Fondo de Préstamo Recurrente para el Tratamiento de Agua Potable Segura de Puerto Rico | Total |
|---|---|---|---|---|---|---|
| Flujos de efectivo por actividades operativas: | | | | | | |
| Recibos de clientes y usuarios | $    20,730 | 12,694 | 4,529 | | | 37,953 |
| Pagos a proveedores | (13,283) | (3,326) | (13,116) | (410) | (34,141) | (64,276) |
| Pagos a los empleados | (10,049) | (5,291) | (2,701) | | — | (18,041) |
| Pagos de beneficios del seguro | — | (1,702) | (628) | | | (2,330) |
| Efectivo neto provisto por (utilizado en) actividades operativas | (2,602) | 2,375 | (11,916) | (410) | (34,141) | (46,694) |
| Flujos de efectivo de actividades de financiamiento no relacionadas con el capital: | | | | | | |
| Subvenciones del gobierno de EE. UU. | — | — | — | — | 18,444 | 18,444 |
| Anticipos de la línea de crédito | — | — | — | 1,763 | — | 1,763 |
| Contribuciones a unidades de componentes | — | — | — | — | (1,522) | (1,522) |
| Transferencias de otros fondos | — | — | 3,112 | — | 4,084 | 7,196 |
| Transferencias a otros fondos | (6,618) | (4,986) | — | — | — | (11,604) |
| Efectivo neto provisto por (utilizado en) actividades de financiamiento no relacionadas con el capital | (6,618) | (4,986) | 3,112 | 1,763 | 21,006 | 14,277 |
| Flujos de efectivo de capital y actividades financieras relacionadas: | | | | | | |
| Anticipos a otros fondos | — | — | — | (1,366) | — | (1,366) |
| Gastos de capital | (181) | — | — | — | — | (181) |
| Efectivo neto provisto (utilizado) por capital y actividades relacionadas de financiamiento | (181) | — | — | (1,366) | — | (1,547) |
| Flujos de efectivo de actividades de inversión: | | | | | | |
| Intereses cobrados por depósitos, inversiones y préstamos | 512 | 8,714 | 449 | — | 3,459 | 13,134 |
| Préstamos originados | — | — | — | — | (24,853) | (24,853) |
| Capital recaudado en préstamos | — | — | — | — | 8,158 | 8,158 |
| Ingresos por ventas y vencimientos de inversiones | — | 13,822 | — | — | — | 13,822 |
| Compras de inversiones | — | (7,452) | — | — | — | (7,452) |
| Efectivo neto provisto por (utilizado en) actividades de inversión | 512 | 15,084 | 449 | — | (13,236) | 2,809 |
| Aumento neto (disminución) en efectivo y equivalentes de efectivo | (8,889) | 12,473 | (8,355) | (13) | (26,371) | (31,155) |
| Efectivo y equivalentes de efectivo - comienzo de año, según reformulación (nota 4) | 12,945 | 52,182 | 15,782 | 13 | 27,889 | 108,811 |
| Efectivo y equivalentes de efectivo - fin de año | $ 4,056 | 64,655 | 7,427 | — | 1,518 | 77,656 |
| Conciliación del ingreso (pérdida) operativo con el efectivo neto provisto por (utilizado en) actividades operativas: | | | | | | |
| Ingresos (pérdidas) operativos | $    (1,967) | 1,588 | (12,187) | (818) | (217,446) | (230,830) |
| Ajustes para conciliar los ingresos operativos (pérdida) con el efectivo neto provisto por (utilizado en) actividades operativas: | | | | | | |
| Intereses devengados por depósitos, préstamos e inversiones | — | — | — | — | (1,846) | (1,846) |
| Depreciación | 782 | 72 | — | — | — | 854 |
| Pérdida por disposición de activos de capital | 10 | — | — | — | — | 10 |
| Pérdida por deterioro de préstamos por cobrar | — | — | — | — | 184,938 | 184,938 |
| Cambios en los activos y pasivos operativos: | | | | | | |
| Disminución (aumento) en cuentas por cobrar | (2,008) | 53 | 126 | — | — | (1,829) |
| Disminución (aumento) en otros activos | 15 | — | — | 2 | — | 17 |
| Aumento (disminución) en cuentas a pagar y pasivos devengados | 497 | 630 | 78 | 406 | 213 | 1,824 |
| Aumento (disminución) adeudado a otras entidades gubernamentales | — | 1 | (2) | — | — | (1) |
| Aumento (disminución) en ingresos no devengados | — | (53) | (3) | — | — | (56) |
| Aumento (disminución) en ausencias compensadas | 228 | 30 | (25) | — | — | 233 |
| Disminución de los beneficios pagaderos por rescisión voluntaria | (159) | — | — | — | — | (159) |
| Aumento (disminución) de los pasivos por discapacidad beneficios a pagar | — | 54 | 97 | — | — | 151 |
| Total de ajustes | (635) | 787 | 271 | 408 | 183,305 | 184,136 |
| Efectivo neto provisto por (utilizado en) actividades operativas | $ (2,602) | 2,375 | (11,916) | (410) | (34,141) | (46,694) |

Ver el informe de los auditores independientes adjunto.

**ELA DE PUERTO RICO**

Fondos Fiduciarios

Año finalizado el 30 de junio de 2016

Los fondos fideicomisarios se utilizan para contabilizar los fondos mantenidos por el ELA en calidad de fideicomisario, o como agente para individuos, organizaciones y otras unidades gubernamentales. Los siguientes son los fondos fiduciarios del ELA:

**Fondos Fiduciarios de Pensiones**

Antes de la promulgación de la Ley Núm. 106 de 2017 del 23 de agosto de 2017, los fondos fiduciarios de pensiones se usaban para contabilizar los activos, pasivos y activos netos disponibles para los beneficios de pensión en fideicomiso para los empleados públicos del ELA. Después del 23 de agosto de 2017, todos los beneficios de pensión se pagarán del Fondo General del Gobierno Primario (como se menciona en la Nota 23).

**(1) Sistema de Retiro de Empleados del ELA de Puerto Rico (SRE)**

El SRE es un plan de pensiones de beneficios definidos de patronos múltiples de costo compartido que, antes del 23 de agosto de 2017, era administrado por la Administración de Sistemas de Retiro Judicial y de Empleados del Gobierno de Puerto Rico y fue creado por la Ley Núm. 447 del 15 de mayo de 1951. El SRE está patrocinado por el ELA, corporaciones públicas y municipios de Puerto Rico. Sustancialmente, todos los empleados de tiempo completo del ELA y sus organismos están cubiertos por el SRE. Todos los empleados regulares nombrados y temporales del ELA se convierten en miembros del plan en la fecha de empleo. Antes del 23 de agosto de 2017, el SRE fue administrado por la Administración de Sistemas de Retiro Judicial y de Empleados del Gobierno de Puerto Rico (la Administración del SRE y el SRJ) que también administró el Sistema de Retiro de Empleados del Gobierno de Puerto Rico y su Contribución al Plan de Seguro Médico de Organismos (SRE MIPC). El SRE MIPC es un plan de beneficios de atención médica posterior al empleo, sin financiamiento, de costos compartidos, de patronos múltiples y otros beneficios definidos proporcionado por el ELA a los miembros retirados del plan.

**(2) Sistema de Anualidades y Pensiones para Maestros de Puerto Rico (SRM)**

El SRM es un plan de pensión de beneficios definidos de patronos múltiples de costo compartido que, antes del 23 de agosto de 2017, era administrado por el Sistema de Retiro para Maestros de Puerto Rico y fue creado por la Ley Núm. 91 del 29 de marzo de 2004, que reemplazó la Ley Núm. 218 del 6 de mayo de 1951. El SRM está patrocinado por el ELA. Todos los maestros activos del Departamento de Educación del ELA están cubiertos por el SRM. Los maestros con licencia que trabajan en escuelas privadas u otras organizaciones educativas tienen la opción de unirse al SRM siempre que se realicen las contribuciones requeridas del patrono y del empleado. Los empleados del SRM también son miembros del plan. Antes del 23 de agosto de 2017, el SRM era administrado por el Sistema de Retiro para Maestros de Puerto Rico (la Administración de SRM) que también administraba el Sistema de Anualidades y Pensiones para Maestros de Puerto Rico para la Contribución del Plan de Seguro Médico (SRM MIPC), un plan no financiado, de costos compartidos, de un empleador, de beneficios definidos de atención médica posterior al empleo provisto por el ELA a los maestros retirados del Departamento de Educación del ELA y empleados retirados de la Administración del SRM.

**ELA DE PUERTO RICO**

Fondos Fiduciarios

Año finalizado el 30 de junio de 2016

**(3)** **Sistema de Retiro de la Judicatura del Estado Libre Asociado de Puerto Rico (SRJ)**

El SRJ es un plan de pensiones de beneficios definidos para un solo patrono que, antes del 23 de agosto de 2017, era administrado por la Administración de Sistemas de Retiro Judicial y de Empleados del Gobierno de Puerto Rico y fue creado por la Ley Núm. 12 del 19 de octubre de 1954. El SRJ está patrocinado por el ELA. Todos los jueces de la rama judicial del ELA son miembros del plan. El SRJ brinda beneficios de retiro a los empleados de la rama judicial del ELA mediante la oficina de la Administración de Instalaciones Judiciales. Antes del 23 de agosto de 2017, el SRJ era administrado por el SRE y la Administración del SRJ que también administraba el Sistema de Retiro de la Judicatura del Estado Libre Asociado de Puerto Rico de la Contribución del Plan de Seguro Médico (SRJ MIPC), un plan de beneficios no financiado, de un solo empleador, de beneficios de atención médica posterior al empleo proporcionado por el ELA a los jueces retirados de la Rama Judicial del ELA.

**Fondo de agencia**

El fondo de agencia se utiliza para contabilizar los activos mantenidos por el ELA como agente para individuos, organizaciones privadas y otros gobiernos. Este fondo es de naturaleza de custodia (activos equivalentes a pasivos) y no implica la medición de los resultados de las operaciones.

**Depósitos Especiales**

Este fondo actúa en calidad de fiduciario para dar cuenta del dinero recibido con fines específicos para los cuales la ley no especifica su registro en ningún otro fondo. Incluye principalmente depósitos bajo la custodia de los tribunales de justicia para pagos de pensión alimenticia, depósitos en garantía, recaudación de ingresos y cuentas de agencias para las que el ELA actúa en calidad de agente.

**ELA DE PUERTO RICO**

Estado Combinado de Resultados Netos Fiduciarios - Fondos Fiduciarios de Pensiones

30 de junio de 2016

(En miles)

| | | Fondos Fiduciarios de Pensiones | | | | | |
|---|---|---|---|---|---|---|---|
| | (SRE) | | (SRM) | | (SRJ) | | |
| | Pensión | Beneficios de atención médica posterior al empleo | Pensión | Beneficios de atención médica posterior al empleo | Pensión | Beneficios de atención médica posterior al empleo | Total |
| **Activos:** | | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales: | | | | | | | |
| No restringido | $ 302,140 | — | 11,354 | — | 1,242 | — | 314,736 |
| Restringido | 139,136 | — | — | — | — | — | 139,136 |
| Efectivo y equivalentes de efectivo en bancos gubernamentales: | | | | | | | |
| No restringido | 162,324 | — | — | — | 3,111 | — | 165,435 |
| Restringido | 48,611 | — | — | — | — | — | 48,611 |
| Cuentas por cobrar - neto: | | | | | | | |
| Patronos | 258,801 | — | — | — | — | — | 258,801 |
| Intereses y dividendos devengados | 8,348 | — | 37 | — | 151 | — | 8,536 |
| Inversiones vendidas | 738 | — | 250 | — | — | — | 988 |
| Otros | 15,000 | — | 14,261 | — | 61 | — | 29,322 |
| Adeudado del SRJ (Adeudado al SRE) | 7,854 | — | — | — | (7,854) | — | — |
| Garantía de transacciones de préstamos de valores | 19,754 | — | 760 | — | 1,078 | — | 21,592 |
| Inversiones a valor de mercado: | | | | | | | |
| Bonos y pagarés | 445,891 | — | — | — | 21,002 | — | 466,893 |
| Fondos de fideicomisos mixtos no cotizados en bolsa | 219,585 | — | 486,571 | — | 23,665 | — | 729,821 |
| Acciones | 1,277 | — | 22,056 | — | — | — | 23,333 |
| Inversiones en asociaciones limitadas | 47,461 | — | 5,574 | — | — | — | 53,035 |
| Préstamos a miembros e intereses por cobrar - netos | 596,997 | — | 366,590 | — | 484 | — | 964,071 |
| Activos de capital - neto | 9,733 | — | 15,942 | — | — | — | 25,675 |
| Otros activos | 754 | — | 393 | — | — | — | 1,147 |
| Total de activos | 2,284,404 | — | 923,788 | — | 42,940 | — | 3,251,132 |
| **Pasivos:** | | | | | | | |
| Cuentas a pagar y pasivos devengados | 104,315 | — | 15,495 | — | — | — | 119,810 |
| Intereses por pagar | 14,094 | — | — | — | — | — | 14,094 |
| Cuentas a paga por títulos comprados de inversiones | 1,609 | — | 212 | — | — | — | 1,821 |
| Obligaciones de préstamos de títulos | 19,754 | — | 760 | — | 1,078 | — | 21,592 |
| Adeudado al Estado Libre Asociado de Puerto Rico | 91,474 | — | 4,824 | — | 6,491 | — | 102,789 |
| Otros pasivos | 184,141 | — | 7,042 | — | 541 | — | 191,724 |
| Bonos a pagar | 3,134,902 | — | — | — | — | — | 3,134,902 |
| Total de pasivos | 3,550,289 | — | 28,333 | — | 8,110 | — | 3,586,732 |
| Resultados netos (déficit) restringidos para pensiones | $ (1,265,885) | — | 895,455 | — | 34,830 | — | (335,600) |

Ver el informe de los auditores independientes adjunto.

**ELA DE PUERTO RICO**

Estado de Cambios en los Resultados Netos Fiduciarios - Fondos Fiduciarios de Pensiones

Año Finalizado el 30 de junio de 2016

(En miles)

| | (SRE) | | (SRM) | | SRJ | | |
|---|---|---|---|---|---|---|---|
| | Pensión | Beneficios de atención médica posterior al empleo | Pensión | Beneficios de atención médica posterior al empleo | Pensión | Beneficios de atención médica posterior al empleo | Total |
| Agregados: | | | | | | | |
| Contribuciones: | | | | | | | |
| Contribuciones del empleador: | | | | | | | |
| Beneficios básicos, netos de provisión a asignación de $222,015 para el SRE y $11,600 para el SRJ | $      582,803 | — | 148,619 | | 10,232 | — | 741,654 |
| Beneficios especiales del | 196,674 | 93,728 | 65,105 | 37,481 | 4,991 | 317 | 398,296 |
| Contribuciones de los miembros | 333,633 | — | 101,361 | | 3,190 | — | 438,184 |
| Total de contribuciones | 1,113,110 | 93,728 | 315,085 | 37,481 | 18,413 | 317 | 1,578,134 |
| Ingresos por inversiones y gastos en inversiones: | | | | | | | |
| Apreciación (depreciación) neta en el valor razonable del interés de las inversiones | 870 | — | 1,887 | — | 986 | — | 3,743 |
| Dividendos | 59,651 | — | 43,476 | — | 747 | — | 103,874 |
| Gastos de inversión, que no sean préstamos de títulos | 277 | — | 870 | — | — | — | 1,147 |
| | (2,631) | — | (1,220) | — | — | — | (3,851) |
| Ingresos netos de inversión, que no sean préstamos de títulos Ingresos por préstamos de títulos | 58,167 | — | 45,013 | — | 1,733 | — | 104,913 |
| | 113 | — | 62 | — | 3 | — | 178 |
| Gastos de préstamos de títulos | — | — | (15) | — | (1) | — | (16) |
| Ingresos netos de préstamos de títulos | 113 | — | 47 | — | 2 | — | 162 |
| Ingresos netos de inversiones | 58,280 | — | 45,060 | — | 1,735 | — | 105,075 |
| Otros ingresos | 52,791 | — | 1,350 | — | 16 | — | 54,157 |
| Total de agregados | 1,224,181 | 93,728 | 361,495 | 37,481 | 20,164 | 317 | 1,737,366 |
| Descuentos: | | | | | | | |
| Beneficios pagados a los participantes | 1,532,640 | 93,728 | 737,335 | 37,481 | 24,280 | 317 | 2,425,781 |
| Reembolsos de contribuciones | 34,937 | — | 13,910 | — | 280 | — | 49,127 |
| Interés sobre bonos pagaderos | 196,211 | — | — | — | — | — | 196,211 |
| Generales y administrativos | 48,605 | — | 25,876 | — | 786 | — | 75,267 |
| Otros gastos | 9,401 | — | — | — | 160 | — | 9,561 |
| Total de deducciones | 1,821,794 | 93,728 | 777,121 | 37,481 | 25,506 | 317 | 2,755,947 |
| Cambio neto en los resultados netos | (597,613) | — | (415,626) | — | (5,342) | — | (1,018,581) |
| Resultados netos (déficit) restringido para pensiones: | | | | | | | |
| Comienzo del año | (668,272) | — | 1,311,081 | — | 40,172 | — | 682,981 |
| Fin de año | $      (1,265,885) | — | 895,455 | — | 34,830 | — | (335,600) |

Ver el informe de los auditores independientes adjunto.

**ELA DE PUERTO RICO**

Estado Combinado de Cambios en Activos y Pasivos - Fondos de Agencias

Año terminado el 30 de junio de 2016

(En miles)

| Activos | | Balance al 30 de junio 2015 | Agregados | Eliminaciones | Balance al 30 de junio 2016 |
|---|---|---|---|---|---|
| Efectivo y equivalentes al efectivo en bancos comerciales: | $ | 598,848 | 1,071,641 | 1,006,092 | 664,397 |
| Efectivo y equivalentes al efectivo en bancos gubernamentales | | 192,477 | 17,049,074 | 17,240,654 | 897 |
| Activos totales | $ | 791,325 | 18,120,715 | 18,246,746 | 665,294 |
| **Pasivos** | | | | | |
| Cuentas a pagar y pasivos devengados | $ | 791,325 | 18,120,715 | 18,246,746 | 665,294 |
| Total de pasivos | $ | 791,325 | 18,120,715 | 18,246,746 | 665,294 |

Ver el informe de los auditores independientes adjunto.

**ELA DE PUERTO RICO**

Unidades de Componentes No Mayores de Presentación Discreta

Año Finalizado el 30 de junio de 2016

Estas entidades, todas las entidades legalmente separadas, de conformidad con la Declaración GASB Núm. 14, según enmienda por las Declaraciones GASB Núm. 39 y 61, se presentan de forma discreta en una columna separada de los estados financieros básicos del Gobierno Primario principalmente debido a la naturaleza del servicios que brindan, la capacidad del ELA de imponer su voluntad, principalmente a través del nombramiento de sus autoridades gubernamentales, y debido a que estas unidades de componentes proporcionan beneficios financieros específicos o imponen cargas financieras al ELA (con la excepción de la Autoridad de Conservación y Desarrollo de Culebra) y el Fideicomiso para Ciencia, Tecnología e Investigación de Puerto Rico, que no cumple con todos estos criterios, pero el ELA ha determinado que sería engañoso excluirlos de la entidad de informes financieros del ELA.  Estas entidades han sido clasificadas como unidades de componentes no mayores porque la gerencia cree que no cumplen con los siguientes factores para su inclusión como mayores: a) los servicios provistos por la unidad de componentes a la ciudadanía son tales que los informes separados como una unidad de componente mayor se consideran esencial para los usuarios de los estados financieros, b) hay transacciones significativas con el Gobierno Primario, o c) hay una relación de beneficio o carga financiera significativa con el Gobierno Primario. Los principios contables seguidos por cada una de las unidades de componentes incluidas en este documento pueden variar según el tipo de industrias en las que están participan (es decir, banca, construcción, servicios públicos, etc.). La información detallada para cada una de estas entidades puede obtenerse directamente de las oficinas administrativas de las entidades correspondientes, como se describe en la Nota 1 a los estados financieros básicos.

**ELA DE PUERTO RICO**

Estados Combinados de Resultados Netos de Unidades de Componentes No

Mayores de Presentación Discreta

30 de junio de 2016

(En miles)

| | Administración para el Desarrollo de Empresas Agropecuarias | Administración de Compensación de Accidentes de Automóviles | Corporación del Centro Cardiovascular de Puerto Rico y el Caribe | Compañía para el Desarrollo Integral de la "Península de Cantera" | Corporación para el Proyecto ENLACE del "Caño Martín Peña" |
|---|---|---|---|---|---|
| Activos: | | | | | |
| Efectivo y equivalentes de efectivo en bancos comerciales | $ 8,322 | 60,845 | 5,704 | 1,976 | 738 |
| Efectivo y equivalentes de efectivo en bancos gubernamentales | 1,356 | — | — | — | — |
| Inversiones | — | 91,029 | — | — | — |
| Cuentas por cobrar - neto: | | | | | |
| Primas de seguros | — | 1,733 | — | — | — |
| Intergubernamental | — | — | — | 95 | — |
| Cuentas | 587 | — | 5,155 | — | — |
| Préstamos y adelantos | 1,068 | 2,000 | — | 5,710 | — |
| Interés devengado | — | 355 | — | — | — |
| Otros | 144 | 778 | 145 | 20 | — |
| Adeudado de - neto: | | | | | |
| Gobierno primario | 41,840 | — | — | — | — |
| Unidades de componentes | — | — | — | — | — |
| Otras entidades del gobierno | 196 | 410 | 1,755 | — | 470 |
| Inventarios | 8,901 | — | 1,264 | — | — |
| Gastos pagados por adelantado | 585 | — | 689 | 5 | — |
| Otros activos | — | 215 | — | — | — |
| Activos restringidos: | | | | | |
| Efectivo y equivalentes de efectivo en bancos comerciales | — | 164 | — | — | 45 |
| Efectivo y equivalentes de efectivo en bancos gubernamentales | — | — | — | — | — |
| Inversiones | — | — | — | — | — |
| Otros activos restringidos | — | — | — | 497 | — |
| Bienes inmuebles en venta o desarrollo futuro | — | — | — | 1,061 | — |
| Activos de capital: | | | | | |
| Terrenos y otros activos no depreciables | 3,739 | 901 | 103 | 80 | 1,976 |
| Depreciables, neto | 20,414 | 4,990 | 14,854 | 3,604 | 1,149 |
| Activos totales | 87,152 | 163,420 | 29,669 | 13,048 | 4,378 |
| Salidas diferidas de recursos: | | | | | |
| Pérdida por reembolso de bonos | — | — | — | — | — |
| Relacionado con pensiones | 21,290 | 7,938 | 33,089 | — | — |
| Entradas diferidas de recursos: | 21,290 | 7,938 | 33,089 | — | — |
| Pasivos: | | | | | |
| Cuentas a pagar y pasivos devengados | 57,185 | 5,336 | 28,096 | 493 | 698 |
| Depósitos y pasivos en custodia | — | — | — | — | — |
| Adeudado a: | | | | | |
| Gobierno primario | — | — | 25,154 | — | — |
| Unidades de componentes | 101,214 | — | 12,594 | 39,717 | — |
| Otras entidades del gobierno | 224 | — | 2,557 | — | — |
| Intereses por pagar | — | — | — | 4,717 | — |
| Ingresos no devengados | 993 | 39,497 | — | — | 45 |
| Pasivos pagaderos dentro de un año: | | | | | |
| Bonos de asignación del ELA | — | — | — | — | — |
| Bonos de ingresos | — | — | — | — | — |
| Pagarés adeudados a instituciones financieras | 2,802 | — | — | — | — |
| Arrendamientos de capital | — | — | — | — | — |
| Ausencias compensadas | 2,515 | 3,309 | 4,019 | — | 79 |
| Beneficios pagaderos por rescisión voluntaria | 2,711 | — | — | — | — |
| Pasivos por el seguro de accidentes automovilísticos y compensación del trabajador | — | 67,362 | — | — | — |
| Otros pasivos a largo plazo | 7,142 | — | 64 | — | — |
| Pasivos pagaderos después de un año: | | | | | |
| Bonos de asignación del ELA | — | — | — | — | — |
| Bonos de ingresos | — | — | — | — | — |
| Pagarés adeudados a instituciones financieras | — | — | — | — | — |
| Arrendamientos de capital | — | — | — | — | — |
| Ausencias compensadas | 2,725 | — | — | — | 119 |
| Obligación de pensiones netas | — | — | — | — | — |
| Pasivos netos de pensiones | 185,174 | 133,003 | 151,604 | — | — |
| Beneficios pagaderos por rescisión voluntaria | 18,765 | — | — | — | — |
| Otros pasivos a largo plazo | — | 4,617 | 5,489 | — | — |
| Total de pasivos | 381,450 | 253,124 | 229,577 | 44,927 | 941 |
| Entradas diferidas de recursos: | | | | | |
| Acuerdos de concesión de servicio | — | — | — | — | — |
| Relacionado con pensiones | 1,341 | 840 | 2,630 | — | — |
| Entradas totales diferidas de recursos | 1,341 | 840 | 2,630 | — | — |
| Resultados Netos: | | | | | |
| Inversión neta en activos de capital | 24,153 | 5,891 | 14,957 | 3,684 | 3,125 |
| Restringido para: | | | | | |
| Proyectos de capital | 194,330 | — | — | — | 152 |
| Servicio de la deuda | — | — | — | — | — |
| Préstamos estudiantiles y otros propósitos educativos | — | — | — | — | — |
| Otros propósitos especificados | — | — | — | 498 | — |
| No restringidos (déficit) | (492,832) | (88,497) | (184,406) | (36,061) | 160 |
| Resultados netos totales (déficit) | $ (274,349) | (82,606) | (169,449) | (31,879) | 3,437 |

362

(Continuaci

**ELA DE PUERTO RICO**

Estados Combinados de Resultados Netos de Unidades de Componentes No Mayores de

Presentación Discreta

30 de junio de 2016

(En miles)

| | Autoridad para la Desarrollo y Conservación de Culebra | Banco para el Desarrollo Económico de Puerto Rico | Corporación de Seguros Agrícolas de Puerto Rico | Corporación del Centro de Bellas Artes | Oficina Independiente para la Protección del Consumidor | Instituto de Cultura Puertorriqueña |
|---|---|---|---|---|---|---|
| **Activos:** | | | | | | |
| Efectivo y equivalentes de efectivo en bancos comerciales | $ 106 | 21,246 | 1,335 | 2,700 | 39 | 1,946 |
| Efectivo y equivalentes de efectivo en bancos gubernamentales | — | 290 | 1,259 | — | 304 | — |
| Inversiones | — | 41,713 | — | — | — | — |
| Cuentas por cobrar - neto: | | | | | | |
| Primas de seguro | — | — | — | — | — | — |
| Intergubernamental | — | — | — | — | — | 120 |
| Cuentas | — | — | — | 111 | — | 550 |
| Préstamos y adelantos | — | 240,526 | — | — | — | — |
| Intereses devengados | — | 1,258 | — | — | — | — |
| Otro | — | — | 91 | — | — | — |
| Adeudado de - neto: | | | | | | |
| Gobierno primario | — | — | — | — | — | — |
| Unidades de componentes | — | — | 3,927 | — | — | — |
| Otras entidades gubernamentales | — | 84 | 508 | — | — | 951 |
| Inventarios | — | — | — | — | — | 2,006 |
| Gatos prepagos | — | — | 14 | 104 | — | — |
| Otros activos | — | 11,287 | — | — | — | — |
| Activos restringidos: | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | 59 | 1,487 | — | — | — | 2,202 |
| Efectivo y equivalentes al efectivo en bancos gubernamentales | — | — | — | — | — | 203 |
| Inversiones | — | — | — | — | — | — |
| Otros activos restringidos | — | 11,931 | — | — | — | — |
| Bienes inmuebles mantenidos para la venta o desarrollo futuro | — | — | — | — | — | — |
| Activos de capital: | | | | | | |
| Tierra y otros activos no depreciables | 640 | 2,735 | — | 3,169 | — | 55 |
| Depreciables, netos | 194 | 5,713 | 67 | 12,789 | 24 | 48,792 |
| Total de activos | 999 | 338,270 | 7,001 | 18,873 | 367 | 56,825 |
| Salidas diferidas de recursos: | | | | | | |
| Pérdida por reembolso de bonos | — | — | — | — | — | — |
| Relacionados con pensiones | 88 | — | — | — | — | — |
| Total de salidas diferidas de recursos | 88 | — | — | — | — | — |
| **Pasivos:** | | | | | | |
| Cuentas por pagar y pasivos devengados | 91 | 1,133 | 1,294 | 265 | 37 | 2,274 |
| Depósitos y pasivos en custodia | — | 168,860 | — | 226 | — | — |
| Adeudado a: | | | | | | |
| Gobierno primario | — | — | — | — | — | — |
| Unidades de componentes | — | 7,833 | 4,692 | — | — | 3,326 |
| Otras entidades del gobierno | — | — | — | — | 36 | — |
| Intereses a pagar | — | 696 | — | — | — | 427 |
| Ingresos no devengados | — | — | 1,342 | — | — | 85 |
| Pasivos pagaderos dentro de un año: | | | | | | |
| Bonos de asignación del ELA | — | — | — | — | — | — |
| Bonos de ingresos | — | — | — | — | — | — |
| Pagarés adeudados a instituciones financieras | — | — | — | — | — | — |
| Arrendamientos de capital | — | — | — | — | — | — |
| Ausencias compensadas | 67 | — | 683 | 96 | — | 31 |
| Beneficios pagaderos por rescisión voluntaria | 14 | — | — | 264 | — | 613 |
| Pasivos por el seguro de accidentes automovilísticos y compensación del trabajador | — | — | — | — | — | — |
| Otros pasivos a largo plazo | — | — | 43 | — | — | — |
| Pasivos pagaderos después de un año: | | | | | | |
| Bonos de asignación del ELA | — | — | — | — | — | — |
| Bonos de ingresos | — | — | — | — | — | — |
| Pagarés adeudados a instituciones financieras | — | — | — | — | — | — |
| Arrendamientos de capital | — | — | — | — | — | — |
| Ausencias compensadas | — | 1,752 | — | 457 | 22 | 1,396 |
| Obligación de pensiones netas | — | — | — | — | — | — |
| Pasivos netos de pensiones | 1,746 | — | — | — | — | — |
| Beneficios pagaderos por rescisión voluntaria | 103 | — | — | 2,069 | — | 3,734 |
| Otros pasivos a largo plazo | — | 4,008 | — | — | — | — |
| Total de pasivos | 2,021 | 184,282 | 8,054 | 3,377 | 95 | 11,886 |
| Entradas diferidas de recursos: | | | | | | |
| Acuerdos de concesión de servicios | — | — | — | — | — | — |
| Relacionados con pensiones | 13 | — | — | — | — | — |
| Total de entradas diferidas de recursos | 13 | — | — | — | — | — |
| **Resultados Netos:** | | | | | | |
| Inversión neta en activos de capital | 834 | 614 | 67 | 15,388 | 24 | 45,521 |
| Restringido para: | | | | | | |
| Proyectos de capital | — | — | — | — | — | — |
| Servicio de la deuda | — | — | — | — | — | — |
| Préstamos estudiantiles y otros propósitos educativos | — | — | — | — | — | — |
| Otros propósitos especificados | 58 | 24,727 | — | — | — | 1,102 |
| no restringidos (déficit) | (1,839) | 128,647 | (1,120) | 108 | 248 | (1,684) |
| Total resultados netos (déficit) | $ (947) | 153,988 | (1,053) | 15,496 | 272 | 44,939 |

(Continuaci

**ELA DE PUERTO RICO**

Unidades de Componentes No Mayores de Presentación Discreta:

Estado Combinado de Resultados Netos

30 de junio de 2016

(En miles)

| | Fondo Institucional de la Guardia Nacional de Puerto Rico | Autoridad Tierras de Puerto Rico | Autoridad de Redesarrollo Local de las Tierras e Instalaciones de la Estación Naval Roosevelt Roads | Corporación para las Artes Musicales | Corporación Pública para la Supervisión de Seguros de Depósito de Cooperativas de Puerto Rico |
|---|---|---|---|---|---|
| **Activos:** | | | | | |
| Efectivo y equivalentes de efectivo en bancos comerciales | $ 3,854 | 13,713 | 549 | 4,137 | 4,102 |
| Efectivo y equivalentes de efectivo en bancos gubernamentales | — | 15,377 | — | 57 | 66 |
| Inversiones | — | — | — | — | 251,594 |
| Cuentas por cobrar - neto: | | | | | |
| Primas de seguros | — | — | — | — | — |
| Intergubernamental | — | 988 | 95 | — | — |
| Cuentas | 282 | 13,801 | 29 | 24 | — |
| Préstamos y adelantos | — | — | — | — | 3,731 |
| Interés devengado | 596 | — | — | — | 1,810 |
| Otros | 332 | — | — | — | 93 |
| Adeudado de - neto: | | | | | |
| Gobierno primario | — | 8,567 | — | — | — |
| Unidades de componentes | — | 9,075 | — | — | — |
| Otras entidades del gobierno | 632 | 1,181 | 171 | 149 | — |
| Inventarios | — | — | — | — | — |
| Gastos pagados por adelantado | 52 | — | 123 | — | — |
| Otros activos | 91 | 6,276 | — | 83 | — |
| Activos restringidos: | | | | | |
| Efectivo y equivalentes de efectivo en bancos comerciales | — | 984 | — | 250 | — |
| Efectivo y equivalentes de efectivo en bancos gubernamentales | — | 1,965 | — | — | — |
| Inversiones | 26,358 | — | — | — | — |
| Otros activos restringidos | — | — | — | — | — |
| Bienes inmuebles mantenidos para la venta o desarrollo futuro | — | — | — | — | — |
| Activos de capital: | | | | | |
| Terrenos y otros activos no depreciables | 7,887 | 87,929 | 12,098 | 568 | 35 |
| Depreciables, neto | 10,433 | 6,223 | 4,270 | 457 | 2,836 |
| Activos totales | 50,517 | 166,079 | 17,335 | 5,725 | 264,267 |
| **Salidas diferidas de recursos:** | | | | | |
| Pérdida por reembolso de bonos | — | — | — | — | — |
| Relacionado con pensiones | — | 8,892 | — | — | — |
| Total de salidas diferidas de recursos | — | 8,892 | — | — | — |
| **Pasivos:** | | | | | |
| Cuentas a pagar y pasivos devengados | 2,235 | 4,811 | 747 | 257 | 109,032 |
| Depósitos y pasivos en custodia | — | 2,567 | 164 | — | — |
| Adeudado a: | | | | | |
| Gobierno primario | — | — | — | — | — |
| Unidades de componentes | — | 33,765 | — | — | — |
| Otras entidades gubernamentales | — | 23,659 | 16,944 | 350 | 42 |
| Interés a pagar | — | 1,235 | — | — | — |
| Ingreso no devengado | — | 9,045 | 1 | 210 | — |
| Pasivos pagaderos dentro de un año: | | | | | |
| Bonos de asignación del ELA | — | 2,975 | — | — | — |
| Bonos de ingresos | — | — | — | — | — |
| Pagarés adeudados a instituciones financieras | — | — | — | — | — |
| Arrendamiento de capital | — | — | — | — | — |
| Ausencias compensadas | 94 | 881 | 233 | 535 | 1,722 |
| Beneficios pagaderos por rescisión voluntaria | — | — | — | 64 | — |
| Pasivos por el seguro de accidentes automovilísticos y compensación del trabajador | — | — | — | — | — |
| Otros pasivos a largo plazo | — | 1,773 | — | — | — |
| Pasivos pagaderos después de un año: | | | | | |
| Bonos de asignación del ELA | — | 52,843 | — | — | — |
| Bonos de ingresos | — | — | — | — | — |
| Pagarés adeudados a instituciones financieras | — | — | — | — | — |
| Arrendamiento de capital | — | 1,014 | — | 207 | — |
| Ausencias compensadas | — | — | — | — | — |
| Obligaciones de pensiones netas | — | 105,622 | — | 18,240 | — |
| Pasivos de pensiones netas | — | — | — | 774 | 508 |
| Beneficios pagaderos por rescisión voluntaria | — | — | — | — | — |
| Otros pasivos a largo plazo | — | 26,887 | — | — | 30 |
| Total de pasivos | 2,329 | 267,077 | 18,089 | 20,637 | 111,334 |
| **Entradas diferidas de recursos:** | | | | | |
| Acuerdos de concesión de servicio | — | — | — | — | — |
| Relacionado con pensiones | — | 765 | — | — | — |
| Total de entradas diferidas de recursos | — | 765 | — | — | — |
| **Resultados netos:** | | | | | |
| Inversión neta en activos de capital | 18,320 | 94,152 | 28 | 1,025 | 2,871 |
| Restringido para: | | | | | |
| Proyectos de capital | — | — | — | — | — |
| Servicio de la deuda | — | — | — | — | — |
| Préstamos estudiantiles y otros propósitos educativos | — | — | — | — | — |
| Otros propósitos especificados | 27,730 | — | — | 250 | 92,763 |
| No restringidos (déficit) | 2,138 | (187,023) | (782) | (16,187) | 57,299 |
| Resultados netos totales (déficit) | $ 48,188 | (92,871) | (754) | (14,912) | 152,933 |

(Continuaci

**ELA DE PUERTO RICO**

Estados Combinados de Resultados Netos de Unidades

de Componentes No Mayores de Presentación Discreta

30 de junio de 2016

(En miles)

| | Corporación del Conservatorio de Música de Puerto Rico | Autoridad del Distrito del Centro de Convenciones de Puerto Rico | Consejo de Educación de Puerto Rico | Comisión de Energía de Puerto Rico | Compañía de Fomento Industrial de Puerto Rico | Autoridad para el Financiamiento de Instalaciones Industriales, Turísticas, Educativas, Médicas y de Control Ambiental de Puerto Rico |
|---|---|---|---|---|---|---|
| **Activos:** | | | | | | |
| Efectivo y equivalentes de efectivo en bancos comerciales | $ 2,145 | 8,836 | 216 | 564 | 24,474 | — |
| Efectivo y equivalentes de efectivo en bancos gubernamentales | — | — | 3,115 | 696 | 7,076 | — |
| Inversiones | — | — | — | — | 4,093 | — |
| Cuentas por cobrar - neto: | | | | | | |
| Primas de seguro | — | — | — | — | — | — |
| Intergubernamental | — | — | — | — | 780 | — |
| Cuentas | — | 7,608 | — | 1,217 | 12,963 | — |
| Préstamos y adelantos | — | 2,490 | — | — | — | — |
| Interés devengado | — | — | — | — | — | — |
| Otro | 588 | — | 1,625 | — | — | — |
| Adeudado de - neto: | | | | | | |
| Gobierno primario | — | — | — | — | 3,808 | — |
| Unidades de componentes | — | 7,240 | — | — | — | — |
| Otras entidades del gobierno | — | — | — | 261 | 992 | — |
| Inventarios | — | — | — | — | — | — |
| Gastos pagados previamente | 13 | 10,345 | — | — | 2,045 | — |
| Otros activos | — | 313 | — | — | — | — |
| Activos restringidos: | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | 1,564 | 5,316 | 120 | — | — | — |
| Efectivo y equivalentes al efectivo en bancos gubernamentales | — | — | 1,994 | — | — | 29 |
| Inversiones | — | 39,939 | — | — | 32,044 | — |
| Otros activos restringidos | — | — | — | — | — | — |
| Bienes inmuebles mantenidos para la venta o desarrollo futuro | — | — | — | — | — | — |
| Activos de capital: | | | | | | |
| Terrenos y otros activos no depreciables | 5,157 | 290,143 | — | 404 | 283,301 | — |
| Depreciables, neto | 73,409 | 384,692 | 50 | 544 | 372,603 | — |
| Total de activos | 82,876 | 756,922 | 7,120 | 3,686 | 744,179 | 29 |
| Salidas diferidas de recursos: | | | | | | |
| Préstamos de refinanciamiento de bonos | — | — | — | — | 559 | — |
| Relacionado con las pensiones | — | — | — | — | — | — |
| Total de salidas diferidas de recursos | — | — | — | — | 559 | — |
| **Pasivos:** | | | | | | |
| Cuentas a pagar y pasivos devengados | 1,548 | 6,937 | 1,441 | 1,300 | 31,684 | 29 |
| Depósitos y pasivos en custodia | — | 4,878 | — | — | 7,603 | — |
| Adeudado a: | | | | | | |
| Gobierno primario | — | — | — | — | — | — |
| Unidades de componentes | 339 | 146,379 | — | — | 77,772 | — |
| Otras entidades gubernamentales | — | 28,350 | — | — | 5,972 | — |
| Interés a pagar | — | — | — | — | — | — |
| Ingresos no devengados | 646 | 6,920 | — | — | — | — |
| Pasivos pagaderos dentro de un año: | | | | | | |
| Bonos de asignación del ELA | — | — | — | — | — | — |
| Bonos de ingresos | — | 11,325 | — | — | 10,065 | — |
| Pagarés adeudados a instituciones financieras | — | — | — | — | 9,702 | — |
| Arrendamientos de capital | — | — | — | — | 105 | — |
| Ausencias compensadas | 391 | 292 | 287 | — | 5,078 | — |
| Beneficios pagaderos por rescisión voluntaria | 21 | — | 124 | — | 965 | — |
| Pasivos por el seguro de accidentes automovilísticos y compensación del trabajador | — | — | — | — | — | — |
| Otros pasivos a largo plazo | — | — | — | — | 161 | — |
| Pasivos pagaderos después de un año: | | | | | | |
| Bonos de asignación del ELA | — | — | — | — | — | — |
| Bonos de ingresos | — | 391,353 | — | — | 157,477 | — |
| Pagarés adeudados a instituciones financieras | — | — | — | — | 94,471 | — |
| Arrendamiento de capital | — | — | — | — | 206 | — |
| Ausencias compensadas | 477 | — | 419 | 172 | — | — |
| Obligaciones de pensiones netas | — | — | — | — | — | — |
| Pasivos de pensiones netas | 55 | — | — | — | — | — |
| Beneficios pagaderos por rescisión voluntaria | — | — | 1,296 | — | 6,547 | — |
| Otros pasivos a largo plazo | — | — | — | — | 22,730 | — |
| Total de pasivos | 3,477 | 596,434 | 3,567 | 1,472 | 430,538 | 29 |
| Entradas diferidas de recursos: | | | | | | |
| Acuerdos de concesión de servicio | — | — | — | — | — | — |
| Relacionados con pensiones | — | — | — | — | — | — |
| Total de entradas diferidas de recursos | — | — | — | — | — | — |
| **Resultados Netos:** | | | | | | |
| Inversión neta en activos de capital | 78,565 | 117,368 | 50 | 948 | 400,196 | — |
| Restringido para: | | | | | | |
| Proyectos de capital | — | 911 | — | — | — | — |
| Servicio de la deuda | — | 39,028 | — | — | 20,558 | — |
| Préstamos estudiantiles y otros propósitos educativos | 1,564 | — | 2,081 | — | — | — |
| Otros propósitos especificados | — | — | — | — | — | — |
| No restringidos (déficit) | (730) | 3,181 | 1,422 | 1,266 | (106,554) | — |
| Resultados netos totales (déficit) | $ 79,399 | 160,488 | 3,553 | 2,214 | 314,200 | — |

Ver el informe de los auditores independientes adjunto.

(Continuaci

**ELA DE PUERTO RICO**

Estados Combinados de Resultados Netos de Unidades

de Componentes No Mayores de Presentación Discreta

30 de junio de 2016

(En miles)

| | Autoridad de Transporte Integrado de Puerto Rico | Administración de Tierras de Puerto Rico | Autoridad de Transporte Marítimo de Puerto Rico y las Islas Municipales | Autoridad Metropolitana de Autobuses de Puerto Rico | Agencia de Finanzas Municipales de Puerto Rico |
|---|---|---|---|---|---|
| Activos: | | | | | |
| Efectivo y equivalentes de efectivo en bancos comerciales | $ 1,478 | 4,105 | 4,313 | 2,657 | — |
| Efectivo y equivalentes al efectivo en bancos gubernamentales | — | — | 5 | — | 5,036 |
| Inversiones | — | 1,619 | — | — | — |
| Cuentas por cobrar - neto: | | | | | |
| Primas de seguro | — | — | — | — | — |
| Intergubernamental | — | — | 688 | — | — |
| Cuentas | — | 229 | 60 | 1 | — |
| Préstamos y adelantos | — | 97 | — | — | — |
| Interés devengado | — | — | — | — | — |
| Otro | — | 23 | — | 1,017 | — |
| Adeudado de - neto: | | | | | |
| Gobierno primario | 2,000 | — | — | — | — |
| Unidades de componentes | — | — | — | 4,468 | — |
| Otras entidades gubernamentales | — | 1,379 | 1,024 | 1,079 | — |
| Inventarios | — | — | 55 | 4,957 | — |
| Gastos pagados previamente | — | 167 | 861 | — | 3,275 |
| Otros activos | — | — | — | 542 | 22 |
| Activos restringidos: | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | — | 82 | — | — | 6,856 |
| Efectivo y equivalentes de efectivo en bancos gubernamentales | — | — | — | — | — |
| Inversiones | — | — | — | — | 699,212 |
| Otros activos restringidos | — | — | — | — | 16,099 |
| Bienes inmuebles mantenidos para la venta o desarrollo futuro | — | 177,387 | — | — | — |
| Activos de capital: | | | | | |
| Terrenos y otros activos no depreciables | — | 30,143 | 122 | 2,500 | — |
| Depreciables, neto | 287 | 7,774 | 58,212 | 21,722 | — |
| Activos totales | 3,765 | 223,005 | 65,340 | 38,943 | 730,500 |
| Salidas diferidas de recursos: | | | | | |
| Pérdida por reembolso de bonos | — | — | — | — | 2,420 |
| Relacionado con pensiones | — | — | — | — | — |
| Total de salidas diferidas de recursos | — | — | — | — | 2,420 |
| Pasivos: | | | | | |
| Cuentas a pagar y pasivos devengados | 433 | 1,047 | 1,933 | 8,000 | 609 |
| Depósitos y pasivos en custodia | — | 34,027 | — | — | 35,475 |
| Adeudado a: | | | | | |
| Gobierno primario | — | 1,054 | 4,279 | 35,467 | — |
| Unidades de componentes | — | — | 72,101 | 6,096 | — |
| Otras entidades del gobierno | 2,000 | 949 | 10,426 | 34,939 | 1,648 |
| Intereses por pagar | — | — | — | — | 13,545 |
| Ingresos no devengados | — | 2,916 | — | — | — |
| Pasivos pagaderos dentro de un año: | | | | | |
| Bonos de asignación del ELA | — | — | — | — | 609 |
| Bonos de ingresos | — | — | — | — | 84,980 |
| Pagarés adeudados a instituciones financieras | — | — | — | 28,255 | — |
| Arrendamiento de capital | — | — | — | — | — |
| Asuencias compensadas | — | 729 | 1,234 | 3,701 | — |
| Beneficios pagaderos por rescisión voluntaria | — | 401 | 335 | 931 | — |
| Pasivos por el seguro de accidentes automovilísticos y compensación del trabajador | — | — | — | — | — |
| Otros pasivos a largo plazo | — | — | 487 | 165 | — |
| Pasivos pagaderos después de un año: | | | | | |
| Bonos de asignación del ELA | — | — | — | — | — |
| Bonos de ingresos | — | — | — | — | 552,759 |
| Pagarés adeudados a instituciones financieras | — | — | — | — | — |
| Arrendamiento de capital | — | — | — | — | — |
| Asuencias compensadas | 157 | — | 1,566 | 1,755 | — |
| Obligación de pensiones netas | — | — | — | — | — |
| Pasivos netos de pensiones | — | — | — | — | — |
| Beneficios pagaderos por rescisión voluntaria | — | 2,414 | 3,240 | 5,919 | — |
| Otros pasivos a largo plazo | — | — | 3,610 | 9,969 | — |
| Total de pasivos | 2,590 | 43,537 | 99,211 | 135,197 | 689,016 |
| Entradas diferidas de recursos: | | | | | |
| Acuerdos de concesión de servicio | — | — | — | — | — |
| Relacionado con pensiones | — | — | — | — | — |
| Total de entradas diferidas de recursos | — | — | — | — | — |
| Resultados Netos: | | | | | |
| Inversión neta en activos de capital | 287 | 6,629 | 58,334 | 24,222 | — |
| Restringido para: | | | | | |
| Proyectos de capital | — | — | — | — | — |
| Servicio de la deuda | — | — | — | — | 74,930 |
| Préstamos estudiantiles y otros propósitos educativos | — | — | — | — | — |
| Otros propósitos especificados | — | 82 | — | — | — |
| No restringido (déficit) | 888 | 172,757 | (92,205) | (120,476) | (31,026) |
| Resultados netos totales (déficit) | $ 1,175 | 179,468 | (33,871) | (96,254) | 43,904 |

Ver el informe de los auditores independientes adjunto.

(Continuaci

**ELA DE PUERTO RICO**

Estados Combinados de Resultados Netos de Unidades

de Componentes No Mayores de Presentación Discreta

30 de junio de 2016

(En miles)

| | Corporación de Finanzas Municipales de Puerto Rico | Autoridad de Puertos de Puerto Rico | Corporación de Distribución Pública de Puerto Rico | Autoridad de Asociaciones Públicas y Privadas de Puerto Rico | Escuela de Artes Plásticas de Puerto Rico |
|---|---|---|---|---|---|
| **Activos:** | | | | | |
| Efectivo y equivalentes de efectivo en bancos comerciales | $ 46,177 | 3,177 | 944 | — | 239 |
| Efectivo y equivalentes de efectivo en bancos gubernamentales | — | 4,074 | — | 374 | 186 |
| Inversiones | — | — | — | — | — |
| Cuentas por cobrar - neto: | | | | | |
| Primas de seguro | — | — | — | — | — |
| Intergubernamental | 29,491 | 2,975 | 71 | — | — |
| Cuentas | 14,025 | 20,869 | 261 | — | 64 |
| Préstamos y adelantos | — | — | — | — | — |
| Interés devengado | — | — | — | — | — |
| Otro | — | — | 41 | — | — |
| Adeudado de - neto: | | | | | |
| Gobierno primario | — | — | 1,446 | — | — |
| Unidades de componentes | — | 6,194 | — | — | — |
| Otras entidades del gobierno | — | — | 65 | 7,702 | — |
| Inventarios | — | — | — | — | — |
| Gastos pagados previamente | — | 4,227 | — | — | — |
| Otros activos | — | 3,748 | 171 | 18 | — |
| Activos restringidos: | | | | | |
| Efectivo y equivalentes de efectivo en bancos comerciales | — | 8,855 | 2,445 | 1,361 | 20 |
| Efectivo y equivalentes al efectivo en bancos gubernamentales | — | — | — | 1 | 8 |
| Inversiones | — | — | — | — | 2,154 |
| Otros activos restringidos | — | 25,351 | — | — | — |
| Bienes inmuebles mantenidos para la venta o desarrollo futuro | — | — | — | — | — |
| Activos de capital: | | | | | |
| Terrenos y otros activos no depreciables | — | 438,496 | 83 | — | — |
| Depreciables, neto | — | 845,584 | 5,245 | 11 | 7,505 |
| Total de activos | 89,693 | 1,363,550 | 10,772 | 9,467 | 10,176 |
| Salidas diferidas de recursos: | | | | | |
| Pérdida por reembolso de bonos | — | 12,506 | — | — | — |
| Relacionado con pensiones | — | — | — | — | 738 |
| Total de entradas diferidas de recursos | — | 12,506 | — | — | 738 |
| **Pasivos:** | | | | | |
| Cuentas a pagar y pasivos devengados | — | 31,686 | 3,208 | 796 | 591 |
| Depósitos y pasivos en custodia | — | 1,393 | — | — | — |
| Adeudado a: | | | | | |
| Gobierno primario | — | 43,640 | — | — | — |
| Unidades de componentes | 326,188 | 320,473 | — | 6,462 | — |
| Otras entidades gubernamentales | 5,569 | 23,735 | — | 618 | 39 |
| Interés a pagar | — | 40,359 | — | — | — |
| Ingreso no devengado | — | 1,655 | — | 1,528 | — |
| Pasivos pagaderos dentro de un año: | | | | | |
| Bonos de asignación del ELA Bonos de ingresos | — | — | — | — | — |
| Pagarés adeudados a instituciones financieras | — | 2,055 | — | — | — |
| Arrendamientos de capital | — | 1,545 | — | — | — |
| Ausencias compensadas | — | — | — | — | — |
| Beneficios pagaderos por rescisión voluntaria | — | 6,225 | 1,004 | — | 138 |
| Pasivos por el seguro de accidentes automovilísticos y compensación del trabajador | — | 2,383 | 451 | — | — |
| Otros pasivos a largo plazo | — | — | — | — | — |
| Pasivos pagaderos después de un año: | | | | | |
| Bonos de asignación del ELA | — | — | — | — | — |
| Bonos de ingresos | — | 195,349 | — | — | — |
| Pagarés adeudados a instituciones financieras | — | 7,442 | — | — | — |
| Arrendamientos de capital | — | — | — | — | — |
| Ausencias compensadas | — | — | 1,545 | — | 263 |
| Obligaciones de pensiones netas | — | — | — | — | — |
| Pasivos de pensiones netas | — | — | — | — | 11,021 |
| Beneficios pagaderos por rescisión voluntaria | — | 19,258 | 3,621 | — | — |
| Otros pasivos a largo plazo | — | 3,319 | 1,680 | — | — |
| Total de pasivos | 331,757 | 700,517 | 11,509 | 9,404 | 12,052 |
| Entradas diferidas de recursos: | | | | | |
| Acuerdos de concesión de servicio | — | 694,734 | — | — | — |
| Relacionado con pensiones | — | — | — | — | 88 |
| Total de pasivos y entradas diferidas de recursos | 331,757 | 1,395,251 | 11,509 | 9,404 | 12,140 |
| Resultados netos: | | | | | |
| Inversión neta en activos de capital | — | 636,346 | 5,328 | 11 | 7,505 |
| Restringido para: | | | | | |
| Proyectos de capital | — | 34,206 | — | — | — |
| Servicio de la deuda | — | — | — | — | — |
| Préstamos estudiantiles y otros propósitos educativos | — | — | — | — | 2,153 |
| Otros propósitos especificados | — | — | 2,238 | — | — |
| No restringido (déficit) | (242,064) | (689,747) | (8,303) | 52 | (10,884) |
| Resultados netos totales (déficit) | $ (242,064) | (19,195) | (737) | 63 | (1,226) |

Ver el informe de los auditores independientes adjunto.

(Continuaci

**ELA DE PUERTO RICO**

Estados Combinados de Resultados Netos de Unidades

de Componentes No Mayores de Presentación Discreta

30 de junio de 2016

(En miles)

| | Fideicomiso para Ciencia, Tecnología e Investigación de Puerto Rico | Autoridad de Teléfonos de Puerto Rico | Compañía de Turismo de Puerto Rico | Compañía de Comercio y Exportación de Puerto Rico | Autoridad de Depósitos Sólidos | Total de Unidades de Componentes No Mayores |
|---|---|---|---|---|---|---|
| **Activos:** | | | | | | |
| Efectivos y equivalentes de efectivo en bancos comerciales | $ 11,020 | — | 33,706 | 3,648 | 862 | 279,673 |
| | 7,129 | — | — | 570 | 219 | 47,189 |
| Efectivo y equivalentes de efectivo en bancos gubernamentales | 78,585 | — | 6,401 | — | — | 475,034 |
| Inversiones | — | — | — | — | — | 1,733 |
| Cuentas por cobrar - neto: | | | | | | |
| Primas de seguro | — | — | 7,959 | 1,113 | — | 86,908 |
| Intergubernamental | — | — | — | — | — | 261,594 |
| Cuentas | — | 1 | 6,069 | — | — | 7,424 |
| Préstamos y adelantos | — | — | — | 3,307 | — | 5,739 |
| Interés devengado | 89 | — | 753 | — | — | 35,303 |
| Otro | — | — | — | — | 2,754 | 60,415 |
| Adeudado de - neto: | | | | | | |
| Gobierno primario | — | — | — | — | — | 30,904 |
| Unidades de componentes | 9,349 | — | — | — | 1,134 | 29,492 |
| Otras entidades del gobierno | — | — | — | — | — | 17,183 |
| Inventarios | — | — | 94 | 211 | — | 22,810 |
| Gastos pagados previamente | 54 | — | — | — | 132 | 22,952 |
| Otros Activos restringidos: | | | | | | |
| Efectivos y equivalentes de efectivo en bancos comerciales | — | — | — | 4,758 | — | 36,568 |
| Efectivo y equivalentes de efectivo en bancos gubernamentales | — | 7 | — | 711 | 330 | 5,248 |
| Inversiones | 5,768 | — | — | 265,974 | — | 1,071,449 |
| Otros activos restringidos | — | — | — | — | — | 53,878 |
| Bienes inmuebles mantenidos para la venta o desarrollo futuro | — | — | 2,600 | — | — | 181,048 |
| Activos de capital: | | | | | | |
| Terrenos y otros activos no depreciables | 35,327 | — | 5,046 | 40,048 | 21,798 | 1,274,483 |
| Depreciable, neto | 2,854 | — | 18,147 | 47,094 | 88,445 | 2,070,987 |
| Total de activos | 150,175 | 8 | 80,775 | 367,434 | 115,674 | 6,078,014 |
| **Salidas diferidas de recursos:** | | | | | | |
| Préstamos de refinanciamiento de bonos | — | — | 1,444 | — | — | 16,929 |
| Relacionado con las pensiones | — | — | — | — | — | 72,035 |
| Total de salidas diferidas de recursos | — | — | 1,444 | — | — | 88,964 |
| **Pasivos:** | | | | | | |
| Cuentas por pagar y pasivos devengados | 4,418 | 7 | 38,699 | 4,428 | 3,245 | 356,023 |
| Depósitos y pasivos en custodia | — | — | — | 2,638 | — | 257,831 |
| Adeudado a: | | | | | | |
| Gobierno primario | — | — | 2,558 | 1,241 | — | 113,393 |
| Unidades de componentes | — | — | 13,947 | 1,047 | 77,166 | 1,250,772 |
| Otras entidades del gobierno | — | — | — | — | 4,967 | 129,041 |
| Interés a pagar | — | — | 4,284 | 3,074 | 13,109 | 115,768 |
| Ingresos no devengados | — | — | — | — | — | 64,883 |
| Pasivos pagaderos dentro de un año: | | | | | | |
| Bonos de asignación del ELA | — | — | 2,371 | — | — | 5,761 |
| Bonos de ingresos | — | — | — | — | 415 | 108,425 |
| Pagarés adeudados a instituciones financieras | — | — | — | 571 | — | 42,875 |
| Arrendamientos de capital | 7 | — | 180 | 47 | — | 339 |
| Ausencias compensadas | — | — | 2,352 | 577 | 259 | 36,531 |
| Beneficios pagaderos por rescisión voluntaria | — | — | 5,508 | 271 | 463 | 15,519 |
| Pasivos por el seguro de accidentes automovilísticos y compensación del trabajador | — | — | — | — | — | 67,362 |
| Otros pasivos a largo plazo | 5 | — | 1,338 | — | — | 11,178 |
| Pasivos pagaderos después de un año: | | | | | | |
| Bonos de asignación del ELA | — | — | 42,811 | — | 7,399 | 103,053 |
| Bonos de ingresos | — | — | — | — | — | 1,296,938 |
| Pagarés adeudados a instituciones financieras | — | — | — | 278,960 | — | 380,873 |
| Arrendamientos de capital | 2 | — | 680 | 53 | — | 941 |
| Ausencias compensadas | — | — | 4,410 | 1,236 | 353 | 20,045 |
| Obligación de pensiones netas | — | — | — | — | — | 18,240 |
| Pasivos de pensiones netos | — | — | — | — | — | 588,170 |
| Beneficios pagaderos por rescisión voluntaria | — | — | — | 1,490 | 4,467 | 74,260 |
| Otros pasivos a largo plazo | — | — | 1,126 | — | — | 83,465 |
| Total de pasivos | 4,432 | 7 | 119,138 | 296,759 | 111,843 | 5,141,686 |
| **Entradas diferidas de recursos:** | | | | | | |
| Acuerdos de concesión de servicio | — | — | — | — | — | 694,734 |
| Relación con pensiones | — | — | — | — | — | 5,677 |
| Total de entradas diferidas de recursos | — | — | — | — | — | 700,411 |
| **Resultados Netos:** | | | | | | |
| Inversión neta en activos de capital | 122,019 | — | 22,333 | 73,584 | 38,381 | 1,822,760 |
| Restringido para: | | | | | | |
| Proyecto de capital | — | — | — | — | — | 229,599 |
| Servicio de la deuda | — | — | — | — | — | 134,516 |
| Préstamos estudiantiles y otros propósitos educativos | — | — | — | — | — | 5,798 |
| Otros propósitos especificados | — | 1 | — | 4,764 | 330 | 154,543 |
| No restringidos (déficit) | 23,724 | — | (59,252) | (7,673) | (34,880) | (2,022,335) |
| Resultados netos totales (déficit) | $ 145,743 | 1 | (36,919) | 70,675 | 3,831 | 324,881 |

Ver el informe de los auditores independientes adjunto.

**ELA DE PUERTO RICO**

Estados Combinados de Actividades de Unidades de

Componentes No Mayores de Presentación Discreta

Año finalizado el 30 de junio de

2016 (En miles)

| | Gastos | Cargos por servicios | Ingresos del programa Subvenciones y contribuciones operativas | Subvenciones y contribuciones de capital | Ingresos (gastos) netos y cambios en los resultados netos | Pagos (del) al gobierno primario | Pagos de (a) otras unidades de componentes | Ingresos generales Subsidios y contribuciones no restringidas a programas específicos | Ganancias por intereses e inversiones | Impuestos a las ventas y otros | Cambios en los resultados netos | Resultados netos (déficit) a comienzos del año (tal como se informó anteriormente) | Corrección de errores y adopción de nuevos pronunciamientos contables (nota 4) | Resultados netos (déficit) al comienzo del año, ajustados y reformulados | Resultados netos (déficit) fin de año |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Administración para el Desarrollo de Empresas Agropecuarias | $ 233,935 | 92,831 | — | — | (141,104) | 92,453 | — | 1,671 | 76 | 887 | (46,017) | (252,648) | 24,316 | (228,332) | (274,349) |
| Administración de Compensación por Accidentes de Automóviles | 69,871 | 85,885 | — | — | 16,014 | (10,716) | — | — | 1,976 | — | 7,274 | (89,880) | — | (89,880) | (82,606) |
| Corporación del Centro Cardiovascular de Puerto Rico y el Caribe | 90,862 | 76,163 | — | — | (14,699) | 187 | — | 68 | — | — | (14,444) | (42,562) | (112,443) | (155,005) | (169,449) |
| Compañía para el Desarrollo Integral de la "Península de Cantera" | 8,754 | — | 1,587 | — | (7,167) | 2,636 | — | 11 | 57 | — | (4,463) | (27,416) | — | (27,416) | (31,879) |
| Corporación para el Proyecto Enlace del "Caño Martín Peña" | 3,062 | — | 48 | 567 | (2,447) | 2,006 | — | 1 | — | 226 | (214) | 3,651 | — | 3,651 | 3,437 |
| Autoridad de Conservación y Desarrollo de Culebra | 736 | 262 | — | — | (474) | 255 | — | — | — | — | (219) | (728) | — | (728) | (947) |
| Banco de Desarrollo Económico de Puerto Rico | 45,564 | 30,177 | — | 26 | (15,361) | — | — | — | — | 514 | (14,847) | 168,835 | — | 168,835 | 153,988 |
| Corporación de Seguros Agrícolas de Puerto Rico | 5,862 | 486 | 928 | — | (4,448) | — | — | 51 | — | — | (4,397) | 3,344 | — | 3,344 | (1,053) |
| Corporación del Centro de Bellas Artes | 6,767 | 2,361 | — | — | (4,406) | 3,785 | — | 3 | — | — | (618) | 16,114 | — | 16,114 | 15,496 |
| Oficina Independiente de Protección al Consumidor | 888 | — | 580 | — | (308) | — | 580 | — | — | — | 272 | — | — | — | 272 |
| Instituto de Cultura Puertorriqueña | 29,169 | — | 1,928 | 85 | (27,156) | 11,770 | — | — | — | — | (15,386) | 59,060 | 2,265 | 60,325 | 44,939 |
| Fideicomiso Institucional de la Guardia Nacional de Puerto Rico | 7,807 | 4,444 | — | — | (3,363) | — | — | 1,605 | — | — | (1,758) | 49,946 | — | 49,946 | 48,188 |
| Autoridad de Tierras de Puerto Rico | 39,347 | 10,113 | 170 | — | (29,064) | 14,566 | — | — | — | 5,638 | (8,860) | (78,358) | (5,653) | (84,011) | (92,871) |
| Autoridad de Reurbanización Local de las Tierras e Instalaciones de la Estación Naval Roosevelt Roads | 3,663 | 494 | 1,284 | - | 1,925 | 1,215 | — | — | — | 32 | (676) | (76) | — | (76) | (784) |
| Corporación para las Artes Musicales | 8,556 | 487 | — | — | (8,069) | 7,525 | — | — | 422 | 219 | 97 | (14,880) | (129) | (15,009) | (14,912) |
| Corporación Pública para la Supervisión y Seguro de Cooperativas de Puerto Rico | 92,782 | 21,868 | 1,038 | — | 69,876 | — | — | — | 9,816 | — | (60,060) | 212,993 | — | 212,993 | 152,933 |
| Corporación del Conservatorio de Música de Puerto Rico | 11,689 | 3,286 | — | 33 | (8,370) | 6,788 | — | 680 | 8 | 22 | (872) | 80,271 | — | 80,271 | 79,399 |
| Autoridad del Distrito del Centro de Convenciones de Puerto Rico | 74,461 | 30,718 | — | — | (43,743) | — | 19,892 | — | 308 | 301 | (23,242) | 183,730 | — | 183,730 | 160,488 |
| Consejo de Educación de Puerto Rico | 14,229 | 620 | 2,407 | — | (11,202) | 11,301 | — | — | 29 | 159 | 287 | 3,266 | — | 3,266 | 3,553 |
| Comisión de Energía de Puerto Rico | 8,578 | — | 1,932 | — | (6,646) | — | 5,220 | — | 7 | — | (1,419) | 3,633 | — | 3,633 | 2,214 |
| Compañía de Fomento Industrial de Puerto Rico | 97,495 | 65,602 | — | 6,657 | (25,236) | — | (2,351) | — | 397 | 8,014 | (19,176) | 333,376 | — | 333,376 | 314,200 |
| Autoridad de Financiamiento de Instalaciones de Control Industrial, Turístico, Educativo, Médico y Ambiental de Puerto Rico | 11 | — | — | — | (11) | — | — | — | 10 | — | (1) | 1 | — | 1 | — |
| Autoridad de Transporte Integrado de Puerto Rico | 11,634 | — | — | — | (11,634) | 6,972 | — | — | — | — | (4,662) | 5,837 | — | 5,837 | 1,175 |
| Administración de Tierras de Puerto Rico | 46,735 | 12,648 | 5,572 | — | (28,515) | — | — | 414 | — | — | (28,101) | 207,569 | — | 207,569 | 179,468 |
| Autoridad de Transporte Marítimo de Puerto Rico y las Islas Municipio | 44,408 | 4,755 | 121 | 6,862 | (32,670) | 30,289 | — | — | — | — | (2,381) | (31,490) | — | (31,490) | (33,871) |
| Autoridad Metropolitana de Autobuses de Puerto Rico | 64,261 | 3,173 | 6,262 | 3,207 | (51,619) | 36,053 | — | — | — | — | (15,566) | (80,688) | — | (80,688) | (96,254) |
| Agencia de Finanzas Municipales de Puerto Rico | 31,544 | — | — | — | (31,544) | — | — | 32,924 | 2 | — | 1,382 | 42,522 | — | 42,522 | 43,904 |
| Corporación de Finanzas Municipales de Puerto Rico | 467,739 | — | 224,842 | — | (242,897) | — | — | — | — | 833 | (242,064) | — | — | — | (242,064) |
| Autoridad de los Puertos de Puerto Rico | 134,651 | 103,226 | 11,287 | — | (20,138) | 25 | 2,351 | 237 | 7,472 | — | (10,053) | (9,142) | — | (9,142) | (19,195) |
| Corporación de Puerto Rico para la Difusión Pública | 22,545 | 3,805 | — | — | (18,740) | 11,819 | — | 2,249 | 77 | — | (4,595) | 4,206 | (348) | 3,858 | (737) |
| Autoridad para Alianzas Público-Privadas de Puerto Rico | 3,556 | 3,621 | — | — | 65 | — | — | 1 | — | — | 66 | (3) | — | (3) | 63 |
| Escuela de Artes Plásticas de Puerto Rico | 4,871 | 610 | 1,881 | — | (2,380) | 2,755 | — | 47 | — | — | 422 | 9,240 | (10,888) | (1,648) | (1,226) |
| Fideicomiso para Ciencia, Tecnología e Investigación de Puerto Rico | 17,723 | 7 | 6,567 | 4,053 | (7,096) | — | — | — | 14 | 174 | (6,922) | 152,665 | — | 152,665 | 145,743 |
| Autoridad Telefónica de Puerto Rico | 17,320 | — | — | — | (17,320) | — | — | — | — | 5,415 | (11,891) | 11,892 | — | 11,892 | 1 |
| Compañía de Turismo de Puerto Rico | 168,358 | 158,597 | 3,560 | — | (6,201) | (20,790) | (82,263) | — | — | 85,689 | (23,565) | (13,354) | — | (13,354) | (36,919) |
| Compañía de Comercio y Exportación de Puerto Rico | 38,187 | 15,466 | 1,313 | — | (21,408) | — | — | — | 12,412 | 668 | (10,253) | 98,932 | (19,929) | 79,003 | 70,675 |
| Autoridad de Desperdicios Sólidos | 46,760 | 2,232 | — | — | (44,528) | 4,580 | — | — | 383 | — | (39,565) | 43,396 | — | 43,396 | 3,831 |
| **Total de unidades de componentes no mayores** | **$ 1,974,380** | **733,897** | **273,307** | **21,490** | **(945,686)** | **215,474** | **(56,571)** | **4,611** | **61,343** | **116,265** | **(604,564)** | **1,052,254** | **(122,809)** | **929,44** | **324,881** |

Ver el informe de los auditores independientes adjunto.