## **<u>ANEXO L</u>**

INFORMES SOBRE PRUEBA DEL INTERÉS SUPERIOR

***Análisis de los cobros de los acreedores en caso de desestimación de las Casos radicados
conforme al Título III para los acreedores del Estado Libre Asociado de Puerto Rico***

El presente análisis evalúa los cobros que se encuentran a disposición de los acreedores del ELA
sobre la base de los remedios disponibles en virtud de las leyes no relativas a quiebras, incluida
la Constitución del Estado Libre Asociado de Puerto Rico. De conformidad con la sección
314(b)(6) de PROMESA, todo Plan de Ajuste sugerido debe ser "viable y en el mejor interés de
los acreedores, lo que requerirá que el tribunal examine si los remedios disponibles bajo las leyes
no relacionadas a la quiebra y a la constitución del territorio conducirían a una mayor
recuperación para los acreedores que lo que ofrece dicho plan". Este análisis brinda un rango
estimado de los cobros que se encontrarían a disposición de los acreedores si se pusiera fin a la
paralización de la ejecución de la deuda, no se confirmara un Plan de Ajuste y se desestimaran
las causas radicadas conforme al Título III del ELA, el SRE, la ACT y la AEP.

Este documento está compuesto por dos secciones. La primera sección ofrece un panorama
general de la metodología seguida para desarrollar el análisis. Dicha metodología delinea el
enfoque para calcular los recursos disponibles para el servicio de la deuda, brinda un resumen de
las obligaciones pendientes de los acreedores y establece la prioridad con la que se desembolsan
los fondos y el orden en el que se presume el pago de los reclamos de los acreedores. La segunda
sección presenta los rangos que definen el rango estimado probable de los cobros que se
encuentran a disposición de los acreedores del ELA.

El presente análisis fue preparado por McKinsey & Company, Inc. Washington D.C. ("McKinsey
& Company"). Proskauer Rose LLP y O'Neill & Borges LLC, [1] sociedades que brindan
asesoramiento jurídico a la Junta de Supervisión y Administración Financiera para Puerto Rico
("JSAF"), le proporcionaron a McKinsey & Company un conjunto de presunciones legales que
fueron empleadas en la elaboración de este análisis. Dichas presunciones se incluyen en el
Apéndice 3 del presente documento. Los asesores financieros de la JSAF le brindaron a
McKinsey & Company información financiera que fue utilizada en la preparación de este
análisis. Esa información financiera incluyó tablas que contienen cálculos de la deuda en bonos
pendiente de pago, la perspectiva respecto de los saldos de efectivo y otros datos financieros.
McKinsey & Company también empleó datos publicados por el Gobierno de Puerto Rico y/o sus
asesores, o bien brindados directamente por ellos. McKinsey & Company aceptó la veracidad,
precisión y exactitud de toda la información y las presunciones jurídicas y financieras
proporcionadas por los demás asesores de la JSAF, así como las ofrecidas por el Gobierno de
Puerto Rico y sus asesores. McKinsey & Company no ha realizado una verificación
independiente de la información y las presunciones recibidas del Gobierno y los asesores, como
tampoco asume una posición independiente respecto de tal información y dichas presunciones.

Las presunciones, proyecciones y estimaciones utilizadas en el presente análisis se encuentran
inherentemente sujetas a incertidumbres comerciales, económicas y políticas y, por ende, pueden
sufrir modificaciones. McKinsey & Company no realiza declaraciones ni brinda garantías en el
sentido de que los cobros efectivamente disponibles o potencialmente obtenidos por los
acreedores sobre la base de los remedios que se encuentran disponibles en virtud de cualquier
ley, incluida la Constitución de Puerto Rico, se aproximen (o no) a las estimaciones y
presunciones incluidas en el análisis, destacándose que los resultados reales pueden diferir
significativamente de los que se expresan en el presente. No obstante, McKinsey & Company

---

[1] En el presente análisis, Proskauer Rose LLP y O´Neill & Borges LLC se denominan, en conjunto,
"asesores legales".

afirma que el rango de cobros identificado en este análisis constituye la mejor estimación sobre la base de las condiciones, los conocimientos y la información que le fueran brindados, según se consignaron precedentemente, al 24 de septiembre de 2019.

### I. Metodología

El análisis supone que se desestimarán las causas radicadas conforme al Título III de PROMESA del ELA, el SRE, la ACT y la AEP, pero los Títulos I y II de dicha Ley continuarán aplicándose. Por lo tanto, el análisis supone que se levantará la paralización automática de ejecución de la deuda contra los cuatro deudores y que la JSAF seguirá funcionando y certificando los Planes Fiscales del ELA, así como imponiendo la implementación de los presupuestos, con sujeción a cualquier ejecución de deuda que exceda el presupuesto ordenada por los tribunales de Puerto Rico. Asimismo, el análisis presume que los acreedores radicarían acciones legales contra el ELA a fin de recuperar los montos que se les adeudan.

La presunción de que los Títulos I y II de PROMESA continuarán aplicándose mantiene el impacto de los ahorros y medidas fiscales que la JSAF inserta en sus Planes Fiscales Certificados. Los asesores legales de la JSAF consideran que sería plausible suponer la inaplicabilidad de los Títulos I y II de PROMESA ya que el Congreso los sancionó en conjunto con el Título III y no queda claro que la intención haya sido que permanezcan vigentes sin el Título III. No obstante, en general, los asesores legales recomiendan que el presente análisis se elabore suponiendo que los Títulos I y II de PROMESA continuarán siendo de aplicación.

El análisis se basa en las proyecciones de ingresos y gastos contenidas en el Plan Fiscal Certificado de Puerto Rico correspondiente a 2019 (el "Plan Fiscal"). Siguiendo los consejos de los asesores legales, se realizaron ajustes a ciertas proyecciones del Plan Fiscal a fin de reflejar la desestimación de las causas radicadas conforme al Título III y la presunción de que no haya un Plan de Ajuste. Dichos ajustes se detallan a continuación:

- El análisis supone que no entrarán en vigor los recortes a las pensiones incluidos en el Plan Fiscal ya que esa medida depende de la confirmación de un Plan de Ajuste. No obstante, el rango de cobros potenciales se encuentra sujeto a la posibilidad de que los tribunales de Puerto Rico no ratifiquen el empleo del poder de policía para permitir pagos de pensiones totales en caso de que las medidas de ahorro del Plan Fiscal no se implementen.

- El análisis supone que no se producirá el congelamiento del devengo de beneficios del sistema de retiro para la judicatura. Por otra parte, en este análisis se presume que las contribuciones futuras de los jueces al Seguro Social se fijarán en cero, ya que se supone que dependen de que se congele el devengo de beneficios jubilatorios.[2]

- Se presupone que continuarán los honorarios profesionales de abogados debido a que se prevé que se necesitará un apoyo superior y prolongado para llevar adelante los litigios. Se presume que los honorarios profesionales de abogados se duplicarán en el año fiscal 2020, respecto de su nivel en el Plan Fiscal del año fiscal 2019, y se incrementarán con la inflación hasta el año fiscal 2023, en cuyo momento se reducirán en un 50% y continuarán aumentando en razón de la inflación hasta el año fiscal 2029.

---

[2]  Siguiendo los consejos de los asesores legales, se implementará el congelamiento del devengo de beneficios del sistema de retiro para maestros. Por ende, también se presume la existencia de contribuciones futuras al Seguro Social en relación con los maestros.

- Se supone que todos los honorarios profesionales relativos al Título III que no correspondan a abogados[3] se reducirán en un 50% una vez desestimadas las causas radicadas conforme al Título III, para luego aumentar con la inflación hasta el año fiscal 2029.

- Se presume que la JSAF seguirá existiendo ya que los requisitos para la disolución de la Junta previstos en PROMESA muy probablemente no se cumplirían si se desestiman las causas radicadas conforme al Título III.

- La asignación anual que otorga el ELA a la ACT se ajusta para reflejar el monto mínimo requerido para asegurar el equilibrio fiscal en la ACT cada año.

El análisis también realiza ajustes adicionales a efectos de incorporar los riesgos relativos a la implementación y ejecución de las medidas fiscales y reformas estructurales previstas en el Plan Fiscal. La desestimación de las causas radicadas conforme al Título III podría dar lugar a incertidumbres políticas y económicas adicionales que afectarían la implementación de dichas medidas. Esos ajustes se describen en la segunda parte del presente análisis.

El análisis emplea los siguientes tres componentes para calcular los cobros que se encuentran a disposición de los acreedores:

- **Paquete de Recursos:** el dinero disponible para satisfacer las obligaciones de los acreedores del ELA, incluidos el efectivo disponible para el servicio de la deuda, los ingresos por impuesto a la propiedad ("ingresos del CRIM") y los ingresos recuperados (*clawback revenues*),[4] otras fuentes disponibles en razón de asignaciones a ciertas Unidades Constitutivas Proyectadas Independientemente (*Independently Forecasted Component Units*, IFCU) y el superávit anual generado por el ELA, excluidas las partidas enumeradas precedentemente.

- **Deuda pendiente de pago:** el capital, los intereses y el cronograma de vencimientos de cada grupo de obligaciones de deuda.

- **Prioridades de distribución de fondos:** la asignación de recursos para el pago de deudas conforme a las prioridades de uso de fondos y de pagos de acuerdo con las leyes de Puerto Rico, así como los plazos previstos en los instrumentos de los bonos.

Se presume que la fecha de entrada en vigor del presente análisis es el 30 de junio de 2019. El porcentaje de cobro se calcula como el valor actual del monto total que se espera que se abone a los acreedores durante el período total del análisis como proporción del total del capital y los intereses pendientes de pago a la fecha de entrada en vigor. Sobre la base de las conversaciones mantenidas con los asesores financieros de la JSAF, el presente análisis presume una tasa de descuento anual del 5% como parámetro razonable para el cálculo del valor actual de los pagos futuros de capital e intereses o las obligaciones futuras.

### i. Paquete de Recursos

---

[3]  Los honorarios profesionales relativos al Título III que no corresponden a abogados incluyen los honorarios abonados por el ELA a asesores financieros y otros asesores no legales respecto de procesos relacionados con el Título III.

[4]  El término "recuperación de ingresos" (*clawback*) se emplea en el presente análisis para referirse a ciertos ingresos que el ELA asignó de forma condicional a algunas de sus organismos.

La cantidad total de recursos disponibles para pagar los reclamos de los acreedores del ELA en cada ejercicio constituye el Paquete de Recursos del ELA. El Paquete de Recursos de cada año está compuesto por la suma de 1) el efectivo inicial disponible para el servicio de la deuda, 2) los ingresos por impuesto a la propiedad (ingresos del CRIM), 3) los ingresos recuperados, 4) las otras fuentes disponibles en razón de asignaciones a ciertas IFCU y 5) el superávit anual generado por el ELA luego del pago de sus gastos operacionales.[5]

**1)** **Efectivo inicial disponible para el servicio de la deuda ("efectivo inicial"):** tal como se describió en el Apéndice 3, el efectivo inicial disponible para el servicio de la deuda a la fecha de entrada en vigor de este análisis está compuesto por efectivo no restringido y efectivo restringido pero disponible para los acreedores, según se describe a continuación:

- **Efectivo no restringido:** se refiere a los fondos del ELA cuyo uso no se encuentra sujeto a limitaciones legales. El efectivo no restringido excluye los fondos que deben emplearse para gastos operacionales específicos debido a las leyes y regulaciones federales o de Puerto Rico. El efectivo no restringido también excluye los fondos que se encuentran sujetos a restricciones legales debido a que forman parte de cuentas de custodia o fiduciarias y los fondos cuyo uso se ve restringido por un derecho de garantía o una orden judicial. Se presume que el efectivo no restringido se encuentra disponible para el servicio de la deuda.

- **Efectivo restringido pero disponible para los acreedores**: se refiere a fondos que se han reservado o separado de otro modo para un determinado servicio de deuda.

La suma de efectivo no restringido y el efectivo restringido disponible para los acreedores constituye el efectivo inicial total disponible para el servicio de la deuda a la fecha de entrada en vigor de este análisis. Tal como se indicó en la sección "Cuentas de efectivo de los deudores" de la Declaración de Divulgación, el análisis de saldos de efectivo es continuo y se encuentra sujeto a revisiones adicionales. Las conversaciones con los asesores financieros de la JSAF sobre el análisis de efectivo condujeron al empleo de un rango preliminar de entre $2.000 millones y $5.000 millones de efectivo potencialmente no restringido, sujeto a posterior análisis. Tal como demostrarán los resultados del análisis, los cobros finales a disposición de los acreedores son sumamente sensibles a la cantidad de efectivo inicial.

**2)** **Ingresos por impuesto a la propiedad ("ingresos del CRIM"):** el Centro de Recaudación de Ingresos Municipales ("CRIM") recauda un impuesto a la propiedad anual del 1,03% sobre los bienes muebles e inmuebles fijado por el ELA. Los ingresos del CRIM se depositan en un Fondo de Redención Estatal e históricamente se han encontrado disponibles para el servicio de la deuda GO del ELA.

**3)** **Ingresos recuperados:** Ciertos impuestos y tarifas son recaudados por el ELA y luego se asignan a ciertas corporaciones públicas. Tal como se describe en el Apéndice 3, sobre la base del Artículo VI, Sección 8 de la Constitución de Puerto Rico, ese análisis presume que estos

---

[5]  El superávit anual generado por el ELA incluido en ese análisis se presenta de manera diferente del superávit anual generado por el ELA según se consigna en el Plan Fiscal. Además de los ajustes efectuados para considerar la inexistencia de un Plan de Ajuste, este análisis considera las otras cuatro fuentes de ingresos descritas en esta sección como independientes del superávit anual total generado por el ELA a los efectos del pago de la deuda.

"ingresos recuperados" pueden emplearse para abonar la deuda de Obligación General (*General Obligation*, GO) del ELA y la deuda con igual prelación que los bonos GO cuando se cumplen dos condiciones: 1) que el ELA cuente con suficientes fondos para cubrir sus gastos operacionales y 2) que el resto del Paquete de Recursos no sea suficiente para cubrir la deuda GO y la deuda con igual prelación que los bonos GO en un año determinado.

Los ingresos recuperados incluyen impuestos y tarifas específicos recaudados por el ELA en representación de la Autoridad de Carreteras y Transportación (ACT), la Autoridad Metropolitana de Autobuses (AMA), la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico (AFI) y la Autoridad del Distrito del Centro de Convenciones de Puerto Rico (ADCC).

Respecto de la ACT, los ingresos sujetos a recuperación son: 1) las Tarifas por Licencias Vehiculares, 2) el Impuesto a la Gasolina, 3) el Impuesto al Gas Oil y el Diesel, 4) una parte del Impuesto a los Productos derivados del Petróleo y 5) una parte del Impuesto a los Cigarrillos.

Respecto de la AMA, los ingresos sujetos a recuperación están compuestos por el monto restante del Impuesto a los Cigarrillos que no se encuentra asignado a la ACT. La AFI recibe el arbitrio del ron y un arbitrio adicional a los productos derivados del petróleo. La ADCC recibe una parte del impuesto hotelero que se abona por la ocupación de habitaciones. El Apéndice 3 describe con detalle las reglamentaciones relativas a cada fuente de ingresos sujeta a recuperación.

**4) Otras fuentes disponibles respecto de asignaciones a ciertas IFCU:** las IFCU son entidades jurídicamente independientes que ha establecido el ELA. Siguiendo los consejos ofrecidos por los asesores legales, este análisis presume que los ingresos generados por las IFCU no se encuentran disponibles para el pago de las obligaciones del ELA a falta de la legislación o el consentimiento correspondiente. Las trece IFCU del Plan Fiscal se enumeran a continuación:

*Gráfico 1: Unidades Constitutivas Proyectadas Independientemente del Plan Fiscal Certificado*

| Núm. | Sigla de la IFCU | Nombre de la IFCU |
|---|---|---|
| 1 | AAFAF | Autoridad de Asesoría Financiera y Agencia Fiscal |
| 2 | ADEA | Administración para el Desarrollo Empresarial Agropecuario |
| 3 | ASEM | Administración de Servicios Médicos |
| 4 | ASES | Administración de Seguros de Salud |
| 5 | Cardio | Centro Cardiovascular de Puerto Rico y del Caribe |
| 6 | AFV | Autoridad para el Financiamiento de la Vivienda |
| 7 | AEP | Autoridad de Edificios Públicos de Puerto Rico |
| 8 | Puertos | Autoridad de los Puertos de Puerto Rico |
| 9 | ADCC | Autoridad del Distrito del Centro de Convenciones de Puerto Rico |
| 10 | CFI | Compañía de Fomento Industrial de Puerto Rico |
| 11 | ATI | Autoridad de Transporte Integrado de Puerto Rico |
| 12 | Turismo | Compañía de Turismo de Puerto Rico |
| 13 | CFSE | Corporación del Fondo del Seguro del Estado |

No obstante, algunas de las asignaciones del ELA a las IFCU pueden encontrarse disponibles para el servicio de la deuda. Tal como se describe en el Apéndice 3, el análisis supone que el ELA tiene control directo sobre los fondos que asigna en su presupuesto a las IFCU. Es posible que todas o algunas de las asignaciones a las IFCU se encuentren disponibles para el servicio de la deuda del ELA.

Respecto de toda IFCU que reciba una asignación que la ayude a generar un superávit, el análisis presume que el ELA reducirá (o eliminará) dicha asignación hasta que la entidad lleve un presupuesto equilibrado a fin de generar más fondos disponibles para el pago de las obligaciones del ELA. Esto se aplicaría a la AAFAF, la ADEA, la ASEM, la ASES, la AFV y la ATI, dado que son las IFCU que históricamente han recibido asignaciones anuales del ELA.

Sin embargo, tal como se indica en el Plan Fiscal, se presume que, en el caso de las IFCU que generan déficit operacional en un año determinado, el ELA financia dicho déficit.

Con respecto a las IFCU que no reciben asignación alguna, se presume que el ELA no tiene acceso a los fondos de dichas IFCU. Las IFCU que entran en esta categoría son el CFSE, Cardio, la AEP, la ADCC y Puertos. Sin embargo, si cualquiera de estas entidades registrara un déficit en un año determinado, se presume que el ELA, como parte de sus gastos operacionales, financiaría el déficit ya que dichas entidades prestan servicios necesarios para el adecuado funcionamiento del ELA.

**5) Superávit anual generado por el ELA que no se relaciona con otras fuentes de ingresos:** los ingresos totales generados por el ELA menos sus gastos operacionales y de capital totales constituyen el superávit anual del ELA.[6] Los ingresos del ELA están compuestos por el total de los ingresos por impuestos del ELA incluidos en el Plan Fiscal (p. ej., el Fondo General, el IVU después de pagos COFINA, la Ley 154 y otros ingresos por impuestos), así como los ingresos provenientes de los Fondos Federales y los Fondos de Ingresos Especiales.

Los gastos operacionales totales del ELA están compuestos por los gastos del Fondo General, los del Fondo de Ingresos Especiales y los de los Fondos Federales proyectados en el Plan Fiscal con respecto a las entidades del Plan Fiscal del ELA, excluidas las IFCU. El Plan Fiscal destaca las siguientes categorías de gastos:

- **Gastos operacionales de nómina y de otra índole del Fondo General:** costos de personal y de otra índole requeridos para el funcionamiento del ELA y sus organismos; estos gastos se encuentran indicados en el presupuesto anual del ELA.

- **Fondos de Ingresos Especiales:** fondos utilizados para gastos gubernamentales y de organismos por fuera de los desembolsos del Fondo General o las asignaciones de Fondos Federales de una entidad; dichos fondos son recaudados por los organismos a partir de las tarifas y cargos por servicios, entre otras fuentes.

- **Financiamiento Federal:** fondos frecuentemente utilizados como fondos trasladables para diversos programas sociales; en algunos casos, los Fondos Federales también se emplean para financiar ciertos gastos operacionales de los organismos.

- **Gastos en Medicaid:** las partes financiadas por el ELA del programa Medicaid, el

---

[6] El superávit del ELA al que se refiere esta sección excluye el efectivo inicial, los ingresos recuperados y los ingresos del CRIM, así como otras fuentes disponibles a partir de las asignaciones a ciertos IFCU.

Programa de Seguro Médico para Niños (*Children's Health Insurance Program*, CHIP), el programa de elegibilidad dual Platino y otros gastos relativos a la salud.

- **Gastos en pensiones del ELA:** beneficios jubilatorios según sistema de reparto *Pay-as-you-go* (PayGo) para los miembros del Sistema de Retiro para Maestros (SRM), el Sistema de Retiro para la Judicatura (SRJ) y el ex Sistema de Retiro de Empleados (SRE). Tal como consta en el Plan Fiscal, los gastos en pensiones de las Unidades Constitutivas Proyectadas Independientemente (IFCU) ya se encuentran considerados en los gastos operacionales de cada IFCU. Los gastos en pensiones son tratados como gastos operacionales del ELA en el análisis; por lo tanto, los gastos en pensiones se abonan en su totalidad (al igual que cualquier otro gasto operacional) antes del pago de cualquier deuda.

- **Asignaciones:** contribuciones del ELA a los municipios, la Universidad de Puerto Rico y la Autoridad de Carreteras y Transportación (ACT), así como a algunas corporaciones públicas, incluidas las IFCU que registran un déficit en un año determinado.

- **Otros gastos operacionales y de capital:** pagos gubernamentales por los costos de los servicios públicos a la AEE y la AAA, ciertos costos de primas de seguros y los gastos de capital relativos al mantenimiento y los proyectos de capital del ELA.

- **Gastos relativos a la reconstrucción y reestructuración:** programas de asistencia pública y de mitigación de riesgos financiados por el ELA que se requieren para la recepción de fondos combinados de la FEMA, así como los honorarios profesionales y costos operacionales relativos a PROMESA de la Junta de Supervisión y Administración Financiera.

- **Incrementos de montos brutos en relación con créditos fiscales y recaudación de la COFIM:** créditos fiscales a personas físicas y jurídicas, así como los gastos de la COFIM (la corporación pública que recauda el Impuesto Municipal sobre Ventas y Uso del 1% para determinados municipios); se presume que los créditos fiscales y la recaudación de la COFIM se equilibran cada año ya que los fondos que ingresan se compensan con los gastos que egresan.

Las proyecciones para estos grupos de ingresos y gastos tienen en cuenta el impacto estimado de las medidas fiscales del Plan Fiscal. Las medidas fiscales son una serie de acciones diseñadas para optimizar la recaudación de ingresos y reducir los gastos públicos, lo cual agilizaría y transformaría al Gobierno de Puerto Rico. Las medidas fiscales comprenden acciones para mejorar el cumplimiento en materia de recaudación tributaria, la implementación de las eficiencias de los organismos, la optimización del sistema de salud y la racionalización de los subsidios otorgados a la Universidad de Puerto Rico y los municipios. Las medidas fiscales previstas en el Plan Fiscal Certificado resultan en una reducción general en los gastos de rendimiento proyectado, excluidos los relativos a fondos federales equivalentes al 18% para el año fiscal 2024.

Las proyecciones de los ingresos y gastos del ELA también calculan el impacto de las reformas estructurales delineadas en el Plan Fiscal. Las reformas estructurales abarcan reformas relativas al capital humano y el bienestar, la facilidad para hacer negocios y la disponibilidad y accesibilidad de la energía. Las reformas estructurales están diseñadas para promover el

crecimiento en la economía, lo cual en última instancia incrementaría la capacidad del ELA de generar ingresos.

Los gastos analizados precedentemente comprenden los gastos operacionales y de capital del ELA. Este análisis refleja modificaciones a las proyecciones de ciertos gastos incluidas en el Plan Fiscal a fin de contabilizar la falta de protecciones en virtud del Título III y un Plan de Ajuste. Como se refirió previamente, las líneas de gastos específicas del Plan Fiscal que se ajustaron son:

- **Costos de pensiones:** los costos de pensiones totales del análisis no incluyen la reducción de los beneficios jubilatorios que se establece en el plan fiscal. Asimismo, los costos de pensiones no incluyen el congelamiento del devengo de beneficios en los planes jubilatorios del sistema de retiro para la judicatura. Por otra parte, el análisis también fija en cero las contribuciones de los jueces a los pagos del Seguro Social, ya que dependen de las medidas en materia de pensiones.

- **Honorarios profesionales:** el análisis ajusta las proyecciones de costos relativas a honorarios de abogados y honorarios profesionales concernientes al Título III que no corresponden a abogados. Se presume que los honorarios profesionales de abogados se duplicarán del año fiscal 2019 al año fiscal 2020 y luego se reducirán a la mitad en el año fiscal 2023. Se presume que los honorarios profesionales relativos al Título III se reducirán a la mitad una vez desestimadas las causas radicadas conforme al Título III. Tanto los honorarios profesionales como los honorarios de abogados relativos al Título III se incrementan cada año según la inflación y se extienden hasta el año fiscal 2029.

- **Gastos de la JSAF:** se presume que la JSAF seguirá existiendo ya que los requisitos para la disolución de la Junta previstos en PROMESA muy probablemente no se cumplan si se desestiman las causas radicadas conforme al Título III.

- **Transferencia del ELA a la ACT:** la transferencia anual a la ACT se ajusta para coincidir con el monto requerido para compensar cualquier déficit operacional que registre la ACT en un determinado año, presumiendo una desestimación concurrente de la causa de la ACT radicada conforme al Título III.

Una vez abonados los gastos operacionales del ELA con los ingresos generados por este, toda suma restante constituye el superávit anual del ELA, tal como se describe en el Plan Fiscal. Se presume que el superávit del ELA se encuentra disponible para el pago de la deuda.

Conforme se describirá posteriormente en la sección titulada "Rango estimado probable de cobros disponibles para los acreedores", ciertos ajustes al Paquete de Recursos fueron incorporados para contabilizar el riesgo de implementación del Plan Fiscal en caso de que se desestimen las causas radicadas conforme al Título III. En consecuencia, se presume que las mediciones macroeconómicas y los ahorros de gastos gubernamentales previstos en el Plan Fiscal se ven afectados.

### ii. Deuda pendiente de pago

El análisis considera las siguientes clases de reclamos sobre la base de la información brindada a McKinsey & Company. Las presunciones relativas a los cálculos del saldo de capital y los intereses impagados que brindaron los asesores legales y financieros son las siguientes:

***Reclamos federales:*** se presume que el ELA adeuda dos categorías de obligaciones al Gobierno

Federal. Se supone que estas obligaciones se abonan en su totalidad antes de efectuar cualquier otro pago de deuda. Siguiendo los consejos de los asesores legales, es probable que el Gobierno Federal recupere todo reclamo impagado mediante la retención de determinados Fondos Federales asignados al ELA para compensar un pago insuficiente. Por ello, se presume que estos reclamos se abonan antes que cualquier otro reclamo de deuda:

- **Reclamos y obligaciones federales:** el Gobierno Federal ha radicado varios reclamos contra el ELA. Dichos reclamos incluyen obligaciones relativas a facturas impagadas, así como multas y tarifas relacionadas en razón de violaciones de la ley federal. Siguiendo los consejos de los asesores legales, dichos reclamos y obligaciones federales representan un monto total de $329 millones, el cual se abonará una vez se levante la actual paralización de ejecución de la deuda.

- **Denegación de reclamos federales:** se supone que el ELA debe devolver los Fondos Federales que gasta pero que posteriormente se declaran inadmisibles en virtud de los criterios o requisitos de otorgamiento. Se presume que dicha denegación de costos federales representa un gasto anual recurrente de $65 millones,[7] el cual debe abonarse en su totalidad antes de que se efectúe el pago de cualquier Obligación General u otro reclamo. La estimación precedente no incluye el monto de ninguna denegación de reclamos federales en relación con fondos vinculados a recuperación de la FEMA.

***Bonos de Obligación General (GO):*** los bonos de Obligación General del ELA fueron emitidos o garantizados por el ELA y respaldados por la buena fe, el crédito y el poder impositivo del ELA según el sentido previsto por la Constitución de Puerto Rico (en conjunto, los "bonos GO" o la "deuda GO"). Dichos bonos se incorporaron a este análisis con el cronograma de vencimientos proyectado en los documentos de emisión. De conformidad con la sección 303 de PROMESA, se presume que el capital de la deuda GO devenga intereses durante la actual paralización de ejecución de la deuda.

Con respecto al valor de estos reclamos, la JSAF radicó acciones en las que impugna la validez de los bonos GO emitidos a partir de 2012, ya que podrían haberse emitido excediendo el límite constitucional de endeudamiento de Puerto Rico. Siguiendo los consejos de los asesores legales, este análisis presume que los bonos GO emitidos a partir de 2012 se declararán inválidos. Sobre la base de los datos brindados por los asesores financieros, el capital total pendiente de pago de los bonos GO, excluidos los bonos GO emitidos a partir de 2012, asciende a $6,509 millones y el total de intereses devengados e impagados a la fecha de entrada en vigor de este análisis asciende a $1,202 millones.

Tal como se indica en el Apéndice 3, existe un riesgo de litigio adicional en relación con la validez de ciertos bonos GO. El Comité Oficial de Acreedores No Asegurados (*Unsecured Claimholders' Committee*, UCC) ha impugnado la validez de todos los bonos GO emitidos a partir de marzo de 2011 basándose en el argumento de que violan el límite constitucional de endeudamiento. El potencial impacto de este litigio sobre los cobros se describe en la sección titulada "Resultados alternativos basados en litigios en curso o riesgos de litigio".

***Deuda con igual prelación que los bonos GO:*** siguiendo los consejos de los asesores legales, se presume que ciertos reclamos reciben la misma prioridad que los bonos GO ya que también se

---

[7] Estimación basada en el Informe Financiero Anual Completo (*Comprehensive Annual Financial Report*, CAFR) de Puerto Rico de 2016, el cual indica que el ELA registró un pago de $65,200,000 por denegación de reclamos federales.

encuentran respaldados por la buena fe, el crédito y el poder impositivo del ELA o cuentan con una garantía del ELA. Tal como se describe en el Apéndice 3, el presente análisis supone que los bonos o préstamos con una garantía del ELA a partir de 2012 se considerarían inválidos y que los tenedores de bonos que tengan esos reclamos no podrían radicar reclamo alguno contra el ELA.

Esta deuda con igual orden de prelación está compuesta por los siguientes reclamos. El valor del capital y los intereses pendientes de pago de dichos reclamos fue proporcionado por los asesores financieros.

- **Bonos de la Autoridad de Edificios Públicos (AEP):** excluidos los bonos AEP emitidos a partir de 2012, los bonos AEP deben abonarse hasta el año fiscal 2041, con un saldo de capital total pendiente de pago equivalente a $3,426 millones e intereses impagados que ascienden a $524 millones a la fecha de entrada en vigor de este análisis. Según se indica en el Apéndice 3, este análisis presume un año de demora antes de que los tenedores de bonos AEP puedan recibir pagos del ELA ya que dichos tenedores deben procurar hacer valer sus derechos ante la AEP antes de demandar un cobro al ELA.

- **Bonos emitidos por la Autoridad del Puerto de las Américas (APLA):** los bonos APLA fueron emitidos en 2005 y adquiridos en 2014 por el BGF (el cual posteriormente los refinanció).[8] Su saldo de capital pendiente de pago asciende a $226 millones con vencimiento final en el año fiscal 2048 y los intereses impagados equivalen a $15 millones a la fecha de entrada en vigor de este análisis.

- **Préstamo de la Administración de Servicios Generales (ASG):** la ASG tiene un préstamo con un saldo pendiente de pago que asciende a aproximadamente $33 millones. Siguiendo los consejos de los asesores legales, este préstamo cuenta con igual prelación que la deuda GO.

En línea con los consejos de los asesores legales, ciertos reclamos con igual prelación que los bonos GO no se consideran en este análisis por haber recibido una garantía del ELA a partir de 2012. Dichos reclamos se detallan a continuación:

- **Préstamos del Banco Gubernamental de Fomento (BGF):** existen cuatro préstamos del BGF con un saldo de capital total pendiente de pago equivalente a $169 millones e intereses impagados que ascienden a $49 millones a la fecha de entrada en vigor de este análisis. El vencimiento de estos préstamos se extiende hasta el año fiscal 2043.

- **Bonos de Anticipo (*Bond Anticipation Notes*, BAN) para la Autoridad para el Financiamiento de la Infraestructura (AFI) de Puerto Rico:** los BAN de la AFI se emitieron originalmente en 2015, con un saldo de capital total pendiente de pago equivalente a $78 millones e intereses impagados que ascienden a $16 millones a la fecha de entrada en vigor de este análisis.

Asimismo, determinados bonos subordinados de la Autoridad de Acueductos y Alcantarillados de Puerto Rico (AAA) también han sido garantizados por el ELA pero no se consideran en este análisis. Tal como se anunció el 9 de agosto de 2019, la AAA reestructuró más de $1,000 millones

---

[8] Los Bonos emitidos por la Autoridad del Puerto de las Américas no se incluyen en los préstamos del Banco Gubernamental de Fomento. Por ello, se mencionan como dos reclamos de deuda independientes.

en deuda que contaba con una garantía del ELA. Como parte de ese proceso, se puso fin a esta garantía para la mayor parte de los reclamos de deuda de la AAA, con excepción de una suma de $284 millones que continúa teniendo una garantía del ELA. Este análisis supone que el ELA no tendría que abonar los reclamos de deuda de la AAA ya que actualmente es poco probable que esta incurra en un incumplimiento de pagos.

Tal como se indica en el Apéndice 3, existe un riesgo de litigio adicional en relación con la validez de ciertos reclamos con igual prelación y reclamos con garantía del ELA. El UCC ha impugnado reclamos relativos a los bonos AEP emitidos a partir de marzo de 2011. También existen argumentos que sostienen que ciertas garantías del ELA emitidas a partir de marzo de 2011 pueden ser inválidas.

***Otros reclamos elegibles:*** tal como se describe en el Apéndice 3, el presente análisis presume que las reclamaciones no aseguradas solo pueden abonarse luego de que se cancelen los montos adeudados en cada año a los tenedores de bonos GO y quienes posean reclamos con igual prelación que estos. Los demás reclamos elegibles incluyen:

- **Reclamos ya concedidos a los demandantes** y adeudados por el ELA ("reclamos con sentencia") o reclamos respecto de los cuales un tribunal ya ha dictado una sentencia, como los pagaderos por la Administración de Vivienda Pública. Se calcula que el monto de estos reclamos asciende a $1,000 millones.

- **Un Reclamo de Fideicomiso de Entidad Pública/BGF bajo el Título VI** equivalente a $578 millones que se tornaría exigible cuando se levante la actual paralización de pago de la deuda del ELA.

- **Reclamos por premios de lotería** que representan premios de lotería impagados de la Lotería de Puerto Rico y el Sistema de Lotería Adicional, con un capital total de $172 millones y $29 millones en intereses impagados. Algunos reclamos por premios de lotería tienen cronogramas de pago multianuales, tal como se indica en el Informe Financiero Anual Completo (CAFR) de Puerto Rico.

- **Deudas comerciales** con un saldo total equivalente a $315 millones exigibles en el año fiscal 2019. Esto incluye el total de las deudas y demás pasivos corrientes y no corrientes del ELA, según constan en el Informe Financiero Anual Completo (CAFR) de 2016 de Puerto Rico.

- **Presunción de reclamos judiciales pendientes contra el ELA.** Siguiendo los consejos de los asesores legales, el análisis supone un rango de entre $2,500 millones y $5,000 millones para estos reclamos.

- **Reclamos de tenedores de bonos del Sistema de Retiro de Empleados (SRE).** Siguiendo los consejos de los asesores legales, este análisis presume que los tenedores de bonos SRE radicarán una reclamación no asegurada contra el ELA por todo monto impagado de la deuda en bonos SRE. Esta presunción también se incorpora al análisis del Sistema de Retiro de Empleados.[9] El valor actual de este reclamo asciende a $3,246

---

[9] El análisis titulado "Análisis de los cobros de los acreedores en caso de desestimación las causas radicadas conforme al Título III para los acreedores del Sistema de Retiro de Empleados (SRE)" incluido en esta Declaración de Divulgación calcula el monto impagado de la deuda en bonos del SRE en el futuro. El valor

millones.

- **Reclamos por ingresos recuperados.** Las corporaciones públicas a las que se asignaron ciertos ingresos recuperados (a saber, ACT, AMA, AFI, ADCC) o los tenedores de bonos de dichas corporaciones públicas pueden radicar un reclamo contra el ELA por una parte de los ingresos recuperados no transferidos por el ELA a las corporaciones públicas en cualquier año. El monto de los reclamos por ingresos recuperados considerado en el análisis equivale al total de los ingresos recuperados que emplea el ELA para cubrir los gastos operacionales cuando se enfrenta a un déficit operacional.[10] El valor de estos reclamos oscila entre $6,085 millones y $9,650 millones.[11]

Siguiendo los consejos de los asesores legales, en el análisis se presume que dos reclamos conocidos se fijan en cero. En primer lugar, se asume que los bonos de la Corporación para el Financiamiento Público de Puerto Rico ("bonos CFP") no forman parte del conjunto de reclamos. Los documentos de los bonos CFP establecieron que la Legislatura no tiene la obligación legal de asignar fondos al pago de los bonos, ya que dichos bonos no constituyen una obligación cuyo cumplimiento pueda reclamarse al ELA. En segundo lugar, se presume que los bonos BGF que contaban con una garantía del ELA no forman parte del conjunto de reclamos ya que los derechos de garantía se extinguieron de conformidad con la reestructuración del BGF en virtud del Título VI.

### iii. Prioridades para la distribución de fondos para el servicio de la deuda

El orden en el que se abonan los reclamos respeta determinadas prioridades. Siguiendo los consejos de los asesores legales, el presente análisis supone que el ELA abonará los reclamos federales en su totalidad antes de cualquier otro pago de deuda ya que el Gobierno Federal podría compensar los reclamos impagados empleando ciertos Fondos Federales destinados al ELA. Una vez pagados los reclamos federales, los fondos del Paquete de Recursos son asignados a los bonos GO y la deuda con igual prelación que los bonos GO, de modo tal que cada clase reciba la misma tasa porcentual de cobro en cada año.[12] Una vez abonados íntegramente los montos adeudados en un año determinado en concepto de reclamos de deuda GO y reclamos con igual prelación que la deuda GO, los fondos remanentes del Paquete de Recursos pueden utilizarse para abonar otros reclamos elegibles.

El Gráfico 2 resume el orden en el que se distribuyen los fondos y se abonan los reclamos, siguiendo el asesoramiento jurídico descrito en el Apéndice 3. Con respecto a los reclamos que se consideran en este análisis, la deuda con igual prioridad recibe el mismo porcentaje de cobro

---

actual al 30 de junio de 2019 de los bonos SRE impagados que se consiga en este análisis emplea una tasa de descuento del 5%. El valor actual de este reclamo se emplea en el denominador para el cálculo del porcentaje de los cobros disponibles para los acreedores.

[10] Este análisis presume que el ELA ejercerá su poder de policía para utilizar los ingresos recuperados a fin de cubrir los gastos operacionales cuando se enfrente a un déficit operacional y los demás fondos del Paquete de Recursos no basten para cubrir dicho déficit. El valor de los reclamos por ingresos recuperados empleado en este análisis representa el valor actual de los ingresos recuperados proyectados que se emplean para pagar los gastos operacionales del ELA, con una tasa de descuento del 5%. El valor actual de este reclamo se emplea en el denominador para el cálculo del porcentaje de los cobros disponibles para los acreedores.

[11] El rango muestra el valor actual de los reclamos por ingresos recuperados empleados para pagar los gastos operacionales del ELA en el extremo superior y el extremo inferior de los cobros disponibles para los acreedores. El rango se describe en la sección "Rango estimado probable de cobros disponibles para los acreedores" de este análisis.

[12] Esto hace referencia al pago total como porcentaje del total del capital y los intereses correspondientes a cada clase de deuda en cada año.

de la deuda pagadera en un año determinado,[13] no permitiéndose pagos anticipados.

*Gráfico 2: Flujo de fondos del análisis*



| Inglés | Español |
|---|---|
| Priority of distribution of funds considered in analysis[1] | Prioridad de distribución de los fondos considerados en el análisis[1] |
| Commonwealth uses all available funds excluding clawback and CRIM to pay operating expenses[2] | El ELA usa todos los fondos disponibles, excluidos los ingresos recuperados y los ingresos CRIM, para el pago de gastos operacionales[2] |
| Deficit Remains | Sigue habiendo déficit |
| Surplus exists | Existe un superávit |
| Commonwealth can exercise police power to use clawback and CRIM revenues to pay operating expenses | El ELA puede ejercer el poder de policía para usar ingresos recuperados e ingresos CRIM para pagar gastos operacionales |
| Are all operating expenses covered? | ¿Se cubren todos los gastos operacionales? |
| No | No |
| No debt is paid | No se paga ninguna deuda |
| Yes | Sí |
| Clawback revenues | Ingresos recuperados |
| Remaining Clawback revenue are transferred to the corresponding public corporation | Los ingresos recuperados remanentes se trasfieren a la corporación pública correspondiente |
| Any remaining clawback and CRIM revenues | Ingresos recuperados e ingresos CRIM remanentes |
| All available resources including clawback and CRIM revenues | Todos los recursos disponibles, incluidos los ingresos recuperados y los ingresos CRIM |
| Pay GO and GO pari passu debt[3] | Pago de deuda GO y deuda con igual prelación que deuda GO[3] |
| Are there resources remaining after paying GO and GO pari passu debt?[4] | ¿Quedan recursos después de pagar la deuda GO y la deuda con igual prelación que la deuda GO? |

---

[13]   No obstante, el total de los cobros para las deudas de la misa clase durante el período del análisis puede diferir en caso de que los reclamos tengan cronogramas de vencimiento diferentes.

| Any other non-clawback revenue[5] | Cualquier otro ingreso que no sea ingreso recuperado[5] |
|---|---|
| Pay other eligible claims with remaining funds[6] | Pago de otros reclamos elegibles con fondos remanentes[6] |
| No other eligible claims are paid | No se paga ningún otro reclamo elegible |
| 1 See Appendix 3 for more details | 1 Ver en el Apéndice 3 detalles adicionales. |
| 2 Operating expenses include fiscal measures as outlined in the Fiscal Plan; Federal claims are included in operating expenses. | 2 Los gastos operacionales incluyen las medidas fiscales previstas en el Plan Fiscal; los reclamos federales se incluyen en los gastos operacionales. |
| 3 The order of the use of funds to pay GO and its pari passu debt is as follows: CRIM revenues, starting cash, Commonwealth surplus, Commonwealth appropriations to certain IFCUs and clawback revenues; any remaining CRIM revenues would be used to pay GO bonds only (but not pari passu debt) | 3 El orden de uso de los fondos para el pago de la deuda GO y la deuda con igual prelación que esta es el siguiente: ingresos CRIM, efectivo inicial, superávit del ELA, asignaciones del ELA a ciertas IFCU e ingresos recuperados; todo ingreso CRIM remanente se utilizaría únicamente para pagar bonos GO (no deuda con igual prelación) |
| 4 GO and GO pari passu debts receive the same percentage recovery for amounts owed in any given year | 4 Las deudas GO y las deudas con igual prelación que estas reciben el mismo porcentaje de cobro respecto de las sumas adeudadas en cualquier año. |
| 5 Includes Commonwealth surplus, Commonwealth appropriations to certain IFCUs and starting cash | 5 Incluye el superávit del ELA, las asignaciones del ELA a ciertas IFCU y el efectivo inicial |
| 6 Other claims receive the same percentage recovery for amounts owe in a given year; any funds that remain after fully servicing other claims in a given year are saved and become the starting cash for the following year. | 6 Otros reclamos reciben el mismo porcentaje de cobro por las sumas adeudadas en un determinado año; todo fondo remanente luego del pago íntegro de otros reclamos en un determinado año se reserva y se convierte en efectivo inicial del año siguiente |

De acuerdo con los consejos de los asesores legales, el empleo de ingresos recuperados e ingresos CRIM sigue las reglas que se exponen a continuación:

- Si el ELA afronta un déficit operacional luego de utilizar todos los recursos disponibles, excluidos los ingresos recuperados y los ingresos CRIM en cualquier año, el análisis presume que el ELA ejercerá su poder de policía para utilizar los ingresos recuperados y los ingresos CRIM para cubrir los gastos operacionales. En caso de que el déficit del ELA se cubra por completo con una parte de los ingresos recuperados y los ingresos CRIM, todo ingreso recuperado remanente se emplearía para cumplir con las obligaciones de los bonos GO y la deuda con igual prelación. Los ingresos recuperados y los ingresos CRIM se distribuirán de modo tal que la deuda GO y la deuda con igual prelación reciban el mismo porcentaje de cobro en cada año.

- Si el ELA alcanza el equilibrio fiscal u obtiene un superávit al excluir los ingresos recuperados y los ingresos CRIM en un año determinado, los ingresos CRIM se emplearían para cancelar los bonos GO y los ingresos recuperados se destinarían al pago de bonos GO y bonos con igual prelación que los bonos GO.[14] Los ingresos recuperados y los ingresos CRIM se distribuirán de modo tal que la deuda GO y la deuda con igual prelación reciban el mismo porcentaje de cobro en cada año. Si se abona el total de la deuda GO y la deuda con igual prelación que ésta exigible en un año determinado, los

_____

[14] El orden de asignación de los fondos para el pago de deuda GO y deuda de igual prelación es el siguiente: Ingresos CRIM, efectivo inicial, superávit del ELA, asignaciones del ELA a ciertas IFCU y, por último, ingresos recuperados.

ingresos recuperados remanentes se devolverán a las respectivas corporaciones públicas (a saber, ACT, AMA, AFI y ADCC).

Siguiendo los consejos de los asesores legales, se presume que los fondos disponibles se imputan primero a los intereses acumulativos adeudados y, luego, al capital de la deuda con vencimiento en ese año o antes, si lo hubiera. Se presume que el capital impagado devenga intereses según las tasas originales estipuladas en cada uno de los documentos de la deuda pertinentes y luego se suma a la deuda del año siguiente. Se asume que los saldos de intereses no devengan intereses.

### II. Rango estimado probable de cobros disponibles para los acreedores

En un escenario en el que no se confirma un Plan de Ajuste y se desestiman las causas radicadas conforme al Título III, existen varios riesgos que pueden afectar la implementación del Plan Fiscal. Al evaluar el rango estimado probable de cobros disponibles para acreedores, el análisis ajusta las proyecciones de ingresos y gastos incluidas en el Plan Fiscal a fin de incorporar los riesgos relativos a la implementación de ciertas reformas estructurales y medidas fiscales.

El análisis establece un rango estimado probable de cobros, en el cual el extremo superior de dicho rango realiza ciertos ajustes a las proyecciones del Plan Fiscal para reflejar los riesgos de implementación y el extremo inferior añade más ajustes de forma progresiva. En particular, el extremo superior del rango estimado probable de recuperaciones presume que el impacto de las reformas estructurales incluidas en el Plan Fiscal no se producirá, pero que las medidas fiscales se implementarán. El análisis supone que, si las causas radicadas conforme al Título III son desestimadas, Puerto Rico afrontará una mayor inestabilidad política y financiera que generará desafíos significativos para la sanción de leyes y la implementación de cooperación entre organismos para instituir reformas estructurales. Asimismo, el impacto de las medidas para introducir reformas estructurales probablemente tendrá menores efectos sobre el crecimiento en razón del clima general de inestabilidad. Sin embargo, se presume que las medidas fiscales se producirán según lo indicado en el Plan Fiscal ya que la JSAF seguiría certificando presupuestos que cumplan con el Plan Fiscal.

El extremo inferior del rango estimado probable de cobros también supone que ciertas medidas fiscales no se implementarán. En particular, si bien la JSAF tiene la facultad de fijar niveles de gasto, es posible que enfrente desafíos al hacer cumplir los niveles de gasto en salud incluidos en el Plan Fiscal. La reforma del sistema de salud prevista en el Plan Fiscal requiere acciones complejas y coordinadas que abarquen a todas las diferentes partes interesadas de dicho sistema y es posible que el ELA tenga pocos incentivos para adoptar dichas acciones en el entorno que se supone en este análisis. Por ello, en el extremo inferior del rango de cobros se presume que los ahorros de la reforma del sistema de salud no se harán efectivos. Por otra parte, se asume que la medida tributaria de corrección no conducirá al aumento de ingresos pretendido, ya que en este escenario el ELA posiblemente esté menos incentivado a adoptar las medidas necesarias para implementar la recaudación.

Además de los ajustes al Paquete de Recursos, el rango estimado probable de cobros se ve afectado por dos variables clave: el efectivo inicial disponible para el servicio de la deuda y el monto de los reclamos judiciales. Siguiendo los consejos de los asesores legales, el análisis supone un rango preliminar de entre $2,500 millones y $5,000 millones para estos reclamos judiciales.

Teniendo en cuenta los rangos indicados previamente, en total, todos los demandantes recibirían

pagos equivalentes a entre $5,800 millones y $9,200 millones.[15] El cobro implícito oscila entre un 19% y un 36% del total de los reclamos.[16][17] Este rango representa los cobros más probables para todos los acreedores en caso de que se desestimen las causas radicadas conforme al Título III y todos los reclamos se ejecuten de acuerdo con leyes que no sean las relativas a quiebras.

*Gráfico 3: Rango estimado probable de cobros disponibles para todos los acreedores del ELA*

| Rango estimado probable de cobros disponibles para todos los acreedores del ELA[1] | | |
|---|---|---|
| VA del pago total en miles de millones de USD, % de cobro | | |
| | Extremo inferior del rango | Extremo superior del rango |
| **Total de cobros[2][3]** | $5.8 <br> *19%* | $9.2 <br> *36%* |
| 1       Los cobros de este gráfico no incluyen los cobros de pensiones que permanecen iguales al 100% y los cobros del SRE que se incluyen en el análisis titulado "Análisis de los cobros de los acreedores en caso de desestimación de las causas radicadas conforme al Título III para los acreedores del Sistema de Retiro de Empleados (SRE)". <br> 2       Estos cobros reflejan los ajustes realizados al Paquete de Recursos dados los riesgos de implementación abordados en este análisis. <br> 3       El cálculo de los cobros presume que se declaran inválidos los bonos GO, los bonos AEP y los reclamos con garantía del ELA emitidos a partir de 2012. | | |

El siguiente cuadro muestra el rango estimado probable de cobros para cada clase de reclamos. Tal como se mencionó en la sección "Deuda pendiente de pago", el cálculo presume la invalidez de los bonos GO, los bonos AEP y los reclamos con garantía del ELA emitidos a partir de 2012.

*Gráfico 4: Rango estimado probable de cobros disponibles para los acreedores del ELA por clase de deuda*

| Rango estimado probable de cobros disponibles para todos los acreedores del ELA[1] | | |
|---|---|---|
| VA del pago total en miles de millones de USD, % de cobro | | |
| | Extremo inferior del rango | Extremo superior del rango |
| Bonos GO | $3.9 <br> *50%* | $6.0 <br> *78%* |
| Reclamos con igual prelación que bonos GO | $1.9 <br> *53%* | $2.7 <br> *75%* |
| Otros reclamos elegibles | $0 <br> *0%* | $0.4 <br> *3%* |
| Total[2][3] | $5.8 <br> *19%* | $9.2 <br> *36%* |

---

[15] El monto se refiere al valor actual de los futuros pagos de deuda empleando una tasa de descuento anual del 5%.

[16] El porcentaje de cobro se calcula como el valor actual (VA) de la deuda total cancelada durante la totalidad del período del análisis, como proporción del capital total pendiente de pago y los intereses impagados al 30 de junio de 2019.

[17] Los reclamos de pensiones y del SRE no se incluyen en el cálculo del cobro de deuda total. Este análisis presume que las pensiones se pagan íntegramente cada año como parte de los gastos operacionales. Los reclamos del SRE se analizan en la sección "Análisis de los cobros de los acreedores en caso de desestimación de las causas radicadas conforme al Título III para los acreedores del Sistema de Retiro de Empleados (SRE)" de este Plan de Ajuste; el presente análisis incluye únicamente la parte relativa al reclamo no garantizado que los tenedores de bonos SRE pueden demandar al ELA respecto de cualquier monto impagado de la deuda en bonos, tal como se describe en la sección titulada "Deuda pendiente de pago" de este análisis.

1       Los cobros de este gráfico no incluyen los cobros de pensiones que permanecen iguales al 100% y los cobros del SRE que se incluyen en el análisis titulado "Análisis de los cobros de los acreedores en caso de desestimación de las causas radicadas conforme al Título III para los acreedores del Sistema de Retiro de Empleados (SRE)".
2       Estos cobros reflejan los ajustes realizados al Paquete de Recursos dados los riesgos de implementación abordados en este análisis.
3       El cálculo de los cobros presume que se declaran inválidos los bonos GO, los bonos AEP y los reclamos con garantía del ELA emitidos a partir de 2012.

Ver en el Apéndice 1 para detalles adicionales sobre los cobros basados en distintos niveles de efectivo inicial y reclamos judiciales que conforman los rangos incluidos previamente.

*Resultados alternativos basados en litigios pendientes*

Sobre la base de los litigios pendientes resumidos en el Apéndice 3, se pusieron a prueba determinadas simulaciones jurídicas. A continuación, se desarrolla el impacto de dichas simulaciones.

### i. Escenario 1

Tal como se indicó en el Apéndice 3, el análisis principal presume que los bonos GO, los bonos AEP y los reclamos con garantía del ELA emitidos a partir de 2012 se consideran inválidos. No obstante, el comité oficial de acreedores no asegurados (UCC) radicó acciones en las que impugnó la validez de los bonos GO, los bonos AEP y los demás reclamos con garantía del ELA emitidos a partir de marzo de 2011. Este escenario supone que las obligaciones mencionadas emitidas a partir de marzo de 2011 se consideran inválidas.

Sobre la base de los datos brindados por los asesores financieros, el capital total pendiente de pago de los bonos GO, excluidos aquellos emitidos a partir de marzo de 2011, asciende a $5,466 millones y el total de intereses devengados e impagados a la fecha de entrada en vigor de este análisis asciende a $993 millones. En este escenario, el capital pendiente de pago de los bonos AEP equivale a $2,244 millones y el total de los intereses devengados e impagados a la fecha de entrada en vigor de este análisis asciende a $365 millones. Asimismo, los BAN de la AFI y los préstamos del BGF se consideran inválidos en el presente escenario; el valor de esos dos reclamos se describe en la sección "Deuda pendiente de pago" del presente análisis.

Los resultados de este escenario se consignan en el Gráfico 5. El rango estimado probable de cobros para el grupo GO aumenta de 50 - 78% en el escenario base a 60 - 85% cuando el análisis considera inválidos los reclamos emitidos a partir de marzo de 2011. El rango estimado probable de los cobros relativos a reclamos con igual prelación que la deuda GO aumenta de 53 - 75% en el escenario base a 59 - 79% en este escenario.

El rango estimado probable de los pagos totales a los acreedores del ELA se reduce de $5,800 millones – 9,200 millones a un rango de $5,500 millones – 8,600 millones. Los pagos totales disminuyen porque se precisa una cantidad menor de ingresos recuperados a medida que el monto total de garantía del ELA se reduce. Por ello, se devuelve una cantidad mayor de ingresos recuperados a las corporaciones públicas.

*Gráfico 5: Rango estimado probable de cobros para acreedores del ELA en caso de que se consideren inválidas las obligaciones GO y las obligaciones con igual prelación que estas emitidas a partir de marzo de 2011.*

| Rango estimado probable de cobros disponibles para acreedores del ELA por clase de deuda en caso de que se consideren inválidas las obligaciones GO y las obligaciones con igual prelación que estas emitidas a partir de marzo de 2011[1][2] VA del pago total en miles de millones de USD, % de cobro | | |
|---|---|---|
| | Extremo inferior del rango | Extremo superior del rango |
| Bonos GO | $4.1 *63%* | $5.5 *85%* |
| Reclamos con igual prelación que bonos GO[1] | $1.5 *59%* | $2.0 *79%* |
| Otros reclamos elegibles | $0 *0%* | $1.1 *8%* |
| Total | $5.5 *19%* | $8.6 *37%* |
| 1      Los cobros de este gráfico no incluyen los cobros de pensiones que permanecen iguales al 100% y los cobros del SRE que se incluyen en el análisis titulado "Análisis de los cobros de | | |

> los acreedores en caso de desestimación de las causas radicadas conforma al Título III para los acreedores del Sistema de Retiro de Empleados (SRE)"
>
> 2          Estos cobros reflejan los ajustes realizados al Paquete de Recursos dados los riesgos de implementación abordados en la sección "Cobros más probables disponibles para los acreedores" de este informe.

Ver en el Apéndice 2 para detalles adicionales sobre los cobros basados en distintos niveles de efectivo inicial y reclamos judiciales que conforman los rangos incluidos previamente.

### ii. Escenario 2

Tal como se describió en el Apéndice 3, es posible que las impugnaciones de ciertos reclamos no tengan éxito. En este escenario, se presume la validez de todos los bonos GO, bonos AEP y reclamos con garantía del ELA en circulación y, por ende, recibirán pagos siguiendo las prioridades de distribución de fondos descritas en este análisis.

En este escenario, sobre la base de los datos brindados por los asesores financieros, el capital total pendiente de pago de los bonos GO asciende a $12,549 millones y el total de intereses devengados e impagados a la fecha de entrada en vigor de este análisis asciende a $2,588 millones. Respecto de los bonos AEP, el saldo de capital pendiente de pago es equivalente a $4,000 millones y los intereses impagados ascienden a $614 millones a la fecha de entrada en vigor de este análisis. Asimismo, se consideran en el presente escenario los BAN de la AFI y los préstamos del BGF; el valor de esos dos reclamos se describe en la sección "Deuda pendiente de pago" del presente análisis. El Gráfico 6 que se incluye a continuación muestra el rango estimado probable de cobros. Los reclamos GO reciben un cobro estimado probable de 29 - 72%. El rango estimado probable de los cobros relativos a la deuda con igual prelación que los bonos GO es equivalente a 37 - 67% en este escenario.

El resultado es que el rango estimado probable de los pagos totales a los acreedores del ELA asciende a $6,100 millones - $13,900 millones. Los pagos totales aumentan porque se precisa una cantidad mayor de ingresos recuperados a medida que el monto total de deuda con garantía del ELA se incrementa. Por ello, se devuelve una cantidad inferior de ingresos recuperados a las corporaciones públicas.

*Gráfico 6: Rango estimado probable de cobros para acreedores del ELA en caso de que se consideren válidos todos los reclamos pendientes de pago*

| **Rango estimado probable de cobros disponibles para acreedores en caso de que se consideren válidos todos los reclamos pendientes de pago[1]**<br>VA del pago total en miles de millones de USD, % de cobro | | |
|---|---|---|
| | Extremo inferior del rango | Extremo superior del rango |
| Bonos GO | $4.4<br>*29%* | $10.8<br>*72%* |
| Reclamos con igual prelación que bonos GO[1] | $1.7<br>*37%* | $3.1<br>*67%* |
| Otros reclamos elegibles | $0<br>*0%* | $0<br>*0%* |
| Total[2][3] | $6.1<br>*15%* | $13.9<br>*41%* |

1          Esta simulación presume que se consideran válidos todos los bonos GO, bonos AEP y reclamos con garantía del ELA pendientes de pago.

2          Los cobros de este gráfico no incluyen los cobros de pensiones que permanecen iguales al 100% y los cobros del SRE que se incluyen en el análisis titulado "Análisis de los cobros de los acreedores en caso de desestimación de las causas radicadas conforme al Título III para los acreedores del Sistema de Retiro de Empleados (SRE)".

> 3        Estos cobros reflejan los ajustes realizados al Paquete de Recursos dados los riesgos
> de implementación abordados en la sección "Cobros más probables disponibles para los
> acreedores" de este informe.

Ver en el Apéndice 2 para detalles adicionales sobre los cobros basados en distintos niveles de
efectivo inicial y reclamos judiciales que conforman los rangos incluidos previamente.

### iii. Escenario 3

Tal como se describe en el Apéndice 3, existen litigios en curso en los que se impugna la validez
de los bonos SRE de conformidad con las leyes de Puerto Rico. Si se declaran inválidos los bonos
SRE, los tenedores de esos bonos no recibirían pagos del SRE ni del ELA. Por ende, el conjunto
de Otras reclamaciones no aseguradas consideradas en este escenario se vería reducido. El rango
estimado probable de cobros se consigna en el Gráfico 7.

*Gráfico 7: Rango estimado probable de cobros para acreedores del ELA en caso de que se
consideren inválidos los reclamos del SRE contra el ELA*

| **Rango estimado probable de cobros para acreedores en caso de que se consideren inválidos los bonos SRE**[1][2]<br>VA del pago total en miles de millones de USD, % de cobro | | |
|---|---|---|
| | Extremo inferior del rango | Extremo superior del rango |
| Bonos GO | $3.9<br>*50%* | $6.0<br>*78%* |
| Reclamos con igual prelación que bonos GO[1] | $1.9<br>*53%* | $2.7<br>*75%* |
| Otros reclamos elegibles | $0<br>*0%* | $0.4<br>*4%* |
| Total[3] | $5.8<br>*21%* | $9.2<br>*42%* |
| 1        Los cobros de este gráfico no incluyen los cobros de pensiones que permanecen iguales al 100% y los cobros del SRE que se incluyen en el análisis titulado "Análisis de los cobros de los acreedores en caso de desestimación de las causas radicadas conforme al Título III para los acreedores del Sistema de Retiro de Empleados (SRE)".<br>2        Esta simulación no toma en consideración ninguna otra simulación jurídica mencionada en esta sección del Informe. Por ello, esta simulación presume que se consideran inválidos los bonos GO, los bonos AEP y los reclamos con garantía del ELA emitidos a partir de 2012.<br>3        Estos cobros reflejan los ajustes realizados al Paquete de Recursos dados los riesgos de implementación abordados en la sección "Cobros más probables disponibles para los acreedores" de este informe. | | |

Ver en el Apéndice 2 para detalles adicionales sobre los cobros basados en distintos niveles de
efectivo inicial y reclamos judiciales que conforman los rangos incluidos previamente.

*APÉNDICE 1*

Los siguientes gráficos brindan detalles adicionales respecto del rango estimado probable de cobros a disposición de los acreedores. El primer gráfico contiene detalles adicionales sobre el total de los cobros para los acreedores y el segundo gráfico muestra los cobros por clase de deuda.

*Gráfico 8: Rango estimado probable de cobros disponibles para todos los acreedores del ELA*

| **Rango estimado probable de cobros disponibles para todos los acreedores** [1] [2] VA del pago total en miles de millones de USD, % de cobro | | | | |
|---|---|---|---|---|
| | | Extremo inferior del rango | Extremo superior del rango | Rango de cobros |
| Reclamos judiciales = $ 2.5 | Efectivo inicial = $2 | $5.8 *20%* | $9.0 *34%* | $5.8 – 9.2 *19 – 36%* |
| | Efectivo inicial = $5 | $6.8 *25%* | $9.2 *36%* | |
| Reclamos judiciales = $ 5.0 | Efectivo inicial = $2 | $5.8 *19%* | $9.0 *31%* | |
| | Efectivo inicial = $5 | $6.8 *23%* | $9.2 *33%* | |
| 1       Los cobros de este gráfico no incluyen los cobros de pensiones que permanecen iguales al 100% y los cobros del SRE que se incluyen en el análisis titulado "Análisis de los cobros de los acreedores en caso de desestimación de las causas radicadas conforme al Título III para los acreedores del Sistema de Retiro de Empleados (SRE)". 2       El cálculo de los cobros presume que se declaran inválidos los bonos GO, los bonos AEP y los reclamos con garantía del ELA emitidos a partir de 2012. | | | | |

*Gráfico 9: Rango estimado probable de cobros disponibles para los acreedores del ELA por clase de deuda y variables*

| **Rango estimado probable de cobros disponibles por clase de deuda** [1] [2] VA del pago total en miles de millones de USD, % de cobro | | | | |
|---|---|---|---|---|
| | | Efectivo inicial = $2 | Efectivo inicial = $5 | Rango de cobros |
| Bonos GO | Reclamos judiciales = $ 2.5 | $3.9 – 6.0 *50-78%* | $4.9 – 6.0 *63-78%* | $3.9 – 6.0 *50-78%* |
| | Reclamos judiciales = $ 5 | $3.9 – 6.0 *50-78%* | $4.9 – 6.0 *63-78%* | |
| Reclamos con igual prelación que bonos GO | Reclamos judiciales = $ 2.5 | $1.9 – 2.7 *53-75%* | $1.9 – 2.7 *53-75%* | $1.9 – 2.7 *53-75%* |
| | Reclamos judiciales = $ 5 | $1.9 – 2.7 *53-75%* | $1.9 – 2.7 *53-75%* | |
| Otros reclamos elegibles | Reclamos judiciales = $ 2.5 | $0 – 0.2 *0-1%* | $0 – 0.4 *0-3%* | $0 – 0.4 *0-3%* |
| | Reclamos judiciales = $ 5 | $0 – 0.2 *0-1%* | $0 – 0.4 *0-2%* | |
| Total | Reclamos judiciales = $ 2.5 | $5.8 – 9.0 *20-34%* | $6.8 – 9.2 *25-36%* | $5.8 – 9.2 *19-36%* |
| | Reclamos judiciales = $ 5 | $5.8 – 9.0 *19-31%* | $6.8 – 9.2 *23-33%* | |
| 1       Los cobros de este gráfico no incluyen los cobros de pensiones que permanecen iguales al 100% y los cobros del SRE que se incluyen en el análisis titulado "Análisis de los cobros de los acreedores en caso de desestimación de las causas radicadas conforme al Título III para los acreedores del Sistema de Retiro de Empleados (SRE)". 2       El cálculo de los cobros presume que se declaran inválidos los bonos GO, los bonos AEP y los reclamos con garantía del ELA emitidos a partir de 2012. | | | | |

APÉNDICE 2

*Gráfico 10: Rango estimado probable de cobros disponibles para los acreedores del ELA por clase de deuda en caso de que se consideren inválidas las obligaciones GO y las obligaciones con igual prelación que estas emitidas a partir de marzo de 2011.*

**Rango estimado probable de cobros disponibles para los acreedores del ELA por clase de deuda en caso de que se consideren inválidas las obligaciones GO y las obligaciones con igual prelación que estas emitidas a partir de marzo de 2011[1][2]**
VA del pago total en miles de millones de USD, % de cobro

|  |  | Efectivo inicial = $2 | Efectivo inicial = $5 | Rango de cobros |
|---|---|---|---|---|
| Bonos GO | Reclamos judiciales = $ 2.5 | $4.1 – 5.5 63-85% | $4.4 – 5.5 68-85% | $4.1 – 5.5 63-85% |
|  | Reclamos judiciales = $ 5 | $4.1 – 5.5 63-85% | $4.4 – 5.5 68-85% |  |
| Reclamos con igual prelación que bonos GO[1] | Reclamos judiciales = $ 2.5 | $1.5 – 2.0 59-79% | $1.5 – 2.0 59-79% | $1.5 – 2.0 59-79% |
|  | Reclamos judiciales = $ 5 | $1.5 – 2.0 59-79% | $1.5 – 2.0 59-79% |  |
| Otros reclamos elegibles | Reclamos judiciales = $ 2.5 | $0 – 0.7 0-5% | $0 – 0.11 0-8% | $0 – 1.1 0-8% |
|  | Reclamos judiciales = $ 5 | $0 – 0.7 0-4% | $0 – 0.11 0-7% |  |
| Total | Reclamos judiciales = $ 2.5 | $5.5 – 8.2 21-34% | $5.9 – 8.6 23-37% | $5.5 – 8.6 19-37% |
|  | Reclamos judiciales = $ 5 | $5.5 – 8.2 19-31% | $5.9 – 8.6 21-34% |  |

1    Los cobros de este gráfico no incluyen los cobros de pensiones que permanecen iguales al 100% y los cobros del SRE que se incluyen en el análisis titulado "Análisis de los cobros de los acreedores en caso de desestimación de las causas radicadas conforme al Título III para los acreedores del Sistema de Retiro de Empleados (SRE)".
2    Estos cobros reflejan los ajustes realizados al Paquete de Recursos dados los riesgos de implementación abordados en la sección "Cobros más probables disponibles para los acreedores" de este informe.

*Gráfico 11: Rango estimado probable de cobros disponibles para acreedores del ELA por clase de deuda en caso de que se consideren válidos todos los reclamos*

**Rango estimado probable de cobros disponibles por clase de deuda en caso de que se consideren válidos todos los reclamos pendientes [1][2][3]**
VA del pago total en miles de millones de USD, % de cobro

|  |  | Efectivo inicial = $2 | Efectivo inicial = $5 | Rango de cobros |
|---|---|---|---|---|
| Bonos GO | Reclamos judiciales = $ 2.5 | $4.4 – 8.9 29-59% | $7.3 – 10.8 48-72% | $4.4 – 10.8 29-72% |
|  | Reclamos judiciales = $ 5 | $4.4 – 8.9 29-59% | $7.3 – 10.8 48-72% |  |
| Reclamos con igual prelación que bonos GO[1] | Reclamos judiciales = $ 2.5 | $1.7 – 3.0 37-65% | $1.8 – 3.1 40-67% | $1.7 –3.1 37-67% |

| | Reclamos judiciales = $ 5 | $1.7 – 3.0 37-65% | $1.8 – 3.1 40-67% | |
| Otros reclamos elegibles | Reclamos judiciales = $ 2.5 | $0 – 0 0-0% | $0 – 0 0-0% | $0 – 0 0-0% |
| | Reclamos judiciales = $ 5 | $0 – 0 0-0% | $0 – 0 0-0% | |
| Total | Reclamos judiciales = $ 2.5 | $6.1 – 11.9 16-34% | $9.1 – 13.9 25-41% | $6.1 – 13.9 15-41% |
| | Reclamos judiciales = $ 5 | $6.1 – 11.9 15-32% | $9.1 – 13.9 24-38% | |

1      Esta simulación presume que se consideran válidos todos los bonos GO, los bonos AEP y los reclamos con garantía del ELA pendientes de pago.

2      Los cobros de este gráfico no incluyen los cobros de pensiones que permanecen iguales al 100% y los cobros del SRE que se incluyen en el análisis titulado "Análisis de los cobros de los acreedores en caso de desestimación de las causas radicadas conforme al Título III para los acreedores del Sistema de Retiro de Empleados (SRE)".

3      Estos cobros reflejan los ajustes realizados al Paquete de Recursos dados los riesgos de implementación abordados en la sección "Cobros más probables disponibles para los acreedores" de este informe.

*Gráfico 12: Rango estimado probable de cobros disponibles para acreedores del ELA por clase de deuda en caso de que se invaliden todos los reclamos del SRE contra el ELA*

**Rango estimado probable de cobros disponibles por clase de deuda en caso de que se consideren inválidos los bonos SRE [1][2]**

VA del pago total en miles de millones de USD, % de cobro

| | | Efectivo inicial = $2 | Efectivo inicial = $5 | Rango de cobros |
|---|---|---|---|---|
| Bonos GO | Reclamos judiciales = $ 2.5 | $3.9 – 6.0 50-78% | $4.9 – 6.0 63-78% | $3.9 – 6.0 50-78% |
| | Reclamos judiciales = $ 5 | $3.9 – 6.0 50-78% | $4.9 – 6.0 63-78% | |
| Reclamos con igual prelación que bonos GO[1] | Reclamos judiciales = $ 2.5 | $1.9 – 2.7 53-75% | $1.9 – 2.7 53-75% | $1.9 –2.7 53-75% |
| | Reclamos judiciales = $ 5 | $1.9 – 2.7 53-75% | $1.9 – 2.7 53-75% | |
| Otros reclamos elegibles | Reclamos judiciales = $ 2.5 | $0 – 0.2 0-2% | $0 – 0.4 0-4% | $0 – 0.4 0-4% |
| | Reclamos judiciales = $ 5 | $0 – 0.2 0-2% | $0 – 0.4 0-4% | |
| Total | Reclamos judiciales = $ 2.5 | $5.8 – 9.0 23-39% | $6.8 – 9.2 28-42% | $5.8 – 9.2 21-42% |
| | Reclamos judiciales = $ 5 | $5.8 – 9.0 21-35% | $6.8 – 9.2 26-37% | |

1      Los cobros no incluyen los cobros relativos a pensiones que permanecen iguales al 100%.

2      Esta simulación no toma en consideración ninguna otra simulación jurídica mencionada en esta sección del Informe. Por ello, esta simulación presume que se consideran inválidos los bonos GO, los bonos AEP y los reclamos con garantía del ELA emitidos a partir de 2012.

APÉNDICE 3

**Plan del ELA en virtud del Título III [1]**

**Análisis de prueba del interés superior – Presunciones**

| | Pregunta | Presunción |
|---|---|---|
| **1.** | **Existencia de PROMESA/Junta:** ¿Deberíamos presumir que se aplican los Títulos I y II de PROMESA? | **PRESUNCIÓN 1 [PRESUNCIÓN PRINCIPAL]:** los Títulos I y II de PROMESA son aplicables. La paralización automática no es aplicable. La Junta funciona y certifica e implementa los planes fiscales y los presupuestos. Los acreedores tienen permitido perseguir sentencias respecto de todos los reclamos vencidos. Una vez que los acreedores de deuda GO (incluidos los acreedores que tengan reclamaciones aseguradas por el ELA) cuenten con "sentencias", podrán demandar todos los "recursos disponibles" y bregar con el ELA por la cantidad de los recursos disponibles que puede destinarse a los gastos operacionales de acuerdo con el poder de policía. La única herramienta de los acreedores de deuda que no sea GO o no esté garantizada por el ELA consiste en esperar una asignación legislativa de montos para el pago de sus reclamos luego de que se satisfaga por completo la deuda GO.<br><br>**FUNDAMENTOS:** la referencia a "leyes no relativas a quiebras" contenida en la sección 314(b)(6) de PROMESA incluiría los Títulos I y II de PROMESA. No existiría una paralización automática en virtud de las leyes no relativas a quiebra. Ni el plan fiscal ni el presupuesto cancelan reclamos ni paralizan acciones. Por lo tanto, el plan fiscal y el presupuesto, en su carácter de leyes no relativas a quiebra, serían aplicables y la Junta de Supervisión continuaría existiendo para implementarlas. Es posible que sus limitaciones implícitas *(es decir.,* montos presupuestados) no restrinjan la cantidad que los acreedores pueden cobrar mediante la ejecución de sus reclamos. Que ello ocurra o no dependerá de la medida en la que el poder de policía evite que los acreedores de deuda GO se apropien de todos los recursos disponibles. Los acreedores de deuda que no sea GO dependen de las asignaciones legislativas para su pago. El plan fiscal certificado limitaría qué puede destinarse al servicio de la deuda, con sujeción a los |

---

[1] En el presente, el Estado Libre Asociado se denomina "Estado Libre Asociado", "ELA" o "PR".

| | Pregunta | Presunción |
|---|---|---|
| | | derechos de los acreedores de deuda GO de ejercer sus derechos de interceptar los recursos disponibles en virtud del Artículo VI, Secciones 6 y 8 de la Constitución de PR. |
| | | **PRESUNCIÓN 2 [RIESGO DE LITIGIO]**: los Títulos I y II de PROMESA no son aplicables. La paralización automática no es aplicable. La Junta no existe y no existen presupuestos ni planes fiscales certificados. |
| | | **FUNDAMENTOS:** la presunción de que los Títulos I y II de PROMESA continúan aplicándose aumenta el cobro de los acreedores debido a las medidas y ahorros que incorpora la Junta de Supervisión en sus planes fiscales certificados. Los asesores legales de la Junta de Supervisión consideran que es posible que los Títulos I y II no sean aplicables ya que el Congreso los sancionó en conjunto con el Título III y no queda claro que la intención haya sido que permanezcan vigentes sin el Título III. No obstante, en general, los asesores legales recomendaron que el presente análisis se elabore suponiendo que los Títulos I y II de PROMESA continuarían siendo de aplicación. |
| 2. | **Superávit:** ¿el efectivo remanente luego del pago de todas las deudas se resguarda cada año en una caja de seguridad para años posteriores con déficit o se traspasa a los recursos del año siguiente? | **PRESUNCIÓN:** en la medida en que haya fondos excedentes luego del pago de todas las deudas vencidas en un año, los fondos quedarán en posesión de Hacienda del ELA y un tribunal decidirá el año siguiente si el poder de policía justifica reservarlos en todo o en parte para años posteriores de déficit a los efectos de servicios esenciales. Los bonos GO y los bonos con garantía del ELA no prevén vencimientos anticipados. El análisis de la prueba del interés superior debe presumir que el excedente se encuentra disponible y se emplea para el servicio de la deuda, no que se ahorra para años posteriores de déficit ni que se deposita en el sistema de pensiones. |
| | | **FUNDAMENTOS:** es posible que los tribunales no estén dispuestos a permitirle al ELA que reserve grandes montos para años posteriores de déficit si ello implica reducir el cobro de menor plazo de los acreedores. |
| 3. | **Efectivo restringido/no restringido** | **PRESUNCIÓN:** sólo el efectivo no restringido se encuentra disponible para el servicio de la deuda en general, mientras que el efectivo restringido para ciertos acreedores se encuentra disponible únicamente para esos acreedores en la medida en que lo exija el ELA u otra ley aplicable. |

| | Pregunta | Presunción |
|---|---|---|
| | | **FUNDAMENTOS:** el efectivo en cuentas sujetas a otras restricciones en virtud de las leyes federales o del ELA no se encuentra disponible para el servicio de la deuda si la naturaleza de las restricciones equivale a la de derechos de garantía, gravámenes o derechos de compensación o recuperación. |
| **4.** | **Ingresos recuperados:** [2] ¿las corporaciones públicas que normalmente tienen derecho a recibir ingresos recuperados ("entidades beneficiarias de ingresos recuperados") tendrían un reclamo válido contra el ELA respecto de cualquier monto de ingresos recuperados empleados para financiar los gastos operacionales o la deuda del ELA? | **PRESUNCIÓN 1 [PRESUNCIÓN PRINCIPAL]:** las entidades beneficiarias de ingresos recuperados o sus tenedores de bonos pueden radicar un reclamo contra el ELA respecto de los fondos recuperados que el ELA haya utilizado para gastos operacionales, pero no respecto de los fondos recuperados empleados para pagar bonos GO o bonos garantizados por el ELA. Este es un reclamo sin garantía ni prioridad *(es decir,* subordinado a la deuda GO) respecto de una recuperación no autorizada contra el ELA y se suma al reclamo contra la entidad beneficiaria de ingresos recuperados *(es decir,* el emisor) respecto de la parte de los fondos recuperados empleados para los gastos operacionales, no así respecto de la parte destinada al pago del servicio de la deuda GO o el servicio de la deuda garantizada por el ELA. La sentencia respecto del reclamo dependerá de muchos factores, incluido el poder de policía, la prioridad y los hechos subyacentes a cada recuperación de ingresos.

**FUNDAMENTOS:** los ingresos recuperados empleados para el pago del servicio de la deuda GO en virtud del plan de ajuste en el que no se pagan íntegramente los reclamos por deuda GO no se encuentran sujetos al argumento de que los fondos recuperados fueron utilizados con fines inapropiados ya que, de conformidad con la Sección 8 del Artículo VI de la Constitución de PR, los ingresos recuperados pueden utilizarse para el servicio de la deuda correspondiente a obligaciones generales. No obstante, la Sección 8 parece estar sujeta al poder de policía del ELA. También es probable que los tenedores de bonos impugnen la recuperación de fondos (anterior y futura) esgrimiendo como fundamento que era innecesaria ya que, en su opinión, existían ingresos disponibles suficientes para pagar el servicio de la deuda GO. Sobre la base de ese argumento y/o dado que el poder de policía se utiliza para desplegar fondos recuperados a fin de pagar gastos operacionales y no el servicio de la deuda GO, los tenedores de |

---

[2] A fin de evitar dudas, el uso del término "recuperación" (*clawback*) no constituirá ni podrá interpretarse como una admisión de hechos, responsabilidad, estipulación o renuncia en litigios actuales o futuros respecto de los ingresos que el ELA asigna condicionalmente a ciertos de sus organismos. Se adjunta como Anexo 1 una revisión de las leyes pertinentes sobre recuperación, así como citas relacionadas.

| | Pregunta | Presunción |
|---|---|---|
| | | bonos radicarán reclamos contra el ELA por el monto de los fondos recuperados que se emplearon de forma supuestamente innecesaria para pagar el servicio de la deuda GO o se utilizaron, en ejercicio del poder de policía, para abonar gastos operacionales del ELA o de entidades beneficiarias de ingresos recuperados. Incluso si no existiera derecho de recuperación, el poder de policía del ELA, sujeto en última instancia a una decisión judicial, podría justificar el cese de la asignación de fondos a organismos beneficiarios de ingresos recuperados para el servicio de la deuda, así como el uso de los fondos para servicios esenciales en el ELA o los organismos beneficiarios de ingresos recuperados.<br><br>Por lo tanto, se presume que en la medida en que el ELA no pueda pagar sus gastos en un año determinado, ejercerá su poder de policía para recuperar ingresos y luego los distribuirá según resulte necesario *(es decir,* puede usar una parte para cubrir los gastos operacionales propios y los de sus organismos —incluidas las entidades beneficiarias de ingresos recuperados— así como el servicio de la deuda). Se presume que los ingresos recuperados pueden utilizarse para cancelar la deuda GO del ELA y la deuda con igual prelación que los bonos GO cuando el ELA cuente con fondos suficientes para pagar sus gastos operacionales. En caso de que no se precise utilizar la totalidad de los ingresos recuperados para el pago de la deuda GO y la deuda con igual prelación que la deuda GO en un determinado año, todo monto remanente de ingresos recuperados se devolverá a sus correspondientes corporaciones públicas. En caso de que el ELA no cuente con suficientes fondos para abonar sus gastos operacionales en un año determinado, se presume que puede ejercer su poder de policía para emplear ingresos recuperados a fin de abonar dichos gastos, siendo posible que el poder de policía dé lugar a reclamos contra el ELA por el monto de los fondos recuperados utilizados.<br><br>**PRESUNCIÓN 2 [RIESGO DE LITIGIO]:** toda recuperación de ingresos (ya sea de acuerdo con la Sección 8 o el poder de policía) fue permisible, por lo que la entidad beneficiaria de los ingresos recuperados o sus tenedores de bonos no pueden radicar reclamos como consecuencia de dicha recuperación. |

| | Pregunta | Presunción |
|---|---|---|
| | | **FUNDAMENTOS:** a diferencia de la Presunción 1, el ELA tendría permitido utilizar fondos recuperados para gastos operacionales de acuerdo con su poder de policía sin dar lugar a reclamos en su contra. |
| | | **PRESUNCIÓN 3 [RIESGO DE LITIGIO]:** no se permitía la recuperación de ingresos, por lo que la entidad beneficiaria de los ingresos recuperados o sus tenedores de bonos pueden radicar un reclamo como consecuencia de los fondos recuperados empleados para el pago de gastos operacionales, bonos GO y bonos garantizados por el ELA. Si los Títulos I y II desplazaran las asignaciones legales preexistentes del ELA a la ACT y las demás entidades beneficiarias de ingresos recuperados, no existen restricciones para el uso de los fondos recuperados por parte del ELA, pero la entidad beneficiaria de los fondos recuperados o sus tenedores de bonos pueden demandar al ELA por perjudicar las obligaciones en virtud de bonos que se les adeudan y radicar reclamos contra el ELA por dicho perjuicio. Específicamente, en cada año en el que no se pague el servicio de la deuda relativa a los bonos de la entidad que de otro modo recibiría ingresos recuperados, presumiríamos que la entidad beneficiaria de ingresos recuperados o dichos tenedores de bonos pueden radicar un reclamo sin garantía ni prioridad *(es decir,* subordinado a la deuda GO) contra el ELA, además del reclamo contra la entidad beneficiaria de ingresos recuperados *(es decir,* el emisor). |
| | | **FUNDAMENTOS:** los Títulos I y II permiten la recuperación de ingresos al otorgarle a la Junta de Supervisión facultades sobre las asignaciones presupuestarias, pero de todos modos puede radicarse un reclamo por daños como consecuencia de dicha recuperación. |
| 5. | **Medidas del plan fiscal - Riesgo de implementación:** ¿existe el riesgo de que las medidas del plan fiscal no se implementen íntegramente? | **PRESUNCIÓN:** se presume un rango de cobros basados en un riesgo alto o medio de implementación de las medidas fiscales y/o reformas estructurales. |
| | | **FUNDAMENTOS:** la desestimación de la causa radicada conforme al Título III y eventuales incertidumbres políticas y económicas adicionales podrían afectar la implementación de las medidas del plan fiscal. Antes y durante los conflictos en Puerto Rico que condujeron a la renuncia del Gobernador Rosello, la Junta de Supervisión entendió que las medidas y reformas estructurales que recomendó no estaban siendo implementadas en tiempo y forma. Luego de la desestimación de las causas radicadas |

|   | **Pregunta** | **Presunción** |
|---|---|---|
|   |   | conforme al Título III, es muy posible que el Gobierno coopere menos con la Junta de Supervisión y los acreedores que pretendan maximizar sus cobros. |
| 6. | **Prioridad de los gastos operacionales (incluidas las pensiones):** ¿los gastos operacionales se abonarán antes de que se pague la deuda GO y la deuda con igual prelación que esta? | **PRESUNCIÓN 1 [PRESUNCIÓN PRINCIPAL]:** se presume que los gastos operacionales indicados en el plan fiscal certificado se abonan antes que el servicio de la deuda. También se presume que el devengo de beneficios jubilatorios para maestros (SRM) se congelará tal como establecieron los planes fiscales certificados, pero que no se congelará el devengo de beneficios para jueces (SRJ). En consecuencia, se presume que los maestros de menos de 45 años reciben seguro social al 1 de enero de 2020.

**FUNDAMENTOS:** el plan fiscal ya proyecta reducciones en los gastos operacionales mediante una serie de medidas fiscales destinadas a reducir los gastos de todo el Gobierno a fin de adaptar el presupuesto a un tamaño adecuado para la población de PR. El plan fiscal certificado proyecta ahorros equivalentes a aproximadamente $13,600 millones desde el año fiscal 2019 hasta el año fiscal 2024, lo cual representa aproximadamente un 15% de los gastos básicos en ese período. Si se consideran únicamente los organismos que cuentan con una reducción, el recorte representa aproximadamente un 25% del gasto básico de este grupo en cuestión. Asimismo, Puerto Rico recortó sustancialmente las pensiones públicas antes de la sanción de PROMESA. Esta simulación presume que cualquier recorte adicional sería perjudicial para la economía de Puerto Rico pero, de acuerdo con el plan fiscal vigente, los niveles de las pensiones se congelarían, lo cual daría lugar a reclamos con sentencia no garantizados.

En la actualidad, los maestros no reciben Seguro Social ya que este grupo se encuentra exento de este beneficio a causa del acuerdo de la "Sección 218" entre el ELA y la Administración del Seguro Social, el cual estipula que los empleados gubernamentales pueden ser eximidos del Seguro Social si participan en un plan de retiro "comparable" como, por ejemplo, uno que incluya contribuciones totales del empleado y el empleador equivalente al 7,5% del sueldo del empleado, como mínimo. No obstante, con el congelamiento del devengo de beneficios de su plan de pensión, los maestros pueden estar cubiertos por el Seguro Social. |

|  | Pregunta | Presunción |
|---|---|---|
|  |  | **PRESUNCIÓN 2 [RIESGO DE LITIGIO]:** se presume que el ejercicio del poder de policía por parte del ELA no se considera plenamente permisible sin la creación de pasivos del ELA para su utilización, en particular si no se implementan todas las medidas de ahorro del plan fiscal. Por ello, se ordenaría al ELA que utilice una parte de sus recursos para pagar la deuda antes de abonar los gastos operacionales. El análisis de sensibilidad debe tomar los gastos no relativos a la deuda (gastos operacionales y de capital, incluidos los pagos de pensiones) del plan fiscal certificado y determinar los montos disponibles para el servicio de la deuda si dichos gastos no relativos a la deuda se reducen en un 2%, 4%, 6%, 8% y 10% adicional (en caso de que la sostenibilidad económica del ELA no se encuentre en riesgo en ese momento). <br><br>**FUNDAMENTOS:** el poder de policía permite el pago de gastos esenciales en primer lugar, pero es posible que los tribunales minimicen el impacto del poder de policía al no liberar los ingresos disponibles para algunos pagos de gastos operacionales y pensiones en la medida en que ello no comprometa la salud, la seguridad y el bienestar públicos. |
| 7. | **Bonos CFP** ¿los Bonos CFP constituyen reclamos admisibles? | **PRESUNCIÓN:** no. <br><br>**FUNDAMENTOS:** los Bonos CFP no tienen derecho de pago, lo cual constituye un requisito para los reclamos en virtud de las leyes del ELA y la sección 101(5) del Código de Quiebras. El pago de esos pagarés se encuentra sujeto a la asignación discrecional de fondos por parte de la Legislatura. Los documentos de los Bonos CFP establecieron que (1) la Legislatura no tiene la obligación legal de asignar fondos al pago de los Bonos CFP y (2) los Bonos CFP no constituyen una obligación del ELA. |
| 8. | **BAN de la AFI:** ¿se han cancelado BAN de la AFI utilizando ingresos Crudita desde 2016? | **PRESUNCIÓN:** los BAN de la AFI se sometieron a la moratoria y no se han cancelado. Cabe destacar que los BAN de la AFI están garantizados por el ELA. Sin la paralización automática, la moratoria puede declararse violatoria de la sección 303 de PROMESA y los BAN de la AFI tendrán derecho de pago. |
| 9. | **Intereses adicionales:** ¿debería devengar intereses adicionales la deuda (capital + intereses) que permaneció impagada durante la paralización? | **PRESUNCIÓN:** se presume que en los años en los que no se efectúa el pago íntegro de la deuda vencida, los pagos posteriores se imputan primero a los intereses y, luego, al capital. |

|  | Pregunta | Presunción |
|---|---|---|
|  |  | i. **Intereses de la deuda GO durante la paralización:** de acuerdo con la sección 303 de PROMESA, los intereses se continúan devengando a la tasa contractual durante cualquier moratoria, a menos que el contrato subyacente prevea intereses moratorios, en cuyo caso estos serán de aplicación. No existen disposiciones legales respecto del pago de intereses sobre intereses.<br><br>ii. **Intereses de la deuda con igual prelación que la deuda GO durante la paralización:** se aplican los mismos criterios que para la deuda GO.<br><br>iii. **Intereses de las reclamaciones no aseguradas durante la paralización:** se presume que no se devengan intereses.<br><br>iv. **Intereses de los reclamos federales durante la paralización:** se presume que se devengan intereses durante la moratoria porque, en última instancia, el Gobierno federal puede cobrar su deuda y los intereses mediante compensación con las futuras ayudas. Los documentos subyacentes a cada reclamo federal pueden fijar las tasas de interés. La tasa actual de las sentencias federales asciende a 1.76% por año.<br><br>v. **Intereses de la deuda impagada:** se presume que la deuda impagada devenga intereses según la tasa de cupón promedio ponderada del año 2019 brindada por CITI (cada grupo de deuda con igual prelación que la deuda GO tiene su propia tasa).<br><br>vi. **Devengo de intereses sobre intereses durante los ejercicios fiscales 19-58:** no. No deben devengarse intereses sobre intereses. El devengo de intereses sobre intereses se encuentra sujeto a principios de equidad ante la falta de un derecho contractual expreso, pero no está permitido en virtud de las leyes del ELA y, por ello, no debería encontrarse disponible. |
| 10. | **Reclamos del Gobierno federal:** ¿cuál es la prioridad de los reclamos federales garantizados y no garantizados? ¿Los documentos son abarcativos? | **PRESUNCIÓN:** los reclamos federales deben pagarse por completo.<br><br>**FUNDAMENTOS:** el Gobierno federal puede compensar reclamos impagados con fondos federales que de otro modo recibiría el ELA — el programa de compensación del Tesoro de EE.UU. (*Treasury Offset* |

| | Pregunta | Presunción |
|---|---|---|
| | | *Program*, TOP) podría activarse de inmediato y el monto total adeudado al Gobierno federal se retendría de transferencias federales futuras al ELA. |
| **11.** | **Reclamos de Tenedores de Bonos SRE:**[3] ¿cuál es el valor de los reclamos de los tenedores de bonos SRE contra el ELA? | **PRESUNCIÓN 1 [PRESUNCIÓN PRINCIPAL]:** los tenedores de bonos SRE radican exitosamente reclamos constitucionales (Cláusulas Contractuales y/o sobre Expropiaciones) contra el ELA. Cada año en el que no se paga el servicio de su deuda, los tenedores de bonos SRE pueden demandar ese monto al ELA como un reclamo no garantizado pagado después de la deuda GO y la deuda con igual prelación. <br><br> **FUNDAMENTOS:** los tenedores de bonos SRE argumentan que la Ley 106-2017, que eliminó las contribuciones patronales en virtud de la ley de creación del SRE, constituyó un perjuicio parar sus derechos contractuales y una expropiación de su garantía, en violación de las Constituciones de Puerto Rico y EE.UU. Asimismo, la sección 552, que eliminó el derecho de garantía sobre las contribuciones patronales posteriores a la fecha de petición del SRE independientemente de los efectos de la Ley 106, probablemente dejaría de aplicarse luego de la desestimación de la causa del SRE radicada conforme al Título III, lo cual dejaría a la Ley 106 como el único fundamento para la eliminación de su garantía y, por ende, una violación de las Cláusulas Contractuales y/o sobre Expropiaciones. <br><br> **PRESUNCIÓN 2 [RIESGO DE LITIGIO]:** los tenedores de bonos SRE tienen un derecho de garantía sobre las contribuciones patronales futuras y se considera que los Pagos PayGo son lo mismo que las Contribuciones Patronales o son el producido de dichas Contribuciones y, por ello, los tenedores de bonos SRE cuentan con reclamos contra el ELA garantizados por un derecho de garantía sobre los Pagos PayGo. El servicio de la deuda, incluidos el capital y los intereses pendientes de pago, se abona antes que la deuda GO o la deuda garantizada por el ELA. <br><br> Esta presunción debe emplearse como si las reclamaciones aseguradas respecto de las contribuciones patronales tuvieran probabilidades de éxito equivalentes a un 0%, 25%, 50%, 75% y 100%. En caso de que el ELA afronte déficits antes del pago íntegro de los bonos SRE, se presume que el ELA puede |

---

[3] Para información sobre los reclamos de los tenedores de bonos SRE contra el SRE, ver las presunciones del análisis de la prueba del interés superior del SRE.

| | Pregunta | Presunción |
|---|---|---|
| | | justificar el uso del poder de policía para el pago de todos sus gastos, incluidas las pensiones, en su totalidad, y que no queda dinero para pagar los bonos SRE u otra deuda.<br><br>**FUNDAMENTOS:** los tenedores de bonos SRE sostuvieron que los Pagos PayGo son lo mismo que las contribuciones patronales, o su producido, y, por ende, se encuentran sujetos al derecho de garantía de los tenedores de bonos SRE, lo cual los convierte en acreedores garantizados del ELA. También sería probable que argumenten que este derecho de garantía, aun si es eliminado por la sección 552 a la fecha de petición del SRE, se reinstauraría una vez desestimada la causa del SRE radicada conforme al Título III.<br><br>**PRESUNCIÓN 3 [RIESGO DE LITIGIO]**: los tenedores de bonos SRE no tiene reclamos contra el ELA.<br><br>**FUNDAMENTOS:** incluso si los tenedores de bonos SRE tuvieran un derecho de garantía sobre derechos de contribuciones futuras, los tenedores de bonos fueron notificados mediante el documento de oferta de bonos de que esos derechos podrían ser modificados o afectados de forma adversa por el ELA, lo cual sucedió mediante la Ley 106-2017 que eliminó las contribuciones patronales al SRE. El hecho de que los tenedores de bonos SRE hayan sido notificados sobre esa potencial modificación también podría reducir significativamente sus posibilidades de radicar exitosamente un reclamo por afectación contractual o expropiación. Por otra parte, la prueba del interés superior debe presumir que los derechos y remedios de los tenedores de bonos se refieren a sus reclamos tal como existían inmediatamente antes de la hipotética desestimación de la causa del SRE, sin ajustes en virtud del plan del SRE; es decir, garantizados únicamente por las contribuciones patronales previas a la fecha de petición del SRE, pero no posteriores, como consecuencia de la sección 552. Por ello, los tenedores de bonos SRE no contaban con derechos contractuales ni garantías que se hubieran visto perjudicados o eliminados por aplicación de la Ley 106. Cabe destacar que es muy probable que para el momento de la vista de confirmación se sepa si las reclamaciones aseguradas de los tenedores de bonos del SRE son eliminados en su mayoría por la sección 552 del Código de Quiebras, ya que la cuestión actualmente se está preparando para el Tribunal de Apelaciones para el Primer Circuito. |

|   | Pregunta | Presunción |
|---|----------|-----------|
|   |          | **PRESUNCIÓN 4 [RIESGO DE LITIGIO]**: los tenedores de bonos SRE no tienen reclamos contra el ELA porque los bonos SRE se emitieron excediendo las facultades correspondientes (*ultra vires*). |
|   |          | **FUNDAMENTOS:** el tribunal decide que los bonos del SRE se emitieron en exceso de las facultades correspondientes, y que los tenedores de bonos no tienen derecho a ningún remedio basado en el derecho de equidad. |
| 12. | **CRIM (impuesto a la propiedad)** | **PRESUNCIÓN:** el impuesto especial a la propiedad del 1.03% que recauda el CRIM se emplea para pagar a los tenedores de bonos GO, pero el ELA podría ejercer el poder de policía para emplear esos ingresos a fin de cubrir servicios esenciales en caso de que tenga déficit y todos los demás fondos disponibles se hayan aplicado a gastos operacionales necesarios y/o el servicio de la deuda GO. |
|   |          | **FUNDAMENTOS:** las Leyes 39-1976 y 83-1991 exigen que el impuesto especial a la propiedad del 1.03% se transfiera al Fondo de Redención de la Deuda GO y se emplee únicamente para el pago de los bonos GO. En un escenario en el que el ELA paga la deuda GO y la deuda garantizada por el ELA, esos fondos depositados en el Fondo de Redención de la Deuda GO deberían utilizarse primero para pagar los bonos GO. Al igual que en todos los escenarios, el monto abonado en concepto deuda GO y deuda garantizada por el ELA debería prorratearse (es decir, la asignación de los ingresos del 1.03% a la deuda GO no debe resultar en un cobro mayor para la deuda GO que para la deuda garantizada por el ELA en ningún año). |
| 13. | **Unidades Constitutivas Proyectadas Independientemente (IFCU):** ¿sus ingresos son "recursos disponibles"? | **PRESUNCIÓN 1 [PRESUNCIÓN PRINCIPAL]:** las IFCU son corporaciones públicas jurídicamente independientes del ELA. Debe considerarse que los ingresos propios de las IFCU no se encuentran disponibles para los acreedores del ELA, tales como los tenedores de bonos GO. En caso de que el ELA brinde una asignación a una IFCU que tenga superávit, debe presumirse que el ELA reduce la asignación hasta que la IFCU tenga un presupuesto equilibrado. |
|   |          | **FUNDAMENTOS:** los ingresos generados por los organismos jurídicamente independientes del ELA no se encuentran a disposición del ELA y transferirle dichos ingresos al ELA requeriría leyes que lo |

|  | Pregunta | Presunción |
|---|---|---|
|  |  | habiliten. No obstante, en un escenario en el que el ELA ejerce sus poderes de policía para abonar servicios esenciales, se esperaría que el ELA no otorgue asignaciones a organismos con superávit. |
|  |  | **PRESUNCIÓN 2 [RIESGO DE LITIGIO]**: el superávit de las IFCU puede ser empleado por el ELA. |
|  |  | **FUNDAMENTOS:** la sección 201(b)(1)(M) de PROMESA establece que un plan fiscal "asegurará que los bienes, fondos o recursos de un organismo territorial no sean prestados, transferidos, o de otra forma utilizados para beneficiar a un territorio o a otro organismo territorial de un territorio cubierto, salvo que esté permitido por la constitución del territorio, por un plan de ajuste aprobado bajo el Título III, o por una Modificación Elegible aprobada bajo el Título VI". Dado que un plan en virtud del Título III o una Modificación Elegible según el Título VI no se encontrarían disponibles en los escenarios de la prueba del interés superior, la transferencia podría lograrse sobre la base de legislación sancionada de acuerdo con la Constitución del ELA. En el pasado, el ELA empleó legislación que autorizaba a las IFCU como el CFSE, la ACAA, Turismo y la CFI a brindar apoyo en materia de liquidez al ELA mediante préstamos o contribuciones. La Ley 26-2017 también autoriza al ELA a recoger recursos de las corporaciones públicas. El hecho de si estas leyes están desplazadas por PROMESA probablemente sea materia de litigio. |
| 14. | ¿Los ingresos por impuestos del ELA asignados al Fondo Especial de Desarrollo Económico de la CFI y los ingresos por tragamonedas de la Compañía de Turismo son recursos disponibles? | **PRESUNCIÓN 1 [PRESUNCIÓN PRINCIPAL]:** no son recursos disponibles (lo cual se condice con la presunción 13). |
|  |  | **PRESUNCIÓN 2 [RIESGO DE LITIGIO]:** dado que esas fuentes de ingresos pertenecen al ELA, este puede ejercer sus poderes de policía para capturar esos fondos. |
|  |  | **FUNDAMENTOS:** la Ley 73-2008 ordenó al Secretario de Hacienda que creara el Fondo Especial de Desarrollo Económico (FEDE) administrado por la CFI. El FEDE recibe el 10% de: (1) los impuestos pagados por los negocios que reciben beneficios tributarios en virtud de la Ley 73 o leyes de incentivos |

|  | Pregunta | Presunción |
|---|---|---|
|  |  | industriales anteriores, o (2) las retenciones tributarias relacionadas con las regalías de las operaciones exentas en virtud de la Ley 73 o leyes de incentivos industriales anteriores.[4]

Los impuestos asignados al FEDE deben considerarse recursos disponibles del ELA.

De acuerdo con la Sección 8 del Artículo VI de la Constitución del ELA, consideramos que el Secretario de Hacienda podría retener la transferencia de los ingresos por impuestos a la CFI y, en su lugar, utilizarlos para el pago de la deuda GO. Sujeto a la aprobación del tribunal, también podría ser retenida por el ELA en ejercicio de su poder de policía.

Cabe destacar que la suspensión de transferencias al FEDE afectaría el programa de desarrollo económico respaldado por el fondo y la base industrial de Puerto Rico, lo cual podría dañar la actividad económica.

Con respecto a los ingresos por máquinas tragamonedas, la Ley 221-1948 establece que dichos ingresos, recaudados por la Compañía de Turismo, se depositarán en un fondo especial de esta. Luego de descontar los costos operacionales (incluida la nómina) y de amortización relacionados con las máquinas tragamonedas, los ingresos anuales netos se distribuyen a: (1) los operadores de casinos, (2) el Fondo General del ELA, (3) la UPR y (4) dos fondos especiales de la Compañía de Turismo. [5]

Los dos fondos de la Compañía de Turismo son: (1) un fondo especial utilizado para financiar los objetivos corporativos de la Compañía de Turismo y (2) el Fondo para el Desarrollo de la Industria Turística de Puerto Rico, establecido para fortalecer y desarrollar la industria turística. La Ley 221 prevé una fórmula según la cual una parte de los ingresos por máquinas tragamonedas se transfiere a cada uno de los fondos.

El ELA podría utilizar la Ley 26-2017 ("Ley de Cumplimiento con el Plan Fiscal") para tomar los ingresos excedentes de la Compañía de Turismo o sancionar normas que modifiquen la Ley 221 y reasignen los ingresos al ELA. Tal como se destacó previamente en relación con la suspensión de |

---

[4] 13 L.P.R.A. sección 10657(a).
[5] 15 L.P.R.A. sección 74.

|  | **Pregunta** | **Presunción** |
|---|---|---|
|  |  | transferencias al FEDE, la eliminación de los fondos destinados a desarrollar la industria turística podría dañar la actividad económica de Puerto Rico. |
| **15.** | **¿Deberían tenerse en cuenta las impugnaciones de los bonos GO y de ciertas deudas garantizadas por el ELA?** | **PRESUNCIÓN 1 [PRESUNCIÓN PRINCIPAL]:** sí. En esta presunción principal, se asume que algunas de esas impugnaciones son exitosas a partir de 2012 y que se declararía la invalidez de los bonos correspondientes (bonos GO y bonos AEP emitidos a partir de 2012) y las garantías del ELA que se emitieron a partir de 2012, así como que los tenedores de bonos que tengan esos reclamos no podrían interponer acciones contra el ELA (incluido cualquier reclamo por enriquecimiento ilícito o similar). |
|  |  | **FUNDAMENTOS:** en la causa radicada conforme al Título III del ELA, la Junta de Supervisión, a través de su Comité Especial de Reclamos y el comité oficial de acreedores no asegurados (UCC), radicó acciones alegando que los bonos GO emitidos en 2012 y 2014 violaban el límite de endeudamiento constitucional de Puerto Rico y que debían rechazarse los reclamos de los presuntos tenedores de dichos bonos GO. La Junta de Supervisión también ha argumentado que los Contratos de Alquiler de la AEP no son verdaderos contratos ni obligaciones presuntamente exigibles en virtud de ellos, sino simplemente obligaciones generales del ELA caracterizadas erróneamente. |
|  |  | **PRESUNCIÓN 2 [RIESGO DE LITIGIO]:** sí. Se presume que todas las impugnaciones de la Presunción 1 son exitosas y que, además, también se declararía la invalidez de los bonos GO, los bonos AEP y las garantías del ELA que se emitieron a partir de 2011, así como que los tenedores de bonos que tienen esos reclamos no podrían interponer acciones contra el ELA (incluido cualquier reclamo por enriquecimiento ilícito o similar). |
|  |  | **FUNDAMENTOS:** además de las impugnaciones mencionadas en los fundamentos precedentes, el UCC también impugnó reclamos relativos a bonos GO emitidos a partir de marzo de 2011 y reclamos relativos a bonos AEP emitidos a partir de marzo de 2011. También existen argumentos que sostienen que ciertas garantías del ELA emitidas a partir de marzo de 2011 pueden ser inválidas. Esta presunción supone que se declaran ha lugar a las objeciones del UCC con respecto a reclamos relativos a bonos GO y AEP |

|   | Pregunta | Presunción |
|---|----------|------------|
|   |          | emitidos a partir de marzo de 2011 y reclamos relativos a garantías del ELA emitidas a partir de marzo de 2011.[6]<br><br>**PRESUNCIÓN 3 [RIESGO DE LITIGIO]:** no. Se presume que los bonos y garantías que se enumeran en el listado de deudas incluido más abajo son válidos y exigibles.<br><br>**FUNDAMENTOS:** las impugnaciones explicadas en los fundamentos precedentes podrían fracasar. |
| 16. | **Para evitar el pago de la deuda GO, ¿es probable que el Secretario de Hacienda renuncie o simplemente se rehúse a transferir los ingresos disponibles a los tenedores de la deuda GO?** | **PRESUNCIÓN:** la Hacienda del ELA cumplirá en tiempo y forma con sus obligaciones de pago y no se enfrentará a la renuncia del Secretario de Hacienda ni a otros acontecimientos que demoren ni reduzcan los pagos. Asimismo, el ELA no lanzaría una oferta pública en la que se reduzca la deuda.<br><br>**FUNDAMENTOS:** aunque todos esos acontecimientos son posibles, presumiremos que todos los funcionarios del Gobierno desempeñarán sus funciones y que los factores exógenos no reducirán los cobros de los acreedores. |

---

[6] Cabe señalar que esta presunción tiene fines exclusivamente ilustrativos. La Junta de Supervisión no se sumó a la objeción del UCC respecto de los Bonos GO emitidos antes de 2012 ni a la objeción respecto de los bonos AEP emitidos a partir de 2011. La Junta de Supervisión continúa evaluando el riesgo de litigio asociado con estas emisiones de bonos y es posible que realice ajustes al tratamiento de dichos reclamos por bonos antes de la vista sobre la Declaración de Divulgación.

**LISTADO DE DEUDAS**[7]

### 1. Costo operacional

a. Plan Fiscal del 9 de mayo de 2019, Gráfico 17: Categorías principales de gastos antes de medidas y reformas estructurales

*GRÁFICO 17: CATEGORÍAS PRINCIPALES DE GASTOS ANTES DE MEDIDAS Y REFORMAS ESTRUCTURALES*
*Impulsores de gastos básicos clave (antes de medidas y reformas estructurales), millones de $*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Nómina (no financiada a nivel federal) | 2,996 | 2,961 | 2,970 | 3,002 | 3,037 | 3,081 | 3,126 |
| Gastos operacionales directos (no financiados a nivel federal)[1] | 1,508 | 1,736 | 1,617 | 1,659 | 1,676 | 1,707 | 1,732 |
| Asignaciones del ELA[2] | 1,274 | 1,246 | 1,134 | 1,348 | 1,358 | 1,346 | 1,356 |
| Gastos en Medicaid del ELA | 120 | 0 | 992 | 2,124 | 2,199 | 2,283 | 2,375 |
| Gastos en pensiones | 2,254 | 2,260 | 2,398 | 2,381 | 2,334 | 2,325 | 2,321 |
| Otros[3] | 2,728 | 2,736 | 2,599 | 2,482 | 2,325 | 2,298 | 2,210 |
| Gastos de IFCU y Fondos de Ingresos Especiales del ELA[4] | 2,544 | 2,816 | 2,969 | 3,056 | 3,083 | 3,122 | 3,164 |
| Gastos financiados a nivel federal | 6,560 | 7,089 | 5,835 | 4,794 | 4,864 | 4,938 | 5,014 |
| Total | 19,984 Ej. 2018 | 20,843 Ej. 2019 | 20,513 Ej. 2020 | 20,847 Ej. 2021 | 20,876 Ej. 2022 | 21,101 Ej. 2023 | 21,298 Ej. 2024 |

1  Incluye únicamente los gastos operacionales del Fondo General. Las versiones anteriores del Plan Fiscal incluían los Fondos de Ingresos Especiales y el Fondo General.
2  Incluye las asignaciones a la ACT, la Universidad de Puerto Rico y los gastos municipales
3  Incluye gastos de recuperación de desastres cubiertos con fondos no federales, gastos de reestructuración, préstamo a la AEE, gastos de capital para mantenimiento, fondos empresariales, desembolsos a entidades por fuera del plan fiscal y otros costos recurrentes y no recurrentes; excluye los ajustes por incremento de montos brutos de gastos.
4  Los gastos de IFCU y Fondos de Ingresos Especiales del ELA se incluyeron previamente en "Otros" gastos; para las IFCU, incluye todos los tipos de fondos (Fondos Federales, Fondos Generales y Fondos de Ingresos Especiales).
5  Incluye fondos federales para nómina, gastos operacionales directos, Medicaid y programas sociales; excluye Unidades Constitutivas Proyectadas Independientemente.

---

[7] La información financiera que se incluye en el presente se basa en información disponible en la mayoría de los estados contables recientes de dominio público y, en ciertos casos, en la información recibida de los asesores de la Junta de Supervisión y los asesores del ELA. Los asesores legales no tienen una postura tomada respecto de la precisión de la información financiera que aquí se brinda.

En ciertas partes del listado de deudas, sólo se incorpora información relativa a la presunción principal.

b. **Ajustes del Plan Fiscal**

i. No se prevé congelamiento de las pensiones para beneficiarios del SRJ ni recorte del 10% de las pensiones. Asimismo, las contribuciones futuras al seguro social correspondientes a los jueces también se eliminan, ya que esos pagos dependen de que se congele el devengo de los beneficios jubilatorios.

ii. Los costos de los honorarios profesionales de abogados se reiteran hasta el año fiscal 2029, presumiendo necesidades amplias en materia de litigio sin las protecciones del Título III o un plan de ajuste. Los honorarios de abogados correspondientes al año fiscal 2019 duplicarían los honorarios proyectados actuales, luego se incrementarían por inflación hasta el año fiscal 2023 para después reducirse un 50% a más tardar en ese año fiscal. Posteriormente, aumentan por inflación hasta el año fiscal 2029 y se eliminan al final de ese ejercicio. Los honorarios profesionales que no correspondan a abogados se reducen un 50% una vez desestimadas las causas radicadas conforme al Título III y aumentan por inflación hasta el año fiscal 2029.

iii. Se presume que los reclamos federales se tornan exigibles una vez levantada la paralización. Estos deben incluirse como una reducción de gastos/ingresos del superávit disponible para el servicio de la deuda, ya que el gobierno federal puede reducir las transferencias a Puerto Rico por el monto adeudado. Se presume un reclamo por denegación de costos federales recurrentes que también debe abonarse en su totalidad.[8] Los reclamos federales representan un total de $329 millones, mientras que la denegación de costos federales recurrentes equivale a $65 millones según el CAFR de 2016, el cual muestra que el ELA registró un pago de $65,200,000.

iv. Se presume que en los años en los que no es posible el pago íntegro de la deuda, los pagos realizados se imputan primero a los intereses y, luego, al capital.

*2. Deuda no garantizada*

a. Préstamo de (aproximadamente) $33 millones de la Administración de Servicios Generales para helicópteros policiales, con una tasa de interés del 3.02% y con vencimiento el 15 de julio de 2020. Este préstamo tiene igual prelación que la deuda GO.

---

[8] La información sobre los montos de los reclamos federales fue provista por otros asesores de la Junta de Supervisión.

### 3. Deuda pública del ELA en virtud del Artículo VI, Sección 8 de la Constitución del ELA

a.    **Bonos GO**

| | Fecha de emisión | Monto emitido | Rango de tasas de interés | Fecha de vencimiento final | Saldo a la Fecha de Petición del ELA |
|---|---|---|---|---|---|
| Bonos para Mejoras Públicas de 1998 | 15/3/98 | $500,000,000 | 6.00 | 01/07/16 | $18,655,000 |
| Bonos para Mejoras Públicas de 1999 | 01/12/98 | $475,000,000 | 5.00 - 5.25 | 01/07/28 | $63,695,000 |
| Bonos para Mejoras Públicas de 2001, Serie A | 07/06/01 | $274,135,000 | 5.25 - 5.50 | 01/07/20 | $224,145,000 |
| Bonos para Mejoras Públicas de 2002, Serie A | 25/10/01 | $455,000,000 | 5.13 - 5.50 | 01/07/31 | $301,955,000 |
| Bonos para Mejoras Públicas de 2003, Serie A | 08/08/02 | $460,000,000 | 5.50 | 01/07/22 | $115,470,000 |
| Bonos para Mejoras Públicas de 2004, Serie A | 16/10/03 | $457,175,000 | 5.00 - 5.25 | 01/07/30 | $149,720,000 |
| Bonos para Mejoras Públicas de 2005, Serie A | 07/10/04 | $440,460,000 | 5.00 - 5.25 | 01/07/31 | $295,040,000 |
| Bonos para Mejoras Públicas de 2006, Serie A | 10/08/06 | $500,000,000 | 1.86 - 5.25 | 01/07/30 | $400,920,000 |
| Bonos para Mejoras Públicas de 2006, Serie B | 30/08/06 | $39,380,000 | 5.25 | 01/07/17 | $39,380,000 |
| Bonos para Mejoras Públicas de 2007, Serie A | 04/10/07 | $408,800,000 | 5.00 - 5.25 | 01/07/37 | $408,800,000 |
| Bonos para Mejoras Públicas de 2008, Serie A | 18/09/08 | $250,000,000 | 5.00 - 6.00 | 01/07/38 | $223,750,000 |
| Bonos para Mejoras Públicas de 2011, Serie A | 12/07/11 | $304,000,000 | 5.75 | 01/07/41 | $304,000,000 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 1998 | 29/01/98 | $503,963,264 | 4.50 - 4.95 | 01/07/23 | $112,675,917 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2000 | 05/04/2000 | $55,910,993 | 5.80 | 01/07/19 | $10,821,641 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2001 | 07/06/01 | $337,235,000 | 5.13 | 01/07/30 | $40,640,000 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2002A | 25/10/01 | $837,960,000 | 4.50 - 5.50 | 01/07/21 | $632,955,000 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2003A | 08/08/02 | $89,610,000 | 5.50 | 01/07/17 | $27,770,000 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2003C-7 | 06/05/03 | $194,610,000 | 6.00 | 01/07/28 | $194,610,000 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2006A | 23/06/06 | $101,695,000 | 5.00 | 01/07/35 | $75,390,000 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2006B | 10/08/06 | $335,650,000 | 5.00 - 5.25 | 01/07/35 | $128,235,000 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2007A | 16/10/07 | $926,570,000 | 5.00 - 5.50 | 01/07/22 | $267,340,000 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2007A-4 | 16/10/07 | $93,835,000 | 5.00 - 5.25 | 01/07/31 | $93,835,000 |

| | Fecha de emisión | Monto emitido | Rango de tasas de interés | Fecha de vencimiento final | Saldo a la Fecha de Petición del ELA |
|---|---|---|---|---|---|
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2008A | 07/05/08 | $735,015,000 | 4.00 - 5.50 | 01/07032 | $467,280,000 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2008C | 07/05/08 | $190,135,000 | 5.20 - 5.90 | 01/07/28 | $159,275,000 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2009A | 17/09/09 | $3,425,000 | 5.63 | 01/07/31 | $3,425,000 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2009B | 17/11/09 | $372,685,000 | 5.75 - 6.50 | 01/07/39 | $372,685,000 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2009C | 16/12/09 | $210,250,000 | 6.00 | 01/07/39 | $210,250,000 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2011A | 17/02/2011 | $356,520,000 | 5.25 - 6.50 | 01/07/40 | $356,520,000 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2011C | 17/03/11 | $442,015,000 | 5.25 - 6.50 | 01/07/40 | $442,015,000 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2011D | 12/07/11 | $52,190,000 | 3.13 - 5.00 | 01/07/20 | $50,735,000 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2011E | 12/07/11 | $245,915,000 | 5.38 - 6.00 | 01/07/34 | $245,915,000 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2012A | 03/04/12 | $2,318,190,000 | 4.00 - 5.75 | 01/07/41 | $2,318,190,000 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2012B | 29/03/12 | $415,270,000 | 3.65 - 5.30 | 01/07/33 | $222,375,000 |
| Bonos de Obligación General (GO) de 2014, Serie A | 17/03/14 | $3,500,000,000 | 8.00 | 01/07/35 | $3,500,000,000 |

b. **Préstamos del BGF (igual prelación que los Bonos GO) ($169 millones de capital y $49 millones de intereses devengados al 30 de junio de 2019)**

  i. Según el Memorando de Oferta del BGF, adjunto a la Declaración de Solicitud de Modificación Cualificada, con fecha del 9 de agosto de 2019 (el "MO") en su página E-124-25, estos préstamos constituyen "deuda pública" y forman parte de las obligaciones generales del ELA.

  ii. El acuerdo bajo el Título VI del BGF incluye ciertas restricciones a la ejecución y el cobro, pero si otros acreedores en posición similar (los Tenedores de Bonos GO) hicieran valer sus derechos y recibieran un cobro, la Autoridad de Cobro de Deuda del BGF podría demandar el mismo trato.

c. **Bonos garantizados por el ELA (igual prelación que los Bonos GO)9**

  i. **Bonos AEP ($4,000 millones)**

    1. Escenario 1: se presume que el total de la deuda es abonado por el ELA.

---

[9] El ELA también garantizó $110 millones de bonos BGF, pero los derechos de los tenedores de esos bonos BGF con respecto a la garantía del ELA se extinguieron al momento del canje y la cancelación de los bonos BGF según el acuerdo en virtud del Título VI (MO del BGF bajo el Título VI, pág. 15).

a. Este es el escenario más probable debido a la dependencia que tiene la AEP del ELA.

b. Dado que la garantía del ELA es una garantía de cobro, los tenedores de bonos AEP deben proceder a hacer valer sus derechos ante la AEP, previo a demandar el cobro al ELA. **Por ello, se presume un año de demora hasta que los tenedores de bonos AEP puedan reclamar por sus derechos ante el ELA** *(es decir, el servicio de su deuda quedaría impagado en el primer año; con posterioridad, el reclamo devengado se ejecutaría y lo pagaría el ELA).*

ii. **Bonos subordinados AAA ($284,755,000)**
   1. Escenario 1: se presume que el ELA paga un 0% de la deuda.
   2. Fundamentos: dada la condición financiera de la AAA, es poco probable que esta incumpla el pago de la garantía restante.

iii. **BAN de la AFI ($78 millones)**
   1. Escenario 1: se presume que el total de la deuda es abonado por el ELA.

iv. **Bonos APLA (Autoridad del Puerto de las Américas) ($226 millones)**
   1. Estos bonos fueron transferidos al Emisor en virtud del acuerdo del BGF bajo el Título VI como parte de los "Bienes Transferidos".
   2. Escenario 1: se presume que el ELA paga un 100% de la deuda.
      a. Este es el escenario más probable ya que el MO del BGF bajo el Título VI señaló (pág. E-99) que el BGF clasificó el préstamo como moroso y se esperaba que los cobros relativos a los bonos, si los hubiera, provinieran del ELA.

### *4. Otras reclamaciones no aseguradas*
a. Reclamo de Fideicomiso de Entidad Pública/BGF bajo el Título VI: $578 millones
b. Reclamos con sentencia: aproximadamente $1,000 millones (*ver* reserva legal del CAFR de 2016)
c. Reclamos judiciales: $5,000 millones, con una simulación de $2,500 millones.
d. Deudas comerciales: $315 millones
e. Premios de lotería: históricamente alrededor de $125 millones. La obligación por premios de lotería impagados debería proyectarse de acuerdo con el borrador del CAFR de 2017.
f. Reclamos de tenedores de bonos del Sistema de Retiro de Empleados (SRE): en el caso base, se presume que los tenedores de bonos SRE radicarán un reclamo no garantizado contra el ELA por todo monto impagado de la deuda en bonos SRE.

g.  Reclamos por recuperación de fondos: en el caso base, se presume que los tenedores de bonos de la entidad beneficiaria de ingresos recuperados podrían radicar un reclamo no garantizado por la parte de los fondos recuperados empleada para gastos operacionales, pero no por la parte utilizada para el pago del servicio de la deuda GO o la deuda garantizada por el ELA.

**<u>Anexo 1</u>**
**Leyes relativas a la recuperación de ingresos**

**Parte I: Leyes que asignan ingresos susceptibles de recuperación a la ACT, AMA, AFI, ATI y ADCC**

| ACT | Derechos de licencias de vehículos de motor | 9 LPRA secs. 2004(l), 2021, 5681 y 5682(e) | Debe pagarlos todo aquel que sea dueño de un vehículo de motor sujeto a derechos anuales de licencia en:<br>▪ oficinas de rentas internas; o<br>▪ estaciones oficiales de inspección; o<br>▪ bancos; o<br>▪ cualquier lugar designado por el Secretario de Hacienda | ▪ Todos los derechos anuales de licencias de vehículos de motor son ingresados por la Hacienda en un Depósito Especial a nombre y para beneficio de la ACT. | 9 LPRA sec. 2004(l):<br><br>"Sujeto a las disposiciones de la sec. 2005 de este título, la Autoridad queda por la presente facultada a: […] [t]omar dinero a préstamo para cualesquiera de sus fines corporativos y emitir bonos de la Autoridad en evidencia de tales obligaciones y garantizar el pago de dichos bonos y sus intereses mediante pignoración u otro gravamen sobre todas sus propiedades, rentas o ingresos, y, sujeto a las disposiciones de la Sec. 8 del Art. VI de la Constitución de Puerto Rico, pignorar para el pago de dichos bonos y sus intereses, el producto de cualesquiera contribuciones u otros fondos que puedan ser puestos a la disposición de la Autoridad por el Estado Libre Asociado".<br><br>9 LPRA sec. 2021:<br><br>"El total del producto del aumento de los quince dólares ($15) en los derechos que se pagarán por concepto de licencia de automóviles de servicio privado y público ingresará en un Depósito Especial a nombre y para beneficio de la Autoridad de Carreteras y Transportación de Puerto Rico para ser usado por la Autoridad para sus fines corporativos. Dicha Autoridad queda por la presente autorizada para comprometer o pignorar el producto de la recaudación así recibida al pago del principal y los intereses de bonos u otras obligaciones de la Autoridad o para cualquier otro propósito lícito de la Autoridad, tal |

compromiso o pignoración quedando sujeto a la disposición de la Sec. 8 del Art. VI de la Constitución de Puerto Rico; disponiéndose, sin embargo, que el producto de dicha recaudación se usará solamente para el pago de intereses y amortización de la deuda pública, según se provee en dicha Sección 8, hasta tanto los otros recursos disponibles referidos en dicha sección sean insuficientes para tales fines; de lo contrario, el producto de dicha recaudación en la cantidad que sea necesaria, se usará solamente para el pago del principal y los intereses de bonos, y otras obligaciones de la Autoridad y para cumplir con cualesquiera estipulaciones convenidas por la Autoridad con los tenedores de dichos bonos u otras obligaciones".

9 LPRA sec. 5681:

"Todo dueño de un vehículo de motor sujeto al pago de derechos anuales de permiso pagará en cualquier colecturía de rentas internas de cualquier municipio, en el lugar que designe el Secretario del Departamento de Hacienda, en las estaciones oficiales de inspección, bancos, o el lugar que designe el Secretario, los derechos que correspondan al vehículo para cada año, según se indican éstos en la notificación que al efecto deberá enviarle el Secretario […]"

[…]

| | | | | | "A menos que se disponga en contrario en esta Ley, el importe de los derechos recaudados de acuerdo con las secs. 5681 y 5682 de este título ingresarán en su totalidad en un Depósito Especial a nombre y para beneficio de la Autoridad de Carreteras y Transportación". |
|---|---|---|---|---|---|
| | | | | | "Se autoriza a la Autoridad a comprometer o pignorar el producto de la recaudación recibida para el pago del principal y los intereses de bonos a otras obligaciones o para cualquier otro propósito lícito de la Autoridad. Tal compromiso o pignoración quedará sujeto a la disposición de la Sección 8 del Artículo VI de la Constitución de Puerto Rico. El producto de dicha recaudación se usará solamente para el pago de intereses y amortización de la deuda pública, según se provee en dicha Sección 8 del Artículo VI de la Constitución, hasta tanto los otros recursos disponibles a que se hace referencia en dicha sección sean insuficientes para tales fines. De lo contrario, el producto de tal recaudación, en la cantidad que sea necesaria, se usará solamente para el pago del principal y los intereses de bonos y otras obligaciones de la Autoridad y para cumplir con cualesquiera estipulaciones convenidas por ésta con los tenedores de dichos bonos u otras obligaciones". |
| | | | | | 9 LPRA sec. 5682(e): |
| | | | | | "Con relación a los derechos a pagar bajo este capítulo, se seguirán las normas siguientes: […] [s]e mantiene el Depósito Especial para beneficio de la Autoridad de |

| | | | | | Carreteras en donde se ingresará la cantidad de quince (15) dólares, por cada renovación de registro de automóviles de servicio privado y público". |
|---|---|---|---|---|---|
| **ACT** | Impuesto sobre gasolina, "gas oil" y "diesel oil" | 13 LPRA sec. 31751<br><br>9 LPRA sec. 2004(l) | ▪ 16 por ciento por galón del arbitrio sobre la gasolina y 4 por ciento por galón del arbitrio sobre "gas oil" y "diesel oil".<br><br>▪ Lo recauda la Hacienda, que posteriormente transfiere los montos mensualmente, o según lo acordado con la ACT, a una cuenta de Depósito Especial a favor de la ACT. | ▪ Los arbitrios sobre la gasolina, el "gas oil" y el "diesel oil" son ingresados por la Hacienda en un depósito especial a favor de la ACT. | 13 LPRA 31751:<br><br>"En caso de que el Estado Libre Asociado de Puerto Rico utilice cantidad alguna del impuesto que se recaude sobre la gasolina, de los cuatro (4) centavos del impuesto sobre 'gas oil' o 'diesel oil' fijados en la sec. 31626 de este título, o de los arbitrios sobre el petróleo crudo, productos parcialmente elaborados y productos terminados derivados del petróleo y cualquier otra mezcla de hidrocarburos fijados en la sec. 31627 de este título para el pago de intereses y amortización de la deuda pública según se establece en la Sección 8 del Artículo VI de la Constitución, las cantidades usadas por el Estado Libre Asociado de Puerto Rico para el pago de intereses y amortización de la deuda pública serán reembolsadas a la Autoridad de Carreteras y Transportación de los recaudos recibidos por el Estado Libre Asociado de Puerto Rico en el próximo año fiscal, o en caso de no ser posible tal reembolso en el próximo año fiscal, en los años fiscales subsiguientes, excepto aquellos recaudos que hayan sido comprometidos para satisfacer cualquier obligación. El producto de dichos recaudos que han de ser usados bajo las disposiciones de esta sección para reembolsar a la Autoridad de Carreteras y Transportación las cantidades utilizadas por el Estado Libre Asociado de Puerto Rico para el pago de intereses y amortización en la deuda pública, no se ingresarán en el Fondo General del Estado Libre |

| | | | | | Asociado de Puerto Rico cuando se cobren, sino que serán transferidos a la Autoridad de Carreteras y Transportación y, sujeto a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico, serán usados para reembolsar dichas cantidades a la Autoridad de Carreteras y Transportación". |
| | | | | | 9 LPRA 2004(l): |
| | | | | | "Sujeto a las disposiciones de la sec. 2005 de este título, la Autoridad queda por la presente facultada a: [...] Tomar dinero a préstamo para cualesquiera de sus fines corporativos y emitir bonos de la Autoridad en evidencia de tales obligaciones y garantizar el pago de dichos bonos y sus intereses mediante pignoración u otro gravamen sobre sus propiedades, rentas o ingresos, y, sujeto a las disposiciones de la Sec. 8 del Art. VI de la Constitución de Puerto Rico, pignorar para el pago de dichos bonos y sus intereses, el producto de cualesquiera contribuciones u otros fondos que puedan ser puestos a la disposición de la Autoridad por el Estado Libre Asociado". |
| **ACT** | Impuesto sobre productos derivados del petróleo | 13 LPRA sec. 31571<br><br>9 LPRA 2004(l) | ▪ El Secretario de Hacienda transferirá mensualmente, el monto total de $12.25 por barril o fracciones es ingresado por el Secretario de Hacienda en un | ▪ El monto total de los impuestos sobre el petróleo crudo y los impuestos sobre el petróleo es ingresado por la Hacienda en un depósito especial a favor de la ACT. | 13 LPRA 31571:<br><br>"En caso de que el Estado Libre Asociado de Puerto Rico utilice cantidad alguna del impuesto que se recaude sobre la gasolina, de los cuatro (4) centavos del impuesto sobre 'gas oil' o 'diesel oil' fijados en la sec. 31626 de este título, o de los arbitrios sobre el petróleo crudo, productos parcialmente elaborados y productos terminados derivados del petróleo y cualquier otra mezcla de hidrocarburos |

| | | | Depósito Especial a favor de la ACT. | | fijados en la sec. 31627 de este título para el pago de intereses y amortización de la deuda pública según se establece en la Sección 8 del Artículo VI de la Constitución, las cantidades usadas por el Estado Libre Asociado de Puerto Rico para el pago de intereses y amortización de la deuda pública serán reembolsadas a la Autoridad de Carreteras y Transportación de los recaudos recibidos por el Estado Libre Asociado de Puerto Rico en el próximo año fiscal, o en caso de no ser posible tal reembolso en el próximo año fiscal, en los años fiscales subsiguientes, excepto aquellos recaudos que hayan sido comprometidos para satisfacer cualquier obligación. El producto de dichos recaudos que han de ser usados bajo las disposiciones de esta sección para reembolsar a la Autoridad de Carreteras y Transportación las cantidades utilizadas por el Estado Libre Asociado de Puerto Rico para el pago de intereses y amortización en la deuda pública, no se ingresarán en el Fondo General del Estado Libre Asociado de Puerto Rico cuando se cobren, sino que serán transferidos a la Autoridad de Carreteras y Transportación y, sujeto a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico, serán usados para reembolsar dichas cantidades a la Autoridad de Carreteras y Transportación". 9 LPRA 2004(l): "Sujeto a las disposiciones de la sec. 2005 de este título, la Autoridad queda por la presente facultada a: […] Tomar dinero a préstamo para cualesquiera de sus fines |

| | | | | | corporativos y emitir bonos de la Autoridad en evidencia de tales obligaciones y garantizar el pago de dichos bonos y sus intereses mediante pignoración u otro gravamen sobre todas sus propiedades, rentas o ingresos, y, sujeto a las disposiciones de la Sec. 8 del Art. VI de la Constitución de Puerto Rico, pignorar para el pago de dichos bonos y sus intereses, el producto de cualesquiera contribuciones u otros fondos que puedan ser puestos a la disposición de la Autoridad por el Estado Libre Asociado". |
|---|---|---|---|---|---|
| **ACT** | Impuesto sobre cigarrillos | 13 LPRA sec. 31751 | ▪ El Secretario de Hacienda transfiere $20,000,000 en rentas por cigarrillos cada año fiscal en pagos mensuales de hasta $2,500,000. Si en alguno de los meses del año fiscal, las rentas del arbitrio fueran insuficientes para realizar el pago, el Secretario de Hacienda ingresará dicha deficiencia utilizando cualquier excedente sobre los $2,500,000 de ingresos | ▪ Los ingresos recaudados por el impuesto sobre los cigarrillos hasta $20,000,000 por año fiscal deben ingresarse en una cuenta de depósito especial a favor de la ACT. | "El monto del impuesto que se recaude sobre los cigarrillos fijados en la sec. 31625 de este título hasta veinte (20) millones de dólares por año fiscal ingresarán en un depósito especial a favor de la Autoridad de Carreteras y Transportación para sus fines y poderes corporativos".<br><br>"Se autoriza a la Autoridad de Carreteras y Transportación para comprometer o pignorar el producto de la recaudación así recibida sobre el arbitrio a los cigarrillos fijada en la sec. 31625 para el pago del principal y los intereses de bonos u otras obligaciones o para cualquier otro propósito lícito de la Autoridad. Tal compromiso o pignoración quedará sujeto a la disposición de la Sección 8 del Artículo VI de la Constitución del Gobierno de Puerto Rico. El producto de dicha recaudación se usará solamente para el pago de intereses y amortización de la deuda pública, según se establece en dicha Sección 8 del Artículo VI de la Constitución, hasta tanto los otros recursos disponibles a que se hace referencia en dicha sección sean insuficientes para tales fines. De lo contrario, el producto de tal recaudación, en la cantidad que sea necesaria, se usará |

| | | | | | |
|---|---|---|---|---|---|
| | | | recaudados en meses anteriores o subsiguientes del mismo año fiscal. | | solamente para el pago del principal y los intereses de bonos y otras obligaciones de la Autoridad y para cumplir con cualesquiera estipulaciones convenidas por ésta con los tenedores de dichos bonos u otras obligaciones". |
| AMA | Impuesto sobre cigarrillos | 13 LPRA sec. 31751 | ▪ El Secretario de Hacienda debe transferir $10,000,000 en rentas por cigarrillos cada año fiscal en pagos mensuales de hasta $800,000. Si en alguno de los meses del año fiscal, las rentas de dicho arbitrio no fueran suficientes para realizar el pago mensual, el Secretario de Hacienda ingresará dicha deficiencia utilizando cualquier excedente sobre los $800,000 de ingresos recaudados por el arbitrio en meses anteriores [o subsiguientes] del mismo año fiscal. | ▪ Los ingresos recaudados por el impuesto sobre los cigarrillos hasta $10,000,000 por año fiscal son ingresadas por la Hacienda en una cuenta de depósito especial a favor de la AMA. | "El monto del impuesto que se recaude sobre los cigarrillos fijados en la sec. 31625 de este título hasta diez (10) millones de dólares por año fiscal ingresarán en un depósito especial a favor de la Autoridad Metropolitana de Autobuses para sus fines y poderes corporativos. El ingreso de estos diez (10) millones de dólares por año fiscal al depósito especial a favor de la Autoridad Metropolitana de Autobuses está en segunda prioridad y subordinado al ingreso de los veinte (20) millones del monto del impuesto que se recaude sobre los cigarrillos fijados en la sec. 31625 de este título que ingrese al depósito especial a favor de la Autoridad de Carreteras y Transportación según se dispone en el inciso (a)(3) de esta sección". <br><br> […] <br><br> "Se autoriza a la Autoridad de Carreteras y Transportación para comprometer o pignorar el producto de la recaudación así recibida sobre el arbitrio a los cigarrillos fijada en la sec. 31625 para el pago del principal y los intereses de sus deudas y obligaciones o para cualquier otro propósito lícito de la Autoridad Metropolitana de Autobuses. Tal compromiso o pignoración quedará sujeto a la disposición de la Sección 8 del Artículo VI de la Constitución del Gobierno de Puerto Rico. El producto de dicha recaudación se usará solamente para el pago de intereses y amortización |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | de la deuda pública, según se establece en dicha Sección 8 del Artículo VI de la Constitución, hasta tanto los otros recursos disponibles a que se hace referencia en dicha sección sean insuficientes para tales fines. De lo contrario, el producto de tal recaudación, en la cantidad que sea necesaria, se usará solamente para el pago del principal y los intereses de deudas y otras obligaciones de la Autoridad y para cumplir con cualesquiera estipulaciones convenidas por ésta con los tenedores de dichos bonos u otras obligaciones". |
| **BAN - AFI** | Productos derivados del petróleo | 13 LPRA sec. 31751a | ▪ La Hacienda recauda un arbitrio adicional sobre productos derivados del petróleo cuyo monto es de $3.25 por barril.<br><br>▪ El Secretario de Hacienda transfiere a la AFI todas los ingresos recaudados por el impuesto adicional de $3.25. | ▪ El producto del arbitrio sobre productos derivados del petróleo es ingresado por la Hacienda a un Fondo Especial de Asistencia Económica para beneficio de la AFI para el pago de su deuda en bonos. | "El producto de los impuestos recaudados por virtud de la sec. 31627a ingresarán en el Fondo Especial de Asistencia Económica de la Autoridad para el Financiamiento de la Infraestructura establecido bajo el Artículo 34 de la Ley Núm. 44 de 21 de junio de 1988 y se utilizarán para (i) repagar las obligaciones incurridas por la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico con el propósito de refinanciar o repagar aquellas deudas u obligaciones de la Autoridad de Carreteras y Transportación que de tiempo en tiempo haya asumido o pagado la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico y (ii) los otros propósitos autorizados bajo el Artículo 34 de la Ley Núm. 44 de 21 de junio de 1988, según enmendada. El Secretario transferirá mensualmente o según lo acuerde con la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico las cantidades de dichos recaudos. El Secretario está autorizado a establecer un mecanismo de cobro mediante el cual los recaudos que corresponda depositar en el Fondo Especial de Asistencia Económica de la Autoridad para el |

Financiamiento de la Infraestructura sean pagados por el contribuyente directamente a la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico, a una institución financiera designada por el Secretario de Hacienda o la Autoridad para el Financiamiento de la Infraestructura o a la institución financiera que actúe como fiduciario en el acuerdo de fideicomiso bajo el cual sean emitidos los bonos de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico para los cuales dichos recaudos son la fuente de repago".

"De acuerdo con el Artículo 34 de la Ley Núm. 44 de 21 de junio de 1988, según enmendada, y sujeto a las condiciones allí establecidas, el producto de los recaudos del arbitrio fijado en la sec. 31627a está pignorado para garantizar el repago de los 'Bonos de Refinanciamiento', las 'Obligaciones Colateralizadas' y la 'Deuda Transferida', según estos términos están definidos en dicho artículo. Se autoriza a la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico, luego de cubrir en cualquier Año Fiscal el repago del principal y los intereses y cualquier otra obligación relacionada a dichos Bonos de Refinanciamiento, dichas Obligaciones Colateralizadas y dicha Deuda Transferida pagadero en dicho Año Fiscal, a comprometer o pignorar el producto de la recaudación de dicho arbitrio a ser depositado en el Fondo Especial de Asistencia Económica de la Autoridad para el Financiamiento de la Infraestructura, para el pago del principal y los intereses de otros bonos u otras obligaciones o para sustentar las obligaciones y operaciones de la

| | | | | | Autoridad de Carreteras y Transportación. Tal compromiso o pignoración quedará sujeto a la disposición de la Sección 8 del Artículo VI de la Constitución de Puerto Rico. El producto de dicha recaudación solamente se usará para el pago de intereses y amortización de la deuda pública, según se establece en dicha Sección 8 del Artículo VI de la Constitución, en la medida que los demás recursos disponibles mencionados en dicha Sección no sean suficientes para tales fines". |
|---|---|---|---|---|---|
| **AFI** | Arbitrios federales | 3 LPRA sec. 1914 | ▪ El Código de Rentas Internas de los EE. UU. establece en su sec. 7652(a)(3) que todos los impuestos recaudados sobre artículos producidos en PR (p. ej. ron) y enviados a los EE. UU., o consumidos en la isla, deben ingresarse a la Hacienda de Puerto Rico.<br><br>▪ Las primeras recaudaciones de arbitrios federales enviadas al Departamento de Hacienda de Puerto Rico en cada año | ▪ Desde el Año Fiscal 2007 hasta el Año Fiscal 2057, el monto de la transferencia será de $117,000,000. | "Comenzando con el Año Fiscal 1988-89, no obstante las disposiciones del Artículo 29A de la Ley Núm. 143 de 30 de junio de 1969, según enmendada, los primeros recaudos de los arbitrios federales enviados al Departamento de Hacienda de Puerto Rico en cada año fiscal, de acuerdo a la Sección 7652(a)(3) del Código de Rentas Internas de Estados Unidos de 1986, según enmendado, hasta una cantidad máxima de treinta millones de dólares ($30,000,000), en el caso del Año Fiscal 1988-89, hasta una cantidad máxima de cuarenta millones de dólares ($40,000,000), en el caso de los Años Fiscales 1989-90 al 1996-97, hasta una cantidad máxima de sesenta millones de dólares ($60,000,000), en el caso del Año Fiscal 1997-98, hasta una cantidad máxima de setenta millones de dólares ($70,000,000), en el caso de los Años Fiscales 1998-1999 al 2005-06, y hasta una cantidad máxima de noventa millones de dólares ($90,000,000), en el caso de los Años Fiscales 2006-07 al 2008-09, y en los años subsiguientes hasta el Año Fiscal 2056-57 la participación será hasta una cantidad de ciento diecisiete millones de dólares ($117,000,000), los cuales ingresarán al momento |

| | | | fiscal deberán ingresarse en un Fondo Especial a ser mantenido por la AFI o a nombre de ella, designado como el Fondo de la Infraestructura de Puerto Rico. | | de ser recibidos por el Departamento de Hacienda de Puerto Rico en un Fondo Especial a ser mantenido por o a nombre de la Autoridad, designado el 'Fondo de la Infraestructura de Puerto Rico' y se utilizarán por la Autoridad para sus propósitos corporativos, lo cual incluirá el desarrollo de la infraestructura necesaria y conveniente para la realización de los Juegos Centroamericanos y del Caribe Mayagüez 2010". [...] "Se faculta a la Autoridad a segregar una porción de dichos Fondos en una (1) o más subcuentas y a pignorar todo o parte de los fondos en una (1) o más subcuentas, sujeto a las disposiciones de la Sec. 8 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico, para el pago del principal e intereses de bonos y de otras obligaciones de la Autoridad, o para el pago de bonos y otras obligaciones emitidas por una entidad beneficiada, o para cualquier otro propósito legal de la Autoridad. Los dineros del Fondo Especial podrán utilizarse para el pago de intereses y para la amortización de la deuda pública del Estado Libre Asociado, según dispone dicha Sec. 8, solamente cuando los demás recursos disponibles, mencionados en dicha Sección, no sean suficientes para tales propósitos". |
|---|---|---|---|---|---|
| **ADCC** | Impuesto sobre habitaciones de hotel | 13 LPRA sec. 2271v | Lo paga el huésped al momento de abonar el canon de ocupación de la habitación al hostelero. Todo | ▪ Cada año, el BGF/la AAFAF determina y certifica a la CTPR el monto necesario para que la ADCC cumpla su servicio de la | "La Compañía [de Turismo] distribuirá las cantidades recaudadas por concepto del impuesto fijado en la sec. 2271o de este título, de la siguiente manera: (a) Antes del comienzo de cada año fiscal el [BGF] determinará y le certificará a la Compañía [de Turismo] y |

| | | | hostelero tiene la obligación de recaudar y enviar dicho impuesto a la Compañía de Turismo de PR ("CTPR"). | deuda. La CTPR realiza pagos mensuales al BGF hasta el monto anual certificado por el BGF. Las rentas del impuesto sobre las habitaciones de hotel se depositan en una cuenta de la ADCC radicada en el [BGF] para beneficio de los tenedores de bonos de la ADCC. | a la [ADCC] la cantidad necesaria para que, durante dicho año fiscal y el primer día del próximo año fiscal, la [ADCC] haga: |
|---|---|---|---|---|---|

a la [ADCC] la cantidad necesaria para que, durante dicho año fiscal y el primer día del próximo año fiscal, la [ADCC] haga:

(1) El pago completo y a tiempo, o la amortización del principal y de los intereses sobre las obligaciones incurridas por la [ADCC] con el [BGF] o los bonos, pagarés u otras obligaciones emitidas, asumidas o incurridas por la [ADCC], según establecido por la Ley Núm. 142 de 4 de octubre de 2001, según enmendada, con la previa autorización por escrito de la Compañía [de Turismo], para llevar a cabo exclusivamente el desarrollo y la construcción de un nuevo centro de convenciones y la infraestructura relacionada;

(2) el pago completo y a tiempo de las obligaciones de la [ADCC] bajo cualquier acuerdo financiero relacionado con los bonos, según se define este término al final de este inciso, que otorgue la [ADCC] con la autorización previa y escrita de la Compañía [de Turismo];

(3) los depósitos requeridos para reponer cualquier reserva establecida para asegurar el pago del principal y los intereses de dichos bonos, pagarés y otras obligaciones emitidas, asumidas o incurridas por la [ADCC], u obligaciones bajo cualquier acuerdo financiero relacionado a los bonos, y

(4) cualquier otro gasto incurrido relacionado con la emisión de dichos bonos, pagarés u otras obligaciones asumidas o incurridas por la [ADCC] o con cualquier acuerdo financiero relacionado a los bonos.

La aprobación previa y por escrito de la Compañía [de Turismo] debe específicamente autorizar el programa de

|  |  |  |  |  | amortización del principal de los bonos, pagarés u otras obligaciones a ser emitidas, asumidas o incurridas por la [ADCC] y los términos y condiciones finales de cualquier acuerdo financiero relacionado a los bonos a ser otorgado por la [ADCC]. La suma determinada y certificada por el [BGF], según indicada arriba, deberá ser depositada en una cuenta especial a ser mantenida por el [BGF] a nombre de la [ADCC] para beneficio de los tenedores de bonos, pagarés u otras obligaciones de la [ADCC] o para beneficio de las otras partes contratantes, bajo cualquier acuerdo financiero relacionado a los bonos. El [BGF] deberá transferir las cantidades depositadas en dicha cuenta especial a los fideicomisarios de los tenedores de bonos, pagarés u otras obligaciones de la [ADCC], o las otras partes contratantes bajo cualquier acuerdo financiero relacionado a los bonos, de acuerdo a las instrucciones escritas provistas por la [ADCC] al [BGF]".

[…]

"Cada año fiscal, la Compañía [de Turismo] deberá transferir al Banco Gubernamental de Fomento para depósito en dicha cuenta especial la suma establecida en el primer párrafo de este inciso mediante transferencias mensuales, comenzando en el mes que inmediatamente sucede al mes en el cual se apruebe esta ley y en el primer mes de cada año fiscal en adelante, equivalentes a una décima parte de aquella cantidad que el Banco Gubernamental de Fomento de Puerto Rico determine y |
|--|--|--|--|--|--|

certifique como necesaria para los pagos a los que se refiere el párrafo introductorio de esta sección [….]"

[…]

"Se autoriza a la Autoridad, con el previo consentimiento escrito de la Compañía [de Turismo], a comprometer o de otra forma gravar el producto de la recaudación del impuesto fijado que debe ser depositada en la cuenta especial según requiere el primer párrafo de este inciso como garantía, para el pago del principal y de los intereses sobre los bonos, pagarés u otras obligaciones emitidas, asumidas o incurridas por la Autoridad, según se describe en este primer párrafo de este inciso, o el pago de sus obligaciones bajo cualquier acuerdo financiero relacionado a los bonos, según descrito en dicho párrafo. Tal compromiso u obligación quedará sujeto a las disposiciones de la Sección 8 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico. El producto de la recaudación del impuesto se utilizará solamente para el pago de los intereses y la amortización de la deuda pública, según se provee en la Sección 8 del Artículo VI de la Constitución, solo en la medida en que los otros recursos disponibles a los cuales se hace referencia en dicha Sección son insuficientes para tales fines. De lo contrario, el producto de tal recaudación en la cantidad que sea necesaria, se utilizará solamente para el pago del principal y de los intereses sobre los bonos, pagarés u otras obligaciones y las obligaciones bajo cualquier acuerdo financiero relacionado a los bonos aquí

| | | | | | contempladas, y para cumplir con cualesquiera estipulaciones convenidas con los tenedores de dichos bonos, pagarés u otras obligaciones o proveedores de acuerdos financieros relacionados a los bonos". |
|---|---|---|---|---|---|
| **ATI**[10] | Impuesto sobre cigarrillos | 13 LPRA sec. 31751 | ▪ El Secretario debe transferir mensualmente, o según lo acuerde con la Autoridad de Transporte Integrado de Puerto Rico, las sumas ingresadas en el depósito especial, deduciendo los montos reembolsados de acuerdo con lo dispuesto en la sección 31668 de este subtítulo. | ▪ El producto de dichas rentas que, en virtud de esta sección, se utilice para reembolsar a la Autoridad de Transporte Integrado de Puerto Rico los montos utilizados por el Estado Libre Asociado de Puerto Rico para el pago de los intereses y la amortización de la deuda pública, deberá ingresarse a la Autoridad de Transporte Integrado de Puerto Rico. | "El monto del impuesto que se recaude sobre los cigarrillos fijados en la sec. 31625 de este título hasta treinta y seis (36) millones de dólares por año fiscal, comenzando con el Año Fiscal 2015-2016, ingresarán en un depósito especial a favor de la Autoridad de Transporte Integrado de Puerto Rico para sus fines y poderes corporativos. El ingreso de estos treinta y seis (36) millones de dólares por año fiscal al depósito especial a favor de la Autoridad de Transporte Integrado de Puerto Rico está en tercera prioridad y subordinado al ingreso de los veinte (20) millones de dólares del monto del impuesto que se recaude sobre los cigarrillos fijados en la sec. 31625 de este título que ingrese al depósito especial a favor de la Autoridad de Carreteras y Transportación, según se dispone en la cláusula (3) de este inciso, y al de los diez (10) millones de dólares del monto del impuesto que se recaude sobre los cigarrillos fijados en la sec. 31625 de este título que ingrese al depósito especial a favor de la Autoridad Metropolitana de Autobuses, según se dispone en la cláusula (4) de este inciso. El monto del impuesto que se recaude sobre los cigarrillos fijados en la sec. 31625 de este título hasta treinta y seis (36) millones de dólares por año fiscal, a partir de la aprobación del Nuevo Sistema Contributivo de Puerto Rico, ingresarán en |

---

[10] La ATI actualmente no tiene deudas pendientes.

|  |  |  |  |  | un depósito especial a favor de la Autoridad de Transporte Integrado de Puerto Rico para sus fines y poderes corporativos. El ingreso de estos treinta y seis (36) millones de dólares por año fiscal al depósito especial a favor de la Autoridad de Transporte Integrado de Puerto Rico está en tercera prioridad y subordinado al ingreso de los veinte (20) millones de dólares del monto del impuesto que se recaude sobre los cigarrillos fijados en la sec. 31625 de este título que ingrese al depósito especial a favor de la Autoridad de Carreteras y Transportación según se dispone en la cláusula (3) de este inciso y al de los diez (10) millones de dólares del monto del impuesto que se recaude sobre los cigarrillos fijados en la sec. 31625 de este título que ingrese al depósito especial a favor de la Autoridad Metropolitana de Autobuses según se dispone en la cláusula (4) de este inciso".

[…]

"La transferencia del producto de la recaudación de dicho arbitrio a la Autoridad de Transporte Integrado de Puerto Rico quedará sujeto a la disposición de la Sección 8 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico. El producto de dicha recaudación solamente se usará para el pago de intereses y amortización de la deuda pública, según se establece en dicha Sección 8 del Artículo VI de la Constitución, en la medida que los demás recursos disponibles mencionados en dicha Sección no sean suficientes para tales fines. En caso de que el Estado Libre Asociado de Puerto Rico utilice cantidad |
|--|--|--|--|--|--|

|  |  |  |  |  | alguna de los arbitrios sobre el cigarrillo fijados en la sec. 31625 para el pago de intereses y amortización de la deuda pública según se establece en la Sección 8 del Artículo VI de la Constitución, las cantidades usadas por el Estado Libre Asociado de Puerto Rico para el pago de intereses y amortización de la deuda pública serán reembolsadas a la Autoridad de Transporte Integrado de Puerto Rico de los recaudos recibidos por el Estado Libre Asociado de Puerto Rico en el próximo año fiscal, o en caso de no ser posible tal reembolso en el próximo Año Fiscal, en los años fiscales subsiguientes, excepto aquellos recaudos que hayan sido comprometidos para satisfacer cualquier obligación. El producto de dichos recaudos que han de ser usados bajo las disposiciones de esta sección para reembolsar a la Autoridad de Transporte Integrado de Puerto Rico las cantidades utilizadas por el Estado Libre Asociado de Puerto Rico para el pago de intereses y amortización en la deuda pública, no se ingresarán en el Fondo General del Estado Libre Asociado de Puerto Rico cuando se cobren, sino que serán transferidos a la Autoridad de Transporte Integrado de Puerto Rico y, sujeto a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico, serán usados para reembolsar dichas cantidades a la Autoridad de Transporte Integrado de Puerto Rico". |
|---|---|---|---|---|---|

**Parte II: Leyes relativas a la recuperación de ingresos**

| LEY DE CREACIÓN | CITA LEGISLATIVA SOBRE RECUPERACIÓN DE INGRESOS |
|---|---|
| **ACT** ||
| **1. Ley de la Autoridad de Carreteras y Transportación de Puerto Rico**<br><br>Entidades involucradas:<br><br>**ACT** (Autoridad de Carreteras y Transportación de Puerto Rico) | 9 L.P.R.A. sec. 2004(l) ("Poderes"):<br><br>(l) Tomar dinero a préstamo para cualesquiera de sus fines corporativos y emitir bonos de la Autoridad en evidencia de tales obligaciones y garantizar el pago de dichos bonos y sus intereses mediante pignoración u otro gravamen sobre todas sus propiedades, rentas, o ingresos, y, sujeto a las disposiciones de la Sec. 8 del Art. VI de la Constitución del Estado Libre Asociado, pignorar para el pago de dichos bonos y sus intereses, el producto de cualesquiera contribuciones u otros fondos que puedan ser puestos a la disposición de la Autoridad por el Estado Libre Asociado.<br><br>9 L.P.R.A. sec. 2021 ("Depósito Especial para beneficio de la Autoridad de Carreteras"):<br><br>El total del producto del aumento de los quince dólares ($15) en los derechos que se pagarán por concepto de licencia de automóviles de servicio privado y público ingresará en un Depósito Especial a nombre y para beneficio de la Autoridad de Carreteras y Transportación de Puerto Rico para ser usado por la Autoridad para sus fines corporativos. Dicha Autoridad queda por la presente autorizada para comprometer o pignorar el producto de la recaudación así recibida al pago del principal y los intereses de bonos u otras obligaciones de la Autoridad o para cualquier otro propósito lícito de la Autoridad, tal compromiso o pignoración quedando sujeto a la disposición de la Sec. 8 del Art. VI de la Constitución de Puerto Rico; disponiéndose, sin embargo, que el producto de dicha recaudación se usará solamente para el pago de intereses y amortización de la deuda pública, según se provee en dicha Sección 8, hasta tanto los otros recursos disponibles referidos en dicha sección sean insuficientes para tales fines; de lo contrario, el producto de dicha recaudación en la cantidad que sea necesaria, se usará solamente para el pago del principal y los intereses de bonos, y otras obligaciones de la Autoridad y para cumplir con cualesquiera estipulaciones convenidas por la Autoridad con los tenedores de dichos bonos u otras obligaciones. |

| | |
|---|---|
| | El Estado Libre Asociado de Puerto Rico por la presente acuerda y se compromete con cualquier persona, firma o corporación, o con cualquier agencia de los Estados Unidos de América o de cualquier Estado o del Estado Libre Asociado de Puerto Rico, que suscriban o adquieran bonos de la Autoridad de Carreteras y Transportación de Puerto Rico para el pago de los cuales el producto de aumento a los derechos que se pagan por concepto de licencias de automóviles de servicio privado, público y otros se pignore, según autorizado por esta sección, a no reducir estos derechos de licencia. |
| **2. Subtítulo 17. Código de Rentas Internas de 2011**<br><br>Entidades involucradas:<br><br>**ACT** (Autoridad de Carreteras y Transportación) | 13 L.P.R.A. sec. 31751 ("Disposición de fondos"):<br><br>(1) El monto del impuesto que se recaude sobre la gasolina y cuatro (4) centavos del impuesto sobre gas oil o diesel oil fijados en la sec. 31626 de este título; y el monto total por año fiscal del arbitrio que se recaude sobre el petróleo crudo, productos parcialmente elaborados y productos terminados derivados del petróleo y cualquier otra mezcla de hidrocarburos fijados en la sec. 31627 de este título, ingresarán en un depósito especial a favor de la Autoridad de Carreteras y Transportación para sus fines corporativos.<br><br>(1)(F) Se autoriza a la Autoridad de Carreteras y Transportación para comprometer o pignorar el producto de la recaudación así recibida sobre gasolina y los cuatro (4) centavos del impuesto sobre 'gas oil' o 'diesel oil' fijados en la sección 31626 de este título y la cantidad asignada en virtud de este Subtítulo del arbitrio sobre el petróleo crudo, productos parcialmente elaborados y productos terminados derivados del petróleo y cualquier otra mezcla de hidrocarburos fijados en la sección 31627 de este título, para el pago del principal y los intereses de bonos u otras obligaciones o para cualquier otro propósito lícito de la Autoridad. Tal compromiso o pignoración quedará sujeto a la disposición de la Sección 8 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico. El producto de dicha recaudación se usará solamente para el pago de intereses y amortización de la deuda pública, según se provee en dicha Sección 8 del Artículo VI de la Constitución, hasta tanto los otros recursos disponibles a que se hace referencia en dicha sección sean insuficientes para |

tales fines. De lo contrario, el producto de tal recaudación, en la cantidad que sea necesaria, se usará solamente para el pago del principal y los intereses de bonos y otras obligaciones de la Autoridad y para cumplir con cualesquiera estipulaciones convenidas por ésta con los tenedores de dichos bonos u otras obligaciones.

(1)(E) En caso de que el monto del producto del impuesto sobre gasolina o 'gas oil' o 'diesel oil' fijados en la sec. 31626 de este título o aquella cantidad de los arbitrios sobre el petróleo crudo, productos parcialmente elaborados y productos terminados derivados del petróleo y cualquier otra mezcla de hidrocarburos fijados en la sec. 31627 de este título, asignados o que en el futuro se asignen a dicha Autoridad de Carreteras y Transportación, resulte ser en cualquier momento insuficiente para pagar el principal y los intereses de los bonos u otras obligaciones sobre dinero tomado a préstamo o emitida por dicha Autoridad de Carreteras y Transportación para pagar el costo de facilidades de tránsito y para el pago de las cuales el producto de dicho impuesto sobre gasolina o 'gas oil' o 'diesel oil' fijados en la sec. 31626 de este título o aquella cantidad de arbitrio sobre el petróleo crudo, productos parcialmente elaborados y productos terminados derivados del petróleo y cualquier otra mezcla de hidrocarburos fijados en la sec. 31627 de este título haya sido pignorado y los fondos de la reserva de la Autoridad de Carreteras y Transportación para el pago de los requerimientos de la deuda se apliquen para cubrir la deficiencia en las cantidades que sean necesarias para hacer tales pagos, las cantidades de tal fondo de reserva usadas para cubrir dicha deficiencia serán reembolsadas a la Autoridad de Carreteras y Transportación del primer producto recibido en el próximo año fiscal o años fiscales subsiguientes por el Gobierno de Puerto Rico provenientes de: (1) cualesquiera otros impuestos que estén en vigor sobre cualquier otro combustible o medio de propulsión que se use, entre otros propósitos, para impulsar vehículos de carreteras; y (2) cualquier parte remanente del impuesto sobre gasolina y 'gas oil' o 'diesel oil' fijados en la sec. 31626 de este título que estén en vigor. El producto de dichos otros impuestos y la parte remanente del impuesto sobre gasolina y 'gas oil' o 'diesel oil' fijado en la sec. 31626 de este título, que han de ser usados bajo las disposiciones de esta sección para reembolsar los fondos de la reserva para los requerimientos de la deuda, no se ingresarán en el Fondo General del Gobierno de Puerto Rico cuando se cobren, sino que serán ingresados en el depósito especial antes mencionado para beneficio de la Autoridad de Carreteras y Transportación de Puerto Rico y, sujeto a las

disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico, serán usados para reembolsar dicho fondo de reserva para el pago de los requerimientos de la deuda.

(3) El monto del impuesto que se recaude sobre los cigarrillos fijados en la sec. 31625 de este título hasta veinte (20) millones de dólares por año fiscal ingresarán en un depósito especial a favor de la Autoridad de Carreteras y Transportación para sus fines y poderes corporativos.

(3)(C) Se autoriza a la Autoridad de Carreteras y Transportación para comprometer o pignorar el producto de la recaudación sobre el arbitrio a los cigarrillos fijada en la sec. 31625 de este título para el pago del principal y los intereses de bonos u otras obligaciones o para cualquier otro propósito lícito de la Autoridad. Tal compromiso o pignoración quedará sujeto a la disposición de la Sección 8 del Artículo VI de la Constitución del Gobierno de Puerto Rico. El producto de dicha recaudación se usará solamente para el pago de intereses y amortización de la deuda pública, según se establece en dicha Sección 8 del Artículo VI de la Constitución, hasta tanto los otros recursos disponibles a que se hace referencia en dicha sección sean insuficientes para tales fines. De lo contrario, el producto de tal recaudación, en la cantidad que sea necesaria, se usará solamente para el pago del principal y los intereses de bonos y otras obligaciones de la Autoridad y para cumplir con cualesquiera estipulaciones convenidas por ésta con los tenedores de dichos bonos u otras obligaciones.

(4) El monto del impuesto que se recaude sobre los cigarrillos fijados en la sec. 31625 de este título hasta diez (10) millones de dólares por año fiscal ingresarán en un depósito especial a favor de la Autoridad Metropolitana de Autobuses para sus fines y poderes corporativos. El ingreso de estos diez (10) millones de dólares por año fiscal al depósito especial a favor de la Autoridad Metropolitana de Autobuses está en segunda prioridad y subordinado al ingreso de los veinte (20) millones de dólares del monto del impuesto que se recaude sobre los cigarrillos fijados en la sec. 31625 de este título que ingrese al depósito especial a favor de la Autoridad de Carreteras y Transportación según se dispone en el inciso (a)(3) de esta sección.

| | |
|---|---|
| | (4)(C) Se autoriza a la Autoridad Metropolitana de Autobuses para comprometer o pignorar el producto de la recaudación sobre el arbitrio a los cigarrillos fijada en la sec. 31625 de este título para el pago del principal y los intereses de bonos y otras obligaciones o para cualquier otro propósito lícito de la Autoridad Metropolitana de Autobuses. Tal compromiso o pignoración quedará sujeto a la disposición de la Sección 8 del Artículo VI de la Constitución del Gobierno de Puerto Rico. El producto de dicha recaudación se usará solamente para el pago de intereses y amortización de la deuda pública, según se establece en dicha Sección 8 del Artículo VI de la Constitución, hasta tanto los otros recursos disponibles a que se hace referencia en dicha Sección sean insuficientes para tales fines. De lo contrario, el producto de tal recaudación, en la cantidad que sea necesaria, se usará solamente para el pago del principal y los intereses de bonos y otras obligaciones de la Autoridad Metropolitana de Autobuses y para cumplir con cualesquiera estipulaciones convenidas por ésta con los tenedores de sus bonos y otras obligaciones. |
| **3.  Ley de Vehículos y Tránsito de Puerto Rico**<br><br>Entidades involucradas:<br><br>**ACT** (Autoridad de Carreteras y Transportación de Puerto Rico) | "Artículo 23.02(c).- Derechos a pagar".<br><br>Se crea un depósito especial para beneficio de la Autoridad en donde se ingresarán la cantidad de quince (15) dólares, por cada renovación de registro de automóviles de servicio privado y público.<br><br>"Artículo 23.01.- Procedimiento para el pago de derechos".<br><br>A menos que se disponga en contrario en esta Ley, el importe de los derechos recaudados de acuerdo con los Artículos 23.01 y 23.02 de esta Ley ingresarán en su totalidad en un Depósito Especial a nombre y para beneficio de la [ACT].<br><br>Se autoriza a la Autoridad a comprometer o pignorar el producto de la recaudación recibida para el pago del principal y los intereses de bonos u otras obligaciones o para cualquier otro propósito lícito de la Autoridad. Tal compromiso o pignoración quedará sujeto a la disposición de la Sección 8 del Artículo VI de la Constitución de Puerto Rico. El producto de dicha recaudación se usará solamente para el pago de intereses y amortización de la deuda pública, según se provee en dicha Sección 8 del Artículo VI de la Constitución, hasta tanto los otros recursos disponibles a que se hace referencia en dicha Sección sean insuficientes para tales fines. De lo contrario, el producto de tal recaudación, en |

| | la cantidad que sea necesaria, se usará solamente para el pago del principal y los intereses de bonos y otras obligaciones de la Autoridad y para cumplir con cualesquiera estipulaciones convenidas por ésta con los tenedores de dichos bonos u otras obligaciones. |
|---|---|
| **4. Código de Rentas Internas para un Nuevo Puerto Rico**<br><br>Entidades involucradas:<br><br>**ACT** (Autoridad de Carreteras y Transportación de Puerto Rico)<br><br>**AMA** (Autoridad Metropolitana de Autobuses) | Se enmienda el inciso (a) de la Sección 3060.11 de la Ley Núm. 1 de 2011, según enmendada, conocida como el "Código de Rentas Internas para un Nuevo Puerto Rico", para que lea como sigue:<br><br>El monto del impuesto que se recaude sobre la gasolina y los cuatro (4) centavos del impuesto sobre gas oil o diesel oil fijados en la Sección 3020.06 de este subtítulo; y el monto total por año fiscal del arbitrio que se recaude sobre el petróleo crudo, productos parcialmente elaborados y productos terminados derivados del petróleo y cualquier otra mezcla de hidrocarburos fijados en la Sección 3020.07 de este subtítulo, ingresarán en un depósito especial a favor de la Autoridad de Carreteras y Transportación para sus fines corporativos.<br><br>Se autoriza a la Autoridad de Carreteras y Transportación para comprometer o pignorar el producto de la recaudación sobre el arbitrio a los cigarrillos fijada en la Sección 3020.05 para el pago del principal y los intereses de bonos u otras obligaciones o para cualquier otro propósito lícito de la Autoridad. Tal compromiso o pignoración quedará sujeto a la disposición de la Sección 8 del Artículo VI de la Constitución de Puerto Rico. El producto de dicha recaudación se usará solamente para el pago de intereses y amortización de la deuda pública, según se establece en dicha Sección 8 del Artículo VI de la Constitución del Gobierno de Puerto Rico, hasta tanto los otros recursos disponibles a que se hace referencia en dicha Sección sean insuficientes para tales fines. De lo contrario, el producto de tal recaudación, en la cantidad que sea necesaria, se usará solamente para el pago del principal y los intereses de bonos y otras obligaciones de la Autoridad y para cumplir con cualesquiera estipulaciones convenidas por ésta con los tenedores de dichos bonos u otras obligaciones.<br><br>El monto del impuesto que se recaude sobre los cigarrillos fijados en la Sección 3020.05 de este subtítulo hasta diez (10) millones de dólares por año fiscal ingresarán en un depósito especial a favor de la Autoridad Metropolitana de Autobuses para sus fines y poderes corporativos. El ingreso de estos diez (10) millones de dólares por año fiscal al depósito especial a favor de la Autoridad |

|  | Metropolitana de Autobuses está en segunda prioridad y subordinado al ingreso de los veinte (20) millones de dólares del monto del impuesto que se recaude sobre los cigarrillos fijados en la Sección 3020.05 de este subtítulo que ingrese al depósito especial a favor de la Autoridad de Carreteras y Transportación según se dispone en el inciso (a)(3) de esta sección.<br><br>Se autoriza a la Autoridad Metropolitana de Autobuses para comprometer o pignorar el producto de la recaudación sobre el arbitrio a los cigarrillos fijada en la Sección 3020.05 para el pago del principal y los intereses de bonos u otras obligaciones o para cualquier otro propósito lícito de la Autoridad Metropolitana de Autobuses. Tal compromiso o pignoración quedará sujeto a la disposición de la Sección 8 del Artículo VI de la Constitución de Puerto Rico. El producto de dicha recaudación se usará solamente para el pago de intereses y amortización de la deuda pública, según se establece en dicha Sección 8 del Artículo VI de la Constitución, hasta tanto los otros recursos disponibles a que se hace referencia en dicha Sección sean insuficientes para tales fines. De lo contrario, el producto de tal recaudación, en la cantidad que sea necesaria, se usará solamente para el pago del principal y los intereses de bonos y otras obligaciones de la Autoridad Metropolitana de Autobuses y para cumplir con cualesquiera estipulaciones convenidas por ésta con los tenedores de sus bonos y otras obligaciones. |
| **AFI** | |
| **1. Ley de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico**<br><br>Entidades involucradas:<br><br>**AFI** (Autoridad para el Financiamiento de la Infraestructura de Puerto Rico) | 3 L.P.R.A. sec. 1906 ("Poderes generales"):<br><br>(m) Hipotecar o pignorar cualquier propiedad para el pago del principal de y los intereses sobre cualesquiera bonos emitidos por la Autoridad o bonos emitidos por una entidad beneficiada, y pignorar la totalidad o parte de los ingresos que la Autoridad recibiese, incluyendo, pero sin limitarse a, y sujeto a las disposiciones del Art. VI, Sec. 8 de la Constitución del Estado Libre Asociado de Puerto Rico, la totalidad o parte de los arbitrios federales u otros fondos que fuesen transferidos a la Autoridad por el Estado Libre Asociado.<br><br>3 L.P.R.A. sec. 1907 ("Bonos de la Autoridad"): |

(a) Los bonos emitidos por la Autoridad podrán hacerse pagaderos del total o de parte de los ingresos brutos o netos y de otros ingresos derivados por la Autoridad que, sujeto a las disposiciones de la Sección 8 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico, podrá incluir el producto de cualquier impuesto u otros fondos que se hagan disponibles a la Autoridad por parte del Estado Libre Asociado, todo según provisto en el contrato de fideicomiso o resolución bajo el cual los bonos son emitidos. El principal de, e intereses sobre los bonos emitidos por la Autoridad podrá ser garantizado mediante la pignoración del total o parte de cualesquiera ingresos de la Autoridad que, sujeto a las disposiciones de la Sección 8 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico, podrá incluir el producto de cualquier impuesto u otros fondos que se hagan disponibles a la Autoridad por parte del Estado Libre Asociado, todo según provisto en el contrato de fideicomiso o resolución bajo el cual los bonos son emitidos. Dicha pignoración será válida y obligatoria desde el momento que se haga sin necesidad de que medie un documento público o notarizado. Los ingresos así gravados, incluyendo aquellos que la Autoridad reciba posteriormente, estarán inmediatamente sujetos a dicho gravamen sin la necesidad de la entrega física de los mismos o de cualquier otro acto, y dicho gravamen será válido y obligatorio y prevalecerá contra cualquier tercero que tenga reclamación de cualquier clase por daños, incumplimiento de contrato u otro motivo contra la Autoridad, con independencia de que dicho tercero no haya sido notificado al respecto. Ni el contrato de fideicomiso o la resolución del bono, ni cualquier contrato colateral mediante el cual los derechos de la Autoridad sobre cualquier ingreso sean pignorados o cedidos tendrán que ser presentados o inscritos para perfeccionar el gravamen sobre los mismos contra cualquier tercero, excepto en los archivos de la Autoridad. La resolución o resoluciones autorizando la emisión de bonos o el contrato de fideicomiso garantizando los mismos podrá contener disposiciones, las cuales serán parte del contrato con los tenedores de los bonos emitidos bajo dicha resolución o resoluciones o bajo dicho contrato de fideicomiso, con respecto a la garantía y creación de gravamen sobre los ingresos y activos de la Autoridad, la creación y mantenimiento de fondos de redención y reservas, limitaciones relativas a los propósitos para los cuales podrá usarse el producto de los bonos, limitaciones en cuanto a la emisión de bonos adicionales, limitaciones en cuanto a la introducción de enmiendas o suplementos a la resolución o resoluciones o al contrato de fideicomiso, a la concesión de derechos, facultades y privilegios y la imposición de obligaciones y responsabilidades al fiduciario bajo cualquier contrato de fideicomiso

o resolución, los derechos, facultades, obligaciones y responsabilidades que habrán de surgir en la eventualidad de un incumplimiento de cualquier obligación bajo dicha resolución o resoluciones o bajo dicho contrato de fideicomiso, o con respecto a cualesquiera derechos, facultades o privilegios conferidos a los tenedores de bonos como garantía de los mismos para aumentar la vendibilidad de los bonos.

3 L.P.R.A. sec. 1914 ("Depósito especial"):

Comenzando con el Año Fiscal 1988-89, no obstante las disposiciones del Artículo 29A de la Ley Núm. 143 de 30 de junio de 1969, según enmendada, los primeros recaudos de los arbitrios federales enviados al Departamento de Hacienda de Puerto Rico en cada año fiscal, de acuerdo a la Sección 7652(a)(3) del Código de Rentas Internas de Estados Unidos de 1986, según enmendado, hasta una cantidad máxima de treinta millones de dólares ($30,000,000), en el caso del Año Fiscal 1988-89, hasta una cantidad máxima de cuarenta millones de dólares ($40,000,000), en el caso de los Años Fiscales 1989-90 al 1996-97, hasta una cantidad máxima de sesenta millones de dólares ($60,000,000), en el caso del Año Fiscal 1997-98, hasta una cantidad máxima de setenta millones de dólares ($70,000,000), en el caso de los Años Fiscales 1998-1999 al 2005-06, y hasta una cantidad máxima de noventa millones de dólares ($90,000,000), en el caso de los Años Fiscales 2006-07 al 2008-09, y en los años subsiguientes hasta el Año Fiscal 2056-57 la participación será hasta una cantidad de ciento diecisiete millones de dólares ($117,000,000), los cuales ingresarán al momento de ser recibidos por el Departamento de Hacienda de Puerto Rico en un Fondo Especial a ser mantenido por o a nombre de la Autoridad, designado el "Fondo de la Infraestructura de Puerto Rico" y se utilizarán por la Autoridad para sus propósitos corporativos, lo cual incluirá el desarrollo de la infraestructura necesaria y conveniente para la realización de los Juegos Centroamericanos y del Caribe Mayagüez 2010. En caso de que los recaudos de dichos arbitrios federales sean insuficientes para cubrir las cantidades aquí asignadas, el Secretario de Hacienda queda autorizado a cubrir tal deficiencia de cualesquiera fondos disponibles y el Director de la Oficina de Gerencia y Presupuesto, a solicitud de la Autoridad para el Financiamiento de la Infraestructura, incluirá en el presupuesto recomendado del año fiscal correspondiente las asignaciones necesarias para cubrir dichas deficiencias.

| | Se faculta a la Autoridad a segregar una porción de dichos Fondos en una (1) o más subcuentas, sujeto a las disposiciones de la Sec. 8 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico, para el pago del principal e intereses de bonos y de otras obligaciones de la Autoridad, o para el pago de bonos y otras obligaciones emitidas por una entidad beneficiada, o para cualquier otro propósito legal de la Autoridad. Los dineros del Fondo Especial podrán utilizarse para el pago de intereses y para la amortización de la deuda pública del Estado Libre Asociado, según dispone dicha Sec. 8, solamente cuando los demás recursos disponibles, mencionados en dicha Sección, no sean suficientes para tales propósitos. |
|---|---|
| **ADCCPR** | |
| **2.Ley del Impuesto sobre el Canon por Ocupación de Habitación de Puerto Rico**<br><br>Entidades involucradas:<br><br>**ADCCPR** (Autoridad del Distrito del Centro de Convenciones de Puerto Rico, una corporación pública del Estado Libre Asociado de Puerto Rico creada por las secs. 6401 *et seq.* del Título 23, conocidas como la "Ley del Distrito del Centro de Convenciones de Puerto Rico")<br><br>**Compañía de Turismo de Puerto Rico,** una corporación pública del Estado Libre Asociado de Puerto Rico, creada por las secs. 671 *et seq.* del Título 23 | 13 L.P.R.A. sec. 2271v ("Disposición de fondos")<br><br>La Compañía [de Turismo] distribuirá las cantidades recaudadas por concepto del impuesto fijado en la sec. 2271*o* de este título, de la siguiente manera:<br>(a) Antes del comienzo de cada año fiscal el [BGF] determinará y le certificará a la Compañía [de Turismo] y a la [ADCC] la cantidad necesaria para que, durante dicho año fiscal y el primer día del próximo año fiscal, la [ADCC] haga:<br>(1) El pago completo y a tiempo, o la amortización del principal y de los intereses sobre las obligaciones incurridas por la [ADCC] con el [BGF] o los bonos, pagarés u otras obligaciones emitidas, asumidas o incurridas por la [ADCC], según establecido por la Ley Núm. 142 de 4 de octubre de 2011, según enmendada, con la previa autorización por escrito de la Compañía [de Turismo], para llevar a cabo exclusivamente el desarrollo y la construcción de un nuevo centro de convenciones y la infraestructura relacionada;<br>(2) el pago completo y a tiempo de las obligaciones de la [ADCC] bajo cualquier acuerdo financiero relacionado con los bonos, según se define este término al final de este inciso, que otorgue la [ADCC] con la autorización previa y escrita de la Compañía [de Turismo];<br>(3) los depósitos requeridos para reponer cualquier reserva establecida para asegurar el pago del principal y los intereses de dichos bonos, pagarés y otras obligaciones emitidas, asumidas o incurridas por [ADCC], u obligaciones bajo cualquier acuerdo financiero relacionado a los bonos, y |

(4) cualquier otro gasto incurrido relacionado con la emisión de dichos bonos, pagarés u otras obligaciones asumidas o incurridas por la [ADCC] o con cualquier acuerdo financiero relacionado a los bonos.

La aprobación previa y por escrito de la Compañía [de Turismo] debe específicamente autorizar el programa de amortización del principal de los bonos, pagarés u otras obligaciones a ser emitidas, asumidas o incurridas por la [ADCC] y los términos y condiciones finales de cualquier acuerdo financiero relacionado a los bonos a ser otorgado por la [ADCC]. La suma determinada y certificada por el [BGF], según indicada arriba, deberá ser depositada en una cuenta especial a ser mantenida por el [BGF] a nombre de la [ADCC] para beneficio de los tenedores de bonos, pagarés u otras obligaciones de la [ADCC] o para beneficio de las otras partes contratantes, bajo cualquier acuerdo financiero relacionado a los bonos. El [BGF] deberá transferir las cantidades depositadas en dicha cuenta especial a los fideicomisarios de los tenedores de bonos, pagarés u otras obligaciones de la [ADCC], o las otras partes contratantes bajo cualquier acuerdo financiero relacionado a los bonos, de acuerdo a las instrucciones escritas provistas por la [ADCC] al [BGF].

Cada año fiscal, la Compañía [de Turismo] deberá transferir al Banco Gubernamental de Fomento para depósito en dicha cuenta especial la suma establecida en el primer párrafo de este inciso mediante transferencias mensuales, comenzando en el mes que inmediatamente sucede al mes en el cual se apruebe esta ley y en el primer mes de cada año fiscal en adelante, equivalentes a una décima parte de aquella cantidad que el Banco Gubernamental de Fomento determine y certifique como necesaria para los pagos a los que se refiere el párrafo introductorio de esta sección [….]

Se autoriza a la Autoridad, con el previo consentimiento escrito de la Compañía, a comprometer o de otra forma gravar el producto de la recaudación del impuesto fijado que debe ser depositada en la cuenta especial según requiere el primer párrafo de este inciso como garantía, para el pago del principal y de los intereses sobre los bonos, pagarés u otras obligaciones emitidas, asumidas o incurridas por la Autoridad, según se describe en este primer párrafo de este inciso, o el pago de sus obligaciones bajo cualquier acuerdo financiero relacionado a los bonos, según descrito en dicho párrafo. Tal compromiso u obligación quedará sujeto a las disposiciones de la Sección 8 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico. El producto de la recaudación del

<table>
<tr><td></td><td>impuesto se utilizará solamente para el pago de los intereses y la amortización de la deuda pública, según se provee en la Sección 8 del Artículo VI de la Constitución, solo en la medida en que los otros recursos disponibles a los cuales se hace referencia en dicha Sección son insuficientes para tales fines. De lo contrario, el producto de tal recaudación en la cantidad que sea necesaria, se utilizará solamente para el pago del principal y de los intereses sobre los bonos, pagarés u otras obligaciones y las obligaciones bajo cualquier acuerdo financiero relacionado a los bonos aquí contempladas, y para cumplir con cualesquiera estipulaciones convenidas con los tenedores de dichos bonos, pagarés u otras obligaciones o proveedores de acuerdos financieros relacionados a los bonos.

En caso de que el monto del producto del impuesto actualmente asignado o que en el futuro se asigne a la Autoridad, de conformidad con este inciso, se utilice para el pago del servicio de la deuda pública y se apliquen para cubrir la deficiencia en las cantidades que sean necesarias para hacer tales pagos, las cantidades de este impuesto usadas para cubrir dicha deficiencia serán reembolsadas a la Autoridad del primer producto recibido en el próximo año fiscal o años fiscales subsiguientes por el Estado Libre Asociado de Puerto Rico provenientes de cualquier parte remanente del impuesto que esté en vigor, sujeto a las disposiciones de la Sec. 8 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico.</td></tr>
</table>

**AMA**

| | |
|---|---|
| **Código de Rentas Internas para un Nuevo Puerto Rico**<br><br>Entidades involucradas:<br><br>**ACT** (Autoridad de Carreteras y Transportación de Puerto Rico)<br><br>**AMA** (Autoridad Metropolitana de Autobuses) | Se enmienda el inciso (a) de la Sección 3060.11 de la Ley Núm. 1-2011, según enmendada, conocida como el "Código de Rentas Internas para un Nuevo Puerto Rico", para que lea como sigue:<br><br>El monto del impuesto que se recaude sobre los cigarrillos fijados en la Sección 3020.05 de este subtítulo hasta veinte (20) millones de dólares por año fiscal ingresarán en un depósito especial a favor de la Autoridad de Carreteras y Transportación para sus fines y poderes corporativos.<br><br>Se autoriza a la Autoridad de Carreteras y Transportación para comprometer o pignorar el producto de la recaudación sobre el arbitrio a los cigarrillos fijada en la Sección 3020.05 para el pago del principal y los intereses de bonos u otras obligaciones o para cualquier otro propósito lícito de la |

Autoridad. Tal compromiso o pignoración quedará sujeto a la disposición de la Sección 8 del Artículo VI de la Constitución de Puerto Rico. El producto de dicha recaudación se usará solamente para el pago de intereses y amortización de la deuda pública, según se establece en dicha Sección 8 del Artículo VI de la Constitución del Gobierno de Puerto Rico, hasta tanto los otros recursos disponibles a que se hace referencia en dicha Sección sean insuficientes para tales fines. De lo contrario, el producto de tal recaudación, en la cantidad que sea necesaria, se usará solamente para el pago del principal y los intereses de bonos y otras obligaciones de la Autoridad y para cumplir con cualesquiera estipulaciones convenidas por ésta con los tenedores de dichos bonos u otras obligaciones.

El monto del impuesto que se recaude sobre los cigarrillos fijados en la Sección 3020.05 de este subtítulo hasta diez (10) millones de dólares por año fiscal ingresarán en un depósito especial a favor de la Autoridad Metropolitana de Autobuses para sus fines y poderes corporativos. El ingreso de estos diez (10) millones de dólares por año fiscal al depósito especial a favor de la Autoridad Metropolitana de Autobuses está en segunda prioridad y subordinado al ingreso de los veinte (20) millones de dólares del monto del impuesto que se recaude sobre los cigarrillos fijados en la Sección 3020.05 de este subtítulo que ingrese al depósito especial a favor de la Autoridad de Carreteras y Transportación según se dispone en el inciso (a)(3) de esta sección.

Se autoriza a la Autoridad Metropolitana de Autobuses para comprometer o pignorar el producto de la recaudación sobre el arbitrio a los cigarrillos fijada en la Sección 3020.05 para el pago del principal y los intereses de bonos u otras obligaciones o para cualquier otro propósito lícito de la Autoridad Metropolitana de Autobuses. Tal compromiso o pignoración quedará sujeto a la disposición de la Sección 8 del Artículo VI de la Constitución de Puerto Rico. El producto de dicha recaudación se usará solamente para el pago de intereses y amortización de la deuda pública, según se establece en dicha Sección 8 del Artículo VI de la Constitución, hasta tanto los otros recursos disponibles a que se hace referencia en dicha sección sean insuficientes para tales fines. De lo contrario, el producto de tal recaudación, en la cantidad que sea necesaria, se usará solamente para el pago del principal y los intereses de bonos y otras obligaciones de la Autoridad Metropolitana de

| | Autobuses y para cumplir con cualesquiera estipulaciones convenidas por ésta con los tenedores de sus bonos y otras obligaciones. |
|---|---|
| **ATI** | |
| **Código de Rentas Internas para un Nuevo Puerto Rico**<br><br>Entidades involucradas:<br><br>**ATI** (Autoridad de Transporte Integrado de Puerto Rico) | 13 L.P.R.A. sec. 31751 ("Disposición de fondos")<br><br>El monto del impuesto que se recaude sobre los cigarrillos fijados en la sec. 31625 de este título hasta treinta y seis (36) millones de dólares por año fiscal, comenzando con el Año Fiscal 2015-2016, ingresarán en un depósito especial a favor de la Autoridad de Transporte Integrado de Puerto Rico para sus fines y poderes corporativos. El ingreso de estos treinta y seis (36) millones de dólares por año fiscal al depósito especial a favor de la Autoridad de Transporte Integrado de Puerto Rico está en tercera prioridad y subordinado al ingreso de los veinte (20) millones de dólares del monto del impuesto que se recaude sobre los cigarrillos fijados en la sección 31625 de este título que ingrese al depósito especial a favor de la Autoridad de Carreteras y Transportación, según se dispone en la cláusula (3) de este inciso, y al de los diez (10) millones de dólares del monto del impuesto que se recaude sobre los cigarrillos fijados en la sección 31625 de este título que ingrese al depósito especial a favor de la Autoridad Metropolitana de Autobuses, según se dispone en la cláusula (4) de este inciso. El monto del impuesto que se recaude sobre los cigarrillos fijados en la sección 31625 de este título hasta treinta y seis (36) millones de dólares por año fiscal, a partir de la aprobación del Nuevo Sistema Contributivo de Puerto Rico, ingresarán en un depósito especial a favor de la Autoridad de Transporte Integrado de Puerto Rico para sus fines y poderes corporativos. El ingreso de estos treinta y seis (36) millones de dólares por año fiscal al depósito especial a favor de la Autoridad de Transporte Integrado de Puerto Rico está en tercera prioridad y subordinado al ingreso de los veinte (20) millones de dólares del monto del impuesto que se recaude sobre los cigarrillos fijados en la sección 31625 de este título que ingrese al depósito especial a favor de la Autoridad de Carreteras y Transportación según se dispone en la cláusula (3) de este inciso y al de los diez (10) millones de dólares del monto del impuesto que se recaude sobre los cigarrillos fijados en la sec. 31625 de este título que ingrese al depósito especial a favor de la Autoridad Metropolitana de Autobuses según se dispone en la cláusula (4) de este inciso. |

El Secretario transferirá mensualmente o según lo acuerde con la Autoridad de Transporte Integrado de Puerto Rico, las cantidades ingresadas en dicho depósito especial, deduciendo de las mismas las cantidades reembolsadas de acuerdo a las disposiciones de la sección 31668 de este subtítulo.

La transferencia del producto de la recaudación de dicho arbitrio a la Autoridad de Transporte Integrado de Puerto Rico quedará sujeto a la disposición de la Sección 8 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico. El producto de dicha recaudación solamente se usará para el pago de intereses y amortización de la deuda pública, según se establece en dicha Sección 8 del Artículo VI de la Constitución, en la medida que los demás recursos disponibles mencionados en dicha Sección no sean suficientes para tales fines En caso de que el Estado Libre Asociado de Puerto Rico utilice cantidad alguna de los arbitrios sobre el cigarrillo fijados en la sección 31625 para el pago de intereses y amortización de la deuda pública según se establece en la Sección 8 del Artículo VI de la Constitución, las cantidades usadas por el Estado Libre Asociado de Puerto Rico para el pago de intereses y amortización de la deuda pública serán reembolsadas a la Autoridad de Transporte Integrado de Puerto Rico de los recaudos recibidos por el Estado Libre Asociado de Puerto Rico en el próximo Año Fiscal, o en caso de no ser posible tal reembolso en el próximo Año Fiscal, en los años fiscales subsiguientes, excepto aquellos recaudos que hayan sido comprometidos para satisfacer cualquier obligación. El producto de dichos recaudos que han de ser usados bajo las disposiciones de esta sección para reembolsar a la Autoridad de Transporte Integrado de Puerto Rico las cantidades utilizadas por el Estado Libre Asociado de Puerto Rico para el pago de intereses y amortización en la deuda pública, no se ingresarán en el Fondo General del Estado Libre Asociado de Puerto Rico cuando se cobren, sino que serán transferidos a la Autoridad de Transporte Integrado de Puerto Rico y, sujeto a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico, serán usados para reembolsar dichas cantidades a la Autoridad de Transporte Integrado de Puerto Rico.

**Parte III: Referencias a la recuperación de ingresos en resoluciones**
Resoluciones de la ACT

I.    Resolución ACT de 1968

Las referencias a la recuperación de ingresos aparecen en tres ocasiones: una en la exposición de motivos y dos en el "modelo de los bonos" incorporado a la resolución.

- Exposición de motivos – "POR CUANTO, mediante la Ley Núm. 75, aprobada el 23 de junio de 1965, según suplementada por la Ley Núm. 50, aprobada el 22 de mayo de 1968, se asignó el producto de seis onceavos del impuesto de once centavos por galón, establecido por la Ley Núm. 2, aprobada el 20 de enero de 1956, según enmendada, a la Autoridad para que sea utilizado para sus fines corporativos y se autorizó expresamente a la Autoridad a pignorar el producto de dicho impuesto de seis centavos por galón recaudado por aquella para el pago del principal y los intereses de bonos u otras obligaciones de la Autoridad o para cualquier otro propósito lícito de la Autoridad, quedando sujeto el producto del impuesto así pignorado a aplicarse en primer término al pago de los intereses y la amortización de la deuda pública de acuerdo con lo dispuesto en la Sección 8 del Artículo VI de la Constitución de Puerto Rico en caso de ser necesario para ello, pero solo en la medida en que los otros ingresos disponibles del Estado Libre Asociado a las que se refiere dicha Sección 8 sean insuficientes para dicho propósito" (Resolución ACT de 1968, p. 2).

- "Modelo de los Bonos" – "El producto de los impuestos sobre la gasolina así asignados a la Autoridad por la Ley Núm. 75 y cualesquiera otros impuestos, derechos o cargos que la Legislatura de Puerto Rico pueda asignar a la Autoridad se encuentra sujeto a ser aplicado en primer término al pago de los intereses y la amortización de la deuda pública de acuerdo con lo dispuesto en la Sección 8 del Artículo VI de la Constitución de Puerto Rico en caso de ser necesario a tal fin, pero solo en la medida en que los otros ingresos disponibles del Estado Libre Asociado a las que se refiere la Sección 8 sean insuficientes para dicho propósito" (Resolución ACT de 1968, p. 17).

- "Modelo de los Bonos" – "El producto de los impuestos sobre la gasolina y el 'gas oil' y 'diesel oil' así asignados a la Autoridad por dicha Ley de Arbitrios de Puerto Rico, el producto de los derechos de licencias así asignados a la Autoridad por dicha Ley de Vehículos y Tránsito de Puerto Rico y cualesquiera otros impuestos, derechos o cargos que la Legislatura de Puerto Rico haya asignado y pueda asignar a la Autoridad se encuentran sujetos a ser aplicados en primer término al pago de los intereses y la amortización de la deuda pública de acuerdo con lo dispuesto en la Sección 8 del Artículo VI de la constitución de Puerto Rico en caso de ser necesario a tal fin, pero solo en la medida en que los otros ingresos disponibles del Estado Libre Asociado sean insuficientes para dicho propósito" (Resolución ACT de 1968, p. 24).

II.    Resolución ACT de 1998

Las referencias a la recuperación de ingresos aparecen en cinco ocasiones: tres en la exposición de motivos y dos en el "modelo de los bonos" incorporado a la resolución.

- Exposición de motivos – "POR CUANTO, mediante el Subtítulo B de la Ley Núm. 120, aprobada el 31 de octubre de 1994, según enmendada, se asignó el producto del impuesto de dieciséis centavos por galón sobre la gasolina y la mitad del impuesto de ocho centavos por galón sobre el 'gas oil' y el 'diesel oil' a la Autoridad para que sea utilizado para sus fines corporativos y se autorizó expresamente a la Autoridad a pignorar el producto de dicho impuesto de dieciséis centavos por galón y cuatro centavos por galón recibido por aquella para el pago del principal y los intereses de bonos u otras obligaciones de la Autoridad o para cualquier otro propósito lícito de la Autoridad, quedando sujeto el producto del impuesto así pignorado a aplicarse en primer término al pago de los intereses y la amortización de la deuda pública de acuerdo con lo dispuesto en la Sección 8 del Artículo VI de la Constitución de Puerto Rico en caso de ser necesario para ello pero solo en la medida en que los otros ingresos disponibles del Estado Libre Asociado a las que se refiere dicha Sección 8 sean insuficientes para dicho propósito" (Resolución ATC de 1998, p. 2).

- Exposición de motivos – "POR CUANTO, mediante la Ley Núm. 9, aprobada el 12 de agosto de 1982, se asignó el producto del aumento de $15 por vehículo en los derechos anuales de licencias de vehículos de motor establecido por el Estado Libre Asociado a la Autoridad para que sea utilizado para sus fines corporativos y se autorizó expresamente a la Autoridad a pignorar el producto de dicho aumento de $15 en los derechos recibidos por aquella para el pago del principal y los intereses de bonos u otras obligaciones de la Autoridad o para cualquier otro propósito lícito de la Autoridad, quedando sujetos los derechos de licencia así pignorados a aplicarse en primer término al pago de los intereses y la amortización de la deuda pública de acuerdo con lo dispuesto en la Sección 8 del Artículo VI de la Constitución de Puerto Rico en caso de ser necesario para ello, pero solo en la medida en que los otros ingresos disponibles del Estado Libre Asociado a las que se refiere dicha Sección 8 sean insuficientes para dicho propósito" (Resolución ACT de 1998, pp. 2-3).

- Exposición de motivos – "POR CUANTO, mediante la Ley Núm. 34, aprobada el 16 de julio de 1997, según enmendada, los primeros $120 millones del producto anual del impuesto recaudado por el uso en Puerto Rico de petróleo crudo, productos parcialmente elaborados o productos terminados derivados del petróleo y de cualquier otra mezcla de hidrocarburos se asignaron a la Autoridad para ser utilizados para sus fines corporativos y se autorizó expresamente a la Autoridad a pignorar el producto de dicho impuesto recibido por aquella para el pago del principal y los intereses de bonos u otras obligaciones de la Autoridad o para cualquier otro propósito lícito de la Autoridad, quedando sujeta la recaudación impositiva así pignorada a aplicarse en primer término al pago y la amortización de la deuda pública de acuerdo con lo dispuesto en la Sección 8 del Artículo VI de la Constitución de Puerto Rico en caso de ser necesario para ello, pero solo en la medida en que los otros ingresos disponibles del Estado Libro Asociado a las que se refiere dicha Sección 8 sean insuficientes para dicho propósito" (Resolución ACT de 1998, p. 3).

- "Modelo de los Bonos" – "El producto de los impuestos sobre el petróleo crudo y los productos derivados así asignados a la Autoridad mediante dicha Ley Núm. 34, el producto de los impuestos sobre la gasolina y el 'gas oil' y 'diesel oil' así asignados a la Autoridad mediante dicha Ley Núm. 120, el producto de los derechos de licencias así asignados a la Autoridad por dicha Ley de Vehículos y Tránsito de Puerto Rico y cualesquiera otros impuestos, derechos o cargos que la Legislatura de Puerto Rico pueda asignar a la Autoridad se encuentran sujetos a aplicarse en primer término al pago de los intereses y la amortización de la deuda pública de acuerdo con lo dispuesto en la Sección 8 del Artículo VI de la Constitución de Puerto Rico en caso

de ser necesario a tal fin, pero solo en la medida en que los otros ingresos disponibles del Estado Libre Asociado a las que se refiere la Sección 8 sean insuficientes para dicho propósito" (Resolución ACT de 1998, p. 19).

- "Modelo de los Bonos" – "El producto de los impuestos sobre el petróleo crudo y los productos derivados así asignados a la Autoridad mediante dicha Ley Núm. 34, el producto de los impuestos sobre la gasolina y el 'gas oil' y 'diesel oil' así asignados a la Autoridad mediante dicha Ley Núm. 120, el producto de los derechos de licencias así asignados a la Autoridad por dicha Ley de Vehículos y Tránsito de Puerto Rico y cualesquiera otros impuestos, derechos o cargos que la Legislatura de Puerto Rico pueda asignar a la Autoridad se encuentran sujetos a aplicarse en primer término al pago de los intereses y la amortización de la deuda pública de acuerdo con lo dispuesto en la Sección 8 del Artículo VI de la Constitución de Puerto Rico en caso de ser necesario a tal fin, pero solo en la medida en que los otros ingresos disponibles del Estado Libre Asociado a las que se refiere la Sección 8 sean insuficientes para dicho propósito" (Resolución ACT de 1998, p. 24).

AFI – Comunicado oficial del 2 de junio de 2005

Se hace referencia a la disposición constitucional sobre recuperación de ingresos en tres partes:

- Portada. "No obstante, dichos arbitrios federales se encuentran sujetos a aplicarse en primer término al pago de las deudas de obligaciones generales y las deudas con garantía del Estado Libre Asociado, cuando los otros ingresos del Estado Libre Asociado no sean suficientes a tal fin".

- Síntesis del comunicado; S-2. "Los Arbitrios Federales y otros ingresos recibidos del Estado Libre Asociado y depositados en el Fondo de Infraestructura se encuentran sujetos a aplicarse en primer término al pago de las deudas de obligaciones generales y las deudas con garantía del Estado Libre Asociado, cuando los otros ingresos del Estado Libre Asociado no sean suficientes a tal fin".

- Página 10. "*Disposiciones sobre pago previo*. La Constitución de Puerto Rico establece que la deuda pública del Estado Libre Asociado constituye un gravamen de primer rango sobre los impuestos y ingresos disponibles del Estado Libre Asociado. La deuda pública incluye bonos y pagarés del Estado Libre Asociado respecto de los cuales se encuentra comprometida la fe, crédito y poder impositivo del Estado Libre Asociado y, de acuerdo con opiniones emitidas por el Secretario de Justicia del Estado Libre Asociado, cualquier pago que el Estado Libre Asociado deba realizar en virtud de las garantías que ha otorgado sobre bonos y pagarés emitidos por sus corporaciones públicas. Los Bonos no constituyen deuda pública del Estado Libre Asociado.

  Antes de aplicarse al pago del principal y los intereses de los Bonos, los Ingresos por Impuestos Especiales constituyen ingresos disponibles conforme a la Constitución. Por consiguiente, en caso de ser necesario, se encuentran sujetos a ser aplicados en primer término al pago del servicio de la deuda pública del Estado Libre Asociado. Sin embargo, conforme a la Ley Habilitadora, dichos ingresos deben utilizarse para tales pagos solo si y en la medida en que todas las demás ingresos disponibles del Estado Libre Asociado conforme a la Constitución sean insuficientes para ese fin. El Estado Libre Asociado nunca ha utilizado Arbitrios Federales para pagar el servicio de su deuda pública".

ADCC – Comunicado oficial del 16 de marzo de 2006

Se hace referencia a la disposición constitucional sobre recuperación de ingresos en tres partes:

- Portada. "**En la medida en que los otros ingresos del Estado Libre Asociado de Puerto Rico sean insuficientes para pagar las deudas de obligaciones generales y otras deudas con garantía del Estado Libre Asociado de Puerto Rico, los ingresos del canon de ocupación hotelera se encuentran sujetos a aplicarse en primer término al pago de dichas deudas y obligaciones del Estado Libre Asociado antes de poder aplicarse al pago del servicio de la deuda de los Bonos**".

- Página 2. "**Si las rentas del Estado Libre Asociado resultan insuficientes para pagar las deudas de obligaciones generales del Estado Libre Asociado y las deudas garantizadas por el Estado Libre Asociado, la Ley del Impuesto sobre Ocupación establece que, conforme a lo dispuesto en la Sección 8 del Artículo VI de la Constitución del Estado Libre Asociado, los ingresos por el Impuesto sobre Ocupación Hotelera se encuentran sujetos a aplicarse en primer término al pago de dichas deudas de obligaciones generales del Estado Libre Asociado o dichas deudas garantizadas antes de poder aplicarse al pago del servicio de la deuda de los Bonos**".

- Páginas 21-22. "La Constitución del Estado Libre Asociado establece que la deuda pública del Estado Libre Asociado constituye un gravamen de primer rango sobre los impuestos y ingresos disponibles del Estado Libre Asociado. La deuda pública incluye bonos y pagarés del Estado Libre Asociado respecto de los cuales se encuentra comprometida la fe, crédito y poder impositivo del Estado Libre Asociado y, de acuerdo con las opiniones emitidas por el Secretario de Justicia del Estado Libre Asociado, cualquier pago que el Estado Libre Asociado deba realizar en virtud de las garantías que ha otorgado sobre bonos y pagarés emitidos por sus corporaciones públicas. Los Bonos no constituyen deuda pública del Estado Libre Asociado.

  Los ingresos del Impuesto sobre Ocupación Hotelera constituyen ingresos disponibles conforme a la Constitución. Por consiguiente, en caso de ser necesario, pueden aplicarse en primer término al pago del servicio de la deuda pública del Estado Libre Asociado. Sin embargo, conforme a la Ley Habilitadora, la Ley del Impuesto sobre Ocupación Hotelera y la Constitución del Estado Libre Asociado, dichos ingresos deben utilizarse para tales pagos solo si y en la medida en que todas las demás ingresos disponibles del Estado Libre Asociado conforme a la Constitución sean insuficientes para ese fin. Las ganancias por inversiones y las sumas de dinero que se encuentran en el Fondo de Reserva para el Servicio de la Deuda no se consideran recursos disponibles del Estado Libre Asociado".

AMA - Acuerdo de Refinanciamiento del 30 de marzo de 2012, con la Enmienda del 4 de septiembre de 2013
que modificó la garantía del impuesto sobre los cigarrillos

- Acuerdo de Refinanciamiento, Sección 3.17 ("Ausencia de inmunidad"): "Disponiéndose, sin embargo, que la Prestamista tenga conocimiento de que la recaudación de la Renta del Impuesto al Diesel puede quedar relegada en prioridad por lo dispuesto en la Sección 8 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico".

- Acuerdo de Refinanciamiento, Sección 18.12 ("Cuentas operativas"): "La Prestataria entregará inmediatamente a la Prestamista copias de cualesquiera notificaciones recibidas de la Hacienda, el Banco Gubernamental de Fomento de Puerto Rico y cualquier otra Autoridad Gubernamental, que informen la decisión (o su inminente adopción) del Estado Libre Asociado de hacer valer la prioridad del Estado Libre Asociado sobre las Rentas del Impuesto al Diesel de la cual goza el Estado Libre Asociado conforme a la Sección 8 del Artículo VI de la Constitución del Estado Libre Asociado".

- Enmienda, Sección 7.2: "Disponiéndose, sin embargo, que la Prestamista tenga conocimiento de que la recaudación de la Renta del Impuesto al Cigarrillo puede quedar relegada en prioridad por lo dispuesto en la Sección 8 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico".

- Enmienda, Sección 10: "La Prestataria entregará inmediatamente a la Prestamista copias de cualesquiera notificaciones recibidas de la Hacienda, el Banco Gubernamental de Fomento de Puerto Rico y cualquier otra Autoridad Gubernamental, que informen la decisión (o su inminente adopción) del Estado Libre Asociado de hacer valer la prioridad del Estado Libre Asociado sobre las Rentas del Impuesto al Cigarrillo de la cual goza el Estado Libre Asociado conforme a la Sección 8 del Artículo VI de la Constitución del Estado Libre Asociado".

Estado Libre Asociado - Sección 8 del Artículo VI de la Constitución de Puerto Rico: disposición sobre "recuperación de ingresos"

- Sección 8 del Artículo VI de la Constitución. "Cuando los recursos disponibles para un año económico no basten para cubrir las asignaciones aprobadas para ese año, se procederá en primer término, al pago de intereses y amortización de la deuda pública, y luego se harán los demás desembolsos de acuerdo con la norma de prioridades que se establezca por ley".

*Análisis de los cobros de los acreedores en caso de desestimación de la causa radicada conforme al Título III para los acreedores del Sistema de Retiro de Empleados (SRE) de Puerto Rico*

El presente análisis evalúa los cobros que se encuentran a disposición de los acreedores del SRE sobre la base de los remedios disponibles en virtud de las leyes no relativas a quiebras, incluida la Constitución del Estado Libre Asociado de Puerto Rico. De conformidad con la sección 314(b)(6) de PROMESA, todo Plan de Ajuste sugerido debe ser "viable y en el mejor interés de los acreedores, lo que requerirá que el tribunal examine si los remedios disponibles bajo las leyes no relacionadas a la quiebra y a la constitución del territorio conducirían a una mayor recuperación para los acreedores que lo que ofrece dicho plan". En este contexto, este análisis brinda un rango estimado de los cobros que se encontrarían a disposición de los acreedores si se pusiera fin a la paralización de la ejecución de la deuda, no se consumara un acuerdo de Plan de Ajuste del SRE y se desestimara la causa radicada conforme al Título III del SRE.

Este documento está compuesto por dos secciones. La primera sección ofrece un panorama general de la metodología empleada para desarrollar el análisis. Dicha metodología delinea el enfoque para calcular los recursos disponibles para el servicio de la deuda, brinda un resumen de las obligaciones pendientes de los acreedores y establece la prioridad con la que se desembolsan los fondos y el orden en el que se presume el pago de los reclamos de los acreedores. La segunda sección presenta los rangos que definen los resultados potenciales estimados probables de los cobros disponibles para los acreedores del SRE.

El presente análisis fue preparado por McKinsey & Company, Inc. Washington D.C. ("McKinsey & Company"). Proskauer Rose LLP[1], empresa que brinda asesoramiento jurídico a la Junta de Supervisión y Administración Financiera para Puerto Rico ("JSAF"), le proporcionó a McKinsey & Company un conjunto de presunciones legales que fueron empleadas en la elaboración de este análisis. Esas presunciones se incluyen en el Apéndice 1 del presente documento e incluyen valores estimados para categorías de activos del SRE. Dichos valores estimados fueron brindados al asesor legal por partes externas. Los asesores financieros de la JSAF le brindaron a McKinsey & Company información financiera que fue utilizada en la preparación de este análisis. Esa información financiera incluyó tablas que contienen cálculos de la deuda en bonos pendiente de pago y otros datos financieros. McKinsey & Company también empleó datos publicados por el Gobierno de Puerto Rico y/o sus asesores, o bien brindados directamente por ellos. McKinsey & Company aceptó la veracidad, precisión y exactitud de toda la información y las presunciones jurídicas y financieras proporcionadas por los demás asesores de la JSAF, así como las ofrecidas por el Gobierno de Puerto Rico y sus asesores. McKinsey & Company no ha realizado una verificación independiente de la información y las presunciones recibidas de otros asesores, como tampoco asume una posición independiente respecto de tal información y dichas presunciones.

Las presunciones, proyecciones y estimaciones utilizadas en el presente análisis se encuentran inherentemente sujetas a incertidumbres comerciales, económicas y políticas y, por ende, pueden sufrir modificaciones. McKinsey & Company no realiza declaraciones ni brinda garantías en el sentido de que los cobros efectivamente disponibles o potencialmente obtenidos por los acreedores sobre la base de los remedios que se encuentran a su disposición en virtud de cualquier ley, incluida la Constitución de Puerto Rico, se aproximen (o no) a las estimaciones y presunciones incluidas en el análisis, destacándose que los resultados reales pueden diferir

---

[1] En el presente análisis, Proskauer Rose LLP se denomina "asesor legal".

significativamente de los que se expresan en el presente. No obstante, McKinsey & Company afirma que el rango de cobros identificado en este análisis constituye la mejor estimación sobre la base de las condiciones, los conocimientos y la información que le fueran brindados, según se consignaron precedentemente, al 24 de septiembre de 2019.

### I. Metodología

El análisis supone que se desestimarán las causas radicadas conforme al Título III de PROMESA, pero los Títulos I y II de dicha Ley continuarán aplicándose. Por lo tanto, el análisis supone que se levantará la paralización automática de ejecución de la deuda y que la JSAF seguirá funcionando y certificando los Planes Fiscales del ELA, así como imponiendo la implementación de los presupuestos, con sujeción a cualquier ejecución de deuda que exceda el presupuesto ordenada por los tribunales de Puerto Rico. Asimismo, el análisis presume que los acreedores radicarían acciones legales contra el ELA y el SRE a fin de recuperar los montos que se les adeudan.

La presunción de que los Títulos I y II de PROMESA continuarán aplicándose incrementa los cobros de los acreedores debido a las medidas y los ahorros que la JSAF inserta en sus Planes Fiscales Certificados. El asesor legal de la JSAF considera que sería plausible suponer la inaplicabilidad de los Títulos I y II de PROMESA ya que el Congreso los sancionó en conjunto con el Título III y no queda claro que la intención haya sido que permanezcan vigentes sin el Título III. No obstante, en general, el asesor legal recomendó que el presente análisis se elabore suponiendo que los Títulos I y II de PROMESA continuarían siendo de aplicación.

El análisis emplea tres componentes para calcular el rango de cobros potenciales disponibles para los acreedores: 1) el Paquete de Recursos disponible para satisfacer las obligaciones de los acreedores del SRE, 2) la deuda pendiente de pago, y 3) las prioridades de distribución de fondos para el servicio de la deuda.

La fecha de entrada en vigor del análisis es el 30 de junio de 2019. El porcentaje de cobro se calcula como el valor actual del monto total que se espera que se abone a los acreedores del SRE durante el período total del análisis como proporción del total del capital y los intereses pendientes de pago a la fecha de entrada en vigor del análisis. Sobre la base de las conversaciones mantenidas con los asesores financieros de la JSAF, el presente análisis presume una tasa de descuento anual del 5% como parámetro razonable para el cálculo del valor actual de los pagos futuros de capital e intereses o las obligaciones futuras.

**1) Paquete de Recursos:** la cantidad total de recursos disponibles para pagar los reclamos de los acreedores del SRE en cada ejercicio constituye el Paquete de Recursos del SRE. Esto es equivalente a los activos remanentes del Sistema de Retiro de Empleados ("activos del SRE"). Siguiendo los consejos del asesor legal de la JSAF, se considera que los bonos SRE no ofrecen recursos por fuera del Título III, lo cual limita sus fuentes de cobro a su garantía. Por ello, sólo podrían utilizarse los activos del SRE que operan como garantía de los bonos SRE para pagarles a los tenedores de bonos SRE. Se presume que los activos del SRE que no son garantía de los bonos SRE ("activos sin gravamen") se encuentran disponibles para las reclamaciones no aseguradas.

Existe un litigio en curso en relación con activos adicionales que podrían encontrarse disponibles para el pago a los acreedores del SRE. El presente análisis sólo considera los activos actualmente en posesión del SRE como parte del Paquete de Recursos disponible para los acreedores del SRE,

ya que el resultado de potenciales litigios futuros es incierto. El litigio en curso y los posibles resultados de dichas incertidumbres se abordan al final del presente análisis.

Siguiendo los consejos del asesor legal, incluidos los cálculos valuatorios de los activos del SRE brindados por partes externas del asesor legal e incluidos en el Apéndice 1, este análisis presume activos del SRE con un valor nominal equivalente a $1,869 millones. Estos activos incluyen el efectivo transferido previamente por el SRE al ELA de conformidad con la Resolución Conjunta 188-2017. Esta suma de efectivo sigue en posesión del ELA y no fue utilizada para financiar pagos a pensionados.

Siguiendo las estimaciones incluidas en el Apéndice 1, el rango estimado del valor de los activos que son garantía de los bonos SRE es de $442 millones-$827 millones.[2] McKinsey & Company aceptó la exactitud de estas estimaciones brindadas por el asesor legal en relación con los activos que sirven de garantía de los bonos SRE, pero no realizó ningún análisis jurídico ni actuarial independiente.

**2) Deuda pendiente de pago:** sobre la base de la información brindada por los asesores financieros de la JSAF, la deuda total en posesión de los tenedores de bonos SRE asciende a $2,947 millones de capital pendiente de pago y $277 millones de intereses impagados a la fecha de entrada en vigor de este análisis. Tal como se indica en el Apéndice 1, la deuda pendiente de pago también supone un monto adicional de $56 millones en Otras reclamaciones no aseguradas.

Este análisis no considera las obligaciones pagaderas a los pensionados, ya que estas fueron asumidas por el ELA en virtud de la Ley 106-2017 tal como se menciona en el Apéndice 1. En la medida en la que no se pague con activos sin gravamen del SRE, las obligaciones pagaderas a los pensionados se cancelarán según lo establecido en la versión de este análisis relativa al ELA, la cual también se incluye en la Declaración de Divulgación.

**3) Prioridades de distribución de fondos:** siguiendo los consejos de los asesores legales, los fondos que operan como garantía de los bonos SRE se encuentran disponibles para el pago a los tenedores de bonos SRE según el cronograma de pagos que se establece en los documentos de los bonos SRE. Se presume que los fondos disponibles se imputan primero a los intereses acumulativos adeudados y, luego, al capital de la deuda con vencimiento en ese año o antes, si lo hubiera. El capital impagado devenga intereses según las tasas originales estipuladas en cada uno de los documentos de la deuda pertinentes y luego se suma a la deuda del año siguiente. Los saldos de intereses no devengan intereses.

Si existen activos remanentes que operan como garantía de los bonos SRE en el Paquete de Recursos después de cancelar la deuda en bonos pendiente de pago en cualquier año, los fondos se reservan para el siguiente año ya que no se permiten los pagos anticipados. Siguiendo los consejos del asesor legal, se presume que los fondos que no constituyen garantía de los bonos SRE se utilizan para el pago de Otras reclamaciones no aseguradas.

El siguiente gráfico resume las prioridades de distribución de fondos, siguiendo los consejos de los asesores legales del Apéndice 1.

*Gráfico 1: Flujo de fondos del análisis*

---

[2] Tal como se indica en el Apéndice 1, los valores de los activos no se encuentran auditados y es posible que no reflejen los valores recuperables de contrapartes de contratos o cuentas.



**Priority of distribution of funds considered in analysis[1]**

*Resource Envelope*

1 See Appendix 1 for more details
2 ERS bonds are considered non-recourse outside of Title III, which limits their sources of recovery to their collateral
3 ERS bondholders cannot collect more than payment in full of contractual debt service in any given year from the combination of ERS and the Commonwealth

| Inglés | Español |
|---|---|
| Priority of distribution of funds considered in the analysis[1] | Prioridad de distribución de los fondos considerados en el análisis[1] |
| Resource envelope | Paquete de Recursos |
| ERS assets that are collateral of ERS bonds[2] | Activos del SRE que son garantía de bonos SRE[2] |
| Any other secured claim against the Commonwealth or against future PayGo contributions | Cualquier otra reclamación asegurada contra el ELA o contra contribuciones futuras al sistema PayGo |
| Payment to ERS bonds | Pago de bonos SRE |
| Is ERS bond debt -owed in any given year fully paid? | ¿Se pagó íntegramente la deuda en bonos SRE adeudada en algún año determinado? |
| Yes | Sí |
| No | No |
| These secured claims are subject to uncertain litigation outcomes and therefore only analyzed under special scenarios mentioned at the end of this analysis | Estas reclamaciones aseguradas se encuentran sujetos a resultados de litigios inciertos y, por ello, se analizan únicamente bajo los escenarios especiales mencionados al final de este análisis |
| Any remaining amount is saved for next year as acceleration of payments is   not allowed | Todo monto restante se reserva para el siguiente año ya que no se permiten los pagos anticipados |
| ERS bondholders might ' assert an unsecured claim against the Commonwealth for any amount of unpaid ERS bond debt owed in any given year= | Los tenedores de bonos SRE podrían radicar Otras reclamaciones no aseguradas contra el ELA por cualquier monto de deuda en bonos SRE impagada adeudada en cualquier año determinado[3] |
| Payments from the Commonwealth are not considered in the recoveries estimated in this analysis | Los pagos del ELA no se consideran en los cobros estimados en este análisis |
| 1      See Appendix 1 for more details | 1      Ver en el apéndice 1 detalles adicionales. |
| 2      ERS bonds are considered non-recourse outside of Title III, which limits their sources of recovery to their collateral | 2      Se considera que los bonos SRE no ofrecen recursos por fuera del Título III, lo cual limita sus fuentes de cobro a su garantía. |
| 3      ERS bondholders cannot collect more than payment in full of contractual debt service In any given year from the combination of ERS and the Commonwealth | 3      Los tenedores de bonos SRE no pueden cobrar más que el pago íntegro del servicio de la deuda contractual correspondiente a cada año de la combinación entre el SRE y el ELA. |

Los cobros consignados en la próxima sección no incluyen los pagos adicionales que pueden recibir los tenedores de bonos SRE de parte del ELA si logran que sus reclamos en contra de este tengan éxito. Tal como se mencionó en el Apéndice 1, los tenedores de bonos SRE pueden radicar un reclamo no garantizado contra el ELA por cualquier monto exigible pero impagado

correspondiente a cualquier año, tal como se presume también en la versión de este análisis relativa al ELA. Esos reclamos, si los hubiera y en la medida en que fueran válidos, se pagarían como parte del conjunto de Otras reclamaciones no aseguradas del ELA y seguirían las prioridades y cobros que se describen en la versión de este análisis relativa al ELA, la cual también se incluye en la Declaración de Divulgación.

### II. Rango estimado probable de cobros disponibles para los acreedores

Al evaluar el rango estimado probable de cobros disponibles para los tenedores de bonos SRE, este análisis fija un rango basado en el espectro de fondos estimados que operan como garantía de los bonos SRE. Sobre la base de estos criterios, el rango de cobros disponible para tenedores de bonos SRE oscila entre $442 millones y $827 millones en valor nominal, lo cual equivale a un rango de cobros de entre $434 millones y $776 millones descontados a una tasa anual del 5%. Estos pagos implican un porcentaje de cobro de entre un 13% y un 24%.[3]

Los cobros disponibles para las reclamaciones no aseguradas superan los $56 millones, lo cual significa un porcentaje de cobro del 100%, pero los demandantes no garantizados no pueden recuperar montos superiores a los que les son adeudados. El monto de los activos sin gravamen que quede después de pagar las reclamaciones no aseguradas no puede emplearse para cancelar bonos SRE. En total, el rango de cobros disponibles tanto para los bonos SRE como para las reclamaciones no aseguradas oscila entre $490 y $832 millones,[4] lo cual implica un porcentaje de cobro de entre un 15% y un 25%.

*Gráfico 2: Rango estimado probable de cobros disponibles para los acreedores del SRE*

| Rango estimado probable de cobros disponibles para los acreedores del SRE VA del pago total en millones de USD, % de cobro | | |
|---|---|---|
| | Extremo inferior del rango | Extremo superior del rango |
| Bonos SRE | $434 *13%* | $776 *24%* |
| Reclamos no garantizados | $56 *100%* | $56 *100%* |
| Total | $490 *15%* | $832 *25%* |

### Resultados alternativos basados en litigios en curso o riesgos de litigios

El rango de cobros está sujeto al resultado del litigio en curso respecto de la cantidad total de reclamos válidos y el conjunto de recursos disponibles para el servicio de la deuda. Dado que el resultado es incierto, esas simulaciones no se consideran en los cobros que se describen más arriba.

En primer lugar, existen litigios en curso en los que se impugna la validez de los bonos SRE de conformidad con las leyes de Puerto Rico. Si se declaran inválidos los bonos SRE, los tenedores de esos bonos no recibirían pagos de los activos que actualmente operan como garantía de los bonos SRE. Asimismo, es posible que los tenedores de bonos SRE deban devolver los pagos ya

---

[3] El porcentaje de cobro se calcula como el valor actual de la deuda total cancelada como proporción del capital total pendiente de pago y los intereses impagados al 30 de junio de 2019.
[4] El monto se refiere al valor actual de los futuros pagos de deuda empleando una tasa de descuento anual del 5%.

recibidos antes de la fecha de petición del SRE. Esos pagos ascienden a aproximadamente $400 millones.

En segundo lugar, existen litigios respecto de si los pagos actuales de los empleadores al sistema PayGo en virtud de la Ley 106-2017 deberían considerarse el mismo activo que las contribuciones patronales al SRE previas a la Ley 106 sujetas a los derechos de garantía de los tenedores de bonos SRE. Como se mencionó en el Apéndice 1, en este caso, los bonos SRE se abonarían antes que los bonos GO o cualquier otra deuda garantizada por el ELA ya que los tenedores de bonos SRE tendrían un gravamen sobre los pagos PayGo. Por ello, los tenedores de bonos SRE recibirían el cobro total de sus reclamos debido a que los pagos PayGo son superiores a la deuda en bonos SRE pagadera en cualquier año. No obstante, los pagos a los tenedores de bonos SRE de parte del ELA pueden disminuir la capacidad del ELA de cubrir sus gastos jubilatorios. El ELA precisaría reducir sus gastos operacionales en otras áreas para poder pagarles a los tenedores de bonos SRE y mantenerse dentro de los límites fijados por el presupuesto anual.

El resultado de este litigio es incierto; por lo tanto, a continuación se presentan diferentes simulaciones. La tabla muestra los cobros disponibles para los tenedores de bonos del SRE suponiendo que se considera que diferentes montos (p. ej. 0%, 25%, 50% y 75%) de reclamos SRE se encuentran garantizados por los pagos PayGo. Además de los pagos provenientes de los pagos PayGo, los tenedores de bonos SRE también recibirían pagos de los activos del SRE que operan como garantía de los bonos SRE.

*Gráfico 3: Rango estimado probable de cobros disponibles para los acreedores del SRE si parte de la deuda en bonos SRE está garantizada por pagos PayGo*

| Rango estimado probable de cobros disponibles para los acreedores del SRE si parte de la deuda anual en bonos SRE se clasifica como garantizada por pagos PayGo VA del pago total en millones de USD, % de cobro | | Extremo inferior del rango | Extremo superior del rango |
|---|---|---|---|
| Bonos SRE | 0% de la deuda garantizada anual | $434 *13%* | $776 *24%* |
| | 25% de la deuda garantizada anual | $1,437 *45%* | $1,776 *55%* |
| | 50% de la deuda garantizada anual | $2,436 *76%* | $2,733 *85%* |
| | 75% de la deuda garantizada anual | $3,409 *100%* | $3,643 *100%* |
| Reclamos no garantizados[1] | | $56 *100%* | $56 *100%* |
| [1]Los cobros de Otras reclamaciones no aseguradas equivalen al 100% en los cuatro escenarios contenidos en este gráfico ya que esos reclamos se abonan íntegramente con activos sin gravamen. | | | |

*APÉNDICE 1*

**Plan del SRE en virtud del Título III**

**Análisis de prueba del interés superior – Presunciones**

| | Pregunta | Presunción |
|---|---|---|
| **1.** | **¿Reclamos de los tenedores de bonos SRE contra los activos del SRE?** | **PRESUNCIÓN 1:** los tenedores de bonos SRE cuentan con un derecho de garantía sobre algunos de los activos restantes del SRE (ver cuadro más abajo) y se les paga únicamente con esos activos. Los reclamos por créditos del SRE contra el ELA son tratados como reclamos generales no garantizados. |
| | | **FUNDAMENTOS:** a pesar de que el Tribunal de Apelaciones para el Primer Circuito determinó que los tenedores de bonos SRE tienen un derecho de garantía sobre ciertos activos del SRE perfeccionado mediante la radicación de una declaración de financiamiento, la decisión no determina sobre qué activos se constituye el derecho de garantía. Los bonos SRE no ofrecen recursos y no otorgan derecho a un reclamo no garantizado contra el SRE por insuficiencia de la garantía que confiera derechos sobre activos sobre los que no tienen un derecho de garantía. |
| | | **SIMULACIÓN:** |
| | | Activos que permanecen en el SRE. |

| Categoría de activos | Valor aproximadamente al 31 de mayo de 2019[1] | Probabilidad de garantía de tenedores de bonos |
|---|---|---|
| Cuenta segregada después de la petición | $93,9 millones | 25-75%<br>Se tratará de una indagación concentrada en los hechos, ya que los tenedores de bonos precisarán satisfacer su |

---

[1] Ciertos valores incluidos en el presente no fueron auditados y fueron provistos por los asesores financieros del Gobierno, siendo posible que no reflejen los valores recuperables de contrapartes de contratos o cuentas, que, en su mayoría, son el ELA, la ACT, los municipios de Puerto Rico y los residentes de Puerto Rico. Por ende, pueden conducir a cobros significativamente inferiores respecto de algunas de estas categorías de activos.

| | Pregunta | Presunción | | |
|---|---|---|---|---|
| | | | | carga relativa al rastreo del efectivo del SRE como producido de su garantía, lo cual probablemente será muy difícil considerando las numerosas fuentes de ingresos. |
| | | Cuentas por cobrar de Contribuciones Patronales (del ELA y ciertos organismos) | $160.5 millones (al 15 de febrero de 2019)[2] | 100% Las contribuciones patronales devengadas antes de la fecha de petición del SRE como consecuencia de trabajo de empleados y no abonadas hasta la fecha dan lugar al derecho a recibir ingresos en virtud de los documentos de los bonos y, por ello, se encuentran sujetas al derecho de garantía respecto de los activos del SRE previos a la petición. |
| | | Cuentas por cobrar de aportaciones adicionales uniformes (AAU) | $600 millones (al 15 de febrero de 2019) | 15-25% Las AAU fueron realizadas de acuerdo con secciones de la Ley de Creación distintas de aquellas en las cuales los tenedores de bonos SRE disponían de un derecho de garantía. Asimismo, no son el producido de los derechos sobre la garantía de ningún otro tenedor de bonos. |
| | | Préstamos a empleados | $354.8 millones | 10-20% |

---

[2] Los tenedores de bonos SRE han afirmado tener un derecho de garantía sobre los pagos PayGo ordenados en virtud de la Ley 106-2017. Incluso si esto es correcto, los pagos PayGo serían bienes adquiridos luego de la fecha de petición del SRE y, por lo tanto, se encontrarían libres de derechos de garantía previos a la petición en virtud de la sección 552 del Código de Quiebras, aplicable de acuerdo con la sección 301(a) de PROMESA y la sentencia sumaria del tribunal que decide sobre esta cuestión (la cuál es actualmente objeto de apelación ante el Tribunal de Apelaciones para el Primer Circuito). No obstante, fuera del Título III, la sección 552 no se aplica. Por ende, los Pagos PayGo al ELA podrían encontrarse sujetos a sus derechos de garantía si se tratan como contribuciones patronales al SRE previas a la Ley 106. No obstante, esto resultaría en una reclamación asegurada contra el ELA, tal como se refirió previamente.

| | Pregunta | Presunción | | |
|---|---|---|---|---|
| | | | | Los pagos realizados respecto de Préstamos a Empleados no se efectúan de acuerdo con las secciones de la Ley de Creación en las cuales los tenedores de bonos SRE tienen un derecho de garantía. Asimismo, la Resolución no les brinda a los tenedores de bonos un derecho de garantía sobre los Préstamos a Empleados. En la medida en que los Préstamos a Empleados se hayan realizado con Contribuciones Patronales, algunas pueden ser rastreables, en cuyo caso su producido podría ser el producido de la garantía de los tenedores de bonos.<br><br>El rango estimado en este caso se basa en la dificultad de rastrear la fuente de estos préstamos hasta las contribuciones patronales, dadas las muchas otras fuentes de ingresos del SRE. |
| | | Inversiones | $206.4 millones | 10-20%<br><br>Las inversiones no están sujetas a ninguna de las secciones de la Ley de Creación en las cuales los tenedores de bonos SRE tienen un derecho de garantía. Asimismo, la Resolución no les brinda a los tenedores de bonos un derecho de garantía sobre las Inversiones. En la medida en que las Inversiones se hayan realizado con Contribuciones Patronales, algunas pueden ser rastreables, en cuyo caso su producido podría ser el producido de la garantía de los tenedores de bonos. El rango estimado en este caso se basa en la dificultad de rastrear la fuente de estas inversiones hasta las contribuciones patronales, dadas las muchas otras fuentes de ingresos del SRE. |

|  | Pregunta | Presunción | | |
|---|---|---|---|---|
|  |  | Efectivo (excluida la cuenta segregada posterior a la petición) | $443.2 millones (incluye la cuenta que tiene los fondos transferido al ELA alrededor del 26/7/17 de acuerdo con la Resolución Conjunta 188) | 25-75% Se tratará de una indagación concentrada en los hechos, ya que los tenedores de bonos precisarán satisfacer su carga relativa al rastreo del efectivo del SRE como producido de su garantía, lo cual probablemente será muy difícil considerando las numerosas fuentes de ingresos. |
|  |  | Otros (p. ej., bienes inmuebles) | $9.8 millones | 10% Los bonos SRE no ofrecen recursos y no otorgan derecho a cobrar de los activos sin gravamen del SRE, los cuales en general se clasifican como edificios, vehículos y equipos de oficina, así como bienes readquiridos. |
| 2. | ¿Reclamos de los tenedores de bonos SRE contra el ELA? | **PRESUNCIÓN 1 [PRESUNCIÓN PRINCIPAL]:** los tenedores de bonos SRE radican exitosamente reclamos constitucionales (Cláusulas Contractuales y/o sobre Expropiaciones) contra el ELA. Cada año en el que no se paga el servicio de su deuda, los tenedores de bonos SRE pueden demandar ese monto al ELA como un reclamo no garantizado pagado después de la deuda GO y la deuda con igual prelación. **FUNDAMENTOS:** los tenedores de bonos SRE argumentan que la Ley 106-2017, que eliminó las contribuciones patronales en virtud de la ley de creación del SRE, constituyó un perjuicio para sus derechos contractuales y una expropiación de su garantía, en violación de las Constituciones de Puerto Rico y EE.UU. Asimismo, la sección 552, que eliminó el derecho de garantía sobre las contribuciones patronales posteriores a la fecha de petición del SRE independientemente de los efectos de la Ley 106, probablemente dejaría de aplicarse luego de la desestimación de la causa del SRE radicada conforme al Título III, lo cual dejaría a la Ley 106 como el único fundamento para la eliminación de su garantía y, por ende, una violación de las Cláusulas Contractuales y/o sobre Expropiaciones. | | |

| | Pregunta | Presunción |
|---|---|---|
| | | **PRESUNCIÓN 2 [RIESGO DE LITIGIO]:** los tenedores de bonos SRE tienen un derecho de garantía sobre las contribuciones patronales futuras y se considera que los Pagos PayGo son lo mismo que las Contribuciones Patronales o son el producido de dichas Contribuciones y, por ello, los tenedores de bonos SRE cuentan con reclamos contra el ELA garantizados por un derecho de garantía sobre los Pagos PayGo. El servicio de la deuda, incluidos el capital y los intereses, se abona antes que la deuda GO o la deuda garantizada por el ELA.<br><br>Esta presunción debe emplearse como si las reclamaciones aseguradas respecto de las contribuciones patronales tuvieran probabilidades de éxito equivalentes a un 0%, 25%, 50%, 75% y 100%. En caso de que el ELA afronte déficits antes del pago íntegro de los bonos SRE, se presume que el ELA puede justificar el uso del poder de policía para el pago de todos sus gastos, incluidas las pensiones, en su totalidad, y que no queda dinero para pagar los bonos SRE u otra deuda.<br><br>**FUNDAMENTOS:** los tenedores de bonos SRE sostuvieron que los Pagos PayGo son el mismo activo que las contribuciones patronales, o su producido, y, por ende, se encuentran sujetos al derecho de garantía de los tenedores de bonos SRE, lo cual los convierte en acreedores garantizados del ELA. También sería probable que argumenten que este derecho de garantía, aun si es eliminado por la sección 552 a la fecha de petición del SRE, se reinstauraría una vez desestimada la causa del SRE radicada conforme al Título III.<br><br>**PRESUNCIÓN 3 [RIESGO DE LITIGIO]:** los tenedores de bonos SRE no tienen reclamos contra el ELA.<br><br>**FUNDAMENTOS:** incluso si los tenedores de bonos SRE tuvieran un derecho de garantía sobre derechos de contribuciones futuras, los tenedores de bonos fueron notificados mediante el documento de oferta de bonos de que esos derechos podrían ser modificados o afectados de forma adversa por el ELA, lo cual sucedió mediante la Ley 106-2017 que eliminó las contribuciones patronales al SRE. El hecho de que los tenedores de bonos SRE hayan sido notificados sobre esa potencial modificación también podría reducir significativamente sus chances de radicar exitosamente un reclamo por afectación contractual o expropiación. Por otra parte, la prueba del interés superior debe presumir que los derechos y remedios de los tenedores de bonos se refieren a sus reclamos tal como existían inmediatamente antes de la hipotética desestimación de la causa del SRE, sin ajustes en virtud del plan del SRE; es decir, garantizados únicamente por las contribuciones patronales previas a la fecha de petición del SRE, pero no posteriores, |

|  | Pregunta | Presunción |
|---|---|---|
|  |  | como consecuencia de la sección 552. Por ello, los tenedores de bonos SRE no contaban con derechos contractuales ni garantías que se hubieran visto perjudicados o eliminados por aplicación de la Ley 106. Cabe destacar que es muy probable que para el momento de la vista de confirmación se sepa si las reclamaciones aseguradas de los tenedores de bonos SRE son eliminados en su mayoría por la sección 552 del Código de Quiebras, ya que la cuestión actualmente se está preparando para el Tribunal de Apelaciones para el Primer Circuito. |
| 3. | **¿Reclamos de los pensionados contra el SRE y/o el ELA?** | **PRESUNCIÓN 1:** los pensionados tienen un reclamo contra el SRE y el ELA, conjuntamente, respecto de sus pensiones, las cuales serán abonadas por el ELA en virtud de la Ley 106-2017. <br><br> **FUNDAMENTOS:** el SRE es responsable de los pagos a pensionados y los pensionados tienen un reclamo contra el SRE respecto de sus pensiones, sujeto a la restricción de que los pensionados no pueden cobrar más que el monto total de la combinación entre el SRE y el ELA. Sin embargo, la Ley 106 exige al SRE que transfiera sus activos al ELA para financiar el sistema de pensiones "*pay-as-you-go*". Por ello, o bien los pensionados cobran de los activos sin gravamen del SRE (ya que los bonos no ofrecen recurso y no otorgan derecho a un reclamo por insuficiencia de garantía pagador de esos activos), o bien estos activos sin garantía se transfieren al ELA para el pago a pensionados mediante el sistema PayGo. En cualquier caso, los activos del SRE que operan como garantía para el pago de bonos SRE se utilizan para el pago de bonos SRE. |
| 4. | **¿Los tenedores de bonos del SRE tienen derecho a adelantar la fecha de pago de sus bonos?** | **PRESUNCIÓN:** no, los bonos SRE no permiten el adelanto de la fecha de pago. |
| 5. | **¿Deberían devengar intereses adicionales los intereses de la deuda que permaneció impagada durante la paralización?** | **PRESUNCIÓN:** no. No deben devengarse intereses sobre intereses. <br><br> **FUNDAMENTOS:** el devengo de intereses sobre intereses se encuentra sujeto a principios de equidad ante la falta de un derecho contractual expreso, pero no se encuentra permitido en virtud de las leyes del ELA y, por ello, no debería encontrarse disponible. |
| 6. | **¿Otros reclamos judiciales?** | **PRESUNCIÓN 1 [PRESUNCIÓN PRINCIPAL]:** el reclamo de exceso de facultades según el cual los bonos SRE fueron emitidos sin autorización carece de mérito. |

| | Pregunta | Presunción |
|---|---|---|
| | | **PRESUNCIÓN 2 [RIESGO DE LITIGIO]:** el reclamo de exceso de facultades elimina los reclamos restantes respecto de los bonos, pero los tenedores de bonos retienen los pagos realizados hasta el momento.<br><br>**PRESUNCIÓN 3 [RIESGO DE LITIGIO]:** el reclamo de exceso de facultades elimina los reclamos restantes respecto de los bonos y los tenedores de bonos deben devolver aproximadamente $400 millones en pagos recibidos por ellos según lo referido en la demanda radicada por el comité especial de reclamos de la JSAF. |

**LISTADO DE DEUDAS**[3]

1. **Costo operacional**

   a. No existen costos operacionales. Las funciones del SRE han sido traspasadas al ELA de acuerdo con la Ley 106-2017. En consecuencia, ya no incurre en costos operacionales.

2. **Deuda del SRE**

| | Fecha de emisión | Monto emitido | Rango de tasas de interés | Fecha de vencimiento final | Saldo a la Fecha de Petición del SRE |
|---|---|---|---|---|---|
| Bonos Prioritarios de Financiamiento de Pensiones, Serie 2008A | 31/01/08 | $1,588,810,799 | 5.85 - 6.45 | 01/07/58 | $1,623,270,999 |
| Bonos Prioritarios de Financiamiento de Pensiones, Serie 2008B | 02/06/08 | $1,058,634,613 | 6.25 - 6.55 | 01/07/58 | $1,243,631,177 |
| Bonos Prioritarios de Financiamiento de Pensiones, Serie 2008C | 30/06/08 | $300,202,930 | 6.15 - 6.50 | 01/07/43 | $301,890,520 |

3. **Otras reclamaciones no aseguradas**

   a. $55,600,000. "Otras obligaciones" según se establece en el CAFR del SRE de 2014.

---

[3] La información financiera que se incluye en el presente se basa en información disponible en la mayoría de los estados contables recientes de dominio público y, en ciertos casos, en la información recibida de los asesores de la Junta de Supervisión y los asesores del ELA. Los asesores legales no tienen una postura tomada respecto de la precisión de la información financiera que aquí se brinda.

En ciertas partes del listado de deudas, sólo se incorpora información relativa a la presunción principal.

*Análisis de los cobros de los acreedores en caso de desestimación de la causa radicada conforme al Título III para los acreedores de la Autoridad de Edificios Públicos (AEP) de Puerto Rico*

El presente análisis evalúa los cobros que se encuentran a disposición de los acreedores de la AEP sobre la base de los remedios disponibles en virtud de las leyes no relativas a quiebras, incluida la Constitución del Estado Libre Asociado de Puerto Rico. De conformidad con la sección 314(b)(6) de PROMESA, todo Plan de Ajuste sugerido debe ser "viable y en el mejor interés de los acreedores, lo que requerirá que el tribunal examine si los remedios disponibles bajo las leyes no relacionadas a la quiebra y a la constitución del territorio conducirían a una mayor recuperación para los acreedores que lo que ofrece dicho plan". En este contexto, este análisis brinda un rango estimado de los cobros que se encontrarían a disposición de los acreedores si se pusiera fin a la paralización de la ejecución de la deuda, no se consumara un acuerdo de Plan de Ajuste y se desestimara la causa radicada conforme al Título III de la AEP.

Este documento está compuesto por dos secciones. La primera sección ofrece un panorama general de la metodología empleada para desarrollar el análisis. Dicha metodología delinea el enfoque para calcular los recursos disponibles para el servicio de la deuda, brinda un resumen de las obligaciones pendientes de los acreedores y establece la prioridad con la que se desembolsan los fondos y el orden en el que se presume el pago de los reclamos de los acreedores. La segunda sección presenta los rangos que definen los resultados potenciales estimados probables de los cobros disponibles para los acreedores de la AEP.

El presente análisis fue preparado por McKinsey & Company, Inc. Washington D.C. ("McKinsey & Company"). Proskauer Rose LLP y O'Neill & Borges LLC,[1] sociedades que brindan asesoramiento jurídico a la Junta de Supervisión y Administración Financiera para Puerto Rico ("JSAF"), le proporcionaron a McKinsey & Company un conjunto de presunciones legales que fueron empleadas en la elaboración de este análisis. Dichas presunciones se incluyen en el Apéndice 1 del presente documento. Los asesores financieros de la JSAF le brindaron a McKinsey & Company información financiera que fue utilizada en la preparación de este análisis. Esa información financiera incluyó tablas que contienen cálculos de la deuda en bonos pendiente de pago, la perspectiva respecto de los saldos de efectivo y otros datos financieros. McKinsey & Company también empleó datos publicados por el Gobierno de Puerto Rico y/o sus asesores, o bien brindados directamente por ellos. McKinsey & Company aceptó la veracidad, precisión y exactitud de toda la información y las presunciones jurídicas y financieras proporcionadas por los demás asesores de la JSAF, así como las ofrecidas por el Gobierno de Puerto Rico y sus asesores. McKinsey & Company no ha realizado una verificación independiente de la información y las presunciones recibidas de otros asesores, como tampoco asume una posición independiente respecto de tal información y dichas presunciones.

Las presunciones, proyecciones y estimaciones utilizadas en el presente análisis se encuentran inherentemente sujetas a incertidumbres comerciales, económicas y políticas y, por ende, pueden sufrir modificaciones. McKinsey & Company no realiza declaraciones ni brinda garantías en el sentido de que los cobros efectivamente disponibles o potencialmente obtenidos por los acreedores sobre la base de los remedios que se encuentran a su disposición en virtud de cualquier ley, incluida la Constitución de Puerto Rico, se aproximen (o no) a las estimaciones y presunciones incluidas en el análisis, destacándose que los resultados reales pueden diferir significativamente de los que se expresan en el presente. No obstante, McKinsey & Company afirma que el rango identificado en este análisis

---

[1] En el presente análisis, Proskauer Rose LLP y O'Neill & Borges LLC se denominan, en conjunto, "asesores legales".

constituye la mejor estimación sobre la base de las condiciones, los conocimientos y la información que le fueran brindados, según se consignaron precedentemente, al 24 de septiembre de 2019.

*I. Metodología*

El análisis supone que se desestimarán las causas radicadas conforme al Título III de PROMESA, pero los Títulos I y II de dicha Ley continuarán aplicándose. Por lo tanto, el análisis supone que se levantará la paralización automática de ejecución de la deuda y que la JSAF seguirá funcionando y certificando los Planes Fiscales del ELA, así como imponiendo la implementación de los presupuestos, con sujeción a cualquier ejecución de deuda que exceda el presupuesto ordenada por los tribunales de Puerto Rico. El análisis presume que los acreedores radicarían acciones legales contra la AEP a fin de recuperar los montos que se les adeudan.

La presunción de que los Títulos I y II de PROMESA continuarán aplicándose mantiene el impacto de los ahorros y medidas fiscales que la JSAF inserta en sus Planes Fiscales Certificados. Los asesores legales de la JSAF consideran que sería plausible suponer la inaplicabilidad de los Títulos I y II de PROMESA ya que el Congreso los sancionó en conjunto con el Título III y no queda claro que la intención haya sido que permanezcan vigentes sin el Título III. No obstante, en general, los asesores legales recomendaron que el presente análisis se elabore suponiendo que los Títulos I y II de PROMESA continuarían siendo de aplicación.

El análisis se basa en las proyecciones de ingresos y gastos contenidas en el Plan Fiscal Certificado de Puerto Rico correspondiente a 2019 (el "Plan Fiscal"). El análisis emplea tres componentes para calcular los cobros potenciales disponibles para los acreedores de la AEP: 1) el Paquete de Recursos disponible para satisfacer las obligaciones de los acreedores de la AEP, 2) la deuda pendiente de pago, y 3) las prioridades de distribución de fondos para el servicio de la deuda.

La fecha de entrada en vigor del análisis es el 30 de junio de 2019. El porcentaje de cobro se calcula como el valor actual del monto total que se espera que se abone a los acreedores durante el período total del análisis como proporción del total del capital y los intereses pendientes de pago a la fecha de entrada en vigor. Sobre la base de las conversaciones mantenidas con los asesores financieros de la JSAF, el presente análisis presume una tasa de descuento anual del 5% como parámetro razonable para el cálculo del valor actual de los pagos futuros de capital e intereses o las obligaciones futuras.

**1) Paquete de Recursos:** la cantidad total de recursos disponibles para pagar los reclamos de los acreedores de la AEP en cada ejercicio constituye el Paquete de Recursos de la AEP. El Paquete de Recursos correspondiente a cada año está compuesto por la suma del efectivo inicial disponible para el servicio de la deuda y la recaudación de alquileres de la AEP luego del pago de gastos operacionales.[2]

Tal como se indicó en la sección "Cuentas de efectivo de los deudores" de la Declaración de Divulgación, el análisis de saldos de efectivo obrantes en las cuentas bancarias de la AEP es continuo y se encuentra sujeto a revisiones adicionales. Siguiendo los consejos obtenidos en conversaciones con los asesores financieros de la JSAF, a los fines de este análisis, se presume un saldo de efectivo total estimado equivalente a $98,800,000 al 30 de junio de 2019. Del saldo total, se estima que $57,100,000 se originaron mediante la recaudación de alquileres y están asignados a gastos operacionales o el servicio de la deuda. La suma de $13,700,000 no se encuentra disponible para los tenedores de bonos

---

[2] Los tenedores de bonos AEP podrían recibir pagos adicionales del ELA ya que los bonos AEP están garantizados por el ELA. No obstante, este análisis se limita a lo que la AEP puede pagarles a sus acreedores. Todo pago adicional potencial de parte del ELA se calcula en la versión de este análisis relativa al ELA, la cual también se incluye en la Declaración de Divulgación. Los tenedores de bonos AEP no pueden cobrar más que el pago íntegro del servicio de la deuda contractual correspondiente a cada año de la combinación entre la AEP y el ELA.

AEP ni otros reclamos ya que dichos fondos son el producido del seguro para la reconstrucción de bienes dañados. El análisis de los $28 millones restantes sigue en curso. Por ende, este análisis considera un rango de entre $57,100,00 y $85,100,000 de fondos posibles disponibles para los tenedores de bonos AEP.

Siguiendo los consejos de los asesores legales, la recaudación de alquileres de la AEP se encuentra disponible para los tenedores de bonos AEP luego del pago de los gastos operacionales de esta. Tal como se indica en el Apéndice 1, este análisis presume que el ELA ejercerá sus poderes de policía para emplear esa recaudación de alquileres para el pago de sus gastos operacionales, lo cual mantendrá a la AEP en funcionamiento. Se presume que ningún otro activo, como el producido de seguros o de la FEMA, se encuentra disponible para los pagos a tenedores de bonos.

Tal como se indica en el Plan Fiscal, los gastos operacionales totales de la AEP están compuestos de costos de personal y de nómina de la AEP, pagos de mantenimiento y servicios públicos, y gastos de capital. Los gastos operacionales de la AEP también incluyen contribuciones jubilatorias anuales al sistema PayGo. Las proyecciones para los grupos de gastos tienen en cuenta el impacto estimado de las medidas fiscales previstas en el Plan Fiscal. Las medidas fiscales son una serie de acciones destinadas a reducir los gastos de la AEP y agilizar sus operaciones.

**2) Deuda pendiente de pago:** la deuda total que poseen los acreedores de la AEP y que se considera en este análisis está compuesta por la suma de la deuda en bonos AEP y las reclamaciones no aseguradas totales contra la AEP. Con respecto a los bonos AEP, la JSAF radicó acciones en las que impugna la validez de los bonos AEP emitidos a partir de 2012, ya que podrían haber sido obligaciones generales del ELA caracterizadas erróneamente y emitidas excediendo el límite constitucional de endeudamiento de Puerto Rico. Siguiendo los consejos de los asesores legales, este análisis presume que los bonos AEP emitidos a partir de 2012 se declararán inválidos.

Sobre la base de la información provista por los asesores financieros de la JSAF y excluyendo los bonos emitidos a partir de 2012, la deuda en bonos AEP está compuesta por la deuda pendiente de pago de los Bonos para Instalaciones de Gobierno y los Bonos de Refinanciamiento, con un saldo de capital pendiente de pago total equivalente a $3,426 millones, más $524 millones de intereses impagados a la fecha de entrada en vigor de este análisis. El saldo total de Otras reclamaciones no aseguradas contra la AEP se estima en $240 millones.

Tal como se indica en el Apéndice 1, existe un riesgo de litigio adicional en relación con la validez de ciertos bonos AEP. El comité oficial de acreedores no asegurados ("UCC") ha impugnado la validez de todos los bonos AEP emitidos a partir de marzo de 2011 basándose en el argumento de que violan el límite constitucional de endeudamiento. El potencial impacto de este litigio sobre los cobros se describe en la sección titulada "Resultados alternativos basados en litigios en curso o riesgos de litigio".

**3) Prioridades de distribución de fondos:** a los tenedores de bonos AEP se les paga con efectivo inicial correspondiente a la recaudación de alquileres, así como con la recaudación de alquileres de la AEP disponible después del pago de gastos operacionales. Los Otras reclamaciones no aseguradas se cancelan con el monto de efectivo inicial que no se constituye como garantía de los bonos AEP, el cual oscila entre $0 y $28 millones. Toda suma de efectivo que quede luego del pago de la deuda en bonos AEP exigible en un año determinado puede reservarse para el año siguiente o utilizarse para pagar Otras reclamaciones no aseguradas.

Siguiendo los consejos de los asesores legales, se presume que los fondos se imputan primero a los intereses acumulativos adeudados y, luego, al capital de la deuda con vencimiento en ese año o antes, si lo hubiera. El capital impagado devenga intereses según las tasas originales estipuladas en cada uno

de los documentos de los bonos pertinentes y luego se suma a la deuda del año siguiente. Los saldos de intereses no devengan intereses.

Siguiendo los consejos de los asesores legales consignados en el Apéndice 1, los fondos disponibles para los tenedores de bonos AEP se distribuyen según lo indicado en el siguiente Gráfico.

*Gráfico 1: Flujo de fondos del análisis*



| Inglés | Español |
|---|---|
| Priority of distribution of funds considered in analysis[1] | Prioridad de distribución de los fondos considerados en el análisis[1] |
| Resource Envelope | Paquete de Recursos |
| Annual PBA surplus from rent receipts[2] | Superávit anual de la AEP por recaudación de alquileres[2] |
| Starting cash from rent receipts (therefore, pledged to PBA bonds)[3] | Efectivo inicial por recaudación de alquileres (consecuentemente, pignorados al pago de bonos AEP)[3] |
| Payment to PBA bonds | Pago de bonos AEP |
| Is PBA bond debt owed in any given year fully paid? | ¿Se pagó íntegramente la deuda en bonos AEP adeudada en algún año determinado? |
| Any remaining amount is saved for next year or used to pay unsecured claims | Todo monto restante se reserva para el siguiente año o se emplea para el pago de Otras reclamaciones no aseguradas |
| PBA bondholders can seek payment from the Commonwealth as PBA bonds hold a Commonwealth guarantee[4] | Los tenedores de bonos AEP pueden demandar pagos al ELA ya que los bonos AEP tienen una garantía del ELA[4] |
| Payments from the Commonwealth are not considered in the recoveries estimated in this analysis | Los pagos del ELA no se consideran en los cobros estimados en este análisis |
| Yes | Sí |
| No | No |
| 1 See Appendix 1 for more details | 1 Ver en el Apéndice 1 detalles adicionales. |
| 2 The annual surplus generated by PBA is comprised of PBA rent receipts less its operating expenses, excluding FEMA and insurance related revenues. Funds different from rent payments (i. e., Insurance proceeds) are not considered available to PBA bondholders | 2 El superávit anual generado por la AEP está compuesto por la recaudación de alquileres de la AEP menos sus gastos operacionales, excluidos los ingresos relativos a seguros y la FEMA. Los fondos que no sean pagos de alquileres (es decir, producido de seguros) no se consideran disponibles para los tenedores de bonos AEP. |

| 3 It refers to cash on hand from rent receipts saved from previous years. As cash was originated through rent receipts, it is available to pay PBA bondholders | 3 Se refiere al efectivo disponible proveniente de la recaudación apartada correspondiente a alquileres de años anteriores. Como el efectivo se originó a partir de la recaudación de alquileres, se encuentra disponible para pagarles a los tenedores de bonos AEP. |
| 4 PBA bondholders cannot collect more than payment in full of contractual debt service in any given year from the combination of PBA and the Commonwealth | 4 Los tenedores de bonos AEP no pueden cobrar más que el pago total del servicio de la deuda contractual correspondiente a cada año de la combinación entre la AEP y el ELA. |

Este análisis no tiene en cuenta los pagos adicionales que podrían recibir los tenedores de bonos AEP de parte del ELA ya que se restringe a los que la propia AEP les paga a sus tenedores de bonos. Siguiendo los consejos de los asesores legales, los bonos AEP tienen una garantía del ELA y, por lo tanto, otorgarían derecho a reclamar pagos del Paquete de Recursos del ELA si sus obligaciones no son canceladas íntegramente por la AEP en un año determinado. Estos pagos seguirían las prioridades y los cobros descritos en la versión de este análisis relativa al ELA, la cual también se incluye en la Declaración de Divulgación.

### II. Rango estimado probable de cobros disponibles para los acreedores

El Plan Fiscal presume que la AEP no genera excedentes ya que sus gastos operacionales son superiores a sus ingresos anuales en el período del análisis, que comienza en el año fiscal 2019 y concluye en el año fiscal 2049. Por ello, el efectivo inicial de la recaudación de alquileres, el cual opera como garantía de los bonos AEP, es el único recurso disponible para los tenedores de bonos AEP.

El análisis estima que el cobro probable disponible para los tenedores de bonos AEP asciende a entre $57,100,000 y $85,100,000, lo cual implica un cobro de entre 1.4% y 2.2%.[3] Los Otras reclamaciones no aseguradas únicamente se abonarían con el efectivo inicial que no opera como garantía de los tenedores de bonos AEP, el cual oscila entre $0 y $28 millones y significa un cobro de entre 0% y 11.7%. Así, el rango estimado probable de cobros totales disponibles para todos los reclamos (a saber, bonos AEP y Otras reclamaciones no aseguradas) va de $57,100,000 a $85,100,000, lo cual implica un rango de cobros de entre 1.4% y 2.0%.

*Gráfico 2: Rango estimado probable de cobros disponibles para todos los acreedores de la AEP*

| **Rango estimado probable de cobros disponibles para los acreedores de la AEP[1]** VA del pago total en millones de USD, % de cobro | | |
|---|---|---|
| | Extremo inferior del rango | Extremo superior del rango |
| Bonos AEP | $57.1 *1.4%* | $85.1 *2.2%* |
| Reclamos no garantizados | $0 *0%* | $28.0 *11.7%* |
| Total | $57.1 *1.4%* | $85.1 *2.0%* |
| 1      Siguiendo los consejos de los asesores legales, los cobros de este gráfico presumen que los bonos AEP emitidos a partir de 2012 se declararán inválidos. | | |

***Resultados alternativos basados en litigios en curso o riesgos de litigios***

---

[3] El porcentaje de cobro se calcula como el valor actual de la deuda total cancelada durante la totalidad del período del análisis, como proporción del capital total pendiente de pago y los intereses impagados al 30 de junio de 2019. Para este cálculo, se emplea una tasa de descuento anual del 5%.

El rango estimado probable de cobros disponibles para los acreedores de la AEP se encuentra sujeto al resultado del litigio en curso respecto de la magnitud total de los reclamos válidos. Dado que el resultado es incierto, esas simulaciones no se consideran en los cobros que se describen más arriba.

### i. Escenario 1

Tal como se presentó en el Apéndice 1 como parte del asesoramiento jurídico brindado por los asesores legales de la JSAF, existe una posible cuestión relativa al perfeccionamiento de las cesiones de pagos de alquileres. En virtud de las leyes de Puerto Rico, las cesiones de alquileres deben perfeccionarse mediante un documento certificado por notario. Esos acuerdos de cesión certificados por notario no fueron encontrados por los asesores legales. Si los bonos AEP no tienen un derecho de garantía perfecto, los tenedores de bonos AEP no tendrían prioridad sobre los acreedores no garantizados con respecto a los pagos de alquileres cedidos. En este escenario, el cobro total disponible para todos los reclamos AEP (a saber, bonos AEP y Otras reclamaciones no aseguradas) también oscilaría entre $57,100,000 y $85,100,000, lo cual implica un cobro de entre 1.4% y 2.0%.[4]

### ii. Escenario 2

El UCC ha impugnado la validez de todos los bonos AEP emitidos a partir de marzo de 2011 basándose en el argumento de que violan el límite constitucional de endeudamiento. Este escenario evalúa el impacto sobre los cobros en caso de que los bonos AEP emitidos a partir de marzo de 2011 se declaren inválidos. Sobre la base de los datos brindados por los asesores financieros y excluyendo los bonos AEP emitidos a partir de marzo de 2011, el capital total pendiente de pago para los bonos AEP asciende a $2,244 millones y los intereses impagados equivalen a $365 millones a la fecha de entrada en vigor del presente análisis. El Gráfico 3 muestra el rango estimado probable de cobros bajo este escenario.

*Gráfico 3: Rango estimado probable de cobros disponibles para todos los acreedores de la AEP en caso de que se consideren inválidos los bonos AEP emitidos a partir de 2011.*

| Rango estimado probable de cobros disponibles para los acreedores de la AEP en caso de que se consideren inválidos los bonos AEP emitidos a partir de marzo de 2011 VA del pago total en millones de USD, % de cobro | | |
|---|---|---|
| | Extremo inferior del rango | Extremo superior del rango |
| Bonos AEP | $57.1 *2.2%* | $85.1 *3.3%* |
| Reclamos no garantizados | $0 *0%* | $28.0 *11.7%* |
| Total | $57.1 *2.0%* | $85.1 *3.0%* |

### iii. Escenario 3

Si todos los bonos AEP pendientes de pago se consideraran válidos, aumentaría la magnitud de los reclamos de los tenedores de bonos AEP. En este escenario, sobre la base de los datos brindados por los asesores financieros, el capital total pendiente de pago de los bonos AEP asciende a $4,000 millones y los intereses impagados equivalen a $614 millones a la fecha de entrada en vigor de este análisis. El Gráfico 4 muestra el rango estimado probable de cobros según este escenario.

*Gráfico 4: Rango estimado probable de cobros disponibles para todos los acreedores de la AEP en caso de que se consideren válidos todos los bonos AEP pendientes de pago*

---

[4] Si los fondos se distribuyen de modo tal que los tenedores de bonos AEP y las reclamaciones no aseguradas reciben el mismo cobro, los bonos AEP recibirían entre $53,800,000 y $80,200,000, mientras que las reclamaciones no aseguradas recibirían entre $3,300,000 y $4,900,000. Sin embargo, la distribución exacta se encuentra sujeta a litigio.

| **Rango estimado probable de cobros disponibles para los acreedores de la AEP en caso de que se consideren válidos los bonos AEP pendientes de pago**<br>VA del pago total en millones de USD, % de cobro | | |
|---|---|---|
| | Extremo inferior del rango | Extremo superior del rango |
| Bonos AEP | $57.1<br>*1.2%* | $85.1<br>*1.8%* |
| Reclamos no garantizados | $0<br>*0%* | $28.0<br>*11.7%* |
| Total | $57.1<br>*1.2%* | $85.1<br>*1.8%* |

*APÉNDICE 1*

**Plan de la AEP en virtud del Título III**

**Análisis de prueba del interés superior – Presunciones**

| | Pregunta | Presunción |
|---|---|---|
| **1.** | ¿Las proyecciones de superávit de la AEP de acuerdo con el plan fiscal pueden utilizarse para el paquete de recursos de la AEP? | **PRESUNCIÓN:** sí, el superávit de la AEP es un activo de la AEP. |
| **2.** | ¿Existe efectivo inicial u otros activos que deberían considerarse para pagarles a los tenedores de bonos AEP? | **PRESUNCIÓN:** el único recurso de los tenedores de bonos es ir contra los pagos de alquileres y las garantías del ELA. Debería considerarse que ningún otro activo (p. ej., el producido de seguros) se encuentra disponible para los pagos a tenedores de bonos. <br><br> Los asesores de la Junta pueden brindar una cifra actualizada del efectivo inicial restringido y no restringido que se encuentra en las cuentas bancarias de la AEP. Parte del efectivo inicial depositado en la cuenta bancaria de la AEP podría pignorarse para el pago a los tenedores de bonos AEP ya que este efectivo corresponde a los ingresos por alquileres. Se presume que el monto de efectivo inicial no pignorado para garantizar los bonos AEP se utiliza para pagar Otras reclamaciones no aseguradas. |
| **3.** | ¿Cuál es la cascada de pagos correspondiente a los bonos AEP? | **PRESUNCIÓN:** luego del pago de los gastos operacionales necesarios con fuentes distintas de los alquileres, si las hubiera, y luego con los alquileres de cualquier propiedad alquilada a la AEP, el saldo de los alquileres se utiliza para el servicio de la deuda. Toda suma de efectivo que quede luego del pago de la deuda en bonos AEP exigible en un año determinado puede reservarse para el año siguiente o utilizarse para pagar Otras reclamaciones no aseguradas. <br><br> Cuando la deuda se incumple, los tenedores de bonos también pueden hacer valer sus reclamos de garantía contra el ELA. Sin embargo, los tenedores de bonos no pueden cobrar más que el pago íntegro del servicio de la deuda contractual de la combinación entre la AEP y el ELA. |

| | **Pregunta** | **Presunción** |
|---|---|---|
| **4.** | ¿Cómo deberían proyectarse los alquileres futuros de la AEP? | **PRESUNCIÓN:** los alquileres de la AEP deberían rastrear las proyecciones del Plan Fiscal. Cabe destacar que es poco probable que el ELA pague alquiler por edificios que no precisa ni ocupa. Si eso es insuficiente para cubrir los pagos de bonos AEP que se tornan exigibles, presumimos que los tenedores de bonos AEP buscarían cobrar del ELA sobre la base de la garantía del ELA respecto de los bonos AEP. |
| **5.** | ¿Cómo se calcularía el cobro correspondiente a los tenedores de bonos AEP? ¿Deberían considerarse los pagos del ELA y los pagos con los fondos excedentes de la AEP? | **PRESUNCIÓN 1 [PRESUNCIÓN PRINCIPAL]:** los pagos a los tenedores de bonos AEP deberían abonarse primero con los ingresos por alquileres de la AEP, incluidos los ingresos excedentes. Los cobros de los tenedores de bonos AEP sobre la base de la garantía del ELA no cuentan en la devolución de la AEP. No obstante, en conjunto, los tenedores de bonos AEP no pueden cobrar más que el pago íntegro del servicio de la deuda contractual de las dos fuentes de cobros.<br><br>**PRESUNCIÓN 2 [RIESGO DE LITIGIO]:** existe una posible cuestión relativa al perfeccionamiento de las cesiones de pagos de alquileres. Según las leyes de PR, las cesiones de alquileres deben realizarse mediante un documento auténtico con una fecha cierta (es decir, mediante un documento certificado por notario). En los documentos de emisión de los bonos AEP que tenemos a nuestra disposición no hemos encontrado un contrato de cesión certificado por notario. No obstante, en virtud de las leyes de PR, un derecho de garantía sin perfeccionar continuaría dando derecho a los tenedores de bonos AEP a su reclamo sin recurso respecto de la garantía. En este escenario, los tenedores de bonos AEP tendrían derecho a pagos de alquileres basados en su contrato de garantía. Sin embargo, dado que la cesión no se encuentra perfeccionada, los tenedores de bonos AEP no tendrían prioridad sobre esos pagos en relación con otros acreedores no garantizados de la AEP. |
| **6.** | ¿Son inválidos los bonos AEP emitidos en 2011 por haber violado el límite constitucional de endeudamiento del ELA? | **PRESUNCIÓN 1 [PRESUNCIÓN PRINCIPAL]:** no, pero los bonos AEP emitidos a partir de 2012 son considerados obligaciones directas del ELA y, como tales, violan el límite de endeudamiento. Por ende, esos bonos son inválidos.<br><br>**FUNDAMENTOS:** la Junta de Supervisión ha argumentado que los Contratos de Alquiler de la AEP no son verdaderos contratos ni obligaciones presuntamente exigibles en virtud de ellos, sino simplemente obligaciones generales del ELA caracterizadas erróneamente. |

| | | Pregunta | Presunción |
|---|---|---|---|
| | | | **PRESUNCIÓN 2 [RIESGO DE LITIGIO]:** sí. Además de los bonos AEP emitidos a partir de 2012, los bonos AEP emitidos a partir de marzo de 2011 también violan el límite de endeudamiento y, por ende, son inválidos. |
| | | | **FUNDAMENTOS:** además de la impugnación explicada previamente, el comité oficial de acreedores no asegurados impugnó los bonos AEP por ese motivo a partir de marzo de 2011. |
| | | | **PRESUNCIÓN 3 [RIESGO DE LITIGIO]:** no. Los bonos AEP emitidos a partir de marzo de 2011 no violan el límite de endeudamiento. |
| | | | **FUNDAMENTOS:** las impugnaciones explicadas en los fundamentos precedentes podrían fracasar. |
| 7. | | ¿Los tenedores de bonos AEP tienen derecho a adelantar la fecha de pago de sus bonos? | **PRESUNCIÓN:** no, los bonos AEP no permiten el adelanto de la fecha de pago. |
| 8. | | ¿Deberían devengar intereses adicionales los intereses de la deuda que permaneció impagada durante la paralización? | **PRESUNCIÓN:** no. No deben devengarse intereses sobre intereses. |
| | | | **FUNDAMENTOS:** el devengo de intereses sobre intereses se encuentra sujeto a principios de equidad ante la falta de un derecho contractual expreso, pero no está permitido en virtud de las leyes del ELA y, por ello, no debería encontrarse disponible. |
| 9. | | ¿Los fondos de la FEMA se encuentran a disposición de los tenedores de bonos? | **PRESUNCIÓN:** no. Los fondos de la FEMA están destinados al financiamiento de gastos relativos a emergencias y no se encuentran disponibles para los gastos generales de la AEP. |

**LISTADO DE DEUDAS**[1]

1.   **Costo operacional**

a. Se proyectan $143 millones en gastos operacionales en 2019, según el Plan Fiscal Certificado de 2019.

2.   **Deuda de la AEP**

| | Fecha de emisión | Monto emitido | Rango de tasas de interés | Fecha de vencimiento final | En circulación al 1 de julio de 2019 |
|---|---|---|---|---|---|
| Bonos de Refinanciamiento de Ingresos por Instalaciones de Gobierno, Serie C | 30/01/02 | $185,290,000 | 5.50 - 5.75 | 01/07/22 | $46,800,000 |
| Bonos de Ingresos por Instalaciones de Gobierno, Serie D | 30/01/02 | $553,733,795 | 5.13 - 5.45 | 01/07/36 | $142,550,001 |
| Bonos de Refinanciamiento de Ingresos por Instalaciones de Gobierno, Serie F | 24/10/02 | $131,445,000 | 5.25 | 01/07/25 | $122,130,000 |
| Bonos de Ingresos por Instalaciones de Gobierno, Serie G | 24/10/02 | $62,000,000 | 4.75 - 5.00 | 01/07/32 | $30,505,000 |
| Bonos de Refinanciamiento de Ingresos por Instalaciones de Gobierno, Serie H | 24/10/02 | $272,717,418 | 5.50 | 01/07/19 | $82,850,000 |
| Bonos de Ingresos por Instalaciones de Gobierno, Serie I | 10/06/04 | $832,385,000 | 5.00 - 5.25 | 01/07/36 | $527,840,000 |
| Bonos de Refinanciamiento de Ingresos por Instalaciones de Gobierno, Serie K | 27/05/04 | $50,000,000 | 5.25 | 01/07/27 | $50,000,000 |
| Bonos de Ingresos por Instalaciones de Gobierno, Serie L | 01/06/93 | $128,895,000 | 5.50 | 01/07/21 | $37,315,000 |
| Bonos de Refinanciamiento de Ingresos por Instalaciones de Gobierno, Serie M-1 | 20/12/07 | $283,550,000 | 5.00 - 6.25 | 01/07/31 | $189,910,000 |
| Bonos de Refinanciamiento de Ingresos por Instalaciones de Gobierno, Serie M-2 | 20/12/07 | $129,300,000 | 5.50 - 5.75 | 01/07/35 | $129,225,000 |
| Bonos de Refinanciamiento de Ingresos por Instalaciones de Gobierno, Serie M-3 | 20/12/07 | $150,000,000 | 6.00 | 01/07/28 | $150,000,000 |
| Bonos de Ingresos por Instalaciones de Gobierno, Serie N | 20/12/07 | $329,415,000 | 5.00 - 5.50 | 01/07/37 | $311,315,000 |
| Bonos de Refinanciamiento de Ingresos por Instalaciones de Gobierno, Serie P | 01/07/09 | $330,935,000 | 5.75 - 7.00 | 01/07/36 | $330,935,000 |

---

[1] La información financiera que se incluye en el presente se basa en información disponible en la mayoría de los estados contables recientes de dominio público y, en ciertos casos, en la información recibida de los asesores de la Junta de Supervisión y los asesores del ELA. Los asesores legales no tienen una postura tomada respecto de la precisión de la información financiera que aquí se brinda.

En ciertas partes del listado de deudas, sólo se incorpora información relativa a la presunción principal.

| | Fecha de emisión | Monto emitido | Rango de tasas de interés | Fecha de vencimiento final | En circulación al 1 de julio de 2019 |
|---|---|---|---|---|---|
| Bonos de Refinanciamiento de Ingresos por Instalaciones de Gobierno, Serie Q | 28/10/09 | $152,540,000 | 5.13 - 6.00 | 01/07/39 | $152,540,000 |
| Bonos de Ingresos por Instalaciones de Gobierno, Serie R | 24/08/11 | $756,449,000 | 5.65 - 5.70 | 01/07/28 | $756,449,000 |
| Bonos de Ingresos por Instalaciones de Gobierno, Serie S | 24/08/11 | $303,945,000 | 5.00 - 6.00 | 01/07/41 | $303,945,000 |
| Bonos de Ingresos por Instalaciones de Gobierno, Serie T | 22/12/11 | $121,528,000 | 5.60 | 01/07/30 | $120,777,000 |
| Bonos de Refinanciamiento de Ingresos por Instalaciones de Gobierno, Serie U | 21/06/12 | $582,345,000 | 3.89 - 5.25 | 01/07/42 | $580,125,000 |

### 3. Otras reclamaciones no aseguradas

    a.   $240 millones. Este monto incluye la suma de las deudas con contratistas y la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico, los préstamos en virtud de líneas de crédito y las contingencias legales devengadas.[2]

---

[2] Estas cifras se basan en información provista por los asesores financieros de la Junta y no han sido verificados de forma independiente.