

# GOBIERNO DE PUERTO RICO
## Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico

**Portada Informativa de Divulgaciones del Mercado Municipal Secundario**
Junta de Reglamentación de Valores Municipales (MSRB - Municipal Securities Rulemaking Board)
Sistema de Acceso al Mercado Municipal Electrónico (EMMA - Electronic Municipal Market Access System)

**ESTA DECLARACIÓN SE RELACIONA CON UNA SOLA EMISIÓN DE BONOS:**

Nombre de la emisión de bonos exactamente como consta en la portada de la Declaración Oficial:
_____
_____
_____

Números CUSIP* de nueve dígitos, en caso de estar disponibles, con las cuales se relacionan los datos:
_____
_____
_____

**ESTA DECLARACIÓN SE RELACIONA CON VARIOS O TODOS LOS VALORES EMITIDOS POR EL EMISOR, O VARIOS O TODOS LOS VALORES DE UN ACREEDOR ESPECÍFICO:**

Nombre del Emisor:  **Corporación del Fondo de Interés Apremiante de Puerto Rico (COFINA)**

Nombre de Otro Obligado (en caso de

haber):

_____

Número(s) CUSIP* de seis dígitos:

**74529J**

_____

**TIPO DE INFORMACIÓN QUE SE PRESENTA:**

A.   ☐Información Financiera Anual y Datos Operativos en conformidad con la Regla 15c2-12

    Periodo Cubierto:          Fiscal

B.   ☒ Estados Financieros Auditados o CAFR en conformidad con la Regla 15c2-12

| Periodo Cubierto: 2018 | Fiscal | Cubierto: | 2017- |
|---|---|---|---|

C.   ☐Notificación de Incumplimiento de Presentar Información Financiera Anual según requerido:

Declaro que he sido autorizado por el emisor, el obligado, o su agente para distribuir esta información públicamente.

_/fdo/ Iván Garau González_
Iván Garau González
Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico,
a título de Agente Fiscal para el Estado Libre Asociado

**Fecha: 20 de junio de 2019**

**PO Box 42001 • San Juan, PR 00940-2001 • Teléfono (787) 722-2525**



**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**

(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Estados Financieros Básicos e
Información Suplementaria Obligatoria

30 de junio de 2018

(Con su Informe de Auditoría Independiente correspondiente)

# CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO

(Una unidad componente del Estado Libre Asociado de Puerto Rico)

### Índice de Materias

|  | **Página** |
|---|---|
| Informe del Auditor Independiente | 1-2 |
| Discusión y Análisis de la Administración (No Auditado) | 3-9 |

Estados Financieros Básicos:

| | |
|---|---|
| Balance General de Fondos del Gobierno y Estado del Patrimonio Neto de los Fondos del Gobierno (Déficit) | 10 |
| Conciliación del Balance General de Fondos del Gobierno y el Estado del Patrimonio Neto de los Fondos del Gobierno (Déficit) | 11 |
| Estados de Fondos del Gobierno sobre Ingresos, Gastos, y Cambios en el Balance del Fondo y Estado de Resultados | 12 |
| Conciliación de los Estados de Fondos del Gobierno sobre Ingresos, Gastos, y Cambios en el Balance del Fondos y el Estado de Resultados | 13 |
| Notas a los Estados Financieros Básicos | 14-56 |


**KPMG** [logo]

KPMG LLP
American International Plaza
Suite 1100
250 Muñoz Rivera Avenue
San Juan, PR 00918-1819

# Informe de los Auditores Independientes

Junta Directiva
Corporación del Fondo de Interés Apremiante de Puerto Rico:

Hemos auditado los estados financieros adjuntos de las actividades gubernamentales y cada fondo principal de la Corporación del Fondo de Interés Apremiante de Puerto Rico (la Corporación), una unidad componente del Estado Libre Asociado de Puerto Rico, al año finalizado el 30 de junio de 2018, inclusive, y las notas relacionadas con los estados financieros, los cuales colectivamente constituyen los estados financieros básicos de la Corporación, en conformidad con lo indicado en la tabla de contenidos.

## Responsabilidad de la Administración con respecto a los Estados Financieros

La Administración es responsable por la preparación y presentación razonable de estos estados financieros en conformidad con los principios de contabilidad generalmente aceptados en los Estados Unidos. Esto incluye el diseño, implementación, y mantenimiento de los controles internos relevantes para la preparación y presentación razonable de estados financieros libres de representaciones materiales incorrectas, sea por motivo de fraude o por error.

## Responsabilidad de los Auditores

Nuestra responsabilidad consiste en expresar un dictamen sobre estos estados financieros en base a nuestra auditoría. Conducimos nuestra auditoría en conformidad con las normas de auditoría generalmente aceptadas en los Estados Unidos de América. Esas normas exigen que planifiquemos la auditoría y la llevemos a cabo de tal forma que se obtenga certeza razonable de que los estados financieros están libres de errores materiales.

Una auditoría involucra la realización de procedimientos para obtener evidencia de auditoría sobre los montos y las divulgaciones expuestas en los estados financieros. Los procedimientos seleccionados dependen del juicio de los auditores, incluyendo una evaluación del riesgo de errores materiales en los estados financieros, sea por motivo de fraude o por error. Al hacer estas evaluaciones de riesgo, el auditor considera los controles internos relevantes para la preparación y presentación justa de los estados financieros para diseñar procedimientos de auditoría que son aptos para las circunstancias, pero no para propósitos de expresar una opinión con respecto a la efectividad de los controles internos de la entidad. Por consiguiente, no expresamos ningún opinión de dicha índole. Una auditoría también incluye una evaluación de la idoneidad de las políticas contables usadas y la razonabilidad de estimados contables importantes realizados por la administración, así como una evaluación de la presentación integral de los estados financieros.

Consideramos que la evidencia de auditoría que hemos obtenido es suficiente e idónea para proveer una base para nuestro dictamen de auditoría.

## Opiniones

En nuestra opinión, los estados financieros arriba mencionados son una representación razonable, en todo aspecto material, de la posición financiera respectiva de cada uno de los fondos principales de la Corporación del Fondo de Interés Apremiante de Puerto Rico, al 30 de junio de 2018, y los cambios respectivos en su situación financiera para el año que termina en esa fecha, en conformidad con los principios de contabilidad generalmente aceptados en los Estados Unidos.

KPMG LLP es una sociedad de responsabilidad limitada de Delaware, y una empresa
miembro de la red KPMG de firmas que son miembros independientes afiliados con
KPMG International Cooperative ("KPMG International"), una entidad Suiza.

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Discusión y Análisis de la Administración (No Auditado)
30 de junio de 2018

**Párrafo de Énfasis**

*Énfasis con Respecto al Título III de la Declaración conforme a PROMESA*

Como se menciona en las notas 3, 4,12(b), y 12(d) de los estados financieros básicos, el 5 de mayo de 2017, la Junta de Supervisión que fue creada por la Ley de Supervisión, Administración, y Estabilidad Económica de Puerto Rico (PROMESA, por las siglas en inglés de Puerto Rico Oversight, Management, y Economic Stability Act) presentó una petición de reparación al amparo del Título III de PROMESA, similar a una petición de quiebra. El 5 de febrero de 2019, el Tribunal del Título III registró una orden confirmando el Tercer Plan Enmendado de Ajuste de la Corporación (el Plan). El Plan entró en vigor en conformidad con sus términos el 12 de febrero de 2019, y la Corporación emergió del Título III de PROMESA. Nuestras opiniones no se ven modificados con respecto a ese asunto.

**Información Adicional**

*Información Suplementaria Obligatoria*

Los principios de contabilidad generalmente aceptados en los Estados Unidos exigen que la discusión de la administración así como en las páginas 3-9 sean presentadas para suplementar los estados financieros básicos. Dicha información, si bien no forma parte de los estados financieros básicos, es exigida por la Junta de Estándares Contables Gubernamentales (Governmental Accounting Standards Board), que las considera parte esencial de la información financiera para entender los estados financieros básicos en su contexto operativo, económico, o histórico apropiado. Hemos aplicado ciertos procedimientos limitados a la información suplementaria obligatoria en conformidad con las normas de auditoría generalmente aceptadas en los Estados Unidos, los cuales consisten en las indagaciones de la administración con respecto a los métodos para preparar la información y comparar la coherencia de información con respecto a las respuestas de la administración a nuestras indagaciones, los estados financieros básicos, y otra información que hemos obtenido durante nuestra auditoría de los estados financieros básicos. No expresamos ninguna opinión ni proveemos garantía alguna con respecto a la información, ya que los procedimientos limitados que fueron seguidos no nos aportan suficiente evidencia para expresar una opinión o proveer garantía.

[Firmado]

San Juan, Puerto Rico
18 de junio de 2019

El Sello Núm. E363986 del Colegio de Contadores Públicos Autorizados de Puerto Rico se fijó a la copia de registro de este informe.

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Discusión y Análisis de la Administración (No Auditado)
30 de junio de 2018

La administración de la Corporación del Fondo de Interés Apremiante de Puerto Rico ("la Corporación" o "COFINA"), ofrece a los lectores de los estados financieros de la Corporación esta exposición narrativa de alto nivel y análisis del desempeño financiero durante el año fiscal finalizado el 30 de junio de 2018. Favor leerlo en conjunción con los estados financieros básicos, incluyendo sus notas, que se presentan al pie de esta sección.

**Datos Financieros Importantes**

- El patrimonio neto del estado de situación del patrimonio neto (déficit) aumentó a $9,432.9 millones al 30 de junio de 2018, de $8,424.7 millones al 30 de junio de 2017. El aumento en el patrimonio neto se debe principalmente a gastos pagados por intereses sobre los Bonos Garantizados por el Impuesto sobre Ventas y otros gastos, de aproximadamente $1,013.9 millones.

- Las recaudaciones de los impuestos de ventas y uso aumentaron a $753.1 millones en el año fiscal 2018, de $724.1 millones en el año fiscal 2017, un aumento de $29 millones. Este aumento se debió a un aumento en la tasa estatutaria de 4%, dispuesto por la Ley Núm. 91, según enmendada. Véase la Nota 1 de los estados financieros básicos.

- Durante el año finalizado el 30 de junio de 2018, la Corporación efectuó sus pagos programados de capital de $18.7 millones, constituidos por sus bonos a tasa fija garantizados por el impuesto sobre ventas, Primera Serie Subordinada 2009A y bonos a tasa fija garantizados por el impuesto sobre ventas, Primera Serie Subordinada 2010A por montos de $15.7 millones y $3 millones, respectivamente. Si bien la Corporación siguió realizando transferencias al fideicomisario, los pagos a los bonistas no fueron desembolsados a partir de junio 2017 y subsiguientemente, en conformidad con una orden del Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (el "Tribunal") registró una orden requiriendo que el fideicomisario interviniera en una acción de interpelación ("interplead") con respecto al pago del 1 de junio de 2017 y cualesquier pagos futuros de capital e intereses sobre bonos senior y subordinados garantizados por el impuesto sobre ventas de la Corporación, hasta que el Tribunal haya registrado una orden definitiva dirigiendo los tiempos y modos de desembolsar dichos fondos. Como se discute en la Nota 12 de los estados financieros básicos, de febrero 2019, el Tribunal Título III confirmó el Tercer Plan de Ajuste Enmendado de la Corporación así como el derecho a acciones de interpelación (interplead) con respecto a los fondos.

- El 12 de febrero de 2019, la Corporación emergió del Título III de PROMESA. En esa fecha, la Corporación perfeccionó su Tercer Plan de Ajuste Enmendado. El Perfeccionamiento del Tercer Plan de Ajuste Enmendado junto con la promulgación de la Ley Núm. 241 de 2018 dispuso la reestructuración de los Bonos COFINA, aclarando su titularidad de los Impuesto sobre Ventas Pignorados COFINA y estableciendo una junta directiva independiente con independencia financiera y operativa del Estado Libre Asociado y una gobernación corporativa coherente con dicha independencia. Para mayor información, refiérase a la Nota 12 de los estados financieros básicos.

- En febrero 2019, los bonistas senior y subordinados de COFINA recibieron bonos senior garantizados por gravamen, con un valor de aproximadamente $12,000 millones a cuenta de sus aproximadamente $17,000 millones en reclamaciones; estos están garantizados por un gravamen estatutario sobre los impuestos pignorados de COFINA reestructurada. La Corporación ha efectuado sus pagos programados sobre sus bonos nuevos de tasa fija garantizados por ingresos del impuesto sobre ventas desde el 12 de febrero de 2019.

**Vista de Alto Nivel de los Estados Financieros**

Estos estados financieros incluyen la sección con la discusión y análisis de la administración, el informe de los auditores independientes, y los estados financieros básicos de la Corporación. Los estados financieros básicos también incluyen notas que explican en mayor detalle cierta información en los estados financieros básicos.

Estos estados financieros básicos y las notas de las mismas deben ser leídas en conjunto con ciertos documentos públicos relacionados con la Corporación. Las notas ofrecen una descripción para propósitos de conveniencia del lector, y se encuentran calificadas integralmente por referencia a las disposiciones del Tercer Plan de Ajuste

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Discusión y Análisis de la Administración (No Auditado)
30 de junio de 2018

Enmendado, la Ley Núm. 241 de 2018, las Determinaciones y Conclusiones Enmendadas, la Orden de Confirmación Enmendada, respectivamente. En la medida que exista cualquier discrepancia entre la descripción que se contiene en la presente y los términos que constan en cada uno de estos documentos, regirán los términos que constan en cada uno de aquellos, respectivamente. A los lectores se les dirige al Tercer Plan de Ajuste Enmendado, Ley Núm. 241 de 2018, las Determinaciones y Conclusiones Enmendadas, la Orden de Confirmación Enmendada, todos los cuales son documentos públicos.

**Estados Financieros Obligatorios**

- El estado de situación del patrimonio neto (déficit) provee información sobre los tipos y montos de los recursos (activos) y las obligaciones de la Corporación (pasivos).

- Los ingresos y gastos del año corriente se contabilizan en el estado de resultados. Este estado de situación mide las actividades de las operaciones de la Corporación durante el año pasado.

- Los estados financieros de los Fondos del Gobierno presentan la posición financiera y resultados de las operaciones de los dos tipos de fondos del gobierno, usando el enfoque de medición de los recursos financieros actuales. Por ejemplo, el estado de ingresos, gastos, y cambios en el balance de fondos se puede usar para determinar si la Corporación cumplió con sus obligaciones de servicio deuda para el año, y como lo hizo.

**Análisis Financiero**

Al evaluar las finanzas de la Corporación, además de los activos y pasivos de la Corporación, se debe considerar también una variedad de factores no financieros, tales como los cambios en las condiciones económicas, y legislación nueva o enmendada del gobierno. Debido a la naturaleza de las actividades de la Corporación, la capacidad financiera y posibilidades de la Corporación de pagar sus obligaciones dependen exclusivamente del impuesto sobre ventas y uso dedicado para financiar el fondo de servicio deuda.

Para mayor información sobre el impuesto sobre ventas y uso usado para financiar el servicio de deuda, refiérase a la Nota 1 de los estados financieros básicos.

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Discusión y Análisis de la Administración (No Auditado)
30 de junio de 2018

**Análisis Financiero a Nivel de Todo el Gobierno**

Los estados financieros a nivel de todo el gobierno fueron diseñados para que el usuario pueda evaluar la condición financiera de la Corporación al cierre de año. A continuación se presenta un resumen del patrimonio neto para la Corporación al 30 de junio de 2018 y 2017 (en miles):

| | 30 de junio | | Cambio | |
| | 2018 | 2017 | Monto | Porcentaje |
|---|---|---|---|---|
| Activo: | | | | |
| Crédito del Estado Libre Asociado | $ 8,158,581 | $ 8,911,656 | $ (753,075) | (8.5)% |
| Otros activos | 1,269,016 | 506,396 | 762,620 | 150.6 |
| Total Activo | 9,427,597 | 9,418,052 | 9,545 | 0.1 |
| | | | | |
| Total egresos diferidos de recursos | 100,102 | 109,400 | (9,298) | (8.5) |
| | | | | |
| Pasivo: | | | | |
| Cuentas por pagar y otras deudas | 998,791 | 311,882 | 686,909 | 220.2 |
| Obligaciones a pagar con activos de disponibilidad restringida | 17,868,731 | 17,544,750 | 323,981 | 1.8 |
| Total pasivo | 18,867,522 | 17,856,632 | 1,010,890 | 5.7 |
| Total ingresos diferidos de recursos | 93,091 | 95,471 | (2,380) | (2.5) |
| | | | | |
| Patrimonio Neto-Libre disponibilidad | $ (9,432,914) | $ (8,424,651) | $ (1,008,263) | 12.0% |

Como se indica arriba, el patrimonio neto de la Corporación, al 30 de junio de 2018, ascendió a $(9,432.9) millones, un aumento de $1,008.4 millones o 12% de $(8,424.7) millones al 30 de junio de 2017. El aumento en el patrimonio neto se debe principalmente a gastos de intereses sobre Bonos Garantizados por el Impuesto sobre Ventas y otros gastos, de aproximadamente $1,013.9 millones. Al 30 de junio de 2018, la Corporación tenía $17,868.7 millones de bonos pagaderos emitidos y en circulación, un aumento de aproximadamente $324 millones o 1.8%, de $17,554.8 millones al 30 de junio de 2017. No hubo emisiones nuevas durante el año finalizado el 30 de junio de 2018; el aumento neto se debió principalmente a la devengación en el descuento sobre los bonos de revalorización de capital. Véase Nota 9 de los estados financieros básicos. El aumento en las cuentas a pagar y otros se debió a la orden del Tribunal del Título III exigiendo una acción de interpelación sobre los pagos futuros de capital e intereses sobre bonos, comenzando por el pago de intereses de junio 2017.

Los pagos del Estado Libre Asociado de Puerto Rico (el Estado Libre Asociado) por el Impuesto sobre Ventas y Uso (IVU) se reconocen como ingresos en los estados financieros de fondo al recaudarlos o en el momento que el Estado Libre Asociado está obligado a efectuar los pagos. En los estados financieros a nivel de todo el gobierno, estos pagos reducen las cuentas por cobrar del Estado Libre Asociado. El monto base del impuesto de ventas pignorado para el año fiscal 2018 de aproximadamente $753.1 redujo el saldo de las cuentas por cobrar del Estado Libre Asociado al 30 de junio de 2018.

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Discusión y Análisis de la Administración (No Auditado)
30 de junio de 2018

Al 30 de junio de 2018 y 2017, la Corporación había registrado $3.4 millones para cubrir cualquier desenlace desfavorable relacionado con una reclamación relacionada con la terminación de un contrato de permuta del año 2008; refiérase a la Note 11 de los estados financieros básicos.

Los ingresos gastos, y cambio en patrimonio neto condensados para el año finalizado el junio 30 de 2017 y 2016, se presentan a continuación (en miles):

| | 30 de junio | | Cambio | |
| | 2018 | 2017 | Monto | Porcentaje |
|---|---|---|---|---|
| Gastos | | | | |
| Intereses sobre deuda a largo plazo | $ (1,013,876) | $ (993,494) | $ (20,382) | 2.1% |
| Otros | $ (4,320) | (1,523) | (2,797 | 183.7% |
| Gastos Totales | (1,018,196) | (995,017 | (23,179) | 2.3% |
| Ingresos de Programas: | | | | |
| Ganancias de Inversiones | 9,933 | 4,322 | 5,611 | 129.8% |
| Total Ingresos | 9,933 | 4,322 | 5,611 | 129.8% |
| Cambio en déficit neto | $ (1,008,263) | $ (990,695) | $ (17,568) | 1.8% |

Los gastos totales en intereses sobre deuda a largo plazo para el año finalizado el 30 de junio de 2018 ascendieron a aproximadamente $1,013.9 millones, un aumento de $20.4 millones en comparación con 2017. El aumento en el gasto en intereses sobre deuda a largo plazo se debe principalmente a un aumento en la tasa de los bonos de interés variable, y el impacto del descuento sobre los bonos de revalorización de capital. En años previos, la Corporación había contabilizado una pérdida de crédito custodial sobre depósitos en el Banco Gubernamental de Fomento para Puerto Rico (el Banco o BGF) ascendiendo a $26.2 millones, en base a una evaluación de la disponibilidad y posibilidad de recuperar dichos depósitos.

La Corporación no tuvo erogaciones en gastos de parte del Estado Libre Asociado para usos autorizados, en conformidad con la Ley Núm. 91 durante el año finalizado el 30 de junio de 2018. Los ingresos por intereses de inversiones aumentaron en comparación con el año previo, debido a la acumulación de fondos transferidos por la Corporación al síndico para el servicio de deuda, los cuales han sido invertidos hasta que el Tribunal del Título III haya determinado el momento y la forma en que se distribuirán los fondos en consignación.

**Análisis Financiero de Fondos del Gobierno**

Los fondos del gobierno de la Corporación informaron un saldo total de fondos al 30 de junio de 2018 y 2017, de $538.7 millones y $489.6 millones, respectivamente. El fondo para servicio de la deuda se financia con las recaudaciones del impuesto sobre ventas y uso y los intereses sobre los mismos. Para los años que terminaron el 30 de junio de 2018 y 2017, los ingresos del impuesto sobre ventas y uso ascendieron a 753.1 millones y 724.1 millones, respectivamente.

**Administración de la Deuda**

Al 30 de junio de 2018, el saldo de los bonos en circulación de la Corporación fue de $17,868.7 millones, después de contabilizar una prima de bonos no amortizada de $70.4 millones, y un descuento no devengado $101.4 millones. Durante el año finalizado el 30 de junio de 2018, no hubo pagos de capital e intereses sobre los bonos prioritario y subordinados de la Corporación garantizados por el impuesto sobre ventas, debido a la acción de interpelación

6

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Discusión y Análisis de la Administración (No Auditado)
30 de junio de 2018

presentada por el síndico.

Al 30 de junio de 2017, el saldo de bonos en circulación de la Corporación fue $17,544.7 millones, después de contabilizar una prima de bonos no amortizada de $74.6 millones, y un descuento no devengado de $101.4 millones. Durante el año finalizado el 30 de junio de 2017, la Corporación efectuó su pago programado de $38.3 millones sobre sus bonos a tasa fija garantizados por el impuesto sobre ventas, primera serie subordinada 2009A.

Los bonos son pagaderos en varias fechas hasta el año fiscal 2058.

Bank of New York Mellon, en su capacidad de síndico de los Bonos Garantizados por el Impuesto sobre Ventas emitidos por la Corporación (en dicha capacidad, el "Síndico"), presentó una demanda contenciosa dentro del procedimiento Título III de la Corporación, solicitando una acción de interpelación para preservar en fideicomiso los fondos en poder del Síndico, mientras quedaba pendiente por el Tribunal la conciliación de todas las disputas con respecto a la titularidad de los fondos. El Tribunal registró una orden exigiendo que el Síndico, a partir del pago de intereses sobre bonos de $16.3 millones que vencieron el 1 de junio de 2017, presente una diligencia de interpelación y sostenga todos los fondos disputados en las cuentas donde se habían depositado, en nombre de la parte o partes que el Tribunal en última instancia determine tienen derecho a dichos fondos.

Como se discute en mayor detalle en la Nota 12 de los estados financieros básicos, el 5 de febrero de 2019, el Tribunal del Título III confirmó el Tercer Plan de Ajuste Enmendado de la Corporación y los fondos de interpelación fueron distribuidos en conformidad con el mismo.

**Calificación Crediticia de COFINA**

Durante los años fiscales 2018 y 2017, COFINA estuvo sujeta a ciertas reducciones de sus calificaciones crediticias por las principales agencias de calificación crediticia. Actualmente, las calificaciones crediticias de la Corporación son de grado no de inversión. La tabla a continuación resume las calificaciones crediticias de la Corporación al 30 de junio de 2018 y 2017:

| Agencia | Fecha | Impuestos Garantizados por Recaudaciones del Impuesto sobre la Venta | |
|---|---|---|---|
| | | Serie Gravamen Senior | Primera Serie Subordinada |
| Moody's | 06/30/18 | Ca | Ca |
| | 06/30/17 | Caa3 | Ca |
| S&P | 06/30/18 | NR | NR |
| | 06/30/17 | D | D |
| Fitch | 06/30/18 | D | D |
| | 06/30/17 | C | C |

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Discusión y Análisis de la Administración (No Auditado)
30 de junio de 2018

**Hechos Conocidos Actualmente:**

**Ley de Supervisión, Administración, y Estabilidad Económica de Puerto Rico**

El 30 de junio de 2016, el Presidente de los Estados Unidos firmó la Ley de Supervisión, Administración, y Estabilidad Económica de Puerto Rico (PROMESA, por sus siglas en inglés de Puerto Rico Oversight, Management, y Economic Stability Act). En términos generales, el propósito de PROMESA es proveer al Estado Libre Asociado y sus unidades componentes, incluyendo la Corporación, disciplina fiscal y económica, entre otras cosas, mediante: (i) el establecimiento de la Junta de Supervisión y Administración Financiera para Puerto Rico (la Junta de Supervisión), cuyas responsabilidad incluyen la certificación de los presupuestos y planes fiscales del Estado Libre Asociado y sus entidades relacionadas, incluyendo la Corporación; (ii) una paralización temporal de todas las demandas de los acreedores; y (iii) dos métodos alternativos para el ajuste de deuda insostenible: (a) un proceso voluntario de modificación deuda bajo el Título VI de PROMESA, que establece un proceso principalmente extrajudicial para la reestructuración deuda, mediante el cual una super-mayoría de los acreedores puede aceptar modificaciones a la deuda financiera; y (b) un procedimiento similar a quiebra bajo el Título III de PROMESA, el cual establece un proceso judicial de reestructuración deuda, basado sustancialmente sobre las disposiciones incorporadas del Código de Quiebras de los Estados Unidos (11 U.S.C. §§ 101, et seq.).

**Inicio del Caso Título III por la Junta de Supervisión**

El 1 de mayo de 2017, caducó la paralización bajo el Título IV de PROMESA, permitiendo que se reanudará la litigación substantiva traída por los bonistas y otros acreedores contra el Estado Libre Asociado y sus instrumentalidades, incluyendo la Corporación. El 3 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador de Puerto Rico (el Gobernador), inició un caso Título III de parte del Estado Libre Asociado, al presentar una petición de remedios al amparo del Título III de PROMESA ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (el Tribunal del Título III). El 5 de mayo de 2017, la Junta de Supervisión, a petición del Gobernador, comenzó un Título III de parte de la Corporación, al presentar una petición de remedio similar, al amparo del Título III de PROMESA ante el Tribunal del Título III.

Bank of New York Mellon, en su capacidad de síndico de los bonos garantizados por el impuesto sobre ventas emitidos por la Corporación (en dicha capacidad, el síndico), presentó una demanda contenciosa dentro del procedimiento Título III de la Corporación, solicitando una acción de interpelación para preservar los fondos en poder del Fideicomisario en el fideicomiso, mientras que estuviera pendiente la conciliación por el Tribunal de todas las disputas relacionadas con la propiedad de los fondos. El Tribunal registró una orden requiriendo que el Fideicomisario, comenzando a partir del pago de $16.3 millones sobre bonos que vencieron el 1 de junio de 2017, presentara una acción de interpelación y mantuviera todos los fondos en las cuentas donde habían sido depositados, en nombre de la parte o partes que en última instancia el Tribunal determine tienen derecho a dichos fondos. La orden del Tribunal permitió que los acreedores litigaran reclamaciones contradictorias con respecto a los fondos en poder del Fideicomisario.

El Título III de PROMESA incorpora las disposiciones sobre suspensiones automáticas de las secciones 362 y 922 del Código de Quiebras, los cuales han sido hechos aplicables a los casos Título III en conformidad con la sección 301 (a) de PROMESA. Como se discutió en mayor detalle en la Nota 12 de los estados financieros básicos, ciertas partes interesadas (bonistas, aseguradores, garantes, inversionistas, y otros) iniciaron procedimientos legales impugnando la constitucionalidad de la ley que creó COFINA y la propiedad de los ingresos futuros del impuesto IVU.

Como se discutió en mayor detalle en la Nota 12 de los estados financieros básicos, el 5 de febrero de 2019, el Tribunal del Título III confirmó el Tercer Plan de Ajuste Enmendado de la Corporación.

El 12 de febrero de 2019, la Corporación emergió del Título III de PROMESA. En esa fecha, la Corporación perfeccionó el Tercer Plan de Ajuste Enmendado junto con la promulgación de la Ley Núm. 241 de 2018, disponiendo la reestructuración de los Bonos COFINA, esclareciendo su titularidad sobre los Ingresos COFINA (según lo definido en Nota 12(f) de los estados financieros básicos) y estableciendo una junta directiva independiente, con independencia

8

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Discusión y Análisis de la Administración (No Auditado)
30 de junio de 2018

financiera y operativa del Estado Libre Asociado, y asimismo una gobernación corporativa congruente con dicha independencia. Para mayor información, refiérase a la Nota 12 de los estados financieros básicos.

**Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico, Ley de Emergencia Financiera y Responsabilidad Fiscal de Puerto Rico, y Orden Ejecutiva Relacionada**

El 6 de abril de 2016, el Estado Libre Asociado promulgó la Ley Núm. 21 de 2016, conocida como la Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico (según enmendada, la Ley de Moratoria). En conformidad con la Ley de Moratoria, el 30 de junio de 2016, el Gobernador firmó una Orden Ejecutiva, EO-2016-030 (EO Núm. 2016-30), declarando un estado de emergencia en el Estado Libre Asociado. La Ley de Moratoria, según enmendada, también creó la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico (AAFAF) como una corporación pública independiente para asumir el rol del BGF como agente fiscal, asesor financiero, y agente reportador para el Estado Libre Asociado y sus instrumentalidades.

El 29 de enero 2017, el Gobernador firmó la Ley Núm. 5 de 2017 (Ley Núm. 5), la Ley de Emergencia Financiera y Responsabilidad Fiscal de Puerto Rico, la cual sustituyó y enmendó la Ley de Moratoria. La Ley Núm. 5 declaró que el Estado Libre Asociado se encontraba en estado de emergencia, y decretó una moratoria sobre la obligación del Estado Libre Asociado de efectuar pagos sobre bonos, y pagarés emitidos o garantizados por el Estado Libre Asociado. La Ley Núm. 5 de 2017 también le confirió a AAFAF la responsabilidad primaria de supervisar asuntos relacionados con la reestructuración de las responsabilidades financieras del Estado Libre Asociado y sus instrumentalidades y las corporaciones públicas, coordinar la gestión de pasivos y otras transacciones con respecto a dichas obligaciones, y velar por el cumplimiento con los planes fiscales y presupuestos aprobadas por la Junta de Supervisión bajo PROMESA.

**Factores mitigantes con respecto al principio contable del supuesto de empresa en funcionamiento "Going Concern"**

No obstante las circunstancias existentes el 30 de junio de 2018, en base a los eventos subsiguientes que remediaron la condición financiera de la Corporación y atendieron sus pasivos, la administración no considera que existen dudas sustanciales sobre las posibilidades de la Corporación de continuar sus funciones como emprendimiento viable (conforme al principio contable de "going concern") a la fecha de estos estados financieros básicos.

Como se discutió en mayor detalle en la Nota 12 de los estados financieros básicos, el 5 de febrero de 2019, el Tribunal del Título III confirmó el Tercer Plan de Ajuste Enmendado. El 12 de febrero de 2019, la Corporación emergió del Título III de PROMESA. En esa fecha, la Corporación perfeccionó su Tercer Plan de Ajuste Enmendado. El perfeccionamiento del Tercer Plan de Ajuste Enmendado junto con la promulgación de la Ley Núm. 241 de 2018 dispuso la reestructuración de los Bonos COFINA, aclarando su propiedad de los Impuestos sobre ventas Pignorados de COFINA y estableciendo una junta directiva independiente con gobernación corporativa robusta, e independencia financiera y operativa del Estado Libre Asociado. Para mayor información, refiérase a la Nota 12 de los estados financieros básicos. La Corporación ha efectuado sus pagos programados sobre sus bonos de tasa fija garantizados por el impuesto sobre ventas recién emitidos desde el 12 de febrero de 2019.

**Solicitudes de mayor información**

Este informe financiero está diseñado para proveerle a personas interesadas una vista de alto nivel de las finanzas de la Corporación, y fortalecer como la Corporación rinde cuentas por los fondos que recibe. Cualquier pregunta sobre este informe, o solicitudes para mayor información deben ser dirigidos a la Corporación del Fondo de Interés Apremiante de Puerto Rico, PO Box 42001, San Juan, Puerto Rico, 00940-2001.

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Balance General de los Fondos del Gobierno y Estado del Patrimonio Neto (Déficit)

Al 30 de junio de 2018

| | Balance General de los Fondos del Gobierno | | | Ajustes | Estado del Patrimonio Neto (Déficit) |
|---|---|---|---|---|---|
| | Fondo General | Fondo de Servicio de la Deuda | Total | | |
| **Activo:** | | | | | |
| Depósitos que devengan intereses colocados en al Banco Gubernamental de Puerto Rico, neto de pérdida de crédito custodial | $ - | $ 49,212,182 | $ 49,212,182 | $ - | $ 49,212,182 |
| Depósitos en bancos comerciales | - | 27,044,744 | 33,418,135 | - | 33,418,135 |
| Efectivo en poder del Fideicomisario | 6,373,391 | - | - | - | - |
| Crédito del Estado Libre Asociado de Puerto Rico | - | 8,158,581,343 | 8,158,581,343 | - | 8,158,581,343 |
| Intereses por cobrar devengados | - | 391,595 | 391,595 | - | 391,595 |
| Otros créditos | - | 1,644,602 | 1,644,602 | - | 1,644,602 |
| Inversiones | - | 1,184,349,530 | 1,184,349,530 | - | 1,184,349,530 |
| Total Activos | 6,373,391 | 9,421,223,996 | 9,427,597,387 | - | 9,427,597,387 |
| **Egresos diferidos de recursos:** | | | | | |
| Disminución acumulada en el valor razonable de derivados de cobertura | - | - | - | 65,954,336 | 65,954,336 |
| Pérdida diferida por refinanciación de bonos | - | - | - | 34,147,655 | 34,147,655 |
| Total egresos diferidos de recursos | - | - | - | 100,101,991 | 100,101,991 |
| **Pasivo:** | | | | | |
| Cuentas por pagar y pasivos devengados | 195,616 | 117,357 | 312,973 | 3,400,000 | 3,712,973 |
| Intereses a pagar devengados | - | 710,247,974 | 710,247,974 | 218,876,099 | 929,124,073 |
| Pasivo por swap de tasa de interés | - | - | - | 65,954,336 | 65,954,336 |
| Ingresos no devengados – imp. sobre ventas y uso | - | 8,158,581,343 | 8,158,581,343 | (8,158,581,343) | - |
| Bonos y pagarés a pagar a más de un año, neto | - | 18,745,000 | 18,745,000 | 17,849,986,350 | 17,868,731,350 |
| Total Pasivos | 195,616 | 8,887,691,674 | 8,887,887,290 | 9,979,635,442 | 18,867,522,732 |
| **Ingresos de recursos diferidos:** | | | | | |
| Ganancia diferida por refinanciación de bonos | - | - | - | 93,090,734 | 93,090,734 |
| **Patrimonio neto/saldo del fondo (déficit):** | | | | | |
| Saldo del fondo: | | | | | |
| Restringido | - | 533,532,322 | 533,532,322 | (533,532,322) | - |
| No asignado | 6,177,775 | - | 6,177,775 | (6,177,775) | - |
| Total saldo del fondo | 6,177,775 | 533,532,322 | 539,710,097 | (539,710,097) | - |
| Total pasivo y saldo del fondo | 6,373,391 | 9,421,223,996 | 9,427,597,387 | | |
| **Estado de situación del patrimonio neto (déficit):** | | | | | |
| De libre disponibilidad | | | | (9,432,914,088) | (9,432,914,088) |
| Estado de situación del patrimonio neto | $ | $ | $ | $ (9,432,914,088) | $ |

Véanse las Notas que acompañan los estados financieros básicos

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Conciliación del Balance General de los Fondos del Gobierno y el Estado del Patrimonio Neto (Déficit)
Al 30 de junio de 2018

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Estado de Ingresos y Gastos de los Fondos del Gobierno y Cambios en los Saldos de los Fondos y
Estado de Resultados
Al 30 de junio de 2018

| | | |
|---|---|---|
| Total Saldo de los Fondos – Fondos del Gobierno: | $ | 539,710,097 |
| Los saldos de las actividades gubernamentales expuestos en el estado de situación del patrimonio neto son diferentes debido a que: | | |
| Los egresos diferidos de recursos no constituyen recursos financieros corrientes, y por consiguiente, no se exponen en los fondos | | 65,954,336 |
| Los intereses a pagar devengados no son pagaderos y exigibles en el período corriente, y por consiguiente, no se exponen en los fondos | | (218,876,099) |
| Los pasivos contingentes no son pagaderos y exigibles en el período corriente, y por consiguiente, no se exponen en los fondos | | (3,400,000) |
| Los bonos y pagarés no son pagaderos y exigibles en el período corriente, y por consiguiente, no se exponen en los fondos | | (17,849,986,350) |
| La pérdida diferida por refinanciación de bonos no se expone como gasto en los estados financieros de fondos del gobierno; sin embargo, dicha pérdida se difiere y amortiza durante la vida remanente de los bonos refinanciados | | 34,147,655 |
| La ganancia diferida por refinanciación de bonos no se expone como ingresos en los estados financieros de fondos del gobierno; sin embargo, dicha ganancia se difiere y amortiza durante la vida remanente de los bonos refinanciados | | (93,090,734) |
| El pasivo por permuta (swap) de la tasa de interés no es pagadero y exigible en el período corriente, y por consiguiente, no se expone en los fondos | | (65,954,336) |
| El crédito del Estado Libre Asociado no constituye un recurso financiero corriente y, por consiguiente, se expone como ingreso no devengado en los estados financieros de los fondos | | 8,158,581,343 |
| Estado de situación del patrimonio neto de las actividades gubernamentales | $ | (9,432,914,088) |

Véanse las Notas que acompañan los estados financieros básicos

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Conciliación del Balance General de los Fondos del Gobierno y el Estado del Patrimonio Neto (Déficit)
Al 30 de junio de 2018

| | | Estado de Ingresos y Gastos de los Fondos del Gobierno y Cambios en los Saldos de los Fondos y Estado de Resultados | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Fondo General | Fondo de Servicio de la Deuda | Total | Ajustes | Estado de Situación de Patrimonio Neto (Déficit) |
| Gastos/erogaciones: | | | | | | |
| Gobierno general: | | | | | | |
| Otros: | $ | - | $ 4,319,507 | $ 4,319,507 | $ - | $ 4,319,507 |
| Servicio de la deuda | | | | | (18,745,000) | - |
| Capital: | | - | 18,745,000 | 18,745,000 | 323,847,260 | 1,013,876,083 |
| Intereses | | - | 690,028,823 | 690,028,823 | 305,102,260 | 1,018,195,590 |
| Total erogaciones/gastos | | - | 713,093,330 | 713,093,330 | | |
| Ingresos de programas: | | | | | | |
| Pago de las obligaciones del Estado Libre | | - | | | | - |
| Asociado de Puerto Rico – Impuesto sobre | | | 753,074,280 | 753,074,280 | (753,074,280) | |
| Ventas y Uso | | 1,102 | 9,931,526 | 9,932,628 | - | 9,932,628 |
| Ganancias de inversiones | | 1,102 | 763,005,806 | 763,006,908 | (753,074,280) | 9,932,628 |
| Total ingresos | | 1,102 | 49,912,476 | 49,913,578 | (1,058,176,540 | (1,008,262,962) |
| Ingresos (gastos) de programas, neto | | | | | | |
| Otras fuentes de financiamiento (usos): | | | | | | |
| Transferencias entrantes (salientes) | | (168,283) | 168,283 | - | - | - |
| Total otras fuentes de financiamiento (usos) | | (168,283) | 168,283 | - | - | - |
| Excedente (déficit) de ingresos y otras | | | | | | |
| fuentes de financiamiento sobre gastos y | | | | | | |
| otras aplicaciones de fondos | | (167,181) | 50,080,759 | 49,913,578 | (49,913,578) | - |
| Cambio en el estado de situación del | | - | - | - | (1,008,262,962) | (1,008,262,962) |
| patrimonio neto (déficit) | | | | | | |
| Saldo/patrimonio neto del fondo (déficit): | | | | | | |
| Al inicio del año | | 6,344,956 | 483,451,563 | 489,796,519 | (8,914,447,645) | (8,424,651,126) |
| Al cierre del año | $ | 6,177,775 | $ 533,532,322 | $ 539,710,097 | $ (9,972,624,185) | $ (9,432,914,088) |

Véanse las Notas que acompañan los estados financieros básicos

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

| | | |
|---|---|---:|
| Cambios netos en los saldos de los fondos – total fondos del gobierno: | $ | 49,913,578 |
| Causas de las diferencias en los saldos de las actividades gubernamentales expuestos en el estado de resultados: | | |
| El repago de la deuda a largo plazo se expone como gasto en los fondos del gobierno, pero el repago reduce las obligaciones a largo plazo en el estado de patrimonio neto (déficit) | | 18,745,000 |
| Los cambios netos en intereses pagaderos expuestos en el estado de resultados no requieren el uso de recursos financieros corrientes, y por consiguiente no se exponen como gasto en los fondos del gobierno | | 446,364 |
| La acumulación de intereses sobre los bonos de revalorización de capital no requiere el uso de recursos financieros corrientes, y por consiguiente, no se expone como gasto en los fondos del gobierno | | (325,159,638) |
| Los pagos del Estado Libre Asociado de Puerto Rico – Impuestos sobre Ventas y Uso son una fuente de recursos financieros corrientes para los fondos del gobierno; sin embargo, reflejan el crédito del Estado Libre Asociado de Puerto Rico en el estado de resultados | | (753,074,280) |
| La amortización de la prima/descuento de bonos, y la ganancia/pérdida por anulación de bonos no requiere el uso de recursos financieros corrientes, y por consiguiente no se expone como ingreso/gasto en los fondos del gobierno: | | |
| Amortización de la prima/descuento de bonos | | |
| Amortización de la ganancia/pérdida por bonos cancelados | | 1,178,429 |
| | | (312,415) |
| Cambio en el estado de situación del patrimonio neto (déficit) de las actividades gubernamentales | $ | (1,008,262,962) |

Véanse las notas que acompañan los estados financieros básicos.

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

**(1) Entidad que Reporta**

La Corporación del Fondo de Interés Apremiante de Puerto Rico (la Corporación o COFINA) es una corporación pública e instrumentalidad del Estado Libre Asociado de Puerto Rico (el Estado Libre Asociado), y constituye una entidad corporativa y política independiente y separada del Estado Libre Asociado. La Corporación fue creada bajo Ley Núm. 91 de la Asamblea Legislativa del Estado Libre Asociado (la Asamblea Legislativa), aprobada el 13 de mayo de 2006; según enmendada por Ley Núm. 291, aprobada el 26 de diciembre de 2006; Ley Núm. 56, aprobada el 6 de julio de 2007; Ley Núm. 1, aprobada el 14 de enero de 2009; Ley Núm. 7, aprobada el 9 de marzo de 2009; Ley Núm. 18, aprobada el 22 de mayo de 2009; Ley Núm. 133, aprobada el 12 de julio de 2012; Ley Núm. 116, aprobada el 10 de octubre de 2013; Ley Núm. 101, aprobada el 1 de julio de 2015; Ley Núm. 84, aprobada el 22 de julio de 2016; y Ley Núm. 241, aprobada el de noviembre 15 de 2018 (colectivamente, la Ley Núm. 91). La Corporación originalmente fue creada para el propósito de financiar el pago, retiro, o anulación de determinadas obligaciones deuda del Estado Libre Asociado pendientes al 30 de junio de 2006 (la Deuda de la Apropiación del 2006).

El Estado Libre Asociado impone un Impuesto sobre Ventas y Uso (IVU) sobre una amplia gama de bienes y servicios. Al 30 de junio de 2017, el impuesto total gravado fue 11.5%, lo cual se asignó de la siguiente manera: 5.5% en beneficio del Estado Libre Asociado (el Impuesto sobre Ventas del 5.5%), 0.5% en beneficio del Fondo de Administración Municipal, 4.5% como sobretasa al impuesto sobre ventas y uso en beneficio del Estado Libre Asociado y 1.0% para los municipios del Estado Libre Asociado.

La Ley Núm. 91 estableció el Fondo de Interés Apremiante, un fondo especial mantenido en nombre de la Corporación, por separado y aparte del Fondo General del Estado Libre Asociado. Al 30 de junio de 2017, la Ley Núm. 91 requiere que los siguientes montos sean depositados en el Fondo de Interés Apremiante cada año fiscal, lo que sea mayor entre: (i) un monto mínimo fijo, referido en la Ley Núm. 91 como el Monto Base de Impuesto sobre ventas Pignorado, o (ii) el resultado de multiplicar el Impuesto sobre Ventas del 5.5% recaudado durante dicho año fiscal por una fracción, cuyo numerador es dos punto setenta-y-cinco por ciento (2.75%), y cuyo denominador es cinco punto cinco por ciento (5.5%) (lo que sea mayor entre (i) y (ii) siendo referido como el Impuesto sobre ventas Pignorado), al 30 de junio de 2017, en cada año fiscal, las primeras recaudaciones del Impuesto sobre Ventas del 5.5% son depositadas en el Fondo Dedicado del Impuesto sobre Ventas y aplicados para financiar el Monto Base de Impuesto sobre ventas Pignorado. El Monto Base de Impuesto sobre ventas Pignorado para el año fiscal finalizado el 30 de junio de 2018, fue $753,074,280. Bajo la Ley Núm. 91, al 30 de junio de 2018, el Monto Base de Impuesto sobre ventas Pignorado aumenta cada año fiscal a una tasa estatutaria del 4.0% hasta $1,850,000,000. Bajo Ley Núm. 91, al 30 de junio de 2018, el dinero depositado en el Fondo Dedicado del Impuesto sobre Ventas puede ser usado para pagar los bonos de la Corporación, o para la satisfacción de los Usos Autorizados (según lo definido a continuación).

Durante 2009, la Asamblea Legislativa expandió los propósitos de la Corporación. Se autorizó que la Corporación pagara o financiara, sea en todo o en parte, o proporcionara fondos, en adición a la Deuda de Apropiación 2006, para: (i) la deuda del Secretario de Hacienda del Estado Libre Asociado (el Secretario de Hacienda) con el Banco Gubernamental de Fomento para Puerto Rico (el Banco o BGF) por un monto de $1,000 millones una porción de cuyo producto fue usado para cubrir el déficit presupuestario del Estado Libre Asociado para el año fiscal 2009; (ii) determinado financiamiento otorgado al Secretario de Hacienda por el Banco, pagadero de los futuros Bonos de Obligación General del Estado Libre Asociado, y cualquier deuda pendiente del Estado Libre Asociado al 31 de diciembre de 2008, que no tuviera una fuente de repago, o que habría sido pagadera de las adjudicaciones presupuestarias; (iii) una porción de las cuentas pagaderas a los proveedores del Estado Libre Asociado; (iv) gastos operativos del Estado Libre Asociado para los años fiscales 2009, 2010, y 2011; (v) gastos operativos del Estado Libre Asociado para el año fiscal 2012, en la medida que estuvieran incluidos en el presupuesto anual del Estado Libre Asociado, (vi) el Fondo de Estímulo Económico de Puerto Rico; (vii) el Fondo de Emergencia del Estado Libre Asociado para cubrir gastos generados por eventos catastróficos como huracanes o inundaciones, y (viii) el Fondo de Alternativas para Empleados Públicos y

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

Cooperación Económica (con todos los antedichos usos, junto con la Deuda de Apropiación del 2006, siendo los Usos Autorizados).

Independientemente del nivel de las recaudaciones del Impuesto sobre Ventas del 5.5%, la Ley Núm. 91, a partir del 30 de junio de 2018, requiere que en cada año fiscal todos las recaudaciones del Impuesto sobre Ventas del 5.5% sean depositados en el Fondo Dedicado del Impuesto sobre Ventas hasta que un monto igual al Monto Base de Impuesto sobre Ventas Pignorado haya sido depositado, antes de que cualquier recaudación del Impuesto sobre Ventas del 5.5% pueda ser depositado en el Fondo General del Estado Libre Asociado.

**(2)   Resumen de Políticas Contables Importantes**

La preparación de los estados financieros básicos en conformidad con los Principios de contabilidad generalmente aceptados en los Estados Unidos (U.S. GAAP) requiere que la administración haga estimados y supuestos que afectan los montos reportados de activos y pasivos y la divulgación de activos y pasivos contingentes a la fecha de los estados financieros, así como los montos reportados de cambios en el patrimonio neto durante el periodo de informes. Los resultados actuales podrían diferir de estos estimados.

Las políticas contables y sobre informes de la Corporación          conforman con los principios contables generalmente aceptados en los Estados Unidos de América, según aplicables a las entidades gubernamentales. La Corporación observa las pautas de la Junta de Normas de Contabilidad Gubernamental (GASB - Governmental Accounting Standards Board), en conformidad con la jerarquía establecida en su Declaración Núm. 55, *Jerarquía de Principios de Contabilidad Generalmente Aceptados para Gobiernos Estatales y Locales,* para la preparación de sus estados financieros básicos.

A continuación se presenta una descripción de las políticas contables más importantes de la Corporación:

*(a)   Base de la Presentación*

Las actividades de la Corporación consisten exclusivamente de actividades gubernamentales. Para propósitos de exponer sus informes, la Corporación ha combinado los estados financieros de fondo y a nivel de todo el gobierno usando un formato de columnas que concilia las partidas individuales con los datos financieros de los fondos a datos a nivel de todo el gobierno en una columna separada.

Estados Financieros a Nivel de Todo el Gobierno – El estado de situación del patrimonio neto de los fondos del gobierno y el estado de actividades exponen información sobre todas las actividades de la Corporación. El efecto de los saldos entre fondos ha sido removido del estado de situación del patrimonio neto de los fondos del gobierno. Las actividades del gobierno se financian por medio de los ingresos del IVU depositados en el Fondo Dedicado del Impuesto sobre Ventas y otras fuentes de fondos.

El estado de patrimonio neto expone los activos y pasivos de la Corporación, con la diferencia reportada como el patrimonio (déficit) neto. El patrimonio neto se expone en dos categorías:

- Patrimonio Neto Restringido – Las actividades cuando existen restricciones sobre el uso del patrimonio neto que son, o bien, impuestos por partes externas como acreedores, garantes, contribuyentes, y similares, o impuestos por ley por medio de disposiciones constitucionales o legislación orgánica.

- Patrimonio Neto No Restringido – Se compone el patrimonio neto que no satisface las definiciones de la categoría anterior. Frecuentemente se designa del patrimonio neto no restringida para propósitos de indicar que la administración no considera que están disponibles para operaciones generales. El patrimonio neto no restringido frecuentemente tiene restricciones sobre uso impuestas por la administración, pero dichas restricciones pueden ser eliminadas o modificadas.

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

El estado de resultados muestra el grado en los que gastos directos de determinada función o segmento son compensados por los ingresos de programas. Los gastos directos son aquellos que se pueden identificar claramente dentro de una función específica. Los ingresos de programas consisten en ganancias de inversiones (incluyendo cambios en el valor razonable derivados de inversión ineficaces). Otras partidas que no satisfacen la definición de ingresos de programas se exponen como ingresos generales.

Estados Financieros de Fondos del Gobierno – Las cuentas de la Corporación se organizan en base a fondos, cada uno de los cuales se considera una entidad contable separada. Se proveen estados financieros para los fondos del gobierno. Los principales fondos del gobierno se exponen como columnas separadas en los estados financieros del fondo. Todos los fondos de la Corporación son fondos principales.

Contabilidad de los Fondos – Las actividades financieras de la Corporación se registran en fondos individuales, cada uno de los cuales se considera una entidad contable separada. La contabilidad de los fondos está diseñada para demostrar cumplimiento legal y para asistir en la administración financiera al segregar transacciones relacionadas con ciertas funciones o actividades del gobierno. Un fondo es una entidad contable separada libros con balances autónomos. Las actividades financieras de la Corporación que se exponen en los estados financieros básicos que acompañan han sido clasificados conforme a los fondos del gobierno principales que se indican a continuación:

- Fondo General – El fondo general de la Corporación se usa para contabilizar todos los recursos financieros, con excepción de aquellos que se exige sean contabilizados en otro fondo.

- Fondo de Servicio deuda – El fondo de servicio deuda se usa para contabilizar el IVU depositado en Fondo Dedicado del Impuesto sobre Ventas para el pago de intereses y capital de obligaciones a largo plazo.

Los saldos para cada fondo gubernamental se despliegan en las siguientes clasificaciones, que indican el peso relativo de las restricciones sobre gastos impuestos sobre los propósitos para los cuales se pueden utilizar los recursos:

- No Disponibles – montos que no pueden ser erogados, ya que, o bien, no existen en forma erogable (por ejemplo, inventarios y montos prepagados), o que se exige legal o contractualmente que deben ser mantenidos intactos. La Corporación no tenía recursos no erogables al 30 de junio de 2018.
- Restringidos – montos que pueden ser erogados únicamente para propósitos específicos, debido a restricciones impuestos por proveedores externos (por ejemplo, otorgantes, bonistas, o niveles superiores de. gobierno), o impuestos por disposiciones constitucionales o leyes orgánicas. Efectivamente, las restricciones pueden ser cambiadas o levantadas únicamente con el consentimiento del proveedor de los recursos o por disposiciones constitucionales o legislación orgánica.
- Comprometidos – montos que pueden ser erogados únicamente para propósitos específicos determinados por medio de una acción formal del nivel máximo del gobierno con facultades para la toma decisiones. Con respecto a la Corporación, el nivel máximo de facultades para la toma decisiones de la Corporación reposa en la junta directiva. La Corporación no tenía recursos comprometidos al 30 de junio de 2018.
- Asignados – montos que el gobierno pretenda usar para propósitos específicos que no satisfacen los criterios para ser clasificados como restringidos o comprometidos (generalmente, ordenes ejecutivos aprobados por el Director Ejecutivo de la Corporación). La Corporación no tenía recursos asignados al 30 de junio de 2018.
- No Asignados – montos que están disponibles para cualquier propósito.

(continuación)

(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

*(b)*   *Enfoque de Medición, Criterios Contables, y Presentación de Estados Financieros*

El tratamiento de los informes contables y financieros se determina por el enfoque de medición aplicable y los criterios contables. El enfoque de medición indica el tipo de recursos que se está midiendo, tales como los recursos financieros actuales o recursos económicos. Los criterios contables indican los momentos de las transacciones o eventos a ser reconocidos en los estados financieros.

Estados Financieros a Nivel de Todo el Gobierno – Los estados Financieros a nivel de todo el gobierno se exponen usando el enfoque de medición y contabilidad en base al principio contable de valores devengados. Los ingresos se contabilizan al ser devengados, y los gastos se contabilizan cuando se incurre la obligación, independientemente de los momentos temporales de los flujos de efectivo relacionados.

Estados Financieros de Fondos del Gobierno – Los estados financieros de los fondos del gobierno se exponen usando el enfoque de medición de recursos financieros actuales y el principio contable modificado de valores devengados. Los ingresos se reconocen en la medida que se hacen medibles y disponibles. Los ingresos se consideran disponibles cuando son recaudables dentro del periodo corriente, o con suficiente aproximación al mismo, para pagar los pasivos del periodo corriente. Para este propósito, la Corporación considera que los ingresos están disponibles si se recaudan dentro de los 30 días posteriores al cierre del año fiscal actual. Los gastos generalmente se registran cuando se incurre la obligación, al igual que bajo el principio contable de valores devengados, excepto que generalmente los intereses sobre obligaciones a largo plazo se reconocen en el momento de ser pagados, y los gastos de capital para servicio deuda y reclamaciones y sentencias se reconocen únicamente cuando el pago está vencido y es exigible. Los gastos pagados en nombre del Estado Libre Asociado se contabilizan como un aumento en las cuentas cobrables del Estado Libre Asociado de Puerto Rico en los estados financieros a nivel de todo el gobierno.

Los pagos del Estado Libre Asociado de Puerto Rico por concepto del IVU se reconocen como ingresos en los estados financieros del fondo al ser recaudados o cuando el Estado Libre Asociado está obligado a efectuar los pagos. En los estados financieros a nivel de todo el gobierno, estos pagos reducen las cuentas por cobrar del Estado Libre Asociado de Puerto Rico. Las recaudaciones del IVU recibidas después de que se hayan liquidado las cuentas por cobrar del Estado Libre Asociado de Puerto Rico se exponen como ingresos en el estado de actividades.

*(c)*   *Contabilidad Presupuestaria*

No se requiere que la Corporación presente un presupuesto para la aprobación de la Asamblea Legislativa; por consiguiente, no se sigue ningún procedimiento formal de contabilidad presupuestaria.

*(d)*   *Inversiones*

Las inversiones se exponen a su valor razonable, con excepción de instrumentos del mercado de dinero con vencimiento remanente de un año o menos en el momento de su adquisición, y posiciones de inversiones de tipo 2a7 (Regla 2a7 de la Ley sobre Compañías de Inversiones del Securities and Exchange Comission [Comisión de Valores y Bolsas de EE.UU.] de 1940), como por ejemplo, en fondos externos de inversión, los cuales se contabilizan a su costo amortizado en conformidad con Declaración GASB Núm. 79, *Ciertos Fondos de Inversión Externos y Participantes en Fondos.* Se considera que el Fideicomiso para la Inversión de los Fondos del Gobierno de Puerto Rico (PRGITF, por las siglas en inglés de Puerto Rico Government Investment Trust Fund) es un fondo externo de inversión similar a los de tipo 2a7, y como tal, expone sus inversiones o inversiones corto plazo a costo amortizado. No hay limitaciones ni restricciones sobre retiros relacionados con los fondos externos de inversión en poder de la Corporación.

El valor razonable se determina en base a los precios de mercado cotizados y las cotizaciones recibidas de corredores o intermediarios independientes u organizaciones de servicios de cotización.

CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

La Declaración GASB Núm. 72, *Medición y Aplicación de Valor Razonable,* define el valor razonable como el precio que se habría recibido para vender un activo o pagado para transferir un pasivo en una transacción en buen orden entre participantes en el mercado a la fecha de medición. Esta Declaración requiere que un gobierno use técnicas de valoración que son apropiadas bajo las circunstancias, y para las cuales hay suficientes datos disponibles para medir el valor razonable. Las técnicas deben ser congruentes con uno o más de los siguientes enfoques: el enfoque de mercado, el enfoque de costos, o el enfoque de ingresos. Esta Declaración también establece una jerarquía de entradas para las técnicas de valoración usadas para medir el valor razonable. Esta jerarquía tiene tres niveles.

Nivel 1 - Entradas cuyos valores se basan sobre precios cotizados (no ajustados) en mercados activos para activos o pasivos idénticos.

Nivel 2 - Entradas aparte de precios cotizados incluidos dentro del Nivel 1 que son observables para los activos o pasivos, sea directa o indirectamente.

Nivel 3 - Entradas que no son observables para el activo o pasivo y que pueden exigir cierto grado de juicio profesional.

*(e)*    *Costos de Emisión de Bonos y Prima/Descuento sobre Bonos*

Las primas (descuentos) sobre bonos se amortizan sistemáticamente a lo largo de la vida de la deuda en los estados financieros a nivel de todo el gobierno. Las primas (descuentos) se reconocen en el periodo cuando se emite la deuda a largo plazo relacionada en los estados financieros de los fondos del gobierno, y por consiguiente no se contabilizan en los periodos subsiguientes. Los costos de emisión de bonos se contabilizan como gastos incurridos en los estados financieros tanto a nivel de todo el gobierno como en los fondos del gobierno.

*(f)*    *Transferencias Entre Fondos*

Las transferencias representan flujos de activos (por ejemplo, efectivo o bienes) sin flujos equivalentes de activos en contraprestación, y sin obligación de ser repagado. En los fondos del gobierno, las transacciones se exponen como otros usos de fondos en el fondo que realiza las transacciones y como otras fuentes de fondos en los fondos que reciben las transacciones.

*(g)*    *Refinanciamientos*

Los refinanciamientos implican la emisión deuda nueva, cuyo producto se usa para el repago inmediato deuda previamente emitida (refinanciamiento corriente) o en algún momento futuro (refinanciamiento anticipado). La diferencia entre el precio de readquisición y el monto neto en libros de la deuda antigua se difiere y amortiza como componente de los gastos en intereses a lo largo de la vida remanente de la deuda antigua o la vida de la deuda nueva, lo que sea más corto. El monto diferido se contabiliza en el estado de situación del patrimonio neto de los fondos del gobierno, o bien como un ingreso diferido egreso diferido de recursos.

*(h)*    *Instrumentos Derivados*

La Corporación usa instrumentos derivados para gestionar el impacto económico de variaciones en las tases de intereses. Los instrumentos derivados se exponen a valor razonable en el estado de patrimonio neto.

*(i)*    *Flujos de Ingresos/Egresos de Recursos Diferidos*

Además de los activos, el estado de patrimonio neto incluye una sección separada para flujos de ingresos/egresos de recursos diferidos. Estos elementos separados del estado financiero, y flujos de ingresos/egresos diferidos diferidas de recursos, representan un agotamiento (gastos/erogaciones) o acumulación (ingresos) del patrimonio neto que se aplica a periodos futuros, y por lo tanto no serán

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

reconocidos como ingresos/egresos diferidos diferidas de recursos hasta entonces. La tabla a continuación expone los ingresos/egresos diferidos de elementos de recursos al 30 de junio de 2018:

| | | |
|---|---|---|
| Egresos diferidos de recursos: | | |
| Disminución acumulada del valor razonable de cobertura de derivados | $ | 74,075,971 |
| Pérdida diferida por refinanciación de bonos | | 34,147,654 |
| | $ | 108,223,625 |
| Ingresos diferidos de recursos: | | |
| Ganancia diferida por refinanciación de bonos | $ | 93,090,735 |

*(j)* *Nueva Norma Contable Adoptada y Pronunciamientos Contables Emitidos pero que aún no han Entrado en Vigor*

**Norma Contable Adoptada**

- La Declaración GASB Núm. 81, *Convenios Irrevocables de Interés Compartido.* Esta Declaración mejora los informes contables y financieros para convenios de intereses compartidos, al proveer pautas para el reconocimiento y la medición de situaciones en las cuales un gobierno es el beneficiario del contrato. Contratos de intereses compartidos son un tipo de contrato de dación usado por los donantes para proveer recursos a dos o más beneficiarios, incluyendo los gobiernos. Los contratos de intereses compartidos pueden ser creados por fideicomisos, u otros contratos legalmente vinculantes y ejecutables, con características equivalentes a los acuerdos de intereses compartidos, mediante los cuales un donante transfiere recursos a un intermediario para que los sostenga y administre en beneficio de un gobierno y por lo menos un beneficiario adicional. Ejemplos de estos tipos de contratos incluyen fideicomisos caritativos principales, fideicomisos caritativos remanentes, y derechos vitalicios en bienes inmobiliarios. Esta Declaración exige que un gobierno que recibe recursos en conformidad con un contrato de intereses compartidos irrevocable debe reconocer activos, pasivos, e ingresos diferidos a partir de la incepción del contrato. Por otra parte, esta Declaración requiere que un gobierno reconozca activos que representan sus intereses beneficiarios en contratos de intereses compartidos irrevocables administrados por terceros, si el gobierno controla la capacidad actual del servicio de los derechos beneficiarios. Esta Declaración requiere que un gobierno reconozca ingresos cuando los recursos son aplicables al periodo del informe. La adopción de esta Declaración no tuvo impacto alguno sobre los estados financieros básicos de la Corporación.

- Declaración GASB Núm. 85, *Ómnibus 2017.* El objetivo de esta Declaración es abordar problemas en la práctica que han sido identificados durante la implementación y aplicación de ciertas Declaraciones GASB. Esta Declaración aborda una variedad de temas, incluyendo asuntos relacionados con mezclas de unidades componentes, fondo de comercio, medición de valor razonable y su aplicación, y beneficios post-empleo (pensiones y otros beneficios post-empleo). Específicamente, esta Declaración aborda la medición de ciertas inversiones en los mercados de dinero y contratos de inversión que devienen intereses participativos a costo amortizado. No hubo impacto material alguno sobre la implementación de las partes aplicables de la Declaración GASB Núm. 85.

**Pronunciamientos Contables Emitidos pero que aún no han Entrado en Vigor**

- Declaración GASB Núm. 84, *Actividades Fiduciarias.* El objetivo de esta Declaración es mejorar las pautas para la identificación de resultados fiduciarias para propósitos contables y financieros, y como dichos resultados deben ser expuestos. Los requerimientos de esta Declaración entran en vigor para los periodos de los informes a partir del 15 de diciembre de 2018. Se anima su aplicación con mayor antelación.

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

- Declaración GASB Núm. 86, *Ciertos Asuntos Relacionados con la Extinción de Deuda.* Esta Declaración mejora la coherencia de los informes contables y financieros para la extinción sustantiva de la deuda, al proveer pautas para transacciones en las cuales el efectivo y otros activos monetarios adquiridos únicamente con recursos existentes – recursos aparte del producto de refinanciación de deuda – se colocan en un fideicomiso irrevocable para el propósito exclusivo de extinguir deuda. Esta Declaración también mejora los informes contables y financieros y sobre deuda sustantivamente extinguida. Los requerimientos de esta Declaración entran en vigor para los años fiscales a partir del 15 de junio de 2017. Se anima su aplicación con la mayor antelación posible.

- Declaración GASB Núm. 88, *Ciertas Divulgaciones Relacionadas con Deuda, Incluyendo Préstamos Directos y Colocaciones Directas.* El objetivo principal de esta Declaración es mejorar la información que se divulga en las notas de los estados financieros de gobiernos, relacionados con deuda, lo cual incluye préstamos directos y colocaciones directas. También aclara cuales pasivos deben incluir los gobiernos al divulgar información relacionado con la deuda. Esta Declaración define lo que es deuda para propósitos de divulgación en las notas a estados financieros, como un pasivo generado por una obligación contractual de pagar efectivo (u otros efectivos que puede ser usados en lugar de efectivo) en uno o más pagos para liquidar un monto que se fija en la fecha en que se establece la obligación contractual. Esta Declaración requiere que información esencial adicional relacionada con deuda sea divulgada en las notas a estados financieros, incluyendo líneas de crédito no utilizadas; activos pignorados en garantía de la deuda; y términos especificados en contratos deuda relacionados con eventos importantes de incumplimiento con consecuencias relacionadas con finanzas, eventos importantes de terminación con consecuencias relacionadas con finanzas, e importantes cláusulas de aceleración subjetiva. Para las notas a estados financieros relacionados con deuda, esta Declaración también requiere que información existente y adicional sea aportada para préstamos directos y colocaciones directas deuda, considerados aparte otra deuda. Los requerimientos de esta Declaración entran en vigor para los periodos de informes a partir del 15 de junio de 2018. Se anima su aplicación con la mayor antelación posible.

- Declaración GASB Núm. 87, *Arriendos.* El objetivo de esta Declaración es ayudar a satisfacer las necesidades de información de los usuarios de estados financieros, al mejorar los informes contables y financieros sobre arriendos de gobiernos. Esta Declaración aumenta la utilidad de los estados financieros de gobiernos requerir el reconocimiento determinado activos y pasivos de arriendos para arriendos que previamente eran clasificados como arriendos operativos y reconocidos como ingresos de recursos o egresos de recursos en base a las disposiciones contractuales de pago. Establece un solo modelo para los bonistas de arriendos, en base al principio fundamental que los arriendos son financiamiento del derecho a usar un activo subyacente. Bajo esta Declaración, se exige que el arrendatario reconozca un pasivo de arriendo y un activo de arriendo intangible de usufructo, y al arrendador se le exige reconocer la cuenta cobrable del arriendo y la entrada diferida de recursos, por consiguiente mejorando la relevancia y coherencia de la información sobre las actividades de arriendo de los gobiernos. Los requerimientos de esta Declaración entran en vigor para los periodos de informes a partir del 15 de diciembre de 2019. Se anima su aplicación con mayor antelación.

La Administración está evaluando el impacto que estas declaraciones podrán tener sobre los estados financieros básicos de la Corporación.

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

**(3)  Factores mitigantes con respecto al principio contable del supuesto de empresa en funcionamiento "Going Concern"**

No obstante las circunstancias existentes el 30 de junio de 2018, en base a los eventos subsiguientes que remediaron la condición financiera de la Corporación y atendieron sus pasivos, la administración no considera que existen dudas sustanciales sobre las posibilidades de la Corporación de continuar como emprendimiento viable (conforme al principio contable de "going concern") a la fecha de estos estados financieros básicos.

El 7 y 8 de noviembre, 2018, respectivamente, la Cámara de Representantes y el Senado de Puerto Rico aprobaron legislación nueva para enmendar y reformular la Ley Núm. 91 de 2006 para establecer el marco legal para la reestructuración de los bonos emitidos y en circulación de COFINA. El 15 de noviembre de 2018, el Gobernador de Puerto Rico firmó su nueva legislación, promulgada como la Ley Núm. 241 de 2018. La Ley Núm. 241 de 2018 estableció el marco legal para la reestructuración de los bonos emitidos y en circulación de COFINA, entre otros, al autorizar la emisión de nuevos Bonos COFINA necesarios para completar las transacciones contempladas bajo el Tercer Plan de Ajuste Enmendado de COFINA.

El 12 de febrero de 2019, la Corporación emergió del Título III de PROMESA. En esa fecha, la Corporación perfeccionó su Tercer Plan de Ajuste Enmendado. El perfeccionamiento del Tercer Plan de Ajuste Enmendado junto con la promulgación de la Ley Núm. 241 de 2018 dispuso la reestructuración de los Bonos COFINA, aclarando su propiedad de los Impuestos sobre ventas Pignorados de COFINA y estableciendo una junta directiva independiente con gobernación corporativa robusta, e independencia financiera y operativa del Estado Libre Asociado. Para mayor información, refiérase a la Nota 12 de los estados financieros básicos. La Corporación ha efectuado sus pagos programados sobre sus bonos de tasa fija garantizados por el impuesto sobre ventas recién emitidos desde el 12 de febrero de 2019.

**(4)  Ley de Supervisión, Administración, y Estabilidad Económica de Puerto Rico**

El 30 de junio de 2016, el Presidente de los Estados Unidos firmó la Ley de Supervisión, Administración, y Estabilidad Económica de Puerto Rico (PROMESA, por las siglas en inglés de Puerto Rico Oversight, Management, y Economic Stability Act), la cual le otorga al Estado Libre Asociado y sus "instrumentalidades territoriales cubiertas", incluyendo la Corporación, acceso a un mecanismo ordenado para reestructurar sus deudas, a cambio de una supervisión federal significante sobre las finanzas del Estado Libre Asociado. En términos generales, el propósito de PROMESA es proveer al Estado Libre Asociado y sus unidades componentes, incluyendo la Corporación, disciplina fiscal y económica, entre otras cosas, mediante: (i) el establecimiento de la Junta de Supervisión y Administración Financiera para Puerto Rico (la Junta de Supervisión), cuyas responsabilidad incluyen la certificación de los presupuestos y planes fiscales del Estado Libre Asociado y sus entidades relacionadas; (ii) una paralización temporal de todas las demandas de los acreedores al amparo del Título IV de PROMESA; y (iii) dos métodos alternativos para el ajuste deuda insostenible: (a) un proceso voluntario de modificación deuda bajo el Título VI de PROMESA, que establece un proceso principalmente extrajudicial para la reestructuración deuda, mediante el cual una super-mayoría de los acreedores puede aceptar modificaciones a la deuda financiera; y (b) un procedimiento análogo al procedimiento tipo quiebra, al amparo del Título III de PROMESA, el cual establece un proceso judicial de reestructuración deuda, basado sustancialmente sobre las disposiciones incorporadas del Código de Quiebras de los Estados Unidos (11 U.S.C. §§ 101, et seq.). Cada uno de estos elementos se dividen entre los siete títulos de PROMESA, que se discuten brevemente a continuación.

*Título I- Establecimiento de la Junta de Supervisión y Asuntos Administrativos*

El Título I de PROMESA estableció la Junta de Supervisión con la promulgación de PROMESA. Como lo declara PROMESA, el fin de la Junta de Supervisión es "proveer un método para alcanzar responsabilidad fiscal y tener acceso a los mercados de capitales". El 31 de agosto de 2016, el Presidente de los Estados Unidos anunció el nombramiento de los miembros de la Junta de Supervisión. Se requiere que cada miembro de la Junta de Supervisión tenga "conocimientos y experiencia en finanzas, mercados de bonos municipales, gerencia, derecho, o sobre la organización o funcionamiento de negocios o del gobierno". La Junta de Supervisión "se creará como una entidad dentro del gobierno del territorio, para la cual se establece" y

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

expresamente no es una entidad del gobierno federal, pero también fue establecido de tal forma que pudiera actuar independiente del Gobernador del Estado Libre Asociado, de tal forma que ni el Gobernador ni la Legislatura puede "(i) ejercer ningún control sobre, supervisar, monitorear, o revisar a la Junta de Supervisión o sus actividades; o (ii) adoptar, implementar o hacer cumplir cualquier estatuto, resolución, política o regla que pueda menoscabar o anular los propósitos a esta Ley, según lo determine la Junta de Supervisión.

*Título II Plan Fiscal y Proceso de Certificación Presupuestario y Cumplimiento*

El Título II de PROMESA estableció los requerimientos para proponer y certificar planes fiscales y presupuestos para el Estado Libre Asociado y sus instrumentalidades, "Cada plan fiscal servirá como la piedra angular para las reformas estructurales que la Junta de Supervisión considere necesario para asegurar que el territorio, o instrumentalidad, esté encaminado hacia la responsabilidad fiscal y acceso a mercados de capital".

En conexión con las negociaciones en torno al PSA Original (según se describe a continuación) y en anticipación de las transacciones contempladas por el PSA Original, el 22 de agosto de 2018, la Junta de Supervisión solicitó un plan fiscal autónomo para la Corporación para los años fiscales del 2019 al 2023. El 27 de agosto de 2018, la Corporación presentó su plan fiscal a la Junta de Supervisión. El 30 de agosto de 2018, la Junta de Supervisión entregó a la Corporación una notificación de violación en conformidad con la sección 201 (c)(3)(B) de PROMESA, requiriendo ciertos cambios y/o explicaciones en un plan fiscal revisado de COFINA. El 7 de septiembre de 2018, la Corporación presentó un plan fiscal revisado a la Junta de Supervisión. El 18 de octubre de 2018, la Junta de Supervisión certificó el plan fiscal de la Corporación, según enmendado.

*Título III – Proceso de Reestructuración Judicial*

El 5 de mayo de 2017, la Junta de Supervisión creada por PROMESA presentó una petición de remedio bajo el Título III de PROMESA, similar al procedimiento de quiebra. El Título III de PROMESA estableció un proceso judicial ante el Tribunal para la reestructuración de las deudas de Puerto Rico y otros territorios de los Estados Unidos, modelado sobre el proceso bajo el Capítulo 9 del Código de Quiebras. Para ser deudores al amparo del Título III, un territorio y/o sus instrumentalidades deben: (i) tener una Junta de Supervisión establecido para el mismo, o ser designado una "entidad cubierta"; (ii) hacer que la Junta de Supervisión emita una certificación de reestructuración bajo PROMESA sección 206(b); y (iii) "desear implementar un plan para ajustar sus deudas." La Junta de Supervisión tiene la autoridad exclusiva de presentar una petición voluntaria solicitando protección bajo el Título III de PROMESA. Véase PROMESA § 304(a). A la fecha de la presente, la Junta de Supervisión, a solicitud del gobierno, ha iniciado casos Título III para el Estado Libre Asociado y COFINA, entre otros.

En un caso Título III, la Junta de Supervisión actúa como representante del deudor, y está autorizado a tomar cualquier acción necesaria para juzgar el caso Título III. Véase PROMESA § 315. Inmediatamente después de presentar la petición Título III, la sección 362 del Código de Quiebras (que se incorpora en los casos Título III bajo PROMESA) se aplica para automáticamente suspender sustancialmente toda litigación en contra del deudor (la Paralización al amparo del Título III). Después de incoar el caso Título III, el Magistrado Presidente de la Corte Suprema de los Estados Unidos debe designar un juez del Tribunal de distrito para ser nombrado y presidir sobre un caso Título III. PROMESA también dispone que el inicio de un caso Título III "no limitará o actuará para menoscabar el poder que tiene un territorio cubierto de controlar, por legislación o por otro medio, su territorio o cualquier instrumentalidad territorial del mismo, en el ejercicio de los poderes políticos o gubernamentales del territorio o de la instrumentalidad territorial."

Un caso Título III culmina con la confirmación de un plan de ajuste deudas por el deudor. La Junta de Supervisión tiene la autoridad exclusiva para presentar un plan de ajuste. Para que pueda ser confirmado, un plan de ajuste propuesto debe satisfacer los requerimientos establecidos en la sección 314 de PROMESA.

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

El 5 de febrero de 2019, el Tribunal del Título III confirmó el Tercer Plan de Ajuste Enmendado de la Corporación. El 12 de febrero de 2019, el Tercer Plan de Ajuste Enmendado quedó sustancialmente perfeccionado y entró en vigor. Para mayor información sobre el Tercer Plan de Ajuste Enmendado, refiérase a la Nota 12.

<u>Título IV – Paralización Temporal de Litigación, Informes del Gobierno, y otras Disposiciones Misceláneas</u>

El Título IV de PROMESA contiene varias disposiciones misceláneas, incluyendo una paralización temporal de litigación relacionada con las "Reclamación de Obligación", remedios con respecto a determinadas leyes sobre salarios y horas, el establecimiento de Grupo de Trabajo del Congreso sobre el Crecimiento Económico en Puerto Rico (el Grupo de Trabajo), y el requerimiento que el Contralor General de los Estados Unidos presente dos informes al Congreso sobre los niveles deuda pública de los territorios de los Estados Unidos, y la expansión del programa HUB Zone del gobierno federal para apoyo a pequeñas empresas en Puerto Rico.

En conformidad con la sección 405 de PROMESA, la promulgación de PROMESA inmediatamente y automáticamente impuso un paralización temporal (la paralización Título IV) a partir del 30 de junio de 2016 (la fecha de promulgación de PROMESA) hasta el 15 de febrero de 2017, con respecto a toda litigación de "Reclamación de Obligación" iniciada en contra del Estado Libre Asociado y sus instrumentalidades después del 18 de diciembre de 2015. Una "Reclamación de Obligación" se define como cualquier derecho a pago o remedio en equidad por motivo de incumplimiento relacionado con "un bono, préstamo, carta de crédito, otro título de préstamo, obligación de seguro, u otro tipo deuda financiera de dinero prestado, incluyendo derechos u obligaciones naturales o adquiridas, ya sea que tales derechos y obligaciones naturales o adquiridas surjan de un contrato, estatuto, o por cualquier otra fuente legal, que en cualquier caso esté relacionado a [lo antedicho]" para el cual el Estado Libre Asociado o alguna de sus instrumentalidades fue el emisor, obligado, o garante, y dichas responsabilidades fueron incurridas previo al 30 de junio de 2016. La Paralización del Título IV fue sujeta a una prórroga única de 75 días por la Junta de Supervisión o una prórroga única de 60 días por el Tribunal de Distrito de los Estados Unidos. El 28 de enero de 2017, la Junta de Supervisión prorrogó la Paralización Título IV por 75 días al 1 de mayo de 2017, momento en el cual expiro la Paralización Título IV.

El Título IV de PROMESA también requirió varios informes del gobierno federal. Primero, PROMESA estableció el Grupo de Trabajo dentro del poder legislativo del gobierno federal Estados Unidos. El Grupo de Trabajo presentó su informe al Congreso el 20 de diciembre de 2016.

Segundo, PROMESA requirió que el Contralor General de los Estados Unidos, por medio de la GAO (por las siglas en inglés del Government Accountability Office), presente un informe a la Cámara y el Senado para el 30 de diciembre de 2017 con respecto a: (i) las condiciones que llevaron al nivel actual deuda de Puerto Rico; (ii) como las acciones del gobierno mejoraron o empeoraron su condición financiera; y (iii) recomendaciones sobre nuevas políticas o acciones fiscales que el Estado Libre Asociado podría adoptar. La GAO publicó este informe el 9 de mayo de 2018.

Tercero, PROMESA requirió que el Contralor General de los Estados Unidos, a través de GAO, presentara un informe al Congreso para el 30 de junio de 2017 sobre la deuda pública de los territorios de los Estados Unidos, Además de su informe inicial, la GAO debe presentar al Congreso informes actualizados sobre la deuda pública por lo menos una vez cada dos años. La GAO publicó este informe el 2 de octubre de 2017.

<u>*Título V- Revitalización de la Infraestructura*</u>

El Título V de PROMESA estableció la posición de Coordinador de Revitalización bajo la Junta de Supervisión y provee un marco para la revitalización de infraestructura, por medio de un proceso de autorización expeditado para "proyectos críticos" según identificados por el Coordinador de Revitalización.

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

*Título VI – Proceso Consensual Extrajudicial para Ajuste de deuda.*

El Título VI de PROMESA estableció un proceso extrajudicial para modificar las deudas de Puerto Rico. Bajo la sección 601(d) de PROMESA, la Junta de Supervisión está autorizada para establecer "fondos" de bonos emitidos por cada emisor relacionado con el gobierno de Puerto Rico, en base a prioridades relativas. Después de establecer los fondos, el emisor gubernamental o cualquier bonista o grupo de bonistas puede proponer una modificación a una o más series de los bonos del emisor gubernamental. En caso que exista un acuerdo voluntario, la Junta de Supervisión debe emitir una certificación y ejecutar ciertos procesos adicionales para poder calificar la modificación.

A la fecha de la presente, el BGF ha completado una reestructuración bajo el Título VI de PROMESA. Como se discutió arriba, en conformidad con los términos de la Modificación Elegible al amparo del Título VI del BGF, cualesquier reclamaciones en relación con los depósitos de la Corporación en BGF fueron extinguidos a cambio de intereses en el Fideicomiso de Entidad Pública. Por consiguiente, el monto recuperado por la Corporación por motivo de su reclamación sobre depósitos dependerá del monto recuperado en última instancia por el Fideicomiso de Entidad Pública por motivo de los Activos del PET (por las siglas en inglés de Fideicomiso de Entidad Pública).

*Título VII—Sentir del Congreso*

El Título VII de PROMESA hace constar el sentir del Congreso "que cualquier solución duradera para la crisis fiscal y económica de Puerto Rico debe incluir reformas fiscales permanentes que fomenten el crecimiento y que se caractericen, entre otras cosas, por el libre flujo de capital entre las posesiones de los Estados Unidos y el resto de los Estados Unidos."

**(5)  Depósitos**

El riesgo de crédito custodial es el riesgo que, en caso de la insolvencia bancaria de una institución de depósito fideicomisario, la Corporación no podrá recuperar sus depósitos, o no podrá recuperar garantías prendarias en poder de una parte externa.

La tabla a continuación divulga el nivel de riesgo de crédito custodial asumido por la Corporación al de junio de 2018. Al 30 de junio de 2018, $108,248,572 del saldo bancario depositario de $108,748,572 no estaba asegurado, en conformidad con lo siguiente:

|  | | Valor Contable | | Saldo en la institución bancaria depositaria | | Monto sin garantía y sin colateral |
|---|---|---|---|---|---|---|
| Depósitos que devengan intereses colocados en el BGF | $ | - | $ | 26,118,255 | $ | 26,118,255 |
| Depósitos colocados en otros bancos | | 49,212,182 | | 49,212,182 | | 48,962,182 |
| Efectivo en poder del Síndico | | 33,418,135 | | 33 418,135 | | 33,168,135 |
| Total | $ | 82,630,317 | $ | 108,748,572 | $ | 108,248,572 |

Al 30 de junio de 2018, BGF siguió enfrentando incertidumbres y riesgos importantes, y no tenía suficientes recursos financieros líquidos para satisfacer sus obligaciones en la medida que vencían. Por consiguiente, los depósitos mantenidos en BGF continuaron bajo estrictas restricciones y limitaciones durante el año fiscal 2018 y periodos subsiguientes. BGF actuó como el agente depositario primario de los fondos del Estado Libre Asociado, sus instrumentalidades, y municipios; los depósitos con BGF de los tenedores de cuentas por consiguiente estaban sujetos a riesgo de crédito custodial. La administración determinó que existía una pérdida de crédito custodial para los depósitos mantenidos en BGF en base a una evaluación de la disponibilidad y recuperabilidad de dichos depósitos, una pérdida de crédito custodial sobre estos depósitos fue registrado para años previos resultando en una reserva con respecto al saldo entero al 30 de junio de 2018. El monto neto en libros de los depósitos remunerados con BGF al 30 de junio de 2018 se indica a continuación:

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

| Fondos del Gobierno | | Valor Contable | | Previsión por Pérdida Crédito Custodial | | Valor Contable Neto |
|---|---|---|---|---|---|---|
| Fondo General: | | | | | | |
| Depósitos con intereses colocados en el BGF | $ | 19,693,391 | $ | (19,693,391) | $ | - |
| Fondo de Servicio de la Deuda | | | | | | |
| Depósitos con intereses colocados en el BGF | | 6,424,864 | | (6,424,864) | | - |
| Total | $ | 26,118,255 | $ | (26,118,255) | $ | - |

Al 10 de agosto de 2018, BGF presentó una acción para reestructurar cierto endeudamiento en conformidad con una Modificación Elegible (la Modificación Elegible) al amparo de Título VI de PROMESA. El Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico aprobó la reestructuración propuesta de BGF el 6 de noviembre de 2018 y la Modificación Elegible se hizo efectiva el 29 de noviembre de 2018.

En conformidad con la Ley Núm. 109-2017, también conocida como la *Ley de Reestructuración de la Deuda del Banco Gubernamental de Fomento de Puerto Rico* (la Ley de Reestructuración) y los términos de la Modificación Elegible, las reclamaciones por motivo depósitos en poder de la Estado Libre Asociado y otras entidades públicas, incluyendo COFINA, serán cambiados por unidades beneficiarias en el "Fideicomiso de Entidad Pública" creado en conformidad con la Ley de Reestructuración de la Deuda del BGF. Específicamente, bajo las disposiciones de la Ley de Reestructuración de la Deuda del BGF, a la fecha de cierre de la Modificación Elegible (la Fecha de Cierre), o sea, el 29 de noviembre de 2018, el saldo de los pasivos debidos entre el Estado Libre Asociado y sus agentes, instrumentalidades, y filiales, incluyendo COFINA (cada una de ellas una Entidad Gubernamental No-Municipal) y BGF será determinado aplicando el saldo pendiente de cualquier préstamo de dicha Entidad Gubernamental No-Municipal debida a BGF o de cualquier bono o pagaré de dicha BGF Entidad Gubernamental No-Municipal tenida por BGF a esa fecha. Aquellas Entidades Gubernamentales No-Municipales que tengan reclamaciones netas contra BGF, después de que se haya dado efecto al ajuste mencionado, lo cual incluye COFINA, recibirán su participación pro-rata de intereses en el Fideicomiso de Entidad Pública (o PET, por sus siglas en inglés), lo cual será considerado en plena satisfacción de toda y cualquier reclamación que dicha Entidad Gubernamental No-Municipal pudiera tener contra BGF. Los activos del PET (los Activos del PET) consistirán, entre otros, de una reclamación en el monto de $905 millones contra el Estado Libre Asociado, que está sujeta a una prueba de reclamación presentada en el caso Título III del Estado Libre Asociado.

Al 28 de febrero de 2018 (el último periodo de informes para el cual BGF disponía de información financiera antes de su descontinuación comercial, con fecha efectiva del 23 de marzo de 2018), la Corporación tenía depósitos de BGF de aproximadamente $26.2 millones (no auditado). Como resultado de la Modificación Elegible, el monto recuperado por la Corporación por motivo de esta reclamación depósitos dependerá del monto recuperado en última instancia recibido por el Fideicomiso de Entidad Pública por motivo de los Activos del PET.

**(6)    Efectos por cobrar del Estado Libre Asociado de Puerto Rico**

Al 30 de junio de 2018, los efectos por cobrar del Estado Libre Asociado de Puerto Rico consistían en montos del Impuesto sobre Ventas del 5.5% por los cuales el Estado Libre Asociado tenía la obligación de efectuar pagos al Fondo Dedicado del Impuesto sobre Ventas cada año fiscal en base a la fórmula que se describe en la Nota 1.

Como se divulgó previamente en la Nota 1, independientemente del nivel de las recaudaciones del Impuesto sobre Ventas del 5.5%, al 30 de junio de 2018, la Ley Núm. 91 requiere que en cada año fiscal todas las recaudaciones del Impuesto sobre Ventas del 5.5% en última instancia sean depositados en el Fondo Dedicado del Impuesto sobre Ventas hasta que se deposite un monto igual al Monto Base de Impuesto sobre ventas

(continuación)

(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

Pignorado antes de que se puedan depositar cualesquier recaudaciones del Impuesto sobre Ventas del 5.5% en el Fondo General del Estado Libre Asociado.

**(7)  Inversiones**

Al 30 de junio de 2018, en conformidad con las pautas de inversión promulgadas por el Banco para agencias y corporaciones públicas del Estado Libre Asociado bajo las facultades dispuestas por la Ley Núm. 113 del 3 de agosto de 1995, y la Orden Ejecutiva 1995-50A (las pautas de inversión), la Corporación está autorizada para comprar o celebrar los siguientes instrumentos de inversiones:

- Obligaciones del gobierno de los Estados Unidos y sus agencias

- Certificados depósito

- Aceptaciones bancarias

- Papel comercial

- Participación en el Fideicomiso para la Inversión de los Fondos del Gobierno de Puerto Rico (PRGITF, por las siglas en inglés de Puerto Rico Government Investment Trust Fund)

- Obligaciones del Estado Libre Asociado de Puerto Rico, sus agencias, municipios, corporaciones públicas, e instrumentalidades

- Obligaciones de gobiernos estatales y locales de los Estados Unidos de América

- Valores garantizados por activos e hipotecarios

- Deuda corporativa, incluyendo contratos de inversiones

- Fondos de inversión externos

Al 30 de junio de 2018, las políticas de inversión de la Corporación establecieron ciertas restricciones y otras pautas sobre vencimientos y montos a ser invertidos en las mencionadas categorías de inversiones y por emisor/contraparte y con respecto a exposición por país. Adicionalmente, dichas políticas proveen pautas para las instituciones con las cuales se pueden ejecutar transacciones de inversión. Adicionalmente, al 30 de junio de 2018, el Comité de Activos y Pasivos (ALCO) del Banco, en conjunción con la junta directiva de la Corporación determinarán, de cuando en cuando, otras transacciones que la Corporación podrá realizar.

Las inversiones en poder del fondo de servicio deuda se compran siguiendo las disposiciones de la escritura de fideicomisario relacionada.

***Riesgo de Tasa de Interés*** – El riesgo de tasa de interés es el riesgo que los cambios en las tasas de intereses podrían adversamente afectar el valor razonable de una inversión. Al 30 de junio de 2018, las políticas de inversión de la Corporación también disponían que el ALCO del Banco tiene la responsabilidad de implementar y monitorear las estrategias y políticas de riesgo de tasas de intereses. Al 30 de junio de 2018, la práctica del ALCO del Banco era de reunirse en base mensual para coordinar y monitorear la gestión de riesgo de tasas de intereses de activos sensibles a la tasa de interés y pasivos sensibles a la tasa de interés, incluyendo la correspondencia entre sus niveles y vencimientos anticipados, en conformidad con las leyes correspondientes y los objetivos de la junta directiva.

La tabla a continuación resume los tipos y vencimientos de inversiones en poder de la Corporación al 30 de junio de 2018:

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

| Tipo de Inversión | | Con vencimiento dentro de un año | Calificación de Riesgo Crediticio |
|---|---|---|---|
| Títulos de Deuda: | | | |
| U.S. Treasury State and Local Government Series (SLG) | $ | 43,415,734 | AAA |
| Deuda Corporativa: | | | |
| BlackRock, Inc. | | 843,823,604 | A-1 |
| Fondos de Inversión: | $ | 297,110,193 | Aaa-mf |
| Dreyfus Government Cash Management | | | |
| Total Inversiones | | $ 1,184,349,531 | |

Al 30 de junio de 2018, las inversiones en fondos de inversión consisten en $297,110,193 invertidos en Dreyfus Government Cash Management (Dreyfus) con Bank of New York Mellon, un fondo de inversión externo registrado con el Securities and Exchange Commission.

*Riesgo Crediticio* – El riesgo crediticio es el riesgo que un emisor u otra contraparte de una inversión no cumplirá sus obligaciones. Las políticas de inversión de la Corporación disponen que las transacciones de inversión serán celebradas únicamente con contrapartes calificadas BBB+/A-1 o superior por Standard & Poor's, o la calificación equivalente de Moody's o Fitch, dependiendo del tipo y vencimiento de la inversión, y la contraparte de la transacción. Cualquier excepción debe ser aprobada por la junta directiva de la Corporación. Las políticas sobre inversiones también exigen que las compras y ventas de los valores de inversión serán hechos valiéndose de procedimiento de entrega contra pago.

Las inversiones en SLG del Departamento del Tesoro de los Estados Unidos llevan la garantía explícita del gobierno de los Estados Unidos Al 30 de junio de 2018, la calificación crediticia de Dreyfus y la cartera deuda Corporativa eran "Aaa-mf" y "A-l", respectivamente, calificada por Standard & Poor's, como se muestra en la tabla arriba. La inversión en Deuda Corporativa y Dreyfus estaba en poder de Bank of New York Mellon, a título de síndico, en nombre de la Corporación.

*Concentración de Riesgo Crediticio* - La Corporación no impone límites sobre los montos que puede invertir en cualquier emisor individual. Al 30 de junio de 2018, el 3.66% de las inversiones de la Corporación estaban en títulos deuda, 71.25% en deuda corporativa, y el 25.09% en fondos de inversión externa.

La tabla a continuación expone las inversiones por nivel de valor razonable en poder de la Corporación al 30 de junio de 2018:

| Inversiones a nivel de valor razonable | | Niveles de Medición de Valor Razonable | | | Total |
|---|---|---|---|---|---|
| | | Nivel 1 | Nivel 2 | Nivel 3 | |
| Títulos de Deuda: | | | | | |
| U.S. Treasury State and Local Government Series (SLG) | | - | 43,415,734 | - | 43,415,734 |
| Deuda Corporativa: | $ | | | | |
| BlackRock, Inc. | | - | 843,823,604 | - | 843,823,604 |
| Total inversiones a valor razonable | | - | 887,239,338 | - | 887,239,338 |
| Inversiones no medidos a valor razonable | | | | | |
| Fondos de Inversión externos: | | | | | |
| Dreyfus Government Cash Management | | | | | 297,110,193 |

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

| | | | | |
|---|---|---|---|---|
| Total Inversiones | | | | $ 1,184,349,531 |

Los títulos valores de deuda y deuda corporativa clasificados en el Nivel 2 de la jerarquía de valor razonable se valoran usando insumos aparte de los precios cotizados bajo el Nivel 1 que son observables para los activos, sea directa o indirectamente, en la fecha de medición.

**(8)   Transacciones con el Banco y el Estado Libre Asociado**

Al 30 de junio de 2018, la Corporación era una entidad relacionada del Banco y del Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico (AAFAF). Durante el año finalizado el 30 de junio de 2018, el Banco y subsiguientemente AAFAF le entregaron ciertos servicios gerenciales y administrativos a la Corporación sin costo alguno.

La Ley Núm. 21, según enmendada, creó AAFAF, como una Corporación pública independiente para asumir el papel del Banco en carácter de agente fiscal, asesor financiero, y agente de informes para el Estado Libre Asociado y sus instrumentalidades (la Ley Núm. 2 de 2017 subsiguientemente derogó y sustituyó las disposiciones de Ley Núm. 21 sobre AAFAF). AAFAF también ha sido asignado las tareas de supervisar asuntos relacionados con la reestructuración o ajuste de los pasivos financieros del Estado Libre Asociado, coordinar la gestión de pasivos, u otras transacciones con respecto a dichas obligaciones, y velar por el cumplimiento con los planes fiscales y presupuestos aprobados por la Junta de Supervisión en conformidad con PROMESA.

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

**(9)    Bonos Pagaderos**

Al 30 de junio de 2018, los Bonos Pagaderos de la Corporación consistían en lo siguiente (en miles):

| Descripción | Tasa Interés Nominal/Efectiva | | Monto |
|---|---|---|---|
| Bonos garantizados por los Ingresos del Impuesto sobre Ventas – Serie 2007A: | | | |
| Bonos de revalorización de capital con vencimiento desde el 1 de  Agosto de 2040 al 1 de agosto de 2056 | 4.96%-5.34% | $ | 2,891,610 |
| Bonos a tasa fija con vencimiento el 1 de agosto de 2057, incluida   la prima no amortizada de $14,452 | 5.25% | | 578,337 |
| Bonos a tasa variable basada en LIBOR con vencimiento el 1 de  Agosto de 2057 | 2.51% | | 136,000 |
| Bonos garantizados por los Ingresos del Impuesto sobre Ventas – Serie 2007B: | | | |
| Bonos de revalorización de capital con vencimiento desde el 1 de agosto de 2027 al 1 de agosto de 2032 | | | |
| | 6.20%-6.25% | | 289,142 |
| Bonos a tasa fija con vencimiento desde el 1 de agosto de 2036 al 1 de agosto de 2057, neto del descuento no acredido de $2,418 | | | |
| | 6.05%-6.35% | | 1,183,642 |
| Bonos garantizados por los Ingresos del Impuesto sobre Ventas – Serie 2007C: | | | |
| Bonos de revalorización de capital con vencimiento desde el 1 de agosto de 2022 al 1 de agosto de 2038 | | | |
| Bonos a plazo fijo desde el 1 de agosto de 2022 al 1 de agosto de 2038 | 6.10% | | 160,318 |
| Bonos garantizados por los Ingresos del Impuesto sobre Ventas – Serie 2008A: | 6.00% | | 415,305 |
| Bonos de revalorización de capital con vencimiento desde el 1 de agosto de 2024 al 1 de Agosto de 2036 | 6.23% | | 461,237 |
| Bonos con fecha de vencimiento específica desde el 1 de agosto de 2027 al 1 de agosto de 2038 | 6.13% | | 488,885 |
| Subtotal arrastrado | | $ | 6,604,476 |

(continuación)

CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

| Descripción | Tasa Interés Nominal/Efectiva | | Monto |
|---|---|---|---|
| Bonos garantizados por los Ingresos del Impuesto sobre Ventas – Primera serie subordinada 2009A: | | | |
| Bonos a tasa fija con vencimiento desde el 1 de agosto de 2015 al 1 de agosto de 2029, incluida la prima no amortizada de $5,519, neto de descuento no devengado $8,788 | 4.25%--6.75% | $ | 1,580,506 |
| Bonos a plazo fijo desde el 1 de agosto de 2036 al 1 de agosto de 2044, incluida la prima no amortizada de $14,147, neto de descuento no devengado de $42,756 | 5.75%--6.50% | | 1,787,401 |
| Bonos de apreciación de capital con vencimiento desde el 1 de agosto de 2030 al 1 de agosto 2034 | 6.87%-7.12% | | 261,874 |
| Bonos garantizados por los Ingresos del Impuesto sobre Ventas – Primera serie subordinada 2009B: | | | |
| Bonos a tasa fija con vencimiento desde el 1 de agosto de 2025 al 1 de agosto de 2039 | 6.05%--6.90% | | 1,080,800 |
| Bonos de apreciación de capital con vencimiento desde el 1 de agosto de 2033 al 1 de agosto 2035 | 7.37%-7.48% | | 104,188 |
| Bonos de apreciación de capital convertibles con vencimiento desde el 1 de agosto de 2025 al 1 de agosto 2031 (1) | 7.00% | | 200,106 |
| Bonos garantizados por los Ingresos del Impuesto sobre Ventas Serie Senior 2009C – Tasa fija, Bonos con vencimiento el 1 agosto, 2057: | 5.75% | | 237,875 |
| Bonos garantizados por los Ingresos del Impuesto sobre Ventas – Primera serie subordinada 2010A: | | | |
| Bonos a tasa fija con vencimiento desde el 1 de agosto de 2016 al 1 de agosto de 2040, incluida la prima no amortizada de $1,025, neto de descuento no devengado de $2,209 | 3.63%-5.63% | | 290,429 |
| Bonos a plazo fijo con vencimiento desde el 1 de agosto de 2036 al 1 de agosto de 2042, neto de descuento sin acumulación de intereses de $ 23,028 | 5.38%-5.50% | | 1,215,991 |
| Bonos de apreciación de capital con vencimiento desde el 1 de agosto de 2031 al 1 de agosto de 2036 | 6.65%--6.77% | | 227,725 |
| Bonos de apreciación de capital convertibles con vencimiento desde el 1 de agosto de 2029 al 1 de agosto 2033 (2) | 6.13%--6.25% | | 252,147 |
| Subtotal arrastrado | | $ | 13,843,518 |

(1)  Convertibles en bonos a tasa fija el 1 de agosto de 2020 para bonos con vencimiento el 1 de agosto de 2030 y 2031.
(2)  Convertibles en bonos a tasa fija el 1 de agosto de 2019.

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

| Descripción | Tasa Interés Nom./Efectiva | | Monto |
|---|---|---|---|
| Bonos garantizados por los Ingresos del Impuesto sobre Ventas – Primera serie subordinada 2010C: | | | |
| Bonos a tasa fija con vencimiento desde el 1 de agosto de 2035 al 1 de agosto de 2041, incluida la prima no amortizada de $13,371, neto de descuento no devengado de $740 | 5.13%-6.50% | $ | 463,483 |
| Bonos a plazo fijo desde el 1 de agosto de 2033 al 1 de agosto de 2041, neto de descuento sin acumulación de intereses de $21,688 | 5.00%-5.50% | | 1,049,284 |
| Bonos de apreciación de capital con vencimiento desde el 1 de agosto de 2037 al 1 de agosto de 2039 | 6.62% | | 165,595 |
| Bonos garantizados por los Ingresos del Impuesto sobre Ventas –Primera serie subordinada 2010D – Bonos a tasa fija con vencimiento el 1 de agosto de 2042 | 5.75% | | 89,435 |
| Bonos garantizados por los Ingresos del Impuesto sobre Ventas -Primera serie subordinada 2010E – Bonos a tasa fija con vencimiento el 1 de agosto de 2042 | 5.75% | | 92,755 |
| Bonos garantizados por los Ingresos del Impuesto sobre Ventas – Primera serie subordinada 2011A-1: | | | |
| Bonos a tasa fija con vencimiento el 1 de agosto de 2043, incluida la prima no amortizada de $2,490, neto de descuento sin acumulación de intereses de $2,518 | 5.00%-5.25% | | 355,002 |
| Bonos de apreciación de capital con vencimiento desde el 1 de agosto de 2023 al 1 de agosto 2041 | 5.25%-6.50% | | 61,651 |
| Bonos garantizados por los Ingresos del Impuesto sobre Ventas – Primera serie subordinada 2011A-2 | | | |
| Bonos de apreciación de capital con vencimiento desde el 1 de agosto de 2043 al 1 de agosto de 2050 | 7.00% | | 534,265 |
| Bonos garantizados por los Ingresos del Impuesto sobre Ventas – Primera serie subordinada 2011B: | | | |
| Bonos a tasa fija con vencimiento desde el 1 de agosto de 2031 al 1 de agosto de 2036 | 5.00%-5.15% | | 45,620 |
| Bonos garantizados por los Ingresos del Impuesto sobre Ventas – Serie Principal 2011C: | | | |
| Bonos a tasa fija con vencimiento el 1 de agosto de 2020 hasta el 1 de agosto de 2039, incluida la prima no amortizada de $8,686, neto de descuento no devengado de $657 | 4.00%-5.00% | | 187,160 |
| Bonos a plazo fijo desde el 1 de agosto de 2040 y el 1 de agosto de 2046, incluida la prima no amortizada de $13,349 | 5.00%-5.25% | | 736,778 |
| Bonos de apreciación de capital con vencimiento desde el 1 de agosto de 2034 al 1 de agosto 2041 | 6.15%-6.25% | | 153,030 |
| Bonos garantizados por los Ingresos del Impuesto sobre Ventas – Serie principal 2011D: | | | |
| Bonos a tasa fija con vencimiento el 1 de agosto de 2023 | 3.80% | | 45,000 |
| Bonos a plazo fijo desde el 1 de agosto de 2025 y el 1 de agosto de 2036 | 4.10%-4.85% | | 46,155 |
| Bonos a pagar, neto | | | |
| | | $ | $17,868,731 |
| Todos los bonos a plazo fijo tienen tasas de interés fijas. | | | |

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

Actividad de bonos pagaderos para el año que finaliza el 30 de junio de 2018 (miles):

| Descripción | Saldo al 30 de junio de 2017 | Adiciones | Reducciones | Saldo al 30 de junio de 2018 |
|---|---|---|---|---|
| Bonos pagaderos | $ 12,136,840 | — | | 12,136,840 |
| Bonos de Apreciación de Capital - principal | 23,004,336 | — | — | 23,004,336 |
| Descuento en bonos CAP | (17,566,606) | 325,160 | | (17,241,446) |
| Menos | | | | |
| Prima de bono no amortizada (descuento), neto | (29,820) | | (1,179) | (30,999) |
| Bonos pagaderos – neto | $ 17,544,750 | 325,160 | (1,179) | 17,868,731 |

Bank of New York Mellon, en su calidad de síndico de los bonos de ingresos del impuesto sobre ventas emitidos por la Corporación (en dicha calidad, el "Síndico"), presentó una demanda contenciosa de interpelación en el procedimiento del Título III de la Corporación para preservar los fondos que el Síndico tenía en fideicomiso, en espera de que el Tribunal resolviera todas las controversias relativas a la propiedad de los fondos. El Tribunal registró una orden requiriendo que el Síndico, comenzando por el pago de intereses sobre los bonos por $16.3 millones que vencieron el 1 de junio de 2017, interviniera en una acción de interpelación y mantuviera todos los fondos disputados en las cuentas en las cuales habían sido depositadas, en nombre de la parte o partes que en última instancia el Tribunal determinara tienen derecho a dichos fondos. Los pagos de intereses sobre bonos de la acción de interpelación por $697.5 millones debidos del 30 de junio 2017 al 30 de junio de 2018 y los pagos de capital por $18.7 millones programados para ser pagados durante el año finalizado el 30 de junio de 2018 se exponen como intereses devengados pagaderos y bonos pagaderos, respectivamente, en los estados financieros del fondo ya que vencían y eran pagaderos a los bonistas al 30 de junio de 2018.

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

Al 30 de junio de 2018, los requerimientos de servicio de la deuda para los bonos en circulación eran los siguientes:

| Año que finaliza el 30 de junio | Capital | Intereses | Intereses Subsidio (1) | Total |
|---|---|---|---|---|
| 2019 y Debido | 66,695,000 $ | 1,402,290,611 $ | (3,834,522) $ | 1,465,151,089 |
| 2020 | 79,765,000 | 697,230,034 | (3,834,522) | 773,160,512 |
| 2021 | 99,185,000 | 714,547,404 | (3,834,522) | 809,897,882 |
| 2022 | 119,865,000 | 711,729,424 | (3,834,522) | 827,759,902 |
| 2023 | 159,270,000 | 704,416,137 | (3,834,522) | 859,851,615 |
| 2024-2028 | 1,475,125,000 | 3,371,567,423 | (19,172,612) | 4,827,519,811 |
| 2029-2033 | 2,936,830,000 | 2,930,563,249 | (19,172,612) | 5,848,220,637 |
| 2034-2038 | 4,772,725,000 | 2,350,958,123 | (19,172,612) | 7,104,510,511 |
| 2039-2043 | 7,277,510,000 | 1,247,059,264 | (16,296,720) | 8,508,272,544 |
| 2044-2048 | 6,876,495,000 | 357,481,374 | | 7,233,976,374 |
| 2049-2053. | 5,808,190,828 | 313,364,874 | | 6,121,555,702 |
| 2054-2058 | 5,469,520,419 | 274,534,754 | | 5,744,055,173 |
| | 35,141,176,247 $ | 15,075,742,671 $ | (92,987,166) $ | 50,123,931,752 |

Mas (menos):
| | |
|---|---|
| Prima No Amortizada | 70,405,358 |
| Descuento No Devengado | (101,403,130) |
| Intereses No Devengados | (17,241,447,125) |
| Bonos pagaderos - neto $ | 17,868,731,350 |

(1) Los Bonos Garantizados por el Impuesto sobre Ventas, Primera Serie Subordinada 2010D y 2010E fueron emitidos como los bonos "Build America Bonds". La Corporación recibirá un pago de subsidio del gobierno federal equivalente al 35% y 45%, respectivamente, del monto de cada pago de intereses. El 24 de junio 24 de 2013, el IRS envió una notificación que el pago del subsidio los Build America Bonds quedaría embargado en un porcentaje entre 8.7% y 6.2% debido a ajustes en el presupuesto del Gobierno Federal (6.6% al 30 de junio de 2018).

Al 30 de junio de 2018, la Corporación tiene $136,000,000 de bonos de tasa ajustable basada en LIBOR que vencen el 1 de agosto de 2057. Como se discutió en la Nota 10, al 30 de junio de 2018, la Corporación había acordado una permuta de tasa de intereses por $136,000,000, mediante la cual recibe la misma tasa pagada sobre los bonos de tasa ajustable y paga una tasa fija del 4.92% hasta el 1 de agosto de 2057. Por consiguiente, la Corporación ha fijado sintéticamente la tasa de interés sobre los bonos de tasa ajustable. Bajo el supuesto que la tasa efectiva al 30 de junio de 2018 seguirá sin cambiar, los requerimientos del servicio de la deuda para los bonos de tasa ajustable y pagos netos de la permuta durante su término, son los siguientes:

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

| Año que finaliza el 30 de junio | Bonos de Tasa Ajustable | | Permuta de Tasas de Interés, Neto | Total |
|---|---|---|---|---|
| | Capital | Interés | | |
| 2019 | $ --- | 3,417,911 | $ 3,273,289 | $ 6,691,200 |
| 2020 | --- | 3,417,911 | 3,273,289 | 6,691,200 |
| 2021 | --- | 3,417,911 | 3,273,289 | 6,691,200 |
| 2022 | --- | 3,417,911 | 3,273,289 | 6,691,200 |
| 2023 | --- | 3,417,911 | 3,273,289 | 6,691,200 |
| 2024-2028 | --- | 17,089,556 | 16,366,444 | 33,456,000 |
| 2029-2033 | --- | 17,089,556 | 16,366,444 | 33,456,000 |
| 2034-2038 | --- | 17,089,556 | 16,366,444 | 33,456,000 |
| 2039-2043 | --- | 17,089,556 | 16,366,444 | 33,456,000 |
| 2044-2048 | --- | 17,089,556 | 16,366,444 | 33,456,000 |
| 2049-2053 | --- | 17,089,556 | 16,366,444 | 33,456,000 |
| 2054-2058 | $ 136,000,000 | 13,956,471 | 13,365,929 | 163,322,400 |
| Total | 136,000,000 | 133,583,362 | $ 127,931,038 | $ 397,514,000 |

El monto depositado cada año en el Fondo de Interés Apremiante se usa para pagar los bonos pagaderos de la Corporación. El monto mínimo a ser depositado es el Monto Base de Impuesto sobre ventas Pignorado, lo cual, para el año fiscal finalizado el 30 de junio de 2018, fue de $753,074,280. El Monto Base IVU aumenta cada año fiscal a una tasa estatutaria del 4.0% hasta llegar a $1,850,000,000. Al 30 de junio de 2018, el estimado del Monto Base de Impuesto sobre ventas Pignorado, por año, es lo siguiente:

| Año que finaliza el 30 de Junio | Monto |
|---|---|
| 2019 | $ 783,197,251 |
| 2020 | 813,525,141 |
| 2021 | 847,106,147 |
| 2022 | 880,990,393 |
| 2023 | 916,230,008 |
| 2024-2028 | 5,161,101,155 |
| 2029-2033 | 6,279,268,701 |
| 2034-2038 | 7,639,690,489 |
| 2039-2043 | 9,050,806,510 |
| 2044-2048 | 9,250,000,000 |
| 2049-2053 | 9,250,000,000 |
| 2054-2058 | 9,250,000,000 |
| | $ 60,122,915,795 |

(continuación)

Case:17-03283-LTS   Doc#:12480-17   Filed:03/20/20   Entered:03/20/20 17:15:06   Desc:

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

En septiembre de 2014, la junta directiva de COFINA celebró un acuerdo con Goldman Sachs (GS), debido a que las reducciones de la calificación crediticia de COFINA por Moody y Fitch provocaron un Evento de Terminación Adicional (ATE) del contrato. Este exigió que COFINA constituyera garantías con el pasar del tiempo; asimismo, permitió que la permuta quedará en sitio y removió todos los ATE. Al 30 de junio de 2018, dichas garantías colaterales ascendieron a $49.2 millones.

El 29 de julio de 2014, Fitch redujo su calificación de los Bonos COFINA Garantizados por el Impuesto sobre Ventas, Serie Senior, y los Bonos COFINA Garantizados por el Impuesto sobre Ventas, Primera Serie Subordinada del Estado Libre Asociado, de "AA-" a "BB-", y de "A+" a "BB-", respectivamente. Posteriormente, Fitch redujo las calificaciones crediticias de la Corporación repetidamente. Al 30 de junio de 2018, la calificación crediticia de la Corporación era "D" tanto para la Serie Senior, como para la Primera Serie Subordinada.

El 11 de julio de 2014, Standard & Poor's Ratings Services (S&P) redujo su calificación de los Bonos COFINA Garantizados por el Impuesto sobre Ventas del Estado Libre Asociado, Serie Senior, y los Bonos COFINA Garantizados por el Impuesto sobre Ventas, Primera Serie Subordinada, de "AA-" a "BBB", y de "A+" a "BBB-", respectivamente. Posteriormente, S&P redujo las calificaciones crediticias de la Corporación repetidamente. Al 30 de junio de 2018, la calificación crediticia de la Corporación era "NR" tanto para la Serie Senior, como para la Primera Serie Subordinada.

El 1 de julio de 2014, Moody's redujo su calificación de los Bonos COFINA Garantizados por el Impuesto sobre Ventas del Estado Libre Asociado, Serie Senior, y Bonos COFINA Garantizados por el Impuesto sobre Ventas, Primera Serie Subordinada, de "Baal " a "Ba3", y de "Baa2" a "Bl", respectivamente. Posteriormente, Moody's redujo la calificación crediticia de la Corporación repetidamente. Al 30 de junio de 2018, la calificación crediticia de la Corporación era "Ca" tanto para los Bonos COFINA Garantizados por el Impuesto sobre Ventas, Serie Senior, como los Bonos COFINA Garantizados por el Impuesto sobre Ventas, Primera Serie Subordinada.

El 23 de noviembre de 2011, la Corporación emitió $397.7 millones de bonos Serie 2011A-1. Parte del producto de los bonos Serie 2011A-1 fue usado para anticipo de reembolso de parte de los bonos Serie 2009A en circulación, acumulando $52,780,000 y con intereses del 4.00% a 6.125%. La Corporación usó aproximadamente $65,867,000 del producto netos de los bonos Serie 2011A-1 emitidos y otros fondos para comprar valores del Gobierno de los Estados Unidos, los cuales fueron depositados en un fondo de fideicomiso irrevocable con un agente de fideicomiso para proveer todos los pagos futuros de servicio deuda de los bonos Serie 2009A refinanciados. El 23 de noviembre de 2011, la Corporación también emitió sus bonos Serie 2011 B ascendiendo a aproximadamente $45.6 millones, como anticipo de reembolso de parte de los bonos Serie 2009 B en circulación, acumulando $38,490,000 y con intereses al 6.05%. La Corporación usó el producto de los bonos Serie 2011B emitidos y otros fondos para comprar valores del Gobierno de los Estados Unidos, los cuales fueron depositados en un fondo de fideicomiso irrevocable con un agente de fideicomiso para proveer todos los pagos futuros de servicio deuda de los bonos Serie 2009 B refinanciados. Por consiguiente, los bonos refinanciados de la Serie 2009A y los bonos refinanciados de la Serie 2009B se consideran cancelados y los pasivos correspondientes han sido eliminados del estado de patrimonio neto. Como resultado de estos refinanciamientos anticipados, la Corporación espera que aumentará su requerimiento total de servicio deuda por aproximadamente $34.3 millones en los próximos 25 años, y que incurrirá una pérdida económica (la diferencia entre los valores presentes de los pagos de servicio deuda de los bonos refinanciados y los bonos que refinancian) de aproximadamente $4.7 millones. El saldo pendiente de los bonos refinanciados por anticipación fue $31,675,000 al 30 de junio de 2018.

**(10) Instrumentos derivados**

Al usar instrumentos derivados financieros para cobertura de su exposición a cambios en las tasas de interés, la Corporación se expone al riesgo de tasa de interés, riesgo crediticio, y riesgo de terminación.

El riesgo de tasas de interés es el efecto adverso sobre el valor de un instrumento financiero que resulta de un

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

cambio en las tasas de interés. La Corporación está expuesta a riesgo de tasa de interés en su permuta de pago fijo y recibo variable; en la medida que LIBOR baja, sube el pago neto de la Corporación sobre la permuta. Al mismo tiempo, bajan los pagos de intereses sobre los bonos de tasa ajustable con cobertura. El riesgo de tasa de interés asociado con contratos de permuta se gestiona al establecer y monitorear los parámetros que limitan los tipos y grados del riesgo de tasa de interés que se pueden asumir.

El riesgo crediticio es el incumplimiento de los términos de los contratos derivados por la contraparte (o su garante). Cuando el valor razonable de un contrato derivado es positivo, la contraparte es deudor de la Corporación, lo cual crea un riesgo crediticio para la Corporación. Cuando el valor razonable de un contrato derivado es negativo, la Corporación es deudor de la contraparte, y por consiguiente, no tiene riesgo crediticio. La Corporación minimiza el riesgo crediticio en instrumentos derivados al acordar transacciones con contrapartes cuya calificación crediticia es aceptable bajo las políticas de inversión de la Corporación. Al 30 de junio de 2018, no existe riesgo crediticio, ya que el valor razonable del instrumento derivado es negativo.

El riesgo de terminación es la posibilidad que una terminación no programada de un instrumento derivado usado para cobertura afectaría la estrategia de pasivos de la Corporación, o que le causaría a la Corporación pagos de terminación a la contraparte no programados potencialmente significativos. La Corporación o sus contrapartes podrán terminar un instrumento derivado si la otra parte incumple los términos del contrato. La Corporación corre el riesgo de que la otra parte incumpla los términos del contrato. La Corporación corre el riesgo que la contraparte termine una permuta en un momento en que la Corporación de Le debe un pago de terminación. Al 30 de junio de 2018, la Corporación había mitigado este riesgo, al especificar que la contraparte tenía derecho a la terminación únicamente en caso de ciertos eventos determinados, incluyendo uno o ambos de los siguientes: mora en los pagos por la Corporación; e insolvencia de la Corporación (o eventos similares). En caso que en el momento de la terminación, un instrumento derivado estuviera en posición de pasivo, la Corporación respondería a la contraparte por un pago igual al pasivo, sujeto a arreglos de neteo.

La Corporación ha celebrado un contrato de canjeo de tasas de intereses (permuta) con una contraparte en conexión con la emisión de Bonos de tasa ajustable en base a LIBOR dentro de la Serie 2007A de los Bonos Garantizados por el Impuesto sobre Ventas (bonos de tasa ajustable). Los bonos de tasa ajustable exponen a variabilidad en sus pagos de intereses. La administración considera que es prudente limitar la variabilidad de los pagos de intereses de los Bonos de tasa ajustable. Para lograr este objetivo, la administración celebró un contrato de permuta de tasa de interés para gestionar las variaciones en los flujos de caja resultantes del riesgo de tasas de intereses. Esta permuta efectivamente cambia la exposición del flujo de caja de tasa variable de los Bonos de tasa ajustable a flujos de caja fijos. Bajo los términos de la permuta de tasas de intereses, la Corporación recibe pagos a tasas de interés variables equivalentes al pago de intereses sobre los Bonos de tasa ajustable, y hace pagos de intereses a tasa fija, por consiguiente creando el equivalente de una deuda a tasa fija. Al 30 de junio de 2018, la calificación crediticia de la contraparte de este contrato de permuta era BBB+ por Standard & Poor's.

El 1 de julio de 2014, Moody's reportó una rebaja a los Bonos LIBOR 2007A, a una calificación de Ba3. El 24 de septiembre de 2014, en vez de terminar el Contrato de Permuta, la Corporación y GS celebraron un nuevo anexo de crédito (el Anexo de Soporte a Crédito 2014) así como una enmienda del Contrato Marco ISDA (el Contrato Marco ISDA 2014) para permitir que la Corporación constituya como garantía sus obligaciones bajo el Contrato de Permuta y para enmendar los eventos de terminación bajo el mismo. El impacto del nuevo acuerdo fue que la Corporación constituyó $12 millones en garantías a favor de Goldman Sachs (GS), y asimismo estableció una cuenta restringida en la cual se depositará cierta porción de la garantía para beneficio de GS. Adicionalmente, a partir del 30 de junio de 2016, hasta el año fiscal 2019, COFINA está comprometida con constituir hasta $15 millones anualmente en garantías adicionales para el 15 de marzo de cada año. Con el pasar del tiempo, el monto máximo que COFINA tendría que constituir como garantía es $60 millones. No hubo

37

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

pagos de garantías durante el año fiscal 30 de junio de 2018, como resultado de la petición de la Corporación bajo el Título III PROMESA. Al 30 de junio de 2018, el monto de garantías en poder de GS es $49.2 millones.

Como se discute en la Nota 12, la Corporación posteriormente rechazó el Contrato de Permuta con GS en conformidad con Tercer Plan de Ajuste Enmendado y se acordó un acuerdo de terminación.

El valor razonable y el monto nocional del instrumento derivado pendiente al 30 de junio de 2018, clasificado por tipo, fue lo siguiente:

| Monto Nocional (en miles) Instrumento Cobertura Derivado | Valor Razonable (en miles) | Cambio en Valor Razonable (en miles) | Indicador Tasa Flotante | Fecha Vencimiento | Recibe | | Paga | | Egresos de efectivo (en miles) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Tipo | Tasa | Tipo | Tasa | |
| $136,000 | $ 65,954 | ($6,606) | 67% de LIBOR 3m más 0.93 | 8/1/2057 | Variable | 2.513% | Fijo | 4.290% | 3,273 |

El valor razonable de la permuta de tasas de interés clasificada en el Nivel 2 de la jerarquía de valor razonable fue estimado usando el método cero cupón. Este método calcula los futuros pagos de liquidación netos requeridos por la permuta, bajo el supuesto que la tasa de interés futura actual implícita en la rebaja de rendimiento anticipa correctamente las tasas futuras en el mercado spot. Estos pagos posteriormente se descuentan usando las tasas spot implícitas en la curva de rendimiento actual para bonos cero cupón hipotéticos, que vencieron en la fecha de cada liquidación neta futura de las permutas.

Como se discutió en la Nota 12, la Corporación posteriormente rechazó el Contrato de Permuta con GS en conformidad con Tercer Plan de Ajuste Enmendado y se acordó un acuerdo de terminación.

**(11)  Contingencia**

En conexión con la terminación de un contrato de canjeo de tasas de intereses (una permuta o *swap*) por un monto nocional de $218 millones, por parte de la Corporación, relacionada con sus Bonos Garantizados por el Impuesto sobre Ventas, Serie 2007A, la Corporación efectuó un pago de terminación a la contraparte en noviembre de 2008. La contraparte posteriormente adujo que tenía derecho a un pago de terminación en exceso de aquel pagado por la Corporación en noviembre de 2008, más intereses a tasa de mora, ascendiendo a aproximadamente $64.0 millones al cierre del año fiscal 2011. La contraparte alega que la fecha de la notificación de terminación usada por la Corporación para propósitos de calcular el pago de terminación no conformaba con el contrato. Adicionalmente, la contraparte alega que el pago de terminación debería haberse basado sobre el valor de las permutas sustitutas acordadas por la Corporación, los cuales actualmente tienen términos de crédito que son diferentes de los que contenían las permutas terminadas.

Durante el año finalizado el 30 de junio de 2011, la Corporación devengó $3.4 millones en conexión con este asunto. Este monto se expone como cuentas a pagar y pasivos devengados en el estado de patrimonio neto que acompaña.

El pago de terminación en cuestión en esta materia fue tratado como una reclamación no asegurada en el Tercer Plan de Ajuste Enmendado de la Corporación y descargado. Para mayor información, refiérase a la Nota 12.

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

**(12) Eventos Subsiguientes**

Los eventos subsiguientes fueron evaluados hasta el 18 de junio de 2019 para determinar si estos eventos debían, o bien ser reconocidos, o divulgados en los estados financieros básicos del 2018. La administración considera que los eventos subsiguientes divulgados a continuación tienen una relación intrínseca con los estados financieros de la Corporación. Si bien estos podrían haber sido divulgados en otra sección de estos estados financieros, la administración considera que requieren mención específica en base a su relevancia y materialidad considerados en conjunto.

**Legislación Importante y Otros Eventos Después del Cierre de Año:**

a) *Acciones Civiles en Contra de la Corporación Presentadas por Varios Grupos de Bonistas y Otros Acreedores*

*Lex Claims, LLC* v. *Garcia-Padilla,* Caso Núm. 16-2374-FAB (D.P.R.) (la Litigación de Lex Claims). El 20 de julio de 2016, ciertos bonistas de Obligación General emitidos por el Estado Libre Asociado (los Bonos GO) entablaron una acción ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (el Tribunal de Distrito, y, en relación a la jurisdicción sobre el caso Título III de la Corporación y los procedimientos que se discuten abajo, el Tribunal del Título III) contra el Estado Libre Asociado y varios de sus funcionarios, incluyendo el Gobernador, buscando (a) remedios declaratorios sobre la Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico, Ley Núm. 21-2016, que autorizó al Gobernador, entre otros, a declarar una moratoria temporal del servicio de la deuda y suspender los recursos de los acreedores, y una orden ejecutiva emitida en conformidad con Ley Núm. 21 anunciando una moratoria sobre el pago de los Bonos GO del Estado Libre Asociado, quedan sustituidos por la sección 204(c)(3) de PROMESA, y (b) interdictos para prevenir ciertas medidas tomadas por el Estado Libre Asociado permitiendo transacciones afuera del curso ordinario de la gestión. El 4 de noviembre de 2016, los demandantes presentaron una Segunda Demanda Enmendada, añadiendo a la Corporación a título demandado en su acción contra funcionarios del Estado Libre Asociado. La Segunda Demanda Enmendada solicitó sentencias declaratorias que impugnaron la validez legal de la Corporación: (1) una declaración que el Impuesto sobre Ventas Pignorado constituye "recursos disponibles" bajo Artículo VI, Sección 8 de la Constitución de Puerto Rico y que dichos fondos no pueden ser depositados con la Corporación o sus bonistas; y (2) una declaración que el Estado Libre Asociado está obligado a otorgarle prioridad absoluta a la deuda de Obligación General, incluyendo prioridad sobre depósitos requeridos con la Corporación y sus Bonistas. El 17 de mayo de 2017, después de que el caso Título III de la Corporación ya había comenzado, el Tribunal del Título III suspendió la Litigación de Lex Claims hasta que se dictara una orden posterior del Tribunal.

El 7 de junio de 2017, la Familia de Fondos UBS y la Familia de Fondos de Puerto Rico (colectivamente, los fondos de Puerto Rico), y los fondos mutuos gestionados por Oppenheimer Funds, Inc., Franklin Advisers, Inc., y la Primera Familia de Fondos de Puerto Rico (colectivamente, los Peticionarios) presentaron la Petición de Reparación de los Fondos de Puerto Rico y el Grupo de Fondos Mutuos para la Paralización Automática en el caso Título III de la Corporación [ECF Núm. 270] (la Petición de Lex Claims) solicitando una orden levantando la paralización automática para permitir la Litigación de Lex Claims, ante el Tribunal de Distrito, para que procediera de forma que el Tribunal de Distrito decidiera la petición de los Fondos Puerto Rico para certificar la cuestión de la constitucionalidad de COFINA ante el Tribunal Supremo de Puerto Rico (la Petición de Certificación), y en caso de estimar la Petición de Certificación, permitir que el Tribunal Supremo de Puerto Rico evalúe y decida las cuestiones certificadas. Alternativamente, los Peticionarios solicitaron que la Litigación de Lex Claims fuera traslada en conformidad con la sección 306(d)(3) de PROMESA a los casos Título III del ELA y de la Corporación, a título de procedimiento contencioso.

El Tribunal del Título III desestimó la Petición de Lex Claims sin prejuicio, sosteniendo que (1) los Peticionarios no habían demostrado que el levantamiento de la medida daría lugar a una conciliación

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

parcial o total de las cuestiones, y que no existía certeza de que el Tribunal Distrito fuera a estimar la certificación para levantar la paralización, o en caso de estimar la Petición de Certificación, el Tribunal Supremo de Puerto Rico aceptaría la certificación; (2) el levantamiento de la paralización automática no contribuía a la economía judicial ya que el Tribunal del Título III tenía varios procedimientos contenciosos en trámite anteriores que abordaban los mismos temas planteados en las cuestiones certificadas; (3) la certificación no había sido plenamente instruida en el Litigio de Lex Claims, y las partes del Litigio de Lex Claims no estaban colocadas en una mejor posición para litigar los asuntos en las cuestiones certificadas que las partes de los casos Título III; y (4) los Peticionarios no habían demostrado que la omisión de levantar la paralización automática ocasionarles un daño específico.

El 5 de febrero de 2019, el Tribunal del Título III emitió una Orden de Confirmación Enmendada (que se discute abajo), confirmando el Tercer Plan de Ajuste Enmendado. El 12 de febrero de 2019, el Tercer Plan de Ajuste Enmendado quedó sustancialmente perfeccionado y entró en vigor. En COFINA el artículo 1.4 del Tercer Plan de Ajuste Enmendado, la Litigación de Lex Claims se define como una de varias "Acciones", y en conformidad con el artículo 2.1(c), "a la Fecha Efectiva, en conformidad con la Orden de Conciliación y la Orden de Confirmación... las Acciones serán desestimadas, con prejuicio, y Reclamación y causas de acción afirmadas en las mismas por cualquier parte de las Acciones se considerarán desestimadas, con prejuicio". Por consiguiente, este caso ha sido desestimado en lo que concierne a COFINA.

*Rodriguez-Perello, et al. v. Rosselló-Nevares, Caso Núm. 17-1566-FAB (D.P.R.).* El 2 de mayo 2017, ciertos bonistas de COFINA entablaron una acción para que se dicte sentencia declarativa y interdíctosen contra de COFINA, la AAFAF, el BGF, el Gobernador Rosselló y algunos otros funcionarios públicos. Las demandantes adujeron que sus participaciones en los valores existentes de la Corporación les conferían derechos contractuales y de propiedad protegidos por las Constituciones de los Estados Unidos y del Estado Libre Asociado, como también por estatutos federales y leyes de Puerto Rico. Los demandantes adujeron también que los demandados habían menoscabado de manera ilícita e inconstitucional estos derechos contractuales, habiéndose apropiado de bienes de las demandantes. En esta acción, las demandantes solicitaron que se protegieran y reivindicaran sus derechos dictando una sentencia declarativa que los demandados habían incumplido obligaciones constitucionales, legales y contractuales de los demandantes hacia los bonistas de COFINA, e interdictos que impidieran la continuación de dichos incumplimientos de las demandadas.

Después del inicio del Caso de la Corporación al amparo del Título III, el Tribunal del Título III emitió una conciliación el 17 de mayo de 2017 suspendiendo esta litigación. No ha habido actividad adicional en esta causa desde el comienzo del caso Título III de la Corporación.

El 5 de febrero de 2019, el Tribunal del Título III emitió una Orden de Confirmación Enmendada (que se discute abajo), confirmando el Tercer Plan de Ajuste Enmendado. El 12 de febrero de 2019, el Tercer Plan de Ajuste Enmendado quedó sustancialmente perfeccionado y entró en vigor. En conformidad con el artículo 1.4 del Tercer Plan de Ajuste Enmendado, la Litigación *Rodriguez-Perello, et al. v. Rosselló-Nevares*, se define como una de varias "Acciones", y en conformidad con el artículo 2.1(c), "a la Fecha Efectiva, en conformidad con la Orden de Conciliación y la Orden de Confirmación... las Acciones serán desestimadas, con prejuicio, y Reclamación y causas de acción afirmadas en las mismas por cualquier parte de las Acciones se consideraran desestimadas, con prejuicio". Por consiguiente, este caso ha sido desestimado en lo que concierne a COFINA.

*Cooperativa de Ahorro y Crédito Abraham Rosa* v. *Estado Libre Asociado de Puerto Rico,* Caso Núm. 18-00028- LTS (D.P.R.). El 22 de marzo de 2018, varias cooperativas de crédito constituidas bajo las leyes de Puerto Rico presentaron una demanda contenciosa contra el Estado Libre Asociado, la Junta de Supervisión, y otras instrumentalidades del Estado Libre Asociado, incluyendo la Corporación, solicitando una sentencia declaratoria que sus tenencias de deuda de Puerto Rico no son extinguibles, y solicitando daños monetarios por motivo del fraude alegado, al emitir y animar a las cooperativas de crédito a comprar

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

instrumentos de servicio deuda de Puerto Rico. El 6 de agosto de 2018, la Junta de Supervisión, en nombre propio y como representante de la Corporación, el Estado Libre Asociado, y ciertas otras instrumentalidades, presentaron peticiones para que se desestime la demanda. Asimismo, el 6 de agosto de 2018, BGF presentó una petición separada para desestimar la demanda. Adicionalmente, varias partes se unieron a las mociones de desestimación o se les dio permiso del Tribunal del Título III para presentar peticiones de litisconsorcio.

El 5 de febrero de 2019, el Tribunal del Título III emitió una Orden de Confirmación Enmendada (que se discute abajo) confirmando el Tercer Plan de Ajuste Enmendado. El 12 de febrero de 2019, el Tercer Plan de Ajuste Enmendado quedó sustancialmente perfeccionado y entró en vigor. En conformidad con el párrafo 30 de la Orden de Confirmación Enmendada, "los demandantes en aquel procedimiento contencioso ante el Tribunal del Título III, intitulado *Cooperativa de Ahorro y Crédito Abraham Rosa, et al.* v. *Estado Libre Asociado de Puerto Rico, et al.,* Adv. Proc. Núm. 18-00028, tendrán derecho a seguir enjuiciando dicha litigación en contra de todas las partes excepto COFINA y COFINA Reorganizada, sujeto a todos los derechos y defensas disponibles con respecto a las reclamaciones y causas de acción afirmadas en las mismas."

Las Cooperativas presentaron una Notificación de Apelación ante el Tribunal del Título III y enmendaron su demanda contenciosa previamente presentada, en respuesta a la confirmación del Plan de Ajuste y después de que su petición para reconsiderar la confirmación del Plan de Ajuste había sido denegada por el Tribunal del Título III. La apelación está registrada con el Primer Circuito bajo número de caso 19-1391. La Junta de Supervisión tiene hasta el 17 de junio de 2019 para presentar una respuesta a la demanda contenciosa enmendada de las Cooperativas.

b) *Incoación del caso Título III por la Junta de Supervisión, Mediación en el caso Título III, y materias claves en disputa en el caso Título III*

El 3 de mayo de 2017, la Junta de Supervisión, a petición del Gobernador de Puerto Rico, incoó un caso bajo el Título III de PROMESA para el Estado Libre Asociado ante el Tribunal del Título III. El 5 de mayo de 2017, la Junta de Supervisión, a petición del Gobernador de Puerto Rico, le siguió con una presentación similar para la Corporación ante el Tribunal del Título III.

*Bank of New York Mellon* v. *COFINA, et al,* Adv. Proc. Núm, 17-00133 (D.P.R.) (La Acción de Interpelación). El 16 de mayo de 2017, poco después del inicio del Caso Título III de la Corporación, Bank of New York Mellon, en su carácter de síndico a título de la escritura de los Valores Existentes (en dicha capacidad, BNYM) presentó una acción de interpelación ante el Tribunal del Título III (la "Acción de Interpelación") solicitando que el tribunal determine los derechos respetivos de ciertas partes a los fondos generados por los Impuestos sobre las Ventas Pignorados en poder de BNYM (los "Fondos en Disputa"). Por medio de la Acción de Interpelación, las partes interesadas adujeron reclamaciones a los Fondos Disputados, fundamentado, entre otras cosas, sobre la existencia o inexistencia de un incumplimiento no subsanado generado por ciertas acciones de la Estado Libre Asociado y la Corporación, incluyendo la aprobación de una ley de cumplimiento del plan fiscal que le permitiera al Gobernador usar el Impuesto sobre ventas Pignorado para cubrir deficiencias en los flujos de cajo del Estado Libre Asociado bajo ciertas circunstancias.

El 30 de mayo de 2017, el Tribunal del Título III estimó la solicitud de interpelación, y ordenó que los Fondos en Disputa permanecieran en fideicomiso, sin efectuar distribución alguna hasta que el Tribunal del Título III dicte su decisión definitiva. Desde el mes de junio hasta el mes de septiembre de 2017, varias partes y partes interesadas, incluyendo BNYM y ciertos acreedores, presentaron solicitudes de documentación y trasladaron citaciones judiciales a varias entidades, afiliadas y funcionarios del Gobierno de Puerto Rico, entre ellas, COFINA, BGF, el Estado Libre Asociado, AAFAF y la Junta de Supervisión. Las entidades e individuos citados produjeron documentos, pero AAFAF y la Junta de Supervisión presentaron sus respectivas exposiciones de hechos, en lugar de presentarse a declarar. El 6 de noviembre

41                                                                              (continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

de 2017, varias partes interesadas, entre ellas, BNYM y ciertos acreedores, presentaron peticiones de sentencia sumaria. La presentación de los alegatos relacionados con la petición de sentencia sumaria finalizó el 5 de enero de 2018, pero el tribunal aún no ha emitido su decisión. El 27 de septiembre de 2018, en vista de los acuerdos y compromisos asumidos en virtud de la PSA (que se examinan a continuación), el Tribunal del Título III decidió, *sua sponte*, desestimar las peticiones de sentencia sumaria en trámite, sin prejuicio de la posibilidad de su reinstauración el 1 de octubre de 2018 o después de esa fecha. [Procedimiento Contencioso Núm. 17-00133, ECF. Núm. 518]. El 27 de noviembre de 2018, BNYM presentó una petición para reinstaurar su moción solicitando una sentencia sumaria parcial, en la cual BNYM solicita una reparación declaratoria relacionada con la existencia o inexistencia de un evento de incumplimiento bajo la resolución de bonos de la Corporación.

El 5 de febrero de 2019, el Tribunal del Título III confirmó el Plan de Ajuste (lo que se discute abajo). El 12 de febrero de 2019, el Plan de Ajuste Enmendado quedó sustancialmente perfeccionado y entró en vigor. Los Fondos Disputados han sido distribuidos en conformidad con los términos y disposiciones del Plan de Ajuste. El 19 de febrero de 2019, las partes intervinientes en la Acción de Interpelación presentaron la Estipulación y Orden Acordada para la Desestimación de la Acción de Interpelación (la "Estipulación de Desestimación") [Adv. Proc. Núm. 17-00133, ECF Núm. 549], en la cual estipularon y acordaron que el Fideicomisario se desistiría de la Petición para Reinstauración y que la Acción de Interpelación y todas las reclamaciones y causas de acción afirmadas o que pudieran haber sido aducidas en la Acción de Interpelación serían desestimadas, con perjuicio, con fecha efectiva del 12 de febrero de 2019. El 20 de febrero de 2019, el Tribunal del Título III emitió una orden en conformidad con la Estipulación de Desistimiento.

c) *La Disputa Estado Libre Asociado-COFINA*
*Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico* v. *Whyte.* Adv. Pro. Núm. 17-00257-LTS (D.P.R.).

El 10 de agosto de 2017, el Tribunal del Título III emitió una orden (la Orden Procesal) para aprobar un protocolo para resolver las disputas entre el Estado Libre Asociado y la Corporación. La Orden Procesal define la Disputa Estado Libre Asociado-COFINA en términos de "si después de haber considerado todas las defensas procesales y sustanciales y reconvenciones, incluyendo las cuestiones constitucionales, los impuestos sobre ventas y uso supuestamente pignorados por COFINA son propiedad del Estado Libre Asociado o COFINA bajo el derecho aplicable…". La Orden Procesal dispuso el nombramiento de (1) un agente para la Junta de Supervisión en carácter de representante del Estado Libre Asociado en su caso Título III (el Agente del Estado Libre Asociado); y (2) un agente para la Junta de Supervisión en carácter de representante de COFINA en su caso Título III (el agente de COFINA).

El 8 de septiembre de 2017, el Agente del Estado Libre Asociado incoó una demanda alegando que los ingresos IVU pignorados por la deuda de bonos COFINA son "propiedad exclusiva del Estado Libre Asociado". La demanda alega que la legislación constituyendo a COFINA "no transfirió a COFINA la propiedad actual de ingresos futuros del IVU", y tampoco cedió a COFINA el derecho del Estado Libre Asociado a percibir dichos ingresos. La demanda alega que la transferencia a COFINA de los ingresos IVU fue, si acaso, una promesa sin garantía alguna de transferir ingresos en el futuro. La demanda además alega que aún en caso que la transferencia de futuros ingresos IVU a COFINA tuviera cualquier efecto legal, dichas transferencias serían meramente un otorgamiento de una participación en garantía con respecto a propiedad adquirida y gobernada por el Artículo 9 del Código Comercial Uniforme. La demanda alega que cualquier participación en garantía de COFINA en los ingresos IVU es inejecutable contra el Estado Libre Asociado, o, alternativamente, no está perfeccionado y que por consiguiente es eludible, y de otro modo subordinado a los derechos de la Junta de Supervisión a título de fideicomisario. La demanda además alega que el caso Título III precluye cualquier interés en garantía.

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

La Demanda también alega que la estructura de COFINA es inconstitucional porque elude las limitaciones sobre deuda que impone la Constitución de Puerto Rico.

El 15 de septiembre de 2017, la Agente de COFINA presentó su respuesta a la Demanda (la "Respuesta y Reconvenciones"), objetando a las reclamaciones del Representante del Estado Libre Asociado, planteando diversas reconvenciones, y solicitando que se dicte sentencia declaratoria que: (a) ley orgánica de COFINA es constitucional y, por ende, el Impuesto sobre las Ventas Pignorado transferido a COFINA es propiedad de COFINA y no es un "recurso disponible" del Estado Libre Asociado; (b) COFINA tiene un gravamen perfeccionado e ineludible sobre el Impuesto sobre las Ventas Pignorado, y existe un acuerdo de subordinación exigible en virtud del cual el Estado Libre Asociado aceptó subordinar todo derecho que pudiera tener en el Impuesto sobre las Ventas Pignorado al derecho de COFINA, y/o el Impuesto sobre las Ventas Pignorado está en poder de un fideicomiso teórico en beneficio de COFINA; (c) la apropiación indebida por parte del Estado Libre Asociado del Impuesto sobre las Ventas Pignorado viola la Constitución de Estados Unidos y la Constitución de Puerto Rico; (d) la ley de cumplimiento del plan fiscal viola la ley PROMESA; (e) la Ley Núm. 84-2016, la cual modificó la ley orgánica de COFINA en el sentido de reducir el monto de los ingresos del Impuesto sobre las Ventas y Uso que recibe COFINA del 6% al 5.5%, viola la ley PROMESA, y que COFINA tiene derecho a un 6% de los ingresos del IVU hasta que se alcance el Monto Base del Impuesto sobre Ventas Pignorado cada año; y (f) toda deuda no perteneciente a COFINA, incluyendo los Bonos de Obligaciones Generales emitidos en contravención de las disposiciones sobre de límites sobre la deuda consagradas en la Constitución de Puerto Rico, no tiene prioridad en virtud de las disposiciones en materia de prioridad de deudas de la Constitución de Puerto Rico. La Respuesta y Reconvenciones de la Representante de COFINA, solicitan que se dicten interdictos, y asimismo que: (y) el Tribunal del Título III ordene que el Impuesto sobre las Ventas Pignorado se mantenga en un fideicomiso teórico a favor de COFINA para evitar la supuesta interferencia dolosa y fraude de Estado Libre Asociado con respecto a esos ingresos; y (z) el Tribunal del Título III emita una orden que prohíba con carácter permanente que el Estado Libre Asociado desvíe o transfiera los ingresos del Impuesto sobre las Ventas Pignorado COFINA, designándolos como "ingresos disponibles" y que tome cualquier acción necesaria para detener, revocar o rechazar la transferencia de esos ingresos a COFINA, o interferir de otra manera con los derechos de COFINA en los mismos.

Además de las reclamaciones planteadas por el Representante del Estado Libre Asociado y la Representante de COFINA, varios grupos de tenedores de bonos de COFINA y del ELA, así como otras partes permitidas a intervenir en el Procedimiento Contencioso, presentaron reconvenciones y reclamaciones recíprocas en torno a la titularidad de la porción aplicable del Impuesto sobre las Ventas y Uso.

AAFAF presentó una petición para desestimar ciertas reclamaciones del Agente del Estado Libre Asociado y las reconvenciones de la Agente COFINA, motivado en que excedían el alcance de sus facultades. Los autos de presentación de documentos y pruebas fueron completados en febrero de 2018. El 21 de febrero, las partes presentaron peticiones de sentencia sumaria. El Tribunal escuchó argumentos verbales el 10 de abril de 2018 y recibió las peticiones para su consideración.

El 21 de diciembre de 2017, el Tribunal del Título III desestimó, sin prejuicio, varias reclamaciones del Representante del Estado Libre Asociado y del Representante de COFINA, al considerarlas fuera del alcance de la Disputa Estado Libre Asociado-COFINA, así como varias reclamaciones presentadas por las partes intervinientes (las "Reclamaciones Desestimadas"). El Tribunal del Título III determinó que el alcance de la Disputa Estado Libre Asociado-COFINA, conforme se define en la Conciliación sobre Procedimientos, se limita a si la propiedad del Impuesto sobre las Ventas Pignorado recae en el Estado Libre Asociado o en COFINA. Las Reclamaciones Desestimadas por el Tribunal del Título III estaban fuera del alcance de la Disputa entre el Estado Libre Asociado y COFINA pues presumían que la propiedad del Impuesto sobre las Ventas Pignorado le correspondía al Estado Libre Asociado o a COFINA, o bien porque abordaban otras cuestiones no relacionadas a la cuestión de titularidad. Tras el fallo del Tribunal del Título III y su posterior decisión de autorizar que el Representante del Estado Libre Asociado modificara su demanda, lo cual sucedió el 16 de enero de 2018, las reclamaciones remanentes del Representante del Estado Libre Asociado eran: (a) que la Ley 91 no transfiere a COFINA la titularidad presente de futuros Ingresos IVU; (b) que la Ley 91 no confiere a COFINA ningún "derecho a recibir" futuros Ingresos IVU; y (c) que

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

la Ley 91 esté diseñada para violar, y de hecho viola, las disposiciones de la Constitución de Puerto Rico sobre presupuestos balanceados. Por su parte, las reclamaciones del Representante de COFINA quedaron reducidas a que la Ley 91 es constitucional y que el Impuesto sobre las Ventas Pignorado y el Fondo Dedicado del Impuesto de Ventas son propiedad de COFINA.

El 21 de febrero de 2018, el Representante del Estado Libre Asociado, el Representante de COFINA y varias partes intervinientes, presentaron una moción cruzada solicitando sentencia sumaria. En su petición, el Representante del Estado Libre Asociado adujo que (a) la Ley 91 no transfiere a COFINA ningún derecho de propiedad presente en la posible recaudación futura de impuestos ya que no existe ninguna propiedad que se pudiera transferir; (b) no hubo ninguna "genuina venta" de ingresos de futuras recaudaciones de impuestos a COFINA ya que el Estado Libre Asociado se reservó las facultades de sustituir, reducir o incluso eliminar esos ingresos, y que tanto el Estado Libre Asociado como COFINA contabilizaron la transacción en cuestión como un "préstamo con garantía colateral" por el Estado Libre Asociado, y no como una "cesión" de ingresos a COFINA; (c) la Ley 91 no transfiere a COFINA el "derecho a recibir", por el Estado Libre Asociado, las futuras recaudaciones de impuestos ya que la Ley no contiene ninguna disposición en ese sentido, y que el Estado Libre Asociado no tiene "derecho a recibir" ingresos de impuestos sino hasta que ocurra una transacción imponible; y (d) que la Ley 91 y la supuesta transferencia de ingresos del IVU son inconstitucionales ya que la Asamblea Legislativa no puede crear estructuras de financiamiento con el efecto de eludir las disposiciones sobre deuda y presupuestos balanceados de la Constitución de Puerto Rico. Las partes intervinientes que presentaron las mociones cruzadas a favor del Estado Libre Asociado adujeron, entre otras cosas, que (a) el alcance del Procedimiento Contencioso se limita a definir la titularidad de los ingresos post-petición y de los ingresos futuros del IVU que no se había podido transferir a COFINA por motivo de la paralización automática; (b) conforme al Código Civil de Puerto Rico, el Estado Libre Asociado no transfirió la propiedad de los futuros ingresos por Impuesto sobre las Ventas y Uso a COFINA; (c) conforme al Código de Quiebras, un "derecho a recibir" futuros ingresos por Impuesto sobre las Ventas y Uso no es un activo transferible; (d) el Impuesto sobre las Ventas Pignorado sigue siendo propiedad del Estado Libre Asociado, en vista de que es un "recurso disponible" en virtud de la Constitución de Puerto Rico; y (e) la Ley 56 no trasfirió a COFINA la propiedad del Impuesto sobre las Ventas Pignorado. Por lo contrario, el Representante de COFINA adujo que la Asamblea Legislativa posee las facultades para transferir y, de hecho transfirió, el Impuesto sobre las Ventas Pignorado a COFINA por medio de la Ley 91. Las partes intervinientes que presentaron las mociones cruzadas favor de COFINA adujeron, entre otras cosas, que (a) la transferencia del Impuesto sobre las Ventas Pignorado efectuada por el Estado Libre Asociado a COFINA era válida en virtud de la Constitución de Puerto Rico; (b) el Impuesto sobre las Ventas Pignorado no es un "recurso disponible" según la Constitución de Puerto Rico; (c) no es "legalmente imposible" transferir futuros ingresos del IVU; y (d) la ley orgánica de COFINA claramente y explícitamente transfiere a COFINA la titularidad del Impuesto sobre las Ventas Pignorado. Una vista sobre las peticiones cruzadas tuvo lugar el 10 de abril de 2018.

Concurrentemente con el litigio del procedimiento contencioso, los representantes participaron en una mediación aprobada por el tribunal para dirimir la Disputa entre el Estado Libre Asociado y COFINA. Auspiciados por el grupo de mediación, los Representantes llegaron a un entendimiento concretado en un Acuerdo Preliminar (el "Acuerdo Preliminar") con respecto a la conciliación de la Disputa entre el Estado Libre Asociado y COFINA. El 5 de junio de 2018, los Representantes presentaron una petición conjunta solicitando que se mantuviera la paralización de la decisión del Tribunal del Título III sobre las peticiones de sentencia sumaria que se encontraban en trámite, por un plazo de sesenta (60) días, en vista del Acuerdo Preliminar al que se había llegado para dirimir la Disputa entre el Estado Libre Asociado y COFINA. El 7 de junio 2018 los Agentes públicamente anunciaría los términos de su Acuerdo en Principio.

Bajo el Acuerdo en Principio, una porción de los ingresos del IVU del 5.5% condicionalmente adjudicado a la Corporación – la porción referida como el Monto Base del Impuesto sobre ventas Pignorado (PSTBA, por las siglas en inglés de Pledge Sales Tax Base Amount) – sería compartida entre la Corporación y el Estado Libre Asociado. Para repetir, la PSTBA es el monto base de los ingresos Impuesto sobre ventas de 5.5% del adjudicado a la Corporación que la Corporación debe recibir bajo la Ley Núm. 91, por lo general antes de que el saldo del Impuesto sobre ventas del 5.5% pueda estar a la disposición del Estado Libre Asociado.

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

El PSTBA actualmente es de aproximadamente $783.2 millones para el año fiscal 2019 ($753.1 millones en el año fiscal 2018) y se incrementa al 4% anualmente, hasta llegar a aproximadamente $1,850 millones en el año fiscal 2041. El Acuerdo en Principio propone, entre otros, repartir el PSTBA de tal forma que la Corporación reciba el 53.65% del PSTBA a partir del año fiscal 2019 mientras que el Estado Libre Asociado recibe el 46.35% restante, sujeto a ciertas restricciones y excepciones. El saldo de los ingresos del Impuesto sobre ventas del 5.5% condicionalmente adjudicados a la Corporación seguiría fluyendo al Estado Libre Asociado.

d)  *Conciliación de la Disputa Estado Libre Asociado-COFINA y el Plan de Ajuste.*

El 29 de agosto de 2018, COFINA, AAFAF, la Junta de Supervisión y varios bonistas y aseguradores de los Bonos COFINA (las Partes de la Conciliación) celebraron el Acuerdo de Soporte al Plan (PSA, por las siglas en inglés de Plan Support Agreement) fechado el 29 de agosto de 2018 (el PSA Original), que contempla, entre otros, (i) el compromiso y la conciliación de la Disputa del Estado Libre Asociado-COFINA, congruente con el Acuerdo en Principio, otorgando a COFINA un interés de participación por un monto de hasta el 53.65% del Monto Base de Impuesto sobre ventas Pignorado; y (ii) la aprobación del Tribunal del Título III del compromiso y la conciliación concurrentemente por medio de un plan de ajuste en el caso Título III de COFINA y una petición de conciliación en el caso Título III del Estado Libre Asociado.

El 20 septiembre de 2018, el PSA Original fue enmendado y replanteado en conformidad con el Acuerdo de Soporte al Plan Enmendado y Replanteado al 20 de septiembre de 2018 (el PSA Enmendado), incluyendo ciertos Bonistas de COFINA adicionales, quienes también poseen una cantidad importante de Bonos de Obligación General del Estado Libre Asociado y que se cuentan entre los demandantes de la Litigación de Lex Claims. Entre otras cosas, el PSA Enmendado dispone que (i) Aurelius Capital Master, Ltd. y Six PRC Investments LLC, y cada una de sus entidades aplicables, solicitarán la desestimación, con perjuicio, de sus reclamaciones y causas de acción en la Litigación de Lex Claims; lo anterior entraría en vigor al momento de registrar una orden aprobando la petición de conciliación y la confirmación del plan de ajuste congruente con el PSA Enmendado, y (ii) las partes del PSA Enmendado generalmente no se opondrán a la aprobación de la petición de conciliación en el caso Título III del Estado Libre Asociado.

El 19 de octubre de 2018, la Junta de Supervisión presentó (i) *Plan de Ajuste Título III del Corporación del Fondo de Interés Apremiante de Puerto Rico* [Caso Núm. 17-3283, Expediente Núm. 4072] (el Plan de Ajuste), la *Declaración de Divulgación del Plan de Ajuste Título III de las Deudas del Corporación del Fondo de Interés Apremiante de Puerto Rico* [Caso Núm. 17-3283, Expediente Núm. 4073], y la *Moción de Orden de la Corporación del Fondo de Interés Apremiante de Puerto Rico (i) Aprobación de la Declaración de Divulgación, (ii) Fecha de Registro de Fijación de Votación, (iii) Notificación de Vista de Aprobación de Confirmación, (iv) Procedimientos de Aprobación de Paquetes de Solicitación y Procedimientos de Distribución, (v) Formularios de Aprobación de Papeletas y Notificación de Elecciones, y Procedimientos para Votación y Elecciones, (vi) Notificación Aprobatoria de Estatus de No-Votación, (vii) Establecimiento de Fechas Límites para Elecciones y Votación, y (viii) Aprobación de Procedimientos para Conteo de Votos* [Caso Núm. 17-3283, Expediente Núm. 4075] (Petición de Declaración de Divulgación) en el caso Título III de COFINA, y (ii) la *Petición del Estado Libre Asociado de Puerto Rico en conformidad con la Regla de Quiebra 9019 para Orden Aprobando Resolución Entre el Estado Libre Asociado de Puerto Rico y Corporación del Fondo de Interés Apremiante de Puerto Rico* [Caso Núm. 17-3283, Expediente Núm. 4067] (la Petición de Conciliación) en el Caso Título III del Estado Libre Asociado. El Plan de Ajuste dispuso la emisión por la Corporación de bonos nuevos por un monto capital aproximado de $12,000 millones (los Bonos COFINA Nuevos, definidos en el Plan de Ajuste como "los valores a ser emitidos por COFINA Reorganizada en la Fecha Efectiva en conformidad con el Plan") y la distribución de efectivo a los bonistas existentes de la Corporación.

45                                                  (continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

El 16 de noviembre de 2018, la Junta de Supervisión presentó el *Plan de Ajuste Título III Enmendado de la Corporación del Fondo de Interés Apremiante de Puerto Rico* [Caso Núm. 17-3283, Expediente Núm. 4296] (el Plan de Ajuste Enmendado), y la *Declaración de Divulgación del Plan de Ajuste Título III Enmendado de las Deudas de la Corporación del Fondo de Interés Apremiante de Puerto Rico* [Caso Núm. 17-3283, Expediente Núm. 4299] (la Declaración de Divulgación Enmendada).

El 20 de noviembre de 2018, el Tribunal del Título III celebró una vista sobre la Petición de Declaración de Divulgación y falló que se registraría una orden aprobando una Versión modificada de la Declaración de Divulgación Enmendada.

El 26 de noviembre de 2018, la Junta de Supervisión presentó el *Segundo Plan de Ajuste Enmendado de Deudas de la Corporación del Fondo de Interés Apremiante de Puerto Rico al Amparo del Título III* [Caso Núm. 17-3283, Expediente Núm. 4363] (el Segundo Plan de Ajuste Enmendado), y la *Declaración de Divulgación del Segundo Plan de Ajuste Enmendado de Deudas de la Corporación del Fondo de Interés Apremiante de Puerto Rico al Amparo del Título III* [Caso Núm. 17-3283, Expediente Núm. 4364] (la Segunda Declaración de Divulgación Enmendada), y una forma revisada de la orden propuesta aprobando la Segunda Declaración de Divulgación Enmendada y sus procedimientos de solicitación relacionados.

El 29 de noviembre de 2018, el Tribunal del Título III registró una orden aprobando la Segunda Declaración de Divulgación Enmendada y los procedimientos de solicitación relacionados.

El 9 de enero de 2019, la Junta de Supervisión presentó el *Tercer Plan de Ajuste Enmendado de Deudas de la Corporación del Fondo de Interés Apremiante de Puerto Rico al Amparo del Título III* [Caso Núm. 17-3283, Expediente Núm. 4652] (el Tercer Plan de Ajuste Enmendado).

El Tercer Plan de Ajuste Enmendado propone, entre otros, liberar al Estado Libre Asociado de toda responsabilidad por reclamaciones y causas de acción en poder de cualquier acreedor de la Corporación (únicamente en su capacidad de acreedor de la Corporación) generadas por o relacionadas con la relación del Estado Libre Asociado y COFINA.

El Tribunal del Título III celebró una vista sobre la Petición de Conciliación y confirmación del Tercer Plan de Ajuste Enmendado el 16 de enero de 2019, y 17 de enero de 2019. El 4 de febrero de 2019, el Tribunal del Título III estimó la Petición de Conciliación y confirmó el Tercer Plan de Ajuste Enmendado mediante el registro de (i) el *Memorándum Dictamen y Orden Aprobando la Conciliación Entre el Estado Libre Asociado de Puerto Rico y la Corporación del Fondo de Interés Apremiante de Puerto Rico* [Caso Núm. 17-3283, Expediente Núm. 5045] (la Orden de Conciliación), (ii) el *Memorándum de Determinación de Hecho y Conclusiones de Derecho en Conexión con la Confirmación del Tercer Plan de Ajuste Enmendado de Deudas de la Corporación del Fondo de Interés Apremiante de Puerto Rico al Amparo del Título III* [Caso Núm. 17-3283, Expediente Núm. 5047] (las Determinaciones y Conclusiones), y (iii) la *Orden y Sentencia Confirmando el Tercer Plan de Ajuste Enmendado de Deudas de la Corporación del Fondo de Interés Apremiante de Puerto Rico al Amparo del Título III* [Caso Núm. 17-3283, Expediente Núm. 5048] (la Orden de Confirmación).

El 5 de febrero de 2019, el Tribunal del Título III enmendó las Determinaciones y Conclusiones y la Orden de Confirmación, al registrar (i) el *Memorándum Enmendado de las Determinaciones de Hecho y Conclusiones de Derecho en Conexión con la Confirmación del Tercer Plan de Ajuste Enmendado de Deudas de la Corporación del Fondo de Interés Apremiante de Puerto Rico al Amparo del Título III* [Caso Núm. 13-3283, Expediente Núm. 5053] (las Determinaciones y Conclusiones Enmendadas) y (ii) la *Orden Enmendada y Sentencia Confirmando el Tercer Plan de Ajuste Enmendado de Deudas de la Corporación del Fondo de Interés Apremiante de Puerto Rico al Amparo del Título III* [Caso Núm. 17-3283, Expediente Núm. 5055] (la Orden de Confirmación Enmendada). En conformidad con las Determinaciones y Conclusiones y la Orden Enmendada, que sustituye las Determinaciones y Conclusiones y la Orden de Confirmación, el Tribunal del Título III confirmó el Tercer Plan de Ajuste Enmendado de la Corporación, y la Fecha Efectiva ocurrió el 12 de febrero de 2019.

En conformidad con la Petición de Conciliación aprobada en el caso Título III del Estado Libre Asociado

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

por medio de la Orden de Conciliación y por medio del Plan de Ajuste confirmado en el Título III, el Tribunal del Título III determinó que la división del Ingreso Fijo en una porción de 53.65%, que recibe la Corporación, y la porción de 46.35%, que recibe el Estado Libre Asociado, es congruente con el Acuerdo en Principio. Adicionalmente, como se describe en mayor detalle en esta Nota, en conformidad con los artículos 1.4 y 2.1(c) del Tercer Plan de Ajuste Enmendado, varias acciones de litigación y reclamaciones y causas de acción alegadas en las mismas han sido desestimadas con prejuicio, en la Fecha Efectiva del Plan de Ajuste (12 de febrero de 2019) en conformidad con la Orden de Conciliación y la Orden de Confirmación.

El 15 de noviembre de 2018, el Gobernador Rosselló-Nevares promulgó la Ley Núm. 241, que enmendó y replanteó la Ley Núm. 91, la cual entró en vigor en la Fecha Efectiva del Plan de Ajuste, para establecer el marco legal para la reestructuración de los bonos de la Corporación en circulación en aquel momento. Con este propósito, la Ley Núm. 241 dispuso: (i) la modificación de la estructura de gobernación corporativa de la Corporación, incluyendo el requerimiento que cada miembro de la junta directiva debe satisfacer las normas de independencia y calificaciones establecidos en la Escritura y los estatutos sociales de la Corporación (incluyendo que ningún miembro de la junta directiva puede ser funcionario, empleado, o director de cualquier entidad del gobierno aparte de la Corporación); (ii) la autorización de que la Corporación emita los Bonos COFINA Nuevos y disponga los términos de dichos bonos; (iii) confirmación de la titularidad de los Ingresos COFINA por la Corporación; (iv) la creación de un gravamen estatutario para garantizar los Bonos COFINA Nuevos; y (v) pactos para garantizar adicionalmente el repago de los bonos de la Corporación, como por ejemplo los Ingresos de COFINA siendo financiados de primeros fondos, un pacto de no afectación, y pactos que permiten al Estado Libre Asociado modificar el Impuesto sobre ventas Pignorado una vez que se hayan satisfecho determinados requerimientos.

La Orden Enmendada de Confirmación confirmó el Tercer Plan de Ajuste Enmendado, el cual autorizó la emisión de aproximadamente $12,000 millones en monto capital de los Bonos COFINA Nuevos, canceló los bonos de la Corporación entonces en circulación, y descargó el pasivo relacionado. La Orden Enmendada de Confirmación también dispuso las siguientes protecciones enumeradas para los Bonos COFINA Nuevos. Específicamente, las disposiciones de la Orden Enmendada de Confirmación incluyen: (i) los Bonos COFINA Nuevos "constituyen obligaciones válidas, vinculantes, legales y ejecutables de COFINA; (ii) Los Impuestos Pignorados COFINA (definidos en el Plan de Ajuste como "los ingresos presentes y futuros y recaudaciones generadas por la porción del Impuesto sobre Ventas que corresponden a una tasa del impuesto del cinco punto cinco por ciento (5.5%)" son propiedad del nuevo emisor "libres de todo gravamen, reclamación, y otros intereses de acreedores del emisor anterior, el emisor nuevo, el Estado Libre Asociado, o cualquier instrumentalidad del Estado Libre Asociado, aparte de los gravámenes otorgados bajo la presente; (iii) los Impuestos Pignorados de COFINA no serán "recursos disponibles" o "ingresos disponibles" del Estado Libre Asociado; y (iv) el Tribunal del Título III retiene para garantizar la protección y ejecución y cumplimiento de marco legal y las garantías colaterales.

El Tercer Plan de Ajuste Enmendado y Ley Núm. 241 de 2018 disponen una reducción del monto del capital de los bonos de la Corporación y aclaran la titularidad de los Impuestos sobre Ventas Pignorados de COFINA. También disponen la independencia financiera y operativa al establecer legitimación independiente para el operativo de la Corporación.

Ciertas partes cuyas objeciones al Tercer Plan Enmendado fueron desestimadas presentaron Notificaciones de Apelación en el Tribunal del Título III. Las apelaciones han sido registradas con el Primer Circuito bajo números de caso 19-1181 (los cuales también se discuten abajo en relación al procedimiento contencioso intitulado *Manuel Natal-Albelo, el al* v. *Financial Oversight and Management Board for Puerto Rico, et al.*) y 19-1182. La fecha límite para presentar la Notificación de Apelación fue el 7 de marzo de 2019. El 12 de abril de 2019, AAFAF y la Junta de Supervisión presentaron la petición de desestimación de las apelaciones, por ser hipotéticas en equidad, aduciendo que ya que las partes no solicitaron una paralización del Tercer Plan de Ajuste Enmendado mientras la apelación estaba en trámite, y ya que el plan quedó sustancialmente perfeccionado el 12 de febrero de 2019, sería injusto a las partes terceras inocentes, al liquidar los cientos de transacciones que ya habrán sido completados para ajustar aproximadamente $17,640 millones de deuda de COFINA. Los recurrentes a la petición de desestimación presentaron su

47                                                                        (continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

respuesta el 15 de mayo de 2019, y la Junta de Supervisión respondió a las objeciones el 29 de mayo de 2019. El asunto ha sido instruido plenamente y las partes están a la espera de la decisión del Tribunal.

Adicionalmente, siete cooperativas de crédito constituidas conforme a las leyes de Puerto Rico presentaron una Notificación de Apelación en el Tribunal del Título III y enmendaron una demanda contenciosa previamente presentada ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico, en respuesta a la confirmación del Plan de Ajuste, y después de que su petición de reconsideración de la confirmación del Plan de Ajuste fue desestimada por el Tribunal del Título III. La apelación está registrada con el Primer Circuito bajo el número de caso 19-1391. El 12 de abril de 2019, la Junta de Supervisión presentó la petición de desestimación las apelaciones de la Orden de Confirmación; los recurrentes registraron sus oposiciones a la petición desestimar del 15 de mayo de 2019, y la Junta de Supervisión respondió a las oposiciones el 29 de mayo 2019. La Junta de Supervisión tiene hasta el 17 de junio 2019 para presentar una respuesta a la demanda contenciosa enmendada de las Cooperativas.

Como se discutió arriba en la Nota 10, la Corporación rechazó el Contrato de Permuta en conformidad con el Tercer Plan de Ajuste Enmendado, y la reclamación por el pago de terminación quedo descargado.

e)  *Litigación sobre la Cláusula de Nombramientos*

El 7 de agosto de 2017, Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC, y Lex Claims, LLC (colectivamente, Aurelius) presentaron una petición para abstener de la petición Estado Libre Asociado Título III y una petición para librarse de la paralización automática del Título III, aduciendo que el caso Título III del Estado Libre Asociado debe ser desestimado por motivo de no ser autorizado, que los actos de la Junta de Supervisión son nulos e inválidos, y que actividades adicionales relacionadas con PROMESA deben ser prohibidas, ya que la Junta de Supervisión, que presentó el procedimiento Título III de parte de la Estado Libre Asociado, fue nombrada de forma inconsistente con los requerimientos de la Cláusula de Nombramientos del Artículo II, Sección 2, Cláusula 2 de la Constitución de los Estados Unidos. El 23 de mayo de 2018, Assured Guaranty Corporación (Assured) presentó una demanda contra la Junta de Supervisión, aduciendo como los procedimientos de nombramientos de PROMESA violan tanto la Cláusula de Nombramientos como la separación de poderes de Constitución de los EE.UU. El 7 de agosto de 2017, la *Unión de Trabajadores de la Industria Eléctrica y Riego* (UTIER) presentó una demanda contenciosa contra la Junta de Supervisión y cada miembro individual de la junta, aduciendo que los procedimientos de nombramiento de PROMESA violan la Cláusula de Nombramientos. El 27 de julio de 2018, miembros del Partido Popular Democrático Popular (PPD) presentaron una demanda contra la Junta de Supervisión (la Acción PPD) solicitando sentencia declaratoria: (i) sosteniendo que las disposiciones sobre la Junta de Supervisión contenidas en PROMESA violan la Cláusula de Nombramientos, o (ii) que decretar la delegación de facultades ejecutivas y legislativas a la Junta de Supervisión es una violación de la doctrina de Separación de Poderes, o (iii) que decretar el ejercicio de las facultades de la Junta de Supervisión sobre presupuestos, para obtener el cumplimiento obligatorio de la adopción de su política pública, constituye una interferencia impermisible en la autonomía legislativa federalmente protegida. El 30 de julio de 2018, en la Acción PPD, el tribunal registró una orden certificando la impugnación por los demandantes de la constitucionalidad de PROMESA ante el Fiscal General de los Estados Unidos.

El 13 de julio de 2018, el Tribunal del Título III denegó la petición de desestimación de Aurelius, sosteniendo que la Junta de Supervisión es una instrumentalidad del territorio de Puerto Rico, establecido en conformidad con sus poderes plenarios bajo el Artículo IV para la reglamentación de los territorios, y que los miembros de la Junta de Supervisión por consiguiente no son "Oficiales de los Estados Unidos" sujetos a la Cláusula de Nombramientos. El 3 de agosto de 2018, en el procedimiento contencioso de Assured, el tribunal registró una sentencia estipulada para los demandados sin prejuicio y cerró el caso. El 15 de agosto de 2018, el tribunal registró una orden el procedimiento contencioso de UTIER, estimando la petición de desestimación y confirmando los nombramientos de la Junta de Supervisión.

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

El 7 de septiembre de 2018, en la Acción PPD, el tribunal registró una orden concediendo la desestimación voluntaria de la causa de acción de los demandantes, en la cual solicitaban una sentencia declaratoria que conforme al derecho común el ejercicio de autoridad de la Junta de Supervisión sobre el presupuesto interferiría indefensiblemente con el derecho de los demandantes a sus facultades legislativas. El 24 de septiembre de 2018, los Estados Unidos presentó una notificación de intervención para defender la constitucionalidad de PROMESA. El 4 de octubre de 2018, la Junta de Supervisión presentó una petición para desestimar y una petición solicitando una orden de paralización de litigación, a la cual respondieron los demandantes, y los Estados Unidos presentó una petición en apoyo de la paralización. El 25 de octubre de 2018, la Junta de Supervisión presentó su respuesta en apoyo de su petición de desestimación. El 20 de noviembre de 2018, el tribunal registró una orden concediendo la petición de paralización promovida por la Junta de Supervisión, determinando que la reclamación de separación de poderes de los demandantes debe quedar suspendida mientras se tramita la conciliación de la Apelación Aurelius ante el Primer Circuito (definido a continuación). Cualquiera de las partes puede presentar una petición para levantar la paralización, en base a una decisión del Primer Circuito.

El 17 de julio de 2018, Aurelius presentó la notificación de apelación al Primer Circuito (Apelación Núm. 18-1671; consolidado con Apelaciones Nos. 18-1746 y 18-1787). El 3 de agosto 3 de 2018, Assured presentó la notificación de apelación ante el Primer Circuito (Caso Núm. 18-1671). El 16 de agosto de 2018, UTIER presentó la notificación de apelación ante el Primer Circuito (Apelación Núm. 18-1787). El 22 de agosto de 2018, los recurrentes (Aurelius, Assured, y UTIER) presentaron una exposición inicial conjunta y apéndice (la Apelación Aurelius). El 1 de octubre de 2018, los recurridos presentaron exposiciones de respuesta. El 1 de noviembre de 2018, UTIER presentó su exposición de respuesta. El 2 de noviembre de 2018, Aurelius y Assured presentaron una exposición de su respuesta conjunta. El Tribunal escuchó argumentos verbales sobre la Apelación Aurelius el 3 de diciembre de 2018, y se reservó su decisión.

El 15 de febrero de 2019, el Primer Circuito sostuvo que el método de PROMESA para nombramientos de la Junta de Supervisión es inconstitucional. El Primer Circuito no desestimó las peticiones bajo el Título III de PROMESA presentados por la Junta de Supervisión, como habían solicitado los demandantes. Más bien, el Primer Circuito validó los actos previos de la Junta de Supervisión y suspendió su mandato durante 90 días. Durante la paralización de 90 días, la Junta de Supervisión puede seguir operando en el curso ordinario de su gestión.

Ya que el Primer Circuito validó los actos previos de la Junta de Supervisión, su decisión no afecta la efectividad del Tercer Plan de Ajuste Enmendado de la Corporación. Adicionalmente, el Tercer Plan de Ajuste Enmendado y la Orden Enmendada de Confirmación explícitamente disponen que cualquier orden definitiva en la litigación sobre la Cláusula de Nombramientos no afectará la conciliación de COFINA y el plan de ajuste: " en caso que se registre una Orden Definitiva en conexión con la Litigación Relacionada con Nombramientos, subsiguientemente al registro de la Orden de Conciliación y la Orden de Confirmación, todos los Acreedores u otras Entidades que reciban, que se considere hayan recibido distribuciones en conformidad con el Plan o como resultado del mismo, consienten y acuerdan que dicha Orden Definitiva de ninguna forma revertirá, afectará, o de otra forma modificará las transacciones contempladas en el Plan, el Acuerdo de Conciliación, la Orden de Confirmación y la Orden de Conciliación."

Lo anterior no obstante, la litigación de la Cláusula de Nombramientos sigue pendiente, y la decisión del Primer Circuito absteniéndose de desestimar los casos Título III, y validando las acciones previas de la Junta de Supervisión queda abierta a apelación por los demandantes y recurrentes. La Junta de Supervisión anunció el 27 de febrero de 2019, que apelará la decisión del Primer Circuito ante la Corte Suprema de los Estados Unidos y que solicitará una paralización del mandato del Primer Circuito, mientras la petición de *certiorari* de la Junta de Supervisión ante la Corte Suprema está en trámite.

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

El 23 de abril de 2019, la Junta de Supervisión apeló la decisión del Primer Circuito ante la Corte Suprema, presentando su petición de *certiorari*. El siguiente día, la Junta de Supervisión presentó la petición ante el Primer Circuito solicitando una prórroga de la paralización de 90 días de su decisión del 15 de febrero hasta la disposición definitiva del caso por la Corte Suprema. El 6 de mayo de 2019, el Primer Circuito concedió en parte la petición de prórroga de la Junta de Supervisión, al prorrogar la paralización de su decisión del 15 de febrero hasta el 15 de julio de 2019, pero desestimando la solicitud de extender la prórroga indefinidamente hasta la disposición definitiva del caso por la Corte Suprema. El 24 de mayo de 2019, Aurelius y UTIER presentaron sus oposiciones a la petición.

El 24 de mayo de 2019, Aurelius apeló la decisión del Primer Circuito al Tribunal Suprema, presentando una petición de certiorari con respecto a la aplicación de la "doctrina de oficial de facto" para confirmar todas las acciones de la Junta de Supervisión previo a la entrada en vigor de la decisión del 15 de febrero de la Primer Circuito. El 28 de mayo de 2019, el comité oficial de acreedores no garantizados nombrado en los casos Título III (aparte de COFINA) (el "Comité de Acreedores") presentó su petición de certiorari en la Corte Suprema, junto con una petición para expeditar la disposición de la apelación en la mayor medida que fuera posible. El 5 de junio de 2019, el Solicitor General de los Estados Unidos, de parte de los Estados Unidos, también presentó una petición de *certiorari* en la Corte Suprema.

f)   *La Investigación de la Junta de Supervisión*

El 2 de agosto de 2017, la Junta de Supervisión anunció su intención, en conformidad con sus facultades bajo PROMESA, de llevar a cabo una investigación para evaluar la crisis fiscal y sus factores contribuyentes, y para examinar la deuda de Puerto Rico y sus emisiones, incluyendo sus prácticas de ventas y divulgación. Con ese fin, la Junta de Supervisión nombró un comité de investigación especial (el Comité de Investigación Especial), y llevo a cabo un proceso competitivo para identificar y seleccionar una firma independiente para realizar la investigación. El 13 de septiembre de 2017, la Junta de Supervisión anunció que el Comité Especial de Investigación había contratado un investigador independiente para llevar a cabo una evaluación de la deuda del Estado Libre Asociado y su conexión con la crisis financiera actual. El Comité Especial de Investigación considera que esta investigación es parte integral de la misión de la Junta de Supervisión de restaurar el equilibrio fiscal y la oportunidad económica, y de promover el retorno del Estado Libre Asociado a los mercados de capital. Las labores del investigador independiente concluyeron, y la Junta de Supervisión publicó el informe definitivo del investigador independiente el 20 de agosto de 2018 (el Informe de la Investigación sobre la Deuda). El Informe de la Investigación sobre la Deuda provee un análisis de los factores históricos, y, más recientemente, factores macroeconómicos y políticos que contribuyen, directamente e indirectamente, a la crisis fiscal y económica del Estado Libre Asociado, el proceso de emisión de bonos municipales del Estado Libre Asociado, y a los esfuerzos legislativos para reestructurar la deuda, así como las determinaciones investigativos de la Junta de Supervisión, sus recomendaciones de políticas, y la identificación de reclamaciones potenciales y cuestiones que ameritan atención normativa.

El Informe de la Investigación sobre la Deuda expuso ciertas determinaciones y recomendaciones, en las siguientes áreas:

- El BGF
- Los servicios básicos públicos de Puerto Rico (PREPA y PRASA)
- La Corporación o COFINA
- El Sistema de Retiro de los Empleados del Estado Libre Asociado (SRE)
- Las Funciones de Presupuestación, Informes Externos, y Contabilidad de Puerto Rico
- El cálculo del Límite Constitucional sobre la Deuda

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

- Las Agencias de Calificación Crediticia (CRA, por las siglas en inglés de Credit Rating Agency)
- Prácticas de Ventas para Bonos Relacionados con Puerto Rico
- Marco de Ética del Gobierno de Puerto Rico
- Uso de Permutas de Tasas de Intereses por los Emisores
- Carencia de Puerto Rico de un Mecanismo Claro para la Validación de los Bonos Relacionados con Puerto Rico Antes de Emitirlos
- Crédito Fiscal por Posesión

Finalmente, el investigador independiente presentó una vista general de potenciales causas de acción. El Informe de la Investigación sobre la Deuda completo se puede encontrar en el sitio web de la Junta de Supervisión.

El 28 de agosto de 2018, la Junta de Supervisión nombró su comité de reclamaciones especiales (el Comité de Reclamaciones Especiales) y delegó al Comité de Reclamaciones Especiales todas y cualesquiera de las facultades de la Junta de Supervisión para evaluar las determinaciones del Informe de Investigación sobre la Deuda y tomar cualquier paso apropiado, incluyendo, entre otros, para recomendar y/o iniciar la negociación y/o encausamiento de reclamaciones en base a las determinaciones de la Informe de Investigación sobre la Deuda de parte de los deudores Título III en beneficio de todos los acreedores y partes interesadas en los casos Título III. El Comité de Reclamaciones Especiales tiene el derecho y plena discreción para determinar el alcance de cualquier acción adicional, incluyendo, entre otros, investigaciones adicionales, así como reclamaciones a ser perseguidas, y el contratamiento de aquellos asesores, consultores, abogados, y otros consejeros que determine sean convenientes, a su discreción exclusiva. El 25 de octubre 2018, la Junta de Supervisión solicitó propuestas de abogados para asistir al Comité de Reclamaciones Especiales con respecto a la consideración de las reclamaciones potenciales descritas en el Informe de Investigación sobre la Deuda. El 28 de noviembre de 2018, el Comité de Reclamaciones Especiales firmó el contrato con el bufete que proveerá esos servicios. La Corporación está cooperando con esta investigación.

El 14 de enero de 2019, el Comité de Reclamaciones Especiales y el Comité de Acreedores presentó una objeción ómnibus conjunta (la Objeción a la Reclamación GO) buscando la desaprobación de más de $6,000 millones de reclamaciones relacionadas con los bonos GO del Estado Libre Asociado emitidos en marzo de 2012 o posteriormente, incluyendo: (a) $2,300 millones en Bonos de Refinanciamiento de Mejoras Públicas, Serie 2012 A emitidos en abril de 2012; (b) $415.27 millones en Bonos de Refinanciamiento de Mejoras Públicas, Serie 2012 B emitidos en marzo de 2012; y (c) $3,500 millones en Obligación General Bonos de 2014, Serie A emitidos en Marzo de 2014. Según la Objeción Reclamación GO, los bonos mencionados son "inválidos" porque, entre otros, fueron emitidos en violación de: (i) el límite al servicio de deuda en la Constitución de la Estado Libre Asociado, que debería haber incluido el servicio deuda de bonos emitidos por la PBA, lo cual la Objeción Reclamación GO caracteriza como una estructura "simulada"; (ii) la cláusula constitucional del Estado Libre Asociado sobre el presupuesto balanceado, que debería haber incluido $425 millones de intereses que fueron excluidos; y (iii) la cláusula constitucional del Estado Libre Asociado sobre el presupuesto balanceado, porque el producto de los Bonos GO Impugnados fueron usados para financiar gastos deficitarios. El 15 de febrero de 2019, el Tribunal del Título III registró una orden procesal relacionada con la Objeción a la Reclamación GO, que le concedió a las partes hasta el 16 de abril de 2019 para entregar notificación de su participación en los procedimientos relacionados con la Objeción a la Reclamación GO.

El 30 de abril de 2019, el Comité de Reclamaciones Especiales, de parte de la Junta de Supervisión, incoó más de 230 procedimientos contenciosos (colectivamente, las Acciones de Evitamiento de Vendedores) contra individuos y entidades que buscaban evitar y recuperar pagos por un total de aproximadamente $4,200 millones hechos por el Estado Libre Asociado, previo al inicio de los casos Título III. Durante su investigación, el Comité de Reclamaciones Especiales identificó estos individuos y entidades a título de haber recibido, durante los cuatro años previos a mayo

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

de 2017, pagos por encima de $2.5 millones sin un contrato válido con el Estado Libre Asociado, donde dicho pagos no concordaban con el contrato aplicable.

El 1 de mayo de 2019, el Comité de Reclamaciones Especiales, de parte de la Junta de Supervisión, y el Comité Oficial de Acreedores No Asegurados designado en los casos Título III (el Comité de Acreedores), incoó un procedimiento contencioso (la Acción de Evitamiento de Honorarios de Bonos) contra determinados suscriptores, contrapartes en contratos de permuta, y bufetes de abogados pretendiendo evitar y recuperar honorarios y utilidades devengadas en conexión con la emisión de $3,500 millones de bonos del Estado Libre Asociado 2014 (los Bonos GO 2014). Según la Acción de Evitamiento de Honorarios de Bonos, los demandantes alegan que cada uno de los demandados estaban conscientes de que BGF estaba violando sus deberes fiduciarios para con el Estado Libre Asociado en el 2014, y que abusaron los derechos del BGF para su propio lucro y enriquecimiento injusto, al ayudar y animar al BGF a emitir los Bonos GO 2014 a expensas del Estado Libre Asociado. Por otra parte, los demandantes además alegan que como resultado de la emisión de los Bonos GO 2014, muchos de los demandados recibieron entre (i) utilidades no devengadas, (ii) el producto de los Bonos GO 2014 para redimir o recomprar otros bonos circulantes del Estado Libre Asociado, o (iii) descuentos no devengados sobre los bonos que compraron para la reventa a sus clientes. Los demandantes consideran que estos productos y utilidades son recuperables por el Estado Libre Asociado a título de transferencias fraudulentas, ya que el Estado Libre Asociado estaba insolvente en el momento de la emisión de los Bonos GO 2014.

El 2 de mayo de 2019 el Comité de Reclamaciones Especiales (de parte de la Junta de Supervisión), AAFAF, y el Comité de Acreedores, incoaron ocho procedimientos contenciosos (colectivamente, las Acciones de Evitamiento de Honorarios de Bonos) pretendiendo recuperar más de $1,000 millones en pagos de intereses y capital efectuados por motivo de ciertos bonos GO del Estado Libre Asociado. Según las Acciones de Evitamiento de Honorarios de Bonos, la legislación de Puerto Rico no autorizaba la emisión de aproximadamente $8,800 millones del Estado Libre Asociados Bonos GO porque fueron emitidos en exceso del límite constitucional sobre la deuda del Estado Libre Asociado. Como resultado, los demandantes alegan que cualesquiera pagos efectuados a cuenta de dichos bonos son, *per se,* ilícitos, y que son recuperables por ser transacciones fraudulentas según el Código de Quiebras (en conformidad con lo incorporado bajo PROMESA).

Estos procesos legales están en trámite, y COFINA no puede prever cuando se concluirán ni su desenlace.

*Manuel Natal-Albelo, et al. v. Financial Oversight and Management Board/or Puerto Rico, et al., Adv. Pro. Núm. 19-00003-LTS (D.P.R.)*

El 6 de diciembre de 2018, Manuel Natal Albelo, representante por acumulación en la Cámara de Representantes de Puerto Rico, Rene Pinto-Lugo, y otros, incluyendo *Movimiento de Concertación Ciudadana* Inc., (VAMOS) y varias uniones, presentaron una demanda (la Demanda) en el Tribunal de Primera Instancia de Puerto Rico, Tribunal Superior de San Juan (el Tribunal Superior) (Civil Núm. SJ2018cv01569), contra el Estado Libre Asociado de Puerto Rico y Carlos Méndez Núñez, en su capacidad oficial como Presidente de la Cámara de Representantes de Puerto Rico (la "Acción Civil"). El 17 de diciembre 2018, la demanda fue presentada ante el Departamento de Justicia de Puerto Rico. La Demanda contiene dos causas de acción. La primera causa de acción alega que el proceso legislativo que llevó a la promulgación de Proyecto de Ley 1837 de la Cámara de Representantes de Puerto Rico y la promulgación de Ley 241-2018, que creó la estructura legal necesaria para ejecutar la reestructuración de COFINA, era defectuosa y violaba los reglamentos de Puerto Rico así como los derechos constitucionales y civiles de Natal bajo las Constituciones de Puerto Rico y los Estados Unidos, ya que no le fue permitido participar en debate previo a la aprobación del proyecto de ley, la primera causa de acción busca la declaración de inconstitucionalidad de la Ley 241. La segunda causa de acción alega que Ley 91-2006 (la legislación COFINA, según enmendada) y Ley 241 (que es una enmienda de la

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

legislación COFINA, y que fue promulgada por el Gobernador de Puerto Rico el 15 de noviembre de 2018), viola las disposiciones de la Constitución de Puerto Rico sobre límites deuda de y presupuestos balanceados.

El 14 de enero de 2019, la Junta de Supervisión, de parte de la Estado Libre Asociado y COFINA, presentó una notificación del traslado de la Acción Civil al Tribunal del Título III, donde se convirtió en Procedimiento Contencioso Núm. 19-00003-LTS (D.P.R.), intitulado *Manuel Natal-Albelo, et al. v. Junta de Supervisión y Administración Financiera para Puerto Rico, et al.* (el Procedimiento Contencioso). El 15 de enero de 2019, el Tribunal del Título III, refirió el procedimiento contencioso a la Juez Magistrada Judith Dein para su administración general previo al juicio.

El 5 de febrero de 2019, el Tribunal del Título III emitió la Orden Enmendada de Confirmación, confirmando el Tercer Plan de Ajuste Enmendado, y las Determinaciones y Conclusiones Enmendadas. En el Párrafo 3 de las Determinaciones y Conclusiones Enmendadas, el Tribunal del Título III tomó conocimiento judicial de la Ley 241 (definido como la Legislación de Bonos Nuevos; Véase Anexo A de las Determinaciones y Conclusiones Enmendadas) y encontró que la ley "fue debidamente promulgada." Véase también el Párrafo 120 de las Determinaciones y Conclusiones Enmendadas (que concluyen que "la Asamblea Legislativa de Estado Libre Asociado aprobó, y su Gobernador firmó, la Legislación de Bonos Nuevos" y que "en conformidad con la jurisprudencia de Puerto Rico, la legislación del Estado Libre Asociado opera con presunción de ser válida si fue aprobada por la Asamblea Legislativa de Puerto Rico y firmada y promulgada por el Gobernador."); nota de pie de página 14 de las Determinaciones y Conclusiones Enmendadas (desestimando las objeciones de Manuel Natal-Albelo y sus co-objetores respecto a la constitucionalidad de la Legislación de Bonos Nuevos bajo las Constituciones de los Estados Unidos y Puerto Rico). El 12 de febrero de 2019, el Tercer Plan de Ajuste Enmendado se perfeccionó sustancialmente y entró en vigor.

El 18 de febrero de 2019, Manuel Natal-Albelo, Rene Pinto-Lugo, y otros, incluyendo VAMOS y varias uniones, presentaron una Notificación de Apelación en el Tribunal del Título III [Caso Núm. 17-03283, ECF Núm. 5155]. El 22 de febrero de 2019, la apelación fue registrada con el Primer Circuito bajo número de caso 19-1181; la apelación sigue pendiente.

El 21 de marzo de 2019, los demandantes presentaron una petición para devolver este caso al Tribunal Superior, aduciendo que el Tribunal del Título III carece jurisdicción sobre la materia de la demanda, porque atañe únicamente violaciones de la Constitución de Puerto Rico y el derecho estatutario de Puerto Rico —no así el derecho federal —lo cual no involucra derechos creados por el Título III de PROMESA. Como resultado, los demandantes reclaman que la Demanda únicamente puede ser adjudicada por un tribunal local de Puerto Rico. El 24 de marzo de 2019, la Junta de Supervisión presentó la petición para anular las peticiones de devolución de los demandantes. El 18 de abril de 2019, el Tribunal del Título III registró una orden estimando la petición de anulación de la Junta de Supervisión, y permitiendo que los demandantes presentaran una petición consolidada para devolver el caso al Tribunal Superior (la "Petición de Devolución") para el 10 de mayo de 2019. El 10 de mayo de 2019, los demandantes presentaron una petición consolidada para devolver el caso al Tribunal Superior (la Petición de Devolución). El 31 de mayo de 2019, la Junta de Supervisión presentó su objeción a la Petición de Devolución. Adicionalmente, AAFAF presentó una petición para intervenir, y una objeción a la Petición de Devolución. El 7 de junio de 2019, el Tribunal del Título III registró una orden estimando la petición de AAFAF para intervenir, y aceptando su objeción a la Petición de Devolución. La respuesta de los demandantes debía ser presentada para el 7 de junio de 2019, y la respuesta de los demandantes a la oposición de AAFAF debía ser presentada para el 11 de junio de 2019. Los Demandantes no respondieron a los autos de oposición de ninguna de las partes.

g)   *Auditorías del Internal Revenue Service (IRS)*

Mediante un oficio fechado el 14 de febrero de 2019, el U.S. Internal Revenue Service (el IRS) notificó a COFINA que está examinando un Formulario 8038-CP (la "Auditoria del IRS") con respecto al el pago de intereses del 1 de agosto de 2017 de sus Bonos Garantizados por el Impuesto sobre Ventas, Primera Serie

CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

Subordinada 2010D (Subsidio del Emisor de los Bonos Build America) (los "Bonos Serie D"). Mediante oficio fechado el 18 de marzo de 2019, el IRS notificó a COFINA que está examinando un Formulario 8038-CP para la fecha de pago de intereses del 1 agosto de 2017 sobre sus Bonos Garantizados por el Impuesto sobre Ventas, Primera Serie Subordinada 2010E (Emisor de los Bonos de Subsidio de la Zona de Recuperación Económica) (los "Bonos Serie E"). COFINA tiene la intención de responder a toda la correspondencia del IRS, y tiene la intención de cooperar con el IRS en sus examinaciones.

El 10 de abril de 2019, el IRS presentó una reclamación de gasto administrativo solicitando la devolución de pagos de subsidios directos post-petición, por un monto de $2,520,731.08 hechos a COFINA en conexión con los Bonos Serie D, y $1,677,624.89 de pagos de subsidios directos post-petición relacionados con los Bonos Serie E, por una reclamación total de $4,198,355.97. El 12 de junio de 2019, AAFAF, de parte propia y de parte de COFINA, presentó una objeción a las pruebas de reclamación del IRS, aduciendo que el IRS no tiene derecho al reembolso de los pagos, ya que COFINA había cumplido plenamente con sus obligaciones bajo los documentos aplicables de los bonos, y que por consiguiente las reclamaciones deberían ser desestimadas e invalidadas en su totalidad.

h) *COFINA Emerge del Título III de PROMESA*

El 19 de octubre de 2018, la Junta de Supervisión presentó (i) Plan de Ajuste Título III de la Corporación del Fondo de Interés Apremiante de Puerto Rico (el Plan de Ajuste), la Declaración de Divulgación del Plan de Ajuste Título III de las Deudas de la Corporación del Fondo de Interés Apremiante de Puerto Rico, y la Moción de Orden de la Corporación del Fondo de Interés Apremiante de Puerto Rico (i) Aprobación de la Declaración de Divulgación, (ii) Fecha de Registro de Fijación de Votación, (iii) Notificación de Vista de Aprobación de Confirmación, (iv) Procedimientos de Aprobación de Paquetes de Solicitación y Procedimientos de Distribución, (v) Formularios de Aprobación de Papeletas y Notificación de Elecciones, y Procedimientos para Votación y Elecciones, (vi) Notificación Aprobatoria de Estatus de No-Votación, (vii) Establecimiento de Fechas Límites para Elecciones y Votación, y (viii) Aprobación de Procedimientos para Conteo de Votos (Petición de Declaración de Divulgación) en el caso Título III de COFINA, y (ii) la Petición del Estado Libre Asociado de Puerto Rico en conformidad con la Regla de Quiebra 9019 para Orden Aprobando Resolución Entre el Estado Libre Asociado de Puerto Rico y Corporación del Fondo de Interés Apremiante de Puerto Rico (la Petición de Conciliación) en el Caso Título III del Estado Libre Asociado. El Plan de Ajuste dispuso la emisión por la Corporación de bonos nuevos por un monto capital aproximado de $12,000 millones (los Bonos COFINA Nuevos, definidos en el Plan de Ajuste como "los valores a ser emitidos por COFINA Reorganizada en la Fecha Efectiva en conformidad con el Plan") y la distribución de efectivo a los bonistas existentes de la Corporación.

En conformidad con la Petición de Conciliación aprobada en el caso Título III del Estado Libre Asociado, por medio de la Orden de Conciliación y el Plan de Ajuste confirmado en el caso Título III, el Tribunal del Título III determinó que la división del Ingreso Fijo en una porción del 53.65%, que recibe COFINA, y una porción del 46.35%, que recibe el Estado Libre Asociado, es congruente con el Acuerdo en Principio. Por otra parte, en conformidad con los artículos, 1.4 y 2.1(c) del Tercer Plan de Ajuste Enmendado, varias acciones de litigación y reclamaciones y causas de acción aducidas en las mismas fueron desestimadas con prejuicio en la Fecha Efectiva del Plan de Ajuste (12 de febrero de 2019) en conformidad con la Orden de Conciliación y la Orden de Confirmación.

El 15 de noviembre de 2018, el Gobernador Rosselló-Nevares firmó Ley Núm. 241, el cual enmendó y replanteó la Ley Núm. 91, y que entró en vigor en la Fecha Efectiva del Plan de Ajuste, para establecer el marco legal para la reestructuración de los bonos de la Corporación en circulación en aquel momento. Con este propósito, la Ley Núm. 241 dispuso: (i) la modificación de la estructura de gobernación corporativa de la Corporación, incluyendo el requerimiento que cada miembro de la junta directiva debe satisfacer las normas de independencia y calificaciones establecidos en la Escritura y los estatutos sociales de la Corporación (incluyendo que ningún

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

miembro de la junta directiva puede ser funcionario, empleado, o director de cualquier entidad del gobierno aparte de la Corporación); (ii) la autorización de que la Corporación emita los Bonos COFINA Nuevos y disponga los términos de dichos bonos; (iii) confirmación de la propiedad de los Ingresos COFINA por la Corporación; (iv) la creación de un gravamen estatutario para garantizar los Bonos COFINA Nuevos; y (v) pactos para garantizar adicionalmente el repago de los bonos de la Corporación, como por ejemplo los Ingresos COFINA que están siendo financiados de primeros fondos, un pacto de no afectación, y pactos que permiten al Estado Libre Asociado modificar el Impuesto sobre ventas Pignorado una vez que se hayan satisfecho determinados requerimientos. La Orden Enmendada de Confirmación y Determinaciones y Conclusiones Enmendadas confirmaron Tercer Plan de Ajuste Enmendado, que autorizó la emisión de Bonos COFINA Nuevos bonos por un monto capital de aproximadamente $12,000 millones, cancelaron los bonos de la Corporación en circulación en aquel momento, y descargaron la obligación relacionada.

La Orden Enmendada de Confirmación y Determinaciones y Conclusiones Enmendadas también dispusieron las siguientes protecciones enumeradas para los Bonos COFINA Nuevos. Específicamente, las disposiciones de la Orden Enmendada de Confirmación incluyen: (i) los Bonos COFINA Nuevos "constituyen obligaciones válidas, vinculantes, legales y ejecutables de COFINA; (ii) Los Impuestos Pignorados COFINA definidos en el Plan de Ajuste como "los ingresos presentes y futuros y recaudaciones generadas por la porción del Impuesto sobre Ventas que corresponden a una tasa del impuesto del cinco punto cinco porciento (5.5%)" son parte del nuevo emisor "libres de todo gravamen, reclamación, y otros intereses de acreedores del emisor anterior, el emisor nuevo, el Estado Libre Asociado, o cualquier instrumentalidad del Estado Libre Asociado, aparte de los gravámenes otorgados bajo la presente; (iii) los Impuestos Pignorados de COFINA no serán "recursos disponibles" o "ingresos disponibles" del Estado Libre Asociado; y (iv) el Tribunal del Título III retiene para garantizar la protección y ejecución y cumplimiento de marco legal y las garantías prendarias.

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

i) *Bonos del Impuesto sobre Ventas 2019*

En febrero 2019, los bonistas COFINA senior y subordinados recibieron nuevos bonos garantizados por gravamen senior, con valor de aproximadamente $12,000 millones por motivo de sus reclamaciones por un monto de aproximadamente $17,000 millones; estos están garantizados por un gravamen estatutario sobre los impuestos pignorados de COFINA reorganizada. Los requerimientos del servicio de deuda para los bonos del impuesto sobre ventas 2019 se presentan a continuación:

| Año que finaliza el 30 de junio | | Capital | | Intereses | | Total |
|---|---|---|---|---|---|---|
| 2019 | $ | 18,865,083 | $ | 401,311,339 | $ | 420,176,422 |
| 2020 | | - | | 436,985,195 | | 436,985,195 |
| 2021 | | 15,461,649 | | 439,003,096 | | 454,464,745 |
| 2022 | | 30,244,951 | | 442,401,055 | | 472,646,006 |
| 2023 | | 44,373,296 | | 447,177,776 | | 491,551,072 |
| 2024-2028 | | 409,080,310 | | 2,359,812,365 | | 2,768,892,675 |
| 2029-2033 | | 688,216,148 | | 2,680,570,571 | | 3,368,786,719 |
| 2034-2038 | | 2,092,715,000 | | 2,005,941,695 | | 4,098,656,695 |
| 2039-2043 | | 1,824,040,201 | | 3,031,682,337 | | 4,855,722,538 |
| 2044-2048 | | 787,779,888 | | 4,174,806,238 | | 4,962,586,126 |
| 2049-2053 | | 1,813,465,290 | | 3,149,121,587 | | 4,962,586,877 |
| 2054-2058 | $ | 4,297,080,000 | | 665,505,750 | | 4,962,585,750 |
| | | 12,021,321,816 | $ | 20,234,319,004 | $ | 32,255,640,820 |

Los Impuestos sobre Ventas Pignorados pagaderos a la Corporación en conformidad con la Ley Núm. 241 (Financiamiento de Primeros Dólares de Ingresos COFINA) para cada año fiscal por los siguientes montos (los cuales son iguales a cincuenta y tres punto sesenta y cinco por ciento (53.65%) de los ingresos fijos para cada año fiscal, son los siguientes:

| Año que finaliza el 30 de junio | | Monto |
|---|---|---|
| 2019 | $ | 420,185,325 |
| 2020 | | 436,992,738 |
| 2021 | | 454,472,448 |
| 2022 | | 472,651,346 |
| 2023 | | 491,557,399 |
| 2024-2028 | | 2,768,930,770 |
| 2029-2033 | | 3,368,827,658 |
| 2034-2038 | | 4,098,693,947 |
| 2039-2043 | | 4,855,757,693 |
| 2044-2048 | | 4,962,625,000 |
| 2049-2053 | | 4,962,625,000 |
| 2054-2058 | | 4,962,625,000 |
| | $ | 32,255,944,324 |

(continuación)

**CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Notas a los Estados Financieros Básicos
30 de junio de 2018

j)   *Conciliación del Contrato de Permuta*

El 11 de febrero de 2019, el Tribunal del Título III ordenó la aprobación de una conciliación en relación
con un Contrato de Permuta (el Contrato de Permuta), según enmendado, originalmente celebrado el 12 de
julio de 2007 entre COFINA y Goldman Sachs (GS) con un valor razonable de $65,954,336 al 30 de junio
de 2018. En conexión con el Contrato de Permuta, COFINA constituyó una garantía colateral con GS en
una cuenta designada que, al 6 de febrero de 2019, contenía aproximadamente $50 millones. A partir del
2 de febrero de 2017 y hasta la fecha actual, y en conformidad con el Contrato de Permuta, vencían y eran
debidos pagos periódicos por un monto acumulado de aproximadamente $8 millones. El Plan de Ajuste de
COFINA (el Plan) dispuso la asignación de una reclamación relacionada con el Contrato de Permuta y
alternativas para la gestión de dicha reclamación, dependiendo de la prioridad de la reclamación GS. Por
otra parte, el Plan también especificaba que todo contrato condicional y arriendo no expirado que existía
entre COFINA y cualquier entidad, y que no hubiera expirado en conformidad con sus propios términos,
o a la fecha de confirmación del Plan, se considerarían rechazados por COFINA a partir de la fecha efectiva,
(según lo definido en el Plan). En conformidad con esta disposición, el Contrato de Permuta se consideró
rechazado en la fecha efectiva, y COFINA y GS acordaron lo siguiente: (1) el rechazo del Contrato de
Permuta en conformidad con los términos de la presente, (2) la cuantificación de los daños asociados con
dicho rechazo, y (3) la gestión de dichas reclamaciones en conformidad con las disposiciones del Plan.
Como parte de la conciliación, se determinó que toda y cualquiera garantía colateral sería para el beneficio
de GS, libre de cualquier reclamación o derecho de cualquier índole, y el 12 de febrero de 2019, COFINA
pagó a GS un monto adicional de $11 millones. Al efectuar el pago, a COFINA y GS no les queda ninguna
obligación recíproca adicional en conformidad con Plan o el Contrato de Permuta, y cada una de las partes
quedó descargada y liberada de cualesquier reclamación y responsabilidades para con la otra generadas
por o relacionada con el Contrato de Permuta.

*** 

57