# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>     Debtors.[1] | PROMESA Title III<br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered)<br><br>**Re: ECF No. 12396** |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY.<br><br>                    Debtor. | PROMESA Title III<br><br>Case No. 17-BK-3567-LTS<br><br>(Jointly Administered)<br><br>**Re: ECF No. 741** |
| ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION,<br><br>     Movants,<br>v.<br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | |

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19- BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

as representative of

PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY,

Respondent.

**THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD'S RESPONSE TO DRA
PARTIES' OPENING RESPONSE TO (I) MOTION OF ASSURED GUARANTY CORP.,
ASSURED GUARANTY MUNICIPAL CORP., AMBAC ASSURANCE CORPORATION,
NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, AND FINANCIAL
GUARANTY INSURANCE COMPANY FOR RELIEF FROM THE AUTOMATIC
STAY, OR, IN THE ALTERNATIVE, ADEQUATE PROTECTION [DKT. NO. 10102],
AND (II) OPPOSITION OF FINANCIAL OVERSIGHT AND MANAGEMENT BOARD
FOR PUERTO RICO TO MOTION OF ASSURED GUARANTY CORP., ASSURED
GUARANTY MUNICIPAL CORP., AMBAC ASSURANCE CORPORATION,
NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, AND FINANCIAL
GUARANTY INSURANCE COMPANY FOR RELIEF FROM THE AUTOMATIC
STAY, OR, IN THE ALTERNATIVE, ADEQUATE PROTECTION [DKT. NO. 10613]**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

RESPONSE.............................................................................................................................. 4

    I.    HTA CREDITORS LACK STANDING TO BRING THE MOTION
        AGAINST THE COMMONWEALTH. ................................................................. 4

        A.    HTA Creditors are not Parties in Interest Entitled to Stay Relief in the
            Commonwealth Title III Case.......................................................................... 4

        B.    HTA Creditors Likewise Lack Prudential Standing. ........................................ 6

    II.    PROMESA TITLE II PREEMPTS INCONSISTENT TERRITORIAL
        APPROPRIATION STATUTES SUCH AS THE EXCISE TAX STATUTES. ......... 6

        A.    PROMESA Preempts Commonwealth Law Requiring Certain Appropriations
            without Oversight Board Certification.............................................................. 6

        B.    Preemption of Commonwealth Statutes Requiring Appropriations to HTA
            Does Not Eliminate Property Rights................................................................. 8

    III.    ACTS 30 AND 31 HAVE BEEN PREEMPTED, NOT REPEALED. ..................... 10

    IV.    BANKRUPTCY CODE § 552 PREVENTS THE HTA CREDITORS' LIENS,
        IF ANY, FROM ATTACHING TO HTA ALLOCABLE REVENUES POST-
        PETITION.......................................................................................................... 11

        A.    The Act 30-31 Revenues are not "Special Revenues."................................... 12

        B.    *Heffernan* Does not Support the DRA Parties' Argument............................. 13

CONCLUSION...................................................................................................................... 15

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bank of N.Y. Mellon v. Puerto Rico Sales Tax Fin. Corp. (COFINA) (In re Fin. Oversight & Mgmt. Bd. for P.R.),*
301 F. Supp. 3d 306 (D.P.R. 2017)........................................................................4

*Cty. of Orange v. Merrill Lynch & Co. (In re Cty. of Orange),*
191 B.R. 1005 (Bankr. C.D. Cal. 1996).................................................................9

*In re Heffernan Mem'l Hosp. Dist.,*
202 B.R. 147 (Bankr. S.D. Cal. 1996)..................................................................14

*In re Las Vegas Monorail,*
429 B.R. 770 (Bankr. D. Nev. 2010)....................................................................12

*In re S. Biotech, Inc.,*
37 B.R. 318 (Bankr. M.D. Fla. 1983)....................................................................6

*In re Sanitary & Improv. Dist. No. 7,*
98 B.R. 970 (Bankr. D. Neb. 1989)........................................................................9

*Katz v. Pershing, LLC,*
672 F.3d 64 (1st Cir. 2012)....................................................................................4

*Mendez-Nunez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.),*
916 F.3d 98 (1st Cir. 2019)....................................................................................7

*Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.),*
330 F. Supp. 3d 685 (D.P.R. 2018)........................................................................7

*New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.),*
351 F.3d 86 (2d Cir. 2003)....................................................................................6

*Roslyn Sav. Bank v. Comcoach Corp. (In re Comcoach Corp.),*
19 B.R. 231 (Bankr. S.D.N.Y. 1982)....................................................................6

*Roslyn Sav. Bank v. Comcoach Corp. (In re Comcoach Corp.),*
698 F.2d 571 (2d Cir. 1983)..............................................................................5, 6

*Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &*
  *Mgmt. Bd. for P.R.),*
  945 F.3d 3 (1st Cir. 2019) ................................................................................7, 11

*Wilcox Constr. Co. v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.),*
  250 F.3d 955 (5th Cir. 2001) ............................................................................6

**STATUTES**

11 U.S.C. § 361 ....................................................................................................6

11 U.S.C. § 362 ....................................................................................................6

11 U.S.C. § 362(d)(2) ..........................................................................................6

11 U.S.C. § 507 ....................................................................................................9

11 U.S.C. § 507(a)(1) ..........................................................................................9

11 U.S.C. § 507(a)(2) ..........................................................................................9

11 U.S.C. § 552(a) ................................................................................2, 11, 13

11 U.S.C. § 901(a) ................................................................................................9

11 U.S.C. § 902(2) ................................................................................3, 11

11 U.S.C. § 902(2)(B) ........................................................................................12

11 U.S.C. § 902(2)(E) ..............................................................12, 13, 14, 15

11 U.S.C. § 928(a) ..............................................................................................13

11 U.S.C. § 943(b)(4) ..........................................................................................9

11 U.S.C. § 1109 ..................................................................................................4

11 U.S.C. § 1109(a) ..............................................................................................5

PROMESA § 4 ......................................................................................................7

PROMESA § 101(a) ..............................................................................................7

PROMESA § 106(e) ..............................................................................................8

PROMESA § 201 ..................................................................................................7

PROMESA § 202 ..................................................................................................7

PROMESA § 204(c)(3)(B) ................................................................................................10

PROMESA § 301(a) ...........................................................................................................9

PROMESA § 314(b)(3) .......................................................................................................9

PROMESA § 314(b)(6) .......................................................................................................9

**OTHER AUTHORITIES**

P.R. Cons. Art. VI, § 8 ...........................................................................................10, 12, 14

H.R. REP. 100-1011 (1988)..............................................................................................12

To The Honorable United States District Judge Laura Taylor Swain:

The Commonwealth of Puerto Rico (the "Commonwealth") and the Puerto Rico Highways and Transportation Authority ("HTA"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the Debtors' sole representative pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] respectfully submit this response (the "Response") to the *DRA Parties' Opening Response to (I) Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from the Automatic Stay, or, in the Alternative, Adequate Protection [Dkt. No. 10102], and (II) Opposition of Financial Oversight and Management Board for Puerto Rico to Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from the Automatic Stay, or, in the Alternative, Adequate Protection [Dkt. No. 10613]* [Case No. 17-bk-3283, ECF No. 12396; Case No. 17-bk-3567, ECF No. 741] (the "DRA Response") filed by the DRA Parties.[3]

## PRELIMINARY STATEMENT

1.      The DRA Parties were permitted to file a response to the Monolines' Amended Lift Stay Motion (the "Motion"), whose Motion is predicated on their alleged interest in HTA revenues as insurers of HTA's 1968 and 1998 bonds.  The DRA Parties filed their own motion for stay relief which relates largely to 23 separate promissory notes between the Government Development Bank for Puerto Rico ("GDB") (the DRA's predecessor) and HTA, which as of July 1, 2018, were for

---

[2]  PROMESA is codified at 48 U.S.C. §§ 2101–2241.

[3]  All undefined terms shall have the meaning ascribed to them in the DRA Response.

over $2.2 billion in outstanding principal and interest (the "<u>DRA Lift Stay Motion</u>") [Case No. 17-bk-3283, ECF No. 7643] ¶ 5.[4]  The DRA Lift Stay Motion will be heard subsequently to the Monolines' Motion.  On the key issue in the instant Motion—the Monolines' lack of security interest in the HTA Allocable Revenues—the Oversight Board and DRA Parties are in complete agreement:  the Monolines' security interests are limited to monies received by HTA and deposited to the credit of the Sinking Funds (or, in the case of the 1998 HTA Bonds, the Revenue Fund) held by the fiscal agent for the 1968 and 1998 HTA Bonds.  DRA Response ¶ 55.

2.       Having acknowledged the limited scope of the Monolines' security interest, the balance of the DRA Parties' arguments either support or have no bearing on the conclusions, articulated in the FOMB Opposition, that (i) HTA creditors lack standing to request relief from the Commonwealth stay, (ii) territorial laws enacted by one legislature requiring future legislatures to appropriate monies to HTA are both unenforceable because one legislature cannot bind a future legislature and preempted by PROMESA, and (iii) any security interest of HTA creditors is prevented from attaching to post-petition revenues by Bankruptcy Code § 552(a).  *First*, the Monolines cannot have a "direct stake" in the Commonwealth's Title III case because the Monolines are creditors of HTA (and not creditors of the Commonwealth).  By definition their interest, if any, in the Commonwealth's Title III case is indirect.  *Second*, the DRA Parties' arguments that PROMESA cannot preempt territorial laws that create property interests misses the mark because one set of the laws merely authorize HTA to grant security interests, but do not create any property interests, and the other set of laws simply require the Commonwealth to appropriate monies to HTA.  The latter laws are preempted, as explained in the FOMB Opposition. HTA granted security interests pursuant to bond resolutions that constitute agreements with the

---

[4] The DRA Parties also assert they hold $200,000,000 in 1998 HTA Bonds.  DRA Lift Stay Motion ¶ 9.

HTA Bondholders (with such security interests being limited to the Sinking Funds and Revenue Fund).  No one argues HTA's grant or the statute authorizing HTA to grant security interests are preempted or unenforceable.  And *third*, the DRA Parties' argument that the HTA Bondholders somehow have a special revenue pledge on a "stream" of revenues from the Commonwealth cannot be reconciled with their acknowledgement that all the HTA Bondholders have is a limited pledge from HTA of monies actually deposited into the specific funds held by the fiscal agent.  In any event, the HTA Allocable Revenues, including the Act 30-31 Revenues, are not "special revenues" within the meaning of Bankruptcy Code § 902(2) and, as a consequence, any security interest of HTA creditors in the HTA Allocable Revenues is prevented from attaching to post-petition HTA Allocable Revenues.

3.     Instead, the DRA Parties' arguments are actually designed to advocate their alleged interests in the Act 30-31 Revenues, which are tax revenues conditionally appropriated to HTA pursuant to Act 30 and Act 31 (both enacted in 2013) and subject to the Security Agreement, dated August 28, 2013, between GDB and HTA.  DRA Response ¶ 4.  The Monolines also claim an interest in the Act 30-31 Revenues.[5]  The DRA Parties' emphasis on their interest in Act 30-31 Revenues could interject intercreditor issues between them and the Monolines which were precluded by the order permitting the DRA Parties' intervention in this contested matter.  *See* [Case No. 17-bk-3283, ECF No. 12005 (the "DRA Participation Order") at 4–5] (excluding from the "Shared Issues" to be discussed in the DRA Response "(ii) intercreditor issues between the DRA and the bondholders at HTA, and (iii) the DRA Parties' rights as lenders to HTA pursuant to the 2013 Security Agreement and right to the Act 30-31 Revenues").  This Response will not address

---

[5]  While the Monolines do not specifically identify Act 30 and Act 31 as creating tax revenues in which they claim an interest, they do claim an interest in any Excise Taxes created pursuant to the Excise Tax Statutes, which definition includes the Act 30-31 Revenues.  *See, e.g.*, Motion ¶ 65 (asserting an interest in revenues of the cigarette tax, which are created by Act 31).

issues pertaining to the DRA Parties' alleged rights in Act 30-31 Revenues, which may be addressed in connection with the DRA Lift Stay Motion. The Oversight Board also reserves all rights to address issues pertaining to such alleged rights and to any intercreditor issues between the Monolines and the DRA Parties.

## RESPONSE

## I.  HTA CREDITORS LACK STANDING TO BRING THE MOTION AGAINST THE COMMONWEALTH.

### A.  HTA Creditors are not Parties in Interest Entitled to Stay Relief in the Commonwealth Title III Case.

4.      For the reasons set forth in the FOMB Opposition (¶¶ 66–69), HTA creditors—both the Monolines and DRA Parties—lack standing to pursue relief against the Commonwealth in connection with any HTA Allocable Revenues because they are creditors of a creditor (HTA), and seek only to assert HTA's rights (if any) against the Commonwealth—not their own rights. Put simply, HTA creditors lack a "direct stake" in such revenues.[6]

5.      The DRA Parties argue HTA creditors are a party in interest under Bankruptcy Code § 1109 and assert that "no more is required." DRA Response ¶ 8. This position has already been rejected by the Court. *Bank of N.Y. Mellon v. Puerto Rico Sales Tax Fin. Corp. (COFINA) (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 301 F. Supp. 3d 306, 312 (D.P.R. 2017) (denying standing to a creditor of the Commonwealth to intervene in a dispute between the Commonwealth and COFINA); *see also Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2012) (to have standing, a party's claims generally must be "premised on [their] own legal rights (as opposed to those of a third party)"). Party in interest status does not include a creditor of a creditor of a debtor. *Bank of*

---

[6] To the extent, if any, that the DRA Parties or Monolines claim they are parties in interest in the Commonwealth's Title III case because a Commonwealth statute requires the Commonwealth to appropriate monies to HTA, at best the statute would provide them with unsecured claims against the Commonwealth for which stay relief is unavailable. In addition, the statute provides them nothing because it is preempted.

*N.Y. Mellon,* 301 F. Supp. 3d at 312.  The reasoning is obvious—the creditor whose rights the creditor of the creditor attempts to prosecute may not agree with what its creditor is trying to do.[7]

6.      The DRA Parties repeatedly assert an alleged "direct stake" that HTA creditors supposedly have in the Commonwealth's Title III case, but nowhere explain how they have a direct interest.  Indeed, neither the DRA Parties nor the GDB even filed a proof of claim against the Commonwealth with respect to the obligations that are the subject of the Motion.[8]  Instead, they concede that they and the Monolines are not "direct creditors" of the Commonwealth (DRA Response ¶ 10), and fail to demonstrate the Court should ignore the general rule denying standing to creditors of creditors.  If anything, by agreeing with the Oversight Board that the Monolines' security interests are limited to certain monies deposited with the fiscal agent for payment of HTA's bonds, and that the Monolines' alleged liens on revenues are invalid and unperfected (DRA Response ¶ 55), they demonstrate that the Monolines have no direct stake in revenues retained by the Commonwealth and that any interest the Monolines may have in the HTA Allocable Revenues is derivative of HTA's interest in those revenues.[9]

---

[7]  The DRA Parties appear to conflate their standing to bring the DRA Lift Stay Motion with that of the Monolines' standing here.  *See* DRA Response ¶ 19 (arguing that the *DRA Parties* have prudential standing).  The DRA Parties' standing is not at issue here, as the Monolines are the movants.

[8]  The issue of the DRA Parties' standing will be briefed separately as part of the DRA Parties' Lift Stay Motion.

[9]  With regard to any interest in the HTA Allocable Revenues, HTA creditors are mere creditors of a creditor (HTA), which *Roslyn Savings Bank v. Comcoach Corp. (In re Comcoach Corp.)* held to be insufficient to confer party in interest status.  698 F.2d 571, 574 (2d Cir. 1983).  The DRA Parties' attempts to distinguish that case are unavailing. The DRA Parties fault the *Comcoach* court for the "incorrect assumption that one 'must be either a creditor or a debtor' to have party in interest standing" in the lift stay context (DRA Response ¶ 14), but then fail to argue they constitute another category of party (such as a trustee or equity security holder) for which the *Comcoach* court unduly restricted party in interest standing.  They cannot, as the Monolines and DRA Parties do not fall into any of the categories of parties in interest enumerated in § 1109(a).  And the DRA Parties note that the facts are different in *Comcoach* than here, which is almost always true as between any two cases, but do not explain how these different facts defeat the rationale supporting the *Comcoach* court's holding.  *Id.* ¶ 16.  Indeed, the DRA Parties' quote the *Comcoach* court's reasoning, denying the bank in *Comcoach* (a creditor of a creditor of the debtor) standing, because "the Bank lacks any right to equitable relief against the bankrupt arising out of a breach of performance giving rise to a right to payment."  *Comcoach*, 698 F.2d at 574.  The same is true here—the DRA Parties lack any right to any form of relief against the Commonwealth.  The only rights the DRA Parties may have to any monies is based on an agreement with HTA—demonstrating the DRA Parties' lack of standing to file suit against the Commonwealth.

**B.**     **HTA Creditors Likewise Lack Prudential Standing.**

7.     The Motion seeks relief from the automatic stay based on lack of adequate protection, among other reasons.  Motion ¶ 94.  Only a secured claimholder of the debtor may seek adequate protection from the debtor.[10]  In the context of the HTA Bonds, the DRA Parties agree the Monolines' security interest is limited to monies held by the Fiscal Agent in the Sinking Funds (or Revenue Fund, as applicable).  Therefore, the Monolines are not secured claimholders of the Commonwealth.  At most, HTA is an unsecured claimholder of the Commonwealth, and the Monolines hold no more than claims against HTA.  The relevant sections of the Bankruptcy Code relating to stay relief and adequate protection—§§ 361 and 362—are intended to protect secured claimholders of a debtor, not secured claimholders of a creditor of a debtor.[11]  The Monolines are "not intended beneficiaries" of these sections of the Bankruptcy Code and therefore lack prudential standing.[12]

**II.     PROMESA TITLE II PREEMPTS INCONSISTENT TERRITORIAL APPROPRIATION STATUTES SUCH AS THE EXCISE TAX STATUTES.**

**A.     PROMESA Preempts Commonwealth Law Requiring Certain Appropriations without Oversight Board Certification.**

---

[10] Unsecured claimholders do not have the right to adequate protection payments. *See In re S. Biotech, Inc.*, 37 B.R. 318, 324 (Bankr. M.D. Fla. 1983); *see also Wilcox Constr. Co. v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.)*, 250 F.3d 955, 961 n.12 (5th Cir. 2001); *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 90–91 (2d Cir. 2003) (concluding that an unsecured claimholder was ineligible to receive adequate protection under section 361 of the Bankruptcy Code; rather, the adequate protection provision of section 361 only protects secured claimholders).

[11] "A noncreditor of a debtor, even though owed a debt by a creditor of the debtor, does not have standing *to seek relief from the automatic stay* for the purpose of recovering on its claim."  *Roslyn Sav. Bank v. Comcoach Corp. (In re Comcoach Corp.)*, 19 B.R. 231, 234 (Bankr. S.D.N.Y. 1982) (emphasis added).  As articulated by the Second Circuit in *Comcoach*:  "Support for this view is found in the Code's legislative history which suggests that, notwithstanding the use of the term 'party in interest', [sic] it is only creditors who may obtain relief from the automatic stay."  *In re Comcoach Corp.*, 698 F.2d at 573–74 (citing H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 175, reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 6136).

[12] In addition, by supporting the Oversight Board's position that Monolines do not have a security interest in the HTA Allocable Revenues at the Commonwealth, they also support the Oversight Board's position that the Commonwealth has an interest in these funds, and thus the stay should not be lifted pursuant to § 362(d)(2).

8.      The DRA Parties' arguments regarding PROMESA's lack of field preemption (DRA Response ¶¶ 20–21), are entirely irrelevant because, as the DRA Parties acknowledge, the Oversight Board has only argued express preemption pursuant to PROMESA § 4 or conflict preemption. FOMB Opposition ¶¶ 83–86 & n.37. Conflict preemption is consistent with the plain language of PROMESA § 4, which only confirms that Congress intended to preempt all "inconsistent" territorial laws—which at the very least must mean laws that conflict with PROMESA.

9.      That is consistent with the Oversight Board's purpose under PROMESA to provide a method for the Commonwealth to "achieve fiscal responsibility and access to the capital markets." PROMESA § 101(a). To that end, PROMESA "prevail[s] over" Commonwealth law inconsistent with PROMESA. *Id.* § 4. PROMESA §§ 201 and 202 grant the Oversight Board exclusive authority to certify fiscal plans, and budgets for the Commonwealth setting all Commonwealth appropriations. *Id.* §§ 201, 202. Here, the Oversight Board never certified fiscal plans or budgets providing for the budget appropriations required by pre-PROMESA Commonwealth statutes under which the DRA Parties contend they have an interest. *See Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.),* 945 F.3d 3, 8 (1st Cir. 2019); *Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.),* 330 F. Supp. 3d 685, 701 (D.P.R. 2018); *see also Mendez-Nunez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.),* 916 F.3d 98, 116 (1st Cir. 2019). Any other interpretation of PROMESA would make it impossible for the Oversight Board to restructure the Commonwealth's debts and fulfill its mandate. This is true not only regarding the HTA Allocable Revenue Statutes, but to many other pre-petition statutes

appropriating money.  If Commonwealth law were not preempted, the Oversight Board's ability to formulate and balance the budget would be greatly frustrated.[13]

### B.   Preemption of Commonwealth Statutes Requiring Appropriations to HTA Does Not Eliminate Property Rights.

10.   The DRA Parties' argument that PROMESA Title II cannot compromise the DRA's property rights (DRA Response ¶ 25) is misplaced.  The Excise Tax Statutes do not create property interests; they levy taxes and conditionally allocate the revenues generated by such taxes to HTA.[14]

11.   The First Circuit, and this Court, have found that all appropriations not expressly included the Oversight Board's budget are preempted.  This would equally apply to the HTA Allocable Revenue Statutes.  *Supra* ¶ 9.  The preemption of the HTA Allocable Revenue Statutes only preempts the appropriations.  The preempted statutes do not grant or create priorities or liens.  HTA creditor priorities will be resolved through a Title III plan of adjustment, and property rights arising from valid liens, if any, will be respected as required by PROMESA and the Fifth Amendment of the U.S. Constitution.[15]  To the extent the DRA Parties seek to challenge measures in the fiscal plan, they are unable to, as no court has subject matter jurisdiction to consider such challenge.  PROMESA § 106(e).

---

[13] As Exhibit "K" to the *Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. [ECF No. 11946] shows, pre-PROMESA statutes mandate the appropriation of more than $1.65 billion annually from the Commonwealth to other entities.  If these statutes were not preempted, the Commonwealth might be required to disburse these appropriations, and the Oversight Board would be unable to carry out its power and duty to control the budget.

[14] But even if the statutes did create property interests, where territorial law is not inconsistent with financial measures taken pursuant to the Oversight Board's powers under Title II of PROMESA, they remain in effect.

[15] Again, the DRA Parties conflate their asserted interests and the interests of the Monolines when they assert that "[t]he DRA's liens and priority designations are property."  DRA Response ¶ 26.  The only asserted liens at issue in the Motion relate to HTA Bonds, not other claims or liens alleged by the DRA Parties.  The claims and liens of the DRA Parties may be addressed in connection with the DRA Lift Stay Motion, assuming the DRA Parties establish standing in that contested matter.

12.     The DRA Parties' argument that PROMESA does not supplant Commonwealth law priority schemes (DRA Response ¶ 28) is also irrelevant.  While Title II of PROMESA preempts uncertified appropriations, it does not disturb priorities, and does not displace Commonwealth law consistent with the fiscal plan as contended by the DRA Parties in the DRA Response (¶ 29). Preemption of priorities occurs only in Title III, in the same manner that Chapter 9 preempts state law priorities.  *See Cty. of Orange v. Merrill Lynch & Co. (In re Cty. of Orange)*, 191 B.R. 1005, 1017 (Bankr. C.D. Cal. 1996) (Chapter 9 incorporates a priority scheme into its provisions despite § 901(a) incorporating only § 507(a)(1) [now codified at § 507(a)(2)] and not other provisions of § 507).  Like Chapter 9, PROMESA incorporates only subsection (a)(2) of § 507, PROMESA § 301(a); accordingly, the priority scheme in PROMESA Title III is similar to that in Chapter 9. For the same reasons that Chapter 9 preempts state law priorities, PROMESA Title III must preempt Commonwealth law priorities.

13.     Moreover, PROMESA § 314(b)(6)—which requires the court to consider creditors' recoveries outside a Title III case—demonstrates a plan of adjustment confirmed under PROMESA Title III may provide recoveries to creditors inconsistent with what they would realize under Commonwealth law, and does not preserve creditors' Commonwealth law rights as the DRA Parties contend in the DRA Response (¶ 31).  PROMESA § 314(b)(3) uses the same language as Bankruptcy Code § 943(b)(4), which prohibits a plan from requiring the debtor to take action prohibited by law; however, that section does not prevent the impairment of creditors' rights.  *See In re Sanitary & Improv. Dist. No. 7*, 98 B.R. 970, 974 (Bankr. D. Neb. 1989) ("If a municipality were required to pay prepetition bondholders the full amount of their claim with interest as contained on the face of the bonds and the [municipality] had no ability to impair the bondholder claims over objection, the whole purpose and structure of Chapter 9 would be of little value . . . .

To create a federal statute [chapter 9 of the Bankruptcy Code] based upon the theory that federal intervention was necessary to permit adjustment of a municipality's debts and then to prohibit the municipality from adjusting such debts is not, in the point of view of this Court, a logical or necessary result"). Similarly, the DRA Parties' citation to PROMESA § 204(c)(3)(B) in the DRA Response (¶ 30), is wholly inapposite and does not affect the preemption analysis. The mechanism detailed in PROMESA § 204(c)(3)(B) that allows the Oversight Board, in certain circumstances, to rescind laws is wholly different from preemption that occurs by operation of law under PROMESA.

### III.     ACTS 30 AND 31 HAVE BEEN PREEMPTED, NOT REPEALED.

14.     The DRA Parties create a strawman by alleging that "[Acts 30 and 31] cannot simply be repealed without undermining private rights." DRA Response ¶ 43. The Oversight Board is not arguing they have been repealed. Rather, certain provisions of those Acts related to expenditures have been preempted, as the First Circuit has held is required under Title II of PROMESA. Any provisions in Acts 30 and 31 not inconsistent with the certified budget remain in effect.

15.     The DRA Parties are mistaken when they argue that "Acts 30 and 31 do not contain any budgetary appropriation requirements" and are not "appropriation statutes." *Id.* ¶¶ 42–43. There is nothing talismanic about the use of the word "appropriation." It simply stands for a required transfer of funds from one governmental instrumentality to another, whether labeled as an appropriation or not. But here, the DRA Parties' denial that Acts 30 and 31 create appropriations is misplaced because they specifically refer to "the amount of the proceeds of the tax on gasoline, gas oil, or diesel oil" as amounts "appropriated or to be appropriated." The appropriation is for HTA's "corporate purposes," subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, and not for the benefit of any creditor. And while

appropriations may affect the value of liens, they do not affect their existence.  If statutes that provide for Commonwealth expenditures from the general fund to be spent or otherwise transferred from the general fund were not found to "contain any budgetary appropriation" nothing would prevent the legislature from legislating around the budget and frustrating the Oversight Board's efforts to achieve fiscal responsibility.  Indeed, the First Circuit held:  "simply put, if a certified budget is to have 'full force and effect,' subsection 202(e)(3)(C), there can be no spending from sources not listed in that budget, regardless of what any territorial laws say."  *See Vázquez-Garced*, 945 F.3d at 8.

### IV.   BANKRUPTCY CODE § 552 PREVENTS THE HTA CREDITORS' LIENS, IF ANY, FROM ATTACHING TO HTA ALLOCABLE REVENUES POST-PETITION.

16.    The DRA Participation Order limits the DRA Parties' participation to discrete "Shared Issues."  With respect to Bankruptcy Code § 552, the DRA Parties are limited to briefing "(vi) whether any liens possessed by the HTA bondholders stopped attaching once the Commonwealth and/or HTA filed for relief under Title III including pursuant to Bankruptcy Code section 552(a)."  As discussed earlier, the DRA Parties acknowledge the HTA Bondholders' have no lien on the HTA Allocable Revenues, but instead have a security interest only in monies actually deposited to the credit of the fiscal agent for the 1968 and 1998 HTA Bonds.  DRA Response ¶ 55. The question, therefore, of whether § 552 cuts off the HTA Bondholders' lien on HTA Allocable Revenues is irrelevant if there is no lien on HTA Allocable Revenues to begin with.  Similarly, there can be no argument that HTA Bondholders have a "special revenue" pledge under § 902(2) if they do not even have a "revenue pledge"—at most HTA Bondholders only have a lien on certain deposit accounts and certainly not on any "stream" of revenues.  The DRA Parties cannot simultaneously argue that HTA Bondholders' security interest is limited to certain deposit accounts and that § 552 does not cut off their lien.

### A.   The Act 30-31 Revenues are not "Special Revenues."

17.   In any event, for the reasons set forth in the FOMB Opposition (¶¶ 106–10), the revenues allocated pursuant to the Excise Tax Statutes, including Acts 30 and 31, are not special revenues on the basis of § 902(2)(B) ("special excise taxes imposed on particular activities or transactions") or § 902(2)(E) ("taxes specifically levied to finance one or more projects or systems"). *First*, the "Act 30-31 Revenues" refer to a purported security interest granted by HTA to GDB in an August 28, 2013 security agreement.  The Commonwealth pledged nothing.  Even if such pledge was "for the benefit of particular creditors of HTA only[,]" as contended by the DRA Parties (DRA Response ¶ 47), it does not make the transfer of HTA Allocable Revenues to HTA for the benefit of those creditors.  Instead, Acts 30 and 31 make clear that any amounts appropriated to HTA are for HTA's corporate purposes and not for the benefit of the creditors. *See* Act 30-3013 § 23.1 ("the amount of the fees collected in accordance with Sections 23.01 and 23.02 of this Act shall be covered in its entirety into a Special Deposit in the name and for the benefit of the Highways and Transportation Authority."); Act 31-2013 § 3(a)(1) ("[t]he sum of the tax collected on gasoline . . . shall be covered into a special deposit  in favor of the Highways and Transportation Authority for its corporate purposes.").  Such revenues (the HTA Allocable Revenues) are not imposed by the debtor that issued the HTA Bonds or borrowed money from the DRA Parties' predecessor (*i.e.*, HTA); rather they are imposed by the Commonwealth and were historically conditionally appropriated to HTA.[16]

---

[16] Special revenue bonds are by design not obligation of the Commonwealth.  *See In re Las Vegas Monorail Co.*, 429 B.R. 770, 782 (Bankr. D. Nev. 2010) ("Municipal Bankruptcy Amendments, Pub. L. No. 100-597, § 8 (1988) (codified at 11 U.S.C. § 928).  The purpose of this provision was to continue the isolation of industrial revenue bond financing from general municipal bond financing.  As stated in Collier, "[i]n general, its effect is to prevent special revenues that secure an issue of revenue bonds from being diverted to be available for the municipality's general expenses or obligations."  6 COLLIER ON BANKRUPTCY ¶ 928.01; *see also* H.R. REP. 100-1011, at 4 (1988) ("Special revenue bonds are issued so that if the asset financed fails, repayment will not come out of general treasury funds - meaning the taxpayer will not have to foot the bill.").

18.     *Second*, even assuming the DRA Parties are correct that the Act 30-31 Revenues were somehow pledged to the DRA Parties as alleged in the DRA Response (¶ 47) (an issue the Court should address only in connection with the DRA Lift Stay Motion), they still do not satisfy the definition of special excise taxes under § 902(2)(E).  They remain subject to retention to pay general obligations of the Commonwealth which untethers them from any particular project or system.  FOMB Opposition ¶ 109–10; Act 30 § 23.1; Act 31 § 3(a)(3)(C).  Additionally, the Act 30-31 Revenues were created after, and not before or in connection with, any projects or systems that were improved through the use of loan proceeds, as Act 30 and Act 31 were enacted in 2013— well after the 1968 and 1998 HTA Bonds were issued, and after certain of the HTA-GDB loans were issued.  Therefore, Act 30-31 Revenues cannot be held to have been "specifically levied to finance one or more projects or systems[.]"  § 902(2)(E).[17]  And even if the Act 30-31 Revenues were special revenues, § 928(a) does not apply to them in the Commonwealth's Title III case because the Commonwealth did not enter into any agreement with the HTA Bondholders or the DRA Parties, which § 928(a) requires to exempt special revenues from the effect of § 552(a).  FOMB Opposition ¶ 107 (excerpting 11 U.S.C. § 928(a), which provides in pertinent part that "special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien *resulting from any security agreement* entered into by the debtor before the commencement of the case.") (emphasis added).

### B.     *Heffernan* Does not Support the DRA Parties' Argument.

19.     The DRA Parties rely on a 1996 memorandum decision from the Southern District of California bankruptcy court to argue Act 30-31 Revenues are special revenues.  DRA Response

---

[17] Notably, these loans were made by the GDB to HTA to allow for HTA's continuing operations (*see* Statement of Motives, Act 30 and Act 31) and not to finance specific projects.  The DRA Parties contend that the Commonwealth had GDB make inter-government loans backed by special revenues.

¶ 48 (citing *In re Heffernan Mem'l Hosp. Dist.*, 202 B.R. 147 (Bankr. S.D. Cal. 1996)). *Heffernan*—which appears to have been uncontested—contained a confirmation finding that certain sales tax revenues realized by a hospital district and pledged pursuant to the district's Chapter 9 plan of adjustment constitute special revenues under § 902(2)(E). *Heffernan*, 202 B.R. at 148. *Heffernan* does not help HTA creditors

20.    In *Heffernan*, a hospital district (the "District") received sales tax revenues imposed by the city of Calexico, California (the "City"). *Id.*[18]  The District filed for protection under Chapter 9 of the Bankruptcy Code, and, pursuant to its plan of adjustment ("Plan"), created a special authority ("Authority") to carry out the transactions in the Plan, including the issuance of certain sales tax revenue bonds (the "Bonds"). *Id.*  At the District's request, the court found that the sales tax revenues, which were pledged by the District to the Authority in the Plan, were special revenues under § 902(2)(E) of the Bankruptcy Code because they are "not available for general municipal purposes" and because the Bonds "do not constitute a debt or liability of the City or the District, but are payable solely from and secured by an absolute and irrevocable assignment and pledge of the Sales Tax Revenues to the Authority." *Id.* at 149.

21.    Here, the Act 30-31 Revenues were not levied to finance any HTA projects or systems, as they were enacted subsequent to the vast majority of HTA's incurrence of debt. *Supra* ¶ 18.  Additionally, their transfer to HTA is subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, unlike the sales tax revenues in *Heffernan*, which had to be used "exclusively" for the District.  202 B.R. at 148 n.1.  The DRA Parties do not argue the Act 30-31 Revenues are "exclusively" used for a "project[] or system[]" or even for a certain purpose, but

---

[18] The sales tax revenues were not levied by the California State Assembly as contended in the DRA Response (¶ 51); rather it was authorized by the California State Assembly and then passed into law by the City.  *Heffernan*, 202 B.R. at 148 n.1.

merely that they "were *intended* for specific creditors of HTA." DRA Response ¶ 49 (emphasis

added).[19]

## CONCLUSION

For the reasons stated herein and in the FOMB Opposition, the Motion should be denied.

Dated: March 23, 2020
       San Juan, Puerto Rico

                                        Respectfully submitted,

                                        */s/ Martin J. Bienenstock*

                                        Martin J. Bienenstock
                                        Brian S. Rosen
                                        Paul V. Possinger
                                        Ehud Barak
                                        (admitted *pro hac vice*)
                                        **PROSKAUER ROSE LLP**
                                        Eleven Times Square
                                        New York, NY 10036 Tel: (212) 969-3000
                                        Fax: (212) 969-2900

                                        *Attorneys for the Financial Oversight and*
                                        *Management Board as representative for the*
                                        *Debtors*

                                        */s/ Hermann D. Bauer*

                                        Hermann D. Bauer
                                        USDC No. 215205
                                        **O'NEILL & BORGES LLC**
                                        205 Muñoz Rivera Ave., Suite 800
                                        San Juan, PR 00918-1813
                                        Tel: (787) 764-1813
                                        Fax: (787) 753-8944

                                        *Co-Attorney for the Financial Oversight and*
                                        *Management Board as representative for the*
                                        *Debtors*

---

[19] *Heffernan* may also have come out differently if the issue had been litigated. Section 902(2)(E) includes "taxes specifically levied to finance one or more projects or systems[.]" 11 U.S.C. § 902(2)(E). No "project or system" appears to have been financed in the Plan in *Heffernan*.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

*/s/ Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
205 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-1813
Fax: (787) 753-8944
