**Hearing Date: April 16, 2020 at 10:00 a.m. (AST)**
**Objection Deadline: April 1, 2020 at 4:00 p.m. (AST)**

# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br>THE COMMONWEALTH OF PUERTO RICO,<br>*et al.*<br><br>Debtors. | ) PROMESA<br>) Title III<br>)<br>) No. 17 BK 3283-LTS<br>)<br>) (Jointly Administered)<br>)<br>)<br>)<br>) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br>PUERTO RICO ELECTRIC POWER<br>AUTHORITY ("PREPA")<br><br>Debtor.[1] | ) PROMESA<br>) Title III<br>)<br>) No. 17 BK 4780-LTS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COBRA ACQUISITIONS LLC'S URGENT MOTION TO
## MODIFY THE STAY ORDER AND ALLOW THE UNDISPUTED TAX CLAIMS

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT.................................................................................1

BACKGROUND ........................................................................................................6

RELIEF REQUESTED................................................................................................9

ARGUMENT ..........................................................................................................10

I.      THE CONTRACTS ENTITLE COBRA TO PAYMENT OF THE UNDISPUTED TAX
        CLAIMS AND PREPA HAS NO LEGITIMATE BASIS FOR WITHHOLDING SUCH
        AMOUNTS.................................................................................................10

II.     COBRA'S ENTITLEMENT TO THE UNDISPUTED TAX CLAIMS WILL NOT BE
        AFFECTED BY THE OUTCOME OF THE CRIMINAL CASE OR THE ONGOING
        FEMA ANALYSIS .......................................................................................12

        A.      The Criminal Case Will Not Affect Cobra's Right to Payment of the
                Undisputed Tax Claims.....................................................................12
        B.      Approval of Funding by FEMA is not Grounds for Withholding Payments
                Under the Contracts ..........................................................................15

III.    CONTINUING LACK OF PAYMENT THREATENS COBRA'S VIABILITY ..............17

IV.     THIS COURT HAS THE POWER TO ORDER THE ALLOWANCE OF AN
        ADMINISTRATIVE EXPENSE CLAIM .......................................................18

        A.      The Undisputed Tax Claims Are Entitled to Administrative Expense
                Priority .............................................................................................20
        B.      The Court Is Not Prohibited Under PROMESA from Allowing the
                Undisputed Tax Claims.....................................................................24

CERTIFICATION OF COMPLIANCE WITH LOCAL RULES AND CASE
MANAGEMENT ORDER .........................................................................................25

CONCLUSION.........................................................................................................25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re ATP Oil & Gas Corp.*,
　　No. 12-36187-MI, 2014 Bankr. LEXIS 1050 (Bankr. S.D. Tex. Mar. 18, 2014)....................24

*In re City of Detroit*,
　　504 B.R. 191 (Bankr. E.D. Mich. 2013) ...............................................................................18

*Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*,
　　536 F.2d 950 (1st Cir. 1976) ...............................................................................................21

*In re Dana Corp*.,
　　Case No. 06-10354-BRL (Bankr. S.D.N.Y. Aug. 1, 2007) ..............................................22-3

*In re Fin. Oversight & Mgmt. Bd.*,
　　366 F. Supp. 3d 256 (D.P.R. 2019)......................................................................................18

*Reading Co. v. Brown*,
　　391 U.S. 471 (1968) ......................................................................................................19-20

*Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*,
　　479 F.3d 167 (2d Cir. 2007)................................................................................................19

*United States. v. Tribble*,
　　Case No. 19-CR-541-FAB, ECF No. 59 (D.P.R. Oct. 18, 2019) .........................................2, 7

*Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.)*,
　　954 F.2d 1 (1st Cir. 1991) .............................................................................................19-20

**Statutes**

11 U.S.C. § 362(a)(3)....................................................................................................................21

11 U.S.C. § 503(b)(1)(A) .........................................................................................................18-20

11 U.S.C. § 507(a)(2)....................................................................................................................19

48 U.S.C. § 2161 ..........................................................................................................................20

48 U.S.C. § 2165(1)-(3) ...............................................................................................................24

48 U.S.C. § 2166 ..........................................................................................................................18

31 L.P.R.A. § 3408 .................................................................................................................13-4

ii

31 L.P.R.A. § 3409 ................................................................................................14

31 L.P.R.A. §§ 3511-14 .........................................................................................14

31 L.P.R.A. § 3514 ................................................................................................14

31 L.P.R.A. § 3516 ................................................................................................14

**Other Authorities**

Clifford Krauss and Stanley Reed, *Oil Prices Dive as Saudi Arabia Takes Aim at
    Russian Production*, N.Y. Times, March 8, 2020.................................................. 2-3

Cobra Acquisitions LLC ("Cobra"), by and through its counsel, respectfully submits this motion (the "Urgent Motion"), pursuant to sections 105(a) and 503(b) of title 11 of the United States Code (the "Bankruptcy Code"), made applicable to these cases by PROMESA section 301, for (i) entry of an order, substantially in the form attached hereto as **Exhibit A**, setting an expedited hearing and objection deadline applicable to this Urgent Motion (the "Proposed Scheduling Order") and (ii) entry of an order, substantially in the form attached hereto as **Exhibit B** (the "Proposed Order") (a) lifting the stay applicable to the *Motion for Allowance and Payment of Administrative Expense Claim* [Case No. 17-BK-3283-LTS, ECF No. 8789] (the "Administrative Expense Motion") solely with respect to the Undisputed Tax Claims (as defined herein) and (ii) finding the Undisputed Tax Claims to be allowed as administrative expense claims under section 503(b)(1) of the Bankruptcy Code, made applicable pursuant to PROMESA section 301, for all purposes in the Title III Case commenced by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") on behalf of the Puerto Rico Electric Power Authority ("PREPA" and, together with the Oversight Board and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), the "Government Parties").  In support of this Urgent Motion, Cobra respectfully states as follows:

### PRELIMINARY STATEMENT

1.      Cobra brings this Urgent Motion because circumstances have changed significantly since this Court entered the Second Stay Order on February 3, 2020, which continued the stay of proceedings on the Administrative Expense Motion until the omnibus hearing on June 3, 2020. *See Order Scheduling Further Status Conference in Connection with Cobra Acquisitions LLC's Motion for Allowance and Payment of Administrative Expense Claims* [Case No. 17-BK-3283-

1

LTS, ECF No. 10607] (the "Second Stay Order").[1]  This Court entered the Stay Order based on

the Government Parties' contentions that the outcomes of (i) a criminal indictment against three

individuals ("Indictment") and (ii) FEMA's analysis of the rates PREPA agreed to pay Cobra for

hurricane restoration work ("FEMA Analysis") could affect Cobra's entitlement to payment for

the work it successfully performed at PREPA's direction.  *See* Case No. 17-BK-3283-LTS, ECF

No. 8886.  At the time this Court entered the Initial Stay Order, trial of the criminal matter was

scheduled for December 9, 2019.  Case No. 17-BK-3283-LTS, ECF No. 8838 at n.4 (citing *United*

*States v. Tribble*, Case No. 19-CR-541-FAB, ECF No. 55 (D.P.R. Oct. 8, 2019).  When this Court

continued the stay until June 3, 2020 on February 3, 2020, that trial date had been set aside and a

status conference scheduled for February 13, 2020.  *Tribble*, Case No. 19-CR-541-FAB, ECF No.

59 (D.P.R. Oct. 18, 2019).  The criminal trial has now been delayed until at least January 19,

2021—a delay far beyond what was in consideration at the time of both the Original Stay Order

and the Second Stay Order.  *Id.* at ECF No. 87.

     2.     The stay, and the resulting delay and uncertainty over when Cobra's entitlement to

payment by PREPA will be addressed, is causing substantial ongoing hardship to Cobra and, by

extension, its parent company, Mammoth Energy Services, Inc. ("Mammoth" and, together with

its subsidiaries, including Cobra, the "Company").[2]  As of March 6, 2020,[3] Mammoth had a market

---

[1]    The Second Stay Order further continued the stay of the Administrative Expense Motion pursuant to this Court's
*Order Granting Joint Urgent Motion of the Oversight Board, PREPA, and AAFAF to Extend All Applicable*
*Deadlines to Cobra Acquisition LLC's Motion for Allowance and Payment of Administrative Expense Claims*
[Case No. 17-BK-3283-LTS, ECF No. 8886] (the "Original Stay Order" and, together with the Second Stay Order,
the "Stay Order").

[2]    Mammoth and all of its subsidiaries, including Cobra, are borrowers under that certain *Amended and Restated*
*Revolving Credit and Security Agreement* dated as of October 19, 2018, as amended, and Cobra is jointly and
severally liable for all obligations thereunder.  *See* Mammoth Energy Services, Inc., Current Report (Form 8-K)
(Oct. 25, 2018), Ex. 10.1.  As such, Cobra's financial condition directly affects Mammoth and its other subsidiaries.

[3]    On March 6, 2020, one business day prior to Saudi Arabia's announcement that it would slash its export oil prices
and which precipitated the current declines in oil prices, the price of Mammoth's stock (NASDAQ: TUSK) closed
at $0.74.  *See, e.g.*, Clifford Krauss and Stanley Reed, *Oil Prices Dive as Saudi Arabia Takes Aim at Russian*

capitalization of approximately $33.4 million, an approximately 96% decrease from its market capitalization of approximately $744 million at the end of March 2019, when Cobra ceased to provide services to PREPA under the Contracts.  Clearly, a further delay of payment on Cobra's receivable of more than $240 million is very significant and threatens to have a further material adverse effect on the Company if at least a significant portion of it is not paid promptly.  As it is now apparent that the criminal proceedings will not be resolved until early 2021 at the earliest, Cobra is compelled to request the Court to grant, at the least, limited relief from the Stay Order to alleviate substantial harm to the Company and its approximately 1,500 employees.  *See* Mammoth Energy Services, Inc., Annual Report (Form 10-K) (March 2, 2020).  If granted, this limited relief from the Stay Order will permit Cobra to seek the allowance and, ultimately, the payment, of the Undisputed Tax Claims, which claims relate to approximately $62 million of tax reimbursements.  As set forth further in this Urgent Motion, the Government Parties' primary rationale for seeking entry of the Stay Order—the Indictment and the FEMA Analysis—has no legal or contractual bearing on the Undisputed Tax Claims.

3.      Such relief is more than appropriate in these circumstances.  Without the services provided by Cobra, PREPA would not be able to operate.  When Cobra began its work under the October 19, 2017 Emergency Master Service Agreement for PREPA's Electrical Grid Repairs – Hurricane Maria (the "First Contract"), Puerto Rico had no power.  Hurricanes Irma and Maria left Puerto Rico a Federal Disaster Zone, with critical infrastructure destroyed or severely damaged.  Flooding, storm surge, landslides, and the lack of cell phone service made travel and operations difficult.  Housing was not available for the many workers needed to undertake the repair work.  Hundreds of workers and tons of equipment to perform the work needed to be brought from the

---

*Production*, N.Y. Times, March 8, 2020, *available at* https://www.nytimes.com/2020/03/08/business/saudi-arabia-oil-prices.html.

mainland.  Cobra overcame these difficult conditions to perform the work it contracted to perform

to restore Puerto Rico's electrical grid under the First Contract and then, after a competitive bid

process, under the May 26, 2018 Master Service Contract for PREPA's Electrical Grid Repairs

Hurricane Maria (the "Second Contract," and, together with the First Contract, the "Contracts").

Cobra completed its contracted services in March 2019.

4.      In stark contrast to Cobra's resolute efforts to perform its obligations, PREPA has

taken every action to delay payment to Cobra on its remaining invoices.  There is no dispute that

PREPA currently owes, but has not paid, tens of millions of dollars for the work Cobra performed.

But at every turn, PREPA has stalled.  First, PREPA asked for more information from Cobra on

certain invoices (information irrelevant to the actual contractual terms).  When Cobra promptly

provided all the information requested by PREPA—even if not required under the Contracts—

PREPA then simply refused to pay.  After months of stonewalling and when no consensual

resolution appeared in sight, Cobra sought relief from this Court through its Administrative

Expense Motion.  Only then did PREPA's counsel invoke the Indictment and FEMA Review as

additional excuses to delay payment on Cobra's remaining claims indefinitely.

5.      These excuses for the delay in payment are not valid.  Withholding reimbursement

on the Undisputed Tax Claims based on the pending criminal proceeding is inconsistent with the

terms of Cobra's Contracts, as Cobra has not been charged with a crime.  *See* Declaration of Gary

Germeroth ("Germeroth Decl.") at ¶ 8, ECF No. 1918-2.[4]  Similarly, the ongoing FEMA Analysis

does not provide a justification for PREPA's failure to pay the Undisputed Tax Claims.  Two

---

[4]    The first time PREPA cited the criminal proceeding as a reason for refusing to pay Cobra undisputed amounts was
in filings in this Court after Cobra filed its Administrative Expense Motion.  To this day, PREPA has not formally
notified Cobra under either Contract that it is objecting to invoices or otherwise withholding payments due on that
basis.  Declaration of Mark Layton ("Layton Decl."), attached hereto as **Exhibit C**, at ¶ 25; Declaration of Mark
Guess ("Guess Decl."), attached hereto as **Exhibit D**, at ¶ 9.

separate reviews, one by FEMA and one by the RAND Corporation, have previously concluded

that the rates PREPA agreed to pay Cobra were reasonable.  Layton Decl. at ¶ 29.  In any event,

FEMA's analysis is focused on whether *PREPA* and *FEMA*, not Cobra, acted on a reasonable and

sound basis.[5]  Nothing in the report issued by the Office of Inspector General of the Department

of Homeland Services ("OIG") that FEMA is responding to suggested that Cobra had done

anything wrong or calls into question whether Cobra is entitled to be reimbursed in accordance

with the First Contract for taxes actually paid to Puerto Rico.

6.      To put it plainly, allowing PREPA to withhold funds clearly due and owing to Cobra

for an indefinite length of time based on manufactured excuses has created a very serious financial

crisis for the Company and puts the livelihood of approximately 1,500 employees at risk.  Indeed,

PREPA's non-payment has already required the Company to renegotiate and amend its credit

facility to avoid breaching covenants to its lenders.  Layton Decl. at ¶ 11.  Obtaining this

amendment from its lenders required the Company to agree to conditions that further constrain the

liquidity of the company.  *Id.*  Without substantial payment by PREPA toward the outstanding

amounts, the Company could breach its amended covenants.  If an event of default occurs, the

lenders, among other things, (i) would not be required to lend any additional amounts to the

Company, (ii) could elect to declare all outstanding borrowings, together with accrued and unpaid

interest and fees, to be due and payable, and (iii) may have the ability to require the Company to

apply all of its available cash to repay its outstanding borrowings.  *Id.* at ¶ 12.  These altered

circumstances alone would be sufficient to merit the limited modification of the Stay Order.  Even

more recently, the global spread of the novel coronavirus and the precipitous drop in oil prices as

---

[5]    Again, PREPA first raised the FEMA Analysis as a ground for withholding payments from Cobra in filings in this
Court, and those assertions have been made solely by PREPA's counsel, not PREPA officials with contract
responsibility.  In fact, the only evidence before the Court as to why PREPA is withholding payments otherwise
due to Cobra is the Germeroth Declaration, which makes no mention of the FEMA Analysis.

a result of actions taken by OPEC, has led the Company's customers to cut back sharply on their activities. These events, coupled with the already strained financial position of the Company, have had an adverse impact on the Company and its operations, and could continue to have an adverse impact until the pandemic moderates and oil prices rise and stabilize. *Id.* at ¶ 9.

7.      In light of the urgency of these circumstances, Cobra files this Urgent Motion to seek relief from the Stay Order on an expedited basis for the limited purpose of seeking an allowed administrative expense claim pursuant to Bankruptcy Code section 503(b)(1) with respect to the Undisputed Tax Claims. The allowance of these amounts is warranted because (1) there is no legitimate dispute that Cobra is entitled to at least that amount under the terms of the Contracts, (2) the outcomes of the Indictment and the FEMA Analysis will not alter Cobra's entitlement to such a payment, (3) making Cobra wait for any substantial payment until the Indictment and FEMA Analysis are resolved is causing substantial harm to the Company, and (4) PREPA has adequate cash on hand to make the payment.

## **BACKGROUND**

8.      On September 30, 2019, Cobra filed a motion seeking an order allowing an administrative expense claim under section 503(b)(1) of the Bankruptcy Code. *See* Administrative Expense Motion at ¶ 15. The Administrative Expense Motion asserts approximately $216 million (plus interest) in claims for post-petition work performed by Cobra under the Contracts between Cobra and PREPA. With interest to date, Cobra's claim is for approximately $254 million.

9.      PREPA does not dispute certain of the amounts under the Contracts that Cobra sought payment for pursuant to the Administrative Expense Motion. Among other items, the "tax gross-up" provision of the First Contract indisputably requires PREPA to reimburse Cobra for taxes it paid to Puerto Rico in 2018 in excess of 8.5%. *See* Ex. 1 to Layton Decl. at 48. That amount is $61,668,083.34 (such amounts, the "Undisputed Tax Claims"). Layton Decl. at ¶ 7.

10.     At the request of the Government Parties, the Court stayed proceedings on the Administrative Expense Motion, including with respect to the Undisputed Tax Claims.  The Stay Order is based on the notion that the outcomes of the pending Indictment against three individuals and the ongoing FEMA Analysis might have an effect on Cobra's ability to recover the full amount it seeks in its Administrative Expense Motion.  Proceedings on the Administrative Expense Motion are currently stayed until the June 4, 2020 hearing.  Trial in the criminal case has now been set to begin on January 19, 2021, at the earliest.  *See Tribble¸* Case No. 19-CR-541-FAB, ECF No. 87 (D.P.R. Feb. 13, 2020).[6]

11.     Nothing in either the First or Second Contracts justifies PREPA's decision to withhold payments based on the Indictment or the FEMA Analysis.  To the contrary, the express provisions in the Contracts addressing criminal proceedings allow PREPA to rescind or terminate the Contracts, or seek reimbursement of monies earned, only if *Cobra* is convicted of or pleads to one of the enumerated crimes.  *See* Ex. 1 to Layton Decl. at 32; Ex. 2 to Layton Decl. at 31.  Cobra, however, has not been charged with any crime, much less convicted of one.  Accordingly, PREPA's withholding of payments based on the Indictment, which does not accuse Cobra of a crime, is impermissible under the Contracts.  For the same reasons, the outcome of the pending criminal proceeding will not affect Cobra's entitlement to payment of the Undisputed Tax Claims.

12.     Similarly, the OIG analyzed whether *FEMA* (not Cobra) performed a sound analysis before determining at the outset of the First Contract that the rates *PREPA* had agreed to pay were reasonable.  *See* Ex. 16 to Layton Decl.  The OIG Report did not conclude that FEMA's

---

[6]     On March 10, 2020, Jovanda Patterson, one of three defendants in *United States v. Tribble*, pleaded guilty to one count of 18 U.S.C. § 208(a), acts affecting a personal financial interest.  Under the terms of the plea agreement, Patterson is required to pay a $100 administrative fee and the government agreed to recommend a sentence of probation.  Patterson's plea wholly relates to her conduct as an employee of FEMA, not Cobra, and has no bearing on the amount owed to Cobra under the Contracts.  *See Tribble*, Case No. 19-CR-541-FAB, ECF No. 92 (D.P.R. Oct. 8, 2019).

determination was incorrect; it merely criticized the analysis that FEMA used to arrive at its determination. Nor did the OIG Report suggest that Cobra did anything wrong, much less that Cobra was somehow responsible for whatever mistakes FEMA might have made. *See id.* Even more fundamentally, this review has nothing to do with taxes Cobra paid to Puerto Rico and thus is irrelevant to Cobra's entitlement to the 2018 tax gross-up. Furthermore, nothing in the Contracts permit PREPA to withhold payments from Cobra based on speculation that FEMA might arrive at a different conclusion than it did in 2017. The Contracts make clear that PREPA's contractual obligation to pay Cobra for its work is not dependent on PREPA's receipt of FEMA funding.[7]

13.    PREPA officials acknowledged before Cobra filed its Administrative Expense Motion that Cobra is currently entitled to payment of at least $30 million (though it remains unclear which portion of the invoices this amount refers to). *See* Layton Decl. at ¶ 26; Guess Decl. at ¶ 6. PREPA expressly stated that it would pay that amount, before reneging because of supposed lack of "liquidity" resulting from FEMA being behind on reimbursements to PREPA. *Id.* In recent filings in this Court, PREPA has acknowledged that it does not dispute a significant percentage of Cobra's $244 million in outstanding invoices (now approximately $254 million as additional interest has accrued). *See* ECF No. 1918-2 (Decl. of Gary Germeroth) at ¶ 8 (of the $244 million outstanding, "PREPA disputes hundreds of Cobra invoices with a total face value of over $200 million (representing over 80% of what Cobra claims is outstanding)"); *see also Reply of Financial Oversight and Management Board to Cobra Acquisition LLC's Omnibus Objection to Fee Applications Filed by Professionals and Request to Increase Holdback Amount*, ECF No. 1922

---

[7]   The sole exception is if FEMA funding is lost due to Cobra's "sole fault." Ex. 1 to Layton Decl. at 16, Ex. 2 to Layton Decl. at 38. If FEMA were to reverse its earlier determination that the rates PREPA agreed to pay Cobra were reasonable, and therefore withhold some funding from PREPA, that result would not be Cobra's "sole fault." It was PREPA's decision, not Cobra's, to agree to pay the rates specified in the Contracts.

(relying on Germeroth Declaration).  Nonetheless, PREPA continues to refuse to pay the amounts that Cobra indisputably earned under the terms of the Contracts, including the 2018 tax gross-up.[8]

14.     According to PREPA, it has approximately $488.5 million in unrestricted cash on hand and is generating revenues of approximately $45 million to $80 million a week, revenues made possible by the repair work performed by Cobra, when the grid's transmission and distribution infrastructure withstood recent earthquakes.  *See* Germeroth Decl. at ¶ 12.  As such, PREPA has sufficient cash on hand to pay Cobra on account of the Undisputed Tax Claims and otherwise continue to operate in the ordinary course.

### **RELIEF REQUESTED**

15.     By this Urgent Motion, Cobra respectfully requests (i) entry of an order, substantially in the form attached hereto as **Exhibit A**, setting (a) a deadline to object to the relief requested by this Urgent Motion on or before April 1, 2020 at 4:00 p.m. (AST), (b) a deadline to file a reply in support of the Urgent Motion on or before April 8, 2020 at 12:00 p.m. (AST) and (c) scheduling a hearing before this Court prior to the April 22, 2020 omnibus hearing and (ii) entry of an order, substantially in the form attached hereto as **Exhibit B**, (a) lifting the stay applicable to the Administrative Expense Motion solely with respect to the Undisputed Tax Claims and (ii) finding the Undisputed Tax Claims to be allowed as administrative expense claims under section 503(b)(1) of the Bankruptcy Code, made applicable pursuant to PROMESA section 301, for all purposes in the Title III Case.

---

[8]   PREPA also refuses to work with Cobra to resolve issues that PREPA has raised with respect to those invoices that it has disputed.  Guess Decl. at ¶ 7.

## **ARGUMENT**

I.   **THE CONTRACTS ENTITLE COBRA TO PAYMENT OF THE UNDISPUTED TAX CLAIMS AND PREPA HAS NO LEGITIMATE BASIS FOR WITHHOLDING SUCH AMOUNTS**

16.   The First Contract required PREPA to reimburse Cobra for taxes paid to Puerto Rico in excess of 8.5 percent:

> In the event that any amounts to be paid to Contractor under this Contract are subject to any taxes (including withholding) imposed by any governmental authority of Puerto Rico in excess of 8.5% and Contractor has not obtained an exemption from such taxes, the amount to be paid to Contractor shall be increased by an amount that, after the payment of such taxes, leaves Contractor with the amount that Contractor would have received if Contractor had been exempt from all such taxes.

Ex. 1 Layton Decl. at 48.

17.   PREPA complied with this "tax gross-up" obligation with respect to Cobra's 2017 tax payments.  Cobra submitted a summary of the amounts billed to PREPA, a summary of the excess tax payments made by Cobra, a certification from Cobra regarding the tax-gross up payments made by Cobra, and Cobra's tax return.  *See* Layton Decl. at ¶ 15.  PREPA fulfilled its obligation to pay the gross-up amounts on August 10, 2018.  *See id.*  For 2018, Cobra submitted identical information demonstrating the tax gross-up to which it is entitled.  *See* Layton Decl. at ¶ 17.  Specifically, on May 29, 2019, Cobra provided PREPA with its relevant tax returns and a worksheet showing the calculation of the tax gross-up and invoice-level supporting detail.  *See id.*

18.   PREPA, however, failed to make the required reimbursement for work performed by Cobra in 2018.  Instead, PREPA began demanding additional information from Cobra not required by the contract and which PREPA did not request for the 2017 payment.  Cobra continuously provided the requested information, but PREPA still did not pay.  *See* Layton Decl. at ¶ 17  The Kafkaesque chain of events to which Cobra was subject proceeded as follows:

- On June 14, 2019, Cobra, at PREPA's request, provided Cobra's effective tax rate and Cobra's expenses.

- On June 17, 2019, Cobra, at PREPA's request, provided Cobra's 2017 Puerto Rico Informative Income Tax Return, Pass Through Entity.

- On June 19, 2019, PREPA sent Cobra a request for several additional categories of information, including information that Cobra had previously provided and (irrelevant) tax returns of Cobra's parent company, which requests Cobra responded to on June 27, 2019.

- On July 1, 2019, PREPA told Cobra that it expected to "get back to [Cobra] next week."

- On July 16, 2019, after additional inquiries from Cobra, PREPA requested more detail about Cobra's effective tax rate, expense details and tax returns, which Cobra promptly provided that same day.

- On July 17, 2019, PREPA requested more information about Cobra's tax rates and Cobra supplied copies of the relevant Puerto Rico tax statutes.

- At another meeting to discuss the tax issue, PREPA requested still more information about Cobra costs.

- On July 25, 2019, Cobra supplied PREPA with details of its costs by general ledger account by month and offered to provide its complete general ledger. The same day, Cobra also provided a reconciliation of the retained earnings roll between the 2017 and 2018 tax returns and a draft of Cobra's 2018 financial statements. Cobra further offered to set up a call between Cobra's tax preparer, a "Big Four" accounting firm, and PREPA's representatives. PREPA did not take up that offer.

- On July 31, 2019, Cobra again requested an update from PREPA on when it could expect payment on the tax gross-up, noting that "[w]e understand you are managing liquidity, but we have to manage our liquidity as well and need to see payments resume." PREPA did not respond and, on August 6, 2019, Cobra followed up with PREPA again. Still no payment was made.

*See* Layton Decl. at ¶ 19-23.

19.    It is clear that Cobra is owed tens of millions of dollars in tax gross-up. Cobra has submitted to PREPA information demonstrating that its 2018 tax payments to Puerto Rico exceeded 8.5% by $61,668,083.34 (*i.e.*, the Undisputed Tax Gross-Up Amount). *See id.* PREPA has not stated that it disagrees with the amount Cobra claims, nor stated what alternative amount

PREPA believes Cobra is owed. *See* Layton Decl. at ¶ 25. Indeed, PREPA has never explained why it has refused to make any of the required tax gross-up payments for 2018, much less offered a basis for withholding the entire amount due. *See id.*

20.     In a filing in this Court, PREPA has asserted that Cobra has not provided "back-up documentation to support its tax gross-up claim." Case No. 17-BK-3283-LTS, ECF No. 8864 at ¶ 23. This is blatantly untrue. As demonstrated above and in the record, Cobra has submitted reams of information to support its tax gross-up claim, greatly exceeding what PREPA found sufficient to support the 2017 tax gross-up. PREPA also has asserted "the tax gross-up dispute … likely require[s] expert discovery." Tellingly, PREPA fails to specify what the supposed "dispute" is, much less what expert testimony might be needed to resolve it. In any event, this assertion is belied by PREPA's failure to accept Cobra's offer to make its tax accountants available to answer PREPA's questions.

## II.     COBRA'S ENTITLEMENT TO THE UNDISPUTED TAX CLAIMS WILL NOT BE AFFECTED BY THE OUTCOME OF THE CRIMINAL CASE OR THE ONGOING FEMA ANALYSIS

21.     PREPA sought and obtained a stay of proceedings on the Administrative Expense Motion on the ground that Cobra's claims might be affected by the outcomes of the Indictment and the FEMA Analysis. Case No. 17-BK-3283-LTS, ECF No. 8886. *See also* Germeroth Decl. at ¶8 ("PREPA has also refused to pay any amounts outstanding to Cobra at this time, pending resolution of [the Indictment]."). Neither the Indictment nor the FEMA analysis, however, will alter Cobra's right to payment of the Undisputed Tax Claims.

### A.     The Criminal Case Will Not Affect Cobra's Right to Payment of the Undisputed Tax Claims

22.     There is no plausible scenario under which PREPA could avoid paying Cobra the Undisputed Tax Claims, even if there were to be one or more convictions in the criminal

proceeding. The tax gross-up claim represents taxes Cobra actually paid to the government of Puerto Rico. The Indictment does not charge Cobra with any wrongdoing and, in fact, the charges asserted against the three individuals have nothing to do with the tax gross-up provision in the First Contract.

23.     Article 69 of the First Contract expressly addresses under what circumstances a criminal conviction would permit PREPA to rescind the contract and refuse further payments. *See* Ex. 1 to Layton Decl. at 32. As required by statute, Article 69 provides for rescission only if Cobra is convicted of or pleads to any of certain crimes. Article 3 of Public Law 458 (since repealed by Act 2 of January 4, 2018). Because the Indictment cannot and will not result in Cobra being convicted of anything, PREPA's suggestion that convictions under the Indictment might allow it to refuse to reimburse Cobra for the $61,668,083.34 taxes actually paid to Puerto Rico in excess of 8.5% as required by the First Contract is simply wrong under the plain terms of the Contract.

24.     PREPA has suggested that criminal convictions might allow it to escape its obligations to pay Cobra under the Contracts if FEMA funding is lost "due to [Cobra's] sole fault." *Oversight Board Reply* at n. 19 (citing Second Contract, Art. 53(F)). PREPA, however, has not alleged that FEMA has withheld, or even threatened to withhold, *any* funding from PREPA because of any of the conduct of Tribble, Ellison and Patterson alleged in the Indictment. If FEMA were to withhold funding from PREPA upon convictions under the Indictment, that would be the "fault" of the indicted individuals (including Asha Tribble, FEMA's Region II, Deputy Regional Administrator), and certainly not Cobra's "sole fault." *Oversight Board Reply* at 23, ¶31 (asserting that an alleged "cloud over Cobra's right to payment under the Cobra Contracts" was created by "Cobra *and certain representatives of FEMA*.") (emphasis added).

13

25.     PREPA also speculates that it "could" have a defense to further payments, a damages claim against Cobra, or the right to claw back payments made to Cobra because the Contracts "*may' be voidable if Cobra obtained them by 'deceit.'*"  *See Oversight Board Reply* at n. 21 (citing 31 L.P.R.A. § 3408) (emphasis added).  The Indictment, however, does not charge Cobra with anything, including deceit, and does not charge that PREPA was induced to enter either Contract by any deceit.  In fact, the Indictment is devoid of *any* allegation that the purpose or result of the alleged misconduct included inducing PREPA to award either the First or Second Contract to Cobra.  It also contains no allegation that PREPA would not have awarded both Contracts to Cobra but for the alleged misconduct.  *See* 31 L.P.R.A. § 3408 ("deceit" exists when misconduct by one party induces the other another party to execute contract it otherwise would not have); *see also* 31 L.P.R.A. § 3409 (deceit nullifies a contract only if it is "serious" and is not employed by both parties).  In fact, the first overt act alleged by the Indictment occurred in December 2017, months after the award of the First Contract, which is the relevant contract for purposes of the Undisputed Tax Claims.  *See* Indictment at ¶ 50.  In any event, the Indictment further states that Cobra was one of three contractors recommended *by PREPA* for selection for the Second Contract.  *See* Indictment at ¶ 34.  The Indictment, therefore, does not give rise to any serious possibility that PREPA will be entitled to nullify either of the Contracts.  Given the lack of factual support for PREPA's speculation otherwise, it is unsurprising that PREPA has not brought the action for annulment that would be required for it to nullify Cobra's Contracts on this ground.  *See* 31 L.P.R.A. §§ 3511-14.  Nor will PREPA ever bring such an action, because a finding of nullity for "deceit" would require PREPA to return to Cobra all of the fruits of Cobra's work under the Contracts.  31 L.P.R.A. § 3514.[9]

---

[9]     PREPA's suggestion that it may be protected from such a result by the "illegality" exception provided by 31 L.P.R.A. § 3516 is off base, because there was nothing illegal about the object of the Cobra Contracts (restoration

**B.     Approval of Funding by FEMA is not Grounds for Withholding Payments Under the Contracts**

26.     PREPA continues to misrepresent that FEMA's analysis of Cobra's costs, which is estimated to be completed by May 29, 2020, could conclude that PREPA does not owe the undisputed amounts claimed by Cobra.   PREPA ignores that (1) FEMA informed PREPA in December 2017 that Cobra's rates for labor and equipment were reasonable, and that Cobra and PREPA relied on that finding to continue with the performance of the first contract, and (2) a federal research center operated by RAND Corporation supported FEMA's December 2017 finding by independently analyzing Cobra's costs and concluding in March 2019 that the rates PREPA agreed to pay Cobra were reasonable.  *See* Ex. 16 to Layton Decl. at 11; Ex. 17 to Layton Decl. at 3.  In its response to the OIG, FEMA reiterated that it had already determined the contract rates are reasonable and that, therefore, its analysis "will focus on the reasonableness of quantities (labor, equipment and material units) based on the actual scope of work completed."  Ex. 16 to Layton Decl. at 10.

27.     None of this, of course, has anything to do with the amount of taxes Cobra paid to Puerto Rico in 2018.  As discussed above, PREPA is obligated under the First Contract to reimburse Cobra for the Undisputed Tax Claims paid by Cobra to Puerto Rico in excess of 8.5% in 2018.  FEMA, in its review of labor, equipment, and material units, is not looking at taxes, assessing the reasonableness of this tax payment, or reviewing PREPA's obligation to reimburse Cobra for the taxes paid to Puerto Rico.  As the reimbursement of taxes is not part of FEMA's review, there is no basis for PREPA to withhold the Undisputed Tax Claims pending FEMA's review of unrelated quantities.

---

of Puerto Rico's devastated power grid) or the consideration given for those Contracts (restoration services in exchange for money payments as prescribed by the Contracts).

28.     Even if FEMA's eventual analysis determines that the rates charged for some quantities of work must be adjusted before FEMA will pay PREPA under its grant, any such adjustment will not result in FEMA refusing to make payment for the work performed or to reimburse for taxes actually paid.  Cobra performed the work as evidenced by the fact that the power is on and PREPA is generating revenue from its sale of power.  In fact, PREPA affirmatively asserts that FEMA is obligated to provide disaster relief funds based on damage assessments as long as there is no evidence of fraud.  (PREPA Reply of Financial Oversight at 11-12.)  While PREPA suggests that FEMA's analysis is looking at whether Cobra committed fraud, the scope of FEMA's review is to look at the "reasonableness of quantities." There is no suggestion by FEMA or the OIG that it is looking at fraud issues as part of its analysis. Finally, PREPA's obligation to pay Cobra is independent of FEMA's obligation to fund PREPA and so, even if FEMA now finds that some of the costs must be adjusted, PREPA cannot adjust what it agreed to pay Cobra under the Contracts.

29.     As PREPA recognizes, it can escape its obligation to pay only if FEMA rejects reimbursement for a reason that is the sole fault of Cobra.  Neither the OIG report nor FEMA's analysis of Cobra's rates suggest Cobra committed a wrong in the contracting process.  In fact, as stated, FEMA and RAND have found that the rates included by Cobra in its proposal and accepted by PREPA are reasonable.

30.     Cobra's contracts are with PREPA, not FEMA.  Under the Contracts, PREPA is required to pay Cobra regardless of whether FEMA is obligated to reimburse PREPA.  Article 29 of the First Contract provides, "The Contractor acknowledges that starting on October 25, 2017, FEMA financial assistance will be used to fund this Contract…Any failure to secure approvals or funding from FEMA or some other source (except due to the Contractor's sole fault) shall not

16

relieve PREPA from its obligations for payment under this Contract." Ex. 1 to Layton Decl. at 16.

Article 53(F) of the Second Contract provides "The Contractor acknowledges that Federal

assistance awarded by U.S. federal agencies will be used, in part, to fund this Contract.  Ex. 2 to

Layton Decl. at 38.  However, any failure of PREPA to secure this funding (except due to the

Contractor's sole fault), shall not relieve PREPA from its obligations of payment under this

Contract."  PREPA, therefore, cannot use the absence of FEMA funding as a basis for its refusal

to pay the Undisputed Tax Claims.

## III.   CONTINUING LACK OF PAYMENT THREATENS COBRA'S VIABILITY

31.     The current delay and uncertainty over when Cobra's entitlement to payment by

PREPA will be addressed, is causing substantial ongoing hardship to Cobra and, by extension, its

parent company, Mammoth.  Allowing PREPA to withhold funds clearly due and owing to Cobra

for an indefinite length of time based on manufactured excuses has created massive financial

uncertainty for the Company and places both the Company and its approximately 1,500 employees

at risk.  *See* Layton Decl. at ¶ 9, 12.  A further delay of payment on Cobra's receivable of more

than $254 million is very significant and could have an adverse effect on the Company if at least

a significant portion of it is not paid promptly.  *See* Layton Decl. at ¶ 8.  If Cobra receives no

payments until 2021, the earliest that the criminal trial could take place, further harm to Cobra

could occur by that time.  This is a true instance where justice delayed could be justice denied.

32.     PREPA's non-payment has already required the Company to renegotiate its credit

facility to avoid breaching its covenants to its lenders.  *See* Layton Decl. at ¶ 11.  The amendment

with the lenders further constrains the liquidity of the Company.  Without a substantial payment

by PREPA toward the outstanding amounts, the Company could breach its amended covenants.

*See id.* at 12.  If an event of default occurs, the lenders, among other things, (i) would not be

required to lend any additional amounts to the Company, (ii) could elect to declare all outstanding

17

borrowings, together with accrued and unpaid interest and fees, to be due and payable, and (iii) may have the ability to require the Company to apply all of its available cash to repay its outstanding borrowings. *See id.* These circumstances alone merit a limited modification of the Stay Order.

33.     On top of this, moreover, the global spread of the novel coronavirus and the precipitous drop in oil prices as a result of actions taken by OPEC, have made matters still worse for the Company as the Company's customers have cut back sharply on their activities. This has caused an adverse impact on the Company and its operations, which could continue until the pandemic moderates and oil prices rise and stabilize. *See* Layton Decl. at ¶ 9.

## IV.    THIS COURT HAS THE POWER TO ORDER THE ALLOWANCE OF AN ADMINISTRATIVE EXPENSE CLAIM

34.     Against this backdrop of Cobra's clear entitlement to the Undisputed Tax Claims and the risks that the continued non-payment poses to Cobra's viability is this Court's power to enter an order allowing the Undisputed Tax Claims in the Title III Case. Indeed, at the "heart" of the bankruptcy process is claims allowance, and a bankruptcy court is empowered to "determine matters that arise directly under the [B]ankruptcy [C]ode, such as fixing a creditor's claim." *In re City of Detroit*, 504 B.R. 191, 225 (Bankr. E.D. Mich. 2013). *See also* 48 U.S.C. § 2166 (providing original and exclusive jurisdiction to the district court of all cases under Title III). Cobra thus respectfully requests that the Undisputed Tax Claims be allowed and granted administrative expense priority under section 503(b)(1)(A) of the Bankruptcy Code.

35.     The Undisputed Tax Claims fall squarely into the category of claims that are "actual and necessary cost[s] and expense[s] of operating the business of [PREPA]" and, thus, under section 507(a)(2) of the Bankruptcy Code, entitled to administrative expense priority. *See In re Fin. Oversight & Mgmt. Bd.*, 366 F. Supp. 3d 256, 291 (D.P.R. 2019) (order confirming Plan for

COFINA and listing categories of allowed administrative expense claims). *See also* 11 U.S.C. § 503(b)(1)(A) (a party is entitled to an administrative expense claim for the "actual, necessary costs and expenses of preserving the estate."); 11 U.S.C. § 507(a)(2) (affording second priority to claims allowable under section 503(b) of the Bankruptcy Code). The cases interpreting section 503(b)(1)(A) of the Bankruptcy Code—which section 301 of PROMESA incorporates—hold consistently that the Bankruptcy Code grants administrative expense priority to post-petition transactions supplied to and beneficial to the debtor and its operations. *Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.)*, 954 F.2d 1, 5 (1st Cir. 1991); *Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, 479 F.3d 167, 172 (2d Cir. 2007).

36.  Here, there is no dispute that Cobra provided critical, post-petition services to PREPA, as required under section 503(b)(1)(A) of the Bankruptcy Code. The Contracts and the extensive effort required to rebuild Puerto Rico's damaged electrical system occurred after the commencement of the Title III Case. The benefits of those contracts to PREPA and its operations are beyond question. Indeed, Cobra's services in restoring PREPA's electrical grid are nothing if not necessary costs. Even if there were any doubt as to the Undisputed Tax Claim's entitlement to administrative expense priority, the Supreme Court has instructed that courts should interpret "actual and necessary costs" expansively. *Reading Co. v. Brown*, 391 U.S. 471, 483 (1968). In *Reading*, the Supreme Court concluded "actual and necessary costs should include costs ordinarily incident to operation of a business, and not be limited to costs without which rehabilitation would be impossible." *Id.* at 483. In reaching that conclusion, the Supreme Court held that considerations of fundamental fairness and logic required the allowance of a claim for administrative priority. *See id.* at 477. For these reasons, the Undisputed Tax Claims plainly are allowable as administrative expenses claims.

37.     Of course, the burden of proving an entitlement to an administrative expense claim rests with Cobra. *Hemingway Transp.*, 954 F.2d at 5 (citations omitted).  But it is a burden that Cobra is and has been ready to satisfy despite the Government Parties' efforts to delay.  Notably, while the Government Parties have asserted factual challenges to certain of Cobra's claims, they also have suggested they may take legal positions that Cobra's claims are not entitled to administrative expense priority.  But such arguments would be without merit, given Cobra's claims arise from vital services it provided to PREPA.  Indeed, on closer examination, the Government Parties' apparent legal arguments as to the Undisputed Tax Claims are specious, a calculated attempt to delay indefinitely contractually-agreed payments.  As such, the Court should find that the Undisputed Tax Claims are entitled to administrative expense priority and enter an order allowing the Undisputed Tax Claims.

**A.     The Undisputed Tax Claims Are Entitled to Administrative Expense Priority**

38.     The Government Parties appear to contest that Cobra's claims, including the Undisputed Tax Claims, could give rise to administrative expense claims under section 503(b) of the Bankruptcy Code.  In their pleadings, the Government Parties have continually reserved their rights to argue that "PROMESA does not recognizes services such as Cobra's as giving rise to administrative expense claims." *See, e.g., Reply of Financial Oversight and Management Board to Cobra Acquisition LLC's Omnibus Objection to Fee Applications Filed by Professionals and Request to Increase Holdback Amount* [ECF No. 1922], n. 20.  But this view of PROMESA is erroneous.  As noted above, PROMESA expressly incorporates section 503 of the Bankruptcy Code, which provides for the allowance of administrative expense claims. *See* 48 U.S.C. § 2161. The Government Parties' argument appears to be that, because there is no estate created under Title III, there can be no "*actual, necessary costs and expenses of preserving the estate*."  11 U.S.C. § 503(b)(1)(A) (emphasis added).  That interpretation, however, ignores the principal underlying

20

Bankruptcy Code section 503(b), the Supreme Court's broad reading of "actual, necessary costs" in *Reading*, and the Government Parties' own practice in this Title III Case.

39.     The substantive policy underlying section 503(b) is common sense, and is applicable to any debtor, including PREPA.  Upon the commencement of a bankruptcy case, the reality is that the case could not succeed if third parties were denied the benefit of priority in exchange for extending credit to the insolvent entity.  *See Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir. 1976) ("[I]f a business is to be reorganized, third parties must be willing to provide the necessary goods and services.  Since they clearly will not do so unless their claims for payment will be paid ahead of the pre-petition debts and liabilities of the debtor, [the Bankruptcy Code] provides a priority for expenses incurred by the debtor-in-possession in order to maintain, preserve, or rehabilitate the bankrupt estate.").  Section 503(b) of the Bankruptcy Code provides that incentive and encourages creditors to continue doing business with a debtor.

40.     PREPA is no different from any other debtor in this respect.  Saddled with billions of dollars in debt amid extremely difficult circumstances, its post-petition creditors need and will continue to need the assurance that their efforts will not go unpaid.  And yet, the natural consequence of the Government Parties' interpretation of section 503(b) is that PREPA may leave its post-petition creditors without means of redress, denied the possibility of an administrative expense claim and potentially subject to the automatic stay should they pursue their claims outside of this Court.  *See* 11 U.S.C. § 362(a)(3) (providing an automatic stay over "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]").  Under the Government Parties' apparent interpretation, any creditor that provides essential, beneficial services to PREPA (or the other Title III debtors) could face the

21

denial of a basic protection under the Bankruptcy Code.  It is incredibly risky to do business with

a financially distressed entity, and the Government Parties appear intent on making it an even more

risky and uncertain proposition, to the ultimate harm of all PREPA's stakeholders.

41.     Unsurprisingly in light of how such a view could imperil their restructuring efforts,

the Government Parties' own actions demonstrate a lack of conviction in their belief that Cobra's

services may not give rise to administrative expense claims.  For instance, the Government Parties

have agreed to provide certain of their pre-petition bondholders with hundreds of millions of

dollars of administrative expense claims.   To justify this treatment, the Government Parties

characterize those claims in part as break-up fees, which bankruptcy courts routinely approve in

other contexts.  *See, e.g.*, *Supplemental Memorandum of Law and Facts in Support of Joint Motion*

*of Puerto Rico Electric Power Authority and AAFAF Pursuant to Bankruptcy Code Sections 362,*

*502, 922 and 928 and Bankruptcy Rules 3012(a)(1) and 9019 for Order Approving Settlements*

*Embodied in the Restructuring Support Agreement and Tolling Certain Limitations Periods* [ECF

No. 1425] ("In addition, the Surviving Administrative Claims should be authorized as a

permissible 'break-up' fee to compensate the Supporting Holders for the risk that the RSA may be

terminated after sitting on their rights for a significant period of time to enable the Government

Parties to proceed with transformation.") ¶ 95.  Of course, the Court has yet to approve this grant

of administrative expenses claims to the pre-petition bondholders, which Cobra has objected to,

but it is a notable admission on behalf of the Government Parties.  After all, the statutory basis for

awarding an administrative expense claim because of a break-up or other termination fee is that it

is an "actual, necessary" cost under section 503(b) of the Bankruptcy Code.  The Government

Parties underscore this point by citing cases approving break-up fees under section 503(b), such

as *In re Dana Corp.*, in their brief.  *Id.*; *In re Dana Corp.*, Case No. 06-10354-BRL (Bankr.

S.D.N.Y. Aug. 1, 2007) (allowing payment of break-up fee and other fees as administrative expenses under section 503(b)(1)(A)).

42.     In a similar vein, the Government Parties have agreed to allow other claims of its post-petition contractors as administrative expense claims. *See, e.g., Opposition to Motion for Allowance of Administrative Expense Claims Filed by Lord Electric Company of Puerto Rico, Inc.* [Case No. 17-BK-3283-LTS, ECF No. 3509] ("AAFAF has offered Lord Electric [a post-petition contractor that conducted restoration and repair work on PREPA's transmission lines] to treat the Claim as an administrative expense and has informed Lord Electric that the Claim will be paid either with funds provided by [FEMA] when they become obligated or by PREPA at the time a plan of adjustment is confirmed," with AAFAF noting that it reserved all rights as to the amount of the allowed claim under Bankruptcy Code section 503(b)).[10]   Simply put, it is contrary to fundamental principles of bankruptcy to treat similar creditors differently.

43.     In short, the Government Parties should not be allowed to take such inconsistent positions to the harm of its creditors like Cobra.  The services Cobra performed for PREPA are entitled to administrative expense priority and, as the Government Parties' own actions demonstrate, assertions to the contrary are meritless.  Cobra's claims are the precise type of beneficial services that the Bankruptcy Code affords priority, given the significant risk to third parties in transacting with a debtor and a debtor's need for third parties to provide goods and services for its operations.

---

[10]   Though unclear in the public record, it appears that Lord Electric's claim was ultimately paid, as Lord Electric voluntarily withdrew its motion for payment, *see Notice of Withdrawal of Motion for Allowance of Administrative Expense Claims* [Case No. 17-BK-3283-LTS, ECF No. 950] and its counsel withdrew from the case following the motion withdrawal, *see Motion to Withdraw as Legal Counsel and Request to Cease Notifications to the Undersigned* [Case No. 17-BK-3283-LTS, ECF No. 3957].

**B.  The Court Is Not Prohibited Under PROMESA from Allowing the
Undisputed Tax Claims**

44.    While PROMESA grants original and exclusive jurisdiction over the Title III Case

to this Court to enter orders, as this Court has recognized previously, it also contains limitations

on that jurisdiction.  *See Order Granting Joint Urgent Motion of the Oversight Board, PREPA, and*

*AAFAF to Extend All Applicable Deadlines to Cobra Acquisition LLC's Motion for Allowance and*

*Payment of Administrative Expense Claims* [ECF No. 1670] ("[T]he Court is not empowered to

require such payment [of Cobra's claims] absent the Oversight Board's consent.") at 3, citing 48

U.S.C. §§ 2165, 2174.  In particular, section 305 of PROMESA limits the Court's jurisdiction such

that it cannot, absent the consent of the Oversight Board, interfere with "(1) any of the political or

governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the

use or enjoyment by the debtor of any income-producing property."  48 U.S.C. § 2165(1)-(3).

45.    These limitations, however, are inapplicable to the Undisputed Tax Claims.  The

entry of an order allowing the Undisputed Tax Claims cannot be said to "interfere" with the

"properties or revenue" of PREPA when PREPA negotiated and executed the contracts, the

Oversight Board conducted a review process of those contracts pursuant to section 204(b)(2) of

PROMESA, and no party otherwise raises any dispute with the specific claims subject to this

Urgent Motion.  Allowance of the Undisputed Tax Claims simply gives legal effect to the

Undisputed Tax Claims in the Title III Case.  The Government Parties should not be allowed, after

the fact, to create controversies where none exist.  *See, e.g., In re ATP Oil & Gas Corp.*, No. 12-

36187-MI, 2014 Bankr. LEXIS 1050, at *10-11 (Bankr. S.D. Tex. Mar. 18, 2014) (finding no

justification or supporting case law to the debtor's argument that administrative expense claims

should be disallowed because, in hindsight, the work may not have benefitted the estate, when

such work was performed under contracts, at the authority and direction of the debtor).

46.     To be clear, Cobra is not asking that the Court enter an order allowing the *disputed* portions of Cobra's claims, and Cobra reserves all rights with respect to those matters.  But there is no valid reason that the Undisputed Tax Claims may not be allowed as administrative expense claims.  Accordingly, because the Government Parties do not contend that these Undisputed Tax Claims were improper or that they are not otherwise obligated to pay such claims, the Government Parties should not be allowed to use the jurisdictional limitations as a shield to performing their contractual obligations.  Cobra, therefore, respectfully requests that the Court enter an order allowing the Undisputed Tax Claims as administrative expense claims in this Title III Case.

### CERTIFICATION OF COMPLIANCE WITH LOCAL RULES AND CASE MANAGEMENT ORDER

47.     Pursuant to Paragraph I.H of the Case Management Procedures, Cobra hereby certifies that it has carefully examined the matter and concluded that there is a true need for an urgent motion; is has not created the urgency through any lack of due diligence; it has made a bona fide effort to resolve the matter without a hearing; and it has made reasonable, good-faith communications in an effort to resolve or narrow the issues that are being brought to the Court.

### CONCLUSION

WHEREFORE, for the reasons set forth above, Cobra respectfully requests that this Court enter orders, substantially in form attached hereto as **Exhibit A** and **Exhibit B**, granting the relief requested herein, and granting Cobra such other relief as this Court deems just and proper.

*[Remainder of page left blank intentionally.]*

25

Dated: March 25, 2020

Respectfully submitted,


Rafael Escalera Rodríguez (No. 122609)
*/s/ Sylvia M. Arizmendi*
Sylvia M. Arizmendi (No. 210714)
Alana Vizcarrondo-Santana (No. 301614)
REICHARD & ESCALERA, LLC
255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, PR 00917-1913
Telephone: (787) 777-8888
Email:  escalera@reichardescalera.com
            arizmendis@reichardescalera.com
            vizcarrondo@reichardescalera.com

Ira S. Dizengoff (*pro hac vice*)
Abid Qureshi (*pro hac vice* admission pending)
Philip C. Dublin (*pro hac vice*)
Steven M. Baldini (*pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
Bank of America Tower
New York, NY 10036
Tel: (212) 872-1000
Fax: (214) 872-1002
Email:  idizengoff@akingump.com
            aqureshi@akingump.com
            pdublin@akingump.com
            sbaldini@akingump.com

--and--

Thomas P. McLish (*pro hac vice*)
Scott M. Heimberg (*pro hac vice*)
Allison Thornton (*pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, DC 20006
Tel: (202) 887-4000
Fax: (202) 887-4288
Email:  tmclish@akingump.com
            sheimberg@akingump.com
            athornton@akingump.com

*Attorneys for Cobra Acquisitions LLC*


I HEREBY CERTIFY, that on this date, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to all attorneys

of record.

*/s/ Sylvia M. Arizmendi*
USDC-PR No. 210714