# EXHIBIT B

# DEFENDANT'S AMENDED ANSWER TO FOURTH AMENDED COMPLAINT

CERTIFIED TRANSLATION:

## COMMONWEALTH OF PUERTO RICO
## COURT OF FIRST INSTANCE
## SAN JUAN SUPERIOR PART

| | |
|---|---|
| EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, et al;, <br><br> Plaintiffs, <br><br> v. <br><br> UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO, et al <br><br> Defendants. | CIVIL NO.: KAC-2011-1067 (901) <br><br> RE: BREACH OF CONTRACT; DAMAGES <br><br> [Stamped by the Court Clerk Feb 4, 2020 4:57] |

**I.**
**DEFENDANTS' AMENDED ANSWER TO "FOURTH AMENDED COMPLAINT"**

TO THE HONORABLE COURT:

COME NOW co-defendants UBS Financial Services Incorporated of Puerto Rico ("UBS PR") and UBS Trust of Puerto Rico ("UBS Trust", and jointly with UBS PR, "Defendants or "UBS Defendants"), through their undersigned legal counsel, and answer the *Fourth Amended Complaint* as follows:[1]

### I.      NATURE OF THE CASE AND SUMMARY

1.1.      During the first half of 2008, the Puerto Rico Government Employees and Judiciary Retirement System Administration (hereinafter the "System") issued three (3) long- term pension obligation bonds (the "Bonds") for a total amount of approximately three billion dollars ($3 billion) and placed them in the Puerto Rican market through a group of underwriters managed by UBS Financial Services lncorporated of Puerto Rico ("UBS").

Answer to Paragraph No. 1.1: Denied, except that it is admitted that the Employee Retirement System of the Commonwealth of Puerto Rico ("System") issued three series of bonds in Puerto Rico during 2008 and that UBS PR served as one of the underwriters for the offered bonds. The underwriting group also included Samuel A. Ramírez & Co, Inc., Santander Securities,

---

[1] As a general rule, terms that are not defined and appear in capital letters are defined in the *Fourth Amended Complaint*. In addition, any heading in this brief is placed solely for the convenience of this Honorable Court. Therefore, the UBS Defendants categorically deny any allegation that may be contained in any heading or footnote to the *Fourth Amended Complaint*.

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

Popular Securities, BBVA APR MSD, Citi, Lehman Brothers, Merrill Lynch & Co., Oriental

Financial Services Corporation, Scotia Capital, TCM Capital, Wachovia Capital Markets, LLC,

and Eurobank MSD.

       1.2      The purpose of said transaction was for the System to obtain funds at low interest

rates, in order to re-invest them at higher return rates, and thus produce a recurring profit for the

System ("positive arbitrage") during the term of the Bonds. This was not achieved. The Bonds

were placed in the local market at such high interest rates that the System has lost, loses and will

continue to lose multimillion-dollar sums, because it has not been able to place the funds product

of the Bonds at sufficiently high return rates to produce revenues and amortize the cost of the

issuance and sale of the Bonds.

       Answer to Paragraph No. 1.2: Denied because, among other reasons, the "purpose of said

transaction" as alleged, is inconsistent with the purpose stated in the bonds' *Offering Statement*.

UBS Defendants respectfully refer this Honorable Court to the *Offering Statements* for the bonds

in question, where it can find a complete and accurate description of the purpose of the issuance

of such bonds. Moreover, UBS Defendants do not have sufficient knowledge or information to

form an opinion as to the veracity of the allegation that the System has not been able to place the

proceeds of the Bonds at sufficiently high return rates to produce a profit and amortize the cost of

issuing and selling the Bonds. The System - the plaintiff in this case - is the party in possession of

complete and accurate information relating, among other reasons, to the following: (1) the sale or

placement of funds raised through the issuance of bonds; (2) the reasons for the System's

investment decisions; and (3) any other potential investment that the System could make or could

have made.

       1.3.     Before the issuance and sale of the Bonds took place, in 2008, UBS, as lead

underwriter, represented to the System that UBS was an expert in financial advice and had the

capacity to place the Bonds, in order to convince the System to engage UBS to undertake the

issuance.

       Answer to Paragraph No. 1.3: Denied because, among other reasons, UBS PR, while

primary underwriter, had no contractual responsibility to the System regarding the System's

strategy on how to use the funds raised with the bond issuance. The System, on the other hand,

was advised by the Government Development Bank for Puerto Rico ("the GDB"), as required by

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing
document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my
knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

Act No. 272 of May 15, 1945 ("Act 272"), and by other advisors, including Mesirow Financial and Global Insight. It is only admitted that UBS PR was engaged to buy bonds and resell them in the local Puerto Rico market.

1.4     Among the representations made by UBS to convince the System that the issuance and sale of the Bonds would be beneficial and would help with the solvency of the System's coffers, was that the proceeds thereof would generate a positive arbitrage, which would result in profits for the System. Not only were those representations false, but they were made so that UBS could make a profit and collect fees and commissions, such as those it actually charged, which exceeded $35 million.

Answer to Paragraph No. 1.4: Denied because, among other reasons, none of UBS Defendants made any representation or assertion that the bonds issued would, by their own, lead to the solvency of the System. In addition, it is denied because, prior to engaging the services of UBS PR as an underwriter, the System had already developed its plan for issuing bonds with the advice of Merrill Lynch and the GDB. It is only admitted that UBS PR's agreement with the System conferred a discount to UBS PR for the purchase of the bonds issued by the System, since UBS PR would be serving as underwriter.

1.5     On April 4, 2013, Act No. 3 of 2013 was passed to comprehensively reform the Commonwealth of Puerto Rico Government Employee System (the "System"). The approval of this Act was an attempt to mitigate the serious financial crisis in which this System and the Commonwealth of Puerto Rico ("ELA") find themselves. The Legislative Assembly of Puerto Rico itself concluded that the issuance of the Bonds was one of the causes of this serious crisis and this was pointed out in the Statement of Motives of said Act. As a significant fact, the legislators expressed that the Bonds will cost the System around $6 billion in interest, plus the repayment of the principal.

Answer to Paragraph No. 1.5: Denied since the allegations do not provide a full and accurate description of the motives or content of Act No. 3 of April 4 2013 ("Act 3"). UBS Defendants further respectfully refer this Honorable Court to the full text of Act 3, as well as its legislative history, for a complete and accurate description of that statute and the public policy considerations that prompted its enactment.[2]

---

[2] This Honorable Court is also requested to take judicial knowledge of both Act 3 and its legislative history, as provided

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

1.6     In addition, as explained below, the issuance and sale of the Bonds were illicit as they violated the public policy established by the Legislative Assembly of Puerto Rico, which denied their approval when they were contemplated throughout the Government; and the Bonds were guaranteed by pledging or alienating employer contributions to the System, which is not permitted by the Retirement Act.

Answer to Paragraph No. 1.6: The allegations entail a legal conclusion, which does not require an answer from UBS Defendants. In the event that an answer is required, the allegations in question are denied. In addition, it is affirmed that the System was advised by its own legal counsel and informed UBS Defendants that the issuance of bonds complied with applicable law.

1.7     This Fourth Amended Complaint is filed for the benefit of the System and the individual Claimants identified below, to recover the serious damages suffered both by the System and by said individual Plaintiffs, caused by the grossly negligent conduct of UBS and UBS Consulting Services of Puerto Rico ("UBS Consulting").

Answer to Paragraph No. 1.7: Denied because, among other reasons, UBS Defendants did not engage in gross negligence or cause any harm to the System or to any of the individual plaintiffs. It is only admitted that plaintiffs allegedly filed the *Fourth Amended Complaint* with the intention of benefiting the System and the individual plaintiffs.

## II. THE PARTIES

**Plaintiffs**:

2.1.    The Retirement Systems is a trust created by Act Number 447 of May 15, 1951, as amended (the "Retirement Act"). The trustees of the System are the members of its Board of Trustees and the fideicommissaries/beneficiaries thereof are the active and retired employees of the Government of Puerto Rico and its political subdivisions and instrumentalities (hereinafter, collectively, the "Government"). As a result of the defendants' acts and omissions described in detail below, the system has suffered losses in excess of $800 million.

Answer to Paragraph No. 2.1: It is only admitted that the System is a trust and its trustees are the members of its Board and the fideicommissaries/beneficiaries are active and retired employees of the Government. The remainder of the allegation is denied because, among other

---

by Rule 202(A)(1), 32 L.P.R.A Ap. VI, R. 202(A)(1). The legislative history is available online: http://www.oslpr.org/legislatura/tl2013/tl_busca_avanzada.asp?res=P%20c0888(accessed today, April 2, 2019).

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

reasons, UBS Defendants have not engaged in any acts or omissions and have not caused any damage or loss to the System or to any of the individual plaintiffs.

2.2.    The Plaintiffs, Pedro José Nazario Serrano and Juanita Sosa Pérez, are of legal age, married to each other, he is retired from the Puerto Rico Treasury Department and she from the Municipality of Carolina, Puerto Rico, and appear in their respective personal capacities and as representatives of the conjugal partnership comprised by both. They are residents of Carolina, Puerto Rico and their mailing address and telephone number are as follows: P.O. Box 3603, Bayamón Gardens Station, Bayamón, Puerto Rico 00958, (787) 289-0233. The direct damage that the defendants' negligent conduct has caused these Plaintiffs is that they have lost their summer bonus and the right to be reimbursed for the cost of medications. This situation has also generated and will continue to cause intense anguish and suffering.

Answer to Paragraph No. 2.2: UBS Defendants UBS deny that they engaged in any type of negligent conduct related to the issuance of the System's bonds and also deny that they caused any damage to Mr. Pedro José Nazario Serrano and/or Ms. Juanita Sosa Pérez. UBS Defendants do not have sufficient knowledge or information to form an opinion as to the veracity of the allegations relating to the following information about these plaintiffs: age, marital status, profession, physical or postal address, telephone number, right to receive "summer bonus" or reimbursement of the cost of medication.

2.3.    Co-Plaintiff Joel Rivera Morales is of legal age, married, employed by the Puerto Rico Ports Authority and a resident of Carolina, Puerto Rico. His address is Villa Fontana Park 5DD24, Muñoz Rivera Street, Carolina, Puerto Rico 00982 and his phone number is (787) 390-5242. The direct damage that the negligent conduct of the defendants has caused Mr. Rivera Morales is that, instead of being able to retire at age 65 with 65% of his salary, he will now have to wait until age 67 and will receive only 34% of his salary, which will not be enough to cover his expenses. This situation has also generated and will continue to cause intense anguish and suffering.

Answer to Paragraph No. 2.3: UBS Defendants deny that they engaged in any type of negligent conduct related to the issuance of the System's bonds and also deny that they caused any damage to Mr. Joel Rivera Morales. UBS Defendants do not have sufficient knowledge or information to form an opinion as to the veracity of the allegations relating to the following

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

information about this plaintiff: age, marital status, profession, physical or postal address, telephone number, ability to qualify for retirement, percentage of the salary that he would receive if he chose to retire.

    2.4.    Co-Plaintiff María de Lourdes Gómez Pérez is of legal age, married, employed at the Department of Family Affairs, and a resident of Carolina, Puerto Rico. Her address is Calle 9 M-14, Urb. Mountain View, Carolina, Puerto Rico and her telephone number is (787) 390-5242. The direct damage that the defendants' negligent conduct has caused Ms. Gómez Pérez is that, after 28 years [working at] the Department of Family Affairs, instead of being able to retire within a year and a half, she will now have to work an additional 6 years and will receive only 38% of her salary, which will not be enough to defray her expenses. This situation has also generated and will continue to cause intense anguish and suffering.

    Answer to Paragraph No. 2.4: UBS Defendants deny that they engaged in any type of negligent conduct related to the issuance of the System's bonds and also deny that they caused any damage to Ms. María de Lourdes Gómez Pérez. UBS Defendants do not have sufficient knowledge or information to form an opinion as to the veracity of the allegations relating to the following information about this plaintiff: age, marital status, profession, physical or postal address, telephone number, ability to qualify for retirement, percentage of the salary that she would receive if she chose to retire.

    2.5.    Co-Plaintiff Héctor Cruz Villanueva is of legal age, married, a civilian employee in the Puerto Rico National Guard, and a resident of Vega Baja, Puerto Rico. His address is Chalets de la Playa, Apartment 487, Vega Baja, Puerto Rico 00693 and his phone number is (787) 647-4584. The direct damage that the defendants' negligent conduct has caused Mr. Cruz Villanueva is that, after 24 years as a civilian employee of the Puerto Rico National Guard, at the time of his retirement he will receive well under 75% of his salary, which will not be sufficient to defray his expenses. This situation has also generated and will continue to cause intense anguish and suffering.

    Answer to Paragraph No. 2.5: UBS Defendants deny that they engaged in any type of negligent conduct related to the issuance of the System's bonds and also deny that they caused any damage to Mr. Héctor Cruz Villanueva. UBS Defendants do not have sufficient knowledge or information to form an opinion as to the veracity of the allegations related to the following

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

information about this plaintiff: age, marital status, profession, physical or postal address, telephone number, percentage of the salary that he would receive if he chose to retire.

2.6. Co-Plaintiff Lourdes Rodríguez is of legal age, married, employed at the Municipal Revenue Collection Center (CRIM) and a resident of Guaynabo, Puerto Rico. Her address is Guácima 0-1, Urb. Santa Clara, Guaynabo, Puerto Rico 00969 and her telephone number is (787) 632-2697. The damage that the defendants' negligent conduct has caused Ms. Rodríguez is that, instead of being able to retire in two years when she turns 57 and receives 40% of her salary, she will not be able to retire until about 10 years from now, when she turns 65. Even so, she will only receive a much lower percentage of her salary, which will not be enough to cover her expenses. This situation has also generated and will continue to cause intense anguish and suffering.

Answer to Paragraph No. 2.6: UBS Defendants deny that they engaged in any type of negligent conduct related to the issuance of the System's bonds and also deny that they caused any damage to Ms. Lourdes Rodríguez. UBS Defendants do not have sufficient knowledge or information to form an opinion as to the veracity of the allegations relating to the following information about this plaintiff: age, marital status, profession, physical or postal address, telephone number, ability to qualify for retirement, percentage of the salary that she would receive if she chose to retire.

2.7. Co-Plaintiff Luis M. Jordán Rivera, is of legal age, married, employed at the Municipal Revenue Collection Center (CRIM) and a resident of San Juan, Puerto Rico. His address is Condominio Miramar Tower, Apartment 5-I, #721 Calle Hernández, San Juan, Puerto Rico 00907 and his phone number is (787) 632-7543. The damage that the negligent conduct of the defendants has caused Mr. Jordán Rivera is that, after working for 28 years at CRIM, at the Municipality of San Juan, at the Department of the Treasury and at the Institute of Culture, instead of being able to retire within a year receiving 75% of his salary, he is now only going to receive 46% of his salary, which will not be enough to cover his expenses. This situation has also generated and will continue to cause intense anguish and suffering.

Answer to Paragraph No. 2.7: UBS Defendants deny that they engaged in any type of negligent conduct related to the issuance of the System's bonds and also deny that they caused any damage to Mr. Luis M. Jordán. UBS Defendants do not have sufficient knowledge or information to form an opinion as to the veracity of the allegations relating to the following information about

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

this plaintiff: age, marital status, profession, physical or postal address, telephone number, ability to qualify for retirement, percentage of the salary that he would receive if he chose to retire.

**Defendants:**

2.8.    Defendant UBS Financial Services Incorporated of Puerto Rico ("UBS") is a corporation organized and existing under the laws of Puerto Rico, engaged in the business of investment banking, financial advice and securities brokerage. Its address and phone number are: Penthouse - American International Plaza, 250 Muñoz Rivera Avenue, Hato Rey, San Juan, Puerto Rico 00918, Phone: (787) 284-3445.

Answer to Paragraph No. 2.8; It is admitted that UBS PR is a corporation organized and existing under the laws of Puerto Rico and that it is engaged in the investment banking business, financial advice and securities brokerage. Moreover, it is admitted that UBS PR's address is Penthouse, 250 Muñoz Rivera Avenue, Hato Rey, San Juan, Puerto Rico 00918, and that its telephone number is: (787) 250-3600.

2.9.    Defendant UBS Consulting Services of Puerto Rico ("UBS Consulting") is a corporation or legal person whose place of formation or incorporation is unknown at this time. It is an affiliate or subsidiary of UBS Financial Services Incorporated of Puerto Rico or an entity related to it and, during the time period relevant to this Fourth Amended Complaint, provided financial advice services to the System. Its known address and phone number are: Penthouse-American International Plaza, 250 Muñoz Rivera Avenue, Hato Rey, San Juan, PR 00918, Telephone (787) 284-3435.

Answer to paragraph 2.9: Denied, because, among other reasons, UBS Consulting is not a corporation, but a subdivision of UBS Trust. It is admitted that the address of UBS Trust is Penthouse, 250 Muñoz Rivera Ave., San Juan, Puerto Rico 00918, and its telephone number is (787) 250-3600. It is also admitted that UBS Trust entered into agreements for consulting services with the System, under which UBS Consulting (a division of UBS Trust) would provide, among other things, services to assist in the development of an asset allocation study and in formulating an investment policy statement. UBS Defendants respectfully refer to this Honorable Court the agreement for consulting services entered into between UBS Trust and the System for a full and accurate description of the contractual relationship between said entities.

2.10.    The unknown Defendant ABC Insurance Company, Inc. is the insurance company,

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

if any, that issued the policy, if any, which, during the time relevant to this Fourth Amended

Complaint insured liability for damages caused by acts, omissions, or negligent and/or illicit

conduct on the part of UBS officials when the issuance and sale of the Bonds or part(s) thereof

was negotiated and/or completed. Its correct name, place of incorporation, telephone number and

fax number are not known at this time.

Answer to Paragraph No. 2.10: Since the allegations are not directed at UBS Defendants,

no responsive allegation is required.

2.11.    The unknown Defendant XYZ Insurance Company, Inc. is the insurance company,

if any, that issued the policy, if any, which during the time relevant to this Fourth Amended

Complaint insured liability for damages caused by acts, omissions, or negligent and illicit conduct

on the part of UBS Consulting. Its correct name, place of incorporation, telephone number and fax

number are not known at this time.

Answer to Paragraph No. 2.11: Since the allegations are not directed at UBS Defendants,

no responsive allegation is required.

## III. PLAINTIFFS' STANDING

3.1.    The System is a trust created by the Retirement Act. The Administrator administers

the System and is appointed by the Board of Trustees. The members of the Board of Trustees are

the trustees of the trust constituted by the System. The active and retired employees of the

Government are the fideicommissaries or beneficiaries of the trust constituted by the System. The

Plaintiffs herein are active or retired employees of the Government and, therefore,

beneficiaries/fideicommissaries of the trust constituted by the System.

Answer to Paragraph No. 3.1: Denied, except as follows: (1) that the System is a trust

created by the Retirement Act; (2) that the System Administrator is appointed by a Board of

Trustees; (3) that the members of the System's Board of Trustees are the trustees of the trust

constituted by the System; (4) that the beneficiaries of the System are active and retired employees

of the Government of Puerto Rico; and (5) that UBS Defendants do not have sufficient knowledge

or information to form an opinion as to the veracity of the allegations related to the status of the

plaintiffs as beneficiaries of the System.

3.2.    Moreover, Act No. 3 of April 4, 2013, in Section 40, also confers standing to the

Plaintiffs herein, by specifically providing:

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing
document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my
knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

"A Cause for action is hereby recognized to the participants and pensioners of the Employees Retirement System of the Government of Puerto Rico and the Judiciary to sue, on their own behalf, non-government investment advisors and underwriters in any transaction in which pension obligation bonds have been issued by the Employees Retirement System of the Government of Puerto Rico and the Judiciary, for damages caused <u>to the System or its beneficiaries</u>."(Emphasis added).

<u>Answer to Paragraph No. 3.2:</u> The allegations formulate a legal conclusion, thus, an answer by UBS Defendants is not required. In the event that an answer is required, the allegations are denied, as they do not contain a full description of Act No. 3. UBS Defendants respectfully refer this Honorable Court to the text of Act No. 3 for a full and accurate description of its contents, and reserve their right to make any legal arguments as to the interpretation, application and effect thereof.

## IV. FACTS

### The 2008 Issuance of Bonds

4.1       During 2007, the investment banking and securities brokerage firm Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") proposed to the then Administrator and the Board of Trustees of the System a long-term issuance of bonds on the principal amount of at least seven billion dollars ($7 billion), to be placed outside Puerto Rico, at interest rates that would allow the System (i) to use approximately seven hundred million dollars ($700,000,000) for current expenses and obligations of the System, injecting liquidity into it; and (ii) invest the remaining six billion three hundred million dollars ($6.3 billion) in securities or instruments that would generate earnings over interest or dividends in excess of the interest payable by the System on the bonds. This excess or positive differential ("positive arbitrage") would produce profits for the System, which would allow it to mitigate its chronic lack of liquidity.

<u>Answer to paragraph 4.1:</u> Denied as drafted, but it is admitted that in 2007, Merrill Lynch, the System and the GDB developed a plan for a bond issuance, the cost of which amounted to approximately seven (7) billion dollars. UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the System's intentions in formulating its investment plan, or how the System planned to use the  funds  it would acquire through the proposed issuance of bonds, which amounted to approximately seven (7) billion dollars. Complete and accurate information on the plan that the System developed with Merrill Lynch and the GDB is in possession of the System.

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

4.2.    The high total aggregate principal amount of the proposed System bonds was crucial, because the projected profits would be minimal or even insignificant in reduced volumes of principal and could be insufficient to cover the costs inherent to the issuance, distribution and sale of the proposed bonds.

Answer to Paragraph No. 4.2: Denied, because, among other reasons, the issuance of bonds amounting to approximately seven (7) billion dollars was not "crucial ... to cover the costs inherent in the issuance, distribution and sale of the proposed bonds". The three (3) billion dollars in bonds for which UBS PR served as the lead underwriter were sufficient to cover the initial discount, the underwriters' discount and the costs of the bonds issuance.

4.3.    After a few months, Merrill Lynch was unable to complete the transaction, since they did not identify a reasonable demand in the market outside Puerto Rico to place the proposed System bonds, at sufficiently low interest rates to produce the positive arbitrage that the System needed.

Answer to Paragraph No. 4.3: UBS Defendants do not have sufficient knowledge or information to form an opinion as to the veracity of the allegations relating to the reasons why the System and Merrill Lynch did not complete the seven (7) billion-dollar issuance outside of Puerto Rico. Full and accurate information about those reasons is in the possession of the System. It is only admitted that the System and Merrill Lynch did not complete the seven (7) billion issuance of bonds.

4.4.    During the period in which the System was negotiating with Merrill Lynch the aforementioned possible issuance of bonds of at least seven billion dollars ($7 billion), the defendant UBS Consulting, directly or through its affiliate(s), under a contract, acted as investment advisor to the Administration and/or the Board of Trustees of the System and falsely represented to said Administration and said Board that it could invest the proceeds from the sale of the Bonds at return rates much higher than the interest that the System would pay for the Bonds.

Answer to paragraph 4.4: Denied because, among other reasons, UBS Consulting is not a legal entity with the legal capacity to enter into a contract. It is only admitted that UBS Trust Company of Puerto Rico ("UBS Trust") had an Agreement for Consulting Services with the System during 2007, pursuant to which the UBS Consulting Services of Puerto Rico division would provide, among other, assistance in the development of an *asset allocation study* and an

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page 11 of 72

*investment policy statement*. Moreover, UBS Trust expressly stated that it did not and could not make any promises, nor did it give, or could it give any guarantees, nor did it formulate or could it formulate any representations or assertions regarding the returns on the System's assets. UBS Defendants respectfully refer this Honorable Court to the *Agreement for Consulting Services* entered into between the System and UBS Trust for a complete and accurate description of the contractual relationship between them.

4.5.     Upon realizing that Merrill Lynch could not place the seven billion dollars ($7 billion) of the proposed bonds outside of Puerto Rico, UBS proposed to the System that it contract UBS itself as an underwriter to issue and sell the proposed bonds. On February 14, 2007, UBS and UBS Consulting, in their attempt to convince the System to hire them as advisors and carry out the aforementioned issuance, made a Power Point presentation to the System's Board of Trustees (see **ANNEX 1**). In that presentation UBS and UBS Consulting represented to the members of the System's Board of Trustees that UBS[,] their firm[,] was among the top ten (10) investment banks globally (**ANNEX 1**, page 3). UBS offered the Retirement System an impressive combination of expertise and global strength, as well as a partnership that guaranteed superlative execution, novel solutions and maximum knowledge in terms of investment advice. (**ANNEX 1**, pages 5, 7 and 10). UBS also made a commitment to acknowledge and accept fiduciary liability and that this is what could be expected from its "Consultant". (**ANNEX 1**, page 26). Regarding the particular problems and challenges of the Puerto Rico Pension System, UBS stressed that it had extensive experience in reconciling market conditions and expectations of results. (**ANNEX 1**, pages 29, 40, 47 and 48).

Answer to Paragraph No. 4.5: Denied, among other reasons, because: (1) the System developed its plan for the issuance of bonds before hiring UBS PR as underwriter; (2) UBS PR did not guarantee that it could successfully resell in the local Puerto Rico market bonds amounting to seven (7) billion dollars, and (3) UBS PR was not contractually required to advise the System on the success of its investment plans related to the funds acquired through the issuance of bonds. Moreover, UBS Trust expressly stated that it did not and could not make any promises, nor did it give, or could it give any guarantees, nor did it formulate or could it formulate any representations or assertions regarding the returns on the System's assets. It is only admitted that UBS PR agreed to act as underwriter for an issuance of System bonds and to sell such bonds in the local Puerto Rico market. In addition, UBS Defendants respectfully refer this Honorable Court to the UBS

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

Presentation for a complete and accurate description of its contents.

4.6.    UBS also represented that it could successfully achieve the placement of the proposed bonds due to its important presence in Puerto Rico and the high volume of the local investment portfolio under its responsibility, as well as invest the proceeds of such sale at a return rate that would produce profits for the System.

Answer to Paragraph No. 4.6: Denied, among other reasons, because: (1) the System developed its plan to issue bonds before hiring UBS PR as an underwriter; (2) UBS PR did not guarantee that it could successfully resell in the local Puerto Rico market an amount of bonds amounting to seven (7) billion dollars, and (3) UBS PR was not contractually required to advise the System on the success of its investment plans related to the funds acquired through the issuance of bonds. Moreover, UBS Trust expressly stated that it did not and could not make any promises, nor did it give or could it give any guarantees, nor did it formulate or could it formulate any representations or assertions regarding the returns on the System's assets. It is only admitted that UBS PR agreed to act as lead underwriter for an issuance of System bonds and to sell such bonds in the local Puerto Rico market.

4.7.    Eventually, the Retirement [System's] Board of Directors hired UBS as the firm in charge of the underwriting of the Retirement System Bonds in the amount of approximately three billion dollars. These were issued on January 29, 2008 (Series A); May 28, 2008 (Series B); and June 26, 2008 (Series C) (collectively, the "Retirement Bonds").

Answer to paragraph 4.7: It is admitted that, in 2008, UBS PR acted as lead underwriter for three issuances of System bonds. It is admitted that on January 29, 2008, the bonds denominated as "Series A" were issued for a total of $1,588,810,799.60. It is admitted that on May 28, 2008, bonds denominated as "Series B" were issued for a total of $1,058,634,613.05. It is admitted that on June 26, 2008, bonds denominated as "Series C" were issued for a total of $300,202,930.00.

4.8.    Among the representations made by UBS and UBS Consulting to the members of the System's Board of Trustees to convince the System that the issuance would be beneficial and would help with the solvency of the System's coffers, was that the proceeds of the issuance would generate a positive arbitrage, which would result in net revenues for the System and that, if part of the issuance was made in the local market, it would be more economical and produce a higher

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

return rate. Not only were those representations false, but they were made so that UBS and the other firms that participated in the issuance could make a profit and earn commissions and fees, such as those which they actually earned, which exceeded $35 million.

Answer to paragraph 4.8: Denied, because, among other reasons, the System developed its plan to issue bonds before contracting the services of UBS PR as underwriter.  It is also denied because none of UBS Defendants guaranteed that the issuance of bonds would lead to the solvency of the System. Moreover, the System recognized in the *Offering Statement* made for the bonds issuance that the System "[may be] unable to invest the proceeds of the Bonds at return rates that equal or exceed the interest rate on the Bonds". It is only admitted that the agreement between UBS PR and the System gave a discount to UBS PR when buying the bonds issued by the System.

4.9.    UBS, through its then chief executive officer, Miguel A. Ferrer, represented to not only the System, but the country in general, through press releases, that the issuance and sale of the Bonds, as recommended by UBS Consulting and UBS, would result in a positive arbitrage for the System from the moment such transactions became effective.

Answer to Paragraph No. 4.9: Denied, because, among other reasons, none of UBS Defendants recommended that the issuance of bonds and their subsequent resale would result in a positive arbitrage for the System. The System developed its plan for the issuance of bonds advised by Merrill Lynch, the GDB, Mesirow Financial and Global Insight. In addition, in the *Official Statement* for bonds, the System recognized the possibility that the issuance of bonds might not result in positive arbitrage by stating: "unable to invest the proceeds of the Bonds at return rates that equal or exceed the interest rate on the Bonds".

4.10.   UBS's proposal was accepted by the System on the basis of representations made by UBS and UBS Consulting. Both UBS and UBS Consulting knew or should have known that the following points were crucial for the financial operation to be successful and to meet the objectives of the System:

Answer to Paragraph No. 4.10: Denied, because, among other reasons, the System developed its plan for the issuance of bonds with the advice of Merrill Lynch and the GDB, not UBS Defendants. UBS Defendants do not have sufficient knowledge or information to form an opinion as to the veracity of the allegations relating to the knowledge that the System had or should have had.

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

4.10.1. That the Bond issuance amount would be sufficiently high (at least $7 billion) to (i) cover the costs of its origination, issuance, distribution and sale; and (ii) produce revenues for the System through the investment by the System of most of the net proceeds from the sale of the Bonds at return rates that would exceed the cost of the Bonds to the System.

Answer to Paragraph No. 4.10.1: Denied, because, among other reasons, the System developed its plan for the issuance of bonds with the advice of Merrill Lynch and the GDB, not UBS Defendants. In addition, it is affirmatively asserted that the issuance of bonds of seven (7) billion dollars was not "crucial" for the System to "cover the costs of [] origination, issuance, distribution and sale... ". The approximately three (3) billion dollars in bonds for which UBS PR served as underwriter were sufficient to cover the initial discount, the discount for underwriters and the costs of issuing the bonds. In the *Official Statements*, the System recognized the possibility that the issuance of bonds in question would not produce profits by declaring that the System "[may be] unable to invest the proceeds of the Bonds at return rates that equal or exceed the interest rate on the Bonds". UBS Defendants neither have knowledge nor sufficient information to form an opinion as to the veracity of the allegations related to the knowledge that the System had or should have had.

4.10.2. That the Bonds' interest rate would be low enough to allow the System to achieve a positive arbitrage by investing the proceeds of their sale.

Answer to Paragraph No. 4.10.2: Denied, because, among other reasons, the System developed its plan for the issuance of bonds with the advice of Merrill Lynch and the GDB, not UBS Defendants. In addition, in the *Official Statements,* the System recognized the possibility that the issuances of bonds in question would not produce a profit, by declaring that the System "[may be] unable to invest the proceeds of the Bonds at return rates that equal or exceed the interest rate on the Bonds. UBS Defendants do not have sufficient knowledge or information to form an opinion as to the veracity of the allegations relating to the knowledge that the System had or should have had.

4.10.3. That the securities in which the System invested the proceeds of the sale of the Bonds were extremely stable and with a minimum credit and/or market risk, since the System could not afford the possibility of losing all or part of its principal or of incurring a loss in interest and/or dividends ("negative arbitrage").

I, Gladys Rodriguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

Answer to Paragraph No. 4.10.3: Denied, because, among other reasons, the System developed its plan for the issuance of bonds with the advice of Merrill Lynch and the GDB, not UBS Defendants. Moreover, decisions on how the System would invest the funds acquired through the sale of the bonds were matters subject only to the discretion of the System, not UBS Defendants. UBS PR was not contractually required to advise the System on the investment of the funds obtained through the sale of the bonds. UBS Trust, on the other hand, expressly informed that it did not and could not make any promises, nor did it give, or could it give any guarantee, nor did it formulate or could it formulate any representation or statement regarding the returns on the System's assets. UBS Defendants do not have sufficient knowledge or information to form an opinion as to the veracity of the allegations relating to the knowledge that the System had or should have had.

4.10.4. That the proportion of the proceeds of the Bonds' sale that would be used by the System to solve its immediate needs be the least possible (no more than approximately ten percent (10%) of the proceeds of the sale), since the great majority of said proceeds would have to be placed by the System in investments to achieve the positive arbitrage needed by the System and which was the main rationale of the proposed issuance and sale of the Bonds.

Answer to Paragraph No. 4.10.4: Denied, because, among other reasons, the System developed its plan for the issuance of bonds with the advice of Merrill Lynch and the GDB, not UBS Defendants. In addition, the decision regarding how to distribute the proceeds of the issuance of bonds was solely at the discretion of the System, not UBS Defendants. UBS Defendants do not have sufficient knowledge or information to form an opinion as to the veracity of the allegations about what the System knew or should have known. UBS Defendants respectfully refer this Honorable Court to the *Official Statements* on the issuance of bonds in order to obtain a complete and accurate description of the System's reasons for the issuance of the bonds.

4.11.   Having knowledge of the foregoing, the System and UBS awarded contracts for the issuance and sale of the Bonds, but not for the full amount originally contemplated of at least seven billion dollars ($7 billion), rather for amounts that were inferior and not sufficient to achieve the aforementioned objectives of the System and without any provision that would require (i) the sale of the total amount necessary for the original plan conceived by Merrill Lynch and well known by UBS and UBS Consulting, to work; or (ii), in absence thereof, the cancellation of the partial issue

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page 16 of 72

and sale of Bonds if the total amount necessary for the plan to function was not accomplished. In other words, there was no "all or nothing provision", which was prudent and necessary to protect the System and its pensioners from the possible negative consequences of not achieving the issuance on the total amount contemplated.

Answer to Paragraph No. 4.11: Denied, because, among other reasons, the decision on the total number of bonds the System would issue was within the discretionary prerogatives of the System and the GDB alone, not of UBS Defendants. In addition, in the *Official Statements*, the System recognized the possibility that the issuance of bonds in question would not produce a profit by stating that the System "[may be] unable to invest the proceeds of the Bonds at return rates that equal or exceed the interest rate on the Bonds". It is only admitted that UBS PR and other underwriters entered into contracts with the System for the sale of bonds in the local Puerto Rico market and that the total number of bonds issued were less than seven (7) billion dollars.

4.12.    Neither did UBS investigate whether the local market had sufficient depth to absorb seven billion dollars ($7 billion) in System bonds, on dates when (i) the local economy had already been contracting for months (ii) local investors were suffering substantial losses in their real estate investments and securities, including, without limitation, bank shares and/or debt instruments guaranteed by banks or other financial institutions; (iii) Puerto Rico's population was aging and declining; and (iv) unemployment in Puerto Rico was increasing.

Answer to Paragraph No. 4.12: It is denied that UBS Defendants had the responsibility to investigate whether the local market had the capacity to absorb an issuance of bonds amounting to seven (7) billion dollars. In addition, UBS PR and the other underwriters were successful in selling all the bonds for which they consented to serve as underwriters.

4.13.    Pursuant to said UBS contract with the System, during the first half of 2008, UBS acted as lead underwriter in the following three issuances, distributions and sales in the local market of System bonds (hereinafter "Bonds"), for the aggregate principal amount of approximately three billion dollars ($3 billion), that is, less than half of the seven billion dollars ($7 billion) originally contemplated:

Answer to Paragraph No. 4.13: It is acknowledged that, in 2008, UBS PR acted as lead underwriter for three System issuances of bonds. In addition, it is only admitted that UBS PR sold those bonds in the local Puerto Rico market and that the principal aggregate of those bonds was

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page 17 of 72

CERTIFIED TRANSLATION:

less than seven (7) billion dollars.

4.13.1. "Senior Pension Funding Bonds, Series A", for one thousand five hundred and fifty-eight million eight hundred and ten thousand seven hundred and ninety-five dollars and sixty cents ($1,558,810,795.60), as of January 29, 2008.

Answer to Paragraph No. 4.13.1: It is admitted that on January 29, 2008, bonds denominated as "Series A" totaling $1,588,810,799.60 were issued.

4.13.2. "Senior Pension Funding Bonds, Series B", for one thousand fifty- eight million six hundred thirty-four thousand six hundred thirteen dollars and five cents ($1,058,634,613.05), dated May 28, 2008.

Answer to Paragraph No. 4.13.2: It is admitted that on May 28, 2008, bonds denominated as "Series B" totaling $1,058,634,613.05 were issued.

4.13.3. "Senior Pension Funding Bonds, Series C", for three hundred million two hundred two thousand nine hundred and thirty dollars ($300,202,930), as of June 26, 2008.

Answer to Paragraph No. 4.13.3: It is admitted that on June 26, 2008, bonds denominated as "Series C" were issued for a total of $300,202,930.00.

4.14.    The maturity of the Bonds fluctuates between July 1, 2023 and July 1, 2058, and their interest rates fluctuate between 5.85% and 6.55% per annum. Such interest is exempt from income tax for residents of Puerto Rico.

Answer to paragraph 4.14: Admitted.

4.15.    Each of the "Official Statements' of the Bonds states that if future market conditions were favorable, the System would consider issuing additional bonds during 2008. Obviously, as it was logical and prudent to presume, such favorable market conditions did not occur and the System has not been able to issue bonds after the issuance of the referred Series C Bonds, on June 26, 2008. The Official Statement of the Series A Bonds represented that the Series B Bonds would not be sold in Puerto Rico under any circumstances. However, both Series B Bonds and Series C Bonds were sold exclusively in Puerto Rico. [Footnote omitted].

Answer to paragraph 4.15: Denied because, among other reasons, the allegations do not provide a full and accurate description of the content of the bonds' *Official Statement*. UBS Defendants respectfully refer this Honorable Court to the *Official Statement* of the bonds for a complete and accurate description of their contents. It is only admitted that the System has not

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

issued any bonds since June 26, 2008 and that the bonds denominated as "Series B" and "Series C" were sold in Puerto Rico.

4.16.    The use of the proceeds from the sale of the Bonds, according to tables appearing in the "Official Statement" of each issue, in the section entitled "Use of Proceeds"), was represented as follows:

| Use | Amount |
|---|---|
| Initial discount | $    7,889,350 |
| Transfer to the System to settle retirement benefits | 2,728,354,898 |
| Underwriters discount and issuance costs | 35,744,191 |
| Capital interest account deposits | 93,737,392 |
| Senior bond debt service account deposits | 81,922,512 |
| **Total** | **$2,947,648,343** |

Answer to Paragraph No. 4.16: Denied because, among other reasons, the allegations do not provide a full and accurate description of the content of the bonds' *Official Statement*. UBS Defendants respectfully refer this Honorable Court to the *Official Statement* of the Bonds for a complete and accurate description of their contents. It is only admitted that each *Official Statement* for the three series of bonds issued contained a table entitled *"Use of Proceeds"*.

4.17.    As can be seen, the proposed use of the Bonds' sale proceeds, as represented in said tables, which appear on page 17 of each of the "Official Statements" and are summarized in 4.16, *supra*, was different to the one it had been contemplated when it intended to make the bond issuance for seven-billion-dollar ($7 billion) through Merrill Lynch, and it was not in line with the original model proposed by Merrill  Lynch and subsequently by UBS, to create  a recurring profit for the System through positive differentials between dividend and interest earnings, on the one hand and interest cost, on the other hand ("positive arbitrage"). It should be noted that said "Offering Statements" present contradictory information about the use of the funds resulting from the sale of the Bonds, since in their introductory pages and in page 17 of each of them it is stated that the System would invest the proceeds from the sale of the Bonds and would use those investments and the revenues thereby produced to pay for pension benefits to its beneficiaries which is not in line with what is summarized in 4.16, supra.

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

Answer to Paragraph No. 4.17: Denied because, among other reasons, the tables appearing on page 17 of each *Official Statement* of the bonds did not contain contradictory information in connection with any other information relating to the use of the funds to be obtained through the issuance of bonds, as it appeared in the *Official Statement*. In addition, the allegations do not provide a complete and accurate description of the content of the bonds' *Official Statement*. UBS Defendants respectfully refer this Honorable Court to the *Official Statement* of the Bonds for a complete and accurate description of their contents.

4.18.   In fact, as explained below, the proceeds from the sale of the Bonds were not used as depicted in the Offering Statements or as proposed to the System's Board of Trustees, and the Bonds have caused, cause and will continue to cause significant losses and serious financial damage to the System. In reality, the proceeds are used approximately as follows and the exact figures of their use will emerge from the discovery of evidence in this case:

Answer to Paragraph No. 4.18: Denied because, among other reasons, the decision on how funds acquired through the issuance of bonds would be used was a discretionary prerogative of the System alone, not of UBS Defendants. In addition, UBS Defendants do not have sufficient knowledge or information to form an opinion as to the veracity of the allegations regarding how the System disposed of the funds it obtained through the issuance of bonds. The complete and accurate information on the use of these funds by the System and the reasons for any investment with them is held by the System, not by UBS Defendants.

4.18.1. Of the sum of approximately $1.6 billion coming from the issuance and sale of the Series A Bonds, approximately $937 million in bonds and shares were invested through Citibank, N.A. and/or its affiliate(s) (hereinafter and collectively, "Citi"). The $937 million invested through Citi are producing an annual return rate of approximately 4.11%, significantly lower than the interest that the Bonds pay, which fluctuate between 5.85% and 6.55% per annum. The remaining balance of the proceeds from the issued Series A Bonds, amounting to approximately $642 million, was used for the payment of costs and deductions related to the issuance and sale of the Bonds, reserve for debt service and payment of System expenses and pensions and therefore does not generate any revenue for the System.

Answer to Paragraph No.  4.18.1: Denied, because, among other reasons, the interest on Series A bonds did not fluctuate between 5.85% and 6.55% *per annum.* UBS Defendants do not

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

have sufficient knowledge or information to form an opinion as to the veracity of the allegations relating to how the funds from the issuance of bonds were used or to the historical or current performance of the System's investments. The complete and accurate information on how the System disposed of the funds from the issuance of bonds and on the historical and current performance of the System's investments is held by the System, not by UBS Defendants. UBS Defendants admit that the "Series A" bonds were issued for a total of $1,588,810,799.60, which is equivalent to approximately $1.6 billion. It is also admitted that part of this amount was used to pay for costs and discounts related to the issuance and sale of the bonds, and to cover expenses of the System and for the payment of pensions. It is also admitted that the System reported having invested nine hundred and thirty-seven (937) million dollars of the net revenues obtained from the issuance of the "Series A" bonds.

4.18.2. Of the aggregate amount of approximately $1.4 billion resulting from the issuance and sale of the Series B and Series C Bonds, approximately 564 million were used to cover the system's cash needs and pension obligations, which generates no income for the system. The remaining $836 million were deposited in the Government Development Bank for Puerto Rico ("the GDB"), earning interest only at 2% per annum (despite the fact that the interest rate payable on the Bonds fluctuates between 5.85% and 6.55% per annum), but as of June 30, 2010 only $737 million remained, as approximately $99 million had been used to cover the System's funding needs.

Answer to paragraph No. 4.18.2: Denied, because, among other reasons, interest on Series B and Series C bonds did not fluctuate between 5.85% and 6.55% *per annum*. UBS Defendants do not have sufficient knowledge or information to form an opinion as to the veracity of the allegations relating to how the funds from the issuance of bonds were used or to the historical or current performance of the System's investments. The complete and accurate information on how the System disposed of the funds from the issuance of bonds and on the historical and current performance of the System's investments is held by the System, not by UBS Defendants. UBS Defendants admit that the "Series B" and "Series C" bonds were issued for a total of $1,058,634,613.05 and $300,202,930.00 respectively. It is also admitted that the System reported having deposited a portion of the funds obtained through the issuance of the "Series B" and "Series C" bonds in the GDB.

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

4.19.   This means that, of the approximately $3 billion in the Bonds' principal, for which the System pays and will pay interest, until maturity, at between 5.85% and 6.55% per annum, as of June 30, 2010 the only unspent investment was $1.674 billion, of which the approximate $937 million invested through Citi returned approximately 4.11% per annum to the System, while the $737 million invested in deposits in the GDB returned only 2% annually to the System.

Answer to Paragraph No. 4.19: Denied because, among other reasons, UBS Defendants do not have sufficient knowledge or information to form an opinion as to the veracity of the allegations relating to how the funds from the issuance of bonds were used or to the historical or current performance of the System's investments. The complete and accurate information on how the System disposed of the funds from the issuance of bonds and on the historical and current performance of the System's investments is held by the System, not by UBS Defendants. UBS Defendants admit that the System reported having invested nine hundred and thirty-seven (937) million dollars of the net proceeds from the issuance of the "Series A" bonds and having deposited a portion of the proceeds from the issuance of the "Series B" and "Series C" bonds into the GDB.

4.20.   The approximately $1.326 billion received by the System and spent and not invested returns absolutely nothing and costs the System between 5.85% and 6.55% per annum. Excluding the cost of those approximately $1.326 billion received and spent (not invested) by the System, it is estimated that the approximately $1.674 billion received and invested by the System have cost, costs and will cost the System approximately $55 million annually in negative arbitrage. This does not include the nearly $36 million on discount, issuance and sale costs of the Bonds incurred and paid by the System when they were issued and sold, nor the financial advisory fees paid by the System to UBS, nor the fees that the System has paid and continues to pay to UBS Consulting.

Answer to Paragraph No. 4.20: Denied, because, among other reasons, the System does not currently pay any commission to UBS Consulting. UBS Defendants do not have sufficient knowledge or information to form an opinion as to the veracity of the allegations relating to how the funds from the issuance of bonds were used or to the historical or current performance of the System's investments. Complete and accurate information on how the System disposed of the funds from the issuance of bonds and on the historical and current performance of the System's investments is held by the System, not by UBS Defendants. In addition, it is affirmatively alleged

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

that it was the System that made the decisions on how to invest the funds from the issuance of bonds, not UBS Defendants.

4.21.   Said losses began when the Series A Bonds were issued and sold on January 29, 2008, and will end when the Bonds mature between the years 2023 and 2058. The exact amount of losses to the System caused by the issuance and sale of the Bonds will be calculated more accurately as the documents to be requested in the discovery of evidence in this case are obtained, but it is preliminarily estimated that the present value of these losses is approximately eight hundred million dollars ($800 million). Incredibly, when the Series B and Series C Bonds were issued, the Series A Bonds had already generated millionaire losses to the System, which was not taken into consideration when the Series B and Series C Bonds were issued.

Answer to Paragraph No. 4.21: Denied because, among other reasons, the System and the GDB made the decisions related to the issuance of the "Series B" and "Series C" bonds. UBS Defendants were not responsible for and did not recommend the System said issuance of bonds. In addition, UBS Defendants were not responsible for any alleged loss by the System as a result of the decision to go ahead with the issuance of the bonds. To the extent that the System has suffered any loss, it must be able to accurately calculate any alleged loss without the need to carry out any type of discovery of evidence, since all relevant information is in the possession of the System, which appears as plaintiff in the captioned case. In addition, UBS Defendants have no knowledge of what information the System and the GDB took into consideration when they decided to issue the "Series B" and "Series C" bonds, so they cannot assert what information the System and the GDB did not take into consideration. UBS Defendants only admit that the bonds issued will mature between 2023 and 2058.

4.22.   As can be seen, the Bonds have actually created a negative arbitrage for the System, which is exactly the opposite of the positive arbitrage which was the main objective pursued by the System upon issuing the Bonds. This has negatively affected the liquidity of the System, significantly weakened its financial condition, caused the credit downgrade of the Government obligations in general and caused serious damage to the Plaintiffs herein (Act No. 3 of April 4, 2013, *supra*).

Answer to Paragraph No. 4.22: The allegations are denied to the extent that they could be interpreted to suggest that UBS Defendants caused any damage to the System or to individual

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page **23** of **72**

plaintiffs. In addition, UBS Defendants do not have sufficient knowledge or information to form an opinion as to the veracity of the allegations, because accurate information on the current performance of the System's investments made with funds from the issuance of bonds and on the impact of the bonds on the liquidity of the System and the financial situation of the System is in the possession of the System, not of UBS Defendants.

4.23.   The contributions to the System by the Government, as employer, are the only source of payment and collateral of the Bonds and, following UBS recommendations, the System alienated or pledged them in favor of the bondholders, as a guarantee and source of payment of the Bonds. Through the Bonds issuance and said alienation or pledge, the debt evidenced by the Bonds increased, de facto, the System's total debt and has negatively affected the rating of the Government's obligations, causing serious damage not only to the System but also to Puerto Rico in general. Said alienation or pledge of the System's employer contributions violates the provisions of Sections 2-116 and 3-105 of the Retirement Act, which restrictively provide for the permitted use of such contributions, none of which is the payment of System bonds or debts. [Footnote omitted] The right to collect said contributions is clearly an asset of the System and, if the System does not now receive them because they are used for the Bonds' debt service, the assets of the System and its capacity to pay benefits to its pensioners and future pensioners are thus diminished, as has unfortunately occurred.

Answer to Paragraph No. 4.23: Denied, because, among other reasons, the System took the decision to pledge employee contributions as security for bonuses with the advice of Merrill Lynch and the GDB, not UBS Defendants. The allegation that the pledge of employee contributions violates the Employee Retirement Act is a legal conclusion that warrants no answer from UBS Defendants. Insofar as an answer is required, it is denied. UBS Defendants further respectfully refer this Honorable Court to Sections 2-116 and 3-105 of the Retirement Act, 3 L.P.R.A. §§ 781 and 786-5, for a complete and accurate description of its contents.

4.24.   Furthermore, the downgrade of the Government's credit will significantly increase the interest costs to the System, since the Government's contributions are the main source for the payment of the System's obligations and the interest cost to the System depends on the interest cost to the Government, since, we repeat, the payment of the System's debts depends largely on the payments received by the System from the Government.

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

Answer to Paragraph No. 4.24: UBS Defendants deny the allegations to the extent that they relate to UBS Defendants.

4.25.   At the end of 2006 and during 2007, when negotiations were taking place for the possible Bonds issuance, the proposal was that the bonds be issued as direct Government bonds, so that the Government could provide the System with the funds resulting from the bonds' sale and thus improve the System's net worth and financial condition, as well as the so-called "funding ratio." The intention was to increase the assets of the System by the net proceeds of the sale of the Bonds and to increase the net worth of the System, as the Bonds would not be debts or liabilities of the System, but of the Government. This would considerably improve the System's "funded or funding ratio." Unfortunately, however, that did not happen.

Answer to Paragraph No. 4.25: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the purported proposal to issue bonds as direct government bonds, and on that basis it is denied. Complete and accurate information on any proposal relating to the issuance of bonds "as direct government bonds" and on the intent or purpose of such proposal is in the possession of the System, not of UBS Defendants.

4.26.   In order for the Bonds to be issued by the Government, the approval of the Legislative Assembly was required. This approval was requested from the Legislative Assembly and denied by it. Despite this denial by the Legislative Assembly and the public policy that such denial established, the System (whose existence and powers emanate from the Retirement Act, that is, from legislation approved by the Legislative Assembly) violated said public policy and, relying on the representations and advice and recommendations of UBS and UBS Consulting, ignored the Legislative Assembly's refusal and recklessly proceeded with the issuance and sale of the Bonds as direct obligations and liabilities of the System (still compromising the Government's credit, by means of the aforementioned alienation or pledge to bondholders of the Government's employer contributions to the System, in violation of the provisions of the Retirement Act). With these violations, the "funded or funding ratio" of the System was negatively affected, as its liabilities increased more than its assets, with a consequent reduction in their net worth.

Answer to Paragraph No. 4.26: Denied because, among other reasons, UBS Defendants did not make any representation to the System on the legality of the issuance of bonds or on the

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

compliance of the issuance of bonds with government public policy. In addition, the System represented to UBS Defendants that it was legally authorized to issue the bonds and that the decision to issue the bonds as System bonds, with contributions from public employees as a source of repayment, was made by the System and the GDB, in accordance with the plan developed by those entities and Merrill Lynch. It is only admitted that the System requested authorization from the Legislative Assembly of the Commonwealth of Puerto Rico ("Legislative Assembly") in 2005 and that it did not act on that request.

4.27.   The System is precluded from mitigating those future recurring losses caused by the Bonds, because the interest rates paid for them do not allow or will not allow in the foreseeable future the attainment of a positive arbitrage or net gain on the investment of the funds it still preserves, if any, from the proceeds of the sale of the Bonds. The additional cost to the System of future financings, caused by the credit downgrade of the Government obligations, caused, in turn, by the issue and sale of the Bonds, must be added to the amount of the mentioned damages.

Answer to Paragraph No. 4.27: Denied, because, among other reasons, the System is not precluded from mitigating any future loss of a recurring nature, as alleged. In addition, UBS Defendants have no knowledge or information about the amount of funds currently in possession of the System from bond issuances, so UBS Defendants cannot form an opinion as to the veracity of the allegation that the System cannot "attain a positive arbitrage or net gain on the investment of the funds ...." UBS Defendants deny that they were responsible for causing the credit downgrade of the Government's general obligations or for causing any other damage to the System or the individual plaintiffs.

**The Minutes of the Boards of Directors**

4.28.   According to page 6 of the Minutes of the System's Board of Trustees corresponding to the Extraordinary Meeting of February 27, 2007, officials of the Government Development Bank for Puerto Rico ("the GDB") represented the following to the System's Board of Trustees' members, regarding the Retirement Bonds:

> "...this solution would extend the life of the System's resources until 2027 and would notably improve the 19% funding ratio which is currently up to 72%. If the increase to 12.5% in contributions proposed in the bill were also approved, using this scheme, the System's obligation could be covered up to 2042" (Emphasis added)."

Answer to Paragraph No. 4.28: UBS Defendants do not have sufficient knowledge or

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

information to form a belief as to the veracity of the allegations relating to the content of the Minutes or the representations that the GDB officials may have made to the members of the System's Board of Trustees about the alleged proposal to issue the bonds or about the likely impact of such issuance on the System's resources, and on those grounds deny them. Complete and accurate information on any proposals related to the issuance of bonds, the resources of the System, the funding ratio, and the obligations of the System is held by the System, not by UBS Defendants. In addition, UBS Defendants were not contractually required to advise the System on matters relating to its bond issuance strategy or the risks that such issuance might entail. The System was advised by the GDB, as required by Act 272, and by other advisors, including Mesirow Financial and Global Insight.

4.29.   At that same meeting, the then Retirement System Administrator represented to the System's Board of Trustees the following, at page 7 of the minutes of said meeting:

> "the financial consultants are already working on the different 'investment distribution scenarios that will be presented for consideration by the Board in the near future. Mr. Cancel Alegria added that the purpose of the conversations on this transaction is that the execution thereof can take place by June 2007, that is, <u>before the closing of the current fiscal year</u>."(Emphasis added).

<u>Answer to Paragraph No. 4.29</u>: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the content of the Minutes or the representations that the System Administrator may have made to the members of the System's Board of Trustees about the work performed by the financial consultants, and on those grounds deny them. Complete and accurate information on any "investment distribution scenario" that the System's financial consultants were allegedly working on, as well as on their execution plan, is held by the System, not by UBS Defendants. In addition, UBS Defendants were not contractually required to advise the System on matters relating to its bond issuance strategy or the risks that such issuance might entail. The System was advised by the GDB, as required by Act 272, and by other advisors, including Mesirow Financial and Global Insight.

4.30.   At a joint meeting between the System's Board of Trustees and the GDB's Board of Directors on January 24, 2008, at which the Retirement Bonds' issue was approved by both Boards, both Boards were also represented that "*The expectation of the issue is that the markets will be favorable and there will be a positive return on the portfolio, which would alleviate the debt.*"

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

Answer to Paragraph No. 4.30: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the representations that could have been made at the joint meeting relating to the expectations of the issuance or the performance of the portfolio, and on those grounds deny them. The complete and accurate information about it is in the possession of the System, not UBS Defendants. In addition, UBS Defendants were not contractually required to advise the System on matters relating to its bond issuance strategy or the risks or results that such issuance might entail. The System was advised by the GDB, as required by Act 272, and by other advisors, including Mesirow Financial and Global Insight.

4.31.   At the same joint meeting, the then Chairman of the Board of Directors of the Government Development Bank, Mr. Rafael Martínez Margarida, asked whether the Retirement System Administration had the mechanisms in place to ensure that, when the money from the issuance came in, it could start producing the expected average return. Mr. Jorge lrizarry Herrans, (then President of the GDB), stated that, together with the consultants, a strategy has been designed for the distribution of these funds, which includes hiring eighteen (18) managers in addition to the eight (8) that already exist and are ready to receive the money.

Answer to Paragraph No. 4.31: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations related to the discussions between the Chairman of the GDB Board and the System during the joint meeting regarding the proposed issuance strategy, and on those grounds deny them. The complete and accurate information about it is in the possession of the System, not UBS Defendants. UBS Defendants were not contractually required to advise the System on matters relating to its strategy for the issuance of bonds or the risks that such issuance might entail. The System was advised by the GDB, as required by Act 272, and by other advisors, including Mesirow Financial and Global Insight. In addition, it is affirmatively alleged that the System and the GDB were the ones to make the decisions related to the issuance of bonds and the distribution of the funds from the sale of the bonds. This was within the discretionary prerogatives of the System and the GDB alone, not of UBS Defendants.

4.32.   The following was also expressed at that joint meeting, at page 9 of the minutes of that meeting:

"Mr. Luis Alfaro Martinez, Vice President of Financing of the Government Development Bank for Puerto Rico, points out that the general fund debt is not being increased **because the obligation is in the Retirement System**, what is being

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

done is changing the source of repayment of the obligations." (Emphasis added).

<u>Answer to Paragraph No. 4.32</u>: Denied, because, among other reasons, the Minute quotes are representations made by the GDB to the System and do not constitute representations made by UBS PR to the System. In addition, decisions relating to the issuance of the bonds were the exclusive prerogative of the System, not of UBS Defendants.

4.33.   Finally, on page 13 of the Minutes of that meeting, the following is stated:

"...Mr. Luis Alfaro Martínez. expressed that the public policy of the Government Development Bank is to maximize the resources and conditions of the local market, which is why the issuance is made first in the local market to then go to the global market. He added that the local market has advantages over the global market, such as, for example, that local bonds are callable before maturity within ten (10) years, which permits that if after ten (10) years the rates are lower, those bonds can be called and refinanced, this cannot be done with global bonds because they are "non-callable". Mr. Alfaro states that originally the market offer was $750 million, as the days went by the interest increased and ended with a demand of $1.4 billion ($1,456,247,368.95) and orders continue to come in, so a **commitment was made with UBS** to provide space and amend the transaction, for which the Board of Trustees and the Board of Directors of the Bank would have to meet again to approve the new amount. The members of the Board of Directors recommended establishing the clause that would allow the amount to be increased by up to 15% without having to submit it before the boards for further approval. The Chairman of the Board of Trustees endorsed the recommendation for the future...". (Emphasis added)

<u>Answer to Paragraph No. 4.33</u>: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the contents of the Minute concerning the alleged cost of the debt, and on those grounds deny them. The complete and accurate information about it is in the possession of the System, not of UBS Defendants.

4.34.   Based on the February 27, 2007 Minutes of the System's Board of Trustees, at page 6, the following was stated:

"... The cost of the debt is estimated at 6%, which allows for <u>positive arbitrage</u> in view of the fact that the System's investments must return 8.5%...". (Emphasis added).

<u>Answer to Paragraph No. 4.34</u>: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the content of the Minute concerning the alleged cost of the debt, and on those grounds deny them. The complete and accurate information about it is in the possession of the System, not UBS Defendants.

4.35.   The Minutes of the System's Board of Trustees Extraordinary Meeting of January 10, 2008, at page 2, state the following:

"...With great enthusiasm and satisfaction, the President informed the Board of Trustees that today the first phase of the issuance of bonds of the Retirement

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

Systems is being launched in the local portion, which corresponds to Puerto Rico. He indicated that in the next hour, the transaction's financing team would be meeting with the brokers to give them a presentation of the structure."

Answer to Paragraph No. 4.35: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the contents of the Minute and about the representations the President may have made to the Board of Trustees about the issuance of bonds, and on those grounds deny them. The complete and accurate information about it is in the possession of the System, not of UBS Defendants.

4.36.   The Minutes of May 13, 2008, at page 20, read as follows:

"...C. Investment Committee of the Board of Trustees
Mr. Jorge Irizarry Herrans, Chairman of the Investment Committee of the Board of Trustees informed the Board Members that the Committee has been meeting to work with the liability driven investment strategy to ensure cash flow from investments for the next six (6) or seven (7) years. Mr. Irizarry Herrans explains that the Committee has examined a large number of proposals on this strategy and continues to develop strategies, and then submit a recommendation to the Board of Trustees...".

Answer to Paragraph No. 4.36: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the content of the Minutes and the representations that Mr. Irizarry may have made to the Board members in relation to the investment strategy known as 'liability driven investment' and on those grounds deny them. The complete and accurate information about it is in the possession of the System, not UBS Defendants. In addition, it is affirmatively alleged that the decisions related to the bonds issuance were the exclusive prerogative of the System, not of UBS Defendants. For this, the System was advised by the GDB, as required by Act 272, and by other advisors, including Mesirow Financial and Global Insight.

4.37.   According to the Minutes of June 13, 2008, Messrs. Juan G. Herrans Barrera and John Thomas Engfer, both UBS officers, appeared as guests at the Board of Directors of the Retirement System.

Answer to Paragraph No. 4.37: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the content of the Minute, and on that basis deny it.

4.38.   At that meeting on June 13, 2008, the Chairman of the Retirement System Board of Trustees says the following on page 3:

"...The Chairman of the Board of Trustees, Mr. Jorge Irizarry Herrans presented to

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page 30 of 72

CERTIFIED TRANSLATION:

the Members of the Board for discussion and approval the recommendations of the Investment Committee of the Board of Trustees and the Financial Consultant of the Agency: UBS, on the investment strategy called 'Liability Driven Investment'. Representatives of UBS: Juan G. Herrans Barrera and John Thomas Engfer, as well as the Interim Treasurer of the Government Development Bank for Puerto Rico, Mr. René Van Noort were there to carry out the presentation of this matter to the Members of the Board...," (Emphasis added).

<u>Answer to Paragraph No. 4.38</u>: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the content of the Minutes and the representations Mr. lrizarry may have made to the Board members in relation to the investment strategy known as 'liability driven investment', and on those grounds deny them. The complete and accurate information about it is in the possession of the System, not UBS Defendants. In addition, it is affirmatively alleged that the decisions related to the issuance of bonds were the exclusive prerogative of the System, not of UBS Defendants. For this, the System was advised by the GDB, as required by Act 272, and by other advisors, including Mesirow Financial and Global Insight.

4.39    Then, the same Minute of June 13, 2008, at page 3, reads as follows:

"...Mr. Irizarry Herrans indicates that the Investment Committee of the Board and the working group of the Government Bank have worked arduously during the past months with the analysis and evaluation of investment strategies that allow the Retirement System to fulfill its obligations to pensioners. The Chairman of the Board points out that both groups, together with the Financial Consultant, have been carefully studying the strategy known as 'LDI' or 'liability driven investment...". (Emphasis added).

<u>Answer to Paragraph No. 4.39</u>: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the content of the Minutes and the representations that Mr. Irizarry may have made to the members of the Board in relation to the investment strategy known as 'liability driven investment', and on those grounds deny them. The complete and accurate information about it is in the possession of the System, not UBS Defendants. In addition, it is affirmatively alleged that the decisions related to the issuance of bonds were the exclusive prerogative of the System, not of UBS Defendants. For this, the System was advised by the GDB, as required by Act 272, and by other advisors, including Mesirow Financial and Global Insight.

4.40    Then, the same Minute of June 13, 2008, at pages 3 and 4, reads as follows:

"...Mr. Irizarry Herrans explains that the 'LDI' strategy is relatively new and therefore many of the alternatives presented by the managers are new in the investment world, so it required a lot of study and analysis by the people working

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

on this exercise. He adds that the group's approach was aimed at selecting an investment combination that offered a high return with the lowest possible risk...." (Emphasis added).

Answer to Paragraph No. 4.40: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the content of the Minutes and the representations that Mr. Irizarry may have made to the members of the Board in relation to the investment strategy known as 'liability driven investment', and on those grounds deny them. The complete and accurate information about it is in the possession of the System, not UBS Defendants. In addition, it is affirmatively alleged that the decisions related to the issuance of bonds were the exclusive prerogative of the System, not of UBS Defendants. For this, the System was advised by the GDB, as required by Act 272, and by other advisors, including Mesirow Financial and Global Insight.

4.41. The same Minute of June 13, 2008, at page 4, states the following:

"Mr. Juan G. Herrans Barrera [from UBS] began his presentation by explaining to the Members of the Board the aspects to be presented for their consideration which are: the asset distribution recommendations on which the Board should deliberate; the explanation of the 'LDI' strategy; and the recommendation for the selection of managers to implement the investment strategy and the amounts to be allocated..." (Emphasis added).

Answer to Paragraph No. 4.41: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the content of the Minutes, and on that basis deny it.

4.42. In addition, page 5 reads as follows:

"...The guests [from UBS] began by presenting to the Board the current distribution of the System's assets assuming that $400 million are raised in addition to the $1 billion raised on June 2, 2008 as a result of the Retirement System bonds issuance, for a grand total of assets of $5,015,200,557; of which 27.28% would be cash. The Consultant's assignment is to recommend how that cash should be distributed...".

Answer to Paragraph No. 4.42: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the content of the Minutes and the representations that they might have [sic] to the members of the Board in relation to the distribution of assets and the results of the issuance of System bonds, and on those grounds deny them. The complete and accurate information on the content of the Minutes is in the possession of the System, not of UBS Defendants. In addition, it is affirmatively alleged that the decisions related to the issuance of bonds were the exclusive prerogative of the System, not of

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

UBS Defendants. For this, the System was advised by the GDB, as required by Act 272, and by other advisors, including Mesirow Financial and Global lnsight.

4.43.   Also, the Minutes of June 13, 2008, at page 5, read as follows, without mentioning the Retirement System's increase in liabilities, resulting from the issue of Bonds:

> "Mr. Jorge Irizarry Herrans intervened at this point to indicate that the $1 billion approved by the Board of Trustees to [be] issue[d] on June 2, 2008 were institutional bonds and that a demand for individual accounts remains, which are the ones to be offered for sale soon. He reported that the $1 billion have already been received and an additional $400 million are estimated. He highlighted as an important achievement for the System that a total of $5 billion in assets has been reached, when only one year ago the System had $2.5 billion, which means that the assets have doubled thanks to the strategy that is being executed. He added that the system's funding ratio, which for 2005 was at 19%, as of June 2008 is at 40% with a plan drawn up to reach 70 or 80% if the strategy is completed...".

Answer to Paragraph No. 4.43: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the content of the Minutes and the representations that Mr. Irizarry may have made to the members of the Board in relation to the proposed issuance of bonds, and on those grounds deny them. The complete and accurate information about it is in the possession of the System, not UBS Defendants. In addition, it is affirmatively alleged that the decisions related to the issuance of bonds were the exclusive prerogative of the System, not of UBS Defendants. For this, the System was advised by the GDB, as required by Act 272, and by other advisors, including Mesirow Financial and Global Insight.

4.44.   Furthermore, the same Minute of June 13, 2008, at pages 5 and 6, reads as follows:

> "...Mr. Juan G. Herrans Barrera continued the presentation by showing the proposed asset distribution in accordance with the recommended strategy on which the Board of Trustees should make a determination. It proposes to allocate $1.7 billion to the 'LDI' strategy. This is equivalent to 34.10% of the total assets considering the $5 billion mentioned above, this equals to one third of the System's portfolio in 'LDI'. The proposal contemplates allocating the $1.4 billion in cash (27.28%) to the 'LDI' strategy and adding to it, through redistribution, $3 million which are currently allocated in shares...". (Emphasis added)."

Answer to Paragraph No. 4.44: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the content of the Minute, and on that ground deny it.

4.45.   According to that Minute of June 13 2008, a "power point" presentation with the UBS logo appears. (Figure omitted)

Answer to Paragraph No. 4.45: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the content of the

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

Minutes, and on those grounds deny them. In addition, UBS Defendants respectfully refer this Honorable Court to the UBS Presentation for a complete and accurate description of its contents. The complete and accurate information on the content of the Minutes is in the possession of the System, not of UBS Defendants.

4.46.   At the same meeting, and according to the Minutes of June 13, 2008, at pages 6 and 7, the following is said:

> "...In order for the Board of Trustees to consider this <u>recommendation</u>, the Consultant presented the two (2) faces of the investments: risk versus return. The <u>diagram presented by the</u> Consultant <u>identifies the current strategy of the System</u>, without considering the cash. This strategy maintains a distribution of 40% of its portfolio in bonds or loans that behave like bonds and 60% in shares. <u>Mr. Herrans Barrera [from UBS] explains that this distribution conforms to the investment policies approved by the Board of Trustees. As a result, the System obtains an approximate yield of 9.52% versus a risk deviation equivalent to 5.5%</u>...." (Emphasis added).

<u>Answer to Paragraph No. 4.46</u>: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the content of the Minutes, and on those grounds deny them. In addition, UBS Defendants respectfully refer this Honorable Court to the UBS Presentation for a complete and accurate description of its contents. The complete and accurate information on the content of the Minutes is in the possession of the System, not of UBS Defendants.

4.47.   In that Minute of June 13, 2008, at pages 7 and 8, the following is stated and the table below is attached:

> "...For this reason, the Consultant proposes an intermediate strategy that offers a return of 10.44% and a risk deviation of 3.74%. Mr. Herrans Barrera [of UBS] points out that he is aware that there are many pension plans and pension foundations that use this strategy very successfully. However, taking into consideration the criterion of prudence, his recommendation is aimed at an intermediate strategy that allows, during the process in which it is used, a cautious evaluation of its results, considering a move towards said strategy based on the results that are obtained...". (Emphasis added). (Figure omitted)

<u>Answer to Paragraph No. 4.47</u>: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the content of the Minutes, and on those grounds deny them. In addition, UBS Defendants respectfully refer this Honorable Court to the UBS Presentation for a complete and accurate description of its contents. Complete and accurate information on the content of the Minutes is in the possession of the System, not of UBS Defendants.

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

4.48.    In the Minutes of June 13 2008, pages 8 and 9 read as follows:

"...Mr. Herrans Barrera [of UBS] continued his presentation by showing averages of probability of profits and returns in the Retirement System portfolio taking into consideration the portfolio distribution alternatives according to the strategies presented for the $1.7 billion of assets at one, three, five and ten years. An analysis thereof shows that portfolio diversification reduces risk and improves returns, which is why the 'LDI' strategy and the combination of strategies that support it for a full economic cycle of seven (7) years is recommended...". (Emphasis added).

Answer to Paragraph No. 4.48: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations related to the content of the Minute, and on those grounds deny them. In addition, UBS Defendants respectfully refer this Honorable Court to the UBS Presentation for a complete and accurate description of its contents. Complete and accurate information on the content of the Minutes is in the possession of the System, not of UBS Defendants.

4.49.    The same Minute of June 13, 2008, at page 12, reads as follows:

"...Therefore, the Consultant points out that this strategy cannot be handled as a conventional strategy, nor can historical data be used on it because it is 'sui generis'. It is then necessary to structure the strategy..." (Emphasis added).

Answer to Paragraph No. 4.49: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the content of the Minute, and on those grounds deny them. In addition, UBS Defendants respectfully refer this Honorable Court to the UBS Presentation for a complete and accurate description of its contents. The complete and accurate information on the content of the Minutes is in the possession of the System, not of UBS Defendants.

4.50.    In that same Minute of June 13, 2008, on page 12, the following is said and the following table is included:

"...To this end, the Financial Consultant submitted a proposal for the rebalancing and redistribution of the new assets of the System, which does not include the Wellington Firm because their alternatives were not very different from the strategies with the System's accounts, they do not add diversity, did not present cohesion, etc. The asset distribution proposal presented by UBS is as follows: (Emphasis added). (Table omitted)

Answer to Paragraph No. 4.50: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the content of the Minutes, and on those grounds deny them. In addition, UBS Defendants respectfully refer this Honorable Court to the UBS Presentation for a complete and accurate description of its contents.

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

The complete and accurate information on the content of the Minutes is in the possession of the System, not of UBS Defendants.

4.51.   The same Minute of June 13, 2008, at page 13, reads as follows:

"...The Members of the Board discussed the proposals presented, where they discussed the expectations that the Retirement System could have when approving the proposed strategies. The Chairman of the Board was very hopeful, understanding that such strategies can extend the useful life of the Retirement System, making reference to the following projections included in the presentation by the consultants...". (Emphasis added). (Graph omitted).

Answer to Paragraph No. 4.51: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the content of the Minutes and the discussion among Board members of the proposals submitted, and on those grounds deny them. The complete and accurate information about it is in the possession of the System, not UBS Defendants. In addition, it is affirmatively alleged that the decisions related to the issuance of bonds were the exclusive prerogative of the System, not of UBS Defendants. To this end, the System was advised by the GDB, as required by Act 272, and by other advisors, including Mesirow Financial and Global lnsight.

4.52.   The same Minute of June 13 2008, at page 15, reads as follows:

"...Having discussed these aspects, CPA Roberto E. Aquino García presented a motion to approve the proposals and recommendations of the Financial Consultant: UBS, regarding the investment strategy considering the 'LDI', the rebalancing and distribution of the Retirement System's assets, as well as the selection of the managers proposed in the presentation. Juan José Zamora Santos, Esq. seconded the motion. As there are no objections, it is approved. To this end, the Chairman of the Board of Trustees, Mr. Jorge Irizarry Herrans, gave instructions to the Retirement Systems Administrator, Minia González Álvarez, Esq. to carry out the corresponding procedures to execute this determination by the Board of Trustees..." (Emphasis and underlined added)

Answer to Paragraph No. 4.52: UBS Defendants do not have sufficient knowledge or information to form a belief as to the veracity of the allegations relating to the content of the Minutes and the approval of the proposals, and on those grounds deny them. The complete and accurate information about it is in the possession of the System, not UBS Defendants. In addition, it is affirmatively alleged that the decisions related to the issuance of bonds were the exclusive prerogative of the System, not of UBS Defendants. For this, the System was advised by the GDB, as required by Act 272, and by other advisors, including Mesirow Financial and Global lnsight.

### The Conway MacKenzie Report

4.53.   On June 30, 2010, the independent firm Conway Mackenzie (hereinafter "CM")

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

was hired by the GDB to study the causes and origin of the crisis that the Retirement System was going through. Specifically, CM focused on several areas, including the analysis carried out to support the decision to issue three billion dollars in Pension Obligation Bonds during 2008. CM is a prestigious firm of Financial Consultants, specializing in forensic analysis and evaluation, with an extensive investigative career. They are Certified Fraud Examiners and Certified Financial Forensic Specialists. The study concluded that the issuance of the 2008 Retirement Bonds was detrimental and contributed to the current crisis of the Retirement System, as well as that it was a risky, ill-conceived and speculative strategy.

Answer to Paragraph No. 4.53: Denied, among other reasons, because UBS Defendants do not have sufficient knowledge or information to form an opinion on the reasons why "the independent firm Conway Mackenzie (hereinafter "CM") was hired by the GDB. It is only admitted that on the CM website, the firm states that they are "Certified Fraud Experts" and "Certified Financial Forensic Specialists". The complete and accurate information on the reasons for said contract is held by the System and the GDB, not by UBS Defendants. In addition, the allegations do not constitute a complete or accurate description of the description of the contents of the Conway MacKenzie Report. In addition, UBS Defendants respectfully refer this Honorable Court to the Conway MacKenzie Report for a complete and accurate description of its contents.

4.54.   The report submitted by CM, reveals that they found that the Board of Trustees of the System was induced to execute this risky transaction, which was miscalculated. Originally, the Retirement System, with the backing of the Government Development Bank, considered issuing $7.0 billion in Obligation Bonds, which would be paid by the contributions received from members and employers. Due to the magnitude of the transaction, it could not be finalized according to the original parameters, and only approximately $2.9 billion were able to be issued; all in the local market, through UBS. This lesser amount was not enough to carry out the strategy originally outlined, and the bond proceeds were not reinvested at a sufficient yield to cover the interest of the bonds and, in addition, to produce a positive arbitrage for the Retirement System, thus, the expected results were never generated to help improve the financial condition of the Retirement System. It was evident that market conditions revealed that this transaction was too risky and there was no appetite for investors to participate in it. In fact, at the extraordinary meeting of the System's Board of Trustees on May 27, 2008, the following point was raised: "Mr. Alfaro Martinez noted

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

that from January [2008] when the first series of bonds were issued, up to the present time, the market has deteriorated by about 35 base points, which represents a substantial difference in bond interest rates, making it more expensive to obtain financing today than in January 2008…Mr. Alfonso Martinez pointed out that these bonds were only sold to the UBS funds, Santander funds and a small order of $5 million to Triple S funds. The strategy of creating an arbitrage for the Retirement System, upon the issuance of Bonds, was poorly conceived from the outset. In reality, the issuance of Pension Obligation Bonds is and will be an additional burden for the Retirement System, which did not provide a solution to the problem and worsened (instead of improving) its funded ratio.

Answer to Paragraph No. 4.54: Denied because, among other reasons, the decisions relating to the issuance of the bonds were the exclusive prerogative of the System, not of UBS Defendants. For this, the System was advised by the GDB, as required by Act 272, and by other advisors, including Mesirow Financial and Global lnsight. In addition, UBS Defendants do not have sufficient knowledge or information to form an opinion as to the veracity of Mr. Alfaro's allegations about the System's representations to the market and bond issuance strategy. The complete and accurate information about it is held by the System and the GDB, not by UBS Defendants. Moreover, the allegations do not constitute a full or accurate description of the description of the contents of the Conway MacKenzie Report. In addition, UBS Defendants respectfully refer this Honorable Court to the Conway MacKenzie Report for a complete and accurate description of its contents.

4.55.   Conway MacKenzie submitted to the System and the GDB its Report on October 2010, titled, "Review of the Events and Decisions That Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico". See ANNEX III of the original Complaint. Page 12 of the Conway MacKenzie Report, states the following, in English:

> As discussed in greater detail below, the POB transaction was subject to significant risks which do not appear to have been fully understood or vetted by the Board of Trustee prior to undertaking the bond issuance strategy. In addition, several early warning signs which existed prior to the issuance of the POBs appear to have been ignored by the ERS's Board of Trustees. Therefore, it is our opinion that given the risks inherent in the transactions, several of which appear to have increased significantly in probability prior to the issuance of these bonds, the decisions to pursue and enter into Series A, Series B and Series C transactions were not prudent and may not comply with the general standards of fiduciary responsibilities of a

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page **38** of **72**

Board of Trustees. Furthermore, our analyses indicate that a significant portion of the POB proceeds were not invested as originally anticipated and as a result, the System has not achieved its targeted arbitrage strategy. (Footnotes and emphasis added).

Answer to paragraph 4.55: Denied since the allegations do not provide a complete and accurate description of the contents of the Conway MacKenzie Report, entitled "*Review of the Events and Decisions that Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico*". UBS Defendants only admit that the plaintiffs attached to their original complaint a report with that title. In addition, UBS Defendants respectfully refer this Honorable Court to the Conway MacKenzie Report for a complete and accurate description of its contents.

4.56.   The findings of the Conway MacKenzie Report regarding the issuance and sale of bonds in the local market through UBS, among others, are devastating, evidence defendants' gross negligence, and are transcribed below in English as they appear in the Report:

In analyzing management's decision to enter into the POB transaction, we found no basis for the initial assumption made that such a strategy would improve the funded status of the ERS. The treatment of bond obligations in the calculation of the UAAL by the System's actuarial consultants appears to support the practical reality that the incurrence of additional debt to increase plan assets should have little effect on the funded status of a pension plan in the short term. If the bond obligations could be excluded from the calculation of net assets or otherwise in the UAAL, we would have expected the ERS to oppose the calculation by Milliman in the System's June 30, 2009 actuarial valuation report. We did not come across any information to suggest there was a disagreement. This could imply a lack of understanding of the true impacts of the bond transaction on the ERS by ERS management, the Board of Trustees and GDB Board of Directors when they made the decision to enter into the POB transaction.

Perhaps even more concerning in our analysis of the decision to enter into the POB transaction is the decision to move forward with the transaction in light of the many warning signs that existed, which suggested full implementation of the strategy would be difficult, if not impossible.

The successful execution of the POB transaction was dependent on certain risks not materializing, primarily the risk that the market would be unable to absorb the full $7.0 billion issuance. Consummating a transaction of significantly less than $7.0 billion would merely serve as an expensive, temporary measure to address the System's liquidity issues, postponing for some period of time the date of the ERS's eventual insolvency. For this reason, the POB transaction resulted in the flawed execution of a failed strategy.

The POB transaction has negatively impacted the ERS and the Government, in general. Rather than addressing the System's long-term funding problems, the $3.0 billion POB transaction merely provided a short-term temporary measure to address the System's liquidity needs, as it was not large enough to create arbitrage opportunities. It did nothing to improve the funded position of the System and due to the negative arbitrage realized and fees paid as part of the P0B transaction, actually worsened the funded position of the System. The short-term liquidity fix

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

is costly, and these costs may be realized for decades to come. In our opinion, the P0B transaction accomplished little more than passing on, and increasing the complexity of, the burden of fixing the System's fundamental structural problems to future administrations of the ERS. (Emphasis added).

<u>Answer to Paragraph No. 4.56</u>: Denied because, among other reasons, UBS Defendants did not engage in gross negligence. In addition, the allegations do not constitute a complete or accurate description of the description of the contents of the Conway MacKenzie Report. In addition, UBS Defendants respectfully refer this Honorable Court to the Conway MacKenzie Report for a complete and accurate description of its contents.

4.57.   The issuance, sale and use of the proceeds from the sale of the Bonds, in violation of the Retirement Act and the public policy promulgated by the Legislative Assembly, constituted grossly negligent and illicit conduct by UBS Consulting and UBS.

<u>Answer to Paragraph No. 4.57</u>: The allegations constitute a legal conclusion that does not require an answer from UBS Defendants. To the extent any answer is required, the allegations regarding UBS Defendants are denied since, among other reasons, UBS Defendants did not have the responsibility to guarantee that the sale of the bonds was in accordance with the relevant legal provisions, since the System represented to UBS Defendants that it had legal authority to issue the bonds. In addition, UBS Defendants were not responsible for making any decisions on how to use the proceeds from the sale of the bonds, since decisions on this matter were the exclusive prerogative of the System.

4.58.   According to the documentation and reports reviewed by CM, it was concluded that the Retirement System Administration was never fully aware of the possible repercussions that this issuance of Bonds would have, which was clearly risky and totally speculative. On page 4 of his report, CM notes the following:

"...Lastly, we believe that the POB transactions may have negatively impacted the ERS and the Government, in general. In analyzing management's decision to enter into the POB transaction, we found no basis for the initial assumption made that such a strategy would immediately improve the funded status of the ERS. In fact, the strategy has not improved the funded position of the System and due to the negative arbitrage realized and fees paid as part of the POB transaction actually, worsened the funded position of the System. The short-term liquidity fix is costly, and these costs may be realized for decades to come. In our opinion, the POB transaction accomplished little more than passing on, and increasing the complexity of, the burden of fixing the System's fundamental structural problems to future administrations of the ERS. In addition, several warning signs which suggested that the full implementation of the POB strategy would be difficult, if not impossible, were identified but ultimately downplayed or ignored by those responsible for making the decisions to enter into the POB transactions (ERS management, the

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

ERS Board of Trustees, and the GDB Board of Directors in 2008). For these reasons, we believe the decision-makers may have failed to meet the standard of due care and other important fiduciary duties in approving such a transaction ...." (Emphasis added).

<u>Answer to Paragraph No. 4.58</u>: Denied because, among other reasons, the allegations do not constitute a complete or accurate description of the description of the contents of the Conway MacKenzie Report. In addition, UBS Defendants again refer this Honorable Court to the Conway MacKenzie Report for a complete and accurate description of its contents. In addition, it is affirmatively alleged that the decisions related to the issuance of bonds were the exclusive prerogative of the System, not of UBS Defendants. For this, the System was advised by the GDB, as required by Act 272, and by other advisors, including Mesirow Financial and Global Insight.

4.59.   On page 10 of the CM Report, the following is noted:

" ...The POBs were issued by the ERS with the intent of providing the System with increased assets to pay benefit obligations, reduce the unfunded accrued actuarial Liability and generate additional revenue to the System through speculative arbitrage ...".

<u>Answer to Paragraph No. 4.59</u>: Denied, because the allegations do not provide a complete and accurate description of the contents of the Conway MacKenzie Report. UBS Defendants respectfully refer this Honorable Court to the Conway MacKenzie Report for a complete and accurate description of its contents.

4.60.   On page 11 of the CM Report, the following is noted:

"...As discussed in greater detail below, the POB transaction was speculative and subject to significant risks which do not appear to have been fully understood or vetted by the Board of Trustee's prior to undertaking the bond issuance strategy in 2008. In addition, several early warning signs which existed prior to the issuance of the POBs appear to have been ignored by the ERS's Board of Trustees. Therefore, it is our opinion that given the risks inherent in the transactions several of which appear to have increased significantly in probability prior to the issuance of these bonds, the decisions to pursue and enter into Series A, Series B and Series C transactions were not prudent and may not comply with the general standards of fiduciary responsibilities of a Board of Trustees. Furthermore, our analyses indicate that a significant portion of the POB proceeds were not invested as originally anticipated ..." (Emphasis added).

<u>Answer to Paragraph No. 4.60</u>: Denied, because the allegations do not provide a complete and accurate description of the contents of the Conway MacKenzie Report. UBS Defendants respectfully refer this Honorable Court to the Conway MacKenzie Report for a complete and accurate description of its contents.

4.61.   On page 11 of the CM Report, the following is added:

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

"...Based on analysis and advice from its lead underwriter, Merrill Lynch, it appears that the GDB and ERS had reason to believe that the proposed $7.0 billion POB transaction would be sufficient to resolve the System's short-term liquidity crisis and meet the System's long-term cashflow requirements but the ERS and the GDB should have known the $3.0 billion of proceeds issued would not solve the long-term cash flow requirements ...".

Answer to paragraph No 4.61: Denied, because the allegations do not provide a complete and accurate description of the contents of the Conway MacKenzie Report. UBS Defendants respectfully refer this Honorable Court to the Conway MacKenzie Report for a complete and accurate description of its contents.

4.62.   On page 12 of the CM Report, the following is noted:

"...Given the treatment by the System's actuarial consultants, we do not believe it was reasonable to conclude that the POB transactions would positively impact the funded ratio immediately, as was originally communicated. We further question how those responsible for making the decision to enter into the POB transaction could have overlooked this fundamental flaw in the forecasted funding ratio's computation methodology...." (Emphasis added).

Answer to Paragraph No. 4.62: Denied, because the allegations do not provide a complete and accurate description of the contents of the Conway MacKenzie Report. UBS Defendants respectfully refer this Honorable Court to the Conway MacKenzie Report for a complete and accurate description of its contents.

4.63.   On page 12 of the CM Report, the following is pointed out:

"...It appears that numerous warning signs existed, foretelling difficulties with placing the bonds and realizing the returns required, yet action plans were not altered ..." (Emphasis added).

Answer to Paragraph No. 4.63: Denied, because the allegations do not provide a complete and accurate description of the contents of the Conway MacKenzie Report. UBS Defendants respectfully refer this Honorable Court to the Conway MacKenzie Report for a complete and accurate description of its contents.

4.64.   On page 12 of the CM Report, the firm arrives to the following conclusion:

...Conclusion
Based upon Merrill Lynch's analyses, the ERS had the capacity to issue $7.0 billion of pension obligation bonds. While it was a reasonable strategy to help address near term liquidity requirements, it was not likely to significantly improve the System's funding status when calculated consistently with prior methodologies. In addition, the transaction was subject to significant risks among others, the risk of a failed or undersubscribed offering and the System's potential inability to generate arbitrage on the POB proceeds. Based upon our review of supporting documents, it appears that these risks were not fully understood or vetted by the decision-makers prior to undertaking the bond issuance strategy and several of these risks actually materialized. Given the importance, magnitude and potential risks associated with

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

a failed strategy, by not understanding or vetting the risks associated with the POB transaction, it appears the ERS management, the Board of Trustees and GDB Board of Directors did not exercise due care...". (Emphasis added).

Answer to paragraph No. 4.64: Denied, because the allegations do not provide a complete and accurate description of the contents of the Conway MacKenzie Report. UBS Defendants respectfully refer this Honorable Court to the Conway MacKenzie Report for a complete and accurate description of its contents.

4.65.   Based on the foregoing facts, UBS had the obligation to identify, for the benefit of the members of the System's Board of Trustees, the significant risks involved in the issuance of Bonds. In other words, UBS, as Financial Advisor, had an obligation to ensure that the members of the System's Board of Trustees understood and fully validated the strategy before approving the issuance. On whether it was prudent to undertake the issuance, the CM Report, on page 12, concludes as follows:

" …2.  Was it prudent to issue the Pension Obligation Bonds?

The ERS and then lead underwriter, Merrill Lynch, pursued a $7.0 billion POB issuance during 2007 but Merrill Lynch was unable to consummate the transaction due to a lackluster demand in the global market. UBS then replaced Merrill Lynch as underwriter and placed approximately $3.0 billion of the bonds in the local Puerto Rico market. Given the System's significant current and projected annual net cash flow shortfalls, the transaction was not large enough to create arbitrage opportunities since a significant portion of the proceeds have been (and will continue to be) utilized to address annual cashflow shortfalls, as opposed to being invested for the long term. This means that the transaction has also resulted in costly annual interest expense for the ERS..."

Answer to Paragraph No. 4.65: Denied, because, among other reasons, UBS PR, as underwriter, was not contractually required to look after the best interests of the System nor to advise the System on its plan on the issuance of bonds or on the success of its investment plans related to the funds acquired through the issuance of bonds. UBS Trust, of which UBS Consulting is a division, expressly informed in its consulting services contract that UBS PR was not assuming any fiduciary duty to the System. Furthermore, UBS Trust expressly stated that it did not and could not make any promises, nor did it give, or could it give any guarantees, nor did it formulate or could it formulate any representations or assertions regarding the returns on the System's assets. In addition, the allegations do not constitute a complete or accurate description of the description of the contents of the Conway MacKenzie Report. UBS Defendants respectfully refer this Honorable Court to the Conway MacKenzie Report for a complete and accurate description of its

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

contents.

4.66. The CM Report concludes the following in regard to market conditions:

"…c. In an ERS Board meeting held in May of 2008, an issue was raised that the "market has deteriorated around 35 basis points since January 2008" (when the first series of bonds were placed) and that "this represented a substantial difference in interest rates of the bonds, making it more expensive to obtain financing".[12]...

_____
[12] Based on the ERS Board of Trustees meeting minutes dated May 27, 2008."

"...d. By June 2008 there were also signs that the stock market was deteriorating. which should have signaled to the ERS that its arbitrage goals were jeopardized ...". (Emphasis added).

Answer to Paragraph No. 4.66: Denied because the allegations do not provide a complete and accurate description of the contents of the Conway MacKenzie Report. UBS Defendants respectfully refer this Honorable Court to the Conway MacKenzie Report for a complete and accurate description of its contents.

4.67. UBS, as Financial Advisor, should have been aware of this market deterioration and should have alerted the members of the System's Board of Trustees and make the corresponding recommendation.

Answer to Paragraph No. 4.67: Denied, because, among other reasons, UBS PR, as underwriter, was not contractually required to look after the best interests of the System nor to advise the System on its plan on the issuance of bonds or on the success of its investment plans related to the funds acquired through the issuance of bonds. UBS Trust, of which UBS Consulting is a division, expressly reported in its agreement for consulting services that UBS PR was not assuming any fiduciary duty to the System. Furthermore, UBS Trust expressly stated that it did not and could not make any promises, nor did it give, or could it give any guarantees, nor did it formulate or could it formulate any representations or assertions regarding the returns on the System's assets.

**Violation of Fiduciary Duty by UBS and UBS Consulting**

4.68. The Regulations of the Uniform Securities Act of Puerto Rico, Act No. 60- 1963, 10 L.P.R.A. §851, et seq., in its relevant section, reads as follows:

"...Section 25.1. Standard of business and **fiduciary duties** toward customers. Every broker-dealer, issuer, **investment adviser**, investment adviser representative, federal covered adviser, investment adviser representative of a federal covered adviser, agent or any other person subject to the provisions of the Act, must observe the highest standard of fiduciary duty toward their customers and investors…." (Emphasis added)

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

Answer to Paragraph No. 4.68: The allegations cite a statutory provision which does not require an answer from UBS Defendants. To the extent that an answer is required, they are denied.

4.69.    UBS, in its capacity as Financial Consultant and investment advisor, had the fiduciary obligation and duty to alert the members of the System's Board of Trustees of the risks inherent in the issuance. There is no doubt that the issuance of bonds recommended by UBS was reckless. UBS should have alerted the members of the System's Board of Trustees. The following conclusions of the CM Report, on pages 14 and 16, reflect this.

> "Conclusion
> The notion that the POB transaction would generate arbitrage opportunities for the System was inherently flawed based on the current liquidity needs of the System. In fact, the POB transaction has and will continue to cost the System money as short-term cashflow problems continue to require the use of the POB proceeds to fund current expenses of the System. Simply put, the ERS cannot generate investment returns on POB proceeds that are used to fund System expenses, as opposed to being invested. For this reason, the POB issuance is currently costing the ERS more than what it is actually earning on invested proceeds. Our findings indicate this occurred because ERS management and Board of Trustees ignored market conditions and were subsequently constrained and blinded by the necessity to utilize cash proceeds to fund cash requirements of the System. This lack of understanding is not reasonable and may not fall within the general standards of fiduciary responsibilities expected by a Board of Trustees..." (Emphasis added).

> "…Perhaps even more concerning in our analysis of the decision to enter into the POB transaction is the decision to move forward with the transaction in light of the many warning signs that existed suggesting full implementation of the strategy would be difficult if not impossible. The successful execution of the POB transaction was dependent on the assumption that the market would be able to absorb the full $7.0 billion issuance, since consummating a transaction of significantly less than $7.0 billion would merely serve as an expensive, temporary solution to the System's liquidity issues, further postponing the date of the ERS's eventual insolvency…". (Underline ours).

Answer to Paragraph No. 4.69: The allegations formulate a legal conclusion which does not require an answer from UBS Defendants. To the extent that any answer is required, the allegations are denied because, among other reasons, UBS PR, as an underwriter, was not required to look after the best interests of the System or to advise the System on its plan for the issuance of bonds. Moreover, UBS Trust, of which UBS Consulting is a division, expressly reported in its consulting services contract that UBS PR was not assuming any fiduciary duty to the System. UBS Trust expressly stated that it did not and could not make any promises, nor did it give, or could it give any guarantee, nor did it formulate or could it formulate any representation or statement regarding the returns on the System's assets. In addition, the allegations do not constitute a complete or accurate description of the description of the contents of the Conway MacKenzie

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

Report. In addition, UBS Defendants respectfully refer this Honorable Court to the Conway MacKenzie Report for a complete and accurate description of its contents.

## V. JURISDICTION AND VENUE:

5.1.     This Honorable Court has the jurisdiction and venue necessary to hear the present case, because the facts described herein occurred in San Juan, Puerto Rico, and because San Juan, Puerto Rico is the municipality in which  UBS Defendants have their place of business.

Answer to Paragraph No. 5.1: The allegations formulate a legal conclusion which does not require an answer from UBS Defendants. To the extent that any answer is required, they are denied.

## VI. FIRST CAUSE OF ACTION/VIOLATION OF CONTRACTUAL DUTIES BY UBS AND UBS CONSULTING

6.1.     Plaintiffs repeat and incorporate herein by reference all that has been previously alleged in this Fourth Amended Complaint.

Answer to Paragraph No. 6.1: UBS Defendants reaffirm and incorporate by reference their answers to the preceding paragraphs.

6.2.     Before the issuance of the Bonds, UBS and UBS Consulting made several presentations and representations to the System that they were experts in financial advice and had the capacity to place the Bonds, in order to convince the System to hire them to carry out the issuance.

Answer to paragraph No. 6.2: Denied, because, among other reasons, none of UBS Defendants was responsible for advising the System on the bond issuance strategy. The System was advised by the GDB, as required by Act 272. The system was also advised by other entities, including Mesirow Financial and Global Insight. It is only admitted that UBS PR signed a contract for the purchase of bonds and their resale in Puerto Rico's local market.

6.3.     Among the representations made by UBS and UBS Consulting, to convince the System that the issuance of the Bonds would be beneficial and would help with the solvency of the System's coffers, was that the investment of the proceeds from of the issuance would generate a positive arbitrage, which would result in net income for the System. These representations were not only false, but were made so that UBS and UBS Consulting could profit and collect their commissions and fees, such as those they actually charged, which surpassed $35 million.

Answer to Paragraph No. 6.3: Denied, because, among other reasons, none of UBS

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Defendants made representations to the System to the effect that the issuance of bonds would lead to the solvency of the System and because the System developed its plan for the issuance of the bonds with the advice of Merrill Lynch and the GDB prior to contracting with UBS PR to serve as underwriter in the issuance. In addition, UBS PR was not contractually required to advise the System in relation to the investment of the funds obtained over the sale of the bonds. UBS Trust, on the other hand, expressly stated that it did not and could not make any promises, nor did it give, or could it give any guarantees, nor did it formulate or could it formulate any representations or assertions regarding the returns on the System's assets. In addition, in the bonds' *Official Statement*, the System recognized the possibility that the issuance of bonds might not result in positive arbitrage by stating: "unable to invest the proceeds of the Bonds at yields that equal or exceed the interest rate on the bonds. It is only admitted that UBS PR's contracts with the System entitled UBS PR to a discount when purchasing the bonds issued by the System."

6.4.    UBS, through its then President, Miguel Ferrer, falsely represented not only to the System, but to the country in general, through press releases, that the issue of bonds, recommended by UBS Consulting and UBS, was going to result in revenues for the System through a positive arbitrage from the very moment of its effectiveness.

Answer to Paragraph 6.4: Denied, because, among other reasons, none of UBS Defendants recommended to the System that the issuance of bonds and their subsequent sale could result in a positive arbitrage for the System. The System developed its plan for the bond issuance with the advice of Merrill Lynch, the GDB, Mesirow Financial and Global Insight. In addition, in the Official Statement for the bonds, the System recognized the possibility that the issuance of bonds might not result in a positive arbitrage by stating: "unable to invest the proceeds of the Bonds at yields that equal or exceed the interest rate on the bonds."

6.5.    In the Official Statement dated January 29, 2008, for the Series A Bonds, UBS and the other underwriters made the following misrepresentations, among others, regarding the use of the proceeds from the sale of Series A Bonds:

a. The proceeds from the sale of the Bonds would be invested and such investments and the earnings therefrom would be used to pay pension benefits to the beneficiaries of the System ("*invest the proceeds of the Bonds and use these investments and the earnings thereon to provide such pension benefits to its beneficiaries*" (First page or cover of the *Official Statement* of January 29, 2008).

b. The proceeds from the sale of the Bonds, after deducting issuance costs,

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

commissions and reserves, will be added to the System's pool of invested assets (*will be added to the System's pool of invested assets*) (Page 17 of the *Official Statement* of January 29, 2008).

Answer to Paragraph No. 6.5: Denied, because, among other reasons, the quotes from the Official Statement of "Series A" bonds are representations made by the System to investors in such bonds and do not constitute representations made by UBS PR to the System. In addition, decisions relating to the use of funds from the sale of the bonds were the exclusive prerogative of the System, not of UBS Defendants. Similarly, the imputation of misrepresentation in footnote number 1 is denied.

6.6.    In the *Official Statement* dated January 29, 2008, for the Series A Bonds, UBS and the other underwriters made the following misrepresentations, among others, regarding the projected future issue  of Series B Bonds, which imported $1,058,634,613.05 and, like the Series A Bonds and Series C Bonds, were sold exclusively in Puerto Rico:

> "*The System currently contemplates offering additional parity Bonds (the "Series B Bonds") in other jurisdictions. The Series B Bonds would be Offered by means of one or more separate Official Statements and may not under any circumstances be purchased by residents of Puerto Rico.*" (Emphasis added).

Answer to Paragraph No. 6.6: Denied, because, among other reasons, the quotes from the Official Statement of "Series A" bonds are representations made by the System to investors in such bonds and do not constitute representations made by UBS PR to the System. In addition, decisions relating to the use of funds from the sale of the bonds were the exclusive prerogative of the System, not of UBS Defendants.

6.7.    In the *Official Statement* of May 28, 2008, for the Series B Bonds, UBS made the following misrepresentations, among others, regarding the use of the proceeds from the sale of the Series B Bonds, which, like the Series C Bonds, were offered and sold only to investors in Puerto Rico, in contravention of the quote in Section 6.6, *supra*:

> a. The proceeds from the sale of the Bonds would be invested and such investments and the earnings therefrom would be used to pay pension benefits to the beneficiaries of the System ("*invest the proceeds of the Bonds and use these investments and the earnings thereon to provide such pension benefits to its beneficiaries*") (First page or cover of the Official Statement of May 28, 2008).

> b. The proceeds from the sale of the Bonds, after deduction of issuance costs, commissions and reserves, will be added to the System's pool of invested assets (*will be added to the System's pool of invested assets*) (Page 17 of the *Official Statement* of May 28, 2008).

Answer to Paragraph No. 6.7: Denied, because, among other reasons, the citations from

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

the Official Statement for "Series B" bonds are representations made by the System to investors in such bonds and do not constitute representations made by UBS PR to the System. In addition, decisions regarding the use of the proceeds from the sale of the bonds were the exclusive prerogative of the System, not of UBS Defendants.

6.8.    In the Official Statement of June 26, 2008, for Series C Bonds, UBS made the following misrepresentations, among others, concerning the use of the proceeds from the sale of the Series C Bonds, which were offered and sold only to investors in Puerto Rico in contravention of the quote in Section 6.6, *supra*:

> a. The proceeds from the sale of the Bonds would be invested and such investments and the earnings therefrom would be used to pay pension benefits to the beneficiaries of the System ("*invest the proceeds of the Bonds and use these investments and the earnings thereon to provide such pension benefits to its beneficiaries*" (First page or cover of the Official Statement of June 26, 2008).

> b. The proceeds from the sale of the Bonds, after deducting issuance costs, commissions and reserves, will be added to the System's pool of invested assets (will be added to the System's pool of invested assets) (Page 17 of the Official Statement of June 26, 2008).

Answer to Paragraph No. 6.8: Denied, because, among other reasons, the quotes from the Official Statement for "Series C" bonds are representations made by the System to investors in such bonds and do not constitute representations made by UBS PR to the System. In addition, decisions regarding the use of funds from the sale of the bonds were the exclusive prerogative of the System, not of UBS Defendants.

6.9.    When the Bonds were issued, Co-Defendant UBS Consulting acted as financial advisor to the System and both it and its affiliate UBS knew or should have known that it would be impossible for the System to prudently invest the proceeds from the sale of the Bonds at a sufficient yield to cover the cost of its interests and generate profits ("positive arbitrage"). In spite of this, and knowing the losses that the issuance and sale of the Bonds would cause to the System, UBS proceeded with the transaction, with the purpose of making a profit and with absolute disregard for the best interests of the System.

Answer to Paragraph No. 6.9: Denied because, among other reasons, the claim that " it would be impossible for the System to prudently invest the proceeds from the sale of the Bonds at a sufficient yield to cover the cost of its interests" is contradicted by the fact that, since 2008, extraordinary yields have been seen in the stock market. In addition, UBS Consulting is not a legal

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page **49** of **72**

CERTIFIED TRANSLATION:

entity with the legal capacity to enter into a contract. It is only admitted that UBS Trust entered

into "Agreements for Consulting Services" with the System, under which UBS Consulting (a

division of UBS Trust) would provide, among other things, services to assist in the development

of an asset allocation study and in formulating an investment policy statement. UBS Trust

expressly stated that it did not and could not make any promises, nor did it give, or could it give

any guarantee, nor did it formulate or could it formulate any representation or statement regarding

the returns on the System's assets. UBS PR was not required to advise the System on the use it

should make of the funds obtained through the issuance of bonds. In addition, decisions regarding

how to use the funds from the issuance of bonds were the exclusive prerogative of the System, not

of UBS Defendants. Moreover, in the bonds' *Official Statement*, the System recognized the

possibility that investments made with the funds obtained from the issuance of bonds might not

generate profits upon stating: "[it may be] unable to invest the proceeds of the Bonds at yields that

equal or exceed the interest rate on the Bonds."

       6.10.    While the System negotiated with Merrill Lynch the possible issuance and sale

outside of Puerto Rico of System bonds for the principal amount of at least seven billion dollars

($7 billion) and subsequently, when the issuance and sale of the Bonds was made in the local

market through UBS, for an amount of approximately three billion dollars ($3 billion), UBS,

directly and/or through its affiliate(s), including, without limitation, UBS Consulting, had a

financial advisory contract with the System. In addition, UBS and UBS Consulting were then

aware of the System's precarious financial condition and were aware of the System's need to

improve its liquidity and create sources of revenue and generate profits to mitigate its chronic

underfunding.

       <u>Answer to paragraph 6.10</u>: Denied because, among other reasons, UBS Consulting is not a

legal entity with the legal capacity to enter into a contract. It is acknowledged that in 2007, UBS

Trust entered into agreements for consulting services with the System, under which UBS

Consulting (a division of UBS Trust) would provide, among other things, services to assist in the

development of an asset allocation study and in formulating an investment policy statement. UBS

Defendants respectfully refer this Honorable Court to the agreements for consulting services

entered into between UBS Trust and the System for a full and accurate description of the

contractual relationship between them. UBS Defendants admit that, at the time the bonds were

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing
document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my
knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

issued, they were aware that the System expected to generate revenues that would enable it to meet its pension payments, that is, its obligations.

6.11. It is the inescapable duty of financial advisors such as UBS Consulting and UBS to defend the best interests of their clients (in this case the System) and to provide them the correct advice for the benefit of the client and over their own. By not only endorsing, but also participating as the lead underwriter in the illicit and grossly negligent issuance of the Bonds, UBS violated its contractual, non-contractual and fiduciary obligations towards the System, as it advised and participated, for profit, in an illicit, reckless and clearly losing transaction that was alien to the objectives and best interests of the System.

Answer to Paragraph No. 6.11: The allegations formulate a legal conclusion which does not require an answer from UBS Defendants. To the extent that any answer is required, the allegations are denied because, among other reasons, UBS PR, as an underwriter, was not required to look after the best interests of the System or to advise the System on its plan for the issuance of bonds. Moreover, UBS Trust, of which UBS Consulting is a division, expressly reported in its consulting services contract that UBS PR was not assuming any fiduciary duty to the System. UBS Trust expressly stated that it did not and could not make any promises, nor did it give or could it give any guarantee, nor did it formulate or could it formulate any representation or statement regarding the returns on the System's assets.

6.12. UBS and UBS Consulting knew or should have known that the issuance and sale of the Bonds violated the public policy established by the Legislative Assembly of Puerto Rico upon rejecting their approval when they were proposed by the Government and that the Retirement Act was being violated. These co-defendants also knew or should have known then that the pledge or alienation of the Government's contributions to the System, as a guarantee and source of payment of the Bonds, compromised the Government's credit, which was precisely what the Legislative Assembly had denied and which violated the public policy established through said denial and also violated the provisions of the Retirement Act regarding the use permitted by said Act of employer contributions to the System.

Answer to Paragraph No. 6.12: The allegations formulate a legal conclusion which does not require an answer from UBS Defendants. To the extent any answer is required, the allegations are denied because, among other reasons, UBS Defendants were not responsible for guaranteeing

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

that the sale of the bonds was in accordance with applicable law. The System represented to UBS Defendants that they had legal authority to issue bonds and to pledge public employee contributions as a source of repayment for the bonds.

6.13.    UBS and UBS Consulting also knew or should have known then that the proceeds of the illicit and grossly negligent sale of the Bonds could not be prudently invested in safe investment vehicles that would produce a sufficient yield to amortize the issuance costs and interest on the Bonds and produce the positive arbitrage that the System needed and that, on the contrary, the investment of the proceeds from the sale of the Bonds would result in a recurring loss to the System, as the interest payable on the Bonds exceeded the yield that the System could reasonably obtain from the net funds investment attained from the sale thereof.

Answer to Paragraph No. 6.13: The allegations formulate a legal conclusion which does not require an answer from UBS Defendants. To the extent that any answer is required, the allegations are denied because, among other reasons, the allegation that "the sale of the Bonds could not be prudently invested in safe investment vehicles that produced a sufficient yield to amortize the issuance costs and interest on the Bonds and produce the positive arbitrage" is contradicted by the fact that, since 2008, extraordinary yields have been seen on the stock market. In addition, UBS Trust expressly stated that it did not and could not make any promises, nor did it give, or could it give any guarantee, nor did it formulate or could it formulate any representation or statement regarding the return on the System's assets. UBS PR was not required to advise the System on the use it should make of the funds obtained through the issuance of bonds. In addition, decisions on how to use the funds from the issuance of bonds were the exclusive prerogative of the System, not of UBS Defendants. Also, in the Official Statement for the bonds, the System recognized the possibility that investments made with the funds obtained from the issuance of bonds might not generate profits by stating: "[it may be] unable to invest the proceeds of the Bonds at yields that equal or exceed the interest rate on the Bonds."

6.14.    UBS and UBS Consulting also knew or should have known that the Bonds would not improve, but would worsen, the "funding or funded ratio" of the System, since, upon their issuance, the net worth of the System would decrease due to the Bond issuance and sale costs and the System's liabilities would increase by an amount greater than the increase in its assets, due to said Bond issuance and sale costs. Despite knowing or [despite the fact] that they should have

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

known all of the above, these co-defendants not only recommended the issuance and sale of the Bonds, but, for further profit, UBS acted as its lead underwriter and placed much of the Bonds in closed-end mutual funds created and administered by UBS and/or UBS affiliates and/or UBS Consulting. This produced large profits for UBS and/or UBS Consulting in the sale of the Bonds and continues to produce annual profits for UBS and/or its affiliates from the management of the closed-end mutual funds invested in the Bonds, whose assets still include much of the Bonds and which are managed by UBS and/or UBS Consulting and/or its affiliates.

Answer to paragraph 6.14: Denied, because, among other reasons, UBS Defendants were not contractually required to advise the System as to whether or not to issue the bonds. The System was advised by the GDB, as required by Act 272; its other advisors include Mesirow Financial and Global Insight. It is only admitted that UBS PR acted as lead underwriter for the sale of bonds issued by the System and that some portion of those bonds was purchased by closed-end mutual funds managed by an affiliate of UBS PR.

6.15.   UBS and UBS Consulting knew or should have known that the projections and estimates used to support the issuance and sale of the Bonds were clearly erroneous and misleading, but they did not warn the System and proceeded with the issuance and sale of the Bonds, for profit and without giving consideration or importance to the predictable negative consequences for the System of such issue and sale of the Bonds.

Answer to Paragraph No. 6.15: Denied, because, among other reasons, UBS Defendants were not contractually required to advise the System as to whether or not to issue the bonds. The System was advised by the GDB, as required by Act 272, and by other advisors, including Mesirow Financial and Global Insight.

6.16.   UBS and UBS Consulting also knew or should have known that the local market did not have sufficient capacity to absorb at least seven billion dollars ($7 billion) in bonds that were contemplated according to the model proposed by Merrill Lynch and which were necessary for the System to obtain the benefits that it needed, as well as that there was no demand in the international market for such bonds.

Answer to Paragraph No. 6.16: Denied, because, among other reasons, UBS Defendants were not contractually required to advise the System on matters related to its bond issuance strategy nor were they required to guarantee that seven (7) billion-dollar bonds could be issued in

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

the local Puerto Rico market. The System was advised by the GDB, as required by Act 272, and by other advisors, including Mesirow Financial and Global Insight. In addition, UBS PR and the other underwriters were successful in selling all of the bonds they contractually agreed to underwrite.

6.17.    Neither UBS nor UBS Consulting conducted an adequate study on the viability of the issuance and sale of the Bonds, their possible harmful consequences for the System and the risks that such a transaction would entail for the System and for the System's and the Government's credit.

Answer to Paragraph No. 6.17: Denied, because, among other reasons, UBS Defendants were not contractually required to advise the System on matters relating to its bond issuance strategy or the risks that such an issuance might entail. The System was advised by the GDB, as required by Act 272, and by other advisors, including Mesirow Financial and Global Insight.

6.18.    Such conduct by UBS and UBS Consulting was grossly negligent and illicit and constituted (i) a violation of UBS' contractual obligations under its contracts with the System; (ii) a violation of UBS's underwriting contracts with the System for the issue and sale of the Bonds, through which UBS had the obligation to act in good faith and protect the interests of the System; (iii) said co-defendants' violation of the contractual and non-contractual fiduciary duties to the System; (iv) and illicit conduct by said co-defendants insofar as they were liable for violating the public policy established by the Legislative Assembly of Puerto Rico upon rejecting the proposal to issue the Bonds through the Government and for violating the Retirement Act by the pledge or alienation of employer contributions to the System as guarantee of the Bonds' payment.

Answer to Paragraph No. 6.18: The allegations formulate a legal conclusion which does not require an answer from UBS Defendants. To the extent that any answer is required, the allegations are denied, because UBS Defendants' duties to the System were limited to those obligations expressly set forth in the contracts entered into by UBS PR and UBS Trust, respectively. Also, it is affirmatively alleged that none of UBS Defendants breached or contravened any duty as set forth in their respective contracts with the System. The System also represented to UBS Defendants that they had the legal authority to issue bonds and to pledge public employee contributions as a source of repayment for those bonds.

6.19.    In fact, the illicit and grossly negligent issuance and sale of the Bonds not only

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

compromised the Government's credit, but has caused the downgrading of the rating of all Government bonds. UBS and UBS Consulting should be liable to the Plaintiffs hereunder for the damages caused to them, as well as to the System for all damages their conduct has caused it, including, but not limited to, (i) the Bond issuance and sale costs; (ii) the recurring losses ("negative arbitrage") that the System has suffered, suffers and will suffer from the issuance and sale of the Bonds until their maturity, due to the fact that the interest paid by the System on the Bonds exceeds the returns that the System receives over the investment of the proceeds of their sale; and (iii) the increase in costs of future System obligations, due to the downgrading of the Government's credit caused by the issuance and sale of the Bonds.

Answer to Paragraph No. 6.19: The allegations formulate a legal conclusion which does not require an answer from UBS Defendants. To the extent that an answer is required, the allegations are denied because UBS Defendants have not caused any harm to the System or the individual plaintiffs.

6.20.   UBS and UBS Consulting made recommendations to the System that were obviously negligent and reckless because, as stated above, they failed to perform an adequate analysis of the risk in which the System was placed as a result of the issuance and sale of the Bonds and the possible consequences of such transactions.

Answer to Paragraph No. 6.20: Denied, because, among other reasons, UBS Defendants were not contractually required to advise the System on matters relating to the risks that the issuance of the bonds might entail. The System was advised by the GDB, as required by Act 272, and by other advisors, including Mesirow Financial and Global Insight.

6.21.   UBS and/or UBS Consulting, directly and/or through one of its affiliates, held a financial advisory contract with the System and UBS, in addition, acted as investment banker and lead underwriter in the issuance of Bonds, under contracts with the System.

Answer to paragraph No. 6.21: Denied, because, among other reasons, UBS PR, as an underwriter, was not required to look after the best interests of the System and because none of UBS Defendants was required, contractually or otherwise, to advise the System as to whether or not to carry out the issuance of bonds. The system was advised by the GDB, as required by Act 272, and by other advisors, including Mesirow Financial and Global Insight. In addition, in its consulting services contract with the System, UBS Trust expressly stated that UBS PR was not

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page 55 of 72

CERTIFIED TRANSLATION:

assuming any fiduciary duty to the System. It is only admitted that UBS Trust had consulting service contracts with the System and that UBS PR and others acted as underwriters for the issuance of bonds issued by the System in accordance with the contracts that, for this purpose, were executed with said System. UBS Defendants respectfully refer this Honorable Court to those consulting service contracts for a complete and accurate description of their contents and UBS Defendants' contractual relationship with the System.

6.22.    UBS and UBS Consulting illegally charged substantial commissions and fees and discounts related to the reckless, illicit and grossly negligent issuance and sale of the Bonds and must return them to the System.

Answer to Paragraph No. 6.22: The allegations formulate a legal conclusion which does not require an answer from UBS Defendants. To the extent that an answer is required, the allegations are denied.

6.23.    The conduct of UBS and UBS Consulting, as referred to above in this Fourth Amended Complaint, was illicit, reckless, grossly negligent, violated its obligations to the System and therefore has caused, causes and will cause damage to the System in multi-million-dollar amounts, as well as damages to the Plaintiffs herein.

Answer to Paragraph No. 6.23: The allegations formulate a legal conclusion which does not require an answer from UBS Defendants. To the extent that an answer is required, the allegations are denied.

## VII. SECOND CAUSE OF ACTION/SECTION 1802 OF THE PUERTO RICO CIVIL CODE /UBS AND UBS CONSULTING

7.1    Plaintiffs repeat and incorporate by reference herein everything previously alleged in this Fourth Amended Complaint.

Answer to Paragraph No. 7.1: UBS Defendants reaffirm and incorporate by reference their answers to the preceding paragraphs.

7.2.    The grossly negligent and illicit conduct of UBS and UBS Consulting in the while providing the services they were required to render to the System and the breach by such defendants of their contractual, non-contractual and fiduciary duties to the System caused the System multi-million dollar damages, as explained above in this Fourth Amended Complaint, and also caused damages to the Plaintiffs, all of which render defendants liable under, among others,

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Translation Page 56 of 72

Section 1802 of the Puerto Rico Civil Code.

Answer to Paragraph No. 7.2: The allegations formulate a legal conclusion which does not require an answer from UBS Defendants. To the extent that any answer is required, the allegations are denied because, among other reasons, UBS Defendants' duties were limited to those expressly set forth in their contracts and agreements with the System. It is affirmatively alleged that UBS Defendants at no time failed to comply with their duties to the System. In addition, none of UBS Defendants has caused damage to the System or the individual plaintiffs.

## VIII. THIRD CAUSE OF ACTION - LIABILITY OF INSURER
## ABC INSURANCE COMPANY INC.:

8.1.    Plaintiffs repeat and incorporate by reference herein everything previously alleged in this Fourth Amended Complaint.

Answer to Paragraph No. 8.1: UBS Defendants reaffirm and incorporate by reference their answers to the preceding paragraphs.

8.2.    Defendant ABC Insurance Company, Inc., whose correct name is unknown at this time, issued policy(s) covering damages caused by reckless, unreasonable, grossly negligent or illicit acts or omissions of UBS and UBS Consulting, during the time period relevant to this Fourth Amended Complaint.

Answer to Paragraph No. 8.2: Since the allegations do not relate directly to UBS Defendants, no answer is required.

8.3.    The reckless, unreasonable, grossly negligent or illicit acts or omissions attributed to UBS Defendants and UBS Consulting in this Fourth Amended Complaint were committed or incurred through UBS officers and the damages caused to the System and Plaintiffs hereunder by such acts or omissions are insured and covered by said policy(s) issued by ABC Insurance Company, Inc, from which the Plaintiffs are claiming indemnification under said policies for damages to them and to the System in the present cause of action.

Answer to Paragraph No. 8.3: Since the allegations do not relate directly to UBS Defendants, no answer is required.

## IX. FOURTH CAUSE OF ACTION. LIABILITY OF XYZ INSURANCE
## COMPANY INC.

9.1.    Plaintiffs repeat and incorporate by reference herein everything previously alleged in this Fourth Amended Complaint.

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

**Answer to Paragraph No. 9.1**: UBS Defendants reaffirm and incorporate by reference their answers to the preceding paragraphs.

9.2.    Defendant XYZ Insurance Company, Inc. whose correct name is unknown at this time, issued policy(s), if any, covering damages caused by the reckless, unreasonable, grossly negligent or illicit acts or omissions herein attributed to UBS Consulting and/or its officers.

**Answer to paragraph 9.2**: Since the allegations do not relate directly to UBS Defendants, no answer is required.

## X. FIFTH CAUSE OF ACTION COSTS AND EXPENSES AND ATTORNEY'S FEES

10.1.    Plaintiffs repeat and incorporate by reference herein everything previously alleged in this Fourth Amended Complaint.

**Answer to Paragraph No. 10.1**: UBS Defendants reaffirm and incorporate by reference their answers to the preceding paragraphs.

10. 2.   The laws of Puerto Rico authorize this Honorable Court to order defendants to pay the costs and expenses of this litigation, including Plaintiffs' contingent attorneys' fees of up to thirty-three percent (33%) of any amount that Defendants are ordered to pay to the System and/or to Plaintiffs in any judgment favorable to Plaintiffs and/or the System in this case.

**Answer to Paragraph No. 10.2**: The allegations made are a legal conclusion which does not require an answer from UBS Defendants. To the extent that an answer is required, the allegations are denied.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The *Fourth Amended Complaint* fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs' causes of action are barred by the statute of limitations in whole or in part.

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs are precluded from litigating their causes of action under the doctrines in equity of "laches," "waiver," "acquiescence," and/or "estoppel." Likewise, Plaintiffs are precluded from litigating the present case by the imperative mandate under the own acts doctrine.

### FOURTH AFFIRMATIVE DEFENSE

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

Plaintiffs assumed the risks of any loss or damage they suffered.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiffs failed to mitigate, minimize or avoid any damage allegedly suffered.

## SIXTH AFFIRMATIVE DEFENSE

At all relevant times, UBS Defendants acted on the basis of the Plaintiffs' representations and guarantees.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are precluded by the doctrine of *in pari delicto.*

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred as they are based on illegal or void contracts.

## NINTH AFFIRMATIVE DEFENSE

UBS Defendants are released from any obligation to perform any obligation under their contracts with the ERS in view of the ERS's material breach of its obligations under the same contracts.

## TENTH AFFIRMATIVE DEFENSE

UBS Defendants have at all times fully performed their contractual obligations.

## ELEVENTH AFFIRMATIVE DEFENSE

UBS Defendants have at all times acted in good faith and each of their actions has been fully justified.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs lack standing to litigate their causes of action.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs are not entitled to the claimed remedies.

## FOURTEENTH AFFIRMATIVE DEFENSE

UBS Defendants affirmatively raise and reserve any and all applicable equitable defenses.

## FIFTEENTH AFFIRMATIVE DEFENSE

UBS Defendants adopt and incorporate by reference any and all other defenses raised in the answers herein. In addition, UBS Defendants adopt and incorporate by reference any other defense raised by any other defendant, to the extent that this may be applicable to UBS Defendants.

## SIXTEENTH AFFIRMATIVE DEFENSE

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

The *Fourth Amended Complaint* does not allege any cause of action against UBS Defendants with sufficient particularity, and thus, UBS Defendants, at this time, lack sufficient knowledge and information to form an opinion on any other existing or available affirmative defense. Accordingly, UBS Defendants reserve the right to assert any other affirmative defense as it becomes available or materializes through the discovery process and/or any other investigation.

## II.
## DEFENDANT UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO'S COUNTERCLAIM AGAINST PLAINTIFF EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO

Defendant UBS Financial Services Incorporated of Puerto Rico ("UBS Financial"), by and through the undersigned counsel, alleges the following against plaintiff Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS").

1.      UBS Financial has sought to file this Counterclaim since April 29, 2019, when it filed, together with the other co-defendant, UBS Defendants' Answer to Fourth Amended Complaint. At that time, UBS Financial informed the Court that it intended to file a counterclaim against the Employees Retirement System of the Government of the Commonwealth of Puerto Rico; however, UBS Financial was not able to file the Counterclaim at that time because it was subjected to an automatic stay in the proceeding that ERS itself had filed before the United States District Court for the District of Puerto Rico (US District Court) by virtue of the Puerto Rico Oversight, Management and Economic Stability Act of 2016 ("PROMESA Act"). In particular, Section III.Q of the Eighth Amended Notice, Case Management and Administrative Procedures (Dkt. #4866-1) in case *In re: The Financial Oversight and Management Board of Puerto Rico, as representative of the Commonwealth of Puerto Rico, et at.,* No. 17-BK-232-LTS and 17-BK-3566-LTS (the "Title III Cases"), barred UBS Financial from filing its Counterclaim in this case without first having the order lifting the automatic stay issued by the US District Court.

2.      Consequently, UBS Financial followed the necessary steps in the Title III Cases in order to obtain an order lifting the automatic stay, which required negotiations with legal counsel for the Financial Oversight and Management Board of Puerto Rico (the "Oversight Board") and legal counsel for the Fiscal Agency and Financial Advisory Board ("AAFAF", its Spanish acronym), to finally obtain an order from the US District Court that would lift the automatic stay and thus allow UBS to file its Counterclaim in this lawsuit. On December 16, 2019, the US District

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

Court issued an order, attached hereto as **Exhibit 1**[3], granting limited relief to lift the automatic stay and allowing UBS Financial to file a counterclaim in this lawsuit (the "Order Lifting Stay").

3. The Order Lifting Stay states "is hereby lifted solely to allow UBS Financial Service Incorporated of Puerto Rico ("UBS Financial") to present its proposed counterclaims in *Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico v. UBS Fin. Servs. Inc. of Puerto Rico*, Civ. No. KAC-2011-1067 (803) (the "ERS Action"), without waiver of, and subject to, any and all defenses The Commonwealth Court shall have the sole discretion as to any procedural requirements for presenting the counterclaims and as to any litigation of the counterclaims in that court." **Exhibit 1,** at 2, ¶ 2.[4] The Order Lifting Stay further establishes that "[t]he automatic stay will, as a matter of law, stay further prosecution and defense of the proposed counterclaims upon the filing of [the Counterclaim] in the ERS Action [in the Commonwealth Court]." *Id* at 2. ¶ 3.[5]

## FACTUAL BACKGROUND

4. The following are counterclaims for breach of contract and indemnification arising from three purchase contracts that the ERS entered into with UBS Financial and other underwriters in 2008 in connection with the issuance made by the ERS of three series of pension fund bonds. In these purchase contracts, the ERS represented to UBS Financial that it had "full legal right, power and authority" to issue and deliver the bonds, that it had obtained all necessary approval from governmental and public agencies to issue the bonds, and that delivering the bonds was not in breach of any constitutional provision or law. UBS Financial purchased the bonds from the ERS based on the ERS's representations that the bonds had been legally issued.

5. Furthermore, the ERS represented in the bond offering statements, that it was issuing the bonds pursuant to the general powers vested in it as per Act 447 of the Puerto Rico Legislative Assembly (the "Retirement Act"), that the Retirement Act authorized the ERS to

---

[3] To facilitate the Court's work, all Exhibits attached hereto are provided on paper in addition to the electronic PDF format in the attached CD.

[4] The original text reads as follows: "[T]he automatic stay is hereby lifted solely to allow UBS Financial Service Incorporated of Puerto Rico ("UBS Financial") to present its proposed counterclaims in *Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico v. UBS Fin. Servs. Inc. of Puerto Rico*, Civ. No. KAC-2011-1067 (803) (the "ERS Action"), without waiver of, and subject to, any and all defenses The Commonwealth Court shall have the sole discretion as to any procedural requirements for presenting the counterclaims and as to any litigation of the counterclaims in that court." **Exhibit 1**, at 2, ¶ 2.

[5] The original text reads as follows: "The automatic stay will, as a matter of law, stay further prosecution and defense of the proposed counterclaims upon their filing in the ERS Action." **Exhibit 1**, at 2, ¶ 3.

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

borrow money by placing debt and to secure such debt with its own assets and that the bonds would be "legally binding special obligations of the System, enforceable in accordance with their terms and the terms of in the bond resolutions". The ERS further represented that "all conditions, acts and things required by law" would have existed and/or occurred at the time of the delivery of the bonds and that the bonds would be within all limits established by the laws of the Commonwealth of Puerto Rico. The ERS also incorporated into the offerings an opinion from its attorneys that the bonds "constitute legal, valid and binding limited obligations of the [ERS].

6.      However, when the ERS joined this lawsuit and filed the Third Amended Complaint in January 2017, it alleged that the bond issuances violated the Puerto Rico law. The ERS has asserted this position in its Fourth Amended Complaint, contradicting its own contractual representations and offering statements that the bonds were legal and that the ERS had authority to issue such bonds.

7.      In addition to the allegations made by the ERS in this lawsuit, the ERS is simultaneously seeking relief in the US District Court under the PROMESA Act proceedings, to declare that the ERS bonds are ultra vires and thus, null and void.

8.      UBS Financial respectfully submits that the ERS' original representations at the time of the bond offerings are correct and its changes in position due to the litigation should be ignored. However, in the event that it is found that the Bonds were not authorized or legally issued, then the ERS will have materially breached the purchase contracts with UBS Financial by making false representations and causing UBS Financial to incur substantial expenses in litigating Plaintiffs' and other claims arising out of the purchase of such bonds. Additionally, UBS Financial would be entitled to be indemnified for any losses incurred as a result of the representations made by the ERS in the bond offering statements with respect to the legality of the bonds.

A.      **The Parties.**

9.      The ERS is a public entity organized under the laws of Puerto Rico as a trust. It was established under the Retirement Act to provide pensions and other benefits to retired employees of the central government, municipalities and public systems of the Commonwealth of Puerto Rico.

10.     UBS Financial is a Puerto Rico corporation that, among other things, provides investment banking services to public and private entities in Puerto Rico. UBS Financial was one

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

of several ERS underwriters in connection with ERS's issuance of pension fund bonds in 2008.

**B.   The ERS decides to issue pension fund bonds and enters into purchase contracts with UBS Financial.**

11.     For a long time, the ERS has suffered from a lack of funds. Beginning in or around 2006, and in consultation with its financial advisor, the Government Development Bank for Puerto Rico, the ERS began to consider the option of raising funds through the issuance of pension fund bonds. In 2007, the ERS was contemplating the issuance of bonds in the global market through Merrill Lynch & Co., Inc. However, the ERS postponed this plan and, instead, decided to issue several series of bonds in the local Puerto Rico market. To carry out its plan, it entered into three purchase contracts with UBS Financial and other investment banks that had agreed to act as underwriters of the bonds.

12.     Specifically, on January 30, 2008, the ERS accepted and entered into an *Amended and Restated Purchase Contract for Senior Pension Funding Bonds, Series A* (the "Series A Purchase Contract") through which UBS Financial and the other underwriters agreed:

> [u]pon the terms and conditions and in reliance on the representations, warranties and agreements set forth herein ... to purchase from the [ERS] ... all (but not less than all) of the $1,588,810,799.60 initial principal amount of Employees Retirement System of the Government of the Commonwealth of Puerto Rico Senior Pension Funding Bonds, Series A....

(*See*, Exhibit 2 ¶ 1) According to the System Secretary's Certificate, the ERS Board of Trustees approved the *Series A Purchase Contract* through a resolution dated January 29, 2008 (Exhibit l).

13.     On May 28, 2008, the ERS accepted and entered into a *Purchase Contract for Senior Pension Funding Bonds, Series B* (the "Series B Purchase Contract") through which UBS Financial and the other underwriters agreed:

> [u]pon the terms and conditions and in reliance on the representations, warranties and agreements set forth herein ... to purchase from the [ERS] ... all (but not less than all) of the $1,058,634,613.05 initial principal amount of Employees Retirement System of the Government of the Commonwealth of Puerto Rico Senior Pension Funding Bonds, Series B....

(*See*, Exhibit 3 ¶ 1) According to the System Secretary's Certificate, the ERS Board of Trustees approved the *Series B Purchase Contract* through a resolution dated January 29, 2008. *Id*.

14.     On June 26, 2008, the ERS accepted and awarded a *Purchase Contract for Senior Pension Funding Bonds, Series* C (the "Series C Purchase Contract" and together with the Series

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

A Purchase Contract and the Series B Purchase Contract, the "Purchase Contracts") through which UBS Financial and the other underwriters agreed:

> [u]pon the terms and conditions and in reliance on the representations, warranties and agreements set forth herein ... to purchase from the ERS all (but not less than all) the amount of $300,202,930.00 in initial capital of the Pension Fund Bonds, Series A of the Employee Retirement System of the Government of the Commonwealth of Puerto Rico, ....

(*See*, Exhibit 4 ¶ 1) In accordance with the System Secretary's Certificate, the ERS Board of Trustees approved the *Series* C *Purchase Contract* by a resolution dated June 26, 2008. *Id*.

15.    The Series A, Series B, and Series C Bonds are hereinafter referred to as the "Bonds".

**C.    The ERS represents and warrants to UBS Financial that it has the legal authority to issue the Bonds.**

16.    In order to induce UBS Financial to accept and award the Purchase Contracts, the ERS made various representations and warranties to UBS Financial and the other underwriters. Specifically, in the *Series A Purchase Contract,* the ERS represented that:

- The [ERS] has full legal right, power and authority to adopt the Bond Resolution, to enter into this Purchase Contract, and to issue and deliver the Bonds to the Underwriters as provided herein …(Ex. 2 ¶ 6(a));

- Except for the approval of the Government Development Bank, which has already been or will before the Closing be obtained and is or will at the Closing be in full force and effect, no approval, permit, consent, or authorization of, or registration or filing with, any governmental or public agency or authority not already obtained or made is required by the [ERS] in connection with the issuance and sale of the Bonds in the Commonwealth of Puerto Rico, or the execution or adoption and delivery by the System of, or the due performance of its obligations under this Purchase Contract ... (Ex. 2¶ 6(b));

- [T]he [ERS] is not in breach of or default under any applicable constitutional provision, law (including, without limitation, any administrative rule-making law) or administrative regulation of the Commonwealth or the United States, or any agency or department of either, or any applicable judgment or decree and no event has occurred and is continuing relating to bonds, notes or other evidences of indebtedness of the **[ERS]** or any **[ERS]** guaranty of bonds, notes or other evidences of indebtedness or indebtedness of others which, with the passage of time or the giving of notice, or both, would constitute a default or an event of default under any such instrument ... (Ex. 2¶ 6(c)).

The ERS made identical representations and warranties on the *Series B Purchase Contract* (*see,* Exhibit 3 ¶¶ 6(a), (b), (c)) and *Series C Purchase Contract* (*see,* Exhibit 4 ¶¶ 6(a), (b), (c)).

**D.    The ERS represents in the *Official Statements* of the Bonds that it has**

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

**legal authority to issue the Bonds.**

17.   The ERS also agreed in the Purchase Contracts to provide UBS Financial with copies of the offering statements for the Bonds (the "Official Statements") and "a certified copy of the Bond Resolution" (Exhibit 2 ¶ 2; Exhibit 3 ¶ 2; Exhibit 4 ¶ 2), and to indemnify UBS Financial:

> against any and all loss, liability claim, damage and expense whatsoever, joint and several, arising out of any untrue statement or alleged untrue statement of material fact contained in the Official Statement (or any amendment or supplement thereto) or the omission or alleged omission of therefrom of a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. ...

(Exhibit 2 ¶ 11 (a); Exhibit 3 ¶ 11(a); Exhibit 4 ¶ 11 (a)).

18.   The ERS specifically represented in both the Official *Statements* and *Bond Resolution* that it had the legal authority to issue the Bonds. For example, in the *Series A Official Statement,* the ERS stated that "[t]he Bonds are being issued pursuant to general authority contained in the [Retirement] Act" (Ex. 5 at 26) and that "[t]he [Retirement] Act authorizes the [ERS] to borrow money, including through the direct placement of debt, and secure any such borrowing with its assets" (*id.,* p. 7). The ERS made similar representations in the *Series B Official Statement* (*See,* Ex. 6 at 25 and 7) and *Series* C *Official Statement* (*See,* Ex. 7 at 25 and 7).

19.   In addition, the *Bond Resolution,* which was incorporated into each of the *Official Statements,* stated that:

> The [ERS] is duly authorized under the Act to create and issue the Bonds and to adopt this Resolution and to create a security interest on the Pledged Property in the manner and to the extent provided in this Resolution. ... The Bonds are and will be the valid and legally binding special obligations of the [ERS], enforceable in accordance with their terms and the terms of this Resolution.

(Ex. 5, Appendix. VI at VI-15, § 705) The ERS further represented that:

> Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and this Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the [ERS], shall be within every debt and other limit prescribed by the laws of the Commonwealth.

(*Id.,* at VI-16, § 709.3)

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

20.     The ERS also hired the law firm of Fiddler Gonzalez & Rodriguez, P.S.C. for them to provide their legal opinions, attached to the bond offering statements, asserting that, "[after having] examined the Constitution and the laws of the Commonwealth of Puerto Rico," "[t]he Bonds have been duly authorized by the System and constitute legal, valid and binding limited obligations of the System ". *See,* **Exhibit 5**, Appendix VIII at VIII-1 and VIII-2 ¶ (3); **Exhibit 6**, Appendix VII at VII-1 and VII-2 ¶ (3); and **Exhibit** 7, Appendix VII at VII-1 and VII-2 ¶ (3).

21.     The ERS's current position that the bonds were not legally authorized totally contradicts its claims addressed to buyers in the *Official Statements,* which assured those buyers that the ERS had the authority to issue the Bonds. When revealing all the material facts in the *Official Statements,* the ERS never indicated that it was required to obtain the approval of the Puerto Rico Legislative Assembly before issuing the Bonds.

### E.     UBS Financial purchases the bonds relying on the representations of the ERS.

22.     As indicated in the Purchase Contracts, UBS Financial and the other underwriters relied on the ERS's representations and warranties with respect to the legality of the Bonds by agreeing to purchase the Bonds. Having received assurances from ERS that it was legally authorized to issue the bonds and that no additional approval from any other government body or agency was necessary, UBS Financial and the other underwriters purchased nearly $3 billion in ERS bonds:

- On January 30, 2008, they purchased the entire amount of $1,588,810,799.60 in initial principal of the Series A Bonds;

- On May 28, 2008, they purchased the entire amount of $1,058,634,613.05 in initial principal of the Series B Bonds;

- And on June 26, 2008, they purchased the entire amount of $300,202,930.00 in initial principal of the Series C Bonds.

### F.     Individual ERS beneficiaries file claims against UBS Financial alleging that it breached the purchase contracts.

23.     On September 29, 2011, two individuals, Pedro José Nazario Serrano and Juanita Sosa Pérez, who claimed to be beneficiaries of the ERS (the "Original Plaintiffs"), filed a complaint alleging claims on behalf of the ERS arising from the issuance of the Bonds. The Original Plaintiffs named UBS Financial, one of their affiliates, two of the other bond underwriters, an advisor to the ERS, and former employees and members of the ERS Board of

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

Trustees as the defendants.

24.     In their original complaint, the Original Plaintiffs alleged that "the issuance of the Bonds was illegal, as it violated public policy established by the Puerto Rico Legislative Assembly, which denied approval of the Bonds when they were contemplated through the government." (Original Complaint ¶ 1.4) The Original Plaintiffs also alleged that this "violation of public policy promulgated by the Legislative Assembly constituted...a breach of UBS Financial's contractual obligations' and that UBS Financial "illegally charged numerous commissions and fees and deductions related to the reckless, illegal and grossly negligent issuance and sale of the Bonds ... ". (*Id.*, ¶¶ 2.31, 7.3)

25.     On April 16, 2013, the Original Claimants filed a Second Amended Complaint, joining five additional plaintiffs who also allegedly benefited from the ERS (along with the Original Plaintiffs, the "Beneficiaries Plaintiffs"). The Second Amended Complaint included similar allegations that the bonds were issued illegally.

**G.     The ERS joins the complaint and files a third and fourth amended complaint, acknowledging that it had no authority to issue the bonds.**

26.     On September 27, 2016, the ERS requested to join the Beneficiaries Plaintiffs' claims against UBS Financial, and was granted that request on the condition that the plaintiffs file an amended complaint, adding the ERS as plaintiff. On January 20, 2017, the ERS and Beneficiaries Plaintiffs complied with the Court's order and filed a Third Amended Complaint. In that complaint, the ERS *joined the Beneficiaries Plaintiffs' allegation that the Bonds were illegal* when it issued them:

> the issuance and sale of the Bonds were illicit as (i) they violated the public policy established by the Legislative Assembly of Puerto Rico, which denied their approval when they were contemplated throughout the Government; and (ii) the Bonds were guaranteed by pledging or alienation of employer contributions to the System, which is not permitted by the Retirement Act.

(Third Amended Complaint, ¶1.7). The ERS included the same allegation when it filed the Fourth Amended Complaint on March 6, 2019. (Fourth Amended Complaint, ¶1.6 and 6.12). In asserting such allegations, the ERS contradicted its prior representations in the Purchase Contracts and *Official Statements* that it had the authority to issue the bonds.

27.     Therefore, in violation of its own contractual and written representations, the ERS now alleges that UBS Financial breached the Purchase Contracts by agreeing to participate in the

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

issuance of bonds that were illegal. They allege that the issuance and sale of the Bonds violated the Retirement Act and constituted "grossly negligent and illicit conduct by UBS Consulting and UBS [Financial]." (*Id.* ¶4.57). In addition, they allege that the conduct of UBS Financial was a "breach by such defendants of their contractual, non-contractual and fiduciary duties to the System..." (Id. ¶ 7.2) because UBS Financial "knew or should have known that the issuance and sale of the Bonds violated the public policy established by the Legislative Assembly of Puerto Rico..." and "that the Retirement Act was being violated" (*Id.* ¶ 6.12).

28.    In addition to the allegations in the present action, the ERS has sought relief in the litigation under the PROMISA Act, claiming that all ERS bonds are ultra vires invalid, and therefore do not have to be repaid. On May 19, 2019, the Oversight Board filed an adversary complaint in the proceedings under the PROMESA Law alleging that:

> This action arises from ERS's issuance of approximately $3 billion dollars ($3,000,000,000) in bonds (the "ERS Bonds") in underwritten public offerings. The Plaintiffs, on behalf of ERS, seek a declaration that the ERS Bonds were issued ultra vires and thus are null and void.

*See*,  *Adversary Complaint to Avoid and Recover Fraudulent Transfers and to Disallow Claim Pursuant to 11 U.S.C. §§ 502, 544, 548 and 550 and Other Law,* at 3, ¶1, *Special Claim Committee of the Fin. Oversight and Mgmt Bd. For P.R. et al. v. American Enterprise Investment Services, Inc., et al. (In re The Fin. Oversight and Mgmt. Ed. for P.R.)* (Case No. 17-03283-LT, D.P.R. May 19, 2019) (No. 7012).

29.    Therefore, there is no doubt that the current position of the ERS is that the Bonds it issued were ultra vires and invalid under Puerto Rico law. The dishonest conduct of the ERS with respect to the legality of the Bonds should not be validated by this Court. UBS Financial respectfully contends that the ERS was right the first time - that the Bonds were legally issued in 2008. But to the extent the US District Court (or this Court) determines that the Bonds were not duly authorized, the representations made in the Purchase Contracts assign to the ERS the risk of illegality of the Bonds. In the instant lawsuit, the ERS improperly seeks to blame UBS Financial for the legal structure of the Bonds, when the reality is that the ERS and its advisors were the ones really responsible for such determinations. To the extent that it is determined that the Bonds were not legally authorized, then the ERS has breached the Purchase Contracts and is liable to UBS Financial for damages resulting from such breaches.

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

30.      UBS Financial has incurred substantial expenses in litigating the Beneficiaries Plaintiffs' and the ERS's breach of contract claims and other claims arising out of the Bonds' purchase. In addition, UBS Financial faces potential claims arising from ERS representations in the *Official Statements* on the legality of the Bonds.

### First Cause of Action - Breach of Contract

31.      UBS Financial reiterates and incorporates the allegations set forth in paragraphs 1 through 30 as if they were set out herein.

32.      The Purchase Contracts are valid and binding contracts.

33.      In the event that the Bonds are determined to be illegal or issued in an invalid manner, the ERS will have materially breached its contractual obligations under the Purchase Contracts by misrepresenting to UBS Financial as having "full legal right, power and authority ... to issue and deliver the Bonds."

34.      In the event that the Bonds are determined to be illegal or issued in an invalid manner, the ERS will have materially breached its contractual obligations under the Purchase Contracts by misrepresenting to UBS Financial that "no approval, permit, consent, or authorization of, or registration or filing with, any governmental or public agency or authority not already obtained or made is required by the [ERS] in connection with the issuance and sale of the Bonds in the Commonwealth of Puerto Rico, or the execution or adoption and delivery by the System of, or the due performance of its obligations under th[e] Purchase Contract[s]."

35.      In the event that the Bonds are determined to be illegal or issued in an invalid manner, the ERS will have materially breached its contractual obligations under the Purchase Contracts by misrepresenting to UBS Financial that  "[it was] not in breach of or default under any applicable constitutional provision, law (including, without limitation, any administrative rule-making law) or administrative regulation of the Commonwealth or the United States, or any agency or department of either, or any applicable judgment or decree."

36.      UBS Financial expressly relied on the veracity of the foregoing representations when entering into the Purchase Contracts.

37.      In the event that the Bonds are determined to be illegal or issued in an invalid manner, material breaches of the Purchase Contracts by the ERS will have caused UBS Financial

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

to suffer substantial damages in litigating the claims of the ERS and Beneficiaries Plaintiffs and other claims in connection with the Purchase Contracts.

38.     The Beneficiaries Plaintiffs have filed claims against UBS Financial, alleging that UBS Financial is liable for the payment of damages because the Bonds were illegally issued.

39.     In the event that UBS Financial is found liable to the Beneficiaries Plaintiffs, such liability shall have emerged, in whole or in part, due to the ERS's material breach of its obligations under the Purchase Contracts.

40.     As a result, UBS Financial will be entitled to damages in an amount to be determined at trial, along with pre and post-judgment interests.

**Second Cause of Action - Indemnification**

41.     UBS Financial reiterates and incorporates the allegations set forth in paragraphs 1 through 40 as if they were set out herein.

42.     The Purchase Contracts are valid and binding contracts.

43.     The ERS agreed in the Purchase Contracts to indemnify UBS Financial "against any and all loss, liability, claim, damage and expense whatsoever, joint and several, arising out of any untrue statement or alleged untrue statement of material fact contained in the Official Statement…or the omission or alleged omission therefrom of a material fact necessary in order to make the statements therein, in light of the circumstances in which they were made, not misleading…"

44.     In the event that the Bonds are determined to be illegal or issued in an invalid manner, the ERS shall have misrepresented in the *Official Statements* of the Bonds that the Bonds were "issued pursuant to general authority contained in the [Retirement] Act".

45.     In the event that the Bonds are determined to be illegal or issued in an invalid manner, the ERS falsely represented in the *Official Statements* of the Bonds that "[t]he [Retirement] Act authorizes the [ERS] to borrow money, including through the direct placement of debt, and secure any such borrowing with its assets."

46.     In the event that the Bonds are determined to be illegal or issued in an invalid manner, the ERS falsely represented in the *Bond Resolution* – incorporated to the *Official Statements* – that "(t)he [ERS] is duly authorized under the Act to create and issue the Bonds and to adopt this Resolution and to create a security interest in the Pledged Property in the manner

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:

and to the extent provided in this Resolution."

    47.    In the event that the Bonds are determined to be illegal or issued in an invalid manner, the ERS falsely represented in the *Bond Resolution* that "[t]he Bonds are and will be the valid and legally binding special obligations of the [ERS], enforceable in accordance with their terms and the terms of this Resolution."

    48.    In the event that the Bonds are determined to be illegal or issued in an invalid manner, the ERS falsely represented in the *Bond Resolution* that "[u]pon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and this Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the [ERS], shall be within every debt and other limit prescribed by the laws of the Commonwealth."

    49.    In the event that the Bonds are determined to be illegal or issued in an invalid manner, the ERS omitted the material facts of the *Official Statements* necessary for the statements contained therein not to be misleading.

    50.    As a result of the foregoing, the ERS shall indemnify UBS Financial for any losses incurred by the latter.

## REQUEST FOR RELIEF

    WHEREFORE, UBS Financial respectfully requests this honorable Court to GRANT this Counterclaim and, consequently, render judgment:

    A.    Granting UBS Financial an indemnification for damages in an amount to be determined at trial;

    B.    Ordering the ERS to indemnify UBS Financial for any liability to which it is or will be subject;

    C.    Grant any other remedy that the Court deems just and appropriate.

    WE CERTIFY: That on this same date we have sent a true and exact copy of the foregoing to the parties through their legal counsel: **Harold D. Vicente González, Esq.**, hvicente@vclawpr.com; **Harold D. Vicente Colón, Esq.**, hdvc@vclawpr.com, **Ivelisse M. Ortiz Moreau, Esq.**, iortiz@vclawpr.com, Vicente & Cuebas, PO Box 11609, San Juan, PR 00910-1609; **Francisco Pujols Meneses, Esq.**, fpujol@pujollawpr.com, Francisco Pujol Law Offices, PSC, PO Box 363042, San Juan, PR 00936-3042; **Federico Hernández Denton, Esq.**, f.hernandezdenton@gmail.com, Urb. Baldrich, 564 Calle Independencia, San Juan, PR 00918; PO Box 9021279, San Juan, PR 00902- 1279; **José Cháves Caraballo, Esq.**, chaves@fc-law.com,

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS

CERTIFIED TRANSLATION:


Puerto Rico Attorneys & Counselors At Law, PO Box 362122, San Juan, PR 00936-2122; and **Carlos E. López López, Esq.**, clopez@wolpopper.com, **Rodolfo Carrión Vargas, Esq.**, rcarrion@wolfpopper.com, Wolf Popper Law Offices PSC, 654 Plaza, Suite I001, 654 Muñoz Rivera Ave., San Juan, PR 00918.

In San Juan, Puerto Rico, on this 4th day of February, 2020.


| | |
|---|---|
| SKADDEN, ARPS, SLATE MEAGHER & FLOM | McCONNELL VALDÉS LLC |
| One Rodney Square | P. O. Box 364225 |
| P. O. Box 636 | San Juan, Puerto Rico 00936-4225 |
| Wilmington, Delaware 19899 | 270 Muñoz Rivera Ave. |
| Tel: (302) 651-3000 | Hato Rey, Puerto Rico 00918 |
| Fax: (302) 651-3001 | Tel: (787) 250-2631/5602 |
| | Fax: (787) 759-8282 |

Paul J. Lockwood (*admitted pro hac vice*)
Nicole A. DiSalvo (*admitted pro hac vice*)
Elisa M.C. Klein (*admitted pro hac vice*)

By: [Signed]
Roberto C. Quiñones-Rivera
RUA: 12,309
RCQ@mcvpr.com

By: [Signed]
Myrgia M. Palacios-Cabrera
RUA: 18,613
MPC@mcvpr.com

*Counsel for UBS Financial Services Incorporated of Puerto Rico and UBS Trust Company of Puerto Rico.*

I, Gladys Rodríguez-Fornaris, MA in Translation (UPR 1995), DO CERTIFY that I have translated into English the foregoing document, as submitted in Spanish by the interested party; and that said translation is true and correct to the best of my knowledge and abilities.
S/ GLADYS RODRÍGUEZ-FORNARIS