## **Exhibit B-1**

ECO PPOA Agreement

DATED AS OF MARCH 27, 2020

AMENDED AND RESTATED

POWER PURCHASE AND OPERATING AGREEMENT

BETWEEN

ECOELÉCTRICA, L.P.

AND

PUERTO RICO ELECTRIC POWER AUTHORITY



## TABLE OF CONTENTS

**Page**

1. DEFINITIONS AND INTERPRETATION ................................................................4
2. EFFECTIVENESS OF THE AGREEMENT ...........................................................18
3. SALE AND PURCHASE OF DEPENDABLE CAPACITY ....................................19
4. NOTICES ..............................................................................................................20
5. TERM......................................................................................................................20
6. REPRESENTATIONS, WARRANTIES AND COVENANTS................................23
7. DISPATCHING .....................................................................................................25
8. CONTROL AND OPERATION OF THE FACILITY.............................................27
9. INTERCONNECTION ...........................................................................................27
10. METERING OF NET ELECTRICAL OUTPUT .....................................................28
11. COMPENSATION, PAYMENT AND BILLINGS .................................................29
12. PERFORMANCE TESTS .......................................................................................30
13. FUEL SUPPLY ......................................................................................................32
14. LIABILITY .............................................................................................................32
15. OPTION TO PURCHASE THE SELLER'S COMPLEX AND LNG TERMINAL ...................35
16. INDEMNIFICATION .............................................................................................35
17. FORCE MAJEURE .................................................................................................38
18. TERMINATION .....................................................................................................38
19. BREACH OF AGREEMENT, DELAYS AND SECURITY ...................................40
20. TAXES AND ENVIRONMENTAL COSTS ..........................................................41
21. INSURANCE..........................................................................................................43
22. ASSIGNMENT .......................................................................................................45
23. QUALIFYING FACILITY STATUS/ APPLICABILITY OF PURPA .....................45
24. MISCELLANEOUS PROVISIONS .......................................................................47
25. CHOICE OF LAW AND VENUE ..........................................................................47
26. COMPLIANCE WITH THE COMMONWEALTH OF PUERTO RICO CONTRACTING REQUIREMENTS ...................50
27. ANTI-CORRUPTION CODE FOR A NEW PUERTO RICO .................................50
28. CONSEQUENCES OF NON-COMPLIANCE ........................................................52
APPENDICES..................................................................................................................52
    **APPENDIX A** – DESIGN LIMITS...............................................................56
    **APPENDIX B** – FUEL COST CORRECTION CURVE................................60
    **APPENDIX C** – CAPACITY PAYMENT CALCULATION ........................64
    **APPENDIX D** – EAF AND AAAF CALCULATION EXAMPLES ................67
    **APPENDIX E** –  INTERCONNECTION ......................................................



**APPENDIX F** – BACKUP FUEL SPECIFICATIONS ................................................................68

**APPENDIX G** – START-UP REIMBURSEMENT ...................................................................69

**APPENDIX H** – NG DELIVERY POINT ..............................................................................70

**APPENDIX I** – SCHEDULED OUTAGE PROGRAM .............................................................71

**APPENDIX J** – NG FUEL SPECIFICATIONS ......................................................................72

**APPENDIX K** – ANCILLARY SERVICES............................................................................73

**APPENDIX L** – NG FUEL MEASUREMENT SCHEMATIC ...................................................75

**APPENDIX M** – PERFORMANCE TEST PROCEDURES .......................................................76

**APPENDIX N** – DEGRADATION ADJUSTMENT FACTOR....................................................77

**APPENDIX O** – HEAT RATE ADJUSTMENT .....................................................................78

**APPENDIX P** – FORM OF ACCEPTABLE GUARANTEE......................................................80



AMENDED AND RESTATED

POWER PURCHASE AND OPERATING AGREEMENT

BETWEEN

ECOELÉCTRICA, L.P.

AND

PUERTO RICO ELECTRIC POWER AUTHORITY

**THIS AMENDED AND RESTATED POWER PURCHASE AND OPERATING AGREEMENT** (the "**Agreement**"), dated as of March 27, 2020 by and between **ECOELÉCTRICA, L.P.**, a limited partnership organized under the laws of Bermuda with its principal office at Road 337, Km. 3.7, Bo. Tallaboa Poniente, Peñuelas, PR 00624-7501, and authorized to do business in the Commonwealth of Puerto Rico ("**Seller**") and herein represented by its General Partner, EcoEléctrica LLC, a limited liability company organized under the laws of the Commonwealth of Puerto Rico, represented herein by its President & General Manager, Eng. Carlos A. Reyes, duly-authorized to enter into this Agreement, and the **PUERTO RICO ELECTRIC POWER AUTHORITY**, a Puerto Rico public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, authorized to enter into this Agreement by virtue of Act Number 83 of May 2, 1941, as amended (22 L.P.R.A. § 196(f)), with offices at 1110 Ponce de Leon Avenue, Santurce, Puerto Rico ("**PREPA**") and herein represented by José F. Ortiz Vázquez, Chief Executive Officer, duly-authorized to enter into this Agreement. Both Seller and PREPA are herein individually referred to as a "**Party**" and collectively referred to as the "**Parties**".

**RECITALS**

**WHEREAS**:

A.  PREPA and Seller are parties to the Power Purchase and Operating Agreement, dated as of March 10, 1995, as amended on October 31, 1997 and September 28, 2006 (the "Pre-Restatement PPOA");

B.  Seller owns, operates and maintains an approximately 530 MW cogeneration facility in Peñuelas, Puerto Rico, that operates on natural gas as primary fuel and diesel fuel oil as backup fuel;

C.  PREPA is an electric utility engaged in the generation, transmission, distribution and sale of electric power within the Commonwealth of Puerto Rico;

D.  on July 2, 2017, PREPA commenced proceedings under Title III of the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA") before the District Court for the District of Puerto Rico (the "PROMESA Court"), which is being administered under Case No. 17-4780 (LTS) (the "PROMESA Case");

E.  in connection with the transformation of the electricity sector in Puerto Rico and to provide cost savings required by PREPA's fiscal plan, the Parties have agreed to enter into this Agreement, which amends and restates the Pre-Restatement PPOA in its entirety, by among other things, providing for the purchase and sale of Dependable Capacity (as defined below) with a discount to the Capacity Payment (as defined below), and providing PREPA with greater flexibility in the procurement of Fuel (as defined below) by adopting an energy conversion structure under which PREPA will deliver to Seller all of the Natural Gas (as defined below) required for the production of Net Electrical Output (as defined below); and



F.      Seller will sell exclusively to PREPA, and PREPA will purchase, the Dependable Capacity made available by Seller in compliance with the Public Utility Regulatory Policies Act of 1978, as amended.

**NOW THEREFORE**, in consideration of these premises and of the mutual covenants and agreements set forth herein, Seller and PREPA, intending to be legally bound, hereby agree to amend and restate the Pre-Restatement PPOA in its entirety as follows:

## 1.      DEFINITIONS AND INTERPRETATION

1.1     Each of the following terms shall have the meaning stated below:

"Acceptable Guarantor" – Any Person meeting the Credit Standards that is approved by Seller to provide a guarantee; provided that such approval shall not to be unreasonably withheld or delayed.

"Acceptable Guarantee" – A guarantee, executed by an Acceptable Guarantor and substantially in the form attached as Appendix P to this Agreement (or in such form as is otherwise acceptable to Seller).

"Acceptable Former Commonwealth Entity" – An entity that timely satisfies the requirements of Section 22.4.

"Acceptable Letter of Credit" – An irrevocable, standby letter of credit in form and substance reasonably acceptable to Seller, issued with a face value equal to the amount of six (6) months of Capacity Payments by an Acceptable Letter of Credit Provider.

"Acceptable Letter of Credit Provider" – A bank, insurance company, or other financial institution organized or licensed as a branch or agency under the laws of the United States of America that meets the Letter of Credit Issuing Bank Requirements.

"Acceptable Private Assignee" – (a) A Non-Commonwealth Entity that upon a Transfer, satisfies as of the date of the Transfer, and covenants to maintain in full force and effect during the Term, one of the following: (i) full compliance with the Credit Standards; (ii) the delivery to Seller of a legal, valid, binding and enforceable Acceptable Guarantee from an Acceptable Guarantor; or (iii) the delivery of an Acceptable Letter of Credit; or (b) an Acceptable Former Commonwealth Entity.

"Actual Gas Utilization" – Natural Gas utilized during the Billing Period as measured (a) prior to the installation of the NG Measurement Facilities, in accordance with the Agreed Operating Procedures, or (b) after such installation, by the NG Measurement Facilities.

"Additional Availability Adjustment Factor" – As set forth in Appendix C.

"Additional Performance Test" – As set forth in Section 12.1.

"Adjusted Guaranteed Base Load Heat Rate" – (a) 7,671 Btu per kWh for the period prior to the Declaration Date for Performance Test 1 and (b) for the period after the Declaration Date for Performance Test 1, the Guaranteed Base Load Heat Rate, as adjusted per the applicable Degradation Adjustment Factor for such period according to Appendix N.

"Affiliate" – Any Person controlling, controlled by or under common control with any other Person.  For purposes of this definition, "control" (including "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the



-4-

ownership of fifty percent (50%) or more of the voting securities or otherwise, including through the power (whether by ownership of share capital, voting security, contract or otherwise) to appoint fifty percent (50%) of the board of directors or equivalent management body of such entity.

"Affirmative Abandonment Notice" – As set forth in Section 15.1.

"Affirmative Permanent Abandonment Purchase Price" – As set forth in Section 15.1.

"Agreed Operating Procedures" – (a) Prior to the finalization of the Agreed Operating Procedure under Section 8.11, the Agreed Operating Procedure dated November 23, 2004 and (b) thereafter, as set forth in Section 8.11, as may be modified from time to time with the written consent of the Parties.

"Agreement" – As set forth in the first paragraph of this document.

"Ancillary Services" – As set forth in Appendix K.

"Assumption Order" – An order of the PROMESA Court, in form and substance acceptable to Seller, that authorizes the assumption by PREPA of this Agreement.

"Assumption Period" – As set forth in Section 15.6.

"Authorized Officer" – The President, any Vice President, the Treasurer, the Secretary or the Assistant Secretary of Seller.

"Automated Peaking Request" – Net Electrical Output, in excess of Dependable Capacity, automatically generated by the Facility in response to a frequency disturbance or other event.

"Automatic Generation Control" or "AGC" – Provides supplementary control that (a) automatically adjusts the power output level of the Facility, (b) maintains system frequency as close as possible to the desired value, minimizing the accumulation of system time error, and (c) maintains the Facility as close as possible to its economic loading as calculated by the Economic Dispatch. AGC includes Load Frequency Control, Economic Dispatch, spinning reserve computation, and production cost monitoring. Appendix A specifies the Design Limits applicable to the Facility for the purpose of AGC. Such limits shall include maximum ramping rates and allowable step changes.

"Available Capacity" – For any hour, the average net electric generating capacity of the Facility made available at the Interconnection Point for dispatch to PREPA for that hour, expressed in kilowatts.

"Available Hours" – The number of hours in which the Facility is capable of providing service and such service is made available to PREPA, whether or not it is actually in service and regardless of the capacity level that can be provided.

"Average Correction Factor" – The weighted average (weighted on an hourly basis by the delivery of the entire volume of Net Electrical Output during a Billing Period) of the Fuel Cost Correction Factors, as determined in accordance with the formula set forth in Appendix O.

"Average Net Derating" – For any hour, the difference expressed in kilowatts between the Dependable Capacity and the Available Capacity, including deratings attributable to a Force Majeure claimed by Seller, for such hour; provided that, where Available Capacity exceeds Dependable Capacity for any hour, the Average Net Derating shall equal zero (0) for such hour.



5

"Backup Fuel" – Diesel fuel oil No. 2 distillate procured by Seller or any other type of fuel or fuel arrangements as mutually agreed by the Parties.

"Backup Fuel Cost" – The cost of Backup Fuel procured by Seller during a Billing Period in accordance with Section 13.1.

"Backup Fuel Delivery Point" – The Backup Fuel tank at the Seller's Complex.

"Backup Fuel Measurement Procedures" – As set forth in the Agreed Operating Procedures.

"Backup Fuel Specifications" – As set forth in Appendix F.

"Base Load Heat Rate" – The Heat Rate, assuming operation of the Facility at Dependable Capacity.

"Billing Period" – As set forth in Section 10.4.

"Calendar Year" or "Year" – A Calendar Year shall be the twelve (12) month period beginning 12:00 midnight on January 1 and ending at 12:00 midnight on the subsequent December 31. The terms Calendar Year and Year may be used interchangeably and shall have the same definition.

"Capacity Payment" –Seller's entire remuneration for the provision of Available Capacity and Ancillary Services and the delivery of Net Electrical Output at the Interconnection Point associated with such Available Capacity, as calculated in accordance with Section 11.2.

"Capacity Payment Discount" – As set forth in Appendix C.

"Capacity Purchase Price" – As set forth in Appendix C.

"Commercial Operation Date" – March 21, 2000.

"Commonwealth Entity" – A government agency, body, or public corporation that is controlled entirely by the Commonwealth of Puerto Rico.

"Commonwealth Assignee" – A Commonwealth Entity to whom a Transfer was made pursuant to Section 22.3.

"Contract Capacity" – 530 MW.

"Court of Competent Jurisdiction" – The state courts of the Commonwealth of Puerto Rico, the United States District Court for the District of Puerto Rico, the PROMESA Court, the United States Court of Appeals for the First Circuit and the United States Supreme Court.

"Credit Standards" – (a) Two credit ratings that are equal to or better than the following, as applicable: (i) BBB- by S&P, (ii) Baa3 by Moody's or (iii) BBB- by Fitch, or (b) two long-term unsecured debt ratings that are equal to or better than the following, as applicable: (i) BBB- by S&P, (ii) Baa3 by Moody's or (iii) BBB- by Fitch; provided that if two or more of the foregoing agencies cease to exist or issue credit ratings, such other equivalent ratings of another rating agency of comparable standing that is reasonably acceptable to Seller shall apply.

"Credit Standard Event" – Either (a) with respect to an Acceptable Private Assignee that has not provided an Acceptable Guarantee or an Acceptable Letter of Credit, the failure of such Acceptable Private Assignee to continue to meet the Credit Standards, or (b) with respect to an Acceptable Guarantor, the failure of the Acceptable Guarantor to meet the Credit Standards, or

any other condition imposed by Seller in order for such guarantor to be considered an Acceptable Guarantor.

"Current Assets" – Cash held in an operating and maintenance reserve account, cash and marketable securities (both not restricted for use and available for current operations), inventories, receivables collectible within one (1) year, accounts receivable, notes receivable, prepaid expenses, and consumables and spare parts expected to be used in the Seller's Complex within one (1) year and that are not required to be depreciated according to GAAP.

"Current Liabilities" – Accounts payable, collections received in advance of services, accrued expenses and other liabilities (excluding principal and interest repayment) coming due within one (1) year.

"Declaration Date" – As set forth in Section 12.4.

"Declaration Notice" – As set forth in Section 12.2.

"Deemed Abandonment Purchase Price" – As set forth in Section 15.2(c).

"Degradation Adjustment Factor" – The Heat Rate degradation factor per original equipment manufacturer degradation curves, as utilized in setting the Heat Rate Degradation Curves.

"Demand Charge" – The demand charge of $22.4944.

"Demand Charge Escalation Factor"– One (1) for 2019, which amount is readjusted each Year, beginning January 1, 2020 (whether or not the Effective Date has occurred prior to such date), using an escalation factor of two percent (2%) per Year.

"Dependable Capacity"– (a) The Contract Capacity, for the period prior to the Declaration Date for Performance Test 1, and (b) on any date thereafter, (i) except in the event that the Parties have agreed to a Dependable Capacity in accordance with Section 12.3, the lower of (A) Contract Capacity, and (B) the Tested Capacity, declared by Seller on the most recent Declaration Date and (ii) in the event that the Parties agreed to a Dependable Capacity in accordance with Section 12.3, such agreed to level of capacity.

"Derated Hours" – That hour or hours, exclusive of Outage Hours, when the Facility is not capable of operating at one hundred percent (100%) of its Dependable Capacity, including hours attributable to a Force Majeure claimed by Seller.

"Design Limits" – As set forth on Appendix A hereto.

"Dispatch" – The ability of PREPA's dispatching centers to schedule and control, directly or indirectly, manually or automatically, the generation of the Facility in order to increase or decrease the Net Electrical Output delivered to the PREPA system in accordance with Prudent Utility Practices, and subject to the Agreed Operating Procedures and the Facility's Design Limits.

"Dispatch Instructions" – As set forth in Section 7.1.

"Dispatchable Mode" – A period during which the Facility will be on PREPA's AGC system with the turbine-generator governors in the frequency bias mode and voltage regulators in service, or off AGC and block-loaded at PREPA's request, with the speed governors and voltage regulators in service.

"Economic Dispatch" – The distribution of total PREPA energy needs among available sources for optimum system economy in accordance with Prudent Utility Practices.



-7-

"Effective Date" – As set forth in Section 2.1.

"Electrical Metering Equipment" – All meters and metering devices (including RTUs) used to measure the delivery and receipt of Net Electrical Output and Available Capacity at the Interconnection Point.

"Emergency" – A condition or situation which in the sole judgment of PREPA is likely to result in imminent significant disruption of service to a significant number of customers or is imminently likely to endanger life or property.

"Energy Control Center" – Energy control center for the operation of the Grid System.

"Energy Policy Act" – The "Puerto Rico Energy Public Policy Act" (SB 1121), enacted April 11, 2019.

"Environmental Costs" – As set forth in Section 20.1.

"Equity" – Seller's net worth in the Seller's Complex after deducting its liabilities from its assets.

"Equivalent Availability Adjustment Factor"– As set forth in Appendix C.

"Equivalent Availability Factor"– As set forth in Appendix C.

"Equivalent Derated Hours" – For any period of time, the number of hours, equal to the sum of the fractions obtained by dividing the Average Net Deratings for each hour during such period by the Dependable Capacity applicable to such hour.

"Equivalent Grid Force Majeure Hours" – As set forth in Appendix C.

"Equivalent Force Majeure Hours" – For a Force Majeure claimed by Seller during any period of time, the sum of (a) the sum of the fractions obtained by dividing, for each Derated Hour during such period, the Average Net Deratings during such Derated Hour attributable to such Force Majeure by the Dependable Capacity applicable to that Derated Hour, plus (b) all Outage Hours attributable to such Force Majeure.

"Equivalent Total Force Majeure Hours" – As set forth in Appendix C.

"Excludable Contract" – Any contract entered into between Seller and another Person (the "Counterparty") if such contract fails to satisfy any of the following requirements: (i) a prudent person exercising reasonable business judgment in light of the facts and circumstances prevailing at the time such contract was executed would have entered into such contract, (ii) such contract is reasonably related to the performance (or ensuring the performance) by Seller of its obligations under this Agreement, (iii) such contract was entered into by Seller in good faith and not with a view to adversely affecting PREPA's interests under Article 15, (iv) if the Counterparty to such contract is an Affiliate of Seller, the rights and obligations of Seller under such contract relate solely to the supply, transportation or terminalling of fuel for use in the Facility or such contract is the Tolling Agreement and the rights and obligations of Seller under such contract (taken as whole) are not materially less favorable to Seller than Seller could have obtained in a comparable transaction entered into at the same time such contract was executed with a Person who was not an Affiliate of Seller, (v) such contract does not require Seller to repay, guarantee or otherwise become liable in respect of any indebtedness for borrowed money (or to reimburse any Person for amounts drawn under a letter of credit), and (vi) such contract does not evidence any interest hedging transaction (or other similar hedging transaction); provided that (x) the Tolling Agreement need not satisfy the requirements of clause (ii) of this definition and (y) if the Tolling Agreement does not initially satisfy the requirements of clause



(iv) of this definition, the Tolling Agreement may be amended or modified on or prior to the Purchase Closing Date pursuant to Article 15 so as to bring it into compliance with the requirements of clause (iv) of this definition. Seller and PREPA agree that there shall be a rebuttable presumption that all contracts to which Seller is a party on such Purchase Closing Date satisfy clauses (i), (ii), (iii), and (iv) of this definition; provided that this presumption shall not apply to any such contract unless Seller delivers to PREPA, reasonably in advance of such Purchase Closing Date, (i) a copy of such contract certified by Seller as being a true, complete and correct copy thereof and (ii) all information reasonably available to Seller (or any of its Affiliates) without undue burden that is relevant to establishing whether or not such contract is an Excludable Contract within the meaning of this definition.

"Facility" – Seller's cogeneration facility, consisting of two combustion turbine units of approximately 187 MW each and one steam turbine unit of approximately 214 MW, including auxiliary equipment and unit transformers on Seller's side of the Interconnection Point.

"Fair Market Value" – The fair market value as determined by a Valuation Firm, based on such firm's assessment of the cash price that an informed and willing seller (under no compulsion to sell) would reasonably obtain in an arms-length private sale of (i) the Seller's Complex, and (ii) if applicable under Section 15.3, the LNG Terminal or LNG Terminal Inventory, to an informed and willing buyer (under no compulsion to purchase), using a commonly accepted valuation methodology applicable at the time of determination and assuming a closing date of sixty (60) days after the Valuation Firm renders such determination.

"FERC" – The Federal Energy Regulatory Commission, or any successor thereto.

"Final Order" – Any order or other action of a Court of Competent Jurisdiction (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon and (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired, excluding any additional time periods that may begin as a result of United States Federal Rule 60(b).

"Fiscal Year" – The Calendar Year, unless otherwise agreed by the Parties.

"Fitch" – Fitch Ratings, Inc. or any successor thereto.

"Fixed Cost Escalation Factor" – A fraction, (i) the numerator of which shall be the average of the twelve (12) monthly values of the US-CPI corresponding to the twelve (12) months ending on December 31 of the Year immediately preceding the date of such calculation and (ii) the denominator of which shall be the average of the twelve (12) monthly values of the US-CPI corresponding to the twelve (12) months ending on December 31, 2018. For the Year 2019 the Fixed Cost Escalation Factor shall be equal to 1 (one).

"Fixed O&M Charge" – As set forth in Appendix C.

"FOMB" – The Fiscal Oversight and Management Board of Puerto Rico, established under the Puerto Rico Oversight, Management and Stability Act of 2016.

"Force Majeure" – As set forth in Article 17.

"Fuel" – Natural Gas or Backup Fuel.

"Fuel Cost Correction Curve" – The specifications set forth in Appendix B.



"Fuel Cost Correction Factor"– For each hour, the factor used in the determination of the Average Correction Factor, based on the average for the hour of the Percent of Dependable Capacity (rounded to the nearest percentage point) determined in accordance with Appendix B.

"Fuel Delivery Point" – The NG Delivery Point and the Backup Fuel Delivery Point.

"Fuel Supply Requirement" – As set forth in Section 13.1.

"GAAP" – Generally Accepted Accounting Principles, as promulgated by the Financial Accounting Standards Board or its predecessor or successors.

"Gas Fuel Cost" – The cost of NG during a Billing Period, as invoiced to PREPA by the NG supplier for the first LNG cargo unloaded at the LNG Terminal during the Billing Period, or if no LNG cargo was unloaded at the LNG Terminal during the Billing Period, the cost of NG at the last shipment of LNG cargo unloaded regardless of the Billing Period in which the unloading occurred.

"General Technical Requirements" – As set forth in Appendix K.

"Grid Force Majeure Event" – As set forth in Section 17.3.

"Grid Force Majeure Event Floor" – An amount in dollars equal to the product of the Fixed O&M Charge multiplied by the Dependable Capacity.

"Grid Restoration Period" – As set forth in Section 17.3.

"Grid System" – The interconnected network of high voltage transmission lines, low voltage distribution lines and associated electric substations, owned by PREPA, which transmits / distributes electricity to ratepayers in the Territory.

"Guaranteed Base Load Heat Rate" – (a) 7,671 Btu per kWh for the period prior to the Declaration Date for Performance Test 1, and (b) on any date of determination from and after the Declaration Date for Performance Test 1, the lower of (a) the Adjusted Guaranteed Base Load Heat Rate in effect on the date before the most recent Declaration Date, and (b) the Tested Heat Rate, declared by Seller on the most recent Declaration Date.

"Guaranteed Fuel Utilization" – Means the guaranteed fuel utilization for the Units (utilizing Natural Gas that complies with the NG Fuel Specifications) determined in accordance with the formula set forth in Appendix O.

"Heat Rate" – The fuel energy consumption expressed in Btu (Higher Heating Value) required for the Facility to generate one (1) kWh of net electric energy.

"Heat Rate Adjustment" – As set forth in Appendix O.

"Heat Rate Degradation Curves" – The Heat Rate degradation curves set forth in Appendix N that show the expected Heat Rate degradation utilized to establish the Degradation Adjustment Factor.

"Higher Heating Value" – The amount of heat released by the unit mass or volume of fuel (initially at 25°C) once it is combusted and the products have returned to a temperature of 25°C, including the latent heat of the vaporization of water.

"Interconnection Facilities" – Seller Interconnection Facilities and PREPA Interconnection Facilities.

"Interconnection Point" – The physical point(s) where the Facility interconnects with the Grid System, as set forth on Appendix E.

"Interim Operator" – As set forth in Section 15.8.

"Interim Period" – As set forth in Section 15.8.

"Interest" – The compensation for the accrual of monetary obligations under this Agreement computed monthly and prorated daily from the time each such obligation is past due based on an annual interest rate equal to the lesser of (i) the Prime Commercial Lending Rate as set by Citibank N.A., New York, New York or any other bank as mutually agreed by the Parties or any other equivalent rate as mutually agreed by the Parties and (ii) the maximum rate allowable under Article 1649 of the Puerto Rico Civil Code or successor statute applicable to past due amounts.

"Inventory Amount" – On any date of determination, an amount equal to the audited cost to Seller (determined in accordance with GAAP) of spare parts owned by Seller and maintained as inventory for the Seller's Complex on such date; provided, that such spare parts (i) have been purchased by Seller no earlier than six (6) years prior to such date, (ii) do not include any expendables, consumables, or bulk materials, (iii) have a unit cost (or unit set cost) of no less than ten thousand dollars ($10,000), which amount shall be subject to the Annual PPI Adjustment (as defined below); (iv) individually are new or reconditioned and in good working order; and (v) have been purchased in accordance with Prudent Utility Practices; and provided, further that PREPA's obligation to pay to Seller the portion of the Inventory Amount pursuant to Article 15 shall not exceed twenty-seven million, five hundred thousand dollars ($27,500,000), which amount shall be subject to the Annual PPI Adjustment (as defined below).  For purposes of this definition, "Annual PPI Adjustment" means, with respect to any dollar amount specified in this definition, an adjustment of such dollar amount as of January 1 of each Year (commencing on the first full year to occur after the Commercial Operation Date) in an amount equal to such dollar amount (as previously adjusted from time to time) multiplied by a fraction, the numerator of which shall be the average of the twelve (12) monthly values of the PPI for the twelve (12) months ending on December 31 of the Year immediately prior to the date of calculation, and the denominator of which shall be the average of the twelve (12) monthly values of the PPI for the twelve (12) months ending on December 31 of the Year which is two (2) Years prior to the date of calculation.

"Letter of Credit Default" – A Letter of Credit Issuer Event occurs with respect to a Letter of Credit Issuer if:

(a)     a Letter of Credit Issuer fails to honor Seller's request to draw on an Acceptable Letter of Credit when such request is in accordance with the requirements of such Acceptable Letter of Credit;

(b)     a Letter of Credit Issuer disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenge the validity of, an Acceptable Letter of Credit;

(c)     an Acceptable Letter of Credit expires or terminates (including expiration or termination in accordance with its terms), or fails or ceases to be in full force and effect at any time after the execution date thereof;

(d)     any bankruptcy event occurs with respect to a Letter of Credit Issuer; or

(e)     an Acceptable Letter of Credit is not renewed or replaced at least fourteen (14) business days prior to the expiration of such Acceptable Letter of Credit.



"Letter of Credit Issuer" – An entity that has issued an Acceptable Letter of Credit.

"Letter of Credit Issuer Event" – A Letter of Credit Issuer has ceased to satisfy the Letter of Credit Issuing Bank Requirements or is no longer organized or licensed as a branch or agency under the laws of the United States of America.

"Letter of Credit Issuing Bank Requirements" – For an Acceptable Letter of Credit Provider, two credit ratings that are equal to or better than the following, as applicable: (a) A3 by Moody's, (b) A- by S&P, or (c) A- by Fitch; provided that if more of than one of Moody's, S&P and Fitch ceases to exist or issue credit ratings, an equivalent rating of another rating agency (or if all three so cease, two rating agencies) of comparable standing that is reasonably acceptable to Seller.

"LNG" – Natural Gas in a liquid state at or below its boiling point and at or near atmospheric pressure.

"LNG Terminal" – The unloading arms, pier, dock, storage and vaporization facilities and all related interconnection and ancillary equipment utilized in Seller's Complex to unload, store, and vaporize LNG.

"LNG Terminal Inventory" – As of the effective date of any purchase of the LNG Terminal pursuant to Section 15.3, the spare parts owned by Seller and maintained as inventory for the LNG Terminal on the day prior to such date; provided, that (i) Seller has purchased such spare parts no earlier than six (6) years prior to such date, (ii) such spare parts exclude any expendables, consumables, or bulk materials, have a unit cost (or unit set cost) of no less than ten thousand dollars ($10,000), which amount shall be subject to the Annual PPI Adjustment (as defined below) and individually are new or reconditioned and in good working order.

"Load Frequency Control" – The control function within the AGC system for the regulation of the power output of the Facility, in response to changes in system frequency and so as to help maintain the scheduled frequency within predetermined limits.

"Maximum Recovery Period" – A period of thirty (30) consecutive days following the occurrence of a Grid Force Majeure Event.

"MM I Program" – As set forth in Section 12.1(b).

"MM II Program" – As set forth in Section 12.1(c).

"MMBTU" – Million British thermal units (Higher Heating Value).

"MRCC" – As set forth in Section 26.1(d)(i).

"Mode of Operation" – As set forth in Appendix K.

"Moody's" – Moody's Investors Service, Inc. or any successor thereto.

"Monthly Aggregate Amount" – An amount for any month, equal to the sum of the Capacity Payment, the Monthly Start-up Reimbursement, Heat Rate Adjustment, Backup Fuel Cost and Peaking Energy Cost.

"Monthly EAF" – As set forth in Appendix C.

"Monthly Invoice" – As set forth in Section 11.1(a).



"Monthly Start-up Reimbursement" – The amount in dollars, calculated in accordance in Appendix G, to reimburse Seller for the restart of any Unit of the Facility following (i) a request by PREPA under Section 7.3 to shut down any Unit of the Facility or (ii) any shutdown of a Unit Facility triggered by the Grid System; provided that Seller shall credit to PREPA the cost of the fuel required for a gas turbine Unit to achieve synchronization with the Grid System during each start up as provided in Appendix G.

"Natural Gas" or "NG" – Any saturated hydrocarbon or mixture of saturated hydrocarbons consisting essentially of methane and other combustible and non-combustible gases in a gaseous state.

"NG Delivery Point" – The position of the NG Measurement Facilities located downstream from the connection of the boil-off gas pipe to the main pipeline where Natural Gas enters the Facility, as further detailed in Appendix H.

"NG Fuel Specifications" – The specifications set forth in Appendix J.

"NG Measurement Facilities" – The main and back-up meter and other equipment as necessary to measure the volume and energy of Natural Gas delivered pursuant to this Agreement, and the on-line chromatographs installed and maintained by Seller, that are necessary to measure the quality of Natural Gas delivered pursuant to this Agreement.

"NG Measurement Review Period" – As set forth in Section 13.8.

"Naturgy" – Naturgy Aprovisionamientos S.A. or any of its Affiliates.

"Net Electrical Output" – The net electrical energy output of the Facility, expressed in kWh, delivered from the Facility at 230 kV to the Interconnection Point.

"Non-Commonwealth Entity" – A Person that is not, or that ceases to be, a Commonwealth Entity.

"Non-Conforming NG" – As set forth in Section 13.6(a).

"Non-Scheduled Outage" – A planned interruption of all or a portion of the electrical output of the Facility that has been coordinated with PREPA and is required for any purpose including inspection, preventive maintenance, or corrective maintenance and which has not been included in the Scheduled Outage Program.

"Operation Security" – As set forth in Section 19.3(a).

"Original Effective Date" – March 10, 1995.

"Outage Hours" – The number of hours, including hours attributable to a Force Majeure claimed by Seller, that the Facility is not capable of providing service at any capacity level, including any period of time that the Facility is not available due to outages affecting the LNG Terminal.

"P3A" – The Puerto Rico Public-Private Partnership Authority.

"Party" or "Parties" – As set forth in the first paragraph of this Agreement.

"Peaking Energy Cost" – An amount (expressed in dollars) equal to the Peaking Rate multiplied by the volume of Net Electrical Output delivered to the Interconnection Point in response to a Peaking Request.



"Peaking Rate" – An amount equal to $0.0308 per kilowatt hour, as increased annually, commencing in calendar year 2020, by the Demand Charge Escalation Factor.

"Peaking Request" – An Automated Peaking Request or a PREPA Peaking Request.

"Percent of Dependable Capacity" – As set forth in Appendix B.

"Performance Tests" – The Scheduled Performance Tests and the Additional Performance Tests.

"Performance Test 1" – As set forth in Section 12.1(a).

"Performance Test 2" – As set forth in Section 12.1(b).

"Performance Test 3" – As set forth in Section 12.1(c).

"Period Hours" – All hours in the relevant period.

"Permanent Abandonment" – (a) An affirmative action taken by Seller, its successors, or assignees, as applicable, to permanently shut down the operations of the Facility, or (b) the Available Hours equaling zero (0) for any period of twenty-four (24) consecutive months whether or not a Force Majeure event has been claimed by Seller, except to the extent that the shutdown referenced in subsection (b) of this definition is the result of PREPA not having satisfied the Fuel Supply Requirement.

"Permanent Closing" – Shall be deemed to have occurred when the Available Hours equal zero (0) for any period of twelve (12) consecutive months, excluding periods of outages due to Force Majeure.

"Permits" – All permits, licenses, approvals, authorizations, consents, variances or waivers issued by federal, Commonwealth and local agencies, commissions, authorities and regulatory bodies with jurisdiction over Seller and the Seller's Complex which are necessary or required for the development, construction, operation or maintenance of the Seller's Complex.

"Person" – An individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"PPI" – The Producer Price Index For Capital Equipment, Construction machinery and equipment (Table 2, Commodity code 11-2) as published by the United States Department of Labor, Bureau of Labor Statistics.

"Post-Original Effective Date Environmental Costs" – As set forth in Section 20.1.

"Post-Original Effective Date Taxes" – As set forth in Section 20.1.

"Pre-Restatement PPOA" – As set forth in the first recital of this Agreement.

"PREB" – The Puerto Rico Energy Bureau, established by Puerto Rico Act 57-2014 (as amended).

"PREPA 1974 Agreement" -- The 1974 Agreement between PREPA and State Street Bank and Trust, Company, as successor trustee

"PREPA 1974 Indenture" – The Trust Indenture dated January 1, 1974, as amended between PREPA and The Chase Manhattan Bank (National Association) as successor trustee.



14

"PREPA Interconnection Facilities" – All equipment and facilities located on PREPA's side of the Interconnection Point constructed and installed for the purpose of interconnecting the Facility with PREPA's electric transmission system, including but not limited to, all Electrical Metering Equipment, transmission lines and associated equipment, relay and switching equipment, and protective devices and safety equipment, as set out in Appendix E.

"PREPA LNG Terminal Purchase Notice" – As set forth in Section 15.3.

"PREPA's Operating Period" – As set forth in Section 19.6(a).

"PREPA Peaking Request" – As set forth in Section 7.5.

"PREPA Power Plant Purchase Notice" – As set forth in Section 15.1.

"Project Lender" – As set forth in Section 22.2.

"PROMESA" – As set forth in the fourth recital of this Agreement.

"PROMESA Case" – As set forth in the fourth recital of this Agreement.

"PROMESA Court" – As set forth in the fourth recital of this Agreement.

"Prudent Electrical Practices" – Those practices, methods, standards and acts which, in the exercise of reasonable judgment in light of the facts known at the time a decision was made, would have been used in prudent electrical engineering and operations to operate a facility similar to the Facility under the same or similar circumstances, including equipment for the generation, transmission, distribution and delivery of electricity, lawfully and with efficiency and dependability, and that are in accordance with the National Electrical Safety Code, the National Electrical Code and any other applicable federal, state or local code.

"Prudent Utility Practices" – Those practices, methods, standards and acts which, in the exercise of reasonable judgment in light of the facts known at the time a decision was made, would have been generally followed by the electric generation industry in the United States and Puerto Rico, as changed from time to time, which generally include, but are not limited to, engineering and operating considerations.

"Purchase Closing Date" – As set forth in Section 15.6.

"Purchased Assets" – As set forth in Section 15.6.

"Purchase Price" – As set forth in Section 15.6(a).

"PURPA" – The Public Utility Regulatory Policies Act of 1978 and the regulations promulgated thereunder in effect as of the date this Agreement is executed or as they are amended in the future from time to time.

"Qualified Operator" – Seller or any Affiliate of Seller or any Affiliate of either of Seller's general partners, or another qualified and experienced operator acceptable to PREPA.

"Qualifying Facility" – A cogeneration facility or a small power production facility which is a Qualifying Facility under Subpart B of Subchapter K, Part 292 of Chapter I, Title 18, Code of Federal Regulations, promulgated by the FERC as such regulations are in effect on the date hereof or as amended from time to time.

"Quarter" – A three (3) month period beginning 12:00 midnight on January 1, April 1, July 1, or October 1.



"Ramp Rates" – The rate(s) of time required for the Facility to change its per kilowatt output from a particular output level to another output level, determined in accordance with Appendix A.

"Required Capital Expenditures" – On any date of determination, an amount equal to the aggregate capital expenditures paid by Seller on or prior to such date but only if and to the extent that (a) such capital expenditures were (i) required to be made by Seller to the Seller's Complex in order to comply with its obligations under this Agreement and·(ii) paid by Seller after the Commercial Operation Date and (b) the necessity for such capital expenditures arose out of events that occurred after the Commercial Operation Date; provided that such capital expenditures shall be net of the value of any equipment replaced or retired and shall not include (i) any capital expenditures required in order to complete the construction of the Seller's Complex and to achieve the Commercial Operation Date, (ii) any capital expenditures paid by PREPA under Section 19.6(b) or otherwise pursuant to this Agreement, (iii) any capital expenditures required as a result of casualty losses to the extent such losses were or should have been covered by insurance required to be maintained by Seller hereunder or were covered by other insurance maintained by Seller, (iv) any capital expenditures made in connection with the maintenance of the Seller's Complex or (v) any capital expenditures made as a result of a defect in the design, engineering or construction of the Seller's Complex (whether or not covered under warranty); the amount paid by Seller for such capital expenditures and the determination of whether such capital expenditures constitute "Required Capital Expenditures" within the meaning of this definition shall be determined and certified by an independent engineer selected by PREPA.

"Required Capital Expenditures-Straight Line" – On any date of determination, an amount equal to the amount of the Required Capital Expenditures that would remain outstanding on such date if each capital expenditure constituting such Required Capital Expenditures was depreciated on straight-line basis over the period commencing on the date such capital expenditure was incurred and ending on the earlier of (i) the end of the useful life of such capital expenditure and (ii) the date which is twenty (20) years after the date such capital expenditure was incurred.

"Restatement GSPA" – The Amended and Restated Gas Sale and Purchase Agreement to be executed by PREPA and Naturgy for the supply of Natural Gas for the Facility and the Costa Sur facility.

"Rolling 2020 Cap" – As set forth in Appendix C.

"RTU" – As set forth in Section 7.1.

"S&P" – S&P Global Ratings, a division of S&P Global Inc., or any successor thereto.

"Scheduled Outage" – A planned interruption of the Facility's generation that has been coordinated in advance with PREPA with mutually agreed start and duration pursuant to Article 8.

"Scheduled Outage Program" – As set forth in Section 8.1.

"Scheduled Performance Tests" – Performance Test 1, Performance Test 2 and Performance Test 3.

"Seller" – As set forth in the first paragraph of this Agreement.

"Seller's Complex" – The collective reference to the premises, facilities and infrastructure comprising the Facility, including the land upon which the Facility is located, the Seller Interconnection Facilities, the desalination plant and associated water pipelines, and other



-16-

equipment reasonably incidental and ancillary to the operation of the Facility, owned by Seller, for the purpose of performing its obligations under this Agreement. For the avoidance of doubt, "Seller's Complex" does not include the LNG Terminal.

"Seller Interconnection Facilities" – All equipment and facilities, located on Seller's side of the Interconnection Point, constructed and installed for the purpose of interconnecting the Facility with PREPA's electric transmission system, including but not limited to, all Electrical Metering Equipment, transmission lines and associated equipment, relay and switching equipment, and protective devices and safety equipment, as set forth in Appendix E.

"T&D Operator" – Any future operator of the interconnected network of high voltage transmission lines, low voltage distribution lines and associated electric substations in the Territory that is a Commonwealth Entity or an Acceptable Private Assignee.

"Taxes" – As set forth in Section 20.1.

"Term" – As set forth in Article 5.

"Terminal Abandonment Notice" – As set forth in Section 15.3.

"Territory" – The unincorporated and organized territory of the United States officially known as the Commonwealth of Puerto Rico.

"Tested Capacity" – For each Performance Test, the net electric generating capacity for the Facility (gross electric generating capacity less station use) made available to PREPA at the Interconnection Point, which includes the capacity obtained through the use of supplementary firing, measured by such test.

"Tested Heat Rate" – For each Performance Test, the Base Load Heat Rate, measured by such test.

"Third Party Fuel Test" – As set forth in Section 13.6.

"Tolling Agreement" – The Amended and Restated LNG Tolling Services Agreement dated September 5, 2019 between Naturgy and Seller.

"Transfer" – As set forth in Section 22.3.

"Twelve Month EAF" – As set forth in Appendix C.

"Unit" – Each of the individual gas turbine units and steam turbine units of the Facility.

"US-CPI" – The All Items, U.S. City Average, Not Seasonally Adjusted, Base: 1982-84=100, All Urban Consumers (CPI-U) Consumer Price index as reported by the U.S. Bureau of Labor Statistics. If the Consumer Price index ceases to be published, or the method of calculation of that index substantially alters, then the nearest equivalent index to the Consumer Price Index published by the Bureau of Labor Statistics for the Labor Department of the Government of the United States of America shall be used as a replacement for the Consumer Price Index in this definition.

"Valuation Firm" – An independent, nationally recognized third-party valuation firm reasonably acceptable to Seller.

"Working Capital" – The amount by which Current Assets exceeds Current Liabilities.

1.2    Interpretation

-17-

In this Agreement and unless the context otherwise requires:

(a) each of the terms Seller, PREPA, Party and Parties shall include all successors and assigns of each such entity under Article 22 hereof;

(b) words in the singular may be interpreted as referring to the plural and vice versa;

(c) where the context requires, terms used in the present tense may be interpreted as referring to the past tense and vice versa; and

(d) all calculations shall be rounded upward to the nearest eight (8) decimal places, except calculations resulting in a dollar amount to be paid hereunder shall be rounded to the nearest cent and calculations of Equivalent Availability Factor, Equivalent Availability Adjustment Factor and Additional Availability Adjustment Factor shall be rounded to the nearest one tenth (1/10) of a percent.

## 2.   EFFECTIVENESS OF THE AGREEMENT

2.1   This Agreement shall become effective on the date on which the Parties jointly sign a certificate, which in the case of PREPA, may be signed by PREPA's counsel, confirming the satisfaction or waiver of each of the following conditions precedent (the "Effective Date"):

(a)  for satisfaction by PREPA:

   (i)   obtaining approval of the P3A to proceed with the finalization of this Agreement;

   (ii)  obtaining approval of each of FOMB, the governing board of PREPA and PREB for the execution and delivery by PREPA of this Agreement;

   (iii) delivery by PREPA of a legal opinion prepared by its external counsel in a form reasonably acceptable to Seller, confirming the warranty made by PREPA in Section 6.13(b); and

   (iv)  full force and effectiveness of the Restatement GSPA.

(b)  for satisfaction by Seller:

   (i)   delivery by Seller of a legal opinion prepared by its external counsel in a form reasonably acceptable to PREPA, confirming the warranty made by Seller in Section 6.5(d);

   (ii)  full force and effectiveness of the Tolling Agreement;

   (iii) delivery by Seller to PREPA of a replacement Operation Security in a form reasonably acceptable to PREPA; and

   (iv)  delivery by Seller of each of the documents and certificates set forth in Sections 26 and 27.2.

(c)  for joint satisfaction by each of the Parties, the Assumption Order shall have been entered by the PROMESA Court and become a Final Order.

2.2   Until the occurrence of the Effective Date, this Agreement shall have no force or effect, and the Pre-Restatement PPOA shall remain in effect in accordance with its terms.



-18-

**3.**   **SALE AND PURCHASE OF DEPENDABLE CAPACITY**

3.1   Seller agrees to sell, and PREPA agrees to purchase, Dependable Capacity, subject to the terms and conditions of this Agreement.

3.2   As part of the provision of Dependable Capacity, Seller agrees to deliver, and PREPA agrees to accept delivery of, Net Electrical Output of the Facility, subject to the terms and conditions of this Agreement.

3.3   PREPA hereby confirms that Seller has delivered the following information under the Pre-Restatement PPOA:

   (a)   one or more documents evidencing that Seller owns the Seller's Complex and has the right to use, for the Term of the Agreement, the real property on which the Seller's Complex is located.   Such document or documents may include a deed of purchase or a lease agreement;

   (b)   a report by a qualified independent consultant selected by both Parties, certifying that (i) the Facility and the Interconnection Facilities, if operated and maintained in accordance with Prudent Electrical Practices, Prudent Utility Practices and/or other appropriate industry standards, can be expected to have a useful life at least equal to the Term of Agreement, and (ii) the Facility and Interconnection Facilities have been designed and constructed in compliance with the terms of the Agreement;

   (c)   originals of certificates of insurance policies for insurance coverage required by Article 21; and

   (d)   copies of all material Permits needed to construct and operate the Facility and Seller Interconnection Facilities.

3.4   Without limiting any other obligations of Seller in this Agreement, PREPA's obligation to purchase Dependable Capacity from Seller is conditioned upon Seller, at its expense, acquiring and maintaining in effect any Permits and completing or having completed any environmental impact studies, in each case necessary (a) for the operation and maintenance of the Facility, which, if not obtained, would prevent Seller from operating the Facility, and/or (b) for Seller to perform its obligation to deliver Net Electrical Output to PREPA in accordance with this Agreement.

**4.**   **NOTICES**

4.1   All notices and other communications hereunder shall be in writing, other than dispatch orders which may be oral and immediately confirmed by telecopy (or such other means as may be agreed by the Parties in writing), and shall be deemed duly given upon receipt after being delivered by hand or sent by registered or certified mail, return receipt requested, postage prepaid or by recognized overnight courier service or by telecopy, addressed as follows:

**If to Seller to:**

EcoEléctrica, L.P.
Road 337, Km 3.7 Bo Tallaboa,
Poniente, Peñuelas PR 00624
Attention:  General Manager
Telecopy:  (787) 487-6002

**If to PREPA:**



19

Puerto Rico Electric Power Authority (if by hand)
1110 Ponce de Leon Avenue
Office #601
Santurce, Puerto Rico
Attention: Executive Director
With a copy to:  General Superintendent – Cogenerators Administration

Puerto Rico Electric Power Authority (if by mail)
G.P.O. Box 364267
San Juan, Puerto Rico 00936
Attention: Executive Director
With a copy to General Superintendent – Cogenerators Administration

4.2     Either Party hereto may change, by notice as above provided, the persons and/or addresses to which all such notices are to be sent.

5.    **TERM**

The term of this Agreement shall begin with the Original Effective Date and expire on September 30, 2032, unless terminated or cancelled in accordance with the terms hereof (the "Term").

6.    **REPRESENTATIONS, WARRANTIES AND COVENANTS**

6.1     Seller covenants and warrants that the Seller's Complex shall be operated and maintained by a Qualified Operator in accordance with (a) the Agreed Operating Procedures, (b) Prudent Electrical Practices and (c) Prudent Utility Practices, including without limitation, synchronizing, voltage and reactive power control.

6.2     Seller covenants and warrants that the Facility shall be operated at the voltage levels determined pursuant to the Agreed Operating Procedures and that the Design Limits shall have an MVA capability based on a 0.85 power factor.  Seller warrants that it will correct any Facility design or construction defect that causes the Facility to have a material adverse effect on PREPA's voltage level or voltage waveform.

6.3     Seller shall, at all times, comply with all applicable laws, ordinances, rules and regulations applicable to it and the use, occupancy and operation of the Seller's Complex, unless the noncompliance therewith would not have a material adverse effect on the operation of the Seller's Complex, provided that in the event of any such noncompliance, Seller shall be diligently contesting any such law, ordinance, rule or regulation in good faith. Seller shall give all required notices and shall pay all charges and fees in connection therewith, unless Seller shall be diligently contesting such payments in good faith.

6.4     Seller shall have the sole responsibility for the payment of any and all fines or other penalties incurred by or imposed upon Seller or its agents, employees, suppliers or subcontractors for noncompliance by Seller, its agents, employees, suppliers or subcontractors with laws, rules, regulations or ordinances applicable to or in connection with the development, construction, ownership and/or the proper operation of the Seller's Complex as determined by those having jurisdiction over the Seller's Complex, and PREPA shall be held harmless from any such fines or penalties and expenses related to these (including without limitation all reasonable attorneys' fees).



6.5    Seller hereby warrants:

(a)    As of the Effective Date, Seller is a limited partnership duly organized, validly existing and in good standing under the laws of Bermuda, is registered to do business in the Commonwealth of Puerto Rico, its general partner is EcoEléctrica LLC, a limited liability company organized under the laws of the Commonwealth of Puerto Rico and its limited partner is EcoEléctrica Holdings LLC, a limited liability company organized under the laws of the Commonwealth of Puerto Rico whose members are IPM Puerto Rico Holding, Inc., the ultimate parent of which is IPM Eagle LLP, a joint venture seventy percent (70%) owned by Engie and thirty percent (30%) Mitsui & Co., and Buenergia Gas & Power LLC, the ultimate parent of which is Global Power Generation, S.A. a joint venture seventy - five percent (75%) Naturgy Energy Group, S.A and twenty-five percent (25%) Kuwait Investment Authority. Seller has all requisite power and authority to conduct its business, to own its properties, and to execute, to deliver, and to perform its obligations under this Agreement.

(b)    The execution, delivery and performance by Seller of this Agreement have been duly authorized by all necessary partnership action, and do not and will not (i) require any consent or approval of Seller's partners, other than that which has been obtained, as certified by the partnership resolution dated March 19, 2020 and delivered to PREPA not later than the Effective Date, (ii) violate any provision of Seller's partnership agreement or other organic documents, any indenture, contract or agreement to which it is a party or by which it or its properties may be bound, or any law, ordinance, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect, or (iii) result in a breach of or constitute a default under Seller's partnership agreement or other organic documents or other material indentures, contracts or agreements to which it is a party or by which it or its property may be bound.

(c)    Seller is not in default under contracts or agreements to which it is a party or by which it or its property may be bound, and which would be expected to materially and adversely impact the ability of Seller to perform its obligations under this Agreement.

(d)    This Agreement is a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

(e)    Except as previously disclosed in writing, there is no pending action or proceeding in which Seller is a party before any court, governmental agency or arbitrator that could reasonably be expected to affect materially and adversely the financial condition or operations of Seller or the ability of Seller to perform its obligations under, or which purports to affect the legality, validity or enforceability of, this Agreement as in effect on the date hereof.

(f)    Seller agrees to maintain a minimum Working Capital of ten million dollars ($10 million) for the duration of the Term.

6.6    Seller agrees that, within forty-five (45) days after every other Quarter following the Effective Date it will cause to be delivered to PREPA a report prepared in accordance with GAAP and signed by the President, Vice President, Treasurer or Controller of Seller or any of Seller's general partners setting forth the following:

(a)    a separate income and expense statement for such semiannual period just ended;

(b)    a balance sheet as of the end of such semiannual period;

(c)    a statement of cash flows of such semiannual period;

(d) a statement of changes in stockholders' Equity as of the end of such semiannual period; and

(e) notes to the financial statements, as applicable.

PREPA acknowledges that all such information delivered to PREPA is confidential information of Seller.

In addition, Seller agrees that each Fiscal Year following the Effective Date it will cause an audit to be prepared in accordance with GAAP, of its books and accounts pertaining to the Seller's Complex by an independent firm of certified public accountants of suitable experience and acceptable to PREPA. Such audit shall commence on or before thirty (30) days after the end of the Fiscal Year and shall be completed within ninety (90) days after its commencement date. On or before the last day of the first month following the completion of such audit, reports of such audits shall be delivered to PREPA. Such audit reports shall set forth, in respect to the preceding Fiscal Year, the same matters as are herein above required for the semiannual reports.

Seller further agrees that it will cause to be delivered to PREPA an annual certification of the names of its Authorized Officers, accountants, and consulting engineers.

6.7    Seller shall make available to PREPA all copies that Seller receives of any maintenance evaluations or reports to be provided by Seller to any third party with a financial security interest in or lien on the Seller's Complex, including evaluations or reports generated at the request of such third parties or performed by an engineering firm employed by such third party.

6.8    Seller agrees to preserve and keep in full force and effect during the Term its partnership existence (including via merger or consolidation with or into another entity, subject to Article 22). Seller further agrees that it will not dissolve and wind-up its affairs, or otherwise dispose of all or substantially all of its assets without the prior approval of PREPA, which approval shall not be unreasonably withheld or delayed.

6.9    PREPA agrees that all information (whether financial, technical, or otherwise) obtained from Seller, including without limitation information obtained pursuant to Section 6.6, or from PREPA's inspections of the Seller's Complex or from any third parties pursuant to Section 6.7, which is not otherwise generally available to the public shall be kept confidential and used solely by PREPA in connection with the performance of its obligations under this Agreement. Disclosure of such information may be made only within PREPA's organization to key personnel, and to third parties serving as PREPA's legal, financial or technical advisors, whose duties justify their need to review and know such material. PREPA shall require each person (and personnel thereof) to agree for the benefit of Seller to maintain the confidentiality of such information. To the extent PREPA is required to disclose such information by any court, governmental agency or to the extent necessary to secure governmental approval or authorization, PREPA shall use its best efforts to seek a confidentiality agreement that assures confidential treatment of the information consistent with the terms of this Section 6.9. In the event PREPA is not successful in obtaining a confidentiality agreement, PREPA and Seller shall use reasonable efforts to obtain through court action the appropriate protective order. Notwithstanding the foregoing, PREPA may disclose the terms and conditions of this Agreement to (i) FOMB, PREB, the PROMESA Court, and any governmental authority or agency of Puerto Rico or the Government of the United States of America for the purposes of obtaining the consents and approvals described in Section 2.1(a), together with such additional information as may be required to obtain such consents and approvals, and (ii) any potential T&D Operator or its Affiliates and their respective advisors and lenders.



6.10    For so long as the PREPA 1974 Indenture remains in effect, all payments by PREPA to Seller under this Agreement shall be treated as current expenses as defined by the terms of the PREPA 1974 Agreement.

6.11    At all times, as available, Seller agrees to provide at no cost to PREPA copies of all final site-related reports and applications, including without limitation, technical, environmental, geological, seismological, licensing and permitting data in Seller's possession, excluding any proprietary design information relating to the Seller's Complex.

6.12    (a)    Seller agrees to use its best reasonable efforts, when soliciting and obtaining personnel to perform services for the Seller's Complex in Puerto Rico, to achieve a goal that not less than fifty percent (50%) expended in Seller's performance of the services pursuant to this Agreement following Commercial Operation Date shall be performed by individuals who are bona fide residents of Puerto Rico as defined in this Section 6.12.

(b)    For purposes of Section 6.12 of this Agreement, an individual shall be considered a bona fide resident of Puerto Rico if said individual has been a resident of Puerto Rico immediately prior to commencing work on the Seller's Complex. To the extent that despite Seller's best reasonable efforts Seller has failed to achieve the goals set forth in Sections 6.12(a), Seller may for purposes of calculating satisfaction of said goals include the services of individuals who at some time prior to commencing work on the Seller's Complex, but not necessarily including the period of time immediately prior to commencing work on the Seller's Complex, were residents of Puerto Rico for at least five (5) consecutive years and who relocated to Puerto Rico in order to perform work on the Seller's Complex. Seller shall, in good faith, be entitled to rely on the representation of each individual applicant as to whether such individual meets the criteria set forth herein.

(c)    Nothing contained herein shall be interpreted as obligating Seller to take any action which would be in violation of the United States Constitution, federal law or the laws of Puerto Rico or of any affirmative action program or equal opportunity obligation to which Seller or its affiliated companies are or may be bound under federal law or the laws of Puerto Rico.

6.13    PREPA warrants that:

(a)    pursuant to Act Number 83 of May 2, 1941, as amended, PREPA is a public corporation duly organized and validly existing under the laws of the Commonwealth of Puerto Rico and has all requisite power and authority to conduct its business, to own its properties, and to execute, to deliver, and to perform its obligations under this Agreement;

(b)    this Agreement is a legal, valid and binding obligation of PREPA, enforceable against PREPA in accordance with its terms; and

(c)    except for the PROMESA Case, or as previously disclosed in writing, there is no pending or, to its best knowledge, threatened action or proceeding against PREPA before any court, governmental agency or arbitrator that could reasonably be expected to affect materially and adversely the financial condition or operations of PREPA or the ability of PREPA to perform its obligations under, or which purports to affect the legality, validity or enforceability of, this Agreement (as in effect on the date hereof).

6.14    Seller shall not be relieved of its obligations under this Agreement as a result of subcontracting any of its obligations to a third party.

6.15    Seller shall provide PREPA with as-built drawings of the Facility within one hundred twenty (120) days after any material modification of the Facility.

7.    **DISPATCHING**



-23-

7.1   Subject to Section 7.4 and the other terms of this Agreement, PREPA (or, for the avoidance of doubt, the T&D Operator, under the circumstances described in Section 22.3), at its sole discretion, shall have the right to Dispatch the Facility within its Design Limits. PREPA's dispatching centers will determine the appropriate level of Dispatch by means of its Automatic Generation Control system and the use of Prudent Utility Practices, and will communicate the same to Seller (the "Dispatch Instruction"). Seller will give the dispatcher a status report every eight (8) hours of the Seller's Complex conditions, including any Seller's Complex restrictions, and the hourly integrated net generation during that period. Seller shall notify the dispatcher immediately if there is any pertinent change in the Seller's Complex status. Seller shall make available through the Facility's remote terminal unit ("RTU") the actual Facility load limit adjustment.

7.2   The Facility will be operated in the Dispatchable Mode. On the fifteenth (15th) day of each month, PREPA shall provide Seller with an estimated daily schedule of operations for the following three (3) months. In addition, by Friday of each week PREPA shall provide Seller with an estimated hourly schedule of operations for the following five (5) weeks. The actual schedule will be determined by the requirements for operation in accordance with Economic Dispatch and Prudent Utility Practices and may be substantially different than the schedule provided in accordance with this section. PREPA will immediately provide notice to Seller at any time that the total level that it intends to Dispatch the Facility during a month changes by five percent (5%) or more from the total level of estimated schedules of operations previously provided to Seller.

7.3   PREPA will use all reasonable efforts to provide Seller with six (6) hours advance notice of a request to either start-up or shutdown either one or two of the gas turbine Units of the Facility. PREPA agrees there will be no more than one hundred (100) requests to shut down the Units of the Facility in any Year; provided, however, that the parties may agree to increase the maximum number of shut-down and start-up requests of any gas turbine Unit of the Facility on an annual basis. The notices herein mentioned must be given orally and confirmed by telecopy (or such other means as may be agreed by the Parties in writing) to the Facility.

7.4   The Facility can be dispatched during any hour up to one hundred percent (100%) of its Dependable Capacity, subject to the Ramp Rates and the Agreed Operating Procedures. In the event that the Facility is operating with the gas turbine or the steam turbine Units not in operation, the Facility Dispatch levels will be reduced in accordance with Prudent Utility Practices and so as to comply with the Facility's Permits. The Facility's Fuel Cost Correction Factor will vary from unity (1.00) based on the Facility's correction curve described in the definition of Fuel Cost Correction Factor.

7.5   At any time, PREPA may request, through the Energy Control Center, Dispatch of the Facility at a level in excess of the Dependable Capacity (each, a "PREPA Peaking Request"). Upon receipt of a PREPA Peaking Request, Seller shall notify the Energy Control Center within one (1) hour of such receipt whether Seller intends to make available Net Electrical Output contemplated by such request at the Interconnection Point. To the extent that Seller confirms such intention to make such output available in such notice, Seller shall make such volumes available during the hours indicated in such request. PREPA shall pay Seller the applicable Peaking Rate for Net Electrical Output in response to a Peaking Request.

7.6   Seller shall provide PREPA with Ancillary Services set forth in Appendix K, which can be used by PREPA to maintain the reliability of the Grid System in accordance standards of the North American Electric Reliability Council as Puerto Rico adds variable generation into the Territory's generation mix, contemplated by the Energy Policy Act. Seller hereby confirms that the Facility can provide each of the Ancillary Services within the Design Limits.



## 8.   CONTROL AND OPERATION OF THE FACILITY

8.1   Seller shall submit to PREPA, in writing, by September 1 of each Year, its desired scheduled outage program (the "Scheduled Outage Program") for the next Year.  Seller shall only schedule Scheduled Outages during periods approved by PREPA, and such approval shall not be unreasonably withheld. PREPA shall have the right, upon one hundred eighty (180) days' prior written notice, to revise the period during which Seller shall not schedule a Scheduled Outage.  If a Scheduled Outage was set for the time period that PREPA has determined a shutdown should not occur, Seller shall submit to PREPA, if consistent with Prudent Utility Practices, an alternate date reasonably acceptable to PREPA for the Scheduled Outage. Scheduled Outages shall be requested and scheduled by the Parties in accordance with Appendix I to this Agreement.  Seller undertakes to perform all planned maintenance on the LNG Terminal during periods of the Scheduled Outages at the Facility.

8.2   Within sixty (60) days of the receipt of the proposed Scheduled Outage Program, PREPA shall notify Seller in writing whether the requested Scheduled Outage periods are acceptable.  If PREPA cannot accept any of the requested Scheduled Outage periods in the Scheduled Outage Program, PREPA shall advise Seller of the time period closest to the requested period when the outage can be scheduled.

Seller shall use all reasonable efforts to comply with the Scheduled Outage Program.  In the event Seller has reason to believe that the duration of the Scheduled Outage will exceed the planned duration of the Scheduled Outage, Seller shall notify PREPA, as soon as possible, of the cause or causes for such delay and of the additional time required to end the Scheduled Outage.  In such event, Seller will use all reasonable efforts to return the Facility to operation in the shortest possible time.

8.3   Seller shall use reasonable efforts to notify PREPA of and coordinate all Non-Scheduled Outages with PREPA.  Seller shall use reasonable efforts to schedule Non-Scheduled Outages to occur during times when the Facility is not projected to be Dispatched, during Scheduled Outages or at such other times as will minimize any adverse effect on the operation of PREPA's electric system.  Seller shall use reasonable efforts to perform and complete Non-Scheduled Outages in a timely manner consistent with Prudent Utility Practices.

8.4   Seller shall employ qualified personnel for monitoring the Seller's Complex and for coordinating operations of the Seller's Complex with PREPA's system. As personnel changes occur, Seller shall periodically provide PREPA with an updated list and qualifications of Seller's personnel who will be responsible for supervising the operation and maintenance of the Seller's Complex and for coordinating operations of the Seller's Complex with PREPA's system.

Seller shall ensure that listed supervisory personnel will be on duty at all times, twenty-four (24) hours a day and seven (7) days a week.

8.5   If an Emergency is declared by PREPA, PREPA's dispatching centers will notify Seller's personnel and, if requested by PREPA, Seller's personnel shall place the Net Electrical Output within the exclusive control of PREPA's dispatching centers for the duration of such Emergency.  Without limiting the generality of the foregoing, PREPA's dispatching centers may require Seller's personnel to delay synchronization or raise or lower production of energy generated by the Facility to maintain safe and reliable load levels and voltages on PREPA's transmission and/or distribution system; provided, however, any changes in the level of Net Electrical Output required by PREPA hereunder shall be implemented in a manner consistent with Prudent Utility Practices and within the Facility's Design Limits.

8.6   Seller shall cooperate with PREPA in establishing Emergency plans, including without limitation, recovery from a local or widespread electrical blackout; voltage reduction in order



25

to effect load curtailment; and other plans which may arise. Seller shall make technical information and data available to PREPA concerning start-up times, black-start capabilities and minimum load-carrying ability.

8.7   If Seller has a Scheduled Outage or a Non-Scheduled Outage, and such Scheduled Outage or Non-Scheduled Outage occurs or would occur during an Emergency, Seller shall make all good faith efforts, consistent with Prudent Utility Practices and with PREPA's approval, to reschedule the Scheduled Outage or Non-Scheduled Outage or if the Scheduled Outage or Non-Scheduled Outage has begun, to expedite the completion thereof.

8.8   Seller has previously provided the following communication facilities linking the Facility with PREPA's dispatching centers:

(a) for the purpose of telemetering, data acquisition, and automatic generation control by PREPA:

    (i)   one dual ported RTU for data acquisition and generation control compatible with PREPA's energy management system;

    (ii)   two voice grade telecommunication circuits for the dual ported RTU. One to Monacillos transmission center ("TC") and the other to Ponce TC;

    (iii)   one voice grade telecommunication circuit for the Facility for the backup telemetry to Monacillos TC; and

    (iv)   pro rata cost of installation by PREPA of all equipment needed for this purpose outside of the Facility and attributable to the Facility, as set forth in the interconnection study performed by PREPA pursuant to Section 9.3 of the Pre-Restatement PPOA;

(b) a voice telephone extension for the purpose of accessing PREPA's dial-up Electrical Metering Equipment and for communicating with the Energy Control Center;

(c) for so long as telecopier communications are required by this Agreement, telephone line and equipment to transmit and receive telecopies;

(d) ring down telephone line to Monacillos TC; and

(e) telecommunications radio compatible with PREPA's trunking radio system.

8.9   Each Party shall keep complete and accurate records and all other data required by each of them for the purposes of proper administration of this Agreement.

(a) All such records shall be maintained for a minimum of five (5) years after the creation of such record or data and for any additional length of time required by regulatory agencies with jurisdiction over the Parties; provided, however, that neither Party shall dispose of or destroy any such records that are specifically designated by the other Party even after five (5) years without thirty (30) days' prior notice to the other Party. If notice is given to the notifying Party during such thirty (30) day period, the notifying Party shall promptly deliver such records and data to the Party wishing to retain such records.

(b) Seller shall maintain an accurate and up-to-date operating log at the Facility with records of: (i) real and reactive power production for each hour; (ii) changes in operating status and Scheduled Outages; (iii) any unusual conditions found during inspections; (iv) the Available Capacity as determined consistent with Prudent Utility Practices and subject to verification by PREPA.

(c) Either Party shall have the right from time to time, upon fourteen (14) days written notice to the other Party and during regular business hours, to examine the records and data of the other Party relating to the proper administration of this Agreement any time during the period the records are required to be maintained.

8.10 At PREPA's request, Seller shall provide certifications of tests and inspections of the electric and protection equipment which may impact PREPA's electrical system. PREPA shall have the right to visit and visually monitor the Seller's Complex during operation and testing.

8.11 Within ninety (90) days after the Effective Date, PREPA and Seller shall mutually develop and reach an agreement on an updated detailed written operating procedures (the "Agreed Operating Procedures") for the operation of the Facility and the LNG Terminal under the terms of this Agreement, including detailed procedures for: (i) the daily nominations, management and coordination of the supply of Fuel, (ii) the reading of the NG Measurement Facilities (when installed in accordance with Section 13.7) and (iii) the resolution of disputes regarding material discrepancies between the quantity of Natural Gas delivered at the NG Delivery Point as registered by the main meter and the backup meter.

## 9. INTERCONNECTION

9.1 Seller shall own and be responsible for the safe and adequate operation and maintenance of all Seller Interconnection Facilities, other than Electrical Metering Equipment. PREPA shall own and be responsible for the safe and adequate operation and maintenance of the PREPA Interconnection Facilities.

9.2 PREPA reserves the right to modify or expand, its requirements for protective devices in the Seller Interconnection Facilities in conformance with Prudent Electrical Practices.

9.3 Each Party shall notify the other in advance of any changes to its system that will affect the proper coordination of protective devices on the two (2) systems.

## 10. METERING OF NET ELECTRICAL OUTPUT

10.1 PREPA shall own and maintain all Electrical Metering Equipment. Seller shall install Electrical Metering Equipment for backup purposes subject to Section 10.3; provided that such backup Metering Equipment shall be subject to PREPA's approval. PREPA covenants to repair or replace all Electrical Metering Equipment no later than one hundred eighty (180) days after the Effective Date.

10.2 All Electrical Metering Equipment shall be located at the Interconnection Point and sealed, and the seals shall be broken only by PREPA personnel when the meters are to be inspected, tested or adjusted. PREPA shall give Seller two (2) weeks' prior written notice thereof and Seller shall have the right to have a representative present during the meter inspection, testing or adjustment. If either Party believes that there has been a meter failure or stoppage, it shall immediately notify the other Party.

10.3 At least once a Year at PREPA's cost and, in addition, from time to time upon two (2) weeks' prior written notice by Seller, at Seller's cost, PREPA will test and calibrate the Electrical Metering Equipment (including any backup meters), in accordance with the provisions for meter testing as established in the American National Standard Code for Electricity Metering (ANSI) Standard C 12.16 for Solid State Electricity Meters and the Handbook for Electrical Metering, Edison Electric Institute 8th Edition or the updated edition in effect and available to PREPA at the time the test is performed. When, as a result of such a test of the Electrical



27

Metering Equipment, a meter is found to be inaccurate by no more than two percent (2%), no adjustment will be made in the amount paid to Seller for Net Electrical Output and Dependable Capacity delivered to PREPA. If the meter is found to be inaccurate by more than two percent (2%), PREPA will use the backup meters to calculate the correct amount delivered to PREPA for the actual period during which inaccurate measurements were made or, if the actual period cannot be determined to the mutual satisfaction of the Parties, for a period equal to the time elapsed since the most recent test, but in no case for a period in excess of one hundred eighty (180) days. If the backup meters are not available, or if the testing of the backup meters demonstrates that those meters are inaccurate by more than two percent (2%), the meter readings shall be adjusted based on the corrected meter readings of the most accurate meter for the actual period during which inaccurate measurements were made, or, if the actual period cannot be determined to the mutual satisfaction of the Parties, for a period equal to one-half of the time elapsed since the most recent test, but in no case for a period in excess of one hundred eighty (180) days. The previous payments by PREPA for this period shall be subtracted from the amount of payments that are calculated to have been owed under this Agreement. The difference shall be offset against or added to the next payment to either Party as appropriate under this or other agreements between the Parties. Each Party shall comply with any reasonable request of the other Party concerning the sealing of meters, the presence of a representative of the other Party when the seals are broken and the test is made, and other matters affecting the accuracy of the measurement of electricity delivered from the Facility. If either Party believes that there has been a meter failure or stoppage, it shall immediately notify the other Party.

10.4   During each one (1) Year period, PREPA shall read the Electrical Metering Equipment twelve (12) times to determine the amount of Net Electrical Output delivered to PREPA between any such two (2) consecutive meter readings (the "Billing Period"). The Billing Period shall not exceed thirty-three (33) days nor be less than twenty-eight (28) days. The meters will be read on the dates indicated on the meter reading program prepared by PREPA and submitted to Seller on or before January 1st of each Calendar Year. PREPA shall notify Seller in advance of any change on the meter reading program. Seller may be present, at its option, during all meter readings. PREPA shall provide Seller with a written statement containing the results of such meter readings within ten (10) days following the reading. PREPA shall, upon prior written notice, also provide access to the results of such meter readings to the P3A, the owner of the Grid System and the T&D Operator.

## 11.   COMPENSATION, PAYMENT AND BILLINGS

11.1   For each Billing Period, PREPA shall pay an amount equal to the Monthly Aggregate Amount as follows:

(a)   On or before the tenth (10th) day following the end of each Billing Period, Seller shall provide PREPA with proposed terms for the Available Capacity, Mode of Operation and Net Electrical Output for the purposes of calculating the Monthly Aggregate Amount due to Seller for such Billing Period. If a discrepancy exists in any of the proposed figures of the terms in the preceding sentence, the Parties shall act in good faith to resolve such discrepancies prior to Seller's issuance of a Monthly Invoice pursuant to Section 11.1(b) below.

(b)   On or before the fifteenth (15th) day following the end of each Billing Period, Seller shall provide PREPA with a written invoice for the Monthly Aggregate Amount and for all other amounts or reimbursements due to Seller hereunder (a "Monthly Invoice"). PREPA shall pay each Monthly Invoice it receives within forty-seven (47) days after the end of the Billing Period. Interest shall accrue on the outstanding payments due to Seller commencing on the forty-eighth (48th) day after the Billing Period. Notwithstanding the



payment requirements set forth in this Section, PREPA shall have the right to offset against the amounts due to Seller from PREPA under this Agreement any amounts owed to PREPA by Seller relating to the Seller's Complex that are not paid when due to PREPA. Payment to PREPA shall be made by wire transfer to an account with a bank to be specified by PREPA in writing. Payment to Seller shall be made by wire transfer to an account with a bank to be specified by Seller in writing. Either Party may, by written notice to the other, change the account to which such payments are to be sent.

(c)   If after Seller provides PREPA with a Monthly Invoice discrepancy exists between the amount of Available Capacity determined by PREPA and the amount set forth in a Monthly Invoice to PREPA, or PREPA in good faith disputes any other amount in such Monthly Invoice, PREPA shall pay the amount it determines in good faith is due based on its meter reading or otherwise, until the dispute is resolved in accordance with this Agreement.

11.2   The Capacity Payment shall be calculated in accordance with the formulae set forth in Appendix C; provided in the event that the calculation of the Capacity Payment at any time results in an amount less than zero dollars ($0), the Capacity Payment shall equal zero dollars ($0).

## 12.   PERFORMANCE TESTS

12.1   Seller shall conduct a performance test of the Facility to establish the Tested Heat Rate and the Tested Capacity:

(a)   within ninety (90) days after the Effective Date ("Performance Test 1");

(b)   within thirty (30) days following the completion of the next planned major maintenance cycle of the Units (the "MM I Program"), currently scheduled for 2021 and 2022 ("Performance Test 2"); and

(c)   within thirty (30) days following the completion of second planned major maintenance cycle of the gas turbine and steam turbine Units (the "MM II Program"), currently scheduled for 2027 and 2028 ("Performance Test 3").

Each of the Parties shall have the right to require additional performance tests at any time before the sixth anniversary of the completion of a Scheduled Performance Test (each, an "Additional Performance Test"). Seller shall bear one hundred percent (100%) of the costs of the Scheduled Performance Tests. The Party requesting any Additional Performance Test shall bear one hundred percent (100%) of the cost of such test. Seller shall complete the MM I Program and MM II Program on each of the gas and steam turbine Units and the hot gas inspection on each gas turbine Unit in accordance with the schedule set forth in Appendix I.

12.2   Upon completion of each Performance Test in accordance with Appendix M, Seller shall declare, and provide PREPA with notification of, the Tested Capacity and Tested Heat Rate of the Facility within five (5) days after receiving such Performance Test report from the qualified third party contracted to conduct the test according to Appendix M (each, a "Declaration Notice"). In the event that the Parties dispute the results of a Performance Test for any reason, the Parties shall exercise their reasonable efforts to resolve such dispute amicably and, if resolved, declare the applicable Tested Capacity and/or Tested Heat Rate in accordance with such resolution.

12.3   In the event that a Performance Test establishes that the Tested Capacity of the Facility exceeds the Contract Capacity, PREPA shall have the right to request an increase in the Dependable Capacity to any level above the Contract Capacity up to such Tested Capacity, which Seller, in



-29-

its sole discretion, shall have the right to accept or reject. In the event that Seller accepts such request, a duly-authorized representative of each Party shall jointly sign a certificate, confirming such increase, and the Dependable Capacity for purposes of this Agreement shall increase as agreed by the Parties from the date indicated in such certificate.

12.4   Each adjustment to the Dependable Capacity and the Guaranteed Base Load Heat Rate, arising out of a Performance Test shall take effect on the date of delivery of the Declaration Notice in accordance with Section 12.2 (each, a "Declaration Date").

## 13.   FUEL SUPPLY

13.1   Commencing on the Effective Date, PREPA shall deliver Natural Gas to Seller at the NG Delivery Point in compliance with the NG Fuel Specifications for each day of operation, at such times as may be required by Seller to satisfy the hourly dispatch requirements to be provided by PREPA (the "Fuel Supply Requirement"), and shall be measured at the NG Delivery Point. Seller shall procure and obtain delivery of Backup Fuel to the Backup Fuel Delivery Point in compliance with the Backup Fuel Specifications, at such times as may be agreed upon with PREPA in accordance with the Agreed Operating Procedures. Seller shall regularly procure and obtain delivery of Backup Fuel, and provide PREPA with a monthly Backup Fuel inventory report, in order to maintain an inventory equivalent to the amount of Backup Fuel necessary to operate the Facility at the full Dependable Capacity for at least three (3) consecutive days, or such larger quantities as may be mutually agreed to by the Parties.

13.2   Unless PREPA (i) delivers Natural Gas that does not conform with the NG Fuel Specifications, or (ii) requests Seller to use Backup Fuel, Seller shall use its best efforts to ensure that each Unit of the Facility operates at the Adjusted Guaranteed Base Load Heat Rate at all times from the Effective Date until the expiration of the Term other than during a Scheduled Outage.

13.3   Each Party shall cooperate reasonably with the other Party to coordinate the supply and transportation of Fuel to the Fuel Delivery Point with the operation of the Facility as follows: (i) by providing the other Party such information as the first Party shall reasonably request regarding the supply and transportation of the Fuel to the Fuel Delivery Point (on both a historical and estimated future basis) and (ii) by maintaining personnel available at all times to address scheduling of Fuel supply and transportation. Subject to the foregoing, PREPA shall have the right to change the quantities of Fuel nominated and received on a daily basis, or more frequently, to the extent permitted, so long as such changes do not disrupt Seller's operations.

13.4   PREPA shall be deemed to be responsible for any damage or personal injury caused by the delivery of NG up to the NG Delivery Point. Seller shall be responsible for any losses of Fuel, and any damages or injury caused by, such NG at and from the NG Delivery Point. PREPA warrants that NG caused to be delivered hereunder to Seller shall be free and clear of all liens or other encumbrances. Risk of loss of all NG shall transfer from PREPA to Seller upon delivery to the Fuel Delivery Point. Notwithstanding the foregoing, Seller waives, and releases PREPA from, any and all liability for any damage to the LNG Terminal or the Seller's Complex or personal injury of third parties arising out of or resulting from Seller's operation of the LNG Terminal.

13.5   After receiving the daily Dispatch Instructions, Seller shall provide to PREPA the Natural Gas daily nominations as required by Seller to satisfy the Dispatch Instructions. The detailed procedure for daily nominations and for renominations shall be set forth in Agreed Operating Procedures.

13.6   (a) If NG supplied by PREPA fails to conform with the NG Fuel Specifications ("Non-Conforming NG"), Seller shall, as soon as reasonably practicable, give written notice to

PREPA that Seller has received Non-Conforming NG, giving details of the nature and expected magnitude of the variance from the parameters in the NG Fuel Specifications and the reason of the non-compliance.

(b) In the event that Seller informs PREPA that it has received Non-Conforming NG in accordance with clause (a) above, PREPA shall have the right to request that Seller send a sample of such NG to an independent third party to be agreed to by the Parties, to determine whether such sample satisfies the criteria for Non-Conforming NG ("Third Party Fuel Test"). The final determination made by such Third Party Fuel Test regarding the Non-Conforming NG shall be binding on both Parties. The cost of such Third Party Fuel Test shall be borne (i) by Seller in the event that the Third Party Fuel Test concludes that the NG conforms with the NG Fuel Specifications, or (ii) by PREPA in the event that the Third Party Fuel Test concludes that the NG is Non-Conforming NG.

(c) PREPA shall, promptly upon becoming aware of the delivery of Non-Conforming NG or promptly upon receipt of notice from Seller referred to in Section 13.6, send a notice to Seller stating, to the extent known to PREPA, the period during which the Non-Conforming NG was delivered, the quantity thereof and how its specifications vary from the ones set out in Appendix J.

(d) If, after exercising commercially reasonable efforts to receive the Non-Conforming NG, Seller determines that it cannot accept, or operate, the Facility, on such Non-Conforming NG, then Seller shall have no obligation to accept such fuel.

13.7   During the Scheduled Outage scheduled for the Year 2020, Seller shall install the NG Measurement Facilities at the Fuel Delivery Point in accordance with the recommendations of the American Gas Association.

If one or more components of the NG Measurement Facilities fails to function or a Party reasonably believes that such facilities inaccurately register the volumes of Fuel delivered to the Fuel Delivery Point, the Parties shall determine the volume of Fuel delivered during such period of failure or inaccurate registration by using one of the following techniques, presented in a descending order of priority:

(a) by using the registration of the backup meter;

(b) by correcting the error if the percentage of error is ascertainable by calibration, test, or mathematical calculation; or

(c) by estimating the quantity of delivery by measuring deliveries during prior periods under similar conditions when any meter was registering accurately.

13.8   In the event that a Party notifies the other Party of a material discrepancy between the quantity of NG delivered to the Fuel Delivery Point as measured by the main meter and backup meter of the NG Measurement Facilities either Party shall have the right to request an adjustment for NG delivered up to the later of (i) one hundred eighty (180) days before the notice of any such NG measurement discrepancy, and (ii) the date of the last meter reading that preceded such notification (the "NG Measurement Review Period"). The Parties shall exercise their reasonable efforts to resolve such discrepancy amicably (including with respect to adjustments for NG delivered during the NG Measurement Review Period).

13.9   Seller shall be responsible for the maintenance and repair of all storage facilities for Backup Fuel, which shall be located at the Seller's Complex.



13.10   Seller shall measure the LNG Terminal electrical energy consumption each Billing Period and provide PREPA with a statement identifying the amount of energy in MMBTU utilized to produce such volume of electrical energy during such Billing Period.

## 14.   LIABILITY

14.1   Each Party shall be responsible for the electrical energy and facilities, including the Seller Interconnection Facilities and PREPA Interconnection Facilities, located on its respective side of the Interconnection Point. The Net Electrical Output made available by Seller to PREPA under this Agreement shall become the property of PREPA at the Interconnection Point, and, except as provided in Section 14.2 below, Seller shall not be liable to PREPA for loss or damage to PREPA's generation, transmission, and distribution system, including the Seller Interconnection Facilities and PREPA Interconnection Facilities, resulting directly or indirectly from the use, misuse or presence of such Net Electrical Output once it passes the Interconnection Point.

14.2   Each Party shall be liable for all foreseeable damages suffered by the other as a necessary consequence of Seller or PREPA's respective negligent performance, omission or failure to perform its respective obligations under this Agreement, as stated under Article 1060 of the Puerto Rico Civil Code, subject to the terms of Section 14.3 below.

14.3   Notwithstanding anything to the contrary contained in this Agreement, neither Party nor any of its Affiliates nor any of their respective directors, officers, shareholders, partners, employees, agents and representatives nor any of their respective heirs, successors and assigns shall in any event be liable to the other Party or its officers, directors, agents, employees or representatives for claims for incidental, consequential or indirect damages to persons or property, whether arising in tort, contract or otherwise, connected with or resulting from performance or nonperformance under this Agreement, including without limitation, claims made by either Party's customers or suppliers, or claims made by third parties, or claims made by either Party for lost profits (except payments specifically provided for in Article 11). Further provided that Seller's liability and PREPA's sole remedy for any damage resulting from the failure to deliver the Net Electrical Output resulting from the low availability of the Facility and its failure to achieve the committed Twelve Month EAF of ninety-three (93%) are those adjustments to the Capacity Purchase Price set forth in Section 11.2. The Parties agree that the remedies provided in the preceding sentence shall not limit any other remedy PREPA may be entitled to under this Agreement in the event the Agreement is terminated pursuant to Article 18.

14.4   Nothing in this Article 14 shall relieve either Party of its obligation to make payments that become or have become due pursuant to Article 11.

## 15.   OPTION TO PURCHASE THE SELLER'S COMPLEX AND LNG TERMINAL

15.1   If a Permanent Abandonment will occur under clause (a) of the definition of Permanent Abandonment, (a) Seller shall provide PREPA with at least ninety (90) days prior notice of such occurrence (the "Affirmative Abandonment Notice"), and (b) PREPA shall have the first option to purchase the Seller's Complex at a purchase price (the "Affirmative Permanent Abandonment Purchase Price") equal to ninety percent (90%) of the amount of the Required Capital Expenditures-Straight Line (calculated as of the date such purchase is consummated). If PREPA desires to exercise such option: (x) PREPA shall provide Seller with notice thereof (a "PREPA Power Plant Purchase Notice") no later than thirty (30) days following its receipt of the Affirmative Permanent Abandonment Notice, and (y) the Parties shall exercise their best efforts to consummate the transfer of the Seller's Complex assets to PREPA within sixty (60) days after the earlier of the delivery of such notice and the occurrence of such Permanent



-32-

Abandonment. If PREPA does not deliver a timely PREPA Power Plant Purchase Notice, a Permanent Abandonment under clause (a) of the definition will take effect at the conclusion of the one-hundred eightieth (180th) day following the delivery of the Affirmative Abandonment Notice, or such later date as Seller may have indicated in the Affirmative Abandonment Notice. If PREPA shall have delivered a timely PREPA Power Plant Purchase Notice, then, a Permanent Abandonment under clause (a) of the definition will only take effect on the earlier of (i) the date when PREPA takes title to the Seller's Complex assets and (ii) 365 days after the Affirmative Abandonment Notice.

15.2

    (a)  In the event that Available Hours equal zero (0), either for two hundred seventy-five (275) consecutive days (excluding periods of outages due to Force Majeure) or six hundred forty (640) consecutive days (regardless of whether a Force Majeure has occurred), then at any time thereafter, PREPA may request, in writing, that Seller provide it with a good faith assessment of whether a Permanent Closing or a Permanent Abandonment under clause (b) of the definition of Permanent Abandonment, as applicable, is reasonably likely to occur. Seller shall respond to such a written inquiry from PREPA within thirty (30) days of receipt thereof, and, to the extent that Seller confirms the likelihood of such occurrence, (i) Seller's response shall also indicate a forecasted date of such occurrence, and (ii) a Permanent Closing or a Permanent Abandonment under clause (b) of the definition as applicable shall be deemed to occur on the date indicated in such response.

    (b)  Without limiting Section 15.2(a), in the event that Available Hours equal zero (0), either for one hundred eighty (180) consecutive days (excluding periods of outages due to Force Majeure) or five hundred fifty (550) consecutive days (regardless of whether a Force Majeure has occurred), then at any time thereafter, PREPA can seek to establish the Fair Market Value for the Seller's Complex by delivering notice to Seller of its intent thereof.

    (c)  Without limiting anything else in this Section 15, upon a Permanent Closing or a Permanent Abandonment under clause (b) of the definition of Permanent Abandonment, PREPA shall have the first option to purchase the Seller's Complex at a price equal to Fair Market Value (the "Deemed Abandonment Purchase Price"), as determined by a Valuation Firm selected by PREPA. If PREPA desires to exercise such option, PREPA shall provide Seller with notice thereof no later than thirty (30) days following a Permanent Closing or a Permanent Abandonment under clause (b) of the definition of Permanent Abandonment. In the event that PREPA exercises such option, unless the process to establish Fair Market value was commenced under Section 15.2(b), the Parties shall have a period, which will not exceed one hundred eighty (180) days after PREPA's notification to Seller of its intent to purchase the Seller's Complex under this Section 15.2, to establish the Fair Market Value for the Seller's Complex. The Parties shall exercise their best efforts to consummate the transfer of the Seller's Complex assets to PREPA within sixty (60) days of the determination of Fair Market Value.

15.3    If Seller intends to abandon the operation of the LNG Terminal for any reason, (a) Seller shall provide PREPA with at one hundred eighty (180) days prior notice of such intention (the "Terminal Abandonment Notice"), and (b) PREPA shall have the first option to purchase the LNG Terminal and LNG Terminal Inventory at a price equal to Fair Market Value, determined by a Valuation Firm selected by PREPA. If PREPA desires to exercise such option, PREPA shall provide Seller with notice thereof ("a PREPA LNG Terminal Purchase Notice") no later than thirty (30) days following its receipt of the Terminal Abandonment Notice. The Parties shall have a period, which will not exceed one hundred eighty (180) days after PREPA's notification to Seller of its intent to purchase the LNG Terminal and the LNG Terminal Inventory under this Section 15.3, to establish the Fair Market Value. The Parties shall exercise their best efforts to consummate the transfer of the LNG Terminal and the LNG Terminal

Inventory to PREPA within sixty (60) days of the determination of Fair Market Value.  If PREPA does not deliver a timely PREPA LNG Terminal Purchase Notice, Seller may cease operation of the LNG Terminal at the conclusion of the one-hundred eightieth (180th) day following the delivery of the Terminal Abandonment Notice, or such later date as Seller may have indicated in the Terminal Abandonment Notice.  If PREPA shall have delivered a timely PREPA LNG Terminal Purchase Notice, then, Seller shall continue to perform the obligations it has under the Tolling Agreement at such time, and Seller's right to abandon the LNG Terminal shall not take effect until the earlier of (i) the date on which Seller transfers title to the LNG Terminal and the LNG Terminal Inventory in accordance with this Section 15.3 and (ii) 365 days after the Terminal Abandonment Notice.

15.4   If PREPA shall have provided notice of its intent to purchase the LNG Terminal following the delivery by Seller of a Terminal Abandonment Notice, upon PREPA's written request, the Parties shall negotiate in good faith and use their commercially reasonable efforts to provide for the operation of the LNG Terminal by Seller (at no cost, expense, or risk to Seller) during the period between the abandonment of the LNG Terminal and the consummation of the transfer as contemplated by Section 15.3, up to a maximum of one hundred eighty (180) days.

15.5   If after the one hundred eighty (180) day period pursuant to Sections 15.2 or 15.3 a Valuation Firm fails to reach a determination of Fair Market Value or a Party disputes such determination, the case will be submitted to a voluntary eminent domain process in a Court of Competent Jurisdiction.  In this event, the Parties mutually agree to request the Court of Competent Jurisdiction to appoint a special master pursuant to Rule 41 of the Puerto Rico Rules of Civil Procedure of 1979, 32 L.P.R.A. App.III, R.41, for the purpose of determining the Fair Market Value of the Seller's Complex and / or the LNG Terminal and LNG Terminal Inventory (as applicable).

15.6   If PREPA exercises any of the purchase options pursuant to Sections 15.1, 15.2 or 15.3, then the Parties shall select a mutually agreeable date for the consummation of such purchase, it being agreed that such date shall be as soon as reasonably practicable after the date of the exercise by PREPA of such option. On the date (the "Purchase Closing Date") when the Parties have determined the Purchase Price and can otherwise satisfy all other requirements for the transfer of Seller's Complex and / or the LNG Terminal and LNG Terminal Inventory (as applicable, the "Purchased Assets") contemplated under this Article 15:

(a)   PREPA shall pay to Seller in immediately available funds an amount (each, a "Purchase Price") equal to (i) for an option exercised under Section 15.1 or 15.2, the sum of the Deemed Abandonment Purchase Price or the Affirmative Permanent Abandonment Purchase Price (as applicable) plus the Inventory Amount, and (ii) for the option exercised under Section 15.3, Fair Market Value of the LNG Terminal and LNG Terminal Inventory;

(b)   Seller shall convey to PREPA, free and clear of all liens and encumbrances, (i) good and marketable title to all elements of the Purchased Assets, (ii) all rights of Seller to use the elements of the Purchased Assets, and (iii) for the option exercised under Section 15.3, good and marketable title to spare parts for the LNG Terminal / LNG Terminal Inventory or utilized in the calculation of the Inventory Amount (as applicable).

In addition, on the Purchase Closing Date, PREPA shall (and Seller shall take such action as may be necessary to permit PREPA to) assume all rights and obligations of Seller under all contracts (other than Excludable Contracts) to which Seller is a party on the Purchase Closing Date to the extent such rights and obligations arise during the period (the "Assumption Period") from and after the Purchase Closing Date to the last day of the Term; provided that PREPA shall not be required to assume (and Seller shall provide PREPA with an indemnity reasonably satisfactory to PREPA in respect of) (x) any liabilities or obligations of Seller under such contracts that arise out of events occurring prior to the first day of, or after the last day of, the



-34-

Assumption Period or that occur as a result of any failure by Seller to perform its obligations under such contracts or (y) any liabilities or obligations (whether or not then due) of Seller under such contracts which arose out of the provision of goods or services under such contracts on or prior to the Purchase Closing Date. Notwithstanding the foregoing, the Purchase Price shall be reduced by an amount equal to the sum (without duplication) of all amounts then due and payable by Seller to PREPA hereunder on the Purchase Closing Date.

15.7   Notwithstanding any other provision to the contrary in this Article 15, PREPA's exercise of any purchase option hereunder shall not extinguish PREPA's obligations to make any payments to Seller in return for its past performance under the Agreement that are due and owing in accordance with the terms thereof.

15.8   Each Party shall bear fifty percent (50%) of the cost of such Valuation Firm during the determination of the Fair Market Value.

## 16.   INDEMNIFICATION

16.1   Each Party shall indemnify and hold harmless the other Party and each of its Affiliates and each of their respective directors, officers, shareholders, partners, employees, agents and representatives and each of their respective heirs, successors and assigns from and against any and all damages, claims, losses, liabilities, actions, causes of action, costs, expenses and obligations (including, without limitation, all reasonable attorneys' fees) whether arising in contract, tort or otherwise to third parties for or on account of injury, bodily or otherwise, to or death of persons or for damage to or destruction of property, in each case resulting from, arising out of or in connection with such indemnifying Party's negligent performance or failure to perform under this Agreement.

16.2   In the event any Party to this Agreement receives notice of any claim or cause of action for which such Party elects to assert a right of indemnification and hold harmless from the other Party, the Party receiving such notice must give prompt written notice to the other Party of the claim.  The Party required to give the indemnification and hold harmless under the terms and provisions of this Agreement will have control of the defense of any such claim or cause of action (except to the extent prevented by any legal conflict of interest) including the selection of counsel to handle same.  In addition to the counsel so selected, the Party being indemnified and held harmless shall be entitled to be represented by counsel of his or its own choosing but, in such event, the cost and expense of said additional counsel shall be borne by the indemnitee.

16.3   As of the Effective Date and for the Term, Seller shall indemnify and hold harmless PREPA for any and all judgments and expenses (including reasonable costs and attorneys' fees) required to be incurred by PREPA as a result of claims of any nature whatsoever resulting from any environmental harm due to the actions of Seller or Seller's agents or employees in the design, planning, construction or operation of the Facility or arising as a result of the presence at the Facility of pollutants, hazardous substances, materials or wastes in excess of amounts and concentrations permitted by applicable federal or Commonwealth laws, rules or regulations then in effect.  In the event Seller fails to reimburse PREPA for such expenses within thirty (30) days of receipt of written notice from PREPA stating that such expenses were incurred, PREPA may offset the amount of such expenses against amounts due Seller from PREPA under this Agreement.

## 17.   FORCE MAJEURE



17.1   For purposes of this Agreement, Force Majeure means any cause beyond the reasonable control of and not the result of the fault or negligence of the Party claiming the Force Majeure. A Force

Majeure shall excuse the performance of the Party claiming a Force Majeure event if such event causes the non-performance or inability to perform. The burden of proof as to whether a Force Majeure has caused a non-performance or inability to perform shall be on the Party claiming the Force Majeure. Except as provided in Section 17.5, the Parties hereto shall be excused from performing hereunder and shall not be liable in damages or otherwise to the extent the non-performance or inability to perform is due to a Force Majeure event.

17.2    Provided that the provisions of Section 17.1 above are met, Force Majeure events include, but are not limited to, the following:

(a)   acts of God, strikes, acts of public enemy, war, blockades, boycotts, riots, insurrections, epidemics, earthquakes, storms, floods, civil disturbances, fires, explosions,

(b)   interruptions of services due to acts or failure to act of any governmental authority,

(c)   condemnation,

(d)   any delay or inability of Seller in obtaining or maintaining Permits,

(e)   the failure of any subcontractor or supplier (including any supplier of fuel to PREPA or its subcontractors or suppliers) to perform as a result of an event that would constitute a Force Majeure hereunder, or, with respect to the supply of Natural Gas from Naturgy, that would constitute Force Majeure under the Restatement GSPA;

The Force Majeure events listed in this Section 17.2 shall not be construed as excluding any other event as long as such event meets the provisions under Section 17.1.

17.3    The occurrence of a hurricane or other severe atmospheric disturbance or event that damages the Grid System and curtails PREPA's ability to Dispatch the Facility within the Design Limits shall qualify as a Force Majeure event affecting PREPA (a "Grid Force Majeure Event"). The duration of each Grid Force Majeure Event ("Grid Restoration Period") shall extend until the earlier of (i) the expiration of the Maximum Recovery Period, and (ii) the date that the restoration of the Grid System first permits PREPA to Dispatch the Facility within the Design Limits in accordance with Prudent Utility Practice as determined using grid operation criteria specified in the Agreed Operating Procedures; provided that PREPA exercises reasonable efforts to complete such restoration as soon as reasonably practicable under the then-prevailing circumstances and limitations.

17.4    Except as otherwise provided in Sections 17.5 hereunder or in Article 11, if either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure, that Party shall be excused from whatever performance is affected by the Force Majeure to the extent so affected; provided that: (i) the non-performing Party, within ten (10) days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence and its estimated duration; (ii) the suspension of performance be of no greater scope and of no longer duration than is required by the Force Majeure consistent with Prudent Utility Practices; (iii) no obligations of either Party which arose prior to the Force Majeure be excused as a result of the Force Majeure; and (iv) the non-performing Party uses its best efforts, consistent with Prudent Utility Practices, to remedy its inability to perform and resume in full its performance under this Agreement; provided that this obligation shall not require the settlement of any strike, walkout or other labor dispute on terms which, in the sole judgment of the Party involved in the dispute, are contrary to its best interest.

17.5    Neither Party shall be excused by reason of Force Majeure from the obligation to make any payments, when due, to the other Party.



17.6    Notwithstanding Section 17.5, for each Billing Period in which the Facility can make Dependable Capacity available at the Interconnection Point during the pendency of a Grid Restoration Period, the Capacity Payment otherwise due and owing for such Billing Period shall be reduced in proportion to the curtailment of Dispatch caused by the Grid Force Majeure Event in accordance with Appendix C; provided that for so long as the Facility remains available, such reduced Capacity Payment shall never fall below the Grid Force Majeure Event Floor to compensate Seller for its fixed, non-financial cost during such Billing Period.

Following the expiration of the Grid Restoration Period, the foregoing reduction to each Capacity Payment shall no longer apply and PREPA shall remit the full Capacity Payment when due, regardless of the Dispatch of the Facility.

17.7    For purposes of this Article, if a Party disputes the other Party's claim of Force Majeure, such dispute shall be resolved by binding arbitration in accordance with the following requirements:

(i)     If within sixty (60) days the dispute is not resolved through negotiations pursued diligently in good faith, the Parties shall attempt to agree on a person with special knowledge and expertise with respect to the claimed Force Majeure to serve as arbitrator. If the Parties cannot agree on an arbitrator within ten (10) days, each shall then appoint one person to serve as an arbitrator and the two thus appointed shall select a third arbitrator with such special knowledge and expertise to serve as chairman of the panel of arbitrators; and such three arbitrators shall determine all matters by majority vote; provided, however, if the two arbitrators appointed by the Parties are unable to agree upon the appointment of the third arbitrator within five (5) days after their appointment, both shall give written notice of such failure to agree to the Parties, and, if the Parties fail to agree upon the selection of such third arbitrator within five (5) days thereafter, then either of the Parties upon written notice to the other may require such appointment from and pursuant to the then-current rules of the American Arbitration Association with the selection of arbitrators from the National Roster of Arbitrators and Mediators (Commercial Arbitrator Panel). Prior to appointment, each arbitrator shall agree to conduct such arbitration in accordance with the terms of this subsection. The arbitration panel may choose legal counsel to advise it on the remedies it may grant, procedure and such other legal issues as the panel deems appropriate.

(ii)    The Parties shall have sixty (60) days to perform discovery and present evidence and argument to the arbitrators. During that period, the arbitrators shall be available to receive and consider all such evidence as is relevant and, within reasonable limits due to the restricted time period, to hear as much argument as is feasible, giving a fair allocation of time to each Party to the arbitration. The arbitrators shall use all reasonable means to expedite discovery and to sanction noncompliance with reasonable discovery requests or any discovery order. The arbitrators shall not consider any evidence or argument not presented during such period and shall not extend such period except by the written consent of both Parties. At the conclusion of such period, the arbitrators shall have forty-five (45) days to reach a determination. To the extent not in conflict with the procedures set forth herein, which shall govern, such arbitration shall be held in accordance with the prevailing rules of the American Arbitration Association for commercial arbitration.

(iii)   The arbitrators shall have the right only to interpret and apply the terms and conditions of this Agreement and to order any remedy allowed by this Agreement but may not change any term or condition of this Agreement, deprive either Party of any right or remedy expressly provided hereunder, or provide any right or remedy that has been excluded hereunder.

(iv)    The arbitrators shall give a written decision to the Parties stating their findings of fact, conclusions of law and order, and shall furnish to each Party a copy thereof signed by them within five (5) days from the date of their determination.

(v)   Any actual determination made by the arbitrators shall be conclusive and binding upon the Parties and not subject to judicial review, except on the grounds of fraud or bias.

(vi)   The Parties shall each pay fifty percent (50%) of the cost of arbitrator or arbitrators.

(vii)   During the pendency of the arbitration, the Party claiming Force Majeure shall use its best efforts, consistent with Prudent Utility Practices, to remedy its inability to perform and resume in full its performance under this Agreement; provided that this obligation shall not require the settlement of any strike, walkout or other labor dispute on terms which, in the sole judgment of the Party involved in the dispute, are contrary to its best interest.

## 18.   TERMINATION

18.1   Termination of this Agreement shall occur only upon: (a) expiration of the Term of this Agreement as provided in Article 5; (b) mutual written consent of the Parties; (c) the Permanent Abandonment or Permanent Closing of the Seller's Complex; (d) the material breach of any of the terms and conditions of this Agreement by either Party, subject to the provisions of Article 19 hereof; or (e) any reason as specified in this Article 18, or (f) at the election of PREPA if (i) the Tolling Agreement was terminated solely due to Seller's default thereunder and (ii) within thirty (30) days after such termination if Seller has not entered into a new tolling agreement with PREPA under the same terms and conditions as the Tolling Agreement.

18.2   Termination of this Agreement shall not discharge either Party hereto from any obligation it owes to the other Party under this Agreement by reasons of any event as described in Sections 15.1, 15.2 or 15.3, transaction, loss, cost, damage, expense, or liability which shall occur or arise (or the circumstances, events, or basis of which shall occur or arise) prior to termination. It is the intent of the Parties hereby that any such obligation owed (whether the same shall be known or unknown at termination or whether the circumstances, events or basis of the same shall be known or unknown at termination) shall survive termination. Any indebtedness by either Party to the other shall be considered payable within ninety (90) days of the termination of this Agreement. This Section 18.2, together with Section 6.9, Article 15, Article 16, Sections 24.4 and 24.7 and Article 25 shall survive termination of this Agreement.

## 19.   BREACH OF AGREEMENT, DELAYS AND SECURITY

19.1   A breach of this Agreement shall be deemed to exist upon the occurrence of any one of the following: (a) the failure by either Party to perform in any material respect its obligations under this Agreement, subject to the provisions of Section 19.2 below; (b) the Equivalent Availability Factor is less than sixty percent (60%) for any period of twelve (12) consecutive months, or less than seventy percent (70%) for any period of twenty-four (24) consecutive months, subject to the provisions of Section 19.2(a); provided that the occurrence of clause (c) of this Section 19.1 shall not give rise to a breach under this clause (b); or (c) in connection with a Permanent Abandonment (unless with respect thereto Seller shall have complied with its obligations under Section 15.1(a) and Section 15.2 (as applicable)), or Permanent Closing (unless Seller shall have complied with its obligations in Section 15.2).

19.2   If either Party believes the other Party has breached this Agreement pursuant to Section 19.1(a) above or if PREPA believes Seller has breached this Agreement pursuant to Section 19.1(a) above, the non-breaching Party shall provide the other Party with written notice (the "Notice of Breach") thereof. If within fifteen (15) days of the receipt of such Notice of Breach, such other Party fails to respond in writing to the Notice of Breach, the non-breaching Party shall be entitled to invoke its remedies under this Agreement and/or under the law. If such other Party disputes in writing that a breach by it has occurred, the Parties may attempt to resolve the matter



38

by any form of dispute resolution mutually acceptable. If the matter is not resolved within sixty (60) days of receipt of the Notice of Breach, either by admission that a specific breach has occurred or by any other agreed solution, the Party serving the Notice of Breach may pursue its remedies under this Agreement and/or under the law. In case the other Party admits in writing, or the resolution contemplated above determines that a breach (other than a payment breach) has occurred, the breaching Party shall have a minimum of thirty (30) days from the latest of (a) receipt of the Notice of Breach, (b) its admission of breach, or (c) when the resolution contemplated above determines that a breach has occurred, to cure the breach or the cause of such breach if the breach is one which by its nature cannot be cured; provided however, that if the breach or such cause cannot be cured within the thirty (30) day period, the breaching Party shall be given an additional reasonable period of time to cure the breach or such cause with the exercise of due diligence. If the breaching Party fails to cure the breach or such cause within such time period, the non-breaching Party may pursue its remedies under this Agreement and/or under the law.

19.3   (a)   Seller shall provide to PREPA, at Seller's sole expense, an unconditional and irrevocable direct pay letter(s) of credit issued by a local bank or any other bank, which such issuing bank and letter(s) of credit shall be subject to PREPA's approval, or a parent company guaranty acceptable to PREPA provided by the ultimate parents of Seller's partners, (or other security acceptable to PREPA) in the amount of twenty million dollars ($20,000,000) ("Operation Security").

(b)   PREPA may draw from the Operation Security required under Section 19.3(a) above to offset any damages PREPA may be entitled to under this Agreement upon Seller's breach of this Agreement under Sections 19.1(a) or 19.1(b) that is not cured within the applicable period set forth in Section 19.2(a); provided that PREPA either obtains the agreement of Seller to the level of damages or obtains a judgment from a Court of Competent Jurisdiction specifying the level of damages. If PREPA reasonably determines that the Operation Security would otherwise expire or cease to exist prior to such agreement or judgment, PREPA may draw from the Operation Security an amount equal to PREPA's claim of damages; provided that PREPA places the drawn amounts in an escrow account in a bank reasonably acceptable to Seller until the appropriate amount of damages is determined. Following such agreement or determination, PREPA may draw from the escrow account and retain amounts equal to the amount of damages, if any, determined to be due to PREPA and PREPA shall deliver to Seller all amounts remaining in the escrow account, if any. Drawing under the Operation Security shall not be the exclusive remedy available to PREPA.

19.4   Any amount drawn by PREPA from the Operation Security according to Section 19.3(b) above after the Commercial Operation Date shall be replenished in the form of cash escrow, an unconditional and irrevocable direct pay letter(s) of credit issued by a local bank or any other bank, which cash escrow, issuing bank and letter(s) of credit shall be subject to PREPA's approval, or a parent company guaranty acceptable to PREPA (or other security acceptable to PREPA) by Seller from and to the extent of the net after-tax cash flow to Seller that is produced after the date that PREPA draws amounts on the Operation Security. If any Operation Security drawn according to Section 19.3(b) above after the Commercial Operation Date is not replenished within ninety (90) days of drawdown by PREPA, Seller shall provide PREPA with a monthly statement from a recognized independent accounting firm, until full replenishment is accomplished, certifying in accordance with GAAP that the net after-tax cash flow from the project is insufficient to replenish the Operation Security. Any failure of Seller to replenish the Operation Security in the manner specified above shall be considered a material breach of this Agreement and PREPA may terminate this Agreement pursuant to Section 18.1(d), without Seller being entitled to any cure period.



19.5   Seller shall be entitled to terminate and have returned to it the Operation Security required under Section 19.3(a) above upon termination of the Agreement and after payment of any and all amounts owed to PREPA and resolution of any pending issues relating thereto.

19.6   (a)   Should a Permanent Abandonment of the Seller's Complex occur under paragraph (a) of the definition of Permanent Abandonment without PREPA being notified in accordance with Section 15.1(a), Seller shall be in default under this Agreement. In such case, PREPA shall be entitled to invoke its remedies under this Agreement and/or under the law; provided that PREPA shall also have the right, and Seller shall permit PREPA, to operate the Seller's Complex for a period of sixty (60) months from the occurrence of such Permanent Abandonment decreased by the actual number of months between the date of notice to PREPA of such Permanent Abandonment and the date operation of the Seller's Complex by Seller actually ceases, or for a period of sixty (60) months from occurrence of a Permanent Closing ("PREPA's Operating Period"), including the corresponding Interest amount; further provided, that PREPA shall have and retain an option to purchase the Seller's Complex at any time after the occurrence of a Permanent Abandonment or Permanent Closing, in accordance with Section 15.1 hereof.

(b)   Any amount paid by PREPA to reduce the debt of the Seller's Complex and/or any capital improvement made by PREPA on the Seller's Complex during PREPA's Operating Period, shall be reimbursed to PREPA by Seller, its successors, or assignees, as applicable, upon the termination of this Agreement, or may be reduced from the determination of the appraised value of the Seller's Complex in the event PREPA exercises its option to purchase the Seller's Complex in accordance with Section 15.1 hereof. In the event PREPA does not exercise its option to purchase, and the Seller's Complex is sold to a third party, PREPA shall turnover to Sellers the proceeds of such sale net of the reimbursement of amounts to reimburse PREPA for capital improvements made pursuant to this paragraph.

19.7   Upon any termination of this Agreement prior to the end of the Term described in Article 5 hereof which is attributable to Seller's breach of the Agreement or Permanent Abandonment or Permanent Closing of the Seller's Complex, Seller agrees to provide at no cost to PREPA copies of all site related data, including without limitation, technical, environmental, geological, seismological, licensing and permitting data in Seller's possession, excluding any proprietary design information relating to the Seller's Complex.

19.8   If requested by PREPA, Seller shall consent to an assignment of the Tolling Agreement from Naturgy to PREPA or its designee in the event that Naturgy defaults under the Restatement GSPA.

## 20.   TAXES AND ENVIRONMENTAL COSTS

20.1   For purposes of this Agreement, "Taxes" shall mean any and all taxes, fees or other charges of any nature, excluding income taxes and repatriation (tollgate) taxes, that are imposed or assessed on or as a result of the ownership or operations of the Seller's Complex by federal, Commonwealth or municipal governmental bodies or agencies responsible for implementing tax laws, rules, regulations or orders. "Environmental Costs" shall mean any and all fixed and variable costs incurred by Seller resulting from the imposition or assessment on or as a result of the ownership or operations of the Seller's Complex by laws, rules, regulations or orders relating to the environment issued by federal, Commonwealth or municipal governmental bodies or agencies. "Post-Original Effective Date Taxes" shall mean all Taxes resulting from tax laws, rules, regulations or orders enacted, approved or issued after the Original Effective Date. "Post-Original Effective Date Environmental Costs" shall mean all Environmental Costs



resulting from laws, rules, regulations or orders enacted, approved or issued after the Original Effective Date.

(a) Seller shall be responsible for all income taxes, repatriation (tollgate) taxes, Taxes and Environmental Costs; provided that PREPA shall reimburse to (if such value is positive) or receive from (if such value is negative), Seller the net effect of any changes in the payments of Taxes by Seller that are the result of the enactment of Post-Original Effective Date Taxes and for all changes in Seller's Environmental Costs that are the result of the enactment of Post-Original Effective Date Environmental Costs, all applicable to Seller by reason of the ownership or operation of the Seller's Complex for the purpose of the delivery or sale by Seller to PREPA of Net Electrical Output or Dependable Capacity (collectively called "Changes") which either (i) are Taxes applicable to fuel used by Seller to provide Net Electrical Output or (ii) are Taxes imposed or assessed by Commonwealth or municipal governmental bodies or agencies; provided, however, that the term "Changes" shall not include (x) any Change after the Commercial Operation Date, as compared to the situation immediately prior to the Commercial Operation Date, which reduce taxes, fees or charges on the extraction or use of seawater utilized in the Seller's Complex to produce electrical energy or desalinated or potable water, or (y) any change resulting from Seller's failure to comply with the conditions or requirements of the Grant of Industrial Tax Exemption to EcoEléctrica L.P., Case No. 08-135-I-42, pursuant to the terms of Act 135 of December 2, 1997, as executed by the Governor of the Commonwealth of Puerto Rico, as amended, or any elective benefit further granted thereunder, or any other tax exemption, decree or grant in effect on the Commercial Operation Date.

(b) Seller agrees that any financial impact attributable to a Post-Original Effective Date Tax or Post-Original Effective Date Environmental Cost paid by PREPA will be subject to the end of Fiscal Year audit, as provided in Section 6.6 hereof, and properly adjusted if applicable.

20.2   Seller will promptly pay and discharge all lawful taxes, assessments and governmental charges or levies imposed upon it or in respect of all or any part of its property or business, all trade accounts payable in accordance with usual and customary business terms, and all claims for work, labor or materials which, if unpaid, might become a lien or charge upon any of its property; provided, however, that Seller shall not be required to pay any such tax, assessment, charge, levy, account payable or claim if (a) the validity, applicability or amount thereof is being contested in good faith by appropriate actions or proceedings which will prevent the forfeiture or sale of any property of Seller or any material interference with the use thereof by Seller and (b) Seller shall set aside on its books reserves deemed by it to be adequate with respect thereto.

## 21.   INSURANCE

21.1   Except for the insurance described in Section 21.1(e), Seller shall obtain or cause its agent or its Affiliate to obtain and maintain during the remainder of the Term the following policies of insurance issued by an A. M. Best rated insurance company or any other insurance providers reasonably acceptable to PREPA, such as Lloyds of London:

(a) Workmen's Compensation Insurance which complies with the laws of the Commonwealth of Puerto Rico and Employer's Liability Insurance with limits of at least $1,000,000;

(b) Comprehensive or Commercial General Liability Insurance with bodily injury and property damage combined single limits of at least $1,000,000 per occurrence. Such insurance shall include, but not necessarily be limited to, specific coverage for contractual liability encompassing the indemnification provisions in Article 16, broad form property damage liability, personal injury liability, explosion and collapse hazard coverage,

products/completed operations liability; and where applicable, watercraft protection and indemnity liability which may be covered on a separate policy;

(c)  Comprehensive Automobile Liability Insurance with bodily injury and property damage combined single limits of at least $1,000,000 per occurrence covering vehicles owned, hired or non-owned;

(d)  Excess Umbrella Liability Insurance with a single limit of at least $9,000,000 per occurrence in excess of the limits of insurance provided in subparagraphs (a), (b) and (c) above;

(e)  All risk physical damage insurance, including comprehensive boiler and machinery coverages, to cover all real and personal property of Seller (including earthquake and hurricanes occurrence) to one hundred percent (100%) of replacement cost to the extent available on commercially reasonable terms as determined by Seller and subject to a reasonable deductible which shall be the responsibility of Seller. This policy of insurance shall be placed into effect on the earlier of Commercial Operation Date or on the date that the insurance provided in Section 21.1(f) expires; and

(f)  Builder's "All Risk" insurance on a "replacement cost" basis insuring the total cost of the Facility to the extent available on commercially reasonable terms as determined by Seller and subject to reasonable deductibles.

21.2   The amounts of insurance required in Section 21.1 above may be satisfied by Seller purchasing primary coverage in the amounts specified or by buying a separate Excess Umbrella Liability policy together with lower limit primary underlying coverage. The structure of the coverage is Seller's option, so long as the total amount of insurance meets PREPA's requirements set forth in Section 21.1.

21.3   The coverages requested in Section 21.1(b) above and any required umbrella or excess coverage could be "occurrence" form policies if available on commercially reasonable terms. In the event Seller has "claims-made" form coverage, Seller shall notify PREPA and the retroactive date established on the first "claims-made" policy shall be maintained on all subsequent renewals.

21.4   Seller shall cause its insurers to amend its Comprehensive or Commercial General Liability and, if applicable, Excess Umbrella Liability policies with the following endorsement items (a) through (e) with respect to the Seller's Complex; and to amend Seller's Worker's Compensation and Automobile Liability policies with endorsement item (e):

(a)  PREPA and their respective board of directors, directors, officers and employees are additional insureds under this policy to the extent of Seller's indemnity obligations elsewhere in this Agreement;

(b)  this insurance is primary, but only for liability arising out of the operation of the Seller's Complex or other matters arising in relation to this Agreement; with respect to the interest of PREPA and their respective directors, officers, and employees, and other insurance maintained by them is excess and not contributory with this insurance;

(c)  the following cross liability clause or other clause with substantially similar language is made a part of the policy: "In the event of claims being made by reason of (i) personal and/or bodily injuries suffered by any employee or employees of one insured hereunder for which another insured hereunder is or may be liable, or (ii) damage to property belonging to any insured hereunder for which another insured is or may be liable, then this policy shall cover such insured against whom a claim is made or may be made in the same



-42-

manner as if separate policies have been issued to each insured hereunder, except with respect to the limits of insurance and only if such claim pertains to the Agreement";

    (d)  insurer hereby waives all rights of subrogation against PREPA and their respective officers, directors and employees; and

    (e)  notwithstanding any provision of the policy, this policy may not be cancelled non-renewed, or materially changed by the insurer without giving thirty (30) days' (ten (10) days in the case of non-payment of premiums) prior written notice to PREPA. All other terms and conditions of the policy remain unchanged.

21.5    Regarding breach of insurance warranties by Seller, all insurance policies under Sections 21.1(b), 21.1(c) and 21.1(d) shall be endorsed, to the extent available on commercially reasonable terms, as follows or with substantially similar language agreeable to the Parties: "The breach of any of the warranties or conditions in this policy by Seller shall not prejudice PREPA's right under this policy." If Seller does not obtain the aforementioned endorsement, then Seller shall pay to PREPA the premium required to obtain said policies to cover and insure itself directly.

21.6    Seller shall cause its insurers or agents to provide PREPA not later than seven (7) days prior to the Effective Date, with the originals of the certificates of insurance evidencing the policies and endorsements listed above (except the insurance requested under Section 21.1(e), in which case certificates of insurance evidencing the policies will be provided within thirty (30) days following the effective date of such policies) with respect to the Seller's Complex. Failure of PREPA to obtain certificates of insurance does not relieve Seller of the insurance requirements set forth herein. Failure to obtain the insurance coverage required by this Article 21 shall in no way relieve or limit Seller's obligations and liabilities under other provisions of this Agreement.

## 22.   ASSIGNMENT

22.1    This Agreement shall not be assigned or transferred by either Party without the prior written consent of the other Party, which consent shall not be unreasonably withheld. Any attempt to assign this Agreement without the prior written consent of the corresponding Party shall be void.

22.2    PREPA acknowledges that as a result of an assignment of Seller's rights and interests (but not its obligations) under this Agreement to a lender of Seller (a "Project Lender"): (a) the Project Lender(s) will have the right upon the occurrence of a default under the Project Lender(s) agreements with Seller to assume or cause a nominee to assume all of the rights and obligations of Seller under this Agreement and (b) the Project Lender(s) will have the right to cure defaults by Seller under this Agreement on the same terms and during the same periods available to Seller.

22.3    Notwithstanding any other provision of this Agreement to the contrary, the Parties acknowledge that PREPA is undergoing a transformation process, and therefore, both Parties agree that in the eventuality of the execution of a Partnership Contract, Sale Contract or any other PREPA Transaction (as these terms are defined in Act No. 120-2018, otherwise known as Puerto Rico Electric System Transformation Act, as amended), PREPA may sell, assign, convey, transfer, pledge, mortgage, sublease, delegate, hypothecate, or otherwise dispose (each, a "Transfer") any of its rights, title, or interest (by novation or other instrument) in this Agreement as permitted by applicable law and at any time, and without Seller's consent without cost, expense or incremental liability to PREPA or a T&D Operator.



22.4   If at any time during the Term, PREPA or a Commonwealth Assignee were to become a Non-Commonwealth Entity, Seller will have the right to terminate the Agreement pursuant to Section 18.1(d), unless effective on the date on which PREPA (or, if applicable, the Commonwealth Assignee) were to become a Non-Commonwealth Entity, PREPA (or, if applicable, the Commonwealth Assignee) satisfies, and covenants to maintain in full force and effect during the Term, one of the following:

(a)   full compliance with the Credit Standards;

(b)   the delivery to Seller of a legal, valid, binding and enforceable Acceptable Guarantee; or

(c)   the delivery of, an Acceptable Letter of Credit.

22.5   Any Acceptable Letter of Credit provided by an Acceptable Private Assignee pursuant to this Agreement shall be subject to the following provisions:

(a)   Unless otherwise agreed in writing by the Parties, each Acceptable Letter of Credit shall be maintained for the benefit of Seller.  The Acceptable Private Assignee shall renew or cause the renewal of any Acceptable Letter of Credit on a timely basis as provided in the relevant Acceptable Letter of Credit. If a Letter of Credit Default occurs Seller shall have the right to make a drawing on the Acceptable Letter of Credit in full unless such assignee shall have provided for the benefit of Seller a substitute Acceptable Letter of Credit (meeting the conditions of this Section 22.5) in equal amount to the Acceptable Letter of Credit being replaced by the close of business on the date that is five (5) business days following the occurrence of such Letter of Credit Default.

(b)   Each Acceptable Letter of Credit shall provide that Seller may draw upon the Acceptable Letter of Credit in an amount (up to the face amount for which the Acceptable Letter of Credit has been issued) that is equal to any or all amount(s) that are due and owing from such assignee under this Agreement, but have not been paid to Seller when due, upon presentation to the issuing bank of one or more statements certified by Seller that the amount(s) drawn under the Acceptable Letter of Credit represent amounts due and owing under the Agreement.

(c)   Each Acceptable Letter of Credit shall provide that Seller may draw the full amount due and owing by such assignee to Seller on the date thereof pursuant to this Agreement (up to the entire undrawn amount of the Acceptable Letter of Credit) if any event giving Seller the right to terminate this Agreement pursuant to Sections 22.4 and Section 18.1(d) has occurred and is continuing, upon presentation to the issuing bank of one or more statements certified by Seller that such an event has occurred and is continuing with respect to the Acceptable Private Assignee.

(d)   Each Acceptable Letter of Credit shall provide that Seller may draw the full amount of such Acceptable Letter of Credit in case of any default by such assignee under the Agreement.

22.6   An Acceptable Private Assignee, other than an Acceptable Private Assignee that has provided an Acceptable Letter of Credit to Seller, shall (a) notify Seller promptly, but in no event more than fourteen (14) days after the date on which such assignee becomes aware of the occurrence of a Credit Standard Event and (b) within thirty (30) days of such Credit Standard Event, provide replacement credit support in the form of an Acceptable Guarantee or an Acceptable Letter of Credit.  If the Acceptable Private Assignee fails to deliver such Acceptable Letter of Credit or Acceptable Guarantee in accordance with clause (b) of the previous sentence, Seller may terminate this Agreement upon notice with immediate effect.



22.7   An Acceptable Private Assignee that has provided an Acceptable Letter of Credit to Seller, shall (i) notify Seller promptly, but in no event more than fourteen (14) days after the date on which such assignee becomes aware of the occurrence of a Letter of Credit Issue Event and (ii) within thirty (30) days of such Letter of Credit Issuer Event, provide replacement credit support in the form of an Acceptable Guarantee or an Acceptable Letter of Credit.  If the Acceptable Private Assignee fails to deliver such Acceptable Letter of Credit or Acceptable Guarantee in accordance with clause (ii) of the previous sentence, Seller may terminate this Agreement upon notice with immediate effect.

## 23.   QUALIFYING FACILITY STATUS/ APPLICABILITY OF PURPA

23.1   Seller in its sole option may maintain the status of the Facility as a Qualifying Facility.  In the event that Seller elects to maintain Qualifying Facility status, this Agreement, and the purchase and sale of Net Electrical Output shall be subject to PURPA.

23.2   In the event the Facility loses its status as a Qualifying Facility pursuant to PURPA, Seller shall vigorously pursue and use reasonable efforts to reobtain Qualifying Facility status. Notwithstanding the above, should Seller be unable to obtain such status, this Agreement shall remain in full force and effect and Seller shall comply, in its relationship with PREPA, with all other provisions of PURPA and the regulations approved under PURPA by FERC or any successor applicable to the relationship between Qualifying Facilities and electric utilities, in particular those provisions which protect, defend, preserve, and/or are propitious to electric utilities; provided, however, that nothing under PURPA or the regulations thereunder shall materially adversely affect in any way the rights, duties, and obligations of the Parties under this Agreement.

## 24.   MISCELLANEOUS PROVISIONS

24.1   This Agreement, including the appendices thereto, can be amended only by agreement between the Parties in writing.

24.2   The failure of either Party to insist in any one or more instances upon strict performance of any provisions of this Agreement, or to take advantage of any of its rights hereunder, shall not be construed as a waiver of any such provisions or the relinquishment of any such right or any other right hereunder, which shall remain in full force and effect.

24.3   The headings contained in this Agreement are used solely for convenience and do not constitute a part of the Agreement between the Parties hereto, nor should they be used to aid in any manner in the construction of this Agreement.

24.4   This Agreement is intended solely for the benefit of the Parties hereto.  Nothing in this Agreement shall be construed to create any duty to, or standard of care with reference to, or any liability to, any person not a Party to this Agreement.

24.5   No officer, employee, or agent of Seller or PREPA or of the Territory or municipal governments shall be entitled to any share or part of this Agreement or to any benefit that may arise therefrom that would be in violation of any law, rule, regulation, order, or policy of the Territory or PREPA.

24.6   This Agreement shall not be interpreted or construed to create an association, joint venture, or partnership between the Parties or to impose any partnership obligation or liability upon either Party.  Neither Party shall have any right, power or authority to enter into any agreement or



-45-

undertaking for, or act on behalf of, or to act as or be an agent or representative of, or to otherwise bind, the other Party.

24.7    Cancellation, expiration or earlier termination of this Agreement shall not relieve the Parties of obligations incurred prior to, or as a result of, such cancellation, expiration or earlier termination of this Agreement, which by their nature should survive such events, including without limitation warranties, remedies, promises of indemnity and confidentiality.

24.8    PREPA agrees to provide electric service to Seller as requested by Seller, at the most advantageous rate available to Seller in accordance with PREPA's applicable rates.

24.9

(a)    Seller hereby certifies and warrants that at the Effective Date it has filed its income tax return for the last five (5) Years, if required, and does not owe any income taxes to the Commonwealth of Puerto Rico, unless it is under a payment plan whose terms and conditions are being complied with.

(b)    Seller certifies and warrants that at the Effective Date it has made all payments and does not owe any monies to the Labor and Human Resources Department of Puerto Rico required by the Puerto Rico Employment Security Act to cover applicable unemployment, temporary disability or sickness, and social security for chauffeurs.

(c)    It is expressly agreed that the conditions in clauses (a) and (b) of this Section 24.9 are an essential requirement of the present Agreement and if the above-mentioned certifications are not correct in any material respect, this will be sufficient cause to cancel this Agreement, following the lapse of any cure period of sixty (60) days.

(d)    All subcontractors employed by Seller shall also comply with the above-mentioned certifications.  Seller shall be responsible for requiring such certification, from all subcontractors and notifying PREPA of such compliance.

24.10   Each Party to this Agreement warrants that, except to the extent that a particular provision of this Agreement expressly creates a different standard, it will be reasonable with respect to the timing and substance of any exercise of its respective rights, obligations, duties and discretions in implementing this Agreement, including, without limitation, the making of and satisfying of requests, the issuance and withholding of consents and findings of acceptability or satisfaction, the incurrence of costs that are the responsibility of the other Party, and the provision of notice to the other Party.

24.11   This Agreement shall inure to the benefit of and be binding upon Seller and PREPA and their respective successors and assigns.

24.12   Either Party may waive breach by the other Party; provided that no waiver by or on behalf of either Party of any breach of this Agreement shall take effect or be binding on that Party unless the waiver is in writing.  A waiver of breach shall extend only to the particular breach waived and shall not limit or otherwise affect any rights that either Party may have with respect to any other or future breach.

24.13   This Agreement is intended by the Parties as the final expression of their agreement and is intended also as a complete and exclusive statement of the terms of their agreement with respect to the Net Electrical Output delivered, and Dependable Capacity sold and purchased hereunder and other matters set out herein with respect to the Seller's Complex. All prior written or oral understandings, offers or other communications of every kind pertaining to the sale of Dependable Capacity hereunder to PREPA by Seller (including under the Pre-Restatement PPOA) are hereby superseded.



24.14   If any provision hereof shall be held invalid, illegal or unenforceable by any Court of Competent Jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

24.15   Each party shall be responsible for its own costs and expenses related to the preparation, negotiation and execution of this Agreement.

24.16   The Parties may execute this Agreement in counterparts, which shall have the same effect as if the Parties both signed the same signature page of this Agreement.

## 25.   CHOICE OF LAW AND VENUE

25.1   This Agreement shall be governed by, construed and enforced in accordance with the laws of the Commonwealth of Puerto Rico and, to the extent applicable, the laws of the United States of America.

25.2   Unless otherwise specified in this Agreement, the venue for all disputes hereunder shall be in a Court of Competent Jurisdiction.

## 26.   COMPLIANCE WITH THE COMMONWEALTH OF PUERTO RICO CONTRACTING REQUIREMENTS

The Parties will comply with all applicable laws, regulations and executive orders that regulate the contracting process and requirements for governmental contracting in the Commonwealth of Puerto Rico.

26.1   Seller shall provide, before the Effective Date, or as otherwise required below, the following documents and certifications:

(a)   <u>Filing of Puerto Rico Income Tax Returns</u>. In compliance with Executive Order Number OE-1991-24 of June 18, 1991, Seller shall, before the Effective Date and whenever requested by PREPA during the term of this Agreement, certify that it has filed all the necessary and required income tax returns to the Government of Puerto Rico for the last five (5) years. As evidence thereof, Seller shall deliver to PREPA an Income Tax Return Filing Certificate, issued by the Treasury Department of Puerto Rico assuring that Seller has filed his Income Tax Return for the last five (5) tax years (Form SC 6088).

(b)   <u>Payment of Puerto Rico Income Taxes</u>. In compliance with Executive Order Number OE-1991-24 of June 18, 1991, Seller shall, before the Effective Date and whenever requested by PREPA during the term of this Agreement, certify that it has complied and is current with the payment of all income taxes that are, or were due, to the Government of Puerto Rico. As evidence thereof, Seller will deliver to PREPA a certification issued by the Treasury Department of Puerto Rico indicating that Seller (i) does not owe taxes to the Commonwealth of Puerto Rico or (ii) is paying such taxes by an installment plan in full compliance with the terms of such plan (Form SC 6096).

(c)   <u>Compliance with Requirements of the Department of Labor and Human Resources of the Commonwealth of Puerto Rico</u>. Pursuant to Executive Order Number 1992-52, dated August 28, 1992 amending OE-1991-24, Seller shall, before the Effective Date and whenever requested by PREPA during the term of this Agreement, certify that it has made (x) all payments required for unemployment benefits, workmen's compensation and social security for chauffeurs, whichever is applicable, or (y) that in lieu thereof, has subscribed a payment plan in connection with any such unpaid items



47

and is in full compliance with the terms of such plan. As evidence thereof, Seller shall deliver to PREPA:

 (i) A certification issued by the Bureau of Employment Security (*Negociado de Seguridad de Empleo*) of the Puerto Rico Department of Labor and Human Resources certifying that Seller does not owe taxes regarding Unemployment or Disability Insurance.

 (ii) A certification issued by the Program for Social Security for Chauffeurs and Other Employees of the Puerto Rico Department of Labor and Human Resources certifying that Seller has no debt with respect to such program.

(d) <u>Real and Personal Property Taxes</u>. Seller shall, before the Effective Date and whenever requested by PREPA during the term of this Agreement, certify that it does not have any current debt regarding property taxes that may be registered with the Government of Puerto Rico's Municipal Tax Collection Center (*Centro de Recaudación de Ingresos Municipales*). Seller shall further certify it is current with the payment of any and all property taxes that are or were due to the Government of Puerto Rico. As evidence thereof, Seller shall deliver to PREPA:

 (i) (A) A certification issued by the Municipal Revenues Collection Center ("MRCC"), assuring that Seller does not owe any tax accruing during the last five (5) years to such governmental agency with respect to personal property or (B) a negative debt certification issued by the MRCC with respect to personal property taxes and a sworn statement executed by Seller indicating that (1) during the last 5 years (or the time in which it has been providing professional services) it has had no taxable business or personal property on the 1st of January of each year, (2) that for such reasons it has not been required to file personal property tax returns, as required under Article 6.03 of Act 83-1991, as amended and (3) that for such reason it does not have an electronic tax file in the MRCC's electronic system.

 (ii) (A) An All Concepts Debt Certification issued by the MRCC assuring that Seller does not owe any taxes to such governmental agency with respect to real and personal property or (B) a negative certification issued by the MRCC with respect to real property taxes.

(e) <u>Sales and Use Taxes</u>. Seller shall deliver to PREPA:

 (i) A certification issued by the Puerto Rico Treasury Department indicating that either Seller (A) does not owe Puerto Rico Sales and Use Taxes to the Commonwealth of Puerto Rico or (B) is paying such taxes by an installment plan and is in full compliance with the terms of such plan.

 (ii) A copy of Seller's Certificate of Merchant's Registration issued by the Treasury Department of Puerto Rico.

(f) <u>Puerto Rico Child Support Administration (*ASUME*)</u>. Seller shall provide an Employer Compliance Certificate indicating that either (i) it is complying with all income withholding orders as established in all cases or (ii) there are no active income withholding orders to comply with at present.

26.2 <u>Compliance with Act No. 1 of Governmental Ethics</u>. As established by Act No. 1 of January 3, 2012, as amended, known as the Ethics Act of the Government of Puerto Rico, no employee or executive of PREPA nor any member of his or her immediate family (spouse, dependent



children, or other members of his or her household or any individual whose financial affairs are under the control of the employee) shall have any direct or indirect pecuniary interest in the services to be rendered under this Agreement, except as may be expressly authorized by the Governor of Puerto Rico in consultation with the Secretary of Treasury and the Secretary of Justice of the Government (3 L.P.R.A. § 8611 et seq.).

26.3   Law 168-2000: Law for the Strengthening of the Family Support and Livelihood of Elderly People. In the event any employee of Seller is bound to pay support for care of elderly people under the Law for the Strengthening of the Family Support and Livelihood of Elderly People in Spanish: "Ley para el Fortalecimiento del Apoyo Familiar y Sustento de Personas de Edad Avanzada", 3 L.P.R.A. §8611 et seq., Seller shall comply with any requirement or order issued by the corresponding administrative agency or local court.

26.4   Law Num. 127, May 31, 2004: Agreement Registration in the Comptroller's Office of Puerto Rico Act. Payment for Services under this Agreement will not be made until this Agreement is properly registered in the Office of the Comptroller of the Government of Puerto Rico pursuant to Law Number 18 of October 30, 1975, as amended.

26.5   Prohibition with respect to execution by public officers: (3 L.P.R.A. 8615(c)). No public officer or employee authorized to contract on behalf of the executive agency for which he/she works may execute a contract between the agency for which he/she works and an entity or business in which he/she or any member of his/her family unit has or has had direct or indirect economic interest during the last four (4) years prior to his/her holding office.

26.6   Prohibition with respect to contracting with officers or employees: (3 L.P.R.A. 8615(d)). No executive agency may execute a contract in which any of its officers or employees or any member of their family units has or has had direct or indirect economic interest during the last four (4) years prior to their holding office, unless the Governor of Puerto Rico gives express authorization thereto with previous recommendation from the Secretary of the Treasury and the Secretary of Justice.

26.7   Prohibition with respect to contracts with officers and employees of other Government of Puerto Rico entities: (3 L.P.R.A. 8615(e)). No public officer or employee may be a party to or have any interest in any profits or benefits produced by a contract with any other executive agency or government dependency unless the Governor of Puerto Rico gives express authorization thereto with previous recommendation from the Secretary of the Treasury and the Secretary of Justice.

26.8   Prohibition with respect to evaluation and approval by public officers: (3 L.P.R.A. 8615(f)). No public officer or employee who has the power to approve or authorize contracts shall evaluate, consider, approve or authorize any contract between an executive agency and an entity or business in which he/she or any member of his/her family unit has or has had direct or indirect economic interest during the last four (4) years prior to his/her holding office.

26.9   Prohibition with respect to execution by public officers contracts with former public officers: (3 L.P.R.A. 8615(h)). No executive agency shall execute contracts with or for the benefit of persons who have been public officers or employees of said executive agency until after two (2) years have elapsed from the time said person has ceased working as such.

26.10  Dispensation. Any and all necessary dispensations required by this contract have been obtained from any government entity and that said dispensations shall become part of the contracting record.



26.11   Rules of Professional Ethics.  Seller acknowledges and accepts that it is knowledgeable of the rules of ethics of his or her profession and assumes responsibility for his or her own actions.

## 27.   ANTI-CORRUPTION CODE FOR A NEW PUERTO RICO

27.1   Seller agrees to comply with the provisions of Act 2-2018, as the same may be amended from time to time, which establishes the Anti-Corruption Code for a New Puerto Rico.  Seller hereby certifies that it does not represent particular interests in cases or matters that imply a conflict of interest, or of public policy, between the executive agency and the particular interests it represents.

27.2   Seller shall furnish a sworn statement to the effect that neither the Seller nor any of its president, vice president, executive directors or members of its board of directors, nor any person performing equivalent functions for the Seller has been convicted of or has pled guilty to any of the crimes listed in Article 6.8 of Act 8-2017, as amended, known as the Act for the Administration and Transformation of Human Resources in the Government of Puerto Rico or any of the crimes included in Act 2-2018.

27.3   Seller hereby certifies that it has not been convicted in Puerto Rico or United States Federal court for under Articles 4.2, 4.3 or 5.7 of Act 1-2012, as amended, known as the Organic Act of the Office of Government Ethics of Puerto Rico, any of the crimes listed in Articles 250 through 266 of Act 146-2012, as amended, known as the Puerto Rico Penal Code, any of the crimes typified in Act 2-2018, as amended, known as the Anti-Corruption Code for a New Puerto Rico or any other felony that involves misuse of public funds or property, including but not limited to the crimes mentioned in Article 6.8 of Act 8-2017, as amended, known as the Act for the Administration and Transformation of Human Resources in the Government of Puerto Rico.

27.4   PREPA shall have the right to terminate the Agreement in the event Seller is convicted in Puerto Rico or United States Federal court for under Articles 4.2, 4.3 or 5.7 of Act 1-2012, as amended, known as the Organic Act of the Office of Government Ethics of Puerto Rico, any of the crimes listed in Articles 250 through 266 of Act 146-2012, as amended, known as the Puerto Rico Penal Code, any of the crimes typified in Act 2-2018, as amended, known as the Anti-Corruption Code for a New Puerto Rico or any other felony that involves misuse of public funds or property, including but not limited to the crimes mentioned in Article 6.8 of Act 8-2017, as amended, known as the Act for the Administration and Transformation of Human Resources in the Government of Puerto Rico.

## 28.   CONSEQUENCES OF NON-COMPLIANCE

28.1   Seller expressly agrees that the conditions outlined throughout Sections 26 and 27 are essential requirements of this Agreement. If any of the certifications listed in Section 26.1 shows a debt, and Seller has requested a review or adjustment of this debt, Seller hereby certifies that it has made such request at the time of the execution of this Agreement.  If the requested review or adjustment is denied and such determination is final, Seller will provide, immediately, to PREPA a proof of payment of this debt.  Otherwise, Seller accepts that the owed amount be offset by PREPA and be retained at the origin and deducted from the corresponding payments to be forwarded to the corresponding governmental agency. Seller accepts and acknowledges its responsibility for, when requested by PREPA, requiring and obtaining a similar warranty and certification from each and every contractor and subcontractor whose service Seller has secured in connection with the services to be rendered under this Agreement and shall forward evidence to PREPA as to its compliance with this requirement. Should any one of these representations, warranties or certifications be incorrect, inaccurate or misleading, in whole or



50

in part, and should such non-compliance not be cured within sixty (60) days, there shall be sufficient cause for PREPA to terminate this Agreement. In case that Seller is not able to obtain the required documentation during the term provided here for causes not in Seller's control, then PREPA agrees to extend the term for Seller to comply.  Seller understands and agrees that PREPA is prohibited to process any payment under this Agreement until the enumerated certifications and sworn statements are submitted to PREPA.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the date first above written.

ECOELÉCTRICA, L.P.
By: EcoEléctrica LLC, its General Partner

By:_____
Title:    PRESIDENT

PUERTO RICO ELECTRIC POWER
AUTHORITY

_____ March 31, 2020

Title:  Chief Executive Officer

APPENDICES

## APPENDIX A – DESIGN LIMITS

I.   <u>Objective</u>

This Appendix specifies the Design Limits applicable to the Facility for the purpose of Automatic Generation Control including Ramp Rates.

II.   <u>Design Limits</u>

The following are preliminary Design Limits for each Unit of the Facility.  These values are identical to those identified as approved criteria in Appendix M:

| | | |
|---|---|---|
| A. Generator Step-Up Transformers ("GSU") Impedance (%): | 1.1.30 | $0 - 14$ |
| B. GSU Connection and Winding: | 1.1.31 | 18 kV (Wye) – 30 kV (Delta) |
| C. Generator Reactances ($X^{nd}$) (%) | 1.1.32 | $14.5 - 16.5$ |
| D. Generator Short Circuit Ratio: | 1.1.33 | $0.5 - 0.75$ |
| E. Generator Kilowatt Rating (kW): | 1.1.34 | $150,000 - 200,000$ |
| F. Generator Kilovar Rating (kVAr): | 1.1.35 | $176,500 - 235,300$ |
| G. Excitation System: | 1.1.36 | Brushless |

III.   <u>Ramp Rates</u>

This Appendix includes three charts depicting Preliminary Normal Start and Loading Characteristics for each of the three types of Facility starts:  Hot Start, Warm Start and Cold Start.  Hot Start, Warm Start and Cold Start are defined in Appendix G.  Each of these charts indicates the Facility's percent of rated load as a function of time and provides the preliminary Ramp Rates for the Facility in units of megawatts per minute ("MW/min").

Preliminary Normal Start and Loading Characteristics
Hot Start (<1 Hour After Shutdown)

Ramp Rate=5.5 MW/min

Ramp Rate= 21.5 MW/min

Time from Initiation (Minutes)

Percent of Rated Load



Preliminary Normal Start and Loading Characteristics
Warm Start (1 - 12 Hours After Shutdown)

Ramp Rate=2 MW/min

Ramp Rate=21.5 MW/min

Percent of Rated Load

Time from Initiation (Minutes)



Preliminary Normal Start and Loading Characteristics
Cold Start (>12 Hours After Shutdown)

Ramp Rate=5.5 MW/min

Ramp Rate=1.5 MW/min

Ramp Rate=21.5 MW/min

Percent of Rated Load

Time from Initiation (Minutes)



# APPENDIX B – FUEL COST CORRECTION CURVE

I.   Objective

This Appendix sets forth the procedure to develop several Fuel Cost Correction Curves (collectively "FCCCs" or individually "FCCC"). A FCCC will be developed for each operating configuration including combined-cycle operation with two (2) combustion turbines, combined-cycle operation with one (1) combustion turbine, simple-cycle operation with two (2) combustion turbines, and simple-cycle operation with one (1) combustion turbine.

The abscissa of the FCCC is the Percent of Dependable Capacity ("$PDC_i$") and the ordinate of the FCCC is the Fuel Cost Correction Factor ("$FCCF_i$"). The $PDC_i$ for each hour i, is defined as that quantity, expressed as a percent, the numerator of which is Seller's capacity output for that hour i ("$SCO_i$") and the denominator of which is the Dependable Capacity ("DPC"). The $FCCF_i$ for each hour i, is defined as that quantity the numerator of which is the Facility's Heat Rate for such hour i ("$HR_i$") at $SCO_i$ and the denominator of which is the Base Load Heat Rate "BHR". The FCCF at 100 Percent of Dependable Capacity is unity.

$$PDC_i = \frac{SCO_i}{DPC} \times 100\%$$

$$FCCF_i = \frac{HR_i}{BHR}$$

II.   Requirements

A.   The derived thermal performance data will reasonably reflect actual operation for each operating configuration.

B.   Characteristics will be represented in the form of an equation or equations which best fit the operating data. The FCCC equation(s) will be either second or third order polynomial equation(s) derived to describe the FCCF as a function of PDC. A piecewise curve fit is allowed.

III.   Performance Test Method

Performance Tests will be conducted for various capacity outputs over the operating range of the Facility. In order to represent steady state conditions the minimum run at each point, following Unit stabilization, will be one (1) hour. During this period, all plant systems consistent with normal operations will be functioning and there shall be no process steam extraction.

A.   The Tested Capacity and Tested Heat Rate will be derived during each Performance Test.

B.   For each operating configuration, one test will be conducted at the minimum dispatch level. Additional Performance Tests will be conducted at various capacity outputs at a maximum interval of 10 Percent of Dependable Capacity or such lesser interval as maintains the change in FCCF at 0.05 or less.

C.   For each test, the $PDC_i$ will be the net kilowatt-hours measured at the Interconnection Point divided by the time increment expressed in hours rounded to the nearest one-hundredth (1/100) of an hour, with the resulting amount divided by the Tested Capacity. The resulting heat rate ($HR_i$) corresponding to the PDC will be the gross fuel consumption over this period divided by the net kilowatt-hours measured at the

Interconnection Point.  The corresponding $FCCF_i$ will be the $HR_i$ divided by the Base Load Heat Rate.

Example:

Assume under combined-cycle operation using two (2) combustion turbines the Tested Capacity is 461,000 kW, the Base Load Heat Rate is 7,500 Btu/kWh and that while producing 230,500 kW (D), the Facility's Heat Rate (HR) is 9,060 Btu/kWh.  At this condition, the Facility's PDC is 50.0 percent (230,500 kW ÷ 461,000 kW) and the $FCCF_{50.0\%}$ is 1.21 (i.e. 9,060 Btu/kWh ÷ 7,500 Btu/kWh), based on the preliminary FCCF curve.



EcoEléctrica, L.P.
Fuel Cost Correction Curve

NYDOCS02/1200628.29



# Appendix B

Rate Average Correction Factor Data

| | |
| --- | --- |
| for the Month of | Jun-09 |
| Month Period | 97.50% |
| Dispatch Factor | 76.83% |
| Capacity Factor | 74.93% |
| ACF | 1.272270 |
| Hours in Period | 744 |



## APPENDIX C – CAPACITY PAYMENT CALCULATION

The Capacity Payment ("CP") shall be calculated as follows:

$$CP\ (\$) = (CPP \times DPC)$$

Where:

DPC                        =        Dependable Capacity, expressed in kW
CPP (\$/kW-month)          =        Capacity Purchase Price, calculated as follows:

$$CPP = ((DC \times DCEF) + (FOMC \times FCEF)) \times FMAF \times EAAF - CPD \times DCEF \times ((BPH - EGFMH)/BPH) \times (1 + AAAF)$$

Where:

| Term | Definition | Formula or Value |
|------|-----------|------------------|
| DC | Demand Charge | \$22.4944/kW-month |
| CPD | Capacity Payment Discount | $\left[\dfrac{\$112,899,267}{530000\ kW \times 12\ month}\right] = \$17.7515/\text{kW-month}$ |
| AAAF | Additional Availability Adjustment Factor | See item (iii) below. |
| EAAF | Equivalent Availability Adjustment Factor | See item (ii) below. |
| BPH | Hours in Billing Period | Variable based on Billing Period |
| EGFMH | Equivalent Grid Force Majeure Hours | See item (i) below. |
| ETFMH | Equivalent Total Force Majeure Hours | See FMAF below. |
| DCEF | Demand Charge Escalation Factor | Set at (1) for 2019 and escalated each year by 2% beginning on January 1, 2020 |
| FOMC | Fixed O&M Charge | \$15.3500/kW-month |
| FCEF | Fixed Cost Escalation Factor | Set at (1) for 2019. Each year beginning on January 1, 2020 the FCEF will be a fraction where (i) the numerator will be the average of the twelve (12) monthly values of the US-CPI corresponding to the twelve months ending on December 31 of the Year immediately preceding such calculation and (ii) the denominator will be the average of the twelve (12) monthly values of the US-CPI corresponding to the twelve (12) months ending on December 31, 2018. |
| FMAF | Force Majeure Adjustment Factor  For each Billing Period, the Force Majeure Adjustment Factor shall be determined as follows, taking into account (i) outages or | $\dfrac{BPH - (ETFMH)}{BPH}$  Where: BPH = Hours in Billing Period ETFMH= Equivalent Total Force Majeure Hours, which is equal to EFMH+EGFMH |



| | deratings due to Force Majeure events claimed by Seller in which Seller is unable to deliver all or part of the Net Electrical Output, and (ii) during the Grid Restoration Period, the inability of PREPA, or curtailment of PREPA's ability, to Dispatch the Facility as a result of a Grid Force Majeure Event | EFMH = Equivalent Force Majeure Hours<br>EGFMH = Equivalent Grid Force Majeure Hours<br><br>If in any Billing Period, the FMAF is less than 0.67 (the "FMAF Floor"), the FMAF will be recalculated with ETFMH capped at 33% of BPH (with the amount that would have resulted from the calculation of ETFMH in excess of the 33% cap being the "Uncapped ETFMH Amount").<br><br>Any Uncapped ETFMH Amount for the current Billing Period shall be multiplied by 1.005, and the product thereof (the "ETFMH Carry Over Amount"), up to 2290, will be carried over into the next Billing Period, and so on until such ETFMH Carry Over Amount equals 0.  If the ETFMH Carry Over Amount exceeds 2290, the amount of ETFMH that exceeds 2290 will be added back to ETFMH in the FMAF equation even if, as a result thereof, the FMAF would be below the FMAF Floor. |

(i)     Equivalent Grid Force Majeure Hours (EGFMH) – During a Grid Restoration Period, the number of hours, in excess of the Equivalent Force Majeure Hours, that a Grid Force Majeure Event curtailed PREPA's ability to Dispatch the Facility during the Billing Period, determined by the following equation:

$$EGFMH = GFMH \times \left(\frac{DPC - ASC}{DPC}\right)$$

Where:

GFMH     =     Number of hours that Grid Force Majeure Event curtailed PREPA's ability to Dispatch the Facility during the corresponding Billing Period

DPC     =     Dependable Capacity, expressed in MW

ASC     =     the average Seller capacity placed in service by PREPA's Dispatch of the Facility during the GFMH expressed in MW

(ii)     Equivalent Availability Adjustment Factor (EAAF) – For each Billing Period, the EAAF shall be calculated based on the Equivalent Availability Factor (EAF) for the period comprising the last twelve Billing Periods ending with the one being billed ("Twelve Month EAF").

For any period of time, the EAF will be equal to the Period Hours, less the Outage Hours less the Equivalent Derated Hours, less the Equivalent Grid Force Majeure Hours, divided by the Period Hours less the Equivalent Total Force Majeure Hours, expressed as a percentage pursuant to the following formula:



$$EAF\ (\%) = \frac{PH - OH - EDH - EGFMH}{PH - ETFMH} \times 100$$

Where:

| | | |
|---|---|---|
| EAF | = | Equivalent Availability Factor |
| PH | = | Period Hours |
| OH | = | Outage Hours |
| EDH | = | Equivalent Derated Hours |
| ETFMH | = | Equivalent Total Force Majeure Hours |
| EGFMH | = | Equivalent Grid Force Majeure Hours |

All hours shall be rounded to the nearest one-tenth (1/10) of an hour and the EAF to the nearest one-tenth (1/10) of a percent.

The EAAF is calculated as set forth below:

| Range | | | | | Equivalent Availability Adjustment Factor (or EAAF) |
|---|---|---|---|---|---|
| | | EAF | $\geq$ | 93% | 101% |
| 93% | > | EAF | $\geq$ | 89% | $101\% - ((93\%\text{-EAF}) \times 1.25)$ |
| 89% | > | EAF | $\geq$ | 86% | $96\% - ((89\%\text{-EAF}) \times 1.5)$ |
| 86% | > | EAF | $\geq$ | 71% | $91.5\% - ((86\%\text{-EAF}) \times 2)$ |
| 71% | > | EAF | $\geq$ | 61% | $61.5\% - ((71\%\text{-EAF}) \times 3)$ |
| 61% | > | EAF | | | 0% |

(iii)   Additional Availability Adjustment Factor (AAAF) – If the EAF for a Billing Period (the "Monthly EAF") exceeds ninety-three percent (93%), an additional availability adjustment factor (the "AAAF") will apply for that Billing Period, subject to the Rolling 2020 Cap.

   a.   For Billing Periods where the Monthly EAF falls between ninety-three percent (93%) and ninety-five percent (95%), the AAAF for that Billing Period will be a value that linearly increases from zero percent (0%) to twenty-nine percent (29%). Where the Monthly EAF exceeds ninety-five percent (95%), the AAAF for that Billing Period will be constant at twenty-nine percent (29%). In such Billing Periods (that is, where the Monthly EAF exceeds ninety-three percent (93%)), the EAAF for that Billing Period shall be the EAAF determined pursuant to clause (ii) above, plus the AAAF.

   b.   During the Billing Periods of 2020 the AAAF is subject to a rolling twelve (12) month cap, whereby the average monthly EAAF plus the applicable monthly AAAF adjustments for the prior twelve (12) months (that is, the last twelve (12) Billing Periods ending with the one being billed), shall not exceed 115% (the "Rolling 2020 Cap").

   c.   Appendix C sets out example calculations of Monthly EAF and AAAF.

**Data assumed for example calculation:**

| | | |
|---|---|---|
| Dependable Capacity | = | 530 MW |
| Contract Year | = | 2022 |
| FCEF | = | 1.061208 |
| BPH | = | 744 |
| Fuel Cost (FC) | = | 7.0 $/MMBTU |
| GBLHR | = | 7650 BTU/kWh |
| ACF | = | 1.02 |

$$CPP(\$/kW\text{-}month) = (DC \times DCEF + FOMC \times FCEF) \times FMAF \times EAAF - CPD \times DCEF \times ((BPH - EGFMH)/BPH) \times (1 + AAAF)$$

$$CP(\$) = CPP \times DPC$$

Note: EAF Rounding to one decimal place applied. All other calculations should be rounded to eight decimal places.

| CP ($)/month | CPP ($/kW-month) | DPC (kW) | DC ($/kW-month) | CPD ($/kW-month) | DCEF | FOMC | FCEF | FMAF | BPH | EGFMH | 12mth EAF | EAF | AAAF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14,791,214 | 27.90795043 | 530,000 | 22.4944 | 17.7515 | 1.0612 | 15.3500 | 1.0612 | 1 | 744 | 0 | 95.0% | 130.0% | 29.0% |
| 13,152,561 | 24.81615223 | 530,000 | 22.4944 | 17.7515 | 1.0612 | 15.3500 | 1.0612 | 1 | 744 | 0 | 94.0% | 115.5% | 14.5% |
| 6,139,391 | 11.58375706 | 530,000 | 22.4944 | 17.7515 | 1.0612 | 15.3500 | 1.0612 | 0.75 | 744 | 0 | 93.0% | 101.0% | 0.0% |
| 10,723,493 | 20.23300641 | 530,000 | 22.4944 | 17.7515 | 1.0612 | 15.3500 | 1.0612 | 0.98 | 744 | 12 | 91.0% | 98.5% | 0.0% |
| 10,449,647 | 19.71631502 | 530,000 | 22.4944 | 17.7515 | 1.0612 | 15.3500 | 1.0612 | 1 | 744 | 0 | 89.0% | 96.0% | 0.0% |
| 9,539,303 | 17.99868437 | 530,000 | 22.4944 | 17.7515 | 1.0612 | 15.3500 | 1.0612 | 0.97 | 744 | 24 | 87.0% | 93.0% | 0.0% |
| 9,066,108 | 17.10586432 | 530,000 | 22.4944 | 17.7515 | 1.0612 | 15.3500 | 1.0612 | 1 | 744 | 0 | 85.0% | 89.5% | 0.0% |
| 2,996,595 | 5.65395192 | 530,000 | 22.4944 | 17.7515 | 1.0612 | 15.3500 | 1.0612 | 0.7 | 744 | 18 | 83.0% | 85.5% | 0.0% |
| 7,363,291 | 13.89300192 | 530,000 | 22.4944 | 17.7515 | 1.0612 | 15.3500 | 1.0612 | 1 | 744 | 0 | 81.0% | 81.5% | 0.0% |
| 6,511,882 | 12.28657072 | 530,000 | 22.4944 | 17.7515 | 1.0612 | 15.3500 | 1.0612 | 1 | 744 | 0 | 79.0% | 77.5% | 0.0% |
| 5,660,474 | 10.68013951 | 530,000 | 22.4944 | 17.7515 | 1.0612 | 15.3500 | 1.0612 | 1 | 744 | 0 | 77.0% | 73.5% | 0.0% |

NYDOCS02/120062829

## APPENDIX D – EAF AND AAAF CALCULATION EXAMPLES

Equivalent Availability Factor Data

| Month | EDH | OH | EDH+OH | Hours in month | EAF this period | 12$^{mth}$ EAF | AAAF | EAAF (includes AAAF) |
|---|---|---|---|---|---|---|---|---|
| Jan '18 | 0.00 | 0.00 | 0.00 | 744.0 | 100.00% | 95.80% | 0.00% | 101.00% |
| Feb '18 | 245.10 | 84.00 | 329.10 | 672.0 | 51.00% | 92.10% | 0.00% | 99.90% |
| Mar '18 | 28.10 | 0.00 | 28.10 | 744.0 | 96.20% | 91.70% | 0.00% | 99.40% |
| Apr '18 | 33.15 | 0.00 | 33.15 | 720.0 | 95.40% | 91.40% | 0.00% | 99.00% |
| May '18 | 1.20 | 0.00 | 1.20 | 744.0 | 99.80% | 93.00% | 0.00% | 101.00% |
| June '18 | 0.00 | 0.00 | 0.00 | 720.0 | 100.00% | 93.20% | 0.00% | 101.00% |
| July '18 | 0.00 | 0.00 | 0.00 | 744.0 | 100.00% | 93.20% | 0.00% | 101.00% |
| Aug '18 | 244.80 | 19.00 | 263.80 | 744.0 | 64.50% | 90.20% | 0.00% | 97.50% |
| Sept '18 | 0.00 | 0.00 | 0.00 | 720.0 | 100.00% | 92.40% | 0.00% | 100.30% |
| Oct '18 | 0.00 | 0.00 | 0.00 | 744.0 | 100.00% | 92.40% | 0.00% | 100.30% |
| Nov '18 | 238.40 | 0.00 | 238.40 | 720.0 | 66.90% | 89.80% | 0.00% | 97.00% |
| Dec '18 | 54.60 | 0.00 | 54.60 | 744.0 | 92.70% | 89.20% | 0.00% | 96.30% |
| Jan '19 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 89.00% | 0.00% | 96.00% |
| Feb '19 | 225.00 | 72.00 | 297.00 | 672.0 | 55.80% | 89.40% | 0.00% | 96.50% |
| Mar '19 | 22.00 | 0.00 | 22.00 | 744.0 | 97.00% | 89.40% | 0.00% | 96.50% |
| Apr '19 | 15.00 | 0.00 | 15.00 | 720.0 | 97.90% | 89.60% | 0.00% | 96.80% |
| May '19 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 89.50% | 0.00% | 96.60% |
| June '19 | 22.00 | 0.00 | 22.00 | 720.0 | 96.90% | 89.20% | 0.00% | 96.30% |
| July '19 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 89.10% | 0.00% | 96.10% |
| Aug '19 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 91.90% | 0.00% | 99.60% |
| Sept '19 | 22.00 | 0.00 | 22.00 | 720.0 | 96.90% | 91.70% | 0.00% | 99.40% |
| Oct '19 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 91.50% | 0.00% | 99.10% |
| Nov '19 | 15.00 | 0.00 | 15.00 | 720.0 | 97.90% | 94.00% | 14.50% | 115.50% |
| Dec '19 | 22.00 | 0.00 | 22.00 | 744.0 | 97.00% | 94.40% | 20.30% | 121.30% |

NYDOCS02/1200628.29

| Month | EDH | OH | EDH+OH | Hours in month | EAF this period | 12$^{mth}$ EAF | AAAF | EAAF (includes AAAF) |
|---|---|---|---|---|---|---|---|---|
| Jan '20 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 94.40% | 20.30% | 115.00% |
| Feb '20 | 15.00 | 0.00 | 15.00 | 696.0 | 97.80% | 97.60% | 29.00% | 115.00% |
| Mar '20 | 22.00 | 0.00 | 22.00 | 744.0 | 97.00% | 97.60% | 29.00% | 115.00% |
| Apr '20 | 328.00 | 72.00 | 400.00 | 720.0 | 44.40% | 93.20% | 2.90% | 103.90% |
| May '20 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 93.20% | 2.90% | 103.90% |
| June '20 | 22.00 | 0.00 | 22.00 | 720.0 | 96.90% | 93.20% | 2.90% | 103.90% |
| July '20 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 93.20% | 2.90% | 103.90% |
| Aug '20 | 15.00 | 0.00 | 15.00 | 744.0 | 96.90% | 93.20% | 2.90% | 103.90% |
| Sept '20 | 22.00 | 0.00 | 22.00 | 720.0 | 98.00% | 93.20% | 2.90% | 103.90% |
| Oct '20 | 15.00 | 0.00 | 15.00 | 744.0 | 81.30% | 91.90% | 0.00% | 99.60% |
| Nov '20 | 135.00 | 0.00 | 135.00 | 720.0 | 97.00% | 91.90% | 0.00% | 99.60% |
| Dec '20 | 22.00 | 0.00 | 22.00 | 744.0 | 98.00% | 91.90% | 0.00% | 99.60% |
| Jan '21 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 91.90% | 0.00% | 94.50% |
| Feb '21 | 278.00 | 72.00 | 350.00 | 672.0 | 47.90% | 88.00% | 0.00% | 94.50% |
| Mar '21 | 22.00 | 0.00 | 22.00 | 744.0 | 97.00% | 88.00% | 0.00% | 100.30% |
| Apr '21 | 15.00 | 0.00 | 15.00 | 720.0 | 97.90% | 92.40% | 0.00% | 100.30% |
| May '21 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 92.40% | 0.00% | 100.30% |
| June '21 | 22.00 | 0.00 | 22.00 | 744.0 | 96.90% | 92.40% | 0.00% | 100.30% |
| July '21 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 91.20% | 0.00% | 98.80% |
| Aug '21 | 120.00 | 0.00 | 120.00 | 744.0 | 83.90% | 91.20% | 0.00% | 98.80% |
| Sept '21 | 22.00 | 0.00 | 22.00 | 720.0 | 96.90% | 91.20% | 0.00% | 98.80% |
| Oct '21 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 91.20% | 0.00% | 100.50% |
| Nov '21 | 15.00 | 0.00 | 15.00 | 720.0 | 97.90% | 92.60% | 0.00% | 100.50% |
| Dec '21 | 22.00 | 0.00 | 22.00 | 744.0 | 97.00% | 92.60% | 0.00% | 100.50% |

115% cap applied (over EAAF column)

NYDOCS02/120062829

| Month | EDH | OH | EDH+OH | Hours in month | EAF this period | 12$^{mth}$ EAF | AAAF | EAAF (includes AAAF) |
|---|---|---|---|---|---|---|---|---|
| Jan '22 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 92.60% | 0.00% | 100.50% |
| Feb '22 | 278.00 | 72.00 | 350.00 | 672.0 | 47.90% | 92.60% | 0.00% | 100.50% |
| Mar '22 | 22.00 | 0.00 | 22.00 | 744.0 | 97.00% | 92.60% | 0.00% | 100.50% |
| Apr '22 | 15.00 | 0.00 | 15.00 | 720.0 | 97.90% | 92.60% | 0.00% | 100.50% |
| May '22 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 92.60% | 0.00% | 100.50% |
| June '22 | 22.00 | 0.00 | 22.00 | 720.0 | 96.90% | 92.60% | 0.00% | 100.50% |
| July '22 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 92.60% | 0.00% | 100.50% |
| Aug '22 | 120.00 | 0.00 | 120.00 | 744.0 | 83.90% | 92.60% | 0.00% | 100.50% |
| Sept '22 | 22.00 | 0.00 | 22.00 | 720.0 | 96.90% | 92.60% | 0.00% | 100.50% |
| Oct '22 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 92.60% | 0.00% | 100.50% |
| Nov '22 | 15.00 | 0.00 | 15.00 | 720.0 | 97.90% | 92.60% | 0.00% | 100.50% |
| Dec '22 | 22.00 | 0.00 | 22.00 | 744.0 | 97.00% | 92.60% | 0.00% | 100.50% |
| Jan '23 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 92.60% | 0.00% | 100.50% |
| Feb '23 | 120.00 | 72.00 | 192.00 | 672.0 | 71.40% | 94.40% | 20.30% | 121.30% |
| Mar '23 | 22.00 | 0.00 | 22.00 | 744.0 | 97.00% | 94.40% | 20.30% | 121.30% |
| Apr '23 | 15.00 | 0.00 | 15.00 | 720.0 | 97.90% | 94.40% | 20.30% | 121.30% |
| May '23 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 94.40% | 20.30% | 121.30% |
| June '23 | 22.00 | 0.00 | 22.00 | 720.0 | 96.90% | 94.40% | 20.30% | 121.30% |
| July '23 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 95.60% | 29.00% | 130.00% |
| Aug '23 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 95.60% | 29.00% | 130.00% |
| Sept '23 | 22.00 | 0.00 | 22.00 | 720.0 | 96.90% | 95.60% | 29.00% | 130.00% |
| Oct '23 | 15.00 | 0.00 | 15.00 | 744.0 | 98.00% | 95.60% | 29.00% | 130.00% |
| Nov '23 | 15.00 | 0.00 | 15.00 | 720.0 | 97.90% | 95.60% | 29.00% | 130.00% |
| Dec '23 | 22.00 | 0.00 | 22.00 | 744.0 | 97.00% | 95.60% | 29.00% | 130.00% |

NYDOCS02/1200628.29



## APPENDIX E – INTERCONNECTION





## APPENDIX F – BACKUP FUEL SPECIFICATIONS

| Parameter | Weight % |
|---|---|
| Sulphur | 0.04 |
| Fuel Bound Nitrogen | 0.015 |
| Ash | 0.010 |
| Carbon | 86.455 |
| Hydrogen | 13.50 |



## APPENDIX G – START-UP REIMBURSEMENT

Start-up costs shall be allocated between the parties as follows: (a) PREPA shall reimburse Seller for costs incurred by Seller in restarting any Unit of the Facility that was shut down due to PREPA's request (whether or not notice was received by Seller), and (b) Seller shall credit PREPA the cost of fuel required for a gas turbine Unit to achieve synchronization with the Grid System during each start-up.  Monthly Start-up Reimbursement ("MSRU") shall be determined during each month in accordance with the following formula:

$$MSRU = (NCS \times \$CS) + (NWS \times \$WS) + (NHS \times \$HS) + \text{Applicable Demand Charge}$$

where the following terms have the following meanings:

| | |
|---|---|
| "Applicable Demand Charge" | The difference between the actual Demand Charge billed to Seller by PREPA and the Demand Charge calculated excluding any demand established by Seller in the Billing Period and any prior Billing Period in restarting a Unit as a result of a shutdown of both units at the request of PREPA. |
| "$CS" | $24,348.68, being the cost per Cold Start of a Unit, which amount shall be adjusted annually and on the first day of each Year during the Term by multiplying such amount times the Fixed Cost Escalation Factor. |
| "Cold Start" | a restart of a Unit that has been shut down for more than twelve hours. |
| "Hot Start" | a restart of a Unit that has been shut down for less than one hour. |
| "$HS" | $ 6,087.17, being the cost per Hot Start of a Unit, which amount shall be adjusted annually and on the first day of each Year during the Term by multiplying such amount times the Fixed Cost Escalation Factor. |
| "NCS" | the number of Cold Starts of Units during such month that are the first occurring restarts after a shutdown requested by PREPA. |
| "NHS" | the number of Hot Starts of Units during such month that are the first occurring restarts after a shutdown requested by PREPA |
| "NWS" | the number of Warm Starts of Units during such month that are the first occurring restarts after a shutdown requested by PREPA |
| "Unit" | one of the two gas turbines that are part of the Facility. |
| "$WS" | $ 15,217.93, being the cost per Warm Start of a Unit, which amount shall be adjusted annually and on the first day of each Year during the Term by multiplying such amount times the Fixed Cost Escalation Factor. |
| "Warm Start" | a restart of a Unit that has been shut down for between one hour and twelve hours. |



APPENDIX H – NG DELIVERY POINT



Delivery Point

SNG and Vaporized NG is mixed and supplied to CTs. 12" header required to 5" at CT.

NG Vaporized to "C" headed to SOGGN HX

16" Vaporized Natural Gas

5" Bias Off Gas Pipeline

70. LNG TWIG GATE
71. LNG TWIG GUARDHOUSE
72. LNG FILL IMPOUNDING AREA
73. GLYCOL PUMPS & SEAWATER HEAT EXCHANGERS AREA
74. SEAWATER STRAINERS AREA
75. SWITCHWARE HOUSE

NYDOCS02/1200628.29



## APPENDIX I – SCHEDULED OUTAGE PROGRAM

Annual Scheduled Outages shall not exceed the amounts set forth below.

<u>Minor Inspection Year</u>

<u>Combustion Inspection – occurs every eighteen (18) months</u>

| | |
|---|---|
| 240 Hours | Per gas turbine, one turbine shutdown at a time. |
| 240 Hours | Per steam turbine (concurrent with one gas turbine). |
| 72 Hours | Total plant shutdown (no electric output). |

<u>Intermediate Inspection Year</u>

<u>Hot Gas Path Inspection – occurs every three (3) years</u>

| | |
|---|---|
| 360 Hours | Per gas turbine, one turbine shutdown at a time. |
| 240 Hours | Per steam turbine (concurrent with one gas turbine). |
| 72 Hours | Total plant shutdown (no electric output). |

<u>Major Overhaul Year</u>

<u>Major Inspection – occurs every six (6) years</u>

| | |
|---|---|
| 600 Hours | Per gas turbine, one turbine shutdown at a time. |
| 720 Hours | Per steam turbine (concurrent with one gas turbine). |
| 72 Hours | Total plant shutdown (no electric output). |

Notes:

a. Inspection types for each Unit may not coincide on the same year.

b. LNG Terminal maintenance and testing is performed during the total plant shutdown.

## APPENDIX J – NG FUEL SPECIFICATIONS

Natural Gas redelivered to EcoEléctrica at NG Delivery Point:

(i)     shall not contain sand, dust, gums, crude oil, impurities or other objectionable substances which may be injurious to pipelines or may interfere with the transmission of the Natural Gas;

(ii)    shall not contain more than three-tenths grains of hydrogen sulphide per hundred standard cubic feet of Natural Gas volume, as measured by methods in accordance with accepted industry practice;

(iii)   shall not contain more than two grains of total sulphur per hundred standard cubic feet of Natural Gas volume, as measured by methods in accordance with accepted industry practice;

(iv)    shall not contain more than 0.25 grains of mercaptan sulphur per hundred standard cubic feet of standard cubic feet Natural Gas volume, as measured by methods in accordance with accepted industry practice, or such higher content as will not result in deliveries of Natural Gas containing more than three-tenths grains of mercaptan sulphur per hundred standard cubic feet of Natural Gas volume, as measured by methods in accordance with accepted industry practice;

(v)     shall not contain more than 2% by volume of carbon dioxide, as measured by methods in accordance with acceptable industry practice;

(vi)    shall not have a water vapor content in excess of seven pounds per million standard cubic feet of Natural Gas volume, such vapor content to be measured by methods in accordance with accepted industry practice;

(vii)   shall be as free of oxygen as it can be kept through the exercise of all reasonable precautions and shall not in any event contain more than 0.4% by volume of oxygen, as measured by methods in accordance with acceptable industry practice;

(viii)  shall have a heating value of not less than 950 Btu per standard cubic foot and not more than 1165 Btu per standard cubic foot.  The heating value shall be measured by methods in accordance with accepted industry practice, such as, but not limited to, recording calorimeter(s) or Natural Gas chromatograph(s) located at appropriate points; and

(ix)    shall be delivered to a NG Delivery Point at a temperature of more than 30° F and less than 100° F, and at the maximum pressure available when operating the vaporizers of 650 psig.

## APPENDIX K – ANCILLARY SERVICES

From the Effective Date until the expiration of the Term and in addition to (or in lieu of) the Dispatch of Net Electrical Output, Seller shall provide to, and PREPA shall have the right to Dispatch the Facility for the receipt into, the Grid System at the Interconnection Point of (i) Reactive Supply and Voltage Control Services, (ii) Regulation and Frequency Response Services, (iii) Energy Imbalance Services, (iv) Spinning Reserve Services, (v) Supplemental Reserve Services, and (vi) Generator Imbalance Services (collectively, the "**Ancillary Services**") in accordance with the General Technical Requirements (as defined below) and Prudent Electrical Practices and Prudent Utility Practices,

where:

"**Reactive Supply and Voltage Control Services**" means the provision by the Facility, within its design limits, of measurable dynamic reactive power voltage support to the Grid System for the maintenance of voltage levels within acceptable limits.

"**Regulation and Frequency Response Services**" means an immediate, proportional increase or decrease of the delivery of Net Electrical Output by the Facility in response to a frequency deviation within the Grid System, which balances generation supply with load and maintains scheduled Grid System frequency on a continuous basis.

"**Energy Imbalance Services**" means, for any hour, an increase or decrease of the delivery of the Net Electrical Output by the Facility, which offsets a foreseeable difference between actual energy delivered to a load and the energy scheduled to that load during such hour.

"**Spinning Reserve**" means the online generation capacity of the Facility, which exceeds the capacity required to supply assigned dispatch and which the Facility can make available to respond to sudden load changes or loss of a generation sources elsewhere in the Grid System by means of primary or secondary frequency control.

"**Spinning Reserve Capacity**" means the electric generating capacity of the Facility expressed in kilowatts made available by Seller at the Interconnection Point as spinning reserve for immediate dispatch by PREPA.

"**Supplemental Spinning Reserve**" means the off-line generation at the Facility, which Seller can synchronize with the Grid System within the times specified in the table below to replace Spinning Reserve following a Unit startup order from the Energy Control Center.

The following requirements shall apply to the provision of Ancillary Services by Seller (the "**General Technical Requirements**"):

1. **Reactive Supply and Voltage Control Services**

   During the provision of Reactive Supply and Voltage Control Services, Seller shall telemeter the status of its automatic voltage regulating equipment to PREPA on a real time basis.

2. **Regulation and Frequency Response Service**

   Units should be operated with primary control enabled whenever synchronized to the grid and with secondary control enabled per PREPA's ECC request.

3. **Energy Imbalance Services**

   Energy Imbalance Services will be provided following PREPA's ECC instructions via either AGC or verbal dispatch instructions.

4. **Spinning Reserve**

   PREPA shall have the right to (i) nominate the Spinning Reserve Capacity from time to time and (ii) utilize the Spinning Reserve Capacity by dispatching the Facility up to its Dependable Capacity, subject in each case to the operational limits of the Facility's automatic generation

control ("**AGC**") described in the subsequent paragraph. Units should be operated with primary control enabled whenever synchronized to the grid and with secondary control enabled per PREPA's ECC request. The applicable Ramp Rate in such event will be as determined in accordance with Appendix A.  If at the time of Spinning Reserve Capacity operation, the Facility is dispatched at less than the Dependable Capacity, for purposes of complying with the required Ramp Rate, such Ramp Rate will apply to the five (5) minutes following the start of the underfrequency disturbance which caused the Spinning Reserve Capacity operation.

For any hour in which the Facility operates in one of the modes identified in the column captioned "Mode of Operation" of the table below, PREPA shall have the right to nominate Spinning Reserve Capacity at an electric generating capacity (expressed in MW) that does not exceed the difference between the higher AGC regulation limit for the Facility identified in the column captioned "AGC HREG Limit MW" of the table below and the lower AGC regulation limit for the Facility identified in the column captioned "AGCL REG Limit MW".

| Mode of Operation | Description | Max MW$_{net}$ | | Min MW$_{net}$ | | AGC LREG Limit | | AGC HREG Limit | |
|---|---|---|---|---|---|---|---|---|---|
| | | MW | % | MW | % | MW | % | MW | % |
| Mode 1 | One gas turbine simple cycle | 165 | 31% | 80 | 15% | 76 | 14% | 165 | 31% |
| Mode 2 | Two gas turbines simple cycle | 345 | 66% | 160 | 30% | 160 | 30% | 345 | 66% |
| Mode 3 | 1 X 1 Combined cycle | 275 | 52% | 240 | 45% | 250 | 47% | 270 | 51% |
| Mode 4 | 2 X 1 Combined cycle | 530 | 100% | 254 | 48% | 254 | 48% | 507 | 96% |
| Mode 5 | 1 X 1 Combined cycle and one gas turbine simple cycle | 450 | 85% | 325 | 61% | 428 | 81% | 448 | 85% |

5. **Supplemental Spinning Reserve**

Following a Unit startup order from the Energy Control Center, Units will be synchronized approximately in the following amount of time:

Time from ECC order to start until Unit synchronized;

| | Cold Start | Warm Start | Hot Start |
|---|---|---|---|
| Gas Turbine | 50 min | same | same |
| Steam Turbine | 260min | 68min | 43min |



APPENDIX L – NG FUEL MEASUREMENT SCHEMATIC

Fuel Delivery Point



NYDOCS02/1200628.29

## APPENDIX M – PERFORMANCE TEST PROCEDURES

Objective

    The purpose of the test is to set the Tested Capacity and Tested Heat Rate and to verify the Ramp Rate of the Facility.

Test Procedure

    Seller will contract a qualified third party for the development, revision and implementation of this testing procedure prior to conducting each Performance Test. The application and installation of the Plant or temporary instrumentation will be defined as part of the procedure. The site specific test procedure and parties (seller, buyer and third party) scope an division of responsibilities will be agreed upon and finalized by the parties no later than 30 days before testing implementation.

Test Duration

    a.    *Tested Capacity*

    On the day of testing, the Tested Capacity period shall be four (4) hours and shall be between 10:00 a.m. and 2:00 p.m.

    b.    *Tested Heat Rate*

    The average of two one hour test per each load point will be utilized to determine the Tested Heat Rate of the Facility. The number of load points necessary to develop the Fuel Cost Correction Curve for each Mode of Operation will be determined according to Appendix B – Fuel Cost Correction Curve.

Test Conditions

    a.    *Tested Capacity*

    The Facility shall be in its normal base-loaded operation mode with the voltage regulator and governor in service, but not on Automatic Generation Control.  The process steam load shall approximate normal operating conditions for the Facility.  All major components shall be operated within their design pressures, temperatures, and flow rates.  Facility operation during the test will be consistent with continuous operation parameters and in accordance with Prudent Utility Practices, as confirmed by Units operating data. All necessary safety and environmental equipment shall be in service.

    b.    *Tested Heat Rate*

    For each Heat Rate test load points the Facility shall be in its normal operation mode with the voltage regulator and governor in service, but not on Automatic Generation Control. The process steam load shall approximate normal operating conditions for the Facility.  All major components shall be operated within their design pressures, temperatures, and flow rates.  Facility operation during the test will be consistent with continuous operation parameters and in accordance with Prudent Utility Practices, as confirmed by Units operating data. All necessary safety and environmental equipment shall be in service.

Test Verification

    During each Performance Test, critical process pressures, temperatures, and flow rates along with the electrical auxiliary consumption shall be recorded at least hourly and copies of the records provided to PREPA.

Witnessing

    PREPA may provide on-site witnesses at its discretion.

## APPENDIX N– DEGRADATION ADJUSTMENT FACTOR

$$AGBLHR_0 = GBLHR / DAF_1$$
$$AGBLHR_i = AGBLHR_{i-1} / DAF_i$$

**Periods:**

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period$_i$ -> | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| Duration -> | 8k EBH | 8k EBH | 8k EBH | 8k EBH | 8k EBH | 8k EBH | 8k EBH | 8k EBH | 8k EBH | 8k EBH | 8k EBH | 8k EBH | 8k EBH | 8k EBH |
| | | Test 1 | | | Test 2 | | | | | Test 3 | | | | |

EBH = Average of EcoEléctrica Combustion Turbines equivalent base operating hours.

**OEM Degradation Factors**

| | Pre-Outage Values | |
|---|---|---|
| Interval: | Power Degradation Factor | Efficiency Degradation Factor |
| 175k | 0.98753 | 0.99550 |
| 200k | 0.98535 | 0.99330 |
| 225k | 0.98073 | 0.99218 |
| 260k | 0.98057 | 0.99143 |

| | Post-Outage Values | |
|---|---|---|
| Interval: | Power Degradation Factor | Efficiency Degradation Factor |
| 150k | 1.00000 | 1.00000 |
| 175k | 0.99656 | 0.99825 |
| 200k | 0.99254 | 0.99667 |
| 225k | 0.99263 | 0.99726 |
| 250k | 0.98823 | 0.99481 |

**Degradation Adjustment Factor**

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period$_i$ -> | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| Duration -> | 8k EBH | 8k EBH | 8k EBH | 8k EBH | 8k EBH | 8k EBH | 8k EBH | 8k EBH | 8k EBH | 8k EBH | 8k EBH | 8k EBH | 8k EBH | 8k EBH |
| DAF$_i$ -> | 1.0000 | 0.9985 | 0.9985 | 1.0012 | 0.9984 | 0.9984 | 1.0018 | 0.9985 | 0.9985 | 1.0034 | 0.9981 | 0.9981 | 1.0017 | 0.9985 |
| | | Test 1 | | | Test 2 | | | | | Test 3 | | | | |

**Sample Calculations**

| Year | Period | DAF | Example #1 | | | Example #2 | | | Example #3 | | | Example #4 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tested Heat Rate | GBLHR | AGBLHR | Tested Heat Rate | GBLHR | AGBLHR | Tested Heat Rate | GBLHR | AGBLHR | Tested Heat Rate | GBLHR | AGBLHR |
| 2019 | 0 | | | | 7671 | | | 7671 | | | 7671 | | | 7671 |
| 2019 | Test 1 | | 7660 | 7660 | | 7700 | 7700 | | 7750 | 7750 | | 7600 | 7600 | |
| 2020 | 1 | 0.99850 | | | 7672 | | | 7682 | | | 7682 | | | 7611 |
| 2021 | 2 | 0.99850 | | | 7683 | | | 7694 | | | 7694 | | | 7623 |
| 2022 | 3 | 1.00118 | 7680 | | 7674 | 7750 | | 7685 | 7650 | | 7685 | 7700 | | 7614 |
| 2023 | Test 2 | | | | | | | | | | 7663 | | | 7626 |
| 2023 | 4 | 0.99835 | | | 7687 | | | 7697 | | | 7675 | | | 7639 |
| 2024 | 5 | 0.99835 | | | 7699 | | | 7710 | | | 7662 | | | 7625 |
| 2025 | 6 | 1.00180 | | | 7686 | | | 7696 | | | 7673 | | | 7637 |
| 2026 | 7 | 0.99850 | | | 7697 | | | 7708 | | | 7685 | | | 7648 |
| 2027 | 8 | 0.99850 | | | 7709 | | | 7719 | | | 7659 | | | 7623 |
| 2028 | 9 | 1.00336 | 7750 | | 7683 | 7700 | | 7694 | 7600 | | | 7800 | | 7637 |
| 2029 | Test 3 | | | | | | | | | | 7615 | | | |
| 2029 | 10 | 0.99806 | | | 7698 | | | 7709 | | | 7630 | | | 7652 |
| 2030 | 11 | 0.99806 | | | 7713 | | | 7724 | | | 7617 | | | 7640 |
| 2031 | 12 | 1.00166 | | | 7700 | | | 7711 | | | 7628 | | | 7651 |
| 2032 | 13 | 0.99850 | | | 7712 | | | 7722 | | | | | | |



77

## APPENDIX O – HEAT RATE ADJUSTMENT

Heat Rate Adjustment (HRA): HRA shall be equal to zero for every hour during a Billing Period where the Facility utilizes Backup Fuel. Where the Facility utilizes NG, HRA shall be computed as follows:

$$HRA\ (\$) = (GFU - AGU) \times GFC$$

Where:

| | | |
|---|---|---|
| GFU (MMBTU) | = | Guaranteed Fuel Utilization, determined using the formula: $(AGBLHR * ACF) \times \dfrac{NEO(kWh)}{10^6}$ |
| AGBLHR (BTU/kWhr) | = | Adjusted Guaranteed Base Load Heat Rate, determined per Appendix N |
| ACF | = | Average Correction Factor, determined using the formula: $\sum_1^n (FCCF_i \times WM\_NEO_i)$ |
| n | = | Total Billing Period Hours |
| FCCF | = | Fuel Cost Correction Factor |
| WM_NEO | = | Weighted mean of the Net Electrical Output (NEO), determined using the formula: $WM\_NEO_i = \dfrac{NEO_i}{\sum_1^n NEO_i}$ |
| DAF | = | Degradation Adjustment Factor |
| NEO | = | Net Electrical Output |
| AGU (MMBTU) | = | Actual Gas Utilization |
| GFC ($/MMBTU) | = | Gas Fuel Cost |

**oElectrica L.P.**
**&R PPOA**
**at Rate Adjustment Calculation Example**
ta assumed for example calculation:

| | | | |
|---|---|---|---|
| Dependable Capacity | = | 530 | MW |
| Contract Year | = | 2022 | |
| FCEF | = | 1.061208 | |
| Gas Fuel Cost (GFC) | = | 7.0 | $/MMBTU |
| AGBLHR | = | 7650 | BTU/kWh |
| ACF | = | 1.02 | |

HRA($) = (GFU - AGU) X FC

GFU(MMBTU) = (AGBLHR X ACF) X NEO /10^6

| HRA ($) | 12mth EAF | EAAF | AAAF | GFU (MMBTU) | AGU (MMBTU) | FC ($/MMBTU) | AGBLHR (BTU/kWh) /10^6 | ACF | NEO (kWh) |
|---|---|---|---|---|---|---|---|---|---|
| (53,493) | 95.0% | 130.0% | 29.0% | 2,598,253 | 2,605,895 | 7.0 | 7650 | 1.02 | 329,651,520 |
| (285,824) | 94.0% | 115.5% | 14.5% | 2,570,903 | 2,611,735 | 7.0 | 7650 | 1.02 | 326,181,504 |
| 178,049 | 93.0% | 101.0% | 0.0% | 2,543,553 | 2,518,118 | 7.0 | 7650 | 1.02 | 322,711,488 |
| (51,804) | 92.0% | 99.8% | 0.0% | 2,516,203 | 2,523,604 | 7.0 | 7650 | 1.02 | 319,241,472 |
| 174,220 | 91.0% | 98.5% | 0.0% | 2,488,853 | 2,463,965 | 7.0 | 7650 | 1.02 | 315,771,456 |
| (50,678) | 90.0% | 97.3% | 0.0% | 2,461,503 | 2,468,743 | 7.0 | 7650 | 1.02 | 312,301,440 |
| 170,391 | 89.0% | 96.0% | 0.0% | 2,434,153 | 2,409,812 | 7.0 | 7650 | 1.02 | 308,831,424 |
| (49,552) | 88.0% | 94.5% | 0.0% | 2,406,803 | 2,413,882 | 7.0 | 7650 | 1.02 | 305,361,408 |
| 166,562 | 87.0% | 93.0% | 0.0% | 2,379,453 | 2,355,659 | 7.0 | 7650 | 1.02 | 301,891,392 |
| (48,426) | 86.0% | 91.5% | 0.0% | 2,352,103 | 2,359,021 | 7.0 | 7650 | 1.02 | 298,421,376 |

Note: EAF Rounding to one decimal place applied. All other calculations should be rounded to eight decimal places.

-79-

## APPENDIX P – FORM OF ACCEPTABLE GUARANTEE

<u>GUARANTEE</u>

GUARANTEE, dated as of [*insert date*] (this "<u>Guarantee</u>"), is made by [*insert name of Parent Guarantor*], a [*insert type of entity*] (the "<u>Guarantor</u>"), in favor of EcoEléctrica, L.P., a limited partnership organized under the laws of Bermuda ( "<u>Seller</u>").

<u>W I T N E S S E T H</u>:

WHEREAS, [*insert name of the Acceptable Private Assignee/ Non-Commonwealth Entity*], a [*insert type of entity*] ("<u>Purchaser</u>"), and Seller are parties to the Amended and Restated Power Purchase and Operating Agreement, dated as of [*insert date of A&R PPOA*], between Purchaser and Seller (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Contract</u>"); and

WHEREAS, the Guarantor currently owns [*insert percentage*] percent of the outstanding stock of Purchaser and will derive substantial direct and indirect benefit from Purchaser's performance of the Contract; and

WHEREAS, Seller has agreed [to consent to the Transfer of the Contract by Puerto Rico Power and Electric Authority to Purchaser][not to terminate the Contract pursuant to Article 22.4 thereof] only if this Guarantee is executed by the Guarantor and delivered to Seller.

NOW, THEREFORE, in order to induce Seller [to consent to the Transfer of the Contract][not to terminate the Contract pursuant to Article 22.4 thereof] and to consummate the transactions contemplated thereby, and for other good and valuable consideration, receipt and sufficiency of all of which are hereby acknowledged, the Guarantor hereby agrees as follows:

1.  <u>Definitions</u>. All capitalized terms used herein that are not defined herein shall have the meanings set forth in the Contract. In addition, as used herein, the following terms shall have the following meanings:

"<u>**Bankruptcy Laws**</u>" shall mean the Bankruptcy Code of the United States of America and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdiction(s) from time to time in effect.

"<u>**Change of Control**</u>" of the Guarantor shall be deemed to have occurred at such time as any Person, together with any affiliates of such Person, is or becomes the beneficial owner, directly or indirectly, of shares of capital stock of the Guarantor entitling such Person acting by itself or with any of its affiliates or contractual counterparties to exercise more than fifty percent (50%) of the total voting power of any class of stock of the Guarantor [entitled to vote in elections of directors of the Guarantor].

"<u>**Consolidated Net Worth**</u>" means, with respect to any Person, as of any date, the consolidated stockholders' equity of such Person determined on a consolidated basis in accordance with generally accepted accounting principles.

"<u>**Guaranteed Obligations**</u>" shall mean:

a)  all obligations of Purchaser under the Contract; and

b)  any and all claims that Seller may have against Purchaser that arise out of the performance or breach by Purchaser of any provision of the Contract.



2. <u>Guarantee</u>.  The Guarantor hereby acknowledges receipt of the Contract, and the Guarantor hereby irrevocably and unconditionally, under any and all circumstances whatsoever, guarantees to Seller and its successors, transferees and assigns the due and punctual payment and performance by Purchaser in accordance with the terms of the Contract of all of the Guaranteed Obligations.

3. <u>Guarantor Indemnification</u>.  The Guarantor hereby indemnifies Seller for all Seller's costs incurred with the enforcement hereof and the enforcement of the Contract.

4. <u>Obligations Absolute</u>.  The obligations of the Guarantor hereunder shall be direct and primary obligations of the Guarantor, shall be absolute, unconditional and irrevocable and shall constitute a guarantee of payment, performance and discharge and not merely of collection.

Such obligations shall not be subject to any counterclaim, set off, deduction, diminution, abatement, recoupment, suspension, deferment, reduction or defense for any reason whatsoever, and the Guarantor shall have no right to terminate this Guarantee or to be released, relieved or discharged from its obligations hereunder for any reason whatsoever (whether or not the Guarantor or Purchaser shall have any knowledge or notice thereof), including, without limitation:

a) any:

    i.   amendment, modification, addition, deletion or supplement to or other change in the Contract or any other instrument or agreement applicable to any of the parties to the Contract,

    ii.   assignment, subcontracting or transfer of the Contract or of any interest therein, or

    iii.   furnishing or acceptance of additional security or an additional guarantee, or any release, substitution or variation of any security or an additional guarantee, for the obligations of Purchaser or any other party to the Contract;

b) any failure, omission or delay on the part of Purchaser or Seller to perform or comply with any term of the Contract;

c) any waiver, consent, extension, indulgence, compromise, release or other action or inaction under or in respect of the Contract or any obligation or liability of Purchaser or Seller, or any exercise or non-exercise of any right, remedy, power or privilege under or in respect of any such instrument or agreement or any such obligation or liability;

d) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or similar proceeding with respect to the Guarantor, Purchaser or Seller or any other Person or any of their respective properties or creditors, or any action taken by any trustee or receiver or by any court in any such proceeding;

e) any discharge, termination, cancellation, frustration, irregularity, invalidity, unenforceability, illegality or impossibility of performance, in whole or in part, of the Contract;

f) any dissolution, merger or consolidation (whether permitted or otherwise) of Purchaser or the Guarantor into or with any other Person or any sale, lease or transfer of any of the assets of Purchaser or the Guarantor to any other Person;

g) any change in the ownership of Purchaser;

h) any payment by the Guarantor to Purchaser or Seller pursuant to an agreement other than this Guarantee; or



i)   any other occurrence or circumstance whatsoever, whether similar or dissimilar to the foregoing, that might otherwise constitute a legal or equitable defense or discharge of the liabilities of a guarantor or surety or that might otherwise limit recourse against the Guarantor.

5.   <u>Waivers by the Guarantor</u>.  To the extent permitted by applicable law, the Guarantor hereby unconditionally waives and agrees to waive at any future time any and all rights that the Guarantor may have or that now or at any time hereafter may be conferred upon it, by applicable law or otherwise, to terminate, cancel, quit or surrender this Guarantee.  Without limiting the generality of the foregoing, it is agreed that, at any time or from time to time, the occurrence or existence of any one or more of the following shall not release, relieve or discharge the Guarantor from liability hereunder, and the Guarantor hereby unconditionally and irrevocably waives, to the extent permitted by applicable law:

a)   notice of any of the matters referred to in Section 3 hereof;

b)   all notices that may be required by applicable law or otherwise, now or hereafter in effect, to preserve intact any rights against the Guarantor including, without limitation, any demand, presentment and protest, proof of notice of non-payment under the Contract, and notice of any default or failure on the part of Purchaser to perform and comply with any covenant, agreement, term or condition of the Contract;

c)   the enforcement, assertion or exercise against Purchaser of any right, power, privilege or remedy conferred in the Contract or otherwise;

d)   any requirement of diligence on the part of any Person;

e)   any requirement to proceed against Purchaser prior to proceeding against the Guarantor or any other guarantee or to utilize or exhaust any remedies;

f)   acceptance of this Guarantee by Seller; or

g)   any other occurrence or circumstance whatsoever, whether similar or dissimilar to the foregoing, that might otherwise constitute a legal or equitable discharge, release or defense of a guarantor or surety, or that might otherwise limit recourse against the Guarantor.

6.   <u>Guarantee Terms</u>.  The Guarantor hereby agrees that a separate action may be brought against it whether or not an action is commenced against Purchaser with respect to any of the Guaranteed Obligations.  It is the intention hereof that the Guarantor shall remain liable as principal until the full amount of all sums payable with respect to the Guaranteed Obligations have been fully paid and the Guaranteed Obligations have been fully performed.

7.   <u>Reinstatement of Guarantee</u>.  This Guarantee shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Guaranteed Obligations is rescinded or must otherwise be restored or returned by the recipient thereof upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Purchaser, or upon or as a result of the appointment of a custodian, receiver, intervenor or conservator of, or trustee or similar officer for, Purchaser or any substantial part of its property, or upon any settlement or compromise of any claim effected by Seller in connection with any such insolvency, bankruptcy, dissolution, liquidation or reorganization with any claimant (including, without limitation, Purchaser) or otherwise, all as though such payments had not been made.  If any event specified in the immediately preceding sentence shall occur, and such occurrence shall prevent, delay or otherwise affect the right of Seller to receive any payment in respect of any Guaranteed Obligation, the Guarantor agrees that, for purposes of this Guarantee and its obligations hereunder and notwithstanding the occurrence of any of the foregoing events, the Guarantor shall forthwith pay any such Guaranteed Obligation at such times and in such amounts as are specified in the Contract.



8. _No Subrogation._ Notwithstanding anything to the contrary in this Guarantee, the Guarantor hereby irrevocably waives all rights that may have arisen in connection with this Guarantee to be subrogated to any of the rights (whether contractual, under Bankruptcy Laws, under common law or otherwise) of Seller against Purchaser or against any collateral security or guarantee held by Seller for the payment of the Guaranteed Obligations. So long as any of the Guaranteed Obligations remain outstanding, if any amount shall be paid by or on behalf of Purchaser to the Guarantor on account of any of the rights herein, such amount shall be held by the Guarantor in trust, segregated from other funds of the Guarantor, and shall, forthwith upon receipt by the Guarantor, be turned over to Seller in the exact form received by the Guarantor (duly endorsed by the Guarantor to Seller, if required), to be applied against the Guaranteed Obligations in such order as Seller may determine. The provisions of this paragraph shall survive the term of this Guarantee and the payment in full of the Guaranteed Obligations.

9. _Rights of Third Parties._ This Guarantee shall not be construed to create any right in any Person other than Seller or to be a contract in whole or in part for the benefit of any Person other than Seller, except to the extent Seller makes an assignment permitted under this Guarantee.

10. _Representations and Warranties._ The Guarantor hereby represents and warrants to Seller as follows:

a) the Guarantor is a [_insert type of entity_] duly organized, validly existing and in good standing under the laws of [_insert jurisdiction of domicile_], is qualified to do business in the Commonwealth of Puerto Rico and in all other jurisdictions in which the nature of the business conducted by it makes such qualification necessary, and has all requisite legal power and authority to execute this Guarantee and to perform the terms, conditions and provisions hereof;

b) the execution and delivery by the Guarantor of this Guarantee have been duly authorized by all requisite action;

c) this Guarantee constitutes the legal, valid and binding obligation of the Guarantor, enforceable against the Guarantor in accordance with its terms;

d) neither the execution, delivery or performance by the Guarantor of this Guarantee, nor the consummation of the transactions contemplated thereby, will result in:

    i. a violation of, or a conflict with, any provision of the organizational documents of the Guarantor;

    ii. a contravention or breach of, or a default under, any term or provision of any contract, agreement or instrument to which the Guarantor is a party or by which it or its property may be bound, which contravention, breach or default could be reasonably expected to have a material adverse effect on the ability of the Guarantor to perform its obligations under this Guarantee to consummate the transactions contemplated by this Guarantee; or

    iii. a violation by the Guarantor of any law.

e) the Guarantor is not in violation of any law promulgated, or judgment entered, by any governmental authority, which violations, individually or in the aggregate, could reasonably be expected to have a material adverse effect on it or its performance of any obligations under this Guarantee;

f) there are no actions, suits or proceedings, now pending or to its best knowledge threatened against the Guarantor before any court or administrative body or arbitral tribunal that might

materially adversely affect the ability of the Guarantor to perform its obligations under this Guarantee; and

g) attached hereto as Exhibit I is a true and correct chart setting forth the ownership of the Guarantor and the Guarantor's ownership of Purchaser.

11. Assignment. The Guarantor may not assign or delegate its obligations under this Guarantee, directly or indirectly, whether by pledge, assignment, sale of assets or the sale or merger (statutory or otherwise). The Guarantor acknowledges and agrees that, without the consent of the Guarantor Seller may (a) assign for collateral and security purposes or create a security interest in its rights and interests under or pursuant to this Guarantee in favor of any financing party and (b) assign this Guarantee or its rights thereunder to any subsidiary or affiliate of Seller.

12. Remedies Non–Exclusive. All remedies provided in this Guarantee shall be deemed cumulative and not in lieu of, or exclusive of, each other or of any other remedy available to Seller at law or in equity, and the exercise of any remedy, or the existence herein of other remedies, shall not prevent the exercise of any other remedy.

13. Notices. All notices to be given hereunder shall be effective upon receipt and shall be in writing and delivered by hand, internationally recognized overnight courier service or first class mail (postage prepaid), to the Guarantor or Seller, as the case may be, at the following address (or such other address as may hereafter be designated in writing by a party):

a) if to Seller:

EcoEléctrica, L.P.
Road 337, Km 3.7 Bo Tallaboa,
Poniente, Peñuelas PR 00624
Attention: General Manager
Telecopy: (787) 487-6002; and

b) if to the Guarantor:

[insert name of Guarantor]
[insert address]

_____
_____

Attention: [General Counsel]
Telecopy:_____

14. Non-Waiver. Seller shall not be deemed to have waived any right under this Guarantee unless Seller shall have delivered to the Guarantor an express written waiver signed by Seller. No failure or successive failure by Seller to enforce any covenant or agreement, and no waiver or successive waivers by Seller of any condition of this Guarantee, shall operate as a discharge of such covenant, agreement or condition, or render the same invalid, or impair Seller's right to enforce the same in the event of any subsequent breach or breaches by the Guarantor.

15. Severability. If any of the terms, covenants or conditions hereof or the application of any such term, covenant or condition shall be held invalid or unenforceable as to the Guarantor or as to any circumstance by any court or arbitrator having jurisdiction, the remainder of such terms, covenants or conditions shall not be affected thereby, shall remain in full force and effect and shall continue to be valid and enforceable in any other jurisdiction, and the Guarantor and Seller shall negotiate in good faith to substitute a term or condition in this Guarantee to replace the one held invalid or unenforceable.



-84-

16. <u>Entire Agreement</u>.  This Guarantee constitutes the entire agreement and contains all of the understandings and agreements of whatsoever kind and nature existing between the Guarantor and Seller and the rights, interests, understandings, agreements and obligations of the Guarantor and Seller relating thereto, and supersedes all prior written or oral agreements, commitments, representations, communications and understandings between the Guarantor and Seller.

17. <u>Amendment</u>.  No amendment, waiver or consent relating to this Guarantee shall be effective unless it is in writing and signed by the Guarantor and Seller.

18. <u>Benefits of Guarantee</u>.  All of the terms and provisions of this Guarantee shall be binding upon and inure to the benefit of the Guarantor and Seller and their respective successors and expressly permitted assigns.

19. <u>Descriptive Headings</u>.  Descriptive headings are for convenience only and shall not control or affect the meaning or construction of any provision of this Guarantee.

20. <u>Rules of Construction</u>.  In the interpretation of this Guarantee, unless the context otherwise expressly states:

a)      the singular includes the plural and vice versa and, in particular (but without limiting the generality of the foregoing), any word or expression defined in the singular has the corresponding meaning used in the plural and vice versa;

b)      the term "or" is not exclusive;

c)      the terms "including", "includes" and "include" shall be deemed to be followed by the words "without limitation";

d)      any reference to any gender includes the other gender;

e)      any reference to any agreement, instrument, contract or other document (A) shall include all appendices, exhibits and schedules thereto and (B) shall be a reference to such agreement, instrument, contract or other document as amended, supplemented, modified, suspended, restated or novated from time to time;

f)      any reference to any law shall include all statutory and administrative provisions consolidating, amending or replacing such law, and shall include all rules and regulations promulgated thereunder;

g)      any reference to "writing" includes printing, typing, lithography and other means of reproducing words in a visible form;

h)      any reference to any Person includes its successors and assigns;

i)      unless otherwise expressly specified, any right may be exercised at any time and from time to time;

j)      all obligations under this Guarantee are continuing obligations throughout the term hereof; and

k)      the fact that counsel to Seller shall have drafted this Guarantee shall not affect the interpretation of any provision of this Guarantee in a manner adverse to Seller or otherwise prejudice or impair the rights of Seller.

21. GOVERNING LAW, ETC. THIS GUARANTEE SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS GUARANTEE MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK AND, BY EXECUTION AND DELIVERY OF THIS GUARANTEE, EACH OF THE PARTIES HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS AND APPELLATE COURTS. EACH OF THE PARTIES HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF TO IT BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, TO EACH OF THE PARTIES AT ITS ADDRESS SET FORTH HEREIN. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS. TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ALL RIGHT OF TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTEE OR ANY MATTER ARISING HEREUNDER.

22. Language. The official text of this Guarantee is English, regardless of any translation that may be made for the convenience of the Guarantor or Seller. All definitive documents, notices, waivers and all other communication, written or otherwise, between the Guarantor and Seller in connection with this Guarantee shall be in English.

23. Term. This Guarantee and all guarantees, covenants and agreements of the Guarantor contained herein shall terminate and be discharged on the date on which all of the Guaranteed Obligations shall be paid and performed or otherwise discharged in full; provided that this Guarantee shall continue to be effective or reinstated, as the case may be, to the extent provided herein.

24. Further Assurances. The Guarantor hereby agrees to execute and deliver all such instruments and take all such action as necessary to perform its obligations under this Guarantee.

25. Reliance Presumed. The Guarantor waives notice of reliance upon this Guarantee by Seller. Each of the Guaranteed Obligations (now or hereafter in effect) shall be deemed conclusively to have been created, contracted or incurred in reliance upon this Guarantee.

26. Guarantor's Condition. The Guarantor shall not consolidate with or merge with or into any Person or permit any Person to merge with or into it or transfer (by lease, assignment, sale or otherwise) all, substantially all or a substantial portion of its properties and assets, in a single transaction or through a series of related transactions, to another Person or group of Persons or permit any of its subsidiaries to enter into any such transaction or transactions, unless:

a) the Guarantor shall be the continuing Person, or the Person formed by such consolidation or into which the Guarantor is merged or to which all or substantially all of the properties and assets of the Guarantor are transferred or to which all or substantially all of the assets of the Guarantor and its subsidiaries on a consolidated basis are transferred (the "surviving entity") shall be a Person organized and existing under the laws of the United States of America, any state or province thereof, the District of Columbia or the Commonwealth of Puerto Rico and shall expressly assume obligations of the Guarantor hereunder; and

b) the surviving entity (whether or not the Guarantor) shall, after giving pro forma effect to such transaction (including the assumption by the surviving entity of the obligations hereunder) have a Consolidated Net Worth equal to or greater than the Consolidated Net Worth of the Guarantor immediately preceding such transaction.



If the Guarantor breaches the provision of the above sentence or undergoes a Change of Control, it shall immediately deposit with Seller the sum of [*insert amount of currency*] in cash as collateral to secure its obligations hereunder, and Seller shall be entitled to use such sum to satisfy any of the Guarantor's obligations hereunder.  Notwithstanding the foregoing, all provisions of this Guarantee shall remain in effect following such deposit.

27. <u>Service of Process</u>. The Guarantor irrevocably appoints [*insert agent's name*] of [*insert address of agent*] as its agent to receive and acknowledge on its behalf service of any writ, summons, order, judgment or other notice of legal process in [*insert jurisdiction*].  The Guarantor agrees that any such legal process shall be sufficiently served on it if delivered to such agent for service at its address for the time being in [*insert jurisdiction*] whether or not such agent gives notice thereof to the Guarantor.

28. <u>Proceedings</u>.  The Guarantor hereby agrees to the consolidation of any dispute or proceeding hereunder with any dispute or proceeding involving the Contract.



IN WITNESS WHEREOF, the Guarantor, intending to be legally bound, has caused this Guarantee to be duly executed and delivered as of the day and year first above written.

[*insert name of Guarantor*]

By: _____

Name: _____

Title: _____


ECOELÉCTRICA, L.P.

By: _____

Name: _____

Title: _____



<u>EXHIBIT I TO APPENDIX P</u>

OWNERSHIP CHART