**<u>Exhibit B-2</u>**

Naturgy GSPA Agreement

**AMENDED AND RESTATED**
**NATURAL GAS SALE AND PURCHASE AGREEMENT**


**BETWEEN**


**NATURGY APROVISIONAMIENTOS S.A.**
**AS SELLER**


**AND**


**PUERTO RICO ELECTRIC POWER AUTHORITY**
**AS BUYER**


**DATED AS OF MARCH 23, 2020**

## TABLE OF CONTENTS

1.  DEFINITIONS AND INTERPRETATION ................................................ 2

2.  SALE AND PURCHASE ........................................................................ 13

3.  DURATION AND CONDITIONS ........................................................... 14

4.  QUALITY ............................................................................................... 15

5.  SUPPLY PERIOD ................................................................................... 17

6.  NG QUANTITIES ................................................................................... 18

7.  SCHEDULING ........................................................................................ 21

8.  TAKE OR PAY AND MAKE UP ........................................................... 23

9.  SELLER'S SHORTFALL ........................................................................ 26

10.  MEASUREMENT AND TESTING ........................................................ 26

11.  TRANSFER OF TITLE AND RISK; INDEMNITY ............................... 30

12.  CONTRACT PRICE ................................................................................ 30

13.  INVOICING, PAYMENT AND CREDIT REQUIREMENT ................... 31

14.  DUTIES, TAXES AND CHARGES ....................................................... 35

15.  FORCE MAJEURE ................................................................................. 35

16.  REPRESENTATIONS, WARRANTIES, LIABILITIES AND INDEMNITIES .............. 38

17.  ASSIGNMENT ........................................................................................ 40

18.  TERMINATION ...................................................................................... 41

19.  APPLICABLE LAW ............................................................................... 43

20.  SETTLEMENT OF DISPUTES .............................................................. 43

21.  NON-WAIVER ....................................................................................... 45

22.  CONFIDENTIALITY .............................................................................. 45

23.  NOTICES ................................................................................................ 46



i

24. ADDRESSES ..................................................................................................... 47

25. BUSINESS PRACTICES AND FOREIGN CORRUPT PRACTICES ACT ..................... 47

26. ADDITIONAL LNG DELIVERY POINT. ........................................................... 48

27. GENERAL ......................................................................................................... 49

28. COMPLIANCE WITH THE COMMONWEALTH OF PUERTO RICO CONTRACTING
    REQUIREMENTS .............................................................................................. 50

29. ANTI-CORRUPTION CODE FOR A NEW PUERTO RICO ............................................ 53

30. CONSEQUENCES OF NON-COMPLIANCE ................................................................ 54

31. NON-DISCRIMINATION........................................................................................ 54

32. ENTIRE AGREEMENT & COUNTERPARTS................................................................. 54

**ANNEXES:**

A. DELIVERY POINTS

B. LNG TERMINAL COMPATIBILITY STANDARDS

C. FORM OF ASSIGNEE GUARANTEE



**THIS AMENDED AND RESTATED NATURAL GAS SALE AND PURCHASE AGREEMENT** dated as of March 23, 2020 (the "**Effective Date**"),

**BETWEEN:**

(1)     **NATURGY APROVISIONAMIENTOS S.A.**, a company incorporated under the laws of the Kingdom of Spain, with a place of business at Avenida de San Luis 77, Madrid 28033, Spain (the "**Seller**"); and

(2)     **PUERTO RICO ELECTRIC POWER AUTHORITY**, a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by an Act of 2 May 1941, No. 83, as amended, with its principal place of business at P.O. Box 363928, San Juan, Puerto Rico 00936-3928 (the "**Buyer**") (each of Buyer and Seller a "**Party**" and, together, the "**Parties**").

**RECITALS:**

(A)     EcoEléctrica, L.P., a limited partnership organized under the laws of Bermuda (the "**Owner**") owns and operates an LNG terminal consisting of one LNG tank and related marine pier facilities located in the vicinity of Peñuelas, Puerto Rico (the "**LNG Facilities**").

(B)     Seller and Owner are parties to an amendment and restatement of the Tolling Service Agreement dated 31 October 1997 as amended (the "**Restatement TSA**"), which provides the Seller with capacity rights at the LNG Facilities and the right to perform, or cause to be performed, certain LNG Tolling services at the LNG Facilities, subject to the terms established thereof.

(C)     Buyer and Seller entered into the Natural Gas Sale and Purchase Agreement, dated as of March 28, 2012, as amended on March 10, 2014, May 11, 2015, and June 29, 2017 (the "**Pre-Restatement GSPA**") for the supply of Natural Gas to units 5 & 6 of Buyer's generation facility, located at Costa Sur, Puerto Rico (the "**Costa Sur Units**"), which will expire on December 31, 2020.

(D)     Buyer intends to enter into the Amended & Restated Power Purchase and Operating Agreement on or about the date hereof with Owner (the "**Restatement PPOA**") under which (i) Owner will continue selling, and Buyer will continue purchasing, generation capacity, made available at Owner's facility at Peñuelas (the "**ECO Generation Facility**") through an extended term that commences on the "Effective Date" (as defined in the Restatement PPOA) and expires on September 30, 2032 (the "**Extended Term**"), and (ii) Buyer will make available Natural Gas to such facility for conversion by the Owner into electric generation capacity and net electric output, during the Extended Term.

(E)     On July 2, 2017, Buyer commenced proceedings under Title III of the Puerto Rico Oversight, Management and Economic Stability Act ("**PROMESA**") before the District Court for the District of Puerto Rico (the "**PROMESA Court**"), administered under Case No. 17-4780 (LTS) (the "**PROMESA Case**").



(F)    Buyer desires to purchase Natural Gas for (i) delivery to the ECO Generation Facility during the Extended Term, and (ii) delivery to the Costa Sur facility until the retirement of such facility.

(G)    As Seller controls the exclusive rights to the existing capacity of the LNG Facilities through the Restatement TSA, Buyer desires to purchase Natural Gas from Seller as the sole source capable of supplying Natural Gas for delivery to the ECO Generation Facility and Costa Sur facility.

(H)    The Parties desire to enter into this Agreement, which amends and restates the Pre-Restatement GSPA in its entirety.

**NOW, THEREFORE, THE SELLER AND THE BUYER HEREBY AGREE** as follows:

## 1.    DEFINITIONS AND INTERPRETATION

1.1    Definitions

In this Agreement, except where the context otherwise requires, each of the following words or expressions have the following meanings:

"**Acceptable Assignee**" means a Commonwealth Entity or an Acceptable Private Assignee.

"**Acceptable Guarantee**" means an Assignee Guarantee executed by an Acceptable Guarantor.

"**Acceptable Guarantor**" means any Person meeting the Credit Standards that is approved by Seller to provide an Assignee Guarantee; provided that such approval shall not be unreasonably withheld or delayed.

"**Acceptable Letter of Credit**" means an irrevocable, standby letter of credit in form and substance reasonably acceptable to Seller, issued by an Acceptable Letter of Credit Provider with a face value of two (2) *multiplied by* six million (6,000,000) MMBtu *multiplied by* the Max ACQ *divided by* 106 TBtu multiplied *by* the average Contract Price over the twelve (12) months preceding the month of calculating such amount.

"**Acceptable Letter of Credit Provider**" means a bank, insurance company, or other financial institution organized or licensed as a branch or agency under the laws of the United States of America that meets the Letter of Credit Issuing Bank Requirements.

"**Acceptable Private Assignee**" means a Non-Commonwealth Entity that, upon a Transfer, satisfies as of the Transfer Date, and covenants to maintain in full force and effect during the remaining of the Term, one of the following: (A) full compliance with the Credit Standards; (B) the delivery to Seller of a legal, valid, binding and enforceable Guarantee from an Acceptable Guarantor; or (C) the delivery of an Acceptable Letter of Credit.



"**Additional LNG Facility**" shall have the meaning given to it in Clause 26.1.

"**Additional LNG Delivery Point**" shall have the meaning given to it in Clause 26.1.

"**Affiliate**" means, in relation to a Party, any company, corporation, partnership or other legal entity (in this definition referred to as a "**Company**"): (a) that is directly or indirectly controlled by such Party; (b) that directly or indirectly controls such Party; or (c) that is directly or indirectly controlled by a Company that also, directly or indirectly, controls such Party. For the purpose of this definition, "**Control**" means the beneficial ownership, either directly or indirectly, of fifty percent (50%) or more of the voting rights in a Company, or (whether alone or acting in concert with others, and whether by the ownership of share capital, the possession of voting power, contract or otherwise) the right to appoint fifty percent (50%) or more of the board of directors or equivalent management body of such Company.

"**Agreement**" means this Agreement and its Annexes, as amended, modified, varied or supplemented from time to time.

"**Annual Contract Quantity**" or "**ACQ**" shall have the meaning given to it in Clause 7.1(a)(i).

"**Annual Delivery Programme**" or "**ADP**" shall have the meaning given to it in Clause 7.1(a).

"**Applicable Law**" means, in relation to any legal Person, property, transaction or event, all applicable provisions of laws, treaties, conventions, statutes, rules, regulations, permits, official directives and orders of, and the terms of all judgments, orders, awards, and decrees issued by, any Competent Authority by which such legal Person is bound or having application to the property, transaction or event in question.

"**Assignee Guarantee**" means a guarantee substantially in the form attached as <u>Annex B</u> to this Agreement (or in such form as is otherwise acceptable to Seller).

"**Assumption Order**" means an order of the PROMESA Court, in form and substance acceptable to Seller, that authorizes the assumption by Buyer of this Agreement.

"**Back-Up Fuel Cover Amount**" means, for each hour (or portion thereof) of a Seller Shortfall Duration, an amount expressed in US Dollars equal to the positive difference between (i) the duly documented cost to Buyer of utilizing the equivalent quantity of fuel oil required to make up for the energy content of the Seller Shortfall Quantity for the operation of the Eco Generation Facility, and (ii) the amount in US Dollars equal to such Seller Shortfall Quantity multiplied by the Contract Price for the month in which such Seller Shortfall Quantity occurs.

"**Bankruptcy End Date**" means the date on which a plan of adjustment consummated in connection with Buyer's case under Title III of PROMESA becomes effective pursuant to its terms.

"**Binding Monthly Schedule**" shall have the meaning given to it in Clause 7.1(a)(iii).



3

"**Btu**" means a British thermal unit, being that amount of heat that is equal to 1,055.056 Joules or 0.000293071 kWh.

"**Business Day**" means a Day, other than a Saturday, Sunday or a public holiday in San Juan (Puerto Rico) or Madrid (Spain).

"**Buyer**" shall have the meaning given to it in the preamble to this Agreement.

"**Buyer Check Meter**" shall have the meaning given to it in Clause 10.2(b).

"**Buyer's NG Credit**" has the meaning given to it in Clause 6.5.

"**Claims**" shall have the meaning given to it in Clause 11.

"**Commonwealth Assignee**" means a Commonwealth Entity to whom a Transfer was made pursuant to Clause 17.1.

"**Commonwealth Entity**" means a government agency, body, or public corporation that is controlled entirely by the Commonwealth of Puerto Rico.

"**Competent Authority**" means any local, federal, state, regional, provincial, municipal, national or supra-national governmental agency, authority, department, inspectorate, minister, official, court, tribunal or public or statutory Person (whether autonomous or not) which has jurisdiction in relation to the performance of this Agreement by either Party including, for the avoidance of doubt, any licensing authority and any port authority, in each case acting within its legal authority, but excluding, for the avoidance of doubt, any Party.

"**Conditions Precedent**" shall have the meaning given to it in Clause 3.2.

"**Conditions Precedent Date**" means the date on which the legal counsel for each Party jointly signs a certificate confirming the satisfaction or waiver of all of the Conditions Precedent.

"**Confidential Information**" shall have the meaning given to it in Clause 22.1.

"**Contract Price**" shall have the meaning given to it in Clause 12.1.

"**Contract Quarter**" means each calendar quarter (beginning on the first Day of each of January, April, July and October) during a Contract Year, provided that (i) the first Contract Quarter shall commence on the Conditions Precedent Date and end on the last Day of such calendar quarter, and (ii) the last Contract Quarter shall commence on the first Day of such quarter and end on the expiration of the Contract Term.

"**Contract Term**" shall have the meaning given to it in Clause 3.1(a).

"**Contract Year**" means any calendar year during the Contract Term, provided that (i) the first Contract Year shall commence on the "Firm Supply Conditions Date" under the Pre-



4

Restatement GSPA, and the (ii) last Contract Year shall end on the expiration of the Contract Term.

"**Corporate Tax**" means any and all Taxes based on income, revenues, profits, or net worth and all state and local franchise, license, occupation and similar Taxes required for the maintenance of corporate existence or to maintain good standing that are assessed against a Party.

"**Costa Sur Delivery Point**" means the point of interconnection between the Costa Sur Units and the EcoEléctrica Complex as further detailed in <u>Annex A.</u>

"**Costa Sur Metering Equipment**" means the existing main and a back-up meter and other equipment as necessary to measure the volume of Natural Gas delivered to the Costa Sur Units installed under the Pre-Restatement GSPA.

"**Costa Sur Seller Shortfall Quantity**" shall have the meaning given to it in Clause 9.1.

"**Costa Sur Shortfall Payment**" shall have the meaning given to it in Clause 9.2.

"**Costa Sur Units**" has the meaning defined in Recital (C) of this Agreement.

"**Courts of Competent Jurisdiction**" means the courts of the Commonwealth of Puerto Rico, the United States District Court for the District of Puerto Rico, the PROMESA Court, the United States Court of Appeals for the First Circuit and the United States Supreme Court.

"**Credit Standard Event**" means either (i) with respect to an Acceptable Private Assignee that has not provided an Acceptable Guarantee or an Acceptable Letter of Credit, the failure of such Acceptable Private Assignee to continue to meet the Credit Standards, or (ii) with respect to an Acceptable Guarantor, the failure of the Acceptable Guarantor to meet the Credit Standards, or any other condition imposed by the Seller in order for such guarantor to be considered an Acceptable Guarantor.

"**Credit Standards**" means (i) two credit ratings that are equal to or better than the following, as applicable: (A) BBB- by S&P, (B) Baa3 by Moody's or (C) BBB- by Fitch, or (ii) two long-term unsecured debt ratings that are equal to or better than the following, as applicable: (A) BBB- by S&P, (B) Baa3 by Moody's or (C) BBB- by Fitch; provided that if any of the foregoing agencies ceases to exist or issue credit ratings, such other equivalent ratings of another rating agency of comparable standing that is reasonably acceptable to Seller shall apply.

"**Daily Contract Quantity**" or "**DCQ**" shall have the meaning given to them in Clause 6.3.

"**Daily Programme**" shall have the meaning given to it in Clause 7.1(a)(iv).

"**Day**" means a period of twenty four (24) consecutive hours beginning at 00:00 hours local time in Puerto Rico.



5

"**Defaulting Party**" shall have the meaning given to it in Clause 18.1(b).

"**Delivery Points**" means the ECO Delivery Point and the Costa Sur Delivery Point and "**Delivery Point**" means either of the foregoing.

"**Disclosing Party**" shall have the meaning given to it in Clause 22.1.

"**Dispute**" shall have the meaning given to it in Clause 20.1(a).

"**ECO Capacity Payment Differential**" means, for each hour (or portion thereof) of a Seller Shortfall Duration, the difference expressed in US Dollars between (i) the capacity payment actually and duly documented as paid by Buyer or as offset by a credit granted by Seller in favour of Buyer, under the Restated PPOA for such hour, based on dependable capacity of the ECO Generation Facility, and (ii) the capacity payment actually and duly documented as paid by Buyer, or as offset by a credit granted by Seller in favour of Buyer, under the Restated PPOA for such hour, based on the reduced capacity of such facility caused by the occurrence of a Seller Shortfall Quantity but upwardly adjusted to reflect Buyer's utilization of back-up fuel (if any) to offset such shortfall.

"**ECO Delivery Point**" means the position of the Metering Equipment located downstream from the connection of the boil-off gas pipe to the main pipeline where Natural Gas enters the ECO Generation Facility as further detailed in Annex A.

"**ECO Generation Facility**" has the meaning given to it in Recital (D).

"**ECO Metering Equipment**" shall have the meaning given to it in Clause 10.2(a)

"**ECO Seller Shortfall Quantity**" has the meaning given to it in Clause 9.3.

"**ECO Shortfall Payment**" has the meaning given to it in Clause 9.4.

"**EcoEléctrica Complex**" means the LNG Facilities, the Existing Pipeline, any LNG terminal improvements and other associated premises, facilities and infrastructure (including property owned or leased or subject to easements) in the vicinity of Peñuelas, Puerto Rico, that are owned and/or operated (directly or through operating contracts with others) by the Owner.

"**Effective Date**" shall have the meaning given to it in the preamble to this Agreement.

"**Environmental Testing Period**" means any testing period during which the Buyer or the Owner removes from service or reduces its generation in any of the Costa Sur Units, respectively in order to comply with the Applicable Law, and which includes the consecutive eight (8) week period during which Buyer removes from service one (1) unit of the Costa Sur Units in order to comply with Applicable Law.

"**Existing Pipeline**" means the pipeline constructed from the LNG Facilities to the Costa Sur Units pursuant to and in accordance with the PPOA.



6

"**Expert**" means a Person of appropriate industry expertise and experience to whom a Dispute, disagreement or another matter of interpretation is or is to be referred to pursuant to Clause 20.2.

"**Final Order**" means any order or other action of a Court of Competent Jurisdiction (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon and (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired, excluding any additional time periods that may begin as a result of United States Federal Rule 60(b).

"**FOMB**" means the Fiscal Oversight and Management Board of Puerto Rico, established under the Puerto Rico Oversight, Management and Stability Act of 2016.

"**Force Majeure**" shall have the meaning given to it in Clause 15.1.

"**Forced Outage**" means, for any hour, the failure or inability of the ECO Generation Facility or Costa Sur Units to make available net electric output for dispatch to the Grid System at the dependable contracted capacity of such facility during such hour for any reason other than Scheduled Maintenance.

"**Governmental Authority**" means the government of the United States of America, any state thereof, the Commonwealth of Puerto Rico, any local jurisdiction, or any political subdivision of any of the foregoing including, but not limited to courts, administrative bodies, departments, commissions, boards, bureaus, agencies, municipalities or other instrumentalities.

"**Grid System**" means the interconnected network of high voltage transmission lines, low voltage distribution lines and associated electric substations, owned by Buyer, which transmits / distributes electricity to rate payers in Puerto Rico.

"**Heat Rate**" has the meaning given to "Adjusted Guaranteed Heat Rate" in the Restatement PPOA.

"**Heating Value**" (also known as High Heating Value (HHV)) means the gross heating value on a dry basis, which is the number of Btus produced by the complete combustion at constant pressure of the amount of dry gas that would occupy a volume of one Standard Cubic Foot at a constant pressure of 14.73 psia and a temperature of 60° F with combustion air at the same temperature and pressure as the gas, the products of combustion being cooled to the initial temperature of the gas and air and the water formed by combustion condensed to the liquid state.

"**HH**" means (in US$/MMBtu) the final settlement price for the New York Mercantile Exchange's Henry Hub Natural Gas futures contracts for the month previous to the month of delivery, rounded to two (2) decimal places.

"**Incremental Costs**" shall have the meaning given to it in Clause 12.3.

"**Jones Act**" means (i) currently Section 27 of the United States' Merchant Marine Act of 1920 which requires that all goods transported by water between United State ports be carried on United States-flag ships, constructed in the United States, owned by United States citizens, and crewed by United States citizens and United States permanent residents, or (ii) any Applicable Law enacted or issued to supplement, substitute, amend or rectify Section 27 of the Merchant Marine Act of 1920 that will have the effect of continuing to require that all goods transported by water between United States mainland ports and Puerto Rico be carried on ships constructed in the United States or owned by United States citizens, or crewed by United States citizens or United States permanent residents.

"**Joule**" means a unit of energy defined in the International System of Units.

"**kWh**" shall mean kilowatt per hour.

"**Large LNG Tanker**" has the meaning given to it in Clause 26.1 as further described in Annex B.

"**Legacy Make-Up Gas**" means the quantity of Make-Up Gas available for nomination by, and scheduling for delivery to, Buyer under the Pre-Restatement GSPA on the Day immediately preceding the Conditions Precedent Date.

"**Letter of Credit Default**" means the occurrence of any of the following events (in each case, to the extent such Letter of Credit has not been replaced):

  (i)     A Letter of Credit Issuer Event occurs;

  (ii)    a Letter of Credit Issuer fails to honor Seller's request to draw on an Acceptable Letter of Credit when such request is in accordance with the requirements of such Acceptable Letter of Credit;

  (iii)   a Letter of Credit Issuer disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, an Acceptable Letter of Credit;

  (iv)    an Acceptable Letter of Credit expires or terminates (including expiration or termination in accordance with its terms), or fails or ceases to be in full force and effect at any time after the Transfer Date; or

  (v)     an Acceptable Letter of Credit is not renewed or replaced at least fourteen (14) business days prior to the expiration of such Acceptable Letter of Credit.

"**Letter of Credit Issuer**" means an entity that has issued an Acceptable Letter of Credit.

"**Letter of Credit Issuer Event**" means a Letter of Credit Issuer has ceased to satisfy the Letter of Credit Issuing Bank Requirements or is no longer organized or licensed as a branch or agency under the laws of the United States of America.

Case:17-03283-LTS   Doc#:12579-3   Filed:04/01/20   Entered:04/01/20 17:12:36   Desc:
Exhibit   Page 13 of 72

"**Letter of Credit Issuing Bank Requirements**" means two credit ratings that are equal to or better than the following, as applicable: (i) A3 by Moody's, (ii) A- by S&P, or (iii) A- by Fitch; provided that if more than one of Moody's, S&P and Fitch ceases to exist or issue credit ratings, an equivalent rating of another rating agency of comparable standing that is reasonably acceptable to Seller shall apply.

"**LIBOR**" means the rate per annum which the British Bankers' Association was offering to prime banks in the London Interbank market for deposits in US$ for a one (1) year period, determined at 11:00 am London Time, as quoted on the date when payment was due. Interest should be calculated on the basis of a three hundred sixty (360) Day year, shall accrue daily and be compounded at three (3)-monthly rests.

"**LNG**" means Natural Gas in a liquid state at or below its boiling point and at or near atmospheric pressure.

"**LNG Delivery Plan**" shall have the meaning given to it in Clause 15.1(a).

"**LNG Facilities**" shall have the meaning given to it in Recital (A).

"**LNG Tanker**" shall have the meaning given to it in Annex B.

"**Make-Up Extension Period**" shall have the meaning given to it in Clause 8.6(a).

"**Make-Up Gas**" shall have the meaning given to it in Clause 8.6.

"**Maximum Annual Contract Quantity**" shall have the meaning given to it in Clause 6.1.

"**Maximum DCQ**" shall have the meaning given to it in Clause 6.3.

"**Maximum Hourly Rate**" shall have the meaning given to it in Clause 6.4(a).

"**Metering Equipment**" means the Costa Sur Metering Equipment and the ECO Metering Equipment.

"**Minimum Annual Contract Quantity**" or "**Minimum ACQ**" shall have the meaning given to it in Clause 6.2.

"**MMBtu**" means 1,000,000 Btu.

"**Mmscf**" means one million Standard Cubic Feet.

"**Monthly Adjusted Required Quantity**" shall have the meaning given to it in Clause 8.2.

"**Monthly Deficiency**" shall have the meaning given to it in Clause 8.1.

"**Monthly Invoice**" shall have the meaning given to it in Clause 13.2.

"**Monthly Take or Pay Payment**" shall have the meaning given to it in Clause 8.2.

"**Monthly Take or Pay Quantity**" shall have the meaning given to it in Clause 8.2.

"**Natural Gas**" or "**NG**" means any saturated hydrocarbon or mixture of saturated hydrocarbons consisting essentially of methane and other combustible and non-combustible gases in a gaseous state.

"**Ninety-Day Schedule**" or "**NDS**" shall have the meaning given to them in Clause 7.1(a).

"**Non-Commonwealth Entity**" means a Person that is not, or that ceases to be, a Commonwealth Entity.

"**Off-Spec Natural Gas**" is any Natural Gas that does not conform to the Specifications set forth in Clause 4.1.

"**Owner**" shall have the meaning given to it in Recital (A).

"**P3A**" means the Puerto Rico Public–Private Partnerships Authority.

"**Party**" and "**Parties**" shall have the meaning given to them in the preamble to this Agreement.

"**Permanent Abandonment**" shall have the meaning given to it in the Restatement PPOA.

"**Permanent Closing**" shall have the meaning given to it in the Restatement PPOA.

"**Person**" shall mean an individual, a corporation, a partnership, a limited liability company, an association a joint stock company, a trust, any unincorporated organization, or any Governmental Authority.

"**Pre-Restatement GSPA**" has the meaning given to it in Recital (C).

"**PREB**" shall mean the Puerto Rico Energy Bureau.

"**PROMESA**" shall have the meaning set forth in the recitals of this Agreement.

"**PROMESA Case**" shall have the meaning set forth in the recitals of this Agreement.

"**PROMESA Court**" shall have the meaning set forth in the recitals of this Agreement.

"**Prompt Contract Price**" is the result of (in U.S. dollars/MMBtu after converting the original units of U.S. dollars/barrel provided that the energy content of a barrel is set in 6.3 MMBtu), with respect to any month, the unweighted average for the relevant month of the mean dated fuel with zero point five percent (0.5%) sulfur as interpolated from the means of the zero point three percent (0.3%) sulfur LP and zero point seven percent (0.7%) sulfur fuels, as published for such month by Platt's Oilgram Price report PRICE AVERAGE SUPPLEMENT, Estimated New York Spot No. 6 Fuel Oil Cargo column rounded to two (2) decimal places. 

"**Prudent Utility Practices**" means practices, methods, conduct and actions (including the practices, methods, conduct and acts engaged in or approved by a significant portion of the power industry in the United States or Puerto Rico) that, at a particular time, in the exercise of reasonable discretion at the time a decision was made, could have been expected to accomplish the desired result in a manner consistent with applicable laws and applicable standards for reliability, safety and economy of the electric system operation and its economic dispatch program. Prudent Utility Practice is not limited to the optimum practice, method or act to the exclusion of all others, but rather is a spectrum of possible practices, methods or acts which can fall within this description.

"**Quarterly Adjusted Required Quantity**" shall have the meaning given to it in Clause 8.4.

"**Quarterly Binding Quantity**" shall have the meaning given to it in Clause 7.1(a)(ii).

"**Quarterly Deficiency**" shall have the meaning given to it in Clause 8.3.

"**Quarterly Take or Pay Payment**" shall have the meaning given to it in Clause 8.5.

"**Quarterly Take or Pay Quantity**" shall have the meaning given to it in Clause 8.5.

"**Reasonable and Prudent Operator**" means a Person seeking in good faith to perform its contractual obligations and comply with Applicable Law, and in so doing, and in the general conduct of its undertaking, exercising that degree of skill, diligence, prudence and foresight which would reasonably and ordinarily be expected from a skilled and experienced international operator engaged in the same type of undertaking under the same or similar circumstances and conditions.

"**Receiving Party**" shall have the meaning given to it in Clause 22.1.

"**Responsible Party**" shall have the meaning given to in Clause 3.5.

"**Restatement PPOA**" has the meaning given to it in Recital (D).

"**Restatement TSA**" has the meaning given to it in Recital (B).

"**Routine Maintenance**" means any interruption of service which is not part of any Scheduled Maintenance or an interruption prearranged on a relatively short notice in the ECO Generation Facility or any of the Costa Sur Units.

"**Scheduled Maintenance**" means the maintenance period scheduled to be performed on the Costa Sur Units or at the ECO Generation Facility to occur at the times and for the durations as determined pursuant to Clause 7.1(a).

"**Seller**" shall have the meaning given to it in the preamble to this Agreement.

"**Seller Shortfall Duration**" means, for any month in which a Seller Shortfall Quantity arises, the number of hours during such month where such shortfall either (i) caused a Forced Outage,



11

or (ii) would have caused a Forced Outage but for the Buyer's election to utilize back-up fuel, in each case at the ECO Generation Facility or for supply to the Costa Sur Units.

"**Seller Shortfall Quantity**" means the sum of (i) the Costa Sur Seller Shortfall Quantity, (ii) the ECO Seller Shortfall Quantity, and (iii) any additional quantities as provided in Clause 4.2(f).

"**Shortfall Payment**" means collectively, the Costa Sur Shortfall Payment and the ECO Shortfall Payment.

"**Small LNG Tanker**" has the meaning given to it in Clause 26.2.

"**Small-Scale LNG Delivery Study**" shall have the meaning given to it in Clause 26.2.

"**Specifications**" shall have the meaning given to it in Clause 4.1.

"**Standard Cubic Foot**" means Natural Gas at a base temperature of 60° F and at a pressure of 14.73 psia with correction for deviation from Boyle's Law.

"**Supply Period**" shall have the meaning given to it in Clause 5.1.

"**Taxes**" shall have the meaning given to it in Clause 14.1.

"**TBtu**" means 1,000,000,000,000 Btu.

"**Termination Event**" shall have the meaning given to it in Clause 18.1(b).

"**Third Party**" means any legal Person not a Party to this Agreement.

"**Threshold**" shall have the meaning given to it in Clause 6.2(d).

"**Transfer**" shall have the meaning given to it in Clause 17.1.

"**Transfer Date**" means the date on which Buyer completes a Transfer to a Non-Commonwealth Entity.

"**Unit Limitations**" means any condition or event that affect any facility or equipment other than the ECO Generation Facility or the Costa Sur Units that does not allow any of Costa Sur Units or units at the ECO Generation Facility to generate at their maximum capacity.

"**US**" means the United States of America.

"**US Dollars**" or "**US$**" means the lawful currency of the United States of America.

1.2     Interpretation

In this Agreement, unless the context requires otherwise:



(a)     References to Clauses and Annexes are to Clauses and Annexes of this Agreement. The Annexes hereto are incorporated herein as an integral part of this Agreement.

(b)     References to a Person include that Person's successors and permitted assigns.

(c)     Headings of Clauses and Annexes are for convenience only and shall not affect the construction or interpretation of this Agreement.

(d)     Where the context requires, words denoting the singular or masculine or neuter only shall include the plural, feminine, body politic or corporate and vice versa.

(e)     References to "include" and "including" shall be construed as "including without limitation."

(f)     The words "agree," "agrees," and "agreed" refer to a written agreement, executed and delivered by the Parties. Wherever either Party's consent or agreement is expressed to "not be unreasonably withheld," it is acknowledged that such obligation shall include, but not be limited to, the obligation of the Party not unreasonably to delay giving the relevant consent or agreement, and in the foregoing case as well as wherever either Party undertakes "efforts" or "endeavors" to do something, or refrain from doing something, it is acknowledged that such Party shall not be in breach of its obligations to the other Party to the extent that such Party's actions are limited by such Party's need to comply with its contractual obligations to any Person, provided that such Party has used its reasonable efforts to obtain any necessary waiver(s) of such relevant obligations and that such Party has not assumed such  obligations subsequent to entering into this Agreement.

(g)     Any law, statute or statutory provision shall be construed as a reference to the same as it may be amended, modified or re-enacted, from time to time, and shall include any subordinate legislation made from time to time under that provision.

(h)     If at any time during the Supply Period a source of information used to determine an index or an index or interest rate itself becomes unavailable or inappropriate then the Parties shall meet as soon as possible thereafter and in good faith discuss and attempt to agree in writing upon a suitable alternative replacement for such source of information or for such index or interest rate.

(i)     For the calendar year 2020, the Parties shall construe "Contract Year" as commencing on the Conditions Precedent Date and expiring on December 31, 2020.

## 2.   SALE AND PURCHASE

The Seller shall sell and deliver at the Delivery Points, and the Buyer shall purchase and take delivery of at the Delivery Points, and pay for, or pay for if not taken, NG, in the quantities, of the quality and at the prices determined in accordance with the terms and conditions of this Agreement.



**3.**    **DURATION AND CONDITIONS**

3.1    Contract Term

    (a)    This Agreement (other than this Clause 3, Clause 7.1 and Clauses 17 through 23, which shall enter into full force and effect on the Effective Date) shall enter into force and effect on the Conditions Precedent Date and shall, subject to the terms hereof, unless earlier terminated, continue in force and effect through September 30, 2032, plus,

        (i)    any Make-Up Extension Period; and

        (ii)    any extension agreed to pursuant to Clause 3.1(b)

        (collectively, the "**Contract Term**").

    (b)    The Parties may extend the Contract Term on such terms and conditions as they may agree to in writing.

3.2    The Parties shall satisfy or waive the following conditions precedent to their performance of this Agreement (the "**Conditions Precedent**"):

    (a)    For satisfaction by Buyer:

        (i)    obtaining approval of the P3A to proceed with the finalization of this Agreement;

        (ii)    obtaining approval of each of FOMB, the governing board of Buyer, and PREB for the execution and delivery by Buyer of this Agreement;

        (iii)    entry of the Assumption Order by the PROMESA Court;

        (iv)    delivery by Buyer of a legal opinion prepared by its external counsel in a form reasonably acceptable to Seller, confirming the legality, validity and enforceability of this Agreement against Buyer in accordance with its terms; and

        (v)    full force and effectiveness of the Restatement PPOA.

    (b)    For satisfaction by Seller:

        (i)    obtaining approval of the relevant corporate authority for the execution and delivery by Seller of this Agreement;

        (ii)    providing each of the documents or certifications described in Clauses 28.1(a) through 28.1(f) and Clause 29.3;

        (iii)    delivery by Seller of a legal opinion prepared by its external counsel in a form reasonably acceptable to Buyer, confirming (1) the legality, validity and



14

enforceability of this Agreement against Seller in accordance with its terms, and (2) the due authorization of Seller to execute, deliver, and perform the Restatement TSA; and

(iv)   delivery by Seller of a letter to Buyer, waiving its right to terminate this Agreement under Clause 15.9 as a result of the event of Force Majeure described in Buyer's letter to Seller, dated January 10, 2020, in a form reasonably acceptable to Buyer.

3.3   If Buyer reasonably anticipates that the respective Government Authority will withhold its approval of either of the Conditions Precedent in Clauses 3.2(a)(i) or 3.2(a)(ii), then Buyer may notify Seller of the reasons for such anticipated withholding, in which case the Parties will meet to discuss the issue and if they agree that it will be impractical to wait for such approval, then the Parties may agree to terminate this Agreement.

3.4   The Parties shall keep each other duly informed of the fulfillment of each of the Conditions Precedent. Each Party shall notify the other Party in writing of the date on which it anticipates that the respective Conditions Precedent for which it is responsible will be satisfied no less than thirty (30) Days prior to such anticipated date. As soon as each Condition Precedent is satisfied, each Party shall confirm in writing the satisfaction of the Conditions Precedent.

3.5   Each Party shall exercise reasonable efforts to satisfy, or procure the satisfaction of, each Condition Precedent for which it is responsible (each, a **"Responsible Party"**) prior to February 1, 2020.

3.6   Each Party shall furnish the other Party upon request by such other Party with any reasonable assistance in fulfilling each Condition Precedent for which that other Party is the Responsible Party.

3.7   Upon the satisfaction of any Condition Precedent, the Responsible Party shall give prompt written notice thereof to the other Party.

3.8   The requirement for the satisfaction of any Condition Precedent can only be waived by the written agreement of both Parties.

**4.   QUALITY**

4.1   The Natural Gas delivered by the Seller to or for the account of the Buyer at the Delivery Point:

(a)   shall not contain sand, dust, gums, crude oil, impurities or other objectionable substances which may be injurious to pipelines or may interfere with the transmission of the Natural Gas;

(b)   shall not contain more than three-tenths grains of hydrogen sulfide per hundred standard cubic feet of Natural Gas volume, as measured by methods in accordance with accepted industry practice;



15

(c)     shall not contain more than two grains of total sulfur per hundred standard cubic feet of Natural Gas volume, as measured by methods in accordance with accepted industry practice;

(d)     shall not contain more than 0.25 grains of mercaptan sulfur per hundred standard cubic feet of Natural Gas volume, as measured by methods in accordance with accepted industry practice;

(e)     shall not contain more than two percent (2%) by volume of carbon dioxide, as measured by methods in accordance with acceptable industry practice;

(f)     shall not have a water vapour content in excess of seven pounds per million standard cubic feet of Natural Gas volume, such vapour content to be measured by methods in accordance with accepted industry practice;

(g)     shall be as free of oxygen as it can be kept through the exercise of all reasonable precautions and shall not in any event contain more than zero point four (0.4%) by volume of oxygen, as measured by methods in accordance with acceptable industry practice;

(h)     shall have a Heating Value of not less than 950 Btu per Standard Cubic Foot and not more than 1165 Btu per Standard Cubic Foot. The Heating Value shall be measured by methods in accordance with accepted industry practice, such as, but not limited to, recording calorimeter(s) or Natural Gas chromatograph(s) located at appropriate points; and

(i)     shall be delivered to the Delivery Point at a temperature of more than 40° F and less than 100° F, and at the maximum pressure available when operating the LNG Facilities' vaporizers at a pressure of 650 pounds per square inch gauge.

The quality specifications set out in paragraphs (a) to (i) above shall be deemed to be the **"Specifications."** The standard test methods as described in the Owner's operating procedures applicable at the LNG Facilities shall be used to determine compliance with the Specifications.

4.2     Failure of Natural Gas to Conform to Specifications

(a)     Seller shall notify Buyer as soon as reasonably practicable after becoming aware of any existing or anticipated failure of the NG available for delivery to the Delivery Point to conform to the Specifications, giving details of the nature and expected magnitude of the variance, the cause of the non-compliance and the probable duration, including the delivery time of such Off-Spec Natural Gas.

(b)     If at any time, the NG offered for delivery by the Seller is or is expected to be Off-Spec Natural Gas, the Buyer may reject in whole or in part the delivery of such gas as well as any further deliveries of such Off- Spec Natural Gas. 

16

(c)    If at any time, the Seller is unable to deliver NG conforming to the Specifications but is able to deliver Off-Spec Natural Gas, the Seller may withhold deliveries until such time as it is able to deliver NG conforming to the Specifications; provided however, that in such event the Buyer shall be entitled to request delivery of such Off-Spec Natural Gas, unless such delivery in the Seller's opinion, acting as a Reasonable and Prudent Operator, would have a detrimental effect on the LNG Facilities or related facilities upstream of the Delivery Point.

(d)    Unless both (i) Buyer is notified of the full extent to which Off-Spec Natural Gas actually fails to meet the Specifications, and (ii) Buyer waives in writing its right to reject such Off-Spec Natural Gas, the Seller shall be liable for all damages incurred by the Buyer as a result of the acceptance of such Off-Spec Natural Gas, including all the reasonable costs and expenses incurred (over and above those normally incurred in accepting conforming Natural Gas) in receiving and treating such Off-Spec Natural Gas by such means as are appropriate; provided, that the Buyer shall exercise commercially reasonable practices to minimize the costs and expenses which may occur.

(e)    If both (i) Buyer is notified of the full extent to which Off-Spec Natural Gas actually fails to meet the Specifications, and (ii) Buyer waives in writing its right to reject such Off-Spec Natural Gas, such Off-Spec Natural Gas shall be deemed to have been delivered in accordance with this Agreement and the Seller shall not be liable for any damages to the Buyer for the acceptance of such Off-Spec Natural Gas; provided, however, that said NG shall be paid for at eighty-five percent (85%) of the Contract Price.

(f)    When NG is not taken by the Buyer due to it being Off-Spec Natural Gas or when Seller withholds NG pursuant to Clause 4.2(c), the Buyer shall not be obliged to pay for such NG not taken, and such NG not taken shall be deemed not to have been made available and shall be considered a "Seller Shortfall Quantity".

(g)    The Buyer shall have no right or remedy with respect to the Off-Spec Natural Gas other than those stated or referred to in this Clause 4.2.

4.3    Any Dispute between the Parties concerning the measurement and/or testing of NG for the purposes of determining the quality thereof at the Delivery Point, shall be settled in accordance with the provisions of Clause 20.2 of this Agreement.

## 5.    SUPPLY PERIOD

5.1    The supply period for NG commenced on the Firm Supply Conditions Date under the Pre-Restatement GSPA and shall continue in force until and including the last Day of the Contract Term (the "**Supply Period**"). 

5.2    The Pre-Restatement GSPA shall govern the Parties' rights and obligations performed or to be performed in connection with NG deliveries taking place prior to the Conditions Precedent Date.

## 6.    NG QUANTITIES

6.1    The "**Maximum Annual Contract Quantity**" for each Contract Year shall equal one hundred and six (106) TBtu, provided that (i) the Maximum Annual Contract Quantity shall be prorated downward ratably for each Contract Year of less than three hundred and sixty five (365) Days including 2020 Contract Year, and (ii) provided further that if the Buyer reduces the Minimum Annual Contract Quantity pursuant to any of Clauses 6.2(c), 6.2(d), or 6.2(e), and has not subsequently increased the Minimum Annual Contract Quantity to fifty five (55) TBtu pursuant to Clause 6.2(h), the Maximum Annual Contract Quantity (effective the same date that any reduction of the Minimum ACQ pursuant to any of Clauses 6.2(c), 6.2(d), or 6.2(e)) shall equal the greater of (1) such reduced Minimum Annual Contract Quantity *multiplied* by a factor of one point two (1.2) and (2) thirty six and one half (36.5) TBtu.

6.2    The "**Minimum Annual Contract Quantity**" or "**Minimum ACQ**" for each Contract Year shall equal fifty five (55) TBtu; provided, however, that:

(a)    the Minimum ACQ shall be prorated downward for each Contract Year in the Contract Term of less than three hundred and sixty five (365) Days;

(b)    any Scheduled Maintenance, Forced Outages, Routine Maintenance, Unit Limitations or any Environmental Testing Period will reduce the Minimum ACQ for any Contract Year on a prorated basis;

(c)    if Buyer retires a Costa Sur Unit, then Buyer shall have the right, but not the obligation, upon six (6) months' prior notice to Seller, to reduce the Minimum Annual Contract Quantity to an amount between 19 TBtu and 55 TBtu, provided that if such reduction takes place on a date other than January 1, the Minimum Annual Contract Quantity for the year in which such reduction occurs shall equal the (i) Minimum ACQ prior to such reduction *multiplied by* the number of Days prior to such reduction in the relevant Contract Year *divided by* the number of Days in such Contract Year *plus* (ii) the Minimum ACQ from and after such reduction *multiplied by* the number of Days from such reduction in the relevant Contract Year *divided by* the number of Days in such Contract Year;

(d)    Starting on January 1, 2024, if peak electricity demand in Puerto Rico falls below two thousand three hundred (2,300) megawatts (the "**Threshold**"), Buyer shall have the right, but not the obligation, upon six (6) months' prior notice to Seller, to reduce the Minimum Annual Contract Quantity to an amount between 19 TBtu and 55 TBtu, provided that if such reduction takes place on a date other than January 1, the Minimum Annual Contract Quantity for the year in which such reduction occurs shall equal the (i) Minimum ACQ prior to such reduction *multiplied by* the number of Days prior to such reduction in the relevant Contract Year *divided by* the number of Days in such 

18

Contract Year *plus* (ii) the Minimum ACQ from and after such reduction *multiplied by* the number of Days from such reduction in the relevant Contract Year *divided by* the number of Days in such Contract Year;

(e)     Starting on January 1, 2024 through the expiration of the Contract Term, in the event that the proportion of renewable generation sources available in Puerto Rico exceeds fifteen percent (15%) of the total power generated by sources connected to the Grid System, Buyer shall have the right, but not the obligation, upon six (6) months' prior notice to Seller, to reduce the Minimum Annual Contract Quantity to an amount between 19 TBtu and 55 TBtu, provided that if such reduction takes place on a date other than January 1, the Minimum Annual Contract Quantity for the year in which such reduction occurs shall equal the (i) Minimum ACQ prior to such reduction *multiplied by* the number of Days prior to such reduction in the relevant Contract Year *divided by* the number of Days in such Contract Year *plus* (ii) the Minimum ACQ from and after such reduction *multiplied by* the number of Days from such reduction in the relevant Contract Year *divided by* the number of Days in such Contract Year;

(f)     In the event that Buyer terminates the Restatement PPOA for Owner's default, Buyer shall have the right, but not the obligation, to reduce the Minimum ACQ (i) prior to the date when Buyer exercises the right to reduce the Minimum ACQ pursuant to Clause 6.2(c), to a quantity between 55 TBtu and 12 TBtu, and (ii) thereafter, to a quantity between 55 TBtu and 0 TBtu, in each case effective on the date of such termination;

(g)     For the avoidance of doubt, in no event shall the cumulative reduction of the Minimum ACQ pursuant to any of Clauses 6.2(c), 6.2(d), or 6.2(e) reduce the Minimum ACQ below 12 TBtu;

(h)     If Buyer elects to reduce the Minimum ACQ pursuant to any of Clauses 6.2(c), 6.2(d), or 6.2(e), Buyer has the right, but not the obligation subsequently, to increase the Minimum ACQ up to a quantity that shall not exceed 55 TBtu, provided that:

      (i)     Buyer must provide at least six (6) Month's prior written notice to Seller of its election to increase the Minimum ACQ;

      (ii)     Upon its receipt of the notice described in Clause 6.2(h)(i) and if so requested by Buyer, Seller shall exercise its best efforts to deliver quantities of NG in excess of nominated quantities applicable during the notice period in accordance with such request;

      (iii)     Such increase shall take effect on the date indicated in Buyer's notice, subject to Clause 6.2(h)(ii); and

      (iv)     Following any such increase of the Minimum ACQ, Buyer shall cease to have the right to decrease the Minimum ACQ pursuant to Clauses 6.2(c), 6.2(d), or 6.2(e).



6.3     In respect of each Day of each Contract Year, the Daily Contract Quantity ("**DCQ**") shall be the daily nomination for each Day of the Binding Monthly Schedule. The "**Maximum DCQ**" that Buyer may nominate for any Day shall be calculated as provided in the formula below provided, however, that Seller shall use reasonable efforts to comply with Buyer's request to deliver a Maximum DCQ in excess of the applicable Maximum DCQ:

Maximum DCQ (in Mmscf/Day) = [ACQ (in TBtu) x 279 Mmscf/Day] / 106 TBtu.

6.4     Maximum Hourly Rate

(a)     Notwithstanding any other provision of this Agreement, Seller shall have no obligation to deliver the DCQ at an hourly rate that exceeds 11.5 Mmscf/hour ("**Maximum Hourly Rate**"); provided, however, that Seller shall use reasonable efforts to comply with the Buyer's requests to exceed such Maximum Hourly Rate to the extent necessary for the operation of the Costa Sur Units and the ECO Generation Facility, subject to the operation of the LNG Facilities.

(b)     The Buyer shall not be obliged, notwithstanding any other provision of this Agreement, to receive the DCQ at an hourly rate over the Maximum Hourly Rate; provided, however, that the Buyer shall use reasonable efforts to comply with the Seller's exceptional requests to exceed such Maximum Hourly Rate to the extent necessary for the performance of this Agreement.

6.5     Use of NG by Owner.

(a)     The Parties acknowledge and agree that Owner, in its operation of the EcoEléctrica Complex, uses NG to generate electricity for the EcoEléctrica Complex's own operations. In order to compensate Buyer for NG used by Owner, Seller agrees to credit Buyer (the "**Buyer's NG Credit**") for the amount of NG used by Owner in each Monthly Invoice calculated as follows:

$$\text{Buyer's NG Credit} = PC \times HR \times CP$$

Where:

PC = For any Month, the amount of electric power consumed by the EcoEléctrica Complex in the prior Month (in kWh);

HR = Heat Rate of the ECO Generation Facility in the prior Month (in MMBtu/kWh); and

CP = the Contract Price applicable to the prior Month.

(b)     The Buyer's NG Credit shall be evidenced by an Owner's statement that Buyer shall cause the Owner to produce in each month and shall promptly deliver to Seller. 

6.6     Seller shall not amend, or agree to any amendment, to the Restatement TSA that would prevent the delivery of NG to Buyer of the volumes contemplated under this Agreement.

## 7.     SCHEDULING

7.1     For each Contract Year, the following provisions shall apply:

(a)     The Annual Delivery Programme ("**ADP**"), Ninety-Day Schedule ("**NDS**") and Weekly Schedules for such Contract Year shall be established according to the following conditions:

(i)     On or before each June 1, the Buyer shall nominate the "**Annual Contract Quantity**" or "**ACQ**" for the upcoming Contract Year, which ACQ must be between the Minimum Annual Contract Quantity and the Maximum Annual Contract Quantity for such Contract Year. The ACQ shall be final and binding.

In addition to the ACQ, the Buyer shall provide:

1.     an estimate of its consumption for each Contract Quarter of such Contract Year and the allocation between each Delivery Point;

2.     its non-binding estimate of the dates of any Scheduled Maintenance or any Environmental Testing Period expected to occur during such Contract Year. Buyer shall be entitled to conduct two (2) Environmental Testing Periods in each calendar year; and

3.     any Make-Up Gas quantities requested by the Buyer to be delivered during such Contract Year. Provided Buyer has at least nominated the Minimum Annual Contract Quantity, Buyer may, at Buyer's option, elect to schedule all or any then outstanding Make-Up Gas for delivery to Buyer.

No later than fifteen (15) days prior to the day of Seller's reasonable estimation of the day on which the Conditions Precedent Date will occur, the Buyer shall modify the ADP and the Quarterly Binding Quantity for Contract Year 2020 to take into account the volumes that will delivered at the Eco Delivery Point and any other changes required upon the entering into force of this Agreement.

(ii)    Except for the first Contract Year, on or before October 1 of each year thereafter, the Buyer shall provide to the Seller an ADP for the ACQ informed by the Buyer in accordance with Clause 7.1(a)(i), for the following Contract Year on a monthly basis and including the monthly detail of any Make-Up Gas (if any), for each Delivery Point; the sum of the quantities of the months of each calendar quarter ("**Quarterly Binding Quantity**") being binding. The sum of the Quarterly Binding Quantities for any Contract Year shall equal the ACQ. This ADP shall include the final dates of any Scheduled Maintenance or any Environmental Testing Period to occur during such Contract Year. Should



Buyer fail to include the ACQ within the four Quarterly Binding Quantities in the notice provided pursuant to this Clause 7.1(a)(ii), Seller may elect to include the NG volumes required to equal the ACQ in any Quaterly Binding Quantity by providing notice of such election to Buyer no later than October 15 of the relevant Contract Year.

(iii)    On or before the fifth (5th) Day of month M-1 the Buyer shall provide to the Seller its NG requirements for the next three (3) months for each Delivery Point (the "**NDS**"). On or before the fifteenth (15th) Day of month M-1 and in accordance with Clause 7.1(b), the Seller shall confirm the NDS. The NDS shall be binding for month M (the "**Binding Monthly Schedule**") and non-binding for month M+1 and M+2. Such NDS shall include the monthly quantities to be delivered to each Delivery Point in each of the next three months; as well as the daily requirements for month M for each Delivery Point. Further, Buyer shall use commercially reasonable efforts to include in each NDS estimated, non-binding daily requirements for months M+1 and M+2.

(iv)    On or before 00:00 hours Puerto Rico Time of each Day of each week, or, if such Day is not a Business Day, on the Business Day immediately preceding such Day, the Buyer shall provide to the Seller a daily estimate of its NG requirements for the next Day for each Delivery Point, to be provided on a daily basis with hourly detail. This daily programme ("**Daily Programme**") shall be reasonably adjusted to the original NDS for the applicable month. For the purpose of this Clause each Daily Programme shall contain consumption details beginning 00:00 hours on each Day until 23:59 hours the same Day. If Buyer fails to provide such a daily estimate for any Day, Seller may rely upon the Binding Monthly Schedule for Buyer's nomination of NG for such Day.

(b)    The Parties shall cooperate in the scheduling to ensure that the Seller supplies NG to each Delivery Point reasonably ratably for each Day in a Contract Year (subject to the Buyer's Scheduled Maintenances and Environmental Testing Periods) in a manner that is consistent with the Seller's projected deliveries and use of LNG, as such projected deliveries or requirements may be adjusted or exist from time to time, and in a manner that permits the Seller to fulfill its obligations under the Restatement TSA.

(c)    The Buyer designates the Operational Manager as specified in Clause 24 to make all the notifications required under this Clause 7.1.

7.2    In accordance with the previous cooperation principle, to the extent a Monthly Deficiency, Quarterly Deficiency or a Seller Shortfall Quantity can reasonably be anticipated to arise, the Parties will exercise commercially reasonable efforts to avoid such circumstances by cooperating in good faith to attempt to resolve such circumstances by rescheduling delivery of NG.



**8.     TAKE OR PAY AND MAKE UP**

8.1     During each month of the Contract Year, Buyer shall take and pay for, or pay for if not taken, a quantity of NG equal to at least seventy-five percent (75%) of the Monthly Adjusted Required Quantity. To the extent Buyer fails to take such quantity, a "**Monthly Deficiency**" shall arise equal to the Monthly Adjusted Required Quantity less the quantity of NG actually taken by the Buyer.

8.2     In respect of each month during a Contract Year, the "**Monthly Adjusted Required Quantity**" shall be the quantity of NG nominated by the Buyer in the Binding Monthly Schedule, reduced by:

(a)     all Seller Shortfall Quantities occurring during such month;

(b)     (i) all quantities of NG not delivered by the Seller or which the Buyer does not take delivery of during such month due to an event of Force Majeure affecting Seller or Buyer, or (ii) all quantities of NG not taken by Buyer due to a Forced Outage; and

(c)     all Make-Up Gas scheduled quantities included in the Binding Monthly Schedule.

In respect of each month in a Contract Year in which a Monthly Deficiency arises, the quantity equal to the difference between the Monthly Deficiency and twenty-five percent (25%) of the Monthly Adjusted Required Quantity will be the "**Monthly Take or Pay Quantity**". Buyer shall pay Seller, in accordance with Clause 13, a "**Monthly Take or Pay Payment**" equal to ninety percent (90%) of the Contract Price applicable to such month multiplied by such Monthly Take or Pay Quantity.

8.3     During each Contract Quarter, Buyer shall take and pay for, or pay for if not taken, a quantity of NG equal to ninety percent (90%) of the Quarterly Adjusted Required Quantity. To the extent Buyer fails to take such quantity, a "**Quarterly Deficiency**" shall arise equal to the Quarterly Adjusted Required Quantity less the quantity of NG actually taken by the Buyer during such Contract Quarter.

8.4     In respect of each Contract Quarter the "**Quarterly Adjusted Required Quantity**" shall be the Quarterly Binding Quantity as per Clause 7.1(a)(ii) reduced by:

(a)     all Seller Shortfall Quantities occurring during such Contract Quarter;

(b)     all quantities of NG not delivered by the Seller or which the Buyer does not take delivery of at the Delivery Point during such Contract Quarter due to an event of Force Majeure affecting the Seller or the Buyer;

(c)     all Make-Up Gas scheduled quantities included in the Quarterly Binding Quantity;

(d)     all quantities of NG for which Buyer incurred a Monthly Take or Pay Payment during such Contract Quarter; and



23

(e)     all quantities of NG not taken by Buyer due to a Forced Outage, a Permanent Abandonment or a Permanent Closing.

8.5     In respect of each Contract Quarter in which a Quarterly Deficiency arises, the Quarterly Deficiency less ten percent (10%) of the Quarterly Adjusted Required Quantity will be the "**Quarterly Take or Pay Quantity**". The Buyer shall pay to the Seller the "**Quarterly Take or Pay Payment**", equal to the ninety percent (90%) of the average Contract Price during such Contract Quarter multiplied by such Quarterly Take or Pay Quantity applicable to such Contract Quarter. Any Quarterly Take or Pay Payment shall be due and payable by the Buyer to the Seller in accordance with Clause 13.

8.6     If pursuant to Clauses 8.2 or 8.5 the Buyer has paid any Monthly Take or Pay Payment or Quarterly Take or Pay Payment or if there is any Legacy Make-Up Gas, then the Buyer shall be entitled to receive from Seller a quantity of "**Make-Up Gas**" equal to (i) the amount of the Legacy Make-Up Gas, *plus* (ii) 95% of all NG paid for but not received as a result of a Monthly Take or Pay Payment, *plus* (iii) 100% of all NG paid for but not received as a result of a Quarterly Take or Pay Payment, subject in each case to the following conditions:

(a)     The Buyer shall be entitled to nominate and schedule for delivery the Make-Up Gas during any following Contract Year or thereafter during the period of time needed to take the Make-Up Gas and up to a maximum of nine (9) months following termination of the Contract Term (the "**Make-Up Extension Period**"). However, if at the time of the termination of the Contract Term Seller reasonably determines that the maximum Make-Up Extension Period is insufficient for Buyer to take the Make-Up Gas in accordance with the terms of this Agreement, then, at Seller's option exercised no later than the end of the Contract Term, (i) Seller will refund to Buyer all amounts paid in respect of the Make-Up Gas not already taken that cannot be reasonably delivered during the maximum Make-Up Extension Period; or (ii) Seller shall further extend the Make-Up Extension Period to include the time needed to take all the Make-Up Gas in accordance with the terms of this Agreement. For the avoidance of doubt, except to the extent Seller elects, in accordance with the preceding subclause (i) to refund take-or-pay amounts paid by Buyer, Seller shall schedule and deliver on a firm basis according to the terms of this Agreement during the Make-Up Extension Period all Make-Up Gas that is owed to Buyer as of the end of the Contract Term.

(b)     The Seller shall deliver the Make-Up Gas scheduled by the Buyer subject to the terms and conditions of this Agreement.

(c)     During the Supply Period, the scheduling of the Make-Up Gas shall be performed in accordance with Clause 7.1 and the following rules will apply:

(i)     To the extent Buyer schedules Make-Up Gas to be delivered during any Contract Year, such Make-Up Gas shall be deemed to be included proportionately in the Binding Monthly Schedule delivered by Buyer.



24

(ii)    During each month, the Make-Up Gas shall only be consumed if Buyer takes the Monthly Adjusted Required Quantity.

(iii)    If for any reason, other than Buyer's unexcused failure to take, Seller fails to deliver any Make-Up Gas that Buyer has scheduled (other than Seller's excused failure to deliver), Buyer shall have the right to reschedule such Make-Up Gas for delivery at a later time.

(iv)    If Buyer fails, due to Buyer's unexcused failure to take, to receive any Make-Up Gas that is has scheduled, Buyer will have the right to reschedule such Make-Up Gas only during the next Annual Delivery Programme, provided that if such failure occurs during the Make-Up Extension Period, then Buyer will not have the right to reschedule such Make-Up Gas but Seller will exercise commercially reasonable efforts to reschedule such Make- Up Gas to the extent requested by Buyer.

(v)    If Seller does not deliver any Make-Up Gas that it has scheduled except due to Seller's excused failure to deliver, then such quantity shall be a Seller Shortfall Quantity and, in addition to any damages Seller may owe pursuant to Clause 9, Seller will refund to Buyer all amounts paid in respect of the NG for which such Make-Up Gas arose.

(d)    If Buyer is unable to schedule or take any Make-Up Gas prior to the end of the Contract Term due to Force Majeure events, Seller will refund to Buyer all amounts paid in respect of the NG for which such Make-Up Gas arose.

(e)    The following specific rules shall apply during the supply of the pending Make-Up Gas during the Make-Up Extension Period:

(i)    The supply during the Make-Up Extension Period shall be as regular and even as practicable, in a manner that permits the Seller to fulfill its obligations under the Restatement TSA.

(ii)    The Parties will schedule an ADP for such Make-Up Extension Period under Clause 7 above as if it were a Contract Year, provided that Buyer shall have the right to schedule additional quantities of Make-Up Gas that arise after the ADP is established at any time prior to the end of the Make-Up Extension Period.

(f)    The price to be paid by the Buyer for any Make-Up Gas shall be the higher of: (i) the Contract Price of the relevant Contract Quarter of delivery of such Make-Up Gas; or (ii) the Contract Price of the relevant period in which the Quarterly Take or Pay Payment arose. The sum to be paid for this Make-Up Gas shall be the applicable price as calculated hereunder *multiplied* by the quantity of Make-Up Gas *less* the Quarterly Take or Pay Payment or the Monthly Take or Pay Payment already paid by the Buyer for the corresponding quantity.



(g)    Only for the purpose of this Clause 8.6, Buyer shall take the Make-Up Gas in a chronological order as the Legacy Make-Up Gas, the Monthly Take or Pay Payment or Quarterly Take or Pay Payment was generated during the Supply Period.

## 9.    SELLER'S SHORTFALL

9.1   If, for any reason other than the occurrence of (a) an event of Force Majeure or (b) reasons attributable to the Buyer, the Seller fails to deliver the scheduled quantity in the Binding Monthly Schedule for delivery to the Buyer at the Costa Sur Delivery Point (including scheduled Make-Up Gas) for the applicable months of any Contract Quarter (the "**Costa Sur Seller Shortfall Quantity**"), the Seller shall be liable to the Buyer in accordance with this Clause 9.

9.2   If a Costa Sur Seller Shortfall Quantity occurs during any Contract Quarter, Seller shall pay liquidated damages to the Buyer in an amount (each, a "**Costa Sur Shortfall Payment**") equal to such Costa Sur Seller Shortfall Quantity multiplied by fifteen percent (15%) of the average of the Prompt Contract Price for the Contract Quarter during which the Costa Sur Seller Shortfall Quantity has occurred.

9.3   If, for any reason other than the occurrence of (a) an event of Force Majeure or (b) reasons attributable to the Buyer, the Seller fails to deliver the scheduled quantity in the Binding Monthly Schedule for delivery to the Buyer at the ECO Delivery Point (including scheduled Make-Up Gas) for the applicable months of any Contract Quarter (the "**ECO Seller Shortfall Quantity**"), the Seller shall be liable to the Buyer in accordance with this Clause 9.

9.4   If an ECO Seller Shortfall Quantity occurs during any Contract Quarter, prior to the Transfer Date, Seller shall pay the Buyer in an amount (a "**ECO Shortfall Payment**") equal to the sum of the ECO Capacity Payment Differential and the Back-Up Fuel Cover Amount, calculated for each hour of the Seller Shortfall Duration, each as duly documented by Buyer.

9.5   If an ECO Shortfall Quantity occurs on or after the Transfer Date, the Seller shall pay liquidated damages to the Buyer in an amount equal to the ECO Seller Shortfall Quantity multiplied by fifteen percent (15%) of the average of the Prompt Contract Price for the Contract Quarter during which the ECO Seller Shortfall Quantity has occurred.

9.6   Seller agrees that Buyer's damages associated with Seller's failure to deliver NG hereunder would be difficult to estimate, and that Clauses 9.2 and 9.5 represent reasonable estimates of such damages.

9.7   Any Shortfall Payment shall be due and payable by the Seller to the Buyer in accordance with Clause 13 following the expiration of the Contract Quarter in which such Shortfall Payment arose.

## 10.    MEASUREMENT AND TESTING

10.1   Unit of Measurement

The following guidelines shall be followed with regard to the units· of measurement to be used by either Party to comply, as appropriate, with the provisions of this Agreement:

(a)    The unit for the purpose of measuring volume shall be one cubic foot of Natural Gas at a base temperature of sixty degrees (60°) F and at a pressure of 14.73 psia with correction for deviation from Boyle's Law. Computation of volumes, including any deviation from Boyle's Law, shall comply with applicable rules, regulations, and orders promulgate by the appropriate regulatory authorities having jurisdiction. For payment purposes, the volume of Natural Gas delivered hereunder will be determined at the pressure reported by the Metering Equipment, or based on fifteen (15) Day average flowing pressure corrected, if necessary, in the event that the Metering Equipment is inoperable or not measuring accurately, as applicable, and will be multiplied by the Btu content per cubic foot to obtain the total Btu contained within such volume of Natural Gas.

(b)    For purposes of measurement and meter calibration, the atmospheric pressure shall be assumed to be 14.73 psia, irrespective of actual elevation or location of the Delivery Point above sea level, or variations in such atmospheric pressure from time to time.

(c)    The static pressure of the Natural Gas passing through the Metering Equipment shall be determined by the use of electronic measurement equipment or by the use of another pressure recording device reasonably acceptable to both Parties. The instantaneous static pressure measurements from the electronic measurement equipment or the arithmetic average of the temperature recorded each Day shall be used in computing Natural Gas volumes.

(d)    If Metering Equipment requiring the use of specific gravity is used, then the specific gravity of the Natural Gas delivered hereunder shall be determined by a method according to accepted industry practice. If a recording gravitometer is used, then the arithmetic average of the specific gravity of the Natural Gas flowing through the meters shall be used in computing Natural Gas volumes. If a spot test method is used, then the specific gravity of the Natural Gas delivery hereunder shall be determined as often as found necessary in practice. Any such test shall determine the specific gravity to be used in computation of volumes values effective the first Day of the following month and shall continue to be used until changed in a like manner by a subsequent test.

(e)    The temperature of the Natural Gas shall be determined by a recording thermometer installed so that it will record the temperature of the Natural Gas flowing through the meters, and such flowing temperature shall be corrected to Fahrenheit.

(f)    Heating Value and energy content will be measured by the Seller as described in "Appendix F-Heating Value Calculation of API MPMS, Chapter 14.3." The determination of Natural Gas composition shall be in accordance with the GPA Standard 2261 "Analysis for Natural Gas Chromatography" and GPA Standard 2172 "Calculation of Gross Heating Value relative density and compressibility factor for Natural Gas Mixtures from compositional analysis." The composition of the NG shall 

be continuously measured by on-line chromatographs installed and maintained (or caused to be installed and maintained) by Seller at Seller's sole expense. The Heating Value of the NG shall be calculated using results from the on-line chromatograph. In the event of failure of the on-line NG chromatograph, chromatograph analysis of samples collected proportional to the flow through the meters shall be used. All electronic metering shall comply with the API Manual of Petroleum Standards, Chapter 21, Flow Measurement Using Electronic Metering Systems, First Edition, dated September, 1993, and any subsequent modification and amendment thereof. Prior to the installation of the Metering Equipment as provided in Clause 10.2, the Heating Value at the ECO Generation Facility shall be deemed to be the same as the Heating Value for the Costa Sur Units pursuant to this Clause 10.1(f).

(g)     The energy content of all NG delivered hereunder shall be in Btu and shall equal the Standard Cubic Feet of such NG multiplied by the Heating Value of such NG.

10.2   Metering Equipment

(a)     Prior to February 29, 2020, the Seller shall use commercially reasonable efforts to install or cause to be installed, at Seller's expense, a main and a back-up meter and other equipment as necessary to measure the volume of Natural Gas delivered to the ECO Generation Facility hereunder (the "**ECO Metering Equipment**"). The ECO Metering Equipment will be installed at the point identified as "EcoEléctrica Metering Station" on the schematic attached as <u>Annex A</u>. The ECO Metering Equipment shall be designed and installed in accordance with the current recommendations of the American Gas Association. If the Metering Equipment (or component(s) thereof) is out of service or registering inaccurately, the volumes of Natural Gas delivered hereunder shall be estimated as follows, in descending order of priority:

(i)      by using the registration of the Buyer Check Meter;

(ii)     by correcting the error if the percentage of error is ascertainable by calibration, test, or mathematical calculation; or

(iii)    by estimating the quantity of delivery by measuring deliveries during prior periods under similar conditions when any meter was registering accurately.

(b)     Buyer has the meter equipment necessary to measure the volume of Natural Gas delivered hereunder (the "**Buyer Check Meters**"). The Buyer Check Meters are installed at the points identified as "Costa Sur Metering Station" and "ECO Metering Station" on the schematic attached in <u>Annex A</u>. The Buyer Check Meters are designed and installed in accordance with the current recommendations of the American Gas Association. In the event that Buyer notifies Seller of a material discrepancy between the quantity of Natural Gas delivered at the Delivery Point by Seller according to the Buyer Check Meter, and the quantity of Natural Gas measured by the Metering Equipment, the Parties will resolve and correct such discrepancy (including with respect to adjustments for prior Natural Gas deliveries). 

28

(c)     For the avoidance of doubt, it is the intent of the Parties that Natural Gas will only be considered delivered when it reaches the Delivery Point, and that any Natural Gas measured at the Metering Equipment that is not actually delivered to the Delivery Point will not be considered delivered and will not be charged to Buyer. In this regard, Buyer will not be charged for line fill or any losses or fuel used on the pipeline between the Metering Equipment and the Delivery Point. Also, if Owner informs Seller about its intention to consume, due to any operational event, any quantity of Natural Gas stored in the pipeline that was not delivered to Buyer at the Delivery Point and, consequently, that was already measured by the Metering Equipment at the Owner Metering Station, Seller shall notify Buyer in writing of such circumstance. The Parties will resolve any material discrepancies resulting from Seller's consumption of Natural Gas under this clause in accordance with Clause 10.2(b).

(d)     Prior to installation of the ECO Metering Equipment, quantities of NG delivered to the ECO Generation Facility will be assumed to be the quantity of regasified LNG delivered from the LNG Facilities *minus* the amount measured at the Costa Sur Metering Equipment.

10.3    Verification

The following guidelines shall be followed with regard to the verification of the Metering Equipment to be used in accordance with this Agreement:

(a)     At least once each month, and from time to time upon at least two (2) weeks prior written notice by either Party to the other, the Seller shall verify or cause to be verified the accuracy of the Metering Equipment. When as a result of such test the Metering Equipment is found to be out of calibration by no more than one percent (1%) when compared to the manufacturer's specifications for such equipment, no adjustment shall be made in the amount paid by the Buyer to the Seller.

(b)     If the testing of the Metering Equipment demonstrates that a meter is out of calibration by more than one percent (1%) when compared to the manufacturer's specifications for such equipment, the applicable Metering Equipment reading for the actual period during which out of calibration measurements were made shall be adjusted based on' the methods stated in Clause 10.2 above.

(c)     If the actual period that such equipment' has been out of calibration cannot be determined to the mutual satisfaction of the Seller and the Buyer, the adjustment shall be for a period equal to one-half of the time elapsed since the most recent test. The previous payments made by the Buyer to the Seller for this period shall be subtracted from the amount of payments that are calculated to have been owed under this Agreement. The difference in US Dollars (which may be a positive or negative amount) shall be added to the next Monthly Invoices pursuant to Clause 13.



(d)     The cost of the monthly testing and calibration of the Metering Equipment described in this Clause 10.3 shall be the responsibility of the Seller. The cost of any testing and

calibration of the Metering Equipment beyond the monthly test permitted in this Clause 10.3 shall also be the responsibility of the Seller, unless the request to test any of the Metering Equipment is made by the Buyer and the results of such test requested by the Buyer demonstrate that the Metering Equipment is less than one percent (1%) out of calibration, in which case the cost of such testing and calibration shall be for the Buyer's account.

(e)     Each Party shall comply with any reasonable request of the other concerning the sealing of the Metering Equipment, the presence of a representative of the Buyer when the seals are broken and tests are conducted, and other matters affecting the accuracy, testing and calibration of the Metering Equipment.

(f)     If either the Seller or the Buyer believes that there has been a failure or stoppage of any of the Metering Equipment, it shall immediately notify the other Party.

10.4    Availability of Readings

At the end of each Month, the Seller shall make available to the Buyer all readings of the Metering Equipment as referenced in Clause 10.2(a).

10.5    Preservation of Records

The Seller shall preserve or cause to be preserved for a period of at least three (3) years following the expiration of this Agreement all test data, charts, and other similar records regarding the measurement of Natural Gas delivered in accordance with this Agreement.

**11.    TRANSFER OF TITLE AND RISK; INDEMNITY**

The NG to be sold by the Seller and purchased by the Buyer in accordance with this Agreement shall be delivered to the Buyer at the Delivery Point. Title and risk in NG, including the risk of loss or (without prejudice to Clause 4 above) contamination, shall pass from the Seller to the Buyer at the Delivery Point (irrespective of the location of the Metering Equipment). Seller agrees to indemnify Buyer and save it harmless from all losses, liabilities or claims including reasonable attorneys' fees and costs of court ("**Claims**"), from any and all Persons, arising from or out of claims of title, personal injury (including death) or property damage from said Natural Gas or other charges thereon which attach before title passes to the Buyer. Buyer agrees to indemnify Seller and save it harmless from all Claims, from any and all Persons, arising from or out of Claims regarding payment, personal injury (including death) or property damage from said Natural Gas or other charges thereon which attach after title passes to the Buyer.

**12.    CONTRACT PRICE**

12.1    Without prejudice to Clause 26, the contract price applicable to the quantities of NG to be sold, purchased and delivered in any month during the Contract Term expressed in US Dollars/MMBtu ("**Contract Price**") shall be calculated as follows: 

| Dates | Contract Price |
|---|---|
| Conditions Precedent Date until December 31, 2020 | 115% x HH + $5.80 |
| January 1, 2021 until December 31, 2021 | 115% x HH + $5.70 |
| January 1, 2022 until December 31, 2022 | 115% x HH + $5.60 |
| January 1, 2023 until September 2032 | 115% x HH + $5.50 |

Notwithstanding anything to the contrary in this Clause 12.1, from the date on which (x) the Jones Act is repealed or amended such that it no longer applies to the transportation by water of LNG between United States mainland ports and Puerto Rico or (y) a waiver of the Jones Act is granted that permits, for a period of not less than one (1) year, the transportation by water of LNG between United States mainland ports and Puerto Rico by means of vessels that do not meet Jones Act requirements, the applicable Contract Price ("**CP**") for any quarter starting after the date the Jones Act ceases to be applicable for such traffic, shall be calculated as follows:

$$CP = 115\% \text{ x HH} + \$4.80$$

12.2    If the Parties are unable to so agree upon a suitable alternative replacement for such source of information or for such index then either Party may refer the matter to an Expert for determination in accordance with Clause 20.2.

12.3    The Seller shall maintain a current accounting of, and shall invoice the Buyer on a monthly basis in accordance with Clause 13 the following (collectively the "**Incremental Costs**"): ·

(a)      any cost originated by the demurrage in the Seller's projected deliveries and use of the Owner's LNG terminal under the Existing TSA caused by reasons attributable to the Buyer; and

(b)      any sums as a result of indemnification obligations paid by the Seller to the Owner related to the payment of liquidated damages under the PPOA and passed through under the Existing TSA, so long as such sums were ultimately caused by the Buyer's breach of its obligations to take and receive NG hereunder.

In any case, the Incremental Costs shall be duly justified and documented costs, effectively charged by Owner to the Seller. Any incremental Costs arising pursuant to this Clause 12.3 shall not constitute incidental, consequential, indirect, special, punitive or exemplary damages.

## 13.    INVOICING, PAYMENT AND CREDIT REQUIREMENT

13.1    Every month the Seller shall invoice the consumption of the Costa Sur Units and the ECO Generation Facility corresponding to the previous calendar month, and whatsoever other amounts that are owed for those items regulated in accordance with this Agreement and current regulations governing the provision of the services at any given time.



13.2    The Seller shall prepare and shall give to the Buyer by not later than the tenth (10th) Day after the end of each calendar month an invoice (the "**Monthly Invoice**") which shall show in respect of the preceding calendar month the following information:

    (a)    the applicable Contract Price;

    (b)    the total quantity of NG delivered to the Buyer at the Delivery Point;

    (c)    the Buyer's NG Credit for such month;

    (d)    any applicable Taxes due for payment by the Buyer; and

    (e)    the net amount payable by the Buyer to the Seller shall be the Contract Price multiplied by the quantities set down in (b) (reduced by the Buyer's NG Credit), plus the Applicable Taxes amounts under (d).

13.3    The Buyer shall pay the net amount to the Seller as due in accordance with such Monthly Invoice.

13.4    If Buyer incurs a liability to the Seller pursuant to Clause 8 for a Monthly Take or Pay Payment or a Quarterly Take or Pay Payment, then Seller shall send to the Buyer (following the end of the applicable month or Contract Quarter) an invoice and reasonable supporting documentation showing the amount payable by the Buyer pursuant to Clause 8.

13.5    If Seller incurs a liability to the Buyer for failing to deliver NG pursuant to Clause 9, then the Buyer shall send to the Seller (following the end of the applicable month) an invoice and the supporting documentation showing the amount payable by the Seller in accordance with Clause 9.

13.6    If any sums are due from one Party to the other Party, except for reasons addressed in Clauses 13.2, 13.4. and 13.5, then the Party to whom such sums are owed shall furnish to the other an invoice describing in reasonable detail the basis for the invoice and providing relevant supporting documentation.

13.7    In respect of any invoice issued pursuant to this Clause 13, the Buyer or the Seller as the case may be, shall pay the amount due within thirty (30) Days after receipt of such invoice.

13.8    Payment of amounts due to one Party from the other Party shall be made by wire transfer in immediately available funds into the bank account nominated from time to time by the Party to which the funds are owed. Each payment of any amount owing hereunder shall be for the full amount due, without reduction, withholding or offset for any reason (including any exchange charges, bank transfer charges or other fees or Taxes). Until further notice, the bank account for each Party is as follows:

**Seller:**    **Bank Name: Banco Santander Puerto Rico**

          **Bank Account #3004696629**

**Buyer:**  **The wire transfer information forwarded by the Chief Financial Officer of PREPA to Seller's authorized representative via email.**

Notwithstanding the foregoing, Seller shall request from Buyer wire instructions prior to transferring any funds to Buyer and shall provide Buyer bank confirmation upon completion of each such transfer.

13.9  If any Party fails to pay the other Party the full amount of any invoice due by the due date, such Party shall also pay interest thereon to the other Party for the period commencing from and including the due date until and including the Day when payment is made. Interest shall be calculated at the rate of four hundred (400) basis points above the LIBOR percentage rate per annum but no greater than the maximum amount allowable by Applicable Law.

13.10  If a Party disagrees in good faith with any invoice, such Party shall pay the full amount invoiced or so stated by the due date thereof and shall immediately notify the other Party of the reasons for its disagreement. An invoice may be contested by the Party that received it, or modified by the Party that sent it, by written notice delivered to the other Party within a period of one hundred and eighty (180) Days after such receipt or sending, as the case may be. If no such notice is served within such period of one hundred and eighty (180) Days, such invoice shall be deemed correct and accepted by both Parties. Promptly after resolution of any Dispute as to an invoice, the amount of any overpayment or underpayment shall be paid by the Seller or the Buyer, as the case may be, to the other Party, together with interest thereon at the rate provided in Clause 13.9 from the date payment was due to the date of payment.

13.11  If, at any time during the Term, Buyer becomes a Non-Commonwealth Entity, Seller will have the right to terminate the Agreement pursuant to Clause 18.1(b)(ii), unless effective on the date on which Buyer becomes a Non-Commonwealth Entity, Buyer satisfies, and covenants to maintain in full force and effect during the Term, one of the following:

    (i)  full compliance with the Credit Standards;

    (ii)  the delivery to Seller of a legal, valid, binding and enforceable Guarantee from an Acceptable Guarantor; or

    (iii)  the delivery of a Letter of Credit.

13.12  Any Letter of Credit provided by an Acceptable Private Assignee pursuant to this Agreement shall be subject to the following provisions:

    (i)  Unless otherwise agreed in writing by the Parties, each Letter of Credit shall be maintained for the benefit of Seller. The Acceptable Private Assignee shall renew or cause the renewal of any Letter of Credit on a timely basis as provided in the relevant Letter of Credit. If a Letter of Credit Default occurs Seller shall have the right to make a drawing on the Letter of Credit in full unless such assignee shall have provided for the benefit of Seller a substitute Letter of



33

Credit (meeting the conditions of Clause 13.12) in equal amount to the Letter of Credit being replaced by the close of business on the date that is five (5) Business Days following the occurrence of such Letter of Credit Default.

(ii) Each Letter of Credit shall provide that Seller may draw upon the Letter of Credit in an amount (up to the face amount for which the Letter of Credit has been issued) that is equal to any or all amount(s) that are due and owing from such assignee under this Agreement, but have not been paid to Seller when due, upon presentation to the issuing bank of one or more statements certified by Seller that the amount(s) drawn under the Letter of Credit represent amounts due and owing under the Agreement.

(iii) Each Letter of Credit shall provide that Seller may draw the full amount due and owing by such assignee to Seller on the date thereof pursuant to this Agreement (up to the entire undrawn amount of the Letter of Credit) if any event giving Seller the right to terminate this Agreement pursuant to Clause 18.1(b)(ii) has occurred and is continuing, upon presentation to the issuing bank of one or more statements certified by Seller that such an event has occurred and is continuing with respect to the Acceptable Private Assignee.

(iv) Each Letter of Credit shall provide that Seller may draw the full amount of such Letter of Credit in case of any default by such assignee under the Agreement.

(v) Buyer shall have the right, but not the obligation, to cause the reissuance of a new Acceptable Letter of Credit at any time.

13.13 An Acceptable Private Assignee, other than an Acceptable Private Assignee that has provided an Acceptable Letter of Credit to Seller, shall (i) notify Seller promptly, but in no event more than fourteen (14) days after the date on which such assignee becomes aware of the occurrence of a Credit Standard Event and (ii) within thirty (30) days of such Credit Standard Event, provide replacement credit support in the form of an Acceptable Guarantee or an Acceptable Letter of Credit. If the Acceptable Private Assignee fails to deliver such Acceptable Letter of Credit or Acceptable Guarantee in accordance with of the previous sentence, Seller may terminate this Agreement upon notice with immediate effect.

13.14 An Acceptable Private Assignee that has provided an Acceptable Letter of Credit to Seller shall (i) notify Seller promptly, but in no event more than fourteen (14) days after the date on which such assignee becomes aware of the occurrence of a Letter of Credit Issue Event and (ii) within thirty (30) days of such Letter of Credit Issuer Event, provide replacement credit support in the form of an Acceptable Guarantee or an Acceptable Letter of Credit. If the Acceptable Private Assignee fails to deliver such Acceptable Letter of Credit or Acceptable Guarantee in accordance the previous sentence, Seller may terminate this Agreement upon notice with immediate effect.



34

## 14.    DUTIES, TAXES AND CHARGES

14.1    Each of the Seller and the Buyer shall be responsible for the payment of all taxes, fees, levies, royalties, duties, penalties, licenses, and other charges imposed by any Governmental Authority ("**Taxes**") which it incurs and for which it is legally responsible for as a result of complying with this Agreement and which correspond to such Party under all applicable tax regulations and laws in force at the "Effective Date" (as defined in the Pre-Restatement GSPA) and throughout the Contract Term in each of the jurisdictions relevant to this Agreement connected to the Parties. If Party is required to remit or pay Taxes that are the other Party's responsibility hereunder, the Party responsible for such Taxes shall promptly reimburse the other Party for such Taxes. Any Party entitled to an exemption from any such Taxes or charges shall furnish the other Party any necessary documentation thereof.

14.2    For the avoidance of doubt and notwithstanding the above:

(a)    Seller represents and warrants that it is the importer of record for all Natural Gas delivered hereunder, and shall be responsible for entry and entry summary filings as well as the payment of associated duties, Taxes and fees, if any, and all applicable record keeping requirements;

(b)    Buyer shall pay or cause to be paid all Taxes imposed by any Governmental Authority after the Delivery Point on the sale, use, or purchase Natural Gas delivered to the Buyer under this Agreement (and on any LNG from which such Natural Gas is derived) and its transportation within the territory of Puerto Rico after the Delivery Point; provided that at all times the Seller shall be responsible for the payment of all and any Corporate Tax payable in Puerto Rico in connection with this Agreement; and

(c)    Seller shall pay or cause to be paid all Taxes imposed by any Government Authority on or with respect to Natural Gas delivered to the Buyer under this Agreement (and on any LNG from which such, Natural Gas is derived) prior to the Delivery Point and all Taxes at the Delivery Point.

## 15.    FORCE MAJEURE

15.1    Neither the Seller nor the Buyer shall be liable for any failure to perform or for omission or delay in the performance of any of its obligations under this Agreement, other than the obligation to make payments of money when due, if and to the extent that the affected Party's performance is prevented, delayed or interfered with by an act, event or circumstance, or combinations of events or circumstances, whether of the kind described herein or otherwise, that is not reasonably with in its control, such Party having acted as a Reasonable and Prudent Operator and which effects could not be prevented or overcome by the exercise of due diligence ("**Force Majeure**").

For the avoidance of doubt, provided that the requirements set out in the preceding paragraph are met, events of Force Majeure shall include but not be limited to the following:



(a)    Loss of, serious accidental damage to, inaccessibility or incapacity of, or inoperability of the relevant loading terminal or upstream facilities affecting an LNG cargo and source indicated in the LNG Delivery Plan. The "**LNG Delivery Plan**" shall mean the indicative LNG cargo scheduling program submitted by the Seller to the Buyer, solely for the purposes of this Clause, not later than thirty (30) Days prior to the commencement of each Contract Year and which shall include for each LNG cargo the expected source. The Seller shall inform Buyer of any modifications to the sources indicated in the LNG Delivery Plan, provided that Seller shall not, at any time nominate any source that is affected by Force Majeure or that is affected by any event that could reasonably lead to a claim of Force Majeure relief under this Agreement;

(b)    Loss of, serious accidental damage to, inaccessibility or incapacity of, or mechanical breakdown or inoperability of an LNG ship requiring her removal from service;

(c)    Loss of, serious accidental damage to, inaccessibility or incapacity of, or inoperability of the LNG Facilities;

(d)    Loss of, serious accidental damage to, inaccessibility or incapacity of, or inoperability of any of the Costa Sur Units or any of the generation units at the ECO Generation Facility that prevents the operation or dispatch of such unit; provided that if an event of Force Majeure affects just one such unit but not any other, the affected Party shall only be released from its obligations under this Agreement with regard to the unit affected by the event of Force Majeure;

(e)    Acts of God, lightning, storm, typhoon, hurricane, tornado, earthquakes, fires, floods, tsunami, earthquake, landslide, soil erosion, subsidence, washout, epidemic, shipwreck, navigational and maritime perils, acts of any Competent Authority or compliance with such acts; explosions, acts of the public enemy, wars (whether declared or undeclared), terrorism or threat thereof, civil war, piracy, civil and military disturbances, strikes, blockades, insurrections, riots, epidemics and quarantine restrictions; strike, lockout or other industrial disturbances involving an enterprise other than a Party, its transporter or its agents or sub-contractors in connection with the Agreement; radioactive contamination or ionizing radiation; or breakdown or unavailability of port facilities or port services ( including the channel, tugs or pilots); and

(f)    Loss of, serious accidental damage to, inaccessibility or incapacity of, or inoperability of the Grid System that prevents the normal dispatch of any of the Costa Sur Units or any of the generation units at the ECO Generation Facility.

15.2    Notwithstanding the foregoing provisions of Clause 15.1, the following shall not be events of Force Majeure:

(a)    events arising out of market decline, market failure, industry economic conditions, or general economic conditions;



(b) the failure to obtain or the withdrawal of any authorization, approval, permit or permission of any Competent Authority, of which the Party claiming Force Majeure was aware, or should have been aware, acting as a Reasonable and Prudent Operator, to the extent such Party could have applied for, obtained, maintained, or extended any such authorization, approval, permit, or permission;

provided, however, that the failure to obtain any authorization, approval, permit or permission of any Competent Authority that is required in order to satisfy the Conditions Precedent shall under no circumstances be considered Force Majeure.

15.3   In the event of any failure or delay of a Party's performance due to the occurrence of a Force Majeure event, the affected Party shall use reasonable efforts (acting as a Reasonable and Prudent Operator) to resume as soon as possible full performance of its obligations under this Agreement, provided that the settlement of strikes or boycotts, lockouts or other industrial disputes, or obstructive action by organisations or local inhabitants, shall be entirely within the discretion of the Party concerned.

15.4   A Party intending to seek relief under this Clause 15 shall as soon as reasonably practicable after it becomes aware of the occurrence of a Force Majeure event:

(a) notify the other Party of the occurrence of an event that it considers may subsequently lead it to claim Force Majeure relief under this Agreement, describing such event, in as much detail as is then reasonably available, and the obligations, the performance of which has been or could be delayed, hindered or prevented thereby, and the estimated period during which such performance may be suspended or reduced, including (to the extent known or ascertainable) the estimated extent of such suspension or reduction in performance; the obligations which could or have been actually delayed or prevented in performance and the estimated period during which such performance may be suspended or reduced, including (to the extent known or ascertainable) the estimated extent of such suspension or reduction in performance;

(b) give a bona-fide good faith estimate of when it shall be able to resume full performance of its obligations; and

(c) give the particulars of the programme to be implemented, if any, to resume full performance hereunder subject to any Third Party confidentiality obligations.

Such notices shall thereafter be supplemented and updated at reasonable intervals during the period of such Force Majeure, specifying the actions being taken to remedy the circumstances causing such Force Majeure and the date on which such Force Majeure is expected to terminate.

15.5   If any Party claims relief under this Clause 15, it shall allow reasonable access to the other Party, upon such other Party's written request, to examine the scene of such event or circumstance which gave rise to the Force Majeure claim, provided that the Party not claiming relief under this Clause 15 shall bear the cost, expense and risk of examining such site.



37

15.6    Where an act, event or circumstance prevents, impedes or delays a Party's performance hereunder, even if such act, event or circumstance primarily affects a Third Party or Third Parties, it shall constitute Force Majeure hereunder as to the Seller or the Buyer, as appropriate, if and to the extent that it is of a kind or character that, if it had happened to a Party, would have come within the definition of Force Majeure under this Clause 15.

15.7    Force Majeure takes effect at the moment a Force Majeure event occurs, not upon giving notice. A Party whose performance is excused by Force Majeure shall not be required, during the period in which the circumstances of the Force Majeure event are continuing, to incur uneconomic costs, make additional investments in new facilities, or bring into production existing or potential reserves not already flowing in support of this Agreement.

15.8    If Seller is rendered wholly or partially unable to deliver NG under this Agreement as a result of a Force Majeure event claimed only by the Buyer, Seller shall have the right to enter into binding contracts with Third Parties to sell and deliver LNG that is not reasonably expected to be needed by the Seller to meet its obligations to the Buyer hereunder based on the expected extent and duration of such Force Majeure as notified by the Buyer.

15.9    If the Force Majeure event is forecast to last (or actually lasts) for a period such that the affected Party shall be prevented from or delayed in performing its obligations hereunder for a period of one hundred eighty (180) consecutive Days or more from the date on which the Force Majeure event first occurred, the Party not claiming Force Majeure shall have the right to terminate this Agreement without liability to either Party by giving written notice to the other Party.

## 16.    REPRESENTATIONS, WARRANTIES, LIABILITIES AND INDEMNITIES

16.1    Each Party hereby represents and warrants to the other Party that, as of the Conditions Precedent Date, to the actual knowledge of its officers and directors:

(a)    With regard to Seller, that the Restatement TSA is in full force and effect and contains provisions that provide that during the Contract Term Seller has the exclusive right to use the existing capacity of the LNG Facilities.

(b)    With regard to Seller it is a corporation or limited liability company duly formed, validly existing and in good standing under the laws of the state and/or country of its incorporation or organization, and is duly qualified to do business in, and is in good standing in, all other jurisdictions where the nature of its business or nature of property owned by it makes such qualification necessary.

(c)    With regard to Buyer it is a Puerto Rico public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, duly organized, validly existing and in good standing under the laws of the Commonwealth of Puerto Rico and is duly qualified to do business in, and is in good standing in the jurisdictions where the nature of its business or nature of property owned by it makes such qualification necessary.



38

(d)     Each Party has all requisite power and authority to conduct its business, to own or lease and operate its properties, and to execute, deliver, and perform its obligations under this Agreement.

(e)     The execution, delivery and performance by such Party of this Agreement has been duly authorized by all necessary corporate action on the part of such Party and do not (i) require any consent or approval of any Competent Authority, such Party's governing body or any other Person, other than those that have been obtained, or the failure to obtain, of which would not have, or could not reasonably be expected to have, a material adverse effect on each Party's ability to perform its obligations hereunder, (ii) violate any provision of such Party's articles of incorporation or by-laws, or other organizational documents, or any Applicable Law in effect, or (iii) result in a breach of or constitute a default under such Party's organizational documents or other material indentures, contracts or agreements to which it is a party or by which it or its properties may be bound.

(f)     This Agreement is a legal, valid, and binding obligation of the Seller and the Buyer enforceable against the Seller and the Buyer, as appropriate, in accordance with its terms.

16.2    The Seller warrants that it has good title to or good right to all NG delivered hereunder and that all NG delivered to the Buyer at the Delivery Point shall be free and clear of all liens, security interests, charges, assessments, privileges, encumbrances and adverse claims whatsoever. The Seller makes no other representation or warranty, written or oral, express or implied that the NG will be fit for a particular purpose, or will be of merchantable quality, and all such representations and warranties are expressly excluded to the fullest extent permitted by law, but nothing in this Clause 16.2 affects the requirement that all NG delivered to the Buyer under this Agreement will meet the Specifications of Clause 4.

16.3    The Seller represents and warrants that it will take or cause to be taken all necessary actions to start NG deliveries after the date that all of the Conditions Precedent are satisfied or waived and that to that end it will obtain or cause to be obtained all required approvals, consents or authorizations from the relevant Competent Authority.

16.4    Seller acknowledges and agrees that (i) the Costa Sur Units suffered damage from an earthquake in Puerto Rico that occurred in January of 2020, and (ii) while Buyer has launched an assessment of this incident, Buyer has not yet determined whether it will rehabilitate or retire the damaged Units as of the Effective Date.

16.5    Except as provided elsewhere in this Agreement, a Party shall not be liable to the other Party under this Agreement, or in tort or otherwise howsoever as a result of any act or omission in the course of or in connection with the carrying out of this Agreement, for or in respect of:

(a)     any consequential, special or punitive loss or damage suffered or incurred by the other Party or its Affiliates;



39

(b)     any loss of income, profits, production or revenue suffered or incurred by the other Party or its Affiliates;

(c)     any business interruption suffered or incurred by the other Party or its Affiliates; or

(d)     any Claim, demand or action made or brought against that other Party by a Third Party.

16.6    Except for the provisions of Clause 12.3, the Buyer's liability arising out of or in connection with any failure to take delivery of NG under this Agreement shall be limited to the amounts payable pursuant to Clause 8 which shall be the Seller's sole and exclusive remedy in such event.

16.7    The Seller's liability for failure to deliver will be limited to the payment of the amounts detailed in Clause 9, which shall be the Buyer's sole and exclusive remedies in such event.

## 17.    ASSIGNMENT

17.1    The Parties acknowledge that Buyer is undergoing a transformation process, and therefore, both Parties agree that in the eventuality of the execution of a Partnership Contract, Sale Contract or any other PREPA Transaction (as these terms are defined in Act No. 120-2018, otherwise known as Puerto Rico Electric System Transformation Act, as amended), Buyer may sell, assign, convey, transfer, pledge, mortgage, sublease, delegate, hypothecate, or otherwise dispose (each, a "**Transfer**") any of its rights, title, or interest (by novation or other instrument) in this Agreement as permitted by Applicable Law and at any time, and without Seller's consent or cost, expense or incremental liability to Buyer, to either a Commonwealth Entity or a Non-Commonwealth Entity. Buyer shall provide notice to Seller of its intent to Transfer this Agreement no later than thirty (30) days prior to the anticipated date of the Transfer.

17.2    On the Transfer Date, Clauses 17.1 and 26 shall cease having any force or effect under this Agreement.

17.3    Except as provided in Clauses 17.1, 17.4 and 17.5, neither Party may assign any of its rights or delegate any of its obligations under this Agreement to a Third Party without the prior written consent of the other Party. Any purported assignment of a Party's rights or obligations hereunder in contravention of this Clause 17 shall be null and void and shall have no force or effect.

17.4    Notwithstanding the foregoing, either Party shall be entitled to assign, or as appropriate, delegate, all, but not part, of its rights and obligations under this Agreement to an Affiliate by providing notice to the other Party, provided that subsequent to any assignment or delegation made pursuant to this Clause 17.4, the original Party and each subsequent assignee or delegatee, having itself assigned or delegated to an Affiliate, shall be fully liable under this Agreement in the event of non-fulfilment of its obligations under this Agreement by an assignee or delegate.



17.5    Notwithstanding the foregoing provisions of this Clause 17, and without the prior written consent of the Buyer but subject to the Seller's written notification to the Buyer, the Seller may

assign (a) its rights to payment under this Agreement to a trust, trustee, bank, paying agent, financial entity or other Person or company for the purposes of any bona fide financing or in order to facilitate the making of any such payment, and (b) any of the Seller's rights under this Agreement to any lender or lender's agent as security for its obligations to any such lender under any such financing.

**18.    TERMINATION**

18.1    This Agreement may be terminated if any of the following circumstances occur:

(a)    the mutual agreement of the Parties;

(b)    in the event that a Termination Event on the part of either Party (the "**Defaulting Party**") has occurred, the other Party may at any time after which such Termination Event has occurred or during which such Termination Event is otherwise continuing, terminate this Agreement by giving written notice of termination to the Defaulting Party in accordance with this Clause 18, with such termination to take effect as from and including the date of such notice. In relation to either Party each of the following shall constitute a termination event (a "**Termination Event**"):

(i)    if any amount payable by that Party under this Agreement has not been paid in full by the due date for the payment of the relevant invoice and the other Party has (after such due date) given notice to the Party requiring payment of such amount and the amount has not been paid in full within ten (10) Business Days after the date of such notice;

(ii)    If a Buyer that is a Non-Commonwealth Entity fails to comply with Clause 13.11;

(iii)    If a Credit Standard Event or a Letter of Credit Issuer Event or a Letter of Credit default occurs and such events are not remedied in accordance with Clause 13.13 or 13.14;

(iv)    if that Party is unable to pay, suspends payment of, or agrees to a moratorium (or threatens any of the foregoing) with respect to all or a substantial part of its debts, makes a general assignment or any composition or compromise with or for the bene fit of its creditors except to the extent otherwise permitted by this Agreement, takes any proceedings with view to a readjustment, rescheduling or deferral of all or a substantial part of its indebtedness (other than in the case of a refinancing);

(v)    if any order is made, or a petition is presented and not withdrawn within a period of twenty-one (21) Days, for the winding-up, liquidation, dissolution, custodianship or administration (or any equivalent proceedings) of that Party;

(vi)    in the case of the Buyer (other than for reasons of Force Majeure or the fault of the Seller), if the Buyer fails to take delivery of a Monthly Take or Pay Quantity



greater than fifty percent (50%) of the sum of the DCQs for any period of three (3) consecutive months;

(vii)  in the case of the Seller, if there is a Seller Shortfall Quantity greater than fifty percent (50%) of the sum of the DCQs for any three (3) month period;

(viii)  if a Party fails to perform or comply with any material obligation or representation contained in this Agreement other than the Buyer's failure to take delivery as referred to in Clause 16.6 and the Seller's failure to deliver referred to in Clause 16.7 and such failure continues unremedied for a period of ten (10) Business Days following receipt of written notice of such default from the other Party;

(ix)  the occurrence of an event of Force Majeure, where the conditions of Clause 15.9 have been met;

(x)  if Buyer has retired both Costa Sur Units and Buyer terminates the Restatement PPOA for Owner's default;

(xi)  if Buyer retires both of the Costa Sur Units after Buyer has terminated the Restatement PPOA for Owner's default; or

(xii)  pursuant to Clauses 3.3, 29.4 or 30.2

provided, however, that paragraphs (iv) and (v) above shall not operate as a Termination Event with respect to Buyer prior to the occurrence of the Bankruptcy End Date.

18.2  On and at any time after the occurrence of a Termination Event, any Party not subject to such Termination Event may, while such Termination Event subsists, by giving five (5) Days' written notice of its intentions to the Defaulting Party, suspend performance of its obligations under this Agreement. Where the Defaulting Party is the Buyer, any such suspension by the Seller shall not constitute a failure by the Seller to make such quantities of NG available for sale and delivery pursuant to the terms of this Agreement during such period of suspension, and the Buyer shall have no rights in respect of such suspended deliveries during such period of suspension. Where the Defaulting Party is the Seller, any such suspension by the Buyer shall not constitute a failure by the Buyer to take delivery of such quantities of NG pursuant to the terms of this Agreement during such period of suspension, and the Seller shall have no rights in respect of such suspended deliveries during such period of suspension. If such Termination Event is remedied thereafter (including, with respect to any late payments, payment in full of any such outstanding invoice together with interest thereon), prior to the exercise of rights under Clause 18.3, the notice of suspension served under this Clause 18.2 shall be deemed to be revoked automatically.

18.3  The termination of this Agreement under this Clause 18 for any reason shall be without prejudice to the rights and remedies of the terminating Party accrued prior to such termination under this Agreement, including in respect of any antecedent breach (whether or not a repudiatory breach) giving rise to such termination. For the avoidance of doubt, neither Party 

42

will be liable to pay any termination payment upon termination of this Agreement other than in respect of liabilities accrued prior to the date of termination.

## 19.   APPLICABLE LAW

This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico and, to the extent applicable, the laws of the United States of America, excluding any choice-of-law provisions that would require application of the laws of a different jurisdiction. The United Nations Convention on Contracts for the International Sale of Goods (the Vienna Sales Convention 1980) and the Convention on the Limitation Period in the International Sale of Goods shall not apply to this Agreement or to the performance thereof or to any aspect of any Dispute arising therefrom.

## 20.   SETTLEMENT OF DISPUTES

20.1   Exclusive Jurisdiction

(a)   Any claim, dispute, disagreement or controversy (each, a "**Dispute**") that arises between the Parties under this Agreement or that is otherwise related to the subject matter of this Agreement, except for those Disputes to be resolved through Expert determination pursuant to Clause below, shall be resolved exclusively in the Federal District Court for the District of Puerto Rico.

(b)   In the event of such Dispute, each Party shall continue performing its obligations hereunder except to the extent such obligations have been properly suspended pursuant to the terms hereof. For the avoidance of doubt, the Buyer shall continue paying amounts due under Clause 13.

20.2   Expert Determination

Any Dispute that arises bet ween the Parties with respect to (a) the determination of quality under Clause 4, or (b) Clause 10 may be referred by either Party to an Expert for such Expert's determination of such Dispute, disagreement or other matter of interpretation in accordance with the following guidelines:

(a)   The Parties hereby agree that such determination shall be conducted expeditiously by an Expert selected unanimously by the Parties.

(b)   The Expert shall not be deemed to be acting in an arbitral capacity.

(c)   The Party requesting that any matter arising under Clauses 4 or 10 of this Agreement is referred to an Expert shall give the other Party notice of such request. If the Parties are unable to agree on the identity of an Expert within ten (10) Days after receipt of the notice of request for an Expert determination, then, upon the request of any of the Parties, the International Centre for Expertise of the International Chamber of Commerce shall appoint such Expert and shall administer such Expert determination through the ICC's Rules for Expertise.



(d)   The Expert shall be and remain at all times wholly impartial as between the Parties, and, once appointed, the Expert shall have no ex parte communications with either of the Parties concerning the Expert determination or the underlying Dispute.

(e)   The Expert procedure shall take place in San Juan, Puerto Rico in English.

(f)   Both Parties agree to cooperate fully in the expeditious conduct of such Expert determination and to provide the Expert with access to all facilities, books, records, documents, information and personnel necessary to make a fully informed decision in an expeditious manner.

(g)   Before issuing a final decision, the Expert shall issue a draft report and allow the Parties to comment on it.

(h)   The Expert shall endeavor to resolve the. Dispute within thirty (30) Days (but no later than sixty (60) Days) after his appointment, taking into account the circumstances requiring an expeditious resolution of the Dispute.

(i)   The Expert's decision shall be final and binding on the Parties.

20.3   Qualification of Experts

(a)   No Person, without the prior written agreement of the Parties, shall be appointed as an Expert pursuant to Clause 20.2, if such Person:

   (i)   is (or has been at any time within ten (10) years preceding notice of the Dispute) an employee of a Party or of an Affiliate of a Party;

   (ii)   is (or has been at any time within five (5) years preceding notice of the Dispute) a consultant or contractor of a Party or of an Affiliate of a Party;

   (iii)   holds any significant financial interest in a Party; or

   (iv)   does not have at least ten (10) years' experience advising or working in the North American NG industry with respect to the subject matters subject to the Expert's determination under Clause 20.2.

(b)   The Parties shall, within two (2) months after the execution of this Agreement, agree on a list of possible Experts for purposes of Clause 20.2; provided, however, that in the event that the Parties are unable to agree on a list of acceptable Experts, then in the event of a Dispute subject to Expert determination pursuant to Clause 20.2, the Expert shall be appointed by the International Centre for Expertise of the International Chamber of Commerce in accordance with Clause 20.2.



21.    **NON-WAIVER**

Delay or failure to exercise any right, power or remedy accruing to any Party as the result of any breach or default hereunder shall not impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default.

22.    **CONFIDENTIALITY**

22.1    The existence and terms of this Agreement and any information directly or indirectly disclosed or furnished, whether orally, in writing or in electronic, digital or any other form, by either Party (or its representatives, employees, directors, officers, agents or Affiliates) (the "**Disclosing Party**") to the other Party (or its representatives, employees, directors, officers, agents or Affiliates) (the "**Receiving Party**") in connection with this Agreement (or in connection with the terms and conditions or the negotiation of any other agreement or document related to this Agreement or to is subject matter either between the Parties or otherwise) which is not:

(a)    already known to the Receiving Party; or

(b)    already in the public domain (other than as a result of a breach of the terms of this Clause 22.1),

such information being "**Confidential Information**" shall, unless otherwise agreed in writing by the Parties, be kept confidential and shall not be sold, traded, published or otherwise disclosed to any Third Party in any manner whatsoever (except as provided in Clause 22.2) by the Receiving Party.

22.2    The Receiving Party may disclose Confidential Information to the following Persons without the consent of the Disclosing Party:

(a)    to the Receiving Party's and its Affiliates' directors, agents and employees;

(b)    to the Receiving Party's lenders and prospective lenders for the sole purpose of obtaining financing based on this Agreement;

(c)    to the Receiving Party's advisors and consultants, including legal counsel, accountants and other agents of the Receiving Party for purposes connected with this Agreement;

(d)    to the operator(s) of electricity transmission and distribution facilities in Puerto Rico;

(e)    to Third Parties on an aggregated basis to the extent such information is delivered to such Third Party for the sole purpose of calculating a published index;

(f)    to Experts and any court in connection with the resolution of a Dispute; and

(g)    to co-shareholders and partners in upstream and downstream projects, any operator of the Seller's facilities and any other relevant Third Parties, in all cases limited (i) only 

45

to operational information; and to the extent strictly necessary to implement this Agreement.

22.3 The Receiving Party disclosing Confidential Information pursuant to Clause 22.2 to a Person identified in Clause 22.2(b) to 22.2(g) shall ensure that such Person undertakes to hold such Confidential Information subject to confidentiality obligations equivalent to those set out in Clause 22.1 (excluding legal counsel). Each Party understands that the Receiving Party, and Persons listed in Clause 22.2(a), (b) or (c) may now or in the future work on similar projects, and the Parties agree that, without prejudice to the other provisions in this Clause 22, such Persons shall not be precluded from working on such other projects because they have reviewed any Confidential Information.

22.4 In the event that disclosure is required by any Competent Authority or Applicable Law, the Receiving Party subject to such requirement may disclose the Confidential Information to the extent so required, but shall promptly notify the Disclosing Party of such disclosure prior to so doing, and shall cooperate (consistent with the Receiving Party's legal obligations) with the Disclosing Party's efforts to obtain protective orders or similar restraints with respect to such disclosure at the expense of the Disclosing Party. Notwithstanding the foregoing, Seller acknowledges that the foregoing shall not apply to any requirements applicable to the Buyer to disclose any Confidential Information that Buyer is required to disclose as a public entity under Applicable Law.

22.5 No press release or public statement concerning the existence, execution of, or other matters directly related to, this Agreement, or the transactions contemplated hereby, shall be issued by the representatives, directors, officers, agents or employees of either Party or its Affiliates unless otherwise agreed by the Parties in writing. In the case of any such press release or public statement, the Parties shall first consult and agree to the specific contents and the manner or timing of presentation or publication thereof. The foregoing shall not apply to any announcement by a Party required in order to comply with any Applicable Law, provided that in this case the relevant Party making such announcement notifies the other Party of the details of such announcement, the relevant Applicable Law to be complied with and, where applicable, the addressee or addressees of such announcement.

22.6 The Parties shall be entitled to all remedies available at law or in equity to enforce, or seek relief in connection with the breach of the confidentiality obligation set out in this Clause 22.

## 23.  NOTICES

All notices, to be given under this Agreement by one Party to the other shall be in writing, sent to the attention of the person indicated in Clause 24 either at (i) the address specified in Clause 24 or (ii) the e-mail address specified in Clause 24 which must be followed with a physical mailing confirming such e-mail  and, unless otherwise agreed, in either English or Spanish.



**24. ADDRESSES**

| | |
|---|---|
| SELLER: | Naturgy Aprovisionamientos S.A.<br>Av. de San Luis 77<br>28033 Madrid<br>Spain |
| Attention: | Emilio Guerra Soriano<br>LNG Portfolio Management |
| Telephone: | +34 91 589 2812 |
| Email: | eguerra@naturgy.com |
| | |
| With *copy* to: | Daniel Martín Gómez<br>LNG Portfolio Management |
| Telephone: | +34 91 201 5761 |
| Email: | dmarting@naturgy.com |
| | |
| BUYER: | Puerto Rico Electric Power Authority<br>Apartado 363928<br>San Juan, Puerto Rico 00936-3928 |
| Attention: | Attn: Fuels Office Manager<br>Fuels Office Manager |
| Telephone: | 787-521-4005 |
| Email: | Edwin.barbosa@prepa.com @prepa.com |
| | |
| With Copies to: | Attn: Operational Manager<br>Power Purchase Contracts |
| Telephone: | 1-787-521-5838 or 1-787-521-5050 |
| Email: | javier.soto@prepa.com; gary.soto@prepa.com |
| | |
| Attention: | Attn: Chief Financial Officer |
| Telephone: | 787-521-4504 or 787-521-4506 |
| Email: | Nelson.Morales@prepa.com |

Either Party may change its address details by giving not less than five (5) Days' written notice to the other Party.

**25. BUSINESS PRACTICES AND FOREIGN CORRUPT PRACTICES ACT**

25.1   Each Party agrees that in connection with its activities conducted pursuant to this Agreement, neither it nor any of its directors, officers, employees, agents, contractors, or Affiliates shall (a) take any action, or omit to take any action that would violate any Applicable Law applicable to that Party, (b) make, promise to make, or authorize, the making of any payment, gift or transfer of anything of value, directly or indirectly, to any official or employee of any government or instrumentality of any government or to any political party or official thereof



47

or any candidate of any political party for the purpose of influencing the action or inaction of such official, employee, political party or candidate, or (c) otherwise take any action, or omit to take any action that would cause the other Party to be in violation of any Applicable Law related to the business practices of such other Party, including the United States Foreign Corrupt Practices Act, the laws of the European Union and the Spanish anti-bribery and corruption laws.

25.2    Each Party agrees and undertakes, on behalf of itself, its directors, officers, employees, agents, contractors or Affiliates, not to pay any fees, commissions or rebates to any employee, officer or agent of the other Party or its Affiliates or shareholders nor provide or cause to be provided to any of them any gifts or entertainment of significant cost or value in connection with their activities conducted pursuant to this Agreement or in order to influence or induce any actions or inactions in connection with the commercial activities of the Parties under this Agreement.

25.3    Without prejudice to Clause 27.5, neither Party shall use any broker, agent, or other intermediary in connection with soliciting, obtaining, negotiating, structuring or performing this Agreement or in connection with the subject matter to which it applies.

25.4    Each Party shall indemnify and hold the other Party harmless from and against any and all losses, damages, liabilities, costs, expenses and claims which arise out of, are incident to, or result from any breach by such Party of this Clause 25.

## 26.    ADDITIONAL LNG DELIVERY POINT.

26.1    Buyer shall have the right to require Seller to deliver LNG cargos to an Additional LNG Delivery Point in lieu of delivery to the LNG Facilities, subject to the requirements of this Clause 26.

26.2    Seller acknowledges that Buyer has undertaken / will commence studies of the commercial and technical feasibility of developing LNG receiving terminal projects at several locations in Puerto Rico.  At Buyer's request, Seller shall (i) commence and complete a study (each, a "**Small-Scale LNG Delivery Study**") of the feasibility of transporting and discharging LNG cargos of less than 125,000 m$^3$ by water-borne vessel to an existing or planned LNG facility (each, a "**Small-Scale LNG Facility**") to determine the most cost-efficient proposal for delivering LNG to such location, and (ii) inform Buyer of its determination whether such facility qualifies as an additional delivery point for LNG under this Agreement (each, a "**Small-Scale LNG Delivery Point**"), based on such study, and, if Seller accepts such Small-Scale LNG Facility as a Small-Scale LNG Delivery Point, recommend a compatible LNG vessel (each, a "**Small LNG Tanker**") for the delivery of LNG to such location, in each case within ninety (90) days of its receipt of such request.

26.3    If any new onshore or conventional FSRU LNG facilities are commissioned in Puerto Rico (each, a "**Conventional LNG Facility**") that are capable of receiving an LNG Tanker, Buyer may request that Seller evaluate such Conventional LNG Facility for designation as an additional delivery point for LNG under this Agreement (each, a "**Conventional LNG Delivery Point**").  Upon the its receipt of such request, Seller shall (i) undertake an assessment 

48

of the compatibility of such Conventional LNG Facility with an LNG Tanker in accordance with the compatibility standards set forth in Annex B, and (ii) inform Buyer of its determination whether such Conventional LNG Facility qualifies as a Conventional LNG Delivery Point, based on such assessment, in each case within sixty (60) days of Seller's receipt of such request.

26.4    In each instance where Seller confirms its acceptance of a Small-Scale Delivery Point or a Conventional LNG Delivery Point under Clause 26.2 and Clause 26.3, respectively (each, an "**Additional LNG Delivery Point**"), the Parties shall as soon as reasonably practicable, but in any event within ninety (90) Days of such confirmation, exercise their best efforts to negotiate in good faith, and agree upon, terms for the delivery of LNG to such Additional LNG Delivery Point (the "**LNG Delivery Terms**"), which shall consist of LNG industry standard provisions addressing: (i) Seller's obligation to transport LNG in LNG Tankers or Small LNG Tankers, (ii) Buyer's obligation to ensure that the Small-Scale LNG Facility or Conventional LNG Facility (each, an "**Additional LNG Facility**") (as applicable) satisfies certain specifications, (iii) Buyer's obligation to provide or cause to be provided to Seller (and allocation to Seller of such port costs) berthing, mooring, docking and tug escort services, including pilot services and those related to tug vessels, service vessels and firefighting required during an LNG ship's presence in port, (iv) scheduling of cargo deliveries, (v) modified provisions related to deficiency and shortfall payment, (vi) additional Force Majeure events regarding delivery of LNG, (vii) quality and measurement provisions, (viii) the minimum LNG volume per delivery, (viii) the maximum annual LNG volume, which shall not exceed the Maximum Annual Contract Quantity less 36 TBtu, and (ix) for delivery by a Small-Scale LNG Tanker, any other reasonable terms that Seller may identify, including a revision to the Contract Price.

26.5    Upon the signing of the LNG Delivery Terms (i) Seller shall commence the delivery of LNG to the Additional LNG Deliver Point in accordance with the LNG Delivery Terms, and (ii) the Parties shall revise the schedule for NG deliveries to each Delivery Point to take into account the deliveries to the Additional LNG Delivery Point in accordance with Clause 7.1.

26.6    For each delivery of LNG to an Additional LNG Delivery Point in accordance with the LNG Delivery Terms, Buyer shall pay to Seller the Contract Price for the LNG made available minus all savings as a result of delivering LNG to the Additional LNG Delivery Point instead of the LNG Facilities (including charges for tolling services at the LNG Facilities) plus any additional cost that Seller incurs to deliver LNG at the Additional LNG Delivery Point in lieu of delivering LNG at the LNG Facilities, including increased shipping and port charges.

## 27.    GENERAL

27.1    If any inconsistency appears between the provisions contained in the body this Agreement and any Annex to this Agreement then the provisions of the body of this Agreement shall prevail.

27.2    If any one or more of the provisions, obligations, or terms herein or part thereof shall be determined by a court of competent jurisdiction to be wholly or partially invalid, void, illegal or unenforceable in any respect by operation of Applicable Law or otherwise, the validity, legality, or enforceability of the remaining provisions, obligations, or terms or part thereof in 

any other jurisdiction shall not in any way whatsoever be affected or impaired thereby and all provisions of this Agreement shall, if alternative interpretations are applicable, be construed so as to preserve the validity and enforceability hereof to the extent that the essential purposes of this Agreement can be determined and effectuated.

27.3   The Parties do not intend any term of this Agreement to be enforceable by any Third Party. The Parties may rescind or vary this Agreement, in whole or in part, without the consent of any Third Party.

27.4   Nothing in this Agreement shall be deemed to create a partnership, joint venture or association establish a principal and agent relationship or any other relationship of a similar nature, including employment, between the Parties or create any joint and several liability. Neither Party shall have any right, power or authority to enter into any agreement or undertaking for, to act on behalf of, to act as or be an agent or representative of, or to otherwise bind, the other Party.

27.5   The Parties acknowledge that this Agreement may have been negotiated and prepared by the Parties with the advice of legal counsel to the extent deemed necessary by each Party. The Parties have agreed to the wording of this Agreement and none of the provisions of this Agreement shall be construed against one Party on the ground that such Party is the author of this Agreement or any part of this Agreement.

27.6   This Agreement may not be amended except by an instrument in writing signed by a duly authorized representative of each Party.

27.7   This Agreement amends and restates the Pre-Restatement GSPA in its entirety.

## 28.   COMPLIANCE WITH THE COMMONWEALTH OF PUERTO RICO CONTRACTING REQUIREMENTS

The Parties will comply with all Applicable Law, regulations and executive orders that regulate the contracting process and requirements for governmental contracting in the Commonwealth of Puerto Rico.

28.1   Seller shall provide, before the Conditions Precedent Date, or as otherwise required below, the following documents and certifications:

(a)   In compliance with Executive Order Number OE-1991-24 of June 18, 1991, Seller shall, before the Conditions Precedent Date and whenever requested by Buyer during the term of this Agreement, certify that it has filed all the necessary and required income tax returns to the Government of Puerto Rico for the last five (5) years. As evidence thereof, Seller shall deliver to Buyer an Income Tax Return Filing Certificate, issued by the Treasury Department of Puerto Rico assuring that Seller has filed its Income Tax Return for the last five (5) tax years (Form SC 6088).

(b)   In compliance with Executive Order Number OE-1991-24 of June 18, 1991, Seller shall, before the Conditions Precedent Date and whenever requested by Buyer during



50

the term of this Agreement, certify that it has complied and is current with the payment of all income taxes that are, or were due, to the Government of Puerto Rico. As evidence thereof, Seller will deliver to Buyer a certification issued by the Treasury Department of Puerto Rico indicating that Seller (i) does not owe taxes to the Commonwealth of Puerto Rico or (ii) is paying such taxes by an installment plan in full compliance with the terms of such plan (Form SC 6096).

(c)    Pursuant to Executive Order Number 1992-52, dated August 28, 1992 amending OE-1991-24, Seller shall, before the Conditions Precedent Date and whenever requested by Buyer during the term of this Agreement, certify that it has made (x) all payments required for unemployment benefits, workmen's compensation and social security for chauffeurs, whichever is applicable, or (y) that in lieu thereof, has subscribed a payment plan in connection with any such unpaid items and is in full compliance with the terms of such plan. As evidence thereof, Seller shall deliver to Buyer:

    (i)    A certification issued by the Bureau of Employment Security (*Negociado de Seguridad de Empleo*) of the Puerto Rico Department of Labor and Human Resources certifying that Seller does not owe taxes regarding Unemployment or Disability Insurance.

    (ii)    A certification issued by the Program for Social Security for Chauffeurs and Other Employees of the Puerto Rico Department of Labor and Human Resources certifying that Seller has no debt with respect to such program.

(d)    Seller shall, before the Conditions Precedent Date and whenever requested by Buyer during the term of this Agreement, certify that it does not have any current debt regarding property taxes that may be registered with the Government of Puerto Rico's Municipal Tax Collection Center (*Centro de Recaudación de Ingresos Municipales*). Seller shall further certify it is current with the payment of any and all property taxes that are or were due to the Government of Puerto Rico. As evidence thereof, Seller shall deliver to Buyer:

    (i)    A certification issued by the Municipal Revenues Collection Center ("**MRCC**"), assuring that Seller does not owe any tax accruing during the last five (5) years to such governmental agency with respect to personal property, or (B) a negative debt certification issued by the MRCC with respect to personal property taxes and a sworn statement executed by Seller indicating that (1) during the last five (5) years (or the time in which it has been providing professional services) it has had no taxable business or personal property on the 1st of January of each year, (2) that for such reasons it has not been required to file personal property tax returns, as required under Article 6.03 of Act 83-1991, as amended and (3) that for such reason it does not have an electronic tax file in the MRCC's electronic system.

    (ii)    An All Concepts Debt Certification issued by the MRCC assuring that Seller does not owe any taxes to such governmental agency with respect to real and 

personal property or (B) a negative certification issued by the MRCC with respect to real property taxes.

(e) Seller shall deliver to Buyer:

    (i) A certification issued by the Puerto Rico Treasury Department indicating that Seller has filed its Puerto Rico Sales and Use Tax for the last sixty (60) contributory periods and either (A) does not owe Puerto Rico Sales and Use Taxes to the Commonwealth of Puerto Rico or (B) is paying such taxes by an installment plan and is in full compliance with the terms of such plan.

    (ii) A copy of Seller's Certificate of Merchant's Registration issued by the Treasury Department of Puerto Rico.

(f) Seller shall provide an Employer Compliance Certificate indicating that either (i) it is complying with all income withholding orders as established in all cases, or (ii) there are no active income withholding orders to comply with at present.

28.2 As established by Act No. 1 of January 3, 2012, as amended, known as the Ethics Act of the Government of Puerto Rico, no employee or executive of Buyer nor any member of his or her immediate family (spouse, dependent children, or other members of his or her household or any individual whose financial affairs are under the control of the employee) shall have any direct or indirect pecuniary interest in the services to be rendered under this Agreement, except as may be expressly authorized by the Governor of Puerto Rico in consultation with the Secretary of Treasury and the Secretary of Justice of the Government (3 L.P.R.A. § 8611 et seq.).

28.3 In the event any employee of Seller is bound to pay support for care of elderly people under the Law for the Strengthening of the Family Support and Livelihood of Elderly People in Spanish: "Ley para el Fortalecimiento del Apoyo Familiar y Sustento de Personas de Edad Avanzada", 3 L.P.R.A. §8611 et seq., Seller shall comply with any requirement or order issued by the corresponding administrative agency or local court.

28.4 Payment for Services under this Agreement will not be made until this Agreement is properly registered in the Office of the Comptroller of the Government of Puerto Rico pursuant to Law Number 18 of October 30, 1975, as amended.

28.5 No public officer or employee authorized to contract on behalf of the executive agency for which he/she works may execute a contract between the agency for which he/she works and an entity or business in which he/she or any member of his/her family unit has or has had direct or indirect economic interest during the last four (4) years prior to his/her holding office.

28.6 No public officer or employee may be a party to or have any interest in any profits or benefits produced by a contract with any other executive agency or government dependency unless the Governor of Puerto Rico gives express authorization thereto with previous recommendation from the Secretary of the Treasury and the Secretary of Justice.



52

28.7    No public officer or employee may be a party to or have any interest in any profits or benefits produced by a contract with any other executive agency or government dependency unless the Governor of Puerto Rico gives express authorization thereto with previous recommendation from the Secretary of the Treasury and the Secretary of Justice.

28.8    No public officer or employee who has the power to approve or authorize contracts shall evaluate, consider, approve or authorize any contract between an executive agency and an entity or business in which he/she or any member of his/her family unit has or has had direct or indirect economic interest during the last four (4) years prior to his/her holding office.

28.9    No executive agency shall execute contracts with or for the benefit of persons who have been public officers or employees of said executive agency until after two (2) years have elapsed from the time said person has ceased working as such.

28.10   Any and all necessary dispensations required by this Agreement have been obtained from any government entity and that said dispensations shall become part of the contracting record.

28.11   Seller acknowledges and accepts that it is knowledgeable of the rules of ethics of his or her profession and assumes responsibility for his or her own actions.

29.     **ANTI-CORRUPTION CODE FOR A NEW PUERTO RICO**

29.1    Seller agrees to comply with the provisions of Act No. 2-2018, as the same may be amended, and as applicable, from time to time, which establishes the Anti-Corruption Code for a New Puerto Rico.

29.2    Seller shall furnish a sworn statement to the effect that neither Seller nor any president, vice president, executive director or any member of a board of officials or board of directors, or any person performing equivalent functions for any contractor has been convicted of or has pled guilty to any of the crimes listed in Article 6.8 of Act 8-2017, as amended, known as the Act for the Administration and Transformation of Human Resources in the Government of Puerto Rico or any of the crimes included in Act 2-2018.

29.3    Seller hereby certifies that it has not been convicted in Puerto Rico or United States Federal court for under Articles 4.2, 4.3, or 5.7 of Act 1-2012, as amended, known as the Organic Act of the Office of Government Ethics of Puerto Rico, any of the crimes listed in Articles 250 through 266 of Act 146-2012, as amended, known as the Puerto Rico Penal Code, any of the crimes typified in Act 2-2018, as amended, known as the Anti-Corruption Code for a New Puerto Rico or any other felony that involves misuse of public funds or property, including but not limited to the crimes mentioned in Article 6.8 of Act 8-2017, as amended, known as the Act for the Administration and Transformation of Human Resources in the Government of Puerto Rico.

29.4    Buyer shall have the right to terminate the Agreement in the event Seller is convicted in Puerto Rico or United States Federal court for under Articles 4.2, 4.3, or 5.7 of Act 1-2012, as amended, known as the Organic Act of the Office of Government Ethics of Puerto Rico, any of the crimes listed in Articles 250 through 266 of Act 146-2012, as amended, known as the



53

Puerto Rico Penal Code, any of the crimes typified in Act 2-2018, as amended, known as the Anti-Corruption Code for a New Puerto Rico or any other felony that involves misuse of public funds or property, including but not limited to the crimes mentioned in Article 6.8 of Act 8-2017, as amended, known as the Act for the Administration and Transformation of Human Resources in the Government of Puerto Rico.

**30.    CONSEQUENCES OF NON-COMPLIANCE**

30.1    The Seller expressly agrees that the conditions outlined throughout Clauses 28 and 29 are essential requirements of this Agreement. If any of the certifications listed in Clause 28.1 shows a debt, and Seller has requested a review or adjustment of this debt, Seller hereby certifies that it has made such request at the time of the Agreement execution. If the requested review or adjustment is denied and such determination is final, Seller will provide, immediately, to Buyer a proof of payment of this debt. The Seller accepts and acknowledges its responsibility for, when requested by Buyer, requiring and obtaining a similar warranty and certification from each and every contractor and subcontractor whose service the Seller has secured in connection with the provision of Natural Gas under this Agreement and shall forward evidence to Buyer as to its compliance with this requirement.

30.2    Should any one of these representations, warranties or certifications be incorrect, inaccurate or misleading, in whole or in part, and should such non-compliance not be cured within sixty (60) days, there shall be sufficient cause for Buyer to terminate this Agreement. In case that the Seller is not able to obtain the required documentation during the term provided here for causes not in Seller's control, then Buyer agrees to extend the term for Seller to comply. Seller understands and agrees that Buyer is prohibited to process any payment under this Agreement until the enumerated certifications and sworn statements are submitted to Buyer.

**31.    NON-DISCRIMINATION**

Seller agrees that it will not discriminate against any employee or applicant for employment on account of race, color, gender, age, sex, national or social origin, social status, political ideas or affiliation, religion, for being or perceived to be a victim of domestic violence, sexual aggression or harassment, regardless of marital status, sexual orientation, gender identity or immigrant status, for physical or mental disability, for veteran status or genetic information.

**32.    ENTIRE AGREEMENT & COUNTERPARTS**

32.1    The terms and conditions contained herein constitute the entire agreement between Buyer and Seller with respect to the subject matter of this Agreement, and supersede all communications, negotiations, and agreements of the Parties, whether written or oral, other than these, made prior to the signing of this Agreement.

32.2    The Parties may execute this Agreement in counterparts, which shall have the same effect as if the Parties both signed the same signature page of this Agreement.



*[Signature Page Follows]*

54

**IN WITNESS WHEREOF** the Parties hereto have caused this Agreement to be executed by their respective duly authorized representatives as of the day and year first above written.

For and on behalf of

**SELLER:**

**NATURGY APROVISIONAMIENTOS S.A.**

By: _Leyre de Adrian_

Name: _LEYRE DE ADRIAN_

Title: _AUTHORIZED REPRESENTATIVE_


For and on behalf of

**BUYER:**

**PUERTO RICO ELECTRIC POWER AUTHORITY**

By: _____

Name: _____

Title: _____

ANNEX A

DELIVERY POINTS

1.    COSTA SUR DELIVERY POINT



## 2.   ECO DELIVERY POINT



## ANNEX B

## LNG TERMINAL COMPATIBILITY STANDARDS

1.  If, pursuant to Clause 26, Buyer elects to propose Additional LNG Facilities as an Additional LNG Delivery Point, Seller may, on reasonable notice to Buyer and at its sole risk, send one or more representatives (including an independent internationally recognized maritime consultant) to inspect, during normal working hours, the Additional LNG Facilities and associated port proposed for the discharge of LNG under this Agreement to ascertain whether such facilities comply with the provisions of this Agreement. Seller shall bear the costs and expenses in connection with any such inspection.

2.  Any inspection carried out pursuant to this Annex B shall not:

    a.  interfere with, or hinder, the safe and efficient construction and operation of any Additional LNG Facility; or

    b.  entitle the Seller or any of its representatives to make any request or recommendation directly to the construction contractor or operator or owner of the Additional LNG Facility except through Buyer in accordance with a notice under this Agreement.

3.  Seller, acting reasonably, shall have the right to reject a proposed Additional LNG Facility as an Additional LNG Delivery Point, or any part thereof, only if it does not comply with the material requirements of this Annex B.

4.  For the purpose of this Annex B, **"International LNG Terminal Standards"** means (to the extent not inconsistent with the express requirements of this Annex B) the international standards and practices applicable to the design, construction, equipment, operation or maintenance of LNG receiving and regasification terminals or LNG liquefaction terminals, as the case may be, established by the following (such standards to apply in the following order of priority): (i) a Governmental Authority having jurisdiction over any Additional LNG Facilities; (ii) the Society of International Gas Tanker and Terminal Operators (to the extent applicable); and (iii) any other internationally recognized non-governmental agency or organization with whose standards and practices it is customary for reasonable and prudent operators of LNG receiving terminals to comply; provided, however, that in the event of a conflict between any of the priorities noted above, the priority with the lowest roman numeral noted above shall prevail.

5.  For the purpose of the compatibility process, in order for proposed Additional LNG Facilities to become an Additional LNG Delivery Point, such Additional LNG Facilities must comply with and include the following:

    a.  unloading facilities capable of receiving LNG Tankers and unloading (i) Large LNG Tankers at a rate of 5,000 m$^3$ per hour;



b.    a vapour return line system of sufficient capacity to transfer to the LNG Tanker quantities of NG necessary for the safe unloading of LNG at such rate, pressures and temperatures as may be required by the LNG Tanker design;

c.    facilities allowing access to the LNG Tanker from onshore adequate for crew and personnel access, the handling and delivery of ship's stores, provisions and spare parts to the LNG Tanker;

d.    LNG storage tanks of adequate capacity to receive and store a full cargo LNG upon each scheduled arrival of an LNG Tanker; and

e.    appropriate systems for email, facsimile, telephone and radio communications with LNG Tankers; and emergency shut down, in accordance with International LNG Terminal Standards for linked ship/shore emergency shut down.

6.    Regarding the unloading of an LNG cargo, the proposed Additional LNG Facilities shall comply with:

a.    during the unloading and discharge of LNG, Buyer shall return NG to the LNG Tanker, in such quantities as are necessary for the safe unloading of LNG at such rates, pressures and temperatures as may be required by the LNG Tanker design and commonly accepted operating practice for LNG Tankers;

b.    the LNG sold and delivered under this Agreement shall be unloaded through manifold strainers of 60 mesh (or such other mesh as shall be agreed from time to time by the Parties); and

c.    tugs, fireboats, pilots and other services as are necessary for the purposes of safety and efficiency and are required by the authorities at the relevant port.

7.    For the purpose of the compatibility process, each LNG Tanker must satisfy the following requirements:

a.    each LNG Tanker shall have a gross volumetric capacity between 125,00 Cubic Meters and 180,00 Cubic Meters;

b.    each LNG Tanker shall be, in accordance with International LNG Tanker Standards: (i) fit in every way for the safe loading, unloading, handling and carrying of LNG in bulk at atmospheric pressure; and (ii) tight, staunch, strong and otherwise seaworthy with cargo handling and storage systems (including instrumentation) necessary for the safe loading, unloading, handling, carrying and measuring of LNG in good order and condition; and

c.    each LNG Tanker shall at all times be maintained in class with any of the following: American Bureau of Shipping, Lloyd's Register, Bureau Veritas, Det Norske Veritas or any other classification society that is mutually agreeable to the Parties.



8.    For the purpose of this Annex B, **"International LNG Tanker Standards"** shall be (to the extent not inconsistent with the express requirements of this Annex B) the international standards and practices applicable to the ownership, design, equipment, operation or maintenance of LNG vessels established by: (i) the International Maritime Organization; (ii) the Oil Companies International Marine Forum (OCIMF); (iii) the Society of International Gas Tanker and Terminal Operators (SIGTTO) (or any successor body of the same); (iv) the International Navigation Association (PIANC); (v) the International Association of Classification Societies; and (vi) any other internationally recognized agency or non-governmental organization with whose standards and practices it is customary for reasonable and prudent operators of LNG vessels to comply, provided, however, that in the event of a conflict between any of the priorities noted above, the priority with the lowest roman numeral noted above shall prevail.

## ANNEX C

## FORM OF ASSIGNEE GUARANTEE

**THIS GUARANTY AGREEMENT**, is made and entered into as of [+], by [+] a company organized and existing under the laws of [..] whose registered office is at [+] ("**Guarantor**"), in favor of [+], a limited liability company organized and existing under the laws of […] whose principal place of business is located at [+] ("**Beneficiary**").

## WITNESSETH:

**WHEREAS**, Beneficiary has entered into the SPA (as defined below) with Puerto Rico Electric Power Authority, a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by an Act of 2 May 1941, No. 83, as amended (together with any successor or permitted assign under the SPA ("Buyer"); and

**WHEREAS**, Buyer has consummated a Transfer (as defined in the SPA) of its rights, title and interest in the SPA to […] ("**Transferee**"); and

**WHEREAS**, the SPA provides that in the event of a Transfer and under certain conditions, Transferee's obligations thereunder be guaranteed by the Guarantor in accordance with and subject to the provisions of this Guaranty Agreement and the Guarantor has agreed (it being in its best commercial interests to do so) to enter into this Guaranty Agreement in respect of the Guaranteed Obligations.

NOW, THEREFORE, in consideration of the premises and mutual agreements contained herein, Guarantor and Beneficiary hereby agree as follows:

## ARTICLE 1. DEFINITIONS

1.1. <u>Definitions</u>. Except as otherwise expressly provided or unless the context otherwise requires, the terms defined in this Section 1.1 shall, for all purposes of this Guaranty Agreement, have the meanings herein specified, the following definitions to be equally applicable to both the singular and plural forms of any of the terms herein defined:

"**Banking Day**" means any day other than a Saturday, a Sunday or any other day on which commercial banks in New York are authorized or required to be closed.

"**Buyer**" has the meaning set out in the recitals of this Guaranty Agreement.

"**Guaranteed Obligations**" has the meaning set forth in Section 3.1 of this Guaranty Agreement.

"**Guarantor**" has the meaning set out in the preamble of this Guaranty Agreement.

"**Guaranty Agreement**" means this Guaranty Agreement dated as of the date first written above, as may from time to time be supplemented, modified or amended as provided herein.

"**Local Banking Day**" has the meaning set forth in Section 4.2(a) of this Guaranty Agreement.

"**SPA**" means that certain Natural Gas Sale and Purchase Agreement dated [+], between Buyer and Beneficiary, as such SPA may from time to time be supplemented, modified or amended as provided therein.

"**Transferee**" has the meaning set out in the recitals of this Guaranty Agreement.

1.2.   Other Defined Terms. Capitalized terms not otherwise defined in this Guaranty Agreement shall have the meanings ascribed thereto in the SPA.

## ARTICLE 2. REPRESENTATIONS OF GUARANTOR

2.1.   Representations of Guarantor. Guarantor makes the following representations to Beneficiary as of the date hereof:

(a)     Guarantor has been duly organized and is validly existing under the laws of […], has full legal right, power and authority to enter into this Guaranty Agreement and to carry out and consummate all transactions contemplated by this Guaranty Agreement, and by proper corporate action has duly authorized the execution and delivery of this Guaranty Agreement;

(b)     the execution and delivery of this Guaranty Agreement and the consummation of the transactions herein contemplated will not conflict with or constitute on the part of Guarantor a breach of or default under its relevant organizational documents, as existing on the date hereof, or any indenture, or other material agreement or instrument to which Guarantor is a party or by which it or its properties are bound or any order, rule or regulation of any court or governmental agency or body having jurisdiction over Guarantor or any of its activities or properties; and

(c)     this Guaranty Agreement has been duly authorized, executed and delivered by Guarantor and constitutes the valid and binding obligation of Guarantor, except to the extent enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting the enforcement of creditors' rights generally and by general equitable principles.

## ARTICLE 3. GUARANTY AND AGREEMENTS

3.1.   Guaranty. Subject to the terms and conditions hereof, Guarantor unconditionally and irrevocably guarantees to Beneficiary the full and prompt payment by Transferee of all of Transferee's payment obligations when due and payable under the SPA to Beneficiary and its successors and permitted assigns, including payment obligations when due and payable in respect of any breach of the SPA by Transferee (the obligations guaranteed under this Guaranty Agreement are hereinafter referred to as the "**Guaranteed Obligations**"); 

provided, however, notwithstanding anything herein to the contrary, Guarantor shall be entitled to all defenses, counterclaims and rights of set off and recoupment that Transferee may have under the SPA other than any such defenses arising out of the bankruptcy, insolvency or similar proceeding concerning Transferee.

3.2.    <u>Unconditional Nature of Obligations</u>. Except as expressly provided in the proviso of Section 3.1, the obligations of Guarantor under this Guaranty Agreement shall be irrevocable and unconditional and shall remain in full force and effect until the date this Guaranty Agreement terminates in accordance with Section 4.6 hereof, and such obligations shall not be affected, modified or impaired upon the happening from time to time of any event, including without limitation any of the following, whether or not with notice to, or the consent of, Guarantor:

(a)    the waiver, surrender, compromise, settlement, release or termination of any or all of the obligations, covenants or agreements of Transferee under the SPA;

(b)    the failure to give notice to Guarantor of the occurrence of a default under the SPA, except for the written demand required by the proviso at the end of Section 3.3 hereof;

(c)    the waiver, compromise or release of the payment, performance or observance by Transferee or by Guarantor, respectively, of any or all of the obligations, covenants or agreements of either of them contained in the SPA or this Guaranty Agreement, as the case may be;

(d)    the extension of the time for payment of any Guaranteed Obligations under the SPA or of the time for performance of any other obligations, covenants or agreements under or arising out of the SPA;

(e)    the modification, amendment or alteration (whether material or otherwise) of any obligation, covenant or agreement set forth in the SPA;

(f)    the taking or the omission of any of the actions referred to in the SPA;

(g)    any failure, omission, delay or lack on the part of Beneficiary to enforce, assert or exercise any right, power or remedy conferred on it in the SPA;

(h)    the voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all the assets, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition with creditors or readjustment of, or other similar proceedings affecting Guarantor or Transferee or any of the respective assets of either of them, or any allegation or contest of the validity of this Guaranty Agreement in any such proceeding;

(i)    any defense based upon any legal disability of Transferee or, to the extent permitted by law, any release, discharge, reduction or limitation of or with respect to any sums



owing by Transferee or any other liability of Transferee to Beneficiary;

(j)    to the extent permitted by law, the release or discharge by operation of law of Guarantor from the performance or observance of any obligation, covenant or agreement contained in this Guaranty Agreement;

(k)    the default or failure of Guarantor fully to perform any of its obligations set forth in this Guaranty Agreement; or

(l)    the invalidity of the SPA or any part thereof.

If any payment by Transferee to Beneficiary is rescinded or must be returned by Beneficiary, the obligations of Guarantor hereunder shall be reinstated with respect to such payment.

Except as expressly set forth in the proviso of Section 3.1, no set-off, counterclaim, reduction, or diminution of any obligation, or any defense of any kind or nature (other than a defense of payment or performance) which Transferee has or may have against Beneficiary shall be available hereunder to Guarantor to reduce the payments to Beneficiary under Section 3.1 of this Guaranty Agreement. Furthermore, no defense previously raised by Transferee arising out of or in connection with a Guaranteed Obligation claimed hereunder and which has been settled in Beneficiary's favor by the dispute resolution procedures of Section 20 of the SPA may be raised by Guarantor and no cure period previously used by Transferee may be used by Guarantor.

Guarantor assumes responsibility for being and remaining informed of the financial condition of Transferee and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations which diligent inquiry would reveal and agrees that Beneficiary shall not have a duty to advise Guarantor of information known to it regarding such condition or any such circumstances.

3.3.    <u>Proceedings Against Guarantor</u>. In the event of a default in the payment of the Guaranteed Obligations when and as the same shall become due and payable, Beneficiary shall have the right to proceed first and directly against Guarantor under this Guaranty Agreement without proceeding against Transferee or exhausting any other remedies which it may have; provided that, notwithstanding the foregoing or anything to the contrary contained herein, Beneficiary shall deliver to Guarantor a written demand for payment of all amounts claimed by Beneficiary hereunder, which written demand shall specify in reasonable detail the basis for such demand, and Guarantor shall pay such amounts promptly, but no later than three (3) Banking Days after its receipt of such written demand.

3.4.    <u>Subrogation</u>. Upon payment of the Guaranteed Obligations, Guarantor shall be subrogated to the rights of Beneficiary against Transferee with respect to such Guaranteed Obligations, and Beneficiary agrees to take at Guarantor's expense such steps as Guarantor may reasonably request to implement such subrogation, provided that Beneficiary shall not be obligated to take any such steps and Guarantor shall not enforce any right arising by way of subrogation or exercise any other right or remedy arising by reason of any performance



by it of this Guaranty Agreement, including, but not limited to, any contractual, statutory or common law rights of reimbursement, contribution or indemnity, whether against the Transferee or any other Person, until the date this Guaranty Agreement terminates in accordance with Section 4.6 hereof.

3.5.  Costs.  Guarantor agrees to pay all reasonable costs, expenses and fees, including without limitation all reasonable documented out-of-pocket attorneys' fees, which may be incurred by Beneficiary in enforcing or attempting to enforce this Guaranty Agreement following any default on the part of Guarantor hereunder, whether the same shall be enforced by suit or otherwise.

3.6.  Existence of Guarantor; Consolidation, Merger, Sale or Transfer. Guarantor covenants that so long as it has any outstanding obligations under this Guaranty Agreement, it will maintain its existence, will not dissolve, sell or otherwise dispose of all or substantially all of its assets and will not consolidate with or merge into another corporation or permit one or more other corporations to consolidate with or merge into it; provided that Guarantor may, without violating the covenants contained in this Section 3.6, consolidate with or merge into another corporation or permit one or more other corporations to consolidate with or merge into it, or sell or otherwise transfer to another corporation all or substantially all of its assets as an entirety and thereafter dissolve, if the surviving, resulting or transferee entity, as the case may be, (a) shall be incorporated, organized or formed and existing under the laws of [.....], (b) assumes, if such corporation or other entity is not Guarantor, all of the obligations of Guarantor hereunder (unless such assumption occurs by operation of law, in which case no express assumption shall be required) and (c) is not, after such transaction, otherwise in default under any provisions hereof.

## ARTICLE 4. MISCELLANEOUS

4.1.  Governing Law and Dispute Resolution. This Guaranty Agreement shall be governed by and construed in accordance with the laws of the State of New York, including Section 5-1401 and Section 5-1402 of the General Obligations Law of the State of New York (but otherwise without reference to any other choice of law principles which would apply the laws of another jurisdiction). Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Guaranty Agreement or the transactions contemplated hereby.

4.2.  Notices.  All notices and other communications to Guarantor or Beneficiary may be electronically communicated or hand delivered or sent by overnight courier, to any party hereto at the addresses as provided in this Section 4.2:

All communications intended for Guarantor shall be sent to:

[+]

with a copy to Buyer at:

[+]



All communications intended for Beneficiary shall be sent to:

[+]

or at any other address of which either of the foregoing (or Guarantor in the case of a change of address for Transferee) shall have notified the other in any manner prescribed in this Section 4.2.

For all purposes of this Guaranty Agreement, a notice or communication will be deemed effective:

(a)    if delivered by hand or sent by overnight courier, on the day it is delivered unless (i) that day is not a day upon which commercial banks are open for the transaction of business in the city specified (a "**Local Banking Day**") in the address for notice provided by the recipient or (ii) if delivered after the close of business on a Local Banking Day, then on the next succeeding Local Banking Day, and

(b)    if sent by facsimile transmission, on the date transmitted, provided that oral or written confirmation of receipt is obtained by the sender unless the date of transmission and confirmation is not a Local Banking Day, in which case on the next succeeding Local Banking Day.

4.3.   <u>Banking Days</u>.  Except as otherwise provided in this Guaranty Agreement, if any date on which a payment is to be made, notice is to be given or other action taken hereunder is not a Banking Day, then such payment, notice or other action shall be made, given or taken on the next succeeding Banking Day in such place, and in the case of any payment, no interest shall accrue for the delay.

4.4.   <u>Successors and Assigns</u>.  This Guaranty Agreement shall be binding upon Guarantor and its successors and permitted assigns and inure to the benefit of Beneficiary and its successors and permitted assigns. Except as provided in Section 3.6 hereof, Guarantor may not assign its obligations hereunder without the prior written consent of Beneficiary. Beneficiary may not assign its rights and obligations hereunder without the prior written consent of Guarantor, except that Beneficiary may, without any prior consent of Guarantor, assign its right and obligations hereunder to any permitted assignee of the SPA.

4.5.   <u>Guaranty for Benefit of Beneficiary</u>.   This Guaranty Agreement is entered into by Guarantor for the benefit of Beneficiary.  Nothing contained herein shall be deemed to create any right in, or to be in whole or in part for the benefit of any person other than Guarantor and Beneficiary and their respective permitted successors and assigns.

4.6.   <u>Term</u>.  This Guaranty Agreement shall terminate and be of no further force and effect upon the earliest of (i) [_____, 20__,] (ii) receipt by Beneficiary of a written notice of termination from Guarantor, which termination shall become effective on the thirtieth (30th) day after the date of receipt by Beneficiary of such notice or (iii) the date on which the SPA shall have terminated or expired and none of the payment obligations of Transferee thereunder remain outstanding. Termination of this Guaranty shall not affect Guarantor's



liability hereunder as to any Guaranteed Obligations existing or arising under the SPA prior to the effective date of termination.

4.7.   <u>Amendments and Waivers</u>.  Any provision of this Guaranty Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by each of Guarantor and Beneficiary.

4.8.   <u>Headings</u>.   The article and section headings of this Guaranty Agreement are for convenience only and shall not affect the construction hereof.

4.9.   <u>Partial Invalidity</u>.  The invalidity of any one or more phrases, sentences, clauses or sections in this Guaranty Agreement shall not affect the validity or enforceability of the remaining portions of this Guaranty Agreement or any part thereof.

4.10.   <u>No Waiver, Remedies</u>.  No failure or delay by Beneficiary in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

4.11.   <u>Execution in Several Counterparts</u>.  This Guaranty Agreement may be executed in any number of counterparts, each of which shall for all purposes be deemed to be an original; but such counterparts shall together constitute but one and the same instrument.

IN WITNESS WHEREOF, GUARANTOR has caused this Guaranty Agreement to be executed in its name and on its behalf by its duly authorized officer as of the date first above written.

GUARANTOR

[_____]

By: _____

Name:_____

Title:_____



Accepted and Agreed by:

BENEFICIARY

[_____]

By: _____

Name: _____

Title: _____