# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>    Debtors.1 | PROMESA Title III<br><br>Case No. 17-BK-3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>    Debtor. | Case No. 17-BK-4780-LTS<br><br>**This Court Filing Relates Only to PREPA and Shall Only Be Filed in the lead Case No. 17-BK-3283-LTS and in PREPA's Title III Case (Case No. 17-BK-4780-LTS)** |

---

1 The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

COBRA ACQUISITIONS LLC,

      Movant,

v.

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

PUERTO RICO ELECTRIC POWER AUTHORITY, *et
al.*,

      Respondents.

**OPPOSITION OF THE OVERSIGHT BOARD, AAFAF, AND PREPA TO
COBRA ACQUISITION LLC'S URGENT MOTION TO
<u>MODIFY THE STAY ORDER AND ALLOW THE UNDISPUTED TAX CLAIMS</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ..........................................................................................................4

    A.    Puerto Rico Disasters and Cobra Contracts ................................4

    B.    Cobra's Criminal Proceedings ...................................................5

    C.    FEMA's Investigation and Analysis ...........................................6

    D.    PREPA Disputes Over $200 Million of Cobra Invoices ............7

    E.    Cobra's Objection to Title III Professional Fees ......................8

ARGUMENT ...............................................................................................................9

    I.    Cobra Is Not Entitled to Allowance of Any Administrative Expense
    Priority Claims At This Time. .......................................................9

        A.    Cobra's Request for Relief Has Already Been Denied, and Cobra
        Offers No Legally Sufficient Reason for the Court to Reconsider
        its Prior Determination ...........................................................9

        B.    Cobra's Claims Do Not Satisfy The Requirements of Bankruptcy
        Code Section 503(b)(1) ........................................................13

        C.    The Tax Claims Are Not "Undisputed" ...................................16

        D.    Cobra's Administrative Expense Claim Cannot be Allowed
        Without Determining Cobra's Liability to PREPA on the Cobra
        Contracts ...............................................................................19

    II.    The Balance of Harms Weighs Decidedly Against Lifting the Stay. ...................26

        A.    Continuing to Operate PREPA During an Emergency
        Overwhelmingly Outweighs Cobra's and Mammoth's Distress .............26

        B.    Cobra's and Mammoth's Distress Are Due to Cobra's Conduct and
        Macroeconomic Factors........................................................26

CONCLUSION..........................................................................................................28

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ambac Assurance Corp. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for
P.R.)*,
927 F.3d 597 (1st Cir. 2019) ........................................................................11

*Aurelius Capital Master, Ltd. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd.
for P.R.)*,
919 F.3d 638 (1st Cir. 2019) ........................................................................11

*Caribbean Ins. Servs., Inc. v. Am. Bankers Life Assurance Co.*,
754 F.2d 2 (1st Cir. 1985) ............................................................................24

*Cherena v. Coors Brewing Co.*,
20 F. Supp. 2d 282 (D.P.R. 1998) ................................................................10

*Concrete Pipe & Prods. v. Constr. Laborers Pension Tr.*,
508 U.S. 602 (1993) .....................................................................................20

*Cooperativa La Sagrada Familia v. Castillo*,
7 P.R. Offic. Trans. 449 (1978) ...................................................................24

*Dopp v. HTP Corp.*,
947 F.2d 506 (1st Cir. 1991) ........................................................................24

*In re Bridgeport Plumbing Prods., Inc.*,
178 B.R. 563 (Bankr. M.D. Ga. 1994) .........................................................14

*In re City of Stockton*,
478 B.R. 8 (Bankr. E.D. Cal. 2012) .........................................................11, 12

*In re Cook & Sons Mining, Inc.*,
Civ. A. No. 05-19, 2005 U.S. Dist. LEXIS 21615 (E.D. Ky. Sept. 28, 2005) ........................14

*In re Express One Int'l*,
217 B.R. 207 (Bankr. E.D. Tex. 1998) .........................................................14

*In re Pabon Rodriguez*,
233 B.R. 212 (Bankr. D.P.R. 1999), *aff'd*, 2000 WL 35916017 (B.A.P. 1st
Cir. 2000), *aff'd*, 17 F. App'x 5 (1st Cir. 2001) ..........................................9

*In re Sanborn, Inc.*,
181 B.R. 683 (Bankr. D. Mass. 1995) ..........................................................14

ii

*Pro Data Services, Inc. v. Departamento De Educación, Estado Libre Asociado*
   *De Puerto Rico*,
   No. 05-3616, 2009 WL 2351562 (P.R. Ct. App. May 26, 2009)............................................25

*Ramírez Anglada v. Club Cala de Palmas*,
   23 P.R. Offic. Trans. 311 (1989) .........................................................................................20

*Reyes v. Jusino Diaz*,
   16 P.R. Offic. Trans. 338 (1985) .........................................................................................25

*Rosado Rosario v. Pagán Santiago*,
   196 D.P.R. 180, 187–192 (P.R. 2016) .................................................................................25

*Sánchez Rodríguez v. López Jiménez*,
   16 P.R. Offic. Trans. 214 (1985) .........................................................................................25

*Zagata Fabricators, Inc. v. Superior Air Prods.*,
   893 F.2d 624 (3d Cir. 1990).................................................................................................14

STATUTES

3 L.P.R.A. §§ 1755–61 ...........................................................................................................22

3 L.P.R.A. § 1756(b) ..............................................................................................................22

3 L.P.R.A. § 1756(d) ................................................................................................................5

22 L.P.R.A. § 196 ....................................................................................................................2

31 L.P.R.A. § 3408 .................................................................................................................24

31 L.P.R.A. § 3432 .................................................................................................................25

31 L.P.R.A. §§ 3511, 3513, 3514 ..........................................................................................24

31 L.P.R.A. § 3516 .................................................................................................................25

11 U.S.C. § 503(b)(1) ...............................................................................................2, 9, 13, 15

42 U.S.C. § 5205(c) ................................................................................................................21

48 U.S.C. §§ 2101–2241............................................................................................................1

P.R. Act No. 2-2018.............................................................................................................5, 22

**OTHER AUTHORITIES**

*Robbins Arroyo LLP: Mammoth Energy Services, Inc. (TUSK) Misled
Shareholders According to a Recently Filed Lawsuit*, businesswire.com (June
21, 2019),
https://www.businesswire.com/news/home/20190621005505/en/Robbins-
Arroyo-LLP-Mammoth-Energy-Services-TUSK ................................................................27

Andrew Scurria, *Puerto Rico Grid Contractor Faces Mounting Claims From
Bribery Probe*, Wall Street Journal (Jan. 23, 2020)................................................................27

*FEMA Public Assistance Program and Policy Guide*, FP-104-009-2, at 22 (April
2018) https://www.fema.gov/media-library-data/1525468328389-
4a038bbef9081cd7dfe7538e7751aa9c/PAPPG_3.1_508_FINAL_5-4-
2018.pdf ................................................................................................................16

RESTATEMENT (SECOND) OF AGENCY § 403 ................................................................20

U.S. ATTORNEY'S MANUEL 9-28.1100 ................................................................19

U.S. ATTORNEY'S MANUEL 9-28.1300 ................................................................19

To the Honorable United States District Judge Laura Taylor Swain:

The Puerto Rico Electric Power Authority ("PREPA"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as PREPA's representative pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[1] and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF," and together with PREPA and the Oversight Board, the "Government Parties") hereby file this objection ("Objection") to Cobra Acquisitions LLC's ("Cobra") *Urgent Motion To Modify The Stay Order And Allow The Undisputed Tax Claims* [ECF No. 12531][2] ("Motion"). In support of this Objection, the Government Parties respectfully state as follows:

## PRELIMINARY STATEMENT

1. The Government Parties are sympathetic to and acknowledge the importance of paying allowable administrative claims promptly. Here, Cobra's claim is disputed and not allowed. Therefore, under any circumstances, Cobra's claim would not become an allowed claim until after any necessary discovery and trial. Given the pending criminal proceeding, it appeared prudent to wait for its outcome and the facts that may come to light in that process, before conducting a hearing on the balance of Cobra's administrative claim, of which Cobra has already been paid over $1 billion in connection with two contracts. That remains the case. While Cobra claims the indictment of its former CEO would not implicate it, as shown below, that is impossible.

2. Recently, Cobra attempted to hold up the entire PREPA Title III case by requesting the suspension of payments to all the professionals necessary to prosecute it, as leverage to get its

---

[1] PROMESA has been codified in 48 U.S.C. §§ 2101–2241.

[2] References to the docket are to Case No. 17-BK-3283-LTS, unless otherwise specified.

disputed claim paid. Having been unsuccessful, Cobra is back with a new strategy. Cobra is requesting the immediate adjudication and allowance of a portion of the unpaid balance of its administrative claim that this Court has twice held should be decided at a later stage. After its original attempt to force PREPA to pay Cobra was stayed, and after having its objections to the fees of all of PREPA's professionals overruled for lack of any factual or legal merit, Cobra seeks a third bite at the apple. Cobra's renewed request for allowance of its alleged "undisputed" Tax Claims should be denied for the following reasons.

3.     *First*, the reasons the Court had for the Second Stay Order remain true today. Cobra essentially argues, similar to its prior argument,[3] that equity requires immediate allowance because the market value of its parent company, Mammoth Energy Services, Inc. ("Mammoth"), has seriously declined in the past year. But Cobra and its parent are threatened with bankruptcy for reasons that have nothing to do with PREPA (including a massive reduction in global oil prices and the catastrophic impact of the COVID-19 pandemic). These developments do not justify compelling a trial on Cobra's administrative claim before all material facts can be uncovered. PREPA is not responsible for the recent drop in oil prices or the outbreak of COVID-19. Regardless of the financial condition of Cobra's parent company, the Government Parties must ensure that PREPA pays only valid claims.[4]

4.     *Second*, Bankruptcy Code section 503(b)(1) gives administrative expense priority only to the "actual, necessary costs and expenses of preserving the estate." As the Court knows

---

[3] *See infra* note 8.

[4] *See, e.g.*, 22 L.P.R.A. § 196 ("PREPA shall be responsible for providing reliable electric power, contributing to the general wellbeing and sustainable future of the People of Puerto Rico, maximizing benefits, and minimizing the social, environmental, and economic impact. It shall offer and provide services at the lowest reasonable cost, through just and reasonable rates, consistent with sound fiscal and operational practices that provide for a reliable, adequate, and nondiscriminatory service that is consistent with the protection of the environment, as well as nonprofitable, and focused on citizen participation and its customers.").

from extensive prior briefing and argument, the outcome of either the FEMA Analysis or the Criminal Proceeding might demonstrate Cobra's administrative expense claim does not meet this standard.

5.      *Third*, contrary to Cobra's assertions, the Tax Claims are subject to dispute, and their value cannot be calculated without first determining how Cobra's former CEO's alleged illegal actions affected the Cobra Contracts.  As discussed below, if, as alleged in the Indictment, Cobra's former president committed illegal acts to benefit Cobra at PREPA's expense, PREPA may be absolved of any further liability to Cobra.  PREPA may even have substantial damages claims against Cobra, including for reimbursement of the funds already paid to Cobra.  Because the Tax Claims are calculated solely by reference to allowable charges Cobra billed PREPA, Cobra must wait until the Criminal Proceedings and the FEMA Analysis are resolved.

6.      Specifically, Cobra's assertion that it would be liable to PREPA under the Cobra Contracts only if Cobra itself were convicted of a crime (Mot. ¶ 11) is false.  Even without being convicted, Cobra's allegedly criminal conduct may have breached the Cobra Contracts in other ways, such as the "duty of complete loyalty" to PREPA under Article 21 of the First Contract, the obligation to reimburse PREPA promptly pursuant to Article 68 of the First Contract if FEMA or the Commonwealth either impose a penalty on PREPA or demand repayment of any public assistance disaster relief funds due wholly or in part to Cobra's fault, and the provisions of both Cobra Contracts that provide PREPA will not have to make any payment to Cobra if FEMA does not reimburse PREPA solely due to Cobra's fault (*i.e.* PREPA's actions were not contributory) (*see, e.g.*, First Contract, Art. 29).  Simply put, the conduct of Cobra's former CEO at issue in the Criminal Proceedings could make Cobra a net obligor to PREPA.  Cobra's Tax Claims cannot be allowed without knowing the outcome of the Criminal Proceedings and the FEMA Analysis.

7.      *Finally*, the equities do not remotely favor Cobra.  The Tax Claims are disputed among other reasons because Cobra's former president is under indictment for bribery, committed on behalf and for the benefit of Cobra, related to the PREPA contracts.  A former FEMA employee has pled guilty to the same indictment.  In the meantime, Cobra has been paid over $1 billion under the Cobra contracts.  The global economic factors that Cobra relies upon in the Motion negatively impact PREPA and its creditors and customers, too.

8.      For these reasons, as more fully detailed below, the Motion should be denied.

## BACKGROUND

A.      **Puerto Rico Disasters and Cobra Contracts**

9.      During September 2017, Puerto Rico was hit by two historically powerful hurricanes—Irma and Maria—that severely damaged PREPA's transmission grid and other infrastructure and left the island without power for several weeks.  On September 20, 2017, President Trump issued a major disaster declaration for Puerto Rico due to the damage resulting from Hurricane Maria, which was designated FEMA-4339-DR.

10.     Pursuant to FEMA-4339-DR, the Federal Emergency Management Agency ("FEMA") was authorized, among other things, to provide assistance to the Commonwealth of Puerto Rico and to PREPA to assist in rebuilding the power system.

11.     On October 19, 2017, PREPA and Cobra entered into the *Emergency Master Service Agreement for PREPA's Electrical Grid Repairs – Hurricane Maria*, dated October 2017 (the "First Contract") for Cobra to perform emergency "storm restoration services" for $200 million.  Through five subsequent amendments, the contract amount for the First Contract was increased to $945 million.  Cobra has been paid approximately $892.9 million pursuant to the First Contract.

4

12.     On May 26, 2018, following the receipt of several proposals from various other contractors in response to a Request for Proposals, PREPA and Cobra entered into the *Master Services Contract for PREPA's Electrical Grid Repairs - Hurricane Maria*, dated May 26, 2018 (the "Second Contract," and with the First Contract, the "Cobra Contracts"), for Cobra to perform restoration and reconstruction services in addition to its emergency storm repair services under the First Contract, in the amount of up to $900 million. Cobra has been paid approximately $202.0 million pursuant to the Second Contract.

13.     Like any entity that contracts with a governmental entity in Puerto Rico, Cobra was required to sign a certification for every invoice that says, in relevant part:

> Under penalty of absolute nullity, I hereby certify that no employee, official or director of PREPA is a party or has been granted any interest or payment by Consultant in the profits or benefits to be obtained under this Contract by Consultant or if any employee, official or director of PREPA has any interest in the profits or benefits under this Contract a waiver has been previously obtained. I, also certify that the only consideration to provide the services under this Contract to Consultant is the payment agreed with PREPA's authorized representative. The total amount of this invoice is fair and correct. The services were provided and no payment has been received for said concept.

First Contract, Art. 3; *see* 3 L.P.R.A. § 1756(d) (repealed 2018); Act 2-2018 § 3.2(e) (replacing 3 L.P.R.A. § 1756).[5]

**B.     Cobra's Criminal Proceedings**

14.     On September 3, 2019, a federal grand jury sitting in the District of Puerto Rico returned a 15-count indictment in the matter of *United States v. Tribble*, Case No. 19-CR-541-FAB, ECF No. 3 (D.P.R. Sept. 3, 2019) (the "Indictment"), alleging criminal charges against Ahsha Tribble, former FEMA Region II Deputy Regional Administrator and Sector Lead for

---

[5]  *See infra*, note 20 and accompanying text.

Power and Infrastructure in Puerto Rico, Donald Keith Ellison, a former President of Cobra, and

Jovanda Patterson, former FEMA Deputy Chief of Staff assigned to San Juan, Puerto Rico and

Cobra employee.[6]

15.    The Indictment alleges that in exchange for things of value provided by Ellison,

Tribble—the most senior-ranking FEMA official in Puerto Rico—took governmental action to

"advance Cobra's interests" and to "secure favorable treatment for Cobra[.]" Indictment ¶ 43.

Tribble is alleged to have used her position at FEMA to exert pressure on PREPA executives to

accelerate payments to Cobra, to assign tasks to Cobra that would have otherwise been performed

by PREPA personnel at a lower cost, to provide Cobra with non-public information that gave

Cobra the upper-hand in the bidding process, and to select Cobra over other contractors.

Indictment ¶¶ 43, 45, 102.

16.    Since the unsealing of the Indictment, Jovanda Patterson entered a guilty plea and

is awaiting sentence. Tribble and Ellison are scheduled to proceed to trial on January 19, 2021.

### C.    FEMA's Investigation and Analysis

17.    The Office of the Inspector General of the Department of Homeland Security

("OIG") issued a report entitled "FEMA's Eligibility Determination of Puerto Rico Electric Power

Authority's Contract with Cobra Acquisitions LLC" (OIG-19-52), dated July 3, 2019 ("OIG

Report"), as part of its ongoing audit into whether FEMA's grants of public assistance to PREPA

and PREPA's contracts with power restoration contractors, including Cobra, complied with federal

laws, regulations and public assistance grant guidelines ("OIG Audit"). The OIG Report addressed

the process FEMA used to approve the rates PREPA agreed to pay Cobra. Pursuant to the OIG

Report, FEMA and the Department of Homeland Security Operational Analysis Center were

---

[6] A copy of the Indictment is at ECF No. 8838-2.

directed to and are conducting an extensive analysis (the "FEMA Analysis") into the fees charged

pursuant to the First Contract, and FEMA is expected to make a final determination as to the

"eligibility of the contract costs and disallow any costs that are not reasonable" by the estimated

completion date of May 29, 2020.  *See* Layton Declaration ("Layton Decl."), Ex. 16 at 8.[7]

### D.     PREPA Disputes Over $200 Million of Cobra Invoices

18.     PREPA has disputed hundreds of Cobra invoices with an aggregate face value in

excess of $200 million. *See Joint Informative Motion Pursuant to Order of October 17, 2019

Regarding Cobra Acquisition LLC's Motion for Allowance and Payment of Administrative

Expense Claims* [ECF 10307] ("Joint Status Report") at 6–7. These invoice disputes include billing

for inaccurate headcounts, unauthorized work, incomplete or missing verification of work

performed as billed, inaccurate demobilization billing, access mapping costs, inaccurate tax gross-

up amounts and the merits of earned discounts taken by PREPA for promptly paid invoices.  *See

id.*  The invoice disputes will be addressed in connection with *Cobra Acquisitions LLC's Motion

for Allowance and Payment of Administrative Expense Claims* [ECF No. 8789] (the

"Administrative Expense Motion"), filed by Cobra on September 30, 2019 and currently stayed

by the Court (see below).

19.     The Administrative Expense Motion seeks an order allowing as an administrative

expense claim Cobra's alleged outstanding balance under the Cobra Contracts of $216,116,471.93,

plus interest not yet invoiced.

20.     On October 10, 2019, PREPA and its representatives requested that the Court stay

all litigation relating to the Administrative Expense Motion to prevent, among other things,

prejudice to the Government Parties and create judicial inefficiency. *See Joint Urgent Motion of*

---

[7]  The OIG Report is also available at https://www.oig.dhs.gov/sites/default/files/assets/2019-07/OIG-19-52-Jul19.pdf.

*the Oversight Board, PREPA, and AAFAF to Extend All Applicable Deadlines to Cobra Acquisition LLC's Motion for Allowance and Payment of Administrative Expense Claims* [ECF No. 8838] (the "Stay Motion"). On October 17, 2019, the Court entered an order, [ECF No. 8886] (the "First Stay Order"), granting the Stay Motion and denying Cobra's opposition. As a result, all litigation relating to the Administrative Expense Motion has been stayed. Following the submission of the Joint Status Report on January 22, 2020, a status conference on the Administrative Expense Motion was held on January 29, 2020 (the "January Status Conference"). The Court indicated at the January Status Conference the Administrative Expense Motion would continue to be stayed since "there is at least one conference and further developments in the criminal case to be expected in the near term, and there is a target date for a report from FEMA, and in light of what appear to be very substantial transaction costs to discovery in preparation for resolution of the factual disputes that might or might not be mitigated by results in the criminal case and the FEMA review . . . ." *See* Jan. 29, 2020 Hr'g Tr. 61:12–18.

21.     Following the January Status Conference, the Court continued the stay of the Administrative Expense Motion and scheduled a further status conference for June 3, 2020 [PREPA ECF No. 1894] (the "Second Stay Order," and with the First Stay Order, the "Stay Orders").

### E.     Cobra's Objection to Title III Professional Fees

22.     On December 4, 2019, Cobra filed the *Omnibus Objection to Fee Applications Filed by Professionals and Request to Increase Holdback Amount* [Case No. 17-BK-3283-LTS, ECF No. 9419] (the "Cobra Fee Application Objection"), objecting to the fee applications of all professionals in PREPA's Title III Case for the quarterly period beginning on June 1, 2019.

23.     On January 9, 2020, Cobra filed the *Supplement to Omnibus Objection to Fee Applications Filed by Professionals and Request to Increase Holdback Amount* [Case No. 17-BK-

8

3283-LTS, ECF No. 9752] (together with the Cobra Fee Application Objection, the "Cobra Fee Objections"), objecting to additional fee applications for the same reasons as expressed in the Cobra Fee Application Objection.

24.     On March 6, 2020, the Court entered an order denying the Cobra Fee Objections because "Cobra ha[d] proffered no legal or factual basis for the relief sought" in the Cobra Fee Objections. *Order Overruling Cobra Acquisitions LLC's Omnibus Objection to Fee Applications Filed by Professionals and Request to Increase Holdback Amount* [ECF No. 12156] at 2.

## ARGUMENT

25.     Cobra now asks the Court to lift the stay imposed by the Second Stay Order, solely with respect to Cobra's asserted outstanding amounts under the "tax gross-up" provision of the First Contract relating to PREPA's reimbursement of Cobra for taxes it paid to Puerto Rico in 2018 in excess of 8.5% (the "Tax Claims"), and allow Cobra's Tax Claims as an administrative expense pursuant to Bankruptcy Code section 503(b)(1). For the following reasons, Cobra's Motion should be denied in its entirety.

**I.     Cobra Is Not Entitled to Allowance of Any Administrative Expense Priority Claims At This Time.**

**A.     Cobra's Request for Relief Has Already Been Denied, and Cobra Offers No Legally Sufficient Reason for the Court to Reconsider its Prior Determination**

26.     While the Motion is not styled as a motion for reconsideration, it is. As this Court has recognized before, a "motion for reconsideration of a previous order is an extraordinary remedy that must be used sparingly because of interest in finality and conservation of scarce judicial resources." *Order Denying Caribbean Airport Facilities, Inc.'s Motion for Reconsideration*, Case No. 17-Bk-3283-LTS, ECF No. 1045 at 1 (D.P.R. Aug. 16, 2017) (quoting *In re Pabon Rodriguez*, 233 B.R. 212, 220 (Bankr. D.P.R. 1999), *aff'd*, 2000 WL 35916017

(B.A.P. 1st Cir. 2000), *aff'd*, 17 F. App'x 5 (1st Cir. 2001)).  To justify the Court reconsidering its

prior order, "[t]he movant 'must either clearly establish a manifest error of law or must present

newly discovered evidence.'"  *Id.* at 2 (quoting *Cherena v. Coors Brewing Co.*, 20 F. Supp. 2d

282, 287 (D.P.R. 1998)).  The Motion fails to do so.

27.     On September 30, 2019, Cobra filed the Administrative Expense Motion, asserting

it is entitled to over $200 million in allegedly "undisputed" claims (including the Tax Claims that

are the subject of this Motion) and asking the Court to order immediate payment of those claims.

The Court stayed adjudication of the Administrative Expense Motion after the Government Parties

revealed that Cobra failed to disclose (i) that its former president had been indicted for allegedly

participating in a criminal conspiracy to bribe FEMA officials in exchange for Cobra's receipt of

valuable repair and restoration contracts, (ii) that FEMA had raised serious questions about the

reasonableness of Cobra's contract costs, and (iii) that many of the claims Cobra asserted were

"uncontested" were, in fact, contested by PREPA.

28.     Importantly, Cobra raised the assertion that the Tax Claims are "undisputed" and

ready for payment in its objection ("Stay Objection") to the Stay Motion (ECF No. 8850 ¶¶ 2, 26)

before the Court entered either of the Stay Orders.  The Court nonetheless entered an order staying

the Administrative Expense Motion in its entirety, without any exception for the Tax Claims.

Moreover, the Court also held that (i) the Criminal Proceedings and FEMA Analysis were both

relevant to the Administrative Expense Motion and weighed in favor of staying all litigation on

the Administrative Expense Motion, and (ii) pursuant to PROMESA section 305, "PROMESA

does not require PREPA to remit any such funds prior to the effective date of a confirmed plan of

adjustment, and the Court is not empowered to require such payment absent the Oversight Board's

consent."  First Stay Order at 1–2.

29.     Cobra points to nothing justifying reconsideration of the Stay Orders.  Everything

true then about the case remains now[8]—the Criminal Proceedings and FEMA Analysis remain

ongoing and (for reasons discussed in detail below) their resolution will be highly relevant to

determining whether PREPA owes Cobra any further payments under the Cobra Contracts, and if

so, how much.

30.     Cobra also asserts that the relief it seeks "cannot be said to 'interfere' with the

'properties or revenue' of PREPA when PREPA negotiated and executed the contracts, the

Oversight Board conducted a review process of those contracts pursuant to section 204(b)(2) of

PROMESA, and no party otherwise raises any dispute with the specific claims subject to this

Urgent Motion."  Mot. ¶ 45.  But Cobra is wrong.  To the extent Cobra seeks an order forcing

PREPA to pay immediately the Tax Claims, Cobra's request directly contravenes PROMESA

section 305, as it would mandate how PREPA uses its property (to pay Cobra).[9]  This Court and

the First Circuit could not have been any clearer on that point.  *See also In re City of Stockton*, 478

B.R. 8, 20–21 (Bankr. E.D. Cal. 2012) (holding court order "that entails payment of money from

---

[8] Cobra previously argued the Tax Claims were undisputed (Stay Objection ¶¶ 2, 26; Joint Status Report at 4) and even raised the drop of Mammoth's market capitalization below $100 million and the financial impact of not paying Cobra's Administrative Expense Claim even as early as October 2019, in the Stay Objection at ¶ 41:

> A stay of any length will greatly prejudice Cobra. The sums owed to Cobra are in excess of $250 million. . . . While Movants calculate that Cobra's claims amount to 'only' 17 percent of the overall price of the Contracts, this is misleading. The market capitalization of Cobra's parent company, Mammoth Energy Services, Inc., is currently less than $100 million .  .  . Cobra is out of pocket most of its claimed amounts, having paid its laborers, suppliers, overhead and myriad others costs associated with rebuilding Puerto Rico's electrical grid on PREPA's behalf.

[9] *See, e.g.*, *Aurelius Capital Master, Ltd. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 919 F.3d 638, 648 (1st Cir. 2019) (court barred by PROMESA section 305 from entering declaratory judgment that "would have directed the Commonwealth about how it must handle and disburse" certain revenues to pay creditors); *Ambac Assurance Corp. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 927 F.3d 597, 602–03 (1st Cir. 2019) (court cannot grant declaratory judgment stating debtor's use of funds was unlawful under PROMESA section 305).

the City treasury" pursuant to valid state obligations "interferes with the City's choice to suspend

such payments" and is barred by Bankruptcy Code section 904.).[10]

31.    And to the extent Cobra merely seeks the allowance, but not the payment, of the

Tax Claims, it fails to articulate a single reason why it is prejudiced by the continued stay of the

Administrative Expense Motion.  The Court already ruled Cobra is "unlikely to be prejudiced by

a delay in adjudication of the Administrative Expense Motion" because the Court could not order

immediate payment even if it were adjudicated.  First Stay Order at 2–3.  That remains true, despite

Cobra's implicit request for reconsideration.  Even though a request for immediate payment is

directly contrary to the Court's prior holdings, Cobra now requests a determination of the

allowance (but not immediate payment) of the Tax Claims to provide assurance of payment to

"assist the Company's survival until receipt of those sums and [to] provide assurance to the

Company's lenders and investors."  Layton Decl. ¶ 13.  Respectfully, reassuring a creditor's

investors and lenders is not a valid rationale for short-circuiting the claims allowance process or

eliminating the need to see how the Indictment and FEMA review unfold.

32.    Of course, Cobra cannot obtain that reassurance anyway.  The validity and amount

of the non-tax claims and the amount or existence of a clawback or nullification under Puerto Rico

law as to non-tax claims must be adjudicated before the Tax Claims can be allowed or disallowed.

Otherwise, PREPA would lose its inherent rights to recoupment and setoff.  The present request is

designed to circumvent the Second Stay Order to "get started" on adjudicating global issues.  *See*

---

[10] Moreover, contrary to Cobra's apparent suggestion, Mot. ¶¶ 45–46, there is no distinction for purposes of PROMESA
section 305 between "disputed" or "undisputed" amounts.  *See* Mar. 4, 2020 Hr'g Tr. 60:25–61:5 ("PROMESA,
likewise, does not restrict the debtor's ability to make expenditures of its choosing along its journey to plan
confirmation. Consequently, there is no legal basis for Cobra's demand that the Court restrain the ability of PREPA
to pay its administrative expenses as they accrue and in a manner that PREPA deems appropriate."); *see also In re
City of Stockton*, 478 B.R. at 21 ("Coercively preserving a status quo that entails payment of money from the City
treasury interferes with the City's choice to suspend such payments. The contents of the City treasury are 'property or
revenues' within the meaning of § 904(2)").

Jan. 29, 2020 Hr'g Tr. 61:2 ("So why are we waiting? Let's get started. Let's do it.").  The global

issues cannot be decided until the facts that relate to the Criminal Proceedings are determined.

Embarking on this now risks duplicative and exhaustive discovery—an underlying basis for the

stay of the Administrative Expense Motion.

> **B.**  **Cobra's Claims Do Not Satisfy The Requirements of Bankruptcy Code Section 503(b)(1)**

33.     Cobra argues there is no dispute its claims are entitled to administrative expense

priority under Bankruptcy Code section 503(b)(1).  Mot. ¶ 36.  Cobra incorrectly suggests the

Government Parties have taken the position that there can be no administrative expense claims

under Bankruptcy Code section 503(b)(1)(A).  Mot. ¶¶ 38–43.  The Government Parties actually

argue that even under the standard administrative expense analysis required by section

503(b)(1)(A), Cobra's claims might not be entitled to administrative expense status based on

Cobra's alleged conduct.

34.     *First*, as discussed throughout, if Cobra overstated the tax gross-up claim because

the underlying "substantive" invoices are deemed invalid (for example, due to a finding that

Cobra's former president's bribery vitiated the contract), the amount of Cobra's overstatement

would not be entitled to administrative priority.  Cobra would have no valid claim to such

overstated Tax Claims (and certainly they do not qualify under Bankruptcy Code section

503(b)(1)).

35.     *Second*, pursuant to the recommendation of OIG in the OIG Report, FEMA is

conducting an analysis of Cobra's contract rates under the First Contract to determine if Cobra's

rates were reasonable and eligible for FEMA's Public Assistance Grant Program.  FEMA

previously conducted an eligibility determination in December 2017 of Cobra's contractual rates

and determined the First Contract rates were reasonable and eligible for FEMA public assistance,

but OIG concluded in the OIG Report that FEMA's December 2017 analysis was unsound.  Layton

Decl., Ex. 16 at 2.  Included in FEMA's updated reasonable cost analysis will be an evaluation of

(i) the actual time and materials costs for reasonableness and (ii) Cobra's compliance with the

contract terms on the costs of transporting equipment and personnel to Puerto Rico.  *Id.* at 5.  If

FEMA concludes Cobra's contract rates for labor, equipment or other costs were not reasonable

and were ineligible for public assistance funding, Cobra's invoices for amounts paid and unpaid,

at least for payments or obligations in excess of FEMA's revised cost analysis, would not meet the

requirements for an administrative expense under Bankruptcy Code section 503.  *See In re*

*Sanborn, Inc.*, 181 B.R. 683, 690 (Bankr. D. Mass. 1995) ("[p]ursuant to § 503(b)(1)(A), the

moving party must establish that the expense was 'reasonable, necessary and benefitted the estate'"

and holding a contract vitiated by illegality under Massachusetts law could not give rise to

administrative expense priority (internal citation omitted)); *In re Express One Int'l*, 217 B.R. 207,

211 (Bankr. E.D. Tex. 1998) ("In order to establish that the expenses involved were both actual

and necessary, the claimant must demonstrate that the charge is a reasonable one for the value or

benefit bestowed upon the bankruptcy estate. It is axiomatic that unreasonable expenses, while

they might be actual would never be necessary."); *In re Cook & Sons Mining, Inc.*, Civ. A. No.

05-19, 2005 U.S. Dist. LEXIS 21615, at *29 (E.D. Ky. Sept. 28, 2005) ("a cost or expense cannot

be characterized as 'necessary' unless it is reasonable when compared to the benefit realized by

the bankruptcy estate."); *In re Bridgeport Plumbing Prods., Inc.*, 178 B.R. 563, 569 (Bankr. M.D.

Ga. 1994) ("The burden of proving entitlement to an administrative expense claim was on [the

claimant], to prove not only that the expense was 'actual' and 'necessary,' but also the reasonable

value of the expense."); *see also Zagata Fabricators, Inc. v. Superior Air Prods.*, 893 F.2d 624,

627 (3d Cir. 1990) (creditor only entitled to administrative expense claim for reasonable value of

14

services under section 503(b)(1)).  If the FEMA Analysis reverses earlier determinations of

reasonableness, then Cobra's Tax Claims could not be entitled to administrative expense status.

36.    Cobra emphasizes that FEMA originally determined, and told PREPA, the contract

rates were reasonable, in an attempt to show the forthcoming FEMA Analysis could not undo or

invalidate PREPA's obligation.  *See* Mot. ¶ 26 ("In its response to the OIG, FEMA reiterated that

it had already determined the contract rates are reasonable and that, therefore, its analysis 'will

focus on the reasonableness of quantities (labor, equipment and material units) based on the actual

scope of work completed.'").  Cobra's view is erroneous in two ways.  First, the OIG Report makes

it clear that FEMA's assessment of the contract rates within the four corners of the contract is *only*

*one input out of several* that FEMA should have used to assess the overall costs (and ultimately,

eligibility for reimbursement).  The OIG Report lists five separate categories of error in FEMA's

original method, including the failure to properly analyze the reasonableness of actual rates for

time, materials, and labor:

> FEMA's eligibility determination of Cobra contract costs was not
> sound for several reasons. First, FEMA did not evaluate the
> reasonableness of the actual time and materials costs incurred under
> the contract. Second, FEMA improperly analyzed the cost
> reasonableness of the contract rates for labor. Third, FEMA's cost-
> reasonableness analysis of Cobra's equipment rates was incomplete
> and unsupported. Fourth, FEMA did not fully analyze the
> reasonableness of additional costs, such as Cobra's costs for
> helicopters, fuel, security and logistics. Finally, FEMA did not
> consider compliance with contract terms in its review of Cobra's
> costs to transport equipment and people to Puerto Rico.

Layton Decl., Ex. 16 at 5.  Accordingly, the OIG has directed FEMA (and the Homeland Security

Operational Analysis Center to independently review the same issues) to conduct its analysis under

the proper methods and to "disallow any costs that are not reasonable."  *See id.* at 8.  Second, the

OIG Report also makes clear that FEMA, in reassessing reasonableness, must recalculate how

Cobra's rates *compared* to the two other proposals.  Specifically, the OIG Report found that

FEMA's original analysis applied an unsound methodology to calculate and compare Cobra's hourly labor rates to those in the other two proposals because, among other things, the original analysis potentially miscalculated the hourly labor rates for the other two proposals and unjustifiably applied "a 15 percent increase to the hourly labor rates for the other two proposals for cost associated with doing business in Puerto Rico, but did not do the same to Cobra's rates." *Id.* at 6–7.    FEMA's original analysis further applied an "incomplete and unsupported" methodology to calculate and compare Cobra's hourly equipment costs. *Id.* at 7.    Reasonableness, therefore, remains subject to the FEMA Analysis.[11]

### C.    The Tax Claims Are Not "Undisputed"

37.    The outcome of the FEMA Analysis and Criminal Proceedings will determine the amounts owed with respect to the Tax Claims for two reasons.    First, at the very least, a reduction of the fees and expenses paid by PREPA that gave rise to the Tax Claims as a result of the FEMA Analysis or the Criminal Proceedings would mean a corresponding reduction in the Tax Claims because taxes are a mathematical function of non-tax amounts paid.    The Tax Claims are calculated

---

[11] Apart from addressing the methodology errors, it is possible that FEMA could now rely simply on the conduct alleged in the Criminal Proceedings to reassess reasonableness.    FEMA's reimbursement guidelines ("Reimbursement Guidelines") state that a cost is "reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time" the Applicant makes the decision to incur the cost." FEMA, *FEMA Public Assistance Program and Policy Guide*, FP-104-009-2, at 22 (April 2018) https://www.fema.gov/media-library-data/1525468328389-4a038bbef9081cd7dfe7538e7751aa9c/PAPPG_3.1_508_FINAL_5-4-2018.pdf.    Accordingly, pursuant to the allegations in the Indictment, FEMA could determine that a prudent person, if she had known about the "circumstances prevailing at the time" involving Cobra's conduct, would not have agreed to "incur the cost" at the prices in the Cobra Contracts or enter into the Cobra Contracts at all.    The Reimbursement Guidelines further state that FEMA determines reasonableness by evaluating several factors, including compliance with applicable procurement requirements. Reimbursement Guidelines at 30 ("State and Territorial government Applicants must follow the same policies and procedures they would use for procurements with non-Federal funds; comply with 2 CFR § 200.322, Procurement of recovered materials; and ensure that every purchase order or other contract includes any clauses required by 2 CFR § 200.326, Contract provisions."); *see also* Layton Decl., Ex. 16 at 6. The allegations of bribery in the Indictment could cause FEMA to find that PREPA did not comply with the procurement requirement. In either case, the Criminal Proceedings bear on the determination of reasonableness, and therefore administrative expense allowance.

as a percentage of and by reference to the "amounts paid to [Cobra]" pursuant to the First Contract.

Notably, the provision cited by Cobra (*see* Layton Decl., Ex. 1 at 48) provides:

> In the event that any amounts to be paid to Contractor under this Contract are subject to any taxes (including withholding) imposed by any governmental authority of Puerto Rico in excess of 8.5% and Contractor has not obtained an exemption from such taxes, **the amount to be paid to Contractor shall be increased by an amount that, after the payment of such taxes, leaves Contractor with the amount that Contractor would have received if Contractor had been exempt from all such taxes**

First Contract, Ex. B (emphasis added).

38.     The Criminal Proceedings or the FEMA Analysis could result in Cobra having to disgorge payments it received or reimburse PREPA.  If it turns out Cobra was overpaid on underlying invoices, there would be an adjustment in the tax gross-up.  Public assistance payments to FEMA have been based on FEMA's December 2017 cost analysis.  If FEMA determines the December 2017 cost analysis was wrong and issues a revised cost analysis that is less than the amounts charged by and paid to Cobra, Cobra would be compelled to return the overpayments. Any such refund would reduce the amounts paid to it and would result in a reduced tax obligation for 2018, which in turn would lessen PREPA's tax gross-up payment obligation.  In other words, if Cobra is required to reimburse some of the "amounts paid to" Cobra, then the Tax Claims will decrease because the amount "that would have been received if [Cobra] had been exempt from all such taxes" would be lower.[12]  Until the Criminal Proceedings and FEMA Analysis are conducted, therefore, it is impossible to quantify the Tax Claims, and Cobra's request must, therefore, be denied at this time.

---

[12] Cobra might, at that point, have a refund claim against the Commonwealth if it overpaid taxes as a result of reduction of fees on account of which it has already paid taxes.

39.     *Second*, if (as explained in detail in the sections below) the FEMA Analysis or the Criminal Proceedings are resolved adversely to Cobra, PREPA's liability to pay Cobra for any work may be eliminated in its entirety, including the entirety of the Tax Claims—indeed, Cobra may become net liable to PREPA.  PREPA should not be forced to pay money to Cobra that Cobra may later have to disgorge (particularly as, by Cobra's own admission, it appears unlikely that Cobra will later be able to repay PREPA, given Cobra's liquidity issues).  Accordingly, the assertion that the Tax Claims are "undisputed" is not true.

40.     Cobra wrongly asserts that PREPA has somehow "manufactured" reasons for non-payment after the fact, and that the 2018 tax gross-up payment process should have simply been approved just like 2017.  On the contrary, PREPA appropriately deployed higher scrutiny and caution in 2018 because of the scale of the payments to Cobra, Cobra's inconsistencies in invoicing, the OIG Audit, and OIG's investigation into Cobra that resulted in the September 2019 indictment of Cobra's CEO.

41.     PREPA's caution with respect to Cobra has proven reasonable.  The Criminal Proceedings allege serious misconduct in the highest ranks of Cobra and FEMA at the expense of PREPA, PREPA's ratepayers, the federal government, and U.S. taxpayers.  Indeed, one defendant in the Criminal Proceedings, Jovanda Patterson, has already entered a guilty plea.  Contrary to Cobra's assertions, the allegations in the Indictment make clear that Cobra was the direct and primary beneficiary of Ellison's fraudulent scheme.  *See, e.g.*, Indictment ¶¶ 43, 45, 102.  The

18

Indictment also alleges that certain monies paid by PREPA and FEMA to Cobra would not have been paid absent the fraud scheme.[13] *See, e.g.*, Indictment ¶¶ 47(c), 57.[14]

42.      Indeed, even if the Criminal Proceedings do not result in Ellison's conviction based on the requirement that the government prove his guilt beyond reasonable doubt, they have already exposed the possibility of serious misconduct by senior Cobra officials that may vitiate the Cobra contracts and that will have to be litigated before Cobra's claims can be allowed (let alone paid). Cobra's repeated attempt to sweep under the rug serious allegations about actions Cobra's former president allegedly took (to benefit Cobra) should not be permitted.

### D.      Cobra's Administrative Expense Claim Cannot be Allowed Without Determining Cobra's Liability to PREPA on the Cobra Contracts

43.      Cobra seeks immediate allowance of its $62 million Tax Claim asserting that regardless of the outcome of the Criminal Proceedings and FEMA Analysis, PREPA "indisputably" has to pay the Tax Claims, and that PREPA's withholding of payments would only be justified if Cobra were convicted of a crime, relying on Article 69 of the First Contract.[15]

---

[13] For example, the Indictment alleges on February 11, 2018 an explosion at PREPA's Monacillo Transmission Center resulted in several municipalities being left without electrical power. Despite representations by PREPA executives that PREPA personnel could repair the damage at a far lower cost than an outside contractor, Tribble, as a FEMA representative, "pressured" PREPA executives to hire Cobra to perform the work, and paid Cobra hundreds and thousands of dollars as a result. Indictment ¶ 57. The Indictment also alleges that Tribble "pressure[d]" PREPA and FEMA executives to enter into a contract with Cobra to perform certain repair work at an area known as the Roosevelt Roads. Indictment ¶ 47(c).

[14] In addition, as the Court is aware, corporations are deemed to act through their executives. The Department of Justice rarely brings charges against corporate entities and will only do so after weighing multiple factors including the company's cooperation, the collateral consequences, including whether there is disproportionate harm to shareholders, pension holders, employees, and others not proven personally culpable, as well as impact on the public arising from the prosecution (see United States Attorney's Manuel 9-28.1100); and the adequacy of the prosecution of individuals responsible for the corporation's malfeasance (see USAM 9-28.1300). Here, DOJ's decision to charge Ellison and not Cobra allowed the authorities to bring to justice individual bad actors without harming employees, and in no way suggests that Cobra as a corporate entity was not the primary beneficiary of the fraud.

[15] Article 69 of the First Contract expressly addresses the circumstances a criminal conviction would entail rescission of the contract and permit PREPA to refuse further payments.

44.     Cobra is wrong.  Contrary to Cobra's assertion that PREPA would only have remedies against Cobra if Cobra is convicted of a crime, Mot. ¶ 11, Cobra (if the allegations in the Indictment are true) breached the Cobra Contracts in several ways that would entitle PREPA to substantial damages, and at a minimum would alleviate it of further obligations to Cobra.

45.     *First*, in Article 21 of the First Contract Cobra expressly "acknowledge[d] that in executing the services pursuant to Contract it has a duty of complete loyalty towards PREPA which includes not having adverse interests to those of PREPA related to the services."  Layton Decl., Ex. 1 § 21.  Importantly, Article 21(2) states that any violation of this "duty of complete loyalty" by "**any of the partners, directors, or employees** of [Cobra] . . . shall constitute a violation" of Article 21.  *Id.* (emphasis added).  If former president Keith Ellison (or any other employee of Cobra) engaged in any conduct that violated Cobra's "duty of complete loyalty" to PREPA, Cobra is liable to PREPA under the express terms of the contract.  A duty of complete loyalty either constitutes or is directly comparable to a fiduciary duty owed by a trustee to trust beneficiaries.[16] Under Puerto Rico law, PREPA would be entitled to—at the very least—damages for a violation of this duty,[17] and possibly may be entitled to disgorgement of all profits obtained from the Cobra Contracts.[18]  These remedies would, at the very least, offset the amount of tax payments PREPA would have to pay Cobra.  The fact Cobra may have to pay significant damages (which will offset the Tax Claims) for what appears to be a clear breach of this duty of loyalty if the allegations in

---

[16] *See, e.g., Concrete Pipe & Prods. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 616 (1993) ("Under principles of equity, a trustee bears an unwavering **duty of complete loyalty** to the beneficiary of the trust, to the exclusion of the interests of all other parties. To deter the trustee from all temptation and to prevent any possible injury to the beneficiary, the rule against a trustee dividing his loyalties must be enforced with 'uncompromising rigidity.'") (internal cites and quotes omitted) (emphasis added).

[17] *Ramírez Anglada v. Club Cala de Palmas*, 23 P.R. Offic. Trans. 311 (1989) (explaining that parties can obtain damages for breach of contractual terms, as well as termination for breach of an "essential obligation").

[18] *See, e.g.*, RESTATEMENT (SECOND) OF AGENCY § 403 ("If an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal.").

20

the Indictment are even partially true demonstrates that it would be premature to try to litigate the

Tax Claims now.

>       46.     *Second*, Article 68 of the First Contract provides:
>
>       If, as a result of **any uncured violation of applicable law by Contractor**, any
>       U.S. Federal agency or the Commonwealth of Puerto Rico disallows or demands
>       repayment for costs incurred in the performance of this Contract, or **if any
>       penalty is imposed due to an act or omission by the Contractor, the
>       Contractor shall be responsible for such penalty, disallowed costs, or
>       repayment demand to the extent of its fault and/or responsibility, and shall
>       reimburse PREPA in full within ten (10) days of determination of its
>       appropriate share of such penalty, disallowance, or repayment demand**. Any
>       monies paid by the Contractor pursuant to this provision shall not relieve the
>       Contractor of liability to PREPA for damages sustained by PREPA by virtue of
>       any, other provision of this Contract.

Layton Decl., Ex. 1 § 68.  A claim for repayment or reimbursement of public assistance funds from

FEMA constitutes a "penalty".  *See, e.g.*, 42 U.S.C. § 5205(c) ("A State or local government shall

not be liable for *reimbursement or any other penalty* for any payment under this chapter if (1) the

payment was authorized by an approved agreement specifying the costs; (2) the costs were

reasonable; and (3) the purpose of the grant was accomplished") (emphasis added).  Far from

requiring "sole fault," this provision of the First Contract states that if any cost is disallowed,

repayment demanded, or penalty imposed due to any "act or omission" of Cobra or violation of

the law by Cobra, Cobra must reimburse PREPA to the extent of Cobra's fault within ten days.

Once more, this shows that if PREPA is required to reimburse, repay or be ineligible for public

assistance funding due to Cobra's fault—even if the penalty was caused by Cobra only in part—

Cobra will be liable to repay PREPA for Cobra's share of the penalty, disallowance, or repayment

demand.  As Cobra has already received more than $1 billion in payments, any such repayment

could dwarf the size of Cobra's purported Tax Claim.

47.     *Third*, pursuant to Article 43 of the First Contract, Cobra agreed to abide by Puerto Rico's Code of Ethics for contractors laid out in Act 84-2002.[19]  Section 5 of Act 84 specifically required the disclosure of all information needed to make informed decisions, among other things. 3 L.P.R.A. § 1756(b) (repealed 2018); *see* Act 2-2018, § 3.2(b).[20]  Violation of this provision made the violator liable to a penalty of three times the value of the contract.  *Id.* § 1760 (repealed 2018); *see* Act 2-2018 § 5.2.  The successor statute also provides for termination as a remedy for such violations. Act 2-2018 § 3.7 ("Noncompliance by any person with any of the provisions of Section 3.2 of this Code shall be sufficient grounds for the Government of Puerto Rico to terminate a contract.").

48.     *Fourth*, Article 29 of the First Contract, removing PREPA's obligation to pay Cobra if PREPA does not obtain payments from FEMA "due to [Cobra's] sole fault," provides no relief for Cobra.  *See* Layton Decl., Ex. 1 § 29.[21]  Given that FEMA is conducting its cost analysis in compliance with the OIG Report, and one of Cobra's most senior former officials is on trial for bribery, any right to payment of Cobra invoices at issue in the Administrative Expense Claim is, at least, in doubt for reasons that solely relate to Cobra.  Under Article 29, when failure to obtain FEMA reimbursement is "due to [Cobra's] sole fault" there is an exception to PREPA's "obligations [of] payment under this *Contract*."  *Id.* (emphasis added).  The sole fault provision thus creates a global absolution of an obligation to pay Cobra, including the Tax Claims.  A plain reading of Article 29

---

19  Layton Decl., Ex. 1 at 19–20 ("Contractor agrees to comply with the provisions of Act of June 18, 2002, No. 84, which establishes a Code of Ethics for the Contractors, Suppliers and Economic Incentive Applicants of the Executive Agencies of the Commonwealth of Puerto Rico.").

20  Act 84 was codified at 3 L.P.R.A. §§ 1755–61.  On January 4, 2018, the Commonwealth approved Act 2-2018, known as the "*Anticorruption Code for a New Puerto Rico*." Act 2-2018 repealed and replaced Act 84-2002 and other statutes enacted to prevent corruption in government contracting.

21  Cobra was fully and explicitly aware that FEMA funding was to be used for all costs under the Cobra Contracts.  *See, e.g.*, Layton Decl., Ex. 1 § 29 ("[Cobra] acknowledges that starting on October 25, 2017, FEMA financial assistance will be used to fund this Contract.").

shows that upon triggering of the sole fault exception the obligation to pay does not arise in the first place.

49.     Cobra attempts to get around this by arguing either (i) that the fault would not be solely Cobra's because it would be joint with Keith Ellison and the allegedly bribed FEMA officials, *see* Mot. ¶ 24, or (ii) fault would be joint with PREPA because "[i]t was PREPA's decision, not Cobra's, to agree to pay the rates specified in the [Cobra] Contracts." Mot. ¶ 12, n.7.

50.     These arguments are simply incredible.  The allegations against Ellison in the criminal indictment are limited to his conduct as CEO of Cobra.  All of Ellison's allegedly criminal activities are imputed to Cobra, as his employer.  The requirement that any violation be Cobra's "sole fault" just makes clear that PREPA—the only other party to the contracts—must not be to blame.  It defies common sense to argue that Cobra cannot be solely at fault because its own employee—the one that gave the alleged bribe to obtain work for Cobra—may also be at fault, along with the FEMA official that allegedly accepted the bribe.  Similarly, it cannot seriously be contended that PREPA is *ipso facto* at fault simply by agreeing to pay the rates Cobra asked PREPA to pay—such a reading would eliminate any meaning of the "sole fault" exception in Article 29.  The criminal acts of Cobra's former president to bring work in for Cobra would likely be attributable to Cobra under applicable law. Cobra acts through its agents, employees, and in particular, its officers.  Its primary officer at the time of contracting—the CEO—has been charged with committing a crime relating to Cobra's contracts with PREPA.  As noted above, Cobra reaped the benefit of the alleged criminal conduct.  The Indictment alleges that the benefits obtained by Cobra were numerous, including the acceleration of payments to Cobra, and the selection of Cobra to perform work that could have been performed at a lower cost by PREPA or other contractors.

23

The fact Cobra has to manufacture such fantastical arguments only demonstrates the Motion lacks any real merit.

51.     If Cobra's former president took the actions discussed in the Indictment, the Cobra Contracts may well be vitiated pursuant to the Puerto Rico law.  For example, mistake as to the essential requirement of Cobra's fitness to be a governmental contractor[22] because of Cobra's failure to disclose its employees' conduct could void the contract. *See, e.g.*, *Cooperativa La Sagrada Familia v. Castillo*, 7 P.R. Offic. Trans. 449 (1978) (explaining the requirements for the error regarding an essential requirement of the contract that invalidates the consent of one of the parties to a contract and makes it void).  Furthermore, the Cobra Contracts may be voidable for having been obtained by "deceit," defined to be "when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which without them [it] would not have made."  31 L.P.R.A. § 3408.[23]  This could give PREPA a complete defense to further payments, a damages claim against Cobra, and/or the right to receive back payments made to Cobra under the vitiated contracts.  *See* 31 L.P.R.A. §§ 3511, 3513, 3514; *Dopp v. HTP Corp.*, 947 F.2d 506, 510 (1st Cir. 1991).

---

[22] Pursuant to Article 69 of the First Contract, which establishes the many requirements the contractor must fulfill in order to comply with Commonwealth law, regulations or executive orders that regulate the contracting process public entities in the Commonwealth of Puerto Rico:

> The Contractor expressly agrees that the conditions outlined throughout Article 69 are essential requirements of this Contract; consequently, should any one of these representations, warrants, and certifications be incorrect, inaccurate or misleading in whole or in part, and should such noncompliance not be cured within thirty (30) days, there shall be sufficient cause for PREPA to terminate this Contract.

Layton Decl., Ex. 1 § 69 (19).  Article 69, section 12, in turn, required Cobra to certify that "no employee or executive of the Contractor, . . .  shall have any direct or indirect pecuniary interest in the services to be rendered under this Contract . . . ." *Id.* § 69 (12).

[23] Cobra contends PREPA would never bring a nullification action based on a theory of deceit because of the effect of restitution (Mot. ¶ 25). To the contrary, if a court were to determine that nullification required restitution, which would be in the form of compensation of equivalent value for services provided, the equivalent value may be less than the contractually-agreed amounts. *Caribbean Ins. Servs., Inc. v. Am. Bankers Life Assurance Co.*, 754 F.2d 2 (1st Cir. 1985) (noting, absent evidence to the contrary, commissions already paid amounted to the equivalent value of the services performed).

52.     Moreover, when one contracting party is implicated in an "illicit" consideration for a contract—that is, a consideration that is contrary to law or good morals (*see* 31 L.P.R.A. § 3432)24—PREPA, as the innocent party, "may recover what he may have given, and shall not be bound to fulfill what he may have promised."  *See* 31 L.P.R.A. § 3516; *see also Rosado Rosario v. Pagán Santiago*, 196 D.P.R. 180, 187–192 (P.R. 2016) (if one of the contracting parties was not at fault, he can claim what he gave and will not be obliged to fulfill what he promised).  Illicit consideration has been found to exist where there was bribery involving a contractor's president and Commonwealth officials.  *See Pro Data Services, Inc. v. Departamento De Educación, Estado Libre Asociado De Puerto Rico*, No. 05-3616, 2009 WL 2351562 (P.R. Ct. App. May 26, 2009) (finding illicit consideration justifying contract nullification where president of contractor had been charged with bribery for giving money to the then Secretary of Education and other officials, with the understanding that the payment would influence the decision to continue the formalization of contracts between contractor and the Puerto Rico Department of Education).  A party to a void contract that did not know about the illicit consideration would not be subject to restitution. *See Sánchez Rodríguez v. López Jiménez*, 16 P.R. Offic. Trans. 214, 226–27 (1985) ("the prevailing rule in this matter – which compels the parties to the contract to restore the original order of things by restituting the obligations object of the contract – is not applicable when the consideration is illegal and immoral.").

---

24 Contrary to Cobra's assertion (Mot. ¶ 25, n.9) illicit consideration can be satisfied if the illegality related to Cobra's motivations, such that they would be deemed "contrary to law or morals" and injure "a general interest of a legal or moral nature." *Sánchez Rodríguez v. López Jiménez*, 16 P.R. Offic. Trans. 214, 226 (1985). This analysis involves assessing "the motives that induced the parties to enter into [the] contract" if "powerful reasons" to do so exist. *Reyes v. Jusino Diaz*, 16 P.R. Offic. Trans. 338, 346 (1985).

II.     **The Balance of Harms Weighs Decidedly Against Lifting the Stay.**

      A.     **Continuing to Operate PREPA During an Emergency Overwhelmingly Outweighs Cobra's and Mammoth's Distress**

     53.     While PREPA does not use its own financial position as a defense to paying valid claims, PREPA is completely entitled to make sure it does not pay invalid claims. Cobra's request would have its claims allowed before critical facts are known. Cobra has acknowledged that in a contract dispute, payments are subject to disgorgement. *See* March 4, 2020 Hr'g Tr. 49:7–8 ("The payments to Cobra, as I said before, are subject to disgorgement, just as payments to professionals are."). Given Cobra's and Mammoth's alleged deteriorating financial condition, Cobra can give no assurance that funds paid now would exist should Cobra be required to disgorge them. Rather, a chance at meaningful recovery of those funds will likely be lost if Cobra and Mammoth enter into their own insolvency proceedings. This prospect presents a clear prejudice to PREPA and its constituents.

      B.     **Cobra's and Mammoth's Distress Are Due to Cobra's Conduct and Macroeconomic Factors**

     54.     Cobra's and Mammoth's distress is not of PREPA's making. PREPA had nothing to do with Cobra's hiring of a CEO who would be indicted for a felony, the resulting criminal proceedings and FEMA Analysis, or the market's response to these events. Cobra and Mammoth imply that the drastic drop in Mammoth's share price was due to PREPA's non-payment. *See* Mot. ¶ 2 (citing a 96% decrease in market capitalization and arguing "a further material adverse effect on the Company [exists] if at least a significant portion of it is not paid promptly."). But during that period, Mammoth's investors sued Mammoth for securities fraud for the company's

failure to disclose the federal probe leading to the Indictment.[25]  After the Wall Street Journal published an article reporting that the FBI had opened a criminal inquiry into Cobra's contracts in June 2019,[26] Mammoth's stock plunged 45% in just two days.[27]  Mammoth and Cobra are facing another $500 million lawsuit filed in January 2020 by Cobra's competitor, MasTec Inc., accusing Mammoth and Cobra of "hoarding roughly $1.4 billion in utility repair work for itself"[28] in connection with Cobra's procurement of the Contracts.  *See* Layton Decl., Ex. 3 at 30.  Cobra also is facing arbitration proceedings resulting from a class action lawsuit commenced in 2019 involving workers alleging a failure to be paid overtime while in Puerto Rico.  *See id.* at 141.

55.    PREPA had nothing to do with any of these alleged issues.  Likewise, PREPA had nothing to do with a global drop in oil prices or the global COVID-19 pandemic.  *See* Mot. ¶ 6. Furthermore, Cobra is not a creditor that has been ignored or largely unpaid.  It has been paid $1.1 billion, more than any other PREPA creditor by several times.  If Mammoth, a business with $1.1 billion in revenues attributable to Puerto Rico alone, has financial issues of the magnitude that is threatening default on its funded debt, it is hard to see how the allowance of the $62 million Tax Claim—less than six percent of the $1.1 billion already paid to Cobra—could possibly solve Mammoth's problems.  Cobra's and Mammoth's insistence that PREPA is responsible for their financial distress is drastically overstated and disingenuous.

---

[25] Andrew Scurria, *Puerto Rico Grid Contractor Faces Mounting Claims From Bribery Probe*, Wall Street Journal (Jan. 23, 2020), https://www.wsj.com/articles/puerto-rico-grid-contractor-faces-mounting-claims-from-bribery-probe-11579816998.

[26] *See* Layton Decl., Ex. 17.

[27] *Robbins Arroyo LLP: Mammoth Energy Services, Inc. (TUSK) Misled Shareholders According to a Recently Filed Lawsuit*, businesswire.com (June 21, 2019), https://www.businesswire.com/news/home/20190621005505/en/Robbins-Arroyo-LLP-Mammoth-Energy-Services-TUSK.

[28] Scurria, *supra* note 25.

## **CONCLUSION**

56.     For the reasons set forth herein, the Government Parties request the Court deny

Cobra's Motion in its entirety.

[*Remainder of Page Intentionally Left Blank*]

New York, New York

April 7, 2020

Respectfully submitted,

**O'NEILL & BORGES LLC**

By: /s/  Hermann D. Bauer
Hermann D. Bauer
USDC No. 215205
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Telephone: (787) 764-8181
Facsimile: (787) 753-8944
Email: hermann.bauer@oneillborges.com

**PROSKAUER ROSE LLP**

By: /s/ Martin Bienenstock
Martin J. Bienenstock*
Paul V. Possinger*
Ehud Barak*
Gregg M. Mashberg*
Eleven Times Square New York, NY 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
Email: mbienenstock@proskauer.com
        ppossinger@proskauer.com
        ebarak@proskauer.com
        gmashberg@proskauer.com

* admitted *pro hac vice*

*Attorneys for the Financial Oversight and
Management Board and as representative
of the Puerto Rico Electric Power Authority*

**DÍAZ & VÁZQUEZ LAW FIRM, P.S.C**.

By: /s/ Katiuska Bolaños
Katiuska Bolaños
kbolanos@diazvaz.com
USDC-PR 231812
290 Jesús T. Piñero Ave.
Oriental Tower, Suite 1105
San Juan, PR  00922-1689
Tel.: (787) 395-7133
Fax. (787) 497-9664

*Co-Attorneys for Puerto Rico Electric Power
Authority*

**MARINI PIETRANTONI MUÑIZ LLC**

By: /s/ Luis C. Marini-Biaggi
Luis C. Marini-Biaggi
USDC No. 222301
Carolina Velaz-Rivero
USDC No. 300913
250 Ponce de León Ave.
Suite 900
San Juan, Puerto Rico 00918
Tel: (787) 705-2171
Fax: (787) 936-7494
Email: lmarini@mpmlawpr.com
        cvelaz@mpmlawpr.com

*Co-Attorneys for the Puerto Rico Fiscal Agency
and Financial Advisor Authority*

**O'MELVENY & MYERS LLP**

By: /s/ John J. Rapisardi
John J. Rapisardi*
Nancy A. Mitchell*
7 Times Square
New York, NY 10036

29

Telephone: (212) 326-2000
Facsimile: (212) 326-2061
Email:  jrapisardi@omm.com
           nmitchell@omm.com

\* admitted pro hac vice

*Attorneys for the Puerto Rico Fiscal
Agency and Financial Advisory
Authority and Puerto Rico Electric Power
Authority*

**GREENBERG TRAURIG, LLP**

By: */s/ Joseph P. Davis III*
Joseph P. Davis III\*
davisjo@GTLAW.com
One International Place, Suite 2000
Boston, MA 02110
Telephone: (617) 310-6000
Facsimile: (617) 279- 8403
\* admitted *pro hac vice*

*Co-Attorneys for Puerto Rico Electric Power
Authority*

## CERTIFICATE OF SERVICE

I hereby certify that, on this same date, I filed this document electronically with the Clerk

of the Court using the CM/ECF System, which will send notification of such filing to all parties

of record and CM/ECF participants in this case.

*Hermann D. Bauer*
Hermann D. Bauer