# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br>THE COMMONWEALTH OF PUERTO RICO,<br>*et al.*<br><br>Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br>PUERTO RICO ELECTRIC POWER<br>AUTHORITY ("PREPA")<br><br>Debtor.[1] | PROMESA<br>Title III<br><br>No. 17 BK 4780-LTS |

### COBRA ACQUISITIONS LLC'S REPLY IN SUPPORT OF ITS URGENT MOTION TO MODIFY THE STAY ORDER AND ALLOW THE UNDISPUTED TAX CLAIMS

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ...................................................................................................................................2
    I.      The Court Has the Authority to Modify Its Stay Order. .........................................2
    II.     The Undisputed Tax Claims Are Entitled to Priority Under Section
           503(b)(1) of the Bankruptcy Code. .........................................................................4
           A.      The Undisputed Tax Claims Are Due and Owing and PREPA is in
                   Breach of Its Obligation to Pay. ..................................................................4
           B.      Neither the FEMA Analysis Nor the Criminal Proceeding Will
                 Alter PREPA's Obligation to Pay the Undisputed Tax Claims ....................7
                 1.      FEMA's Review is Not a Basis for Withholding the
                       Undisputed Tax Claims ...................................................................7
                 2.      The Criminal Case Will Not Affect Cobra's Right to
                       Payment of the Undisputed Tax Claims.........................................10
    III.    PREPA's Continuing Breach of Its Obligation to Pay the Undisputed Tax
           Claims Threatens the Company's Viability and Is Manifestly Unjust. ..................14

CONCLUSION...............................................................................................................................15

# **TABLE OF AUTHORITIES**

**Cases** Page(s)

*Arden Way Assocs. v. Boesky*,
    660 F. Supp. 1494 (S.D.N.Y. 1987) ................................................................................3

*Bethlehem Steel Corp. v. BP Energy Co. (In re Bethlehem Steel Corp.)*,
    291 B.R. 260 (Bankr. S.D.N.Y. 2003) ..............................................................................7

*Brock v. Tolkow*,
    109 F.R.D. 116 (E.D.N.Y. 1985) .....................................................................................2

*In re GHR Energy Corp.*,
    41 B.R. 668 (Bankr. D. Mass. 1984) ...............................................................................5

*Green v. Cosby*,
    177 F. Supp. 3d 673 (D. Mass. 2016) ..............................................................................2

*Hol-Gar Mfg. Corp. v. United States*,
    351 F.2d 972 (Ct. Cl. 1965) .......................................................................................10, 13

*S.G. Phillips Constructors, Inc. v. City of Burlington (In re S.G. Phillips*
    *Constructors, Inc.)*,
    45 F.3d 702 (2d Cir. 1995) .............................................................................................11

*In re Sanborn Inc.*,
    181 B.R. 683 (Bankr. Mass. 1995) ..................................................................................7

*United States v. Tribble*,
    Case No. 19-CR-541-FAB, ECF No. 87 (D.P.R.) ...........................................................3

*Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.)*,
    954 F.2d 1 (1st Cir. 1992) ................................................................................................7

**Statutes**

18 U.S.C. § 208(a) ................................................................................................................11

Bankruptcy Code section 503(b)(1) ..........................................................................2, 4, 7, 12

**Other Authorities**

RESTATEMENT (SECOND) OF CONTRACTS § 203(a) ...............................................................10, 13

RESTATEMENT (SECOND) OF CONTRACTS § 203(c) ...............................................................10, 13

Cobra Acquisitions LLC ("Cobra"), by and through its counsel, respectfully submits this reply ("Reply") to the Opposition of the Oversight Board, AAFAF, and PREPA (the "Opposition"), Case No. 17-BK-4780, ECF No. 1959,[1] to Cobra Acquisitions LLC's Urgent Motion to Modify Stay Order & Allow Undisputed Tax Claims (the "Motion"), ECF No. 12531.[2] In support of this Reply, Cobra respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Government Parties' Opposition reveals that, even though they previously sought and obtained what they described as a short-term stay and an extension thereof (until the June 3, 2020 omnibus hearing), their true objective is to delay payment on any of Cobra's claims until the final outcome of both the FEMA Analysis and the pending criminal case, no matter how long that takes. *See* Opp'n at ¶¶ 5-6. As Cobra demonstrated in its Motion, and as PREPA ignores, the criminal trial will not begin until January 2021 at the earliest and likely will not end until almost a year from now. Meanwhile, Cobra and its parent, Mammoth, having borrowed more than $80 million to pay the Puerto Rico taxes at issue, are facing material financial consequences and require the almost $62 million PREPA is contractually obligated to reimburse Cobra. Mot. at 3. Under these changed circumstances occasioned by the material delay in the pending criminal case (the outcome of which has no bearing on PREPA's obligations on the Undisputed Tax Claims) and for the reasons explained in the Motion and in this Reply, the Court should exercise its authority to modify the Stay Order and allow the Undisputed Tax Claims.

2. Cobra limited its Motion to the Undisputed Tax Claims because it is abundantly clear that (1) the Undisputed Tax Claims are due and owing, and (2) the merits of those claims

---

[1] References to the docket are to Case No. 17-BK-03283-LTS, unless otherwise specified.
[2] Unless otherwise specified, capitalized terms have the same meaning as in the Motion.

1

will not be affected by the FEMA Analysis or the criminal proceeding. The Opposition fails to rebut either point. *First*, nothing in the Contracts allows PREPA to withhold payment on the Undisputed Tax Claims for the reasons PREPA espouses in the Opposition. *Second*, the FEMA Analysis cannot possibly affect the Undisputed Tax Claims because those claims are unrelated to, and cannot be impacted by, the analysis FEMA is conducting. FEMA cannot change the amount of 2018 Puerto Rico taxes Cobra was legally required to, and did, pay, nor can it relieve PREPA of its contractual obligation to reimburse Cobra for those payments. Similarly, whatever the eventual outcome of the criminal proceeding may be, there is no possibility that it will permit PREPA to shirk its contractual responsibility to reimburse Cobra for taxes it indisputably paid in connection with Cobra's heroic rebuilding of PREPA's electrical system after it was devastated by two hurricanes. Accordingly, the Motion should be granted and the Undisputed Tax Claims should be allowed as administrative expenses under section 503(b)(1) of the Bankruptcy Code.

## ARGUMENT

### I. The Court Has the Authority to Modify Its Stay Order.

3. The Motion does not seek reconsideration of the Stay Order. Rather, Cobra seeks modification of the stay based on changed circumstances. As the Court noted in the Original Stay Order, ECF No. 8886, "federal courts possess the inherent power to stay proceedings for prudential reasons." Original Stay Order at 2 (citing *Microfinancial, Inc. v. Premier Holidays, Int'l, Inc.*, 385 F.3d 72, 77 (1st Cir. 2004) (cited by *Green v. Cosby*, 177 F. Supp. 3d 673, 678 (D. Mass. 2016)). Following the entry of a stay for prudential reasons, "the court retains the ability to modify or dissolve the stay …." *Green v. Cosby*, 177 F. Supp. 3d at 681; *see also Brock v. Tolkow*, 109 F.R.D. 116 (E.D.N.Y. 1985) ("[W]hile criminal investigations and prosecutions can take a woefully long time, a stay of discovery does not mean that enforcement of the public interests at stake in the civil case will be indefinitely deferred…In addition, defendant is free to petition this

2

Court to lift or modify the stay should there be change in circumstances that would warrant such action."). A modification to a stay order is appropriate "if and when the balance of burdens, and private and public interests so requires." *Arden Way Assocs. v. Boesky*, 660 F. Supp. 1494, 1500 (S.D.N.Y. 1987).

4. As the Motion makes clear, circumstances have changed dramatically since the Original Stay Order was entered on October 17, 2019. At that time, the criminal trial was scheduled for December 9, 2019. PREPA argued that the Court should enter a stay until this Court's January 29, 2020 omnibus hearing because that "should give the criminal court enough time to try Ellison, Tribble and Patterson" and would not "overly prolong[]" Cobra's administrative expense claims. ECF No. 8838 at ¶¶ 7, 34. The Court agreed, finding that "[s]ignificant factual and legal questions that could bear upon [Cobra's] Administrative Expense Motion will likely be addressed in connection with the criminal trial of Cobra's former president and two former [FEMA] officials, which is currently scheduled for December 9, 2019." Original Stay Order at 2. The Court stayed the Administrative Expense Motion until the January 29, 2020 omnibus hearing.

5. As of the omnibus hearing on January 29, 2020, however, the criminal trial date had been vacated and had not been rescheduled. At that hearing, the Court entered the Second Stay Order extending the stay until the June 3, 2020 omnibus hearing. On February 13, 2020, the criminal trial was continued to January 19, 2021. *United States v. Tribble*, Case No. 19-CR-541-FAB, ECF No. 87 (D.P.R.). The trial is estimated to take five to six weeks and, thus, is unlikely to be completed until late February or March 2021, assuming it is not delayed further. *See id.* As a result, a stay initially contemplated to be approximately three months long, and then extended for a little more than four months, now threatens to last almost a year and a half from when it was first entered.

3

6. In the meantime, the Company's financial situation has deteriorated. It badly needs cash, and the approximately $62 million in tax reimbursements that PREPA currently owes but refuses to pay would make a substantial difference to the Company's well-being. Continuing the stay as to the Undisputed Tax Claims would thus not only "overly prolong" the resolution of Cobra's claims, but might do far greater damage to Cobra, working a manifest injustice. Cobra respectfully submits that that was not the Court's intent in entering the stay.

## II. The Undisputed Tax Claims Are Entitled to Priority Under Section 503(b)(1) of the Bankruptcy Code.

7. The Undisputed Tax Claims clearly are entitled to priority as administrative expense claims under Bankruptcy Code section 503(b)(1) and none of the Government Parties' arguments to the contrary—whether contractual or rank speculation about the potential outcome of the FEMA Analysis and the criminal proceedings—withstand scrutiny.

### A. The Undisputed Tax Claims Are Due and Owing and PREPA is in Breach of Its Obligation to Pay.

8. The Opposition does not dispute that: (1) the First Contract required PREPA to reimburse Cobra for taxes paid to Puerto Rico in excess of 8.5% of taxable income; (2) Cobra's 2018 tax payments to Puerto Rico exceeded 8.5% of taxable income by $61,668,083.34 (*i.e.*, the Undisputed Tax Claims); (3) Cobra's submissions to PREPA demonstrated its entitlement to the amount claimed; and (4) PREPA failed to make the tax gross-up payment for 2018 required by the First Contract. On these facts and under the express terms of the First Contract, the Undisputed Tax Claims have been due and owing to Cobra by PREPA since April 2019.

9. The Opposition reveals that PREPA is withholding the Undisputed Tax Claims, not because of any contract provision that allows it to do so, but because PREPA speculates that facts "may," "could," or "might" be proved someday that would generate a contractual basis to withhold

4

the payment.[3] Despite multiple opportunities, PREPA has come forward with no such facts beyond its speculative theories (based on misreadings of the OIG Report and the Indictment) that it might in the future be able to allege facts sufficient to warrant withholding the tax gross-up payments. This Court should not permit mere hopes, rather than evidence, to hold up the allowance of the Undisputed Tax Claims. *See In re GHR Energy Corp.*, 41 B.R. 668, 672 (Bankr. D. Mass. 1984) (stating that absent "convincing contradictory evidence," "[t]he contract rate is presumed reasonable and is to be taken[.]") (citations omitted).

10.  PREPA has not and cannot point to any provision of the First Contract that supports its position. Cobra unquestionably submitted the required information that triggered PREPA's obligation to reimburse Cobra for excess 2018 taxes paid.[4] PREPA does not dispute that its own officials affirmatively told Cobra that the submission of its 2018 tax return would be sufficient for PREPA to make the payment. Layton Decl. at ¶ 17. As PREPA's own conduct shows, the 2018 tax gross-up is due and owing. PREPA's failure to pay is a breach of contract.

11.  The excuses PREPA gives for its failure to pay are meritless and unsupported by any applicable contract terms.

- PREPA asserts that it "deployed higher scrutiny and caution in 2018" than it did in 2017. Opp'n ¶ 40. But the First Contract, unsurprisingly, does not permit PREPA to withhold otherwise payments that are due at its own whim. Nor does it permit PREPA to make unilateral changes to the prerequisites to payment. To the contrary, PREPA must pay invoices within 10 days of receipt unless it disapproves the invoice within seven days of receipt. *See* Ex. 1 to Layton Decl. at 2-4. PREPA did not disapprove Cobra's invoices for the Undisputed Tax Claims within that time period.

- PREPA also contends that it may withhold payment of the Undisputed Tax Claims so long as it disputes any of Cobra's underlying invoices. PREPA argues that all

---

[3] PREPA does not repeat or attempt to defend its prior assertion to this Court that PREPA is withholding payment on the 2018 tax gross-up because Cobra has not provided "back-up documentation to support its tax gross-up claim." ECF No. 8864 ¶ 23.

[4] Cobra did the same for the information with respect to its 2017 excess taxes, for which PREPA promptly paid. PREPA does not dispute that the information Cobra submitted for the year met all contractual prerequisites.

5

disputes that might affect the total amount Cobra is owed under the First Contract must be resolved before the amount of the tax gross-up can be fixed. The Contract contains no such exception to PREPA's obligation to pay. PREPA implicitly acknowledged as much when it promptly paid the 2017 tax gross-up.

12. Furthermore, under the tax gross-up provision in the First Contract, PREPA is required to reimburse Cobra's *actual tax payments* in excess of 8.5% of taxable income. *See* Ex. 1 to Layton Decl. at 48. The parties agreed that, if the amounts "to be paid" to Cobra are subject to Puerto Rico taxes in excess of 8.5% of taxable income, "the amount to be paid to [Cobra] shall be increased by an amount that, *after the payment of such taxes*, leaves [Cobra] with the amount that [Cobra] would have received if [Cobra] had been exempt from all such taxes." *Id.* (emphasis added). As an accrual basis taxpayer, Cobra was required to pay taxes to Puerto Rico on all of the amounts for which it invoiced PREPA in 2018 for work under the First Contract, even if those invoices were yet "to be paid." Suppl. Decl. of Mark Layton at ¶ 4. There is no dispute that Cobra's actual tax liability in excess of 8.5% of taxable income for 2018 was $61,668,083.34, and that Cobra paid that amount to Puerto Rico.

13. Accordingly, resolution of disputes over Cobra's outstanding invoices cannot have any effect on Cobra's tax liability for 2018, despite PREPA's incorrect assertions otherwise. Opp'n at ¶ 38. Cobra was *legally required* to pay taxes on the amounts it had invoiced to PREPA in 2018 and that amount is now fixed. PREPA's non-payment of any of those invoices will not change Cobra's 2018 tax liability, nor allow it to seek a refund from Puerto Rico.[5] Thus, the amount of the tax gross-up that PREPA is required to reimburse Cobra for 2018 also will not change.

14. Even if PREPA was correct that it might be able to claw back amounts in respect of the 2018 tax gross-up from Cobra if PREPA wins the disputes on the underlying invoices, *the*

---

[5] While it is possible that PREPA's non-payment of 2018 invoices could generate tax losses in future years, any such losses would be valueless to Cobra unless Cobra earns offsetting income in Puerto Rico in those future years. Cobra currently has no work in Puerto Rico and is not planning further work in Puerto Rico.

6

*total claw-back could not exceed 0.2% of the Undisputed Tax Claims*. The Opposition ignores the fact that the taxes at issue were paid only on 2018 invoices under the First Contract and that PREPA already has paid 99.8% of those invoices. Layton Supp. Decl. at ¶ 3. The vast majority of the parties' other disputes relate to the Second Contract.

      **B.**      **Neither the FEMA Analysis Nor the Criminal Proceeding Will Alter PREPA's Obligation to Pay the Undisputed Tax Claims**

15.      Perhaps recognizing that its contractual arguments are unavailing, the Government Parties turn to hypothetical outcomes that the FEMA Analysis and the Indictment may have on this Court's determination over the allowance of Cobra's claims. But, as set forth in the Motion and this Reply, neither the FEMA Analysis nor the Indictment will answer the question before this Court: whether the Undisputed Tax Claims were actual and necessary costs incurred by PREPA in operating its business. *Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.)*, 954 F.2d 1, 5 (1st Cir. 1992). The clear answer to that question is yes.

      **1.**      **FEMA's Review is Not a Basis for Withholding the Undisputed Tax Claims**

16.      Contrary to the Government Parties' position, the FEMA Analysis is not determinative of whether Cobra's administrative expense claims are allowed. *See* Opp'n at ¶ 35 (arguing that Cobra's invoices for services in excess of FEMA's revised cost analysis would not meet the requirements of section 503(b)(1)). As the cases cited in the Opposition make clear, absent evidence otherwise, courts will presume that the contract rate is the reasonable value of the services provided to the debtor. *See* Opp'n at ¶ 35 (citing *In re Sanborn Inc.*, 181 B.R. 683 (Bankr. Mass. 1995)).[6] The FEMA Analysis will not relieve the Government Parties of their burden to rebut the presumption that the Undisputed Tax Claims are reasonable.

---

[6]  *Sanborn* acknowledged the presumption in favor of the contract rate as the reasonable value for the services and goods provided under a contract. *In re Sanborn, Inc.*, 181 B.R. at 688; *accord Bethlehem Steel Corp. v. BP Energy*

7

17. *First*, the FEMA Analysis will not change the fact that PREPA owes Cobra the Undisputed Tax Claims.[7] The OIG Report directing FEMA to conduct a further analysis did not mention Cobra's tax payments to Puerto Rico, the tax gross-up provision or otherwise implicate PREPA's obligation to reimburse Cobra for taxes paid. *See* Ex. 16 to Layton Decl. As stated by FEMA itself, the FEMA Analysis "will focus on the reasonableness of quantities (labor, equipment and material units) based on the actual scope of work completed." *See id.* at 13. FEMA, in other words, is not reviewing PREPA's contractual commitment to reimburse Cobra for taxes paid, assessing the reasonableness of this tax payment, or reviewing PREPA's current obligation to reimburse Cobra for the taxes paid to Puerto Rico. In fact, FEMA concluded in 2017 that the contract terms included by PREPA in its contract with Cobra were acceptable. *See id.* at 5. Accordingly, there is no basis to believe that the FEMA Analysis might affect or make any finding relating to the Undisputed Tax Claims or provide any basis for PREPA to withhold payment in respect of the Undisputed Tax Claims.

18. PREPA points to the possibility that FEMA may disallow reimbursement to PREPA of some costs as grounds for PREPA to withhold payment on the Undisputed Tax Claims. This argument fails for multiple reasons. First, as demonstrated *infra*, because Cobra is required to pay its taxes on an accrual basis, no post-2018 changes in the amounts PREPA owes to Cobra can alter Cobra's 2018 tax liability to Puerto Rico, which was already paid. Cobra was *legally required* to pay the amount of Puerto Rico taxes that it paid in 2018 and PREPA was obligated under the tax gross-up provision of the First Contract to reimburse Cobra for its *actual tax*

---

*Co. (In re Bethlehem Steel Corp.)*, 291 B.R. 260, 264 (Bankr. S.D.N.Y. 2003) ("[W]here a contract exists, the contractual rate is the reasonable value of the goods and services provided to the estate.").

[7] FEMA estimated that its analysis would be complete in May 2020. While there was never any guarantee that FEMA would stick to this schedule, the COVID-19 disruptions increase the likelihood that the completion of FEMA's Analysis may be delayed.

8

*payments* in excess of 8.5% of taxable income. Regardless of what FEMA finds, therefore, PREPA will remain liable to Cobra in respect of the Undisputed Tax Claims.

19. Even ignoring (as PREPA does) that Cobra's 2018 tax liability is fixed, PREPA's argument is wrong. The First Contract contains a specific provision addressing the possibility that FEMA might not reimburse PREPA for all of the amounts PREPA is contractually obligated to pay Cobra. Article 29 reflects the parties' express agreement that PREPA would remain obligated to pay Cobra whether or not FEMA reimburses PREPA, unless FEMA's failure to reimburse PREPA was Cobra's "sole fault." *See* Ex. 1 to Layton Decl. at 16 ("Any failure to secure approvals or funding from FEMA or some other source (except due to the Contractor's sole fault) shall not relieve PREPA from its obligations for payment under this Contract.").

20. PREPA speculates that the FEMA Analysis may result in a retroactive decision not to reimburse PREPA for amounts PREPA agreed to pay Cobra under the Contracts. By definition, this cannot be Cobra's sole fault. PREPA, of its own volition, agreed to the terms of the Contracts, including Cobra's rates, and did so only after multiple levels of review and approval and advice of counsel. PREPA also fails to explain how it could be Cobra's sole fault if FEMA made mistakes in reaching its December 2017 conclusion that Cobra's rates for labor and equipment were reasonable or if RAND Corporation erred in its independent March 2019 finding that the rates PREPA agreed to pay Cobra were reasonable. *See* Ex. 16 to Layton Decl. at 11; Ex. 17 to Layton Decl. at 3. For these reasons, the ongoing FEMA Analysis, even if it results in FEMA declining to reimburse PREPA some amounts, could not possibly support a finding that such result is Cobra's sole fault.

21. PREPA incorrectly relies on Article 68's language addressing the possibility of monetary penalties imposed by government authorities for "uncured violation of applicable law

9

by Contractor" and making Cobra responsible "to the extent of its fault and/or responsibility" for such penalties. *See* Ex. 1. to Layton Decl. at 55. This provision is irrelevant here, however, because the OIG Report directing the FEMA Analysis says nothing about penalizing Cobra, nor does it suggest that Cobra committed any "uncured violation of applicable law." Moreover, this general provision, which does not mention FEMA at all, must give way to the parties' more specific agreement in Article 29 that loss of FEMA funding will affect PREPA's payment obligation only if the loss is Cobra's "sole fault."[8] PREPA's argument essentially reads the specific terms of Article 29 out of the First Contract. Contracts, however, must be construed to give "effect to as many of the contract terms as possible." RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (1981). "[A]n interpretation which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous." *Hol-Gar Mfg. Corp. v. United States,* 351 F.2d 972, 979 (Ct. Cl. 1965). And "[s]pecific terms and exact terms [of a contract] are given greater weight than general language." RESTATEMENT at § 203(c). Thus, Article 68 is of no help to PREPA here.

### 2. The Criminal Case Will Not Affect Cobra's Right to Payment of the Undisputed Tax Claims

22. The Opposition next raises a string of hypotheticals about the invoices being deemed "invalid" or "voidable" or "nullified" or "vitiated" based on the outcome of the criminal proceedings. These legal conclusions as to the Contracts will not be determined, and may not even be addressed, by the criminal court, as they involve the rights and liabilities of Cobra and PREPA. Instead, the allegations by the Government Parties that Cobra breached the Contracts go to the heart of the claims allowance process subject to this Court's jurisdiction and should be resolved

---

[8] Article 68 originally referred to FEMA, but the parties expressly amended it to remove any mention of FEMA in Amendment 1 to the First Contract, indicating that the parties' agreement with respect to non-payment by FEMA is in Article 29, not Article 68.

10

through that process. *S.G. Phillips Constructors, Inc. v. City of Burlington (In re S.G. Phillips Constructors, Inc.)*, 45 F.3d 702, 705 (2d Cir. 1995) ("[N]othing is more directly at the core of bankruptcy administration . . . than the quantification of all liabilities of the debtor[.]"). It is this Court that will determine the amounts allowable under the Contracts and, to what extent, if any, PREPA's allegations that Cobra breached the Contracts affect PREPA's liability for the actual and undisputed benefits that Cobra provided to PREPA.

23. As of now, however, PREPA has presented no evidence that the Indictment will affect the Undisputed Tax Claims. As PREPA acknowledges, the First Contract provides PREPA with remedies only if Cobra is convicted or pleads guilty. Opp'n at n.15 ("Article 69 of the First Contract expressly addresses the circumstances [in which] a criminal conviction would entail rescission of the contract and permit PREPA to refuse further payments.").[9] But Cobra has not been charged, much less convicted by plea or otherwise, of any crime. Accordingly, PREPA has no current right to withhold payment of the Undisputed Tax Claims based on the existence of the Indictment against Mr. Ellison and Ms. Tribble.[10] Moreover, the outcome of those criminal proceedings will not, and indeed cannot, trigger any right PREPA may have to rescind the First Contract or refuse payment of the Undisputed Tax Claims.

24. PREPA claims that, "if" the Indictment's allegations are someday proved true, Cobra "may" have breached the contract in ways that would give rise to claims for damages by

---

[9] Subparagraph 12 of Article 69 provides: "In accordance with Article 6 of Public Law 458 of December 29, 2000 of the Commonwealth of Puerto Rico, as amended, *Cobra Acquisitions LLC acknowledges that its conviction or guilty plea* for any of the crimes enumerated in Article 3 of such Act, shall entail, in addition to any other applicable penalty, the automatic rescission of this Contract. In addition, but only to the extent required by Public Law 458, PREPA shall have the right to demand the reimbursement of payments pursuant to this Contract that directly result from the committed crime." Ex. 1 to Layton Decl. at 32 (emphasis added).

[10] As explained in the Motion, Jovanda Patterson pleaded guilty to one count of 18 U.S.C. § 208(a), acts affecting a personal financial interest, pursuant to a plea agreement in which the government agreed to recommend probation. Mot. at n.6. Patterson's plea relates entirely to her own conduct as a FEMA employee, did not relate to the contracts in any way, did not involve Ms. Tribble or Mr. Ellison, and had nothing to do with the conspiracy allegations in the Indictment. Indeed, her plea and has no bearing on the amount owed to Cobra under the Contracts.

11

PREPA and release from further obligations to pay. Opp'n at ¶ 44. PREPA fails to explain how any possible outcome of the criminal charges alleged in the Indictment itself could result in PREPA escaping its obligation to pay Cobra on account of the Undisputed Tax Claims. Indeed, each of PREPA's arguments with respect to the hypothetical impact of the criminal proceedings implicates issues far beyond those that will be determined by the criminal court. These arguments are nothing more than ordinary claim disputes properly heard in front of this Court.

- PREPA claims that the criminal case might give rise to a PREPA claim that Cobra violated the duty of loyalty. And if those speculative contingencies happen, PREPA says that, irrespective of any such right under the terms of the Contracts, PREPA might have a claim for damages and "may possibly" be entitled to disgorgement of profits, all of which supposedly would offset the amount of tax payments owed. Opp'n at ¶ 45. PREPA fails to explain how this series of conjectures justifies its failure to comply now with its contractual obligation to pay amounts currently due and owing under the Contracts. As PREPA acknowledges, its remedy if Cobra violated Article 21 is a breach claim and, as such, is properly an argument that should be raised and determined by this Court.[11]

- PREPA invokes Article 68, which addresses the possibility that penalties will be imposed on *PREPA* as a result of conduct by Cobra. PREPA suggests that FEMA might disallow amounts it owes to PREPA after the criminal proceeding is over. Opp'n at ¶ 46. But FEMA has never hinted that it might withhold funds from PREPA as a result of the conduct alleged in the Indictment and PREPA points to no evidence suggesting that FEMA would do so. This is unsurprising because FEMA has no reason to punish PREPA for actions allegedly taken by Ms. Tribble or Mr. Ellison. This odd conjecture is not a basis to allow PREPA to escape its obligations.

- PREPA also turns to Article 43 of the First Contract, requiring compliance with the Code of Ethics. But this provision is of no help to PREPA's position. To begin, PREPA does not explain how the criminal proceeding will establish that Cobra did not "disclos[e] all information needed to make informed decisions." Opp'n at ¶ 47. The alleged misconduct began *after* the First Contract was awarded, so no failure to disclose resulted in the award of the only contract relevant to the Undisputed Tax Claims. In any event, PREPA's reading of the general language of Article 43 would

---

[11] The notion that PREPA could prove damages anywhere near the amount necessary to offset the $62 million tax liability is fanciful. It is undisputed that Cobra performed all of the work required to rebuild Puerto Rico's electrical system as provided in the Contracts and nothing in the Indictment disputes the high quality and efficacy of that work or that Cobra earned every penny that it invoiced to PREPA. In other words, PREPA does not seriously contest the benefits its services provided to the Debtors, as required under Bankruptcy Code section 503(b)(1). At most the Indictment alleges that Ms. Tribble exerted "pressure" on PREPA to "accelerate payments" and to assign Cobra tasks over PREPA employees or other contractors (Indictment at ¶102), but does not allege that any such "pressure" resulted in any material harm to PREPA.

12

effectively write out of the contract Article 69's specific requirement of a conviction before PREPA can refuse payment based on alleged criminal conduct. As noted *infra*, this violates well-established principles of contract interpretation by rendering Article 69 meaningless. RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (1981); *Hol-Gar Mfg. Corp.*, 351 F.2d at 979. The more specific terms of Article 69 must take precedence over the general provisions of Article 43. RESTATEMENT at § 203(c) ("Specific terms and exact terms [of a contract] are given greater weight than general language."). Moreover, a violation of the Code of Ethics may result in termination of the contract and a claim for compensation. Act 2-2018 at §3.7. But, even if PREPA terminated the First Contract, however, Cobra would still be entitled to payment of the Undisputed Tax Claims. The First Contract is clear that, upon termination, "PREPA shall pay to the Contractor all portions of the work completed and for actual, reasonable, and necessary expenses caused by such termination, which shall apply in the case of Termination by either Party for any reason." Ex. 1 to Layton Decl. at 10. Thus, even if the outcome of the criminal proceeding were to give PREPA a right to terminate the contract, it would still be contractually required to pay Cobra the Undisputed Tax Claims. To the extent PREPA believed it was due compensation, it could make a claim, but withholding the Undisputed Tax Claims would not be an available remedy.

- PREPA also claims, bizarrely, that Article 29 grants PREPA a "global absolution to pay Cobra, including the Tax Claims." Opp'n at ¶ 48. Article 29 does no such thing. It provides that PREPA must pay Cobra even if PREPA is not reimbursed by FEMA. It provides an exception if FEMA's failure to reimburse is Cobra's sole fault. Obviously, this in no way absolves PREPA from its current obligation to pay Cobra the Undisputed Tax Claims. PREPA does not claim, much less demonstrate, that FEMA has declined any request by PREPA for reimbursement of its tax gross-up obligation, or that FEMA has indicated in any way that it might decline any such request in the future. In short, PREPA has no basis whatsoever for its rank speculation that FEMA might withhold funding from PREPA based on the outcome of the criminal case. And if FEMA did so based upon the actions of Ms. Tribble, a FEMA employee, that certainly could not be said to be Cobra's sole fault.

25. PREPA also rehashes arguments it has made before (which Cobra has repeatedly rebutted) to the effect that the criminal case might give rise to an argument that the First Contract is vitiated because Cobra improperly or fraudulently obtained it. PREPA argues that Cobra might be shown to have obtained the First Contract by "deceit," by "failing to disclose its employees' conduct," or through "illicit consideration." Opp'n at ¶¶ 51-52. These arguments are meritless and based on mischaracterizations of the Indictment. In addition to falsely referring to "Cobra's Criminal Proceeding" and "Cobra's allegedly criminal conduct" (Cobra is not a party to any

13

criminal proceeding and is not alleged to have engaged in any criminal conduct), PREPA asserts that the Indictment alleges a "conspiracy to bribe FEMA officials in exchange for Cobra's receipt of valuable repair and restoration contracts." Opp'n at ¶ 27. *See also* Opp'n at ¶ 15. This is simply not true. The Indictment does not allege that either Contract was awarded as a result of bribery or any other wrongdoing. The first overt act alleged by the Indictment occurred in December 2017, months *after* PREPA awarded Cobra the First Contract, which is the relevant contract for purposes of the Undisputed Tax Claims. *See* Indictment at ¶ 50. In any event, the Indictment makes no allegation that the purpose or result of the alleged misconduct included inducing PREPA to award the First Contract to Cobra.

### III. PREPA's Continuing Breach of Its Obligation to Pay the Undisputed Tax Claims Threatens the Company's Viability and Is Manifestly Unjust.

26. The Motion demonstrated the increasing hardship PREPA's continuing breach of its payment obligations, and the uncertainty over when those breaches will be addressed, is bringing and will continue to bring to Cobra. Mot. at ¶¶ 31-33. PREPA, however, argues that it is "completely entitled to make sure it does not pay invalid claims." Opp'n at ¶ 53. But PREPA's obligations to make timely payment and its rights to withhold payment are constrained by the terms of the Contracts it induced Cobra to enter with its promises of prompt payment, not by its own self-serving declarations. As the undisputed facts amply demonstrate, the Undisputed Tax Claims are entitled to allowance as administrative expense claims under section 503(b)(1).

27. In truth, PREPA is now asserting an entitlement to breach its contractual obligations to Cobra and then stonewall all efforts to enforce the Contract by raising speculative and unfounded theories that it might someday have an offset or counterclaim. PREPA's penchant for speculation is so strong that it now claims the right to withhold payment on the theory that Cobra

14

*may* someday prove unable to satisfy claims that PREPA *might* decide in the future to assert based upon evidence that it does not presently have. *See* Opp'n at ¶ 53. This logic refutes itself.

28. Especially outlandish is PREPA's assertion that, because it has already paid Cobra $1.1 billion, the Company does not actually need or deserve additional payments. *See* Opp'n at ¶ 55. As PREPA knows, Cobra did not simply pocket the payments PREPA has made. Cobra used that money to fund the enormous expense of rebuilding PREPA's electrical system, which required massive amounts of labor and supplies, as well as the management skills to complete this herculean effort. Indeed, Cobra was forced to borrow the money necessary to pay the Puerto Rico taxes at issue. Layton Decl. at ¶ 8. Cobra incurred hundreds of millions of additional expenses that are going unreimbursed as PREPA continues to refuse to pay Cobra's outstanding invoices. Like most businesses today, the Company is suffering from myriad factors that it cannot control, but its hardships are unquestionably being compounded by PREPA's unjustifiable failure to pay amounts due to the contracting party that restored PREPA's very ability to function. This is easily cured.

## CONCLUSION

WHEREFORE, for the reasons set forth in the Motion and herein, Cobra respectfully requests that this Court enter an order, substantially in the form attached as **Exhibit B** to the Motion, granting the relief requested herein, and granting Cobra such other relief as this Court deems just and proper.

*[Remainder of page left blank intentionally.]*

Dated: April 14, 2020

Respectfully submitted,

| | |
|---|---|
| Rafael Escalera Rodríguez (No. 122609) | Ira S. Dizengoff (*pro hac vice*) |
| */s/ Sylvia M. Arizmendi* | Abid Qureshi (*pro hac vice* admission pending) |
| Sylvia M. Arizmendi (No. 210714) | Philip C. Dublin (*pro hac vice*) |
| Alana Vizcarrondo-Santana (No. 301614) | Steven M. Baldini (*pro hac vice*) |
| REICHARD & ESCALERA, LLC | AKIN GUMP STRAUSS HAUER & FELD LLP |
| 255 Ponce de León Avenue | One Bryant Park |
| MCS Plaza, 10th Floor | Bank of America Tower |
| San Juan, PR 00917-1913 | New York, NY 10036 |
| Telephone: (787) 777-8888 | Tel: (212) 872-1000 |
| Email: escalera@reichardescalera.com | Fax: (214) 872-1002 |
| arizmendis@reichardescalera.com | Email: idizengoff@akingump.com |
| vizcarrondo@reichardescalera.com | aqureshi@akingump.com |
| pabong@reichardescalera.com | pdublin@akingump.com |
| | sbaldini@akingump.com |

--and--

Thomas P. McLish (*pro hac vice*)
Scott M. Heimberg (*pro hac vice*)
Allison Thornton (*pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, DC 20006
Tel: (202) 887-4000
Fax: (202) 887-4288
Email: tmclish@akingump.com
  sheimberg@akingump.com
  athornton@akingump.com

*Attorneys for Cobra Acquisitions LLC*