**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>Debtor.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |

**REPLY OF ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND INVESCO FUNDS IN FURTHER SUPPORT OF MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 3013 FOR ENTRY OF AN ORDER RECLASSIFYING CLASS 39A AND CLASS 41 CLAIMS UNDER OVERSIGHT BOARD'S PLAN OF <u>ADJUSTMENT DATED FEBRUARY 28, 2020</u>**

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "<u>Commonwealth</u>") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("<u>COFINA</u>") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("<u>HTA</u>") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("<u>ERS</u>") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("<u>PREPA</u>") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("<u>PBA</u>") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT .................................................................................................1

ARGUMENT ........................................................................................................................2

I.    FIRST CIRCUIT LAW REQUIRES THAT SUBSTANTIALLY SIMILAR
CLAIMS BE CLASSIFIED TOGETHER...........................................................................2

    A.    Cases Permitting Separate Classification Of Deficiency Claims Subject To
Section 1111(b) Represent A Minority View And, In Any Event, Do Not
Justify Separate Classification of Retiree Claims....................................................3

    B.    Granada Wines Is Controlling Authority In This Circuit ........................................6

    C.    Section 1129(b) Is Irrelevant To Classification Of Claims And Does Not
Justify Separate Classification Of Substantially Similar Claims............................7

II.    RETIREE CLAIMS ARE "SUBSTANTIALLY SIMILAR" TO OTHER
UNSECURED, NON-PRIORITY CLAIMS ...................................................................9

    A.    Section 201(b)(1)(C) Does Not Change The Priority Or Nature Of Retiree
Claims ....................................................................................................................10

    B.    Different Proposed Treatment Is Not A Basis For Separate Classification...........11

    C.    Retiree Claims Are Not Claims For "Essential Public Services" .........................13

    D.    Classifying Retiree Claims With Other Non-Priority Unsecured Claims Is
Consistent With The Parties' Reasonable Expectations ........................................15

III.    THE FACT THAT THIS IS A GOVERNMENTAL RESTRUCTURING DOES
NOT CHANGE THE LEGAL NATURE OF THE RETIREE CLAIMS OR
JUSTIFY SEPARATE CLASSIFICATION .................................................................16

IV.    THE OBJECTORS FAIL TO IDENTIFY A LEGITIMATE NON-
GERRYMANDERING PURPOSE FOR THEIR CLASSIFICATION SCHEME...........18

V.    BANKRUPTCY RULE 3013 IMPOSES NO TIME CONSTRAINTS ON WHEN
A MOTION MAY BE BROUGHT ..............................................................................20

VI.    SECTIONS 301(E), 312, AND 313 DO NOT OVERRIDE RULE 3013 ........................22

VII.    THE OBJECTORS' OTHER PROCEDURAL ARGUMENTS ARE WITHOUT
MERIT .....................................................................................................................24

CONCLUSION....................................................................................................................26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

Albright v. Oliver,
    510 U.S. 266 (1994) ............................................................................14

Aqueduct & Sewer Authority of P.R. v. Union Empleados A.A.A.,
    5 P.R. Offic. Trans. 602 (P.R. 1976) ...............................................15

Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.),
    280 F.3d 648 (6th Cir. 2002) ...........................................................6

Doe v. Cape Elizabeth Sch. Dist.,
    832 F.3d 69 (1st Cir. 2016) .............................................................24

Duncan v. Walker,
    533 U.S. 167 (2001) ........................................................................13

Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Global Designated Activity Co.,
    948 F.3d 457 (1st Cir. 2020) ...........................................................11

Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv. LLC,
    915 F.3d 838 (1st Cir. 2019) ...........................................................14

Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,
    529 U.S. 120 (2000) ........................................................................24

Granada Wines, Inc. v. New England Teamsters and Trucking Industry Pension Fund,
    748 F.2d 42 (1st Cir. 1984) ........................................................ *passim*

In re 18 RVC, LLC,
    485 B.R. 492 (Bankr. E.D.N.Y. 2012) ...........................................20

In re 266 Washington Assocs.,
    141 B.R. 275 (Bankr. E.D.N.Y.), aff'd sub nom. In re Washington Assocs.,
    147 B.R. 827 (E.D.N.Y. 1992) .......................................................7

In re 4th St. E. Investors, Inc.,
    2012 WL 1745500 (Bankr. C.D. Cal. May 15, 2012) ....................12

In re 500 Fifth Ave. Assocs.,
    148 B.R. 1010 (Bankr. S.D.N.Y. 1993),
    Aff'd, 1993 Wl 316183 (S.D.N.Y. May 21, 1993) ........................21

In re Barney & Carey Co.,
    170 B.R. 17 (Bankr. D. Mass. 1994) ......................................3, 4, 18, 20

**TABLE OF AUTHORITIES (cont'd)**

**Page(s)**

In re Bjolmes Realty Tr.,
    134 B.R. 1000 (Bankr. D. Mass. 1991) ................................................................ *passim*

In re BWP Transp., Inc.,
    462 B.R. 225 (Bankr. E.D. Mich. 2011) ..........................................................8

In re CGE Shattuck, LLC, No. 99-12287-JMD,
    1999 WL 33457789 (Bankr. D.N.H. DEC. 20, 1999) ................................4, 5

In re Charles Street African Methodist Episcopal Church of Boston,
    499 B.R. 66 (Bankr. D. Mass. 2013) ..................................................5

In re City of Detroit,
    524 B.R. 147 (Bankr. E.D. Mich. 2014) ......................................5, 15

In re City of Stockton,
    526 B.R. 35 (Bankr. E.D. Cal. 2015) ..................................................17

In re Cranberry Hill Assocs. Ltd. P'ship,
    150 B.R. 289 (Bankr. D. Mass. 1993) ..................................................4

In re Curtis Center Ltd. P'ship,
    195 B.R. 631 (Bankr. E.D.Pa. 1996) ..................................................20

In re Fin. Oversight & Mgmt. Bd. for P.R.,
    583 B.R. 626 (D.P.R. 2017) ..................................................24

In re G & C Foundry Co., Ltd., No. 06-30601,
    2008 WL 4560741 (Bankr. N.D. Ohio Oct. 9, 2008) ......................................21

In re Gato Realty Tr. Corp.,
    183 B.R. 15 (Bankr. D. Mass. 1995) ..................................................3, 5

In re Hanish, LLC,
    570 B.R. 4 (Bankr. D.N.H. 2017) ..............................................*passim*

In re Hillside Park Apartments, L.P.,
    205 B.R. 177(Bankr. W.D. Mo. 1997) ..................................................20

In re Manuel Mediaviavilla, Inc., No. 13-2800 (MCF),
    2015 WL 3780463 (Bankr. D.P.R. June 16, 2015) ......................................7

In re Midway Investments, Ltd.,
    187 B.R. 382 (Bankr. S.D.Fla. 1995) ..................................................20

TABLE OF AUTHORITIES (cont'd)

**Page(s)**

In re Montreal, Maine & Atl. Ry., Ltd.,
    799 F.3d 1 (1st Cir. 2015) ...............................................................13

In re Nat'l Paper & Type Co. of P.R.,
    120 B.R. 624 (D.P.R. 1990) ...............................................................6

In re Nat'l/Northway Ltd. P'ship,
    279 B.R. 17 (Bankr. D. Mass. 2002) .................................................2, 4, 5, 13

In re Rexford Properties LLC,
    558 B.R. 352 (Bankr. C.D. Cal. 2016) ...............................................21

In re River Valley Fitness One Ltd. P'ship,
    2003 WL 22298573 (Bankr. D.N.H. Sept. 19, 2003) .........................................5

In re Salem Suede, Inc.,
    219 B.R. 922 (Bankr. D. Mass. 1998) .................................................8

In re Thornwood Associates,
    161 B.R. 367 (Bankr. M.D. Pa. 1993) Aff'd, 162 B.R. 438 (M.D. Pa. 1993) .................12

In re United States Truck Company, Inc.,
    800 F.2d 581 (6th Cir. 1986) .............................................................6

In re W.R. Grace & Co.,
    2008 WL 4571559 (Bankr. D. Del. Oct. 10, 2008) ...........................................24

J.R.T. v. Assoc. Servs. Medicos Hosp.,
    15 P.R. Offic. Trans. 476 (P.R. 1984) ...................................................15

Matter of Greystone III Joint Venture,
    995 F.2d 1274 (5th Cir. 1991) .............................................................12

Morales Morales v. E.L.A.,
    126 D.P.R. 92 (P.R. 1990) ...............................................................15

Ramirez-Lluveras v. Pagan-Cruz,
    833 F. Supp. 2d 182 (D.P.R. 2012) .......................................................15

TRW Inc. v. Andrews,
    534 U.S. 19 (2001) ...............................................................13

U.S. v. Zannino,
    895 F.2d 1 (1st Cir. 1990) ...............................................................15

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Union Empleados Carreteras v. J.R.T.,
    19 P.R. Offic. Trans. 138 (P.R. 1987) ........................................................15

Victory Park Credit Opportunities, LP v. VPR Liquidation Tr. ex rel. Milligan,
    539 B.R. 305  (W.D. Tex. 2015) .............................................................8

**Statutes & Other Authorities:**

11 U.S.C. § 1123(a)(4) ....................................................................................6

48 U.S.C. § 2141(b)(1)(c) ...............................................................................10

PROMESA
    § 101(a) ...............................................................................................18
    § 201(b)(1) ..........................................................................................18
    § 209 ...................................................................................................18
    § 310 ...................................................................................................24
    § 312(a) ...............................................................................................22
    § 313 ...................................................................................................23
    § 314(b)(7) ..........................................................................................11

P.R. Const. Art. II, § 18 ...................................................................................14

23 L.P.R.A. § 104(c) ........................................................................................16
23 L.P.R.A. § 104(c)(3) ......................................................................................9

Fed. R. Bankr. P. 3013 .....................................................................................21

H.R. Rep. No. 114-602 (2016) .............................................................10, 11, 18

The Supporting Parties hereby file this reply (the "Reply") in further support of the Motion (ECF No. 11989) and their Partial Joinder and Statement in Support with respect thereto (ECF No. 12687, the "Joinder", and together with the Motion, the "3013 Motion"),[2] and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      Try as they might, the Objectors cannot credibly rebut the legal propositions at the heart of the 3013 Motion: (i) in the First Circuit, the controlling authority on claims classification is Granada Wines, which requires that all "substantially similar" claims of the same rank against the same property be placed in the same plan class (see Section I below), and (ii) the unsecured, non-priority Retiree Claims in Class 39A are "substantially similar" to all other unsecured, non-priority claims, including the CW General Unsecured Claims in Class 41 (see Section II below). The Objectors' reliance on lower court cases within the First Circuit and cases *from other jurisdictions* does nothing to change these clear principles. The Objectors' reliance on the fact that this case is a "governmental restructuring" (rather than a non-governmental restructuring) similarly fails to remove the plan from the controlling principles of Granada Wines (see Section III below). Finally, the Objectors have failed to carry their burden of identifying a legitimate purpose for Class 39A's separate classification. Indeed, the arguments and factual admissions in the Objections demonstrate that the Objectors intend to rely on their gerrymandering of Class 39A—or, in the

---

[2] This Reply responds to the following objections or reservations of rights (collectively, the "Objections") filed by the following parties (the "Objectors"): (i) AFT (ECF No. 12084, "AFT.Obj."); (ii) the Retiree Committee (ECF No. 12684, "Ret.Obj.", and ECF No. 12725, "Ret.Supp."); (iii) AFSCME (ECF No. 12689, "AFSCME.Obj."); (iv) National (ECF No. 12718); (v) QTCB Noteholder Group (ECF No. 12723, "QTCB.Obj."); (vi) LCDC (ECF No. 12724, "LCDC.Obj."); and (vii) FOMB (ECF No. 12726, "FOMB.Obj."). Any argument in the Reply relevant to any Objection is made in response to each relevant Objection. Capitalized terms not defined in this Reply shall have the meanings ascribed to them in the Motion, Joinder, or Objections, as applicable. Unless otherwise indicated, all references to ECF numbers in this Reply refer to the docket in Case No. 17-3283-LTS.

alternative, their gerrymandering of the nineteen different classes of substantively identical "CW
Bonds Claims"—to provide an impaired accepting class for the Amended Plan (see Section IV
below).

2.      Aside from the Objectors' misguided merits objections, the Objectors raise a
variety of procedural issues designed to delay addressing the classification-related defects in the
Amended Plan.  To that end, the Objectors argue, without support in the text of Rule 3013 or the
caselaw cited, that the 3013 Motion should not and cannot be heard prior to a confirmation hearing
(see  Section V below).  FOMB also claims that Sections 301(e), 312, and 313 of PROMESA place
it above the law and beyond the reach of Rule 3013, but the plain text of those sections refutes that
assertion, as does the need to read those sections in harmony with Section 310, which expressly
incorporates Rule 3013 into PROMESA (see Section VI below).  Finally, the Objectors raise a
menu of additional procedural arguments that have no merit, such as seeking to strike the Joinder
without moving for that relief (see Section VII below).

3.      The Court should overrule the Objections and grant the Motion.

## ARGUMENT

## I.      First Circuit Law Requires That Substantially Similar Claims Be Classified Together

4.      The Objectors fail to refute that Granada Wines, Inc. v. New England Teamsters
and Trucking Industry Pension Fund, 748 F.2d 42 (1st Cir. 1984), "is the controlling case for
classification of claims in this circuit."  Nat'l/Northway Ltd. P'ship, 279 B.R. 17, 25 (Bankr. D.
Mass. 2002); see also, e.g., In re Bjolmes Realty Tr., 134 B.R. 1000 (Bankr. D. Mass. 1991) ("The

controlling authority on claim classification in this circuit is [Granada Wines].").[3]  As noted in the

Joinder, Granada Wines "adopted a strict approach" to claims classification, "namely, that **all**

**claims of equal legal priority must be placed in the same class."**  In re Barney & Carey Co.,

170 B.R. 17, 22, 24 (Bankr. D. Mass. 1994) (emphasis added); see also, e.g., In re Hanish, 570

B.R. 4, 15 (Bankr. D.N.H. 2017) ("The First Circuit follows what is known as the 'strict approach'

to classification.").  Because the Amended Plan fails to place all non-priority, unsecured claims in

a single class, as required under the "strict approach" of Granada Wines, the classification in the

proposed Amended Plan is defective on its face.

> **A.** **Cases Permitting Separate Classification Of Deficiency Claims Subject
> To Section 1111(b) Represent A Minority View And, In Any Event, Do
> Not Justify Separate Classification of Retiree Claims**

5.      The Objectors rely on two cases, In re Bjolmes Realty Tr., 134 B.R. 1000 (Bankr.

D. Mass. 1991), and In re Gato Realty Tr. Corp., 183 B.R. 15 (Bankr. D. Mass. 1995), which

permitted separate classification of unsecured deficiency claims that were subject to an election

under Section 1111(b) of the Bankruptcy Code.  Had the creditors so elected, the claims would

have been converted to secured claims.  See FOMB Obj. ¶ 56; Ret.Obj. at pp. 8, 10.  Bjolmes and

Gato should have no impact on the outcome here.  First, these cases are, at best, outliers within the

First Circuit, and more likely were never good law.  More recent decisions within the First Circuit

have refused to follow Bjolmes and Gato, stating that the separate classifications they permitted

---

[3] The Objectors' suggestion that the holding of Granada Wines with respect to classification is *dicta* is
contrary to the clear text of the decision.  See FOMB.Obj. ¶¶ 13, 48, 53; Ret.Obj. at pp. 8-9.  In Granada
Wines, the debtor argued that the claims subject to the dispute should "be treated as if [they] were in a
separate class because the plan treated [them] differently by providing for reduced payment . . . [and] this
separate classification was justified."  748 F.2d at 46.  The First Circuit therefore needed to address the
issue of claim classification in order to reach its ultimate holding, and, in doing so, held that the claims
could not be treated as though they were in different classes because "separate classifications for unsecured
creditors are only justified 'where the legal character of their claims is such as to accord them a status
different from the other unsecured creditors.'"  Id. at 46.

are inconsistent with Granada Wines.[4]  Second, and more fundamentally, Bjolmes and Gato are outliers in that their holding is even a minority view when viewed *across all other jurisdictions*, including jurisdictions whose approach to claims classification is less strict than the First Circuit's.[5]

6.     Furthermore, even Bjolmes and Gato do not support separate classification of the Retiree Claims, because those decisions properly focused on security and priority as the primary factors (and which, under PROMESA § 301(e), are the *exclusive* factors) relevant to determining whether claims are "substantially similar."   Specifically, Bjolmes and Gato grounded their conclusion that an unsecured deficiency claim could be separately classified on the fact that, under Section 1111(b), the claimholder had the right to instead treat the claim as *secured*:

> The Debtor also refers to the [creditor]'s right to make an election under § 1111(b). ***This is the right to treat the entire amount of its allowed claim as a secured claim*** even though this amount exceeds the value of its mortgage interest.  ***Should this election be made, the [creditor] would not be entitled to share with [unsecured] creditors in other property*** now in the bankruptcy estate or brought into the estate through the avoidance powers. The [creditor]'s sole recourse would then be to look to the mortgaged property.  ***Here is the type***

---

[4] See, e.g., In re Nat'l/Northway Ltd. P'ship, 279 B.R. 17, 25 (Bankr. D. Mass. 2002) (disagreeing with Bjolmes and Gato and holding that "in this circuit at least, unsecured claims, whether trade or deficiency claims, must be classified together."); In re CGE Shattuck, LLC, No. 99-12287-JMD, 1999 WL 33457789, at *4 (Bankr. D.N.H. Dec. 20, 1999) (explaining that "the majority of bankruptcy court decisions in the First Circuit hold that, as a general matter, deficiency claims cannot be classified separately from general unsecured claims" and citing Gato and Bjolmes as cases inconsistent with this majority approach); In re Barney & Carey Co., 170 B.R. 17, 24 (Bankr. D. Mass. 1994) ("this Court respectfully declines to follow Bjolmes, as it finds that the ability to make the secured party election is insufficient to permit separate classification of the undersecured portion of a recourse obligation."); In re Cranberry Hill Assocs. Ltd. P'ship, 150 B.R. 289, 290 (Bankr. D. Mass. 1993) ("respectfully disagreeing" with Bjolmes and holding that "the plan cannot be confirmed because it separates Prudential's deficiency claim from the class containing the other unsecured creditors . . . [and] that [] separate classification  . . . violates § 1122.").

[5] See, e.g., In re Hanish, 570 B.R. 4, 15 (Bankr. D. N.H. 2017) ("Notably, the majority of courts, including those that apply less stringent standards than the First Circuit, hold that the ability to make an election under 11 U.S.C. § 1111(b) does not justify the separate classification of unsecured deficiency claims"); Nat'l/Northway, 279 B.R. at 26 (noting Gato court's acknowledgement that its view was "clearly the minority view."); Barney, 170 B.R. at 22-23 (explaining that "a minority approach . . . has permitted separate classification of deficiency claims" and Bjolmes is "within this minority.").

> *of dichotomy referred to in Granada Wines—a difference in rank
> with respect to property*.

Bjolmes, 134 at 1003 (emphasis added); see also Gato, 183 B.R. at 21-22 ("[T]his Court will follow
the holding of Bjolmes."). Retiree Claims are not subject to Section 1111(b), and, thus, the
claimants have no right to transform their unsecured claims into secured claims.

7.     In any event, even if the Bjolmes and Gato minority position on the separate
classification of deficiency claims subject to 1111(b) enjoyed more support than it does, this would
not help the Objectors, because the Objectors are not arguing for separate classification of a
deficiency claim subject to 1111(b). Instead, the Objectors are arguing for separate classification
of Retiree Claims based on what amounts to a "business justification" (FOMB.Obj. ¶ 43), namely
that government employees are vital to the Commonwealth's "operations" and the Commonwealth
therefore "has a strong interest in preserving its relationships with its employees, in enhancing
their motivation, and in attracting skilled new employees." Ret.Obj. at 14 (quoting In re City of
Detroit, 524 B.R. 147 (Bankr. E.D. Mich. 2014)); see also FOMB.Obj. ¶ 45 (same). But Granada
Wines prohibits separate classification based on a purported business or economic justification.[6]
In reality, therefore, the Objectors have no support for their position from within the First Circuit.[7]

---

[6] See, e.g., In re Nat'l/Northway Ltd. P'ship, 279 B.R. 17, 30 (Bankr. D. Mass. 2002) ("The Debtor ignores
that the Ninth Circuit has adopted a test less stringent than the strict approach of *Granada Wines* and [unlike
the First Circuit] permits separate classification of claims based upon the economic or business reasons
advanced by a debtor."); CGE Shattuck, 1999 WL 33457789, at *4 ("*Granada* adopts the strict approach
under pre-Code Chapter X cases which required that a plan must classify all legally similar claims together
regardless of business or economic issues."). Indeed, even the Gato court, which read Granada Wines to
permit separate classification of a deficiency claim, still read Granada Wines as "rejecting the business
justification approach." Gato, 183 B.R. at 21.

[7] The Objectors also attempt to undermine Granada Wines by citing to cases in the First Circuit where the
decisive factor was that a separately classified creditor had *agreed* to less favorable treatment. See Ret.Obj.
at pp. 8-10 (citing In re River Valley Fitness One Ltd. P'ship, 2003 WL 22298573, at *8 (Bankr. D.N.H.
Sept. 19, 2003) and In re Charles Street African Methodist Episcopal Church of Boston, 499 B.R. 66, 96
(Bankr. D. Mass. 2013)). Those cases have no application here, where the Retiree Claims are receiving the
most favorable treatment and other parties (including the Supporting Parties) have *not* agreed to any inferior
treatment. For example, in Charles Street, a creditor objected to the debtor's plan on the basis that a junior
lienholder should be placed in the same class and treated the same as the general unsecured creditors
because the junior lienholder was unsecured. 499 B.R. at 95. The court rejected this argument, because

### B.   *Granada Wines* Is Controlling Authority In This Circuit

8.     The remaining authority cited by the Objectors is equally uncompelling.   In particular, the Objectors' reliance on the *Sixth Circuit's* interpretation of Section 1122 in Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648, 661 (6th Cir. 2002), and In re United States Truck Company, Inc., 800 F.2d 581, 585-86 (6th Cir. 1986) is at odds with First Circuit case law.   See, e.g., FOMB.Obj. ¶¶ 41-42; Ret.Obj. at 9.   These and similar out-of-Circuit cases holding that Section 1122 does not require that all similar claims be grouped in one class simply cannot be applied here, where First Circuit precedent directly on point is to the contrary.   See, e.g., Panetti v. Quarterman, 551 U.S. 930, 961 (2007) ("The District Court, of course, was bound by Circuit precedent . . . ."); United States v. Rodriguez-Pacheco, 475 F.3d 434, 441 (1st Cir. 2007) ("[A] legal decision rendered by a court will be followed by all courts inferior to it in the judicial system.") (citing 3 J. Moore et al., Moore's Manual—Federal Practice and Procedure § 30.10[1] (2006) (footnotes omitted)).

9.     FOMB also cites In re Nat'l Paper & Type Co. of P.R., 120 B.R. 624, 626 (D.P.R. 1990) to argue that Granada Wines is not followed in the District of Puerto Rico.   See FOMB.Obj. at ¶ 54.   However, that case permitted separate classification of claims under Section 1122(b)'s "administrative convenience" **exception** to the rule that substantially similar claims should be placed in the same class.   This exception is not at issue here and was not at issue in Granada Wines.

---

the general unsecured creditors "assented to the treatment in question by voting, unanimously, to accept the plan." Id. at 96. Additionally, the court explained that the issue of claim classification was irrelevant because even if the junior lienholder and general unsecured creditors were placed in the same class, they could be treated differently under Bankruptcy Code section 1123(a)(4), which allows different treatment for claims in a class where a holder "agrees to a less favorable treatment." 11 U.S.C. § 1123(a)(4). See In re Hanish, LLC, 570 B.R. 4 (Bankr. D.N.H. 2017) ("The lynchpin of [the Charles] decision is that separate classification of the junior lienholder from the general unsecured claims did not change the outcome of the case because both classes were impaired and accepted the plan. The court's invocation of 11 U.S.C. § 1123(a)(4) was to emphasize the fact that these creditors could, and presumably would in light of their votes, agree to [their proposed treatment] even if they were in the same class, *rendering classification irrelevant*.") (emphasis added).

As shown above, bankruptcy and district courts in this Circuit uniformly apply the Granada Wines standard, as they are required to do.

10.     Similarly, FOMB mischaracterizes the court's holding in In re Manuel Mediaviavilla, Inc., No. 13-2800 (MCF), 2015 WL 3780463 (Bankr. D.P.R. June 16, 2015). FOMB.Obj. ¶ 55.   Manuel addressed a creditor's objection that claim classification was done for the purpose of gerrymandering.  2015 WL 3870463, at *4-6.  In holding that this objection was moot, the court did not *sua sponte* raise the issue of claim classification more generally.  2015 WL 3870463, at *6.  There is nothing about Manuel that runs counter to Granada Wines.[8]

### C.     Section 1129(b) Is Irrelevant To Classification Of Claims And Does Not Justify Separate Classification Of Substantially Similar Claims

11.     As an additional means of attempting to dislodge Granada Wines as the controlling authority here, FOMB argues that it must be permitted to separately classify substantially similar claims because, otherwise, the unfair discrimination requirement for cramdown plans under 11 U.S.C. § 1129(b)(1) would have no applicability.  See, e.g., FOMB Obj. ¶¶ 12, 38.  But classification and unfair discrimination are "discrete legal issues," and only classification is at issue in the Motion.  In re 266 Washington Assocs., 141 B.R. 275, 286 (Bankr. E.D.N.Y.), aff'd sub nom. In re Washington Assocs., 147 B.R. 827 (E.D.N.Y. 1992) ("Whether or not a plan discriminates unfairly is beside the point at this juncture.  The Debtor hopelessly confuses two *discrete legal issues* by merging them into a seamless web. Unfair discrimination is a cram down issue under 11 U.S.C. § 1129(b)(1).   Classification of claims are 11 U.S.C. §§ 1122 and 1129(a)(10) issues . . . .") (emphasis added).).

---

[8] Strangely, in arguing *against* the application of Granada Wines, the Retiree Committee cites cases holding that Congress is presumed to know applicable case law when legislating.  Ret.Supp. ¶ 7. Based on those cases, Congress must be presumed to have intended for Granada Wines to apply when enacting PROMESA for Puerto Rico (which is located in the First Circuit).

12.     Indeed, the terminology and analyses under Sections 1122 and 1129(b) are distinct. Unlike Section 1122, Section 1129(b) does not use the term "substantially similar," which under Granada Wines means of equal rank with respect to the same property.  Instead, caselaw applying Section 1129(b) uses the broader term "similarly situated," which refers to claims of the same general category (e.g., administrative claims, secured claims, priority claims).  In re Trenton Ridge Inv'rs, LLC, 461 B.R. 440, 495 (Bankr. S.D. Ohio 2011) ("In the context of unfair discrimination, the phrase **'similarly situated'** suggests an 'inquiry focuse[d] on discrimination among categories of creditors who hold similar legal claims against the debtor, [such as] 'Administrative Claims,' 'Secured Claims,' [and] 'Priority Claims[.]'") (alteration in original) (emphasis added). Substantially dissimilar claims can nonetheless be similarly situated (including, for example, claims secured by a lien on different but similar property).  See, e.g., Victory Park Credit Opportunities, LP v. VPR Liquidation Tr. ex rel. Milligan, 539 B.R. 305, 312 (W.D. Tex. 2015) (secured creditor raised a justiciable issue of unfair discrimination because other secured creditor received its portion of proceeds from the sale of collateral while complaining secured creditor's share of proceeds remained in a trust account); In re BWP Transp., Inc., 462 B.R. 225, 233 (Bankr. E.D. Mich. 2011) (discussing whether plan unfairly discriminated against secured creditor who was to be paid its secured claim over six years when other secured creditors holding claims of equal priority would be paid over five years).  Unsurprisingly, therefore, courts in the First Circuit conduct both a classification analysis under Granada Wines and an "unfair discrimination" analysis under Section 1129(b) without encountering any conflict between the two.  See e.g., In re Salem Suede, Inc., 219 B.R. 922, 933-34 (Bankr. D. Mass. 1998) (concluding that classification of judgment creditors' claims violated Granada Wines and then also finding that "[t]he Debtors' Plan discriminates unfairly against the Judgment Creditors because no other creditors, secured or

unsecured, are forced to forfeit their liens or distributions from the Debtors if they do not provide a release of third parties").

## II.   Retiree Claims Are "Substantially Similar" To Other Unsecured, Non-Priority Claims

13.     Given that First Circuit law requires "substantially similar" claims to be placed in the same class, the Retiree Claims must be classified together with the CW General Unsecured Claims (and any other non-priority unsecured claims).  The Retiree Committee—but not the FOMB—argues that the Retiree Claims are not "substantially similar" to other unsecured, non-priority claims.  This assertion cannot withstand scrutiny.   As an initial matter, as Ambac noted in its joinder, the claim at issue in Granada Wines was itself a claim for liability *to a pension fund*, and yet the First Circuit rejected the debtor's argument that the pension claim's "legal nature" was different from that of other general unsecured claims.  See ECF No. 12691 ¶ 6; Granada Wines, 748 F.2d at 47.[9]  Granada Wines itself therefore disposes of the argument that pension-related claims are not "substantially similar" to other unsecured claims of the same priority, and the various theories advanced by the Retiree Committee in support of this argument should be rejected.[10]

---

[9] The Retiree Committee tries to distinguish the pension claim in Granada Wines from the Retiree Claims by pointing out that "the affected creditor in Granada Wines was a pension fund, not a class of individual retirees" (Ret.Supp. ¶ 3), but this makes no difference to the legal nature of the claim, especially given that the purpose of a pension fund is to pay pension benefits to individual retirees.

[10] Because the OMB Act (i) grants "[p]ayment of employer contributions to retirement systems and payment of pensions to individuals granted under special statutes" a third-priority status together with other "Regular expenses" of government, and (ii) provides that "disbursements related to the [various] services" possessing this third-priority status "shall not have preference among themselves but shall be handled simultaneously," the Retiree Claims have the same priority level as other "Regular expenses" of government, including the CW General Unsecured Claims.  See 23 L.P.R.A. § 104(c)(3).  Alternatively, if the OMB Act priorities do not apply, then Retiree Claims and CW General Unsecured Claims are both just unsecured, non-priority claims.

A.    **Section 201(b)(1)(C) Does Not Change The Priority Or Nature Of Retiree Claims**

14.    The Retiree Committee argues that "Congress distinguished pension obligations from all other Commonwealth claims in PROMESA Section 201(b)(1)(C)" by requiring that "a certified fiscal plan 'provide adequate funding for public pension systems,' 48 U.S.C. § 2141(b)(1)(C)."  Ret.Obj. at 11.  Effectively, the Retiree Committee is arguing that Section 201(b)(1)(C) changes the legal nature of pension claims by giving them a priority that they did not possess pre-PROMESA.  Read as a whole, however, Section 201(b) does not support this argument.  The only subsection of 201(b) that addresses priorities is Section 201(b)(1)(N), which mandates that pre-PROMESA "lawful priorities" must be "respected;" by contrast, Section 201(b)(1)(C) makes no mention of "priorities," nor does it purport to establish any such priorities.

15.    The legislative history concurs.  Congress in the House Report explicitly rejected the Retiree Committee's argument, emphasizing that Section 201(b)(1)(C) was *not* intended to modify the pre-existing priority of obligations under Puerto Rico law or to prioritize pensions over bondholders:

> The Committee [on Natural Resources] acknowledges the concern as to the ambiguity of the language regarding the funding of public pension systems. To clarify, Section 201(b)(1)(C) tasks the Oversight Board with ensuring fiscal plans ''provide adequate funding for public pension systems.'' **This language should not be interpreted to reprioritize pension liabilities ahead of the lawful priorities or liens of bondholders as established under the territory's constitution, laws, or other agreements.** While this language seeks to provide an adequate level of funding for pension systems, it does not allow for pensions to be unduly favored over other indebtedness in a restructuring.

H.R. Rep. No. 114-602 (2016) (attached hereto as "Exhibit A") at 45 (emphasis added).

16.    In any event, the First Circuit has already held that fiscal-plan-related provisions like Section 201(b) do not affect the operation of Bankruptcy Code provisions incorporated into

PROMESA. <u>Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Global Designated Activity Co.</u>, 948 F.3d 457, 476-77 (1st Cir. 2020) ("[Section 201(b)] governs only the Board's Fiscal Plan, not the operation of Title III of PROMESA"). The First Circuit made this holding with respect to Section 552 of the Bankruptcy Code, but by the same reasoning, Section 201(b)(1)(C) does not govern the operation of Section 1122.

17.     The Retiree Committee correctly points out that Section 201(b)'s fiscal plan requirements do intersect with Title III's requirements, namely through Section 314(b)(7)'s requirement that, to be confirmed, "any plan of adjustment must . . . comply with the certified fiscal plan." PROMESA § 314(b)(7). But just like Section 201(b) itself, Section 314(b)(7) is intended to *preserve* pre-PROMESA priorities, not to create new priorities, as the House Report confirms:

> By incorporating consistency with the Fiscal Plan into the requirements of confirmation of a plan of adjustment, the Committee [on Natural Resources] has ensured lawful priorities and liens, as provided for by the territory's constitution, laws, and agreements, will be respected in any restructuring.

H.R. Rep. No. 114-602 (2016) (Ex. A) at 50. The effect of Section 314(b)(7) is therefore not to change the legal nature (<u>i.e.</u>, priority) of Retiree Claims, it is merely to mandate that "the Commonwealth cannot confirm a plan of adjustment unless that plan provides for the payment of retirees' claims in a way that reflects 'adequate funding' of the pension systems." Ret.Obj. at 4.

### B.     <u>Different Proposed Treatment Is Not A Basis For Separate Classification</u>

18.     The Retiree Committee also asserts that separate classification of Retiree Claims is justified because the proposed "treatment" of Retiree Claims is "fundamentally different" from the proposed treatment of CW General Unsecured Claims and other putatively unsecured claims. Ret.Obj. at 12. That remarkable assertion turns <u>Granada Wines</u> on its head. The entire point of

requiring similar claims to be in the same class is that they should be treated the same way by the

plan. Different treatment of similar claims is exactly the evil the First Circuit sought to prevent.

It can in no way, then, be a justification for departing from the strict classification standard. See,

e.g, In re Thornwood Associates, 161 B.R. 367, 374 (Bankr. M.D. Pa. 1993) aff'd, 162 B.R. 438

(M.D. Pa. 1993) (classification based on treatment was improper because such a "difference is in

a debtor's proposed treatment of a claim rather than in the nature of the claim as it relates to the

assets of the estate. The latter constitutes the proper test for differential classification."); see also

Matter of Greystone III Joint Venture, 995 F.2d 1274, 1280, 1281 (5th Cir. 1991) ("Even if [the

debtor's] Plan had treated the trade creditors differently from [the insurance creditor], the

[separate] classification scheme here is still improper."); In re 4th St. E. Investors, Inc., 2012 WL

1745500, at *6 (Bankr. C.D. Cal. May 15, 2012) ("No analysis or authority suggests that similarity

of claims should be determined according to how they are treated in the plan."). Indeed, the First

Circuit in Granada Wines rejected the debtor's argument that a pension claim could be classified

separately because it was treated differently, foreclosing entirely the argument that different

treatment can justify different classification. See Granada Wines, 748 F.2d at 46-47 (rejecting

debtor's argument that "the [pension fund] withdrawal liability claim should nevertheless be

treated as if it were in a separate class **because the plan treated it differently** by providing for

reduced payment on it.") (emphasis added).

19.     The Retiree Committee cites no cases identifying differences in treatment as a valid

basis for separate classification.[11]  Instead, the Retiree Committee cites cases standing for the valid

---

[11] The Retiree Committee tries to suggest that the Retiree Claims are substantially different from other
unsecured claims because the Retiree Claims have different payment terms, specifically "unlike the CW
Unsecured Claims of commercial creditors, who contracted to be paid a fixed sum at a fixed time, retirees
agreed to defer their compensation with the expectation that the deferred compensation, *i.e.*, their pension,
would be paid in periodic payments over the balance of their life (and that of any surviving spouse), based
on formulas established when they worked for the Commonwealth or other governmental entities."

but distinct proposition that, pursuant to Section 1123(a)(4) of the Bankruptcy Code, all claims within a class must receive the "same treatment." Ret.Obj. at pp. 12-13. This is correct, but it is exactly why substantially similar claims must be in the same class.

### C.     Retiree Claims Are Not Claims For "Essential Public Services"

20.     The Retiree Committee also argues that "Retiree Claims are claims for 'essential public services' under Article II, section 18 of the Puerto Rico Constitution and Section 201(b)(1)(B)." Ret.Obj. at 13. Pension payments cannot be "essential public services" under Section 201(b)(1)(B) of PROMESA, however, because a separate provision of Section 201(b) already addresses pension payments, namely Section 201(b)(1)(C). Reading Section 201(b)(1)(B) as covering the same subject matter as Section 201(b)(1)(C) would impermissibly render Section 201(b)(1)(B) superfluous.[12] Notably, the "pension" provision of Section 201 (201(b)(1)(C)) immediately follows the "essential public services" provision (201(b)(1)(B)), indicating that Congress thought about the relationship between pensions and "essential public services" and decided to address them separately. Furthermore, the different funding standards within each provision show an intent to apply Section 201(b)(1)(C) to pension payments. Section 201(b)(1)(B) requires FOMB to ensure "funding" of true essential public services, without any qualification,

---

Ret.Obj. at 12. The Retiree Committee cites no authority suggesting that these types of differences in payment terms are relevant to determining whether claims are "substantially similar." Indeed, the general rule is that "[w]here the differences are in the rates of interest, in the amounts, in the dates of maturity, in names of payees, *the manner in which the claim arose* and such other minor details, they cannot affect the 'nature,' i.e., the kind of claim, otherwise a separate class would have to be provided for nearly every type of situation." In re Nat'l/Northway Ltd. P'ship, 279 B.R. 17, 28 (Bankr. D. Mass. 2002) (citation omitted, emphasis in original). In addition to the cited payment terms being irrelevant, the Retiree Committee fails to establish that there are no claims in Class 41 that are similarly structured to be paid over time, and the revenue-bond-related claims in Classes 42-44 were, in fact, designed to be paid over time.

[12] See, e.g., TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001)); In re Montreal, Maine & Atl. Ry., Ltd., 799 F.3d 1, 9 (1st Cir. 2015) ("There is a general canon of statutory construction which teaches that courts should construe statutes to avoid rendering superfluous any words or phrases therein.").

whereas Section 201(b)(1)(C) requires only "*adequate* funding for public pension systems."  The

specific provision addressing "pension systems" governs over the general provision addressing

"essential public services."  See, e.g., Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv. LLC,

915 F.3d 838, 851 (1st Cir. 2019) (applying "ancient canon of interpretation" that "the 'specific

governs the general.'"); see also Albright v. Oliver, 510 U.S. 266, 273-74 (1994).

21.     Moreover, even if some Retiree Claims qualified as "essential public services"

under Puerto Rico law, Article II, Section 18 of the Puerto Rico Constitution provides no support

for the Retiree Committee's argument that this accords them any special priority or makes them

"different" from CW General Unsecured Claims (Ret.Obj. at 13).  Article II, Section 18 merely (i)

establishes a right to strike and engage in certain other labor-related activities, and (ii) clarifies that

the provision does not limit the authority of the Legislative Assembly to enact laws in response to

grave emergencies that imperil public health or safety.  Specifically, Article II, Section 18 provides

as follows:

> In order to assure their right to organize and to bargain collectively,
> persons employed by private businesses, enterprises and individual
> employers and by agencies or instrumentalities of the government
> operating as private businesses or enterprises, in their direct
> relations with their own employers *shall have the right to strike, to
> picket and to engage in other legal concerted activities*.
>
> *Nothing herein contained [Nada de lo contenido en esta sección]
> shall impair the authority of the Legislative Assembly to enact laws
> to deal with grave emergencies that clearly imperil the public
> health or safety or essential public services.*

P.R. Const. art. II, § 18 (emphasis added).  Nothing in Section 18 remotely refers to pensions or

government retirees or grants them any particular legal status or priority, nor can Section 18 be

construed as a broad grant of emergency powers available for any use the Legislative Assembly

sees fit.  The provision merely permits the Legislative Assembly to prevent certain labor-related

activities when there is an "emergency" that imperils essential public services.  Every judicial

decision to address Section 18 and its legislative history supports Section 18's limitation to the labor context.[13]

22.     In any event, the Retiree Committee fails to develop any argument sufficient to establish either that (i) each and every Retiree Claim is based on the provision of an "essential public service" as such term is defined in applicable law (which the Retiree Committee fails to cite), or that (ii) any emergency exists, or has existed in the past, that could justify the invocation of Section 18.  Because the Retiree Committee made no effort to develop its perfunctory arguments regarding Section 18 and "essential public services" more generally, those arguments are waived. See Ramirez-Lluveras v. Pagan-Cruz, 833 F. Supp. 2d 182, 191 (D.P.R. 2012) (citing U.S. v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)).

### D.     Classifying Retiree Claims With Other Non-Priority Unsecured Claims Is Consistent With The Parties' Reasonable Expectations

23.     The Retiree Committee also cites a law review article dealing with *unfair discrimination, not classification* to suggest that "the parties' expectations" should factor into the classification analysis.  Ret.Obj. at 13.  AFT makes a similar argument, relying on a portion of In re City of Detroit, 524 B.R. 147, 257 (Bankr. E.D. Mich. 2014), that likewise addresses *unfair discrimination, not classification*.  See AFT.Obj. ¶¶ 3.i, 3.iii.  Given their focus on "unfair discrimination" under 1129(b), not classification under 1122, these authorities are inapplicable.

---

[13] See Aqueduct & Sewer Authority of P.R. v. Union Empleados A.A.A., 5 P.R. Offic. Trans. 602 (P.R. 1976) (holding that a law purporting to prohibit the right to strike regardless of whether a serious emergency existed was unconstitutional under Article II, Section 18); J.R.T. v. Assoc. Servs. Medicos Hosp., 15 P.R. Offic. Trans. 476, 481-82 (P.R. 1984) (citing Article II, Section 18 as the constitutional foundation "[i]n Puerto Rico, [for] the workers' rights to assemble, to bargain collectively, to strike, to picket, and to engage in other concerted activities . . . ."); Morales Morales v. E.L.A., 126 D.P.R. 92 (P.R. 1990) (citing Section 18 in part and stating, "[c]ontrary to the United States Constitution, our Constitution expressly embodies the workers' rights to organize, bargain collectively, to strike, to picket, and other activities that rank high in our democracy."); Union Empleados Carreteras v. J.R.T., 19 P.R. Offic. Trans. 138, 141 (P.R. 1987) (examining whether the Highway Authority operated as a private business and therefore qualified as an employer for purpose of "the collective bargaining and labor rights consecrated in Secs. 17 and 18 of our Bill of Rights").

24.     In any event, the <u>Detroit</u> court's analysis under Section 1129(b) relied in large part on the "reasonable expectations of the parties" based on their relative rights under the Michigan constitution, which contained a clause expressly prohibiting impairment of pension benefits and thereby "[gave] notice to all unsecured creditors of a municipality that the rights of pension creditors are distinctive and of special value to the citizens of th[e] state." <u>Id.</u>  <u>See</u> <u>Detroit</u>, 524 B.R. at 257.  Here, by contrast, the Puerto Rico Constitution provides no special protection to pensions (other than judicial pensions), but the Puerto Rico Constitution and the OMB Act do accord (i) a first-priority status to GO Bonds and (ii) a second-priority status to "commitments entered into by virtue of legal contracts in force" and "binding obligations to safeguard the credit, reputation and good name of the Government of the Commonwealth of Puerto Rico," including revenue bonds.  <u>See</u> 23 L.P.R.A. § 104(c).  As a result, in the Puerto Rico context, a <u>Detroit</u>-style analysis of "reasonable expectations" would support more favorable treatment of bondholders as compared to pensioners.

## III.   **The Fact That This Is A Governmental Restructuring Does Not Change The Legal Nature Of The Retiree Claims Or Justify Separate Classification**

25.     Some Objectors contend re-classification should not occur here because the Commonwealth is a "governmental entity" or because this is a "governmental bankruptc[y]," "governmental restructuring," or "governmental insolvency proceeding." <u>See</u>, <u>e.g</u>, Ret.Supp. ¶ 3; FOMB.Obj. ¶ 1; Ret.Obj. § A.3; AFT Obj. ¶ 3.ii.  None of the cited precedents from past "governmental restructurings" are from the First Circuit, and none addressed or decided a challenge to separate classification of pension claims.[14]   The only major "governmental

---

[14] In <u>Detroit</u>, the only contested classification issue was whether certain claims had been improperly classified in the *same* class, not whether they had been improperly classified *separately*.  <u>Detroit</u>, 524 B.R. at 246-47.  In <u>In re City of Stockton</u>, 526 B.R. 35, 60 (Bankr. E.D. Cal. 2015) (FOMB Obj. ¶ 45 n.23; Ret.Obj. at 15), the only contested classification issue was Franklin Templeton Investments' argument "that Franklin's unsecured claim should be separately classified." <u>Id.</u> at 38.  The <u>Stockton</u> court *rejected* that

restructuring" in the First Circuit to date has been for Central Falls, Rhode Island.  Although that

case does not appear to have addressed any contested classification issues with respect to pension

claims—meaning that <u>Granada Wines</u>, which expressly addressed a contested issue regarding

separate classification of pension claims, remains the most relevant First Circuit precedent even in

"governmental restructurings"—it is notable that in <u>Central Falls</u>, pension claims were impaired

while bond claims remained unimpaired.[15]  As such, the precedents cited by the Objectors provide

no relevant guidance or analysis with respect to how to decide a *contested* classification issue *in

this case*.  If anything, what these precedents illustrate is that the debtors in past governmental

restructurings have wisely avoided contested classification fights by building broad consensus

around a plan supported by most major stakeholders.

26.     To the extent that there are differences between Title III of PROMESA, which

governs this particular "governmental restructuring," and both chapter 11 and *chapter 9* of the

Bankruptcy Code, the relevant differences weigh against separate classification of the Retiree

Claims.  Most notably, PROMESA identified only security and priority as relevant factors to be

considered when classifying claims.  As set forth in the Joinder, under the doctrine of *inclusio*

---

argument and affirmed the "legitimacy of [the] classification" of Franklin's unsecured claim with other
unsecured claims.  <u>Id.</u> at 62.  Another case relied on by the Objectors, <u>In re City of San Bernardino</u>, No. 12-
bk-28006, Dkt. 2164 (Bankr. C.D. Cal. Feb. 7, 2017) (attached hereto as "<u>Exhibit B</u>") (FOMB Obj. ¶ 45
n.23; Ret.Obj. at 15) is a confirmation order that expressly emphasizes that "[n]ot a single confirmation
objection was filed to . . . separate classification of CalPERS' [pension-related] claims." <u>See</u> Ex. B ¶ 12.1.2.
Similarly, <u>In re City of Vallejo</u>, No. 08-26813, Dkt. 1113 (Bankr. E.D. Cal. Aug. 4, 2011) (attached hereto
as "<u>Exhibit C</u>") (FOMB Obj. ¶ 45 n.23; Ret.Obj. at 15) is merely a two-page confirmation order devoid of
any indication that any parties objected to separate classification of pension claims or that the court decided
any contested issues related to separate classification of pensions. The <u>Vallejo</u> order does reference and
overrule one objection filed at ECF No. 1091 of that case, but that objection did not concern classification
of pension claims.

[15] <u>See</u> *Fourth Amended Disclosure Statement With Respect To The Fourth Amended Plan For The
Adjustment Of Debts Of The City Of Central Falls*, Case No. 11-13105 (Bankr. D.R.I. July 27, 2012) at 3-
6 (attached hereto as "<u>Exhibit D</u>").  Like the general obligation bonds that remained unimpaired in <u>Central
Falls</u>, the GO Bonds in Puerto Rico are secured by a statutory lien.  <u>See</u> *Motion of Assured Guaranty Corp.,
Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corp. to Dismiss Adversary
Complaint*, Adv. Proc. No. 19-291-LTS, ECF No. 53 ¶¶ 27-30.

*unius est exclusio alterius*, PROMESA's inclusion of security and priority in Section 301(e) as the relevant considerations excludes consideration of other factors.  <u>See</u> Joinder ¶ 13.  No Objector identifies any competing principle of statutory construction that could lead to a different conclusion.  FOMB baldly asserts that "[i]f security and priority were the only acceptable parameters for determining whether claims are 'substantially similar' for classification purposes, PROMESA would have made that clear" (FOMB.Obj. ¶ 46), but PROMESA did make it clear by identifying only those factors, and in case there was any ambiguity in the statute, Congress made it even clearer in the legislative history: "**[Section 301] requires the Oversight Board to determine whether creditors within an entity are 'substantially similar' <u>based on whether the claims are secured and whether such claims have priority over other claims</u>.**"  H.R. Rep. No. 114-602 (2016), Ex. A at 48 (emphasis added).

27.    In addition, Congress expressly provided that the purpose of FOMB, and by extension PROMESA, was to "provide a method for Puerto Rico to achieve fiscal responsibility and access to the capital markets."  PROMESA § 101(a); <u>see also</u> PROMESA §§ 201(b)(1), 209.  Protection of creditor rights through adherence to the requirements of PROMESA and the Bankruptcy Code, including with respect to claims classification, will promote "access to the capital markets" by reassuring potential future investors that the rule of law prevails in Puerto Rico, and will thereby serve the express purpose of PROMESA.

## IV.    <u>The Objectors Fail To Identify A Legitimate Non-Gerrymandering Purpose For Their Classification Scheme</u>

28.    The Objectors try to shift the burden onto the Supporting Parties to *prove* that the Objectors gerrymandered (<u>see</u>, <u>e.g.</u> Ret.Supp. ¶ 8).  In reality, though, the burden is on the *debtor* to show "a legitimate **non-gerrymandering reason** for the separate classification."  <u>In re Barney & Carey Co.</u>, 170 B.R. 17, 24 (Bankr. D. Mass. 1994) (emphasis added).  As previously

demonstrated, none of the purported non-gerrymandering reasons offered by the Objectors are recognized in the First Circuit or otherwise hold up to scrutiny.

29.     The Objectors' substantive defense to the argument that they gerrymandered Classes 39A and 41-44 in order to try to engineer an acceptance by the retiree class (39A) is that they may not need to rely on their gerrymandering of those particular classes after all because they have now even more thoroughly gerrymandered the "CW Bond Claim" classes and are likely to receive an "acceptance" from at least one of them.  See, e.g., FOMB.Obj. ¶¶ 5, 39 n.19, 47; Ret.Supp. ¶ 9.[16]  This "defense" is entirely consistent with the Supporting Parties' theory in the Joinder, which was that the plan proponents classified the Retiree Claims separately and gave them an outsized recovery in the hopes that retirees could function as an accepting class, but as a backup also gerrymandered the CW Bond Claims into nineteen different classes to increase their odds of carrying one or more of these miniature "CW Bond Claim" classes.  Joinder ¶¶ 22-23.

30.     Indeed, by further shrinking the size of the "CW Bond Claim" classes between the Initial Plan and the Amended Plan, the Objectors may have hoped to put themselves in a position to make representations to the Court about the large number of "different" classes that were likely to accept the plan, thereby creating the illusion of broad-based support.  LCDC exemplifies this strategy in its Objection when it asserts: "[A]ssuming that 80% of bondholders vote on the Amended Plan, the claims held solely by the PSA Creditors would translate into more than 2/3 support in dollar amount from bondholders in **four out of the six anticipated classes** of uninsured

---

[16] Given that the Objectors' main defense to the Supporting Parties' argument that Classes 39A and 41 are gerrymandered is to argue that Objectors will likely be able to obtain an acceptance from one or more of the CW Bond Claim classes, it was essential for the Supporting Parties to analyze in the Joinder how and why the Objectors also gerrymandered the CW Bond Claim classes. This was not a circumstance under which the Supporting Parties brought before the Court issues beyond the scope of the Motion.  Contrary to the assertions by certain Objectors that the gerrymandering of the CW Bond Claims is irrelevant to the Motion, these facts were essential in demonstrating the factual matters at issue in the Motion. In any event, in addition to being a joinder, the Joinder was also a "statement in support," and the Supporting Parties are unaware of any procedural limitations on the subject matters that can be discussed in such a "statement."

bonds, with significant support from the PSA Creditors in the other two classes of uninsured bonds." See, e.g., LCDC.Obj. ¶ 12 n.11 (emphasis added).  Far from disproving the Supporting Parties' gerrymandering allegations, the Objections only substantiate them.

31.    FOMB also suggests that gerrymandering-based challenges to a plan cannot be considered until voting has actually occurred (see, e.g., FOMB.Obj. ¶¶ 5, 39, 47, 55), but this argument is without merit.  A court "is not required to wait until the hearing on confirmation to address the issue of artificial classification, or gerrymandering . . ." In re Hillside Park Apartments, L.P., 205 B.R. 177, 189 (Bankr. W.D. Mo. 1997).  Consistent with these principles, there are many examples of courts both considering and sustaining gerrymandering objections prior to voting on a plan.[17]  The Court can, and should, do so here.

## V.    Bankruptcy Rule 3013 Imposes No Time Constraints On When a Motion May Be Brought

32.    The Objectors argue that the 3013 Motion is premature and must await plan confirmation.  See, e.g., See Ret.Obj. pp. 16-17; Ret.Supp. ¶ 11; FOMB.Obj. ¶ 35-39; QTCB.Obj. ¶ 5; LCDC.Obj. ¶ 24.  The question of whether a motion under Bankruptcy Rule 3013 must be brought at any specific time is answered by the rule's plain language which—tellingly—does not impose any time limitations:

> For the purposes of the plan and its acceptance, the court may, on motion after hearing on notice as the court may direct, determine classes of creditors and equity security holders pursuant to §§ 1122, 1222(b)(1), and 1322(b)(1) of the Code.

---

[17] See, e.g., In re 18 RVC, LLC, 485 B.R. 492, 497 (Bankr. E.D.N.Y. 2012); In re Curtis Center Ltd. P'ship, 195 B.R. 631, 643 (Bankr. E.D.Pa. 1996); In re Midway Investments, Ltd., 187 B.R. 382, 392 (Bankr. S.D.Fla. 1995); In re Barney & Carney Co., 170 B.R. 17, 25 (Bankr. D.Mass. 1994); see also In re Hanish, LLC, 570 B.R. 4, 17-18 (Bankr. D.N.H. 2017).

Fed. R. Bankr. P. 3013.  The Objectors nevertheless argue that the 3013 Motion is premature and

must await plan confirmation.[18]  Ironically, the Objectors try to support this argument with a case

that determined the validity of a proposed classification scheme prior to the plan confirmation

process.  In re Rexford Properties LLC, 558 B.R. 352, 365 (Bankr. C.D. Cal. 2016) (ruling on a

proposed classification scheme because "**Rule 3013 contemplates consideration and approval

of a claim classification scheme prior to the plan confirmation hearing.**") (emphasis added)

(cited at Ret.Obj. at 16; Ret.Supp. ¶ 11; FOMB.Obj. ¶ 37; LCDC.Obj. ¶ 24; QTCB.Obj. ¶ 5).[19]

The court in Rexford, however, declined to rule on other issues sounding in unfair discrimination

and good faith, because Rule 3013 has limitations.  Id. at 355.  Recognizing this, the Objectors

attempt to re-characterize the basis for relief in the 3013 Motion here from claim classification to

unfair discrimination, changing facts in order to conform them to the law by inaccurately asserting

that the 3013 Motion raises confirmation issues that it never actually raised.  See FOMB.Obj. ¶ 37;

Ret.Obj. at 16; LCDC.Obj. ¶ 24; QTCB.Obj. ¶ 5; Ret.Supp. ¶ 11.  However, the request for relief

in the 3013 Motion is simple—a determination that there has been improper claim classification

under Bankruptcy Code Section 1122.  The 3013 Motion is procedurally proper and respects Rule

3013's scope.[20]

---

[19]  See also In re 500 Fifth Ave. Assocs., 148 B.R. 1010, 1017 n.7 (Bankr. S.D.N.Y. 1993), aff'd, 1993 WL
316183 (S.D.N.Y. May 21, 1993) ("Issues of claim classification raised pursuant to a Rule 3013 may be
ripe for determination prior to a confirmation hearing."); In re G & C Foundry Co., Ltd., No. 06-30601,
2008 WL 4560741, at *3 (Bankr. N.D. Ohio Oct. 9, 2008) ("Rule 3013 does not specify a time for filing a
motion for determination of classes of claims pursuant to § 1122.").

[20]  Additionally, to the extent the Objectors argue that the 3013 Motion is subject to the Court's Final Stay
Order (ECF No. 12189) or related rulings, they are wrong.  See FOMB.Obj. ¶ 30-31; Ret.Obj. at 16-17;
LCDC.Obj. ¶ 25; QTCB.Obj. ¶ 3.  During the March 4, 2020 omnibus hearing, this Court ruled that the
Rule 3013 Motion was not subject to the Final Stay Order and could proceed.  See Tr. of Hearing, (March
4, 2020), at 228:24 –229:13.

## VI.   Sections 301(e), 312, and 313 Do Not Override Rule 3013

33.    FOMB also contends that Rule 3013 simply does not apply to it, because it has an "exclusive right" to propose and amend a plan under PROMESA §§ 312-313 and because PROMESA § 301(e) provides that the Oversight Board must consider whether claims are secured and have priority in determining whether claims are "substantially similar" for purposes of Section 1122.  FOMB.Obj. ¶¶ 3, 26-27, 40.  But none of these provisions overrides the Court's power to rule on the legality of classifications in a plan, which Rule 3013 clearly empowers the Court to do.[21]  Section 312 merely provides that only FOMB, as opposed to any other party, "may file a plan."  PROMESA § 312(a).  But in order to rule on the 3013 Motion, the Court does not need to authorize any party other than FOMB to file a new plan, nor even order FOMB to do so.  The Court only needs to make a finding that the current classification scheme in the proposed Amended Plan does not comply with PROMESA, and then FOMB can decide whether it wants to file a new plan or not.  Indeed, exclusivity is hardly unique to PROMESA.  Chapter 11 debtors automatically have the exclusive right to file a plan during the first 120 days of the case.  11 U.S.C. § 1121(b).  No one has ever believed, much less asserted, that plans filed during this exclusive period are not subject to Rule 3013.

34.    Section 313, meanwhile, actually (i) *limits* FOMB's ability to modify a plan and (ii) authorizes the Court to provide guidance to FOMB on this topic *before* confirmation.  Section 313 provides:  "The Oversight Board . . . may modify the plan at any time **before confirmation**, but may not **modify the plan so that the plan as modified fails to meet the requirements of this title.**"  PROMESA § 313 (emphasis added).  The text of the statute raises the question:  How is FOMB supposed to know whether a modified plan it is contemplating "fails to meet the

---

[21] FOMB's hypothetical regarding whether the Court could determine classification under Rule 3013 where "two or more" classifications "could possibly be confirmable" is irrelevant here, because the only classification proposed to date is obviously non-confirmable.  See FOMB.Obj. ¶¶ 4, 28.

-22-

requirements of [Title III]" unless this Court tells it?  Notably, FOMB indicates in its Objection

that the proposed Amended Plan "may have to be significantly altered" as a result of the COVID-

19 pandemic.  FOMB.Obj. ¶ 10.  The fact that FOMB may currently be contemplating significant

modifications to the proposed Amended Plan makes it all the more urgent that the Court provide

FOMB with guidance as to the legality of its proposed classification scheme, and that it do so

"before confirmation."  PROMESA § 313.  Otherwise, the potential waste of resources will likely

be substantial.

35.    Finally, contrary to FOMB's assertion, Section 301(e) does not prevent creditors

from proposing, or the Court from approving, classifications different from those proposed in

FOMB's plan of adjustment.  Section 301(e) simply provides that "in determining whether claims

are 'substantially similar' for the purpose of section 1122 . . . , [FOMB] shall consider whether

such claims are secured and whether such claims have priority over other claims."  FOMB's

contention that the Court may not order different classifications unless FOMB "request[s]" such a

ruling[22] flies in the face of Rule 3013—a rule that Congress expressly incorporated into

PROMESA.  See PROMESA § 310 ("The Federal Rules of Bankruptcy Procedure shall apply to

a case under this title and to all civil proceedings arising in or related to cases under this title.").  It

is axiomatic that courts should interpret multiple provisions of the same statute as parts of a

coherent, harmonious regime.[23]  Here, for the reasons stated above, there is no conflict among

---

[22] See FOMB.Opp. ¶ 40 ("[N]either *Colliers* nor Rule 3013 can require the Court to overrule PROMESA
sections 301(e), 312 and 313 and tell the Oversight Board what plan to propose if the Oversight Board does
not request such a ruling."); id. ¶ 27 ("It follows that only the Oversight Board may invoke Bankruptcy
Rule 3013 in Title III (or the debtor in chapter 9) to seek guidance as to the formulation of a plan of
adjustment."); id. ¶ 3 ("[N]othing in the statute allows the Court to tell the Oversight Board what
classification to propose, as all Movants are urging the Court to do."); id. ¶ 28 ("Even if the Court were to
interpret Rule 3013 as permitting it to make classification determinations binding on the Oversight Board .
. . .").

[23] See, e.g., Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000) ("A court
must therefore interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible,

Sections 301(e), 310, 312(a), and 313 of PROMESA, and the Court should interpret the statute consistent with its overall regulatory scheme by giving effect to all three provisions, including Section 310's incorporation of Rule 3013.

## VII.   **The Objectors' Other Procedural Arguments Are Without Merit**

36.     The Objectors also raise a host of other procedural challenges to the Joinder, all without merit.  For example, some Objectors contend that the Joinder is a disguised motion or that it seeks relief beyond that requested in the Motion (see, e.g., FOMB.Obj. ¶¶ 2, 7), but the only relief requested in the Joinder is that the Motion be granted.  See Joinder ¶¶ 7, 30.[24]

37.     Some Objectors also urge the Court to strike portions of the Joinder on the purported basis that the Joinder seeks relief beyond that requested in the Motion (which it does not) (FOMB.Obj. ¶ 11; Ret.Supp. ¶ 1), but as those Objectors well know, requests for affirmative relief, such as the striking of filings, can only be sought by motion, not through an objection.[25] Indeed, FOMB has employed the proper procedural mechanism of a motion when it has sought to strike pleadings in the past (see, e.g., Adv. Proc. No. 17-151-LTS, ECF No. 155), and its failure to file a proper motion to strike here likely reflects its understanding that there is no serious basis for doing so.

---

all parts into an harmonious whole[.]"); Doe v. Cape Elizabeth Sch. Dist., 832 F.3d 69, 89 (1st Cir. 2016) (J. Lipez, concurring) (citing Brown & Williamson Tobacco for the above proposition).

[24] In passing, FOMB suggests that the Supporting Parties lack standing to join the Motion unless they are requesting relief that goes beyond that requested in the Motion (FOMB.Obj. ¶ 29). But the Supporting Parties have standing to object to the classification scheme in any event because "it is precisely the Debtor's classification of unsecured claims into . . . separate classes that may allow the Debtor to cram down" the plan on the Supporting Parties.  In re Hanish, 570 B.R. 4, 13 (Bankr. D.N.H. 2017).  In any event, FOMB does not develop this "standing" argument, so it is waived.  See supra ¶ 22.

[25] In re Fin. Oversight & Mgmt. Bd. for P.R., 583 B.R. 626, 637 (D.P.R. 2017); In re W.R. Grace & Co., 2008 WL 4571559, at * 1 n.2 (Bankr. D. Del. Oct. 10, 2008) ("Requests for affirmative relief cannot be combined with a response to a motion.").

38.     Some Objectors also suggest that the April 7 timing of the Joinder was somehow inappropriate.  However, under the Court's Case Management Procedures (ECF No. 11885-1, the "CMO"), April 7 was "[t]he deadline to file an Objection."  CMO § III.I.  An "Objection" is defined to include "responses to the Pleadings" (id. § I.B), and "Pleadings" are defined to include "motions" (id.).  The Joinder was a "response" to a "Pleading," so to the extent the CMO establishes a deadline for filing joinders to motions,[26] April 7 was that deadline.  Indeed, this Court has previously held that a joinder that Assured filed to a motion on the *reply* deadline (which is later than the objection deadline) was "timely" where Assured had merely filed a *reservation of rights* on the objection deadline.  See ECF Nos. 7824 (reservation of rights filed on objection deadline); 8024 (joinder filed on reply deadline); 8212 (order denying FOMB's motion to strike joinder and finding that the joinder "was timely").

39.     Some of the Objectors also suggest that it was somehow unfair to file the Joinder after AFT and the Retiree Committee had already filed their objections on March 5 and April 7, respectively (see, e.g, FOMB.Obj. ¶ 11), but the applicable scheduling order in fact set April 13 as the deadline to file "Opposition papers to the 3013 Motion" (ECF No. 12670).  It is therefore unclear why AFT and the Retiree Committee filed their objections early, rather than on April 13 like the other Objectors.  In any event, the Retiree Committee subsequently sought and obtained leave to file a supplemental opposition specifically to the Joinder.  See ECF No. 12708; see also FOMB.Obj. ¶ 11 n.8.[27]  Thus, no prejudice can be asserted.

---

[26] The CMO does not expressly set a deadline for "joinders" to motions, but it does set a deadline for "joinders to an Objection," which is the same as the deadline for replies to an Objection.  CMO § III.K.

[27] FOMB also faults the Supporting Parties for allegedly not disclosing that FOMB intended to oppose the extension of the Supporting Parties' reply deadline, but as the attached correspondence reveals ("Exhibit E"), FOMB never gave what it says was a "clear indication" that it intended to oppose the deadline extension.  See FOMB.Obj. ¶ 24.  All FOMB wrote was that it was "unable to take a position," which is exactly what the Supporting Parties reported in their Urgent Motion.  See ECF No. 12688 ¶ 14 ("FOMB indicated that it was unable to take a position with respect to the relief requested in this Urgent Motion.").

## **CONCLUSION**

For the reasons stated above and in the 3013 Motion, the Court should grant the Motion.

---

In the past, whenever FOMB actually has given a "clear indication" of its intent to oppose an Urgent
Motion, the Supporting Parties have always so indicated in the motion.  See, e.g., ECF No. 12388 ¶ 15.

Dated:     New York, New York
           April 17, 2020

CASELLAS ALCOVER & BURGOS P.S.C.        CADWALADER, WICKERSHAM & TAFT LLP

By: */s/ Heriberto Burgos Pérez*          By: */s/ Mark C. Ellenberg*
    Heriberto Burgos Pérez                     Mark C. Ellenberg*
    USDC-PR 204809                             Howard R. Hawkins, Jr.*
    Ricardo F. Casellas-Sánchez               William J. Natbony*
    USDC-PR 203114                             Ellen M. Halstead*
    Diana Pérez-Seda                           Thomas J. Curtin*
    USDC-PR 232014                             Casey J. Servais*
    P.O. Box 364924                            200 Liberty Street
    San Juan, PR 00936-4924                    New York, NY 10281
    Telephone:(787) 756-1400                   Telephone:  (212) 504-6000
    Facsimile: (787) 756-1401                  Facsimile:  (212) 504-6666
    Email: hburgos@cabprlaw.com                Email:  mark.ellenberg@cwt.com
           rcasellas@cabprlaw.com                      howard.hawkins@cwt.com
           dperez@cabprlaw.com                         bill.natbony@cwt.com
                                                       ellen.halstead@cwt.com
*Attorneys for Assured Guaranty Corp. and*             thomas.curtin@cwt.com
*Assured Guaranty Municipal Corp.*                     casey.servais@cwt.com

                                           * Admitted *pro hac vice*

                                           *Attorneys for Assured Guaranty Corp. and Assured*
                                           *Guaranty Municipal Corp.*

**TORO COLÓN MULLET P.S.C.**

*/s/ Manuel Fernández-Bared*
MANUEL FERNÁNDEZ-BARED
USDC-PR No. 204,204
Email: mfb@tcm.law

*/s/ Linette Figueroa-Torres*
LINETTE FIGUEROA-TORRES
USDC-PR No. 227,104
Email: lft@tcm.law

*/s/ Jane Patricia Van Kirk*
JANE PATRICIA VAN KIRK
USDC–PR No. 220,510
Email: jvankirk@tcm.law
P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760

**KRAMER LEVIN NAFTALIS &
FRANKEL LLP**

*s/ Thomas Moers Mayer*
THOMAS MOERS MAYER*
AMY CATON*
DOUGLAS BUCKLEY*
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 715-9100
Fax: (212) 715-8000
Email: tmayer@kramerlevin.com
        acaton@kramerlevin.com
        dbuckley@kramerlevin.com
* (admitted *pro hac vice*)

*Counsel to the Invesco Funds*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I filed this document electronically with the Clerk of the Court using

the CM/ECF System, which will send notification of such filing to all parties of record in the

captioned case.

At New York, New York, the 17th day of April, 2020.

By:  <u>/s/ *Howard R. Hawkins, Jr.*    </u>
Howard R. Hawkins, Jr.*
*admitted pro hac vice