**<u>EXHIBIT A</u>**

| 114TH CONGRESS<br>*2d Session* | HOUSE OF REPRESENTATIVES | REPT. 114–602<br>Part 1 |
|---|---|---|

# PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT

JUNE 3, 2016.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. BISHOP of Utah, from the Committee on Natural Resources, submitted the following

# R E P O R T

together with

## ADDITIONAL VIEWS

[To accompany H.R. 5278]

[Including cost estimate of the Congressional Budget Office]

The Committee on Natural Resources, to whom was referred the bill (H.R. 5278) to establish an Oversight Board to assist the Government of Puerto Rico, including instrumentalities, in managing its public finances, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike all after the enacting clause and insert the following:

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "Puerto Rico Oversight, Management, and Economic Stability Act" or "PROMESA".

(b) TABLE OF CONTENTS.—The table of contents of this Act is as follows:

Sec. 1. Short title; table of contents.
Sec. 2. Effective date.
Sec. 3. Severability.
Sec. 4. Supremacy.
Sec. 5. Definitions.
Sec. 6. Placement.
Sec. 7. Compliance with Federal laws.

TITLE I—ESTABLISHMENT AND ORGANIZATION OF OVERSIGHT BOARD

Sec. 101. Financial Oversight and Management Board.
Sec. 102. Location of Oversight Board.
Sec. 103. Executive Director and staff of Oversight Board.
Sec. 104. Powers of Oversight Board.
Sec. 105. Exemption from liability for claims.
Sec. 106. Treatment of actions arising from Act.
Sec. 107. Budget and funding for operation of Oversight Board.

59–006

2

Sec. 108. Autonomy of Oversight Board.
Sec. 109. Ethics.

### TITLE II—RESPONSIBILITIES OF OVERSIGHT BOARD

Sec. 201. Approval of fiscal plans.
Sec. 202. Approval of budgets.
Sec. 203. Effect of finding of noncompliance with budget.
Sec. 204. Review of activities to ensure compliance with fiscal plan.
Sec. 205. Recommendations on financial stability and management responsibility.
Sec. 206. Oversight Board duties related to restructuring.
Sec. 207. Oversight Board authority related to debt issuance.
Sec. 208. Required reports.
Sec. 209. Termination of Oversight Board.
Sec. 210. No full faith and credit of the United States.
Sec. 211. Analysis of pensions.
Sec. 212. Intervention in litigation.

### TITLE III—ADJUSTMENTS OF DEBTS

Sec. 301. Applicability of other laws; definitions.
Sec. 302. Who may be a debtor.
Sec. 303. Reservation of territorial power to control territory and territorial instrumentalities.
Sec. 304. Petition and proceedings relating to petition.
Sec. 305. Limitation on jurisdiction and powers of court.
Sec. 306. Jurisdiction.
Sec. 307. Venue.
Sec. 308. Selection of presiding judge.
Sec. 309. Abstention.
Sec. 310. Applicable rules of procedure.
Sec. 311. Leases.
Sec. 312. Filing of plan of adjustment.
Sec. 313. Modification of plan.
Sec. 314. Confirmation.
Sec. 315. Role and capacity of Oversight Board.
Sec. 316. Compensation of professionals.
Sec. 317. Interim compensation.

### TITLE IV—MISCELLANEOUS PROVISIONS

Sec. 401. Rules of construction.
Sec. 402. Right of Puerto Rico to determine its future political status.
Sec. 403. First minimum wage in Puerto Rico.
Sec. 404. Application of regulation to Puerto Rico.
Sec. 405. Automatic stay upon enactment.
Sec. 406. Purchases by territory governments.
Sec. 407. Protection from inter-debtor transfers.
Sec. 408. GAO report on Small Business Administration programs in Puerto Rico.
Sec. 409. Congressional Task Force on Economic Growth in Puerto Rico.
Sec. 410. Report.

### TITLE V—PUERTO RICO INFRASTRUCTURE REVITALIZATION

Sec. 501. Definitions.
Sec. 502. Position of Revitalization Coordinator.
Sec. 503. Critical projects.
Sec. 504. Miscellaneous provisions.
Sec. 505. Federal agency requirements.
Sec. 506. Judicial review.
Sec. 507. Savings clause.

### TITLE VI—CREDITOR COLLECTIVE ACTION

Sec. 601. Creditor Collective action.
Sec. 602. Applicable law.

### TITLE VII—SENSE OF CONGRESS REGARDING PERMANENT, PRO-GROWTH FISCAL REFORMS

Sec. 701. Sense of Congress regarding permanent, pro-growth fiscal reforms.

**SEC. 2. EFFECTIVE DATE.**

(a) IN GENERAL.—Except as provided in subsection (b), this Act shall take effect on the date of the enactment of this Act.

(b) TITLE III AND TITLE VI.—

(1) Title III shall apply with respect to cases commenced under title III on or after the date of the enactment of this Act.

(2) Titles III and VI shall apply with respect to debts, claims, and liens (as such terms are defined in section 101 of title 11, United States Code) created before, on, or after such date.

**SEC. 3. SEVERABILITY.**

If any provision of this Act or the application thereof to any person or circumstance is held invalid, the remainder of this Act, or the application of that provision to persons or circumstances other than those as to which it is held invalid, is not affected thereby, provided that title III is not severable from titles I and II, and titles I and II are not severable from title III.

**SEC. 4. SUPREMACY.**

The provisions of this Act shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this Act.

3

## SEC. 5. DEFINITIONS.

In this Act—

(1) AGREED ACCOUNTING STANDARDS.—The term "agreed accounting standards" means modified accrual accounting standards or, for any period during which the Oversight Board determines in its sole discretion that a territorial government is not reasonably capable of comprehensive reporting that complies with modified accrual accounting standards, such other accounting standards as proposed by the Oversight Board.

(2) BOND.—The term "Bond" means a bond, loan, letter of credit, other borrowing title, obligation of insurance, or other financial indebtedness for borrowed money, including rights, entitlements, or obligations whether such rights, entitlements, or obligations arise from contract, statute, or any other source of law, in any case, related to such a bond, loan, letter of credit, other borrowing title, obligation of insurance, or other financial indebtedness in physical or dematerialized form of which the issuer, obligor, or guarantor is the territorial government.

(3) BOND CLAIM.—The term "Bond Claim" means, as it relates to a Bond—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

(4) BUDGET.—The term "Budget" means the Territory Budget or an Instrumentality Budget, as applicable.

(5) PUERTO RICO.—The term "Puerto Rico" means the Commonwealth of Puerto Rico.

(6) COMPLIANT BUDGET.—The term "compliant budget" means a budget that is prepared in accordance with—

(A) agreed accounting standards; and

(B) the applicable Fiscal Plan.

(7) COVERED TERRITORIAL INSTRUMENTALITY.—The term "covered territorial instrumentality" means a territorial instrumentality designated by the Oversight Board pursuant to section 101 to be subject to the requirements of this Act.

(8) COVERED TERRITORY.—The term "covered territory" means a territory for which an Oversight Board has been established under section 101.

(9) EXECUTIVE DIRECTOR.—The term "Executive Director" means an Executive Director appointed under section 103(a).

(10) FISCAL PLAN.—The term "Fiscal Plan" means a Territory Fiscal Plan or an Instrumentality Fiscal Plan, as applicable.

(11) GOVERNMENT OF PUERTO RICO.—The term "Government of Puerto Rico" means the Commonwealth of Puerto Rico, including all its territorial instrumentalities.

(12) GOVERNOR.—The term "Governor" means the chief executive of a covered territory.

(13) INSTRUMENTALITY BUDGET.—The term "Instrumentality Budget" means a budget for a covered territorial instrumentality, designated by the Oversight Board in accordance with section 101, submitted, approved, and certified in accordance with section 202.

(14) INSTRUMENTALITY FISCAL PLAN.—The term "Instrumentality Fiscal Plan" means a fiscal plan for a covered territorial instrumentality, designated by the Oversight Board in accordance with section 101, submitted, approved, and certified in accordance with section 201.

(15) LEGISLATURE.—The term "Legislature" means the legislative body responsible for enacting the laws of a covered territory.

(16) MODIFIED ACCRUAL ACCOUNTING STANDARDS.—The term "modified accrual accounting standards" means recognizing revenues as they become available and measurable and recognizing expenditures when liabilities are incurred, in each case as defined by the Governmental Accounting Standards Board, in accordance with generally accepted accounting principles.

(17) OVERSIGHT BOARD.—The term "Oversight Board" means a Financial Oversight and Management Board established in accordance with section 101.

(18) TERRITORIAL GOVERNMENT.—The term "territorial government" means the government of a covered territory, including all covered territorial instrumentalities.

(19) TERRITORIAL INSTRUMENTALITY.—

4

(A) IN GENERAL.—The term "territorial instrumentality" means any political subdivision, public agency, instrumentality—including any instrumentality that is also a bank—or public corporation of a territory, and this term should be broadly construed to effectuate the purposes of this Act.

(B) EXCLUSION.—The term "territorial instrumentality" does not include an Oversight Board.

(20) TERRITORY.—The term "territory" means—

(A) Puerto Rico;

(B) Guam;

(C) American Samoa;

(D) the Commonwealth of the Northern Mariana Islands; or

(E) the United States Virgin Islands.

(21) TERRITORY BUDGET.—The term "Territory Budget" means a budget for a territorial government submitted, approved, and certified in accordance with section 202.

(22) TERRITORY FISCAL PLAN.—The term "Territory Fiscal Plan" means a fiscal plan for a territorial government submitted, approved, and certified in accordance with section 201.

### SEC. 6. PLACEMENT.

The Law Revision Counsel is directed to place this Act as chapter 20 of title 48, United States Code.

### SEC. 7. COMPLIANCE WITH FEDERAL LAWS.

Except as otherwise provided in this Act, nothing in this Act shall be construed as impairing or in any manner relieving a territorial government, or any territorial instrumentality thereof, from compliance with Federal laws or requirements or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety, and environment of persons in such territory.

# TITLE I—ESTABLISHMENT AND ORGANIZATION OF OVERSIGHT BOARD

### SEC. 101. FINANCIAL OVERSIGHT AND MANAGEMENT BOARD.

(a) PURPOSE.—The purpose of the Oversight Board is to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets.

(b) ESTABLISHMENT.—

(1) IN GENERAL.—Except as provided in paragraph (2), a Financial Oversight and Management Board for a territory is established in accordance with this section only if the Legislature of the territory adopts a resolution signed by the Governor requesting the establishment.

(2) PUERTO RICO.—Notwithstanding paragraph (1), a Financial Oversight and Management Board is hereby established for Puerto Rico.

(3) CONSTITUTIONAL BASIS.—The Congress enacts this Act pursuant to article IV, section 3 of the Constitution of the United States, which provides Congress the power to dispose of and make all needful rules and regulations for territories.

(c) TREATMENT.—An Oversight Board established under this section—

(1) shall be created as an entity within the territorial government for which it is established in accordance with this title; and

(2) shall not be considered to be a department, agency, establishment, or instrumentality of the Federal Government.

(d) OVERSIGHT OF TERRITORIAL INSTRUMENTALITIES.—

(1) DESIGNATION.—

(A) IN GENERAL.—An Oversight Board, in its sole discretion at such time as the Oversight Board determines to be appropriate, may designate any territorial instrumentality as a covered territorial instrumentality that is subject to the requirements of this Act.

(B) BUDGETS AND REPORTS.—The Oversight Board may require, in its sole discretion, the Governor to submit to the Oversight Board such budgets and monthly or quarterly reports regarding a covered territorial instrumentality as the Oversight Board determines to be necessary and may designate any covered territorial instrumentality to be included in the Territory Budget; except that the Oversight Board may not designate a covered territorial instrumentality to be included in the Territory Budget if applicable territory law does not require legislative approval of such covered territorial instrumentality's budget.

5

(C) SEPARATE INSTRUMENTALITY BUDGETS AND REPORTS.—The Oversight Board in its sole discretion may or, if it requires a budget from a covered territorial instrumentality whose budget does not require legislative approval under applicable territory law, shall designate a covered territorial instrumentality to be the subject of an Instrumentality Budget separate from the applicable Territory Budget and require that the Governor develop such an Instrumentality Budget.

(D) INCLUSION IN TERRITORY FISCAL PLAN.—The Oversight Board may require, in its sole discretion, the Governor to include a covered territorial instrumentality in the applicable Territory Fiscal Plan. Any covered territorial instrumentality submitting a separate Instrumentality Fiscal Plan must also submit a separate Instrumentality Budget.

(E) SEPARATE INSTRUMENTALITY FISCAL PLANS.—The Oversight Board may designate, in its sole discretion, a covered territorial instrumentality to be the subject of an Instrumentality Fiscal Plan separate from the applicable Territory Fiscal Plan and require that the Governor develop such an Instrumentality Fiscal Plan. Any covered territorial instrumentality submitting a separate Instrumentality Fiscal Plan must also submit a separate Instrumentality Budget.

(2) EXCLUSION.—

(A) IN GENERAL.—An Oversight Board, in its sole discretion, at such time as the Oversight Board determines to be appropriate, may exclude any territorial instrumentality from the requirements of this Act.

(B) TREATMENT.—A territorial instrumentality excluded pursuant to this paragraph shall not be considered to be a covered territorial instrumentality.

(e) MEMBERSHIP.—

(1) IN GENERAL.—

(A) The Oversight Board shall consist of seven members appointed by the President who meet the qualifications described in subsection (f) and section 109(a).

(B) The Board shall be comprised of one Category A member, one Category B member, two Category C members, one Category D member, one Category E member, and one Category F member.

(2) APPOINTED MEMBERS.—

(A) The President shall appoint the individual members of the Oversight Board, of which—

(i) the Category A member should be selected from a list of individuals submitted by the Speaker of the House of Representatives;

(ii) the Category B member should be selected from a separate list of individuals submitted by the Speaker of the House of Representatives;

(iii) the Category C members should be selected from a list submitted by the Majority Leader of the Senate;

(iv) the Category D member should be selected from a list submitted by the Minority Leader of the House of Representatives;

(v) the Category E member should be selected from a list submitted by the Minority Leader of the Senate; and

(vi) the Category F member may be selected in the President's sole discretion.

(B) After the President's selection of the Category F Board member, for purposes of subparagraph (A) and within a timely manner—

(i) the Speaker of the House of Representatives shall submit two non-overlapping lists of at least three individuals to the President; one list shall include three individuals who maintain a primary residence in the territory or have a primary place of business in the territory;

(ii) the Senate Majority Leader shall submit a list of at least four individuals to the President;

(iii) the Minority Leader of the House of Representatives shall submit a list of at least three individuals to the President; and

(iv) the Minority Leader of the Senate shall submit a list of at least three individuals to the President.

(C) If the President does not select any of the names submitted under subparagraphs (A) and (B), then whoever submitted such list may supplement the lists provided in this subsection with additional names.

(D) The Category A member shall maintain a primary residence in the territory or have a primary place of business in the territory.

(E) With respect to the appointment of a Board member in Category A, B, C, D, or E, such an appointment shall be by and with the advice and

6

consent of the Senate, unless the President appoints an individual from a list, as provided in this subsection, in which case no Senate confirmation is required.

(F) In the event of a vacancy of a Category A, B, C, D, or E Board seat, the corresponding congressional leader referenced in subparagraph (A) shall submit a list pursuant to this subsection within a timely manner of the Board member's resignation or removal becoming effective.

(G) With respect to an Oversight Board for Puerto Rico, in the event any of the 7 members have not been appointed by September 30, 2016, then the President shall appoint an individual from the list for the current vacant category by December 1, 2016, provided that such list includes at least 2 individuals per vacancy who meet the requirements set forth in subsection (f) and section 109, and are willing to serve.

(3) EX OFFICIO MEMBER.—The Governor, or the Governor's designee, shall be an ex officio member of the Oversight Board without voting rights.

(4) CHAIR.—The voting members of the Oversight Board shall designate one of the voting members of the Oversight Board as the Chair of the Oversight Board (referred to hereafter in this Act as the "Chair") within 30 days of the full appointment of the Oversight Board.

(5) TERM OF SERVICE.—

(A) IN GENERAL.—Each appointed member of the Oversight Board shall be appointed for a term of 3 years.

(B) REMOVAL.—The President may remove any member of the Oversight Board only for cause.

(C) CONTINUATION OF SERVICE UNTIL SUCCESSOR APPOINTED.—Upon the expiration of a term of office, a member of the Oversight Board may continue to serve until a successor has been appointed.

(D) REAPPOINTMENT.—An individual may serve consecutive terms as an appointed member, provided that such reappointment occurs in compliance with paragraph (6).

(6) VACANCIES.—A vacancy on the Oversight Board shall be filled in the same manner in which the original member was appointed.

(f) ELIGIBILITY FOR APPOINTMENTS.—An individual is eligible for appointment as a member of the Oversight Board only if the individual—

(1) has knowledge and expertise in finance, municipal bond markets, management, law, or the organization or operation of business or government; and

(2) prior to appointment, an individual is not an officer, elected official, or employee of the territorial government, a candidate for elected office of the territorial government, or a former elected official of the territorial government.

(g) NO COMPENSATION FOR SERVICE.—Members of the Oversight Board shall serve without pay, but may receive reimbursement from the Oversight Board for any reasonable and necessary expenses incurred by reason of service on the Oversight Board.

(h) ADOPTION OF BYLAWS FOR CONDUCTING BUSINESS OF OVERSIGHT BOARD.—

(1) IN GENERAL.—As soon as practicable after the appointment of all members and appointment of the Chair, the Oversight Board shall adopt bylaws, rules, and procedures governing its activities under this Act, including procedures for hiring experts and consultants. Such bylaws, rules, and procedures shall be public documents, and shall be submitted by the Oversight Board upon adoption to the Governor, the Legislature, the President, and Congress. The Oversight Board may hire professionals as it determines to be necessary to carry out this subsection.

(2) ACTIVITIES REQUIRING APPROVAL OF MAJORITY OF MEMBERS.—Under the bylaws adopted pursuant to paragraph (1), the Oversight Board may conduct its operations under such procedures as it considers appropriate, except that an affirmative vote of a majority of the members of the Oversight Board's full appointed membership shall be required in order for the Oversight Board to approve a Fiscal Plan under section 201, to approve a Budget under section 202, to cause a legislative act not to be enforced under section 204, or to approve or disapprove an infrastructure project as a Critical Project under section 503.

(3) ADOPTION OF RULES AND REGULATIONS OF TERRITORIAL GOVERNMENT.—The Oversight Board may incorporate in its bylaws, rules, and procedures under this subsection such rules and regulations of the territorial government as it considers appropriate to enable it to carry out its activities under this Act with the greatest degree of independence practicable.

(4) EXECUTIVE SESSION.—Upon a majority vote of the Oversight Board's full voting membership, the Oversight Board may conduct its business in an executive session that consists solely of the Oversight Board's voting members and

7

is closed to the public, but only for the business items set forth as part of the vote to convene an executive session.

**SEC. 102. LOCATION OF OVERSIGHT BOARD.**

The Oversight Board shall have an office in the covered territory and additional offices as it deems necessary. At any time, any department or agency of the United States may provide the Oversight Board use of Federal facilities and equipment on a reimbursable or non-reimbursable basis and subject to such terms and conditions as the head of that department or agency may establish.

**SEC. 103. EXECUTIVE DIRECTOR AND STAFF OF OVERSIGHT BOARD.**

(a) EXECUTIVE DIRECTOR.—The Oversight Board shall have an Executive Director who shall be appointed by the Chair with the consent of the Oversight Board. The Executive Director shall be paid at a rate determined by the Oversight Board.

(b) STAFF.—With the approval of the Chair, the Executive Director may appoint and fix the pay of additional personnel as the Executive Director considers appropriate, except that no individual appointed by the Executive Director may be paid at a rate greater than the rate of pay for the Executive Director unless the Oversight Board provides for otherwise. The staff shall include a Revitalization Coordinator appointed pursuant to Title V of this Act. Any such personnel may include private citizens, employees of the Federal Government, or employees of the territorial government, provided, however, that the Executive Director may not fix the pay of employees of the Federal Government or the territorial government.

(c) INAPPLICABILITY OF CERTAIN EMPLOYMENT AND PROCUREMENT LAWS.—The Executive Director and staff of the Oversight Board may be appointed and paid without regard to any provision of the laws of the covered territory or the Federal Government governing appointments and salaries. Any provision of the laws of the covered territory governing procurement shall not apply to the Oversight Board.

(d) STAFF OF FEDERAL AGENCIES.—Upon request of the Chair, the head of any Federal department or agency may detail, on a reimbursable or nonreimbursable basis, and in accordance with the Intergovernmental Personnel Act of 1970 (5 U.S.C. 3371–3375), any of the personnel of that department or agency to the Oversight Board to assist it in carrying out its duties under this Act.

(e) STAFF OF TERRITORIAL GOVERNMENT.—Upon request of the Chair, the head of any department or agency of the covered territory may detail, on a reimbursable or nonreimbursable basis, any of the personnel of that department or agency to the Oversight Board to assist it in carrying out its duties under this Act.

**SEC. 104. POWERS OF OVERSIGHT BOARD.**

(a) HEARINGS AND SESSIONS.—The Oversight Board may, for the purpose of carrying out this Act, hold hearings, sit and act at times and places, take testimony, and receive evidence as the Oversight Board considers appropriate. The Oversight Board may administer oaths or affirmations to witnesses appearing before it.

(b) POWERS OF MEMBERS AND AGENTS.—Any member or agent of the Oversight Board may, if authorized by the Oversight Board, take any action that the Oversight Board is authorized to take by this section.

(c) OBTAINING OFFICIAL DATA.—

(1) FROM FEDERAL GOVERNMENT.—Notwithstanding sections 552 (commonly known as the Freedom of Information Act), 552a (commonly known as the Privacy Act of 1974), and 552b (commonly known as the Government in the Sunshine Act) of title 5, United States Code, the Oversight Board may secure directly from any department or agency of the United States information necessary to enable it to carry out this Act, with the approval of the head of that department or agency.

(2) FROM TERRITORIAL GOVERNMENT.—Notwithstanding any other provision of law, the Oversight Board shall have the right to secure copies, whether written or electronic, of such records, documents, information, data, or metadata from the territorial government necessary to enable the Oversight Board to carry out its responsibilities under this Act. At the request of the Oversight Board, the Oversight Board shall be granted direct access to such information systems, records, documents, information, or data as will enable the Oversight Board to carry out its responsibilities under this Act. The head of the entity of the territorial government responsible shall provide the Oversight Board with such information and assistance (including granting the Oversight Board direct access to automated or other information systems) as the Oversight Board requires under this paragraph.

(d) OBTAINING CREDITOR INFORMATION.—

(1) Upon request of the Oversight Board, each creditor or organized group of creditors of a covered territory or covered territorial instrumentality seeking to participate in voluntary negotiations shall provide to the Oversight Board, and

8

the Oversight Board shall make publicly available to any other participant, a statement setting forth—

(A) the name and address of the creditor or of each member of an organized group of creditors; and

(B) the nature and aggregate amount of claims or other economic interests held in relation to the issuer as of the later of—

(i) the date the creditor acquired the claims or other economic interests or, in the case of an organized group of creditors, the date the group was formed; or

(ii) the date the Oversight Board was formed.

(2) For purposes of this subsection, an organized group shall mean multiple creditors that are—

(A) acting in concert to advance their common interests, including, but not limited to, retaining legal counsel to represent such multiple entities; and

(B) not composed entirely of affiliates or insiders of one another.

(3) The Oversight Board may request supplemental statements to be filed by each creditor or organized group of creditors quarterly, or if any fact in the most recently filed statement has changed materially.

(e) GIFTS, BEQUESTS, AND DEVISES.—The Oversight Board may accept, use, and dispose of gifts, bequests, or devises of services or property, both real and personal, for the purpose of aiding or facilitating the work of the Oversight Board. Gifts, bequests, or devises of money and proceeds from sales of other property received as gifts, bequests, or devises shall be deposited in such account as the Oversight Board may establish and shall be available for disbursement upon order of the Chair, consistent with the Oversight Board's bylaws, or rules and procedures. All gifts, bequests or devises and the identities of the donors shall be publicly disclosed by the Oversight Board within 30 days of receipt.

(f) SUBPOENA POWER.—

(1) IN GENERAL.—The Oversight Board may issue subpoenas requiring the attendance and testimony of witnesses and the production of books, records, correspondence, memoranda, papers, documents, electronic files, metadata, tapes, and materials of any nature relating to any matter under investigation by the Oversight Board. Jurisdiction to compel the attendance of witnesses and the production of such materials shall be governed by the statute setting forth the scope of personal jurisdiction exercised by the covered territory, or in the case of Puerto Rico, 32 L.P.R.A. App. III. R. 4. 7., as amended.

(2) FAILURE TO OBEY A SUBPOENA.—If a person refuses to obey a subpoena issued under paragraph (1), the Oversight Board may apply to the court of first instance of the covered territory. Any failure to obey the order of the court may be punished by the court in accordance with civil contempt laws of the covered territory.

(3) SERVICE OF SUBPOENAS.—The subpoena of the Oversight Board shall be served in the manner provided by the rules of procedure for the courts of the covered territory, or in the case of Puerto Rico, the Rules of Civil Procedure of Puerto Rico, for subpoenas issued by the court of first instance of the covered territory.

(g) AUTHORITY TO ENTER INTO CONTRACTS.—The Executive Director may enter into such contracts as the Executive Director considers appropriate (subject to the approval of the Chair) consistent with the Oversight Board's bylaws, rules, and regulations to carry out the Oversight Board's responsibilities under this Act.

(h) AUTHORITY TO ENFORCE CERTAIN LAWS OF THE COVERED TERRITORY.—The Oversight Board shall ensure the purposes of this Act are met, including by ensuring the prompt enforcement of any applicable laws of the covered territory prohibiting public sector employees from participating in a strike or lockout. In the application of this subsection, with respect to Puerto Rico, the term "applicable laws" refers to 3 L.P.R.A. 1451q and 3 L.P.R.A. 1451r, as amended.

(i) VOLUNTARY AGREEMENT CERTIFICATION.—

(1) IN GENERAL.—The Oversight Board shall issue a certification to a covered territory or covered territorial instrumentality if the Oversight Board determines, in its sole discretion, that such covered territory or covered territorial instrumentality, as applicable, has successfully reached a voluntary agreement with holders of its Bond Claims to restructure such Bond Claims—

(A) except as provided in subparagraph (C), if an applicable Fiscal Plan has been certified, in a manner that provides for a sustainable level of debt for such covered territory or covered territorial instrumentality, as applicable, and is in conformance with the applicable certified Fiscal Plan;

(B) except as provided in subparagraph (C), if an applicable Fiscal Plan has not yet been certified, in a manner that provides, in the Oversight

9

Board's sole discretion, for a sustainable level of debt for such covered territory or covered territorial instrumentality; or

(C) notwithstanding subparagraphs (A) and (B), if an applicable Fiscal Plan has not yet been certified and the voluntary agreement is limited solely to an extension of applicable principal maturities and interest on Bonds issued by such covered territory or covered territorial instrumentality, as applicable, for a period of up to one year during which time no interest will be paid on the Bond Claims affected by the voluntary agreement.

(2) EFFECTIVENESS.—The effectiveness of any voluntary agreement referred to in paragraph (1) shall be conditioned on—

(A) the Oversight Board delivering the certification described in paragraph (1); and

(B) the agreement of a majority in amount of the Bond Claims of a covered territory or a covered territorial instrumentality that are to be affected by such agreement, provided, however, that such agreement is solely for purposes of serving as a Qualifying Modification pursuant to subsection 601(g) of this Act and shall not alter existing legal rights of holders of Bond Claims against such covered territory or covered territorial instrumentality that have not assented to such agreement.

(3) PREEXISTING VOLUNTARY AGREEMENTS.—Any voluntary agreements that the territorial government or any covered territorial instrumentality has executed with holders of its debts to restructure such debts prior to the date of enactment of the Act shall be deemed to be in conformance with the requirements of this subsection, to the extent the requirements of paragraph (2)(B)(i) have been satisfied.

(j) RESTRUCTURING FILINGS.—

(1) IN GENERAL.—Subject to paragraph (3), before taking an action described in paragraph (2) on behalf of a debtor or potential debtor in a case under title III, the Oversight Board must certify the action.

(2) ACTIONS DESCRIBED.—The actions referred to in paragraph (1) are—

(A) the filing of a petition; or

(B) the submission or modification of a plan of adjustment.

(3) CONDITION FOR PLANS OF ADJUSTMENT.—The Oversight Board may certify a plan of adjustment only if it determines, in its sole discretion, that it is consistent with the applicable certified Fiscal Plan.

(k) CIVIL ACTIONS TO ENFORCE POWERS.—The Oversight Board may seek judicial enforcement of its authority to carry out its responsibilities under this Act.

(l) PENALTIES.—

(1) ACTS PROHIBITED.—Any officer or employee of the territorial government who prepares, presents, or certifies any information or report for the Oversight Board or any of its agents that is intentionally false or misleading, or, upon learning that any such information is false or misleading, fails to immediately advise the Oversight Board or its agents thereof in writing, shall be subject to prosecution and penalties under any laws of the territory prohibiting the provision of false information to government officials, which in the case of Puerto Rico shall include 33 L.P.R.A. 4889, as amended.

(2) ADMINISTRATIVE DISCIPLINE.—In addition to any other applicable penalty, any officer or employee of the territorial government who knowingly and willfully violates paragraph (1) or takes any such action in violation of any valid order of the Oversight Board or fails or refuses to take any action required by any such order, shall be subject to appropriate administrative discipline, including (when appropriate) suspension from duty without pay or removal from office, by order of the Governor.

(3) REPORT BY GOVERNOR ON DISCIPLINARY ACTIONS TAKEN.—In the case of a violation of paragraph (2) by an officer or employee of the territorial government, the Governor shall immediately report to the Oversight Board all pertinent facts together with a statement of the action taken thereon.

(m) ELECTRONIC REPORTING.—The Oversight Board may, in consultation with the Governor, ensure the prompt and efficient payment and administration of taxes through the adoption of electronic reporting, payment and auditing technologies.

(n) ADMINISTRATIVE SUPPORT SERVICES.—Upon the request of the Oversight Board, the Administrator of General Services or other appropriate Federal agencies shall promptly provide to the Oversight Board, on a reimbursable or non-reimbursable basis, the administrative support services necessary for the Oversight Board to carry out its responsibilities under this Act.

(o) INVESTIGATION OF DISCLOSURE AND SELLING PRACTICES.—The Oversight Board may investigate the disclosure and selling practices in connection with the purchase of bonds issued by the Government of Puerto Rico for or on behalf of any retail investors including any underrepresentation of risk for such investors and any rela-

10

tionships or conflicts of interest maintained by such broker, dealer, or investment adviser is as provided in applicable laws and regulations.

(p) FINDINGS OF ANY INVESTIGATION.—The Oversight Board shall make public the findings of any investigation referenced in subsection (o).

**SEC. 105. EXEMPTION FROM LIABILITY FOR CLAIMS.**

The Oversight Board, its members, and its employees shall not be liable for any obligation of or claim against the Oversight Board or its members or employees or the territorial government resulting from actions taken to carry out this Act.

**SEC. 106. TREATMENT OF ACTIONS ARISING FROM ACT.**

(a) JURISDICTION.—Except as provided in section 104(f)(2) (relating to the issuance of an order enforcing a subpoena), and title III (relating to adjustments of debts), any action against the Oversight Board, and any action otherwise arising out of this Act, in whole or in part, shall be brought in a United States district court for the covered territory or, for any covered territory that does not have a district court, in the United States District Court for the District of Hawaii.

(b) APPEAL.—Notwithstanding any other provision of law, any order of a United States district court that is issued pursuant to an action brought under subsection (a) shall be subject to review only pursuant to a notice of appeal to the applicable United States Court of Appeals.

(c) TIMING OF RELIEF.—Except with respect to any orders entered to remedy constitutional violations, no order of any court granting declaratory or injunctive relief against the Oversight Board, including relief permitting or requiring the obligation, borrowing, or expenditure of funds, shall take effect during the pendency of the action before such court, during the time appeal may be taken, or (if appeal is taken) during the period before the court has entered its final order disposing of such action.

(d) EXPEDITED CONSIDERATION.—It shall be the duty of the applicable United States District Court, the applicable United States Court of Appeals, and, as applicable, the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any matter brought under this Act.

(e) REVIEW OF OVERSIGHT BOARD CERTIFICATIONS.—There shall be no jurisdiction in any United States district court to review challenges to the Oversight Board's certification determinations under this Act.

**SEC. 107. BUDGET AND FUNDING FOR OPERATION OF OVERSIGHT BOARD.**

(a) SUBMISSION OF BUDGET.—The Oversight Board shall submit a budget for each fiscal year during which the Oversight Board is in operation, to the President, the House of Representatives Committee on Natural Resources and the Senate Committee on Energy and Natural Resources, the Governor, and the Legislature.

(b) FUNDING.—The Oversight Board shall use its powers with respect to the Territory Budget of the covered territory to ensure that sufficient funds are available to cover all expenses of the Oversight Board. Within 30 days after the date of enactment of this Act, the territorial government shall designate a dedicated funding source, not subject to subsequent legislative appropriations, sufficient to support the annual expenses of the Oversight Board as determined in the Oversight Board's sole and exclusive discretion.

**SEC. 108. AUTONOMY OF OVERSIGHT BOARD.**

(a) IN GENERAL.—Neither the Governor nor the Legislature may—

(1) exercise any control, supervision, oversight, or review over the Oversight Board or its activities; or

(2) enact, implement, or enforce any statute, resolution, policy, or rule that would impair or defeat the purposes of this Act, as determined by the Oversight Board.

(b) OVERSIGHT BOARD LEGAL REPRESENTATION.—In any action brought by or on behalf of the Oversight Board, the Oversight Board shall be represented by such counsel as it may hire or retain so long as no conflict of interest exists.

**SEC. 109. ETHICS.**

(a) CONFLICT OF INTEREST.—Notwithstanding any ethics provision governing employees of the covered territory, all members and staff of the Oversight Board shall be subject to the Federal conflict of interest requirements described in section 208 of title 18, United States Code.

(b) FINANCIAL DISCLOSURE.—Notwithstanding any ethics provision governing employees of the covered territory, all members of the Oversight Board and staff designated by the Oversight Board shall be subject to disclosure of their financial interests, the contents of which shall conform to the same requirements set forth in section 102 of the Ethics in Government Act of 1978 (5 U.S.C. app.).

11

# TITLE II—RESPONSIBILITIES OF OVERSIGHT BOARD

**SEC. 201. APPROVAL OF FISCAL PLANS.**

(a) IN GENERAL.—As soon as practicable after all of the members and the Chair have been appointed to the Oversight Board in accordance with section 101(e) in the fiscal year in which the Oversight Board is established, and in each fiscal year thereafter during which the Oversight Board is in operation, the Oversight Board shall deliver a notice to the Governor providing a schedule for the process of development, submission, approval, and certification of Fiscal Plans. The notice may also set forth a schedule for revisions to any Fiscal Plan that has already been certified, which revisions must be subject to subsequent approval and certification by the Oversight Board. The Oversight Board shall consult with the Governor in establishing a schedule, but the Oversight Board shall retain sole discretion to set or, by delivery of a subsequent notice to the Governor, change the dates of such schedule as it deems appropriate and reasonably feasible.

(b) REQUIREMENTS.—

(1) IN GENERAL.—A Fiscal Plan developed under this section shall, with respect to the territorial government or covered territorial instrumentality, provide a method to achieve fiscal responsibility and access to the capital markets, and—

(A) provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on—

(i) applicable laws; or

(ii) specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plan;

(B) ensure the funding of essential public services;

(C) provide adequate funding for public pension systems;

(D) provide for the elimination of structural deficits;

(E) for fiscal years covered by a Fiscal Plan in which a stay under titles III or IV is not effective, provide for a debt burden that is sustainable;

(F) improve fiscal governance, accountability, and internal controls;

(G) enable the achievement of fiscal targets;

(H) create independent forecasts of revenue for the period covered by the Fiscal Plan;

(I) include a debt sustainability analysis;

(J) provide for capital expenditures and investments necessary to promote economic growth;

(K) adopt appropriate recommendations submitted by the Oversight Board under section 205(a);

(L) include such additional information as the Oversight Board deems necessary;

(M) ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of a covered territory or another covered territorial instrumentality of a covered territory, unless permitted by the constitution of the territory, an approved plan of adjustment under title III, or a Qualifying Modification approved under title VI; and

(N) respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of this Act.

(2) TERM.—A Fiscal Plan developed under this section shall cover a period of fiscal years as determined by the Oversight Board in its sole discretion but in any case a period of not less than 5 fiscal years from the fiscal year in which it is certified by the Oversight Board.

(c) DEVELOPMENT, REVIEW, APPROVAL, AND CERTIFICATION OF FISCAL PLANS.—

(1) TIMING REQUIREMENT.—The Governor may not submit to the Legislature a Territory Budget under section 202 for a fiscal year unless the Oversight Board has certified the Territory Fiscal Plan for that fiscal year in accordance with this subsection, unless the Oversight Board in its sole discretion waives this requirement.

(2) FISCAL PLAN DEVELOPED BY GOVERNOR.—The Governor shall submit to the Oversight Board any proposed Fiscal Plan required by the Oversight Board by the time specified in the notice delivered under subsection (a).

(3) REVIEW BY THE OVERSIGHT BOARD.—The Oversight Board shall review any proposed Fiscal Plan to determine whether it satisfies the requirements set

12

forth in subsection (b) and, if the Oversight Board determines in its sole discretion that the proposed Fiscal Plan—

(A) satisfies such requirements, the Oversight Board shall approve the proposed Fiscal Plan; or

(B) does not satisfy such requirements, the Oversight Board shall provide to the Governor—

(i) a notice of violation that includes recommendations for revisions to the applicable Fiscal Plan; and

(ii) an opportunity to correct the violation in accordance with subsection (d)(1).

(d) REVISED FISCAL PLAN.—

(1) IN GENERAL.—If the Governor receives a notice of violation under subsection (c)(3), the Governor shall submit to the Oversight Board a revised proposed Fiscal Plan in accordance with subsection (b) by the time specified in the notice delivered under subsection (a). The Governor may submit as many revised Fiscal Plans to the Oversight Board as the schedule established in the notice delivered under subsection (a) permits.

(2) DEVELOPMENT BY OVERSIGHT BOARD.—If the Governor fails to submit to the Oversight Board a Fiscal Plan that the Oversight Board determines in its sole discretion satisfies the requirements set forth in subsection (b) by the time specified in the notice delivered under subsection (a), the Oversight Board shall develop and submit to the Governor and the Legislature a Fiscal Plan that satisfies the requirements set forth in subsection (b).

(e) APPROVAL AND CERTIFICATION.—

(1) APPROVAL OF FISCAL PLAN DEVELOPED BY GOVERNOR.—If the Oversight Board approves a Fiscal Plan under subsection (c)(3), it shall deliver a compliance certification for such Fiscal Plan to the Governor and the Legislature.

(2) DEEMED APPROVAL OF FISCAL PLAN DEVELOPED BY OVERSIGHT BOARD.—If the Oversight Board develops a Fiscal Plan under subsection (d)(2), such Fiscal Plan shall be deemed approved by the Governor, and the Oversight Board shall issue a compliance certification for such Fiscal Plan to the Governor and the Legislature.

(f) JOINT DEVELOPMENT OF FISCAL PLAN.—Notwithstanding any other provision of this section, if the Governor and the Oversight Board jointly develop a Fiscal Plan for the fiscal year that meets the requirements under this section, and that the Governor and the Oversight Board certify that the fiscal plan reflects a consensus between the Governor and the Oversight Board, then such Fiscal Plan shall serve as the Fiscal Plan for the territory or territorial instrumentality for that fiscal year.

**SEC. 202. APPROVAL OF BUDGETS.**

(a) REASONABLE SCHEDULE FOR DEVELOPMENT OF BUDGETS.—As soon as practicable after all of the members and the Chair have been appointed to the Oversight Board in the fiscal year in which the Oversight Board is established, and in each fiscal year thereafter during which the Oversight Board is in operation, the Oversight Board shall deliver a notice to the Governor and the Legislature providing a schedule for developing, submitting, approving, and certifying Budgets for a period of fiscal years as determined by the Oversight Board in its sole discretion but in any case a period of not less than one fiscal year following the fiscal year in which the notice is delivered. The notice may also set forth a schedule for revisions to Budgets that have already been certified, which revisions must be subject to subsequent approval and certification by the Oversight Board. The Oversight Board shall consult with the Governor and the Legislature in establishing a schedule, but the Oversight Board shall retain sole discretion to set or, by delivery of a subsequent notice to the Governor and the Legislature, change the dates of such schedule as it deems appropriate and reasonably feasible.

(b) REVENUE FORECAST.—The Oversight Board shall submit to the Governor and Legislature a forecast of revenues for the period covered by the Budgets by the time specified in the notice delivered under subsection (a), for use by the Governor in developing the Budget under subsection (c).

(c) BUDGETS DEVELOPED BY GOVERNOR.—

(1) GOVERNOR'S PROPOSED BUDGETS.—The Governor shall submit to the Oversight Board proposed Budgets by the time specified in the notice delivered under subsection (a). In consultation with the Governor in accordance with the process specified in the notice delivered under subsection (a), the Oversight Board shall determine in its sole discretion whether each proposed Budget is compliant with the applicable Fiscal Plan and—

(A) if a proposed Budget is a compliant budget, the Oversight Board shall—

(i) approve the Budget; and

13

   (ii) if the Budget is a Territory Budget, submit the Territory Budget to the Legislature; or

  (B) if the Oversight Board determines that the Budget is not a compliant budget, the Oversight Board shall provide to the Governor—

   (i) a notice of violation that includes a description of any necessary corrective action; and

   (ii) an opportunity to correct the violation in accordance with paragraph (2).

 (2) Governor's revisions.—The Governor may correct any violations identified by the Oversight Board and submit a revised proposed Budget to the Oversight Board in accordance with paragraph (1). The Governor may submit as many revised Budgets to the Oversight Board as the schedule established in the notice delivered under subsection (a) permits. If the Governor fails to develop a Budget that the Oversight Board determines is a compliant budget by the time specified in the notice delivered under subsection (a), the Oversight Board shall develop and submit to the Governor, in the case of an Instrumentality Budget, and to the Governor and the Legislature, in the case of a Territory Budget, a revised compliant budget.

(d) Budget Approval by Legislature.—

 (1) Legislature adopted budget.—The Legislature shall submit to the Oversight Board the Territory Budget adopted by the Legislature by the time specified in the notice delivered under subsection (a). The Oversight Board shall determine whether the adopted Territory Budget is a compliant budget and—

  (A) if the adopted Territory Budget is a compliant budget, the Oversight Board shall issue a compliance certification for such compliant budget pursuant to subsection (e); and

  (B) if the adopted Territory Budget is not a compliant budget, the Oversight Board shall provide to the Legislature—

   (i) a notice of violation that includes a description of any necessary corrective action; and

   (ii) an opportunity to correct the violation in accordance with paragraph (2).

 (2) Legislature's revisions.—The Legislature may correct any violations identified by the Oversight Board and submit a revised Territory Budget to the Oversight Board in accordance with the process established under paragraph (1) and by the time specified in the notice delivered under subsection (a). The Legislature may submit as many revised adopted Territory Budgets to the Oversight Board as the schedule established in the notice delivered under subsection (a) permits. If the Legislature fails to adopt a Territory Budget that the Oversight Board determines is a compliant budget by the time specified in the notice delivered under subsection (a), the Oversight Board shall develop a revised Territory Budget that is a compliant budget and submit it to the Governor and the Legislature.

(e) Certification of Budgets.—

 (1) Certification of developed and approved territory budgets.—If the Governor and the Legislature develop and approve a Territory Budget that is a compliant budget by the day before the first day of the fiscal year for which the Territory Budget is being developed and in accordance with the process established under subsections (c) and (d), the Oversight Board shall issue a compliance certification to the Governor and the Legislature for such Territory Budget.

 (2) Certification of developed instrumentality budgets.—If the Governor develops an Instrumentality Budget that is a compliant budget by the day before the first day of the fiscal year for which the Instrumentality Budget is being developed and in accordance with the process established under subsection (c), the Oversight Board shall issue a compliance certification to the Governor for such Instrumentality Budget.

 (3) Deemed certification of territory budgets.—If the Governor and the Legislature fail to develop and approve a Territory Budget that is a compliant budget by the day before the first day of the fiscal year for which the Territory Budget is being developed, the Oversight Board shall submit a Budget to the Governor and the Legislature (including any revision to the Territory Budget made by the Oversight Board pursuant to subsection (d)(2)) and such Budget shall be—

  (A) deemed to be approved by the Governor and the Legislature;

  (B) the subject of a compliance certification issued by the Oversight Board to the Governor and the Legislature; and

  (C) in full force and effect beginning on the first day of the applicable fiscal year.

14

(4) DEEMED CERTIFICATION OF INSTRUMENTALITY BUDGETS.—If the Governor fails to develop an Instrumentality Budget that is a compliant budget by the day before the first day of the fiscal year for which the Instrumentality Budget is being developed, the Oversight Board shall submit an Instrumentality Budget to the Governor (including any revision to the Instrumentality Budget made by the Oversight Board pursuant to subsection (c)(2)) and such Budget shall be—

(A) deemed to be approved by the Governor;

(B) the subject of a compliance certification issued by the Oversight Board to the Governor; and

(C) in full force and effect beginning on the first day of the applicable fiscal year.

(f) JOINT DEVELOPMENT OF BUDGETS.—Notwithstanding any other provision of this section, if, in the case of a Territory Budget, the Governor, the Legislature, and the Oversight Board, or in the case of an Instrumentality Budget, the Governor and the Oversight Board, jointly develop such Budget for the fiscal year that meets the requirements under this section, and that the relevant parties certify that such budget reflects a consensus among them, then such Budget shall serve as the Budget for the territory or territorial instrumentality for that fiscal year.

**SEC. 203. EFFECT OF FINDING OF NONCOMPLIANCE WITH BUDGET.**

(a) SUBMISSION OF REPORTS.—Not later than 15 days after the last day of each quarter of a fiscal year (beginning with the fiscal year determined by the Oversight Board), the Governor shall submit to the Oversight Board a report, in such form as the Oversight Board may require, describing—

(1) the actual cash revenues, cash expenditures, and cash flows of the territorial government for the preceding quarter, as compared to the projected revenues, expenditures, and cash flows contained in the certified Budget for such preceding quarter; and

(2) any other information requested by the Oversight Board, which may include a balance sheet or a requirement that the Governor provide information for each covered territorial instrumentality separately.

(b) INITIAL ACTION BY OVERSIGHT BOARD.—

(1) IN GENERAL.—If the Oversight Board determines, based on reports submitted by the Governor under subsection (a), independent audits, or such other information as the Oversight Board may obtain, that the actual quarterly revenues, expenditures, or cash flows of the territorial government are not consistent with the projected revenues, expenditures, or cash flows set forth in the certified Budget for such quarter, the Oversight Board shall—

(A) require the territorial government to provide such additional information as the Oversight Board determines to be necessary to explain the inconsistency; and

(B) if the additional information provided under subparagraph (A) does not provide an explanation for the inconsistency that the Oversight Board finds reasonable and appropriate, advise the territorial government to correct the inconsistency by implementing remedial action.

(2) DEADLINES.—The Oversight Board shall establish the deadlines by which the territorial government shall meet the requirements of subparagraphs (A) and (B) of paragraph (1).

(c) CERTIFICATION.—

(1) INCONSISTENCY.—If the territorial government fails to provide additional information under subsection (b)(1)(A), or fails to correct an inconsistency under subsection (b)(1)(B), prior to the applicable deadline under subsection (b)(2), the Oversight Board shall certify to the President, the House of Representatives Committee on Natural Resources, the Senate Committee on Energy and Natural Resources, the Governor, and the Legislature that the territorial government is inconsistent with the applicable certified Budget, and shall describe the nature and amount of the inconsistency.

(2) CORRECTION.—If the Oversight Board determines that the territorial government has initiated such measures as the Oversight Board considers sufficient to correct an inconsistency certified under paragraph (1), the Oversight Board shall certify the correction to the President, the House of Representatives Committee on Natural Resources, the Senate Committee on Energy and Natural Resources, the Governor, and the Legislature.

(d) BUDGET REDUCTIONS BY OVERSIGHT BOARD.—If the Oversight Board determines that the Governor, in the case of any then-applicable certified Instrumentality Budgets, and the Governor and the Legislature, in the case of the then-applicable certified Territory Budget, have failed to correct an inconsistency identified by the Oversight Board under subsection (c), the Oversight Board shall—

15

(1) with respect to the territorial government, other than covered territorial instrumentalities, make appropriate reductions in nondebt expenditures to ensure that the actual quarterly revenues and expenditures for the territorial government are in compliance with the applicable certified Territory Budget or, in the case of the fiscal year in which the Oversight Board is established, the budget adopted by the Governor and the Legislature; and

(2) with respect to covered territorial instrumentalities at the sole discretion of the Oversight Board—

(A) make reductions in nondebt expenditures to ensure that the actual quarterly revenues and expenses for the covered territorial instrumentality are in compliance with the applicable certified Budget or, in the case of the fiscal year in which the Oversight Board is established, the budget adopted by the Governor and the Legislature or the covered territorial instrumentality, as applicable; or

(B)(i) institute automatic hiring freezes at the covered territorial instrumentality; and

(ii) prohibit the covered territorial instrumentality from entering into any contract or engaging in any financial or other transactions, unless the contract or transaction was previously approved by the Oversight Board.

(e) TERMINATION OF BUDGET REDUCTIONS.—The Oversight Board shall cancel the reductions, hiring freezes, or prohibition on contracts and financial transactions under subsection (d) if the Oversight Board determines that the territorial government or covered territorial instrumentality, as applicable, has initiated appropriate measures to reduce expenditures or increase revenues to ensure that the territorial government or covered territorial instrumentality is in compliance with the applicable certified Budget or, in the case of the fiscal year in which the Oversight Board is established, the budget adopted by the Governor and the Legislature.

**SEC. 204. REVIEW OF ACTIVITIES TO ENSURE COMPLIANCE WITH FISCAL PLAN.**

(a) SUBMISSION OF LEGISLATIVE ACTS TO OVERSIGHT BOARD.—

(1) SUBMISSION OF ACTS.—Except to the extent that the Oversight Board may provide otherwise in its bylaws, rules, and procedures, not later than 7 business days after a territorial government duly enacts any law during any fiscal year in which the Oversight Board is in operation, the Governor shall submit the law to the Oversight Board.

(2) COST ESTIMATE; CERTIFICATION OF COMPLIANCE OR NONCOMPLIANCE.—The Governor shall include with each law submitted to the Oversight Board under paragraph (1) the following:

(A) A formal estimate prepared by an appropriate entity of the territorial government with expertise in budgets and financial management of the impact, if any, that the law will have on expenditures and revenues.

(B) If the appropriate entity described in subparagraph (A) finds that the law is not significantly inconsistent with the Fiscal Plan for the fiscal year, it shall issue a certification of such finding.

(C) If the appropriate entity described in subparagraph (A) finds that the law is significantly inconsistent with the Fiscal Plan for the fiscal year, it shall issue a certification of such finding, together with the entity's reasons for such finding.

(3) NOTIFICATION.—The Oversight Board shall send a notification to the Governor and the Legislature if—

(A) the Governor submits a law to the Oversight Board under this subsection that is not accompanied by the estimate required under paragraph (2)(A);

(B) the Governor submits a law to the Oversight Board under this subsection that is not accompanied by either a certification described in paragraph (2)(B) or (2)(C); or

(C) the Governor submits a law to the Oversight Board under this subsection that is accompanied by a certification described in paragraph (2)(C) that the law is significantly inconsistent with the Fiscal Plan.

(4) OPPORTUNITY TO RESPOND TO NOTIFICATION.—

(A) FAILURE TO PROVIDE ESTIMATE OR CERTIFICATION.—After sending a notification to the Governor and the Legislature under paragraph (3)(A) or (3)(B) with respect to a law, the Oversight Board may direct the Governor to provide the missing estimate or certification (as the case may be), in accordance with such procedures as the Oversight Board may establish.

(B) SUBMISSION OF CERTIFICATION OF SIGNIFICANT INCONSISTENCY WITH FISCAL PLAN AND BUDGET.—In accordance with such procedures as the Oversight Board may establish, after sending a notification to the Governor and Legislature under paragraph (3)(C) that a law is significantly incon-

16

sistent with the Fiscal Plan, the Oversight Board shall direct the territorial government to—

(i) correct the law to eliminate the inconsistency; or

(ii) provide an explanation for the inconsistency that the Oversight Board finds reasonable and appropriate.

(5) FAILURE TO COMPLY.—If the territorial government fails to comply with a direction given by the Oversight Board under paragraph (4) with respect to a law, the Oversight Board may take such actions as it considers necessary, consistent with this Act, to ensure that the enactment or enforcement of the law will not adversely affect the territorial government's compliance with the Fiscal Plan, including preventing the enforcement or application of the law.

(6) PRELIMINARY REVIEW OF PROPOSED ACTS.—At the request of the Legislature, the Oversight Board may conduct a preliminary review of proposed legislation before the Legislature to determine whether the legislation as proposed would be consistent with the applicable Fiscal Plan under this subtitle, except that any such preliminary review shall not be binding on the Oversight Board in reviewing any law subsequently submitted under this subsection.

(b) EFFECT OF APPROVED FISCAL PLAN ON CONTRACTS, RULES, AND REGULATIONS.—

(1) TRANSPARENCY IN CONTRACTING.—The Oversight Board shall work with a covered territory's office of the comptroller or any functionally equivalent entity to promote compliance with the applicable law of any covered territory that requires agencies and instrumentalities of the territorial government to maintain a registry of all contracts executed, including amendments thereto, and to remit a copy to the office of the comptroller for inclusion in a comprehensive database available to the public. With respect to Puerto Rico, the term "applicable law" refers to 2 L.P.R.A. 97, as amended.

(2) AUTHORITY TO REVIEW CERTAIN CONTRACTS.—The Oversight Board may establish policies to require prior Oversight Board approval of certain contracts, including leases and contracts to a governmental entity or government-owned corporations rather than private enterprises that are proposed to be executed by the territorial government, to ensure such proposed contracts promote market competition and are not inconsistent with the approved Fiscal Plan.

(3) SENSE OF CONGRESS.—It is the sense of Congress that any policies established by the Oversight Board pursuant to paragraph (2) should be designed to make the government contracting process more effective, to increase the public's faith in this process, to make appropriate use of the Oversight Board's time and resources, to make the territorial government a facilitator and not a competitor to private enterprise, and to avoid creating any additional bureaucratic obstacles to efficient contracting.

(4) AUTHORITY TO REVIEW CERTAIN RULES, REGULATIONS, AND EXECUTIVE ORDERS.—The provisions of this paragraph shall apply with respect to a rule, regulation, or executive order proposed to be issued by the Governor (or the head of any department or agency of the territorial government) in the same manner as such provisions apply to a contract.

(5) FAILURE TO COMPLY.—If a contract, rule, regulation, or executive order fails to comply with policies established by the Oversight Board under this subsection, the Oversight Board may take such actions as it considers necessary to ensure that such contract, rule, executive order or regulation will not adversely affect the territorial government's compliance with the Fiscal Plan, including by preventing the execution or enforcement of the contract, rule, executive order or regulation.

(c) RESTRICTIONS ON BUDGETARY ADJUSTMENTS.—

(1) SUBMISSIONS OF REQUESTS TO OVERSIGHT BOARD.—If the Governor submits a request to the Legislature for the reprogramming of any amounts provided in a certified Budget, the Governor shall submit such request to the Oversight Board, which shall analyze whether the proposed reprogramming is significantly inconsistent with the Budget, and submit its analysis to the Legislature as soon as practicable after receiving the request.

(2) NO ACTION PERMITTED UNTIL ANALYSIS RECEIVED.—The Legislature shall not adopt a reprogramming, and no officer or employee of the territorial government may carry out any reprogramming, until the Oversight Board has provided the Legislature with an analysis that certifies such reprogramming will not be inconsistent with the Fiscal Plan and Budget.

(3) PROHIBITION ON ACTION UNTIL OVERSIGHT BOARD IS APPOINTED.—During the period after a territory becomes a covered territory and prior to the appointment of all members and the Chair of the Oversight Board, such covered territory shall not enact new laws that either permit the transfer of any funds or assets outside the ordinary course of business or that are inconsistent with the

17

constitution or laws of the territory as of the date of enactment of this Act, provided that any executive or legislative action authorizing the movement of funds or assets during this time period may be subject to review and reversal by the Oversight Board upon appointment of the Oversight Board's full membership.

(d) IMPLEMENTATION OF FEDERAL PROGRAMS.—In taking actions under this Act, the Oversight Board shall not exercise applicable authorities to impede territorial actions taken to—

(1) comply with a court-issued consent decree or injunction, or an administrative order or settlement with a Federal agency, with respect to Federal programs;

(2) implement a federally authorized or federally delegated program; or

(3) implement territorial laws, which are consistent with a certified Fiscal Plan, that execute Federal requirements and standards.

**SEC. 205. RECOMMENDATIONS ON FINANCIAL STABILITY AND MANAGEMENT RESPONSIBILITY.**

(a) IN GENERAL.—The Oversight Board may at any time submit recommendations to the Governor or the Legislature on actions the territorial government may take to ensure compliance with the Fiscal Plan, or to otherwise promote the financial stability, economic growth, management responsibility, and service delivery efficiency of the territorial government, including recommendations relating to—

(1) the management of the territorial government's financial affairs, including economic forecasting and multiyear fiscal forecasting capabilities, information technology, placing controls on expenditures for personnel, reducing benefit costs, reforming procurement practices, and placing other controls on expenditures;

(2) the structural relationship of departments, agencies, and independent agencies within the territorial government;

(3) the modification of existing revenue structures, or the establishment of additional revenue structures;

(4) the establishment of alternatives for meeting obligations to pay for the pensions of territorial government employees;

(5) modifications or transfers of the types of services that are the responsibility of, and are delivered by the territorial government;

(6) modifications of the types of services that are delivered by entities other than the territorial government under alternative service delivery mechanisms;

(7) the effects of the territory's laws and court orders on the operations of the territorial government;

(8) the establishment of a personnel system for employees of the territorial government that is based upon employee performance standards;

(9) the improvement of personnel training and proficiency, the adjustment of staffing levels, and the improvement of training and performance of management and supervisory personnel; and

(10) the privatization and commercialization of entities within the territorial government.

(b) RESPONSE TO RECOMMENDATIONS BY THE TERRITORIAL GOVERNMENT.—

(1) IN GENERAL.—In the case of any recommendations submitted under subsection (a) that are within the authority of the territorial government to adopt, not later than 90 days after receiving the recommendations, the Governor or the Legislature (whichever has the authority to adopt the recommendation) shall submit a statement to the Oversight Board that provides notice as to whether the territorial government will adopt the recommendations.

(2) IMPLEMENTATION PLAN REQUIRED FOR ADOPTED RECOMMENDATIONS.—If the Governor or the Legislature (whichever is applicable) notifies the Oversight Board under paragraph (1) that the territorial government will adopt any of the recommendations submitted under subsection (a), the Governor or the Legislature (whichever is applicable) shall include in the statement a written plan to implement the recommendation that includes—

(A) specific performance measures to determine the extent to which the territorial government has adopted the recommendation; and

(B) a clear and specific timetable pursuant to which the territorial government will implement the recommendation.

(3) EXPLANATIONS REQUIRED FOR RECOMMENDATIONS NOT ADOPTED.—If the Governor or the Legislature (whichever is applicable) notifies the Oversight Board under paragraph (1) that the territorial government will not adopt any recommendation submitted under subsection (a) that the territorial government has authority to adopt, the Governor or the Legislature shall include in the statement explanations for the rejection of the recommendations, and the Governor or the Legislature shall submit such statement of explanations to the President and Congress.

18

**SEC. 206. OVERSIGHT BOARD DUTIES RELATED TO RESTRUCTURING.**

(a) REQUIREMENTS FOR RESTRUCTURING CERTIFICATION.—The Oversight Board, prior to issuing a restructuring certification regarding an entity (as such term is defined in section 101 of title 11, United States Code), shall determine, in its sole discretion, that—

(1) the entity has made good-faith efforts to reach a consensual restructuring with creditors;

(2) the entity has—

(A) adopted procedures necessary to deliver timely audited financial statements; and

(B) made public draft financial statements and other information sufficient for any interested person to make an informed decision with respect to a possible restructuring;

(3) the entity is either a covered territory that has adopted a Fiscal Plan certified by the Oversight Board, a covered territorial instrumentality that is subject to a Territory Fiscal Plan certified by the Oversight Board, or a covered territorial instrumentality that has adopted an Instrumentality Fiscal Plan certified by the Oversight Board; and

(4)(A) no order approving a Qualifying Modification under section 601 has been entered with respect to such entity; or

(B) if an order approving a Qualifying Modification has been entered with respect to such entity, the entity is unable to make its debt payments notwithstanding the approved Qualifying Modification, in which case, all claims affected by the Qualifying Modification shall be subject to a title III case.

(b) ISSUANCE OF RESTRUCTURING CERTIFICATION.—The issuance of a restructuring certification under this section requires a vote of no fewer than 5 members of the Oversight Board in the affirmative, which shall satisfy the requirement set forth in section 302(2) of this Act.

**SEC. 207. OVERSIGHT BOARD AUTHORITY RELATED TO DEBT ISSUANCE.**

For so long as the Oversight Board remains in operation, no territorial government may, without the prior approval of the Oversight Board, issue debt or guarantee, exchange, modify, repurchase, redeem, or enter into similar transactions with respect to its debt.

**SEC. 208. REQUIRED REPORTS.**

(a) ANNUAL REPORT.—Not later than 30 days after the last day of each fiscal year, the Oversight Board shall submit a report to the President, Congress, the Governor and the Legislature, describing—

(1) the progress made by the territorial government in meeting the objectives of this Act during the fiscal year;

(2) the assistance provided by the Oversight Board to the territorial government in meeting the purposes of this Act during the fiscal year;

(3) recommendations to the President and Congress on changes to this Act or other Federal laws, or other actions of the Federal Government, that would assist the territorial government in complying with any certified Fiscal Plan;

(4) the precise manner in which funds allocated to the Oversight Board under section 107 and, as applicable, section 104(e) have been spent by the Oversight Board during the fiscal year; and

(5) any other activities of the Oversight Board during the fiscal year.

(b) REPORT ON DISCRETIONARY TAX ABATEMENT AGREEMENTS.—Within six months of the establishment of the Oversight Board, the Governor shall submit a report to the Oversight Board documenting all existing discretionary tax abatement or similar tax relief agreements to which the territorial government, or any territorial instrumentality, is a party, provided that—

(1) nothing in this Act shall be interpreted to limit the power of the territorial government or any territorial instrumentality to execute or modify discretionary tax abatement or similar tax relief agreements, or to enforce compliance with the terms and conditions of any discretionary tax abatement or similar tax relief agreement, to which the territorial government or any territorial instrumentality is a party; and

(2) the members and staff of the Oversight Board shall not disclose the contents of the report described in this subsection, and shall otherwise comply with all applicable territorial and Federal laws and regulations regarding the handling of confidential taxpayer information.

(c) QUARTERLY REPORTS OF CASH FLOW.—The Oversight Board, when feasible, shall report on the amount of cash flow available for the payment of debt service on all notes, bonds, debentures, credit agreements, or other instruments for money borrowed whose enforcement is subject to a stay or moratorium hereunder, together

19

with any variance from the amount set forth in the debt sustainability analysis of the Fiscal Plan under section 201(b)(1)(I).

**SEC. 209. TERMINATION OF OVERSIGHT BOARD.**

An Oversight Board shall terminate upon certification by the Oversight Board that—

    (1) the applicable territorial government has adequate access to short-term and long-term credit markets at reasonable interest rates to meet the borrowing needs of the territorial government; and

    (2) for at least 4 consecutive fiscal years—

        (A) the territorial government has developed its Budgets in accordance with modified accrual accounting standards; and

        (B) the expenditures made by the territorial government during each fiscal year did not exceed the revenues of the territorial government during that year, as determined in accordance with modified accrual accounting standards.

**SEC. 210. NO FULL FAITH AND CREDIT OF THE UNITED STATES.**

(a) IN GENERAL.—The full faith and credit of the United States is not pledged for the payment of any principal of or interest on any bond, note, or other obligation issued by a covered territory or covered territorial instrumentality. The United States is not responsible or liable for the payment of any principal of or interest on any bond, note, or other obligation issued by a covered territory or covered territorial instrumentality.

(b) SUBJECT TO APPROPRIATIONS.—Any claim to which the United States is determined to be liable under this Act shall be subject to appropriations.

(c) FUNDING.—No Federal funds shall be authorized by this Act for the payment of any liability of the territory or territorial instrumentality.

**SEC. 211. ANALYSIS OF PENSIONS.**

(a) DETERMINATION.—If the Oversight Board determines, in its sole discretion, that a pension system of the territorial government is materially underfunded, the Oversight Board shall conduct an analysis prepared by an independent actuary of such pension system to assist the Oversight Board in evaluating the fiscal and economic impact of the pension cash flows.

(b) PROVISIONS OF ANALYSIS.—An analysis conducted under subsection (a) shall include—

    (1) an actuarial study of the pension liabilities and funding strategy that includes a forward looking projection of payments of at least 30 years of benefit payments and funding strategy to cover such payments;

    (2) sources of funding to cover such payments;

    (3) a review of the existing benefits and their sustainability; and

    (4) a review of the system's legal structure and operational arrangements, and any other studies of the pension system the Oversight Board shall deem necessary.

(c) SUPPLEMENTARY INFORMATION.—In any case, the analysis conducted under subsection (a) shall include information regarding the fair market value and liabilities using an appropriate discount rate as determined by the Oversight Board.

**SEC. 212. INTERVENTION IN LITIGATION.**

(a) INTERVENTION.—The Oversight Board may intervene in any litigation filed against the territorial government.

(b) INJUNCTIVE RELIEF.—

    (1) IN GENERAL.—If the Oversight Board intervenes in a litigation under subsection (a), the Oversight Board may seek injunctive relief, including a stay of litigation.

    (2) NO INDEPENDENT BASIS FOR RELIEF.—This section does not create an independent basis on which injunctive relief, including a stay of litigation, may be granted.

# TITLE III—ADJUSTMENTS OF DEBTS

**SEC. 301. APPLICABILITY OF OTHER LAWS; DEFINITIONS.**

(a) SECTIONS APPLICABLE TO CASES UNDER THIS TITLE.—Sections 101 (except as otherwise provided in this section), 102, 104, 105, 106, 107, 108, 112, 333, 344, 347(b), 349, 350(b), 351, 361, 362, 364(c), 364(d), 364(e), 364(f), 365, 366, 501, 502, 503, 504, 506, 507(a)(2), 509, 510, 524(a)(1), 524(a)(2), 544, 545, 546, 547, 548, 549(a), 549(c), 549(d), 550, 551, 552, 553, 555, 556, 557, 559, 560, 561, 562, 902 (except as otherwise provided in this section), 922, 923, 924, 925, 926, 927, 928, 942,

20

944, 945, 946, 1102, 1103, 1109, 1111(b), 1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4), 1123(a)(5), 1123(b), 1123(d), 1124, 1125, 1126(a), 1126(b), 1126(c), 1126(e), 1126(f), 1126(g), 1127(d), 1128, 1129(a)(2), 1129(a)(3), 1129(a)(6), 1129(a)(8), 1129(a)(10), 1129(b)(1), 1129(b)(2)(A), 1129(b)(2)(B), 1142(b), 1143, 1144, 1145, and 1146(a) of title 11, United States Code, apply in a case under this title and section 930 of title 11, United States Code, applies in a case under this title; however, section 930 shall not apply in any case during the first 120 days after the date on which such case is commenced under this title.

(b) MEANINGS OF TERMS.—A term used in a section of title 11, United States Code, made applicable in a case under this title by subsection (a), has the meaning given to the term for the purpose of the applicable section, unless the term is otherwise defined in this title.

(c) DEFINITIONS.—In this title:

(1) AFFILIATE.—The term "affiliate" means, in addition to the definition made applicable in a case under this title by subsection (a)—

(A) for a territory, any territorial instrumentality; and

(B) for a territorial instrumentality, the governing territory and any of the other territorial instrumentalities of the territory.

(2) DEBTOR.—The term "debtor" means the territory or covered territorial instrumentality concerning which a case under this title has been commenced.

(3) HOLDER OF A CLAIM OR INTEREST.—The term "holder of a claim or interest", when used in section 1126 of title 11, United States Code, made applicable in a case under this title by subsection (a)—

(A) shall exclude any Issuer or Authorized Instrumentality of the Territory Government Issuer (as defined under Title VI of this Act) or a corporation, trust or other legal entity that is controlled by the Issuer or an Authorized Territorial Instrumentality of the Territory Government Issuer, provided that the beneficiaries of such claims, to the extent they are not referenced in this subparagraph, shall not be excluded; and

(B) with reference to Insured Bonds, shall mean the monoline insurer insuring such Insured Bond to the extent such insurer is granted the right to vote Insured Bonds for purposes of directing remedies or consenting to proposed amendments or modifications as provided in the applicable documents pursuant to which such Insured Bond was issued and insured.

(4) INSURED BOND.—The term "Insured Bond" means a bond subject to a financial guarantee or similar insurance contract, policy and/or surety issued by a monoline insurer.

(5) PROPERTY OF THE ESTATE.—The term "property of the estate", when used in a section of title 11, United States Code, made applicable in a case under this title by subsection (a), means property of the debtor.

(6) STATE.—The term "State" when used in a section of title 11, United States Code, made applicable in a case under this title by subsection (a) means State or territory when used in reference to the relationship of a State to the municipality of the State or the territorial instrumentality of a territory, as applicable.

(7) TRUSTEE.—The term "trustee", when used in a section of title 11, United States Code, made applicable in a case under this title by subsection (a), means the Oversight Board, except as provided in section 926 of title 11, United States Code.

(d) REFERENCE TO TITLE.—Solely for purposes of this title, a reference to "this title", "this chapter", or words of similar import in a section of title 11, United States Code, made applicable in a case under this title by subsection (a) or to "this title", "title 11", "Chapter 9", "the Code", or words of similar import in the Federal Rules of Bankruptcy Procedure made applicable in a case under this title shall be deemed to be a reference to this title.

(e) SUBSTANTIALLY SIMILAR.—In determining whether claims are "substantially similar" for the purpose of section 1122 of title 11, United States Code, made applicable in a case under this title by subsection (a), the Oversight Board shall consider whether such claims are secured and whether such claims have priority over other claims.

(f) OPERATIVE CLAUSES.—A section made applicable in a case under this title by subsection (a) that is operative if the business of the debtor is authorized to be operated in a case under this title.

**SEC. 302. WHO MAY BE A DEBTOR.**

An entity may be a debtor under this title if—

(1) the entity is—

(A) a territory that has requested the establishment of an Oversight Board or has had an Oversight Board established for it by the United States Congress in accordance with section 101 of this Act; or

21

 (B) a covered territorial instrumentality of a territory described in paragraph (1)(A);

 (2) the Oversight Board has issued a certification under section 206(b) of this Act for such entity; and

 (3) the entity desires to effect a plan to adjust its debts.

**SEC. 303. RESERVATION OF TERRITORIAL POWER TO CONTROL TERRITORY AND TERRITORIAL INSTRUMENTALITIES.**

Subject to the limitations set forth in titles I and II of this Act, this title does not limit or impair the power of a covered territory to control, by legislation or otherwise, the territory or any territorial instrumentality thereof in the exercise of the political or governmental powers of the territory or territorial instrumentality, including expenditures for such exercise, whether or not a case has been or can be commenced under this title, but—

 (1) a territory law prescribing a method of composition of indebtedness or a moratorium law, but solely to the extent that it prohibits the payment of principal or interest by an entity not described in section 109(b)(2) of title 11, United States Code, may not bind any creditor of a covered territory or any covered territorial instrumentality thereof that does not consent to the composition or moratorium;

 (2) a judgment entered under a law described in paragraph (1) may not bind a creditor that does not consent to the composition; and

 (3) unlawful executive orders that alter, amend, or modify rights of holders of any debt of the territory or territorial instrumentality, or that divert funds from one territorial instrumentality to another or to the territory, shall be preempted by this Act.

**SEC. 304. PETITION AND PROCEEDINGS RELATING TO PETITION.**

 (a) COMMENCEMENT OF CASE.—A voluntary case under this title is commenced by the filing with the district court of a petition by the Oversight Board pursuant to the determination under section 206 of this Act.

 (b) OBJECTION TO PETITION.—After any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the petition does not meet the requirements of this title; however, this subsection shall not apply in any case during the first 120 days after the date on which such case is commenced under this title.

 (c) ORDER FOR RELIEF.—The commencement of a case under this title constitutes an order for relief.

 (d) APPEAL.—The court may not, on account of an appeal from an order for relief, delay any proceeding under this title in the case in which the appeal is being taken, nor shall any court order a stay of such proceeding pending such appeal.

 (e) VALIDITY OF DEBT.—The reversal on appeal of a finding of jurisdiction shall not affect the validity of any debt incurred that is authorized by the court under section 364(c) or 364(d) of title 11, United States Code.

 (f) JOINT FILING OF PETITIONS AND PLANS PERMITTED.—The Oversight Board, on behalf of debtors under this title, may file petitions or submit or modify plans of adjustment jointly if the debtors are affiliates; provided, however, that nothing in this title shall be construed as authorizing substantive consolidation of the cases of affiliated debtors.

 (g) JOINT ADMINISTRATION OF AFFILIATED CASES.—If the Oversight Board, on behalf of a debtor and one or more affiliates, has filed separate cases and the Oversight Board, on behalf of the debtor or one of the affiliates, files a motion to administer the cases jointly, the court may order a joint administration of the cases.

 (h) PUBLIC SAFETY.—This Act may not be construed to permit the discharge of obligations arising under Federal police or regulatory laws, including laws relating to the environment, public health or safety, or territorial laws implementing such Federal legal provisions. This includes compliance obligations, requirements under consent decrees or judicial orders, and obligations to pay associated administrative, civil, or other penalties.

 (i) VOTING ON DEBT ADJUSTMENT PLANS NOT STAYED.—Notwithstanding any provision in this title to the contrary, including sections of title 11, United States Code, incorporated by reference, nothing in this section shall prevent the holder of a claim from voting on or consenting to a proposed modification of such claim under title VI of this Act.

**SEC. 305. LIMITATION ON JURISDICTION AND POWERS OF COURT.**

Subject to the limitations set forth in titles I and II of this Act, notwithstanding any power of the court, unless the Oversight Board consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with—

 (1) any of the political or governmental powers of the debtor;

22

(2) any of the property or revenues of the debtor; or

(3) the use or enjoyment by the debtor of any income-producing property.

**SEC. 306. JURISDICTION.**

(a) FEDERAL SUBJECT MATTER JURISDICTION.—The district courts shall have—

(1) except as provided in paragraph (2), original and exclusive jurisdiction of all cases under this title; and

(2) except as provided in subsection (b), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, original but not exclusive jurisdiction of all civil proceedings arising under this title, or arising in or related to cases under this title.

(b) PROPERTY JURISDICTION.—The district court in which a case under this title is commenced or is pending shall have exclusive jurisdiction of all property, wherever located, of the debtor as of the commencement of the case.

(c) PERSONAL JURISDICTION.—The district court in which a case under this title is pending shall have personal jurisdiction over any person or entity.

(d) REMOVAL, REMAND, AND TRANSFER.—

(1) REMOVAL.—A party may remove any claim or cause of action in a civil action, other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce the police or regulatory power of the governmental unit, to the district court for the district in which the civil action is pending, if the district court has jurisdiction of the claim or cause of action under this section.

(2) REMAND.—The district court to which the claim or cause of action is removed under paragraph (1) may remand the claim or cause of action on any equitable ground. An order entered under this subsection remanding a claim or cause of action, or a decision not to remand, is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291 or 1292 of title 28, United States Code, or by the Supreme Court of the United States under section 1254 of title 28, United States Code.

(3) TRANSFER.—A district court shall transfer any civil proceeding arising under this title, or arising in or related to a case under this title, to the district court in which the case under this title is pending.

(e) APPEAL.—

(1) An appeal shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district court.

(2) The court of appeals for the circuit in which a case under this title has venue pursuant to section 307 of this title shall have jurisdiction of appeals from all final decisions, judgments, orders and decrees entered under this title by the district court.

(3) The court of appeals for the circuit in which a case under this title has venue pursuant to section 307 of this title shall have jurisdiction to hear appeals of interlocutory orders or decrees if—

(A) the district court on its own motion or on the request of a party to the order or decree certifies that—

(i) the order or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;

(ii) the order or decree involves a question of law requiring the resolution of conflicting decisions; or

(iii) an immediate appeal from the order or decree may materially advance the progress of the case or proceeding in which the appeal is taken; and

(B) the court of appeals authorizes the direct appeal of the order or decree.

(4) If the district court on its own motion or on the request of a party determines that a circumstance specified in clauses (i), (ii), or (iii) of paragraph (3)(A) exists, then the district court shall make the certification described in paragraph (3).

(5) The parties may supplement the certification with a short statement of the basis for the certification issued by the district court under paragraph (3)(A).

(6) Except as provided in section 304(d), an appeal of an interlocutory order or decree does not stay any proceeding of the district court from which the appeal is taken unless the district court, or the court of appeals in which the appeal is pending, issues a stay of such proceedings pending the appeal.

(7) Any request for a certification in respect to an interlocutory appeal of an order or decree shall be made not later than 60 days after the entry of the order or decree.

23

(f) REALLOCATION OF COURT STAFF.—Notwithstanding any law to the contrary, the clerk of the court in which a case is pending shall reallocate as many staff and assistants as the clerk deems necessary to ensure that the court has adequate resources to provide for proper case management.

**SEC. 307. VENUE.**

(a) IN GENERAL.—Venue shall be proper in—

(1) with respect to a territory, the district court for the territory or, for any territory that does not have a district court, the United States District Court for the District of Hawaii; and

(2) with respect to a covered territorial instrumentality, the district court for the territory in which the covered territorial instrumentality is located or, for any territory that does not have a district court, the United States District Court for the District of Hawaii.

(b) ALTERNATIVE VENUE.—If the Oversight Board so determines in its sole discretion, then venue shall be proper in the district court for the jurisdiction in which the Oversight Board maintains an office that is located outside the territory.

**SEC. 308. SELECTION OF PRESIDING JUDGE.**

(a) For cases in which the debtor is a territory, the Chief Justice of the United States shall designate a district court judge to sit by designation to conduct the case.

(b) For cases in which the debtor is not a territory, and no motion for joint administration of the debtor's case with the case of its affiliate territory has been filed or there is no case in which the affiliate territory is a debtor, the chief judge of the court of appeals for the circuit embracing the district in which the case is commenced shall designate a district court judge to conduct the case.

**SEC. 309. ABSTENTION.**

Nothing in this title prevents a district court in the interests of justice from abstaining from hearing a particular proceeding arising in or related to a case under this title.

**SEC. 310. APPLICABLE RULES OF PROCEDURE.**

The Federal Rules of Bankruptcy Procedure shall apply to a case under this title and to all civil proceedings arising in or related to cases under this title.

**SEC. 311. LEASES.**

A lease to a territory or territorial instrumentality shall not be treated as an executory contract or unexpired lease for the purposes of section 365 or 502(b)(6) of title 11, United States Code, solely by reason of the lease being subject to termination in the event the debtor fails to appropriate rent.

**SEC. 312. FILING OF PLAN OF ADJUSTMENT.**

(a) EXCLUSIVITY.—Only the Oversight Board, after the issuance of a certificate pursuant to section 104(j) of this Act, may file a plan of adjustment of the debts of the debtor.

(b) DEADLINE FOR FILING PLAN.—If the Oversight Board does not file a plan of adjustment with the petition, the Oversight Board shall file a plan of adjustment at the time set by the court.

**SEC. 313. MODIFICATION OF PLAN.**

The Oversight Board, after the issuance of a certification pursuant to section 104(j) of this Act, may modify the plan at any time before confirmation, but may not modify the plan so that the plan as modified fails to meet the requirements of this title. After the Oversight Board files a modification, the plan as modified becomes the plan.

**SEC. 314. CONFIRMATION.**

(a) OBJECTION.—A special tax payer may object to confirmation of a plan.

(b) CONFIRMATION.—The court shall confirm the plan if—

(1) the plan complies with the provisions of title 11 of the United States Code, made applicable to a case under this title by section 301 of this Act;

(2) the plan complies with the provisions of this title;

(3) the debtor is not prohibited by law from taking any action necessary to carry out the plan;

(4) except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that on the effective date of the plan each holder of a claim of a kind specified in 507(a)(2) of title 11, United States Code, will receive on account of such claim cash equal to the allowed amount of such claim;

24

(5) any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval;

(6) the plan is feasible and in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan; and

(7) the plan is consistent with the applicable Fiscal Plan certified by the Oversight Board under title II.

(c) CONFIRMATION FOR DEBTORS WITH A SINGLE CLASS OF IMPAIRED CREDITORS.—If all of the requirements of section 314(b) of this title and section 1129(a) of title 11, United States Code, incorporated into this title by section 301 other than sections 1129(a)(8) and 1129(a)(10) are met with respect to a plan—

(1) with respect to which all claims are substantially similar under section 301(e) of this title;

(2) that includes only one class of impaired claims; and

(3) that was not accepted by such impaired class,

the court shall confirm the plan notwithstanding the requirements of such sections 1129(a)(8) and 1129(a)(10) of title 11, United States Code if the plan is fair and equitable with respect to such impaired class.

**SEC. 315. ROLE AND CAPACITY OF OVERSIGHT BOARD.**

(a) ACTIONS OF OVERSIGHT BOARD.—For the purposes of this title, the Oversight Board may take any action necessary on behalf of the debtor to prosecute the case of the debtor, including—

(1) filing a petition under section 304 of this Act;

(2) submitting or modifying a plan of adjustment under sections 312 and 313; or

(3) otherwise generally submitting filings in relation to the case with the court.

(b) REPRESENTATIVE OF DEBTOR.—The Oversight Board in a case under this title is the representative of the debtor.

**SEC. 316. COMPENSATION OF PROFESSIONALS.**

(a) After notice to the parties in interest and the United States Trustee and a hearing, the court may award to a professional person employed by the debtor (in the debtor's sole discretion), the Oversight Board (in the Oversight Board's sole discretion), a committee under section 1103 of title 11, United States Code, or a trustee appointed by the court under section 926 of title 11, United States Code—

(1) reasonable compensation for actual, necessary services rendered by the professional person, or attorney and by any paraprofessional person employed by any such person; and

(2) reimbursement for actual, necessary expenses.

(b) The court may, on its own motion or on the motion of the United States Trustee or any other party in interest, award compensation that is less than the amount of compensation that is requested.

(c) In determining the amount of reasonable compensation to be awarded to a professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—

(1) the time spent on such services;

(2) the rates charged for such services;

(3) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this chapter;

(4) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(5) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the restructuring field; and

(6) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title or title 11, United States Code.

(d) The court shall not allow compensation for—

(1) unnecessary duplication of services; or

(2) services that were not—

(A) reasonably likely to benefit the debtor; or

(B) necessary to the administration of the case.

(e) The court shall reduce the amount of compensation awarded under this section by the amount of any interim compensation awarded under section 317 of this title,

25

and, if the amount of such interim compensation exceeds the amount of compensation awarded under this section, may order the return of the excess to the debtor.

(f) Any compensation awarded for the preparation of a fee application shall be based on the level and skill reasonably required to prepare the application.

**SEC. 317. INTERIM COMPENSATION.**

A debtor's attorney, or any professional person employed by the debtor (in the debtor's sole discretion), the Oversight Board (in the Oversight Board's sole discretion), a committee under section 1103 of title 11, United States Code, or a trustee appointed by the court under section 926 of title 11, United States Code, may apply to the court not more than once every 120 days after an order for relief in a case under this title, or more often if the court permits, for such compensation for services rendered before the date of such an application or reimbursement for expenses incurred before such date as is provided under section 316 of this title.

# TITLE IV—MISCELLANEOUS PROVISIONS

**SEC. 401. RULES OF CONSTRUCTION.**

Nothing in this Act is intended, or may be construed—

(1) to limit the authority of Congress to exercise legislative authority over the territories pursuant to Article IV, section 3 of the Constitution of the United States;

(2) to authorize the application of section 104(f) of this Act (relating to issuance of subpoenas) to judicial officers or employees of territory courts;

(3) to alter, amend, or abrogate any provision of the Covenant To Establish a Commonwealth of the Northern Mariana Islands in Political Union With the United States of America (48 U.S.C. 1801 et seq.); or

(4) to alter, amend, or abrogate the treaties of cession regarding certain islands of American Samoa (48 U.S.C. 1661).

**SEC. 402. RIGHT OF PUERTO RICO TO DETERMINE ITS FUTURE POLITICAL STATUS.**

Nothing in this Act shall be interpreted to restrict Puerto Rico's right to determine its future political status, including by conducting the plebiscite as authorized by Public Law 113–76.

**SEC. 403. FIRST MINIMUM WAGE IN PUERTO RICO.**

Section 6(g) of the Fair Labor Standards Act of 1938 (29 U.S.C. 206(g)) is amended by striking paragraphs (2) through (4) and inserting the following:

"(2) In lieu of the rate prescribed by subsection (a)(1), the Governor of Puerto Rico, subject to the approval of the Financial Oversight and Management Board established pursuant to section 101 of the Puerto Rico Oversight, Management, and Economic Stability Act, may designate a time period not to exceed four years during which employers in Puerto Rico may pay employees who are initially employed after the date of enactment of such Act a wage which is not less than the wage described in paragraph (1). Notwithstanding the time period designated, such wage shall not continue in effect after such Board terminates in accordance with section 209 of such Act.

"(3) No employer may take any action to displace employees (including partial displacements such as reduction in hours, wages, or employment benefits) for purposes of hiring individuals at the wage authorized in paragraph (1) or (2).

"(4) Any employer who violates this subsection shall be considered to have violated section 15(a)(3).

"(5) This subsection shall only apply to an employee who has not attained the age of 20 years, except in the case of the wage applicable in Puerto Rico, 25 years, until such time as the Board described in paragraph (2) terminates in accordance with section 209 of the Act described in such paragraph.".

**SEC. 404. APPLICATION OF REGULATION TO PUERTO RICO.**

(a) SPECIAL RULE.—The regulations proposed by the Secretary of Labor relating to exemptions regarding the rates of pay for executive, administrative, professional, outside sales, and computer employees, and published in a notice in the Federal Register on July 6, 2015, and any final regulations issued related to such notice, shall have no force or effect in the Commonwealth of Puerto Rico until—

(1) the Comptroller General of the United States completes the assessment and transmits the report required under subsection (b); and

(2) the Secretary of Labor, taking into account the assessment and report of the Comptroller General, provides a written determination to Congress that applying such rule to Puerto Rico would not have a negative impact on the economy of Puerto Rico.

26

(b) ASSESSMENT AND REPORT.—Not later than two years after the date of enactment of this Act, the Comptroller General shall examine the economic conditions in Puerto Rico and shall transmit a report to Congress assessing the impact of applying the regulations described in subsection (a) to Puerto Rico, taking into consideration regional, metropolitan, and non-metropolitan salary and cost-of-living differences.

(c) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) the Bureau of the Census should conduct a study to determine the feasibility of expanding data collection to include Puerto Rico and the other United States territories in the Current Population Survey, which is jointly administered by the Bureau of the Census and the Bureau of Labor Statistics, and which is the primary source of labor force statistics for the population of the United States; and

(2) if necessary, the Bureau of the Census should request the funding required to conduct this feasibility study as part of its budget submission to Congress for fiscal year 2018.

**SEC. 405. AUTOMATIC STAY UPON ENACTMENT.**

(a) DEFINITIONS.—In this section:

(1) LIABILITY.—The term "Liability" means a bond, loan, letter of credit, other borrowing title, obligation of insurance, or other financial indebtedness for borrowed money, including rights, entitlements, or obligations whether such rights, entitlements, or obligations arise from contract, statute, or any other source of law related to such a bond, loan, letter of credit, other borrowing title, obligation of insurance, or other financial indebtedness in physical or dematerialized form, of which—

(A) the issuer, obligor, or guarantor is the Government of Puerto Rico; and

(B) the date of issuance or incurrence precedes the date of enactment of this Act.

(2) LIABILITY CLAIM.—The term "Liability Claim" means, as it relates to a Liability—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

(b) IN GENERAL.—Except as provided in subsection (c) of this section, the establishment of an Oversight Board for Puerto Rico (i.e., the enactment of this Act) in accordance with section 101 operates with respect to a Liability as a stay, applicable to all entities (as such term is defined in section 101 of title 11, United States Code), of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the Government of Puerto Rico that was or could have been commenced before the enactment of this Act, or to recover a Liability Claim against the Government of Puerto Rico that arose before the enactment of this Act;

(2) the enforcement, against the Government of Puerto Rico or against property of the Government of Puerto Rico, of a judgment obtained before the enactment of this Act;

(3) any act to obtain possession of property of the Government of Puerto Rico or of property from the Government of Puerto Rico or to exercise control over property of the Government of Puerto Rico;

(4) any act to create, perfect, or enforce any lien against property of the Government of Puerto Rico;

(5) any act to create, perfect, or enforce against property of the Government of Puerto Rico any lien to the extent that such lien secures a Liability Claim that arose before the enactment of this Act;

(6) any act to collect, assess, or recover a Liability Claim against the Government of Puerto Rico that arose before the enactment of this Act; and

(7) the setoff of any debt owing to the Government of Puerto Rico that arose before the enactment of this Act against any Liability Claim against the Government of Puerto Rico.

(c) STAY NOT OPERABLE.—The establishment of an Oversight Board for Puerto Rico in accordance with section 101 does not operate as a stay—

(1) solely under subsection (b)(1) of this section, of the continuation of, including the issuance or employment of process, of a judicial, administrative, or other

27

action or proceeding against the Government of Puerto Rico that was commenced on or before December 18, 2015; or

(2) of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power.

(d) CONTINUATION OF STAY.—Except as provided in subsections (e), (f), and (g) the stay under subsection (b) continues until the earlier of—

(1) the later of—

(A) the later of—

(i) February 15, 2017; or

(ii) six months after the establishment of an Oversight Board for Puerto Rico as established by section 101(b);

(B) the date that is 75 days after the date in subparagraph (A) if the Oversight Board delivers a certification to the Governor that, in the Oversight Board's sole discretion, an additional 75 days are needed to seek to complete a voluntary process under title VI of this Act with respect to the government of the Commonwealth of Puerto Rico or any of its territorial instrumentalities; or

(C) the date that is 60 days after the date in subparagraph (A) if the district court to which an application has been submitted under subparagraph 601(m)(1)(D) of this Act determines, in the exercise of the court's equitable powers, that an additional 60 days are needed to complete a voluntary process under title VI of this Act with respect to the government of the Commonwealth of Puerto Rico or any of its territorial instrumentalities; or

(2) with respect to the government of the Commonwealth of Puerto Rico or any of its territorial instrumentalities, the date on which a case is filed by or on behalf of the government of the Commonwealth of Puerto Rico or any of its territorial instrumentalities, as applicable, under title III.

(e) JURISDICTION, RELIEF FROM STAY.—

(1) The United States District Court for the District of Puerto Rico shall have original and exclusive jurisdiction of any civil actions arising under or related to this section.

(2) On motion of or action filed by a party in interest and after notice and a hearing, the United States District Court for the District of Puerto Rico, for cause shown, shall grant relief from the stay provided under subsection (b) of this section.

(f) TERMINATION OF STAY; HEARING.—Forty-five days after a request under subsection (e)(2) for relief from the stay of any act against property of the Government of Puerto Rico under subsection (b), such stay is terminated with respect to the party in interest making such request, unless the court, after notice and a hearing, orders such stay continued in effect pending the conclusion of, or as a result of, a final hearing and determination under subsection (e)(2). A hearing under this subsection may be a preliminary hearing, or may be consolidated with the final hearing under subsection (e)(2). The court shall order such stay continued in effect pending the conclusion of the final hearing under subsection (e)(2) if there is a reasonable likelihood that the party opposing relief from such stay will prevail at the conclusion of such final hearing. If the hearing under this subsection is a preliminary hearing, then such final hearing shall be concluded not later than thirty days after the conclusion of such preliminary hearing, unless the thirty-day period is extended with the consent of the parties in interest or for a specific time which the court finds is required by compelling circumstances.

(g) RELIEF TO PREVENT IRREPARABLE DAMAGE.—Upon request of a party in interest, the court, with or without a hearing, shall grant such relief from the stay provided under subsection (b) as is necessary to prevent irreparable damage to the interest of an entity in property, if such interest will suffer such damage before there is an opportunity for notice and a hearing under subsection (e) or (f).

(h) ACT IN VIOLATION OF STAY IS VOID.—Any order, judgment, or decree entered in violation of this section and any act taken in violation of this section is void, and shall have no force or effect, and any person found to violate this section may be liable for damages, costs, and attorneys' fees incurred in defending any action taken in violation of this section, and the Oversight Board or the Government of Puerto Rico may seek an order from the court enforcing the provisions of this section.

(i) GOVERNMENT OF PUERTO RICO.—For purposes of this section, the term "Government of Puerto Rico", in addition to the definition set forth in section 5(11) of this Act, shall include—

28

(1) the individuals, including elected and appointed officials, directors, officers of and employees acting in their official capacity on behalf of the Government of Puerto Rico; and

(2) the Oversight Board, including the directors and officers of and employees acting in their official capacity on behalf of the Oversight Board.

(j) NO DEFAULT UNDER EXISTING CONTRACTS.—

(1) Notwithstanding any contractual provision or applicable law to the contrary and so long as a stay under this section is in effect, the holder of a Liability Claim or any other claim (as such term is defined in section 101 of title 11, United States Code) may not exercise or continue to exercise any remedy under a contract or applicable law in respect to the Government of Puerto Rico or any of its property—

(A) that is conditioned upon the financial condition of, or the commencement of a restructuring, insolvency, bankruptcy, or other proceeding (or a similar or analogous process) by, the Government of Puerto Rico, including a default or an event of default thereunder; or

(B) with respect to Liability Claims—

(i) for the non-payment of principal or interest; or

(ii) for the breach of any condition or covenant.

(2) The term "remedy" as used in paragraph (1) shall be interpreted broadly, and shall include any right existing in law or contract, including any right to—

(A) setoff;

(B) apply or appropriate funds;

(C) seek the appointment of a custodian (as such term is defined in section 101(11) of title 11, United States Code);

(D) seek to raise rates; or

(E) exercise control over property of the Government of Puerto Rico.

(3) Notwithstanding any contractual provision or applicable law to the contrary and so long as a stay under this section is in effect, a contract to which the Government of Puerto Rico is a party may not be terminated or modified, and any right or obligation under such contract may not be terminated or modified, solely because of a provision in such contract is conditioned on—

(A) the insolvency or financial condition of the Government of Puerto Rico at any time prior to the enactment of this Act;

(B) the adoption of a resolution or establishment of an Oversight Board pursuant to section 101 of this Act; or

(C) a default under a separate contract that is due to, triggered by, or a result of the occurrence of the events or matters in paragraph (1)(B).

(4) Notwithstanding any contractual provision to the contrary and so long as a stay under this section is in effect, a counterparty to a contract with the Government of Puerto Rico for the provision of goods and services shall, unless the Government of Puerto Rico agrees to the contrary in writing, continue to perform all obligations under, and comply with the terms of, such contract, provided that the Government of Puerto Rico is not in default under such contract other than as a result of a condition specified in paragraph (3).

(k) EFFECT.—This section does not discharge an obligation of the Government of Puerto Rico or release, invalidate, or impair any security interest or lien securing such obligation. This section does not impair or affect the implementation of any restructuring support agreement executed by the Government of Puerto Rico to be implemented pursuant to Puerto Rico law specifically enacted for that purpose prior to the enactment of this Act or the obligation of the Government of Puerto Rico to proceed in good faith as set forth in any such agreement.

(l) PAYMENTS ON LIABILITIES.—Nothing in this section shall be construed to prohibit the Government of Puerto Rico from making any payment on any Liability when such payment becomes due during the term of the stay, and to the extent the Oversight Board, in its sole discretion, determines it is feasible, the Government of Puerto Rico shall make interest payments on outstanding indebtedness when payments become due during the length of the stay.

(m) FINDINGS.—Congress finds the following:

(1) A combination of severe economic decline, and, at times, accumulated operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing has created a fiscal emergency in Puerto Rico.

(2) As a result of its fiscal emergency, the Government of Puerto Rico has been unable to provide its citizens with effective services.

(3) The current fiscal emergency has also affected the long-term economic stability of Puerto Rico by contributing to the accelerated outmigration of residents and businesses.

(4) A comprehensive approach to fiscal, management, and structural problems and adjustments that exempts no part of the Government of Puerto Rico is nec-

29

essary, involving independent oversight and a Federal statutory authority for the Government of Puerto Rico to restructure debts in a fair and orderly process.

(5) Additionally, an immediate—but temporary—stay is essential to stabilize the region for the purposes of resolving this territorial crisis.

(A) The stay advances the best interests common to all stakeholders, including but not limited to a functioning independent Oversight Board created pursuant to this Act to determine whether to appear or intervene on behalf of the Government of Puerto Rico in any litigation that may have been commenced prior to the effectiveness or upon expiration of the stay.

(B) The stay is limited in nature and narrowly tailored to achieve the purposes of this Act, including to ensure all creditors have a fair opportunity to consensually renegotiate terms of repayment based on accurate financial information that is reviewed by an independent authority or, at a minimum, receive a recovery from the Government of Puerto Rico equal to their best possible outcome absent the provisions of this Act.

(6) Finally, the ability of the Government of Puerto Rico to obtain funds from capital markets in the future will be severely diminished without congressional action to restore its financial accountability and stability.

(n) PURPOSES.—The purposes of this section are to—

(1) provide The Government of Puerto Rico with the resources and the tools it needs to address an immediate existing and imminent crisis;

(2) allow the Government of Puerto Rico a limited period of time during which it can focus its resources on negotiating a voluntary resolution with its creditors instead of defending numerous, costly creditor lawsuits;

(3) provide an oversight mechanism to assist the Government of Puerto Rico in reforming its fiscal governance and support the implementation of potential debt restructuring;

(4) make available a Federal restructuring authority, if necessary, to allow for an orderly adjustment of all of the Government of Puerto Rico's liabilities; and

(5) benefit the lives of 3.5 million American citizens living in Puerto Rico by encouraging the Government of Puerto Rico to resolve its longstanding fiscal governance issues and return to economic growth.

(o) VOTING ON VOLUNTARY AGREEMENTS NOT STAYED.—Notwithstanding any provision in this section to the contrary, nothing in this section shall prevent the holder of a Liability Claim from voting on or consenting to a proposed modification of such Liability Claim under title VI of this Act.

**SEC. 406. PURCHASES BY TERRITORY GOVERNMENTS.**

The text of section 302 of the Omnibus Insular Areas Act of 1992 (48 U.S.C. 1469e), is amended to read as follows: "The Governments of the Commonwealth of Puerto Rico, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and the United States Virgin Islands are authorized to make purchases through the General Services Administration.".

**SEC. 407. PROTECTION FROM INTER-DEBTOR TRANSFERS.**

(a) PROTECTION OF CREDITORS.—While an Oversight Board for Puerto Rico is in existence, if any property of any territorial instrumentality of Puerto Rico is transferred in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property, or which deprives any such territorial instrumentality of property in violation of applicable law assuring the transfer of such property to such territorial instrumentality for the benefit of its creditors, then the transferee shall be liable for the value of such property.

(b) ENFORCEABILITY.—A creditor may enforce rights under this section by bringing an action in the United States District Court for the District of Puerto Rico after the expiration or lifting of the stay of section 405, unless a stay under title III is in effect.

**SEC. 408. GAO REPORT ON SMALL BUSINESS ADMINISTRATION PROGRAMS IN PUERTO RICO.**

Section 15 of the Small Business Act (15 U.S.C. 644) is amended by adding at the end the following new subsection:

"(t) GAO REPORT ON SMALL BUSINESS ADMINISTRATION PROGRAMS IN PUERTO RICO.—Not later than 180 days after the date of enactment of this subsection, the Comptroller General of the United States shall submit to the Committee on Small Business of the House of Representatives and the Committee on Small Business and Entrepreneurship of the Senate a report on the application and utilization of contracting activities of the Administration (including contracting activities relating to HUBZone small business concerns) in Puerto Rico. The report shall also identify any provisions of Federal law that may create an obstacle to the efficient implementation of such contracting activities.".

30

**SEC. 409. CONGRESSIONAL TASK FORCE ON ECONOMIC GROWTH IN PUERTO RICO.**

(a) ESTABLISHMENT.—There is established within the legislative branch a Congressional Task Force on Economic Growth in Puerto Rico (hereinafter referred to as the "Task Force").

(b) MEMBERSHIP.—The Task Force shall be composed of eight members as follows:

(1) One member of the House of Representatives, who shall be appointed by the Speaker of the House of Representatives, in coordination with the Chairman of the Committee on Natural Resources of the House of Representatives.

(2) One member of the House of Representatives, who shall be appointed by the Speaker of the House of Representatives, in coordination with the Chairman of the Committee on Ways and Means of the House of Representatives.

(3) One member of the House of Representatives, who shall be appointed by the Minority Leader of the House of Representatives, in coordination with the ranking minority member of the Committee on Natural Resources of the House of Representatives.

(4) One member of the House of Representatives, who shall be appointed by the Minority Leader of the House of Representatives, in coordination with the ranking minority member of the Committee on Ways and Means of the House of Representatives.

(5) One member of the Senate, who shall be appointed by the Majority Leader of the Senate, in coordination with the Chairman of the Committee on Energy and Natural Resources of the Senate.

(6) One member of the Senate, who shall be appointed by the Majority Leader of the Senate, in coordination with the Chairman of the Committee on Finance of the Senate.

(7) One member of the Senate, who shall be appointed by the Minority Leader of the Senate, in coordination with the ranking minority member of the Committee on Energy and Natural Resources of the Senate.

(8) One member of the Senate, who shall be appointed by the Minority Leader of the Senate, in coordination with the ranking minority member of the Committee on Finance of the Senate.

(c) DEADLINE FOR APPOINTMENT.—All appointments to the Task Force shall be made not later than 15 days after the date of enactment of this Act.

(d) CHAIR.—The Speaker shall designate one Member to serve as chair of the Task Force.

(e) VACANCIES.—Any vacancy in the Task Force shall be filled in the same manner as the original appointment.

(f) STATUS UPDATE.—Between September 1, 2016, and September 15, 2016, the Task Force shall provide a status update to the House and Senate that includes—

(1) information the Task Force has collected; and

(2) a discussion on matters the chairman of the Task Force deems urgent for consideration by Congress.

(g) REPORT.—Not later than December 31, 2016, the Task Force shall issue a report of its findings to the House and Senate regarding—

(1) impediments in current Federal law and programs to economic growth in Puerto Rico including equitable access to Federal health care programs;

(2) recommended changes to Federal law and programs that, if adopted, would serve to spur sustainable long-term economic growth, job creation and attract investment in Puerto Rico;

(3) the economic effect of Administrative Order No. 346 of the Department of Health of the Commonwealth of Puerto Rico (relating to natural products, natural supplements, and dietary supplements) or any successor or substantially similar order, rule, or guidance of the Commonwealth of Puerto Rico; and

(4) additional information the Task Force deems appropriate.

(h) CONSENSUS VIEWS.—To the greatest extent practicable, the report issued under subsection (f) shall reflect the shared views of all eight Members, except that the report may contain dissenting views.

(i) HEARINGS AND SESSIONS.—The Task Force may, for the purpose of carrying out this section, hold hearings, sit and act at times and places, take testimony, and receive evidence as the Task Force considers appropriate. If the Task Force holds hearings, at least one such hearing must be held in Puerto Rico.

(j) STAKEHOLDER PARTICIPATION.—In carrying out its duties, the Task Force shall consult with the Puerto Rico Legislative Assembly, the Puerto Rico Department of Economic Development and Commerce, and the private sector of Puerto Rico.

(k) RESOURCES.—The Task Force shall carry out its duties by utilizing existing facilities, services, and staff of the House of Representatives and Senate, except that no additional funds are authorized to be appropriated to carry out this section.

(l) TERMINATION.—The Task Force shall terminate upon issuing the report required under subsection (f).

**SEC. 410. REPORT.**

The Comptroller General shall submit a report to the Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate describing—

(1) the conditions which led to the level of debt per capita and based upon overall economic activity;

(2) how actions of the territorial government improved or impaired the territory's financial conditions; and

(3) recommendations on non-fiscal actions, nor policies that would imperil America's homeland and national security, that could be taken by Congress or the Administration to avert future indebtedness of territories, States or local units of government while respecting sovereignty and constitutional parameters.

# TITLE V—PUERTO RICO INFRASTRUCTURE REVITALIZATION

**SEC. 501. DEFINITIONS.**

In this title:

(1) ACT 76.—The term "Act 76" means Puerto Rico Act 76–2000 (3 L.P.R.A. 1931 et seq.), approved on May 5, 2000, as amended.

(2) CRITICAL PROJECT.—The term "Critical Project" means a project identified under the provisions of this title and intimately related to addressing an emergency whose approval, consideration, permitting, and implementation shall be expedited and streamlined according to the statutory process provided by Act 76, or otherwise adopted pursuant to this title.

(3) ENERGY COMMISSION OF PUERTO RICO.—The term "Energy Commission of Puerto Rico" means the Puerto Rico Energy Commission as established by Subtitle B of Puerto Rico Act 57–2014.

(4) ENERGY PROJECTS.—The term "Energy Projects" means those projects addressing the generation, distribution, or transmission of energy.

(5) EMERGENCY.—The term "emergency" means any event or grave problem of deterioration in the physical infrastructure for the rendering of essential services to the people, or that endangers the life, public health, or safety of the population or of a sensitive ecosystem, or as otherwise defined by section 1 of Act 76 (3 L.P.R.A. 1931). This shall include problems in the physical infrastructure for energy, water, sewer, solid waste, highways or roads, ports, telecommunications, and other similar infrastructure.

(6) ENVIRONMENTAL QUALITY BOARD.—The term "Environmental Quality Board" means the Puerto Rico Environmental Quality Board, a board within the executive branch of the Government of Puerto Rico as established by section 7 of Puerto Rico Act 416–2004 (12 L.P.R.A. 8002a).

(7) EXPEDITED PERMITTING PROCESS.—The term "Expedited Permitting Process" means a Puerto Rico Agency's alternate procedures, conditions, and terms mirroring those established under Act 76 (3 L.P.R.A. 1932) and pursuant to this title shall not apply to any Federal law, statute, or requirement.

(8) GOVERNOR.—The term "Governor" means the Governor of Puerto Rico.

(9) INTERAGENCY ENVIRONMENTAL SUBCOMMITTEE.—The term "Interagency Environmental Subcommittee" means the Interagency Subcommittee on Expedited Environmental Regulations as further described by section 504.

(10) LEGISLATURE.—The term "Legislature" means the Legislature of Puerto Rico.

(11) PLANNING BOARD.—The term "Planning Board" means the Puerto Rico Planning Board, a board within the executive branch of the Government of Puerto Rico established by Puerto Rico Act 75–1975 (23 L.P.R.A. 62 et seq.).

(12) PROJECT SPONSOR.—The term "Project Sponsor" means a Puerto Rico Agency or private party proposing the development of an existing, ongoing, or new infrastructure project or Energy Project.

(13) PUERTO RICO AGENCY OR AGENCIES.—The terms "Puerto Rico Agency" or "Puerto Rico Agencies" means any board, body, board of examiners, public corporation, commission, independent office, division, administration, bureau, department, authority, official, person, entity, municipality, or any instrumentality of Puerto Rico, or an administrative body authorized by law to perform duties of regulating, investigating, or that may issue a decision, or with the power to issue licenses, certificates, permits, concessions, accreditations, privileges, franchises, except the Senate and the House of Representatives of the Legislature and the judicial branch.

32

(14) PUERTO RICO ELECTRIC POWER AUTHORITY.—The term "Puerto Rico Electric Power Authority" means the Puerto Rico Electric Power Authority established by Puerto Rico Act 83–1941.

**SEC. 502. POSITION OF REVITALIZATION COORDINATOR.**

(a) ESTABLISHMENT.—There is established, under the Oversight Board, the position of the Revitalization Coordinator.

(b) APPOINTMENT.—

(1) IN GENERAL.—The Revitalization Coordinator shall be appointed by the Governor as follows:

(A) Prior to the appointment of the Revitalization Coordinator and within 60 days of the appointment of the full membership of the Oversight Board, the Oversight Board shall submit to the Governor no less than three nominees for appointment.

(B) In consultation with the Oversight Board, not later than 10 days after receiving the nominations under subparagraph (A), the Governor shall appoint one of the nominees as the Revitalization Coordinator. Such appointment shall be effective immediately.

(C) If the Governor fails to select a Revitalization Coordinator, the Oversight Board shall, by majority vote, appoint a Revitalization Coordinator from the list of nominees provided under paragraph (A).

(2) QUALIFICATIONS.—In selecting nominees under paragraph (1)(A), the Oversight Board shall only nominate persons who—

(A) have substantial knowledge and expertise in the planning, predevelopment, financing, development, operations, engineering, or market participation of infrastructure projects, provided that stronger consideration may be given to candidates who have experience with Energy Projects and the laws and regulations of Puerto Rico that may be subject to an Expedited Permitting Process;

(B) does not currently provide, or in the preceding 3 calendar years provided, goods or services to the government of Puerto Rico (and, as applicable, is not the spouse, parent, child, or sibling of a person who provides or has provided goods and services to the government of Puerto Rico in the preceding 3 calendar years); and

(C) shall not be an officer, employee of, or former officer or employee of the government of Puerto Rico in the preceding 3 calendar years.

(3) COMPENSATION.—The Revitalization Coordinator shall be compensated at an annual rate determined by the Oversight Board sufficient in the judgment of the Oversight Board to obtain the services of a person with the skills and experience required to discharge the duties of the position, but such compensation shall not exceed the annual salary of the Executive Director.

(c) ASSIGNMENT OF PERSONNEL.—The Executive Director of the Oversight Board may assign Oversight Board personnel to assist the Revitalization Coordinator.

(d) REMOVAL.—

(1) IN GENERAL.—The Revitalization Coordinator may be removed for any reason, in the Oversight Board's discretion.

(2) TERMINATION OF POSITION.—Upon the termination of the Oversight Board pursuant to section 209 of this Act, the position of the Revitalization Coordinator shall terminate.

**SEC. 503. CRITICAL PROJECTS.**

(a) IDENTIFICATION OF PROJECTS.—

(1) PROJECT SUBMISSION.—Any Project Sponsor may submit, so long as the Oversight Board is in operation, any existing, ongoing, or proposed project to the Revitalization Coordinator. The Revitalization Coordinator shall require such submission to include—

(A) the impact the project will have on an emergency;

(B) the availability of immediate private capital or other funds, including loan guarantees, loans, or grants to implement, operate, or maintain the project;

(C) the cost of the project and amount of Puerto Rico government funds, if any, necessary to complete and maintain the project;

(D) the environmental and economic benefits provided by the project, including the number of jobs to be created that will be held by residents of Puerto Rico and the expected economic impact, including the impact on ratepayers, if applicable;

(E) the status of the project if it is existing or ongoing; and

(F) in addition to the requirements found in subparagraphs (A) through (E), the Revitalization Coordinator may require such submission to include any or all of the following criteria that assess how the project will—

33

(i) reduce reliance on oil for electric generation in Puerto Rico;

(ii) improve performance of energy infrastructure and overall energy efficiency;

(iii) expedite the diversification and conversion of fuel sources for electric generation from oil to natural gas and renewables in Puerto Rico as defined under applicable Puerto Rico laws;

(iv) promote the development and utilization of energy sources found on Puerto Rico;

(v) contribute to transitioning to privatized generation capacities in Puerto Rico;

(vi) support the Energy Commission of Puerto Rico in achievement of its goal of reducing energy costs and ensuring affordable energy rates for consumers and business; or

(vii) achieve in whole or in part the recommendations, if feasible, of the study in section 505(d) of this title to the extent such study is completed and not inconsistent with studies or plans otherwise required under Puerto Rico laws.

(2) IDENTIFICATION OF RELEVANT PUERTO RICO AGENCIES.—Within 20 days of receiving a project submission under paragraph (1), the Revitalization Coordinator shall, in consultation with the Governor, identify all Puerto Rico Agencies that will have a role in the permitting, approval, authorizing, or other activity related to the development of such project submission.

(3) EXPEDITED PERMITTING PROCESS.—

(A) SUBMISSION OF EXPEDITED PERMITTING PROCESS.—Not later than 20 days after receiving a project submission, each Puerto Rico Agency identified in paragraph (1) shall submit to the Revitalization Coordinator the Agency's Expedited Permitting Process.

(B) FAILURE TO PROVIDE EXPEDITED PERMITTING PROCESS.—If a Puerto Rico Agency fails to provide an Expedited Permitting Process within 20 days of receiving a project submission, the Revitalization Coordinator shall consult with the Governor to develop within 20 days an Expedited Permitting Process for the Agency.

(C) IMPLEMENTATION AND PRIORITIZATION.—The Revitalization Coordinator shall require Puerto Rico Agencies to implement the Expedited Permitting Process for Critical Projects. Critical Projects shall be prioritized to the maximum extent possible in each Puerto Rico Agency regardless of any agreements transferring or delegating permitting authority to any other Territorial Instrumentality or municipality.

(b) CRITICAL PROJECT REPORT.—

(1) IN GENERAL.—For each submitted project, the Revitalization Coordinator in consultation with the Governor and relevant Puerto Rico Agencies identified in subsection (a)(2) shall develop a Critical Project Report within 60 days of the project submission, which shall include:

(A) An assessment of how well the project meets the criteria in subsection (a)(1).

(B) A recommendation by the Governor whether the project should be considered a Critical Project. If the Governor fails to provide a recommendation during the development of the Critical Project Report, the failure shall constitute a concurrence with the Revitalization Coordinator's recommendation in subparagraph (E).

(C) In the case of a project that may affect the implementation of Land-Use Plans, as defined by Puerto Rico Act 550–2004, a determination by the Planning Board will be required within the 60-day timeframe. If the Planning Board determines such project will be inconsistent with relevant Land-Use Plans, then the project will be deemed ineligible for Critical Project designation.

(D) In the case of an Energy Project that will connect with the Puerto Rico Electric Power Authority's transmission or distribution facilities, a recommendation by the Energy Commission of Puerto Rico, if the Energy Commission determines such Energy Project will affect an approved Integrated Resource Plan, as defined under Puerto Rico Act 54–2014. If the Energy Commission determines the Energy Project will adversely affect an approved Integrated Resource Plan, then the Energy Commission shall provide the reasons for such determination and the Energy Project shall be ineligible for Critical Project designation, provided that such determination must be made during the 60-day timeframe for the development of the Critical Project Report.

(E) A recommendation by the Revitalization Coordinator whether the project should be considered a Critical Project.

34

(2) PUBLIC INVOLVEMENT.—Immediately following the completion of the Critical Project Report, the Revitalization Coordinator shall make such Critical Project Report public and allow a period of 30 days for the submission of comments by residents of Puerto Rico specifically on matters relating to the designation of a project as a Critical Project. The Revitalization Coordinator shall respond to the comments within 30 days of closing the coming period and make the responses publicly available.

(3) SUBMISSION TO OVERSIGHT BOARD.—Not later than 5 days after the Revitalization Coordinator has responded to the comments under paragraph (2), the Revitalization Coordinator shall submit the Critical Project Report to the Oversight Board.

(c) ACTION BY THE OVERSIGHT BOARD.—Not later than 30 days after receiving the Critical Project Report, the Oversight Board, by majority vote, shall approve or disapprove the project as a Critical Project, if the Oversight Board—

(1) approves the project, the project shall be deemed a Critical Project; and

(2) disapproves the project, the Oversight Board shall submit to the Revitalization Coordinator in writing the reasons for disapproval.

**SEC. 504. MISCELLANEOUS PROVISIONS.**

(a) CREATION OF INTERAGENCY ENVIRONMENTAL SUBCOMMITTEE.—

(1) ESTABLISHMENT.—Not later than 60 days after the date on which the Revitalization Coordinator is appointed, the Interagency Environmental Subcommittee shall be established and shall evaluate environmental documents required under Puerto Rico law for any Critical Project within the Expedited Permitting Process established by the Revitalization Coordinator under section 503(a)(3).

(2) COMPOSITION.—The Interagency Environmental Subcommittee shall consist of the Revitalization Coordinator, and a representative selected by the Governor in consultation with the Revitalization Coordinator representing each of the following agencies: The Environmental Quality Board, the Planning Board, the Puerto Rico Department of Natural and Environmental Resources, and any other Puerto Rico Agency determined to be relevant by the Revitalization Coordinator.

(b) LENGTH OF EXPEDITED PERMITTING PROCESS.—With respect to a Puerto Rico Agency's activities related only to a Critical Project, such Puerto Rico Agency shall operate as if the Governor has declared an emergency pursuant to section 2 of Act 76 (3 L.P.R.A. 1932). Section 12 of Act 76 (3 L.P.R.A. 1942) shall not be applicable to Critical Projects. Furthermore, any transactions, processes, projects, works, or programs essential to the completion of a Critical Project shall continue to be processed and completed under such Expedited Permitting Process regardless of the termination of the Oversight Board under section 209.

(c) EXPEDITED PERMITTING PROCESS COMPLIANCE.—

(1) WRITTEN NOTICE.—A Critical Project Sponsor may in writing notify the Oversight Board of the failure of a Puerto Rico Agency or the Revitalization Coordinator to adhere to the Expedited Permitting Process.

(2) FINDING OF FAILURE.—If the Oversight Board finds either the Puerto Rico Agency or Revitalization Coordinator has failed to adhere to the Expedited Permitting Process, the Oversight Board shall direct the offending party to comply with the Expedited Permitting Process. The Oversight Board may take such enforcement action as necessary as provided by section 104(l).

(d) REVIEW OF LEGISLATURE ACTS.—

(1) SUBMISSION OF ACTS TO OVERSIGHT BOARD.—Pursuant to section 204(a), the Governor shall submit to the Oversight Board any law duly enacted during any fiscal year in which the Oversight Board is in operation that may affect the Expedited Permitting Process.

(2) FINDING OF OVERSIGHT BOARD.—Upon receipt of a law under paragraph (1), the Oversight Board shall promptly review whether the law would adversely impact the Expedited Permitting Process and, upon such a finding, the Oversight Board may deem such law to be significantly inconsistent with the applicable Fiscal Plan.

(e) ESTABLISHMENT OF CERTAIN TERMS AND CONDITIONS.—No Puerto Rico Agency may include in any certificate, right-of-way, permit, lease, or other authorization issued for a Critical Project any term or condition that may be permitted, but is not required, by any applicable Puerto Rico law, if the Revitalization Coordinator determines the term or condition would prevent or impair the expeditious construction, operation, or expansion of the Critical Project. The Revitalization Coordinator may request a Puerto Rico Agency to include in any certificate, right-of-way, permit, lease, or other authorization, a term or condition that may be permitted in accordance with applicable laws if the Revitalization Coordinator determines such inclu-

35

sion would support the expeditious construction, operation, or expansion of any Critical Project.

(f) DISCLOSURE.—All Critical Project reports, and justifications for approval or rejection of Critical Project status, shall be made publicly available online within 5 days of receipt or completion.

**SEC. 505. FEDERAL AGENCY REQUIREMENTS.**

(a) FEDERAL POINTS OF CONTACT.—At the request of the Revitalization Coordinator and within 30 days of receiving such a request, each Federal agency with jurisdiction over the permitting, or administrative or environmental review of private or public projects in Puerto Rico, shall name a Point of Contact who will serve as that agency's liaison with the Revitalization Coordinator.

(b) FEDERAL GRANTS AND LOANS.—For each Critical Project with a pending or potential Federal grant, loan, or loan guarantee application, the Revitalization Coordinator and the relevant Point of Contact shall cooperate with each other to ensure expeditious review of such application.

(c) EXPEDITED REVIEWS AND ACTIONS OF FEDERAL AGENCIES.—All reviews conducted and actions taken by any Federal agency relating to a Critical Project shall be expedited in a manner consistent with completion of the necessary reviews and approvals by the deadlines under the Expedited Permitting Process, but in no way shall the deadlines established through the Expedited Permitting Process be binding on any Federal agency.

(d) TRANSFER OF STUDY OF ELECTRIC RATES.—Section 9 of the Consolidated and Further Continuing Appropriations Act, 2015 (48 U.S.C. 1492a) is amended—

(1) in subsection (a)(5), by inserting ", except that, with respect to Puerto Rico, the term means, the Secretary of the Interior" after "Secretary of Energy" after "Secretary of the Interior"; and

(2) in subsection (b)—

(A) by inserting "(except in the case of Puerto Rico, in which case not later than 270 days after the date of enactment of the Puerto Rico Oversight, Management, and Economic Stability Act)" after "of this Act"; and

(B) by inserting "(except in the case of Puerto Rico)" after "Empowering Insular Communities activity".

**SEC. 506. JUDICIAL REVIEW.**

(a) DEADLINE FOR FILING OF A CLAIM.—A claim arising under this title must be brought no later than 30 days after the date of the decision or action giving rise to the claim.

(b) EXPEDITED CONSIDERATION.—The District Court for the District of Puerto Rico shall set any action brought under this title for expedited consideration, taking into account the interest of enhancing Puerto Rico's infrastructure for electricity, water and sewer services, roads and bridges, ports, and solid waste management to achieve compliance with local and Federal environmental laws, regulations, and policies while ensuring the continuity of adequate services to the people of Puerto Rico and Puerto Rico's sustainable economic development.

**SEC. 507. SAVINGS CLAUSE.**

Nothing in this title is intended to change or alter any Federal legal requirements or laws.

# TITLE VI—CREDITOR COLLECTIVE ACTION

**SEC. 601. CREDITOR COLLECTIVE ACTION.**

(a) DEFINITIONS.—In this title:

(1) ADMINISTRATIVE SUPERVISOR.—The term "Administrative Supervisor" means the Oversight Board established under section 101.

(2) AUTHORIZED TERRITORIAL INSTRUMENTALITY.—The term "Authorized Territorial Instrumentality" means a covered territorial instrumentality authorized in accordance with subsection (e).

(3) CALCULATION AGENT.—The term "Calculation Agent" means a calculation agent appointed in accordance with subsection (k).

(4) CAPITAL APPRECIATION BOND.—The term "Capital Appreciation Bond" means a Bond that does not pay interest on a current basis, but for which interest amounts are added to principal over time as specified in the relevant offering materials for such Bond, including that the accreted interest amount added to principal increases daily.

(5) CONVERTIBLE CAPITAL APPRECIATION BOND.—The term "Convertible Capital Appreciation Bond" means a Bond that does not pay interest on a current basis, but for which interest amounts are added to principal over time as speci-

36

fied in the relevant offering materials and which converts to a current pay bond on a future date.

(6) INFORMATION AGENT.—The term "Information Agent" means an information agent appointed in accordance with subsection (l).

(7) INSURED BOND.—The term "Insured Bond" means a bond subject to a financial guarantee or similar insurance contract, policy or surety issued by a monoline insurer.

(8) ISSUER.—The term "Issuer" means, as applicable, the Territory Government Issuer or an Authorized Territorial Instrumentality that has issued or guaranteed at least one Bond that is Outstanding.

(9) MODIFICATION.—The term "Modification" means any modification, amendment, supplement or waiver affecting one or more series of Bonds, including those effected by way of exchange, repurchase, conversion, or substitution.

(10) OUTSTANDING.—The term "Outstanding," in the context of the principal amount of Bonds, shall be determined in accordance with subsection (b).

(11) OUTSTANDING PRINCIPAL.—The term "Outstanding Principal" means—

(A) for a Bond that is not a Capital Appreciation Bond or a Convertible Capital Appreciation Bond, the outstanding principal amount of such Bond; and

(B) for a Bond that is a Capital Appreciation Bond or a Convertible Capital Appreciation Bond or a Convertible Capital Appreciation Bond, the current accreted value of such Capital Appreciation Bond or a Convertible Capital Appreciation Bond, as applicable.

(12) POOL.—The term "Pool" means a pool established in accordance with subsection (d).

(13) QUALIFYING MODIFICATION.—The term "Qualifying Modification" means a Modification proposed in accordance with subsection (g).

(14) SECURED POOL.—The term "Secured Pool" means a Pool established in accordance with subsection (d) consisting only of Bonds that are secured by a lien on property, provided that the inclusion of a Bond Claim in such Pool shall not in any way limit or prejudice the right of the Issuer, the Administrative Supervisor, or any creditor to recharacterize or challenge such Bond Claim, or any purported lien securing such Bond Claim, in any other manner in any subsequent proceeding in the event a proposed Qualifying Modification is not consummated.

(15) TERRITORY GOVERNMENT ISSUER.—The term "Territory Government Issuer" means the Government of Puerto Rico or such covered territory for which an Oversight Board has been established pursuant to section 101.

(b) OUTSTANDING BONDS.—In determining whether holders of the requisite principal amount of Outstanding Bonds have voted in favor of, or consented to, a proposed Qualifying Modification, a Bond will be deemed not to be outstanding, and may not be counted in a vote or consent solicitation for or against a proposed Qualifying Modification, if on the record date for the proposed Qualifying Modification—

(1) the Bond has previously been cancelled or delivered for cancellation or is held for reissuance but has not been reissued;

(2) the Bond has previously been called for redemption in accordance with its terms or previously become due and payable at maturity or otherwise and the Issuer has previously satisfied its obligation to make, or provide for, all payments due in respect of the Bond in accordance with its terms;

(3) the Bond has been substituted with a security of another series; or

(4) the Bond is held by the Issuer or by an Authorized Territorial Instrumentality of the Territory Government Issuer or by a corporation, trust or other legal entity that is controlled by the Issuer or an Authorized Territorial Instrumentality of the Territory Government Issuer, as applicable.

For purposes of this subsection, a corporation, trust or other legal entity is controlled by the Issuer or by an Authorized Territorial Instrumentality of the Territory Government Issuer if the Issuer or an Authorized Territorial Instrumentality of the Territory Government Issuer, as applicable, has the power, directly or indirectly, through the ownership of voting securities or other ownership interests, by contract or otherwise, to direct the management of or elect or appoint a majority of the board of directors or other persons performing similar functions in lieu of, or in addition to, the board of directors of that legal entity.

(c) CERTIFICATION OF DISENFRANCHISED BONDS.—Prior to any vote on, or consent solicitation for, a Qualifying Modification, the Issuer shall deliver to the Calculation Agent a certificate signed by an authorized representative of the Issuer specifying any Bonds that are deemed not to be Outstanding for the purpose of subsection (b) above.

(d) DETERMINATION OF POOLS FOR VOTING.—The Administrative Supervisor, in consultation with the Issuer, shall establish Pools in accordance with the following:

(1) Not less than one Pool shall be established for each Issuer.

37

(2) A Pool that contains one or more Bonds that are secured by a lien on property shall be a Secured Pool.

(3) The Administrative Supervisor shall establish Pools according to the following principles:

(A) For each Issuer that has issued multiple Bonds that are distinguished by specific provisions governing priority or security arrangements, including Bonds that have been issued as general obligations of the Territory Government Issuer to which the Territory Government Issuer pledged the full or good faith, credit, and taxing power of the Territory Government Issuer, separate Pools shall be established corresponding to the relative priority or security arrangements of each holder of Bonds against each Issuer, as applicable, provided, however, that the term "priority" as used in this section shall not be understood to mean differing payment or maturity dates.

(B) For each Issuer that has issued senior and subordinated Bonds, separate Pools shall be established for the senior and subordinated Bonds corresponding to the relative priority or security arrangements.

(C) For each Issuer that has issued multiple Bonds, for at least some of which a guarantee of repayment has been provided by the Territory Government Issuer, separate Pools shall be established for such guaranteed and non-guaranteed Bonds.

(D) Subject to the other requirements contained in this section, for each Issuer that has issued multiple Bonds, for at least some of which a dedicated revenue stream has been pledged for repayment, separate Pools for such Issuer shall be established as follows—

(i) for each dedicated revenue stream that has been pledged for repayment, not less than one Secured Pool for Bonds for which such revenue stream has been pledged, and separate Secured Pools shall be established for Bonds of different priority; and

(ii) not less than one Pool for all other Bonds issued by the Issuer for which a dedicated revenue stream has not been pledged for repayment.

(E) The Administrative Supervisor shall not place into separate Pools Bonds of the same Issuer that have identical rights in security or priority.

(4) Notwithstanding the preceding provisions of this subsection, a preexisting voluntary agreement may classify Insured Bonds and uninsured bonds in different Pools and provide different treatment thereof so long as the preexisting voluntary agreement has been agreed to by—

(A) holders of a majority in amount of all uninsured bonds outstanding in the modified Pool; and

(B) holders (including insurers with power to vote) of a majority in amount of all Insured Bonds.

(e) AUTHORIZATION OF TERRITORY INSTRUMENTALITIES.—A covered territorial instrumentality is an Authorized Territorial Instrumentality if it has been specifically authorized to be eligible to avail itself of the procedures under this section by the Administrative Supervisor.

(f) INFORMATION DELIVERY REQUIREMENT.—Before solicitation of acceptance or rejection of a Modification under subsection (h), the Issuer shall provide to the Calculation Agent, the Information Agent, and the Administrative Supervisor, the following information—

(1) a description of the Issuer's economic and financial circumstances which are, in the Issuer's opinion, relevant to the request for the proposed Qualifying Modification, a description of the Issuer's existing debts, a description of the impact of the proposed Qualifying Modification on the territory's or its territorial instrumentalities' public debt;

(2) if the Issuer is seeking Modifications affecting any other Pools of Bonds of the Territory Government Issuer or its Authorized Territorial Instrumentalities, a description of such other Modifications;

(3) if a Fiscal Plan with respect to such Issuer has been certified, the applicable Fiscal Plan certified in accordance with section 201; and

(4) such other information as may be required under applicable securities laws.

(g) QUALIFYING MODIFICATION.—A Modification is a Qualifying Modification if—

(1) the Issuer proposing the Modification has consulted with holders of Bonds in each Pool of such Issuer prior to soliciting a vote on such Modification;

(2) each exchanging, repurchasing, converting, or substituting holder of Bonds of any series in a Pool affected by that Modification is offered the same amount of consideration per amount of principal, the same amount of consideration per amount of interest accrued but unpaid and the same amount of consideration per amount of past due interest, respectively, as that offered to each other ex-

38

changing, repurchasing, converting, or substituting holder of Bonds of any series in a Pool affected by that Modification (or, where a menu of instruments or other consideration is offered, each exchanging, repurchasing, converting, or substituting holder of Bonds of any series in a Pool affected by that Modification is offered the same amount of consideration per amount of principal, the same amount of consideration per amount of interest accrued but unpaid and the same amount of consideration per amount of past due interest, respectively, as that offered to each other exchanging, repurchasing, converting, or substituting holder of Bonds of any series in a Pool affected by that Modification electing the same option under such menu of instruments);

(3) the Modification is certified by the Administrative Supervisor as being consistent with the requirements set forth in section 104(i)(1) and is in the best interests of the creditors and is feasible; or

(4) notwithstanding paragraphs (1) through (3), the Administrative Supervisor has issued a certification that—

(A) the requirements set forth in section 104(i)(2) have been satisfied; or

(B) the Modification is consistent with a restructuring support or similar agreement to be implemented pursuant to the law of the covered territory executed by the Issuer prior to the establishment of an Oversight Board for the relevant territory.

(h) SOLICITATION.—

(1) Upon receipt of a certification from the Administrative Supervisor under subsection (g), the Information Agent shall, if practical and except as provided in paragraph (2), submit to the holders of any Outstanding Bonds of the relevant Issuer, including holders of the right to vote such Outstanding Bonds, the information submitted by the relevant Issuer under subsection (f)(1) in order to solicit the vote of such holders to approve or reject the Qualifying Modification.

(2) If the Information Agent is unable to identify the address of holders of any Outstanding Bonds of the relevant Issuer, the Information Agent may solicit the vote or consent of such holders by—

(A) delivering the solicitation to the paying agent for any such Issuer or Depository Trust Corporation if it serves as the clearing system for any of the Issuer's Outstanding Bonds; or

(B) delivering or publishing the solicitation by whatever additional means the Information Agent, after consultation with the Issuer, deems necessary and appropriate in order to make a reasonable effort to inform holders of any Outstanding Bonds of the Issuer which may include, notice by mail, publication in electronic media, publication on a website of the Issuer, or publication in newspapers of national circulation in the United States and in a newspaper of general circulation in the territory.

(i) WHO MAY PROPOSE A MODIFICATION.—For each Issuer, a Modification may be proposed to the Administrative Supervisor by the Issuer or by one or more holders of the right to vote the Issuer's Outstanding Bonds. To the extent a Modification proposed by one or more holders of the right to vote Outstanding Bonds otherwise complies with the requirements of this title, the Administrative Supervisor may accept such Modification on behalf of the Issuer, in which case the Administrative Supervisor will instruct the Issuer to provide the information required in subsection (f).

(j) VOTING.—For each Issuer, any Qualifying Modification may be made with the affirmative vote of the holders of the right to vote at least two-thirds of the Outstanding Principal amount of the Outstanding Bonds in each Pool that have voted to approve or reject the Qualifying Modification, provided that holders of the right to vote not less than a majority of the aggregate Outstanding Principal amount of all the Outstanding Bonds in each Pool have voted to approve the Qualifying Modification. The holder of the right to vote the Outstanding Bonds that are Insured Bonds shall be the monoline insurer insuring such Insured Bond to the extent such insurer is granted the right to vote Insured Bonds for purposes of directing remedies or consenting to proposed amendments or modifications as provided in the applicable documents pursuant to which such Insured Bond was issued and insured.

(k) CALCULATION AGENT.—For the purpose of calculating the principal amount of the Bonds of any series eligible to participate in such a vote or consent solicitation and tabulating such votes or consents, the Territory Government Issuer may appoint a Calculation Agent for each Pool reasonably acceptable to the Administrative Supervisor.

(l) INFORMATION AGENT.—For the purpose of administering a vote of holders of the right to vote such Bonds, including the holders of the right to vote such Bonds, or seeking the consent of holder of Bonds, including the holders of the right to vote such Bonds, to a written action under this section, the Territory Government Issuer may appoint an In-

39

formation Agent for each Pool reasonably acceptable to the Administrative Supervisor.

(m) BINDING EFFECT.—

(1) A Qualifying Modification will be conclusive and binding on all holders of Bonds whether or not they have given such consent, and on all future holders of those Bonds whether or not notation of such Qualifying Modification is made upon the Bonds, if—

(A) the holders of the right to vote the Outstanding Bonds in every Pool of the Issuer pursuant to subsection (j) have consented to or approved the Qualifying Modification;

(B) the Administrative Supervisor certifies that—

(i) the voting requirements of this section have been satisfied;

(ii) the Qualifying Modification complies with the requirements set forth in section 104(i)(1); and

(iii) except for such conditions that have been identified in the Qualifying Modification as being non-waivable, any conditions on the effectiveness of the Qualifying Modification have been satisfied or, in the Administrative Supervisor's sole discretion, satisfaction of such conditions has been waived;

(C) with respect to a Bond Claim that is secured by a lien on property and with respect to which the holder of such Bond Claim has rejected or not consented to the Qualifying Modification, the holder of such Bond—

(i) retains the lien securing such Bond Claims; or

(ii) receives on account of such Bond Claim, through deferred cash payments, substitute collateral, or otherwise, at least the equivalent value of the lesser of the amount of the Bond Claim or of the collateral securing such Bond Claim; and

(D) the district court for the territory or, for any territory that does not have a district court, the United States District Court for the District of Hawaii, has, after reviewing an application submitted to it by the applicable Issuer for an order approving the Qualifying Modification, entered an order that the requirements of this section have been satisfied.

(2) Upon the entry of an order under paragraph (1)(D), the conclusive and binding Qualifying Modification shall be valid and binding on any person or entity asserting claims or other rights, including a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of Bonds subject to the Qualifying Modification, any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such Bonds. All property of an Issuer for which an order has been entered under paragraph (1)(D) shall vest in the Issuer free and clear of all claims in respect of any Bonds of any other Issuer. Such Qualifying Modification will be full, final, complete, binding, and conclusive as to the territorial government Issuer, other territorial instrumentalities of the territorial government Issuer, and any creditors of such entities, and should not be subject to any collateral attack or other challenge by any such entities in any court or other forum. Other than as provided herein, the foregoing shall not prejudice the rights and claims of any party that insured the Bonds, including the right to assert claims under the Bonds as modified following any payment under the insurance policy, and no claim or right that may be asserted by any party in a capacity other than holder of a Bond affected by the Qualifying Modification shall be satisfied, released, discharged, or enjoined by this provision.

(n) JUDICIAL REVIEW.—

(1) The district court for the territory or, for any territory that does not have a district court, the United States District Court for the District of Hawaii shall have original and exclusive jurisdiction over civil actions arising under this section.

(2) Notwithstanding section 106(e), there shall be a cause of action to challenge unlawful application of this section.

(3) The district court shall nullify a Modification and any effects on the rights of the holders of Bonds resulting from such Modification if and only if the district court determines that such Modification is manifestly inconsistent with this section.

**SEC. 602. APPLICABLE LAW.**

In any judicial proceeding regarding this title, Federal, State, or territorial laws of the United States, as applicable, shall govern and be applied without regard or reference to any law of any international or foreign jurisdiction.

40

# TITLE VII—SENSE OF CONGRESS REGARDING PERMANENT, PRO-GROWTH FISCAL REFORMS

**SEC. 701. SENSE OF CONGRESS REGARDING PERMANENT, PRO-GROWTH FISCAL REFORMS.**

It is the sense of the Congress that any durable solution for Puerto Rico's fiscal and economic crisis should include permanent, pro-growth fiscal reforms that feature, among other elements, a free flow of capital between possessions of the United States and the rest of the United States.

## PURPOSE OF THE BILL

The purpose of H.R. 5278 is to establish an Oversight Board to assist the Government of Puerto Rico, including instrumentalities, in managing its public finances.

## BACKGROUND AND NEED FOR LEGISLATION

Puerto Rico is in the midst of a fiscal crisis. The island has accumulated over $110 billion in combined debt and unfunded pension liabilities, and has seen a 10% decline in population over the past decade. Puerto Rico's local politicians have accelerated the crisis on the island through the passage of harmful legislation, including the imposition of a moratorium on the payment of debt. Due to the realities facing the island, and the inability of its local politicians to bring order and transparency, immediate congressional action is required. Because Puerto Rico is a United States territory and its residents are United States citizens, Congress has the responsibility and authority to make all needful rules and regulations for Puerto Rico.

Puerto Rico's situation underscores the necessity for Congressional action, and highlights the purpose of the Committee on Natural Resources' efforts to address the crisis. On May 18, 2016, Congressman Sean P. Duffy introduced H.R. 5278, the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA). H.R. 5278 represents the second iteration of PROMESA, the first being H.R. 4900, and incorporates solutions to the Puerto Rico crisis learned from the testimony received during the Committee's four hearings, as well as concerns raised by Members and stakeholders commenting on H.R. 4900.

The Committee's first hearing, *Exploring Energy Challenges and Opportunities Facing Puerto Rico* (Subcommittee on Energy and Mineral Resources, January 12, 2016), identified the need for energy and infrastructure development on the island, and highlighted the current deficiencies plaguing the island. For instance, Puerto Rico is hampered by permitting inefficiencies, with the World Bank having ranked Puerto Rico as 135th out of 189 countries for ease of "Dealing with Construction Permits." PROMESA in Title V addresses both the bureaucratic processes that hinder development on the island, and promotes the infusion of private capital to spur economic development. The Oversight Board has the opportunity to fast-track infrastructure projects by co-opting existing Puerto Rico laws, thus providing project proponents with the assurances of regulatory certainty.

The Committee's second hearing, *The Need for the Establishment of a Puerto Rico Financial Stability and Economic Growth Authority* (Subcommittee on Indian, Insular and Alaska Native Affairs,

February 2, 2016), outlined the need for an independent oversight board to oversee Puerto Rico's fiscal and governmental activities. At that hearing, the Committee received testimony from former Washington D.C. Mayor Anthony Williams who had previously served as an officer of the D.C. Board. Mayor Williams described the successes of the D.C. Board, and the challenges a similar board would face if instituted over Puerto Rico. Other testimony highlighted the limited oversight and transparency of actions within Puerto Rico's governmental entities, such as the failure of Puerto Rico's government to provide any audited financials for the past two fiscal years, and the lack of institutional control. As such, Titles I and II of PROMESA remedy the deteriorating health of Puerto Rico's finances and economy—at no net cost to the U.S. taxpayer—through the establishment of an Oversight Board for the territory.

The third hearing, *U.S. Department of the Treasury's Analysis of the Situation in Puerto Rico* (Full Natural Resources Committee, February 25, 2016), provided valuable testimony as to why Puerto Rico needed access to debt restructuring. Counsellor Antonio Weiss with the U.S. Department of the Treasury informed the Committee as to the unsustainability of Puerto Rico's debt and the disorderly state of Puerto Rico's financials. Therefore Titles III and VI of H.R. 5278 provide Puerto Rico's indebted entities, with the management of the Oversight Board, the opportunity to restructure their debts in a fair and equitable manner for their respective creditors.

The final hearing was a legislative hearing on H.R. 4900 (Full Natural Resources Committee, April 13, 2016). That hearing alerted the Committee to a number of concerns expressed by stakeholders, such as the U.S. Department of the Treasury, and Members of the Committee. H.R. 5278 addresses many of the concerns raised to the Committee and provides a workable solution that will ensure Puerto Rico regains access to capital markets and achieves fiscal responsibility and transparency.

SECTION BY SECTION ANALYSIS OF THE BILL AS ORDERED REPORTED

*Section 1. Short title; Table of contents*

This section establishes the short title of the act as the "Puerto Rico Oversight, Management, and Economic Stability Act" or "PROMESA." The bill contains seven titles: Title I—Establishment and Organization of Oversight Board; Title II—Responsibilities of Oversight Board; Title III—Adjustment of Debts; Title IV—Miscellaneous Provisions; Title V—Puerto Rico Infrastructure Revitalization; Title VI—Creditor Collective Action; and Title VII—Sense of Congress Regarding Permanent, Pro-Growth Fiscal Reforms.

*Section 2. Effective date*

This section defines the effective date of the act as the date of enactment, provides that Title III only applies to cases commenced under it on or after the date of enactment, and ensures Titles III and VI apply to all debts, claims and liens, regardless of creation date.

42

*Section 3. Severability*

If any provision of PROMESA is found invalid, this section permits the remainder of the Act to be unaffected by such invalidation, but expressly ties Titles I and II with Title III, such that if one title is found invalid, the other two titles will be as well. Accordingly, debt restructuring under Title III will be unavailable to Puerto Rico if the Oversight Board (including the manner in which appointments to the Oversight Board are made) is determined by a court to be invalid.

*Section 4. Supremacy*

This section provides that the provisions of PROMESA control if any territorial, or state law or regulation is inconsistent with the Act.

*Section 5. Definitions*

This section defines commonly used terms in the Act.

*Section 6. Placement*

This section instructs the Office of the Law Revision Counsel to place PROMESA as a new chapter under Title 48 (Territories and Insular Possession) of the United States Code to act as a buffer against claims this legislation will lead to similar laws being applied to states.

*Section 7. Compliance with Federal laws*

This section requires territories to continue compliance with all other Federal laws or requirements protecting health, safety, and the environment, as well as those territorial laws implementing Federally-authorized and delegated programs.

TITLE I—ESTABLISHMENT AND ORGANIZATION OF OVERSIGHT BOARD

*Section 101. Financial Oversight and Management Board*

This section establishes a Financial Oversight and Management Board (Oversight Board) within the Puerto Rico government pursuant to Article IV of the U.S. Constitution, which grants Congress plenary authority and responsibility over the territories. Furthermore, this section authorizes the creation of an Oversight Board for any other territory of the United States if such territory, by duly adopted resolution, requests an Oversight Board. In general, the Oversight Board is granted broad authority over territorial instrumentalities, and is empowered to require that instrumentalities establish fiscal plans and budgets in accordance with Sections 201 and 202.

Additionally, this section provides for the appointment of seven individuals to the Oversight Board through a process that ensures that a majority of its members are effectively chosen by Republican congressional leaders on an expedited timeframe, while upholding the President's constitutional role in making appointments.

The selection process requires Congressional leaders to provide lists of names to the President for appointment to the Oversight Board. The individuals comprising the lists are required to have knowledge and expertise in finance, municipal bond markets, management, law, or the organization or operation of business or gov-

43

ernment and may not be an officer, elected official, employee, or candidate for office of the territorial government prior to appointment. Once the lists are provided, the President has until September 30, 2016, to either select from the lists or appoint someone with the advice and consent of the Senate. If the President fails to appoint the full membership by that deadline, then the President must select candidates from the provided lists before December 1, 2016.

Each voting member's service on the Oversight Board is subject to a limit of three years, but allows for the reappointment of members. Vacancies must be filled in the manner by which the original member was appointed. The members are not paid for their service but shall be reimbursed reasonable and necessary expenses.

This section also outlines the authority of the Oversight Board to adopt bylaws and procedures required to conduct its business, provided that at an affirmative vote of a majority of Oversight Board's fully appointed members (i.e., at least four affirmative votes out of seven) shall be required to approve a Fiscal Plan under Section 201, to approve a Budget under Section 202, to veto a legislative act under Section 204, or to deem an infrastructure project as a Critical Project under Section 503.

In addition to the voting members appointed by the President, this section permits the Governor, or the Governor's designee to serve on the Oversight Board in an *ex officio* capacity without voting rights. However, the Oversight Board, upon a majority vote, may conduct its business in an executive session of its voting members, to the exclusion of the *ex officio* member.

### Section 102. Location of Oversight Board

This section requires the Oversight Board to maintain offices in the territory it oversees and gives it the authority to have offices in other locations as necessary. Furthermore, Federal agencies are authorized to provide facilities and equipment for the Oversight Board to use.

### Section 103. Executive director and Staff of Oversight Board

This section enables the Oversight Board to hire an executive director, revitalization coordinator, and staff as necessary. Salary for staff is at the discretion of the Oversight Board, provided that no staff may be paid more than the executive director. Additionally, the Oversight Board is allowed to have employees from the territorial or Federal government on detail.

### Section 104. Powers of Oversight Board

This section sets forth the powers of the Oversight Board. Powers relating to the routine day-to-day operation of the Oversight Board include: holding hearings and sessions; obtaining official data from the territorial and Federal government, as well as creditors; accepting gifts; entering into contracts; and accepting support services from the General Services.

Furthermore, the section establishes powers relating to achieving fiscal stability and creditworthiness of a territory which includes: issuing subpoenas; certifying voluntary agreements between creditors and debtors, protecting preexisting voluntary restructuring agreements; filing a petition to restructure or to submit or modify

44

a plan of adjustment on behalf of a debtor; seeking judicial enforcement of its authority to carry out the purposes of the Act; imposing appropriate penalties for violations of valid orders of the Oversight Board; ensuring prompt and efficient payment of taxes through electronic reporting, payment, and auditing technologies; and ensuring the prompt enforcement of applicable territorial law prohibiting public sector employees from participating in a strike or lockout.

The Committee recognizes the failure of an amendment to execute properly at markup, which has caused subparagraph (i)(3) to not operate as intended. The goal of this provision is to ensure preexisting, voluntary deals negotiated between creditors and debtors stay intact upon passage of PROMESA. However, this provision should not be used to justify last-minute, haphazard deals seeking to avoid Oversight Board scrutiny. As such, any clarifications made to this subparagraph will provide a date certain by which voluntary negotiations must have been completed.

*Section 105. Exemption from liability for claims*

This section exempts members and employees of the Oversight Board from liability resulting from actions taken while carrying out the provisions of PROMESA.

*Section 106. Treatment of actions arising from Act*

Except for an action arising out of Title III or out of the Oversight Board's issuance of a subpoena (Section 104(f)(2)), any action arising out of this Act is required to be brought in the United States district court for the covered territory. For a territory that lacks a district court, such action must be brought in the United States District Court for Hawaii.

Therefore, in the case of Puerto Rico, any non-Title III or non-subpoena related action must be brought in the U.S. District Court for the District of Puerto Rico. Appeals shall be handled in the applicable U.S. Court of Appeals (in the case of Puerto Rico, it is the First Circuit).

*Section 107. Budget and funding for operation of Oversight Board*

This section requires the Oversight Board to submit an annual budget to the President and committees of jurisdiction within the House of Representatives and Senate, and requires the territorial government to provide a funding source for the operations of the Oversight Board.

*Section 108. Autonomy of the Oversight Board*

This section prevents the territorial government or legislature from exercising any control over the Oversight Board, or from enacting, implementing, or enforcing any legislation, resolution, policy, or rule that would impair the purposes of the Act. Furthermore, the Oversight Board is explicitly permitted to hire outside counsel for representation.

*Section 109. Ethics*

This section subjects all members and staff of the Oversight Board to Federal conflict of interest and financial disclosure requirements.

45

TITLE II—RESPONSIBILITIES OF OVERSIGHT BOARD

*Section 201. Approval of Fiscal Plans*

This section establishes the method for developing Fiscal Plans for territorial governments and instrumentalities that provide the appropriate elected officials with the autonomy to develop such Fiscal Plans with guidance from the Oversight Board. To initiate the process, the Oversight Board determines a schedule by which the Governor must provide an approvable and certifiable Fiscal Plan. If the Governor fails to draft an acceptable Fiscal Plan as determined by the Oversight Board by the deadlines set forth in the schedule, then the Oversight Board will develop and adopt the Fiscal Plan, which shall be deemed approved by the Governor.

Each Fiscal Plan serves as the cornerstone for the structural reforms the Oversight Board deems necessary to ensure the territory, or instrumentality, will be on a path towards "fiscal responsibility and access to capital markets." These documents incorporate requirements including any recommendation made by the Oversight Board pursuant to Section 205, the elimination of structural deficits, as well as the improvement of fiscal governance, accountability, and internal controls. Importantly, Fiscal Plans ensure the protection of the lawful priorities and liens as guaranteed by the territorial constitution and applicable laws, and prevent unlawful inter-debtor transfers of funds.

The Committee acknowledges the concern as to the ambiguity of the language regarding the funding of public pension systems. To clarify, Section 201(b)(1)(C) tasks the Oversight Board with ensuring fiscal plans "provide adequate funding for public pension systems." This language should not be interpreted to reprioritize pension liabilities ahead of the lawful priorities or liens of bondholders as established under the territory's constitution, laws, or other agreements. While this language seeks to provide an adequate level of funding for pension systems, it does not allow for pensions to be unduly favored over other indebtedness in a restructuring.

*Section 202. Approval of budgets*

This section outlines the process for developing annual budgets. Similar to the development of Fiscal Plans, the Oversight Board will establish a schedule the Governor and Legislature must meet for the development of territory and territorial instrumentality budgets. All budgets developed under this section must be developed in accordance with the appropriate Fiscal Plan. If the Governor and Legislature fail to develop certifiable budgets within the established deadline, then the Oversight Board is required to develop the budget for the territory or territorial instrumentality for that fiscal year.

*Section 203. Effect of finding of noncompliance with budget*

This section requires the Governor to submit a report at the end of each fiscal quarter to the Oversight Board describing the actual revenues, expenditures, and cash flow of the government for the previous quarter, as well as any other information the Oversight Board may request. If the revenues, expenditures, or cash flow is not in accordance with the certified budget, then the Oversight Board will alert the Governor of the inconsistency and provide an

46

opportunity for the Governor to correct the inconsistency. If the Governor fails to correct such inconsistency within an established timeframe, then the Oversight Board shall make appropriate reductions in non-debt expenditures within the budget of the territorial government or territorial instrumentality to ensure the quarterly budget aligns with the certified budget.

*Section 204. Review of activities to ensure compliance with Fiscal Plan*

This section imposes a requirement that the Legislature of a territorial government provide a cost estimate with each duly enacted law, as well as a certification by the Legislature that such law is consistent with the Fiscal Plan. If the law is significantly inconsistent with the Fiscal Plan, or does not have a cost estimate associated with it, then the Oversight Board is granted the authority to "take such actions as it considers necessary," including preventing enforcement of such laws.

Furthermore, this section mandates the Oversight Board to work with the territorial government to promote compliance of transparency in contracting by maintaining a registry of all contracts executed. The Oversight Board also has the authority to establish policies requiring precursory review by the Oversight Board of contracts, executive orders, rules, and regulations before such items could be executed, and requires such contracts and executive actions to promote market competition.

This section prohibits the enactment of new laws authorizing budgetary transfers between instrumentalities during the timeframe between the enactment of PROMESA and the appointment of the Oversight Board's full membership. If any transfers of funds or assets during that period occur, such transfers of funds or assets are subject to review and reversal by the Oversight Board. Any transfer or reprogramming of funds that occurs after that time period will be subject to Oversight Board approval if such transfer or reprogramming of funds would require legislative approval.

*Section 205. Recommendations on financial stability and management responsibility*

This section establishes a process by which the Oversight Board may make recommendations to the Legislature or Governor of a territory. Such recommendations made under this section vary in scope and seek to ensure compliance with the Fiscal Plan and Budgets, as well as promote the financial stability, economic growth, management responsibility, and efficiency of service delivery of the territorial government. Additionally, the Oversight Board may make recommendations concerning the establishment of alternatives to pay for pensions, and the privatization and commercialization of entities within the territorial government.

Upon receipt of a recommendation from the Oversight Board, the Governor or Legislature must respond with a report detailing how such recommendations will be implemented, or why such recommendations will be ignored.

The Oversight Board may incorporate any recommendations—even those not adopted by the Legislature or Governor—into the development of Fiscal Plans.

47

*Section 206. Oversight Board duties related to restructuring*

This section establishes the requirements an entity must achieve to obtain a certification to enter into Title III. The Oversight Board, in its sole discretion, must certify by an affirmative vote of at least five of the seven members that the entity has: (1) made good-faith efforts to reach a consensual restructuring with its creditors; (2) adopted procedures necessary to deliver timely audited financial statements, and has delivered draft financial statements and other information sufficient for an interested person to make an informed decision; (3) the entity has a Fiscal Plan in place; and (4) no order approving a Qualifying Modification, as provided by Section 601, is in place.

*Section 207. Oversight Board authority related to debt issuance*

This section prohibits the territorial government from issuing debt without prior approval from the Oversight Board.

*Section 208. Required reports*

This section requires the Oversight Board to submit annual reports that describe the progress the territorial government has made in meeting the objectives of PROMESA, the assistance provided by the Oversight Board to the territorial government, recommendations to the President or Congress as to any changes in Federal laws that should occur, the precise use of funds by the Oversight Board, and any other activities the Oversight Board deems necessary.

Two additional reporting requirements on the Oversight Board are: (1) an examination of tax abatement agreements in place between the territorial government and private corporations; and (2) quarterly assessments on the amount of cash flow available for the payment of debt service on all notes, bonds, debentures, credit agreements, or other instruments for money borrowed.

*Section 209. Termination of Oversight Board*

This section establishes the conditions that must be met before the Oversight Board is terminated. The three conditions are: (1) the territorial government has adequate access to short- and long-term credit markets at reasonable rates; (2) for four consecutive years, the territorial government has developed its Budgets in accordance with modified accrual accounting standards; and (3) the territorial government has achieved balanced budgets during those four consecutive years.

*Section 210. No full faith and credit of the United States*

This section explicitly prohibits the full faith and credit of the United States from being pledged for any bond issued by the covered territory while an Oversight Board is in effect. Additionally, this section subjects any claim to which the United States is found to be liable to the appropriation process.

Finally, this section further insulates the Federal government from any expenditure by expressly prohibiting the authorization of Federal funds for the payment of any liability of the territorial government.

48

*Section 211. Analysis of pensions*

This section requires the Oversight Board to analyze pensions of the territorial government if the Oversight Board determines that the pension system is underfunded. Such an analysis includes an actuarial study of the pension liabilities, sources of funding available to cover pension debts, a review of existing benefits and the sustainability of such benefits, and a review of the pension system's legal structure and operational arrangements.

*Section 212. Intervention in litigation*

This section authorizes the Oversight Board to intervene in any litigation filed against the territorial government.

TITLE III—ADJUSTMENT OF DEBTS

*Section 301. Applicability of other laws; Definitions*

This section incorporates by reference a number of sections from Title 11 of the U.S. Code (Bankruptcy) to provide an administrative and procedural framework for debt adjustment under this Title.

Furthermore, this section provides applicable definitions for Title III, and requires the Oversight Board to determine whether creditors within an entity are "substantially similar" based on whether the claims are secured and whether such claims have priority over other claims.

*Section 302. Who may be a debtor*

This section limits access to Title III by allowing only entities that are subject to an Oversight Board and have received the appropriate certification pursuant to Section 206(b) to be considered a debtor.

*Section 303. Reservation of territorial power to control territory and territorial instrumentalities*

This section provides that, subject to Titles I and II of this Act, nothing in this Act prohibits a covered territory from exercising its political and government control over a territory and its instrumentalities. Several exceptions are provided within this section prohibiting the application of any territory law prescribing a method of composition or moratorium on the indebtedness of the territory or its instrumentalities to a non-consenting creditor. Furthermore, this section preempts the governor from issuing any unlawful executive orders that alter, amend, or modify the rights of holders of debt, nor may an executive order divert funds from one instrumentality to another or to the territory.

*Section 304. Petition and proceedings relating to petition*

This section exclusively authorizes the Oversight Board to initiate a proceeding for debt restructuring of an entity. Furthermore, the section enables the joint filing of petitions for debtors if the debtors are affiliated, as well as providing for joint administration of affiliated debtor cases.

*Section 305. Limitation on jurisdiction and powers of court*

This section limits a court from interfering with the political or governmental powers of the debtor, with any of the property or rev-

49

enues of the debtor, or with the debtor's enjoyment of income-producing property, unless the debtor consents to such interference or the plan of adjustment provides otherwise.

*Section 306. Jurisdiction*

This section establishes original and exclusive jurisdiction for any case under Title III with the Federal district courts, and enables such court to oversee any additional claim or civil cause of action in which the party is involved for which the overseeing court has jurisdiction.

This section further provides for the manner in which removal, remands, transfers and appeals of relevant jurisdictional claims and cases should proceed. Generally, appeals are to be handled in the same manner that proceedings are taken to the courts of appeals from district courts.

*Section 307. Venue*

This section outlines the process for determining venue. Generally, venue for restructuring under this Title will be the Federal district court for the covered territory (or territorial instrumentality) or—for a territory that does not have a district court—the U.S. District Court for Hawaii. In effect, venue for Puerto Rico will be U.S. District Court for the District of Puerto Rico; venue for the U.S. Virgin Islands will be the U.S. District Court for the Virgin Islands; venue for American Samoa, the Commonwealth of the Northern Mariana Islands; and venue for Guam will be the U.S. District Court for Hawaii.

If the Oversight Board so determines, venue for the case will be in the district court for the jurisdiction in which the Oversight Board maintains an office that is located outside the territory. In the case of Puerto Rico, venue will probably be in the District of Columbia.

*Section 308. Selection of presiding judge*

This section authorizes the Chief Justice of the United States to designate a district court judge to sit over the case if the debtor is a Territory. Otherwise the designation is left to the chief judge of the court of appeals.

*Section 309. Abstention*

This section allows a district court to abstain in the interest of justice from hearing a particular proceeding arising in or related to a case under Title III.

*Section 310. Applicable rules of procedure*

This section applies the Federal Rules of Bankruptcy Procedure to a case brought under Title III.

*Section 311. Leases*

This section exempts a lease to a territory from being treated as an executory contract or unexpired lease solely because the lease is subject to termination for failure of a debtor to appropriate rent.

50

*Section 312. Filing of plan of adjustment*

This section permits only the Oversight Board to file a plan of adjustment, once the Oversight Board has issued a certification pursuant to Section 104(j).

*Section 313. Modification of plan*

This section allows the Oversight Board to repeatedly change or modify a plan of adjustment, as submitted per Section 312, before such plan is confirmed, so long as such modification meets the requirements of Title III.

*Section 314. Confirmation*

This section outlines the conditions necessary to having a plan confirmed by a court. Under this section, the court shall confirm a plan if: (1) the plan complies with the referenced statutes in Section 301; (2) the plan complies with Title III; (3) the debtor is not prohibited by law from undertaking any of the actions of the plan; (4) unless otherwise agreed to, the holders of claims specified in 11 U.S.C. 507(a)(2) will receive cash equal to the allowed amount of such claim; (5) the debtor has secured the necessary legislative, regulatory, or electoral approval of such plan, or such provision is expressly conditioned on the securing of such actions; (6) the plan is in the best interest of the creditors and is feasible, which must include a consideration as to whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided; and (7) the plan is consistent with the Fiscal Plan as established under Title II of PROMESA.

By incorporating consistency with the Fiscal Plan into the requirements of confirmation of a plan of adjustment, the Committee has ensured lawful priorities and liens, as provided for by the territory's constitution, laws, and agreements, will be respected in any debt restructuring that occurs.

*Section 315. Role and capacity of Oversight Board*

This section designates the Oversight Board as the representative of the debtor and authorizes the Oversight Board to take any action necessary on behalf of the debtor including the filing of a petition under Section 304, the submission or modification of a plan of adjustment, or the submission of other filings as required by the court.

*Section 316. Compensation of professionals*

This section permits the court to authorize the debtor's reasonable payment of professionals, such as attorneys, paralegals or others connected with a Title III proceeding. This ensures these professionals will receive compensation for services rendered during the Title III case.

*Section 317. Interim compensation*

This section authorizes the court to permit payment to professionals while the Title III case is ongoing.

51

TITLE IV—MISCELLANEOUS PROVISIONS

*Section 401. Rules of construction*

This section provides that nothing in PROMESA shall be construed as limiting the authority of Congress to exercise legislative authority over the territories, or as hindering agreements between treaties and covenants affecting the Northern Mariana Islands or American Samoa.

*Section 402. Right of Puerto Rico to determine its future political status*

This section maintains the right for Puerto Rico to conduct a plebiscite to determine its future political status.

*Section 403. First minimum wage in Puerto Rico*

This section grants the Governor of Puerto Rico, subject to approval by the Oversight Board, the authority to designate a time period no greater than four years during which employers may pay employees who are initially employed after the date of enactment of PROMESA a wage that is less than the national minimum wage. Furthermore, the provision raises the maximum age of applicability of the statute for Puerto Rico from 20 to 25, but limits such age extension to the length of the Oversight Board's tenure.

*Section 404. Application of regulation to Puerto Rico*

This section exempts Puerto Rico from the regulations introduced by the Secretary of Labor on July 6, 2015 (80 Fed. Reg. 38515), relating to overtime rates for executive, administrative, professional, outside sales, and computer employees until such time as the U.S. Government Accountability Office (GAO) has completed a study regarding the economic condition of Puerto Rico, and the Secretary of Labor, upon considering such GAO study, recommends to Congress the regulation be held applicable in Puerto Rico.

This section also states that it is the sense of Congress for the Census Bureau to include Puerto Rico and the other territories in data collection efforts.

*Section 405. Automatic stay upon enactment*

This section automatically stays all litigation against Puerto Rico and its instrumentalities, as well as any other judicial, administrative or other action or proceedings to enforce or collect claims. The stay will remain in effect until the later of six months after the date of enactment or February 15, 2017. However, an extension may occur for 75 days if the Oversight Board certifies that this time is needed to complete a voluntary modification under Title VI, or for 60 days if the U.S. District Court for the District of Puerto Rico makes a similar determination.

If a party is determined to be subject to irreparable damage because of the imposition of the stay, the District Court is authorized to grant relief from the stay to such party.

The stay does not authorize the Government of Puerto Rico to stop payment on any of its liabilities. On the contrary, to the extent the Oversight Board determines it is feasible, the Government must continue to make scheduled interest payments during the stay.

52

The Committee views the stay as a critical component of the legislation. First, it preempts a rush to the courts by aggrieved creditors—an event that could increase the impact of and accelerate Puerto Rico's debt crisis. Second, the stay ensures order during the initial few months of the Oversight Board's existence, thereby allowing the Oversight Board the opportunity to establish its foundational structure and begin its monumental task of ensuring Puerto Rico regains access to capital markets.

*Section 406. Purchases by territory governments*

This section authorizes Puerto Rico and the other territories to make purchases through the General Services Administration.

*Section 407. Protection from inter-debtor transfers*

This section grants creditors the right to sue upon the conclusion of the stay, if the government of Puerto Rico transfers property between instrumentalities during the tenure of the Oversight Board in violation of any agreement, or applicable law that a creditor has or would have a pledge of, security interest in, or lien on such property.

*Section 408. GAO report on small business administration programs in Puerto Rico*

This section requires the GAO to conduct a report on the application and utilization of contracting activities of the Small Business Administration related to the HUBZone program.

*Section 409. Congressional Task Force on economic growth in Puerto Rico*

This section establishes a bipartisan, bicameral, Congressional Task Force comprised of eight members. Four of the members will be from the House and four will be from the Senate, split evenly between parties. The Task Force must provide a report no later than December 31, 2016, regarding: impediments in current Federal law and programs to economic growth in Puerto Rico including equitable access to Federal health care programs; recommended changes to Federal law and programs that would spur sustainable, long-term growth; the economic consequences of a Puerto Rico Department of Health regulation; and additional information as deemed necessary.

*Section 410. Report*

This section requires the GAO to submit a report to the House Committee on Natural Resources and Senate Committee on Energy and Natural Resources describing the conditions that led to the level of debt per capita, how the actions of the territorial government improved or impaired the territory's financial conditions, and recommendations that could be taken by Congress or the Administration to avert future indebtedness of territories and states, while respecting sovereignty and constitutional parameters.

53

TITLE V—PUERTO RICO INFRASTRUCTURE REVITALIZATION

*Section 501. Definitions*

This section provides the definitions to commonly used phrases and words throughout Title V, including a reference to the statutory authority (Act 76) within Puerto Rico on which Title V is premised.

*Section 502. Position of Revitalization Coordinator*

This section establishes a Revitalization Coordinator under the Oversight Board to carry out the purposes of this Title, and the process for appointing the Revitalization Coordinator. The position will expire upon the termination of the Oversight Board.

*Section 503. Critical Projects*

This section outlines the criteria and process for a project to be designated as a Critical Project. To be considered as a Critical Project, a project proponent must apply to the Revitalization Coordinator and outline the impact the project will have on addressing infrastructure needs, the availability of private capital, economic benefits provided by the project, the status of the project (if it is ongoing), and additional criteria the Revitalization Coordinator may require. Furthermore, if the project is an energy project, the proponent may be required to submit additional information, such as how the project will help decrease the cost of electricity. If the project adversely impairs Puerto Rico's established land use plans, or an approved integrated resources plan, then such project will be ineligible for Critical Project designation.

In determining whether a project should be classified as a Critical Project, the Revitalization Coordinator must consider both recommendations from the Governor and comments from Puerto Rico's residents.

Additionally, this section outlines the process for Puerto Rico agencies to establish an expedited permitting process pursuant to Puerto Rico's Act 76–2000 (Act 76). If an agency fails to have such a process, then one will be established for it by the Revitalization Coordinator and Governor.

Finally, this section dictates that once a project is deemed a Critical Project, it gains the expedited permitting and review process of Act 76.

The Committee does not intend for projects that are not approved to be Critical Projects or that are deemed to be ineligible for Critical Project designation to be precluded from reapplying for Critical Project designation. If a project receives an adverse ruling, the Committee would encourage the project proponent to amend his or her proposal, and resubmit it for Critical Project designation.

*Section 504. Miscellaneous provisions*

This section prohibits Puerto Rico's Legislature and Governor from hindering the Act 76 process or any expedited permitting process authorized thereunder, and allows project proponents to petition the Oversight Board if the Revitalization Coordinator or Puerto Rico agencies are failing to expedite the project as envisioned by this Title. Furthermore, the section ensures Critical Projects approved prior to the termination of the Oversight Board

54

receive continued expedited service even after the termination of the Board.

### Section 505. Federal agency requirements

This section requires Federal agencies, at the request of the Revitalization Coordinator, to designate a point of contact within the Federal agency to serve as a liaison to the Revitalization Coordinator, and expedites to the greatest extent possible the completion of any required Federal action connected to a Critical Project.

### Section 506. Judicial review

This section expedites the judicial process for any claim brought under Title V, and requires any such claim to be filed within 30 days after the date of the decision or action giving rise to such claim. The District Court for the District of Puerto Rico has jurisdiction for claims brought under this title.

### Section 507. Savings clause

This section provides that nothing in this Title is intended to change or alter Federal requirements or laws.

#### TITLE VI—CREDITOR COLLECTIVE ACTION

### Section 601. Creditor collective action

This section establishes a voluntary process for debt restructuring by debtors and creditors in a territory or territorial instrumentality covered by this bill. The Oversight Board is required to divide the creditors of each debtor into pools based upon criteria such as whether the bonds are distinguished by governing priority or security arrangements, whether the bonds were issued with the full or good faith credit, or whether senior and subordinated bonds were issued, among other considerations. Each pool, as established by the Oversight Board in consultation with the issuer, is permitted to vote on a Qualifying Modification, which essentially is a plan to restructure the debt. In order for a Qualifying Modification to be binding, a two-thirds majority of the outstanding principal amount in each pool must vote to accept the proposal. Dissenting creditors within a pool can be ordered into the Qualifying Modification by a district court. All pools of a debtor must meet the voting threshold in order for a Qualifying Modification to be approved.

### Section 602. Applicable law

This section provides that United States law—and not international law or other foreign jurisdictional law—shall apply to Title VI.

#### TITLE VII—THE SENSE OF CONGRESS REGARDING PERMANENT, PRO-GROWTH FISCAL REFORMS

### Section 701. Sense of Congress regarding permanent, pro-growth fiscal reforms

This section recognizes that any solution to Puerto Rico's economic crisis should include lasting, pro-growth propositions, including those promoting free-flowing capital between the United States and its possessions.

55

COMMITTEE ACTION

H.R. 5278 was introduced on May 18, 2016, by Congressman Sean P. Duffy (R–WI). The bill was referred to the Committee on Natural Resources, and in addition to the Committees on the Judiciary, Education and the Workforce, and Small Business. On May 24, 2016, the Natural Resources Committee met to consider the bill. Congressman Garret Graves (R–LA) and Congressman Jared Polis (D–CO) offered amendment designated #1; it was adopted by voice vote. Congressman Garret Graves (R–LA) and Congressman Donald S. Beyer, Jr. (D–VA) offered amendment designated 046; it was adopted by voice vote. Congressman Jared Polis (D–CO) and Congressman Dan Benishek (R–MI) offered an amendment designated 173; it was adopted by voice vote. Chairman Rob Bishop (R–UT) offered an en bloc amendment designated #1; it was adopted by voice vote. Congressman Ruben Gallego (D–AZ) offered an amendment designated 046; it was adopted by voice vote. Congressman Ruben Gallego (D–AZ) offered an amendment designated 045; it was adopted by a roll call vote of 19 yeas to 18 nays, as follows:

56

**Committee on Natural Resources**
U.S. House of Representatives
114th Congress

Date: 05-25-16                                    Recorded Vote # 1

Meeting on / Amendment on: Gallego_045 Amendment to H.R. 5278 (Rep. Sean Duffy), "Puerto Rico Oversight, Management, and Economic Stability Act" (PROMESA)

| MEMBERS | Yes | No | Pres | MEMBERS | Yes | No | Pres |
|---|---|---|---|---|---|---|---|
| **Mr. Bishop, UT, Chairman** | X | | | **Mr. LaMalfa, CA** | | X | |
| *Mr.Grijalva, AZ, Ranking Member* | X | | | *Mrs. Dingell, MI* | X | | |
| **Mr. Young, AK** | | | | **Mr. Denham, CA** | | X | |
| *Mrs. Napolitano, CA* | | | | *Mr. Gallego, AZ* | X | | |
| **Mr. Gohmert, TX** | | X | | **Mr. Cook, CA** | | X | |
| *Mrs. Bordallo, Guam* | | | | *Mrs. Capps, CA* | X | | |
| **Mr. Lamborn, CO** | | X | | **Mr. Westerman, AR** | | X | |
| *Mr. Costa, CA* | | | | *Mr. Polis, CO* | X | | |
| **Mr. Wittman, VA** | | X | | **Mr. Graves, LA** | | X | |
| *Mr. Sablan, CNMI* | | | | *Mr. Clay, MO* | | | |
| **Mr. Fleming, LA** | | X | | **Mr. Newhouse, WA** | | X | |
| *Mrs. Tsongas, MA* | X | | | **Mr. Zinke, MT** | X | | |
| **Mr. McClintock, CA** | | X | | **Mr. Hice, GA** | | X | |
| *Mr. Pierluisi, Puerto Rico* | X | | | **Mrs. Radewagen, AS** | X | | |
| **Mr. Thompson, PA** | X | | | **Mr. MacArthur, NJ** | X | | |
| *Mr. Huffman, CA* | X | | | **Mr. Mooney, WV** | | | |
| **Mrs. Lummis, WY** | | X | | **Mr. Hardy, NV** | | X | |
| *Mr. Ruiz, CA* | X | | | **Mr. LaHood, IL** | | X | |
| **Mr. Benishek, MI** | X | | | | | | |
| *Mr. Lowenthal, CA* | X | | | | | | |
| **Mr. Duncan, SC** | | X | | | | | |
| *Mr. Cartwright, PA* | X | | | | | | |
| **Mr. Gosar, AZ** | | X | | | | | |
| *Mr. Beyer, VA* | X | | | | | | |
| **Mr. Labrador, ID** | | X | | | | | |
| *Mrs. Torres, CA* | X | | | **TOTALS** | 19 | 18 | |

57

Congressman Jody B. Hice (R–GA) offered an amendment designated 022; it was adopted by voice vote. Congressman Thomas MacArthur (R–NJ) offered an amendment designated 050REV; it was adopted by voice vote. Congresswoman Norma J. Torres (D–CA) offered an amendment designated 023; it fell on a point of order. Congressman Jared Polis (D–CO) offered an amendment designated 168; it fell on a point of order. Congressman Jared Polis (D–CO) offered an amendment designated 169; it fell on a point of order. Congressman Jared Polis (D–CO) offered an amendment designated 170; it fell on a point of order. Congressman John Fleming (R–LA) offered an amendment designated 076; it was not adopted by a roll call vote of 12 yeas to 26 nays, as follows:

58

**Committee on Natural Resources**
U.S. House of Representatives
114th Congress

Date: 05-25-16                    Recorded Vote # 2

Meeting on / Amendment on: Fleming_076 Amendment to H.R. 5278 (Rep. Sean Duffy), "Puerto Rico Oversight, Management, and Economic Stability Act" (PROMESA)

| MEMBERS | Yes | No | Pres | MEMBERS | Yes | No | Pres |
|---|---|---|---|---|---|---|---|
| **Mr. Bishop, UT, Chairman** | | X | | **Mr. LaMalfa, CA** | X | | |
| *Mr.Grijalva, AZ, Ranking Member* | | X | | *Mrs. Dingell, MI* | | X | |
| **Mr. Young, AK** | | | | **Mr. Denham, CA** | | X | |
| *Mrs. Napolitano, CA* | | | | *Mr. Gallego, AZ* | | X | |
| **Mr. Gohmert, TX** | X | | | **Mr. Cook, CA** | X | | |
| *Mrs. Bordallo, Guam* | | | | *Mrs. Capps, CA* | | X | |
| **Mr. Lamborn, CO** | X | | | **Mr. Westerman, AR** | | X | |
| *Mr. Costa, CA* | | X | | *Mr. Polis, CO* | | X | |
| **Mr. Wittman, VA** | X | | | **Mr. Graves, LA** | | X | |
| *Mr. Sablan, CNMI* | | | | *Mr. Clay, MO* | | X | |
| **Mr. Fleming, LA** | X | | | **Mr. Newhouse, WA** | | X | |
| *Mrs. Tsongas, MA* | | X | | **Mr. Zinke, MT** | | X | |
| **Mr. McClintock, CA** | X | | | **Mr. Hice, GA** | X | | |
| *Mr. Pierluisi, Puerto Rico* | | X | | **Mrs. Radewagen, AS** | | X | |
| **Mr. Thompson, PA** | | X | | **Mr. MacArthur, NJ** | | | |
| *Mr. Huffman, CA* | | X | | **Mr. Mooney, WV** | | | |
| **Mrs. Lummis, WY** | X | | | **Mr. Hardy, NV** | | X | |
| *Mr. Ruiz, CA* | | X | | **Mr. LaHood, IL** | X | | |
| **Mr. Benishek, MI** | | X | | | | | |
| *Mr. Lowenthal, CA* | | X | | | | | |
| **Mr. Duncan, SC** | X | | | | | | |
| *Mr. Cartwright, PA* | | X | | | | | |
| **Mr. Gosar, AZ** | X | | | | | | |
| *Mr. Beyer, VA* | | X | | | | | |
| **Mr. Labrador, ID** | | X | | | | | |
| *Mrs. Torres, CA* | | X | | **TOTALS** | 12 | 26 | |

59

Congressman John Fleming (R–LA) offered an amendment designated 079; it was not adopted by a roll call vote of 6 yeas to 33 nays, as follows:

60

**Committee on Natural Resources**
U.S. House of Representatives
114th Congress

Date:  05-25-16                                              Recorded Vote # 3

Meeting on / Amendment on: Fleming_079 Amendment to H.R. 5278 (Rep. Sean Duffy), "Puerto Rico Oversight,
Management, and Economic Stability Act" (PROMESA)

| MEMBERS | Yes | No | Pres | MEMBERS | Yes | No | Pres |
|---|---|---|---|---|---|---|---|
| **Mr. Bishop, UT, Chairman** | | X | | **Mr. LaMalfa, CA** | | X | |
| *Mr.Grijalva, AZ, Ranking Member* | | X | | *Mrs. Dingell, MI* | | X | |
| **Mr. Young, AK** | | X | | **Mr. Denham, CA** | | X | |
| *Mrs. Napolitano, CA* | | X | | *Mr. Gallego, AZ* | | X | |
| **Mr. Gohmert, TX** | X | | | **Mr. Cook, CA** | | X | |
| *Mrs. Bordallo, Guam* | | | | *Mrs. Capps, CA* | | X | |
| **Mr. Lamborn, CO** | X | | | **Mr. Westerman, AR** | | X | |
| *Mr. Costa, CA* | | X | | *Mr. Polis, CO* | | | |
| **Mr. Wittman, VA** | X | | | **Mr. Graves, LA** | | X | |
| *Mr. Sablan, CNMI* | | | | *Mr. Clay, MO* | | X | |
| **Mr. Fleming, LA** | X | | | **Mr. Newhouse, WA** | | X | |
| *Mrs. Tsongas, MA* | | X | | **Mr. Zinke, MT** | | X | |
| **Mr. McClintock, CA** | X | | | **Mr. Hice, GA** | | X | |
| *Mr. Pierluisi, Puerto Rico* | | X | | **Mrs. Radewagen, AS** | | X | |
| **Mr. Thompson, PA** | | X | | **Mr. MacArthur, NJ** | | X | |
| *Mr. Huffman, CA* | | X | | **Mr. Mooney, WV** | | | |
| **Mrs. Lummis, WY** | | X | | **Mr. Hardy, NV** | | | |
| *Mr. Ruiz, CA* | | X | | **Mr. LaHood, IL** | | X | |
| **Mr. Benishek, MI** | | X | | | | | |
| *Mr. Lowenthal, CA* | | X | | | | | |
| **Mr. Duncan, SC** | | X | | | | | |
| *Mr. Cartwright, PA* | | X | | | | | |
| **Mr. Gosar, AZ** | X | | | | | | |
| *Mr. Beyer, VA* | | X | | | | | |
| **Mr. Labrador, ID** | | X | | | | | |
| *Mrs. Torres, CA* | | X | | **TOTALS** | 6 | 33 | |

61

Congressman Ryan K. Zinke (R–MT) offered an amendment designated #1; it was adopted by voice vote. Congressman John Fleming (R–LA) offered an amendment designated 091; it was not adopted by voice vote. Congressman Garret Graves (R–LA) offered an amendment designated #2; it was adopted by voice vote. Congressman John Fleming (R–LA) offered an amendment designated 090; it was not adopted by a roll call vote of 5 yeas to 33 nays, as follows:

62

**Committee on Natural Resources**
U.S. House of Representatives
114th Congress

Date: 05-25-16                                     Recorded Vote # 4

Meeting on / Amendment on: Fleming_090 Amendment to H.R. 5278 (Rep. Sean Duffy), "Puerto Rico Oversight, Management, and Economic Stability Act" (PROMESA)

| MEMBERS | Yes | No | Pres | MEMBERS | Yes | No | Pres |
|---|---|---|---|---|---|---|---|
| **Mr. Bishop, UT, Chairman** | | X | | **Mr. LaMalfa, CA** | | X | |
| *Mr.Grijalva, AZ, Ranking Member* | | X | | *Mrs. Dingell, MI* | | X | |
| **Mr. Young, AK** | | X | | **Mr. Denham, CA** | | X | |
| *Mrs. Napolitano, CA* | | X | | *Mr. Gallego, AZ* | | X | |
| **Mr. Gohmert, TX** | X | | | **Mr. Cook, CA** | | X | |
| *Mrs. Bordallo, Guam* | | X | | *Mrs. Capps, CA* | | X | |
| **Mr. Lamborn, CO** | X | | | **Mr. Westerman, AR** | | X | |
| *Mr. Costa, CA* | | X | | *Mr. Polis, CO* | | X | |
| **Mr. Wittman, VA** | X | | | **Mr. Graves, LA** | | | |
| *Mr. Sablan, CNMI* | | | | *Mr. Clay, MO* | | X | |
| **Mr. Fleming, LA** | X | | | **Mr. Newhouse, WA** | | X | |
| *Mrs. Tsongas, MA* | | X | | **Mr. Zinke, MT** | | X | |
| **Mr. McClintock, CA** | X | | | **Mr. Hice, GA** | | X | |
| *Mr. Pierluisi, Puerto Rico* | | X | | **Mrs. Radewagen, AS** | | X | |
| **Mr. Thompson, PA** | | X | | **Mr. MacArthur, NJ** | | X | |
| *Mr. Huffman, CA* | | | | **Mr. Mooney, WV** | | | |
| **Mrs. Lummis, WY** | | X | | **Mr. Hardy, NV** | | X | |
| *Mr. Ruiz, CA* | | X | | **Mr. LaHood, IL** | | X | |
| **Mr. Benishek, MI** | | X | | | | | |
| *Mr. Lowenthal, CA* | | X | | | | | |
| **Mr. Duncan, SC** | | X | | | | | |
| *Mr. Cartwright, PA* | | X | | | | | |
| **Mr. Gosar, AZ** | | X | | | | | |
| *Mr. Beyer, VA* | | X | | | | | |
| **Mr. Labrador, ID** | | X | | | | | |
| *Mrs. Torres, CA* | | X | | **TOTALS** | 5 | 33 | |

63

Congressman Thomas MacArthur (R–NJ) offered and withdrew an amendment designated 055. Congressman Tom McClintock (R–CA) offered an amendment designated 094; it was not adopted by a roll call vote of 12 yeas to 27 nays, as follows:

64

**Committee on Natural Resources**
U.S. House of Representatives
114th Congress

Date: 05-25-16                                    Recorded Vote # 5

Meeting on / Amendment on: McClintock_094 Amendment to H.R. 5278 (Rep. Sean Duffy), "Puerto Rico Oversight, Management, and Economic Stability Act" (PROMESA)

| MEMBERS | Yes | No | Pres | MEMBERS | Yes | No | Pres |
|---|---|---|---|---|---|---|---|
| **Mr. Bishop, UT, Chairman** | | X | | **Mr. LaMalfa, CA** | X | | |
| *Mr.Grijalva, AZ, Ranking Member* | | X | | *Mrs. Dingell, MI* | | X | |
| **Mr. Young, AK** | | X | | **Mr. Denham, CA** | | | |
| *Mrs. Napolitano, CA* | | X | | *Mr. Gallego, AZ* | | X | |
| **Mr. Gohmert, TX** | X | | | **Mr. Cook, CA** | X | | |
| *Mrs. Bordallo, Guam* | | | | *Mrs. Capps, CA* | | X | |
| **Mr. Lamborn, CO** | X | | | **Mr. Westerman, AR** | X | | |
| *Mr. Costa, CA* | | X | | *Mr. Polis, CO* | | X | |
| **Mr. Wittman, VA** | X | | | **Mr. Graves, LA** | | X | |
| *Mr. Sablan, CNMI* | | | | *Mr. Clay, MO* | | X | |
| **Mr. Fleming, LA** | X | | | **Mr. Newhouse, WA** | X | | |
| *Mrs. Tsongas, MA* | | X | | **Mr. Zinke, MT** | | X | |
| **Mr. McClintock, CA** | X | | | **Mr. Hice, GA** | X | | |
| *Mr. Pierluisi, Puerto Rico* | | X | | **Mrs. Radewagen, AS** | | X | |
| **Mr. Thompson, PA** | | X | | **Mr. MacArthur, NJ** | | X | |
| *Mr. Huffman, CA* | | X | | **Mr. Mooney, WV** | | | |
| **Mrs. Lummis, WY** | | X | | **Mr. Hardy, NV** | X | | |
| *Mr. Ruiz, CA* | | X | | **Mr. LaHood, IL** | X | | |
| **Mr. Benishek, MI** | | X | | | | | |
| *Mr. Lowenthal, CA* | | X | | | | | |
| **Mr. Duncan, SC** | | | | | | | |
| *Mr. Cartwright, PA* | | X | | | | | |
| **Mr. Gosar, AZ** | | X | | | | | |
| *Mr. Beyer, VA* | | X | | | | | |
| **Mr. Labrador, ID** | | X | | | | | |
| *Mrs. Torres, CA* | | X | | **TOTALS** | 12 | 27 | |

65

Congressman Raul R. Labrador (R–ID) offered and withdrew an amendment designated 043. Chairman Rob Bishop (R–UT) offered an amendment designated #2; it was adopted by voice vote. Congressman John Fleming (R–LA) offered an unnumbered amendment; it was not adopted by a roll call vote of 16 yeas to 23 nays, as follows:

66

**Committee on Natural Resources**
U.S. House of Representatives
114th Congress

Date:  05-25-16                                        Recorded Vote # 6

Meeting on / Amendment on: Fleming (unnumbered) Amendment to H.R. 5278 (Rep. Sean Duffy), "Puerto Rico Oversight, Management, and Economic Stability Act" (PROMESA)

| MEMBERS | Yes | No | Pres | MEMBERS | Yes | No | Pres |
|---|---|---|---|---|---|---|---|
| **Mr. Bishop, UT, Chairman** | | X | | **Mr. LaMalfa, CA** | X | | |
| *Mr. Grijalva, AZ, Ranking Member* | | X | | *Mrs. Dingell, MI* | | X | |
| **Mr. Young, AK** | | X | | **Mr. Denham, CA** | | X | |
| *Mrs. Napolitano, CA* | | X | | *Mr. Gallego, AZ* | | X | |
| **Mr. Gohmert, TX** | X | | | **Mr. Cook, CA** | | | |
| *Mrs. Bordallo, Guam* | | | | *Mrs. Capps, CA* | | X | |
| **Mr. Lamborn, CO** | X | | | **Mr. Westerman, AR** | X | | |
| *Mr. Costa, CA* | | X | | *Mr. Polis, CO* | | X | |
| **Mr. Wittman, VA** | X | | | **Mr. Graves, LA** | | X | |
| *Mr. Sablan, CNMI* | | | | *Mr. Clay, MO* | | X | |
| **Mr. Fleming, LA** | X | | | **Mr. Newhouse, WA** | X | | |
| *Mrs. Tsongas, MA* | | X | | **Mr. Zinke, MT** | | X | |
| **Mr. McClintock, CA** | X | | | **Mr. Hice, GA** | X | | |
| *Mr. Pierluisi, Puerto Rico* | | X | | **Mrs. Radewagen, AS** | | X | |
| **Mr. Thompson, PA** | X | | | **Mr. MacArthur, NJ** | | X | |
| *Mr. Huffman, CA* | | X | | **Mr. Mooney, WV** | | | |
| **Mrs. Lummis, WY** | X | | | **Mr. Hardy, NV** | X | | |
| *Mr. Ruiz, CA* | | X | | **Mr. LaHood, IL** | X | | |
| **Mr. Benishek, MI** | | X | | | | | |
| *Mr. Lowenthal, CA* | | X | | | | | |
| **Mr. Duncan, SC** | X | | | | | | |
| *Mr. Cartwright, PA* | | | | | | | |
| **Mr. Gosar, AZ** | X | | | | | | |
| *Mr. Beyer, VA* | | X | | | | | |
| **Mr. Labrador, ID** | X | | | | | | |
| *Mrs. Torres, CA* | | X | | **TOTALS** | 16 | 23 | |

67

Congressman John Fleming (R–LA) offered an amendment designated 080; it was not adopted by voice vote. Congressman John Fleming (R–LA) offered an amendment designated 092; it was not adopted by voice vote. Congressman John Fleming offered an amendment designated 093; it fell on a point of order. The bill, as amended, was ordered favorably reported to the House of Representatives by a roll call vote of 29 yeas, 10 nays and 1 present on May 25, 2016, as follows:

68

**Committee on Natural Resources**
U.S. House of Representatives
114th Congress

Date:  05-25-16                  Recorded Vote # 7

Meeting on / Amendment on: On Favorably reporting H.R. 5278 (Rep. Sean Duffy), "Puerto Rico Oversight,
Management, and Economic Stability Act" (PROMESA), as amended

| MEMBERS | Yes | No | Pres | MEMBERS | Yes | No | Pres |
|---|---|---|---|---|---|---|---|
| **Mr. Bishop, UT, Chairman** | X | | | **Mr. LaMalfa, CA** | | X | |
| *Mr. Grijalva, AZ, Ranking Member* | X | | | *Mrs. Dingell, MI* | X | | |
| **Mr. Young, AK** | X | | | **Mr. Denham, CA** | X | | |
| *Mrs. Napolitano, CA* | X | | | *Mr. Gallego, AZ* | X | | |
| **Mr. Gohmert, TX** | | X | | **Mr. Cook, CA** | | | |
| *Mrs. Bordallo, Guam* | | | | *Mrs. Capps, CA* | X | | |
| **Mr. Lamborn, CO** | | X | | **Mr. Westerman, AR** | X | | |
| *Mr. Costa, CA* | X | | | *Mr. Polis, CO* | X | | |
| **Mr. Wittman, VA** | | X | | **Mr. Graves, LA** | X | | |
| *Mr. Sablan, CNMI* | | | | *Mr. Clay, MO* | X | | |
| **Mr. Fleming, LA** | | X | | **Mr. Newhouse, WA** | | X | |
| *Mrs. Tsongas, MA* | X | | | **Mr. Zinke, MT** | X | | |
| **Mr. McClintock, CA** | | X | | **Mr. Hice, GA** | X | | |
| *Mr. Pierluisi, Puerto Rico* | X | | | **Mrs. Radewagen, AS** | X | | |
| **Mr. Thompson, PA** | X | | | **Mr. MacArthur, NJ** | X | | |
| *Mr. Huffman, CA* | X | | | **Mr. Mooney, WV** | | | |
| **Mrs. Lummis, WY** | X | | | **Mr. Hardy, NV** | | X | |
| *Mr. Ruiz, CA* | X | | | **Mr. LaHood, IL** | X | | |
| **Mr. Benishek, MI** | X | | | | | | |
| *Mr. Lowenthal, CA* | X | | | | | | |
| **Mr. Duncan, SC** | | X | | | | | |
| *Mr. Cartwright, PA* | X | | | | | | |
| **Mr. Gosar, AZ** | | X | | | | | |
| *Mr. Beyer, VA* | X | | | | | | |
| **Mr. Labrador, ID** | X | | | | | | |
| *Mrs. Torres, CA* | | | X | **TOTALS** | 29 | 10 | 1 |

69

COMMITTEE OVERSIGHT FINDINGS AND RECOMMENDATIONS

Regarding clause 2(b)(1) of rule X and clause 3(c)(1) of rule XIII of the Rules of the House of Representatives, the Committee on Natural Resources' oversight findings and recommendations are reflected in the body of this report.

COMPLIANCE WITH HOUSE RULE XIII

1. Cost of Legislation. Clause 3(d)(1) of rule XIII of the Rules of the House of Representatives requires an estimate and a comparison by the Committee of the costs which would be incurred in carrying out this bill. However, clause 3(d)(2)(B) of that rule provides that this requirement does not apply when the Committee has included in its report a timely submitted cost estimate of the bill prepared by the Director of the Congressional Budget Office under section 402 of the Congressional Budget Act of 1974. Under clause 3(c)(3) of rule XIII of the Rules of the House of Representatives and section 403 of the Congressional Budget Act of 1974, the Committee has received, and adopts as its own, the following cost estimate for this bill from the Director of the Congressional Budget Office:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, June 3, 2016.*

Hon. ROB BISHOP,
*Chairman, Committee on Natural Resources,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has prepared the enclosed cost estimate for H.R. 5278, the Puerto Rico Oversight, Management, and Economic Stability Act.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contacts are Megan Carroll and Matthew Pickford.

Sincerely,

KEITH HALL.

Enclosure.

*H.R. 5278—Puerto Rico Oversight, Management, and Economic Stability Act*

Summary: H.R. 5278 would create a legal framework for the federal government to oversee the fiscal and budgetary affairs of certain U.S. territories. In particular, the bill would outline procedures under which the governments of such territories and their instrumentalities could establish an oversight board and thus restructure their public debt. The bill would immediately establish such a board for the Commonwealth of Puerto Rico.

In CBO's view, and in keeping with guidance specified by the *1967 President's Commission on Budget Concepts*, a control board established under H.R. 5278 should be considered a federal entity largely because of the extent of federal control involved in its establishment and operations. Because it would be a federal entity, all cash flows related to the board's administrative costs should be recorded in the federal budget. On that basis, over the 2017–2026 period, CBO estimates that enacting H.R. 5278 would:

70

- Increase direct spending by $370 million for the board's administrative costs;
- Increase revenues—from amounts transferred to the oversight board by the government of Puerto Rico to cover the board's expenses—by $370 million; and
- Have no significant net effect on the federal deficit.

In addition, CBO estimates that completing various reports and administrative requirements specified by the bill would cost about $1 million in 2017; such spending would be subject to the availability of appropriated funds.

Pay-as-you-go procedures apply because enacting the legislation would affect direct spending and revenues. CBO estimates that enacting the legislation would not increase net direct spending or on-budget deficits in any of the four consecutive 10-year periods beginning in 2027.

H.R. 5278 contains intergovernmental and private-sector mandates as defined in the Unfunded Mandates Reform Act (UMRA). CBO estimates that the aggregate costs of the mandates on public entities would exceed the annual threshold established in UMRA for intergovernmental mandates ($77 million in 2016, adjusted annually for inflation). Because CBO is uncertain about how claims by creditors would be affected and the amount of losses that would occur as a result of the bill, CBO cannot determine whether the aggregate cost of the mandates on private entities would exceed the annual threshold established in UMRA for private-sector mandates ($154 million in 2016, adjusted annually for inflation).

Major provisions: Under the United States Constitution, the federal government retains sovereign authority to govern U.S. territories and insular areas. H.R. 5278 would create a legal framework for the federal government to establish oversight boards with broad authority to exercise control over the fiscal and budgetary affairs of U.S. territories.[1] The bill also would outline procedures under which territorial governments could restructure public debt, subject to the approval of any such oversight boards established on their behalf.

In general, oversight boards would be established only at the request of territorial governments; however, H.R. 5278 would automatically establish an oversight board for the Commonwealth of Puerto Rico, which currently faces a financial crisis. It has already failed to make scheduled payments to service the territory's outstanding public debt—which currently totals more than $70 billion—and further defaults are widely viewed as inevitable.[2]

To help Puerto Rico address its mounting financial difficulties, the bill would establish a seven-member Financial Oversight and Management Board (hereafter, the board) that would assume control over fiscal and budgetary decisions of the Puerto Rican government, including its municipalities, agencies, and public corporations (hereafter, instrumentalities). The President would appoint all seven members of the board, six of whom would be chosen among individuals recommended by Congressional leaders. The

---

[1] Such territories include Puerto Rico, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and the U.S. Virgin Islands.
[2] D. Andrew Austin, *Puerto Rico's Current Fiscal Challenges*, Report for Congress R44095 (Congressional Research Service, May 2, 2016).

71

Governor of Puerto Rico (or a designee) would serve on the board as an ex officio member without voting rights.

Under H.R. 5278, the board would:

• Ensure that fiscal plans and annual budgets developed by the governor and legislature of Puerto Rico and territorial instrumentalities meet certain accounting standards and fiscal requirements;

• Review and approve such fiscal plans and budgets (or, if necessary, develop alternative plans that meet all such standards and requirements);

• Monitor ongoing budget execution to identify any differences between projected and actual revenues and expenditures; and

• Determine whether any such differences require corrective actions, including potential reductions in certain nondebt expenditures, hiring freezes, or other measures to reduce expenditures.

To achieve those objectives, the bill would give the oversight board certain sovereign powers over the Puerto Rican government and its instrumentalities. In particular, the bill would authorize the board to require the Puerto Rican government to provide the board with a dedicated source of funding, not subject to further legislative action, to cover its expenses. In addition, the board could issue subpoenas, obtain any necessary information and data from agencies and entities of the United States or Puerto Rico, and initiate civil actions in U.S. courts to enforce its authority. The board could enforce laws of Puerto Rico that prohibit employees of the territorial government and its instrumentalities from participating in a strike or lockout and, if necessary, effectively nullify any new laws or policies adopted by Puerto Rico that did not conform to requirements specified in the bill.

A variety of provisions of H.R. 5278 would establish the legal framework for restructuring public debt issued by Puerto Rico and its instrumentalities. The bill would prohibit Puerto Rico from issuing any new debt without the board's approval and would grant the board the sole authority to approve agreements to restructure existing public debt. (The bill specifies requirements that would pertain to any debt restructuring agreements negotiated prior to the bill's enactment.) Title III of the legislation would outline procedures—enforceable in U.S. courts—for such debt restructuring. The control board would represent Puerto Rico and its instrumentalities in all such proceedings. Upon enactment, H.R. 5278 would establish a stay on judicial or administrative proceedings against Puerto Rico (or a territorial instrumentality) related to existing debts. Finally, title VI would establish a process for creditors to pursue collective actions related to proposals to restructure some types of debt.

Once established, the control board would continue to operate until it certified that the government of Puerto Rico had, for at least four consecutive fiscal years, developed and adhered to budgets that met the bill's requirements, and that the territorial government had sufficient access to credit markets at reasonable rates.

Finally, HR. 5278 contains a variety of other provisions that would:

72

- Affirm Puerto Rico's right to determine its future political status with respect to the United States;
- Modify the minimum wage for most Puerto Rican workers under age 25;
- Require the Government Accountability Office to prepare a report on implementation in Puerto Rico of certain programs of the Small Business Administration;
- Establish a Congressional task force to recommend changes to federal laws and activities that would support economic growth in Puerto Rico; and
- Specify procedures aimed at accelerating review and permitting, by Puerto Rican and U.S. government agencies, of specific types of infrastructure projects.

Budgetary treatment: Cash flows of the government of Puerto Rico and its instrumentalities currently are excluded from the federal budget. In CBO's view, enacting H.R. 5278 would not change that general budgetary treatment; under the bill, overall net costs related to Puerto Rico's ongoing operations—including those stemming from decisions made by the control board established under the bill—would remain separate from the federal budget.

H.R. 5278 would specify that the proposed control board should not be considered part of the U.S. federal government; however, in CBO's view the activities of such boards should be considered federal activities, consistent with principles specified by the *1967 President's Commission on Budget Concepts*. Although the report issued by that commission has no legal status, it remains the primary authoritative statement on the scope of the federal budget. The commission recommended that, "the budget should, as a general rule, be comprehensive of the full range of federal activities. Borderline agencies and transactions should be included . . . unless there are exceptionally persuasive reasons for exclusion."[3] Thus, CBO believes the control board should be included in the budget because of the significant degree of federal control involved in its establishment and operations. In particular:

- The authority to establish the oversight board derives from the federal government's constitutional power to *"make all needful rules and regulations"* regarding U.S. territories;[4]
- The President would appoint all seven voting members of the board; and
- The board would have broad sovereign powers to effectively overrule decisions by Puerto Rico's legislature, governor, and other public authorities.

As a result, in CBO's view, all cash flows related to the oversight board established for Puerto Rico under H.R. 5278 should be recorded in the federal budget. More specifically, amounts provided by Puerto Rico to fund the board's operations should be recorded in the federal budget as revenues, and subsequent expenditures should be recorded as federal direct spending because they would not be contingent on further legislation.

Estimated cost to the Federal Government: The estimated budgetary effect of H.R. 5278 is shown in the following table. The costs

---

[3] President's Commission on Budget Concepts, *Report of the President's Commission on Budget Concepts* (October 1967), p.25.

[4] Art. IV, sec. 3, cl. 2 of the U.S. Constitution.

73

of this legislation fall within budget function 800 (general government).

| | By fiscal year, in millions of dollars— | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2017–2021 | 2017–2026 |
| INCREASES IN DIRECT SPENDING | | | | | | | | | | | | |
| Estimated Budget Authority | 200 | 150 | 5 | 5 | 5 | 5 | 0 | 0 | 0 | 0 | 365 | 370 |
| Estimated Outlays .............. | 200 | 150 | 5 | 5 | 5 | 5 | 0 | 0 | 0 | 0 | 365 | 370 |
| INCREASES IN REVENUES | | | | | | | | | | | | |
| Estimated Revenues .......... | 200 | 150 | 5 | 5 | 5 | 5 | 0 | 0 | 0 | 0 | 365 | 370 |
| NET CHANGE IN THE DEFICIT | | | | | | | | | | | | |
| Impact on Deficit ................ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Note: Implementing the bill also would increase discretionary costs by $1 million in 2017 and by less than $500,000 in subsequent years.

Basis of estimate: For this estimate, CBO assumes that H.R. 5278 will be enacted before the end of fiscal year 2016. The bill would authorize the oversight board to require the government of Puerto Rico government to establish a dedicated source of funding to fully cover anticipated direct spending for the board's expenses. Under H.R. 5278, such amounts—which would be considered revenues—would be transferred to the board and would remain available, without further appropriation, for the board's ongoing operating costs.

For this analysis, CBO examined the administrative costs—particularly for legal and financial expertise required to oversee procedures related to bankruptcy and debt restructuring—incurred by institutions involved in resolving financial crises faced by U.S. municipalities, including Detroit, Philadelphia, New York City, and the District of Columbia. For example, according to media reports the city of Detroit spent more than $170 million over a period of about 18 months for the services of legal and financial firms to manage bankruptcy proceedings related to that city's $18 billion in public debt. Other major bankruptcy cases in the private sector have involved administrative costs that have totaled hundreds of millions of dollars over a few years.

According to a 2015 report by Bloomberg news service, Puerto Rico and the Puerto Rico Electric Power Authority—a public corporation that serves as the territory's primary electric utility—have already spent more than $60 million for legal and financial advisory services to explore options for restructuring more than $70 billion in existing public debt. In addition, officials of the government of Puerto Rico indicated to CBO that they anticipate spending around $75 million in 2017 for ongoing legal and financial services related to restructuring the government's debt.

Based on those previous costs for restricting government debt, as well as information from the Department of the Treasury about the likely costs to operate the Puerto Rican oversight board, CBO expects that the board would spend roughly twice as much as the city of Detroit over the next two years to restructure the territory's debt and to prepare balanced budgets. CBO estimates that the board's activities would increase direct spending by $370 million over the 2017–2022 period. Most of that increase—$350 million—would occur within the first two years and would primarily cover fees of

74

legal and financial consultants hired to restructure Puerto Rico's debt. After that restructuring was achieved, CBO estimates the board would spend $5 million annually to help the Puerto Rican government prepare and execute balanced budgets for the next four consecutive years as required by the bill—or through fiscal year 2022. For this estimate, CBO assumes that after the debt is restructured Puerto Rico would be able to meet the requirement of having balanced budgets for four consecutive years; however, if Puerto Rico could not meet that requirement, or if the board considered Puerto Rico's access to capital markets to be insufficient to meet the country's needs, the board would continue to operate after 2022. This estimate does not include any additional budgetary effects that could occur under the bill if other U.S. territories requested to have similar boards established on their behalf.

The estimated increase in direct spending under H.R. 5278 would be fully offset by increased revenues from transfers of cash from Puerto Rico, which CBO estimates would total $370 million over the 2017–2022 period. Under the bill, the Puerto Rican government would be required to provide such amounts to the oversight board. (That requirement is an intergovernmental mandate and is discussed in more detail in the section entitled Intergovernmental and Private-Sector Impact.) For this estimate, CBO assumes that amounts necessary to cover the oversight board's expenses would be transferred to the board as needed to pay expenses.

Finally, CBO estimates that establishing a Congressional task force to address economic issues in Puerto Rico and completing various reports and administrative tasks would increase federal costs. Based on information about the cost of similar activities, CBO estimates such costs would total $1 million in 2017 and less than $500,000 annually thereafter; such spending would be subject to the availability of appropriated funds.

Pay-As-You-Go considerations: The Statutory Pay-As-You-Go Act of 2010 establishes budget-reporting and enforcement procedures for legislation affecting direct spending or revenues. The net changes in outlays and revenues that are subject to those pay-as-you-go procedures are shown in the following table.

CBO ESTIMATE OF PAY-AS-YOU-GO EFFECTS FOR H.R. 5278, AS ORDERED REPORTED BY THE HOUSE COMMITTEE ON NATURAL RESOURCES ON MAY 25, 2016

| | By fiscal year, in millions of dollars— | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2016–2021 | 2016–2026 |
| NET CHANGE IN THE DEFICIT | | | | | | | | | | | | | |
| Statutory Pay-As-You-Go Impact | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Memorandum: | | | | | | | | | | | | | |
| Changes in Outlays ........... | 0 | 200 | 150 | 5 | 5 | 5 | 5 | 0 | 0 | 0 | 0 | 365 | 370 |
| Changes in Revenues ........ | 0 | 200 | 150 | 5 | 5 | 5 | 5 | 0 | 0 | 0 | 0 | 365 | 370 |

Increase in long-term direct spending and deficits: CBO estimates that enacting the legislation would not increase net direct spending or on-budget deficits in any of the four consecutive 10-year periods beginning in 2027.

Intergovernmental and private-sector impact: H.R. 5278 contains intergovernmental and private-sector mandates as defined in UMRA. CBO estimates that the aggregate costs of the mandates on

75

public entities would exceed the annual threshold established in UMRA for intergovernmental mandates ($77 million in 2016, adjusted annually for inflation). Because CBO is uncertain about how claims by creditors would be affected and the amount of losses that would occur as a result of the bill, CBO cannot determine whether the aggregate cost of the mandates on private entities would exceed the annual threshold established in UMRA for private-sector mandates ($154 million in 2016, adjusted annually for inflation).

*Mandates that apply to public entities*

The bill would impose a number of mandates on the territorial government of Puerto Rico and its instrumentalities. Those instrumentalities include 78 municipalities, the Government Development Bank for Puerto Rico, public utilities and corporations, and other public entities within the territory.

Oversight board and administrative costs. The bill would create a framework for the federal government to oversee the fiscal affairs of the territory and would require the territorial government and its instrumentalities to comply with the directives and processes instituted by the board. The board would have the power to oversee and direct most of the budgetary activities of the territorial government and its instrumentalities. Government agencies and other public entities would be required to:

• Develop and submit fiscal plans, budgets, certifications, and other budgetary analyses;
• Provide the board with direct access to written and electronic records, documents, information, and data;
• Undertake reforms within their organizations, including reductions in spending and staff, necessary to achieve the goals of fiscal plans and budgets approved for the territory and instrumentalities; and
• Enforce laws necessary for the board to carry out its oversight activities;

According to officials in the territorial government, many government agencies and other public entities would have to hire additional personnel, particularly those with financial expertise, in order to comply with directives, information requests, and audits from the board. In some cases the territorial governments might be able to draw upon existing resources to fulfill some of those requirements, but the scope of activity for governmental agencies will expand significantly as the new directives from the oversight board are fulfilled and restructuring plans are implemented. Although the magnitude of those costs is uncertain, CBO estimates that public entities would spend several hundred million dollars over the next several years to comply with the board's requirements and to implement new fiscal plans. CBO expects that most of those costs would be incurred in the first few years after enactment of the legislation, when the board would be active.

The bill also would require the government of Puerto Rico to pay for the costs of the board's operations and activities. CBO estimates that the board's operations would cost $370 million over the 2017–2022 period, with most of those costs occurring in the first few years.

Preemption of territorial and local laws. The bill contains several preemptions of territorial and local authority. Because preemptions

76

limit the authority of territorial and local governments, they are intergovernmental mandates as defined in UMRA. Among those preemptions,

• Section 4 of the bill would broadly preempt any general or specific law or regulation of the territory or its instrumentalities that is inconsistent with the legislation;

• Section 105 would exempt the board and its employees from liability for any claim brought against them resulting from actions taken to carry out the legislation; and

• Section 504 would preempt territorial and local laws governing permitting for infrastructure projects by creating a fast-track authority for critical projects.

Infrastructure. The bill would authorize an expedited approval process for critical infrastructure projects and would require the governor of Puerto Rico to appoint a revitalization coordinator, who would serve under the board, to coordinate critical infrastructure projects for the territory.

The bill would require territorial and local agencies that oversee permits to operate as if the governor had declared a state of emergency. Under Puerto Rican law, projects undertaken pursuant to an emergency order are exempt from the requirements of various Puerto Rican laws governing environmental reviews and administrative proceedings for projects. As part of that process, the bill would prohibit territorial and local agencies from requiring any permit, certificate, right-of-way, lease or other authorization from including a term or condition if the coordinator determines that it would impair the approval of those projects.

The expedited approval process could result in a loss of revenue from permits and fees for government agencies; however, because of the low cost of permits and limited number of projects that would be fast-tracked under this process, CBO estimates that the amount of forgone revenue would be small.

*Other effects on public entities*

The bill would provide benefits to the government of Puerto Rico and its instrumentalities by authorizing the rights and procedures under U.S. bankruptcy laws to be applied to those public entities. In the aggregate, territorial and local governments, as well as other public entities in Puerto Rico, owe more than $70 billion to creditors. By providing access to U.S. bankruptcy laws, the bill would allow those entities to restructure or possibly reduce their outstanding debt.

*Mandates that apply to both public and private entities*

The bill would impose mandates on public and private creditors that own Puerto Rican debt in two ways:

• By imposing a temporary stay on litigation relating to defaults by Puerto Rico while the board develops its bylaws and procedures, the bill would limit the ability of those entities to file claims in court or receive compensation for existing claims related to the recovery of their assets.

• By requiring creditors that are placed into specific debt pools to accept modifications to debt, The bill could affect public or private creditors in a number of ways, causing savings for some and losses for others. The amount recovered by a

creditor through the procedures established in the bill and the timing of payments to creditors relative to what would happen in the absence of the bill would depend on several factors. Those factors would include market conditions and decisions by the courts and the oversight board.

Because of uncertainty about the number of creditors that would have their debt restructured, the scope of that debt, and changes to debt obligations, CBO has no basis for estimating either the overall direction or magnitude of those effects on public or private entities.

Estimate prepared by: Federal Costs: Megan Carroll and Matthew Pickford; Impact on State, Local, and Tribal Governments: Jon Sperl; Impact on the Private Sector: Paige Piper/Bach.

Estimate approved by: H. Samuel Papenfuss, Deputy Assistant Director for Budget Analysis.

2. Section 308(a) of Congressional Budget Act. Clause 3(c)(2) of rule XIII of the Rules of the House of Representatives requires each committee report that accompanies a measure providing new budget authority, spending authority, or new credit authority or changing revenues or tax expenditures to contain a cost estimate, as required by section 308(a) of the Congressional Budget Act of 1974, as amended, and when practicable with respect to estimates of new budget authority, a comparison of the total estimated funding level for the relevant program (or programs) to the appropriate levels under current law. The Congressional Budget Office has concluded that enacting H.R. 5278 will have "no significant net effect on the federal deficit" and that various reports and administrative requirements would cost about $1 million 2017, subject to the availability of appropriated funds.

3. General Performance Goals and Objectives. As required by clause 3(c)(4) of rule XIII, the general performance goal or objective of this bill is to establish an Oversight Board to assist the Government of Puerto Rico, including instrumentalities, in managing its public finances.

### EARMARK STATEMENT

This bill does not contain any Congressional earmarks, limited tax benefits, or limited tariff benefits as defined under clause 9(e), 9(f), and 9(g) of rule XXI of the Rules of the House of Representatives.

### COMPLIANCE WITH PUBLIC LAW 104–4

The Committee on Natural Resources adopts as its own the estimate of Federal mandates prepared by the Director of the Congressional Budget Office pursuant to section 423 of the Unfunded Mandates Reform Act.

### COMPLIANCE WITH H. RES. 5

Directed Rule Making. The Chairman believes that this bill does not require any Federal agency to conduct rule-making proceedings.

Duplication of Existing Programs. This bill does not establish or reauthorize a program of the Federal government known to be duplicative of another program. Such program was not included in

78

any report from the Government Accountability Office to Congress pursuant to section 21 of Public Law 111–139 or identified in the most recent Catalog of Federal Domestic Assistance published pursuant to the Federal Program Information Act (Public Law 95–220, as amended by Public Law 98–169) as relating to other programs.

### PREEMPTION OF STATE, LOCAL OR TRIBAL LAW

This bill would preempt any inconsistent State or territory law. The bill would not preempt any tribal law.

### CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3(e) of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, and existing law in which no change is proposed is shown in roman):

## FAIR LABOR STANDARDS ACT OF 1938

\*       \*       \*       \*       \*       \*       \*

### MINIMUM WAGES

SEC. 6. (a) Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:

(1) except as otherwise provided in this section, not less than—

(A) $5.85 an hour, beginning on the 60th day after the date of enactment of the Fair Minimum Wage Act of 2007;

(B) $6.55 an hour, beginning 12 months after that 60th day; and

(C) $7.25 an hour, beginning 24 months after that 60th day;

(2) if such employee is a home worker in Puerto Rico or the Virgin Islands, not less than the minimum piece rate prescribed by regulation or order; or, if no such minimum piece rate is in effect, any piece rate adopted by such employer which shall yield, to the proportion or class of employees prescribed by regulation or order, not less than the applicable minimum hourly wage rate. Such minimum piece rates or employer piece rates shall be commensurate with, and shall be paid in lieu of, the minimum hourly wage rate applicable under the provisions of this section. The Secretary of Labor, or his authorized representative, shall have power to make such regulations or orders as are necessary or appropriate to carry out any of the provisions of this paragraph, including the power without limiting the generality of the foregoing, to define any operation or occupation which is performed by such home work employees in Puerto Rico or the Virgin Islands; to establish minimum piece rates for any operation or occupation so defined; to prescribe the method and procedure for

79

ascertaining and promulgating minimum piece rates; to prescribe standards for employer piece rates, including the proportion or class of employees who shall receive not less than the minimum hourly wage rate; to define the term "home worker"; and to prescribe the conditions under which employers, agents, contractors, and subcontractors shall cause goods to be produced by home workers;

(3) if such employee is employed as a seaman on an American vessel, not less than the rate which will provide to the employee, for the period covered by the wage payment, wages equal to compensation at the hourly rate prescribed by paragraph (1) of this subsection for all hours during such period when he was actually on duty (including periods aboard ship when the employee was on watch or was, at the direction of a superior officer, performing work or standing by, but not including off-duty periods which are provided pursuant to the employment agreement); or

(4) if such employee is employed in agriculture, not less than the minimum wage rate in effect under paragraph (1) after December 31, 1977.

(b) Every employer shall pay to each of his employees (other than an employee to whom subsection (a)(5) applies) who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, and who in such workweek is brought within the purview of this section by the amendments made to this Act by the Fair Labor Standards Amendments of 1966, title IX of the Education Amendments of 1972, or the Fair Labor Standards Amendments of 1974, wages at the following rate: Effective after December 31, 1977, not less than the minimum wage rate in effect under subsection (a)(1).

(d)(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality or production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

(2) No labor organization, or its agents, representing employees of an employer having employees subject to any provisions of this section shall cause or attempt to cause such an employer to discriminate against an employee in violation of paragraph (1) of this subsection.

(3) For purposes of administration and enforcement, any amounts owing to any employees which have been withheld in violation of this subsection shall be deemed to be unpaid minimum wages or unpaid overtime-compensation under this Act.

80

(4) As used in this subsection, the term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

(e)(1) Notwithstanding the provisions of section 13 of this Act (except subsections (a)(1) and (f) thereof), every employer providing any contract services (other than linen supply services) under a contract with the United States or any subcontract thereunder shall pay to each of his employees whose rate of pay is not governed by the Service Contract Act of 1965 (41 U.S.C. 351–357) or to whom subsection (a)(1) of this section is not applicable, wages at rates not less than the rates provided for in subsection (b) of this section.

(2) Notwithstanding the provisions of section 13 of this Act (except subsections (a)(1) and (f) thereof) and the provisions of the Service Contract Act of 1965, every employer in an establishment providing linen supply services to the United States under a contract with the United States or any subcontract thereunder shall pay to each of his employees in such establishment wages at rates not less than those prescribed in subsection (b), except that if more than 50 per centum of the gross annual dollar volume of sales made or business done by such establishment is derived from providing such linen supply services under any such contracts or subcontracts, such employer shall pay to each of his employees in such establishment wages at rates not less than those prescribed in subsection (a)(1) of this section.

(f) Any employee—

(1) who in any workweek is employed in domestic service in a household shall be paid wages at a rate not less than the wage rate in effect under section 6(b) unless such employee's compensation for such service would not because of section 209(a)(6) of the Social Security Act constitute wages for the purpose of title II of such Act, or

(2) who in any workweek—

(A) is employed in domestic service in one or more households, and

(B) is so employed for more than 8 hours in the aggregate,

shall be paid wages for such employment in such workweek at a rate not less than the wage rate in effect under section 6(b).

(g)(1) In lieu of the rate prescribed by subsection (a)(1), any employer may pay any employee of such employer, during the first 90 consecutive calendar days after such employee is initially employed by such employer, a wage which is not less than $4.25 an hour.

〔(2) No employer may take any action to displace employees (including partial displacements such as reduction in hours, wages, or employment benefits) for purposes of hiring individuals at the wage authorized in paragraph (1).

〔(3) Any employer who violates this subsection shall be considered to have violated section 15(a)(3).

〔(4) This subsection shall only apply to an employee who has not attained the age of 20 years.〕

81

*(2) In lieu of the rate prescribed by subsection (a)(1), the Governor of Puerto Rico, subject to the approval of the Financial Oversight and Management Board established pursuant to section 101 of the Puerto Rico Oversight, Management, and Economic Stability Act, may designate a time period not to exceed four years during which employers in Puerto Rico may pay employees who are initially employed after the date of enactment of such Act a wage which is not less than the wage described in paragraph (1). Notwithstanding the time period designated, such wage shall not continue in effect after such Board terminates in accordance with section 209 of such Act.*

*(3) No employer may take any action to displace employees (including partial displacements such as reduction in hours, wages, or employment benefits) for purposes of hiring individuals at the wage authorized in paragraph (1) or (2).*

*(4) Any employer who violates this subsection shall be considered to have violated section 15(a)(3).*

*(5) This subsection shall only apply to an employee who has not attained the age of 20 years, except in the case of the wage applicable in Puerto Rico, 25 years, until such time as the Board described in paragraph (2) terminates in accordance with section 209 of the Act described in such paragraph.*

\*       \*       \*       \*       \*       \*       \*

----------

## SMALL BUSINESS ACT

\*       \*       \*       \*       \*       \*       \*

SEC. 15. (a) To effectuate the purposes of this Act, small-business concerns within the meaning of this Act shall receive any award or contract or any part thereof, and be awarded any contract for the sale of Government property, as to which it is determined by the Administration and the contracting procurement or disposal agency (1) to be in the interest of maintaining or mobilizing the Nation's full productive capacity, (2) to be in the interest of war or national defense programs, (3) to be in the interest of assuring that a fair proportion of the total purchases and contracts for property and services for the Government in each industry category are placed with small-business concerns, or (4) to be in the interest of assuring that a fair proportion of the total sales of Government property be made to small-business concerns; but nothing contained in this Act shall be construed to change any preferences or priorities established by law with respect to the sale of electrical power or other property by the Government or any agency thereof. These determinations may be made for individual awards or contracts or for classes of awards or contracts. If a proposed procurement includes in its statement of work goods or services currently being performed by a small business, and if the proposed procurement is in a quantity or estimated dollar value the magnitude of which renders small business prime contract participation unlikely, or if a proposed procurement for construction seeks to package or consolidate discrete construction projects, or the solicitation involves an unnecessary or unjustified bundling of contract requirements, as determined by the Administration, the Procurement Activity shall provide a copy of the proposed procurement to the Procurement Activity's Small Business Procurement Center Representative at least

82

30 days prior to the solicitation's issuance along with a statement explaining (1) why the proposed acquisition cannot be divided into reasonably small lots (not less than economic production runs) to permit offers on quantities less than the total requirement, (2) why delivery schedules cannot be established on a realistic basis that will encourage small business participation to the extent consistent with the actual requirements of the Government, (3) why the proposed acquisition cannot be offered so as to make small business participation likely, (4) why construction cannot be procured as separate discrete projects, or (5) why the agency has determined that the bundled contract (as defined in section 3(o)) is necessary and justified. The thirty-day notification process shall occur concurrently with other processing steps required prior to issuance of the solicitation. Within 15 days after receipt of the proposed procurement and accompanying statement, if the Procurement Center Representative believes that the procurement as proposed will render small business prime contract participation unlikely, the Representative shall recommend to the Procurement Activity alternative procurement methods which would increase small business prime contracting opportunities. Whenever the Administration and the contracting procurement agency fail to agree, the matter shall be submitted for determination to the Secretary or the head of the appropriate department or agency by the Administrator. For purposes of clause (3) of the first sentence of this subsection, an industry category is a discrete group of similar goods and services. Such groups shall be determined by the Administration in accordance with the definition of a "United States industry" under the North American Industry Classification System, as established by the Office of Management and Budget, except that the Administration shall limit such an industry category to a greater extent than provided under such classification codes if the Administration receives evidence indicating that further segmentation for purposes of this paragraph is warranted due to special capital equipment needs or special labor or geographic requirements or to recognize a new industry. A market for goods or services may not be segmented under the preceding sentence due to geographic requirements unless the Government typically designates the area where work for contracts for such goods or services is to be performed and Government purchases comprise the major portion of the entire domestic market for such goods or services and, due to the fixed location of facilities, high mobilization costs, or similar economic factors, it is unreasonable to expect competition from business concerns located outside of the general areas where such concerns are located. A contract may not be awarded under this subsection if the award of the contract would result in a cost to the awarding agency which exceeds a fair market price.

(b) With respect to any work to be performed the amount of which would exceed the maximum amount of any contract for which a surety may be guaranteed against loss under section 411 of the Small Business Investment Act of 1958 (15 U.S.C. 694(b)), the contracting procurement agency shall, to the extent practicable, place contracts so as to allow more than one small business concern to perform such work.

(c)(1) As used in this subsection:

83

(A) The term "Committee" means the Committee for Purchase from the Blind and Other Severely Handicapped established under the first section of the Act entitled "An Act to create a Committee on Purchases of Blind-made Products, and for other purposes", approved June 25, 1938 (41 U.S.C. 46).

(B) The term "public or private organization for the handicapped" has the same meaning given such term in section 3(e).

(C) The term "handicapped individual" has the same meaning given such term in section 3(f).

(2)(A) During fiscal year 1995, public or private organizations for the handicapped shall be eligible to participate in programs authorized under this section in an aggregate amount not to exceed $40,000,000.

(B) None of the amounts authorized for participation by subparagraph (A) may be placed on the procurement list maintained by the Committee pursuant to section 2 of the Act entitled "An Act to create a Committee on Purchases of Blind-made Products, and for other purposes", approved June 25, 1938 (41 U.S.C. 47).

(3) The Administrator shall monitor and evaluate such participation.

(4)(A) Not later than ten days after the announcement of a proposed award of a contract by an agency or department to a public or private organization for the handicapped, a for-profit small business concern that has experienced or is likely to experience severe economic injury as the result of the proposed award may file an appeal of the proposed award with the Administrator.

(B) If such a concern files an appeal of a proposed award under subparagraph (A) and the Administrator, after consultation with the Executive Director of the Committee, finds that the concern has experienced or is likely to experience severe economic injury as the result of the proposed award, not later than thirty days after the filing of the appeal, the Administration shall require each agency and department having procurement powers to take such action as may be appropriate to alleviate economic injury sustained or likely to be sustained by the concern.

(5) Each agency and department having procurement powers shall report to the Office of Federal Procurement Policy each time a contract subject to paragraph (2)(A) is entered into, and shall include in its report the amount of the next higher bid submitted by a for-profit small business concern. The Office of Federal Procurement Policy shall collect data reported under the preceding sentence through the Federal procurement data system and shall report to the Administration which shall notify all such agencies and departments when the maximum amount of awards authorized under paragraph (2)(A) has been made during any fiscal year.

(6) For the purpose of this subsection, a contract may be awarded only if at least 75 per centum of the direct labor performed on each item being produced under the contract in the sheltered workshop or performed in providing each type of service under the contract by the sheltered workshop is performed by handicapped individuals.

(7) Agencies awarding one or more contracts to such an organization pursuant to the provisions of this subsection may use multiyear contracts, if appropriate.

84

(d) For purposes of this section priority shall be given to the awarding of contracts and the placement of subcontracts to small business concerns which shall perform a substantial proportion of the production on those contracts and subcontracts within areas of concentrated unemployment or underemployment or within labor surplus areas. Notwithstanding any other provison of law, total labor surplus area set-asides pursuant to Defense Manpower Policy Number 4 (32A C.F.R. Chapter 1) or any successor policy shall be authorized if the Secretary or his designee specifically determines that there is a reasonable expectation that offers will be obtained from a sufficient number of eligible concerns so that awards will be made at reasonable prices. As soon as practicable and to the extent possible, in determining labor surplus areas, consideration shall be given to those persons who would be available for employment were suitable employment available. Until such definition reflects such number, the present criteria of such policy shall govern.

(e) PROCUREMENT STRATEGIES; CONTRACT BUNDLING.—

(1) IN GENERAL.— To the maximum extent practicable, procurement strategies used by a Federal department or agency having contracting authority shall facilitate the maximum participation of small business concerns as prime contractors, subcontractors, and suppliers, and each such Federal department or agency shall—

(A) provide opportunities for the participation of small business concerns during acquisition planning processes and in acquisition plans; and

(B) invite the participation of the appropriate Director of Small and Disadvantaged Business Utilization in acquisition planning processes and provide that Director access to acquisition plans.

(2) MARKET RESEARCH.—

(A) IN GENERAL.— Before proceeding with an acquisition strategy that could lead to a contract containing consolidated procurement requirements, the head of an agency shall conduct market research to determine whether consolidation of the requirements is necessary and justified.

(B) FACTORS.— For purposes of subparagraph (A), consolidation of the requirements may be determined as being necessary and justified if, as compared to the benefits that would be derived from contracting to meet those requirements if not consolidated, the Federal Government would derive from the consolidation measurably substantial benefits, including any combination of benefits that, in combination, are measurably substantial. Benefits described in the preceding sentence may include the following:

(i) Cost savings.
(ii) Quality improvements.
(iii) Reduction in acquisition cycle times.
(iv) Better terms and conditions.
(v) Any other benefits.

(C) REDUCTION OF COSTS NOT DETERMINATIVE.— The reduction of administrative or personnel costs alone shall not be a justification for bundling of contract requirements unless the cost savings are expected to be substantial in rela-

85

tion to the dollar value of the procurement requirements to be consolidated.

(3) STRATEGY SPECIFICATIONS.— If the head of a contracting agency determines that an acquisition plan for a procurement involves a substantial bundling of contract requirements, the head of a contracting agency shall publish a notice on a public website that such determination has been made not later than 7 days after making such determination. Any solicitation for a procurement related to the acquisition plan may not be published earlier than 7 days after such notice is published. Along with the publication of the solicitation, the head of a contracting agency shall publish a justification for the determination, which shall include the following information:

(A) The specific benefits anticipated to be derived from the bundling of contract requirements and a determination that such benefits justify the bundling.

(B) An identification of any alternative contracting approaches that would involve a lesser degree of bundling of contract requirements.

(C) An assessment of—

(i) the specific impediments to participation by small business concerns as prime contractors that result from the bundling of contract requirements; and

(ii) the specific actions designed to maximize participation of small business concerns as subcontractors (including suppliers) at various tiers under the contract or contracts that are awarded to meet the requirements.

(4) CONTRACT TEAMING.—

(A) IN GENERAL.— In the case of a solicitation of offers for a bundled or consolidated contract that is issued by the head of an agency, a small business concern that provides for use of a particular team of subcontractors or a joint venture of small business concerns may submit an offer for the performance of the contract.

(B) EVALUATION OF OFFERS.— The head of the agency shall evaluate an offer described in subparagraph (A) in the same manner as other offers, with due consideration to the capabilities of all of the proposed subcontractors or members of the joint venture as follows:

(i) TEAMS.— When evaluating an offer of a small business prime contractor that includes a proposed team of small business subcontractors, the head of the agency shall consider the capabilities and past performance of each first tier subcontractor that is part of the team as the capabilities and past performance of the small business prime contractor.

(ii) JOINT VENTURES.— When evaluating an offer of a joint venture of small business concerns, if the joint venture does not demonstrate sufficient capabilities or past performance to be considered for award of a contract opportunity, the head of the agency shall consider the capabilities and past performance of each member of the joint venture as the capabilities and past performance of the joint venture.

86

(C) STATUS AS A SMALL BUSINESS CONCERN.— Participation of a small business concern in a team or a joint venture under this paragraph shall not affect the status of that concern as a small business concern for any other purpose.

(f) CONTRACTING PREFERENCE FOR SMALL BUSINESS CONCERNS IN A MAJOR DISASTER AREA.—

(1) DEFINITION.— In this subsection, the term "disaster area" means the area for which the President has declared a major disaster, during the period of the declaration.

(2) CONTRACTING PREFERENCE.— An agency shall provide a contracting preference for a small business concern located in a disaster area if the small business concern will perform the work required under the contract in the disaster area.

(3) CREDIT FOR MEETING CONTRACTING GOALS.— If an agency awards a contract to a small business concern under the circumstances described in paragraph (2), the value of the contract shall be doubled for purposes of determining compliance with the goals for procurement contracts under subsection (g)(1)(A).

(g)

(1) GOVERNMENTWIDE GOALS.—

(A) ESTABLISHMENT.— The President shall annually establish Governmentwide goals for procurement contracts awarded to small business concerns, small business concerns owned and controlled by service-disabled veterans, qualified HUBZone small business concerns, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women in accordance with the following:

(i) The Governmentwide goal for participation by small business concerns shall be established at not less than 23 percent of the total value of all prime contract awards for each fiscal year. In meeting this goal, the Government shall ensure the participation of small business concerns from a wide variety of industries and from a broad spectrum of small business concerns within each industry.

(ii) The Governmentwide goal for participation by small business concerns owned and controlled by service-disabled veterans shall be established at not less than 3 percent of the total value of all prime contract and subcontract awards for each fiscal year.

(iii) The Governmentwide goal for participation by qualified HUBZone small business concerns shall be established at not less than 3 percent of the total value of all prime contract and subcontract awards for each fiscal year.

(iv) The Governmentwide goal for participation by small business concerns owned and controlled by socially and economically disadvantaged individuals shall be established at not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year.

87

(v) The Governmentwide goal for participation by small business concerns owned and controlled by women shall be established at not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year.

(B) ACHIEVEMENT OF GOVERNMENTWIDE GOALS.— Each agency shall have an annual goal that presents, for that agency, the maximum practicable opportunity for small business concerns, small business concerns owned and controlled by service-disabled veterans, qualified HUBZone small business concerns, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women to participate in the performance of contracts let by such agency. The Small Business Administration and the Administrator for Federal Procurement Policy shall, when exercising their authority pursuant to paragraph (2), insure that the cumulative annual prime contract goals for all agencies meet or exceed the annual Governmentwide prime contract goal established by the President pursuant to this paragraph.

(2)(A) The head of each Federal agency shall, after consultation with the Administration, establish goals for the participation by small business concerns, by small business concerns owned and controlled by service-disabled veterans, by qualified HUBZone small business concerns, by small business concerns owned and controlled by socially and economically disadvantaged individuals, and by small business concerns owned and controlled by women in procurement contracts of such agency. Such goals shall separately address prime contract awards and subcontract awards for each category of small business covered.

(B) Goals established under this subsection shall be jointly established by the Administration and the head of each Federal agency and shall realistically reflect the potential of small business concerns, small business concerns owned and controlled by service-disabled veterans, qualified HUBZone small business concerns, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women to perform such contracts and to perform subcontracts under such contracts.

(C) Whenever the Administration and the head of any Federal agency fail to agree on established goals, the disagreement shall be submitted to the Administrator for Federal Procurement Policy for final determination.

(D) After establishing goals under this paragraph for a fiscal year, the head of each Federal agency shall develop a plan for achieving such goals at both the prime contract and the subcontract level, which shall apportion responsibilities among the agency's acquisition executives and officials. In establishing goals under this paragraph, the head of each Federal agency shall make a consistent effort to annually expand participation by small business concerns from each industry category in procurement contracts and subcontracts of such agency, including participation by small business concerns owned and controlled by service-disabled veterans, qualified HUBZone small business concerns, small busi-

88

ness concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women.

(E) The head of each Federal agency, in attempting to attain expanded participation under subparagraph (D), shall consider—

(i) contracts awarded as the result of unrestricted competition; and

(ii) contracts awarded after competition restricted to eligible small business concerns under this section and under the program established under section 8(a).

(F)(i) Each procurement employee or program manager described in clause (ii) shall communicate to the subordinates of the procurement employee or program manager the importance of achieving goals established under subparagraph (A).

(ii) A procurement employee or program manager described in this clause is a senior procurement executive, senior program manager, or Director of Small and Disadvantaged Business Utilization of a Federal agency having contracting authority.

(3) First tier subcontracts that are awarded by Management and Operating contractors sponsored by the Department of Energy to small business concerns, small businesses concerns owned and controlled by service disabled veterans, qualified HUBZone small business concerns, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women, shall be considered toward the annually established agency and Government-wide goals for procurement contracts awarded.

(h) REPORTING ON GOALS FOR PROCUREMENT CONTRACTS AWARDED TO SMALL BUSINESS CONCERNS.—

(1) AGENCY REPORTS.— At the conclusion of each fiscal year, the head of each Federal agency shall submit to the Administrator a report describing—

(A) the extent of the participation by small business concerns, small business concerns owned and controlled by veterans (including service-disabled veterans), qualified HUBZone small business concerns, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women in the procurement contracts of such agency during such fiscal year;

(B) whether the agency achieved the goals established for the agency under subsection (g)(2) with respect to such fiscal year;

(C) any justifications for a failure to achieve such goals; and

(D) a remediation plan with proposed new practices to better meet such goals, including analysis of factors leading to any failure to achieve such goals.

(2) REPORTS BY ADMINISTRATOR.— Not later than 60 days after receiving a report from each Federal agency under paragraph (1) with respect to a fiscal year, the Administrator shall submit to the President and Congress, and to make available on a public Web site, a report that includes—

89

(A) a copy of each report submitted to the Administrator under paragraph (1);

(B) a determination of whether each goal established by the President under subsection (g)(1) for such fiscal year was achieved;

(C) a determination of whether each goal established by the head of a Federal agency under subsection (g)(2) for such fiscal year was achieved;

(D) the reasons for any failure to achieve a goal established under paragraph (1) or (2) of subsection (g) for such fiscal year and a description of actions planned by the applicable agency to address such failure, including the Administrator's comments and recommendations on the proposed remediation plan; and

(E) for the Federal Government and each Federal agency, an analysis of the number and dollar amount of prime contracts awarded during such fiscal year to—

(i) small business concerns—

(I) in the aggregate;

(II) through sole source contracts;

(III) through competitions restricted to small business concerns; and

(IV) through unrestricted competition;

(ii) small business concerns owned and controlled by service-disabled veterans—

(I) in the aggregate;

(II) through sole source contracts;

(III) through competitions restricted to small business concerns;

(IV) through competitions restricted to small business concerns owned and controlled by service-disabled veterans; and

(V) through unrestricted competition;

(iii) qualified HUBZone small business concerns—

(I) in the aggregate;

(II) through sole source contracts;

(III) through competitions restricted to small business concerns;

(IV) through competitions restricted to qualified HUBZone small business concerns;

(V) through unrestricted competition where a price evaluation preference was used; and

(VI) through unrestricted competition where a price evaluation preference was not used;

(iv) small business concerns owned and controlled by socially and economically disadvantaged individuals—

(I) in the aggregate;

(II) through sole source contracts;

(III) through competitions restricted to small business concerns;

(IV) through competitions restricted to small business concerns owned and controlled by socially and economically disadvantaged individuals;

(V) through unrestricted competition; and

90

(VI) by reason of that concern's certification as a small business owned and controlled by socially and economically disadvantaged individuals;

(v) small business concerns owned by an Indian tribe (as such term is defined in section 8(a)(13)) other than an Alaska Native Corporation—

(I) in the aggregate;

(II) through sole source contracts;

(III) through competitions restricted to small business concerns;

(IV) through competitions restricted to small business concerns owned and controlled by socially and economically disadvantaged individuals; and

(V) through unrestricted competition;

(vi) small business concerns owned by a Native Hawaiian Organization—

(I) in the aggregate;

(II) through sole source contracts;

(III) through competitions restricted to small business concerns;

(IV) through competitions restricted to small business concerns owned and controlled by socially and economically disadvantaged individuals; and

(V) through unrestricted competition;

(vii) small business concerns owned by an Alaska Native Corporation—

(I) in the aggregate;

(II) through sole source contracts;

(III) through competitions restricted to small business concerns;

(IV) through competitions restricted to small business concerns owned and controlled by socially and economically disadvantaged individuals; and

(V) through unrestricted competition; and

(viii) small business concerns owned and controlled by women—

(I) in the aggregate;

(II) through competitions restricted to small business concerns;

(III) through competitions restricted using the authority under section 8(m)(2);

(IV) through competitions restricted using the authority under section 8(m)(2) and in which the waiver authority under section 8(m)(3) was used;

(V) through sole source contracts awarded using the authority under subsection 8(m)(7);

(VI) through sole source contracts awarded using the authority under section 8(m)(8);

(VII) by industry for contracts described in subclause (III), (IV), (V), or (VI); and

(VIII) through unrestricted competition; and

91

(F) for the Federal Government, the number, dollar amount, and distribution with respect to the North American Industry Classification System of subcontracts awarded during such fiscal year to small business concerns, small business concerns owned and controlled by service-disabled veterans, qualified HUBZone small business concerns, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women, provided that such information is publicly available through data systems developed pursuant to the Federal Funding Accountability and Transparency Act of 2006 (Public Law 109–282), or otherwise available as provided in paragraph (3).

(3) ACCESS TO DATA.—

(A) FEDERAL PROCUREMENT DATA SYSTEM.— To assist in the implementation of this section, the Administration shall have access to information collected through the Federal Procurement Data System, Federal Subcontracting Reporting System, or any new or successor system.

(B) AGENCY PROCUREMENT DATA SOURCES.— To assist in the implementation of this section, the head of each contracting agency shall provide, upon request of the Administration, procurement information collected through agency data collection sources in existence at the time of the request. Contracting agencies shall not be required to establish new data collection systems to provide such data.

(i) Nothing in this Act or any other provision of law precludes exclusive small business set-asides for procurements of architectural and engineering services, research, development, test and evaluation, and each Federal agency is authorized to develop such set-asides to further the interests of small business in those areas.

(j)(1) Each contract for the purchase of goods and services that has an anticipated value greater than $2,500 but not greater than $100,000 shall be reserved exclusively for small business concerns unless the contracting officer is unable to obtain offers from two or more small business concerns that are competitive with market prices and are competitive with regard to the quality and delivery of the goods or services being purchased.

(2) In carrying out paragraph (1), a contracting officer shall consider a responsive offer timely received from an eligible small business offeror.

(3) Nothing in paragraph (1) shall be construed as precluding an award of a contract with a value not greater than $100,000 under the authority of subsection (a) of section 8 of this Act, section 2323 of title 10, United States Code, section 712 of the Business Opportunity Development Reform Act of 1988 (Public Law 100–656; 15 U.S.C. 644 note), or section 7102 of the Federal Acquisition Streamlining Act of 1994.

(k) There is hereby established in each Federal agency having procurement powers an office to be known as the "Office of Small and Disadvantaged Business Utilization". The management of each such office shall be vested in an officer or employee of such agency, with experience serving in any combination of the following roles: program manager, deputy program manager, or assistant program

92

manager for Federal acquisition program; chief engineer, systems engineer, assistant engineer, or product support manager for Federal acquisition program; Federal contracting officer; small business technical advisor; contracts administrator for Federal Government contracts; attorney specializing in Federal procurement law; small business liaison officer; officer or employee who managed Federal Government contracts for a small business; or individual whose primary responsibilities were for the functions and duties of section 8, 15 or 44 of this Act. Such officer or employee—

(1) shall be known as the "Director of Small and Disadvantaged Business Utilization" for such agency;

(2) shall be appointed by the head of such agency to a position that is a Senior Executive Service position (as such term is defined under section 3132(a) of title 5, United States Code), except that, for any agency in which the positions of Chief Acquisition Officer and senior procurement executive (as such terms are defined under section 44(a) of this Act) are not Senior Executive Service positions, the Director of Small and Disadvantaged Business Utilization may be appointed to a position compensated at not less than the minimum rate of basic pay payable for grade GS–15 of the General Schedule under section 5332 of such title (including comparability payments under section 5304 of such title);

(3) shall be responsible only to (including with respect to performance appraisals), and report directly and exclusively to, the head of such agency or to the deputy of such head, except that the Director for the Office of the Secretary of Defense shall be responsible only to (including with respect to performance appraisals), and report directly and exclusively to, such Secretary or the Secretary's designee;

(4) shall be responsible for the implementation and execution of the functions and duties under sections 8 and 15 of this Act which relate to such agency;

(5) shall identify proposed solicitations that involve significant bundling of contract requirements, and work with the agency acquisition officials and the Administration to revise the procurement strategies for such proposed solicitations where appropriate to increase the probability of participation by small businesses as prime contractors, or to facilitate small business participation as subcontractors and suppliers, if a solicitation for a bundled contract is to be issued;

(6) shall assist small business concerns to obtain payments, required late payment interest penalties, or information regarding payments due to such concerns from an executive agency or a contractor, in conformity with chapter 39 of title 31, United States Code, or any other protection for contractors or subcontractors (including suppliers) that is included in the Federal Acquisition Regulation or any individual agency supplement to such Government-wide regulation;

(7) shall have supervisory authority over personnel of such agency to the extent that the functions and duties of such personnel relate to functions and duties under sections 8 and 15 of this Act;

93

(8) shall assign a small business technical adviser to each office to which the Administration has assigned a procurement center representative—

(A) who shall be a full-time employee of the procuring activity and shall be well qualified, technically trained and familiar with the supplies or services purchased at the activity; and

(B) whose principal duty shall be to assist the Administration procurement center representative in his duties and functions relating to sections 8 and 15 of this Act,

(9) shall cooperate, and consult on a regular basis, with the Administration with respect to carrying out the functions and duties described in paragraph (4) of this subsection;

(10) shall make recommendations to contracting officers as to whether a particular contract requirement should be awarded pursuant to subsection (a), section 8(a) of this Act, or section 2323 of title 10, United States Code, which shall be made with due regard to the requirements of subsection (m), and the failure of the contracting officer to accept any such recommendations shall be documented and included within the appropriate contract file;

(11) shall review and advise such agency on any decision to convert an activity performed by a small business concern to an activity performed by a Federal employee;

(12) shall provide to the Chief Acquisition Officer and senior procurement executive of such agency advice and comments on acquisition strategies, market research, and justifications related to section 44 of this Act;

(13) may provide training to small business concerns and contract specialists, except that such training may only be provided to the extent that the training does not interfere with the Director carrying out other responsibilities under this subsection;

(14) shall receive unsolicited proposals and, when appropriate, forward such proposals to personnel of the activity responsible for reviewing such proposals;

(15) shall carry out exclusively the duties enumerated in this Act, and shall, while the Director, not hold any other title, position, or responsibility, except as necessary to carry out responsibilities under this subsection;

(16) shall submit, each fiscal year, to the Committee on Small Business of the House of Representatives and the Committee on Small Business and Entrepreneurship of the Senate a report describing—

(A) the training provided by the Director under paragraph (13) in the most recently completed fiscal year;

(B) the percentage of the budget of the Director used for such training in the most recently completed fiscal year; and

(C) the percentage of the budget of the Director used for travel in the most recently completed fiscal year; and

(17) shall, when notified by a small business concern prior to the award of a contract that the small business concern believes that a solicitation, request for proposal, or request for

94

quotation unduly restricts the ability of the small business concern to compete for the award—

(A) submit the notice of the small business concern to the contracting officer and, if necessary, recommend ways in which the solicitation, request for proposal, or request for quotation may be altered to increase the opportunity for competition;

(B) inform the advocate for competition of such agency (as established under section 1705 of title 41, United States Code, or section 2318 of title 10, United States Code) of such notice; and

(C) ensure that the small business concern is aware of other resources and processes available to address unduly restrictive provisions in a solicitation, request for proposal, or request for quotation, even if such resources and processes are provided by such agency, the Administration, the Comptroller General, or a procurement technical assistance program established under chapter 142 of title 10, United States Code.

This subsection shall not apply to the Administration.

(l) PROCUREMENT CENTER REPRESENTATIVES.—

(1) ASSIGNMENT AND ROLE.— The Administrator shall assign to each major procurement center a procurement center representative with such assistance as may be appropriate.

(2) ACTIVITIES.— A procurement center representative is authorized to—

(A) attend any provisioning conference or similar evaluation session during which determinations are made as to whether requirements are to be procured through other than full and open competition and make recommendations with respect to such requirements to the members of such conference or session;

(B) review, at any time, barriers to small business participation in Federal contracting previously imposed on goods and services through acquisition method coding or similar procedures, and recommend to personnel of the appropriate activity the prompt reevaluation of such barriers;

(C) review barriers to small business participation in Federal contracting arising out of restrictions on the rights of the United States in technical data, and, when appropriate, recommend that personnel of the appropriate activity initiate a review of the validity of such an asserted restriction;

(D) review any bundled or consolidated solicitation or contract in accordance with this Act;

(E) have access to procurement records and other data of the procurement center commensurate with the level of such representative's approved security clearance classification, with such data provided upon request in electronic format, when available;

(F) receive unsolicited proposals from small business concerns and transmit such proposals to personnel of the activity responsible for reviewing such proposals, who shall furnish the procurement center representative with information regarding the disposition of any such proposal;

95

(G) consult with the Director the Office of Small and Disadvantaged Business Utilization of that agency and the agency personnel described in paragraph (7) and (8) of subsection (k) with regard to agency insourcing decisions covered by subsection (k)(11);

(H) be an advocate for the maximum practicable utilization of small business concerns in Federal contracting, including by advocating against the consolidation or bundling of contract requirements when not justified; and

(I) carry out any other responsibility assigned by the Administrator.

(3) APPEALS.— A procurement center representative is authorized to appeal the failure to act favorably on any recommendation made pursuant to paragraph (2). Such appeal shall be filed and processed in the same manner and subject to the same conditions and limitations as an appeal filed by the Administrator pursuant to subsection (a).

(4) The Administration shall assign and co-locate at least two small business technical advisers to each major procurement center in addition to such other advisers as may be authorized from time to time. The sole duties of such advisers shall be to assist the procurement center representative for the center to which such advisers are assigned in carrying out the functions described in paragraph (2) and the representatives referred to in subsection (k)(6).

(5) POSITION REQUIREMENTS.—

(A) IN GENERAL.— A procurement center representative assigned under this subsection shall—

(i) be a full-time employee of the Administration;

(ii) be fully qualified, technically trained, and familiar with the goods and services procured by the major procurement center to which that representative is assigned; and

(iii) have the certification described in subparagraph (C).

(B) COMPENSATION.— The Administrator shall establish personnel positions for procurement center representatives assigned under this subsection, which are classified at a grade level of the General Schedule sufficient to attract and retain highly qualified personnel.

(C) CERTIFICATION REQUIREMENTS.—

(i) IN GENERAL.— Consistent with the requirements of clause (ii), a procurement center representative shall have a Level III Federal Acquisition Certification in Contracting (or any successor certification) or the equivalent Department of Defense certification, except that any person serving in such a position on or before January 3, 2013, may continue to serve in that position for a period of 5 years without the required certification.

(ii) DELAY OF CERTIFICATION REQUIREMENTS.—

(I) TIMING.— The certification described in clause (i) is not required for any person serving as a procurement center representative until the date that is one calendar year after the date such

96

person is appointed as a procurement center representative.

(II) APPLICATION.— The requirements of subclause (I) shall—

(aa) be included in any initial job posting for the position of a procurement center representative; and

(bb) apply to any person appointed as a procurement center representative after January 3, 2013.

(6) MAJOR PROCUREMENT CENTER DEFINED.— For purposes of this subsection, the term "major procurement center" means a procurement center that, in the opinion of the Administrator, purchases substantial dollar amounts of goods or services, including goods or services that are commercially available.

(7) TRAINING.—

(A) AUTHORIZATION.— At such times as the Administrator deems appropriate. the breakout procurement center representative shall conduct familiarization sessions for contracting officers and other appropriate personnel of the procurement center to which such representative is assigned. Such sessions shall acquaint the participants with the provisions of this subsection and shall instruct them in methods designed to further the purposes of such subsection.

(B) LIMITATION.— A procurement center representative may provide training under subparagraph (A) only to the extent that the training does not interfere with the representative carrying out other activities under this subsection.

(8) ANNUAL BRIEFING AND REPORT.— A procurement center representative shall prepare and personally deliver an annual briefing and report to the head of the procurement center to which such representative is assigned. Such briefing and report shall detail the past and planned activities of the representative and shall contain such recommendations for improvement in the operation of the center as may be appropriate. The head of such center shall personally receive such briefing and report and shall, within 60 calendar days after receipt, respond, in writing, to each recommendation made by such representative.

(m)(1) Each agency subject to the requirements of section 2323 of title 10, United States Code, shall, when implementing such requirements—

(A) establish policies and procedures that insure that there will be no reduction in the number of dollar value of contracts awarded pursuant to this section and section 8(a) in order to achieve any goal or other program objective; and

(B) assure that such requirements will not alter or change the procurement process used to implement this section or section 8(a).

(2) All procurement center representatives (including those referred to in subsection (k)(6)), in addition to such other duties as may be assigned by the Administrator, shall—

97

(A) monitor the performance of the procurement activities to which they are assigned to ascertain the degree of compliance with the requirements of paragraph (1);

(B) report to their immediate supervisors all instances of noncompliance with such requirements; and

(C) increase, insofar as possible, the number and dollar value of procurements that may be used for the programs established under this section, section 8(a), and section 2323 of title 10, United States Code.

(n) For purposes of this section, the determination of labor surplus areas shall be made on the basis of the criteria in effect at the time of the determination, except that any minimum population criteria shall not exceed twenty-five thousand. Such determination, as modified by the preceding sentence, shall be made by the Secretary of Labor.

(o) LIMITATIONS ON SUBCONTRACTING.—A concern may not be awarded a contract under subsection (a) as a small business concern unless the concern agrees to satisfy the requirements of section 46.

(p) ACCESS TO DATA.—

(1) BUNDLED CONTRACT DEFINED.— In this subsection, the term "bundled contract" has the meaning given such term in section 3(o)(1).

(2) DATABASE.—

(A) IN GENERAL.— Not later than 180 days after the date of the enactment of this subsection, the Administrator of the Small Business Administration shall develop and shall thereafter maintain a database containing data and information regarding—

(i) each bundled contract awarded by a Federal agency; and

(ii) each small business concern that has been displaced as a prime contractor as a result of the award of such a contract.

(3) ANALYSIS.— For each bundled contract that is to be recompeted as a bundled contract, the Administrator shall determine—

(A) the amount of savings and benefits (in accordance with subsection (e)) achieved under the bundling of contract requirements; and

(B) whether such savings and benefits will continue to be realized if the contract remains bundled, and whether such savings and benefits would be greater if the procurement requirements were divided into separate solicitations suitable for award to small business concerns.

(4) ANNUAL REPORT ON CONTRACT BUNDLING.—

(A) IN GENERAL.— Not later than 1 year after the date of the enactment of this paragraph, and annually in March thereafter, the Administration shall transmit a report on contract bundling to the Committees on Small Business of the House of Representatives and the Senate.

(B) CONTENTS.— Each report transmitted under subparagraph (A) shall include—

(i) data on the number, arranged by industrial classification, of small business concerns displaced as

98

prime contractors as a result of the award of bundled contracts by Federal agencies; and

(ii) a description of the activities with respect to previously bundled contracts of each Federal agency during the preceding year, including—

(I) data on the number and total dollar amount of all contract requirements that were bundled; and

(II) with respect to each bundled contract, data or information on—

(aa) the justification for the bundling of contract requirements;

(bb) the cost savings realized by bundling the contract requirements over the life of the contract;

(cc) the extent to which maintaining the bundled status of contract requirements is projected to result in continued cost savings;

(dd) the extent to which the bundling of contract requirements complied with the contracting agency's small business subcontracting plan, including the total dollar value awarded to small business concerns as subcontractors and the total dollar value previously awarded to small business concerns as prime contractors; and

(ee) the impact of the bundling of contract requirements on small business concerns unable to compete as prime contractors for the consolidated requirements and on the industries of such small business concerns, including a description of any changes to the proportion of any such industry that is composed of small business concerns.

(5) ACCESS TO DATA.—

(A) FEDERAL PROCUREMENT DATA SYSTEM.— To assist in the implementation of this section, the Administration shall have access to information collected through the Federal Procurement Data System.

(B) AGENCY PROCUREMENT DATA SOURCES.— To assist in the implementation of this section, the head of each contracting agency shall provide, upon request of the Administration, procurement information collected through existing agency data collection sources.

(q) REPORTS RELATED TO PROCUREMENT CENTER REPRESENTATIVES.—

(1) TEAMING AND JOINT VENTURE REQUIREMENTS.—

(A) IN GENERAL.— Each Federal agency shall include in each solicitation for any multiple award contract above the substantial bundling threshold of the Federal agency a provision soliciting bids from any responsible source, including responsible small business concerns and teams or joint ventures of small business concerns.

(B) TEAMS.— When evaluating an offer of a small business prime contractor that includes a proposed team of

99

small business subcontractors for any multiple award contract above the substantial bundling threshold of the Federal agency, the head of the agency shall consider the capabilities and past performance of each first tier subcontractor that is part of the team as the capabilities and past performance of the small business prime contractor.

(C) JOINT VENTURES.— When evaluating an offer of a joint venture of small business concerns for any multiple award contract above the substantial bundling threshold of the Federal agency, if the joint venture does not demonstrate sufficient capabilities or past performance to be considered for award of a contract opportunity, the head of the agency shall consider the capabilities and past performance of each member of the joint venture as the capabilities and past performance of the joint venture.

(2) POLICIES ON REDUCTION OF CONTRACT BUNDLING.—

(A) IN GENERAL.— Not later than 1 year after the date of enactment of this subsection, the Federal Acquisition Regulatory Council established under section 25(a) of the Office of Federal Procurement Policy Act (41 U.S.C. 4219(a)) shall amend the Federal Acquisition Regulation issued under section 25 of such Act to—

(i) establish a Government-wide policy regarding contract bundling, including regarding the solicitation of teaming and joint ventures under paragraph (1); and

(ii) require that the policy established under clause (i) be published on the website of each Federal agency.

(B) RATIONALE FOR CONTRACT BUNDLING.— Not later than 30 days after the date on which the head of a Federal agency submits data certifications to the Administrator for Federal Procurement Policy, the head of the Federal agency shall publish on the website of the Federal agency a list and rationale for any bundled contract for which the Federal agency solicited bids or that was awarded by the Federal agency.

(3) REPORTING.— Not later than 90 days after the date of enactment of this subsection, and every 3 years thereafter, the Administrator shall submit to the Committee on Small Business and Entrepreneurship of the Senate and the Committee on Small Business of the House of Representatives a report regarding procurement center representatives and commercial market representatives, which shall—

(A) identify each area for which the Administration has assigned a procurement center representative or a commercial market representative;

(B) explain why the Administration selected the areas identified under subparagraph (A); and

(C) describe the activities performed by procurement center representatives and commercial market representatives.

(r) MULTIPLE AWARD CONTRACTS.—Not later than 1 year after the date of enactment of this subsection, the Administrator for Federal Procurement Policy and the Administrator, in consultation with the Administrator of General Services, shall, by regulation, es-

Case:17-03283-LTS   Doc#:12871-1   Filed:04/17/20   Entered:04/17/20 15:53:54   Desc:
Exhibit A - H.R. Rep. No. 114-602 Part 1 - PR Oversight Mgmt and Economic Stabil   Page 101 of 124

100

tablish guidance under which Federal agencies may, at their discretion—

(1) set aside part or parts of a multiple award contract for small business concerns, including the subcategories of small business concerns identified in subsection (g)(2);

(2) notwithstanding the fair opportunity requirements under section 2304c(b) of title 10, United States Code, and section 303J(b) of the Federal Property and Administrative Services Act of 1949 (41 U.S.C. 253j(b)), set aside orders placed against multiple award contracts for small business concerns, including the subcategories of small business concerns identified in subsection (g)(2); and

(3) reserve 1 or more contract awards for small business concerns under full and open multiple award procurements, including the subcategories of small business concerns identified in subsection (g)(2).

(s) DATA QUALITY IMPROVEMENT PLAN.—

(1) IN GENERAL.— Not later than October 1, 2015, the Administrator of the Small Business Administration, in consultation with the Small Business Procurement Advisory Council, the Administrator for Federal Procurement Policy, and the Administrator of General Services, shall develop a plan to improve the quality of data reported on bundled or consolidated contracts in the Federal procurement data system (described in section 1122(a)(4)(A) of title 41, United States Code).

(2) PLAN REQUIREMENTS.— The plan shall—

(A) describe the roles and responsibilities of the Administrator of the Small Business Administration, each Director of Small and Disadvantaged Business Utilization, the Administrator for Federal Procurement Policy, the Administrator of General Services, senior procurement executives, and Chief Acquisition Officers in—

(i) improving the quality of data reported on bundled or consolidated contracts in the Federal procurement data system; and

(ii) contributing to the annual report required by subsection (p)(4);

(B) recommend changes to policies and procedures, including training procedures of relevant personnel, to properly identify and mitigate the effects of bundled or consolidated contracts;

(C) recommend requirements for periodic and statistically valid data verification and validation; and

(D) recommend clear data verification responsibilities.

(3) PLAN SUBMISSION.— The Administrator of the Small Business Administration shall submit the plan to the Committee on Small Business of the House of Representatives and the Committee on Small Business and Entrepreneurship of the Senate not later than December 1, 2016.

(4) IMPLEMENTATION.— Not later than October 1, 2016, the Administrator of the Small Business Administration shall implement the plan described in this subsection.

(5) CERTIFICATION.— The Administrator shall annually provide to the Committee on Small Business of the House of Representatives and the Committee on Small Business and Entre-

101

preneurship of the Senate a certification of the accuracy and completeness of data reported on bundled and consolidated contracts.

(6) DEFINITIONS.— In this subsection, the following definitions apply:

(A) CHIEF ACQUISITION OFFICER; SENIOR PROCUREMENT EXECUTIVE.— The terms "Chief Acquisition Officer" and "senior procurement executive" have the meanings given such terms in section 44(a) of this Act.

(B) BUNDLED OR CONSOLIDATED CONTRACT.— The term "bundled or consolidated contract" means a bundled contract (as defined in section 3(o)) or a contract resulting from the consolidation of contracting requirements (as defined in section 44(a)(2)).

*(t) GAO REPORT ON SMALL BUSINESS ADMINISTRATION PROGRAMS IN PUERTO RICO.—Not later than 180 days after the date of enactment of this subsection, the Comptroller General of the United States shall submit to the Committee on Small Business of the House of Representatives and the Committee on Small Business and Entrepreneurship of the Senate a report on the application and utilization of contracting activities of the Administration (including contracting activities relating to HUBZone small business concerns) in Puerto Rico. The report shall also identify any provisions of Federal law that may create an obstacle to the efficient implementation of such contracting activities.*

\*      \*      \*      \*      \*      \*      \*

## SECTION 302 OF THE OMNIBUS INSULAR AREAS ACT OF 1992

**SEC. 302. INSULAR GOVERNMENT PURCHASES.**

⟦The Governments of American Samoa, Guam, the Northern Mariana Islands, the Trust Territory of the Pacific Islands, and the Virgin Islands are authorized to make purchases through the General Services Administration.⟧ *The Governments of the Commonwealth of Puerto Rico, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and the United States Virgin Islands are authorized to make purchases through the General Services Administration.*

\*      \*      \*      \*      \*      \*      \*

## CONSOLIDATED AND FURTHER CONTINUING APPROPRIATIONS ACT, 2015

\*      \*      \*      \*      \*      \*      \*

**SEC. 9. STUDY OF ELECTRIC RATES IN THE INSULAR AREAS.**

(a) DEFINITIONS.—In this section:

(1) COMPREHENSIVE ENERGY PLAN.— The term "comprehensive energy plan" means a comprehensive energy plan prepared and updated under subsections (c) and (e) of section 604 of the Act entitled "An Act to authorize appropriations for certain insular areas of the United States, and for other purposes", approved December 24, 1980 (48 U.S.C. 1492).

(2) ENERGY ACTION PLAN.— The term "energy action plan" means the plan required by subsection (d).

(3) FREELY ASSOCIATED STATES.— The term "Freely Associated States" means the Federated States of Micronesia, the Republic of the Marshall Islands, and the Republic of Palau.

(4) INSULAR AREAS.— The term "insular areas" means American Samoa, the Commonwealth of the Northern Mariana Islands, Puerto Rico, Guam, and the Virgin Islands.

(5) SECRETARY.— The term "Secretary" means the Secretary of the Interior, *except that, with respect to Puerto Rico, the term means, the Secretary of Energy* .

(6) TEAM.— The term "team" means the team established by the Secretary under subsection (b).

(b) ESTABLISHMENT.—Not later than 180 days after the date of enactment of this Act *(except in the case of Puerto Rico, in which case not later than 270 days after the date of enactment of the Puerto Rico Oversight, Management, and Economic Stability Act)* , the Secretary shall, within the Empowering Insular Communities activity *(except in the case of Puerto Rico)* , establish a team of technical, policy, and financial experts—

(1) to develop an energy action plan addressing the energy needs of each of the insular areas and Freely Associated States; and

(2) to assist each of the insular areas and Freely Associated States in implementing such plan.

(c) PARTICIPATION OF REGIONAL UTILITY ORGANIZATIONS.—In establishing the team, the Secretary shall consider including regional utility organizations.

(d) ENERGY ACTION PLAN.—In accordance with subsection (b), the energy action plan shall include—

(1) recommendations, based on the comprehensive energy plan where applicable, to—

(A) reduce reliance and expenditures on fuel shipped to the insular areas and Freely Associated States from ports outside the United States;

(B) develop and utilize domestic fuel energy sources; and

(C) improve performance of energy infrastructure and overall energy efficiency;

(2) a schedule for implementation of such recommendations and identification and prioritization of specific projects;

(3) a financial and engineering plan for implementing and sustaining projects; and

(4) benchmarks for measuring progress toward implementation.

(e) REPORTS TO SECRETARY.—Not later than 1 year after the date on which the Secretary establishes the team and annually thereafter, the team shall submit to the Secretary a report detailing progress made in fulfilling its charge and in implementing the energy action plan.

(f) ANNUAL REPORTS TO CONGRESS.—Not later than 30 days after the date on which the Secretary receives a report submitted by the team under subsection (e), the Secretary shall submit to the appropriate committees of Congress a summary of the report of the team.

103

(g) APPROVAL OF SECRETARY REQUIRED.—The energy action plan shall not be implemented until the Secretary approves the energy action plan.

\*        \*        \*        \*        \*        \*        \*

104

COMMITTEE CORRESPONDENCE

**U.S. House of Representatives**

**Committee on Natural Resources**

**Washington, DC 20515**

25 May 2016

The Honorable Steve Chabot
Chairman
Committee on Small Business
2361 Rayburn HOB
Washington, DC 20515

Dear Mr. Chairman:

On May 25, 2016, the Committee on Natural Resources ordered favorably reported as amended H.R. 5278, the Puerto Rico Oversight, Management, and Economic Stability Act.  The bill was referred primarily to the Committee on Natural Resources, with an additional referral to the Committee on Small Business, among other committees.

I ask that you allow the Committee on Small Business to be discharged from further consideration of the bill so that it may be scheduled by the Majority Leader.  This discharge in no way affects your jurisdiction over the subject matter of the bill, and it will not serve as precedent for future referrals.  In addition, should a conference on the bill be necessary, I would support your request to have the Committee on Small Business represented on the conference committee.  Finally, I would be pleased to include this letter and any response in the bill report filed by the Committee on Natural Resources to memorialize our understanding, as well as in the Congressional Record.

Thank you for your consideration of my request, and I look forward to further opportunities to work with you this Congress.

Sincerely,

Rob Bishop
Chairman
Committee on Natural Resources

cc:   The Honorable Paul D. Ryan, Speaker
      The Honorable Kevin McCarthy, Majority Leader
      The Honorable Raul Grijalva, Ranking Member, Committee on Natural Resources
      The Honorable Thomas J. Wickham, Jr., Parliamentarian

http://naturalresources.house.gov

105

STEVE CHABOT, Ohio
CHAIRMAN

NYDIA M. VELAZQUEZ, New York
RANKING MEMBER

## Congress of the United States
### U.S. House of Representatives
### Committee on Small Business
2361 Rayburn House Office Building
Washington, DC 20515-0515

May 25, 2016

The Honorable Rob Bishop
Chairman
Committee on Natural Resources
1324 Longworth Building
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

I am writing regarding H.R. 5278, the Puerto Rico Oversight, Management and Economic Stability Act. The bill contains a provision that is within the jurisdiction of the Committee on Small Business.

I recognize and appreciate your desire to bring this bill before the House of Representatives in an expeditious manner. Accordingly, I will agree that the Committee on Small Business be discharged from further consideration of the bill. I do so with the understanding that this action does not affect the jurisdiction of the Committee on Small Business, and that the Committee expressly reserves the right to seek conferees on any provision within its jurisdiction during any House-Senate conference that may be convened on this or any similar legislation. I would ask that you support any such request.

I also ask that a copy of this letter be included in the Congressional Record during the consideration of H.R. 5278 on the House floor.

Thank you for your consideration and for your work on this legislation.

Sincerely,

Steve Chabot
Chairman
Committee on Small Business

cc:    The Honorable Paul Ryan, Speaker
       The Honorable Kevin McCarthy, Majority Leader
       The Honorable Nydia Velázquez, Ranking Member, Committee on Small Business
       The Honorable Thomas J. Wickham, Parliamentarian

106

## U.S. House of Representatives
## Committee on Natural Resources
### Washington, DC 20515

31 May 2016

The Honorable John Kline
Chairman
Committee on Education and the Workforce
2176 Rayburn HOB
Washington, DC 20515

Dear Mr. Chairman:

On May 25, 2016, the Committee on Natural Resources ordered favorably reported as amended H.R. 5278, the Puerto Rico Oversight, Management, and Economic Stability Act. The bill was referred primarily to the Committee on Natural Resources, with an additional referral to the Committee on Education and the Workforce, among others.

I ask that you allow the Committee on Education and the Workforce to be discharged from further consideration of the bill so that it may be scheduled by the Majority Leader. This discharge in no way affects your jurisdiction over the subject matter of the bill, and it will not serve as precedent for future referrals. In addition, should a conference on the bill be necessary, I would support your request to have the Committee on Education and the Workforce represented on the conference committee. Finally, I would be pleased to include this letter and any response in the bill report filed by the Committee on Natural Resources to memorialize our understanding, as well as in the Congressional Record.

Thank you for your consideration of my request, and I look forward to further opportunities to work with you this Congress.

Sincerely,

Rob Bishop
Chairman
Committee on Natural Resources

cc:   The Honorable Paul D. Ryan, Speaker
      The Honorable Kevin McCarthy, Majority Leader
      The Honorable Raul Grijalva, Ranking Member, Committee on Natural Resources
      The Honorable Thomas J. Wickham, Jr., Parliamentarian

http://naturalresources.house.gov

107

MAJORITY MEMBERS:

JOHN KLINE, MINNESOTA, *Chairman*

JOE WILSON, SOUTH CAROLINA
VIRGINIA FOXX, NORTH CAROLINA
DUNCAN HUNTER, CALIFORNIA
DAVID P. ROE, TENNESSEE
GLENN THOMPSON, PENNSYLVANIA
TIM WALBERG, MICHIGAN
MATT SALMON, ARIZONA
BRETT GUTHRIE, KENTUCKY
TODD ROKITA, INDIANA
LOU BARLETTA, PENNSYLVANIA
JOSEPH J. HECK, NEVADA
LUKE MESSER, INDIANA
BRADLEY BYRNE, ALABAMA
DAVID BRAT, VIRGINIA
BUDDY CARTER, GEORGIA
MICHAEL D. BISHOP, MICHIGAN
GLENN GROTHMAN, WISCONSIN
STEVE RUSSELL, OKLAHOMA
CARLOS CURBELO, FLORIDA
ELISE STEFANIK, NEW YORK
RICK ALLEN, GEORGIA



**COMMITTEE ON EDUCATION
AND THE WORKFORCE**
U.S. HOUSE OF REPRESENTATIVES
2176 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6100

MINORITY MEMBERS:

ROBERT C. "BOBBY" SCOTT, VIRGINIA
*Ranking Member*

RUBÉN HINOJOSA, TEXAS
SUSAN A. DAVIS, CALIFORNIA
RAÚL M. GRIJALVA, ARIZONA
JOE COURTNEY, CONNECTICUT
MARCIA L. FUDGE, OHIO
JARED POLIS, COLORADO
GREGORIO KILILI CAMACHO SABLAN,
   NORTHERN MARIANA ISLANDS
FREDERICA S. WILSON, FLORIDA
SUZANNE BONAMICI, OREGON
MARK POCAN, WISCONSIN
MARK TAKANO, CALIFORNIA
HAKEEM S. JEFFRIES, NEW YORK
KATHERINE M. CLARK, MASSACHUSETTS
ALMA S. ADAMS, NORTH CAROLINA
MARK DeSAULNIER, CALIFORNIA

May 31, 2016

The Honorable Rob Bishop
Chairman, Committee on Natural Resources
House of Representatives
Washington, D.C. 20515

Dear Mr. Chairman:

I am writing to confirm our mutual understanding with respect to H.R. 5278, the *Puerto Rico Oversight, Management, and Economic Stability Act*. Thank you for consulting with the Committee on Education and the Workforce with regard to H.R.5278 on those matters within the Committee's jurisdiction.

In the interest of expediting the House's consideration of H.R. 5278, the Committee on Education and the Workforce will forgo further consideration of this bill. However, I do so only with the understanding this procedural route will not be construed to prejudice my Committee's jurisdictional interest and prerogatives on this bill or any other similar legislation and will not be considered as precedent for consideration of matters of jurisdictional interest to my Committee in the future. Additionally, I appreciate your committee's assistance with any additional improvements to the bill within the jurisdiction of the Education and the Workforce Committee.

I respectfully request your support for the appointment of outside conferees from the Committee on Education and the Workforce should this bill or a similar bill be considered in a conference with the Senate. I also request you include our exchange of letters on this matter in the Committee Report on H.R. 5278 and in the Congressional Record during consideration of this bill on the House Floor. Thank you for your attention to these matters.

Sincerely,

*John Kline*

JOHN KLINE
Chairman

CC:   The Honorable Paul Ryan
      The Honorable Bobby Scott
      The Honorable Raul Grijalva
      The Honorable Tom Wickham

108

ROB BISHOP, UT
CHAIRMAN
DON YOUNG, AK
LOUIE GOHMERT, TX
DOUG LAMBORN, CO
ROBERT J. WITTMAN, VA
JOHN FLEMING, LA
TOM McCLINTOCK, CA
GLENN THOMPSON, PA
CYNTHIA M. LUMMIS, WY
DAN BENISHEK, MI
JEFF DUNCAN, SC
PAUL A. GOSAR, AZ
RAÚL R. LABRADOR, ID
DOUG LaMALFA, CA
JEFF DENHAM, CA
PAUL COOK, CA
BRUCE WESTERMAN, AR
GARRET GRAVES, LA
DAN NEWHOUSE, WA
RYAN ZINKE, MT
JODY HICE, GA
AUMUA AMATA COLEMAN RADEWAGEN, AS
TOM MacARTHUR, NJ
ALEX MOONEY, WV
CRESENT HARDY, NV
DARIN LaHOOD, IL

**U.S. House of Representatives**
**Committee on Natural Resources**
**Washington, DC 20515**

RAÚL M. GRIJALVA, AZ
RANKING MEMBER
GRACE F. NAPOLITANO, CA
MADELEINE Z. BORDALLO, GU
JIM COSTA, CA
GREGORIO KILILI CAMACHO SABLAN, CNMI
NIKI TSONGAS, MA
PEDRO R. PIERLUISI, PR
JARED HUFFMAN, CA
RAÚL RUIZ, CA
ALAN LOWENTHAL, CA
MATTHEW CARTWRIGHT, PA
DON BEYER, VA
NORMA J. TORRES, CA
DEBBIE DINGELL, MI
RUBÉN GALLEGO, AZ
LOIS CAPPS, CA
JARED POLIS, CO
WM. LACY CLAY, MO

DAVID WATKINS
DEMOCRATIC STAFF DIRECTOR

31 May 2016

JASON KNOX
STAFF DIRECTOR
The Honorable Bob Goodlatte
Chairman
Committee on the Judiciary
2138 Rayburn HOB
Washington, DC 20515

Dear Mr. Chairman:

On May 25, 2016, the Committee on Natural Resources ordered favorably reported as amended H.R. 5278, the Puerto Rico Oversight, Management, and Economic Stability Act. The bill was referred primarily to the Committee on Natural Resources, with an additional referral to the Committee on the Judiciary, among others.

I ask that you allow the Committee on the Judiciary to be discharged from further consideration of the bill so that it may be scheduled by the Majority Leader. This discharge in no way affects your jurisdiction over the subject matter of the bill, and it will not serve as precedent for future referrals. In addition, should a conference on the bill be necessary, I would support your request to have the Committee on the Judiciary represented on the conference committee. Finally, I would be pleased to include this letter and any response in the bill report filed by the Committee on Natural Resources to memorialize our understanding, as well as in the Congressional Record.

Thank you for your consideration of my request, and I look forward to further opportunities to work with you this Congress.

Sincerely,

Rob Bishop
Chairman
Committee on Natural Resources

cc:   The Honorable Paul D. Ryan, Speaker
      The Honorable Kevin McCarthy, Majority Leader
      The Honorable Raul Grijalva, Ranking Member, Committee on Natural Resources
      The Honorable Thomas J. Wickham, Jr., Parliamentarian

109

ONE HUNDRED FOURTEENTH CONGRESS

# Congress of the United States
## House of Representatives
COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6216
(202) 225-3951
http://www.house.gov/judiciary

June 2, 2016

The Honorable Rob Bishop
Chairman
Committee on Natural Resources
1324 Longworth House Office Building
Washington, DC 20515

Dear Chairman Bishop,

I am writing with respect to H.R. 5278, the "Puerto Rico Oversight, Management, and Economic Stability Act," which was referred to the Committee on Natural Resources and in addition to the Committee on the Judiciary among other committees. As a result of your having consulted with us on provisions in H.R. 5278 that fall within the Rule X jurisdiction of the Committee on the Judiciary, I agree to discharge our committee from further consideration of this bill so that it may proceed expeditiously to the House floor for consideration.

The Judiciary Committee takes this action with our mutual understanding that by foregoing consideration of H.R. 5278 at this time, we do not waive any jurisdiction over subject matter contained in this or similar legislation and that our committee will be appropriately consulted and involved as this bill or similar legislation moves forward so that we may address any remaining issues in our jurisdiction. Our committee also reserves the right to seek appointment of an appropriate number of conferees to any House-Senate conference involving this or similar legislation and asks that you support any such request.

I appreciate your May 31, 2016, letter confirming this understanding with respect to H.R. 5278 and would ask that a copy of our exchange of letters on this matter be included in your committee report and in the *Congressional Record* during Floor consideration of H.R. 5278.

Sincerely,

Rob Goodlatte
Chairman

cc:   The Honorable John Conyers, Jr.
      The Honorable Raul Grijalva
      The Honorable Paul Ryan, Speaker
      Mr. Thomas J. Wickham, Jr., Parliamentarian

ADDITIONAL VIEWS

As Puerto Rico's sole elected representative in Congress, I write separately to explain why I support H.R. 5278, the *Puerto Rico Oversight, Management, and Economic Stability Act*, or PROMESA. H.R. 5278 is exceptional insofar as it was negotiated in a painstakingly bipartisan manner at an intensely partisan time in American political life, and inasmuch as it has been successful to date despite a well-funded and often dishonest lobbying campaign against the bill. The bill is imperfect—as all compromises by definition are—but it is also indispensable for my constituents. Of this I have no doubt.

At the May 25, 2016 markup of H.R. 5278, a bipartisan coalition of Committee members remained united to defeat multiple amendments designed to kill or severely weaken the bill. Amendments that were adopted strengthen the bill or are purely technical in nature.

I am convinced there is no superior legislative alternative to H.R. 5278 that can obtain the bipartisan support necessary to become law. Wishing there were does not make it so. And my constituents are not helped one iota by wishful thinking. They need swift, concrete action.

*Overview*

After decades of profound inequality at the federal level and profound mismanagement at the local level, the Puerto Rico government is in crisis, unable to meet its obligations to citizens and creditors. My constituents are leaving for the states in historic numbers, in search of equality and economic opportunity. Those who remain on the island face grave challenges. Everywhere I go in Puerto Rico, I see the concern etched on their faces. They fear for their finances, for their family, and for their future.

In an emergency, the first step is to stabilize the situation. I believe PROMESA can accomplish this objective. It pairs a comprehensive debt restructuring mechanism endorsed by the experts at the United States Treasury Department with an independent and temporary oversight board (which is not a federal entity)—not a heavy-handed control board—to help ensure that the Puerto Rico government conducts itself in a responsible, transparent, and disciplined manner.

I want to begin by underscoring five broad points about the bill before I highlight some specific provisions in the bill.

First, this bill is necessary, but not sufficient. Many commentators, including some of my congressional colleagues, like to cite one cause of the crisis in Puerto Rico, namely mismanagement at the local level. But they ignore the other cause of the crisis, which is inequality at the federal level enabled by Puerto Rico's status as a territory—rather than a state—of the United States. It may give

111

such commentators comfort to blame everything on Puerto Rico, but it is a false comfort rooted in a flawed reading of history. The second-class treatment my constituents are subjected to, a consequence of our second-class status, must end. It will not happen in PROMESA, but I am confident it will happen soon.

Second, nobody is more dissatisfied than I am that the government of Puerto Rico has arrived at the point where an oversight board is being contemplated. The last thing I need is to be lectured to about the importance of democracy and dignity, particularly by those Puerto Rico politicians who prefer for Puerto Rico to remain a territory rather than to become a state or a sovereign nation, and who have therefore been complicit in the denial of democracy and dignity to the people of Puerto Rico. After all, I support statehood for Puerto Rico, because I want the 3.4 million American citizens I represent to have full democratic rights, not fewer democratic rights. Accepting a board is personally, not to mention politically, painful. But it is also the right and necessary thing to do. For those Puerto Rico politicians who seek broad debt restructuring authority but oppose an oversight board—this is not realistic. After intensive negotiations, the bill establishes a board that is robust but reasonable. Its powers are far less potent than the powers that Congress conferred upon the board that it established for the District of Columbia in Public Law 104–8, the *District of Columbia Financial Responsibility and Management Assistance Act of 1995*. This is appropriate because Puerto Rico and the District are different in key respects. (I would note that P.L. 104–8 was supported by the District's delegate in Congress, my colleague Rep. Eleanor Holmes Norton, and history has vindicated her actions.) The Puerto Rico government and the oversight board should work together as partners for prosperity, not as petty rivals for power. If the Puerto Rico government does its job well, the board will have a limited role and will cease to operate within a few years.

Third, I would never—under any circumstances—support this legislation if it authorized a court-supervised debt restructuring mechanism that is unfair to the over 330,000 workers and retirees in Puerto Rico's severely underfunded public pension systems. The real threat to pension plan participants in Puerto Rico does not come from congressional action on PROMESA, but rather from the lack of congressional action. Those who argue otherwise may be well-intentioned, but they are wrong.

Fourth, as discussed in further detail below, I oppose Section 403 of the bill, which authorizes the Puerto Rico government to allow island employers to pay certain younger workers—hired after the date of enactment—less than the federal minimum wage for a specified period of time while the oversight board is in existence. In an otherwise bipartisan bill, this is the only instance where ideology can be said to have trumped intelligence. Nevertheless, I do not anticipate that the Puerto Rico government will ever use this authority, so its practical impact will be zero. Therefore, it is not worth discarding the broader bill over this misguided, but ultimately meaningless, provision.

Fifth and finally, there is a genuine emergency in Puerto Rico. I respect those who have concerns with certain aspects of the bill, but urge them to look at the bill holistically. If they do, I think

112

they will find that its pros vastly outweigh its cons. Any public official who opposes this bill has the responsibility to articulate a superior alternative approach that can actually become law. As noted, I do not believe one exists. In my view, the choice is between this imperfect but indispensable bill and no bill at all. And no bill is the worst possible outcome for Puerto Rico and the United States as a whole.

Now I would like to discuss some discrete provisions of H.R. 5278 in additional detail.

*The Powers and Responsibilities of the Oversight Board*

In general, the oversight board, which is not a federal entity, will provide guardrails for the Puerto Rico government, but will not supplant or replace the territory's elected leaders, who will retain primary control over budgeting and fiscal policymaking.

As per Section 201, the governor of Puerto Rico will develop a long-term fiscal plan—covering at least five fiscal years—that meets broad standards set forth in the law. The fiscal plan must ensure the funding of essential public services, provide adequate funding for public pension systems, estimate revenues and expenditures in accordance with appropriate accounting standards, eliminate structural budget deficits, provide for a sustainable level of debt, improve fiscal governance, provide for capital expenditures that promote economic growth, and respect the relative priorities that different classes of bondholders have vis-à-vis one another under Puerto Rico law. The oversight board will be required to certify the fiscal plan, but the governor will have numerous opportunities to craft a fiscal plan that conforms to the law.

As per Section 202, once a fiscal plan is in place, the governor will prepare a proposed budget that complies with the certified fiscal plan. After the oversight board approves the proposed budget, the proposed budget will be transmitted to the Puerto Rico Legislative Assembly as normal. The governor will have numerous opportunities to craft a compliant budget, incorporating any feedback received from the board. Upon receiving the budget, the Legislative Assembly will retain its constitutional right to modify the budget as it sees fit, so long as the budget continues to be consistent with the certified fiscal plan. Once the board approves the budget adopted by the Legislative Assembly, the certified budget will take effect. Thus, the board would itself step in to craft a multi-year fiscal plan or annual budget only as a last resort, and only in the event that Puerto Rico's elected leaders utterly fail to do the jobs for which they are elected.

As per Section 203, at the end of each quarter during the Puerto Rico fiscal year, the governor will provide a report to the oversight board, describing the revenues, expenditures and cash flows for the preceding quarter, as compared to what was projected to be spent and received in the certified budget. Based on this report and other information available to the board, the board may determine that there is a material inconsistency between what was projected to occur in the certified budget and what actually occurred. If that is the case, the board may ask the Puerto Rico government for additional information to explain the inconsistency and, if the additional information is not sufficient to justify the inconsistency, the

113

board may advise the Puerto Rico government to address the inconsistency through whatever remedial action the Puerto Rico government deems appropriate (for example, reducing spending or increasing revenues). If the Puerto Rico government does not address the inconsistency after being given multiple opportunities to do so, only then will the board be authorized to step in and address the problem. Again, Puerto Rico's fate rests in the hands of its elected leaders, under the broad supervision of the board.

Section 204(a) warrants careful analysis. An earlier version of PROMESA, released as a "discussion draft" on March 29th, required the oversight board to review every legislative act enacted by the Puerto Rico government and to make a determination—in the board's sole discretion—about whether each act was consistent with the certified fiscal plan. If the board determined that the act was consistent with the fiscal plan, the act would be allowed to take effect. However, if the board determined that the act was significantly inconsistent with the fiscal plan, the board was required to declare the act "null and void." This was essentially the procedure in place for the District of Columbia under Public Law 104–8, the *District of Columbia Financial Responsibility and Management Assistance Act of 1995*.

In H.R. 5278, Section 204(a) has been substantially improved. Under the bill, the governor will send each legislative act to the board, but the board can opt not to require the governor to do so. Moreover, as long as the governor provides the board with (1) a "score" of the bill from the Puerto Rico Office of Management and Budget (OMB) or another appropriate entity estimating the impact of the act on expenditures and revenues, and (2) a certification from the Puerto Rico OMB or another appropriate entity that the law is not significantly inconsistent with the certified fiscal plan, then the act is insulated from board review. It would only be if the Puerto Rico government, after being given numerous opportunities, fails to transmit to the board the cost estimate or the certificate of "no significant inconsistency," or if the Puerto Rico government certifies that the law is significantly inconsistent but fails to provide a reasonable explanation for such inconsistency, that the board would even be authorized—rather than required—to prevent enforcement of the legislative act in question. In summary, as long as the Puerto Rico government adheres to the most basic requirements of responsible legislating, it is exceedingly unlikely that any legislative act will ever be reviewed by the board, much less reversed. This is a "good government" provision because the Puerto Rico government should not be enacting legislation without having a reasonable sense of what its fiscal impact will be.

Section 204(b) also requires precise description. The earlier version of PROMESA, released as a discussion draft on March 29th, mandated that the oversight board review every contract, other than "vendor contracts," proposed to be executed by the Puerto Rico government—and did not define the term "vendor contracts." Given that the Puerto Rico government executes over 100,000 contracts annually, this provision—apart from being objectionable as a policy matter—was infeasible as a practical matter.

Like Section 204(a), Section 204(b) has been substantially improved in H.R. 5287. First, it requires the oversight board to work

114

with the Puerto Rico Office of the Comptroller to ensure that government agencies and departments are complying with the existing Puerto Rico law that requires agencies and departments to maintain a registry of all contracts they have executed and to send a copy of those contracts to the Office of the Comptroller, who publishes those contracts in an online database searchable by the public. This is a positive, pro-transparency measure.

Second, Section 204(b) authorizes—but does not require—the board to establish a policy to review certain contracts before they can be executed by the Puerto Rico government to determine whether they are inconsistent with the certified fiscal plan, thereby giving the board the discretion to craft a smart, sensible policy. The bill includes a "Sense of Congress" provision expressing the view that any policy established by the board "should be designed to make the government contracting process more effective, to increase the public's faith in this process, to make appropriate use of the Oversight Board's time and resources, to make the territorial government a facilitator of and not a competitor to private enterprise, and to avoid creating any additional bureaucratic obstacles to efficient contracting." Compare this to Public Law 104–8, the *District of Columbia Financial Responsibility and Management Assistance Act of 1995*, which authorized the oversight board to pre-review every contract proposed to be executed by the District of Columbia government.

Section 204(b) applies the same reasonable oversight board procedures applicable to contracts to rules, regulations and executive orders as well. This is a dramatic improvement over the March 29th discussion draft, which authorized the board to directly issue rules and regulations, binding upon the people of Puerto Rico, as if the board were the Puerto Rico government.

Section 205 has also been substantially improved from the March 29th discussion draft. The discussion draft, which was drawn more or less verbatim from Public Law 104–8, (1) authorized the oversight board to submit recommendations to the Puerto Rico government regarding steps the government could take to promote financial stability and management efficiency, (2) required the Puerto Rico government to respond in writing as to whether it supported or opposed those recommendations, and then (3) empowered the board to impose its recommendations over the objection of the Puerto Rico government so long as the board provided notice to Congress. Under H.R. 5287, the anti-democratic provision empowering the oversight board to impose its recommendations over the objection of the Puerto Rico government has been removed. The board is still authorized to make policy recommendations and to obtain a written response from the Puerto Rico government regarding whether it will, or will not, implement those recommendations. Section 201 does require the fiscal plan put forward by the Puerto Rico governor to "adopt appropriate recommendations" submitted by the oversight board under Section 205, but the term "appropriate" provides the governor with significant flexibility to adopt sound recommendations and to decline to adopt unsound recommendations. The goal is for the governor and the board to work together for the benefit of the people of Puerto Rico, not to have parallel governing structures.

115

Section 208 requires the oversight board to submit a report to federal and local officials after each Puerto Rico fiscal year describing what the board has accomplished, how it has spent its funds, and the improvements that Puerto Rico has made. This section also requires the governor to submit a report to the oversight board, which the board must keep confidential, regarding the discretionary tax abatement or tax waiver agreements that the Puerto Rico government has with certain companies doing business on the island, providing these companies with a tax rate lower than the statutory rate.

Section 209 pertains to the termination of the board. The March 29th discussion draft provided that the oversight board would terminate once certain conditions were met, but could "snap back" into operation if certain triggering events subsequently took place. Under H.R. 5287, there is no longer a "snap back" provision. The board will terminate, once and for all, when the specified conditions are met. In terms of those conditions, the earlier draft required the Puerto Rico government to (1) have a balanced budget for five consecutive years and (2) have regained access to the capital markets at reasonable interest rates. H.R. 5287 shortens the time period in (1) to four consecutive years, the same as was required of the District of Columbia in P.L. 104–8.

Section 211 provides that, if the oversight board determines that one of Puerto Rico's public pension systems is underfunded, the board shall conduct an analysis—prepared by an independent actuary retained by the board—of that pension system. The March 29th discussion draft contained a more ideologically-driven provision that required the Joint Board for the Enrollment of Actuaries to analyze Puerto Rico's public pension systems, but that was drafted in a way that appeared to encourage the Board's analysis to reach certain pre-determined conclusions. That language was removed and replaced with the current, impartial language of Section 211.

*The debt restructuring framework*

Taken together, the relevant provisions of H.R. 5278—including Section 104(i), Section 104(j), Section 201, Section 206, Title III, Section 405, and Title VI—authorize debt-issuing public entities in Puerto Rico to restructure their debts in a federal court-supervised process under certain terms and conditions, if good-faith efforts by an entity to reach a consensual debt-restructuring agreement with its creditors have not borne fruit.

Section 405 imposes a stay on all creditor litigation in order to create a more suitable environment in which debt restructuring negotiations can occur. The stay lasts from date of enactment through February 15, 2017 or six months after the date of enactment, whichever is later. The stay can be extended by up to 75 days if the oversight board determines such an extension is necessary for an entity to reach a consensual agreement with its creditors.

As per Section 206, in order for a debt-issuing entity to access a federal court-supervised restructuring under Title III, the oversight board must determine that (1) the entity has made good-faith efforts to reach a consensual restructuring agreement with creditors, and (2) the entity has made public draft financial statements and adopted procedures necessary to deliver timely audited finan-

116

cial statements. If 5 of the 7 members of the board determine that these criteria have been met, the board shall provide a certification and the debt-issuing entity can access Title III.

Good-faith efforts to reach a consensual restructuring agreement can take different forms, including—but not limited to—use of the "collective action clause" provisions of Title VI of PROMESA. Under this process, a debt-issuing entity can reach agreement with a critical mass of creditors in a particular class or pool (two-thirds of the owners of the outstanding principal in that pool), and that agreement can become binding—that is, enforceable by a court—on "holdout" creditors in the pool. This process will be mediated by the oversight board, called the "Administrative Supervisor" for purposes of Title VI. The debt-issuing entity can propose a particular modification to be voted on by creditors, or creditors can propose a modification that can be accepted by the board on behalf of the debt-issuing entity. But proposed modifications must meet certain standards before they can be voted on and accepted. Any voluntary agreement must be certified by the oversight board before it takes effect. In general, the board must determine that the debt restructuring agreement provides for a sustainable level of debt and that it is consistent with the certified fiscal plan.

Once a debt-issuing entity has accessed Title III, the oversight board—as the representative of the entity—will file the petition to adjust debts and file the plan of adjustment that proposes particular treatment for different classes of creditors (bondholders, government workers, retired government workers, vendors who have sold goods or services to the government). The board may only put forward a plan of adjustment that is consistent with the certified fiscal plan, meaning, among other things, that the plan of adjustment must provide "adequate finding" for public pension systems.

With limited exceptions, the provisions normally applicable in a proceeding under the federal bankruptcy code will apply to a Title III proceeding under PROMESA.

In order to confirm a plan of adjustment, the federal judge must determine, among other things, that the plan (1) is feasible and in the best interests of creditors (which is drawn verbatim from federal bankruptcy law); and (2) is consistent with the certified fiscal plan. The fiscal plan, in turn, is required to provide adequate funding for public pension systems and to "respect the relative lawful priorities or lawful liens, as applicable, in the constitution, other laws, or agreements" in effect in Puerto Rico prior to the date of enactment. This provision does not exempt any creditor from haircuts and simply memorializes what a federal judge would almost certainly do in any event—that is, look to relative payment priorities set forth in applicable state law when administering a debt restructuring process.

In sum, H.R. 5278 gives debt-issuing entities in Puerto Rico strong but fair tools to restructure their unsustainable debt, ideally through consensual, out-of-court agreements, but through a court-supervised process if necessary. It is important to emphasize that I do not view Puerto Rico and its creditors as adversaries engaged in a zero-sum conflict where one side's gain is another side's loss. Instead, I regard Puerto Rico and its creditors as passengers on the

117

same distressed ship. We are going to sail safely to shore together, or we are going to sink together.

*Labor related provisions*

Section 403 relates to the application of the federal minimum wage in Puerto Rico. This provision, which I oppose, has generated controversy, and so it is important to understand exactly what the provision does—and does not—do.

Current federal law allows employers throughout the United States to pay workers up to age 20, in the first 90 days of employment, less than the federal minimum wage of $7.25 per hour, but no less than $4.25 per hour. Section 403 authorizes the governor of Puerto Rico, with the permission of the oversight board, to allow island employers to extend the 90-day period to up to 4 years, but only for Puerto Rico employees hired after the date of enactment. If the governor does not opt in, this provision has no effect. Once the oversight board is terminated, this provision is rendered null and void.

The provision also amends federal law to allow Puerto Rico employers to extend the subminimum wage provision to workers up to age 25, rather than up to age 20. Again, this is only for workers hired after the date of enactment and, again, this provision becomes null and void upon the termination of the oversight board. The Puerto Rico government can simply override this provision by enacting legislation maintaining the age ceiling age at 20.

In short, if the Puerto Rico government does not want to pay workers of any age less than $7.25 per hour for any period of time, it is completely free to take action to ensure that result, by declining to opt in to one provision (extending the 90-day rule) and affirmatively opting out of the other provision (raising the 20-year-old age ceiling).

More generally, this is a deeply misguided provision, even if it will not have any practical effect in Puerto Rico. The people of Puerto Rico are American citizens. Puerto Rico's economy is part of the U.S. economy. As federal policymakers, our objective should be to close the gap between Puerto Rico and the states, not to widen it. The gap exists precisely because the federal government has treated Puerto Rico unequally and unfairly over the years, and so the last thing Congress should be doing is enacting more bills that treat my constituents unequally and unfairly.

As Sergio Marxuach, the policy director at a Puerto Rico-based think tank, the Center for a New Economy, explained in detail during his testimony before the Senate Committee on Energy and Natural Resources on October 22, 2015, the application of the federal minimum wage to Puerto Rico is not the cause of the U.S. territory's economic problems and exempting Puerto Rico from the federal minimum wage is likely to harm, rather than to help, the territory's economy.

The percentage of working-age individuals in Puerto Rico who are working or seeking work in the formal economy—known as the labor participation rate—is very low. It currently stands at under 40 percent, compared to a U.S. national average of over 60 percent. There is a large informal economy in Puerto Rico, meaning many individuals earn income, but do not pay payroll or income taxes on

118

that income and do not accrue benefits like Medicare and Social Security.

Given the specific situation in Puerto Rico, the goal of federal and local policymakers should be to enact policies that encourage island residents, whether they are unemployed or working in the informal economy, to obtain jobs in the formal economy. Authorizing employers in Puerto Rico to pay certain workers under the federal minimum wage would not help achieve this objective.

A recent report by the Puerto Rico Institute of Statistics compared the cost of living in Puerto Rico with approximately 325 urban areas in the United States, and concluded that the overall cost of living in Puerto Rico—encompassing gasoline, energy, food and housing—is 13 percent higher than in those jurisdictions. Residents of Puerto Rico are also required to pay an 11.5 percent sales tax on most purchases, which is the highest sales tax in the nation. It is difficult to see how a worker in Puerto Rico could earn under $7.25 an hour, pay taxes on that income, and still meet his or her most basic needs. The most likely result of exempting Puerto Rico from the federal minimum wage would be to discourage individuals from working in the formal economy, to encourage more individuals to work in the informal economy, to provide an additional incentive for individuals to rely upon government assistance programs rather than to work, and to increase the already-historic level of migration from Puerto Rico to the states. I am not aware of a single economist in Puerto Rico who has argued otherwise.

Rather than authorizing employers in Puerto Rico to pay workers a lower wage, a far more constructive course of action would be for Congress to include Puerto Rico in the federal earned income tax credit program and to fully extend the federal child tax credit program to the territory, as many economists in the states and Puerto Rico have proposed. Nearly every individual in the states who receives a refund check under the EITC and CTC programs does not earn enough to owe a single penny in federal income taxes, so there is no reasonable basis to argue that Puerto Rico residents should not be eligible for these programs because Congress has chosen to exempt territory residents from certain federal income taxes—the usual excuse given by policymakers for Puerto Rico's discriminatory treatment under the EITC and CTC programs.

Section 404 relates to the U.S. Department of Labor's (DOL's) administrative rule. This rule—which became final on May 18, 2016—increases the salary threshold above which an employee is exempt from the overtime provision of the Fair Labor Standards Act (FLSA), raising it from the current $455 per week ($23,660 per year) to $970 per week ($50,440 per year). Accordingly, executive, administrative, and professional employees making between $455 and $970 per week are now covered by the overtime provisions of the FLSA and entitled to overtime pay for hours worked in excess of 40 per week.

The final DOL rule applies to Puerto Rico employers, even though the Puerto Rico Secretary of Labor requested an exemption from this rule and I expressed concern about my inability to obtain a reasonable estimate about the potential impact of extending the higher salary threshold to Puerto Rico. My concern was rooted in the fact that the White House issued a document to members of

119

Congress that provides a state-by-state breakdown of how many workers in each jurisdiction are likely to be affected by the new rule. As is often the case, however, no breakdown was provided for Puerto Rico. This document was based on a statistical product called the Current Population Survey—jointly prepared by the U.S. Census Bureau and the Department of Labor—that is not conducted in Puerto Rico.

Section 404 will exempt Puerto Rico from the overtime rule. However, the provision requires the Government Accountability Office—within two years of the date of enactment—to prepare a report analyzing the economic impact of including Puerto Rico in the rule. Then, the Department of Labor, using the GAO report and other relevant information, can certify that including Puerto Rico in the rule will not have a negative impact on Puerto Rico's economy. Upon that certification, Puerto Rico will be included in the rule. If the certification is not provided, Puerto Rico will continue to be excluded.

At my request, the provision also includes a "Sense of Congress'" that the Census Bureau and the Department of Labor should conduct a study to determine the feasibility of extending the Current Population Survey to Puerto Rico and the other territories, and should request the funding from Congress necessary to conduct that study—about $194,000—if it cannot fund the study with current appropriations.

I support Section 404 in its current form.

*Puerto Rico's Political Status*

Section 402, included at my request, confirms that nothing in H.R. 5872 shall be interpreted "to restrict Puerto Rico's right to determine its future political status, including by conducting the plebiscite as authorized by Public Law 113–76."

This provision is of critical importance. The American public and their elected representatives must come to terms with a fundamental fact, which is that the main cause of Puerto Rico's economic, fiscal and demographic problems is its undemocratic and unequal political status. As then-Chairman Ron Wyden and then-Ranking Member Lisa Murkowski both recognized during their opening statements at an August 1, 2013 hearing held by the Senate Committee on Energy and Natural Resources, a clear majority of voters in Puerto Rico rejected this status in a locally-sponsored plebiscite held in November 2012. My constituents are now being governed under an arrangement to which they do not consent.

Puerto Rico's status as a territory is not an abstract or theoretical problem. It is a moral, social and political wrong with crushing practical consequences for the men, women and children I represent. There will always be some people and politicians who assert, despite overwhelming evidence to the contrary, that Puerto Rico's consistent underperformance relative to the 50 states over the course of many decades has nothing to do with the unequal treatment that Puerto Rico receives as a territory. There are even people and politicians who claim that Puerto Rico's status is an advantage rather than a disadvantage, though their voices have mostly gone silent in recent years. These people and politicians can always be counted on to find some reason why *now* is not the mo-

120

ment to address the issue of status. They are wrong on the merits, and they are on the wrong side of history. The time has come for my constituents to have equality in this union or to have independence outside of it. If Puerto Rico can be compared to a weak and fragile body, then territory status is its depleted heart. Puerto Rico has the potential to be strong and stable, but it needs a powerful new heart.

I look forward to the day when the U.S. citizens who reside in Puerto Rico, especially the hundreds of thousands of men and women who have served this nation in the armed forces, can vote for their national leaders and fully participate in debates over national policy that affect every aspect of their lives. I look forward to the day when Puerto Rico will be treated equally as a matter of right, and does not have to beg this Congress for fair treatment. I look forward to the day when my constituents have the exact same rights and responsibilities as my stateside colleagues' constituents—not better treatment, not worse treatment and not "special" treatment.

That new day is just over the horizon. As noted, in a 2012 local plebiscite, Puerto Rico voters rejected territory status. In that same plebiscite, more voters expressed a preference for statehood than for any other status option. Congress responded in January 2014 by enacting an historic law—P.L. 113–76, explicitly referenced in Section 402 of PROMESA—that authorizes, and appropriates $2.5 million in funding for, the first federally-sponsored status plebiscite in the 118 years that Puerto Rico has been a U.S. territory. It is my hope and expectation that, in 2017, the Puerto Rico government will use this authority to conduct a federally-sponsored, yes-or-no plebiscite on whether Puerto Rico should be admitted as a state. In the immediate term, there is much that the Puerto Rico government and the federal government should do to help the territory manage its economic crisis, including—most urgently—swiftly enacting PROMESA. However, for Puerto Rico to truly prosper, it must be treated equally. And to be treated equally, the territory should become a state.

PEDRO R. PIERLUISI.

### ADDITIONAL VIEWS

Puerto Rico's debt currently exceeds the size of its entire economy. On June 29th of last year, Puerto Rico's governor, Alejandro Garcia Padilla, declared that the Commonwealth's $70 billion in debt "is not payable." According to the U.S. Treasury Department, "Puerto Rico is already in default."[1]

The island has been "shut out of the municipal bond market for more than two years and ran out of funding sources traditionally used to finance government operations more than six months ago."[2] In February, the Puerto Rico government announced that "it had substantial doubt about its ability to operate in the long term."[3]

The situation in Puerto Rico is close to, or has already become, a humanitarian crisis. Essential services are being cut or reduced. Schools and hospitals, if not already shuttered, face daily electricity or water shortages. Because hospitals don't have money to pay vendors, they are increasingly unable to provide healthcare services. The Obama Administration has grown increasingly concerned about Puerto Rico's ability to "handle a Zika outbreak because of the island's health care system challenges."[4]

As a result of the faltering economy, it is estimated that almost 100,000 Puerto Ricans left the island for better opportunities on the U.S. mainland last year, exacerbating the economic crisis.

H.R. 5278, introduced by Representative Sean Duffy (R–WI) on May 18, 2016, would assist Puerto Rico in restructuring $70 billion in unpayable debt. It is successor legislation to H.R. 4900, also introduced by Representative Duffy on April 12, 2016, as well as several discussion drafts released by the Majority.

The bill would create a process for the Commonwealth of Puerto Rico and the four other U.S. Territories, to restructure their bond debts under the direction of a seven-member Financial Oversight and Management Board ("Oversight Board"), which would have broad powers over the island's budget and finances. The legislation specifies that the Oversight Board is not a federal entity.

Members would be appointed to the Oversight Board by the President, selected from lists submitted by the House Speaker and Minority Leader, and the Senate Majority and Minority Leaders. Importantly, an Oversight Board is created for Puerto Rico, leaving the other Territories with the option to create an Oversight Board if their Governor and legislatures jointly request such an entity.

---

[1] January 15, 2016 letter to Speaker Paul Ryan from Jacob Lew, Secretary of the Treasury
[2] *Id.*
[3] Nick Brown, (February 17, 2016). *Puerto Rico government cites 'substantial doubt' about its solvency* http://www.reuters.com/article/us-usa-puertorico-debt-idUSKCN0VQ045
[4] Stephanie Amour, (February 18, 2016). *Obama Administration Pushes Steps to Aid Puerto Rico With Zika Virus* http://www.wsj.com/articles/obama-administration-pushes-steps-to-aid-puerto-rico-with-zika-virus-1455843671

122

The bill outlines the conditions and methods by which Puerto Rico's outstanding debt could be restructured in federal court. The legislation would also impose a temporary stay on litigation, which is critically important, so that the Oversight Board can begin its work.

Prior drafts granted the Oversight Board far more sweeping authorities, including the power to fine or imprison public employees. A prior draft also included a provision authorizing conveyance of a portion of the Vieques National Wildlife Refuge to the Commonwealth, which was removed.

Previous drafts included language disadvantaging pension benefits in the restructuring process, as well. According to reports, the Teachers' Retirement System, together with the Public Employees' Retirement System, covering almost 330,000 workers and retirees, are broke, with combined liabilities of $43.2 billion and assets of just $1.8 billion.

The reported bill requires the Fiscal Plan to "provide adequate funding for public pension systems," meaning that the pension system must be made solvent enough to fund accrued pension benefits owed under current law.

Despite these improvements, H.R. 5278 is flawed legislation.

Section 403 expands application of the existing federal subminimum wage ($4.25/hr. for the first 90 days of employment) from covering those under 20 to covering those under 25 in Puerto Rico. It further extends application of the subminimum wage from 90 days to as long as four years, if the Governor requests the extension and the Oversight Board approves.

The authority of the Governor to request an extension expires with the termination of the Oversight Board. The Governor and local legislature retain the ability to increase the minimum wage above $7.25 per hour. While the bill prohibits firing employees for the purpose of replacing them with lower paid workers, Section 403 will only incentivize more workers to leave the island in search of a more livable wage.

Section 404 directs the Secretary of Labor, using a GAO study to be completed within 2 years of enactment, to determine if the new Department of Labor ("DOL") rule on overtime pay would negatively impact the economy of Puerto Rico, if implemented. The new DOL rule expands the pay cap for overtime pay eligibility from $23,660 per year to $47,476 per year. The rule would not apply on Puerto Rico until the determination is made. Like expanding the subminimum wage, delaying or potentially blocking new guarantees for overtime pay will further depress Puerto Rico's labor market.

The Oversight Board's powers are excessive, including the authority to force compliance with its edicts over local objections and override local legislative acts that are inconsistent with a required Fiscal Plan. The bill also gives the Oversight Board further authority to micro-manage Puerto Rico's budget, potentially leading to more devastating budget cuts.

Title V allows proposed construction projects to bypass critical local and Commonwealth-level environmental, public health, and consumer protections. These protections are not barriers to infrastructure upgrades and need not be waived. The real problem is ac-

123

cess to capital, which will be addressed by the restructuring provisions, and a culture of mismanagement, addressed by a newly-created Energy Commission. The only precedent for using the approach in Title V for energy upgrades in Puerto Rico occurred between 2010 and 2012 and was an abject failure.

In addition to these harmful provisions, several critical issues are not addressed in H.R 5278. The bill fails to provide a long-term solution to Puerto Rico's inadequate Medicaid treatment or allow access to the Earned Income Tax Credit (EITC), which would be helpful in increasing the island's meager 45% job participation rate. H.R. 5278 fails to include any federal stimulus funding or authorize supplemental funding to address the spread of the Zika virus on the island.

During Committee consideration of H.R. 5278, Democrats offered amendments to address some of the troubling provisions outlined above; these amendments were largely outside the jurisdiction of this Committee and, therefore, ruled out of order. It is unfortunate that the three other House Committees to which the bill was referred appear to have no plans to consider the bill.

Committee Republicans, meanwhile, sought to completely derail H.R. 5278 through amendments designed to remove or water down agreed-upon provisions such as the stay on litigation or the automatic Oversight Board for Puerto Rico. These and other poison-pill amendments were withdrawn or defeated by bipartisan votes.

H.R. 5278 includes extraneous and potentially counterproductive provisions and does not go far enough in providing protections for pensioners or a real federal investment in the Commonwealth's dying economy.

Measured against an ideal bill, this legislation is flawed. Measured against the on-going humanitarian crisis in Puerto Rico, however, this legislation is a workable compromise and necessary.

RAÚL M. GRIJALVA,
*Ranking Member, Committee on Natural Resources.*

○