# **EXHIBIT B**

PAUL R. GLASSMAN (State Bar No. 76536)
FRED NEUFELD (State Bar No. 150759)
MARIANNE S. MORTIMER (State Bar No. 296193)
STRADLING YOCCA CARLSON & RAUTH
A Professional Corporation
100 Wilshire Blvd., 4th Floor
Santa Monica, CA 90401
Telephone: (424) 214-7000
Facsimile: (424) 214-7010
E-mail: pglassman@sycr.com
        fneufeld@sycr.com
        mmortimer@sycr.com

GARY D. SAENZ (State Bar No. 79539)
CITY ATTORNEY
300 North "D" STREET, Sixth Floor
San Bernardino, CA 92418
Telephone: (909) 384-5355
Facsimile: (909) 384-5238
E-mail: saenz_ga@sbcity.org

Attorneys for Debtor
City of San Bernardino, California

FILED & ENTERED

FEB 07 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY moser    DEPUTY CLERK

CHANGES MADE BY COURT

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### RIVERSIDE DIVISION

In re

CITY OF SAN BERNARDINO,
CALIFORNIA,

                Debtor.

Case No. 6:12-bk-28006-MJ

Chapter 9

**ORDER CONFIRMING THIRD AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF SAN BERNARDINO, CALIFORNIA (JULY 29, 2016), AS MODIFIED; FINDINGS OF FACT AND CONCLUSIONS OF LAW IN RESPECT THEREOF**

1.      On July 29, 2016, the City of San Bernardino, California ("City") filed with this U.S. Bankruptcy Court (the "Court") the City's *Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California* (*July 29, 2016*) (the "Plan"), the *Third Amended Disclosure Statement* with respect to the Plan (the "Disclosure Statement"), an Appendix of Exhibits, a notice of the materials distributed to all known creditors in connection with voting on the Plan and the hearing on confirmation of the Plan, and related documents [Dkt. Nos. 1880 through 1885] (the "Solicitation Materials"), and began solicitation of acceptances of the Plan.  Prior to that date, on July 7, 2016, the Court entered its order approving the Disclosure Statement and setting certain deadlines and procedures for voting to accept or reject the Plan and filing objections to confirmation of the Plan [Dkt. No. 1874] (the "Disclosure Statement Order").

2.      On September 30, 2016, the City filed and served its Memorandum of Law in Support of the Plan (the "Memorandum") and related pleadings, a Notice of Plan Modifications, the Declaration of Catherine Nownes-Whitaker (the "Ballot Tabulation") and the Declarations of John E. Bartel, Jarrod Burguan, Michael Busch, Kenneth Dieker, Georgeann Hanna, Mark Scott, Justin McCrary [Dkt. Nos. 1981-1992],and shortly thereafter a supplemental declaration from Justin McCrary [Dkt. Nos. 1997 and 1998] (the "Declarations").  The Ballot Tabulation reported that all classes of impaired claims voted to accept the Plan.  With respect to Class 13 of the Plan, the impaired class of General Unsecured Claims,[1] 983 creditors holding $154 million in claims voted to accept the Plan, and 43 creditors holding $2.8 million in claims voted to reject the Plan.  Class 13, which is receiving a 1% distribution on allowed claims, voted to accept the Plan by more than 95% of votes cast and more than 98% in dollar amount of such claims.

3.      The hearings on confirmation of the Plan commenced on October 14, 2016, at 10:00 a.m. and continued on November 15 and December 6, 2016 (the three hearings are referred to as, the

---

[1]  All capitalized terms used but not defined herein are used as defined in the Plan or Disclosure Statement.  Any term used in the Plan or this Confirmation Order that is not defined in the Plan, Disclosure Statement or this Confirmation Order but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.  To the extent of any conflict or inconsistency between the terms of the Plan and this Confirmation Order, the Confirmation Order shall govern.  Any ambiguity in the Plan shall be resolved by reference to this Confirmation Order to the fullest extent possible.

"Confirmation Hearing").  At the Confirmation Hearing, only four creditors holding unliquidated

Litigation Claims maintained objections to confirmation of the Plan – William Schmart, Paul Triplett,

Rovinski Renter and Javier Banuelos  (the "Objections"), all other objections having been resolved or

withdrawn.  At the Confirmation Hearing, the Court admitted the Ballot Tabulation and Declarations

into evidence, including the reports and other exhibits attached to such Declarations, without objection

by any creditor or other party in interest.  Based upon the Declarations, the legal authority set forth in

the Memorandum, the record of the Confirmation Hearing and this Confirmation Order, all objections to

confirmation of the Plan, including the Objections, that have not been consensually resolved, are

overruled on the merits pursuant to this order (this "Confirmation Order").[2]

        4.      The Court having reviewed the Plan, the Disclosure Statement, the Disclosure Statement

Order, the Appendix of Exhibits, the Ballot Tabulation, the Declarations and the reports and other

exhibits attached to such Declarations, the Objections, the Memorandum, and the other papers before the

Court in connection with the confirmation of the Plan; having heard the statements of counsel in support

of and in opposition to confirmation of the Plan at the Confirmation Hearing as reflected in the record at

the Confirmation Hearing; having considered all evidence admitted at the Confirmation Hearing; having

taken judicial notice of the papers and pleadings on file in the Bankruptcy Case[3]; and after due

deliberation and having determined that (i) notice of the Confirmation Hearing and the opportunity of

any party in interest to object to confirmation of the Plan were adequate and appropriate in accordance

with Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule(s)") 2002 and 3016 through 3020 and

the Disclosure Statement Order, as to all entities to be affected by the Plan and the injunctions provided

for therein, and (ii) the legal and factual bases set forth in the Memorandum and at the Confirmation

---

[2]  In addition to overruling the Objections on the merits, the Banuelos Objection is separately overruled
because it was filed 39 days after the Court-established deadline for filing objections to confirmation of
the Plan, and the Renter Objection is separately overruled because it was filed as a joinder to an
objection to confirmation that was subsequently withdrawn.  *See* Bankruptcy Rule 3020(b)(1) ("An
objection to confirmation of the plan shall be filed . . . within a time fixed by the court.").

[3]  The Court takes judicial notice of the docket of the Bankruptcy Case maintained by the Clerk of the
Court, including, without limitation, all pleadings and other documents filed, all orders entered, and all
evidence and argument made, proffered or adduced at the hearings held before the Court during the
pendency of the Bankruptcy Case.  *See* Federal Rule of Evidence 201(c).

Hearing and as set forth in this Confirmation Order establish just cause for the relief granted herein, the

Court hereby makes the following Findings of Fact and Conclusions of Law:[4]

**IT IS HEREBY FOUND AND DETERMINED THAT**:

5.    <u>Exclusive Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157 and 1334)</u>.  This

Court has jurisdiction over the Bankruptcy Case pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is

proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), and this Court has exclusive jurisdiction to determine

whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be

confirmed, and to enter a final order with respect thereto.  The City is a proper debtor under Section[5]

109 and the proper proponent of the Plan under Section 941.  The City filed the Plan by the deadline set

by the Court.

6.    <u>Modifications of the Plan</u>.

6.1.    On September 30, 2016, the City filed and served certain Plan modifications (Dkt.

No. 1992, the "First Modifications").  Only one party in interest, the Big Independent Cities Excess Pool

Joint Powers Authority ("BICEP"), filed an objection to the First Modifications, and on November 10,

2016, the City proposed additional Plan modifications to address BICEP's concerns (Dkt. No. 2049 at

17:9-11 and 18:9-21, the "Second Modifications").  The Second Modifications became part of the

settlement between BICEP and the City (Dkt. 2096, 3:7-20), which settlement will be approved pursuant

to this Confirmation Order. The Court also requested that the City clarify Article VII.D. of the Plan with

respect to indemnification of employees.  The City modified the Plan by revising the language in Article

VII.D. of the Plan, which had provided, "In addition, following the Effective Date, the City will

continue to provide Indemnification in accordance with the City's pre-petition practices (as revised from

time to time). The City reserves the right to provide or deny requests or demands for Indemnification in

accordance with its practices," to provide, "The City shall indemnify the past and present officers and

---

[4]   These written findings and conclusions supplement the oral findings and conclusions states by the
court at the confirmation hearings.  Any inconsistency between the oral rulings and the written rulings
shall be resolved by giving deference to the written rulings.
[5]   Unless otherwise indicated, all "Section" references are to title 11 of the U.S. Code, the Bankruptcy
Code.

employees of the City with respect to claims against such officers and employees that arose prior to the

Confirmation Date in accordance with the City's pre-petition practices and state law, and the City shall

continue to provide such indemnification with respect to claims against officers and employees that arise

after the Confirmation Date." (the "Third Modification").

      6.2.    The First, Second and Third Modifications are hereinafter referred to as the "Plan

Modifications." The City asserted that the Plan Modifications benefit creditors, and the Court finds that

the Plan Modifications do not materially adversely affect or change the treatment of any holders of

claims who have not accepted such Plan Modifications. Accordingly, pursuant to Section 942 and

Bankruptcy Rule 3019, the Plan Modifications do not require additional disclosure under Section 1125

or re-solicitation of acceptances or rejections under Section 1126, nor do the Plan Modifications require

that holders of claims be afforded an opportunity to change previously cast acceptances or rejections of

the Plan. Disclosure of the Plan Modifications in the filings and service on September 30 and November

10, 2016 and in the record at the Confirmation Hearing constitutes due and sufficient notice thereof

under the circumstances of the Bankruptcy Case. Accordingly, all references to the Plan herein shall

mean the Plan as modified by the Plan Modifications, and all votes cast with respect to the Plan prior to

the filing of the Plan Modifications shall continue to be binding and shall apply with respect to the Plan

as modified by the Plan Modifications. A redline showing the Plan filed on July 29, 2016 as modified

by the Plan Modifications was filed by the City on January 3, 2017. The Plan attached hereto as Exhibit

A incorporates the Plan Modifications and is the Plan confirmed by this Confirmation Order.

      7.    Transmittal and Mailing of Materials; Notice. The Solicitation Materials were

transmitted and served upon all interested parties in compliance with the Disclosure Statement Order

and in compliance with the Bankruptcy Rules, and such transmittal and service was adequate and

sufficient. *See Notice of Materials Distributed to Creditors in Connection with the Hearing on

Confirmation of the City's Chapter 9 Plan of Adjustment of Debts* [Dkt. No. 1883]. Notice of the

Confirmation Hearing and all deadlines in the Disclosure Statement Order was given in compliance with

the Bankruptcy Rules and the Disclosure Statement Order and was good and sufficient notice in

accordance with Bankruptcy Rules 2002 and 3020, and no other or further notice is or was required.

Votes for acceptance or rejection of the Plan were solicited in good faith, after transmittal of the

Disclosure Statement containing adequate information, and otherwise in compliance with Bankruptcy Code sections 1125 and 1126 and Bankruptcy Rules 3016 through 3020.

8. <u>Impaired Classes Voting to Accept the Plan</u>. As evidenced by the Ballot Tabulation, all impaired Classes of Claims, meaning Classes 1, 2, 5, 6, 9, 12, 13 and 14 (and Classes 10 and 11 that are incorporated into Class 13), voted to accept the Plan pursuant to the requirements of Sections 1124 and 1126. Thus, at least one impaired class of Claims has voted to accept the Plan.

9. <u>Classes Deemed To Accept the Plan</u>. Classes 3, 4, 7 and 8 are not impaired under the Plan and are deemed to have accepted the Plan pursuant to Section 1126(f).

10. <u>No Cramdown Required</u>. Since all Classes of Claims either voted to accept the Plan or are deemed to accept the Plan, Section 1129(b) does not apply and the Court is not required to consider the cramdown requirements of Section 1129(b) as to any Class of Claims (as there are no dissenting Classes).

11. <u>Plan Compliance With Section 941</u>. Section 941 requires that the Debtor file a plan of adjustment with the petition for relief, or by any deadline for doing so set by the Court. The City complied with each of the Court's deadlines related to filing of the Plan, including timely filing the Plan that creditors voted on. Thus, the Plan satisfies Section 941.

12. <u>Plan Compliance With Section 943(b)(1)</u>. The Plan complies with the provisions of the Bankruptcy Code made applicable to chapter 9.

    12.1. <u>Classification and Treatment of Claims (11 U.S.C. §§ 1122, 1123(a)(1) - (4))</u>.

        12.1.1. In accordance with Section 1122(a), Article III of the Plan classifies each Claim against the City into a Class containing only substantially similar Claims. The legal rights under applicable law of each holder of Claims within each Class under the Plan are substantially similar in nature and character to the legal rights of all other holders of Claims within such Class. No Claims were separately classified under the Plan to gerrymander favorable votes with respect to the Plan. In accordance with Section 1122(b), convenience claims are separately classified in Class 14 under the Plan solely for the purpose of administrative convenience. In accordance with Section 1123(a)(1), Article III of the Plan properly classifies all Claims that require classification. Valid factual and legal reasons exist for the separate classification of (a) certain secured Claims from other secured Claims and

1   (b) certain unsecured Claims from other unsecured Claims. In accordance with Section 1123(a)(2),

2   Article IV of the Plan properly identifies and describes each Class of Claims that is not impaired under

3   the Plan. In accordance with Section 1123(a)(3), Article IV of the Plan properly identifies and describes

4   the treatment of each Class of Claims that is impaired under the Plan. In accordance with Section

5   1123(a)(4), the Plan provides the same treatment for each Claim of a particular Class.

6             12.1.2.  Class 8 is comprised of the claims of CalPERS.  After a successful

7   mediation led by Judge Zive, the City entered into a settlement with CalPERS that resolved a number of

8   complex and disputed statutory and contractual claims of CalPERS.  Good business, economic and

9   public policy reasons supported the City's entering into the settlement with CalPERS, including that the

10   City is unable to hire and maintain a sustainable workforce at this time without continuing to provide

11   CalPERS pension benefits to its employees.  In order to treat CalPERS' claims pursuant to the

12   settlement, the City separately classified the claims.  Therefore, the City had legitimate economic

13   reasons for separately classifying CalPERS' claims.  Not a single confirmation objection was filed to (i)

14   the City's settlement with CalPERS, (ii) the separate classification of CalPERS' claims or (iii) the

15   treatment of CalPERS' claims under the Plan.

16             12.1.3.  Class 12 is comprised of the claims of the POB Creditors (which defined

17   term, as used herein and in the Plan, the Disclosure Statement and related documents, shall include, for

18   the avoidance of doubt, Ambac Assurance Corporation), who held claims of approximately $51 million

19   based upon the  POBs.  Although the City argued that the POB Creditors hold general unsecured claims,

20   that position was disputed by the POB Creditors who argued that under California law they were entitled

21   to payment on their claims with the same priority as the payments the City makes to CalPERS.  The

22   Court entered an order dismissing the POB Creditors' complaint for declaratory relief on the matter, but

23   the POB Creditors took an appeal to the Bankruptcy Appellate Panel for the Ninth Circuit (the

24   "B.A.P."), which appeal is still pending at the B.A.P.  The treatment of the POB Creditors under the

25   Plan, paying them approximately 40 cents on the dollar over a 30 year term, reflects the City's decision

26   to settle rather than litigate with the POB Creditors. Settlements and compromises are "a normal part of

27   the process of reorganization."  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.*

28   *Anderson*, 390 U.S. 414, 424, 88 S. Ct. 1157, 1163 (1968) (quoting *Case v. Los Angeles Lumber Prods.*

*Co.*, 308 U.S. 106, 130 (1939)).  In evaluating whether a proposed agreement is fair and equitable, courts in the Ninth Circuit generally consider four factors: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the interest of the creditors and a proper deference to their reasonable views.  *Arden v. Motel Partners (In re Arden)*, 176 F.3d 1226, 1228 (9th Cir. 1999); *In re Woodson*, 839 F.2d 610, 620 (9th Cir. 1988); *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1381 (9th Cir. 1986).  Given the unique litigation risk – the complexity of the litigation, the procedural posture and the potential impact a reversal on appeal could have on the feasibility of the Plan – and the fact that the City believed that settlement would assist the City in obtaining necessary public financing in the capital markets in the future, the City was well within its discretion to settle.  Moreover, no creditor or other party filed an objection to the separate classification and treatment of the POB Creditors.  There is no evidence that the City classified the POB Creditor claims separately for the purpose of gerrymandering the vote.  As the vote tabulation shows, even without Class 12, several other classes of impaired creditors voted to accept the Plan, so Class 12 was not separately classified to create an impaired consenting class.

12.1.4.   Thus, the City was well within its discretion to separately classify and treat the claims of CalPERS and the POB Creditors and did so for good business and economic reasons.  The Court finds that the CalPERS Claims and POB Claims are validly classified separately from other claims because they have a different legal character, and there are good business reasons to do so.

12.1.5.   Under the Plan, Litigation Claims are included in Class 13, the class of General Unsecured Claims that receives a 1% distribution on the allowed amount of the claim.  One or more of the Objections to confirmation of the Plan argued that the Litigation Claims should have been separately classified and not included in Class 13 and should have received better treatment than other General Unsecured Claims.  However, the Litigation Claims are substantially similar to the other claims in Class 13 and classifying them in the same class with the other General Unsecured Claims is a legitimate exercise of the City's discretion in structuring its Plan.[6]  Substantially similar claims are those

---

[6] *See Steelcase Inc. v. Johnston (In re Johnston)*, 21 F.3d 323, 327-28 (9th Cir. 1993) (proponent of plan has wide latitude in determining whether similar claims should be separately classified); *Franklin*

that "share common priority and rights against the debtor's estate." *In re Greystone III Joint Venture*, 995 F.2d 1274, 1278 (5th Cir. 1991). "Unsecured claims will, generally speaking, comprise one class . . . because they are claimants of equal legal rank entitled to share pro rata in values remaining after payment of secured and priority claims.*" FGH Realty Corp. v. Newark Airport/Hotel Ltd. P'ship*, 155 B.R. 93, 99 (D. N.J. 1993). Numerous courts have held that litigation claims against a debtor have the same rights under state law as unsecured notes, unsecured claims for goods and services, and unsecured contract claims, and all such claims should generally be placed in a single class. *See e.g., In re Frascella Enterprises, Inc.*, 360 B.R. 435, 443 (Bankr. E.D. Pa. 2007) ("Unsecured claims, whether trade, tort, unsecured notes, or deficiency claims of secured creditors, are generally included in a single class because they are of equal rank entitled to share pro rata in values remaining after payment of secured and priority claims.") (quoting *In re 266 Washington Assoc.*, 141 B.R. 275, 282 (Bankr. E.D.N.Y. 1992)); *see also Norton Bankruptcy Law and Practice*, § 60.5 ("Unsecured claims will, generally speaking, comprise one class, whether trade, tort, publicly held debt or a deficiency of a secured creditor."). Under applicable non-bankruptcy law, the holders of Litigation Claims have no greater right, interest or priority of payment on their claims against the City than the unpaid providers of goods and services, or contract counterparties with breach claims against the City. Therefore, the Litigation Claims are substantially similar to the other claims in Class 13, and the City was authorized under Section 1122(a) to classify all those unsecured claims in a single class.

12.1.6. A related classification objection made in one or more of the Objections was that certain of the Litigation Claims are civil rights claims arising under 42 U.S.C. § 1983 ("§ 1983"), and such claims should not be discharged or impaired in bankruptcy proceedings. But civil rights claims may be impaired in bankruptcy proceedings and are dischargeable, just like other claims against a debtor. "Congress has restructured the bankruptcy act several times and has never sought to restrain cities from using bankruptcy as a tool to restructure debts incurred by civil rights judgments." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs (In re City of Desert Hot Springs),* 339 F.3d

---

*High Yield Tax-Free Income Fund et al. v. City of Stockton, California (In re City of Stockton, California)*, 542 B.R. 261, 280 (B.A.P. 9th Cir. 2015) ("Generally, § 1122 allows plan proponents broad discretion to classify claims and interests according to the particular facts and circumstances of each case.").

782, 791 (2003), *cert. denied*, 540 U.S. 1110, 124 S. Ct. 1076 (2004); *see also O'Loghlin v. County of Orange*, 229 F.3d 871, 874 (9th Cir. 2000) (holding that discharge provision of Section 944(b) barred any post-confirmation prosecution of claims arising under the Americans with Disability Act ("ADA") that arose prior to the entry of the confirmation order in the chapter 9 case of Orange County, including both pre-petition and post-petition claims, as long the claims are based upon pre-confirmation violations of the ADA). Similarly, in *Ortiz v County of Orange*, 1998 U.S. App. LEXIS 16486 (9th Cir. 1998), the Ninth Circuit held that a civil rights plaintiff's prepetition § 1983 claims against Orange County and three County officials were discharged by the operation of Section 944(b) and confirmation of Orange County's chapter 9 plan. "The confirmation of the County's plan thus erases the County's liability for damages on Ortiz's § 1983 claims." *Id*.[7] Under these precedents, § 1983 and other civil rights claims against the City and the City's police officers in their official capacity are discharged under Section 944(b).

12.1.7. The question of whether claims arising under § 1983 can be discharged was also addressed in the recent Detroit chapter 9 case. Under the Detroit chapter 9 plan, § 1983 claims were treated as general unsecured claims and received notes with an estimated recovery value of 10-13 cents on the dollar.[8] Holders of § 1983 claims objected to confirmation and argued that treatment of their claims as unsecured claims violated their Fourteenth Amendment right to receive compensation for the violations of their constitutional rights,[9] which claims they argued cannot be impaired under a

---

[7] *See also, V.W. ex rel. Barber v. City of Vallejo (In re City of Vallejo)*, 2013 U.S. Dist. LEXIS 109145 (E.D. Cal. 2013) (holding that § 1983 claims against City of Vallejo and its chief of police in his official capacity that arose after commencement of the chapter 9 case and before confirmation of the plan are discharged under Section 944(b) and barred from further prosecution); *Johnson v. Hoagland*, 32 Fed. Appx. 22, 23 (3d Cir. 2002) (pre-confirmation date § 1983 claim against police officer discharged when police officer obtained a chapter 7 discharge).

[8] *See Eighth Amended Plan for Adjustment of Debts of the City of Detroit, Mich.,* (Bankr. E.D. Mich.), Case No. 13-53846, Dkt. No. 8045; *see also In re City of Detroit, Michigan,* 524 B.R. 147, 262 (Bankr. E.D. Mich. 2014) (referring to Detroit's Fourth Amended Disclosure Statement, Dkt. No. 4391, at 41).

[9] The Fourteenth Amendment does not itself provide any right of action for constitutional violations but instead assigns that task to Congress, which has the "power to enforce, by appropriate legislation, the provisions of" the Fourteenth Amendment. U.S. Const. amend. XIV, § 5. In § 1983, Congress created a cause of action for individuals who suffer violations of their federal constitutional rights committed under color of state law. § 1983 imposes "a species of tort liability," and creates a right to money

1    bankruptcy plan.[10]  In support of its treatment of the § 1983 claims as unsecured claims and

2    dischargeable, Detroit argued that (a) the claims fell squarely within the definition of claim under

3    Bankruptcy Code Section 101(5), (b) had Congress intended to carve out such claims from

4    dischargeability in chapter 9 cases it could have done so, and (c) instead, § 1983 claims are not included

5    in applicable exceptions to discharge.[11]  Accordingly, Detroit argued that Congress did not intend that

6    § 1983 claims be deemed non-dischargeable.

7            12.1.8.   U.S. Bankruptcy Judge Rhodes certified to the U.S. Attorney General

8    that the constitutionality of chapter 9 was called into question by the § 1983 claimants, and the Attorney

9    General filed a brief.  The Attorney General agreed with Detroit that the damages remedy set forth in

10   § 1983 exists by legislative grace and is not a constitutional requirement.  The Attorney General

11   concluded that "[b]ecause section 1983 creates a damages remedy and not substantive rights and

12   because that remedy arises from congressional enactment and not constitutional mandate, the United

13   States submits that the Plan's treatment of the section 1983 claims does not raise an issue arising under

14   the Fourteenth Amendment." *See United States of America's Brief in Response to Order of Certification*

15   *Pursuant to 28 U.S.C. § 2403(a)*, Detroit Docket No. 6664.  Judge Rhodes agreed.  *See In re City of*

16   *Detroit, Michigan*, 524 B.R. 147, 262-65 (Bankr. E.D. Mich. 2014) (impairing and discharging the

17   § 1983 claims against the City of Detroit does not violate the Fourteenth Amendment), *appeal dismissed*

18   *as moot*, 2015 U.S. Dist. LEXIS 134477, *16 (E.D. Mich. September 29, 2015).

19           12.1.9.   In sum, the Ninth Circuit has held that prepetition and post-petition civil

20   rights claims in general, and § 1983 claims specifically, are dischargeable claims in a chapter 9 case, the

21   U.S. Department of Justice agrees, as did the bankruptcy court in the largest chapter 9 bankruptcy in

22   U.S. history, and the U.S. District Court in the Detroit case dismissed the appeal from the order

---

damages for those who are the victims of constitutional violations perpetrated under color of state law.
*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999) (quoting *Heck v. Humphrey*, 512 U.S.477, 483 (1994)).  § 1983 claims are statutory tort claims, not constitutional claims because the damages remedy in § 1983 exists only by legislative grace and not constitutional requirement.

[10]  *See Objection of Creditors Deborah Ryan, et al.,* Detroit Dkt. No. 4099; *Brief in Concurrence of Creditors Dwayne Provience, et al.,* Detroit Dkt. No. 5693.

[11]  *See Debtor's Supplemental Brief On Legal Issues*, Detroit Docket No. 5707.

1    confirming the Detroit chapter 9 plan.  The Objection that civil rights claims must be or should be

2    separately classified and treated better than other General Unsecured Claims is not supported by any

3    precedent or convincing argument and is overruled.

4                12.1.10.   Therefore, the Plan complies with the requirements of Sections 1122,

5    1123(a)(1), 1123(a)(2), 1123(a)(3) and 1123(a)(4).

6                12.1.11.   Even if, *arguendo*, the Plan had classified Litigation Claims as a

7    separate class, and assuming that such a hypothetical class had voted to reject the Plan, the Plan would

8    still satisfy the cramdown requirements of Section 1129(b) with respect to such hypothetical dissenting

9    class of Litigation Claims. Section 1129(b) authorizes the Court to confirm the Plan even if not all

10   impaired classes have accepted the Plan, provided that the Plan has been accepted by at least one

11   impaired class and that "the plan does not discriminate unfairly, and is fair and equitable, with respect to

12   each class of claims or interests that is impaired under, and has not accepted, the plan."  11 U.S.C. §

13   1129(b)(1).  Here, impaired classes 1, 2, 5, 6, 9, 12, 13 (inclusive of Classes 10 and 11 incorporated

14   therein) and 14 voted to accept the Plan, therefore the Plan has been accepted by at least one impaired

15   class. Section 1129(b)(2)(B) of the Bankruptcy Code (the codification of the so-called "absolute priority

16   rule") provides that, for a plan to be fair and equitable, unsecured creditors may receive less than the

17   value of their claims as of the effective date of a plan only if no class of junior claims or interests

18   receives any distribution on account of their claims or interests.  11 U.S.C. § 1129(b)(2)(B).  Application

19   of the absolute priority rule to unsecured creditors of a municipal debtor generally is not possible

20   because, in chapter 9, there can be no junior class of equity interests, the class most commonly

21   prevented from receiving or retaining property by the application of the absolute priority rule.  *See In re*

22   *Corcoran Hosp. Dist.*, 233 B.R. 449, 458 (Bankr. E.D. Cal. 1999) (holding that the proposed chapter 9

23   plan did not implicate the absolute priority rule because there were no holders of equity interests in the

24   debtor hospital).  Rather, the requirement that a plan be fair and equitable as to unsecured creditors of a

25   municipal debtor is satisfied where creditors receive "all that they can reasonably expect in the

26   circumstances."  *See Lorber v. Vista Irr. Dist.*, 127 F.2d 628, 639 (9th Cir. 1942) (collecting cases), *cert.*

27   *denied* 323 U.S. 784, 65 S. Ct. 270 (1944); *see also West Coast Life Ins. Co. v. Merced Irr. Dist.*, 114

28   F.2d 654, 679 (9th Cir. 1940) (affirming confirmation of plan under municipal debtor provisions of

1    Bankruptcy Act of 1898 when the plan payments were "all that could reasonably be expected in all the

2    existing circumstances"). In determining what can reasonably be expected under the circumstances, it is

3    not necessary that all taxes collected go to pay creditors, because the municipality must retain adequate

4    funding to continue operations. *Lorber*, 127 F.2d at 639, *Corcoran*, 233 B.R. at 459; *Collier on*

5    *Bankruptcy*, ¶ 943.03[1][f][B], Alan N. Resnick & Henry J. Sommer, 16th ed. (further references to this

6    source are cited as "*Collier*").

7              12.1.12.   Here, the City is proposing to pay creditors what the circumstances

8    allow, which is all that can reasonably be expected. The City's financial crisis forced the City to

9    severely cut municipal services, which process continued during the chapter 9 case. As demonstrated in

10   the Busch Decl. and described in the Plan, the City does not now have, and is not projected to have, the

11   financial resources to fully fund its infrastructure repairs and necessary rebuilding of police and other

12   municipal services, let alone pay anything more on general unsecured claims than 1%. The amount of

13   the City's deferral of spending on basic municipal infrastructure has been dramatic: $180 million

14   deferred for street repairs, $130 million deferred for facility repairs and improvements, the failure to

15   inspect 80% of the sewer system. Even after paying only 1% on Class 13 General Unsecured Claims,

16   those and other basics of municipal services will not be fully funded during the course of the City's 20-

17   year Financial Model; indeed some may not be funded at even 50% of what is required. *See* Busch

18   Decl. at ¶¶21-26; Scott Decl. at ¶9; and discussion in the City's Disclosure Statement of the extensive

19   deferrals. Even that limited funding, to keep the City moving towards service solvency, is based upon

20   the Financial Model's assumption that the City can discharge its $209.3 million of unsecured debt based

21   upon a 1% distribution on allowed claims. *See* Busch Decl. at ¶14; Scott Decl. at ¶9.[12]

22             12.1.13.   Under the Plan, approximately $209.3 million in General Unsecured

23   Claims will receive a distribution of 1% on the Allowed Claims, comprised of approximately:

24   $46.7 million of liquidated retiree claims; $129.8 million of liquidated Consenting Union Claims;

25   $22.8 million of estimated Litigation Claims; and $10 million of additional unsecured claims. If the

26   City is required to pay more on general unsecured claims, it will have nothing left to fund its

27   ────────────────

28   [12] The impact of financial shortfalls on the on the provision of municipal services has been called
     "service insolvency" and addressing such service insolvency is a primary reason cites file chapter 9.

rehabilitation and service stabilization. If the City cannot provide adequate services, especially police services, it will not be able to attract new economic activity. If the City cannot dedicate its resources to rehabilitation, it will continue a cycle of decline that led to the chapter 9 case in the first place. Therefore, the City's proposed 1% distribution to general unsecured creditors is all that can reasonably be expected under the existing circumstances. The 1% distribution would apply to the Litigation Claims whether they are included in Class 13 or separately classified. Thus, there is no benefit to separate classification of the Litigation Claims; they would still only get 1%, because the unrefuted evidence shows that 1% is all that the City has available to pay them. Therefore, the Plan is fair and equitable under Section 1129(b) as to Litigation Claims and all other claims.

    12.1.14. The Plan is also fair and equitable in the nonbankruptcy sense because it treats substantially all unsecured claims, including Litigation Claims, equally – holders of Litigation Claims against Indemnified Parties are treated the same as holders of comparable Litigation Claims against the City. That Plan feature avoids a potential scenario where a § 1983 claim against one of the City's police officers could get paid 100%, while a comparable § 1983 claim against the City, even on the same facts, would receive only a 1% distribution.

    12.1.15. The Plan also does not discriminate unfairly with respect to holders of Litigation Claims. The estimated $23 million of Litigation Claims are receiving the very same treatment as the other $186 million in General Unsecured Claims that are in Class 13. All holders of General Unsecured Claimants – retirees, employees, trade creditors and holders of Litigation Claims – are sharing the pain, equally. Accordingly the Court finds and concludes that the Plan is fair and equitable and does not discriminate unfairly with respect to any hypothetical separate class of Litigation Claims and satisfies the cramdown requirements of Section 1129(b) with respect to such hypothetical class of Litigation Claims and all other claims.

    12.2. <u>Adequate Means to Implement the Plan (11 U.S.C. § 1123(a)(5))</u>.  In accordance with Section 1123(a)(5), Article VII of the Plan provides adequate means for its implementation, including that the City will continue to collect sales tax revenues, real property tax revenues, user utility taxes, and other taxes, fees, and revenues following the Effective Date. *See* Plan at Article VII; *see also* Disclosure Statement at Article V.C. (discussing revenue enhancement measures, regionalization or

outsourcing of City services, the City's Police Resources Plan, street and road repair, seismic retrofits and Charter reform). These revenues will enable the City to maintain and fund municipal services, including fire and police protection, as well as to satisfy the City's obligations to its creditors as restructured pursuant to the Plan. The City's financial advisors prepared a detailed long-term financial plan (the "Financial Model") which projects that, with the savings from the adjustment of debts under the Plan, the City will achieve a balanced and sustainable budget for the foreseeable future. *See* Disclosure Statement at Article VI.D.; *see also* Busch Declaration at ¶14.

   12.3. <u>Permitted Plan Provisions (11 U.S.C. § 1123(b))</u>. In accordance with Section 1123(b)(1), Article IV of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims. In accordance with Section 1123(b)(2), Article VI of the Plan provides for the assumption, assumption and assignment, or rejection of the Executory Contracts or Unexpired Leases of the City that have not been previously assumed, assumed and assigned, or rejected pursuant to section 365 of the Bankruptcy Code and orders of the Court. In accordance with Section 1123(b)(3), Article VIII of the Plan provides that the City shall retain all of its claims, causes of action, rights of recovery, rights of offset, recoupment rights to refunds, and similar rights. In accordance with Section 1123(b)(5), Article IV of the Plan modifies or leaves unaffected, as the case may be, the rights of holders of Claims in each Class. In accordance with Section 1123(b)(6), the Plan includes additional appropriate provisions that are not inconsistent with applicable provisions of the Bankruptcy Code, including the provisions of Articles IX (Distributions), X (Disputed Claims), XI (Effect of Confirmation), XII (Retention of Jurisdiction), XIII (Conditions Precedent) and XIV (Miscellaneous Provisions).

   12.4. <u>Disclosure, Solicitation & Acceptance (11 U.S.C. §§ 1125, 1126 and 1129(a)(2)</u>.

    12.4.1. In accordance with Section 1129(a)(2), the City has complied with the applicable provisions of the Bankruptcy Code. The legislative history to Section 1129(a)(2) reveals that the purpose of this requirement is to incorporate the provisions of Sections 1125 and 1126 regarding disclosure and plan solicitation. *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989 (1978). The City has complied with the requirements of Sections 1125 and 1126. Specifically, in the Disclosure Statement Order, the Court ruled that the Disclosure Statement satisfied the requirements of section 1125(b). Dkt. No. 1874 at ¶4. On July 29, 2016, the City served by mail the following Solicitation

Materials on all parties entitled to vote on the Plan: (a) a cover letter; (b) a CD that contained the Plan, the Disclosure Statement, the Appendix of Exhibits, the Disclosure Statement Order and the Notice of Voting Procedures (the "CD"); (c) the "Notice of: (1) October 14, 2016 Hearing to Consider Confirmation of 'Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California (July 29, 2016)'; (2) September 2, 2016 Deadline for Filing Objections to Confirmation of the Third Amended Plan; (3) Other Deadlines; and (4) Effect of Confirmation of the Plan (the "Confirmation Hearing Notice"); (d) a Ballot and a preaddressed return envelope (postage prepaid), and (e) for some voters, one of the following notices: a letter from the Official Retiree Committee to holders of Retiree Health Benefit Claims; a notice to the holders of 1996 Refunding Bonds and 1999 Refunding Certificates of Participation; or a notice to holders of Litigation Claims regarding certain insurance coverage issues (the "Notice to Holders of Litigation Claims").

    12.4.2. The Solicitation Materials were sent to all eligible voters deemed to be holders of allowed claims for voting purposes. Under the Voting Procedures, that meant all creditors whose claims were listed in the City's schedules as not disputed, contingent or unliquidated, or who filed proofs of claim. Thus, the City complied with the requirements of Sections 1125 and 1126. Also on July 29, 2016, the City sent copies of the CD and the Confirmation Hearing Notice to all known creditors of the City and all other parties in interest that had requested notice. This mailing to all known creditors also included, for holders of Litigation Claims, the Notice to Holders of Litigation Claims. *See generally* Notice of Materials Distributed to Creditors in Connection With the Hearing on Confirmation of the City's Chapter 9 Plan of Adjustment of Debts (Dkt. No. 1883), filed on July 29, 2016; *see also* Ballot Tabulation at ¶8. The City also published the Confirmation Hearing Notice in two local newspapers, the San Bernardino County Sun and the Riverside Press Enterprise.

    12.4.3. Service of the Solicitation Materials satisfied the requirements of:

    12.4.3.1. Bankruptcy Rules 2002 and 3016, including that the Plan at Article XI, and the Disclosure Statement at Article VI.G., describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined by, and identify the entities that would be subject to, the third party injunction provisions of Article XI of the Plan (the "Plan Injunction"). Article VI.G.7. of the Disclosure Statement also describes the City's reasons for the necessity of the Plan Injunction.

12.4.3.2.    <u>Bankruptcy Rule 3017</u>, including that the Court set deadlines for accepting or rejecting the Plan and filing objections to the Plan, and such deadlines were prominently displayed in the Solicitation Materials, that the Solicitation Materials included all documents required to be distributed to creditors in connection with a plan confirmation hearing, and that creditors received the Solicitation Materials with at least 28 days notice for filing objections as required by Bankruptcy Rule 3017(f) with respect to the Plan Injunction.

12.4.3.3.    <u>Bankruptcy Rule 3018</u>, because the Solicitation Materials were distributed to all creditors eligible to vote on the Plan and in accordance with the specific requirements of the Disclosure Statement Order, using forms of ballots approved by the Court in the Disclosure Statement Order.

12.4.3.4.    <u>Bankruptcy Rule 3019,</u> because the City gave adequate notice of the Plan Modifications, no creditor except BICEP objected to the Plan Modifications, and BICEP's objections were consensually resolved (*see* Dkt. No. 2096), and the Court has determined that the Plan Modifications do not adversely change the treatment of any claim.

12.4.3.5.    <u>Bankruptcy Rule 3020</u>, because the Court scheduled the Confirmation Hearing and set a deadline for filing objections to confirmation of the Plan, and adequate notice thereof was given to all known creditors of the City, including adequate notice of the terms of the Plan Injunction, as required in Bankruptcy Rules 2002, 3016 and 3017; the Court is entering this Confirmation Order after the conclusion of the Confirmation Hearing; and this Confirmation Order describes in specific detail the terms of the Plan Injunction and all acts to be enjoined pursuant to the Plan Injunction, and identifies the entities subject to the Plan Injunction.

12.4.3.6.    Thus, the City complied with all of the requirements of Section 1129(a)(2).

12.5.    <u>Plan Proposed in Good Faith and Not by Any Means Prohibited by Law</u> <u>(11 U.S.C. § 1129(a)(3)).</u>

12.5.1.  Section 1129(a)(3) requires that a plan be proposed in good faith and not by any means forbidden by law.  The determination of what constitutes good faith is based upon the totality of the circumstances in a particular case and is a very fact-dependent exercise. *Franklin High*

1  *Yield Tax-Free Income Fund et al. v. City of Stockton, California (In re City of Stockton, California)*,

2  542 B.R. 261, 228-79 (B.A.P. 9th Cir. 2015). "In order to satisfy the statutory requirement of good

3  faith, a plan must be intended to achieve a result consistent with the objectives of the Bankruptcy Code."

4  *In re Corey*, 892 F.2d 829, 835 (9th Cir. 1989) (citing *Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.)*,

5  84 Bankr. 167, 172 (Bankr. 9th Cir. 1988) and *Jorgensen v. Federal Land Bank of Spokane (In re*

6  *Jorgensen)*, 66 Bankr. 104, 108-09 (Bankr. 9th Cir. 1986)). The principal purpose of chapter 9 "is to

7  allow an insolvent municipality to restructure its debts in order to continue to provide public services."

8  *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 41 (Bankr. D. Colo. 1999). An overarching goal of

9  chapter 9 is to relieve the municipality's residents from the effects of further declining services caused

10  by the enormity of the claims pending against a city, by restructuring that debt. *Collier* ¶ 943.03[7][a].

11       12.5.2. Based on the record of this Bankruptcy Case, the City has demonstrated

12  that its primary objective in proposing the Plan is to restructure its debts and continue providing services

13  to its residents, and the Plan achieves precisely that result. The City has remained open and honest at all

14  stages of the Bankruptcy Case regarding its motivations for structuring the Plan, particularly the need to

15  improve the level of municipal services delivered to its residents generally (and in particular to rebuild

16  the San Bernardino Police Dept.) within a reasonable period of time, and the consequent inability of the

17  City to fund significant recoveries for creditors.

18       12.5.3. The Plan satisfies the good faith standard. Ever since the City filed its

19  petition for relief under chapter 9, the City's actions have demonstrated good faith. In its opinion

20  decreeing that the City was eligible for relief under chapter 9, after a comprehensive review of the facts,

21  the Court determined that the City commenced its chapter 9 case with the desire to restructure debt and

22  effect a plan of adjustment, and the "steps taken after the petition date show that the City began

23  implementation of the steps necessary to restructure its debt." *In re City of San Bernardino*, 499 B.R.

24  776, 787-88 (Bankr. C.D. Cal. 2013). The Court added: "The City's financial problems fall within the

25  situations contemplated by chapter 9. Here, the City cannot achieve a balanced budget unless it is

26  allowed to reorganize its debt. The City cannot keep current with its mounting obligations because it is

27  insolvent. The City's filing is consistent with the purposes of chapter 9, which is to give a debtor a

28  'breathing spell' so that it may establish a plan of adjustment." *Id.* at 790. Ever since the Court gave the

1    City that breathing spell, the City's management team and its outside professionals have devoted

2    thousands of hours to negotiating with the City's creditors, largely facilitated by Judge Zive's mediation

3    efforts, to reach settlements with the creditor constituencies.  Those settlements have been entered into

4    with CalPERS, the Official Retiree Committee, the holders of the PARS Claims, the SBPOA (the police

5    officers union), the SBCPF (the firefighters union), all other City employee unions, the holders of the

6    1996 Refunding Bond Claims and the 1999 Refunding Certificates of Participation Claims, the POB

7    Creditors, and all secured creditors of the City.[13]  The success of those settlements is evidenced by the

8    fact that all impaired classes of creditors voted to accept the Plan, by wide margins.  Even Class 13 – the

9    class receiving a 1% distribution – voted to accept the Plan, with more than 95% in dollar amount and

10   number of votes cast voting to accept the Plan.  The City's almost completely successful effort to

11   replace confrontation with consensus provides ample evidence for this Court to conclude that the Plan

12   was proposed with honesty and good intentions, and in good faith.  The Plan, the Plan Injunction and the

13   treatment of claims are, and the process pursuant to which the City has sought confirmation of the Plan

14   has been, fundamentally fair to the City's creditors.

15                    12.5.4.   The unrefuted evidence shows that the City is not able to pay more than

16   1% on its more that $209 million in unsecured claims, without placing in jeopardy the feasibility of the

17   Plan and the City's return to service solvency.  The City has also submitted unrefuted evidence that it

18   must dedicate much of its limited resources to its Police Resources Plan.  The City is a high crime area,

19   yet most of the City's fleet of police vehicles are beyond their scheduled service life, much of the Police

20   Department's technology is severely out of date, and the Police Department is severely understaffed due

21   to the City's financial crisis.  Investing in police safety is properly a critical part of the Plan and a key to

22   economic growth.  The City's proposal to use its limited income for upgrading the safety of the City's

23   communities reflects the good faith of the City. So too, that the City has proposed to treat substantially

24   all unsecured creditors equally in terms of the 1% distribution, and that substantially all creditors are

25

26   _____

27   [13] *See Franklin High Yield Tax-Free Income Fund et al. v. City of Stockton, California (In re City of Stockton, California*), 542 B.R. 261 (B.A.P. 9th Cir. 2015) ("At the outset the record reflects that the Plan was the product of extended negotiations . . . resulting in multiple collective bargaining agreements and settlements with creditor constituencies.").

28

1   consenting (not having objected) to "share the pain" equally, also is evidence that this Plan has been

2   proposed in good faith.

3          12.5.5.   Thus, the City has satisfied the good faith requirement of Section

4   1129(a)(3).

5          12.5.6.   The Plan also has not been proposed by any means forbidden by law.

6   As provided in Article VII.A. of the Plan, the City will implement the Plan by continuing to operate

7   pursuant to its Charter, the California Constitution, and applicable state and federal laws.

8          12.5.7.   One of the Objections to confirmation of the Plan argued that the Plan

9   Injunction contravenes the Anti-Injunction Act.  The Anti-Injunction Act provides that "[a] court of the

10  United States may not grant an injunction to stay proceedings in a State court except as expressly

11  authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its

12  judgments." 28 U.S.C. § 2283.  The Anti-Injunction Act prohibits courts of the United States[14] from

13  enjoining state court proceedings except in three situations: (i) if expressly authorized by an Act of

14  Congress, or (ii) where necessary in aid of its jurisdiction or (iii) to protect or effectuate its judgments.

15         12.5.8.   Section 105(a) is an expressly authorized exception to the Anti-

16  Injunction Act, and Section 105(a) authorizes the Bankruptcy Court to stay proceedings in state courts.

17  *Si Yeon Park v. State Street Bank & Trust Co. (In re Si Yeon Park)*, 198 B.R. 956, 967 (Bankr. C.D. Cal.

18  1996). The basic purpose of Section 105(a) is to enable the bankruptcy court to do whatever is necessary

19  to aid its jurisdiction, i.e., anything arising in or relating to a bankruptcy case. *Id.*; *see also, Parker v.*

20  *Goodman (In re Parker),* 499 F.3d 616, 627 (6th Cir. 2007) ("Courts have widely affirmed that the

21  expressly authorized exception to the Anti-Injunction Act includes injunctions authorized under the

22  bankruptcy laws. Section 105 includes the authority to enjoin litigants from pursuing actions pending in

---

23  [14] Courts have held that the bankruptcy courts are not "courts of the United States" and thus the Anti-

24  Injunction Act does not apply in bankruptcy court. *See  In re G.S.F. Corp.,* 938 F.2d 1467, 1477 (1st Cir.
    1991); *see also In re Perroton*, 958 F.2d 889 (9th Cir. 1992) (bankruptcy court not "court of the United

25  States" for purposes of 28 U.S.C. § 1915 and thus not authorized to waive filing fees).  In *G.S.F.,* the
    First Circuit held that, "[b]y its terms, the Anti-Injunction Act does not govern bankruptcy courts.  Its

26  provisions restrict only the 'courts of the United States' defined as including 'the Supreme Court of the
    United States, courts of appeals, district courts constituted by chapter 5 of this title including the Court

27  of International Trade and any court created by Act of Congress the judges of which are entitled to hold
    office during good behavior." *Id.* (quoting 28 U.S.C. § 451).

28

other courts that threaten the integrity of a bankrupt's estate. . . . [Section 105] provides an 'expressly authorized' exception to the Anti-Injunction Act."); *Alard v. Weitzman (In re DeLorean Motor Co.)*, 991 F.2d 1236, 1242 (6th Cir. 1993) ("Section 105(a) contemplates injunctive relief in precisely those instances where parties are pursuing actions pending in other courts that threaten the integrity of a bankrupt's estate." (internal quotation marks omitted)); *Unencumbered Assets Trust v. Hampton-Stein (In re Nat'l Century Fin. Enters.)*, 407 B.R. 895, 900 (Bankr. S.D. Oh. 2009) (Anti-Injunction Act does not prevent court from enjoining state court action). The Bankruptcy Appellate Panel for the Ninth Circuit summed it up this way:

> The legislative history of § 105(a) clearly indicates that this provision was intended to be a statutory exception to the Anti-Injunction Act, 28 U.S.C. 2283, which provides that "a court of the United States may not grant an injunction to stay proceedings in a State court *except as expressly authorized by Act of Congress*, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283 (1994) (emphasis added). *See* H.R. Rep. No. 95-959, 95th Cong., 1st Sess., at 316-17 (1977), *reprinted in*, 1978 *U.S.C.C.A.N.* 5787, 5815 (stating that § 105 is "an authorization, as required under 28 USC 2283, for a court of the United States to stay the action of a State court"); S. Rep. No. 989, 95th Cong., 2d Sess., at 29 (1978) (same).

*Huse v. Huse-Sporsem (In re Birting Fisheries, Inc.)*, 300 B.R. 489, 497 n.7 (B.A.P. 9th Cir. 2003). Therefore, the Anti-Injunction Act does not apply to prohibit the Plan Injunction.

12.5.9. Another Objection to confirmation of the Plan, citing the U.S. Supreme Court's decision in *Law v. Siegel,* 134 S. Ct. 1188 (2014), argued that the Plan violates Bankruptcy Code Section 524(e) and circumvents the statutory scheme of 42 U.S.C. § 1983. *Law v. Siegel* held that a bankruptcy court has statutory authority under Section 105(a) to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code, except when doing so overrides explicit mandates of other sections of the Bankruptcy Code. 134 S. Ct. at 1194. [15] Here, the

---

[15] Courts have rejected attempts to expand *Law v. Siegel* beyond the holding that Section 105(a) cannot contravene explicit provisions of the Bankruptcy Code. *See e.g.*, *Clark's Crystal Springs Ranch, LLC v. Gugino (In re Clark)*, 548 B.R. 246, 252-53 (B.A.P. 9th Cir. 2016) (holding that *Law v. Siegel* does not prevent Section 105(a) substantive consolidation order); *Redmond v. Jenkins (In re Alternate Fuels, Inc.)*, 789 F.3d 1139, 1149 (10th Cir. 2015) (holding *Law v. Siegel* does not prevent a court from recharacterizing debt as equity because "*Law* held simply that a court may not employ § 105(a) to override other explicit mandates in the Bankruptcy Code."); *Official Comm. of Unsecured Creditors of SGK Ventures, LLC v. NewKey Group, LLC (In re SGK Ventures, LLC)*, 521 B.R. 842, 848-49 (Bankr. N.D. Ill. 2014) (ruling that *Law v. Siegel* does not limit trustee derivative standing, because "[t]here is no

Plan does not violate Section 524(e) because Section 524(e) does not apply in chapter 9.  *See* Sections

103(f) and 901 (delineating which sections of the Bankruptcy Code apply in chapter 9, and expressly

excluding 524(e)); *Deocampo v. Potts*, 836 F.3d 1134, 1143 (9th Cir. 2016) ) ("Chapter 9, unlike

Chapter 11, does not incorporate Section 524(e)").  The Plan also does not circumvents the statutory

scheme of 42 U.S.C. § 1983 because § 1983 claims are dischargeable in bankruptcy cases, including in

chapter 9 cases (*see* findings and conclusions at ¶¶ 12.1.6 through 12.19, *supra*), just as claims arising

under other federal statutory schemes may be impaired and discharged under bankruptcy plans (*e.g.*,

certain environmental, collective bargaining agreement and tax claims).  Accordingly, the Objection to

confirmation of the Plan based upon *Law v. Siegel* is overruled.

      12.5.10.   Accordingly, the Plan has been proposed in good faith and not by

means forbidden by law and the City has satisfied the requirements of Section 1129(a)(3).

      12.6.   <u>Regulatory Approval of Rate Changes (11 U.S.C. § 1129(a)(6))</u>.  The City is not

subject to any governmental rate-setting commission, and section 1129(a)(6) is therefore not applicable.

Nevertheless, it is worth noting that the Article XII.B.4. of the Plan provides that it shall be a condition

to the occurrence of the Effective Date of the Plan that "[t]he City shall have received any and all

authorizations, consents, regulatory approvals, rulings, no-action letters, opinions, and documents that

are necessary to implement this Plan and that are required by law, regulation or order."

      12.7.   <u>Acceptance of Plan by all Impaired Classes of Claims (11 U.S.C. § 1129(a)(8))</u>.

Classes 3, 4, 7 and 8 are unimpaired under the Plan.  Therefore, these classes are deemed to have

accepted the Plan.  11 U.S.C. § 1126(f).  Classes 1, 2, 5, 6, 9, 12, 13 and 14 (and Classes 10 and 11 that

are incorporated into Class 13) are impaired under the Plan and entitled to vote.  The Ballot Tabulation

shows that each such impaired class voted overwhelmingly to accept the Plan. Thus, the Plan complies

with the requirement set forth in section 1129(a)(8).

      12.8.   <u>Acceptance of Plan by at Least One Impaired Class of Claims (11 U.S.C. §
1129(a)(10))</u>.  Section 1129(a)(10) requires that at least one class of claims that is impaired under the

---

provision of the Bankruptcy Code prohibiting a grant of derivative trustee standing, and so *Law* has no
bearing here."); *In re Sunland, Inc.*, 2014 Bankr. LEXIS 5000, at *14 (Bankr. D.N.M. Dec. 11, 2014)
(*Law v. Siegel* does not prevent bankruptcy court from issuing a channeling injunction).

Plan accept the Plan, determined without including acceptances of the Plan by any insider.  Each of impaired classes 1, 2, 5, 6, 9, 12, 13 and 14 voted to accept the Plan.  Thus, the Plan satisfies Section 1129(a)(10).

13.  <u>Plan Compliance With Section 943(b)(2)</u>.  Section 943(b)(2) requires that the Plan comply with the plan confirmation requirements expressly provided in chapter 9.  As discussed above, the Plan complies with the requirements of Section 941 and 942.  The Plan's compliance with the remaining requirements of Section 943 is discussed below.

14.  <u>Disclosure and Reasonableness of Amounts to be Paid by the City for Services or Expenses in the Case or Incident to the Plan  (11 U.S.C. § 943(b)(3))</u>.  The City represented that it has been paying its professionals and those of the Official Retiree Committee in the ordinary course, and that there are no outstanding unpaid costs and expenses that fall within the ambit of Section 943(b)(3).  Therefore, the City has complied with the requirements of Section 943(b)(3).

15.  <u>Plan Compliance With Section 943(b)(4)</u>.

15.1.  Section 943(b)(4) prevents confirmation of a plan of adjustment that requires the debtor to take any action prohibited by law.  This section is intended to prevent chapter 9 debtors from using chapter 9 cases for the purpose of circumventing compliance with state law after confirmation.  *See In re Sanitary & Improvement Dist. No. 7*, 98 B.R. 970 (Bankr. D. Neb. 1989); *Collier* ¶ 943.03[4].  The Plan provides that the City will comply with all laws, regulations, and ordinances following confirmation, and nothing in the Plan proposes an action in violation of existing applicable laws. For example, (1) the Plan makes clear that funds restricted to certain uses by applicable non-bankruptcy law would not and cannot be used to pay General Fund obligations; (2) the Plan provides that the City will comply with all laws and regulations applicable to its obligations to CalPERS; and (3) the Plan provides that the City will continue to cooperate with the County in implementing the annexation of the City into the County Fire District in accordance with the annexation approval requirements of the Local Agency Formation Commission for San Bernardino County ("LAFCO").

15.2.  The City also is not using the Plan to shirk its statutory obligations under Government Code §§ 825, 825.2, 995 and 996.4 to indemnify City employees for judgments and costs of defense of such employees incurred in lawsuits based upon pre-Confirmation Date acts or omissions

1  of such employees that arose within the scope of their employment (indeed, the Plan was modified to

2  expressly so provide, *see* discussion of Plan Modifications, *supra*; *see also* discussion of City's statutory

3  indemnification obligations *infra*). Therefore, the Plan complies with the requirement of Section

4  943(b)(4).

5        16.    <u>Payment of Administrative Claims (11 U.S.C. § 943(b)(5))</u>.

6        16.1.   The Plan satisfies the requirements of Section 943(b)(5) because the Plan

7  expressly provides for the cash payment, in full, of Allowed Administrative Claims, including

8  administrative expenses allowed under section 503(b) of the Bankruptcy Code, either (1) on the

9  Effective Date or as soon as reasonably practicable thereafter or (2) if the Administrative Claim is not

10  Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes

11  an Allowed Claim.  The Plan provides at Articles I.B.16. and II.A, and the City argued in the

12  Memorandum at Section III(B)(3), that Administrative Claims in this Bankruptcy Case means the costs

13  or expenses of administration of the Bankruptcy Case, and are limited to claims arising under Section

14  503(b)(3)(D) and (F), and 503(b)(4) and (b)(5), which are claims for: making a substantial contribution

15  in the chapter 9 case, expenses of official committee members incurred in the performance of their

16  duties, and reasonable compensation for attorneys or accountants working for parties making a

17  substantial contribution to the chapter 9 case.[16]  If such claims are allowed, they will be paid under the

18  Plan as Administrative Expenses.  Otherwise, all other post-petition claims against the City are classified

19  as Other Post-petition Claims, which are included in Class 13 General Unsecured Claims and receive the

20  treatment afforded Class 13 Claims, including claims that creditors may assert are post-petition claims

21  under Section 503(b)(1)(A), *i.e.*, the "actual, necessary costs and expenses of preserving the estate."

22        16.2.   The Plan's treatment of claims asserted under Section 503(b)(1)(A) as Class 13

23  Other Post-petition Claims, rather than as expenses entitled to administrative claim priority, is based

24  upon the City's position that there are no Section 503(b)(1)(A) claims in a chapter 9 case because there

25  is no estate in a chapter 9 case.  *See e.g., Diamond Z Trailer, Inc. v. JZ L.L.C. (In re JZ L.L.C.),* 371 B.R.

26

27  _____

[16] The City acknowledged in the Memorandum that claims arising under Sections 503(b)(7), (8) and (9)
28  may be allowable administrative expenses in this chapter 9 case but the City stated there are no such
claims pending against the City.

412, 419 n.4 (B.A.P. 9th Cir. 2007); *In re City of Vallejo*, 403 B.R. 72, 78, n.2 (Bankr. E.D. Cal. 2009);

*In re Jefferson County, Ala.*, 484 B.R. 427, 460-61 (Bankr. N.D. Ala. 2012). There can be no

"necessary costs and expenses of preserving the estate" in a case where no estate exists. *In re New York*

*City Off-Track Betting Corp.,* 434 B.R. 131, 142 (Bankr. S.D.N.Y. 2010). Statutes allowing

administrative priorities in bankruptcy "must be tightly construed." *Howard Delivery Serv. v. Zurich*

*Am. Ins. Co.,* 547 U.S. 651, 667, 126 S. Ct. 2105, 2116 (2006). "[I]f one claimant is to be preferred over

others, the purpose should be clear from the statute." *Id.* "We take into account, as well, the

complementary principle that preferential treatment of a class of creditors is in order only when clearly

authorized by Congress. *Id.* at 655. Administrative expenses are narrowly construed in chapter 9 cases.

*In re Orange County,* 179 B.R. 195, 201 (Bankr. C.D. Cal. 1995). None of the Objections refuted the

City's argument and therefore the court did not explicitly rule on this issue.

16.3. The scope of administrative claims in chapter 9 cases was the subject of disputes

in earlier stages of the Bankruptcy Case, but those disputes were all resolved without the Court having to

address the proper treatment of Section 503(b)(1)(A) claims in chapter 9. The Court is again not called

upon to resolve the dispute because there is none. No creditor filed an objection to the Plan's exclusion

of Section 503(b)(1)(A) claims from Administrative Claim classification and treatment. Under those

circumstances, the Court finds that the Plan complies with the requirements of Section 943(b)(5).

17. Regulatory or Electoral Approvals (11 U.S.C. § 943(b)(6)). Section 943(b)(6) requires

that any regulatory or electoral approval necessary under applicable non-bankruptcy law in order to

carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such

approval. Article XIII.B.4. of the Plan expressly provides that a condition precedent to the Effective

Date is that the "City shall have received any and all authorizations, consents, regulatory approvals,

rulings, no-action letters, opinions, and documents that are necessary to implement this Plan and that are

required by law, regulation or order." The City needed and obtained the agreement of the County and

the approval of LAFCO for the annexation of the City into the County Fire District. No other regulatory

or electoral approvals are required to carry out the provisions of the Plan. Thus, the Plan satisfies the

requirements of Section 943(b)(6).

18. Best Interests of Creditors; Feasibility of Plan (11 U.S.C. § 943(b)(7)).

18.1.   Best Interests of Creditors.

18.1.1.   Unlike the best interests test under chapter 11, where the plan proponent is obligated to show that each objecting creditor will receive under the plan at least as much as the creditor would receive in a chapter 7 liquidation, no such comparison is available in chapter 9 because municipalities cannot be liquidated.  Therefore, the best interests test in chapter 9 compares what creditors as a group receive under the plan, compared to what each creditor individually could achieve if the Bankruptcy Case were dismissed.  As the Ninth Circuit B.A.P. has explained it:  "By their terms, the 'best interests' tests in chapters 9 and 11 are different, and only in chapter 11 is particular consideration of the best interests of individual creditors specified. By its terms, the 'best interests' test in chapter 9 is collective rather than individualized, and that interpretation is supported by the very context of chapter 9."  *Franklin High Yield Tax-Free Income Fund et al. v. City of Stockton, California (In re City of Stockton, California*), 542 B.R. 261, 283 (B.A.P. 9th Cir. 2015).  The B.A.P. added: "We conclude that the 'best interests' test in chapter 9 considers the collective interests of all concerned creditors in a municipal plan of adjustment rather than focusing on the claims of individual creditors." *Id.* at 286.

18.1.2.   In determining if the Plan is in the collective best interests of all creditors, a court is required to determine whether or not the plan as proposed is better than the alternatives.  *See In re Sanitary & Improvement Dist., No. 7*, 98 B.R. 970, 974 (Bankr. D. Neb. 1989).  Since liquidation of a municipality is not contemplated under chapter 9, and dismissal of a chapter 9 case is the only real alternative to confirmation of a plan, a court is required to determine whether the chapter 9 plan is a better alternative for creditors than dismissal of the case. *Cnty. of Orange v. Merrill Lynch & Co. (In re Cnty. of Orange)*, 191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996); *Collier* ¶ 943.03[7].

18.1.3.   The Plan is in the best interests of creditors. The Plan provides the City's creditor body, as a whole, with a better alternative than dismissal of the Bankruptcy Case and all that creditors can reasonably expect under the circumstances.[17]  Since liquidation is not an alternative,

---

[17] *See, e.g., West Coast Life Ins. Co. v. Merced Irr. Dist.*, 114 F.2d 654, 679 (9th Cir. 1940) (affirming confirmation of plan under municipal debtor provisions of Bankruptcy Act of 1898 when the plan payments were "all that could reasonably be expected in all the existing circumstances"); *Lorber v. Vista Irr. Dist.*, 127 F.2d 628, 639 (9th Cir. 1942) (the test for the fairness of a chapter 9 plan is whether the creditors receive all that they can reasonably expect in the circumstances), *cert. denied* 323 U.S. 784, 65 S. Ct. 270 (1944).

the only alternative to confirmation of the Plan is dismissal of the case altogether, leaving creditors to race to the state and federal courts. The result would be chaos because the creditors, of which there are thousands, would be required to fend for themselves in a mad scramble to litigate their claims in the state and federal courts. As the U.S. Supreme Court held in the chapter 9 case of *Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502, 510, 62 S. Ct. 1129, 1134 (1942), this "policy of every man for himself is destructive of the potential resources upon which rests the taxing power which in actual fact constitutes the security for unsecured obligations outstanding to a city." The race to the courthouse is certainly not a viable alternative. "The experience of the two modern periods of municipal defaults, after the depressions of '73 and '93, shows that the right to enforce claims against the city through mandamus is the empty right to litigate." *Id.,* 316 U.S. at 510, 62 S. Ct. at 1133.

18.1.4.  In the City's case, dismissal would result in the City being flooded with litigation from creditors with whom the City has achieved settlement agreements that are tied to confirmation of the Plan; settlements with: secured bondholders and other secured creditors, the POB Creditors, the PARS claimants, the SBCPF, SBPOA and the other employee unions, the Official Retiree Committee and CalPERS. Massive litigation costs would burden the City, its creditors, and all parties in interest, although creditors financially equipped to pursue litigation most quickly (and thus win "the race to the courthouse") would benefit disproportionately. But even the swiftest of creditors would likely find its ability to collect on a judgment stymied by the inability of the City to pay such judgments without violating provisions of the California Constitution that restrict payment of General Fund obligations with Restricted Funds. In short, dismissal of the chapter 9 case would result in chaos, with few if any creditors emerging safely from the blizzard of inevitable litigation. The City, its residents and its creditors cannot afford to be left in such a circumstance. Confirmation of the Plan is in the best collective interests of the City's creditors. All creditors are better off under the Plan, even with the 1% distribution, than they would be in the chaos that could ensue upon dismissal of the chapter 9 case.

18.1.5.  Earlier in the Bankruptcy Case in connection with the approval of the Disclosure Statement, a creditor argued the City should liquidate assets to pay claims. However, as the City demonstrated in the course of the proceedings on the adequacy of the Disclosure Statement, substantially all of the City's public use properties are either vital to the operation of the City (*e.g.,* the

police headquarters building) or have such distressed value that they have little financial value to creditors other than as public use facilities.  The same is true for City owned equipment.  *See generally* Article IV.B. of the Disclosure Statement, "City Assets," and the documents in the Appendix of Exhibits referred to in Article IV.B. The City has demonstrated that the sale of City assets would not materially increase the funds available to pay creditor claims.

18.1.6.   Even if, hypothetically, a sale of public use facilities like libraries, parks, youth centers and sports facilities would generate some financial value, such sale would reduce the provision of vital public services to the City's residents, particularly to the City's poorest residents who cannot afford alternative private sector for-profit facilities. The City is entitled to make the political and governmental decisions to retain such public facilities, as it is well accepted that a chapter 9 debtor cannot be compelled to liquidate assets.  *See Silver Sage Partners, Ltd. v. City of Desert Hot Springs (In re City of Desert Hot Springs)*, 339 F.3d 782, 789 (9th Cir. 2003) (Chapter 9 makes no provision for conversion of the case to another chapter or for an involuntary liquidation of any of the debtor's assets); *Newhouse v. Corcoran Irr. Dist.*, 114 F.2d 690, 691 (9th Cir. 1940) (chapter 9 debtor's property cannot be disposed of as in an ordinary business bankruptcy proceeding); *Lorber v. Vista Irr. Dist.*, 127 F.2d 628, 637 (9th Cir. 1942) (same).

18.1.7.   The Plan satisfies the best interests test because confirmation of the Plan is a better result for creditors than dismissal of the Bankruptcy Case, asset sales are not a viable or legal option, and the Plan is fair and equitable in the non-bankruptcy sense because creditors are receiving all that they can reasonably expect in the circumstances.

18.2.   <u>Feasibility of the Plan</u>.

18.2.1.   A chapter 9 plan is feasible if it shows that the debtor can make the payments promised under the plan and maintain post-confirmation operations.  *Collier* ¶ 943.03[7][b]. For the Court to find that the City's Plan is feasible, the City need not prove that success is guaranteed; rather, it must establish that the assumptions and projections underlying the Plan are reasonable and that, as a result the Plan is more likely than not to succeed.  *See e.g. Prime Healthcare Mgmt., Inc. v. Valley Health Sys. (In re Valley Health Sys.)*, 429 B.R. 692, 711 (Bankr. C.D. Cal. 2010) (chapter 9 plan is feasible if "it offers a reasonable prospect of success and is workable").  To prove that the Plan is

1     feasible, the City must show that the City will be able to both maintain municipal services at the level it

2     deems necessary to the continued viability of the City and make the payments set forth in the Plan.  *See,*

3     *Mount Carbon*, 242 B.R. at 34-35; *In re Corcoran Hosp. Dist.*, 233 B.R. 449, 453-54 (Bankr. E.D. Cal.

4     1999) (finding that chapter 9 plan was feasible based on reliable testimony that the debtor would be able

5     to make the payments provided under the plan and that the plan was based on reasonable projections of

6     future income and expenses); *In re Connector 2000 Ass'n*, 447 B.R. 752, 765-66 (Bankr. D.S.C. 2011)

7     (chapter 9 plan was feasible based on reasonable projections regarding debtor's ability to make

8     payments under the plan).

9                 18.2.2.   The Plan is feasible because it is more likely than not that the City will

10    be able to (a) make all payments contemplated by the Plan without a significant probability of default

11    and (b) sustainably provide adequate municipal services to its residents.  Therefore, the City has

12    demonstrated a reasonable prospect that the City will successfully implement the Plan.  The City's

13    Financial Model, which is attached to the Declaration of Michael Busch, projects, over a 20-year post-

14    Confirmation Date period, revenues and expenditures, anticipated cost savings and future revenue

15    enhancement actions necessary for the City to remain cash and budget solvent while providing an

16    adequate level of basic services to the City's residents.  It also budgets funds for road and street

17    maintenance and repair, building upgrades, parks, libraries, community centers, the Police Resources

18    Master Plan and other essential services which have been neglected for a long time due to the lack of

19    funds.  *See* Busch Declaration at ¶7.

20                 18.2.3.   According to Mr. Busch, the City must restructure its debts through the

21    Plan in order to continue as a viable municipality and provide basic essential services to the City's

22    residents.  Without restructuring its debts through the Plan, the City will operate at a deficit within a few

23    years after exiting bankruptcy.  *Id.* at ¶8.  With the adjustment of debts proposed under the Plan, the City

24    will emerge from bankruptcy protection as a viable municipal service provider for its residents *Id.* at

25    ¶14.  The Busch testimony was uncontroverted by any creditor in the case, including those creditors like

26    the bondholders that had engaged nationally-known financial advisory firms to review the City's

27    finances and financial wherewithal.  The projections in the Financial Model are reasonable and

28    appropriate regarding the ability of the City to generate the monies necessary to fund the Plan and

1  provide basic essential services to its residents. Therefore, the Plan is feasible for the purposes of

2  Section 943(b)(7).

3         19.  <u>Article XI of the Plan; the Plan Injunction</u>. Other than with respect to the terms of the

4  Plan Injunction (separately discussed below), the discharge, release, injunction, stay and settlement

5  provisions of Articles XI.A., XI.B, XI.C., XI.D. and XI.F. are standard plan provisions and no creditor

6  or other party in interest objected to the terms of such provisions. The exculpation provision of Article

7  XI.E of the Plan complies with applicable law and is appropriate. Such provision contains a carve-out

8  for gross negligence and willful misconduct and is limited to claims arising out of the City's

9  restructuring efforts and the Bankruptcy Case. In addition, the Plan's exculpation provision extends only

10  to parties who either have settled with the City or have actively participated in the City's restructuring

11  activities. No creditor or other party in interest objected to the exculpation provisions of Article XI.E.

12        19.1.  <u>City's Statutory Obligation to Pay the Judgments Against its Employees</u>

13          19.1.1.  The Plan Injunction arises from the City's state law obligations under

14  California Government Code §§ 825, 970, 995 and 996 to indemnify its employees for judgments

15  against the employees based upon employee acts or omissions arising within the scope of employment,

16  and which act or omission was not due to actual malice, actual fraud or corruption (acts or omissions

17  outside the scope of employment, or due to actual malice, actual fraud or corruption, are referred to as

18  the "Exceptions"). Thus, subject to the Exceptions, the City is obligated to pay the debts created by

19  entry of judgments against its employees. Pursuant to Government Code § 970.2, a court may issue a

20  writ of mandate to compel the City to pay a judgment against one of its employees based on acts or

21  omissions within the scope of employment. The statutory scheme imposes this duty on the City to

22  ensure the "the zealous execution of official duties by public employees." *Johnson v. California*, 69

23  Cal. 2d 782, 792 (1968).

24          19.1.2.  The City's obligation to indemnify typically arises in two circumstances.

25  The first and most common circumstance is where the City assumes the defense of the employee at an

26  initial stage of the lawsuit, well before a judgment is issued. Government Code § 995 requires the City

27  to assume the defense unless one of the Exceptions applies, and Government Code § 825 requires that

28  the City pay any ensuing judgment entered in favor of a third party plaintiff. *See L.A. Police Protective*

1  *League v. City of L.A.*, 27 Cal. App. 4th 168, 174-76 (Cal. App. 1994).  The second more unusual

2  circumstance is where the City refuses to assume the defense (presumably because the City believes an

3  Exception applies), a judgment is subsequently entered against the employee, and it is judicially

4  determined that none of the Exceptions apply.  In that second fact pattern, Government Code §§ 825.2

5  and 996.4 require that the City pay the judgment and all of the employee's defense costs, and

6  Government Code § 970.2 provides that a writ of mandate is an appropriate remedy to compel the City

7  to pay.  *See Pelayo v. City of Downey*, 570 F. Supp. 2d 1183, 1195 (C.D. Cal. 2008); *Farmers Ins. Grp.*

8  *v. Cty. of Santa Clara*, 11 Cal. 4th 992, 1002 (1995); *Rivas v. City of Kerman*, 10 Cal. App. 4th 1110,

9  1116 (Cal. App. 1992); *see generally DeGrassi v. City of Glendora*, 207 F.3d 636 (9th Cir. 2000)

10  (explaining the operation of the applicable Government Code provisions on municipal employee

11  indemnification).  Municipal employee indemnity provisions of the Government Code also apply to

12  claims against police officers arising under 42 U.S.C. § 1983.  *Williams v. Horvath*, 16 Cal. 3d 834, 845

13  (1976).

14          19.1.3.  The State of California has long recognized that indemnification of

15  police officers, in particular, is a public good.

16          The reason for the [police officer indemnification] rule is: The duties of policemen are

17          performed for the benefit of the public, and the public is directly concerned in preserving

18          and protecting these officers from the hazard of death or bodily injuries to which the

19          performance of their official duties expose them. Aside from any considerations purely

        personal to the officer, it is for the public good that these officers, as instruments through

20          which the city performs its functions, shall be shielded from the personal hazards [of

21          litigation] which attend the discharge of their official duties. With such protection afforded,

        the public can expect that its laws will be zealously enforced without any hesitation

22          occasioned by considerations of possible personal involvement in defending resulting

        litigation.

23  *Sinclair v. Arnebergh*, 224 Cal. App. 2d 595, 599 (1964) (internal citations omitted); *see also Monell v.*

24  *Dep't of Soc. Servs.*, 436 U.S. 658, 713, 98 S.Ct. 2018, n.9 (1978) (Powell, J., concurring) (the policy of

25  municipalities to indemnify officials sued for conduct within the scope of their authority "furthers the

26  important interest of attracting and retaining competent officers, board members, and employees.").

27          19.1.4.  The indemnification of municipal employees, and particularly police

28  officers, plays an important role in the efficient and effective functioning of the City and its departments

1 and agencies, including the Police Department. *See* Burguan Declaration at ¶14, Scott Declaration at ¶8,

2 McCrary Declaration at ¶7, and Supplemental McCrary Declaration at ¶18. The City's Chief of Police,

3 Jarrod Burguan, testified that if the City was at risk of being unable to indemnify police officers in full

4 for liability against lawsuits alleging harms committed during the performance of their job duties as

5 officers, and the officers were thus exposed to personal liability and potential financial ruin, the City

6 would not be able to hire new police officers, many police officers would leave for more financially

7 stable municipalities or federal, state or county law enforcement agencies, and the crime rate in the City

8 would increase. Burguan Declaration at ¶14. Indeed, the City's Police Department has already been hit

9 hard by the opportunities for qualified candidates to serve in other agencies with more financial stability

10 and better equipment. Impairing the City's indemnification obligations to the officers would pose

11 severe challenges to retention of existing officers and recruitment of new and lateral officers. Burguan

12 Declaration at ¶14; McCrary Declaration at ¶7; Exhibit 1 to McCrary Declaration,¶18.

13         19.1.5. Despite the clear state law statutory obligation to indemnify officers and

14 the practical necessity of indemnifying officers to ensure officer morale and retention, *id.*, the unrefuted

15 evidence shows that the City does not and will not have the funds necessary to both pay the judgments

16 against the City's employees and invest in the Police Resources Plan, among other things. *See* Busch

17 Declaration at ¶¶ 14-15. To ensure the efficient and effective functioning of the City and its

18 departments, and in particular the City Police Department, the Plan provides for payment of judgments

19 against the City, and payment of judgments against the Indemnified Parties that the City is required

20 under state law to pay, in the same manner, *i.e.*, as Class 13 Claims that receive a 1% payment on the

21 allowed claim. The Plan Injunction – which allows holders of Litigation Claims against the Indemnified

22 Parties to liquidate their claims to judgment in the state and federal courts, but enjoins collection of any

23 such judgment against the Indemnified Parties' personal assets – is the tool that allows the City to

24 implement its Plan.

25         19.1.6. Without the relief provided by the Plan Injunction, the City would not

26 have the funds to both pay creditors pursuant to the Plan and effect the necessary revitalization of

27 municipal services for its residents. The City has demonstrated that it has the funds to implement the

28 1% distribution to creditors, and no evidence has been presented by anyone that there is more money

1    available to pay a higher distribution, including to holders of Litigation Claims that may obtain

2    judgments against the Indemnified Parties.

3           19.2.    The Plan Injunction is Necessary and Appropriate to Carry Out the Terms of the

4    Plan.  The Court finds and concludes that it has the jurisdiction under 28 U.S.C. § 1334(b) and authority

5    under 11 U.S.C. §§ 105(a) (court may issue any order necessary or appropriate to carry out the

6    provisions of title 11) and 1123(b)(6) (plan may include any appropriate provision not inconsistent with

7    the applicable provisions of title 11) to approve the Plan Injunction, and the Plan Injunction is necessary

8    to carry out the terms of the Plan and is appropriate in the circumstances of the Bankruptcy Case.

9                          19.2.1.  Jurisdiction

10                 19.2.1.1.    This Court has jurisdiction to approve a chapter 9 plan that

11   addresses the claims against the Indemnified Parties.  28 U.S.C. § 1334(b) grants jurisdiction over all

12   civil proceedings arising under title 11, or arising in or related to cases under title 11.  "Proceedings

13   related to the bankruptcy include . . . suits between third parties which have an effect on the

14   bankruptcy." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307, 115 S. Ct. 1493, 1498-99 (1995).  In the

15   Ninth Circuit, bankruptcy court "related to" jurisdiction exists over enforcement of a judgment against a

16   non-debtor that could conceivably have an effect on the administration of the debtor's bankruptcy.  *In re*

17   *American Hardwoods, Inc.*, 885 F.2d 621, 623 (9th Cir. 1989) (explaining that a bankruptcy court has

18   subject matter jurisdiction to permanently enjoin a creditor from enforcing a state court judgment against

19   non-debtor guarantors because the enforcement of the state court judgment could conceivably affect the

20   administration of the debtor's plan).  The ability of holders of Litigation Claims to enforce their claims

21   against City employees (the Indemnified Parties) that have indemnification rights against the City will

22   certainly have a material effect on the City and its assets, its payment obligations under the Plan and the

23   City's ability to devote post-confirmation assets to the revitalization of municipal services.

24                 19.2.1.2.    Here, the combined effect of California Government Code

25   §§ 825, 825.2, 995 and 996.4 is that the City must pay a judgment against its employees as long as none

26   of the Exceptions apply.  The judgment is a debt of the City, enforceable by writ of mandate. *See*

27   Government Code § 970.2. "The general rule is that relief sought nominally against an officer [of a

28   public entity] is in fact against the sovereign if the decree would operate against the latter." *Hawaii v.*

ORDER CONFIRMING CHAPTER 9 PLAN          32

1    *Gordon*, 373 U.S. 57, 58,  83 S. Ct. 1052, 1053 (1963).  Similarly, the "general rule is that a suit is

2    against the sovereign 'if the judgment sought would expend itself on the public treasury or domain, or

3    interfere with the public administration,' or if the effect of the judgment would be to 'restrain the

4    Government from acting, or to compel it to act.'" *Dugan v. Rank*, 372 U.S. 609, 620, 83 S. Ct. 999, 1006

5    (1963) (internal citations omitted).  Under *Hawaii v. Gordon* and *Dugan v. Rank*, the City's statutory

6    Government Code § 825 obligation to pay the judgment makes the judgment a claim on the City's

7    treasury and certainly a "related to" claim under 28 U.S.C. § 1334.  Therefore, the Court has jurisdiction

8    over such claims against the Indemnified Parties, and any objections that the Court lacks jurisdiction are

9    overruled.

                           19.2.2.    Authority for the Plan Injunction

11                          19.2.2.1.    Section 105(a) provides that the Court may issue any order

12   that is necessary or appropriate to carry out the provisions of title 11.  11 U.S.C. § 105(a).  The Ninth

13   Circuit has previously declined to approve third-party injunctions in chapter 11 cases on the basis that

14   Section 524(e) limits the court's equitable power under section 105 to order the discharge of the

15   liabilities of nondebtors.  *In re American Hardwoods, Inc.*, 885 F.2d 621, 626 (9th Cir. 1989).  Section

16   524(e), however, is inapplicable in chapter 9 cases, and thus the holdings of *American Hardwoods* and

17   its progeny do not control the outcome here.  *See* 11 U.S.C. § 901(a) (not including Section 524(e) in

18   chapter 9); *Deocampo v. Potts*, 836 F.3d 1134, 1143 (9th Cir. 2016) ("Chapter 9, unlike Chapter 11,

19   does not incorporate Section 524(e). . . As such, the rationale relied upon by *Lowenschuss* [that, in a

20   Chapter 11 proceeding, § 524(e) precludes bankruptcy courts from discharging the liabilities of non-

21   debtors] does not apply in Chapter 9 proceedings."); *see also In re Connector 2000 Ass'n*, 447 B.R. 752,

22   767 (Bankr. D. S.C. 2011) (chapter 9 plan approved that contained third party releases and injunctions).

23                          19.2.2.2.    The circumstance under which a municipal debtor may

24   include a third-party release and injunction in its plan of adjustment is an evolving field of the law and a

25   matter of first impression in the Ninth Circuit.  In the two recent municipal insolvencies of large

26   California cities, Vallejo and Stockton, this relief was not sought.  In the Detroit chapter 9 case, Judge

27   Rhodes held that Section 524(e) is not a bar to a third-party release or injunction in a chapter 9 case, but

28   the proponent still must show that the injunction is necessary or appropriate under section 105(a).

> A bankruptcy court's power to order a third party release is based on its power to reorder creditor-debtor relations needed to achieve a successful reorganization . . . [and] the release [must be] essential to reorganization [because] the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor."

*In re City of Detroit, Michigan,* 524 B.R. 147, 266 (Bankr. E.D. Mich. 2014) (citations omitted). Judge Rhodes explained that to gain approval of such a release, the debtor-city must show that the release of officers is "necessary to the [c]ity's efficient and effective functioning, to its revitalization, or the success of the plan." *Id.* The record of the Detroit chapter 9 case was devoid of any evidence substantiating the need, and the debtor's requested third party release was not approved. *Id.* at 297.

        19.2.2.3.     So too in the City of Vallejo chapter 9 case. *See Deocampo v. Potts*, 836 F.3d 1134 (9th Cir. 2016). In *Deocampo*, after confirmation of its plan of adjustment, the City of Vallejo, defending its officers in a district court action, attempted to shoehorn a third party release/injunction into its confirmed plan by arguing that the plan discharged claims against the officers along with claims against the city. The Ninth Circuit recognized that a third-party injunction is not precluded by the existing jurisprudence in the Ninth Circuit because 524(e) does not apply in chapter 9, but found on the facts that the Vallejo plan did not discharge or enjoin claims against the officers. The *Deocampo* court recognized that where an injunction is permissible, it at a minimum must be express and be supported by "specific factual findings." *Id.* at 1144; *see also* Federal Rule of Bankruptcy Procedure 3016 ("If a plan provides for an injunction against conduct not otherwise enjoined under the Code, the plan and disclosure statement shall describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction."). The Vallejo plan did not expressly provide for such an injunction. *Id.* at 1144 - 45. There was no mention of an injunction of third-party claims. *Id.* Moreover, because the plan did not provide for an injunction there were no specific factual findings that such an injunction was necessary or appropriate to the plan of adjustment. *Id.* Finally, as noted by the *Detroit* court, the proponent of a third party injunction must show "that the additional protection of a third-party release is necessary to the City's efficient and effective functioning, to its revitalization, or to the success of its plan," *Id.* at 1144

1   n.14.  The Vallejo confirmation order did not include a judicial finding that the third-party discharge or

2   adjustment was an integral part of the reorganization.  *Id.* at 1145.

3           19.2.2.4.     Applying the considerations identified by the *Deocampo*

4   court, an injunction may be permissible if (i) the injunction is express; (ii) the injunction is an integral

5   part of the reorganization; and (iii) the injunction is supported by specific factual findings regarding the

6   necessity of the injunction to the City's efficient and effective functioning, to its revitalization, or to the

7   success of the plan.  In this case, the injunction is necessary because the City cannot afford to pay the

8   judgments of the plaintiffs against the Indemnified Parties and, absent the injunction, the City would be

9   unable to provide municipal services in accordance with the annual budgets contemplated in the City's

10  Financial Model, including not being able to implement the Police Resources Plan or make the payments

11  required by the Plan.

12          19.2.3.  Necessity for and Propriety of the Plan Injunction.

13          19.2.3.1.     The first factor is satisfied because the Plan Injunction was

14  expressly set forth in the Plan, the Disclosure Statement and the applicable notices as required by the

15  Federal Rules of Bankruptcy Procedure applicable to third-party injunctions.  FRBP 3016(c) provides

16  that "[i]f a plan provides for an injunction against conduct not otherwise enjoined under the Code, the

17  plan and disclosure statement shall describe in specific and conspicuous language (bold, italic, or

18  underlined text) all acts to be enjoined and specify the entities that would be subject to the injunction."

19  Federal Rule of Bankruptcy Procedure 3016(c).  The City satisfied this rule because the Plan Injunction,

20  set forth in section XI.C of the Plan, was printed in bold-faced type and specified the acts to be enjoined

21  and the entities that would be subject to the injunction.

22          19.2.3.2.     In addition, Federal Rule of Bankruptcy Procedure

23  2002(c)(3), entitled "Notice of Hearing on Confirmation when Plan Provides for an Injunction,"

24  provides: "If a plan provides for an injunction against conduct not otherwise enjoined under the Code,

25  the notice required under Rule 2002(b)(2) shall: (A) include in conspicuous language (bold, italic or

26  underlined text) a statement that the plan  proposes an injunction; (B) describe briefly the nature of the

27  injunction; and (C) identify the entities that would be subject to the injunction."  As reflected in the

28  Confirmation Hearing Notice, the City satisfied the requirements of Rule 2002(c)(3). The Confirmation

1   Hearing Notice includes in bold text a statement that the Plan includes an injunction and describes that

2   injunction.  In addition the entities that are subject to the injunction are identified.  Accordingly, the City

3   complied with the requirements of the Federal Rules of Bankruptcy Procedure.  *Cf. Deocampo*, 836 F.3d

4   at 1144 - 1146 (Vallejo's chapter 9 plan did not contain any express third party injunction, and no notice

5   of a third party injunction was provided).  By contrast with *Deocampo*, the City complied with the

6   detailed requirements of the Federal Rules of Bankruptcy Procedure, ~~and~~ gave notice to all creditors,

7   and published notice so that any potentially affected creditors would have notice and the opportunity to

8   be heard. The Plan and notices related to the Plan complied with the Federal Rules of Bankruptcy

9   Procedure with regard to plan injunctions.  There is no question that the City made the Plan Injunction a

10  linchpin of the Plan and the effect of the Plan Injunction was highly publicized.  Accordingly, this first

11  factor is satisfied.

12                     19.2.3.3.     The second and third factors – that the injunction is integral

13  to this reorganization and its success, necessary for the revitalization of the City and its efficient and

14  effective functioning, and demonstrated by the record before the Court – are also satisfied. The

15  circumstances surrounding the City's slide into insolvency are described in the prior opinions of this

16  Court in this Bankruptcy Case.  *See In re City of San Bernardino, California*, 499 B.R. 776, 778-79

17  (Bankr. C.D. Cal. 2013) (the "*Eligibility Opinion*"); *In re City of San Bernardino, California*, Case No.

18  12-28006, 2014 Bankr. LEXIS 5322, *6-13 (Bankr. C.D. Cal. 2014).  In summary, the Great Recession

19  and the burst of the housing bubble in 2007 negatively affected the City of San Bernardino like many

20  other cities in California and the entire country. The drop in housing prices and increase in foreclosures

21  of single family residences resulted in significantly lower property tax revenues, a prime source of

22  revenue for California cities. The City was particularly hard hit by these phenomena because, due to the

23  cheaper housing and available financing, an influx of people moved to the Inland Empire during the

24  boom, and the consequent bust led to unprecedented foreclosures – one of the highest rates in the

25  country. Along with the foreclosures came substantial unemployment, as much of the population had

26  been employed in the housing industry, from construction workers to realtors to mortgage brokers,

27  resulting in a significant drop in household income. This decline led to less consumer sales and

28

1  consequently smaller sales tax revenues, another major component of the City's revenues. *Eligibility*

2  *Opinion*, 499 B.R. at 778-79.

3           19.2.3.4.    The City's unemployment rate was 16.9% as of June 2012,

4  more than double the national rate of 8.2%. The City was impacted not only on the revenue side but also

5  by escalating expenses. The influx of population created a greater demand for public services, from

6  public safety (police and fire) to more mundane matters such as street repair and infrastructure

7  maintenance. As the economy worsened and revenues decreased, the City took some stop gap measures

8  to try to stop the bleeding. It implemented a hiring freeze and down-sized departments, reducing the

9  workforce by 20%. It negotiated and imposed concessions on its unions, saving about $10 million per

10 year. It exhausted its general fund reserves and sold excess assets to provide cash to fund ongoing

11 operations. *Id.*

12          19.2.3.5.    In May 2012, the then new Director of Finance, Jason

13 Simpson, began analyzing the City's financial condition, while attempting to formulate a budget for

14 2012-13. In doing so, Simpson determined that the budget projection for 2012-13 resulted in a

15 $45.9 million cash deficit with no general fund reserves; the cash balances for the prior two fiscal years

16 had been overstated; the beginning cash deficit for the next fiscal year was over $18.2 million; and the

17 City did not have enough unrestricted cash or reserves to pay its current financial obligations, those

18 obligations to become due beginning in July 2012, and continuing indefinitely. *Eligibility Opinion*, 499

19 B.R. at 780; *see also San Bernardino City Professional Firefighters Local 891 v. City of San*

20 *Bernardino, California (In re City of San Bernardino, California)*, 530 B.R. 474, 477 (C.D. Cal. 2015)

21 ("The City's financial situation deteriorated quickly in the summer of 2012. The City ran out of cash to

22 pay its creditors and employees, and had a projected budget deficit of $45.8 million. Personnel costs

23 alone were projected to exceed all of the City's General Fund revenue.").

24          19.2.3.6.    During the pendency of this Bankruptcy Case, as described

25 above, the City dramatically reduced expenses and worked diligently to increase revenues. Yet, if the

26 City were to move forward without restructuring its debts through the Plan, the City would still operate

27 at a deficit of nearly $4 million beginning in fiscal year 2018-19, and this operating deficit would

28 increase each year to a peak of a deficit of nearly $20.5 million in fiscal year 2025-26. Busch

1  Declaration at ¶8. Thus the City must restructure its debts through the Plan in order to continue as a

2  viable municipality and provide basic essential services to the City's residents. *Id.* at ¶14. By contrast,

3  with the restructuring and fiscal and service stabilization components to the Financial Model, the City

4  will be a viable municipal service provider for its residents. *Id.* The record before the Court

5  demonstrates that the City must allocate its very limited resources to the provision of municipal services

6  to its residents and the rehabilitation of the City's vital infrastructure. Even given the 1% payment of

7  claims under the Plan, including on Litigation Claims against the City and the Indemnified Parties, the

8  City cannot afford to fully fund the City's critical needs. Busch Declaration at ¶21, Scott Declaration at

9  ¶9.

10          19.2.3.7.     Public safety is a major concern of the City. *See*

11  Declaration of Andrea M. Travis-Miller [Dkt. No. 126], at ¶15. The City's high violent crime rates top

12  state and national averages. Burguan Declaration at ¶7. In 2015, the City, led by Police Chief Burguan,

13  prepared the Police Services Five Year Resources Plan ("Police Resources Plan"), which was approved

14  at a regularly noticed public meeting of the Mayor and Common Council on November 16, 2015.

15  Burguan Declaration at ¶5 and Exhibit 1 thereto. The Police Resources Plan as proposed and adopted by

16  the Mayor and Common Council requires additional funds of $56.5 million over five years to

17  implement. *Id.*

18          19.2.3.8.     During the bankruptcy case, crime further increased in the

19  City. As of June 2016, there have been significant increases in violent crimes over 2015, such as

20  criminal homicide (a 100% increase), forcible rape (a 15.56% increase) and aggravated assault (a

21  17.96% increase). There were 50 homicides in San Bernardino in 2016 as of September 27, which is

22  more than the total number of homicides for all of 2015. The City has a significantly higher homicide

23  rate this year per 100,000 residents than Chicago or Oakland. Burguan Declaration at ¶ 8.

24          19.2.3.9.     Under the current Financial Model, only approximately 15%

25  of the funds needed are allocated for infrastructure repair and maintenance, and the City can afford just

26  40% of what is necessary to fund the critical needs identified in the Police Resources Plan. Scott

27  Declaration at ¶9. That 40% allocation is sufficient for the City to provide basic essential services to its

28  residents, but the City will not be able to afford much beyond those basic services and the City's critical

1    needs for funding for police services will not be fully addressed for the foreseeable future.  If the City is

2    required to pay more than 1% under the Plan, the City would be required to further reduce funding for

3    the Police Resources Plan and infrastructure repair and maintenance. *Id.*  Mr. Scott testified, consistent

4    with Mr. McCrary's expert testimony, that decreasing funding for the Police Resources Plan would

5    result in an increase in violent crime, less services to City residents, even greater challenges to attracting

6    businesses, and the impairment of economic growth and investment in the City.  *Id.*  Under those

7    circumstances, and given the realities of the City's indemnification obligations, it is necessary and

8    appropriate to enjoin the holders of Litigation Claims against Indemnified Parties from recovering from

9    City employees personally for harms that occurred within the scope of employment.

10                   19.2.3.10.    In addition, the City's police officers and other employees

11   contributed substantial consideration to the adjustment of debts under the Plan. The City's police

12   officers and other employees agreed to the City's modified terms and conditions of employment under

13   their new collective bargaining agreements, and as part of that process agreed to a 1% distribution on

14   their claims, which claims the parties have valued at $130 million.  The police officers alone agreed to a

15   1% distribution on their claims valued by the parties at $74 million, principally claims for reduction of

16   pension and retiree health benefits. The employees had credible arguments under state law regarding the

17   legality of the modifications of the benefits, the litigation of which would certainly have dramatically

18   disrupted the City's momentum to a substantially consensual plan.  Moreover, had the police officers

19   prevailed in any such litigation, the resulting inability of the City to impair up to $130 million of claims

20   would have stopped the City's reorganization dead in its tracks.  The police officers and other City

21   employees made a substantial financial contribution to the reorganization.

22                   19.2.3.11.    The police officers also make a contribution to the City's

23   reorganization by putting their lives on the line to keep the City's residents safe and secure, knowing

24   that the performance of their job duties could inevitably lead to both injury and litigation at some point

25   in their careers. *See e.g.,* the declarations of former police officers Brian Cartony (Dkt. No. 1995-1) at

26   ¶ 3 ("shot in the lower back by a suspect in the course of a homicide"), Daniel Keil (Dkt. No. 1995-2) at

27   ¶ 4-5 ("multiple physical altercations with suspects," "run over by a vehicle," "head injuries from being

28   knocked into walls and floors," and "neck injuries, back injuries and blowing out both knees" in

1    incidents with suspects), and John Montecino  (Dkt. No. 1995-4) at ¶ 4 ("shot at on multiple, separate

2    occasions in the line of duty").  The City's police officers as a group are making a substantial

3    contribution to the Plan and the City's revitalization by virtue of their continued service to the City.

4                                    19.2.3.12.    Another factor in favor of approving the Plan Injunction is

5    that the Plan Injunction is narrowly tailored.  First, at the request of certain holders of Litigation Claims,

6    the City revised the Plan Injunction to clarify that claims against Indemnified Parties can be litigated and

7    can proceed to judgment. Only collection of those judgments will be enjoined, and only to the extent of

8    the City's indemnification obligation. The plaintiffs will still be able to recover from any available

9    insurance.  If not satisfied with applicable insurance, claims against employees that are indemnified by

10   the City (the Indemnified Parties) will be satisfied as General Unsecured Class 13 Claims under the

11   Plan. The Plan Injunction is narrowly tailored to achieve the specific purposes of the Plan, namely that

12   the City can operate after the Confirmation Date in accordance with the Financial Model and provide

13   basic municipal service to its residents.

14                                   19.2.3.13.    A final factor that the Court weighed in favor of approving

15   the Plan Injunction was the settlement achieved by the City and BICEP (see Dkt. No. 2096), which

16   settlement kept in place the excess liability coverage provided for in the BICEP Agreements even

17   though the City will pay the self-insured retention ("SIR") in accordance with the treatment of Class 13

18   claims under the Plan.  Thus, for the Litigation Claims allowed in an amount in excess of the $1 million

19   SIR under the BICEP Agreements, the City will utilize the coverage available under the BICEP

20   Agreements to pay the portion of the claim in excess of $1 million.

21         20.    Burden of Proof.  The City has met its burden of proving by a preponderance of the

22   evidence on the elements of Section 943(b) and the other Sections of the Bankruptcy Code made

23   applicable to confirmation of the Plan by Sections 103)(f) and 901, including Sections 1122 through

24   1142, and 1145.

25   **ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, AS FOLLOWS**:

26         21.    Confirmation of Plan.

27                21.1.    The Plan and each of its provisions (whether or not specifically approved herein)

28   are CONFIRMED in each and every respect, pursuant to section 943 of the Bankruptcy Code.  Failure

specifically to include or reference particular sections or provisions of the Plan or any related agreement in this Confirmation Order shall not diminish or impair the effectiveness of such sections or provisions, it being the intent of the Court that the Plan be confirmed and such related agreements be approved in their entirety.  The Effective Date of the Plan shall occur on the date determined by the City when the conditions set forth in Section XIII.B of the Plan have been satisfied or, if applicable, have been waived in accordance with Section XIII.C of the Plan.

21.2.   Any objections or responses to, or reservations of right regarding confirmation of the Plan that (a) have not been withdrawn, waived or settled prior to the entry of this Confirmation Order or (b) are not cured by the relief granted herein are hereby OVERRULED in their entirety and on the merits, and all withdrawn objections or responses are hereby deemed withdrawn with prejudice.  All creditors that failed to file objections to confirmation of the Plan are hereby deemed to have waived any objections to the terms of the Plan, confirmation of the Plan, and the terms of this Confirmation Order.

22.   <u>Confirmation Order Binding on All Parties</u>.  In accordance with Section 944(a) and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Confirmation Order shall be binding upon: (a) the City; (b) any and all holders of Claims, including holders of Litigation Claims against the City or the Indemnified Parties, irrespective of whether (i) any such Claim is impaired under the Plan, (ii) proof of any such Claim has been filed or deemed filed under section 501 of the Bankruptcy Code, (iii) any such Claim is allowed under section 502 of the Bankruptcy Code or (iv) the holders of such Claims accepted, rejected or are deemed to have accepted or rejected the Plan; (c) any and all non-debtor parties to executory contracts or unexpired leases with the City; (d) any party to any settlement with the City; and (g) the respective heirs, executors, administrators, trustees, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, guardians, successors or assigns of any of the foregoing.

23.   <u>Discharge of Claims</u>.  Except as specifically provided otherwise in the Plan, this Confirmation Order or any document or instrument evidencing or implementing any settlement approved hereby, as of the Effective Date, pursuant to Sections 524(a)(1), 524(a)(2) and 944(b), all debts of the City shall be, and hereby are, discharged, and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged debt;

1    *provided that* such discharge shall not apply to debts held by an entity that, before the Confirmation

2    Date, had neither notice nor actual knowledge of the Bankruptcy Case.

3          24.    Approval And Effectiveness of Plan Article XI Provisions; Including The Plan Injunction

4          24.1.    The Provisions of Article XI. of the Plan, including the Plan Injunction, are

5    approved in all respects, are incorporated herein in their entirety, are so ordered and shall be

6    immediately effective on the Effective Date of the Plan without further order or action on the part of the

7    Court, the City, the Indemnified Parties or any holder of a Litigation Claim.

8          24.2.    Pursuant to the Plan Injunction, all entities holding, claims, judgments or rights to

9    remedies against past or present employees or officers of the City entitled to Indemnification[18] from the

10   City (the Indemnified Parties[19]) based upon acts or omissions that occurred or arose prior to the

11   Confirmation Date are hereby enjoined from enforcing such claims, judgments or remedies in any

12   manner against the person or assets of the Indemnified Parties, except that the Plan Injunction shall not

13   prevent the holders of judgments or remedies from seeking recourse against available insurance

14   coverage.  The Plan Injunction applies to all pre-Confirmation Date claims against the Indemnified

15   Parties, whether or not a lawsuit based upon such claim has been filed or will be filed, and whether a

16   lawsuit is filed prior to or after the Confirmation Date.  Therefore, holders of Litigation Claims[20] against

17   Indemnified Parties: (a) shall be entitled to payment of any such allowed claims pursuant to the terms of

18

19   [18] "Indemnification," as defined in the Plan, means rights of indemnity, defense, reimbursement, and

20   advancement of fees and expenses of current and former officers and employees of the City with respect
     to any claims or lawsuits brought against such officers and employees by third parties, in each case

21   arising out of an act or omission occurring within the scope of such officer's or employee's employment
     as an employee of the City.

22   [19] "Indemnified Parties," as defined in the Plan, means the current and former officers and employees of

23   the City who are entitled to Indemnification.

24   [20] Litigation Claims, as defined in the Plan, means (a) those lawsuits against the City that are still
     pending as of the Confirmation Date, including those listed in Exhibit 6 to the Appendix [of Exhibits to

25   Plan]; (b) those lawsuits against the City that are filed on or after the Confirmation Date based on acts,
     claims or omissions that occurred or arose prior to the Confirmation Date; and (c) those lawsuits against

26   any of the Indemnified Parties, whether filed prior to the Confirmation Date or on or after the
     Confirmation Date based on acts, claims or omissions that occurred or arose prior to the Confirmation

27   Date, as to which lawsuits the City has assumed or will assume the defense thereof and became or
     becomes obligated to pay any judgment arising therefrom pursuant to Cal. Government Code §§ 825,

28   970, 995 and 996 and any other applicable law or rule.

the Plan as Class 13 Claims that are receiving a 1% distribution on the amount of the allowed claim;

(b) may also recover from available insurance; but (c) may not enforce any claims, judgments or

remedies arising from their Litigation Claims against the person or assets of the Indemnified Parties.

       24.3.   Attached to this Confirmation Order as Exhibit B are non-exclusive lists prepared by the City of: (a) pending lawsuits in which pre-Confirmation Date claims against Indemnified Parties are asserted; and (b) claimants who have given the City notice of pre-Confirmation Date claims against Indemnified Parties but have not yet filed lawsuits. All persons and entities asserting the pre-Confirmation Date claims referenced in Exhibit B are subject to the Plan Injunction with respect to such pre-Confirmation Date claims against Indemnified Parties. All other persons and entities not identified on Exhibit B but who have or will assert pre-Confirmation Date claims against Indemnified Parties are also subject to the Plan Injunction with respect to such pre-Confirmation Date claims. The inclusion of a person or entity on Exhibit B is not and shall not be deemed an admission by the City that such party has a claim against the City or an Indemnified Party, nor shall the omission of a person or entity from Exhibit B constitute a waiver of the applicability of the Plan Injunction or otherwise prejudice the City in any way.

       24.4.   Approval of ADR Procedures; Continuation of Stay for Purposes of ADR and Claims Allowance Procedures.

       24.4.1.  The ADR Procedures are approved, incorporated into this Confirmation Order by this reference and made a part hereof, and shall be enforceable in this Court and any other court of applicable jurisdiction. All holders of claims against the City or the Indemnified Parties are directed to participate in the ADR Procedures prior to pursuing allowance of their claims in this Court or liquidation of their claims in any other court. The City shall have until the later of (x) 180 days after the Effective Date or (y) 180 days after the City receives written notice of a pre-Confirmation Date claim against the City or an Indemnified Party to give notice to the claimant that the City intends to try and resolve the claim pursuant to the ADR Procedures. The Court shall retain jurisdiction to resolve disputes arising in implementation of the ADR Procedures, and to fill in any gaps in the ADR Procedures as circumstances require.

24.4.2.  All injunctions or stays provided for in the Bankruptcy Case pursuant to Bankruptcy Code Sections 105, 362, or 922, or otherwise, and in existence immediately prior to the Confirmation Date, shall remain in full force and effect until the Effective Date, and shall continue in full force and effect after the Effective Date, together with the injunction provisions of Article XI of the Plan, for the purpose of resolving claims, including Litigation Claims, through the ADR Procedures, judicial determination of the City's liability (or lack thereof) on any pre-Confirmation Date claim and the allowance or disallowance thereof.

24.4.3.  If a claim cannot be resolved through the ADR Procedures, then any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim is preserved.  *See* 28 U.S.C. §§ 157(b)(5) and 1411; *see also Sigma Micro Corp. v. Healthcentral.com (In re Healthcentral.com*), 504 F.3d 775, 787 (9th Cir. 2007) ("A Seventh Amendment jury trial right does not mean the bankruptcy court must instantly give up jurisdiction and that the case must be transferred to the district court. Instead, the bankruptcy court is permitted to retain jurisdiction over the action for pre-trial matters.  Allowing the bankruptcy court to retain jurisdiction over pre-trial matters does not abridge a party's Seventh Amendment right to a jury trial.").

25.  <u>Survival of Indemnification Obligations</u>.  In accordance with the operation of the Plan Injunction, nothing in this Confirmation Order or the Plan discharges the obligations of the City, pursuant to its past practices and applicable law, to indemnify its officers and employees for any pre-Confirmation Date acts or omissions in the scope of their employment by the City.

26.  <u>Executory Contracts and Unexpired Leases</u>.  Assumption of the contracts and leases listed in the List of Assumed Executory Contracts and Unexpired Leases filed with the Court, as modified from time to time, is hereby approved. Assumption and assignment of the contracts and leases listed in the List of Assumed and Assigned Executory Contracts and Unexpired Leases filed with the Court, as modified from time to time, is hereby approved.  Rejection of the contracts and leases listed in the List of Rejected Executory Contracts and Unexpired Leases filed with the Court, as modified from time to time, is hereby approved, and all other executory contracts and unexpired leases that are not assumed or assumed and assigned are hereby rejected.  Any time within 180 days after the Effective

1   Date, the City may file a motion to add or remove contracts or leases to or from the List of Assumed

2   Executory Contracts and Unexpired Leases, List of Assumed and Assigned Executory Contracts and

3   Unexpired Leases and List of Rejected Executory Contracts and Unexpired Leases, or otherwise modify

4   any decision to assume, assign or reject any executory contract or unexpired lease, upon notice to the

5   counterparty.

6        27.   <u>Plan Implementation</u>.  In accordance with Section 1142, without the necessity of further

7   action by the Court, the City is authorized to take any and all actions necessary or appropriate to

8   implement, effectuate and consummate the Plan, this Confirmation Order and the transactions

9   contemplated thereby or hereby.

10        28.   <u>Binding Effect of Prior Orders</u>.  Effective as of the Confirmation Date, but subject to the

11   occurrence of the Effective Date and subject to the terms of the Plan and this Confirmation Order, all

12   prior orders entered in the Bankruptcy Case and all documents and agreements executed by the City as

13   authorized and directed thereunder shall be binding upon and shall inure to the benefit of the City and

14   any other parties expressly subject thereto.

15        29.   <u>Final Order; Waiver of Stay</u>.  This Confirmation Order is a final order, and the period in

16   which an appeal must be filed shall commence immediately upon the entry hereof. The stay of this

17   Confirmation Order otherwise imposed by Bankruptcy Rule 3020(e) is hereby waived as of the date

18   hereof.

19        30.   <u>Reversal</u>.  If any or all of the provisions of this Confirmation Order are hereafter

20   reversed, modified, ~~or~~ vacated or stayed by subsequent order of this Court or any other federal appellate

21   court with appropriate jurisdiction, such reversal, modification, ~~or~~ vacatur or stay shall not affect the

22   validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to

23   the City's receipt of written notice of such order. Notwithstanding any such reversal, modification, ~~or~~

24   vacatur, or stay of this Confirmation Order, any such act or obligation incurred or undertaken pursuant

25   to, and in reliance on, this Confirmation Order prior to the effective date of such reversal, modification,

26   ~~or~~ vacatur or stay shall be governed in all respects by the provisions of this Confirmation Order and the

27   Plan and all related documents or any amendments or modifications thereto.

28

31.    Miscellaneous Provisions.

     31.1.    Additional Non-Material Modifications.  The City is hereby authorized to make non-material modifications or amendments to the Plan at any time prior to the substantial consummation of the Plan, without further order of the Court.

     31.2.    Kohl's.  Nothing in the Plan or this Confirmation Order shall effect a discharge or waiver of the Claims of Kohl's Department Stores, Inc. ("Kohl's") for refunds on account of taxes paid to the City after the Petition Date (the "Tax Refund Claims"), which are subject to a tolling agreement between the City and Kohl's dated August 7, 2014, the Amended Tolling Agreement dated August 7, 2015, and the Second Amended Tolling Agreement dated as of July 30, 2016 (collectively, the "Tolling Agreement").  The Tolling Agreement shall remain in effect, and all of Kohl's and the City's rights, claims and defense in connection with the Tax Refund Claims are hereby preserved.

     31.3.    Class 14 Elections Made in Error to Detriment of Claimants.  Notwithstanding anything to the contrary in the Plan or any applicable Ballot, any Retiree holding an Allowed Retiree Health Benefit Claim of more than $10,000.00, who elected on their Ballot to have their Retiree Health Benefit Claim treated as a Convenience Class Claim (Class 14), shall be deemed not to have made such election.  Each Retiree Health Benefit Claim of more than $10,000.00 shall be treated as a Class 13 General Unsecured Claim.

     31.4.    Certain Settlements.

       31.4.1.  The "Stipulation Between City of San Bernardino and BICEP Resolving BICEP's Motion to Compel Assumption or Rejection of the BICEP Agreements and BICEP's Objection to Confirmation of City's Third Amended Plan," filed on December 2, 2016 (Dkt. No. 2096, the "BICEP Stipulation"), is hereby approved, incorporated herein as part of this Order and made a part of the Plan, and the Court shall retain jurisdiction to resolve all disputes between the City and BICEP in any way related to pre-Confirmation Date claims against the City or the Indemnified Parties (including utilizing the "mediation first" provisions of the BICEP Stipulation).  The City's assumption of the BICEP Agreements is also approved.

       31.4.2.  Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the City's obligations under the SBCPF Settlement Agreement may not be

discharged pursuant to the claims discharge provisions of the Plan or Bankruptcy Code, and the

SBCPF's right to enforce the SBCPF Settlement Agreement in this Court shall not be enjoined. For the

avoidance of doubt, as set forth in the Plan, the SBCPF Settlement Agreement shall not be rejected.

31.4.3.  The POB Settlement Agreement (i) was duly authorized, executed and

delivered by the City, (ii) the obligations of the City under such agreement are valid and binding

obligations of the City, enforceable in accordance with its terms, and (iii) is hereby approved. The City

is authorized to enter into, execute, deliver and file with the Court any further documents the City

reasonably deems necessary to implement the Settlement Agreement (the "Additional Documents"),

including but not limited to the Additional Documents filed with the Court at Docket No. 2150 (as such

may be modified or amended from time to time). Upon the occurrence of the Effective Date and

execution and delivery by the parties of the Additional Documents, (a) such Additional Documents shall

be deemed duly authorized, executed and delivered by the parties, and (b) the obligations of the parties

under such Additional Documents shall be valid and binding obligations of the parties and enforceable

in accordance with their respective terms.

31.4.4.  The Plan and this Confirmation Order shall not impair or modify in any

way SANBAG's rights under the SANBAG Agreement (including without limitation SANBAG's power

to withhold Measure I funds).

31.4.5.  The City's settlements with the Consenting Unions, including the

attendant memorandums of understanding and each Agreement Regarding Class 13 General Unsecured

Claim between the City and the respective Consenting Union are hereby approved (including the

stipulated amounts of Class 13 General Unsecured Claims) and shall govern the distributions to current

and former employees of the City represented by such Consenting Unions.

31.5.  1996 Refunding Bonds and 1999 Refunding Certificates of Participation.

31.5.1.  The holders of the 1996 Refunding Bonds and 1999 Refunding

Certificates of Participation (the "Insured Bonds") have received appropriate notice of: (i) the

solicitation of the Plan, (ii) the confirmation hearing, (iii) National's position as the deemed holder of

the claims of the Insured Bonds, and the fact that National was entitled to vote to accept or reject the

Plan as such, (iv) the fact that the holders of the Insured Bonds were not entitled to vote to accept or

reject the Plan, (v) the deadline for voting on the Plan, (vi) the deadline for objecting to confirmation of the Plan, and (vii) the exculpation provisions set forth in Section XI.E. of the Plan. No holder of an Insured Bond filed an objection to the Plan, either on a formal or informal basis, nor submitted a vote in relation to the Plan. Each holder of an Insured Bond is therefore bound by the terms and provisions of the Plan, including but not limited to Section XI.E. of the Plan.

       31.5.2. The Plan and each of the Plan Documents and ancillary agreements and undertakings necessary to effectuate the Plan (including, without limitation, the 1999 Refunding Certificates of Participation Amendment and the 1996 Refunding Bonds Amendment) were developed and negotiated in good faith and at arms'-length among representatives of the City, National, the 1999 Refunding Certificates of Participation Trustee and the 1996 Refunding Bonds Trustee. The Plan's classification, indemnification, exculpation, release, and injunction provisions are consistent with sections 105, 1122, 1123(b)(6), 1123(b)(3)(A), 1129, and 1142 of the Bankruptcy Code, and are each necessary for the Debtor's successful reorganization.

       31.5.3. Entry into and consummation of the transactions contemplated by 1999 Refunding Certificates of Participation Amendment and the 1996 Refunding Bonds Amendment is in the best interests of the City and holders of the Insured Bonds and are approved in all respects. Each of the City, National, the 1999 Refunding Certificates of Participation Trustee and the 1996 Refunding Bonds Trustee has exercised reasonable business judgment in connection with the negotiation and consummation of the 1999 Refunding Certificates of Participation Amendment and the 1996 Refunding Bonds Amendment, respectively, and the transactions contemplated thereby. The City, the 1999 Refunding Certificates of Participation Trustee and the 1996 Refunding Bonds Trustee are authorized, without further notice to or action, order, or approval of this Court or any other Person, to enter into and fully perform their obligations under the Plan and each of the Plan Documents and ancillary agreements and undertakings necessary to effectuate the Plan (including, without limitation, the 1999 Refunding Certificates of Participation Amendment and the 1996 Refunding Bonds Amendment).

       31.5.4. The City, National, the 1999 Refunding Certificates of Participation Trustee, the 1996 Refunding Bonds Trustee, and each of their respective agents, successors, predecessors, control persons, members, officers, directors, employees and agents and their respective

attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such

persons, to the extent applicable, (i) have acted in "good faith" within the meaning of section 1125(e) of

the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code, the

Bankruptcy Rules, the Local Rules and any applicable non-bankruptcy law, rule, or regulation governing

the adequacy of disclosure in connection with all their respective activities relating to the solicitation of

acceptances to the Plan and their participation in the activities described in section 1125 of the

Bankruptcy Code and (ii) shall be deemed to have participated in good faith and in compliance with the

applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan,

and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any

time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances

or rejections of the Plan or the offer and issuance of the securities under the Plan, and are entitled to the

protections afforded by section 1125(e) of the Bankruptcy Code and the release, exculpation and related

Plan provisions, as set forth and to the extent provided pursuant to Article XI of the Plan.

31.6. <u>Agreements with the United States</u>. Notwithstanding any other provision of the

Plan or this Confirmation Order to the contrary:

31.6.1. The City's obligations pursuant to its Contracts for Loan Guarantee

Assistance Under Section 108 of the Housing and Community Development Act of 1974, as amended,

42 U.S.C. § 5308, with the United States Department of Housing and Urban Development shall remain

extant and enforceable and not subject to discharge pursuant to 11 U.S.C. § 944; provided, however, that

the City retains all defenses to the enforceability of such obligations under applicable non-bankruptcy

law.

31.6.2. Nothing in the Plan or Confirmation Order shall adversely affect in any

way the rights and remedies of the United States and the State of California under the  consolidated

actions styled as *City of San Bernardino v. United States and State of California, on behalf of*

*Department of Toxic Substances Control v. United States*, Civil Action Nos. 96-8867 (MRP), 96-5205

(MRP) - Consolidated (C.D. Cal.), including without limitation, the Consent Decree therein and any

amendment thereto ("C.D. Cal. Actions"), nor shall anything in the Plan or the Confirmation Order

divest or limit the jurisdiction of the United States District Court for the Central District of California

over the C.D. Cal. Actions.  Upon the Effective Date of the Plan, the C.D. Cal. Actions shall survive the bankruptcy case and may be adjudicated and enforced in the United States District Court for the Central District of California, provided, however, that Bankruptcy Court approval must be obtained for any allowance of an administrative expense.

     31.6.3.  As to the United States, its agencies, departments or agents, nothing in the Plan or Confirmation Order shall discharge, release, or otherwise preclude: (1) any liability of the City to the United States, its agencies, departments or agents arising on or after the Effective Date; (2) any liability to the United States, its agencies, departments or agents that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (3) any valid defense of  setoff or recoupment with respect to a Claim of the United States, its agencies, departments or agents; (4) the continued validity of the City's obligations to the United States, its agencies, departments or agents under any grant or cooperative assistance agreement; (5) any liability of any entity under environmental law arising or springing anew after the Effective Date that any entity would be subject to as a post-Effective Date owner or operator of property; or (6) the United States from, subsequent to the Confirmation Date, pursuing any police or regulatory action against the City.

   32. <u>Notice of Effective Date</u>.  On or before 14 days after occurrence of the Effective Date, the City or its agent shall mail or cause to be mailed to all holders of Claims the Notice of the Effective Date, which will inform such holders of: (i) entry of the Confirmation Order; (ii) the occurrence of the Effective Date; (iii) the assumption and rejection of the City's executory contracts and unexpired leases pursuant to this Plan, as well as the deadline for the filing of Claims arising from such rejection; (iv) the procedures for changing an address of record pursuant to Section IX of the Plan; and (v) such other matters as the City deems to be appropriate.

   33. <u>Findings Of Fact And Conclusions Of Law</u>.  Regardless of where set forth in this Confirmation Order, any finding of fact constitutes a finding of fact even if it is stated as a conclusion of law or otherwise, and any conclusion of law constitutes a conclusion of law even if it is stated as a finding of fact or otherwise. All findings of fact and conclusions of law announced by the Court on the record in connection with confirmation of the Plan or otherwise at the Confirmation Hearing are

1   incorporated herein by reference.  The findings of fact and conclusions of law set forth herein and in the

2   record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law

3   pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy

4   Rules 7052 and 9014.

5

6                                                     ###

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   Date: February 7, 2017

                                        Meredith A. Jury
27                                       United States Bankruptcy Judge

28

# Exhibit A

PAUL R. GLASSMAN (State Bar No. 76536)
FRED NEUFELD (State Bar No. 150759)
MARIANNE S. MORTIMER (State Bar No. 296193)
KATHLEEN D. DeVANEY (State Bar No. 156444)
STRADLING YOCCA CARLSON & RAUTH
A Professional Corporation
100 Wilshire Blvd., 4th Floor
Santa Monica, CA 90401
Telephone: (424) 214-7000
Facsimile: (424) 214-7010
E-mail: pglassman@sycr.com
        fneufeld@sycr.com
        mmortimer@sycr.com
        kdevaney@sycr.com

GARY D. SAENZ (State Bar No. 79539)
CITY ATTORNEY
300 North "D" STREET, Sixth Floor
San Bernardino, CA 92418
Telephone: (909) 384-5355
Facsimile: (909) 384-5238
E-mail: saenz_ga@sbcity.org

Attorneys for Debtor
City of San Bernardino

## UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA
### RIVERSIDE DIVISION

| | |
|---|---|
| In re | Case No. 6:12-bk-28006-MJ |
| CITY OF SAN BERNARDINO, CALIFORNIA, | Chapter 9 |
| Debtor. | **THIRD AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF SAN BERNARDINO, CALIFORNIA (JULY 29, 2016), AS MODIFIED** |

<u>Plan Confirmation Hearing</u>
  Date:      October 14, 2016
  Time:      10:00 a.m.
  Place:     Courtroom 301
             3420 Twelfth Street
             Riverside, CA 92501-3819

# TABLE OF CONTENTS

Page

I. RULES OF INTERPRETATION; DEFINITIONS; COMPUTATION OF TIME ...................1
    A.    Rules of Interpretation. ...............................................................................1
    B.    Definitions. .....................................................................................................1
    C.    Computation of Time. .................................................................................17

II. TREATMENT OF ADMINISTRATIVE CLAIMS AND PROFESSIONAL CLAIMS ........17
    A.    Treatment of Administrative Claims. .......................................................17
    B.    Deadline for the Filing and Assertion of Administrative Claims. ...........17
    C.    Treatment of Professional Claims. ...........................................................18
    D.    Priority Claims in Chapter 9. ....................................................................18

III. DESIGNATION OF CLASSES OF CLAIMS ......................................................18

IV. TREATMENT OF CLAIMS ...............................................................................19
    A.    Class 1 – 1996 Refunding Bonds Claims .................................................19
    B.    Class 2 – 1999 Refunding Certificates of Participation Claims ...............20
    C.    Class 3 – Secured Claims: CIEDB Harriman Project Claims ...................21
    D.    Class 4 – Secured Claims: CIEDB Pavement Project Claims ...................21
    E.    Class 5 – Secured Claims: Police Station AC Financing Claims .............22
    F.    Class 6 – Secured Claims: Burgess Claims ..............................................22
    G.    Class 7 – Claims on Restricted Revenue Bond and Note Payable Obligations ..........23
    H.    Class 8 – CalPERS Claims ........................................................................23
    I.    Class 9 – PARS Claims. ............................................................................24
    J.    Class 10 – Consenting Union Claims ........................................................24
    K.    Class 11 – Retiree Health Benefit Claims .................................................26
    L.    Class 12 – POB Claims. .............................................................................26
    M.    Class 13 – General Unsecured Claims .....................................................26
    N.    Class 14 – Convenience Class Claims ......................................................27

V. ACCEPTANCE OR REJECTION; CRAMDOWN ...............................................27
    A.    Voting of Claims. .......................................................................................27

VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...............28
    A.    Assumption of Executory Contracts and Unexpired Leases. ..................28
    B.    Cure Payments. ..........................................................................................28
    C.    Rejection of Executory Contracts and Unexpired Leases. ......................29
    D.    Claims Arising From Rejection. .................................................................29
    E.    Modifications to Assumption, Assignment or r
        ejection of Executory Contracts and Unexpired Leases. ........................30

VII. EXECUTION AND IMPLEMENTATION OF THE PLAN ....................................30
    A.    In General. ..................................................................................................30
    B.    Means for Implementation of the Plan. ....................................................30
    C.    Insurance. ...................................................................................................50
    D.    Continued Operations ................................................................................52

VIII. RETENTION OF THE CITY'S RIGHTS OF ACTION ........................................52

IX. DISTRIBUTIONS ...........................................................................................53
    A.    Distribution Agent. ....................................................................................53
    B.    Delivery of Distributions. ...........................................................................53
    C.    Distributions of Cash. ................................................................................53
    D.    Timeliness of Payments. ...........................................................................53
    E.    Compliance with Tax, Withholding, and Reporting Requirements ..........54
    F.    Time Bar to Cash Payments. .....................................................................54

| | | | |
|---|---|---|---|
| | G. | No De Minimis Distributions | 54 |
| | H. | Distributions of Unclaimed Property. | 54 |
| | I. | No Distributions on Account of Disputed Claims. | 55 |
| | J. | Certain Claims to be Expunged. | 55 |
| | K. | No Post-petition Accrual | 55 |
| X. | | DISPUTED CLAIMS; OBJECTIONS TO CLAIMS; PROSECUTION OF OBJECTIONS TO DISPUTED CLAIMS | 56 |
| | A. | Claims Objection; ADR Procedures; Prosecution of Objections. | 56 |
| | B. | Payments and Distributions with Respect to Disputed Claims | 56 |
| XI. | | EFFECT OF CONFIRMATION | 56 |
| | A. | Discharge of the City. | 56 |
| | B. | Release by Holders of Pre-Confirmation Date Claims. | 57 |
| | C. | Injunction. | 58 |
| | D. | Term of Existing Injunctions or Stays. | 59 |
| | E. | Exculpation. | 59 |
| | F. | Comprehensive Settlement of Claims and Controversies. | 60 |
| | G. | Limitation on Scope of Release and Injunction Provisions of Sections XI.B. and XI.C. With Respect to the Indemnified Parties | 60 |
| | H. | Agreements with the United States | 61 |
| XII. | | RETENTION OF AND CONSENT TO JURISDICTION | 62 |
| XIII. | | CONDITIONS PRECEDENT | 64 |
| | A. | Conditions Precedent to Confirmation. | 64 |
| | B. | Conditions Precedent to Effective Date. | 64 |
| | C. | Waiver of Conditions to Effective Date. | 64 |
| | D. | Effect of Failure of Conditions. | 65 |
| | E. | No Admission of Liability. | 65 |
| XIV. | | MISCELLANEOUS PROVISIONS | 65 |
| | A. | Modification of Plan. | 65 |
| | B. | Dissolution of the Retiree Committee. | 65 |
| | C. | Severability. | 66 |
| | D. | Governing Law. | 66 |
| | E. | Effectuating Documents and Further Transactions. | 66 |
| | F. | Request for Waiver of Automatic Stay of Confirmation Order. | 67 |
| | G. | Notice of Effective Date. | 67 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    The City of San Bernardino, California, a debtor under Chapter 9 of the Bankruptcy Code in

2 the case *In re City of San Bernardino, California*, Case No. 6:12-28006, currently pending in the

3 United States Bankruptcy Court for the Central District of California, hereby proposes the following

4 *Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California (July 29,*

5 *2016), as Modified* pursuant to Bankruptcy Code section 941.

6    Please refer to the Disclosure Statement included with this Plan for a discussion of the City's

7 financial condition, the developments throughout the Bankruptcy Case, and other important

8 information.  The City encourages you to read this Plan and the Disclosure Statement in their

9 entirety before voting to accept or reject this Plan.

10 **I.    RULES OF INTERPRETATION; DEFINITIONS; COMPUTATION OF TIME**

11    **A.    <u>Rules of Interpretation.</u>**

12    For purposes herein:  (i) the words "herein," "hereof," "hereto," "hereunder," and others of

13 similar import refer to this Plan as a whole and not to an particular section, subsection, or clause

14 contained in this Plan; (ii) unless otherwise specified, all references in this Plan to "Sections" and

15 "Exhibits" (uppercased) are to the respective Section in the Plan or Exhibit to the Appendix, as the

16 same may be amended or modified from time to time; (iii) the headings in this Plan are for

17 convenience of reference only and do not limit or otherwise affect the provisions of this Plan; (iv) in

18 the appropriate context, words denoting the singular number include the plural number and vice

19 versa; (v) the rules of construction set forth in Bankruptcy Code section 102 apply; (vi) any term

20 used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code

21 or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the

22 Bankruptcy Rules, as the case may be; and (vii) any reference to an Entity as a holder of a Claim

23 includes such Entity's successors and assigns.

24    **B.    <u>Definitions.</u>**

25    **1.    <u>1996 Refunding Bonds</u>** means the $16,320,000 San Bernardino Joint Powers

26 Financing Authority Lease Revenue Refunding Bonds (City Hall Project) Series 1996 issued

27 pursuant to the 1996 Trust Indenture.

28

2.     **1996 Refunding Bonds Agreements (City Hall)** means the following executory contracts and unexpired leases to which the City is a party:  (i) the Continuing Disclosure Agreement dated December 18, 1996, by and between the City and the 1996 Refunding Bonds Trustee; (ii) the Ground Lease dated as of December 1, 1996, by and between the City and the RDA; and (iii) the City Hall Lease.

3.     **1996 Refunding Bonds Amendment** means the Amendment to the 1996 Trust Indenture and the City Hall Lease, which will be included as an Exhibit to the Appendix.

4.     **1996 Refunding Bonds Trustee** means U.S. Bank National Association, not individually but as successor indenture trustee under the 1996 Trust Indenture with respect to the 1996 Refunding Bonds.

5.     **1996 Trust Indenture** means the Trust Indenture, dated as of December 1, 1996, between the JPFA and First Trust of California, National Association, as trustee, entered into in connection with the issuance the 1996 Refunding Bonds.

6.     **1998 Refunding Certificates of Participation** means the $36,230,000 City of San Bernardino Municipal Water Department 1998 Refunding Sewer Revenue Certificates of Participation.

7.     **1998 Refunding Certificates of Participation Agreements (Sewer)** means the following contracts and agreements to which the City is a party:  (i) the Trust Agreement, dated July 1, 1998, by and among the San Bernardino Public Safety Authority, the City and the 1998 Refunding Certificates of Participation Trustee; (ii) the Installment Purchase Agreement, dated July 1, 1998, by and between the City and the San Bernardino Public Safety Authority; and (iii) all other documents or agreements executed in connection with the foregoing and the 1998 Refunding Certificates of Participation as to which the City is a party, beneficiary or obligor.

8.     **1998 Refunding Certificates of Participation Trustee** means U.S. Bank National Association, not individually but as indenture trustee under the 1998 Trust Indenture with respect to the 1998 Refunding Certificates of Participation.

9. **1999 Refunding Certificates of Participation** means the $15,480,000 Refunding Certificates of Participation (Police Station, South Valle and 201 North E Street Projects) issued pursuant to the 1999 Trust Agreement.

10. **1999 Refunding Certificates of Participation Agreements (Police Station/201 North E Street/South Valle)** means the following executory contracts and unexpired leases to which the City is a party: (i) the Continuing Disclosure Agreement dated September 29, 1999 by and between the City and the 1999 Refunding Certificates of Participation Trustee; (ii) the 201 North E Street Lease Agreement dated as of September 1, 1999, by and between the JPFA, as lessor, and the City, as lessee; (iii) the Police Station Lease; (iv) the South Valle Lease Agreement, dated as of September 1, 1999, by and between the JPFA, as lessor, and the City, as lessee; (v) the South Valle Site and Facility Lease, dated as of September 1, 1999, by and between the City, as lessor, and the JPFA, as lessee; (vi) the Agency Agreement, dated as of September 1, 1999, between the City and the RDA; and (vii) the Reimbursement Agreement, dated as of September 29, 1999, by and between the RDA and the City.

11. **1999 Refunding Certificates of Participation Amendment** means the Amendment to the 1999 Trust Agreement and to the Police Station Lease, which will be included as an Exhibit to the Appendix.

12. **1999 Refunding Certificates of Participation Trustee** means U.S. Bank National Association, not individually but as indenture trustee under the 1999 Trust Agreement with respect to the 1999 Refunding Certificates of Participation.

13. **1999 Trust Agreement** means the Trust Agreement, dated as of September 1, 1999, between the JPFA, the City and U.S. Bank National Association, as trustee, entered into in connection with the issuance of the 1999 Refunding Certificates of Participation.

14. **415 Trust** means the private trust established pursuant to the City of San Bernardino Excess Benefit Trust Agreement from which the PARS Excess Benefit Plan distributions are made.

15. **AB 506** means Assembly Bill 506, as codified at California Government Code § 53760 *et seq.*

16. **Administrative Claim** means the costs or expenses of administration of the Bankruptcy Case not already paid by the City that are allowed under Bankruptcy Code section 503(b) and entitled to priority under Bankruptcy Code section 507(a)(2) to the extent made applicable in Chapter 9 (i) which the City agrees is an Allowed administrative expense; or (ii) which the Bankruptcy Court determines is an Allowed administrative expense.

17. **ADR Procedures** means the alternative dispute resolution procedures, which are included as an Exhibit to the Appendix.

18. **Affiliate** has the meaning set forth in Bankruptcy Code section 101(2).

19. **Allowed** means, with reference to any Claim, a Claim that

(i)    is on the List of Creditors (as may be amended from time to time pursuant to Bankruptcy Rule 1009) and is not listed as unliquidated, contingent or disputed on the List of Creditors, and for which no contrary proof of claim has been filed (subject to objection as set forth in the next subsection);

(ii)    is asserted in a proof of claim filed in compliance with Bankruptcy Code section 501 and any applicable Bankruptcy Court order or designated on the List of Creditors and as to which:  (A) no objection has been, or subsequently is, filed, or notice given, within the 180 Day Deadline established pursuant to Section X.A of this Plan (as such deadline may be extended by the Bankruptcy Court upon application of the City from time to time); (B) the Bankruptcy Court has entered a Final Order allowing all or a portion of such Claim (but only in the amount so allowed); or (C) the Bankruptcy Court has entered a Final Order under Bankruptcy Code section 502(c) estimating the amount of the Claim for purposes of allowance;

(iii)    is subject to a stipulation between the City and the holder of such Claim providing for the allowance of such Claim;

(iv)    is deemed "Allowed" pursuant to the terms of this Plan; or

(v)    is designated as "Allowed" in a pleading entitled "Designation Of Allowed Claims" (or a similar title) filed with the Bankruptcy Court by the City on or after the Effective Date.

20.     **Appendix** means all of the documents, schedules and exhibits referred to in the Plan and Disclosure Statements as Exhibits thereto, which Appendix will be filed with the Court and distributed along with the Disclosure Statement when the City solicits votes to accept the Plan.

21.     **Ballot** means the ballot(s), in the form(s) approved by the Bankruptcy Court in the Plan Solicitation Order accompanying the Disclosure Statement and provided to each holder of a Claim entitled to vote to accept or reject this Plan.

22.     **Bankruptcy Case** means the case under Chapter 9 of the Bankruptcy Code commenced by the City, styled *In re City of San Bernardino, California*, Case No. 6:12-28006-MJ, currently pending in the Bankruptcy Court.

23.     **Bankruptcy Code** means title 11 of the United States Code, as amended from time to time, as applicable to the Bankruptcy Case.

24.     **Bankruptcy Court** means the United States Bankruptcy Court for the Central District of California, Riverside Division, or such other court that lawfully exercises jurisdiction over the Bankruptcy Case.

25.     **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Bankruptcy Case, together with the local rules of the Bankruptcy Court applicable to the Bankruptcy Case.  Unless otherwise indicated, references in this Plan to "Bankruptcy Rule _____" are to the specifically identified rule of the Federal Rules of Bankruptcy Procedure.

26.     **Bar Date** means the applicable date by which a particular proof of claim must be filed, as established by the Bankruptcy Court.  There may be multiple Bar Dates for various types or classes of claims.

27.     **BICEP** means the Big Independent Cities Excess Pool Joint Powers Authority.

28.     **BICEP Agreement** means the BICEP Master Memorandum of Liability Coverage between the City and BICEP and the exhibits and schedules evidencing the terms thereunder.

29.     **Burgess** means Tim Burgess.

30.    **Burgess Claims** means the claims of Burgess arising under the Burgess Documents.

31.    **Burgess Documents** means the transaction documents entered into in connection with the City's financed acquisition of the real property located at 120 South D Street in San Bernardino, including: the Purchase and Sale Agreement; the San Bernardino City Fire Department Maintenance Facility Note in the original principal sum of $1,200,000 (the "Burgess Note"); the Indenture and Loan Agreement, and a Deed of Trust, Security Agreement, Assignment of Leases and Rents, and Financing Statement.

32.    **Business Day** means a day other than a Saturday, a Sunday, or any other day on which banking institutions in Los Angeles, California, are required or authorized to close by law or executive order.

33.    **CalPERS** means the California Public Employees' Retirement System.

34.    **CalPERS Claims** means the claims of CalPERS arising out of the City's relationship with CalPERS and participation in the CalPERS system, including its contracts with CalPERS and applicable laws and regulations, as applied or interpreted pursuant to applicable provisions of California law, and any other claims asserted by CalPERS against the City, including under the Mediator's Order.

35.    **Cash** means cash and cash equivalents, including withdrawable bank deposits, wire transfers, checks, and other similar items.

36.    **Charter** means the Charter of the City of San Bernardino, State of California, as is currently in effect, and any amendments, replacements or changes thereto.

37.    **Charter Committee** means the committee established by the City to draft a proposed revised and/or replacement Charter for consideration by the City's voters (not the voters under this Plan).

38.    **CIEDB** means the California Infrastructure and Economic Development Bank.

39.     **CIEDB Documents** means the transaction documents pursuant to which CIEDB provided bond financing to the City to fund the City's (i) $2 million Harriman Project, (ii) $10 million Pavement Project, and (iii) $2.55 million Verdemont Fire Station Project.

40.     **City** means the City of San Bernardino, California, the debtor in the Bankruptcy Case.

41.     **City Hall Lease** means the Lease Agreement dated as of December 1, 1996, by and between the JPFA, as lessor, and the City, as lessee.

42.     **Claim** has the meaning set forth in Bankruptcy Code section 101(5).

43.     **Class** means any group of Claims classified herein pursuant to Bankruptcy Code section 1123(a).

44.     **Common Council** means the duly elected legislative body of the City, often referred to as the City Council.

45.     **Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the Docket.

46.     **Confirmation Hearing** means the hearing to be conducted by the Bankruptcy Court regarding confirmation of this Plan, as such hearing may be adjourned, reconvened or continued from time to time.

47.     **Confirmation Order** means the order of the Bankruptcy Court confirming this Plan pursuant to Bankruptcy Code section 943.

48.     **Consenting Union** means those formally recognized bargaining units of City employees that have entered into modified or new collective bargaining agreements, Memoranda of Understanding or letter agreements with the City or that will have entered into such prior to the confirmation of this Plan.

49.     **Consenting Union Claims** means the Allowed Claims of the Consenting Unions and the employees represented by such unions arising in connection with modifications to the terms and conditions of employment of the represented employees that gave rise to Claims, in the amount stipulated by the City and the Consenting Union.

1     **50.     Contract Rejection Claim** means a claim arising from the rejection of an

2  executory contract or unexpired lease of non-residential real property.

3     **51.     Convenience Class Claim** means any Allowed Claim that is greater than zero

4  but is equal to or less than $100 in Allowed amount or irrevocably reduced to $100 in Allowed

5  amount at the election of the holder of the Allowed Claim as evidenced by the Ballot submitted by

6  such holder; *provided, however*, that an Allowed Claim may not be subdivided into multiple Claims

7  of $100 or less for purposes of receiving treatment as a Convenience Class Claim.

8     **52.     CSWRCB Revenue Bond Claim** means the secured claim asserted by the

9  California State Water Resources Control Board in the proof of claim marked as document number

10  311 in the register of claims and filed February 6, 2014.

11     **53.     CSWRCB Revenue Bond** means the bond, issued on or about April 1, 2000,

12  reflecting the City's assignment of a portion of obligations under the State Revolving Fund Loan,

13  originally executed on or about April 12, 1994, by and between the State Water Resources Control

14  Board and the Santa Ana Watershed Project Authority, for the construction of a Regional Tertiary

15  Treatment System.

16     **54.     Disallowed** means a Claim or portion thereof that:  (i) is disallowed by a Final

17  Order of the Bankruptcy Court; (ii) is on the List of Creditors (as amended from time to time in

18  accordance with Bankruptcy Rule 1009): (A) in the amount of $0.00; or (B) as contingent, disputed,

19  or unliquidated; and as to which no proof of claim has been filed by the applicable Bar Date; (iii)

20  the holder has agreed is equal to $0.00 or is to be withdrawn, disallowed or expunged; or (iv) is not

21  on the List of Creditors and as to which no proof of claim has been filed by the applicable Bar Date.

22     **55.     Disclosure Statement** means the Third Amended Disclosure Statement, and

23  all exhibits and schedules incorporated therein, as approved by the Bankruptcy Court pursuant to

24  Bankruptcy Code section 1125 (made applicable to this Bankruptcy Case pursuant to 11 U.S.C.

25  § 901(a)), in an order entered on July 7, 2016 (Docket No. 1874), as the same may be amended,

26  modified, or supplemented in accordance with the Bankruptcy Code.

27     **56.     Disputed Claim** means any Claim or portion thereof that has not become

28  Allowed and that is not Disallowed.  In the event that any part of a Claim is a Disputed Claim,

except as otherwise provided in this Plan, such Claim shall be deemed a Disputed Claim in its entirety for purposes of distribution under this Plan unless the City otherwise agrees in writing in its sole discretion.  Without limiting the foregoing, a Claim that is the subject of a pending application, motion, complaint, objection, or any other legal proceeding seeking to disallow, limit, reduce, subordinate, or estimate such Claim shall be deemed to be a Disputed Claim.

57.    **Docket** means the docket of the Bankruptcy Case maintained by the Clerk of the Bankruptcy Court and, unless otherwise indicated, "Docket No." references mean to that Docket.

58.    **Effective Date** means the first Business Day after the Confirmation Date on which the conditions specified in Section XIII.B of this Plan have been satisfied or waived.

59.    **Eligibility Contest** means, collectively, the proceedings on the City's eligibility to be a debtor under Chapter 9 of the Bankruptcy Code and the related pleadings, arguments, formal and informal discovery, hearings, orders and appeals.

60.    **Employee Wage and Benefit Claims** means the claims of current and former employees of the City and their collective bargaining representatives for unpaid wages and benefits, but not including Claims included in any other category of Claims.

61.    **Exculpated Party** means the Entities referred to in Section XI.E of this Plan.

62.    **Final Order** means a judgment, order, ruling, or other decree issued and entered by the Bankruptcy Court which judgment, order, ruling, or other decree has not been reversed, stayed, modified, or amended and as to which:  (i) the time to appeal or petition for review, rehearing, or certiorari has expired and no appeal or petition for review, rehearing, or certiorari is then pending; or (ii) any appeal or petition for review, rehearing, or certiorari has been finally decided and no further appeal or petition for review, rehearing, or certiorari can be taken or granted.

63.    **Financial Model** means the City's Long Term 20-Year Financial Model (the "Financial Model") in support of the financial feasibility of the Plan that is attached as an Exhibit in the Appendix.

64.    **Fire Alerting System Financing Agreement** means the Master Equipment Lease/Purchase Agreement entered into as of December 16, 2009, between the City and Western

Alliance (as assignee of Bank of America, National Association), with respect to certain equipment and fire station alerting systems for twelve of the City's fire stations and one dispatch center.

65. **Franchise Agreements** means the franchise agreements to which the City is a party, and which were entered into prior to the Petition Date between the City and certain utility and similar service providers.

66. **General Fund** means the City's chief operating fund, which is used to account for all financial resources except those required to be accounted for in another fund (such as the Restricted Funds).

67. **General Unsecured Claim** means a Claim of a general unsecured creditor of the City, and General Unsecured Claims include all claims except Administrative Claims, Professional Claims, Secured Claims, CalPERS Claims, POB Claims, Class 9 PARS Claims, Convenience Class Claims, those Claims payable from a Restricted Fund, and those Claims relating to the 1996 Refunding Bonds or the 1999 Refunding Certificates of Participation. General Unsecured Claims includes, without limitation, the SBCPF General Unsecured Claim, Retiree Health Benefit Claims, Consenting Union Claims, Employee Wage and Benefit Claims, Contract Rejection Claims, Litigation Claims, Other Post-petition Claims, all Claims of pre-petition vendors and service providers to the City, and the unsecured and/or deficiency portion, if any, of the claims of the holders of the Claims in Classes 1 through 6. As a result of the settlements that the City has entered into with the official Retiree Committee and with each of the unions representing City employees, the Class 10 Consenting Union Claims and Class 11 Retiree Health Benefit Claims are fully included in Class 13 General Unsecured Claims for all purposes, including voting on the Plan and claim treatment under the Plan.

68. **Harriman Project** means the "Harriman Place Street Extension Project – Phase I," a $2,000,000 project to extend the eastern end of Harriman Place to align with a nearby intersection, in order to facilitate the development of a regional commercial shopping center and the improvement of a local blighted area.

69. **HUD** means the U.S. Department of Housing and Urban Development.

70. **Impaired** means a Claim or interest that is impaired within the meaning of Bankruptcy Code section 1124.

71. **Impositions** means those modified terms and conditions of employment implemented by the City pursuant to Common Council Resolutions 2013-19, 2013-20 and 2014-364, and additional modifications, if any, to the terms and conditions of employment implemented by the City, that are in place on the Confirmation Date, including pursuant to this Plan.

72. **Indemnification** means rights of indemnity, defense, reimbursement, and advancement of fees and expenses of current and former officers and employees of the City with respect to any claims or lawsuits brought against such officers and employees by third parties, in each case arising out of an act or omission occurring within the scope of such officer's or employee's employment as an employee of the City.

73. **Indemnified Parties** means the current and former officers and employees of the City who are entitled to Indemnification.

74. **Insured Portion** means that portion of any Workers Compensation Claim that is covered by one or more of the City's insurance policies or one or more of the risk-sharing or excess risk sharing pools of which the City is a member, up to the amount of the policy limits, including any excess coverage policies.

75. **JPFA** means the San Bernardino Joint Powers Financing Authority.

76. **Litigation Claims** means (a) those lawsuits against the City that are still pending as of the Confirmation Date, including those listed in Exhibit 6 to the Appendix; (b) those lawsuits against the City that are filed on or after the Confirmation Date based on acts, claims or omissions that occurred or arose prior to the Confirmation Date; and (c) those lawsuits against any of the Indemnified Parties, whether filed prior to the Confirmation Date or on or after the Confirmation Date based on acts, claims or omissions that occurred or arose prior to the Confirmation Date, as to which lawsuits the City has assumed or will assume the defense thereof and became or becomes obligated to pay any judgment arising therefrom pursuant to Cal. Government Code §§ 825, 970, 995 and 996 and any other applicable law or rule.

77.     **List of Creditors** means the First Amended List of Creditors filed by the City on November 8, 2013 (Docket No. 869), as such list may be amended, supplemented or otherwise modified.

78.     **Mediator's Order** means the order issued on June 9, 2014 by the Honorable Gregg W. Zive, U.S. Bankruptcy Judge for the District of Nevada (acting as the court-appointed mediator), evidencing the agreement between the City and CalPERS regarding the treatment of the CalPERS Claims under the Plan and certain other agreements.

79.     **MOU** means a Memorandum of Understanding comprising a collective bargaining agreement between the City and a union representing City employees.

80.     **National** means National Public Finance Guarantee Corporation, a New York stock insurance corporation.

81.     **Notice of the Effective Date** shall have the meaning ascribed to such phrase in Section XIV.F of this Plan.

82.     **Objection Deadline** means the deadline fixed by the Bankruptcy Court for filing objections to confirmation of this Plan.

83.     **Other Post-petition Claims** means unpaid Claims asserted against the City for services rendered to, goods delivered to or obligations incurred by the City after the Petition Date that do not constitute Administrative Claims.

84.     **PARS Claim** means the Claims of the PARS Participants in respect of: (a) the funds in the PARS Plans, which is a Class 9 PARS Claim; and (b) any other obligation of the City under the PARS Plans, including claims for payment of any unfunded liability.

85.     **PARS Enhancement Plan** means the City of San Bernardino Public Agency Retirement System Retirement Enhancement Plan, which was amended and restated effective July 1, 2007.

86.     **PARS Excess Benefit Plan** means the City of San Bernardino Excess Benefit Plan, effective January 1, 2008.

87.     **PARS Participant** means a participant in either the PARS Enhancement Plan or the PARS Excess Benefit Plan.

88. **PARS Plans** means, collectively, the PARS Enhancement Plan and the PARS Excess Benefit Plan.

89. **PARS Trust** means the trust, related to a multi-employer plan PARS Trust Agreement to which the City, along with other municipalities, is a party, from which the distributions under the PARS Enhancement Plan are paid.

90. **PARS Settlement** means the Settlement Agreement between the City and the PARS Participants, dated as of April 20, 2016.

91. **Pavement Project** means the "Pavement Reconstruction and Rehabilitation Project," a $10,000,000 project to finance the construction, acquisition and installation of pavement in or around the public streets throughout the City.

92. **Petition Date** means August 1, 2012.

93. **Plan** means this *Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California (July 29, 2016), as Modified* together with any exhibits hereto (including those attached as exhibits to the Appendix), each in their present form or as they may be altered, amended or modified from time to time in accordance with the provisions of this Plan, the Confirmation Order, the Bankruptcy Code, and the Bankruptcy Rules.

94. **Plan Document** means (a) the documents referenced in this Plan as such, a copy of which will be attached as an Exhibit to the Appendix, or (b) any other document entered into in connection with and pursuant to this Plan, that is in form and substance acceptable to the City, has been duly and validly executed and delivered, or deemed executed by the parties thereto, and for which all conditions to its effectiveness have been satisfied or waived.

95. **Plan Solicitation Order** means the *Order: (A) Approving Third Amended Disclosure Statement With Respect to the Third Amended Plan for the Adjustment of Debts (May 27, 2016); and (B) Setting Certain Deadlines Regarding Voting to Accept or Reject the Third Amended Plan and Related Matters* (Docket No. 1874, entered on July 7, 2016), by which the Bankruptcy Court approved the Disclosure Statement as containing adequate information for the purpose of dissemination and solicitation of votes on and confirmation of this Plan and established certain rules, deadlines, and procedures for the solicitation of votes with respect to and the balloting on this Plan.

96. **POBs** mean the Series A-1 and Series A-2 Taxable Pension Obligation Bonds issued by the City pursuant to a Trust Agreement dated October 1, 2005.

97. **POB Claims** means those Allowed Claims of the holders of the outstanding POBs.

98. **POB Creditors** means the holders of the POB Claims.

99. **POB Settlement Agreement** means the comprehensive settlement regarding the treatment of the POB Claims entered into by the City and the POB Creditors in March 2016.

100. **Police Station Lease** means the Police Station Lease Agreement, dated as of September 1, 1999, by and between the JPFA, as lessor, and the City, as lessee.

101. **Police Station AC Financing Agreement** means the Master Equipment Lease/Purchase Agreement entered into as of October 1, 2004, between the City and Western Alliance (as assignee of Koch Financial Corporation), with respect to four water-cooled air conditioners in use in the City's police headquarters.

102. **Pre-Confirmation Date Claims** means all Claims against the City that arose prior to the Confirmation Date.

103. **Professional Claim** means a Claim of professionals for unpaid services and costs during the Bankruptcy Case or incident to the Plan to be paid by the City.

104. **RDA** means the former Redevelopment Agency of the City of San Bernardino (also referred to as the Economic Development Agency).

105. **Reinsurance Policies** means the reinsurance policies between BICEP and certain insurance companies indemnifying BICEP for losses covered by the BICEP Agreement.

106. **Restricted Funds** means those funds whose use is restricted by applicable law for a particular purpose or otherwise legally restricted by their providers (such as grantors, bondholders and other governmental units).

107. **Restricted Revenue Bond and Note Payable Obligations** means any and all bond and/or note payable obligations that are secured by a pledge of and lien on "restricted" and/or "special" revenues (as defined in Bankruptcy Code section 902(2)), including the 1998 Refunding Certificates of Participation and the CSWRCB Revenue Bond Claim, and including obligations that

arise pursuant to all installment purchase agreements, security agreements, trust indentures, reimbursement agreements, fee letters, and other agreements with respect thereto to which the City is a party and which are payable from and secured by special and restricted sources of revenues.

**108.** **Retirees** means those retirees of the City that are covered by the Retiree Settlement.

**109.** **Retiree Committee** means the Official Committee of Retirees, appointed in the Bankruptcy Case on October 11, 2013 [Docket No. No. 828], by the Office of the United States Trustee pursuant to Bankruptcy Code sections 1102(a)(1) and 1102(b)(1), as the membership thereof may have been reconstituted from time to time by the Office of the United States Trustee, which represents only the interests of retirees from the City and does not represent current employees or any other creditors.

**110.** **Retiree Health Benefit Claims** means those Allowed Claims of the Retirees pursuant to the Retiree Settlement based upon modifications to retiree health benefits.

**111.** **Retiree Settlement** means the settlement entered into between the City and the Retiree Committee on behalf of the Retirees.

**112.** **Rights of Action** means any claims, causes of action, rights of recovery, rights of offset or recoupment, defenses, rights to refunds, and similar rights owned by, accruing to, or assigned to the City pursuant to the Bankruptcy Code or pursuant to any contract, statute, or legal theory, including without limitation any rights to, claims, or causes of action for recovery under any (i) policies of insurance issued to or on behalf of the City or (ii) any pooling arrangements that the City participates in (including with BICEP).

**113.** **Rust Omni** means Rust Consulting/Omni Bankruptcy, the ballot tabulator in the Bankruptcy Case.

**114.** **SBCPF** means the San Bernardino City Professional Firefighters, Local 891.

**115.** **SBCPF General Unsecured Claim** means the Consenting Union Claim of the SBCPF and its current and former members in the amount of $14 million pursuant to the SBCPF Settlement Agreement (described therein as the Fire Union General Unsecured Claim) which claim shall be treated as a Class 13 General Unsecured Claim for all purposes.

116. **SBCPF Settlement Agreement** means the Settlement Agreement and Release dated as of February 8, 2016 among the City, the SBCPF and certain members of the SBCPF.

117. **Secured Claim** means a Claim that is secured (i) by a lien that is not subject to avoidance or subordination under the Bankruptcy Code or applicable non-bankruptcy law; or (ii) as a result of rights of setoff under section 553; but in any event only to the extent of the value, determined in accordance with Bankruptcy Code section 506(a), of the holder's interest in the City's interest in property or to the extent of the amount subject to such setoff, as the case may be.

118. **State** means the state of California, unless otherwise indicated.

119. **Unimpaired** means a Claim that is not Impaired within the meaning of Bankruptcy Code section 1124.

120. **Uninsured Portion** means the amount in excess of the Insured Portion of an Allowed Workers Compensation Claim.

121. **Verdemont Fire Station Project** means the "Verdemont Fire Station Project," a $2,550,000 project to finance the construction, acquisition and installation of the Verdemont Fire Station, located on real property owned by the City, as well as the purchase of two new fire engines.

122. **Water Department** means the San Bernardino Municipal Water Department.

123. **Water Funds** means funds received by the City/Water Department in the form of bank accounts, cash, investments or otherwise derived from any or all of the following sources: (i) the payments from rate payers for water and water related services; (ii) any reasonable reserves held by or for the Water Department; (iii) proceeds of any water bond issuances, including, without limitation the 1998 Sewer Bonds; (iv) the monies paid pursuant to the settlement agreement between the City and the United States pursuant to *State of California Department of Toxic Substances Control v. United States Department of the Army*, United States District Court Case No. 96-5205(MRP) consolidated with *City of San Bernardino Municipal Water Department v. United States Department of the Army*, United States District Court Case No. 96- 8867(MRP); and (v) any water related development fees or water related capital fees.

124. **Western Alliance** means Western Alliance Equipment Finance, Inc. or any assignee thereof.

125. **Workers' Compensation Claims** means those Claims pursuant to California workers compensation law (California Labor Code section 3200 *et seq.*) of current and former City employees who have suffered an eligible injury while employed by the City.

**C.** **Computation of Time.**

In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) apply.

**II.** **TREATMENT OF ADMINISTRATIVE CLAIMS AND PROFESSIONAL CLAIMS**

**A.** **Treatment of Administrative Claims.**

Except to the extent that the holder of an Allowed Administrative Claim agrees to a different treatment, the City or its agent shall pay to each holder of an Allowed Administrative Claim, in full satisfaction, release, and discharge of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim on the later of (i) the Effective Date or (ii) the date on which such Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable. The City's consent to the Bankruptcy Court adjudicating Administrative Claim status is given without the City in any way consenting or agreeing that Claims for post-petition obligations of the City are or would be entitled to status as Administrative Claims as "the actual necessary costs and expenses of preserving the estate" under Bankruptcy Code section 503(b), and the City reserves its right to maintain that such Claims are Other Post-petition Claims under this Plan.

**B.** **Deadline for the Filing and Assertion of Administrative Claims.**

All requests for payment or any other means of preserving and obtaining payment of Administrative Claims that have not been paid, released, or otherwise settled, must be filed with the Bankruptcy Court and served upon the City no later than 30 days after the date on which the Notice of Effective Date is served. Any proof of claim for payment of an Administrative Claim, that is not timely filed by such date will be forever barred, and holders of such Claims shall be barred from asserting such Claims in any manner against the City

**C.     Treatment of Professional Claims.**

Professional Claims are claims of professionals for unpaid services and costs during the Bankruptcy Case or incident to the Plan to be paid by the City.  Bankruptcy Code section 943(b)(3) provides that, in order to confirm the Plan, all amounts to be paid by the City for services or expenses incurred in the Bankruptcy Case, or incident to the Plan, must be fully disclosed and must be reasonable.  After the Effective Date, there will be paid to each holder of a Professional Claim, in full satisfaction, release, and discharge of such Claim, Cash in an amount equal to the amount the Bankruptcy Court determines is reasonable.  The City, in the ordinary course of its business, and without the requirement for Bankruptcy Court approval, may pay for professional services that are rendered and costs that are incurred following the Effective Date.

**D.     Priority Claims in Chapter 9.**

The only priority claims incorporated into Chapter 9 through Bankruptcy Code section 901 are Administrative Claims allowed under Bankruptcy Code section 503(b) and entitled to priority under Bankruptcy Code section 507(a)(2).  The treatment of all such Administrative Claims is set forth immediately above in Sections II.A and II.B.  No other kinds of priority claims set forth in Bankruptcy Code section 507 are recognized in this Bankruptcy Case, and Claims that are not Administrative Claims herein and that would constitute administrative expenses in a case under another chapter of the Bankruptcy Code, including Other Post-petition Claims, are treated in Chapter 9 and in this Plan as General Unsecured Claims.

**III.    DESIGNATION OF CLASSES OF CLAIMS**

Pursuant to Bankruptcy Code sections 1122 and 1123(a)(1), all Claims other than Administrative Claims and Professional Claims are classified for all purposes, including voting, confirmation, and distribution pursuant to this Plan, as follows:

| | | |
|---|---|---|
| Class 1 - | 1996 Refunding Bonds Claims | (Impaired/Voting) |
| Class 2 - | 1999 Refunding Certificates of Participation Claims | (Impaired/Voting) |
| Class 3 - | Secured Claims: CIEDB Harriman Project Claims | (Unimpaired/Nonvoting) |

| Class 4 - | Secured Claims: CIEDB Pavement Project Claims | (Unimpaired/Nonvoting) |
|---|---|---|
| Class 5 - | Secured Claims: Police Station AC Financing Claims | (Impaired/Voting) |
| Class 6 - | Secured Claims: Burgess Claims | (Impaired/Voting) |
| Class 7 - | Claims on Restricted Revenue Bond and Note Payable Obligations | (Unimpaired/Nonvoting) |
| Class 8 - | CalPERS Claims | (Unimpaired/Nonvoting) |
| Class 9 - | PARS Claims | (Impaired/Voting) |
| Class 10 - | Consenting Union Claims | (Impaired/Voting) |
| Class 11 - | Retiree Health Benefit Claims | (Impaired/Voting) |
| Class 12 - | POB Claims | (Impaired/Voting) |
| Class 13 - | General Unsecured Claims | (Impaired/Voting) |
| Class 14 – | Convenience Class Claims | (Impaired/Voting) |

## IV. TREATMENT OF CLAIMS

### A. Class 1 – 1996 Refunding Bonds Claims

**Impairment and Voting.** Class 1 is Impaired by this Plan because the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims. Accordingly, National, as the deemed holder of the Claims in this Class, is entitled to vote to accept or reject this Plan.

**Treatment.** Subject to the terms and conditions of the 1996 Refunding Bonds Amendment, on the Effective Date, the 1996 Trust Indenture and the City Hall Lease will be amended and supplemented. In addition, in connection with the 1996 Refunding Bonds Amendment, the City will assume the 1996 Refunding Bond Agreements (City Hall) and will cure, or provide adequate assurance for the prompt cure, of all defaults under the 1996 Refunding Bond Agreements (City Hall) that are required to be cured under section 365(b)(1)(A) of the Bankruptcy Code. The effectiveness of the 1996 Refunding Bonds Amendment will also be subject to a number of terms and conditions as set forth therein. Subject to the 1996 Refunding Bonds Amendment, the 1996 Refunding Bonds Trustee shall retain all of its rights, remedies, security interests and collateral

under the 1996 Trust Indenture, as amended, and any bonds, notes, security agreements, or any other instruments or agreements executed in connection with the 1996 Refunding Bonds or otherwise providing, granting or perfecting a lien in connection with the 1996 Refunding Bonds.

**B.      Class 2 – 1999 Refunding Certificates of Participation Claims**

**Impairment and Voting.**  Class 2 is Impaired by this Plan because the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims.  Accordingly, National, as the deemed holder of the Claims in this Class, is entitled to vote to accept or reject this Plan.

**Treatment.**  Subject to the terms and conditions of the 1999 Refunding Certificates of Participation Amendment, on the Effective Date, the 1999 Trust Agreement and the Police Station Lease will be amended and supplemented.  Pursuant to the 1999 Refunding Certificates of Participation Amendment, on the Effective Date, funds from the "Reserve Fund" (in excess of the "Reserve Requirement") and the "Capital Reserve Fund" (as such terms are defined in the 1999 Trust Agreement) will be used to pay in full all remaining lease payments due from the City under the Police Station Lease.  In addition, pursuant to Section 10.02 of the Police Station Lease, the City will give notice of an optional redemption of the 1999 Refunding Certificates of Participation in an amount equal to the amount of the Police Station Lease prepayment hereunder, with such redemption to occur at the earliest practicable date following the occurrence of the Effective Date.  Such notice will specify the order of redemption of the 1999 Refunding Certificates of Participation, which order will ensure that the remaining payments required to be made by the City under the 1999 Refunding Certificates of Participation Agreements (Police Station/201 North E Street/South Valle) will be sufficient to pay the principal of and interest on the 1999 Refunding Certificates of Participation when due, as certified by an independent financial consultant of the City reasonably acceptable to National and the 1999 Refunding Certificates of Participation Trustee.  On the Effective Date, the City will deposit the proceeds of the prepayment of the Police Station Lease with the 1999 Refunding Certificates of Participation Trustee to hold in trust pursuant to the terms of the 1999 Trust Agreement pending the redemption of the 1999 Refunding Certificates of Participation required hereunder.

In connection with the 1999 Refunding Certificates of Participation Amendment, the City will also assume the 1999 Refunding Certificates of Participation Agreements (Police Station/201 North E Street/South Valle), including the Police Station Lease, as amended by the 1999 Refunding Certificates of Participation Amendment, and will cure, or provide adequate assurance for the prompt cure, of all defaults under the 1999 Refunding Certificates of Participation Agreements (Police Station/201 North E Street/South Valle) that are required to be cured under section 365(b)(1)(A) of the Bankruptcy Code. The effectiveness of the 1999 Refunding Certificates of Participation Amendment will also be subject to a number of terms and conditions, as set forth therein. Subject to the 1999 Refunding Certificates of Participation Amendment, the 1999 Refunding Certificates of Participation Trustee shall retain all of its rights, remedies, security interests and collateral (other than with respect to the Police Station) under the 1999 Trust Agreement, as amended, and any bonds, notes, security agreements, or any other instruments or agreements executed in connection with the 1999 Refunding Certificates of Participation or otherwise providing, granting or perfecting a lien in connection with the 1999 Refunding Certificates of Participation.

C.     **Class 3 – Secured Claims: CIEDB Harriman Project Claims**

**Impairment and Voting.** Class 3 is not Impaired by this Plan because the treatment of this Class will not affect the legal, equitable, or contractual rights of the holders of the Claims. Accordingly, the holders of Claims in this Class are not entitled to vote to accept or reject this Plan.

**Treatment.** The Claims of CIEDB in respect of the Harriman Project will be paid in accordance with those CIEDB Documents relating to the CIEDB's financing of the Harriman Project.

D.     **Class 4 – Secured Claims: CIEDB Pavement Project Claims**

**Impairment and Voting.** Class 4 is not Impaired by this Plan because the treatment of this Class will not affect the legal, equitable, or contractual rights of the holders of the Claims. Accordingly, the holders of Claims in this Class are not entitled to vote to accept or reject this Plan.

1       **Treatment.** The Claims of CIEDB in respect of the Pavement Project will be paid in

2 accordance with those CIEDB Documents relating to the CIEDB's financing of the Pavement

3 Project.

4       **E.**      **Class 5 – Secured Claims: Police Station AC Financing Claims**

5       **Impairment and Voting.** Class 5 is Impaired by this Plan because the treatment of this

6 Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and,

7 accordingly, the holders of the Claims in this Class are entitled to vote to accept or reject this Plan.

8       **Treatment.** The collateral securing the Western Alliance Claim will be returned to Western

9 Alliance and Western Alliance shall have a Class 13 General Unsecured Claim in the approximate

10 amount of $475,000 which will receive a 1% distribution. Western Alliance may leave the Police

11 Station ACs on City property (or property controlled by the City) without any liability to the City,

12 and if so, the Police Station ACs shall be deemed abandoned to the City, without any City liability to

13 Western Alliance.

14       **F.**      **Class 6 – Secured Claims: Burgess Claims**

15       **Impairment and Voting.** Class 6 is Impaired by this Plan because the treatment of this

16 Class will affect the legal, equitable, or contractual rights of the holders of the Burgess Claims, and,

17 accordingly, the holders of the Burgess Claims are entitled to vote to accept or reject this Plan.

18       **Treatment.** The maturity date with respect to the Burgess Documents is in 2019, at which

19 time a large balloon payment (approximately $1.1 million) is due to Burgess. Under the Plan, the

20 Burgess Documents will be amended to extend the maturity date until 2022, and the balloon

21 payment will be amortized over that 3-year period with interest continuing to accrue through the new

22 maturity date on the unpaid principal balance at the current interest rate set forth in the Note (5%)

23 which will be paid on January 1 and July 1 of each year of the 3 year extension period. The Burgess

24 Documents will also be amended to provide that Burgess has granted the City the option until April

25 30, 2017 to pay the principal amount due under the Note at a 10% discount (the "Discounted

26 Payoff"), plus all accrued and unpaid interest at the rate set forth in the Note through the date that the

27 Discounted Payoff payment is made. The City exercised its option to make the Discounted Payoff

28

payment in June 2016, and then conveyed the Fire Maintenance Facility to the County Fire District in connection with annexation of the City into the County Fire District.

**G.**     **Class 7 – Claims on Restricted Revenue Bond and Note Payable Obligations**

**Impairment and Voting.** Class 7 is not Impaired by this Plan because the treatment of this Class will not affect the legal, equitable, or contractual rights of the holders of the Claims. Accordingly, the holders of Claims in this Class are not entitled to vote to accept or reject this Plan.

**Treatment.** Claims on Restricted Revenue Bond and Note Payable Obligations, including Claims under the 1998 Refunding Certificates of Participation and the CSWRCB Revenue Bond Claim, are secured by a pledge of and lien on revenues of several of the City's systems and enterprises, which are restricted revenues and "special revenues" as defined in Bankruptcy Code section 902(2). The City will pay Restricted Revenue Bond and Notes Payable Obligations in the ordinary course of business pursuant to the applicable documents (which will be assumed by the City on the Effective Date, with any defaults, to the extent any defaults exist as of the Effective Date, that are required to be cured under section 365(b)(1)(A) of the Bankruptcy Code cured, or adequate provision made for the prompt cure thereof). In April 2016, (a) the 1998 Refunding Certificates of Participation were defeased and paid in full, in the approximate amount of $3.4 million, and (b) the final amount outstanding on the CSWRCB Revenue Bond Claim, in the approximate amount of $1.7 million, was repaid.

**H.**     **Class 8 – CalPERS Claims**

**Impairment and Voting.** Class 8 is not Impaired by this Plan because the treatment of this Class will not affect the legal, equitable, or contractual rights of the holder of such Claims, and, accordingly, the holders of the Claims in this Class are not entitled to vote to accept or reject this Plan.

**Treatment.** The CalPERS Claims will be paid in accordance with the Mediator's Order. Notwithstanding anything in this Plan to the contrary, nothing in this Plan is intended to or does impair or interfere with the rights of the City and CalPERS under the Mediator's Order, which is incorporated into this Plan. Without limiting the generality of the forgoing, the City ratifies in full its relationship with CalPERS, and the Plan will not impair the City's obligations to CalPERS or the

1    CalPERS Claims.  In the event that there is any inconsistency between the Mediator's Order and this

2    Plan, the Mediator's Order shall control.   Notwithstanding Section XII hereof, except as specifically

3    provided in the Mediator's Order, the City and CalPERS reserve all of their rights with respect to the

4    jurisdiction of the Bankruptcy Court over CalPERS.

5         **I.**     **Class 9 – PARS Claims**

6         **Impairment and Voting.**  Class 9 contains the claim of the PARS Participants with respect

7    to the PARS Plans.  Class 9 is Impaired by this Plan because the treatment of this Class will affect

8    the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders

9    of the Claims in this Class are entitled to vote to accept or reject this Plan.

10        **Treatment.**  The Class 9 PARS Claims shall be treated in accordance with the PARS

11   Settlement, a copy of which is attached to the Appendix.  In accordance with the PARS Settlement,

12   the PARS Plans will be rejected, and the City will waive any and all claims to the funds held within

13   the PARS Trust and the 415 Trust as of the date of termination of the PARS Plans, (ii) the amounts

14   remaining in the PARS Trust and the 415 Trust will be distributed to the PARS Participants pursuant

15   to agreed-upon allocations, and the City will endeavor to make each such distributions in a manner

16   that will minimize adverse tax consequences for each PARS Participant, (iii) the City will make a

17   distribution of $290,000.00 on the later of the Effective Date or July 5, 2017, and a distribution

18   $290,000.00 on the later of the Effective Date or July 5, 2018, in each case to the PARS Participants

19   pursuant to agreed-upon allocations, and (iv) the City will be discharged from any and all obligations

20   to further fund any PARS Plan or to make any other distributions on account of the PARS Claims.

21   The Class 9 Claims are Impaired and the holders of the Class 9 Claims are entitled to vote the

22   Claims to accept or reject the Plan.

23        **J.**     **Class 10 – Consenting Union Claims**

24        **Impairment and Voting.**  Class 10 is Impaired by this Plan because the treatment of this

25   Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and,

26   accordingly, the holders of the Claims in this Class are entitled to vote to accept or reject this Plan.

27        **Treatment**.  Upon reaching agreement with a union representing City employees on the

28   terms of a new or modified memorandum of understanding or similar agreement, such agreement

will be reflected in a Plan Document. The Claims of the employees and the formally recognized bargaining agent that are, by agreement, discharged under this Plan, will be included in Class 13 General Unsecured Claims and will be treated accordingly. Each of the City's settlements with the Consenting Unions (other than with the SBCPF and Fire Management) contain the following provisions:

- the MOU will become null and void and of no further effect if the Plan is not confirmed;

- the Confirmation Order (approving the Plan) shall provide for approval of the settlement and, where applicable, the modified or new Memorandum of Understanding ("MOU"); and

- all claims of the union and its members with respect to wages, pensions (including implementation of cost sharing and elimination of the employer paid member contribution ("EPMC") benefit, other benefits and other terms and conditions of employment that arose prior to the date of the confirmation of the Plan, including, without limitations, all claims arising from the City's changes to the terms and conditions of employment and/or rejection or the prior MOU (collectively the "union claims"), shall be treated as general unsecured claims under the Plan, and the City and its officers shall be discharged from such union claims upon confirmation of the Plan; *provided*, *however*, that any claims arising under the settlement or MOU after it is executed by the City and the union (*e.g.* grievances) shall not be discharged as long as (a) the union complies with the terms of the MOU, and (b) the Bankruptcy Court confirms the Plan; and

- the union and the City shall agree on the amount of the union claims and the union shall vote the union claims as Class 13 General Unsecured Claims in support of the Plan.

The Class 10 Consenting Union Claims are General Unsecured Claims and shall be treated as part of Class 13 General Unsecured Claims for all purposes, including for voting on the Plan and payment on the claims.

**K.**     **Class 11 – Retiree Health Benefit Claims**

**Impairment and Voting.**  Class 11 is Impaired by this Plan because the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are entitled to vote to accept or reject this Plan.

**Treatment**.  The holders of the Retiree Health Benefit Claims will receive the rights and benefits set forth in the Retiree Settlement, **including that their pension benefits will not be modified**, but retiree health benefits will be modified, in accordance with the procedures implemented by the City on January 1, 2015.  The Retiree Health Care Claims are the claims of retirees based upon the reduction in retiree health benefits.  The Class 11 Retiree Health Benefit Claims are General Unsecured Claims and shall be treated as part of Class 13 General Unsecured Claims for all purposes, including for voting on the Plan and payment on the claims.

**L.**     **Class 12 – POB Claims**

**Impairment and Voting.**  Class 12 is Impaired by this Plan because the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims.  Accordingly, the holders of Claims in this Class are entitled to vote to accept or reject this Plan.

**Treatment.**  Class 12 is comprised of Claims held by the holders of the outstanding POBs issued by the City in 2005.  Under the Plan, the POB Creditors will be paid in accordance with the POB Settlement Agreement, which was entered into between the City and the POB Creditors in March 2016.  Pursuant to the terms of that settlement, under the Plan, the City will make installment payments over a thirty-year term, starting one year after the City's chapter 9 plan is confirmed and goes effective.  The City will make payments of $1.6 to $2.5 million per fiscal year until 2046 instead of the $3.3 million to $4.7 million per fiscal year owed under the terms of the 2005 pension bond agreement.  The entirety of the POB Settlement Agreement is deemed incorporated into the Plan and the Confirmation Order shall expressly approve the POB Settlement Agreement.

**M.**     **Class 13 – General Unsecured Claims**

**Impairment and Voting.**  Class 13 General Unsecured Claims include all claims except Administrative Claims, Professional Claims, Secured Claims, CalPERS Claims, POB Claims, Class 9 PARS Claims, Convenience Class Claims, those Claims payable from a Restricted Fund, and those

1  Claims relating to the 1996 Refunding Bonds or the 1999 Refunding Certificates of Participation.

2  General Unsecured Claims includes, without limitation, the SBCPF General Unsecured Claim,

3  Retiree Health Benefit Claims, Consenting Union Claims, Employee Wage and Benefit Claims,

4  Contract Rejection Claims, Litigation Claims, Other Post-petition Claims, all Claims of pre-petition

5  vendors and service providers to the City, and unsecured and/or deficiency portion, if any, of the

6  claims of the holders of the Claims in Classes 1 through 6.  As a result of the settlements that the

7  City has entered into with the official Retiree Committee and with each of the unions representing

8  City employees, the Class 10 Consenting Union Claims and Class 11 Retiree Health Benefit Claims

9  are fully included in this Class 13 General Unsecured Claims for all purposes, including voting on

10  the Plan and claim treatment under the Plan.  Class 13 is Impaired by this Plan because the treatment

11  of this Class will affect the legal, equitable, or contractual rights of the holders of the Claims.

12  Accordingly, the holders of Claims in this Class are entitled to vote to accept or reject this Plan.

13  **Treatment.**  On the Effective Date, or as soon as reasonably practicable after the Effective

14  Date, Holders of Allowed Class 13 Claims will receive a distribution equal to 1% of their Allowed

15  General Unsecured Claims.

16  **N.**  **Class 14 – Convenience Class Claims**

17  **Impairment and Voting.**  Class 14 is Impaired by this Plan because the treatment of this

18  Class will affect the legal, equitable, or contractual rights of the holders of the Claims, and,

19  accordingly, the holders of the Claims in this Class are entitled to vote to accept or reject this Plan.

20  **Treatment.**  Within 30 days after the Effective Date, each holder of an Allowed

21  Convenience Class Claim will receive the lesser of the Allowed amount of the holder's Allowed

22  Convenience Class Claim or $100 at the election of the holder of the Allowed Convenience Class

23  Claim.

24  **V.**  **ACCEPTANCE OR REJECTION; CRAMDOWN**

25  **A.**  **Voting of Claims.**

26  Each holder of an Allowed Claim classified into the following Classes shall be entitled to

27  vote each such Claim to accept or reject this Plan:  Class 1 – 1996 Refunding Bonds Claims; Class 2

28  – 1999 Refunding Certificates of Participation Claims; Class 5 – Police Station AC Financing

1    Claims; Class 6 – Burgess Claims; Class 9 – PARS Claims; Class 10 – Consenting Union Claims;

2    Class 11 – Retiree Health Benefit Claims;  Class 12 – POB Claims;  Class 13 – General Unsecured

3    Claims; and Class 14 – Convenience Class Claims.

4          With respect to any Class of Impaired Claims that fails to accept this Plan, the City, as

5    proponent of this Plan, will request that the Bankruptcy Court nonetheless confirm this Plan pursuant

6    to the so-called "cramdown" powers set forth in Bankruptcy Code section 1129(b).

7    **VI.**      **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

8         **A.**      **Assumption of Executory Contracts and Unexpired Leases.**

9          Upon the Effective Date, without the need to file any motions, the City will assume (a) all of

10    the executory contracts and unexpired leases listed in the "List of Assumed Executory Contracts and

11    Unexpired Leases" and in the "List of Assumed and Assigned Executory Contracts and Unexpired

12    Leases," (b) those contracts and leases specifically provided for in this Plan as being assumed or

13    assumed and assigned, including but not limited to Franchise Agreements that have not been reduced

14    to ordinance, the leases and contracts addressed in Classes 1, 2 and 7 of this Plan, (c) all contracts

15    and leases of the City's Water Department, and (d) to the extent it is an executory contract governed

16    by the provisions of Section 365 of the Bankruptcy Code, the BICEP Agreement and the CalPERS

17    contract.  The City shall be entitled to modify or supplement the List of Assumed Executory

18    Contracts and Unexpired Leases and the List of Assumed and Assigned Executory Contracts and

19    Unexpired Leases any time up to seven days prior to the Confirmation Hearing.  The City will not

20    assume those unexpired leases and executory contracts specified in Section VI.C. below to be

21    rejected.

22         **B.**      **Cure Payments.**

23          The Bankruptcy Court shall resolve any and all disputes regarding:  (i) the amount of any

24    cure payment to be made in connection with the assumption of any contract or lease; (ii) the ability

25    of the City to provide "adequate assurance of future performance" within the meaning of Bankruptcy

26    Code section 365 under the contract or lease to be assumed; and (iii) any other matter pertaining to

27    such assumption and assignment.  Any party to an executory contract or unexpired lease that is to be

28    assumed, or assumed and assigned, by the City that asserts that any payment or other performance is

1   due as a condition to the proposed assumption shall file with the Bankruptcy Court and serve upon

2   the City a written statement and accompanying declaration in support thereof, specifying the basis

3   for its Claim on the date that objections to confirmation of this Plan are due, September 2, 2016.

4   The failure to timely file and serve such a statement in accordance with this Plan shall be deemed to

5   be a waiver of any and all objections to the proposed assumption and of any claim for cure amounts

6   of the agreement at issue.

7       **C.      Rejection of Executory Contracts and Unexpired Leases.**

8           Upon the Effective Date, without the need to file any motions, the following leases and

9   contracts are rejected:  (a) the contracts and leases listed in the "List of Rejected Executory Contracts

10  and Unexpired Leases," (b) any other contracts and leases expressly provided for under the terms of

11  this Plan as rejected, (c) and all other contracts and leases not assumed pursuant to Section VI.A. of

12  this Plan.  For the avoidance of doubt, none of the following contracts and leases are rejected:

13  (a) those contracts and leases related to the 1996 Refunding Bonds Agreements (City Hall), the 1999

14  Refunding Certificates of Participation Agreements (Police Station/201 North E Street/South Valle)

15  and the 1998 Refunding Certificates of Participation Agreements (Sewer) (the assumption of which

16  are addressed in Classes 1, 2 and 7 of this Plan); (b) the contracts and leases of the City's Water

17  Department; and (c) the SBCPF Settlement Agreement.

18          The City shall be entitled to modify or supplement the List of Rejected Executory Contracts

19  and Unexpired Leases any time up to 7 days prior to the Confirmation Hearing.

20      **D.      Claims Arising From Rejection.**

21          Proofs of claim arising from the rejection of executory contracts or unexpired leases must be

22  filed with the Bankruptcy Court and served on the City no later than 30 days after the Effective Date.

23  Any Claim for rejection damages for which a proof of claim is not filed and served within such time

24  will be forever barred and shall not be enforceable against the City or its assets, properties, or

25  interests in property.  All rejection damage claims will be treated as a Claim in Class 13 (General

26  Unsecured Claims).

27

28

**E. Modifications to Assumption, Assignment or Rejection of Executory Contracts and Unexpired Leases.**

Any time within 180 days after the Effective Date, the City may file a motion to add or remove contracts or leases to or from the List of Assumed and Assigned Executory Contracts and Unexpired Leases and the List of Rejected Executory Contracts and Unexpired Leases or otherwise modify any decision to assume, assign or reject any executory contract or unexpired lease, upon notice to the counterparty. The Bankruptcy Court may grant such motion for cause shown, including that no opposition to the motion was filed.

## VII. EXECUTION AND IMPLEMENTATION OF THE PLAN

**A. In General.**

On or as soon as reasonably possible after the Effective Date, the City will execute all Plan Documents requiring execution, deliver same to the counterparties to such Plan Documents and perform thereunder.

On and after the Effective Date, the City will continue to operate pursuant to the Charter, the California Constitution, and other applicable laws.

On and after the Effective Date, the City will take all actions required under the ADR Procedures, *provided*, *however*, that the settlement of any Claims pursuant to the ADR Procedures will be subject to the required consents, if any, of any applicable insurance carrier.

**B. Means for Implementation of the Plan.**

The implementation of the Plan will be accomplished by the City:

- implementing its settlements with CalPERS, the Retiree Committee, the SBCPF, the Consenting Unions and the POB Creditors;

- performing its Plan obligations to the other Creditors whose Claims are Impaired or Unimpaired under the Plan;

- complying with the contracts and memoranda of understanding that the City is entering in connection with the City's annexation into the County Fire District and the City's contracting out of certain municipal services including to Burrtec; and

- performing its obligations in good faith under the ADR Procedures to facilitate settlement of disputed claims.

1   Certain of the critical elements of Plan implementation are discussed in items 1-4 below, and further

2   discussion is contained in the Disclosure Statement.

3                    **1.     Alternative Methods of Delivering Municipal Services**

4          A keystone of the Plan is contracting out and/or regionalization of certain municipal services

5   currently provided by City employees.  Municipalities have been contracting for virtually all

6   municipal services since the 1950s.  For a City such as San Bernardino, this approach can generate

7   economies of scale savings and labor cost savings.  Services can be provided by either private sector

8   service providers or other public agencies, either through a contract or by regionalization.

9          The City has implemented annexation of the City into the County Fire District, and the

10   County Fire District is providing Fire Services directly to the City's residents.  The City also entered

11   into a contract for solid waste disposal, recycling, sweeping and right-of-way clean-up services with

12   Burrtec in January 2016.

13         In addition, the other services the City will be considering contracting out include fleet

14   maintenance, business licensing, engineering, inspections, information technology, graffiti

15   abatement, traffic signal maintenance, street maintenance, custodial maintenance, code enforcement

16   and more.  Such regionalization or outsourcing will allow the City to achieve both significant

17   savings and receive additional revenues.  While the City has done relatively little contracting in the

18   past, it has had success with contracting out park maintenance functions in the last several years.

19   The City believes that utilizing alternative methods to deliver municipal services will have

20   significant economic and other benefits to the City and its residents.

21                    **a.     City's Joint Application With the County of
                             San Bernardino to Annex the City into the**
22                           **San Bernardino County Fire Protection District**

23         In April 2015, the City issued a request for proposals to provide Fire Services to the City.

24   The City received two proposals in response – one from the County Fire District for annexation and

25   one from Centerra Group, LLC for private contracting of Fire Services.  The City also received a

26   proposal from the Interim Fire Chief for reorganization of the existing Fire Department.  The City

27   hired a consulting firm, Citygate Associates LLC ("Citygate"), to evaluate the proposals and make

28   recommendations.

In August 2015, Citygate completed its evaluation and issued its report entitled "Evaluation of Fire Service Proposals" ("Citygate Evaluation").  On August 24, 2015, the former City Manager, Allen Parker, with the assistance of Andrew Belknap of Management Partners and Citygate, presented their evaluation and recommendations at a regularly noticed meeting of the City's Common Council.  Both the Citygate Evaluation and the memorandum dated August 24, 2015 to the Mayor and Common Council from Mr. Parker and Mr. Belknap regarding Annexing to San Bernardino County Fire Protection District for Fire Service Delivery ("Staff Report") recommended that the City move forward with the County Fire District proposal.  After hearing and considering the presentations and public comments made at a five hour August 24, 2015 meeting, the Common Council approved Resolution No. 2015-195 which authorized: (1) City staff to negotiate with San Bernardino County and the County Fire District the terms and conditions of annexation and return to the Common Council for approval; and (2) the City Manager to negotiate an interim contract for the County Fire District to deliver Fire Services to the City until the annexation is completed and return to the Common Council for approval. Ultimately, the City and County Fire District decided not to enter into an interim contract, and proceed only with annexation of the City into the County Fire District.

The County Fire District is a proven and professional provider of the full range of fire and emergency medical services.  The County Fire District currently operates 56 fire stations, serving unincorporated San Bernardino County and 7 incorporated cities (including the City of Fontana).  It has a total of approximately 865 employees of which 642 are sworn firefighters.  By annexation of the City into the County Fire District, the City will be able to take advantage of two existing County Fire District stations to serve portions of the City and pool costs for a large number of administrative, support and specialized services such as management, dispatch, purchasing, fire prevention, EMS management, hazardous materials response, search and rescue and wildland fire response.

In accordance with Resolution No. 2015-195 and in furtherance of the City's Plan, the City submitted its certified application to the Local Agency Formation Commission of the County of San Bernardino (" LAFCO"), a local commission (separate and independent of the County of San

1    Bernardino's government) empowered under the Cortese-Knox-Hertzberg Local Government

2    Reorganization Act of 2000 to ensure an orderly and efficient growth pattern and use of land

3    resources and protect against overlapping governmental jurisdiction within San Bernardino County.

4            In September 2015, the San Bernardino County Board of Supervisors, acting as the

5    governing body for the County Fire District, adopted a substantially similar resolution to the City's

6    making the annexation application a joint request from the City and County Fire District.  LAFCO

7    subsequently opened two proposals for governmental reorganization, LAFCO 3198 – reorganization

8    to include annexation into the County Fire District, its Valley Service Zone and Service Zone FP-5;

9    and LAFCO 3197 – sphere of influence amendments (expansion) for the County Fire District.  After

10   LAFCO opened the two proposals, the City, as well as several County agencies (Assessor, Registrar

11   of Voters and Surveyor) provided information necessary to support the reorganization proposal and

12   the sphere amendment.

13           In October 2015, LAFCO held the Departmental Review Committee Meeting to review both

14   proposals.  Based on the meeting LAFCO issued a determinations letter on October 21 for both

15   LAFCO 3197 and LAFCO 3198.  In response to the determinations letter, the County Fire District

16   filed a revised Plan of Service and Five Year Financial Forecast on October 28, 2015.  The Five

17   Year Financial Forecast showed a City General Fund property tax transfer revenue requirement

18   starting at $20.4 million in FY 2016/17, increasing to $22.9 million in FY 2020/21.  From an

19   economic standpoint, this result is quite favorable to the City when measured against the financial

20   projection prepared for the City by Urban Futures as part of the annexation analysis, which showed

21   City costs for a stand-alone fire department would have a General Fund revenue requirement of from

22   $32.9 million to $36.7 million over the same five year period.

23           Under the County Fire District's Plan of Service, City residents will experience improved

24   service from a dispatch system which has faster call processing time than is associated with the City

25   dispatch system, as well as from direct responses from two County Fire stations which are closer to

26   some sections of the City than City responding stations. County Fire also has more equipment for

27   delivery of fire services such as water tenders, water rescue boats, heavy equipment for floods or

28   earth moving, hand crews, ambulance response (in seven areas), additional hazardous materials

response capabilities, and sophisticated urban search and rescue capabilities. Regionalization of fire services is considered an industry best practice in order to make service delivery more seamless and to take advantage of economies of scale. Many cities are currently served using an annexation model, and LAFCO has approved of several annexations into the County Fire District.

In January 2016, LAFCO held a public hearing to discuss LAFCO's staff recommendation to accept the joint City/County annexation application. The application, including County Fire's proposed service plan, was approved unanimously on January 27, 2016 as set forth in LAFCO Resolution No. 3211. In February 2016, the 30 day reconsideration period of LAFCO's decision ended and the Notice of Protest Hearing was issued. On April 21, 2016, LAFCO held the Protest Hearing and the number of protests received was below 5% for both property owners and registered voters. Accordingly, the LAFCO Executive Director determined that annexation of the City into the County Fire District can proceed.

Annexation of the City into the County Fire District was implemented on July 1, 2016. Completing the annexation in time for a July 1, 2016 effective date was crucial to the City's reorganization efforts. The transition process for current City employees is underway. It is the City's intention that disruptions to employment, compensation and benefits be kept to a minimum in connection with the County Fire District taking over the provision of Fire Services. Nonetheless, the City estimates that annual economic benefits from annexation will be between approximately $7.4 million and $12 million. The City's Financial Model shows that even including certain one-time transition costs associated with the annexation, the transfer of service responsibility will improve the City's fiscal position by in excess of $30 million, and considerably more if deferred maintenance costs are taken into consideration. Without annexation the projections show that the City would soon run an annual deficit of up to $12 million per year. Therefore, successful annexation is fundamental to restoring the City to solvency.

Under annexation, the City will remain responsible for certain "legacy" pension costs. These legacy pension costs are accounted for in the Financial Model under the line item entitled "Fire's Legacy CalPERS Pension Cost," and are estimated at approximately $3.3 million in fiscal year 2016-17 with annual increases up to $10 million annually in fiscal year 2033-34 for a total of

1   approximately $131 million over the term of the Financial Model.  The decision to annex into the

2   County Fire District does not have an impact on these costs because they relate to and must be paid

3   for the period when the City operated its own Fire Department.  Even taking into consideration these

4   estimated legacy pension costs, the City firmly believes that the increased savings and revenue

5   improvements to the City from annexation on a net basis (particularly in contrast to the cost to the

6   City of continuing to fund a stand-alone fire department) will be of significant benefit to the City and

7   its residents and are critical to the success of the City's Plan.

8               **b.**      **Burrtec Contract for Solid Waste Disposal and Related Services**

9               California cities are increasingly contracting with the private sector for solid waste and

10   recycling.  Today the vast majority of cities in Southern California provide solid waste and recycling

11   services under a franchise agreement with one or more private companies.  The move to private

12   contractors is justified by the economies of scale available to private companies which serve

13   numerous jurisdictions.  These economies are found in several areas including capital acquisition,

14   fleet maintenance, workers compensation, employee recruitment, safety and training programs,

15   customer service / billing, technology and management.  Recent examples include Hemet which

16   contracted its solid waste service to CR&R Waste and Recycling Services in 2011, and Newport

17   Beach which contracted its residential solid waste services (commercial had already been contracted)

18   to CR&R in 2013.  Most cities in the Inland Empire provide these services through contracting with

19   private companies.

20               With California recycling requirements that have been in place for over 25 years, refuse

21   haulers gradually have expanded their businesses to include materials sorting, recycling, public

22   education, and in some cases, street sweeping and other related services, working in partnership with

23   individual cities and counties.  In addition, the more sophisticated companies use specialized routing

24   systems to reduce travel times and produce and closely monitor work measurements based on their

25   experience.  Given the expertise developed in multiple jurisdictions by these waste companies, and

26   the economies of scale that larger operations can provide, it is likely that contracting these services

27   to a private company will result in lower or similar costs to provide the service, plus increased

28

1    franchise fees paid to the City's General Fund by the contractor, along with fees paid by the

2    contractor to the City for an exclusive agreement.

3          In June 2015, the City sent out a request for proposals to contract three of its largest

4    maintenance services – solid waste and recycling, street sweeping and right-of-way cleanup.  These

5    services are currently performed by approximately 100 employees in the City's Public Works

6    Department.  Four companies submitted proposals, all of which are active in solid waste collection

7    and street sweeping in the Southern California area.  An evaluation team of consultants with

8    experience in contracting and solid waste evaluated the companies' financial statements, reviewed

9    the technical, financial proposals and references, and provided a recommendation to the City

10   Manager.  In November 2015, a recommendation was made to the Common Council, the Common

11   Council selected Burrtec and then directed staff to negotiate a ten-year agreement.  In January 2016,

12   the negotiations with Burrtec were completed and the Common Council has approved the contract

13   between the City and Burrtec as Resolution No. 2016-10, a copy which is included as Exhibit 29 in

14   the Appendix.  A copy of the Burrtec Contract is included as Exhibit 30 in the Appendix.  As a

15   result, the City will be able to offer the same or better level of services than the City currently

16   provides with substantial economic benefit to the City.

17         In connection with the Burrtec Contract, the City has received or expects to receive these

18   benefits: (1) a one-time franchise fee payment of $5 million within 60 days of execution of an

19   agreement; (2) franchise fees of $2.8 million per year above current levels which the City estimates

20   will net a cumulative annual revenue stream of  approximately $5 million to $7.6 million per year

21   over the 20-year term of the Financial Model as reflected in line item "New Waste Management

22   Franchise" (which amounts to approximately $106.9 million in revenues); and (3) net revenue from

23   the sale of refuse vehicles, carts, bins, and containers of $9,454,000 after vehicle leases are paid (the

24   City estimates gross sale values of $12.225 million, which less of remaining lease payments, will net

25   the City approximately $9.45 million of this amount – an estimate that is included in the Financial

26   Model under the line item, "Proceeds from IW Vehicle Sale & CIP").  In addition, Burrtec has

27   agreed to reimburse the City for "wear and tear" costs on the City's streets over the course of the

28

1    Financial Model (which costs are currently reflected in the line item "Proceeds from IW Vehicle

2    Sale & CIP").

### c.    Fleet Maintenance

4          The City has been financially unable to replace its vehicles and equipment in accordance

5    with industry standards or provide an effective fleet maintenance operation. About 479 units,

6    representing 56% of the City's total fleet, are currently due or past due for replacement at an

7    estimated cost of more than $41 million. The aging fleet has resulted in a significant burden on the

8    understaffed fleet maintenance employees who must contend with an aging fleet and an inefficient

9    fleet operation. Deferred fleet maintenance also puts the City at risk for compliance with state

10    mandated equipment and vehicle inspections. The City is attempting to address this issue through

11    the transfers of certain heavy equipment to Burrtec as part of its outsourcing efforts, and through

12    resources directed via the Police Resources Plan (in the form of new fleet vehicles, which the City

13    intends will alleviate some of the maintenance issues currently faced). The City also anticipates

14    outsourcing fleet maintenance operations in 2016 to provide the City with increased resources and

15    estimated annual savings of $400,000 beginning in fiscal year 2016-17 and increasing thereafter to

16    about $600,000 as shown in the line item "Contract Fleet Maintenance" in the Financial Model.

### d.    Other Contracting Options

18          There are other areas where the City likely will derive efficiencies from a contract approach.

19    Efforts are underway to contract for business license administration, custodial services, graffiti

20    abatement and some information technology functions which are anticipated to be completed in

21    2016 and 2017. Areas where savings have yet to be identified but might offer benefit include

22    engineering, inspection, code enforcement and attorney services, and the City is preparing RFPs and

23    implementing an analysis of each option.

### 2.    Police Resources Plan

25          The primary municipal service provided by the City is for police services. Reducing the

26    City's violent and other crime rates and addressing the City's perception as a "dangerous" city are

27    the most pressing issues facing the City. As shown in the chart below, San Bernardino has more

28

than double the violent crime rate as either the surrounding region or the state as a whole. For every three violent crimes per 1,000 residents in the region, there are ten such crimes in San Bernardino.

*State and Regional Crime Rates Compared to San Bernardino in 2014*



| | Violent Crime per 1,000 | Property Crime per 1,000 | Part 1 Crime per 1,000 |
|---|---|---|---|
| San Bernardino | 100% | 100% | 100% |
| California | 43% | 55% | 53% |
| Region Average | 30% | 58% | 53% |

*Sources: 2015 California Department of Finance; 2014 Federal Bureau of Investigation Crime Reports*
*Notes: Region average includes large nearby cities: Fontana, Moreno Valley, Rancho Cucamonga, Ontario, Riverside, and Corona.*
*Part 1 crimes include violent and property crimes as defined by the Federal Bureau of Investigation.*

San Bernardino's crime rates are high even when compared to other high-crime cities in California. Of the 63 California cities with populations between 100,000 and 400,000, San Bernardino has the second highest Part 1 crime rate. The table below provides demographic and crime data for the 10 cities with the highest crime rates within this population range. Notably, San Bernardino also has a significantly lower median household income and a higher percentage of people in poverty than other cities with high rates of crime. People living in poverty are the victims of violent crime at more than twice the rate of high income populations according to a study by the Bureau of Justice Statistics between 2008 and 2014.

*High-Crime Cities in California between 100,000 and 400,000 in population – Demographic Data*

| 3.        City | 2015 Population | 2014 Part 1 Crimes per 1,000 Residents* | 2014 Violent Crimes per 1,000 Residents | 2014 Percent Violent Crime of Part 1 Crimes | 2013 Median Household Income | 2013 Percent of All People in Poverty |
|---|---|---|---|---|---|---|
| Antioch | 108,298 | 46.9 | 7.8 | 17% | $65,254 | 14.9 |
| Bakersfield | 369,505 | 45.0 | 4.5 | 10% | $56,204 | 20.4 |
| Berkeley | 118,780 | 46.7 | 3.6 | 8% | $63,312 | 18.7 |
| Concord | 126,069 | 45.0 | 3.7 | 8% | $65,798 | 12.1 |
| Modesto | 209,186 | 52.3 | 8.5 | 16% | $47,060 | 20.8 |
| Richmond | 107,346 | 48.0 | 7.9 | 16% | $54,589 | 18.5 |
| San Bernardino | 213,933 | 53.7 | 9.9 | 19% | $38,385 | 32.4 |
| Stockton | 306,999 | 56.1 | 13.0 | 23% | $46,831 | 24.3 |
| Vallejo | 119,683 | 49.8 | 8.6 | 17% | $58,371 | 17.5 |
| Victorville | 121,168 | 41.6 | 5.3 | 13% | $50,034 | 25.3 |
| State | 38,714,725 | 28.4* | 4.0 | 14% | $61,094 | 15.9 |

*Sources: 2015 California Department of Finance; 2014 Federal Bureau of Investigation Crime Reports; 2009-2013 American Community Survey Estimates*
*Note: Part 1 crimes include violent and property crimes as defined by the Federal Bureau of Investigation.*

San Bernardino's rates of crime also top national averages. San Bernardino has 53.7 Part 1 crimes per 1,000 residents and 9.9 violent crimes per 1,000 residents, significantly higher than the respective national rates of 29.6 and 3.7, according to the 2014 Crime Reports by the Federal Bureau of Investigation.

Yet, financial circumstances have forced the City to reduce the size of its Police Department. The Police Department's sworn staffing levels have been in decline steadily since 2009, while crime rates remain steady and response times rose to unacceptable levels. The general service impacts can be described as follows:

- Sworn staffing has been reduced from 356 full-time equivalent (FTE) employees in 2008 to 248 today (30% reduction),

1     • Patrol division sworn staffing has been reduced by 25% since 2008,

2     • Community policing teams have been scaled back by about 75%,

3     • Narcotics enforcement has been reduced by 50% since 2008,

4     • Traffic enforcement personnel were reduced by 58% since 2008,

5     • Priority 1 average response times increased 76% since 2008, and

6     • Almost 36% of patrol vehicles are overdue for replacement.

7 Unless residents, business owners and visitors feel safe in the City, efforts to attract economic

8 development and new residents will be significantly hampered. Currently, funding for the Police

9 Department falls well below the average compared with other similarly sized California cities with

10 high rates of crime.

11 *Similar Sized California Cities with Top Crime Rates – Police Expenditure per Part 1 Crime in FY 2014-15*



*Sources: FY 2014-15 Adopted City Budgets; 2014 Federal Bureau of Investigation Crime Reports*
*Note: Part 1 crimes include violent and property crimes as defined by the Federal Bureau of Investigation.*

20 The City will have to dedicate significant resources to very specific and measurable elements to

21 reduce crime.

22     To address these issues, the City developed a five-year plan intended to bolster the City's

23 police resources and reduce the City's crime rates (the "Police Resources Plan") which was

24 approved by the Common Council in November 2015. A staff report outlining the Police Resources

25 Plan is included in the Appendix as Exhibit 11. The primary objective of the Police Resources Plan

26 is to rebuild sworn staffing levels and provide the sworn staff with the tools (largely technology,

27 equipment and vehicles) needed to do the job as follows:

28

- Increase staffing levels of the City's Police Department to enable the Police Department to reduce call response time sand be able to build deeper relationships in the community;

- Invest in the Police Department technology (to replace otherwise aging and deficient systems, to improve efficiency and effectiveness and to ensure business continuity and access to critical systems); and

- Fleet replacement (to replace the Police Department's largely aging fleet - with more than half of all police cars 10 years or older and roughly a fifth with more than 100,000 miles). The Police Resources Plan also seeks to increase community engagement in strategies to reduce crime and increase economic development opportunities.

With respect to staffing, the table below provides a history of authorized sworn police staffing levels over the last 10 years. The City's sworn police staffing was at its peak of 356 positions in 2009. Since that time the number of sworn positions has decreased by almost 30%. Also, the number of actual positions (those filled) is at the lowest level in a decade.

*History of Sworn Police Staffing Levels*

| 4. Fiscal Year | Budgeted | Year-End Actual |
|---|---|---|
| FY 2005-06 | 312 | 311 |
| FY 2006-07 | 330 | 323 |
| FY 2007-08 | 346 | 346 |
| FY 2008-09 | 356 | 324 |
| FY 2009-10 | 350 | 326 |
| FY 2010-11 | 350 | 348 |
| FY 2011-12 | 305 | 292 |
| FY 2012-13 | 281 | 272 |
| FY 2013-14 | 260 | 234 |
| FY 2014-15 | 248 | 229 |
| FY 2015-16 | 248 | 214 (November) |
| Percent Change FY 2011 to 16 | -29% | -39% |

*Source: San Bernardino Police Department*

Ideally, the Police Resources Plan will result in 89 new positions, for an overall 29% increase in sworn positions. Although still below the peak staffing level of 356 in fiscal year 2009, this increase will enable the department to deliver its core service mission, reduce call response times, and provide the depth required to engage with the community on a path to improving the overall quality of life. Increased staffing would also have a significant impact on the ability of the department to redeploy officers and other staff to address those critical community issues related to gangs, illegal narcotics, prostitution, and traffic enforcement. Increasing both sworn and civilian staffing levels will provide renewed capacity to the department to be able to reconstitute or expand some of the specialty units designed to address these issues and reduce associated crime.

The City will only be able to fund a fraction of the Police Resources Plan with existing revenues. To address the staffing and technology goals identified above, the City will spend approximately $17.6 million over the next five year period, with a total expenditure of $91 million over the 20 year term of the Financial Model as reflected in the "Police Services Master Plan" line item. Over the horizon of the Financial Model, the City projects it can afford only about 40% of what is necessary to fund the Police Resources Plan.

With respect to police fleet vehicles, more than half of the City's Police Department vehicles require replacement, as reflected in the List of City Non-Fire Vehicles included in the Appendix as Exhibit 15. The City's Financial Model allocates approximately $23.4 million over the 20 year term for new police vehicles as reflected in the Capital Investment-Fleet-Police line item to address the third goal of Police Resources Plan.

The Police Resources Plan addresses some of the most critical needs for the Police Department in its fight against rising crime rates. While the cost to the City of implementing the Police Resources Plan is not insignificant, research has shown that reductions in crime rates can lead to higher tax revenues and increased economic development. Thus, the City's plan to upgrade the Police Department's infrastructure (staffing, IT and fleet) will have long term economic benefits for the City.

3. **Necessary Reinvestment in City Infrastructure**

a. **Street and Road Repair Proposal**

As set forth on the Street Repairs Report included in the Appendix as Exhibit 9, the City's right-of-way capital maintenance backlog exceeds $180 million. To fund the much needed right-of-way maintenance needs, the City of San Bernardino will utilize both restricted funding sources (Measure I and State Gas Tax Funds) as well as General Fund resources. The City's Financial Model allocates only about $7.1 million over 20-years to address a current need exceeding $180 million. Even though the addition of General Fund monies increases the funding available over the next 20-years, the City will still be able to fund only a small fraction of the current need (as reflected at line "Capital Investment – Public Right-of-Way" of the Financial Model and in the Street Repairs Plan). While not sufficient to fully address all of the City's street repair and maintenance needs, the additional application of General Funds is at least anticipated to reduce the numbers of streets within the City that will require rehabilitation and/or full reconstruction. Because the City's costs for backlogged capital maintenance will continue to grow over the 20-year funding term, the funding percentage is anticipated to decline annually as costs for repairs go up. As a result, the City will need to find additional sources for funding in the coming years.

San Bernardino Associated Governments ("SANBAG") is the council of governments and transportation planning agency for San Bernardino County. Among other things, SANBAG administers Measure I, the half-cent transportation sales tax approved by county voters in 1989. Pursuant to a letter agreement dated January 14, 2016, by and between the City and SANBAG (the "SANBAG Agreement"): (a) SANBAG is authorized to withhold, and has been withholding, certain Measure I funds until the City is in compliance with its obligations under Measure I and its requirements; and (b) such authorized withholding is without the need to seek relief under the Bankruptcy Code, among other things. The Plan and the confirmation of the Plan shall not affect, impair or modify, in any way, SANBAG's rights under the SANBAG Agreement, including the power to continue to withhold funds until the City is in compliance with its obligations under Measure I and its requirements, and the Confirmation Order shall so expressly provide.

b. **Outdated Information Technology (IT) Systems Upgrade**

Since the early years of the Great Recession, the City eliminated funding for Information Technology (IT) capital requirements. In recent years, the City has allocated funds to replace only those systems which have failed, but continues to risk other failures due to lack of funding availability. The lack of funding availability for IT infrastructure has left the City with operational systems that are long past their useful life and are beyond manufacture support and/or warranty. More concerning is the lack of a back-up system if the City's network crashes and is unrecoverable. To address these basic service level issues, the City is allocating approximately $11.5 million over the term of the Financial Model as reflected in the line item Capital Investment – IT Infrastructure.

c. **Replacement of Aging Fleet of Vehicles**

Similar to other capital equipment and maintenance needs, the City's vehicle fleet has not received adequate funding for replacement vehicles for many years. Much of the City's fleet is well beyond it useful life and has become costly to maintain. Some of the City's fleet needs have been resolved through contracting of solid waste and other services and annexation into the County Fire District. The City will no longer need to fund vehicles associated with fire service and emergency medical services due to the successful annexation into the County Fire District; and integrated waste, recycling, street sweeping, right-of-way clean-up and park maintenance fleet needs have been met through contracting out these municipal services. However, the City still must finance the replacement of essential vehicles necessary to provide basic services such as facility maintenance, public works, animal control, code enforcement, and planning and building inspection. The City has allocated $25.3 million for general purpose vehicles as reflected in the Capital Investment-Fleet-Other line item over the term of the Financial Model.

d. **Seismic Retrofit of City Hall**

The City has considered seismic retrofitting of City Hall since 2002. The City Hall site is within 4 miles of the San Andreas Fault which is capable of producing a magnitude 8.0 earthquake. The next dominant fault is the San Jacinto at a distance of 2 miles capable of producing a magnitude 7.5 earthquake. These faults make the City of San Bernardino, including the location of City Hall, one of the most seismically hazardous locations in California. On any business day, more than 200

people on average occupy City Hall.  The City Hall building is a 7-story structure with one

subterranean level reinforced concrete structure designed in 1970.  It is constructed with lightweight

concrete slabs, beams and columns and to the 1968 UBC building code. However, the 1971 San

Fernando earthquake demonstrated vulnerability of this type of construction to collapse. Starting

with the 1973 Building Code, this type of construction was prohibited in areas with high and

moderate seismic potential.

In 2002, IDS performed work on the seismic strengthening project of the City Hall parking

structure. While performing this work, IDS reported to the City that the building had sustained

structural damage which had occurred during the Landers earthquake of 2002. Subsequently, the

City solicited proposals from earthquake engineering consultants to perform a seismic evaluation of

the building, but due to funding constraints, the City did not proceed at that time with the

evaluations. In 2007, URS Corporation was retained by the City to perform a seismic evaluation of

City Hall.  Based on the review and soil testing under City Hall, URS' review confirmed that the

building needed seismic retrofitting.

In July 2015, the City developed and sent out a Request for Qualifications (RFQ) to

architects and large contractors who have successfully completed large-scale seismic retrofits for

municipalities, universities and other public entities while maintaining the design integrity of their

buildings.  The City received statements of qualifications and project estimates from five firms.

Following a review of the proposals received, the IDS Group was selected to perform the work. The

work requested consists of performing a detailed analysis to pinpoint the problem areas and to

recommend a retrofit strategy for City Hall, identify additional professional assistance that will be

required for implementation, and estimate associated construction costs and schedule.  The options

for continuity of City operations during the retrofitting process will also be considered because the

seismic retrofit will require all of the employees as well as the furnishings, equipment and

infrastructure necessary for those employees to perform their job duties to move to another building

during the work required to complete the retrofit.

IDS Group's work was recently completed and the City Hall seismic retrofit is projected to

cost $20 million.  The Financial Model assumes a $20 million financing for the seismic retrofit costs,

1    equal to an annual debt service of $1.7 million, and these costs are included in the Financial Model

2    in the Capital Investment – Buildings & Fixtures line item.

3    **4.    City Charter Reform**

4         The City historically has experienced a wide range of operational and other problems that

5    have adverse economic impacts due to the existing Charter structure.  As one example, the Charter

6    specifies that both primary and general elections for City officers are to be held at times other than

7    the nominal November general election in numbered years.  As a result, the City cannot consolidate

8    its elections with most State and Federal elections.  This costs the City at least $270,000 more per

9    election cycle because costs cannot be shared.  It also diminishes voter turnout.

10        The Mayor and Common Council established the Volunteer Citizen-Based Charter

11   Committee ("Charter Committee") in March 2014.  The Charter Committee identified the Charter as

12   a barrier to efficient and effective government because it is overly complex, hard to understand, and

13   contains elements that are inconsistent with best practices for modern municipal government.  The

14   Charter Committee worked to develop recommendations for a new or substantially revised charter

15   that reflects the principles of good governance and meets the City's needs.  The Charter Committee

16   has met approximately twice per month since May 2015 with the goal of providing

17   recommendations to the Mayor and Common Council by May 2016, and has sought public input and

18   engaged in community outreach efforts through public forums.

19        On December 29, 2015 the Charter Committee completed its work on the charter skeleton.

20   The charter skeleton is an outline of the key elements, ideas and principles to be addressed in the

21   City's charter, including an overall governance structure.  In order to recommend a charter that

22   reflects best practices consistent with modern municipal governance, the Charter Committee decided

23   to propose a completely new charter instead of recommending numerous amendments to the existing

24   charter. The City intends to place a proposed new charter before the City's voters on the November

25   2016 ballot.

26        The Charter Committee's preliminary recommendations for the charter result in a governance

27   structure that looks fundamentally different than the existing governance structure.  It shows an

28   organizational structure with greater clarity in roles, responsibilities and reporting relationships.

1  Perhaps most importantly, the City Manager is unambiguously responsible for City operations and

2  management. It removes administrative and management decisions from the Mayor and Common

3  Council and focuses their role on establishing policies to be carried out by the City Manager and

4  executive leadership.

5        This structure is consistent with best practices for council-manager forms of government, as

6  well as the provisions of modern-era charters. Assuming this charter approach is placed on the ballot

7  by the Mayor and Common Council and approved by the voters, the City will have a governance and

8  management structure which much more closely approximates the structure in other comparable

9  California cities. This is of critical importance to the City and its residents because the governance

10  approach taken by other cities leads to performance which is demonstrably better in terms of the

11  delivery of municipal services and the maintenance of fiscal solvency than has been the case for the

12  City under the current system of government.  While awaiting Charter reform, the City is operating

13  under the Operating Practices for Good Government protocol the City adopted which streamlines

14  decision making, increases efficiency and provides for better accountability.  The City expects that

15  Charter reform will result in streamlined operations, increased efficiency and improved City

16  government accountability.  The City's Plan is not conditioned upon approval of any Charter

17  reforms, and the City's Financial Model and feasibility analysis do not assume or require that any

18  Charter reforms will be implemented.

19        **5.**    **Revenue Enhancement Measures**

20        While revenue enhancement is severely constrained under California law, there are a number

21  of best practices which can be implemented to generate revenues.  The City has evaluated

22  approximately 14 additional revenue sources (many of which require voter approval) and the

23  Financial Model contemplates implementation of various new fee adjustments.  In 2015, the City

24  implemented increases to the cost allocation structure for the water, sewer treatment and sewer

25  collection enterprise funds.  The City's fire service annexation application requested annexation into

26  a service zone with an approximate $148 per parcel annual fee, which would generate new revenue

27  of approximately $7.8 million for Fire Services. The City also negotiated a solid waste management

28  franchise fee.

Many measures the City considered for purposes of raising revenues have been rejected because they would not be realistically feasible to implement.  In light of the very low income levels among a substantial percentage of the City's residents, the City faces significant hurdles in pursuing voter approved tax measures.  The City remains the poorest community of its size in California, and it has grown progressively poorer over the past decades.  According to the latest U.S. Census Bureau data:  the per capita income of City residents is $14,879, compared to a state average of $29,527; the median household income in the City is $38,385, compared to a state average of $61,094; and the percentage of City residents living below poverty level is 32.4%, compared to a state wide average of 15.9%.  The median value of owner occupied housing units in the City is $152,800 compared to a state average of $366,400.

Compounding the severe poverty is the City's relatively low population growth rate.  Over the past 25 years, the City had a compound annual growth rate of 1%, and over the last five years the compound annual growth rate was 0.25%.  The City's inability to provide a basic level of municipal services only exacerbates the slow growth rate.  Until the City can restore a decent level of municipal services to attract new residents, new population growth is expected to continue to be in the poorer population sectors of the City where the demand for City services is even greater.

A summary of key potential revenue enhancement options the City considered is set forth below.

### a.    Measure Z Sales Tax Reauthorization

The City is working towards reauthorization of the Measure Z sales tax in 2021, which requires voter approval.  The City projects that reauthorization of the Measure Z sales tax will lead to estimated revenues of between $8.7 million and $12.8 million each year between fiscal year 2021 through fiscal year 2034 for a total of approximately $134.7 million.  Other than Measure Z, the City considered but decided against further sales tax increases at this time.  Sales tax in the City is already among the highest in the region, and an increase would only unduly burden the City's residents who are among the poorest in California.  City officials reasonably determined that the residents are not financially capable at this time of carrying a heavier sales tax load in addition to the other revenue measures that will be implemented in connection with the Plan.

### b. Cost Allocation Revisions for Enterprise Funds

Following the City's plans to restructure its operations for service delivery efficiencies, it was necessary to create a new cost allocation strategy which allowed the City to recover costs associated with general administrative and public safety services. Such cost allocation provides the City an equitable return for services, while allowing the City to continue to receive cost allocation fees from the City's utilities throughout the term of the Financial Model. Implementing this strategy will ensure the City an increasing cost allocation return for services as the City's cost for general administration, public safety and right-of-way maintenance increase during the term of the Financial Model. Specifically, the Financial Model (at line items "Transfers In – Water Fund," Transfers In – Sewer Treatment" and "Transfers In – Sewer Collection") assumes transfers into the General Fund from the water, sewer treatment and sewer collection enterprise funds of a total of almost $4 million in Fiscal Year ("FY") 2015-16 growing to almost $6.9 million in FY 2033-34 for a total of approximately $109 million over the term of the Financial Model.

### c. Water/Sewer Utilities Fees

The City is implementing new water/sewer utility rate increases in connection with an agreement adopted between the City and the City's Water Department which will provide the City with additional revenue.

### d. Other Opportunities Considered

The City considered additional opportunities to improve revenues from existing sources and generate revenue from new sources such as implementing: (1) a raise in the existing Utility User Tax, or an application of the tax to additional utilities; (2) a higher Transient Occupancy Tax; (3) a higher Real Property Transfer Tax; (4) a higher Business License Fee; (5) a 911 Communication Fee; (6) a Paramedic Subscription Fee; (7) a higher Emergency Response Fee; and (8) a larger Electricity Franchise Fee. However, based on the City's assessment at this time, such sources are not likely to be successful at this time. This is due primarily to a poor residential community unlikely to vote for tax or fee increases. Implementing the above taxes and fees would also require significant time, as well as fundamental management and technology improvements which separately require a funding investment. As such, the City has determined that the above options are

1   not financially feasible for the City at this time.  In the interim, and as an alternative, the City is

2   instead focused on seeking to realize additional potential revenue with updated fee and charges

3   schedules implemented later in 2016, better collection on existing fees and charges, and resource

4   management, together with the parcel tax being implemented for fire and EMS services as part of

5   annexation into the County Fire District.

6       **C.      Insurance.**

7       The City is self-insured for the first $1 million of defense costs, settlements and judgments

8   per bodily injury or personal injury claim.  If the amount of judgment or settlement exceeds

9   $1 million, the City, as a member of the BICEP, and pursuant to the BICEP Agreement, has

10  purchased excess liability coverage that is backed by Reinsurance Policies between BICEP and each

11  of Great American Insurance Company, Wesco Insurance Company and Starr Indemnity & Liability

12  Co. (and/or other companies that BICEP contracts with for reinsurance).  The aggregate effect of the

13  BICEP Agreement and the Reinsurance Policies is to provide annually up to $9 million of coverage

14  per claim and an aggregate $26 million dollars of coverage for personal liability and bodily injury

15  claims above the City's $1 million self-insured retention per claim, subject to the other terms,

16  conditions and limitations of the BICEP Agreement and the Reinsurance Policies, copies of which

17  are attached to the Appendix as Exhibit 5.

18      Under the BICEP Agreement, (1) bodily injury means physical injury, emotional distress,

19  sickness, or disease sustained by a person, including death resulting from any of these at any time;

20  and (2) personal injury means damages caused by or arising out of one or more of the following:

21  (a) false arrest, detention or imprisonment, malicious prosecution or abuse of process; (b) wrongful

22  entry or eviction; (c) publication or utterance of material that slanders or libels a person or

23  organization or disparages a person's or organization's goods, products or services, or infringement

24  of copyright, title or slogan, or oral or written publication of material that violates a person's right of

25  privacy; (d) discrimination, other than employment practices, based upon race, religion, nationality,

26  national origin, color, creed, sex, sexual orientation, handicap, disability, age or employment or

27  violation of civil rights; and (e) assault and battery.

28

1      Under paragraphs 6.1 and 6.2 of Exhibit A to the BICEP Agreement, the City is obligated to

2   provide BICEP with written notice of any claim or occurrence that the BICEP Agreement covers or

3   potentially covers if, among other things, the claim involves paralysis, brain damage,

4   dismemberment or death or otherwise has potential damages exposure of at least $500,000 (which

5   potential damages exposure includes claimant's attorney's fees, costs and prejudgment interest).

6   The City in the ordinary course provides notice to BICEP of such claims.  Attached to the Disclosure

7   Statement as Exhibit 6A is a list of claims as to which the City has provided such notice to BICEP

8   (including claims that do not necessarily meet the criteria of Section 6.1 of Exhibit A to the BICEP

9   Agreement).

10      Under the Plan, if necessary to preserve its rights and the rights of claimants under the

11   BICEP Agreement, and solely to the extent that Section 365 of the Bankruptcy Code is applicable to

12   the BICEP Agreement, the City will assume the BICEP Agreement pursuant to Section 365.  In that

13   event, the Confirmation Order shall contain findings regarding the approval of assumption and the

14   satisfaction of the cure and adequate assurance requirements of Section 365(b) of the Bankruptcy

15   Code.

16      Attached to the Appendix as Exhibit 4 are the ADR Procedures that shall be used to liquidate

17   the claims of claimants holding Litigation Claims as part of the claims allowance procedures.  The

18   City designed the ADR Procedures to substantially reduce the cost to the City and the claimants of

19   reaching an equitable resolution of the claims.  The City intends to make concrete mediation

20   settlement proposals once the Plan is confirmed and the ADR Procedures apply, and the City will

21   pay for the costs of the mediators that are used in the ADR Procedures.  The ADR Procedures also

22   provide that, unless otherwise directed by the Bankruptcy Court, after the Effective Date of the Plan

23   the City shall have the discretion to enter into settlements regarding the allowance and payment of

24   Litigation Claims without further order of the Bankruptcy Court.  The ADR Procedures also provide

25   that BICEP will be a released party in any settlement entered into by the City in respect of any

26   Litigation Claims.

27      ***In connection with solicitation of votes to approve the Plan, the City will provide a separate***

28   ***notice to the holders of Litigation Claims listed in Exhibit 6 to the Appendix that a discussion of***

*the Litigation Claims, the BICEP Agreement and the Reinsurance Policies is contained in Section*

*IV.A.9. of the Disclosure Statement, and that copies of the ADR Procedures, the BICEP*

*Agreement and the Reinsurance Policies are attached as Exhibits 4 and 5 to the Appendix. A*

*more extensive discussion of Litigation Claims and the BICEP Agreement is found in the*

*Disclosure Statement at Section IV.A.9.*

### D.    Continued Operations

Following the Effective Date, the City will continue to operate under its Charter (subject to any changes, repeal or amendments pursuant to voter action), the California Constitution, and other applicable laws. The City will continue to collect real property tax revenues, sales tax revenues, the user utility tax, and other taxes, fees, and revenues following the Effective Date, spending such revenues on municipal services. In accordance with existing policies and operational guidelines, the City will continue to pay ordinary course debt, including, without limitation, Workers' Compensation Claims (the Uninsured Portion, where the Insured Portion is covered by insurance), trade and/or vendor claims, amounts due CalPERS and amounts due federal agencies (e.g., HUD, and Environmental Protection Agency) that provide ongoing funding to the City. The City shall indemnify the past and present officers and employees of the City with respect to claims against such officers and employees that arose prior to the Confirmation Date in accordance with the City's pre-petition practices and state law, and the City shall continue to provide such indemnification with respect to claims against officers and employees that arise after the Confirmation Date.

## VIII.  RETENTION OF THE CITY'S RIGHTS OF ACTION

All of the City's Rights of Action shall be retained by the City after the Effective Date. The failure to list in this Plan, Disclosure Statement, the Appendix or any Plan Document any potential or existing Right of Action retained by the City is not intended to and shall not limit the rights of the City to pursue any such Right of Action. Unless a Right of Action is expressly waived, relinquished, released, compromised, or settled in this Plan or otherwise, the City expressly reserves all Rights of Action for later adjudication, and as a result, no preclusion doctrine, including without limitation the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Rights of Action upon confirmation or

consummation of this Plan or thereafter.  Without limiting the foregoing, the City expressly reserves the right to pursue against any Entity any claims alleged in any lawsuit in which the City is a defendant or an interested party, and to enforce its rights with respect to the BICEP Agreement and the Reinsurance Policies and to bring claims for damages for any breach thereof.

## IX.    DISTRIBUTIONS

### A.    Distribution Agent.

On and after the Effective Date, the City shall act as the Distribution Agent under this Plan. The City may also retain one or more agents (including Rust Omni) to perform or assist it in performing the distributions to be made pursuant to this Plan, which agents may serve without bond. The City may provide reasonable compensation to any such agent(s) without further notice or Bankruptcy Court approval.

### B.    Delivery of Distributions.

All distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth in the books and records of the City or its agents, unless the City has been notified by such holder in a writing that contains an address for such holder different from the address reflected in the City's books and records that is mailed to Rust Consulting/Omni Bankruptcy, 5955 DeSoto Avenue, Suite 100, Woodland Hills, CA 91367 at least two weeks prior to such distribution. All distributions to Indenture Trustees or similar Entities shall be made in accordance with the relevant indenture or agreement, as applicable.

### C.    Distributions of Cash.

Any payment of Cash to be made by the City or its agent pursuant to this Plan shall be made by check drawn on a domestic bank or by wire transfer, at the sole option of the City.

### D.    Timeliness of Payments.

Any payments or distributions to be made pursuant to this Plan shall be deemed to be timely made if made within 30 days after the dates specified in this Plan.  Whenever any distribution to be made under this Plan shall be due on a day that is not a Business Day, such distribution instead shall be made, without interest on such distribution, on the immediately succeeding Business Day, but shall be deemed to have been timely made on the date due.

**E.**     **Compliance with Tax, Withholding, and Reporting Requirements.**

    The City shall comply with all tax, withholding, reporting, and like requirements imposed on it by any government unit, and all distributions pursuant to this Plan shall be subject to such withholding and reporting requirements. In connection with each distribution with respect to which the filing of an information return (such as Internal Revenue Service Forms W-2, 1099, or 1042) or withholding is required, the City shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law. With respect to any entity from whom a tax identification number, certified tax identification number, or other tax information that is required by law to avoid withholding has not been received by the City, the City at its sole option may withhold the amount required and distribute the balance to such entity or decline to make such distribution until the information is received.

**F.**     **Time Bar to Cash Payments.**

    Checks issued by the City on account of Allowed Claims shall be null and void if not negotiated within 91 days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the City by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check must be made on or before the second anniversary of the Effective Date. After such date, all Claims in respect of voided checks will be discharged and forever barred and the City will retain all moneys related thereto.

**G.**     **No _De Minimis_ Distributions.**

    Notwithstanding any other provision of this Plan, no Cash payment of less than $10 will be made by the City on account of any Allowed Claim.

**H.**     **Distributions of Unclaimed Property.**

    If any distribution to any holder of a Claim is returned to the City or its agent as undeliverable, no further distributions shall be made to such holder unless and until the City is notified in writing of such holder's then-current address. Any unclaimed distributions shall be set aside and maintained by the City. On the first business day after the first anniversary of the Effective Date and after each subsequent anniversary until all Plan distributions are completed, the City shall

post on its official website a list of unclaimed distributions, together with a schedule that identifies

the name and last-known addresses of the holders of any unclaimed distributions. The City shall not

be required to make any further attempt to locate the holders of any unclaimed distributions. Any

distribution under this Plan that remains unclaimed after 120 days following the date of the first

posting on the website may be deemed by the City not to have been made and, together with any

accrued interest or dividends earned thereon, may, at the City's sole discretion, be transferred to and

vest in the City to be used by the City for any purpose. The City shall not be obligated to make any

further distributions on account of any Claim with respect to which an undeliverable distribution was

made or was to be made, and such Claim shall be treated as a Disallowed Claim. Nothing contained

herein shall affect the discharge of the Claim with respect to which such distribution was to be made,

and the holder of such Claim shall be forever barred from enforcing such Claim against the City or

its assets, estate, properties, or interests in property.

**I.       No Distributions on Account of Disputed Claims.**

Notwithstanding anything to the contrary in this Plan, no distributions shall be made on

account of any part of any Disputed Claim until such Claim becomes Allowed (and then only to the

extent so Allowed).  Distributions made after the Effective Date in respect of Claims that were not

Allowed as of the Effective Date (but which later became Allowed) shall be deemed to have been

made as of the Effective Date.

**J.       Certain Claims to be Expunged.**

Any Claim that has been or is hereafter listed in the List of Creditors as contingent,

unliquidated or disputed, and for which no proof of Claim is or has been timely filed, is not

considered to be an Allowed Claim and shall be expunged without further action by the City and

without further notice to any party or any action, approval or order of the Bankruptcy Court.

**K.       No Post-petition Accrual.**

Unless otherwise specifically provided in this Plan, in an executed Plan Document or

otherwise required by order of the Bankruptcy Court, the City will not be required to pay to any

holder of a Claim any interest, penalty, or late charge accrued or accruing with respect to such claim

from the Petition Date through the Confirmation Date.

## X. DISPUTED CLAIMS; OBJECTIONS TO CLAIMS; PROSECUTION OF OBJECTIONS TO DISPUTED CLAIMS

### A. Claims Objection; ADR Procedures; Prosecution of Objections.

The City will have the right to object to the allowance of Claims with respect to which liability or allowance is disputed in whole or in part and to subject any Disputed Claim to the ADR Procedures. The City shall have until the later of (x) 180 days after the Effective Date or (y) 180 days after a Claim was filed or scheduled, to either: (a) file and serve objections to Claims, or (b) give notice to the holder of a Disputed Claim that the City intends to try and resolve allowance of the Claim pursuant to the ADR Procedures (the "180 Day Deadline"). Upon the request of the City, the Bankruptcy Court shall be authorized to extend the 180 Day Deadline. The City anticipates there will be additional Bar Dates for certain Claims classified under this Plan. The ADR Procedures are attached to the Appendix as an Exhibit.

### B. Payments and Distributions with Respect to Disputed Claims.

After the Effective Date has occurred, at such time as a Disputed Claim becomes an Allowed Claim, in whole or in part, the City or its agent will distribute to the holder thereof the distribution(s), if any, to which such holder is then entitled under this Plan. Such distribution(s), if any, will be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order (or such other date as the Claim becomes an Allowed Claim). Unless otherwise specifically provided in this Plan, no interest will be paid on Disputed Claims that later become Allowed Claims.

## XI. EFFECT OF CONFIRMATION

### A. Discharge of the City.

Upon the Effective Date, the City will be discharged from all Debts of the City and Claims against the City as of the Confirmation Date, including without limitation all Pre-Confirmation Date Claims, other than (i) any Debt specifically and expressly excepted from discharge by this Plan or the Confirmation Order, or (ii) any Debt owed to an entity that, before the Confirmation Date, had neither notice, including notice by publication, as applicable, nor actual knowledge of the Bankruptcy Case. The rights afforded in this Plan and the treatment of all holders of Pre-

Confirmation Date Claims, whether such Claims are Impaired or Unimpaired under this Plan, will be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever arising on or before the Confirmation Date, known or unknown, including any interest accrued or expenses incurred thereon from and after the Petition Date, whether against the City or any of its properties, assets, or interests in property. Except as otherwise provided herein, upon the Effective Date, all Pre-Confirmation Date Claims will be and shall be deemed to be satisfied, discharged, and released in full, be they Impaired or Unimpaired under this Plan.

Notwithstanding anything to the contrary in this Section XI.A., the City's obligations under the SBCPF Settlement Agreement may not be discharged pursuant to the claims discharge provisions of the Bankruptcy Code.

**B.** **Release by Holders of Pre-Confirmation Date Claims.**

**AS OF THE EFFECTIVE DATE, IN CONSIDERATION FOR THE OBLIGATIONS OF THE CITY UNDER THE PLAN, EACH HOLDER OF A PRE-CONFIRMATION DATE CLAIM IS DEEMED TO FOREVER RELEASE, WAIVE AND DISCHARGE ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, JUDGMENTS, AND LIABILITIES WHATSOEVER (INCLUDING WITHOUT LIMITATION THE AB 506 PROCESS AND THE ELIGIBILITY CONTEST) AGAINST THE CITY AND THE INDEMNIFIED PARTIES, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW OR AT EQUITY, WHETHER FOR TORT, CONTRACT, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY IN WHOLE OR IN PART TO THE CITY, THE INDEMNIFIED PARTIES AND THEIR ASSETS AND PROPERTY, THE BANKRUPTCY CASE, THE DISCLOSURE STATEMENT, THIS PLAN OR THE SOLICITATION OF VOTES ON THIS PLAN THAT**

1  SUCH HOLDER OF A PRE-CONFIRMATION DATE CLAIM WOULD HAVE BEEN

2  LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY)

3  OR THAT ANY HOLDER OF A CLAIM OR OTHER ENTITY WOULD HAVE BEEN

4  LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF SUCH HOLDER OF A

5  PRE-CONFIRMATION DATE CLAIM (WHETHER DIRECTLY OR DERIVATIVELY);

6  *PROVIDED*, *HOWEVER*, THAT THIS SECTION XI.B. SHALL NOT OPERATE TO

7  WAIVE, DISCHARGE OR RELEASE THE RIGHTS OF HOLDERS OF PRE-

8  CONFIRMATION DATE CLAIMS TO ENFORCE THIS PLAN AND THE CONTRACTS,

9  INSTRUMENTS, RELEASES, AND OTHER AGREEMENTS OR DOCUMENTS

10  DELIVERED UNDER THIS PLAN OR ASSUMED PURSUANT TO THIS PLAN OR

11  ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT.

12      **C.**    **Injunction.**

13      Except as otherwise expressly provided in this Plan, all Entities who have held, hold, or

14  may hold Pre-Confirmation Date Claims shall be permanently enjoined from and after the

15  Confirmation Date, with respect to such Pre-Confirmation Date Claims, from: (i) commencing

16  or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any

17  kind against the City or its property or any or all of the Indemnified Parties or any of their

18  property; (ii) enforcing, levying, attaching, collecting, or recovering by any manner or means

19  any judgment, award, decree, or order against the City or its property or any or all of the

20  Indemnified Parties or any of their property; (iii) creating, perfecting, or enforcing any lien or

21  encumbrance of any kind against the City or its property or any or all of the Indemnified

22  Parties or any of their property; (iv) asserting any right of setoff, subrogation, or recoupment

23  of any kind against any obligation due to the City or any or all of the Indemnified Parties,

24  except as otherwise permitted by Bankruptcy Code section 553; (v) proceeding in any manner

25  in any place whatsoever that does not conform to or comply with the provisions of this Plan or

26  the settlements provided for in this Plan Documents; and (vi) taking any actions to interfere

27  with implementation or consummation of this Plan.

28

**D. Term of Existing Injunctions or Stays.**

All injunctions or stays provided for in the Bankruptcy Case pursuant to Bankruptcy Code sections 105, 362, or 922, or otherwise, and in existence immediately prior to the Confirmation Date, shall remain in full force and effect until the Effective Date; and shall continue in full force and effect after the Effective Date with respect to the ADR Procedures, determination of the City's liability (or lack thereof) on any Pre-Confirmation Date Claim and the allowance or disallowance thereof.

**E. Exculpation.**

Each of the following is an Exculpated Party under this Plan: (i) the City and each of the persons (including their staff) acting in the following capacities during the Bankruptcy Case: Mayor, City Attorney, City Manager, Assistant City Manager, member of the Common Council, and any employee of the City that submitted a declaration in support of any pleading filed by the City in the Bankruptcy Case; (ii) any of the City's financial advisors, attorneys, accountants, investment bankers or advisors, consultants, representatives and other professionals, including but not limited to the following: (A) Management Partners, Inc.; (B) Urban Futures, Inc.; (C) Stradling Yocca Carlson & Rauth, a Professional Corporation; (D) Law Office of Linda L. Daube, A Professional Corporation, and (E) Rust Omni; (iii) the members of the Retiree Committee, (iv) U.S. Bank National Association, in its capacities as indenture trustee; and (v) counsel for the Retiree Committee, Bienert Miller & Katzman, PLC. Except with respect to obligations specifically arising pursuant to or preserved in this Plan, no Exculpated Party shall have or incur, any liability to any person or Entity for any act taken or omitted to be taken in connection with, relating to or arising out of the City's restructuring efforts and the Bankruptcy Case, including the authorization given to file the Bankruptcy Case, the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of this Plan, the solicitation of votes and acceptances for this Plan, the property to be distributed under this Plan, the settlements implemented under this Plan, the Exhibits, the Appendix, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in

connection with the consummation of the transactions set forth in this Plan or the management or operation of the City; *provided, however*, that nothing in this Section XI.E shall be deemed to release or exculpate any Exculpated Party for its willful misconduct or gross negligence. Each Exculpated Party shall be entitled to reasonably rely upon the advice of counsel and financial advisors with respect to its duties and responsibilities under, or in connection with, the Bankruptcy Case, the administration thereof and this Plan.

F.    **Comprehensive Settlement of Claims and Controversies.**

In consideration for the distributions and other benefits provided under this Plan, the provisions of this Plan, including the exculpation and release provisions contained in this Section XI, constitute a good faith compromise and settlement of all Claims, causes of action or controversies relating to the rights that a holder of a Claim may have with respect to any Claim against the City and/or the Indemnified Parties, any distribution to be made pursuant to this Plan on account of any such Claim and any and all Claims or causes of action of any party arising out of or relating to the Eligibility Contest.  The entry of the Confirmation Order constitutes the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that all such compromises and settlements are in the best interests of the City and the holders of Claims, and are fair, equitable, and reasonable.

G.    Limitation on Scope of Release and Injunction Provisions of
**Sections XI.B. and XI.C. With Respect to the Indemnified Parties**

Notwithstanding anything in Sections XI.B. and XI.C. to the contrary, the holders of Litigation Claims against the Indemnified Parties shall be entitled to liquidate their claims in the appropriate court, subject to first attempting to settle the claims through the ADR Procedures, and seek a judgment against the Indemnified Party; except, however, that the enforcement of those judgments, if any, against the Indemnified Parties and their property is enjoined, but this injunction shall not impair (a) the right of the holders of the Litigation Claims to seek recovery against available insurance, if any, or (b) the rights of the Covered Parties to the coverage under the BICEP Agreement.

**H.    Agreements with the United States**

The Confirmation Order shall provide that, notwithstanding any other provision of the Plan or Confirmation Order to the contrary:

(a)    The City's obligations pursuant to its Contracts for Loan Guarantee Assistance Under Section 108 of the Housing and Community Development Act of 1974, as amended, 42 U.S.C. § 5308, with the United States Department of Housing and Urban Development shall remain extant and enforceable and not subject to discharge pursuant to 11 U.S.C. § 944; *provided*, *however*, that the City retains all defenses to the enforceability of such obligations under applicable non-bankruptcy law.

(b)    Nothing in the Plan or Confirmation Order shall adversely affect in any way the rights and remedies of the United States and the State of California under the  consolidated actions styled as *City of San Bernardino v. United States and State of California, on behalf of Department of Toxic Substances Control v. United States*, Civil Action Nos. 96-8867 (MRP), 96-5205 (MRP) - Consolidated (C.D. Cal.), including without limitation, the Consent Decree therein and any amendment thereto ("C.D. Cal. Actions"), nor shall anything in the Plan or the Confirmation Order divest or limit the jurisdiction of the United States District Court for the Central District of California over the C.D. Cal. Actions.  Upon the Effective Date of the Plan, the C.D. Cal. Actions shall survive the bankruptcy case and may be adjudicated and enforced in the United States District Court for the Central District of California, *provided*, *however*, that Bankruptcy Court approval must be obtained for any allowance of an administrative expense.

(c)    As to the United States, its agencies, departments or agents, nothing in the Plan or Confirmation Order shall discharge, release, or otherwise preclude: (1) any liability of the City to the United States, its agencies, departments or agents arising on or after the Effective Date; (2) any liability to the United States, its agencies, departments or agents that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (3) any valid defense of  setoff or recoupment with respect to a Claim of the United States, its agencies, departments or agents; (4) the continued validity of the City's obligations to the United States, its agencies, departments or agents under any grant or cooperative assistance agreement; (5) any liability of any entity under environmental law

1    arising or springing anew after the Effective Date that any entity would be subject to as a post-

2    Effective Date owner or operator of property; or (6) the United States from, subsequent to the

3    Confirmation Date, pursuing any police or regulatory action against the City.

4    **XII.    RETENTION OF AND CONSENT TO JURISDICTION**

5            Following the Effective Date, the Bankruptcy Court shall retain and have exclusive

6    jurisdiction over any matter arising under the Bankruptcy Code and relating to the City, or arising in

7    or related to the Bankruptcy Case or this Plan, including, without limitation:

8            **1.**     to resolve any matters related to the assumption, assumption and assignment,

9    rejection or other disposition of any contract or lease to which the City is a party or with respect to

10   which the City may be liable, and to hear, determine and, if necessary, liquidate any Claims arising

11   therefrom, including with respect to the BICEP Agreement and the Reinsurance Policies;

12           **2.**     to enter such orders as may be necessary or appropriate to implement or

13   consummate the provisions of this Plan, and all other contracts, settlement agreements, instruments,

14   releases, exculpations, and other agreements or documents related to this Plan;

15           **3.**     to determine any and all motions, adversary proceedings, applications, and

16   contested or litigated matters that may be pending on the Effective Date or that, pursuant to this

17   Plan, may be instituted by the City after the Effective Date or that are instituted by any holder of a

18   Claim before or after the Effective Date concerning any matter based upon, arising out of, or relating

19   to the Bankruptcy Case, whether or not such action initially is filed in the Bankruptcy Court or any

20   other court;

21           **4.**     to ensure that distributions to holders of Allowed Claims are accomplished as

22   provided herein;

23           **5.**     to hear and determine any objections to Claims or to proofs of Claim filed,

24   both before and after the Effective Date, including any objections to the classification of any Claim,

25   and to allow, disallow, determine, liquidate, classify, estimate, or establish the priority of or secured

26   or unsecured status of any Claim, in whole or in part;

27           **6.**     to enter and implement such orders as may be appropriate in the event the

28   Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

7.      to issue such orders in aid of execution of this Plan, to the extent authorized by Bankruptcy Code section 1142(b);

8.      to consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

9.      to the extent that the City elects to bring such matters before the Bankruptcy Court, to hear and determine all disputes regarding compensation for City professionals for services rendered and expenses incurred prior to the Effective Date;

10.     to hear and determine all disputes or controversies arising in connection with or relating to this Plan or the Confirmation Order or the interpretation, implementation, or enforcement of this Plan or the Confirmation Order or the extent of any Entity's rights or obligations incurred in connection with, or released, discharged enjoined, or exculpated under, this Plan or the Confirmation Order;

11.     to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with respect to the consummation, implementation or enforcement of this Plan;

12.     to determine any other matters that may arise in connection with or are related to this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release or other agreement or document related to this Plan or the Disclosure Statement (including whether the conditions to confirmation or the effectiveness of this Plan have been met, and any ancillary matters that are necessary or integral to the confirmation or effectiveness of this Plan, such as interpretation of the City Charter).

13.     to hear any other matter for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code;

14.     to hear and determine all disputes or controversies arising in connection with or relating to the terms or enforcement of any relevant agreements related to this Plan and Confirmation Order; and

15.     to enter a final decree closing the Bankruptcy Case.

**XIII.   CONDITIONS PRECEDENT**

      **A.**     **Conditions Precedent to Confirmation.**

      The condition precedent to confirmation of this Plan is the entry of the Confirmation Order in form and substance satisfactory to the City.

      **B.**     **Conditions Precedent to Effective Date.**

      The "effective date of this Plan," as used in Bankruptcy Code section 1129, shall not occur, and this Plan shall be of no force and effect, until the Effective Date.  The occurrence of the Effective Date is subject to the satisfaction (or waiver as set forth in Section XIII.C) of the following conditions precedent:

      **1.**     Confirmation Order.  The Confirmation Order shall have been entered, shall be in full force and effect, and shall be a Final Order (but the requirement that the Confirmation Order be a Final Order may be waived by the City at any time).

      **2.**     Plan Documents.  All agreements and instruments contemplated by, or to be entered into pursuant to, this Plan shall be in form and substance acceptable to the City; shall have been duly and validly executed and delivered, or deemed executed by the parties thereto; and all conditions to their effectiveness shall have been satisfied or waived.

      **3.**     1996 Refunding Bonds Amendment and 1999 Refunding Certificates of Participation Amendment.  All conditions to the effectiveness of the 1996 Refunding Bonds Amendment and the 1999 Refunding Certificates of Participation Amendment have been satisfied or waived in accordance with the terms of such amendments.

      **4.**     Authorizations, Consents, Etc.  The City shall have received any and all authorizations, consents, regulatory approvals, rulings, no-action letters, opinions, and documents that are necessary to implement this Plan and that are required by law, regulation or order.

      **5.**     Timing.  The Effective Date shall occur on the first Business Day after the City determines that all conditions precedent of Section XIII.B. are satisfied or waived.

      **C.**     **Waiver of Conditions to Effective Date.**

      The City may waive in whole or in part any condition to effectiveness of this Plan *provided*, *however*, that the City may only waive the condition to the effectiveness set forth in Section XIII.B.3

1    with the express prior written consent of National, the 1996 Refunding Bonds Trustee, and the 1999

2    Refunding Certificates of Participation Trustee, which consents shall not be unreasonably withheld.

3    Any such waiver of a condition may be effected at any time, without notice or leave or order of the

4    Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver

5    with the Bankruptcy Court.

6          **D.**     **Effect of Failure of Conditions.**

7          In the event that the conditions to effectiveness of this Plan have not been timely satisfied or

8    waived, and upon notification submitted by the City to the Bankruptcy Court, (i) the Confirmation

9    Order shall be vacated, (ii) no distributions under this Plan shall be made, (iii) the City and all

10   holders of Claims shall be restored to the status quo ante as of the day immediately preceding the

11   Confirmation Date as though the Confirmation Date never occurred, and (iv) all of the City's

12   obligations with respect to the Claims shall remain unchanged and nothing contained herein shall be

13   deemed to constitute a waiver or release of any claims by or against the City or any other entity or to

14   prejudice in any manner the rights, remedies, or claims of the City or any entity in any further

15   proceedings involving the City.

16         **E.**     **No Admission of Liability.**

17         This Plan constitutes a settlement and compromise between and among the City and various

18   parties.  This Plan shall not be deemed an admission or concession by any party with respect to any

19   factual or legal contention, right, defense, or position taken by the City.

20   **XIV.**   **MISCELLANEOUS PROVISIONS**

21         **A.**     **Modification of Plan.**

22         The City reserves the right to modify this Plan both before and after confirmation of this Plan

23   as permitted by Bankruptcy Code Section 1127(d) and the other applicable provisions of the

24   Bankruptcy Code and Bankruptcy Rules.

25         **B.**     **Dissolution of the Retiree Committee.**

26         On the Effective Date, the Retiree Committee shall be released and discharged of and from

27   all further authority, duties, responsibilities, and obligations relating to and arising from and in

28

connection with the Bankruptcy Case, and the Retiree Committee shall be deemed dissolved and its appointment terminated.

**C.    Severability.**

If after entry of the Confirmation Order, any term or provision of this Plan is held by any court having jurisdiction, including on appeal, to be invalid, void, or unenforceable, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding as long as the economic and legal substance of the Claims treatment and other transactions that this Plan contemplates are not affected in any manner materially adverse to the City.  At the election of and with the consent of the City, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been subsequently altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**D.    Governing Law.**

Except where the Bankruptcy Code or other federal law applies, or where an Exhibit to the Appendix or Plan Document provides otherwise, the rights, duties, and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of California, without giving effect to principles of conflicts of laws.

**E.    Effectuating Documents and Further Transactions.**

The City is authorized (and its appropriate officers and employees are authorized and directed) to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms, provisions and intent of this Plan.

**F.**     **Request for Waiver of Automatic Stay of Confirmation Order.**

This Plan shall serve as a motion seeking a waiver of the automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e).  Any objection to this request for waiver shall be Filed and served on or before the Objection Deadline.

**G.**     **Notice of Effective Date.**

On or before 14 days after occurrence of the Effective Date, the City or its agent shall mail or cause to be mailed to all holders of Claims the Notice of the Effective Date, which will inform such holders of:  (i) entry of the Confirmation Order; (ii) the occurrence of the Effective Date; (iii) the assumption and rejection of the City's executory contracts and unexpired leases pursuant to this Plan, as well as the deadline for the filing of Claims arising from such rejection; (iv) the deadline established under this Plan for the filing of Administrative Claims; (v) the procedures for changing an address of record pursuant to Section IX; and (vi) such other matters as the City deems to be appropriate.

DATED:  July 29, 2016                    CITY OF SAN BERNARDINO, CALIFORNIA


                                          By:   /s/ Mark Scott
                                                Mark Scott
                                                City Manager



Submitted By:
STRADLING YOCCA CARLSON &
RAUTH, P.C.

By: /s/ Paul R. Glassman
       Paul R. Glassman
       Fred Neufeld
       Marianne S. Mortimer
       Kathleen D. DeVaney

Attorneys for the City of San Bernardino

# Exhibit B

## Pending Lawsuits in which Claims against Indemnified Parties Have Been Asserted

(Please review the "Order Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California (July 29, 2016), as Modified" to which this Exhibit B is attached, and in particular paragraphs 24.1 through 24.4.3. of such order.)

| | COURT* | CASE NUMBER |
|---|---|---|
| Advance Healing Qualified Patients Association v. City of Highland, City of San Bernardino | State | CIVDS1304894 |
| Jessica Alexander, Grace Chapel Of San Bernardino, Operation Grace v. Michael W McKinney, MICA PR, Inc, City of San Bernardino, R. Carey Davis, Mark Persico, Allen Parker | State | CIVDS1510158 |
| J. A. through Guardian Ad Litem Keyondra Marshall, Sherry Watson, individually and as Representative of the Estate of Jarriel Dashawn Allen, and Jerry Allen v. City of San Bernardino, Officer Adam Affrunti, and Officer Chris Gray | Federal | 5:09-cv-01388-JLQ-JC |
| Edward Andrade v. City of San Bernardino | State | CIVDS1511329 |
| Jonathan Aragon, P.A. by and through Guardian Ad Litem v. City of San Bernardino Police Department | State | CIVDS1206481 |
| Gustavo Arzola, Yesenia Rosales, FC by and through her Guardian Ad Litem Yesenia Rosales, AC by and through her Guardian Ad Litem, RA by and through his Guardian Ad Litem, ALC by and through her Guardian Ad Litem Yesenia Rosales v. City of San Bernardino, Officer G. Walout, Officer Ahmed | Federal | 5:15-cv-02370-PA-KK |
| Monica Ballard, De'Sean Larkins, and Albert Dickson v. City of San Bernardino, San Bernardino Police Department, Marc Alvarez | Federal | 2:10-cv-02769-DMG-AJW |
| Bank of America, N.A. v. Duane M. Magee, Sr., Velda L. Magee, The Redevelopment Agency of the City of San Bernardino, City of San Bernardino, First American Title Insurance Company, Rosalind A Joseph, City of San Bernardino As Successor Agency | State | CIVDS1504173 |
| Bank of New York Mellon FKA the Bank of New York v. Lidia Gutierrez, City of San Bernardino | State | CIVDS1604507 |
| Javier Banuelos v. City of San Bernardino, County of San Bernardino, Chief of Police Keith Kilmer, Officer S. Aguilar, Officer G. Prinz, Officer S. Bonshire | Federal | 5:13-cv-00736-GW-DTB |
| Rajiv Barse, Anjali Barse and Sanjiv Barse v. City of San Bernardino | State | 2:13-cv-05687-BRO-VBK |
| Hector Briones and Roseland Harding v. City of San Bernardino, San Bernardino Police Department, San Bernardino City Chief of Police Keith L. Kilmer, Adam Affrunti, State of California, California Highway Patrol | Federal | 2:10-cv-07571-CBM-OP |
| Daniel Brown v. San Bernardino Police Department, and Officer Gutierrez, and Officer N Lindsay | Federal | 5:13-cv-01376-JLS-JC |
| Erik A Brown v. City of San Bernardino, Officer A Castro, Officer A Stewart | Federal | 2:12-cv-02300-RGK-OP |
| Arcadio Bucio, Guadalupe Garfias v. City of San Bernardino, Angelica Ordonez | State | CIVDS1114571 |

\* in the column for "Court" unless specified otherwise:

"Federal" means the United States District Court for the Central District of California

"State" means the Superior Court for the County of San Bernardino

## Pending Lawsuits in which Claims against Indemnified Parties Have Been Asserted

(Please review the "Order Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California (July 29, 2016), as Modified" to which this Exhibit B is attached, and in particular paragraphs 24.1 through 24.4.3. of such order.)

| | COURT* | CASE NUMBER |
|---|---|---|
| Sandee Bush v. City of San Bernardino | State | CIVDS1209194 |
| Jermaine Bush, and Bush's Towing  v. Officer M Block, Seargent Cokesh, Seargent S Lyter, and Jane or John Doe | Federal | 5:13-cv-01795-DDP-JC |
| Jesus Castaneda v. City of San Bernardino, Jarrod Burguan, R Wicks, Prinz, Dillon, Olvera, Ahmed, Harris, and Jarrod Burguan | Federal | 5:15-cv-00910-VAP-KK |
| Dillon Clark v. San Bernardino Chamber of Commerce, John Coute, City of San Bernardino Parks & Recreation | State | CIVDS1601383 |
| Linda Cornwall, San Bernardino City Unified School District v. Skanska-Rados, Steve P. Rados, Inc, City of San Bernardino, County of San Bernardino, San Bernardino Associated Governments, California Department of Transporation | State | CIVDS1312628 |
| Corey Day v. City of San Bernardino, San Bernardino Police Department, and Officer Jason Betts | Federal | 5:13-cv-00362-JGB-SP |
| Jennifer DeVore v.  City of San Bernardino, Arturo Reyna | State | CIVDS1602073 |
| Maria Duran v. City of San Bernardino, Timothy Strutton | State | CIVDS1406337 |
| Rosemary Easley, David W. Easley, Susan M Stewart, John C. Easley, Patricia A. Rhodes v. City of San Bernardino, Felix Emilio Salazar, Elizabeth Galindo Salazar, Stephen Easley | State | CIVDS1515304 |
| Edwards, James v. San Bernardino Police Officer Erik Campos | State | CIVDS1112593 |
| Nykisha Ellsion, Jacqueline York, Valen Edwards v. City of San Bernardino, San Bernardino Police Department, Officer Serbando Saenz, Officer Roy Diaz, Chief Mike Billdt | State | CIVDS1005001 |
| E.M.W.,  a minor, through Guardian Ad Litem Angelica Martinez and A.W.M., a minor, through Guardian Ad Litem Angelica Martinez v. City of San Bernardino, Officer Jose Loera | State | CIVDS1110870 |
| Ford Wholesale Company, Inc., Mitchell Thomas v. County of San Bernardino, San Bernardino County Flood Control District, City of San Bernardino, City of Riverside as a Cross-Defendant | State | CIVDS1109321 |
| Joseph Frazier  v. City of San Bernardino | State | CIVDS1409882 |
| Amery Gaspard and Yvonne Hrindich  v. DEA Task Force, Chuck Rosenburg, and County of San Bernardino | Federal | 5:15-cv-01802-BRO-KES |
| William Gibson v. City of Highland, County of San Bernardino, City of San Bernardino | State | CIVDS1517420 |
| Justin Ryan Golding v. City of San Bernardino, City of Riverside, Norstar Plumbing and Engineering Inc., and West Colony Community Association, Cross-Complainant Landmark American Insurance Company | State | CIVSS700791 |
| Francisca Zina Gomez v. City of San Bernardino Municipal Water Department, Kelley Caldera, Jorge Castillo, Janice Reins, Robin Ohama | State | CIVDS1400951 |
| Laura Guarino v. City of San Bernardino | State | CIVDS905017 |

* in the column for "Court" unless specified otherwise:
"Federal" means the United States District Court for the Central District of California
"State" means the Superior Court for the County of San Bernardino

## Pending Lawsuits in which Claims against Indemnified Parties Have Been Asserted

(Please review the "Order Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California (July 29, 2016), as Modified" to which this Exhibit B is attached, and in particular paragraphs 24.1 through 24.4.3. of such order.)

| | COURT* | CASE NUMBER |
|---|---|---|
| O.G. and J.G., through Guardian Ad Litem, Beatriz A. Guzman v. Public Safety Academy, Michael Dickinson, Steve Filson, Kathy Toy, Laura Reddix, San Bernardino City Unified School District, City of San Bernardino; Southern Insurance Company | State | CIVDS1102174 (which has been consolidated with CIVDS1015386) |
| Andrew Hayden v. Donald Charles Sawyer, San Bernardino Police Department, City of San Bernardino | State | CIVDS1412409 |
| Gaspar Gonzalez Hernandez v. City of San Bernardino, Steven Aguirre Aranda | State | CIVDS1411827 |
| Alejandro Holguin, Christina Vasquez v. Scott Washburn, City of San Bernardino | State | CIVDS1200190 |
| Jerry Holloway v. City of San Bernardino | State | CIVDS1305842 |
| Rosa House v. California Department of Transportation, The People of the State of California, Skanska, City of San Bernardino, County of San Bernardino, Caltrans, Skansa USA Civil West California District, San Bernardino Associated Governments, Skanska-Rados, Department of Transportation, The People of the State of California | State | CIVDS1204063 |
| State Farm Mutual Automobile Insurance, Ensley Willis Howell v. Gabriel Garcia, City of San Bernardino | State | CIVDS1105727 |
| Interinsurance Exchange of the Automobile Club (Severa Woods) v. City of San Bernardino | State | CIVDS1602450 |
| Katie Irvin v. Casa Ramona Academy, San Bernardino City Unified School District, City of San Bernardino | State | CIVDS1201930 |
| Adrian Jimenez v. City of San Bernardino, San Bernardino Police Department, and Clayton Zeigler | Federal | 5:13-cv-01874-DMG-SP |
| Francisco Yovani Sanchez Joaquin v. City of San Bernardino, Langsdon Canright, M. Flint | Federal | 2:10-cv-07138-CAS-RC |
| Asinia Johnson v. County of San Bernardino, City of San Bernardino | State | CIVDS1600272 |
| Larry Judge v. County of San Bernardino, City of San Bernardino, Officer Macias | State | CIVDS1403453 |
| Melissa Kelley v. John Plasencia, City of San Bernardino | State | CIVDS1209109 |
| Korey A. King v. San Bernardino Police Officers, City of San Bernardino, M. Siems, and Dimala | Federal | 5:16-cv-02249-AG-E |
| Tina Marie Leyva v. San Bernardino Municipal Water Department, Mark Anthony Chavarria | State | CIVDS1600711 |
| Carmen Lopez v. City of San Bernardino, Officer D Han, Officer O. Warren, A. Quiroz | State | CIVDS1507527 |
| LYU Development v. City of San Bernardino, Department of Code Enforcement | State | CIVDS1511003 |
| Maria Macias, Michael Macias v. City of San Bernardino, Charles Michael Vest | State | CIVDS1605768 |

* in the column for "Court" unless specified otherwise:

"Federal" means the United States District Court for the Central District of California

"State" means the Superior Court for the County of San Bernardino

**Pending Lawsuits in which Claims against Indemnified Parties Have Been Asserted**

(Please review the "Order Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California (July 29, 2016), as Modified" to which this Exhibit B is attached, and in particular paragraphs 24.1 through 24.4.3. of such order.)

|  | COURT* | CASE NUMBER |
|---|---|---|
| Michael Ray Madrigal, Robert Martin Madrigal, Alice Madrigal, and Darlene Madrigal-Campa  v. City of San Bernardino, Sharon Bonshire, John Cardillo, Janie Cozine, and Erik Campos | Federal | 2:12-cv-03286-MWF-OP |
| Terrell Markham, Sonja Edwards, and Terry Markham v. City of San Bernardino and Officer Adam Affrunti | Federal | 2:09-cv-08455-ODW-DTB |
| Lisa Matus, Rachel Matus, Raymond Matus, Lisa Marie Matus, Richard Matus v. City of San Bernardino, San Bernardino Police Department | State | CIVDS1201235 |
| May, Sr., Cedric, Brenda Standifer, S.D.M. and S.J.M., minors by and through their Guardian Ad Litem Sasha Graves, Maurice Jennings, Anthony Jennings, and Jashanda Sandifer v. City of San Bernardino, Officer Joseph Aguilar, Officer Jose Vasquez, Officer Byron Clark, Officer Langston Canright, Officer Melissa Flint, and Sergeant James Beach | Federal | 5:10-cv-00978-VAP-DTB |
| Antal Medina v. Spriggs, Harris, Johnson, and John Doe | Federal | 5:16-cv-01123-R-JC |
| Mejia, Maria D., Salvador Melgoza, and Ma. Guadalupe Melgoza v. City of San Bernardino, Officer Brad Grantz; Officer Kenneth Edwards; Officer Troy Forsythe; Officer Christopher Emon; Officer Carlos Gutierrez; Sgt. Dave Dillon; Sgt. Ray Rocha; Sgt. Stephen Lyter; and Chief Keith Kilmer | Federal | 5:11-cv-00452-VAP-DTB |
| Richard Melson Jr. v. Tanner Atkinson, City of San Bernardino | State | CIVDS1504395 |
| Mercury Insurance Company v. City of San Bernardino | State | CIVDS1504846 |
| Jose Mora, Roberta Mora, Julio Mora, Kathy Mora, Warren Shaun Barclay, Sandra Barclay, v. City of Highland, East Valley Water District, City of San Bernardino, County of San Bernardino cross-defendants are San Bernardino County Flood Control District, San Bernardino Valley Municipal Water District, First American Title Insurance Company | State | CIVDS1114384 |
| Arnold Morales, M.M. v. City of San Bernardino Municipal Water Department | State | CIVDS1313050 |
| Patricia Murray, J. M., C. M., M. M. I., V.M., H.M., and M.M., II v. City of San Bernardino, County of San Bernardino, San Bernardino Police Department, and San Bernardino County Sheriff's Department | Federal | 5:13-cv-00276-TJH-DTB |
| Sheryl Jackson and Kelvin Nash v. City of San Bernardino, Officer Robert Bellamy, Officer Ronel Newton, Sergeant Dan Gomez, Officer Lanier Rogers, Officer Clint Walton, Officer Erick Martin, Officer Brett Murphy, Officer Shaun Sandoval, Officer Robert Hernandez, and Chief Keith Kilmer | Federal | 2:09-cv-08671-RGK-FFM |
| Jeffery Newton, I.V.N., a minor, v. Par Electrical Contractors, Inc., Southern California Edison Company, City of San Bernardino, W.A. Rasic Construction Company, Inc. | State | CIVDS1508532 |
| Joe Ortiz, Sr, Joe Andrew Ortiz, S. M. O, C.D.O., Nancy Ortiz, I.H., J.O., J. P. O., N. O., and Estate of Joe Ortiz, Jr.v. City of San Bernardino and Dominick Martinez | Federal | 5:16-cv-02291-JGB-KK |
| Kiritkumar R. Patel, Purnima K. Patel v. Mark Scott, City of San Bernardino | State | CIVDS1609316 |

* in the column for "Court" unless specified otherwise:

"Federal" means the United States District Court for the Central District of California

"State" means the Superior Court for the County of San Bernardino

## Pending Lawsuits in which Claims against Indemnified Parties Have Been Asserted

(Please review the "Order Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California (July 29, 2016), as Modified" to which this Exhibit B is attached, and in particular paragraphs 24.1 through 24.4.3. of such order.)

| | COURT* | CASE NUMBER |
|---|---|---|
| People of the State of California by and through the City Attorney for the City of San Bernardino, and City of San Bernardino v. Quantum Patient Center, Blake Ambartsumyan, Shannon Peters, Edna Fria, Mayra Lopez | State | CIVDS1600059 |
| Placo San Bernardino, LLC v. City of San Bernardino, City of San Bernardino Economic Development Agency, Panattoni Development Company, Inc. | State | BC468955 |
| Jermeisha C. Porter v. City of San Bernardino, W. Outlaw | State | CIVDS1102116 |
| Rogelio G Quiroga v. J Betts | Federal | 5:11-cv-02029-VAP-DTB |
| Carlos Ramirez v. County of San Bernardino, Michael E Siems, Officer Martin, and City of San Bernardino | Federal | 5:15-cv-01015-FMO-PLA |
| Quibillah J Rasheed and Shaunisha Holliday v. City of San Bernardino and Devon Reid | Federal | 5:14-cv-00586-DMG-MRW |
| Renter, Rovinski v. City of San Bernardino, Officer Dave Green | Federal | 2:11-cv-07222-GAF-CW |
| M.A.R., by and through his Guardian Ad Litem Christy Luna v. City of San Bernardino, Michael Bildt, Sergeant R. Topping, Officer Chris Gray, Officer J. Simpson, and Officer C. Dai | State | CIVDS1009578 |
| Maria De Lourdes Reyes, Israel Ruiz, Diana Richardson, Jessica Laurie, Randall Watson, Joshua Laurie, Adam Laurie, Jacob Laurie v. County of San Bernardino, County of San Bernardino Flood Control, City of San Bernardino, Los Angeles County Metropolitan Transportation, SanBAG, San Bernardino County Flood Control District, Southern California Regional Rail Authority | State | CIVDS1503543 |
| Russell Eric Robertson v. City of San Bernardino, Officers of the City of San Bernardino Police Department, Sergeant D Green, and Officer D Acosta | Federal | 5:12-cv-01626-RGK-DTB |
| Billy Ray Robinson v. San Bernardino Police Dept, Clark, and Plummer | Federal | 5:11-cv-01205-RGK-AGR |
| Jennifer Robles, A.R., J.R., M.R.,  v. City of San Bernardino, San Bernardino Police Department | State | CIVDS1400540 |
| Consuelo Rodriguez v. City of San Bernardino, Joseph Valdivia | State | CIVDS1502652 |
| Kandy Roe  v. City of San Bernardino, City of San Bernardino City Attorney's Office, City of San Bernardino Code Compliance | State | CIVDS1516961 |
| Karmel Roe, Trustee for the Karmel F. Roe Trust v. City of San Bernardino, City of San Bernardino Code Enforcement Division - aka Community Policing Specialists, CPS Officer Michelle Neville, San Bernardino City Attorney's Office, City Hearing Officer Leland P. McElhaney | State | CIVDS1514187 |
| Mekione Samatua, Faena Forsythe, Pepesima Tofili, Violeta Aga v. City of San Bernardino | State | CIVDS917832 |
| Guadalupe Sanchez, Joseph Bennett v. County of San Bernardino, All American Asphault, City of San Bernardino | State | CIVDS1415691 |

* in the column for "Court" unless specified otherwise:

"Federal" means the United States District Court for the Central District of California

"State" means the Superior Court for the County of San Bernardino

**Pending Lawsuits in which Claims against Indemnified Parties Have Been Asserted**

(Please review the "Order Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California (July 29, 2016), as Modified" to which this Exhibit B is attached, and in particular paragraphs 24.1 through 24.4.3. of such order.)

|  | COURT* | CASE NUMBER |
|---|---|---|
| Sharkey, Matthew, Kathleen Cryder, Timothy Williamson, Joshua Gutierrez v. Public Safety Academy, Michael Dickinson, Steve Filson, Kathy Toy, Laura Reddix, San Bernardino City Unified School District, City of San Bernardino | State | CIVDS1015386 (which has been consolidated with CIVDS1102174) |
| John T. Shepherd, Barbara N. Jenkins, Title Acquisition Company I, LLC v. BAC Home Loan Servicing LP, Reconstrust Company NA, City of San Bernardino, Joyce Patel, JP Realty, San Bernardino Police Department, Bank of America, N.A. | State | CIVDS1208969 |
| James Darryl Sheppard v. Carisma Owens, City of San Bernardino, County of San Bernardino | State | CIVDS1517429 |
| Kristopher Dominiq Sheridan v. James Beach | Federal | 5:13-cv-01756-ODW-MRW |
| Donald Sipple, John Simon, Karl Simonsen, Christopher Jacobs, New Cingular Wireless PCS LLC v. City of Alameda, City of San Bernardino, et al. | Los Angeles County Superior | BC462270 |
| Carlos Rene Solis v. Douglas Height, Officer Neritoe, Douglas Heath, and Ronel Newton | Federal | 5:12-cv-00736-JLS-MLG |
| State Farm Mutual Automobile Insurance Company v. City of San Bernardino, Jacob Lee Adams | State | CIVDS1404809 |
| Altheia Taylor v. City of San Bernardino and S Casarez | Federal | 5:09-cv-00240-MMM-MAN |
| Virgil L Taylor v. Brad Lawrence, Gerald Beall, Bennett, White, Everett, Detective Vicki Cervantes, and Brenda Shaw | Federal | 5:09-cv-01656-CJC-MRW |
| The Inland Oversight Committee, Creed-21, Highland Hills Homeowners Association v. City of San Bernardino, Real Party In Interest First American Title Insurance Company | State | CIVDS1509296 |
| Frances Thomas v. City of San Bernardino | State | CIVDS1109403 |
| Lori Tillery v. City of San Bernardino | State | CIVDS1306172 |
| Paul Triplett v. Cityof San Bernardino, Michael A. Billdt, Christopher Grey, Jason King | Federal | 2:08-cv-07257-MWF-AJW |
| Sandra Uhrig v. Dave Carlson, City of San Bernardino | State | CIVDS1410793 |
| Tiffany Valdez, Candy Rojas, Whitney Little v. Roberto Retamoza, City of San Bernardino, County of San Bernardino | State | CIVDS1407514 |
| Gilbert Daniel Vallejo v. San Bernardino Police Department | State | CIVDS1207323 |
| Tatiana Vargas-Roman v. City of San Bernardino, Joseph Beers, Richard Lee Hale, Joseph Beels | State | CIVDS1104423 |
| Bobbie Vasquez, Sally Campos Bobadilla, Ramona Padilla v. Willie Mason Jr., City of San Bernardino | State | CIVDS1208006 |
| Benito Villesca v. San Bernardino Police Department, City of San Bernardino, Arrowhead Regional Medical Center, County of San Bernardino | State | CIVDS1203211 |
| Wade, Michael v. City of San Bernardino, Adam Affrunti | Federal | 2:11-cv-09831-GHK-SP |

* in the column for "Court" unless specified otherwise:

"Federal" means the United States District Court for the Central District of California

"State" means the Superior Court for the County of San Bernardino

## Pending Lawsuits in which Claims against Indemnified Parties Have Been Asserted

(Please review the "Order Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California (July 29, 2016), as Modified" to which this Exhibit B is attached, and in particular paragraphs 24.1 through 24.4.3. of such order.)

| | COURT* | CASE NUMBER |
|---|---|---|
| Wang, Roger H., Vivine Wang v. Wal-Mart Real Estate Business Trust, Wal-Mart Stores, Inc., LSA Associates, Inc., Hall & Foreman, Inc., Harold Garcelon, City of San Bernardino, California Department of Transportation, The People of the State Of California | State | SCVSS129158 |
| Valander Williams v. City of San Bernardino | State | CIVDS1310729 |
| Latricia Woods, A.G. v. City of San Bernardino, City of San Bernardino Police Department | State | CIVDS1212419 |
| Sheila Woods v. Sunset Ridge Apartments, LLC, City of San Bernardino, County of San Bernardino | State | CIVDS1212446 |
| James Wrysinski, Paula Robbins v. Carlos Vargas Meza, City of San Bernardino | State | CIVDS1311254 |
| X.J.G., a minor by and through his Guardian Ad Litem, Angelina Sanchez, C.A., a minor by and through his Guardian Ad Litem, Rosaisela Avalos, Brunilda Gonzalez, Angelina Cesar, Xochilt Gutierrez and Sasha Gonzalez v. City of San Bernardino, Police Chief Robert Handy, Kenny Kiecolt, and Anthony Castro | Federal | 5:13-cv-02286-DSF-SP |
| Jose Zamora, Ana Maria Herrera, Cesar Castro, Jorge Nava, Concepcion Garriodo v. 9 Unidentified San Bernardino City Police Officers | State | CIVDS1513869 |

* in the column for "Court" unless specified otherwise:

"Federal" means the United States District Court for the Central District of California

"State" means the Superior Court for the County of San Bernardino

## Pre-Confirmation Date claims against Indemnified Parties as to which the City has received notice but no lawsuit has yet been filed

(Please review the "Order Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California (July 29, 2016), as Modified" to which this Exhibit B is attached, and in particular paragraphs 24.1 through 24.4.3. of such order.)

| |
|---|
| 21ST CENTURY INSURANCE AS SUBROGEE OF SENANAYAKE, SHAYANI |
| AFNI, INC., AS BENEFICIARY OF AAA (AUTOMOBILE ASSOCIATION OF AMERICA) AS SUBROGEE OF FIGEROID |
| AFNI, INC., AS SUBROGEE OF RAYMOND MACIAS |
| ALLIANCE UNITED INSURANCE, AS SUBROGEE OF LORENA GUTIERREZ |
| ALLSTATE INSURANCE, AS SUBROGEE OF RAYMOND VARGAS |
| ALLSTATE INSURANCE, AS SUBROGEE OF S. PEREYRA |
| ALVARADO, ALEX |
| ALVAREZ, RUBEN |
| AMERICAN AUTOMOBILE ASSOCIATION, AS SUBROGEE OF ANDRES TREVINO |
| AMERICAN AUTOMOBILE ASSOCIATION, AS SUBROGEE OF SAMUEL THOMAN |
| AMES, ROBERT |
| ANIMAL CONTROL |
| ANTUNEZ, HERNAN |
| ARIAS, FRANK |
| ARZOLA, RAYLINE |
| AT&T INC. |
| AUTOMOBILE ASSOCIATION OF AMERICA AS SUBROGEE OF AMANDA & TREVOR LUJAN |
| BALL, VICKIE |
| Y.B., GUARDIAN VERONICA CONTRERAS |
| BARRETT BUSINESS SERVICES INC |
| BARRY, SCOTT |
| BATTS, CHARLES |
| BAUER, KRISTIN |
| BELINSKI, PAUL |
| BISHOYI, PRABIN |
| BOLDS, DORA |
| BRADFORD, QUAMA |
| BRIGGS, TANYA |
| BROWN, CAPRICE |
| BRYAN, FELICIA |
| BURRTEC WASTE INDUSTRIES |
| CALIFORNIA ACCESS SCAFFOLD |
| CASTRO, CEASAR |
| CHAVEZ, MELISSA |
| CISNEROS, ELEANOR |
| CISNEROS, JENNIFER |
| CISNEROS, KRISTEN |
| COBB, ESTATE OF WILLIAM |
| COLE, DONNIE |
| COLEMAN, ARTHUR |

**Pre-Confirmation Date claims against Indemnified Parties as to
which the City has received notice but no lawsuit has yet been filed**

(Please review the "Order Confirming Third Amended Plan for the Adjustment of Debts of the City of
San Bernardino, California (July 29, 2016), as Modified" to which this Exhibit B is attached, and in
particular paragraphs 24.1 through 24.4.3. of such order.)

| |
|---|
| COMPARAN, ISRAEL |
| CONTRERAS, ALEXA |
| CONTRERAS, APRIL |
| CONTRERAS, FROYLAN |
| CONTRERAS, VERONICA |
| COOKS, LATISHA |
| CRUMSEY, CLAUDETTE |
| CRUZ, FELIX RENTERIA |
| DAVIS, DEBBIE |
| DE LA ROSA, JUNE |
| DETT, PAULA |
| DOE, JANE |
| DOMINGUEZ, EMILIO |
| EISMANN, ELBA |
| ELIZALDE, JUAN |
| EPPS, DIANNA |
| ESHMON, DAMONTE |
| FAST FORWARD CONCRETE CUTTING INC |
| FELDER, ARTHUR |
| FIGEROID, KRISTEN |
| FLORES, JESUS |
| FONTES, ART |
| FRANK & KIT'S GARAGE |
| FRANKLIN, MICHAEL |
| FRANKLIN, PAT |
| FRAZIER, JOSEPH |
| FREEMAN, LA TONYA |
| FRONTIER |
| FUENTES, SAMMY |
| FULLER, CECIL |
| GARCIA, ABIGAIL |
| GARCIA, GABRIEL |
| GARRETT, JOSEPH |
| GARRIOLO, CONCEPCION |
| GASTELUM, BRIAN |
| GOMEZ, STEPHANIE |
| GONZALES, FRANCISCO |
| GONZALEZ, KARINA |
| GOODMAN, VALERIE |
| GREEN, ARCHIE |

**Pre-Confirmation Date claims against Indemnified Parties as to which the City has received notice but no lawsuit has yet been filed**

(Please review the "Order Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California (July 29, 2016), as Modified" to which this Exhibit B is attached, and in particular paragraphs 24.1 through 24.4.3. of such order.)

| |
|---|
| GREGGS, CHARISSE |
| GUZMAN, MARIA |
| HALL, JAMES |
| HALL, STARLEA |
| HARDEN, JIM |
| HERNANDEZ, ELIA |
| HERNANDEZ, JULIAN |
| HERNANDEZ, MARIELENA |
| HERNANDEZ, RICARDO |
| HERNANDEZ-GONZALEZ, GASPER |
| HERRERA, ANA MARIA |
| HILLBURGER, TARALYNN |
| HISPANO INVESTORS, INC |
| HOOKS, ADREANNA |
| HORACE MANN INSURANCE, AS SUBROGEE OF SUSAN JINOJOSA |
| HOT LINE CONSTRUCTION, INC |
| HOWARD, KEVIN |
| HOWARD, TILLY |
| HOWARD, VAN |
| HUANG, SHI XIONG |
| HURTADO, CHRISTIAN |
| INFINITY INSURANCE AS SUBROGEE OF FRANCISCA SEAY |
| INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB, AS SUBROGEE OF OTILIA AGUILAR |
| INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB, AS SUBROGEE OF RICO ENRIQUEZ |
| INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB, AS SUBROGEE OF SEVERA WOODS |
| ISHINO, TRACY |
| IUHAS, FLORIN |
| J.A, A MINOR |
| JACKSON, CASEY |
| JARRETT, CODY |
| JAVREGUI, FIDEL |
| JIMENEZ, JESUS |
| JOSPH, BETTY |
| KILPRATRICK, EDWARD |
| LAMAR, SAMUEL |
| LAMBERT, KATHARINA |
| LANDEROS, RUTH |
| LAWSON, JAMES |

### Pre-Confirmation Date claims against Indemnified Parties as to which the City has received notice but no lawsuit has yet been filed

(Please review the "Order Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California (July 29, 2016), as Modified" to which this Exhibit B is attached, and in particular paragraphs 24.1 through 24.4.3. of such order.)

| |
|---|
| LEETH, CANDRA |
| LEETH, SAUL |
| LERMA, EDITH |
| LEYVA, TINA |
| LLAMAS, LORENA |
| LOMA LINDA UNIVERSITY MEDICAL CENTER, AS SUBROGEE OF ROBERT HENDERSON |
| LORD, ERIC |
| N.L., GUARDIAN VERONICA CONTRERAS |
| MACIAS, MARIA |
| MACIAS, MICHAEL |
| MADDOX, DENISE |
| MAHARAJ, SANJAY |
| MANSFIELD, FRANK |
| MAPFRE INSURANCE AS SUBROGEE OF JESSICA LOMELI |
| MARTINEZ, JOEL |
| MARTINEZ, JOHN |
| MAYFIELD, TERESA |
| MCPPHERSON, DEBBIE |
| MEDICAL CENTER CONVALESCENT HOSPITAL |
| MEDINA, ANTAL |
| MERCURY INS,  AS SUBROGEE OF REGINA JUAREZ |
| MERCURY INS, AS SUBROGEE OF CATHERINE MUNOZ |
| MERCURY INS, AS SUBROGEE OF IKEEN THOMAS |
| MEZA-ROSALES, CHRISTIAN |
| MIRNADA, LEONARDO |
| MITCHELL, THOMAS |
| MORGAN, LYNN |
| MUNOZ, JOSE |
| NATIONAL GENERAL INSURANCE,  AS SUBROGEE OF CONSUELO RODRIGUEZ |
| NATIONAL GENERAL INSURANCE,  AS SUBROGEE OF JOHN UHRIG |
| NATIONWIDE INSURANCE,  AS SUBROGEE OF BARRY, SCOTT |
| NAVA, JORGE |
| NELSON, JAMES |
| NGO, JEN |
| NGO, SUU |
| NUNEZ, CAMERON |
| NUNEZ, RANDY |
| PARKER, GREG |
| PEREZ, PAULA |
| PEWS, JR., JESSE |

### Pre-Confirmation Date claims against Indemnified Parties as to which the City has received notice but no lawsuit has yet been filed

(Please review the "Order Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California (July 29, 2016), as Modified" to which this Exhibit B is attached, and in particular paragraphs 24.1 through 24.4.3. of such order.)

| |
|---|
| PHAM, HONG THI VIET |
| PITTS, BEVERLY |
| POWELL, MICHAEL |
| PRINCE, TIMOTHY |
| PUGA, RUTH |
| QUERSHI, RASHID/CAL SIERRA PR |
| RAMIREZ, EVA SAN RAMON |
| RAMIREZ, JUAN |
| RAMIREZ, LUIS |
| RAMOS, NOE |
| REPUBLIC SERVICES |
| RIBERA, ELEANOR |
| RILEY, DAMION |
| ROBBINS, PAULA |
| ROBINSON, MITCHELL |
| ROMERO, IRENE |
| ROSALES, YESINIA |
| ROSETTI, SANDRA |
| ROSETTI, VICTOR |
| RUIZ, NISSA |
| S.T. (A MINOR), GUARDIAN STARLEA HALL |
| SAMATUA, JOHN |
| SANCHEZ, ANTONIO |
| SANCHEZ, EDGAR |
| SAUREZ, ANGELICA |
| SAUREZ, SAUL |
| SCHAEFER, ROBERT |
| SCHENCK, STEPHEN |
| SCHENCK, STEPHEN (HEIRS OF ) |
| SCOTT, SONJANETHA |
| SERRANO, ISABEL |
| SHAH, FAGUNI, (ESTATE OF) |
| SHAH, JYOTSNA |
| SHAH, NITIN |
| SHAH, VEENA, (ESTATE OF) |
| SHIELDS, SUSAN |
| SILVA, MARIA |
| SIXTOS, GIOVANNI |
| SKINNER SR, BRETT |
| SOUTHERN CALIFORNIA EDISON |

### Pre-Confirmation Date claims against Indemnified Parties as to which the City has received notice but no lawsuit has yet been filed

(Please review the "Order Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California (July 29, 2016), as Modified" to which this Exhibit B is attached, and in particular paragraphs 24.1 through 24.4.3. of such order.)

| |
|---|
| SOUTHERN CALIFORNIA EDISON |
| ST. BERNARDINE MEDICAL CENTER, ENGINEERING DEPARTMENT |
| STANFIELD, SHARON |
| STATE FARM, AS SUBROGEE OF BRYANT TRUJILLO |
| STATE FARM, AS SUBROGEE OF WILLIAM WEATHERS |
| TAYLOR, EVANGELIST |
| TOBAR, ERNIE |
| TORRES, VICTOR |
| TRAVELERS CASUALTY INSURANCE CO. |
| TREUHERZ, CLAUDIA |
| TREUHERZ, ROBERT |
| TRUJILLO, BRYAN |
| TURNER, TRINA |
| UNITED FINANCIAL CASUALTY COMPANY, AS SUBROGEE OF CLIFFORD UTLEY |
| VASQUEZ, RAY |
| VERIZON |
| VERIZON/FRONTIER |
| VILLAGE GREEN APARTMENTS |
| VILLALUZ, GRACE |
| VILLALUZ, JUAN |
| WAHEEK, HAKIM |
| WILLIAMS, KEALON |
| WILLIAMS, MELISSA |
| WINDLEY, JOHN (ESTATE OF) |