**<u>EXHIBIT C</u>**

2008-26813

August 04, 2011

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0003678945

**83**

1   MARC A. LEVINSON (SBN 57613)
    NORMAN C. HILE (SBN 57299)
2   JOHN H. KNOX (SBN 129777)
    JOHN W. KILLEEN (SBN 258395)
3   ORRICK, HERRINGTON & SUTCLIFFE LLP
    400 Capitol Mall, Suite 3000
4   Sacramento, CA  95814
    Telephone:   (916) 447-9200
5   Facsimile:   (916) 329-4900
    malevinson@orrick.com
6   nhile@orrick.com
    jknox@orrick.com
7   jkilleen@orrick.com

8

9   Attorneys for Debtor
    City of Vallejo

10              UNITED STATES BANKRUPTCY COURT

11              EASTERN DISTRICT OF CALIFORNIA

12                  SACRAMENTO DIVISION

13   In re:                              Case No.  2008-26813

14   CITY OF VALLEJO, CALIFORNIA,        Chapter 9

15              Debtor                   ORDER CONFIRMING CITY OF
                                         VALLEJO'S SECOND
16                                       AMENDED PLAN FOR THE
                                         ADJUSTMENT OF DEBTS OF
17                                       CITY OF VALLEJO,
                                         CALIFORNIA, AS MODIFIED
18                                       AUGUST 2, 2011

19

20                                       **CONFIRMATION HEARING**

21                                       **Date:    July 28, 2011**
                                         **Time:    10:00 a.m.**
22                                       **Dept:    A**
                                         **Judge:   Hon. Michael S. McManus**

23

24

25

26

27

28

RECEIVED
August 03, 2011
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0003678945

1    Having considered the City of Vallejo's ("City") Memorandum in Support of

2  Confirmation of Second Amended Plan for the Adjustment of Debts of City of Vallejo,

3  California, as Modified July 15, 2011, the accompanying declarations, and the City's Second

4  Amended Plan for the Adjustment of Debts of City of Vallejo, California, as modified August 2,

5  2011 ("Plan"), Dkt. No. 1109, a copy of which is attached as Exhibit 1, the May 20, 2011 version

6  of the Plan having been transmitted to creditors, and it having been determined after hearing on

7  notice that the requirements for confirmation set forth in 11 U.S.C. § 943 have been satisfied as

8  articulated in the Court's minute order,

9    IT IS HEREBY ORDERED that:

10    1.  The Plan is CONFIRMED.

11    2.  The objection to the Plan filed by creditors Ana Menjivar and Wynathen Ketchum,

12      Dkt. No. 1091, is overruled.

13    3.  The City's July 15, 2011, and August 2, 2011 modifications to the May 20 version

14      of the Plan comply with 11 U.S.C. § 942 and do not fail to meet the requirements

15      of chapter 9 of the Bankruptcy Code.

16    4.  Within seven business days of the entry of this Order, the City shall serve by mail

17      all creditors, parties in interest, and all parties to the City's executory contracts and

18      unexpired leases with a Notice of Entry.

19    5.  The City shall cause the Notice of Entry to be published in a newspaper of general

20      circulation in the City.  The Plan need not be reprinted in such publication, which

21      shall instead provide information enabling any interested party to obtain a copy of

22      the Plan at no cost via U.S. Mail.

23    6.  The Notice of Entry shall include a copy of this Order and a copy of the Plan.

24    7.  The Notice of Entry also shall provide clear notice that (a) pursuant to the Plan, the

25      City is assuming all executory contracts and unexpired leases (subject to, with

26      respect to the unexpired leases expressly identified in the Plan as modified

27      pursuant the Plan, those modifications); (b) the City is not rejecting any executory

28      contracts or unexpired leases; (c) the City believes that it is not in default under

ORDER CONFIRMING CITY OF VALLEJO'S SECOND
AMENDED PLAN AS MODIFIED AUGUST 2

1    any such executory contracts and unexpired leases (other than under those

2    identified unexpired leases); and (d) any party to an executory contract or

3    unexpired lease (other than a party to one of those identified unexpired leases) may

4    object to the assumption of such agreement by filing in this Court and serving on

5    the City an objection within 21 days of the later of (i) service of the Notice of

6    Entry by mail; and (ii) publication in the newspaper of general circulation.

    8.   In the event any such objections are filed, the City shall file a responsive pleading

    within 14 days of receiving objections, and shall schedule and provide notice of a

    hearing at which all objections will be heard.

Dated: August 04, 2011

By the Court:

Michael S. McManus
United States Bankruptcy Judge

ORDER CONFIRMING CITY OF VALLEJO'S SECOND
AMENDED PLAN AS MODIFIED AUGUST 2

Filed 08/04/11    Case 08-26813    Doc 1113

# Exhibit 1

FILED

August 2, 2011

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0003675332

**79**

1   MARC A. LEVINSON (SBN 57613)
    NORMAN C. HILE (SBN 57299)
2   JOHN H. KNOX (SBN 129777)
    JOHN W. KILLEEN (SBN 258395)
3   ORRICK, HERRINGTON & SUTCLIFFE LLP
    400 Capitol Mall, Suite 3000
4   Sacramento, CA 95814
    Telephone: (916) 447-9200
5   Facsimile: (916) 329-4900
    malevinson@orrick.com
6   nhile@orrick.com
    jknox@orrick.com
7   jkilleen@orrick.com

8   Attorneys for Debtor
    City of Vallejo

9

10              UNITED STATES BANKRUPTCY COURT

11              EASTERN DISTRICT OF CALIFORNIA

12                    SACRAMENTO DIVISION

13

| 14 | In re | **Case No. 2008-26813** |
|----|-------|------------------------|
| 15 | CITY OF VALLEJO, CALIFORNIA, | **Chapter 9** |
| 16 | Debtor | **SECOND AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF CITY OF VALLEJO, CALIFORNIA, AS MODIFIED AUGUST 2, 2011** |
| 17 | | |
| 18 | | |
| 19 | | |

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

I.  DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION .................. 1

    A.  Definitions.................................................................................................... 1

    B.  Rules of Construction.................................................................................. 24

II.  TREATMENT AND DEADLINE FOR THE ASSERTION OF ADMINISTRATIVE CLAIMS AND PROFESSIONAL CLAIMS ............................. 25

    A.  Treatment of Administrative Claims............................................................ 25

    B.  Treatment of Professional Claims............................................................... 25

    C.  Priority Claims In Chapter 9 ....................................................................... 25

    D.  Deadline for the Filing and Assertion of Administrative Claims (Other Than Ordinary Course Administrative Claims) and Professional Claims ........... 26

III.  DESIGNATION OF CLASSES OF CLAIMS .............................................................. 26

IV.  TREATMENT OF CLAIMS ......................................................................................... 27

    A.  Class 1A1 through Class 1D2, Inclusive – Claims of Union Bank With Respect to the Union Bank COPs ............................................................... 27

    B.  Classes 2A and 2B – Claims of The Indenture Trustee and of National With Respect to the Series 1999 COPs .................................................... 31

    C.  Class 3 - Claims of the MPA Assignees under the MPA Lease ......................... 33

    D.  Class 4 - Claims of Westamerica under the Westamerica Lease ...................... 33

    E.  Classes 5 - Claims of CalPERS with Respect to the CalPERS Pension Plan, as Trustee Under the CalPERS Pension Plan for the Benefit of CalPERS Pension Plan Participants ........................................................................... 34

    F.  Class 6A –General Unsecured Claims Convenience Class – Retiree Health Benefits Claims .......................................................................................... 34

    G.  Class 6B – General Unsecured Claims ....................................................... 35

    H.  Class 7 – General Liability Claims ............................................................. 37

    I.  Class 8 –Workers Compensation Claims.................................................... 37

    J.  Class 9 – Holders of Restricted Revenue Bond and Note Payable Obligations .................................................................................................. 38

V.  ACCEPTANCE OR REJECTION; CRAM DOWN .................................................... 39

    A.  Voting of Claims ......................................................................................... 39

VI.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......... 39

    A.  Assumption of Executory Contracts and Unexpired Leases................................ 39

    B.  Rejection of Executory Contracts and Unexpired Leases............................. 39

    C.  Cure Payments ........................................................................................... 39

    D.  Assumption Objection Procedure ............................................................... 40

VII.  IMPLEMENTATION AND MEANS FOR IMPLEMENTATION OF THIS PLAN .......................................................................................................................... 40

**TABLE OF CONTENTS**
**(continued)**

Page

VIII.   DISTRIBUTIONS ............................................................................................. 41

    A.   Distribution Agent ................................................................................. 41

    B.   Delivery of Distributions ...................................................................... 41

    C.   Undeliverable Distributions .................................................................. 42

    D.   Distributions of Cash ............................................................................ 42

    E.   Timeliness of Payments ........................................................................ 43

    F.   Compliance With Tax, Withholding and Reporting Requirements .................... 43

    G.   Time Bar to Cash Payments .................................................................. 43

    H.   No De Minimis Distributions ................................................................ 44

    I.   No Distributions on Account of Disputed Claims ................................. 44

    J.   No Postpetition Accrual ........................................................................ 44

IX.   DISPUTED CLAIMS; OBJECTIONS TO CLAIMS; PROSECUTION OF
OBJECTIONS TO DISPUTED CLAIMS .......................................................... 44

    A.   Claims Objection Deadline; Prosecution of Objections ....................... 44

    B.   Reserves, Payments, and Distributions With Respect to Disputed Claims .......... 44

X.   EFFECT OF CONFIRMATION ........................................................................ 45

    A.   Discharge of the City ............................................................................ 45

    B.   Injunction .............................................................................................. 45

    C.   Term of Existing Injunctions or Stays .................................................. 46

XI.   RETENTION OF AND CONSENT TO JURISDICTION ................................ 46

XII.   CONDITIONS PRECEDENT .......................................................................... 48

    A.   Condition Precedent to Confirmation ................................................... 48

    B.   Conditions Precedent to Effective Date ................................................ 48

    C.   Waiver of Conditions to Effective Date ................................................ 49

    D.   Effect of Failure of Conditions ............................................................. 49

XIII.   MISCELLANEOUS PROVISIONS ................................................................. 49

    A.   Dissolution of the Committee ............................................................... 49

    B.   Severability ........................................................................................... 50

    C.   Governing Law ...................................................................................... 50

    D.   Effectuating Documents and Further Transactions ............................... 50

    E.   Notice of Effective Date ........................................................................ 51

# TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*In re City of Vallejo, California,*
    Case No. 2008-26813 ................................................................................ 3

### FEDERAL STATUTES

11 U.S.C. § 101(5) ...................................................................................... 3

11 U.S.C. § 102 ......................................................................................... 24

11 U.S.C. § 501 .......................................................................................... 1

11 U.S.C. § 502(c) ....................................................................................... 1

11 U.S.C. § 506(a) ...................................................................................... 16

11 U.S.C. § 507 ......................................................................................... 25

11 U.S.C. § 553 ..................................................................................... 16, 46

11 U.S.C. § 902(2) ...................................................................................... 38

11 U.S.C. § 941 ........................................................................................... 1

11 U.S.C. § 943 ...................................................................................... 3, 25

11 U.S.C. § 944 ......................................................................................... 45

11 U.S.C. § 1102(a)(1) ................................................................................... 3

11 U.S.C. § 1122 ..................................................................................... 3, 26

11 U.S.C. § 1124 ..................................................................................... 7, 22

11 U.S.C. § 1125 .......................................................................................... 4

11 U.S.C. § 1129 ................................................................................... 39, 48

11 U.S.C. § 1142(b) .................................................................................... 47

### STATE STATUTES

Cal. Gov't Code § 810 ................................................................................... 5

Cal. Gov't Code § 3200 ................................................................................ 24

Cal. Gov't Code § 37351.5 ..................................................................... 8, 29, 33

CITY OF VALLEJO'S SECOND AMENDED
PLAN OF ADJUST. AS MODIFIED AUGUST 2, 2011

1           The City of Vallejo, California (the "City"), a debtor under chapter 9 of the United

2    States Bankruptcy Code, hereby proposes the following Second Amended Plan of Adjustment of

3    Debts, as modified August 2, 2011 (this "Plan"), pursuant to section 941 of the Bankruptcy

4    Code.[1]

5           Please refer to the accompanying Disclosure Statement for a discussion of the

6    City's financial condition, the developments throughout the Chapter 9 Case, for a summary and

7    analysis of this Plan and for other important information.  The City encourages you to read this

8    Plan and the Disclosure Statement in their entirety before voting to accept or reject this Plan.  No

9    materials other than the Disclosure Statement and the various Exhibits and Schedules attached to

10    or incorporated therein have been approved for use in soliciting acceptance or rejections of this

11    Plan.

## I.     DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION

### A.    Definitions.

       1.    **Administrative Claim** means any Claim for an administrative expense of

the kind described in sections 503(b) or 507(a)(2) of the Bankruptcy Code.

       2.    **Allowed** means a Claim that:

          (a)    Is asserted in a proof of claim filed in compliance with section 501

of the Bankruptcy Code and any applicable orders of the Bankruptcy Court and as to which: (i) no

objection has been filed within the deadline established pursuant to Section IX(A) of the Plan;

(ii) the Bankruptcy Court has entered a Final Order allowing all or a portion of such Claim (but

only in the amount so allowed); or (iii) the Bankruptcy Court has entered a Final Order under

section 502(c) of the Bankruptcy Code estimating the amount of the Claim for purposes of

allowance;

          (b)    Is subject to a stipulation between the City and the holder of such

Claim providing for the allowance of such Claim;

          (c)    Is deemed "allowed" pursuant to this Plan;

/ / /

---

[1]  The definitions of capitalized terms used throughout this Plan are set forth in Section I.A.

1                (d)      Is designated as "allowed" in a pleading entitled "Designation of

2  Allowed Claims" (or a similar title of the same import) filed with the Bankruptcy Court by the

3  City on or after the Effective Date; or

4                (e)      Is an Administrative Claim as to which the Bankruptcy Court has

5  entered a Final Order allowing all or a portion of such claim (but only in the amount so allowed).

6        **3.**     **Assumption Objection Procedure** shall have the meaning ascribed to it in

7  Section VI.D of the Plan.

8        **4.**     **Authority** means the Vallejo Public Financing Authority.

9        **5.**     **Ballot** means the ballot(s), in the form(s) approved by the Bankruptcy

10  Court in the Plan Solicitation Order, accompanying the Disclosure Statement and provided to

11  each holder of a Claim entitled to vote to accept or reject this Plan.

12        **6.**     **Bankruptcy Code** means title 11 of the United States Code, as amended

13  from time to time, as applicable to the Chapter 9 Case.

14        **7.**     **Bankruptcy Court** means the United States Bankruptcy Court for the

15  Eastern District of California, Sacramento Division, or such other court that lawfully exercises

16  jurisdiction over the Chapter 9 Case.

17        **8.**     **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as

18  amended from time to time, as applicable to the Chapter 9 Case, together with the local rules of

19  the Bankruptcy Court applicable to the Chapter 9 Case.  Unless otherwise indicated, references in

20  this Plan to "Bankruptcy Rule _____" are to the specifically identified rule of the Federal Rules

21  of Bankruptcy Procedure.

22        **9.**     **Bar Date** means the applicable date by which a particular proof of claim

23  must be filed, as established by the Bankruptcy Court.

24        **10.**     **Business Day** means a day on which Union Bank is open for regular

25  commercial banking business at its headquarters branch in San Francisco, California.

26        **11.**     **CalPERS** means the California Public Employees' Retirement System.

27  / / /

28  / / /

**12.** **CalPERS Pension Plans** means, collectively, the following pension plan contracts between CalPERS and the City: (1) Safety Plan of the City of Vallejo (Employer # 527); and (2) Miscellaneous Plan of the City of Vallejo (Employer # 527).

**13.** **CalPERS Pension Plan Participants** means those current and former City employees and their survivors and other dependants who are the beneficiaries of one or both of the CalPERS Pension Plans.

**14.** **Cash** means cash and cash equivalents, including withdrawable bank deposits, wire transfers, checks, and other similar items.

**15.** **Chapter 9 Case** means the case under chapter 9 of the Bankruptcy Code commenced by the City, styled as *In re City of Vallejo, California,* Case No. 2008-26813, currently pending in the Bankruptcy Court.

**16.** **City** means the City of Vallejo, California, the debtor in the Chapter 9 Case.

**17.** **City Council** means the duly elected legislative body of the City.

**18.** **Claim** means a claim against the City or the property of the City within the meaning of section 101(5) of the Bankruptcy Code.

**19.** **Class** means one of the classes of Claims established under Section III pursuant to section 1122 of the Bankruptcy Code.

**20.** **Committee** means the Official Unsecured Creditors Committee of City of Vallejo Retirees, appointed in the Chapter 9 Case by the Office of the United States Trustee pursuant to section 1102(a)(1) of the Bankruptcy Code as the membership thereof has been reconstituted from time to time by the Office of the United States Trustee.

**21.** **Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

**22.** **Confirmation Order** means the order of the Bankruptcy Court confirming this Plan pursuant to section 943 of the Bankruptcy Code.

**23.** **Controller** means the California State Controller's Office.

**24.** **COPs** means certificates of participation.

- 3 -

Case:17-03283-LTS   Doc#:12871-3   Filed:04/17/20   Entered:04/17/20 15:53:54   Desc:
Exhibit C - Vallejo No. 08-26813 Dkt. 1113   Page 13 of 84

Filed 08/04/11   Case 08-26813   Doc 1113   Page 13 of 84   Doc 1113

25.   **COPs Documents** means, with respect to each of the Series 1999 COPs, the Series 2000 COPs, the Series 2001 COPs, the Series 2002 COPs and the Series 2003 COPs, collectively, the leases, assignment agreement and trust agreement, and, as applicable, the Reimbursement Agreement (with respect to the Union Bank COPs) and Financial Guaranty Agreement (with respect to the Series 1999 COPs) providing for the payment obligations of the City evidenced and represented by the respective series of COPs and other payment obligations of the City associated with that series of COPs.

26.   **Disallowed** means a Claim or portion thereof that has been disallowed by an Order.

27.   **Disclosure Statement** means the disclosure statement, and all exhibits and schedules incorporated therein, that relates to this Plan and that is approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, modified or supplemented in accordance with the Bankruptcy Code.

28.   **Disputed Claim** means any Claim or portion thereof that has not become Allowed and that is not Disallowed.  In the event that any part of a Claim is Disputed, except as otherwise provided in this Plan, such Claim shall be deemed Disputed in its entirety for purposes of distribution under this Plan unless the City otherwise agrees in writing in its sole discretion.  Without limiting the foregoing, a Claim that is the subject of a pending application, motion, complaint, objection, or any other legal proceeding seeking to disallow, limit, reduce, subordinate, or estimate such Claim shall be deemed to be Disputed.

29.   **Effective Date** means the first business day after the date on which the conditions specified in Section XII have been satisfied or waived.  For purposes of calculating various payments, particularly those to Union Bank, the Effective Date was assumed to be July 1, 2011.  However, because the hearing on Confirmation will not occur until July 28, the City estimates that the Effective Date will occur in late August or September 2011, so the calculations will be slightly altered.

30.   **Final Order** means a judgment, order, ruling, or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal having

1    jurisdiction over the subject matter thereof which judgment, order, ruling, or other decree has not

2    been reversed, stayed, modified, or amended and as to which: (a) the time to appeal or petition for

3    review, rehearing or certiorari has expired and no appeal or petition for review, rehearing or

4    certiorari is then pending; or (b) any appeal or petition for review, rehearing or certiorari has been

5    finally decided and no further appeal or petition for review, rehearing or certiorari can be taken or

6    granted.

7          **31.**    **Five-Year General Fund Business Plan** means the financial planning

8    document adopted by the City Council by resolution dated November 30, 2010, that presents

9    strategies to maintain a balanced operating budget, address the City's debts, rebuild fiscal

10    stability, and enable the City to continue to provide municipal services to its residents and covers

11    the City's five fiscal years commencing on July 1, 2010 and ending on June 30, 2015.

12          **32.**    **General Fund** means the City's chief operating fund, which is used to

13    account for all financial resources except those required to be accounted for in another fund (such

14    as the Restricted Funds).

15          **33.**    **General Liability Claim** means a tort or contract Claim filed against the

16    City pursuant to the Government Claims Act, California Government Code section 810 *et seq.*.

17          **34.**    **General Unsecured Claim** means any unsecured Claim <u>that is not</u> (1) an

18    Administrative Claim; (2) a General Liability Claim; or (3) a Workers Compensation Claim.

19          **35.**    **General Unsecured Claims Pool** means the $5 million of cash contributed

20    by the General Fund (as described in the Five-Year General Fund Business Plan) to be used for

21    payment to holders of Allowed General Unsecured Claims.

22          **36.**    **IAFF** means the International Association of Firefighters, Local 1186.

23          **37.**    **IAFF Member General Unsecured Claim** means a Claim by a member

24    of IAFF on account of or in any way related to the City's rejection of the prepetition labor

25    agreement between the City and IAFF and the City's non-compliance with the prepetition labor

26    agreement under the City's pendency plan prior to the entry into the amended collective

27    bargaining agreement effective July 1, 2010, including without limitation the City's changes to

28    medical benefits, minimum staffing, and compensation of such members, and any claim by such

members to future reduced pension payments or disability payments because the calculation of their future pension or disability benefits is based upon a reduced highest and best year of compensation compared to what would have been payable under the rejected labor agreement. However, IAFF Member General Unsecured Claim expressly does not include, without limitation, any Claim for unpaid leave, PTO, and accrued vacation buyout amounts, or any Claim for personal injury, wrongful termination, individual grievance different from other IAFF members, workers compensation, actual disability, or other tort, or any Claim by an individual who was a member of the IAFF but who retired prior to the Petition Date, and thus whose interests are represented in this chapter 9 case by the Committee.

38.    **IAFF/IBEW Member Claims** means IAFF Member General Unsecured Claims and IBEW Member General Unsecured Claims, collectively.

39.    **IBEW** means the International Brotherhood of Electrical Workers, Local 2376.

40.    **IBEW Member General Unsecured Claim** means a Claim by a member of IBEW on account of or in any way related to the City's rejection of the prepetition labor agreement between the City and IBEW and the City's non-compliance with the prepetition labor agreement under the City's pendency plan prior to the entry into the postpetition amended collective bargaining agreement effective April 1, 2010, including without limitation the City's changes to medical benefits, and compensation of such members, and any claim by such members to future reduced pension payments or disability payments because the calculation of their future pension or disability benefits is based upon a reduced highest and best year of compensation compared to what would have been payable  under the rejected labor agreement.  However, IBEW General Unsecured Claim expressly does not include, without limitation, any Claim for unpaid leave, PTO, and accrued vacation buyout amounts, or any Claim for personal injury, wrongful termination, individual grievance different from other IBEW members, workers compensation, actual disability, or other tort, or any Claim by an individual who was a member of the IBEW but who retired prior to the Petition Date, and thus whose interests are represented in this chapter 9 case by the Committee.

41.    **Impaired** means a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

42.    **Indenture Trustee** means the financial institution acting in the capacity of indenture trustee with respect of the Series 1999 COPs.  As of the date of this Plan, the Indenture Trustee is Wells Fargo Bank, National Association.

43.    **Insured Portion** means that portion of an Allowed Workers Compensation Claim or an Allowed General Liability Claim that is covered by one or more of the excess risk-sharing pools of which the City is a member, up to the amount of the policy limits, including any excess coverage policies.

44.    **Leave Buyout Calculation** means the spreadsheet prepared by the City that will enumerate and calculate the amount, if any, of the Leave Buyout Claim that each claimant may, at his or her option, convert in whole or in part to retirement service credit by timely exercising the Leave Buyout Option.

45.    **Leave Buyout Claim** means a Claim of a former City employee on account of unpaid sick leave, vacation pay or other compensation or reimbursement due upon such employee's retirement or other separation from City service.

46.    **Leave Buyout Option** means the option of holders of Allowed Leave Buyout Claims to convert all or part of each Claimant's Allowed Leave Buyout Claim to retirement service credit, subject to the following terms and conditions:

(a)    Eligibility for retirement service credit shall be determined with reference to the applicable collective bargaining agreement at the time of the separation, and shall be subject to the rules and regulations established by CalPERS.  Thus, for example (1) retirement service credit may be given only for unused and unpaid sick leave (and, conversely, not given for unpaid vacation pay); and (2) the Safety Service Retirement is capped at 90% of final compensation (which is generally equivalent to 30 years of service for members of the Vallejo Police Officers Association and of IAFF);

(b)    The City will provide the approximately 40 holders of Leave Buyout Claims with the Leave Buyout Calculation;

1          (c)      The amount of a Leave Buyout Claim converted pursuant to the

2   Leave Buyout Option will be converted at 65% of the amount otherwise owing in order to

3   provide such holders with the equivalent of the estimated cash payout to other holders of Allowed

4   Class 6B claims; and

5          (d)      The amount of an Allowed Leave Buyout Claim that is not

6   converted to retirement service credit shall be treated the same as other Allowed Class 6B Claims.

7          **47.      Leave Buyout Option Exercise Form** means that form attached to the

8   Plan as Exhibit F that will include: (1) the full name of the Claimant as well as his/her Social

9   Security number; (2) the dollar amount eligible for conversion to service credit as per the Leave

10  Buyout Calculation; (3) the dollar amount, if any, the Claimant requests be converted; (4) the

11  Claimant's express acknowledgment that he/she understands that (a) the amount of the converted

12  portion of his/her Leave Buyout Claim will be discounted by 35%; and (b) any amount that is not

13  converted to retirement service credit shall be treated the same as any other Allowed Class 6B

14  claim; (5) a signature block including a signature line and a blank for the date the Leave Buyout

15  Option Form is signed; and (6) information as to where and when such form must be returned.

16         **48.      MPA Assignees** means the assignees of the MPA Lease, being the Peg

17  Yorkin Living Trust, and William D. and Francine M. Osenton, pursuant to Assignment

18  Agreements dated as of December 27, 2001 by and between each MPA Assignee and MPA

19  Leasing Corporation.

20         **49.      MPA Lease** means the Lease Agreement by and between the City and

21  MPA Leasing Corporation, dated as of December 27, 2001, under which remain aggregate

22  principal components of unpaid lease payments in the amount of approximately $829,248.

23         **50.      MVLF Intercept** means the election by the City with respect to the Series

24  1999 COPs and the Series 2000 COPs to guarantee payments evidenced and represented thereby

25  pursuant to California Government Code Section 37351.5.

26         **51.      MVLF Revenues** means the motor vehicle license fee revenues allocable

27  to the City and subject to the election of the City pursuant to the MVLF Intercept.

28  / / /

CITY OF VALLEJO'S SECOND AMENDED
PLAN OF ADJUST. AS MODIFIED AUGUST 2, 2011

**52.** **National** means National Public Finance Guaranty Corporation, as the reinsurer to MBIA Insurance Corporation and MBIA Insurance Corp. of Illinois pursuant to a Quota Share Reinsurance Agreement.

**53.** **National MVLF Adversary** means Adversary Proceeding No. 10-02722 pending in the Bankruptcy Court commenced by National against the City with respect to MVLF Intercept and MVLF Revenues.

**54.** **National Policies** means, collectively, the Debt Service Reserve Surety Bond and the Financial Guaranty Insurance Policy issued by MBIA Insurance Corporation with respect to the Series 1999 COPs.

**55.** **National Settlement Agreement** means the settlement agreement, dated as of January 25, 2011 by and among the City, National and the Controller, and acknowledged by the Indenture Trustee. A copy of the National Settlement Agreement is attached as Exhibit A.

**56.** **National Settlement Agreement Motion** means the motion filed on June 17, 2011 in the National MVLF Adversary.

**57.** **New MPA Documents** means the new documents reflecting the City's revised payment obligations under the MPA Lease as discussed in Section IV(C) and memorialized in Exhibit B.

**58.** New Union Bank Documents means, collectively—

(a) **The New Union Bank Site Lease**, being a new site lease that amends and restates, in their entireties and as a single site lease, the Union Bank COPs Site Leases, pursuant to which all of the real property currently leased under the Union Bank COPs Site Leases (as shown in Exhibit C) will be leased to the Authority on the same general terms (in the aggregate) as are presently provided under the Union Bank COPs Site Leases; provided, however, that there will be no additional consideration for that lease and the term there of may not be less than the term of the new Union Bank Facility Lease plus ten days, nor longer than the maximum term permitted by law, and including similar provisions for the extension or reduction of that term as are provided in Union Bank COPs Site Leases;

/ / /

(b)    **The New Union Bank Facility Lease**, being a new facility lease that amends and restates, in their entireties and as a single facility lease, the Union Bank COPs Facility Leases, pursuant to which such real property will be leased back to the City on the same general terms (in the aggregate) as are presently provided under the Union Bank COPs Facility Leases, provided, however, that the rental payments thereunder will be revised as shown in Exhibit D and due on the first Business Day of each calendar year in advance for that year, and the term thereof will be extended to June 30, 2042, including similar provisions for the extension or reduction of that term as are provided in Union Bank COPs Facility Leases;

(c)    **The New Union Bank Reimbursement Agreement Payment Agreement**, being a new reimbursement agreements payment agreement that amends and restates, in their entireties and as a single payment obligation, the respective payment obligations of the City due Union Bank under the Union Bank COPs Reimbursement Agreements, adjusted as follows:

1.    While deemed a single payment obligation, the components of that payment obligation will be comprised of two conceptual payment obligations (or tranches)—respectively, the "A" obligation and the "B" obligation—each with a notional starting principal balance, a period of no interest accrual, a following period of interest accrual at a fixed interest rate, annual payments beginning on various dates certain of a portion of that notional principal balance and of accrued but unpaid interest thereon, and, in the case of the "B" obligation, capitalization for some period of time of certain accrued but unpaid interest, all as set forth below;

2.    The notional starting principal balance of (i) the "A" obligation will be $20,000,000; and (ii) the "B" obligation will be the New Union Bank Reimbursement Obligations Starting Principal Balance less $20,000,000 (presently estimated to be approximately $21,367,933);

3.    No interest will accrue on either the "A" obligation or the "B" obligation from the Effective Date through December 31, 2014, and interest will commence to accrue on both those obligations on January 1, 2015;

4.      When interest commences to accrue thereon, interest will accrue on the principal balance from time to time outstanding of (i) the "A" obligation at the fixed rate per annum of approximately 2.5%; and (ii) the "B" obligation at the fixed rate per annum of approximately 1.625%, in each case until that balance of principal has been paid in full;

5.      From the time that interest commences to accrue on the "B" obligation (January 1, 2015), the amount of interest that will accrue thereon during each calendar year, before giving effect to any payment of principal that is to be paid on that obligation on the first Business Day of that calendar year as set forth below, if remaining unpaid, will be added to the outstanding principal balance of that obligation as of January 1st of that year, and will thereafter bear interest as part of that principal until paid;

6.      Interest will be payable annually on the first Business Day of each calendar year, in a single annual payment, in advance, commencing with (i) as to the "A" obligation, the 2015 calendar year; and (ii) as to the "B" obligation, the 2018 calendar year, and continuing, in each case, until the principal balance of that obligation has been paid in full; provided, however, that if an interest payment as to either obligation was due and payable on the first Business Day of the prior calendar year and any interest has accrued on that obligation as of the first Business Day of the current calendar year that was not paid in advance on the first Business Day of that prior calendar, all that accrued but not previously paid in advance interest must also be paid on the first Business Day of the current calendar year;

7.      Principal will be payable annually on the first Business Day of each calendar year, in a single annual payment, commencing with, (i) as to the "A" obligation, the 2012 calendar year; and (ii) as to the "B" obligation, the 2025 calendar year, as to each of those years for each of those obligations in the respective amounts set forth on Exhibit E to the extent set forth thereon, and, if necessary, after the nominal maturity date of each of those obligations as provided in paragraphs c.8 and c.10 below;

8.      Subject to paragraphs c.9 and c.10 below, the outstanding principal balance, all accrued but unpaid interest, and all other amounts due under the New Union Bank Reimbursement Agreement Payment Agreement with respect to (i) the "A" obligation will

Filed 08/04/11

1    be due and payable on January 1, 2026; and (ii) the "B" obligation will be due and payable on

2    January 1, 2042 (those dates, respectively, being the nominal maturity dates of those obligations);

3              9.      Notwithstanding paragraphs c.6 through c.8 above, if the

4    principal and interest payment obligation of the City under the New Union Bank Reimbursement

5    Agreement Payment Agreement on the first Business Day of any calendar year exceeds the lease

6    payment due by the City to the Authority under the New Union Bank Facility Lease for that year

7    and assigned to the Bank by the Authority pursuant to the New Union Bank Assignment

8    Agreement, the amount of that payment obligation in excess of that lease payment, (i) if and to

9    the extent that the same constitutes interest (with the "A" obligation being deemed to be paid

10   before the "B" obligation and interest being deemed to be paid before principal), will be added to

11   the outstanding principal balance of the "B" obligation as of January 1st of that year and will

12   thereafter bear interest as part of that principal until paid; and (ii) if and to the extent that the same

13   constitutes principal, will be deferred until after the nominal maturity date of the respective "A"

14   or "B" obligation that is not so paid, all as provided in paragraph c.10 below;

15             10.     If any principal payment obligation of the City under the

16   New Union Bank Reimbursement Agreement Payment Agreement is deferred as provided in the

17   preceding paragraph, (i) the maturity date of the respective "A" obligation or "B" obligation with

18   respect to which that principal payment obligation is deferred will be extended to January 1st of

19   the following year (and, if the nominal maturity date of the "B" obligation is being so extended,

20   the respective terms of the New Union Bank Site Lease and the New Union Bank Facility Lease

21   will be commensurately extended for an additional year as provided therein) and from year to

22   year until the "A" obligation and "B" obligation have, respectively, been paid in full; and (ii) the

23   amount of principal to be paid on the first Business Day of each calendar year after the year in

24   which the nominal maturity of the "B" obligation occurs will be (i) the fair rental value of the

25   properties leased to the City under the New Union Bank Facility Lease for the calendar year in

26   which that first Business Day occurs; less (ii) the amount of interest due and payable pursuant to

27   paragraph c.6 above;

28   / / /

CITY OF VALLEJO'S SECOND AMENDED
PLAN OF ADJUST. AS MODIFIED AUGUST 2, 2011

11.    If there is an Event of Default, at the election of Union Bank, the respective rates at which interest will accrue on the "A" obligation and the "B" obligation set out in paragraph c.4 above will increase by one percent per annum until each Event of Default has been cured or waived; provided, however, that the adding of accrued but unpaid interest to the outstanding principal balance of the "B" obligation as otherwise provided herein will not constitute a cure of any Event of Default that arises due to the failure to pay the default interest differential;

12.    The payment obligations of the City under the New Union Bank Reimbursement Agreement Payment Agreement may not be accelerated; however, pursuant to the New Union Bank Facilities Lease, to the extent that all of the obligations under the New Union Bank Reimbursement Agreement Payment Agreement are not fully paid as of the end of the nominal term of the New Union Bank Facilities Lease, the New Union Bank Facilities Lease will be extended  for an additional term (not to exceed any legal limitation on the term of such lease and the New Union Bank Site Lease) until such obligations are fully paid; and

13.    Payment by the City of lease payments under the New Union Bank Facilities Lease shall be credited against amounts payable under the New Union Bank Reimbursement Agreement Payment Agreement.  Notwithstanding any other provision of the New Union Bank Reimbursement Agreement Payment Agreement, the City's obligation to make payments thereunder shall be limited to amounts the City is due under the New Union Bank Facilities Lease, and under no circumstances shall the City be obligated to make any payment to Union Bank thereunder to the extent such payment is not paid as a result of a payment under the New Union Bank Facilities Lease.

(d)    **The New Union Bank Assignment Agreement**, being a new assignment agreement pursuant to which the Authority's rights under the New Union Bank Facility Lease and the New Union Bank Site Lease will be assigned to Union Bank directly (as the prior holder of the Union Bank COPs) and as security for the New Union Bank Reimbursement Obligations. For the avoidance of doubt, while Union Bank will be entitled to

/ / /

receive only one full recovery under the New Union Bank Facility Lease and the New Union Bank Reimbursement Obligations, those obligations will not merge or be deemed to merge.

59.     **New Union Bank Reimbursement Obligations** means, collectively, the obligations of the City to Union Bank under the Union Bank Letter of Credit Reimbursement Agreements as adjusted pursuant to this Plan and evidenced by the New Union Bank Reimbursement Agreement Payment Agreement.

60.     **New Union Bank Reimbursement Obligations Starting Principal Balance** means (i) the aggregate principal amount due the Bank under the Union Bank COPs Reimbursement Agreements ($45,677,760); plus (ii) a portion of the amount of accrued but unpaid interest on that aggregate principal amount equal to $1,827,573; less (iii) the amount of the Unspent Proceeds (presently estimated to be $6,137,400), calculated as of the Effective Date, for an presently estimated total of $41,367,933.

61.     **Notice of Effective Date** shall have the meaning ascribed to such phrase in Section XIII(E) of the Plan.

62.     **Notice of Entry** means the notice mandated by Bankruptcy Rule 2002(f)(7), which also shall disclose the Assumption Objection Procedure described to Section VI of this Plan;

63.     **Ordinary Course Administrative Claim** means an Administrative Claim, other than a Professional Claim, that represents an obligation incurred in the ordinary course of business of the City (as determined by the City in its sole discretion).

64.     **Payment Dates** shall mean a Business Day on or before September 30, 2011, and a Business Day on or before September 30, 2012.  Half of the payments to holders of Allowed Class 6B Claims will be made on the first such Payment Date, and the second half will be made on the second such Payment Date.  Neither the City nor the representatives of the members of the IAFF or IBEW may negotiate, including without limitation in any future collective bargaining agreement, to reduce, modify, or extend the payments as provided in the Plan to holders of Allowed IAFF Member General Unsecured Claims or Allowed IBEW Member General Unsecured Claims.

65.    **Petition Date** means May 23, 2008.

66.    **Plan** means this Second Amended Plan of Adjustment of Debts, as Modified July 15, 2011, together with any Exhibits, each in their present form or as they may be altered, amended or modified from time to time in accordance with the provisions of this Plan, the Confirmation Order, the Bankruptcy Code, and the Bankruptcy Rules.

67.    **Plan Solicitation Order** means the Order Approving (1) Adequacy Of Information In Disclosure Statement With Respect To The City's Plan Of Adjustment; (2) Form, Scope And Nature of Solicitation, Balloting, Tabulation And Notices With Respect Thereto; And (3) Related Confirmation Procedures, Deadlines And Notices, by which the Bankruptcy Court on May 31, 2011 approved the Disclosure Statement as containing adequate information for the purpose of dissemination and solicitation of votes on and confirmation of this Plan and established certain rules, deadlines, and procedures for the solicitation of votes with respect to and the balloting on this Plan.

68.    **Pre-Effective Date Claims** shall have the meaning ascribed to such phrase in Section X(A).

69.    **Professional Claim** means a Claim required to be filed pursuant to Section II of the Plan for approval of amounts, if any, to be paid after the Effective Date for services or expenses in the Chapter 9 Case or incident to this Plan.

70.    **Restricted Funds** means the over 100 special purpose and enterprise funds administered by the City, the use of which is restricted by, among other things, grants, federal law, the California Constitution or other California law, such that the assets of the Restricted Funds may not lawfully be used to pay obligations of the General Fund.  Among the uses of the assets in the Restricted Funds are payment of the Restricted Revenue Bond and Note Payable Obligations.

71.    **Restricted Funds Claims Pool** means the cash or cash equivalent to be contributed by Restricted Funds to pay the Allowed Claims of holders of Restricted Funds Payment Claims.  The formula for calculating the amount of the Restricted Funds Claims Pool is described in Section IV(G) of the Plan in the discussion of the classification and treatment of

- 15 -

1    Class 6B.  As of the date hereof, the City estimates the amount to approximate $970,000, but the

2    number can and will be altered as General Unsecured Claims are Allowed and Disallowed

3    through the Claims resolution process.

4            **72.**    **Restricted Funds Payment Claims** means the General Unsecured Claims

5    that are compensation and benefits-related Claims of IBEW members whose compensation and

6    benefit payments are allocated by the City to the Restricted Funds, including but not limited to the

7    Water Enterprise Fund, the Housing Authority and the Marina Enterprise Fund.

8            **73.**    **Restricted Revenue Bond and Note Payable Obligations** means,

9    collectively, the (i) Water Enterprise Revenue Bond and Notes Payable Obligations; and (ii)

10    Special Assessment and Special Tax Obligations.

11            **74.**    **Retiree Health Benefit Claim** means a Claim by a former City employee

12    on account of or in any way related to the City's postpetition reduction of its contribution to

13    health benefit payments to former City employees.  The City objected to all Retiree Health

14    Benefit Claims on May 20, 2011, requesting that each be disallowed except for the approximately

15    80 claims, which aggregate approximately $60,000, which the City acknowledges should be

16    Allowed.  The Bankruptcy Court sustained the City's objections in orders filed on July 6, 2011.

17            **75.**    **Rights of Action** means any rights, claims, or causes of action owned by,

18    accruing to, or assigned to the City pursuant to the Bankruptcy Code or pursuant to any contract,

19    statute, or legal theory, including without limitation any rights to, claims, or causes of action for

20    recovery under any policies of insurance issued to or on behalf of the City.

21            **76.**    **Risk Management Internal Service Fund** means the fund established by

22    the City to accumulate resources for interdepartmental charges expended on self insurance for

23    General Liability Claims and Workers Compensation Claims.

24            **77.**    **Secured Claim** means a Claim that is secured, in whole or in part, (a) by a

25    lien that is not subject to avoidance or subordination under the Bankruptcy Code or applicable

26    non-bankruptcy law; or (b) as a result of rights of setoff under section 553 of the Bankruptcy

27    Code; but in any event only to the extent of the value, determined in accordance with section

28    / / /

506(a) of the Bankruptcy Code, of the holder's interest in the City's interest in property or to the

extent of the amount subject to such setoff, as the case may be.

78.     **Series 1999 COPs** means the instruments entitled "Certificates of

Participation (1999 Capital Improvement Project) Evidencing Direct, Undivided, Fractional

Interests of the Owners Thereof in Lease Payments to be made by the City of Vallejo, California,

as Rental for Certain Property Pursuant to a Lease Agreement with the Vallejo Public Financing

Authority," currently evidencing aggregate principal components of unpaid lease payments in the

amount of $3,785,000.

79.     **Series 2000 COPs** means the "Certificates of Participation (2000 Capital

Improvement Project) Evidencing Direct, Undivided, Fractional Interests of the Owners Thereof

in Lease Payments to be made by the City of Vallejo, California, as Rental for Certain Property

Pursuant to a Lease Agreement with the Vallejo Public Financing Authority," currently

evidencing aggregate principal components of unpaid lease payments in the amount of

$22,050,000.

80.     **Series 2000 COPs Assignment Agreement** means the Assignment

Agreement dated as of September 1, 2000, between the Authority and Union Bank (as then

trustee under the Series 2000 COPs Trust Agreement) made with respect to the Series 2000 COPs

and the Series 2000 COPs Reimbursement Agreement.

81.     **Series 2000 COPs Facility Lease** means the Lease Agreement dated as of

September 1, 2000, between the Authority, as lessor, and the City, as lessee, made with respect to

the Series 2000 COPs.

82.     **Series 2000 COPs Letter of Credit** means Irrevocable Letter of Credit

No. 306S236472 dated August 19, 2005, issued by Union Bank for the account of the City and

the benefit of the trustee under the Series 2000 COPs Trust Agreement with respect to the Series

2000 COPs.

83.     **Series 2000 COPs Reimbursement Agreement** means the

Reimbursement Agreement dated as of August 1, 2005, between the City and Union Bank made

with respect to the 2000 Letter of Credit.

84.    **Series 2000 COPs Site Lease** means the Site and Facility Lease dated as of September 1, 2000, between the City, as lessor, and the Authority, as lessee, made with respect to the Series 2000 COPs.

85.    **Series 2000 COPs Trust Agreement** means the Trust Agreement dated as of September 1, 2000, the Authority, the City, and Union Bank, as then trustee, made with respect to the Series 2000 COPs, as amended by the First Supplemental Trust Agreement dated as of August 1, 2005, between the Authority, the City, and Wells Fargo Bank, N.A., as successor trustee.

86.    **Series 2001 COPs** means the "Certificates of Participation (2001 Capital Improvement Project) Evidencing Direct, Undivided, Fractional Interests of the Owners Thereof in Lease Payments to be made by the City of Vallejo, California, as Rental for Certain Property Pursuant to a Lease Agreement with the Vallejo Public Financing Authority," currently evidencing aggregate principal components of unpaid lease payments in the amount of $9,490,000.

87.    **Series 2001 COPs Assignment Agreement** means the Assignment Agreement dated as of May 1, 2001, between the Authority and Union Bank (as trustee under the Series 2001 COPs Trust Agreement) made with respect to the Series 2001 COPs and the Series 2001 COPs Reimbursement Agreement.

88.    **Series 2001 COPs Facility Lease** means the Lease Agreement dated as of May 1, 2001, between the Authority, as lessor, and the City, as lessee, made with respect to the Series 2001 COPs.

89.    **Series 2001 COPs Letter of Credit** means Irrevocable Letter of Credit No. 306S233430 dated May 17, 2001, issued by Union Bank for the account of the City and the benefit of the trustee under the Series 2001 COPs Trust Agreement with respect to the Series 2001 COPs, as amended by the First Amendment to Irrevocable Letter of Credit dated May 5, 2006.

90.    **Series 2001 COPs Reimbursement Agreement** means the Reimbursement Agreement dated as of May 1, 2001, between the City and Union Bank made

1   with respect to the 2000 Letter of Credit, as amended by the First Amendment to Reimbursement

2   Agreement dated as of May 1, 2006, between the City and Union Bank.

3          **91.**     **Series 2001 COPs Site Lease** means the Site and Facility Lease dated as

4   of May 1, 2001, between the City, as lessor, and the Authority, **as** lessee, made with respect to the

5   Series 2001 COPs.

6          **92.**     **Series 2001 COPs Trust Agreement** means the Trust Agreement dated as

7   of May 1, 2001, the Authority, the City, and Union Bank, as trustee, made with respect to the

8   Series 2001 COPs.

9          **93.**     **Series 2002 COPs** means the "Certificates of Participation (2002 Capital

10  Improvement Project) Evidencing Direct, Undivided, Fractional Interests of the Owners Thereof

11  in Lease Payments to be made by the City of Vallejo, California, as Rental for Certain Property

12  Pursuant to a Lease Agreement with the Vallejo Public Financing Authority," currently

13  evidencing aggregate principal components of unpaid lease payments in the amount of

14  $8,190,000.

15         **94.**     **Series 2002 COPs Assignment Agreement** means the Assignment

16  Agreement dated as of December 1, 2002, between the Authority and Union Bank (as trustee

17  under the Series 2002 COPs Trust Agreement) made with respect to the Series 2002 COPs and

18  the Series 2002 COPs Reimbursement Agreement.

19         **95.**     **Series 2002 COPs Facility Lease** means the Lease Agreement dated as of

20  December 1, 2002, between the Authority, as lessor, and the City, as lessee, made with respect to

21  the Series 2002 COPs.

22         **96.**     **Series 2002 COPs Letter of Credit** means Irrevocable Letter of Credit

23  No. 306S235322 dated December 11, 2003, issued by Union Bank for the account of the City and

24  the benefit of the trustee under the Series 2002 COPs Trust Agreement with respect to the Series

25  2002 COPs.

26         **97.**     **Series 2002 COPs Reimbursement Agreement** means the

27  Reimbursement Agreement dated as of December 1, 2002, between the City and Union Bank

28  made with respect to the 2000 Letter of Credit.

**98.**    **Series 2002 COPs Site Lease** means the Site Lease dated as of December 1, 2002, between the City, as lessor, and the Authority, as lessee, made with respect to the Series 2002 COPs.

**99.**    **Series 2002 COPs Trust Agreement** means the Trust Agreement dated as of December 1, 2002, the Authority, the City, and Union Bank, as trustee, made with respect to the Series 2002 COPs.

**100.**    **Series 2003 COPs** means the "Certificates of Participation (2003 Capital Improvement Project) Evidencing Direct, Undivided, Fractional Interests of the Owners Thereof in Lease Payments to be made by the City of Vallejo, California, as Rental for Certain Property Pursuant to a Lease Agreement with the Vallejo Public Financing Authority," currently evidencing aggregate principal components of unpaid lease payments in the amount of $6,132,760.

**101.**    **Series 2003 COPs Assignment Agreement** means the Assignment Agreement dated as of December 1, 2003, between the Authority and Union Bank (as trustee under the Series 2003 COPs Trust Agreement) made with respect to the Series 2003 COPs and the Series 2003 COPs Reimbursement Agreement.

**102.**    **Series 2003 COPs Facility Lease** means the Lease Agreement dated as of December 1, 2003, between the Authority, as lessor, and the City, as lessee, made with respect to the Series 2003 COPs.

**103.**    **Series 2003 COPs Letter of Credit** means Irrevocable Letter of Credit No. 3306S234568 dated December 5, 2002, issued by Union Bank for the account of the City and the benefit of the trustee under the Series 2003 COPs Trust Agreement with respect to the Series 2003 COPs.

**104.**    **Series 2003 COPs Reimbursement Agreement** means the Reimbursement Agreement dated as of December 1, 2003, between the City and Union Bank made with respect to the 2000 Letter of Credit.

/ / /

/ / /

- 20 -

105.    **Series 2003 COPs Site Lease** means the Site Lease dated as of December 1, 2003, between the City, as lessor, and the Authority, as lessee, made with respect to the Series 2003 COPs.

106.    **Series 2003 COPs Trust Agreement** means the Trust Agreement dated as of December 1, 2003, the Authority, the City, and Union Bank, as trustee, made with respect to the Series 2003 COPs.

107.    **SIR Claim** means a Workers Compensation Claim or General Liability Claim subject to the City's self insurance retention, which means that the first $500,000 of any resolved claim against the City is an obligation of the City rather than an obligation of an excess risk-sharing pool of which the City is a member.

108.    **Special Assessment and Special Tax Obligations** means, collectively:

(a)    Vallejo Public Financing Authority, Local Agency Revenue Bonds (Hiddenbrooke Improvement District), 2004 Series A, originally issued in the aggregate principal amount of $22,400,000, of which $16,095,000 remains outstanding (which include underlying City assessment obligations securing the bonds);

(b)    Hiddenbrooke Improvement District No. 1998-1 of the City of Vallejo Improvement Bonds, 1998 Series A and Improvement Bonds, 1998 Series B (Federally Taxable), originally issued in the aggregate principal amount of $39,945,000, of which $16,095,000 remains outstanding;

(c)    Vallejo Public Financing Authority Local Agency Revenue Bonds 2003 Series B (Northeast Quadrant), originally issued in the aggregate principal amount of $5,100,000, of which $825,000 remains outstanding (which include underlying City assessment obligations securing the bonds);

(d)    Vallejo Public Financing Authority Local Agency Revenue Bonds 2003 Series A (Glen Cove), originally issued in the aggregate principal amount of $10,800,000 of which $1,285,000 remains outstanding (which include underlying City assessment obligations securing the bonds);

/ / /

CITY OF VALLEJO'S SECOND AMENDED
PLAN OF ADJUST. AS MODIFIED AUGUST 2, 2011

(e)     Northeast Quadrant Improvement District No. 2003-1 of the City of Vallejo Improvement Bonds, 2003 Series A, originally issued in the aggregate principal amount of $8,170,000, of which $7,395,000 remains outstanding; and

(f)     Vallejo Public Financing Authority 1998 Limited Obligation Revenue Bonds (Fairgrounds Drive Assessment District Refinancing), originally issued in the aggregate principal amount of $6,055,000, of which $605,000 remains outstanding (which include underlying City assessment obligations securing the bonds).

109.    **Unclaimed Property** shall have the meaning ascribed to such phrase in Section VIII(C)(2).

110.    **Unimpaired** means a Claim that is not Impaired within the meaning of section 1124 of the Bankruptcy Code.

111.    **Uninsured Portion Claim** means the amount of a resolved Insured Claim in excess of the Insured Amount.

112.    **Union Bank** means Union Bank, N.A., formerly known as Union Bank of California, N.A..

113.    **Union Bank COPs** means, collectively, the Series 2000 COPs, the Series 2001 COPs, the Series 2002 COPs, and the Series 2003 COPs.

114.    **Union Bank COPs Assignment Agreements** means, collectively, (i) the Series 2000 COPs Assignment Agreement; (ii) the Series 2001 COPs Assignment Agreement; (iii) the Series 2002 COPs Assignment Agreement; and (iv) the 2003 COPs Assignment Agreement.

115.    **Union Bank COPs Documents** means the COPs Documents with respect to the Union Bank COPs.

116.    **Union Bank COPs Facility Leases** means, collectively, (i) the Series 2000 COPs Facility Lease; (ii) the Series 2001 COPs Facility Lease; (iii) the Series 2002 COPs Facility Lease; and (iv) the 2003 COPs Facility Lease.

/ / /

/ / /

CITY OF VALLEJO'S SECOND AMENDED
PLAN OF ADJUST. AS MODIFIED AUGUST 2, 2011

117.    **Union Bank COPs Letters of Credit** means, collectively, (i) the Series 2000 COPs Letter of Credit; (ii) the Series 2001 COPs Letter of Credit; (iii) the Series 2002 COPs Letter of Credit; and (iv) the Series 2003 COPs Letter of Credit.

118.    **Union Bank COPs Reimbursement Agreements** means, collectively, (i) the Series 2000 COPs Reimbursement Agreement; (ii) the Series 2001 COPs Reimbursement Agreement; (iii) the Series 2002 COPs Reimbursement Agreement; and (iv) the 2003 Series COPs Reimbursement Agreement.

119.    **Union Bank COPs Site Leases** means, collectively, (i) the Series 2000 COPs Site Lease; (ii) the Series 2001 COPs Site Lease; (iii) the Series 2002 COPs Site Lease; and (iv) the 2003 COPs Site Lease.

120.    **Union Bank COPs Trust Agreements** means, collectively, (i) the Series 2000 COPs Trust Agreement; (ii) the Series 2001 COPs Trust Agreement; (iii) the Series 2002 COPs Trust Agreement; and (iv) the 2003 COPs Trust Agreement.

121.    **Unspent Proceeds** means, with respect to the Series 2000 COPs, the Series 2001 COPs and the Series 2002 COPs, the amount of original proceeds of such COPs, together with interest earnings thereon, held by the trustee for such COPs and remaining unspent as of the Effective Date, which amounts are pledged to the respective COPs pursuant to the COPs Documents.  As of January 18, 2011, the amount of the Unspent Proceeds is as follows:

| Series | Unspent Proceeds Amount |
| --- | --- |
| 2000 | $ 222,400 |
| 2001 | $ 844,000 |
| 2002 | $5,071,000 |
| Total | $6,137,400 |

122.    **Water Enterprise Revenue Bond and Notes Payable Obligations** means, collectively:

(a)    City of Vallejo Variable Rate Demand Water Revenue Bonds, 2001 Series A, originally issued in the aggregate principal amount of $23,075,000, of which $19,305,000 remain outstanding;

/ / /

- 23 -

1            (b)      City of Vallejo Water Revenue Refunding Bonds, Series 2006,

2    originally issued in the aggregate principal amount of $45,790,000 of which $41,245,000 remain

3    outstanding;

4            (c)      Loan from the United States Department of Commerce, Water Fund

5    maturing on July 1, 2017, in the original principal amount of $2,560,923, of which $671,139

6    remains unpaid;

7            (d)      Loan from the State of California, Department of Water Resources

8    maturing on January 1, 2025, in the original principal amount of $68,080, of which $49,358

9    remains unpaid; and

10            (e)      Loan from the State of California, Department of Water Resources

11    maturing on January 2, 2021, in the original principal amount of $6,675,000, of which $3,842,825

12    remains unpaid.

13            **123.**    **Westamerica** means Westamerica Bank.

14            **124.**    **Westamerica Lease** means the lease agreement dated as of October 9,

15    1997, by and between the City and Municipal Leasing Associates, Inc. of which Westamerica is

16    the assignee, under which remain aggregate principal components of unpaid lease payments in the

17    approximate amount of $186,236.

18            **125.**    **Workers Compensation Claims** means those Claims pursuant to

19    California workers compensation law (California Labor Code section 3200 *et seq.*) of current and

20    former City employees who have suffered an eligible injury while employed by the City.

21        **B.**      **Rules of Construction.**

22            The following rules of construction apply to this Plan:  (a) unless otherwise

23    specified, all references in this Plan to "Sections" and "Exhibits" are to the respective Section in

24    or Exhibit to this Plan, as the same may be amended or modified from time to time; (b) the

25    headings in this Plan are for convenience of reference only and do no limit or otherwise affect the

26    provisions of this Plan; (c) words denoting the singular number include the plural number and

27    vice versa; (d) the rules of construction set forth in section 102 of the Bankruptcy Code apply;

28    (e) in computing any period of time prescribed or allowed by this Plan, the provisions of

Bankruptcy Rule 9006(a) apply; and (f) the words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained in this Plan.

## II.    TREATMENT AND DEADLINE FOR THE ASSERTION OF ADMINISTRATIVE CLAIMS AND PROFESSIONAL CLAIMS

### A.    Treatment of Administrative Claims.

Except to the extent that the holder of an Allowed Administrative Claim agrees to a different treatment, the City or its agent shall pay to each holder of an Allowed Administrative Claim, in full satisfaction, release and discharge of such Claim, Cash in an amount equal to such Allowed Administrative Claim on the later of (i) the Effective Date, (ii) the date on which such Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable.

### B.    Treatment of Professional Claims.

Pursuant to section 943(a)(3) of the Bankruptcy Code, all amounts paid following the Effective Date or to be paid following the Effective Date for services or expenses in the Chapter 9 Case or incident to this Plan must be disclosed to the Bankruptcy Court and must be reasonable.  There shall be paid to each holder of a Professional Claim, in full satisfaction, release and discharge of such Claim, Cash in an amount equal to that portion of such Claim that the Bankruptcy Court approves as reasonable, on or as soon as reasonably practicable following the date on which the Bankruptcy Court enters an Order determining such reasonableness.  The City, in the ordinary course of its business, and without the requirement for Bankruptcy Court approval, may pay for those attorney services rendered and those costs incurred following the Effective Date.

### C.    Priority Claims In Chapter 9.

The only kind of priority claims incorporated into chapter 9 through Section 901 are Administrative Claims allowed under section 507(a)(2) of the Bankruptcy Code.  The treatment of all such Administrative Claims is set forth above in Sections II(A) and II(B).  No other kinds of priority claims set forth in section 507 of the Bankruptcy Code are recognized in chapter 9 cases, and Claims that would constitute administrative claims in a case under another

- 25 -

1   chapter of the Bankruptcy Code are treated in chapter 9 and in this Plan as General Unsecured

2   Claims.

3       **D.**   **Deadline for the Filing and Assertion of Administrative Claims (Other Than Ordinary Course Administrative Claims) and Professional Claims.**

4

5       **All requests for payment or any other means of preserving and obtaining**

6   **payment of Administrative Claims (other than ordinary course Administrative Claims) that**

7   **have not been paid, released, or otherwise settled, and all requests for approval of**

8   **Professional Claims, must be filed with the Bankruptcy Court and served upon the City no**

9   **later than thirty (30) days after the date on which the Notice of Effective Date is mailed.**

10  Any request for payment of an Administrative Claim or a Professional Claim that is not timely

11  filed by such date will be forever barred, and holders of such Claims shall be barred from

12  asserting such Claims in any manner against the City.

13  **III.**   **DESIGNATION OF CLASSES OF CLAIMS**

14      Pursuant to section 1122 of the Bankruptcy Code, all Claims other than

15  Administrative Claims and Professional Claims are classified for all purposes, including voting,

16  confirmation, and distribution pursuant to this Plan, as follows:

17      Class 1A1 – Claims of Union Bank as sole holder of the Series 2000 COPs.

18      Class 1A2 – Claims of Union Bank as obligee of the City under the Series 2000

19  COPs Reimbursement Agreement (but, for the avoidance of doubt, and without merger thereof,

20  only to the extent of one full recovery under Classes 1A1 and 1A2).

21      Class 1B1 – Claims of Union Bank as sole holder of the Series 2001 COPs.

22      Class 1B2 – Claims of Union Bank as obligee of the City under the Series 2001

23  COPs Reimbursement Agreement (but, for the avoidance of doubt, and without merger thereof,

24  only to the extent of one full recovery under Classes 1B1 and 1B2).

25      Class 1C1 – Claims of Union Bank as sole holder of the Series 2002 COPs.

26      Class 1C2 – Claims of Union Bank as obligee of the City under the Series 2002

27  COPs Reimbursement Agreement (but, for the avoidance of doubt, and without merger thereof,

28  only to the extent of one full recovery under Classes 1C1 and 1C2).

Class 1D1 – Claims of Union Bank as sole holder of the Series 2003 COPs.

Class 1D2 – Claims of Union Bank as obligee of the City under the Series 2003 COPs Reimbursement Agreement (but, for the avoidance of doubt, and without merger thereof, only to the extent of one full recovery under Classes 1D1 and 1D2).

Class 2A – Claims of the Indenture Trustee as trustee for the holders of the Series 1999 COPs.

Class 2B - Claims of National as insurer of the Series 1999 COPs to the extent National is subrogated to the rights of the Indenture Trustee, or due payment by the City under the Financial Guaranty Agreement between National and the City, dated as of July 13, 1999, as a result of payment by National on the National Policies.

Class 3 - Claims of the MPA Assignees under the MPA Lease.

Class 4 - Claims of Westamerica under the Westamerica Lease.

Class 5 - Claims of CalPERS with respect to the CalPERS Pension Plan, as trustee under the CalPERS Pension Plan for the benefit of CalPERS Pension Plan Participants.

Class 6A - General Unsecured Claims Convenience Class – Retiree Health Benefits Claims

Class 6B - General Unsecured Claims

Class 7 - General Liability Claims

Class 8 - Workers Compensation Claims

Class 9 - Restricted Revenue Bond and Note Payable Obligations

## IV.    TREATMENT OF CLAIMS

### A.    Class 1A1 through Class 1D2, Inclusive – Claims of Union Bank With Respect to the Union Bank COPs.

#### 1.    Impairment and Voting.

Classes 1A1, 1A2, 1B1, 1B2, 1C1, 1C2, 1D1, and 1D2 are Impaired by this Plan since the treatment of these Classes will affect the legal, equitable or contractual rights of Union Bank, the holder of Claims. Accordingly, each of these Classes is entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order; provided, however, that for voting

Filed 08/04/11    Doc 1113

1    purposes only, each pair of (i) Classes 1A1 and 1A2; (ii) Classes 1B1 and 1B2; (iii) Classes 1C1

2    and 1C2; and (iv) Classes 1D1, and 1D2, are deemed a single class.

3            **2.**    **Treatment.**

4            The Union Bank COPs Documents and the obligations of the City thereunder,

5    representing, in the aggregate, the Claims held by Union Bank in Classes 1A1, 1A2, 1B1, 1B2,

6    1C1, 1C2, 1D1, and 1D2, all of which are deemed Allowed, will be adjusted as follows, all

7    effective on or as of the Effective Date:

8            (a)    Without the necessity of making a motion, the City, as lessor, shall

9    be deemed to assume each of the Union Bank COPs Site Leases (subject to the amendment and

10   restatement thereof by the New Union Bank Site Lease as provided below), and the City shall

11   cause the Authority to sign and deliver to the City and Union Bank a consent to that assumption;

12   provided, however, that (i) no defaults of the City, under the Union Bank COPs Site Leases need

13   be cured, all of the same being deemed cured; and (ii) no adequate assurance of future

14   performance thereunder need be provided, all of the foregoing being deemed provided by the

15   amendment and restatement thereof, as provided below, by the New Union Bank Site Lease;

16           (b)    Without the necessity of making a motion, the City, as tenant, shall

17   be deemed to assume each of the Union Bank COPs Facility Leases (subject to the amendment

18   and restatement thereof by the New Union Bank Facility Lease as provided below), and the City

19   shall cause the Authority to sign and deliver to the City and Union Bank a consent to that

20   assumption; provided, however, that (i) no defaults of the City, under the Union Bank COPs

21   Facility Leases need be cured, all of the same being deemed cured; and (ii) no adequate assurance

22   of future performance thereunder need be provided, all of the foregoing being deemed provided

23   by the amendment and restatement thereof, as provided below, by the New Union Bank Facility

24   Lease;

25           (c)    The Union Bank COPs Site Leases and the Union Bank COPs

26   Facility Leases will be amended and restated, respectively, by the New Union Bank Site Lease

27   and the New Union Bank Facility Lease, and the City shall cause the Authority to execute (*i.e.*, to

28   sign and deliver), and the City shall execute, the same as, respectively, tenant and landlord

1    thereunder. As to the JFK Library, the new Union Bank Documents will retain priority over the

2    MPA Lease pursuant to a subordination agreement or to another document acceptable to Union

3    Bank, the City and the Authority;

4           (d)    In recognition of the MVLF Intercept guaranteeing the payment of

5    the 2000 COPs, a portion of these lease payments to be made by the City pursuant to the New

6    Union Bank Facility Lease, as shown in Exhibit D, will be deemed to be guaranteed by the City's

7    election under California Government Code Section 37351.5, and the City will file any and all

8    necessary notices with the Controller to give continuing effect to such election; *provided*,

9    *however*, that no such new election or notice shall be deemed to provide Union Bank with any

10    greater rights with respect to the MVLF Intercept than it would have had with respect to the

11    Series 2000 COPs; nor shall it have any effect on any rights or remedies relating to MVLF

12    Revenues that any other creditor of the City may have under the MVLF Intercept. As to the JFK

13    Library, the New Union Bank Documents will retain priority over the MPA Lease which shall be

14    a form acceptable to Union Bank, the Authority and the City; and *provided, further*, that Union

15    Bank shall be appointed and deemed to function as "trustee" for purposes of giving notices and

16    receiving payments of MVLF intercept funds pursuant to California Government Code Section

17    37351.5;

18           (e)    The Unspent Proceeds will be paid to Union Bank by the respective

19    trustees under the Union Bank COPs Trust Agreements under which those respective Unspent

20    Proceeds are held;

21           (f)    All accrued but unpaid interest on the aggregate principal amount

22    due the Bank under the Union Bank COPs Reimbursement Agreements in excess of the amount

23    thereof included in the New Union Bank Reimbursement Obligations Starting Principal Balance

24    (that is, all accrued but unpaid interest at the non-default contract rate in excess of $1,827,573 and

25    all accrued but unpaid interest at the default contract rate in excess of that at the non-default

26    contract rate) will be deemed waived;

27    / / /

28    / / /

(g)     The Union Bank COPs Reimbursement Agreements will be amended and restated by the New Union Bank Reimbursement Agreement Payment Agreement, and the City and Union Bank shall execute the same;

(h)     The Union Bank COPs Assignment Agreements will be amended and restated by the New Union Bank Assignment Agreement, and the City shall cause the Authority to execute, and the Bank shall execute, the same;

(i)     The City shall pay to the respective trustees under the Union Bank COPs Trust Agreements all accrued but unpaid fees, expenses, and charges due each thereunder;

(j)     The City shall pay to Union Bank (other than as trustee under any of the Union Bank COPs Trust Agreements) all accrued but unpaid fees, expenses, and charges (but, for the avoidance of doubt, excluding principal or accrued but unpaid interest) due under the Union Bank COPs Documents;

(k)     The City and the Authority shall approve the execution of each of the New Union Bank Documents to which it is a party (including taking all steps necessary to allow the New Union Bank Facilities Lease and the New Union Bank Site Lease to have the maximum terms permitted by law);

(l)     Union Bank shall surrender all of the Union Bank COPs under each series thereof to the respective trustee under the respective Union Bank COPs Trust Agreement for that series for cancellation by that trustee, and, upon each of those respective cancellations, the remaining Union Bank COPs Documents with respect to that series, including that Union Bank COPs Trust Agreement, will be deemed terminated and have no further force or effect except to the extent that any of those Union Bank COPs Documents have been amended and restated pursuant to this Plan by one of the New Union Bank Documents, in which case, all the obligations of the City and the other parties thereto are deemed continued in and subsumed by that amended and restated New Union Bank Document as provided therein;

(m)     The respective trustee under each of the Union Bank COPs Trust Agreements will be deemed discharged as trustee under that Union Bank COPs Trust Agreement; and

CITY OF VALLEJO'S SECOND AMENDED
PLAN OF ADJUST. AS MODIFIED AUGUST 2, 2011

(n)     After accomplishment of the foregoing, all Rights of Action against Union Bank and the respective trustee under each of the Union Bank COPs Trust Agreements existing as of the Effective Date are deemed expressly waived, relinquished, released, compromised, and settled in this Plan, except Rights of Action that arise on or after the Effective Date under the New Union Bank Documents.

**B.     Classes 2A and 2B – Claims of The Indenture Trustee and of National With Respect to the Series 1999 COPs.**

**1.     Impairment and Voting.**

Classes 2A and 2B are Impaired by this Plan since the treatment of these Classes will affect the legal, equitable or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in each of these Classes are entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.  Pursuant to the terms of the indenture for the Series 1999 COPs, in the event of a default by the City with requires National to make a payment to the Indenture Trustee on behalf of the holders of the COPs, then, so long as National is not in default of its obligations under the applicable documents, National shall be entitled to control and direct the exercise of remedies available to holders against the City under such indenture, including voting on a plan of adjustment.  National has made a payment under the on account of the City's payment default, and National is not in default of its obligations thereunder and is thereby entitled to vote the interests of the holders of the Series 1999 COPs under the Plan.  If National ceases to make payments or is in default of its obligations in the future, the Indenture Trustee shall nevertheless forbear from exercising any remedies under the indenture for the Series 1999 COPs so long as the City performs its obligations to make lease payments pursuant to the National Settlement Agreement.

**2.     Treatment.**

National filed the National MVLF Adversary seeking to establish that it has the right to access the MVLF Intercept to recover payments due and unpaid with respect to the Series 1999 COPs.  The City opposed the grant of such relief.  The City, National and other parties

/ / /

Filed 08/04/11

Doc 1113

1   entered into the National Settlement Agreement, a copy of which is Exhibit A[2].  Pursuant to the

2   National Settlement Agreement, on or about February 1, 2011, the City made an initial payment

3   to National.  The National MVLF Adversary will be dismissed with prejudice upon entry of a

4   Final Order approving the National Settlement Agreement Motion, and the City will be required

5   to make payments equal to 75% of the amounts due with respect to the Series 1999 COPs until

6   fiscal year 2013-14, with full payments from fiscal year 2013-14 and thereafter, and will be

7   required to make arrearage payments to National, with interest, from excess MVLF Revenues, if

8   any, commencing on January 15, 2014.  In addition to an initial payment in a compromised

9   amount of attorney fees incurred by National, the City also will reimburse National for its

10   reasonable attorney fees incurred in connection with the Chapter 9 Case on and after February 1,

11   2011.

12          The COPs Documents with respect to the Series 1999 COPs will be assumed by

13   the City without the necessity of making a motion, and will remain in full force and effect;

14   provided that pursuant to the National Settlement Agreement, National and the Indenture Trustee

15   will forebear from enforcing any remedies against the City or the real property leased under the

16   COPs Documents for the Series 1999 COPs provided that the City honors its obligations under

17   the National Settlement Agreement and this Plan.  Because the COPs Documents for the Series

18   1999 COPs are not altered by this Plan or otherwise, the holders of the Series 1999 COPs remain

19   entitled to payment in full of any shortfall as a result of the lower than contract  payments made

20   by the City under the National Settlement Agreement by virtue of National's obligations under

21   the National Policies.

22          Pursuant to the National Settlement Agreement and this Plan, the City

23   acknowledges that, in the event the City fails to honor its obligations to National or the Indenture

24   Trustee under the National Settlement Agreement or this Plan, the City will not oppose the filing

25   by the Indenture Trustee of a notice with the Controller to intercept MVLF Revenues or the

26   payment of MVLF Revenues by the Controller to the Indenture Trustee or to National.  The

27

28   [2] In the event of any discrepancy between the terms of the Plan and the terms of the National
Settlement Agreement, the terms of the National Settlement Agreement shall control.

1   Controller has agreed that it will intercept such MVLF Revenues, pursuant to Section 37351.5 of

2   the California Government Code; and pay such MVLF Revenues to the Indenture Trustee without

3   further order of any court;  *provided*, *however*, that nothing in this Plan or in the National

4   Settlement Agreement shall have any effect on any rights or remedies relating to MVLF

5   Revenues that Union Bank or any other creditor of the City may have under the MVLF Intercept.

6       C.    **Class 3 - Claims of the MPA Assignees under the MPA Lease.**

7           1.    **Impairment and Voting.**

8           Class 3 is Impaired by this Plan since the treatment of this Class will affect the

9   legal, equitable or contractual rights of the holders of the Claims, and, accordingly, the holders of

10  the Claims in this Class are entitled to vote to accept or reject this Plan in accordance with the

11  Plan Solicitation Order.

12          2.    **Treatment.**

13          The City will assume the MPA Lease without the necessity of making a motion,

14  and in connection therewith, the schedule of the City's payment obligations under the MPA Lease

15  shall be replaced by the New MPA Documents, which reflects a reduction in the principal

16  components of unpaid lease payments as well as the reduction of other of the City's obligations

17  under the MPA Lease.  In addition, the City will pay up to a maximum of $20,000 to the Peg

18  Yorkin Living Trust, one of the MPA Lease Assignees, to cover attorney fees associated with the

19  Chapter 9 Case and the Plan.  The documents with respect to the MPA Lease shall be junior in

20  priority to the New Union Bank Documents with respect to the JFK Library.

21      D.    **Class 4 - Claims of Westamerica under the Westamerica Lease.**

22          1.    **Impairment and Voting.**

23          Class 4 is not Impaired by this Plan because the treatment of this Class will not

24  affect the legal, equitable or contractual rights of the holder of the Claim, and, accordingly, the

25  holder of the Claim in this Class is not entitled to vote to accept or reject this Plan.

26          2.    **Treatment.**

27          The City will continue honor its obligations under the Westamerica Lease, and

28  WestAmerica retains all of its rights and remedies under applicable nonbankruptcy law.

CITY OF VALLEJO'S SECOND AMENDED
PLAN OF ADJUST. AS MODIFIED AUGUST 2, 2011

E.   **Classes 5 - Claims of CalPERS with Respect to the CalPERS Pension Plan, as Trustee Under the CalPERS Pension Plan for the Benefit of CalPERS Pension Plan Participants.**

      1.   **Impairment and Voting.**

Class 5 is not Impaired by this Plan because the treatment of this Class will not affect the legal, equitable or contractual rights of the holder of such Claims, and, accordingly, the holder of the Claims in this Class is not entitled to vote to accept or reject this Plan.

      2.   **Treatment.**

The City will continue to honor its obligations under the CalPERS Pension Plans, and CalPERS as trustee and the CalPERS Pension Plan Participants retain all of their rights and remedies under applicable nonbankruptcy law.  Thus, CalPERS and the CalPERS Pension Plan Participants will be entitled to the same rights and benefits to which they are currently entitled under the CalPERS Pension Plans. CalPERS, pursuant to the CalPERS Pension Plans, will continue to be made available to provide pension benefits for participants in the manner indicated under the provisions of the CalPERS Pension Plans and remedies under applicable nonbankruptcy law.

F.   **Class 6A –General Unsecured Claims Convenience Class – Retiree Health Benefits Claims**

      1.   **Impairment and Voting.**

Class 6A is not Impaired by this Plan since the treatment of this Class will not affect the legal, equitable or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are not entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

      2.   **Treatment.**

So long as Allowed Retiree Health Benefit Claims aggregate less than $100,000, which the City believes will be the case, Holders of Allowed Retiree Health Benefit Claims shall be paid in full on or before the first Business Day following the 60-day anniversary of the Effective Date, and in any event shall be paid on or before September 30, 2011.  If Allowed

/ / /

Retiree Health Benefit Claims aggregate an amount greater than $100,000, then Retiree Health Benefit Claims shall instead be classified as Class 6B Claims, and treated accordingly.

**G.  Class 6B – General Unsecured Claims**

**1.  Impairment and Voting.**

Class 6B is Impaired by this Plan since the treatment of this Class will affect the legal, equitable or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

**2.  Treatment.**

Holders of Allowed Class 6B Claims will share pro rata in distributions from the General Unsecured Claims Pool and the Restricted Funds Claims Pool, less the amounts paid to holders of Allowed Class 6A Claims.  Such amount will approximate $5.9 million, of which approximately $1 million will be funded by the Restricted Funds Claims Pool on account of those IBEW employees compensated from Restricted Funds.  The foregoing notwithstanding, the amounts the City will contribute to the General Funds Claims Pool and the Restricted Funds Claims Pool will be reduced by the present value of the amounts necessary to fund the cost of the conversion of Leave Buyout Claims by those exercising the Leave Buyout Option.  Thus, for example, if the present value of the cost of future pension contributions by the City on account of the exercise of the Leave Buyout Option by former employees whose compensation was paid by the General Fund is $100,000, then the General Fund Unsecured Claims Pool contribution will be reduced from $5 million to $4.9 million.  Such reduction will have no impact on other holders of Allowed Class 6B Claims because the amount of Claims entitled to a cash payment will be reduced proportionately on account of the exercise of the Leave Buyout Option.  The distributions will be made on the Payment Dates.

Prior to the Confirmation Date, the City on one hand, and IAFF and IBEW on the other hand, will enter into a settlement agreement or settlement agreements that provide for the reduction of the IAFF/IBEW Member Claims and reduced payment of the remainder of such Claims.  The reductions in the claimed amounts will constitute the settlement of disputes between

1   the City and the two unions and their members of the allowable amounts of such Claims (which,

2   in the aggregate, amount to in excess of $32 million), and will result in payments to members of

3   IAFF totaling $3 million and to members of IBEW totaling $2.1 million.  The settlement

4   agreements also will direct that specified amounts of those payments otherwise due to holders of

5   Allowed IAFF/IBEW Member Claims on the first of the Payment Dates (the "Direct Payments")

6   will instead be paid by the City directly to counsel for the two unions or to the repayment to the

7   unions themselves of loans incurred (or repayment directly to the entities from whom they

8   borrowed) in order to enable the unions to pay legal fees and costs, which are currently estimated

9   in aggregate to be approximately $900,000 for the IAFF and $450,000 for the IBEW.  The City

10  and the unions believe but do not guaranty that the Direct Payments will not be taxable to the

11  holders of such Allowed IAFF/IBEW Member Claims, and thus that the Direct Payments will not

12  result in withholding obligations by the City.  The settlement agreements will further provide that

13  the Claims of union members to their share of the net payments to pursuant to the Plan (after

14  payment of the attorney fees and related loans, as well as after payment of employee and

15  employer tax withholding and related charges, including any payments related to CalPERS

16  required pension obligations) shall be proportionate to such members' claims as agreed by the

17  City and the unions and approved by the Bankruptcy Court as part of approving the settlement

18  agreement(s).  Should the City and the unions be unable to agree on the allowable amounts of

19  union members' claims, the City retains the right to object to these claims or take other

20  appropriate action to determine the allowable amounts, based on the City's employment records.

21          The City hopes to provide holders of Leave Buyout Claims with the Leave Buyout

22  Calculation prior to the hearing on Confirmation.   The Holder of a Leave Buyout Claim may

23  exercise the Leave Buyout Option by providing written notice to Debora Boutte, the City's

24  Director of Human Resources.  Such notice must be actually received by Ms. Boutte by the later

25  of (a) 4:30 p.m. PST on Friday, August 12, 2011; or (b) 28 days following receipt of the Leave

26  Buyout Calculation by such Holder or by his or her counsel of record.  The exercise of the Leave

27  Buyout Option shall be accomplished by completing, executing the Leave Buyout Option

28  Exercise Form and transmitting it to Ms. Boutte.

The remaining members of Class 6B will receive the same percentage payment on account of their Allowed Claims as will the holders of the IAFF Member General Unsecured Claims and the IBEW Member General Unsecured Claims, which the City estimates to be approximately 20% to 30% of their claims.

**H.      Class 7 – General Liability Claims**

       **1.      Impairment and Voting.**

Class 7 is Impaired by this Plan since the treatment of this Class will affect the legal, equitable or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

       **2.      Treatment.**

The SIR Claim portion of each Allowed General Liability Claim will be paid on the Payment Dates from the Risk Management Internal Service Fund, and will receive the same percentage payment on the dollar of Allowed Claim as will the holders of Allowed Class 6B Claims.  The Insured Portion of each Allowed General Liability Claim is not Impaired, and shall be paid by the applicable excess risk-sharing pool.

**I.      Class 8 –Workers Compensation Claims**

       **1.      Impairment and Voting.**

Class 8 is not Impaired by this Plan since the treatment of this Class will not affect the legal, equitable or contractual rights of the holders of the Claims, and, accordingly, the holders of the Claims in this Class are not entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

       **2.      Treatment.**

The City must pay Allowed SIR Claims related to Worker Compensation Claims in full.  If not, the City will lose its State workers compensation insurance for those claims in excess of the SIR, exposing the City's current and former workers to grave risk.  The City will pay the SIR Claims related to Worker Compensation Claims from the Risk Management Internal Service Fund.

**J.**    **Class 9 – Holders of Restricted Revenue Bond and Note Payable Obligations.**

    **1.**    **Impairment and Voting.**

Class 9 is not Impaired by this Plan since the treatment of this Class will not affect the legal, equitable or contractual rights of the holders of the Claims, and, accordingly, the holders of Claims in this Class are not entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

    **2.**    **Treatment.**

Class 9 consists of Claims of the holders of bonds and notes that are secured by special and restricted sources of revenues and are not payable from the General Fund.

    <u>Water Enterprise Revenue Bond and Notes Payable Obligations</u>.  The City's water enterprise obligations are secured by a pledge of and lien on revenues of the City's water system, which are restricted revenues pursuant to the State Constitution, and are "special revenues" as defined in section 902(2) of the Bankruptcy Code.  These revenues are not a part of or available to the General Fund, and the General Fund is not obligated to make any payment on the water enterprise obligations.  The City may transfer amounts from the water enterprise fund to the General Fund only to pay costs which are directly incurred by the General Fund to provide the enterprise-related services.  Such transfers are treated by the enterprise as operation and maintenance expenses.  The City will continue to apply revenues from the water system to the payment of the water enterprise obligations as required by the terms of such obligations.

    <u>Special Assessment and Special Tax Obligations</u>.  The City's special assessment and special tax obligations are secured by certain special assessments and special taxes levied on specific real property within the respected districts for which these obligations were issued.  These special assessment and special tax revenues are legally restricted to the payment of debt service on the special assessment and special tax obligations, are "special revenues" as defined in section 902(2) of the Bankruptcy Code and cannot be used for any other purpose or be transferred to the General Fund.  The General Fund is not obligated to pay debt service on the special assessment and special tax obligations.  The City will continue to apply revenues from the

/ / /

1    applicable special assessments and special taxes to pay the special assessment and special tax

2    obligations as required by the terms of such obligations.

3    **V.    ACCEPTANCE OR REJECTION; CRAM DOWN**

4        **A.    Voting of Claims.**

5          Each holder of an Allowed Claim classified into Classes 1A1, 1A2, 1B1, 1B2,

6    1C1, 1C2, 1D1, 1D2, 2A, 2B, 3, 6B and 7 shall be entitled to vote each such Claim to accept or

7    reject this Plan (subject, in the case of Classes 1A1, 1A2, 1B1, 1B2, 1C1, 1C2, 1D1, and 1D2, to

8    paired Class voting pursuant to Section IV.A.1 above).

9          With respect to any Impaired Class of Claims that fails to accept this Plan, the

10    City, as proponent of this Plan, intends to request that the Bankruptcy Court nonetheless confirm

11    this Plan pursuant to the so-called "cram down" powers set forth in Bankruptcy Code section

12    1129(b).

13    **VI.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

14        **A.    Assumption of Executory Contracts and Unexpired Leases.**

15          Except as otherwise provided in this Plan with respect to the Union Bank COPs

16    Site Lease, the Union Bank COPs Facility Leases, the COPs Documents for the Series 1999

17    COPs, and the MPA Lease, all of the City's executory contracts and unexpired leases are assumed

18    as of the Effective Date, subject to the Assumption Objection Procedure.

19        **B.    Rejection of Executory Contracts and Unexpired Leases.**

20          Other than executory contracts and unexpired leases that have been rejected during

21    the Chapter 9 Case, none of the City's executory contracts and unexpired leases shall be rejected.

22        **C.    Cure Payments.**

23          The City represents that other than the agreements with the holders of Class 1, 2

24    and 3 Claims (which are otherwise dealt with in the Plan), it is not in default under any of its

25    executory contracts and unexpired leases, with the exception of a putative default under any

26    agreement that contains a so-called *ipso facto* clause.  Such clauses are unenforceable as against

27    the City pursuant to Bankruptcy Code section 365, even if the City were otherwise in default

28    under any such agreement(s).

CITY OF VALLEJO'S SECOND AMENDED
PLAN OF ADJUST. AS MODIFIED AUGUST 2, 2011

**D.      Assumption Objection Procedure.**

The Plan shall be attached to the Notice of Entry, which the City shall cause to be mailed within seven Business days after the Confirmation Date to all creditors and parties in interest, including all parties to the City's executory contracts and unexpired leases.  The City also shall cause the Notice of Entry to be published in a newspaper of general circulation in the City.  The Plan need not be reprinted in such publication, which shall instead provide information enabling any interested party to obtain a copy of the Plan at no cost via U.S. Mail.  The Notice of Entry shall provide clear notice that (1) pursuant to the Plan, the City is assuming all executory contracts and unexpired leases; (2) the City is not rejecting any executory contracts or unexpired leases; (3) the City believes that it is not in default under any such executory contracts and unexpired leases; and (4) any party to an executory contract or unexpired lease may object to the assumption of such agreement by filing in the Bankruptcy Court and serving on the City an objection within 21 days of the later of (i) service of the Notice of Entry by mail; and (ii) publication in the newspaper of general circulation. Service on the City shall be accomplished by emailing the objection to malevinson@orrick.com or by mailing it to the following address:

> Marc A. Levinson
> Orrick Herrington & Sutcliffe LLP
> 400 Capitol Mall, Suite 3000
> Sacramento, CA 95814-4497

In the event that any objections are filed and served, the City will file a responsive pleading within 14 days of filing, and will schedule a hearing at which time all objections may be heard.

**VII.   IMPLEMENTATION AND MEANS FOR IMPLEMENTATION OF THIS PLAN**

Following the Effective Date, the City will continue to operate pursuant to the City Charter, the Constitution of the State of California and other applicable laws.  While the City Council adopted the fiscal policies and projections in the Five-Year General Fund Business Plan to govern the allocation of the City's unrestricted resources, the City acknowledges and understands that financial plans and budgets are not fixed in stone, and that ongoing adjustments will have to be made during the course of the five years covered by the Five-Year General Fund

1   Business Plan in order to enable the City to adjust to changing economic and operational needs.

2   However, this Plan represents the City's commitment to the binding treatment of the holders of

3   Claims in the various Classes as enumerated in this Plan.

4         All of the City's claims, causes of action, rights of recovery, rights of offset,

5   recoupment rights to refunds and similar rights shall be retained by the City.  The failure to list in

6   the Disclosure Statement any potential or existing Right of Action retained by the City is not

7   intended to and shall not limit the rights of the City to pursue any such action although the City

8   acknowledges that it has no claims, causes of action, etc. against Union Bank with respect to the

9   Union Bank COPs.  Unless a Right of Action is expressly waived, relinquished, released,

10   compromised or settled in this Plan, the City expressly reserves all Rights of Action for later

11   adjudication and, as a result, no preclusion doctrine, including the doctrines of res judicata,

12   collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise)

13   or laches, shall apply to such Rights of Action upon or after the confirmation or consummation of

14   this Plan or the Effective Date.  In addition, the City expressly reserves the right to pursue or

15   adopt against any other entity any claims alleged in any lawsuit in which the City is a defendant

16   or an interested party.

17   **VIII.   DISTRIBUTIONS**

18       **A.   Distribution Agent.**

19         On or after the Effective Date, the City may retain one or more agents to perform

20   or assist it in performing the distributions to be made pursuant to this Plan, which agents may

21   perform without bond.  The City may provide reasonable compensation to any such agent(s)

22   without further notice or Court approval.

23       **B.   Delivery of Distributions.**

24         All distributions to any holder of an Allowed Claim shall be made at the address of

25   such holder as set forth in the books and records of the City or its agents, unless the City has been

26   notified by such holder in a writing that contains an address for such holder different from the

27   address reflected in its books and records.  All distributions to with respect to Classes 1A, 1B, 1C,

28   / / /

1  1D, 2A, 2B and 3 shall be made in accordance with the New Union Bank Documents, the COPs

2  Documents, the National Settlement Agreement and the New MPA Documents, as appropriate.

3  **C.    Undeliverable Distributions.**

4  **1.    Holding of Undeliverable Distributions.**

5  If any distribution to any holders is returned to the City or its agent as

6  undeliverable, no further distributions shall be made to such holder unless and until the City is

7  notified in writing of such holder's then-current address.  Unless and until the City is so notified,

8  such distribution shall be deemed to be "Unclaimed Property" and shall be dealt with in

9  accordance with Section VIII(C)(2).

10  **2.    Unclaimed Property.**

11  If any entity entitled to receive distributions pursuant to this Plan does not present

12  itself on the Effective Date or on such other date on which such entity becomes eligible for

13  distribution, such distributions shall be deemed to be "Unclaimed Property."  Unclaimed Property

14  shall be set aside and held in a segregated account to be maintained by the City pursuant to the

15  terms of this Plan.

16  **3.    Notification and Forfeiture of Unclaimed Property.**

17  No later than 60 days after the first Payment Date, the City shall file with the

18  Bankruptcy Court a list of Unclaimed Property, together with a schedule that identifies the name

19  and last-known address of holders of the Unclaimed Property; the City otherwise shall not be

20  required to attempt to locate any such entity.  On the 60th day following the second Payment

21  Date, all remaining Unclaimed Property and accrued interest or dividends earned thereon shall be

22  remitted to and vest in the City.

23  **D.    Distributions of Cash.**

24  Any payment of Cash to be made by the City or its agent pursuant to this Plan

25  shall be made by check drawn on a domestic bank or by wire transfer, at the sole option of the

26  City.

27  / / /

28  / / /

CITY OF VALLEJO'S SECOND AMENDED
PLAN OF ADJUST. AS MODIFIED AUGUST 2, 2011

Case:17-03283-LTS Doc#:12871-8 Filed:04/17/20 Entered:04/17/20 15:53:54 Desc:
Exhibit C - Vallejo No. 08-26813 Dkt. 1113 Page 52 of 84

Filed 08/04/11

E.     **Timeliness of Payments.**

Any payments or distributions to be made pursuant to this Plan shall be deemed to be timely made if made within fourteen (14) days after the dates specified in this Plan.  Whenever any distribution to be made under this Plan shall be due on a day that is a Saturday, Sunday, or legal holiday, such distribution instead shall be made, without interest, on the immediately succeeding day that is not a Saturday, Sunday, or legal holiday, but shall be deemed to have been timely made on the date due.

F.     **Compliance With Tax, Withholding and Reporting Requirements.**

The City shall comply with all tax, withholding and reporting and like requirements imposed on it by any government unit, including without limitation, any payments related to CalPERS's required pension obligations, and all distributions pursuant to this Plan shall be subject to such withholding and reporting requirements.  In connection with each distribution with respect to which the filing of an information return (such as Internal Revenue Service Forms W-2, 1099 or 1042) or withholding is required, the City shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law.  With respect to any entity from whom a tax identification number, certified tax identification number, or other tax information is required by law to avoid withholding has not been received by the City, the City at its sole option, may withhold the amount required and distribute the balance to such entity or decline to make such distribution until the information is received.

G.     **Time Bar to Cash Payments.**

Checks issued by the City on account of Allowed Claims shall be null and void if not negotiated within 90 days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the City by the holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before the second anniversary of the Effective Date.  After such date, all Claims in

/ / /

respect of voided checks shall be discharged and forever barred and the City shall retain all
moneys related thereto.

**H.**     **No *De Minimis* Distributions.**

Notwithstanding any other provision of this Plan, no Cash payment of less than ten
dollars ($10.00) shall be made by the City on account of any Allowed Claim.

**I.**     **No Distributions on Account of Disputed Claims.**

Notwithstanding anything to the contrary in this Plan, no distributions shall be
made on account of any part of any Disputed Claim until such Claim becomes Allowed (and then
only to the extent so Allowed).  Distributions made after the Effective Date in respect of Claims
that were not Allowed as of the Effective Date (but which later became Allowed) shall be deemed
to have been made as of the Effective Date.

**J.**     **No Postpetition Accrual.**

Except as provided in the National Settlement Agreement, unless otherwise
specifically provided in this Plan or Allowed by order of the Bankruptcy Court, the City shall not
be required to pay to any holder of a Claim any interest, penalty or late charge accruing with
respect to such Claim on or after the Petition Date.

**IX.**    **DISPUTED CLAIMS; OBJECTIONS TO CLAIMS; PROSECUTION OF
          OBJECTIONS TO DISPUTED CLAIMS**

**A.**     **Claims Objection Deadline; Prosecution of Objections.**

The City shall have the right to object to the allowance of Claims filed with the
Bankruptcy Court with respect to which liability or allowance is disputed in whole or in part.
Unless otherwise ordered by the Bankruptcy Court, the City shall file and serve any such
objections to Claims by not later than 180 days after the Effective Date (or, in the case of Claims
lawfully filed after the Effective Date, by not later than 180 days after the date of filing of such
Claims).

**B.**     **Reserves, Payments, and Distributions With Respect to Disputed Claims.**

So long as the first or second Payment Date has occurred, at such time as a
Disputed Claim becomes an Allowed Claim, in whole or in part, the City or its agent shall

distribute to the holder thereof the distributions, if any, to which such holder is then entitled under this Plan. Such distributions, if any, shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order (or such other date as the Claim becomes an Allowed Claim), but in no event more than 60 days thereafter. Unless otherwise specifically provided in this Plan or Allowed by order of the Bankruptcy Court, no interest shall be paid on Disputed Claims that later become Allowed Claims.

## X.  **EFFECT OF CONFIRMATION**

### A.  **Discharge of the City**.

Pursuant to section 944 of the Bankruptcy Code, upon the Effective Date, the City shall be discharged from all debts (as defined in the Bankruptcy Code) of the City and Claims against the City other than (a) any debt specifically and expressly excepted from discharge by this Plan or the Confirmation Order, or (b) any debt owed to an entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case; *provided*, *however*, that such discharge does not discharge the obligations contained in the National Settlement Agreement, the New Union Bank Documents or the New MPA Documents.

The rights afforded in this Plan and the treatment of all Holders of Claims, be the Claims Impaired or Unimpaired under this Plan, shall be in exchange for and in complete satisfaction, discharge and release of all Claims of any nature whatsoever arising on or before the Effective Date, known or unknown, including any interest accrued or expenses incurred thereon from and after the Petition Date, whether against the City or any of its properties, assets or interests in property. Except as otherwise provided herein, upon the Effective Date, all Claims against the City [that arose prior to the Confirmation Date ("Pre-Effective Date Claims")] shall be and shall be deemed to be satisfied, discharged and released in full, be they Impaired or Unimpaired under this Plan.

### B.  **Injunction**.

Except as otherwise expressly provided in this Plan, all entities who have held, hold or may hold pre-Effective Date Claims shall be permanently enjoined from and after the

1    Effective Date, from: (a) commencing or continuing in any manner any action or other

2    proceeding of any kind with respect to any such pre-Effective Date Claim against the City or its

3    property; (b) enforcing, attaching, collecting, or recovering by any manner or means any

4    judgment, award, decree or order against the City or its property with respect to such pre-

5    Effective Date Claims; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind

6    against the City or its property; and (d) asserting any right of setoff, subrogation or recoupment of

7    any kind against any obligation due to the City with respect to any such pre-Effective Date Claim,

8    except as otherwise permitted by section 553 of the Bankruptcy Code.

9        **C.    Term of Existing Injunctions or Stays.**

10        Unless otherwise provided, and as provided in the National Settlement Agreement,

11    all injunctions or stays provided for in the Chapter 9 Case pursuant to sections 105, 362, or 922 of

12    the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in

13    full force and effect until the Effective Date.

14    **XI.    RETENTION OF AND CONSENT TO JURISDICTION**

15        Following the Effective Date, the Bankruptcy Court shall retain and have

16    exclusive jurisdiction over any matter (1) arising under the Bankruptcy Code and relating to the

17    City, (2) arising in or related to the Chapter 9 Case or this Plan, and (3) otherwise for the

18    following:

19        1.    to resolve any matters related to the assumption, assumption

20    and assignment, or rejection of any executory contract or unexpired lease to which the City is a

21    party or with respect to which the City may be liable (including but not limited to, resolving any

22    objections filed pursuant to the Assumption Objection Procedure), and to hear, determine and, if

23    necessary, liquidate, any Claims arising therefrom, including those matters related to the

24    amendment after the Effective Date of this Plan;

25        2.    to enter such orders as may be necessary or appropriate to

26    implement or consummate the provisions of this Plan, and all other contracts, instruments,

27    releases, and other agreements or documents related to this Plan;

28    / / /

CITY OF VALLEJO'S SECOND AMENDED
PLAN OF ADJUST. AS MODIFIED AUGUST 2, 2011

3.    to determine any and all motions, adversary proceeding, applications and contested or litigated matters that may be pending on the Effective Date or that, pursuant to this Plan, may be instituted by the City after the Effective Date or that are instituted by any holder of a Claim before or after the Effective Date concerning any matter based upon, arising out of, or relating to the Chapter 9 Case, whether or not such action initially is filed in the Bankruptcy Court or any other court;

4.    to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

5.    to hear and determine any objections to Claims or to proofs of Claim filed, both before and after the Effective Date, including any objections to the classification of any Claim, and to allow, disallow, determine, liquidate, classify, estimate or establish the priority of or secured or unsecured status of any Claim, in whole or in part;

6.    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed or vacated;

7.    to issue such orders in aid of execution of this Plan, to the extent authorized by section 1142(b) of the Bankruptcy Code;

8.    to consider any modifications of this Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

9.    to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

10.    to hear and determine all disputes or controversies arising in connection with or relating to this Plan or the Confirmation Order or the interpretation, implementation, or enforcement of this Plan or the Confirmation Order or the extent of any entity's obligations incurred in connection with or released under this Plan or the Confirmation Order;

Filed 08/04/11

11.     to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of this Plan;

12.     to determine any other matters that may arise in connection with or are related to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document related to this Plan or the Disclosure Statement;

13.     to hear any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code;

14.     to hear and determine all disputes or controversies arising in connection with or relating to the terms or enforcement of the National Settlement Agreement; and

15.     to enter a final decree closing the Chapter 9 Case.

## XII.     CONDITIONS PRECEDENT

### A.     Condition Precedent to Confirmation.

The entry of the Confirmation Order in form and substance satisfactory to the City, and is reasonably satisfactory to Union Bank, National and the Indenture Trustee, is a condition precedent to confirmation of this Plan.

### B.     Conditions Precedent to Effective Date.

The "effective date of the plan," as used in section 1129 of the Bankruptcy Code, shall not occur, and this Plan shall be of no force and effect, until the Effective Date. The occurrence of the Effective Date is subject to the satisfaction (or waiver as set forth in Section XII(C)) of the following conditions precedent:

**1.     Confirmation Order**. The Confirmation Order shall have been entered.

**2.     Plan Documents**. All agreements and instruments contemplated by, or to be entered into pursuant to, this Plan shall be in form and substance acceptable to the City, shall have been duly and validly executed and delivered, or deemed executed by the parties thereto, and all conditions to their effectiveness shall have been satisfied or waived.

**3.** **Timing**. The Effective Date shall occur on the first day after which the conditions set forth in Section XII(B)(1) and XII(B)(2) are satisfied or waived; *provided* that, unless otherwise ordered by the Bankruptcy Court, the Effective Date must occur by no later than six months after the Confirmation Date.

**C.** **Waiver of Conditions to Effective Date**.

The City may waive in whole or in part any condition to effectiveness of this Plan. Any such waiver of a condition may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

**D.** **Effect of Failure of Conditions**.

In the event that the conditions to effectiveness of this Plan have not been timely satisfied or waived, and upon notification submitted by the City to the Bankruptcy Court (a) the Confirmation Order shall be vacated, (b) no distributions under this Plan shall be made, (c) the City and all holders of Claims shall be restored to the *status quo* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (d) all of the City's obligations with respect to the Claims shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the City or any other entity or to prejudice in any manner the rights of the City or any entity in any further proceedings involving the City.

**XIII.** **MISCELLANEOUS PROVISIONS**

**A.** **Dissolution of the Committee**.

On the Effective Date, the Committee shall be released and discharged of and from all further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 9 Case and the Committee shall be deemed dissolved and its appointment terminated. The professionals retained by the Committee and the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered or expenses incurred after the Effective Date, except for services rendered and expenses incurred in

/ / /

Filed 08/04/11

1  connection with any applications by such professionals or committee members for allowance of

2  Professional Claims timely filed after the Effective Date as provided in this Plan.

3        **B.**     **Severability.**

4        If, prior to the Confirmation Date, any term or provisions of this Plan is held by

5  the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, with the

6  consent of the City, shall have the power to alter and interpret such term or provision to make it

7  valid or enforceable to the maximum extent practicable, consistent with the original purpose of

8  the term or provision held to be invalid, void or unenforceable, and such term or provision shall

9  then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or

10  interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and

11  effect and shall in no way be affected, impaired or invalidated by such holding, alteration or

12  interpretation. The Confirmation Order shall constitute a judicial determination and shall provide

13  that each term and provision of this Plan, as it may have been altered or interpreted in accordance

14  with the foregoing, is valid and enforceable pursuant to its terms.

15        **C.**     **Governing Law.**

16        Except to the extent that the Bankruptcy Code or other federal law is applicable, or

17  to the extent that an Exhibit hereto or Plan Document provides otherwise, the rights, duties and

18  obligations arising under this Plan shall be governed by, and construed and enforced in

19  accordance with, the laws of the State of California, without giving effect to principles of

20  conflicts of laws.

21        **D.**     **Effectuating Documents and Further Transactions.**

22        Each of the officials and employees of the City is authorized to execute, deliver,

23  file, or record such contracts, instruments, releases, indentures, and other agreements or

24  documents and take such actions as may be necessary or appropriate to effectuate and further

25  evidence the terms and provisions of this Plan.

26  / / /

27  / / /

28  / / /

1  **E.**      **Notice of Effective Date.**

2            On or before ten (10) days after occurrence of the Effective Date, the City or its

3  agent shall mail or cause to be mailed to all holders of Claims a notice that informs such holders

4  of: (a) entry of the Confirmation Order (while also will have been the subject of the Notice of

5  Entry); (b) the occurrence of the Effective Date; (c) the deadline established under this Plan for

6  the filing of Administrative Claims; (d) the procedures for changing an address of record pursuant

7  to Section VIII; and (e) such other matters as the City deems to be appropriate.

8

9

10  DATED:  August 2, 2011                    CITY OF VALLEJO, CALIFORNIA

11

12                                        By:    /s/  Phil Batchelor
                                                Phil Batchelor
13                                              City Manager

14  Submitted By:

15  ORRICK, HERRINGTON & SUTCLIFFE LLP

16

17          /s/ Marc A. Levinson
    Marc A. Levinson
18  Norman C. Hile
    John H. Knox
19  John W. Killeen
    Attorneys for the City of Vallejo
20

21

22

23

24

25

26

27

28

1

**EXHIBITS TO SECOND AMENDED PLAN FOR THE ADJUSTMENT OF
DEBTS OF CITY OF VALLEJO, CALIFORNIA, AS MODIFIED
AUGUST 2, 2011**

2

3

4

EXHIBIT A – National Settlement Agreement

5

EXHIBIT B – Schedule of New MPA Lease Payments

6

EXHIBIT C – Schedule of Union Bank Leased Property

7

EXHIBIT D – Schedule of New Union Bank Facility Annual Lease Payments

8

EXHIBIT E – Schedule of New Union Bank Reimbursement Agreement Payment Agreement
           Annual Principal Payments

9

EXHIBIT F – Leave Buyout Option Exercise Form

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "Settlement Agreement") is entered into as of the 25th day of January 2011, by and among

  (1)   National Public Finance Guarantee Corporation ("National");

  (2)   The City of Vallejo, California (the "City"); and

  (3)   The Controller for the State of California (the "Controller") with respect to Sections 1, 3 and 7 only.

Where applicable, National, the City and the Controller are hereinafter individually and collectively referred to as each "Party" or as the "Parties."

## Recitals

WHEREAS, National[1] insures the Vallejo Public Financing Authority Certificates of Participation (1999 Capital Improvements Project) ("1999 COPs"), for which Wells Fargo Bank, N.A. acts as trustee (the "Trustee") pursuant to the Trust Agreement dated as of July 1, 1999 (the "Trust Agreement").;

WHEREAS, National has also issued a Surety Bond pursuant to a Financial Guaranty Agreement with the City, dated as of July 13, 1999 (the "Financial Guaranty Agreement");

WHEREAS, the proceeds of the 1999 COPs funded the construction of Fire Station #7; financed improvements to Fire Station #1, 2, 3, 4, 5 and 6; and provided upgrades to the fire and police communications systems, among other capital improvement projects within the City;

WHEREAS, the Vallejo Public Financing Authority (the "Authority") leased the foregoing properties and improvements to the City pursuant to a Lease Agreement dated as of

---

[1] National represents that it is a stock insurance corporation, duly organized and existing under the laws of the State of New York, and is the reinsurer pursuant to the Quota Share Reinsurance Agreement, effective as of January 1, 2009, by and between MBIA Insurance Corporation ("MBIA") and MBIA Insurance Corp. of Illinois, now known as National Public Finance Guarantee Corporation. MBIA insured the 1999 COPs and issued a Debt Service Reserve Surety Bond (the "Surety Bond") upon their original issuance.

OHS West:261074521.1

July 1, 1999 (the "Lease Agreement");

WHEREAS, the Authority assigned its interest under the Lease Agreement to the Trustee pursuant to an Assignment Agreement dated as of July 1, 1999;

WHEREAS, by Resolution adopted by the City Council on June 22, 1999, the City notified the Controller that it elected to provide a guarantee to the lease payments supporting the 1999 COPs pursuant to California Government Code § 37351.5 (the "Intercept Act") from Motor Vehicle License Fees and successor taxes (collectively, "VLFs") allocated from time-to-time by the State of California to the City;

WHEREAS, on May 23, 2008 (the "Petition Date"), the City commenced a case under chapter 9 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of California (the "Bankruptcy Court"), Case No. 08-26813 (the "Bankruptcy Case");

WHEREAS, on May 1, 2009, the City gave notice to the Trustee that it was suspending lease payments owed to the Trustee for the benefit of the holders of the 1999 COPs for the remainder of Fiscal Year 2008-2009 and has continued to suspend such lease payments (the "Lease Default");

WHEREAS, as of the date of this Settlement Agreement, the Trustee has filed or will file claims with National that National has paid as draws on the Surety Bond held in the debt service reserve established under the Trust Agreement in the aggregate amount of approximately $303,440, plus accrued interest;

WHEREAS, National has incurred significant attorney's fees and expenses in connection with the Bankruptcy Case and the Lease Default and provided documentation thereof to the City;

WHEREAS, National has commenced an Adversary Proceeding against the City (No. 10-

02722) (the "Adversary Proceeding") in the Bankruptcy Case seeking, among other things, to enforce the Intercept Act and the Controller has moved to intervene in the Adversary Proceeding;

WHEREAS, the Parties wish to settle all claims, resolve any and all issues among them without the expense and inconvenience associated with further litigation and put any and all claims, related or unrelated, finally to rest;

WHEREAS, the City filed its proposed plan of adjustment (the "Plan") on or about January 18, 2011 and the agreement between National and the City memorialized herein is incorporated into the Plan;

NOW, THEREFORE, in full and final settlement of any and all claims, in consideration of the promises and mutual agreements herein contained, and intending to be legally bound and achieve the utmost of finality, the Parties agree as follows:

(1)     Acknowledgement.  The City and the Controller acknowledge and agree that (i) the Intercept Act has been triggered by the failure of the City to pay the scheduled amounts due under the Lease Agreement for the benefit of the 1999 COPs and (ii) the Trustee, for the benefit of the 1999 COPs, is entitled to the VLFs pursuant to the Intercept Act, subject to the terms of this Settlement Agreement;

(2)     Settlement Payments.

        (a)     Initial Payment.  On or before January 31, 2011, the City shall pay National $248,462 by wire transfer of immediately available funds, which is equal to 75% of the principal amount of National's current outstanding claim of $303,440 plus accrued interest, with the unpaid balance thereof (the "Default Balance") to be included in the Shortfall Indebtedness (as defined below).  National shall not contest the receipt and application of VLFs by the City from the Petition Date through the date of this Settlement Agreement.

        (b)     Forbearance Period; Future Payment.  For the fiscal years 2010-11 (for that portion commencing on February 1, 2011), 2011-12 and

Filed 08/04/11   Case 08-26813   Doc 1113   Page 6 of 9

2012-13 (the "Forbearance Period"), the City shall pay the Trustee an amount equal to 75% of the scheduled amount due under the Lease Agreement for the benefit of the 1999 COPs as and when due.  Subject thereto, National shall instruct the Trustee to forbear with respect to recovery of any shortfall on payments due from the City under the Lease Agreement for the benefit of the 1999 COPs (the "Lease Shortfall").

(c)   Shortfall Indebtedness.  The Lease Shortfall and the Default Balance shall accrue and bear interest at a rate equal to the weighted average coupon payable on the 1999 COPs, namely 5.25% per annum and shall be referred to herein collectively as the "Shortfall Indebtedness."

(d)   Payments After July 1, 2013.  Commencing on July 1, 2013 (the first day of the City's 2013-2014 fiscal year), the City shall timely pay the Trustee the full scheduled amount as and when due under the Lease Agreement for the benefit of the 1999 COPs, and commencing on January 15, 2014 additionally shall pay National, on January 15 and July 15 of each year, an amount equal to (a) 100% of all VLFs to which the City would be entitled under the California Revenue and Taxation Code during the previous 6 months minus (b) the amount paid to the Trustee under the Lease Agreement for the same period, provided that the VLFs exceed the total amounts due under the Lease Agreement for such period.  The funds paid to National in excess of the amounts due under the Lease Agreement shall be referred to herein as the "VLF Catch-up Payment."  For the avoidance of doubt, the City's obligation to pay amounts due under the Lease Agreement for the benefit of the 1999 COPs shall not be dependent on the City's receipt of VLFs in any amount.

(e)   Application of VLF Catch-up Payment.  The VLF Catch-up Payment shall be applied to the Shortfall Indebtedness until paid in full.  For the avoidance of doubt, each VLF Catch-Up Payment shall be applied to the Shortfall Indebtedness in the following order of priority: (i) interest and (ii)  principal.  To the extent that the Shortfall Indebtedness is not paid in full by the time of the last scheduled payment under the Lease Agreement, the City shall pay the unpaid balance of the Shortfall Indebtedness to National no later than January 15, 2030.

(f)   Reimbursement of National's Attorney's Fees.  On or before January 31, 2011 the City shall reimburse National for its attorney's fees and expenses accrued through January 31, 2011 by wire transfer of immediately available funds in the amount of

$400,000 as a compromise and settlement of National's significantly larger reimbursement claim.  The City further agrees to reimburse National for all of its reasonable attorney's fees and expenses incurred in connection with the Bankruptcy Case accrued from February 1, 2011 promptly upon receipt of documentation thereof.

(3)    Future Default by City.  If the City fails to perform any of its obligations under this Settlement Agreement (a "City Default"), the City agrees that (a) any act by National or the Trustee that informs the Controller of the City's nonpayment under the 1999 COPs pursuant to the Intercept Act or otherwise shall not be deemed a violation of the automatic stay under Section 362 of the Bankruptcy Code and (b) the City will not oppose payment by the Controller of VLFs to National or the Trustee under the Intercept Act.  The Controller acknowledges that upon a City Default the Controller will comply with the statutory requirements of the Intercept Act and pay VLFs to the Trustee without further notice or order of any court; provided, however, that nothing in this Section 3 shall have any effect on any rights or remedies relating to the VLFs that any other creditor of the City may have under the Intercept Act.

(4)    Union Bank Claims.  The City represents, acknowledges and agrees that the terms of this Settlement Agreement are not inconsistent with any compromise, settlement or proposed Plan treatment of the claims filed by or on behalf of Union Bank (the "UB Claims") in the Bankruptcy Case.

(5)    Incorporation of Terms in Plan.  The Plan and any other plan of adjustment filed or to be filed by the City in the Bankruptcy Case shall incorporate terms that are consistent with the terms herein, including, without limitation, acknowledgment by the City that the Trustee is entitled to receipt of VLFs under the Intercept Act as contemplated herein, and disclosing the settlement and/or adjustment of the UB Claims, and such terms shall be subject to National's review and approval prior to filing by the City (such Plan terms, as approved by National, are

referred to herein as the "Plan Settlement Terms").

(6)     Rule 9019 Motion/Adversary Proceeding.  Upon execution of this Settlement Agreement, the City and National shall promptly file a motion for approval of this Settlement Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "Rule 9019 Motion"). Any hearings on motions in the Adversary Proceeding, including National's Motion for Summary Judgment and the Controller's Motion to Intervene, and the Rule 9019 Motion shall be adjourned and continued until confirmation of a plan of adjustment in the Bankruptcy Case is approved or denied, or until the Plan is withdrawn (without the filing of an amended plan of adjustment).  Upon entry of a final, non-appealable order approving the Plan or of another plan of adjustment containing the Plan Settlement Terms, the Parties shall seek approval of the Rule 9019 Motion and, upon entry of a final, non-appealable order approving the Rule 9019 Motion, the Adversary Proceeding shall be dismissed.

(7)     Termination.  The City acknowledges and agrees that (i) if a plan of adjustment is confirmed that does not contain the Plan Settlement Terms, (ii) if a plan of adjustment containing the Plan Settlement Terms is withdrawn and not replaced by an amended plan of adjustment which contains the Plan Settlement Terms, or (iii) if no plan of adjustment is confirmed and the Bankruptcy Case is dismissed, then the Rule 9019 Motion shall be withdrawn, this Settlement Agreement shall terminate and National may prosecute the Adversary Proceeding and take such other actions that it deems appropriate.  In no event will any payments made by the City to National or the Trustee hereunder be repaid or refunded to the City, provided that payments made under Sections 2(a), (b), (d) and (f) hereunder shall be credited to the City's indebtedness to National.

(8)     Reporting Requirements.  While any obligations of the City hereunder are

outstanding:

      (a)      <u>VLF Notices</u>.  At the time of its semi-annual shortfall indebtedness payment to National, as required in Section 2(d) hereof, the City shall submit copies of the monthly VLF remittance notices received from the Controller for the periods covered by such payment; and

      (b)      <u>On-Going Information</u>.  As soon as they become available to the public, the City will forward to National (i) its annual general fund budget, (ii) any mid-year or other update to the annual general fund budget, and (iii) its annual audited financial statements.  The City agrees to promptly comply with National's reasonable requests for additional information regarding the City.

All such notices, information and certificates shall be deemed effective upon personal delivery or e-mail delivery or within five (5) days after deposit with the United States Postal Service by Certified Mail, postage prepaid, return receipt requested, and addressed to:

      National Public Finance Guaranty Corporation
      113 King Street
      Armonk, New York 10504

      Att:      Gary Saunders, Esq.
               Deputy General Counsel

      E-mail:   gary.saunders@optinuityar.com

(9)      <u>Releases</u>.  Upon entry of a final, non-appealable order of the Bankruptcy Court approving the Rule 9019 Motion and except as otherwise provided in this Settlement Agreement, National, the City and  the Controller shall each forever release and discharge each other and each other's predecessors, successors, assigns, partners, executive members, members, officers, managers, employees, representatives, attorneys, agents, divisions, subsidiaries, affiliates (and past and present partners, executive members, members, officers, managers, employees, agents, representatives and attorneys of such divisions, subsidiaries, and affiliates), executors, or administrators, and all persons acting by, through, under or in concert with any of them, from

any and all charges, complaints, claims, liabilities, obligations, promises, agreements,

controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and

expenses (including attorneys' fees and costs actually incurred) of any nature whatsoever, in law

or equity, known or unknown, suspected or unsuspected, that the Parties ever had, now have or

hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing whatsoever

with respect to National's claims in connection with the 1999 COPs.  Notwithstanding anything

in this Settlement Agreement to the contrary, the right of the Parties to enforce any of the terms

of this Settlement Agreement and the matters set forth in Section 7 herein shall survive this

release.

      (10)   <u>Rule of Ambiguities</u>.  Each Party agrees that this Settlement Agreement was

authored by all of the Parties, and that this Settlement Agreement does not constitute the

exclusive written product of any Party.

      (11)   <u>No Modification</u>.  No waiver or modification of this Settlement Agreement or any

term hereof shall be binding unless it is in writing and signed by each Party affected thereby or

its expressly authorized representatives.

      (12)   <u>Choice of Law</u>.  This Agreement shall be construed and interpreted, and the rights

of the Parties shall be determined, in accordance with the laws of the State of California, without

giving effect to any provision thereof that would require the application of the substantive laws

of any other jurisdiction, except to the extent that such laws are superseded by the Bankruptcy

Code.

      (13)   <u>Jurisdiction</u>.  Without limiting any Party's right to appeal any order of the

Bankruptcy Court, (i) provided that no plan of adjustment has been confirmed and the

Bankruptcy Case has not been dismissed before any action or proceeding respecting this

Settlement Agreement has been commenced, the Bankruptcy Court shall retain exclusive

jurisdiction to enforce the terms of this Settlement Agreement and to decide any claims or

disputes which may arise or result from, or be connected with this Settlement Agreement, any

breach of default hereunder, or the transactions contemplated hereby, and (ii) any and all

proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court,

and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy

Court.  If the Bankruptcy Case is dismissed without the confirmation of a plan of adjustment,

then any such proceeding may be commenced in any state or federal court of competent

jurisdiction located in the State of California.

(14)    Further Assurances.  Each of the Parties hereto will execute, acknowledge and

deliver any further assurances, documents and instruments and take such other actions as

reasonably requested by any other Party hereto for the purpose of giving effect to the

transactions contemplated herein or the intentions of the Parties with respect thereto.

(15)    Benefit and Burden.  This Settlement Agreement shall be binding upon, and inure

to the benefit of, the Parties hereto and their respective representatives, successors, agents and

assigns.

(16)    Voluntary Execution.  The Parties hereby acknowledges that they have read and

that they understand the foregoing Settlement Agreement and that they have affixed their

signature hereto voluntarily and without coercion.

(17)    Counterparts.  This Settlement Agreement may be executed in one or more

counterparts, each of which shall be deemed an original, and all counterparts so executed shall

constitute one agreement binding on all of the Parties hereto, notwithstanding that all of the

Parties are not signatory to the same counterpart.  This Settlement Agreement may be executed

OHS West:261074521.1

9

either by original or facsimile, either of which will be equally binding.

(18)   <u>Entire Agreement</u>.  All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties hereto concerning the subject matter hereof are contained herein.  No other agreements, covenants, representations or warranties, express or implied, oral or written, have been made by any party hereto to any other party concerning the subject matter hereof.  All prior and contemporaneous conversations, negotiations, possible and alleged agreements, representations, covenants and warranties concerning the subject matter hereof are merged herein.  This is an integrated Settlement Agreement.

(19)   <u>Authority</u>.  The undersigned signatories hereto each represent and warrant that they have the authority to execute this Settlement Agreement and to bind the Parties to this Settlement Agreement upon whose behalf they are executed.

(20)   <u>Representation by Counsel</u>.  The Parties acknowledge that they consulted with their attorneys concerning the releases and waivers contained in this Settlement Agreement and that the releases and waivers they have made herein are knowing, conscious and with full appreciation that they are forever foreclosed from pursuing any of the rights so waived.

(21)   <u>Bankruptcy Court Approval</u>.  This Settlement Agreement is expressly subject to approval of the Bankruptcy Court and, except as provided in Sections 1, 2(a) and (f), 6 and 7 hereof which are immediately binding and enforceable, shall have no force or effect unless and until so approved by the Bankruptcy Court.

National Public Finance Guarantee

Dated:  January __, 2011                    Corporation


                                           By:  _____



                                           The City of Vallejo, California

Dated:  January __, 2011


                                           By:  _____



                                           The Controller for the State of California
                                           with respect to Sections 1, 3 and 7 only

Dated:  January __, 2011


                                           By:  _____



**ACKNOWLEDGEMENT OF TRUSTEE**

    Wells Fargo Bank, N.A., as Indenture Trustee for the 1999 COPs ("Wells"), acknowledges that it has read and understands this Settlement Agreement.  It agrees that the provisions of Section 2(b) hereof constitute an instruction by National to forebear from exercising any remedies with respect to the Lease Shortfall, and that it will comply with such instruction until further instruction is given by National.  Wells reserves the right to demand an appropriate indemnity from National in accord with the provisions of the Indenture for both this instruction and any future instruction.

Wells Fargo Bank, N.A., solely in its capacity as Trustee for the 1999 COPs


By:_____
    Virginia A. Housum, Vice President

# Exhibit B

Filed 08/04/11   Case 08-26813   Doc 1113   Page 76 of 79

| Exhibit B - Schedule of New MPA Lease Payments ||
|---|---|
| **Payment Date** | **Payment Amount** |
| 12/1/2011 | 0 |
| 6/1/2012 | 0 |
| 12/1/2012 | 0 |
| 6/1/2013 | 0 |
| 12/1/2013 | 0 |
| 6/1/2014 | 0 |
| 12/1/2014 | 50,732 |
| 6/1/2015 | 50,732 |
| 12/1/2015 | 50,732 |
| 6/1/2016 | 50,732 |
| 12/1/2016 | 50,732 |
| 6/1/2017 | 50,732 |
| 12/1/2017 | 50,732 |
| 6/1/2018 | 50,732 |
| 12/1/2018 | 50,732 |
| 6/1/2019 | 50,732 |
| 12/1/2019 | 50,732 |
| 6/1/2020 | 50,732 |
| 12/1/2020 | 50,732 |
| 6/1/2021 | 50,732 |
|  |  |
| Total: | 710,248 |

# Exhibit C

EXHIBIT C

DESCRIPTION OF LEASED PROPERTIES
(Union Bank COPs)

| **Property Description** | **Address** |
|---|---|
| **Series 2000 COPs** | |
| City Hall | 555 Santa Clara Street |
| John F. Kennedy Library | 505 Santa Clara Street |
| Corp. Yard (excluding Police) | 111 Amador Street |
| Florence Douglas Senior Center | 333 Amador Street |
| Naval Museum | 734 Marin Street |
| Community Center | 401 Amador Street |
| So. Vallejo Community Center | 545 Magazine Street |
| Transit Yard (VCTC Facility) | 1850 Broadway Street |
| Ball Field | APN: 0056-156-010<br>APN: 0056-156-030 |
| **Series 2001 COPs** | |
| Blue Rock Springs Golf Course | 655 Columbus Parkway |
| **Series 2002 COPs** | |
| Vacant Land (at Glen Cove) | APN: 0079-220-070 |
| Vacant Land (at Hiddenbrooke) | APN: 0182-060-030 |
| Vacant Land (at Hiddenbrooke) | APN: 0182-060-040 |
| Vacant Land (at Hiddenbrooke) | APN: 0182-060-430 |

| Property Description | Address |
|---|---|
| Vacant Land (at Hiddenbrooke) | APN: 0182-280-420 |
| | APN: 0182-280-430 |
| Vacant Land (at Hiddenbrooke) | APN: 0182-280-120 |

### Series 2003 COPs

| | |
|---|---|
| Vacant Land (at Glen Cove) | APN: 0079-340-020 |
| Vacant Land (at Glen Cove) | APN: 0079-330-290 |

# Exhibit D

## Exhibit D - Schedule of New Union Bank Lease Payments

| Payment Date | Payment Amount | MVLF Intercept Portion |
|---|---|---|
| 1/1/2012 | 1,185,938 | 632,695 |
| 1/1/2013 | 1,120,604 | 566,592 |
| 1/1/2014 | 1,382,872 | 696,655 |
| 1/1/2015 | 1,864,604 | 980,395 |
| 1/1/2016 | 1,864,604 | 980,395 |
| 1/1/2017 | 1,864,604 | 980,395 |
| 1/1/2018 | 1,864,604 | 980,395 |
| 1/1/2019 | 1,864,604 | 980,395 |
| 1/1/2020 | 1,864,604 | 980,395 |
| 1/1/2021 | 1,864,604 | 980,395 |
| 1/1/2022 | 1,864,604 | 980,395 |
| 1/1/2023 | 1,864,604 | 980,395 |
| 1/1/2024 | 1,864,604 | 980,395 |
| 1/1/2025 | 1,698,666 | 980,395 |
| 1/1/2026 | 1,698,666 | 980,395 |
| 1/1/2027 | 1,731,432 | 996,644 |
| 1/1/2028 | 1,741,210 | 1,001,493 |
| 1/1/2029 | 1,741,041 | 1,001,409 |
| 1/1/2030 | 1,733,654 | 997,745 |
| 1/1/2031 | 2,054,666 | 1,156,941 |
| 1/1/2032 | 2,054,666 | 1,156,941 |
| 1/1/2033 | 2,054,666 | 1,156,941 |
| 1/1/2034 | 2,054,666 | 1,156,941 |
| 1/1/2035 | 2,054,666 | 1,156,941 |
| 1/1/2036 | 2,054,666 | 1,156,941 |
| 1/1/2037 | 1,449,220 | 902,182 |
| 1/1/2038 | 1,054,666 | 661,024 |
| 1/1/2039 | 1,054,666 | 661,024 |
| 1/1/2040 | 1,054,666 | 661,024 |
| 1/1/2041 | 1,054,666 | 678,713 |
| 1/1/2042 | 403,337 | 48,670 |
| Total: | 51,079,351 | 28,212,250 |

# Exhibit E

## Exhibit E - Schedule of New Union Bank Reimbursement Agreement Payment Agreement Annual Payments

| Payment Date | Obligation A | | Obligation B | | | Combined |
| --- | --- | --- | --- | --- | --- | --- |
| | Obligation A Principal | Obligation A Interest | Obligation B Original Principal | Obligation B Negative Amortization Principal | Obligation B Interest | Total Payments |
| 1/1/2012 | 1,185,938 | 0 | | | | 1,185,938 |
| 1/1/2013 | 1,120,604 | 0 | | | | 1,120,604 |
| 1/1/2014 | 1,382,872 | 0 | | | | 1,382,872 |
| 1/1/2015 | 1,456,840 | 407,765 | | | | 1,864,604 |
| 1/1/2016 | 1,493,261 | 371,344 | | | | 1,864,604 |
| 1/1/2017 | 1,530,592 | 334,012 | 0 | | | 1,864,604 |
| 1/1/2018 | 1,556,121 | 295,747 | 847 | | 11,889 | 1,864,604 |
| 1/1/2019 | 1,568,784 | 256,844 | 27,100 | | 11,876 | 1,864,604 |
| 1/1/2020 | 1,522,531 | 217,625 | 67,352 | | 57,096 | 1,864,604 |
| 1/1/2021 | 1,483,229 | 179,561 | 145,812 | | 56,002 | 1,864,604 |
| 1/1/2022 | 1,520,310 | 142,481 | 148,181 | | 53,633 | 1,864,604 |
| 1/1/2023 | 1,558,318 | 104,473 | 150,589 | | 51,225 | 1,864,604 |
| 1/1/2024 | 1,597,276 | 65,515 | 153,036 | | 48,777 | 1,864,604 |
| 1/1/2025 | 760,520 | 25,583 | 622,576 | | 289,988 | 1,698,666 |
| 1/1/2026 | 262,803 | 6,570 | 1,046,311 | | 382,983 | 1,698,666 |
| 1/1/2027 | 0 | 0 | 1,365,452 | | 365,980 | 1,731,432 |
| 1/1/2028 | 0 | 0 | 1,397,418 | | 343,792 | 1,741,210 |
| 1/1/2029 | 0 | 0 | 1,419,958 | | 321,084 | 1,741,041 |
| 1/1/2030 | 0 | 0 | 1,435,645 | | 298,009 | 1,733,654 |
| 1/1/2031 | 0 | 0 | 1,779,986 | | 274,680 | 2,054,666 |
| 1/1/2032 | 0 | 0 | 1,808,911 | | 245,755 | 2,054,666 |
| 1/1/2033 | 0 | 0 | 1,838,306 | | 216,361 | 2,054,666 |
| 1/1/2034 | 0 | 0 | 1,868,178 | | 186,488 | 2,054,666 |
| 1/1/2035 | 0 | 0 | 1,898,536 | | 156,130 | 2,054,666 |
| 1/1/2036 | 0 | 0 | 1,069,039 | 860,349 | 125,279 | 2,054,666 |
| 1/1/2037 | 0 | 0 | 967,049 | 388,244 | 93,927 | 1,449,220 |
| 1/1/2038 | 0 | 0 | 982,763 | 0 | 71,903 | 1,054,666 |
| 1/1/2039 | 0 | 0 | 918,024 | 80,709 | 55,933 | 1,054,666 |
| 1/1/2040 | 0 | 0 | 256,865 | 758,098 | 39,704 | 1,054,666 |
| 1/1/2041 | 0 | 0 | 0 | 1,031,456 | 23,211 | 1,054,666 |
| 1/1/2042 | 0 | 0 | 0 | 396,887 | 6,449 | 403,337 |
| Total | 20,000,000 | 2,407,520 | 21,367,933 | 3,515,743 | 3,788,155 | 51,079,351 |

# Exhibit F

### *In Re City of Vallejo, California*, Case No. 08-26813 (Bankr. E.D. Cal. 2008)

## LEAVE BUYOUT OPTION EXERCISE FORM

I, _____, SSN _____, have asserted a claim in the above-captioned bankruptcy case for sick leave, vacation leave, holiday leave, and/or accrued compensatory time for which the City of Vallejo, California (the "City") did not compensate me in accordance with the operative collective bargaining agreement at the time I separated from the City. I understand that the City has classified my claim in Class 6B as a general unsecured claim.

I have reviewed the chart prepared by the City showing the amount of my unpaid sick and/or other types of leave for which I was not compensated upon my separation from the City ("Leave Buyout Calculation"). Specifically, I have reviewed the section of the Leave Buyout Calculation entitled "Service Credit Conversion Analysis." I understand that these numbers reflect the City's best estimates based on its own figures and calculations and information provided to the City by CalPERS. For purposes of my service credit conversion, I accept the City's figures as accurate and will not subsequently challenge the City's figures absent gross negligence or willful concealment on the City's part.

I understand that the City has agreed to permit me, in lieu of receiving a cash payment for my unpaid sick leave claim, to instead convert some or all of my unpaid sick leave to CalPERS retirement service credit. I understand that the amount of unpaid sick leave I am eligible to convert is limited by state law, CalPERS regulations, and the relevant memorandum of understanding between the City and my former bargaining group at the time I separated from the City.

Having reviewed the Leave Buyout Calculation and particularly the column entitled "Maximum Service Credit Avail.," I understand that the maximum amount of unpaid sick leave that I am eligible to convert to retirement service credit is _____ hours. I understand that my claim for any unpaid sick leave not eligible for conversion will be treated like all other allowed Class 6B claims, and that I will receive a cash payment from the City consistent with such treatment.

I hereby elect to convert _____ hours of my eligible unpaid sick leave to service time credit. I understand that, in exchange for allowing me to convert unpaid sick leave to service time, the City will discount the amount of eligible sick leave by approximately 35% so as to ensure that my unpaid sick leave claim is treated similarly to other Class 6B claims.

I further understand and acknowledge that I will cause this Leave Buyout Option Exercise Form to be notarized prior to submitting it in executed form to the City.

**DATE:**_____

**NAME:**_____

**SIGNATURE:**

_____

**THIS FORM AND THE ATTACHED ACKNOWLEDGMENT FORM MUST BE RETURNED TO DEBORA BOUTTÉ, CITY OF VALLEJO HUMAN RESOURCES DIRECTOR, 555 SANTA CLARA STREET, VALLEJO CALIFORNIA, 94590, 707-648-4436, FACSIMILE 707-648-5292, DBOUTTE@CI.VALLEJO.CA.US, BY THE LATER OF 4:30 PDT ON FRIDAY, AUGUST 12, 2011, OR 28 DAYS FOLLOWING RECEIPT OF THE LEAVE BUYOUT CALCULATION BY YOU OR YOUR COUNSEL OF RECORD.**

OHS WEST:261225418.1