# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------------------ x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

          Debtors.[1]

------------------------------------------------------------------------ x

PROMESA
Title III

Case No. 17-BK-3283 (LTS)

(Jointly Administered)

**REPLY IN SUPPORT OF MOTION OF OFFICIAL COMMITTEE OF UNSECURED
CREDITORS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE
3013 FOR ENTRY OF AN ORDER RECLASSIFYING CLASS 39A
AND CLASS 41 CLAIMS UNDER OVERSIGHT BOARD'S PLAN OF
<u>ADJUSTMENT DATED FEBRUARY 28, 2020</u>**

---

[1]    The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four
(4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto
Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico
Sales Tax Financing Corporation ("<u>COFINA</u>") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of
Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("<u>HTA</u>") (Bankruptcy Case
No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the
Government of the Commonwealth of Puerto Rico ("<u>ERS</u>") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last
Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("<u>PREPA</u>") (Bankruptcy Case
No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings
Authority ("<u>PBA</u>") (Bankruptcy Case No. 19-BK-5233 (LTS)) (Last Four Digits of Federal Tax ID: 3801)
(Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

REPLY ................................................................................................................... 6

I.    Rule 3013 Is Available to All Parties In Interest, Not Merely the Oversight Board ............................................................................................................ 6

II.   3013 Motion Should Be Heard Prior to Disclosure Statement Hearing ............... 8

     A.   Debtors and Other Parties Should Not Waste Time and Money Preparing for Plan Confirmation if The Plan is Not Confirmable ............ 9

     B.   Considering the 3013 Motion Now Will Not Lead to Inefficient Piecemeal Litigation ................................................................. 11

     C.   The Committee is Not Opposed to the Court Deferring Consideration of the 3013 Motion Until After the Oversight Board Files its May 1, 2020 Status Report ........................................ 13

III.  Committee's Rule 3013 Motion Is Not an Unfair Discrimination Objection ...... 14

IV.  Retiree Claims and CW General Unsecured Claims Must Be Classified Together ................................................................................................ 16

     A.   Section 1122 Imposes Limits on Separate Classification of Similar Claims ....................................................................................... 17

     B.   Controlling First Circuit Precedent Prohibits Separate Classification of Retiree Claims and CW General Unsecured Claims ....................................................................................... 19

           i.   The Committee Has Accurately Construed the Holding and Application of Granada Wines ........................................ 19

           ii.  Municipal Nature of Commonwealth's Bankruptcy Case Does Not Alter Classification Rules ............................... 25

     C.   Retiree Claims and CW General Unsecured Claims Are Legally Indistinguishable and Therefore Substantially Similar .......................... 27

           i.   Any Differences in Non-Bankruptcy Legal Rights Have No Impact on Substantial Similarity ..................................... 28

           ii.  Objections Rely on Inappropriate (and Inaccurate) Moralistic Judgment ................................................ 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 266 Washington Assocs.*,
141 B.R. 275 (Bankr. E.D.N.Y.), *aff'd sub nom. In re Washington Assocs.*,
147 B.R. 827 (E.D.N.Y. 1992) ................................................................18

*In re 4th St. E. Investors, Inc.*,
2012 WL 1745500 (Bankr. C.D. Cal. May 15, 2012) ...........................32

*In re 500 Fifth Ave. Assocs.*,
148 B.R. 1010 (Bankr. S.D.N.Y. 1993)...................................................7

*In re AOV Indus., Inc.*,
792 F.2d 1140 (D.C. Cir. 1986)..............................................................27

*In re Barney & Carey Co.*,
170 B.R. 17 (Bankr. D. Mass. 1994) ......................................................20

*In re Bjolmes Realty Tr.*,
134 B.R. 1000 ...............................................................................20, 24, 28

*In re Bos. Post Rd. Ltd. P'ship*,
21 F.3d 477 (2d Cir. 1994).....................................................................30

*In re Brotby*,
303 B.R. 177 (B.A.P. 9th Cir. 2003).......................................................32

*In re Charles St. African Methodist Episcopal Church of Bos.*,
499 B.R. 66 (Bankr. D. Mass. 2013) ......................................................21

*In re City of Detroit*,
524 B.R. 147 (Bankr. E.D. Mich. 2014)........................................24, 25, 33

*In re Corcoran Hosp. Dist.*,
233 B.R. 449 (Bankr. E.D. Cal. 1999).....................................................25

*In re Diaz*,
586 B.R. 588 (Bankr. W.D. Tex. 2018), *aff'd sub nom. In re Vega-Lara*, No.
5:18-CV-00796-RCL, 2019 WL 4545613 (W.D. Tex. Sept. 19, 2019) ....................................6

*In re Dow Corning Corp.*,
280 F.3d 648 (6th Cir. 2002) ............................................................17, 32

*In re DRW Prop. Co. 82*,
60 B.R. 505 (Bankr. N.D. Tex. 1986).....................................................10

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
    948 F.3d 457 (1st Cir. 2020)............................................................30

*In re Frascella Enters., Inc.*,
    360 B.R. 435 (Bankr. E.D. Pa. 2007) ........................................27, 29

*Granada Wines, Inc. v. New Eng, Teamsters & Trucking Indus. Pension Fund*,
    748 F.2d 42 (1984).............................................................. *passim*

*Matter of Greystone III Joint Venture*,
    995 F.2d 1274 (5th Cir. 1991) ..............................................27

*In re Hanish, LLC*,
    570 B.R. 4 (Bankr. D.N.H. 2017) ....................................19, 20, 21

*In re Hardeman Cty. Hosp. Dist.*,
    540 B.R. 229 (Bankr. N.D. Tex. 2015).....................................7, 24

*In re Highlands Grp. of Brunswick, LLC*,
    No. 11-07628-8-SWH, 2012 WL 5385633 (Bankr. E.D.N.C. Nov. 1, 2012) ............7

*Matter of Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987).............................................16

*In re Lisanti Foods, Inc.*,
    329 B.R. 491 (D.N.J. 2005) ..............................................28

*In re Los Angeles Land & Investments, Ltd.*,
    282 F. Supp. 448 (D. Haw. 1968)......................................28, 29

*In re Manuel Mediaviavilla, Inc.*,
    No. 13-2800 (MCF), 2015 WL 3780463 (Bankr. D.P.R. June 16, 2015) ............22, 23

*In re Mastercraft Record Plating, Inc.*,
    32 B.R. 106 (Bankr. S.D.N.Y. 1983) ....................................16

*In re Mirant Corp.*,
    No. 03-46590-DML-11, 2005 WL 6440372 (Bankr. N.D. Tex. May 24, 2005).............7

*In re Nat'l Paper & Type Co. of P.R.*,
    120 B.R. 624 (D.P.R. 1990)..............................................22

*In re Nat'l/Northway Ltd. P'ship*,
    279 B.R. 17 (Bankr. D. Mass. 2002) ...................................... *passim*

*In re Packer*,
    586 B.R. 274 (Bankr. N.D. Ill. 2018) ....................................6

*In re Rexford Props. LLC*,
  558 B.R. 352 (Bankr. C.D. Cal. 2016)........................................................14, 15, 18

*In re River Valley Fitness One Ltd. P'ship*,
  Case No. 01-12829, 2003 WL 22298573 (Bankr. D.N.H. Sep. 19, 2003) ........................21, 22

*In re Sentinel Mgmt. Grp., Inc.*,
  398 B.R. 281 (Bankr. N.D. Ill. 2008) ..........................................................27

*In re Williams*,
  253 B.R. 220 (Bankr. W.D. Tenn. 2000) ........................................................16

**Statutes**

11 U.S.C.
  § 901........................................................................................7, 24
  § 926........................................................................................25, 26
  § 1111(b)....................................................................................20
  § 1122.....................................................................................*passim*
  § 1122(a)...................................................................................*passim*
  § 1122(b)....................................................................................22, 24
  § 1123........................................................................................32
  § 1123(a)(4).................................................................................21, 32
  § 1129(a)(10)................................................................................19
  § 1129(b)(1).................................................................................18, 19
  § 1221.........................................................................................6
  § 1322(b)(1)...................................................................................6

The Bankruptcy Act ............................................................................24, 28

**Other Authorities**

P. R. Const. Art. II, § 18 ....................................................................31

Fed. R. of Bankr. P.
  R. 3013...................................................................................*passim*
  R. 9019.......................................................................................12

PROMESA
  § 201(b)(1)(B)................................................................................31
  § 201(b)(1)(C)................................................................................30, 31
  § 301(e)....................................................................................3, 25, 26, 30

To the Honorable United States District Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors (the "Committee")[1] respectfully files this reply (the "Reply") in support of its *Motion of Official Committee of Unsecured Creditors Pursuant to Federal Rule of Bankruptcy Procedure 3013 for Entry of an Order Reclassifying Class 39A and Class 41 Claims Under Oversight Board's Plan of Adjustment Dated February 28, 2020* [Docket No. 11989] (the "3013 Motion")[2] and in response to the objections to the 3013 Motion filed by (i) the Oversight Board [Docket No. 12726] (the "Oversight Board Objection"); (ii) the Official Committee of Retired Employees of the Commonwealth of Puerto Rico [Docket No. 12684] (the "Retiree Objection");[3] (iii) the American Federation of State, County, and Municipal Employees International Union [Docket No. 12689] (the "AFSCME Objection"); (iv) the Lawful Constitutional Debt Coalition [Docket No. 12724] (the "LCDC Objection"); (v) the QTCB Noteholder Group [Docket No. 12723] (the "QTCB Objection"); and (vi) the American Federation of Teachers [Docket No. 12084] (the "AFT Objection" and, together with the Oversight Board Objection, the Retiree Objections, the AFSCME Objection, the LCDC Objection, and the QTCB Objection, the "Objections" and, each objecting party, an "Objector"). In support of the Reply, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      What becomes clear in reviewing the Objections is that the Oversight Board, the Retiree Committee and the other Objectors will do anything to avoid a ruling on the merits of the

---

[1]    The Committee is the official committee of unsecured creditors for all Title III Debtors, other than PBA and COFINA.

[2]    All capitalized terms used but not defined herein have the meanings set forth in the 3013 Motion.

[3]    The Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the "Retiree Committee") also filed a supplemental objection [Docket No. 12725] (the "Retiree Supplemental Objection" and, together with the Retiree Objection, the "Retiree Objections").

3013 Motion, as a decision by this Court granting the 3013 Motion would derail the Proposed

Plan they support.  The Objectors therefore lead with—and to some extent focus almost entirely

on—the idea that the Court should not even consider issues that could be an impediment to plan

confirmation in advance of confirmation, even if there is a built-in mechanism for doing so, as

they believe it would open the proverbial floodgates to inefficient piecemeal litigation.  These

concerns are not valid.  The 3013 Motion raises a single, narrow issue that will require minimal

additional effort to resolve:  whether the Proposed Plan's separate classification of CW General

Unsecured Claims (Class 41) and Retiree Claims (Class 39A) is permissible under First Circuit

law.  The Committee does not ask the Court to address any confirmation-related issues, such as

unfair discrimination, or to opine on the classification of other claims, such as the GO and

revenue bond claims, which are raised in some of the joinders.

2.     The Objectors are also uniform in their dramatic mischaracterization of the 3013

Motion as an attack on the retirees and an effort to rob them of their recoveries.  Again, these

concerns are unfounded.  The Committee does not ask the Court to reduce the recoveries of the

retirees *by a single penny*.  All the Committee asks is that CW General Unsecured Claims be

placed in the same class as the Retiree Claims and receive the same recovery, as the law requires.

Although the plight of the retirees is a tragic one, and government employees are of course vital

to the Commonwealth's future, the same is true of holders of other general unsecured claims,

which in most cases are small businesses that employ thousands of local workers and provide

equally vital services to the Commonwealth and its residents, and which—contrary to the Retiree

Committee's contentions—did not become creditors of the Commonwealth voluntarily.

3.     While the Oversight Board may contend it is not economically possible to classify

and treat Retiree Claims and CW General Unsecured Claims similarly under the current

Proposed Plan, that is a problem of its own making.  The Oversight Board made the decision to

engage in piecemeal settlement negotiations with individual creditor constituencies, including

the GO and PBA bondholders, who are receiving the bulk of the value under the Proposed Plan.[4]

The Oversight Board must now live with the consequences of that decision by either

renegotiating such settlements or facing the reality that their plan is not confirmable.

4.      In addition to their misguided thematic responses to the 3013 Motion, the seven

Objections raise a variety of procedural and substantive issues that they contend require its denial

or, at a minimum, deferral.  All miss the mark.

5.      Procedurally, the Objectors start with the audacious yet entirely unsupportable

claim (raised only by the Oversight Board) that no party in interest other than the Oversight

Board may bring a Rule 3013 motion, because only the Oversight Board can propose a plan of

adjustment in Title III.  Nothing in the text of the rule, the provisions of PROMESA, or the case

law supports this position.  To the contrary, chapter 11 cases applying Rule 3013 make clear that

it is available to creditors without regard to whether they have the right to file a plan, including

before the debtor's exclusivity period has expired.  PROMESA, in turn, adopts Rule 3013 and

section 1122 of the Bankruptcy Code wholesale, without modification, and also adds new section

301(e), which only narrows the Oversight Board's discretion by specifying issues that it must

consider when classifying claims.  If one were to follow the Oversight Board's flawed argument

---

[4]     Whatever can be said about the sympathetic nature of the holders of CW General Unsecured Claims and their
value to the Commonwealth's future, no one could reasonably contend they are less sympathetic than the
bondholders, who largely consist of the most wealthy and sophisticated distressed investors on the planet. The
bondholders are sophisticated speculators who sought active involvement in the Title III cases and are getting
paid millions of dollars in additional consideration for the privilege of spearheading the PSA.  Certain of the
GO Bonds were trading as low as 20 cents on the dollar in December 2017, which means that a bondholder who
purchased GO Bonds at that time and now stands to receive a plan recovery of approximately 80% would see a
300% return on its investment.

to its logical conclusion, the Oversight Board's exclusive right to file a plan would prohibit

creditors from raising any of the Bankruptcy Code's confirmation requirements.

6.      As another means to avoid—at least temporarily—a ruling on the merits of the

3013 Motion, the Objectors urge the Court to defer it until plan confirmation.  Although the

Objectors make this argument purportedly in the name of efficiency, it would achieve the

opposite result.  No one disputes that the parties to these cases will spend tens of millions of

dollars preparing for heavily contested hearings on the disclosure statement and plan

confirmation, not to mention additional millions of dollars on the solicitation of votes.  Yet, all of

this effort and expense may be for nothing if the Court ultimately agrees with the Committee that

the Proposed Plan cannot be confirmed because it incorporates an unlawful classification

scheme.  It is therefore more efficient to resolve the 3013 Motion now, than it is to wait until the

confirmation hearing, after these expenses have been incurred.

7.      The Objectors present various doomsday scenarios in which consideration of the

3013 Motion will open the floodgates to the pre-confirmation litigation of additional claims and

issues, such as those implicated by some of the joinders.  These concerns are not valid.

Whatever may be said about the joinders, it is clear that the Rule 3013 Motion itself addresses a

very narrow issue that the Court can and should consider in isolation.  The Objectors also

contend that the 3013 Motion should be denied because it constitutes an impermissible unfair

discrimination objection, which the Committee can only raise at plan confirmation.  This

argument improperly conflates separate concepts and should be rejected for that reason.

8.      Once the Objectors finally address the 3013 Motion on its merits, they divide their

arguments into two categories and get the law (and the facts) wrong on both.  The Objectors first

ask the Court to apply a different legal standard.  They suggest the Court should either misread

or simply ignore the First Circuit's clear directive in *Granada Wines*, as confirmed by decades of subsequent case law, that the "general rule regarding classification is that all creditors of equal rank with claims against the same property should be placed in the same class." *Granada Wines, Inc. v. New Eng, Teamsters & Trucking Indus. Pension Fund*, 748 F.2d 42, 46 (1984). The Objectors craft their arguments on this point by citing to inapposite case law from other circuits and manufacturing nonexistent distinctions between chapter 11 cases and municipal bankruptcies. The First Circuit, however, has indisputably rejected the "flexible approach" to classification the Objectors urge the Court to apply, and has instead adopted the strict view that claims ***must*** be classified together, unless they exhibit differences in legal rank.

9.      The Objectors' second set of arguments on the merits contend that, regardless of which standard applies to the classification inquiry, CW General Unsecured Claims and Retiree Claims are sufficiently different to justify their separate classification. These arguments rely in large part on perceived factual distinctions between the two groups of claims that do not actually exist, including the fallacy that only the retirees are (i) "involuntary" creditors of the Commonwealth and (ii) vital to its future. As explained above, the small businesses that hold other general unsecured claims are no different. In any event, these and the Objectors' other alleged differences—including that the retiree claimants are owed a payment stream as opposed to a lump sum—are legally irrelevant. The case law is clear that neither a claim's origin nor the number of payments it seeks to recover has any bearing on classification.

10.      For all of these reasons and those discussed further below, the Court should grant the 3013 Motion in full and should not wait until confirmation to do so.

## <u>REPLY</u>

**I.     Rule 3013 Is Available to All Parties In Interest, Not Merely the Oversight Board**

11.     The Oversight Board argues that "only the Oversight Board may invoke

Bankruptcy Rule 3013 in Title III (or the debtor in chapter 9) to seek guidance as to the

formulation of a plan of adjustment."[5]  This argument is flawed for a number of reasons.  Most

fundamentally, there is no basis to conclude that the right to move under Rule 3013 changes

based on the chapter of the Bankruptcy Code under which the debtor filed.  Both the language of

the rule and the case law applying it are devoid of any such distinction.  In fact, contrary to the

Oversight Board's argument, the plain language of Rule 3013 reveals that it applies equally

across the Bankruptcy Code's various chapters.

12.     Bankruptcy Rule 3013 allows the court to "determine classes of creditors and

equity security holders pursuant to §§1122 [of chapter 11], 1222(b)(1) [of chapter 12], and

1322(b)(1) [of chapter 13] of the Code."  Unlike chapter 11 (but like chapter 9), both chapter 12

and chapter 13 grant the debtor ***exclusive*** authority to file a plan.  *See, e.g.*, *In re Diaz*, 586 B.R.

588, 595 (Bankr. W.D. Tex. 2018) ("Section 1321 states that '[t]he debtor shall file a plan.'  The

Court recognizes that a chapter 13 debtor has the exclusive right to file a plan."), *aff'd sub nom.*

*In re Vega-Lara*, No. 5:18-CV-00796-RCL, 2019 WL 4545613 (W.D. Tex. Sept. 19, 2019); *In re*

*Packer*, 586 B.R. 274, 283 (Bankr. N.D. Ill. 2018) (pursuant to 11 U.S.C. §1221, "only the

debtor may file a plan in Chapter 12").  Yet, nothing in the language of Rule 3013 suggests that

only in chapter 11 may non-debtors avail themselves of the rule.

13.     The chapter 11 cases applying Rule 3013 also undermine the Oversight Board's

position, as they show that courts have considered Rule 3013 motions by non-debtors ***during the***

---

[5]     Oversight Board Obj. ¶ 27.

*debtor's exclusivity period*.  *See, e.g., In re Highlands Grp. of Brunswick, LLC*, No. 11-07628-8-SWH, 2012 WL 5385633, at *2 (Bankr. E.D.N.C. Nov. 1, 2012) (adjudicating creditors' Rule 3013 motion filed after the debtor had already filed both a plan and an amended plan); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1013 (Bankr. S.D.N.Y. 1993) (granting creditors' Rule 3013 motion filed following filing of debtor's plan); *In re Mirant Corp.*, No. 03-46590-DML-11, 2005 WL 6440372, at *1 (Bankr. N.D. Tex. May 24, 2005) (adjudicating creditors' committee's Rule 3013 motion after debtors' filed first amended plan).[6]  If the Oversight Board is correct that only a party in interest that has the ability to propose a plan may seek relief under Rule 3013, then it would make no sense for courts to permit creditors in chapter 11 cases to file Rule 3013 motions before the debtor's exclusivity period has expired or been terminated.

14.     The Oversight Board has not identified any basis for applying Rule 3013 differently in chapter 9 or PROMESA.  As the Oversight Board recognizes, Rule 3013 derives from Bankruptcy Code section 1122.  Because Bankruptcy Code section 901 incorporates section 1122 into chapter 9, "application of §1122 in chapter 9 cases should be essentially the same as in chapter 11 cases."  *In re Hardeman Cty. Hosp. Dist.*, 540 B.R. 229, 234 (Bankr. N.D. Tex. 2015).  Applying section 1122 in chapter 9 (or PROMESA) the same way it applies in chapter 11 requires the parallel application of Rule 3013, which is simply a procedural vehicle for the application of section 1122.

---

[6]     The Oversight Board has previously taken the position that Rule 3013 motions may only be brought before a proposed plan is filed, *see Reply of the Fin. Oversight and Mgmt. Bd. in support of Urgent Mot. to Adjourn Disclosure Statement Hr'g & Related Deadlines* at ¶3 [Docket No. 12544], and alludes to the same argument in its Objection.  *See* Oversight Board Obj. ¶ 4.  Thus, the Oversight Board's position appears to be that (i) only the Oversight Board can move under Rule 3013 and (ii) it can do so only prior to the filing of a plan.  The cases cited herein in which (a) non-debtors moved under Rule 3013 (b) after the plan was filed reveal the fallacy of the Oversight Board's theory.  Additionally, and as explained in detail in the Assured joinder [Docket No. 12687], the Oversight Board's argument has no support in the statutory language or (even) in the Advisory Committee Note, and is inconsistent with the case law.  The Committee joins in paragraphs 26 through 29 of the Assured joinder [Docket No. 12687].

15.     Finally, the fact that Rule 3013 affects only the timing, but not the standards, for classification, reveals another defect in the Oversight Board's argument.  If challenging classification once a plan has been formulated is an impermissible intrusion on the Oversight Board's right to propose or modify a plan, what changes once the confirmation hearing is scheduled?  By the Oversight Board's logic, any objection to classification would constitute an effort to "impose classifications on the Oversight Board, and, consequently, amend an already-filed Plan."[7]  This is, of course, nonsense.  Surely, even the Oversight Board would concede that (i) the Court is allowed to make determinations regarding what classification schemes are legal, (ii) these determinations are binding on the Oversight Board, and (iii) parties other than the debtor can ask the court to make such determinations.

## II.     3013 Motion Should Be Heard Prior to Disclosure Statement Hearing

16.     In an effort to avoid an adverse ruling on the merits of the 3013 Motion, the Objectors contend that the Court should wait until confirmation to resolve the straightforward classification issues it presents.  They attempt to support this argument with a collection of doomsday predictions, inaccurate proclamations about the role of Rule 3013, inflammatory comments regarding the Committee's motives, and a lengthy discussion of the joinders filed by certain creditors that are ultimately not relevant to the narrow relief sought by the 3013 Motion. What the Objections do not provide is any cogent rationale for waiting until confirmation to resolve the 3013 Motion.  There is none.  Adjudicating the classification issue now could save the debtors and other parties significant time and money and will not lead to the cascade of piecemeal litigation that the Oversight Board fears.

---

[7]     Oversight Board Obj. ¶ 26.

A.   Debtors and Other Parties Should Not Waste Time and Money Preparing for Plan
Confirmation if The Plan is Not Confirmable

17.      After three years in Title III, the Oversight Board has proposed a plan of

adjustment, together with a related disclosure statement, that is, to say the least, complex.  Under

basic principles of bankruptcy law, the Oversight Board cannot seek confirmation of its proposed

plan unless and until the disclosure statement is approved, which, in this case, will not occur

before extensive briefing and a contested hearing.  Assuming the disclosure statement is

approved, the Oversight Board will then have to solicit votes on its proposed plan.  Given that

hundreds of thousands of proofs of claim have been filed and many of the bond issuances were

issued without indenture trustees and purchased by small retail holders, solicitation will be a

massive undertaking.  Voting packages will have to be sent to hundreds of thousands of

creditors; this process will almost certainly take months and cost millions of dollars.

18.      Once the votes have been tabulated, the Oversight Board will be able to finally

turn to the process of seeking to confirm its proposed plan of adjustment.  Preparation for the

confirmation hearing will involve extensive fact and expert document discovery and depositions,

litigation of inevitable discovery disputes, and pre-trial briefing.  At the end of that process, the

confirmation hearing itself will, optimistically, according to the Oversight Board, consist of a

ten-day trial, likely involving hundreds if not thousands of exhibits and dozens of witnesses.  The

Objectors argue that only at this stage should the Court consider the 3013 Motion.

19.      The Objectors make this argument, ironically, in the name efficiency.  But they

have it backwards.  Indeed, it would be entirely inefficient to spend thousands of hours and

millions of dollars preparing for a confirmation hearing only to, following the hearing, have the

Court agree with the Committee that the plan's proposed classification scheme is, and always has

been, unlawful.  In that event, the Proposed Plan will not be confirmed, and all parties will have

wasted months litigating issues that will have to be revisited once the Oversight Board

proposes—and resolicits—another plan of adjustment.[8]

20.     Against this backdrop, the Committee makes one simple and narrow request: that

the Court determine the 3013 Motion before, or concurrently with, the disclosure statement

hearing.  It has been argued that the Bankruptcy Rule 3013 is discretionary; it has also been

argued that the Court lacks the discretion to delay ruling on the 3013 Motion until confirmation.[9]

Regardless, the Committee merely urges that, under these circumstances, the Court should not

wait that long to address the important and basic issues raised by the 3013 Motion.

21.     As discussed in detail in the 3013 Motion, numerous courts have utilized Rule

3013 to decide classification issues prior to confirmation.[10]  Indeed, consistent with the

Committee's concerns, one court has explained that the whole purpose of Rule 3013 is obtain a

court ruling on questions of "voter classification prior to the solicitation of voter acceptances for

confirmation of a proposed plan of reorganization."  *In re DRW Prop. Co. 82*, 60 B.R. 505, 506

(Bankr. N.D. Tex. 1986).  This is fully consistent with the plain language of Rule 3013, which

similarly explains that Rule 3013 is for "the purposes of the plan and ***its acceptance***."[11]

22.     The Objectors make no serious attempt to address this body of case law, instead

resorting to generic recitals regarding the Court's discretion.  In the process, they ignore the fact

that the Oversight Board recently filed a stipulation relating to the PRIFA BAN claims that,

---

8    Improper classification is not an issue that can be "fixed" through a last-minute modification of the Proposed
     Plan at the confirmation hearing.  Rather, it is a material change that would require re-solicitation of the
     amended plan for all creditors.

9    Assured joinder [Docket No. 12687].

10   *See* 3013 Mot. ¶¶ 14-15.

11   Fed. R. Bankr. Proc. 3013 (emphasis added).

among other things, seeks to resolve the classification of such claims under the Proposed Plan.[12]
This stipulation shows that the Oversight Board knows classification issues can be resolved in
advance of confirmation.

23.     In the end, resolution of the 3013 Motion prior to approval of the disclosure
statement is the perfect example of a "win-win" for all parties: if the CW General Unsecured
Claims and the Retiree Claims are improperly classified, it is in the best interest of all parties,
including creditors, the debtors, the Oversight Board, and the Court itself, to know this now.

B.     <u>Considering the 3013 Motion Now Will Not Lead to Inefficient Piecemeal
Litigation</u>

24.     The Objectors argue that the Court's consideration of the 3013 Motion at this time
would "result in a litigation overload for the Court from numerous one-off litigations prior to
confirmation, as evidenced by the Supporting Parties' attempt to introduce a host of new
issues."[13]  These concerns are unfounded.

25.     While the Objectors appear to direct this argument primarily to the joinders filed
by Ambac and Assured, the 3013 Motion itself presents a narrow legal issue: whether or not the
proposed separate classification of Retiree Claims and CW General Unsecured Claims is
permissible under controlling First Circuit authority.  The Court can resolve this question based
on the briefing before it and oral argument.  There is no need for additional briefing, discovery,
or other litigation.  The burden that the 3013 Motion imposes on the Court is therefore limited.

26.     The Committee cannot control the arguments and issues other parties have
presented in their joinders, but such issues and arguments are distinguishable from those raised

---

[12]     *See Mot. of the Commonwealth of Puerto Rico Pursuant to Bankr. Rule 9019 for an Order Approving Stip. and
Agreed Order (A) Allowing PRIFA BANs Guarantee Claim, (B) Authorizing Escrow of PRIFTA Funds and (C)
Directing the Dismissal of Litigation with Prejudice* [Docket No. 12519].

[13]     *See, e.g.*, Oversight Board Obj.¶ 8.

by the 3013 Motion.  The 3013 Motion asks the Court to classify the claims of only two

constituencies—the retirees and general unsecured creditors—whose respective rights and legal

positions have been crystalized.  The joinders, by contrast, raise classification issues as to claims

that remain subject to ongoing predicate disputes, including the Revenue Bond Claims, which

remain subject to ongoing "gating" litigation as to whether or not such claims are secured or

entitled to priority treatment.  It may be more efficient to defer classification of the Revenue

Bond Claims until such predicate issues have been resolved, but the same is not true for the

claims at issue in the 3013 Motion.

27.    Similarly without merit is the Objectors' argument that the Court already decided

to defer consideration of the 3013 Motion when it rejected the Committee's request to litigate the

GO priority objection.[14]  The GO priority objection is different from the 3013 Motion in at least

two important respects.  First, as the Oversight Board acknowledges, the Court stayed the GO

priority objection in large part because "it is not prudent to litigate issues that will be resolved if

the plan is confirmed."[15]  This does not apply to the 3013 Motion.  Contrary to the GO priority

objection, which the Oversight Board will ask the Court to resolve at confirmation pursuant to

Rule 9019, classification issues cannot be resolved through the prism of a "settlement" and must

be decided on their merits, either now or at confirmation.[16]  Second, the 3013 Motion imposes

even less burden on the Court than the GO priority objection.  Whereas the GO priority objection

---

[14]    Oversight Board Obj. ¶ 31.

[15]    *Id.*

[16]    Although the court must also consider the GO priority objection at confirmation, the Oversight Board and other
plan proponents will argue it need only do so by evaluating the reasonableness of the Oversight Board's
settlement of that objection through the prism of Federal Rule of Bankruptcy Procedure 9019.  Thus, according
to the Oversight Board and others, deferring resolution of the GO priority objection to confirmation simplifies
these cases by obviating the need for full litigation of the objection on its merits.

litigation requires further briefing and (according to some parties) potential discovery and an
evidentiary hearing, the 3013 Motion is already fully briefed and raises pure issues of law.

28.     In sum, the Court has been presented with a narrow question: is the proposed
separate classification of Retiree Claims and CW General Unsecured Claims permissible under
controlling First Circuit authority?  The answer to this question is either yes or no; if no, then the
plan as proposed cannot be confirmed.  The Court should not delay in reaching this decision.

C.     The Committee is Not Opposed to the Court Deferring Consideration of the 3013
Motion Until After the Oversight Board Files its May 1, 2020 Status Report

29.     The Oversight Board also contends that "it is an inefficient use of judicial
resources for the 3013 Motion and Partial Joinders to go forward" at this time given that the plan
confirmation schedule has been placed on hold pending the Oversight Board's submission of a
status report on May 1, 2020.[17]  The Committee is mindful that the world and, by extension,
these cases have changed dramatically following the filing of the 3013 Motion as a result of the
global pandemic caused by COVID-19.  The Oversight Board, however, has not given any
indication that the crisis will lead to changes in the plan's classification scheme, at least not as
far as the Retiree Claims and CW General Unsecured Claims are concerned.

30.     In the unlikely event the Oversight Board were to announce in its May 1, 2020
filing that it *is* modifying the plan in a manner that moots relief sought by the 3013 Motion—for
example, by classifying Retiree Claims and CW General Unsecured Claims together—the
Committee would agree that the Court need not consider the 3013 Motion at this time.  The
Committee therefore has no objection to deferring consideration of the 3013 Motion until after
the submission of the May 1 status report.  The Committee believes it is critical, however, for the

---

[17]     Oversight Board Obj. ¶ 10.

13

Court to consider the Rule 3013 motion prior to any disclosure statement hearing based on a plan
that contains the present classification scheme.

### III. Committee's Rule 3013 Motion Is Not an Unfair Discrimination Objection

31.     Both the Oversight Board Objection and the Retiree Objection assert that the 3013
Motion is a disguised unfair discrimination objection.[18]  The basis for this contention seems to be
the Committee's acknowledged belief that the recovery offered its constituents under the
proposed plan is insufficient.  The Objections, however, offer no line of demarcation between a
permissible (under Rule 3013) classification objection and an impermissible (under Rule 3013)
unfair discrimination objection.

32.     Instead, the Objections rely on the statement in *Rexford Properties* that Rule 3013
is reserved for the pre-confirmation determination of classification issues, and does not
contemplate "advance determinations of other confirmation issues such as unfair
discrimination," which arises only once a debtor has failed to obtain unanimous (by class)
approval of a plan.  *In re Rexford Props. LLC*, 558 B.R. 352, 355 (Bankr. C.D. Cal. 2016).  The
Committee does not dispute this explanation of Rule 3013.  Tellingly, however, the Objections
omit any discussion of *Rexford Properties* beyond this generic statement.

33.     What the Objections ignore is that, after its prefatory remarks about the purpose
and limits of Rule 3013, the *Rexford Properties* court engaged in a lengthy analysis of the
classification issues raised by the parties.  The court first carefully analyzed each of the 14
similar, but separately classified, claims.  The court next reviewed the controlling case law and
addressed a novel legal issue as to whether the Ninth Circuit (which, in contrast to the First
Circuit, permits separate classification for economic or business reasons) requires that separately

---

[18]   Retiree Obj. at 6; Oversight Board Obj. ¶ 37.

classified, but similar, claims be absolutely critical or necessary to the debtor's plan, or merely
that the favored claims provide genuine financial or operational benefits to the debtor.  *In re
Rexford Props. LLC,* 558 B.R. at 361-65.

34.     In other words, notwithstanding its prefatory remarks, the *Rexford Properties*
court did exactly what the 3013 Motion seeks: it reviewed the similar, but separately classified,
claims and determined whether applicable law permitted separate classification.  The *Rexford
Properties* court explained that its approach "maintains the doctrinal distinction between (1)
whether the separate classification of substantially similar claims is appropriate under
Bankruptcy Code section 1122, and (2) whether the proposed treatment of those claims unfairly
discriminates." *Id*.

35.     Finally, it is noteworthy that in *Rexford Properties* the party opposing the
classification scheme (and objecting to the debtor's Rule 3013 motion) was a creditor that, under
the plan, was classified with general unsecured claims and would receive less than the favored
creditors.  Under the Oversight Board's theory, the mere fact that the objector would not have
pursued its objection "based on separate classification if [general unsecured creditors] were
receiving the same or better treatment than the [favored] class,"[19] should have rendered the
objection an impermissible unfair discrimination objection.  Of course, this is not what
happened; as discussed, the *Rexford Properties* court addressed the classification issue, at length.
Indeed, the Oversight Board's theory would lead to the bizarre result that the only entities
entitled to move under Rule 3013 without their motion being branded an impermissible unfair
discrimination objection are (i) the debtor and (ii) the parties that benefit from the classification.

---

[19]     Oversight Board Obj. ¶ 35.

36.     The Oversight Board also argues that the 3013 Motion must really be an unfair discrimination argument because Bankruptcy Code section 1122, by its terms, prohibits only the joint classification of dissimilar claims and not the separate classification of similar claims.[20] This argument ignores the very cases the Oversight Board cites that adopt a flexible approach to classification.  These cases recognize that even though the express language of section 1122 does not "address the presence of similar claims in separate classes," there, nonetheless, "must be some limit on a debtor's power to classify creditors in such a manner."  *Matter of Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (quoting *In re U.S. Truck Co., Inc.*, 800 F.2d 581, 586 (6th Cir. 1986)).  Moreover, this limit is derived from section 1122, as "[i]mplicit in section 1122 is the requirement that claims be sufficiently dissimilar to warrant separate classification." *In re Williams*, 253 B.R. 220, 224 (Bankr. W.D. Tenn. 2000) (citing *In re U.S. Truck Co.*).[21] Finally, as a bankruptcy court in this circuit has explained, "section 1122 provides little guidance as to how claims are to be classified."  *In re Nat'l/Northway Ltd. P'ship*, 279 B.R. 17, 25 (Bankr. D. Mass. 2002).  "It mandates that only 'substantially similar' claims or interests may be grouped together. It does not indicate whether claims that are substantially similar must be classified together. ***In this circuit, however, the answer is that they must***."  *Id.* (emphasis added).

## IV.   Retiree Claims and CW General Unsecured Claims Must Be Classified Together

37.     The Objectors' arguments as to the merits of the 3013 Motion fall into several categories.  First, the Oversight Board argues that no statutory predicate exists for the relief the Committee seeks because neither section 1122 of the Bankruptcy Code nor any other provision

---

[20]   *See* Oversight Board Obj. ¶¶ 37-39.

[21]   *See also In re Mastercraft Record Plating, Inc.*, 32 B.R. 106, 108 (Bankr. S.D.N.Y. 1983) (subsequent history omitted) ("Although § 1122(a) deals with the placing of dissimilar claims in the same class, it by necessary implication deals with the placing of similar claims in different classes.").

of the Bankruptcy Code or PROMESA restricts the Oversight Board's "ability to place claims in *separate* classes."[22]  <u>Second</u>, both the Oversight Board and the Retiree Committee argue that *Granada Wines* does not control the classification issues in the 3013 Motion for various reasons, including that classification is different in municipal bankruptcies.  <u>Third</u>, the Retiree Committee and others contend that section 1122 permits (indeed, requires) the separate classification of the Retiree Claims and the CW General Unsecured Claims because they are so dissimilar and because of the sympathetic nature of the holders of Retiree Claims.  As discussed below, each of these arguments is mistaken on either the law or the facts (or both) and should be rejected.

> A.   <u>Section 1122 Imposes Limits on Separate Classification of Similar Claims</u>

38.     The Oversight Board's assertion that section 1122 "does not dictate which claims, if any, must be classified together" is demonstrably incorrect.[23]  Indeed, even the cases relied on and cited by the Oversight Board reject the conclusion that section 1122 has nothing to say about the classification of similar claims—they simply hold that section 1122 grants broad, but not unlimited, discretion, in that regard.[24]

39.     The First Circuit has taken a different approach on the issue.  On the question of the proper interpretation of section 1122 and "whether claims that are substantially similar must be classified together," "*[i]n this circuit, . . . the answer is that they must.*"  *In re Nat'l/Northway Ltd. P'ship*, 279 B.R. 17, 25 (Bankr. D. Mass. 2002) (emphasis added).  Thus, contrary to the Oversight Board's contention, in the First Circuit, section 1122 does govern the debtor's ability to separately classify similar claims and therefore applies to the 3013 Motion.

---

[22]   Oversight Board Obj. ¶ 12 (emphasis in original).

[23]   Oversight Board Obj. ¶ 41.

[24]   *See, e.g.*, *In re Dow Corning Corp.*, 280 F.3d 648, 661 (6th Cir. 2002) ("Congress **incorporated into section 1122** broad discretion to determine proper classification . . . .") (emphasis added).

40.     The Oversight Board also claims that section 1129(b)(1) is "effectively a statutory grant of permission to classify substantially similar claims separately as long as there is no unfair discrimination against the class that rejects."[25]  In other words, according to the Oversight Board, the only limit on separate classification is unfair discrimination.  This proposition (in support of which the Oversight Board cites no authority) is undermined by the cases the Oversight Board relies on elsewhere in its brief.

41.     As discussed above, the Oversight Board (and the Retiree Objection) rely on *Rexford Properties* to illustrate that unfair discrimination and classification are separate issues that should not be conflated.[26]  Indeed, the *Rexford Properties* court explained that there is a "doctrinal distinction between (1) whether the separate classification of substantially similar claims is appropriate under Bankruptcy Code section 1122, and (2) whether the proposed treatment of those claims unfairly discriminates for purposes of Bankruptcy Code section 1129(b)(1)."  558 B.R. at 365.  That distinction is based on the understanding that the "classification inquiry is aimed at preventing the gerrymandering of a plan vote," while the "unfair discrimination inquiry, by contrast, is aimed at determining whether the disparate treatment of similar claims is fair."  *Id.*  By arguing that the only limitation on classification is unfair discrimination, the Oversight Board improperly conflates these two separate concepts. *See In re 266 Washington Assocs.*, 141 B.R. 275, 286 (Bankr. E.D.N.Y.), *aff'd sub nom. In re Washington Assocs.*, 147 B.R. 827 (E.D.N.Y. 1992) ("Whether or not a plan discriminates unfairly is beside the point at this juncture. The Debtor hopelessly confuses two ***discrete legal issues*** by merging them into a seamless web. Unfair discrimination is a cram down issue under

---

[25]     Oversight Board Obj. ¶ 43.

[26]     Retiree Obj. at 16; Oversight Board Obj. ¶ 37.

11 U.S.C. § 1129(b)(1).  Classification of claims are 11 U.S.C. §§ 1122 and 1129(a)(10)

issues....") (emphasis added).).

42.     The Oversight Board also argues that the unfair discrimination provision in

section 1129(b)(1) would have "no application or meaning" if a plan cannot classify substantially

similar claims separately.[27]  This argument incorrectly assumes that the Committee seeks to

prohibit the separate classification of similar claims of all types.[28]  Not so.  Separate

classification may be appropriate where the claims are of different legal character.  In the First

Circuit, however, these differences may not be found in technical distinctions that have no

impact in bankruptcy.  Therefore, in such limited circumstances, a plan may separately classify

claims and provide disparate treatment across such classes, thus implicating section 1129(b)(1)'s

prohibition on disparate treatment that rises to the level of unfair discrimination.  In other words,

the First Circuit's strict approach to classification does not mean that unfair discrimination under

1129(b)(1) is no longer a meaningful and important creditor protection.[29]

B.     Controlling First Circuit Precedent Prohibits Separate Classification of Retiree
        Claims and CW General Unsecured Claims

i.     *The Committee Has Accurately Construed the Holding and Application of
        Granada Wines*

43.     In the over 35 years since *Granada Wines* was decided, courts in and out of the

First Circuit have understood it to stand for one important, and basic, proposition:  although

Bankruptcy Code section 1122(a) "does not indicate whether claims that are substantially similar

---

[27]   Oversight Board Obj. ¶ 38.

[28]   The Retiree Objection similarly mischaracterizes the Committee's position, claiming that "[t] read the UCC's
       Motion, one would think the Bankruptcy Code prescribes that all unsecured claims be classified together."
       Retiree Obj. at 7.

[29]   *See generally In re Hanish, LLC*, 570 B.R. at 16 (the "First Circuit s strict construction of 11 U.S.C. § 1122(a)
       makes detecting gerrymandering substantially easier by creating a strong presumption that facially similar
       claims should be classified together.  That is not to say gerrymandering is not an issue at all.").

must be classified together, . . . *in this circuit, . . . the answer is that they must*." *In re Nat'l/Northway Ltd. P'ship*, 279 B.R. at 25 (emphasis added) (discussing *Granada Wines* and recognizing it to be "controlling" on this point). Ignoring this explicit statement (and many others like it[30]) the Retiree Committee and the Oversight Board argue that *Granada Wines* either does not adopt the strict classification rule advanced in the 3013 Motion or, if it does so, was wrongly decided. These arguments find no support in the *Granada Wines* decision itself or other First Circuit case law.

44. One of the cases cited by the Oversight Board, *In re Bjolmes Realty Tr.*, 134 B.R. 1000, 1002 (Bankr. D. Mass. 1991), is particularly instructive. Holding that the "controlling authority on claim classification in this circuit is" *Granada Wines*, the *Bjolmes* court was dismissive of the exact approach taken by the Objections here, noting that the debtor's "fond reference to decisions handed down in other jurisdictions permitting separate classification of claims based upon practical difference among the classes," was irrelevant given that "that *Granada Wines* requires a distinction among classes based upon the legal nature of claims." *Id.* Ultimately, the *Bjolmes* court held that the debtor had identified a legal distinction sufficient to justify separate classification of unsecured claims under *Granda Wines*: the under-secured creditor's right to have its claim treated as a fully secured claim pursuant to Bankruptcy Code

---

30  *See, e.g.*, *In re Hanish, LLC*, 570 B.R. 4, 15 (Bankr. D.N.H. 2017) ("Given that the First Circuit applies the strictest approach to classification, it necessarily follows that other courts have accepted justifications for separate classification that are simply inconsistent with" First Circuit law.); *In re Nat'l/Northway Ltd. P'ship*, at 30 (explaining that while courts in other circuits may have "adopted a test less stringent than the strict approach of *Granada Wines* and permit[] separate classification of claims based upon the economic or business reasons advanced by a debtor . . . [t]he strict approach of *Granada Wines* carves out no such exemptions to the general rule for classifying claims in [the First C]ircuit"); *In re Barney & Carey Co.*, 170 B.R. 17, 22 (Bankr. D. Mass. 1994) ("the First Circuit has adopted a strict approach, namely, that all claims of equal legal priority must be placed in the same class, subject to the administrative convenience exception").

section 1111(b), which was the "type of dichotomy referred to in *Granada Wines*—a difference

in rank with respect to property." *Id.*[31]  No such distinction exists here.

45.     Despite this case law, and the clear statement in *Granada Wines* that the "general

rule regarding classification is that all creditors of equal rank with claims against the same

property should be placed in the same class," 748 F.2d at 46, the Retiree Committee and the

Oversight Board both urge the Court to interpret *Granada Wines* as supporting a more flexible

approach to classification.  The approach they advocate would give debtors unfettered discretion

to classify substantially similar claims separately as long as they are not doing so for purposes of

gerrymandering.  No support exists for this position.

46.     The Retiree Committee cites to two bankruptcy court decisions in the First

Circuit, but neither supports its position.  The Retiree Committee first cites to *In re Charles*

*Street African Methodist Episcopal Church of Boston.*[32]  This case does not further the Retiree

Committee's cause.  In that case, the bankruptcy court approved the separate classification of

allegedly similar claims where the separately classified creditor ***assented*** to the disparate

treatment.  *In re Charles St. African Methodist Episcopal Church of Bos.*, 499 B.R. 66, 96

(Bankr. D. Mass. 2013).  The court distinguished *Granada Wines* on that basis:

> *Granada Wines* differs from the present case in that the affected
> creditor in that case did not assent to its disparate, lesser treatment.
> Here, the affected creditors assent, a difference that, in view of §
> 1123(a)(4), makes a difference.  *Granada Wines* therefore does not
> govern the present facts.

---

[31]     As the Objections note, there is a debate amongst courts in the First Circuit whether this holding regarding the
right to an 1111(b) election is correct as applied to *Granada Wine*'s strict classification rule.  It is clear,
however, that this debate turns entirely on the unique nature of section 1111(b) and its treatment of an otherwise
unsecured claim as secured.  Because unsecured claims and secured claims must be classified separately, the
effect of the legal fiction of treating an unsecured claim as a secured one is an interesting legal issue but is,
ultimately, entirely irrelevant to the classification of retiree and general unsecured claims, as holders of Retiree
Claims have no such right to have their claims treated as fully secured.

[32]     Retiree Obj. at 9-10.

*Id.* Here, the CW General Unsecured Claims have, of course, not assented to their treatment under the proposed plan of adjustment. The *Charles Street* decision is therefore inapplicable and does not support a narrow reading of *Granada Wines* for purposes of the present dispute.[33]

47. Nor does *In re River Valley Fitness One Ltd. P'ship*, Case No. 01-12829, 2003 WL 22298573 (Bankr. D.N.H. Sep. 19, 2003), help the Retiree Committee. According to the Retiree Committee, this case rejects the interpretation of *Granada Wines* as prohibiting ***any*** separate classification of unsecured claims.[34] The 3013 Motion does not take this position. To the contrary, the 3013 Motion acknowledges that classification of unsecured claims may be appropriate where the claims are of different legal character with respect to their rank against the debtor or its property. The *River Valley* decision turned on such a distinction: "[b]ecause Ledyard Bank has agreed to subordinate repayment of its claim to other unsecured creditors, ***the rank, legal character and status of the Ledyard Bank claim is different from other unsecured claims*** and separate classification is permissible under *Granada Wines*." *In re River Valley Fitness*, 2003 WL 22298573, at *9 (emphasis added). In other words, *River Valley* holds only that a subordinated creditor is of a different rank and may be separately classified. This principle is both non-controversial and irrelevant here.

48. For its part, the Oversight Board cites two cases—*In re Nat'l Paper & Type Co. of P.R.*, 120 B.R. 624, 626 (D.P.R. 1990) and *In re Manuel Mediaviavilla, Inc.*, No. 13-2800 (MCF), 2015 WL 3780463, at *6 (Bankr. D.P.R. June 16, 2015)—as support for its position that

---

[33] *See also In re Hanish, LLC*, 570 B.R. 4 (Bankr. D.N.H. 2017) ("The lynchpin of [the *Charles Street*] decision is that separate classification of the junior lienholder from the general unsecured claims did not change the outcome of the case because both classes were impaired and accepted the plan. The court's invocation of 11 U.S.C. § 1123(a)(4) was to emphasize the fact that these creditors could, and presumably would in light of their votes, agree to [their proposed treatment] even if they were in the same class, rendering classification irrelevant.").

[34] Retiree Obj. at 8.

courts in this district have rejected *Granada Wines*.  In the former, the court explained that

"unsecured creditors in this reorganization plan are placed in distinct categories depending on the

size of the debt owed to the creditor."  *Matter of Nat'l Paper & Type Co. of Puerto Rico*, 120

B.R. at 625-26.  "Thus, classes with smaller debts owed to the creditor" (i.e., the administrative

convenience class) received favored treatment under the plan.  *Id.*  In other words, the only

classification issue in this case was the straightforward application of section 1122(b)'s statutory

exception for the separate classification of an administrative convenience class.[35]

49.     The latter case is entirely inapposite.  In *Manuel Mediaviavilla*, there were three

debtors: a corporate chapter 11 debtor and husband and wife joint individual chapter 11 debtors.

2015 WL 3780463, at \*6.  The debtors proposed a joint plan, pursuant to which a lender's claim

was placed in the general unsecured class with all other unsecured claims, while certain

unsecured governmental claims—asserted against ***a different debtor***—were placed in a separate

class.  In fact, this separate classification scheme was adopted at the court's insistence, as the

"Court requested that the Debtors independently classify and treat all secured and unsecured

claims for the corporate and individuals' cases."  *Id.* at \*4.

50.     The court (unsurprisingly) held that this separate classification was not

gerrymandering, and that it was necessary to "clarify that such claims are limited to the corporate

debtor and they do not apply to the individual debtors," thereby avoiding a *de facto* substantive

consolidation of the debtors' estates.  *Id*.  The decision in *Manuel Mediaviavilla* thus has no

application to the present circumstances.  Moreover, the Committee notes that in *Manuel*

---

[35]   To the extent that *Matter of Nat'l Paper & Type Co.* can be read as adopting the flexible approach to
classification advocated by courts in other circuits, it does so without any discussion of the classification
standard adopted by *Granada Wines*.  The Committee submits that, in this regard, it is this opinion (and not
*Granada Wines* and its 35 years of subsequent case law) that is wrongly decided.

*Mediaviavilla*, the court ultimately rejected the proposed plan; there was, therefore, no need for the court to raise the issue of claim classification more generally.[36]

51.     Unable to successfully sidestep the clear directive of *Granada Wines*, the Oversight Board and the Retiree Committee next resort to arguing that the First Circuit's statements as to the strict classification rule were mere *dicta* because *Granada Wines* was dealing with a plan that did not have separate classification.  This argument, too, lacks merit, as it ignores the manner in which the First Circuit actually characterized the issue before it.  In *Granada Wines*, the debtor argued that even though it had not separately classified the pension fund claim from other general unsecured claims, it should "nevertheless be treated as if it were in a separate class because the plan treated it differently."  *Granada Wines*, 748 F.2d at 46.  Crediting this argument, the court explained that (according to the debtor) "this separate classification was justified."  *Id*.  It was this second claim—that the separate classification was justified—that the First Circuit rejected; it did not reject (or even address) the debtor's preliminary argument that it had, effectively, separately classified the claims at issue.

52.     Finally, the Oversight Board and the Retiree Committee contend that, even if *Granada Wines* does adopt a strict classification rule (a conclusion made inescapable by the decades of case law interpreting and applying *Granada Wines*), the decision was wrongly decided.[37]  In response to this argument, the Committee notes only that, unless and until the First Circuit agrees with this characterization of its ruling in *Granada Wines*, that ruling "is the

---

[36]     The Oversight Board finds significant that the *Manuel Mediaviavilla* court did not even cite to *Granada Wines*. *See* Oversight Board Obj. ¶ 55.  Respectfully, in light of the case law in the First Circuit, it seems improbable (to say the least) that the court would have issued an opinion addressing the separate classification of similar claims without addressing *Granada Wines*—even (or especially) if the bankruptcy court considered itself not bound by *Granada Wines*.  Much more likely is that the bankruptcy court did not cite *Granada Wines* because its holding regarding the separate classification of similar claims was not relevant or necessary to the bankruptcy court's ruling.

[37]     Retiree Obj. at 9.

controlling case for classification of claims in this circuit," and this Court is bound by it.[38]

*Nat'l/Northway Ltd. P'ship*, 279 B.R. at 25.

> ii. *Municipal Nature of Commonwealth's Bankruptcy Case Does Not Alter Classification Rules*

53.    The Objections further contend that the strict approach to classification set forth

in *Granada Wines* should not apply under chapter 9 or PROMESA.  The Committee, however, is

not aware of—and no Objector points to—any case law or other authority holding that

classification of claims in a municipal bankruptcy is governed by a different standard.  To the

contrary, because section 901 of the Bankruptcy Code incorporates section 1122 into chapter 9,

"application of §1122 in chapter 9 cases should be essentially the same as in chapter 11 cases."

*In re Hardeman Cty. Hosp. Dist.*, 540 B.R. 229, 234 (Bankr. N.D. Tex. 2015) (citing Collier on

Bankruptcy P 901.04).  Accordingly, courts addressing issues of classification in municipal cases

apply the same standard as, and rely on, cases in the chapter 11 (*i.e.*, corporate) context.  *See In

re City of Detroit*, 524 B.R. 147, 246 (Bankr. E.D. Mich. 2014) (reciting applicable law of

section 1122 and citing to corporate cases); *In re Corcoran Hosp. Dist.*, 233 B.R. 449, 454

(Bankr. E.D. Cal. 1999) (same).  PROMESA is no different.  In addition to incorporating Rule

3013 and section 1122(a) wholesale, PROMESA also adds section 301(e), which only serves to

circumscribe the Oversight Board's authority by compelling it to consider whether claims are

secured or have priority in determining how to classify such claims.[39]

---

[38]    The Committee reserves all rights in this regard and notes, briefly, that Congress' creation of section 1122(b) as
an exception to the rule of 1122(a) "lends support to an interpretation that [Section 1122] otherwise requires all
substantially similar claims to be placed in one class."  *Bjolmes*, 134 B.R. at 1003.  Additionally, while the
Objections criticize *Granada Wines*' reliance on pre-Bankruptcy Code cases, "[t]he legislative history of section
1122 indicates that it was a codification of case law that existed under the Bankruptcy Act."  *In re
Nat'l/Northway Ltd. P'ship*, 279 B.R at 27 .

[39]    *See* PROMESA § 301(e) ("In determining whether claims are 'substantially similar' for the purpose of section
1122 of Title 11, made applicable in a case under this subchapter by subsection (a), the Oversight Board shall
consider whether such claims are secured and whether such claims have priority over other claims.").

54.      With these principles in mind, the fact that "plans of adjustment in Chapter 9

routinely classify—and treat—pension obligations separately from other unsecured claims"[40] is

not the result of any unique nature of municipal bankruptcy.  Instead, it is the foreseeable result

of the fact that all of the cases cited by Objectors were decided in circuits that, unlike the First

Circuit, have adopted the "business or economic justification" approach to classification.  For

example, the Oversight Board discusses the classification decision in the *City of Detroit*

bankruptcy at length, noting in doing so that the chapter 9 court in that case "followed the Sixth

Circuit's flexible approach" to classification.[41]  This approach has no relevance in the First

Circuit, regardless of the chapter of the Bankruptcy Code under which the case is pending.

55.      In its objection, AFT references this Court's *Memorandum Opinion and Order*

*Denying Renewed Motion of Certain Secured Creditors of the Employees Retirement System of*

*the Government of the Commonwealth of Puerto Rico for Appointment as Trustees under 11*

*U.S.C. § 926*, dated January 7, 2020 [Case No. 17 BK 3566-LTS, Docket No. 763], for its

pronouncement that "unlike the commercial focus of bankruptcy cases of private entities, the

'primary purpose' of governmental insolvency proceedings 'is not future profit, but rather

continued provision of public services' such as education, health and safety."  *Id.* (internal

citations omitted).  This opinion, and the Court's remarks therein concerning the purpose of

government bankruptcies, have no bearing on the 3013 Motion.  The asserted "purpose" of a

bankruptcy case cannot override firm requirements of the Bankruptcy Code, such as those

relating to classification of claims, and the Objectors cite no authority to the contrary.

---

[40]    Retiree Obj. at 15; *see also* Oversight Board Obj. ¶ 45.

[41]    Oversight Board Obj. ¶ 45.

56.     Finally, the Oversight Board suggests that "PROMESA's language" further

supports a flexible approach to classification.  If anything, the opposite is true.  The Oversight

Board cites to section 301(e) of PROMESA, mentioned above, which provides that, "[i]n

determining whether claims are 'substantially similar' for the purpose of section 1122 of Title

11, . . . the Oversight Board shall consider whether such claims are secured and whether such

claims have priority over other claims."  PROMESA § 301(e).  This provision actually supports

the Committee's position, as it effectively codifies *Granada Wines* by recognizing that the

appropriateness of separate classification should turn on the relative "rank"—*i.e.*, security and/or

priority—of the claims.  And while the Oversight Board suggests that section 301(e) gives it

added flexibility in classifying claims, it actually does the opposite by imposing requirements

(telling the Oversight Board what it "shall" do) that otherwise do not exist under section 1122.

C.     Retiree Claims and CW General Unsecured Claims Are Legally Indistinguishable
       and Therefore Substantially Similar

57.     Several of the Objections argue (wrongly) that the Retiree Claims have certain

features that separate them from the CW General Unsecured Claims and, therefore, require (not

merely justify) separate treatment under section 1122(a).[42]   To support their arguments, the

Objections point to a hodgepodge of supposed legal and factual differences between the two

groups of general unsecured claims.  These alleged differences, however, do not support a

finding that the claims are not substantially similar under section 1122(a).  Moreover, some of

the alleged differences are inaccurate factually and therefore nonexistent in reality.

---

[42]    *See* Retiree Obj. at 11-13; AFSCME Obj. ¶ 2; AFT Obj. ¶ 2.

i.  *Any Differences in Non-Bankruptcy Legal Rights Have No Impact on
    Substantial Similarity*

58.    The Committee does not disagree with the Retiree Committee that a sufficient

difference in legal character may render claims dissimilar, justifying separate classification.  The

Retiree Committee, however, ignores the significant body of case law explaining that legal

distinctions not meaningful in bankruptcy do not create dissimilarity.

59.    "Foremost among [the rules governing classification] is the notion that the focus

of the classification is the legal character of the claim as it relates to the **assets of the debtor**."  *In

re AOV Indus., Inc.*, 792 F.2d 1140, 1150 (D.C. Cir. 1986) (emphasis in original).[43]  In other

words, "the similarity of claims is not judged by comparing creditor claims *inter se*," but

"[r]ather, . . . whether the claims in a class have the same or similar legal status in relation to the

assets of the debtor."  *In re Frascella Enters., Inc.*, 360 B.R. 435, 442 (Bankr. E.D. Pa. 2007);

*see also In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 298 (Bankr. N.D. Ill. 2008) ("the

emphasis is not upon the holder of the claim so much as it is upon what type of claim the holder

has **against the estate**") (emphasis added).  Accordingly, "[u]nsecured claims, whether trade,

tort, unsecured notes, or deficiency claims of secured creditors, are generally included in a single

class because they are of equal rank entitled to share pro rata in values remaining after payment

of secured and priority claims."  *Frascella Enterprises,* 360 B.R. at 443.

60.    The First Circuit utilizes the same approach.  *Granada Wines*, discussed at length

in the 3013 Motion, "is the controlling case for classification of claims in" the First Circuit.

*Nat'l/Northway Ltd. P'ship*, 279 B.R. at 25 .  And, as explained in the 3013 Motion, "*Granada

Wines* requires a difference in rank concerning rights against the debtor or its property."  *In re*

---

[43]    *See* also *Matter of Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991) (rejecting argument that
"legal difference" between deficiency and trade claims justified separate classification and holding "state law is
irrelevant where, as here, the Code has eliminated the legal distinction between" the claims at issue").

*Bjolmes Realty Tr.*, 134 B.R. 1000, 1003 (Bankr. D. Mass. 1991).  The District Court of New

Jersey has similarly understood *Granada Wine*'s charge that "[s]eparate classifications for

unsecured creditors are only justified where the legal character of their claims is such to accord

them a status different from the other unsecured creditors," as supporting the conclusion that

"[s]ubstantially similar claims are those which share common priority status and other legal

rights against the debtor's assets."  *In re Lisanti Foods, Inc.*, 329 B.R. 491, 510 (D.N.J. 2005)

(quoting *Granada Wines*) (internal citations omitted), *aff'd sub nom.*, *In re Lisanti Foods Inc.*,

241 F. App'x 1 (3d Cir. 2007).

61.     Against this body of law, the Retiree Committee asserts that Retiree Claims are of

a different legal character than the CW General Unsecured Claims because, "unlike the CW

Unsecured Claims of commercial creditors, who contracted to be paid a fixed sum at a fixed

time, retirees agreed to defer their compensation with the expectation that the deferred

compensation, *i.e.*, their pension, would be paid in periodic payments."[44]  This argument is

flawed.  It is illogical to argue that a claim for a stream of deferred payments is legally different

(for purposes of classification and similarity of claims) than a claim for a lump sum payment.  In

either case, the creditor is entitled only to assert a claim against the estate in a stated face amount

as of the petition date.  The Retiree Committee cites no case law or other authority in support of

its novel theory to the contrary.[45]

---

[44]   Retiree Obj. at 12.

[45]   In concluding that classification is governed by a claim's legal character, the *Granada Wines* court "cited with
approval," *Nat'l/Northway Ltd. P'ship*, 279 B.R. at 27, the Bankruptcy Act case *In re Los Angeles Land &
Investments, Ltd.*, 282 F. Supp. 448, 454 (D. Haw. 1968) (subsequent history omitted).  In that case, the court
explained that the "test to be applied appears to be one directed toward a determination of the 'nature' of the
claim.  This would encompass an analysis of the legal character or the quality of the claim as it relates to the
assets of the debtor . . . .Where the differences are in the rates of interest, in the amounts, *in the dates of
maturity*, in names of payees, the manner in which the claim arose and such other minor details, they cannot
affect the 'nature,' i.e., the kind of [the] claim . . . . .).  *Id.* at 453-54 (emphasis added).

62.     The Retiree Committee also finds a difference in legal character in its assertion

that holders of CW General Unsecured Claims, unlike retirees, "could decide whether to do

business with the Commonwealth or to buy its bonds based on whatever due diligence those

creditors decided to conduct."[46]  This argument is, as an initial matter, based on incorrect facts.

The creditors represented by the Committee, and classified by the Oversight Board and the

Commonwealth as CW General Unsecured Claims, include thousands of involuntary creditors,

such as individuals (or businesses) that had their property wrongfully taken by the

Commonwealth, tort victims harmed by the Commonwealth's negligence, and tax refund

claimants who overpaid on their taxes.[47]  The CW General Unsecured Claims do not include the

claims classified in the various GO Bond Classes,[48] and therefore the assertion that holders of

CW General Unsecured Claims chose to buy Commonwealth bonds[49] is simply inaccurate.

63.     The Retiree Committee's argument that classification should turn on the

circumstances under which the claims arose is also wrong as a matter of law, as it violates the

directive that the "similarity of claims is not judged by comparing creditor claims *inter se*."  *In re*

*Frascella Enters.*, 360 B.R. at 442.  Indeed, courts have rejected precisely these types of

distinctions, recognizing that "the ***different origins*** of [two sets of claims], which enjoy similar

rights and privileges within the Bankruptcy Code, do not alone justify separate segregation."  *In*

---

[46]   Retiree Obj. at 13. Similarly, the AFSCME Objection also asserts that "a public employee or retiree who
receives minimal wages or pension payments, and may be anxious and scared about being able to afford food,
medicine and shelter, is not similarly situated to an unsecured institutional creditor who voluntarily chose to do
business with Puerto Rico."  *See* AFSCME Obj. ¶ 2.

[47]   The Retiree Committee also ignores the fact that holders of CW General Unsecured Claims also (i) include
thousands of small, local businesses that provided critical services to the Commonwealth and (ii) consist of
creditors who had a *past* relationship with the Commonwealth that gives rise to their claims.  Moreover, while
(in addition to the tens of thousands of involuntary creditors who had no such choice) these small businesses
may have chosen to do business to the Commonwealth, they were in no more position to perform whatever due
diligence they desired than were the holders of Retiree Claims.

[48]   The Committee continues to reserve all rights regarding the appropriateness of this, or any other, classification.

[49]   *See* Retiree Obj. at 13.

*re Bos. Post Rd. Ltd. P'ship*, 21 F.3d 477, 483 (2d Cir. 1994) (emphasis added) (addressing separate classification of deficiency claims and trade claims).

64.     The Retiree Committee further claims that the Retiree Claims are of a different legal character than the CW General Unsecured Claims because section 201(b)(1)(C) of PROMESA requires that a certified fiscal plan provide adequate funding for public pension systems.[50]  This limited provision of PROMESA no more renders the claims dissimilar than do the differences in payment schedule, and does not create a sufficient difference in legal character to make the Retiree Claims dissimilar from the CW General Unsecured Claims.  As explained above, substantial similarity is determined by a claim's priority under the Bankruptcy Code and by its legal rights against specific assets or property of the debtor (*i.e.*, a security interest).[51] "Adequate funding" does not give Retiree Claims a security interest in the Commonwealth's property, nor does it change their bankruptcy priority.  Indeed, this provision of PROMESA says nothing at all about classification or treatment of claims—all it says is that whatever recoveries pension holders receive must be adequately funded.  Moreover, because this provision is found in Title II of PROMESA it "governs only the Board's Fiscal Plan, not the operation of Title III of PROMESA," including the classification scheme of a plan of adjustment.  *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 948 F.3d 457, 477 (1st Cir. 2020).[52]

---

[50]   Retiree Obj. at 11.

[51]   In this regard, the directive in section 301(e) of PROMESA that substantial similarity is determined by "whether such claims are secured and whether such claims have priority over other claims" is really a codification of the well-accepted case law that has developed around Bankruptcy Code section 1122.  Section 301(e) does not, as the Oversight Board seems to believe based on its repeated references to the section throughout its Objection, represent a sea change in applicable law.

[52]   The distinction between Title II and Title III also addresses the contention that Retiree Claims are for distinct from the CW General Unsecured Claims because they are claims for essential services.  Additionally, the provision of the Puerto Rico Constitution cited by the Retiree Objection as supposedly granting this status contains no such language and, in fact, makes no mention of pensions.  *See* P.R. Const. art. II § 18.  Nor does the Retiree Objection cite any provision of Commonwealth law that grants pension claims any sort of payment priority—and, in any event, any such state law priority would be inapplicable in the Commonwealth's Title III bankruptcy case.

65.     All of the Retiree Committee's arguments concerning the alleged substantial

differences in their claims are undermined by the fact that a group of current and former

Commonwealth employees has filed a joinder in the 3013 Motion.[53]  These creditors, who

describe themselves as "active or ex-employees (***many retired employees***) of the Commonwealth

of Puerto Rico who hold claims related to back pay wages,"[54] are virtually, if not entirely,

identical to the holders of the Retiree Claims in Class 39A, yet they have been classified

separately as CW General Unsecured Claims in Class 41.  This fact highlights the arbitrariness of

the Proposed Plan's classification scheme and provides strong support for the Committee's

argument that the Retiree Claims and CW General Unsecured Claims are in fact substantially

similar under First Circuit law.

66.     Finally, the Retiree Objection takes the novel position that Retiree Claims and

CW General Unsecured Claims should (indeed, must) be classified separately because they

receive different treatment under the proposed Plan.[55]  This argument misapprehends basic

principles of bankruptcy law and the operation of the Bankruptcy Code.[56]  Section 1123(a)(4) of

the Bankruptcy Code requires that every claim in any given class receive the same treatment.

Consequently, if a debtor desires to treat claims differently, it can do so only if it classifies them

separately.  But that classification must itself be permissible under section 1122.[57]  The Retiree

Objection would read section 1122 out of the Bankruptcy Code, as the debtor's ***decision*** to treat

---

[53]  *See Partial Joinder and Statement in Support of Group of Creditors' with Ordinary Course Employee Claims* [Docket No. 12811].

[54]  *Id.* ¶ 1 (emphasis added).

[55]  *See* Retiree Obj. at 11-12.

[56]  *See In re 4th St. E. Investors, Inc.*, 2012 WL 1745500, at *5 (Bankr. C.D. Cal. May 15, 2012) ("No analysis or authority suggests that similarity of claims should be determined according to how they are treated in the plan.").

[57]  Of course, even if the separate classification of similar claims is determined to be appropriate, the debtor's decision to favor one class over the other must also be permissible.

claims disparately would render such claims dissimilar, automatically requiring separate classification.[58]

ii.   *Objections Rely on Inappropriate (and Inaccurate) Moralistic Judgment*

67.   In an effort to justify the proposed Plan's separate classification and treatment of Retiree Claims and CW General Unsecured Claims, the Objections make moralistic judgments about the relative worth of the holders of these two groups of claims.  For example, the Retiree Committee asserts that, unlike the holders of CW General Unsecured Claims, the labor provided by holders of Retiree Claims was necessary to "make the Commonwealth a viable territory in which to live."[59]  Similarly, the AFT Objection claims that the 3013 Motion's assertion that Retiree Claims and CW General Unsecured Claims are legally indistinct is flawed because this assertion ignores the "reality in Puerto Rico" that holders of Retiree Claims are the backbone of the Commonwealth.[60]

68.   Although the Committee is appreciative of the sacrifices made by the Commonwealth's retirees and is sympathetic to the hardships they have experienced, these unfortunate realities have no relevance to this dispute.  As discussed above, classification is determined by how a claim relates to the debtor, not by comparing claims—let alone claimants— to each other.  The perceived importance of a specific claimant (or group of claimants) to the Debtors' reorganization will only be relevant, if ever, to the treatment of claims (*i.e.,* whether or

---

[58]   Neither of the two cases cited by the Retiree Committee actually supports this novel theory of bankruptcy law. In *Dow Corning*, the Sixth Circuit made the simple observation that a plan that provided claimants in one class "far more effective recovery rights" than claimants in the same class violated section 1123(a)(4)'s injunction against separate treatment for claims in any given class.  *In re Dow Corning Corp.*, 280 F.3d 648, 660 (6th Cir. 2002).  Indeed, the Sixth Circuit held that the classification structure was proper, consistent with the basic understanding that section 1122 and section 1123 stand distinct from one another.  *Id.*  Similarly, *In re Brotby*, 303 B.R. 177, 186 (B.A.P. 9th Cir. 2003), stands for nothing more than the unassailable proposition that 1123(a)(4) requires that claims in the same class receive the same treatment.

[59]   Retiree Obj. at 14.

[60]   AFT Obj. ¶ 3.

not unfair discrimination has occurred), not their classification.  But even at the unfair

discrimination stage, disparate treatment cannot be justified by arguments that focus on the

circumstances of the claimant, as opposed to the claimant's importance to the debtor.  *See In re*

*City of Detroit*, 524 B.R. 147, 258 (Bankr. E.D. Mich. 2014) (explaining that the Court's

judgment "necessarily excludes the relative needs of the creditors in the disparately treated

classes" and "no case law in any of the rehabilitative chapters suggests that creditors' needs are

an appropriate consideration in determining whether a plan unfairly discriminates").

Accordingly, statements about the sacrifices made by retirees, while heart wrenching, are not

relevant as a matter of law.

69.     To the extent such considerations were relevant (they are not), it must be noted

that the Objectors ignore that labor and services provided by holders of CW General Unsecured

Claims are also critical to the Commonwealth's viability.  Among such holders are small

businesses that create thousands of local, on-island, jobs and provide critical services and

supplies to the Commonwealth.  Some of these small business themselves ended up filing for

bankruptcy as a result of the Commonwealth's failure to pay its debts; many more may if they

receive no more than the paltry recovery being offered to CW General Unsecured Claims.  By

failing to acknowledge the contributions of these small businesses, the Objectors arguments

ignore a fundamental driver of Puerto Rico's economy.[61]

70.     Under the Objectors' distorted view of the world, only former government

workers are critical to the Commonwealth, while the contractors who built the facilities and

---

[61]   The Oversight Board also ignores the burden that would be placed on the Commonwealth's public welfare
system in the event thousands of people operating or employed by small businesses lost their jobs and/or their
business.  *See* Oversight Board Obj. ¶ 45 ("If the Plan were to provide [Retiree Claims] lesser treatment, it
would nonetheless have to supplement their restructured pension benefits with welfare payments to ensure their
survival.")

office buildings in which those government workers worked, the suppliers that sold the tools they used to perform their jobs, and the grocers that sold them the food they ate are not.  This is not reality.  Such small businesses have been (and continue to be) every bit as vital to the Commonwealth's future as its retirees.    All the Committee requests through the 3013 Motion is that such businesses and other persons—to the extent they hold general unsecured claims against the Commonwealth—be classified together with retiree claimants under the proposed Plan.  This is the result the law requires.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Committee respectfully requests that the Court enter an order,

substantially in the form attached as **Exhibit A** to the 3013 Motion, granting the relief requested

therein and granting such other relief as the Court deems just and proper.

Dated: April 17, 2020                    By:  _/s/ Luc A. Despins_____

                                          PAUL HASTINGS LLP
                                          Luc A. Despins, Esq. *(Pro Hac Vice)*
                                          Nicholas A. Bassett, Esq. *(Pro Hac Vice)*
                                          G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
                                          200 Park Avenue
                                          New York, New York 10166
                                          Telephone:  (212) 318-6000
                                          lucdespins@paulhastings.com
                                          nicholasbassett@paulhastings.com
                                          alexbongartz@paulhastings.com

                                          *Counsel to the Official Committee of Unsecured
                                          Creditors*

                                          By:   _/s/ Juan J. Casillas Ayala_____

                                          CASILLAS, SANTIAGO & TORRES LLC
                                          Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
                                          Israel Fernández Rodríguez, Esq. (USDC - PR 225004)
                                          Juan C. Nieves González, Esq. (USDC - PR 231707)
                                          Cristina B. Fernández Niggemann, Esq. (USDC - PR
                                          306008)
                                          PO Box 195075
                                          San Juan, Puerto Rico 00919-5075
                                          Telephone: (787) 523-3434 Fax: (787) 523-3433
                                          jcasillas@cstlawpr.com
                                          ifernandez@cstlawpr.com
                                          jnieves@cstlawpr.com
                                          cfernandez@cstlawpr.com

                                          *Local Counsel to the Official Committee of Unsecured
                                          Creditors*