## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>              Debtors.[1] | PROMESA<br>Title III<br><br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>             Debtor. | PROMESA<br>Title III<br><br><br>No. 17 BK 3567-LTS |

*Caption Continued on Following Page*

---

[1]    The debtors in these Title III cases, along with each debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are (i) the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority (Bankruptcy Case No. 19 BK 5523-LTS) (Last Fourt Digits of Federal Tax ID: 3801).

|  |  |
|---|---|
| THE COMMONWEALTH OF PUERTO RICO and PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>          Movants,<br><br>          -v-<br><br>AMBAC ASSURANCE CORPORATION,<br><br><br>          Respondent. | PROMESA<br>Title III<br><br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

### AMBAC ASSURANCE CORPORATION'S OPPOSITION TO MOTION OF FINANCIAL OVERSIGHT AND MANAGEMENT BOARD PURSUANT TO BANKRUPTCY CODE SECTIONS 105(A) AND 362 FOR ORDER DIRECTING AMBAC TO WITHDRAW COMPLAINT

**FERRAIUOLI LLC**

221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001

**KASOWITZ BENSON TORRES LLP**

1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

*Attorneys for Ambac Assurance Corporation*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ....................................................................................................................... 3

I.      PRHTA AND METROPISTAS ENTER INTO A 40-YEAR CONCESSION
AGREEMENT ................................................................................................................ 3

II.     THE MORATORIUM ACT ........................................................................................... 4

III.    METROPISTAS EXPLOITS PRHTA TO FRAUDULENTLY EXTEND THE
CONCESSION AGREEMENT ...................................................................................... 5

      A.     The Commonwealth Diverted the Extension Agreement Proceeds from
PRHTA ................................................................................................................ 6

      B.     PRHTA Did Not Receive Reasonably Equivalent Value for the 10-Year
Extension and Toll Share Increase ..................................................................... 8

IV.    THE COMPLAINT ......................................................................................................... 9

OPPOSITION .......................................................................................................................... 10

I.      THE COMPLAINT DOES NOT INTERFERE WITH THE DEBTORS'
PROPERTY RIGHTS .................................................................................................. 10

      A.     The Complaint Does Not Interfere With PRHTA's Rights Under the
Concession Agreement ..................................................................................... 10

      B.     The Complaint Does Not Implicate the Debtors' Interests in the
Proceeds of the Extension Agreement, Toll Share Revenues, or Other
Property ............................................................................................................. 12

      C.     The Complaint Does Not Seek to Enforce a Lien on PRHTA's Property ........... 13

II.     AMBAC HAS STANDING TO PURSUE CLAIMS AGAINST
METROPISTAS ........................................................................................................... 15

      A.     PRHTA Has Abandoned Section 544(b) Claims Against Metropistas ............... 15

      B.     PROMESA Does Not Preempt Ambac's Avoidance Claims Under
Puerto Rico Law ............................................................................................... 19

            i.     Legal Standard ....................................................................................... 19

            ii.    There Is No Express Federal Preemption of Ambac's Claims ................. 21

iii.    There Is No Implied Federal Preemption of Ambac's Claims ................. 22

C.    The Complaint Does Not Seek to Recover on a Claim Against PRHTA ............. 24

D.    Ambac May Pursue Its Unjust Enrichment Claim Against Metropistas .............. 25

CONCLUSION ...................................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Fin., Inc. v. WM Capital Partners 53, LLC (In re Allied Fin., Inc.)*,
    572 B.R. 45 (Bankr. D.P.R. 2017) .................................................................................20, 22

*Amusement Indus., Inc. v. Midland Ave. Assocs., LLC*,
    820 F. Supp. 2d 510 (S.D.N.Y. 2011) ..................................................................................12

*Antilles Cement Corp. v. Fortuño*,
    670 F.3d 310 (1st Cir. 2012) ................................................................................................20

*Baena v. KPMG LLP*,
    389 F. Supp. 2d 112 (D. Mass. 2005) ..................................................................................25

*Barber v. Westbay (In re Integrated Agri, Inc.)*,
    313 B.R. 419 (Bankr. C.D. Ill. 2004) ..................................................................................18

*BFP v. Resolution Tr. Corp.*,
    511 U.S. 531 (1994) .............................................................................................................21

*Boudreaux v. Hall Oil Co. (In re Butler Logging, Inc.)*,
    538 B.R. 174 (Bankr. S.D. Ga. 2015) ..................................................................................18

*Caplin v. Marine Midland Grace Tr. Co. of N.Y.*,
    406 U.S. 416 (1972) .............................................................................................................25

*Casey Nat'l Bank v. Roan*,
    668 N.E.2d 608 (Ill. Ct. App. 1996) ....................................................................................18

*Chamber of Commerce of U.S. v. Whiting*,
    563 U.S. 582 (2011) .............................................................................................................20

*In re Coronella Props., LLC*,
    Case No. 06-13886, 2011 WL 839529 (Bankr. D. Mass. Mar. 7, 2011) ..............................23

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) .............................................................................................................20

*DeBuono v. NYSA-ILI Med. & Clinical Servs. Fund*,
    520 U.S. 806 (1997) .........................................................................................................20, 24

*Donarumo v. Furlong (In re Furlong)*,
    660 F.3d 81 (1st Cir. 2011) ..................................................................................................11

*E.E.O.C. v. Mass.*,
   987 F.2d 64 (1st Cir. 1993) ................................................................21

*English v. Gen. Elec. Co.*,
   496 U.S. 72 (1990) ..........................................................................20

*Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*,
   Case No. 01-1047, 2002 WL 31174470 (S.D.N.Y. Sept. 26, 2002)........................15

*Franklin Cal. Tax-Free Tr. v. Puerto Rico*,
   85 F. Supp. 3d 577 (D.P.R. 2015)............................................................19

*Freightliner Corp. v. Myrick*,
   514 U.S. 280 (1995) ..........................................................................20

*Gill v. Nexgen Energy Holdings PCC Ltd. (In re Taheripour)*,
   Case No. 12-30028, 2016 WL 1255298 (Bankr. C.D. Cal. Mar. 30, 2016) ...........................25

*Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. (In re Fin. Oversight & Mgmt. Bd.)*,
   939 F.3d 340 (1st Cir. 2019) ................................................................24

*Greenwood Tr. Co. v. Mass.*,
   971 F.2d 818 (1st Cir. 1992) ................................................................21

*In re Gronczewski*,
   444 B.R. 526 (E.D. Pa. 2011) ...............................................................17

*Hatchett v. United States*,
   330 F.3d 875 (6th Cir. 2003) ...........................................................19, 22

*Invest Vegas, LLC v. 21st Mortg. Corp. (In re Residential Capital, LLC)*,
   556 B.R. 555 (Bankr. S.D.N.Y. 2016) ........................................................14

*Klingman v. Levinson*,
   114 F.3d 620 (7th Cir. 1997) ...............................................................19

*Klingman v. Levinson*,
   158 B.R. 109 (N.D. Ill. 1993) ..............................................................18

*Lambregtse v. IndyMac Mortg. Servs. (In re Lambregtse)*,
   Case No. 10-14152, 2012 WL 3133899 (Bankr. D.N.H. July 31, 2012)................................22

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996).........................................................................20

*Merchants Auto. Grp. v. Advantage Opco, LLC*,
   Case No. 14-318, 2015 WL 728494 (D.N.H. Feb. 19, 2015) ...................................13

*In re Mo. River Sand & Gravel, Inc.*,
  88 B.R. 1006 (Bankr. D.N.D. 1988) ...................................................................18

*Mwangi v. Wells Fargo Bank (In the Matter of Mwangi)*,
  764 F.3d 1168 (9th Cir. 2014) .........................................................................14

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
  564 B.R. 192 (S.D.N.Y. 2016)..........................................................................13

*Pioneer Commercial Funding Corp. v. United Airlines, Inc.*,
  122 B.R. 871 (S.D.N.Y. 1991)..........................................................................14

*Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*,
  485 U.S. 495 (1998)....................................................................................21, 22

*Queenie, Ltd. v. Nygard Int'l*,
  321 F.3d 282 (2d Cir. 2003)..............................................................................13

*Rentas v. TRM, LLC (In re Malavet)*,
  552 B.R. 24 (Bankr. D.P.R. 2016) ....................................................................22

*In re Rosenblum*,
  545 B.R. 846 (Bankr. E.D. Pa. 2016) ...............................................................18

*Shearson Lehman Hutton, Inc. v. Wagoner*,
  944 F.2d 114 (2d Cir. 1991)..............................................................................25

*Slabicki v. Gleason (In re Slabicki)*,
  466 B.R. 572 (B.A.P. 1st Cir. 2012) .................................................................11

*In re Tessmer*,
  329 B.R. 776 (Bankr. M.D. Ga. 2005)..............................................................18

*Unisys Corp. v. Dataware Products, Inc.*,
  848 F.2d 311 (1st Cir. 1988) ......................................................................17, 24

*Whitman-Nieves v. Puerto Rico Fed. Credit Union (In re Whitman-Nieves)*,
  549 B.R. 440 (Bankr. D.P.R. 2016) ..................................................................11

*Yu v. GSM Nation, LLC*,
  Case No. 12293-VCMR, 2017 WL 2889515 (Del. Ch. July 7, 2017)...............12

*Yusin Brake Corp. v. Motorcar Parts of Am., Inc.*,
  Case No. 13-9223, 2014 WL 2560612 (S.D.N.Y. June 6, 2014) ......................13

**Statutes**

19 L.P.R.A. § 2265 ..............................................................................................14

27 L.P.R.A. § 2603 ...............................................................................................................3

27 L.P.R.A. § 2609(e) .........................................................................................................5

27 L.P.R.A. § 2616 ...............................................................................................................7

31 L.P.R.A. § 3499 .............................................................................................................11

11 U.S.C. § 362(a)(3) ...................................................................................................11, 17

11 U.S.C. § 362(a)(4) ...................................................................................................13, 14

11 U.S.C. § 544(b) ...................................................................................................... *passim*

11 U.S.C. § 546(a) ...................................................................................................... *passim*

11 U.S.C. § 550(a) .............................................................................................................12

11 U.S.C. § 554 .............................................................................................17, 22, 23, 24

11 U.S.C. § 926 ...........................................................................................................22, 23

Moratorium Act § 102 ........................................................................................................4

Moratorium Act § 201(a) ...................................................................................................4

Ambac Assurance Corporation ("Ambac") respectfully submits this opposition (the "Opposition") to the *Motion of Financial Oversight and Management Board Pursuant to Bankruptcy Code Sections 105(a) and 362 for Order Directing Ambac to Withdraw Complaint* (Dkt. No. 12569, the "Motion," and the Memorandum of Law in support thereof, Dkt. No. 12570, "Memo of Law").[2]

## PRELIMINARY STATEMENT

Ambac filed its Complaint[3] asserting its rights and claims under Puerto Rico law for the harm Metropistas inflicted on Ambac when it entered into the Extension Agreement with PRHTA. As shown in the Complaint, Metropistas knew or recklessly disregarded that the Commonwealth would divert the proceeds received from Metropistas, that PRHTA would not receive reasonably equivalent value for the valuable rights it transferred and that Ambac's lien rights would be disregarded.

The Oversight Board does not dispute the existence of claims against Metropistas. Nor does it deny that it failed to pursue those claims pursuant to Section 544(b) of the Bankruptcy Code when it had standing to do so. In an attempt to silence Ambac and protect Metropistas, however, the Oversight Board asks the Court to stay claims that it did not – and now cannot – pursue. That attempt must fail.

*First*, far from interfering with PRHTA's rights under the Concession Agreement as the Oversight Board alleges, the Complaint seeks relief *only* against Metropistas that would have an effect *only* on Metropistas's property by requiring it to pay reasonably equivalent value for the rights it received – *and will retain* – notwithstanding Ambac's claims. Nor does Ambac seek to

---

[2]     On April 1, 2020, Metropistas filed a joinder to the Motion [Dkt. No. 12578]. Ambac reserves its right to argue that Metropistas does not have standing to intervene in this proceeding.

[3]     Capitalized terms not defined in the Preliminary Statement shall have the meaning ascribed to them below.

enforce any lien on PRHTA's property.  Instead, the Complaint only seeks a declaration that Ambac has a valid, continuing lien on the toll revenues – collected by Metropistas *for its own account* – which are not property of PRHTA.

**Second**, Ambac may pursue its avoidance claims against Metropistas because they were deemed abandoned when the Oversight Board failed to pursue them within the two-year limitations period prescribed by Section 546(a) of the Bankruptcy Code.  Under First Circuit law, the standards governing a creditor's motion to pursue estate claims derivatively do not apply to a creditor pursuing its own claims once the debtor has abandoned them.  Eschewing the ramifications of its decision not to pursue claims against Metropistas, the Oversight Board argues that Ambac's prosecution of its Complaint is "counter" to PROMESA.  Unable to show any express federal preemption of Ambac's claims, the Oversight Board claims that PROMESA reflects "Congress' intent" to preempt Ambac's rights.  Nothing in PROMESA, however, implies such an intent, let alone demonstrates "a clear and manifest purpose" of preempting the reversion to Ambac of its avoidance claims against Metropistas, as Supreme Court precedent requires.  Congress never preempted Ambac's claims against Metropistas.  To the contrary, PROMESA incorporates the operative provisions of the Bankruptcy Code that validate Ambac's rights to bring these claims.

**Third**, Ambac has a cognizable unjust enrichment claim against Metropistas because Metropistas was unjustly enriched *at the expense of Ambac* because Metropistas disregarded Ambac's liens.  PRHTA therefore never had standing to bring Ambac's unjust enrichment claim. But even assuming¸ *arguendo*, that it did, the claim would be deemed abandoned as a matter of law just like Ambac's avoidance claims.

For those reasons, and as further explained below, the Court should deny the Motion.

- 2 -

## BACKGROUND[4]

### I.    PRHTA AND METROPISTAS ENTER INTO A 40-YEAR CONCESSION AGREEMENT

1.    In 2009, the Puerto Rico Legislative Assembly (the "Legislative Assembly") passed Act No. 29-2009, the Public-Private Partnership Act ("Act 29") (codified at 27 L.P.R.A. §§ 2601-2623), with the mission of "promot[ing] the use of Public-Private Partnerships as a development strategy." Act 29, Statement of Motives. Pursuant to Act 29, the Puerto Rico Highways and Transportation Authority ("PRHTA") is authorized "to establish partnerships and to execute partnership contracts in connection with any function, service or facility for which they are responsible under the provisions of their organic acts or the applicable special laws, pursuant to the provisions of this chapter." 27 L.P.R.A. § 2603. Compl. ¶ 32.

2.    Pursuant to Act 29, PRHTA and Autopistas Metropolitanas de Puerto Rico, LLC ("Metropistas") entered into a concession agreement (the "Concession Agreement") dated June 27, 2011. *Id.* ¶ 33.

3.    The Concession Agreement granted a 40-year lease and assigned toll revenues generated by the use of certain roads (the "Toll Roads") to Metropistas in exchange for, in relevant part, an up-front concession fee of approximately $1.1 billion (the "Concession Fee"). These toll revenues were previously pledged to the repayment of the PRHTA Bonds. *Id.* ¶ 34. The Concession Fee was used to defease certain PRHTA Bonds.[5]

---

[4]    For a more detailed description of the relevant facts Ambac respectfully refers the Court to Ambac's Complaint in *Ambac Assurance Corporation v. Autopistas Metropolitanas de Puerto Rico, LLC*, Civil No. 3:20-cv-01094 (D.P.R. Feb. 19, 2020) [Dkt. No. 1] (the "Complaint" or "Compl.").

[5]    *See* Project Profile: Puerto Rico PR-22 and PR-5 Lease, *available at* www.fhwa.dot.gov/ipd/project_profiles/pr_pr22_and_pr5_lease.aspx ("The total $1.436 billion administrative concession will finance, rehabilitate, operate, and maintain the facilities over 40 years. Of that total, $1,080 million is an upfront payment of which about 90% was used to defease all outstanding tax-exempt toll-revenue debt ($902 million) . . . .").

4.      In addition to the outright assignment of certain toll revenues to Metropistas, the Concession Agreement provided for a 50-50 split of other toll revenues – those generated through a specific dynamic-pricing system (the "BRT/DTL Toll Revenues") – between PRHTA and Metropistas.  *Id.* ¶ 35.

## II.      THE MORATORIUM ACT

5.      On April 6, 2016, the Governor signed into law the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act (Act No. 21-2016, the "Moratorium Act").  The Moratorium Act recited that it was enacted to address the "desperate" fiscal emergency facing the Commonwealth and to avoid the "potential catastrophic effects of allowing creditors to exercise their enforcement remedies," which "would undeniably harm the health, safety and welfare of the residents of the Commonwealth."  Moratorium Act § 102.  The Moratorium Act authorized the Governor to declare a "state of emergency" over any governmental entity of the Commonwealth.  Moratorium Act § 201(a).  Compl. ¶ 45.[6]

6.      Less than a month after the enactment of the Moratorium Act, the Governor exploited his newfound power and issued a series of orders that declared moratoriums on various debt obligations (including obligations of PRHTA), suspended the transfer of funds pledged to the repayment of the debts affected by the moratoriums, and elevated the payment of junior unsecured debts over senior secured debts.  *Id.* ¶ 47.[7]

---

[6]      As further described in the Complaint, upon the declaration of a state of emergency, the Moratorium Act directed or empowered the Governor to take numerous actions that violated Ambac's constitutional rights, and authorized the Governor to prioritize payment of "essential services" over "covered obligations."  Complaint ¶¶ 45-46.

[7]      As further described in the Complaint, the Moratorium Act was a patent violation of the Commonwealth Constitution because it altered the Fiscal Year Budget Priority Provision.  Complaint ¶¶ 48-49.

### III.    METROPISTAS EXPLOITS PRHTA TO FRAUDULENTLY EXTEND THE CONCESSION AGREEMENT

7.    On or about April 21, 2016, just two weeks after the Moratorium Act was enacted, PRHTA and Metropistas entered into an agreement extending the Concession Agreement (the "Extension Agreement").  Compl. ¶ 50.  Pursuant to the Extension Agreement, Metropistas's exclusive concession – and the rights and revenues to be derived therefrom – was extended for 10 more years, from 2051 through 2061,[8] and Metropistas's allocated share of the BRT/DTL Toll Revenues increased from 50% to 75% (the "Toll Share Increase").  *Id.*  The 10-year extension and Toll Share Increase were given to Metropistas even though the toll revenues generated by the Toll Roads in that period, and PRHTA's 50% share of the BRT/DTL Toll Revenues, were subject to Ambac's lien.  *Id.*

8.    In exchange for the 10-year extension and the Toll Share Increase PRHTA provided to Metropistas, PRHTA was to receive an additional $100 million upfront payment, with the possibility of an additional $15 million upon the satisfaction of certain conditions.[9] Even though Ambac and other bondholders had a lien on these proceeds, none were used to defease the PRHTA Insured Bonds.  *Id.* ¶ 51.

9.    The circumstances surrounding the Extension Agreement were extraordinary, and should have raised red flags to any reasonable counterparty such as Metropistas.  *Id.* ¶ 52. Metropistas knew or recklessly disregarded that the Commonwealth was in severe financial distress and that, because of the Executive Orders and the Moratorium Act, the proceeds of the transaction would be diverted to the Commonwealth away from PRHTA and its creditors with

---

[8]    By extending the overall term of the Concession Agreement to 50 years, PRHTA achieved the maximum term permissible under Act 29 without triggering a legislative approval requirement.  *See* 27 L.P.R.A. § 2609(e) (providing that any extension of public-private partnership beyond 50 years "must be approved by legislation").

[9]    As part of the Concession Agreement, Metropistas also agreed to make investments in new tolling gantries and to share with PRHTA 30% of certain incremental revenues on such new gantries.

liens on these proceeds.  *Id.*  Metropistas thus knew or recklessly disregarded that the proceeds of
the transaction would not benefit PRHTA – the entity with the rights, as of 2051, to operate the
Toll Roads and the corresponding revenue – at all.  *Id.*  Metropistas also knew or recklessly
disregarded that entering into an extension of the Concession Agreement that would not
commence for another thirty-five years was an unprecedented event.  *Id.*  With this knowledge,
Metropistas opted to exploit the situation for its own gain, agreeing to pay far less than
reasonably equivalent value for what it received.  *Id.*  Metropistas thus knowingly, and in bad
faith, agreed to the Extension Agreement to the detriment of PRHTA and its creditors, including
Ambac, to which reasonably equivalent value for the transfer should have been provided.  *Id.*

### A.    The Commonwealth Diverted the Extension Agreement Proceeds from PRHTA

10.    The day after the Extension Agreement was announced, PRHTA's Executive
Director publicly stated that PRHTA had "yet to determine how to use the money."  Compl.
¶ 53.

11.    After becoming concerned about the potential diversion of its proceeds, on April
29, 2016, counsel for Ambac wrote to PRHTA's counsel at Nixon Peabody, LLP ("Nixon")
requesting information about the Extension Agreement payment and confirmation that PRHTA
was maintaining, and would continue to maintain, the proceeds of the transaction for the benefit
of PRHTA and its bondholders.  *Id.* ¶ 54.  In response, Nixon stated that the proceeds of the
Extension Agreement were being held by the Puerto Rico Economic Development Bank ("EDB")
"in the name of the [PRHTA]," but declined to offer any assurance those proceeds would be held
for the benefit of PRHTA and its bondholders.  *Id.*

12.    On May 10, 2016, Ambac filed suit against PRHTA and EDB seeking, among
other things, appointment of a receiver for PRHTA.  *Id.* ¶ 55.  Ambac alleged that PRHTA

breached its fiduciary duties to bondholders, and by extension Ambac, by entering into the
Extension Agreement knowing that the Governor and not PRHTA would control the proceeds of
the transaction under 27 L.P.R.A. § 2616.  *Id.*  Ambac further alleged that "PRHTA's sale of
valuable assets knowing that any proceeds would likely be siphoned off by the Commonwealth
government constitutes the latest in a series of breaches of fiduciary duties" by PRHTA.  *Id.*[10]

13.     On May 13, 2016, as Ambac feared – and as Metropistas knew or recklessly
disregarded would happen – the Governor announced that virtually all of the proceeds from the
Extension Agreement would *not* be transferred to PRHTA or applied to PRHTA's benefit, but
would instead be used to pay suppliers of the Commonwealth's "essential services."  *Id.* ¶ 56.
The announcement indicated that a mere $18.2 million of the $100 million Extension Agreement
payment would be used to pay down part of PRHTA's $155 million obligations to its
contractors.  *Id.*

14.     On May 17, 2016 – less than four weeks after the Extension Agreement was
executed – the Governor issued an executive order ("Executive Order 18") declaring a state of
emergency over PRHTA until June 30, 2016.  *Id.* ¶ 57.  Executive Order 18 stopped the flow of
certain revenues to PRHTA Bonds, purported to stay all litigation arising from nonpayment of
PRHTA covered obligations, and authorized PRHTA to use toll revenues to provide "essential
services."  *Id.*  On June 30, 2016, the Governor issued an executive order ("Executive Order 30")
extending the PRHTA state of emergency until January 31, 2017.  *Id.*  Also, on June 30, 2016, the
Governor issued another executive order (Executive Order 31, and, collectively with Executive
Order 18 and Executive Order 30, the "Executive Orders") that suspended the Commonwealth's
obligation to transfer certain revenues to PRHTA.  *Id.*  By the end of May 2016, Ambac learned

---

[10]     *See* Am. Compl., 3:16-cv-01893-JAG, Dkt. No. 14 at 2.

that only approximately $5 million of the original $100 million Extension Agreement payment remained in EDB accounts for the benefit of PRHTA.  *Id.*[11]

15.     Thus, as Metropistas knew or recklessly disregarded would happen, PRHTA did not receive the benefit of the insufficient consideration it was purportedly entitled to in exchange. *Id.* ¶ 58.  Instead, virtually all of the benefit derived from the Extension Agreement was directed to the Commonwealth, to the detriment of PRHTA and its creditors, including Ambac.  *Id.*

**B.     PRHTA Did Not Receive Reasonably Equivalent Value for
the 10-Year Extension and Toll Share Increase**

16.     PRHTA did not receive reasonably equivalent value in return for the 10-year extension and the Toll Share Increase that it provided to Metropistas.  Compl. ¶ 59.

17.     Through the Extension Agreement, PRHTA fraudulently transferred to Metropistas a valuable 10-year extension of the Concession Agreement.  *Id.* ¶ 60.  But for the extension, the Toll Roads – and revenue generated from them – would have reverted back to PRHTA in 2051.  *Id.*  Instead, Metropistas's lease of the Toll Roads – and right to revenue generated from them – will continue through 2061.  *Id.*

18.     Through the Extension Agreement, PRHTA also fraudulently transferred the Toll Share Increase to Metropistas.  *Id.* ¶ 61.  Specifically, PRHTA transferred to Metropistas half of its share of the BRT/DTL Toll Revenues, increasing Metropistas's share from 50% to 75%.  *Id.* By providing the Toll Share Increase to Metropistas, PRHTA's share of these certain toll revenues decreased to 25%.  *Id.*

19.     In exchange for these valuable transfers, PRHTA received almost nothing.  *Id.* ¶ 62.  Instead, virtually all of Metropistas's $100 million up-front payment was diverted to the

---

[11]     *See* Memorandum of Law, 3:16-cv-01893, Dkt. No. 49 at 34.

Commonwealth.  *Id.*  This occurred despite the fact that PRHTA was the proper party to which moneys were owed, which Metropistas knew because the Concession Agreement specifically provided that the rights to operate the highways and their corollary revenue would revert to PRHTA following termination.  *Id.*

20.     Even if that money had not been diverted to the Commonwealth, PRHTA would not have received reasonably equivalent value for the transfers.  *Id.* ¶ 63.  Upon information and belief, the 10-year extension alone is worth significantly more than the $115 million that Metropistas agreed to pay.  *Id.*  This price was only available because of PRHTA's and the Commonwealth's desperate financial situation and the lack of any competitive bidding process. *Id.*

21.     Ambac was directly and proximately harmed by Metropistas's failure to provide reasonably equivalent value to PRHTA.  *Id.* ¶ 64.  The funds paid by Metropistas and PRHTA's share of the BRT/DTL Toll Revenues were subject to Ambac's lien, and should have been used to service the PRHTA Insured Bonds.  *Id.*  Even if the proceeds of the transaction and PRHTA's share of the BRT/DTL Toll Revenues were not encumbered, Ambac was still harmed because these funds should have been available to PRHTA to pay its operating expenses, leaving the Toll Revenues available to service the PRHTA Bonds.  *Id.*  Instead, upon information and belief, PRHTA has been using Toll Revenues to pay its operating expenses in violation of the PRHTA Resolutions since 2016.  *Id.*  Had the proceeds of the Extension Agreement and PRHTA's share of the BRT/DTL Toll Revenues been available to PRHTA, those proceeds would have reduced PRHTA's need to use Toll Revenues on a dollar-for-dollar basis, allowing the Toll Revenues to be used to service the PRHTA Bonds.  *Id.*

## IV.   __THE COMPLAINT__

22.     On February 19, 2020, Ambac filed the Complaint, seeking three types of relief:

(i) an order rescinding the Extension Agreement to the extent necessary to satisfy its claims

against PRHTA; (ii) restitution from Metropistas, as well as a disgorgement of all profits and

benefits obtained by Metropistas from the fraudulent transfers described in the Complaint; and

(iii) a declaration that Ambac has a valid, continuing lien on the toll revenues collected by

Metropistas for its own account that are generated by (a) the Toll Roads from 2051 through

2061, and (b) the Toll Share Increase.  Compl. ¶¶ 80, 90, 95.

23.     On March 13, 2020, the Oversight Board claimed in a letter to Ambac that the

Complaint violates the automatic stay because it (i) seeks to avoid transfers based on contracts

entered into by PRHTA and Metropistas; (ii) seeks to revert property transfers made to the

Debtors pursuant to those contracts; (iii) asserts unjust enrichment claims that are allegedly

property of PRHTA; and (iv) attempts to enforce a lien against property of PRHTA.[12]

24.     On March 24, 2020, Ambac sent a response letter to the Oversight Board,

explaining that the Complaint does not violate the automatic stay because it seeks relief only

against Metropistas that would have an effect *only* on Metropistas's property.[13]

## OPPOSITION

## I.   THE COMPLAINT DOES NOT INTERFERE WITH
##      THE DEBTORS' PROPERTY RIGHTS

### A.   The Complaint Does Not Interfere With PRHTA's Rights
###      Under the Concession Agreement

25.     The Oversight Board argues that the Complaint somehow interferes with

PRHTA's interests under the Concession Agreement by seeking to rescind the Extension

Agreement, thereby violating Section 362(a)(3) of the Bankruptcy Code, which stays "any act to

---

[12]     A true and correct copy of the Oversight Board's letter to Ambac is attached hereto as **Exhibit A**.

[13]     A true and correct copy of Ambac's letter to the Oversight Board is attached hereto as **Exhibit B**.

obtain possession of property of the estate or of property from the estate or to exercise control

over property of the estate." 11 U.S.C. § 362(a)(3).  Memo of Law ¶¶ 6-7.

26.     The Oversight Board appears to misunderstand the relief Ambac seeks in its

Complaint, which is solely against non-debtor property.

27.     As a threshold matter, the "automatic stay does not extend to the assets of a

corporation," like Metropistas, that is not the debtor.  *Donarumo v. Furlong (In re Furlong)*,

660 F.3d 81, 89-90 (1st Cir. 2011); *see also Slabicki v. Gleason (In re Slabicki)*, 466 B.R. 572,

580 (B.A.P. 1st Cir. 2012) ("The automatic stay generally does not bar acts against non-

debtors."); *Whitman-Nieves v. Puerto Rico Fed. Credit Union (In re Whitman-Nieves)*, 549 B.R.

440, 445 (Bankr. D.P.R. 2016) ("The provisions of the automatic stay are for the benefit of the

debtor, they are not extensive to third parties, thus collection efforts against a third party . . . that

is not a debtor in bankruptcy are not protected by the provisions of the automatic stay.").

28.     The Complaint expressly "seeks an order rescinding the Extension Agreement *to

the extent necessary to satisfy [Ambac's] claims against PRHTA*."[14]  As Ambac had made clear

to the Oversight Board before it filed the Motion, Ambac does not seek to rescind PRHTA's

contractual rights under the Concession Agreement or the Extension Agreement.[15]  Instead, it

seeks money damages *from Metropistas* measured by Metropistas's failure to pay reasonably

equivalent value to PRHTA for the concession rights it received.  Under Puerto Rico law, where,

as here, rescission of a fraudulent transfer *in toto* is impossible, a party liable for the fraudulent

transfer must indemnify the creditor-plaintiff for its "losses and damages."  31 L.P.R.A. § 3499.

That is all Ambac seeks here.  This is entirely consistent with other fraudulent conveyance legal

---

[14]     *See* Compl. ¶ 80 (emphasis added).

[15]     *See* Exhibit B.

regimes such as the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform

Fraudulent Conveyance Act and the Uniform Voidable Transactions Act, all of which are

predicated on "avoiding" or "annulling" transfers, but which allow creditors to merely recover

the monetary value of the fraudulent transfer to satisfy their indebtedness. *See* 11 U.S.C.

§ 550(a) ("[T]he trustee may recover, for the benefit of the estate, the property transferred, or, if

the court so orders, *the value of such property*[.]") (emphasis added); *Amusement Indus., Inc. v.

Midland Ave. Assocs., LLC*, 820 F. Supp. 2d 510, 528 (S.D.N.Y. 2011) (applying New York law)

("[W]here the assets fraudulently transferred no longer exist or are no longer in the possession of

the transferee, a money judgment may be entered against the transferee in an amount up to the

value of the fraudulently transferred assets."); *Yu v. GSM Nation, LLC*, Case No. 12293-VCMR,

2017 WL 2889515, at *4 (Del. Ch. July 7, 2017) (applying Delaware law) ("[Plaintiff] can

obtain [money damages] against . . . the transferee of a fraudulent transfer.").

29.     The Complaint, which seeks solely monetary damages against a non-debtor

defendant, does not violate the automatic stay.[16]

### B.      The Complaint Does Not Implicate the Debtors' Interests in the Proceeds of the Extension Agreement, Toll Share Revenues, or Other Property

30.     The Oversight Board claims that because "the effect of a rescission is to void the

contract and revert the parties to their prior positions," the Complaint "implicates the Debtors'

interests in the proceeds [of the Extension Agreement], including the Lump Sum Payment,

HTA's rights to future toll revenues, and the benefits of Metropistas' investments in bi-

---

[16]     Contrary to the Oversight Board's assertion (Memo of Law ¶ 11), the Complaint does not "deprive [PRHTA] of the ability to assume [the Extension Agreement] pursuant to section 365 of the Bankruptcy Code." That argument assumes that Ambac seeks to rescind the Extension Agreement which, as explained, is incorrect. Indeed, assumption of the Extension Agreement by PRHTA (assuming it is executory and needs to be assumed in order to remain valid) would not prevent Ambac from obtaining the relief it seeks, *i.e.*, monetary damages from Metropistas.

directional toll gantries."  Memo of Law ¶ 8.  The Oversight Board is wrong.

31.     As explained above, the premise of this argument completely fails.  The
Complaint seeks only monetary recovery from Metropistas, and Ambac has confirmed in writing
that it does not seek to "unwind" or "rescind" the Extension Agreement.[17]  Nor does it seek to
"revert the parties to their prior positions."  *Id.* ¶ 8.  As such, the Complaint does not – indeed, it
cannot – "preclude the Commonwealth from using its own funds as it sees fit" or otherwise
implicate any of the Debtors' interests.  *Id.*

32.     In light of the foregoing, the Complaint does not violate the automatic stay
because it does not implicate – let alone jeopardize – any of the Debtors' interests in the
proceeds of the Concession Agreement or any other rights in connection therewith.

### C.     The Complaint Does Not Seek to Enforce a Lien on PRHTA's Property

33.     The Oversight Board argues that the Complaint violates Section 362(a)(4) of the
Bankruptcy Code by seeking to enforce a lien against PRHTA's property in violation of the stay.
11 U.S.C. § 362(a)(4).  Memo of Law ¶¶ 17-20.  Again, the Oversight Board mischaracterizes
the nature of the specific relief sought in the Complaint.

---

[17]     Furthermore, even if the Oversight Board were correct that Ambac seeks to "unwind" the Extension
Agreement (and it does not), the Oversight Board's assertions (Memo of Law ¶ 9) that PRHTA "could be required
to disgorge the $115 million in proceeds to Metropistas," and "could also have to remove the new tolling points that
were funded by Metropistas' investments[,]" amount to nothing more than rank speculation, which cannot support
extension of the automatic stay to Metropistas.  *See Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 288 (2d Cir. 2003)
(refusing to extend the automatic stay to non-debtor defendants, reasoning that if the stay were extended based on
mere "apprehension" of an adverse effect on the debtor "there would be vast and unwarranted interference with
creditors' enforcement of their rights against non-debtor co-defendants"); *N.J. Carpenters Health Fund v. Royal
Bank of Scotland Grp., PLC*, 564 B.R. 192, 195 (S.D.N.Y. 2016) (the automatic stay does not bar an action against
non-debtors based merely on a "speculation that a judgment [against the non-debtors] 'would potentially have
preclusive effect' on the Debtor Defendants"); *Merchants Auto. Grp. v. Advantage Opco, LLC*, Case No. 14-318,
2015 WL 728494, at *4 (D.N.H. Feb. 19, 2015) ("Advantage's theories about the possible harm to Wheelz's
contract interests are too hypothetical and speculative to support imposition of an automatic stay."); *Yusin Brake
Corp. v. Motorcar Parts of Am., Inc.*, Case No. 13-9223, 2014 WL 2560612, at *4 (S.D.N.Y. June 6, 2014) (the
automatic stay is inapplicable to a non-debtor defendant where "there is no plausible argument that this suit will
have immediate adverse economic consequence for [debtor's] estate") (emphasis added).

34.     Ambac does not seek to enforce a lien against PRHTA's property.  The Complaint

only seeks a declaration that Ambac "has a valid, continuing lien on the toll revenues collected

by Metropistas *for its own account*[.]"  *See* Compl. ¶ 95 (emphasis added).  Because the revenues

collected by Metropistas *for its own account* are not property of PRHTA, there can be no

violation of Section 362(a)(4).  *See Mwangi v. Wells Fargo Bank (In the Matter of Mwangi)*,

764 F.3d 1168, 1179 (9th Cir. 2014) (There is no violation of the automatic stay "based on the

operation of Wells Fargo's administrative pledge [on account funds] . . . because the Debtors had

no right to possess or control the account funds during this period."); *Pioneer Commercial

Funding Corp. v. United Airlines, Inc.*, 122 B.R. 871, 878 (S.D.N.Y. 1991) ("[T]here is no

authority supporting the proposition that the funds already received by United, a non-bankrupt

third-party, are property of Presidential's estate. Thus, the Bank Group's action is not an attempt

to enforce a lien against property of the estate."); *Invest Vegas, LLC v. 21st Mortg. Corp. (In re

Residential Capital, LLC)*, 556 B.R. 555, 561 (Bankr. S.D.N.Y. 2016) ("[B]ecause the Subject

Property itself was not property of the Debtors' bankruptcy estates, the HOA Lien Sale—despite

effectively extinguishing the value of the Real Estate Instruments that were property of the

Debtors' estates—did not violate the automatic stay.").

35.     The Oversight Board further argues that "Ambac can only have a lien against

property of HTA [because] HTA is the only entity that granted bondholders a lien."  Memo of

Law ¶ 17.  Therefore, the Oversight Board asserts, "Ambac seeks a declaration that it holds a lien

on property in which HTA has an interest."  *Id.*  That assertion is incorrect.

36.     Where, as here, a creditor has a lien on a debtor's property and that property is

transferred to a third party, the lien is still enforceable against the property.  *See, e.g.*, 19

L.P.R.A. § 2265 ("[A] security interest . . . continues in collateral notwithstanding sale, lease,

license, exchange, or other disposition thereof unless the secured party authorized the disposition

free of the security interest or agricultural lien[.]"); *Fleet Capital Corp. v. Yamaha Motor Corp.,*

*U.S.A.*, Case No. 01-1047, 2002 WL 31174470, *16-22 (S.D.N.Y. Sept. 26, 2002) (secured

creditor's lien survived purchase of the collateral where buyer was not in the ordinary course and

the sale was prohibited by the loan agreement).  Ambac may therefore enforce its lien on funds

owned by Metropistas without having any effect on PRHTA's property.

## II.    AMBAC HAS STANDING TO PURSUE CLAIMS AGAINST METROPISTAS

37.    Under First Circuit law, Ambac can pursue its claims against Metropistas because

PRHTA has abandoned these claims by failing to assert them before the deadline in Section

546(a) of the Bankruptcy Code.  The Oversight Board does not seriously contest this.  Instead, it

resorts to a quasi-preemption argument by claiming that Ambac's prosecution of claims is

somehow "counter" to PROMESA.  But the Oversight Board conspicuously fails to meet its

heavy burden to overcome the presumption that Congress did not intend to preempt Puerto Rico

law.

### A.    PRHTA Has Abandoned Section 544(b) Claims Against Metropistas

38.    Under Section 544(b) of the Bankruptcy Code, a bankruptcy estate obtains the

right to "avoid any transfer of an interest of the debtor in property or any obligation incurred by

the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is

allowable under section 502 of this title or that is not allowable only under section 502(e) of this

title."  11 U.S.C. § 544(b).  Thus, by filing its Title III proceeding, PRHTA obtained the rights of

Ambac and other creditors to pursue avoidance actions grounded in state law.  PRHTA's rights

expire, however, if it fails to assert them within the two-year deadline in Section 546(a) of the

Bankruptcy Code.  There is no dispute PRHTA did not commence an action within this deadline

and, thus, such rights revert to the parties that owned them prior to the Title III proceeding:
PRHTA's creditors.

39.     While acknowledging that "out-of-Circuit chapter 11 cases suggest creditors
regain standing to bring fraudulent transfer actions following the expiry of the section 546(a)
statute of limitations[,]" the Oversight Board incongruously claims that "this case law is
inconsistent with First Circuit jurisprudence, which requires creditors to seek leave of the court
and demonstrate benefit to the estate before filing fraudulent transfer claims, *without exception*."
Memo of Law at 9 n.9 (emphasis added).  This argument improperly conflates two separate
principles:  (i) the standard that applies for a party to gain *derivative* standing to bring claims *on
behalf of the estate* and (ii) whether Section 544(b) claims that a debtor fails to assert within the
Section 546(a) deadline revert to the creditors that owned such claims before the bankruptcy.

40.     The principle of derivative standing simply does not apply here.  Indeed, the
Oversight Board specifically acknowledges that Ambac brings the avoidance action "only for
itself," but argues that "neither the Court nor the other creditors would let Ambac get away with
hijacking an avoidance action for itself when all creditors could otherwise bring it."  Memo of
Law ¶ 16.  Ambac has not "hijacked" anything; to the contrary, it owns the claims by operation
of law.  It owned the claims that the Oversight Board failed to assert before the Title III
proceedings, and now those claims have reverted to it (and all other eligible PRHTA creditors)
because, as discussed below, the Oversight Board abandoned them.  Because Ambac does not
seek to bring any claims on behalf of the estate, the derivative standing standards asserted by the
Oversight Board are completely irrelevant.

41.     While the Oversight Board suggests that the claims against Metropistas simply
vanished after the Section 546(a) deadline expired, in the First Circuit, unasserted Section 544(b)

- 16 -

claims revert to creditors as a matter of law.  In *Unisys Corp. v. Dataware Products, Inc.*, 848
F.2d 311 (1st Cir. 1988), a creditor pursued an avoidance action against non-debtors.  The debtor
intervened and argued that, even though the trustee had abandoned the fraudulent conveyance
claims, the automatic stay under Section 362(a)(3) of the Bankruptcy Code prevented the
creditor from pursuing those claims, which had been property of the debtor's estate.  *Id.* at
313-14.  The First Circuit rejected the debtor's argument, holding that "the right of action to sue
[the non-debtors], once abandonment by the trustee took place*, reposed in [the creditor] free of
any stay*."  *Id.* at 314 (emphasis added).  Clearly contradicting the Oversight Board's argument,
the First Circuit did *not* require the creditor "to seek leave of the court and demonstrate benefit to
the estate before filing fraudulent transfer claims[.]"  Memo of Law at 9 n.9; *Unisys*, 848 F.2d at
314.

42.     The Oversight Board makes much of the fact that PROMESA does not
incorporate Section 554 of the Bankruptcy Code – a procedure by which a trustee may be
allowed or ordered to abandon property of the estate – arguing that abandonment of avoidance
actions by PRHTA is therefore "legally impossible."  Memo of Law ¶ 12; 11 U.S.C. § 554.
Nothing in Section 554, PROMESA or any other statute, however, indicates that Section 554 is
the only avenue for abandoning avoidance actions, and the Oversight Board fails to cite *even one*
statute or case to the contrary.

43.     Indeed, numerous courts have held that where a trustee fails to assert Section
544(b) claims within the limitations period prescribed in Section 546(a), Section 554 is irrelevant
because the claims are deemed abandoned as a matter of law and revert to the creditors who
owned them in the first place.  *See In re Gronczewski*, 444 B.R. 526, 534 (E.D. Pa. 2011)
("[Creditors'] right to prosecute the fraudulent transfer claims raised in the State Court Action

ultimately depends on whether the chapter 7 Trustee has any interest in pursuing those claims . . . [before the Section 546(a) deadline expires].”); *Klingman v. Levinson*, 158 B.R. 109, 113 (N.D. Ill. 1993) (“[T]here is no dispute that the trustee never sought to recover the conveyance challenged by [the creditors].  The statute of limitations has long since run on the trustee's right to bring that action.  The court finds that [creditors] have standing to pursue their claims in this action.”); *In re Rosenblum*, 545 B.R. 846, 857 (Bankr. E.D. Pa. 2016) (“[D]uring the period that a trustee retains exclusive standing, creditors may not raise fraudulent transfer claims . . . *until after the trustee's standing expires [pursuant to Section 546(a)]*.”) (emphasis added); *Boudreaux v. Hall Oil Co. (In re Butler Logging, Inc.)*, 538 B.R. 174, 182 (Bankr. S.D. Ga. 2015) (“[C]reditors may still be able to pursue their state law fraudulent transfer causes of action against non-debtor transferees, such as when the § 546 statute of limitations has expired or the Trustee abandons such claims.”); *In re Tessmer*, 329 B.R. 776, 779 (Bankr. M.D. Ga. 2005) (“The creditors do not regain the right to [bring avoidance claims] unless the trustee abandons the claim *or he 'no longer has a viable cause of action' because, for example, the statute of limitations has run*.”) (emphasis added); *Barber v. Westbay (In re Integrated Agri, Inc.)*, 313 B.R. 419, 427-28 (Bankr. C.D. Ill. 2004) (“A creditor regains standing to pursue a state law fraudulent conveyance action, in its own name and for its own benefit*, once the statute of limitations expires on the bankruptcy trustee's right to bring the claim*.”) (emphasis added); *In re Mo. River Sand & Gravel, Inc.*, 88 B.R. 1006, 1012 (Bankr. D.N.D. 1988) (“[T]rustee has validly abandoned property . . . [i]f [he] has consumed the two-year limitation period of section 546(a)[.]”); *Casey Nat'l Bank v. Roan*, 668 N.E.2d 608, 612-13 (Ill. Ct. App. 1996) (“While the trustee has the exclusive right to pursue fraudulently conveyed assets pursuant to section 546(a) of the Code once bankruptcy has been initiated[], the trustee loses that right and creditors may

- 18 -

step in once the trustee no longer has a viable cause of action (in this case because the statute of

limitations for initiating a cause for fraudulent conveyance had expired as to the trustee)).”; *see

also Hatchett v. United States*, 330 F.3d 875, 886 (6th Cir. 2003) (“[T]he Bankruptcy Code does

not extinguish the right of the Government to bring a state law action for fraudulent conveyance

after the debtor receives a discharge in bankruptcy.”); *Klingman v. Levinson*, 114 F.3d 620, 629

(7th Cir. 1997) (bankruptcy petition “did nothing to pretermit” creditor’s previously filed

fraudulent transfer claim).

44.     In light of the foregoing, all Section 544(b) avoidance actions against Metropistas

are deemed abandoned by PRHTA as a matter of law.  Such abandoned claims have reverted to

Ambac, which may bring them under applicable law.

### B.     PROMESA Does Not Preempt Ambac’s Avoidance Claims Under Puerto Rico Law

45.     The Oversight Board does not dispute that Ambac has fraudulent transfer claims

against Metropistas under Puerto Rico law.  The Oversight Board further admits that it decided

not to pursue them before the limitations period in Section 546(a) expired.  Memo of Law ¶ 14.

Nonetheless, the Oversight Board claims that PROMESA implicitly bars Ambac from pursuing

those abandoned causes of action.  *Id.* ¶¶ 11-14.  Though the Oversight Board conspicuously

fails to articulate a preemption analysis, the crux of its argument is that “Ambac’s prosecution of

any [state law] avoidance action . . . is *counter to* [PROMESA],” and, as such, is preempted.  *Id.*

¶ 12 (emphasis added).

### i.     Legal Standard

46.     “Express preemption” occurs when congressional intent to preempt state law is

made explicit in the language of a federal statute.  *Franklin Cal. Tax-Free Tr. v. Puerto Rico*,

85 F. Supp. 3d 577, 595 (D.P.R. 2015).[18]  If Congress does not explicitly preempt state law,

preemption may still occur when federal regulation in a legislative field is so pervasive that

congressional intent allows no inference that it left room for the states to supplement it, *English

v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990), or where "state law is in actual conflict with federal

law." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995).  "Conflict," or "implied"

preemption may arise when it is impossible to comply with both federal and state law, or when

state law stands as an obstacle to achieving the objectives of federal law.  *Crosby v. Nat'l

Foreign Trade Council*, 530 U.S. 363, 373 (2000).

47.     "Implied preemption analysis does not justify a freewheeling judicial inquiry into

whether a state statute is in tension with federal objectives; such an endeavor would undercut the

principle that it is Congress rather than the courts that pre-empts state law." *Chamber of

Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (internal quotation marks omitted).

Because states are due respect as independent sovereigns in our federal system, there is a starting

presumption against implied federal preemption of state law rights.  *See Medtronic, Inc. v. Lohr*,

518 U.S. 470, 485 (1996) (noting that the Supreme Court has "long presumed that Congress does

not cavalierly pre-empt state-law causes of action"); *see also Allied Fin., Inc. v. WM Capital

Partners 53, LLC (In re Allied Fin., Inc.)*, 572 B.R. 45, 53 (Bankr. D.P.R. 2017) (same).

48.     Consequently, a party arguing for implied preemption bears a "considerable

burden of overcoming the starting presumption that Congress does not intend to supplant state

law." *DeBuono v. NYSA-ILI Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997) (internal

quotation marks omitted).  Indeed, "a clear and manifest purpose of pre-emption is always

---

[18]     "For preemption purposes, the laws of Puerto Rico are the functional equivalent of state laws." *Antilles
Cement Corp. v. Fortuño*, 670 F.3d 310, 323 (1st Cir. 2012).

required." *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503

(1998) (internal quotation marks omitted); *see also E.E.O.C. v. Mass.*, 987 F.2d 64, 67 (1st Cir.

1993) ("Congress should make its intention clear and manifest when it intends to preempt the

historic powers of the state[.]"); *Greenwood Tr. Co. v. Mass.*, 971 F.2d 818, 823 (1st Cir. 1992)

("[T]he different strains of preemption all operate on the assumption that the historic police

powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and

manifest purpose of Congress.") (internal quotation marks omitted).

49.     Applying the foregoing principles in the context of the federal bankruptcy

statutory scheme, the Supreme Court has held that "[t]o displace traditional state regulation . . .

[the Bankruptcy Code] must be clear and manifest. . . . Otherwise, the Bankruptcy Code will be

construed to adopt, rather than displace, pre-existing state law." *BFP v. Resolution Tr. Corp.*,

511 U.S. 531, 544-45 (1994) (internal quotation marks omitted).  As such, the Bankruptcy

Code's fraudulent transfer provision, which is devoid of "clear and manifest" congressional

intent to displace state law, could not be construed to invalidate it.  *Id.* at 544.

50.     As shown below, the Oversight Board has shown neither express nor implied

federal preemption under PROMESA of Ambac's causes of action under Puerto Rico law.

### ii.     There Is No Express Federal Preemption of Ambac's Claims

51.     In what appears to be an invocation of the express preemption doctrine, the

Oversight Board argues that since "[i]t is undisputed that Ambac is prosecuting a fraudulent

transfer action under section 544(b)(1)" of the Bankruptcy Code, Ambac may not pursue its

claims because the two-year limitations period under Section 546(a) of the Bankruptcy Code has

passed.  Memo of Law ¶ 12.

52.     Ambac is not prosecuting a Section 544(b)(1) claim.  That, of course, is an estate

claim that PRHTA could assert on behalf of all creditors.  Here, Ambac is bringing the claim for

its own benefit.  As such, the two-year limitations period under Section 546(a) does not apply to

Ambac.  *See Rentas v. TRM, LLC (In re Malavet)*, 552 B.R. 24, 33 (Bankr. D.P.R. 2016) ("The

statute of limitations in section 546(a) . . . applies to trustees appointed in Chapters 7, 11, 12 . . .

debtors-in-possession and . . . trustees in a confirmed plan."); *Hatchett*, 330 F.3d at 887 ("[T]he

statute of limitations in § 546 applies only to actions by trustees.").

### iii.    There Is No Implied Federal Preemption of Ambac's Claims

53.    Attempting to show that "Ambac's prosecution of any avoidance action . . . is

counter to [PROMESA]," the Oversight Board conjures up a Congressional intent to prevent

creditors like Ambac from pursuing abandoned state law claims.  Memo of Law ¶¶ 13-14.  This

"intent" is purportedly implied by (i) the fact that PROMESA does not incorporate Section 554

of the Bankruptcy Code, which prescribes a procedure by which a trustee may be allowed or

ordered to abandon certain property of the estate; and (ii) Section 926 of the Bankruptcy Code,

which allows creditors to request the appointment of a trustee "if the debtor refuses to pursue a

cause of action under section 544[.]"  *Id.*  11 U.S.C. §§ 554, 926.  The Oversight Board,

however, has failed to show any such implication, let alone demonstrate "a clear and manifest

purpose" of preempting the reversion to Ambac of its avoidance claims against Metropistas.  *Isla

Petroleum Corp.*, 485 U.S. at 503.

54.    Nor has the Oversight Board shown – as it must – that it would be "impossible" to

comply with PROMESA while allowing Ambac to assert its rights under Puerto Rico law.  *See

Allied Fin.*, 572 B.R. at 52-53; *Lambregtse v. IndyMac Mortg. Servs. (In re Lambregtse)*, Case

No. 10-14152, 2012 WL 3133899, at *3 (Bankr. D.N.H. July 31, 2012) ("[T]he Court cannot

glean from the complaint that Congress explicitly [superseded state law], that the bankruptcy

code exclusively regulates the same subject matter, or that a conflict arises between the

bankruptcy code and [state law] such that it is impossible to comply with both federal and state

law.").

55.     The Oversight Board asserts – without any supporting authority – that "Section 926 would serve no purpose if creditors can simply wait for two years to pass and then bring avoidance actions for themselves without requesting the Court to appoint a trustee to bring them."  Memo of Law ¶ 13.  That assertion is facially wrong.

56.     *First*, nothing in Section 926 suggests that it extinguishes creditors' rights under state law.  *Second*, far from serving "no purpose" in the scenario depicted by the Oversight Board, Section 926 prevents individual creditors from bringing claims *on behalf of the estate* to ensure that the party bringing the claim is an estate fiduciary for all creditors.  Nothing in Section 926 suggests, however, that creditors must follow the procedure prescribed therein *after* the debtor has abandoned its right to bring avoidance actions for their own benefit.  Indeed, the debtor cannot "refuse" to pursue a cause of action it has no authority to pursue.

57.     Nor does the Oversight Board explain (because it cannot) why the fact that PROMESA does not incorporate Section 554 of the Bankruptcy Code renders PRHTA's abandonment of the avoidance actions "legally impossible."  *Id.* ¶ 12.  Indeed, as explained above (¶¶ 42-43), abandonment pursuant to Section 554 is not required where abandonment has been otherwise effectuated by the expiration of the limitations period under Section 546(a).

58.     Furthermore, far from reflecting Congress's intent to render abandonment of the avoidance actions "legally impossible," PROMESA does not incorporate Section 554 for the simple reason that inclusion thereof would be meaningless.  Section 554 allows for abandonment of property "*of the estate*," which, upon abandonment, reverts *to the debtor.  See In re Coronella Props., LLC*, Case No. 06-13886, 2011 WL 839529, at *4 (Bankr. D. Mass. Mar. 7, 2011) ("[P]roperty abandoned under [Section 554] ceases to be part of the estate.  It reverts to the

debtor[.]").  In cases under PROMESA, there is no "estate" and, thus, all property *already vests in the debtor* so there is no separate party to which the estate would abandon property.  *See Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. (In re Fin. Oversight & Mgmt. Bd.)*, 939 F.3d 340, 349 (1st Cir. 2019) ("PROMESA and the municipal bankruptcy code instruct that we replace all instances of 'property of the estate' that appear in the incorporated provisions of the bankruptcy code with 'property of the debtor.' . . . . [T]he concept of 'the estate' has no role under PROMESA.").  Section 554 was excluded from PROMESA because it could serve no purpose in PROMESA proceedings.

59.     The Oversight Board has fallen utterly short of carrying the "considerable burden of overcoming the starting presumption that Congress does not intend to supplant state law." *DeBuono*, 520 U.S. at 814.  Therefore, PROMESA does not preempt Ambac's right to bring avoidance claims against Metropistas under Puerto Rico law.

### C.     The Complaint Does Not Seek to Recover on a Claim Against PRHTA

60.     The Oversight Board argues that the Complaint independently violates Bankruptcy Code Section 362(a)(1) because "[a] creditor's filing of a fraudulent transfer claim against a non-debtor third party constitutes an action 'to recover a claim against the debtor.'" Memo of Law ¶¶ 21-22.  The Oversight Board is wrong.

61.     As described above, the First Circuit has expressly held that a third party pursuing claims against a non-debtor does not violate the automatic stay "once abandonment by the trustee took place." *Unisys*, 848 F.2d at 314.  Moreover, none of the out-of-circuit cases cited by the Oversight Board (Memo of Law ¶ 22) address claims that had been abandoned by the debtor (as they were here).  Finally, contrary to the Oversight Board's assertion (Memo of Law ¶ 23), the Complaint does not seek "to recover on [Ambac's] claims against [PRHTA]."  As described above, the Complaint only seeks money damages *from Metropistas*, measured by Metropistas's

failure to pay reasonably equivalent value to PRHTA.  Compl. ¶¶ 80, 90.

### D.     Ambac May Pursue Its Unjust Enrichment Claim Against Metropistas

62.     The Oversight Board fails to show why Ambac may not pursue its unjust

enrichment claims against Metropistas.  The Oversight Board argues that "there is no basis on

which [PRHTA] could have abandoned a cause of action for unjust enrichment."  Memo of Law

at 3 n.5.  PRHTA, however, never had standing to bring Ambac's unjust enrichment claim in the

first place, and the Oversight Board has not attempted to show otherwise.

63.     It is well settled that a bankruptcy trustee "does not have standing to sue [third

parties] on behalf of [creditors]."  *Caplin v. Marine Midland Grace Tr. Co. of N.Y.*, 406 U.S.

416, 434 (1972); *see also Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir.

1991) (citing *Caplin*) ("It is well settled that a bankruptcy trustee has no standing generally to

sue third parties on behalf of the estate's creditors, but may only assert claims held by the

bankrupt corporation itself."); *Gill v. Nexgen Energy Holdings PCC Ltd. (In re Taheripour)*,

Case No. 12-30028, 2016 WL 1255298, at *8 (Bankr. C.D. Cal. Mar. 30, 2016) ("The Supreme

Court and the Ninth Circuit have both held . . . that bankruptcy trustees do not have standing to

prosecute actions against third parties on behalf of creditors as opposed to on behalf of a

debtor.").  As a corollary of the foregoing, "in order for the Trustee to have standing, he must

allege injuries to [the debtor] itself, and not injuries to third parties, such as [the debtor's]

creditors who currently will not be repaid."  *Baena v. KPMG LLP*, 389 F. Supp. 2d 112, 116 (D.

Mass. 2005).

64.     Here, Metropistas was unjustly enriched *at the expense of Ambac* as a direct and

proximate cause of its misconduct, including the taking of toll revenues that were part of

Ambac's collateral and should have been paid to it.  Compl. ¶¶ 81-90.  PRHTA therefore never

had standing to bring Ambac's unjust enrichment claim.

65.     Furthermore, *even if* PRHTA had the right to pursue Ambac's unjust enrichment claim under Section 544 of the Bankruptcy Code (it did not), it would be deemed abandoned as a matter of law for the same reasons PRHTA is deemed to have abandoned Ambac's avoidance actions (*see ¶¶* 38-44 *supra*).

66.     In light of the foregoing, Ambac may pursue its unjust enrichment claim against Metropistas.

## **CONCLUSION**

Accordingly, for each of the reasons stated herein, Ambac respectfully requests that the Court deny the Motion.

[*Remainder of page intentionally left blank*]

Dated: April 28, 2020

FERRAIUOLI LLC

By: /s/ *Roberto A. Cámara-Fuertes*
Roberto A. Cámara-Fuertes
USDC P.R. No. 219002
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001
Email: rcamara@ferraiuoli.com

KASOWITZ BENSON TORRES LLP
Andrew K. Glenn (admitted *pro hac vice*)
Olga Lucia Fuentes-Skinner (admitted *pro hac vice*)
Marissa E. Miller (admitted *pro hac vice*)
Shai Schmidt (admitted *pro hac vice*)
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800
Email: aglenn@kasowitz.com
          ofuentes@kasowitz.com
          memiller@kasowitz.com
          sschmidt@kasowitz.com

*Attorneys for Ambac Assurance Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this case.

/s/ *Roberto A. Cámara-Fuertes*
Roberto A. Cámara-Fuertes
(USDC-PR Bar No. 219002)
221 Ponce de León Avenue,
5th Floor
San Juan, PR 00917
Telephone:  (787) 766-7000
Facsimile:  (787) 766-7001
Email: rcamara@ferraiuoli.com
