Hearing Date:  May 13, 2020 at 9:30a.m. (AST)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

---------------------------------------------------------------------

|  |  |  |
|---|---|---|
| | X | |
| | : | |
| In re: | : | |
| | : | |
| THE FINANCIAL OVERSIGHT AND | : | PROMESA |
| MANAGEMENT BOARD FOR PUERTO RICO, | : | Title III |
| | : | |
| as representative of | : | Case No. 17-BK-3283 (LTS) |
| | : | |
| THE COMMONWEALTH OF PUERTO RICO *et al.*, | : | (Jointly Administered) |
| | : | |
| Debtors.[1] | X | Re: Dkt. Nos. 12496, 12500 |

---------------------------------------------------------------------

**DRA PARTIES' REPLY TO (I) THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD'S RESPONSE TO DRA PARTIES' OPENING RESPONSE, AND (II) LIMITED JOINDER OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF FINANCIAL OVERSIGHT AND MANAGEMENT BOARD'S RESPONSE TO DRA PARTIES' OPENING BRIEF**

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801).

## TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ..........................................................................................................2

REPLY.........................................................................................................................3

I.      Creditors of HTA Have Standing to Seek Stay Relief Against the
        Commonwealth. ...........................................................................................3

II.     PROMESA Does Not Preempt the Excise Tax Statutes........................................6

        A.      PROMESA Does Not Disturb the DRA Parties' Property Rights..............6

        B.      PROMESA Preserves Commonwealth Law Priority Rights. ...................10

III.    HTA Creditor Liens Continue to Attach to Post-Petition Special Revenues.........13

CONCLUSION...........................................................................................................15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. Fed'n Labor Relations Auth.*, 388
F.3d 405, 412 (3d Cir. 2004)......................................................................................8

*Antle v. Tuchbreiter*, 111 N.E.2d 836, 840 (Ill. 1953)....................................................9

*Ashton v. Cameron County Water Improvement District*, 298 U.S. 513 (1936) ...........12

*Ass'n of Retired Emps. v. City of Stockton (In re City of Stockton)*, 478 B.R. 8, 18 (Bankr.
E.D. Cal. 2012) ............................................................................................................12

*Bank of N.Y. Mellon v. Puerto Rico Sales Tax Fin. Corp. (COFINA) (In re Fin. Oversight
& Mgmt. Bd. for P.R.)*, 301 F. Supp. 3d 306, 312 (D.P.R. 2017),...................................4

*Butner v. U.S.*, 440 U.S. 48 (1979) .................................................................................13

*Button's Estate v. Anderson*, 28 A.2d 404, 410 (Vt. 1942) .............................................9

*Cnty. of Orange v. Merrill Lynch & Co. (In re Cnty. of Orange)*, 191 B.R. 1005 (Bankr.
C.D. Cal. 1996)........................................................................................................11, 12

*Connecticut v. Doehr*, 501 U.S. 1, 12 (1991) ..................................................................5

*Graham v. Illinois State Toll Highway Auth.*, 695 N. E.2d 360, 367 (Ill. 1998) ..............9

*Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290
(2010)..............................................................................................................................11

*High Voltage Eng'g Corp.*, 403 B.R. 163, 166-67 (D. Mass. 2009) ...........................3, 4

*Holt v. Henley*, 232 U. S. 637, 639 (1914) ......................................................................7

*In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985)................................................4

*In re French Bourekas, Inc.*, 183 B.R. 695, 696 (Bankr. S.D.N.Y. 1995) ......................5

*In re Heffernan Memorial Hospital District*, 202 B.R. 147, 149 (Bankr. S.D. Cal. 1996). ..........15

*In re Hernandez*, 487 B.R. 353, 367 (Bankr. D.P.R. 2013) .........................................10

*In re Horton*, 595 B.R. 1,4 (Bankr. D.D.C. 2019) .........................................................4

*In re Peachtree Lane Assocs., Ltd.*, 188 B.R. 815, 824-25 (N.D. Ill. 1995)...................4

*In re Vill. Rathskeller, Inc.*, 147 B.R. 665, 669 (Bankr. S.D.N.Y. 1992) ........................5

*Kronemyer v. Am. Contractors Indem. Co. (In re Kronemyer), 405 B.R. 915, 921 (9th Cir. BAP 2009)*.................................................................................................................4

*Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) ..............................................................12

*Mazzone v. Attorney Gen.*, 736 N.E.2d 358, 366 (Mass. 2000)....................................9

*Nowak v Wereszynski*, 250 N.Y.S.2d 981, 982 (N.Y. App. Div. 1964) ......................8, 9

*Roslyn Sav. Bank v. Comcoach Corp. (In re Comcoach Corp.)*, 698 F.2d 571 (2d Cir. 1983) ............................................................................................................................4

*State Highway Comm'n v. Spainhower*, 504 S.W.2d 121 (Mo. 1973) .........................9

*U.S. v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993) ..................................5

*United States v. Sec. Indus. Bank*, 459 U.S. 70, 79-82 (1982)....................................7

*Vaqueria Tres Monjitas, Inc. v. Irizarry*, 600 F.3d 1, 2-3 (1st Cir. 2010)...................8

## Statutes

### Federal Statutes

U.S. Const., Amend V, XIV .........................................................................................5

11 U.S.C. § 507(a)(2).............................................................................................11, 12

11 U.S.C. § 522(f)(2) .....................................................................................................7

11 U.S.C. § 552 ..........................................................................................................2, 13

11 U.S.C. § 901 ...........................................................................................................11

11 U.S.C. § 902(2) .........................................................................................................2

11 U.S.C. § 902(2)(B)...............................................................................................13, 14

11 U.S.C. § 902(2)(E)..........................................................................................13, 14, 15

Section 103 of PROMESA .........................................................................................12

Section § 201(b)(1)(N) of PROMESA .........................................................................7

Section 202(b)(1)(N) of PROMESA ..........................................................................10

Section 204(c)(3)(B) of PROMESA ...........................................................................10

ii

Section 301(a) of PROMESA ......................................................................10, 11

Section 314(b) of PROMESA ...........................................................................10

Section 314(b)(3) of PROMESA .......................................................................11

Section 314(b)(6) of PROMESA .......................................................................11

**Puerto Rico Statutes**

P.R. Constitution, Art. III, § 17..........................................................................10

Act 30-2013 § 1; Act 31-2013 §§ 3(a)(1)-(3). ........................................... *passim*

**Treaties**

3 Collier on Bankruptcy ¶362.07[2] ....................................................................5

63C Am. Jur. 2d Public Funds § 4 .......................................................................9

63C Am. Jur. 2d Public Funds § 34 (2020) ........................................................8

**Other Authorities**

H.R.Rep. No. 94–260, 94th Cong., 1st Sess., at 9–10, reprinted in 1976 USCCAN at
547-48. ...............................................................................................................12

**COME NOW** the DRA Parties,[2] by and through the undersigned legal counsel, hereby submit this reply to the (i) *Financial Oversight and Management Board's Response to DRA Parties' Opening Response* [Dkt. No. 12496] (the "<u>FOMB Response</u>"), and (ii) *Limited Joinder of Official Committee of Unsecured Creditors in Support of Financial Oversight and Management Board's Response to DRA Parties' Opening Response* [Dkt. No. 12500] (the "<u>UCC Joinder</u>").

**<u>PRELIMINARY STATEMENT</u>**

The DRA Parties have filed a motion seeking to lift the automatic stay in an effort to protect their property and collateral rights in the Act 30-31 Revenues.  The FOMB has sought to deny creditors like the DRA those rights and continues to do so in the FOMB Response.  As discussed below (and will be addressed in future proceedings), the DRA Parties have standing to proceed with their lift stay request and the Court should permit them to do so.

In their Opening Brief, the DRA Parties asserted their rights to seek relief from the automatic stay.  The DRA Parties (and HTA bondholders[3]) have a direct financial stake in any pledged revenues diverted improperly by the FOMB to the Commonwealth.  This makes them parties in interest in the Commonwealth Title III case and provides them the right to seek to lift the stay.[4]

---

[2] Capitalized terms used herein but not defined shall have the meaning ascribed to them in the Opening Brief [Dkt. No. 12396].

[3] As noted in the Opening Brief, the DRA Parties object to certain arguments that the HTA bondholders have properly perfected liens in the Act 30-31 Revenues.  *See* Opening Brief ¶ 55.  For the avoidance of doubt, nothing herein shall be construed as an admission or acceptance that the Monolines and/or the trustee for the HTA bonds have valid and perfected liens over their purported collateral.

[4] The DRA Parties acknowledge other standing issues unique to the DRA Parties shall be addressed subsequently in connection with the DRA Lift Stay Motion [Dkt. No. 7643].

1

The FOMB fails to respond to this argument directly—instead relying on a novel (and largely irrelevant) test that would exclude "creditors of creditors" from seeking to lift the automatic stay.  The Court should reject this unsupported theory—a theory that would severely prejudice the DRA Parties' constitutional due process rights.

The FOMB also argues that Acts 30 and 31 have been preempted and that such preemption somehow does not affect the DRA's property rights, even though this would ensure the DRA could not recover on its collateral.  The FOMB's arguments boil down to a hairsplitting exercise that would deprive the DRA of its constitutionally protected property rights.

Additionally, the FOMB continues to dwell on an argument that Section 552 of the Bankruptcy Code prevents HTA creditors' liens from attaching to post-petition Act 30-31 Revenues.  The FOMB's arguments lack merit (and are likely untimely), as the FOMB ignores the fact that the revenues at issue are special revenues under the plain language of Section 902(2) of the Bankruptcy Code.

### BACKGROUND

1.      On March 16, 2020, the DRA Parties filed their Opening Brief in accordance with the DRA Participation Order, addressing several Shared Issues related to standing and secured status.  *See* Opening Brief ¶¶ 1-2.

2.      On March 23, 2020, the FOMB filed its response, disputing that HTA creditors have standing to seek stay relief against the Commonwealth and arguing that PROMESA preempts the Excise Tax Statutes and that Section 552 of the Bankruptcy Code prevents HTA creditors' liens from attaching to post-petition HTA revenues.  *See* FOMB Response §§ I-IV.

3.       On the same day, the Official Committee of Unsecured Creditors joined in certain
arguments set forth in the FOMB Response and separately reiterated the FOMB's arguments
with respect to preemption.  *See* UCC Joinder ¶¶ 2-4.[5]

## REPLY

### I.  Creditors of HTA Have Standing to Seek Stay Relief Against the Commonwealth.

4.       The Opening Brief demonstrated that HTA creditors have standing as parties in
interest to participate in the Commonwealth's Title III case because they have a direct stake in
the proceeding.  *See* Opening Brief ¶¶ 8-17.  The DRA owns credits that are secured by the HTA
revenues, including the Act 30-31 Revenues.  *See* DRA Lift Stay Motion ¶ 35.  These are the
very revenues that the Commonwealth improperly diverted from the HTA.  *See id.* ¶¶ 34, 80, 81.
The Commonwealth's actions therefore directly jeopardize the DRA Parties' property interest.  It
is difficult to imagine a more concrete "stake" in the Commonwealth's Title III case than this.
*High Voltage Eng'g Corp.*, 403 B.R. 163, 166-67 (D. Mass. 2009) (holding that there is standing
if an order "diminish[es]" property interests or "detrimentally affect[s the appellant's] rights").

5.       The FOMB ignores these facts and instead urges the Court to adopt a "general
rule" that "[p]arty in interest status does not include a creditor of a creditor of a debtor."  FOMB
Response ¶¶ 5-6.[6]  The Court should reject this "general rule."  It is contrary to both common
sense and well-established precedent holding that party in interest status is a case-specific

---

[5] The Monolines also filed a Response and Reservation of Rights to the Opening Brief [Dkt. No. 12491].

[6] The FOMB also asserts that the DRA does not have a "direct stake" in the Commonwealth's Title III case because "neither the DRA Parties nor the GDB even filed a proof of claim against the Commonwealth with respect to the obligations that are the subject of the Motion."  FOMB Response ¶ 6.  The DRA Parties disagree with this contention and will brief this issue fully in connection with the DRA Lift Stay Motion, if necessary.  *See id.* ¶ 6 n.8.  However, the presence or absence of a proof of claim does not alter the DRA Parties' direct stake in their collateral currently held by the Commonwealth.  *See High Voltage Eng'g Corp.*, 403 B.R. at 166.  The Court should dismiss this argument out of hand.

3

inquiry not governed by rigid categorical rules.  *See In re Amatex Corp.*, 755 F.2d 1034, 1042

(3d Cir. 1985) (standing in a bankruptcy case extends to "anyone holding a direct financial stake

in the outcome of the case"); *In re Peachtree Lane Assocs., Ltd.*, 188 B.R. 815, 824-25 (N.D. Ill.

1995) ("Determining whether a given party is a 'party in interest' … calls for a case by case

analysis.")*.*  The proper focus is on a prospective party's "stake in the proceeding" and whether it

is "sufficient … to require representation."  *In re High Voltage Eng'g Corp.*, 403 B.R. at 166.[7]

6.     While the FOMB's remaining arguments lack merit for the reasons previously

described in the DRA Parties' Opening Brief, *see generally* Opening Brief ¶¶ 8-19, we address

two specific concerns posed by the FOMB's response with respect to standing.

7.     First, the FOMB continues to rely largely on the Second Circuit's oft-criticized

opinion, *Roslyn Sav. Bank v. Comcoach Corp. (In re Comcoach Corp.)*, 698 F.2d 571 (2d Cir.

1983), in support of its argument that a creditor of a creditor lacks standing.  *See* FOMB

Response ¶ 6 n.9.  The widespread view of courts outside the Second Circuit is that *Comcoach*

"'unduly limited the availability of stay relief, and that the better approach is to recognize that

any party affected by the stay should be entitled to move for relief.'"  *In re Horton*, 595 B.R. 1, 4

(Bankr. D.D.C. 2019) (quoting 3 *Collier on Bankruptcy* ¶ 362.07[2] (describing the courts that

reject *Comcoach* as "the better approach")); *see also Kronemyer v. Am. Contractors Indem. Co.

(In re Kronemyer)*, 405 B.R. 915, 921 (9th Cir. BAP 2009) ("[c]reditors may obtain relief from

the stay if their interests would be harmed by continuance of the stay.").  Even courts within the

---

[7] The FOMB disputes the proposition that "nothing more is required" beyond party in interest status under Section 1109 to seek stay relief.  *See* FOMB Response ¶ 5.  But the case it quotes, *Bank of N.Y. Mellon v. Puerto Rico Sales Tax Fin. Corp. (COFINA) (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 301 F. Supp. 3d 306, 312 (D.P.R. 2017), stands simply for the proposition that a party must also have Article III standing.  This is not disputed.  The DRA Parties (and HTA) clearly have Article III standing by virtue of their concrete financial stake in the outcome of this proceeding.  *See* Opening Brief ¶¶ 11-12.

Second Circuit have limited *Comcoach* to its facts.  *See, e.g.*, *In re Vill. Rathskeller, Inc.*, 147

B.R. 665, 669 (Bankr. S.D.N.Y. 1992) (distinguishing *Comcoach* by its facts); *In re French*

*Bourekas, Inc.*, 183 B.R. 695, 696 (Bankr. S.D.N.Y. 1995) (same).  This Court should reject the

application of *Comcoach* here as well.

8.      Second, the FOMB suggests that the Court should bar participation because "the

creditor whose rights the creditor of the creditor attempts to prosecute may not agree with what

its creditor is trying to do."  FOMB Response ¶ 5.  That concern has no application here because

the DRA Parties seek to protect their own property interests in the diverted revenues, and not

those of an intermediary.  There is no conflict in the relevant interests.

9.      As the DRA Parties explained, the FOMB's position would lead to precisely the

"anomalous" situation frequently warned against[8]: a party blocked from seeking relief from the

potential damage caused by the actions of the Commonwealth in diverting pledged revenues

because it is subject to the automatic stay.  *See* Opening Brief ¶ 11 (quoting 3 *Collier on*

*Bankruptcy* ¶ 362.07).  Congress could not have intended this in enacting PROMESA – and if it

did, the statute would violate constitutional due process rights.  *See* U.S. Const. Amend. V, XIV;

*U.S. v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993) ("[I]ndividuals must receive . . .

an opportunity to be heard before the Government deprives them of property."); *Connecticut v.*

*Doehr*, 501 U.S. 1, 12 (1991) (holding that liens are a form of property "subject to the strictures

of due process").

---

[8] The FOMB's position leads to absurd results.  For example, if A loaned a diamond ring to B, and B in turn loaned it to C, the FOMB's rule would bar A from seeking to recover the ring from C despite A's rightful ownership. Congress cannot have intended that a property owner would not be considered a "party in interest" in a proceeding that directly implicates that property.  Yet this is precisely the result the FOMB seeks here: a ruling that the DRA Parties cannot participate in the Commonwealth's Title III case even though their substantial property interests are directly at issue.

10.     For these reasons and those stated in the Opening Brief, this Court should hold that the property interests at stake here more than suffice to establish standing.[9]

## II.     PROMESA Does Not Preempt the Excise Tax Statutes.

11.     PROMESA has no field preemptive effect and preempts Commonwealth laws only to the extent they directly conflict with PROMESA's provisions.  PROMESA repeatedly and expressly states that liens and priority rights that exist in Commonwealth law must remain fully in force.  *See* Opening Brief ¶¶ 20-34.  To that end, the DRA Parties' property rights in the pledged revenues remain unharmed by PROMESA.

12.     The FOMB responds that (1) the Excise Tax Statutes do not create property rights and are only preempted as "uncertified appropriations," and (2) PROMESA supplants the relevant Commonwealth priority schemes.  *See* FOMB Response ¶ 10-13.  The DRA Parties addressed this topic broadly in their Opening Brief, *see generally* Opening Brief ¶¶ 20-39, but below, respond to the principal counterarguments raised by the FOMB.

### A.     PROMESA Does Not Disturb the DRA Parties' Property Rights.

13.     The key question discussed in the Opening Brief is *whether PROMESA can extinguish the DRA Parties' and HTA bondholders' liens on the HTA revenues*.  It cannot and does not.  The FOMB sidesteps this crucial point.  Instead, it offers several unpersuasive arguments that construe PROMESA to extinguish HTA creditors' liens on the pledged revenues—thereby intruding on their constitutional rights.

14.     Consistent with the U.S. Constitution, the U.S. Supreme Court has carefully read bankruptcy laws to protect secure property interests, such as liens.  *See* Opening Brief ¶¶ 26-34.

---

[9]  In addition, for the reasons set out in the Opening Brief, the DRA Parties and HTA creditors also have prudential standing.  *See* Opening Brief ¶¶ 18-19.

6

PROMESA recognizes that secured property interests must be treated differently under bankruptcy law, and it expressly preserves Commonwealth law liens and priority rights. *See, e.g.*, PROMESA § 201(b)(1)(N) (providing that any fiscal plan shall "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to June 30, 2016").

15.     Recognizing that PROMESA cannot displace property rights, the FOMB suggests that PROMESA may extinguish the revenue source behind the liens but preserve the property rights in the liens. *See* FOMB Response ¶ 15. This is meaningless word play. The liens at issue are on the HTA revenues. *See, e.g.*, Security Agreement § 1.2.[10] Extinguishing the funding source of those revenues, without providing adequate replacement, nullifies the liens and destroys the property interest. This does not simply reduce the value of the liens, as the FOMB suggests. *See* FOMB Response ¶ 15. It eliminates them completely. *See* Opening Brief ¶ 26.

16.     The FOMB also ignores the Supreme Court's admonition that a statute should not be read to extinguish a preexisting lien without a clear statement to the contrary. *See United States v. Sec. Indus. Bank*, 459 U.S. 70, 79-82 (1982) (declining to construe 11 U.S.C. § 522(f)(2) to destroy a preexisting lien without a clear statement); *Holt v. Henley*, 232 U. S. 637, 639 (1914) (establishing that bankruptcy statutes apply prospectively absent a clear expression of Congressional intent). A court cannot, based on inferences, read a statute to undermine secured property rights. Nevertheless, that is exactly what the FOMB urges.

---

[10] The DRA Parties are mindful that the DRA Participation Order precludes the DRA Parties from raising intercreditor disputes between the DRA and holders of HTA bonds. *See* DRA Participation Order at 4. The DRA Parties' reference to the Security Agreement and certain portions of Acts No. 30 and 31 are made solely for purposes of elucidating the substantive issues to be discussed in this submission.

17.     Finally, the FOMB argues that the Excise Tax Statutes have nothing to do with property rights because the statutes are mere "appropriations."  *See* FOMB Response ¶ 12.  But the Excise Tax Statutes are not "appropriations."  They allocate the Act 30-31 Revenues to HTA for the purpose of repaying the GDB.  *See* Act 30-2013 § 1; Act 31-2013 §§ 3(a)(1)-(3). Together with the Security Agreement, the Excise Tax Statutes establish a private property interest held by the DRA.  *See* Opening Brief ¶ 43.

18.     The FOMB relies on the erroneous premise that Acts 30 and 31 give the Commonwealth discretion on how to allocate those revenues in its yearly budgets (*i.e.*, an appropriation) but fails to identify any legal basis to support this notion -- which diverges from established public finance law in several jurisdictions (including Puerto Rico) as detailed below. *See* FOMB Response ¶¶ 14-15.

19.     An appropriation is understood as a legislative authorization to withdraw funds from the state treasury and to spend those funds for a specific purpose or project.  *See* 63C Am. Jur. 2d Public Funds § 34 (2020).  Only funds that are available in the state's treasury and within the legislature's control for purposes of annual budgeting may be subject to appropriations. *See id.*  Funds or revenues that are not deposited into the General Fund cannot be subject to the appropriations process.  *See Vaqueria Tres Monjitas, Inc. v. Irizarry*, 600 F.3d 1, 2-3 (1st Cir. 2010) (monies deposited into a special account under a regulatory scheme that were kept separate from the Commonwealth's general fund were not deemed Commonwealth funds subject to appropriation); *Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. Fed'n Labor Relations Auth.*, 388 F.3d 405, 412 (3d Cir. 2004) (determining that whether a state revolving fund is deemed an appropriation depends on whether that particular fund is financed—or is permitted to be financed—by annual budgetary appropriated funds); *Nowak v Wereszynski*, 250 N.Y.S.2d

8

981, 982 (N.Y. App. Div. 1964) (holding that a city has no beneficial right or interest in revenues that were pledged to preserve and protect the security of outstanding bonds).

20.     When a state legislature designates specific funds for other purposes, the state lacks legal or equitable rights to such funds which, consequently, do not enter the state's treasury.  *See* 63C Am. Jur. 2d Public Funds § 4 (citing *State Highway Comm'n v. Spainhower*, 504 S.W.2d 121 (Mo. 1973)).  For instance, statutes which allocate specific revenues for special purposes make these funds legally unavailable for expenditure and not susceptible to the annual appropriation process.  *See Mazzone v. Attorney Gen.*, 736 N.E.2d 358, 366 (Mass. 2000) ("A general law that directs that funds be used for a specific purpose is not an appropriation"); *Antle v. Tuchbreiter*, 111 N.E.2d 836, 840 (Ill. 1953)  ("[W]here a statute categorically commands the performance of an act, so much money as is necessary to pay the command may be disbursed without explicit appropriation." (citation omitted)); *Button's Estate v. Anderson*, 28 A.2d 404, 410 (Vt. 1942) (funds can be exempted from  appropriation requirements by the Legislature). These allocations strip subsequent legislatures of their prerogatives over the allocated funds unless the legislation is amended.  *See Graham v. Illinois State Toll Highway Auth.*, 695 N.E.2d 360, 367 (Ill. 1998).

21.     Here, Acts 30 and 31 that: (1) the revenues shall be covered into a special deposit for the benefit of the HTA (and not into the General Fund); (2) they were created for the specific purpose of repaying the GDB; and (3) the Commonwealth does not have the authority to divert them to the General Fund.[11]  *See* Act 30-2013 § 1; Act 31-2013 §§ 3(a)(1), (3).  Based on the

---

[11] The only mechanism the Commonwealth has available to legally divert the Act 30-31 Revenues is through a claw-back under Article VI, Section 8 of the Puerto Rico Constitution. To date, no forum has resolved whether the Commonwealth's enforcement and execution of the claw-back was and/or continues to be valid, which dispute remains pending and ongoing.

9

statutory provisions, Acts 30 and 31 cannot be treated as budgetary appropriation statutes.  It

would take more than the FOMB's omission of the Act 30-31 Revenues from the certified

budgets to amend these laws to turn them into appropriation statutes.  Moreover, contrary to the

FOMB's suggestion otherwise, *see* FOMB Response ¶¶ 9, 15, the Puerto Rico Constitution's

prohibition of including more than one subject in any legislative bill requires that any

amendment to Acts 30 and 31 cannot be accomplished through approval of a budgetary bill.  *See*

P.R. Constitution, Art. III, § 17.  In short, PROMESA does not and cannot cancel HTA creditors'

property rights in the HTA pledged revenues.

### B.    PROMESA Preserves Commonwealth Law Priority Rights.

22.    PROMESA consistently and explicitly preserves Commonwealth law priority

designations.  *See* Opening Brief ¶¶ 28-33.  Nevertheless, the FOMB now contends that Title III

of PROMESA preempts those priorities.  *See* FOMB Response ¶ 12.  But the text of the statute

and long-established principles of statutory interpretation prove the opposite.

23.    To begin, the FOMB accepts that Title II of PROMESA preserves

Commonwealth law priority rights, but then contends that Title III preempts them.  *See* FOMB

Response ¶ 12.  But Titles II and III both consistently demonstrate Congress's intent to preserve

Commonwealth law priority rights except when they expressly conflict with the statute, as

demonstrated by Sections 202(b)(1)(N), 204(c)(3)(B), 301(a), and 314(b) of PROMESA.  *See*

Opening Brief ¶¶ 29-33.  In the absence of a clear congressional directive to the contrary, the

proper interpretation of PROMESA is that these rights are preserved throughout both Title II and

Title III.  The Court should resist the FOMB's effort to pit PROMESA against itself.  *See In re*

*Hernandez*, 487 B.R. 353, 367 (Bankr. D.P.R. 2013) ("[A] cardinal rule of construction is that a

statute should be read as a harmonious whole . . . .") (internal quotation marks omitted).

10

24.     The FOMB next argues that the provisions of Title III discussed in the Opening

Brief do "not preserve creditors' Commonwealth law rights."  FOMB Response ¶ 13.  But

Sections 314(b)(6) and 314(b)(3) (each pertaining to plan confirmation standards) demonstrate

Congress's intent to preserve territorial law regarding priorities by explicitly referencing

applicable Commonwealth law in the plan confirmation standards, thereby harmonizing them

with other provisions of PROMESA that similarly protect Commonwealth law rights.

*See* Opening Brief ¶ 31.  Instead, the FOMB reads Sections 314(b)(6) and 314(b)(3) as isolated

provisions without any connection to the other parts of the statute.  This is improper because

"[c]ourts have a duty to construe statutes, not isolated provisions."  *Graham Cnty. Soil & Water

Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010) (internal quotation marks

omitted).  These provisions are properly understood to reflect Congress's clear intent that runs

through PROMESA – to preserve Commonwealth law priority rights and lien property rights.

*See* Opening Brief ¶ 31.

25.     The FOMB's treatment of Section 301(a) is equally unpersuasive.  While Section

301(a) incorporates many provisions of the Bankruptcy Code, it excludes most of the Bankruptcy

Code's Section 507 waterfall priority provision.  *See* Opening Brief ¶ 32.  Excluding the federal

priority scheme from PROMESA further demonstrates Congress's intent that existing

Commonwealth law as to priorities continues to control.  *See id*.

26.     The FOMB and UCC cite *Cnty. of Orange v. Merrill Lynch & Co. (In re Cnty. of

Orange)*, 191 B.R. 1005 (Bankr. C.D. Cal. 1996).  *See* FOMB Response ¶ 12; UCC Joinder ¶¶ 2-

3.  *Cnty. of Orange* concluded that Chapter 9 incorporates the Bankruptcy Code's priority

scheme despite the fact that Section 901 of the Bankruptcy Code (like Section 301 of

PROMESA) incorporates only Section 507(a)(2) of the Bankruptcy Code – not the entire priority

scheme.  *See Cnty. of Orange*, 191 B.R. at 1020.  The FOMB's and UCC's reliance on this case

is misplaced.

27.     As an initial matter, the *Cnty. of Orange* court was wrong in saying that Chapter 9

incorporates the Bankruptcy Code's priority scheme after Congress *expressly excluded* it from

Chapter 9's text.  Adopting the position here would be at odds with the foundational principle

that "the sole function of the courts" is "to enforce [a statute] according to its terms."  *Lamie v.

U.S. Tr.*, 540 U.S. 526, 534 (2004) (internal quotation marks omitted).[12]

28.     Congress's decision to leave the bulk of the Section 507 priority scheme out of

Chapter 9 (and ultimately PROMESA) is wholly consistent with the origins of Chapter 9 and the

U.S. Supreme Court's holding in *Ashton v. Cameron County Water Improvement District* that

principles of state sovereignty limit Congress's bankruptcy power.  *See* 298 U.S. 513 (1936).

The *Ashton* decision "has endured and has influenced Congress always to confine its exercise of

the bankruptcy power to measures that do not usurp state sovereignty."  *Ass'n of Retired Emps.

v. City of Stockton (In re City of Stockton)*, 478 B.R. 8, 18 (Bankr. E.D. Cal. 2012).  Indeed, the

House Report for the 1976 Bankruptcy Act explains that "[t]he bill follows [*Ashton*'s] holdings

and retains the limitation on the court's power" so as to preserve state sovereignty.  H.R. Rep.

No. 94–260, 94th Cong., 1st Sess., at 9–10, *reprinted in* 1976 USCCAN at 547–48.  Congress's

decision to defer to state priority schemes in Chapter 9, therefore, has deep roots in constitutional

principle, further undermining the *Cnty. of Orange* court's reading of the statute.

29.     Finally, in its joinder, the UCC argues that "the uniform preemption of state law

priorities" is necessary to achieve the overall goal of uniformity in bankruptcy, despite

---

[12] In any event, *Cnty. of Orange* does not apply in the PROMESA context.  As noted previously, Section 103 of
PROMESA expressly preserves Commonwealth law except where in direct conflict with the federal statute.  *See*
Opening Brief ¶ 33.

Congress's decision to exclude much of the federal priority scheme from Chapter 9.  UCC

Joinder ¶¶ 2-3.  Incorporating each state's individual priority schemes in the Chapter 9 context,

however, does not undermine the U.S. Constitution's mandate for uniform bankruptcy laws.

Congress may validly prescribe that federal law should honor state law priorities, each of which

may differ.  *See Butner v. U.S.*, 440 U.S. 48 (1979) (holding that rights created by state law are

honored in bankruptcy unless a specific bankruptcy provision or policy requires differently).

**III.    HTA Creditor Liens Continue to Attach to Post-Petition Special Revenues.**

30.    The DRA Parties explained that Act 30-31 Revenues are special revenues under

Bankruptcy Code Sections 902(2)(B) ("special excise taxes imposed on particular activities or

transactions") and (2)(E) ("taxes specifically levied to finance one or more projects or systems"),

that they qualify as special revenues even though they were imposed by the Commonwealth, and

that any liens possessed by HTA creditors did not stop attaching once the Debtors filed their

Title III petitions pursuant to Section 552(a).  *See* Opening Brief ¶¶ 45-52.[13]  In response, the

FOMB argues that the Act 30-31 Revenues are not special revenues because the Commonwealth

did not pledge them to the DRA Parties, and, even if it had, they do not satisfy the definition of

special excise taxes under Section 902(2)(E).  *See* FOMB Response ¶¶ 17-18.

31.    With respect to its first argument, the FOMB attempts to defeat the "special"

status of the Act 30-31 Revenues by focusing on their source.  *See* FOMB Response ¶ 17. It

asserts (with no support) that such special revenues must be pledged by the debtor (here, HTA),

but the FOMB cannot point to anything in either Section 902(2)(B) or (E) (or elsewhere)

imposing such a requirement.  In fact, the plain language of Section 902(2)(B) neither mentions

---

[13] The DRA Parties continue to believe addressing the "special revenue" status of the Act 30-31 Revenues is premature under the Court's Final Case Management Order for Revenue Bonds [Dkt. No. 12186] but respond here in an abundance of caution.

"the debtor" nor places restrictions on who imposes the special excise taxes—a fact that the
FOMB overlooks.

32.     The FOMB then argues that the Act 30-31 Revenues are not special revenues—
seemingly under both Section 902(2)(B) and (E)—because they are allocated to HTA for its
corporate purposes, and not particular creditors.  *See* FOMB Response ¶ 17.  As an initial matter,
the FOMB's argument improperly conflates these two different subsections by reading a
requirement into Section 902(2)(B) that does not exist under its plain language.  Moreover, the
Statements of Motives of Act 30 and 31 make clear that the statutes were *not* enacted to allocate
revenues to HTA for its corporate purposes, but rather for the purpose of enabling HTA to pay
down its debt to the GDB.  *See* Opening Brief ¶ 47; Statements of Motives of Act 30-2013 and
Act 31-2013 ("Given the structural deficit of the General Fund and the inability of the [GDB] to
continue financing the operations of [HTA], it is imperative to identify other sources of income
that allow [HTA] to continue operating and repay such financing to the [GDB].").

33.     The FOMB further argues that Act 30-31 Revenues are not special revenues under
Section 902(2)(E) because (1) they are subject to retention to pay general obligations of the
Commonwealth, and (2) they were enacted after any projects or systems were improved through
the use of loan proceeds.  *See* FOMB Response ¶ 18.  Again, the FOMB ignores that the specific
intent and clear purpose of the Act 30-31 Revenues was repayment to the GDB for financing
HTA's continued operations.  *See supra* ¶¶ 18, 22, 36.  It is irrelevant that Act 30-31 Revenues
were allocated to HTA subsequent to the issuance of the bonds or that Act 30-31 Revenues may
be subject to claw-back to pay general obligations of the Commonwealth—a premise the FOMB
assumes is valid but the DRA Parties dispute.  *See* FOMB Response ¶ 18.  This limited carveout
does not defeat the statutes' otherwise clear purpose.

14

34.     Finally, the FOMB's attempt to distinguish *In re Heffernan Memorial Hospital District*, which was cited in the Opening Brief, *see* FOMB Response ¶ 21, is meritless.  The FOMB ignores the court's central holding that the sales tax revenues at issue constituted "special revenues" within the meaning of Section 902(2)(E) because the revenue stream pledged and assigned to the debtor "[was] available only for the purpose of providing security and payment to the bondholders" and was not available for its general municipal purposes.  202 B.R. 147, 149 (Bankr. S.D. Cal. 1996).  Here, the Act 30-31 Revenues were similarly pledged so that HTA could pay down its GDB loan obligations.  Accordingly, the DRA Parties' conclusion is firmly supported by *Heffernan*, and the FOMB fails to rebut this conclusion.[14]

## CONCLUSION

WHEREFORE, the DRA Parties respectfully request that the Court (i) take note of the foregoing in consideration of the Monolines' Amended Lift Stay Motion and (ii) grant any such order and further relief as is just and proper.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, today April 30, 2020.

---

[14] In addition, the FOMB argues that even if the Act 30-31 Revenues are special revenues, Section 928(a) does not apply to them in the Commonwealth's Title III case because the Commonwealth did not enter into any security agreement with the DRA Parties.  *See* FOMB Response ¶ 18.  Section 928(a) maintains the DRA's lien on the post-petition revenues acquired by HTA and will ultimately determine the magnitude of the DRA Parties' HTA post-petition claim in the HTA's Title III case.  The DRA Parties are addressing the special revenues issue now in accordance with the DRA Participation Order.  *See* DRA Participation Order at 6.

**MCCONNELL VALDÉS LLC**

270 Muñoz Rivera Avenue, Suite 7
Hato Rey, Puerto Rico 00918
PO Box 364225
San Juan, Puerto Rico 00936-4225
Telephone: 787-250-5632
Facsimile: 787-759-9225

By: */s/Arturo J. García-Solá*
Arturo J. García-Solá
USDC No. 201903
Email: ajg@mcvpr.com

By: */s/Alejandro J. Cepeda-Diaz*
Alejandro J. Cepeda-Diaz
USDC No. 222110
Email: ajc@mcvpr.com

By: */s/Nayuan Zouairabani*
Nayuan Zouairabani
USDC No. 226411
Email: nzt@mcvpr.com

***Attorneys for AmeriNational Community
Services, LLC as servicer for the GDB Debt
Recovery Authority***

**C. CONDE & ASSOC. LAW OFFICES**

By: */s/ Carmen D. Conde Torres*

Carmen D. Conde Torres
(USDC No. 207312)
254 San José Street, Suite 5
San Juan, PR 00901-1523
Tel. 787-729-2900
Fax. 787-729-2203
E-Mail: condecarmen@condelaw.com

*-and-*

**ORRICK, HERRINGTON &
SUTCLIFFE LLP**

By: */s/ Douglas S. Mintz*
Douglas S. Mintz (admitted pro hac vice)
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005-1706
Telephone: (202) 339-8400
Facsimile: (202) 339-8500
E-mail: dmintz@orrick.com

and

Laura Metzger (admitted pro hac vice)
Peter Amend (admitted pro hac vice)
David Litterine-Kaufman (pro hac vice
admission pending)
Monica Perrigino (admitted pro hac vice)
51 West 52nd Street
New York, N.Y. 10019
Telephone: (212) 506-5000
E-mail: lmetzger@orrick.com
pamend@orrick.com
dlitterinekaufman@orrick.com
mperrigino@orrick.com

***Attorneys for Cantor-Katz Collateral Monitor
LLC, as Collateral Monitor for GDB Debt
Recovery Authority***

16

4165-8474-5251.18