**<u>NATBONY REPLY DECLARATION</u>**
**<u>EXHIBIT 14</u>**

NEW ISSUE – BOOK ENTRY ONLY

RATINGS
Standard & Poor's: BBB+
Moody's: Baa3

# $381,739,786.55

# Puerto Rico Public Finance Corporation

### $47,935,000 2003 Series A Bonds
### $272,560,000 2003 Series B Refunding Bonds
### $61,244,786.55 2003 Series C Refunding Bonds
### (Commonwealth Appropriation Bonds)

Puerto Rico Public Finance Corporation (the "Corporation") is issuing the 2003 Series A Bonds (the "Series A Bonds") to fund the purchase of a promissory note (the "Series 2003 A Note") issued in connection with the restructuring of certain loans made by Government Development Bank for Puerto Rico ("Government Development Bank") to Puerto Rico Land Authority, a public corporation of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"). The Series A Bonds are limited obligations of the Corporation payable solely from payments of principal of and interest on the Series 2003 A Note and other promissory notes of certain departments, agencies, instrumentalities and public corporations of the Commonwealth previously purchased by the Corporation (collectively, the "Act 164 Notes") pursuant to Act Number 164 of the Legislature of Puerto Rico, approved December 17, 2001 ("Act 164"). The Act 164 Notes are payable solely from budgetary appropriations to be made by the Legislature of Puerto Rico pursuant to Act 164. The Legislature of Puerto Rico is not legally required to appropriate funds for such payments.

The Corporation is issuing the 2003 Series B Refunding Bonds (the "Series B Refunding Bonds") to refund certain of the Corporation's outstanding 1995 Series A Bonds, 1995 Series C Refunding Bonds and 1996 Series D Refunding Bonds. The 1995 Series A Bonds, 1995 Series C Refunding Bonds and 1996 Series D Refunding Bonds were issued to fund in part the purchase of a promissory note (the "Act 113 Note") issued by Puerto Rico Maritime Shipping Authority to Government Development Bank. The Series B Refunding Bonds are limited obligations of the Corporation payable solely from payments of principal of and interest on the Act 113 Note made pursuant to Act Number 113 of the Legislature of Puerto Rico, approved September 27, 1994 ("Act 113"). The Act 113 Note is payable solely from budgetary appropriations to be made by the Legislature of Puerto Rico pursuant to Act 113. The Legislature of Puerto Rico is not legally required to appropriate funds for such payments.

The Corporation is issuing the 2003 Series C Refunding Bonds (the "Series C Refunding Bonds," and together with the Series A Bonds and Series B Refunding Bonds, the "2003 Bonds") to refund certain of the Corporation's outstanding 1996 Series E Bonds and 1996 Series F Bonds. The 1996 Series E Bonds and 1996 Series F Bonds were issued to fund the purchase of a promissory note (the "Act 163 Note," and together with the Act 164 Notes and the Act 113 Note, the "Notes") issued in connection with the restructuring of certain loans made by Government Development Bank to the Department of Treasury of Puerto Rico. The Series C Refunding Bonds are limited obligations of the Corporation payable solely from payments of principal of and interest on the Act 163 Note made pursuant to Act Number 163 of the Legislature of Puerto Rico, approved August 11, 1995 ("Act 163"). The Act 163 Note is payable solely from budgetary appropriations to be made by the Legislature of Puerto Rico pursuant to Act 163. The Legislature of Puerto Rico is not legally required to appropriate funds for such payments.

The 2003 Bonds will have the following characteristics:

- The 2003 Bonds will be dated their date of delivery.
- The 2003 Bonds will be registered under The Depository Trust Company's book-entry only system. Purchasers of the 2003 Bonds will not receive definitive bonds.
- Interest on the 2003 Bonds will accrue from their date of issuance. Interest on the 2003 Bonds, except capital appreciation bonds, will be payable monthly on the first day of each month, commencing on August 1, 2003. Interest on the capital appreciation bonds will compound semi-annually on each August 1 and February 1, commencing on August 1, 2003, and will be payable at maturity or redemption.
- The maturity schedules, interest rates and prices or yields to maturity of the 2003 Bonds are set forth on the inside cover page of this Official Statement.
- The 2003 Bonds are subject to redemption as described in this Official Statement.
- In the opinion of Bond Counsel, interest on the 2003 Bonds will be exempt from Puerto Rico and United States taxes to residents of Puerto Rico. Interest on the 2003 Bonds is not excludable from gross income for federal income tax purposes under Section 103(a) of the United States Internal Revenue Code. See *Tax Matters* beginning on page 31 of this Official Statement.

The 2003 Bonds are expected to be delivered on or about July 10, 2003 in San Juan, Puerto Rico.

**The 2003 Bonds will not constitute an obligation of the Commonwealth or any of its political subdivisions or public instrumentalities (other than the Corporation), and neither the Commonwealth nor any of its political subdivisions or public instrumentalities (other than the Corporation) will be liable thereon. The Corporation has no taxing power.**

| | | |
|---|---|---|
| **Popular Securities** | **Oriental Financial Services** | **Santander Securities** |
| **BBVA Capital Markets** | **Citigroup** | **Doral Securities** |
| **Morgan Stanley** | **Prudential Securities Incorporated** | **R-G Investments Corporation** |
| | **UBS Financial Services Incorporated of Puerto Rico** | |

July 2, 2003

# Puerto Rico Public Finance Corporation
## (Commonwealth Appropriation Bonds)

### $47,935,000 2003 Series A Bonds

#### $16,210,000 Serial Bonds

| Maturity Date August 1, | Principal Amount | Interest Rate | Price |
|---|---|---|---|
| 2004 | $1,435,000 | 1.45% | 100% |
| 2005 | 1,460,000 | 1.95 | 100 |
| 2006 | 1,485,000 | 2.50 | 100 |
| 2007 | 1,525,000 | 2.80 | 100 |
| 2008 | 1,565,000 | 3.25 | 100 |
| 2009 | 1,615,000 | 3.65 | 100 |
| 2010 | 1,675,000 | 3.95 | 100 |
| 2011 | 1,740,000 | 4.20 | 100 |
| 2012 | 1,815,000 | 4.45 | 100 |
| 2013 | 1,895,000 | 4.60 | 100 |

#### $31,725,000 Term Bonds

$10,975,000 5.05% Term Bonds due August 1, 2018 – Yield 5.05%
$20,750,000 5.15% Term Bonds due August 1, 2025 – Yield 5.188% (NRO[†])

### $272,560,000 2003 Series B Refunding Bonds

#### $59,400,000 Serial Bonds

| Maturity Date August 1, | Principal Amount | Interest Rate | Price |
|---|---|---|---|
| 2009 | $10,920,000 | 3.65% | 100% |
| 2010 | 11,350,000 | 3.95 | 100 |
| 2011 | 11,825,000 | 4.20 | 100 |
| 2012 | 12,360,000 | 4.45 | 100 |
| 2013 | 12,945,000 | 4.60 | 100 |

#### $213,160,000 Term Bonds

$73,905,000 5.05% Term Bonds due August 1, 2018 – Yield 5.05%
$139,255,000 5.15% Term Bonds due August 1, 2025 – Yield 5.188% (NRO[†])

### $61,244,786.55 2003 Series C Refunding Bonds

#### $61,244,786.55 Capital Appreciation Bonds

| Maturity Date August 1, | Initial Principal Amount | Maturity Amount | Price | Yield to Maturity |
|---|---|---|---|---|
| 2010 | $13,812,989.45 | $18,395,000 | 75.091% | 4.10% |
| 2011 | 13,000,994.40 | 18,390,000 | 70.696 | 4.35 |
| 2012 | 12,183,744.30 | 18,395,000 | 66.234 | 4.60 |
| 2013 | 11,468,555.70 | 18,390,000 | 62.363 | 4.75 |
| 2014 | 10,778,502.70 | 18,410,000 | 58.547 | 4.90 |

---

[†] Not reoffered

No dealer, broker, sales representative or other person has been authorized by the Corporation or the Underwriters to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Corporation or the Underwriters. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of the 2003 Bonds by any person in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale. The delivery of this Official Statement at any time does not imply that the information contained herein is correct as of any time subsequent to its date. The information set forth herein has been obtained from the Corporation, the Commonwealth and other official sources that are believed to be reliable. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Corporation or the Commonwealth since the date hereof. The Underwriters have provided the following sentence for inclusion in this Official Statement: The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

**IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE 2003 BONDS OFFERED HEREBY AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.**

There is currently no secondary market for the 2003 Bonds and there can be no assurance that a secondary market will develop or, if it does develop, that it will provide holders of the 2003 Bonds with liquidity for their investment or that it will continue for the life of the 2003 Bonds.

## TABLE OF CONTENTS

|  | Page |
|---|---|
| INTRODUCTORY STATEMENT AND PLAN OF FINANCE | 1 |
| Series A Bonds | 2 |
| Series B Refunding Bonds | 3 |
| Series C Refunding Bonds | 4 |
| USE OF PROCEEDS | 6 |
| PUERTO RICO PUBLIC FINANCE CORPORATION | 6 |
| THE 2003 BONDS | 8 |
| General | 8 |
| Optional Redemption | 8 |
| Mandatory Redemption | 9 |
| Notice and Effect of Redemption | 10 |
| Book-Entry Only System | 11 |
| Payments and Transfers | 13 |
| Discontinuance of Book-Entry Only System | 13 |
| SOURCE OF PAYMENT AND SECURITY FOR THE SERIES A BONDS | 14 |
| General | 14 |
| Act 164 and Act 164 Notes | 14 |
| Investment of Funds | 16 |
| Letter of Credit | 16 |
| Flow of Funds | 17 |
| No Acceleration of the Act 164 Bonds | 18 |
| Limitation on Additional Bonds | 18 |
| SOURCE OF PAYMENT AND SECURITY FOR THE SERIES B REFUNDING BONDS | 18 |
| General | 18 |
| Act 113 and Act 113 Note | 19 |
| Flow of Funds | 20 |
| Act 113 Reserve Account | 20 |
| No Acceleration of the Act 113 Bonds | 21 |
| Limitation on Additional Bonds | 21 |
| SOURCE OF PAYMENT AND SECURITY FOR THE SERIES C REFUNDING BONDS | 21 |
| General | 21 |
| Act 163 and Act 163 Note | 21 |
| Act 163 Reserve Account | 23 |

|  | Page |
|---|---|
| Flow of Funds | 23 |
| No Acceleration of the Series C Refunding Bonds | 25 |
| Limitation on Additional Bonds | 25 |
| BUDGETARY PROCESS AND PAYMENT OF COMMONWEALTH OBLIGATIONS | 26 |
| RECENT DEVELOPMENTS | 27 |
| Revenues and Expenditures for Fiscal Year 2003 | 27 |
| Standard & Poor's Removes Commonwealth's Debt From Credit Watch | 27 |
| PUBLIC SECTOR DEBT OF THE COMMONWEALTH | 28 |
| Public Sector Debt | 28 |
| Trends of Public Sector Debt | 29 |
| TAX MATTERS | 31 |
| CONTINUING DISCLOSURE UNDERTAKING | 32 |
| VERIFICATION OF MATHEMATICAL COMPUTATIONS | 35 |
| UNDERWRITING | 35 |
| LEGAL MATTERS | 35 |
| LEGAL INVESTMENT | 35 |
| GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO | 35 |
| RATINGS | 35 |
| MISCELLANEOUS | 36 |

| Appendix I | Summary of the Act 164 Trust Agreement | I-1 |
|---|---|---|
| Appendix II | Summary of the Act 113 Trust Agreement | II-1 |
| Appendix III | Summary of the Act 163 Trust Agreement | III-1 |
| Appendix IV | Proposed Forms of Opinion of Bond Counsel | IV-1 |
| Appendix V | Government Development Bank | V-1 |
| Appendix VI | Table of Accreted Values for the Capital Appreciation Bonds | VI-1 |

[This page intentionally left blank]

**$381,739,786.55**
**Puerto Rico Public Finance Corporation**
**$47,935,000 2003 Series A Bonds**
**$272,560,000 2003 Series B Refunding Bonds**
**$61,244,786.55 2003 Series C Refunding Bonds**
**(Commonwealth Appropriation Bonds)**

## INTRODUCTORY STATEMENT AND PLAN OF FINANCE

The purpose of this Official Statement of Puerto Rico Public Finance Corporation (the "Corporation"), a subsidiary of Government Development Bank for Puerto Rico ("Government Development Bank"), which includes the cover page, the Appendices hereto and the information incorporated by reference as set forth below, is to furnish certain information in connection with the issuance and sale by the Corporation of the $47,935,000 2003 Series A Bonds (the "Series A Bonds"), $272,560,000 2003 Series B Refunding Bonds (the "Series B Refunding Bonds") and $61,244,786.55 2003 Series C Refunding Bonds (the "Series C Refunding Bonds," and together with the Series A Bonds and the Series B Refunding Bonds, the "2003 Bonds").

This Official Statement incorporates by reference (i) the Commonwealth's Financial Information and Operating Data Report dated April 1, 2003 (the "Commonwealth Report") included as *Appendix I* to the Official Statement, dated April 16, 2003, of the Commonwealth of Puerto Rico $360,000 Public Improvement Refunding Bonds, Series 2003 B and $1,018,245,000 Public Improvement Refunding Bonds, Series 2003 C; and (ii) the Comprehensive Annual Financial Report of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") for the Fiscal Year ended June 30, 2002, prepared by the Department of the Treasury of Puerto Rico (the "Commonwealth's Annual Financial Report"), which report includes the basic financial statements of the Commonwealth as of and for the Fiscal Year ended June 30, 2002, which have been audited by KPMG LLP, independent auditors, as stated in their report dated April 30, 2003, accompanying the financial statements. KPMG LLP did not audit the financial statements of the Public Buildings Authority capital project fund (a major fund) and certain activities, funds and component units separately identified in their report. Those financial statements were audited by other auditors whose reports have been furnished to KPMG LLP, and their opinion on the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors.

The Commonwealth's Annual Financial Report and the Commonwealth Report were filed by the Commonwealth with each nationally recognized municipal securities information repository ("NRMSIR"). Any appendix of an official statement of the Commonwealth or of any instrumentality of the Commonwealth containing the Commonwealth's Annual Financial Report or the Commonwealth Report filed with each NRMSIR and the Municipal Securities Rulemaking Board (the "MSRB") or any other document containing the Commonwealth's Annual Financial Report or the Commonwealth Report filed with each NRMSIR after the date hereof and prior to the termination of the offering of the 2003 Bonds shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in any of the above described documents incorporated herein by reference shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any subsequently filed document modifies or supersedes such statement. Any statement contained herein shall also be deemed to be modified or superseded to the extent that a statement contained in any subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

1

For information on how to obtain the Commonwealth's Annual Financial Report and the Commonwealth Report, see "Miscellaneous."

This Official Statement, including information incorporated in this Official Statement by reference, contains certain "forward-looking statements" concerning the Commonwealth's operations and financial condition. These statements are based upon a number of assumptions and estimates which are subject to significant uncertainties, many of which are beyond the control of the Commonwealth. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate," and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

Descriptions of the Corporation, the Commonwealth, the 2003 Bonds, the respective Trust Agreements (as such term is defined below) and certain other documents are included in this Official Statement. Such descriptions do not purport to be comprehensive or definitive. All references herein to the respective Trust Agreements and other documents are qualified in their entirety by reference to each such document. References herein to the 2003 Bonds are qualified in their entirety by reference to the form thereof. Unless otherwise defined herein, capitalized terms used herein shall have the meaning set forth in the respective Trust Agreements, summaries of which are included as *Appendix I, II* and *III* to this Official Statement. The resolutions of the Corporation authorizing the issuance of each of the series of 2003 Bonds (collectively, the "Resolutions") and each of the aforesaid documents are available for inspection at the offices of the Corporation, located at Minillas Government Center, De Diego Avenue, Stop 22, San Juan, Puerto Rico 00940.

**Series A Bonds**

The Series A Bonds will be issued pursuant to a certain trust agreement, dated December 27, 2001 (the "Act 164 Trust Agreement"), between the Corporation and The Bank of New York, as trustee (the "Act 164 Trustee") for the purpose of providing the Corporation with the necessary funds to (i) purchase from Government Development Bank a promissory note (the "Series 2003 A Note") issued by Puerto Rico Land Authority, a public corporation of the Commonwealth (the "Land Authority"), at a price equal to the principal amount thereof plus accrued interest, and (ii) pay costs of issuance of the Series A Bonds.

The Series A Note and certain other promissory notes of certain departments, agencies, instrumentalities and public corporations of the Commonwealth (the "Authorized Debtors") previously purchased by the Corporation were issued in connection with the restructuring and refinancing of certain loans made by Government Development Bank to such Authorized Debtors pursuant to the terms of Act Number 164 of the Legislature of Puerto Rico, approved December 17, 2001 ("Act 164"). The Corporation previously issued its 2001 Series C Bonds, 2001 Series D Bonds, 2001 Series E Bonds, 2002 Series A Bonds and 2002 Series B Bonds (collectively, together with the Series A Bonds, the "Act 164 Bonds") in the aggregate initial principal amount of $2,500,440,326.25 for the purpose of providing the Corporation with the necessary funds to purchase from Government Development Bank such other promissory notes. All promissory notes issued by the Authorized Debtors pursuant to Act 164 which are purchased by the Corporation (including the Series 2003 A Note) are referred to herein as the "Act 164 Notes."

Additional bonds may be issued under the Act 164 Trust Agreement only to (i) refund any outstanding Act 164 Bonds, (ii) fund a reserve account, if applicable, (iii) pay capitalized interest with respect to any such additional bonds, and (iv) pay the cost of issuance of such additional bonds.

The Series A Bonds and the other outstanding Act 164 Bonds are limited obligations of the Corporation, payable solely from and secured by Pledged Revenues (as defined in the Act 164 Trust Agreement), consisting of payments of principal of and interest on the Act 164 Notes and other amounts deposited to the credit of the Puerto Rico Public Finance Corporation Act 164 Sinking Fund (the "Act 164 Sinking Fund") established under

2

the Act 164 Trust Agreement, including the investment earnings thereon. Payments of principal and interest under the Act 164 Notes will be made solely from budgetary appropriations to be made by the Legislature of Puerto Rico ("Legislative Appropriations") pursuant to Act 164. Act 164 requires the Office of Management and Budget to include in the operating budget of the Commonwealth, submitted annually to the Legislature of the Commonwealth, the amounts necessary, up to a maximum of $225 million per Fiscal Year, to pay the principal of and interest on the Act 164 Notes as they become due. If the Legislative Appropriations provided for under Act 164 are made on a timely basis each year and in the required amounts, payments of principal and interest required to be made under the Act 164 Notes will at all times be sufficient to pay the principal of and interest on the Series A Bonds and other outstanding Act 164 Bonds as they become due and payable. The Legislature of Puerto Rico is not legally bound to appropriate funds for such payments. See *Source of Payment and Security for the Series A Bonds*.

**Series B Refunding Bonds**

The Series B Refunding Bonds will be issued pursuant to a certain trust agreement, dated June 30, 1995 (the "Act 113 Trust Agreement"), between the Corporation and Banco Santander Puerto Rico, as trustee (the "Act 113 Trustee") for the purpose of providing funds (i) to refund certain of the bonds designated Puerto Rico Public Finance Corporation 1995 Series A Bonds (the "1995 Series A Bonds"), Puerto Rico Public Finance Corporation 1995 Series C Refunding Bonds (the "1995 Series C Bonds") and Puerto Rico Public Finance Corporation 1996 Series D Refunding Bonds (the "1996 Series D Bonds," and together with the 1995 Series A Bonds and the 1995 Series C Bonds, the "Act 113 Refunded Bonds") in the amount and maturities identified in the table below and (ii) to pay costs of issuance of the Series B Refunding Bonds.

| Refunded Bonds | Maturity Date | Interest Rate* | Principal Amount to be Refunded** | Redemption Date | Redemption Price |
|---|---|---|---|---|---|
| 1995 Series A Bonds | | | | | |
| SERIAL | 2003 | 6.50% | $ 1,025,000.00 | At maturity | — |
| TERMS | 2013 | 7.05 | 9,645,000.00 | 08/01/05 | 101.5% |
| | 2020 | 7.15 | 7,315,000.00 | 08/01/05 | 101.5 |
| | 2020 | 7.20 | 45,735,000.00 | 08/01/05 | 101.5 |
| | 2025 | 7.25 | 55,285,000.00 | 08/01/05 | 101.5 |
| CABS | 2014 | 7.25 | 3,700,699.75 | 08/01/05 | 101.5 |
| | 2015 | 7.25 | 3,443,801.40 | 08/01/05 | 101.5 |
| | 2016 | 7.25 | 3,209,371.25 | 08/01/05 | 101.5 |
| | 2017 | 7.25 | 2,986,659.00 | 08/01/05 | 101.5 |
| | 2018 | 7.25 | 2,781,324.00 | 08/01/05 | 101.5 |
| | 2019 | 7.25 | 2,590,169.40 | 08/01/05 | 101.5 |
| | 2020 | 7.25 | 2,412,072.00 | 08/01/05 | 101.5 |
| | 2021 | 7.30 | 3,406,989.60 | 08/01/05 | 101.5 |
| | 2022 | 7.30 | 3,171,251.50 | 08/01/05 | 101.5 |
| | 2023 | 7.30 | 2,953,198.50 | 08/01/05 | 101.5 |
| | 2024 | 7.30 | 2,747,631.10 | 08/01/05 | 101.5 |
| | 2025 | 7.30 | 2,558,687.25 | 08/01/05 | 101.5 |
| 1995 Series C Bonds | | | | | |
| SERIALS | 2003 | 6.60 | 5,825,000 | At maturity | — |
| | 2004 | 6.60 | 4,740,000 | At maturity | — |
| TERMS | 2013 | 7.30 | 52,865,000 | 08/01/05 | 101.5 |
| | 2020 | 7.30 | 18,825,000 | 08/01/05 | 101.5 |
| 1996 Series D Bonds | | | | | |
| TERM | 2005 | 6.85 | 385,000 | (1) | — |

---

* Yield, in the case of Capital Appreciation Bonds.
** Accreted value as of August 1, 2005, in the case of Capital Appreciation Bonds.
(1) Payment on August 1, 2003 of an amortization requirement.

3

The Corporation will deposit the net proceeds of the Series B Refunding Bonds, together with other available monies, with the Act 113 Trustee, as escrow agent, under the terms of an escrow deposit agreement ("Act 113 Escrow Fund"). The net proceeds, together with such other monies, will be invested in Government Obligations (as defined in the Act 113 Trust Agreement) and obligations of the Federal Home Loan Mortgage Corporation, the principal of and interest on which when due, together with any monies deposited with the Act 113 Trustee remaining uninvested, will provide monies sufficient to pay the interest coming due on the Act 113 Refunded Bonds through their dates of redemption or at maturity and to pay the principal of and premium, if any, on the Act 113 Refunded Bonds on their dates of redemption or at maturity. The sufficiency of the amount so deposited, with investment earnings thereon, to accomplish the refunding of the Act 113 Refunded Bonds will be verified by Causey Demgen & Moore Inc. (the "Verification Agent").

Upon the deposit with the Act 113 Trustee of the Government Obligations and the obligations of the Federal Home Loan Mortgage Corporation referred to above, the Act 113 Refunded Bonds will, in the opinion of Bond Counsel, no longer be deemed to be outstanding under the Act 113 Trust Agreement.

The Corporation had previously issued the Act 113 Refunded Bonds and other bonds under the Act 113 Trust Agreement (collectively, together with the Series B Refunding Bonds, the "Act 113 Bonds") in the aggregate initial principal amount of $298,908,973.65 for the purpose of providing the Corporation with the funds necessary to purchase from Government Development Bank a promissory note (the "Act 113 Note") of Puerto Rico Maritime Shipping Authority ("PRMSA") issued pursuant to the terms of Act Number 113 of the Legislature of Puerto Rico, approved September 27, 1994, as amended ("Act 113").

Additional bonds may be issued under the Act 113 Trust Agreement only to (i) refund any outstanding Act 113 Bonds; (ii) fund a reserve account, if applicable; and (iii) pay the costs of issuance of such additional bonds.

The Series B Refunding Bonds and the other outstanding Act 113 Bonds are limited obligations of the Corporation, payable solely from and secured by the Pledged Revenues (as defined in the Act 113 Trust Agreement), consisting of payments of principal of and interest on the Act 113 Note and other amounts deposited to the credit of the Puerto Rico Public Finance Corporation Act 113 Sinking Fund established under the Act 113 Trust Agreement (the "Act 113 Sinking Fund"), including any monies on deposit to the credit of the reserve account established thereunder, and the investment earnings therefrom. Payments of principal and interest under the Act 113 Note will be made solely from Legislative Appropriations pursuant to Act 113. Act 113 provides that the Commonwealth shall honor the payment of principal of and interest on the Act 113 Note and that the Office of Management and Budget shall include in the operating budget of the Commonwealth submitted annually to the Legislature of the Commonwealth the amounts necessary to pay the principal of and interest on the Act 113 Note. If the Legislative Appropriations provided for under Act 113 are made on a timely basis each year and in the required amounts, payments of principal and interest required to be made under the Act 113 Note will at all times be sufficient to pay the principal of and interest on the Series B Refunding Bonds and other outstanding Act 113 Bonds as they become due and payable. The Legislature of Puerto Rico is not legally bound to appropriate funds for such payments. See *Source of Payment and Security for the Series B Refunding Bonds*.

**Series C Refunding Bonds**

The Series C Refunding Bonds will be issued pursuant to a certain trust agreement, dated April 23, 1996 (the "Act 163 Trust Agreement"), between the Corporation and Banco Santander Puerto Rico, as trustee (the "Act 163 Trustee") for the purpose of providing funds (i) to refund certain of the bonds designated Puerto Rico Public Finance Corporation 1996 Series E Bonds (the "1996 Series E Bonds") and Puerto Rico Public Finance Corporation 1996 Series F Bonds (the "1996 Series F Bonds," and together with the 1996 Series E Bonds, the

"Act 163 Refunded Bonds") in the amount and maturities identified in the table below and (ii) to pay costs of issuance of the Series C Refunding Bonds.

| Refunded Bonds | Maturity Date | Interest Rate[*] | Principal Amount to be Refunded[**] | Redemption Date | Redemption Price |
|---|---|---|---|---|---|
| 1996 Series E Bonds | | | | | |
| TERM | 2004 | (1) | $ 2,895,000.00 | (2) | — |
| 1996 Series F Bonds | | | | | |
| CABS | 2010 | 7.40% | 13,755,229.15 | 08/01/06 | 101.5% |
| | 2011 | 7.40 | 12,787,670.40 | 08/01/06 | 101.5 |
| | 2012 | 7.40 | 11,894,574.90 | 08/01/06 | 101.5 |
| | 2013 | 7.40 | 11,057,907.00 | 08/01/06 | 101.5 |
| | 2014 | 7.40 | 10,294,135.60 | 08/01/06 | 101.5 |

---

[*]   Yield, in the case of Capital Appreciation Bonds.
[**]   Accreted value as of August 1, 2006, in the case of Capital Appreciation Bonds.
(1)   Floating rate equal to 89.5% of the Applicable LIBID Rate (as defined in the Act 163 Trust Agreement).
(2)   Payment on August 1, 2003 of a sinking fund requirement.


The Corporation will deposit the net proceeds of the Series C Refunding Bonds, together with other available monies, with the Act 163 Trustee, as escrow agent, under the terms of an escrow deposit agreement ("Act 163 Escrow Fund"). The net proceeds, together with such other monies, will be invested in Government Obligations (as defined in the Act 163 Trust Agreement) of the type described in clauses (i) and (ii) of the definition of that term, the principal of and interest on which when due, together with any monies deposited with the Act 163 Trustee remaining uninvested, will provide monies sufficient to pay the interest coming due on the Act 163 Refunded Bonds through their dates of redemption or at maturity and to pay the principal of and premium, if any, on the Act 163 Refunded Bonds on their dates of redemption or at maturity. The sufficiency of the amount so deposited, with investment earnings thereon, to accomplish the refunding of the Act 163 Refunded Bonds will be verified by the Verification Agent.

Upon the deposit with the Act 163 Trustee of the Government Obligations referred to above, the Act 163 Refunded Bonds will, in the opinion of Bond Counsel, no longer be deemed to be outstanding under the Act 163 Trust Agreement.

The Corporation had previously issued the Act 163 Refunded Bonds and other bonds under the Act 163 Trust Agreement (collectively, together with the Series C Refunding Bonds, the "Act 163 Bonds") in the aggregate initial principal amount of $192,108,734.65 for the purpose of providing the Corporation with the funds necessary to purchase from Government Development Bank a promissory note (the "Act 163 Note") of the Department of the Treasury of Puerto Rico (the "Treasury Department") issued pursuant to the terms of Act Number 163 of the Legislature of Puerto Rico, approved August 11, 1995, as amended ("Act 163").

Additional bonds may be issued under the Act 163 Trust Agreement only to (i) refund any outstanding Act 163 Bonds; (ii) fund a reserve account, if applicable; and (iii) pay the costs of issuance of such additional bonds.

The Series C Refunding Bonds and the other outstanding Act 163 Bonds are limited obligations of the Corporation, payable solely from and secured by Pledged Revenues (as defined in the Act 163 Trust Agreement), consisting of payment of principal of and interest on the Act 163 Note and other amounts deposited to the credit of the Bond Fund established under the Act 163 Trust Agreement (the "Act 163 Bond Fund"),

including any monies deposited to the credit of the reserve account established thereunder, and the investment earnings therefrom. Payments of principal and interest under the Act 163 Note will be made solely from Legislative Appropriations pursuant to Act 163. Act 163 provides that the Commonwealth shall honor the payment of principal of and interest on the Act 163 Note and that the Office of Management and Budget shall include in the operating budget of the Commonwealth submitted annually to the Legislature of the Commonwealth the amounts necessary to pay the principal of and interest on the Act 163 Note. If the Legislative Appropriations provided for under Act 163 are made on a timely basis each year and in the required amounts, payments of principal and interest required to be made under the Act 163 Note will at all times be sufficient to pay the principal of and interest on the Series C Refunding Bonds and other outstanding Act 163 Bonds as they become due and payable. The Legislature of Puerto Rico is not legally bound to appropriate funds for such payments. See *Source of Payment and Security for the Series C Refunding Bonds*.

## USE OF PROCEEDS

The sources and uses of bond proceeds are set forth below.

**Sources:**

| | |
|---|---|
| Principal Amount of the Series A Bonds | $ 47,935,000.00 |
| Principal Amount of the Series B Refunding Bonds | 272,560,000.00 |
| Initial Principal Amount of the Series C Refunding Bonds | 61,244,786.55 |
| Original Issue Discount | (800,025.00) |
| Total Sources...................................................................................................... | $380,939,761.55 |

**Uses:**

| | |
|---|---|
| Purchase of the Series 2003 A Note (principal and accrued interest) | $ 47,333,429.85 |
| Deposit to Act 113 Escrow Fund | 268,892,969.06 |
| Deposit to Act 163 Escrow Fund | 60,525,072.81 |
| Underwriting discount, legal, printing and other costs of issuance | 4,188,289.83 |
| Total Uses........................................................................................................... | $380,939,761.55 |

## PUERTO RICO PUBLIC FINANCE CORPORATION

The Corporation is a subsidiary corporation of Government Development Bank, created pursuant to Resolution Number 5044 of the Board of Directors of Government Development Bank, as amended ("Resolution No. 5044"), adopted pursuant to the authority granted under Act Number 17 of the Legislature of Puerto Rico, approved September 23, 1948, as amended. The Corporation is exempt from the payment of any Commonwealth taxes on its revenues and properties and constitutes an independent governmental instrumentality of the Commonwealth, separate and apart from Government Development Bank. The obligations of the Corporation are not obligations of Government Development Bank. For additional information regarding the Corporation and Government Development Bank, see "Government Development Bank for Puerto Rico" under *Public Corporations* in the Commonwealth Report.

6

The Board of Directors of the Corporation consists of the same members of the Board of Directors of Government Development Bank, who are the following:

| Member | Occupation | Expiration Date |
|---|---|---|
| Juan Agosto Alicea, Chairman | Executive Director, Puerto Rico Aqueduct and Sewer Authority | September 22, 2004 |
| Fermín Contreras Bordallo, Vice Chairman | Private investor | September 22, 2003 |
| Melba Acosta Febo | Director, Office of Management and Budget | September 22, 2006 |
| Juan A. Flores Galarza | Secretary of the Treasury | September 22, 2004 |
| Samuel H. Jové Fontán | President, BMJ Foods of Puerto Rico, Inc. | September 22, 2003 |
| Carmen Conde Torres | Attorney at law | September 21, 2004 |
| Milton Segarra Pancorbo | Secretary, Department of Economic Development and Commerce | September 23, 2006 |

The following individuals are currently officers of the Corporation:

*Héctor Méndez Vázquez*, President, is also President of Government Development Bank. He took office on July 1, 2002. At the time of this appointment, he was Executive Vice President and Treasurer of Government Development Bank, a position he held since February 2001. He obtained a Bachelor's degree in Business Administration with a major in Accounting and Management from the University of Puerto Rico, and a Master's degree in Finance and International Trade from Inter American University of Puerto Rico. He is licensed as a Certified Trading Advisor by the Commodity Futures Trading Commission and as a Financial Advisor by the Puerto Rico Commissioner of Financial Institutions. He has vast experience in securities arbitrage, rate risk management, and future swaps and options. He began his professional career with The Chase Manhattan Bank in Puerto Rico in 1974 as an internal auditor. In 1977, he joined Banco Central Hispano Puerto Rico, where he occupied several management positions, including Executive Vice President and member of the Board of Directors.

*Carlos M. Piñeiro*, Executive Vice President, is also Executive Vice President of Government Development Bank, a position he assumed in 2002. Prior to joining Government Development Bank, Mr. Piñeiro held various positions in investment banking in Chicago, Illinois, and was Executive Vice President of a Puerto Rico health care institution. Mr. Piñeiro received a Bachelor's of Science degree in Industrial Engineering from Lehigh University, and a Master in Business Administration from the University of Michigan Business School.

*María de Lourdes Rodríguez*, Acting General Counsel, is also Acting General Counsel of Government Development Bank, a position she assumed in 2003. Prior to joining Government Development Bank, Ms. Rodríguez worked as an attorney in private practice in the Corporate and Environmental Law areas. Ms. Rodríguez received a Bachelor's degree from The Catholic University of America in Washington, D.C., and a law degree from University of Puerto Rico Law School.

*Olga L. Ortiz*, Secretary of the Board of Directors of the Corporation, is also Secretary of the Board of Directors of Government Development Bank.

Pursuant to Resolution No. 5044, the Corporation has the authority, among other things, to issue bonds and other obligations for borrowed money payable out of all or any part of funds received in payment of the principal of and interest on securities of governmental instrumentalities of the Commonwealth purchased by the Corporation or any other funds or assets of the Corporation as provided by the resolution or trust agreement authorizing the issuance of its bonds.

# THE 2003 BONDS

## General

The 2003 Bonds are being issued as registered bonds without coupons and will be initially registered only in the name of Cede & Co., as nominee of The Depository Trust Company ("DTC"), New York, New York, which will act as securities depository for the 2003 Bonds. The 2003 Bonds will be available to purchasers in denominations of $5,000 principal amount or maturity amount (in the case of capital appreciation bonds) and any integral multiple thereof only under the book-entry system maintained by DTC through brokers and dealers who are, or act through, DTC Participants (as defined herein).  Purchasers will not receive physical delivery of the 2003 Bonds. So long as any purchaser is the Beneficial Owner (as defined herein) of a 2003 Bond, such purchaser must maintain an account with a broker or dealer who is, or acts through, a DTC Participant to receive payment of principal of and interest on such 2003 Bonds. See "Book-Entry Only System" below.

The 2003 Bonds are being issued pursuant to each of their respective Resolutions and Trust Agreements. The 2003 Bonds will be issued in such aggregate principal amounts or initial principal amounts (in the case of capital appreciation bonds) and will be stated to mature as set forth on the inside cover page of this Official Statement.

Interest on the 2003 Bonds will accrue from their date of issue at the rates set forth on the inside cover page of this Official Statement, and will be payable, except in the case of capital appreciation bonds,  monthly on the first day of each month, commencing on August 1, 2003, until their respective maturities.  Interest on the capital appreciation bonds will compound semi-annually on each August 1 and February 1, commencing on August 1, 2003, and will be payable at maturity or redemption.

Interest on the capital appreciation bonds will accrue from their date of issue.  Such interest will be added to the accreted value of such bonds (which is initially equal to their initial principal amount) on the first day of each August 1 and February 1 (each a "Valuation Date"), and will be payable at maturity or redemption. *Appendix VI* sets forth a table of the accreted values of the capital appreciation bonds on each Valuation Date. On any date other than a Valuation Date, the accreted value of the capital appreciation bonds will be equal to the sum of (a) the accreted value on the preceding Valuation Date (or, if there is no preceding Valuation Date, the initial principal amount) and (b) the product of (1) a fraction, the numerator of which is the number of days having elapsed from the preceding Valuation Date (or from the original issue date if there is no preceding Valuation Date) and the denominator of which is the number of days from such preceding Valuation Date (or from the original issue date if there is no preceding Valuation Date) to the next succeeding Valuation Date and (2) the difference between the accreted values for such Valuation Dates (or between the initial principal amount and the accreted value on the first Valuation Date).

Interest will be calculated on the basis of a 360-day year of twelve 30-day months.

## Optional Redemption

At the option of the Corporation, and upon at least 30 days' notice, the 2003 Bonds maturing on or after August 1, 2012, are subject to redemption, from any monies available for that purpose under the respective Trust Agreements (other than from monies set aside with respect to an Amortization Requirement applicable to such Bonds), prior to maturity, in whole or in part, on any date not earlier than August 1, 2011, as directed by the Corporation, at the redemption prices (expressed as a percentage of principal amount or accreted value, in the case of the capital appreciation bonds) set forth in the table below, together with accrued interest to the dates fixed for redemption in the case of the serial and term bonds.

| Period During Which Redeemed | Redemption Price |
|---|---|
| August 1, 2011 through July 31, 2012 | 102% |
| August 1, 2012 through July 31, 2013 | 101 |
| August 1, 2013 and thereafter | 100 |

## Mandatory Redemption

*Series A Bonds*

The Series A Bonds maturing on August 1, 2018 and August 1, 2025 (the "Series A Term Bonds"), are subject to redemption upon at least 30 days' notice, to the extent of their Amortization Requirement set forth below, commencing on August 1, 2014 and 2019, respectively, and on August 1 of each year thereafter, at a redemption price of par plus accrued interest to the dates fixed for redemption.

Amortization Requirement for the Series A Term Bonds means the principal amount fixed for the retirement by purchase or redemption of Series A Term Bonds in any Bond Year (the period from August 1 to July 31 of the following year), as provided for in the Act 164 Trust Agreement. The Amortization Requirement shall be the principal amount for each Bond Year fixed in the respective Resolution and the aggregate amount of the Amortization Requirement for the Series A Term Bonds shall be equal to the aggregate principal amount of such Series A Term Bonds.

### Amortization Requirements for Series A Bonds due August 1,

| Year | 2018 | 2025 |
|---|---|---|
| 2014 | $1,985,000 | |
| 2015 | 2,085,000 | |
| 2016 | 2,190,000 | |
| 2017 | 2,300,000 | |
| 2018 | 2,415,000[*] | |
| 2019 | | $2,535,000 |
| 2020 | | 2,670,000 |
| 2021 | | 2,805,000 |
| 2022 | | 2,950,000 |
| 2023 | | 3,100,000 |
| 2024 | | 3,260,000 |
| 2025 | | 3,430,000[*] |
| **Average life (years)** | **13.16** | **19.26** |

[*] Maturity

If at the close of any Bond Year the total principal amount of the Series A Term Bonds retired by purchase or redemption or called for redemption under the provisions of the Act 164 Trust Agreement during such Bond Year shall be in excess of the amount of the Amortization Requirement for such Bond Year, then the amount of the Amortization Requirement shall be reduced for such subsequent Bond Years in such amounts aggregating the amount of such excess as shall be determined by the President of the Corporation in an order filed with the Act 164 Trustee on or before the 15th day of August following the close of such Bond Year.

*Series B Refunding Bonds*

The Series B Refunding Bonds maturing on August 1, 2018 and August 1, 2025 (the "Series B Term Bonds"), are subject to redemption upon at least 30 days' notice, to the extent of their Amortization Requirement set forth below, commencing on August 1, 2014 and 2019, respectively, and on August 1 of each year thereafter, at a redemption price of par plus accrued interest to the dates fixed for redemption.

Amortization Requirement for the Series B Term Bonds means the principal amount fixed for the retirement by purchase or redemption of Series B Term Bonds in any Bond Year (the period from August 1 to July 31 of the following year), as provided for in the Act 113 Trust Agreement. The Amortization Requirement shall be the principal amount for each Bond Year fixed in the respective Resolution and the aggregate amount of the Amortization Requirement for the Series B Term Bonds shall be equal to the aggregate principal amount of such Series B Term Bonds.

**Amortization Requirements for
Series B Bonds due August 1,**

| Year | 2018 | 2025 |
|------|------|------|
| 2014 | $13,315,000 | |
| 2015 | 14,010,000 | |
| 2016 | 14,745,000 | |
| 2017 | 15,510,000 | |
| 2018 | 16,325,000* | |
| 2019 | | $17,175,000 |
| 2020 | | 18,090,000 |
| 2021 | | 18,710,000 |
| 2022 | | 19,700,000 |
| 2023 | | 20,740,000 |
| 2024 | | 21,845,000 |
| 2025 | | 22,995,000* |
| **Average life (years)** | **13.16** | **19.25** |

\* Maturity

If at the close of any Bond Year the total principal amount of the Series B Term Bonds retired by purchase or redemption or called for redemption under the provisions of the Act 113 Trust Agreement during such Bond Year shall be in excess of the amount of the Amortization Requirement for such Bond Year, then the amount of the Amortization Requirement shall be reduced for such subsequent Bond Years in such amounts aggregating the amount of such excess as shall be determined by the President of the Corporation in an order filed with the Act 113 Trustee on or before the 15th day of August following the close of such Bond Year.

**Notice and Effect of Redemption**

Any redemption of the 2003 Bonds, either in whole or in part, shall be made upon at least 30 days' notice by mail to DTC or, if the book-entry only system as described below has been discontinued, by first class mail, postage prepaid, to all registered owners in the manner and under the terms and conditions provided in the respective Trust Agreement. On the date designated for redemption, notice having been given as provided in the respective Trust Agreement and monies for payment of the principal (or accreted value, in the case of capital appreciation bonds) of and redemption premium, if any, and the interest on the 2003 Bonds or portions thereof so called for redemption being held by the respective Trustee, interest on the 2003 Bonds or portions thereof so

called for redemption shall cease to accrue. Subject to certain provisions of the respective Trust Agreement, 2003 Bonds and portions thereof which have been duly called for redemption under the provisions of the respective Trust Agreement, or with respect to which irrevocable instructions to call for redemption or to pay at maturity have been given, and for which sufficient monies or investments permitted by the respective Trust Agreement are held in a separate account for the payment of the principal of (or accreted value, in the case of capital appreciation bonds) and redemption premium, if any, and the interest on the 2003 Bonds or portions thereof to be paid or redeemed, such 2003 Bonds shall not be deemed to be outstanding under the respective Trust Agreement, and the registered owners thereof shall have no rights with respect thereto, except to receive payment of the principal (or accreted value, in the case of capital appreciation bonds) thereof and redemption premium, if any, and the interest therein from such separate account.

Each notice of redemption shall contain, among other things, the CUSIP identification number of the 2003 Bonds (or portions thereof) being called for redemption, the redemption date and price, and the address at which such 2003 Bonds are to be surrendered for payment of the redemption price. Any defect in such notice or the failure to mail any such notice to DTC will not affect the validity of the proceedings for the redemption of any other 2003 Bond.

If less than all the 2003 Bonds of any maturity of a particular series are called for redemption, the particular 2003 Bonds or portions thereof to be redeemed shall be selected by the respective Trustee, as the case may be, in such manner as it in its discretion may determine to be appropriate and fair, except that so long as the book-entry only system remains in effect, in the event of any such partial redemption, DTC shall reduce the credit balances of the applicable DTC Participants with respect to the applicable series and maturity of the 2003 Bonds and such DTC Participants shall in turn select those Beneficial Owners (as defined herein) whose ownership interests are to be extinguished by such partial redemption, each by such method as DTC or such DTC Participant, as the case may be, in its sole discretion, deems fair and appropriate.

**Book-Entry Only System**

The following information concerning DTC and DTC's book-entry system has been obtained from DTC and neither the Corporation nor the Underwriters take any responsibility for the accuracy thereof.

DTC will act as securities depository for the 2003 Bonds. The 2003 Bonds will be issued as fully registered bonds in the name of Cede & Co. (DTC's partnership nominee) or such other nominee as may be requested by an authorized representative of DTC. One fully registered 2003 Bond will be issued for each maturity of each series of the 2003 Bonds in the aggregate principal amount of such maturity of such series and will be deposited with DTC.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 2 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments from over 85 countries that DTC's participants (the "Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Government Securities Clearing Corporation, MBS Clearing Corporation, and Emerging Markets Clearing

Corporation, (NSCC, GSCC, MBSCC, and EMCC are also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has Standard & Poor's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com.

Purchases of the 2003 Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the 2003 Bonds on DTC's records. The ownership interest of each actual purchaser of a 2003 Bond (a "Beneficial Owner") will in turn be recorded in the Direct or Indirect Participants' records. Beneficial Owners will not receive written confirmations from DTC of their purchases, but Beneficial Owners are expected to receive written confirmation providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the 2003 Bonds will be accomplished by entries made on the books of Direct or Indirect Participants acting on behalf of the Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interest in 2003 Bonds except in the event that use of the book-entry only system for the 2003 Bonds is discontinued.

To facilitate subsequent transfers, all 2003 Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. The deposit of 2003 Bonds with DTC and their registration in the name of Cede & Co. effect no change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the 2003 Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such 2003 Bonds are credited, which may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices will be sent to Cede & Co. If less than all of the 2003 Bonds within a maturity and series are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in the 2003 Bonds to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the 2003 Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Corporation as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the 2003 Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the 2003 Bonds will be made to Cede & Co. or to such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Corporation or the respective Trustee, on the payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name", and will be the responsibility of such Participant and not of DTC, the Corporation or any of the Trustees, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other

nominee as may be requested by an authorized representative of DTC) is the responsibility of the Corporation or the respective Trustee, disbursement of such payments to Direct Participants shall be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners shall be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the 2003 Bonds at any time by giving reasonable notice to the Corporation and the respective Trustees. Under such circumstances, in the event that a successor securities depository is not obtained, definitive 2003 Bonds are required to be printed and delivered.

The Corporation may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, definitive 2003 Bonds will also be printed and delivered.

**Payments and Transfers**

No assurance can be given by the Corporation, the Underwriters or any of the Trustees that DTC will make prompt transfer of payments to the Direct Participants or that Direct Participants will make prompt transfer of payments to Indirect Participants or to Beneficial Owners. The Corporation, the Underwriters and the Trustees are not responsible or liable for payment by DTC or Participants or for sending transaction statements or for maintaining, supervising or reviewing records maintained by DTC or Participants.

*The Corporation, the Underwriters and the Trustees will have no responsibility or obligation to such Direct Participants, Indirect Participants, or the persons for whom they act as nominees with respect to the payments to or the providing of notice for the Direct Participants, the Indirect Participants, or the Beneficial Owners. Payments made to DTC or its nominee shall satisfy the obligations of the Corporation to the extent of such payments.*

For every transfer of the 2003 Bonds, the Beneficial Owner may be charged a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto.

**Discontinuance of Book-Entry Only System**

In the event that such book-entry only system is discontinued for the 2003 Bonds, the following provisions will apply to the 2003 Bonds: principal of the 2003 Bonds and redemption premium, if any, thereon will be payable in lawful money of the United States of America at the principal corporate trust office of the respective Trustee in New York, New York or San Juan, Puerto Rico, as the case may be. Interest on the 2003 Bonds (other than capital appreciation bonds) will be payable monthly on the first day of each month, by check mailed to the respective addresses of the registered owners thereof as shown on the registration books of the Corporation maintained by the respective Trustee, as of the close of business on the record date therefor as set forth in the respective Trust Agreement, as applicable. The 2003 Bonds will be issued only as registered bonds without coupons in authorized denominations. The transfer of the 2003 Bonds will be registrable and the 2003 Bonds may be exchanged at the principal corporate trust office of the respective Trustee in New York, New York or San Juan, Puerto Rico, as the case may be, upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

## SOURCE OF PAYMENT AND SECURITY FOR THE SERIES A BONDS

**General**

The Series A Bonds and other outstanding Act 164 Bonds are payable solely from and are secured by the Act 164 Pledged Revenues. Act 164 Pledged Revenues consist of payments of principal of and interest on the Act 164 Notes, which are required to be deposited to the credit of the Act 164 Bond Service Account and Act 164 Redemption Account established under the Act 164 Trust Agreement, any other monies deposited to the credit of those Accounts, including investment earnings thereon, and the monies on deposit in the Act 164 Surplus Account established under the Act 164 Trust Agreement, including investment earnings thereon. Under the Act 164 Trust Agreement, the Corporation pledged to the Act 164 Trustee, for the benefit of the holders of the Act 164 Bonds, the Act 164 Notes previously purchased by the Corporation, and will similarly pledge the Series 2003 A Note. See *Appendix I - Summary of the Act 164 Trust Agreement*.

**Act 164 and Act 164 Notes**

Prior to the issuance of any of the Act 164 Bonds, Government Development Bank held approximately $2.4 billion in loans made to Authorized Debtors. These loans had been made by Government Development Bank for the purpose of funding, among other things, capital expenditures and operating deficits of the Authorized Debtors. Prior to the enactment of Act 164, the loans did not have an established source of repayment. The Legislature of Puerto Rico approved Act 164 in order to provide a source of repayment for these loans and enable Government Development Bank to sell the loans in the capital markets through bond issues of the Corporation.

Act 164 required Authorized Debtors to negotiate and execute with Government Development Bank the agreements necessary to recognize, formalize, restructure and/or refinance the loans and to finance all expenses incurred in connection therewith. Act 164 provides that the Commonwealth, through budgetary appropriations during the next thirty Fiscal Years, commencing with Fiscal Year 2001-2002, will pay the principal of and interest on the loans as the same may be restructured and/or refinanced under Act 164. Act 164 provides, however, that such budgetary appropriations shall not exceed $225 million per Fiscal Year.

In connection with the issuance in 2001 and 2002 of the previously issued Act 164 Bonds, Government Development Bank and the Corporation entered into Debt Restructuring and Assignment Agreements with the Authorized Debtors whereby the Authorized Debtors restructured and refinanced their corresponding loans. Pursuant to such Debt Restructuring and Assignment Agreements, the Authorized Debtors executed the Act 164 Notes (other than the Series 2003 A Note) and the Corporation issued the Act 164 Bonds (other than the Series A Bonds) and applied the net proceeds therefrom to purchase the Act 164 Notes (other than the Series 2003 A Note) from Government Development Bank, without recourse to Government Development Bank. Similarly, on the date of delivery of the Series A Bonds, the Corporation will apply the net proceeds therefrom to purchase the Series 2003 A Note from Government Development Bank, without recourse to Government Development Bank.

Under the Debt Restructuring and Assignment Agreements, Government Development Bank has agreed that it will not restructure and refinance any loan if, as a result thereof, the annual interest, principal and other payments required to be made by the Authorized Debtors under the Act 164 Notes and loans would exceed $225 million per Fiscal Year.

Under the Act 164 Notes, the Authorized Debtors are required to make, on or before July 15 of each Fiscal Year, commencing July 15, 2002, payments thereunder equal to the sum of the following amounts, without duplication: (i) the interest on, principal of, redemption premium, if any, and accreted value of the Act 164 Bonds which is due and payable in the Bond Year which begins during such Fiscal Year (whether at maturity, in connection with an Amortization Requirement, upon redemption or otherwise) less any amounts

14

available in the Act 164 Sinking Fund for the payment of such amounts in such Bond Year; (ii) any fees, expenses or other amounts becoming due and payable in such Bond Year to the provider (a "Facility Provider"), if applicable, of a credit facility or a liquidity facility (each a "Facility") under the agreement relating to such Facility or any amounts required to reimburse a Facility Provider for payments made under any such Facility in respect of the Act 164 Bonds and not theretofore reimbursed; (iii) if applicable, all payments required to be made by the Corporation under any Swap Agreement (as defined in the Act 164 Trust Agreement) (such payments being called the "Corporation Swap Payments") expected to be due and payable for such Bond Year (to the extent not already included in the portion corresponding to interest on the Act 164 Bonds); (iv) any fees or reimbursement for expenses payable to the Act 164 Trustee under the Act 164 Trust Agreement; (v) if applicable, any amount then due by the Corporation to the Hedge Counterparty (as defined in the Act 164 Trust Agreement) for breakage cost or other termination payment under the terms of any Swap Agreement; and (vi) any other amount becoming due and payable in such Bond Year in respect of the Act 164 Bonds or becoming due and payable under the provisions of the Act 164 Trust Agreement. See *Appendix I - Summary of the Act 164 Trust Agreement.* The aggregate principal and interest installments required to be paid under the Act 164 Notes will be sufficient to cover the aggregate principal amount of and the aggregate annual amount of interest payable on the Act 164 Bonds, together with fees, expenses and other amounts payable by the Corporation or the Act 164 Trustee with respect to the Act 164 Bonds.

The Act 164 Notes are payable solely from Legislative Appropriations made pursuant to Act 164. Act 164 provides that (i) the Commonwealth shall honor, by means of budgetary appropriations, the payment of principal of and interest on the Act 164 Notes and loans, (ii) the Office of Management and Budget shall include in the operating budget of the Commonwealth submitted annually to the Legislature of Puerto Rico in each of the succeeding thirty Fiscal Years, commencing with Fiscal Year 2001-2002, the amounts necessary to pay the principal of and interest on the Act 164 Notes and loans, up to a maximum annual amount of $225 million per Fiscal Year, and (iii) the budgetary appropriations made thereunder may be used only for the payment of principal of and interest on the Act 164 Notes and loans and related costs, and are not subject to third party claims. The proposed budget for Fiscal Year 2003-2004 contains an appropriation in respect of the Act 164 Notes and loans in an amount sufficient to pay debt service thereon through and including July 1, 2004.

The funds to be provided by the Commonwealth to make the payments required under the Act 164 Notes and loans are subject to and conditioned upon the appropriation of such funds by the Legislature of Puerto Rico in the annual budget of the Commonwealth. If all required annual Legislative Appropriations are made in full and all payments of principal and interest due under the Act 164 Notes are timely paid, such payments will be sufficient to pay the principal of and interest on the Act 164 Bonds as the same become due and payable, together with all amounts payable under the Act 164 Trust Agreement. **The failure to make annual Legislative Appropriations in the amounts required would cause a shortfall in the monies available under the Act 164 Notes to pay principal and interest due on the Act 164 Bonds.**

The principal of, redemption premium, if any, and interest on the Act 164 Bonds will be payable solely from the Legislative Appropriations made pursuant to Act 164 and other sources described above. **The Legislature of Puerto Rico is not legally bound to appropriate sufficient amounts to timely pay the principal of, redemption premium, if any, and interest due on the Act 164 Bonds. There is no assurance that sufficient funds will be appropriated or otherwise made available to make such payments on the Act 164 Bonds.** For a discussion of Puerto Rico's budgetary process, see *Budgetary Process and Payment of Commonwealth Obligations* below and the Commonwealth Report, which is incorporated herein by reference.

Bondholders have no legal recourse to require the Legislature of Puerto Rico to appropriate the funds necessary to timely pay the principal of, redemption premium, if any, and interest due on the Act 164 Bonds.

Neither the Corporation nor the Commonwealth has ever defaulted on the payment of principal of or interest on any of its debt.

**Investment of Funds**

Pending their application for the payment of principal of and interest on the Act 164 Bonds on the dates required, funds on deposit in the Act 164 Sinking Fund (including funds representing the Legislative Appropriation) shall be invested by the Act 164 Trustee as required by the Act 164 Trust Agreement. Pursuant to the Act 164 Trust Agreement, such funds may be invested, among other investments, in an investment agreement with a financial institution which has a long term debt rating in one of the three highest rating categories by Moody's Investors Service ("Moody's") and Standard & Poor's Ratings Services ("Standard & Poor's") (without regards to any gradations within such categories). Losses incurred in connection with such investments may result in a shortfall in the monies available to pay principal and interest due on the Act 164 Bonds. See *Appendix I - Summary of the Act 164 Trust Agreement.*

**Letter of Credit**

Under the Commonwealth's Constitution, if the annual budget of capital expenditures and operating expenses of the Commonwealth for a Fiscal Year has not been adopted by June 30 of the preceding Fiscal Year, the budget for such preceding Fiscal Year is automatically renewed for the ensuing Fiscal Year, until a new budget for such succeeding Fiscal Year is approved by the Legislature of Puerto Rico and the Governor. This means that if the debt service on the Act 164 Notes for any Fiscal Year and, therefore, the annual budgetary appropriation for such Fiscal Year is less than the debt service on the Act 164 Notes in the immediately succeeding Fiscal Year, then in the case of a delay in the approval of the budget for such succeeding Fiscal Year, pending approval of the new budget, the budgetary appropriation that would carry over and be available to meet debt service on the Act 164 Notes for such succeeding Fiscal Year would be insufficient to meet the debt service on the Act 164 Notes. See *Budgetary Process and Payment of Commonwealth Obligations.*

Prior to the issuance of the Series A Bonds, the maximum increase from one Fiscal Year to the next in the aggregate debt service on the Act 164 Notes and the loans remaining with Government Development Bank (the "Maximum Difference"), and thus, the maximum difference in the annual budgetary appropriation under Act 164 from one Fiscal Year to the next with respect to the payment of debt service on the Act 164 Notes and such loans, as estimated by Government Development Bank based on its projected schedule of amortization of principal of such loans, is approximately $50,000,000.

To cover the risk that in any year during the term of the Act 164 Bonds the budget is not adopted prior to June 30 and the budgetary appropriation that automatically carries over from the prior Fiscal Year may be insufficient to cover fully the debt service payments on the Act 164 Bonds during the ensuing Bond Year, Government Development Bank issued an irrevocable, transferable standby letter of credit (the "Act 164 Letter of Credit") in favor of the Act 164 Trustee solely for the benefit of the owners of the Act 164 Bonds. The Act 164 Letter of Credit is in the stated amount of $50,000,000, which amount represents the estimated Maximum Difference throughout the term of the Act 164 Bonds, as discussed above. The Act 164 Letter of Credit enables the Act 164 Trustee to draw up to the full amount thereunder unless: (i) on or prior to the third Business Day immediately preceding August 1 of each Fiscal Year during the term of the Act 164 Bonds it receives written notice from the Corporation to the effect that the operating budget of the Commonwealth for such Fiscal Year has been adopted, or (ii) the Act 164 Trustee has otherwise received funds representing the full amount of the principal and interest due with respect to the Act 164 Bonds for the Bond Year commencing within such Fiscal Year. In connection with the issuance of additional Act 164 Bonds such as the Series A Bonds, the Act 164 Trustee may be required to consent to amendments to the Act 164 Letter of Credit or release the Act 164 Letter of Credit in exchange for a new letter of credit from Government Development Bank or another financial institution meeting the requirements of the Act 164 Trust Agreement. Such amended Act 164 Letter of Credit or successor letter of credit would be in a stated amount higher or lower than the stated amount of the Act 164 Letter of Credit to the extent the Maximum Difference increases or decreases as a result of the issuance of

16

additional Act 164 Bonds.  See "Limitation on Additional Bonds" under *Source of Payment and Security for the Series A Bonds*.

The Act 164 Letter of Credit will expire on August 15, 2030.  The stated amount of the Act 164 Letter of Credit will be reduced by the amount of any drawing thereunder.  The Act 164 Letter of Credit will be reinstated in the amount of any drawing upon receipt by Government Development Bank of reimbursement of the full amount due to it with respect to such drawing.  The Act 164 Letter of Credit will not cover the risk that no appropriation is made by the Legislature of Puerto Rico under Act 164 for any particular Fiscal Year (or that an appropriation is made pursuant to Act 164 in an amount lower than the amount of debt service on the Act 164 Notes due with respect to any particular Fiscal Year).  If the budget for any particular Fiscal Year is adopted but no appropriation for the payment of the Act 164 Notes is included in such budget, the Act 164 Trustee may not make a draw under the Act 164 Letter of Credit.  The Act 164 Letter of Credit was issued pursuant to a Letter of Credit and Reimbursement Agreement, dated as of December 27, 2001, by and between the Corporation and the Government Development Bank.  *Appendix V* sets forth certain information with respect to Government Development Bank.

The Act 164 Trust Agreement permits the Corporation to substitute the Act 164 Letter of Credit or any successor letter of credit for a letter of credit in the same stated amount, for a term at least as long as the remaining term of the Act 164 Letter of Credit or the successor letter of credit being replaced, containing administrative provisions substantially similar to those of the Act 164 Letter of Credit and reasonably acceptable to the Act 164 Trustee and issued by a bank, banking association or trust company whose long-term debt obligations are rated at the time of issuance of such letter of credit in one of the three highest rating categories (without regard to any gradation within such rating category) by Standard & Poor's and Moody's.

**Flow of Funds**

Under the Act 164 Trust Agreement, the Corporation agrees to cause the Secretary of the Treasury to transfer to the Act 164 Trustee, no later than July 15 of each Fiscal Year while the Act 164 Bonds are outstanding, funds representing the entire Legislative Appropriation needed for the payment of all amounts due in respect of the Act 164 Notes (including principal of and interest on the Act 164 Bonds) for the immediately succeeding Bond Year, for deposit in the Act 164 Sinking Fund as described below.

Any Legislative Appropriation (or funds received in substitution therefor or with respect to the Act 164 Notes, including any monies received pursuant to a draw under the Act 164 Letter of Credit) and other funds received by the Act 164 Trustee, including any Hedge Counterparty Swap Payments (other than monies received from draws made under any Credit Facility or Liquidity Facility, other than the Act 164 Letter of Credit, which monies will be deposited in special subaccounts as provided in the Act 164 Trust Agreement) for the payment of principal of and interest on the Act 164 Bonds shall be deposited in the Act 164 Sinking Fund in the following order:

first, to the credit of the Act 164 Bond Service Account, such amount as may be required to make the total amount then to the credit of the Act 164 Bond Service Account equal to the sum of (i) the amount of interest then or to become due and payable on the Act 164 Bonds then outstanding during the Bond Year commencing within the Fiscal Year with respect to which such Legislative Appropriation is made or such funds are received; and (ii) the amount of principal then or to become due and payable not later than July 31 of such Bond Year on the serial bonds of each series then outstanding;

second, to the credit of the Act 164 Redemption Account, such amount as may be required to make the total amount then to the credit of the Act 164 Redemption Account in the Bond Year commencing within the Fiscal Year with respect to which such Legislative Appropriation is made or such funds are

17

received equal to the Amortization Requirement for such Bond Year for the term bonds of each series then outstanding; and

*third*, to the credit of the Act 164 Surplus Account, any remaining amount.

Under the Act 164 Trust Agreement, the Act 164 Trustee is required to make a draw under the Act 164 Letter of Credit on the second Business Day immediately preceding August 1 of any Bond Year unless it receives written notice from the Corporation prior to such date to the effect that a budget for the Fiscal Year commencing on the preceding July 1 has been adopted or it has otherwise received funds representing the full amount of principal and interest due with respect to the Act 164 Bonds for such Bond Year.

### No Acceleration of the Act 164 Bonds

The Act 164 Bonds, which include the Series A Bonds, are not subject to acceleration upon the occurrence of an event of default or otherwise.

### Limitation on Additional Bonds

No additional bonds may be issued under the Act 164 Trust Agreement except to (i) refund any outstanding Act 164 Bonds, (ii) fund a reserve account, if applicable, (iii) pay capitalized interest with respect to any additional bonds issued under the Act 164 Trust Agreement, or (iv) pay the costs of issuance of such additional bonds issued under the Act 164 Trust Agreement. All such additional bonds will be issued on a parity with the Act 164 Bonds and will be entitled to the same benefit and security under the Act 164 Trust Agreement.

No additional bonds may be issued unless the amounts of principal and interest payable under the Act 164 Notes (assuming timely payments under the Act 164 Notes) after the issuance of such additional bonds are sufficient to pay the principal of and interest on all outstanding bonds after the issuance of such additional bonds as the same become due, together with other amounts required to be paid by the Corporation with respect to the Act 164 Bonds, any outstanding Credit or Liquidity Facility, if applicable, or under the Act 164 Trust Agreement. In addition, no additional bonds may be issued unless the Act 164 Letter of Credit is amended to change the stated amount thereof or a successor letter of credit is issued in favor of the Act 164 Trustee, if necessary, so that in either case the stated amount of the Act 164 Letter of Credit or such successor letter of credit is not less than the estimated Maximum Difference after the issuance of such additional bonds as certified by the Corporation. Any successor letter of credit must be issued by a bank, banking association or trust company whose long-term debt obligations are rated at the time of issuance of such letter of credit in any of the three highest rating categories (without regard to any gradations within any such category) by Standard & Poor's and Moody's.

## SOURCE OF PAYMENT AND SECURITY FOR THE SERIES B REFUNDING BONDS

### General

The Series B Refunding Bonds and other outstanding Act 113 Bonds are payable solely from and are secured by the Act 113 Pledged Revenues, consisting of payments of principal of and interest on the Act 113 Note and monies deposited to the credit of the Act 113 Sinking Fund, including any monies on deposit in the Reserve Account established thereunder, and the investment earnings therefrom. The Series B Refunding Bonds and other outstanding Act 113 Bonds are entitled to the same benefit and security under the Act 113 Trust Agreement. See *Appendix II – Summary of the Act 113 Trust Agreement.*

**Act 113 and Act 113 Note**

Act 113 authorized PRMSA to negotiate and execute with Government Development Bank and other financial institutions the financing agreements required to restructure and/or refund the then existing debt obligations of PRMSA. Act 113 provides that such restructuring and/or refunding, together with the expenses incurred in connection therewith and any required deposits to a reserve account, shall not exceed $310,000,000.

Pursuant to the authority conferred by Act 113, Government Development Bank, PRMSA and the Corporation entered into a Debt Restructuring and Assignment Agreement whereby (i) Government Development Bank and PRMSA agreed to restructure the existing PRMSA debt by substituting PRMSA's obligations under an existing loan agreement with Government Development Bank (in the principal amount of $292,339,464.02) for the obligations arising under the Act 113 Note; and (ii) the Corporation purchased the Act 113 Note from Government Development Bank and Government Development Bank assigned the Act 113 Note to the Corporation, without recourse to Government Development Bank.

Under the Act 113 Note, PRMSA is required to pay such amounts as shall be sufficient to pay the principal of and redemption premium, if any, and interest on the Act 113 Bonds, together with other amounts required to be paid by the Corporation with respect to the Act 113 Bonds and the Act 113 Trust Agreement, including, without limitation, amounts required to reimburse a provider of a Credit Facility, Liquidity Facility, Reserve Account Insurance Policy or Reserve Account Letter of Credit (as such terms are defined in the Act 113 Trust Agreement), for advances made in respect of principal of or interest on the Act 113 Bonds and any fees payable to such provider, as any such amounts become due and payable. The Act 113 Note provides that the total payments of principal thereunder will not exceed $310,000,000.

The Act 113 Note is payable solely from Legislative Appropriations to be made pursuant to Act 113. Act 113 provides that (i) the Commonwealth shall honor the payment of principal of and interest on the Act 113 Note, (ii) the Office of Management and Budget shall include in the budget of the Commonwealth submitted annually to the Legislature of Puerto Rico, the amounts necessary to satisfy the payment of principal of and interest on the Act 113 Note, (iii) the funds to be provided by the Commonwealth to make the payments required under the Act 113 Note are subject to and conditioned upon the appropriations of such funds by the Legislature of Puerto Rico in the annual budget of the Commonwealth commencing with the budget for Fiscal Year 1995-96, and (iv) the Legislative Appropriations made thereunder may be used only for the payment of principal of and interest on the Act 113 Note and related costs, and are not subject to third party claims.

Act 113 requires the Secretary of the Treasury to deposit in a special account at Government Development Bank (or other financial institution) the amounts necessary to pay principal of and interest on the Act 113 Note on or before such payments become due, provided sufficient funds are appropriated by the Legislature of Puerto Rico.

The principal of, redemption premium, if any, and interest on the Act 113 Bonds will be payable solely from the Legislative Appropriations made pursuant to Act 113 and other sources described above. **The Legislature of Puerto Rico is not legally bound to appropriate sufficient amounts to timely pay the principal of, redemption premium, if any, and interest due on the Act 113 Bonds. There is no assurance that sufficient funds will be appropriated or otherwise made available to make such payments on the Act 113 Bonds.** For a discussion of Puerto Rico's budgetary process, see *Budgetary Process and Payment of Commonwealth Obligations* below and the Commonwealth Report, which is incorporated herein by reference.

Bondholders have no legal recourse to require the Legislature of Puerto Rico to appropriate the funds necessary to timely pay the principal of, redemption premium, if any, and interest due on the Act 113 Bonds.

Neither the Corporation nor the Commonwealth has ever defaulted on the payment of principal of or interest on any of its debt.

**Flow of Funds**

The Corporation shall cause the Secretary of the Treasury of the Commonwealth to transfer to the Act 113 Trustee, no later than July 15 of each Fiscal Year while the Act 113 Bonds are outstanding, funds representing the entire Legislative Appropriations (as defined in the Act 113 Trust Agreement) for such Fiscal Year, for deposit in the Act 113 Sinking Fund as follows:

first, to the credit of the Act 113 Bond Service Account, such amount as may be required to make the total amount then deposited to the credit of the Act 113 Bond Service Account equal to the sum of (i) the amount of interest then or to become within the current Fiscal Year due and payable on the Act 113 Bonds then outstanding and (ii) the amount of principal of the Act 113 Bonds then or to become within the current Fiscal Year due and payable;

second, to the credit of the Act 113 Redemption Account, such amount as may be required to make the total amount then to the credit of the Act 113 Redemption Account equal to the Amortization Requirement for such Fiscal Year for the Act 113 Term Bonds then outstanding plus the premium, if any, on such principal amount of Act 113 Term Bonds that would be payable if such principal amount of Act 113 Term Bonds were to be redeemed in such Fiscal Year prior to their respective maturities from monies held to the credit of the Act 113 Sinking Fund;

third, to the credit of the Act 113 Reserve Account, such amount as may be required to make the amount then to the credit of the Act 113 Reserve Account equal to the maximum aggregate Principal and Interest Requirement (as defined in the Act 113 Trust Agreement) for the current or any Fiscal Year thereafter on the Bonds Outstanding (as defined in the Act 113 Trust Agreement); and

fourth, to the credit of the Act 113 Surplus Account, any remaining amount.

**Act 113 Reserve Account**

The Act 113 Reserve Account was established pursuant to the Act 113 Trust Agreement to maintain on deposit therein an amount equal to the maximum Principal and Interest Requirement for any Fiscal Year on account of all Act 113 Bonds outstanding under the Act 113 Trust Agreement.

In lieu of or in substitution of monies on deposit to the credit of the Reserve Account, the Corporation may cause to be deposited into the Act 113 Reserve Account a Reserve Account Insurance Policy or Reserve Account Letter of Credit (as such terms are defined in the Act 113 Trust Agreement). Such Reserve Account Insurance Policy or Reserve Account Letter of Credit shall be payable or available to be drawn upon, as the case may be, to pay the principal of or interest on the Act 113 Bonds on any interest payment date, whenever monies in the Act 113 Bond Service Account or the Act 113 Redemption Account are insufficient for such purpose. See *Appendix II – Summary of the Act 113 Trust Agreement.*

The Corporation has funded the Act 113 Reserve Account with a Reserve Account Letter of Credit issued by Government Development Bank in an amount equal to the maximum Principal and Interest Requirement on the Act 113 Bonds (including the Series B Refunding Bonds). See *Appendix V – Government Development Bank.*

Funds on deposit to the credit of the Act 113 Reserve Account or amounts available to be drawn under the Reserve Account Letter of Credit or Reserve Account Insurance Policy will be used to pay principal of and

interest on the Act 113 Bonds whenever the payments received in respect of the Act 113 Note are insufficient for such purpose.

**No Acceleration of the Act 113 Bonds**

The Act 113 Bonds, which include the Series B Refunding Bonds, are not subject to acceleration upon the occurrence of an event of default or otherwise.

**Limitation on Additional Bonds**

No additional bonds may be issued under the Act 113 Trust Agreement, except to refund any outstanding Act 113 Bonds, to pay the costs of issuance of such refunding bonds and make any required deposit to the credit of the Reserve Account in the Act 113 Sinking Fund. All such refunding bonds will be issued on a parity with the then outstanding Act 113 Bonds and will be entitled to the same benefit and security under the Act 113 Trust Agreement.

## SOURCE OF PAYMENT AND SECURITY FOR THE SERIES C REFUNDING BONDS

**General**

The Series C Refunding Bonds and other outstanding Act 163 Bonds are payable solely from and are secured by the Act 163 Pledged Revenues, consisting of the portion of the annual payments of principal of and interest on the Act 163 Note required to be deposited to the credit of the Act 163 Bond Service Account and Act 163 Redemption Account established under the Act 163 Trust Agreement, any other monies deposited to the credit of those Accounts, including investment earnings therefrom, and the monies on deposit in the Act 163 Reserve Account and Act 163 Surplus Account established under the Act 163 Trust Agreement, including investment earnings therefrom. The monies on deposit in the Act 163 Reserve Account and Act 163 Surplus Account established under the Act 163 Trust Agreement, including investment earnings therefrom, also secure the payment of any other bonds issued under the Act 163 Trust Agreement and the obligations of the Corporation to the 1996 Series E Letter of Credit Bank under the Reimbursement Agreement, and to the Hedge Counterparty under the Rate Swap and the GIC (as such terms are defined in the Act 163 Trust Agreement). See *Appendix III –Summary of the Act 163 Trust Agreement.*

**Act 163 and Act 163 Note**

Act Number 103 of the Legislature of Puerto Rico, approved August 26, 1994 ("Act 103"), was enacted to allow the Treasury Department to obtain from Government Development Bank or other financial institutions financing to pay certain debt owed by the Treasury Department to the municipalities as described below. Pursuant to Act 103, the Treasury Department entered into a loan agreement with Government Development Bank whereby Government Development Bank provided a line of credit to the Treasury Department. Act 163 repealed Act 103 and authorized the Treasury Department to obtain from GDB or other financial institutions a financing in an amount not to exceed $215,000,000 plus interest thereon at a maximum rate of 8%. Act 163 provides that the proceeds of the financing will be used to pay the debt owed by the Treasury Department to the municipalities of Puerto Rico relating to the revisions of the property tax records of the Treasury Department. Pursuant to Act 163, the Treasury Department and Government Development Bank amended the loan agreement executed under Act 103 in order to, among other things, reduce the line of credit previously granted to a principal amount not to exceed $215,000,000 bearing interest at a rate of 8% per annum.

Government Development Bank, the Treasury Department and the Corporation entered into a Debt Restructuring and Assignment Agreement whereby (i) Government Development Bank and the Treasury Department agreed to restructure the existing debt of the Treasury Department by substituting part of the

21

Treasury Department's obligations under the then existing loan agreement with Government Development Bank for the Act 163 Note, and (ii) the Corporation purchased the Act 163 Note from Government Development Bank and Government Development Bank assigned the Act 163 Note to the Corporation, without recourse to Government Development Bank.

Under the Act 163 Note, the Treasury Department is required to pay in each Fiscal Year, without duplication: (i) the interest on, principal of (excluding the principal of the 1996 Series E Bonds which is included in the Series E Sinking Fund Requirement), redemption premium, if any, and Accreted Value or Appreciated Value of the Act 113 Bonds which is due and payable in such Fiscal Year (whether at maturity, in connection with an Amortization Requirement, upon redemption or otherwise) less all amounts expected to be received by the Corporation and deposited with the Act 163 Trustee during such Fiscal Year pursuant to the Rate Swap and the GIC if such Rate Swap and GIC shall be at the time in full force and effect and not terminated or liquidated; (ii) the Series E Sinking Fund Requirement which is due and payable in such Fiscal Year; (iii) the amount required to purchase or redeem the Act 163 Bonds in such Fiscal Year pursuant to the Act 163 Trust Agreement; (iv) all amounts then due to the 1996 Series E Letter of Credit Bank; (v) all of the Corporation's Swap Payments expected to be due and payable for such Fiscal Year; (vi) the amounts required to be deposited to the credit of the Act 163 Reserve Account established under the Act 163 Trust Agreement in such Fiscal Year, including any amounts required to cure any deficiency therein; (vii) any fees, expenses or other amounts becoming due and payable in such Fiscal Year to the provider of a Facility (as defined in the Act 163 Trust Agreement) under the agreement relating to such Facility or any amounts required to reimburse a provider of a Facility for payments made under any such Facility with respect to the Act 163 Bonds and not theretofore reimbursed; (viii) any fees or reimbursement for expenses payable to the Act 163 Trustee under the Act 163 Trust Agreement; (ix) any amount then due by the Corporation to the Hedge Counterparty for breakage cost or other termination payment under the terms of the Master Agreement; and (x) any other amount becoming due and payable in such Fiscal Year with respect to the Act 163 Bonds or becoming due and payable under the Act 163 Trust Agreement. Of the total payments made under the Act 163 Note each year, an amount equal to 8% of the principal balance of the Act 163 Note as of the end of the prior Fiscal Year is the interest paid thereunder and the remaining amount constitutes principal paid thereunder. Under the Act 163 Trust Agreement, the Act 163 Note is pledged to the Act 163 Trustee as security for the payment of all obligations secured by the Act 163 Trust Agreement.

The Act 163 Note is payable solely from Legislative Appropriations to be made pursuant to Act 163. Act 163 provides that the Office of Management and Budget shall include in the budget of the Commonwealth submitted annually to the Legislature of Puerto Rico the amounts necessary to satisfy the payment of principal of and interest on the Act 163 Note.

The funds to be provided by the Commonwealth to make the payments required under the Act 163 Note are subject to and conditioned upon the appropriation of such funds by the Legislature of Puerto Rico in the annual budget of the Commonwealth during the term of twenty (20) years, commencing with the budget for Fiscal Year 1995-96. If all required annual Legislative Appropriations are made and all payments of principal and interest due under the Act 163 Note are timely paid, such payments will be sufficient to pay the principal of and interest on the Act 163 Bonds (other than the 1996 Series E Bonds which are secured by monies drawn under the 1996 Series E Letter of Credit) as the same become due and payable, together with all fees payable to the 1996 Series E Letter of Credit Bank and Government Development Bank with respect to their respective Letters of Credit. Under some circumstances, the failure to make annual Legislative Appropriations for an extended period of time may cause a shortfall in the monies available under the Act 163 Note to pay principal and interest due on the Act 163 Bonds (other than the 1996 Series E Bonds which are secured by monies drawn under the 1996 Series E Letter of Credit).

The principal of, redemption premium, if any, and interest on the Act 163 Bonds will be payable solely from the Legislative Appropriations made pursuant to Act 163 and other sources described above. **The**

**Legislature of Puerto Rico is not legally bound to appropriate sufficient amounts to timely pay the principal of, redemption premium, if any, and interest due on the Act 163 Bonds. There is no assurance that sufficient funds will be appropriated or otherwise made available to make such payments on the Act 163 Bonds.** For a discussion of Puerto Rico's budgetary process, see *Budgetary Process and Payment of Commonwealth Obligations* below and the Commonwealth Report, which is incorporated herein by reference.

Bondholders have no legal recourse to require the Legislature of Puerto Rico to appropriate the funds necessary to timely pay the principal of, redemption premium, if any, and interest due on the Act 163 Bonds.

Neither the Corporation nor the Commonwealth has ever defaulted on the payment of principal of or interest on any of its debt.

**Act 163 Reserve Account**

The Act 163 Reserve Account was established in the Act 163 Bond Fund pursuant to the Act 163 Trust Agreement to maintain on deposit therein an amount equal to the Reserve Account Requirement (as defined in the Act 163 Trust Agreement) for any Fiscal Year on account of all the Bonds Outstanding (as defined in the Act 163 Trust Agreement) under the Act 163 Trust Agreement.

In lieu of any required deposit or in substitution of monies on deposit to the credit of the Act 163 Reserve Account, the Corporation may cause to be deposited to the credit of the Act 163 Reserve Account a Reserve Account Insurance Policy or a Reserve Account Letter of Credit in an amount equal to such required deposit, which Reserve Account Insurance Policy or Reserve Account Letter of Credit shall be satisfactory in form and substance to the Act 163 Trustee and the Hedge Counterparty and shall (i) be payable or available to be drawn upon, as the case may be (upon the giving of notice as required thereunder), on any payment date for the Act 163 Bonds on which a withdrawal from the Act 163 Reserve Account would be required under the Act 163 Trust Agreement, and (ii) give the Act 163 Trustee the right to draw on any Reserve Account Insurance Policy or Reserve Account Letter of Credit prior to the expiration thereof unless the Corporation has furnished a replacement Reserve Account Insurance Policy or Reserve Account Letter of Credit or has provided sufficient monies to make the amounts then on deposit to the credit of the Act 163 Reserve Account equal to the amount required therefor. If a disbursement is made under a Reserve Account Insurance Policy or a Reserve Account Letter of Credit, the funds thereafter becoming available for deposit to the credit of the Act 163 Reserve Account shall be used by the Act 163 Trustee to reinstate the amounts available to be drawn under such Reserve Account Insurance Policy or Reserve Account Letter of Credit in an amount at least equal to the amount being reimbursed to the provider of such Reserve Account Insurance Policy or Reserve Account Letter of Credit or, if such reinstatement is not available, to deposit to the credit of the Act 163 Reserve Account monies in the amount of the disbursement made under such Reserve Account Insurance Policy or Reserve Account Letter of Credit or a combination of such alternatives. See *Appendix III – Summary of the Act 163 Trust Agreement*.

The Act 163 Reserve Account was funded for the benefit of the Act 163 Bonds and the 1996 Series E Letter of Credit Bank with a Reserve Account Letter of Credit issued by Government Development Bank in an amount equal to the Reserve Account Requirement. See *Appendix V- Government Development Bank*.

**Flow of Funds**

The Corporation shall cause the Secretary of the Treasury of the Commonwealth to transfer to the Act 163 Trustee, no later than July 15 of each Fiscal Year while the Act 163 Bonds are outstanding, funds representing the entire Legislative Appropriation (as defined in the Act 163 Trust Agreement) for such Fiscal Year, for deposit in the Act 163 Bond Fund as described below.

Any Legislative Appropriation (or funds received in substitution therefore or with respect to the Act 163 Note) and other funds received by the Act 163 Trustee (other than monies received from draws made under the 1996 Series E Letter of Credit or the Hedge Counterparty Swap payment or income from investments of amounts on deposit in the Act 163 Bond Fund which must be deposited as described below) for the payment of principal of and interest on the Act 163 Bonds, for the payment of amounts due to the 1996 Series E Letter of Credit Bank under the Act 163 Trust Agreement or for the payments of the Corporation's Swap payment or other obligations of the Corporation under the Master Agreement (as defined in the Act 163 Trust Agreement) shall be deposited in the Act 163 Bond Fund in the following order:

first, (i) to the credit of the 1996 Series E Interest Subaccount established in the 1996 Series E Bonds Account such amount as may be required to make the total amount then to the credit of such Subaccount (after (x) making an allowance for and treating as already received and credited to such Subaccount (1) the portion of the Sinking Fund Investment Income required to be deposited therein during such Fiscal Year under the Act 163 Trust Agreement and (2) provided the Rate Swap is in full force and effect and not terminated or liquidated, the Hedge Counterparty Swap Payments expected to be received by the Corporation under the Act 163 Trust Agreement and (y) debiting to such Subaccount the Corporation's Swap Payments expected to be paid during such Fiscal Year) equal to the sum of (A) the amount of interest then or to become within the current Fiscal Year due and payable on the 1996 Series E Bonds, and (B) the amount of interest on any Reimbursement Obligation Principal (as defined in the Act 163 Trust Agreement) then or to become within the current Fiscal Year due and payable to the 1996 Series E Letter of Credit Bank under the Reimbursement Agreement, (ii) to the credit of the Act 163 Bond Service Account, such amount as may be required to make the total amount then to the credit of the Act 163 Bond Service Account equal to the sum of the amount of interest then or to become within the current Fiscal Year due and payable on the Act 163 Bonds of each series then Outstanding, other than the 1996 Series E Bonds, and (iii) to the credit of the 1996 Series E Letter of Credit Fee Subaccount established in the 1996 Series E Bonds Account, such amount as may be required to make the total amount then to the credit of such Subaccount (after making an allowance for and treating as already received and credited to such Subaccount the portion of the Sinking Fund Investment Income required to be deposited therein during such Fiscal Year, as provided in the Act 163 Trust Agreement) equal to the 1996 Series E Letter of Credit Fee then or to become within the current Fiscal Year due and payable; provided that, at any time the amount of funds available for deposit to the Act 163 Bond Fund is insufficient to make the full amount of the deposit required under clauses (i), (ii) and (iii) above, the amount available shall be divided pro rata among such three accounts based on the amount required to be deposited in each such account;

second, (i) to the credit of the 1996 Series E Sinking Fund Subaccount established in the 1996 Series E Bonds Account, the sum of (A) the Series E Sinking Fund Requirement for the current Fiscal Year and (B) any Reimbursement Obligation Principal (not including the 1996 Series E Letter of Credit Fee) then due to the 1996 Series E Letter of Credit Bank under the Reimbursement Agreement, (ii) to the credit of the Act 163 Bond Service Account, such amount as may be required to make the total amount then to the credit of the Act 163 Bond Service Account equal to the amount of principal of the Act 163 Bonds of each series then outstanding, other than the 1996 Series E Bonds, then or to become within the current Fiscal Year due and payable, and (iii) to the credit of the Act 163 Redemption Account, such amount as may be required to make the total amount then to the credit of the Act 163 Redemption Account equal to the Amortization Requirement for such Fiscal Year for the term Act 163 Bonds (other than the 1996 Series E Bonds) of each series then outstanding plus the premium, if any, on such principal amount of term Act 163 Bonds that would be payable if such principal amount of term Act 163 Bonds were to be redeemed in such Fiscal Year prior to their respective maturities from monies held to the credit of the Act 163 Bond Fund; provided that, if the amount of funds available for deposit to the accounts provided in clauses (i), (ii) and (iii) above is insufficient to make the full amount of the deposit

24

required under such clauses, the amount available shall be divided *pro rata* among such three accounts based on the amount required to be deposited in each such account;

third, to the credit of the 1996 Series E Sinking Fund Subaccount, such amount (other than any 1996 Series E Sinking Fund Requirement) as may be required to pay any amount then due by the Corporation to the Hedge Counterparty for breakage cost or other termination payment under the terms of the Master Agreement;

fourth, to the credit of the Act 163 Reserve Account, such amount as may be required to make the amount then to the credit of the Act 163 Reserve Account equal to the Act 163 Reserve Account Requirement; and

fifth, to the credit of the Act 163 Surplus Account, any remaining amount.

Funds received by the Act 163 Trustee from draws made under the 1996 Series E Letter of Credit must be deposited to the credit of the 1996 Series E Letter of Credit Subaccount established in the 1996 Series E Bonds Account and used solely to pay principal and interest on the 1996 Series E Bonds. Funds received by the Act 163 Trustee consisting of the Hedge Counterparty Swap Payments must be deposited to the credit of the 1996 Series E Interest Subaccount. Income from the investments made of the funds on deposit in each Subaccount must remain on deposit to the credit of such Subaccount and must be applied for the purposes provided in the Act 163 Trust Agreement. See *Appendix III – Summary of the Act 163 Trust Agreement*.

**All amounts on deposit to the credit of the 1996 Series E Bonds Account shall be held in trust exclusively for the benefit of the holders of 1996 Series E Bonds and the Series E Letter of Credit Bank.**

**No Acceleration of the Series C Refunding Bonds**

The Series C Refunding Bonds are not subject to acceleration upon the occurrence of an event of default or otherwise.

**Limitation on Additional Bonds**

No additional bonds may be issued under the Act 163 Trust Agreement except to refund any outstanding Act 163 Bonds, to pay the costs of issuance of such refunding bonds and make any required deposit to the credit of the Act 163 Reserve Account in the Act 163 Bond Fund. All such refunding bonds will be issued on a parity with the Act 163 Bonds then outstanding and will be entitled to the same benefit and security under the Act 163 Trust Agreement.

No refunding bonds may be issued unless the amounts of principal and interest payable under the Act 163 Note (assuming timely payment under the Act 163 Note) after the issuance of the such refunding bonds, combined with monies to be received from any interest rate swap arrangement or guaranteed investment contracts, are sufficient to pay the principal of and interest on all Bonds Outstanding (as defined in the Act 163 Trust Agreement) under the Act 163 Trust Agreement after the issuance of such refunding bonds, together with other amounts required to be paid by the Corporation with respect to the Act 163 Bonds, any outstanding credit enhancement facility and the Act 163 Trust Agreement. In addition, while the 1996 Series E Bonds remain outstanding, no refunding bonds may be issued, without the consent of the 1996 Series E Letter of Credit Bank, unless (i) no payment of principal on such refunding bonds becomes due before the maturity date of the 1996 Series E Bonds, (ii) the Cash Debt Service (as defined in the Act 163 Trust Agreement) on all Act 163 Bonds outstanding for each Fiscal Year after the issuance of such refunding bonds is equal to or less than the Cash Debt Service on all Act 163 Bonds outstanding for the same Fiscal Year before the issuance of such refunding

bonds, (iii) no such refunding bonds mature after August 1, 2014, and (iv) no such refunding bonds are Put Bonds or Variable Rate Bonds (as such terms are defined in the Act 163 Trust Agreement).

## BUDGETARY PROCESS AND PAYMENT OF COMMONWEALTH OBLIGATIONS

The Fiscal Year of the Commonwealth begins on July 1 and ends on June 30 (references herein to a particular Fiscal Year are based on the year in which such Fiscal Year ends). The Governor is constitutionally required to submit to the Legislature of Puerto Rico an annual budget of capital improvements and operating expenses of the Commonwealth for the ensuing Fiscal Year. The annual budget is prepared by the Office of Management and Budget, working with the Planning Board, the Treasury Department, Government Development Bank and other government offices and agencies. Section 7 of Article VI of the Constitution of Puerto Rico provides: "The appropriations made for any Fiscal Year shall not exceed the total revenues, including available surplus, estimated for said Fiscal Year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

The annual budget, which is developed utilizing elements of program budgeting and zero-base budgeting, includes an estimate of revenues and other resources for the ensuing Fiscal Year under (i) laws existing at the time the budget is submitted and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his/her judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board.

The Legislature of Puerto Rico may amend the budget submitted by the Governor, but may not increase any items so as to cause a deficit without imposing taxes to cover such deficit. Upon passage by the Legislature of Puerto Rico, the budget is referred to the Governor, who may decrease or eliminate any item, but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislature of Puerto Rico with objections. The Legislature of Puerto Rico, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the end of the Fiscal Year, the annual budget for the preceding Fiscal Year as originally approved by the Legislature of Puerto Rico and the Governor is automatically renewed for the ensuing Fiscal Year until a new budget is approved by the Legislature of Puerto Rico and the Governor. This permits the Commonwealth to continue to make payments of its operating and other expenses until a new budget is approved.

During any Fiscal Year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures necessary to balance the budget, or make recommendations to the Legislature of Puerto Rico for new taxes, or take any other necessary action to meet the estimated deficiency, or authorize borrowings under provisions of existing legislation, or take action which involves a combination of such steps. Any such proposed adjustments shall give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority: first, the payment of the interest on, and amortization requirements for, public debt (Commonwealth general obligation and guaranteed debt); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain and certain commitments to protect the name, credit and good faith of the Commonwealth government; third, current expenditures in the areas of health, protection of persons and property, education, welfare and retirement systems; and fourth, all other purposes.

The Constitution of Puerto Rico provides that the public debt of the Commonwealth will constitute a first claim on available Commonwealth revenues. Public debt of the Commonwealth includes general obligation bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged and, according to opinions rendered by the Attorney General of the Commonwealth, also any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its

26

public instrumentalities. The 2003 Bonds do not constitute public debt of the Commonwealth for purposes of the constitutional provision described above.

For a description of the public debt of the Commonwealth and a more detailed discussion of the Commonwealth Budget, see the Commonwealth Report, which is incorporated herein by reference.

**The 2003 Bonds do not constitute an obligation of the Commonwealth or any of its political subdivisions or public instrumentalities (other than the Corporation), and neither the Commonwealth nor any of its political subdivisions or public instrumentalities (other than the Corporation) shall be liable thereon. The Corporation has no taxing power.**

## RECENT DEVELOPMENTS

### Revenues and Expenditures for Fiscal Year 2003

For the first eleven months of Fiscal Year 2003 (July 2002 through May 2003), General Fund revenues were $6,716 million, which is $393.6 million or 6.2% higher than General Fund revenues during the first eleven months of Fiscal Year 2002, but $84.3 million or 1.2% less than budgeted revenues for this period. The Commonwealth government has identified other revenues and other funding sources to cover the revenue shortfall, including revenues expected to be collected pursuant to Act Number 119 of the Legislature of Puerto Rico, approved May 5, 2003, that provides certain payment incentives to taxpayers that have existing tax debts with the Treasury Department and certain gains relating to the lottery system's investment portfolio.

Expenditures for the full Fiscal Year 2003, on the other hand, are projected to be $7,972.8 million, which is $130.1 million or 1.7% higher than the $7,842.7 million budgeted for the full fiscal year. The principal reasons for the higher expenditures are (i) health reform costs that are projected to be approximately $70 million higher than the amount budgeted; (ii) payroll and other costs of education that are projected to be approximately $180.1 million higher than the amount budgeted; and (iii) lower projected expenditures in other areas of approximately $120 million, which partially offset the higher health and education expenditures. The Government expects to cover these additional expenditures with $60.1 million of reserve funds from the Commonwealth's Budgetary Fund and with a $70 million grant received from the Federal Government under the state and local fiscal relief provisions of the Jobs and Growth Tax Relief Reconciliation Act of 2003.

### Standard & Poor's Removes Commonwealth's Debt From Credit Watch

On April 14, 2003, Standard & Poor's removed the Commonwealth's outstanding general obligation debt from credit watch with negative implications and assigned to it a rating of "A-" with negative outlook. See *Ratings* in the Commonwealth Report. Information on Standard & Poor's rating rationale is available at its website at www.standardandpoors.com.

Standard & Poor's had previously announced on December 11, 2002, that it was placing its ratings and underlying ratings on the Commonwealth's outstanding debt on credit watch with negative implications, reflecting concerns over the Commonwealth's general ability to enforce appropriate accounting, fiscal, and management controls with respect to equipment leases entered into by certain Commonwealth agencies and municipalities. Standard & Poor's indicated that the Commonwealth's laxity in such controls was noted in three transactions entered into by two Commonwealth agencies and one municipality, where the Commonwealth may have been incorrectly represented to the investors as the ultimate obligor of the leases in question. Standard & Poor's indicated it would be reviewing information to be provided by the Commonwealth and should its concerns not be speedily resolved, rating action could follow.

The Commonwealth provided Standard & Poor's information addressing its concerns after conducting an audit of all leasing contracts involving Commonwealth agencies and municipalities. It also took measures to reinforce its controls over the execution of lease contracts by government agencies, including proposing legislation making it a crime for any Commonwealth employee to enter into any such leasing contract without the written approval of Government Development Bank.

## PUBLIC SECTOR DEBT OF THE COMMONWEALTH

**Public Sector Debt**

Public sector debt comprises bonds and notes of the Commonwealth, its municipalities, and public corporations ("notes" as used in this section refers to certain types of non-bonded debt regardless of maturity), subject to the exclusions described below. Direct debt of the Commonwealth is supported by Commonwealth taxes. The Constitution of Puerto Rico limits the amount of general obligation (full faith and credit) debt that can be issued or guaranteed by the Commonwealth. The Commonwealth's policy has been and continues to be to maintain the amount of such debt prudently below its constitutional limitation. Debt of municipalities, other than bond anticipation notes, is supported by real and personal property taxes and municipal license taxes. Debt of public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations from rates charged for services or products. However, certain debt of public corporations is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

The following table presents a summary of public sector debt as of April 30, 2003. Excluded from the table is debt not primarily payable from either Commonwealth or municipal taxes, Commonwealth appropriations or rates charged by public corporations for services or products. Also excluded from the table is debt the inclusion of which would reflect double counting, including, but not limited to, $1,404,270,000 of bonds issued by the Municipal Finance Agency to finance its purchase of bonds of Puerto Rico municipalities, and $849,365,000 of obligations of Government Development Bank issued to purchase certain Commonwealth public sector debt and for other purposes, of which $267,000,000 is guaranteed by the Commonwealth.

28

## Commonwealth of Puerto Rico
## Public Sector Debt
### (in thousands)

|  | April 30, 2003 |
|---|---|
| Puerto Rico direct debt (1) | $7,237,115 |
| Municipal debt | 1,876,733 |
| Public corporations debt | |
| Puerto Rico guaranteed debt (2) | 610,542 |
| Debt supported by Puerto Rico appropriations or taxes  (3) | 14,296,445 |
| Other non-guaranteed debt  (4) | 7,208,190 |
| Total public corporations debt | 22,115,177 |
| Total public sector debt | $31,229,025 |

---

(1) Includes $34,775,000 of certain indebtedness originally issued by the Urban Renewal and Housing Corporation that was transferred to the Commonwealth by virtue of Act Number 134 of the Legislature of Puerto Rico, approved on December 13, 1994 ("Act No. 134") (such indebtedness is referred to as "Transferred CRUV Debt").  Also includes $37,627,000 of indebtedness originally incurred by Housing Bank and subsequently assumed by the Commonwealth in connection with the reorganization of Housing Finance Corporation.  This amount excludes any Commonwealth general obligation bonds that have been refunded with proceeds that were invested in guaranteed investment contracts or other securities not eligible to effect a legal defeasance, even though such bonds will be considered outstanding under their respective authorizing resolutions and for purposes of calculating the Commonwealth's constitutional debt limitation.  Excludes the issuance of $360,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2003 B and $1,018,245,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2003 C, issued on May 6, 2003.

(2) Consists of $473,717,000 of bonds issued by the Aqueduct and Sewer Authority and $136,825,000 of State Revolving Fund loans, incurred under various federal water laws.  Excludes Public Buildings Authority bonds and notes in the principal amount of $2,153,755,000, which are primarily payable from Commonwealth appropriations and $267,000,000 of Government Development Bank bonds payable from available monies of Government Development Bank.

(3) Represents, among others, bonds and notes issued by the Aqueduct and Sewer Authority, the Highway and Transportation Authority, the Housing Finance Authority, the Infrastructure Financing Authority, the Public Buildings Authority and the Public Finance Corporation.

(4) Includes $1,074,180,000 of Infrastructure Financing Authority bonds which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.  Excludes $1,171,200,000 of Children's Trust Fund bonds which are payable solely from a portion of the payments to be received pursuant to the tobacco litigation settlement.

*Source:*  Government Development Bank

No deductions have been made in the above table for debt service funds and debt service reserve funds. The table above and the amounts shown throughout this section as representing outstanding debt include outstanding capital appreciation bonds at their respective original principal amounts and do not include any accretion thereon.

## Trends of Public Sector Debt

Historically, the Commonwealth has maintained a fiscal policy that provides for a prudent relationship between the growth of public sector debt and the growth of the economic base required to service that debt. During certain fiscal years, however, public sector debt has increased at a rate greater than the growth of gross product. For instance, public sector debt increased by 12.1% during Fiscal Year 2001, compared to a 6.7% increase in gross product for the same year.  The increase in the rate of growth of public sector debt during Fiscal Year 2001 was due to the issuance during such Fiscal Year of $1,092,550,000 of bonds of the Infrastructure Financing Authority and $397,005,000 of bonds of the Children's Trust Fund, both of which are payable from sources other than Commonwealth appropriations or taxes or revenues of public corporations

derived from services or products.  Excluding these bond issues, the rate of growth of public sector debt for Fiscal Year 2001 would have been 5.9%.  During Fiscal Year 2002, public sector debt increased by 10.5% compared to a 2.3% increase in gross product for the same Fiscal Year.

As of April 30, 2003, outstanding short-term debt, relative to total debt, was 7.2%.

The following table shows the trends in gross product (in current dollars) and public sector debt for the five Fiscal Years ended June 30, 2002 and the first ten months of Fiscal Year 2003.

### Commonwealth of Puerto Rico
### Public Sector Debt and Gross Product
### (dollars in millions)[*]

| | Public Sector Debt | | | | | Gross Product [(1)] | |
| June 30 | Long Term | Short Term [(2)] | Short Term as % of Total | Total | Rate of Increase | Amount | Rate of Increase |
|---|---|---|---|---|---|---|---|
| 1998 | 20,759 | 1,563[(3)] | 7.0 | 22,322 | 14.4 | 35,111 | 8.6 |
| 1999 | 20,905 | 1,773[(3)] | 7.8 | 22,678 | 1.6 | 38,281 | 9.0 |
| 2000 | 21,620 | 2,202[(3)] | 9.2 | 23,822 | 5.0 | 41,419 | 8.2 |
| 2001 | 23,436[(4)] | 2,871[(3)(5)] | 10.9 | 26,307 | 10.4 | 44,173 | 6.7 |
| 2002 | 27,818[(6)] | 1,250[(3)] | 4.3 | 29,068 | 10.5 | 45,189 | 2.3 |
| April 30, 2003 | 28,974[(7)] | 2,255 | 7.2 | 31,229 | 7.4 | N/A | N/A |

[*]   Totals may not add due to rounding.
(1)   In current dollars.
(2)   Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.
(3)   Does not include the tax and revenue anticipation notes that were outstanding at the close of the indicated fiscal years because prior to the end of said fiscal years sufficient funds had been set aside for the payment of such notes in full.
(4)   Excludes $397.0 million of bonds of Children's Trust outstanding on this date.  If these bonds had been included, the rate of growth of public sector debt for fiscal year 2001 would have been 12.1%.  Includes $1,092.5 million of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.
(5)   Includes a $164 million line of credit from Government Development Bank to the Secretary of the Treasury whose proceeds were applied to pay debt service on general obligation bonds in lieu of funds available therefor in the General Fund.
(6)   Excludes $390.1 million of bonds of Children's Trust outstanding on this date.  Includes $1,081.5 million of bonds of Infrastructure Financing Authority outstanding on this date, which are payable from the sale of a controlling interest in Puerto Rico Telephone Company.
(7)   Excludes $1,171.2 million of bonds of Children's Trust outstanding on this date.  Includes $1,074.2 million of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

*Source:*  Government Development Bank

## TAX MATTERS

The following is a summary of the opinion of Pietrantoni Méndez & Alvarez LLP, Bond Counsel, regarding certain Puerto Rico tax and United States federal income tax consequences of the ownership of the 2003 Bonds. This section does not purport to cover all of the Puerto Rico tax and United States federal income tax consequences arising from the purchase and ownership of the 2003 Bonds. The following is based upon laws and regulations now in effect and is subject to change.

In the opinion of Bond Counsel, based on the laws of Puerto Rico now in force:

1. Interest on the 2003 Bonds is exempt from Puerto Rico income and withholdings taxes, including the alternative minimum tax imposed by Section 1017 of the Puerto Rico Internal Revenue Code of 1994, as amended (the "P.R. Code");

2. The 2003 Bonds are exempt from property taxes imposed by the Municipal Property Tax Act of 1991, as amended, and interest thereon is exempt from the municipal license tax imposed by the Municipal License Tax Act of 1974, as amended;

3. The transfer of the 2003 Bonds by (i) gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of the Commonwealth at the time the gift is made and (ii) death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico;

4. Gain realized from the sale or exchange of a 2003 Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of the Commonwealth;

5. The 2003 Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments; and

6. Interest on the 2003 Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the 2003 Bonds with "eligible funds," as such term is defined in the Acts.

The P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a 2003 Bond over its initial offering price (the "Accretion Amount"). Under the current administrative practice followed by the Puerto Rico Department of the Treasury, the Accretion Amount is treated as interest.

Prospective owners of the 2003 Bonds, including but not limited to financial institutions, should be aware that ownership of the 2003 Bonds may result in having a portion of their interest and other expenses attributable to interest on the 2003 Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes.

In the opinion of Bond Counsel, based on the provisions of the United States Internal Revenue Code of 1986, as amended (the "Code"), now in force:

1. Interest on the 2003 Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, a corporation (i) organized under the laws of Puerto Rico, or (ii) otherwise constituting a foreign corporation under the Code, is not subject to income taxation under the Code provided such interest or "original issue discount" is not effectively connected, or treated as effectively connected, with or attributable to the conduct of a trade or business within the United States by such corporation;

2. Interest on the 2003 Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, an individual who is a *bona fide* resident of Puerto Rico during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within Puerto Rico and, therefore, is excludable from gross income for purposes of the Code pursuant to Section 933(1) thereof;

3. Interest on the 2003 Bonds is not excludable from the gross income of the recipient thereof for federal income tax purposes under Section 103(a) of the Code;

4. A person that is subject to income tax under the Code on its worldwide income will generally be subject to federal income tax on any gain realized upon the sale or exchange of the 2003 Bonds. However, pursuant to Notice 89-40 issued by the United States Internal Revenue Service on March 27, 1989, gain on the sale or exchange of the 2003 Bonds by an individual who is a *bona fide* resident of Puerto Rico during the entire taxable year will constitute Puerto Rico source income and, therefore, qualify for the exclusion provided in Section 933(1) of the Code, provided such 2003 Bonds do not constitute inventory in the hands of such individual; and

5. The transfer of the 2003 Bonds by death or gift will not be subject to estate or gift tax under the Code in the case of decedents or donors who, at the time of death or gift, are (i) residents of Puerto Rico and (ii) (x) United States citizens that acquired such citizenship solely by reason of birth or residence in Puerto Rico or (y) not United States citizens.

Prospective owners of the 2003 Bonds should also be aware that the Code provides special rules for the taxation of shareholders of foreign corporations that qualify as "controlled foreign corporations," "personal holding companies," "foreign personal holding companies" or "passive foreign investment companies," as such terms are defined by the Code.

The opinion of Bond Counsel regarding the tax consequences under Puerto Rico law and the Code arising from ownership of, receipt or accrual of interest on, or disposition of the 2003 Bonds is limited to the above.

## CONTINUING DISCLOSURE UNDERTAKING

In order to assist the Underwriters in complying with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC"), the Corporation and the Commonwealth, as specifically stated below, will agree to the following:

1. The Commonwealth will agree to file within 305 days after the end of each Fiscal Year beginning with its Fiscal Year ended on June 30, 2003, with each NRMSIR and with any Commonwealth state information depository ("SID"), core financial information and operating data for the prior Fiscal Year, including (i) its audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial

information and operating data) on the Commonwealth, and information as to revenues, expenditures, financial operations and indebtedness of the Commonwealth, generally found or incorporated by reference in this Official Statement; and

2.      The Corporation will agree to file, in a timely manner, with each NRMSIR or with the MSRB and with any SID, notice of any failure by the Commonwealth to comply with paragraph 1 above and of the occurrence of any of the following events with respect to the 2003 Bonds if, in the judgment of the Corporation or its agent, such event is material:

| | |
|---|---|
| (a) | principal and interest payment delinquencies; |
| (b) | non-payment related to defaults; |
| (c) | unscheduled draws on debt service reserves reflecting financial difficulties; |
| (d) | unscheduled draws on credit enhancements reflecting financial difficulties; |
| (e) | substitution of credit or liquidity providers, or their failure to perform; |
| (f) | adverse opinions or events affecting the tax-exempt status of the 2003 Bonds; |
| (g) | modifications to rights of the holders (including Beneficial Owners) of the 2003 Bonds; |
| (h) | bond calls; |
| (i) | defeasances; |
| (j) | release, substitution, or sale of property securing repayment of the 2003 Bonds; and |
| (k) | rating changes. |

The Corporation may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Corporation, such other event is material with respect to the 2003 Bonds, but the Corporation does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

With respect to the following events:

Events (d) and (e).  The Corporation does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the 2003 Bonds, unless the Corporation applies for or participates in obtaining the enhancement.

Event (f). For information on the tax status of the 2003 Bonds, see *Tax Matters*.

Event (h).  The Corporation does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if (1) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *The 2003 Bonds*, (2) the only open issue is which 2003 Bonds will be redeemed in the case of a partial redemption, (3) notice of redemption is given to the Bondholders as required under the terms of the 2003 Bonds, and (4) public notice of the redemption is given pursuant to Securities Exchange Act of 1934 Release Number 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or 2003 Bond purchases.

The Commonwealth expects to provide the information described in paragraph 1(ii) above by filing its first bond official statement that includes such information for the preceding Fiscal Year or, if no such official statement is issued by the 305-day deadline, by filing the Commonwealth Report by such deadline and a supplemental report containing other information to the extent necessary to provide the information described in paragraph 1 by such deadline.

The Commonwealth has entered into similar continuing disclosure covenants in connection with, among other things, the issuance of its general obligation bonds and prior issuance of bonds of the Corporation.  The Commonwealth did not comply with such continuing disclosure covenants with respect to the filing of the

Comprehensive Annual Financial Report for the Fiscal Year ended June 30, 2002, which was filed on June 20, 2003 (more than 305 days after the end of such Fiscal Year).

As of the date of this Official Statement, there is no Commonwealth SID, and the NRMSIRs are: Bloomberg Municipal Repository, 100 Business Park Drive, Skillman, New Jersey 08558; Standard & Poor's J.J. Kenny Repository, 55 Water Street, 45th Floor, New York, New York 10041; FT Interactive Data, Att: NRMSIR, 100 William Street, New York, New York 10038; and DPC Data Inc., One Executive Drive, Fort Lee, New Jersey 07024.

The Commonwealth and the Corporation acknowledge that their undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners of the 2003 Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of their respective undertakings shall be limited to a right to obtain specific enforcement of the Corporation's or the Commonwealth's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Corporation and the Commonwealth written notice of any request to cure such breach, and the Corporation or the Commonwealth, as applicable, shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan for the equal benefit of all Beneficial Owners of the outstanding 2003 Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of any of the Covenants at issue. Moreover, Proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Section 2 and 2A of Act Number 104, approved June 29, 1955, as amended (32 L.P.R.A. § 3077 and § 3077a), which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be granted against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if:

(1)     the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Corporation or the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the 2003 Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners, as determined by parties unaffiliated with the Corporation or the Commonwealth; and the amendment does not adversely affect the Trustees; or

(2)     all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Corporation or the Commonwealth, as applicable, elects that the Covenants shall be deemed amended accordingly.

The Commonwealth has further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Causey Demgen & Moore Inc. will verify, from the information provided to them, the mathematical accuracy as of the date of delivery of the Series B Refunding Bonds and Series C Refunding Bonds of the computations contained in the provided schedules to determine that the anticipated receipts from the securities and cash deposits listed in such schedules, to be held in escrow, will be sufficient to pay, when due, the principal, interest and call premium payment requirements, if any, of the Act 113 Refunded Bonds and the Act 163 Refunded Bonds, respectively. Causey Demgen & Moore Inc. will express no opinion on the assumptions provided to them.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the 2003 Bonds from the Corporation at an aggregate discount of $3,512,157.99 from the initial public offering prices of such bonds set forth or derived from information set forth on the inside cover page hereof. The obligations of the Underwriters are subject to certain conditions precedent, and the Underwriters will be obligated to purchase all the 2003 Bonds, if any 2003 Bonds are purchased. The Underwriters may offer to sell the 2003 Bonds to certain dealers (including dealers depositing 2003 Bonds into investment trusts) and institutional purchasers at prices lower than the initial public offering prices, and such offering prices may be changed, from time to time, by the Underwriters.

## LEGAL MATTERS

The proposed forms of opinion of Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico, Bond Counsel, are set forth in *Appendix IV* to this Official Statement. Certain legal matters will be passed upon for the Underwriters by Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico.

## LEGAL INVESTMENT

The 2003 Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act Number 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Corporation in connection with the 2003 Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the 2003 Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.

## RATINGS

Moody's and Standard & Poor's have assigned the 2003 Bonds ratings of "Baa3" and "BBB+", respectively. These ratings will reflect only the respective views of the rating agencies and an explanation of the significance of each rating may be obtained only from the respective rating agency. There is no assurance that such ratings will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by either or both of such rating agencies, if in the judgment of either or both, circumstances

so warrant. Any such downward revision or withdrawal of either of such ratings may have an adverse effect on the market prices of the 2003 Bonds.

Such rating agencies were provided with materials relating to the Commonwealth and the 2003 Bonds and other relevant information, and no application has been made to any other rating agency for the purpose of obtaining a rating on the 2003 Bonds.

## MISCELLANEOUS

The foregoing summaries of or references to the various acts, the 2003 Bonds, the respective Trust Agreements, the respective Resolutions, the respective Notes, the Debt Restructuring and Assignment Agreements, the respective Letters of Credit, the Acts and the summaries of or references to the various acts contained in the Commonwealth Report incorporated by reference herein are made subject to all the detailed provisions thereof to which reference is hereby made for further information and do not purport to be complete statements of any or all of such provisions.

Appended to and constituting a part of this Official Statement are (i) a summary of the provisions of the Act 164 Trust Agreement (*Appendix I*), (ii) a summary of the provisions of the Act 113 Trust Agreement (*Appendix II*), (iii) a summary of the provisions of the Act 163 Trust Agreement (*Appendix III*), (iv) the proposed forms of opinion of Bond Counsel (*Appendix IV*), (v) information relating to Government Development Bank (*Appendix V*) and (vi) a table showing the accreted values of the capital appreciation bonds on each Valuation Date (*Appendix VI*).

This Official Statement incorporates by reference the Commonwealth's Annual Financial Report and the Commonwealth Report. The Commonwealth Report has been filed by the Commonwealth with the MSRB and with each NRMSIR. The Commonwealth's Annual Financial Report has been filed by the Commonwealth with each NRMSIR as part of the Comprehensive Annual Financial Report of the Commonwealth for the Fiscal Year ended June 30, 2002.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of the Commonwealth Annual Financial Report and the Commonwealth Report incorporated herein by reference. Requests for such document should be directed to Director-General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, Santurce, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the Commonwealth Annual Financial Report and the Commonwealth Report may be obtained by contacting a NRMSIR. The address of each NRMSIR is set forth in *Continuing Disclosure Undertaking* above.

The information set forth in this Official Statement, except for information appearing in *Underwriting* and *Appendix IV* was supplied by certain officials of Government Development Bank, the Corporation and the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities and is included in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was supplied by DTC.

This Official Statement will be filed with each NRMSIR and the MSRB.

**PUERTO RICO PUBLIC FINANCE CORPORATION**

By: _____\s\ Carlos M. Piñeiro_____
Executive Vice President

[This page intentionally left blank]

APPENDIX I

## SUMMARY OF THE ACT 164 TRUST AGREEMENT

The following is a summary of certain provisions of the Trust Agreement, dated December 27, 2001, relating to the Act 164 Bonds (the "Trust Agreement"). The statements contained herein do not purport to be complete and this summary is qualified in its entirety by reference to the Trust Agreement.

### Definitions of Certain Terms

The following words and terms have the following meanings, unless the context otherwise requires. Words importing the singular number include the plural number in each case and vice versa, and words importing persons include firms and corporations.

"**Accreted Value**" shall mean with respect to any Capital Appreciation Bond or Capital Appreciation and Income Bond (i) as of any Valuation Date, the amount set forth for such date in the resolution authorizing such Capital Appreciation Bond or Capital Appreciation and Income Bond and (ii) as of any date other than a Valuation Date, the sum of (a) the Accreted Value on the preceding Valuation Date (or, if there is no preceding Valuation Date, the initial principal amount) and (b) the product of (1) a fraction, the numerator of which is the number of days having elapsed from the preceding Valuation Date (or from the original issue date if there is no preceding Valuation Date) and the denominator of which is the number of days from such preceding Valuation Date (or from the original issue date if there is no preceding Valuation Date) to the next succeeding Valuation Date and (2) the difference between the Accreted Values for such Valuation Dates (or between the initial principal amount and the Accreted Value on the first Valuation Date).

"**Act**" shall mean Act Number 164 of the Legislature of Puerto Rico, approved December 17, 2001.

"**Amortization Requirement**" shall mean, for the Term Bonds of any Series for any Bond Year, the principal amount fixed or computed for the retirement by purchase or redemption of Term Bonds in such Bond Year.

The Amortization Requirement for the Term Bonds of each Series shall be initially in the respective principal amounts for each Bond Year as fixed in a resolution of the Corporation adopted prior to the issuance of the Bonds of such Series, and the aggregate amount of such Amortization Requirements for the Term Bonds of such Series shall be equal to the aggregate principal amount of the Term Bonds of such Series.

If at the close of any Bond Year the total principal amount of Term Bonds of any Series retired by purchase or redemption, or called for redemption under the provisions of the Trust Agreement during such Bond Year, shall be in excess of the amount of the Amortization Requirement for the Term Bonds of such Series for such Bond Year, then the amount of the Amortization Requirement for the Term Bonds of such Series shall be reduced for such subsequent Bond Years in such amounts aggregating the amount of such excess as shall be determined by the President of the Corporation in an order filed with the Trustee on or before the fifteenth (15th) day of the August following the close of such Bond Year.

It shall be the duty of the Trustee, on or before the 15th day of each Bond Year, to compute the Amortization Requirement for the then current Bond Year for the Term Bonds of each Series then Outstanding. The Amortization Requirement for the then current Bond Year shall continue to be applicable during the balance of such current Bond Year and no adjustment shall be made therein by reason of Term Bonds purchased or redeemed or called for redemption during such current Bond Year.

"**Appreciated Value**" shall mean, with respect to any Capital Appreciation and Income Bond (i) up to the Interest Commencement Date set forth in the resolution of the Board providing for the issuance of such Bond, an amount equal to the Accreted Value of such Bond and (ii) as of any date of computation on and after the Interest Commencement Date, an amount equal to the Accreted Value of such Bond on the Interest Commencement Date.

"**Authorized Debtors**" shall mean the departments, agencies, instrumentalities and public corporations of the Commonwealth authorized to recognize, formalize, restructure and/or refinance their advances, repayment commitments, obligations and/or loans with Government Development Bank pursuant to the Act.

"**Board**" shall mean the Board of Directors of the Corporation as constituted from time to time and which shall be the Board of Directors of Government Development Bank as provided by Resolution Number Five Thousand Forty-Four (5044), adopted December twelve (12), nineteen hundred eighty-four (1984) by the Board of Directors of Government Development Bank, as amended, or, if said Board shall be abolished, the board or body succeeding to the principal functions thereof or to whom the powers of the Corporation shall be given by law.

"**Bond Year**" shall mean the period commencing on the first day of August of any year and ending on the last day of July of the following year.

"**Bondholder**," "**Holder**," "**holder**," "**Holder of Bonds**," or "**Owner**" or any similar term, shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

"**Bonds**" or "**bonds**" shall mean the bonds of the Corporation issued under the provisions of the Trust Agreement.

"**Business Day**" means a day other than a Saturday, Sunday or a day on which commercial banks in the City of New York, New York, or San Juan, Puerto Rico, are closed to the public.

"**Capital Appreciation Bonds**" shall mean any Bonds the accruing interest on which is compounded periodically on each of the dates designated for compounding in the resolution authorizing said Bonds and payable in an amount equal to the then current Accreted Value only at the maturity, earlier redemption or other payment date therefor, all as so provided by such resolution, and which may be either Serial Bonds or Term Bonds.

"**Capital Appreciation and Income Bonds**" shall mean any Bonds the accruing interest on which is not paid prior to the Interest Commencement Date specified in the resolution authorizing such Bonds and the Appreciated Value for such Bonds is compounded periodically on the dates designated in such resolution prior to the Interest Commencement Date for such Capital Appreciation and Income Bonds, and which may be either Serial Bonds or Term Bonds.

"**Corporation**" shall mean Puerto Rico Public Finance Corporation, a governmental instrumentality of the Commonwealth of Puerto Rico and a wholly-owned subsidiary of Government Development Bank for Puerto Rico.

I-2

"**Corporation Swap Payments**" means the net payments required to be made by the Corporation to the Hedge Counterparty under a Rate Swap (if applicable).

"**Credit Facility**" shall mean an irrevocable letter of credit, policy of municipal bond insurance, guaranty, purchase agreement, credit agreement or similar facility in which the person providing such facility irrevocably agrees to provide funds to make payment of the principal of, premium, if any, and interest on Bonds to which such Credit Facility relates.

"**Fiscal Year**" shall mean the period commencing on the first day of July of any year and ending on the last day of June of the following year or any other twelve month period designated by the Board.

"**GDB Letter of Credit**" shall mean the irrevocable transferable stand-by letter of credit issued by Government Development Bank in favor of the Trustee solely for the benefit of the Bondholders on the date of issue of the Corporation's 2001 Series C Bonds and 2001 Series D Bonds.

"**Government Development Bank**" shall mean Government Development Bank for Puerto Rico.

"**Government Obligations**" shall mean (i) direct obligations of, or obligations the timely payment of principal of and the interest on which is unconditionally guaranteed by, the United States Government, (ii) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, any of the following:  Banks for Cooperatives, Federal Farm Credit Banks, Federal Home Loan Banks, Export-Import Bank of the United States, Federal Financing Bank, Government National Mortgage Association, Farmer's Home Administration, Federal Home Loan Mortgage Corporation, Federal National Mortgage Association or Federal Housing Administration, and which obligations are rated at the time of purchase in the highest rating category by both Moody's and Standard & Poor's, (iii) all other obligations issued or unconditionally guaranteed as to principal and interest by an agency or instrumentality controlled or supervised by and acting as an instrumentality of the United States Government pursuant to authority granted by the Congress, which obligations are rated at the time of purchase in the highest rating category by both Moody's and Standard & Poor's and (iv) receipts evidencing the ownership of payments of principal of or interest on any of such obligations, which receipts are rated in the highest rating category by both Moody's and Standard & Poor's.

"**Hedge Counterparty**" means the provider of any Rate Swap with respect to the Bonds as counterparty under a Swap Agreement which provider must have a rating with respect to its long-term unsecured debt which is rated in one of the three highest rating categories (without regard to any gradation within such category) by Standard & Poor's or Moody's.

"**Hedge Counterparty Swap Payments**" means the net payments required to be made by a Hedge Counterparty to the Corporation under a Rate Swap.

"**Interest Commencement Date**" shall mean, with respect to any Capital Appreciation and Income Bond, the date specified in the resolution providing for the issuance of such Bond after which interest accruing on such Bond shall be payable on a periodic basis, with the first such payment date being the applicable Interest Payment Date immediately succeeding such Interest Commencement Date.

"**Interest Payment Dates**" shall mean the dates on which interest on a Series of Bonds or portion thereof is scheduled to be due and payable, as is provided by a resolution of the Board adopted prior to the issuance of such Series of Bonds.

"**Interim Bonds**" shall mean any Bonds issued on an interim basis that are expected to be repaid from the proceeds of Bonds or other indebtedness.

I-3

"**Investment Agreement**" shall mean any agreement for the investment of moneys entered into by the Trustee with a Qualified Financial Institution or collateralized at all times by Government Obligations having a market value at least equal to the principal amount of such agreement, as to which collateral the Trustee has a perfected first priority security interest, which collateral is held by the Trustee or its agent free and clear of claims by third parties and which collateral will result in the agreement being rated in the highest rating category by both Moody's and Standard & Poor's.

"**Investment Obligations**" shall mean (i) Government Obligations, (ii) time deposits, certificates of deposit or similar arrangements with, or banker's acceptances issued by, any bank, banking association or trust company, including the Trustee, which is a member of the Federal Deposit Insurance Corporation having a combined capital and surplus aggregating not less than $150,000,000 and reported deposits of not less than $250,000,000, (iii) repurchase agreements with banks mentioned in (ii) above, including the Trustee, or with primary government dealers having a capital and surplus in excess of $150,000,000, with respect to any of the securities mentioned in (i) above, provided such securities are on deposit with the Trustee (or any duly appointed agent of the Trustee) and such agreements are structured as sale - purchase agreements rather than secured loans, (iv) obligations issued by the Commonwealth or any state or territory of the United States, which are rated in one of the three highest rating categories (without regard to any gradations within such category) by both Moody's and Standard & Poor's, (v) municipal obligations, the payment of the principal of and the interest on which is insured, which are rated in one of the three highest rating categories (without regard to any gradations within such category) by both Moody's and Standard & Poor's, (vi) commercial paper rated, or backed by a letter of credit or line of credit the provider of which is rated, in the highest rating category (without regard to any gradations within such category) by both Moody's and Standard & Poor's, (vii) an Investment Agreement, (viii) money market accounts of any state, Commonwealth or federally chartered bank, banking association, trust company or subsidiary trust company, including the Trustee, that is rated or whose parent bank is rated in the highest short-term rating category or in the highest long-term rating category by Moody's or Standard & Poor's (without regard to any gradations within such category) or money market funds registered under the Investment Company Act of 1940, as amended, whose shares are registered under the Securities Act of 1933, as amended, and having a rating by Standard & Poor's of "AAAm-G" or "AAAm", (ix) units of beneficial interest in any non-arbitrage investment program pools created by Government Development Bank or any of its subsidiaries or affiliates, (x) any obligation permitted under the laws of the Commonwealth which are rated in one of the three highest rating categories (without regard to any gradations within such category) by both Moody's and Standard & Poor's, and (xi) any securities otherwise permitted as eligible collateral under Act No. 69 of the Legislature of Puerto Rico, approved August 14, 1991, as amended.

"**Legislative Appropriation**" shall mean the funds appropriated by the Legislature of Puerto Rico in the annual budget of capital improvements and operating expenses of the Commonwealth for any Fiscal Year for the payment of the Notes pursuant to the provisions of the Act or, in the case such budget of the Commonwealth for any Fiscal Year has not been approved by the commencement of such Fiscal Year, until such budget is approved, the funds representing the amounts which had been appropriated in the budget of the Commonwealth for the previous Fiscal Year for the payment of the Notes pursuant to the provisions of the Act in accordance with Article VI, Section 6 of the Constitution of the Commonwealth.

"**Liquidity Facility**" shall mean a letter of credit, policy of municipal bond insurance, guaranty, purchase agreement or similar facility in which the person providing such facility agrees to provide funds to pay the purchase price of Put Bonds upon their tender by the Holders of Put Bonds.

"**Loans**" shall mean the advances, repayment commitments, obligations and/or loans of the Authorized Debtors specified in the Act.

"**Maximum Difference**" shall mean the maximum increase from one Fiscal Year to the next in the aggregate debt service on the Notes and on the Loans remaining with Government Development Bank.

"**Moody's**" means Moody's Investors Service, Inc., a corporation organized and existing under the laws of the State of Delaware, its successors and their assigns, and, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "Moody's" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Corporation.

"**Notes**" shall mean promissory notes of the Authorized Debtors executed in connection with the restructuring of Loans pursuant to the Act and purchased with the proceeds of any Series of Bonds and pledged to the Trustee pursuant to the Trust Agreement.

"**Outstanding**" when used with reference to the Bonds shall mean, as of any date of determination, all Bonds theretofore authenticated and delivered except:

    a)    Bonds theretofore cancelled by the Trustee or delivered to the Trustee for cancellation;

    b)    Bonds that are deemed paid and no longer outstanding, as provided in the Trust Agreement;

    c)    Bonds paid or Bonds in lieu of which other Bonds have been issued pursuant to the provisions of the Trust Agreement relating to Bonds destroyed, mutilated, stolen or lost, unless evidence satisfactory to the Trustee has been received that any such Bond is held by a bona fide purchaser;

    d)    Bonds tendered or deemed tendered, as provided in the resolution of the Board for any Series of Bonds; and

    e)    for purposes of any consent or other action to be taken under the Trust Agreement by the Holders of a specified percentage principal amount of Bonds, Bonds actually known by the Trustee to be held by or for the account of the Corporation.

"**Pledged Revenues**" shall mean all of the Corporation's right, title and interest in and to (i) all amounts paid and to be paid in respect of the Notes, (ii) all moneys and Investment Obligations on deposit to the credit of the Sinking Fund, (iii) the Hedge Counterparty Swap Payments, if any, and (iv) all investment earnings on the foregoing.

"**Put Bonds**" shall mean Bonds that by their terms may be tendered by and at the option of the Holder thereof for payment prior to the stated maturity thereof.

"**Qualified Financial Institution**" means the Federal National Mortgage Association, or any bank, trust company or national banking association, or a corporation subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956, as amended, or any government securities dealer, insurance company or other financial institution, in each case whose unsecured obligations or uncollateralized long term debt obligations (or obligations guaranteed by its parent entity) shall at all times during the term of the Investment Agreement issued by such Qualified Financial Institution have been assigned a rating by Standard & Poor's and Moody's in one of the three highest rating categories (without regard to any gradations within any such category), or which has issued a letter of credit, contract or agreement in support of debt obligations which at all times shall have been so rated.

"**Rate Swap**" means any interest rate swap arrangement between the Corporation and a Hedge Counterparty pursuant to any Swap Agreement and related documentation.

"**Rating Agencies**" shall mean Standard & Poor's and Moody's.

"**Reimbursement Agreement**" shall mean any letter of credit and reimbursement agreement or other similar agreement to pay the amounts due to the provider of a Credit Facility or a Liquidity Facility between the Corporation and any provider of a Credit Facility or a Liquidity Facility.

"**Reimbursement Obligation**" shall mean all amounts payable by the Corporation to a provider of a Credit Facility or Liquidity Facility pursuant to its agreement with such provider, including any fees payable and expenses reimbursable to such provider.

"**Reserve Account**" shall mean the account of that name which may be established in the Sinking Fund.

"**Reserve Account Insurance Policy**" shall mean the insurance policy, surety bond or other evidence of insurance deposited to the credit of the Reserve Account in lieu of or in partial substitution for cash or securities on deposit therein, which policy, bond or other evidence of insurance constitutes an unconditional senior obligation of the issuer thereof. The issuer thereof shall be a municipal bond insurer whose senior debt obligations, ranking pari passu with its obligations under such policy, bond or other evidence of insurance, are rated, at the time of deposit for the credit of the Reserve Account, in any of the three highest rating categories (without regard to any gradations within any such category) by Moody's and Standard & Poor's.

"**Reserve Account Letter of Credit**" shall mean the irrevocable, transferable letter of credit deposited to the credit of the Reserve Account in lieu of or in partial substitution for cash or securities on deposit therein, which letter of credit constitutes an unconditional senior obligation of the issuer thereof. The issuer of such letter of credit shall be Government Development Bank or a banking association, bank or trust company or branch thereof whose senior debt obligations, ranking pari passu with its obligations under such letters of credit are rated at the time of deposit to the credit of the Reserve Account, in any of the three highest rating categories (without regard to any gradations within any such category) by Moody's and Standard & Poor's.

"**Serial Bonds**" shall mean the Bonds designated as serial bonds in the resolutions authorizing such Bonds.

"**Series**" shall mean all of the Bonds authenticated and delivered at one time on original issuance and pursuant to any resolution authorizing such Bonds as a separate Series of Bonds, or any Bonds thereafter authenticated and delivered in lieu of or in substitution for such Bonds pursuant to the Trust Agreement, regardless of variations in maturity, interest rate or other provisions.

"**Sinking Fund**" shall mean the "Puerto Rico Public Finance Corporation Act 164 Sinking Fund," a special fund created and designated pursuant to the Trust Agreement.

"**Standard & Poor's**" means Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc., a corporation organized and existing under the laws of the State of New York, its successors, their assigns, and, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "Standard & Poor's" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Corporation.

"**Swap Agreement**" shall mean any Interest Rate Swap Agreement between the Corporation and a Hedge Counterparty related to the Bonds.

I-6

"**Term Bonds**" shall mean the Bonds designated as term bonds in the resolutions authorizing such Bonds.

"**Valuation Date**" shall mean, with respect to any Capital Appreciation Bond or Capital Appreciation and Income Bond, the date or dates set forth in the resolution authorizing such bonds on which Accreted Values are assigned to the Capital Appreciation Bonds or Capital Appreciation and Income Bonds.

"**Variable Rate Bonds**" shall mean Bonds issued with a variable, adjustable, convertible or similar interest rate that is not fixed in percentage at the date of issue for the term thereof.

## Sinking Fund and Accounts

A special fund is created under the Trust Agreement and designated the "Puerto Rico Public Finance Corporation Act 164 Sinking Fund" (the "Sinking Fund") to be held by the Trustee. There are created three separate accounts in the Sinking Fund designated "Bond Service Account," "Redemption Account," and "Surplus Account." If the resolution of the Board providing for the issuance of Bonds under the Trust Agreement requires that a Reserve Account be established, a separate account in the Sinking Fund designated "Reserve Account" is authorized to be created in accordance with such resolution. Subject to the terms and conditions set forth in the Trust Agreement, moneys held to the credit of the Sinking Fund shall be held in trust and applied by the Trustee solely for the purposes set forth below and pending such application shall be subject to the lien and charge created pursuant to the Trust Agreement until paid out or transferred as provided therein.

The Corporation shall cause the Secretary of the Treasury of the Commonwealth to transfer to the Trustee, no later than July 15 of each Fiscal Year while the Bonds are Outstanding, funds representing the entire Legislative Appropriation for such Fiscal Year.

All funds received by the Trustee representing the Legislative Appropriation (or funds received in substitution therefor or in respect of the Notes, including any moneys received pursuant to a draw under the GDB Letter of Credit) and other funds received by the Trustee, including any Hedge Counterparty Swap Payments (other than any moneys received from draws made under any Credit Facility or Liquidity Facility, other than the GDB Letter of Credit, which moneys will be deposited in special subaccounts as provided below), shall be deposited in the Sinking Fund in the following order:

first, to the credit of the Bond Service Account, such amount as may be required to make the total amount then to the credit of the Bond Service Account equal to the sum of (i) the amount of interest then or to become due and payable on the Bonds of each Series then Outstanding during the Bond Year commencing within the Fiscal Year with respect to which such Legislative Appropriation is made or such funds are received and (ii) the amount of principal then or to become due and payable not later than July 31 of such Bond Year on the Serial Bonds of each Series then Outstanding;

second, to the credit of the Redemption Account, such amount as may be required to make the total amount then to the credit of the Redemption Account in the Bond Year commencing within the Fiscal Year with respect to which such Legislative Appropriation is made or such funds are received equal to the Amortization Requirement for such Bond Year for the Term Bonds of each Series then Outstanding; and

third, to the credit of the Surplus Account, any remaining amount.

If the Corporation issues Variable Rate Bonds pursuant to the Trust Agreement, the assumptions for calculating interest for the current Bond Year to ensure a sufficient deposit for the payment of said interest shall be made on the basis established in the resolution authorizing the issuance of such Variable Rate Bonds.

If there is a Credit Facility or a Liquidity Facility issued by a provider in connection with the issuance of a Series of Bonds, any moneys received from draws under such Credit Facility or a Liquidity Facility shall be deposited in separate subaccounts in the Bond Service Account or the Redemption Account, as appropriate, and used to pay the principal of and interest on the Bonds secured thereby.

To the extent required by a resolution of the Board in connection with the issuance of any Series of Bonds, the Trustee shall establish one or more subaccounts within the Bond Service Account and the Redemption Account to segregate amounts paid under any of the Notes and make withdrawals from such subaccounts to make payments under any Series of Bonds designated in such resolution. Nothing in the foregoing sentence shall be deemed to affect the parity status of the Bonds.

**Withdrawals from Bond Service Account**

On each Interest Payment Date or as otherwise provided in the resolution of the Board authorizing the issuance of a Series of Bonds, the Trustee shall withdraw from the Bond Service Account and (1) remit by mail (or by wire transfer if so provided by resolution of the Board) to each Holder of Bonds the amounts required for paying interest upon such Bonds as such interest becomes due, and (2) set aside sufficient moneys for paying the principal of Serial Bonds as such principal becomes due.

**Withdrawals from Redemption Account**

Moneys held to the credit of the Redemption Account shall be applied to the retirement of Bonds as follows:

(a)     Subject to the provisions of paragraph (c) below, the Trustee shall endeavor to purchase Bonds or portions of Bonds, whether or not such Bonds or portions shall then be subject to redemption, at the most advantageous price obtainable by it with reasonable diligence, such price not to exceed the principal of such Bonds plus the amount of the premium, if any, that would be payable on the next redemption date to the holders of such Bonds under the redemption provisions of the Trust Agreement if such Bonds or portions of Bonds should be called for redemption on such date from the moneys in the Sinking Fund. The Trustee shall pay the interest accrued on such Bonds or portions of Bonds to the date of delivery thereof from the Bond Service Account and the principal portion of such purchase price from the Redemption Account. No such purchase shall be made by the Trustee within the period of forty-five (45) days immediately preceding the date on which such Bonds are subject to call for redemption under the redemption provisions of the Trust Agreement except from moneys in excess of the amounts set aside or deposited for such redemption of Bonds;

(b)     Subject to the provisions of paragraph (c) below, the Trustee shall call for redemption on each date on which Bonds are subject to redemption from moneys in the Sinking Fund such amount of Bonds or portions of Bonds then subject to redemption as, with the redemption premium, if any, will exhaust the moneys then held for the credit of the Redemption Account as nearly as may be; provided, however, that not less than $100,000 principal amount of Bonds shall be called for redemption at any one time. Such redemption shall be made pursuant to the redemption provisions of the Trust Agreement. Prior to calling Bonds or portions of Bonds for redemption the Trustee shall withdraw from the Bond Service Account and from the Redemption Account (including moneys transferred from the Reserve Account (if applicable) to the credit of the Redemption Account) and set aside in separate accounts or deposit with the paying agents the respective amounts required for paying the interest on, and the principal and redemption premium, if any, of the Bonds or portions of Bonds so called for redemption;

I-8

(c)      Moneys in the Redemption Account shall be applied by the Trustee in each Bond Year to the retirement of Bonds of each Series then Outstanding in the following order:

first, the Term Bonds of each such Series to the extent of the Amortization Requirement, if any, for such Bond Year for the Term Bonds of each such Series then Outstanding, plus the applicable premium, if any, and, if the amount available in such Bond Year shall not be sufficient therefor, then in proportion to the Amortization Requirement, if any, for such Bond Year for the Term Bonds of each such Series then Outstanding, plus the applicable premium, if any;

second, any balance then remaining shall be applied to the purchase of any Bonds then Outstanding whether or not such Bonds shall then be subject to redemption, in accordance with the provisions of paragraph (a) above; and

third, any balance then remaining shall be applied to the retirement of Bonds of each Series as directed by the Corporation.

**Withdrawals from Surplus Account**

Moneys held to the credit of the Surplus Account shall be applied by the Trustee to make payments in the following order: (i) to make up any deficiency in the Bond Service Account and the Redemption Account; (ii) to pay the compensation of the Trustee and other amounts payable to the Trustee under the Trust Agreement upon the written request of the Corporation; (iii) to make Corporation Swap Payments (if applicable), if any; (iv) to pay any fees and expenses payable to the providers of any Credit Facility, Liquidity Facility, Reserve Account Insurance Policy or Reserve Account Letter of Credit (if applicable) upon the written request of the Corporation; and (v) to reimburse or pay any provider of such facilities (if applicable) for any other amounts due under the agreement with such provider.

Any moneys held to the credit of the Surplus Account after all amounts described in the preceding paragraph required to be paid in respect of a Bond Year have been paid shall, upon the written request of the Corporation, be transferred to the credit of the Bond Service Account or the Redemption Account.

**Reserve Account**

If the resolution of the Board providing for the issuance of Bonds under the Trust Agreement requires that a Reserve Account be established, a separate account in the Sinking Fund designated "Reserve Account" is authorized to be created in accordance with said resolution, in which Reserve Account there shall be established separate subaccounts as provided in such resolution. In such event the Trustee shall, from the funds received by the Trustee in accordance with the Trust Agreement, prior to depositing any amounts to the credit of the Surplus Account, deposit to the credit of each subaccount within the Reserve Account such amount as may be required to make the amount then on deposit to the credit of each such subaccount equal to the amount established in such resolution of the Board. Any Reserve Accounts created under the Trust Agreement will be applicable to one or more Series of Bonds issued under the Trust Agreement as provided in the resolution of the Board authorizing any such Series.

In lieu of any required deposit or in substitution of moneys on deposit to the credit of the Reserve Account (if applicable), the Corporation may cause to be deposited to the credit of the Reserve Account a Reserve Account Insurance Policy or a Reserve Account Letter of Credit in an amount equal to such required deposit, which Reserve Account Insurance Policy or Reserve Account Letter of Credit shall be satisfactory in form and substance to the Trustee and shall be payable or available to be drawn upon, as the case may be (upon the giving of notice as required thereunder), on any payment date for the Bonds on which a withdrawal from the Reserve Account would be required under the Trust Agreement, and give

the Trustee the right to draw on any Reserve Account Insurance Policy or Reserve Account Letter of Credit prior to the expiration thereof unless the Corporation has furnished a replacement Reserve Account Insurance Policy or Reserve Account Letter of Credit or has provided sufficient moneys to make the amounts then on deposit to the credit of the Reserve Account equal to the amount required therefor. If a disbursement is made under a Reserve Account Insurance Policy or a Reserve Account Letter of Credit, the funds thereafter becoming available for deposit to the credit of the Reserve Account shall be used by the Trustee to reinstate the amounts available to be drawn under such Reserve Account Insurance Policy or Reserve Account Letter of Credit in an amount at least equal to the amount being reimbursed to the provider of such Reserve Account Insurance Policy or Reserve Account Letter of Credit or, if such reinstatement is not available, to deposit to the credit of the Reserve Account moneys in the amount of the disbursement made under such Reserve Account Insurance Policy or Reserve Account Letter of Credit or a combination of such alternatives.

**Additional Bonds**

Additional Bonds may be issued under and secured by the Trust Agreement, subject to certain conditions, at any time or times solely for the purpose of (i) purchasing any additional Notes from Government Development Bank, (ii) providing funds for refunding all or any part of the Outstanding Bonds of any one or more Series by payment at maturity or redemption at a selected redemption date or dates or combination of such payment at maturity and redemption, including the payment of any redemption premium thereon, (iii) making a deposit to a Reserve Account (if applicable), (iv) paying capitalized interest, and (v) paying the costs of issuance of such additional Bonds. No additional Bonds may be issued unless the amounts of principal and interest payable under the Notes after the issuance of such additional Bonds are sufficient to pay the principal of and interest on all Bonds Outstanding after the issuance of such additional Bonds, together with other amounts required to be paid by the Corporation with respect to the Bonds, any Credit Facility or Liquidity Facility relating thereto, any Corporation Swap Payments and the Trust Agreement. In addition, no additional Bonds may be issued unless the GDB Letter of Credit is amended to change the stated amount, if necessary, or a successor letter of credit issued in favor of the Trustee is obtained, so that in either case the stated amount of the GDB Letter of Credit or such successor letter of credit is not less than the estimated Maximum Difference after the issuance of such additional Bonds as certified by the Corporation. Any successor letter of credit must be issued by a bank, banking association or trust company whose long-term debt obligations are rated at the time of issuance of the letter of credit in any of the three highest rating categories (without regard to any gradations within any such category) by Moody's and Standard & Poor's.

**Investment of Moneys**

Moneys held to the credit of the Bond Service Account and the Redemption Account (except any subaccounts established by one or more resolutions of the Board to segregate amounts received from a Credit Facility or a Liquidity Facility, which resolution or resolutions may provide for the investment of moneys deposited to the credit of any such subaccount) shall, as nearly as may be practicable, be continuously invested and reinvested, at the written direction of the Corporation specifying the particular investment to be made, in (i) Government Obligations that shall mature, or that shall be subject to redemption by the holder thereof at the option of such holder, not later than the respective dates when moneys held for the credit of said accounts will be required for the purposes intended; or (ii) Investment Agreements pursuant to which funds would be available not later than the respective dates when moneys held for the credit of said accounts would be required for the purposes intended. Moneys held to the credit of the Surplus Account shall be continuously invested and reinvested at the written direction of the Corporation in any Investment Obligations selected by it. Moneys held to the credit of the Reserve Account (if applicable) shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Corporation in Investment Obligations selected by it that shall mature no later than the final maturity of the Bonds.

Obligations so purchased as an investment of moneys in any such fund or account shall be deemed at all times to be a part of such fund or account, and any investment earnings and profit or loss realized on the sale or maturity thereof, shall be credited or debited to such fund or account; provided, however, that if the required deposit to any account in the Sinking Fund has been made for the current Bond Year, the investment earnings on moneys held to the credit of such account shall be deposited to the credit of any other account of the Sinking Fund for which such required deposit has not been made, in the order required by the Trust Agreement, and thereafter shall be deposited to the credit of such account in the Sinking Fund as shall be directed by the Corporation.

**No Impairment**

The Corporation covenants and agrees that, so long as any of the Bonds shall be Outstanding and so long as any of its other obligations under any Reimbursement Agreement (if applicable) or Swap Agreement (if applicable) shall remain unpaid, none of the Pledged Revenues will be used for any purpose other than as provided in the Trust Agreement, and that no contract or contracts will be entered into or any action taken by which the rights of the Trustee, the holders or such other parties secured by the Trust Agreement to such Pledged Revenues might be impaired or diminished.

**Inclusion of Principal and Interest Requirement in Budget**

Each year while any Bonds are Outstanding, the Corporation shall file a timely request with the Director of the Office of Management and Budget of Puerto Rico to include in the annual budget of capital improvements and operating expenses of the Commonwealth for the next Fiscal Year the necessary Legislative Appropriation so that payments in respect of the Notes shall be sufficient to cover the principal and interest payable with respect to the Bonds and all other amounts payable in respect of the Bonds or payable under the Trust Agreement during the Bond Year commencing within such Fiscal Year.

**Enforcement of Remedies**

At the request of the holders of not less than 20% of the aggregate principal amount of Bonds then Outstanding, the Trustee shall proceed, subject to the Trustee's rights to indemnification under the Trust Agreement, to protect and enforce its rights and the rights of the holders under the laws of Puerto Rico or under the Trust Agreement, including all rights with respect to the Notes and the Pledged Revenues, by such suits, actions or special proceedings in equity or at law, or by proceedings in the office of any board or officer having jurisdiction, either for specific performance of any covenant or agreement contained in the Trust Agreement or in aid or execution of any power granted in the Trust Agreement or for the enforcement of any proper or legal remedy, provided, that the Trustee may not sell or otherwise dispose of the Notes.

**Pro Rata Application of Funds**

If at any time the moneys in the Sinking Fund shall not be sufficient to pay the interest on or the principal of the Bonds as the same shall become due and payable, such moneys (except for any moneys obtained from a drawing on a Credit Facility, other than the GDB Letter of Credit, or Liquidity Facility (if applicable) and deposited in a separate subaccount which shall secure only one or more specified Series of Bonds or moneys deposited in any subaccount within the Reserve Account that secures only such specified Series of Bonds), together with any moneys then available or thereafter becoming available for such purpose, whether through the exercise of the remedies provided for in the Trust Agreement or otherwise, shall be applied as follows:

first, to the payment to the persons entitled thereto of all installments of interest then due and payable in the order in which such installments became due and payable and, if the

I-11

amount available shall not be sufficient to pay in full any particular installment, then to the payment, ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in such Bonds;

second, to the payment to the persons entitled thereto of the unpaid principal of any of the Bonds which shall have become due and payable (other than Bonds called for redemption for the payment of which moneys are held pursuant to the provisions of the Trust Agreement) in the order of their due dates, with interest on such Bonds at the respective rates specified therein from the respective dates upon which such Bonds became due and payable, and, if the amount available shall not be sufficient to pay in full the principal of such Bonds due and payable on any particular date, together with such interest, then to the payment first of such interest, ratably, according to the amount of such interest due on such date, and then to the payment of such principal, ratably, according to the amount of such principal due on such date, to the persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in such Bonds;

third, to the payment of the interest on and the principal of such Bonds, to the purchase and retirement of Bonds and to the redemption of Bonds, all in accordance with the provisions of the Trust Agreement;

fourth, to the payment of any amounts then due and owing to a provider of a Credit Facility or a Liquidity Facility (if applicable); and

fifth, to the payment of any amounts then due and payable to a Hedge Counterparty under a Swap Agreement (if applicable).

**Supplemental Agreements Without Bondholders' Consent**

The Corporation and the Trustee may, without the consent or approval of, or notice to, any of the Bondholders, from time to time and at any time, enter into agreements supplemental to the Trust Agreement as shall not be inconsistent with the terms and provisions thereof, for the following purposes:

      (a)     to cure any ambiguity or formal defect or omission in the Trust Agreement or in any supplemental agreement or to correct or supplement any provision contained therein that may be defective or inconsistent with any other provisions contained therein; or

      (b)     to grant to or confer upon the Trustee for the benefit of the Bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the Bondholders or the Trustee; or

      (c)     to add to the conditions, limitations and restrictions on the issuance of Bonds under the provisions of the Trust Agreement, other conditions, limitations and restrictions thereafter to be observed; or

      (d)     to add to the covenants and agreements of the Corporation in the Trust Agreement other covenants and agreements thereafter to be observed by the Corporation or to surrender any right or power therein reserved to or conferred upon the Corporation; or

      (e)     to permit the issuance of Bonds in coupon form; or

      (f)     to qualify the Bonds or any of the Bonds for registration under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended; or

(g)      to qualify the Trust Agreement as an "indenture" under the Trust Indenture Act of 1939, as amended; or

(h)      to make such changes as may be necessary to adjust the terms of the Trust Agreement so as to facilitate the issuance of Variable Rate Bonds, Capital Appreciation Bonds, Capital Appreciation and Income Bonds, Put Bonds, Interim Bonds and such other Bonds as may be marketable from time to time; or

(i)      to make such changes as may be necessary to comply with the provisions of Puerto Rico law relating to the exclusion of interest on the Bonds from gross income thereunder; or

(j)      to make such changes as may evidence the right and interest of an issuer of a Credit Facility or a Liquidity Facility that secures any Series of Bonds; or

(k)      to make such changes as may be necessary to create a Reserve Account for any Bonds.

## Modification with Consent of Holders of Majority of Bonds

Subject to the terms and provisions contained in the Trust Agreement, and not otherwise, the holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding (or in case less than all of several Series of Bonds then Outstanding are affected by the proposed supplemental agreement, the holders of not less than a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time the consent is given) shall have the right, from time to time, anything contained in the Trust Agreement to the contrary notwithstanding, to consent to and approve the execution by the Corporation and the Trustee of such agreement or agreements supplemental thereto as shall be deemed necessary or desirable by the Corporation for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained in the Trust Agreement or in any supplemental agreement; provided, however, that nothing contained in the Trust Agreement shall permit, or be construed as permitting, without the consent of the holders of 100% of the Bonds Outstanding affected by the proposed supplemental agreement (a) an extension of the time for the payment of the principal of or the interest on any Bond, or (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, or (c) the creation of any lien or a pledge of funds other than the lien and pledge created by the Trust Agreement, or (d) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (e) a reduction in the aggregate principal amount of the Bonds required for consent to such supplemental agreement or any waiver under the Trust Agreement.

## Amendments to the Notes

The Trustee (as assignee of the Notes) may, without the consent or approval of, or notice to any of the Bondholders, enter into, from time to time and at any time, such amendments to the Notes, in form satisfactory to the Trustee, as shall not be inconsistent with the terms and provisions thereof to (a) cure any ambiguity or formal defect or omission in the Notes, provided such action shall not materially adversely affect the interests of the Bondholders, or (b) grant to or confer upon the Corporation or Trustee for the benefit of the Bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the Corporation or Bondholders or the Trustee, or (c) provide for the substitution of any Notes for other notes of Authorized Debtors, provided that such substitution does not restrict, limit or reduce the obligation of the Authorized Debtors to make payments sufficient to pay the principal of and interest on the Bonds, or otherwise impair the security of the Bondholders of any Series of Bonds under the Trust Agreement, or (d) change the Applicable Percentage (as defined in the Notes) with respect to any Note, or (e) make any other change which, in the judgment of the Trustee, based upon an opinion of counsel, will not restrict, limit or reduce the obligation of the Authorized

I-13

Debtors to make the payments under the Notes sufficient to pay the principal of or interest on the Bonds, or otherwise impair the security of the Bondholders under the Trust Agreement.

Except for amendments provided for in the preceding paragraph,  the Trustee shall not enter into any amendment to the Notes unless notice of the proposed amendment shall have been given and the holders of not less than a majority in aggregate principal amount of the Bonds then Outstanding shall have consented to and approved the execution thereof, all as provided for under "Modification with Consent of Holders of Majority of Bonds" above; and provided further that without the consent of all of the holders of the Bonds Outstanding affected by such change, no such amendment shall be entered into by the Trustee which would restrict, limit or reduce the obligations of the Authorized Debtors with respect to the Bonds.

**Supplements and Amendments to the GDB Letter of Credit**

The Trustee, the Corporation and Government Development Bank may, without the consent or approval of, or notice to, any of the Bondholders, agree to and execute, from time to time and at any time, such amendments and supplements to the GDB Letter of Credit as shall not be inconsistent with the terms and provisions thereof, which amendments or supplements in the opinion of the Trustee, based upon an opinion of counsel, shall not be detrimental to the interests of the Holders of the Bonds to:

(a)     cure any ambiguity or formal defect or omission in the GDB Letter of Credit or in any supplement thereto,

(b)     grant to or confer upon the Trustee for the benefit of the Holders of the Bonds any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the Holders of the Bonds or the Trustee, or

(c)     reduce the stated amount of the GDB Letter of Credit to the extent that the Maximum Difference is reduced, as certified by the President or any Executive Vice President of the Corporation, or

(d)     make any other change which, in the judgment of the Trustee, based upon an opinion of counsel, will not restrict, limit or reduce the obligation of Government Development Bank to make the payments under the GDB Letter of Credit to pay the principal of or interest on the Bonds or otherwise impair the security of the Holders of the Bonds under the Trust Agreement.

Except for supplements and amendments described above, the Trustee shall not agree to any supplement or amendment to the GDB Letter of Credit unless notice of the proposed execution of such supplement or amendment shall have been given to the Holders of the Bonds and the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding shall have consented to and approved the execution thereof.  Except as described above, nothing contained in the Trust Agreement shall permit or be construed as permitting any amendment or modification of any provision of the GDB Letter of Credit which would reduce the amount of any payment required to be made thereunder to the Trustee, or would postpone the time of any such payment, or would alter the conditions under which any such payment is made, or any other amendment or modification which would adversely affect the security of the Holders of the Bonds, as the case may be.

**Defeasance**

If all the Outstanding Bonds shall have been paid or deemed to have been paid as provided below and all amounts due and owing to any provider of a Credit Facility, Liquidity Facility or Rate Swap shall have been paid, then and in that case the right, title and interest of the Trustee under the Trust Agreement shall cease, terminate and become void, and such Bonds shall cease to be entitled to any benefit or security under the Trust Agreement.  In such event, the Trustee shall transfer and assign to the Corporation all property then held by the Trustee, shall execute such documents as may be reasonably required by the Corporation to evidence such transfer and assignment and shall turn over to the Corporation any surplus in any account in the Sinking Fund.

Any Outstanding Bond shall be deemed to have been paid within the meaning and with the effect expressed in the Trust Agreement when the whole amount of the principal of and interest on such Bond shall have been paid or when (a) there shall have been deposited with the Trustee or another fiduciary institution acting as escrow agent for the holder of such Bond either moneys in an amount which shall be sufficient, or Government Obligations, which shall not contain provisions permitting the redemption thereof at the option of the issuer, the principal of and interest on which when due, and without any reinvestment thereof, will provide moneys which, together with the moneys, if any, deposited with or held by the Trustee available therefor, shall be sufficient, to pay when due the principal of and premium, if any, and interest due and to become due on such Bond on or prior to the redemption date or maturity date thereof, as the case may be, and (b) in the event such Bond does not mature and is not to be redeemed within the next succeeding sixty 60 days, the Corporation shall have given the Trustee irrevocable instructions to give, as soon as practicable, a notice to the holder of such Bond by first-class mail, postage prepaid, stating that the deposit of moneys or Government Obligations has been made with the Trustee or another fiduciary institution acting as escrow agent for the holder of such Bond and that such Bond is deemed to have been paid in accordance with the Trust Agreement and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal of and premium, if any, and interest on such Bond.

[This page intentionally left blank]

**APPENDIX II**

## SUMMARY OF THE ACT 113 TRUST AGREEMENT

The following is a summary of certain provisions of the Trust Agreement, dated June 30, 1995, relating to the Act 113 Bonds (the "Trust Agreement"). The statements contained herein do not purport to be complete and this summary is qualified in its entirety by reference to the Trust Agreement.

**Definitions of Certain Terms**

The following words and terms have the following meanings, unless the context otherwise requires. Words importing the singular number include the plural number in each case and vice versa, and words importing persons include firms and corporations.

"**Accreted Value**" shall mean, with respect to any Capital Appreciation Bond or Capital Appreciation and Income Bond (i) as of any Valuation Date, the amount set forth for such date in the resolution authorizing such Capital Appreciation Bond or Capital Appreciation and Income Bond (or, if there is no preceding Valuation Date, the initial principal amount) and (ii) as of any date other than a Valuation Date, the sum of (a) the Accreted Value on the preceding Valuation Date and (b) the product of (1) a fraction, the numerator of which is the number of days having elapsed from the preceding Valuation Date (or from the original issue date if there is no preceding Valuation Date) and the denominator of which is the number of days from such preceding Valuation Date (or from the original issue date if there is no preceding Valuation Date) to the next succeeding Valuation Date and (2) the difference between the Accreted Values for such Valuation Dates  (or between the initial principal amount and the Accreted Value on the first Valuation Date).

"**Act**" shall mean Act No. 113 of the Legislature of Puerto Rico, approved September 27, 1994.

"**Amortization Requirement**" shall mean, for the Term Bonds of any Series for any Fiscal Year, the principal amount fixed or computed for the retirement by purchase or redemption of Term Bonds in such Fiscal Year, as provided for in the Trust Agreement. The Amortization Requirement for the Term Bonds of each Series shall be initially in the respective principal amounts for each Fiscal Year as fixed in a resolution of the Corporation adopted prior to the issuance of the Bonds of such Series, and the aggregate amount of such Amortization Requirement for the Term Bonds of such Series shall be equal to the aggregate principal amount of the Term Bonds of such Series. If at the close of any Fiscal Year the total principal amount of Term Bonds of any Series retired by purchase or redemption, or prior to the close of such Fiscal Year called for redemption with moneys held for the credit of the Redemption Account pursuant to the Trust Agreement, shall be in excess of the amount of the Amortization Requirement for the Term Bonds of such Series for such Fiscal Year, then the amount of the Amortization Requirement for the Term Bonds of such Series shall be reduced for such subsequent Fiscal Years in such amounts aggregating the amount of such excess as shall be determined by the President of the Corporation in an order filed with the Trustee on or before the 10th day following the close of such Fiscal Year. If at the close of any Fiscal Year the total principal amount of Term Bonds of any Series retired by purchase or redemption, or prior to the close of such Fiscal Year called for redemption with moneys held for the credit of the Redemption Account pursuant to the Trust Agreement, shall be less than the amount of the Amortization Requirement for the Term Bonds of such Series for such Fiscal Year, then the amount of the Amortization Requirement for the Term Bonds of such Series for the next succeeding Fiscal Year shall be increased by the amount of such deficiency.

"**Appreciated Value**" shall mean, with respect to any Capital Appreciation and Income Bond (i) up to the Interest Commencement Date set forth in the resolution of the Board providing for the issuance of such Bond, an amount equal to the Accreted Value of such Bond and, (ii) as of any date of computation on and after the Interest Commencement Date, an amount equal to the Accreted Value of such Bond on the Interest Commencement Date.

"**Balloon Bonds**" shall mean any Bonds, interest on which is payable periodically and twenty-five percent (25%) or more of the original principal amount of which matures during any one Fiscal Year and for which maturing principal amount Amortization Requirements have not been designated.

"**Board**" shall mean the Board of Directors of the Corporation as constituted from time to time and which shall be the Board of Directors of Government Development Bank as provided by Resolution Number Five Thousand Forty-Four (5044), adopted December twelve (12), nineteen hundred eighty-four (1984) by the Board of Directors of Government Development Bank, as amended, or, if said Board shall be abolished, the board or body succeeding to the principal functions thereof or to whom the powers of the Corporation shall be given by law.

"**Bondholder**," "**Holder**," "**holder**," "**Holder of Bonds**," or "**Owner**" or any similar term, shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

"**Bonds**" or "**bonds**" shall mean the bonds of the Corporation issued under the provisions of the Trust Agreement.

"**Business Day**" means a day other than a Saturday, Sunday or a day on which commercial banks in the City of New York, New York, or San Juan, Puerto Rico, are closed to the public.

"**Capital Appreciation Bonds**" shall mean any Bonds the interest on which is compounded periodically on each of the dates designated for compounding in the resolution authorizing said Bonds and payable in an amount equal to the then current Accreted Value only at the maturity, earlier redemption or other payment date therefor, all as so provided by such resolution, and which may be either Serial Bonds or Term Bonds.

"**Capital Appreciation and Income Bonds**" shall mean any Bonds the accruing interest on which is not paid prior to the Interest Commencement Date specified in the resolution authorizing such Bonds and the Appreciated Value for such Bonds is compounded periodically on the dates designated in such resolution prior to the Interest Commencement Date for such Capital Appreciation and Income Bonds, and which may be either Serial Bonds or Term Bonds.

"**Credit Facility**" shall mean an irrevocable letter of credit, policy of municipal bond insurance, guaranty, purchase agreement, credit agreement or similar facility in which the person providing such facility irrevocably agrees to provide funds to make payment of the principal of, premium, if any, and interest on Bonds to which such Credit Facility relates.

"**Extendible Maturity Bonds**" shall mean Bonds, the maturities of which, by their terms, may be extended by and at the option of the holders of the Bonds or the Corporation.

"**Fiscal Year**" shall mean the period commencing on the first day of July of any year and ending on the last day of June of the following year or any other twelve month period designated by the Board.

II-2

"**Government Obligations**" shall mean (i) direct obligations of, or obligations the payment of the principal of and interest on which are unconditionally guaranteed by, the United States of America; (ii) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clause (i) above held by a bank (including the Trustee) or trust company as custodian, under which the owner of said interests is the real party in interest and has the right to proceed directly and individually against the obligor on the underlying obligations described in said clause (i), and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated; (iii) municipal obligations, the payment of the principal of, interest and redemption premium, if any, on which are irrevocably secured by obligations described in clause (i) or (ii) above and which obligations are not subject to redemption prior to the date on which the proceeds attributable to the principal of such obligations are to be used and have been deposited in an escrow account that is irrevocably pledged to the payment of the principal of and interest and redemption premium, if any, on such municipal obligations; and (iv) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clause (iii) above held by a bank (including the Trustee) or trust company as custodian, under which the owner of said interests is the real party in interest and has the right to proceed directly and individually against the underlying obligations described in said clause (iii), and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated.

"**Interest Commencement Date**" shall mean, with respect to any Capital Appreciation and Income Bond, the date specified in the resolution providing for the issuance of such Bond after which interest accruing on such Bond shall be payable semiannually or otherwise on a periodic basis, with the first such payment date being the applicable Interest Payment Date immediately succeeding such Interest Commencement Date.

"**Interim Bonds**" shall mean any Bonds issued on an interim basis that are expected to be repaid from the proceeds of Bonds or other indebtedness.

"**Interest Payment Dates**" shall mean the dates on which interest on a Series of Bonds or portion thereof is scheduled to be due and payable, as provided by a resolution of the Board adopted prior to the issuance of such Series of Bonds.

"**Investment Obligations**" shall mean any of the following, to the extent that the same is legal for the investment of public funds under the laws of the Commonwealth:

(i)      Government Obligations;

(ii)      obligations issued or guaranteed by an agency of the United States of America or person controlled by or supervised by and acting as an instrumentality of the United States of America pursuant to authority granted by Congress, whether now existing or hereafter organized, including but not limited to those of the Federal Home Loan Mortgage Corporation, Federal Home Loan Banks, Farm Credit System, Student Loan Marketing Association and Federal National Mortgage Association and evidences of ownership of proportionate interests in future interest or principal payments in obligations specified above held by a bank (including the Trustee) or trust company as custodian, under which the owner of said interests is the real party in interest and has the right to proceed directly and individually against the obligor on the underlying obligations described above, and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated;

(iii)     bankers acceptances, certificates of deposit or time deposits of any bank (including the Trustee), trust company or savings and loan association (including any investment in pools of such bankers acceptances, certificates of deposit or time deposits) whose general unsecured long-term debt obligations are rated at least as high as the Bonds by both Moody's Investors Service, Inc. or any successor thereto and Standard and Poor's Ratings Services or any successor thereto, which to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation, are either (A) issued by a bank, trust company or savings and loan association having, on the date of investment, a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by such securities, as are described in clauses (i) or (ii) above, having a market value at least equal to the principal amount of such bankers acceptances, certificates of deposit or time deposits (or portion thereof not so insured) provided that the Trustee has a perfected first lien security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(iv)     obligations issued by any state or territory of the United States of America, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's Investors Service, Inc. or any successor thereto and Standard & Poor's Ratings Services or any successor thereto;

(v)     municipal obligations, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's Investors Service, Inc. or any successor thereto and Standard & Poor's Ratings Services or any successor thereto;

(vi)     any repurchase or investment agreement with any bank (including the Trustee) trust company or insurance company whose general unsecured long-term debt obligations are rated at least as high as the Bonds by both Moody's Investors Services, Inc. or any successor thereto and Standard and Poor's Ratings Services or any successor  thereto, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any one or more of the securities described in (i) or (ii) above, provided that the Trustee has a perfected first lien security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(vii)     commercial paper rated, or backed by a letter of credit or line of credit rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's Investors Service, Inc. or any successor thereto and Standard & Poor's Ratings Services or any successor thereto; and

(viii)     any other obligations, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's Investors Service, Inc. or any successor thereto and Standard & Poor's Ratings Services or any successor thereto.

"Legislative Appropriations" shall mean the funds appropriated by the Legislature of Puerto Rico in the annual budget of capital improvements and operating expenses of the Commonwealth for any Fiscal Year for the payment of the Note pursuant to the provisions of the Act or, in the case such budget of the Commonwealth for any Fiscal Year has not been approved by the commencement of such Fiscal Year, until such budget is approved, the funds representing the amounts which had been appropriated in the budget of the Commonwealth for the previous Fiscal Year for the payment of the Note pursuant to the provisions of the Act in accordance with Article VI, Section 6 of the Constitution of the Commonwealth.

"**Liquidity Facility**" shall mean a letter of credit, policy of municipal bond insurance, guaranty, purchase agreement or similar facility in which the person providing such facility agrees to provide funds to pay the purchase price of Put Bonds upon their tender by the Holders of Put Bonds.

"**Note**" shall mean the Promissory Note of Puerto Rico Maritime Shipping Authority, dated the date of issue of the Series A Bonds, as the same may be amended pursuant to the Trust Agreement, in the principal amount equal to the sum of (i) the principal and redemption premium, if any, due and payable in respect of the Bonds, (ii) amounts required to reimburse a provider of a Credit Facility, Liquidity Facility, Reserve Account Insurance Policy or Reserve Account Letter of Credit for payments made under any such facility, insurance policy or letter of credit in respect of principal of the Bonds, (iii) any fees payable to such provider under the agreement relating to such facility, insurance policy or letter of credit and any fees or reimbursement for expenses payable to the Trustee under the Trust Agreement, and (iv) any other amount payable in respect of the Bonds or payable under the provisions of the Trust Agreement; and providing for the payment of interest in an amount equal to the interest payable on the Bonds, including reimbursements to a provider of any such facility, insurance policy or letter of credit for payments made thereunder in respect of interest on the Bonds.

"**Outstanding**" when used with reference to the Bonds shall mean, as of any date of determination, all Bonds theretofore authenticated and delivered except:

(i)  Bonds theretofore cancelled by the Trustee or delivered to the Trustee for cancellation;

(ii)  Bonds that are deemed paid and no longer outstanding as provided in the Trust Agreement;

(iii)  Bonds in lieu of which other Bonds have been issued pursuant to the provisions of the Trust Agreement relating to Bonds destroyed, mutilated, stolen or lost, unless evidence satisfactory to the Trustee has been received that any such Bond is held by a bona fide purchaser;

(iv)  Bonds tendered or deemed tendered, as provided in the resolution of the Board for any Series of Bonds; and

(v)  for purposes of any consent or other action to be taken under the Trust Agreement by the Holders of a specified percentage of principal amount of Bonds, Bonds known by the Trustee to be held by or for the account of the Corporation.

"**Pledged Revenues**" shall mean all of the Corporation's right, title and interest in and to (i) all amounts paid and to be paid in respect of the Note, (ii) all moneys and Investment Obligations on deposit to the credit of the Sinking Fund established under the Trust Agreement, and (iii) all investment earnings on the foregoing.

"**Principal and Interest Requirement**" for any Fiscal Year, as applied to the Bonds of any Series, shall mean the sum of:

(i)  the amount required to pay the interest on all Bonds of such Series then Outstanding that is payable on each Interest Payment Date in such Fiscal Year;

(ii)  the amount required to pay the principal of all Serial Bonds of such Series then Outstanding that is payable upon the maturity of such Serial Bonds in such Fiscal Year; and

(iii)    the Amortization Requirement for the Outstanding Term Bonds of such Series for such Fiscal Year.

The following rules shall apply in determining the amount of the Principal and Interest Requirement:

(a)    The interest on Variable Rate Bonds shall be the interest to accrue on such Variable Rate Bonds for such Fiscal Year; provided, however, that for purposes of determining the maximum Principal and Interest Requirement in order to determine the amount to be on deposit to the credit of the Reserve Account, the interest on Variable Rate Bonds shall be assumed to be the highest interest rate payable thereon as provided in the resolution of the Board authorizing such Variable Rate Bonds.

(b)    In the case of Put Bonds, the "put" date or dates shall be ignored if a source for payment of said "put" is a Credit Facility or a Liquidity Facility, and the stated Fiscal Years for Amortization Requirements and dates for principal payments shall be used, and in the case of Bonds secured by a Credit Facility or a Liquidity Facility, the repayment terms of each Credit Facility or Liquidity Facility (whether or not evidenced by provisions included in the Bonds, such as an interest rate adjustment to apply if an unreimbursed drawing on the Credit Facility or Liquidity Facility shall occur) shall be ignored, unless the issuer of the Credit Facility or the Liquidity Facility has advanced funds thereunder and such amount has not been repaid, in which case Principal and Interest Requirement shall include the repayment obligation thereof in lieu of the stated terms of the Bonds, in accordance with the principal repayment schedule and interest rate or rates specified in the documents relating to such Credit Facility or Liquidity Facility, if the repayment obligation is secured on a parity with Bonds;

(c)    In the case of Extendible Maturity Bonds, the Bonds shall be deemed to mature on the later of the stated maturity date and the date to which such stated maturity date has been extended;

(d)    In the case of Capital Appreciation Bonds, the principal and interest portions of the Accreted Value becoming due at maturity or by virtue of an Amortization Requirement shall be included in the year in which said principal and interest portions are due;

(e)    In the case of Capital Appreciation and Income Bonds, the principal and interest portions of the Appreciated Value shall be included in the year in which said principal and interest portions are due;

(f)    In the case of Balloon Bonds or Interim Bonds, the debt service requirements may be excluded and in lieu thereof the Balloon Bonds or Interim Bonds shall be viewed as debt securities having a comparable federal tax status as such Balloon Bonds or Interim Bonds, hypothetically maturing in substantially equal annual payments of principal and interest over a period of not more than 30 years (as determined in the certificate described below) from the date of issuance thereof, bearing a fixed interest rate equal to the average interest rate per annum for such debt securities on the date of issuance of the Balloon Bonds or Interim Bonds and issued by issuers having a credit rating, issued by Moody's Investors Service, Inc. or any successor thereto or Standard & Poor's Ratings Services or any successor thereto, comparable to that of the Corporation, as shown by a certificate of an underwriting or investment banking firm experienced in marketing such securities; and

(g)    If all or a portion of the principal of or interest on a Series of Bonds is payable from funds irrevocably set aside or deposited for such purpose, together with projected earnings thereon to the extent such earnings are projected to be from Investment Obligations, such principal or interest shall not be included in determining the Principal and Interest Requirement; provided that the Trustee shall have

II-6

received on or prior to the date of calculation a verification from an independent certified public accountant demonstrating the sufficiency of such funds and projected earnings for such purpose.

"**Put Bonds**" shall mean Bonds that by their terms may be tendered by and at the option of the Holder thereof for payment prior to the stated maturity thereof.

"**Reserve Account Insurance Policy**" shall mean the insurance policy, surety bond or other evidence of insurance deposited to the credit of the Reserve Account in lieu of or in partial substitution for cash or securities on deposit therein, which policy, bond or other evidence of insurance constitutes an unconditional senior obligation of the issuer thereof. The issuer thereof shall be a municipal bond insurer whose senior debt obligations, ranking *pari passu* with its obligations under such policy, bond or other evidence of insurance, are rated, at the time of deposit for the credit of the Reserve Account, in any of the three highest rating categories of either Moody's Investors Service, Inc. or any successor thereto or Standard & Poor's Ratings Services or any successor thereto.

"**Reserve Account Letter of Credit**" shall mean the irrevocable, transferable letter of credit deposited to the credit of the Reserve Account in lieu of or in partial substitution for cash or securities on deposit therein, which letter of credit constitutes an unconditional senior obligation of the issuer thereof. The issuer of such letter of credit shall be Government Development Bank for Puerto Rico or a banking association, bank or trust company or branch thereof whose senior debt obligations, ranking *pari passu* with its obligations under such letters of credit are rated at the time of deposit to the credit of the Reserve Account, in any of the three highest rating categories of either Moody's Investors Service, Inc. or any successor thereto or Standard & Poor's Ratings Services or any successor thereto.

"**Serial Bonds**" shall mean the Bonds designated as serial bonds in the resolutions authorizing such Bonds.

"**Series**" shall mean all of the Bonds authenticated and delivered at one time on original issuance and pursuant to any resolution authorizing such Bonds as a separate Series of Bonds, or any Bonds thereafter authenticated and delivered in lieu of or in substitution for such Bonds pursuant to the Trust Agreement, regardless of variations in maturity, interest rate or other provisions.

"**Term Bonds**" shall mean the Bonds designated as term bonds in the resolutions authorizing such Bonds.

"**Valuation Date**" shall mean, with respect to any Capital Appreciation Bond or Capital Appreciation and Income Bond, the date or dates set forth in the resolution authorizing such Bonds on which Accreted Values are assigned to the Capital Appreciation Bonds or Capital Appreciation and Income Bonds.

"**Variable Rate Bonds**" shall mean Bonds issued with a variable, adjustable, convertible or similar interest rate that is not fixed in percentage at the date of issue for the term thereof.

**Sinking Fund and Accounts**

A special fund is created under the Trust Agreement and designated the "Puerto Rico Public Finance Corporation PRMSA Note Sinking Fund" (the "Sinking Fund") to be held by the Trustee. There are created four separate accounts in the Sinking Fund designated "Bond Service Account," "Redemption Account," "Reserve Account" and "Surplus Account." Subject to the terms and conditions set forth in the Trust Agreement, moneys held to the credit of the Sinking Fund shall be held in trust and applied by the

Trustee solely for the purposes set forth below and pending such application shall be subject to the lien and charge created pursuant to the Trust Agreement until paid out or transferred as provided therein.

The Corporation shall cause the Secretary of the Treasury of the Commonwealth to transfer to the Trustee, no later than July 15 of each Fiscal Year while the Bonds are Outstanding, funds representing the entire Legislative Appropriation for such Fiscal Year.

All funds received by the Trustee representing the Legislative Appropriation (or funds received in substitution therefor or in respect of the Note) shall be deposited in the Sinking Fund in the following order:

(a)      to the credit of the Bond Service Account, such amount as may be required to make the total amount then to the credit of the Bond Service Account equal to the sum of (i) the amount of interest then or to become within the current Fiscal Year due and payable on the Bonds of each Series then Outstanding and (ii) the amount of principal of the Bonds of each Series then or to become within the current Fiscal Year due and payable;

(b)      to the credit of the Redemption Account, such amount as may be required to make the total amount then to the credit of the Redemption Account equal to the Amortization Requirement for such Fiscal Year for the Term Bonds of each Series then Outstanding plus the premium, if any, on such principal amount of Term Bonds that would be payable if such principal amount of Term Bonds were to be redeemed in such Fiscal Year prior to their respective maturities from moneys held to the credit of the Sinking Fund;

(c)      to the credit of the Reserve Account, such amount as may be required to make the amount then to the credit of the Reserve Account equal to the maximum aggregate Principal and Interest Requirement for any Fiscal Year thereafter on the Bonds Outstanding; and

(d)      to the credit of the Surplus Account, any remaining amount.

In lieu of any required deposit or in substitution of moneys on deposit to the credit of the Reserve Account, the Corporation may cause to be deposited to the credit of the Reserve Account a Reserve Account Insurance Policy or a Reserve Account Letter of Credit in an amount equal to such required deposit.

**Withdrawals from Bond Service Account**

The Trustee shall on each Interest Payment Date or as otherwise provided in the resolution of the Board authorizing the issuance of a Series of Bonds, withdraw from the Bond Service Account and (1) remit by mail (or by wire transfer if so provided by resolution of the Board) to each Holder of Bonds the amounts required for paying interest upon such Bonds as such interest becomes due, and (2) set aside sufficient moneys for paying the principal of Bonds as such principal becomes due.

**Withdrawals from Redemption Account**

Moneys held to the credit of the Redemption Account shall be applied to the retirement of Bonds as follows:

(a)      Subject to the provisions of paragraph (c) below, the Trustee shall endeavor to purchase Bonds or portions of Bonds, whether or not such Bonds or portions shall then be subject to redemption, at

II-8

the most advantageous price obtainable with reasonable diligence, such price not to exceed the principal of such Bonds plus the amount of the premium, if any, that would be payable on the next redemption date to the holders of such Bonds under the redemption provisions of the Trust Agreement if such Bonds or portions of Bonds should be called for redemption on such date from the moneys in the Redemption Account.  The Trustee shall pay the interest accrued on such Bonds or portions of Bonds to the redemption date from the Bond Service Account and the purchase price from the Redemption Account.  No such purchase shall be made by the Trustee within the period of forty-five (45) days immediately preceding the date on which such Bonds are subject to call for redemption in part under the redemption provisions of the Trust Agreement except from moneys other than the moneys set aside or deposited for such redemption of Bonds.

(b)     Subject to the provisions of paragraph (c) below, the Trustee shall call for redemption on each date on which Bonds are subject to redemption from moneys in the Redemption Account such amount of Bonds or portions of Bonds then subject to redemption as, with the redemption premium, if any, will exhaust the moneys then held for the credit of the Redemption Account as nearly as may be; provided, however, that not less than $100,000 principal amount of Bonds shall be called for redemption at any one time.  Such redemption shall be made pursuant to the redemption provisions of the Trust Agreement. Prior to calling Bonds or portions of Bonds for redemption the Trustee shall withdraw from the Bond Service Account and from the Redemption Account (including moneys transferred from the Reserve Account to the credit of the Redemption Account) and set aside in separate accounts or deposit with the paying agents the respective amounts required for paying the interest on, and the principal and redemption premium, if any, of the Bonds or portions of Bonds so called for redemption.

(c)     Moneys in the Redemption Account shall be applied by the Trustee in each Fiscal Year to the retirement of Bonds of each Series then Outstanding in the following order:

first, the Term Bonds of each such Series to the extent of the Amortization Requirement, if any, for such Fiscal Year for the Term Bonds of each such Series then Outstanding plus the applicable premium, if any, and, if the amount available in such Fiscal Year shall not be sufficient therefor, then in proportion to the Amortization Requirement, if any, for such Fiscal Year for the Term Bonds of each such Series then Outstanding, plus the applicable premium, if any;

second, any balance then remaining shall be applied to the purchase of any Term Bonds then Outstanding whether or not such Bonds shall then be subject to redemption, in accordance with the provisions of paragraph (a) above;

third, any balance then remaining shall be applied to the redemption of the Term Bonds of each such Series in proportion to the Amortization Requirement, if any, for such Fiscal Year for the Term Bonds of each such Series then Outstanding, plus the payment of the applicable premium, if any; and

fourth, after the retirement of all Term Bonds, any balance still remaining shall be applied to the retirement of the Serial Bonds of each Series in proportion to the aggregate principal amount of the Serial Bonds of each such Series originally issued under the provisions of the Trust Agreement.

**Withdrawals from Reserve Account**

Moneys held to the credit of the Reserve Account shall be used for the purpose of paying interest on the Bonds and maturing principal of Bonds when moneys held to the credit of the Bond Service Account shall be insufficient for such purpose and thereafter for the purpose of making deposits to the

credit of the Redemption Account pursuant to the requirements of the Trust Agreement whenever and to the extent that the Legislative Appropriations or the moneys received in respect of the Note are insufficient therefor.

Any moneys held to the credit of the Reserve Account in excess of the maximum aggregate Principal and Interest Requirement on the Bonds Outstanding for any Fiscal Year thereafter shall, upon the written request of the Corporation, be transferred to the credit of the Bond Service Account or the Redemption Account.

**Withdrawals from Surplus Account**

Moneys held to the credit of the Surplus Account shall be applied by the Trustee to make payments in the following order: (i) to pay the compensation of the Trustee and other amounts payable to the Trustee under the Trust Agreement; (ii) to pay any fees payable to the providers of any Credit Facility, Liquidity Facility, Reserve Account Insurance Policy or Reserve Account Letter of Credit; and (iii) to reimburse any provider of such facilities for any amounts due under the agreement with such provider.

Any moneys held to the credit of the Surplus Account after all amounts described in the preceding paragraph required to be paid in respect of a Fiscal Year have been paid shall, upon the written request of the Corporation, be transferred to the credit of the Bond Service Account or the Redemption Account.

**Refunding Bonds**

Additional Bonds may be issued under and secured by the Trust Agreement, subject to certain conditions, at any time or times solely for the purpose of (i) providing funds for refunding all or any part of the Outstanding Bonds of any one or more Series by payment at maturity or redemption at a selected redemption date or dates or combination of such payment at maturity and redemption, including the payment of any redemption premium thereon, (ii) making a deposit to the Reserve Account, and (iii) paying the costs of issuance of such refunding Bonds.

**Investment of Moneys**

Moneys held for the credit of the Bond Service Account and the Redemption Account shall, as nearly as may be practicable, be continuously invested and reinvested, at the written direction of the Corporation, in Government Obligations that shall mature, or that shall be subject to redemption by the holder thereof at the option of such holder, not later than the respective dates when moneys held for the credit of said accounts will be required for the purposes intended. Moneys held for the credit of the Reserve Account shall as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Corporation in Investment Obligations that shall mature no later than the final maturity of the Bonds. Moneys held for the credit of the Surplus Account shall be continuously invested and reinvested at the written direction of the Corporation in any investment selected by it.

Obligations so purchased as an investment of moneys in any such fund or account shall be deemed at all times to be a part of such fund or account, and any investment earnings and profit or loss realized on the sale or maturity thereof, shall be credited or debited to such fund or account; provided, however, that if the required deposit to any account in the Sinking Fund has been made for the current Fiscal Year, the investment earnings on moneys held to the credit of such account shall be deposited to the credit of any other account of the Sinking Fund for which such required deposit has not been made, in

the order required by the Trust Agreement, and thereafter shall be deposited to the credit of such account in the Sinking Fund as shall be directed by the Corporation.

### No Impairment

The Corporation covenants and agrees that, so long as any of the Bonds shall be Outstanding, none of the Pledged Revenues will be used for any purpose other than as provided in the Trust Agreement, and that no contract or contracts will be entered into or any action taken by which the rights of the Trustee or of the Holders to such Pledged Revenues might be impaired or diminished.

### Inclusion of Principal and Interest Requirement in Budget

Each year while any Bonds are Outstanding, the Corporation shall file a timely request with the Director of the Office of Budget and Management of the Commonwealth to include in the annual budget of capital improvements and operating expenses of the Commonwealth for the next Fiscal Year the necessary appropriations so that payments in respect of the Note shall be sufficient to cover the Principal and Interest Requirement of the Bonds for the next Fiscal Year and all other amounts payable in respect of the Bonds or payable under the Trust Agreement.

### Enforcement of Remedies

At the request of the holders of not less than twenty percent (20%) of the aggregate principal amount of Bonds then Outstanding, the Trustee shall proceed, subject to the Trustee's rights to indemnification under the Trust Agreement, to protect and enforce its rights and the rights of the Holders under the laws of the Commonwealth or under the Trust Agreement, including all rights with respect to the Note and the Pledged Revenues, by such suits, actions or special proceedings in equity or at law, or by proceedings in the office of any board or officer having jurisdiction, either for the specific performance of any covenant or agreement contained herein or in aid or execution of any power herein granted for the enforcement of any proper legal or equitable remedy, as the Trustee, being advised by counsel, shall deem most effectual to protect and enforce such rights.

### Pro Rata Application of Funds

If at any time the moneys in the Sinking Fund shall not be sufficient to pay the interest on or the principal of the Bonds as the same shall become due and payable, such moneys (except for any moneys obtained from a drawing on a Credit Facility or Liquidity Facility which shall secure only specified Bonds), together with any moneys then available or thereafter becoming available for such purpose, whether through the exercise of the remedies provided for in the Trust Agreement or otherwise, shall be applied as follows:

first, to the payment to the persons entitled thereto of all installments of interest then due and payable in the order in which such installments became due and payable and, if the amount available shall not be sufficient to pay in full any particular installment, then to the payment, ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in such Bonds;

second, to the payment to the persons entitled thereto of the unpaid principal of any of the Bonds which shall have become due and payable (other than Bonds called for redemption for the payment of which moneys are held pursuant to the provisions of the Trust

II-11

Agreement) in the order of their due dates, with interest on such Bonds at the respective rates specified therein from the respective dates upon which such Bonds became due and payable, and, if the amount available shall not be sufficient to pay in full the principal of such Bonds due and payable on any particular date, together with such interest, then to the payment first of such interest, ratably, according to the amount of such interest due on such date, and then to the payment of such principal, ratably, according to the amount of such principal due on such date, to the persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in such Bonds;

third, to the payment of the interest on and the principal of such Bonds, to the purchase and retirement of Bonds and to the redemption of Bonds, all in accordance with the provisions of the Trust Agreement;

fourth, to the payment of any amounts then due and owing to a provider of a Credit Facility or a Liquidity Facility.

**Supplemental Agreements Without Bondholders' Consent**

The Corporation and the Trustee may, without the consent or approval of, or notice to, any of the Bondholders, from time to time and at any time, enter into agreements supplemental to the Trust Agreement as shall not be inconsistent with the terms and provisions thereof, for the following purposes:

(a)     to cure any ambiguity or formal defect or omission in the Trust Agreement or in any supplemental agreement or to correct or supplement any provision contained therein that may be defective or inconsistent with any other provisions contained therein; or

(b)     to grant to or confer upon the Trustee for the benefit of the Bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the Bondholders or the Trustee; or

(c)     to add to the conditions, limitations and restrictions on the issuance of Bonds under the provisions of the Trust Agreement, other conditions, limitations and restrictions thereafter to be observed; or

(d)     to add to the covenants and agreements of the Corporation in the Trust Agreement other covenants and agreements thereafter to be observed by the Corporation or to surrender any right or power therein reserved to or conferred upon the Corporation; or

(e)     to permit the issuance of Bonds in coupon form, if the conditions precedent stated therein have been met; or

(f)     to qualify the Bonds or any of the Bonds for registration under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended; or

(g)     to qualify the Trust Agreement as an "indenture" under the Trust Indenture Act of 1939, as amended; or

II-12

(h)     to make such changes as may be necessary to adjust the terms of the Trust Agreement so as to facilitate the issuance of Variable Rate Bonds, Capital Appreciation Bonds, Capital Appreciation and Income Bonds, Put Bonds, Extendible Maturity Bonds, Balloon Bonds, Interim Bonds and such other Bonds as may be marketable from time to time; or

(i)     to make such changes as may be necessary to comply with the provisions of Commonwealth law relating to the exclusion of interest on the Bonds from gross income thereunder; or

(j)     to make such changes as may evidence the right and interest of an issuer of a Credit Facility or a Liquidity Facility that secures any Series of Bonds.

**Modification with Consent of Holders of Majority of Bonds**

Subject to the terms and provisions contained in the Trust Agreement, and not otherwise, the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding (or in case less than all of several Series of Bonds then Outstanding are affected by the proposed supplemental agreement, the Holders of not less than a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time the consent is given) shall have the right, from time to time, anything contained in the Trust Agreement to the contrary notwithstanding, to consent to and approve the execution by the Corporation and the Trustee of such agreement or agreements supplemental thereto as shall be deemed necessary or desirable by the Corporation for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained in the Trust Agreement or in any supplemental agreement; provided, however, that nothing contained in the Trust Agreement shall permit, or be construed as permitting, without the consent of the Holders of one hundred percent (100%) of the Bonds Outstanding (a) an extension of the time for the payment of the principal of (other than as provided by the terms of an Extendible Maturity Bond) or the interest on any Bond, or (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, or (c) the creation of any lien or a pledge of funds other than the lien and pledge created by the Trust Agreement, or (d) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (e) a reduction in the aggregate principal amount of the Bonds required for consent to such supplemental agreement or any waiver hereunder. In lieu of the Holders of Bonds secured by a Credit Facility or a Liquidity Facility, the provider thereof shall be viewed as the Holder of such Bonds for purposes of consents to modifications.

**Amendments to the Note**

The Trustee (as assignee of the Note) and Puerto Rico Maritime Shipping Authority may enter into, from time to time and at any time, such amendments to the Note, in form satisfactory to the Trustee, as shall not be inconsistent with the terms and provisions thereof to (a) cure any ambiguity or formal defect or omission in the Note, provided such action shall not materially adversely affect the interests of the Bondholders, or (b) grant to or confer upon the Corporation or Trustee for the benefit of the Bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the Corporation or Bondholders or the Trustee, or (c) provide for the substitution of the Note for one or more notes of the Puerto Rico Maritime Shipping Authority, each such new note securing one or more Series of the Bonds, provided that, in the opinion of bond counsel, such substitution will not restrict, limit or reduce the obligation of the Puerto Rico Maritime Shipping Authority to make payments sufficient to pay the principal of and interest on the Bonds, or otherwise impair the security of the Bondholders of any Series of Bonds under this Agreement, or (d) make any other change which, in the judgment of the Trustee, will not restrict, limit or reduce the obligation of Puerto Rico Maritime Shipping

Authority to make the payments under the Note to pay the principal of or interest on the Bonds, or otherwise impair the security of the Bondholders under the Trust Agreement.

Except for amendments provided for in the preceding paragraph, the Trustee shall not enter into any amendment to the Note unless notice of the proposed amendment shall have been given and the holders of not less than a majority in aggregate principal amount of the Bonds then outstanding shall have consented to and approved the execution thereof, all as provided for under "Modification with Consent of Holders of Majority of Bonds" above; and provided further that without the consent of all of the holders of the Bonds outstanding affected by such change, no such amendment shall be entered into by the Trustee which would restrict, limit or reduce the obligations of Puerto Rico Maritime Shipping Authority with respect to the Bonds.

## Defeasance

If all the Outstanding Bonds shall have been paid or deemed to have been paid as provided below and all amounts due and owing to any provider of a Credit Facility or a Liquidity Facility shall have been paid, then and in that case the right, title and interest of the Trustee under the Trust Agreement shall cease, terminate and become void, and such Bonds shall cease to be entitled to any benefit or security under the Trust Agreement. In such event, the Trustee shall transfer and assign to the Corporation all property then held by the Trustee, shall execute such documents as may be reasonably required by the Corporation to evidence such transfer and assignment and shall turn over to the Corporation any surplus in any account in the Sinking Fund.

Any Outstanding Bond shall be deemed to have been paid within the meaning and with the effect expressed in the Trust Agreement when the whole amount of the principal of and interest on such Bond shall have been paid or when (a) there shall have been deposited with the Trustee or another fiduciary institution acting as escrow agent for the Holder of such Bond either moneys in an amount which shall be sufficient, or sufficient Government Obligations or obligations issued by the Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Farm Credit System, Federal Home Loan Banks or Student Loan Marketing Association, to pay when due the principal of and premium, if any, and interest due and to become due on such Bond on or prior to the redemption date or maturity date thereof, as the case may be, and (b) in the event such Bond does not mature and is not to be redeemed within the next succeeding sixty (60) days, the Corporation shall have given the Trustee irrevocable instructions to give, as soon as practicable, a notice to the Holder of such Bond by first-class mail, postage prepaid, stating that the deposit of moneys or sufficient Government Obligations or other obligations mentioned in clause (a) of this paragraph has been made with the Trustee or another fiduciary institution acting as escrow agent for the Holder of such Bond and that such Bond is deemed to have been paid in accordance with the Trust Agreement and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal of and premium, if any, and interest on such Bond.

APPENDIX III

## SUMMARY OF THE ACT 163 TRUST AGREEMENT

The following is a summary of certain provisions of the Trust Agreement, dated April 23, 1996, relating to the Act 163 Bonds (the "Trust Agreement"). The statements contained herein do not purport to be complete and this summary is qualified in its entirety by reference to the Trust Agreement.

**Definitions of Certain Terms**

The following words and terms have the following meanings, unless the context otherwise requires. Words importing the singular number include the plural number in each case and vice versa, and words importing persons include firms and corporations.

"**Accreted Value**" shall mean, with respect to any Capital Appreciation Bond or Capital Appreciation and Income Bond as of any Valuation Date, the amount set forth for such date in the resolution authorizing such Capital Appreciation Bond or Capital Appreciation and Income Bond and as of any date other than a Valuation Date, the sum of the Accreted Value on the preceding Valuation Date (or, if there is no preceding Valuation Date, the initial principal amount and the product of a fraction, the numerator of which is the number of days having elapsed from the preceding Valuation Date (or from the original issue date if there is no preceding Valuation Date) and the denominator of which is the number of days from such preceding Valuation Date (or from the original issue date if there is no preceding Valuation Date) to the next succeeding Valuation Date and the difference between the Accreted Values for such Valuation Dates (or between the initial principal amount and the Accreted Value on the first Valuation Date).

"**Act**" shall mean Act No. 163 of the Legislature of Puerto Rico, approved August 11, 1995.

"**Amortization Requirement**" shall mean, for the term Bonds of any series for any Fiscal Year (other than the Series E Bonds), the principal amount fixed or computed for the retirement by purchase or redemption of term Bonds in such Fiscal Year, as provided for in the Trust Agreement. The Amortization Requirement for the term Bonds of each series shall be initially in the respective principal amounts for each Fiscal Year as fixed in a resolution of the Corporation adopted prior to the issuance of the Bonds of such series, and the aggregate amount of such Amortization Requirement for the term Bonds of such series shall be equal to the aggregate principal amount of the term Bonds of such series. If at the close of any Fiscal Year the total principal amount of term Bonds of any series retired by purchase or redemption, or prior to the close of such Fiscal Year called for redemption with moneys held for the credit of the Redemption Account pursuant to the Trust Agreement, shall be in excess of the amount of the Amortization Requirement for the term Bonds of such series for such Fiscal Year, then the amount of the Amortization Requirement for the term Bonds of such series shall be reduced for such subsequent Fiscal Years in such amounts aggregating the amount of such excess as shall be determined by the President of the Corporation in an order filed with the Trustee on or before the 10th day following the close of such Fiscal Year. If at the close of any Fiscal Year the total principal amount of term Bonds of any series retired by purchase or redemption, or prior to the close of such Fiscal Year called for redemption with moneys held for the credit of the Redemption Account pursuant to the Trust Agreement, shall be less than the amount of the Amortization Requirement for the term Bonds of such series for such Fiscal Year, then the amount of the Amortization Requirement for the term bonds of such series for the next succeeding Fiscal Year shall be increased by the amount of such deficiency.

**"Appreciated Value"** shall mean, with respect to any Capital Appreciation and Income Bond (i) up to the Interest Commencement Date set forth in the resolution of the Board providing for the issuance of such Bond, an amount equal to the Accreted Value of such Bond and (ii) as of any date of computation on and after the Interest Commencement Date, an amount equal to the Accreted Value of such Bond on the Interest Commencement Date.

**"Balloon Bonds"** shall mean any Bonds the interest on which is payable periodically and 25% or more of the original principal amount of which matures during any one Fiscal Year and for which maturing principal amount Amortization Requirements have not been designated.

**"Board"** shall mean the Board of Directors of the Corporation.

**"Capital Appreciation Bonds"** shall mean any Bonds the interest on which is compounded periodically on each of the dates designated for compounding in the resolution authorizing said Bonds and payable in an amount equal to the then current Accreted Value only at the maturity, earlier redemption or other payment date therefor, all as so provided by such resolution, and which may be either serial Bonds or term Bonds.

**"Capital Appreciation and Income Bonds"** shall mean any Bonds the accruing interest on which is not paid prior to the Interest Commencement Date specified in the resolution authorizing such Bonds and the Appreciated Value for such Bonds is compounded periodically on the dates designated in such resolution prior to the Interest Commencement Date for such Capital Appreciation and Income Bonds, and which may be either serial Bonds or term Bonds.

**"Cash Debt Service"** for any Fiscal Year shall mean the sum of (i) the Principal and Interest Requirement on all Bonds Outstanding for such Fiscal Year (determined without any adjustments allowed by paragraphs (c), (d) and (g) of the definition of the term Principal and Interest Requirement), (ii) the annual fees and expenses payable to the provider of any Facility during such Fiscal Year, (iii) the annual fees payable to the Trustee and (iv) any other fees and expenses payable during such Fiscal Year under the Trust Agreement.

**"Credit Facility"** shall mean an irrevocable letter of credit (including the Series E Letter of Credit), policy of municipal bond insurance, guaranty, purchase agreement, credit agreement or similar facility in which the person providing such facility irrevocably agrees to provide funds to make payment of the principal of, premium, if any, and interest on Bonds to which such Credit Facility relates.

**"Department"** means the Department of the Treasury of the Commonwealth of Puerto Rico.

**"Extendible Maturity Bonds"** shall mean Bonds, the maturities of which, by their terms, may be extended by and at the option of the holders of the Bonds or the Corporation.

**"Facility"** shall mean a Credit Facility, Liquidity Facility, Reserve Account Letter of Credit or Reserve Account Insurance Policy.

**"Fiscal Year"** shall mean the period commencing on the first day of July of any year and ending on the last day of June of the following year or any other twelve consecutive month period designated by the Board.

**"GIC Provider"** means the provider of a guaranteed investment contract for the investment of moneys in the Series E Sinking Fund Subaccount established under the Trust Agreement.

III-2

"**Government Obligations**" shall mean (i) direct obligations of, or obligations the payment of the principal of and interest on which are unconditionally guaranteed by, the United States of America; (ii) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clause (i) above and maturing not later than the earliest call date for the underlying obligations, which obligations are held by a bank (including the Trustee) or trust company as custodian, under which the owner of said interests is the real party in interest and has the right to proceed directly and individually against the obligor on the underlying obligations described in said clause (i) and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated; (iii) municipal obligations (A) the payment of the principal of, interest and redemption premium, if any, on which are irrevocably secured by obligations described in clause (i) or (ii) above, which obligations are not subject to redemption prior to the date on which the proceeds attributable to the principal of such obligations are to be used and have been deposited in an escrow account that is irrevocably pledged to the payment of the principal of and interest and redemption premium, if any, on such municipal obligations and (B) rated in the highest rating category (without regard to any gradation within such category) by Standard & Poor's Ratings Services or any successor thereto and Moody's Investors Service, Inc. or any successor thereto; and (iv) evidences of ownership of proportionate interests in future interest or principal payments on municipal obligations specified in clause (iii) above held by a bank (including the Trustee) or trust company as custodian maturing not later than the earliest call date of the underlying obligations, under which the owner of said interests is the real party in interest and has the right to proceed directly and individually against the underlying municipal obligations described in said clause (iii) and which underlying obligations are (A) not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated and (B) rated in the highest rating category (without regard to any gradation within such category) by Standard & Poor's Ratings Services or any successor thereto and Moody's Investors Service, Inc. or any successor thereto.

"**Hedge Counterparty**" means the provider of the Rate Swap and/or the Series E GIC with respect to the Series E Bonds (initially National Westminster Bank, Plc, acting through its capital markets group, as counterparty under the Master Agreement).

"**Hedge Counterparty Swap Payments**" means the net payments required to be made by the Hedge Counterparty to the Corporation under the Rate Swap.

"**Interest Commencement Date**" shall mean, with respect to any Capital Appreciation and Income Bond, the date specified in the resolution providing for the issuance of such Bond after which interest accruing on such Bond shall be payable semiannually or otherwise on a periodic basis, with the first such payment date being the applicable interest payment date immediately succeeding such Interest Commencement Date.

"**Interim Bonds**" shall mean any Bonds issued on an interim basis that are expected to be repaid from the proceeds of Bonds or other indebtedness.

"**Investment Obligations**" shall mean any of the following, to the extent that the same is legal for the investment of public funds under the laws of the Commonwealth:

(i)     Government Obligations;

(ii)     obligations issued or guaranteed by an agency of the United States of America or person controlled by or supervised by and acting as an instrumentality of the United States of America pursuant to authority granted by Congress, whether now existing or hereafter organized, including but not limited

III-3

to those of the Federal Home Loan Mortgage Corporation, Federal Home Loan Banks, Farm Credit System, Student Loan Marketing Association and Federal National Mortgage Association and that, except for those obligations of the agencies listed above, are rated at least AA or its equivalent by Standard and Poor's Ratings Services or any successor thereto and Aa2 or its equivalent by Moody's Investors Service, Inc. or any successor thereto, and evidences of ownership of proportionate interests in future interest or principal payments in obligations specified above held by a bank (including the Trustee) or trust company as custodian maturing not later than the earliest call date of the underlying obligations, under which the owner of said interests is the real party in interest and has the right to proceed directly and individually against the obligor on the underlying obligations described above, and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated;

(iii)    bankers acceptances, certificates of deposit or time deposits (including any investment in pools of such bankers acceptances, certificates of deposit or time deposits) of any bank (including the Trustee), trust company or savings and loan association whose general unsecured long-term debt obligations are rated at least Aa2 or its equivalent by Moody's Investors Service, Inc. or any successor thereto and AA or its equivalent by Standard & Poor's Ratings Services or any successor thereto, which to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation, are either (A) issued by a bank, trust company or savings and loan association having, on the date of investment, a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by such securities, as are described in clauses (i) or (ii) above, having a market value at least equal to the principal amount of such bankers acceptances, certificates of deposit or time deposits (or portion thereof not so insured) provided that the Trustee has a perfected first lien security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(iv)    obligations issued by any state or territory of the United States of America, which are rated, on the date of investment therein, in one of the two highest rating categories (without regard to any gradation within such category) by both Moody's Investors Service, Inc. or any successor thereto and Standard & Poor's Ratings Services or any successor thereto;

(v)    municipal obligations, which are rated, on the date of investment therein, in one of the two highest rating categories (without regard to any gradation within such category) by both Moody's Investors Service, Inc. or any successor thereto and Standard & Poor's Ratings Services or any successor thereto;

(vi)    any repurchase or investment agreement with any bank (including the Trustee), trust company or insurance company whose general unsecured long-term debt obligations are rated at least Aa2 or its equivalent by Moody's Investors Service, Inc. or any successor thereto and AA or its equivalent by Standard & Poor's Ratings Services or any successor thereto, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any one or more of the securities described in (i) or (ii) above, provided that the Trustee has a perfected first lien security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(vii)    commercial paper rated, or secured by a letter of credit or line of credit rated, on the date of investment therein, in the highest rating category (without regard to any gradation within such category) by both Moody's Investors Service, Inc. or any successor thereto and Standard & Poor's Ratings Services or any successor thereto;

III-4

(viii)   certificates of deposit or time deposits of Government Development Bank for Puerto Rico; and

(ix)   any other investment obligations, which are rated, on the date of investment therein, in one of the two highest rating categories (without regard to any gradation within such category) by both Moody's Investors Service, Inc. or any successor thereto and Standard & Poor's Ratings Services or any successor thereto.

"**Legislative Appropriation**" shall mean the funds appropriated by the Legislature of Puerto Rico in the annual budget of capital improvements and operating expenses of the Commonwealth for any Fiscal Year for the payment of the Note pursuant to the provisions of the Act or, in the case such budget of the Commonwealth for any Fiscal Year has not been approved by the commencement of such Fiscal Year, until such budget is approved, the funds representing the amounts which had been appropriated in the budget of the Commonwealth for the previous Fiscal Year for the payment of the Note pursuant to the provisions of the Act in accordance with Article VI, Section 6, of the Constitution of the Commonwealth.

"**Liquidity Facility**" shall mean a letter of credit, policy of municipal bond insurance, guaranty, purchase agreement or similar facility in which the person providing such facility agrees to provide funds to pay the purchase price of Put Bonds upon their tender by the holders of Put Bonds.

"**Master Agreement**" shall mean the ISDA Master Agreement between the Corporation and the Hedge Counterparty dated as of April 23, 1996.

"**Note**" shall mean the Promissory Note of the Department, dated as of July 1, 1995, as the same may be amended pursuant to the Trust Agreement, in the principal amount of $177,410,086 and bearing interest at the rate of 8% per annum.

"**Outstanding**" when used with reference to the Bonds shall mean, as of any date of determination, all Bonds theretofore authenticated and delivered except:

(i)   Bonds theretofore cancelled by the Trustee or delivered to the Trustee for cancellation;

(ii)   Bonds that are deemed paid and no longer Outstanding as provided in the Trust Agreement;

(iii)   Bonds in lieu of which other Bonds have been issued pursuant to the provisions of the Trust Agreement relating to Bonds destroyed, mutilated, stolen or lost, unless evidence satisfactory to the Trustee has been received that any such Bond is held by a bona fide purchaser;

(iv)   Bonds tendered or deemed tendered, as provided in the resolution of the Board for any series of Bonds; and

(v)   for purposes of any consent or other action to be taken under the Trust Agreement by the holders of a specified percentage of principal amount of Bonds, Bonds known by the Trustee to be held by or for the account of the Corporation.

"**Payment Date**" shall mean any date on which interest on or principal of any series of Bonds shall be due and payable.

III-5

"**Permitted Investments**" shall mean (i) Government Obligations of the type described in clauses (i) and (ii) of the definition of that term that mature not later than the maturity of the Series E Bonds, (ii) the Series E GIC, (iii) bankers acceptances, certificates of deposit or time deposits of the Series E Letter of Credit Bank and (iv) bankers acceptances, certificates of deposit or time deposits of any bank (including the Trustee), trust company or savings and loan association whose general unsecured long-term debt obligations are rated at least Aa2 or its equivalent by Moody's Investors Service, Inc. or any successor thereto and AA or its equivalent by Standard & Poor's Ratings Services or any successor thereto, which are collateralized at all times by such securities as are described in clauses (i) or (ii) of the definition of Government Obligations, having a market value at least equal to the principal amount of such bankers acceptances, certificates of deposit or time deposits provided that the Trustee has a perfected first lien security interest in the collateral and that such collateral is held free and clear of claims by third parties.  Any of the investments described in clauses (i) to (iv) above may be combined with the Rate Swap or, with the written consent of the Series E Letter of Credit Bank, other interest rate swap arrangements.

"**Pledged Revenues**" shall mean the Series E Pledged Revenues and the Series F Pledged Revenues.

"**Principal and Interest Requirement**" for any Fiscal Year, as applied to the Bonds of any Series, shall mean the sum of:

(i)     the amount required to pay the interest on all Bonds of such series then Outstanding that is payable on each interest payment date in such Fiscal Year;

(ii)     the amount required to pay the principal of all serial Bonds of such series then Outstanding that is payable upon the maturity of such serial Bonds in such Fiscal Year;

(iii)     the Amortization Requirement for the Outstanding term Bonds of such series for such Fiscal Year; and

(iv)     the Series E Sinking Fund Requirement for such Fiscal Year.

The following rules shall apply in determining the amount of the Principal and Interest Requirement:

(a)     In the case of the Series E Bonds, interest shall be calculated at a fixed rate of 5.8687% per annum on the Outstanding principal amount of the Series E Bonds less the Sinking Fund Principal, provided that the Rate Swap and the Series E GIC shall be in full force and effect and not terminated or liquidated.

(b)     Subject to the preceding clause (a), the interest on Variable Rate Bonds shall be the interest to accrue on such Variable Rate Bonds for such Fiscal Year; provided, however, that for purposes of determining the maximum Principal and Interest Requirement in order to determine the amount to be on deposit to the credit of the Reserve Account, the interest on Variable Rate Bonds shall be assumed to be the highest interest rate payable thereon as provided in the resolution of the Board authorizing such Variable Rate Bonds;

(c)     In the case of Put Bonds, the "put" date or dates shall be ignored if said "put" is payable from a Credit Facility or a Liquidity Facility, and the stated Fiscal Years for Amortization Requirements and dates for principal payments shall be used, and in the case of Bonds secured by a Credit Facility or a

III-6

Liquidity Facility, the repayment terms of each Credit Facility or Liquidity Facility (whether or not evidenced by provisions included in the Bonds, such as interest rate adjustments to apply if an unreimbursed drawing on the Credit Facility or Liquidity Facility shall occur) shall be ignored, unless the issuer of the Credit Facility or Liquidity Facility has advanced funds thereunder and such amount has not been repaid, in which case Principal and Interest Requirement shall include the repayment obligation thereof in lieu of the stated terms of the Bonds, in accordance with the principal repayment schedule and interest rate or rates specified in the documents relating to such Credit Facility or Liquidity Facility, if the repayment obligation is secured on a parity with Bonds;

(d)     In the case of Extendible Maturity Bonds, the Bonds shall be deemed to mature on the later of the stated maturity date and the date to which such stated maturity date has been extended;

(e)     In the case of Capital Appreciation Bonds, the principal and interest portions of the Accreted Value becoming due at maturity or by virtue of an Amortization Requirement shall be included in the year in which said principal and interest portions are due;

(f)     In the case of Capital Appreciation and Income Bonds, the principal and interest portions of the Appreciated Value shall be included in the year in which said principal and interest portions are due;

(g)     In the case of Balloon Bonds (other than the Series E Bonds) or Interim Bonds, the debt service requirements may be excluded and in lieu thereof the Balloon Bonds or Interim Bonds shall be viewed as debt securities having a comparable federal tax status as such Balloon Bonds or Interim Bonds, hypothetically maturing in substantially equal annual payments of principal and interest over a period ending not later than August 1, 2014 (as determined in the certificate described below), bearing interest at a fixed rate per annum equal to the average interest rate per annum for such debt securities on the date of issuance of the Balloon Bonds or Interim Bonds and issued by issuers having a credit rating, issued by Moody's Investors Service, Inc. or any successor thereto or Standard & Poor's Ratings Services or any successor thereto, comparable to that of the Corporation, as shown by a certificate of an underwriting or investment banking firm experienced in marketing such securities; and

(h)     If all or a portion of the principal of or interest on a series of Bonds is payable from funds irrevocably set aside or deposited for such purpose, together with projected earnings thereon to the extent such earnings are projected to be from Government Obligations of the type described in clauses (i) and (ii) of that definition, such principal or interest shall not be included in determining the Principal and Interest Requirement; provided that the Trustee shall have received on or prior to the date of calculation a verification from an independent certified public accountant demonstrating the sufficiency of such funds and projected earnings for such purpose.

"**PRPFC Swap Payments**" means the net payments required to be made by the Corporation to the Hedge Counterparty under the Rate Swap.

"**Put Bonds**" shall mean Bonds that by their terms may be tendered by and at the option of the holder thereof for payment prior to the stated maturity thereof.

"**Rate Swap**" means the interest rate swap arrangement between the Corporation and the Hedge Counterparty pursuant to the Master Agreement and related documentation.

"**Reimbursement Obligation**" shall mean all amounts payable by the Corporation to a provider of a Facility pursuant to its agreement with such provider, including any fees payable and expenses reimbursable to such provider in accordance with such agreement.

"**Reimbursement Obligation Principal**" shall mean all Reimbursement Obligations of the Corporation to a provider of a Credit Facility other than the obligation to pay interest on amounts owing to the provider of such Credit Facility under the agreement with the provider of such Credit Facility.

"**Reserve Account Insurance Policy**" shall mean the insurance policy, surety bond or other evidence of insurance deposited to the credit of the Reserve Account in lieu of or in partial substitution for cash or securities on deposit therein, which policy, bond or other evidence of insurance constitutes an unconditional senior obligation of the issuer thereof. The issuer thereof shall be a municipal bond insurer whose senior debt obligations, ranking *pari passu* with its obligations under such policy, bond or other evidence of insurance, are rated, at the time of deposit for the credit of the Reserve Account, in any of the two highest rating categories by Moody's Investors Service, Inc. or any successor thereto and Standard & Poor's Ratings Services or any successor thereto.

"**Reserve Account Letter of Credit**" shall mean the irrevocable, transferable letter of credit deposited to the credit of the Reserve Account in lieu of or in partial substitution for cash or securities on deposit therein, which letter of credit constitutes an unconditional senior obligation of the issuer thereof. The issuer of such letter of credit shall be the Government Development Bank for Puerto Rico or a banking association, bank or trust company or branch thereof whose senior debt obligations, ranking *pari passu* with its obligations under such letters of credit are rated at the time of deposit to the credit of the Reserve Account, in any of the two highest rating categories by Moody's Investors Service, Inc. or any successor thereto and Standard & Poor's Ratings Services or any successor thereto.

"**Reserve Account Requirement**" shall mean an amount equal to the maximum aggregate Principal and Interest Requirement of the Bonds Outstanding for the then current Fiscal Year or any Fiscal Year thereafter.

"**Series E GIC**" shall mean the transaction between the Corporation and the Hedge Counterparty under the Master Agreement evidenced by the confirmation bearing the Hedge Counterparty's reference number NY00948.

"**Series E Letter of Credit**" shall mean the irrevocable, transferable, direct pay Letter of Credit issued by the Series E Letter of Credit Bank under the terms of the Series E Reimbursement Agreement to secure the payment of the Series E Bonds.

"**Series E Letter of Credit Bank**" shall mean National Westminster Bank, Plc, acting through its New York Branch or any successor thereto issuing a letter of credit to secure the Series E Bonds.

"**Series E Letter of Credit Fee**" means the fees and other expenses payable to the Series E Letter of Credit Bank under Sections 2.02, 3.01 and 3.02 of the Series E Reimbursement Agreement.

"**Series E Pledged Revenues**" shall mean all of the Corporation's right, title and interest in and to (i) such portion of the amounts paid and to be paid in respect of the Note that are required under the terms of the Trust Agreement to be deposited to the credit of the Series E Bonds Account, the Reserve Account and the Surplus Account established under the Trust Agreement, (ii) the Hedge Counterparty Swap Payments (iii) all moneys and investments on deposit to the credit of the Series E Bonds Account, the Reserve Account and the Surplus Account, and (iv) all investment earnings on the foregoing.

"**Series E Reimbursement Agreement**" shall mean the Letter of Credit and Reimbursement Agreement between the Corporation and the Series E Letter of Credit Bank dated as of April 15, 1996.

"**Series E Sinking Fund Requirement**" shall mean the amount required to be deposited each year in the Series E Sinking Fund Subaccount established in the Series E Bonds Account to cover the payment of principal of the Series E Bonds due on their maturity date, as provided for in the resolution of the Board authorizing the issuance of the Series E Bonds.

"**Series F Pledged Revenues**" shall mean all of the Corporation's right, title and interest in and to (i) such portion of the amounts paid and to be paid in respect of the Note that are required under the terms of the Trust Agreement to be deposited to the credit of the Bond Service Account, the Redemption Account, the Reserve Account and the Surplus Account established under the Trust Agreement, (ii) all moneys and Investment Obligations on deposit to the credit of the Bond Service Account, the Redemption Account, the Reserve Account and the Surplus Account, and (iii) all investment earnings on the foregoing.

"**Sinking Fund Investment Income**" shall mean all interest and other income generated from Permitted Investments in the Series E Sinking Fund Subaccount.

"**Sinking Fund Principal**" shall mean an amount equal to the aggregate Series E Sinking Fund Requirement for the current and all preceding Fiscal Years that is then on deposit to the credit of the Series E Sinking Fund Subaccount.

"**Valuation Date**" shall mean, with respect to any Capital Appreciation Bond or Capital Appreciation and Income Bond, the date or dates set forth in the resolution authorizing such bonds on which Accreted Values are assigned to the Capital Appreciation Bonds or Capital Appreciation and Income Bonds.

"**Variable Rate Bonds**" shall mean Bonds issued with a variable, adjustable, convertible or similar interest rate that is not fixed in percentage at the date of issue for the term thereof.

**Bond Fund and Accounts**

A special fund is created under the Trust Agreement and designated the "Puerto Rico Public Finance Corporation Treasury Department Note Bond Fund" (the "Bond Fund") to be held by the Trustee. There are created five separate accounts in the Bond Fund designated "Bond Service Account," "Series E Bonds Account," "Redemption Account," "Reserve Account" and "Surplus Account." Subject to the terms and conditions set forth in the Trust Agreement, moneys held to the credit of the Bond Fund shall be held in trust and applied by the Trustee solely for the purposes set forth below and pending such application shall be subject to the lien and charge created pursuant to the Trust Agreement until paid out or transferred as provided therein.

The Corporation shall cause the Secretary of the Treasury of the Commonwealth to transfer to the Trustee, no later than July 15 of each Fiscal Year while the Bonds are outstanding, funds representing the entire Legislative Appropriation for such Fiscal Year.

All funds received by the Trustee representing the Legislative Appropriation (or funds received in substitution therefor or in respect of the Note) and other funds received by the Trustee (other than moneys received from draws made under the Series E Letter of Credit or Hedge Counterparty Swap Payments or income from investments of amounts on deposit in the Bond Fund which must be deposited as described

below) for the payment of principal of and interest on the Bonds, for the payment of any Reimbursement Obligation or other obligation of the Corporation under the Trust Agreement or under the Series E Reimbursement Agreement or for the payment of the PRPFC Swap Payments or other obligations of the Corporation under the Master Agreement shall be deposited in the Bond Fund to the credit of the Accounts herein specified and in the following order:

first, (i) to the credit of the Series E Interest Subaccount established in the Series E Bonds Account such amount as may be required to make the total amount then to the credit of such Subaccount (after (A) making an allowance for and treating as already received and credited to such Subaccount (i) the portion of the Sinking Fund Investment Income required to be deposited therein during such Fiscal Year under the Trust Agreement and (ii) provided the Rate Swap is in full force and effect and not terminated or liquidated, the Hedge Counterparty Swap Payments expected to be received by the Corporation under the Rate Swap during such Fiscal Year and required to be deposited in the Series E Interest Subaccount under the Trust Agreement and (B) debiting to such Subaccount the PRPFC Swap Payments expected to be paid during such Fiscal Year) equal to the sum of (1) the amount of interest then or to become within the current Fiscal Year due and payable on the Series E Bonds and (2) the amount of interest on any Reimbursement Obligation Principal then or to become within the current Fiscal Year due and payable to the Series E Letter of Credit Bank under the Series E Reimbursement Agreement, (ii) to the credit of the Bond Service Account, such amount as may be required to make the total amount then to the credit of the Bond Service Account equal to the sum of the amount of interest then or to become within the current Fiscal Year due and payable on the Bonds of each series then Outstanding, other than the Series E Bonds, and (iii) to the credit of the Series E Letter of Credit Fee Subaccount established in the Series E Bonds Account such amount as may be required to make the total amount then to the credit of such Subaccount (after making an allowance for and treating as already received and credited to such Subaccount the portion of the Sinking Fund Investment Income required to be deposited therein during such Fiscal Year) equal to the Series E Letter of Credit Fee then or to become within the current Fiscal Year due and payable; provided that, if at any time the amount of funds available for deposit to the Bond Fund is insufficient to make the full amount of the deposit required under clauses (i), (ii) and (iii) above, the amount available shall be divided pro rata among such three accounts based on the amount required to be deposited in each such account;

second, (i) to the credit of the Series E Sinking Fund Subaccount established in the Series E Bonds Account, the sum of (A) the Series E Sinking Fund Requirement for the current Fiscal Year and (B) any Reimbursement Obligation Principal (not including the Series E Letter of Credit Fee) then due to the Series E Letter of Credit Bank under the Series E Reimbursement Agreement, (ii) to the credit of the Bond Service Account, such amount as may be required to make the total amount then to the credit of the Bond Service Account equal to the amount of principal of the Bonds of each series then Outstanding, other than the Series E Bonds, then or to become within the current Fiscal Year due and payable, and (iii) to the credit of the Redemption Account, such amount as may be required to make the total amount then to the credit of the Redemption Account equal to the Amortization Requirement for such Fiscal Year for the term Bonds (other than the Series E Bonds) of each series then Outstanding plus the premium, if any, on such principal amount of term Bonds that would be payable if such principal amount of term Bonds were to be redeemed in such Fiscal Year prior to their respective maturities from moneys held to the credit of the Bond Fund; provided that, if the amount of funds available for deposit to the accounts provided in clauses (i), (ii) and (iii) above is insufficient to make the full amount of the deposit required under such clauses, the amount available shall be divided pro rata among such three accounts based on the amount required to be deposited in each such account;

third, to the credit of the Series E Sinking Fund Subaccount, such amount (other than any Series E Sinking Fund Requirement) as may be required to pay any amount then due by the Corporation

to the Hedge Counterparty for breakage cost or other termination payment under the terms of the Master Agreement;

fourth, to the credit of the Reserve Account, such amount as may be required to make the amount then to the credit of the Reserve Account equal to the Reserve Account Requirement; and

fifth, to the credit of the Surplus Account, any remaining amount.

The Trustee shall draw, in such manner and at such times as is provided in the Trust Agreement, on the Series E Letter of Credit such amounts as may be required to pay principal of and interest on the Series E Bonds when the same become due and payable. Funds received by the Trustee from draws made under the Series E Letter of Credit must be deposited to the credit of the Series E Letter of Credit Subaccount established in the Series E Bonds Account and used solely to pay principal of and interest on the Series E Bonds.

Funds received by the Trustee consisting of Hedge Counterparty Swap Payments must be deposited to the credit of the Series E Interest Subaccount.

Income from the investments made of the funds on deposit in each Subaccount must remain on deposit to the credit of such Subaccount and must be applied for the purposes provided in the Trust Agreement.

In lieu of any required deposit or in substitution of moneys on deposit to the credit of the Reserve Account, the Corporation may cause to be deposited to the credit of the Reserve Account a Reserve Account Insurance Policy or a Reserve Account Letter of Credit in an amount equal to such required deposit.

**Establishment of Subaccounts in the Series E Bonds Account and Withdrawals Therefrom**

There are created four subaccounts in the Series E Bonds Account designated "Series E Letter of Credit Subaccount," "Series E Letter of Credit Fee Subaccount," "Series E Interest Subaccount" and "Series E Sinking Fund Subaccount."

The Trustee shall deposit in the Series E Letter of Credit Subaccount the proceeds of all draws made under the Series E Letter of Credit.

The Trustee shall deposit in the Series E Interest Subaccount (i) the portion of the Legislative Appropriation required to be deposited therein under the provisions of clause (i) of paragraph "first" under "Bond Fund and Accounts" above, (ii) the balance of the Sinking Fund Investment Income available after making the required deposit to the Series E Letter of Credit Fee Subaccount and (iii) the Hedge Counterparty Swap Payments.

The Trustee shall deposit in the Series E Sinking Fund Subaccount the portion of the Legislative Appropriation corresponding to the Series E Sinking Fund Requirement.

The Trustee shall deposit in the Series E Letter of Credit Fee Subaccount upon receipt thereof (i) the portion of the Legislative Appropriation required to be deposited therein under the provisions of clause (iii) of paragraph "first" under "Bond Fund and Accounts" above and (ii) an amount equal to 5.577428% of the Sinking Fund Investment Income.

On each Payment Date, after making a draw under the Series E Letter of Credit and paying the interest and principal due on the Series E Bonds with the proceeds of such draw, the Trustee shall withdraw from the Series E Interest Subaccount an amount equal to the interest on the Series E Bonds paid with the proceeds of such draw and from the Series E Sinking Fund Subaccount an amount equal to the principal of the Series E Bonds paid with the proceeds of such draw and remit such amounts to the Series E Letter of Credit Bank on or before 5:00 p.m., New York time, on such Payment Date as reimbursement to the Series E Letter of Credit Bank for such draw under the terms of the Series E Reimbursement Agreement. If on a Payment Date the Series E Letter of Credit Bank shall have failed to make lawful payment of a draw properly presented in strict compliance with the requirements of the Series E Letter of Credit, the Trustee shall withdraw on such date from the Series E Interest Subaccount and remit by mail (or by wire transfer if so provided by the resolution of the Board authorizing the Series E Bonds) to each holder of Series E Bonds the amounts required for paying interest on such Bonds due on such Payment Date and withdraw from the Series E Sinking Fund Subaccount and set aside sufficient moneys for paying principal of the Series E Bonds due on such date.

On each August 1 and February 1, the Trustee shall withdraw from the Series E Interest Subaccount and remit to the Hedge Counterparty any PRPFC Swap Payments required to be made on such date.

On each August 1 and February 1, the Trustee shall withdraw from the Series E Letter of Credit Fee Subaccount and remit immediately to the Series E Letter of Credit Bank any Series E Letter of Credit Fee then due to the Series E Letter of Credit Bank.

On each date on which the Corporation is required to make a payment to the Hedge Counterparty under the Series E GIC, the Trustee shall withdraw from the Series E Sinking Fund Subaccount and remit to the Hedge Counterparty an amount equal to the amount required to be paid to the Hedge Counterparty under the Series E GIC on such date.

All amounts on deposit to the credit of the Series E Bonds Account shall be held in trust and applied exclusively for the benefit of the holders of Series E Bonds, the Series E Letter of Credit Bank and the Hedge Counterparty.

**Withdrawals from Bond Service Account**

On each Payment Date or as otherwise provided in the resolution of the Board authorizing the issuance of a series of Bonds, the Trustee shall withdraw from the Bond Service Account and (1) remit by mail (or by wire transfer if so provided by resolution of the Board) to each holder of Bonds (other than the Series E Bonds) the amounts required for paying interest upon such Bonds as such interest becomes due, and (2) set aside sufficient moneys for paying the principal of Bonds (other than the Series E Bonds) as such principal becomes due.

**Withdrawals from Redemption Account**

Moneys held to the credit of the Redemption Account shall be applied to the retirement of Bonds (other than Series E Bonds) as follows:

(a)     Subject to the provisions of paragraph (c) below, the Trustee shall endeavor to purchase Bonds or portions of Bonds, whether or not such Bonds or portions shall then be subject to redemption, at the most advantageous price obtainable with reasonable diligence, such price not to exceed the principal of such Bonds plus the amount of the premium, if any, that would be payable on the next redemption date

III-12

to the holders of such Bonds under the redemption provisions of the Trust Agreement if such Bonds or portions of Bonds should be called for redemption on such date from the moneys in the Redemption Account. The Trustee shall pay the interest accrued on such Bonds or portions of Bonds to the redemption date from the Bond Service Account and the purchase price from the Redemption Account. No such purchase shall be made by the Trustee within the period of 45 days immediately preceding the date on which such Bonds are subject to call for redemption in part under the redemption provisions of the Trust Agreement except from moneys other than the moneys set aside or deposited for such redemption of Bonds;

(b)     Subject to the provisions of paragraph (c) below, the Trustee shall call for redemption on each date on which Bonds are subject to redemption from moneys in the Redemption Account such amount of Bonds or portions of Bonds then subject to redemption as, with the redemption premium, if any, will exhaust the moneys then held for the credit of the Redemption Account as nearly as may be; provided, however, that not less than $100,000 principal amount of Bonds shall be called for redemption at any one time. Such redemption shall be made pursuant to the redemption provisions of the Trust Agreement;

(c)     Moneys in the Redemption Account shall be applied by the Trustee in each Fiscal Year to the retirement of Bonds of each series then Outstanding in the following order:

first, the term Bonds of each such series to the extent of the Amortization Requirement, if any, for such Fiscal Year for the term Bonds of each such series then Outstanding and, if the amount available in such Fiscal Year shall not be sufficient therefor, then in proportion to the Amortization Requirement, if any, for such Fiscal Year for the term Bonds of each such series then Outstanding, if any;

second, any balance then remaining shall be applied first to the redemption of any term Bonds that are subject to redemption without premium and (after the Series E Bonds have been paid in full and all amounts due to the Series E Letter of Credit Bank and the Hedge Counterparty have been satisfied) any balance remaining to the purchase of any term Bonds then Outstanding whether or not such Bonds shall then be subject to redemption, in accordance with the provisions of paragraph (a) above;

third, any balance then remaining shall be applied to the redemption of the term Bonds of each such series in proportion to the Amortization Requirement, if any, for such Fiscal Year for the term Bonds of each such series then Outstanding, plus the payment of the applicable premium, if any; and

fourth, after the retirement of all term Bonds, any balance still remaining shall be applied to the retirement of the serial Bonds of each series in proportion to the aggregate principal amount of the serial Bonds of each such series originally issued under the provisions of the Trust Agreement.

**Withdrawals from Reserve Account**

While any Series E Bonds are Outstanding or any amounts are due to the Series E Letter of Credit Bank or the Hedge Counterparty, moneys held to the credit of the Reserve Account shall be used by the Trustee for the purpose of making the deposits required under clauses "first," "second" and "third" under "Bond Fund and Accounts" above in the same order provided for in said clauses whenever and to the extent that the Legislative Appropriation or the moneys received in respect of the Note are insufficient therefor.

Any moneys held to the credit of the Reserve Account in excess of the Reserve Account Requirement on the Bonds Outstanding for any Fiscal Year thereafter shall, upon the written request of the Corporation, be transferred to the credit of the Bond Service Account or the Redemption Account.

**Withdrawals from Surplus Account**

Moneys held to the credit of the Surplus Account shall be applied by the Trustee to make payments in the following order:  (i) to pay any fees and expenses payable to the providers of any Credit Facility, Liquidity Facility, Reserve Account Insurance Policy or Reserve Account Letter of Credit; (ii) to reimburse or pay any provider of such facilities for any other amounts due under the agreement with such provider; and (iii) to pay the compensation of the Trustee and other amounts payable to the Trustee under the Trust Agreement upon the written request of the Corporation.

Any moneys held to the credit of the Surplus Account after all amounts described in the preceding paragraph required to be paid in respect of a Fiscal Year have been paid shall, upon the written request of the Corporation, be transferred to the credit of the Bond Service Account or the Redemption Account.

**Additional Bonds — Refunding Bonds**

Additional Bonds may be issued under and secured by the Trust Agreement, subject to certain conditions, at any time or times solely for the purpose of (i) providing funds for refunding all or any part of the Outstanding Bonds of any one or more series by payment at maturity or redemption at a selected redemption date or dates or combination of such payment at maturity and redemption, including the payment of any redemption premium thereon, (ii) making a deposit to the Reserve Account, and (iii) paying the costs of issuance of such refunding Bonds.  No refunding Bonds may be issued unless the amounts of principal and interest payable under the Note (assuming timely payments under the Note) after the issuance of such refunding Bonds, combined with moneys to be received from any interest rate swap arrangement or guaranteed investment contract, are sufficient to pay the principal of and interest on all Bonds Outstanding after the issuance of such refunding Bonds, together with other amounts required to be paid by the Corporation with respect to the Bonds, any Facility relating thereto and the Trust Agreement.  In addition, while the Series E Bonds remain Outstanding, no refunding Bonds may be issued, without the consent of the Series E Letter of Credit Bank, unless (i) no payment of principal on such refunding Bonds becomes due before the maturity date of the Series E Bonds, (ii) the Cash Debt Service on all Bonds Outstanding for each Fiscal Year after the issuance of such refunding Bonds is equal to or less than the Cash Debt Service on all Bonds Outstanding for the same Fiscal Year before the issuance of such refunding Bonds, (iii) no such refunding Bonds mature after August 1, 2014, and (iv) no such refunding Bonds are Put Bonds or Variable Rate Bonds.

**Investment of Moneys**

Moneys held to the credit of the Bond Service Account and the Redemption Account shall, as nearly as may be practicable, be continuously invested and reinvested, at the written direction of the Corporation, in Government Obligations, Permitted Investments of the type described in clauses (iii) and (iv) of the definition of that term and Investment Obligations of the type described in clause (ii) of the definition of that term, that shall mature, or that shall be subject to redemption by the holder thereof at the option of such holder, not later than the respective dates when moneys held for the credit of said accounts will be required for the purposes intended.  Moneys held to the credit of the subaccounts established in the Series E Bonds Account shall, as nearly as may be practicable, be continuously invested and reinvested, at the written direction of the Corporation in Permitted Investments that shall mature, or that

shall be subject to redemption by the holder thereof at the option of such holder, not later than the respective dates when moneys held to the credit of said subaccounts will be required for the purposes intended, except that moneys to the credit of the Series E Letter of Credit Subaccount shall be held uninvested. Moneys held to the credit of the Reserve Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Corporation in Investment Obligations that shall have a remaining term to maturity of one year or less. Moneys held to the credit of the Surplus Account shall be continuously invested and reinvested at the written direction of the Corporation in any Investment Obligation selected by it.

Obligations so purchased as an investment of moneys in any such fund or account shall be deemed at all times to be a part of such fund or account, and any investment earnings and profit or loss realized on the sale or maturity thereof, shall be credited or debited to such fund or account; provided, however, that if the required deposit to any account in the Bond Fund has been made for the current Fiscal Year, the investment earnings on moneys held to the credit of such account (other than investment earnings on moneys held to the credit of the Series E Bonds Account) shall be deposited to the credit of any other account of the Bond Fund for which such required deposit has not been made, in the order required by the Trust Agreement, and thereafter shall be deposited to the credit of such account in the Bond Fund as shall be directed by the Corporation.

**No Impairment**

The Corporation covenants and agrees that, so long as any of the Bonds shall be Outstanding and so long as any of its other obligations under the Series E Reimbursement Agreement or the Master Agreement shall remain unpaid, none of the Pledged Revenues will be used for any purpose other than as provided in the Trust Agreement, and that no contract or contracts will be entered into or any action taken by which the rights of the Trustee, the holders or such other parties secured by the Trust Agreement to such Pledged Revenues might be impaired or diminished.

**Inclusion of Principal and Interest Requirement in Budget**

Each year while any Bonds are Outstanding, the Corporation shall file a timely request with the Director of the Office of Management and Budget of the Commonwealth to include in the annual budget of capital improvements and operating expenses of the Commonwealth for the next Fiscal Year the necessary legislative appropriations so that payments in respect of the Note shall be sufficient to cover for the next Fiscal Year (without duplication): (i) the interest on, principal of (excluding the principal of the Series E Bonds which is included in the Series E Sinking Fund Requirement), redemption premium, if any, and Accreted Value or Appreciated Value of the Bonds which is due and payable in such Fiscal Year (whether at maturity, in connection with an Amortization Requirement, upon redemption or otherwise) less all amounts expected to be received by the Corporation and deposited with the Trustee during such Fiscal Year pursuant to the Rate Swap and the Series E GIC if such Rate Swap and Series E GIC shall be at the time in full force and effect and not terminated or liquidated; (ii) the Series E Sinking Fund Requirement which is due and payable in such Fiscal Year; (iii) the amount required to purchase or redeem Bonds in such Fiscal Year pursuant to the Trust Agreement; (iv) all amounts then due to the Series E Letter of Credit Bank pursuant to the Series E Reimbursement Agreement; (v) all PRPFC Swap Payments expected to be due and payable for such Fiscal Year (to the extent not already included in the portion corresponding to interest on the Series E Bonds); (vi) the amounts required to be deposited to the credit of the Reserve Account established under the Trust Agreement in such Fiscal Year, including any amounts required to cure any deficiency therein; (vii) any fees, expenses or other amounts becoming due and payable in such Fiscal Year to the provider of a Facility under the agreement relating to such Facility or any amounts required to reimburse a provider of a Facility for payments made under any such Facility

in respect of the Bonds and not theretofore reimbursed; (viii) and any fees or reimbursement for expenses payable to the Trustee under the Trust Agreement; (ix) any amount then due by the Corporation to the Hedge Counterparty for breakage cost or other termination payment under the terms of the Master Agreement; and (x) any other amount becoming due and payable in such Fiscal Year in respect of the Bonds or becoming due and payable under the Trust Agreement.

**Enforcement of Remedies**

If the Trustee shall have received from the Series E Letter of Credit Bank a written notice that an event of default under the Series E Reimbursement Agreement has occurred and is then continuing or that it has determined not to reinstate the interest portion of the Series E Letter of Credit in accordance with the provisions of the Series E Reimbursement Agreement and that the Series E Letter of Credit will be terminated, the Trustee shall, by notice in writing to the Corporation, declare the principal of all the Series E Bonds then outstanding to be immediately due and payable, and upon such declaration the same shall become and be immediately due and payable, and the Trustee shall immediately draw a draft under the Series E Letter of Credit in an amount sufficient to pay the amount of principal and interest then due and payable on the Series E Bonds.

In the event that the Series E Letter of Credit Bank fails to make lawful payment under the Series E Letter of Credit of a drawing made and presented in strict compliance with the terms thereof, the Trustee is required to enforce all of its rights under the Series E Letter of Credit by such actions at law or in equity as it deems necessary in order to protect the interest of the holders of Series E Bonds.

At the request of the holders of not less than 20% of the aggregate principal amount of Bonds then Outstanding, the Series E Letter of Credit Bank or the Hedge Counterparty, the Trustee shall proceed, subject to the provisions of the next paragraph, to protect and enforce its rights and the rights of the holders, the Series E Letter of Credit Bank and the Hedge Counterparty under the laws of the Commonwealth or under the Trust Agreement, including all rights with respect to the Note and the Pledged Revenues, provided, that the Trustee may not sell or otherwise dispose of the Note.

So long as the Series E Letter of Credit remains in effect and the Series E Letter of Credit Bank shall not have failed to make lawful payment under the Series E Letter of Credit upon demand for payment having been made in strict compliance with the terms and conditions thereof, then (a) without the prior written consent of the Series E Letter of Credit Bank, neither the Trustee nor the holders of the Bonds shall be entitled to exercise any right or remedy under the Trust Agreement, except for the right of the Trustee, or of the holders of not less than 20% of the aggregate principal amount of Bonds then Outstanding to request the Trustee to sue for, enforce payment of and recover judgment for any and all amounts then due from the Corporation for principal, premium, if any, interest or otherwise under any of the provisions of the Bonds, and (b) upon the written request of the Series E Letter of Credit Bank, the Trustee (i) shall take such action and exercise such rights and remedies provided in the Trust Agreement as are requested by the Series E Letter of Credit Bank, provided, however, that the Trustee shall not be required to impair the rights of the holders of the Bonds as described under "Modification with Consent of Holders of Majority of Bonds" or "Amendments to the Note" below without the prior consent of the holders of the requisite percentage of Bonds Outstanding and (ii) shall waive any default.

**Pro Rata Application of Funds**

If at any time the moneys in the Bond Fund (excluding those deposited to the credit of the Series E Bonds Account) shall not be sufficient to pay the interest on or the principal of the Bonds (other than the Series E Bonds) as the same shall become due and payable, such moneys (except for (1) moneys

deposited in the Series E Bonds Account which secure solely the Series E Bonds, the Series E Letter of Credit Bank and the Hedge Counterparty and (2) any other moneys obtained from a drawing on some other Credit Facility or Liquidity Facility and deposited in any other separate subaccount which shall secure only other specified Bonds), together with any moneys then available or thereafter becoming available for such purpose, whether through the exercise of the remedies provided for in the Trust Agreement or otherwise, shall be applied as follows:

first, to the payment to the persons entitled thereto of all installments of interest then due and payable in the order in which such installments became due and payable and, if the amount available shall not be sufficient to pay in full any particular installment, then to the payment, ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in such Bonds;

second, to the payment to the persons entitled thereto of the unpaid principal of any of the Bonds which shall have become due and payable (other than the Series E Bonds or Bonds called for redemption for the payment of which moneys are held pursuant to the provisions of this Agreement) in the order of their due dates, with interest on such Bonds at the respective rates specified therein from the respective dates upon which such Bonds became due and payable, and, if the amount available shall not be sufficient to pay in full the principal of such Bonds due and payable on any particular date, together with such interest, then to the payment first of such interest, ratably, according to the amount of such interest due on such date, and then to the payment of such principal, ratably, according to the amount of such principal due on such date, to the persons entitled thereto without any discrimination or preference except as to any difference in the respective rates of interest specified in such Bonds;

third, to the payment of the interest on and the principal of such Bonds, to the purchase and retirement of Bonds and to the redemption of Bonds, all in accordance with the provisions of the Trust Agreement; and

fourth, to the payment of any amounts then due and owing to a provider of a Credit Facility or a Liquidity Facility (other than the Series E Letter of Credit).

**Supplemental Agreements Without Bondholders' Consent**

The Corporation and the Trustee may, without the consent or approval of, or notice to, any of the bondholders but with the written consent of the Series E Letter of Credit Bank and the Hedge Counterparty, from time to time and at any time, enter into agreements supplemental to the Trust Agreement as shall not be inconsistent with the terms and provisions thereof, for the following purposes:

(a)     to cure any ambiguity or formal defect or omission in the Trust Agreement or in any supplemental agreement or to correct or supplement any provision contained therein that may be defective or inconsistent with any other provisions contained therein; or

(b)     to grant to or confer upon the Trustee for the benefit of the bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the bondholders or the Trustee; or

(c)     to add to the conditions, limitations and restrictions on the issuance of Bonds under the provisions of the Trust Agreement, other conditions, limitations and restrictions thereafter to be observed; or

(d)     to add to the covenants and agreements of the Corporation in the Trust Agreement other covenants and agreements thereafter to be observed by the Corporation or to surrender any right or power therein reserved to or conferred upon the Corporation; or

(e)     to permit the issuance of Bonds in coupon form, if the conditions precedent stated therein have been met; or

(f)     to qualify the Bonds or any of the Bonds for registration under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended; or

(g)     to qualify the Trust Agreement as an "indenture" under the Trust Indenture Act of 1939, as amended; or

(h)     to make such changes as may be necessary to adjust the terms of the Trust Agreement so as to facilitate the issuance of Variable Rate Bonds, Capital Appreciation Bonds, Capital Appreciation and Income Bonds, Put Bonds, Extendible Maturity Bonds, Balloon Bonds, Interim Bonds and such other Bonds as may be marketable from time to time; or

(i)     to make such changes as may be necessary to comply with the provisions of Commonwealth law relating to the exclusion of interest on the Bonds from gross income thereunder; or

(j)     to make such changes as may evidence the right and interest of an issuer of a Credit Facility or a Liquidity Facility that secures any series of Bonds.

**Modification with Consent of Holders of Majority of Bonds**

Subject to the terms and provisions contained in the Trust Agreement, and not otherwise, the holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding (or in case less than all of several series of Bonds then Outstanding are affected by the proposed supplemental agreement, the holders of not less than a majority in principal amount of the Bonds of each series so affected and Outstanding at the time the consent is given) shall have the right, from time to time, anything contained in the Trust Agreement to the contrary notwithstanding, to consent to and approve the execution by the Corporation and the Trustee of such agreement or agreements supplemental thereto as shall be deemed necessary or desirable by the Corporation for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained in the Trust Agreement or in any supplemental agreement; provided, however, that nothing contained in the Trust Agreement shall permit, or be construed as permitting, without the consent of the holders of 100% of the Bonds Outstanding (a) an extension of the time for the payment of the principal of (other than as provided by the terms of an Extendible Maturity Bond) or the interest on any Bond, or (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, or (c) the creation of any lien or a pledge of funds other than the lien and pledge created by the Trust Agreement, or (d) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (e) a reduction in the aggregate principal amount of the Bonds required for consent to such supplemental agreement or any waiver under the Trust Agreement, and nothing contained in the Trust Agreement shall permit, without the consent of 100% of the Series E Bonds Outstanding, a modification of any provisions of the Trust Agreement relating in any way to the Series E Letter of Credit.

No supplemental trust agreement will become effective without the written consent of the Series E Letter of Credit Bank and the Hedge Counterparty.

III-18

**Amendments to the Note**

The Trustee (as assignee of the Note) may enter into, from time to time and at any time, such amendments to the Note, in form satisfactory to the Trustee, as shall not be inconsistent with the terms and provisions thereof to (a) cure any ambiguity or formal defect or omission in the Note, provided such action shall not materially adversely affect the interests of the Bondholders, or (b) grant to or confer upon the Corporation or Trustee for the benefit of the Bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the Corporation or Bondholders or the Trustee, or (c) provide for the substitution of the Note for one or more notes of the Department, each such new note securing one or more series of Bonds, provided that, in the opinion of bond counsel, such substitution will not restrict, limit or reduce the obligation of the Department to make payments sufficient to pay the principal of and interest on the Bonds, or otherwise impair the security of the Bondholders of any series of Bonds under the Trust Agreement, or (d) make any other change which, in the judgment of the Trustee, will not restrict, limit or reduce the obligation of the Department to make the payments under the Note to pay the principal of or interest on the Bonds, or otherwise impair the security of the Bondholders under the Trust Agreement.

Except for amendments provided for in the preceding paragraph, the Trustee shall not enter into any amendment to the Note unless notice of the proposed amendment shall have been given and the holders of not less than a majority in aggregate principal amount of the Bonds then outstanding shall have consented to and approved the execution thereof, all as provided for under "Modification with Consent of Holders of Majority of Bonds" above; and provided further that without the consent of all of the holders of the Bonds outstanding affected by such change, no such amendment shall be entered into by the Trustee which would restrict, limit or reduce the obligations of the Department with respect to the Bonds.

No amendment to the Note will become effective without the written consent of the Series E Letter of Credit Bank and the Hedge Counterparty.

**Amendments to Series E Letter of Credit**

The Trustee may enter into, from time to time and at any time, such amendments to the Series E Letter of Credit as shall not be inconsistent with the terms and provisions thereof, and which in the opinion of the Trustee shall not be detrimental to the interests of the holders of the Series E Bonds, to (a) cure any ambiguity or formal defect or omission in the Series E Letter of Credit or in any supplement thereto, or (b) grant to or confer upon the Trustee for the benefit of the holders of Series E Bonds any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the holders of Series E Bonds or the Trustee, or (c) make any other change which, in the judgment of the Trustee, will not restrict, limit or reduce the obligation of the Series E Letter of Credit Bank to pay the principal of or interest on the Series E Bonds, or otherwise impair the security of the holders of Series E Bonds under the Trust Agreement.

Except for amendments provided for in the preceding paragraph, the Trustee shall not enter into any amendment to the Series E Letter of Credit unless notice of the proposed amendment shall have been given to the holders of the Series E Bonds and the holders of not less than a majority in aggregate principal amount of the Series E Bonds then Outstanding shall have consented to and approved the execution thereof, all as provided for under "Modification with Consent of Holders of Majority of Bonds" above; and provided further that no such amendment shall be entered into by the Trustee which would reduce the amount of any payment required to be made thereunder to the Trustee, or would postpone the time of any such payment, or would alter the conditions under which any such payment is made or would adversely affect the security of the holders of the Series E Bonds.

**Defeasance**

If all the Outstanding Bonds shall have been paid or deemed to have been paid as provided below and all amounts due and owing to any provider of a Credit Facility or a Liquidity Facility and the Hedge Counterparty shall have been paid, then and in that case the right, title and interest of the Trustee under the Trust Agreement shall cease, terminate and become void, and such Bonds shall cease to be entitled to any benefit or security under the Trust Agreement. In such event, the Trustee shall transfer and assign to the Corporation all property then held by the Trustee, shall execute such documents as may be reasonably required by the Corporation to evidence such transfer and assignment and shall turn over to the Corporation any surplus in any account in the Bond Fund.

Any Outstanding Bond shall be deemed to have been paid within the meaning and with the effect expressed in the Trust Agreement when the whole amount of the principal of and interest on such Bond shall have been paid or when (a) there shall have been deposited with the Trustee or another fiduciary institution acting as escrow agent for the holder of such Bond either moneys in an amount which shall be sufficient, or sufficient Government Obligations of the type described in clauses (i) and (ii) of the definition of that term, which shall not contain provisions permitting the redemption thereof other than at the option of the holder, to pay when due the principal of and premium, if any, and interest due and to become due on such Bond on or prior to the redemption date or maturity date thereof, as the case may be, and (b) in the event such Bond does not mature and is not to be redeemed within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to give, as soon as practicable, a notice to the holder of such Bond by first-class mail, postage prepaid, stating that the deposit of moneys or sufficient Government Obligations or other obligations mentioned in clause (a) of this paragraph has been made with the Trustee or another fiduciary institution acting as escrow agent for the holder of such Bond and that such Bond is deemed to have been paid in accordance with the Trust Agreement and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal of and premium, if any, and interest on such Bond.

**Successor Letter of Credit for Series E Bonds**

At any time prior to the expiration of the Series E Letter of Credit or any successor letter of credit then outstanding, the Corporation may at its option provide for the delivery to the Trustee of a successor letter of credit providing for the payment of the principal of and interest on the Series E Bonds, issued by a bank, banking association or trust company whose long-term debt obligations are rated not lower than AA or its equivalent by Standard & Poor's Ratings Services or any successor thereto and Aa2 or its equivalent by Moody's Investors Service, Inc. or any successor thereto. Any successor letter of credit shall be for a term at least as long as the remaining term of the letter of credit being replaced and shall be in an aggregate principal amount equal to the principal of the Series E Bonds plus not less than 110 days' interest accrued thereon at the maximum rate.

The Trustee shall not accept a successor letter of credit unless it also receives, among other things, (i) an opinion of a recognized firm of municipal bond attorneys that the delivery of such successor letter of credit is authorized by and complies with the Trust Agreement and (ii) a written notice from each rating agency then rating the Series E Bonds confirming that the rating on such Bonds will not be lowered or withdrawn as a result of the delivery of the successor letter of credit.

**APPENDIX IV**

### PROPOSED FORM OF OPINION OF BOND COUNSEL

July __, 2003

Puerto Rico Public Finance Corporation
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined Act No. 17 of the Legislature of Puerto Rico approved September 23, 1948, as amended, creating Government Development Bank for Puerto Rico ("Government Development Bank") as a public corporation and a governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), Resolution No. 5044, as amended, of Government Development Bank and other proofs submitted in connection with the creation by Government Development Bank of a subsidiary of Government Development Bank and an independent governmental instrumentality of the Commonwealth designated Puerto Rico Public Finance Corporation (the "Corporation").

We have also examined certified copies of a Trust Agreement, dated December 27, 2001 (the "Trust Agreement"), by and between the Corporation and The Bank of New York, Trustee (the "Trustee"), certified copies of the Resolution of the Board of Directors of the Corporation (the "Resolution") authorizing the issuance and delivery of the bonds mentioned below, and other proofs submitted relative to the authorization, issuance and sale of:

**$47,935,000**
**PUERTO RICO PUBLIC FINANCE CORPORATION**
**2003 SERIES A BONDS**

bearing interest at such rates, payable on such dates, maturing in such principal amounts and subject to redemption prior to maturity, all as set forth in the Resolution and the Trust Agreement (the "2003 Series A Bonds").

The proceeds of the 2003 Series A Bonds are to be used by the Corporation to purchase from Government Development Bank a promissory note of Puerto Rico Land Authority (the "2003 Series A Note") and pay expenses incurred in connection with the issuance of the 2003 Series A Bonds.

The Corporation currently has outstanding bonds previously issued under the Trust Agreement, the proceeds of which were used to purchase from Government Development Bank certain promissory notes of departments, agencies, instrumentalities or public corporations of the Commonwealth (such notes, together with the 2003 Series A Note, the "Notes").

The principal of and the interest on such outstanding bonds and the 2003 Series A Bonds are payable solely from Pledged Revenues (as defined in the Trust Agreement), consisting of payments of principal of and interest on the Notes and other funds held by the Trustee under the Trust Agreement.

Puerto Rico Public Finance Corporation
July ___, 2003
Page

The principal of and interest on the Notes is payable solely from annual appropriations made by the Legislature of Puerto Rico pursuant to Act No. 164 of the Legislature of Puerto Rico approved on December 17, 2001.

We have also examined one of said 2003 Series A Bonds as executed and authenticated.

From such examination, we are of the opinion that:

1.      Said Act No. 17, as amended, has been validly enacted and is in full force and effect, and said Resolution No. 5044, as amended, has been duly adopted and is in full force and effect, and the Corporation is a duly constituted and existing subsidiary corporation of Government Development Bank and an independent governmental instrumentality of the Commonwealth.

2.      The Resolution has been validly and legally adopted.

3.      The Trust Agreement has been duly executed and delivered.

4.      The 2003 Series A Bonds have been duly authorized and issued, among other things, to provide funds for the purchase of the 2003 Series A Note.

5.      The 2003 Series A Bonds are valid and binding obligations of the Corporation, payable solely from Pledged Revenues (as defined in the Trust Agreement), consisting of payments of principal of and interest on the Notes and other funds held by the Trustee under the Trust Agreement.

6.      The 2003 Series A Bonds do not constitute a debt of the Commonwealth, any of its public instrumentalities (other than the Corporation) or any of its municipalities or other political subdivisions, and neither the Commonwealth, any of its public instrumentalities (other than the Corporation) nor any of such municipalities or other political subdivisions are liable thereon.

7.      Based on the laws of the Commonwealth now in force:

a.      Interest on the 2003 Series A Bonds is exempt from Puerto Rico income and withholding taxes, including the alternative minimum tax imposed by Section 1017 of the Puerto Rico Internal Revenue Code of 1994, as amended (the "P.R. Code").

b.      The 2003 Series A Bonds are exempt from property taxes imposed by the Municipal Property Tax Act of 1991, as amended, and interest thereon is exempt from the municipal license tax imposed by the Municipal License Tax Act of 1974, as amended.

c.      The transfer of the 2003 Series A Bonds (i) by gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of the Commonwealth at the time the gift is made and (ii) by death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico.

Puerto Rico Public Finance Corporation
July __, 2003
Page

d.      Gain realized from the sale or exchange of a 2003 Series A Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of the Commonwealth.

e.      The 2003 Series A Bonds will be considered an obligation of an instrumentality of the Commonwealth for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of the Commonwealth and certain other investments.

f.      Interest on the 2003 Series A Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the 2003 Series A Bonds with "eligible funds," as such term is defined in the Acts.

8.      Based on the provisions of the United States Internal Revenue Code of 1986, as amended (the "Code"), now in force:

a.      Interest on the 2003 Series A Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, a corporation (i) organized under the laws of the Commonwealth, or (ii) otherwise constituting a foreign corporation under the Code, is not subject to income taxation under the Code provided such interest or "original issue discount" is not effectively connected, or treated as effectively connected, with or attributable to the conduct of a trade or business within the United States by such corporation.

b.      Interest on the 2003 Series A Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, an individual who is a *bona fide* resident of the Commonwealth during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within the Commonwealth and, therefore, is excludable from gross income for purposes of the Code pursuant to Section 933(1) thereof.

c.      Interest on the 2003 Series A Bonds is not excludable from the gross income of the recipient thereof for federal income tax purposes under Section 103(a) of the Code.

d.      A person that is subject to income tax under the Code on its worldwide income will generally be subject to federal income tax on any gain realized upon the sale or exchange of the 2003 Series A Bonds. However, pursuant to Notice 89-40 issued by the United States Internal Revenue Service on March 27, 1989, gain on the sale or exchange of the 2003 Series A Bonds by an individual who is a *bona fide* resident of the Commonwealth during the entire taxable year will constitute Puerto Rico source income and, therefore, qualify for the exclusion provided in Section 933(1) of the Code, provided such 2003 Series A Bonds do not constitute inventory in the hands of such individual.

IV-3

Puerto Rico Public Finance Corporation
July ___, 2003
Page

     e.     The transfer of the 2003 Series A Bonds by death or gift will not be subject to estate or gift tax under the Code in the case of decedents or donors who, at the time of death or gift, are (i) residents of Puerto Rico and (ii) (x) United States citizens that acquired such citizenship solely by reason of birth or residence in Puerto Rico or (y) not United States citizens.

The P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a 2003 Series A Bond over its initial offering price (the "Accretion Amount"). Under the current administrative practice followed by the Department of the Treasury of the Commonwealth, the Accretion Amount is treated as interest.

Prospective owners of the 2003 Series A Bonds, including but not limited to financial institutions, should be aware that ownership of the 2003 Series A Bonds may result in having a portion of their interest and other expenses attributable to interest on the 2003 Series A Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes.

Prospective owners of the 2003 Series A Bonds should also be aware that the Code provides special rules for the taxation of shareholders of foreign corporations that qualify as "controlled foreign corporations," "personal holding companies," "foreign personal holding companies" or "passive foreign investment companies," as such terms are defined by the Code.

Other than as described herein, we have not addressed, and we are not opining upon, the federal or Commonwealth income tax consequences to any investor arising from the ownership of, receipt or accrual of interest on, or disposition of the 2003 Series A Bonds.

                Very truly yours,

                [To be signed "Pietrantoni Méndez & Alvarez LLP"]

## PROPOSED FORM OF OPINION OF BOND COUNSEL

July __, 2003

Puerto Rico Public Finance Corporation
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined Act No. 17 of the Legislature of Puerto Rico, approved September 23, 1948, as amended, creating Government Development Bank for Puerto Rico ("Government Development Bank") as a public corporation and a governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), Resolution No. 5044 of Government Development Bank and other proofs submitted in connection with the creation by Government Development Bank of a subsidiary of Government Development Bank and an independent governmental instrumentality of the Commonwealth designated Puerto Rico Public Finance Corporation (the "Corporation").

We have also examined certified copies of the Trust Agreement, dated June 30, 1995 (the "Trust Agreement"), by and between the Corporation and Banco Santander Puerto Rico, as successor trustee (the "Trustee"), certified copies of the Resolution of the Board of Directors of the Corporation (the "Resolution") authorizing the issuance and delivery of the bonds mentioned below, and other proofs submitted relative to the authorization, issuance and sale of:

**$272,560,000**
**PUERTO RICO PUBLIC FINANCE CORPORATION**
**2003 SERIES B REFUNDING BONDS**

bearing interest at the rates, payable on such dates, or having a yield to maturity, maturing in such principal amounts and subject to redemption prior to maturity, all as set forth in the Resolution and the Trust Agreement (the "2003 Series B Refunding Bonds").

The proceeds of the 2003 Series B Refunding Bonds are to be used by the Corporation to refund certain of the bonds designated Puerto Rico Public Finance Corporation 1995 Series A Bonds (Commonwealth Appropriation Bonds), Puerto Rico Public Finance Corporation 1995 Series C Refunding Bonds (Commonwealth Appropriation Bonds), and Puerto Rico Public Finance Corporation 1996 Series D Refunding Bonds (Commonwealth Appropriation Bonds)(collectively, the "Refunded Bonds") and pay expenses incurred in connection with the issuance of the 2003 Series B Refunding Bonds.

The principal of and the interest on the 2003 Series B Refunding Bonds and all other outstanding bonds issued under the Trust Agreement are payable solely from Pledged Revenues (as defined in the Trust Agreement), consisting of payments of principal of and interest on a certain promissory note of Puerto Rico Maritime Shipping Authority (the "Note") and other funds held by the Trustee under the Trust Agreement. The principal of and interest on the Note is payable solely from annual appropriations made by the Legislature of Puerto Rico pursuant to Act No. 113 of the Legislature of Puerto Rico approved on September 27, 1994.

Puerto Rico Public Finance Corporation
July __, 2003
Page

     We have also examined one of said 2003 Series B Refunding Bonds as executed and authenticated.

     From such examination we are of the opinion that:

     1.    Said Act No. 17, as amended, has been validly enacted and is in full force and effect, and said Resolution No. 5044 has been duly adopted and is in full force and effect, and the Corporation is a duly constituted and existing subsidiary corporation of Government Development Bank and an independent governmental instrumentality of the Commonwealth.

     2.    The Resolution has been validly and legally adopted.

     3.    The Trust Agreement has been duly executed and delivered.

     4.    The 2003 Series B Refunding Bonds have been duly authorized and issued to refund, in part, the Refunded Bonds.

     5.    The 2003 Series B Refunding Bonds are valid and binding obligations of the Corporation, payable solely from Pledged Revenues, consisting of payments of principal of and interest on the Note and other funds held by the Trustee under the Trust Agreement.

     6.    The 2003 Series B Refunding Bonds do not constitute a debt of the Commonwealth, any of its public instrumentalities (other than the Corporation) or any of its municipalities or other political subdivisions, and neither the Commonwealth, any of its public instrumentalities (other than the Corporation) nor any of such municipalities or other political subdivisions are liable thereon.

     7.    Based on the laws of the Commonwealth now in force:

          a.    Interest on the 2003 Series B Refunding Bonds is exempt from Commonwealth income and withholding taxes, including the alternative minimum tax imposed by Section 1017 of the Puerto Rico Internal Revenue Code of 1994, as amended (the "P.R. Code").

          b.    The 2003 Series B Refunding Bonds are exempt from personal property taxes imposed by the Municipal Property Tax Act of 1991, as amended, and interest thereon is exempt from municipal license tax imposed by the Municipal License Tax Act of 1974, as amended.

          c.    The transfer of the 2003 Series B Refunding Bonds (i) by gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of the Commonwealth at the time the gift is made and (ii) by death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico.

          d.    Gain realized from the sale or exchange of a 2003 Series B Refunding Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of the Commonwealth.

Puerto Rico Public Finance Corporation
July ___, 2003
Page

e.      The 2003 Series B Refunding Bonds will be considered an obligation of an instrumentality of the Commonwealth for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of the Commonwealth and certain other investments.

f.      Interest on the 2003 Series B Refunding Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the 2003 Series B Refunding Bonds with "eligible funds," as such term is defined in the Acts.

8.      Based on the provisions of the Internal Revenue Code of 1986, as amended (the "Code"), now in force:

a.      Interest on the 2003 Series B Refunding Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, a corporation (i) organized under the laws of the Commonwealth, or (ii) otherwise constituting a foreign corporation under the Code, is not subject to income taxation under the Code provided such interest or "original issue discount" is not effectively connected, or treated as effectively connected, with or attributable to the conduct of a trade or business within the United States by such corporation.

b.      Interest on the 2003 Series B Refunding Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, an individual who is a *bona fide* resident of the Commonwealth during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within the Commonwealth and, therefore, is excludable from gross income for purposes of the Code pursuant to Section 933(1) thereof.

c.      Interest on the 2003 Series B Refunding Bonds is not excludable from the gross income of the recipient thereof for federal income tax purposes under Section 103(a) of the Code.

d.      A person that is subject to income tax under the Code on its worldwide income will generally be subject to federal income tax on any gain realized upon the sale or exchange of the 2003 Series B Refunding Bonds. However, pursuant to Notice 89-40 issued by the United States Internal Revenue Service on March 27, 1989, gain on the sale or exchange of the 2003 Series B Refunding Bonds by an individual who is a *bona fide* resident of the Commonwealth during the entire taxable year will constitute Puerto Rico source income and, therefore, qualify for the exclusion provided in Section 933(1) of the Code, provided such 2003 Series B Refunding Bonds do not constitute inventory in the hands of such individual.

Puerto Rico Public Finance Corporation
July __, 2003
Page

        e.      The transfer of the 2003 Series B Refunding Bonds by death or gift will not be subject to estate or gift tax under the Code in the case of decedents or donors who, at the time of death or gift, are (i) residents of Puerto Rico and (ii) (x) United States citizens that acquired such citizenship solely by reason of birth or residence in Puerto Rico or (y) not United States citizens.

The P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a 2003 Series B Refunding Bond over its initial offering price (the "Accretion Amount"). Under the current administrative practice followed by the Department of the Treasury of the Commonwealth, the Accretion Amount is treated as interest.

Prospective owners of the 2003 Series B Refunding Bonds, including but not limited to financial institutions, should be aware that ownership of the 2003 Series B Refunding Bonds may result in having a portion of their interest and other expenses attributable to interest on the 2003 Series B Refunding Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes.

Prospective owners of the 2003 Series B Refunding Bonds should also be aware that the Code provides special rules for the taxation of shareholders of foreign corporations that qualify as "controlled foreign corporations," "personal holding companies," "foreign personal holding companies" or "passive foreign investment companies," as such terms are defined by the Code.

Other than as described herein, we have not addressed, and we are not opining upon, the federal or Commonwealth income tax consequences to any investor arising from the ownership of, receipt or accrual of interest on, or disposition of the 2003 Series B Refunding Bonds.

                    Very truly yours,

                    [To be signed "Pietrantoni Méndez & Alvarez LLP"]

IV-8

**PROPOSED FORM OF OPINION OF BOND COUNSEL**

July __, 2003

Puerto Rico Public Finance Corporation
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined Act No. 17 of the Legislature of Puerto Rico approved September 23, 1948, as amended, creating Government Development Bank for Puerto Rico ("Government Development Bank") as a public corporation and a governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), Resolution No. 5044, as amended, of Government Development Bank and other proofs submitted in connection with the creation by Government Development Bank of a subsidiary of Government Development Bank and an independent governmental instrumentality of the Commonwealth designated Puerto Rico Public Finance Corporation (the "Corporation").

We have also examined certified copies of the Trust Agreement, dated April 23, 1996 (the "Trust Agreement"), by and between the Corporation and Banco Santander Puerto Rico, as successor trustee (the "Trustee"), certified copies of the Resolution of the Board of Directors of the Corporation (the "Resolution") authorizing the issuance and delivery of the bonds mentioned below, and other proofs submitted relative to the authorization, issuance and sale of:

**$61,244,786.55**
**PUERTO RICO PUBLIC FINANCE CORPORATION**
**2003 SERIES C REFUNDING BONDS**

payable on such dates, having a yield to maturity, maturing in such principal amounts and subject to redemption prior to maturity, all as set forth in the Resolution and the Trust Agreement (the "2003 Series C Refunding Bonds").

The proceeds of the 2003 Series C Refunding Bonds are to be used by the Corporation to refund certain of the bonds designated Puerto Rico Public Finance Corporation 1996 Series E Bonds (Commonwealth Appropriation Bonds) and Puerto Rico Public Finance Corporation 1996 Series F Bonds (Commonwealth Appropriation Bonds) and pay expenses incurred in connection with the issuance of the 2003 Series C Refunding Bonds.

The principal of and the interest on the 2003 Series C Refunding Bonds and all other outstanding bonds issued under the Trust Agreement are payable solely from Pledged Revenues (as defined in the Trust Agreement), consisting of payments of principal of and interest on a certain promissory note of the Puerto Rico Department of the Treasury (the "Note"), and other funds held by the Trustee under the Trust Agreement. The principal of and interest on the Note is payable solely from annual appropriations made by the Legislature of Puerto Rico pursuant to Act No. 163 of the Legislature of Puerto Rico approved on August 11, 1995.

Puerto Rico Public Finance Corporation
July __, 2003
Page

We have also examined one of said 2003 Series C Refunding Bonds as executed and authenticated.

From such examination, we are of the opinion that:

1.      Said Act No. 17, as amended, has been validly enacted and is in full force and effect, and said Resolution No. 5044, as amended, has been duly adopted and is in full force and effect, and the Corporation is a duly constituted and existing subsidiary corporation of Government Development Bank and an independent governmental instrumentality of the Commonwealth.

2.      The Resolution has been validly and legally adopted.

3.      The Trust Agreement has been duly executed and delivered.

4.      The 2003 Series C Refunding Bonds have been duly authorized and issued, among other things, to provide funds to refund certain of the Corporation's outstanding 1996 Series E Bonds and 1996 Series F Bonds.

5.      The 2003 Series C Refunding Bonds are valid and binding obligations of the Corporation, payable solely from Pledged Revenues (as defined in the Trust Agreement), consisting of payments of principal of and interest on the Note  and other funds held by the Trustee under the Trust Agreement.

6.      The 2003 Series C Refunding Bonds do not constitute a debt of the Commonwealth, any of its public instrumentalities (other than the Corporation) or any of its municipalities or other political subdivisions, and neither the Commonwealth, any of its public instrumentalities (other than the Corporation) nor any of such municipalities or other political subdivisions are liable thereon.

7.      Based on the laws of the Commonwealth now in force:

a.      Interest on the 2003 Series C Refunding Bonds is exempt from Puerto Rico income and withholding taxes, including the alternative minimum tax imposed by Section 1017 of the Puerto Rico Internal Revenue Code of 1994, as amended (the "P.R. Code").

b.      The 2003 Series C Refunding Bonds are exempt from property taxes imposed by the Municipal Property Tax Act of 1991, as amended, and interest thereon is exempt from the municipal license tax imposed by the Municipal License Tax Act of 1974, as amended.

c.      The transfer of the 2003 Series C Refunding Bonds (i) by gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of the Commonwealth at the time the gift is made and (ii) by death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico.

Puerto Rico Public Finance Corporation
July __, 2003
Page

       d.     Gain realized from the sale or exchange of a 2003 Series C Refunding Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of the Commonwealth.

       e.     The 2003 Series C Refunding Bonds will be considered an obligation of an instrumentality of the Commonwealth for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of the Commonwealth and certain other investments.

       f.     Interest on the 2003 Series C Refunding Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the 2003 Series C Refunding Bonds with "eligible funds," as such term is defined in the Acts.

    8.     Based on the provisions of the United States Internal Revenue Code of 1986, as amended (the "Code"), now in force:

       a.     Interest on the 2003 Series C Refunding Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, a corporation (i) organized under the laws of the Commonwealth, or (ii) otherwise constituting a foreign corporation under the Code, is not subject to income taxation under the Code provided such interest or "original issue discount" is not effectively connected, or treated as effectively connected, with or attributable to the conduct of a trade or business within the United States by such corporation.

       b.     Interest on the 2003 Series C Refunding Bonds received by, or "original issue discount" (within the meaning of the Code) accrued to, an individual who is a *bona fide* resident of the Commonwealth during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within the Commonwealth and, therefore, is excludable from gross income for purposes of the Code pursuant to Section 933(1) thereof.

       c.     Interest on the 2003 Series C Refunding Bonds is not excludable from the gross income of the recipient thereof for federal income tax purposes under Section 103(a) of the Code.

       d.     A person that is subject to income tax under the Code on its worldwide income will generally be subject to federal income tax on any gain realized upon the sale or exchange of the 2003 Series C Refunding Bonds. However, pursuant to Notice 89-40 issued by the United States Internal Revenue Service on March 27, 1989, gain on the sale or exchange of the 2003 Series C Refunding Bonds by an individual who is a *bona fide* resident of the Commonwealth during the entire taxable year will constitute Puerto Rico source income and, therefore, qualify for the exclusion provided in Section 933(1) of the Code, provided such 2003 Series C Refunding Bonds do not constitute inventory in the hands of such individual.

Puerto Rico Public Finance Corporation
July __, 2003
Page

      e.      The transfer of the 2003 Series C Refunding Bonds by death or gift will not be subject to estate or gift tax under the Code in the case of decedents or donors who, at the time of death or gift, are (i) residents of Puerto Rico and (ii) (x) United States citizens that acquired such citizenship solely by reason of birth or residence in Puerto Rico or (y) not United States citizens.

      The P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a 2003 Series C Refunding Bond over its initial offering price (the "Accretion Amount"). Under the current administrative practice followed by the Department of the Treasury of the Commonwealth, the Accretion Amount is treated as interest.

      Prospective owners of the 2003 Series C Refunding Bonds, including but not limited to financial institutions, should be aware that ownership of the 2003 Series C Refunding Bonds may result in having a portion of their interest and other expenses attributable to interest on the 2003 Series C Refunding Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes.

      Prospective owners of the 2003 Series C Refunding Bonds should also be aware that the Code provides special rules for the taxation of shareholders of foreign corporations that qualify as "controlled foreign corporations," "personal holding companies," "foreign personal holding companies" or "passive foreign investment companies," as such terms are defined by the Code.

      Other than as described herein, we have not addressed, and we are not opining upon, the federal or Commonwealth income tax consequences to any investor arising from the ownership of, receipt or accrual of interest on, or disposition of the 2003 Series C Refunding Bonds.

      Very truly yours,

      [To be signed "Pietrantoni Méndez & Alvarez LLP"]

IV-12

**APPENDIX V**

**GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO**

The following information has been obtained from Government Development Bank.  Neither the Corporation nor the Underwriters have verified such information, and they shall have no liability with respect to such information.

Government Development Bank is a government instrumentality of the Commonwealth created by Act Number 17 of the Legislature of Puerto Rico, approved September 23, 1948, as amended.  Government Development Bank's primary purpose is to act as fiscal agent for the Commonwealth and its public entities.  In that capacity, Government Development Bank acts as fiscal agent in connection with all short-term borrowings and bond issues of the Commonwealth, its public corporations and municipalities.  In addition, Government Development Bank grants loans to the Commonwealth, its public corporations and municipalities, and to the private sector.

As of June 30, 2002, Government Development Bank had total assets of $8.68 billion, total deposits of $3.87 billion and capital of $2.00 billion.  For the year ended June 30, 2002, it reported net income of $217.7 million.

The principal offices of Government Development Bank are located at Minillas Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico.  For more detailed information on Government Development Bank, please refer to its Annual Report for the year ended June 30, 2002, a copy of which may be obtained by calling or writing to Director - New York Office, Government Development Bank for Puerto Rico, 140 Broadway, 38th Floor, New York, NY 10005, telephone number (212) 422-6420 or to Director - Public Finance Department, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, PR 00940, telephone number (787) 722-4170.  Upon request, Government Development Bank will furnish a copy of its Annual Report for the year ended June 30, 2002.

[This page intentionally left blank]

**APPENDIX VI**

## SERIES C REFUNDING BONDS
## TABLE OF ACCRETED VALUES FOR THE CAPITAL APPRECIATION BONDS
### (Per $5,000 Maturity Amount)

| Valuation Date | CABS Due From 08/01/10 To 08/01/14 | | | | |
|---|---|---|---|---|---|
| | 08/01/2010 | 08/01/2011 | 08/01/2012 | 08/01/2013 | 08/01/2014 |
| 07/10/2003 | $3,754.55 | $3,534.80 | $3,311.70 | $3,118.15 | $2,927.35 |
| 08/01/2003 | 3,763.45 | 3,543.65 | 3,320.50 | 3,126.70 | 2,935.65 |
| 02/01/2004 | 3,840.60 | 3,620.75 | 3,396.90 | 3,200.95 | 3,007.55 |
| 08/01/2004 | 3,919.30 | 3,699.50 | 3,475.00 | 3,277.00 | 3,081.25 |
| 02/01/2005 | 3,999.65 | 3,779.95 | 3,554.95 | 3,354.85 | 3,156.75 |
| 08/01/2005 | 4,081.65 | 3,862.15 | 3,636.70 | 3,434.50 | 3,234.10 |
| 02/01/2006 | 4,165.35 | 3,946.15 | 3,720.35 | 3,516.10 | 3,313.30 |
| 08/01/2006 | 4,250.75 | 4,032.00 | 3,805.90 | 3,599.60 | 3,394.50 |
| 02/01/2007 | 4,337.85 | 4,119.70 | 3,893.45 | 3,685.05 | 3,477.65 |
| 08/01/2007 | 4,426.80 | 4,209.30 | 3,983.00 | 3,772.60 | 3,562.85 |
| 02/01/2008 | 4,517.55 | 4,300.85 | 4,074.60 | 3,862.20 | 3,650.15 |
| 08/01/2008 | 4,610.15 | 4,394.40 | 4,168.35 | 3,953.90 | 3,739.60 |
| 02/01/2009 | 4,704.65 | 4,490.00 | 4,264.20 | 4,047.85 | 3,831.20 |
| 08/01/2009 | 4,801.10 | 4,587.65 | 4,362.30 | 4,143.95 | 3,925.05 |
| 02/01/2010 | 4,899.55 | 4,687.40 | 4,462.60 | 4,242.40 | 4,021.25 |
| 08/01/2010 | 5,000.00 | 4,789.35 | 4,565.25 | 4,343.15 | 4,119.75 |
| 02/01/2011 | | 4,893.55 | 4,670.25 | 4,446.30 | 4,220.70 |
| 08/01/2011 | | 5,000.00 | 4,777.65 | 4,551.90 | 4,324.10 |
| 02/01/2012 | | | 4,887.55 | 4,660.00 | 4,430.05 |
| 08/01/2012 | | | 5,000.00 | 4,770.70 | 4,538.60 |
| 02/01/2013 | | | | 4,884.00 | 4,649.75 |
| 08/01/2013 | | | | 5,000.00 | 4,763.70 |
| 02/01/2014 | | | | | 4,880.40 |
| 08/01/2014 | | | | | 5,000.00 |