## NATBONY REPLY DECLARATION
### EXHIBIT 23

1992 JTS 16, 129 D.P.R. 824, 1992 WL 754978 (P.R.)

HONS. ZAIDA HERNÁNDEZ TORRES, por
sí y como REPRESENTANTE a la CÁMARA
DE REPRESENTANTES, EDISON MISLA
ALDARONDO, por sí y como REPRESENTANTE
a la CÁMARA DE REPRESENTANTES
ET ALS., demandantes y apelados,

v.

HON. RAFAEL HERNÁNDEZ COLÓN,
GOBERNADOR DEL ESTADO LIBRE ASOCIADO
DE PUERTO RICO; JOSÉ M. ALONSO GARCÍA,
DIRECTOR DE LA OFICINA DE PRESUPUESTO
y GERENCIA DE PUERTO RICO, y RAMÓN
GARCÍA SANTIAGO, SECRETARIO DE HACIENDA
DE PUERTO RICO, demandados y apelantes.

En El Tribunal Supremo De Puerto Rico.
*Número:* AC-91-833

SENTENCIA de *Arnaldo López Rodríguez,* J. (San Juan), que declara inconstitucional la Resolución Conjunta de Presupuesto de Mejoras Capitales y Gastos de Funcionamiento del Estado Libre Asociado de Puerto Rico para el año fiscal 1991-1992, Resolución Núm. 163 de 10 de agosto de 1991, por crear un presupuesto deficitario. *Revocada.*

*Anabelle Rodríguez, Procuradora General,* abogada de los apelantes; *Manuel D. Herrero García* y *Carlos Santiago Tavares,* abogados de los apelados; *José Trías Monge,* abogado del Banco Gubernamental de Fomento para Puerto Rico, *amicus curiae.*

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Mediante el presente recurso de apelación, el Gobernador de Puerto Rico, Hon. Rafael Hernández Colón, el Director de la Oficina de Presupuesto y Gerencia, José M. Alonso García, y el Secretario de Hacienda, Hon. Ramón García Santiago, solicitan que revisemos la sentencia del Tribunal Superior, Sala de San Juan, que declaró inconstitucional la Resolución Conjunta de Presupuesto de Mejoras Capitales y Gastos de Funcionamiento del Estado Libre Asociado de Puerto Rico para el año fiscal 1991-1992, Resolución Núm. 163 de 10

de agosto de 1991, por ser ésta creadora de un presupuesto deficitario al momento de su aprobación.

El Procurador General sostiene que la controversia de autos no es justiciable por cuanto los demandantes, miembros de la Cámara de Representantes de uno de los partidos de minoría, carecen de legitimación activa y por razón de que la controversia plantea una cuestión política. Además, señala que el presupuesto general de 1991–1992, aprobado mediante la Resolución Conjunta Núm. 163, *supra,* no viola el Art. VI, Sec. 7 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1. Analizada la controversia, revocamos.
**\*831**

I

El 16 de agosto de 1991, los Representantes Zaida Hernández Torres y Edison Misla Aldarondo —por sí y como representantes a la Cámara, y toda la delegación del Partido Nuevo Progresista, representada por su portavoz— presentaron ante el Tribunal Superior, Sala de San Juan, una petición de *injunction* permanente y sentencia declaratoria contra el Hon. Gobernador de Puerto Rico, Rafael Hernández Colón, el Director de la Oficina de Presupuesto y Gerencia, Sr. José M. Alonso García, y contra el Secretario de Hacienda, Hon. Ramón García Santiago.

[1] Alegaron en su petición que la Resolución Conjunta Núm. 163, *supra,* que provee las asignaciones para los gastos ordinarios de las Ramas Legislativa, Judicial y Ejecutiva del Estado Libre Asociado, y aprobada para el año fiscal 1991–1992, es "inconstitucional e ilegal", puesto que crea un presupuesto deficitario y, por consiguiente, violatorio del Art. VI, Sec. 7 de la Constitución del Estado Libre Asociado, *supra.* [1]

[1] "Las asignaciones hechas para un año económico no podrán exceder de los recursos totales calculados para dicho año económico, a menos que se provea por ley para la imposición de contribuciones suficientes para cubrir dichas asignaciones." Art. VI, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 369.

También señalaron que el desbalance presupuestario emanaba de una serie de "deudas millonarias por concepto de servicios" (Anejo III, pág. 34) que tenían ciertas agencias gubernamentales y de una acreencia que tenía la Autoridad de Energía Eléctrica contra el gobierno central en concepto del subsidio a sus abonados y por los programas de electrificación rural y del sistema de riego, esto a pesar de que no había sido incluida en el presupuesto partida alguna en concepto de esas deudas. Por razón de este desbalance solicitaron que el Tribunal Superior declarara inconstitucional la referida

resolución Conjunta, que emitiera **832** un *injunction* permanente para impedir el uso de los fondos asignados al amparo de dicha resolución y que se prohibiera la práctica de no incluir en el presupuesto general los fondos para el pago de las deudas del gobierno central con sus distintas instrumentalidades.

Mediante "Moción de desestimación y/o de sentencia sumaria" los demandados en el pleito esgrimieron sus argumentos. En primer lugar, alegaron que la expedición del *injunction* estaba vedada por el Art. 678 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 3524.

Adujeron, además, que la controversia traída ante la atención del tribunal no era justiciable por estar presente una situación en la que aplica la doctrina de cuestión política y porque los legisladores peticionarios carecían de legitimación activa para lograr su pretensión en el tribunal. Para sustentar su posición de que la ausencia de legitimación activa era patente, dejaron establecido en su moción que los promoventes no habían alegado ni establecido un daño real, inmediato y preciso, y que además no habían demostrado que alguna de sus prerrogativas o facultades en su función de legisladores había sido entorpecida o menoscabada.

Los Representantes demandantes se opusieron y refutaron las contenciones de los demandados en cuanto a la doctrina de justiciabilidad y los méritos de la controversia. Por considerar que no existía una controversia real de hechos y bajo la teoría de que les asistía la razón como cuestión de derecho, los Representantes Hernández Torres y Misla Aldarondo también solicitaron que el tribunal dictara sentencia sumaria.

El 11 de octubre de 1991 se celebró una vista para la discusión de las respectivas mociones de sentencia sumaria, pero quedando ciertos asuntos pendientes que fueron traídos a la atención del tribunal ese día, una segunda vista quedó señalada para una fecha posterior.

Estando el pleito en esta etapa, el 28 de octubre de **833** 1991, un día antes del señalamiento, el Director de la Oficina de Presupuesto y Gerencia, Sr. José M. Alonso García, y el Director Ejecutivo de la Autoridad de Energía Eléctrica, Sr. José A. del Valle, suscribieron un acuerdo mediante el cual se establecía que como parte del presupuesto anual que le sería sometido a la Legislatura, el Director de la Oficina de Presupuesto incluiría una partida anual para amortizar el principal que se le adeudaba a la Autoridad de Energía Eléctrica. Este acuerdo comenzaría a ejecutarse en el año fiscal 1993 y culminaría en el 2007. No empece a ello y a los planteamientos de los demandados de que la controversia

se había tornado académica, el litigio continuó su curso y, después de celebrada la vista señalada, el caso quedó sometido. El 16 de diciembre de 1991 el Tribunal Superior dictó sentencia.

En cuanto a la alegación del Estado Libre Asociado de que los Representantes Hernández Torres y Misla Aldarondo carecían de legitimación activa para iniciar el litigio, el tribunal de instancia escuetamente concluyó que "[l]os legisladores tienen capacidad para cuestionar en los tribunales la constitucionalidad de una ley que atenta contra los intereses del país'D'. Anejo I, pág. 1. No citó caso o autoridad otra alguna. Además, determinó que la controversia no planteaba una cuestión política y, por ende, era justiciable.

Finalmente, el tribunal resolvió que el presupuesto anual aprobado mediante la Resolución Conjunta Núm. 163, *supra*, era inconstitucional por ser deficitario al momento de su aprobación en violación al Art. VI, Sec. 7 de la Constitución del Estado Libre Asociado, *supra*. También, libró el auto de *injunction* permanente solicitado, ordenándole al Director de la Oficina de Presupuesto y Gerencia y al Secretario de Hacienda que "reconozcan y atiendan" la asignación dispuesta en el Art. 2 de la Ley Núm. 4 de 8 de junio de 1981 (22 L.P.R.A. sec. 212n.) aclarando que si los recursos disponibles para el año económico 1991–1992 no **834** bastaban, se activarían los mecanismos establecidos en el Art. VI, Secs. 7 y 8 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1.

Ese mismo día, la Procuradora General de Puerto Rico recurrió ante nos e invocó el auxilio de nuestra jurisdicción para que ordenásemos la paralización de la sentencia emitida en el caso hasta que nos pronunciáramos sobre el escrito de apelación, que simultáneamente había presentado. Por plantear la apelación una cuestión constitucional sustancial la acogimos, y en virtud de la Regla 57.6 de Procedimiento Civil, 32 L.P.R.A. Ap. III, suspendimos los efectos del *injunction* permanente librado.

Después de presentada por la Procuradora General una moción para que se acortaran los términos reglamentarios, mediante Resolución de 20 de diciembre de 1991 concedimos a las partes hasta el 7 de enero de 1992 para presentar los correspondientes alegatos. Debido a la importancia de la controversia planteada instruimos, además, al Banco Gubernamental de Fomento que expresara su postura respecto al asunto en calidad de *amicus curiae*. Dispusimos, además, para la celebración de una vista oral a llevarse a cabo el 14 de enero de 1992.

Una vez celebrada la vista oral, el caso quedó sometido para la correspondiente decisión. Hoy resolvemos que los Representantes demandantes carecen de legitimación activa para iniciar la presente acción en protección del interés público y que, por lo tanto, ni este Foro ni el tribunal de instancia tienen jurisdicción para adjudicar la controversia referente a la constitucionalidad del presupuesto general del año fiscal en curso. Veamos por qué.

## II

**[2]** Al resolver la controversia de autos, partimos de la premisa que nuestra facultad constitucional de revisar las leyes de acuerdo con los preceptos constitucionales sólo **\*835** puede ser ejercida dentro de los lindes de una controversia real y verdadera entre aquellos sujetos antagónicos que pretenden un remedio judicial. *E.L.A. v. Aguayo*, 80 D.P.R. 552, 581–584 (1958). También recordamos que el buen análisis jurídico es aquel que admite la importancia del instrumento lógico de la distinción.

**[3]** El principio de justiciabilidad nos impone el deber de examinar si los demandantes poseen legitimación activa, elemento necesario para la debida adjudicación de los méritos de una controversia. Aunque durante las últimas décadas hemos interpretado liberalmente los requisitos de acción legitimada de personas afectadas por una actuación gubernamental, esto "no quiere decir que la puerta está abierta de par en par para la consideración de cualquier caso que desee incoar cualquier ciudadano en alegada protección de una política pública'D'. *Salas Soler v. Srio. de Agricultura*, 102 D.P.R. 716, 723–724 (1974).

**[4]** Bajo esta normativa requerimos que "[l]a persona que pretende ser parte ha de tener una capacidad individualizada y concreta 'en la reclamación' procesal". *Col. Ópticos de P.R. v. Vani Visual Center*, 124 D.P.R. 559, 563 (1989). De esta manera aseguramos "que el promovente de la acción es uno cuyo interés es de tal índole que, con toda probabilidad, habrá de proseguir su causa de acción vigorosamente y habrá de traer a la atención del tribunal las cuestiones en controversia". *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 413 (1982). Véanse: *Flast v. Cohen*, 392 U.S. 83, 99–100 (1968); *Baker v. Carr*, 369 U.S. 186, 204 (1962).

**[5]** Corresponde a cada litigante demostrar que tiene acción legitimada para acudir al foro judicial. Al amparo de esta doctrina, y en ausencia de un estatuto que expresamente confiera legitimación activa a ciertas personas — *Salas Soler v. Srio. de Agricultura*, supra, pág. 723— es **\*836** esencial para la parte que solicita un remedio judicial que pruebe:

(1) que ha sufrido un daño claro y palpable; (2) que el daño es real, inmediato y preciso, y no abstracto o hipotético; (3) que existe una conexión entre el daño sufrido y la causa de acción ejercitada, y (4) que la causa de acción surge bajo el palio de la Constitución o de una ley. *Hernández Agosto v. Romero Barceló*, supra, pág. 414; *Fund. Arqueológica v. Depto. de la Vivienda*, 109 D.P.R. 387, 392 (1980). Véanse, a modo comparativo: *Warth v. Seldin*, 422 U.S. 490 (1975); *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91 (1979); *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252 (1977); *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 220–222 (1974); *Valley Forge College v. Americans United*, 454 U.S. 464 (1982); *Baker v. Carr*, supra; *Frothingham v. Mellon*, 262 U.S. 447 (1923).

**[6–7]** Estos criterios son especialmente más rigurosos si se pretende reclamar los derechos de terceros al revisar la constitucionalidad de leyes. Esto corresponde a "la regla general de que un litigante no puede impugnar la constitucionalidad de una ley aduciendo que la misma infringe los derechos constitucionales de terceras personas que no son parte en la acción'D'. *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 271 (1975). Como corolario de esta norma, en el caso particular de las agrupaciones o colectividades, cuando demandan a nombre de sus miembros requerimos (1) que sus miembros tengan legitimación activa para demandar a nombre propio; (2) que los intereses que se pretenden proteger estén relacionados con los objetivos de la organización, y (3) que la reclamación y el remedio solicitado no requieran la participación individual de los socios en el pleito. Véase, a modo ilustrativo, *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). **\*837**

## III

**[8]** En el caso particular de los cuerpos legislativos, tanto en la jurisdicción federal como en Puerto Rico, se reconoce que tienen acción legitimada para comparecer por sí o para autorizar a uno de sus miembros o a una comisión legislativa para representarlos en los tribunales. *Hernández Agosto v. Romero Barceló*, supra, pág. 415. Véase, también, Nota, *Congressional Access to the Federal Courts*, 90 Harv. L. Rev. 1632, 1647–1648 (1977).

**[9]** En esa decisión también declaramos que "los legisladores en su condición de miembros de la Asamblea Legislativa *tienen capacidad jurídica para vindicar sus prerrogativas y funciones constitucionales* tales como, en este caso, la participación de los miembros del Senado en el proceso de confirmación alegadamente menoscabada por

el Gobernador". (Énfasis suplido.) *Hernández Agosto v. Romero Barceló*, supra, pág. 416. Véanse: *Nogueras v. Hernández Colón*, 127 D.P.R. 638 (1991); *Nogueras v. Hernández Colón*, 127 D.P.R. 405 (1990); Comentario, *Standing for State and Federal Legislators*, 23 Santa Clara L. Rev. 811 (1983).

[10] Bajo esta normativa, un legislador tiene acción legitimada para defender un interés individual tradicional, vinculado con el proceso legislativo o como representante oficialmente nombrado por el cuerpo para impugnar una actuación ejecutiva. Véase L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 150. También tiene acción legitimada para vindicar un interés personal en el ejercicio pleno de sus prerrogativas legislativas. Íd., pág. 151.

[11] En estos casos, corresponde a los promoventes demostrar que tienen derechos de origen constitucional o estatutario que han sido vulnerados. Al igual que cualquier **\*838** ciudadano particular, para impugnar la validez de una ley los legisladores también tienen que demostrar que han sufrido un daño claro y palpable como resultado de la actuación del demandado. *Hernández Agosto v. Romero Barceló*, supra, pág. 414. Véanse, además: *Harrington v. Bush*, 553 F.2d 190 (D.C. Cir. 1977); *Coleman v. Miller*, 307 U.S. 433 (1939).

[12] Al amparo de esta doctrina, el legislador tiene legitimación activa cuando reclama un derecho personal a base de un daño que ha sufrido vinculado con su función legislativa. Bajo este razonamiento, le hemos reconocido legitimación activa a un legislador cuando la controversia giraba en torno a la elegibilidad del promovente a ocupar un escaño legislativo. *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977).

[13] Igualmente hemos adjudicado controversias en las que un legislador ha sido designado como representante oficial de un cuerpo legislativo ante el foro judicial, conforme a una autorización expresa del cuerpo mediante resolución debidamente aprobada para vindicar derechos y prerrogativas de dicha cámara. *Hernández Agosto v. Romero Barceló*, supra, pág. 413. Véase, también, *Peña Clos v. Cartagena Ortiz*, 114 D.P.R. 576 (1983).

[14] También, hemos permitido que los legisladores de la minoría cuestionen una regla senatorial que coarta sus derechos constitucionales a participar en las etapas esenciales y significativas de los procesos investigativos o deliberativos en las comisiones de la Cámara Alta. *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986).

[15] Finalmente, hemos reconocido que un legislador personal y directamente afectado por una actuación gubernamental puede cuestionar la constitucionalidad de una ley o de una actuación estatal al amparo de los derechos de terceras personas igualmente perjudicados, siempre que **\*839** cumplan con los requisitos estrictos de la doctrina de *ius tertii. Noriega v. Gobernador*, 122 D.P.R. 650 (1988). [2]

2    En ese caso, el Representante David Noriega junto al Lic. Graciany Miranda Marchand alegaron que ellos habían sido perjudicados en su carácter personal por la práctica del Gobierno de preparar listas y expedientes de personas por razones ideológicas.

No obstante, en ninguno de los casos analizados anteriormente nos confrontamos con una controversia análoga a la de autos. En este caso los Representantes demandantes reclaman legitimación activa a nombre del interés público o como representante de su electorado. Sostienen que la aprobación de un presupuesto alegadamente desbalanceado causa un perjuicio general a toda la ciudadanía.

A modo ilustrativo, examinemos la experiencia en los Estados Unidos en situaciones similares antes de emitir un pronunciamiento sobre la legitimación de los Representantes demandantes.

## IV

[16–17] Aunque el Tribunal Supremo federal no ha establecido unos criterios aplicables a la evaluación de la legitimación activa de los congresistas, *la norma prevaleciente en los tribunales federales y estatales es que los legisladores no tienen legitimación en representación de sus votantes o del interés público*. En su tratado sobre derecho constitucional en Estados Unidos, el Prof. Laurence H. Tribe examina la jurisprudencia pertinente sobre este asunto y concluye que claramente los legisladores per se no reúnen los requisitos necesarios para representar a terceros ni tampoco tienen la legitimación para reclamar a nombre de sus votantes o de la ciudadanía en general. En estos casos no se alega un daño individual o personal, sino un asunto de interés público donde el agravio es de índole general. Estas acciones violan el principio cardinal de antigua **\*840** estirpe de que un litigante está impedido de reclamar un perjuicio general:

> Just as clearly, however, a legislator's suit in the second capacity —purely as a representative of constituents' interests — falls short of minimal standing requirements. On occasion legislators

Hernandez Torres v. Hernandez Colon, 1992 JTS 16 (1992)
129 D.P.R. 824

have invoked this theory to challenge alleged infringements of their powers based on their constituents' interest in these powers. Such an approach does not fall within recognized exceptions to the general ban on the assertion of the rights of absent third parties, nor does it meet the more generous standards governing organizational or parens patriae suits discussed earlier in this section. Moreover, recognition of any such constituent interest might violate the bar on assertion of "generalized grievances"; interested constituents should therefore be required to intervene if this theory is advanced, to allow careful examination of their asserted interest. (Énfasis suprimido y escolios omitidos.) Tribe, *op. cit.*, pág. 151.

[18] Un examen cuidadoso de toda la doctrina desarrollada en Estados Unidos sobre este tema revela que existe unanimidad de criterios de que la posición de legislador no le confiere a él un derecho especial a tener acceso a las cortes federales:

> Although the interest he asserts is unique to congressmen, just as a trustee asserts an interest unique to his official capacity, the analysis used to determine whether he has standing should not be unique to this kind of plaintiff. *Indeed, the proposition that the official position of a congressman confers on him a special entitlement to access to the federal courts has been uniformly rejected. There is no warrant for a standing test unique to congressmen.* (Énfasis suplido.) Nota, *supra*, pág. 1636.

[19] La norma prevaleciente tanto en las cortes federales como estatales es que los legisladores tienen que demostrar un daño claro y palpable, y cumplir con los criterios de legitimación aplicables a las otras personas. Nota, *supra*, pág. 1636. Por su posición, tampoco pueden obtener un remedio judicial fundamentándose únicamente en la alegación de un daño indirecto o de que lo hacen para evitar **\*841** un perjuicio general. *Schlesinger v. Reservists to Stop the War*, supra.

[20] En *Warth v. Seldin*, supra, pág. 500, el Tribunal Supremo federal señaló los peligros inherentes a la intervención judicial en los casos en que se reclamaba acción legitimada en asuntos de interés público:

> Without such limitations —closely related to Art. III concerns but essentially matters of judicial self-governance— the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights.

En este tipo de acción también ocurre el problema que entre la ciudadanía o el electorado en general hay diversidad de criterios en conflicto en cualquier asunto de interés público y es imposible representar una posición sin discrepar con uno de los sectores de su comunidad.

> Perhaps the most troubling aspect of legislative attempts to invoke representational standing stems from the fact that there presumably is a wide difference of opinion among a legislator's constituents on any given issue. Thus it generally will be impossible for a legislator to represent one part of his or her constituency in the courts without taking a position that another part of that constituency opposes. Because of such conflicts of interest, representational standing should not be afforded congressmen seeking to assert the rights of their constituents. (Escolios omitidos.) R.L. Dessem, *Congressional Standing to Sue: Whose Vote is This, Anyway?*, 62 Notre Dame L. Rev. 1, 21 (1986).

[21] A través de todo el desarrollo doctrinal se entiende que los legisladores lo que realmente pretenden, al reclamar legitimación activa a base de un perjuicio general, es que los tribunales revoquen una decisión aprobada mayoritariamente en un proceso democrático en que no ha habido menoscabo alguno de sus prerrogativas legislativas. **\*842** Por entender

que este reclamo es esencialmente una excusa de los legisladores para trasladar el debate legislativo de la arena política al foro judicial, se rechaza en todas las jurisdicciones que los legisladores tengan acción legitimada para demandar en representación del interés público para impugnar estatutos aprobados por la Asamblea Legislativa:

> In congressional lawsuits against the Executive Branch, a concern for the separation of powers has led this court consistently to dismiss actions by individual congressmen whose real grievance consists of their having failed to persuade their fellow legislators of their point of view, and who seek the court's aid in overturning the results of the legislative process. *Barnes v. Kline*, 759 F.2d 21, 28 (Cir. D.C. 1984).

**[22–23]** En este tipo de acción no se trata de una demanda incoada por el legislador para vindicar su interés personal en cuanto al ejercicio de sus prerrogativas legislativas, tanto directa como derivada. Tribe, *op. cit.*, pág. 150; *Kennedy v. Sampson*, 511 F.2d 430 (Cir. D.C. 1974); *Harrington v. Bush*, supra; *Moore v. U.S. House of Representatives*, 733 F.2d 946 (Cir. D.C. 1984); *Mitchell v. Laird*, 488 F.2d 611 (Cir. D.C. 1973); *Williams v. Phillips*, 360 F. Supp. 1363 (D.C. 1973). Simplemente, se trata de situaciones donde los litigantes no logran persuadir a sus colegas de los méritos de su posición y recurren al foro judicial para impugnar la validez del estatuto aprobado por sus cuerpos legislativos, no empece a sus objeciones. En estas circunstancias, la intervención judicial afectaría el delicado balance del esquema de separación de poderes: [3]

[3]   Véanse: A.M. Bickel, *The Passive Virtues*, 75 Harv. L. Rev. 40 (1961); G. Gunther, *The Subtle Vices of the "Passive Virtues"— A Comment on Principle and Expediency in Judicial Review*, 64 Colum. L. Rev. 1 (1964).

Courts are justifiably cautious when individual congressmen seek to vindicate political rights as legislators. Indiscriminately entertaining congressional-plaintiff suits could lead to potential **\*843** misuse of the courts by congressmen. It would encourage congressmen to bypass the political process to alter thereby a carefully developed balance between Congress and the President, and perhaps to inhibit their harmonious relations. In addition, a permissive approach to congressional standing might require continual, intolerable supervision by the judiciary of the workings of

government. The powers of the President and Congress would be subject to constant judicial scrutiny, thus giving courts an inordinate amount of power over the elected branches. Finally, courts inevitably would upset the normal legislative process if they agreed to intervene in intra-legislative disputes. (Escolios omitidos.) Nota, *The Justiciability of Congressional-Plaintiff Suits*, 82 Colum. L. Rev. 526, 528 (1982). Véase, además, Nota, *Equitable Discretion to Dismiss Congressional-Plaintiff Suits: A Reassessment*, 40 Case W. Res. L. Rev. 1075 (1989–1990).

**[24]** Examinada la experiencia en Estados Unidos, considerando nuestro ordenamiento constitucional y, en particular, su esquema de separación de poderes y los peligros inherentes que tiene la intervención judicial en litigios de esta índole, concluimos que los legisladores no tienen legitimación activa para impugnar la validez de un estatuto únicamente en representación del interés de la ciudadanía en general. Corresponde a los ciudadanos directamente perjudicados por esta acción, que hayan sufrido un daño claro y palpable, recurrir a los tribunales en defensa de sus intereses.

**V**

Alegan los apelados en su alegato, y así lo reconoce el foro de instancia, que tienen legitimación para iniciar este pleito y aducen que tienen el derecho y el deber de fiscalizar la obra pública y el funcionamiento del Gobierno como parte de sus prerrogativas como legisladores. Reclaman que la continuada aplicación de un presupuesto que es inconstitucional menoscaba y entorpece esta prerrogativa legislativa fiscalizadora. **\*844**

En la vista oral celebrada por este Tribunal, los Representantes demandantes elaboraron su tesis:
HON. HERNANDEZ DENTON:

Con permiso, licenciado. Antes de entrar en esa parte de su exposición yo tengo una serie de preguntas relacionadas con legitimación activa que quisiera que el compañero me conteste.

De su alegato entiendo que ustedes sostienen que su participación en la aprobación de la Resolución del presupuesto no fue limitada de alguna manera por la acción en el hemiciclo en el proceso de aprobación del presupuesto.

LCDO. SANTIAGO TAVAREZ:

Hernandez Torres v. Hernandez Colón, 1992 TSPR 16 (1992)

129 D.P.R. 824

Bueno, es limitada siempre y cuando el debate en el hemiciclo al ...., pues, al final la votación .....

HON. HERNANDEZ DENTON:

Pero participaron plenamente los Senadores de la Minoría en las Comisiones, .....

LCDO. SANTIAGO TAVAREZ::

Participaron en las Comisiones, ......

HON. HERNÁNDEZ DENTON:

..... obtuvieron la información.

LCDO. SANTIAGO TAVAREZ:

.... participaron en el debate en el hemiciclo, inclusive la representación en la Cámara de Representantes radicó un informe sobre la medida donde una de las alegaciones principales que se hicieron era esto mismo. Se le indicó así también.....

HON. HERNANDEZ DENTON:

En términos de su prerrogativa como Legisladores, ¿en alguna manera se vieron afectadas en ese proceso?

LCDO. SANTIAGO TAVAREZ:

*Bueno, en ese proceso no, porque ese es un proceso político donde finalmente se suman los votos.*

HON. HERNANDEZ DENTON:

*¿No fueron afectadas negativamente? ¿No se afectaron en el proceso?*

LCDO. SANTIAGO TAVAREZ:

*No.*

HON. HERNANDEZ DENTON:

¿Y cómo se afectaron?

LCDO. SANTIAGO TAVAREZ:

Bueno, la alegación nuestra es que solamente ellos participaron en ese proceso político. Pero lo que sucede con el planteamiento en este caso es que esto va más allá de una cuestión política. O sea, los peticionarios lo que están alegando es que en la medida que se apruebe legislación que sea contraria a los **\*845** preceptos constitucionales y legales establecidos, pues en esa medida la actuación legislativa es inválida porque lo que se está haciendo es ejerciendo una actividad política que al final debe ser que se apruebe una legislación que sea válida y ellos como representantes del pueblo tienen la obligación y el deber de fiscalizar para que se lleve a cabo la aprobación de las leyes de la manera correcta como dispone la ley suprema del país, que es la Constitución. Porque allí a debatir y a votar por unas medidas que sean inconstitucionales, que sean ilegales, pues obviamente ese no es el propósito para el cual se creó la Legislatura.

HON. HERNANDEZ DENTON:

*O sea, el reclamo es uno, no de representación de terceros ni de representación ...*

LCDO. SANTIAGO TAVAREZ::

*No, también incluye representación de terceros.*

HON. HERNANDEZ DENTON:

*¿En qué medida?*

LCDO. SANTIAGO TAVAREZ:

En la medida en que *ellos son representantes de un pueblo que los eligió y que uno de sus deberes es, en nombre de ese pueblo, fiscalizar y realizar unas actuaciones que sean legales. Y en esa medida ellos están representando unos terceros que es el pueblo, podríamos llamar consumidor, el pueblo contribuyente de este país que somos los que aportamos los fondos para que se distribuyan dentro de esa Resolución.* Y esa Resolución tiene que distribuirse como indica la Constitución y como indican las leyes. (Énfasis suplido.) Moción de reconsideración, págs. 7–9.

Surge claramente de las expresiones del abogado de la parte apelada y del expediente de autos *que sus prerrogativas como legisladores no fueron lesionadas.* Si hubiera sido así no vacilaríamos en ejercer nuestra jurisdicción en protección de sus prerrogativas. *Silva v. Hernández Agosto,* supra.

---

**[25]** Hemos dicho que "[l]as minorías tienen una obligación especial de descargar su responsabilidad fiscalizadora sin obstaculizar el funcionamiento legislativo. Las Cámaras tienen los poderes e instrumentos necesarios para asegurar que tanto la mayoría como la minoría cumplan con sus obligaciones hacia el cuerpo y el país sin que se viole[n] el equilibrio y el carácter representativo de la **\*846** Rama Legislativa". *Silva v. Hernández Agosto*, supra, pág. 70.

**[26]** La función fiscalizadora "implica la provisión de los instrumentos razonables y necesarios e igualdad de oportunidades en todas las etapas críticas del proceso legislativo". *Rexach Benítez v. Gobernador*, 119 D.P.R. 521, 536 (1987), voto disidente del Juez Asociado Señor Negrón García. En el caso de autos, los legisladores ejercieron su función fiscalizadora a cabalidad. Según admitieron en la vista oral los Representantes de la minoría obtuvieron la información necesaria del presupuesto y sometieron un informe con unas propuestas para modificar las asignaciones contempladas por el proyecto remitido a la Asamblea Legislativa. También participaron activamente en las comisiones que estudiaron el presupuesto y tuvieron oportunidad de interrogar a los funcionarios del Gobierno que testificaron en las vistas. Por último, expusieron su posición en los debates en el hemiciclo de la Cámara y votaron en contra de la Resolución Conjunta Núm. 163, *supra*.

En otras palabras, ellos aceptaron que tuvieron los instrumentos necesarios y la igualdad de oportunidades en todas las etapas significativas del proceso legislativo y que enérgicamente defendieron sus posiciones. También pudieron participar plenamente en el proceso legislativo. Claramente no se les menoscabaron sus prerrogativas legislativas.

**[27–28]** No obstante, los apelados sostienen que tienen legitimación porque representan al "pueblo contribuyente de este país que somos los que aportamos los fondos para que se distribuyan dentro de esa Resolución'D'. Transcripción de la vista oral, pág. 53. En su exposición no toman en consideración las disposiciones de la Ley Núm. 2 aprobada el 25 de febrero de 1946, conocida como la ley que prohíbe los pleitos del contribuyente (32 L.P.R.A. secs. 3074–3076). **\*847** Ésta, en sus Arts. 2 y 3 (32 L.P.R.A. secs. 3074 y 3075) dispone lo siguiente:
Artículo 2:

La acción conocida en equidad como acción del contribuyente queda por la presente prohibida.

Artículo 3:

Ningún tribunal de Puerto Rico tendrá jurisdicción para conocer, o continuar conociendo si se hubiera ya iniciado, bien en primera instancia o en grado de apelación, de ninguna acción o procedimiento en que se impugne la validez o constitucionalidad de cualquier ley o resolución de la Asamblea Legislativa de Puerto Rico o de cualquier actuación de un funcionario público autorizada por ley de la Asamblea Legislativa de Puerto Rico, cuando el demandante no alegue otro interés en la acción o procedimiento, ni otra capacidad para demandar, que la de ser contribuyente o representar a los contribuyentes como clase y que, como tal, sufre o pueda sufrir daños por virtud de dicha ley, resolución o actuación.

**[29]** Como vemos, la Asamblea Legislativa expresamente prohibió no solamente los pleitos del contribuyente, sino también la representación de éste en los tribunales de justicia cuando se impugne la validez de un estatuto y que se alegue que se sufre un daño por virtud de éste. Véase, en términos ilustrativos, *Frothingham v. Mellon*, supra; *Flast v. Cohen*, supra. La alegación de "representación del pueblo contribuyente" de los legisladores en el caso de autos no procede como cuestión de derecho.

**[30]** Tampoco nos resulta convincente la alegación de los legisladores sobre su representación del "interés público'D'. Surge del análisis detenido de nuestra jurisprudencia que este Tribunal no ha reconocido legitimación a un legislador cuando lo que invoca es "interés público'D'. Este tipo de alegación es ambigua y no cumple con los criterios doctrinales de legitimación activa ya analizados anteriormente y es contraria a la norma uniforme que prevalece en Estados Unidos de que un legislador no puede **\*848** sostener acción legitimada para impugnar un estatuto únicamente en representación de la ciudadanía en general.

Por otro lado, ignora que existen otras personas y entidades, tales como la propia Autoridad de Energía Eléctrica y sus bonistas, que podrían ser directamente agraviados por la deuda contraída por el pago del subsidio de petróleo para los consumidores de escasos recursos. Por el hecho de que la Autoridad de Energía Eléctrica llegó a un acuerdo con la Oficina de Presupuesto y Gerencia, no significa que debamos otorgar legitimación activa a una parte que claramente no la posee.

En estas circunstancias, resulta realmente sorprendente que con una escueta aseveración de que los legisladores representan el interés público, el juez de instancia, sin ulterior análisis jurídico y sin fundamento alguno, le haya reconocido acción legitimada a los peticionarios en este pleito. Con el pretexto de examinar los méritos de la controversia y emitir pronunciamientos sobre la validez del presupuesto aprobado por la Asamblea Legislativa, dicho foro ignoró el rigor jurídico que nos impone el principio de justiciabilidad.

Finalmente, no podemos ceder a la tentación de obviar los principios de legitimación activa expuestos anteriormente para adjudicar los méritos de este recurso en vista del innegable interés público que reviste el presupuesto general del Gobierno de Puerto Rico. Por razón de "interés público'D' no podemos olvidar que a través de la historia de la revisión judicial en Estados Unidos y Puerto Rico, los tribunales han "establecido valiosísimos criterios de autolimitación [judicial] para guiar su conducta en situaciones que requieren el ejercicio de su 'grave y delicada función' de juzgar la validez constitucional de las medidas legislativas .... Factores determinantes de estas normas son la falibilidad del juicio humano, la condición negativa del poder judicial que no posee la autoridad directa que adviene a las otras dos ramas por ser electas por el pueblo, y la    **\*849** convicción de que la corte perdería su influencia y prestigio y finalmente su autoridad, si, a diario, *y fuera de los estrictos límites de un genuino procedimiento judicial*, estuviese pasando juicio sobre la validez constitucional de las actuaciones legislativas y ejecutivas". (Énfasis suplido y escolio omitido.) *E.L.A. v. Aguayo*, supra, págs. 595–597.

Si descartásemos este principio histórico de prudencia judicial, socavaríamos la doctrina constitucional de separación de poderes, faltaríamos el respeto a la soberanía del pueblo y asumiríamos la función que Platón asignó a los filósofos reyes en su monumental obra *La República*. Aceptar esta función violaría los principios rectores de nuestro ordenamiento democrático que juramos defender al asumir nuestros cargos.

Por los pronunciamientos expuestos anteriormente, *procede la revocación de la sentencia recurrida. Los Representantes Hon. Zaida Hernández Torres y Hon. Edison Misla Aldarondo no demostraron que habían sufrido daños personales, claros y palpables, ni que tampoco se le había menoscabado sus prerrogativas legislativas. Su reclamo fundamental es de un perjuicio general a nombre de toda la*

*ciudadanía y, por las razones expuestas anteriormente, no tienen legitimación activa para incoar esta acción.*

*Se dictará la sentencia correspondiente.*

Los Jueces Asociados Señores Negrón García y Rebollo López emitieron opiniones disidentes. El Juez Asociado Señor Alonso Alonso no intervino.

--O--

Opinión disidente del Juez Asociado Señor Negrón García.

"La disidencia es el poder de los sin poder." Vaclav Havel. Aún frente a la multiforme intolerancia, el juez de vocación jamás renuncia a señalar y remediar la injusticia  **\*850** según su conciencia. Debe descalificar, sin cortapisas, toda norma o arbitrariedad violatoria de la Constitución. Estas oraciones exteriorizan la psicodinámica vital íntima de un espíritu libre que alienta y alimenta el elemento de *independencia judicial*, vivencia más preciada en la doctrina de frenos y contrapesos, y en la que reposa la separación de poderes en nuestra estructura organizacional de gobierno democrático. "Cuando un juez percibe que una interpretación del texto se ha apartado tanto de su verdadero significado, *un deber constitucional con la comunidad de mayor envergadura*, lo obliga a exponer esa desviación y a señalar un derrotero distinto." (Traducción nuestra.) Juez Asociado Señor William W. Brennan, *Discurso pronunciado ante la Asociación de Abogados Criminalistas*, Nueva York, 1990.

I

La decisión mayoritaria suscrita por el Juez Asociado Señor Hernández Denton, con "rigor jurídico'D' (opinión mayoritaria, pág. 848), acoge la tesis *restrictiva* de los demandados Hons. Rafael Hernández Colón, José M. Alonso García y Ramón García Santiago que niega legitimación activa (*standing*) a los legisladores Hons. Zaida Hernández Torres y Edison Misla Aldarondo. De ese modo revocan la exhaustiva y documentada sentencia del Tribunal Superior, Sala de San Juan (Hon. A. López Rodríguez, Juez), que el 16 de diciembre de 1991 decretó *inconstitucional* la Resolución Conjunta Núm. 163 de 10 de agosto de 1991 de la Asamblea Legislativa sobre *el presupuesto general para el año fiscal de 1991–1992*. Súbitamente, detienen todo el proceso evolutivo liberal de "las últimas décadas'D' (íd., pág. 834) que implícita y expresamente les reconoció el derecho a reivindicar las prerrogativas de sus cargos. *Nogueras v. Hernández Colón*, 127 D.P.R. 638 (1991); *Nogueras v. Hernández Colón*, 127 D.P.R. 405 (1990); *Noriega v. Gobernador* **\*851** , 122

D.P.R. 650 (1988); *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986); *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 415–416 (1982).

Estimamos esa interpretación errónea e injusta. Siguiendo las mismas fuentes de autoridad, demostraremos que ambos legisladores satisfacen los requisitos de legitimación activa, esto es, que sufrieron un daño claro, real, inmediato y preciso, que la causa de acción surge bajo el palio de la Constitución y de una ley, y que existe una conexión entre el daño y dicha causa de acción. A fin de cuentas, su función principal es "asegurar al tribunal que el promovente de la acción es uno cuyo interés es de tal índole que, con toda probabilidad, habrá de proseguir su causa de acción *vigorosamente* y habrá de traer a la atención del tribunal las cuestiones en controversia". (Énfasis suplido.) *Hernández Agosto v. Romero Barceló*, supra, pág. 413; *Col. Ópticos de P.R. v. Vani Visual Center*, 124 D.P.R. 559 (1989).

Incluso, bajo las categorías citadas por la mayoría, "procede reconocerle a un legislador legitimación activa [*standing*] *cuando demuestra que la actuación impugnada tiene el efecto de anular su voto, pasado o futuro*, o cuando están en juego otros aspectos fundamentales de sus prerrogativas legislativas". (Énfasis y traducción nuestros.) L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 153. Véase *Kennedy v. Sampson*, 511 F.2d 430 (Cir D.C. 1974).

En dos dimensiones, los demandantes Honorables Hernández Torres y Misla Aldarondo probaron ante el foro de instancia un *interés sustancial* en el resultado de una *controversia legítima* que afecta significativamente el desempeño de sus funciones, prerrogativas, derechos y privilegios frente a un *deber afirmativo* impuesto por *la Constitución*. Nos explicamos con mayores detalles.

*Primero*, aparte del planteamiento principal de presupuesto desbalanceado y desde sus inicios, en las alegaciones **\*852** de la demanda (párrafo 9 c) expusieron, en esencia y entre otras, una causa de acción dirigida a reclamar y a obligar al Primer Ejecutivo Honorable Hernández Colón *et al.* a acatar y darle plena vigencia al financiamiento previsto estatutariamente del subsidio de tarifa residencial de abonados económicamente menos privilegiados y de consumo mensual no mayor de 400 K.W.H. Como sabemos, mediante la Ley Núm. 4 de 8 de junio de 1981 (22 L.P.R.A. sec. 212(b) y n.) se limitó su costo a cien millones de dólares ($100,000,000) anuales y su financiamiento pasó directamente a constituir —por *mandato expreso* de la

Asamblea Legislativa— "una obligación del Estado Libre Asociado de Puerto Rico que deberá cubrirse de cualesquiera fondos *no comprometidos del Tesoro, no más tarde de sesenta (60) días a partir de la facturación mensual de la Autoridad al Departamento de Hacienda por este concepto*". (Énfasis suplido.) 22 L.P.R.A. sec. 212(b)(1). Su Art. 2 (22 L.P.R.A. sec. 212 n.) en lo pertinente dispuso una *asignación autorrenovable*, a saber, en "años subsiguientes, los recursos necesarios para continuar este programa *se consignarán en la Resolución Conjunta del Presupuesto General del Estado Libre Asociado*, disponiéndose que dicha cantidad consignada no excederá de cien (100) millones de dólares, más cinco por ciento (5%) para imprevistos". (Énfasis suplido.)

La posición del Primer Ejecutivo fue y ha sido que no viene obligado a cumplir con esa ley, pues la Resolución Conjunta Núm. 163, *supra, derogó tácitamente* la obligación *autorrenovable*, impuesta por la Asamblea Legislativa y asumida previamente por el Estado, de pagar el subsidio. Es innegable que esa contención y actuación tuvo — y continúa teniendo— el efecto perjudicial inmediato de *anular los votos* pasados de *todos* los legisladores en torno a la asignación vigente *renovada automáticamente;* obligación que permaneció inalterada aun cuando la Asamblea Legislativa enmendó subsiguientemente la ley con la Ley Núm. **\*853** 34 de 24 de julio de 1989 (22 L.P.R.A. sec. 212(b)(1) y (2)). Lógicamente, de manera palpable y concreta, lesionó las prerrogativas de los cargos de ambos representantes. Ello configuró una causa de acción específica, redimible bajo la Constitución, la cual tenían perfecto derecho a ventilarla en los tribunales. No estamos, pues, ante una situación en que se trata de impugnar una ley por el mero hecho de que un legislador votó contra su aprobación o, como afirma la mayoría, "traslad[a] el debate legislativo a la arena política al foro judicial ...". Opinión mayoritaria, pág. 842. [2]

[2]   Incluso, algunos tribunales han reconocido legitimación activa a legisladores para cuestionar la constitucionalidad de una actuación de otra rama de gobierno, *Harrington v. Bush*, 553 F.2d. 190 (Cir. D.C. 1977), y la validez de una cláusula de la Constitución. *Trombetta v. Florida*, 353 F. Supp. 575 (Fla. 1973); *Dyer v. Blair*, 390 F. Supp. 1291 (N.D. Ill. 1975).

Por otro lado, es unánime el consenso de que el Art. VI, Sec. 7 de nuestra Constitución, L.P.R.A., Tomo 1, impone un deber afirmativo al Primer Ejecutivo y a la Asamblea Legislativa de aprobar un *presupuesto balanceado*. Se trata de una función constitucional *compartida*, análoga a la del proceso senatorial de confirmación. *Nogueras v. Hernández Colón,*

Hernández Torres v. Hernández Colón, 1992 JTS 16 (1992)

129 D.P.R. 824

127 D.P.R. 638 (1991); *Hernández Agosto v. López Nieves*, 114 D.P.R. 601 (1983). Tan es así, que los codemandados Hernández Colón *et al.* alegaron ante el foro de instancia que la participación en el presupuesto de la Asamblea Legislativa los llevaba a concluir que dicho Cuerpo era "*una parte indispensable*". Anejo IV, pág. 29.

Ante una función de ese género —compartida— nuestro esquema constitucional no deja al arbitrio de ninguno de esos poderes su cumplimiento. Es obvio que si cualesquiera —Primer Ejecutivo o la Asamblea Legislativa—menoscaba o incumple dicho deber constitucional, el otro poder puede legítimamente venir a los tribunales a compeler su cumplimiento. Y en sana lógica es ineludible concluir que si la Asamblea Legislativa, como Cuerpo, no actúa en defensa de sus prerrogativas constitucionales, cualquiera de **\*854** sus miembros tiene legitimación activa para acudir a los tribunales y obligar al Primer Ejecutivo a cumplir con el *deber afirmativo* impuesto por nuestra Constitución. Esa es la única forma que puede evitarse que se menoscabe su voto. No concebimos cómo en un Gobierno de leyes, no hombres, un legislador venga obligado a aceptar dócil y pasivamente la inconstitucionalidad o ilegalidad de un acto ejecutivo que anula una legislación vigente —y sus votos— por el simple hecho de ostentar esa condición. En materia de justiciabilidad, no debemos confundir "legitimidad" con "cuestión política'D'.

Ciertamente, la controversia ante nos, lejos de presentarse como simplemente un asunto de interés general —que esquiva los criterios clásicos de legitimación activa— cae perfectamente dentro de la zona de intereses protegidos de los miembros —mayoritarios o minoritarios— de la Asamblea Legislativa. Naturalmente, la inacción de la mayoría legislativa no afecta la legitimación de los miembros de la minoría. Recuérdese que "[e]n contraste con la Constitución federal, la nuestra reconoció y garantizó expresamente, como medio de fiscalización, a las minorías legislativas. '[E]s básico para la *salud democrática* que las minorías tengan una representación que, *aun bajo las circunstancias más desfavorables*, les permita cumplir adecuadamente su función de fiscalizar y estimular a la mayoría en su obra de gobierno sin crear entorpecimientos que puedan resultar en detrimento de la democracia.' ... 4 Diario de Sesiones de la Convención Constituyente 2590 (1952)". (Énfasis en el original.) *Hernández Torres v. Gobernador*, 129 D.P.R. 678, 680–681 (1991), voto preliminar disidente.

Lo absurdo del *ratio decidendi* mayoritario es que se nutre de un razonamiento circular vicioso. Como no penetran en los méritos de la controversia, les resulta imposible constatar que los reclamantes Honorables Hernández Torres y Misla Aldarondo efectivamente han sufrido un daño **\*855** claro, real e inmediato protegido por la Constitución y una ley. Se hacen eco de la teoría de los demandados Honorable Hernández Colón *et al.* de que *sólo* la Autoridad de Energía Eléctrica tendría legitimación activa. [3] Decimos absurdo, pues el propio Juez ponente, Señor Hernández Denton, reconoció la situación de *control absoluto* que ejerce el Primer Ejecutivo sobre dicha corporación pública, lo que en la práctica equivale a decir que el acudir la Autoridad de Energía Eléctrica a los tribunales es un imposible. En la vista oral dicho magistrado afirmó: "Pero dado el hecho de que la Autoridad de Energía Eléctrica, aunque es una corporación pública, su Junta de Directores es nombrada por el Gobernador y dado el hecho de que pasado el número de años que hubo, la Autoridad de Energía Eléctrica de los autos surge que no invocó, no hubo ningún tipo de objeción.'D' T.E., pág. 5. Basado en esos hechos, con cierto escepticismo, inmediatamente preguntó: "¿*Podemos realmente creer que la Autoridad de Energía Eléctrica, aunque en teoría podría ser una parte interesada, es realmente una parte que iría a los tribunales?*" (Énfasis suplido.) Íd.

[3]    *Motu proprio*, "[d]ada la naturaleza de la controversia planteada" (Resolución de 20 de diciembre de 1991), la mayoría del Tribunal estimó conveniente ordenar la participación del Banco Gubernamental de Fomento. No proveyeron igual trámite en cuanto a la Autoridad de Energía Eléctrica.

Esa observación trasciende la simple interrogante teórica. El control del Primer Ejecutivo logró convertir en realidad un "acuerdo" de pago suscrito únicamente por el Director Ejecutivo de la Autoridad de Energía Eléctrica, Sr. José A. Del Valle, y el codemandado Director de Presupuesto, Honorable Alonso García, de finiquitar el asunto. Aceptado por la Junta de Directores, significa que esta controversia jamás podría traerse a los tribunales.

Esa tesis forense ha sido exitosa y ha logrado sofocar la *JUSTICIA*. En virtud de una interpretación estrecha sobre legitimación activa se ha levantado una muralla infranqueable que rebasa este recurso. A partir de hoy, en el #ámbito **\*856** constitucional, las controversias en materia de presupuesto y desembolso de fondos públicos estarán vedadas para los tribunales. El Gobierno no vendrá obligado a honrar e incluir en el presupuesto las obligaciones y deudas incurridas con las distintas corporaciones públicas; de ser incluidas por la Asamblea Legislativa no vendrá obligado a pagarlas, y finalmente el Primer Ejecutivo podrá suscribir, a través

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

de funcionarios bajo su control —en su mayoría por él designado— un "acuerdo" para pagar en quince (15) años una deuda que por ley debió satisfacerse en tres (3). "Derecho es lo derecho, lo recto, lo acorde con la justicia. Por eso, ha de empapar de ésta todas sus soluciones." J.B. Vallet de Goytisolo, *Estudios sobre fuentes del Derecho y método jurídico*, Madrid, Ed. Montecorvo, 1982, pág. 55. Rechazamos toda interpretación judicial, "al margen de aquella realidad viva a la que deb[e] aplicarse. Las leyes no están hechas para ser confrontadas con legajos y pliegos de recursos y alegaciones, sino para plantearlas y aplicarlas a la vida real donde deben llenar un determinado fin". Íd., pág. 740.

## II

Abiertas las puertas del tribunal, examinemos en los méritos si verdaderamente el presupuesto 1991-1992 es nulo por ser desde su inicio deficitario, esto es, si cumple con "el plan mínimo [constitucional] para mantener la estabilidad económica del gobierno." Diario de Sesiones, *supra*, pág. 2587. Este "plan mínimo'D' quedó trazado en cuatro (4) disposiciones básicas que analizaremos separadamente.

La *primera* —Art. IV, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 349— impone al Gobernador el deber ministerial de "[p]resentar a la Asamblea Legislativa, al *comienzo* de cada sesión ordinaria, un mensaje sobre la situación del Estado y someterle además un *informe* sobre **\*857** las condiciones del Tesoro de Puerto Rico y los desembolsos *propuestos* para el año económico siguiente. *Dicho informe contendrá los datos necesarios para la formulación de un programa de legislación'D'.* (Énfasis suplido.)

En lo concerniente al concepto "presupuesto", la frase "*datos necesarios*", en palabras del delegado Víctor Gutiérrez Franki, "incluyen los sobrantes que pueda haber, los e[s]timados del producto de las contribuciones establecidas, el montante de los bonos que puedan estar sujetos a venta en el mercado de bonos, las ayudas federales, o sea, *todos los fondos* que van a *engrosar* lo disponible en el Tesoro de Puerto Rico, *para hacer frente a los gastos de ese año económico*. Y sigue diciendo la proposición que, además, someterá los gastos relativos a los *desembolsos propuestos*". (Énfasis suplido.) Diario de Sesiones, *supra*, Vol. 2, pág. 882. Más adelante aclaró: "[E]l *Gobernador tiene que someter ambas cosas*. Hay que leer la sección completa. El estimado de ingresos de recursos y el estimado de gastos y esto es, como muy bien dice el compañero Figueroa, lo que se llama en hacienda pública, un *presupuesto para el año económico*.

*Y ese presupuesto contendrá el estimado de recursos y el estimado de gastos.*" (Énfasis suplido.) Íd., pág. 887.

En síntesis, "el Gobernador debe presentar a la Asamblea Legislativa un mensaje sobre el estado del gobierno y además *un informe detallado sobre los propuestos ingresos y desembolsos para el próximo año*'D'. (Énfasis suplido.) Informe de la Comisión de la Rama Legislativa, Diario de Sesiones, *supra*, Vol. 4, pág. 2587.

Ese informe detallado sobre los propuestos ingresos y desembolsos es la base para que la Asamblea Legislativa apruebe el presupuesto balanceado. El término "presupuesto" incorpora dos (2) acepciones generales. La acepción derivada de la forma verbal latina *supponere* —poner, colocar, poner debajo, subordinar, substituir— significa "motivo", "causa" o "pretexto" con que se ejecuta una acción. Es **\*858** una *suposición previa* en cuanto a las causas o los motivos de alguna cosa. Aquello que es presupuesto se da por sentado; un presupuesto es una constante que precede o subyace otra cosa. Por otro lado, el término adquiere acepción dentro del ámbito financiero. El *Diccionario de la Lengua Española*, Madrid, Ed. Espasa-Calpe, 1984, T. II, pág. 1101, lo define como: "*Cómputo* anticipado del costo de una obra, y también de los gastos o de las rentas de un hospital, ayuntamiento u otro cuerpo ...." (Énfasis suplido.) En cuanto a esta acepción, la palabra incorpora formas verbales, como "presupuestar" y adjetivales como "presupuestario".

Cabanellas añade una definición "legal" para la ley de contabilidad: "Los presupuestos generales del Estado son la enumeración de las obligaciones que la Hacienda debe satisfacer en cada año con relación a los servicios que hayan de mantenerse en el mismo, y el cálculo de los recursos o medios que se consideren realizables para cubrir aquellas atenciones." G. Cabanellas, *Diccionario Enciclopédico de Derecho Civil*, T. VI, 1981, pág. 394. Por su parte, el ilustrado juez sentenciador incorporó la definición siguiente: "acto legislativo mediante el cual se autoriza el montante máximo de los gastos que el Gobierno puede realizar durante un período de tiempo determinado en las atenciones que detalladamente se especifican y se prevén los ingresos necesarios para cubrirlos". A. Rodríguez Bereijo, *El Presupuesto del Estado*, Madrid, Ed. Tecnos, 1970, pág. 19.

Estas definiciones ponen de manifiesto que el valor y la utilidad del "informe detallado" del Primer Ejecutivo dependerá realmente de que las categorías de ingresos y gastos estén razonable y correctamente valoradas. "Los fallos en la valoración pueden ser objetivos o subjetivos. Los

fallos de valoración pueden considerarse *objetivos* si son resultado de una omisión o error involuntarios debido a una deficiencia sencilla en el aparato administrativo y contable **\*859** encargado de efectuar las valoraciones. Estos efectos son normalmente fáciles de corregir. Más graves y peligrosos son los defectos de origen *subjetivo*, que traducen, para los asientos presupuestarios que incluyen cierta aleatoriedad, una tendencia bien a valorar por defecto los ingresos y por exceso los gastos, o bien a valorar los excesos, los ingresos y por defecto los gastos. En el primer caso, se producirán presupuestos demasiado *equilibrados* que desembocarán en una acumulación improductiva de tesorería. En el segundo caso, el equilibrio aparente encubre un *desequilibrio real* que deja sin sentido las decisiones que hemos creído adoptar y que obliga, durante su ejecución a ponerlas en tela de juicio." Y. Bernard y J.C. Colli, *Diccionario Económico y Financiero*, 4ta ed., Madrid, Ed. Du Sevil, 1975, pág. 1.123.

Según la Asamblea Constituyente, el *presupuesto* no es una ley unitaria, sino que comprende *todas* las leyes de asignaciones. El concepto incluye "no solamente los gastos ordinarios de funcionamiento, sino también mejoras permanentes, asignaciones a empresas públicas y otras asignaciones, incluyendo, desde luego, el principal e intereses de la deuda pública, de manera que se pueda utilizar una mejor técnica de presupuesto". Diario de Sesiones, *supra*, Vol. 3, pág. 2009. Ese mismo historial demuestra que la Asamblea Legislativa confirió al Primer Ejecutivo una amplia facultad para formular y controlar el proceso presupuestario, claro está, dentro de los parámetros constitucionales.

Estos parámetros nos llevan a la *segunda* disposición —Art. VI, Sec. 7, Const. E.L.A., *supra*, pág. 369— que establece: "[l]as asignaciones hechas *para un año económico* no podrán exceder de *los recursos totales calculados* para *dicho año económico*, a menos que se provea por *ley* para la imposición de contribuciones suficientes para cubrir dichas asignaciones." (Énfasis suplido.)

Su texto nos revela que estamos precisamente ante la **\*860** cláusula típica que impone "la precaución'D' de *presupuesto balanceado*. El *amicus curiae* Banco Gubernamental de Fomento así lo acepta. Alegato *del amicus curiae*, pág. 6. Esta sección, por primera vez, incorpora la frase *recursos totales calculados*. Según la explicación del delegado Luis Negrón López, éstos "son aquellos *recursos* que se *conocen* ya, porque se sabe cuáles van a ser, tales como ayudas federales, como ingresos fijos, como superávit, etc.; y *los calculados*, los que dependen del producto de las contribuciones y de otros

factores, que no se pueden prever al *comienzo* del año fiscal". (Énfasis suplido.) Diario de Sesiones, *supra*, Vol. 2, pág. 893.

La Constitución rompió de este modo con el molde riguroso de visualizar la ley de presupuesto como una *sola* pieza legislativa; se "contempla la ley de presupuesto general como una ley que englobará *todos los presupuestos* que va a hacer la Asamblea Legislativa". (Énfasis suplido.) Diario de Sesiones, *supra*, Vol. 2, pág. 896. Ello respondió a la visión moderna de que la "formulación de un programa de gobierno conlleva la aprobación de una ley de presupuesto general y *de mucha más legislación en adición a ésa*. Hay leyes que no tienen que ser de asignación necesariamente y, por consiguiente, no tienen que ir en la ley de presupuesto general y que se refieren a la formulación del programa de gobierno. *Y hay leyes que asignan fondos, que no tienen que ir a la ley de presupuesto general* y que forman parte del programa de gobierno que se formule por el poder legislativo". (Énfasis suplido.) Íd., pág. 898.

Este nuevo enfoque constitucional explica la dinámica *doble*, en tiempo, que sustancialmente se proyecta sobre la Asamblea Legislativa. La *primera*, durante la etapa de confección del presupuesto antes de 1ro de julio. Si "después de considerados todos los recursos que *se estimen o se calculen* para un año económico *si desea el poder legislativo proveer para que haya asignaciones por encima de esos recursos*, o sea, después de considerar cualquier emisión de **\*861** bonos, después de considerar la ayuda federal, después de considerar los ingresos contributivos y no contributivos que existan [cuando se terminen todos esos recursos, podemos ir a la imposición de contribuciones] ... absolutamente". (Énfasis suplido.) Diario de Sesiones, *supra*, Vol. 2, pág. 894. En esta etapa, si no hay los recursos, la Asamblea Legislativa no puede exceder el cálculo de los recursos totales ni efectuar más asignaciones, "a menos que se provea por ley ... para la imposición de contribuciones suficientes para cubrir [el exceso de] dichas asignaciones". Informe de la Rama Legislativa, Diario de Sesiones, *supra*, Vol. 4, pág. 2587.

Igual limitación tiene la Asamblea Legislativa durante el curso del año fiscal ya presupuestado. Si no hay fondos disponibles, no puede realizar válidamente más asignaciones, salvo que imponga contribuciones.

Ahora bien, ¿qué sucede cuando a posteriori, vigente el presupuesto —sobre la marcha— surge que las asignaciones excedieron los recursos? La interrogante nos lleva a visitar el Art. VI, Sec. 8 de la Constitución del Estado Libre Asociado,

Case:17-03283-LTS Doc#:13004-23 Filed:04/30/20 Entered:04/30/20 12:38:28 Desc:
Exhibit 23 Page 15 of 36
Hernandez Torres v. Hernandez Colon, 1992 JTS 16 (1992)

129 D.P.R. 824

*supra*, pág. 369, el cual dispone: "[c]uando los recursos disponibles para un año económico no basten para cubrir las *asignaciones aprobadas para ese año*, se procederá en primer término, al pago de intereses y amortización de la deuda pública, y luego se harán los demás desembolsos de acuerdo con la norma de prioridades que se establezca por *ley*." (Énfasis suplido.)

Por sus propios términos, esta sección no es susceptible de activarse para remediar la situación cuando la Asamblea Legislativa *comienza* con un presupuesto deficitario, por razón de ab initio haber incurrido en asignaciones en exceso de los cálculos de los recursos totales. El precepto constitucional fue concebido para remediar situaciones excepcionales creadas por circunstancias aleatorias y distintas, fuera de las esferas evolutivas legislativas, y claro está, del Primer Ejecutivo. Se orienta hacia el futuro: "[s]i **\*862** a pesar de esta precaución [presupuesto balanceado] los recursos disponibles no son suficientes para cubrir las asignaciones se debe establecer un orden de prioridades comenzando con el pago de intereses y amortización de la deuda pública. Esta prioridad constitucional se adopta con el propósito de asegurar garantías para mantener el crédito público, tan necesario para el mejoramiento económico del pueblo." Informe de la Rama Legislativa, Diario de Sesiones, *supra*, Vol. 4, pág. 2587.

Recapitulando: la cláusula constitucional de *presupuesto balanceado* impide a la Asamblea Legislativa y al Primer Ejecutivo aprobar el presupuesto general si conocen, a la luz de las proyecciones de todos los recursos disponibles, que éstos son limitados y sobrepasan las asignaciones. En ese momento ninguno de esos poderes puede "balancear" o "cuadrar" el presupuesto a base de activar el mecanismo excepcional de reserva previsto en el Art. VI, Sec. 8 de la Constitución del Estado Libre Asociado, *supra*, y las disposiciones de la Ley de Contabilidad del Gobierno de Puerto Rico, Ley Núm. 230 de 23 de julio de 1974 (3 L.P.R.A. sec. 283 *et seq.*). Lo contrario significaría crear artificialmente la impresión de que el presupuesto es balanceado, esto es, uno en el que los egresos no exceden los recursos estimados. En esa etapa inicial, cuando las asignaciones aprobadas exceden los recursos calculados, hay que recurrir al mecanismo de imponer contribuciones. Si no lo hacen, como el Gobernador está impedido constitucionalmente de refrendar un presupuesto deficitario, tiene que al veto de partidas —Const. E.L.A., *supra*, Art. III, Sec. 20— y rebajar o eliminar cualquier asignación que otorgue fondos en más de una partida. *Únicamente de este modo se salva el vicio constitucional de un presupuesto deficitario en su origen.*

No es posible argumentar que durante el proceso de aprobar el presupuesto el Gobernador puede invocar el mecanismo de prioridades contenido en el Art. VI, Sec. 8 de la **\*863** Constitución del Estado Libre Asociado, *supra*, y lo dispuesto en la Ley de Contabilidad del Gobierno de Puerto Rico, Ley Núm. 230, *supra*. Esa concepción es totalmente extraña al plan mínimo constitucional de "mantener la estabilidad económica del gobierno". Diario de Sesiones, *supra*, Vol. 4, pág. 2587.

No podemos dejar de remachar que, bajo nuestra Constitución, los presupuestos son *anuales*. Enfatizamos esta característica, pues muchos de los argumentos de los demandados Honorable Hernández Colón *et al.*, sostenidos también por el *amicus curiae* Banco Gubernamental de Fomento, no toman en cuenta —y por ende pierden validez — que las cláusulas constitucionales que rigen la solución del caso giran en torno a ese período anual; no se extienden más allá. En la medida en que algunas de las disposiciones de la Ley de Contabilidad del Gobierno de Puerto Rico, Ley Núm. 230, *supra*, y la Ley Orgánica de la Oficina de Presupuesto y Gerencia, Ley Núm. 147 de 18 de junio de 1980 (23 L.P.R.A. sec. 101 *et seq.*), violan el esquema integral anual constitucional, son nulas. *Ninguna ley, reglamento o acto ejecutivo pueden contrariar la Constitución.*

### III

A la luz de estos horizontes constitucionales, es evidente que el presupuesto —Resolución Núm. 163, *supra*— *al momento de ser aprobado* por el codemandado Honorable Hernández Colón —10 de agosto de 1991— contenía en su origen un déficit de noventa y cuatro millones ochocientos setenta y nueve mil doscientos setenta dólares y cuarenta y ocho centavos ($94,879,270.48). *Este dato matemático no se discute.* El presupuesto violó el Art. VI, Sec. 7 de nuestra Constitución, *supra*, porque las asignaciones para el año fiscal 1990-1991 —incluso las obligaciones existentes del Gobierno Central con la Autoridad de Energía Eléctrica — excedieron los recursos *totales* calculados para el mismo **\*864** período. Si el presupuesto comprende *todas* las leyes de asignaciones, "que no necesariamente tienen que hacerse en una sola pieza legislativa" —Negrón López, Diario de Sesiones, *supra*, Vol. 2, pág. 889—no cabe otra conclusión.

La verdad es que desde el año fiscal 1988-1989, el Gobierno Central no ha cumplido con la obligación legal que asumió de satisfacerle a la Autoridad de Energía Eléctrica el costo del subsidio otorgado a los abonados. Repetimos, esa deuda asciende a noventa y cuatro millones novecientos

mil ochocientos diez dólares y cuarenta y ocho centavos ($94,900,810.48).

Obsérvese que estamos ante una asignación *autorrenovable* que ha de ser cubierta de los "fondos no comprometidos". En la vista oral (T.E., pág. 40), la Procuradora General *aceptó* la definición de "fondos no comprometidos" elaborada por la ilustrada sala de instancia, esto es, los "*estimados como ingresos al inicio del año fiscal* para ser asignados luego de que en el presupuesto se cubra la deuda pública y las asignaciones dispuestas por ley o *asignaciones autorrenovables* montantes a "$839,657,826". (Énfasis suplido.)

Para salvar la inconstitucionalidad del presupuesto, en su alegato el *amicus curiae* Banco Gubernamental de Fomento hace referencia a la recomendación de la Comisión para la Reorganización de la Rama Ejecutiva de que se eliminaran las asignaciones autorrenovables. Alegato del *amicus curiae*, págs. 12–13. En alto vuelo imaginario afirma que la Asamblea Constituyente "*repudió* el concepto de la asignación autorrenovable como método ya obsoleto para achicar el papel del Gobernador en la formación del presupuesto". (Énfasis suplido.) Íd., pág. 13. Incluso llega al extremo de concluir que "ha desaparecido ... toda ... base constitucional para [el] empleo [de asignaciones autorrenovables]". Íd., pág. 25.

Estos asertos son un juego de palabras carentes de apoyo sólido. La realidad es que esa nota cautelar no fue **\*865** recogida en la Constitución. Independientemente de su sabiduría, no hay impedimento alguno a las asignaciones autorrenovables. *No son tabú en nuestro ambiente constitucional-legislativo.* Sobre el particular, basta recordar que la Asamblea Constituyente tuvo como trasfondo la vigencia de la Ley de la Universidad de Puerto Rico, Ley Núm. 135 de 7 de mayo de *1942*, subsiguientemente enmendada, 18 L.P.R.A. ants. secs. 631–658, que como técnica legislativa estableció "en calidad de *asignación autorrenovable*, con cargo a los fondos generales de Tesoro Estatal no comprometidos" determinados fondos anuales (18 L.P.R.A. sec. 653(a) (ed. de 1961)). No existe la más mínima constancia del alegado "repudio". La Oficina de Presupuesto y Gerencia del Gobernador define las *asignaciones autorrenovables* como aquellos "recursos del Fondo General autorizados por la Asamblea Legislativa para fines específicos y que se repiten anualmente, *hasta que la propia Asamblea Legislativa determine otra cosa*". (Énfasis suplido.) *Glosario de Definiciones de Términos— Primer Tomo del Presupuesto*, 1991-1992, pág. 16. La Ley de

Contabilidad de Puerto Rico, Ley Núm. 230, *supra*, reconoce este tipo de asignación automática (3 L.P.R.A. sec. 283g(j)). [4]

[4] Véase, además, *Esso Standard Oil v. A.P.P.R.*, 95 D.P.R. 772 (1968), que toma como trasfondo la Resolución Conjunta Núm. 103 de 24 de junio de 1958 que otorgó una *asignación autorrenovable* a la Autoridad de los Puertos.
Del historial legislativo de esa resolución se desprende que el concepto de "asignación autorrenovable" consiste en unos fondos que se verán reproducidos automáticamente a lo largo de un período preestablecido, *a menos que se disponga en contrario.*

La validez post constitucional de este tipo de asignaciones presupuestarias autorrenovables ha servido de base para las constantes gestiones del Poder Judicial en las que solicita de los Poderes Ejecutivo y Legislativo por "disposición de ley, el presupuesto de ... de partidas *autorrenovables* cuya asignación no haya que justificar anualmente ante la Asamblea Legislativa y el Gobernador". *Informe al* **\*866** *Tribunal Supremo del Comité para el Estudio y Evaluación del Sistema Judicial*, presidido por el Lcdo. José Trías Monge, marzo de 1965, pág. 40. Véanse: *La Judicatura Puertorriqueña*, Conferencia Judicial de Puerto Rico, octubre 1981, págs. 377–383; *La Independencia Judicial en Puerto Rico*, Conferencia Judicial de Puerto Rico, octubre 1988, págs. 122–123; *In re: Conferencia Judicial de P.R., Sesión Especial*, Resolución del Tribunal Supremo de 10 de octubre de 1989.

Para superar esta realidad, en sus alegatos, los demandados Honorable Hernández Colón *et al.* y el *amicus curiae* Banco Gubernamental de Fomento insisten que la asignación autorrenovable de la Ley Núm. 4, *supra*, quedó "*tácitamente derogad*[*a*] con la acción legislativa de ignorar la partida, obedeciendo a un juicio político (ejecutivo-legislativo) de atender el subsidio mediante fondos de la A.E.E.". (Énfasis suplido.) Alegato de los apelantes, pág. 65. La cuestión amerita cierta elaboración, pues en la vista oral la Procuradora General reiteró el argumento de derogación tácita, aunque reconoció la existencia de la deuda por parte del Gobierno, la cual sería atendida por el acuerdo de plan de pago de quince (15) años. T.E., págs. 8–12. No comprendemos cómo puede argüirse la tesis de derogación tácita y, sin embargo, se acepte que el Gobierno asumió esa obligación. Aun así, examinemos el planteamiento de derogación tácita.

Este planteamiento se fundamenta en dos (2) argumentos. El primero, que en los detalles presupuestarios sometidos por el Gobernador a la Asamblea Legislativa durante los últimos tres (3) años se expresó que la Autoridad de Energía Eléctrica

asumiría el pago del subsidio; el segundo, que la Resolución Conjunta Núm. 163, *supra*, no asignó esos fondos. Sobre el particular, el ilustrado foro de instancia correctamente determinó que los detalles presupuestarios proyectados en los "mamotretos son el desglose de la *petición* presupuestaria que el Poder Ejecutivo **\*867** le somete al Poder Legislativo para respaldar su Proyecto de Presupuesto General. *No son ley, ni forman parte de la Resolución Conjunta del Presupuesto General que finalmente apruebe al Asamblea Legislativa. Las cámaras pueden aprobar o no las recomendaciones presupuestarias*". (Énfasis suplido.) Anejo I, pág. 1AA.

Ahora bien, arguyendo que esas expresiones formaran parte de la Resolución Núm. 163, *supra*, estaríamos ante un acto *nulo*. Distinto a la Constitución federal, la nuestra, en su Art. III, Sec. 17, Const. E.L.A., *supra*, pág. 344, dispone: "La ley de presupuesto general sólo podrá contener asignaciones y reglas para el desembolso de las mismas." Esta cláusula prohíbe terminantemente que en la Ley de Presupuesto General se incluyan asuntos no germanos, a saber, tirillas (*ryders*). Véase Diario de Sesiones, *supra*, Vol. 2, págs. 919–920. En otras palabras, la doctrina que rechaza derogaciones tácitas de los *elementos sustantivos de una ley* —por silencio o implicación— a través de una subsiguiente Ley General de Presupuesto, *es de rango constitucional en Puerto Rico, no reglamentario.* Ante esa diferencia crucial, no nos explicamos cómo el *amicus curiae* Banco Gubernamental de Fomento invoque como autoridades judiciales *City of Los Angeles v. Adams*, 556 F.2d 40, 48 ( Cir. D.C. 1977); *Republic Airlines, Inc. v. U.S. Dep. of Transp.*, 849 F.2d 1315, 1320 (10mo Cir. 1985), y *United States v. Dickerson*, 310 U.S. 554, 555 (1940). *Estos casos, de su faz, son distinguibles, resueltos al amparo de una "reglamentación'D' congresional, no una limitación constitucional.* Curiosamente, *Soto v. MacLeod, Auditor*, 56 D.P.R. 807, 814–815 (1940), también citado para sostener que una Ley General de Presupuesto puede enmendar una ley contentiva de una asignación separada, es claramente *inaplicable*. Allí la voluntad legislativa quedó plasmada con una reducción *expresa* de un sueldo de cuatro mil dólares (\$4,000) a tres mil ciento treinta y cinco dólares **\*868** (\$3,135), partida *propia del presupuesto*, y no de carácter sustantivo.

Aclaramos que salvo esa limitación constitucional, no negamos facultad a la Asamblea Legislativa para dejar sin efecto una ley o asignación autorrenovable, creadora de obligaciones. Ahora bien, su naturaleza continua exige que sea una derogación *expresa;* la voluntad legislativa debe surgir diáfanamente. Aquí no es así. Cabe acentuar que el Presupuesto General del año 1989-1990 fue aprobado

el 30 de julio de 1989. Seis (6) días antes, la obligación había sido *reiterada* por la Asamblea Legislativa y el Primer Ejecutivo mediante la Ley Núm. 34, *supra*, enmendatoria de la Sec. 22(b)(1) y (2) de la Ley de la Autoridad de Energía Eléctrica de Puerto Rico, 22 L.P.R.A. sec. 212(b)(1) y (2). Esa enmienda *no varió* el mandato original de que el "costo del anterior subsidio constituirá una obligación del Estado Libre Asociado de Puerto Rico que *deberá cubrirse de cualesquiera fondos no comprometidos del Tesoro*, no más tarde de sesenta (60) días a partir de la facturación mensual de la Autoridad al Departamento de Hacienda por este concepto." (Énfasis suplido.) 22 L.P.R.A. sec. 212(b)(1).

Más aún, un (1) año y cuatro (4) meses después, el propio demandado Honorable Hernández Colón reiteró inequívocamente el criterio de que era una obligación anual vigente, que se cubriría con fondos no comprometidos del Tesoro Estatal. A tal efecto, el 21 de noviembre de 1990, al aprobar el *reglamento* para la concesión del subsidio, mandó que fuera "*costeado* por el Fondo General del Tesoro Estatal" (Regla 1.4r), y que en la fórmula de ajuste se tomara en cuenta la "[*a*]rortaci##on del Gobierno de Puerto Rico para el pago del subsidio en el mes o año'D' (Regla 2.4a). Sin ambages, el Honorable Hernández Colón diáfanamente reconoció y reafirmó su convicción de que "[e]l subsidio o crédito en la factura a que se refiere la *Ley y este Reglamento* constituye una *obligación económica* del Gobierno Central de Puerto Rico, *que se cubre con fondos no* **\*869** *comprometidos del Tesoro Estatal*" (Regla 7.1a). (Énfasis suplido.)

No es menester abundar más. La tesis de derogación tácita choca contra la Constitución, las actuaciones del Primer Ejecutivo y los demás fundamentos jurídicos. Como sentenció el reputado juez de instancia, "[n]i el Gobernador ni la Asamblea Legislativa *pueden pasar por alto el mandato de ley que les compele a asignar el dinero para el pago del subsidio. Mientras la ley continúe vigente hay que cumplirla.* Si el Gobernador o las cámaras legislativas desean alterar la carga del subsidio tienen que tomar acción afirmativa sobre la ley para modificarla o derogarla. Lo que no pueden hacer es obviar la asignación autorrenovable como si la ley no existiera, a pesar de que ésta continúa en pleno vigor sin que haya sido alterad[a] o modificada en forma alguna y el subsidio se ha continuado brindando.... Resolvemos que la omisión de la asignación en el presente Presupuesto para el pago del referido subsidio no queda subsanada con el alegado compromiso de presentar legislación *prospectiva*". (Énfasis suplido.) Anejo I, págs. 1EE–1FF y 1II.

## IV

*Presupuesto balanceado* no es una frase obscena. Para su consecución, no podemos perder de vista la íntima relación que existe entre la Autoridad de Energía Eléctrica y las demás corporaciones públicas creadas para hacer viable y hacer posible el tomar prestado dinero mediante la "emisión de bonos" para fines públicos, *suplementando así el Fondo General.*

En economía, como en otras área del quehacer humano, los excesos son malos. Distinto a las grandes potencias, economías marginales como la puertorriqueña dependen fundamentalmente del crédito para su estímulo. Tienen que garantizar de la forma más diáfana posible su *solvencia* **\*870** crediticia. La palabra *BONISTA* es vital para Puerto Rico; constitucional y legalmente se estima y garantiza al más alto rango posible.

Puerto Rico usa el dólar como papel moneda. No tenemos autoridad para crear más de la misma especie por medio de la impresión de moneda o de créditos. Ello nos obliga a hacer el mejor uso posible de las teorías monetaristas para influir las distintas etapas de nuestra economía. Tomamos conocimiento judicial de los distintos programas gubernamentales y de innumerable legislación tendente a estimularla, y así contrarrestar el alto y crónico desempleo y ahorro negativo. Recurrir a la alternativa de coger empréstitos (bonos, etc.) e inyectarlos al país a través del Banco Gubernamental de Fomento, la Autoridad de Energía Eléctrica, la Autoridad de Edificios Públicos y la Autoridad de Acueductos y Alcantarillados ha sido la práctica tradicional. En un mercado libre ello implica atraer el capital y requiere de valoraciones (*ratings*) crediticia (*Standard and Poor's—Moodys*, etc.). Para no crear sombras y robustecer esa credibilidad de buen deudor, se consignó en la Constitución el principio de *presupuesto balanceado* y control del margen prestatario. Ello explica el *ratio* entre deuda total de Puerto Rico e ingreso anual público, y es una de las razones que clásicamente se aducen para el Departamento de Hacienda no limpiar de sus computadores las "deudas incobrables".

Definitivamente, en la Constitución, el presupuesto balanceado representa la piedra angular para nuestro pasado y futuro crecimiento económico. Se esculpió en nuestra Ley Fundamental, a modo de un mensaje a la comunidad financiera de Estados Unidos, que nuestro Gobierno *no gastaría más* de lo que recaudase en contribuciones, aportaciones federales, etc. Ese mensaje era tan importante que el afán de restaurar la credibilidad y brindar las

más amplias garantías a los inversionistas del importante programa de **\*871** viviendas públicas motivó la "opinión consultiva" rechazada en *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958).

La comparecencia del *amicus curiae* Banco Gubernamental de Fomento entremezcla válidas teorías económicas no implantables en esta realidad. Los presupuestos desbalanceados, incluso los deficitarios, son *complejas medicinas* para el capitalismo moderno, no viables en una economía como la nuestra, tan singularmente dirigida por la función gubernamental y que depende principalmente del crédito gubernamental para insuflar capital de desarrollo.

Reconocemos que este Tribunal no es el llamado a establecer ni pautar la política económica del país. Ello no significa que debemos *abdicar* la obligación de velar que se cumplan las normas mínimas que el pueblo plasmó en la Constitución. No podemos permitir que una armoniosa interrelación del Primer Ejecutivo y de la Asamblea Legislativa la subvierta en aras de salvar situaciones transitorias, sean o no político-partidistas.

La opinión mayoritaria elabora una normativa escurridiza sobre legitimación activa y sacrifica la sustancia y justicia. La aplicación de esa teoría restrictiva de acceso a los tribunales es a costa del crédito y la reputación financiera del país. Ello augura consecuencias funestas para el pueblo en general y las administraciones futuras.

Dar por no leída la cláusula constitucional que, en garantía del buen crédito del E.L.A. *exige un presupuesto balanceado,* equivale a ignorar que nuestro mecanismo económico visualizó el *crédito* para influenciar gubernamentivamente el monto de dinero local en circulación. *Se puso así en la Constitución porque se creyó necesario e indispensable.* Evitemos que los vientos pasajeros derrumben esa piedra angular de nuestra economía; respetemos la letra clara de la Constitución.

La técnica de presupuestos deficitarios como fundamentos para atender los graves problemas sociales, hasta **\*872** ahora se consideraban saludables si eran usados con moderación, se mantenía al día el costo de la deuda y si en ciclos razonables se contrarrestaban con amortizaciones (superávit). Ello era posible en países con capacidad para imprimir y crear moneda utilizando como base principal el valor bruto de la producción nacional. Sin embargo, resulta muy peligroso, riesgoso y posiblemente fatal para Puerto Rico que no posee ese poder y depende sólo del crédito para lograr recursos que han de utilizarse en la promoción económica. Esta es otra razón

Hernandez Torres v. Hernandez Colon, 1992 JTS 16 (1992)

129 D.P.R. 824

por la cual sabiamente se puso la garantía de *presupuesto balanceado* en la Constitución.

**V**

A modo de epílogo, una aclaración. En este disenso hemos demostrado que el proceso que se siguió para aprobar el actual presupuesto es inconstitucional. El sustrato que nutre esta conclusión ha sido que *no es válida* la práctica generalizada de anualmente omitir asignar recursos suficientes para cumplir con las deudas contraídas con las corporaciones públicas, acumulando deudas millonarias y encubriendo así un presupuesto deficitario. La utilización de los recursos de las corporaciones públicas para financiar programas o cubrir el déficit presupuestario es inconstitucional, pues rompe el esquema de autonomía y separación fiscal que sirve de basamento a esas instrumentalidades. Tiende a menoscabar su solidez económica, lo que eventualmente conlleva aumentos de tarifas que han de ser satisfechas por todos los consumidores. No es constitucional que el Gobierno gaste los dineros de las corporaciones públicas y que éstas asuman las deudas.

Resolver estas verdades constitucionales no son, al decir mayoritario, "[asumir] la función que Platón asignó a los filósofos reyes ...". Opinión mayoritaria, pág. 849. Si así fuera, la descargamos "platónicamente'D', esto es, **\*873** "[i]dealmente, con desinterés, de honesto modo". *Diccionario de la Lengua Española*, *op. cit*., pág. 1075.

Reiteramos nuestro *voto preliminar disidente* de que no es permisible constitucionalmente que la Asamblea Legislativa ni el Primer Ejecutivo excluyan del presupuesto la totalidad de las deudas gubernamentales con las corporaciones públicas por servicios prestados. La práctica significa que los libros nunca reflejarán el monto total realmente adeudado de aproximadamente más de ochocientos millones de dólares ($800,000,000). *La magia documental no debe ocultar un presupuesto en verdad deficitario, balanceado artificialmente.*

**--O--**

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

El campo de las leyes —distinto a otras disciplinas como las matemáticas, la física, la química, etc.— no es uno preciso y exacto. En relación con cualquier controversia legal existen, como regla general, dos "caras de la moneda". Como consecuencia de ello, *cualquier* profesional del derecho puede desarrollar, y fundamentar, un razonamiento legal en apoyo

de cualquiera de las dos posiciones en controversia en un caso en particular de tal forma que cualquiera de dichas posiciones, *aun cuando realmente no lo sea*, parezca lógica, razonable y correcta.

Esa particularidad, que es tan "distintiva" del Derecho, es la que precisamente le permite a esta disciplina evolucionar y mejorarse continuamente y, por qué no decirlo, a los abogados ganarse la vida, ya que si sólo hubiera una "solución'D' a un problema legal, no habría ninguna necesidad para la existencia de la litigación contenciosa. Por otro lado, esa misma particularidad es la que causa que, *en ocasiones*, la actividad y labor del abogado resulte incomprensible **\*874** para la ciudadanía en general y que, hasta cierto punto, es la causa para la insatisfacción con, y descrédito de, la profesión legal ante los ojos de esa misma ciudadanía. En ocasiones, resulta difícil entender cómo un profesional del Derecho, en defensa de una posición en particular, puede sostener, y argumentar, con vehemencia una posición que obviamente es errónea en derecho y moralmente inaceptable.

Esa situación, esto es, la existencia de "dos caras de la moneda" en toda controversia legal es la que precisamente hace tan complicada y difícil la labor del juez. Su ministerio no puede consistir en meramente limitarse a escoger, *en forma acomodaticia*, una de las posibles soluciones y fundamentar la misma citando, como obediente autómata, decisiones y escritos en apoyo de la posición seleccionada; decisiones y escritos que aun cuando puedan parecer aplicables, por tratar del mismo tema, realmente no lo son pues han sido emitidas por jueces de otras jurisdicciones a la luz de las circunstancias, específicas y particulares, que imperan en dichas jurisdicciones.

*La labor del juez requiere algo más.* Este tiene que estar en disposición, en primer lugar, de actuar únicamente conforme los dictados de su conciencia, esto es, libre de toda atadura o influencia ajenas a su función y, en adición, libre de todo prejuicio o discrimen de clase alguna. En otras palabras, la objetividad e imparcialidad son requisitos indispensables del *buen* juez. Ausentes estas cualidades, la decisión que se emita por éste, por más fundamentada que luzca, será siempre una insatisfactoria.

Por otro lado, no puede enfatizarse lo suficiente el hecho de que ante posiciones conflictivas y, en ocasiones, igualmente fundamentadas, el "norte" que debe guiar el intelecto del juez no puede ser otro que el bien común. Ese es el factor determinante en, o fin último de, toda decisión judicial. Ello así por cuanto el propósito que inspira el establecimiento

**\*875** de las leyes y de todo sistema de derecho es precisamente ese: el bienestar general de la ciudadanía.

Ahí la razón por la cual la interrogante a ser contestada por el juez no se puede limitar a decidir cuál es la posición que encuentra más apoyo en la jurisprudencia y los comentaristas. Esa labor, aun cuando importante, la puede realizar una computadora primitiva o, inclusive, un estudiante de primer año de Derecho. El término "jurídicamente procedente" implica, y conlleva, algo más que unas numerosas citas legales. Dicho término necesariamente significa que la solución a ser decretada por el juez no sólo esté dentro de los parámetros establecidos por el ordenamiento jurídico sino que la referida solución debe ser en beneficio general de la ciudadanía.

Es debido a ello que si en la consecución de esa solución justa y beneficiosa, esto es, "jurídicamente procedente", el juez no encuentra precedente aplicable que apoye la misma, entonces ese juez tiene que estar presto y decidido a "abrir brecha" y establecer, conforme las guías generales del ordenamiento, *nueva* jurisprudencia. No debe olvidarse, después de todo, que en el "comienzo" no existían precedentes. Pero aún en el caso de que existan precedentes en contrario, si éstos no satisfacen su sentido de justicia, el juez no puede permitir que los mismos le impidan decretar la solución correcta que la situación, el momento y el bienestar de la ciudadanía, requieren y exigen que él determine. *Esa, repetimos, es precisamente la razón por la cual el que lleva con orgullo la toga es un ser pensante, sensible e inteligente, y no una computadora o un autómata.*

La decisión que emite una mayoría de los integrantes del Tribunal en el presente caso ciertamente *no* es ejemplo de lo anteriormente expresado. *La misma —en unión a un sinnúmero de decisiones emitidas en los pasados seis (6) años — es una que posiblemente tendrá el efecto de destruir* **\*876** *la reputación y credibilidad que en tiempos pasados tuvo este Tribunal.*

La Opinión mayoritaria, pág. 834, al resolver que los legisladores demandantes "carecen de legitimación activa para iniciar la presente acción en representación del interés público y que, por lo tanto, ni este Foro ni el tribunal de instancia tienen jurisdicción para adjudicar la controversia referente a la constitucionalidad del presupuesto general del año fiscal en curso" *no sólo le pone punto final a la presente controversia sino que, desgraciadamente para este País, igualmente causa la desestimación inmediata de varios pleitos y recursos de gran interés público, actualmente*

pendientes ante los tribunales de instancia y este Foro, *tales como:* la impugnación del nombramiento, como juez del Tribunal Superior, del Lcdo. Wilfredo Santos López; la impugnación del contrato que le fuera otorgado al Lcdo. Héctor Rivera Cruz en relación con la liquidación de la Corporación de Renovación Urbana y Vivienda; el pleito en que se impugna la constitucionalidad del Departamento de Asuntos de la Comunidad Puertorriqueña en los Estados Unidos, y cualquier otro pleito que se radique en el futuro en representación y vindicación del interés público y en beneficio de nuestro País. La "suerte está echada" en cuanto a este tipo de casos.

La decisión hoy emitida es una tan errónea, dañina y jurídicamente improcedente que constituye, a nuestro juicio, índice de un tribunal confundido y que confunde al País en general, y a la profesión legal en particular, mediante la emisión de decisiones contradictorias, inconsistentes y totalmente carentes de una filosofía judicial definida. *La reputación y credibilidad de este Tribunal tiene que necesariamente afectarse mientras se continúe —apoyándose en tecnicismos legales y so color de "prudencia judicial"—eludiendo y rehusando cumplir con la función principal de este Tribunal, esto es, la de ilustrar al País y de pautar el Derecho respecto a las cuestiones fundamentales* **\*877** *que afectan el bienestar general, y destino, del mismo.* [1] Parafraseando a Séneca, ninguna brisa le puede ser favorable a una institución que no sabe hacia donde se dirige.

[1]   El pasado 29 de noviembre de 1991, esa misma Mayoría —alegando que *carecía de jurisdicción* para emitir un recurso de *injunction*—rehusó dilucidar en los méritos la procedencia jurídica del referéndum del 8 de diciembre de 1992. Véase, *Gierbolini Rodríguez v. Gobernador,* 129 D.P.R. 402 (1991).

¿Palabras fuertes? Ciertamente que sí. ¿Doloroso tener que decirlas? Definitivamente, sí. ¿Justificadas las mismas? Igualmente creemos que sí. Veamos por qué.

## I

Este Tribunal siempre ha sido un foro judicial imaginativo, teniendo siempre razones de sobra para sentirse genuinamente orgulloso de tener a su haber el establecimiento de normas jurisprudenciales de avanzada, en beneficio de nuestros conciudadanos, relativas las mismas a áreas del Derecho en que tribunales de otras jurisdicciones todavía se encuentran "en pañales'D'. Una de esas áreas en que *habíamos* "abierto brecha" lo es la referente a la "capacidad jurídica o legitimación activa" (*standing*) del ciudadano que comparece al foro judicial en solicitud de remedio, en específico, *en*

*situaciones en que están envueltas cuestiones de vasto interés público.*

En esa área específica del Derecho, y haciendo "derecho criollo", *este Tribunal ha sido más liberal e innovador que, inclusive, los tribunales de la jurisdicción federal norteamericana.* En dicha jurisdicción, no hay duda, el trato que se le ha dado a la llamada "acción pública'D' ha sido una conservadora y restringida. Véanse: *Sierra Club v. Morton*, 405 U.S. 727 (1972); *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208 (1974); *Warth v. Seldin*, 422 U.S. 490 (1975). Esta interpretación restrictiva por parte **\*878** del Foro federal, sin embargo, ha sido objeto de severa crítica y se anticipa que la misma no perdurará. [2]

[2] Véase L.L. Jaffe, *The Citizen as Litigant in Public Actions: The Non-Hohfeldian or Ideological Plaintiff*, 116 U. Pa. L. Rev. 1033 (1968); L.L. Jaffe, *Judicial Control of Administrative Action*, Boston, Ed. Little Brown and Company, 1965, págs. 459-500.
En adición, se ha expresado, en lo pertinente, que:
"There is good reason to believe that *Sierra Club* is not constitutionally compelled and that the Court may in time recognize suits for citizens representing the public interest. *If such suits become available, congressmen should be able to challenge executive action not as congressmen but as representatives of the public interest.* Since such suits are likely to be accepted, if at all, only in a court's discretion, the official position of the congressman will still be important since his role as a publicly-elected representative makes him an especially able plaintiff. (Énfasis suplido y escolios omitidos.) Nota, *Congressional Standing to Challenge Executive Action*, 122 U. Pa. L. Rev. 1366, 1380 (1974)."

Como es sabido, a diferencia de la acción judicial referente a una contienda privada, las "acciones públicas'D' tienen el propósito de remediar actuaciones gubernamentales ilegales que afectan a un gran sector de la ciudadanía. Las mismas, en adición, tienen el fin último de vindicar la "política pública'D'. En esta clase de casos, por lo general, los tribunales implantan remedios prospectivos y correctivos, a diferencia de remedios compensatorios. A. Chayes, *The Supreme Court 1981 Term; Foreword: Public Law Litigation and the Burger Court*, 96 Harv. L. Rev. 4 (1982).

Es norma fundamental reiterada y ratificada por este Tribunal que las fuentes de la política pública son la Constitución, las leyes y los precedentes legales —*Ocasio v. Alcalde Mun. de Maunabo*, 121 D.P.R. 37 (1988); *Ortiz Andújar v. E.L.A.*, 122 D.P.R. 817 (1988); *J.R.T. v. Vigilantes, Inc.*, 125 D.P.R. 581 (1990); *Hurd v. Hodge*, 334 U.S. 24 (1948)— constituyendo

la política pública de más alto rango la que emana de nuestra Constitución.

Como correctamente expresa el *amicus curiae* —Banco Gubernamental de Fomento para Puerto Rico— en el alegato que radicara a petición nuestra, el concepto de presupuesto en Puerto Rico ha evolucionado hacia el "servicio del mejoramiento planificado de la sociedad" (Alegato del **\*879** *amicus curiae*, pág. 13) y a la vez va dirigido a robustecer "la garantía que se asienta el buen crédito de Puerto Rico". Íd. [3] Claramente la Resolución Conjunta Núm. 163 de 10 de agosto de 1991 para el año fiscal 1991-1992, que establece el Presupuesto de Mejoras Capitales y Gastos de Funcionamiento del Estado Libre Asociado de Puerto Rico, *es un asunto de alto interés público.*

[3] Alegato del *amicus curiae*, pág. 25.

Como consecuencia del hecho que el Primer Ejecutivo del País y la Asamblea Legislativa de Puerto Rico *omitieron* consignar, o presupuestar, en la referida Resolución Conjunta Núm. 163 la asignación de fondos que vienen en la obligación de hacer anualmente, referente la misma al subsidio por concepto de energía eléctrica, en virtud de las disposiciones de la Ley Núm. 83 de 2 de mayo de 1941 (22 L.P.R.A. secs. 191–217) y de la Ley Núm. 4 de 8 de junio de 1981 (22 L.P.R.A. sec. 212(b) y n.) los demandantes cuestionan la *constitucionalidad* de dicha Resolución Conjunta Núm. 163 al amparo de la *política pública* establecida por los forjadores de nuestra Constitución en las Secs. 6, 7 y 8 del Art. VI, y la Sec. 4 del Art. IV de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, las cuales requieren, en síntesis y en lo pertinente, que el presupuesto sea uno "balanceado". [4] **\*880**

[4] El Art. IV, Sec. 4 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ed. 1982, pág. 349, dispone:
"Los deberes, funciones y atribuciones del Gobernador serán:
"Presentar a la Asamblea Legislativa, al comienzo de cada sesión ordinaria, un mensaje sobre la situación del Estado y someterle además un informe sobre las condiciones del Tesoro de Puerto Rico y los desembolsos propuestos para el año económico siguiente. Dicho informe contendrá los datos necesarios para la formulación de un programa de legislación.'D'
La Sec. 6 del Art. VI de nuestra Constitución, ante, págs. 368–369, provee:
"Cuando a la terminación de un año económico no se hubieren aprobado las asignaciones necesarias para los gastos ordinarios de funcionamiento del gobierno y

pública durante el siguiente año económico, continuarán rigiendo las partidas consignadas en las últimas leyes aprobadas para los mismos fines y propósitos, en todo lo que fueren aplicables, y el Gobernador autorizará los desembolsos necesarios a tales fines hasta que se aprueben las asignaciones correspondientes."

La Sec. 7 del Art. VI de nuestra Constitución, ante, pág. 369, dispone:

"Las asignaciones hechas para un año económico no podrán exceder de los recursos totales calculados para dicho año económico, a menos que se provea por ley para la imposición de contribuciones suficientes para cubrir dichas asignaciones."

La Sec. 8 del Art. VI de nuestra Constitución, ante, pág. 369, provee:

"Cuando los recursos disponibles para un año económico no basten para cubrir las asignaciones aprobadas para ese año, se procederá en primer término, al pago de intereses y amortización de la deuda pública, y luego se harán los demás desembolsos de acuerdo con la norma de prioridades que se establezca por ley."

Al recomendar la aprobación de las referidas disposiciones a la Convención Constituyente, la Comisión de la Rama Legislativa expresó, en el informe que a esos efectos le rindiera, que:

Estos cuatro artículos integran un plan mínimo *para mantener la estabilidad económica del gobierno.*

En primer lugar el Gobernador debe presentar a la Asamblea Legislativa un mensaje sobre el estado del gobierno y además un informe detallado sobre los propuestos ingresos y desembolsos para el próximo año. *Las asignaciones que haga la Asamblea Legislativa no podrán exceder el cálculo de los recursos totales, a menos que se impongan contribuciones suficientes para cubrir el exceso.* Si a pesar de esta precaución los recursos disponibles no son suficientes para cubrir las asignaciones se debe establecer un orden de prioridades comenzando con el pago de intereses y amortización de la deuda pública. *Esta prioridad constitucional se adopta con el propósito de asegurar garantías para mantener el crédito público, tan necesario para el mejoramiento económico del pueblo.* (Énfasis suplido.) 4 Diario de Sesiones de la Convención Constituyente 2587(1952).

Nadie, *por lo menos con alguna seriedad,* podrá negar, en consecuencia, *que nos encontramos frente a una acción judicial en que está envuelta una cuestión de vasto interés público,* esto es, *llana y sencillamente nos enfrentamos a la llamada "acción pública'D'.* Conforme a dicha situación es

que venimos en la obligación de examinar si los demandantes tienen o no "capacidad jurídica'D' (*standing*) para radicar la acción en controversia; *ello en vista de que según surge de la demanda radicada, y de la sentencia emitida por el foro de instancia, los referidos demandantes incoaron el* **\*881** *pleito no sólo como miembros de la Cámara de Representantes de Puerto Rico sino en su capacidad individual, esto es, como ciudadanos particulares.*

Procedemos a examinar la jurisprudencia que ha emitido este Tribunal durante las pasadas cuatro (4) décadas en lo referente a la *capacidad jurídica* (*standing*) de *los ciudadanos* en relación con acciones que están *revestidas de alto interés público.*

## II

Hace poco más de cuarenta y cuatro (44) años —al revocar una sentencia emitida a nivel de instancia de-sestimatoria de una petición de *mandamus,* referente dicha solicitud al idioma a ser utilizado en las escuelas públicas del País— este Tribunal expresó, en *Asociación de Maestros v. Pérez, Gobernador Int.,* 67 D.P.R. 848, 851 (1947), que:

> No cabe duda .... que la *selección del idioma* que ha de servir de vehículo a la enseñanza pública de un país, *es una cuestión de interés público. También lo es que las leyes se pongan en ejecución.* Tratándose de cuestiones de interés público, sostiene la mayoría de las autoridades que interpretan preceptos similares al nuestro, que cuando la cuestión envuelta es de interés público y el mandamus tiene por objeto conseguir la ejecución de un deber público, el pueblo es considerado como la parte especialmente interesada y *el demandante no necesita probar que tiene interés especial en el resultado del caso. Basta demostrar que es un ciudadano y como tal está interesado en la ejecución y protección del derecho público.* (Énfasis suplido.)

Veintisiete (27) años más tarde este Tribunal —*demostrando un ejemplarizante sentido del deber que tenemos de ilustrar y pautar el Derecho en el País,* y echando a un lado una interpretación restrictiva del concepto de "capacidad jurídica'D' (*standing*)— entró a decidir en los méritos el derecho, *reclamado por otros,* del ex Gobernador Roberto

Sánchez Vilella a ocupar un escaño legislativo. Al así hacerlo, **\*882** en *Fuster v. Busó*, 102 D.P.R. 327, 328 (1974), expresamos, en lo pertinente, que:

... Es *controvertible* si los demandantes tienen capacidad jurídica (standing) para traer este pleito ....

Decimos que es controvertible la capacidad jurídica de los demandantes porque este pleito tiene el propósito nominal de sentar en la Cámara de Representantes de Puerto Rico al señor Roberto Sánchez Vilella pero el señor Sánchez Vilella *quien sería la persona realmente interesada* no es demandante ni es parte en el litigio. *Sin embargo, debido al interés público del asunto y a que están envueltas en él varias disposiciones constitucionales,* una disposición de la Ley Electoral y una actuación de la Junta Estatal de Elecciones, *hemos decidido entrar en los méritos.* (Énfasis en el original suprimido y énfasis suplido.)

En *Salas Soler v. Srio. de Agricultura*, 102 D.P.R. 716 (1974) —caso en que el Tribunal Superior se había negado, por razón de alegada falta de capacidad jurídica del demandante para radicar la acción, a expedir un auto de *mandamus* requiriendo del Secretario de Agricultura que sometiera la declaración de impacto ambiental que exige la Ley sobre Política Pública Ambiental de Puerto Rico— *expresamente ratificamos* la norma, antes transcrita, establecida en el año de 1947 en el caso de *Asociación de Maestros v. Pérez, Gobernador Int.*, ante. Entre otros señalamientos, expresamos entonces que:
El tema general de los criterios que deben regir la definición de las personas o entidades con capacidad para entablar litigios ha sido y continúa siendo objeto de discusión intensa. Freund estima que la materia se cuenta entre "las más amorfas en todo el dominio del derecho público'D' (traducción nuestra), *Hearings on S. 2097 Before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary*, 89th Cong., 2d Sess., parte 2, pág. 498 (1966). El Juez Douglas ha afirmado que "Las generalizaciones sobre la capacidad para demandar son en gran parte inservibles." (Traducción nuestra.) *Association of Data Processing Serv. Organizations* v. *Camp*, 397 U.S. 150, 151 (1970). Davis considera que "*las decisiones del Tribunal Supremo [de Estados Unidos]* sobre la capacidad para demandar **\*883** *son confusas y contradictorias y continúan en estado de desorden.*" (Traducción nuestra.) 3 Davis, *Administrative Law Treatise*, sec. 22.18 (Supp. 1965).

Puede notarse también que la tendencia general es hacia *la liberalización* de la doctrina. Davis, *The Liberalized Law of Standing*, 37 U. Chi. L. Rev. 450 (1970); Jaffe

*Standing Again*, 84 Harv. L. Rev. 633 (1971). El desarrollo de esta tendencia ha sido mucho más pronunciado en la jurisprudencia estatal que en la federal. Homburger, A., *Private Suits in the Public Interest in the United States of America*, 23 Buffalo L. Rev. 343, 390 (1974). (Énfasis suplido.) *Salas Soler v. Srio. de Agricultura*, ante, págs. 718–719.

Por otro lado, añadimos y establecimos en el citado caso de *Salas Soler v. Srio. de Agricultura*, ante, págs. 723–724, que para

... demostrar que se es una persona afectada por una acción gubernamental ... *no hay necesidad de demostrar daño económico.* ... *El daño puede basarse en consideraciones ambientales, recreativas, espirituales o aun simplemente estéticas.* ... Nuestra decisión ... *no* quiere decir que la puerta está abierta de par en par para la consideración de *cualquier caso* que desee incoar *cualquier ciudadano* en *alegada* protección de una política pública. Debe examinarse el nexo entre el interés del ciudadano y la acción radicada; el hecho de que los demandantes puedan representar adecuadamente el interés público y asumir su debida defensa; si el caso es justiciable o si puede montar a una intervención indebida del poder judicial con el funcionamiento de otra parte del gobierno; si la controversia está madura para decisión, y si el litigio en cuestión constituye un medio adecuado para plantear en su debida dimensión y particularidad el problema de que se trate. (Énfasis suplido.)

Finalmente, expresamos en el citado caso de *Salas Soler v. Srio. de Agricultura*, ante, págs. 725–726, que:

> En el derecho de algunos otros países *la tendencia hacia una liberalización creciente de las oportunidades de demandar es igualmente marcada.* ... La ley impone *un claro deber público y no existe impedimento para exigir su observancia en la referida doctrina ...".* (Énfasis suplido.) **\*884**

En relación con este punto, resultan *particularmente ilustrantes* unos señalamientos que se hicieran en *E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394, 399 (1983). En el mismo, en lo pertinente, expresamos que:
En *Salas Soler* v. *Srio. de Agricultura*, 102 D.P.R. 716 (1974), comentamos ampliamente las dificultades de este campo. Véase: *Data Processing Service* v. *amp*, 397 U.S.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

150, 151 (1970). Estas dificultades tienen diversas fuentes. En primer término, tendemos a veces a olvidar que, a fin de cuentas, *la doctrina de capacidad para demandar es tan solo un mecanismo que los tribunales utilizan en ocasiones para delimitar su propia jurisdicción*, para no adentrarse en los dominios de otras ramas del gobierno, para no lanzarse a resolver cuestiones hipotéticas o planteadas dentro de un contexto inadecuado de hechos, para ejercer, en suma, las "virtudes pasivas" sobre las que teorizaba Alexander Bickel. Bickel, *The Supreme Court 1960 Term-Foreword: The Passive Virtues*, 75 Harv. L. Rev. 40 (1961). *Hay que ir, para sopesarlas a plena luz, a las fuerzas subyacentes que motivan en la realidad la abstención o intervención judicial en una situación dada.*

En segundo lugar, nos inclinamos mucho a la generalización, a sentar normas con vocación de universalidad en circunstancias muy dispares que requieren tratamientos diferentes. El familiar modelo de la contienda privada *ha nublado* en algunos casos, por ejemplo, el análisis de la acción pública emergente. *Se sigue buscando por algunas cortes el daño personal al litigante, cuando el problema es formular otro juego de normas para la consideración de cuestiones de vasto interés público.* A Chayes, *The Supreme Court 1981 Term-Foreword: Public Law Litigation and the Burger Court*, 96 Harv. L. Rev. 4 (1982).

Estimamos que debe distinguirse entre situaciones diversas. (Énfasis suplido.)

Terminamos este breve análisis jurisprudencial con una de las más recientes expresiones de este Tribunal respecto a la norma, *amplia y liberal,* imperante en esta jurisdicción en materia de capacidad jurídica (*standing*) para demandar. En *Solís v. Municipio de Caguas*, 120 D.P.R. 53, 53–56 (1987) —al revocar una sentencia emitida por el Tribunal Superior que había desestimado la acción radicada **\*885** por alegadamente carecer de *standing* la parte demandante —expresamos, en términos claros y definitivos, que:
Nos toca revisar una escueta sentencia del Tribunal Superior, Sala de Caguas que, de sostenerse, tiene el efecto de revocar, dejar sin efecto y alterar el estado de Derecho sobre la capacidad jurídica para demandar que *hemos uniformemente seguido durante los últimos cuarenta años. Asociación de Maestros* v. *Pérez, Gobernador Int.*, 67 D.P.R. 848 (1947).

Reiteradamente hemos expresado en nuestras decisiones desde *Asociación de Maestros v. Pérez, Gobernador Int.,* ante, que la *doctrina sobre capacidad jurídica para*

*entablar demanda contra las agencias y funcionarios gubernamentales, debe ser interpretada amplia y liberalmente.* (Énfasis suplido.)

### III

Ante este *claro e incuestionable historial jurisprudencial de liberalidad* de parte de este Tribunal en relación con la materia de capacidad jurídica (*standing*) —acorde el mismo con la tendencia jurídica moderna de otros Países— interpone la mayoría de los integrantes del Tribunal en el día de hoy el "mecanismo que los tribunales utilizan en ocasiones", *E.L.A. v. P. R. Tel. Co.*, ante, del "principio histórico de prudencia judicial" (opinión mayoritaria, pág. 849) —la frivolidad del cual, en el presente caso, es transparente— para sostener o apoyar su errónea tesis de que los demandantes no tienen capacidad jurídica para incoar la acción judicial ante nuestra consideración.

Al así actuar, la Mayoría *no sólo* echa a un lado, y destruye, toda una rica tradición jurisprudencial de avanzada que tomó años perfeccionar, *sino que* le niega a la ciudadanía puertorriqueña —al no entrar en los méritos del caso—unas importantes, y necesarias, pautas legales sobre un asunto de obvia trascendencia e importancia pública. En adición, *y en relación con el caso específico ante nuestra consideración*, el Tribunal arbitrariamente descarta el hecho **\*886** innegable de que mediante la acción en controversia unos ciudadanos correctamente han cuestionado la inobservancia de una ley vigente — Ley Núm. 4 de 8 de junio de 1981, ante— por funcionarios del Gobierno que tienen el deber ineludible de acatarla y ponerla en vigor; acción oficial realizada en abierta violación de la *política pública* emanante de varias disposiciones de nuestra Constitución. *En otras palabras,* caprichosamente se ignora por este Tribunal que estamos ante una acción que está revestida del más alto interés público imaginable, radicada la misma por ciudadanos que están "interesado[s] en la ejecución y protección del derecho público'D'. *Asociación de Maestros v. Pérez, Gobernador Int.,* ante, pág. 851.

Por otro lado, y aun cuando nuestra jurisprudencia y la tendencia liberal moderna en materia de *standing* no requiere que el ciudadano demandante demuestre que ha sufrido un "daño económico'D' —pudiendo basarse la acción, inclusive, en "consideraciones ambientales, recreativas, espirituales o aun simplemente estéticas'D', *Salas Soler v. Srio. de Agricultura,* ante, pág. 723, la Mayoría echa a un lado, y prefiere ignorar, *el hecho innegable de que en el presente caso el daño que puede sufrir el Pueblo de Puerto Rico,*

por la acción oficial que hoy no permite que se impugne, *es uno concreto, real, económico y no abstracto*. Al concederle este Tribunal "carta blanca" a los Poderes Ejecutivos y Legislativos para que, en flagrante violación de una ley válida y obligatoria, no consignen en el presupuesto anual una asignación requerida por esa ley —*la deuda de la cual asciende, en la actualidad, a la suma de noventa y seis (96) millones de dólares*— se está poniendo en riesgo el buen nombre y crédito del Gobierno de Puerto Rico, y en peligro la salud fiscal de este Pueblo.

*Cabe preguntarse:* si en el pasado le hemos concedido capacidad jurídica a unos ciudadanos demandantes, que en realidad no la tenían, únicamente "debido al interés público del asunto y a que están envueltos en [el caso] varias **\*887** disposiciones constitucionales" *(Fuster v. Busó*, ante) y si hemos sostenido que un ciudadano tiene *standing* para cuestionar acciones gubernamentales que puedan causar daños de índole "ambientales, recreativas, espirituales o aun simplemente estéticas'D', *Salas Soler v. Srio. de Agricultura*, ante, pág. 723, ¿Cómo Es Posible que los Ciudadanos de Esta Bendita Tierra no Tengan Capacidad Jurídica para Cuestionar Acciones Gubernamentales que Pueden Causar la Quiebra del País?

No debe ni puede existir la menor duda. Los demandantes del epígrafe obviamente tienen la suficiente capacidad jurídica, *cuando menos en su carácter de ciudadanos*, para entablar la presente acción en protección del interés general de la ciudadanía y para poner en vigor, y salvaguardar, la política pública que emana de la Sec. 7 del Art. VI de nuestra Constitución, ante. Los demandantes, en resumen, cumplen

con todos los requisitos que exige nuestra jurisprudencia en lo referente a capacidad jurídica (*standing*). A esos efectos, véanse: *Salas Soler v. Srio. de Agricultura*, ante; *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407 (1982).

Como se expresara por este Tribunal en fecha sumamente reciente, la "*función principal* [de la doctrina de *standing*] es *'asegurar al tribunal que el promovente de la acción* es uno cuyo interés es de tal índole que, con toda probabilidad, *habrá de proseguir* su causa de acción vigorosamente *y habrá de traer* a la atención del tribunal las cuestiones en controversia'*". (Énfasis suplido.) *Col. Ópticos de P.R. v. Vani Visual Center*, 124 D.P.R. 559, 564 (1989). No hay que temer por esa situación en el presente caso. La conducta responsable y vigorosa observada por los demandantes hasta la fecha en la tramitación del caso constituye la mejor garantía de ello. **\*888**

### IV

En conclusión, la Opinión mayoritaria emitida en el presente caso, al negarle capacidad jurídica a los demandantes apelados, es una tan errónea, inconsistente y absurda que hay "que ir, para sopesarlas a plena luz, a las fuerzas subyacentes que [motivaron] en la realidad la abstención o intervención judicial en una situación'D' como la planteada. Expresiones del Lcdo. José Trías Monge, Juez ponente, en *E.L.A. v. P.R. Tel. Co.*, ante, pág. 399.

Resulta preferible, en observancia del "principio histórico de prudencia judicial" (Opinión mayoritaria, pág. 848), no especular sobre las fuerzas subyacentes que motivaron la abstención judicial del Tribunal en el caso de autos.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

129 D.P.R. 824

**1992 JTS 16, 129 D.P.R. 824, 1992 WL 754978 (P.R.)**
HON. ZAIDA HERNÁNDEZ TORRES, in her own name and behalf and as REPRESENTATIVE of the HOUSE OF REPRESENTATIVES, HON. EDISON MISLA ALDARONDO, in his own name and behalf and as REPRESENTATIVE of the HOUSE OF REPRESENTATIVES, ET AL., plaintiffs and appellees,

v.

HON. RAFAEL HERNÁNDEZ COLÓN, GOVERNOR OF THE COMMONWEALTH OF PUERTO RICO; JOSÉ M. ALONSO GARCÍA, DIRECTOR OF THE OFFICE OF MANAGEMENT AND BUDGET, and RAMÓN GARCÍA SANTIAGO, SECRETARY OF THE TREASURY OF PUERTO RICO, defendants and appellants.
In the Supreme Court of Puerto Rico.
*Number:* AC-91-833

--O--

Dissenting opinion of Associate Judge Negrón García.

"Dissidence is the power of the powerless." Vaclav Havel. Even in the face of multifarious intolerance, a judge will never forego identifying and remedying injustice **\*850** according to his conscience. He must disqualify, without constraints, any rule or arbitrariness that violates the Constitution. These statements externalize the vital and intimate psychodynamic of a free spirit that encourages and nurtures the element of *judicial independence*, the most valued phenomenon in the doctrine of checks and balances, and on which rests the separation of powers in the organizational structure of our democratic government. "When a judge notices that a textual interpretation has strayed dramatically from the original meaning of the text, *a constitutional obligation of the utmost importance* compels him to expose this divergence and indicate a different direction." (Our translation.) Associate Judge William W. Brennan, *Address to the Criminal Lawyers Association*, New York, 1990.

**I**

The majority decision signed by Associate Judge Hernández Denton, with "legal rigor" 'D' (majority opinion, pg. 848), reflects the *restrictive* argument of the defendants, the Hons. Rafael Hernández Colón, José M. Alonso García and Ramón García Santiago, that denies the (*standing*) to sue to the lawmakers, in this case the Hons. Zaida Hernández Torres and Edison Misla Aldarondo. Thus, they revoke the exhaustive and documented ruling of the higher court, Court of San Juan (Hon. A. López Rodríguez, Judge), who, on December 16, 1991, decreed *Joint Resolution No.* 163 of August 10, 1991 of the legislature regarding the *general budget for the financial year 1991–1992 to be unconstitutional*. Suddenly, they halt the entire liberal and progressive advance of "recent decades 'D' (id., pg. 834) which implicitly and expressly granted them the right to affirm the prerogatives of their positions. *Nogueras vs. Hernández Colón*, 127 D.P.R. 638 (1991); *Nogueras vs. Hernández Colón*, 127 D.P.R. 405 (1990); *Noriega vs. Gobernador* **\*851**, 122

Case:17-03283-LTS Doc#:13004-23 Filed:04/30/20 Entered:04/30/20 12:38:28 Desc:
Hernandez Torres vs. Hernandez Colon Exhibit 23 Page 27 of 36

129 D.P.R. 824

D.P.R. 650 (1988); *Silva vs. Hernández Agosto*, 118 D.P.R. 45 (1986); *Hernández Agosto vs. Romero Barceló*, 112 D.P.R. 407, 415–416 (1982).

We consider this interpretation wrong and unjust. Following the same sources of authority, we will demonstrate that both lawmakers meet the requirements for standing to sue. That is to say they suffered clear, real, immediate and precise damage, that the cause of action arises within the framework of the Constitution and a law, and that there is a connection between the damage and this cause of action. Ultimately, its main function is "to assure the court that the plaintiff in the action is one whose interest is of such a nature that, with all likelihood, the plaintiff will have to pursue their cause of action *vigorously* and will have to bring the matter in dispute to the attention of the court." (Emphasis added.) *Hernández Agosto vs. Romero Barceló*, supra, pg. 413; *Col. Ópticos de P.R. vs. Vani Visual Center*, 124 D.P.R. 559 (1989).

Under the categories mentioned by the majority, it is even "appropriate to recognize a lawmaker's *standing* to sue *when the lawmaker demonstrates that the challenged action has the effect of annuling his vote, past or future*, or when other basic aspects of his legislative prerogatives are at stake." (Emphasis and translation ours.) L.H. Tribe, *American Constitutional Law*, 2nd ed., New York, Ed. Foundation Press, 1988, pg. 153. See *Kennedy vs. Sampson*, 511 F.2d 430 (Cir D.C. 1974).

In two aspects, the plaintiffs, the Honorable Hernández Torres and the Honorable Misla Aldarondo, proved to the first instance court a *substantial interest* in the result of a *legitimate dispute* that significantly affects the performance of their duties, prerogatives, rights and privileges vis-à-vis an *affirmative obligation* imposed by the *Constitution*. We will now explain our position in more detail.

First, apart from the main issue of the unbalanced budget, and from the outset, in the allegations *852 of the claim (paragraph 9 c) they stated, in essence, and among others, a cause of action aimed at requiring and compelling Chief Executive Honorable Hernández Colón *et al.* to observe and give full effect to the statutorily envisaged financing of the residential rate subsidy of economically less privileged subscribers and of the monthly consumption of no more than 400 K.W.H. As we know, by means of Law No. 4 of June 8, 1981 (22 L.P.R.A. sec. 212(b) and n.) its cost was limited to one hundred million dollars ($100,000,000) a year and its financing came directly to constitute — by *express mandate* of the

legislature — "an obligation of the Commonwealth of Puerto Rico that it must cover any funds *not committed by the Treasury, within sixty (60) days of the monthly billing from the Authority to the Finance Department for this item*". (Emphasis added.) In this respect, 22 L.P.R.A. sec. 212(b)(1). Its Art. 2 (22 L.P.R.A. sec. 212 n.) provided for a *self-renewable appropriation*, to wit: in "subsequent years, the necessary resources for continuing this program *will be allocated in the Joint Resolution of the General Budget of the Commonwealth*, stating that this allocated amount may not exceed one hundred (100) million dollars, plus five percent (5%) for unforeseen events." (Emphasis added.)

The position of the Chief Executive was, and has been, that it is not obligated to comply with that law, because Joint Resolution No. 163, *supra, implicitly repealed the self-renewable* obligation, imposed by the legislature and previously assumed by the State, to pay the subsidy. It is undeniable that that dispute and action had – and continues to have – the immediate damaging effect of *anulling the past votes* of *all* lawmakers aimed at the automatic renewal of the *current appropriation*; an obligation that remained unchanged even when the legislature later amended the law by means of Law No. *853 34 of July 24, 1989 (22 L.P.R.A. sec. 212(b)(1) and (2)). Logically, in a palpable and concrete way, it harmed the prerogatives of the responsibilities of both representatives. This led to a specific cause of action, redeemable under the Constitution, which they had an unquestionable right to bring before the courts. We are not, then, faced with a situation in which the intention is to challenge a law based on the mere fact that a lawmaker voted against its approval or, as the majority asserts, "to transfer the legislative debate from the political arena to the judicial one…". Majority opinion, pg. 842. [2]

2    Some courts have even recognized lawmakers' standing to sue in order to question the constitutionality of an action of another branch of government, *Harrington vs. Bush*, 553 F.2d. 190 (Cir. D.C. 1977), and the validity of a clause of the Constitution. *Trombetta vs. Florida*, 353 F. Supp. 575 (Fla. 1973); *Dyer vs. Blair*, 390 F. Supp. 1291 (N.D. Ill. 1975).

Furthermore, the consensus is unanimous that Art. VI, Sec. 7 of our Constitution, L.P.R.A.[Laws of Puerto Rico Annotated], Volume 1, imposes an affirmative duty on the Chief Executive and the legislature to approve a *balanced budget*. It concerns a *shared* constitutional duty, analogous to the duty of the process of senatorial confirmation. *Nogueras vs. Hernández Colón,*

Case:17-03283-LTS   Doc#:13004-23   Filed:04/30/20   Entered:04/30/20 12:38:28   Desc:
Exhibit 23   Page 28 of 36
Hernández Torres vs. Hernández Colón, 129 D.P.R. 824 (1992)

129 D.P.R. 824

127 D.P.R. 638 (1991); *Hernández Agosto vs. López* Nieves, 114 D.P.R. 601 (1983). So much so, that the co-defendants Hernández Colón et al. alleged to the first instance court that participation in the legislature's budget led them to conclude that this Body was "*an indispensable part*". Annex IV, pg. 29.

Regarding a duty of this nature – shared – our constitutional system does not leave its compliance to the discretion of any of those powers. It is obvious that if any party – the Chief Executive or the legislature – undermines or fails to fulfill this constitutional duty, the other may legitimately have recourse to the courts to compel its compliance. And it is only logical to conclude that if the legislature, as a body, does not act in defense of its constitutional prerogatives, any of **\*854** its members have the standing to turn to the courts and obligate the Chief Executive to comply with their *affirmative duty* imposed by our Constitution. This is the only way to avoid their vote being undermined. We cannot conceive how in a Government of laws, not men, a lawmaker is obligated to docilely and passively accept the unconstitutionality or illegality of an executive act that annuls existing legislation – and his or her votes – due to the simple fact of holding this status. In the matter of justiciability we must not confuse "legitimacy" with "political issue 'D'".

Certainly, the present controversy, far from being simply a matter of general interest – which skirts the classic criteria of standing to sue – falls perfectly within the area of protected interests of the members – majority or minority – of the legislature. Naturally, the inaction of the legislative majority does not affect the legitimacy of the minority. Recall that "[i]n contrast to the federal Constitution, ours expressly recognizes and guarantees, as a means of scrutiny, legislative minorities. '[I]t is essential for *democratic health* that the minorities have a representation that, even *under unfavorable circumstances*, enables them to adequately fulfill their duty of holding accountable and stimulating the majority in its governing tasks without creating obstacles that could be detrimental to democracy." … 4 Record of Proceedings of the Constitutional Convention 2590 (1952)." (Original emphasis.) *Hernández Torres vs. Gobernador*, 129 D.P.R. 678, 680–681 (1991), initial dissenting opinion.

The absurd thing about the majority *ratio decidendi* is that it is nurtured by a reasoning that amounts to a vicious circle. Since they do not enter into

the merits of the dispute, it is impossible for them to see that the plaintiffs, the Honorable Hernández Torres and Misla Aldarondo, have effectively suffered **\*855** clear, real and immediate damage protected by the Constitution and a law. They reiterate the theory of the defendants, the Honorable Hernández Colón *et al,.* that *solely* the Electric Power Authority has standing to sue. [3] This is absurd, for the judge-rapporteur himself, Mr. Hernández Denton, acknowledged the *absolute control* that the Chief Executive exercises over this public corporation, which in practice is equivalent to saying that the Electric Power Authority's applying to the courts is impossible. In the oral proceedings this judge stated: "But given the fact that with the Electric Power Authority, despite being a public corporation, its Board of Directors is appointed by the governor, and given the numbers of years that have passed, the records show that the Electric Power Authority did not invoke it, that there was no type of objection. 'D' T.E., pg. 5. Based on these facts, with a certain degree of skepticism, he asked: "*Can we really believe that the Electric Power Authority, even in theory, could be an interested party. Is it really a party that could turn to the courts?*" (Emphasis added). Id.

3   *Motu proprio*, "[g]iven the nature of the dispute" (Resolution of December 20, 1991), the majority of the Court considered it desirable to order the participation of the Government Development Bank. They did not provide the same procedure for the Electric Power Authority.

That observation transcends the simple theoretical question. The control of the Chief Executive was able to convert into a reality a payment "agreement" signed solely by the Executive Director of the Electric Power Authority, Mr. José A. Del Valle, and the co-defendant, Budget Director Honorable Alonso García, to close the issue. Accepted by the Board of Directors, it means that this dispute could never be brought before the courts.

This forensic reasoning was successful and has resulted in the stifling of *JUSTICE*. By virtue of a narrow interpretation of standing to sue, an impassable wall has been erected that exceeds this recourse. As of today, in the constitutional **\*856** #sphere, disputes in matters concerning the budget and disbursement of public funds are withheld from the courts. The Government is not obligated to honor and include in the budget the obligations and debts incurred with different public corporations; included by the legislature, it will not be obligated to pay them. Lastly, the Chief Executive may sign, through

129 D.P.R. 824

officials under his authority – the majority appointed by him – an "agreement" to pay, in fifteen (15) years, a debt that by law should be paid in three (3) years. "The law is upright, righteous, in line with justice. That is why all its solutions must be filled with this." J.B. Vallet de Goytisolo, *Estudios sobre fuentes del Derecho y método jurídico [Studies on sources of the law and legal method]*, Madrid, Ed. Montecorvo, 1982, pg. 55. We reject any judicial interpretation "apart from the living reality to which it must be applied. Laws are not made to be confronted with dossiers and folios of appeals and allegations, but to be conceived and applied to real life where they should fulfill a particular objective." Id., pg. 740.

## II

The courtroom doors open, we now analyze the merits to determine if the 1991-1992 budget is truly invalid for being, since its inception, deficient, that is, if its complies with "the minimum [constitutional] plan to maintain the economic stability of the government." Record of Proceedings, *supra*, pg. 2587. This "minimum plan 'D'" was outlined in four (4) basic provisions that we will analyze separately.

The *first* —Art. IV, Sec. 4, Const. E.L.A., L.P.R.A., Volume 1, ed. 1982, pg. 349— imposed on the Governor the ministerial duty of "[s]ubmitting to the legislature, at the *beginning* of each ordinary session, a message regarding the status of the State and submitting to it, in addition, a *report* on **857** the conditions of the Treasury of Puerto Rico and the disbursements proposed for the following economic year. *This report will contain the data needed to formulate a legislative program 'D'*. (Emphasis added.)

Regarding the concept "budget", the expression "*necessary data*", in the words of representative Víctor Gutiérrez Franki, "includes the surplus that there could be, the estimates of the product of the established tax contributions, the amount of the bonds that could be subject to being sold on the bond market, federal aid, in other words, all *the funds* that are going to *increase* what is available in the Treasury of Puerto Rico *to address the expenses of that economic year*. And he continues proposing that, in addition, the Governor will submit the costs related to the *proposed disbursements*". (Emphasis added.) Record of Proceedings, *supra*, Vol. 2, pg. 882. Later he clarified: *"[T]he Governor has to order both things.* It is necessary to read the entire section. The estimate of resources income and the estimate of expenditures, and this is, as our colleague Figueroa eloquently states, what is called in public finance, a *budget for the economic year*.

*And that budget will contain the estimate of resources and the estimate of expenditures."* (Emphasis added.) Id., pg. 887.

To sum up, "the Governor must submit to the legislature a message regarding the status of the government and, in addition, a *detailed report of the proposed income and disbursements for the coming year* 'D'. (Emphasis added.) Report of the Legislative Committee, Record of Proceedings, supra, Vol. 4, pg. 2587.

That detailed report on the proposed income and disbursements is the basis for the legislature's approval of the balanced budget. The term "budget" incorporates two (2) general meanings. The meaning derived from the Latin verb *supponere* —to put, to place, to put below, to subordinate, to substitute— means the "motive", "cause" or "pretext" with which an action is performed. It is **858** a *preliminary assumption* regarding to the causes or motive of something. That which is supposed is taken for granted; a presupposition is a constant that precedes or underlies something else. Conversely, the term acquires meaning in a financial context. *Diccionario de la Lengua Española*, Madrid, Ed. Espasa-Calpe, 1984, Vol. II, pg. 1101, defines it as: "*Anticipated* calculation of the cost of a work, and also of the expenses or the income of a hospital, town council or other body…" (Emphasis added.) Regarding this definition, the word includes verbal forms such as "to budget" and adjectival forms such as "budgetary".

Cabanellas adds a "legal" definition for accounting law: "The general budgets of the State are the enumeration of the obligations that the Treasury must satisfy each year in relation to the services that must be maintained therein, and the calculation of the resources or means that are considered achievable to cover those concerns." G. Cabanellas, *Diccionario Enciclopédico de Derecho Civil [Encyclopaedic Dictionary of Civil Law]*, Vol. VI, 1981, pg. 394. For his part, the illustrious trial judge included the following definition: "legislative act authorizing the maximum amount of the expenditures that the Government can make during a specific period of time on the concerns that are specified in detail and anticipating the income needed to pay for them." A. Rodríguez Bereijo, *El Presupuesto del Estado [Budget of the State]*, Madrid, Ed. Tecnos, 1970, pg. 19.

These definitions make clear that the value and use of the Chief Executive's "detailed report" will actually depend on whether the categories of income and expenditures are reasonable and correctly appraised. "Mistakes in assessment can be objective or subjective. The

129 D.P.R. 824

assessment errors can be considered *objective* if they are the result of an involuntary omission or error due to a simple deficiency in the administrative or accounting unit **\*859** charged with making the assessments. These errors are usually easy to correct. More serious and dangerous are defects that are *subjective* in origin, which result in, for budgetary entries that include a certain amount of randomness, a tendency to assess income by default and expenditure by excess, or to value excess, income and, by default, expenditure. In the first case, the result will be overly *balanced* budgets that will lead to a counterproductive accumulation of liquid assets. In the second case, the apparent balance conceals an *actual imbalance* that renders the decisions we believed we adopted meaningless and necessitates questioning them during their implementation." Y. Bernard and J.C. Colli, *Diccionario Económico y Financiero [Economic and Financial Dictionary]*, 4th ed., Madrid, Ed. Du Sevil, 1975, pg. 1,123.

According to the Constituent Assembly, the *budget* is not a unitary law, but includes *all* the laws of appropriation. The concept includes "not only ordinary operating expenses, but also permanent improvements, appropriations to public companies and other appropriations, including, needless to say, the principle and interest on public debt, such that a better budget technique can be used." Record of Proceedings, *supra*, Vol. 3, pg. 2009. This same record shows that the legislature granted the Chief Executive broad powers to formulate and control the budget process, albeit within constitutional parameters.

These parameters lead us to the *second* provision —Art. VI, Sec. 7, Const. E.L.A., *supra*, pg. 369— which states: [t]he appropriations made *for an economic year may not exceed the total resources calculated* for *this economic year*, unless it is provided for by *law* the imposition of sufficient taxes to cover these appropriations." (Emphasis added.)

The text reveals that we are dealing with the **\*860** typical clause that imposes "the precaution 'D' of a *balanced budget*. The *amicus curiae* Government Development Bank thus accepts it. *Amicus curiae* argument, pg. 6. This section, for the first time, includes the phrase *total calculated resources*. According to the explanation provided by representative Luis Negrón López, these "are those *resources* which are already *known*, because we know which they will be, such as federal aid, or fixed incomes, or surplus, etc.; and *calculated* resources, ones that depend on the product of taxes and on other

factors, which cannot be foreseen at the *start* of the financial year". (Emphasis added.) Record of Proceedings, *supra*, Vol. 2, pg. 893.

The Constitution thus broke the rigid mold of viewing the budget law as a *single* piece of legislation; "the general budget law is envisaged as a law that will encompass *all the budgets* that the legislature is going to prepare." (Emphasis added.) Record of Proceedings, supra, Vol. 2, pg. 896. This was a response to the modern vision that the "formulation of a government program entails the approval of a general budget and of *much more additional legislation*. There are laws that do not necessarily have to be assigned and, consequently, do not have to go into the general budget law and that refer to the formulation of a government program. *And there are laws that assign funds, which do not have to go into the general budget law* and that form part of the government program that is formulated by the legislature." (Emphasis added.) Id. pg. 898.

This new constitutional focus explains the *double* dynamic, in time, which is substantially projected onto the legislature. The *first* is during the preparation of the budget before July 1. If, "after considering all the resources that are *considered or calculated* for an economic year, *if the legislative power wishes to provide for appropriations beyond those resources*, that is, after considering any issuing of **\*861** bonds, after considering federal aid, after considering contributory and non-contributory income that exists [when all of these resources are exhausted, we can resort to taxation] … absolutely". (Emphasis added.) Record of Proceedings, *supra*, Vol. 2, pg. 894. AT this stage, if there are not any resources, the legislature may not exceed the calculation of these total resources nor issue more appropriations, "unless taxation sufficient to cover [the excess of] these appropriations is provided for by law." Legislative Branch Report, Record of Proceedings, *supra*, Vol. 4, pg. 2587.

The legislature has the same limitation during the course of the already budgeted financial year. If there are not any available funds, it cannot validly make more appropriations, unless it imposes taxes.

Now, what happens when a posteriori the existing budget, appropriations appear-along the way-that exceed resources? The question leads us to Art. VI. Sec. 8 of the Constitution of the Commonwealth,

129 D.P.R. 824

*supra*, pg. 369, which states: "[w]hen the resources available for one financial year do not suffice to cover the *appropriations approved for that year*, we will proceed, in the first place, to the payment of interest and amortization of the public debt, and then, later, other disbursements will be made in accordance with the priorities established by *law*. (Emphasis added.)

By its own terms, this section is not subject to being activated to remedy the situation when the legislature *begins* with a budget deficit, on the ab initio grounds of having incurred appropriations in excess of the calculations of the total resources. The constitutional precept was conceived to remedy exceptional situations created by random and distinct circumstances, outside of legislative developmental spheres, and, of course, of the Chief Executive. It is oriented toward the future: "[i]f **\*862** despite this precaution [balanced budget] the available resources are not sufficient to cover the appropriations, an order of priorities must be established starting with the payment of interest and amortization of public debt. This constitutional priority is adopted in order to ensure guarantees that maintain the public credit, so necessary for the economic improvement of the people." Legislative Branch Report, Record of Proceedings, *supra*, Vol. 4, pg. 2587.

To recapitulate: the *balanced budget* constitutional clause prevents the legislature and the Chief Executive from approving the general budget if they are aware that, in view of the projection of all the available resources, these resources are limited and the appropriations are excessive. At that time none of those powers can "balance" or "square" the budget by activating the exceptional reserve mechanism provided for in Art. VI, Sec. 8 of the Constitution of the Commonwealth, supra, and the provisions of the Accounting Act of the Government of Puerto Rico, Law No. 230 of July 23, 1974 (3 L.P.R.A. sec. 283 *et seq*.) The contrary would mean artificially creating the impression that the budget is balanced, that is, one in which expenses do not exceed estimated resources. In that initial stage, when the approved appropriations exceed the calculated resources, recourse must be made to taxation. If this is not done, as the Governor is constitutionally prevented from endorsing a budget deficit, he must turn to a line-item veto — Const. E.L.A., *supra*, Art. III, Sec. 20 — and lower or eliminate any appropriation that grants funds in more than one item. *Only in this way can the constitutional vice of a budget deficit be overcome at its root.*

It cannot be argued that during the process of approving the budget the Governor can invoke the priorities mechanism contained in Art. VI., Sec. 8 of the **\*863** Constitution of the Commonwealth, *supra*, and the provisions of the Accounting Act of the Government of Puerto Rico, Law No. 230, *supra*. This notion is utterly foreign to the minimal constitutional plan of "maintaining the economic stability of the government." Record of Proceedings, *supra*, Vol. 4, pg. 2587.

We cannot neglect to point out that, under our Constitution, budgets are *annual*. It is important to stress this feature, as many of the arguments of the defendants, the Honorable Hernández Colón, *et al*., also sustained by the *amicus curiae* Government Development Bank, do not take into consideration – and thus lose validity – that the constitutional clauses that govern the solution of the case revolve around this annual period and do not extend beyond it. To the extent that some of the provisions of the Accounting Act of the Government of Puerto Rico, Law No. 230, *supra*, and Organic Law of the Budget and Management Office, Law Num. 147 of June 18, 1980 (23 L.P.R.A. sec. 101 *et seq.*), violate the annual comprehensive constitutional framework, they are invalid. *No law, rule or executive act can oppose the Constitution.*

### III

In view of these constitutional horizons, it is evident that the budget —Resolution No. 163, *supra— at the time of being approved* by the co-defendant, the Honorable Hernández Colón —August 10, 1991— originally contained a deficit of ninety-four million eight hundred seventy-nine thousand two hundred seventy dollars and forty-eight cents ($94,879,270.48). *This mathematical figure is not at issue.* The budget violated Art. VI, Sec. 7 of our Constitution, *supra*, because the appropriations for the 1990-1991 financial year — including the existing obligations of the central government with the Electric Energy Authority — exceeded the *total* resources calculated for the same **\*864** period. If the budget includes *all* the appropriation laws, "which do not necessarily have to be made in a single piece of legislation" —Negrón López, Record of Proceedings, *supra*, Vol. 2, pg. 889— no other conclusion can be drawn.

The truth is that during the 1988-1989 financial year, the central government has not complied with the legal obligation that it assumed of paying the Electric Energy Authority for the cost of the subsidy granted to subscribers. To repeat, this debt amounts to ninety-four million nine hundred

Case:17-03283-LTS Doc#:13004-23 Filed:04/30/20 Entered:04/30/20 12:38:28 Desc:
Hernandez Torres vs. Hernandez Colon...
Exhibit 23 Page 32 of 36

129 D.P.R. 824

thousand eight hundred ten dollars and forty-eight cents ($94,900,810.48).

Note that what we have here is a *self-renewable* appropriation that must be covered with "uncommitted funds". In the oral proceedings (T.E., pg. 40), the Solicitor General *accepted* the definition of "uncommitted funds" prepared by the illustrious chamber, that is, those "*considered as income at the outset of the financial year* to be assigned after the public debt and appropriations provided for by law or *self-renewable appropriations* amounting to $839,657,826" are covered in the budget. (Emphasis added.)

To overcome the unconstitutionality of the budget, in its argument the *amicus curiae* Government Development Bank makes reference to the recommendation of the Committee on Reorganization of the Executive Branch that self-renewable appropriations be eliminated. *Amicus curiae* argument, pgs. 12–13. In a fanciful flight of the imagination it states that the Constituent Assembly "*repudiated* the notion of self-renewable appropriations as an obsolete method for lessening the role of the governor in the formation of the budget." (Emphasis added.) Id., pg. 13. It even goes to the extreme of concluding that "any … constitutional basis for [the] use [of self-renewable appropriations] has disappeared." Id., pg. 25.

These assertions amount to a word game lacking any solid foundation. The reality is that this precautionary note was not *865 reflected in the Constitution. Independent of its wisdom, there is no obstacle whatsoever to self-renewable appropriations. *They are not taboo in our constitutional-legislative arena*. Regarding the matter, it will suffice to recall that the Constituent Assembly had as a backdrop the validity of the Law of the University of Puerto Rico, Law No. 135 of May 7, 1942, subsequently amended, 18 L.P.R.A. ants. secs. 631-658, which as a legislative technique established "as *self-renewable appropriation*, determined annual funds financed with the uncommitted general funds of the State Treasury (18 L.P.R.A. sec. 653(a) (ed. de 1961)). There is no record whatsoever of the alleged "repudiation". The Office of Budget and Management defines self-renewable appropriations as those "resources of the General Fund authorized by the legislature for specific purposes and that are repeated annually, *until the legislature decides on something else."* (Emphasis added.) *Glossary of Definitions of Terms—First Budget Volume, 1991-1992*, pg. 16. Accounting

Act of Puerto Rico, Law No. 230, *supra*, recognizes this type of automatic appropriation (3 L.P.R.A. sec. 283g(j)). [4]

4   See also *Esso Standard Oil vs. A.P.P.R.*, 95 D.P.R. 772 (1968), which takes as a backdrop Joint Resolution No. 103 of June 24, 1958, which granted a *self-renewable appropriation* to the Port Authority. From the legislative record of that resolution, it can be gathered that the notion of "self-renewable appropriation" consists in funds that will automatically be reproduced throughout a pre-established period, *except where otherwise provided.*

The post-constitutional validity of this type of self-renewable budget appropriation has served as a basis for the continued efforts of the Judiciary wherein it requests from the executive and legislative powers, "as required by law, the budget for … *self-renewable* items whose appropriation does not have to be justified annually to the legislature and the Governor. *Report to the *866 Supreme Court of Committee from the Committee on the Study and Assessment of the Judicial System*, presided over by José Trías Monge, March 1965, pg. 40. See: *Puerto Rican Judiciary*, Judicial Conference of Puerto Rico, October 1981, pgs. 377–383; *Judicial Independence in Puerto Rico*, Judicial Conference of Puerto Rico, October 1988, pgs. 122–123; *In re: Judicial Conference of P.R., Special Session*, Supreme Court Decision of October 10, 1989.

To overcome this reality, in their arguments, the defendants, the Honorable Hernández Colón, *et al.* and the *amicus curiae* Government Development Bank insist that the self-renewable appropriation of Law No. 4, *supra*, was "*implicitly repealed[a]* in the legislative action of ignoring the item, obeying a political judgment (executive-legislative) of attending to the subsidy by means of funds of the A.E.E [Electric Energy Authority]." (Emphasis added.) Appellants' argument, pg. 65. The question merits a certain degree of explanation, for in the oral proceedings the Solicitor General reiterated the argument of implicit repeal, although she recognized the existence of the debt on the part of the Government, which would be addressed in the fifteen-day (15) payment plan agreement. T.E., pgs. 8–12. We do not understand how the argument of implicit repeal can be argued, and, nonetheless, it is accepted that the Government assumed that obligation. Even so, we will analyze the approach of implicit repeal.

This approach is based on two (2) arguments. The first, which in the budget details submitted by the Governor to the legislature during the last three (3) years, indicated that the Electric Power Authority

Case:17-03283-LTS Doc#:13004-23 Filed:04/30/20 Entered:04/30/20 12:38:28 Desc:
Hernandez Torres vs. Hernandez Colon... Exhibit 23 Page 33 of 36

129 D.P.R. 824

would assume the payment of the subsidy; the second, that Joint Resolution No. 163 *supra* did not allocate those funds. On that matter, the illustrious court correctly decided that the budget details projected in the "amendments are the breakdowns of the *budget* request that the executive power **\*867** submitted to the legislative power to back its General Budget Project. *They are not law, nor do they form part of the Joint Resolution of the General Budget that the legislature ultimately approves. The chambers may approve or not approve the budget recommendations."* (Emphasis added.) Annex I, pg. 1AA.

Now, arguing that these expressions formed part of Resolution No. 163, *supra*, we would be faced with an invalid *act*. In contrast to the Federal Constitution, ours, in its Art. III, Sec. 17, Const. E.L.A., *supra*, pg. 344, states: "The general budget law only may contain appropriations and rules for the disbursement thereof." This clause strictly prohibits that matters that are not germane (*ryders*) be included in the General Budget Law. See Record of Proceedings, *supra*, Vol. 2, pgs. 919– 920. In other words, the doctrine that rejects implicit repeals of the *substantive elements of a law* —due to silence or implication— through a subsequent General Budget Law, *has constitutional status in Puerto Rico.* In the face of this crucial difference, it is hard to explain how the *amicus curiae* Government Development Bank invokes as judicial authorities the *City of Los Angeles vs. Adams*, 556 F.2d 40, 48 (Cir. D.C. 1977); *Republic Airlines, Inc. vs. U.S. Dep. of Transp.*, 849 F.2d 1315, 1320 (10th Cir. 1985), and *United States vs. Dickerson*, 310 U.S. 554, 555 (1940). *These cases, at face value, are distinguishable, settled under a congressional rule 'D', not a constitutional limitation.* Curiously, *Soto vs. MacLeod*, Auditor, 56 D.P.R. 807, 814–815 (1940), also cited to argue that a General Budget Law can amend a law containing a separate appropriation, is clearly *inapplicable.* Beyond the legislative will, it was expressed in a *specific* reduction of a salary from four thousand dollars ($4,000) to three thousand one hundred thirty-five dollars **\*868** ($3,135), an item *of the budget itself,* and not of a substantive character.

We clarify that except for that constitutional limitation, we do not deny the power of the legislature to invalidate a law or renewable appropriation, creator of obligations. Now, its ongoing nature requires that it be an express *derogation*; the legislative will should emerge transparently. Here this is not so. It should be emphasized that the 1989-1990 budget was approved on

July 30, 1989. Six (6) days earlier, the obligation had been *reiterated* by the chief executive through Law No. 34, supra, amending Sec. 22(b)(1) and (2) of the Electric Energy Authority of Puerto Rico Act, 22 L.P.R.A. sec. 212(b)(1) and (2). That amendment *did not change* the original mandate that the "cost of the previous subsidy will constitute an obligation of the Commonwealth of Puerto Rico that *must be covered with any non-committed funds of the Treasury,* no later than sixty (60) days from the monthly billing of the Treasury Department Authority for this item." (Emphasis added.) 22 L.P.R.A. sec. 212(b)(1).

Even more, one (1) year and four (4) months later, the defendant, the Honorable Hernández Colón, unequivocally reiterated the criteria that it was a valid annual obligation, which would be covered with committed State Treasury Funds. To this end, on November 21, 1990, approving the *rule* for the granting of the subsidy, he ordered that the "*cost* be covered by the General Fund of the State Treasury" (Rule 1.4r), and that the "[[6]c]ontribution of the Government of Puerto Rico for payment of the subsidy in the month or year 'D' (Rule 2.4a) be taken into consideration in the adjustment formula. Unambiguously, the Honorable Hernández Colón transparently recognized and affirmed his conviction that "[t]he subsidy or credit in the invoice to which the *Law and this Rule* refer constitutes an *economic obligation* of the Central Government of Puerto Rico, *which is covered with uncommitted* **\*869** *funds of the State Treasury*" (Rule 7.1a). (Emphasis added.)

It is not necessary to go into further detail. The argument of implicit repeal runs up against the Constitution, the actions of the Chief Executive and other legal foundations. As the renowned judge ruled, "[n]either the Governor nor the legislature *can ignore the mandate of law that compels them to assign money for payment of the subsidy. While the law remains in force, it must be obeyed.* If the Governor or legislative chambers wish to alter the burden of the subsidy they must take affirmative action with respect to the law in order to amend or repeal it. What they cannot do is circumvent the self-renewable appropriation as if the law did not exist, despite the fact that it remains in full effect without having been changed or amended in any way and the subsidy has continued providing … We believe that the omission of the appropriation in the present Budget for the payment of the referred to subsidy is not rectified with the alleged commitment to submit *prospective* legislation." (Emphasis added.) Annex I, pgs. 1EE–1FF and 1II.

Case:17-03283-LTS Doc#:13004-23 Filed:04/30/20 Entered:04/30/20 12:38:28 Desc:
Hernandez Torres vs. Hernandez Colón, 129 D.P.R. 824 (1992)
Exhibit 23 Page 34 of 36

129 D.P.R. 824

## IV

*Balanced budget* is not a dirty expression. To attain it, we cannot lose sight of the close relationship between the Electric Energy Authority and the other public corporations created to make viable and possible the taking of money provided through the "issuing of bonds" for public purposes, *thereby supplementing the General Fund.*

In economics, as in other areas of human endeavor, excesses are bad. In contrast to major powers, marginal economies such as the Puerto Rican economy depend fundamentally on credit as a stimulus. They have to guarantee as transparently as possible their *credit* **\*870** solvency. The word *BONDHOLDER* is crucial for Puerto Rico; constitutionally and legally it is considered, and guarantees, the highest status possible.

Puerto Rico uses the dollar as paper currency. We do not have the authority to create more of the same by printing currency or credits. This obligates us to make the best use possible of monetary theories to influence the different stages of our economy. We take judicial note of the different government programs and innumerable laws aimed at stimulating the economy, and thus counteracting the high level of chronic unemployment and negative saving. The alternative of taking loans (bonds, etc.) and injecting them into the country through the Government Development Bank, the Electric Energy Authority, the Public Buildings Authority and the Aqueduct and Sewer Authority has been traditional practice. In a free market this entails attracting capital and requires credit *ratings* (*Standard and Poor's—Moodys*, etc.) To avoid creating shadows and to strengthen the credibility of a good debtor, the principle of a *balanced budget* and control of budget margin is enshrined in the Constitution. This explains the *relationship* between the total debt of Puerto Rico and annual public revenue, and it is one of the reasons traditionally put forward to discourage the Treasury Department from wiping "uncollectable debt" from its computers.

Certainly, in the Constitution, the balanced budget represents the cornerstone of our past and present economic growth. It is ingrained in our Fundamental Law, as a message to the financial community of the United States that our Government *would not spend more* than it collected in taxes, federal contributions, etc. That message was so important that the desire to restore credibility and provide the

the broadest guarantees to investors in the important public housing **\*871** program resulted in the "advisory opinion" rejected in *E.L.A. vs. Aguayo*, 80 D.P.R. 552 (1958).

The appearance of the *amicus curiae* Government Development Bank mixes together valid economic theories that cannot be implemented in this reality. Unbalanced budgets, even deficient ones, are *complex medicines* for modern capitalism, not viable in an economy such as ours, so singularly directed by government function and one that depends primarily on government credit to inject life into development capital.

We recognize that it is not the responsibility of this court to establish or offer guidelines for the political economy of the country. This does not mean, however, that we must *abdicate* the duty of ensuring that the minimum standards that the people expressed in the Constitution are met. We cannot allow a harmonious interrelationship of the chief executive and the legislature undermine the Constitution for the sake of overcoming temporary situations, whether they are political-partisan or not.

The majority opinion involves an elusive rule on the standing to sue and sacrifices substance and justice. The application of that restrictive theory of access to the court is at the cost of the credit and financial reputation of the country. This suggests dire consequences for the people in general and future administrations.

Leaving unread the constitutional clause which, guaranteeing the good credit of the E.L.A., *requires a balanced budget*, is the equivalent of ignoring that our economic mechanism viewed credit as a means of governmentally influencing the amount of local money in circulation. *It was thus placed in the Constitution because it was believed to be necessary and indispensable.* We must avoid allowing prevailing winds to shake the foundations of this cornerstone of our economy; we must respect the clear letter of the Constitution.

The technique of budget deficits as the basis for addressing serious social problems, until **\*872** were considered healthy if they were used in moderation, kept the cost of debt current and if in reasonable cycles were counterbalanced with amortizations (surplus). This was possible in countries with the ability to print and create currency using the gross value of national production as the main base. However, it is very dangerous, risky and possibly fatal for Puerto Rico, which does not possess that power and depends only on credit to obtain the resources that need to be used in economic development. This is another reason

129 D.P.R. 824

why the guarantee of a *balanced budget* was wisely included in the Constitution.

**V**

We will conclude with a clarification. In this dissent we have demonstrated that the process that was followed to approve the current budget is unconstitutional. The underlying element nourishing this conclusion has been that the generalized practice of annually omitting to allocate sufficient resources to meet the debts assumed with public corporations, accumulating millions of dollars in debt and thus covering up a budget deficit, *is invalid.* The use of the resources of public corporations to finance programs or to cover the budget deficit is unconstitutional because it breaks the framework of autonomy and fiscal separation that serves as the basis for these instrumentalities. It tends to undermine its economic solidity, which eventually leads to rate increases that must be paid by all consumers. It is unconstitutional that the Government spends the money of public corporations and that the latter assumes the debt.

Resolving these constitutional realities is not, as the majority says, "to [assume] the function that Plato assigned to the philosopher kings…" Majority opinion, pg. 849. If this were so, we discharge it platonically 'D', that is, **\*873** "[i]deally disinterestedly, honestly." *Diccionario de la Lengua Española, op. cit.*, pg. 1075.

We reiterate *our preliminary dissenting* opinion that it is not constitutionally permissible that the legislature or the Chief Executive excludes from the budget the totality of government debts with public corporations for services rendered. The practice means that the books will never reflect the total amount actually owed, approximately eight hundred million dollars ($800,000,000). *The documentary sleight of hand must not hide a truly deficient budget, one balanced artificially.*



**SUBMISSION ID:**

**DATE OF TRANSLATION:** 31-Jul-15

**ELECTRONIC FILE NAME:** Dissenting Opinion of Associate Judge Negrón García in Hernández Torres v. Hernández Colón, 1992 D.P.R. 824 (1992).

**SOURCE LANGUAGE:** Spanish

**TARGET LANGUAGE:** English

**TRANSPERFECT JOB ID:** TPT733598

TransPerfect is globally certified under the standards ISO 9001:2015 and ISO 17100:2015. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

TCert v. 2.0