**NATBONY REPLY DECLARATION**
**EXHIBIT 65**

| 100TH CONGRESS  2d Session | HOUSE OF REPRESENTATIVES | REPORT 100-1011 |
|---|---|---|

# MUNICIPAL BANKRUPTCY AMENDMENTS OF 1988

SEPTEMBER 30, 1988.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. RODINO, from the Committee on the Judiciary, submitted the following

# REPORT

[To accompany H.R. 5347]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 5347) to amend title 11 of the United States Code with respect to claims payable from special revenues by municipalities that are debtors; and for other purposes, having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

### PROCEDURAL BACKGROUND OF H.R. 5347

On January 25, 1988, Congressman Don Edwards introduced H.R. 3845, legislation to amend chapter 9 of the bankruptcy laws.

On September 8, 1988, the Subcommittee on Monopolies and Commercial Law held a hearing on H.R. 3845. Testimony was received from: Honorable Iola Williams, Vice-Mayor and Councilmember, San Jose, California, on behalf of the National League of Cities;[1] Richard Levin, Esq., of Stutman, Treister & Glatt, on behalf of the National Bankruptcy Conference; and James E. Spiotto, Esq., of Chapman and Cutler, on behalf of the National Association of Bond Lawyers. All witnesses supported the legislation.

On September 22, 1988, the Subcommittee held a mark-up of H.R. 3845, adopted an amendment in the nature of a substitute introduced by Mr. Edwards to make technical corrections, and favorably reported the legislation by voice vote. The technical correc-

---

[1] Councilmember Williams stated that her appearance was also made on behalf of the National Governor's Association, National Conference of State Legislatures, National Association of Counties, U.S. Conference of Mayors, Government Finance Officers Association, and the National Association of State Budget Officers, all of which supported the legislation.

19-006

tions included correcting the citation to a subsection of the definitional part of the Bankruptcy Code, and amending the table of sections within chapter 9 of the Code to reflect the changes made by the bill.

Mr. Edwards introduced H.R. 5347 on September 23, 1988 as a clean bill consisting of the amendment in the nature of a substitute adopted by the Subcommittee.

On September 27, 1988, the Committee on the Judiciary ordered H.R. 5347 favorably reported, by voice vote.

## BACKGROUND AND SUMMARY OF H.R. 5347

### I. BACKGROUND

Under the bankruptcy law, a municipal bankruptcy is the bankruptcy of a city, town, or other state subdivision, or public agency or instrumentality of a state (such as a school district or sanitary district). A municipality is different from other debtors who file bankruptcy, because, unlike other debtors, a municipality cannot simply go out of business. It must continue to provide its residents with essential services such as police protection, fire protection, sewage and garbage removal, and schools. Thus, chapter 9 of the Bankruptcy Code (11 U.S.C. 901 et. seq.) is designed just for municipalities, to keep them in existence by allowing municipalities to adjust their debts (11 U.S.C. 941).

Statutory provisions governing the bankruptcy of a municipality were first enacted in the 1930's. New York City's financial problems of the early 1970's focused attention on municipal bankruptcy provisions, and led to an amendment to Chapter IX of the old Bankruptcy Act in 1976. In 1978, when the new Bankruptcy Code was written, the provisions of old Chapter IX were largely incorporated into the new law as chapter 9. Most of the other general business bankruptcy provisions in the new law, such as the treatment of secured claims, liens and the preference provisions, were incorporated by reference into the new chapter 9.

Concern has been voiced in recent years that some of these general business bankruptcy provisions—most prominently the avoidance under section 552(a) of the Bankruptcy Code (11 U.S.C. 552(a)) of a lien resulting from a pre-petition security interest on property acquired post-petition—are inconsistent with principles of municipal finance, particularly with respect to public works projects financed by revenue bonds. No major municipal bankruptcy has occurred to validate these concerns, but supporters of reform argue—and the Committee agrees—that the potential for harm does exist.

The financial crisis that confronted the city of Cleveland, Ohio in 1979 sparked some of the current concerns. Testimony at the Subcommittee on Monopolies and Commercial Law hearing on September 8, 1988 by both the National Association of Bond Lawyers and the National Bankruptcy Conference indicated that the city's lenders were unwilling to extend additional financing to the city during its financial problems because of lenders' concerns about the applicability of section 552(a) of the bankruptcy law to invalidate the lenders' liens should Cleveland file for bankruptcy. Fortunately, Cleveland did not have to file bankruptcy, and the law was not tested.

Municipal bankruptcies do not occur frequently. According to the Administrative Office of the United States Courts, there have been 35 chapter 9 bankruptcies filed since the enactment of the Bankruptcy Reform Act of 1978; most of these debtors were small entities such as utilities, sanitary districts, hospitals and schools. Only a very few towns or cities have filed bankruptcy—some in response to a large judgment rendered against a small town which the town is unable to pay. While there is not great use of chapter 9, the effect of a municipal bankruptcy in terms of providing essential services to residents can be great.

One municipal bankruptcy that has been filed under the Bankruptcy Reform Act of 1978 was by the San Jose, California Unified School District on June 30, 1983. As Hon. Iola Williams, Vice-Mayor and Councilmember of San Jose, testified to the Subcommittee on Monopolies and Commerical Law at its hearing:

> [c]onfronted with California's Proposition 13 and severe labor problems, the school district became insolvent in the middle of bitter labor negotiations. The vast majority of creditors were individual teachers.[2]

Though section 552(a) of the bankruptcy law would seem to terminate the lien of pre-petition revenue bondholders on specific monies, and though section 547 would seem to make payments to such bondholders within ninety days prior to bankruptcy preferences, San Jose continued post-petition to make payments to these bondholders in the same manner as if no bankruptcy has been filed. Payments were made with property tax revenues on which the bondholders held liens.

There were at least two reasons why the San Jose School District, in the words of Vice-Mayor Williams "ignored the federal law."[3] First, San Jose believed it was limited by California's Constitution (Article XIIIB, sec. 1, commonly referred to as Proposition 13) from using the pledged property tax revenues for any purpose other than paying the revenue bondholders. Second, as Vice Mayor Williams told the Subcommittee:

> it became immediately evident that the district had to make clear to the system's bondholders that the action would not in any way impair their rights. If the district had defaulted on those bond obligations, it would have caused irreversible harm to the school district's ability to issue debt for any other public purpose.[4]

Subsequent to its chapter 9 bankruptcy filing, the San Jose School District resolved its labor problems, and dismissed its bankruptcy before any challenges to its actions were raised and resolved.

The Committee believes that the potential problem in the bankruptcy laws as applied to municipal bankruptcies should be remedied. H.R. 5347 remedies the inconsistencies between bankruptcy law and principles of municipal finance to remove the potential for problems that now exist.

---

[2] Hearing on H.R. 3845, Legislation to Amend Chapter 9 of the Bankruptcy Code, September 8, 1988, Subcommittee on Monopolies and Commerical Law, 100th Cong., 2d sess.
[3] Id.
[4] Id.

## II. MUNICIPAL FINANCE

Municipalities finance public works projects primarily with one of two types of bonds: general obligation bonds and special revenue bonds. General obligation bonds are bonds backed by and repaid from the general treasury funds of a municipality. In the event of a default, the bondholders can lay claim to any of the non-exempt assets of the municipality for repayment. General obligation bonds are like unsecured debt.

Special revenue bonds, on the other hand, are usually backed by and repaid only from the revenues generated from the physical asset built with the money raised by the bond offering. A lien in favor of the bondholders exists on this revenue stream, but not on the physical asset itself; it would violate public policy to permit the possibility of a foreclosure on a public facility. In the event of a default, bondholders cannot look to any other assets of the municipality for repayment. Only the income stream generated by the asset or the income specifically pledged as security by the municipality can be used. Special revenue bonds are issued so that if the asset financed fails, repayment will not come out of general treasury funds—meaning the taxpayer will not have to foot the bill.

## III. PRIMARY CONCERNS COVERED BY H.R. 5347

The main problem with the municipal bankruptcy laws raised by supporters of H.R. 5347 is that under section 552(a) of the Bankruptcy Code, made applicable to chapter 9 cases by section 901, property acquired by a debtor after filing bankruptcy is not subject to any lien created prior to bankruptcy. In a municipal bankruptcy, this means that the lien created by a revenue bond issued prior to bankruptcy is extinguished. The post-petition revenues generated by the asset financed would then not be used to repay holders of revenue bonds. Instead, the revenues would go into the general treasury, for distribution to all creditors of the municipality—including the special revenue bondholders—on a pro rata basis. Since the general treasury funds in a municipal bankruptcy situation will generally be inadequate to pay all creditors in full, this could mean that revenue bondholders will ultimately receive much less than what they thought to be the value of their lien interest.

As stated earlier, one of the purposes of revenue bonds is to ensure that if the asset financed fails, general taxpayer funds will not be used to repay the debt. The effect of section 552, which could result in general treasury funds being used to repay revenue bondholders, would be to defeat this purpose. In some states, it might even run afoul of state constitutions and statutes if general treasury funds are used to repay specific revenue bond obligations. Special revenue bonds of a bankrupt municipality would essentially be turned into general obligation bonds—but without the authorization by popular vote usually required before a municipality can issue a general obligation bond. There may also be a danger that the municipality's general debt limit could be exceeded.

H.R. 5347 would eliminate this problem by making special revenues still subject to a post-petition lien in a chapter 9 bankruptcy, notwithstanding section 552(a).

Another potential problem in the bankruptcy laws in the case of a municipal bankruptcy is the possible application of the section 547 preference provisions to the payments made on a special revenue bond. Under section 547, incorporated into chapter 9 by section 901, payments made to a creditor within 90 days prior to a bankruptcy filing can be recovered by a debtor if the payments were more than that creditor would have received had the debtor filed a chapter 7 liquidation bankruptcy. In the municipal bankruptcy context, section 547, coupled with section 552's extinguishing of liens, means that payments made to a holder of a revenue bond within 90 days prior to bankruptcy might be subsequently recovered by the debtor from the bondholder as a preference.

H.R. 5347 would make section 547 inapplicable to a revenue bond so there could be no potential preference problem.

A third potential problem involves the operation of section 1111(b), incorporated into chapter 9 by section 901, which might convert special revenue bonds from bonds that have no recourse against general municipal treasury funds into bonds that do have recourse against the treasury. This would again raise the difficulties mentioned above. H.R. 5347 eliminates this possibility.

### IV. POSSIBLE EFFECT ON ABILITY OF MUNICIPALITY TO OBTAIN FINANCING

Proponents of the legislation argue that in the absence of the changes contained therein, municipalities—particularly the small to medium-sized cities—may have trouble raising money through special revenue bonds, disrupting the municipal finance market and harming the municipalities. Lenders may be reluctant to advance funds for projects, particularly in municipalities that are having some financial difficulties, when the possibility exists that the lien securing repayment could be avoided if the municipality files bankruptcy. Proponents argue that bond rating agencies may downgrade the creditworthiness of certain special revenue bonds because of what could happen in a bankruptcy. Proponents acknowledge that this has not seemed to have happened yet, but say this is only because of what they term the relatively good financial condition now of state and local governments.

### V. SECTION-BY-SECTION ANALYSIS

*Section 1* amends the definition of "insolvent" in section 101(31) of the Bankruptcy Code with respect to municipalities so that an insolvent municipality is one that is either not paying or is unable to pay its debts—except debts that are in good faith disputed—when they come due. The existing definition of insolvent, generally that liabilities exceed non-exempt assets, does not really apply to municipalities. Most of the assets of a municipality are exempt and cannot be used for the repayment of debt. Accordingly, the liabilities of even financially sound municipalities will in most cases exceed their non-exempt assets, and, under existing law, these municipalities would be considered insolvent. The change made by section 1 corrects this, and ensures that financially sound municipalities will not be considered insolvent. What is important to creditors

is not the value of a municipality's assets, but rather the ability of the municipality to repay its debts.

The present tense used in the amendment to the definition of insolvent refers to the time at which the definition is important—for instance, at the petition date for purposes of section 109(c), and the transfer date for purposes of section 547.

*Section 2* amends section 109(c)(3) of the Bankruptcy Code to strike language which, in light of the change made by section 1, is rendered duplicative.

*Section 3* makes section 1129(a)(6) of the Bankruptcy Code, which is applicable to chapter 11 debtors, applicable to chapter 9 debtors as well. Section 1129(a)(6) requires, as a condition of plan confirmation, that any government regulatory commission with post-confirmation jurisdiction over the rates charged by a debtor approve any rate change provided for in the plan—or, alternatively, that any rate change provided for in the plan be conditioned on getting this regulatory commission approval. Since municipal utilities are subject to the rate regulation in some states, this requirement of section 1129(a)(6) is incorporated into chapter 9.

*Section 4* adds a new subsection (2) to Bankruptcy Code section 902 to provide a definition for special revenues in chapter 9. Defining the scope of special revenues is key to the legislation, since a primary purpose of the legislation is to eliminate the possibility of avoiding a lien on post-petition special revenues under section 552(a) of the Bankruptcy Code. The intent is to define special revenues to include the revenue derived from a project or from a specific tax levy, where such revenues are meant to serve as security to the bondholders.

Five categories of special revenues are covered by the legislation. The first type, described in new subsection (2)(A), consists of receipts derived from the ownership or operation of a debtor's systems or projects used to provide transportation, utilities, or other services. It would include receipts from the operation of water, sewage, waste, or electric systems.

The second type, described in new subsection (2)(B), covers special excise taxes imposed on particular activities or transactions—such as an excise tax on hotel or motel rooms imposed by some municipalities or an excise tax on the sale of alcoholic beverages. A general sales tax, which is not imposed on particular activities or transactions, would not be a special revenue.

The third type, described in new subsection (2)(C), includes as special revenues incremental tax receipts from the benefited area in the case of tax-increment financing. For example, if a financed public improvement causes the property values around it to go up, the owners of this surrounding property may pay higher property taxes because of it. The amount of the increased property taxes attributable to the rise in property value resulting from the public improvement would be special revenues under subsection (2)(C). Although these types of receipts would be collected as part of the general tax levy, they are considered to be attributable to the financed public improvements, and so are not part of the pre-existing tax base of the community.

Examples of the fourth type of special revenues, described in new subsection (2)(D), those derived from particular functions of the

debtor, include regulatory fees and stamp taxes imposed for the recording of deeds.

The fifth type of special revenues, described in new subsection (2)(E), includes taxes levied to finance a particular project. This does not include a general property, sales, or income tax, except as described in new subsection (2)(C). A tax levied to finance the construction of a stadium would be a special revenue under clause (2)(E).

*Section 5* adds two new subsections to Bankruptcy Code section 922, dealing with the automatic stay applicable to a chapter 9 case. New subsection (c) gives administrative claim status to a secured creditor who has been given adequate protection to protect its interest, but who suffers loss anyway because of the application of the stay or the granting of a lien under Bankruptcy Code 364(d). This is justified because the loss to the creditor is not due to the creditor's action, but rather to an attempt to benefit the debtor. It essentially makes a rationale already accepted in the Bankruptcy Code in section 507(b) (which does not apply in chapter 9) applicable to chapter 9.

To help achieve a primary goal of the bill, new subsection (d) to section 922 states that the automatic stay of Bankruptcy Code section 362 does not operate to stay paying pledged revenues, consistent with new section 927 of the Bankruptcy Code, to the revenue bondholders holding liens on such revenues.

*Section 6* amends Bankruptcy Code section 926 to make the preference provisions of section 547 inapplicable to note payments, bond payments and defeasances in a chapter 9 bankruptcy. The possibility that a chapter 9 debtor will prefer some bondholders over others does not appear to be great, so preference provisions are not as necessary in such situations. At the same time, the ability of municipalities to obtain future financing will be enhanced if bond or note payments made in good faith during the period prior to bankruptcy cannot be avoided post-petition as a preference. A fraudulent transfer to noteholders or bondholders can still be avoided because of the applicability of section 548 to chapter 9 cases.

*Section 7* adds a new section 927 to chapter 9 to ensure that non-recourse revenue bonds cannot be converted, under section 1111(b) of the Bankruptcy Code, into recourse, or general obligation debt. Permitting a revenue bond to be essentially converted into a general obligation bond, in addition to greatly hindering the prospects for troubled municipalities to get future financing because of lender concerns over loss of lien status, may violate some state constitutions and statutes—in states where general obligation bonds can only be issued constitutionally with the approval of the electorate, or in states with statutes setting forth the general debt limit (towards which revenue bonds do not count). New section 927 leaves the legal and contractual limitations of revenue bonds and state law intact without otherwise altering Bankruptcy Code provisions with respect to nonrecourse financing.

*Section 8* adds a new section 928 (a) and (b) to chapter 9 of the Bankruptcy Code, and is key to the bill. New subsection (a) states that a lien on special revenues acquired by the debtor after the commencement of the case cannot be avoided under Bankruptcy

Code section 552(a); the lien is still valid post-petition. Without new subsection (a), the risk exists that a lien on special revenues could be avoided under Bankruptcy Code section 552(a), effectively turning the revenue bond into a general obligation bond. This would give rise to the problems mentioned above in the discussion of section 7 of H.R. 5347. By eliminating this risk, section 8 should make it easier for troubled municipalities to obtain needed financing of public projects.

New subsection 928(b) ensures that in the case of project financing (such as financing construction of an electric generating plant by debt secured by a lien on revenues generated by the sale of power from the plant) or system financing (such as financing improvements to a local electric distribution system by debt secured by a lien on revenues of the entire system), the lien on special revenues will be subordinate to the necessary operating expenses of the project or system. This is important because payment of operating expenses—those necessary to keep the project or system going—must be protected so that the project or system can be maintained in good condition to generate the revednue to repay bondholders (and, importantly, to provide residents of the municipality with the service the project or system is meant to deliver). Bonds secured by municipal betterment assessments are excepted from subsection (b) in recognition of the fact that operating costs related to these assessments (which are often levied to finance construction of sewers, streets, and the like) are financed separately, not from special revenues, but from current user charges or taxation; in the case of bonds secured by these assessments, subordinating the lien to operating expenses would materially change the bargain.

Subsection (b) sets forth a minimum standard for paying operating expenses ahead of debt service where revenues are pledged. It is not intended to displace any broader standard contained in the terms of the pledge or applicable nonbankruptcy law.

*Section 9* adds a new section 929 to the Bankruptcy Code to bring treatment of municipal leases in bankrupcty into conformity with how such leases are treated and used in the world of municipal finance. New section 929 says that a lease to a municipality shall not be treated as an executory contract or unexpired lease that could be subject to assumption or rejection under section 365, or that could give rise to a claim for damages limited by section 502(b)(6), just because it is subject to termination in the event the debtor fails to appropriate rent. For reasons unique to municipalities, many financial leases are required to be subject to appropriation of the rent. They are generally marketed as debt obligations and treated as debt obligations for tax purposes; to be consistent, new section 929 treats municipal leases as such for bankruptcy purposes.

*Section 10* adds a new subsection (6) to section 943(b) of the Bankruptcy Code, dealing with plan confirmation requirements in chapter 9. New subsection (6) says that if regulatory or electoral approval is necessary under nonbankruptcy law to carry out any provision of the plan, either such approval must be obtained before the court can confirm the chapter 9 plan, or this provision of the plan must be expressly conditioned on getting such approval. Many municipal actions require regulatory or electoral approval under con-

stitutional, statutory or charter provisions. These approvals are not limited to rates, but extend often to such other matters as the acquisition or disposition of property or the incurring of indebtedness. If such approval is required before certain action can be taken by a municipality, either it must be obtained before the plan can be confirmed, or the provisions in the plan setting forth this action must be expressly conditioned on getting such approval. New subsection (6) does not require electoral approval for the plan, just electoral approval for actions to be taken under the plan that would require electoral approval if taken otherwise than under the plan.

*Section 11* is a technical amendment to the table of sections to chapter 9 of the bankruptcy laws that adds in the new sections added by this legislation.

*Section 12* sets forth the effective date for the amendments made by H.R. 5347. The effective date is the date of enactment, and the amendments will apply only to bankruptcy cases filed on or after the date of enactment of the legislation. This legislation, therefore, should not be construed to affect or prejudice chapter 9 cases pending on the date of enactment.

INFORMATION SUBMITTED PURSUANT TO RULES

FEDERAL ADVISORY COMMITTEE ACT OF 1972

The Committee finds that this legislation does not create any new advisory committee within the meaning of the Federal Advisory Committee Act of 1972.

OVERSIGHT FINDINGS

This Committee exercises oversight responsibilities with respect to the bankruptcy laws of the United States. No findings or recommendations of the Committee on Government Operations were received as referred to in rule XI, clause 2(l)(3)(D).

INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(l)(4) of rule XI, the Committee estimates that this bill will not have an inflationary impact on prices and costs in the operation of the national economy.

NEW BUDGET AUTHORITY

Pursuant to clause 2(l)(3)(B) of rule XI, the Committee estimates that the bill creates no new budget authority or new or increased tax expenditures.

COST

Pursuant to clause 7 of rule XIII, the Committee states that it concurs with the estimate submitted by the Congressional Budget Office as set forth below.

BUDGET STATEMENT

Pursuant to clause 2(l)(3)(B) of rule XI, the following estimate was prepared by the Congressional Budget Office and submitted to the Committee:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, September 28, 1988.*

Hon. PETER W. RODINO, Jr.,
*Chairman, Committee on the Judiciary,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed H.R. 5347, a bill to amend title 11 of the United States Code with respect to claims payable from special revenues by municipalities that are debtors, and for other purposes, as ordered reported by the House Committee on the Judiciary, September 27, 1988. Enactment of this bill would result in no costs for the federal government, and could result in some savings for state and local governments. These savings are very uncertain, however, and depend on conditions and events that we cannot predict.

H.R. 5347 would amend the federal bankruptcy laws to clarify provisions concerning revenue bonds issued by municipalities and the separate rights of revenue and general obligation bond holders. (Revenue bonds are issued to finance a specific program or project and are secured by a lien on the revenues generated by that program or project, while general obligation bonds are secured by a pledge of the general taxing power of the issuer.) These amendments would resolve conflicts between the bankruptcy laws and state and local law governing municipal finance, and reduce investors' uncertainty.

Under existing conditions, enactment of this legislation probably would not have a significant impact on the cost of municipal debt, because the issues addressed by the bill are not a major factor affecting bond rates. It is possible, however, that a future legal ruling based on current law could undermine the security of bond holders and disturb the municipal bond market. All cities could then face higher borrowing costs and a city experiencing serious financial difficulties could find it very difficult or impossible to issue revenue bonds. By clarifying the law, H.R. 5347 should help to prevent this situation. The CBO cannot predict, however, whether such a situation would arise, or exactly how the markets would respond in the absence of this legislation.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contact is Marjorie Miller, who can be reached at 226-2860.

Sincerely,

JAMES L. BLUM,
*Acting Director.*

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change in proposed is shown in roman):

# TITLE 11, UNITED STATES CODE

\* \* \* \* \* \* \*

## CHAPTER 1—GENERAL PROVISIONS

\* \* \* \* \* \* \*

**§ 101. Definitions**

In this title—
    (1) \* \* \*

\* \* \* \* \* \* \*

    (31) "insolvent" means—
        (A) with reference to an entity other than a partnership *and a municipality*, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—
            (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
            (ii) property that may be exempted from property of the estate under section 522 of this title; 【and】
        (B) with reference to a partnership, financial condition such that the sum of such partnership's debts is greater than the aggregate of, at a fair valuation—
            (i) all of such partnership's property, exclusive of property of the kind specified in subparagraph (A)(i) of this paragraph; and
            (ii) the sum of the excess of the value of each general partner's nonpartnership property, exclusive of property of the kind specified in subparagraph (A) of this paragraph, over such partner's nonpartnership debts; *and*
        *(C) with reference to a municipality, financial condition such that the municipality is—*
            *(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or*
            *(ii) unable to pay its debts as they become due;*

\* \* \* \* \* \* \*

**§ 109. Who may be a debtor**

  (a) \* \* \*

\* \* \* \* \* \* \*

(c) An entity may be a debtor under chapter 9 of this title if and only if such entity—
    (1) is a municipality;
    (2) is generally authorized to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;

(3) is insolvent [or unable to meet such entity's debts as such debts mature]:

\*   \*   \*   \*   \*   \*   \*

## CHAPTER 9—ADJUSTMENT OF DEBTS OF A MUNICIPALITY

### Subchapter I—General Provisions

Sec.
901. Applicability of other sections of this title.
902. Definitions for this chapter.
903. Reservation of State power to control municipalities.
904. Limitation on jurisdiction and powers of court.

### Subchapter II—Administration

921. Petition and proceedings relating to petition.
922. Automatic stay of enforcement of claims against the debtor.
923. Notice.
924. List of creditors.
925. Effect of list of claims.
926. Avoiding powers.
[927]. Dismissal.
*927. Limitation on recourse.*
*928. Post petition effect of security interest.*
*929. Municipal leases.*
*930. Dismissal.*

### Subchapter III—The Plan

941. Filing of plan.
942. Modification of plan.
943. Confirmation.
944. Effect of confirmation.
945. Continuing jurisdiction and closing of the case.
946. Effect of exchange of securities before the date of the filing of the petition.

## Subchapter I—General Provisions

### § 901. Applicability of other sections of this title

(a) Sections 301, 344, 347(b), 349, 350(b), 361, 362, 364(c), 364(d), 364(e), 364(f), 365, 366, 501, 502, 503, 504, 506, 507(a)(1), 509, 510, 524(a)(1), 524(a)(2), 544, 545, 546, 547, 548, 549(a), 549(c), 549(d), 550, 551, 552, 553, 557, 1102, 1103, 1109, 1111(b), 1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4), 1123(a)(5), 1123(b), 1124, 1125, 1126(a), 1126(b), 1126(c), 1126(e), 1126(f), 1126(g), 1127(d), 1128, 1129(a)(2), 1129(a)(3), *1129(a)(6)*, 1129(a)(8), 1129(a)(10), 1129(b)(1), 1129(b)(2)(A), 1129(b)(2)(B), 1142(b), 1143, 1144, and 1145 of this title apply in a case under this chapter.

\*   \*   \*   \*   \*   \*   \*

### § 902. Definitions for this chapter

In this chapter—
(1) "property of the estate", when used in a section that is made applicable in a case under this chapter by section 103(e) or 901 of this title, means property of the debtor;
*(2) "special revenues" means—*
*(A) receipts derived from the ownership, operation, or disposition of projects or systems of the debtor that are primarily used or intended to be used primarily to provide trans-*

*portation, utility, or other services, including the proceeds of borrowings to finance the projects or systems;*
  *(B) special excise taxes imposed on particular activities or transactions;*
  *(C) incremental tax receipts from the benefited area in the case of tax-increment financing;*
  *(D) other revenues or receipts derived from particular functions of the debtor, whether or not the debtor has other functions; or*
  *(E) taxes specifically levied to finance one or more projects or systems, excluding receipts from general property sales or income taxes (other than tax-increment financing) levied to finance the general purposes of the debtor;*

[(2)] *(3)* "special tax payer" means record owner or holder of legal or equitable title to real property against which a special assessment or special tax has been levied the proceeds of which are the sole source of payment of an obligation issued by the debtor to defray the cost of an improvement ralating to such real property;

[(3)] *(4)* "special tax payer affected by the plan" means special tax payer with respect to whose real property the plan proposes to increase the proportion of special assessments or special taxes referred to in paragraph (2) of this section assessed against such real property; and

[(4)] *(5)* "trustee", when used when used in a section that is made applicable in a case under this chapter by section 103(e) or 901 of this title, means debtor, except as provided in section 926 of this title.

\* \* \* \* \* \* \*

## Subchapter II—Administration

\* \* \* \* \* \* \*

## § 992. Automatic stay of enforcement of claims against the debtor

(a) \* \* \*

\* \* \* \* \* \* \*

*(c) If the debtor provides, under section 362, 364, or 922 of this title, adequate protection of the interest of the holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection such creditor has a claim arising from the stay of action against such property under section 362 or 922 of this title or from the granting of a lien under section 364(d) of this title, then such claim shall be allowable as an administrative expense under section 503(b) of this title.*

*(d) Notwithstanding section 362 of this title and subsection (a) of this section, a petition filed under this chapter does not operate as a stay of application of pledged special revenues in a manner consistent with section 927 of this title to payment of indebtedness secured by such revenues.*

\* \* \* \* \* \* \*

## § 926. Avoiding powers

*(a)* If the debtor refuses to pursue a cause of action under section 544, 545, 547, 548, 549(a), or 550 of this title, then on request of a creditor, the court may appoint a trustee to pursue such cause of action.

*(b) A transfer of property of the debtor to or for the benefit of any holder of a bond or note, on account of such bond or note, may not be avoided under section 547 of this title.*

## *§ 927. Limitation on recourse*

*The holder of a claim payable solely from special revenues of the debtor under applicable nonbankruptcy law shall not be treated as having recourse against the debtor on account of such claim pursuant to section 1111(b) of this title.*

## *§ 928. Post petition effect of security interest*

*(a) Nothwithstanding section 552(a) of this title and subject to subsection (b) of this section, special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.*

*(b) Any such lien on special revenues, other than municipal betterment assessments, derived from a project or system shall be subject to the necessary operating expenses of such project or system, as the case may be.*

## *§ 929. Municipal leases*

*A lease to a municipality shall not be treated as an executory contract or unexpired lease for the purposes of section 365 or 502(b)(6) of this title soley by reason of its being subject to termination in the event the debtor fails to appropriate rent.*

## § [927.] *930.* Dismissal

(a) After notice and a hearing, the court may dismiss a case under this chapter for cause, including—

    (1) want of prosecution;

    (2) unreasonable delay by the debtor that is prejudicial to creditors;

    (3) failure to propose a plan within the time fixed under section 941 of this title;

    (4) if a plan is not accepted within any time fixed by the court;

    (5) denial of confirmation of a plan under section 943(b) of this title and denial of additional time for filing another plan or a modification of a plan; or

    (6) if the court has retained jurisdiction after confirmation of a plan—

        (A) material default by the debtor with respect to a term of such plan; or

        (B) termination of such plan by reason of the occurrence of a condition specified in such plan.

(b) The court shall dismiss a case under this chapter if confirmation of a plan under this chapter is refused.

\* \* \* \* \* \* \*

### Subchapter III—The Plan

\* \* \* \* \* \* \*

### § 943. Confirmation

(a) A special tax payer may object to confirmation of a plan.

(b) The court shall confirm the plan if—

(1) the plan complies with the provisions of this title made applicable by sections 103(e) and 901 of this title;

(2) the plan complies with the provisions of this chapter;

(3) all amounts to be paid by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable;

(4) the debtor is not prohibited by law from taking any action necessary to carry out the plan;

(5) except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that on the effective date of the plan each holder of a claim of a kind specified in section 507(a)(1) of this title will receive on account of such claim cash equal to the allowed amount of such claim; 【and】

*(6) any regulatory or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval; and*

【(6)】 *(7)* the plan is in the best interests of creditors and is feasible.

\* \* \* \* \* \* \*

○