**EXHIBIT A**

# In Re: The Financial Oversight
# and Management Board for Puerto Rico

Expert Report of
William W. Holder

April 30, 2020

Contains Information Designated as Confidential by the Government Parties

# Table of Contents

I.     Summary of Opinions ................................................................................................1

II.    Qualifications ...........................................................................................................6

III.   Fund Accounting Principles Acknowledge that Proceeds from Restricted PRIFA Rum Tax Revenues and HTA Excise Tax Revenues May be Held in a Pooled Account (e.g., the TSA) ...................................................................................................................8

IV.    The Treasury's Accounting Conveys that HTA Excise Tax Revenues Are Restricted and Is Inconsistent with the Assertions Made by the FOMB and Mr. Ahlberg .........................10

    A.   HTA Excise Tax Revenues Are Recorded in a Special Revenue Fund (Fund 278), Distinct From the General Fund ...................................................................11

    B.   During FY 2015, HTA Had Authority to Access and Use HTA Excise Tax Revenue Proceeds that Were Deposited in the TSA and Designated Part of Fund 278.............................................................................................................13

    C.   The TSA Cash Flow Reports Continue to Convey Restrictions on the Use of HTA Excise Tax Revenues ...............................................................................14

V.     The Treasury's Accounting Conveys that PRIFA Rum Tax Revenues Are Restricted and Is Inconsistent With Assertions Made by the FOMB and Mr. Ahlberg ................................15

    A.   The Resources Generated by the Enabling Act "To Be Covered Into the Infrastructure Fund" Were Accounted for in PRIFA's Special Revenue Fund and Reported as Restricted in FY 2015 ...............................................................16

    B.   Recording PRIFA Rum Tax Revenue Proceeds in the General Fund is Not Inconsistent with the Infrastructure Fund Being a Special Revenue Fund.................17

VI.    The Commonwealth's Accounting Systems Should Allow For the Identification of Fund 278 and Infrastructure Fund Moneys ...............................................................................18

VII.   Analysis of the TSA's Historic Cash Position Compared to the Clawed-Back Revenues from the HTA and PRIFA Bonds ...........................................................................19

Contains Information Designated as Confidential by the Government Parties

## I. Summary of Opinions

1.    I have been retained by counsel for Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation., Ambac Assurance Corporation, and Financial Guaranty Insurance Company ("Movants").[1]  I have been asked to evaluate certain statements made by (1) the Financial Oversight and Management Board for Puerto Rico (the "FOMB") in the context of a preliminary hearing on certain motions and (2) Mr. Timothy Ahlberg, who testified as the representative of the Commonwealth of Puerto Rico (the "Commonwealth"), the Puerto Rico Highways and Transportation Authority ("HTA") and the Puerto Rico Infrastructure Financing Authority ("PRIFA").[2]  Specifically, I understand that the FOMB and Mr. Ahlberg have asserted that, because certain excise taxes have been held in pooled bank accounts of the Commonwealth of Puerto Rico (the "Treasury Single Account" or "TSA"), the excise taxes therefore are Commonwealth resources that may or may not be appropriated by the Commonwealth in its discretion, and that the excise taxes must be understood to be undifferentiated Commonwealth resources.  It is my opinion that based upon my review of the methods of accounting of the Department of the Treasury of the Commonwealth of Puerto Rico (the "Treasury") for the HTA Excise Tax Revenues[3] and PRIFA Rum Tax Revenues[4] in Treasury bank accounts, testimony, and other relevant documents produced by the Commonwealth and the HTA, and for the reasons set forth below, that these statements or assertions are inconsistent with the manner in which the Commonwealth has historically accounted for such taxes.

---

[1] Assured Guaranty Corp./Assured Guaranty Municipal Corp, National Public Finance Guarantee Corp., Ambac Assurance Corp., and Financial Guaranty Insurance Company are represented by Cadwalader, Wickersham & Taft, LLP; Weil, Gotshal & Manges, LLP; Milbank LLP; and Butler Snow, LLP, respectively.

[2] ███████████████████████████████████████████████████████████████████████████████████

[3] "HTA Excise Tax Revenues" for purposes herein shall mean the (i) special excise taxes consisting, among other things, of taxes on gasoline, diesel, crude oil, cigarettes, and other special excise taxes collected by Treasury and allocated to HTA through enabling legislation, including the Puerto Rico Internal Revenue Code, 13 L.P.R.A. § 31751 and (ii) special excise taxes consisting of motor vehicle license fees collected by the Commonwealth and allocated to HTA by enabling legislation, including Vehicle and Traffic Law, 9 L.P.R.A. §§ 2013(a)(2), 2021, 5681. The enabling legislation for the HTA Excise Taxes shall be referred to herein as the "HTA Excise Tax Statutes."

[4] "PRIFA Rum Tax Revenues" for purposes herein shall mean the first $117 million per year in excise taxes imposed by the government of the United States on rum products, among other products, that are remitted to the Commonwealth and allocated to PRIFA by enabling legislation, including the Puerto Rico Infrastructure Financing Authority Act (the "PRIFA Enabling Act"), 3 L.P.R.A. § 1914.

2.       As a threshold matter, it is important to recognize that generally accepted accounting principles ("GAAP" or "fund accounting") is the framework governmental entities, including the Commonwealth,[5] use to track and account for resources (e.g., moneys).  Governmental accounting systems are organized and operated on a fund basis.[6]  Fund accounting calls for the financial resources of a government to be accounted for and reported in appropriate funds.[7]  The Commonwealth uses the following definition of "fund":

> An amount of money or other resource set aside for the purpose of carrying out a specific activity or to achieve certain objectives pursuant to the special laws, regulations, restrictions or limitations and which constitute an independent fiscal and accounting entity. It includes the accounts created to keep record of the proceeds of the issuance of bonds that may be authorized.[8]

3.       A significant objective of fund accounting is to report a government's stewardship of financial resources and its compliance with restrictions and other limitations placed on the use of those resources.[9]  The Governmental Accounting Standards Board ("GASB"),[10] the authoritative body that establishes professional accounting standards for governmental entities, has referred to "accountability" as "the paramount objective from which all other objectives must flow."[11]

---

[5] McKeen Letter Dep. Exh 1 at p. 5, ██████████████

[6] NCGA Statement 1, Principle 2.

[7] While the term "fund" can be used in several contexts, in GAAP, "fund" is a term of art: "[A] fiscal and accounting entity with a self-balancing set of accounts recording cash and other financial resources, together with all related liabilities and residual equities or balances, and changes therein, which are segregated for the purpose of carrying on specific activities or attaining certain objectives in accordance with special regulations, restrictions, or limitations." *See* NCGA Statement 1, par 3; GASB Statement No. 34, pars 63, 64.

[8] 3 L.P.R.A. § 283b.

[9] NCGA No. 1, Principle 1, "A governmental accounting system must make it possible both: (a) to present fairly and with full disclosure the financial position and results of operations of the funds and account groups of the governmental unit in conformity with generally accepted accounting principles; and (b) to determine and demonstrate compliance with finance-related legal and contractual provisions."

[10] The GASB, established in 1984, is the independent, private-sector organization, that establishes accounting and financial reporting standards for U.S. state and local governments that follow Generally Accepted Accounting Principles (GAAP). See https://www.gasb.org/jsp/GASB/Page/GASBLandingPage&cid=1175804799024. GAAP is a set of standards, principles and practices that guide accounting and financial reporting for state and local governments and U.S. territories, such as the Commonwealth. The "GAAP hierarchy" identifies sources of GAAP, ranked by their level of authority. The most authoritative guidance includes GASB statements and interpretations, as well as statements and interpretations of the GASB's predecessor, the National Council on Governmental Accounting ("NCGA"). Other sources of GAAP include GASB Technical Bulletins, AICPA Audit and Accounting Guides, and the Government Finance Officers Association's "Governmental Accounting, Auditing and Financial Reporting" (the "GAAFR").

[11] GASB Concept Statement No. 1, par 76, "Governmental financial reporting should provide information to assist users in (a) assessing accountability and (b) making economic, social, and political decisions. The duty to be publicly accountable is more significant in governmental financial reporting than in business enterprise financial reporting. For this reason, the Board gave considerable weight to the concept of accountability. It appears throughout the discussion of the governmental environment, and assessing accountability is a pervasive use of financial reporting as indicated in the section on uses of financial reports. Although it is referred to specifically only in paragraph 77, accountability is implicit in all of the listed objectives. The Board considers it to be the paramount objective from which all other objectives must flow."

4.      In fund accounting, governmental entities, including the Commonwealth, use terms of art to describe limitations on the use of resources.  For example, the term "restricted" is a term of art in fund accounting and represents a significant signal provided to financial statement users. Assets and the related fund balance of a fund should be accounted for and reported as restricted only when such constraints on the resources are (1) "externally imposed by creditors (such as through debt covenants), grantors, contributors, or laws or regulations of other governments," or (2) "imposed by law though constitutional provisions or enabling legislation."[12]  In essence, the expenditure of restricted resources must be in conformity with the imposed restrictions regardless of the government's desire to reallocate or redeploy those resources.

5.      Typically, most of a government's fiscal activities (i.e., revenues and expenditures) are accounted for and reported in the general fund.  The general fund is used "to account for and report all financial resources not accounted for and reported in another fund," and these resources are generally expended through annual budgetary processes.[13]  A significant portion of the Commonwealth's resources and activities were reported in the general fund of the Commonwealth (the "General Fund").[14]

6.      Restrictions and other limitations on certain governmental resources may be conveyed in a number of ways.  For example, restricted resources may be accounted for in the general fund, as long as the restricted resources are separately tracked for accounting purposes and any financial statements prepared in conformity with GAAP clearly convey the restrictions and other limitations.  In addition, financial resources from specific revenue sources that are restricted or committed to expenditures for specified purposes may be accounted for in special revenue or other governmental fund types.  The Commonwealth also uses special revenue funds and debt service funds.  The Commonwealth's use of special revenue funds and debt service funds is not

---

[12] GASB 54 par 8-9, "Fund balance should be reported as restricted when constraints placed on the use of resources are either: a. Externally imposed by creditors (such as through debt covenants), grantors, contributors, or laws or regulations of other governments; or b. Imposed by law through constitutional provisions or enabling legislation.
Enabling legislation, as the term is used in this Statement, authorizes the government to assess, levy, charge, or otherwise mandate payment of resources (from external resource providers) and includes a legally enforceable requirement that those resources be used only for the specific purposes stipulated in the legislation. Legal enforceability means that a government can be compelled by an external party—such as citizens, public interest groups, or the judiciary—to use resources created by enabling legislation only for the purposes specified by the legislation."
[13] GASB 54 par 29, "That definition stated that the general fund "is used to account for all financial resources except those required to be accounted for in another fund."
[14] *See, for example*, CW_STAY0000229 at 237.

unique to Puerto Rico and is common in financial reporting for government issuers with outstanding bond debt.

7.      Based on my knowledge and experience and my analysis in this matter, and with these basic principles in mind, I have formed following additional conclusions and opinions.

8.      The HTA Excise Tax Revenues:

a.  Both prior to and following the issuance of Executive Order OE-2015-046 on November 30, 2015 (the "Clawback Order"),[15] the Treasury accounted for HTA Excise Tax Revenues in a special revenue fund (Fund 278). ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Accounting for the HTA Excise Tax Revenues in that special revenue fund conveys, in this matter, that the revenues are restricted for debt service purposes.  Likewise, the Treasury's classification of the HTA Excise Tax Revenues as part of a "Special Revenue Fund" in TSA Cash Flow Reports, in this matter, also conveys that the revenues are restricted.

b.  The Commonwealth treated Fund 278's resources as restricted even when the resources were in Treasury's bank accounts and even though they were pooled with other moneys. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Under fund accounting, HTA's actions in regard to these proceeds are consistent with those revenues being restricted and not for the Commonwealth's general use even while the moneys were held in Treasury bank accounts. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

c.  Fund 278, a special revenue fund, is distinct from the General Fund. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



---

[15] The Clawback Order directed the Puerto Rico Secretary of the Treasury to retain HTA Excise Tax Revenues and Rum Excise Tax Revenues for the payment of debt service on the Commonwealth's public debt.  The term "clawback" or any variation thereof is not intended to convey any opinion on whether the Commonwealth lawfully used the HTA and PRIFA Excise Tax Revenues under Section 8 of Article VI of the Puerto Rico Constitution.

I have been asked to assume that (1) the "clawback" of HTA and rum excise taxes by the Commonwealth was invalid and (2) PROMESA does not preempt the Puerto Rico excise tax or other relevant statutes.

[16]

      d.  The accounting treatment of the HTA Excise Tax Revenues is inconsistent with the assertion that the Commonwealth had the ability to deploy the resources in an unrestricted manner.[17]

9.    The PRIFA Rum Tax Revenues:

      a.  The PRIFA Enabling Act calls for the Commonwealth to establish the "Puerto Rico Infrastructure Fund" (the "Infrastructure Fund"). Consistent with the PRIFA Enabling Act, the resources generated by the act were accounted for and reported in a special revenue fund titled, "Puerto Rico Infrastructure Financing Authority" fund.

      b.  The recording of PRIFA Rum Tax Revenues in the Puerto Rico Integrated Financial Accounting System ("PRIFAS") as General Fund revenue is not inconsistent with the Infrastructure Fund existing as a special revenue fund. Fund accounting allows governmental entities discretion to implement tracking and accounting of moneys in different ways so long as the restrictions are properly maintained and conveyed.

10.    It is further my opinion that moneys restricted to use for specific activities can be, and in practice often are, pooled in a single bank account or accounts along with unrestricted moneys or moneys to be used for other purposes.

11.    Moreover, it is necessary for a government to have sufficient accounting systems and controls in place to permit the tracing of restricted resources and related expenditures. Cash from different revenue streams—such as the HTA Excise Tax Revenues and PRIFA Rum Tax Revenues, each subject to restrictions on use—must by necessity be traceable into and out of bank accounts. ████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████ Fund accounting is one of the tools used by governments, including the Commonwealth, to trace restricted resources.[18]

12.    Finally, as shown in **Exhibits 1** and **2**, between July 2017 and November 2019, the total amount of cumulative revenues clawed back from the HTA and PRIFA bondholders (collectively, the "Clawed-Back HTA and PRIFA Tax Revenues") was approximately $1.3 billion. The balance of the TSA exceeded this amount at all relevant times.

---

[17] I understand from the financial statements that the sole exception would be if in a given fiscal year available resources are not sufficient to repay debt service on the Commonwealth's general obligation bonds, in which case the excise taxes would be used to pay that debt service and would be reimbursed in subsequent fiscal years. *See* Ahlberg Deposition Exhibits 13 and 24.

[18] I understand that the most recent Commonwealth and HTA audited financial statements for the fiscal year ended June 30, 2016 change the reporting of certain excise tax revenues based on the Clawback Order. ████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████

II.    **Qualifications**

13.    I currently serve as Dean of the Leventhal School of Accounting and hold the Alan Casden Dean's Chair of Accountancy at the University of Southern California. During the course of my career, I have taught courses in financial and managerial accounting, auditing, and taxation in undergraduate and graduate programs. I have twice been named as one of the "Top 100 People" in the accounting profession by Accounting Today. I also received the Gold Medal for Distinguished Service, the highest honor awarded by the American Institute of Certified Public Accountants ("AICPA").

14.    I have authored or co-authored a number of books, research monographs, and journal articles on the topics of financial accounting, reporting, and auditing. My published works include the university textbook Intermediate Accounting, published by Harcourt, Brace, Jovanovich; the financial statement auditing practice manual Audits of Local Governments, published by Thomson Reuters; Reducing the Incidence of Fraudulent Financial Reporting: The Role of the Securities and Exchange Commission, published by the SEC and Financial Reporting Institute; the practice manual Audits of Local Governments, published by Thomson Reuters; Materiality Considerations, published by the AICPA and a number of others that address financial accounting, reporting, and auditing issues.

15.    Over the course of my career, I have served in a number of capacities on governance and standards-setting bodies of the accounting profession, including ten years as a member of the Governmental Accounting Standards Board ("GASB"), the Board of Directors (Chair of the Audit Committee) of the AICPA, and the Accounting Standards Executive Committee ("AcSEC") of the AICPA.[19] The GASB and AcSEC are professional bodies responsible for developing authoritative financial accounting and reporting standards. In addition, I have served on the AICPA's State and Local Government Accounting Committee serving as the senior technical editor to that organization's state and local government audit guide, "Audits of State and Local Governments" and performed a number of assignments relating to governmental accounting for the National Council on Governmental Accounting ("NCGA"), the Municipal Finance Officers Association, and the League of California Cities. Moreover, I have served as

---

[19] AcSEC is now identified as the Financial Reporting Executive Committee or "FinREC."
https://www.aicpa.org/interestareas/frc/accountingfinancialreporting/finrec.html.

Chair of the Audit Committees of the Board of Directors of both the John Wayne Cancer Institute and the John Wayne Cancer Foundation. I am a Certified Public Accountant in California and Oklahoma.

16.     I have served as an expert witness and consultant in a number of cases in state and federal courts, been retained by the U.S. Securities and Exchange Commission ("SEC") and the U.S. Department of Justice, and provided related trial testimony. In addition, I have consulted with numerous companies, public accounting firms, and governmental agencies about a variety of accounting, financial reporting, and auditing matters.

17.     A copy of my curriculum vitae, including my publications, is attached as **Appendix A**. A list of matters in which I have provided expert testimony over the past four years is included as **Appendix B**.

18.     In connection with my work, I have called on the knowledge and experience gained during my professional career. My opinions are based on my experience and expertise in governmental accounting, reporting, and auditing and my understanding of relevant facts and circumstances in this matter and are not intended to represent legal conclusions or opinions.

19.     I am being compensated at my standard hourly billing rate of $875 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I also receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

20.     I have reviewed publicly available information, documents produced, and deposition testimony in this matter to date. I also have read and considered relevant portions of the authoritative literature of the accounting profession that applies to governmental entities. Materials that I have considered in preparing this report are cited in the footnotes to this report and are contained in **Appendix C**.

21.     I understand that, at this time, the Court has authorized limited discovery into certain specific issues and that additional discovery has been requested but has not yet been provided and may be, in the future, requested or made available in connection with any final hearing on

those motions. I reserve the right to amend or supplement this report based on additional information that may be obtained.

### III.   Fund Accounting Principles Acknowledge that Proceeds from Restricted PRIFA Rum Tax Revenues and HTA Excise Tax Revenues May be Held in a Pooled Account (e.g., the TSA)

22.   In Puerto Rico, the Treasury's cash is managed on a centralized basis in the Treasury Single Account (TSA), described as "the Commonwealth's main operational account in which substantially all of the Commonwealth's public funds are deposited and from which most expenses are disbursed."[20] TSA deposits include receipts of revenues assigned to certain public corporations and pledged for the payment of their debt service:

> Receipts in the TSA include tax collections (including revenues assigned to certain public corporations and pledged for the payment of their debt service), charges for services, intergovernmental collections (such as reimbursements from Federal assistance grants), the proceeds of short and long-term debt issuances, and other receipts. Only a portion of the revenues received by the TSA is included in the annual General Fund budget presented to the Puerto Rico Legislative Assembly for approval. Other revenues are separately assigned by law to certain agencies or public corporations but still flow through the TSA.[21]

23.   Under fund accounting principles, governments have flexibility as to the manner in which they manage cash.  In other words, the Treasury may hold cash in a pooled account (e.g., the TSA) for the benefit of parties other than the Commonwealth.  Moneys received and restricted to use for specific activities may be pooled in a single bank account along with moneys to be used for other purposes:

> This requirement of a complete set of accounts for each fund refers to identification of accounts in the accounting records, and does not necessarily extend to physical segregation of assets or liabilities. For example, it is not

---

[20] 10/20/17 TSA Cash Flow Report p. 6; *see also* Id. p. 5, which further defines the TSA as follows: "Treasury Single Account means the Commonwealth's main operational account in which substantially all Commonwealth public funds are deposited and from which most expenses are disbursed. TSA receipts include tax collections, charges for services, intergovernmental collections, the proceeds of short and long-term debt issuances and amounts held in custody by the Secretary of the Treasury for the benefit of the Commonwealth's fiduciary funds. Only a portion of the revenues received by the TSA is included in the annual General Fund budget presented to the Puerto Rico Legislative Assembly for approval."

Notwithstanding this definition, I understand that there are many bank accounts that are part of the TSA. In their reports, however, the Treasury conveys the sources of resources and indicates that there are restrictions or other limitations on certain of those resources (e.g., fiduciary funds). Such restrictions and limitations require tracing of the resources to ensure their faithful expenditure and appropriate reporting.

[21] 10/20/17 TSA Cash Flow Report p. 6.

necessary to have a separate bank account for each fund unless required by law, bond indenture, or other reason.[22]

24.    Fund accounting eliminates the need to segregate resources in separate bank accounts to ensure and demonstrate compliance with restrictions and other limitations:

> At the start of the twentieth century, for example, a number of state and local governments were beset by charges of financial corruption and mismanagement. Critics of the period charged that financial misfeasance and malfeasance were abetted by poor accounting and financial reporting practices. In particular, critics argued that state and local governments needed to segregate their financial resources to ensure that monies were spent only for approved purposes. In response to these criticisms, many governments began to establish separate cash accounts to manage resources dedicated for various purposes.

> Of course, improvements in cash management techniques have made multiple cash accounts a thing of the past for most state and local governments. Nonetheless, governments have continued to find value in accounting separately for financial resources that are restricted or otherwise earmarked for special purposes. In this manner, the separate cash accounts of the early 20th century evolved into the funds still used today by state and local governments to ensure and demonstrate legal compliance.[23]

25.    Moneys received and restricted to use for specific activities can be, and in practice often are, pooled in a single bank account along with unrestricted moneys or moneys to be used for other purposes.[24]  It would be unremarkable for moneys held in the TSA to be restricted for a particular use.  For example, from an accounting perspective, proceeds of HTA Excise Tax Revenues and PRIFA Rum Tax Revenues can be deposited and held in the TSA, even if such proceeds are restricted for HTA and PRIFA debt service.

26.    Depositing restricted resources in a pooled bank account does not extinguish or affect restrictions on those resources. The need to expend restricted governmental resources in conformity with those restrictions does not change irrespective of whether separate or pooled bank accounts are employed.[25]

---

[22] NCGA Statement 1 par 21.

[23] GFOA, Governmental Accounting Auditing and Financial Reporting, 2005, p. 16.  *See also* GFOA, Governmental Accounting, Auditing, and Financial Reporting, 2012, Chapter 4, "At the inception of fund accounting, individual funds most often corresponded to separate bank accounts. Since that time, advances in treasury management have reduced or eliminated the need for multiple bank accounts. Accordingly, today's funds may exist only as data sets within the government's information system."

[24] NCGA Statement 1 par 21, "This requirement of a complete set of accounts for each fund refers to identification of accounts in the accounting records, and does not necessarily extend to physical segregation of assets or liabilities. For example, it is not necessary to have a separate bank account for each fund unless required by law, bond indenture, or other reason."

[25] GASB, Statement No. 54, ¶¶8-10, "Net Assets Restricted by Enabling Legislation, should be reported as restricted fund balance. Fund balance should be reported as restricted when constraints placed on the use of resources are either: a. Externally

27.     Since at least 2014, the PRIFA Rum Tax Revenues and, since at least 2015, HTA Excise Tax Revenues were deposited into the Commonwealth's TSA.[26]  The deposit of proceeds from PRIFA Rum Tax Revenues and HTA Excise Tax Revenues in the TSA is not inconsistent with those amounts being restricted for PRIFA and HTA debt service, respectively.

## IV.     The Treasury's Accounting Conveys that HTA Excise Tax Revenues Are Restricted and Is Inconsistent with the Assertions Made by the FOMB and Mr. Ahlberg

28.     HTA is a public corporation and instrumentality of the Commonwealth that is responsible for the construction, operation and maintenance of the Commonwealth's highways, toll roads, and mass transportation systems.[27]

29.     I understand that the Movants contend that (1) HTA bonds at issue in this matter – bonds issued under Resolutions No. 68-18 and 98-06 (collectively the "HTA Bonds") – were secured by a lien granted by HTA on toll revenues and HTA Excise Tax Revenues, (2) the Commonwealth granted a lien in the HTA Excise Tax Revenues, (3) the HTA Excise Tax Statutes provide, in substance, that the Commonwealth must deposit the Excise Taxes in "special deposit" and not in the General Fund, and (4) the Commonwealth made certain commitments to HTA bondholders in various statutory provisions.  Specifically, the Commonwealth "pledge[d] to, and agree with, any person…subscribing to or acquiring bonds of the Authority to finance in whole or in part any traffic facilities or any part thereof, that it will not limit or restrict the rights or powers hereby vested in the Authority until all such bonds at any time issued, together with the interest thereon, are fully met and discharged."[28]

---

imposed by creditors (such as through debt covenants), grantors, contributors, or laws or regulations of other governments; or b. Imposed by law through constitutional provisions or enabling legislation.  Enabling legislation, as the term is used in this Statement, authorizes the government to assess, levy, charge, or otherwise mandate payment of resources (from external resource providers) and includes a legally enforceable requirement that those resources be used only for the specific purposes stipulated in the legislation.  Amounts that can only be used for specific purposes pursuant to constraints imposed by formal action of the government's highest level of decision-making authority should be reported as committed fund balance. Those committed amounts cannot be used for any other purpose unless the government removes or changes the specified use by taking the same type of action (for example, legislation, resolution, ordinance) if employed to previously commit those amounts.  Committed fund balance also should incorporate contractual obligations to the extent that existing resources in the fund have been specifically committed for use in satisfying those contractual requirements."

[26] See Ahlberg Deposition Exhibits 13 and 24.

[27] Puerto Rico Highways and Transportation Authority Financial Statements for the year ended June 30, 2015,  Note 1 - Organization,  p. 30, "Puerto Rico Highways and Transportation Authority (the Authority) is a public corporation and instrumentality of the Commonwealth of Puerto Rico, created by Act No. 74 of June 23, 1965, as amended, to design, construct and administer toll roads and highways, and other facilities for the movement of persons, vehicles and vessels, and for the planning, promotion and feasibility of mass transportation systems."

[28] See Highway and Transportation Authority Act (9 L.P.R.A. § 2019.)  See also 13 L.P.R.A. § 31751 ("The Government of Puerto Rico … also agrees and is committed to ensure that said amounts shall be covered into a special deposit in the name and

### A. HTA Excise Tax Revenues Are Recorded in a Special Revenue Fund (Fund 278), Distinct From the General Fund

30. Fund 278 is a fiscal and accounting entity in the Commonwealth Treasury's accounting system.[29] I understand that fund numbers, such as Fund 278, are used to designate funds that are separate from the General Fund.[30] ███████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

---

for the benefit of the Highways and Transportation Authority of Puerto Rico, as provided in this Section, until said bonds issued at any time, including their interest, have been paid in full."). 13 L.P.R.A. § 31751(a)(1)(D) ("The Government of Puerto Rico hereby agrees and is committed to any person, firm, or corporation, or any agency of the United States of America, or of any state or of the Government of Puerto Rico, that subscribes or acquires bonds of the Highways and Transportation Authority of Puerto Rico for the payment of which the proceeds of the tax on gasoline, gas oil, or diesel oil and the amount appropriated of the excise tax on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbons fixed in Section 3020.07 are thus pledged, as authorized by this section, to not reduce the tax on gasoline, gas oil, or diesel oil fixed in Section 3020.06, to an amount of less than sixteen cents (16¢) per gallon of gasoline or of four cents (4¢) per gallon of gas oil or diesel oil, respectively, and to not reduce the rates fixed in Section 3020.07 in effect by the date of approval of this Code. It also agrees and is committed to not eliminate or reduce the tax to an amount less than sixteen cents (16¢) per gallon of gasoline or of four cents (4¢) per gallon of gas oil or diesel oil fixed in Section 3020.06 of this Subtitle, nor reduce or eliminate the rates of the excise tax on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbon fixed in Section 3020.07. It also agrees and is committed to ensure that said amounts shall be covered into a special deposit in the name and for the benefit of the Highways and Transportation Authority of Puerto Rico, as provided in this Section, until said bonds issued at any time, including their interest, have been paid in full."). 9 L.P.R.A. § 2021 ("The Commonwealth of Puerto Rico hereby agrees and pledges itself to any person, firm or corporation, or to any agency of the United States of America or of any state, or the Commonwealth of Puerto Rico, who subscribes, or acquires bonds of the Highways and Transportation Authority of Puerto Rico, for the payment of which the proceeds from the increase in the fees paid for public and private service automobile licenses and others, is pignorated as authorized by this section, not to reduce these license fees."). 9 L.P.R.A. § 5681 ("The Commonwealth of Puerto Rico hereby agrees and makes a commitment to any person or agency of the United States of America, of any state or of the Government of Puerto Rico that sell or acquire bonds of the Authority for the payment of which the proceeds of the fees paid for motor vehicle and trailer licenses and others is pledged, as authorized by this section, not to reduce the license fees or the amount collected from the same that the Authority must receive.")

[29] *See* Letter from Elizabeth McKeen, "re: In re Fin. Oversight & Mgmt. Bd., No. 17-BK-3283-LTS – Discovery on Lift Stay Motions – Movants' Letters Dated February 24, 2020 and February 26, 2020," March 13, 2020 at p. 5, "Funds in Treasury's accounting system are both fiscal and accounting entities. … Fund 278 is one of the many fund numbers used to designate 'Special Revenue Funds' within the Treasury systems."

[30] *See* Letter from Elizabeth McKeen, "re: In re Fin. Oversight & Mgmt. Bd., No. 17-BK-3283-LTS – Discovery on Lift Stay Motions – Movants' Letters Dated February 24, 2020 and February 26, 2020 ." March 13, 2020 at p. 5, "Separate Fund numbers exist to designate federal funds and the PR General Fund.".

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

31.      The Commonwealth's characterization of Fund 278 as a "special revenue fund"[33] also is
of particular significance.  Special revenue funds are used to "account for and report the proceeds
of specific revenue sources that are restricted or committed to expenditures for specified
purposes."[34]  In its cash flow reports, the Treasury defines "Special Revenue Funds" as
"Commonwealth governmental funds separate from the General Fund that are created by law, are
not subject to annual appropriation and have specific uses established by their respective
enabling legislation.  Special Revenue Funds are funded from, among other things, revenues
from federal programs, tax revenues assigned by law to public corporations and other third
parties, fees and charges for services by agencies, dividends from public corporations and
financing proceeds."[35]  In this matter, the revenues were restricted due to the provisions of excise
tax statutes and constraints externally imposed by creditors (i.e., debt covenants).[36]  The act of
accounting for the HTA Excise Tax Revenues, even though proceeds from revenues are on
deposit in Commonwealth bank accounts, in a special revenue fund—both prior to and
subsequent to the Clawback Order—conveys, in this matter, that the resources were and continue
to be restricted, i.e., the resources were limited to HTA debt service.

32.      The Commonwealth treated Fund 278's resources as if they were restricted even when
the moneys were in Treasury bank accounts, irrespective of whether they were pooled with other
moneys.



---

[33] *See* Letter from Elizabeth McKeen, "re: In re Fin. Oversight & Mgmt. Bd., No. 17-BK-3283-LTS – Discovery on Lift Stay
Motions – Movants' Letters Dated February 24, 2020 and February 26, 2020," March 13, 2020 at p. 5, "Funds in Treasury's
accounting system are both fiscal and accounting entities. … Fund 278 is one of the many fund numbers used to designate
'Special Revenue Funds' within the Treasury systems."

[34] GASB, Statement No. 54, ¶30.

[35] CW_STAY0000229 at 231.

[36] *See* Puerto Rico Highways and Transportation Authority Financial Statements for the year ended June 30, 2015, p. 5, defining
the "Restricted for Debt Service" category as "consist[ing] of restricted assets for the principal and interest payments of the bonds
payable," and noting that "[t]his restriction is imposed by the bondholders through debt covenants."; id. at 36, "Non-operating
revenues consist principally of gasoline, diesel, petroleum and cigarettes taxes and vehicle license fees which are allocated to the
Authority by the Commonwealth of Puerto Rico as approved by law to finance the acquisition and construction of capital assets
and for the payment of the related debt."

[37]

[REDACTED][38]

33.     In its cash flow reports, the Treasury has consistently categorized the HTA Excise Tax Revenues as special-revenue collections, as opposed to General Fund collections.[39]  The fact that proceeds of the HTA Excise Tax Revenues designated as part of Fund 278 may have been pooled with other restricted and unrestricted cash in Treasury bank accounts does not alter the special-revenue and restricted nature of the HTA Excise Tax Revenues.  It is not uncommon for a government to pool cash of its various governmental entities in a centralized account while continuing to maintain accounting recognition of the restricted and special-revenue status of particular revenues with limited use.

**B.     During FY 2015, HTA Had Authority to Access and Use HTA Excise Tax Revenue Proceeds that Were Deposited in the TSA and Designated Part of Fund 278**

34.     [REDACTED] As discussed above, the revenues recorded into Fund 278 are reported as resources of HTA.

35.     The Commonwealth's accounting systems and processes indicate that HTA had the ability to access and use HTA Excise Tax Revenue proceeds while the cash was held in the Treasury's bank account.  Specifically, Commonwealth Treasury documents indicate that HTA was delegated approval authority for vouchers for the movement of HTA Excise Tax Revenue collections from Treasury operating bank accounts to HTA bank accounts.  Treasury Circular Letter 1300-01-99, App 3, identifies SC 735 payment vouchers as "[d]ocuments for which data entry and approval have been delegated to the agencies." [REDACTED]

---

[38] Ahlberg Deposition, April 23, 2020, p. 291:3–6.  *See also* Ahlberg Deposition Exhibit 13, pp. 5–6.

[39] *See* TSA Cash Flow as of July 14, 2017, CW_STAY00000409-421 at 412-413; TSA Cash Flow for October & November FY2018, CW_STAY00000229-242 at 231; TSA Cash Flow for the month of October FY20, CW_STAY0000859-878 at 861, TSA Cash Flow for the month of January FY20; CW_STAY00000914-933 at 916.

[40] [REDACTED]

[41] [REDACTED]

[REDACTED]

36. [REDACTED]

[REDACTED]

### C. The TSA Cash Flow Reports Continue to Convey Restrictions on the Use of HTA Excise Tax Revenues

37. Beginning in July 2017, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") and the Treasury began preparing periodic (often weekly) TSA Cash Flow Reports.[43] The TSA Cash Flow Reports continue to be prepared weekly and are publicly available on AAFAF's website.[44]

38. In TSA each Cash Flow Reports from 2017 through the present, cash inflows from HTA Excise Tax Revenues are reported as "HTA Pass Through" or "Non-General Fund Pass-Through" collections, as opposed to General Fund collections.[45] The HTA Pass Through amounts were consistently categorized as "Special Revenue Funds."[46] The TSA Cash Flow Reports defines the term "Special Revenue Funds" as used in those reports as:

> Commonwealth governmental funds separate from the General Fund that are created by law, are not subject to annual appropriation and have specific uses established by their respective enabling legislation. Special Revenue Funds are



[REDACTED]

---

[42] [REDACTED]

[43] Puerto Rico AAFAF, "Publications & Reports," http://www.aafaf.pr.gov/reports html.

[44] Puerto Rico AAFAF, "Publications & Reports," http://www.aafaf.pr.gov/reports html.

[45] *See e.g.*, See e.g., TSA FY 2018 Cash Flow, as of November 10, 2017, p. 7. n some of the TSA cash flow reports, HTA Pass Through funds were listed under the header "Retained Revenues" (defined as "Retained Revenues are revenues conditionally assigned to certain public corporations and the collections of those revenues are through accounts referred to as "pass through" account"). *See* TSA FY 2018 Cash Flow, as of December 19, 2017, p. 8. Note that beginning in January 2019, HTA Pass Through Funds were reported under "Non-General Fund Pass-Through Collections." *See* Puerto Rico AAFAF, "Publications & Reports," http://www.aafaf.pr.gov/reports html [REDACTED]

[46] *See e.g.*, CW_STAY0000409 at 415 (listing "HTA Pass Through" collections under "Special Revenue Funds"; "Special Revenue Fund Collections are pledged to specific public corporations and are known as 'pass-through' accounts."). In some of the TSA cash flow reports, HTA Pass Through funds were listed under the header "Retained Revenues" (defined as "Retained Revenues are revenues conditionally assigned to certain public corporations and the collections of those revenues are through accounts referred to as "pass through" account"). *See* TSA FY 2018 Cash Flow, as of December 19, 2017, p. 8. Note that beginning in January 2019, HTA Pass Through Funds were reported under "Non-General Fund Pass-Through Collections." *See* Puerto Rico AAFAF, "Publications & Reports," http://www.aafaf.pr.gov/reports html.

funded from, among other things, revenues from federal programs, tax revenues assigned by law to public corporations and other third parties, fees and charges for services by agencies, dividends from public corporations and financing proceeds.[47]

39.   By reporting proceeds from HTA Excise Tax Revenues under the "special revenue funds" heading, the TSA Cash Flow Reports continue to signal that there are restrictions on the use of HTA Excise Tax Revenues.  Over time, the language used in the heading for the HTA Pass Through revenues changed, ███████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████ [49]

## V.   The Treasury's Accounting Conveys that PRIFA Rum Tax Revenues Are Restricted and Is Inconsistent With Assertions Made by the FOMB and Mr. Ahlberg

40.   PRIFA is a financing authority responsible for providing financial, administrative, and other types of assistance to other component units and instrumentalities, "which are authorized to develop infrastructure facilities and to establish alternative means for financing them."[50]

41.   PRIFA publicly reported that its outstanding debt primarily consists of "special tax revenue bonds" which are payable from federal excise taxes levied on rum and other items produced in Puerto Rico and sold in the United States ("PRIFA Bonds").[51] I understand that (1)

---

[47] See e.g. Ahlberg Deposition Exhibit 5, p. 3.

[48] ████████████████████████████████████████████████████████

[49] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

[50] 2015 Commonwealth Annual Report p. 58, "PRIFA is a financing authority whose responsibilities are to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other component units and governmental instrumentalities of the Commonwealth, which are authorized to develop infrastructure facilities and to establish alternative means for financing them."

[51] See, e.g., 2015 Commonwealth Annual Report p. 58-9, "PRIFA's total debt outstanding, mostly Special Tax Revenue Bonds comprising over 95% of its total debt payable from federal excise taxes levied on the rum and other artless produced in Puerto Rico and sold in the United States, which taxes are collected by the US Treasury and returned to the Commonwealth."

the PRIFA Enabling Act provides that each year, PRIFA is to receive from the Treasury the first

$117 million in rum tax revenues (i.e., the PRIFA Rum Tax Revenues),[52] which is to be

"covered" into the Infrastructure Fund "to be maintained by or on behalf" of PRIFA,[53] (2),

PRIFA, in turn, pledged the PRIFA Rum Tax Revenues to the PRIFA bondholders,[54] and (3) the

Commonwealth made certain commitments to PRIFA bondholders in statutory provisions.

Specifically, the Commonwealth "pledge[d] and agree[d] with the holders of any bonds…that it

shall not limit or alter the rights hereby conferred to the Authority until such bonds and the

interest thereon are paid in full and such contracts are fully performed and honored on the part of

the Authority" and that PRIFA, "as an agent of the Commonwealth, is hereby authorized to

include this pledge on behalf of the Commonwealth on such bonds or contracts."[55]

> ### A.   The Resources Generated by the Enabling Act "To Be Covered Into the Infrastructure Fund" Were Accounted for in PRIFA's Special Revenue Fund and Reported as Restricted in FY 2015

42.     The Commonwealth disclosed that it accounted for and reported the resources generated

by the Enabling Act in a special revenue fund for the PRIFA Rum Tax Revenues.  For example,

---

[52] See Supplemental Opposition of Commonwealth of Puerto Rico to Amended PRIFA Bondholder Motion to Lift Automatic Stay, February 03, 2020, ¶5. *See also* 3 L.P.R.A. § 1914 provides, in relevant part: "[T]he **first proceeds of the federal excise taxes remitted to the Department of the Treasury of Puerto Rico on each fiscal year,** pursuant to Section 7652(a)(3) of the United States Internal Revenue Code of 1986, as amended, for up to a maximum amount of … **one hundred and seventeen million dollars ($117,000,000),** which when received by the Department of the Treasury of Puerto Rico, shall be covered into a Special Fund to be maintained by or on behalf of the Authority, designated as the 'Puerto Rico Infrastructure Fund', and be used by the Authority for its corporate purposes, which shall include the development of the infrastructure necessary and convenient for holding the Mayaguez 2010 Central American and Caribbean Games." (emphasis added)

[53] 3 L.P.R.A. § 1914. The PRIFA Enabling Act states: "the first proceeds of the federal excise taxes remitted to the Department of the Treasury of Puerto Rico on each fiscal year, pursuant to Section 7652(a)(3) of the United States Internal Revenue Code of 1986, as amended, . . . in the case of fiscal years 2006-07 to 2008-09, and in subsequent years until fiscal year 2056-57, the participation shall be for an amount of up to one hundred and seventeen million dollars ($117,000,000), which when received by the Department of the Treasury of Puerto Rico, **shall be covered into a Special Fund to be maintained by or on behalf of the Authority, designated as the 'Puerto Rico Infrastructure Fund'**, and be used by the Authority for its corporate purposes . . . ."

[54] See Trust Agreement dated October 1, 1988, between PRIFA and U.S. Bank Trust National Association, successor trustee (the "Trust Agreement") at 9: [I]n order to secure the payment of the Bonds at any time issued and outstanding hereunder and the interest and premium, if any, thereon according to their tenor, purpose, and effect, and in order to secure the performance and observance of all the covenants, agreements and conditions therein and herein contained, the Authority has executed and delivered this Agreement and has pledged and does hereby pledge to the Trustee the Pledged Revenues (as defined herein) and as security for the payment of the Bonds and the interest and premium, if any, thereon and as security for the satisfaction of any other obligation assumed by it in connection with such bonds…."

[55] 3 L.P.R.A. § 1913, Covenant of Commonwealth with bondholders, "The Commonwealth pledges and agrees with the holders of any bonds issued under this chapter and with those persons or entities that enter into contracts with the Authority, pursuant to the provisions hereof, that it shall not limit or alter the rights hereby conferred to the Authority until such bonds and the interest thereon are paid in full and such contracts are fully performed and honored on the part of the Authority; Provided, however, That nothing provided herein shall affect or alter such limitation if adequate measures are provided by law for the protection of said holders of the Authority's bonds or of those who have entered into such contracts with the Authority. The Authority, as an agent of the Commonwealth, is hereby authorized to include this pledge on behalf of the Commonwealth on such bonds or contracts."

in its audited basic financial statements for the year ended June 30, 2015, the Commonwealth stated:

> The special revenue fund of the Puerto Rico Infrastructure Financing Authority, a blended component unit, is used to account principally for the moneys received by the Commonwealth, up to $117 million, of certain federal excise taxes levied on rum and other articles produced in Puerto Rico and sold in the United States, which are collected by the U.S. Treasury and returned to the Commonwealth.[56]

43.     As noted above, special revenue funds are used "to account for and report the proceeds of specific revenue sources that are restricted or committed to expenditures for specified purposes other than debt service or capital projects."[57]

44.     Because the Commonwealth "pledge[d] and agree[d]" with the bondholders that a defined portion of the PRIFA Rum Tax Revenues would be used for debt service on the bonds "until such bonds and the interest thereon are paid in full and such contracts are fully performed and honored"[58] and granted PRIFA the authority to include that pledge on behalf of the Commonwealth, in my opinion, the resulting resources were "restricted," as that term of art is used in fund accounting.

### B.     Recording PRIFA Rum Tax Revenue Proceeds in the General Fund is Not Inconsistent with the Infrastructure Fund Being a Special Revenue Fund

45.





---

[56] Commonwealth of Puerto Rico, Basic Financial Statements and Required Supplementary Information for Fiscal Year Ended June 30, 2015, (With Independent Auditors' Report Thereon), p. 357.

[57] GASB No. 54 par 30. The Commonwealth's TSA Cash Flow Reports similarly recognize that Special Revenue Funds are "separate from the General Fund", "are not subject to annual appropriation", and have "specific uses established by their respective enabling legislation." *See* CW_STAY00000409 at 412-13; CW_STAY0000229 at 231; CW_STAY0000859 at 861; CW_STAY0000914 at 916.

[58] 3 L.P.R.A. § 1913, Covenant of Commonwealth with bondholders, "The Commonwealth pledges and agrees with the holders of any bonds issued under this chapter and with those persons or entities that enter into contracts with the Authority, pursuant to the provisions hereof, that it shall not limit or alter the rights hereby conferred to the Authority until such bonds and the interest thereon are paid in full and such contracts are fully performed and honored on the part of the Authority; Provided, however, That nothing provided herein shall affect or alter such limitation if adequate measures are provided by law for the protection of said holders of the Authority's bonds or of those who have entered into such contracts with the Authority. The Authority, as an agent of the Commonwealth, is hereby authorized to include this pledge on behalf of the Commonwealth on such bonds or contracts."

[59]

██████████████████████████████████████████████
████████████████

46.      The accounts used in accounting systems like PRIFAS are helpful for tracking funds subject to particular restrictions, but those accounts are not, in and of themselves, ultimately determinative of which moneys are held as special funds or otherwise subject to restrictions. Fund accounting acknowledges that governmental entities have discretion to implement tracking and accounting of moneys in different ways so long as the restrictions are properly maintained and conveyed.  Fund accounting allows for PRIFA's special fund revenues to be tracked as part of the General Fund.

## VI.   The Commonwealth's Accounting Systems Should Allow For the Identification of Fund 278 and Infrastructure Fund Moneys

47.      It is necessary for a government to have sufficient accounting systems and controls in place to permit the tracing of restricted resources and related expenditures.  Management cannot responsibly make assertions about the government's finances in financial statements prepared in conformity with GAAP without having some reasonable basis for doing so.[60] A comprehensive framework of internal control provides a basis for management's assertions contained in financial statements presented in conformity with GAAP.[61]

48.      Controls to trace cash receipts and related disbursements are necessary to assure compliance with restrictions and other limitations commonly associated with streams of revenues at state or local governments. Cash from different revenue streams (including HTA Excise Tax Revenues and PRIFA Rum Tax Revenues) must by necessity be traceable into and out of bank accounts and the Commonwealth's accounting system, even if restricted cash in bank accounts are pooled with cash from other unrestricted revenue sources.[62] ██████████████████

██████████████████████████████████████████████
██████████████████████████████████

---

[60] 2012 GAAFR, Chapter 44, "Management cannot responsibly make assertions about an entity's finances without having some reasonable basis for doing so. A comprehensive framework of internal control provides that reasonable basis."

[61] 2012 GAAFR, Chapter 1. "A comprehensive framework of internal control is necessary to provide management a responsible basis for assuming responsibility for the financial statements."

[62] See, e.g., 2012 GAAFR, Chapter 42, "Records should be designed in accordance with the following principles: … a unique identifier should be assigned to each transaction to allow for easy tracing. … The information system should systematically collect the data needed for both managerial purpose (for example, cost accounting) and financial reporting)…"

█████████████████████████████████████████ [63] Fund accounting is one of the tools used by governments, including the Commonwealth, to trace restricted resources.

49.    Because the Commonwealth financial statements indicate that they are prepared in conformity with GAAP, the Commonwealth necessarily must track the various sources of resources it is receiving and the uses of those resources. One should be able to identify moneys accounted for in Fund 278 or held to the credit of the Infrastructure Fund by applying fund accounting principles and reviewing the Commonwealth's general ledger and other transaction records. By applying fund accounting principles, one should also be able to identify the proceeds from HTA Excise Tax Revenues and the balance allocable to the Infrastructure Fund.

## VII.    Analysis of the TSA's Historic Cash Position Compared to the Clawed-Back Revenues from the HTA and PRIFA Bonds

50.    I have been asked to consider whether the balance of the TSA fell below the cumulative Clawed-Back HTA and PRIFA Tax Revenues.[64]

51.    In the context of this report, prepared for a preliminary hearing, I was asked to limit my analysis to the time period from July 2017 through November 2019. The Treasury has publicly reported cash balances in the TSA since July 2017.[65] I may be asked to extend the analysis that I



[64] This analysis was performed based on bank account balances rather than on fund accounting and related fund balances.
[65] The cash balances used in this analysis are those reported in the TSA cash flow reports. See http://www.aafaf.pr.gov/reports.html; HTA_STAY0000001, CW_STAY0000156–176, CW_STAY0000203–28, CW_STAY0000297–309, CW_STAY0000467–81, CW_STAY0000422–36, CW_STAY0000535–547, CW_STAY0000590–824, CW_STAY0000846–92, CW_STAY0000934–53, ERS_LS0000954–69, ERS_LS0001018–33, ERS_LS0001469–82, ERS_LS0001540–54.

Contains Information Designated as Confidential by the Government Parties

have conducted to cover the entire time period for which the HTA and PRIFA bonds have not been paid in full.

52.     In order to conduct the lowest intermediate balance test in this context, I compared the cumulative amount of Clawed-Back HTA and PRIFA Tax Revenues to the TSA cash balance at each month end from July 2017 to November 2019.  As discussed in Section III above, as part of the Treasury's cash management system, cash is pooled into multiple bank accounts that collectively comprise the TSA.[66]

53.     As shown in **Exhibits 1** and **2**, between July 2017 and November 2019, the total amount of Clawed-Back HTA and PRIFA Tax Revenues from bondholders was approximately $1.3 billion.  The balance of the TSA exceeded this amount at all relevant times.  Accordingly, for this time period, the entire amount clawed back from bondholders is traceable under the lowest intermediate balance test.

54.     I have not conducted a lowest intermediate balance test with respect to HTA and PRIFA Tax Revenues that were clawed back prior to July 2017.  I understand that the Commonwealth has not disclosed TSA Cash Flow Reports for that time period.  With additional discovery showing the Commonwealth's cash balances, I may be asked to extend this analysis to cover the additional time period prior to July 2017.

William W. Holder

Executed this 30th day of April, 2020

52814548.v4

---

[66] See Letter from E. L. Mckeen and Michael Mervis, "Re: In re Fin. Oversight & Mgmt. Bd., No. 17-BK-3283-LTS – Discovery on Lift Stay Motions – Response to Movants' Request During Meet and Confer Conference Call on April 16, 2020," April 19, 2020, p. 1.  *See also* CW_STAY0000156–176.