**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re: ) | |
| ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO ) | |
| ) | Case No. 17-bk-3283 (LTS) |
| as representative of ) | |
| ) | |
| THE COMMONWEALTH OF PUERTO RICO, *et al.* ) | |
| ) | |
| Debtors.[1] ) | |
| X | |
| In re: ) | |
| ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO, ) | |
| ) | Case No. 17-bk-3566 (LTS) |
| as representative of ) | |
| ) | **Re:  ECF Nos. 838 & 871** |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE ) | |
| GOVERNMENT OF THE COMMONWEALTH OF ) | Case No. 17-bk-3283 (LTS) |
| PUERTO RICO, ) | |
| ) | **Re:  ECF Nos. 12446 & 12901** |
| - and - ) | |
| ) | ***This Pleading Relates to ERS and*** |
| THE FINANCIAL OVERSIGHT AND ) | ***the Commonwealth Only, and*** |
| MANAGEMENT BOARD FOR PUERTO RICO ) | ***Should Be Filed in Both Dockets.*** |
| ) | |
| as representative of ) | |
| ) | |
| THE COMMONWEALTH OF PUERTO RICO, ) | |
| ) | |
| Debtors. ) | |
| X | |

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID:8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

as representative of

THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF
PUERTO RICO,

- and -

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

as representative of

THE COMMONWEALTH OF PUERTO RICO,

Movants,

v.

ANDALUSIAN GLOBAL DESIGNATED ACTIVITY
COMPANY, CROWN MANAGED ACCOUNTS FOR
AND ON BEHALF OF CROWN/PW SP, GLENDON
OPPORTUNITIES FUND, L.P., LMA SPC FOR AND
ON BEHALF OF MAP 98 SEGREGATED
PORTFOLIO, MASON CAPITAL MASTER FUND
L.P., OAKTREE-FORREST MULTI-STRATEGY, LLC
(SERIES B), OAKTREE OPPORTUNITIES FUND IX,
L.P., OAKTREE OPPORTUNITIES FUND IX
(PARALLEL), L.P., OAKTREE OPPORTUNITIES
FUND IX (PARALLEL 2), L.P., OAKTREE
HUNTINGTON INVESTMENT FUND II, L.P.,
OAKTREE OPPORTUNITIES FUND X, L.P.,
OAKTREE OPPORTUNITIES FUND X (PARALLEL),
L.P., OAKTREE OPPORTUNITIES FUND X
(PARALLEL 2), L.P., OAKTREE VALUE
OPPORTUNITIES FUND HOLDINGS, L.P., OCEANA
MASTER FUND LTD., OCHER ROSE, L.L.C.,
PENTWATER MERGER ARBITRAGE MASTER
FUND LTD., PWCM MASTER FUND LTD.,
REDWOOD MASTER FUND, LTD., AND SV
CREDIT, L.P.,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

- and - )

)

PUERTO RICO AAA PORTFOLIO BOND FUND, )
INC., PUERTO RICO AAA PORTFOLIO BOND FUND )
II, INC., PUERTO RICO AAA PORTFOLIO TARGET )
MATURITY FUND, INC., PUERTO RICO FIXED )
INCOME FUND, INC., PUERTO RICO FIXED )
INCOME FUND II, INC., PUERTO RICO FIXED )
INCOME FUND III, INC., PUERTO RICO FIXED )
INCOME FUND IV, INC., PUERTO RICO FIXED )
INCOME FUND V, INC., PUERTO RICO GNMA & )
U.S. GOVERNMENT TARGET MATURITY FUND, )
INC., PUERTO RICO INVESTORS BOND FUND I, )
PUERTO RICO INVESTORS TAX-FREE FUND, INC., )
PUERTO RICO INVESTORS TAX-FREE FUND, INC. )
II, PUERTO RICO INVESTORS TAX-FREE FUND III, )
INC., PUERTO RICO INVESTORS TAX-FREE FUND )
IV, INC., PUERTO RICO INVESTORS TAX-FREE )
FUND V, INC., PUERTO RICO INVESTORS TAX- )
FREE FUND VI, INC., PUERTO RICO MORTGAGE- )
BACKED & U.S. GOVERNMENT SECURITIES )
FUND, INC., TAX-FREE PUERTO RICO FUND, INC., )
TAX- FREE PUERTO RICO FUND II, INC., AND )
TAX-FREE PUERTO RICO TARGET MATURITY )
FUND, INC., )

)

- and - )

)

THE BANK OF NEW YORK MELLON, AS FISCAL )
AGENT, )

)

Respondents. )

_____ X

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

**PRELIMINARY STATEMENT** ............................................................. **2**

**RELEVANT FACTS AND PROCEDURAL BACKGROUND** ........................................... **5**

    I.     ERS and the ERS Bonds .................................................. 5

    II.    PROMESA and Title III Cases ............................................. 6

    III.   Pension Reform.......................................................... 8

    IV.   Procedural History ...................................................... 9

    V.    Claims Asserted by the ERS Bondholders and Fiscal Agent .................. 10

    VI.   Other ERS Bondholder Actions Related to ERS and the ERS Title III Case....... 12

          A.    The Prepetition Lift Stay Proceeding................................. 12

          B.    Resolved Actions in the ERS Title III Case............................ 13

               i.     The Section 552 Dispute. ................................. 13

               ii.    The Section 926 Dispute ................................. 14

               iii.   The Renewed Lift Stay Motion............................. 15

          C.    Pending Actions in the ERS Title III Case. ........................... 16

               i.     The Post-Petition Legislation Adversary Proceeding................. 16

               ii.    The Lien-Scope Adversary Proceeding and the *Ultra Vires* Litigation .......................................... 16

**LEGAL STANDARD** .................................................................... **17**

**ARGUMENT** .......................................................................... **19**

    I.     THE CLAIMS ASSERTED AGAINST THE DEBTORS IN THE ADMINISTRATIVE EXPENSE MOTIONS SHOULD BE DISALLOWED AND DISMISSED UNDER RULE 12(b)(1) AND (b)(6). ....... 19

          A.    The Section 552 Decision Precludes All Administrative Expense Claims. ............................................................. 19

          B.    Claimants Fail to Meet the Standard for an Administrative Expense Claim and Their Motion Should be Dismissed Under Rule 12 (b)(6). .......................................................... 21

               i.     Claimants Do Not Have Administrative Expense Claims Against ERS............................................. 22

               ii.    Claimants Do Not Have Administrative Expense Claims Against the Commonwealth............................... 23

               iii.   The Administrative Expense Claims Do Not Satisfy Bankruptcy Code § 503. ............................... 26

          C.    Claimants Cannot Assert a Claim Under Statutes Requiring Employers' Contributions Because Such Statutes Are Preempted by PROMESA............................................... 27

i

D.   Alternatively, the Specific Allegations in the Administrative Expense Claims Fail to State a Claim Under Rule 12(b)(1) and (b)(6) and Such Claims Should Be Disallowed and Dismissed............... 30

  i.    Each Claim Asserted in the Post-Petition Legislation AP Incorporated in the Administrative Expense Claims and the Proofs of Claim Should be Disallowed and Dismissed. ............... 30

  ii.   Claims Against ERS for Breaches of Prepetition Covenants and Other Prepetition Obligations Arising Under the Resolution Do Not Give Rise to Administrative Expense Claims. ........................................................................................ 59

  iii.  ERS Was Not "Unjustly Enriched." ............................................. 60

  iv.   Assorted Claims Against the Commonwealth Are Duplicative of Claims Asserted in the Post-Petition Legislation AP. ................................................................................ 60

  v.    The Commonwealth Did Not Violate Section 407 of PROMESA .................................................................................. 61

  vi.   The Commonwealth and ERS Did Not Violate the January Stipulation Approved by Judge Besosa. ...................................... 64

  vii.  Claimants Do Not Have a Claim Arising From Any Alleged Failure of the Debtors to Adequately Protect Claimants' Property Interest. ..................................................... 64

  viii. The Additional Administrative Expense Claims Alleged Against the Debtors in the Supplement Should Also Be Dismissed. ............................................................................... 65

II.   THE CLAIMS ASSERTED AGAINST THE COMMONWEALTH IN THE PROOFS OF CLAIM SHOULD BE DISMISSED UNDER RULE 12(b)(6). ....................................................................................... 76

  A.   The Claims in the Proofs of Claim Should Be Dismissed. ...................... 76

  B.   The Additional Claims in the Supplement Should Be Dismissed. ........... 76

    i.   The Administrative Expense Claims Cannot Be Asserted as Prepetition Claims........................................................................ 76

    ii.  The Ultra Vires Counterclaims Should be Dismissed. ................. 77

    iii. Claimants Fail to State a Claim that the Moratorium Act and the ERS Executive Order Effected a Taking of Claimants' Property. ...................................................................... 77

    iv.  No Viable Claim is Stated that Prepetition Revisions to the Enabling Act Effected a Taking of Claimants' Property. ............. 78

III.  THE CLAIMS ASSERTED AGAINST ERS IN THE PROOFS OF CLAIM SHOULD BE DISMISSED UNDER RULE 12(b)(6). ........................... 78

  A.   The Claims in the Proofs of Claim Should Be Dismissed. ...................... 78

  B.   The Additional Claims in the Supplement Should Be Dismissed. ........... 79

| | | |
|---|---|---|
| i. | The Administrative Expense Claims Cannot Be Asserted as Prepetition Claims. | 80 |
| ii. | The *Ultra Vires* Counterclaims Should Be Dismissed. | 80 |
| iii. | Claimants Fail to State a Claim that ERS Breached Representations and Covenants About Assets in Which ERS Could Grant a Security Interest. | 80 |
| iv. | *Ultra Vires* Claims Should Resolved in the *Ultra Vires* AP | 81 |
| v. | The Claim that ERS Was "Dolo" in Connection with the Resolution and Issuance of the ERS Bonds Fails as a Matter of Law. | 81 |
| vi. | The Negligent Misrepresentation Claim Fails to State a Claim. | 82 |
| vii. | The Resolution Was Not Based on a Mutual Mistake. | 82 |
| viii. | The Claim ERS Breached Warranties in the Purchase Contract Fails to State a Claim. | 83 |
| ix. | The Claim the Moratorium Act and the ERS Executive Order Effected a Taking of Claimants' Property Fails. | 83 |

**CONCLUSION** ........................................................................................................ **84**

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*A&D Auto Sales, Inc. v. United States*,
   748 F.3d 1142 (Fed. Cir. 2014)................................................................42

*Abercrombie v. Hayden Corp. (In re Abercrombie)*,
   139 F.3d 755 (9th Cir. 1998) ................................................................26

*Allied Structural Steel Co. v. Spannaus*,
   438 U.S. 234 (1978)................................................................50

*Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*,
   267 F.3d 30 (1st Cir. 2001)................................................................4

*Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*,
   374 F.3d 23 (1st Cir. 2004)................................................................18

*Altair Glob. Credit Opportunities Fund (A), LLC v. Fin. Oversight & Mgmt Bd.
   for P.R. (In re Fin. Oversight & Mgmt Bd. for P.R.)*,
   914 F.3d 694 (1st Cir. 2019)................................................................64

*Amalgamated Transit Union v. Commonwealth of Mass.*,
   666 F.2d 618 (1st Cir. 1981)................................................................52

*Ambac Assurance Corp. v. Commonwealth of P.R. (In re Fin. Oversight & Mgmt.
   Bd. for P.R.)*,
   297 F. Supp. 3d 269 (D.P.R. 2018), *aff'd*, 927 F.3d 597 (1st Cir. 2019) ..............61

*Ambrose v. City of White Plains*,
   No. 10-CV-4946, 2018 WL 1635498 (April 2, 2018 S.D.N.Y.) ......................52, 59

*Andalusian Glob. Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R.
   (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
   954 F.3d 1 (1st Cir. 2020)................................................................ *passim*

*Andalusian Glob. Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R.
   (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
   No. 17-bk-3566-LTS, 2020 WL 114518 (D.P.R. Jan. 7, 2020), *aff'd*, 954 F.3d
   1 (1st Cir. 2020)................................................................15

*Andrus v. Allard*,
   444 U.S. 51 (1979)................................................................44

iv

*Ashcroft v. Iqbal,*
    556 U.S. 662 ....................................................................................17, 18

*Ass'n of Retired Emps. of City of Stockton v. City of Stockton (In re City of Stockton),*
    478 B.R. 8 (Bankr. E.D. Cal. 2012) .........................................................50

*Aurelius Capital Master, Ltd. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd for P.R.)*
    919 F.3d 638 (1st Cir. 2019) .............................................................48, 49

*Baltimore Teachers Union v. Mayor & City Council of Baltimore,*
    6 F.3d 1012 (4th Cir. 1993) ........................................................51, 55, 59

*Banco Nacional de Cuba v. Sabbatino,*
    376 U.S. 398 (1964) ................................................................................39

*Bank of N.Y. v. Treco (In re Treco),*
    240 F.3d 148 (2d Cir. 2001) ....................................................................20

*Bank of New York v. Adelphia Comm'ns Corp. (In re Adelphia Commc'ns Corp.),*
    307 B.R. 432 (S.D.N.Y. 2004) .................................................................49

*Barretto Peat, Inc. v. Luis Ayala Colon Sucrs., Inc.,*
    896 F.2d 656 (1st Cir. 1990) ...................................................................74

*Bayron Toro v. Serra,*
    19 P.R. Offic. Trans. 646 (P.R. 1987) ....................................................53

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................17

*Brown v. Legal Found. of Wash.,*
    538 U.S. 216 (2003) ................................................................................42

*Buffalo Teachers Fed'n v. Tobe,*
    464 F.3d 362 ................................................................................. *passim*

*Cantellops v. Alvaro-Chapel,*
    234 F.3d 741(1st Cir. 2000) ....................................................................69

*Chrysler Corp. v. Kolosso Auto Sales, Inc.,*
    148 F.3d 892 (7th Cir. 1998) ..................................................................54

*City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.),*
    656 F.3d 82 (1st Cir. 2011) .....................................................................35

*Claudio-de León v. Sistema Universitario Ana G. Méndez*,
    775 F.3d 41 (1st Cir. 2014) ........................................................................................4

*Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*,
    508 U.S. 602 (1993) ...............................................................................................44

*Connolly v. Pension Benefit Guar. Corp.*,
    475 U.S. 211 (1986) ....................................................................................... *passim*

*Diaz-Diaz v. Fortuño-Burset*,
    No. 11-1632, 2012 WL 2498912 (D.P.R. June 27, 2012) ....................................51

*Donohue v. New York*,
    347 F. Supp. 3d 110 (N.D.N.Y. 2018) ...................................................................59

*Dowell v. D.R. Kincaid Chair Co.*,
    125 N.C. App. 557 (1997) .....................................................................................33

*Emps. Ret. Sys. of Puerto Rico v. Andalusian Glob. Designated Activity Co. (In re
    Fin. Oversight & Mgmt. Bd. for P.R.)*,
    385 F.Supp.3d 138 (D.P.R. 2019) .........................................................................14

*Emps. Ret. Sys. v. Andalusian Glob. Designated Activity Co. (In re Fin. Oversight
    & Mgmt. Bd. for P.R.)*,
    948 F.3d 457 (1st Cir. 2020) ......................................................................... *passim*

*Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*,
    459 U.S. 400 (1983) ....................................................................................... *passim*

*Erie R.R. Co. v. Tompkins*,
    304 U.S. 64 (1938) .................................................................................................39

*Fagot Rodriguez v. Republic of Costa Rica*,
    139 F. Supp. 2d 173 (D.P.R. 2001) .......................................................................66

*Faitoute Iron & Steel Co. v. City of Asbury Park*,
    316 U.S. 502 (1942) ...............................................................................................45

*Fideicomiso De Law Tierra Del Caño Martin Peña v. Fortuño*,
    604 F.3d 7 (1st Cir. 2010) .....................................................................................41

*Forest Props., Inc. v. United States*,
    177 F.3d 1360 (Fed. Cir. 1999) .......................................................................41, 42

*Franklin Cal. Tax-Free Tr. v. Puerto Rico*,
    85 F. Supp. 3d 577 (D.P.R. 2015), *aff'd*, 805 F.3d 322 (1st Cir. 2015), *aff'd*,
    136 S. Ct. 1938 (2016) ...........................................................................................50

*Franklin Mem'l Hosp. v. Harvey*,
   575 F.3d 121 (1st Cir. 2009)............................................................................45

*Gen. Office Prods. Corp. v. A.M. Capen's Sons, Inc.*,
   607 F.Supp. 1191 (D.P.R. 1986)....................................................................73

*Gen. Office Prods. Corp. v. A.M. Capen's Sons, Inc.*,
   780 F.2d 1077 (1st Cir. 1986)........................................................................73

*Generadora De Electricidad Del Caribe, Inc. v. Foster Wheeler Corp.*,
   92 F. Supp. 2d 8 (D.P.R. 2000)......................................................................18

*Gilbert v. City of Cambridge*,
   932 F.2d 51 (1st Cir. 1991)............................................................................44

*Hadacheck v. Sebastian*,
   239 U.S. 394 (1915)........................................................................................44

*Hatton v. Mun. de Ponce*,
   No. RE-91-37, 1994 WL 909605 (P.R. Jan. 12, 1994)..................................38

*Hawaii Hous. Auth. v. Midkiff*,
   467 U.S. 229 (1984)........................................................................................41

*Hayduk v. Lanna*,
   775 F.2d 441 (1st Cir. 1985)..........................................................................18

*Hendler v. United States*,
   175 F.3d 1374 (Fed. Cir. 1999)......................................................................42

*Hermandad De Empleados Del Fondo Del Seguro Del Estado, Inc. v. P.R. (In re
   Fin. Oversight & Mgmt. Bd. for P.R.)*,
   No. 17-3283 (LTS), 2019 U.S. Dist. LEXIS 176447 (D.P.R. Sept. 27, 2019)......................55

*Home Bldg. & Loan Ass'n v. Blaisdell*,
   290 U.S. 398 (1934)..........................................................................45, 50, 52

*Horwitz-Matthews, Inc. v. City of Chicago*,
   78 F.3d 1248 (7th Cir. 1996) .........................................................................54

*iHealthcare, Inc. v. Yessenow (In re iHealthcare, Inc.)*,
   No. 07-20612, 2011 Bankr. LEXIS 2107 (Bankr. N.D. Ind. June 9, 2011) ...........................31

*In re Bradlees Stores, Inc.*,
   No. 02 CIV. 0896 (WHP), 2003 WL 76990 (S.D.N.Y. Jan. 9, 2003), *aff'd*, 78
   F. App'x 166 (2d Cir. 2003) ..........................................................................23

*In re Charlesbank Laundry, Inc.*,
    755 F.2d 200 (1st Cir. 1985)..................................................................................24

*In re Comcoach Corp.*,
    698 F.2d 571 (2d Cir. 1983)..................................................................................27

*In re Drexel Burnham Lambert Grp., Inc.*,
    138 B.R. 687 (Bankr. S.D.N.Y. 1992)..................................................................23

*In re FBI Distribution Corp.*,
    330 F.3d 36 (1st Cir. 2003)..................................................................................22

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    927 F.3d 597 (1st Cir. 2019), *cert. denied sub nom. Ambac Assurance Corp. v.*
    *Fin. Oversight & Mgmt. Bd. for P.R.*, 140 S. Ct. 856 (2020) ..................................35

*In re GT Advanced Techs., Inc.*,
    547 B.R. 3 (Bankr. D.N.H. 2016), *aff'd sub nom. Tera Xtal Tech. Corp. v. GT*
    *Advanced Techs., Inc.*, No. 16-CV-91-PB, 2017 WL 590340 (D.N.H. Feb. 13,
    2017) ..................................................................................................................23

*In re Hemingway Transp.*,
    954 F.2d 1 (1st Cir. 1992)..............................................................................25, 26

*In re Jeans.com*,
    491 B.R. 16 (Bankr. D.P.R. 2013)........................................................................22

*In re Keene Corp.*,
    188 B.R. 881 (Bankr. S.D.N.Y. 1995)..................................................................33

*In re Lacoquille Inv. Co.*,
    44 B.R. 731 (Bankr. S.D. Fla. 1984)....................................................................31

*In re Mammoth Mart*,
    536 F.2d 950 (1st Cir. 1976)................................................................................25

*In re Old Carco LLC*,
    424 B.R. 650 (Bankr. S.D.N.Y. 2010), *aff'd*, No. 09-50002 AJG, 2010 WL
    4455648 (S.D.N.Y. Nov. 2, 2010) ........................................................................22

*In re Perkins*,
    902 F.2d 1254 (7th Cir. 1990) ..............................................................................36

*In re STN Enters.*,
    779 F.2d 901 (2d Cir. 1985)..................................................................................35

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
    480 U.S. 470 (1987)..............................................................................................44

*Lingle v. Chevron U.S.A., Inc.*,
  544 U.S. 528 (2005)................................................................43, 44

*Lopez v. Bulova Watch Co., Inc.*,
  582 F. Supp. 755 (D.R.I. 1984)................................................................18

*Lynch v. United States*,
  292 U.S. 571 (1934)................................................................21

*McAndrews v. Fleet Bank of Mass., N.A.*,
  989 F.2d 13 (1st Cir. 1993)................................................................44

*Medina & Medina v. Country Pride Foods, Ltd.*,
  631 F. Supp. 293 (D.P.R. 1986)................................................................37

*Mitchell Excavators, Inc. v. Mitchell*,
  734 F.2d 129 (2d Cir. 1984)................................................................36

*Montoyo-Rivera v. Pall Life Scis. PR, LLC*,
  No. 16-2102 (GAG), 245 F. Supp. 3d 337 (D.P.R. 2017)................................................................31

*Murr v. Wisconsin*,
  137 S. Ct. 1933 (2017)................................................................47

*N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*,
  567 F.3d 8 (1st Cir. 2009)................................................................18

*Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt.*
  *Bd. for P.R.)*,
  330 F. Supp. 3d 685 (D.P.R. 2018), *aff'd and remanded*, 945 F.3d 3 (1st Cir.
  2019) ................................................................29

*Nisselson v. Lernout*,
  469 F.3d 143 (1st Cir. 2006)................................................................39

*Nw. Airlines v. United States Dep't of Transp.*,
  15 F.3d 1112 (D.C. Cir. 1994)................................................................68

*Olson v. United States*,
  292 U.S. 246 (1934)................................................................41

*Oriental Fin. Grp. v. Fed Ins. Co.*,
  598 F. Supp. 2d 199 ................................................................68

*Outdoor Media Dimensions, Inc. v. State*,
  150 Or.App. 106 (Or.App. 1997)................................................................71

*P.R. Tel. Co. v. Sprintcom, Inc.*,
  662 F.3d 74 (1st Cir. 2011)..................................................................38

*Parella v. Ret. Bd. of the Rhode Island Emps. Ret. Sys.*,
  173 F.3d 46 (1st Cir. 1999)..................................................................20

*Parkview Adventist Med. Ctr. v. United States*,
  842 F.3d 757 (1st Cir. 2016)................................................................31

*Penn Central Transp. Co. v. City of New York*,
  438 U.S. 104 (1978)..............................................................42, 44, 46

*Penn Terra, Ltd. v. Dep't of Envtl. Resources*,
  733 F.2d 267 (3d Cir. 1984).................................................................31

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.*,
  467 U.S. 717 (1984)............................................................................50

*Pierson & Gaylan v. Creel & Atwood (In re Consol. Bancshares, Inc.)*,
  785 F.2d 1249 (5th Cir. 1986) .............................................................36

*Plan Bienestar Salud v. Alcalde Cabo Rojo*,
  14 P.R. Offic. Trans. 896 (1983) .........................................................38

*Pro-Eco, Inc. v. Bd. of Comm'rs of Jay Cty.*,
  57 F.3d 505 (7th Cir. 1995) ..........................................................20, 21

*Punta Lima, LLC v. Punta Lima Dev. Co., LLC*,
  No. 1901673, 2020 WL 710770 (D.P.R. Feb. 22, 2020).......................38

*Reading Co. v. Brown*,
  391 U.S. 471 (1968)............................................................................24

*Redondo Constr. Corp. v. Izquierdo*,
  662 F.3d 42 (1st Cir. 2011)..................................................................54

*Rodriguez v. Fed. Deposit Ins. Corp.*,
  140 S. Ct. 713 (2020)..........................................................................39

*Rok Builders, LLC v. 2010-1 SFG Venture LLC (In re Moultonborough Hotel
  Group, LLC)*,
  726 F.3d 1 (1st Cir. 2013)..............................................................66, 70

*Ropico, Inc. v. City of New York*,
  425 F. Supp. 970 (S.D.N.Y. 1976) ......................................................47

*Sal Tinnerello & Sons, Inc. v. Town of Stonington*,
  141 F.3d 46 (2d Cir. 1998)..................................................................51

*Soler v. United States (In re Soler)*,
  250 B.R. 694 (Bankr. D. Minn. 2000) ..................................................................49

*Steinke v. Sungard Fin. Sys., Inc.*,
  121 F.3d 763 (1st Cir. 1997) ..............................................................................70

*Stewart v. Husqvarna Constr. Prods. N. Am.*,
  Civ. No. 11-1182, 2012 U.S. Dist. LEXIS 62585 (D.P.R. May 4, 2012) ...............36

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
  451 U.S. 630 (1981) ...........................................................................................39

*TM Park Ave. Assocs. v. Pataki*,
  214 F.3d 344 (2d Cir. 2000) ...............................................................................54

*Trinidad Hernández v. E.L.A.*,
  188 D.P.R. 828 (P.R. 2013) ..........................................................................53, 57

*United States v. Winstar Corp.*,
  518 U.S 839 (1996) ............................................................................................68

*United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuño*,
  633 F.3d 37 (1st Cir. 2011) .......................................................................... *passim*

*United States v. Blankenship*,
  382 F.3d 1110 (11th Cir. 2004) ...........................................................................68

*United States v. Dow*,
  357 U.S. 17 (1958) .............................................................................................42

*United States v. Va. Elec. & Power Co.*,
  365 U.S. 624 (1961) ...........................................................................................41

*Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R.*,
  945 F.3d 3 .....................................................................................................28, 29

*Village of Euclid v. Ambler Realty Co.*,
  272 U.S. 365 (1926) ...........................................................................................44

*Warth v. Seldin*,
  422 U.S. 490 (1975) ...........................................................................................35

*Westernbank P.R. v. Kachkar*,
  Civ. No. 07-1606, 2009 U.S. Dist. LEXIS 126405 (D.P.R. Dec. 10, 2009)...........38, 39, 67

*Wright v. Union Cent. Life Ins. Co.*,
  311 U.S. 273 (1940) ...........................................................................................20

**STATUTES**

3 L.P.R.A. § 761 .................................................................................................................5

3 L.P.R.A. §§ 761–788 .......................................................................................................5

3 L.P.R.A. § 781(g) ...........................................................................................................27

3 L.P.R.A. § 786-5 ............................................................................................................32

11 U.S.C. § 101(5) .........................................................................................................8, 72

11 U.S.C. § 362(b)(4) .......................................................................................................31

11 U.S.C. § 365 .................................................................................................................68

11 U.S.C. § 501 .................................................................................................................43

11 U.S.C. § 503 ...........................................................................................................*passim*

11 U.S.C. § 552 ...........................................................................................................*passim*

11 U.S.C. § 922(c) ............................................................................................................64

11 U.S.C. § 926 ..........................................................................................14, 15, 36, 66

11 U.S.C. § 944 .................................................................................................................48

11 U.S.C. § 1109(b) ..........................................................................................................27

31 L.P.R.A. § 3499 ...........................................................................................................72

48 U.S.C. §§ 2101–2241 ....................................................................................................1

PROMESA § 4 ...............................................................................................................7, 28

PROMESA § 101 .................................................................................................................6

PROMESA § 201 ...............................................................................................7, 28, 40, 64

PROMESA § 202 ...............................................................................................7, 28, 29, 62

PROMESA § 302(2) .............................................................................................................7

PROMESA § 305 ...............................................................................................................35

PROMESA § 405(m)(2) .....................................................................................................47

PROMESA § 407 .........................................................................................................61, 63

UCC § 1–304, Comment 1 ................................................................................69

**OTHER AUTHORITIES**

Congressional Task Force on Economic Growth in Puerto Rico, Report to the
    House and Senate (Dec. 20, 2016)
    https://www.finance.senate.gov/imo/media/doc/Bipartisan%20Congressional
    %20Task%20Force%20on%20Economic%20Growth%20in%20Puerto%20Ri
    co%20Releases%20Final%20Report.pdf ................................................................8

Fed. R. Civ. P. 9(b) ........................................................................................18

H.R. Rep. No. 114-602 ....................................................................................61

P.R. Act No. 21-2016.................................................................................8, 58

P.R. Act No. 106-2017................................................................................ *passim*

P.R. CONST. Article II, §§ 18, 19 ....................................................................45

Restatement (Second) Torts, § 895B(3)(a) (Am. Law Inst. 1977) ..............................25

Restatement (Third) of Restitution and Unjust Enrichment § 2(2)
    (Am. Law Inst. 2010)................................................................................60

Restatement (Third) of Torts: Liability for Economic Harm § 3
    (Am. Law Inst. 2012)...........................................................................37, 70

Restatement (Third) of Torts: Liability for Economic Harm § 5
    (Am. Law Inst. 2012)................................................................................82

Restatement (Third) of Torts: Liability for Economic Harm § 17(1)(c)
    (Am. Law Inst. 2018)................................................................................74

U.S. CONST. Amendment V ............................................................................40

U.S. CONST. Article I, § 10, cl. 1 ...................................................................50

**MOTION OF THE
COMMONWEALTH
OF PUERTO RICO AND THE
EMPLOYEES RETIREMENT SYSTEM OF
THE GOVERNMENT OF THE COMMONWEALTH
OF PUERTO RICO TO DISALLOW AND DISMISS CLAIMS
ASSERTED OR FILED BY ERS BONDHOLDERS AND THE ERS
FISCAL AGENT PURSUANT TO BANKRUPTCY RULES 3007(B) & 7012(B)**

To the Honorable United States District Judge Laura Taylor Swain:

The Commonwealth of Puerto Rico (the "Commonwealth") and the Employees Retirement

System of the Government of the Commonwealth of Puerto Rico ("ERS," and together with the

Commonwealth, the "Debtors"), by and through the Financial Oversight and Management Board

for Puerto Rico (the "Oversight Board"), as the Debtors' sole representative pursuant to section

315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2]

respectfully submit this motion (the "Motion"), seeking entry of an order, pursuant to Federal

Rules of Civil Procedure 12(b)(1) and 12(b)(6), made applicable to this Motion by Federal Rules

of Bankruptcy Procedure 7012 and 9014 and this Court's *Order Granting Urgent Joint Motion for*

*Entry of a Schedule for Resolution of the ERS Bondholder Claims and Administrative Expense*

*Motions* [Case No. 17-bk-3283, ECF No. 12446; Case No. 17-bk-3566, ECF No. 838],

substantially in the form attached as **Exhibit A** hereto, disallowing and dismissing claims (the

"Claims")[3] filed or asserted against the Debtors by certain groups of ERS Bondholders ("ERS

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101–2241.

[3] The Claims include those asserted by (a) certain ERS Bondholders in the (i) *ERS Bondholders' Motion and Request
for Allowance and Payment of Post-Petition and Administrative Expense Claims* [ECF No. 9285 in Case No. 17-bk-
3283 and ECF No. 707 in Case No. 17-bk-3566] and (ii) *ERS Bondholders' Motion and Request for Allowance and
Payment of Post- Petition and Administrative Expense Claims* [ECF No. 9294 in Case No. 17-bk-3283 and ECF No.
710 in Case No. 17-bk-3566] (collectively, the "Bondholder Administrative Expense Motions"), (b) the Fiscal Agent
in the *Joinder in ERS Bondholders' Motion for Allowance of Administrative Expense Claim* [ECF No. 9298 in Case
No. 17-bk-3283 and ECF No. 712 in Case No. 17-bk-3566] (the "Fiscal Agent Joinder" and, together with the
Bondholder Administrative Expense Motions, the "Administrative Expense Motions"), (c) the Claimants in the *ERS
Bondholders' Supplement to Proofs of Claim and Motions for Allowance of Administrative Expense Claims* [ECF No.
12536 in Case No. 17-bk-3283 and ECF No. 848 in Case No. 17-bk-3566] (the "Supplement"), (d) the Fiscal Agent
in proofs of claim numbers 16775, 16777, and 32004 (the "Fiscal Agent Proofs of Claim"), and (e) the ERS

Bondholder Groups") and The Bank of the New York Mellon, as Fiscal Agent for the ERS Bonds
(the "Fiscal Agent" and, together with the ERS Bondholder Groups, the "Claimants").  In support
of this Motion, the Oversight Board respectfully represents:

## PRELIMINARY STATEMENT[4]

1.     By this Motion, the Oversight Board seeks an order disallowing and dismissing all
Claims asserted against the Commonwealth and ERS by the ERS Bondholder Claimants, except
for their nonrecourse Claims against ERS for unpaid principal and interest on the ERS Bonds.[5]
The Claims against the Commonwealth allege liability arising from the enactment of the Post-
Petition Legislation, which changed the system for funding pension payments.   Previously,
government employers made Employers' Contributions to ERS based on a percentage of payroll,
and ERS used them to pay pensions and bond payments.  Under the new "pay-as-you-go" system,
Employers' Contributions were eliminated and the Commonwealth assumed responsibility to pay
retirement benefits directly and is reimbursed by public employers for pension payments (the
"PayGo Payments") made to their retirees.   Because ERS does not receive Employers'
Contributions which no longer exist, Claimants assert their collateral—the "Pledged Property," as
defined in the Resolution, which included ERS's "right to receive" Employers' Contributions—
was diverted to the Commonwealth.  The ERS Bondholders theorize the PayGo Payments are
effectively the Employers' Contributions previously made to ERS, and were taken from them

---

Bondholder Groups in the proofs of claim listed in Appendix 2 to the *Order Granting Urgent Joint Motion for Entry
of a Schedule for Resolution of the ERS Bondholder Claims and Administrative Expense Motions* [ECF No. 12446 in
Case No. 17-bk-3283 and ECF No. 838 in Case No. 17-bk-3566] (the "ERS Bondholder Groups Proofs of Claim"
and, together with the Fiscal Agent Proofs of Claim, the "Proofs of Claim").

[4] All capitalized terms not defined in this section shall have the meaning ascribed to them below.

[5] The Debtors believe those Claims should be disallowed as well, as the ERS Bonds issuance was *ultra vires* rendering
the ERS Bonds invalid.  These issues are being litigated in the *Ultra Vires* AP, which is proceeding pursuant to the
ERS AP Scheduling Order.

without compensation.  Their claims against the Commonwealth allege, among other things, the Post-Petition Legislation violated the Takings Clause of the U.S. and Commonwealth Constitutions, the Contracts Clause of the U.S. and Commonwealth Constitutions, and the automatic stay.  *See* [Case No. 17-bk-3283, ECF No. 707 ¶ 24].

2.      However, this Court's opinion, affirmed by the First Circuit, held Bankruptcy Code § 552 eliminated the ERS Bondholders' security interests in the Employers' Contributions, thereby rendering totally irrelevant the Commonwealth's enactment of the Post-Petition Legislation.  This Court held ERS's "right to receive" Employers' Contributions based on future labor not yet performed, "calculated and owed" as of the ERS Petition Date was a mere expectancy, and therefore not a prepetition property right of ERS in which the ERS Bondholders could have an attached security interest.  *See Emps. Ret. Sys. v. Andalusian Glob. Designated Activity Co. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 948 F.3d 457, 468–70, 472 & n.13 (1st Cir. 2020) (the "Section 552 Decision").  Because the "right to receive" not yet performed, calculated, and owed contributions is not property, it is impossible for PayGo Payments to be a transfer of the ERS Bondholders' interest in the "right to receive" them.  For that reason the Post-Petition Legislation cannot support a Takings Claim.  Also, that the impairment of the ERS Bondholders' ability to recover on their claims was a result of the application of § 552 of the Bankruptcy Code, not any action by the Commonwealth, eliminates any alleged Contracts Clause claim.  In addition, because the Commonwealth budget certified by the Oversight Board does not include an appropriation for Employers' Contributions to ERS, such appropriations would be preempted by PROMESA § 202, and ERS would not have received or have a right to receive such Employers' Contributions, which also eliminates any Commonwealth liability.

3.      As a result of the Section 552 Decision alone, all Claims in the Administrative

Expense Motions (including those supplemented in the Supplement) asserted against the Debtors

(the "Administrative Expense Claims") should be disallowed and dismissed under Fed. R. Civ. P.

12(b)(6) for failure to state a claim.  Further, independent of the Section 552 Decision, Claimants

are not entitled to an administrative priority claim.  They did not provide any postpetition property

or services necessary for the preservation of the Debtors.  Claimants here are prepetition creditors

based on prepetition agreements.  Treating them differently would violate a foundational principle

of bankruptcy law:  treating similarly situated creditors similarly.

4.      The Proofs of Claim filed by Claimants against the Commonwealth also challenge

the Post-Petition Legislation and should be disallowed and dismissed for the same reason as the

Administrative Expense Claims.  Furthermore, the Resolution,[6] Offering Statement, and related

documents make explicit that the ERS Bonds are solely payable by ERS, *see, e.g.*, Ex. B at VIII-

2 (proposed form opinion of Bond Counsel); *id.* at 23 (Offering Statement), and are not a liability

of the Commonwealth, which is an independent basis to disallow and dismiss the claims.  Indeed,

the Offering Statement explicitly warns that in times of financial distress the bondholders have the

risk of the Commonwealth altering Employers' Contributions.  Ex. B at 26 (Offering Statement)

("The [ERS] Bonds do not constitute public debt."); *see also Emps. Ret. Sys.*, 948 F.3d at 469 ("the

Official Statement put the Bondholders on notice that the Employers' Contributions stem from

appropriations that the Commonwealth legislature could, and likely would, reduce if it could not

fully fund its planned appropriations.").

---

[6] In considering this motion pursuant to Fed. R. Civ. P. 12(b)(6), the Court may take judicial notice of the Resolution, Offering Statement, and other documents for which no party contests their validity.  *See Claudio-de León v. Sistema Universitario Ana G. Méndez*, 775 F.3d 41, 46 (1st Cir. 2014) ("In conducting this review, we, like the district court, may consider 'documents the authenticity of which are not disputed by the parties, documents central to plaintiffs' claim, and documents sufficiently referred to in the complaint.'") (quoting *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001)).

5.       With respect to the Claims asserted against ERS, the Administrative Expense
Claims are primarily allegations of postpetition violations of prepetition covenants which cannot
give rise to administrative expense claims, or are improper attempts to transform claims for breach
of a prepetition contract to postpetition tort and fraud claims.  Any prepetition claims against ERS
arising from allegations of breach of covenants should also be disallowed and dismissed as such
breaches do not create liability apart from principal and interest and cannot operate to transform
contractually agreed  nonrecourse claims to recourse claims.  Subject to the outcome of the *Ultra
Vires* AP, Claimants should be allowed at most a nonrecourse Claim against ERS in the amount
of unpaid principal and interest owed on the ERS Bonds as of the ERS Petition Date in an amount
agreed to by the parties or determined by the Court in a subsequent proceeding.

## RELEVANT FACTS AND PROCEDURAL BACKGROUND[7]

**I.       ERS and the ERS Bonds**

6.       ERS is a trust established by the Commonwealth in 1951 for the economic well-
being of public employees.  ERS is an agency of the government, separate and apart from the
Commonwealth government and its other instrumentalities.  *See* Act 447 of May 15, 1951
(codified, as amended, at 3 L.P.R.A. §§ 761–788) (the "Enabling Act").  ERS was established to
administer the payment of pensions and other benefits to officers and employees of the
Commonwealth government, members and employees of Puerto Rico's Legislative Assembly (the
"Legislature"), and officers and employees of public corporations and municipalities.  *See*
3 L.P.R.A. § 761.  ERS was funded primarily by contributions from employers.  Employers

---

[7] Additional background can be found in the *Supplemental Objection of Financial Oversight and Management Board,
Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Proof of Claim Against the Commonwealth
by the Bank of New York Mellon, as Fiscal Agent (Claim No. 16775)* [Case No. 17-bk-3283, ECF No. 9700].

covered by ERS included the Commonwealth, its instrumentalities, and municipalities, excluding, among others, the school system and the judiciary.

7.     On January 24, 2008, ERS issued approximately $2.9 billion in bonds (the "ERS Bonds") pursuant to a *Pension Funding Bond Resolution*, adopted January 24, 2008 (the "Resolution,") attached as Appendix VI to the official statement for the first series of the ERS Bonds (the "Offering Statement" attached hereto as **Exhibit B**).  The Resolution provided the ERS Bonds would be secured by a security interest in "Pledged Property," Ex. B at VI-8 (Resolution at § 501), which the Resolution defined to include "Revenues."  *Id.* at VI-36.  "Revenues" included "all Employers' Contributions received by [ERS]," *Id.* at VI-37, which the Resolution defined as contributions made to ERS pursuant to specified sections—2-116, 3-105, and 4-113—of the Enabling Act based on a percentage of an employer's payroll.  *Id.* at VI-33.  The Offering Statement emphasized: "***The Legislature of the Commonwealth could reduce the Employer Contribution rate or make other changes in existing law that adversely affect the amount of Employer Contributions.***"  Ex. B at 26 (Offering Statement) (emphasis in original).

8.     On June 2, 2008, ERS executed a security agreement (the "Security Agreement," attached hereto as **Exhibit C**, which grants to the Fiscal Agent, for the benefit of holders of ERS Bonds, "a security interests in (i) the Pledged Property, and (ii) all proceeds thereof and all after-acquired property [of the types included as Pledged Property], subject to application as permitted by the Resolution."

## II.     PROMESA and Title III Cases

9.     On June 30, 2016, Congress enacted PROMESA.  PROMESA established the Oversight Board, and charged it with "provid[ing] a method for [Puerto Rico] to achieve fiscal responsibility and access to the capital markets."  PROMESA § 101(a), (b)(1).  Among other

things, PROMESA also empowers the Oversight Board to commence restructuring cases on behalf of the Commonwealth and ERS.  *Id.* § 302(2).

10.    PROMESA § 201 gives the Oversight Board the sole power to certify fiscal plans for the Commonwealth and its instrumentalities.  *Id.* § 201.  PROMESA § 202(e) gives the Oversight Board the sole power to certify budgets for the Commonwealth and its instrumentalities setting all appropriations, which, once certified, shall be deemed to be "in full force and effect beginning on the first day of the applicable fiscal year."  *Id*. § 202(e).

11.    PROMESA § 4 provides "the provisions of [PROMESA] shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with [PROMESA]."  *Id.* § 4.

12.    On March 13, 2017, the Board certified a fiscal plan for the Commonwealth (the "March 2017 Fiscal Plan," attached hereto as **Exhibit D**).  Among other things, the March 2017 Fiscal Plan contemplated the Commonwealth converting to a "pay-as-you-go" pension system to ensure funds would be available to pay beneficiaries.  Ex. D at 22 (March 2017 Fiscal Plan).  Neither the March 2017 Fiscal Plan nor any other certified Commonwealth fiscal plan or budget provided for the appropriation of Employers' Contributions to ERS.

13.    On May 3, 2017 the Oversight Board filed a petition for the Commonwealth, commencing the Commonwealth's Title III case.

14.    On May 21, 2017 (the "ERS Petition Date"), the Oversight Board filed a petition for ERS, commencing ERS's Title III case.

15.    On February 15, 2018, the Court entered the *Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [Case No. 17-bk-3283, ECF No. 2521], which, among other things, set May 29, 2018 at 4:00 p.m.

(Atlantic Standard Time) as "the deadline (the <u>General Bar Date</u>") for filing proofs of claims (as

defined in Bankruptcy Code § 101(5)) against the Debtors on account of (i) claims arising, or

deemed to have arisen, prior to the respective commencement dates for their Title III Cases,

including, for the avoidance of doubt, bond claims . . . ." *Id.* ¶ 3.

### III.   Pension Reform

16.     Since 1999, the Commonwealth has amended the Enabling Act numerous times in

an effort to shore up ERS's actuarial deficiency.  *See, e.g.*, Acts 305-1999 ("<u>Act 305</u>"); 116-2011;

3-2013; and 32-2013.  Notwithstanding such measures, ERS's financial condition continued to

worsen, with a net pension liability over $30 billion as of June 30, 2015.  *See* Congressional Task

Force on Economic Growth in Puerto Rico, Report to the House and Senate at 12 (Dec. 20, 2016).[8]

Responding to the imminent liquidity crisis at ERS and throughout the Commonwealth, Governor

García Padilla signed the *Puerto Rico Emergency Moratorium and Financial Rehabilitation Act*,

Act 21-2016 on April 6, 2016 (the "<u>Moratorium Act</u>").  The Moratorium Act authorized the

Governor to prioritize essential government services over the financial obligations of the

Commonwealth and its instrumentalities by imposing a moratorium on debt service payments.  Act

21-2016 §§ 108, 201(a).  Thereafter, on June 30, 2016, Governor García Padilla signed an

executive order (E.O. 2016-031) (the "<u>ERS Executive Order</u>"), which suspended "any obligation

of ERS pursuant to [the Resolution] to transfer contributions made by employers that participate

in ERS, and any assets in lieu thereof or derived thereunder paid to ERS under [Act 447] to the

[Fiscal Agent]."  ERS Executive Order at 2.

---

[8] The task force report can be found on:
https://www.finance.senate.gov/imo/media/doc/Bipartisan%20Congressional%20Task%20Force%20on%20Econom
ic%20Growth%20in%20Puerto%20Rico%20Releases%20Final%20Report.pdf.

17.     On June 25, 2017, the Legislature passed the *Joint Resolution for Other Allocations for Fiscal Year 2017–2018* ("Joint Resolution 188," attached hereto as **Exhibit E**), and, on August 23, 2017, Governor Rosselló signed Act 106-2017 ("Act 106," attached hereto as **Exhibit F**) into law.  Together, Act 106 and Joint Resolution 188 (collectively, the "Post-Petition Legislation") reformed Puerto Rico's retirement systems by (a) having the Commonwealth assume ERS's obligations to pay pensioners, (b) having employers reimburse the Commonwealth (*i.e.*, make PayGo Payments) for payments actually made by the Commonwealth to the employers' current pensioners, and (c) because ERS would no longer be responsible for paying benefits, eliminating employers' obligations to contribute to ERS.  *See* Ex. F §§ 2.1(b), 2.4(e) (Act 106); Ex. E § 4 (Joint Resolution 188).  As a result of the Post-Petition Legislation, ERS stopped receiving Employers' Contributions as of July 1, 2017, and was relieved of the obligation to pay retiree benefits.

18.     As part of these reforms, and in partial exchange for the Commonwealth's assumption of ERS's obligation to pay retirement benefits, ERS was required to sell its assets and transfer the proceeds, in addition to any existing available funds, to the Puerto Rico Department of Treasury's general fund to offset a portion of the Commonwealth's assumed pension liabilities.  *See* Ex. F § 1.4 (Act 106); Ex. E § 2 (Joint Resolution 188).  Consistent therewith, ERS transferred certain of its assets (the "Transferred Assets") to the Commonwealth.  *Andalusian Glob. Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 954 F.3d 1, 6 (1st Cir. 2020).[9]

## IV.     Procedural History

---

[9] As the Oversight Board has represented to this Court and the First Circuit, if the Lien-Scope AP "determines that the Bondholders have a valid lien on the $190.48 million the [Oversight] Board agrees was transferred from the System to the Commonwealth [*i.e.*, the Transferred Assets], the [Oversight] Board will recognize that lien and distribute to the Bondholders the value of that amount."  *Andalusian*, 954 F.3d at 10.

19.     This Motion relates to proofs of claim and motions for allowance and payment of administrative expenses filed by two groups of ERS Bondholders and the Fiscal Agent.  Shortly after ERS filed a Title III petition, certain of these Claimants also commenced an adversary proceeding against the Commonwealth and ERS challenging the Commonwealth's enactment of the Post-Petition Legislation.  The Oversight Board moved to dismiss that adversary proceeding, which motion was held in abeyance pending resolution of issues regarding the perfection of Claimants' security interest and whether § 552(a) of the Bankruptcy Code prevents Claimants' security interest from attaching to postpetition Employers' Contributions.  The Oversight Board filed objections to the proofs of claim and Claimants filed motions for payment and allowance of administrative expenses asserting the ERS Bondholders were harmed by the enactment of the Post-Petition Legislation.  The parties agreed to defer ligating these issues pending the outcome of the appeal to the First Circuit on the § 552 issues.  After the First Circuit affirmed this Court's decision, the parties reached agreement, which was embodied in an order providing the Oversight Board would file a single motion seeking to disallow and dismiss all claims challenging the Post-Petition Legislation, as well as other claims filed by the two ERS Bondholders Groups and the Fiscal Agent against the Commonwealth and ERS.  *See Order Granting Urgent Joint Motion for Entry of a Schedule for Resolution of the ERS Bondholder Claims and Administrative Expense Motions* [Case No. 17-bk-3283, ECF No. 12446; Case No. 17-bk-3566, ECF No. 838] (as subsequently amended in [Case No. 17-bk-3283, ECF No. 12901; Case No. 17-bk-3566, ECF No. 871] the "Claims Scheduling Order").

## V.     Claims Asserted by the ERS Bondholders and Fiscal Agent

20.     The ERS Bondholders and Fiscal Agent have filed numerous motions for payment of administrative expenses and proofs of claim against the Commonwealth and ERS.  These claims include those asserted by:

a. certain ERS Bondholders in the:

   i. *ERS Bondholders' Motion and Request for Allowance and Payment of Post-Petition and Administrative Expense Claims* [ECF No. 9285 in Case No. 17-bk-3283 and ECF No. 707 in Case No. 17-bk-3566] (the bondholder group represented by Jones Day);

   ii. *ERS Bondholders' Motion and Request for Allowance and Payment of Post-Petition and Administrative Expense Claims* [ECF No. 9294 in Case No. 17-bk-3283 and ECF No. 710 in Case No. 17-bk-3566] (the bondholder group represented by White & Case) (together, with the motion described in "a.i.", above, the "Bondholder Administrative Expense Motions"); and

   iii. proofs of claim filed by each of the individual bondholders listed in Appendix 2 to the *Order Granting Urgent Joint Motion for Entry of a Schedule for Resolution of the ERS Bondholder Claims and Administrative Expense Motions* [ECF No. 12446 in Case No. 17-bk-3283 and ECF No. 838 in Case No. 17-bk-3566] (collectively, the "ERS Bondholder Groups' Proofs of Claim");

b. the Fiscal Agent in the:

   i. *Joinder in ERS Bondholders' Motion for Allowance of Administrative Expense Claim* [ECF No. 9298 in Case No. 17-bk-3283 and ECF No. 712 in Case No. 17-bk-3566] (the "Fiscal Agent Joinder" and, together with the Bondholder Administrative Expense Motions, the "Administrative Expense Motions");

   ii. proofs of claim numbers 16775, 16777, and 32004 (the "Fiscal Agent Proofs of Claim" and, together with the ERS Bondholder Groups' Proofs of Claims, the "Proofs of Claim"); and

c. all Claimants in the *ERS Bondholders' Supplement to Proofs of Claim and Motions for Allowance of Administrative Expense Claims* [ECF No. 12536 in Case No. 17-bk-3283 and ECF No. 848 in Case No. 17-bk-3566] (the "Supplement" and, together with the claims asserted in the Administrative Expenses Motions and the Proofs of Claim, the "Claims").

By this Motion, the Debtors seek to disallow and dismiss all Claims,[10] except for nonrecourse

Claims asserted by the Claimants against ERS for unpaid principal and interest on the ERS Bonds

---

[10] The Debtors have already objected to the Proofs of Claim. To the extent any bases to dismiss proofs of claim filed against the Commonwealth and ERS are not set forth herein, the Oversight Board incorporates by reference its arguments in its objections to the proofs of claim filed against the Commonwealth and ERS. *See* [Case No. 17-bk-3283, ECF Nos. 7075 and 9700] (objecting to the Fiscal Agent's proof of claim against the Commonwealth); [Case

in an amount to be agreed by the parties or determined by the Court, subject to a determination of the validly of the ERS Bonds in the *Ultra Vires* AP.

## VI. Other ERS Bondholder Actions Related to ERS and the ERS Title III Case

21.     Prior to and since the commencement of ERS's Title III case, the Commonwealth, ERS, and Claimants, as well as the Official Committee of Unsecured Creditors (the "Creditors' Committee"), the Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the "Retiree Committee" and, together with the Creditors' Committee, the "Committees"), the Special Claims Committee of the Oversight Board (the "Special Claims Committee"), and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF" and, together with the Oversight Board and the Special Claims Committee, the "Government Parties" and, together with the Claimants and the Committees, the "Parties") have been involved in a multitude of actions, appeals, contested matters, and adversary proceedings relating to Claimants' assertion of claims against the Debtors arising from their asserted interest in the ERS Bonds.  Certain of these actions are described below.

### A. The Prepetition Lift Stay Proceeding

22.     After PROMESA was enacted, but before the filing of ERS's Title III case, certain of the ERS Bondholders filed a motion (the "Section 405 Motion") with the United States District Court for the District of Puerto Rico (the "District Court") seeking to lift the stay contained in § 405 of PROMESA (the "Section 405 Stay"), asserting that their alleged security interests in certain property of ERS lacked adequate protection.  *Altair Global Credit Opportunities Fund (A),*

---

No. 17-bk-3283, ECF Nos. 9702 and 9704] (objecting to the ERS Bondholder Groups' proofs of claim against the Commonwealth) (collectively, the "Commonwealth Claim Objections"); [Case No. 17-bk-3283, ECF No. 9701] (objecting to the Fiscal Agent's proof of claim against ERS); [Case No. 17-bk-3283, ECF Nos. 9703 and 9705] (objecting to the ERS Bondholder Groups' proofs of claims against ERS) (collectively, the "ERS Claim Objections").

*L.L.C. v. Garcia Padilla*, [Case No. 16-cv-2696, ECF No. 1] (Sept. 21, 2016) (J. Besosa) (the "Prepetition Proceeding").

23.    On January 17, 2017, certain parties (including ERS) entered into a joint stipulation to resolve the Section 405 Motion (the "January Stipulation") which was approved by the District Court. *Id.* [ECF No. 83]. In accordance with the January Stipulation, Employers' Contributions received by ERS from during the pendency of the Section 405 Stay were transferred by ERS to a segregated account for the benefit of the movants. *Id.* [ECF No. 83 ¶ 4].

24.    On April 11, 2017, the parties entered into a second joint stipulation (the "April Stipulation"), whereby ERS would transfer funds to the Fiscal Agent on a monthly basis for payment of interest on the ERS Bonds during the Section 405 Stay. *Id.* [ECF No. 86 ¶ 2]. Both the January Stipulation and the April Stipulation provided that "[a]ll other rights, claims and remedies of the ERS Bondholders, the Commonwealth and the ERS are expressly reserved." *Id.* [ECF No. 83 ¶ 5; ECF No. 86 ¶ 5].

**B.    Resolved Actions in the ERS Title III Case.**

**i.    The Section 552 Dispute.**

25.    On May 31, 2017, certain ERS Bondholders filed a motion to lift the automatic stay and for adequate protection on the ground that the March 2017 Fiscal Plan allegedly "allocated all of ERS's revenues to the Commonwealth." [Case No. 17-bk-3566, ECF No. 26 ¶ 4]. The ERS Bondholders and the Oversight Board stipulated to a schedule regarding the lift-stay motion. *Id.* [ECF No. 170] (the "July Stipulation"). The Oversight Board also agreed to pay the interest on the ERS Bonds from a segregated account as adequate protection payments, subject to a reservation of rights. *Id.* [ECF No. 170 at 4 (¶ D)]. That account was exhausted in July 2018. *Id.*

26.    In accordance with the July Stipulation, on July 21, 2017, ERS commenced an adversary proceeding, in which, as pertinent here, ERS alleged that "section 552(a) of the

Bankruptcy Code prevents any security interest [of the Claimants] from attaching to Revenues [including, among other things, the Employers' Contributions] received by ERS during the postpetition period." [Adv. Proc. No. 17-00213 (LTS), ECF No. 1 ¶ 143] (D.P.R. July 21, 2017). This Court agreed with ERS, *see Employees Retirement System of Puerto Rico v. Andalusian Global Designated Activity Co. (In re Financial Oversight & Management Board for Puerto Rico)*, 385 F.Supp.3d 138, 155 (D.P.R. 2019), and, on January 30, 2020, the First Circuit affirmed this Court's decision. *Emps. Ret. Sys.*, 948 F.3d at 468. Accordingly, Claimants have no security interest in Employers' Contributions "based on payroll amounts for work occurring on and after the petition date[.]" *Id.*[11]

### ii.      The Section 926 Dispute

27.      On January 28, 2019, certain ERS Bondholders demanded that the Oversight Board initiate an avoidance action against the Commonwealth on behalf of ERS in connection with the Post-Petition Legislation. [Case No. 17-bk-3566, ECF No. 704-4]. After filing a motion requesting the Court appoint a trustee to pursue such actions under Bankruptcy Code § 926, the Commonwealth and ERS entered into a stipulation, approved by the Court, that extended by 270 days the limitations period for ERS to bring an avoidance action against the Commonwealth. [Case No. 17-bk-3566, ECF No. 376] (the "Tolling Stipulation"). The Tolling Stipulation identified the bondholders as third-party beneficiaries. *See id.* at 4.

28.      On October 30, 2019 certain ERS Bondholders renewed their demand that ERS initiate avoidance actions against the Commonwealth to "pursue certain avoidance actions arising from transfers made under or in connection with [the Post-Petition Legislation]"). [Case No. 17-

---

[11] The ERS Bondholder Groups have indicated they intend to ask the United States Supreme Court to review the Section 552 Decision. Supplement at 10 n.6.

bk-3566, ECF No. 704-2 at 1].   Again, they filed a motion requesting appointment of a § 926

trustee, which the Court denied in light of the other avenues the ERS Bondholders had to pursue

their requested relief, the Oversight Board's interest in a holistic restructuring of the

Commonwealth and ERS, and the viable defenses to the ERS Bondholders' proposed claims.  *See*

*Andalusian Glob. Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin.*

*Oversight & Mgmt. Bd. for P.R.)*, No. 17-bk-3566-LTS, 2020 WL 114518, at *3 (D.P.R. Jan. 7,

2020), *aff'd*, 954 F.3d 1 (1st Cir. 2020).  The First Circuit affirmed, holding that "[i]n denying the

Bondholders' motion, the [Court] clearly did not abuse its discretion[.]"  *Andalusian*, 954 F.3d at

5 (the "Section 926 Decision").

### iii.     The Renewed Lift Stay Motion.

29.     On February 21, 2019, certain ERS Bondholders renewed their original motion

(discussed *supra* ¶ 25) for stay relief and adequate protection.  [Case No. 17-bk-3566, ECF

No. 367] (the "Renewed Lift Stay Motion").  In connection with that motion, the bondholders

argued their security interest attaches to the PayGo Payments being received by the

Commonwealth, and that their interest in the PayGo Payments was not being adequately protected.

*E.g.*, *id.* [ECF No. 583 ¶ 3].  ERS objected, arguing, among other things, that even if § 552(a) did

not prevent the ERS Bondholders' security interest from attaching to Employers' Contributions

generated postpetition, their interest would not attach to the PayGo Payments—an entirely

different asset in which the Resolution did not grant the ERS Bondholders a security interest.  *See*

*generally id.* [ECF Nos. 579 and 598].  ERS also argued that, even if the ERS Bondholders

established an interest in PayGo Payments, such interest was adequately protected.

30.     The Court terminated the Renewed Lift Stay Motion in view of its ruling (discussed

*supra* ¶ 26) that ERS Bondholders' security interest does not attach to Employers' Contributions

generated postpetition.  *Id.* [ECF No. 640].

C.      **Pending Actions in the ERS Title III Case.**

i.      **The Post-Petition Legislation Adversary Proceeding**

31.      On July 27, 2017, certain ERS Bondholders commenced an adversary proceeding

seeking to invalidate Joint Resolution 188, and subsequently amended the complaint following the

passage of Act 106 in order to challenge that Act as well.  *See* [Case No. 17-ap-219-LTS, ECF

No. 39; Case No. 17-ap-220-LTS, ECF No. 39] (the "Post-Petition Legislation AP").  Specifically,

the ERS Bondholders sought declarations that:  (i) the Post-Petition Legislation was void because

it violated the automatic stay; (ii) their claims against ERS were secured; (iii) their security interest

attaches to the post-petition PayGo Payments; and (iv) the Post-Petition Legislation unjustly

enriched the Commonwealth and violated the Takings and Contracts Clauses of the U.S. and

Commonwealth constitutions.  *Id.* ¶¶ 99–176.  The Oversight Board moved to dismiss the Post-

Petition Legislation AP.  *Id.* [ECF No. 41].  That proceeding was stayed until the First Circuit

issued the Section 552 Decision.  *Id.* [ECF No. 69].  No action has been taken in the Post-Petition

Legislation AP since the stay was lifted.  The claims alleged by the ERS Bondholders therein are

incorporated by reference by Claimants in the Administrative Expense Motions and certain Proofs

of Claim.  *See, e.g.*, [Case No. 17-bk-3566, ECF No. 707 ¶ 27]; Proof of Claim No. 16775.  The

Debtors seek dismissal and disallowance of those claims by this Motion.

ii.      **The Lien-Scope Adversary Proceeding and the *Ultra Vires* Litigation**

32.      On May 19, 2019 the Special Claims Committee and the Creditors' Committee

commenced adversary proceedings seeking to recover monies paid to ERS Bondholders on the

ground that the issuance of the ERS Bonds was *ultra vires*, and therefore any payments thereon

were constructive fraudulent conveyances.  Adv. Proc. Nos. 19-355, 19-356, 19-357, 19-358, 19-

359, and 19-361 (LTS) (D.P.R. May 29, 2019) (collectively, the "*Ultra Vires* AP").  The objections

of the Retiree Committee [Case No. 17-bk-3283, ECF No. 6482; Case No. 17-bk-3566, ECF

No. 469] and of the Creditors' Committee [Case No. 17-bk-3283, ECF Nos. 5580 and 5586; Case No. 17-bk-3566, ECF Nos. 381 and 384] to claims arising from the ERS Bonds asserting that the issuance was *ultra vires* are being litigated in connection with the *Ultra Vires* AP.  *Ultra Vires* AP [ECF No. 16 at 3].

33.     On May 20, 2019, ERS and the Creditors' Committee filed a complaint alleging the ERS Bondholders do not hold valid and enforceable security interests in any of ERS's remaining assets or the proceeds thereof, except for ERS's right to receive unpaid Employers' Contributions owed on account of prepetition work already performed by employees (the "Accounts Receivable").[12]  Adv. Proc. Nos. 19-366 and 19-367 (LTS) (D.P.R. May 20, 2019) (the "Lien-Scope AP") [ECF No. 1 ¶ 8].  The Lien-Scope AP will also determine if Claimants' lien extends to the Transferred Assets.  The Lien-Scope AP and the *Ultra Vires* AP are being addressed according to an agreed scheduling order.  [Case No. 17-bk-3283, ECF No. 8962, as amended by ECF No. 10728] (the "ERS AP Scheduling Order").

## **LEGAL STANDARD**

34.     This Motion is filed pursuant to the Claims Scheduling Order, and seeks dismissal and disallowance of Claims asserted against ERS and the Commonwealth in the Proofs of Claim, the Administrative Expenses Motions, and the Supplement thereto.

35.     To survive a Rule 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This burden obligates a plaintiff to provide "more than labels and conclusions, and a formulaic

---

[12] In accordance with paragraph 13 of that certain "926 Stipulation" [Case No. 17-bk-3283, ECF No. 6990], the Creditors' Committee exercised its right to allege that Pledged Property also does not include the Accounts Receivable. Lien-Scope AP, [ECF No. 1 ¶ 156 n.13].

recitation of a cause of action's elements will not do." *Id.* at 545. Courts need not accept as true legal conclusions or "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (citation omitted).

36.     Certain Claims allege the Debtors committed "fraud" or "dolo" (deceit) in connection with the Resolution. *See, e.g.*, Supplement ¶¶ 4, 11, 23. Where "fraud lies at the core of the action," the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies. *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985) (citing *Lopez v. Bulova Watch Co., Inc.*, 582 F. Supp. 755, 766 (D.R.I. 1984)); *see also N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009); *see also Generadora De Electricidad Del Caribe, Inc. v. Foster Wheeler Corp.*, 92 F. Supp. 2d 8, 20 (D.P.R. 2000) (finding a "dolo" claim must meet the heightened standard of review under Rule 9(b) if it involves the five elements of fraud: (1) a false representation of a material fact; (2) knowledge or belief in its falsity by the person making the representation; (3) belief in the representation's truth by the person to whom it is made (4) intent that the representation should be acted upon; and (5) detrimental reliance by the person claiming to have been deceived). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This pleading standard is satisfied by averring "the who, what, where, and when of the allegedly false or fraudulent representation." *Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004). "[A] complaint's general averment of the defendant's 'knowledge' of material falsity" is insufficient unless the complaint "identif[ies] the basis for inferring scienter . . . [by] also set[ting] forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Cardinale*, 567 F.3d at 13 (citations omitted).

## ARGUMENT

I.   **THE CLAIMS ASSERTED AGAINST THE DEBTORS IN THE ADMINISTRATIVE EXPENSE MOTIONS SHOULD BE DISALLOWED AND DISMISSED UNDER RULE 12(b)(1) AND (b)(6).**

### A.   The Section 552 Decision Precludes All Administrative Expense Claims.

37.     Claimants allege they are entitled to Administrative Expense Claims arising from the Commonwealth's enactment of the Post-Petition Legislation, *see, e.g.*, [Case No. 17-bk-3566, ECF No. 707 ¶ 24], which discontinued the Employers' Contributions to ERS and provided for the transfer of the Transferred Assets from ERS to the Commonwealth.  *See supra* ¶¶ 17–18. Claimants assert the Post-Petition Legislation "was enacted after the commencement of the ERS and the Commonwealth's Title III cases . . . [and] effected transfers of ERS's property that were unauthorized and wrongful."  *See* [ECF No. 707 ¶ 26].  Other than the Transferred Assets, which are the subject of a pending adversary proceeding, *see supra* ¶ 33, the property Claimants allege was transferred by ERS is the "right to receive" Employers' Contributions.  They lodge a number of theories to support their Administrative Expense Claims, including that the Post-Petition Legislation violated the Takings Clause of the U.S. and Commonwealth Constitutions, the Contracts Clause of the U.S. and Commonwealth Constitutions, and unjustly enriched the Commonwealth, among other claims.  *See* [ECF No. 707 ¶ 24].  As explained in the Preliminary Statement, now that it is clear Claimants would not receive the Employers' Contributions with or without the Post-Petition Legislation, it is impossible for Claimants to have an administrative claim (or any claim) arising from the enactment of the Post-Petition Legislation.

38.     Nowhere do Claimants explain how their Administrative Expense Claims survive the Section 552 Decision, which ruled the ERS Bondholders' security interest did not attach to Employers' Contributions not yet "calculated and owed" as of the ERS Petition Date because ERS's "right to receive" Employers' Contributions was a mere expectancy, and therefore not a

prepetition property right of ERS in which the ERS Bondholders could have an attached security interest. *See Emps. Ret. Sys.*, 948 F.3d at 468–70, 472 & n.13. Thus, when the Post-Petition Legislation was enacted, and the PayGo Payments commenced, Claimants' security interest no longer attached to any newly created assets, whether PayGo Payments (accepting for the sake of argument that PayGo Payments are equivalent to Employers' Contributions) or the Employers' Contributions. The predicate for Claimants' Claims—that there were "transfers of ERS property"—fails because the "right to receive" Employers' Contributions based on postpetition labor that had not yet been performed, calculated, and owed as of the Petition Date is not property. It follows, therefore, that Claimants likewise have no interest in the PayGo Payments made postpetition.

39.    Accordingly, Claimants cannot have any Administrative Expense Claims as a consequence of any action of the Commonwealth or ERS with respect to Employers' Contributions after the ERS Petition Date. Section 552 of the Bankruptcy Code—and not the Post-Petition Legislation—limits Claimants' potential recoveries to assets of ERS existing as of the ERS Petition Date, as their security interest does not attach to assets generated after that date. The Post-Petition Legislation did not affect any rights—property, contractual, or otherwise—that Claimants had on the ERS Petition Date. Without a property interest, a Takings claim fails as a matter of law, *see, e.g.*, *Parella v. Ret. Bd. of the Rhode Island Emps. Ret. Sys.*, 173 F.3d 46, 58 (1st Cir. 1999) ("Takings Clause issue can arise only after a plaintiff's property right has been independently established."),[13] and without a legislative impairment of a contractual right, a Contracts clause

---

[13] Without a perfected security interest, no property interest exists for Takings Clause purposes, because alleged impairments of unsecured contractual rights do not constitute a taking. *See Wright v. Union Cent. Life Ins. Co.*, 311 U.S. 273, 278 (1940). Absent a lien, the bare right to be paid is not property under the Takings Clause. *See, e.g.*, *Bank of N.Y. v. Treco (In re Treco)*, 240 F.3d 148, 161 (2d Cir. 2001) ("If the claim is unsecured, it is not 'property' for purposes of the Takings Clause."); *Pro-Eco, Inc. v. Bd. of Comm'rs of Jay Cty.*, 57 F.3d 505, 510 (7th Cir. 1995)

claim also fails as a matter of law, *United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuño*, 633 F.3d 37, 41 (1st Cir. 2011) (a viable Contracts clause claim necessarily requires the demonstration of a "substantial impairment of a contractual relationship.").

40.     The First Circuit recognized the futility of the relief the ERS Bondholders seek here—a claim based on the Post-Petition Legislation.  The First Circuit observed:

> Our [Section 552 Decision] determined that the Bondholders did not have a prepetition property interest in postpetition Employers' Contributions and thus limited the Bondholders' liens on Employers' Contributions to only those Contributions already paid, or "calculated and owed" as of the petition date.  [*Emps. Ret. Sys.*], 948 F.3d at 468–70, 472 & n.13.  <u>The Bondholders have failed to make any argument as to why our [Section 552 Decision] would not also limit their proposed claims as to postpetition Employers' Contributions.</u>

*Andalusian*, 954 F.3d at 6 n.4 (emphasis added).  As a result of the Section 552 Decision alone, all Administrative Expense Claims filed or asserted against the Debtors should be disallowed and dismissed as they are predicated on the theory that the Post-Petition Legislation somehow harmed Claimants by discontinuing Employers' Contributions.  That theory has been rejected by this Court and the First Circuit.  *Emps. Ret. Sys.*, 948 F.3d at 468.

**B.     Claimants Fail to Meet the Standard for an Administrative Expense Claim and Their Motion Should be Dismissed Under Rule 12 (b)(6).**

41.     Section 503(b)(1)(A) of the Bankruptcy Code allows administrative expenses for the "actual, necessary costs and expenses of preserving the estate[.]"  11 U.S.C. § 503(b)(1)(A).

---

("the property right of a secured party to collateral is 'quite different in legal contemplation' from the creditor's contract right to repayment of the debt")

Further, although the Supreme Court once referred to contracts as property under the Takings Clause, *see Lynch v. United States*, 292 U.S. 571, 579 (1934), the Supreme Court's later decision in *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211 (1986) "effectively overrul[ed], if it had not already been overruled, *Lynch* . . . to the extent that it [*i.e.*, *Lynch*] flatly holds that contracts are property that the government may not take without compensation." *Pro-Eco, Inc.* 57 F.3d at 510 n.2; *see also Buffalo Teachers Fed'n v. Tobe*, 464 F.3d at 362, 374–75 (cases cited therein). In the 85 years since *Lynch* was decided, the Supreme Court has never held that unsecured rights arising from contract are property under the Takings Clause.

Even if the Administrative Expense Claims somehow survive the Section 552 Decision (and they do not), such claims still should be disallowed and dismissed.  Claimants cannot have an administrative expense claim against ERS resulting from a breach of a prepetition contract—the Resolution.  In any event, Claimants have not alleged (and cannot allege) that they have provided any postpetition property or services necessary for the preservation of either the Commonwealth or ERS.

### i.      Claimants Do Not Have Administrative Expense Claims Against ERS.

42.      The Administrative Expense Claims allege assorted, overlapping breaches ERS allegedly committed postpetition.  *See, e.g.*, [Case No. 17-bk-3566, ECF No. 707 ¶ 24] ("ERS's post-petition breach of its obligation to pay principal and interest on the ERS Bonds . . . [and] ERS's numerous post-petition breaches of its obligations under the ERS Bonds, the ERS Bond Resolution and the security agreement . . . ."); *see also id.* ¶¶ 28–33.  Claimants assert these breaches entitle their Claims to be allowed as administrative expenses, or in the alternative, to be non-dischargeable in these proceedings.  *Id.* ¶ 25.  Claimants are wrong.  If Claimants were right, then every debtor breaching a prepetition loan agreement would be liable for the loan as an administrative expense.

43.      In the First Circuit, for a claim to be entitled to administrative expense priority, it "must have arisen from a transaction with the trustee or debtor in possession, rather than from a pre-petition transaction with the debtor[.]"  *In re Jeans.com*, 491 B.R. 16, 24 (Bankr. D.P.R. 2013) (quoting *In re FBI Distribution Corp.*, 330 F.3d 36, 42 (1st Cir. 2003)).  Every one of Claimants' alleged breaches relates to obligations arising under the ERS Bonds, the Resolution, and the Security Agreement—all of which are prepetition transactions with ERS.  It is well-established that an alleged postpetition breach of a prepetition contract does not convert the claim arising therefrom into an administrative expense claim.  *See In re Old Carco LLC*, 424 B.R. 650, 657

22

(Bankr. S.D.N.Y. 2010), *aff'd*, No. 09-50002 AJG, 2010 WL 4455648 (S.D.N.Y. Nov. 2, 2010)

("where there is a pre-petition contract or lease, and the consideration supporting the claim is

supplied pre-petition, courts have determined that those claims are not entitled to administrative

priority, even if the right to payment arises post-petition"); *In re GT Advanced Techs., Inc.*, 547

B.R. 3, 12 (Bankr. D.N.H. 2016), *aff'd sub nom. Tera Xtal Tech. Corp. v. GT Advanced Techs.,*

*Inc.*, No. 16-CV-91-PB, 2017 WL 590340 (D.N.H. Feb. 13, 2017) (quoting *Old Carco*); *see also*

*In re Bradlees Stores, Inc.*, No. 02 CIV. 0896 (WHP), 2003 WL 76990, at *3 (S.D.N.Y. Jan. 9,

2003), *aff'd*, 78 F. App'x 166 (2d Cir. 2003) ("contract-based bankruptcy claims are deemed to

arise at the time the contract is executed, and therefore a post-petition breach of a pre-petition

contract gives rise solely to a pre-petition claim."); *In re Drexel Burnham Lambert Grp., Inc.*, 138

B.R. 687, 696 n.12 (Bankr. S.D.N.Y. 1992) ("Where the debtors' obligations stem from

contractual liability, even a post-petition breach will be treated as a prepetition liability where the

contract was executed prepetition.") (citation omitted). The reasoning is obvious enough—

prepetition obligations are the very obligations a bankruptcy case endeavors to restructure. If a

postpetition breach of a prepetition contract, such as a failure to pay interest on bonds issued

prepetition, led to an administrative expense claim, debtors would be unable to free themselves

from onerous prepetition obligations, frustrating the very purpose of a bankruptcy case.

44.     Even if ERS did breach the Resolution (either before or after the ERS Petition

Date), the Claims are limited to Claimants' collateral, because the ERS Bonds are nonrecourse.

### ii.     Claimants Do Not Have Administrative Expense Claims Against the Commonwealth.

45.     Claimants assert they are entitled to an administrative expense claim against the

Commonwealth based on the Commonwealth's alleged wrongful conduct in enacting the Post-

Petition Legislation.[14]   The two opinions Claimants cite—*Reading Co. v. Brown*, 391 U.S. 471 (1968) and *In re Charlesbank Laundry, Inc.*, 755 F.2d 200 (1st Cir. 1985) [ECF No. 707 ¶ 25]— do not support their Claims being granted as administrative expenses under § 503(b).   In *Reading*, a trustee's alleged negligence led to a fire that damaged a non-debtor third party, who then asserted an administrative expense claim.   *Reading*, 391 U.S. at 473.   The Supreme Court held under the Bankruptcy Act (in effect then) that damages caused by the actions of a trustee operating a business in a chapter XI arrangement give rise to "actual and necessary costs" of preserving the bankruptcy estate.   *Id.* at 479–83.   The Supreme Court based its decision on the fact that, in a chapter XI case, the "business [is] operating under a Chapter XI arrangement for the benefit of creditors" to increase their recovery, *id.* at 479, and that, as the only purpose of continuing to operate the debtor was to increase prepetition creditors' recoveries, it was only fair to give innocent third parties that "had an insolvent business thrust upon [them] by operation of law" administrative priority.   *Id.* at 478. In *Charlesbank*, the First Circuit applied *Reading* to a chapter 11 case under the Bankruptcy Code and held a civil compensatory fine, where a debtor deliberately violated a zoning ordinance (presumably because it was more lucrative than to follow it) qualifies as an administrative expense under § 503(b)(1)(A) of the Bankruptcy Code as an actual, necessary cost and expense of preserving the estate.   755 F.2d at 202.

46.     As a gating matter, yet again the Section 552 Decision blocks allowance of Claimants' claim because it shows Claimants would not have been entitled to the Employers' Contributions regardless of whether the Commonwealth enacted the Post-Petition Legislation. Also, Claimants cannot base an administrative expense claim on the simple fact the

---

[14] The Post-Petition Legislation was not wrongful, as it was a valid legislative action to provide for benefits for retirees. *See infra* ¶¶ 115–124.

Commonwealth passed legislation—they must demonstrate an actual claim before they can possibly assert they have an administrative expense priority. Claimants' attempt to equate a tort or wrongful conduct (a fire under *Reading* or a zoning violation under *Charlesbank*) to legislation under Puerto Rico law should be rejected out of hand. The enactment of legislation cannot constitute a tort or a violation of law, nor can be the acts taken pursuant to that legislation. *See* Restatement (Second) Torts, § 895B(3)(a) (Am. Law Inst. 1977) ("Even when a State is subject to tort liability, it and its governmental agencies are immune to the liability for acts and omissions constituting . . . the exercise of a . . . legislative function"); *id.* § 265 ("One is privileged to commit an act which would otherwise be . . . a conversion if he is acting in discharge of a duty or authority *created by* law to preserve the public safety, health, peace, or other public interest, and his act is reasonably necessary to the performance of his duty or the exercise of his authority.") (emphasis added). If the Post-Petition Legislation is not a Taking or a violation of the Contracts Clause (which it is not) it cannot be a basis for any claim let alone an administrative expense claim.

47.     *Reading* and *Charlesbank* illustrate that where a *chapter 11 debtor* operating a business postpetition harms a person or entity—through negligence or violation of the law—with whom the debtor had no *prepetition* relationship, an administrative expense claim *may* be owed. The First Circuit repeatedly has declined to apply *Reading* to postpetition conduct by debtors harming claimants with respect to prepetition obligations. *See In re Hemingway Transp.*, 954 F.2d 1, 6–7 (1st Cir. 1992) (finding claim for attorney fees based on postpetition lawsuit that was based on prepetition contract did not fall under *Reading* because "its *prepetition* genesis ultimately distinguishes it from the *postpetition* losses accorded priority in *Reading* and *Charlesbank*") (emphasis in original); *In re Mammoth Mart*, 536 F.2d 950, 955 (1st Cir. 1976) ("It is only when the debtor-in-possession's actions themselves—that is, considered apart from any obligation of the

debtor—give rise to a legal liability that the claimant is entitled to the priority of a cost and expense

of administration."); *see also Abercrombie v. Hayden Corp. (In re Abercrombie)*, 139 F.3d 755,

759 (9th Cir. 1998) (*Reading* exception is inapplicable where "the source of the estate's obligation

remains the prepetition fee provision" even where debtor's actions continued postpetition).

48.      Here, the entirety of the Claims are based solely on ERS Bonds issued prepetition,

and certain actions taken by the Commonwealth and ERS that allegedly harmed Claimants' chance

of getting paid on those bonds.  As a result, Claimants' claims have a "prepetition genesis" that

takes them outside the *Reading* doctrine.  *See In re Hemingway Transp.*, 954 F.2d at 7.  Moreover,

Claimants here are sophisticated financial entities who assumed all the risks of ownership of the

ERS Bonds, which risks were prominently displayed in the Offering Statement at the time the

bonds were issued, including that the Employers' Contributions could be reduced or even

eliminated.  *See* Ex. B at 26 (Offering Statement) ("***The Legislature of the Commonwealth could

reduce the Employer Contribution rate or make other changes in existing law that adversely

affect the amount of Employer Contributions.***") (emphasis in original).  Claimants are not

innocent third parties harmed by a trustee's negligence, or governmental entities enforcing zoning

violations willfully violated.  Accordingly, the *Reading* doctrine does not apply to the

Administrative Expense Claims.

> **iii.     The Administrative Expense Claims Do Not Satisfy Bankruptcy Code
> § 503.**

49.      Perhaps recognizing their claims do not fit any definition of "administrative

expense," Claimants do not even attempt to tether such claims to a subsection within § 503(b) of

the Bankruptcy Code.  *See, e.g.*, [Case No. 17-bk-3283, ECF No. 707 ¶ 25] (alleging only that the

Administrative Expense Claims are "allowable as an administrative expense under section 503(b)"

and "arise[] post-petition and [are] allowable as an administrative expense.").  Of course,

Claimants are not providing any benefit to the Debtors postpetition, nor do they identify an "actual, necessary cost[] and expense[] of preserving" the Debtors.  11 U.S.C. § 503(b)(1)(A).  Neither the Commonwealth nor ERS is operating a business postpetition for the benefit of creditors; rather, as this Court has recognized, they are restructuring to be able to provide for the welfare of the people of Puerto Rico.

50.      In any event, even assuming for the sake of argument that administrative expenses could be granted to prepetition creditors harmed by postpetition actions, Claimants lost their secured claims pursuant to Bankruptcy Code § 552, and were not harmed by the Post-Petition Legislation, so *Reading* and *Charlesbank* are inapplicable.  *See supra* ¶¶ 37–40.

51.      Further, even if there were an administrative expense claim against the Commonwealth, the claim belongs to ERS and not Claimants.  Though Claimants argue they have a security interest in ERS's "right to receive" the unpaid Employers' Contributions, any claim arising from the impairment of the "right to receive" belongs to ERS and only ERS has standing to prosecute such claim.  Party-in-interest standing under Bankruptcy Code § 1109(b) is confined to parties whose interests are directly—and not indirectly or derivatively—affected by a Title III case.  Party-in-interest status does not include a creditor of a creditor of a debtor.  *See, e.g.*, *In re Comcoach Corp.*, 698 F.2d 571, 574 (2d Cir. 1983).  This reasoning is obvious—the creditor whose rights the creditor of the creditor attempts to prosecute may not agree with what the other creditor is trying to do.

C.      **Claimants Cannot Assert a Claim Under Statutes Requiring Employers' Contributions Because Such Statutes Are Preempted by PROMESA.**

52.      The Enabling Act makes explicit that Employers' Contributions are subject to annual appropriation by the Commonwealth.  *See* 3 L.P.R.A. § 781(g).  The expectation that future Employers' Contributions will be contributed to ERS is nothing more than a forward-looking

27

projection based on a budget preempted by PROMESA.  Congress gave the Oversight Board extensive powers to develop and certify fiscal plans and budgets for the Commonwealth and its instrumentalities, *see* PROMESA §§ 201, 202, and provided that "[t]he provisions of [PROMESA] shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with [PROMESA]."  PROMESA § 4.

53.     Any statute requiring the Commonwealth to appropriate Employers' Contributions to ERS is preempted, for the simple reason that it purports to appropriate Commonwealth money without regard to the Oversight Board's certified fiscal plans and budgets.  As the First Circuit has recognized, PROMESA preempts any territorial law appropriating funds outside an Oversight Board certified budget because "[s]imply put, . . . there can be no spending from sources not listed in [a certified] budget, regardless of what any territorial law says."  *Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R.*, 945 F.3d 3, 8.  As a result, any claim based on the Commonwealth's failure to make such appropriations must be denied, as the territorial laws that may have once required such appropriations were preempted by PROMESA.  The law is simple: preempted statutes cannot give rise to valid claims.

54.     Notably, the fiscal plans and budgets that the Oversight Board has certified do not contain any appropriations for Employers' Contributions.[15]  *See, e.g.*, *Certified Commonwealth Fiscal Plan With Corrections*, Financial Oversight & Management Board for Puerto Rico Documents (Apr. 18, 2017) at 14, available at oversightboard.pr.gov/documents/ (providing that the "Paygo program for ERS . . . is initiated in 2018"); *Certified Budget for the Commonwealth*

---

[15] The fiscal plans for ERS were included in the Commonwealth fiscal plans.

*for the Fiscal Year 2018–19*, available at oversightboard.pr.gov/documents/.[16]   Under

PROMESA, the certified budgets are deemed to be approved by the Legislature "in full force and

effect" during that fiscal year.  As this Court has already ruled, "a budget approved and adopted

by the Oversight Board as compliant with a certified fiscal plan becomes law . . . and inconsistent

Commonwealth laws are preempted."  *Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin.*

*Oversight & Mgmt. Bd. for P.R.)*, 330 F. Supp. 3d 685, 701 (D.P.R. 2018), *aff'd and remanded*,

945 F.3d 3 (1st Cir. 2019).  The First Circuit agreed:

> A prior year authorization for spending that is not covered by the
> budget is inconsistent with PROMESA's declaration that the
> Oversight Board-certified budget for the fiscal year is in full force
> and effect, and is therefore preempted by that statutory provision
> by force of Section 4 of PROMESA.

945 F.3d at 8 (citing *Nevares*, 330 F. Supp. 3d at 704) (emphasis original)

55.     In addition, the Enabling Act was enacted by a prior legislature that did not have

the power to bind the current and future legislatures to make appropriations.  Pursuant to

PROMESA § 202(e)(3), the budget certified by the Oversight Board—which does not appropriate

Employers' Contributions—is "deemed to be approved" by the present legislature and to be "in

full force and effect."  PROMESA § 202(e)(3)(A), (C).  The Legislature has thus been deemed to

approve an appropriation that conflicts with and overrides the Enabling Act's appropriation of

Employers' Contributions.  Because the obligation to make Employers' Contributions originates

in statutes preempted by PROMESA, the elimination thereof cannot give rise to liability of the

Commonwealth.

---

[16] On June 30, 2019, the Oversight Board certified a budget for the Commonwealth for the Fiscal Year 2019–20,
which similarly did not provide for Employers' Contributions.

**D.**   **Alternatively, the Specific Allegations in the Administrative Expense Claims Fail to State a Claim Under Rule 12(b)(1) and (b)(6) and Such Claims Should Be Disallowed and Dismissed.**

    **i.**   **Each Claim Asserted in the Post-Petition Legislation AP Incorporated in the Administrative Expense Claims and the Proofs of Claim Should be Disallowed and Dismissed.**

56.     The Administrative Expense Claims and the Proofs of Claim incorporate the eight causes of action asserted in the Post-Petition Legislation AP.  *See* [ECF No. 707 ¶ 27].  Each Claim should be dismissed.

**1.     The Post-Petition Legislation Did Not Violate the Automatic Stay.**

57.     Claimants allege the Commonwealth "violated the ERS automatic stay when it passed the Post-Petition Legislation" which was an "action by the Commonwealth to obtain possession of property of the ERS and from the ERS, and to exercise control over property of the ERS" and that "[t]he Post-Petition Legislation is therefore void ab initio and cannot be implemented."  Post-Petition Legislation AP [ECF No. 39 ¶¶ 105, 109–110].  Claimants show no damage from the Post-Petition Legislation and cannot do so, now that it is clear and final that they lacked any interests in the Employers' Contributions even before the Post-Petition Legislation was enacted.  In any event, this Court has already upheld the Commonwealth's exercise of its legislative powers to initiate transactions affecting its assets against a challenge such legislation violated the automatic stay.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, No. 17-3283 [ECF No. 3941] (D.P.R. Sept. 18, 2018) (denying a request for application of the automatic stay to a Puerto Rico statute effectuating the restructuring of the Government Development Bank and granting claims and releases among entities including title III debtors, and holding "[i]t is evident that Congress intended to preserve governmental debtors' ability to initiate transactions affecting their assets given, for example, the inclusion of Section 303 . . . and 305 of PROMESA.

30

Respectively, these provisions preserve the authority of territories to exercise 'political or governmental powers,' and prohibit the Court from interfering with Title III debtors' property and political or governmental powers."). *See also* Post-Petition Legislation AP [ECF No. 41 at § II.A.].[17]

### 2.     The Request for a Determination of Secured Status in the ERS Title III Case is Duplicative of the Claims in the Lien-Scope AP.

58.     Claimants allege ERS "retains full ownership rights in the Pledged Property, including any Pledged Property in possession of the Commonwealth pursuant to [the Post-Petition Legislation]" and that Claimants are "secured creditors to the full extent of their claims against the ERS."  Post-Petition Legislation AP [ECF No. 39 ¶¶ 115, 117].  However, this Claim is duplicative of the claims being resolved in the Lien-Scope AP, which will determine the extent, if any, of Claimants' security interest in assets at ERS.  *See* Lien-Scope AP [ECF No. 1 ¶ 8].  A case is generally deemed duplicative if "the claims, parties, and available relief do not significantly differ between two actions." *iHealthcare, Inc. v. Yessenow (In re iHealthcare, Inc.)*, No. 07-20612, 2011 Bankr. LEXIS 2107 at *6 (Bankr. N.D. Ind. June 9, 2011) (internal quotations and citations omitted).  Accordingly, this Claim should be disallowed and dismissed as duplicative.  *See iHealthcare, 2011 Bankr*. LEXIS 2107 at *7–8 ("If the cases are indeed duplicative, there is a rebuttable presumption that the first should proceed and the second case should be dismissed.") (citation omitted); *Montoyo-Rivera v. Pall Life Scis. PR, LLC*, No. 16-

---

[17] Additionally, acts designed to "protect the public safety and welfare" of the public are exempt from the automatic stay under § 362(b)(4) of the Bankruptcy Code.  *Parkview Adventist Med. Ctr. v. United States*, 842 F.3d 757, 763 (1st Cir. 2016).  Public safety and welfare is interpreted broadly to include "generally applicable regulatory laws," not just situations involving direct harm to the public at large.  *Parkview Adventist*, 842 F.3d at 764; *see also Penn Terra, Ltd. v. Dep't of Envtl. Resources*, 733 F.2d 267, 273 (3d Cir. 1984) (explaining the exception "should, whenever possible, be read in favor of the States.").  As such, the Post-Petition Legislation falls under the § 362(b)(4) exception from the stay.  *See In re Lacoquille Inv. Co.*, 44 B.R. 731, 733 (Bankr. S.D. Fla. 1984) (holding enactment of a town ordinance constituted a police and regulatory power under § 362(b)(4) and explaining the automatic stay "does not exempt a debtor from the exercise of municipal legislative authority or any other exercise of its police or regulatory power.  Nor does it vest this court with the authority to supplant the municipal governing body.").

2102 (GAG), 245 F. Supp. 3d 337, 342 (D.P.R. 2017) ("Courts have held that a plaintiff has no

right to maintain two separate actions involving the same subject matter at the same time in the

same court against the same defendant") (internal quotations and citations omitted); *see also* Post-

Petition Legislation AP [ECF No. 41 § I.A.].

### 3. Any Claims to Assets Transferred to the Commonwealth Will Be Determined by the Lien-Scope AP.

59.     Claimants allege "all assets or cash proceeds of the ERS transferred to the

Commonwealth and any future employer contributions made to the Commonwealth's General

Fund [as a result of the Post-Petition Legislation] remain subject to [Claimants'] liens on the

Pledged Property."   Post-Petition Legislation AP [ECF No. 39 ¶ 128].   However, only the

Transferred Assets were transferred from ERS to the Commonwealth, and the Debtors have

represented Claimants will receive the value of such assets if their security interest attaches thereto.

*See supra* n.9.  Whether the Transferred Assets are subject to Claimants' security interest will be

determined in the Lien-Scope AP.

60.     Further, the Employers' Contributions cannot be deemed collateral security of

Claimants due to the Section 552 Decision; thus whether the PayGo Payments substitute for them

is of no consequence.   Even if postpetition Employers' Contributions are considered assets

transferred to the Commonwealth in which Claimants could have an attached security interest,

Claimants cannot have any interest in the PayGo Payments, as they are not an asset in which the

Resolution grants ERS Bondholders a security interest or the proceeds thereof.  Pursuant to specific

sections of the Enabling Act, Employers' Contributions were made periodically on the basis of

*current employees* working for Commonwealth entities participating in ERS.  *See* 3 L.P.R.A.

§ 786-5 (repealed).[18]  The Post-Petition Legislation eliminated the Employers' Contributions and implemented an entirely new retirement system.  The new statutory scheme is not a mere transfer of the Employers' Contributions, as employers were directed to stop paying Employers' Contributions to ERS, and such contributions were eliminated.  Instead, under specific sections of the Post-Petition Legislation (in which ERS Bondholders have no security interest), employers are now required to make the PayGo Payments to the Commonwealth, which assumed responsibility for disbursing accrued pension benefits to pension beneficiaries.

61.     Accordingly, the PayGo Payments are different from the Employers' Contributions that ERS previously received.  The legal obligation to make Employers' Contributions based on employees' ongoing work no longer exists.  *See* Ex. E § 4(3) (Joint Resolution 188).  Therefore, Claimants do not have an attached security interest in the PayGo Payments because PayGo Payments are not described in the Security Agreement or the Resolution, and even if they were, § 552 would prevent the security interest from attaching, and, accordingly, have no claims against the Commonwealth in connection with such payments.  *See, e.g.*, *In re Keene Corp.*, 188 B.R. 881, 893 (Bankr. S.D.N.Y. 1995), *corrected* (Nov. 30, 1995) ("the security interest is limited to the property described in the security agreement."); *Dowell v. D.R. Kincaid Chair Co.*, 125 N.C. App. 557, 561 (1997) (security interest in collateral does not extend beyond the scope of what was set out in the security agreement); *see also generally* [Case No. 17-bk-3566, ECF Nos. 579 and 598] (for additional arguments explaining that—independent of the Section 552 Decision—the PayGo Payments are not an asset in which Claimants have a security interest).  The PayGo Payments are likewise not proceeds of the Employers' Contributions.  Nor could Claimants otherwise have a Claim against the Commonwealth for nonpayment of the ERS Bonds.  The Resolution and related

---

[18] In 2017, that rate was 15.525% of the compensation regularly received by eligible employees.  *Id.* §§ 787f, 787g.

documents recognize that ERS—and not the Commonwealth—is responsible for paying the ERS

Bondholders.   *See* Ex. B at VI-1 (Resolution) ("[ERS] wishes to issue limited, non-recourse

obligations in the form of Bonds, payable solely from the Pledged Property) Ex. B at VIII-2

(proposed form opinion of Bond Counsel) ("The Bonds are limited, non-recourse obligations of

[ERS] . . .  The Bonds do not constitute a debt, obligation or pledge of the full faith, credit or taxing

power of the Commonwealth or any of its municipalities or instrumentalities (other than [ERS].)");

*id.* at 23 (Offering Statement) ("The Bonds are not an obligation of the Commonwealth or any of

its instrumentalities or political subdivisions, other than the System.").

### 4.   The Post-Petition Legislation Did Not Unjustly Enrich the Commonwealth.

62.    Claimants allege "any transfer of Pledged Property pursuant to the Post-Petition

Legislation will result in an unjust enrichment of the Commonwealth at [Claimants'] expense."

Post-Petition Legislation AP [ECF No. 39 ¶ 136].  First, this Claim simply repackages Claimants'

contention that they were secured by postpetition Employers' Contributions, which contention has

been overruled.

63.    In any event, any claim for unjust enrichment must be disallowed and dismissed

because (i) any claim for unjust enrichment belongs to ERS, not Claimants, *see id.* [ECF No. 41

§ V.A.], (ii) Claimants failed to state a claim for unjust enrichment, *see id.* [ECF No. 41 § V.B.],

(iii) a claim for unjust enrichment does not exist where Claimants have other claims, such as

contract claims, that govern the dispute at issue, *see id.* [ECF No. 4 § V.C.], and (iv) to the extent

Claimants assert a claim for unjust enrichment under federal law, PROMESA precludes such a

claim, and federal common law does not apply here.  *See id.* [ECF No. 41 § V.D.].

### a.   The Claim (if any) for Unjust Enrichment Belongs to ERS and Should Be Dismissed for Lack of Standing Under Rule 12(b)(1) .

64.     Claimants allege the Commonwealth is unjustly enriched at ERS's expense.
However, only the entity wrongfully harmed has standing to pursue such an action.  *See City
Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82, 90
(1st Cir. 2011) ("A court tasked with determining who can pursue a particular claim must look to
the kind of harm alleged."); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) (plaintiffs must
assert their own legal rights and interests, and cannot rest their claims to relief on the legal rights
or interests of third parties).  To the extent ERS was harmed, only ERS, not the Claimants, can
assert claims against the Commonwealth.  *See In re Am. Cartage, Inc.*, 656 F.3d at 90 (holding
only the trustee had standing to pursue actions against debtor's former manager as the debtor's
estate suffered the direct harm; any resulting harm to the value of secured creditor's collateral is
"derivative and indirect" and not sufficient to confer standing to a third party).

65.     Claimants cannot otherwise obtain standing.  In a chapter 11 context, some courts
have granted third parties derivative standing to pursue actions belonging to the debtor in limited
circumstances.  *See In re STN Enters.*, 779 F.2d 901, 903–905 (2d Cir. 1985) (setting forth criteria
warranting granting derivative standing).  Derivative standing is not available to Claimants
because PROMESA § 305 prevents this Court from entering an order depriving ERS of an asset
absent Oversight Board consent.  PROMESA § 305 provides "notwithstanding any power of the
court, unless the Oversight Board consents or the plan so provides, the court may not, by any stay,
order, or decree, in the case or otherwise, interfere with (1) any of the political or governmental
powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the use or enjoyment
by the debtor of any income-producing property."  PROMESA § 305.  *See In re Fin. Oversight &
Mgmt. Bd. for P.R.*, 927 F.3d 597, 602–03 (1st Cir. 2019), *cert. denied sub nom. Ambac Assurance
Corp. v. Fin. Oversight & Mgmt. Bd. for P.R.*, 140 S. Ct. 856 (2020) ("On its face, the text of

section 305 bars the Title III court from granting [the movant] such relief [that would require the Title III court itself to direct the Commonwealth's use of its revenues and property in a manner that contravenes the expressed will of the Commonwealth legislature, the Governor of Puerto Rico, and the Oversight Board] absent consent from the Oversight Board or unless the Fiscal Plan so provides."). Derivative standing is patently unavailable under PROMESA § 305. Granting derivative standing would permit Claimants to obtain control over an asset of ERS without Oversight Board consent in violation of PROMESA. The only relief available to Claimants which is analogous to derivative standing is pursuant to Bankruptcy Code § 926, which Claimants tried and failed to obtain. *Andalusian*, 954 F.3d at 5. Claimants cannot circumvent the First Circuit's ruling by asserting ERS's claims here.

66.     Without derivative standing, when a third party attempts to assert an action vested in a debtor, courts dismiss the action. *In re Perkins*, 902 F.2d 1254, 1257-58 (7th Cir. 1990); *Pierson & Gaylan v. Creel & Atwood (In re Consol. Bancshares, Inc.)*, 785 F.2d 1249, 1253–54 (5th Cir. 1986); *Mitchell Excavators, Inc. v. Mitchell*, 734 F.2d 129, 131–32 (2d Cir. 1984). The Court should therefore dismiss and disallow this Claim.

### b.     Claimants Cannot State a Claim for Unjust Enrichment.

67.     Even if Claimants have standing (which they do not), Claimants cannot state a claim for unjust enrichment against the Commonwealth. Under Puerto Rico law, Claimants must plead five elements to state a claim for unjust enrichment:  (1) existence of enrichment; (2) a corresponding impoverishment; (3) a connection between the enrichment and the impoverishment; (4) lack of justification for enrichment; and (5) non-existence of legal principle which would prohibit application of unjust enrichment. *Stewart v. Husqvarna Constr. Prods. N. Am.*, Civ. No. 11-1182, 2012 U.S. Dist. LEXIS 62585, at *21 (D.P.R. May 4, 2012).

68.     Claimants cannot satisfy the standard for unjust enrichment as a matter of law, and by making the claim ignore reality.  The entire reason for the Post-Petition Legislation is that ERS had almost completely run out of money to pay pensioners and a new funding mechanism for this critical function had to be established.  The Commonwealth is not being unjustly enriched.  As Joint Resolution 188 makes clear, the Commonwealth assumed ERS's obligation to pay pension and other retirement benefits to not only its own retirees, but also those of the other public employers who participated in ERS.  Pursuant to the Joint Resolution, the Commonwealth will use any available funds transferred to make pension payments to retirees of the Commonwealth and non-Commonwealth public employers.  *See* Ex. E § 3 (Joint Resolution 188); *see also* Ex. F at 10 (Act 106).  Claimants ignore that the additional burdens the Commonwealth is assuming— taking responsibility for all of ERS's pension payments—are worth less than the benefits the Commonwealth is allegedly receiving (ERS's assets, as Claimants themselves assert, are insufficient to fund the pension liabilities; *see* Post-Petition Legislation [ECF No. 39 ¶¶ 55, 58– 59]).  Indeed, the Commonwealth will simply use the transferred funds to pay public pension obligations.  The Commonwealth will not be able to enjoy these amounts for any other uses.  Accordingly, the Commonwealth is not being enriched and ERS is not being impoverished on account of any Commonwealth action.

### c.    A Claim for Unjust Enrichment Does Not Exist Where Claimants Have Other Claims that Govern the Dispute at Issue.

69.     Unjust enrichment is a remedy of last resort under Puerto Rico law.  "An action brought under the doctrine of unjust enrichment is subsidiary in nature and will only be available in situations where there is no available action to seek relief."  *Medina & Medina v. Country Pride Foods, Ltd.*, 631 F. Supp. 293, 302 (D.P.R. 1986) (dismissing claim for unjust enrichment where tort claim existed).  Unjust enrichment is not available where a contract governing the parties'

37

relationship exists. *P.R. Tel. Co. v. Sprintcom, Inc.*, 662 F.3d 74, 97 (1st Cir. 2011) ("under Puerto

Rico law, the doctrine of unjust enrichment does not apply where, as here, there is a contract that

governs the dispute at issue."); *Punta Lima, LLC v. Punta Lima Dev. Co., LLC*, No. 1901673,

2020 WL 710770, at \*14 (D.P.R. Feb. 22, 2020) (same). Nor is unjust enrichment available where

a statute governs the rights and relationships among parties. *See Westernbank P.R. v. Kachkar*,

Civ. No. 07-1606, 2009 U.S. Dist. LEXIS 126405, at \*99 (D.P.R. Dec. 10, 2009) ("under Puerto

Rico law, an unjust enrichment claim may stand only where no other law applies to the case" such

as "when there is no statute applicable to the case at issue."). On the basis of this authority, a

claim for unjust enrichment is not available to Claimants. *See id.* at \*100–01 (dismissing claim

for unjust enrichment where factual allegations underlying claim supported other legal theories of

recovery).[19]

70.    Further, the Puerto Rico Supreme Court has determined that the unjust enrichment

doctrine cannot be invoked whenever it contravenes an important public policy principle

embodied in the Constitution of Puerto Rico or the laws of Puerto Rico. *See Plan Bienestar Salud

v. Alcalde Cabo Rojo*, 14 P.R. Offic. Trans. 896, 903–904 (1983); *see also Hatton v. Mun. de

Ponce*, No. RE-91-37, 1994 WL 909605 (P.R. Jan. 12, 1994) (unjust enrichment doctrine does not

apply to government entities in benefit of private entities if the government contracting

requirements were not followed).

        **d.**    **PROMESA Precludes a Common Law Claim for Unjust
Enrichment**

---

[19] That the Commonwealth has affirmative defenses warranting the dismissal of those claims does not change the outcome. *Westernbank*, 2009 U.S. Dist. LEXIS 126405 at \*101 ("That the defendants have failed to plead these [non-unjust enrichment counterclaims] adequately to survive the motion to dismiss, or that [plaintiff's] affirmative defenses have defeated them, does not render the underlying tort and contract laws inapplicable to the situation. Since several statutes are applicable to the case at issue, the doctrine of unjust enrichment is precluded.").

71.     The remedy of unjust enrichment is also precluded by PROMESA.  Congress provided protection for the Claimants' interests under PROMESA as the Commonwealth must comply with PROMESA § 314 to confirm a plan of adjustment.  This statutory construct balances the needs of the Commonwealth to govern and address its economic crisis with providing protections for creditors.  Allowing a claim for unjust enrichment would contravene Congress's careful balancing of interests under PROMESA.  *See Westernbank*, 2009 U.S. Dist. LEXIS 126405, at *99 (claim for unjust enrichment not available where statute governs the parties' relationships and right to recovery).

72.     Nor can Claimants have a claim for unjust enrichment under federal law.  A federal court's ability to formulate federal common law and to apply federal common law in an action is limited.  *See Rodriguez v. Fed. Deposit Ins. Corp.*, 140 S. Ct. 713, 717 (2020); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (explaining there is "no federal general common law").  Federal common law can only be applied where a gap in a federal statute exists.  *Nisselson v. Lernout*, 469 F.3d 143, 154 n.3 (1st Cir. 2006) ("To the extent that the trustee's claims are premised on federal statutes, we arguably have discretion to use federal common law").  Absent statutory authorization to formulate substantive rules, a court has authority to create a federal common law remedy only when it is "necessary to protect uniquely federal interests."  *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 426 (1964)); *Rodriguez*, 140 S. Ct. at 717.

73.     No gap exists in PROMESA.  PROMESA represents comprehensive legislation aimed at addressing the Commonwealth's economic crisis.  PROMESA appropriately balances the Commonwealth's need to restructure its debt (including a creditor's rights in connection

39

therewith) with the Commonwealth's governmental powers, and protects Claimants' rights through the plan of adjustment requirements in PROMESA § 314.

74.     Accordingly, all claims for unjust enrichment should be disallowed and dismissed.

### 5.     The Enactment of the Post-Petition Legislation Was for a "Public Use."

75.     Claimants allege the Post-Petition Legislation "was not enacted for a 'public purpose' within the meaning of the meaning of the U.S. and P.R. Takings Clauses[,]" and that "the Post-Petition Legislation violates the U.S. and P.R. Takings Clauses[.]"   Post-Petition Legislation AP [ECF No. 39 ¶¶ 146, 148].   The Takings Clause provides that private property shall not "be taken for public use, without just compensation," U.S. CONST. amend. V.   Here, it is impossible to understand how legislation enacted "in accordance with the . . . [March 2017] Fiscal Plan[,]" Ex. F at 1 (Act 106), that covers virtually every aspect of financial and socio-economic life in Puerto Rico could not have been enacted for a "public purpose."   As Act 106 itself states: "Complying with this [Fiscal] Plan constitutes a compelling interest of the Commonwealth in order to maintain its operations and protect those who are most vulnerable."   Ex. F at 9 (Act 106). Additionally, PROMESA's requirement that a Fiscal Plan "provide adequate funding for public pension systems," PROMESA § 201(b)(1)(C), is tantamount to a Congressional finding that actions taken to support such systems are in the public interest.

76.     The Legislature expressly made such a "public use" finding in enacting Act 106: it invoked the police powers under the P.R. Constitution and concluded that the "serious economic and fiscal emergency situation of Puerto Rico, it is necessary to approve this Act . . . in order to provide the Government with the sufficient liquidity to pay the pension benefits of public employees  who already retired or who will do so in the future."   Ex. F at 9 (Act 106). Accordingly, the Post-Petition Legislation is rationally related to a public purpose and cannot

40

violate the "public use" requirement.  *See, e.g.*, *Fideicomiso De Law Tierra Del Caño Martin Peña v. Fortuño*, 604 F.3d 7, 17–18 (1st Cir. 2010); *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 241 (1984).   *See also* Post-Petition Legislation AP [ECF No. 41 § IV.A.]; [Case No. 17-bk-3283, ECF No. 9700 ¶¶ 109–11].

### 6.   The Post-Petition Legislation Was Not a Taking.

77.    Claimants allege "the Post-Petition Legislation, on its face, constitutes an unconstitutional taking of their Pledged Property without just compensation in violation of the U.S. and P.R. Takings Clauses."  Post-Petition Legislation AP [ECF No. 39 ¶ 157].  This is incorrect.  Even if a Takings claim somehow survives the Section 552 Decision (which it does not), Claimants have failed to state a claim for an unconstitutional Taking.  The Takings Claims should be disallowed and dismissed.  *See also* [Case No. 17-bk-3283, ECF No. 9700 ¶¶ 102–103].

### a.   Claimants Have Not Alleged What Was "Taken" and Lack Standing

78.    Putting aside that the Section 552 Decision shows there was nothing to be taken, any Takings claim must be asserted by individual bondholders, as a Takings claim is necessarily based on the loss each individual bondholder allegedly suffered.  In other words, any Claims arising from an alleged taking are based on the price of the ERS Bonds prior to the governmental action allegedly constituting the taking, minus the price of the ERS Bonds subsequent to such action.   Put into numbers, a distressed debt purchaser acquiring ERS Bonds at 50 cents, whose bonds drop to 30 cents after an alleged taking, may assert only a 20 cent Takings claim.  *See, e.g.*, *Forest Props., Inc. v. United States*, 177 F.3d 1360, 1367 (Fed. Cir. 1999) (loss due to taking is measured by "the change, if any, in the fair market value caused by the regulatory imposition"); *see also United States v. Va. Elec. & Power Co.,* 365 U.S. 624, 633 (1961) (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934) ("The guiding principle of just compensation is

reimbursement to the owner for the property interest taken.  'He is entitled to be put in as good a position pecuniarily as if his property had not been taken.  He must be made whole but is not entitled to more.'"); *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 235-36 (2003) ("[J]ust compensation required by the Fifth Amendment is measured by the property owner's loss rather than the government's gain.").

79.    A Takings claimant cannot prove its claim without demonstrating its economic loss. *See, e.g.*, *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1157 (Fed. Cir. 2014) (citing *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)).  "[I]f the regulatory action is not shown to have had a negative economic impact on the [claimant's] property, there is no regulatory taking."  *Hendler v. United States*, 175 F.3d 1374, 1385 (Fed. Cir. 1999).

80.    Claimants must show what the value of their property interest would have been "but for the government action."  *A&D*, 748 F.3d at 1157.  Such proof necessarily requires a realistic determination of the value of the property immediately *before* the government action.  *See, e.g.*, *Forest Props., Inc.*, 177 F.3d at 1367 (loss due to taking is measured by "the change, if any, in the fair market value caused by the regulatory imposition").

81.    None of the Claimants have alleged any loss they suffered as a result of any alleged taking.  Further, bondholders that acquired ERS Bonds subsequent to issuance have not alleged that they acquired any Takings claim from the previous bondholder; unless they expressly did acquire such an interest and such assignment was valid, they lack standing to bring the claims of the bondholder owning the bonds at the time of the alleged Taking.  *United States v. Dow*, 357 U.S. 17, 22 (1958) ("The owner at the time the Government takes possession rather than the owner at an earlier or later date, is the one who has the [Takings Clause] claim and is to receive payment.")

(internal cites and quotes omitted).  And the Fiscal Agent cannot assert Takings claims which depend on each bondholder's particular circumstances.

82.     Moreover, if any Takings claim does arise in ERS *vis-à-vis* the Commonwealth as a result of the Post-Petition Legislation, such rights would belong only to ERS, and not the Fiscal Agent.  Bankruptcy Code § 501, which authorizes the filing of proofs of claim, does not authorize a creditor of a creditor to file a proof of claim.  Parties that are creditors of a creditor, without more, have no claim against a debtor.  And in any event, the Claimants lack derivative standing to assert any claims against the Commonwealth for its implementation of the Post-Petition Legislation.

### b.     Any "Taking" Was a Permissible Regulatory Taking.

83.     Courts have identified two classes of takings: *per se* takings and regulatory takings. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005).  *Per se* takings are limited to cases where the "government requires an owner to suffer a permanent physical invasion of her property," or its regulations "completely deprive an owner of '*all* economically beneficial us[e]' of her property."  *Id.* (citation omitted; emphasis in original).  Neither scenario applies here: the Post-Petition Legislation does not require or contemplate any "physical invasion" of any property, and it does not completely deprive Claimants of all of their allegedly relevant "property" interest.  *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224–25 (1986) (analyzing claim of "taking" of contractual right as a regulatory taking); *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 374 (2d Cir. 2006) (same).

84.     The Takings Clause analysis therefore must proceed under the three-part *Penn Central* inquiry for regulatory takings, which requires consideration of (i) "the economic impact of the regulation on the claimant," (ii) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (iii) "the character of the governmental action."

43

*Penn Cent.*, 438 U.S. at 124; *see also Lingle*, 544 U.S. at 538–39; *Connolly*, 475 U.S. at 225;

*McAndrews v. Fleet Bank of Mass., N.A.*, 989 F.2d 13, 18–19 (1st Cir. 1993).   The party alleging

a regulatory taking bears a "heavy burden." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480

U.S. 470, 493 (1987).

### 1)      Economic Impact on Property Owner.

85.     The Post-Petition Legislation's economic impact on Claimants does not support a

taking because—under the relevant inquiry, which is qualitative, not quantitative— many elements

of the bundle of rights Claimants possess remain unimpaired.

86.     An "infringement that leaves virtually the whole of the owner's possessory rights

intact does not constitute a taking." *McAndrews*, 989 F.2d at 18 (citing *Penn Central*, 438 U.S. at

130–31 and *Gilbert v. City of Cambridge*, 932 F.2d 51, 56 (1st Cir. 1991)).  The question is whether

the regulation preserves an "economically viable property use" for the owner.  *Id.*  "Put another

way, 'where an owner possesses a full "bundle" of property rights, the destruction of one "strand"

of the bundle is not a taking, because the aggregate must be viewed in its entirety.'"  *Id.* (citing

*Andrus v. Allard*, 444 U.S. 51, 65–66 (1979)).   Accordingly, "mere diminution in the value of

property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe and Prods. of

Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993) (citing *Village of

Euclid v. Ambler Realty Co.*, 272 U.S. 365, 384 (1926) (no taking despite 75% diminution in value

of property), and *Hadacheck v. Sebastian*, 239 U.S. 394, 405 (1915) (no taking despite 92.5%

diminution in value of property)).

87.     Here, Claimants still own a significant part of the bundle of rights they possessed

before the Post-Petition Legislation; *i.e.*, rights under the Resolution, subject to the

Commonwealth's ability to reduce or even eliminate the Employers' Contributions.  Subject to the

*Ultra Vires* AP, ERS does not contest Claimants' (i) interest in Employers' Contributions collected

by ERS, which have been distributed to the ERS Bondholders, (ii) interest in ERS's Accounts Receivable, and (iii) right to assert a claim against ERS and receive treatment in a plan of adjustment in accordance with the terms of the Resolution as determined by the Court in the Lien-Scope AP.  Claimants simply face diminished payments pursuant to the Resolution, but any such reduction would amount only to a quantitative diminution of contractual expectations (if Claimants can show that those expectations were diminished at all as of the enactment of the Post-Petition Legislation).  Such conduct does not constitute a wholesale destruction of the bundle of rights constituting the alleged property interest, and therefore Claimants fail to state a Takings claim.

**2)     Extent of Interference with Investment-Backed
Expectations**

88.     Nor can the Claimants' "distinct investment-backed expectations" support a finding of a taking.  "Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end."  *Connolly*, 475 U.S. at 227 (citation omitted).

89.     The same is true for investors in government debt:  such investments are necessarily made with the awareness that a state's obligation to protect the safety and welfare of its citizenry is fundamental and inalienable, and may from time to time affect its ability to find additional resources to service its debt as well.  *See Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502, 514 (1942); *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 435 (1934); *see also, e.g.*, *Franklin Mem'l Hosp. v. Harvey*, 575 F.3d 121, 128 (1st Cir. 2009) (plaintiff's "investment-backed expectations are tempered by the fact that it operates in [a] highly regulated . . . industry").  Indeed, the Puerto Rico Constitution expressly warned prospective investors and others that all alleged constitutional rights were subject to the Commonwealth's police power.  P.R. CONST. art. II, §§ 18, 19.

45

90.     Particularly in this case, the "investment-backed expectations" of holders of Puerto Rican debt have been formed for years in the awareness of the Commonwealth's increasing inability to pay as scheduled.  ERS's own financial difficulties had been amply documented and publicized, well before the ERS Bonds were issued, with a pension reform (Act 305) occurring in 1999, nine years before the ERS Bonds were issued.  *See supra* ¶ 16.  Among other things, Act 305 had warned that ERS was "in critical condition with an actuarial deficit that exceed[ed] five point nine billion dollars, according to the projections of [ERS's] actuaries."  *See* Act 305, Statement of Legislative Intent.

91.     Furthermore, as discussed above, Claimants had notice that (1) the amount of Employers' Contributions was subject to legislative change, *see supra* ¶ 7, and (2) Commonwealth courts had a long history of upholding changes to the pension system to promote its solvency.  *See, e.g.*, *infra* ¶ 122.  Accordingly, Claimants' investment-backed expectations have not been interfered with substantially enough to state a Takings clause claim.

### 3)     Character of Interference

92.     The third *Penn Central* factor—the nature of the governmental action—also militates against a Takings claim.  "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good."  *Penn Central*, 438 U.S. at 124 (citation omitted).

93.     This case, of course, does not involve a physical invasion or even a permanent appropriation of Claimants' alleged property for the government's own use.  Rather, it involves an adjustment of "the benefits and burdens of economic life to promote the common good [, which] does not constitute a taking requiring Government compensation."  *Connolly*, 475 U.S. at 225.

94.     Congress has made clear that as result of the "fiscal emergency, the Government of Puerto Rico has been unable to provide its citizens with effective services."   PROMESA § 405(m)(2).   The Post-Petition Legislation is clearly designed to "obtain fiscal stability" in response to an economic crisis.  *Buffalo Teachers*, 464 F.3d at 375.  In that circumstance, even if the necessary measures may "take from Peter to pay Paul, . . . such burden shifting does not, without more, amount to a regulatory taking." *Id.* at 376.

95.     Here, every interested constituency in the Commonwealth's future—public employees, consumers of public services, taxpayers, pensioners, and bondholders—faces diminished expectations in a joint effort to keep the lights on, the schools open, the justice system functioning, and the streets safe while respecting investor expectations to the extent feasible.  *See, e.g.*, *Ropico, Inc. v. City of New York*, 425 F. Supp. 970, 977 (S.D.N.Y. 1976) ("Even if [New York's Moratorium Act] provides for a taking of some contractual rights of the [bondholders], given the pressing public emergency which the legislature found, such a limited taking of plaintiffs' rights without compensation or judicial review is a permissible exercise of the state's police power").

96.     The Supreme Court has made clear that, "[i]n all instances, the [Takings] analysis must be driven by the purpose of the Takings Clause, which is to prevent the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) (internal quotations omitted).  In the circumstances here, the Post-Petition Legislation was designed to protect the retirement benefits of employees who provided service to all residents of the Commonwealth. And particularly in light of all the other measures the Commonwealth has taken and is still taking to address its disastrous financial condition, Claimants are not the only ones being forced to bear

the burdens rising from that fiscal crisis and the bankruptcy of the old ERS pension system.

Accordingly, even if Claimants' had property interests to be taken, which they did not, Claimants'

Takings clause Claim should be disallowed and dismissed.  *See also* [Case No. 17-bk-3283, ECF

No. 9700 ¶¶ 112–128].

### c.     A Breach of a Contract or Obligation is Not a Taking.

97.     Further, even if the Commonwealth had an obligation, under a contract or

otherwise, to maintain legislation requiring employers to make Employers' Contributions, that

obligation would yield, at most, a general unsecured claim to ERS.  Rejecting or breaching

obligations are what debtors must do.  They are not takings.  *See also supra* n.13.

### 7.     Claimants Cannot Obtain an Advisory Opinion Prior to a Plan of Adjustment that Takings Claims Cannot Be Impaired.

98.     Claimants assert that they are "entitled to a declaration that any award of just

compensation or damages for violation of the U.S. and P.R. Takings Clauses cannot be impaired

by a PROMESA plan of adjustment or an order confirmation a PROMESA plan of adjustment."

Post-Petition Legislation AP [ECF No. 39 ¶ 163].  However, this Claim is not ripe because it

presents a question that depends on contingencies that may never come to pass.  Notably,

PROMESA § 301(a), incorporates Bankruptcy Code § 944 into Title III.  Section 944 provides *all*

debts are discharged other than those held by entities not having notice or knowledge of the Title

III case.

99.     As the First Circuit recently held, "no claims will be discharged, and no

determinations will be made about the treatment of claims, until the plan of adjustment is

confirmed."  *Aurelius Capital Master, Ltd. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd for

P.R.)* 919 F.3d 638, 647 (1st Cir. 2019).  Only at the confirmation stage will the treatment of

Claimants' Claims be ripe for adjudication; anything before then would be hypothetical because

48

"the Commonwealth has [not] arrived at a definitive position regarding any disbursement of" its funds.  *Id.* (internal quotation marks omitted).

100.    This is because "[a] dischargeability determination is only necessary if there is a discharge," *Soler v. United States (In re Soler)*, 250 B.R. 694, 697 (Bankr. D. Minn. 2000), and a discharge can occur only once a plan is confirmed.  When there is substantial uncertainty regarding the treatment of a creditor's claim against a debtor in a plan, the question of whether those claims may be discharged at some point in the future is inappropriate.  *Bank of New York v. Adelphia Comm'ns Corp. (In re Adelphia Commc'ns Corp.)*, 307 B.R. 432, 438–39 (S.D.N.Y. 2004).

101.    Even the Oversight Board's filing of a plan of adjustment does not render this claim ripe for resolution.   The outcome of litigation, continuing negotiations between the Commonwealth, its creditors, and other relevant stakeholders render the plan's ultimate treatment of Claimants' Claims too uncertain to satisfy the ripeness prong.  *See Adelphia Comm'ns Corp.*, 307 B.R. at 439 ("uncertainties" in proposed plan's treatment of bondholders' claims that "could have a material effect on the nature of the controversy, or even make it go away . . . make this dispute inappropriate for determination at this time").

### 8.    The Post-Petition Legislation Does Not Violate the Contracts Clauses of the U.S. and Commonwealth Constitutions.

102.    Claimants allege "[t]he Commonwealth's substantial impairment of the ERS's contractual obligations to the [Claimants] [through the Post-Petition Legislation] constitute a violation of the U.S. and P.R. Contracts Clauses and cannot be implemented."   Post-Petition Legislation AP [ECF No. 39 ¶ 175].  Even if such claim survives the Section 552 Decision, and

still exists notwithstanding the appropriation of Employers' Contributions made to ERS were preempted,[20] Claimants are mistaken.

103.    The U.S. Constitution's Contracts Clause provides "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts. . . ." U.S. CONST. art. I, § 10, cl. 1.  The Puerto Rico Constitution's Contracts Clause is similar and is construed the same way as is the federal provision. *Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 85 F. Supp. 3d 577, 603 (D.P.R. 2015), *aff'd*, 805 F.3d 322 (1st Cir. 2015), *aff'd*, 136 S. Ct. 1938 (2016).

104.    Although the Contracts Clause's language "is facially absolute, its prohibition must be accommodated to the inherent police power of the State to safeguard the vital interests of its people." *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983) (internal quotations omitted); *accord, e.g., Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978) ("[I]t is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States."); *Blaisdell*, 290 U.S. at 434–35 ("Not only is the [Contracts Clause] qualified by the measure of control which the State retains over remedial processes, but the state also continues to possess authority to safeguard the vital interests of its people…. [T]he reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order."); *UAW v. Fortuño*, 633 F.3d 37, 41 (1st Cir. 2011) ("Despite its unequivocal language, [the Contract Clause] does not make unlawful every state law that conflicts with any contract. . . .  Rather, [a] court's task is to reconcile the strictures of the Contract Clause

---

[20] Following passage of PROMESA, any impairment to the Resolution arose from the preemption of the Enabling Act's appropriations by PROMESA, and therefore do not implicate the Contract Clause. *Ass'n of Retired Emps. of City of Stockton v. City of Stockton (In re City of Stockton)*, 478 B.R. 8, 16 (Bankr. E.D. Cal. 2012) ("[T]he shield of the Contracts Clause crumbles in the bankruptcy arena."); *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 n.9 (1984) ("[T]he Framers explicitly refused to subject federal legislation impairing private contracts to the literal requirements of the Contract Clause.").

50

with the essential attributes of sovereign power necessarily reserved by the States to safeguard the
welfare of their citizens.") (internal citations and quotation marks omitted).

105.    To reconcile the Contracts Clause with a state's inherent police power, courts apply
a two-pronged test.  *Id.*  The first question is whether the state or Commonwealth law has in fact
operated as a substantial impairment of a contractual relationship.  *Energy Reserves Grp.*, 459 U.S.
at 411.  If so, the second question is whether the impairment was "reasonable and necessary" to
serve an "important public purpose."  *UAW*, 633 F.3d at 49 (internal quotations omitted).  The
party claiming a constitutional violation bears the burden to establish both prongs of the test.  *Id.*
at 42–45 (granting motion to dismiss constitutional challenge); *see also, e.g.*, *Sal Tinnerello &
Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 55 (2d Cir. 1998) ("The Town need not prove its
choice the best among the available alternatives; rather, [plaintiff] must prove that there is no
rational relationship between the Town's ends and its means.  Merely contending there was a better
way, [plaintiff] has not carried its burden.").

106.    When analyzing whether a state's impairment of a contract is justified under the
police power, courts afford the legislature less deference where the state has an interest in the
contract than where the state impairs a private contract.  But, even where the state has an interest
in the allegedly impaired contract, the legislature's choices are still entitled to "meaningful
deference."  *UAW*, 633 F.3d at 44; *accord, e.g.*, *Diaz-Diaz v. Fortuño-Burset*, No. 11-1632, 2012
WL 2498912, at *3 (D.P.R. June 27, 2012) ("less deference does not imply no deference to the
state's decision") (internal quotations omitted); *see also Baltimore Teachers Union v. Mayor &
City Council of Baltimore*, 6 F.3d 1012, 1019 (4th Cir. 1993) (reversing ruling that salary
reductions violated Contract clause because "[the] district court afforded essentially no deference

whatsoever to [city's] determinations of the reasonableness and necessity of the salary reductions" in light of fiscal crisis).

107.     Meaningful deference to legislative decisions is necessary even where the state has an interest in the allegedly impaired contract because making the policy choices among legislative alternatives "is a task far better suited to legislators than to judges." *Amalgamated Transit Union v. Commonwealth of Mass.*, 666 F.2d 618, 643 (1st Cir. 1981); *see also Buffalo Teachers Fed'n* 464 F.3d at 372 ("we find no need to second-guess the wisdom of picking the wage freeze over other policy alternatives"); *Ambrose v. City of White Plains*, No. 10-CV-4946, 2018 WL 1635498, at *21 (April 2, 2018 S.D.N.Y.) (same); *cf. Blaisdell*, 290 U.S. at 447–48 (rejecting Contracts clause challenge to legislation, and noting that "[w]hether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned").

108.     Claimants fail to state a Contracts clause claim related to the Post-Petition Legislation (as alleged in the Post-Petition Legislation AP) because they fail to allege a material impairment of Claimants' contractual relationship relative to Claimants' reasonable expectations. Additionally, even if Claimants could allege a substantial impairment occurred, the Post-Petition Legislation serves an important public purpose—funding retirement benefits for public employees—and was a reasonable and necessary means to accomplish that purpose, rendering the Claim defective.

        **a.     Claimants' Contract Was Not Substantially Impaired.**

109.     Not every contract impairment violates the Contracts Clause; the impairment must be "substantial"—and a "substantial impairment" of contractual rights cannot be assumed. *UAW*, 633 F.3d at 42.  State action that merely "restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment." *Energy Reserves Grp.*, 459 U.S. at 411.  Thus, Claimants must plausibly allege the challenged action substantially impairs its

rights relative to the reasonable expectations of the ERS Bondholders when they entered into the debt agreements.

110.    Claimants fail to adequately allege any such substantial impairment.  In fact, ERS Bondholders were on notice from the outset that Employers' Contributions were subject to change. For example, the Offering Statement warned that "***[t]he Legislature of the Commonwealth could reduce the Employer Contribution rate or make other changes in existing law that adversely affect the amount of Employer Contributions***."  Ex. B at 26 (Offering Statement) (emphasis in original).  Similarly, the Resolution provided that "Employers' Contribution Rate shall mean the rate of contribution of each Employer to the System, *initially* 9.275% of the Covered Payroll"— thereby informing prospective investors that the stated contribution was only the "initial" one and was subject to change.  Ex. B at VI-33 (Resolution) (emphasis added).

111.    The permissibility of legislative changes to public retirement funds is long-settled Commonwealth law and hard-wired into the nature of such funds.  Public-employee benefits and municipal bonds are subject to extensive state regulation.   Three decades ago, the Commonwealth's highest court rejected a Contracts Clause challenge by pensioners to changes in system eligibility because "[c]hanging conditions and requirements, such as years of service, *contributions to the fund*, and retirement age, are essential to preserve the solvency of the fund." *Bayron Toro v. Serra*, 19 P.R. Offic. Trans. 646, 664 (P.R. 1987) (emphasis added); *see also Trinidad Hernández v. E.L.A.*, 188 D.P.R. 828 (P.R. 2013) (upholding legislative changes to public employees' pension plans).  Claimants were on notice of the risk of these changes as were the pensioners.   And, the case law is clear that contractual rights subject to predictable risk of regulation can be altered without giving rise to a Contracts clause claim.  *See Energy Reserves Grp.*, 459 U.S. at 416 (rejecting Contracts clause challenge by claimant that "knew its contractual

rights were subject to alteration by state price regulation"); *Chrysler Corp. v. Kolosso Auto Sales, Inc.*, 148 F.3d 892, 896 (7th Cir. 1998) (rejecting Contracts clause challenge to regulation that was predictable in light of prior legislation in the same area); *see also Emps. Ret. Sys.*, 948 F.3d at 468 (holding ERS had merely an "expectancy" and not a property right in postpetition Employers' Contributions).

112.    Every contract creates alternative rights:  performance or the payment of damages for breach.  *Redondo Constr. Corp. v. Izquierdo*, 662 F.3d 42, 48 (1st Cir. 2011).  As long as recourse to one of those remains, there is no impairment of contract.  *See id*.  ("If a state breaches a contract but does not impair the counterparty's right to recover damages for the breach, the state has not impaired the obligation of the contract."); *TM Park Ave. Assocs. v. Pataki*, 214 F.3d 344, 349 (2d Cir. 2000) (same); *Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1250–51 (7th Cir. 1996) (same).  That is the case here.  The ERS Bondholders have their claims against ERS and those claims will be treated in accordance with Title III.

113.    The Resolution is between ERS and the Fiscal Agent.  ERS's obligation under the contract is to deposit Employers' Contributions it received with the Fiscal Agent to be used to pay the ERS Bonds.  Ex. B at VI-9 (Resolution § 504(1)).  This mechanism is still intact, and ERS's obligations remain.  The enactment of the Post-Petition Legislation does not violate or impair any provision of the Resolution—to the contrary, the Fiscal Agent agreed that that ERS—and not the Commonwealth—is responsible for paying the ERS Bondholders.  *See supra* ¶ 4.

114.    Accordingly, Claimants cannot state a claim for substantial impairment of contractual obligations.

        **b.**      **Even If Claimants Could Allege A Substantial Impairment Occurred, the Alleged Impairment Was Reasonable and Necessary to Serve an Important Public Purpose.**

115.    Even if Claimants could plausibly allege the Post-Petition Legislation substantially impaired Claimants' contracts, the Contracts clause claim must still be dismissed because the legislation served an important public purpose and was a reasonable and necessary means to do so. *See UAW*, 633 F.3d at 46.  "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves Grp.*, 459 U.S. at 412.  An effort to address a "general social or economic problem" is sufficient to meet that standard. *Id*.

116.    The Post-Petition Legislation was enacted to serve legitimate public purposes:  to ensure benefits could be paid to retirees and to address the Commonwealth's fiscal crisis.  The Statement of Motives explains Act 106 was an exercise of the "Police Power" to "safeguard the welfare of our retirees and public employees," "protect those who are most vulnerable[,]" address "the serious economic and fiscal emergency situation of Puerto Rico," and "set Puerto Rico [o]nto a path of financial recovery." Ex. F at 9 (Act 106, Statement of Motives).  It further provides "the implementation of this reform as part of the Fiscal Plan constitutes a compelling interest[] of the State in order to guarantee the public interest." *Id.* at 12;  *see, e.g.*, *Buffalo Teachers Fed'n*, 464 F.3d at 369 ("the legislative interest in addressing a fiscal emergency is a legitimate public interest[,]" and wage freeze to deal with fiscal crisis serves important public purpose); *see also Baltimore Teachers*, 6 F.3d at 1019 (noting that plaintiff employees did not dispute "that ensuring the financial integrity of the City is a significant public purpose"); *Hermandad De Empleados Del Fondo Del Seguro Del Estado, Inc. v. P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, No. 17-3283 (LTS), 2019 U.S. Dist. LEXIS 176447, at *22–23 (D.P.R. Sept. 27, 2019) (quoting *Buffalo Teachers Fed'n*, 464 F.3d at 369, and *Baltimore Teachers*, 6 F.3d at 1019).

117.    As the Legislature observed:   "If our pensioners are deprived of their pension benefits, not only they, but also the Government and the society in general would be facing serious consequences."  Ex. F at 18 (Act 106, Statement of Motives).  Without adequate (or any) pensions, more pensioners would need welfare and other social services from the Commonwealth, whose resources would then become even further strained.  Accordingly, the Post-Petition Legislation serves important government purposes, and the Commonwealth is entitled to "meaningful deference" as to the policy choices it made to provide retirement benefits for its public employees and deal with the Commonwealth's overall fiscal situation.

118.    In addition to serving important public purposes, the Post-Petition Legislation was "reasonable and necessary[,]" as is required to avoid triggering a Contracts clause claim.  *See UAW*, 633 F.3d at 47.  The Legislature itself determined that "the measures taken in this Act are necessary and reasonable to properly address the fiscal crisis and the actuarial insolvency of the Retirement System . . . ."  Ex. F at 12 (Act 106, Statement of Motives).  The Legislature concluded Act 106 "provides the legal framework that would allow us to comply with the provisions and achieve the goals set for the Retirement Systems under the [Oversight Board's] Fiscal Plan," which "establishes fiscal adjustments to stabilize Government finances at a time where there is no access to the financial market."  *Id.*  The Legislature added that, "[i]f these measures are not implemented, the social and economic welfare of Puerto Rico shall suffer irreparable damages."  *Id.*

119.    The Legislature did not act unreasonably in not adopting the Claimants' proffered alternative:   full payment of ERS's obligations pursuant to the Resolution, presumably by increasing the Employers' Contributions.  Wishing there were more money to pay creditors, however, does not create it.  "[I]t is always the case that to meet a fiscal emergency taxes conceivably may be raised.  It cannot be the case, however, that the legislature's *only* response to

a fiscal emergency is to raise taxes." *Buffalo Teachers*, 464 F.3d at 372 (emphasis in original).

Further, courts are hesitant to "second-guess the wisdom" of the legislature's policy choices when

a fiscal emergency means the legislature is faced with options that are all unappealing for one

reason or another. *Id.*

120.    In *Trinidad Hernández v. E.L.A.*, 188 D.P.R. 828 (P.R. 2013), a translated copy of

which is attached hereto as **Exhibit G**, plaintiff pensioners contended that, instead of impairing

pension benefits by reforming the pension system, the Legislature could have "increase[d] its

revenues through other measures, such as increasing the Sales and Use Tax (SUT) capture rate, or

raising taxes." *Id.* at 6.  But, the Puerto Rico Supreme Court affirmed the dismissal of the case,

holding the plaintiffs had "failed to show that they have evidence to persuade the court at a trial

that these alternatives are feasible and less burdensome."  *Id.*  The court also observed the

legislation's "Statement of Motives shows that the Legislature considered other types of measures

to address the solvency crisis affecting the Retirement System, but concluded that these 'are not

feasible and, in any case, neither can they alone solve the present actuarial crisis.'"  *Id.* (quoting

Act 106, Statement of Motives).

121.    The Commonwealth had previously attempted countless reforms to support ERS,

including increasing contributions to ERS.  *See* Ex. F at 15 (Act 106, Statement of Motives).  The

Legislature noted:

> Several attempts were made in the past to reform the three
> Retirement Systems.  However, these measures were unsuccessful
> and their results insufficient, which has led to a lack of liquidity and
> insolvency in these systems.  Moreover, given the profound and
> severe fiscal crisis we are currently experiencing, the Government
> is prevented from shoring up the three Retirement Systems.  This
> Joint Resolution, therefore, puts forth the pay-as-you-go system as
> a new method for safeguarding pensions for Government retirees.

Ex. E at 2 (Joint Resolution 188).  The past reforms had failed for many reasons, including

"inadequate contributions, the approval of special laws, early retirement programs, changes in the

Participants' life expectancy, failed investments, unwise management, bond issues that yielded no

benefits . . . and fell short of saving the Retirement Systems [including ERS]."  Ex. F at 17 (Act

106, Statement of Motives).  As the Court is well aware, municipalities and public corporations

are insolvent.  Therefore, in light of financial difficulties faced by the Commonwealth, and the

"heavy impact and burden" caused by the commencement of the Commonwealth's obligation to

use resources of the General Fund to make disbursements to current pensioners of the Retirement

Systems (including ERS), it was "necessary and reasonable to eliminate the [Employers'

Contributions.]"  *Id.* at 18.  The Legislature thus had considered (and attempted) some theoretically

plausible alternatives to the Post-Petition Legislation, but nevertheless concluded the Post-Petition

Legislation was needed to address the Commonwealth's public pension systems.

122.    Further, the Post-Petition Legislation cannot be looked at in isolation.  It was but

one part of a wide-ranging, comprehensive effort to attack the Commonwealth's fiscal crisis on

multiple fronts and to avoid imposing all the burden on any one group by spreading any ensuing

discomfort throughout all sectors of society.  *See* Ex. F at 12 (Act 106, Statement of Motives)

("[The Fiscal] Plan establishes fiscal adjustments to stabilize Government finances at a time where

there is no access to the financial market.").  For example, in 2016, the Commonwealth passed the

Moratorium Act, and the Governor promulgated various executive orders, all of which suspended

payment of principal and interest on public debt and had suspended payment of revenues to the

so-called "clawback entities."  *See, e.g.*, Moratorium Act; ERS Executive Order.  And, in 2017

alone, the Legislature exercised its police power to enact many other laws to promote

Commonwealth-wide reforms and enable Puerto Rico to return to the path of fiscal responsibility. *See, e.g.*, Law 3-2017; Law 4-2017; Law 5-2017; Law 8-2017; Law 26-2017; and Law 46-2017.

123.    Courts have not hesitated to reject Contracts clause challenges where, as here, the challenged legislation was only one of many measures adopted to address a fiscal crisis. *See, e.g.*, *Buffalo Teachers*, 464 F.3d at 371; *Baltimore Teachers*, 6 F.3d at 1020 n.12; *Donohue v. New York*, 347 F. Supp. 3d 110, 134 (N.D.N.Y. 2018) (upholding reduction in contributions to retirees' health insurance "[i]n light of the considerable cuts made across all aspects of the State's spending"); *Ambrose*, 2018 WL 1635498, at *8, *21.

124.    Accordingly, the Legislature could logically conclude "that the measures taken in . . . Act [106] are necessary and reasonable to properly address the fiscal crisis and the actuarial insolvency of [ERS]. . . ." Ex. F at 12 (Act 106, Statement of Motives).  Claimants thus have failed to state a viable claim arising under the Contracts clause, which Claim should be disallowed and dismissed. *See also* [Case No. 17-bk-3283, ECF No. 9700 ¶¶ 79–99].

> **ii.    Claims Against ERS for Breaches of Prepetition Covenants and Other Prepetition Obligations Arising Under the Resolution Do Not Give Rise to Administrative Expense Claims.**

125.    Claimants assert administrative expense claims against ERS for various breaches of the Resolution. *See* [Case No. 17-bk-3566, ECF No. 707 ¶¶ 28–33].  Accordingly, each of these alleged breaches are of obligations that arose prepetition.  Therefore, the claimed breach—whether occurring prepetition or postpetition—is a breach of a prepetition contract from which no administrative claim will arise.  *See supra* ¶¶ 42–44.  Furthermore, as Claimants' Claims do not allege an actual and necessary cost of preserving the estate, they do not qualify as administrative expenses under § 503(b)(1)(A), *see supra* ¶¶ 49–51, and even if they did, such Claims are preempted.  *See supra* ¶¶ 52–55.

### iii.   ERS Was Not "Unjustly Enriched."

126.   Claimants assert ERS was "unjust[ly] enriched" by issuing the ERS Bonds and then not making all promised principal and interest payments in connection therewith.  *See* [Case No. 17-bk-3566, ECF No. 707 ¶ 34].  As explained above, a claim for unjust enrichment may not lie if the claimant has other claims, such as a contract claim, that governs the dispute.  *See supra* ¶ 69; *see also* Restatement (Third) of Restitution and Unjust Enrichment § 2(2) (Am. Law Inst. 2010) ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment").  At most, Claimants have a contractual claim against ERS for unpaid principal and interest on the ERS Bonds.  Such failure to pay would not be "unjust enrichment," but a breach of ERS's prepetition contractual obligations.  And, as explained above, *supra* ¶¶ 42–44, this alleged breach of a prepetition obligation constitutes no more than a prepetition claim, and not a § 503(b) claim as Claimants contend.

### iv.   Asserted Claims Against the Commonwealth Are Duplicative of Claims Asserted in the Post-Petition Legislation AP.

127.   Claimants assert a variety of Claims against the Commonwealth which are duplicative of Claims asserted against the Commonwealth in the Post-Petition Legislation AP.  *See* [Case No. 17-bk-3566, ECF No. 707 ¶¶ 35–39] (asserting Administrative Expense Claims against the Commonwealth (1) for violating the automatic stay, (2) with respect to any Pledged Property in the Commonwealth's possession, (3) for violation of the U.S. and Puerto Rico Takings Clauses, (4) for violation of the U.S. and Puerto Rico Contracts Clauses, and (5) unjust enrichment of the Commonwealth).  As explained above, the Claims asserted in items (1) and (3)–(5) must be dismissed, *see supra* ¶¶ 57, 62–74, 77–97, and 102–124, and the Claim asserted in item (2) is being resolved pursuant to the Lien-Scope AP.  *See supra* ¶ 59.  Accordingly, all of these Claims should be dismissed and disallowed for the reasons stated above.

v.     **The Commonwealth Did Not Violate Section 407 of PROMESA.**

128.    Claimants allege the Commonwealth is liable for the transfer of the Transferred

Assets as well as the PayGo Payments.  *See* [Case No. 17-bk-3566, ECF No. 707 ¶ 40].  However,

by its terms, PROMESA § 407 precludes recovery under this theory.

129.    Section 407(a) of PROMESA provides that:

> While an Oversight Board for Puerto Rico is in existence, if any
> property of any territorial instrumentality of Puerto Rico is
> transferred in violation of applicable law under which any creditor
> has a valid pledge of, security interest in, or lien on such property,
> or which deprives any such territorial instrumentality of property in
> violation of applicable law assuring the transfer of such property to
> such territorial instrumentality for the benefit of its creditors, then
> the transferee shall be liable for the value of such property.

PROMESA § 407(a).  Section 407(b), in turn, provides creditors with a mechanism to enforce

rights under § 407—but only *after the Title III stay has been lifted*:

> A creditor may enforce rights under this section by bringing an
> action in the United States District Court for the District of Puerto
> Rico after the expiration or lifting of the stay of section 405, unless
> a stay under title III is in effect.

PROMESA § 407(b).

130.    Thus, on its face, § 407(b) expressly bars creditor enforcement actions when, as

here, a stay is in effect under Title III.  *Ambac Assurance Corp. v. Commonwealth of P.R. (In re*

*Fin. Oversight & Mgmt. Bd. for P.R.)*, 297 F. Supp. 3d 269, 293 (D.P.R. 2018), *aff'd*, 927 F.3d

597 (1st Cir. 2019).  Section 407 is not intended to be used in the context of a Title III case, while

the automatic stay remains in effect.[21]

---

[21] *Cf.* Report from the House Committee on Natural Resources, H.R. Rep. No. 114-602, pt. 1S at 52 (2016) ("*Sec. 407.*
Protection from Inter-Debtor Transfers . . .  This section grants creditors the right to sue ***upon the conclusion of the***
***stay***, if the government of Puerto Rico transfers property between instrumentalities during the tenure of the Oversight
Board in violation of any agreement, or applicable law that a creditor has or would have a pledge of, security interest
in, or lien on such property.") (emphasis added).

131.     Even if the stay did not bar enforcement here, Claimants do not meet the requirements of either of the two causes of action provided for by § 407.  The first requires (i) the transfer (ii) of a territorial instrumentality's property, (iii) which is subject to a lien, pledge, or security interest, and (iv) that the transfer is in violation of applicable law.  Claimants' failure to meet any single element mandates a decision in favor of the Debtors.

132.     First, as noted above, Claimants have no lien against, pledge of, or security interest in any ERS assets allegedly transferred to the Commonwealth, other than the Transferred Assets, which cannot form the basis of a cause of action against the Commonwealth because if such assets are subject to Claimants' security interest, the value thereof will be provided to Claimants.  Second, even if an actionable transfer could be alleged, there was no such transfer "in violation of applicable law," because the transfers (a) were made in accordance with Act 106, not in violation of any law (b) the Enabling Act requiring payment of Employers' Contributions to ERS is preempted by PROMESA, which *is* "applicable law," and—because it was passed by a prior legislature that cannot bind the current and future legislatures—has been overridden by the certified budget, which is deemed approved by the legislature under PROMESA § 202(e).  Third, the future Employers' Contributions are not the "property of a territorial instrumentality" because they are not "property."  ERS's conditional statutory expectancy to receive these funds, even if not preempted, does not make those funds ERS property.  Employers have not granted ERS any security interest or other property interest in future Employers' Contributions.  *Emps. Ret. Sys.*, 948 F.3d at 468.

133.     Defendants fare no better under § 407's second cause of action.  That claim requires (i) a transfer (ii) of an instrumentality's property, (iii) which deprives the instrumentality of its property, (iv) in violation of applicable law assuring the transfer of such property for the benefit

of creditors.  For the reasons identified regarding the first cause of action, there has been no violation of applicable law, nor any "property" that was transferred.  Also, Claimants do not allege the existence of any law assuring transfer of property to territorial instrumentalities for the benefit of creditors.  The statutes requiring Employers' Contributions predate the issuance of the ERS Bonds, and enabled ERS to operate the retirement system, and thus were not for the benefit of ERS's creditors.  Accordingly, Claimants' § 407 claim must fail as a matter of law.

134.   Moreover, even if Defendants have a viable claim under § 407, it is, at best, an unsecured claim.  Section 407(a) makes a transferee liable for the "*value*" of the property transferred—it does not create a property interest, or require the transferee to return the property received.[22]  Put differently, if Claimants had administrative or secured claims under § 407, that would mean that every dollar saved by the Oversight Board's fiscal plans and budgets that preempted Commonwealth statutory appropriations would be unavailable to create a sustainable economy.

135.   Finally, assuming for the sake of argument Claimants had a valid § 407(a) claim, under § 407(b) such a claim could not be allowed prior to confirmation of a plan.  Absent stay relief, § 407(b) precludes creditors from enforcing a § 407(a) claim during a PROMESA Title III case.  *See* PROMESA § 407(b).  In addition, PROMESA § 201(b)(1)(M) provides a fiscal plan shall "ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of a covered territory or another covered territorial

---

[22] Nor could Defendants' § 407 claims be deemed administrative claims because Defendants did not provide any postpetition property or services necessary for the preservation of the Commonwealth. *See* 11 U.S.C. § 503(b)(1)(A) (incorporated by PROMESA § 301).  Turning such claims into administrative claims would also produce an absurd result.  Namely, the Commonwealth—which expressly and statutorily disclaimed any liability under the Bonds, and which is only paying discounted amounts to its creditors—would somehow have to pay the full amount to ERS's creditors.  This would undermine the very structure of PROMESA and the Oversight Board's control over the Commonwealth budget.

instrumentality of a covered territory, ***unless permitted by*** the constitution of the territory, ***an approved plan of adjustment*** under title III, or a Qualifying Modification approved under title VI." *Id.* § 201(b)(1)(M) (emphases added).  Given that § 201(b)(1)(M) provides that a transfer, like the one described in § 407, can be approved in a plan, it simply cannot be that such a judicially-approved transfer could separately give rise to a cause of action under § 407.  Thus, even if Claimants have a claim under PROMESA § 407, the claim cannot be allowed prior to confirmation of a plan (and cannot be allowed if the plan permits such transfer).  The mechanics of PROMESA § 407 reveal it can only be invoked outside Title III.

136.    This claim should be disallowed and dismissed.  *See also* [Case No. 17-bk-3283, ECF No. 9700 ¶¶ 139–42].

### vi.    The Commonwealth and ERS Did Not Violate the January Stipulation Approved by Judge Besosa.

137.    Claimants allege ERS "admitted that it received employer contributions from the Commonwealth and did not transfer those amounts to the specified account, in violation of the Order [approving the January Stipulation.]"  *See* [Case No. 17-bk-3566, ECF No. 707 ¶ 41]. Claimants cite the DiPompeo Declaration, which was filed on November 3, 2017, as support for this claim.  *Id.*  However, the First Circuit already has ruled—in 2019—that the Debtors did not violate the January Stipulation.  *Altair Glob. Credit Opportunities Fund (A), LLC v. Fin. Oversight & Mgmt Bd. for P.R. (In re Fin. Oversight & Mgmt Bd. for P.R.)*, 914 F.3d 694, 721 (1st Cir. 2019).  This Claim must be disallowed and dismissed.

### vii.    Claimants Do Not Have a Claim Arising From Any Alleged Failure of the Debtors to Adequately Protect Claimants' Property Interest.

138.    Claimants allege they have been harmed by continuation of the automatic stay, and that the Claim resulting from such harm is allowable as an administrative expense under § 922(c) of the Bankruptcy Code.  *See* [Case No. 17-bk-3566, ECF No. 707 ¶ 42].  However, Claimants

have not adequately alleged (nor could they) that there has been any diminution in the value of

their collateral.  As a result of the Section 552 Decision, the scope of their collateral, if any, is in

assets that were held prepetition by ERS, which will be determined following resolution of the

Lien-Scope AP and the *Ultra Vires* AP.  Until such time, Claimants cannot plausibly allege such

collateral has been diminished, as they have not established which assets constitute their collateral

in the first instance.  Any allowed secured claims established by Claimants will be addressed in a

plan of adjustment in accordance with Title III which requires payment of the full amount of the

allowed secured claim.  Therefore, this Claim should be dismissed.

### viii.  The Additional Administrative Expense Claims Alleged Against the Debtors in the Supplement Should Also Be Dismissed.

139.    The additional Claims originally asserted in the Administrative Expense Motions,

*see* [Case No. 17-bk-3566, ECF No. 707 ¶ 43], and supplemented in the Supplement (¶¶ 3–17) are

duplicative of Claims being resolved in parallel proceedings, are claims for breaches of prepetition

contracts, *see supra* ¶¶ 41–48, and/or fail to state a claim upon which relief can be granted, among

other infirmities.  They all should be dismissed.

### 1.  The Supplemental Administrative Expense Claims Against ERS Should Be Dismissed.

140.    Claimants allege assorted Claims that ERS unlawfully abdicated its responsibilities

to pay principal and interest on the ERS Bonds (Supplement ¶¶ 3–10).  While these Claims may

be dressed up in theories of tort or equity, among others, at bottom, they complain of ERS's failure

to comply with its prepetition obligations under the Resolution.  Accordingly, any Claims arising

therefrom are prepetition and cannot, as a matter of law, be administrative expenses, and should

be dismissed on this ground alone.  *See supra* ¶¶ 42–44.  Additionally, where a contract governs

the relationship between two parties, an aggrieved party cannot rely on actions sounding in tort or

equity to redress the same grievance.  *Rok Builders, LLC v. 2010-1 SFG Venture LLC (In re*

*Moultonborough Hotel Group, LLC)*, 726 F.3d 1, 7 (1st Cir. 2013) ("Promissory estoppel . . .

provides a basis for recovery when no contract exists."); *Fagot Rodriguez v. Republic of Costa

Rica*, 139 F. Supp. 2d 173, 184 n.10 (D.P.R. 2001) ("The Supreme Court of Puerto Rico has held

that [Article 1802 of the Puerto Rico Civil Code, governing damage caused by fault or negligence,

and Article 1054, governing damages cause in connection with contractual obligations] are

mutually exclusive, observing that Article 1802 applies only when no prior obligation exists

between the person causing the damage and the one receiving it.") (citations and quotation marks

omitted).   The additional Claims against ERS in the Supplement arise from a contract—the

Resolution—and Claimants cannot recover on claims against ERS other than those arising from

the terms of the contract.   All of the additional Claims asserted against ERS in the Supplement

should be dismissed.

### a. Claimants Fail to State a Claim that the Post-Petition Legislation Was a Fraudulent Transfer.

141.    Claimants allege "[b]ecause the transfers effected by the Post-Petition Legislation

from ERS to the Commonwealth were made in fraud of ERS's creditors—the Bondholders—they

are voidable under Puerto Rico law as fraudulent transfers."  Supplement ¶ 3.  Claimants lack

standing to assert such Claims, and their request to be appointed as § 926 trustees to pursue such

claims was denied. *See supra* ¶ 28.  In respect of the Post-Petition Legislation, under Claimants'

theory, the Commonwealth was not allowed to amend the law the Offering Statement warned

Claimants could be amended to their detriment.  In respect of the transfer of other assets from ERS

to the Commonwealth, the Commonwealth and Oversight Board have stated the value of the other

assets against which Claimants have valid liens would be distributed to them. *Andalusian*, 954

F.3d at 10.

142.    In any event, a valid exercise of the Commonwealth's power to legislate cannot be avoidable under Commonwealth law—specifically Commonwealth fraudulent transfer law.  Here, the transfers of tangible assets ERS made to the Commonwealth pursuant to the Post-Petition Legislation were made in exchange for the Commonwealth assuming ERS's obligations to make pension payments to retirees and bearing the risk of employers failing to reimburse their share of PayGo payments.  Such valuable consideration (made pursuant to a valid legislative determination) is incompatible with a fraudulent transfer.  *See, e.g.*, *Westernbank P.R.*, 2009 U.S. Dist. LEXIS 126405 at *121 (noting that "[a]ny detriment to the opposite party constitutes valuable consideration").  Commonwealth fraudulent transfer law is therefore inapplicable.  In any event, even if ERS could somehow be liable for complying with the Post-Petition Legislation, as explained previously, the Debtors have represented that the value of any assets transferred to the Commonwealth will be provided to Claimants if their security interest attaches thereto.  *See supra* n.9.

### b.    Claimants Fail to State a Claim that ERS Deceitfully Evaded Compliance with its Contractual Obligations.

143.    Claimants allege Puerto Rico law prohibits "'dolo' or 'deceit' in the performance of a contractual obligation" and that "[a]cting knowingly and intentionally, ERS [] used various devices to evade compliance with its contractual obligations."  Supplement ¶ 4.  The "various devices" cannot mean legislation.  If the Post-Petition Legislation is not unconstitutional (*e.g.*, in violation of the Takings or Contracts clause), it is the law and the law cannot be fraud, deceit or "dolo."  In addition, Claimants ignore the specific circumstances ERS faced:  a multibillion dollar unfunded pension liability for hundreds of thousands of Commonwealth retirees.  As the First Circuit recognized, there are "obvious differences between governmental bankruptcies and commercial private party bankruptcies. . . .  Unlike a commercial bankruptcy, which attempts to

67

balance the rights of creditors and debtors, the principle purpose of chapter 9, and by analogy
PROMESA, is to allow municipal debtors the opportunity to continue operations while adjusting
or refinancing their creditor obligations." *Andalusian*, 954 F.3d at 7–8 (internal quotations and
brackets omitted).  The Commonwealth and its instrumentalities, such as ERS, are all parts of a
system sustaining the lives of over three million Americans.  They must work hand-in-hand with
one another.  It was unrealistic, for instance, to expect ERS to oppose the Post-Petition Legislation,
and ERS's failure to do so is not bad faith.  In any event, all the actions Claimants allege ERS took
in derogation of its duties are with respect to the Resolution—a prepetition contract, for which no
administrative claims will lie.  *See supra* ¶¶ 42–44.  Further, even if the Court finds "dolo," that
would not entitle Claimants to any Claims in addition to those for unpaid principal and interest (if
any).  *See Oriental Fin. Grp. v. Fed Ins. Co.*, 598 F. Supp. 2d 199, 224 (noting that the difference
in damages between a breach of contract with or without dolo is the recovery of all damages
originating from the breach, whether or not they were foreseeable).

### c.     No Claim is Stated that ERS Breached An Obligation to Perform in Good Faith.

144.     Claimants allege "ERS knowingly and intentionally breached its obligation to
perform under the Bond Resolution in good faith."  Supplement ¶ 5.  Claimants have it backwards.
Inside and outside bankruptcy, contracts are often expected to be breached when it is economically
better to breach than to perform.[23]  Bankruptcy Code § 365 exists to promote breach of executory

---

[23] *United States v. Blankenship*, 382 F.3d 1110, 1133–34 (11th Cir. 2004) (internal citations omitted); *accord Nw.
Airlines v. United States Dep't of Transp.*, 15 F.3d 1112, 1120 n.5 (D.C. Cir. 1994) ("'Efficient breach' refers to the
principle that a breaching party has the option of paying damages rather than performing its contractual obligations
where damages are an adequate substitute for specific performance." (citation omitted)); *see also United States v.
Winstar Corp.*, 518 U.S 839, 919–20 (1996) (Scalia, J., concurring) ("Virtually every contract operates, not as a
guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance: 'The duty to
keep a contract at common law means a prediction that you must pay damages if you do not keep it, — and nothing
else.' Holmes, *The Path of the Law* (1897), in The Collected Works of Justice Holmes 391, 394 (S. Novick ed. 1995)").

contracts with court approval.   Nonexecutory contracts are breachable without a court order.

However, there is no claim for a "bad faith" breach of contract; good faith controls how the parties

perform their contractual obligations, but does not create separate obligations, especially in a civil

law system. *See, e.g.*, UCC § 1–304, Comment 1 ("This section does not support an independent

cause of action for failure to perform or enforce in good faith.   Rather, this section means that a

failure to perform or enforce, in good faith, a specific duty or obligation under the contract,

constitutes a breach of that contract or makes unavailable, under the particular circumstances, a

remedial right or power.").   In support of the contention that ERS breached the covenant of good

faith and fair dealing Claimants cite only one case, *Cantellops v. Alvaro-Chapel*, 234 F.3d 741 (1st

Cir. 2000)*.   But *Cantellops* does not support Claimants' argument; it is in no way factually

analogous to the present case, and its analysis of the breach of good faith cause of action is limited

to a single sentence noting the uncontroversial proposition that a claim for violation of the covenant

of good faith can lie even if the explicit terms of an agreement were not violated.   *Id.* at 744.

Further, for the reasons stated immediately above, *see supra* ¶ 143, ERS's failure to oppose the

Post-Petition Legislation is not an act in bad faith (ERS does not control the Legislature or the

Commonwealth), and even if it were, Claimants would be entitled to at most a prepetition claim

no greater than that for unpaid principal and interest.

> ### d.   Claimants Fail to State a Claim that ERS Acted With Fault or Negligence in Fulfilling Its Contractual Obligations.

145.   Claimants allege "ERS failed to take any steps to vindicate the Bondholders' rights

and reduce its longstanding underfunding."   Supplement ¶ 6.   That is not the case.   The Enabling

Act was amended numerous times since 1999 in an effort to shore up ERS's finances.   *See supra*

¶ 16.   For this reason and the reasons stated above, including that no tort claim can arise from the

breach of contract, *see supra* ¶ 140, ERS's failure to oppose the Post-Petition Legislation and other

alleged contractual breaches do not give rise to a claim of negligence.  *See also* Restatement (Third) of Torts: Liability for Economic Harm § 3 (Am. Law Inst. 2012) ("there is no liability in tort for economic loss caused by negligence in the performance or negotiation of a contract between the parties.").  Breach of a covenant simply gives rise to the right to declare a default under the contract.  Further, even they did, Claimants would be entitled to, at most, nonrecourse unsecured prepetition claims for unpaid principal and interest.

       **e.**      **Claimants Fail to State a Claim that ERS Breached Its Duties, Causing Unjust Enrichment.**

146.    Claimants allege "[b]ecause ERS's breach of its duties caused unjust enrichment and harmed the Bondholders, the Bondholders are entitled to recover the assets transferred from ERS to the extent necessary to make them whole."  Supplement ¶ 7.  However, as explained above, Claimants cannot state a claim for unjust enrichment against ERS.  *See supra* ¶ 126.  Accordingly, any claim derivative of unjust enrichment (such as a "breach of duties") must be dismissed.  Further, Claimants fail to state a claim for relief, as a "breach of duties causing unjust enrichment" is not a cognizable cause of action.

       **f.**      **Claimants Fail to State a Claim for Promissory Estoppel.**

147.    Claimants allege "[t]he Bondholders did in fact reasonably rely on ERS's promises, and this reliance resulted in the loss of the Claimants' collateral, principal, and accrued interest . . . .   [and] [i]njustice can be avoided only by enforcing ERS's promises to the Bondholders and requiring ERS to make the Bondholders whole."  Supplement ¶ 8.  All claims in bankruptcy arise out of debtors' broken promises.  However, a promissory estoppel claim does not lie where a contract governs the dispute at issue.  *Moultonborough Hotel Group, LLC*, 726 F.3d at 7; *Steinke v. Sungard Fin. Sys., Inc.*, 121 F.3d 763, 776 (1st Cir. 1997) ("Courts typically invoke the doctrine of promissory estoppel when the formal requirements of contract formation are absent

and when enforcing the promise would serve the interest of justice."). And even if they could assert such a claim, Claimants would be entitled to, at most, nonrecourse prepetition claims for unpaid principal and interest. *See supra* ¶¶ 42–44.

### g.   Claimants Fail to State a Claim That ERS Converted Claimants' Property.

148.     Claimants allege "ERS's actions [in connection with the Post-Petition Legislation] indefinitely deprived the Bondholders of their collateral and contract rights, and thus amount to conversion under Puerto Rico law." Supplement ¶ 9. As noted above, Bondholders do not have any collateral arising from post-petition Employers' Contributions. There is nothing to convert. *See also infra* ¶ 154. Further, Claimants can have no conversion claim where a contract governs their rights. *See supra* ¶ 140. And Claimants have cited to no case law in which a conversion claim was allowed to proceed against a party for complying with the law. *See Outdoor Media Dimensions, Inc. v. State*, 150 Or.App. 106, 111 (Or.App. 1997) ("Generally, when property is lawfully taken, there is no conversion."). *See supra* ¶ 46. In any event, the Debtors have represented that Claimants will receive the value of any assets transferred to the Commonwealth if their security interest attaches thereto. *See supra* n.9.

### h.   Claimants Fail to State a Claim that ERS Acted with Fault or Negligence.

149.     Claimants allege "ERS acted with fault or negligence when it failed to oppose the enactment of the Post-Petition Legislation despite its contractual obligation to do so, and when it aided the Commonwealth by selling its assets and transferring its funds to the Commonwealth." Supplement ¶ 10. However, as explained above, there is no viable claim of fault or negligence in connection with efforts ERS did or did not take to comply with the Post-Petition Legislation; *see supra* ¶ 145, and Claimants can have no tort claim where a contract governs their rights. *See supra* ¶ 140. And even if there were such a claim, Claimants would be entitled to, at most, nonrecourse

71

prepetition claims for unpaid principal and interest.  Even assuming a covenant to oppose the Post-Petition Legislation was breached, outside Title III it would only provide Claimants their rights under the Resolution, including to require ERS to carry out any covenant or agreement with the ERS Bondholders, and does not give rise to a separate breach of contract claim.  Ex. B at VI-22 (Resolution at § 1102(1)(ii)).  In Title III, Bankruptcy Code §§ 101(5) and 502(b) require that all rights be converted to money claims.

### 2. The Supplemental Claims Administrative Expense Against the Commonwealth Should Be Dismissed.

150.    In the Supplement, Claimants allege assorted Claims that the Commonwealth is liable for enacting the Post-Petition Legislation.  Supplement ¶¶ 11–17.  As explained above, *see, e.g.*, *supra* ¶¶ 115–124, the Post-Petition Legislation was a valid exercise of the Commonwealth's legislative powers, in particular in light of its responsibility to provide for its retirees.  Accordingly, all such Claims should be dismissed and disallowed.

### a. Claimants Fail to State a Claim that the Commonwealth Fraudulently Acquired ERS's Assets.

151.    Claimants allege "[t]he Commonwealth . . . owes a duty of indemnification to the Bondholders for the losses and damages caused to them by the alienation of ERS's assets under the Post-Petition Legislation."  Supplement ¶ 11 (internal quotation marks omitted).  The Commonwealth realleges and reincorporates its response to this theory as set forth in paragraphs 141–142 above.  Claimants' allegations are dependent on the Court finding the Post-Petition Legislation both harmed Claimants and was impermissible.  The statute cited by Claimants is inapposite because it concerns losses and damages due to alienation of assets "in fraud of creditors."  31 L.P.R.A. § 3499.  As explained above, *see supra* ¶¶ 141–142, the transfers effected by ERS in compliance with the Post-Petition Legislation cannot plausibly be characterized as fraudulent, so 31 L.P.R.A. § 3499 is inapplicable.  In any event, the value any assets transferred to

72

the Commonwealth will be provided to Claimants if their security interest attaches thereto.  *See*

*supra* n.9.

> **b.      No Claim is Stated that the Commonwealth Aided and
> Abetted Any Alleged ERS Breaches.**

152.    Claimants allege "[t]he Commonwealth knowingly participated in ERS's breach of

the contractual, statutory, and other duties ERS owed to the Claimants."   Supplement ¶ 12.

Claimants ignore that the contract they had provided for nonrecourse claim for repayment of

principal and interest.   Nothing more.   The Commonwealth realleges and reincorporates by

reference its response to this theory as set forth in paragraphs 140–149 above which establish that

there cannot be a breach of duty by ERS owed to Claimants.   Claimants additionally fail to state a

claim upon which relief can be granted, as they do not allege the elements for a claim of aiding

and abetting another's breach of duties, in particular where, as here, the respondent is a

governmental entity.

> **c.      Claimants Fail to State a Claim that the Commonwealth
> Tortiously Interfered with the Resolution.**

153.    Claimants allege the Commonwealth "enacted the Post-Petition Legislation as a

means to evade ERS's obligations to the Bondholders[.]"  Supplement ¶ 13.  This is demonstrably

incorrect.   As Act 106 provides expressly, the Post-Petition Legislation was enacted to provide

benefits for Commonwealth retirees.  Ex. F at 18 (Act 106, Statement of Motives).  And, as the

Offering Statement explained, Employers' Contributions were always subject to change.  Ex. B at

26 (Offering Statement).  Further, the statutes and cases Claimants cite are inapposite; as noted by

the First Circuit in the case cited by Claimants, in order to establish tortious interference with a

contract it is necessary to show "fault," which, in this context means not mere voluntariness, but

malice or bad intention.  *Gen. Office Prods. Corp. v. A.M. Capen's Sons, Inc.*, 780 F.2d 1077, 1079

(1st Cir. 1986) (citing *Gen. Office Prods. Corp. v. A.M. Capen's Sons, Inc.*, 607 F.Supp. 1191,

1194 (D.P.R. 1986)); Restatement (Third) of Torts: Liability for Economic Harm § 17(1)(c) (Am. Law Inst. 2018) (liability for interference with contract requires wrongful conduct). *Id.* cmt. e ("Liability does not arise, and privileges need not become relevant, when a defendant uses lawful means to protect legitimate interests distinct from competition for the benefits of the contract"). The adoption of legislation, by definition, is "lawful means." Further, the Claimants are unable to allege plausibly malice in the Commonwealth's action or an intention to interfere with Claimants' contract with ERS, as the enactment of the Post-Petition Legislation was a valid exercise of the Commonwealth's legislative authority intended to provide benefits for Commonwealth retirees by means within its power. *See supra* ¶¶ 115–124.

###### d.    Claimants Fail to State a Claim that the Commonwealth Converted Claimants' Property.

154.    Claimants allege "[t]he Post-Petition Legislation . . . intentionally and indefinitely deprived the Claimants of their collateral and contract rights." Supplement ¶ 14. However, this claim turns on this Court ruling the Post-Petition Legislation is invalid, which, as explained previously, *see supra* ¶¶ 56–124, cannot be the case. And the statutes and cases Claimants cite are inapposite because they concern the malicious and wrongful exercise of authority over another's property. *See Barretto Peat, Inc. v. Luis Ayala Colon Sucrs., Inc.*, 896 F.2d 656, 657–58 (1st Cir. 1990). Here, the Commonwealth does not "exercise . . . authority" over any of the "property" listed by Claimants as having been converted—namely (i) valid and perfected security interests and liens on the Pledged Property, (ii) contract rights under the documents governing the ERS Bonds, (iii) contract rights under the ERS Bond Resolution, and (iv) the right to receive principal and interest payments. To the extent Claimants argue that the Commonwealth converted their *collateral*, this claim fails because Claimants do not possess a property interest in the PayGo Payments, *see supra* ¶¶ 60–61, and they will receive the value of the Transferred Assets if entitled

thereto.  *See supra* n.9.  Further, this allegation also fails to state a claim, as Claimants cite no

examples of a government being held liable for conversion purely on the grounds that it passed

legislation having an adverse effect on a party's contractual expectations.

> e.     **Claimants Fail to State a Claim the Commonwealth
>        Committed Harmful Fault or Negligence.**

155.    Claimants allege "[t]he Commonwealth acted with fault or negligence when it

enacted the Post-Petition Legislation[.]"  Supplement ¶ 15.  Again, this claim turns on the Post-

Petition Legislation being impermissible, which it was not.  *See supra* ¶¶ 56–124.  Further, as

against the government, Claimants fail to state a claim that the government may be held liable

under Puerto Rico's general fault or negligence statute for acts of legislation.

> f.     **Claimants Fail to State a Claim that the Commonwealth
>        Was Unjustly Enriched.**

156.    Claimants allege "because ERS's breach of duties caused unjust enrichment . . . the

Bondholders are entitled to recover the assets transferred from ERS to Commonwealth to the

extent necessary to make the Bondholders whole."  Supplement ¶ 16.  The Commonwealth

realleges and reincorporates its response to this theory of liability as set forth in paragraph 146

above.  Further, as explained above, this claim must be dismissed.  *See supra* ¶¶ 62–74.

> g.     **Any Commonwealth Assets In Which Claimants' Have
>        A Security Interest Will Be Determined in the Lien-
>        Scope AP.**

157.    Claimants allege the Commonwealth is "holding ERS's assets—including the

[PayGo Payments] . . . for the benefit of the Bondholders[.]"  Supplement ¶ 17.  However, as

explained previously, the PayGo Payments are not the same thing as Employers' Contributions,

and are not assets in which the Claimants have a security interest under the terms of the Resolution

or as determined by the Section 552 Decision.  *See supra* ¶¶ 60–61.  And the value of any assets

transferred to the Commonwealth will be provided to Claimants to the extent, if any, their security

interest attaches thereto.  *See supra* n.9.

## II.   THE CLAIMS ASSERTED AGAINST THE COMMONWEALTH IN THE PROOFS OF CLAIM SHOULD BE DISMISSED UNDER RULE 12(b)(6).

### A.   The Claims in the Proofs of Claim Should Be Dismissed.

158.   The Claims Scheduling Order provides that, by this Motion, the Oversight Board

may move to disallow and dismiss "Claims," which includes the claims asserted in (i) the Fiscal

Agent's proofs of claim filed against the Commonwealth [Claim Nos. 16775 and 32004] and

(ii) the ERS Bondholders Groups' proofs of claim filed against the Commonwealth (listed in

Appendix 2 of the Claims Scheduling Order).  Claims Scheduling Order ¶ 5.  The basis for such

dismissals are set forth herein as such claims are duplicative of the claims asserted in the

Administrative Expense Claims, and to the extent they are not, the Debtors incorporate by

reference their arguments in the Commonwealth Claim Objections.  *See supra* n.10.

### B.   The Additional Claims in the Supplement Should Be Dismissed.

159.   The additional Claims alleged against the Commonwealth in the Supplement

(¶¶ 28–31) also should be dismissed, as they are duplicative of Claims being resolved in parallel

proceedings, among other infirmities.  *See supra* ¶ 58.  Further, as explained above, the Resolution

and Offering Statement made explicit that Bonds are not an obligation of the Commonwealth.  *See*

*supra* ¶ 61.

#### i.   The Administrative Expense Claims Cannot Be Asserted as Prepetition Claims.

160.   Claimants seek, in the alternative, to assert their Claims in paragraph 11 through 17

of the Supplement as prepetition Claims.   Supplement ¶ 28.   The Debtors reincorporate by

reference their response to such claims.  *See supra* ¶¶ 150–157.  Such Claims alleged against the

Commonwealth are no more allowable as prepetition Claims than as Administrative Expense

Claims. Further, certain of these claims (Supplement ¶¶ 11–12, 15) were not included in proofs of claim filed before the bar date and should be disallowed as untimely.

### ii. The *Ultra Vires* Counterclaims Should be Dismissed.

161. Claimants incorporate by reference counterclaims they claim to have alleged against the Commonwealth in the *Ultra Vires* AP. Supplement ¶ 29. However, such Claims (contained in Counts I–V of the *Ultra Vires* AP [ECF No. 21]) allege counterclaims only against ERS, and not the Commonwealth. As these counterclaims never were asserted against the Commonwealth, there is no basis for Claimants to pursue them here, and any such claims are therefore filed after the General Bar Date and should be dismissed. In addition, Count IV (Unjust Enrichment by ERS) and Count V (Negligent Misrepresentation Against ERS) should be dismissed on the merits, as explained herein. *See supra* ¶ 126; *infra* ¶ 172.

### iii. Claimants Fail to State a Claim that the Moratorium Act and the ERS Executive Order Effected a Taking of Claimants' Property.

162. Claimants allege that the Moratorium Act and the ERS Executive Order, which, among other things, "suspended 'any obligation of [] ERS pursuant to the [Resolution] to transfer [certain] contributions . . . to the Fiscal Agent," and "suspended the Commonwealth's obligations to 'make or transfer Employer[s'] Contributions to ERS up to the amount of debt service payable by ERS during fiscal years 2016-2017[,]'" violated the Takings Clause of the U.S. and Commonwealth constitutions. Supplement ¶ 30. However, no security interests were impaired, and no assets were taken as a result of these alleged actions which required that assets be retained by ERS rather than be transferred to the Fiscal Agent. As explained above, to the extent any assets retained by ERS are subject to Claimants security interest as determined by the Lien-Scope AP, Claimants will receive the value thereof. *See supra* ¶ 58. And to the extent the Commonwealth somehow wrongfully suspended an obligation to pay Employers' Contributions, it is ERS, and not

Claimants, who have standing to recover on account of any such obligations.  Further, Claimants do not even allege anything has been taken; instead, they qualify their allegations with the modifying phrase that they have a Takings claim "*to the extent* [their collateral was taken.]" Supplement ¶ 30 (emphasis added).

### iv. No Viable Claim is Stated that Prepetition Revisions to the Enabling Act Effected a Taking of Claimants' Property.

163.    Claimants allege certain unpaid employers' contributions "remained calculated and owing to ERS as of the [ERS] Petition Date[,]" "[s]uch amounts constitute Pledged Property under the Bond Resolution in which the Claimants had a perfected security interest, regardless of any impact of the Section 552 Decision. . . ." and that "to the extent employer contributions were eliminated or cancelled through prepetition revisions to the ERS Enabling Act or other prepetition conduct, the Bondholders were damaged thereby and are entitled to just compensation for taking of their collateral."  Supplement ¶ 31.  Claimants do not identity any specific revisions to the Enabling Act.  As explained above, to the extent any assets retained by ERS are subject to Claimants security interest as determined by the Lien-Scope AP, Claimants will receive the value thereof.  *See supra* ¶ 58.  And again, Claimants do not even allege anything has been taken; instead, they qualify their allegations with the modifying phrase that they have a Takings claim "*to the extent* [their collateral was taken.]"  Supplement ¶ 31 (emphasis added).

## III. THE CLAIMS ASSERTED AGAINST ERS IN THE PROOFS OF CLAIM SHOULD BE DISMISSED UNDER RULE 12(b)(6).

### A. The Claims in the Proofs of Claim Should Be Dismissed.

164.    The Claims Scheduling Order provides that, by this Motion, the Oversight Board may move to disallow and dismiss "Claims," which includes the claims asserted in (i) the Fiscal Agent's proof of claim filed against ERS [Claim No. 16777] and (ii) the ERS Bondholders Groups' proofs of claim filed against ERS (listed in Appendix 2 of the Scheduling Order).  Claims

Scheduling Order ¶ 5.  The basis for such dismissals are set forth herein as such claims are duplicative of the claims asserted in the Administrative Expense Claims, and to the extent they are not, the Debtors incorporate by reference their arguments in the ERS Claim Objections.  *See also supra* n.10.

**B.    The Additional Claims in the Supplement Should Be Dismissed.**

165.    The additional Claims alleged against ERS in the Supplement (¶¶ 19–27) also should be dismissed, as they are duplicative of Claims being resolved in parallel proceedings, *see supra* ¶ 58, and/or fail to state a claim upon which relief can be granted, among other infirmities. Further, to the extent such Claims are validly asserted against ERS, they can provide Claimants with a claim no greater than a prepetition, nonrecourse Claim against ERS for the amount of unpaid principal and interest on their bonds.  Claimants are not entitled to a "bonus" claim for their additional claims, such as breaches of prepetition covenants in the Resolution, above and beyond at most, the principal and interest they are owed on the ERS Bonds.  Therefore, any amounts asserted in excess thereof should be disallowed.  *See, e.g.*, Sept. 11, 2019 Hr'g Tr. at 47: 16–21 ("The Court concludes that any element of [an individual COFINA bondholders'] claim [asserting constitutional violations] that was not literally duplicative of the text of the Bank of New York Mellon Master Proof of Claim is nonetheless duplicative of that Master Proof of Claim because both seek to realize rights to payment under the same instruments, the subordinated bonds."); *see also* [Case No. 17-bk-3283, ECF No. 9703 ¶ 12].

166.    Furthermore, neither can Claimants' contractual claims related to nonpayment of principal and interest, such as that ERS violated its prepetition covenants, provide them recourse against ERS.  The Resolution and Offering Statement make abundantly clear that the ERS Bonds are limited, nonrecourse obligations payable solely from the Employers' Contributions.  *See* Ex. B at VI-1, VI-3 (Resolution at Preamble, §§ 201, 202(3)(ii)); Ex. B at Cover Page, 23, 37 (Offering

Statement).    The terms of the Resolution govern, and Claimants are unable to bootstrap a

nonrecourse claim for nonpayment of the ERS Bonds into a recourse Claim against ERS by

asserting breaches of covenants in the resolution.

> **i.      The Administrative Expense Claims Cannot Be Asserted as Prepetition
> Claims.**

167.    Claimants seek, in the alternative, to assert their Claims in paragraphs 3 through 10

of the Supplement as prepetition Claims.    Supplement ¶ 19.    The Debtors reincorporate by

reference their response in paragraphs 140–149 to such claims.    Additionally, such Claims must

be disallowed because, among other reasons, ERS is not liable for representing that it could grant

a lien on the right to receive Employers' Contributions, as such representations were proper.    *See

infra* ¶ 169.    Otherwise, such Claims should be resolved in the *Ultra Vires* AP.

> **ii.      The *Ultra Vires* Counterclaims Should Be Dismissed.**

168.    Claimants incorporate by reference counterclaims they have alleged against ERS

in the *Ultra Vires* AP.    Supplement ¶ 20.    For the reasons explained above,[24] *see supra* ¶ 161, these

Claims should be dismissed.

> **iii.      Claimants Fail to State a Claim that ERS Breached Representations
> and Covenants About Assets in Which ERS Could Grant a Security
> Interest.**

169.    Claimants allege "[i]f the Section 552 [D]ecision is upheld, ERS's representations

[that ERS's right to receive future Employers' Contributions was a legal asset of ERS on which

ERS had the power to grant liens] will have been false[.]"    Supplement ¶ 21.    This is incorrect.

The Section 552 Decision did not hold that ERS's "right to receive" was not a legal asset.    Instead,

it held that that asset comes into existence only when amounts are "calculable and owed."    *Emps.*

---

[24] Above, the Debtors argue that such counterclaims are alleged only against ERS.    Accordingly, the response above
that the counterclaims are alleged against the wrong Debtor is not incorporated herein.

*Ret. Sys.*, 948 F.3d 457, 468–70, 472 & n.13.  Thus, the representation was true as regards all future

rights that became due and owing.

### iv.    *Ultra Vires* Claims Should Resolved in the *Ultra Vires* AP.

170.    Claimants allege "ERS represented and covenanted that it had authority to issue the

bonds and that the bonds were valid[,]" and if the ERS Bonds issuance was *ultra vires*, Claimants

"were damaged by ERS's breach [of its covenant.]"  Supplement ¶ 22.  This Claim is duplicative

of claims alleged in the *Ultra Vires* AP and if successful will result only in Claims against ERS

for principal and interest under the ERS Bonds, and should be resolved in that proceeding.

### v.    The Claim that ERS Was "Dolo" in Connection with the Resolution and Issuance of the ERS Bonds Fails as a Matter of Law.

171.    Claimants allege "ERS made several representations in connection with the

formation of the [] Resolution and the issuance of the ERS Bonds on which the [Claimants]

reasonably relied [regarding the validity of the ERS Bonds,]" and that "[i]f the Section 552

Decision is upheld and/or a court determines in a final judgment that [sic] the ERS Bonds were

*ultra vires*, the representations [ERS made] will have been false."  Supplement ¶ 23.  As explained

above, ERS accurately represented in which assets it could grant a security interest.  There were

no representations made regarding § 552 of the Bankruptcy Code.  *See supra* ¶ 169.  And as also

explained above, Claims relating to whether the ERS Bonds issuance was *ultra vires*—including

Claims related to ERS's purchase contract with the underwriters of the ERS Bonds (the "Purchase

Contract")—should be resolved in the *Ultra Vires* AP.  *See supra* ¶ 170.  Further, any Claims

alleged against the Debtors with respect to the Purchase Contract are untimely, as the paragraph

of the addenda to the proofs of claim filed by the ERS Bondholder Groups the Supplement purports

to supplement—*see, e.g.*, proof of claim No. 28669 ¶ 29—contains no mention whatsoever of the

Purchase Contract..  The Claims Scheduling Order made clear that "[w]hile the Supplements can

explain and provide additional support for the 'additional claims' identified [for example, in paragraph 29 of proof of claim No. 28669] . . . the Supplement cannot identify new claims, and if it does identify new claims, the Government Parties and Committees reserve their rights to object to those claims, including as untimely."  Claims Scheduling Order ¶ 4.iii.  In light of the Claims Scheduling Order and the General Bar Date, any Claims with respect to the Purchase Contract are untimely and should disallowed and dismissed.

### vi.  The Negligent Misrepresentation Claim Fails to State a Claim.

172.   Claimants allege "[i]n connection with the issuance of the ERS Bonds, ERS made several representations about its ability to grant a lien on its statutory right to receive future employers' contributions and the validity of the ERS Bonds which . . . were at least negligent." Supplement ¶ 24.  As explained above, ERS accurately represented in which assets it could grant a security interest.  *See supra* ¶ 169.  Further, no negligent misrepresentation claim may lie in connection with a contract.  *See* Restatement (Third) of Torts: Liability for Economic Harm § 5 (Am. Law Inst. 2012) ("This Section [on negligent misrepresentation] does not recognize liability for negligent misrepresentations made in the course of negotiating or performing a contract between the parties.").  And claims relating to whether the ERS Bonds issuance was *ultra vires* should be resolved in the *Ultra Vires* AP.  *See supra* ¶ 170.  In any event, Claimants' contract gives rise to a nonrecourse claim, regardless of which provisions are breached.

### vii.  The Resolution Was Not Based on a Mutual Mistake.

173.   Claimants allege "to the extent the Bond Resolution, the ERS Bonds, and the related contract documents were premised on a mutual mistake, they should be rescinded or reformed, the parties should be returned to the *status quo ante*, and ERS should make restitution to the Bondholders."  Supplement ¶ 25.  However as explained above, ERS accurately represented in which assets it could grant a security interest.  *See supra* ¶ 169.  And Claimants make no effort to

allege the elements of mutual mistake.  Finally, claims relating to whether the ERS Bonds issuance

was ultra vires should be resolved in the *Ultra Vires* AP.  *See supra* ¶ 170.

### viii.    The Claim ERS Breached Warranties in the Purchase Contract Fails to State a Claim.

174.    Claimants allege in the Purchase Contract that "ERS made representations and

warranties that the ERS Bonds were 'valid, binding and legally enforceable obligations of [ERS,]"

among others, and that, "[t]o the extent the Section 552 Decision is affirmed and/or a court

concludes in a final judgment that the ERS Bonds were *ultra vires*, these warranties will be

breached and ERS will be liable for any damage suffered by the Bondholders as a consequence of

ERS's breach."  Supplement ¶ 26.  However, as explained above, ERS accurately represented in

which assets it could grant a security interest.  There were no representations made regarding § 552

of the Bankruptcy Code.  *See supra* ¶ 169.  And claims that ERS breached the Purchase Contract

should be resolved in the *Ultra Vires* AP, if not dismissed altogether for being untimely.  *See supra*

¶ 171.  And, as stated above, Claimants' contract gives rise to a prepetition nonrecourse claim

regardless of which covenants or representations are purportedly breached.

### ix.    The Claim the Moratorium Act and the ERS Executive Order Effected a Taking of Claimants' Property Fails.

175.    Claimants allege against ERS—as they did against the Commonwealth—that the

Moratorium Act and the ERS Executive Order violated the Takings Clause of the U.S. and

Commonwealth constitutions.  Supplement ¶ 27.  For the reasons set forth above, *supra* ¶ 162,

these Claims should be dismissed.    Additionally, they should be dismissed as the

Commonwealth—and not ERS—promulgated the Moratorium Act and the ERS Executive Order.

## **CONCLUSION**

176.    For the foregoing reasons, the Oversight Board respectfully requests that this Court

enter an order, substantially in the form attached as **Exhibit A** hereto, dismissing and disallowing

the Claims identified above, with prejudice.

*[Remainder of Page Intentionally Left Blank]*

Dated: May 6, 2020
San Juan, Puerto Rico

Respectfully submitted,

/s/ Martin J. Bienenstock

Martin J. Bienenstock (*pro hac vice*)
Jeffery W. Levitan (*pro hac vice*)
Margaret A. Dale (*pro hac vice*)
Ehud Barak (*pro hac vice*)
Joshua A. Esses (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

/s/ Luis F. del Valle-Emmanuelli
Luis F. del Valle-Emmanuelli
USDC-PR No. 209514
P.O. Box 79897
Carolina, Puerto Rico 00984-9897
Tel. 787.977.1932
Fax. 787.722.1932
dvelawoffices@gmail.com

**OF COUNSEL FOR
A&S LEGAL STUDIO, PSC**
434 Avenida Hostos
San Juan, PR 00918
Tel: (787) 751-6764/ 763-0565
Fax: (787) 763-8260

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico, as
representative of the Employees Retirement
System of the Government of the
Commonwealth of Puerto Rico*

## Exhibit A

**Proposed Order**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| In re: | ) | PROMESA |
| | ) | Title III |
| THE FINANCIAL OVERSIGHT AND | ) | |
| MANAGEMENT BOARD FOR PUERTO RICO | ) | |
| | ) | Case No. 17-bk-3283 (LTS) |
| as representative of | ) | |
| | ) | |
| THE COMMONWEALTH OF PUERTO RICO, *et al.* | ) | |
| | ) | |
| Debtors.[1] | ) | |
| | X | |
| In re: | ) | PROMESA |
| | ) | Title III |
| THE FINANCIAL OVERSIGHT AND | ) | |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) | Case No. 17-bk-3566 (LTS) |
| | ) | |
| as representative of | ) | **Re: ECF No. ___** |
| | ) | |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) | Case No. 17-bk-3283 (LTS) |
| GOVERNMENT OF THE COMMONWEALTH OF | ) | |
| PUERTO RICO, | ) | **Re: ECF No. ___** |
| | ) | |
| - and - | ) | *This Pleading Relates to ERS and* |
| | ) | *the Commonwealth Only, and* |
| THE FINANCIAL OVERSIGHT AND | ) | *Should Be Filed in Both Dockets* |
| MANAGEMENT BOARD FOR PUERTO RICO | ) | |
| | ) | |
| as representative of | ) | |
| | ) | |
| THE COMMONWEALTH OF PUERTO RICO, | ) | |
| | ) | |
| Debtors. | ) | |
| | X | |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico(Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**ORDER
GRANTING MOTION
OF THE COMMONWEALTH
OF PUERTO RICO AND THE
EMPLOYEES RETIREMENT SYSTEM OF
THE GOVERNMENT OF THE COMMONWEALTH
OF PUERTO RICO TO DISALLOW AND DISMISS CLAIMS
ASSERTED OR FILED BY ERS BONDHOLDERS AND THE ERS
FISCAL AGENT PURSUANT TO BANKRUPTCY RULES 3007(B) & 7012(B)**

Upon consideration of the *Motion of the Commonwealth of Puerto Rico and the Employees Retirement System of the Government of the Commonwealth of Puerto Rico to Disallow and Dismiss Claims Asserted or Filed by ERS Bondholders and the ERS Fiscal Agent Pursuant to Bankruptcy Rules 3007(b) & 7012(b)* (the "Motion") and the Court having found and determined that:  (i) the Court has jurisdiction to consider the Motion and the relief requested therein pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6); (ii) venue is proper before this Court pursuant to PROMESA Section 307(a); (iii) due and proper notice of this Motion has been provided under the particular circumstances and no other or further notice need be provided; (iv) based on the statements and arguments made in the Motion, the relief requested in the Motion is in the best interest of the Commonwealth and its creditors; (v) any objections to the relief requested in the Motion having been withdrawn or overruled; and (vi) the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein. Accordingly, it is hereby **ORDERED THAT**:

1.    The *Motion of the Commonwealth of Puerto Rico and the Employees Retirement System of the Government of the Commonwealth of Puerto Rico to Disallow and Dismiss Claims Asserted or Filed by ERS Bondholders and the ERS Fiscal Agent Pursuant to Bankruptcy Rules 3007(b) & 7012(b)* is granted.

2.    All Claims filed or asserted against the Commonwealth and ERS in the Administrative Expense Motions (and the corresponding Claims in the Supplement) are disallowed and dismissed, with prejudice.

3.    All Claims filed or asserted against the Commonwealth in the Proofs of Claim (and the corresponding Claims in the Supplement) are disallowed and dismissed, with prejudice.

4.    The Fiscal Agent shall have a prepetition Claim against ERS in the amount of unpaid principal and interest owed on the ERS Bonds as of the ERS Petition Date in an amount agreed to by the parties or determined by the Court; provided, however, that such Claim may be reduced or eliminated in accordance with resolution of the *Ultra Vires* AP. Other than such Claim, all Claims filed or asserted against ERS in the Proofs of Claim (and the corresponding Claims in the Supplement) are disallowed and dismissed, with prejudice.

5.    The terms of and conditions of this Order shall be immediately effective and enforceable upon its entry.

6.    The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

**SO ORDERED.**

Dated: _____, 2020

_____
THE HONORABLE LAURA TAYLOR SWAIN
UNITED STATES DISTRICT JUDGE