Opposition Deadline: **June 17, 2020**
Hearing Date and Time: **TBD**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>              Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,<br><br>             Debtor | PROMESA<br>Title III<br><br>No. 17 BK 3566-LTS |

## THE OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE COMMONWEALTH OF PUERTO RICO'S MOTION TO DISMISS PROOFS OF CLAIMS AND ADMINISTRATIVE EXPENSE CLAIMS ASSERTED AGAINST THE COMMONWEALTH AND ERS BY CERTAIN HOLDERS OF ERS BONDS AND THE FISCAL AGENT

---

[1] The Debtors in these jointly-administered PROMESA title III cases (these "**Title III Cases**"), along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are: (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric and Power Authority (Bankruptcy Case No. 17 BK 4780) (Last Four Digits of Federal Tax ID: 3747).

Opposition Deadline: **June 17, 2020**
Hearing Date and Time: **TBD**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION .............................................................................................................. 1

FACTUAL BACKGROUND .............................................................................................. 3

LEGAL STANDARD ........................................................................................................ 5

ARGUMENT ..................................................................................................................... 6

I.      Claimants Have Not Established That Any Of Their Claims Are Entitled To
        Administrative Priority Under Bankruptcy Code Sections 503 Or 922(c). ....................... 6

II.     All Claims Should Be Dismissed Because The ERS Bonds Were Issued
        *Ultra Vires*. ...................................................................................................... 11

III.    The First Circuit's Section 552 Decision Is Fatal To The Administrative Claims. .......... 13

IV.     The Administrative Claims Are Based On A False Premise. ........................................... 14

        A.      The Commonwealth Acted Lawfully.................................................................. 15

        B.      ERS Acted Lawfully In Implementing The Post-Petition Legislation. ............... 17

V.      To The Extent Claimants Have Valid Claims Under The ERS Bonds, Claimants
        Are Limited To Recovering From Their Collateral And Cannot Assert Claims Against
        The Commonwealth................................................................................................ 18

VI.     Claimants Fail To Support Multiple Claims With Any Factual Allegations.................... 21

VII.    Claimants Have Improperly Asserted New Claims. ....................................................... 22

VIII.   There Are Independent Claim-Specific Reasons For Dismissal Of Certain
        Claims. .................................................................................................................. 22

        A.      The Post-Petition Legislation Did Not Violate ERS's Automatic Stay............... 23

        B.      Neither The Commonwealth Nor ERS Have Been Unjustly Enriched. .............. 25

        C.      The Post-Petition Legislation Does Not Constitute An Unconstitutional Taking. 26

        D.      The Post-Petition Legislation Does Not Violate the Contracts Clause................ 28

        E.      Claimants' Fraudulent Transfer Claims Fail As A Matter Of Law. .................... 30

        F.      Claimants Cannot Assert A Plausible Estoppel Claim. ...................................... 33

        G.      Claimants' Mutual Mistake Claim Fails. ........................................................... 33

        H.      Claimants Lack Standing to Pursue ERS's Alleged Breaches of Warranties in the
                Purchase Contracts. .............................................................................................. 34

IX.     Any Administrative Claims Must Be Reduced By Amounts Already Paid To Claimants
        And, For Any Tort Claims, Damages Are Limited. ....................................................... 34

CONCLUSION............................................................................................................... 35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<span style="font-variant: small-caps;">Cases</span>

*ACA Fin. Guaranty Corp. v. City of Buena Vista*,
  917 F.3d 206 (4th Cir. 2019) ...................................................20

*Ana María Sugar Co. v. Castro*,
  28 D.P.R. 241, 1920 WL 3321 (1920)...................................................32

*Baum-Holland v. El Conquistador P'ship L.P., S.E.*,
  336 F. Supp. 3d 6 (D.P.R. 2018)...................................................19

*Baybank-Middlesex v. Ralar Distributiors, Inc.*,
  69 F.3d 1200 (1st Cir. 1995)...................................................10

*Belanger v. BNY Mellon Asset Mgmt., LLC*,
  307 F.R.D. 55 (D. Mass. 2015)...................................................21

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................21

*Boston Trading Grp., Inc. v. Burnazos*,
  835 F.2d 1504 (1st Cir. 1987)...................................................32

*Buffalo Teachers Fed'n v. Tobe*,
  464 F.3d 362 (2d Cir. 2006)...................................................27

*Central Transp. Co. v. Pullman's Palace Car Co.*,
  139 U.S. 24 (1891)...................................................12

*Cerame-Vivas v. Aguiar*,
  99 D.P.R 45 (1970) ...................................................32

*Downing/Salt Pond Partners, L.P. v. R.I. & Providence Plantations*,
  643 F.3d 16 (1st Cir. 2011)...................................................26

*Enos v. Union Stone, Inc.*,
  732 F.3d 45 (1st Cir. 2013)...................................................33, 34

*Esso Standard Oil S.A. Ltd. v. P.R. Port Auth.*,
  95 D.P.R. 772 (1968)...................................................32

*Feinman v. Messia (In re Messia)*,
  184 B.R. 176 (Bankr. D. Mass. 1995) ...................................................31

*Fershtman v. Schectman*,
   450 F.2d 1357 (2d Cir. 1971)................................................................35

*Fideicomiso De La Tierra Del Cano Martin Pena v. Fortuño*,
   604 F.3d 7 (1st Cir. 2010)................................................................28

*Foley v. Wells Fargo Bank, N.A.*,
   772 F.3d 63 (1st Cir. 2014)................................................................21

*Franklin Cal. Tax-Free Tr. v. Puerto Rico*,
   85 F. Supp. 3d 577 (D.P.R. 2015)................................................................28

*Gary Jet Ctr., Inc. v. AFCO AvPORTS Mgmt. LLC*,
   863 F.3d 718 (7th Cir. 2017)................................................................29

*GE Mobile Water, Inc. v. Red Desert Reclamation, LLC*,
   6 F.Supp.3d 195 (D.N.H. 2014)................................................................33

*González v. San Juan Dist. Ct.*,
   42 D.P.R. 199 (P.R. 1931)................................................................31

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991)................................................................15

*Gutierrez v. Popular Auto, Inc. (In re Gutierrez)*,
   526 B.R. 449 (Bankr. D.P.R. 2015)................................................................19, 20

*Haw. Hous. Auth. v. Midkiff*,
   467 U.S. 229 (1984)................................................................28

*Hutt v. Dean Witter Reynolds, Inc.*,
   737 F.Supp.128 (D. Mass. 1990)................................................................35

*In re Actrade Fin. Techs. Ltd.*,
   337 B.R. 791 (Bankr. S.D.N.Y. 2005)................................................................32

*In re Carpet Ctr. Leasing Co.*,
   991 F.2d 682 (11th Cir. 1993)................................................................10

*In re Computer Learning Centers, Inc.*,
   344 B.R. 79 (Bankr. E.D. Va. 2006)................................................................33

*In re Cont'l Airlines, Inc.*,
   154 B.R. 176 (Bankr. D. Del. 1993)................................................................10

*In re Empresas Inabon, Inc.*,
   358 B.R. 487 (Bankr. D.P.R. 2006)................................................................34

*In re FBI Distribution Corp.*,
  330 F.3d 36 (1st Cir. 2003) ...................................................................................7

*In re Fin. Oversight & Mgmt. Bd. of Puerto Rico*,
  948 F.3d 457 (1st Cir. 2020) ...................................................................... passim

*In re Fin. Oversight & Mgmt. Bd. of Puerto Rico*,
  954 F.3d 1 (1st Cir. 2020) .......................................................................... passim

*In re Fin. Oversight and Mgmt. Bd. of Puerto Rico*,
  297 F.Supp.3d 269 (D.P.R. 2018)........................................................................30

*In re Hemingway Transport, Inc.*,
  954 F.2d 1 (1st Cir. 1992) ............................................................................7, 8, 9

*In re Mullen*,
  172 B.R. 473 (Bankr. D. Mass. 1994) .................................................................10

*In re New York City Off-Track Betting Corp.*,
  434 B.R. 131 (Bankr. S.D.N.Y. 2010) ...................................................................7

*In re Residential Capital, LLC*,
  2016 WL 3240256 (Bankr. S.D.N.Y. June 3, 2016).............................................33

*In re Wheeler*,
  12 B.R. 908 (Bankr. D. Mass. 1981) ...................................................................10

*In re Wey*,
  854 F.2d 196 (7th Cir. 1988) ...............................................................................31

*Int'l Salt Co., LLC v. City of Boston*,
  590 F.3d 1 (1st Cir. 2009) ...................................................................................11

*Jiménez v. Liberty Mutual Insurance Co.*,
  2019 WL 8334499 (D.P.R. Mar. 31, 2019) .........................................................20

*Lacoquille Inv. Co. v. Town of Manalapan (In re Lacoquille Inv. Co.)*,
  44 B.R. 731 (Bankr. S.D. Fla. 1984)....................................................................24

*Las Marias v. Mun. San Juan*,
  159 D.P.R. 868 (2003) ...........................................................................11, 12, 13

*LSI Design and Integration Corp. v. Tesaro, Inc.*,
  2020 WL 1027773 (D. Mass. Mar. 3, 2020)........................................................22

*Lyda v. City of Detroit (In re City of Detroit)*,
  841 F.3d 684 (6th Cir. 2016) ...............................................................................23

iv

*Mass. Bd. of Retirement v. Murgia,*
    427 U.S. 307 (1976)........................................................................................................15

*Masso-Torrellas v. Municipality of Toa Alta,*
    845 F.3d 461 (1st Cir. 2017) .......................................................................................... 27

*Moore v. Univ. of Kan.,*
    124 F. Supp. 3d 1159 (D. Kan. 2015).............................................................................20

*New Haven Inclusion Cases,*
    399 U.S. 392 (1970)..................................................................................................27, 28

*Newton Covenant Church v. Great Am. Ins. Co.,*
    956 F.3d 32, 2020 WL 1815971 (1st Cir. Apr. 10, 2020) ...................................................5, 6

*Norton v. McOsker,*
    407 F.3d 501 (1st Cir. 2005)......................................................................................12, 13

*Oliveras v. Banco Popular de Puerto Rico (In re Alicia Casanova),*
    595 B.R. 616 (Bankr. D.P.R. 2018) ...............................................................................30

*P.R. Tel. Co. v. SprintCom, Inc.,*
    662 F.3d 74 (1st Cir. 2011)............................................................................................25

*Parkview Adventist Med. Ctr. v. United States,*
    842 F.3d 757 (1st Cir. 2016) ..........................................................................................24

*Peer Intern. v. Latin American Music Corp.,*
    161 F.Supp.2d 38 (D.P.R. 2001).....................................................................................34

*PHL Variable Ins. Co. v. Town of Oyster Bay,*
    929 F.3d 79 (2d Cir. 2019).............................................................................................13

*PHL Variable Ins. Co. v. Town of Oyster Bay,*
    2017 WL 2371188 (E.D.N.Y. May 30, 2017) ........................................................................12

*Plaza Carolina Mall, L.P. v. Municipality of Barceloneta,*
    91 F. Supp. 3d 267 (D.P.R. 2015).............................................................................11, 12

*Reading v. Brown,*
    391 U.S. 471 (1968)......................................................................................................7, 8

*Redondo Constr. Corp. v. Izquierdo,*
    662 F.3d 42 (1st Cir. 2011)............................................................................................29

*Rivera v. Centro Medico de Turabo, Inc.,*
    575 F.3d 10 (1st Cir. 2009)............................................................................................21

*Satellite Broad. Cable, Inc. v. Telefonica de Espana, S.A.*,
   807 F.Supp.218 (D.P.R. 1992) .................................................................35

*Seitter v. Schoenfeld*,
   88 B.R. 343 (D. Kan. 1988) .....................................................................33

*Sher v. SAF Fin., Inc.*,
   2011 WL 4835700 (D. Md. Oct. 11, 2011) .............................................33

*Solarchick ex rel. Solarchick v. Metro. Life Ins. Co.*,
   430 F. Supp. 2d 511 (W.D. Pa. 2006) ......................................................35

*Surplus Store & Exchange, Inc. v. City of Delphi*,
   928 F.2d 788 (7th Cir. 1991) ...................................................................18

*Trinidad Hernandez v. ELA*,
   188 D.P.R. 828 (2013) ........................................................................15, 20

*Torres Marrero v. Mayor Ponce*,
   199 D.P.R. 493 (2017) ..............................................................................26

*United Auto, Aerospace, Agricultural Implement Workers of Am., Int'l Union v. Fortuño*,
   633 F.3d 37 (1st Cir. 2011) ............................................................. passim

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
   484 U.S. 365 (1988) ..................................................................................10

*Ute Mesa Lot 1, LLC v. First-Citizens Bank & Tr. Co. (In re Ute Mesa Lot 1, LLC)*,
   736 F.3d 947 (10th Cir. 2013) .................................................................31

*Valle-Ortiz v. R.J. Reynolds Tobacco Co.*,
   385 F. Supp. 2d 126 (D.P.R. 2005) .........................................................13

*Waisman v. Wagner*,
   227 Wis. 193 (1938) ..................................................................................12

*Westernbank P.R. v. Kachkar*,
   2009 WL 6337949 (D.P.R. Dec. 10, 2009) .............................................25

*Woods v. Wells Fargo Bank N.A.*,
   733 F.3d 349 (1st Cir. 2013) ......................................................................5

**STATUTES**

31 L.P.R.A. § 3028 .........................................................................................31

31 L.P.R.A. § 3492(3) .....................................................................................31

11 U.S.C. § 361 ...............................................................................................10

11 U.S.C. § 362(a) ................................................................................................................23

11 U.S.C. § 362(b) ................................................................................................................24

11 U.S.C. § 503(b)(1) ........................................................................................................6, 7

11 U.S.C. § 552.............................................................................................................1, 2, 27

48 U.S.C. § 2141(b)(1)(C) .................................................................................................9, 15

48 U.S.C. § 2161 ...................................................................................................................10

48 U.S.C. § 2194(m)(1) .........................................................................................................27

**OTHER AUTHORITIES**

6 COLLIER ON BANKRUPTCY ¶ 901.04[13][a] (16th ed. 2019) ................................................8

*McQuillin: the Law of Municipal Corporations*, 10 McQuillin Mun. Corp. §29:15 (3d ed.) .......12

Fed. R. Bankr. P. 7006(b) .......................................................................................................5

Fed. R. Civ. P. 12(b) ..............................................................................................................1

Opposition Deadline: **June 17, 2020**
Hearing Date and Time: **TBD**

The Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the

"**Retiree Committee**") hereby submits this motion (the "**Motion**"), pursuant to Fed. R. Civ. Proc.

12(b) to dismiss with prejudice, the Proofs of Claim and Administrative Expense Claims

(collectively, the "**Administrative Claims**") filed by certain holders of ERS Bonds and The Bank

of New York Mellon (collectively, the "**Claimants**").[2]

## INTRODUCTION

1.    The operative contractual document between Claimants and ERS—the January 24,

2008 Bond Resolution—states that "[t]he Bonds shall be special obligations of [ERS] ***payable***

***solely*** from the Pledged Property without recourse against other assets of the System. ***The***

***Commonwealth shall not be liable for the Bonds or any Ancillary Bond Facility***." (*See* ERS Dkt.

707 ("**Admin. Motion**") at Ex. A.A, §201 (emphasis added).) On January 30, 2020, the First

Circuit further clarified Claimants' rights under the Bond Resolution, holding that 11 U.S.C. §552

as incorporated into PROMESA, terminated Claimants' liens in any Pledged Property in which

ERS acquired rights on and after May 21, 2017 and that ERS also had no property interest in future

Employer Contributions that were not yet due. *See In re Fin. Oversight & Mgmt. Bd. of P.R.*, 948

F.3d 457, 468 (1st Cir. 2020). Notwithstanding the express contractual limitations on their rights

to collect and the First Circuit's decision, Claimants have filed Administrative Claims against both

ERS and the Commonwealth, all of which depend upon this Court ignoring the First Circuit's

binding decision and the contractual limitations Claimants agreed to when they purchased their

ERS Bonds. Although Claimants advance a number of different theories in support of their

Administrative Claims, the gravamen of the Administrative Claims is that, after ERS filed its Title

III petition, the Commonwealth should not have passed legislation reforming Puerto Rico's

---

[2] The Administrative Claims are listed in Exhibit A hereto.

pension system and when the Commonwealth did so, Claimants were harmed.

2.      But if Claimants possess any claims at all (and the Court's separate determination of the *ultra vires* issue will determine that), the Claimants have, at most, only a claim against whatever pre-petition Pledged Property ERS still possesses or that is being held by the Commonwealth for Claimants' benefit. That is the bargain Claimants struck when they decided to purchase their interest in ERS Bonds. Claimants' attempts to manufacture other claims through allegations of intentionally wrongful conduct or violations of the United States or Puerto Rico Constitutions—all of which revolve around the Commonwealth's post-petition pension reforms—are baseless.

3.      Most fundamentally, the alleged Administrative Claims do not qualify for administrative expense because all of the alleged theories of recovery stem from a pre-petition contract—the Bond Resolution. These alleged Administrative Claims also lack a legal basis. As even Claimants acknowledge, by the time the Commonwealth and ERS filed their Title III petitions, the Puerto Rican pension system was in crisis. (*See* Admin. Motion ¶3 (noting the pre-petition "severe underfunding of ERS").) The old pension system had failed despite years of attempted reform. Faced with its potential collapse, the Commonwealth changed how pension obligations were funded and switched to a pay-as-you-go model. (Ex. B hereto, 3/13/17 Oversight Board Res.; Admin Motion Ex. A.B (J. Res. 188, Statement of Legislative Intent); *id.* Ex.A.C (Act 106, Statement of Legislative Intent).) This change was necessary and in the best interest of the people of Puerto Rico, and could not have caused any harm to Claimants (or ERS) given the First Circuit's January 30, 2020 decision on the applicability of §552 and ERS's lack of a property interest in future Employer Contributions. Further, Claimants fail to acknowledge that the Offering Statement for the ERS Bonds made it crystal clear that the Commonwealth might modify or

eliminate Employer Contributions to ERS in the future. (*Se* Ex. C hereto, Bond Offering Statement, Series A at 26; *see also Financial Oversight & Management Board*, 948 F.3d at 468-69.) The fact that this possibility played out due to the indisputable fiscal crisis facing Puerto Rico in no way makes ERS or the Commonwealth liable to Claimants beyond the non-recourse contractual claims that the Bond Resolution provides against Pledged Property. This is clear as a matter of law and the alleged Administrative Claims should be dismissed.

## FACTUAL BACKGROUND

4.     For purposes of this Motion only, the Retiree Committee limits itself to those facts alleged in the Administrative Claims, including any documents referenced in the Administrative Claims, and any additional facts over which this Court may take judicial notice.

5.     In 2008, ERS issued the ERS Bonds in an attempt to address continuing issues concerning the funding of pensions for the Commonwealth's active and retired public employees. (Admin. Motion ¶4.) In connection with this offering, ERS made a Bond Offering Statement available to potential bond purchasers which summarized the terms of the bonds and ERS's obligations thereunder. (*See* Ex. C hereto, ERS Bond Offering Statement.) The contractual relationship between ERS and holders of the ERS Bonds is governed by the ERS Bond Resolution. (Admin. Motion ¶5.)

6.     The Bond Resolution states that "[t]he Bonds shall be special obligations of [ERS] payable solely from the Pledged Property without recourse against other assets of [ERS]." (Admin. Motion Ex.A.A, §201.) "Pledged Property" is defined to include "[a]ll Employers' Contributions received by [ERS] or the Fiscal Agent. (*Id*. at VI-36.) The Bond Resolution also states that "[t]he Commonwealth shall not be liable for the Bonds or any Ancillary Bond Facility. Neither any Bond nor any Ancillary Bond Facility shall constitute a debt of the Commonwealth … and the Commonwealth shall not be liable to make any payments thereon nor shall any Bond or any

Ancillary Bond Facility be payable out of any funds or assets other than the Pledged Property."

(*Id*. §201.)

7.      On May 3, and May 21, 2017, the Commonwealth and ERS, respectively, filed their

petitions under Title III of PROMESA. (Admin. Motion ¶¶8-9.) When the Title III cases were

commenced, the pension system was in a state of crisis. (*Id*. ¶3) (noting the "severe underfunding

of ERS" as of the Title III filings). On June 25, 2017, the Puerto Rico Legislature passed Joint

Resolution for Other Allocation of Fiscal Year 2017-2018 ("**Joint Resolution 188**"), which among

other things, provided for ERS to sell its assets and transfer the proceeds to the Commonwealth so

those funds could be used to pay pension obligations. (*Id*. ¶10.) Joint Resolution 188 also provided

that government employers would stop paying Employer Contributions to ERS. (*Id*.) Joint

Resolution 188's Statement Of Legislative Intent is specific and clear regarding the law's purpose:

> Several attempts were made in the past to reform the three
> Retirement Systems. Nevertheless, these measures were
> unsuccessful and ultimately insufficient, which has led to a lack of
> liquidity and insolvency in these systems. Moreover, given the
> profound and severe fiscal crisis we are currently experiencing, the
> Government is prevented from shoring up the three Retirement
> Systems. This Joint Resolution, therefore, puts forth the pay as you
> go system as a new method for safeguarding pensions for
> Government retirees.

(*Id*. at Ex. A.B (Statement of Legislative Intent).)

8.      On August 18, 2017, the Puerto Rico Legislature passed Act 106-2017 ("**Act 106**"

and together with Joint Resolution 188, the "**Post-Petition Legislation**"), which provided for the

termination of Employer Contributions and the establishment of a new pay-as-you-go ("**PayGo**")

pension system. (Admin. Motion ¶12.) Act 106's Statement of Legislative Intent goes into great

detail regarding the incredible fiscal challenges that faced ERS and the funding of pensions and

flatly states that "Puerto Rico is currently experiencing an unprecedented financial and social

crisis." (*Id.* Ex. A.C, p.1.) After doing so, the Statement of Legislative Intent provides:

> [T]he Legislative Assembly believes that the measures taken in this
> Law are necessary and reasonable to adequately address the fiscal
> crisis and actuarial insolvency of the Retirement Systems for Puerto
> Rican Government Employees, the Judiciary and for Teachers. It
> also creates the legal framework that will facilitate compliance with
> the provisions and targets related to the Retirement Systems
> included in the Fiscal Plan certified by the Oversight Board in
> accordance with the Federal PROMESA Act. Said Plan establishes
> fiscal adjustments aimed at stabilizing Government finances in
> times when there is no access to the financial markets. If we do not
> implement these measures, Puerto Rico's economic and social
> wellbeing will suffer irreparable damage, and as such implementing
> this reform as part of the Fiscal Plan is a pressing interest of the State
> to protect the public interest.

(*Id.* at p.7.)

9.      As required by the Post-Petition Legislation, ERS has transferred approximately

$190.48 million to the Commonwealth. The Commonwealth has agreed to return these funds if

Claimants are able to trace their liens to these funds. *See In re Financial Oversight & Mgmt. Bd.

of P.R.*, 954 F.3d 1, 10 (1st Cir. 2020). No other ERS funds have been transferred pursuant to the

Post-Petition Legislation. (ERS Dkt. 727, ¶¶35, 49.)

## LEGAL STANDARD

10.      Under Federal Rule of Bankruptcy Procedure 7012(b), a party's "failure to state a

claim upon which relief can be granted" requires the dismissal of the action. For claims "alleging

fraud or mistake, a party must state with particularity the circumstances constituting fraud or

mistake," which the First Circuit has held "mandat[es] specifics about the time, place, and content

of the alleged false representations." Fed. R. Bankr. P. 7006(b); *Woods v. Wells Fargo Bank N.A.*,

733 F.3d 349, 358 (1st Cir. 2013). For all other claims, Claimants must allege sufficient facts to

make each claim "plausible on its face." *Newton Covenant Church v. Great Am. Ins. Co.*, 956 F.3d

32, 2020 WL 1815971 at *2 (1st Cir. Apr. 10, 2020). In addition to considering any well-pled alleged facts, the Court "may also consider documents incorporated by reference in [the Claims], matters of public record, and other matters susceptible to judicial notice." *Id*.

<strong>ARGUMENT</strong>

11.     The Claims are contained in multiple filings (62 proofs of claim, three administrative expense motions, and one supplement) filed by three different law firms against two Title III debtors. All told, Claimants assert dozens of claims against both ERS and the Commonwealth. To streamline the arguments for dismissal, this Motion first addresses the legal arguments which should result in the dismissal of all of the alleged Administrative Claims and then addresses independent, claim-specific arguments for why certain individual Administrative Claims also fail.

**I.     Claimants Have Not Established That Any Of Their Claims Are Entitled To Administrative Priority Under Bankruptcy Code Sections 503 Or 922(c).**

12.     As an initial matter, whatever claims Claimants may possess, those claims are not entitled to administrative expense priority. Claimants argue otherwise, relying upon §503(b) or §922(c) of the Bankruptcy Code. (Admin Motion ¶¶25-26.) Claimants contend that §503 provides administrative expense priority for their claims because "the Post-Petition Legislation was enacted after the commencement of the ERS and Commonwealth Title III cases and the post-petition conduct of ERS and the Commonwealth was in violation of the law." (*Id*. ¶26.) Claimants also argue that their alleged Administrative Claims are based upon a "failure of adequate protection" under §922(c) of the Bankruptcy Code. (*Id*. ¶25.) Both arguments fail.

13.     ***First***, Claimants do not have a claim under the only part of §503 that could apply here—subsection (b)(1). That subpart provides administrative expense status for "the actual, necessary costs and expense of preserving *the estate*…." 11 U.S.C. §503(b)(1) (emphasis added).

But PROMESA, like chapter 9, "does not incorporate section 541 of the Bankruptcy Code, which provides for the creation of a bankruptcy 'estate'." *In re New York City Off-Track Betting Corp.*, 434 B.R. 131, 141 (Bankr. S.D.N.Y. 2010). As a result, "courts have clearly established that in chapter 9 cases, there is no 'estate' property. *Id.* (citing cases). This means that "there can be no administrative expenses for the actual and necessary costs of preserving the estate;" *i.e.*, "no operating administrative expenses are permitted in a chapter 9 bankruptcy case." *Id.*

14.     And even if this were not the rule, "for a claim to qualify as an administrative expense under subsection 503(b)(1), (1) it must have arisen from a transaction with the trustee or debtor in possession, rather than from a prepetition transaction with the debtor, and (2) the consideration supporting the claim must have benefitted the estate in some demonstrable way." *In re FBI Distribution Corp.*, 330 F.3d 36, 42 (1st Cir. 2003). Here, the underlying transaction that serves as the basis for the alleged Administrative Claims are the ERS Bonds, which were issued in 2008—almost a decade prior to the Title III filings. Likewise, any benefit ERS or the Commonwealth would have received from the ERS Bonds was in 2008, when the bonds were first issued. Indeed several of the theories of recovery are cast as claims for breach of the Bond Resolution. (*See* Ex.A hereto). Consequently, the underlying basis for the alleged Administrative Claims is rooted in pre-petition events, making any claims pre-petition claims. *See In re Hemingway Transport, Inc.*, 954 F.2d 1, 7 (1st Cir. 1992) (holding "*prepetition* genesis" of claims distinguished claims "from the *postpetition* losses accorded priority in *Reading*….") (original emphasis).

15.     While Claimants do not make the argument directly, their citation to *Reading v. Brown*, 391 U.S. 471 (1968), may be an attempt to fit their alleged Administrative Claims within a narrow exception to the traditional test the Supreme Court first recognized under the Bankruptcy

Act. (Admin. Motion, ¶25.) In *Reading*, a claimant argued its tort claim should be granted administrative priority because the debtor's receiver allegedly committed the tort. 391 U.S. at 473. While the Court acknowledged the claimant could not satisfy the traditional test for administrative priority, principles of fairness required allowance of the claim. *Id.* at 477-78. The Court drew a distinction between the claimant and the debtor's pre-petition creditors noting that the claimant "did not merely suffer injury at the hands of an insolvent business [like all creditors have]: it had an insolvent business thrust upon it by operation of law." *Id*. at 478. The Court held that a post-petition creditor who had no say in its dealings with the bankrupt debtor should be paid ahead of pre-petition creditors "for whose benefit the continued operation of the business [through the bankruptcy process] was allowed." *Id*.

16.     Claimants do not fall under *Reading.* As an initial matter, *Reading*'s applicability to a municipal bankruptcy is questionable. The Supreme Court was clear regarding the nature of the administrative clam it was allowing, stating that under the Bankruptcy Act "it is theoretically sounder, as well as linguistically more comfortable, to treat tort claims arising during an arrangement *as actual and necessary expenses of the arrangement rather than debts of the bankrupt.*" *Id*. at 482 (emphasis added). But as noted above, under chapter 9 and PROMESA, there is no such thing as an actual and necessary expense of the "arrangement" (*i.e.*, the estate); administrative claims exist only for "expenses incurred in or in connection with the chapter 9 case itself." 6 COLLIER ON BANKRUPTCY ¶901.04[13][a] (16th ed. 2019). Thus, *Reading* and its progeny do not apply here.

17.     But even if *Reading* could apply under PROMESA, it does not apply to the alleged Administrative Claims because as the First Circuit has held, *Reading* does not apply to "creditors who enter into voluntary *prepetition* transactions with the debtor…." *Hemingway Transport*, 954

F.2d at 6 (original emphasis). Here, all of the alleged Administrative Claims arise from the pre-petition ERS Bonds. The fact that Claimants now complain about certain post-petition conduct is of no matter—their claims are rooted in the pre-petition past and cannot fall under *Reading*. As the First Circuit noted, "[w]e are aware of no authority that the [*Reading*] exception encompasses a right to payment originating in a prepetition contract with the debtor." *Id.* at 7.

18.     In addition, the basis for the alleged Administrative Claims is the assertion that the "post-petition conduct of ERS and the Commonwealth was in violation of the law." This plainly is not so. As noted below, for the Commonwealth, its alleged illegal conduct was enacting the Post-Petition Legislation, but there is no basis for the Court to hold that passing legislation (particularly, legislation in accordance with the Oversight Board's Fiscal Plan that was intended to fulfill the Oversight Board's statutory obligations under PROMESA to adequately fund pensions (*see* 48 U.S.C. §2141(b)(1)(C)), can be a violation of the law. As for ERS, its allegedly wrongful post-petition conduct consists of *following* the law—something, as Claimants have argued elsewhere, "ERS had no choice" but to do. (Case No. 20-1065 (1st Cir.), Dkt. 00117538689 at 35-36.) It simply cannot be that ERS violated the law by following the law.

19.     ***Second***, Claimants are incorrect when they argue that under §922(c), "a claim for failure of adequate protection," serves as a basis for granting their claims administrative expense status. (Admin. Motion ¶25.) Claimants' explanation for why they believe §922(c) applies is sparse:

> Movants have been harmed by the continuation of the automatic stay of sections 362 and 922. Movants diligently and repeatedly sought relief from stay for lack of adequate protection. Nevertheless, adequate protection has failed and Movants have a claim arising from the stay of action against the Pledged Property. Under section 922(c) of the Bankruptcy Code, such claim is allowable as an administrative expense.

(*Id.* ¶42.)

20.     While there are no cases directly interpreting §922(c), there are many cases interpreting the almost identical language found in §507(c). Simply put, these provisions "provide[] that when adequate protection has been given to a secured creditor and later proves to be inadequate, the creditor becomes entitled to a superpriority administrative expense claim to the extent that the proffered adequate protection was insufficient." *In re Carpet Ctr. Leasing Co.*, 991 F.2d 682, 685 (11th Cir. 1993); *accord Baybank-Middlesex v. Ralar Distributors, Inc.*, 69 F.3d 1200, 1203 (1st Cir. 1995) (noting §507(b) "provides a 'superpriority' claim where adequate protection fails"). This is so because the concept of adequate protection has a simple purpose: it "represents the maintenance of the status quo of the creditor while the automatic stay maintains the status quo of the debtor." *In re Wheeler*, 12 B.R. 908, 909 (Bankr. D. Mass. 1981). Maintaining the "status quo" means protecting a creditor holding a secured claim from a "decrease in the value" of the secured claim caused by the automatic stay or the debtor's use of the collateral. 48 U.S.C. §2161 (incorporating 11 U.S.C. §361); *see also United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370 (1988); *In re Mullen*, 172 B.R. 473, 476 (Bankr. D. Mass. 1994); *In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180 (Bankr. D. Del. 1993).

21.     Although the allegations of the Administrative Claims are sparse, it appears that Claimants are contending that by eliminating Employer Contributions and ordering the wind-down of ERS and the transfer of its assets to the Commonwealth, the Post-Petition Legislation effected a diminution of their collateral, giving rise to an adequate protection claim entitled to priority under §922(c). The First Circuit's decision holding that Claimants do not have a security interest in any Employer Contributions that would have come into existence after May 21, 2017 defeats the first part of this argument. *See Fin. Oversight & Mgmt. Bd.*, 948 F.3d at 468. Further, because the

Commonwealth is holding the funds that ERS transferred to it for Claimants' benefit in the event that Claimants can trace their liens to such funds, Claimants cannot claim that their interest in such funds has been diminished. *See Fin. Oversight & Mgmt. Bd.*, 954 F.3d at 10. Accordingly, the Administrative Claims should be dismissed as a matter of law because regardless of whether those claims have any substantive merit (and they do not), they are not entitled to administrative priority.

## II.   All Claims Should Be Dismissed Because The ERS Bonds Were Issued *Ultra Vires.*

22.     Even if there were a basis for Claimants to seek administrative priority for their alleged Administrative Claims, those claims all fail substantively. The Administrative Claims all seek recovery of amounts due under the ERS Bonds. The ERS Bonds, however, are *ultra vires* because they were issued outside the scope of the ERS Enabling Act—the legislation that authorizes and limits ERS's ability to engage in debt financing. This issue is presently being litigated in a separate proceeding with summary judgment briefing scheduled to conclude on September 8, 2020. (ERS Dkt. 866.) While the Retiree Committee will not explain here why the ERS Bonds are *ultra vires* as those issues are pending in another contested proceeding, the Court can and should decide now the legal ramifications of an *ultra vires* finding. And the caselaw is clear: if the ERS Bonds were issued *ultra vires*, they are null and void and cannot serve as the basis for any claim against either ERS or the Commonwealth.

23.     When a private party contracts with a state or local governmental entity, the party is presumed to know the scope of the entity's authority to make contracts. *Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*, 91 F. Supp. 3d 267, 290-91 (D.P.R. 2015). "Parties that contract with a municipality are aware of the need to conduct themselves in accordance with" the municipality's contracting regulations. *Las Marias v. Mun. San Juan*, 159 D.P.R. 868, 875 (2003); *accord Int'l Salt Co., LLC v. City of Boston*, 590 F.3d 1, 6 (1st Cir. 2009) (applying Massachusetts

law). Thus, when a governmental entity enters into a contract that is outside the scope of its
authority, that contract or agreement "is void" and the private party cannot state any claim related
to that contract. *Las Marias*, 159 D.P.R. at 874; *Plaza Carolina*, 91 F. Supp. 3d at 290-91; *accord
Central Transp. Co. v. Pullman's Palace Car Co.*, 139 U.S. 24, 48 (1891) ("All contracts made by
a corporation beyond the scope of those powers are unlawful and void").

24.     This rule eliminates all of the Administrative Claims. As one commentator has
summarized:

> If a contract is ultra vires, it is wholly void. Because the contract is void,
> (a) no recovery can be had against the municipality on it; (b) there can be
> no ratification, except by the legislature; (c) the municipality cannot be
> estopped to deny the validity of the contract; and (d) there can be no
> recovery on an implied contract, although it has been executed and the
> municipality has received the benefit of the contract.

*McQuillin: the Law of Municipal Corporations*, 10 McQuillin Mun. Corp. §29:15 (3d ed.); *accord
PHL Variable Ins. Co. v. Town of Oyster Bay*, 2017 WL 2371188, at *14-16 (E.D.N.Y. May 30,
2017) (dismissing fraud claims against municipality where alleged misstatements were
misstatement of law and "plaintiff is charged with knowledge" of the law) (applying New York
law); *Waisman v. Wagner*, 227 Wis. 193 (1938) (dismissing fraud based claims against
municipality in connection with an *ultra vires* contract because "[a]greements that are beyond the
power of a city to make are void") (applying Wisconsin law).

25.     The law is the same in Puerto Rico. For example, if the ERS Bonds are *ultra vires*,
Claimants can state no claim for breach of contract. *See Las Marias*, 159 D.P.R. at 874 (rejecting
claim for breach of contract against city which contracted *ultra vires*). Nor can Claimants seek
*"any remedy in equity, such as unjust enrichment"* under an *ultra vires* contract. *Id.* at 875; *accord
Norton v. McOsker*, 407 F.3d 501, 506 (1st Cir. 2005) ("'[T]he doctrine of estoppel … has no
application to a contract … which is void because it violates … the dictates of public policy.'")

(changes in original) (quoting *Doherty v. Bartlett*, 81 F.2d 920, 925 (1st Cir. 1936).) An *ultra vires* finding would be fatal to all other Administrative Claims as well. The Puerto Rico Supreme Court has explained that the purpose of the *ultra vires* doctrine is to "protect the interests and the money of the people that the government represents." *Las Marias,* 159 D.P.R. at 875. Consequently, the rule exists and is "applied inflexibl[y]" to protect the public from having to pay for *ultra vires* actions. *Id*. It would contravene this purpose to find the Commonwealth or ERS liable for fraud or other bond-related claims. In sum, given that every Administrative Claim is tethered to the ERS Bonds, a finding that the bonds were issued *ultra vires* would require the dismissal of all Administrative Claims.

26.    Moreover, the Administrative Claims based on fraud and similar torts fail for an additional reason. In Puerto Rico, fraud requires proof that the "plaintiff reasonably and foreseeably relied" upon a "false representation." *Valle-Ortiz v. R.J. Reynolds Tobacco Co.*, 385 F. Supp. 2d 126, 133 (D.P.R. 2005). Yet, as explained above, Puerto Rican law charges a private party contracting with a government entity with knowledge of that entity's power to make contracts. Put simply, Claimants cannot establish that they "reasonably" relied upon a false representation regarding the authority to issue the bonds when the law holds them responsible for understanding that authority. Other courts applying a similar legal structure have reached the same conclusion. *See PHL Variable Ins. Co. v. Town of Oyster Bay*, 929 F.3d 79, 94-95 (2d Cir. 2019) (applying New York law); *accord* 10 McQuillin Mun. Corp. §29:4 (3d ed.) (collecting cases).

27.    Accordingly, if the Court finds the ERS Bonds are *ultra vires*, it also should disallow the Administrative Claims on the same basis with prejudice.

### III.    The First Circuit's Section 552 Decision Is Fatal To The Administrative Claims.

28.    The First Circuit's January 30, 2020 decision—where it held, among other things, that ERS had no cognizable property interest in future Employer Contributions and therefore

Claimants "did not have any security interest in such contributions"—compels disallowing with prejudice all of the Administrative Claims. *See Fin. Oversight & Mgmt. Bd.*, 948 F.3d at 468. All of the alleged post-petition claims depend on the allegation that when the Commonwealth enacted the Post-Petition Legislation, the Commonwealth took something from Claimants (or ERS) and harmed Claimants in the process. (*See* Admin. Motion ¶¶27-43.) But the First Circuit's decision makes clear that Claimants had no interest in Employer Contributions coming into existence on or after May 17, 2017 and ERS had no interest in Employer Contributions that might have come into existence following the enactment of the Post-Petition Legislation. Thus, even assuming that the Commonwealth's enactment of the Post-Petition Legislation could have harmed Claimants in some way, notwithstanding the express warnings Claimants received that this might occur, it could not have done so here because, by the time the Commonwealth enacted this legislation in the summer of 2017, Claimants had no interest in Employer Contributions. Accordingly all of the alleged Administrative Claims should be disallowed.

## IV.    The Administrative Claims Are Based On A False Premise.

29.    The lynchpin of all of the Administrative Claims is that the Commonwealth and ERS acted unlawfully when the Commonwealth enacted the Post-Petition Legislation. (Admin. Motion ¶26.) Claimants summarize this theory as follows:

> ERS and the Commonwealth damaged the Bondholders through the enactment of Joint Resolution for Other Allocations for Fiscal Year 2017-2018 ("Joint Resolution 188"), passed June 25, 2017, and Act 106-2017 ("Act 106"), enacted August 18, 2017 (collectively, the "Post-Petition Legislation"), the passage of various other unlawful acts and executive orders, and other unlawful actions. The Bondholders are entitled to post-petition claims and administrative expense status for these claims, which all arose after the ERS and Commonwealth Petition Dates as a result of the Commonwealth's and ERS's violation of the law in enacting the Post-Petition Legislation.

(Admin. Suppl. ¶2). From this premise flows a litany of alleged claims. (*See id*. ¶¶3-17; Admin. Motion ¶¶24, 27-40). This theory is baseless, thus dooming all of the Administrative Claims.

### A.    The Commonwealth Acted Lawfully.

30.    Claimants provide no plausible legal or factual basis for their assertion that the Commonwealth's management of its pension system through the Post-Petition Legislation was unlawful. As an initial matter, the Commonwealth has the unquestionable legal authority to structure its pension system as it sees fit. *See Gregory v. Ashcroft*, 501 U.S. 452, 473 (1991) (holding that it was Missouri's "prerogative" as a "sovereign state" to proscribe a maximum retirement age for judges); *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 314-17 (1976) (per curiam) (similar). And the Puerto Rico Supreme Court has held that the Commonwealth has the power and discretion to "adopt changes that guarantee the stability and solvency of the [retirement] system." *Trinidad Hernandez v. ELA*, 188 D.P.R. 828, 835 (2013) (per curiam). Moreover, the ERS Enabling Act is clear that the purpose behind ERS was to allow its funds to "be used and applied …. [f]or the payment of retirement and disability annuities, death benefits and annuities, and other benefits … in order to achieve economy and efficiency in the administration of the Government of the Commonwealth of Puerto Rico." 3 L.P.R.A. § 761.

31.    Nothing in PROMESA changes this calculus. In fact, quite the opposite, PROMESA requires the Oversight Board to create a fiscal plan that "provide[s] adequate funding for public pension systems." 48 U.S.C. § 2141(b)(1)(C). The Puerto Rican legislature passed Joint Resolution 188 and Act 106 to conform to the Oversight Board's certified Fiscal Plan and to ensure adequate funding for pensions through the move to a PayGo system—something even Claimants acknowledge was not occurring prior to the passage of the Post-Petition Legislation. (*See* Admin. Motion ¶3 (noting the "severe underfunding of ERS" prior to the Post-Petition Legislation); *see also id*. ¶¶55-56, 58-59.) Consequently, there can be nothing "unlawful" about the Commonwealth

15

passing legislation designed to provide a better pension system for its citizens in furtherance of PROMESA's mandate. (*See* Admin. Motion at Ex.A.A (Joint Resolution 188, Statement of Intent noting inadequacy of previous attempts at pension reform and stating that "[t]his Joint Resolution … puts forth the pay as you go system as a new method for safeguarding pensions for Government retirees").)

32.     In their Administrative Claims, Claimants single out the Post-Petition Legislation's termination of Employer Contributions as particularly egregious. But, again, given the First Circuit's decision that ERS had no property interest in the continuation of Employer Contributions (and thus neither did Claimants), the termination of future Employer Contributions cannot give rise to liability. *See Fin. Oversight & Mgmt. Bd.*, 948 F.3d at 468.

33.     In addition, Claimants continue to ignore the fact that their operative contractual document, the Bond Resolution, always contemplated that the Commonwealth could eliminate or reduce the Employer Contributions, and that the Claimants had no guarantee that this would not happen. *Id.* at 469-70. The Bond Offering Statement, for example, in the section entitled "Investment Considerations" warned potential buyers of ERS bonds that "*[t]he Legislature of the Commonwealth could reduce the Employer Contribution rate or make other changes in existing law that adversely affect the amount of Employer Contributions.*" (Ex. C, Bond Offering Statement, Series A at 26 (emphasis in original).) Buyers of ERS Bonds also were told that the Commonwealth Legislature was not making any promises not to amend the law "in a way adverse to Bondholders" and that, unlike other jurisdictions, the Constitution of Puerto Rico does not contain provisions that expressly prohibit the Legislature from amending the Employer Contribution requirements under the Act." *Id.* Potential purchasers of the bonds also were warned that if the Legislature changed the law establishing Employer Contributions "*the ability of [ERS]*

16

*to pay debt service on Bonds when due could be adversely affected*." (*Id*. (emphasis added).) The Offering Statement even went so far as to expressly state that one of the conditions that might cause the Legislature to make changes to Employer Contributions was "where there is severe financial stress affecting one or more of the Government Employers." (*Id*.)

34.     Plainly, anyone buying an ERS Bond understood that there was substantial risk that the collateral securing these non-recourse bonds could be eliminated and, if that happened, the Bond Resolution precluded any recourse to ERS's other assets or to those of the Commonwealth. As the First Circuit held, Claimants were "on notice that the Employers' Contributions stem from appropriations that the Commonwealth legislature could, and likely, would reduce if it could not fully fund its planned appropriations" and also "knew that if the Commonwealth experienced additional financial problems, such problems could adversely affect the Bondholders." *Fin. Oversight & Mgmt. Bd.,* 948 F.3d at 469. These facts make Claimants' argument—that the Commonwealth acted wrongfully by exercising its broad powers to manage its pension system and taking actions that bondholders had been warned for years might occur—implausible.

### B.     ERS Acted Lawfully In Implementing The Post-Petition Legislation.

35.     As with the Commonwealth, Claimants' argument that because ERS complied with the Post-Petition Legislation ERS has additional liability to them beyond the obligation to allow Claimants to collect from Pledged Property is meritless. As Claimants recently acknowledged before the First Circuit, "ERS did not exercise *any* power" when the Commonwealth passed the Post-Petition Legislation and any actions ERS took in conformity with the Post-Petition Legislation were "involuntary". (Case No. 20-1065 (1st Cir.), Dkt. 00117538689 at 54-55) (original emphasis).) That is plainly true—the Puerto Rican legislature enacted Joint Resolution 188 and Act 106, and ERS complied with its requirements; it could not do otherwise. Consequently, Claimants' various intent-based claims against ERS in connection with the passage

and implementation of the Post-Petition Legislation all fail a matter of law. *See United Auto, Aerospace, Agricultural Implement Workers of Am., Int'l Union v. Fortuño*, 633 F.3d 37, 42 n.5 (1st Cir. 2011) (holding that government officials were not liable for constitutional claims based on legislative action which violated no law); *Surplus Store & Exchange, Inc. v. City of Delphi*, 928 F.2d 788, 791-92 (7th Cir. 1991) (holding that a municipality could not be liable under *Monell* for simply following state law).

36.    While the alleged Administrative Claims focus primarily on the Commonwealth's termination of Employer Contributions, Claimants also complain that ERS acted wrongfully because "[t]he Post-Petition Legislation required ERS to sell and transfer its assets and funds, all of which are subject to [Claimants'] liens on the Pledged Property." (Admin. Motion ¶40.) Again, by complying with the law, ERS could not have acted unlawfully. *United Auto, Aerospace, Agricultural Implement Workers*, 633 F.3d at 42 n.5. Further, the only ERS property that ERS has transferred to the Commonwealth post-petition is $190.48 million, and as the First Circuit recently noted: "[t]he Board has represented to this Court and to the Title III court that, if [it is] determine[d] that the Bondholders have a valid lien on the $190.48 million … the Board will recognize that lien and distribute to the Bondholders the value of that amount." *Fin. Oversight & Mgmt. Bd.*, 954 F.3d at 10. Given that the Commonwealth is holding the only post-petition transfer of ERS's property for Claimants' benefit, this transfer cannot support a finding of liability against either ERS or the Commonwealth. Claimants simply have no post-petition claim to bring.

**V.    To The Extent Claimants Have Valid Claims Under The ERS Bonds, Claimants Are Limited To Recovering From Their Collateral And Cannot Assert Claims Against The Commonwealth.**

37.    All of Claimants alleged Administrative Claims against the Commonwealth fail as a matter of law because Claimants have waived their right to recover from the Commonwealth and are limited to recovering from the Pledged Property. The Bond Resolution is explicit that

Claimants ability to recover under the ERS Bonds is limited to the Pledged Property and that Claimants have contractually agreed not to seek recovery from the Commonwealth. The Bond Resolution states in its opening paragraphs: "WHEREAS, in order to decrease the unfunded liability of [ERS], [ERS] wishes to issue limited, non-recourse obligations in the form of Bonds, ***payable solely form the Pledged Property***." (Admin. Motion Ex.A.A at VI-I (emphasis added). Section 201 of the Bond Resolution repeats this point, stating: "[t]he Bonds shall be special obligations of [ERS] ***payable solely from the Pledged Property*** without recourse against other assets of [ERS]. ***The Commonwealth shall not be liable for the Bonds or any Ancillary Bond Facility***." (*Id.* (emphasis added).) The Bond Resolution further states: "[n]either any Bond nor any Ancillary Bond Facility shall constitute a debt of the Commonwealth," that "the Commonwealth shall not be liable to make any payment thereon," and that no "Bond or any Ancillary Bond Facility be payable out of any funds or assets other than the Pledged Property…." (*Id.*) This clear language precludes any lability for the ERS Bonds against the Commonwealth.

38.     This waiver of the right to collect from the Commonwealth is enforceable under Puerto Rican law. Section 4 of the Civil Code provides that a party may agree to waive or "renounce[]" any future claims it might have based on the contract. 31 L.P.R.A. §4; *Gutierrez v. Popular Auto, Inc. (In re Gutierrez)*, 526 B.R. 449, 461-62 (Bankr. D.P.R. 2015). Such a waiver is enforceable where: (1) the party agreeing to the waiver gave "informed consent," meaning the waiver was "clear, unambiguous, and explicit"; (2) the waiver is not "inconsistent with public policy"; and (3) the clause does not "constitute[] an invalid adhesion contract." *Baum-Holland v. El Conquistador P'ship L.P., S.E.*, 336 F. Supp. 3d 6, 26 (D.P.R. 2018). Each of these requirements is present here as a matter of law.

39.     *First*, Claimants gave "informed consent" because the waiver language found in §2 of the Bond Resolution is "clear, unambiguous, and explicit." *Id.* The Bond Resolution states expressly: the "***Commonwealth shall not be liable for the Bonds or any Ancillary Bond Facility***" nor shall payment be made "out of any funds or assets other than the Pledged Property." (Admin. Motion Ex.A.A §201 (emphasis added).) Puerto Rican courts enforce "clear and unambiguous" language of this type. In *Jiménez v. Liberty Mutual Insurance Co.,* for example*,* a the United States District Court for the District of Puerto Rico held that a contract which stated that one party "shall not be liable" served to "clear[ly]," and "unambiguous[ly]" preclude liability. 2019 WL 8334499, at *3 (D.P.R. Mar. 31, 2019).

40.     *Second*, holding that Claimants waived their alleged claims against the Commonwealth would not be "inconsistent with public policy." Puerto Rico's Civil Code expressly provides for such waivers. *See* 31 L.P.R.A. §4. Because the Civil Code "constitutes an exercise of public policy" deserving of the judiciary's "deference," this Court should hold that the waiver of claims against the Commonwealth, which is consistent with the Civil Code, is consistent with public policy. *See Trinidad Hernandez v. ELA*, 188 D.P.R. 828, 838 (2013) (per curiam).

41.     Moreover, "public policy" or the "public interest" as used in §4 is a "series of norms and ideals ... that are not always codified in the law and fill the gaps between what has been made law and what has not been expressly made into law but would otherwise harm, if tolerated, the general interest." *Gutierrez*, 526 B.R. at 462 (citing *Martinez Marrero v. U.S. Dist. Ct. for Dist. of P.R.*, 180 D.P.R. 579, 589 (2011)). A waiver—agreed to by investors when they bought their bonds—which seeks to limit the liability on those bonds to the entity which actually issued the bonds and to the property that entity pledged as collateral does not violate any set of commonly held "norms and ideals" nor does it harm the "general interest." Indeed, such waivers in the context

of limited obligation or non-recourse bonds are quite common. *See, e.g., ACA Fin. Guaranty Corp.*

*v. City of Buena Vista*, 917 F.3d 206, 213-14 (4th Cir. 2019) (describing a similar limited obligation

bond); *Moore v. Univ. of Kan.*, 124 F. Supp. 3d 1159, 1165 (D. Kan. 2015) (same).

42.    ***Third***, the Bond Resolution is not an "invalid adhesion contract." As the First

Circuit has explained, under Puerto Rico law "[a]dhesion does not imply nullity of a contract. If

the wording of the contract is explicit and its language is clear, its terms and conditions are binding

on the parties." *Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 19 (1st Cir. 2009) (internal

citations; quotations omitted). Here, when Claimants, sophisticated purchasers of distressed

financial instruments, elected to purchase their ERS Bonds, they did so understanding that the ERS

Bonds were subject to the terms of a Bond Resolution. Because the Bond Resolution's terms are

"explicit" and "clear," those terms are "binding." *Id.* In sum, Claimants are legally barred from

asserting claims against the Commonwealth.

## VI.    Claimants Fail To Support Multiple Claims With Any Factual Allegations.

43.    Despite being given and taking the opportunity to amend their Administrative

Claims, several claims are simply grouped together in a single paragraph without any

accompanying factual allegations. These claims are listed on Exhibit D hereto. But given that a

complaint must give the objecting parties "fair notice of what the … claim is and the grounds upon

which it rests," this approach fails as a matter of law. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555 (2007) (alteration in original). For these claims, Claimants have made no attempt to inform

this Court which facts correspond to which claim, leaving that arduous work and "unjustified

burden [to] the court." *Belanger v. BNY Mellon Asset Mgmt., LLC*, 307 F.R.D. 55, 57 (D. Mass.

2015). As the First Circuit has explained, courts are not "pigs hunting for truffles in the record."

*Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 79 (1st Cir. 2014) (affirming dismissal of

complaint). Given the lack of any factual allegations supporting these claims, they should be

dismissed. Any dismissal also should be with prejudice given that Claimants were afforded multiple opportunities to amend their Administrative Claims and failed to correct the deficiencies in their pleadings. *See LSI Design and Integration Corp. v. Tesaro, Inc.*, 2020 WL 1027773, at *1 (D. Mass. Mar. 3, 2020) (denying plaintiff a "third bite at the apple" at amending its complaint).

## VII.    Claimants Have Improperly Asserted New Claims.

44.    This Court's March 18, 2020 *Order Granting Urgent Joint Motion For Entry Of A Schedule For Resolution Of The ERS Bondholder Claims and Administrative Expense Motions* provided, among other things, that Claimants were allowed to file "Supplements" laying out additional support for their previously asserted Administrative Claims. (Commonwealth Dkt. 12446 ¶3) ("**Scheduling Order**").) The Scheduling Order also was clear that "[w]hile the Supplements can explain and provide additional support for the 'additional claims'" Claimants already had asserted in their pleadings, "the Supplement cannot identify new claims, and if it does identify new claims, the Government Parties and Committees reserve their rights to object to those claims, including as untimely." (*Id*. ¶4(iii)). Despite this directive, Claimants have alleged a host of new claims in their Supplement. A list of these new claims is attached hereto as Exhibit F. These claims are untimely as the bar date for filing proofs of claim against either the Commonwealth or ERS (June 29, 2018) has long since passed. (Commonwealth Dkt. 3160.) Likewise, the Court set a deadline of November 21, 2019 for Claimants to file administrative expense claims and expressly refused to allow Claimants to assert new administrative claims in the Supplement. (Commonwealth Dkt. 8818). Thus, these claims should be dismissed as untimely.

## VIII.    There Are Independent Claim-Specific Reasons For Dismissal Of Certain Claims.

45.    While the preceding arguments provide multiple grounds on which this Court can and should dismiss all of the Administrative Claims, additional claim-specific reasons also exist to dismiss certain of the Administrative Claims.

### A.    The Post-Petition Legislation Did Not Violate ERS's Automatic Stay.

46.    Claimants argue that that the Post-Petition Legislation violated ERS's automatic stay and is therefore void *ab initio* and cannot be implemented. (*See* Ex. E hereto, Representative Proof of Claim (Commonwealth) ¶21.) Based on this proposition, Claimants argue that they have an administrative expense claim for the Employer Contributions that would have been paid to ERS, but for the stay violation.

47.    Claimants' allegation of a stay violation presupposes that ERS (and Claimants) would have had a property interest in future Employer Contributions absent the Post-Petition Legislation, but in light of the First Circuit's §552 decision, as explained above, that is not the case. *Fin. Oversight & Mgmt. Bd.*, 948 F.3d at 468. That holding is fatal to a claim that the Commonwealth violated the automatic stay in the ERS Title III case because the automatic stay only protects a debtor's interests in its property. *See* 11 U.S.C. §362(a). Without any property interest in the future Employer Contributions, there was nothing for the automatic stay in ERS's case to protect, and thus the Commonwealth could not have violated the ERS automatic stay when it enacted the Post-Petition Legislation and eliminated future Employer Contributions.

48.    But even if there were a property interest to protect here, Claimants' automatic stay claim still fails as a matter of law for two additional reasons. ***First***, §305 of PROMESA preempts this claim as that provision (like §904 after which it was modeled) deprives federal courts of any power to interfere with a municipal debtor's political or governmental powers, or property or revenues, during a chapter 9 case without the debtor's consent. *See, e.g., Lyda v. City of Detroit (In re City of Detroit)*, 841 F.3d 684, 695-96 (6th Cir. 2016). The scope this preemptive power defeats any argument that a government's exercise of its powers violates the automatic stay in a case where the governmental entity is the debtor. *Id.*

49.     As the First Circuit has explained, the reason for this bar is because "[u]nlike a commercial bankruptcy, which attempts to balance[e] the rights of creditors and debtors, the principle purpose of chapter 9, and by analogy PROMESA, is to allow municipal debtors the opportunity to continue operations while adjusting or refinancing their creditor obligations." *Fin. Oversight and Mgmt. Bd.*, 954 F.3d at 7-8 (original change) (internal quotations omitted). For a governmental entity to do that, it must be free to exercise its political and governmental powers free from creditor interference as well. Thus, Claimants' automatic stay violation claim is in direct conflict with §305 of PROMESA, as the relief they seek would render the Commonwealth and ERS unable to continue implementing the Post-Petition Legislation—laws passed by the Puerto Rico Legislature and signed by the Governor for the very purpose of assuring that pension payments to retirees are not disrupted.

50.     **Second**, the Commonwealth's enactment of the Post-Petition Legislation also was a valid exercise of its police powers and thus falls under the police power exception to the automatic stay. Section 362(b)(4) of the Bankruptcy Code excepts from the automatic stay "the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory powers." 11 U.S.C. §362(b); *see also Lacoquille Inv. Co. v. Town of Manalapan (In re Lacoquille Inv. Co.*), 44 B.R. 731, 733 (Bankr. S.D. Fla. 1984). The First Circuit has instructed that to evaluate whether the police power exception applies: "[w]e ask whether the governmental action is designed primarily to protect the public safety and welfare. If so, the government action ... is exempt." *Parkview Adventist Med. Ctr. v. United States*, 842 F.3d 757, 763 (1st Cir. 2016) (citations and quotations omitted).

51.     Here, the Post-Petition Legislation states that it is intended to "safeguard[]" pensions for Government retirees. (Admin. Motion, Ex. A.B at 2; Ex. A.C at 5.). Thus, when the

24

Commonwealth enacted the Post-Petition Legislation it was exercising its police and regulatory powers and its actions are therefore excepted from the stay. Claimants' Administrative Claims based on an alleged automatic stay violation should be dismissed.

### B.   Neither The Commonwealth Nor ERS Have Been Unjustly Enriched.

52.   Claimants also allege that the Post-Petition Legislation unjustly enriched the Commonwealth and ERS. (*See* Ex. E hereto, ¶25.) Under Puerto Rico law, to state a claim for unjust enrichment a claimant must allege: (1) the occurrence of an enrichment; (2) a correlative loss; (3) a connection between the loss and the enrichment; (4) absence of cause to justify the enrichment; and (5) lack of a legal provision which precludes application of an enrichment without cause. *Westernbank P.R. v. Kachkar*, , 2009 WL 6337949, at *29 (D.P.R. Dec. 10, 2009), *report and recommendation adopted*, 2010 WL 1416521 (D.P.R. Mar. 31, 2010).

53.   Claimants' unjust enrichment claims fail because the unjust enrichment doctrine "applies only when there is no applicable statute" or contract between the parties: *Id.* at *29; *P.R. Tel. Co. v. SprintCom, Inc.*, 662 F.3d 74, 97 (1st Cir. 2011) (same). Given the First Circuit's §552 decision, the only plausible unjust enrichment is ERS's transfer to the commonwealth of $190.48 million. But this transfer occurred pursuant to the Post-Petition Legislation. In the event the Court holds the ERS Bonds are not *ultra vires*, Claimants have an applicable contract, the ERS Bond Resolution, and the transfer occurred pursuant to a statute. Most importantly, because the Commonwealth is holding the $190.48 million for the benefit of Claimants until they prove their entitlement to those funds, that transfer (which is the only transfer that occurred here) could not have unjustly enriched the Commonwealth at Claimants' expense. *See Fin. Oversight & Mgmt. Bd.*, 954 F.3d at 10.

54.   In addition, Claimants cannot plausibly allege the "occurrence of an enrichment" because the Post-Petition Legislation benefitted retirees, not ERS or the Commonwealth. Joint

Resolution 188 states on its face that its purpose is to implement "a new method for safeguarding pensions for Government retirees" (Admin. Motion Ex.A.B at 2) and Act 106 provides that it "seeks to safeguard the wellbeing of [] pensioners and public servants." (*Id*. Ex.A.C at 5.) Claimants allege no facts that make it plausible that this stated purpose is not accurate. Indeed, the Commonwealth is not enriched at all, as it is assuming the obligations to pay directly all pensions previously administered by ERS, JRS, and TRS. (*Id*. §2.1.)

> ### C.   The Post-Petition Legislation Does Not Constitute An Unconstitutional Taking.

55.     Claimants also allege that the Post-Petition Legislation and acts taken in conformity with it constitute an unconstitutional taking under both the United States and Puerto Rico Constitutions. (*See* Ex. E hereto, at ¶ 23.) The "taking" that they allege occurred was the "transfer [of Claimants'] collateral to the Commonwealth"—*i.e*., the Pledged Property. (Admin. Motion ¶36.) This claim fails for several reasons.[3]

56.     ***First,*** Claimants have not been denied compensation for the takings they allege as they are still advancing their Court of Claims case. Given this, the First Circuit has held, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Downing/Salt Pond Partners, L.P. v. R.I. & Providence Plantations*, 643 F.3d 16, 20 (1st Cir. 2011) (internal quotations omitted).

57.     ***Second***, Claimants cannot maintain a Takings Clause claim because, if the Court were to find that the ERS Bonds were not issued *ultra vires,* they would retain a contract claim against ERS, a government agency, which could be collected against any Pledged Property over

---

[3] The claims will not be analyzed separately because the Puerto Rico Supreme Court has indicated that the United States and Puerto Rico Takings Clauses are coextensive. *See Torres Marrero v. Mayor Ponce*, 199 D.P.R. 493, 502 (2017).

which Claimants retain a lien. *Masso-Torrellas v. Municipality of Toa Alta*, 845 F.3d 461, 468 (1st
Cir. 2017). "[A]ctions such as contract termination or detention of property under the contract that
would constitute a simple breach of contract when a non-governmental entity is involved do not
become a constitutional violation simply because the contracting party is a [governmental entity]."
*Id*. Because the Post-Petition Legislation does not purport to deprive Claimants of their right to
assert a breach of contract claim against ERS, it cannot constitute a taking.

58.     ***Third***, no taking has occurred. Whatever rights Claimants held in the Pledged
Property before the Post-Petition Legislation, they still hold today. The only possible transfer of
Pledged Property that could have occurred pursuant to the Post-Petition Legislation, given the First
Circuit's §552 ruling, is the $190.48 million that ERS transferred to the Commonwealth, and those
funds are being held for Claimants' benefit. *See Fin. Oversight & Mgmt. Bd.*, 954 F.3d at 10.

59.     Moreover, even if that were not true, Claimants still cannot plausibly allege a taking
occurred here. Courts have routinely indicated that government actions are less likely to be a taking
when, like the Post-Petition Legislation, they were taken to address fiscal emergencies. *See New
Haven Inclusion Cases*, 399 U.S. 392, 491 (1970); *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362,
374-76 (2d Cir. 2006) (wage reductions for employees in midst of city's budget crisis was not a
taking). Those cases apply here. Joint Resolution 188 states that it was intended to address the
"lack of liquidity and insolvency" in the pension systems and recognized that Puerto Rico's
"profound and severe fiscal crisis" prevented the government from taking other steps to reform the
pension systems. (Admin. Motion Ex. A.B.) Similarly, Act 106 provides in its Statement of
Legislative Intent, "Puerto Rico is currently experiencing an unprecedented financial and social
crisis. … This crisis has hit Puerto Rican families very hard. The greatest sacrifices have been
demanded from the most vulnerable members of our society …." (Admin. Motion Ex. A.C. at 1-

2.) Congress expressly found that Puerto Rico's present financial crisis is an emergency. 48 U.S.C. §2194(m)(1). Thus, Claimants, like the secured creditors in the *New Haven Inclusion Cases*, having "invested their capital in a public [entity] that does owe an obligation to the public," should be viewed as having "assumed the risk that in any depression or any reorganization the interest of the public would be considered as well as theirs." 399 U.S. at 491-92.

60.    And even if Claimants could assert a taking (and they cannot), the Post-Petition Legislation satisfies the "public use" test: as long as "the exercise of the eminent domain power is *rationally related* to a *conceivable* public purpose," the "public use" test is satisfied. *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 241 (1984) (quoting *Berman v. Parker*, 348 U.S. 26, 32 (1954). Here the public purpose is not merely "conceivable"—it is obvious. The Post-Petition Legislation is clear that it was passed to be "a new method for safeguarding pensions for Government retirees" (Admin. Motion Ex. A.B, at 2) and to "safeguard the wellbeing of our pensioners and public servants." (*id*. Ex.A.C at 5.) Any transfer of ERS's assets to the Commonwealth in order to more efficiently administer the new retirement pension system is not a taking. In analogous circumstances, the First Circuit has held that it was undoubtedly a "public use" for Puerto Rico to transfer dilapidated lands from a quasi-private trust back to the Commonwealth to rehabilitate and manage those lands more efficiently. *Fideicomiso De La Tierra Del Cano Martin Pena v. Fortuño*, 604 F.3d 7, 18 (1st Cir. 2010).

**D.    The Post-Petition Legislation Does Not Violate the Contracts Clause.**

61.    Working their way through the United States and Puerto Rican Constitutions, Claimants next assert that the Post-Petition Legislation violates the Contracts Clauses of those Constitutions. (Ex. E hereto, ¶ 24.) Because both clauses are co-extensive, they can be analyzed together. *See Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 85 F. Supp. 3d 577, 603 (D.P.R. 2015). Both "[c]ontracts Clause claims are analyzed under a two-pronged test." *United Auto.*, 633 F.3d at

41. "The first question is whether the state law has ... operated as a substantial impairment of a contractual relationship. If the contract was substantially impaired, the court next turns to the second question and asks whether the impairment was reasonable and necessary to serve an important government purpose." *Id.*

62.     Claimants do not satisfy the "substantial impairment" prong, which requires them to "show more than a breach [of a contract]; it must show that the defendants have somehow impaired its ability to obtain a remedy for a demonstrated breach." *Redondo Constr. Corp. v. Izquierdo*, 662 F.3d 42, 48 (1st Cir. 2011). Put differently, under the Contracts Clause, "a contract is impaired only when the legislation destroys *both* the obligation to perform on the contract *and* the obligation to pay damages for nonperformance." *Gary Jet Ctr., Inc. v. AFCO AvPORTS Mgmt. LLC*, 863 F.3d 718, 722 (7th Cir. 2017) (emphasis in original). Claimants, however, fail to allege that the Post-Petition Legislation impairs *both* contractual obligations *and* remedies. The Claims only allege that these laws impair ERS's contractual obligations, not their remedies. (*See* Ex. E hereto, ¶24.) Nor could Claimants make such an allegation as nothing in Post-Petition Legislation purports to change the terms of the ERS Bondholder Resolution or deprives Claimants of their right to assert a claim *against ERS* in its Title III case—which they have done.

63.     What is more, even Claimants' contractual obligation impairment argument is incorrect. The Post-Petition Legislation in no way requires ERS to not make payments on the ERS Bonds, and any transfer of ERS property that has occurred in accordance with its terms is being held for Claimants' benefit. In sum, the Post-Petition Legislation is agnostic when it comes to ERS's contractual obligations to Claimants and therefore has resulted in no impairment to ERS's contractual obligations, much less the "substantial impairment" required.

29

64.     The Contracts Clause claim also fails because the Post-Petition Legislation is "reasonable and necessary to serve an important government purpose"—the continued payment of pension benefits to the Commonwealth's retirees in the face of Puerto Rico's "profound and severe" and "unprecedented financial and social crisis." (Admin. Motion Ex. A.B; A.C.) This Court already has found similar facts more than sufficient to defeat a similar Contracts Clause challenge to other legislation passed by the Commonwealth during the pendency of these Title III Cases. *See In re Fin. Oversight and Mgmt. Bd. for Puerto Rico*, 297 F.Supp.3d 269, 288-89 (D.P.R. 2018). The Court should do so again, and dismiss Claimants' Contracts Clause claim.

### E.     Claimants' Fraudulent Transfer Claims Fail As A Matter Of Law.

65.     Claimants also allege that the passage of the Post-Petition Legislation (including the termination of Employer Contribution) and ERS's transfer of assets in accordance with that legislation constitute fraudulent transfers under Puerto Rican law. (ERS Dkt. 848, ¶3). This claim should be dismissed for many reasons.

66.     ***First***, as an initial matter, Claimants lack standing to bring the alleged fraudulent transfer claims given this Court's decision, upheld by the First Circuit, rejecting their previous attempts to do so. *Fin. Oversight & Mgmt. Bd.*, 954 F.3d at 7-10. ***Second,*** given that the First Circuit has expressly held that that ERS had no property interest in future Employer Contributions, when the Post-Petition Legislation eliminated future Employer Contributions, it was not "transferring" ERS's property. *Fin. Oversight & Mgmt. Bd.*, 948 F.3d at 468.

67.     ***Third,*** the Post-Petition Legislation constituted an amendment of a previous law (Act 447) and the amendment of a statute cannot constitute a "transfer" because "a 'transfer' cannot occur without 'property' or 'an interest in property.'" *Oliveras v. Banco Popular de Puerto Rico (In re Alicia Casanova)*, 595 B.R. 616, 618 (Bankr. D.P.R. 2018) ("for a debtor to transfer property, the debtor must first have an interest in that property"). Because Act 447 was not ERS's

property and did not create any property rights for ERS in future Employer Contributions, ERS

could not have transferred Act 447. *See Fin. Oversight & Mgmt. Bd.*, 948 F.3d at 468.

68.   Moreover, what happened here also cannot be a transfer because neither the

Commonwealth nor ERS gave Act 447 to someone else. All the Commonwealth did was amend

Act 447 and the alteration of something is not a transfer. As one court in this Circuit explained,

"[i]nherent" in the definition of a transfer is "the acquisition of an interest by a third party."

*Feinman v. Messia (In re Messia)*, 184 B.R. 176, 177 (Bankr. D. Mass. 1995). Other courts are in

accord. *See, e.g.*, *In re Wey*, 854 F.2d 196, 199 (7th Cir. 1988) (the "extinguishment of [an] equity

interest … [is] not a transfer"); *Ute Mesa Lot 1, LLC v. First-Citizens Bank & Tr. Co. (In re Ute

Mesa Lot 1, LLC)*, 736 F.3d 947, 951-52 (10th Cir. 2013) (even "[t]hough the right to convey

property may have been devalued, it has not been 'disposed of' or 'parted with' so to qualify as a

'transfer'.…[A] 'diminished' interest does not equate to a 'transferred' interest").

69.   ***Fourth,*** the two Puerto Rican statutes Claimants base their fraudulent transfer claim

upon—Articles 1064 and 1243 of the Civil Code—have no applicability here. Article 1064 allows

"[c]reditors, after having attached the property of which the debtor may be in possession … [to]

impugn the acts which the debtor may have performed in fraud of their right." 31 L.P.R.A. § 3028.

What Claimants ignore is that Article 1064 is a remedy of last resort and only can be utilized after

the creditor already has "attached the property of which the debtor may be in possession" (*id*.)—a

necessary step Claimants have not taken. *See González v. San Juan Dist. Ct.*, 42 D.P.R. 199 (P.R.

1931) (holding that before a creditor can avail themselves of Article 1064 remedies the creditor

must have exhausted the property of which the debtor is still in possession). Article 1243 of the

Civil Code also does not apply. That provision—entitled "Contracts subject to rescission"—

provides, in relevant part, for the rescission of contracts "executed in fraud of creditors, when the

latter cannot recover, in any other manner, what is due them." 31 L.P.R.A. §3492(3). But, here, Claimants are not seeking to rescind a contract and thus, this statute does not apply.

70.     Moreover, Claimants' reliance on Articles 1064 and 1243 of the Civil Code fails for another fundamental reason—both statutes require actual fraud on the part of the transferor, which Claimants allege is ERS. *See, e.g.*, *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005) ("[I]t is the intent of the transferor and not the transferee that is relevant for purposes of pleading a claim for intentional fraudulent conveyance"). But ERS did not enact the Post-Petition Legislation and thus, if this enactment could have been done with a fraudulent intent, that intent was not ERS's intent. Further, as Claimants very recently told the First Circuit, "ERS had no choice in the matter [of the Post-Petition Legislation], so the transfer of its property was by definition involuntary." (Case No. 20-1065 (1st Cir.), Dkt. 00117538689 at 35-36.) Claimants have not cited any case that supports the proposition that someone can commit fraud through an involuntary action and the case law is to the contrary. *See, e.g., Boston Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1508-09 (1st Cir. 1987) (actual fraudulent conveyances require knowing, intentional acts by the transferor).

71.     Similarly, any transfer ERS made it made in accordance with the law and there does not appear to be any case that holds that complying with the law can form the basis of a fraudulent transfer; on the contrary, the Puerto Rico Supreme Court held that "no transfer is fraudulent if it is done for a legal cause." *Ana María Sugar Co. v. Castro*, 28 D.P.R. 241, 1920 WL 3321, at *3(P.R. 1920). And the Puerto Rico Supreme Court has held that a law is presumed valid unless and until the Puerto Rico Supreme Court declares the law unconstitutional. *See Cerame-Vivas v. Aguiar*, 99 D.P.R 45, 51 (P.R. 1970); *Esso Standard Oil S.A. Ltd. v. P.R. Port Auth.*, 95 D.P.R. 772, 783(P.R.

1968). No tribunal has declared either Joint Resolution 188 or Act 106 invalid and so no colorable claim arises under Puerto Rico law for actions taken in conformity with those laws.

72.   **Finally**, under no circumstances can Claimants use ERS's alleged fraudulent transfers to the Commonwealth to recover against ERS because fraudulent transfer liability only runs to "the transferee." *Sher v. SAF Fin., Inc.*, 2011 WL 4835700, at \*2 (D. Md. Oct. 11, 2011); *Seitter v. Schoenfeld*, 88 B.R. 343, 345 (D. Kan. 1988) (same).

## F.   Claimants Cannot Assert A Plausible Estoppel Claim.

73.   Claimants allege with respect to their alleged estoppel claims that ERS should be compelled to honor certain provisions of the Bond Resolution. (ERS Dkt. 848, ¶ 8). As an initial matter, this claim seeks declaratory judgment and injunctive relief which is "not available in connection with a proof of claim." *See, e.g.*, *In re Computer Learning Centers, Inc.*, 344 B.R. 79, 92 (Bankr. E.D. Va. 2006); *In re Residential Capital, LLC*, 2016 WL 3240256, at \*6 (Bankr. S.D.N.Y. June 3, 2016) (same).

74.   Further, as Claimants acknowledge, all of ERS's alleged failures are failures to comply with its contractual obligations under the Bond Resolution. Estoppel, however, is a non-contractual or quasi-contractual claim; it has no basis where a contract exists—here, the Bond Resolution. *GE Mobile Water, Inc. v. Red Desert Reclamation, LLC*, 6 F.Supp.3d 195, 202 (D.N.H. 2014) ("Promissory estoppel, however, is not premised upon the existence of a contract, but rather upon the alternative theory that, even if there was no contract, the plaintiff was induced to rely on the defendant' non-contractual promises"). The claim should be dismissed.

## G.   Claimants' Mutual Mistake Claim Fails.

75.   Claimants also allege that the ERS Bond Resolution should be rescinded on the theory that ERS and the Bondholders had a mutual mistake regarding ERS's alleged representation that "its right to receive employers' contributions was a legal asset of the system, and that the

bonds were valid and enforceable." (ERS Dkt. 848, ¶25). A mutual mistake only applies where the parties are mistaken about a material fact. *Enos v. Union Stone, Inc.*, 732 F.3d 45, 48 (1st Cir. 2013) ("Under First Circuit law, as elsewhere, where there is no meeting of the minds between the parties because of a mistake of fact, no contract is formed…."); *Peer Intern. v. Latin American Music Corp.*, 161 F.Supp.2d 38, 51 n.17 (D.P.R. 2001) ("rescission applies when there has been a mutual mistake of material fact….) (internal quotations omitted).). Here, the alleged mistakes are mistakes of law. (ERS Dkt. 848, ¶25.) Consequently, the mutual mistake doctrine cannot apply and this claim should be dismissed.

### H.   Claimants Lack Standing to Pursue ERS's Alleged Breaches of Warranties in the Purchase Contracts.

76.   Claimants allege that ERS breached the Purchase Contract it had with the underwriters and that Claimants have standing to pursue these alleged breaches because they are "the successors and assigns" of the underwriters of the ERS Bonds because they are "subsequent purchasers of the ERS Bonds." (ERS Dkt. 848, ¶26.) Claimants provide no explanation for that conclusion and nothing in the Purchase Contract suggests that is true. Given that Claimants allege no facts to support this claim, it should be dismissed.

### IX.   Any Administrative Claims Must Be Reduced By Amounts Already Paid To Claimants And, For Any Tort Claims, Damages Are Limited.

77.   Claimants have not stated the precise amount of their alleged Administrative Claims, but have stated that they "are in excess of, and include, the principal amount held by the Movants…." (Admin. Motion 1 n.2.) To the extent Claimants do possess any allowable Administrative Claims, the amount of such Administrative Claim should be reduced by any amounts Claimants already have been paid on account of their ERS Bond holdings and by any funds the Fiscal Agent is holding for Claimants. *See, e.g.*, *In re Empresas Inabon, Inc.*, 358 B.R. 487, 519-20 (Bankr. D.P.R. 2006).

78.     In addition, for any tort based claim, the allowable amount can be no more than the actual amounts Claimants paid for their ERS Bonds. As one court explained:

> In contrast [to expectation damages in contract actions], compensatory damages, available in tort actions, are intended to compensate the injured party for the loss caused by the tortious conduct. In a tort action, the parties did not enter into any bargain or meeting of the minds that should be enforced; without a legally enforceable bargain, there is no benefit to which a plaintiff is legally entitled. For that reason, expectation damages, as defined above, are not appropriate in a tort action.

*Solarchick ex rel. Solarchick v. Metro. Life Ins. Co.*, 430 F. Supp. 2d 511, 513-14 (W.D. Pa. 2006); *accord Satellite Broad. Cable, Inc. v. Telefonica de Espana, S.A.*, 807 F. Supp. 218, 222 (D.P.R. 1992) (holding that tort-based claim for alleged tortious behavior in connection with precontractual negotiations does not give rise to expectation damages).

79.     In other words, tort damages are personal to the Claimants and are therefore limited to the amount of damage each Claimant actually have suffered, which would be funds they personally expended to purchase their interests in the ERS Bonds. *See Hutt v. Dean Witter Reynolds, Inc.*, 737 F. Supp. 128, 131 (D. Mass. 1990) (holding that a "defrauded buyer [of a security] may recover the difference between the actual value of an item purchased and the price paid, as well as outlays directly attributable to the defendant's conduct … 'but not damages covering the expected fruits of an unrealized speculation'") (emphasis removed); *Fershtman v. Schectman*, 450 F.2d 1357, 1361 (2d Cir. 1971) (same).

## CONCLUSION

For all of the foregoing reasons, the Retiree Committee requests that the Court dismiss the Administrative Claims with prejudice and grant such other relief as may be equitable and just.

Dated: May 6, 2020

Respectfully submitted,

**JENNER & BLOCK LLP**

**BENNAZAR, GARCÍA & MILIÁN, C.S.P.**

By:

By:

*/s/ Robert Gordon*
Robert Gordon (admitted *pro hac vice*)
919 Third Ave
New York, NY 10022-3908
rgordon@jenner.com
212-891-1600 (telephone)
212-891-1699 (facsimile)

*/s/ A.J. Bennazar-Zequeira*
A.J. Bennazar-Zequeira
Héctor M. Mayol Kauffmann
Edificio Union Plaza
1701 Avenida Ponce de León #416
Hato Rey, San Juan, PR 00918
ajb@bennazar.org
hector.mayol@bennazar.org
787-754-9191 (telephone)
787-764-3101 (facsimile)

Catherine Steege (admitted *pro hac vice*)
Melissa Root (admitted *pro hac vice*)
Landon Raiford (admitted *pro hac vice*)
353 N. Clark Street
Chicago, IL 60654
csteege@jenner.com
mroot@jenner.com
lraiford@jenner.com
312-222-9350 (telephone)
312-239-5199 (facsimile)

*Counsel for The Official Committee of Retired
Employees of Puerto Rico*