Objection Deadline: **TBD**
Hearing Date and Time: **TBD**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                      Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,<br><br>                      Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3566-LTS<br><br>Re: Adv. Pro. Nos. 1-00356, 19-00357, 19-00358, 19-039, 19-00361, 19-00366 and 19-00367 |

---

[1] The Debtors in these jointly-administered PROMESA title III cases (these "**Title III Cases**"), along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are: (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric and Power Authority  (Bankruptcy Case No. 17 BK 4780) (Last Four Digits of Federal Tax ID: 3747).

**MOTION OF THE OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE
COMMONWEALTH OF PUERTO RICO, THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD OF PUERTO RICO AS REPRESENTATIVE OF THE
EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO, THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS, AND THE SPECIAL CLAIMS COMMITTEE OF THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO
TO COMPEL DEPOSITION TESTIMONY BY ERS BONDHOLDERS AND THE
<u>SUPPLEMENT OF THE ERS BONDHOLDERS' PRIVILEGE LOGS</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... i

Table of Authorities ........................................................................................................ i

PRELIMINARY STATEMENT .................................................................................... 1

FACTUAL BACKGROUND .......................................................................................... 6

I.      The ERS Bonds Litigation. ............................................................................... 6

II.     Depositions Of Bondholders. ............................................................................ 8

        A.      S.V. Credit Deposition. ......................................................................... 9

        B.      Ocher Rose Deposition. ....................................................................... 10

        C.      Redwood Deposition. ........................................................................... 11

        D.      Oaktree Deposition. ............................................................................. 11

        E.      Andalusian Deposition. ....................................................................... 12

        F.      Pentwater Deposition. ......................................................................... 13

III.    The Bondholders' Privilege Logs .................................................................... 14

IV.     Efforts To Resolve This Discovery Dispute. .................................................. 14

RELIEF REQUESTED ................................................................................................. 19

ARGUMENT ................................................................................................................ 20

I.      The Court May Compel Disclosure Where There Is An Improper Assertion Of The
        Attorney-Client Privilege Or Where The Privilege Has Been Waived. ........................... 20

II.     The Bondholders Have Improperly Asserted The Attorney-Client Privilege Over Non-
        Privileged Information. ........................................................................................ 21

III.    The Bondholders Have Waived Any Privilege Over The Materials And Facts They Have
        Affirmatively Placed At Issue In This Litigation. ............................................................ 24

CONCLUSION ............................................................................................................. 32

Certification Pursuant to Rule 37(a)(1) and the Eleventh Amended Case Management
        Procedures ................................................................................................................ 33

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acosta v. Med. Staffing of Am., LLC*,
   No. 18-CV-226, 2019 WL 6122016 (E.D. Va. Mar. 15, 2019)..............................................22

*Adrian v. Mesirow Fin. Structured Settlements, LLC*,
   647 F. Supp. 2d 126 (D.P.R. 2009)................................................................................. passim

*Arista Records LLC v. Lime Group*,
   06-CV-5936, 2011 WL 1642434 (S.D.N.Y. Apr. 20, 2011) ...................................................24

*B.C.F. Oil Refining, Inc. v. Consol. Edison Co. of N.Y.*,
   168 F.R.D. 161 (S.D.N.Y. 1996) ...........................................................................................22

*Bailey v. State of Maine Comm'n on Governmental Ethics & Election Practices*,
   277 F.R.D. 48 (D. Me. 2001)..................................................................................................21

*Blattman v. Scaramellino*,
   891 F.3d 1 (1st Cir. 2018).......................................................................................................19

*Cavallaro v. U.S.*,
   284 F.3d 236 (1st Cir. 2002)...................................................................................................21

*Chevron Corp. v. Pennzoil Co.*,
   974 F.2d 1156 (9th Cir. 1992) ................................................................................................24

*Chin v. Rogoff & Co. P.C.*,
   No. 05 CV-8360, 2008 WL 2073934 (S.D.N.Y. 2008)..........................................................25

*Conkling v. Turner*,
   883 F.2d 431 (5th Cir. 1989) ..................................................................................................24

*Cosgrove v. Nat'l Fire & Marine Ins. Co.*,
   No. 14-CV-2229-HRH, 2016 WL 4578139 (D. Ariz. Sept. 2, 2016)....................................29

*Cue, Inc. v. General Motors LLC*,
   No. 13-CV-12647, 2015 WL 4750844 (D. Mass. Aug. 10, 2015) .........................................20

*Echavarria v. Roach*,
   No. 16-CV-1118, 2018 WL 6788525 (D. Mass. Dec. 26, 2018)............................................21

*First United Fin. Corp. v. Specialty Oil Co., Inc.-1*,
   5 F.3d 944 (5th Cir. 1993) ........................................................................................................2

*Gerald v. Univ. of Puerto Rico,*
   No. 08-CV-084, 2011 WL 13351282 (D.P.R. July 28, 2011) ................................................24

*Grabowski v. Bank of Boston,*
   997 F.Supp. 111 (D. Mass. 1997) ..........................................................................................2

*Greater Newburyport Clamshell Alliance v. Pub. Serv. Co. of New Hampshire,*
   838 F.2d 13 (1st Cir. 1988) ........................................................................................ passim

*In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.),*
   348 F.3d 16 (1st Cir. 2003) .........................................................................................20, 24

*In re Kidder Peabody Sec. Litig.,*
   168 F.R.D. 459 (S.D.N.Y. 1996) ...........................................................................................29

*In re San Juan Dupont Plaza Hotel Fire Lit.,*
   No. MDL-721, 1989 WL 168401 (D.P.R. Dec. 2, 1988) ........................................................21

*Lluberes v. Uncommon Prods., LLC,*
   663 F.3d 6 (1st Cir. 2011) ....................................................................................................19

*Lombardi v. Whitehall XII/Hubert St., LLC,*
   No. 04 CV-6752 (PAC), 2008 WL 2557419 (S.D.N.Y. June 26, 2008) ................................29

*Officemax Inc. v. Sousa,*
   No. 09-CV-631, 2010 WL 3853194 (D. Me. Sept. 28, 2010) ................................................21

*Reis v. Nat'l Passenger R.R. Corp.,*
   No. 07-CV-236, 2008 WL 11388569, at *5 (D.R.I. May 27, 2008) ......................................25

*Rivera v. Kmart Corp.,*
   190 F.R.D. 298 (D.P.R. 2000) .....................................................................................4, 24, 29

*S.E.C. v. Yorkville Advs., LLC,*
   300 F.R.D. 152 (S.D.N.Y. 2014) ...........................................................................................22

*Sapia v. Board of Education of City of Chicago,*
   351 F.Supp.3d 1125 (N.D. Ill. 2019) ....................................................................................20

*Sax v. Sax,*
   136 F.R.D. 542 (D. Mass. 1991) .................................................................................4, 24, 29

*Skytec, Inc. v. Logistic Sys. Inc.,*
   No. 15-CV-2104-BJM, 2018 WL 4372726 (D.P.R. Sept. 12, 2018) ......................................19

*Thurmond v. Compaq Comp. Corp.,*
   198 F.R.D. 475 (E.D. Tex. 2000) .....................................................................................22, 23

*Travelers Cas. & Sur. Co. of Am. v. Paderta*,
  315 F. Supp. 3d 1096 (N.D. Ill. 2018) ................................................................2

*U.S. v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991)..........................................................................24, 29

*U.S. v. Legal Servs. For N.Y. Cty.*,
  249 F.3d 1077 (D.C. Cir. 2001) ...........................................................................20

*United States v. Desir*,
  273 F.3d 39 (1st Cir. 2001).............................................................................24, 28

*Upjohn Co. v. U.S.*,
  449 U.S. 383 (1981)...............................................................................................22

*Warren v. Rojas*,
  2011 U.S. Dist. LEXIS 163726 (D. Mass. Feb. 17, 2011) ...................................22

*Westernbank Puerto Rico v. Kachkar*,
  No 07-CV-1606, 2009 WL 10680987 (D.P.R. May 6, 2009) ................................19

STATUTES

19 L.P.R.A. § 1752(b)(1) ...............................................................................................2, 26

11 U.S.C. § 502 .................................................................................................................6

ERS Enabling Act ...................................................................................................... passim

Uniform Commercial Code section 8-202 .............................................................. passim

OTHER AUTHORITIES

Federal Rule of Bankruptcy Procedure 3007 ...................................................................6

Federal Rule of Bankruptcy Procedure 7037 ............................................................1, 18

Federal Rule of Civil Procedure 37 ........................................................................1, 17, 18

Federal Rule of Civil Procedure 26 .................................................................................5

Federal Rule of Civil Procedure 30(b)(6) .........................................................5, 7, 18, 31

Federal Rule of Civil Procedure 37(A)(1) .......................................................................32

To The Honorable United States Magistrate Judge Judith G. Dein:

Movants[2], pursuant to Rule 37 of the Federal Rules of Civil Procedure ("**Rule 37**"), made applicable herein by Rule 7037 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rule 7037**"), respectfully move to compel (i) responsive deposition testimony concerning whether the ERS Bonds are *ultra vires* over which certain holders of ERS Bonds ("**Bondholders**") improperly asserted attorney-client privilege; and (ii) the supplement of Bondholders' privilege logs to disclose whether any documents withheld on privilege grounds discusses or references the *ultra vires* issue (or any facts and circumstances related to that issue).

## PRELIMINARY STATEMENT

1.      The Bondholders have wrongfully exploited the attorney-client privilege as both a shield and a sword to obstruct discovery into the validity and enforceability of the ERS Bonds and the merits of the Bondholders' claims for payment (in excess of $3.1 billion) in connection with the ERS Bonds. In various claims objections and adversary proceedings, Movants have argued that Puerto Rico law did not permit ERS to issue the ERS Bonds in 2008. The ERS Bonds are therefore *ultra vires* and void, and cannot give rise to any remedy against ERS, the Commonwealth, or any other Title III debtor.

2.      Movants' position is that the validity of the ERS Bonds is a legal issue to be decided based on the text of the ERS Enabling Act and that there are no defenses to the *ultra vires* doctrine under Puerto Rico law. The Bondholders, however, argue that the ERS Bonds, even if *ultra vires* and invalid, are nevertheless enforceable as to them under section 8-202(b) of the Uniform

---

[2] Movants consist of the Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the "**Retiree Committee**"), the Financial Oversight and Management Board for Puerto Rico, as representative of the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico ("**FOMB**"), the Official Committee of Unsecured Creditors (the "**Creditors Committee**"), and the Special Claims Committee of the Financial Oversight and Management Board for Puerto Rico (the "**SCC**").

Commercial Code. Under section 8-202, even if a bond is "issued with a defect going to its validity," that bond may still be "valid in the hands of a purchaser for value and *without notice* of the particular defect unless the defect involves a violation of a constitutional provision." 19 L.P.R.A. § 1752(b)(1) (emphasis added). The statute further explains that a "person has 'notice' of a fact when he has actual knowledge of it; or he has received a notice or notification of it; or from all the facts and circumstances known to him at the time in question he has reason to know that it exists." *Id.* § 451(25). This definition encompasses both actual notice and constructive notice. *See, e.g., First United Fin. Corp. v. Specialty Oil Co., Inc.-1*, 5 F.3d 944, 947 (5th Cir. 1993); *Grabowski v. Bank of Boston*, 997 F.Supp. 111, 127 (D. Mass. 1997); *Travelers Cas. & Sur. Co. of Am. v. Paderta*, 315 F. Supp. 3d 1096, 1101 (N.D. Ill. 2018).

3.      As such, a critical, and potentially dispositive issue that the Bondholders have injected into these proceedings is whether the Bondholders, whenever they purchased ERS Bonds, had actual or constructive notice that the ERS Bonds were issued *ultra vires*.[3] The Bondholders' position is that they may enforce the ERS Bonds under section 8-202 because, according to them, they did not have such notice—from *any* source—when each Bondholder purchased ERS Bonds. Of course, any source includes Bondholders' counsel, which would be one of the most likely and logical sources of "notice" under the UCC regarding whether ERS exceeded its statutory authority in issuing the ERS Bonds.

4.      Movants have sought to test the Bondholders' contention that they did not receive actual or constructive notice of the ERS Bonds' invalidity through (among other discovery)

---

[3] The Bondholders have made multiple purchases of ERS Bonds over time. Consequently, to the extent section 8-202 is relevant, they will need to prove that they were without notice at the time of each purchase.

depositions of each Bondholder.[4] Thus far, Movants have deposed six of Bondholders' corporate representatives, with further depositions forthcoming. At each deposition, counsel for a Movant has repeatedly asked a simple, open-ended question that did not implicate legal advice or target attorney-client communications: when did the Bondholders first become aware of the *ultra vires* issue or any facts or circumstances that would give the Bondholders reason to know the ERS Bonds were *ultra vires*. In every instance, counsel for the Bondholders cautioned the witnesses to exclude "privileged" information in response to those questions, so that even if the Bondholder had learned from its counsel *facts* that would give it reason to know the ERS Bonds were *ultra vires*, the witness would exclude from the answer the fact that the Bondholder had communications with counsel on the general subject of the ERS Bonds' validity or enforceability. The Bondholders' counsel even instructed their witnesses that if they first learned of the *ultra vires* issue through counsel they were not to provide that date to the examiner—even though the date of a privileged communication is information that would be required on a privilege log entry for the communication. Each witness followed these improper instructions.

5.      As a result, the Bondholders have refused to give testimony on the facts most relevant to their section 8-202 argument—namely, when the Bondholders first learned of the *ultra vires* issue or of facts or circumstances that would have given them reason to know the ERS Bonds were invalidly issued from any source, which are facts uniquely in the Bondholders' knowledge.

6.      The Court should compel that testimony now, just as it previously compelled the Bondholders to produce documents relevant to their notice of the *ultra vires* issues. (*See* Case No. 17-3566, Dkt. 795, at ¶ 2). As a threshold issue, the information Movants seek is not privileged at

---

[4] While every Bondholder makes the same UCC section 8-202(b) argument, the analysis for each Bondholder will be different as the Bondholders purchased their respective holdings independently of each other and at various points in time, including after the Title III Cases commenced.

all. *When* the Bondholders first learned facts indicating that the ERS Bonds are *ultra vires* is not

"privileged." Facts are not privileged, even when communicated by counsel. The date of a

communication with counsel is likewise not privileged. And the communications do not become

privileged because they concern the legal issue of whether the ERS Bonds are *ultra vires*; at most,

that implicates the subject-matter of advice given, not the advice itself (*i.e.*, counsel's conclusion

concerning the ERS Bonds' validity).

7.     But even if the timing and general subject matter of communications could

somehow be construed as "privileged," the Bondholders have waived any applicable privilege.

This is because they affirmatively placed those communications at issue by arguing that they did

not know and had no reason to know *from any source* that the ERS Bonds were *ultra vires* when

they purchased or acquired the ERS Bonds. Movants cannot hope to refute the Bondholders' notice

argument if the Bondholders refuse to provide the most basic facts concerning whether and when

they learned that a question concerning the ERS Bonds' validity existed.

8.     The Bondholders invocation of the privilege therefore impermissibly operates both

as a shield and as a sword. Their privilege objections seek to protect them from disclosing

potentially harmful facts (such as their earlier knowledge of the *ultra vires* defect or the possibility

of such defect) as "privileged" while they simultaneously declare an absence of knowledge about

harmful "non-privileged" facts. The First Circuit has, for decades, condemned this abusive

litigation tactic. *See, e.g.*, *Greater Newburyport Clamshell Alliance v. Pub. Serv. Co. of New

Hampshire*, 838 F.2d 13, 15 (1st Cir. 1988) (finding that party waived ability to assert privilege

over materials by placing them at issue in litigation); *Adrian v. Mesirow Fin. Structured

Settlements, LLC*, 647 F. Supp. 2d 126, 130-31 (D.P.R. 2009) (same); *Rivera v. Kmart Corp.*, 190

F.R.D. 298, 304 (D.P.R. 2000) (same); *Sax v. Sax*, 136 F.R.D. 542, 544 (D. Mass. 1991) (same).

4

9.     Accordingly, because the Bondholders have affirmatively placed their knowledge (more specifically, their alleged lack of knowledge) at issue in this litigation by asserting the section 8-202 argument, their privilege objections at the depositions were improper. Given the amount of the Bondholders' asserted claims against ERS and the Commonwealth and the impairment allowance of those claims could have on other stakeholders, it is imperative that Movants be given the opportunity to fully examine the merits of Bondholders' notice argument.

10.     Movants, therefore, request that the Court order each of the Bondholders' Rule 30(b)(6) deponents to reappear for up to two hours of additional testimony to answer questions about all of the facts and circumstances that each of them had reason to know of related to the *ultra vires* nature of the ERS Bonds, regardless of the source of such information, and when they learned of such facts and circumstances, even if their first knowledge of such facts or circumstances came from counsel.

11.     The Court also should order the Bondholders to supplement their privilege logs, which are deficient for the same reasons as their deposition testimony. Specifically, the Bondholders have failed to indicate whether any of the thousands of documents they have withheld as privileged involves a discussion of the *ultra vires* issue, including facts and circumstances that could give the Bondholders reason to know of that defect. This information is highly relevant to the 8-202 defense, not privileged, and required to be logged under Rule 26. Moreover, to the extent Bondholders' modifications to their privilege logs reflect that documents relevant to Bondholders' notice of the *ultra vires* issue have been withheld, those documents must be produced as any privilege that could otherwise apply has been waived due to the fact that Bondholders have put this issue "at issue" through their reliance on UCC section 8-202. To the extent the Bondholders contend that not a single document they have withheld as privileged discusses or references the

*ultra vires* issue (or any facts and circumstances related to such issue), they should be required to certify as much to the Court.

12.     Finally, if any deponent continues to refuse to answer questions regarding the *ultra vires* issue on the basis for privilege, or if a Bondholder fails to adequately address its privilege log deficiencies, the Court should strike that Bondholder's section 8-202 argument.

## FACTUAL BACKGROUND

### I.    The ERS Bonds Litigation.

13.     The Committees and Governmental Parties in these Title III Cases have objected to the approximately $3.1 billion of claims asserted by the Bondholders arising from their putative rights under the ERS Bonds.

14.     On March 12, 2019, the Creditors Committee filed its *Omnibus Objection of Official Committee of Unsecured Creditors to Claims Asserted by Holders of Bonds Issued by Employees Retirement System of Government of Puerto Rico* [Case No. 17-3566, Dkt. 381] and its *Objection of Official Committee of Unsecured Creditors to Claims Asserted by Oaktree Funds That Hold Bonds Issued by Employees Retirement System of Government of Puerto Rico* [Case No. 17-3283, Dkt. 5586] (together, the "**Creditors Committee's ERS Claim Objections**").

15.     The Creditors Committee's ERS Claim Objections sought the disallowance of all claims asserted against ERS based on the ERS Bonds on the grounds that Puerto Rico law did not authorize the 2008 ERS Bonds issuance. The ERS Bonds were therefore issued *ultra vires*, are null and void, and provide the Bondholders no remedy against ERS.

16.     On April 23, 2019, the Retiree Committee filed its *Omnibus Objection of the Official Committee of Retired Employees of the Commonwealth of Puerto Rico, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of ERS Bonds Against ERS and the Commonwealth* [Case No. 17-3283, Dkt. 6482; Case No. 17-

3566, Dkt. 469] (the "**Retiree Committee's Claim Objection**" and together with the Creditors

Committee's ERS Claim Objections, the "**Objections**").

17.     The Retiree Committee's Claim Objection seeks the disallowance of all ERS Bond-

based claims asserted against the Commonwealth and/or ERS, including on the grounds that the

ERS Bonds were issued *ultra vires*.

18.     In conjunction with these Objections, the FOMB, acting through its Special Claims

Committee, filed numerous adversary proceedings attacking the ERS Bonds' validity and the

Bondholders' claims [Adv. Nos. 19-356, 19-357, 19-361] (collectively, the "**Adversary**

**Proceedings**"). The FOMB argued that the ERS Bonds are *ultra vires* and therefore do not give

rise to valid claims in these Title III Cases. The FOMB sought a declaration that the ERS Bonds

were void *ab initio* and requested an order clawing back all funds ERS paid to creditors pursuant

to the ERS Bonds.

19.     The Bondholders have responded to the Objections and Adversary Proceedings by

arguing, among other things, that section 8-202 of the Uniform Commercial Code validates the

ERS Bonds even if they were issued *ultra vires*. This is so, the Bondholders argue, because they

allegedly were purchasers for value without "notice" (as the UCC defines that term) of the alleged

defect (*i.e.*, the illegal issuance of the ERS Bonds) at the time they made their purchases or

otherwise acquired rights in the ERS Bonds. (*See generally* Case No. 17-3566, Dkt. 688, at ¶¶ 54-

70).

20.     On October 7, 2019, the Court entered an Order allowing the parties to proceed

with discovery and briefing on the argument that the ERS Bonds were issued *ultra vires*. (Case

No. 17-3283, Dkt. 8818). The parties are currently engaged in discovery, with summary judgment

briefing on the *ultra vires* issue scheduled to conclude in September 2020. (Case No. 17-3283, Dkt. 12855).

**II.     Depositions Of Bondholders.**

21.     Movants have noticed Rule 30(b)(6) depositions of numerous Bondholders and have taken Rule 30(b)(6) depositions of Andalusian Global Designated Activity Company ("**Andalusian**"), Oaktree Capital Management, L.P. and related funds ("**Oaktree**"), Ocher Rose, LLC ("**Ocher Rose**"), Pentwater Capital Management ("**Pentwater**"), Redwood Master Fund, Ltd. ("**Redwood**"), and S.V. Credit, L.P. ("**S.V. Credit**")—all of whom are secondary purchasers of the ERS Bonds and thus are themselves the only source of information regarding their purchases of the ERS Bonds available to Movants. Movants' notices covered, among other things: (i) the Bondholders' review of the ERS Enabling Act, which governed ERS's ability to issue debt; (ii) their review of the ERS Bonds' offering statement; and (iii) any other due diligence they conducted on the ERS Bonds. (*See generally* Ocher Rose Deposition Notice, attached hereto as Ex. A, 17-18). These three deposition topics were limited to the time period at or before the Bondholders' purchases of their ERS Bonds. (*Id.*) Movants also noticed a deposition topic concerning any evaluation that the Bondholders conducted at any time "concerning the validity or legality of the ERS Bonds." (*Id.* at 18).

22.     From the first deposition to the last, counsel for the Bondholders objected to questions on these topics. They claimed privilege over when the Bondholders first learned that the ERS Bonds were *ultra vires* and invalid, or first learned of the possibility that the ERS were *ultra vires* and invalid, and counsel therefore precluded the witnesses from providing testimony relevant to their section 8-202 argument. In fact, the only information counsel allowed the Bondholder witnesses to testify about regarding their notice argument is the date on which the Bondholders

first became aware that a party had raised it in a pleading in the Title III cases that the ERS Bonds were issued *ultra vires*.[5]

### A.   S.V. Credit Deposition.

23.      To begin, Shanshan Cao as corporate representative of S.V. Credit, L.P., refused to provide testimony bearing upon the Bondholders' section 8-202 argument. When Ms. Cao was asked: "Do you recall when SV Credit first learned or heard of the argument that the ERS bonds were not validly issued?" counsel for the Bondholders immediately intervened and "caution[ed]" the witness "not to disclose privileged communications in your response." (S. Cao Dep. Tr., attached hereto as Ex. B, at 60:25, 61:2-6). The witness refused to provide any details about S.V. Credit's knowledge with respect to the *ultra vires* issues, beyond noting that she was aware of a pleading in which the argument was first made in these Title III Cases in November, 2017. (*Id.* at 61:7-66:21). When asked when, if at all, S.V. Credit, "through any means" heard the argument the ERS bonds were illegally issued, Ms. Cao was advised not to disclose any privileged communications. (*Id.* at 64:18-24). When asked whether she was "withholding information on the basis of [her] counsel's caution," Ms. Cao stated she had "nothing to add" *(Id.* at 65:15-19). Asked to clarify her response, if she was withholding information based on her counsel's instruction, she was again instructed not to answer and followed that instruction, repeatedly. (67:6-17; 68:16-69:9) Later, relying on another privilege instruction from counsel, the witness did not answer whether, before purchasing the ERS Bonds, SV Credit "hear[d] the argument that the ERS bonds may be illegally issued or invalid." (*Id.* at 66:22-67:17). The witness maintained her refusal to answer when Movants questioned whether SV Credit heard the *ultra vires* argument (regardless of source)

---

[5] Excerpts from the relevant portions of each deposition transcript are attached hereto as Exhibits B-G.)

before 2015, or if SV Credit heard the argument (again, regardless of source) before 2014. (*Id.* at 67:20-69:9).

24. Moreover, Bondholders' counsel asserted privilege over questions that merely asked whether the validity of the bonds was a topic of discussion, even where there was no inquiry into the substance of the discussions. (*Id.* at 82:19-83:6).

**B.     Ocher Rose Deposition.**

25. Likewise, in the deposition of Ocher Rose corporate representative Patrick Dowd, Mr. Dowd was asked "When did Ocher Rose first come aware of an argument that the ERS bonds were issued without authority." (P. Dowd Dep. Tr., attached hereto as Ex. C, at 78:5-7). Mr. Dowd responded that Ocher Rose's awareness came from a pleading filed in the Title III Cases. (*Id.* at 78:8-13; *id.* at 78:23-79:3). Mr. Dowd was then asked: "Are you excluding from your answer advice that you may have received from counsel?" (*Id.* at 79:4-5). Counsel for the Bondholders then instructed Mr. Dowd not to answer whether a communication existed on the basis that counsel was "not sure there's a way for him to answer that question yes or no without revealing something about the substance he's received from counsel." (*Id.* at 79:6-9).

26. Next, Mr. Dowd was asked: "Prior to the point in time in which you learned of the [*ultra vires*] argument based on it being made publicly in the Title III Cases, did your counsel ever identify for you the possibility that that argument could be made?" (*Id.* at 79:12-16). And as before, counsel for the Bondholders instructed the witness not to answer on privilege grounds, even though the question only addressed whether a conversation concerning this general subject matter ever occurred, and not counsel's substantive legal advice as to whether the ERS Bonds actually were *ultra vires*. (*Id.* at 79:18-24, 80:3-14). In addition, counsel for the Bondholders stated that testimony or documentary material indicating that the Bondholders requested advice on the general subject matter of "whether the bonds were valid" would itself be privileged. (*Id.* at 97:20-25).

### C.     Redwood Deposition.

27.     Similarly, Justin Boyer, the corporate representative of Redwood, also refused to testify about his knowledge based on privilege grounds. Mr. Boyer testified that he relied on the ERS Bonds resolution, the offering statement, and the ERS Enabling Act to conclude that the ERS Bonds were valid and not *ultra vires*. (J. Boyer Dep. Tr., attached hereto as Ex. D at 86:21-87:10). Under further questioning on what formed the basis of Redwood's belief "that the offering statement can be used to determine whether the ERS bonds were valid, authorized obligations of ERS," Mr. Boyer stated that he believed the "bond resolution is the governing document" but that "[t]hese are technical, legal points." (*Id.* at 89:4-6; 8-11). Given the witness's suggestion that he lacked the expertise to completely and accurately analyze the bond resolution and offering statement, Mr. Boyer was asked: "In forming the belief and understanding that the ERS bonds were valid, authorized obligations of ERS," did Redwood "consult with counsel?" (*Id.* at 89:14-16). Counsel immediately objected based on privilege and instructed the witness not to answer. (*Id.* at 89:18-20). The witness then refused to answer and later asserted that any discussions involving the *ultra vires* issue constituted "privileged conversation[s]." (*Id.* at 90:5-7, 91:11-13).

### D.     Oaktree Deposition.

28.     Counsel put up the same roadblocks in the deposition of Jordan Mikes as corporate representative of Oaktree. Movants asked the witness: "What is your understanding of the *ultra vires* topic?" (J. Mikes Dep. Tr., attached hereto as Ex. E at 40:13-14). The witness followed the advice of counsel not to answer on privilege grounds. (*Id.* at 40:21-25, 41:1-2). Movants followed up by asking, "[s]o there's nothing that informs your understanding of the *ultra vires* topic other than privileged information that you received from counsel?" (*Id.* at 41:3-6). The witness responded: "That's correct." (*Id.* at 41:7).

11

29.     Later in the deposition, Bondholders' counsel instructed Mr. Mikes not to answer regarding facts. Mr. Mikes testified that the review of the Spanish version of the Enabling Act would have been delegated to the legal function. When asked for the date when someone delegated that task, Bondholders' counsel instructed the witness not to answer; an instruction Mr. Mikes followed. (*Id*. at 63:7-64:20).

30.     Movants also asked about Oaktree's understanding of ERS's authority to issue bonds, before or when Oaktree purchased ERS Bonds. Specifically, Movants asked: "on the dates on which Oaktree purchased ERS bonds in 2014, was anyone at Oaktree aware of the issue of whether ERS had authority to issue the ERS bonds?" (*Id.* at 216:6-10). The witness answered "No." (*Id.* at 216:11). Movants then asked, "when you say no, are you excluding from your answer any communications Oaktree had with counsel on whether ERS had authority to issue the bonds?" (*Id.* at 216:12-15). This question drew a privilege objection, after which the witness refused to answer. (*Id.* at 216:16-20). This pattern repeated itself when Movants also asked about Oaktree's notice of any *ultra vires* issues when making additional purchases of ERS Bonds in 2015 and 2017. (*Id.* at 216:21-218:12). In both cases the witness refused to testify, one way or the other, whether any communications on the *ultra vires* issue even existed, much less describe their substance.

### E.     Andalusian Deposition.

31.     James Bolin, as corporate representative for Andalusian, also refused to answer questions that go to the heart of the *ultra vires* litigation. Movants asked: "Was the *ultra vires* argument ever a subject of conversation before Andalusian first purchased ERS bonds?" (J. Bolin Dep. Tr., attached hereto as Ex. F at 86:4-6). The witness stated "no," but then refused to answer Movants' question concerning whether he was "withholding any information on the basis" that he "believe[d] it to be privileged." (*Id.* at 86:7-13). Counsel for the Bondholders instructed the witness not to answer that second question on privilege grounds. (*Id.* at 86:10-13).

12

32.     Movants also asked: "Has [Andalusian] ever reviewed statements other than the
ERS Enabling Act describing the ability of Puerto Rico instrumentalities to issue bonds?" (*Id.* at
125:21-24). Citing privilege, counsel for the Bondholders instructed the witness to answer only to
the extent he could remember non-privileged materials that he reviewed in connection with the
purchases of bonds issued by entities other than ERS. (*Id.* at 125:25-126:10). The privilege
objection therefore ensured that the witness did not provide relevant testimony on the ERS Bonds
*ultra vires* issues.

### F.     Pentwater Deposition.

33.     Finally, counsel for the Bondholders asserted the same privilege objections at the
deposition of Luke Corning as corporate representative for Pentwater. Early in the deposition,
counsel for Movants stated that, based on the previous depositions, it was his "understanding that
any question that I ask regarding any communication Pentwater had with counsel regarding the
ERS bonds you will instruct the witness not to answer?" (L. Corning Dep. Tr., attached hereto as
Ex. G at 43:14-21). Counsel for the Bondholders responded that was "correct" and he would
"instruct the witness not to answer questions that would seek to divulge communications that
Pentwater had with counsel about any topics, including communications, to the extent they
occurred, regarding whether the bonds were issued ultra vires." (*Id.* at 43:22, 44:17-22). Indeed,
counsel for the Bondholders objected on privilege grounds when Movants subsequently asked:
"when Pentwater first purchased an ERS bond, was it aware that there had been a challenge to the
validity of ERS bonds?" (*Id.* at 51:7-15).

13

## III.    The Bondholders' Privilege Logs

34.    The Bondholders, with the exception of Redwood,[6] have produced privilege logs collectively listing thousands of documents allegedly subject to a variety of privileges, including the attorney-client privilege and work product doctrine. Movants have identified a number of deficiencies in the logs, most of which remain subject to further meet-and-confer discussions and are not addressed by this Motion.[7] One issue that is addressed herein, however, is the fact that not a single description on any of the logs references the *ultra vires* issue.[8] In notable contrast, certain of the privilege log entries explicitly reference discussions of other legal issues, including lien scope issues, which, of course, is inconsistent with the Bondholders' position during the depositions that disclosing the topics of communications with counsel would reveal privileged information. (*See* Group Ex. M (excerpts from Bondholders' privilege logs).

## IV.    Efforts To Resolve This Discovery Dispute.

35.    From the outset, Movants informed counsel for the Bondholders that the privilege assertions were improper. At each deposition, Movants expressly reserved all rights to challenge the objections and seek to compel the testimony that the Bondholders refused to give. (*See, e.g.,* Cao Dep. Tr., Ex. B, at 61:22-62:9; Dowd Dep. Tr, Ex. C, at 80:3-10, 97:7-99:5, 132:11-133:11; Boyer Dep. Tr., Ex. D, at 89:21-90:4; Mikes Dep. Tr., Ex. E, at 63:11-64:22, 218:9-11; Bolin Dep. Tr., Ex. F, at 134:12-135:2; Corning Dep. Tr., Ex. G, at 43:11-45:12, 116:19-25). Movants also held each deposition open, pending the resolution of this dispute.

---

[6] Redwood allegedly withheld no documents as privileged.

[7] Movants reserve their right to seek further relief from this Court in the event those issues cannot be resolved with the Bondholders.

[8] One privilege log entry does reference the issue but only because the document is a Reorg Research email regarding the Creditors Committee's ERS Claim Objection's and has the phrase "Illegally Made" in the subject line. Tellingly, Bondholders' subject matter description of the document eliminates any such reference. (*See* Exhibit N).

36.     On March 2, 2020, immediately after the first deposition of Ocher Rose, Movants sent a letter to the Bondholders that memorialized, among other things, their objections to the privilege assertions. The letter explained that Ocher Rose's corporate representative "was instructed not to answer (and did not answer) questions concerning whether Ocher Rose had heard any argument that the ERS Bonds were *ultra vires* prior to AAFAF raising that argument in briefing filed in November 2017." (Dalsen Letter, Mar. 2, 2020, attached hereto as Ex. H at 3). Movants noted that, "unless the Bondholders are prepared to waive their arguments under UCC section 8-202(b), they cannot use privilege assertions to block discovery into whether and when they had 'reason to know' the ERS Bond issuance was invalid—an issue *the Bondholders* affirmatively raised." (*Id.* (emphasis in original)).

37.     The Bondholders responded on March 4, 2020. They highlighted that Ocher Rose's witness testified that the "'*argument* that the ERS bonds were issued without authority' was 'not something we were aware of until the *argument* was raised' in the Title III proceedings.'" (Fox Letter, Mar. 4, 2020, attached hereto as Ex. I at 5 (emphasis added)). They continued: "the problem is not with asking a witness when Ocher Rose first learned of the *ultra vires argument*. The problem is with asking specifically about the nature of legal advice received or not received." (*Id.* at 6 (emphasis added)). By focusing on notice of the "argument" that the ERS Bonds were issued *ultra vires*, the Bondholders sidestepped whether they had notice of any *facts* indicating that the ERS Bonds suffered from a defect in their issuance.

38.     The Bondholders also argued the Ocher Rose representative's testimony was complete by citing his statement that "there was nothing we saw in our due diligence that caused us to have concern about the validity of the bonds." (*Id.* at 5). But the Bondholders neglected to mention that they instructed the witness not to answer any questions concerning what that due

diligence consisted of and what it revealed about the ERS Bonds. Critically, though, the specific details of the Bondholders' investigation of the ERS Bonds would be the only testimony through which Movants could explore what the Bondholders actually knew (or reasonably should have known under the circumstances) about defects in the 2008 ERS Bond issuance, and when they knew it.

39.     After the Bondholders continued to make improper privilege objections at subsequent depositions, Movants sent an additional letter on March 13, 2020. This letter noted that, "when the Bondholders first learned of facts and contentions relating to the validity of the ERS Bonds is not 'privileged,' even if the source of those facts or contentions was counsel." (Dalsen Letter, Mar. 13, 2020, attached hereto as Ex. J at 5). Because the Bondholders "placed their knowledge of facts and contentions relating to the validity of the ERS Bonds at issue by claiming they were 'without notice' of defects in the ERS Bond issuance," as provided in section 8-202, they waived any privilege that protected such knowledge from disclosure. (*Id.* at 6). Moreover, the Bondholders' "communications with counsel may be exceptionally probative of whether they had 'notice' within the meaning of [section 8-202], particularly in view of witness testimony suggesting there would be more to add but for the instructions to exclude counsel as a source of knowledge, facts, and notice." (*Id.*) Movants requested that the Bondholders make all witnesses available for an additional two hours of depositions on the section 8-202 notice issue, and agree not to instruct the witnesses to refuse to answer questions on this topic. (*Id.*) Movants also raised issues with the Bondholders' privilege logs, including by calling out certain examples of deficient entries, and asked for supplemental information.

40.     The Bondholders refused Movants' requests. First, they reiterated their argument that the witnesses provided appropriate and responsive testimony about when they learned that the

16

*ultra vires* objection to the ERS Bonds was being made in these Title III Cases. (Papez Letter, Mar. 24, 2020, attached hereto as Ex. K at 1-2).[9] They then disputed that they waived privilege regarding their notice of the defects in the 2008 ERS Bond issuance. (*Id.* at 2-3). The Bondholders maintained that they "are not relying on any advice or information they received from counsel as a basis for their argument that they acquired the ERS Bonds 'without notice of the particular defect.' . . . Rather, they are relying on their lack of notice, from *any source*." (*Id.* at 3) (emphasis added). In doing so, the Bondholders set up a red herring. The dispute is not whether counsel advised the Bondholders concerning whether section 8-202 applies (a topic about which Movants have not inquired); instead, the dispute is over whether the Bondholders had notice of *facts* (from counsel or otherwise) that put them on notice that the ERS Bonds were issued *ultra vires*. Notably, the Bondholders failed to explain why, if they are making the argument that they lacked notice of the *ultra vires* issuance from "any source," the facts and circumstances surrounding the Bondholders' most likely source of that information (counsel) is immune from investigation. As for the privilege logs, the Bondholders provided limited additional information for the example entries Movants identified in their letter as deficient. The Bondholders did not, however, state definitively for all such entries whether or not the withheld document discussed the *ultra vires* issue.

41.     On April 28, 2020, Movants laid out the infirmities of the Bondholders' response. (Dalsen Letter, Apr. 28, 2020, attached hereto as Ex. L). The letter specifically called attention to the fact that the Bondholders are improperly "withholding factual information about when [the

---

[9] The Bondholders recognized that Shanshan Cao's deposition did not even provide a clear answer on SV Credit's notice of the *argument* that the ERS Bonds were issued *ultra vires*. (Ex. K at 2.) The Bondholders offered to supplement Ms. Cao's testimony to provide further testimony on this issue. But, again, the focus of section 8-202 is SV Credit's notice of facts when or before it purchased ERS Bonds, not notice of arguments that were only made after that purchase occurred.

Bondholders] were put on notice of the *ultra-vires* issue…." (*Id*. at 1). Likewise, Movants highlighted the Bondholders' impermissible refusal to provide the date the Bondholders first heard of the *ultra vires* issue and noted that "[t]he fact that counsel appears to have put the Bondholders on notice of the *ultra vires* issues concerns at best the subject-matter of a communication, which is not privileged." (*Id*. at 2). Movants also again addressed continuing deficiencies in the Bondholders' privilege logs.

42.     Consistent with their obligations under Rule 37, counsel for Movants telephonically met and conferred with Bondholders' counsel on May 5, 2020, regarding the Bondholders' privilege objections at the depositions described above. During that call, counsel for the Bondholders continued to assert that Movants have all the information they need or are entitled because the Bondholder witnesses testified about when they first became aware of the "argument" that the ERS Bonds were *ultra vires*. But, as they had during the deposition, Bondholders' counsel refused to confirm or deny whether prior to that date any communications existed between them and Bondholders regarding the possibility that the ERS Bonds were issued *ultra vires* (as opposed to communications after the Bondholders became aware that a party had formally raised the *ultra vires* argument in a pleading). In doing so, Bondholders' counsel continued to assert that existence of any such communication, the date of any such communication, and the general subject matter of any such communication were privileged and immune from disclosure.

43.     With respect to privilege logs, Bondholders' counsel suggested during the May 5, 2020 meet-and-confer that the absence of any reference to the *ultra vires* issue on the privilege logs may indicate that no withheld document discusses the issue. This, however, cannot be reconciled with the Bondholders' deposition objections. Indeed, if the Bondholders believe it would invade the attorney-client privilege for a witness to testify as to whether or not he or she

18

discussed the *ultra vires* issue with counsel, then they logically must also believe it would invade the attorney-client privilege to disclose the same information (*i.e.*, the subject matter of communications with counsel) on a privilege log. Conversely, if the Bondholders are indeed willing to represent that no logged document discusses the *ultra vires* issue, then this proves the point that their deposition objections were baseless.

44.     The parties' discussion concluded without a negotiated resolution, and counsel for Movants advised counsel for the Bondholders that they intended to file this Motion.[10]

## RELIEF REQUESTED

45.     Pursuant to Rule 37 and Bankruptcy Rule 7037, Movants respectfully request that the Court order each of the Bondholder's Rule 30(b)(6) deponents to reappear for a two-hour deposition and to answer questions about all of the facts and circumstances that each of them had reason to know of related to the *ultra vires* nature of the ERS Bonds, including any information that came from counsel, and when they knew of such facts and circumstances, even if their first knowledge of such facts or circumstances came from counsel.

46.     In addition, Movants request that the Court order the Bondholders to either (i) supplement their privilege logs to identify all documents that reference the *ultra vires* issue or facts and circumstances that would have given the Bondholders reason to know the ERS Bonds were invalidly issued, or (ii) represent to the Court that no such documents exist. To the extent Bondholders' modifications to their privilege logs reflect that documents relevant to Bondholders'

---

[10] During the May 5, 2020 call, Movants initially informed Bondholders' counsel that they did not intend to move to compel as to the privilege logs at this time. Based on the discussions that occurred during the call, however, Movants reevaluated their position and decided to move on the privilege logs to the limited extent set forth herein. Movants notified counsel of this intention via email on May 6, 2020 and offered to further meet and confer to the extent counsel wished to do so. This offer was declined.

notice of the *ultra vires* issue have been withheld, those documents must be produced as any privilege that could otherwise apply has been waived.

47.     Movants also submit that if any deponent continues to refuse to answer questions regarding the *ultra vires* issue on the basis for privilege, or if a Bondholder fails to adequately address its privilege log deficiencies, the Court should strike that Bondholder's section 8-202 argument.

## ARGUMENT

I.     **The Court May Compel Disclosure Where There Is An Improper Assertion Of The Attorney-Client Privilege Or Where The Privilege Has Been Waived.**

48.     Discovery under the Federal Rules of Civil Procedure intentionally "casts a wide net" and "alter[s] the adversarial nature of litigation to remove the elements of surprise and gamesmanship to make trial a transparent, fair process." *Skytec, Inc. v. Logistic Sys. Inc.*, No. 15-CV-2104-BJM, 2018 WL 4372726, at *5 (D.P.R. Sept. 12, 2018).

49.     If a party refuses to answer deposition questions on the basis of the attorney-client privilege, a court may compel relevant testimony if it finds that the privilege is inapplicable or waived. *See Westernbank Puerto Rico v. Kachkar*, No 07-CV-1606, 2009 WL 10680987, at *3-4 (D.P.R. May 6, 2009) (compelling deposition testimony where privilege objections were without merit). The same is true with respect to documents withheld as privileged. The First Circuit has instructed that the privilege should be "narrowly construed because it comes with substantial costs and stands as an obstacle of sorts to the search for truth." *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 24 (1st Cir. 2011); *accord Blattman v. Scaramellino*, 891 F.3d 1, 4 (1st Cir. 2018) (finding waiver of privilege). "The party who invokes the privilege bears the burden of establishing that it applies to the communications at issue and that it has not been waived." *In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 22 (1st Cir. 2003).

## II.       The Bondholders Have Improperly Asserted The Attorney-Client Privilege Over Non-Privileged Information.

50.      Here, the Bondholders' privilege assertions cast far too broad a net. For example, the Bondholders have refused to disclose whether they ever communicated with counsel regarding the general subject matter of the *ultra vires* issue before purchasing ERS Bonds. Likewise, the Bondholders have refused to provide the *date* they first discussed the *ultra vires* issue. This requested information, however, does not seek or require the disclosure of the substance of any communication with counsel and instead asks only if, and when, communications concerning that general subject matter occurred.

51.      Because it is well-established that this type of information, which, at most, requires the disclosure of the general subject matter or existence and date of a communication, is not privileged, the Bondholders' privilege assertions are improper, and they should be compelled to provide this information. "Courts have consistently held that the general subject matters of clients' representations are not privileged. Nor does the general purpose of a client's representation necessarily divulge a confidential professional communication, and therefore that data is not generally privileged." *U.S. v. Legal Servs. For N.Y. Cty.*, 249 F.3d 1077, 1081 (D.C. Cir. 2001) (internal citations omitted). This Court is no different and has held that "non-privileged information" includes "the author, recipient, date and subject matter" of a communication. *Cue, Inc. v. General Motors LLC*, No. 13-CV-12647, 2015 WL 4750844, at *10 (D. Mass. Aug. 10, 2015); *accord Sapia v. Board of Education of City of Chicago*, 351 F.Supp.3d 1125, 1132 (N.D. Ill. 2019). ("The privilege does not foreclose inquiry into the fact of representation itself or the dates upon which services are rendered as long as the substance of the attorney-client relationship is shielded from disclosure."); *Officemax Inc. v. Sousa*, No. 09-CV-631, 2010 WL 3853194, at *4 (D. Me. Sept. 28, 2010) ("Plaintiff's counsel is not to assert attorney/client privilege objections

21

based upon the objection that the only thing the deponent knows about any of these subject matters is what counsel has told them. The subject matter is fair game…."). As one court in this district summarized, "[w]hen a privilege is claimed, the witness nevertheless should answer questions relevant to the existence, extent, or waiver of the privilege, such as the date of the communication, who made the statement to whom, and in whose presence, the names of other persons to whom the contents of the statement have been disclosed, and the general subject matter of the statement." *In re San Juan Dupont Plaza Hotel Fire Lit.*, No. MDL-721, 1989 WL 168401, at *38 (D.P.R. Dec. 2, 1988).

52.     The law could not be otherwise. To establish that the attorney-client privilege applies, the privilege's proponent bears the burden of proving that there were "communications" between counsel and client. *See Cavallaro v. U.S.*, 284 F.3d 236, 245 (1st Cir. 2002) (setting forth the elements of attorney-client privilege). Given that the existence of a communication is necessary to evaluate whether the attorney-client privilege even applies, it cannot be that a party may properly assert the privilege over whether a communication even exists or the date of that communication.

53.     What is more, the information Movants seek here is precisely what the Bondholders would have to disclose in a privilege log to enable the parties and the Court to determine whether the privilege protects the communications' underlying substance. *See Echavarria v. Roach*, No. 16-CV-1118, 2018 WL 6788525, at *4 (D. Mass. Dec. 26, 2018) (requiring privilege log to include "the date of the communication"); *Bailey v. State of Maine Comm'n on Governmental Ethics & Election Practices*, 277 F.R.D. 48, 51 (D. Me. 2001) (finding privilege log insufficient where privilege log "does not indicate the origination date or subject matter of the 'many e-mails.'"); *S.E.C. v. Yorkville Advs., LLC*, 300 F.R.D. 152, 162 (S.D.N.Y. 2014) ("The January 25 Privilege Log fails to provide adequate descriptions of the subject matter, authors and recipients of the

22

withheld documents); *Acosta v. Med. Staffing of Am., LLC*, No. 18-CV-226, 2019 WL 6122016, at \*3 (E.D. Va. Mar. 15, 2019); *accord Warren v. Rojas*, 2011 U.S. Dist. LEXIS 163726, at \*9-10 (D. Mass. Feb. 17, 2011) ("The information provided in a privilege log must be sufficient to enable opposing parties and the court to determine whether each element of the asserted privilege is satisfied; a blanket claim of the asserted privilege does not satisfy the burden of proof."). The Bondholders plainly know this. Their privilege logs specify what communications they are withholding on privilege grounds that pertain to the lien scope dispute (the other issue being litigated alongside this dispute). *See* Group Ex. M (excerpts from Bondholders' privilege logs). Communications pertaining to the *ultra vires* issue should not be treated differently.

54.    Likewise, it is well established that facts the Bondholders may have learned from counsel regarding the *ultra vires* nature of the ERS Bonds are not privileged and counsel's instructions precluding the disclosure of such facts is improper. *Upjohn Co. v. U.S.*, 449 U.S. 383, 395 (1981) (the attorney-client privilege "does not protect disclosure of the underlying facts by those who communicated with the attorney"); *accord B.C.F. Oil Refining, Inc. v. Consol. Edison Co. of N.Y.*, 168 F.R.D. 161, 165 (S.D.N.Y. 1996) ("[T]he attorney-client privilege simply does not extend to facts know to a party that are central to that party's claims, even if such facts came to be known through communications with counsel…."); *Thurmond v. Compaq Comp. Corp.*, 198 F.R.D. 475, 483 (E.D. Tex. 2000) ("the attorney-client privilege does not reach facts within the client's knowledge, even if the client learned those facts through communications with counsel.")

55.    The decision in *Tardiff v. County of Knox* is instructive. 246 F.R.D. 66, 80 (D. Me. 2007). There, the plaintiff asserted the attorney-client privilege and refused to disclose when she first realized she might have a claim against the defendant. In holding that the privilege did not apply, the court held that "*[w]]hen* the plaintiff first realized that she had a claim is a fact clearly

within her own knowledge; no lawyer told her that." *Id*. So too here. When the Bondholders first became aware of the possibility that the ERS Bonds were issued *ultra vires* is a fact solely within the Bondholder's knowledge and a fact they must disclose—it is irrelevant if the Bondholders learned of that fact from counsel.

56.     In sum, the Bondholders are wrong when they argue that this information on the *ultra vires* issue is protected by the attorney-client privilege and they should be compelled to provide testimony on these topics.

### III.    The Bondholders Have Waived Any Privilege Over The Materials And Facts They Have Affirmatively Placed At Issue In This Litigation.

57.     Even assuming that the attorney-client privilege could somehow apply to at least some aspects of the Bondholders' due diligence with respect to the ERS Bonds, the Bondholders have waived the privilege by affirmatively placing their notice of the *ultra vires* defect at issue. They have injected that material fact into this litigation by arguing that section 8-202 of the Uniform Commercial Code validates the ERS Bonds as to the Bondholders, even if they are *ultra vires*.[11]

58.     An otherwise applicable privilege is waived if a party affirmatively makes arguments that place material facts at issue. As the First Circuit has noted, "the privilege ends at the point where the defendant can show that the plaintiff's civil claim, and the probable defenses thereto, are enmeshed in important evidence that will be unavailable to the defendant if the privilege prevails." *Greater Newburyport Clamshell Alliance*, 838 F.2d at 20. Put differently,

---

[11] For the avoidance of doubt, Movants do not concede section 8-202 applies or that it can be a "defense" for the Bondholders. Instead, Movants seek discovery on issues pertaining to it, including but not limited to the Bondholders' notice that the 2008 ERS Bond Issuance was *ultra vires*, because the Bondholders continue to assert section 8-202 arguments. Movants reserve all rights to contest the applicability of section 8-202 on any ground.

principles of "fairness require[] that the privilege holder surrender the privilege to the extent that

it will weaken, in a meaningful way, the defendant's ability to defend." *Id.*

59.     The reason for this rule is that the privilege "was intended as a shield, not a sword."

*Sax*, 136 F.R.D. at 543; *accord U.S. v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991). Parties then

cannot "invoke[e] the attorney-client privilege" to suppress "the best, and perhaps only" evidence

that their opponent may use to support their case, especially when it would be "unreasonably

difficult for them to obtain the information elsewhere." *Adrian*, 647 F. Supp. 2d at 131; *Greater

Newburyport*, 838 F.2d at 22.

60.     In such a circumstance, "invoking the attorney-client privilege to shield" relevant

material from "scrutiny" "effectively transforms the privilege into a weapon" that "strikes down"

the opposing party's claim or defense. *Adrian*, 647 F. Supp. 2d at 131. This offensive use of the

privilege is not consistent with the privilege's limited role in promoting "full and free discussion"

between lawyer and client, so that the client may "conform his conduct to the dictates of the law"

and "present legitimate claims and defenses if litigation ensues." *XYZ Corp.*, 348 F.3d at 22. Courts

therefore routinely find that parties waive the privilege when they place material facts at issue in

litigation and the only way their adversaries can test the validity of those alleged facts is to gain

access to the privileged material. *See, e.g., United States v. Desir*, 273 F.3d 39, 45 (1st Cir. 2001);

*Greater Newburyport*, 838 F.2d at 20-22; *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162-63

(9th Cir. 1992); *Conkling v. Turner*, 883 F.2d 431, 434-35 (5th Cir. 1989); *Gerald v. Univ. of

Puerto Rico*, No. 08-CV-084, 2011 WL 13351282, at *3 (D.P.R. July 28, 2011); *Adrian*, 647 F.

Supp. 2d, at 131; *Rivera v. Kmart Corp.*, 190 F.R.D. 298, 304 (D.P.R. 2000); *Sax*, 136 F.R.D. at

543-44; *Arista Records LLC v. Lime Group*, 06-CV-5936, 2011 WL 1642434, at *2 (S.D.N.Y.

Apr. 20, 2011); *Chin v. Rogoff & Co. P.C.*, No. 05 CV-8360, 2008 WL 2073934, at *5 (S.D.N.Y.

2008); *Reis v. Nat'l Passenger R.R. Corp.*, No. 07-CV-236, 2008 WL 11388569, at *5 (D.R.I. May

27, 2008).

61.     As noted above, for the Bondholders to prevail on their section 8-202 argument,

they must prove that, before they purchased or acquired the ERS Bonds, they had no notice—from

*any* source—of the ERS Bonds' *ultra vires* nature, or of facts and circumstances that would have

given the Bondholders "reason to know" of the ERS Bonds' invalidity. And the Bondholders have

been clear that they are indeed alleging and are relying on a lack of notice from any and every

source—which includes counsel. (Papez Letter, Ex. K at 3 (stating that the Bondholders "are

relying on their own lack of notice, from any source" as the basis for their section 8-202

argument)). Yet by invoking the attorney-client privilege, they simultaneously refuse to answer

questions concerning their investigation into the validity of the ERS Bonds that in any way touches

on communications with counsel. And their assertion is absolute: not only do Bondholders refuse

to disclose the substance of any communications with counsel on this issue, but they also refuse to

acknowledge whether the subject of *ultra vires* was discussed at all or even what *facts* they may

have learned from counsel relating to the issue. In the First Circuit, the Bondholders do not get to

unilaterally decide not to disclose what they heard about the validity of the ERS Bonds and when

they heard it, even if the source of that information was counsel, since they have chosen to place

their own knowledge, from any source, at issue in these matters. *Greater Newburyport*, 838 F.2d

at 20-22.

62.     The Bondholders' response that their testimony regarding when they became aware

that parties in these Title III Cases were making *arguments* that the ERS Bonds are *ultra vires* is

sufficient is too clever in view of the text of section 8-202. (*See, e.g.,* Papez Letter, Ex. K at 1-2).

Section 8-202 applies only when a purchaser of an invalid bond was "without notice of the

26

particular defect" in the bond. 19 L.P.R.A. § 1752(b)(1). Nothing in that provision qualifies the "without notice" language. So the inquiry is not limited to whether the party invoking section 8-202 had notice that an *argument* with respect to the bond's defect was being made, as the Bondholders suggest. Instead, the inquiry focuses on whether the party had notice of *any facts* or circumstances that would give them reason to know there was a defect in the ERS Bonds, at or prior to the time the party purchased the bonds, regardless of whether any one was "arguing" the issue. *Id.* § 451(25). The Bondholders' sleight of hand seeks to prevent inquiry into underlying facts and circumstances directly relevant to section 8-202(b) by focusing solely on when someone made an "argument" about validity. The fact that the party had notice of the possibility that the argument *could* be made (including from counsel) is equally as relevant under section 8-202.

63.     So while the question of when the Bondholders first learned that a party had raised the *ultra vires* issue in a court document has relevance, it cannot justify the Bondholders' refusal to testify as to when they first had notice of the *ultra vires* defect; the facts and circumstances that would give them reason to know about the defect; or whether that notice occurred at or prior to their purchases of ERS Bonds. It is possible that those two points in time could be the same but the fact that the Bondholders have consistently refused to represent that that they are strongly suggests that they are not. If the Bondholders want to rely upon section 8-202 (which Movants do not concede is relevant), they must provide full and complete testimony on this issue, which includes disclosure of communications between counsel and the Bondholders that (1) pre-date the Bondholders' awareness that a party had formally raised the *ultra vires* argument in a pleading; and (2) speak to the Bondholders' awareness of the possibility that ERS exceeded its statutory authority in issuing the ERS Bonds.

27

64.     A waiver finding is especially warranted because the Bondholders (all purchasers on the secondary market) themselves are the only sources of information about what they knew about the validity of the ERS Bonds or had reason to know based on the information they received and when they knew it. *Adrian v. Mesirow Financial* is instructive. 647 F. Supp. 2d at 126. The plaintiff there agreed to a settlement in a previous lawsuit where Mesirow served as the structured settlement broker. *Id*. at 128. Plaintiff claimed that Mesirow advised her that she would not owe taxes on the settlement under Puerto Rico law. *Id.* When she learned that she did, in fact, owe taxes on the settlement, she brought suit against Mesirow alleging that Mesirow made negligent misrepresentations with respect to the settlement's tax treatment, committed fraud, and breached its fiduciary duty to her. *Id.* She alleged that she would not have agreed to the settlement (or would have demanded a larger settlement amount) but for Mesirow's incorrect advice as to the tax issues. *Id.*

65.     Mesirow moved to compel the production of communications between the plaintiff and her counsel from the previous litigation concerning the settlement's tax treatment. *Id.* at 129. Mesirow argued that an essential element to the plaintiff's claims was that she relied on the advice that Mesirow provided. *Id.* at 129-30. The only way that Mesirow could rebut that element was to show that the plaintiff received notice, from her own counsel, that the settlement could be taxed under Puerto Rico law. *Id.*

66.     The Court agreed and found that the plaintiff waived the attorney-client privilege by putting her own knowledge, and purported reliance on Mesirow's advice, at issue in the litigation. It found that allowing the plaintiff to invoke the privilege over communications with her counsel "about the tax ramifications of the settlement agreement essentially shields from Mesirow the communications with her attorneys that may provide the *best, and perhaps only*, basis for

Mesirow's defense against the plaintiff's allegations." *Id.* at 131 (emphasis added). The court thus determined that the plaintiff should not be permitted to use the privilege as a "weapon which with she strikes down Mesirow's defense." *Id.*

67.    The Court should reach the same result here. By refusing to answer questions about their knowledge of the *ultra vires* issues, the Bondholders have attempted to tie Movants' hands. The only entities who truly know the scope and timing of the Bondholders' understanding of the *ultra vires* issues are the Bondholders themselves. If they continue to refuse to answer these questions, they prevent Movants, and eventually the Court, from evaluating the propriety of the Bondholders' purported section 8-202 argument. *See id.* at 132 (finding waiver appropriate because "Mesirow cannot show through any means other than using Adrian's communications with her former counsel that Adrian did not reach her settlement agreement based exclusively on Mesirow's representations"). Movants' claims are therefore "enmeshed in important evidence that will be unavailable to [them] if the privilege prevails." *Id.* at 131. The privilege must yield to provide Movants an opportunity to determine what the Bondholders knew and when they knew it. *See Greater Newburyport*, 838 F.2d at 20-22; *Desir*, 273 F.3d at 45.

68.    What is more, the Bondholders' communications with counsel were their most likely source of information about whether the ERS Bonds were issued *ultra vires* and the facts underlying that conclusion—a fact even the Bondholders' witnesses acknowledge, since the question of ERS authority under the Enabling Act to issue the ERS Bonds is inherently legal in nature. (J. Boyer Dep. Tr., Ex. D at 89:8). In fact, Oaktree's witness testified that Oaktree's entire understanding of the *ultra vires* issue came from counsel. (J. Mikes Dep. Tr., attached hereto as Ex. E at 40:13-14; 21-25; 41:1-7). Other testimony suggests this is true of other Bondholders as well. For example, while Mr. Bolin from Andalusian initially stated there were no *ultra vires*

29

discussions before Andalusian's first purchase of the ERS Bonds, he was subsequently instructed not to answer whether his "no" was excluding information learned from counsel. (J. Bolin Dep. Tr., attached hereto as Ex. F at 86:4-13). This instruction would make sense only if Mr. Bolin were excluding information or communications with counsel.

69.     But where, as here, a party "raise[s] an issue of his lack of understanding . . . in circumstances in which perhaps the only person who would have explained" that matter to him "was his attorney," then the party's assertion of a lack of understanding, notice, or knowledge amounts to "an implicit waiver of the privilege" as to those issues. *Sax*, 136 F.R.D. at 544. In other words, when a party raises an argument "based on factual assertions that, either explicitly or implicitly, incorporates the advice or judgment of its counsel, it cannot deny an opposing party the opportunity to discover the foundation for those assertions in order to contest them." *Cosgrove v. Nat'l Fire & Marine Ins*. Co., No. 14-CV-2229-HRH, 2016 WL 4578139, at *5 (D. Ariz. Sept. 2, 2016). Because the Bondholders' "privileged communications [with] counsel may bear on [their] knowledge or lack thereof" regarding the *ultra vires* issues at (and prior to) the time they purchased ERS Bonds, their privilege must yield. *Lombardi v. Whitehall XII/Hubert St., LLC*, No. 04 CV-6752 (PAC), 2008 WL 2557419, at *1 (S.D.N.Y. June 26, 2008).

70.     The Court should also find waiver here because it would be manifestly unfair to maintain the privilege under the circumstances. Numerous courts have focused on whether the use of the privilege is fair when determining whether an "at issue" waiver has occurred. *See, e.g., Greater Newburyport*, 838 F.2d at 20; *Bilzerian*, 926 F.2d at 1292; *Adrian*, 647 F. Supp. 2d at 130; *Rivera*, 190 F.R.D. at 304; *Sax*, 136 F.R.D. at 543; *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 470 (S.D.N.Y. 1996).

71.     Here, the continued use of the privilege will obstruct Movants' inquiry into the critical, and potentially dispositive, issue in the *ultra vires* litigation and will have enormous effects on all other parties in interest in these Title III Cases. The Bondholders assert claims against ERS and the Commonwealth that exceed $3.1 billion. They have clearly calculated that using the privilege may allow them to overcome Movants' challenges to their claims, merely by obstructing Movants' access to the best, and perhaps only, evidence that contests their section 8-202 argument.

72.     If the Bondholders' claims were allowed, the recoveries of every other creditor in these Title III Cases will be diluted. The creditors harmed by this result will include, for example, the 160,000 retirees that the Retiree Committee represents, as well as other general unsecured creditors, all of whom, unlike the Bondholders, cannot simply sell their debt to exit their positions and minimize their losses. If the recoveries of these creditors are going to be impaired on account of the Bondholders' claims, Movants and the Court are entitled to understand fully the truth of when and how the Bondholders actually became aware of any defects in the ERS Bonds. If the Bondholders truly did not learn of the *ultra vires* defect until after their purchase or acquisition of the ERS Bonds, then they should have no issue giving deposition testimony on these topics; but their invocation of the privilege suggests otherwise. The Court should not allow the Bondholders to get a free pass from disclosing what is likely the most relevant information that exists to evaluate whether the Bondholders' assertion that they were not on notice from any party is accurate.

* * *

By asserting the section 8-202 argument and then claiming a lack of notice from all sources, which by definition includes counsel, the Bondholders affirmatively placed at issue in this litigation what they knew about the *ultra vires* issuance of the ERS Bonds, and when they knew it. Their privilege instructions and refusal to answer relevant questions at each deposition were

31

without basis and improper. The Court should compel that testimony now, both because the privilege does not apply at all, and, even if it did, it has been waived as the Bondholders cannot use the privilege as a shield and sword and because it would be manifestly unfair to bar Movants from obtaining the evidence that is most probative on the issues raised by the Bondholders' section 8-202 argument.

The Court should also order the Bondholders to supplement their deficient privilege logs for all the same reasons. If the Bondholders received a communication from counsel referencing the *ultra vires* issue (or facts and circumstances related thereto), such fact is not privileged, is critical to evaluating the Bondholders' notice argument, and must be disclosed.

## CONCLUSION

For all of the foregoing reasons, Movants request that the Court order each of the Bondholders' Rule 30(b)(6) deponents to reappear for a two-hour deposition and to answer questions about all of the facts and circumstances that each of them had reason to know of related to the *ultra vires* nature of the ERS Bonds, including any information that came from counsel, and when they knew of such facts and circumstances, even if their first knowledge of such facts or circumstances came from counsel.

In addition, the Bondholders should be required to either (i) supplement their privilege logs to identify all documents that reference the *ultra vires* issue or related facts and circumstances, or (ii) represent to the Court that no such documents exist. To the extent Bondholders' modifications to their privilege logs reflect that documents relevant to Bondholders' notice of the *ultra vires* issue have been withheld, those documents must be produced as any privilege that could otherwise apply has been waived due to the fact that Bondholders have put this issue "at issue" through their reliance on UCC section 8-202.

32

Finally, if any deponent continues to refuse to answer questions regarding the *ultra vires* issue on the basis for privilege, or if a Bondholder fails to adequately address its privilege log deficiencies, the Court should strike that Bondholder's section 8-202 argument. Movants also ask that this Court grant such other relief as may be just.

### CERTIFICATION PURSUANT TO RULE 37(a)(1) AND THE ELEVENTH AMENDED CASE MANAGEMENT PROCEDURES

Pursuant to Rule 37(a)(1) of the Federal Rules of Civil Procedure and the Eleventh Amended Case Management Procedures, I hereby certify that on May 5, 2020, counsel for the Retiree Committee, the FOMB, the Creditors' Committee, the SCC and AAFAF conferred in good faith with counsel for the Bondholders and the Fiscal Agent via telephone. After conferring about the subject of this motion, the parties have not been able to agree on a resolution as of the date of this filing.

*[Signature Pages Follow]*

Dated: May 6, 2020

Respectfully submitted,

**JENNER & BLOCK LLP**

**BENNAZAR, GARCÍA & MILIÁN, C.S.P.**

By:
/s/ Robert Gordon
Robert Gordon (admitted *pro hac vice*)
919 Third Ave
New York, NY 10022-3908
rgordon@jenner.com
212-891-1600 (telephone)
212-891-1699 (facsimile)

Catherine Steege (admitted *pro hac vice*)
Melissa Root (admitted *pro hac vice*)
Landon Raiford (admitted *pro hac vice*)
353 N. Clark Street
Chicago, IL 60654
csteege@jenner.com
mroot@jenner.com
lraiford@jenner.com
312-222-9350 (telephone)
312-239-5199 (facsimile)

By:
/s/ A.J. Bennazar-Zequeira
A.J. Bennazar-Zequeira
Héctor M. Mayol Kauffmann
Edificio Union Plaza
1701 Avenida Ponce de León #416
Hato Rey, San Juan, PR 00918
ajb@bennazar.org
hector.mayol@bennazar.org
787-754-9191 (telephone)
787-764-3101 (facsimile)

*Counsel for The Official Committee of Retired
Employees of Puerto Rico*

Respectfully submitted,

/s/ Margaret A. Dale

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*Pro hac vice*)
Jeffrey W. Levitan (*pro hac vice*)
Margaret A. Dale (*pro hac vice*)
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900
Email: mbienenstock@proskauer.com
Email: brosen@proskauer.com
Email: jlevitan@proskauer.com
Email: mdale@proskauer.com

*/s/ Luis F. de Valle-Eammanuelli*
Luis F. del Valle-Emmanuelli
USDC-PR No. 209514
P.O. Box 79897
Carolina, Puerto Rico 00984-9897
Tel: (787) 977-1932
Fax: (787) 722-1932
Email: dvelawoffices@gmail.com

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico, as
representative of the Employees Retirement
System of the Government of the
Commonwealth of Puerto Rico*

*/s/ Sunni P. Beville*

BROWN RUDNICK LLP
Edward S. Weisfelner, Esq. (*pro hac vice*)
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
Email: eweisfelner@brownrucknick.com

Sunni P. Beville, Esq. (*pro hac vice*)
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
Email: sbeville@brownrudnick.com

*Counsel to the Special Claims Committee*

*/s/ Alberto Estrella*

ESTRELLA, LLC
Alberto Estrella (USDC-PR 209804)
Kenneth C. Suria (USDC-PR 213302)
P.O. Box 9023596
San Juan, Puerto Rico 00902-3596
Tel: (787) 977-5050
Fax: (787) 977-5090

*Local Counsel to the Special Claims Committee*

*/s/ Luc A. Despins*

PAUL HASTINGS LLP
Luc A. Despins (*pro hac vice*)
James R. Bliss, Esq. (*pro hac vice*)
James B. Worthington, Esq. (*pro hac vice*)
G. Alexander Bongartz (*pro hac vice*)
200 Park Aenue
New York, NY 10166
Tel: (212) 318-6000
Email: lucdespins@paulhastings.com
Email: jamesbliss@paulhastings.com
Email: jamesworthington@paulhastings.com
Email: alexbongartz@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors*

*/s/ Juan J. Casillas Ayala*

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq. (USDC-PR 218312)
Israel Fernández Rodrigues, Esq. (USDC-PR 22504)
Juan C. Nieves González, Esq. (USDC-PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC-PR 306008)
P.O. Box 195075
San Juan, Puerto Rico 00919-5075
Tel: (797) 523-3434
Fax: (797) 523-3433
Email: jcasillas@cstlawpr.com
Email: ifernandez@cstlawpr.com
Email: jnieves@cstlawpr.com
Email: cfernandez@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors*

*/s/ John Arrastia*

GENOVESE JOBLOVE & BATTISTA, P.A.
John Arrastia, Esq. (*pro hac vice*)
John H. Genovese, Esq. (*pro hac vice*)
Jesus M. Suarez, Esq. (*pro hac vice*)

36

Mariaelena Gavo-Guitian, Esq. (*pro hac vice*)
100 SE 2nd Street, Suite 4400
Miami, FL 33131
Tel: (305) 349-2300
Email: jarrastia@gjb-law.com
Email: jgenovese@gjb-law.com
Email: jsuarez@gjb-law.com
Email: mguitian@gjb-law.com

*Special Litigation Counsel to the Official
Committee of Unsecured Creditors*