# **Exhibit I**

JONES DAY

100 HIGH STREET • 21ST FLOOR • BOSTON, MASSACHUSETTS 02110.1781

TELEPHONE: +1.617.960.3939 • FACSIMILE: +1.617.449.6999

Direct Number: (617) 449-6925
drfox@jonesday.com

March 4, 2020

<u>VIA E-MAIL</u>

William D. Dalsen
Proskauer Rose LLP
One International Place
Boston, MA 02110

Jennifer L. Roche
Proskauer Rose LLP
2029 Century Park East
Suite 2400
Los Angeles, CA 90067

Madhu Pocha
O'Melveney & Meyers
1999 Avenue of the Stars
8th Floor
Los Angeles, CA 90067

Re:   <u>Depositions of ERS Bondholders and Other Ultra Vires/Lien Scope Discovery</u>

Dear Will, Jennifer, and Madhu:

I write in response to Will's March 2 letter, as well as to follow up on several other outstanding and past-due issues.

### A.   Will's March 2 Letter Regarding Depositions

#### 1.   Topics 13 to 15

While we remain unclear as to the relevance of topics 13 to 15 to these proceedings, and reserve all of our rights on that issue, we confirm that our clients' representatives will be prepared to provide general testimony on those topics.

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • DETROIT
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID • MELBOURNE
MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MOSCOW • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SAUDI ARABIA • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

William D. Dalsen
March 4, 2020
Page 2

### 2. Topics 16 and 17

Our limitation of Topics 16 and 17 to information about investments in municipal securities (not Treasury or foreign bonds) that the party in question has purchased since 2007 in amounts exceeding either (a) $10 million purchase price or (b) 1% of the market value of the party's portfolio at the time of purchase, and that the party still holds, come directly from *your own* Request for the Production of Documents No. 22, and from the limitations that you expressly agreed to accept in order to resolve our objections to the production of any documents responsive to that request and Request No. 24 on burden and relevance grounds.

Obviously, it would make no sense—and would do nothing to alleviate our burden and relevance concerns—if, having agreed upon narrowed document requests to resolve our objections, you then insisted on Rule 30(b)(6) topics that were broader still than your original document requests. We agreed to the limitations as to the document requests as a good faith compromise with you, and are therefore surprised and dismayed that you now appear to be taking a position that is not consistent with our prior agreement. Of course, you are free to ask our representatives as a matter of their personal knowledge about other investments, as you asked Mr. Dowd on Friday and Mr. Boyer on Tuesday. But to require us to prepare witnesses regarding *all* previous municipal and government investments made by our clients would be to renege on your agreement with us to resolve our objections to your document requests.

### 3. ERS Enabling Act

We are under no obligation to prepare our clients' representatives to testify about legal contentions regarding the proper interpretation of the ERS Enabling Act. Our clients' contentions about the legal interpretation of the ERS Enabling Act are set forth in our pleadings. "[D]epositions, including 30(b)(6) depositions, are designed to discover facts, not contentions or legal theories, which, to the extent discoverable at all prior to trial, must be discovered by other means." *JPMorgan Chase Bank v. Liberty Mut. Ins. Co.*, 209 F.R.D. 361, 362 (S.D.N.Y. 2002). This portion of your letter therefore reflects "a mistaken belief about depositions generally, and about depositions sought pursuant to Fed. R. Civ. P. 30(b)(6) in particular." *Id.*

That is doubly so with respect to the interpretation of the Spanish-language ERS Enabling Act. Even if statutory construction were a factual question that is the proper subject of a deposition—and it is not—our clients' obligation under Rule 30 is limited to preparing witnesses regarding factual "information known or reasonable available to" them. Many of our clients may have no such information regarding a Spanish-language document. As Mr. Dowd explained on Friday as to Ocher Rose, for example, Mr. Dowd "do[es not] speak Spanish," and "no one at Ocher Rose speaks or reads Spanish," so no one at Ocher Rose "would have reviewed the Spanish version of" the ERS Enabling Act. Dowd Dep. Tr. 81:3-6, 82:6-15. Mr. Dowd's

William D. Dalsen
March 4, 2020
Page 3

answers reflect neither a limitation on our designation of a Rule 30(b)(6) deponent nor a lack of preparation, but simply Ocher Rose's lack of any responsive factual information on the subject of the Spanish-language ERS Enabling Act.

To the extent that our clients had at the time of their purchase of ERS Bonds or have today a factual understanding of pertinent portions of the ERS Enabling Act, in any language, separate from the legal contentions that are laid out in our briefing, they will be prepared to testify about that understanding. Your request for more exceeds both the bounds of proper Rule 30(b)(6) discovery and the bounds of the factual information known to our clients.

### 4.   Designation of Mr. Daniels for Topics 16 and 17

Although your letter is not entirely clear, I take it that your complaints as to Ocher Rose's designation of Rule 30(b)(6) witnesses lie with Ocher Rose's designation of Mr. Daniels, rather than Mr. Dowd, to testify about Topics 16 and 17, which relate to other municipal securities purchased by Ocher Rose. Your complaints are both irrelevant and unfounded.

Your complaints about the designation of Mr. Daniels to testify about Topics 16 and 17 are irrelevant because Ocher Rose had no substantive Rule 30(b)(6) testimony to give, via any witness, regarding those topics. As Mr. Dowd explained, Ocher Rose has only ever held ERS Bonds, so it has never "purchased or acquired" any "government and/or municipal securities . . . other than the ERS Bonds." Dowd Dep. Tr. 122:25-123:3. Indeed, although you chose not to question Mr. Daniels in any detail on the issue, he said the same thing in explaining the nature of the Ocher Rose entity. Daniels Dep. Tr. 21:17-24 ("Q.  Who is Ocher Rose, LLC?  A.  It's a special purpose entity that holds ERS bonds. . . . [T]he sole purpose of the entity is to hold the bonds. So it does nothing else besides hold the bonds."). Moreover, Mr. Dowd provided extensive testimony in his personal capacity about other municipal securities purchased or considered for purchase on behalf of funds other than Ocher Rose by King Street Capital Management. Dowd Dep. Tr. 24:3-31:24, 86:16-91:8. Mr. Dowd would have had nothing more to say had he been designated as a 30(b)(6) witness on the question, because none of that testimony involved bonds purchased or acquired by Ocher Rose. Thus, your supposed confusion over which Ocher Rose designee would cover Topics 16 and 17 was entirely harmless.

Your complaints about the designation of Mr. Daniels to testify about Topics 16 and 17 are also entirely unfounded. Ocher Rose was entitled to choose its designees and divide its topics among those designees as it chose. And Ocher Rose was under no obligation to identify to you in advance of the deposition who its designees would be as to which topics. Nevertheless, on February 12, Sarah emailed you regarding our clients' availability for depositions, and made clear that Ocher Rose would divide its designees between "Lien Scope topics" and "Ultra Vires topics." We received no follow-up inquiry from you until nearly two weeks later, on February

JONES DAY

William D. Dalsen
March 4, 2020
Page 4

24, when you asked who you should place on Proskauer's security list as the "designee for the lien scope topics." I promptly identified Mr. Daniels as that designee.

At no time before Mr. Daniels' deposition began on Friday did you or anyone else ask which specific topics Mr. Daniels would handle and which topics Mr. Dowd would handle. In an effort to avoid any possible misunderstanding, I therefore volunteered to you un-asked, before the deposition of Mr. Daniels even began and in the presence of all counsel, including Mr. Bassett, that Mr. Daniels was Ocher Rose's designee on topics 11, 12, 16 to 19, and 21—with 19 and 21 limited to lien scope issues in those topics. Neither you nor anyone else made any objection or asked any follow-up questions. But you did suggest that I repeat that statement on the record, to avoid any misunderstanding, which I then did. *See* Daniels Dep. Tr. 37:2-5 ("The topics [for which Mr. Daniels was the designee] are 11 12, 16 to 19, and 21. And for 19 and 21, it's limited to the lien scope issues in those topics."). Once again, no one asked any follow-up questions or made any objections.

Ultimately, your letter assumes that Topics 16 and 17 were obviously relevant to the *ultra vires* proceedings and not to the lien scope proceedings. Simply put, we did not share that understanding. Nowhere did your Rule 30(b)(6) notice identify Topics 16 and 17 as lien scope topics. We viewed topics 16 and 17 as irrelevant to all of the proceedings, *ultra vires* and lien scope alike, because they involve bonds that are not at issue in these proceedings, as we explained in connection with your requests for the production of documents on related topics. In any event, as explained above, Ocher Rose had no substantive testimony to provide on those topics. We designated Mr. Daniels to address them for the simple reason that he was more familiar than Mr. Dowd with Ocher Rose's role and investments. *See* Dowd Dep. Tr. 22:19-23 ("Q. What does Ocher Rose do? A. I'm not I think best—I'm not—I'm not closely involved with sort of the – our different entities, and what they do and how they work, I'm not particularly knowledgeable on."). And again, we made that designation crystal clear both before the start of Mr. Daniels' deposition and on the record early in that deposition. Your decision not to ask Mr. Daniels any questions on Topics 16 and 17 after these two clear disclosures was your own.

### 5. Privilege Assertions

Your three objections to privilege assertions during the depositions of Mr. Daniels and Mr. Dowd are equally meritless.

As to your first objection, Mr. Daniels is a lawyer, and he serves an Associate General Counsel in the legal department at King Street Capital Management. There is nothing remarkable about Mr. Daniels' claiming privilege over legal advice he provided in a conversation with another King Street Capital Management employee, Evan Mossop. Your complaint seems to be that Mr. Daniels *also* received factual information from Mr. Mossop

JONES DAY

William D. Dalsen
March 4, 2020
Page 5

during that same conversation for purposes of preparing for his Rule 30(b)(6) deposition. But Mr. Daniels did not claim privilege over any of that factual information. *See* Daniels Dep. Tr. 60:24-61:3 ("Q Are there any facts that Mr. Mossop shared with you during these discussions that you are withholding from your answers? A. No."). And Mr. Daniels testified about that factual information at length. *See, e.g.*, Daniels Dep. Tr. 43:7-22 (describing the materials Mr. Mossop reviewed at the time that the ERS Bonds held by Ocher Rose were acquired); *id.* at 44:6-45:18 (describing Mr. Mossop's view of the Official Statement's description of the Bondholders' collateral versus the Bond Resolution's provisions); *id.* at 48:4-22 (describing Mr. Mossop's understanding of the potential for changes in employer contributions); *id.* at 49:14-51:14 (describing Mr. Mossop's understanding of the scope of pledged property and the "waterfall" of funds, and his review of the ERS Enabling Act). It is unremarkable that a single conversation between lawyer and client about the subject of ongoing litigation may have included both privileged and non-privileged portions, and the fact that this occurred does nothing to suggest that the privileged portions were improperly withheld.

As to your second objection, the testimony to which you refer concerns investments by funds that are not parties to this litigation in securities that are not at issue in these proceedings. It is therefore of, at best, minimal relevance to begin with. And the nature of Mr. Bassett's questions on this topic meant that revealing the identity of the issuers involved would unavoidably reveal substantive information about the privileged legal advice that was sought and received. In particular, Mr. Dowd initially testified that King Street Capital Management had "sought legal advice on" the authority of a government issuer to issue securities "relating to other investments [it had] considered." Dowd Dep. Tr. 88:7-9. Mr. Bassett then asked, "Which other investments?" *Id.* at 88:10. Given Mr. Dowd's prior testimony, answering that question by identifying specific investments would have revealed the complete substance of a request for legal advice: that King Street asked its lawyers whether the issuer of that security had the legal authority to issue it. That is a matter within the core of the attorney-client privilege, and Mr. Dowd was properly instructed not to reveal it.

As to your third objection, Mr. Dowd gave extensive testimony about when and how Ocher Rose first became aware of the contention that the ERS Bonds were issued *ultra vires*—the relevant issue for purposes of UCC § 8-202(b). He testified that the "argument that the ERS bonds were issued without authority" was "not something we were aware of until the argument was raised" in the Title III proceedings. Dowd Dep. Tr. 78:5-13. He confirmed that "Ocher Rose did not ever become aware of that argument prior to it being made in a public court filing." *Id.* at 78:23-3. He testified that he did not "recall focusing on" the ERS Enabling Act's language authorizing borrowing, and that that provision was not "a focus of ours," until November 2017, when the *ultra vires* argument was first raised. *Id.* at 84:5-7, 18-22. And he explained that "[i]n the course of researching [the ERS bond] investment, . . . there was nothing we saw in our due diligence that caused us to have concern about the validity of the bonds." *Id.* at 85:20-24. Mr.

JONES DAY

William D. Dalsen
March 4, 2020
Page 6

Dowd contrasted that state of affairs with other investments for which King Street Capital Management *had* sought legal advice concerning validity: whereas in those other cases, "there were facts that came up in our diligence that caused concern for us and caused us to focus on [the validity] issue and seek the advice," "[w]hen we did the diligence on the ERS bonds, and as I mentioned, reviewed the resolution and reviewed the opinion of counsel and other – other facts, there was nothing that made us concerned about this issue, so we didn't focus on it." *Id.* at 90:22-91:8; *see also id.* at 93:11-19.

The invocation of privilege occurred not because of any limitation that we placed on Mr. Dowd's answers, but rather because Mr. Bassett intentionally forced such an objection by directly asking Mr. Dowd about the content of legal advice provided by counsel: "Prior to the point in time in which you learned of the argument based on it being made publicly in the Title III cases, did your counsel ever identify for you the possibility that that argument could be made?" Dowd Dep. Tr. 79:12-16. Mr. Dowd cannot answer that question, which asks directly about the content of privileged communications, either yes or no without revealing core privileged information about the substance of the legal advice that was provided to Ocher Rose. In contrast, Mr. Dowd can—and did—testify to the date when Ocher Rose first became aware of the *ultra vires* argument. Mr. Dowd answered that question directly, without any claim of privilege or caution to limit his answer to non-privileged sources of information. Dowd Dep. Tr. 78:5-9. In other words, the problem is not with asking a witness when Ocher Rose first learned of the *ultra vires* argument. The problem is with asking specifically about the nature of legal advice received or not received.

This is exactly the same point that I made before Judge Dein in the portion of the January 15 hearing transcript that your letter cites. I explained that our interrogatories were "asking for a fact, which is when they learned about a particular contention or when they came to a particular conclusion. We're not asking about the communications that led them to that. We're not asking about the content of the communications." Tr. of Jan. 15, 2020 Hr'g at 22:9-13. Mr. Dowd gave clear, unqualified testimony about the relevant fact: when Ocher Rose first learned of the *ultra vires* argument. It was only when Mr. Bassett sought to ask Mr. Dowd specifically about legal advice received that privilege was invoked.

Finally, you make a passing reference to Ocher Rose's privilege log, but you do not describe any particular detail aside from its (entirely irrelevant) length. If you have a concern about our privilege logs, we are available to confer on those concerns.

JONES DAY

William D. Dalsen
March 4, 2020
Page 7

### B. Other Issues

#### 1. Interrogatory Responses

We still have not received a response to Matt's February 25 letter to Jennifer concerning ERS's facially inadequate supplemental interrogatory responses. These interrogatories have already been the subject of a motion to compel, and ERS was ordered to provide supplemental responses more than six weeks ago. The supplemental responses that ERS provided plainly failed to satisfy Judge Dein's order. Please confirm that you will provide adequate supplemental responses this week.

#### 2. Privilege Log

We still have not received a privilege log from ERS, even though ERS had agreed to complete its document productions by the middle of last month. Please let us know when we can expect one.

#### 3. AAFAF and Commonwealth Depositions

It has now been more than a week since Madhu agreed to provide information to us to enable us to determine whether declarations or stipulations might suffice as an alternative to the deposition subpoenas we served on the Commonwealth and AAFAF. Please advise as to when we can expect his information.

#### 4. Information Requested regarding ERS's Document Production

We also still have not received a response to either of our letters seeking information and clarification regarding documents that ERS has produced, such as information about ERS's bank account records. We sent the first of those letters on February 13 and the second of those letters on February 28. We need that information, and Madhu has stated that ERS will work to provide it to us. Please provide it.

Sincerely,

*/s/ David R. Fox*

cc:   All Counsel of Record