IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| GIARA WASHINGTON DEL VALLE; | CIVIL No. |
| LYNNOTT ADORNO GONZÁLEZ; | |
| EMILIO ADORNO OTERO; | |
| JENNIFER M. AMBERT MARTÍNEZ; | RE: CIVIL RIGHTS, |
| LUIS G. AULÍ FLORES; | DAMAGES |
| IRVING BAYON CORREA; | |
| JOSÉ BETANCOURT ALICEA; | PLAINTIFF DEMANDS |
| JOSÉ R. BONILLA CARABALLO; | TRIAL BY JURY |
| IVONNE BORRERO CASADO; | |
| EDGAR CALDERÓN LEBRÓN; | |
| OMAR J. CLAUDIO LLOPIZ; | |
| SATURNO CRUZ CARRASQUILLO; | |

GIARA WASHINGTON DEL VALLE;
LYNNOTT ADORNO GONZÁLEZ;
EMILIO ADORNO OTERO;
JENNIFER M. AMBERT MARTÍNEZ;
LUIS G. AULÍ FLORES;
IRVING BAYON CORREA;
JOSÉ BETANCOURT ALICEA;
JOSÉ R. BONILLA CARABALLO;
IVONNE BORRERO CASADO;
EDGAR CALDERÓN LEBRÓN;
OMAR J. CLAUDIO LLOPIZ;
SATURNO CRUZ CARRASQUILLO;
WANDA CRUZ DIAZ;
JUAN CRUZ DONES;
REBECCA DE PEDRO GONZALEZ;
SARAI DIAZ REYES;
JOSÉ ESPINOSA DIAZ;
JOSHUA FIGUEROA SERRANO;
FERNANDO FUENTES RODRÍGUEZ;
IVELISSE GONZÁLEZ ALEMAN;
MIGUEL A. GONZÁLEZ GERENA;
ANA GONZALEZ LEDESMA;
ALLAN A. GRIFFITH FIGUEROA;
GENESIS HERNANDEZ DIAZ;
CARLOS HERNÁNDEZ RESTO;
JORGE IRIZARRY PARÍS;
EDWIN JÍMENEZ RESTO;
MARY LASTRA RIVERA;
OSCAR LEDESMA ALBORS;
JEAN LEÓN RENTA;
ARIADNA LÓPEZ;
JANICE MARCHAND BAUZA;
JAZMINE T. MARTINEZ GALINDEZ;
WANDA MORALES PEREZ;
CRISTOBAL MAYSONET GARCÍA;
DOROTHY MYERS ROSARIO;
JOSE NARVAEZ CARRION;
JONUEL NEGRON DIAZ;
RUTH OLIVERO ALVAREZ;
JOSE A. ONTAÑO ROSARIO;
ALEJANDRA ORTIZ MELÉNDEZ;
OMAR PADRÓ PAGÁN;
GILBERTO PAGÁN RESTO;

1

WILFRIDO PALACIO CAMACHO;
KEVIN J. PAREDES SÁNCHEZ;
ADY PAZ OTERO;
CATHERINE QUIÑONES PIMENTEL;
NEFTALI RAMOS LOZADA;
ARNALDO REYES PEREZ;
AUGUSTO B. RIVERA FALÚ;
FÉLIX RIVERA GONZÁLEZ;
LUIS A. RIVERA GONZALEZ;
PRISCILLA RIVERA GONZALEZ;
NERY LUZ RIVERA MELENDEZ;
DIEGO RIVERA ORTIZ;
IVÁN G. RIVERA RÍOS;
RAMON RIVERON MUÑOZ;
JOSE RODRIGUEZ CONCEPCION;
JOSEPH RODRÍGUEZ RODRÍGUEZ;
JUAN RODRIGUEZ SAURE;
RAÚL SÁNCHEZ;
LUIS SANTAELLA DIAZ;
GIANCARLO SANTIAGO MARTÍNEZ;
PABLO SANTIAGO RODRÍGUEZ;
JEAN SANTIAGO TORRES;
CARLOS SANTOS FIGUEROA;
ANTONIO SOLA MARTI;
EMMANUEL SOTO RAMOS;
NELSON M. TORRES MALDONADO;
ALTAGRACIA TORRES MARRERO;
ISALÍ TORRES MARTÍNEZ;
MYRIAM TORRES RIOS;
FRANCES VÁZQUEZ RODRIGUEZ;
RAQUEL VEGA LÓPEZ;
CHRISTIAN E. VEGA VILLALBA;
KASSANDRA I. VELA CALO;
WANDA VICENTI LATORRE; AND
JAVIER WALKER CARRASQUILLO

Plaintiffs
v.

THOMAS RIVERA SCHATZ,
JANE DOE, and the Conjugal
Partnership composed by both
of them, in their personal
capacity and in his official
capacity as PRESIDENT OF THE
SENATE OF PUERTO RICO; CARLOS
"JOHNNY" MENDEZ, JANE ROE, and

the Conjugal Partnership composed by both of them in his personal capacity and in his official capacity as SPEAKER OF THE HOUSE OF EPRESENTATIVES OF THE COMMONWEALTH OF PUERTO RICO; **GABRIEL HERNANDEZ, JANE POE,** and the Conjugal Partnership composed by both of them, in their personal capacity and in his official capacity as Chief of Staff of the President of the Senate; **WILFREDO RAMOS, JANE LOE,** and the Conjugal Partnership composed by both of them in their personal capacity and in his official capacity as SUPERINTENDENT OF THE CAPITOL BUILDING; **PABLO SASTRE, JANE MOE,** and the Conjugal Partnership composed by both of them in their personal capacity and in his official capacity as AUXILIARY SUPERINTENDENT IN CHARGE OF OPERATIONS; **ANGEL REDONDO, JANE BOE,** and the Conjugal Partnership composed by both of them in their personal capacity and in his official capacity as AUXILIARY SUPERINTENDENT IN CHARGE OF ADMINISTRATION; **JOSE FIGUEROA TORRES, JANE TOE,** and the Conjugal Partnership composed by both of them in their personal capacity and in his official capacity as HUMAN RESOURCES DIRECTOR AT THE OFFICE OF THE SUPERINTENDENT OF THE CAPITOL BUILDING; JANE VOE; and JOHN VOE,
Defendants

<u>**C O M P L A I N T**</u>

**TO THE HONORABLE COURT:**

Plaintiffs, through the undersigned attorneys, very respectfully state, aver and pray as follows:

## NATURE OF THE ACTION AND JURISDICTION

1. This is an action for compensatory and punitive damages, injunctive and equitable relief under the First and Fourteenth amendments to the Constitution of the United States of America, and Sections 1983 and 1988 of title 42 United States Code for the deprivation of Plaintiffs' property rights without due process of law, the retaliatory termination of their employment based on their political beliefs, damages to their professional reputation and mental anguish and emotional damages caused to plaintiffs by the defendants. The amounts claimed exceed $75,000.00.

2. This case is an example of the widespread pattern of political discrimination that has occurred in the Puerto Rico Legislature in the aftermath of the November 2016 General Election. It has happened during the first months after the New Progressive Party ("NPP") gained control of the Puerto Rico legislature due to the November 2016 general elections results. Defendants, all NPP affiliated individuals plan<ed, directed, ordered, condoned, allowed, authorized, and/or executed, individually and jointly,

copious adverse employment actions against low-level
Senate, House and other Capitol Building employees, because
they were affiliated (or perceived as being affiliated)
with a political party other than NPP and/or actively
supported a candidate affiliated to a political party other
than the NPP.

3. The seventy-eight (78) Plaintiffs to this action are all
former low-level employees of the Office of the
Superintendent that fell victims to Defendants' vicious,
insensible, abusive and discriminatory practices. These
Plaintiffs worked in positions for which political
affiliation is not an appropriate requirement, did not have
a single complaint as to their work performance, and
Plaintiffs' positions were necessary and essential for the
proper functioning of the Puerto Rico Legislature.
Plaintiffs also depended on such positions to sustain their
relatives and carry out their daily lives. However,
Defendants did not care, and preferred that NPP affiliated
individuals, some of them their relatives, occupied such
positions, even though these new employees had never
performed the duties and that Defendants' actions were
unconstitutional and illegal. As a result, Defendants
deprived Plaintiffs of a substantial portion of the funds
with which they sustained their families and carried out

their daily lives simply because, as Defendants perceived,
they favored, supported and/or were affiliated with an
opposing political party, or a particular candidate
affiliated to an opposing political party, particularly the
Popular Democratic Party ("PDP") and PDP candidates.

4. Defendants actions against Plaintiffs were illegal, as
Defendants carried them out while being fully aware, yet
intentionally disregarding, of a clear and consistent
longstanding case law from the Supreme Court of Puerto
Rico, this Honorable Court, and the United States Court of
Appeals for the First Circuit, repeatedly proscribing
politically motivated adverse employment actions against
government employees that occupy positions for which
political affiliation is not an appropriate requirement.

5. This Court has jurisdiction to entertain these claims
pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343 and 42 U.S.C.
§1983 and §1988.

6. The venue is proper in this district pursuant to 28 U.S.C.
§1391.

**THE PARTIES**

**PLAINTIFFS**

7. Plaintiff GIARA WASHINGTON DEL VALLE ("Washington del
Valle") is of legal age, a resident of Puerto Rico and a
citizen of the United States of America. Plaintiff

6

Washington del Valle commenced working at the Office of the Superintendent in August of 2013 and worked as a Contract Specialist when she was terminated on February 15, 2017 because of her political affiliation.

8. Plaintiff LYNNOTT ADORNO GONZÁLEZ ("Adorno González") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Adorno González commenced working at the Office of the Superintendent in July of 2014 and worked as an Administrative Assistant when she was terminated on February 15, 2017 because of her political affiliation. At the time of termination, was receiving psychological assistance services from the "Programa de Ayuda al Empleado (PAE)".

9. Plaintiff EMILIO ADORNO OTERO ("Adorno Otero") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Adorno Otero commenced working at the Office of the Superintendent in October of 2013, and was an Electrician Assistant when he was terminated on February 15, 2017 because of his political affiliation.

10. Plaintiff JENNIFER AMBERT MARTÍNEZ ("Ambert Martínez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Ambert Martínez began working at the Office of the Superintendent in 2015, and was performing duties as a Maintenance Services

Assistant ("Auxiliar de Servicios de Mantenimiento") when she was dismissed on February 15, 2017, because of her political affiliation with the PDP and her support of PDP candidates.

11.   Plaintiff LUIS G. AULÍ FLORES ("Aulí Flores") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Aulí Flores commenced working at the Office of the Superintendent in April 18, 2016, as an Internal Security Officer and worked as low level security guard when he was terminated on February 15, 2017 because of his political affiliation.

12.   Plaintiff IRVING BAYÓN CORREA ("Bayón Correa") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Bayón Correa began working at the Office of the Superintendent in August 2015, and was performing duties as a Warehouse Keeper ("Guardalmacén") when he was dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates.

13.   Plaintiff JOSÉ BETANCOURT ALICEA ("Betancourt Alicea") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Betancourt Alicea began working at the Office of the Superintendent in January 2015, and was performing duties as a Conservation

and Facility Repair Technician when he was dismissed on
February 15, 2017, because of his political affiliation
with the PDP and his support of PDP candidates.

14.     Plaintiff JOSÉ BONILLA CARABALLO ("Bonilla Caraballo")
is of legal age, a resident of Puerto Rico and a citizen of
the United States of America. Plaintiff Bonilla Caraballo
began working at the Office of the Superintendent in
February 1, 2013, and was performing duties as a
Maintenance Services Assistant ("Auxiliar de Servicios de
Mantenimiento") when he was dismissed on February 15, 2017,
because of his political affiliation with the PDP and his
support of PDP candidates.

15.     Plaintiff IVONNE BORRERO CASADO ("Borrero Casado") is
of legal age, a resident of Puerto Rico and a citizen of
the United States of America. Plaintiff Borrero Casado
began working at the Office of the Superintendent in 2015,
and was performing duties as a Maintenance Services
Assistant ("Auxiliar de Servicios de Mantenimiento") when
she was dismissed on February 15, 2017, because of her
political affiliation with the PDP and her support of PDP
candidates.

16.     Plaintiff EDGAR CALDERÓN LEBRÓN ("Calderón Lebrón") is
of legal age, a resident of Puerto Rico and a citizen of
the United States of America. Plaintiff Calderón Lebrón

commenced working at the Office of the Superintendent in May 28, 2013, as an Internal Security Officer and worked as low level security guard when he was terminated on February 15, 2017 because of his political affiliation.

17.    Plaintiff OMAR CLAUDIO LLOPIZ ("Claudio Llopiz") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Claudio Llopiz began working at the Office of the Superintendent in March 2013, and was performing duties as an Assistant Director of Conservation and Technical Services when he was dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates. At the time of the termination, Plaintiff Santiago Rodriguez had an open case before the Puerto Rico State Insurance Fund because of a work-place related accident.

18.    Plaintiff SATURNO CRUZ CARRASQUILLO ("Cruz Carrasquillo") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Cruz Carrasquillo commenced working at the Office of the Superintendent in December 2013, as an Internal Security Officer and worked as low level security guard when he was terminated on February 15, 2017 because of his political affiliation.

19.     Plaintiff WANDA CRUZ DÍAZ ("Cruz Díaz") is of legal
age, a resident of Puerto Rico and a citizen of the United
States of America. Plaintiff Cruz Díaz commenced working at
the Office of the Superintendent in August of 2013 and
worked as a Project Management Officer when she was
terminated on February 15, 2017 because of her political
affiliation.


20.     Plaintiff JUAN CRUZ DONES ("Cruz Dones") is of legal
age, a resident of Puerto Rico and a citizen of the United
States of America. Plaintiff Cruz Dones began working at
the Office of the Superintendent in July 2014, and was
performing duties as a Maintenance Services Assistant
("Auxiliar de Servicios de Mantenimiento") when he was
dismissed on February 15, 2017, because of his political
affiliation with the PDP and his support of PDP candidates.

21.     Plaintiff REBECCA DE PEDRO GONZÁLEZ ("de Pedro
González") is of legal age, a resident of Puerto Rico and a
citizen of the United States of America. Plaintiff de Pedro
González commenced working at the Office of the
Superintendent in January of 2014 and worked as an
Administrative Official when she was terminated on February
15, 2017 because of her political affiliation.

22.    Plaintiff SARAI DÍAZ REYES ("Díaz Reyes") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Díaz Reyes began working at the Office of the Superintendent in June, 2013, and was performing duties as a Maintenance Services Assistant ("Auxiliar de Servicios de Mantenimiento") when she was dismissed on February 15, 2017, because of her political affiliation with the PDP and his support of PDP candidates.

23.    Plaintiff JOSÉ ESPINOSA DÍAZ ("Espinosa Díaz") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Espinosa Díaz commenced working at the Office of the Superintendent in March 2015, as an Internal Security Supervisor when he was terminated on February 15, 2017 because of his political affiliation.

24.    Plaintiff JOSHUA FIGUEROA SERRANO ("Figueroa Serrano") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Figueroa Serrano began working at the Office of the Superintendent in December 2015, and was performing duties as a Conservation and Facility Repair Technician when he was dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates.

25.    Plaintiff FERNANDO FUENTES RODRÍGUEZ ("Fuentes Rodríguez") is of legal age, a resident of Puerto Rico and

a citizen of the United States of America. Plaintiff
Fuentes Rodríguez began working at the Office of the
Superintendent in March of 2013, and was performing duties
as a Conservation and Facility Repair Supervisor when he
was dismissed on February 15, 2017, because of his
political affiliation with the PDP and his support of PDP
candidates.

26.    Plaintiff IVELISSE GONZÁLEZ ALEMÁN ("González Alemán")
is of legal age, a resident of Puerto Rico and a citizen of
the United States of America. Plaintiff González Alemán
began working at the Office of the Superintendent in August
2013, and was performing duties as an Assistant Director of
Facilities Conservation and Technical Services when she was
dismissed on February 15, 2017, because of her political
affiliation with the PDP and her support of PDP candidates.

27.    Plaintiff MIGUEL A. GONZÁLEZ GERENA ("Gonzalez
Gerena") is of legal age, a resident of Puerto Rico and a
citizen of the United States of America. Plaintiff Gonzalez
Gerena began working at the Office of the Superintendent in
August 2013, and was performing duties as a Conservation
and Facility Repair Technician when he was dismissed on
February 15, 2017, because of his political affiliation
with the PDP and his support of PDP candidates.

28.     Plaintiff  ANA.  M.  GONZÁLEZ  LEDESMA  ("González
Ledesma")  is  of  legal  age,  a  resident  of  Puerto  Rico  and  a
citizen  of  the  United  States  of  America.  Plaintiff  González
Ledesma  commenced  working  at  the  Office  of  the
Superintendent  in  January  of  2014  and  worked  as  an
Administrative  Assistant  when  she  was  terminated  on
February 15, 2017 because of her political affiliation.

29.     Plaintiff  ALAN  A.  GRIFFITH  FIGUEROA  ("Griffith
Figueroa")  is  of  legal  age,  a  resident  of  Puerto  Rico  and  a
citizen  of  the  United  States  of  America.  Plaintiff  Griffith
Figueroa  began  working  at  the  Office  of  the  Superintendent
in  January  2014,  and  was  performing  duties  as  a  Maintenance
Services  Assistant  ("Auxiliar  de  Servicios  de
Mantenimiento")  when  he  was  dismissed  on  February  15,  2017,
because  of  his  political  affiliation  with  the  PDP  and  his
support of PDP candidates.

30.     Plaintiff GÉNESIS HERNÁNDEZ DÍAZ ("Hernández Díaz") is
of  legal  age,  a  resident  of  Puerto  Rico  and  a  citizen  of
the  United  States  of  America.  Plaintiff  Hernández  Díaz
commenced  working  at  the  Office  of  the  Superintendent  in
July  of  2015  and  worked  as  an  Administrative  Assistant  when
she  was  terminated  on  February  15,  2017  because  of  her
political affiliation.

31.     Plaintiff CARLOS E. HERNÁNDEZ RESTO ("Hernández
Resto") is of legal age, a resident of Puerto Rico and a
citizen of the United States of America. Plaintiff
Hernández Resto began working at the Office of the
Superintendent in 2013, and was performing duties as a
Conservation and Facility Repair Technician when he was
dismissed on February 15, 2017, because of his political
affiliation with the PDP and his support of PDP candidates.

32.     Plaintiff JORGE IRIZARRY PARÍS ("Irizarry París ") is
of legal age, a resident of Puerto Rico and a citizen of
the United States of America. Plaintiff Irizarry París
began working at the Office of the Superintendent in
February 2014, and was performing duties as a Conservation
and Facility Repair Technician when he was dismissed on
February 15 2017, because of his political affiliation with
the PDP and his support of PDP candidates.

33.     Plaintiff EDWIN JIMENEZ RESTO ("Jimenez Resto") is of
legal age, a resident of Puerto Rico and a citizen of the
United States of America. Plaintiff Jimenez Resto began
working at the Office of the Superintendent in December
2014, and was performing duties as a Conservation and
Facility Repair Technician when he was dismissed on
February 15, 2017, because of his political affiliation
with the PDP and his support of PDP candidates.

34.     Plaintiff MARY L. LASTRA RIVERA ("Lastra Rivera") is
of legal age, a resident of Puerto Rico and a citizen of
the United States of America. Plaintiff Lastra Rivera
commenced working at the Office of the Superintendent in
February 2016 and worked as a Sales Representative when she
was terminated on February 15, 2017 because of her
political affiliation.

35.     Plaintiff OSCAR LEDESMA ALBORS ("Ledesma Albors") is
of legal age, a resident of Puerto Rico and a citizen of
the United States of America. Plaintiff Ledesma Albors
began working at the Office of the Superintendent in 2013,
and was performing duties as a Gardener when he was
dismissed on February 15, 2017, because of his political
affiliation with the PDP and his support of PDP candidates.

36.     Plaintiff JEAN LEÓN RENTA ("León Renta") is of legal
age, a resident of Puerto Rico and a citizen of the United
States of America. Plaintiff León Renta commenced working
at the Office of the Superintendent in July 2013, and was
an Internal Security Supervisor when he was terminated on
February 15, 2017 because of his political affiliation.

37.     Plaintiff ARIADNA LÓPEZ ("Lopez") is of legal age, a
resident of Puerto Rico and a citizen of the United States
of America. Plaintiff Lopez commenced working at the Office
of the Superintendent in November 2015 and worked as a

16

Receptionist when she was terminated on February 15, 2017 because of her political affiliation.

38.   Plaintiff JANICE MARCHAND BAUZÁ ("Marchand Bauzá") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Marchand Bauzá commenced working at the Office of the Superintendent in June of 2014 and worked as a Human Resources Specialist when she was terminated on February 15, 2017 because of her political affiliation.

39.   Plaintiff JAZMINE T. MARTÍNEZ GALÍNDEZ ("Martínez Galíndez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Martínez Galíndez commenced working at the Office of the Superintendent in July 2014 and worked as an Administrative Executive Assistant when she was terminated on February 15, 2017 because of her political affiliation.

40.   Plaintiff WANDA MORALES PÉREZ ("Morales Pérez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Morales Pérez commenced working at the Office of the Superintendent in October of 2013 and worked as a General Services Assistant when she was terminated on February 15, 2017 because of her political affiliation. At the time of termination, Plaintiff Morales Perez was receiving treatment form the

Puerto Rico State Insurance Fund due a work-related incident.

41.    Plaintiff CRISTOBAL MAYSONET GARCÍA ("Maysonet García") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Maysonet García commenced working at the Office of the Superintendent in June 2015, as an Internal Security Officer with low level duties as a security guard when he was terminated on February 15, 2017 because of his political affiliation.

42.    Plaintiff DOROTHY MYERS ROSARIO ("Myers Rosario") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Myers Rosario commenced working at the Office of the Superintendent in January of 2013 and worked as an Administrative Assistant when she was terminated on February 15, 2017 because of her political affiliation.

43.    Plaintiff JOSÉ NARVÁEZ CARRIÓN ("Narváez Carrión") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Narváez Carrión commenced working at the Office of the Superintendent in July of 2015, and was a Letterer and/or Engraver ("Rotulista") when he was terminated on February 15, 2017 because of his political affiliation.

18

44.    Plaintiff JONUEL NEGRÓN DÍAZ ("Negrón Díaz") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Negrón Díaz commenced working at the Office of the Superintendent in December of 2013, and was an Emergency Management Officer when he was terminated on February 15, 2017 because of his political affiliation.

45.    Plaintiff RUTH Y. OLIVERO ALVAREZ ("Olivero Alvarez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Olivero Alvarez commenced working at the Office of the Superintendent in January 2013 and was performing duties as a Human Resources Assistant when she was terminated on February 15, 2017 because of her political affiliation. Plaintiff Olivero Alvarez was under treatment before the Puerto Rico State Insurance Fund Corporation when her employment was terminated due to a work-place related incident.

46.    Plaintiff JOSÉ A. ONTAÑO ROSARIO ("Ontaño Rosario") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Ontaño Rosario commenced working at the Office of the Superintendent in March of 2013, and was a Carpentry Supervisor when he was terminated on February 15, 2017 because of his political affiliation.

47.     Plaintiff ALEJANDRA ORTIZ MELÉNDEZ ("Ortiz Meléndez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Ortiz Meléndez commenced working at the Office of the Superintendent in August of 2014 and worked as a Receptionist when she was terminated on February 15, 2017 because of her political affiliation.

48.     Plaintiff OMAR PADRÓ PAGÁN ("Padró Pagán ") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Padró Pagán began working at the Office of the Superintendent in October 2016, and was performing duties as a Conservation and Facility Repair Technician when he was dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates.

49.     Plaintiff GILBERTO PAGÁN RESTO ("Pagán Resto") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Pagán Resto commenced working at the Office of the Superintendent in April 28, 2013, as an Internal Security Officer and worked as low level security guard when he was terminated on February 15, 2017 because of his political affiliation.

50.     Plaintiff WILFRIDO PALACIO CAMACHO ("Palacio Camacho") is of legal age, a resident of Puerto Rico and a citizen of

the United States of America. Plaintiff Palacio Camacho began working at the Office of the Superintendent in February 2013, and was performing duties as a Conservation and Facility Repair Technician when he was dismissed on February, 15 2017, because of his political affiliation with the PDP and his support of PDP candidates.

51.    Plaintiff KEVIN PAREDES SANCHEZ ("Paredes Sanchez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Paredes Sanchez began working at the Office of the Superintendent in February 2016, and was performing duties as a Conservation and Facility Repair Technician when he was dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates.

52.    Plaintiff ADY PAZ OTERO ("Paz Otero") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Paz Otero commenced working at the Office of the Superintendent in March 2013, as an Internal Security Supervisor when she was terminated on February 15, 2017 because of her political affiliation. Plaintiff Paz Otero was under treatment before the Puerto Rico State Insurance Fund Corporation when her employment was terminated due to a work-place related incident.

53.     Plaintiff CATHERINE QUIÑONES PIMENTEL ("Quiñones Pimentel") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Quiñones Pimentel commenced working at the Office of the Superintendent in January of 2013 and worked as an Auditor when she was terminated on February 15, 2017 because of her political affiliation.

54.     Plaintiff NEFTALÍ RAMOS LOZADA ("Ramos Lozada") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Ramos Lozada commenced working at the Office of the Superintendent in September of 2016, and was a Certified Electrician when he was terminated on February 15, 2017 because of his political affiliation.

55.     Plaintiff ARNALDO REYES PÉREZ ("Reyes Pérez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Reyes Pérez commenced working at the Office of the Superintendent in January of 2015, and was an Electrician Assistant when he was terminated on February 15, 2017 because of his political affiliation.

56.     Plaintiff AUGUSTO B. RIVERA FALÚ ("Rivera Falú") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Rivera Falú commenced

working at the Office of the Superintendent in February 2013, as an Internal Security Officer when he was terminated on February 15, 2017 because of his political affiliation.

57.    Plaintiff FELIX RIVERA GONZÁLEZ ("Rivera González") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Rivera González commenced working at the Office of the Superintendent in September 1, 2016, as an Internal Security Officer and worked as low level security guard when he was terminated on February 15, 2017 because of his political affiliation.

58.    Plaintiff LUIS A. RIVERA GONZÁLEZ ("Rivera González") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Rivera González commenced working at the Office of the Superintendent in February of 2013, and was a Certified Electrician when he was terminated on February 15, 2017 because of his political affiliation.

59.    Plaintiff PRISCILLA RIVERA GONZÁLEZ ("Rivera González") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Rivera González commenced working at the Office of the Superintendent in January of 2014 and worked as a Receptionist ("Recepcionista Telefonista") when she was

23

terminated on February 15, 2017 because of her political affiliation.

60.     Plaintiff NERY LUZ RIVERA MELENDEZ ("Rivera Melendez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Rivera Melendez began working at the Office of the Superintendent in February 15, 2013, and was performing duties as a Maintenance Services Assistant ("Auxiliar de Servicios de Mantenimiento") when she was dismissed on February 15, 2017, because of her political affiliation with the PDP and her support of PDP candidates.

61.     Plaintiff DIEGO RIVERA ORTÍZ ("Rivera Ortíz") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Rivera Ortíz began working at the Office of the Superintendent in March 2013, and was performing duties as a Maintenance Services Assistant ("Auxiliar de Servicios de Mantenimiento") when he was dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates.

62.     Plaintiff IVÁN G. RIVERA RÍOS ("Rivera Ríos") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Rivera Ríos began working at the Office of the Superintendent in July 2016,

and was performing duties as a Conservation and Facility Repair Technician when he was dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates.

63.     Plaintiff RAMÓN RIVERÓN MUÑOZ ("Riverón Muñoz") is of legal age, a resident of Puerto Rico and a Cuban national with legal immigration status in the United States of America. Plaintiff Riverón Muñoz began working at the Office of the Superintendent in 2013, and was performing duties as a Cabinetmaker when he was dismissed on February, 15 2017, because of his presumed political affiliation with the PDP and his support of PDP candidates.

64.     Plaintiff JOSÉ RODRÍGUEZ CONCEPCIÓN ("Rodríguez Concepción") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Rodríguez Concepción commenced working at the Office of the Superintendent in March 2013, and was an Event Coordinator when he was terminated on February 15, 2017 because of his political affiliation.

65.     Plaintiff JOSEPH RODRÍGUEZ RODRÍGUEZ ("Rodríguez Rodríguez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Rodríguez Rodríguez commenced working at the Office of the Superintendent in October 2016, as an Internal Security

Officer with low level duties as a security guard when he was terminated on February 15, 2017 because of his political affiliation.

66.    Plaintiff JUAN RODRÍGUEZ SAURE ("Rodríguez Saure") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Rodríguez Saure commenced working at the Office of the Superintendent in February of 2016 and worked as a Human Resources Analyst when she was terminated on February 15, 2017 because of her political affiliation.

67.    Plaintiff RAÚL SÁNCHEZ ("Raúl Sánchez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Raúl Sánchez began working at the Office of the Superintendent in July 2013, and was performing duties as a Warehouse Supervisor when he was dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates.

68.    Plaintiff LUIS SANTAELLA DÍAZ ("Santaella Díaz") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Santaella Díaz began working at the Office of the Superintendent on July 24, 2016, and was performing duties as an Internal Security Officer when he was dismissed on February 15, 2017, because

of his political affiliation with the PDP and his support of PDP candidates.

69.    Plaintiff GIANCARLO SANTIAGO MARTINEZ ("Santiago Martinez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Santiago Martinez commenced working at the Office of the Superintendent in August 2015, as an Internal Security Officer and worked as low level security guard when he was terminated on February 15, 2017 because of his political affiliation.

70.    Plaintiff PABLO SANTIAGO RODRÍGUEZ ("Santiago Rodríguez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Santiago Rodríguez began working at the Office of the Superintendent in September 2013, and was performing duties as a Conservation and Facility Repair Technician when he was dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates. At the time of the termination, Plaintiff Santiago Rodriguez had an open case before the Puerto Rico State Insurance Fund because of a work-place related accident.

71.    Plaintiff JEAN SANTIAGO TORRES ("Santiago Torres") is of legal age, a resident of Puerto Rico and a citizen of

the United States of America. Plaintiff Santiago Torres began working at the Office of the Superintendent in February 2013, and was performing duties as a Maintenance Services Assistant ("Auxiliar de Servicios de Mantenimiento") when he was dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates.

72.    Plaintiff CARLOS SANTOS FIGUEROA ("Santos Figueroa") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Santos Figueroa began working at the Office of the Superintendent in 2013, and was performing duties as a Conservation and Facility Repair Technician when he was dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates.

73.    Plaintiff ANTONIO SOLÁ MARTÍ ("Solá Martí") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Solá Martí commenced working at the Office of the Superintendent in September of 2014, and was a Certified Electrician when he was terminated on February 15, 2017 because of his political affiliation.

74.    Plaintiff EMANUEL SOTO RAMOS ("Soto Ramos") is of legal age, a resident of Puerto Rico and a citizen of the

United States of America. Plaintiff Soto Ramos commenced working at the Office of the Superintendent in October of 2014, and was a Project Management Officer when he was terminated on February 15, 2017 because of his political affiliation.

75.    Plaintiff NELSON M. TORRES MALDONADO ("Torres Maldonado") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Torres Maldonado commenced working at the Office of the Superintendent in August 2014, as an Internal Security Officer and worked as a security guard when he was terminated on February 15, 2017 because of his political affiliation.

76.    Plaintiff ALTAGRACIA TORRES MARRERO ("Torres Marrero") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Torres Marrero commenced working at the Office of the Superintendent in March 2013 and worked as an Administrative Assistant when she was terminated on February 15, 2017 because of her political affiliation.

77.    Plaintiff ISALÍ TORRES MARTÍNEZ ("Torres Martínez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Torres Martínez commenced working at the Office of the Superintendent in

April of 2015 and worked as an Administrative Assistant
when she was terminated on February 15, 2017 because of her
political affiliation.

78.    Plaintiff MYRIAM TORRES RÍOS ("Torres Ríos") is of
legal age, a resident of Puerto Rico and a citizen of the
United States of America. Plaintiff Torres Ríos commenced
working at the Office of the Superintendent in August of
2014 and worked as an Administrative Assistant when she was
terminated on February 15, 2017 because of her political
affiliation.

79.    Plaintiff   FRANCES   VÁZQUEZ   RODRÍGUEZ   ("Vázquez
Rodríguez") is of legal age, a resident of Puerto Rico and
a citizen of the United States of America. Plaintiff
Vázquez Rodríguez commenced working at the Office of the
Superintendent in August 16, 2014, as an Internal Security
Officer and worked as a security guard when he was
terminated on February 15, 2017 because of his political
affiliation.

80.    Plaintiff RAQUEL VEGA LÓPEZ ("Vega López") is of legal
age, a resident of Puerto Rico and a citizen of the United
States of America. Plaintiff Vega López began working at
the Office of the Superintendent in September 2014, as an
Internal Security Officer and was performing duties as an
Administrative Assistant when she was dismissed on February

15, 2017, because of her political affiliation with the PDP and her support of PDP candidates.

81.    Plaintiff CHRISTIAN E. VEGA VILLALBA ("Vega Villalba") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Vega Villalba commenced working at the Office of the Superintendent in January 2016, and was a Pre-Intervention Officer (Oficial de Pre-Intervención) when he was terminated on February 15, 2017 because of his political affiliation.

82.    Plaintiff KASSANDRA I. VELA CALO ("Vela Calo") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Vela Calo commenced working at the Office of the Superintendent in January 2015 and worked as a Human Resources Assistant when she was terminated on February 15, 2017 because of her political affiliation.

83.    Plaintiff WANDA VICENTI LATORRE ("Vicenti Latorre") is of legal age, a resident of Puerto Rico and a citizen of the United States of America. Plaintiff Vicenti Latorre commenced working at the Office of the Superintendent in April of 2013 and worked as a Accounting when she was terminated on February 15, 2017 because of her political affiliation.

84.     Plaintiff   JAVIER   WALKER   CARRAQUILLO   ("Walker
Carraquillo") is of legal age, a resident of Puerto Rico
and a citizen of the United States of America. Plaintiff
Walker Carraquillo commenced working at the Office of the
Superintendent in January 2013, and was a General Services
Coordinator when he was terminated on February 15, 2017
because of his political affiliation.

**DEFENDANTS**

85.     Defendant THOMAS RIVERA SCHATZ ("Rivera Schatz") is
the  newly  elected  President  of  the  Senate  of  the
Commonwealth of Puerto Rico ("Senate").

        a. As a result of the November 8, 2016 General
Election, the NPP gained a majority of the seats in the
Senate.

        b. Rivera Schatz had been the NPP Senate candidate
that received the most electoral votes of any NPP Senate
candidate during the general election.

        c. Following the November 2016 General Election,
Rivera Schatz immediately became the frontrunner for the
position of President of the Senate. On or about mid
November 2016, Governor Elect Ricardo Rosello announced
that the NPP caucus in the Senate elected Rivera Schatz to
become the next President of the Senate.

d. Rivera Schatz was sworn in as a Senator on January 2, 2013.

e. On January 2017, Rivera Schatz formally became the President of the Senate.

f. Rivera Schatz had also been the President of the Senate for the NPP from January 2nd, 2009, until December 31st, 2013. Hence, as a result of the November 6th, 2012 and Novermber 8th, 2016, General Elections, he was re-elected to the Senate under the NPP insignia.

g. Rivera Schatz is a well-known member of the NPP who has occupied various high-ranking positions under NPP administrations.

h. He has also held and currently holds numerous high-ranking positions within the NPP itself.

i. Rivera Schatz is the highest-ranking officer and nominating authority of the Senate and, by law – along with the Speaker of the House – of the Office of the Superintendent of the Capitol Building.

j. Rivera Schatz, together with the other co-Defendants, and all of their respective agents and employees of their full political trust, were involved in the transition of the current Office of the Superintendent from the House to the Senate.

k. At all times relevant and material to this action Rivera Schatz has acted under color of state law.

86.    Rivera Schatz is sued in this action in his personal capacity, in his official capacity as President of the Senate and as highest-ranking officer of the Office of the Superintendent.

87.    Defendant CARLOS "JOHNNY" MENDEZ ("Mendez") is the newly elected Speaker of the House of Representatives of the Commonwealth of Puerto Rico ("House of Representatives").

a. As a result of the November 8th, 2016 General Election, the NPP gained a majority of the seats in the House of Representatives.

b. Immediately after the election, Mendez became the frontrunner for the position of Speaker of the House of Representatives, and was the only Representative nominated to occupy the position. On or about mid November 2016, Governor Elect Ricardo Rosselló announced that the NPP caucus in the House of Representatives elected Mendez to become the next Speaker of the House of Representatives.

c. Mendez was a Representative for the NPP from January 2nd 2012, until December 31, 2016, under the NPP insignia. In the November 8th, 2016 General Election, he

was re-elected to the House of Representatives under the NPP insignia.

d. Mendez was once more sworn in as a Representative on January 2nd, 2017.

e. On January 14th, 2013, Mendez formally became the Speaker of the House of Representatives.

f. As Speaker of the House Mendez is the highest-ranking officer and nominating authority of the House and, by law – along with the President of the Senate – of the Office of the Superintendent of the Capitol Building (which hosts both the buildings and offices composing the entire Legislative Branch of the Commonwealth of Puerto Rico).

g. Mendez was actively involved in the transition of both the House and the current Office of the Superintendent.

h. At all times relevant and material to this action, Mendez has been a well-known member of the NPP that has occupied various positions under NPP administrations.

i. At all times relevant and material to this action Mendez has acted under color of state law.

j. Mendez is sued in this action in his personal capacity, and in his official capacity as Speaker of the House of Representatives.

88.     Defendant GABRIEL HERNANDEZ ("Hernandez") is the Chief
of Staff for the Office of the President of the Senate of
the Capitol Building.

a. Hernandez was appointed to such position by the
President of Senate, co-Defendant Rivera Schatz.

b. Hernandez enjoys the full trust, including
political trust, of and is loyal to Rivera Schatz, Mendez
and the NPP.

c. Upon information and belief, it was Rivera Schatz
who designated Hernandez to such position.

d. Hernandez is a well-known, loyal and active member
of the NPP who has participated and collaborated with the
party in regards to numerous activities and events,
including activities and events involving employees of the
Senate and the Office of the Superintendent.

e. At all times relevant and material hereto,
Hernandez was acting under color of state law.

f. Hernandez is sued in this action in his individual
capacity, and in his official capacity as the Chief of
Staff for the Office of the President of the Senate.

89.     Defendant WILFREDO RAMOS ("Ramos") is the
Superintendent of the Capitol Building ("Superintendent").

a. As required by law and regulation, Ramos was
appointed to such position by consensus between the

36

President of Senate – co-Defendant Rivera Schatz and the
Speaker of the House of Representatives – co-Defendant
Mendez.

b. Ramos enjoys the full trust—including political
trust—of and is loyal to Rivera Schatz, Mendez and the NPP.

c. Upon information and belief, it was Rivera Schatz
who recommended, nominated, and designated Ramos to such
position.

d. Ramos is a well-known, loyal and active member of
the NPP who has participated and collaborated with the
party in regards to numerous activities and events,
including activities and events involving employees of the
Office of the Superintendent.

e. At all times relevant and material hereto, Ramos
was acting under color of state law.

f. Ramos is sued in this action in his individual
capacity, and in his official capacity as the
Superintendent of the Capitol Building.

90.     Defendant PABLO SASTRE ("Sastre") is the Auxiliary
Superintendent in Charge of Operations of the Office of the
Superintendent.

a. Sastre was appointed to such position by Ramos.

b. Sastre enjoys the full trust—including full trust—
of and is loyal to both co-Defendant Rivera Schatz and co-

Defendant Ramos, as well as to the NPP. As a matter of
fact, Sastre was fully aware of the illegality of
Defendants' acts because he was Plaintiff in the case of
<u>Sastre v. Superintendencia del Capitolio,</u>, 13-cv-01245
(JAF), where a similar controversy was dilucidated and the
illegality of actions such as those in this complaint was
clearly illustrated.

c. Sastre is a well-known, loyal and active member of
the NPP that has participated and collaborated with the
party in regard to numerous activities and events,
including activities and events involving employees of the
Office of the Superintendent.

d. During the 2009-2012 term, where the NPP also had
control of the Puerto Rico Legislature, Sastre performed
duties as Auxiliary Superintendent at the Office of the
Superintendent, where he met and learned the political
affiliations of some of the employees that were terminated
from employment on or after January, 2017, including
Plaintiffs.

e. At all times relevant and material hereto, Sastre
was acting under color of state law.

f. Sastre is sued in this action in his individual
capacity, and in his official capacity as Auxiliary

Superintendent in Charge of Operations of the Office of the Superintendent.

91.     Defendant ÁNGEL REDONDO ("Redondo") is the Auxiliary Superintendent in Charge of Administration of the Office of the Superintendent.

a. Redondo was appointed to such position by Ramos.

b. Redondo enjoys the full trust of and is loyal to both co-Defendants Rivera Schatz and Ramos, as well as to Sastre and the NPP.

c. Redondo is a well-known, loyal and active member of the NPP who has participated and collaborated with the party in regards to numerous activities and events, including activities and events involving employees of the Office of the Superintendent.

d. At all times relevant and material hereto, Redondo was acting under color of state law.

e. Redondo is sued in this action in his individual capacity, and in his official capacity as Auxiliary Superintendent in Charge of Administration of the Office of the Superintendent.

92.     Defendant JOSE FIGUEROA TORRES ("Figueroa Torres") is the Human Resources Director of the Office of the Superintendent.

a. Figueroa Torres was appointed to such position by Ramos.

b. Figueroa Torres enjoys the full trust of and is loyal to both co-Defendant Rivera Schatz and co-Defendant Ramos, Sastre and Redondo as well as to the NPP.

c. Figueroa Torres is a well-known, loyal and active member of the NPP who has participated and collaborated with the party in regard to numerous activities and events, including activities and events involving employees of the Office of the Superintendent.

d. At all times relevant and material hereto, Figueroa Torres was acting under color of state law.

e. Figueroa Torres is sued in this action in his individual capacity, and in his official capacity as Human Resources Director of the Office of the Superintendent.

93.     Defendant JANE VOE is an employee of the Office of the Superintendent and/or the Senate and/or the House of Representatives whose name and identity are not presently known, but which directly participated in, authorized or condoned – and/or set in motion a series of events directed to – the termination of individuals for their political beliefs, including plaintiffs. At all times relevant and material hereto, Doe was acting under color of state law.

94.     JOHN VOE is an employee of the Office of the
Superintendent and/or the Senate and/or the House of
Representatives whose name and identity are not presently
known, but which directly participated in, authorized or
condoned – and/or set in motion a series of events directed
to – the termination of individuals for their political
beliefs, including plaintiffs. At all times relevant and
material hereto, Doe was acting under color of state law.

95.     JANE DOE, JANE TOE, JANE POE, JANE LOE, JANE, MOE,
JANE BOE AND JANE TOE in their personal capacity and the
conjugal partnership composed with their respective
husbands and defendants above named, are included to be
afforded due process in the event that, as components of
the conjugal partnership, they are found liable for the
illegal actions of their husbands.

**FACTUAL ALLEGATIONS**

**GENERAL ALLEGATIONS AS TO ALL PLAINTIFFS**

**Relevant Background**

95.     The Office of the Superintendent is the office in
charge of keeping and maintaining the buildings, offices
and structures of the Puerto Rico Legislative Branch, as
well peripheral areas, in optimal conditions. It was
created to direct and supervise the maintenance,

conservation and repairs that take place in the buildings of the Puerto Rico Legislative Branch.

96.   Law 4 of 1977, as amended, created the Office of the Superintendent of the Capitol Building. Said law states that the "Office of the Superintendent shall be directed by a person to be appointed by mutual agreement of the President of the Senate of Puerto Rico and the Speaker of the House of Representatives of Puerto Rico."

97.   Under Puerto Rico law, moreover, the "President of the Senate and the Speaker of the House of Representatives of Puerto Rico shall appoint necessary personnel to achieve the purpose of" the Office of the Superintendent of the Capitol Building.

98.   Puerto Rico law further vests the Superintendent with the power to "establish the internal organization of the Superintendent's office, and to plan, direct, and supervise its operation." In short, the office's day to day administration and operations.

99.   On September 28th, 2000, a Personnel Regulation was approved at the Office of the Superintendent with the signatures of Charlie Rodríguez Colón, then President of the Senate, and Edison Misla Aldarondo, then Speaker of the House of Representatives. Said regulation, which to this date is still in effect, states that the President of the

42

Senate and the Speaker of the House of Representatives "will appoint by mutual agreement the Superintendent of the Capitol Building, who in turn will appoint the personnel necessary to operate the Office of the Superintendent of the Capitol Building".

100.    Besides the Office of the Superintendent, the Office of Legislative Services is another office that provides support to the legislative bodies in Puerto Rico, i.e. the House of Representatives and the Senate. It has been a tradition at the Puerto Rico legislature that every four-year term the internal administration and operation of each of these support offices is transferred from one president of a legislative body to the president of the other legislative body.

101.    During the 2005-2009 term NPP-affiliated Speaker of the House Jose Aponte oversaw the administration and operation of the Office of the Superintendent, and during the 2009-2012 term it was NPP-affiliated Senate President Thomas Rivera-Schatz. During the 2013-2016 term, PDP-affiliated Speaker of the House Jaime Perelló oversaw the administration and operation of the Office of the Superintendent. Since the beginning of 2017, again NPP-affiliated Senate President Thomas Rivera-Schatz oversees

the administration and operation of the Office of the
Superintendent.

102.    On the other hand, then Speaker of the House,
Jenniffer González-Colón oversaw the operations and
administration of the Office of Legislative Services during
the 2009-2012 term. During the 2013-2016 term, PDP-
affiliated Senate President Eduardo Bhatia Gautier oversaw
the administration and operation of the Office of
Legislative Services. Since the beginning of 2017, NPP-
affiliated Speaker of the House Carlos "Johnny" Mendez
oversees the administration and operation of the Office of
Legislative Services.

103.    Accordingly, between January 2005 and December 2013,
Superintendents appointed by NPP administrations
administered the Office of the Superintendent. And between
January 2013 and December 2016, a Superintendent appointed
by PDP administration administered the Office of the
Superintendent.

104.    From January 2005 to late 2006, the Superintendent was
Ms. Nélida Santiago, and from late 2006 to December 2012,
the Superintendent was Mr. Eliezer Velázquez. From January
2013 to December 2016, the Superintendent was Javier
Vázquez.

105.    All  Plaintiffs  worked  in  the  Office  of  the
Superintendent.

106.    On November 8th, 2016, a contentious General Election
was held in Puerto Rico.

107.    In that election NPP gubernatorial candidate Ricardo
Rosselló  defeated  David  Bernier,  who  was  running  for
governor on the ticket of the PDP. The NPP also won most of
the  seats  in  the  Senate  and  in  the  House  of
Representatives;  vesting  the  NPP  with  control  of  both
legislative  bodies  and  the  right  to  select  the  bodies'
presidents from amongst the NPP delegations.

108.    The  NPP  is  now  the  political  party  in  power.  It
controls  both  the  Executive  and  Legislative  Branches.  As  a
result, it also controls the Office of the Superintendent.

109.    Pursuant  to  Article  3,  Section  8  of  the  Puerto  Rico
Constitution,  the  newly  elected  members  of  the  legislative
branch were sworn in on January 2nd, 2017.

110.    Since  immediately  after  the  election,  however,
defendants nevertheless began exercising their influence as
reelected  members  of  the  legislature  to  be  appointed  to
powerful  positions,  and  exercised  de  facto  authority,
effectively  directing  and  influencing  the  affairs  of  the
legislature,  including  the  Office  of  the  Superintendent,
within weeks of the election.

111.    As a result of the change of administration during the
present term, from 2017 to 2020, the President of the
Puerto Rico Senate, defendant Thomas Rivera Schatz,
oversees the day to operations and administration of the
Office of the Superintendent, while co-Defendant Carlos
"Johnny" Mendez oversees the operations and administration
of the Office of Legislative Services.

112.    Consequently, co-defendant Rivera Schatz recommended
and nominated co-defendant Wilfredo Ramos for
Superintendent. Co-Defendant Carlos "Johnny" Mendez agreed,
as required by law.

113.    In or about mid-late November 2016, a transition
committee was established to provide for the transition in
the Senate from the PDP to the NPP. In a similar fashion, a
Transition Committee was established to provide for the
transition at the Office of the Superintendent from the
former PDP controlled House to the now NPP controlled
Senate.

114.    Because Rivera Schatz was elected by the NPP caucus to
become the new President of the Senate, he appointed a
majority, if not all, of the members of the transition
committees for both the Senate and the Office of the
Superintendent.

115.   During the month of November 2016, Rivera Schatz informed Jaime Perelló that he would appoint co-defendant Wilfredo Ramos as the Superintendent and named Ramos also to begin with the transition process of the Office of the Superintendent.

116.   Ramos, as well as all the other individuals involved in the transition process on behalf of the incoming administration, is loyal NPP and Rivera Schatz follower.

117.   Ramos, as well as all the other individuals involved in the transition process on behalf of the incoming administration, executed numerous orders and/or carried out numerous commands on behalf of Rivera Schatz during the transition process and acted as his agents on numerous occasions.

118.   Co-Defendants Rivera Schatz, Gabriel Hernandez, Wilfredo Ramos and Pablo Sastre were involved in and actively participated during the transition process.

119.   In or about early December 2016, all the managers and/or directors in charge of the different areas of service at the Office of the Superintendent made a presentation to the incoming transition committee regarding the status of their respective areas. Co-Defendants Wilfredo Ramos and Pablo Sastre, among others, were all present during the presentation.

120.   The members of the transition committee and all Defendants requested and/or were given access to and personally verified all records of the Office of the Superintendent, including personnel lists and employee information. They have also had these lists in their possession at all times relevant and material to this action.

121.   As per their request, the members of the transition committee were given access to a list of all employees that specifically included the dates on which each employee began working at the Office of the Superintendent.

122.   All co-defendants, and in particular Rivera Schatz and Mendez, as high-ranking NPP officials, have unrestricted access to NPP information, personnel, resources, and documents within the possession custody and/or control of the NPP and/or its officers, employees, personnel and/or agents. They have access to electoral lists, donation records, volunteer lists, and other information showing NPP-affiliated voters and loyal NPP supporters. They verified, authorized, condoned, or provided their agents and employees of their political trust with these records for the purpose of engaging in political discrimination and retaliation.

123.    At   all   times   relevant   and   material   hereto,   co-
defendants' staffs were composed of loyal and active NPP
followers with a long history in the NPP. All Defendants
appointed   to   and/or   selected   these   individuals   for
supervisory positions in the Senate and in the office of
the   Superintendent   immediately   after   the   change   in
administration. Some of these individuals had worked in the
Puerto  Rico  Legislature  (including  the  Senate,  House  and
Office of the Superintendent) during previous years.

124.    Around   the   first   week   of   December   2016,   former
Superintendent  Javier  Vázquez  issued  a  memo  to  all  the
managers  and  directors  informing  that  as  part  of  the
transition  process  members  of  the  incoming  transition
committee,  including  co-defendant  Wilfredo  Ramos,  would
visit the work areas at the Office of the Superintendent to
have personal contact with the employees of the agency.

125.    Defendants in effect visited the different departments
and  offices  throughout  the  Office  of  the  Superintendent,
including  Plaintiffs'  work-areas,  and  saw  Plaintiffs
performing  their  work,  during  occasions  relevant  and
material to this action.

126.    During  said  visits,  co-defendants  Ramos,  Sastre  and
other  members  of  the  incoming  committee,  under  the
direction  and  authorization  of  the  other  co-defendants,

talked to the employees in their work areas, and specifically asked them their names, positions, duties and the date on, or the administration under, which they had begun working at the Office of the Superintendent. As discussed further below, these conversations had the purpose of acquiring information regarding political affiliations.

127. At all times relevant and material hereto, Plaintiffs were employees of the Office of the Superintendent whose positions did not involve crafting, developing, or implementing public policy. Plaintiffs' positions were neither public-policy-making positions, nor positions that required the Plaintiffs to perform public-policy functions.

128. Regardless of its alleged "trust" label, none of the Plaintiffs performed functions of close proximity to policy-making employees, nor did such Plaintiffs otherwise had access to politically sensitive information or confidential information related to public policy matters or the legislative process. In short, political affiliation was not an appropriate requirement of Plaintiffs' positions.

129. None of the Plaintiffs had ever received a negative evaluation of his/her work performance at the Office of the Superintendent, whether verbally or in writing.

130.   As noted before, all Plaintiffs had worked at the
Office of the Superintendent during the previous PDP
administration and were affiliated to and had been
politically active on behalf of a political party other
than the NPP, specifically the PDP.

131.   The Office of the Superintendent, a relatively small
working place of about 320 employees divided into smaller
departments, had a highly charged political atmosphere in
the months leading to the November 2016 election; an
atmosphere that became increasingly more politically
charged and harassing during the months that followed the
November 2016 election.

132.   This is so because of the very nature of the
Legislature, which hosts numerous politicians, and their
politically loyal staffers and employees, all of whom are
very active in Puerto Rico politics.

133.   Because of the political nature of the Puerto Rico
Legislature, political affiliations are commonly known, and
easy to perceive and to figure out.

134.   Defendants and their agents and employees of their
full trust are (and were) well aware of Plaintiffs'
political affiliation and participation to a party other
than the NPP and its candidates, in particular the PDP and
PDP affiliated candidates, and/or perceived them as being

affiliated to and having participated in the general election on behalf of the PDP.

135.   All of the Defendants and their agents and employees of their full trust also knew, assumed, and/or perceived that the Plaintiffs had voted for the PDP and/or for PDP affiliated candidates, or for candidates not affiliated to the NPP, during the 2016 election.

136.   Besides PDP affiliated employees, the Office of the Superintendent also employed numerous NPP affiliated individuals before the November 2016 election, some of which were promoted by Defendants to high-level political-trust positions within months after winning the same.

137.   The Office of the Superintendent is a relatively small and highly politicized place of work, where all employees interact daily, and where politics are commonly discussed and the political affiliations of employees are well known, including by Defendants. All Plaintiffs worked in even smaller departments or work areas within the Office of the Superintendent.

138.   Most, if not all, of the employees of the Office of the Superintendent, including Plaintiffs, were very active in political campaigns, and enthusiastically participated in PDP political activities and events, and those of PDP political candidates.

139.    It was common knowledge at the Office of the
Superintendent (including by Defendants and employees of
their political-trust) that all Plaintiffs avidly supported
the PDP or particular PDP affiliated candidates for, and
during, the 2016 elections and that these Plaintiffs were
active during the PDP's electoral campaign.

140.    At all times relevant and material to this action, NPP
and PDP affiliated employees of the Office of the
Superintendent and the Legislature in general, including
Plaintiffs and Defendants, openly revealed, endorsed or
promoted their political affiliations to or in the presence
of co-workers and supervisors, including to Defendants
themselves; praised their respective party candidates and
status preferences; and publicly discussed their attendance
to their parties' activities and events. All Defendants
(and Defendants' agents and employees of their political
trust) had access to this information readily available;
and they were personally aware, made aware, and directed
others to become aware, of many such facts.

141.    Employees of the Office of the Superintendent,
including Plaintiffs, Defendants, and NPP affiliated
employees of the Office of the Superintendent and the
Senate, such as employees of Defendants' political trust,
and NPP affiliated individuals who ascended to or were

53

appointed to supervisory positions, openly and actively debated amongst themselves their respective political parties' platforms, stances on certain issues, and candidates.

142.    Defendants, employees of Defendants' political trust, and NPP affiliated individuals who were eventually ascended to or were appointed to supervisory positions by Defendants, were active participants during these debates and/or personally witnessed Plaintiffs' debate in favor of the PPD, candidates affiliated with the PPD, and/or the positions and ideals of the PPD and PPD candidates, amongst other comments tending to show their affiliation to political parties other than the NPP (mostly PDP), thereby gathering personal knowledge of Plaintiffs political affiliation.

143.    As part of their participation in the adverse employment actions at issue herein Defendants directed and/or used Office of the Superintendent employees of their political trust (and other Senate employees of their political trust) to gather information pertaining to Plaintiffs' political affiliations and to execute adverse employment actions because of political affiliations and beliefs, including the adverse employment actions asserted herein.

144.    Moreover,   in   the   days   leading   up   to   the   General
Election,  employees  of  the  Office  of  the  Superintendent
wore   clothing   and/or   accessories   with   their   respective
party  colors.  Plaintiffs  did  not  express  or  demonstrated
any  sympathy  whatsoever  to  the  NPP  or  any  NPP  candidate  in
such  a  manner  during  the  same  period.  As  such,  they  were
perceived as political opponents.

145.    The   highly-charged   political   atmosphere   in   the
Plaintiffs'   different   work   areas   became   increasingly
hostile  and  harassing  during  the  weeks  leading  up  to  the
November  2016  election,  and  in  the  months  thereafter,
particularly  the  days  before,  and  the  weeks  that  followed,
the  appointment  of  the  new  administration  at  the  Office  of
the  Superintendent,  and  the  swearing  in  of  Rivera  Schatz  as
President of the Senate and Mendez as Speaker of the House.

146.    In  the  months  after  the  election,  including  the  months
of  December  2016  and  January  2017,  NPP  affiliated  employees
proudly  and  repeatedly  wore  the  NPP's  blue  and  white  colors
to signal their loyalty to the NPP.

147.    Moreover,  on  January  2nd,  2017  was  the  swearing-in  of
the  newly  elected  NPP  affiliated  Governor  of  Puerto  Rico,
which  takes  place  in  the  Capitol  Building,  and  of  the  newly
elected  NPP  majority  of  the  Senate  and  the  House  of
Representatives.  Although,  unsurprisingly,  some  employees

affiliated to the PDP that worked in the administrative areas were told not to come to work, other PDP affiliated employees that worked in specific areas, such as some Plaintiffs, had to work.

148.   On said date, employees affiliated to the NPP again could be seen proudly wearing and displaying the blue and white colors of the NPP.

149.   Plaintiffs did not express or demonstrated any sympathy whatsoever to the NPP or any NPP candidate in any of the previously stated manners during such period, facts known to all Defendants to this action and to their agents and employees of their political trust.

150.   As such, they were perceived as political opponents, and constantly harassed, threatened and mocked, including by Defendants themselves on the basis of their political affiliation and beliefs. Among the threats was the loss of employment, as discussed further below.

151.   After the election, NPP affiliated employees were obviously happy and cheerful, while PDP affiliated employees, like Plaintiffs, were not. On such occasions, individuals who were not happy and cheerful, such as Plaintiffs, were perceived in their work area as affiliated with a party different than the one in power (NPP), in particular the PDP, including by all Defendants (and their

agents and employees of their political trust), who continuously roamed around the Office of the Superintendent, including Plaintiffs' work areas and saw that Plaintiffs were not celebrating, but rather were discouraged and frustrated by the election results. During such instances these individuals were constantly politically discriminated and harassed.

152.   Immediately after the election, NPP affiliated employees, including Defendants and employees of their political trust, began constantly harassing individuals affiliated with or perceived to be affiliated with political parties other than the NPP. Such conduct remains to this day and which has resulted in a chilling effect and has had a compromising effect on Plaintiffs First Amendment rights and their desires to engage in activities protected by the First Amendment.

153.   One of the first actions of the Defendants after taking control of the Office of the Superintendent and the legislature in general was to change the logo of the office, as well as the employees' uniforms and identification card to bear blue and white colors—the colors of the NPP.

154. Defendant Rivera Schatz even spent thousands of taxpayers' dollars remodeling his Presidential Office with blue and white furniture.

155. During numerous occasions NPP affiliated individuals, including Defendants, their agents and employees of their political trust, were heard making comments in the Office of the Superintendent, and in the Legislature in general, to the effect that the employees affiliated to political parties other than the NPP, in particular individuals affiliated to the PDP, including Plaintiffs, had their days numbered. Statements to the effect that "it was their turn" and that the new administration needed space to accommodate "their people" or "persons whom they could trust" would usually follow these comments.

156. For example, after the results of the election were known, a NPP affiliated secretary told one of the Plaintiffs in a demeaning, revengeful and retaliatory way that he and his PDP friends were going to be terminated soon because of their political preferences and what the PDP had "done" to NPP employees of the Office of the Superintendent in 2012.

157. In a similar fashion, "Billy" Medina, from the office of Defendant Rivera Schatz, disrupted the Office of the Superintendent employees and created a hostile environment

by continuously making derogatory comments to Ledesma
Albors stating that: soon you will be gone ("ya mismo se
van"); when my people come, you are done ("cuando los mios
lleguen se les acabo el guiso"); among others.

158.   In another incident, "Roy" Sanchez, who later was put
in charge of Internal Security, started to change
employee's positions favoring NPP affiliates. Plaintiff
Negron Diaz witnessed as Roy Sanchez kept a diary as he
observed employees and talked to them asking when they had
started working at the Office of the Superintendent.

159.   In yet another separate incident, co-Defendant Sastre
said in front of one of the Plaintiffs to this case in a
demeaning manner, that he knew he was PDP affiliate.

160.   In fact, these comments were not unfounded; as even
before the change of administration (during the months of
November and December, 2016) loyal Rivera Schatz, Ramos and
NPP followers, including individuals that ultimately
substituted Plaintiffs in their positions, were seen
roaming around the Office of the Superintendent with
employment application documents. It was obvious that these
were to be the new employees that would be substituting
Plaintiffs.

161.   In another separate instance, Plaintiff Olivero
Alvarez worked at the Office of Human Resources where she

saw people coming in and out asking for work and new position because of their affiliation to the NPP. Olivero Alvarez was subjected to continuous derogatory comments like "all this garbage (referring to Olivero Alvarez) will go" and "all this dirt (referring to Olivero Alvarez) will go" ("toda esta zahorria se va", "este polvorín se va") by other personnel from the office such as Jean Marie Rodriguez and Nancy Morales, and from NPP affiliate visitors. Olivero Alvarez complained about the situation to the Director of Human Resources and informed him that the continuous comments had a terrible emotional effect upon her, but he did nothing.

162.    As noted before, as soon as the NPP won the election, Defendants, their political-trust employees and employees of the Office of the Superintendent in general – acting pursuant to the instructions and authorization of Defendants – initiated a campaign to verify and/or to gather information tending to show the political affiliation of those employees at the Office of the Superintendent who were not affiliated to the NPP, including Plaintiffs, for the purpose of discriminating and retaliating against them for having opposing political views and beliefs.

163.    This was easy to do, as noted before. Defendants and
Defendants' political-trust employees worked in the Office
of the Superintendent and Senate for years and, for the
reasons explained above, knew who was and who was not
affiliated to the NPP. Defendants also directed, authorized
and condoned that loyal NPP followers, including employees
of their political trust at the office of the
Superintendent and the Senate, gathered information
pertaining to the political views and affiliations of the
employees at the Office of the Superintendent, including
those of Plaintiffs, and to provide them to Defendants.

164.    Defendants, and/or others upon Defendants
instructions, direction, condonation or authorization
(whether explicitly, implicitly, tacitly or expressly) were
provided with and used this information to execute the
adverse employment actions giving rise to this Complaint.
Unsurprisingly, individuals attempting to ascertain the
political affiliations of employees at the Office of the
Superintendent during the months that followed the 2016
General Election, and who gathered this information, were
promoted to political-trust positions after the change in
administration of the Office of the Superintendent.

165.    Plaintiffs had participated in the entourages of PDP
affiliated candidates and would be seen on TV, heard on the

radio, and seen in newspapers or in the candidates' public Facebook and other social media pages. Some Plaintiffs were staunch defenders of the PDP in their nonprivate Facebook accounts, Instagram and other social media sites that anyone can access.

166.    Thus, Defendants and individuals acting pursuant to Defendants' direction, instructions, condonation, authorization, whether directly or indirectly, tacitly or implicitly, verified these sources and accounts, as well as other sources such as NPP, Senate, House and Office of the Superintendent records and lists, in order to determine, ascertain and verify the political affiliations of legislature and Office of the Superintendent Employees with the purpose of discriminating against and/or retaliating against employees of the Office of the Superintendent affiliated to a political party other than the NPP, in particular the PDP, including Plaintiffs.

167.    Moreover, as also noted above, NPP affiliated members of the incoming transition committee were provided a list of all employees of the Office of the Superintendent that included the date of their hiring. Historically, when an administration at the Office of the Superintendent has an opportunity to hire new employees, the individuals hired are usually affiliated with and loyal to the political

party in power, making political affiliations known to by
the date of hiring.

168.    As noted before, all Plaintiffs had been hired under
the prevous PDP administrations, fact known to all
Defendants in this case.

169.    For this reason, as also noted before, Defendants
and/or individuals acting on their behalf, direction or
authorization, would routinely ask Plaintiffs the dates on
which they began working in the Office of the
Superintendent.

170.    Furthermore, on some occasions, Defendants, and/or
individuals of Defendants' political trust, and/or other
NPP affiliated employees of the Office of the
Superintendent, acting pursuant to Defendants' instructions
and/or authorization, asked Plaintiffs when and how they
began working at the Office of the Superintendent with the
purpose of ascertaining whether they were not NPP
followers.

171.    This employment list and/or information gathered was
provided to, shared with, and reviewed by all Defendants to
discriminate against employees of the Office of the
Superintendent because of their political affiliations and
beliefs.

172.    Furthermore, upon information and belief, Defendants personally reviewed the personnel records at the Office of the Superintendent and the Office of the President of the Senate, and compared these to NPP documents that identified NPP affiliated voters, in order to ascertain the political affiliations of all employees at the Office of the Superintendent, and/or directed, instructed or authorized others (whether directly, indirectly or tacitly) to do this on their behalf, or otherwise gather information related to the political affiliations of all employees of the Office of the Superintendent, and to provide Defendants with this information, for the purpose of discriminating against and/or retaliating against individuals such as Plaintiffs for being affiliated with a political party other than the NPP and/or for being perceived as being affiliated with a political party other than the NPP.

173.    The aforementioned employment list and/or information gathered was provided to, shared with, and reviewed by all Defendants to discriminate against employees of the Office of the Superintendent because of their political affiliations and beliefs.

174.    In fact, it was of common knowledge in the Legislature that Defendants even compiled a list and created profiles of legislature and Office of the Superintendent employees

whom they understood not to be affiliated with the NPP, in particular PDP affiliated individuals that had participated in PDP campaigns. Individuals known to Plaintiffs saw these lists. Some Plaintiffs, unbeknownst of the purpose of the list even provided information for its confection when requested by their supervisors.

175. Indeed, NPP affiliated employees of the Office of the Superintendent, including newly appointed NPP affiliated Supervisors, Defendants themselves, and employees loyal to Defendants and the NPP, constantly made reference to a list of employees to be terminated on the basis of their political beliefs and affiliations during times relevant and material hereto, and specifically stated that the Defendants were creating a list of all employees affiliated to political parties other than the NPP; in particular PDP affiliated employees or employees who were perceived by the Defendants as being affiliated to or having voted for the PDP or for candidates affiliated with the PDP.

176. As discussed more in detail below, Defendants, including Rivera Schatz and Mendez, also directed, promoted, authorized and condoned adverse employment actions, including terminations, against any and all individuals affiliated with or perceived as being affiliated with a political party other than the NPP on a

generic basis, even without knowing the individuals' name
or positions, if such individuals were affiliated with or
were perceived to be affiliated with a political party
other than the NPP and/or supported, or were perceived as
having supported an PDP affiliated candidate.

177.    As discussed more in detail below, Rivera Schatz,
Mendez, Ramos and the other co-Defendants also set in
motion a series of events or acts with full knowledge that
these were to culminate, and intending that such acts
culminated, in mass firings of PDP affiliated employees, or
employees affiliated with a political party other than the
NPP, because of and in retaliation for their political
affiliation, their exercise of First Amendment rights, and
their engagement in activities protected by the First
Amendment, including the right to vote, the right to speak
out on and participate in political and public policy
matters, the right not to speak out on and participate in
political and public policy matters, and the right of
political association.

178.    With blatant and reckless disregard to the
constitutional rights of humble, hard-working individuals
with no complaints as to their work performance, Defendants
initiated a campaign to purge and clear the Office of the
Superintendent of individuals affiliated to, or perceived

to be affiliated to, a political party other than the NPP, in particular of PDP affiliated individuals, and/or employees who supported, or were perceived as having supported, an PDP affiliated candidate, solely for these having exercised their First Amendment rights and for having engaged in activities protected by the First Amendment.

179.  In the months following Defendants' assumption of power many employees identified with the PDP were terminated by the Defendants and/or Defendants refused to renew their contracts. Defendants also substituted them with loyal NPP followers.

180.  Such acts should not only be looked upon as individual acts that implicate the Constitution and other provisions asserted herein, but also as part of a widespread pattern and practice that not only permeates the entire legislative branch of the Commonwealth of Puerto Rico. Similar events transpired in other branches as well.

**Defendants Politically Motivated Discriminatory and Retaliatory Acts**

181.  As noted above, pursuant to Article 3, Section 8 of the Puerto Rico Constitution, the newly elected members of the legislative branch were sworn in on January 2nd, 2017.

182.   Rivera Schatz immediately recommended the appointment of co-defendant Ramos as Superintendent. The Speaker of the House, Carlos "Johnny" Mendez, favored such recommendation.

183.   As such, co-defendant Ramos, jointly and in close coordination with co-defendant Rivera Schatz and Gabriel Hernandez, is in charge of the internal administration and operation of the Office of the Superintendent. They organize and direct the activities related to the operation of said agency including, among others, the selection, appointment, classification, promotion, retribution, discipline, layoff, termination, and sanctions of the personnel at the Office of the Superintendent.

102.   Co-defendants Ramos and Rivera Schatz are in charge of all personnel decisions and order, direct, condone and/or approve all personnel decisions, including the adverse employment actions giving rise to this complaint.

103.   As noted above, Ramos and Rivera Schatz were exercising their newly acquired powers and influence since the days after the election.

104.   On February 15th, 2017 the politically motivated termination of all Plaintiffs took place in the Office of the Superintendent.

105.   The political motivation behind these terminations was so obvious that the day of termination, some NPP affiliated

substitutes were already at the Office of the Superintendent.

106. After weeks of incertitude and representations by co-defendants Ramos, Sastre and Figueroa that they would not be fired, on February 15th, 2017 after 1:00pm. all Plaintiffs were given a termination letter stating only that their position was one of trust and that could be terminated at will.

107. Rivera Schatz formally assumed the position of President of the Puerto Rico Senate and Mendez that of Speaker of the House of Representatives, on January 9th, 2017, although, as noted, they were exercising their newly acquired powers and influence as being the incoming presidents of the legislative bodies since the days after the election.

108. Not coincidentally, immediately after Rivera Schatz and Mendez were sworn in as President of the Senate and Speaker of the House of Representatives respectively, numerous PDP affiliated employees, or those perceived as being affiliated to a political party other than the NPP, or employees that supported PDP affiliated candidates were terminated by Defendants because of their political affiliation, participation and beliefs; their exercise of First Amendment rights; and/or their involvement in

activities protected by the First Amendment to the U.S. Constitution.

109.   Rivera Schatz, Ramos and the other co-Defendants participated in, and authorized, directed, condoned and/or executed (directly, indirectly, explicitly and/or tacitly) the terminations of employees of the Office of the Superintendent (and many more employees of the Legislature) affiliated to, or who were perceived by Defendants, their agents, and employees acting pursuant to Defendants' instructions as being be affiliated with a political party other than the NPP and NPP candidates, in particular the PPD and PPD affiliated candidates, including Plaintiffs, because of and in retaliation for such employees' exercise of First Amendment rights, and their engagement in activities protected by the First Amendment (including the right to vote, the right to speak out on and participate in political and public policy matters, the right not to speak out on and participate in political and public policy matters, and the right of political association and affiliation, among others).

110.   Rivera Schatz, Mendez, Hernandez, Ramos and the other co-Defendants participated in, and authorized, directed, condoned and/or executed (directly, indirectly, explicitly and/or tacitly) the terminations of employees of the Office

of the Superintendent (and many more employees of the Legislature) affiliated to, or who were perceived by Defendants, their agents, and employees acting pursuant to Defendants' instructions as being be affiliated with a political party other than the NPP and NPP candidates, in particular the PDP and PDP affiliated candidates, including the Plaintiffs, on a generic and general basis (that is, without knowing the employee or his position), because of and in retaliation for such employees' exercise of First Amendment rights, and their engagement in activities protected by the First Amendment, including the right to vote, the right to speak out on and participate in political and public policy matters, the right not to speak out on and participate in political and public policy matters, and the right of political association and affiliation, among others.

111.   Co-Defendants Rivera Schatz, Mendez, Hernandez, Ramos, Sastre and Figueroa also knowingly set in motion a series of events with full knowledge that these were to culminate in, and intending that such acts culminated in, mass firings of PDP affiliated employees, or employees affiliated with a political party other than the NPP, such as Plaintiffs; because of and in retaliation for such employees' exercise of First Amendment rights, and their

engagement in activities protected by the First Amendment (including the right to vote, the right to speak out on and participate in political and public policy matters, the right not to speak out on and participate in political and public policy matters, and the right of political association and affiliation, among others).

112.    In fact, Defendants openly admitted this, without hesitation, even to some the Plaintiffs to this case. For example, co-Defendants Ramos and Sastre told some of the Plaintiffs in this case that they were terminating their services because they had "orders from above" and that it was "out of their hands" to terminate them.

113.    On various occasions before and after the General Election, and in the days leading up to and following the change in administration, Defendants and employees of their political-trust, as well as other NPP affiliated employees of the Office of the Superintendent, including newly appointed supervisors, stated in a similar and consistent manner, one after the other, that they were going to get terminate those who were not affiliated to the NPP and those who were recruited by the the PDP.

114.    Several Plaintiffs that participated Transition Committee meetings, witnessed how the Chief of Staff for the President of the Senate, Gabriel Hernandez, asked on

several occasion for the resignation of the employees
identified in the list as PDP affiliates or otherwise
recruited by Superintendent Javier Vazquez. Gabriel
Hernandez asked at every meeting to be updated as to which
employees had resigned. Plaintiff Martinez Galindez
witnessed how Gabriel Hernandez questioned why the people
Javier Vazquez had "moved" had not been fired and
specifically asked why she had not been terminated.

115.    Plaintiff Marchand Bauzá was requested by the NPP
Transition Committee to prepare a list of employees from
the Office of the Superintendent with information
regarding: their position, position changes, salaries,
address, the date of employment, telephone number and
social security. The requested lists where for a period of
the four years of PDP administration. Marchand Bauzá was
informed that instructions on how to handle the affairs of
the Office of the Superintendent where directly from the
President of the Senate, Thomas Rivera Schatz, and she
witnessed how the Chief of Staff, Gabriel Hernandez acted
on those instructions.

116.    In a similar fashion, PDP affiliated employees, or
employees perceived to be affiliated to a party other than
the NPP, such as Plaintiffs, were constantly and repeatedly

being told by these individuals that their "days were numbered" and that "they were going to leave soon".

117.   Defendants and their agents also repeatedly stated other variations of these words and phrases.

118.   After he learned about the intention to terminate the Plaintiffs, Luis Vega, the Security Supervisor, informed Torres Maldonado that in a meeting he had reviewed a list of employees that were going to be terminated from the Office of the Superintendent and that his name was included in a list of employees identified with the PPD. Luis Vega claimed that he asked for Torres Maldonado's name to be removed from the list because he wanted to keep him because of his good work. Luis Vega expressed to Torres Maldonado that he was told not to interfere o his behalf because he would get in "trouble" and that they were just following orders from the Office President of the Senate.

119.   In fact, some newly appointed NPP affiliated supervisors stated on numerous occasions that if it were up to them they would retain individuals affiliated with, or perceived as being affiliated with, political parties other than the NPP (including PDP affiliated employees) because these were good employees; but that they nonetheless had to follow instructions "from above".

120.    As Plaintiff Rivera Melendez was handed the letter of termination, Mr. Miguel Flores Caro and Eddie Nuñez apologized for having to terminate her employment as they indicated that it was "nothing personal" and that order for firing them came from "above".

121.    In another incident, co-Defendant Rivera Shatz told a close relative of Plaintiff de Pedro Gónzalez that the reason for the termination was because the Plaintiff political affiliation to the PDP.

122.    On one specific occasion, Plaintiff Díaz Reyes was informed by the secretary of Representative Antonio "Tony" Soto, a person by the name of Annabelle, that her name was included in the list of the employees the NPP was going to fire. Anabelle informed her that the list "was managed by "Gaby", the President of the Senate Rivera Schatz Chief of Staff, Gabriel Hernández Rodríguez.

123.    Plaintiff Borrero Casado witnessed as Defendants Sastre, Figueroa, Wilfredo Ramos and Rivera Schatz, together with Directors and other personnel from the Office of the Superintendent entered the "Bunker" for meetings.

124.    But these are not the only incidents that show Rivera Schatz's direct and indirect participation, involvement, intent, motivation and animus in politically motivated adverse employment actions such as the ones at issue here.

125.    Several   supervisors   from   the   Office   of   the
Superintendent, the Senate and the House of Representatives
when   handing   out   termination   letters   specifically
implicated Defendant Rivera Schatz and stated that those
where his orders and nothing could be done about it.

126.    It was well-known that Rivera Schatz had his sister
Sylvia Rivera Schatz appointed to occupy the position of
Director of Protocol of the Office of the Superintendent.
Sylvia   Rivera   Schatz   herself   asked   several   of   the
plaintiffs when they had started to work at the Office of
the Superintendent and who had recommended them.

127.    Given the relationship between Rivera Schatz and the
Office of the Superintendent mentioned above, as well as
the pattern and practice of political discrimination and
retaliation sweeping the Puerto Rico legislature, it is
plausible that Rivera Schatz and Mendez were involved in
the terminations at issue here either throughout his direct
acts, or throughout indirect conduct that amounts to
authorization or condonation of political discrimination
either specifically or in a generic basis.

128.    The foregoing (and other reasonable inferences that
may be permissibly drawn from the averments in this
complaint) shows that the politically motivated adverse
employment actions at issue here were not only the intended

76

result of Defendants' direct and indirect actions, including generically authorizing, condoning and promoting adverse employment actions against individuals affiliated or perceived as being affiliated to political parties other than the NPP, but also that Defendants also intentionally set in motion a series of events of acts directed to create the appearance of an atmosphere of impunity as to politically motivated dismissal, intending that their employees interpreted such actions and events as a mandate, permit, authorization or order to execute politically motivated adverse employment actions, as it indeed happened. As a result, a pattern and practice of political discrimination and retaliation currently exists in the Puerto Rico Legislature.

129. On numerous occasions, during times relevant and material hereto, the Defendants also made disparaging political remarks against PDP affiliates, the prior PDP administration and the previous PDP affiliated administration of the Office of the Superintendent.

130. Furthermore, the discriminatory and retaliatory political motivations behind the adverse employment actions at issue may be also discerned by Defendants' hiring practices.

131.    All of the plaintiffs had been recruited by the PDP
Superintendent Javier Vazquez within the four years of the
PDP administration.

132.    However, when Defendants arrived, they terminated
Plaintiffs weeks after assuming their positions, and
without evaluating Plaintiffs' job performance, abilities
or duties.

133.    Upon information and belief, there had not been a
single complaint as to Plaintiffs' performance at the time
they were terminated.

134.    Defendants terminated Plaintiffs and substituted them,
either with other employees or by contracting out the
services, which reflects that their positions were
necessary.

135.    Unsurprisingly, some of those substitutes had worked
at the Office of the Superintendent between 2008 and 2012
including Defendat Pablo Sastre; were related to NPP trust
employees from the legislature; and had been active
participants during the 2016 electoral campaign and other
campaign(s) on behalf of the NPP and candidates affiliated
with the NPP.

136.    Other Plaintiffs can also attest to the hiring of new
employees to perform their duties, as they visited the
Office of the Superintendent after their terminations and

saw new individuals who had never worked there before
performing their duties and the duties of other PDP
affiliated employees that were terminated.

137. In other words, Defendants all carried out their
repeated promises, and that of the employees of their
political-trust, such as newly appointed NPP affiliated
supervisors bringing in "their people" referring to NPP
affiliates.

138. In sum, co-Defendants Rivera Schatz, Mendez,
Hernandez, Ramos, Sastre and Figueroa: (1) personally
participated (directly and indirectly) in the underlying
terminations because of Plaintiffs' exercise of First
Amendment rights and for engaging in activity protected by
the First Amendment, including the right to vote and to
associate with a political party of their choosing, and/or
because they were not affiliated with, or were not
perceived to be affiliated with, the NPP, including through
supervisory encouragement, condonation or acquiescence or
gross negligence amounting to deliberate indifference; (2)
directed, authorized and/or condoned the termination of as
many NPP-affiliated employees as possible (or otherwise not
affiliated with or perceived as not being affiliated with
the NPP) in a generic basis, because of their exercise of
First Amendment rights; and/or, (3) set forth a series of

events with the full knowledge and intent that these events would culminate in political discrimination and retaliation against PDP affiliated employees and employees affiliated with or perceived as being affiliated with a political party other than the NPP.

139.    All Defendants not only acted individually to deprive Plaintiffs and other employees of the Office of the Superintendent of their Federal Constitutional rights, but they also acted in a concerted and/or conspiratorial manner to achieve that goal.

**SPECIFIC ALLEGATIONS AS TO ALL PLAINTIFFS[1]**

***Plaintiff Giara Washington del Valle***

140.    Plaintiff Giara Washington del Valle ("Washington del Valle") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

141.    Plaintiff Washington del Valle commenced working at the Office of the Superintendent in August of 2013 and worked as a Contract Specialist when she was terminated on February 15, 2017 because of her political affiliation.

142.    Party affiliation is not an appropriate requirement for Washington del Valle's position. At all times relevant and material hereto, Washington del Valle was a public

---

[1] In order to avoid repetition, all previous allegations referring to Plaintiffs, unless individually specified, are incorporated by reference as if set forth in full herein to apply to each Plaintiff.

employee whose position was not a public-policy-making position, or one that required her to perform public-policy functions. Washington del Valle did not perform functions of close proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

143.    Washington del Valle engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

144.    Washington del Valle's principal duties were professional, administrative work, which consists of the supervision, development and coordination of the processing and handling of all matters related to contracts of professional services, consultative and construction works that are offered in the Office of the Superintendent at the Capitol District.

145.    For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Washington del Valle is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Washington del Valle avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections.

Moreover, Defendants also knew or assumed that Washington del Valle voted for the PDP.

146.    Washington del Valle was the Director of the Protocol Office at the Office of the Superintendent until December 29, 2016.

147.    Washington del Valle agreed to a change in position from Director of the Protocol Office to a Contract Specialist under the assumption that with the change she would not be terminated. Javier Vazquez, the PDP administration Superintendent, had met with the new NPP administration members during the transition with regards to Washington del Valle and other employees who held director or supervisor positions in an effort to ensure their positions. He informed the employees and Washington del Valle that if they agreed to the change in position and a cut in their salaries they would not be terminated.

148.    The change in position and reduction in salary had a direct effect on Washington del Valle's benefits at the time of her liquidation due to the termination. This effect was common knowledge at the Office of the Superintendent and shows intention and bad faith.

149.    Washington del Valle is a PDP party affiliate and is actively involved in PDP party activities. This fact was common knowledge at the Office of the Superintendent and

was known to all Defendants in this case (and by their
agents and employees of their political trust).

150.   Washington del Valle actively participated in the PDP
primaries supporting PDP candidates.

151.   Washington del Valle actively participated in rallies,
meetings, and activities such as the "Abrazo Popular",
among others. She also participated with the political
campaign activities of the PPD candidate for governor,
David Bernier, Hector Ferrer and for Jaime Perelló.

152.   Washington del Valle actively participated in various
electoral campaign closings for PDP candidates running on
the 2016 elections.

153.   Like some co-workers and the other Plaintiffs,
Washington del Valle was also seen by Defendants (and their
agents and employees of their political trust), and other
NPP-affiliated employees of the Office of the
Superintendent, in photos and/or videos participating of
political events or issuing political commentary during the
2016 electoral campaign, including in those posted on
public Facebook accounts.

154.   Washington del Valle herself had a public Facebook
account where she was friends with some of her NPP
affiliated co-workers, and posted statuses regarding her
political affiliation.

155.    Washington del Valle considers herself a close friend
with the PDP President of the House of Representatives,
Jaime Perello. This fact was common knowledge at the Office
of the Superintendent and was known to all Defendants in
this case (and by their agents and employees of their
political trust).

156.    Washington del Valle also engaged in friendly
political discussions with non-PDP and NPP affiliate co-
workers where she expressed her support to the PDP party
and PDP candidates Jaime Perello, Eduardo Bahtia, Anibal
Jose Torres, David Bernier and Hector Ferrer.

157.    Washington del Valle, during the 2016 electoral
campaign, continuously used red color clothing expressing
her affiliation to the PDP party.

158.    William Torres, an NPP affiliate employee expressed to
Washington del Valle that they had done a great job, but
because of their political affiliation they could not
remain at the Office of the Superintendent.

159.    The new NPP Director Miguel Flores informed Washington
del Valle that he wanted her to remain in her position but
that in reality "it did not work like that".

160.    These facts, as well as others provided throughout
this complaint relating to or tending to show Washington
del Valle's political affiliation, preferences involvement

84

and activism, were known to all Defendants in this case
(and by their agents and employees of their political
trust).

161.    After the elections the workplace became very tense.
Co-workers affiliated to the NPP stopped talking or
greeting her in the mornings. Washington del Valle was
subjected to continuous comments stating that she was going
to be fired and/or replaced because of her political
affiliation to the PPD.

162.    After the elections, Guillermo Rodriguez told
Washington del Valle that she was going to be terminated
and replaced by an NPP affiliated employee because of her
political affiliation even when she did a good job.

163.    Washington del Valle was asked directly by Carlos
Vazquez, who presided the Transition Committee, when she
was recruited to work at the Office of the Superintendent.

164.    Washington del Valle was informed that instruction on
how to handle the affairs of the Office of the
Superintendent where directly from the office of the
President of the Senate, Thomas Rivera Schatz, and handled
by the Chief of Staff, Gabriel Hernandez.

165.    After January 2, 2017, the working environment at the
Office of the Superintendent became hostile. The new NPP
affiliated Directors would not assign Washington del Valle

any work and her usual tasks were assigned to NPP affiliate
Yaritza Ribas.

166.    After January 2, 2017, Washington del Valle was
advised to delete her Facebook account and any pictures or
information regarding her political affiliation from the
internet because NPP affiliates were investigating
employees in order to identify their political affiliation.

167.    After January 2, 2017, all comments from the new NPP
administration were related to the termination of PDP
affiliated employees. "Ay bendito" was the common phrase to
state that they great work but had to be terminated.

168.    After January 2, 2017, there were rumors that there
was a list prepared by the NPP affiliated employees that
identified PDP affiliates and contained the date of
employment at the Office of the Superintendent and who had
recommended the employee. This list was going to be used
for termination purposes.

169.    After January 2, 2017, Washington del Valle witnessed
as NPP affiliates were openly seeking for employment and
better positions at the Office of the Superintendent.

170.    Washington del Valle was informed that she would be
substituted by an NPP affiliated employee, Norberto Mendez.

171.    Defendants terminated Washington del Valle's
employment without warning and without cause, by way of a

letter of February 15, 2017. Her termination was effective on the same day.

172. Defendants terminated and dismissed Washington del Valle from her job without evaluating her job performance and efficiency.

173. At no time prior to her dismissal did the Defendants discipline Washington del Valle or issue a reprimand related to the performance of her duties.

174. The reason that Washington del Valle's job was terminated was because the Defendants knew that she belonged to – or otherwise perceived her to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

175. In the alternative, Defendants terminated her because they knew that she was not an active supporter of the NPP.

176. As a result of this termination, Defendants have deprived Washington del Valle of the income and benefits by which she sustained herself and her family; have subjected her to personal pain and suffering; and have punished her in the exercise of her civil rights by terminating her employment – all because she is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or

affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and or being a known supporter of the PDP.

177.   Defendants' actions have resulted in a chilling effect and have had a compromising effect on Washington del Valle's exercise of her First Amendment rights and her desires to engage in activities protected by the First Amendment.

### *Plaintiff Lynnott Adorno González*

178.   Plaintiff Lynnott Adorno González ("Adorno González ") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

179.   Plaintiff Adorno González commenced working at the Office of the Superintendent in July of 2014 and worked as an Administrative Assistant when she was terminated on February 15, 2017 because of her political affiliation.

180.   Plaintiff Adorno González, at the time of termination, was referred to and receiving psychological assistance services from the "Programa de Ayuda al Empleado (PAE)".

181.   Party affiliation is not an appropriate requirement for Adorno González' position. At all times relevant and material hereto, Adorno González was a public employee whose position was not a public-policy-making position, or one that required her to perform public-policy functions.

Adorno González did not perform functions of close proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

182. Adorno González engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

183. Adorno González' principal duties were administrative and secretarial and provided support to the Internal Security and Emergency Management divisions of the Office of the Superintendent. She coordinated trainings, answered the telephones, received data and synchronized external ambulance or fire department services, among others.

184. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Adorno González is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Adorno González avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Adorno González voted for the PDP.

185.    Adorno González actively participated in the PDP 2016
electoral campaign in support of the candidate Jaime
Perelló, the president of the House of Representatives, and
she endorsed him. She took part in meetings,
concentrations, tele marathons, manifestations and the PDP
Assembly.

186.    Adorno Gonzalez actively participated the of 2016
Electoral campaign attending rallies, meetings, and
activities in favor of the PDP party and the candidate for
Governor, David Bernier.

187.    Adorno González also engaged in friendly political
discussions with non-PDP co-workers and expressed her
support in favor of PDP candidate for Governor, David
Bernier.

188.    These facts, as well as others provided throughout
this complaint relating to or tending to show Adorno
González' political affiliation, preferences involvement
and activism, were known to all Defendants in this case
(and by their agents and employees of their political
trust).

189.    After the elections, the workplace became very tense.
Co-workers affiliated to the NPP continuously commented
that PDP affiliated employees were going to be fired and/or
replaced.

190.    After the election, Adorno González was removed from her duties and no work was assigned to her. The new administration did not refer the call to her and she had no assigned work.

191.    After the election, Adorno González received comments from Victor Perez and Edgardo Serrano (Emergency Management official) that she'd stay on her position. She also received other comments stating that every four years it's the same and everything changes, then it happens again. The Auxiliary Superintendent, Redondo, asked her to cooperate with the transition employees. He assured her that they were not going to fire anybody.

192.    At some time after January 2, 2017, the plaintiff saw Edgardo Serrano taking pictures if other employees and reported it to the supervisor. Some people he photographed were fired.

193.    Defendants terminated Adorno González' employment without warning and without cause, by way of a letter of February 15, 2017. Her termination was effective on the same day.

194.    Defendants terminated and dismissed Adorno González from her job without evaluating her job performance and efficiency.

195.   At no time prior to her dismissal did the Defendants discipline Adorno González or issue a reprimand related to the performance of her duties.

196.   The reason that Adorno González' job was terminated was because the Defendants knew that she belonged to – or otherwise perceived her to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

197.   In the alternative, Defendants terminated her because they knew that she was not an active supporter of the NPP.

198.   As a result of this termination, Defendants have deprived Adorno González of the income and benefits by which she sustained herself and her family; have subjected her to personal pain and suffering; and have punished her in the exercise of her civil rights by terminating her employment – all because she is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and or being a known supporter of the PDP.

199.   Defendants' actions have resulted in a chilling effect and have had a compromising effect on Adorno González'

exercise of her First Amendment rights and her desires to engage in activities protected by the First Amendment.

***Plaintiff Emilio Adorno Otero***

200.    Plaintiff Emilio Adorno Otero ("Adorno Otero") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

201.    Plaintiff Adorno Otero commenced working at the Office of the Superintendent in October of 2013, and was an Electrician Assistant when he was terminated on February 15, 2017 because of his political affiliation.

202.    Party affiliation is not an appropriate requirement for Adorno Otero's position. At all times relevant and material hereto, Adorno Otero was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions. Adorno Otero did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

203.    In fact, political affiliation is not a requirement Adorno Otero's position.

204.    Adorno Otero engaged in functions of a routine nature that required competence, specific knowledge and efficient performance, not political affiliation.

205.  Adorno Otero's principal duties were electrical repairs and installations in the Capitol District.

206.  For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Adorno Otero is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves and by their agents and employees of their political trust) that Adorno Otero avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, these individuals also knew or assumed that Adorno Otero had voted for the PDP.

207.  Adorno Otero actively participated of the 2016 PDP electoral race by attending meetings, rallies and activities in support of the PDP party.

208.  Adorno Otero participated as a PDP affiliate of activities such as "Abrazo Popular", among others.

209.  Adorno Otero was called to serve as an electoral poll officer for the PDP but had a previous engagement and could not serve.

210.  Adorno Otero's PDP affiliation was common knowledge within the Office of the Superintendent.

211.    These facts, as well as others provided throughout
this complaint relating to or tending to show Adorno
Otero's political affiliation, preferences involvement and
activism, were known to all Defendants in this case.

212.    After January 2, 2017, when the new NPP administration
created uncertainty and a difficult environment for the
employees who were presumed or identified as PDP
affiliates.

213.    Defendants terminated and dismissed Adorno Otero from
his job without evaluating his job performance or
efficiency.

214.    At no time prior to his dismissal did the Defendants
Adorno Otero or issue a reprimand related to the
performance of his duties.

215.    Defendants terminated Adorno Otero's employment
without warning and without cause, by way of a letter of
February 15, 2017. His termination was effective on the
same day.

216.    The reason that Adorno Otero's job was terminated was
because the Defendants knew that he belonged to – or
otherwise perceived him to be a member of and/or affiliated
with – a political party other than the NPP, particularly
the PDP.

217.   In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

218.   As a result of this termination, Defendants have deprived Adorno Otero of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or because he is a known supporter of the PDP.

219.   Defendants' actions have resulted in a chilling effect and have had a compromising effect on Adorno Otero's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

### *Plaintiff Jennifer Ambert Martínez*

220.   Plaintiff Jennifer Ambert Martínez ("Ambert Martínez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

221.   Plaintiff Ambert Martínez began working at the Office of the Superintendent in 2015, and was performing duties as

a Maintenance Services Assistant ("Auxiliar de Servicios de Mantenimiento") when she was dismissed on February 15, 2017, because of her political affiliation with the PDP and his support of PDP candidates.

222.    Party affiliation is not an appropriate requirement for Ambert Martínez's position. At all times relevant and material hereto, Ambert Martínez was a public employee whose position was not a public-policy-making position, or one that required her to perform public-policy functions.

223.    Ambert Martínez did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

224.    Ambert Martínez engaged in functions of a routine nature that required manual competence and efficient performance, not political affiliation.

225.    Ambert Martínez's principal duties were to perform cleaning and maintenance services to the common areas of the Capitol building. Her duties required: sweeping, mopping, washing toilets and basins, collecting and disposing of trash, among other.

226.    For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Ambert Martínez

is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Ambert Martínez avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Ambert Martínez had voted for the PDP.

227. Ambert Martínez was recommended for the position at the Office of the Superintendent by Verma Martínez, who is known PDP affiliate who has worked for over fifteen years in the Capitol District.

228. Ambert Martínez actively participated in rallies, meetings, and the PDP campaign closing celebrated at the Hiram Bithorn Stadium. She also participated with the political campaign activities of the PPD former President of the House of Representatives Jaime Perelló.

229. Like some co-workers and the other Plaintiffs, Ambert Martínez was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

230.    Ambert Martínez herself had a public Facebook account where she was friends with some of his NPP affiliated co-workers, and posted statuses regarding her political affiliation.

231.    These facts, as well as others provided throughout this complaint relating to or tending to show Ambert Martínez's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

232.    After the 2016 General Elections, the atmosphere in the Office of the Superintendent became tense and politically charged. NPP affiliated employees made continuous comments that they were going to "clean the house", as to the termination of all presumed PDP affiliated employees.

233.    After January 2, 2017, Ambert Martínez and her fellow co-workers had a meeting with the new Superintendent Wilfredo Ramos, her Supervisor Mr. Darwin Santiago and Mr. Pablo Sastre, where they all were reassured that they would not be terminated if they performed their duties accordingly and kept up the good quality of their work.

234.    Mr. Darwin Santiago advised Ambert Martínez to be on time and do not take any day off because the new

administration was reviewing all their files at the Human
Resources Office.

235.    Ambert Martínez noticed favorable position changes for
NPP affiliate personnel, such as the two grandchildren of
Roberto "Junior" Maldonado, who was the Administrator of
the Senate under the NPP prior Presidency of Tomas Rivera
Schatz, that were moved from maintenance work to the
infirmary and one Internal Security. She also noticed a lot
of new people around the Office of the Superintendent
requesting to be hired.

236.    On February 15, 2017, Ambert Martínez was given a
letter of termination without warning and without cause.
The letter was effective immediately.

237.    The letter stated that she was fired because her
position was of trust.

238.    Defendants terminated and dismissed Ambert Martínez
from her job without evaluating her job performance and
efficiency.

239.    At no time prior to her dismissal did the Defendants
discipline Ambert Martínez or issue a reprimand related to
the performance of her duties.

240.    The reason that Ambert Martínez's job was terminated
was because the Defendants knew that she belonged to – or
otherwise perceived her to be a member of and/or affiliated

with – a political party other than the NPP, particularly
the PDP.

241.    In the alternative, Defendants terminated her because
they knew that she was not an active supporter of the NPP.

242.    As a result of this termination, Defendants have
deprived Ambert Martínez of the income and benefits by
which she sustained herself and her family; have subjected
her to personal pain and suffering; and have punished her
in the exercise of her civil rights by terminating her
employment – all because she is not a member of or
affiliated with the NPP, and did not vote for the NPP or
for NPP candidates in the 2016 election; and/or is
perceived by Defendants as not being a member of or
affiliated with the NPP and/or not having voted for the NPP
or for the NPP candidates in the 2016 election; and/or
Defendants knew of her political affiliation with the PDP.

243.    Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Ambert Martínez's
exercise of her First Amendment rights and her desires to
engage in activities protected by the First Amendment.

### *Plaintiff Luis G. Aulí Flores*

244.    Plaintiff Luis G. Aulí Flores ("Aulí Flores") is of
legal age, a resident of Puerto Rico and a citizen of the
United States of America.

245.  Plaintiff Aulí Flores commenced working at the Office of the Superintendent in April 18, 2016, as an Internal Security Officer and worked as low level security guard when he was terminated on February 15, 2017 because of his political affiliation.

246.  Party affiliation is not an appropriate requirement for Aulí Flores's position. At all times relevant and material hereto, Aulí Flores was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions. Aulí Flores did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

247.  Aulí Flores engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

248.  Aulí Flores's principal duties were to provide security services and watch for the safety of all the areas, buildings, equipment and property of the Office of the Superintendent to preserve and keep these safe; to watch for the safety and security of all persons in the Capitol District.

249. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Aulí Flores was considered to be an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves and by their agents and employees of their political trust) that Aulí Flores was friends with the Superintendent, Javier Vazquez Collazo who avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, these individuals also knew or assumed that Aulí Flores had voted for the PDP.

250. Aulí Flores's was recommended for the position by Javier Vázquez Collazo, the Superintendent of The Capitol Building, who is identified and a political activist for the PDP party. This was common knowledge within the Office of the Superintendent. Also, his brother in la worked for the House of Representatives providing services to the President's office.

251. Aulí Flores also actively participated together with the Superintendent Javier Vazquez Collazo in activities that were honored with the participation of PPD party politicians including the President of the House of Representatives.

252.   Aulí Flores participated in discussions where co-workers expressed affiliation with the PDP.

253.   These facts, as well as others provided throughout this complaint relating to or tending to show Aulí Flores' presumed political affiliation were known to all Defendants in this case.

254.   Like some co-workers and the other Plaintiffs, Aulí Flores was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

255.   Aulí Flores himself had a public Facebook account where he was friends with some of his PDP affiliated co-workers, that posted statuses regarding political affiliation.

256.   After Election Day, Aulí Flores was asked in several occasions when he had started to work at the Office of the Superintendent and who had recommended him to work at the Office of the Superintendent.

257.    After Election Day, the working environment became extremely tense and hostile, NPP employees where constantly making comments and teasing PDP with inappropriate remarks.

258.    Defendants terminated and dismissed Aulí Flores from his job without evaluating his job performance or efficiency.

259.    At no time prior to his dismissal did the Defendants discipline Aulí Flores or issue a reprimand related to the performance of his duties.

260.    Defendants terminated Aulí Flores' employment without warning and without cause, by way of a letter of February 15, 2017. His termination was effective on the same day.

261.    The reason that Aulí Flores' job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

262.    In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

263.    As a result of this termination, Defendants have deprived Aulí Flores  of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment

– all because he is not a member of or affiliated with the
NPP, and did not vote for the NPP or for NPP candidates in
the 2016 election; and/or is perceived by Defendants as not
being a member of or affiliated with the NPP and/or not
having voted for the NPP or for the NPP candidates in the
2016 election; and/or because he is a known supporter of
the PDP.

### Plaintiff Irving Bayón Correa

264.   Plaintiff Irving Bayón Correa ("Bayón Correa") is of
legal age, a resident of Puerto Rico and a citizen of the
United States of America.

265.   Plaintiff Bayón Correa began working at the Office of
the Superintendent in August 2015, and was performing
duties as a Warehouse Keeper ("Guardalmacén") when he was
dismissed on February 15, 2017, because of his political
affiliation with the PDP and his support of PDP candidates.

266.   Party affiliation is not an appropriate requirement
for Bayón Correa's position. At all times relevant and
material hereto, Bayón Correa was a public employee whose
position was not a public-policy-making position, or one
that required him to perform public-policy functions.

267.   Bayón Correa did not perform functions of proximity to
policy-making employees, or otherwise have access to

politically sensitive information or confidential information related to public policy matters.

268. Bayón Correa engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

269. Bayón Correa principal duties as a warehouse employee where he performed tasks such as delivery, registry, control and dispatch of materials and equipment of the Office of the Superintendent.

270. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) believed that Bayón Correa was considered to be an active member of the PDP. It was believed at the Office of the Superintendent (and by Defendants themselves and by their agents and employees of their political trust) that Bayón Correa supported the PDP during the 2016 elections and was believed to be active during the PDP's electoral campaign for the 2016 elections. Moreover, these individuals also assumed that Bayón Correa had voted for the PDP.

271. Bayón Correa is affiliated to the PDP party.

272. Bayón Correa was recommended for the position at the Office of the Superintendent by Jose Luis Santiago Correa who was the driver for the President of the House of

Representatives, Jaime Perello. Jose Luis Santiago Correa
is a known PPD affiliate.This fact was known by his co-
workers at the Office of the Superintendent.

273.    During the electoral campaign, Bayón Correa sometimes
wore a red shirt to work that identified him with the PDP
party.

274.    These facts, as well as others provided throughout
this complaint relating to or tending to show Bayón
Correa's political affiliation, preferences involvement and
activism, were known to all Defendants in this case (and
their agents and employees of their political trust).

275.    Like some co-workers and the other Plaintiffs, Bayón
Correa was also seen by Defendants (and their agents and
employees of their political trust), and other NPP-
affiliated employees of the Office of the Superintendent,
in photos and/or videos participating of events or issuing
political commentary during the 2016 electoral campaign,
including in those posted on public Facebook accounts.

276.    Bayón Correa himself had a public Facebook account
where he was friends with some of his NPP affiliated co-
workers, and posted statuses regarding his political
affiliation.

277.   After election day, the working environment turned tense and NPP affiliate co-workers made continuous comments about the PDP employees being fired.

278.   After Election day, Bayón Correa was asked on several occasions about his political affiliation to the PDP party.

279.   After January 2, 2017, NPP affiliated employees of the Office of the Superintendent told him to be careful and to prepare himself because he had been identified as a PDP affiliate.

280.   After January 2, 2017, Bayón Correa was moved from his position and assigned to work with signage.

281.   On February 15, 2017, Bayón Correa was given a letter of termination without warning and without cause. The letter was effective immediately.

282.   The letter stated that he was fired because his position was of trust.

283.   Defendants terminated and dismissed Bayón Correa from his job without evaluating his job performance and efficiency.

284.   At no time prior to his dismissal did the Defendants discipline Bayón Correa or issue a reprimand related to the performance of his duties.

285.   The reason that Bayón Correa 's job was terminated was because the Defendants knew that he belonged to – or

otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

286.    In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

287.    As a result of this termination, Defendants have deprived Bayón Correa of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or Defendants knew of his political affiliation with the PDP.

288.    Defendants' actions have resulted in a chilling effect and have had a compromising effect on Bayón Correa 's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

*Plaintiff Jose Betancourt Alicea*

289.    Plaintiff Jose Betancourt Alicea ("Betancourt Alicea")
is of legal age, a resident of Puerto Rico and a citizen of
the United States of America.

290.    Plaintiff Betancourt Alicea began working at the
Office of the Superintendent in January 2015, and was
performing duties as a Conservation and Facility Repair
Technician when he was dismissed on February 15, 2017,
because of his political affiliation with the PDP and his
support of PDP candidates.

291.    Party affiliation is not an appropriate requirement
for Betancourt Alicea's position. At all times relevant and
material hereto, Betancourt Alicea was a public employee
whose position was not a public-policy-making position, or
one that required him to perform public-policy functions.

292.    Betancourt Alicea did not perform functions of
proximity to policy-making employees, or otherwise have
access to politically sensitive information or confidential
information related to public policy matters.

293.    Betancourt Alicea engaged in functions of a routine
nature that required competence and efficient performance,
not political affiliation.

294.    Betancourt Alicea principal duties were diverse manual
labor for the maintenance, conservation and repair of the

facilities, equipment, buildings and green areas of the
Capitol District.

295.    For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) believed that Betancourt Alicea
was an active member of the PDP. It was believed at the
Office of the Superintendent (and by Defendants themselves
and by their agents and employees of their political trust)
that Betancourt Alicea supported the PDP during the 2016
elections and was believed to be active during the PDP's
electoral campaign for the 2016 elections. Moreover, these
individuals also assumed that Betancourt Alicea had voted
for the PDP.

296.    Plaintiff Jose Betancourt Alicea prior employment was
with the Municipality of Carolina where he met
Superintendent Javier Vazquez who is a known affiliate of
the PDP by all Defendants.

297.    Betancourt Alicea also actively participated in the
2016 electoral race by attending meetings, rallies, and
activities in support of the PDP party. He actively
participated of the campaigns for PDP candidates such as:
Representative Jaime Perelló and Hector Ferrer.

298.    Betancourt Alicea sometimes during the campaign wore
red shirts to work as a message that he was affiliated to
the PDP.

299.    Like some co-workers and the other Plaintiffs,
Betancourt Alicea was also seen by Defendants (and their
agents and employees of their political trust), and other
NPP-affiliated employees of the Office of the
Superintendent, in photos and/or videos participating of
political events or issuing political commentary during the
2016 electoral campaign, including in those posted on
public Facebook accounts.

300.    Betancourt Alicea himself had a public Facebook
account where he was friends with some of his NPP
affiliated co-workers, and posted statuses regarding his
political affiliation.

301.    These facts, as well as others provided throughout
this complaint relating to or tending to show Betancourt
Alicea's political affiliation, preferences involvement and
activism, were known to all Defendants in this case (and
their agents and employees of their political trust).

302.    After election day, the Conservation and Facility
Repair brigades were overloaded with work related to the
remodeling and preparation of the offices for the new NPP
senators set to move in. The brigades were ordered to work

overtime, weekends and holidays during the Christmas Season.

303.    After election day, Betancourt Alicea felt that the work environment was rough, there were a lot of rumors that the brigade was going to be terminated by the new NPP administration.

304.    On February 15, 2017, Betancourt Alicea was given a letter of termination without warning and without cause. The letter was effective immediately.

305.    The letter stated that he was fired because his position was of trust.

306.    Defendants terminated and dismissed Betancourt Alicea from his job without evaluating his job performance and efficiency.

307.    At no time prior to his dismissal did the Defendants discipline Betancourt Alicea or issue a reprimand related to the performance of his duties.

308.    The reason that Betancourt Alicea's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

309.    In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

310.    As a result of this termination, Defendants have deprived Betancourt Alicea of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or Defendants knew of his political affiliation with the PDP.

311.    Defendants' actions have resulted in a chilling effect and have had a compromising effect on Betancourt Alicea's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

### *Plaintiff José Bonilla Caraballo*

312.    Plaintiff José Bonilla Caraballo ("Bonilla Caraballo") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

313.    Plaintiff Bonilla Caraballo began working at the Office of the Superintendent in February 1, 2013, and was performing duties as a Maintenance Services Assistant ("Auxiliar de Servicios de Mantenimiento") when he was

dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates.

314.    Party affiliation is not an appropriate requirement for Bonilla Caraballo's position. At all times relevant and material hereto, Bonilla Caraballo was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions.

315.    Bonilla Caraballo did not perform functions of close proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

316.    Bonilla Caraballo engaged in functions of a routine nature that required manual competence and efficient performance, not political affiliation.

317.    Bonilla Caraballo's principal duties were to perform cleaning and maintenance services to the facilities, furniture and equipment of the assigned areas such as: sweeping, mopping, washing windows, cleaning and polishing furniture, and collecting and disposing of trash, among other.

318.    For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Bonilla Caraballo is an active member of the PDP. It was of common

knowledge at the Office of the Superintendent (and by Defendants themselves) that Bonilla Caraballo avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Bonilla Caraballo had voted for the NPP.

319. During the 2016 electoral campaign, Bonilla Caraballo worked as an electoral polling officer authorized by the State Electoral Commission as a representative of the PDP party.

320. Electoral polling officers are required to train and register before the State Electoral Commission identifying the individual's political affiliation and making it a matter of public records.

321. Bonilla Caraballo actively participated in the primary, rallies, meetings, the General Assembly and campaign closings of the PDP. He also contributed with the political campaign of PDP District Representative candidate Roberto Rivera and Jaime Perelló.

322. Like some co-workers and the other Plaintiffs, Bonilla Caraballo was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events

or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

323. Bonilla Caraballo himself had a public Facebook account where he was friends with some of his NPP affiliated co-workers, and posted statuses regarding his political affiliation.

324. These facts, as well as others provided throughout this complaint relating to or tending to show Bonilla Caraballo's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

325. After the 2016 General Elections, the atmosphere in the Office of the Superintendent became tense and politically charged. NPP affiliated employees made continuous comments as to the termination of all presumed PDP affiliated employees specially those hired after the 2012 election.

326. Sometime after January 2, 2017, Bonilla Caraballo was called in for an interview by Mr. David Figueroa in which he was asked about his assigned work areas, duties and when he started to work at the Office of the Superintendent.

327. After January 2, 2017, Bonilla Caraballo noticed a lot of NPP affiliate personnel requesting changes in working

118

conditions and positions. He also noticed a lot of new people around the Office of the Superintendent requesting to be hired.

328. On February 15, 2017, Bonilla Caraballo was given a letter of termination without warning and without cause. The letter was effective immediately.

329. The letter stated that he was fired because his position was of trust.

330. Defendants terminated and dismissed Bonilla Caraballo from his job without evaluating his job performance and efficiency.

331. At no time prior to his dismissal did the Defendants discipline Bonilla Caraballo or issue a reprimand related to the performance of his duties.

332. The reason that Bonilla Caraballo's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

333. In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

334. As a result of this termination, Defendants have deprived Bonilla Caraballo of the income and benefits by which he sustained himself and his family; have subjected

him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or Defendants knew of his political affiliation with the PDP.

335.    Defendants' actions have resulted in a chilling effect and have had a compromising effect on Bonilla Caraballo's exercise of her First Amendment rights and his desires to engage in activities protected by the First Amendment.

***Plaintiff Ivonne Borrero Casado***

336.    Plaintiff Ivonne Borrero Casado ("Borrero Casado") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

337.    Plaintiff Borrero Casado began working at the Office of the Superintendent in 2015, and was performing duties as a Maintenance Services Assistant ("Auxiliar de Servicios de Mantenimiento") when she was dismissed on February 15, 2017, because of her political affiliation with the PDP and his support of PDP candidates.

338.    Party affiliation is not an appropriate requirement for Borrero Casado's position. At all times relevant and material hereto, Borrero Casado was a public employee whose position was not a public-policy-making position, or one that required her to perform public-policy functions.

339.    Borrero Casado did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

340.    Borrero Casado engaged in functions of a routine nature that required manual competence and efficient performance, not political affiliation.

341.    Borrero Casado's principal duties were to perform cleaning and maintenance services to the common areas including the restrooms of the Capitol building. Her duties required: sweeping, mopping, washing toilets and basins, collecting and disposing of trash, among other.

342.    For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Borrero Casado is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Borrero Casado avidly supported the PDP during the 2016 elections and was active during the PDP's

electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Borrero Casado had voted for the PDP.

343. Borrero Casado was recommended for the position at the Office of the Superintendent by the office of PDP Representative Javier Aponte Dalmau where her sister works and is a known PDP affiliate.

344. Borrero Casado actively participated in rallies, meetings, and the PDP campaign closings celebrated at Dorado, Carolina and the Hiram Bithorn Stadium. She also participated with the political campaign activities of the Cadidate for Governor for the PDP, David Bernier.

345. Borrero Casado also participated of PDP political activities such as: "Abrazo Popular", the painting of "la Pava" in Caguas, and the voting drill at "Placita de Santurce".

346. Borrero Casado's supervisor, David Figueroa who is a known NPP affiliate, had knowledge of her PDP affiliation because he had asked her on several occasions and she had volunteered the information.

347. Like some co-workers and the other Plaintiffs, Borrero Casado was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent,

in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

348. Borrero Casado herself had a public Facebook account where she was friends with some of his NPP affiliated co-workers, and posted statuses regarding her political affiliation.

349. These facts, as well as others provided throughout this complaint relating to or tending to show Borrero Casado's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

350. After the 2016 General Elections, the atmosphere in the Office of the Superintendent became tense and people were concerned with all the changes and the continuous comments that they were going to terminate of all presumed PDP affiliated employees.

351. After January 2, 2017, Borrero Casado was assigned to maintenance and cleaning tasks at the "Bunker" a very restricted area located at the fourth floor of the Capitol Building. She was allowed to enter the "Bunker" in order to clean the restrooms and collect the trash.

352. Borrero Casado witnessed as Pablo Sastre, Jose
Figueroa (Human Resources Director), Wilfredo Ramos
(Superintendent), Directors, and others entered the
"Bunker" for meetings. Jazmin Orengo appeared to be in
charge of coordinating the meetings.

353. Sometime after January 2, 2017, Borrero Casado found
Senate President Thomas Rivera Schatz trying to find his
way to the "Bunker" and showed him the way.

354. Borrero Casado noticed favorable position changes for
NPP affiliate personnel, such as the two grandchildren of
Roberto "Junior" Maldonado, who was the Administrator of
the Senate under the NPP prior Presidency of Tomas Rivera
Schatz, that were moved from maintenance work to the
infirmary and one Internal Security. She also noticed a lot
of new people around the Office of the Superintendent
requesting to be hired.

355. On February 15, 2017, Borrero Casado was given a
letter of termination without warning and without cause.
The letter was effective immediately.

356. The letter stated that she was fired because her
position was of trust.

357. Defendants terminated and dismissed Borrero Casado
from her job without evaluating her job performance and
efficiency.

358.   At no time prior to her dismissal did the Defendants
discipline Borrero Casado or issue a reprimand related to
the performance of her duties.

359.   The reason that Borrero Casado's job was terminated
was because the Defendants knew that she belonged to – or
otherwise perceived her to be a member of and/or affiliated
with – a political party other than the NPP, particularly
the PDP.

360.   In the alternative, Defendants terminated her because
they knew that she was not an active supporter of the NPP.

361.   As a result of this termination, Defendants have
deprived Borrero Casado of the income and benefits by which
she sustained herself and her family; have subjected her to
personal pain and suffering; and have punished her in the
exercise of her civil rights by terminating her employment
– all because she is not a member of or affiliated with the
NPP, and did not vote for the NPP or for NPP candidates in
the 2016 election; and/or is perceived by Defendants as not
being a member of or affiliated with the NPP and/or not
having voted for the NPP or for the NPP candidates in the
2016 election; and/or Defendants knew of her political
affiliation with the PDP.

362.   Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Borrero Casado's

exercise of her First Amendment rights and her desires to engage in activities protected by the First Amendment.

### Plaintiff Edgar Calderón Lebrón

363.    Plaintiff Edgar Calderón Lebrón ("Calderón Lebrón") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

364.    Plaintiff Calderón Lebrón commenced working at the Office of the Superintendent in May 28, 2013, as an Internal Security Officer and worked as low level security guard when he was terminated on February 15, 2017 because of his political affiliation.

365.    Party affiliation is not an appropriate requirement for Calderón Lebrón's position. At all times relevant and material hereto, Calderón Lebrón was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions. Calderón Lebrón did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

366.    Calderón Lebrón engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

367.    Calderón Lebrón's principal duties were similar to a
security guard providing security services and watch for
the safety of all the areas, buildings, equipment and
property of the Office of the Superintendent and the
Capitol area to preserve and keep these safe; to watch for
the safety and security of all persons in the Capitol
District.

368.    For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) were aware that Calderón Lebrón
was considered to be an active member of the PDP. It was of
common knowledge at the Office of the Superintendent (and
by Defendants themselves and by their agents and employees
of their political trust) that Calderón Lebrón supported
the PDP during the 2016 elections and believed to be active
during the PDP's electoral campaign for the 2016 elections.
Moreover, these individuals also knew or assumed that
Calderón Lebrón had voted for the PDP.

369.    Calderón Lebrón's was recommended for the position by
Javier Walker, a close friend of Javier Vázquez Collazo,
the Superintendent of The Capitol Building, who is
identified and a political activist for the PDP party. This
was common knowledge within the Office of the
Superintendent.

127

370. Calderón Lebrón also actively participated in activities of the Office of the Superintendent that were honored with the participation of PPD party politicians including the President of the House of Representatives.

371. These facts, as well as others provided throughout this complaint relating to or tending to show Calderón Lebrón's presumed political affiliation were known to all Defendants in this case.

372. Like some co-workers and the other Plaintiffs, Calderón Lebrón was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

373. Calderón Lebrón himself had a public Facebook account and Snapchat where he was friends with some of his PDP affiliated co-workers that posted statuses regarding political affiliation.

374. After Election Day, Calderón Lebrón was asked in several occasions when he had started to work at the Office of the Superintendent.

375.    After Election Day, the working environment became tense and uncertain, NPP employees where constantly making comments as to who was going to be terminated.

376.    Defendants terminated and dismissed Calderón Lebrón from his job without evaluating his job performance or efficiency.

377.    At no time prior to his dismissal did the Defendants discipline Calderón Lebrón or issue a reprimand related to the performance of his duties.

378.    Defendants terminated Calderón Lebrón's employment without warning and without cause, by way of a letter of February 15, 2017. His termination was effective on the same day.

379.    The reason that Calderón Lebrón's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

380.    In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

381.    As a result of this termination, Defendants have deprived Calderón Lebrón  of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him

in the exercise of his civil rights by terminating his
employment – all because he is not a member of or
affiliated with the NPP, and did not vote for the NPP or
for NPP candidates in the 2016 election; and/or is
perceived by Defendants as not being a member of or
affiliated with the NPP and/or not having voted for the NPP
or for the NPP candidates in the 2016 election; and/or
because he is a known supporter of the PDP.

382.   Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Calderón Lebrón's
exercise of his First Amendment rights and his desires to
engage in activities protected by the First Amendment.

### Plaintiff Omar J. Claudio Llopiz

383.   Plaintiff Omar J. Claudio Llopiz ("Claudio Llopiz") is
of legal age, a resident of Puerto Rico and a citizen of
the United States of America.

384.   Plaintiff Claudio Llopiz began working at the Office
of the Superintendent in March 2013, and was performing
duties as an Assistant Director of Conservation and
Technical Services when he was dismissed on February 15,
2017, because of his political affiliation with the PDP and
his support of PDP candidates.

385. At the time of the termination, Plaintiff Santiago Rodriguez had an open case before the Puerto Rico State Insurance Fund because of a work-place related accident.

386. Party affiliation is not an appropriate requirement for Claudio Llopiz 's position. At all times relevant and material hereto, Claudio Llopiz was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions.

387. Claudio Llopiz did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

388. Claudio Llopiz engaged in functions of a routine nature that required manual competence and efficient performance, not political affiliation.

389. Claudio Llopiz 's principal duties were a draftsman ("delineante") in charge of drafting and creating drawings for minor construction projects and remodeling of buildings and facilities in the Office of the Superintendent and the Capitol District.

390. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Claudio Llopiz is an active member of the PDP. It was of common knowledge

at the Office of the Superintendent (and by Defendants themselves) that Claudio Llopiz avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Claudio Llopiz had voted for the PDP.

391.   Claudio Llopiz actively participated during the PDP 2016 Electoral campaign as a running candidate for the Municipal Legislature of Cataño.

392.   Claudio Llopiz actively participated in rallies, meetings and attended campaign closings of the PDP. He participated of "Abrazo Popular" and other similar activities. He actively participated of the campaign for the governor candidate David Bernier; and candidates Jose Nadal Power and Luis Vega Ramos.

393.   These facts, as well as others provided throughout this complaint relating to or tending to show Claudio Llopiz 's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

394.   After the 2016 General Elections, the atmosphere in the Office of the Superintendent became tense because of the rumors that NPP administration was going to terminate the employees that had been identified as recruited by the

PDP administration. It was rumored that Roy Sanchez was preparing a list of the employees to be terminated to be shared with "Billy" Sanchez at the office of the President of the Senate,

395. After January 2, 2017, Claudio Llopiz's was told by Pablo Sastre that the new NPP administration was not going to terminate employees that performed their tasks accordingly and that he was doing good work.

396. On February 15, 2017, Claudio Llopiz was given a letter of termination without warning and without cause. The letter was effective immediately.

397. The letter stated that he was fired because her position was of trust.

398. Defendants terminated and dismissed Claudio Llopiz from his job without evaluating his job performance and efficiency.

399. At no time prior to his dismissal did the Defendants discipline Claudio Llopiz or issue a reprimand related to the performance of her duties.

400. The reason that Claudio Llopiz's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

401.   In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

402.   As a result of this termination, Defendants have deprived Claudio Llopiz of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or Defendants knew of his political affiliation with the PDP.

403.   Defendants' actions have resulted in a chilling effect and have had a compromising effect on Claudio Llopiz's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

### *Plaintiff Saturno Cruz Carrasquillo*

404.   Plaintiff Saturno Cruz Carrasquillo ("Cruz Carrasquillo") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

405.   Plaintiff Cruz Carrasquillo commenced working at the Office of the Superintendent in December 2013, as an

Internal Security Officer and worked as low level security guard when he was terminated on February 15, 2017 because of his political affiliation.

406.    Party affiliation is not an appropriate requirement for Cruz Carrasquillo's position. At all times relevant and material hereto, Cruz Carrasquillo was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions. Cruz Carrasquillo did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

407.    Cruz Carrasquillo engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

408.    Cruz Carrasquillo's principal duties were similar to a security guard providing security services and watch for the safety of all the areas, buildings, equipment and property of the Office of the Superintendent and the Capitol area to preserve, keep these safe and to watch for the safety and security of all persons in the Capitol District.

409.    For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the

Superintendent in general) were aware that Cruz
Carrasquillo was considered to be an active member of the
PDP. It was of common knowledge at the Office of the
Superintendent (and by Defendants themselves and by their
agents and employees of their political trust) that Cruz
Carrasquillo supported the PDP during the 2016 elections
and believed to be active during the PDP's electoral
campaign for the 2016 elections. Moreover, these
individuals also knew or assumed that Cruz Carrasquillo had
voted for the PDP.

410.    Cruz Carrasquillo's was recommended for the position
by Maritza Alejandro Chavenas who works for the office of
Senator Eduardo Bahtia who was the President of the Senate
under PDP administration.

411.    Cruz Carrasquillo also actively participated in the
2012 and 2016 political campaign of PDP candidate Eduardo
Bhatia.

412.    Cruz Carrasquillo actively participated of the PDP
2016 political primary. He supported PDP candidate for
Governor, David Bernier.

413.    Like some co-workers and the other Plaintiffs, Cruz
Carrasquillo was also seen by Defendants (and their agents
and employees of their political trust), and other NPP-
affiliated employees of the Office of the Superintendent,

in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign.

414. Cruz Carrasquillo himself had a public Facebook account where he was friends with some of his NPP affiliated co-workers, and posted statuses regarding his political affiliation.

415. Cruz Carrasquillo had friendly discussions with his co-workers and his supervisor; Luis Vega who is NPP affiliate; related to politics and the political campaign where he shared his affiliation to the PDP.

416. These facts, as well as others provided throughout this complaint relating to or tending to show Cruz Carrasquillo's presumed political affiliation were known to all Defendants in this case.

417. After Election Day, Cruz Carrasquillo was asked in several occasions when he had started to work at the Office of the Superintendent.

418. After Election Day, his position remained the same, even though the Supervisor Vega told the plaintiff that the night shift would be eliminated because Genesis Security is in charge of that shift.

419.    Luis Vega, the night shift supervisor, was a known NPP
        affiliate   and   had   knowledge   of   Cruz   Carrasquillo's
        affiliation to the PDP.

420.    After Election Day, the working environment became
        tense and uncertain, NPP employees where constantly making
        comments  as  to  who  was  going  to  be  terminated.  Roberto
        Cañas even told the plaintiff to stop wearing his uniform
        because it was red and resembled the PDP.

421.    Defendants terminated and dismissed Cruz Carrasquillo
        from  his  job  without  evaluating  his  job  performance  or
        efficiency.

422.    At no time prior to his dismissal did the Defendants
        discipline Cruz Carrasquillo or issue a reprimand related
        to the performance of his duties.

423.    Defendants terminated Cruz Carrasquillo's employment
        without warning and without cause, by way of a letter of
        February 15, 2017. His termination was effective on the
        same day.

424.    The reason that Cruz Carrasquillo's job was terminated
        was because the Defendants knew that he belonged to – or
        otherwise perceived him to be a member of and/or affiliated
        with – a political party other than the NPP, particularly
        the PDP.

425.   In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

426.   As a result of this termination, Defendants have deprived Cruz Carrasquillo of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or because he is a known supporter of the PDP.

### Plaintiff Wanda Cruz Díaz

427.   Plaintiff Wanda Cruz Díaz ("Cruz Díaz") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

428.   Plaintiff Cruz Díaz commenced working at the Office of the Superintendent in August of 2013 and worked as an Project Management Officer when she was terminated on February 15, 2017 because of her political affiliation.

429.   Party affiliation is not an appropriate requirement for Cruz Díaz' position. At all times relevant and material

139

hereto, Cruz Díaz was a public employee whose position was not a public-policy-making position, or one that required her to perform public-policy functions. Cruz Díaz did not perform functions of close proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

430.    In fact, political affiliation is not a requirement for Cruz Díaz' position.

431.    Cruz Díaz engaged in functions of a routine nature that required competence, specific knowledge of construction projects and efficient performance, not political affiliation.

432.    Cruz Díaz' principal duties were to coordinate construction and renovation projects in the facilities of the Capitol District.

433.    For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Cruz Díaz is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Cruz Díaz avidly supported the PDP during the 2016 elections and was active during the PDP's electoral

campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Cruz Díaz voted for the PDP.

434.  Cruz Díaz was recommended for the position at the Office of the Superintendent by Jose Sosa Velez and Javier Vazquez the PDP administration Superintendent.

435.  Cruz Díaz also engaged in friendly political discussions with non-PDP and NPP affiliate co-workers in which she expressed her political affiliation to the PDP party and her support for PDP candidates.

436.  On occasion, Cruz Díaz wore red clothing to her work at the Office of the Superintendent that expressed her support to the PDP party. This was common knowledge between co-workers that wore the color of their party affiliation.

437.  Cruz Diaz was asked by NPP affiliates when she had started to work at the Office of the Superintendent.

438.  Like some co-workers and the other Plaintiffs, Cruz Díaz was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

439.    Cruz Díaz herself had a public Facebook account where she was friends with some of his NPP affiliated co-workers, and posted statuses regarding her political affiliation.

440.    These facts, as well as others provided throughout this complaint relating to or tending to show Cruz Díaz' political affiliation, preferences involvement and activism, were known to all Defendants in this case (and by their agents and employees of their political trust).

441.    After the elections, the workplace became very tense. There were many changes and a lot of new people at the Office of the Superintendent. Cruz Díaz was subjected to continuous comments stating that PDP affiliates would be terminated and replaced

442.    Defendants terminated Cruz Díaz' employment without warning and without cause, by way of a letter of February 15, 2017. Her termination was effective on the same day.

443.    Defendants terminated and dismissed Cruz Díaz from her job without evaluating her job performance and efficiency.

444.    At no time prior to her dismissal did the Defendants discipline Cruz Díaz or issue a reprimand related to the performance of her duties.

445.    The reason that Cruz Díaz' job was terminated was because the Defendants knew that she belonged to – or otherwise perceived her to be a member of and/or affiliated

with – a political party other than the NPP, particularly the PDP.

446.    In the alternative, Defendants terminated her because they knew that she was not an active supporter of the NPP.

447.    As a result of this termination, Defendants have deprived Cruz Díaz of the income and benefits by which she sustained herself and her family; have subjected her to personal pain and suffering; and have punished her in the exercise of her civil rights by terminating her employment – all because she is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and or being a known supporter of the PDP.

448.    Defendants' actions have resulted in a chilling effect and have had a compromising effect on Cruz Díaz' exercise of her First Amendment rights and her desires to engage in activities protected by the First Amendment.

***Plaintiff Juan Cruz Dones***

449.    Plaintiff Juan Cruz Dones ("Cruz Dones") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

450.   Plaintiff Cruz Dones began working at the Office of the Superintendent in July 2014, and was performing duties as a Maintenance Services Assistant ("Auxiliar de Servicios de Mantenimiento") when he was dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates.

451.   Party affiliation is not an appropriate requirement for Cruz Dones' position. At all times relevant and material hereto, Cruz Dones was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions.

452.   Cruz Dones did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

453.   Cruz Dones engaged in functions of a routine nature that required manual competence and efficient performance, not political affiliation.

454.   Cruz Dones' principal duties were to perform cleaning and maintenance services to the facilities, equipment and furniture of the Office of the Superintendent and other assigned areas in the Capitol District. His duties required: sweeping, mopping, washing, dusting, collecting and disposing of trash, among other.

455.    For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) were aware that Cruz Dones is an
active member of the PDP. It was of common knowledge at the
Office of the Superintendent (and by Defendants themselves)
that Cruz Dones avidly supported the PDP during the 2016
elections and was active during the PDP's electoral
campaign for the 2016 elections. Moreover, Defendants also
knew or assumed that Cruz Dones had voted for the PDP.

456.    Cruz Dones actively participated in rallies, meetings,
and political campaign activities of the PPD candidate for
governor, David Bernier.

457.    Like some co-workers and the other Plaintiffs, Cruz
Dones was also seen by Defendants (and their agents and
employees of their political trust), and other NPP-
affiliated employees of the Office of the Superintendent,
in photos and/or videos participating of political events
or issuing political commentary during the 2016 electoral
campaign, including in those posted on public Facebook
accounts.

458.    Cruz Dones himself had a public Facebook account where
he was friends with some of his NPP affiliated co-workers,
and posted statuses regarding his political affiliation.

459.    These facts, as well as others provided throughout this complaint relating to or tending to show Cruz Dones' political affiliation, preferences involvement and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

460.    After the 2016 General Elections, the atmosphere in the Office of the Superintendent became tense and politically charged. NPP affiliated employees made continuous comments as to the termination of all presumed PDP affiliated employees.

461.    After the 2016 General Elections, Pablo Sastre assured Cruz Dones that he shouldn't be concerned because they were not going to be terminated. Sastre told him to disregard the rumors.

462.    Cruz Dones was concerned because he had received information that there were lists of the employees to be terminated that were prepared by NPP affiliated employees.

463.    After January 2, 2017, Cruz Dones was asked by his supervisor Darwin Santiago and by Daniel Figueroa when he had started to work at the Office of the Superintendent.

464.    After January 2, 2017, Cruz Dones was removed from his assigned area to a new location.

465.    On February 15, 2017, Cruz Dones was given a letter of termination without warning and without cause. The letter was effective immediately.

466.    Miguel Flores handed Cruz Dones the termination letter and apologized for the termination.

467.    The letter stated that he was fired because his position was of trust.

468.    Defendants terminated and dismissed Cruz Dones from his job without evaluating his job performance and efficiency.

469.    At no time prior to his dismissal did the Defendants discipline Cruz Dones or issue a reprimand related to the performance of her duties.

470.    The reason that Cruz Dones' job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

471.    In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

472.    As a result of this termination, Defendants have deprived Cruz Dones of the income and benefits by which he sustained himself and his family; have subjected his to personal pain and suffering; and have punished him in the

147

exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or Defendants knew of her political affiliation with the PDP.

473.    Defendants' actions have resulted in a chilling effect and have had a compromising effect on Cruz Done's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

**_Plaintiff Rebecca de Pedro González_**

474.    Plaintiff Rebecca de Pedro González ("de Pedro González") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

475.    Plaintiff de Pedro González commenced working at the Office of the Superintendent in January of 2014 and worked as an Administrative Official when she was terminated on February 15, 2017 because of her political affiliation.

476.    Party affiliation is not an appropriate requirement for de Pedro González' position. At all times relevant and material hereto, de Pedro González was a public employee whose position was not a public-policy-making position, or

one that required her to perform public-policy functions.
de Pedro González did not perform functions of close
proximity to policy-making employees, or otherwise have
access to politically sensitive information or confidential
information related to public policy matters.

477.    de Pedro González engaged in functions of a routine
nature that required competence and efficient performance,
not political affiliation.

478.    de Pedro González' principal duties were clerical and
secretarial in support of the administration of the Office
of the Superintendent related to the computer information
systems.

479.    For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) were aware that de Pedro
González is an active member of the PDP. It was of common
knowledge at the Office of the Superintendent (and by
Defendants themselves) that de Pedro González avidly
supported the PDP during the 2016 elections and was active
during the PDP's electoral campaign for the 2016 elections.
Moreover, Defendants also knew or assumed that de Pedro
González voted for the PDP.

480.    de Pedro González is an active supporter of the PDP
party. She actively participated in rallies, meetings, and

activities such as the Campaign closing, among others. She
also participated with the political campaign activities of
the PPD candidate for governor, David Bernier, and for
Jaime Perelló.

481.    Like some co-workers and the other Plaintiffs, de
Pedro González was also seen by Defendants (and their
agents and employees of their political trust), and other
NPP-affiliated employees of the Office of the
Superintendent, in photos and/or videos participating of
political events or issuing political commentary during the
2016 electoral campaign, including in those posted on
public Facebook accounts.

482.    de Pedro González herself had a public Facebook
account where she was friends with some of his NPP
affiliated co-workers, and posted statuses regarding her
political affiliation.

483.    de Pedro González also engaged in friendly political
discussions with non-PDP and NPP affiliate co-workers in
support of PDP candidates.

484.    These facts, as well as others provided throughout
this complaint relating to or tending to show de Pedro
González' political affiliation, preferences involvement
and activism, were known to all Defendants in this case

(and by their agents and employees of their political trust).

485. After the elections, the workplace became very tense. There was a lot of pressure and stress. de Pedro González was subjected to continuous comments stating that she was going to be fired and/or replaced because of her political affiliation to the PPD.

486. de Pedro González was informed that there were lists of employees identified as PDP affiliates that were going to be terminated. Emmanuel Rosado stated that the lists were ready and Johnathan Cruz saw the lists at the Human Resources Office.

487. de Pedro González is the niece of Jaime del Valle. Jaime del Valle spoke directly with the President of the Senate Thomas Rivera Schatz with regards to de Pedro Gonzalez employment and was told that she could not stay at the Office of the Superintendent because she was affiliated to the PDP.

488. Defendants terminated de Pedro González' employment without warning and without cause, by way of a letter of February 15, 2017. Her termination was effective on the same day.

489.    Defendants terminated and dismissed de Pedro González
from her job without evaluating her job performance and
efficiency.

490.    At no time prior to her dismissal did the Defendants
discipline Rivera González or issue a reprimand related to
the performance of her duties.

491.    The reason that de Pedro González' job was terminated
was because the Defendants knew that she belonged to – or
otherwise perceived her to be a member of and/or affiliated
with – a political party other than the NPP, particularly
the PDP.

492.    In the alternative, Defendants terminated her because
they knew that she was not an active supporter of the NPP.

493.    As a result of this termination, Defendants have
deprived de Pedro González of the income and benefits by
which she sustained herself and her family; have subjected
her to personal pain and suffering; and have punished her
in the exercise of her civil rights by terminating her
employment – all because she is not a member of or
affiliated with the NPP, and did not vote for the NPP or
for NPP candidates in the 2016 election; and/or is
perceived by Defendants as not being a member of or
affiliated with the NPP and/or not having voted for the NPP

or for the NPP candidates in the 2016 election; and or being a known supporter of the PDP.

494.    Defendants' actions have resulted in a chilling effect and have had a compromising effect on de Pedro González' exercise of her First Amendment rights and her desires to engage in activities protected by the First Amendment.

### *Plaintiff Sarai Díaz Reyes*

495.    Plaintiff Sarai Díaz Reyes ("Díaz Reyes") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

496.    Plaintiff Díaz Reyes began working at the Office of the Superintendent in June, 2013, and was performing duties as a Maintenance Services Assistant ("Auxiliar de Servicios de Mantenimiento") when she was dismissed on February 15, 2017, because of her political affiliation with the PDP and his support of PDP candidates.

497.    Party affiliation is not an appropriate requirement for Díaz Reyes's position. At all times relevant and material hereto, Díaz Reyes was a public employee whose position was not a public-policy-making position, or one that required her to perform public-policy functions.

498.    Díaz Reyes did not perform functions of close proximity to policy-making employees, or otherwise have

access to politically sensitive information or confidential information related to public policy matters.

499. Díaz Reyes engaged in functions of a routine nature that required manual competence and efficient performance, not political affiliation.

500. Díaz Reyes's principal duties were to perform cleaning and maintenance services to the common areas of the Capitol building and was in charge of cleaning and maintenance of the restroom facilities located at the House of Representatives Annex building. Her duties required: sweeping, mopping, washing toilets and basins, collecting and disposing of trash, among other.

501. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Díaz Reyes is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Díaz Reyes avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Díaz Reyes had voted for the PDP.

502. During the 2016 electoral campaign, Díaz Reyes worked as an electoral polling officer authorized by the State

Electoral Commission as a representative of the PDP party in Guaynabo at Rafael Hernandez School.

503.    Electoral polling officers are required to train and register before the State Electoral Commission identifying the individual's political affiliation and making it a matter of public records.

504.    Díaz Reyes actively participated in the primary, rallies, meetings, the General Assembly and the PDP campaign closing celebrated at the Hiram Bithorn Stadium. She also participated with the political campaign activities of the PPD candidate for governor, David Bernier, and for Jaime Perelló.

505.    Like some co-workers and the other Plaintiffs, Díaz Reyes was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

506.    Díaz Reyes herself had a public Facebook account where she was friends with some of his NPP affiliated co-workers, and posted statuses regarding her political affiliation.

507.    These facts, as well as others provided throughout this complaint relating to or tending to show Díaz Reyes's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

508.    After the 2016 General Elections, the atmosphere in the Office of the Superintendent became tense and politically charged. NPP affiliated employees made continuous comments as to the termination of all presumed PDP affiliated employees.

509.    After the 2016 General Elections, Diaz Reyes approached Mr. Darwin Santiago with regards to her permanency at the Office of the Superintendent. Mr. Santiago assured her that maintenance personnel were never terminated and she shouldn't be concerned.

510.    Sometime after January 2, 2017, Díaz Reyes was informed by the secretary of Representative Antonio "Tony" Soto; Annabelle; that her name was included in the list of the employees the NPP was going to fire. She was informed that the "list "was managed by "Gaby", the President of the Senate Rivera Schatz Chief of Staff, Gabriel Hernández Rodríguez.

511.    Diaz Reyes was asked on various occasions when she started to work at the Office of the Superintendent.

512.    After January 2, 2017, Díaz Reyes and her fellow co-
workers had a meeting with the new Superintendent Wilfredo
Ramos, her Supervisor Mr. Darwin Santiago and Mr. Pablo
Sastre, where they all were reassured that they would not
be terminated if they performed their duties accordingly
and kept up the good quality of their work.

513.    Mr. Darwin Santiago advised Diaz Reyes to be on time
and do not take any day off because the new administration
was reviewing all their files at the Human Resources
Office.

514.    Diaz Reyes noticed favorable position changes for NPP
affiliate personnel, such as the two grandchildren of
Roberto "Junior" Maldonado, who was the Administrator of
the Senate under the NPP prior Presidency of Tomas Rivera
Schatz, that were moved from maintenance work to the
infirmary and one Internal Security. She also noticed a lot
of new people around the Office of the Superintendent
requesting to be hired.

515.    On February 15, 2017, Díaz Reyes was given a letter of
termination without warning and without cause. The letter
was effective immediately.

516.    As Diaz Reyes was handed the letter of termination,
Mr. Miguel Flores Caro made an expression stating that the
determination for her termination was "out of his hands".

157

517. The letter stated that she was fired because her position was of trust.

518. Diaz Reyes supervisor, Darwin Santiago, informed her early in the morning that her name was on the list of the PDP affiliate employees that were going to be terminated later during the day. Mr. Santiago explained to her that he tried to speak with President Rivera Schatz's Chief of Staff, but he was shut to any negotiation. Darwin Santiago then accompanied Diaz Reyes to Representative Soto's office to see if they could have her removed from the "list".

519. Defendants terminated and dismissed Díaz Reyes from her job without evaluating her job performance and efficiency.

520. At no time prior to her dismissal did the Defendants discipline Díaz Reyes or issue a reprimand related to the performance of her duties.

521. The reason that Díaz Reyes's job was terminated was because the Defendants knew that she belonged to – or otherwise perceived her to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

522. In the alternative, Defendants terminated her because they knew that she was not an active supporter of the NPP.

523.   As a result of this termination, Defendants have deprived Díaz Reyes of the income and benefits by which she sustained herself and her family; have subjected her to personal pain and suffering; and have punished her in the exercise of her civil rights by terminating her employment – all because she is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or Defendants knew of her political affiliation with the PDP.

524.   Defendants' actions have resulted in a chilling effect and have had a compromising effect on Díaz Reyes's exercise of her First Amendment rights and her desires to engage in activities protected by the First Amendment.

### Plaintiff Jose Espinosa Díaz

525.   Plaintiff Jose Espinosa Díaz ("Espinosa Díaz") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

526.   Plaintiff Espinosa Díaz commenced working at the Office of the Superintendent in March 2015, as an Internal Security Supervisor when he was terminated on February 15, 2017 because of his political affiliation.

527.    Party affiliation is not an appropriate requirement
        for Espinosa Díaz's position. At all times relevant and
        material hereto, Espinosa Díaz was a public employee whose
        position was not a public-policy-making position, or one
        that required him to perform public-policy functions.
        Espinosa Díaz did not perform functions of proximity to
        policy-making employees, or otherwise have access to
        politically sensitive information or confidential
        information related to public policy matters.

528.    Espinosa Díaz engaged in functions of a routine nature
        that required competence and efficient performance, not
        political affiliation.

529.    Espinosa Díaz's principal duties were to supervise,
        coordinate and develop the different activities related to
        the security services, protection and watch for the
        preservation and safety of the property, employees and
        visitors of the Office of the Superintendent and the
        Capitol District.

530.    For the reasons set forth in this Complaint, all
        Defendants (and employees of the Office of the
        Superintendent in general) were aware that Espinosa Díaz is
        an active member of the PDP. It was of common knowledge at
        the Office of the Superintendent (and by Defendants
        themselves and by their agents and employees of their

political trust) that Espinosa Díaz avidly supported the
PDP during the 2016 elections and was active during the
PDP's electoral campaign for the 2016 elections. Moreover,
these individuals also knew or assumed that Espinosa Díaz
had voted for the PDP.

531.    Espinosa Díaz was recommended for the position by the
President of the House of Representatives Jaime Perello
under PDP party. This was common knowledge within the
Office of the Superintendent.

532.    Espinosa Díaz actively participated of the PDP
campaign in rallies, meetings, and activities like the
"Abrazo Popular", among others. He also participated with
the political campaign activities of the PPD candidate for:
governor candidate, David Bernier; and Representative Jaime
Perello.

533.    Like some co-workers and the other Plaintiffs,
Espinosa Díaz was also seen by Defendants (and their agents
and employees of their political trust), and other NPP-
affiliated employees of the Office of the Superintendent,
in photos and/or videos participating of political events
or issuing political commentary during the 2016 electoral
campaign, including in those posted on public Facebook
accounts.

534.  Espinosa Díaz himself had a public Facebook account where he was friends with some of his NPP affiliated co-workers, and posted statuses regarding his political affiliation.

535.  Espinosa Díaz on several occasions wore color red shirts to work on specific days that identified him as an affiliate of the PDP.

536.  Espinosa Díaz participated in political discussions were co-workers expressed their party affiliation and spoke in favor of their candidates. Espinosa Díaz expressed his views in favor the PDP and Jaime Perello.

537.  These facts, as well as others provided throughout this complaint relating to or tending to show Espinosa Díaz's political affiliation, preferences involvement and activism, were known to all Defendants in this case.

538.  After Election Day, the working environment changed and became tense. Employees were concerned about losing their jobs. Co-workers affiliated with the NPP said that the new NPP administration was going to fire PDP employees in reprimand for what the PDP had done in 2013.

539.  After Election Day, Luis Vega who is affiliated with the NPP and was the night shift supervisor, made known to others that he would only "save" seven of the Internal

Security Office employees and that the other were going to "go".

540.    At some time during the transition period, Espinosa Díaz was approached Mr. Roy Sanchez, who asked him when he was hired.

541.    After January 2, 2017, the new NPP administration took over they started undermining his authority and giving the second shift employees instructions overriding his. When he asked the security officers why they were doing a different task they would tell him that the new instructions came from Roy Sanchez.

542.    After January 2, 2017, when the new NPP administration created uncertainty and a difficult environment for the employees who were presumed or identified as PDP affiliates. On January 30, 2017, all employees were called into a meeting and rumors that they were going to be fired surrounded the Capitol District. After more than an hour of wait, the meeting was cancelled. The next day, January 31, 2017, they were called again to a meeting and there were rumors that the termination letters were ready, the meeting was canceled once again. They were told by NPP co-workers that they were not fired because the local press had taken notice of the termination of Senate employees and were at the Capitol District.

163

543.    Espinosa Díaz was called into a meeting with many of
his co-workers assigned to Internal Security on February
15, 2017. Most of the Office of the Superintendent Internal
Security Officers was terminated. NPP affiliated employees
did not receive a termination letter.

544.    Defendants terminated and dismissed Espinosa Díaz from
his job without evaluating his job performance or
efficiency.

545.    At no time prior to his dismissal did the Defendants
discipline Espinosa Díaz  or issue a reprimand related to
the performance of his duties.

546.    Defendants terminated Espinosa Díaz's employment
without warning and without cause, by way of a letter of
February 15, 2017. His termination was effective on the
same day.

547.    The reason that Espinosa Díaz's job was terminated was
because the Defendants knew that he belonged to – or
otherwise perceived him to be a member of and/or affiliated
with – a political party other than the NPP, particularly
the PDP.

548.    In the alternative, Defendants terminated him because
they knew that he was not an active supporter of the NPP.

549.    As a result of this termination, Defendants have
deprived Espinosa Díaz of the income and benefits by which

he sustained himself and his family; have subjected him to
personal pain and suffering; and have punished him in the
exercise of his civil rights by terminating his employment
- all because he is not a member of or affiliated with the
NPP, and did not vote for the NPP or for NPP candidates in
the 2016 election; and/or is perceived by Defendants as not
being a member of or affiliated with the NPP and/or not
having voted for the NPP or for the NPP candidates in the
2016 election; and/or because he is a known supporter of
the PDP.

550.    Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Espinosa Díaz's
exercise of his First Amendment rights and his desires to
engage in activities protected by the First Amendment.

### Plaintiff Joshua Figueroa Serrano

551.    Plaintiff Joshua Figueroa Serrano ("Figueroa Serrano")
is of legal age, a resident of Puerto Rico and a citizen of
the United States of America.

552.    Plaintiff Figueroa Serrano began working at the Office
of the Superintendent in December 2015, and was performing
duties as a Conservation and Facility Repair Technician
when he was dismissed on February 15, 2017, because of his
political affiliation with the PDP and his support of PDP
candidates.

553.   Party affiliation is not an appropriate requirement
for Figueroa Serrano's position. At all times relevant and
material hereto, Figueroa Serrano was a public employee
whose position was not a public-policy-making position, or
one that required him to perform public-policy functions.

554.   Figueroa Serrano did not perform functions of
proximity to policy-making employees, or otherwise have
access to politically sensitive information or confidential
information related to public policy matters.

555.   Figueroa Serrano engaged in functions of a routine
nature that required competence and efficient performance,
not political affiliation.

556.   Figueroa Serrano principal duties were diverse manual
labor for the maintenance, conservation and repair of the
facilities, equipment, buildings and green areas of the
Capitol District. Figueroa Serrano was assigned duties
related to the trimming, cutting, cleaning and preservation
of the gardens and green areas of the Capitol District.

557.   For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) believed that Figueroa Serrano
was considered to be an active member of the PDP. It was
believed at the Office of the Superintendent (and by
Defendants themselves and by their agents and employees of

166

their political trust) that Figueroa Serrano supported the
PDP during the 2016 elections and was believed to be active
during the PDP's electoral campaign for the 2016 elections.
Moreover, these individuals also assumed that Figueroa
Serrano had voted for the PDP.

558.   Figueroa Serrano also actively participated in the
2016 electoral race by attending rallies, meetings and
activities in support of the PDP party such as the "Abrazo
Popular". He also participated in activities with the
President of the Senate Eduardo Bahtia.

559.   Figueroa Serrano was recommended for the position at
the Office of the Superintendent by a PPD affiliate,
Adalberto Pantojas.

560.   These facts, as well as others provided throughout
this complaint relating to or tending to show Figueroa
Serrano's political affiliation, preferences involvement
and activism, were known to all Defendants in this case
(and their agents and employees of their political trust).

561.   After election day, the Conservation and Facility
Repair brigades were overloaded with work. The brigades
were ordered to work overtime, weekends and holidays during
the Christmas Season.

562. After election day, the working environment turned hostile and NPP affiliate co-workers made continuous comments about the PDP employees being fired.

563. After January 2, 2017, there was a meeting with the new Superintendent Wilfredo Ramos where he expressed that nobody was not going to be fired and that the most important thing was that employees had to do good work.

564. After January 2, 2016, Figueroa Serrano witnessed how NPP affiliated personnel were moved to better positions.

565. On February 15, 2017, Figueroa Serrano was given a letter of termination without warning and without cause. The letter was effective immediately.

566. The letter stated that he was fired because his position was of trust.

567. Defendants terminated and dismissed Figueroa Serrano from his job without evaluating his job performance and efficiency.

568. At no time prior to his dismissal did the Defendants discipline Figueroa Serrano or issue a reprimand related to the performance of his duties.

569. The reason that Figueroa Serrano's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated

with – a political party other than the NPP, particularly the PDP.

570.   In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

571.   Figueroa Serrano witnessed how NPP affiliated personnel were not fired on February 15, 2017.

572.   As a result of this termination, Defendants have deprived Figueroa Serrano  of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or Defendants knew of his political affiliation with the PDP.

573.   Defendants' actions have resulted in a chilling effect and have had a compromising effect on Figueroa Serrano's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

***Plaintiff Fernando Fuentes Rodríguez***

574.    Plaintiff    Fernando    Fuentes    Rodríguez    ("Fuentes Rodríguez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

575.    Plaintiff Fuentes Rodríguez began working at the Office of the Superintendent in March of 2013, and was performing duties as a Conservation and Facility Repair Supervisor when he was dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates.

576.    Party affiliation is not an appropriate requirement for Fuentes Rodríguez's position. At all times relevant and material hereto, Fuentes Rodríguez was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions.

577.    Fuentes Rodríguez did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

578.    Fuentes Rodríguez engaged in functions of a routine nature that required manual competence and efficient performance, not political affiliation.

579.    Fuentes Rodríguez's principal duties were to supervise and coordinate manual labor required for the maintenance,

conservation and repair of facilities, structures, equipment and areas in the Capitol's facilities.

580. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Fuentes Rodríguez is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Fuentes Rodríguez avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Fuentes Rodríguez had voted for the NPP.

581. During the 2016 electoral campaign, Fuentes Rodríguez was trained to participate as an electoral polling officer by the State Electoral Commission as a representative of the PDP party.

582. The training was provided at the PDP Headquarters and required to register the identification of the participants for State Electoral Commission public records.

583. Like some co-workers and the other Plaintiffs, Fuentes Rodríguez was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events

or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

584. Fuentes Rodríguez himself had a public Facebook account where he was friends with some of his NPP affiliated co-workers, and posted statuses regarding his political affiliation.

585. These facts, as well as others provided throughout this complaint relating to or tending to show Fuentes Rodríguez's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

586. After the 2016 General Elections, the atmosphere in the Office of the Superintendent became tense and politically charged.

587. The Conservation and Facility Repair brigades were overloaded with work related to the remodeling and preparation of the offices for the NPP senators to move in. The brigades were ordered to work overtime, weekends and holidays during the Christmas Season.

588. Brigades filed the proper documents to claim compensatory time for the extra work. Fuentes Rodriguez accumulated 37 days of compensatory time at the time of his termination.

589.   Brigades were told that if they did good work they would not be removed from their work. Mr. Pablo Sastre assured them that he had "spoken for them" so they would not be removed from their positions.

590.   On February 15, 2017, Fuentes Rodríguez was given a letter of termination without warning and without cause. The letter was effective immediately.

591.   The letter stated that he was fired because his position was of trust.

592.   Defendants terminated and dismissed Fuentes Rodríguez from his job without evaluating his job performance and efficiency.

593.   At no time prior to his dismissal did the Defendants discipline Fuentes Rodríguez or issue a reprimand related to the performance of his duties.

594.   The reason that Fuentes Rodríguez's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

595.   In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

596.   As a result of this termination, Defendants have deprived Fuentes Rodríguez of the income and benefits by

which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or Defendants knew of his political affiliation with the PDP.

597. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Fuentes Rodríguez's exercise of her First Amendment rights and his desires to engage in activities protected by the First Amendment.

### Plaintiff Ivelisse González Alemán

598. Plaintiff Ivelisse González Alemán ("González Alemán") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

599. Plaintiff González Alemán began working at the Office of the Superintendent in August 2013, and was performing duties as an Assistant Director of Facilities Conservation and Technical Services when she was dismissed on February 15, 2017, because of her political affiliation with the PDP and her support of PDP candidates.

600.    Party affiliation is not an appropriate requirement
    for González Alemán's position. At all times relevant and
    material hereto, González Alemán was a public employee
    whose position was not a public-policy-making position, or
    one that required her to perform public-policy functions.

601.    González Alemán did not perform functions of proximity
    to policy-making employees, or otherwise have access to
    politically sensitive information or confidential
    information related to public policy matters.

602.    González Alemán engaged in functions of a routine
    nature that required manual competence and efficient
    performance, not political affiliation.

603.    González Alemán's principal duties were to assist in
    the planning, direction and supervision of maintenance,
    cleaning, remodeling, repair and minor construction
    projects of the facilities managed by the Office of the
    Superintendent including technical services such as
    electric, plumbing and refrigeration.

604.    For the reasons set forth in ther Complaint, all
    Defendants (and employees of the Office of the
    Superintendent in general) were aware that González Alemán
    is an active member of the PDP. It was of common knowledge
    at the Office of the Superintendent (and by Defendants
    themselves) that González Alemán avidly supported the PDP

during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that González Alemán had voted for the PDP.

605. González Alemán actively participated during the PDP primaries for the 2016 Electoral.

606. González Alemán actively participated in rallies, meetings and attended campaign closings of the PDP. She actively participated of the campaign for Representative Jaime Perello, and the candidate for Major of the Municipality of Carolina Jose Aponte de la Torre.

607. Gonzalez Aleman participated at times of discussions between co-workers related to the 2016 political campaign.

608. These facts, as well as others provided throughout the complaint relating to or tending to show González Alemán's political affiliation, preferences involvement and activism, were known to all Defendants in the case (and their agents and employees of their political trust).

609. After the 2016 General Elections, the atmosphere in the Office of the Superintendent became tense and hostile because of the rumors that NPP administration was going to terminate the employees that had been identified as PDP affiliates.

176

610.    After Januery 2, 2017, Gonzalez Aleman's duties were
changed taking away many of her functions and tasks while
enduring hostile working environment.

611.    After January 2, 2017, Gonzalez Alemán witnessed as
NPP affiliated employees were changed from working
positions to benefit them and increase their compensations.

612.    On February 15, 2017, González Alemán was given a
letter of termination without warning and without cause.
The letter was effective immediately.

613.    The letter stated that he was fired because her
position was of trust.

614.    Defendants terminated and dismissed González Alemán
from her job without evaluating her job performance and
efficiency.

615.    At no time prior to her dismissal did the Defendants
discipline González Alemán or issue a reprimand related to
the performance of her duties.

616.    The reason that González Alemán's job was terminated
was because the Defendants knew that she belonged to – or
otherwise perceived her to be a member of and/or affiliated
with – a political party other than the NPP, particularly
the PDP.

617.    In the alternative, Defendants terminated her because
they knew that she was not an active supporter of the NPP.

618.   As   a   result   of   the   termination,   Defendants   have
deprived   González   Alemán   of   the   income   and   benefits   by
which   she   sustained   herself   and   her   family;   have   subjected
her   to   personal   pain   and   suffering;   and   have   punished   her
in   the   exercise   of   her   civil   rights   by   terminating   her
employment   –   all   because   she   is   not   a   member   of   or
affiliated   with   the   NPP,   and   did   not   vote   for   the   NPP   or
for   NPP   candidates   in   the   2016   election;   and/or   is
perceived   by   Defendants   as   not   being   a   member   of   or
affiliated   with   the   NPP   and/or   not   having   voted   for   the   NPP
or   for   the   NPP   candidates   in   the   2016   election;   and/or
Defendants   knew   of   her   political   affiliation   with   the   PDP.

619.   Defendants'   actions   have   resulted   in   a   chilling   effect
and   have   had   a   compromising   effect   on   González   Alemán's
exercise   of   her   First   Amendment   rights   and   her   desires   to
engage   in   activities   protected   by   the   First   Amendment.

***Plaintiff Miguel A. Gonzalez Gerena***

620.   Plaintiff   Miguel   A.   Gonzalez   Gerena   ("Gonzalez
Gerena")   is   of   legal   age,   a   resident   of   Puerto   Rico   and   a
citizen   of   the   United   States   of   America.

621.   Plaintiff   Gonzalez   Gerena   began   working   at   the   Office
of   the   Superintendent   in   August   2013,   and   was   performing
duties   as   a   Conservation   and   Facility   Repair   Technician
when   he   was   dismissed   on   February   15,   2017,   because   of   his

political affiliation with the PDP and his support of PDP candidates.

622.     Party affiliation is not an appropriate requirement for Gonzalez Gerena's position. At all times relevant and material hereto, Gonzalez Gerena was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions.

623.     Gonzalez Gerena did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

624.     Gonzalez Gerena engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

625.     Gonzalez Gerena principal duties were diverse manual labor for the maintenance, conservation and repair of the facilities, equipment, buildings and green areas of the Capitol District. Gonzalez Gerena performed duties similar to a "handyman" for the Office of the Superintendent.

626.     For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) believed that Gonzalez Gerena was considered to be an active member of the PDP. It was believed at the Office of the Superintendent (and by

Defendants themselves and by their agents and employees of their political trust) that Gonzalez Gerena supported the PDP during the 2016 elections and was believed to be active during the PDP's electoral campaign for the 2016 elections. Moreover, these individuals also assumed that Gonzalez Gerena had voted for the PDP.

627.    Gonzalez Gerena also actively participated in the 2016 electoral race by attending meetings and activities in support of the PDP party such as the painting of "La Pava" in Caguas. He also participated in various activities with the President of House of of Representatives, Jaime Perelló in Mayaguez, Barceloneta and Caguas, among others.

628.    Gonzalez Gerena was recommended for the position at the Office of the Superintendent by the PPD affiliate community leader of his Municipality, the letter of recommendation is part of his human resources file.

629.    Like some co-workers and the other Plaintiffs, Gonzalez Gerena was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

630.     Gonzalez Gerena himself had a public Facebook account
where he was friends with some of his NPP affiliated co-
workers, and posted statuses regarding his political
affiliation such as, pictures in activities with House of
Representatives President, Jaime Perello.

631.     These facts, as well as others provided throughout
this complaint relating to or tending to show Gonzalez
Gerena's political affiliation, preferences involvement and
activism, were known to all Defendants in this case (and
their agents and employees of their political trust).

632.     After election day, The Conservation and Facility
Repair brigades were overloaded with work related to the
remodeling and preparation of the offices for the NPP
elected senators to move in. The brigades were ordered to
work overtime, weekends and holidays during the Christmas
Season.

633.     After election day, Gonzalez Gerena felt that the work
environment was rigid and tense due to the uncertainty. He
worked seven days a week all of which was under
compensatory time which the new NPP administration said
they will not pay.

634.     After election day, there were continuous rumors that
the NPP administration was going to terminate all employees
that were recruited by the PDP. Gonzalez Gerena was told by

181

the new Superintendent Wilfredo Ramos that nobody was not going to be fired, he gave "his word" that no one would be fired if they did their work and performed well.

635. On February 15, 2017, Gonzalez Gerena was given a letter of termination without warning and without cause. The letter was effective immediately.

636. The letter stated that he was fired because his position was of trust.

637. Defendants terminated and dismissed Gonzalez Gerena from his job without evaluating his job performance and efficiency.

638. At no time prior to his dismissal did the Defendants discipline Gonzalez Gerena or issue a reprimand related to the performance of his duties.

639. The reason that Gonzalez Gerena's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

640. In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

641. After February 15, 2017, Gonzalez Gerena visited the Office of the Superintendent where he was informed that all employees who were not terminated would be turned into

permanent employees so they couldn't be fired in the
future. Gonzalez Gerena was told that new NPP
administration fired employees recruited 5 years or less
but they did not fire the members of the NPP party who had
spent less time working there. Also, that the the
Superintendent employees were being threaten not to give
out any recommendation letters and that there will be
retaliation for those who plea or help the ones terminated.

642.   As a result of this termination, Defendants have
deprived Gonzalez Gerena of the income and benefits by
which he sustained himself and his family; have subjected
him to personal pain and suffering; and have punished him
in the exercise of his civil rights by terminating his
employment – all because he is not a member of or
affiliated with the NPP, and did not vote for the NPP or
for NPP candidates in the 2016 election; and/or is
perceived by Defendants as not being a member of or
affiliated with the NPP and/or not having voted for the NPP
or for the NPP candidates in the 2016 election; and/or
Defendants knew of his political affiliation with the PDP.

643.   Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Gonzalez Gerena's
exercise of her First Amendment rights and his desires to
engage in activities protected by the First Amendment.

### Plaintiff Ana. M. González Ledesma

644. Plaintiff Ana. M. González Ledesma ("González Ledesma") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

645. Plaintiff González Ledesma commenced working at the Office of the Superintendent in January of 2014 and worked as an Administrative Assistant when she was terminated on February 15, 2017 because of her political affiliation.

646. Party affiliation is not an appropriate requirement for González Ledesma's position. At all times relevant and material hereto, González Ledesma was a public employee whose position was not a public-policy-making position, or one that required her to perform public-policy functions. González Ledesma did not perform functions of close proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

647. González Ledesma engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

648. González Ledesma's principal duties were related to the information and computer systems in support of the administration of the Superintendent Office's systems, also performed clerical and secretarial duties.

649.   For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) were aware that González Ledesma
is an active member of the PDP. It was of common knowledge
at the Office of the Superintendent (and by Defendants
themselves) that González Ledesma avidly supported the PDP
during the 2016 elections and was active during the PDP's
electoral campaign for the 2016 elections. Moreover,
Defendants also knew or assumed that González Ledesma voted
for the PDP.

650.   González Ledesma actively participated in rallies,
meetings, and activities in support of the PDP, among
others. She also participated with the political campaign
activities of the PPD candidate for governor, David
Bernier, Carmen Yulin for Major of San Juan and for Jaime
Perelló.

651.   Like some co-workers and the other Plaintiffs,
González Ledesma was also seen by Defendants (and their
agents and employees of their political trust), and other
NPP-affiliated employees of the Office of the
Superintendent, in photos and/or videos participating of
political events or issuing political commentary during the
2016 electoral campaign, including in those posted on
public Facebook accounts.

652.    González Ledesma herself had a public Facebook account
where she was friends with some of his NPP affiliated co-
workers, and posted statuses regarding her political
affiliation.

653.    González Ledesma also engaged in friendly political
discussions with non-PDP co-workers during lunch and at
work. Her PDP affiliation was of common knowledge between
co-workers.

654.    These facts, as well as others provided throughout
this complaint relating to or tending to show González
Ledesma's political affiliation, preferences involvement
and activism, were known to all Defendants in this case
(and by their agents and employees of their political
trust).

655.    After the elections, the workplace became very tense.
Co-workers affiliated to the NPP stopped interacting with
presumed PDP affiliates and avoided talking to her.
González Ledesma was subjected to continuous comments
stating that she was going to be fired and/or replaced
because of her political affiliation to the PPD.

656.    Defendants terminated González Ledesma's employment
without warning and without cause, by way of a letter of
February 15, 2017. Her termination was effective on the
same day.

657.   Defendants terminated and dismissed González Ledesma from her job without evaluating her job performance and efficiency.

658.   At no time prior to her dismissal did the Defendants discipline González Ledesma or issue a reprimand related to the performance of her duties.

659.   The reason that González Ledesma's job was terminated was because the Defendants knew that she belonged to – or otherwise perceived her to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

660.   In the alternative, Defendants terminated her because they knew that she was not an active supporter of the NPP.

661.   As a result of this termination, Defendants have deprived González Ledesma of the income and benefits by which she sustained herself and her family; have subjected her to personal pain and suffering; and have punished her in the exercise of her civil rights by terminating her employment – all because she is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP

or for the NPP candidates in the 2016 election; and or being a known supporter of the PDP.

662.    Defendants' actions have resulted in a chilling effect and have had a compromising effect on González Ledesma's exercise of her First Amendment rights and her desires to engage in activities protected by the First Amendment.

**Plaintiff Alan A. Griffith Figueroa**

663.    Plaintiff Alan A. Griffith Figueroa ("Griffith Figueroa") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

664.    Plaintiff Griffith Figueroa began working at the Office of the Superintendent in January 2014, and was performing duties as a Maintenance Services Assistant ("Auxiliar de Servicios de Mantenimiento") when he was dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates.

665.    Party affiliation is not an appropriate requirement for Griffith Figueroa's position. At all times relevant and material hereto, Griffith Figueroa was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions.

666.    Griffith Figueroa did not perform functions of close proximity to policy-making employees, or otherwise have

access to politically sensitive information or confidential information related to public policy matters.

667. Griffith Figueroa engaged in functions of a routine nature that required manual competence and efficient performance, not political affiliation.

668. Griffith Figueroa's principal duties were to perform cleaning and maintenance services for the Office of the Superintendent. His duties required: sweeping, mopping, washing, dusting, collecting and disposing of trash, among other.

669. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Griffith Figueroa's wife is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Griffith Figueroa's wife avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections.

670. Griffith Figueroa actively participated in the political campaign activities of the PDP candidate Luis Daniel Ríos and Roberto Ríos.

671. These facts, as well as others provided throughout this complaint relating to or tending to show Griffith

Figueroa's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

672.    After the 2016 General Elections, the atmosphere in the Office of the Superintendent became tense and politically charged. NPP affiliated employees made continuous comments as to the termination of all presumed PDP affiliated employees.

673.    After the 2016 General Elections, "Billy" Medina approached Griffith Figueroa and asked him about his political views and the plaintiff replied that he was there for work.

674.    After the 2016 General Elections, there were rumors that there were 150 employees that were going to be fired but the plaintiff didn't know if he was going to be fired.

675.    Griffith Figueroa noticed favorable position changes for NPP affiliate personnel, some he knew.

676.    On February 15, 2017, Millie Fuentes called a meeting during the morning to let her employers know that she wasn't their supervisor anymore, and that they had to report to Miguel Fuentes.

677.    On February 15, 2017, Griffith Figueroa was given a letter of termination without warning and without cause. The letter was effective immediately.

678.   The letter stated that he was fired because his position was of trust.

679.   Sometime after February 15, 2017, he saw the new NPP Superintendent Wilfredo Ramos in the hallway, who told Griffith Figueroa that the order to fire employees came from the Senate President and the Chief of Staff, Gabriel "Gaby" Hernandez. He also spoke with sub-director, Ramon Luis Figueroa, who told Griffith Figueroa the guidelines for firing employees came from President of the Senate, Rivera Schatz's office.

680.   Defendants terminated and dismissed Griffith Figueroa from his job without evaluating his job performance and efficiency.

681.   At no time prior to his dismissal did the Defendants discipline Griffith Figueroa or issue a reprimand related to the performance of his duties.

682.   The reason that Griffith Figueroa's job was terminated was because the Defendants knew that she belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

683.   In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

684.    As a result of this termination, Defendants have deprived Griffith Figueroa of the income and benefits by which she sustained himself and his family; have subjected his to personal pain and suffering; and have punished her in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or Defendants knew of his political affiliation with the PDP.

685.    Defendants' actions have resulted in a chilling effect and have had a compromising effect on Griffith Figueroa's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

*Plaintiff Génesis Hernández Díaz*

686.    Plaintiff Génesis Hernández Díaz ("Hernández Díaz") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

687.    Plaintiff Hernández Díaz commenced working at the Office of the Superintendent in July of 2015 and worked as an Administrative Assistant when she was terminated on February 15, 2017 because of her political affiliation.

688.    Party affiliation is not an appropriate requirement
for Hernández Díaz' position. At all times relevant and
material hereto, Hernández Díaz was a public employee whose
position was not a public-policy-making position, or one
that required her to perform public-policy functions.
Hernández Díaz did not perform functions of close proximity
to policy-making employees, or otherwise have access to
politically sensitive information or confidential
information related to public policy matters.

689.    Hernández Díaz engaged in functions of a routine
nature that required competence and efficient performance,
not political affiliation.

690.    Hernández Díaz' principal duties were administrative
and secretarial and provided support to the Auction Office
and served as a connection with the Auction Board. Her
duties were of clerical and administrative nature.

691.    For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) were aware that Hernández Díaz
is an active member of the PDP. It was of common knowledge
at the Office of the Superintendent (and by Defendants
themselves) that Hernández Díaz avidly supported the PDP
during the 2016 elections and was active during the PDP's
electoral campaign for the 2016 elections. Moreover,

Defendants also knew or assumed that Hernández Díaz voted for the PDP.

692. Hernández Díaz actively participated of the PDP campaign in activities such as rallies and meetings, among others. She also participated with the political campaign activities of the PPD candidates such as: Representative Jaime Perello and Candidate for Governor David Bernier.

693. Hernández Díaz actively participated of the PDP primaries in support of PDP candidates.

694. Hernández Díaz also engaged in friendly political discussions with non-PDP and NPP co-workers expressing her support for the PDP and its candidates.

695. These facts, as well as others provided throughout this complaint relating to or tending to show Hernández Díaz' political affiliation, preferences involvement and activism, were known to all Defendants in this case (and by their agents and employees of their political trust).

696. After the elections the workplace became very tense. Co-workers affiliated to the NPP stopped talking or greeting her in the mornings. Hernández Díaz was subjected to continuous comments stating that she was going to be fired and/or replaced because of her political affiliation to the PPD.

697.    After January 2, 2017, Hernández Diaz new supervisor and Director was NPP affiliate Sylvia Rivera Schatz, the sister of Thomas Rivera Schatz the NPP Senate President.

698.    After January 2, 2017, Hernandez Díaz was asked when she had started to work at the Office of the Superintendent by her supervisors. She was informed by co-workers that there was a list including this information and party affiliation that contained the names of the employees that were going to be terminated.

699.    Defendants terminated Hernández Díaz' employment without warning and without cause, by way of a letter of February 15, 2017. Her termination was effective on the same day.

700.    Defendants terminated and dismissed Hernández Díaz from her job without evaluating her job performance and efficiency.

701.    At no time prior to her dismissal did the Defendants discipline Hernández Díaz or issue a reprimand related to the performance of her duties.

702.    The reason that Hernández Díaz' job was terminated was because the Defendants knew that she belonged to – or otherwise perceived her to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

703.   In the alternative, Defendants terminated her because they knew that she was not an active supporter of the NPP.

704.   As a result of this termination, Defendants have deprived Hernández Díaz of the income and benefits by which she sustained herself and her family; have subjected her to personal pain and suffering; and have punished her in the exercise of her civil rights by terminating her employment – all because she is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and or being a known supporter of the PDP.

705.   Defendants' actions have resulted in a chilling effect and have had a compromising effect on Hernández Díaz' exercise of her First Amendment rights and her desires to engage in activities protected by the First Amendment.

### Plaintiff Carlos E. Hernández Resto

706.   Plaintiff Carlos E. Hernández Resto ("Hernández Resto") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

707.   Plaintiff Hernández Resto began working at the Office of the Superintendent in 2013, and was performing duties as a Conservation and Facility Repair Technician when he was

dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates.

708. Party affiliation is not an appropriate requirement for Hernández Resto's position. At all times relevant and material hereto, Hernández Resto was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions.

709. Hernández Resto did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

710. Hernández Resto engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

711. Hernández Resto principal duties were several manual tasks related the maintenance, conservation and repair of the facilities, equipment, buildings and green areas of the Capitol District. His duties were those of a "handyman" including painting, plumbing, and wood-work, among others.

712. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) believed that Hernández Resto was considered to be an active member of the PDP. It was believed at the Office of the Superintendent (and by

Defendants themselves and by their agents and employees of their political trust) that Hernández Resto supported the PDP during the 2016 elections and was believed to be active during the PDP's electoral campaign for the 2016 elections. Moreover, these individuals also assumed that Hernández Resto had voted for the PDP.

713. Hernández Resto was recruited for the job at the Office of the Superintendent by the PDP Administration Superintendent, Javier Vazquez. He had also a letter of recommendation from the Office of House of Representatives President Jaime Perello.

714. Hernandez Resto actively participated in activities at the House of Representatives and with the Office of the Superintendent where PDP candidates attended during the 2016 electoral race.

715. Like some co-workers and the other Plaintiffs, Hernández Resto was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

716. Hernandez Resto expressed himself in favor of PDP candidates among his co-workers and it was common knowledge that he had been recruited during the PDP administration so his NPP co-workers knew he was a PDP affiliate.

717. Pablo Sastre questioned Hernandez Resto with regards to his commencement of employment at the Office of the Superintendent.

718. On occasion, Pablo Sastre made a comment in front of Hernandez Resto's co-workers stating that he knew Hernandez was PDP affiliate.

719. These facts, as well as others provided throughout this complaint relating to or tending to show Hernández Resto's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

720. After election day, the Conservation and Facility Repair brigades were overloaded with work related to the remodeling and preparation of the offices for the NPP elected senators to move in. The brigades were ordered to work overtime, weekends and holidays during the Christmas Season.

721. After Election Day, Hernandez Resto felt that they were pressured to work all the extra time because of all

the comments that if they did not do the work they would be
fired. There was a lot of uncertainty.

722.   After January 2, 2017, there was a meeting with the
new Superintendent Wilfredo Ramos where he expressed that
nobody was not going to be fired if they performed their
assigned tasks responsibly. Everyone felt relieved by his
expressions and they worked over-time in order to show that
they were able to perform the work as requested.

723.   On February 15, 2017, Hernández Resto was given a
letter of termination without warning and without cause.
The letter was effective immediately.

724.   The letter stated that he was fired because his
position was of trust.

725.   Defendants terminated and dismissed Hernández Resto
from his job without evaluating his job performance and
efficiency.

726.   At no time prior to his dismissal did the Defendants
discipline Hernández Resto or issue a reprimand related to
the performance of his duties.

727.   The reason that Hernández Resto's job was terminated
was because the Defendants knew that he belonged to – or
otherwise perceived him to be a member of and/or affiliated
with – a political party other than the NPP, particularly
the PDP.

728. In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

729. As a result of this termination, Defendants have deprived Hernández Resto of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or Defendants knew of his political affiliation with the PDP.

730. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Hernández Resto exercise of her First Amendment rights and his desires to engage in activities protected by the First Amendment.

### Plaintiff Jorge Irizarry París

731. Plaintiff Jorge Irizarry París ("Irizarry París ") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

732. Plaintiff Irizarry París began working at the Office of the Superintendent in February 2014, and was performing

duties as a Conservation and Facility Repair Technician
when he was dismissed on February 15 2017, because of his
political affiliation with the PDP and his support of PDP
candidates.

733.    Party affiliation is not an appropriate requirement
for Irizarry París' position. At all times relevant and
material hereto, Irizarry París was a public employee whose
position was not a public-policy-making position, or one
that required him to perform public-policy functions.

734.    Irizarry París did not perform functions of proximity
to policy-making employees, or otherwise have access to
politically sensitive information or confidential
information related to public policy matters.

735.    Irizarry París engaged in functions of a routine
nature that required competence and efficient performance,
not political affiliation.

736.    Irizarry París principal duties were diverse manual
labor for the maintenance, conservation and repair of the
facilities, equipment, buildings and green areas of the
Capitol District.

737.    For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) believed that Irizarry París was
considered to be an active member of the PDP. It was

believed at the Office of the Superintendent (and by Defendants themselves and by their agents and employees of their political trust) that Irizarry París supported the PDP during the 2016 elections and was believed to be active during the PDP's electoral campaign for the 2016 elections. Moreover, these individuals also assumed that Irizarry París had voted for the PDP.

738. Plaintiff Irizarry Paris was recommended for the position at the Office of the Superintendent by Julio Mojica and the Superintendent Javier Vazquez who is a known affiliate of the PDP by all Defendants.

739. Irizarry París also actively participated in the 2016 electoral race by attending meetings, rallies, and activities in support of the PDP party. He actively participated of the campaigns for PDP candidates such as: Representative Jaime Perelló and Cesar Hernandez. Irizarry París attended different PDP political events in the municipalities of Camuy, Quebradillas and Cabo Rojo.

740. Irizarry París sometimes during the campaign wore red shirts to work as a message that he was affiliated to the PDP.

741. Irizarry París participated in discussions where his NPP co-workers expressed how they were going to "fire them all" once they won the 2016 elections. Political

discussions were frequent between the Office of the Superintendent employees during the 2016 political race.

742. Like some co-workers and the other Plaintiffs, Irizarry París was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

743. Irizarry París himself had a public Facebook account where he was friends with some of his NPP affiliated co-workers, and posted statuses regarding his political affiliation.

744. These facts, as well as others provided throughout this complaint relating to or tending to show Irizarry París' political affiliation, preferences involvement and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

745. After election day, The Conservation and Facility Repair brigades were overloaded with work related to the remodeling and preparation of the offices for the new NPP senators set to move in. The brigades were ordered to work

overtime, weekends and holidays during the Christmas Season.

746. After election day, Irizarry París felt that the work environment was rough, even the greetings were disrespectful. According to the plaintiff, the new NPP administration was exploiting the employees.

747. After election day, Irizarry París was told that he would be moved to another brigade, that he would "stay" but the brigade supervisor, Fernando Fuentes, would be fired.

748. After election day, Irizarry París knew he would be fired because he heard supervisors talking about who will stay, according to NPP affiliate employee Wilfredo Torres, he'd be "turned to shreds because of his political affiliation."

749. After election day, Irizarry París was asked by Francisco Santiago when he began working at the Superintendent's Office. The plaintiff told Santiago that the PDP administration hired him.

750. On February 15, 2017, Irizarry París was given a letter of termination without warning and without cause. The letter was effective immediately.

751. The letter stated that he was fired because his position was of trust.

752.  Defendants terminated and dismissed Irizarry París from his job without evaluating his job performance and efficiency.

753.  At no time prior to his dismissal did the Defendants discipline Irizarry París or issue a reprimand related to the performance of his duties.

754.  The reason that Irizarry París' job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

755.  In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

756.  As a result of this termination, Defendants have deprived Irizarry París of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the

2016 election; and/or Defendants knew of his political affiliation with the PDP.

757.   Defendants' actions have resulted in a chilling effect and have had a compromising effect on Irizarry París's exercise of her First Amendment rights and his desires to engage in activities protected by the First Amendment.

**_Plaintiff Edwin Jimenez Resto_**

758.   Plaintiff Edwin Jimenez Resto ("Jimenez Resto") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

759.   Plaintiff Jimenez Resto began working at the Office of the Superintendent in December 2014, and was performing duties as a Conservation and Facility Repair Technician when he was dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates.

760.   Party affiliation is not an appropriate requirement for Jimenez Resto's position. At all times relevant and material hereto, Jimenez Resto was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions.

761.   Jimenez Resto did not perform functions of proximity to policy-making employees, or otherwise have access to

politically   sensitive   information   or   confidential
information related to public policy matters.

762.   Jimenez Resto engaged in functions of a routine nature
that   required   competence   and   efficient   performance,   not
political affiliation.

763.   Jimenez   Resto   principal   duties   were   diverse   manual
labor   for   the   maintenance,   conservation   and   repair   of   the
facilities,   equipment,   buildings   and   green   areas   of   the
Capitol   District.   Jimenez   Resto   performed   duties   similar   to
a "handyman" for the Office of the Superintendent.

764.   For   the   reasons   set   forth   in   this   Complaint,   all
Defendants   (and   employees   of   the   Office   of   the
Superintendent in general) believed that Jimenez Resto was
considered   to   be   an   active   member   of   the   PDP.   It   was
believed   at   the   Office   of   the   Superintendent   (and   by
Defendants themselves and by their agents and employees of
their political trust) that Jimenez Resto supported the PDP
during   the   2016   elections   and   was   believed   to   be   active
during   the   PDP's   electoral   campaign   for   the   2016   elections.
Moreover, these individuals also assumed that Jimenez Resto
had voted for the PDP.

765.   Jimenez Resto also actively participated in the 2016
electoral   race   by   attending   meetings,   rallies,   and

activities in support of the PDP party such as "Abrazo Popular".

766. Jimenez Resto actively supported PDP candidate for Governor, David Bernier.

767. During the 2016 electoral campaign, Jimenez Resto participated of the required training to act as an electoral poll officer authorized by the State Electoral Commission as a representative of the PDP party.

768. Electoral poll officers are required to train and register before the State Electoral Commission identifying the individual's political affiliation.

769. Jimenez Resto participated in discussions where co-workers expressed affiliation with the PDP.

770. These facts, as well as others provided throughout this complaint relating to or tending to show Jimenez Resto's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

771. After election day, The Conservation and Facility Repair brigades were overloaded with work related to the remodeling and preparation of the offices for the NPP senators to move in. The brigades were ordered to work overtime, weekends and holidays during the Christmas

Season. Jimenez Resto worked six days a week during that time.

772. After January 2, 2016, the working environment became hostile and aggressive. The brigades had a lot of pressure to finish the new NPP legislator's offices.

773. Sometime after January 2, 2017, Jimenez Resto was approached by Pablo Sastre who inquired on when he had started to work at the Office of the Superintendent and asked for which political party he had voted.

774. Jimenez Resto was informed of a meeting by Pablo Sastre; between Sastre, Carrasquillo, Manuel Camacho and Edwin Jimenez; were he received very good recommendations and that he was not going to be terminated because he had a good attitude, disposition and initiative.

775. Jimenez Resto was absent on February 15, 2017.

776. On February 16, 2016 Jimenez Resto was given a letter of termination without warning and without cause. The letter was dated February 15, 2017 and was effective immediately.

777. Pedro Morales handed Jimenez Resto the letter of termination. Jimenez Resto met with Pablo Sastre as he exited a meeting between the Directors. Pablo Sastre informed him that he felt impotent because he wanted

Jimenez Resto to stay because of the good work he had done
while remodeling the fountains at the Capitol District.

778. The letter stated that he was fired because his
position was of trust.

779. Defendants terminated and dismissed Jimenez Resto from
his job without evaluating his job performance and
efficiency.

780. At no time prior to his dismissal did the Defendants
discipline Jimenez Resto or issue a reprimand related to
the performance of his duties.

781. The reason that Jimenez Resto's job was terminated was
because the Defendants knew that he belonged to – or
otherwise perceived him to be a member of and/or affiliated
with – a political party other than the NPP, particularly
the PDP.

782. In the alternative, Defendants terminated him because
they knew that he was not an active supporter of the NPP.

783. As a result of this termination, Defendants have
deprived Jimenez Resto of the income and benefits by which
he sustained himself and his family; have subjected him to
personal pain and suffering; and have punished him in the
exercise of his civil rights by terminating his employment
– all because he is not a member of or affiliated with the
NPP, and did not vote for the NPP or for NPP candidates in

the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or Defendants knew of his political affiliation with the PDP.

784.    Defendants' actions have resulted in a chilling effect and have had a compromising effect on Jimenez Resto's exercise of her First Amendment rights and his desires to engage in activities protected by the First Amendment.

**_Plaintiff Mary Lastra Rivera_**

785.    Plaintiff Mary L. Lastra Rivera ("Lastra Rivera") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

786.    Plaintiff Lastra Rivera commenced working at the Office of the Superintendent in February 2016 and worked as a Sales Representative when she was terminated on February 15, 2017 because of her political affiliation.

787.    Party affiliation is not an appropriate requirement for Lastra Rivera's position. At all times relevant and material hereto, Lastra Rivera was a public employee whose position was not a public-policy-making position, or one that required her to perform public-policy functions. Lastra Rivera did not perform functions of close proximity to policy-making employees, or otherwise have access to

politically sensitive information or confidential information related to public policy matters.

788. Lastra Rivera engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

789. Lastra Rivera's principal duties were administrative, clerical and secretarial and provided support to the sales and purchase area of the Office of the Superintendent.

790. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Lastra Rivera is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Lastra Rivera avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Lastra Rivera voted for the PDP.

791. During the 2016 electoral campaign, Lastra Rivera trained to participate as an electoral poll officer authorized by the State Electoral Commission as a representative of the PDP party at Rio Grande.

792. Electoral poll officers are required to train and register before the State Electoral Commission identifying

the individual's political affiliation and making it a matter of public records.

793.    Lastra Rivera actively participated of the PDP campaign in meetings, rallies and activities such as the "Abrazo Popular", among others. She also participated with the political campaign activities of the PPD candidates such as: Representative Jaime Perello and Candidate for Governor David Bernier.

794.    Like some co-workers and the other Plaintiffs, Lastra Rivera was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

795.    Lastra Rivera herself had a public Facebook account where she was friends with some of his NPP affiliated co-workers.

796.    These facts, as well as others provided throughout this complaint relating to or tending to show Lastra Rivera's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and by their agents and employees of their political trust).

214

797. After the elections, the workplace became very tense.
Co-workers affiliated to the NPP made derogatory comments
and where continuously talking about the termination of
presumed PDP affiliated employees.

798. After January 2, 2017 Lastra Rivera's supervisor was
Sylvia Rivera Schatz, the Senate's President Thomas Rivera
Schatz sister.

799. Lastra Rivera was asked by Sylvia Rivera Schatz and by
Lynnette Martinez when she had started to work at the
Office of the Superintendent.

800. Defendants terminated Lastra Rivera's employment
without warning and without cause, by way of a letter of
February 15, 2017. Her termination was effective on the
same day.

801. Defendants terminated and dismissed Lastra Rivera from
her job without evaluating her job performance and
efficiency.

802. At no time prior to her dismissal did the Defendants
discipline Lastra Rivera or issue a reprimand related to
the performance of her duties.

803. The reason that Lastra Rivera's job was terminated was
because the Defendants knew that she belonged to – or
otherwise perceived her to be a member of and/or affiliated

with – a political party other than the NPP, particularly
the PDP.

804.     In the alternative, Defendants terminated her because
they knew that she was not an active supporter of the NPP.

805.     As a result of this termination, Defendants have
deprived Lastra Rivera of the income and benefits by which
she sustained herself and her family; have subjected her to
personal pain and suffering; and have punished her in the
exercise of her civil rights by terminating her employment
– all because she is not a member of or affiliated with the
NPP, and did not vote for the NPP or for NPP candidates in
the 2016 election; and/or is perceived by Defendants as not
being a member of or affiliated with the NPP and/or not
having voted for the NPP or for the NPP candidates in the
2016 election; and or being a known supporter of the PDP.

806.     Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Lastra Rivera's
exercise of her First Amendment rights and her desires to
engage in activities protected by the First Amendment.

### Plaintiff Oscar Ledesma Albors

807.     Plaintiff Oscar Ledesma Albors ("Ledesma Albors") is
of legal age, a resident of Puerto Rico and a citizen of
the United States of America.

808.    Plaintiff Ledesma Albors began working at the Office of the Superintendent in 2013, and was performing duties as a Gardener when he was dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates.

809.    Party affiliation is not an appropriate requirement for Ledesma Albors's position. At all times relevant and material hereto, Ledesma Albors was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions.

810.    Ledesma Albors did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

811.    Ledesma Albors engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

812.    Ledesma Albors principal duties were several manual tasks related to planting, reproduction, pruning, weeding, cutting and maintenance of plants, shrubs, ornamental trees and grass in gardens and green areas of the Superintendence facilities of the Capitol District.

813.    For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the

Superintendent in general) believed that Ledesma Albors was considered to be an active member of the PDP. It was believed at the Office of the Superintendent (and by Defendants themselves and by their agents and employees of their political trust) that Ledesma Albors supported the PDP during the 2016 elections and was believed to be active during the PDP's electoral campaign for the 2016 elections. Moreover, these individuals also assumed that Ledesma Albors had voted for the PDP.

814.    Ledesma Albors participated of the 2016 PDP primaries.

815.    Ledesma Albors also actively participated in the 2016 electoral race by attending meetings, rallies and activities in support of the PDP party. He actively participated of PDP candidate Luis Daniel Rivera campaign.

816.    Ledesma Albors expressed himself on several occasions and while sharing with NPP affiliate co-workers of his support to PDP candidates during the 2016 Elections.

817.    Like some co-workers and the other Plaintiffs, Ledesma Albors was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral

campaign, including in those posted on public Facebook accounts.

818.   Ledesma Albors Torres himself had a public Facebook account where he was friends with some of his NPP affiliated co-workers, and posted statuses regarding his political affiliation.

819.   After Election Day, NPP affiliates advised Ledesma Albors and other co-workers to delete their Facebook accounts and to not post anything regarding the elections and the new NPP administration because they would be fired.

820.   Ledesma Albors was informed that NPP affiliated personnel was going through their Facebook accounts looking for information in order to have them terminated from their employment at the Office of the Superintendent.

821.   These facts, as well as others provided throughout this complaint relating to or tending to show Ledesma Albors's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

822.   After the 2016 General Elections, the atmosphere in the Office of the Superintendent became tense and politically charged. NPP affiliated employees made continuous derogatory comments as to the termination of all presumed PDP affiliated employees.

823. After the 2016 General Elections, Ledesma Albors was asked on several occasions by "Billy" Medina and Efrain Santiago, both NPP affiliates, when he had started to work at the Office of the Superintendent.

824. "Billy" Medina created a hostile environment by continuously making derogatory comments to Ledesma Albors stating that: soon you will be gone ("ya mismo se van"); when my people come, you are done ("cuando los mios lleguen se les acabo el guiso"); among others.

825. After January 2, 2017, Ledesma Albors witnessed how the Transportation Director, affiliated to the NPP, would meet with different employees in order to gather information on the political affiliation of the employees hired during PDP administration.

826. Efrain Santiago informed Ledesma Albors that he had seen his name in a list of the employees that were going to be terminated.

827. After election day, the Conservation and Facility Repair brigades were overloaded with work related to the remodeling and preparation of the offices for the NPP elected senators to move in. The brigades were ordered to work overtime, weekends and holidays during the Christmas Season.

828.    After Election Day, Ledesma Albors felt that they were
pressured to work all the extra time because of all the
comments that if they did not do the work they would be
fired. There was a lot of uncertainty.

829.    After January 2, 2017, there was a meeting with the
new Superintendent Wilfredo Ramos where he expressed that
nobody was not going to be fired if they performed their
assigned tasks responsibly. Everyone felt relieved by his
expressions and they worked over-time to show that they
were able to perform the work as requested and keep their
jobs.

830.    On February 15, 2017, Ledesma Albors was given a
letter of termination without warning and without cause.
The letter was effective immediately.

831.    The letter stated that he was fired because his
position was of trust.

832.    Defendants terminated and dismissed Ledesma Albors
from his job without evaluating his job performance and
efficiency.

833.    At no time prior to his dismissal did the Defendants
discipline Ledesma Albors or issue a reprimand related to
the performance of his duties.

834.    The reason that Ledesma Albors's job was terminated
was because the Defendants knew that he belonged to – or

otherwise perceived him to be a member of and/or affiliated
with – a political party other than the NPP, particularly
the PDP.

835.   In the alternative, Defendants terminated him because
they knew that he was not an active supporter of the NPP.

836.   As a result of this termination, Defendants have
deprived Ledesma Albors of the income and benefits by which
he sustained himself and his family; have subjected him to
personal pain and suffering; and have punished him in the
exercise of his civil rights by terminating his employment
– all because he is not a member of or affiliated with the
NPP, and did not vote for the NPP or for NPP candidates in
the 2016 election; and/or is perceived by Defendants as not
being a member of or affiliated with the NPP and/or not
having voted for the NPP or for the NPP candidates in the
2016 election; and/or Defendants knew of his political
affiliation with the PDP.

837.   Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Ledesma Albors
exercise of his First Amendment rights and his desires to
engage in activities protected by the First Amendment.

***Plaintiff Jean León Renta***

838.    Plaintiff Jean León Renta ("León Renta") is of legal
        age, a resident of Puerto Rico and a citizen of the United
        States of America.

839.    Plaintiff León Renta commenced working at the Office
        of the Superintendent in July 2013, and was an Internal
        Security Supervisor when he was terminated on February 15,
        2017 because of his political affiliation.

840.    Party affiliation is not an appropriate requirement
        for León Renta's position. At all times relevant and
        material hereto, León Renta was a public employee whose
        position was not a public-policy-making position, or one
        that required him to perform public-policy functions. León
        Renta did not perform functions of proximity to policy-
        making employees, or otherwise have access to politically
        sensitive information or confidential information related
        to public policy matters.

841.    León Renta engaged in functions of a routine nature
        that required competence and efficient performance, not
        political affiliation.

842.    León Renta's principal duties were to supervise,
        coordinate and develop the different activities related to
        the security services, protection and watch for the
        preservation and safety of the property, employees and

visitors of the Office of the Superintendent and the Capitol District.

843.   For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that León Renta is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves and by their agents and employees of their political trust) that León Renta avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, these individuals also knew or assumed that León Renta had voted for the PDP.

844.   León Renta actively participated of the 2016 PDP primaries in support of PDP candidates. This was common knowledge within the Office of the Superintendent.

845.   León Renta actively participated of the PDP campaign in rallies, meetings, and activities like the "Abrazo Popular", among others. He also participated with the political campaign activities of the PPD candidate Representative Jaime Perello.

846.   Like some co-workers and the other Plaintiffs, León Renta was also seen by Defendants (and their agents and employees of their political trust), and other NPP-

affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

847.    León Renta himself had a public Facebook account where he was friends with some of his NPP affiliated co-workers, and posted or liked statuses regarding his political affiliation.

848.    During the 2016 electoral campaign, León Renta worked as an electoral poll officer authorized by the State Electoral Commission as a representative of the PDP party at II Precinct in the Municipality of Bayamon.

849.    Electoral poll officials are required to train and register before the State Electoral Commission identifying the individual's political affiliation and making it a matter of public records.

850.    These facts, as well as others provided throughout this complaint relating to or tending to show León Renta's political affiliation, preferences involvement and activism, were known to all Defendants in this case.

851.    After Election Day, the working environment changed and became tense. Employees were concerned about losing their jobs. Co-workers affiliated with the NPP told him

that he was going to "go" meaning he would be terminated.
It was said that the new NPP administration was going to
fire PDP employees in reprimand for what the PDP had done
in 2013 and that there was a list prepared by Pablo Sastre
and "Redondo" of the employees to be removed.

852.    Luis Vega who is affiliated with the NPP and was the
night shift supervisor, made known to others that he would
replace León Renta and take over his day shift.

853.    After January 2, 2017, the new NPP administration took
over they started undermining his authority and giving
employees instructions overriding his. When he asked the
security officers why they were doing a different task they
would tell him that the new instructions came from Luis
Vega or Roy Sanchez.

854.    After January 2, 2017, when the new NPP administration
created uncertainty and a difficult environment for the
employees who were presumed or identified as PDP
affiliates. On January 30, 2017, all employees were called
into a meeting and rumors that they were going to be fired
surrounded the Capitol District. After more than an hour of
wait, the meeting was cancelled. The next day, January 31,
2017, they were called again to a meeting and there were
rumors that the termination letters were ready, the meeting
was canceled once again. They were told by co-workers that

they were not fired because the local press had taken
notice of the termination of Senate employees and were at
the Capitol District.

855.    León Renta was called into a meeting with many of his
co-workers assigned to Internal Security on February 15,
2017. Most of the Office of the Superintendent Internal
Security Officers was terminated. NPP affiliated employees
did not receive a termination letter.

856.    Defendants terminated and dismissed León Renta from
his job without evaluating his job performance or
efficiency.

857.    At no time prior to his dismissal did the Defendants
discipline León Renta or issue a reprimand related to the
performance of his duties.

858.    Defendants terminated León Renta's employment without
warning and without cause, by way of a letter of February
15, 2017. His termination was effective on the same day.

859.    The reason that León Renta's job was terminated was
because the Defendants knew that he belonged to – or
otherwise perceived him to be a member of and/or affiliated
with – a political party other than the NPP, particularly
the PDP.

860.    In the alternative, Defendants terminated him because
they knew that he was not an active supporter of the NPP.

861.   As a result of this termination, Defendants have deprived León Renta of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or because he is a known supporter of the PDP.

862.   Defendants' actions have resulted in a chilling effect and have had a compromising effect on León Renta's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

### Plaintiff Ariadna López

863.   Plaintiff Ariadna López ("Lopez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

864.   Plaintiff Lopez commenced working at the Office of the Superintendent in November 2015 and worked as a Receptionist when she was terminated on February 15, 2017 because of her political affiliation.

865.   Party affiliation is not an appropriate requirement
for Lopez' position. At all times relevant and material
hereto, Lopez was a public employee whose position was not
a public-policy-making position, or one that required her
to perform public-policy functions. Lopez did not perform
functions of close proximity to policy-making employees, or
otherwise have access to politically sensitive information
or confidential information related to public policy
matters.

866.   Lopez engaged in functions of a routine nature that
required competence and efficient performance, not
political affiliation.

867.   Lopez' was a Human Resources Assistant until January
19, 2017 when the new NPP administration changed her duties
to Warehouse Receptionist. As a Human Resources Assistant,
she performed administrative and clerical tasks and was
assigned to prepare the attendance documents for employees
in several areas. As a Receptionist, she performed some
clerical duties, attended the phones and engaged the public
if needed.

868.   For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) were aware that Lopez is an
active member of the PDP. It was of common knowledge at the

Office of the Superintendent (and by Defendants themselves) that Lopez avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Lopez voted for the PDP.

869. Lopez actively participated of the 2016 PDP Elections campaign events. She assisted to monthly meetings and rallies at the principal offices of the PDP.

870. Lopez participated of the training to work as an Electoral Poll Officer representing the PDP during the 2016 Elections.

871. Electoral Poll Officers are required to train and register before the State Electoral Commission identifying their political affiliation.

872. Like some co-workers and the other Plaintiffs, Lopez was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

873. Lopez herself had a public Facebook account where she was friends with some of his NPP affiliated co-workers.

874.    These facts, as well as others provided throughout
this complaint relating to or tending to show Lopez'
political affiliation, preferences involvement and
activism, were known to all Defendants in this case (and by
their agents and employees of their political trust).

875.    After the elections, the workplace became very tense.
Co-workers affiliated to the NPP stopped talking or
greeting her in the mornings. Lopez was subjected to
continuous derogatory comments. Daily she received comments
that the NPP administration was going to fire her, that
they were going to remove her form Human Resources.

876.    Lopez witnessed how NPP affiliated Dadva Correa and
others were assigned to go through the employees Human
Resources Files to gather information.

877.    After Election Day, there were many changes of working
areas and departments. The working environment became
toxic. Many new personnel came to the Human Resources
Office to comply with the paperwork required for their
appointments.

878.    Lopez was asked by Pablo Sastre when she had started
to work at the Office of the Superintendent.

879.    After the election, Lopez witnessed how NPP affiliates
who had access to employee's files at the Human Resources
Office; Davda Correa, Jose Luis Morales and Samuel Diaz;

prepared personnel lists in order to identify the date each employee had been recruited to work at the Office of the Superintendent.

880.    Lopez saw the personnel lists and was aware that the secretary for the NPP administration Human Resources Director, Isis Colon, was managing the information for him.

881.    Lopez also saw lists of future employees that were going to be recruited for all areas and such list included names of past NPP employees of the Office of the Superintendent that were returning. The list contained the name and position assigned to each person. Samuel Diaz had a copy of this list.

882.    On January 19, 2017, Lopez was removed from her area and her position and was sent to perform tasks as a receptionist in the warehouse area.

883.    Defendants terminated Lopez's employment without warning and without cause, by way of a letter of February 15, 2017. Her termination was effective on the same day.

884.    Defendants terminated and dismissed Lopez from her job without evaluating her job performance and efficiency.

885.    At no time prior to her dismissal did the Defendants discipline Lopez or issue a reprimand related to the performance of her duties.

886.    The reason that Lopez' job was terminated was because
the Defendants knew that she belonged to – or otherwise
perceived her to be a member of and/or affiliated with – a
political party other than the NPP, particularly the PDP.

887.    In the alternative, Defendants terminated her because
they knew that she was not an active supporter of the NPP.

888.    As a result of this termination, Defendants have
deprived Lopez of the income and benefits by which she
sustained herself and her family; have subjected her to
personal pain and suffering; and have punished her in the
exercise of her civil rights by terminating her employment
– all because she is not a member of or affiliated with the
NPP, and did not vote for the NPP or for NPP candidates in
the 2016 election; and/or is perceived by Defendants as not
being a member of or affiliated with the NPP and/or not
having voted for the NPP or for the NPP candidates in the
2016 election; and or being a known supporter of the PDP.

889.    Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Lopez' exercise of
her First Amendment rights and her desires to engage in
activities protected by the First Amendment.

***Plaintiff Janice Marchand Bauzá***

890.    Plaintiff Janice Marchand Bauzá ("Marchand Bauzá") is
of legal age, a resident of Puerto Rico and a citizen of
the United States of America.

891.    Plaintiff Marchand Bauzá commenced working at the
Office of the Superintendent in June of 2014 and worked as
a Human Resources Specialist when she was terminated on
February 15, 2017 because of her political affiliation.

892.    Party affiliation is not an appropriate requirement
for Marchand Bauzá's position. At all times relevant and
material hereto, Marchand Bauzá was a public employee whose
position was not a public-policy-making position, or one
that required her to perform public-policy functions.
Marchand Bauzá did not perform functions of close proximity
to policy-making employees, or otherwise have access to
politically sensitive information or confidential
information related to public policy matters.

893.    Marchand Bauzá engaged in functions of a routine
nature that required competence and efficient performance,
not political affiliation.

894.    Marchand Bauzá's principal duties were professional,
administrative work, which consists of the planning,
organization, supervision, and coordination of the
processing and handling of all matters related to human

resources administration at the Office of the Superintendent.

895.   For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Marchand Bauzá is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Marchand Bauzá avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Marchand Bauzá voted for the PDP.

896.   Marchand Bauzá was the Auxiliary Director of the Human Resources Office at the Office of the Superintendent until December 30, 2016.

897.   Marchand Bauzá agreed to a change in position from Director of the Human Resources Office to a Human Resources Specialist under the assumption that with the change she would not be terminated. The new NPP administration Superintendent, Wilfredo Ramos, requested of her to accept the change in her position in order to keep her working for the Office of the Superintendent. Wilfredo Ramos informed Marchand Bauzá that he had watched her perform her duties during the transition and was impressed with the quality of

her work. Marchand Bauzá was informed that if she agreed
to the change in position and a cut in her salary she would
not be terminated.

898. The change in position and reduction in salary had a
direct effect on Marchand Bauzá's benefits at the time of
her liquidation due to the termination. This effect was
common knowledge at the Office of the Superintendent and
shows intention and bad faith.

899. Marchand Bauzá is a PDP party affiliate and is
actively involved in PDP party activities. This fact was
common knowledge at the Office of the Superintendent and
was known to all Defendants in this case (and by their
agents and employees of their political trust).

900. Marchand Bauzá actively participated in the PDP
primaries supporting PDP candidates.

901. During the 2016 primaries, Marchand Bauzá worked as an
electoral poll officer authorized by the State Electoral
Commission as a representative of the PDP party. Marchand
Bauzá has worked as an electoral poll officer during
various elections representing the PDP party.

902. Electoral poll officers are required to train and
register before the State Electoral Commission identifying
the individual's political affiliation and making it a
matter of public records.

903. Marchand Bauzá actively participated in rallies, meetings, and activities such as the "Abrazo Popular", among others. She also participated with the political campaign activities of the PPD candidate for governor, David Bernier, Eduardo Bahtia, Javier Aponte and for Jaime Perelló.

904. Marchand Bauzá actively participated in various electoral campaign closings for PDP candidates running on the 2016 elections.

905. Like some co-workers and the other Plaintiffs, Marchand Bauzá was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

906. Marchand Bauzá herself had a public Facebook account where she was friends with some of her NPP affiliated co-workers, and posted statuses regarding her political affiliation.

907. Marchand Bauzá was recommended for the position at the Office of the Superintendent by PDP Representative Javier Aponte Dalmau and by PDP affiliate Jose Sosa. Jose Sosa had

been Marchand Bauzá's Supervisor while she was employed by
the Municipality of Carolina. The Municipality of Carolina
has a PDP Major and its employees are presumed affiliates
of the PDP party. This fact was common knowledge at the
Office of the Superintendent and was known to all
Defendants in this case (and by their agents and employees
of their political trust).

908.    Marchand Bauzá actively participated of private
parties and activities together with the PDP President of
the Senate, Eduardo Bahtia and in support of candidate for
Governor David Bernier. She also attended the birthday
parties celebrated for Eduardo Bahtia and Jaime Perello.

909.    Marchand Bauzá, during the 2016 electoral campaign,
continuously used red color clothing expressing her
affiliation to the PDP party.

910.    The new NPP Director of Human Resources informed
Marchand Bauzá that he wanted her to remain in her position
and she shouldn't be concerned about termination.

911.    These facts, as well as others provided throughout
this complaint relating to or tending to show Marchand
Bauzá's political affiliation, preferences involvement and
activism, were known to all Defendants in this case (and by
their agents and employees of their political trust).

912.    After the elections the workplace became very tense. Co-workers affiliated to the NPP stopped talking or greeting her in the mornings. Marchand Bauzá was subjected to continuous comments stating that she was going to be fired and/or replaced because of her political affiliation to the PPD.

913.    After the elections, Marchand Bauzá was the subject of continuous comments that she was going to be terminated and replaced by an NPP affiliated employee because of her political affiliation even when she performed an excellent job.

914.    Marchand Bauzá participated of the transition process on behalf of the PDP administration of the Office of the Superintendent.

915.    The NPP Transition Committee requested form Marchand Bauzá a list of employees with information regarding: their position, position changes, salaries, address, the date of employment, telephone number and social security.

916.    The requested lists where for a period of the four years of PDP administration.

917.    The NPP Transition Committee requested Marchand Bauza to provide lists of vacant positions, employees with healthcare benefits, retired employees, training, open investigations and informative bulletins from PAE.

918.    Marchand Bauzá was informed that instructions on how
to handle the affairs of the Office of the Superintendent
where directly from the President of the Senate, Thomas
Rivera Schatz, and she witnessed how the Chief of Staff,
Gabriel Hernandez acted on those instructions.

919.    After January 2, 2017, the working environment at the
Office of the Superintendent became tense and hostile. Co-
workers stopped greeting her and talking to her. The new
NPP affiliated employees assigned to her area made
continuous derogatory comments and laughed at their
situation telling them that they were all going to be
fired.

920.    After January 2, 2017, Marchand Bauzá witnessed as the
NPP administration reviewed all employees files at the
Human Resources Office.

921.    After January 2, 2017, there were rumors that there
was a list prepared by the NPP affiliated employees that
identified PDP affiliates to be terminated. Gabriel
Hernandez was in "charge" of the list and it was Thomas
Rivera Schatz who gave the order for termination of the
identified PDP affiliated employees of the Office of the
Superintendent.

922. After January 2, 2017, Marchand Bauzá witnessed as the new NPP Auxiliary Director of the Human Resources Office took bunches of employees files into his office.

923. Marchand Bauzá witnessed during a meeting how the Director of Human Resources had a chart with all the information on the Human Resources Office employees, he asked her for additional information stating that it was requested for a meeting.

924. Defendants terminated Marchand Bauzá's employment without warning and without cause, by way of a letter of February 15, 2017. Her termination was effective on the same day.

925. Defendants terminated and dismissed Marchand Bauzá from her job without evaluating her job performance and efficiency.

926. At no time prior to her dismissal did the Defendants discipline Marchand Bauzá or issue a reprimand related to the performance of her duties.

927. The reason that Marchand Bauzá's job was terminated was because the Defendants knew that she belonged to – or otherwise perceived her to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

928.    In the alternative, Defendants terminated her because
they knew that she was not an active supporter of the NPP.

929.    As a result of this termination, Defendants have
deprived Marchand Bauzá of the income and benefits by which
she sustained herself and her family; have subjected her to
personal pain and suffering; and have punished her in the
exercise of her civil rights by terminating her employment
– all because she is not a member of or affiliated with the
NPP, and did not vote for the NPP or for NPP candidates in
the 2016 election; and/or is perceived by Defendants as not
being a member of or affiliated with the NPP and/or not
having voted for the NPP or for the NPP candidates in the
2016 election; and or being a known supporter of the PDP.

930.    Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Marchand Bauzá's
exercise of her First Amendment rights and her desires to
engage in activities protected by the First Amendment.

### *Plaintiff Jazmine T. Martínez Galíndez*

931.    Plaintiff Jazmine T. Martínez Galíndez ("Martínez
Galíndez") is of legal age, a resident of Puerto Rico and a
citizen of the United States of America.

932.    Plaintiff Martínez Galíndez commenced working at the
Office of the Superintendent in July 2014 and worked as an

Administrative Executive Assistant when she was terminated on February 15, 2017 because of her political affiliation.

933.    Party affiliation is not an appropriate requirement for Martínez Galíndez' position. At all times relevant and material hereto, Martínez Galíndez was a public employee whose position was not a public-policy-making position, or one that required her to perform public-policy functions. Martínez Galíndez did not perform functions of close proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

934.    Martínez Galíndez engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

935.    Martínez Galíndez' principal duties were administrative, clerical and secretarial and provided support to the operations area of the Office of the Superintendent.

936.    For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Martínez Galíndez is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Martínez Galíndez avidly

supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Martínez Galíndez voted for the PDP.

937. Martínez Galíndez actively participated of the PDP campaign in activities such as the "Abrazo Popular", among others. She also participated with the political campaign activities of the PPD candidates such as: Representative Jaime Perello and Candidate for Governor David Bernier.

938. Like some co-workers and the other Plaintiffs, Martínez Galíndez was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

939. Martínez Galíndez herself had a public Facebook account where she was friends with some of his NPP affiliated co-workers.

940. These facts, as well as others provided throughout this complaint relating to or tending to show Martínez Galíndez' political affiliation, preferences involvement and activism, were known to all Defendants in this case

244

(and by their agents and employees of their political trust).

941. After the elections, the workplace became very tense. Martínez Galíndez was subjected to continuous derogatory comments.

942. Martinez Galíndez participated of the Transition Committee in representation of the Office of the Superintendent with regards to the PDP administration.

943. At the Transition Committee meetings Martinez Galindez witnessed that NPP administration had a list of the Office of the Superintendent employees identified by political affiliation.

944. At the Transition Committee meetings, the Chief of Staff for the President of the Senate, Gabriel Hernandez, asked on several occasion for the resignation of the employees identified in the list and asked at every meeting to be updated as to which employees had resigned.

945. Gabriel Hernandez produced a list by mid December 2016 including names of the new Directors for the Office of the Superintendent and their salaries.

946. Martinez Galindez witnessed how Gabriel Hernandez questioned why the people Javier Vazquez had "moved" had not been fired and specifically asked why she had not been terminated.

947.    Martinez Galindez witnessed as Pablo Sastre met with
        NPP affiliates complaints as to the PDP employees and
        requests to be moved to other offices or recommendations
        for new positions.

948.    After January 2, 2017, Miguel Miranda who is NPP
        affiliate asked Martinez Galindez about her political
        affiliation. Miguel Miranda also informed her that her
        personal friendship with Superintendent Javier Vazquez was
        prejudicial and jeopardized her employment.

949.    Martinez Galindez found out through a co-worker that
        NPP affiliate personnel were going through her employee
        record and her public profiles in Facebook. She proceeded
        to confront them and was informed that the NPP had pictures
        of her that showed her political affiliation to the PDP.

950.    On February 10, 2017, Miguel Miranda asked Martinez
        Galindez to a meeting and informed her that the change to
        her designation as performed in December 2016 was not
        valid. He informed her that her salary was too "high" and
        that if she wanted to stay she had to agree to lower her
        salary. Later in the afternoon, Miguel Miranda called her
        to ask if she agreed to lowering her salary and that she
        should be grateful because at "least" she had work and
        "would not be fired on Wednesday". On the following Sunday,

Miguel Miranda texted Martinez Galindez asking if he "still had a secretary".

951. Defendants terminated Martínez Galíndez' employment without warning and without cause, by way of a letter of February 15, 2017. Her termination was effective on the same day.

952. Defendants terminated and dismissed Martínez Galíndez from her job without evaluating her job performance and efficiency.

953. At no time prior to her dismissal did the Defendants discipline Martínez Galíndez or issue a reprimand related to the performance of her duties.

954. The reason that Martínez Galíndez' job was terminated was because the Defendants knew that she belonged to – or otherwise perceived her to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

955. In the alternative, Defendants terminated her because they knew that she was not an active supporter of the NPP.

956. As a result of this termination, Defendants have deprived Martínez Galíndez of the income and benefits by which she sustained herself and her family; have subjected her to personal pain and suffering; and have punished her in the exercise of her civil rights by terminating her

employment – all because she is not a member of or
affiliated with the NPP, and did not vote for the NPP or
for NPP candidates in the 2016 election; and/or is
perceived by Defendants as not being a member of or
affiliated with the NPP and/or not having voted for the NPP
or for the NPP candidates in the 2016 election; and or
being a known supporter of the PDP.

957.   Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Martínez Galíndez's
exercise of her First Amendment rights and her desires to
engage in activities protected by the First Amendment.

**Plaintiff Wanda Morales Pérez**

958.   Plaintiff Wanda Morales Pérez ("Morales Pérez") is of
legal age, a resident of Puerto Rico and a citizen of the
United States of America.

959.   Plaintiff Morales Pérez commenced working at the
Office of the Superintendent in October of 2013 and worked
as a General Services Assistant when she was terminated on
February 15, 2017 because of her political affiliation.

960.   At the time of termination, Plaintiff Morales Pérez
was receiving treatment form the Puerto Rico State
Insurance Fund due a work-related incident.

961.   Party affiliation is not an appropriate requirement
for Morales Pérez's position. At all times relevant and

material hereto, Morales Pérez was a public employee whose position was not a public-policy-making position, or one that required her to perform public-policy functions. Morales Pérez did not perform functions of close proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

962.    Morales Pérez engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

963.    Morales Perez's duties included clerical services related to inventory recordkeeping, among others.

964.    For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Morales Pérez is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Morales Pérez avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Morales Pérez voted for the PDP.

965.    Morales Pérez actively participated in the PDP 2016 electoral campaign in support of the candidate for Governor

David Bernier. She took part in meetings, concentrations, manifestations and activities, such as "Abrazo Popular".

966. Morales Pérez also engaged in friendly political discussions with non-PDP co-workers and her political affiliation was common knowledge.

967. Morales Pérez used color red clothing that identified her political affiliation to the PDP.

968. These facts, as well as others provided throughout this complaint relating to or tending to show Morales Pérez' political affiliation, preferences involvement and activism, were known to all Defendants in this case (and by their agents and employees of their political trust).

969. After the elections, the workplace became very tense. Co-workers affiliated to the NPP advised her not to talk about her political affiliation because she would be fired.

970. Morales Pérez was made aware by other co-workers that Human Resources personnel were reviewing all employees' files to compile information on employees affiliated to the PDP.

971. Morales Pérez witnessed as NPP affiliated persons came to the Office of the Superintendent to ask for work. Also, employees that were terminated but were NPP affiliated were rehired immediately.

972.    Defendants    terminated    Morales    Pérez'    employment
without warning and without cause, by way of a letter of
February 15, 2017. Her termination was effective on the
same day.

973.    Defendants terminated and dismissed Morales Pérez from
her  job  without  evaluating  her  job  performance  and
efficiency.

974.    At no time prior to her dismissal did the Defendants
discipline Morales Pérez or issue a reprimand related to
the performance of her duties.

975.    The reason that Morales Pérez' job was terminated was
because  the  Defendants  knew  that  she  belonged  to  –  or
otherwise perceived her to be a member of and/or affiliated
with – a political party other than the NPP, particularly
the PDP.

976.    In the alternative, Defendants terminated her because
they knew that she was not an active supporter of the NPP.

977.    As  a  result  of  this  termination,  Defendants  have
deprived Morales Pérez of the income and benefits by which
she sustained herself and her family; have subjected her to
personal pain and suffering; and have punished her in the
exercise of her civil rights by terminating her employment
– all because she is not a member of or affiliated with the
NPP, and did not vote for the NPP or for NPP candidates in

the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and or being a known supporter of the PDP.

978. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Morales Pérez' exercise of her First Amendment rights and her desires to engage in activities protected by the First Amendment.

### *Plaintiff Cristobal Maysonet García*

979. Plaintiff Cristobal Maysonet García ("Maysonet García") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

980. Plaintiff Maysonet García commenced working at the Office of the Superintendent in June 2015, as an Internal Security Officer with low level duties as a security guard when he was terminated on February 15, 2017 because of his political affiliation.

981. Party affiliation is not an appropriate requirement for Maysonet García's position. At all times relevant and material hereto, Maysonet García was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions. Maysonet García did not perform functions of proximity to policy-making employees, or otherwise have access to

politically    sensitive    information    or    confidential
information related to public policy matters.

982.   Maysonet García engaged in functions of a routine
nature that required competence and efficient performance,
not political affiliation.

983.   Maysonet García's principal duties were to watch the
areas, buildings, equipment and property of the Office of
the Superintendent to preserve and keep these safe; to
notify immediately any irregularity that may happen during
his shift; to maintain order in the areas of public access;
to keep watch and secure all visitors at the Capitol
District.

984.   From February 2016 to December 2016, Maysonet García
was assigned and provided security services to the office
of PDP Representative Rafael "Tatito" Hernández Montañez.

985.   For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) were aware that Maysonet García
is an active member of the PDP. It was of common knowledge
at the Office of the Superintendent (and by Defendants
themselves and by their agents and employees of their
political trust) that Maysonet García avidly supported the
PDP during the 2016 elections and was active during the
PDP's electoral campaign for the 2016 elections. Moreover,

these individuals also knew or assumed that Maysonet García had voted for the PDP.

986. During the 2016 electoral campaign, Maysonet García worked as an electoral poll officer authorized by the State Electoral Commission as a representative of the PDP party in the Municipality of Vega Alta.

987. Electoral poll officers are required to train and register before the State Electoral Commission identifying the individual's political affiliation and making it a matter of public records.

988. Maysonet García actively participated of the PDP primaries, in rallies, meetings, the "Abrazo Popular", among others. He also participated with the political campaign activities of the PPD candidate for: governor candidate, David Bernier; Representative Rafael "Tatito" Hernández Montañez; and for Oscar Santiago.

989. Like some co-workers and the other Plaintiffs, Maysonet García was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

990.    Maysonet García himself had a public Facebook account
where he was friends with some of his NPP affiliated co-
workers, and posted statuses regarding his political
affiliation.

991.    These facts, as well as others provided throughout
this complaint relating to or tending to show Maysonet
García's political affiliation, preferences involvement and
activism, were known to all Defendants in this case.

992.    After Election Day, Maysonet García was asked in
several occasions when he had started to work at the Office
of the Superintendent and who had recommended him.

993.    After January 2, 2017, Maysonet García duties where
changed and he was removed from work area and assigned to
the Luis A. Ferré parking lot. He was told by his
supervisor that the order came from Roy Sanchez.

994.    After Election Day, the working environment became
extremely tense, NPP employees where constantly making
comments and teasing PDP employees with offensive remarks.

995.    After Election Day, Maysonet García noticed that many
new people allegedly affiliated with the new NPP
administration started to come by the Office of the
Superintendent to ask for work. Mr. Roy Sanchez acted as in
charge of decisions and supervising the Internal Security
area.

996. Maysonet García was called into a meeting with many of his co-workers assigned to Internal Security on February 15, 2017. Most of the Office of the Superintendent Internal Security Officers were terminated and he noticed that the NPP affiliated co-workers were not terminated.

997. Defendants terminated and dismissed Maysonet García from his job without evaluating his job performance or efficiency.

998. At no time prior to his dismissal did the Defendants discipline Maysonet García or issue a reprimand related to the performance of his duties.

999. Defendants terminated Maysonet García's employment without warning and without cause, by way of a letter of February 15, 2017. His termination was effective on the same day.

1000. The reason that Maysonet García's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1001. In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1002. As a result of this termination, Defendants have deprived Maysonet García of the income and benefits by

which he sustained himself and his family; have subjected
him to personal pain and suffering; and have punished him
in the exercise of his civil rights by terminating his
employment – all because he is not a member of or
affiliated with the NPP, and did not vote for the NPP or
for NPP candidates in the 2016 election; and/or is
perceived by Defendants as not being a member of or
affiliated with the NPP and/or not having voted for the NPP
or for the NPP candidates in the 2016 election; and/or
because he is a known supporter of the PDP.

1003. Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Maysonet García's
exercise of his First Amendment rights and his desires to
engage in activities protected by the First Amendment.

### *Plaintiff Dorothy Myers Rosario*

1004. Plaintiff Dorothy Myers Rosario ("Myers Rosario") is
of legal age, a resident of Puerto Rico and a citizen of
the United States of America.

1005. Plaintiff Myers Rosario commenced working at the
Office of the Superintendent in January of 2013 and worked
as an Administrative Assistant when she was terminated on
February 15, 2017 because of her political affiliation.

1006. Party affiliation is not an appropriate requirement
for Myers Rosario's position. At all times relevant and

material hereto, Myers Rosario was a public employee whose position was not a public-policy-making position, or one that required her to perform public-policy functions. Myers Rosario did not perform functions of close proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1007. In fact, political affiliation is not a requirement for Myers Rosario's position.

1008. Myers Rosario engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1009. Myers Rosario's principal duties were administrative, secretarial and clerical in support of the Office of Internal Audit.

1010. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Myers Rosario is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Myers Rosario avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover,

Defendants also knew or assumed that Myers Rosario voted for the PDP.

1011. Myers Rosario actively participated in rallies, meetings, and activities in support of the PDP party. She also attended the General Assembly of the PDP party.

1012. Myers Rosario actively supported Jaime Perello, President of the House of Representatives, in his 2008 and 2016 campaigns. She also participated in activities in support of Jaime Perelllo including the moment he presented his resignation.

1013. Like some co-workers and the other Plaintiffs, Myers Rosario was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

1014. Myers Rosario herself had a public Facebook account where she was friends with some of his NPP affiliated co-workers, and posted statuses regarding her political affiliation.

1015. Myers Rosario also engaged in friendly political discussions with non-PDP and NPP affiliate co-workers in support of the PDP party and PDP candidates.

1016. These facts, as well as others provided throughout this complaint relating to or tending to show Myers Rosario's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and by their agents and employees of their political trust).

1017. After January 2017, her workplace became very tense. There were many changes and continuous rumors that PDP affiliates were going to be fired and replaced. Co-workers affiliated to the NPP changed their attitude towards her and stopped talking or greeting her in the mornings. Myers Rosario was subjected to continuous comments stating that she was going to be fired and/or replaced because of her political affiliation to the PPD.

1018. Defendants terminated Myers Rosario's employment without warning and without cause, by way of a letter of February 15, 2017. Her termination was effective on the same day.

1019. Defendants terminated and dismissed Myers Rosario from her job without evaluating her job performance and efficiency.

1020. At no time prior to her dismissal did the Defendants discipline Myers Rosario or issue a reprimand related to the performance of her duties.

1021. The reason that Myers Rosario's job was terminated was because the Defendants knew that she belonged to – or otherwise perceived her to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1022. In the alternative, Defendants terminated her because they knew that she was not an active supporter of the NPP.

1023. As a result of this termination, Defendants have deprived Myers Rosario of the income and benefits by which she sustained herself and her family; have subjected her to personal pain and suffering; and have punished her in the exercise of her civil rights by terminating her employment – all because she is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and or being a known supporter of the PDP.

1024. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Myers Rosario's

exercise of her First Amendment rights and her desires to
engage in activities protected by the First Amendment.

*Plaintiff José Narváez Carrión*

1025. Plaintiff José Narváez Carrión ("Narváez Carrión") is
of legal age, a resident of Puerto Rico and a citizen of
the United States of America.

1026. Plaintiff Narváez Carrión commenced working at the
Office of the Superintendent in July of 2015, and was a
Letterer and/or Engraver ("Rotulista") when he was
terminated on February 15, 2017 because of his political
affiliation.

1027. Party affiliation is not an appropriate requirement
for Narváez Carrión's position. At all times relevant and
material hereto, Narváez Carrión was a public employee
whose position was not a public-policy-making position, or
one that required him to perform public-policy functions.
Narváez Carrión did not perform functions of proximity to
policy-making employees, or otherwise have access to
politically sensitive information or confidential
information related to public policy matters.

1028. Narváez Carrión engaged in functions of a routine
nature that required competence and efficient performance,
not political affiliation.

1029. Narváez Carrión's principal duties were provision of
several support services corresponding to operations within
the General Services Lettering unit of the Office of the
Superintendent.

1030. For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) presumed that Narváez Carrión is
an active member of the PDP. It was of common knowledge at
the Office of the Superintendent (and by Defendants
themselves and by their agents and employees of their
political trust) that Narváez Carrión supported the PDP
during the 2016 elections and was active during the PDP's
electoral campaign for the 2016 elections. Moreover, these
individuals also knew or assumed that Narváez Carrión had
voted for the PDP.

1031. Narváez Carrión participated of rallies during the
2016 PDP campaign in support of PDP candidates. This was
common knowledge within the Office of the Superintendent.

1032. Like some co-workers and the other Plaintiffs, Narváez
Carrión was also seen by Defendants (and their agents and
employees of their political trust), and other NPP-
affiliated employees of the Office of the Superintendent,
participating of events or issuing commentary during the

2016 electoral campaign, including in those posted on public Facebook accounts.

1033. Narváez Carrión himself had a public Facebook account where he was friends with some of his NPP affiliated co-workers, and posted or liked statuses regarding his political affiliation.

1034. These facts, as well as others provided throughout this complaint relating to or tending to show Narváez Carrión's political affiliation, preferences involvement and activism, were known to all Defendants in this case.

1035. Defendants terminated and dismissed Narváez Carrión from his job without evaluating his job performance or efficiency.

1036. At no time prior to his dismissal did the Defendants Narváez Carrión or issue a reprimand related to the performance of his duties.

1037. Defendants terminated Narváez Carrión's employment without warning and without cause, by way of a letter of February 15, 2017. His termination was effective on the same day.

1038. The reason that Narváez Carrión's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated

with – a political party other than the NPP, particularly
the PDP.

1039.  In the alternative, Defendants terminated him because
they knew that he was not an active supporter of the NPP.

1040.  As a result of this termination, Defendants have
deprived Narváez Carrión of the income and benefits by
which he sustained himself and his family; have subjected
him to personal pain and suffering; and have punished him
in the exercise of his civil rights by terminating his
employment – all because he is not a member of or
affiliated with the NPP, and did not vote for the NPP or
for NPP candidates in the 2016 election; and/or is
perceived by Defendants as not being a member of or
affiliated with the NPP and/or not having voted for the NPP
or for the NPP candidates in the 2016 election; and/or
because he is a known supporter of the PDP.

1041.  Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Narváez Carrión's
exercise of his First Amendment rights and his desires to
engage in activities protected by the First Amendment.

### Plaintiff Jonuel Negrón Díaz

1042.  Plaintiff Jonuel Negrón Díaz ("Negrón Díaz ") is of
legal age, a resident of Puerto Rico and a citizen of the
United States of America.

1043.   Plaintiff Negrón Díaz commenced working at the Office
of the Superintendent in December of 2013, and was an
Emergency Management Officer when he was terminated on
February 15, 2017 because of his political affiliation.

1044.   Party affiliation is not an appropriate requirement
for Negrón Díaz' position. At all times relevant and
material hereto, Negrón Díaz was a public employee whose
position was not a public-policy-making position, or one
that required him to perform public-policy functions.
Negrón Díaz did not perform functions of proximity to
policy-making employees, or otherwise have access to
politically sensitive information or confidential
information related to public policy matters.

1045.   Negrón Díaz engaged in functions of a routine nature
that required competence and efficient performance, not
political affiliation.

1046.   Negrón Díaz' principal duties were to be in charge of
development and coordination of different activities
related to the attention and management of emergency
situations and disasters in the different facilities of
Capitol District.

1047.   For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) were aware that Negrón Díaz is

an active member of the PDP. It was of common knowledge at
the Office of the Superintendent (and by Defendants
themselves and by their agents and employees of their
political trust) that Negrón Díaz Negrón Díaz avidly
supported the PDP during the 2016 elections and was active
during the PDP's electoral campaign for the 2016 elections.
Moreover, these individuals also knew or assumed that
Negrón Díaz had voted for the PDP.

1048. Negrón Díaz was referred and recommended for the job
at the Office of the Superintendent by the Security
Supervisor of the Senate who was a known PDP affiliate and
by the Sargent in Arms of the Senate under Eduardo Bhatia's
Presidency. This was common knowledge within the Office of
the Superintendent.

1049. Like some co-workers and the other Plaintiffs, Negrón
Díaz was also seen by Defendants (and their agents and
employees of their political trust), and other NPP-
affiliated employees of the Office of the Superintendent,
in photos and/or videos expressing on political events or
issuing political commentary during the 2016 electoral
campaign, including in those posted on public Facebook
accounts.

1050. Negrón Díaz himself had a public Facebook account
where he was friends with some of his NPP affiliated co-

workers, and posted or liked statuses regarding his
political affiliation.

1051. These facts, as well as others provided throughout
this complaint relating to or tending to show Negrón Díaz'
political affiliation, presumed preferences involvement and
activism, were known to all Defendants in this case.

1052. After January 2, 2017, when the new NPP administration
created uncertainty and a hostile environment for the
employees who were presumed or identified as PDP
affiliates.

1053. NPP affiliated employees stopped talking to him and
made continues comments with regards to the termination of
PDP presumed affiliated employees.

1054. After January 2, 2017, Mr. Roy Sanchez was in charge
of distributing the work. He started to change employee's
positions favoring NPP affiliates. Negron Diaz witnessed as
Roy Sanchez kept a diary as he observed employees and
talked to them asking when they had started working at the
Office of the Superintendent.

1055. On January 30, 2017, all employees were called into a
meeting and rumors that they were going to be fired
surrounded the Capitol District. After more than an hour of
wait, the meeting was cancelled. The next day, January 31,
2017, they were called again to a meeting and there were

rumors that the termination letters were ready, the meeting
was canceled once again. They were told by co-workers that
they were not fired because the local press had taken
notice of the termination of Senate employees and were at
the Capitol District.

1056.  Defendants terminated and dismissed Negrón Díaz from
his job without evaluating his job performance or
efficiency.

1057.  At no time prior to his dismissal did the Defendants
Negrón Díaz or issue a reprimand related to the performance
of his duties.

1058.  Defendants terminated Negrón Díaz' employment without
warning and without cause, by way of a letter of February
15, 2017. His termination was effective on the same day.

1059.  The reason that Negrón Díaz' job was terminated was
because the Defendants knew that he belonged to – or
otherwise perceived him to be a member of and/or affiliated
with – a political party other than the NPP, particularly
the PDP.

1060.  In the alternative, Defendants terminated him because
they knew that he was not an active supporter of the NPP.

1061.  As a result of this termination, Defendants have
deprived Negrón Díaz of the income and benefits by which he
sustained himself and his family; have subjected him to

personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or because he is a known supporter of the PDP.

1062. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Negrón Diaz's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

### Plaintiff Ruth Y. Olivero Alvarez

1063. Plaintiff Ruth Y. Olivero Alvarez ("Olivero Alvarez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1064. Plaintiff Olivero Alvarez commenced working at the Office of the Superintendent in January 2013 and was performing duties as a Human Resources Assistant when she was terminated on February 15, 2017 because of her political affiliation.

1065. Plaintiff Olivero Alvarez was under treatment before the Puerto Rico State Insurance Fund Corporation when her

270

employment was terminated due to a work-place related incident.

1066. Party affiliation is not an appropriate requirement for Olivero Alvarez's position. At all times relevant and material hereto, Olivero Alvarez was a public employee whose position was not a public-policy-making position, or one that required her to perform public-policy functions. Olivero Alvarez did not perform functions of close proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1067. Olivero Alvarez engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1068. Olivero Alvarez's principal duties were administrative and secretarial including clerical work, answering the telephone calls, providing assistance, receiving documents and attending to visitors.

1069. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Olivero Alvarez is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Olivero Alvarez avidly supported the PDP

during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Olivero Alvarez voted for the PDP.

1070. Olivero Alvarez actively participated of the PDP campaign in activities such as the "Abrazo Popular", among others. She also participated with the political campaign activities of the PPD candidates such as: Representative Jaime Perello and Candidate for Governor David Bernier.

1071. Olivero Alvarez wore a red shirt and red tennis shoes on several Friday's for casual day that had the intention to identify her as a PDP affiliate.

1072. Olivero Alvarez was recruited to work at the Office of the Superintendent by Javier Vazquez, the Superintendent under PDP administration. Their kids played basketball together. These facts and Alvarez friendship with the Superintendent were common knowledge at the Office of the Superintendent.

1073. During the 2016 electoral campaign, Olivero Alvarez registered to work in the primaries and trained in order to work as an electoral poll officer as a representative of the PDP party.

1074. Electoral poll officers are required to train and register before the State Electoral Commission identifying the individual's political affiliation.

1075. Like some co-workers and the other Plaintiffs, Olivero Alvarez was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

1076. Olivero Alvarez herself had a public Facebook account where she was friends with some of his NPP affiliated co-workers, and posted statuses and pictures regarding her political affiliation.

1077. These facts, as well as others provided throughout this complaint relating to or tending to show Olivero Alvarez's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and by their agents and employees of their political trust).

1078. After the elections, the workplace became very tense and uncertain. Co-workers affiliated to the NPP stopped talking or greeting her in the mornings. Olivero Alvarez

was subjected to comments that she was going to be terminated as well as her boyfriend because her ex-husband was a PNP affiliate and had requested her termination. A co-worker, Javier Bonilla, told her that she could stay and work as a "cleaning lady".

1079. Olivero Alvarez participated of a meeting with the new Superintendent, Wilfredo Ramos, where he stated that no employee was going to be terminated if they were performing their tasks responsibly and efficiently.

1080. After January 2, 2017, Olivero Alvarez was informed by Jean Marie Rodriguez that there was a list of employees to be terminated identifying each by their political affiliation. Olivero Alvarez was told that her name was in a list of employees that were not going to be terminated because of her situation before the State Insurance Fund.

1081. Olivero Alvarez worked at the Office of Human Resources where she saw people coming in and out asking for work and new position because of their affiliation to the NPP. Olivero Alvarez was subjected to continuous derogatory comments ("toda esta zahorria se va", "este polvorín se va") by other personnel from the office such as Jean Marie Rodriguez and Nancy Morales, and from NPP affiliate visitors. Olivero Alvarez complained about the situation to the Director of Human Resources and informed him that the

continuous comments had a terrible emotional effect upon her, but he did nothing.

1082.  Olivero Alvarez witnessed how closed door meetings took place at the Office of the Human Resources Director, Jose Guillermo Figueroa, with regards to employee's files. Olivero Alvarez herself was called to a meeting where she was asked questions with regards to her human resources employee file, she was informed that they were "studying" each file.

1083.  Defendants terminated Olivero Alvarez's employment without warning and without cause, by way of a letter of February 15, 2017. Her termination was effective on the same day.

1084.  Defendants terminated and dismissed Olivero Alvarez from her job without evaluating her job performance and efficiency.

1085.  At no time prior to her dismissal did the Defendants discipline Olivero Alvarez or issue a reprimand related to the performance of her duties.

1086.  The reason that Olivero Alvarez's job was terminated was because the Defendants knew that she belonged to – or otherwise perceived her to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1087.   In the alternative, Defendants terminated her because
they knew that she was not an active supporter of the NPP.

1088.   As a result of this termination, Defendants have
deprived Olivero Alvarez of the income and benefits by
which she sustained herself and her family; have subjected
her to personal pain and suffering; and have punished her
in the exercise of her civil rights by terminating her
employment – all because she is not a member of or
affiliated with the NPP, and did not vote for the NPP or
for NPP candidates in the 2016 election; and/or is
perceived by Defendants as not being a member of or
affiliated with the NPP and/or not having voted for the NPP
or for the NPP candidates in the 2016 election; and or
being a known supporter of the PDP.

1089.   Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Olivero Alvarez's
exercise of her First Amendment rights and her desires to
engage in activities protected by the First Amendment.

### Plaintiff José A. Ontaño Rosario

1090.   Plaintiff José A. Ontaño Rosario ("Ontaño Rosario") is
of legal age, a resident of Puerto Rico and a citizen of
the United States of America.

1091.   Plaintiff Ontaño Rosario commenced working at the
Office of the Superintendent in March of 2013, and was a

Carpentry Supervisor when he was terminated on February 15, 2017 because of his political affiliation.

1092. Party affiliation is not an appropriate requirement for Ontaño Rosario's position. At all times relevant and material hereto, Ontaño Rosario was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions. Ontaño Rosario did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1093. In fact, political affiliation is not a requirement of Ontaño Rosario's position.

1094. Ontaño Rosario engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1095. Ontaño Rosario's principal duties were to be in charge and supervise the Carpentry Workshop in the Capitol District.

1096. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Ontaño Rosario is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants

themselves and by their agents and employees of their political trust) that Reyes Pérez avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, these individuals also knew or assumed that Reyes Pérez had voted for the PDP.

1097. Ever since 1984, Ontaño Rosario has actively been involved working in support of the PDP party and registered to work as an electoral poll officer as a representative of the PDP party. He also trained future electoral poll officials.

1098. Electoral poll officers are required to train and register before the State Electoral Commission identifying the individual's political affiliation.

1099. During 1990, Ontaño Rosario was the Director of Field Operations for Fernando Diaz Zayas, the PDP candidate for Major in Aguas Buenas. In 1998, he performed duties as Campaingn Director for Luis Arroyo.

1100. From 1991 to 1998, and from 2004 to 2016, Ontaño Rosario Performed duties as an Electoral Commissioner for the PDP party.

1101. Ontaño Rosario also engaged in friendly political discussions with non-PDP and NPP affiliate co-workers

expressing his views in support of the PDP party and its candidates.

1102. Ontaño Rosario actively participated of the 2016 PDP primaries in support of PDP candidates. This was common knowledge within the Office of the Superintendent.

1103. Ontaño Rosario also actively participated in the 2016 electoral race by attending rallies, meetings and activities in support of the PDP party. He also participated in activities with the President of the Senate Eduardo Bahtia and supported the campaign of Jose Luis Dalmau and Jesus Santa.

1104. Ontaño Rosario was recommended for the position at the Office of the Superintendent by Senate President Eduardo Bahtia and the PDP Major for the Municipality of Aguas Buenas.

1105. Like some co-workers and the other Plaintiffs, Ontaño Rosario was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

1106. Ontaño Rosario himself had a public Facebook account where he was friends with some of his NPP affiliated co-workers, and posted or liked statuses regarding his political affiliation.

1107. These facts, as well as others provided throughout this complaint relating to or tending to show Ontaño Rosario' political affiliation, preferences involvement and activism, were known to all Defendants in this case.

1108. After January 2, 2017, when the new NPP administration created uncertainty and a difficult environment for the employees who were presumed or identified as PDP affiliates.

1109. After January 2, 2017, Ontaño Rosario witnessed as NPP affiliated employees asked and met with Pablo Sastre requesting for PDP affiliated employees to be removed or terminated.

1110. Defendants terminated and dismissed Ontaño Rosario from his job without evaluating his job performance or efficiency.

1111. At no time prior to his dismissal did the Defendants Ontaño Rosario or issue a reprimand related to the performance of his duties.

1112. Defendants terminated Ontaño Rosario's employment without warning and without cause, by way of a letter of

February 15, 2017. His termination was effective on the same day.

1113. The reason that Ontaño Rosario's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1114. In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1115. As a result of this termination, Defendants have deprived Ontaño Rosario of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or because he is a known supporter of the PDP.

1116. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Ontaño Rosario's

exercise of his First Amendment rights and his desires to
engage in activities protected by the First Amendment.

### Plaintiff Alejandra Ortiz Meléndez

1117. Plaintiff Alejandra Ortiz Meléndez ("Ortiz Meléndez")
is of legal age, a resident of Puerto Rico and a citizen of
the United States of America.

1118. Plaintiff Ortiz Meléndez commenced working at the
Office of the Superintendent in August of 2014 and worked
as a Receptionist when she was terminated on February 15,
2017 because of her political affiliation.

1119. Party affiliation is not an appropriate requirement
for Ortiz Meléndez' position. At all times relevant and
material hereto, Ortiz Meléndez was a public employee whose
position was not a public-policy-making position, or one
that required her to perform public-policy functions. Ortiz
Meléndez did not perform functions of close proximity to
policy-making employees, or otherwise have access to
politically sensitive information or confidential
information related to public policy matters.

1120. Ortiz Meléndez engaged in functions of a routine
nature that required competence and efficient performance,
not political affiliation.

1121. Ortiz Meléndez' principal duties were to answer the
phones, give the public orientation and to give information

to who called the Superintendent's Office. At some time she
was asked to compile a list of over 90 employees with
information on their assigned tasks.

1122. For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) were aware that Ortiz Meléndez
is an active member of the PDP. It was of common knowledge
at the Office of the Superintendent (and by Defendants
themselves) that Ortiz Meléndez avidly supported the PDP
during the 2016 elections and was active during the PDP's
electoral campaign for the 2016 elections. Moreover,
Defendants also knew or assumed that Ortiz Meléndez voted
for the PDP.

1123. Ortiz Meléndez' actively participated in rallies,
meetings, the PDP campaign closing, among others. She also
participated with the political campaign activities of the
PPD candidates.

1124. Like some co-workers and the other Plaintiffs, Ortiz
Meléndez was also seen by Defendants (and their agents and
employees of their political trust), and other NPP-
affiliated employees of the Office of the Superintendent,
in photos and/or videos participating of political events
or issuing political commentary during the 2016 electoral

campaign, including in those posted on public Facebook accounts.

1125. Ortiz Meléndez herself had a public Facebook account where she was friends with some of his NPP affiliated co-workers, and posted statuses regarding her political affiliation.

1126. Ortiz Meléndez also engaged in friendly political discussions with non-PDP co-workers during the 2016 electoral campaigns.

1127. These facts, as well as others provided throughout this complaint relating to or tending to show Ortiz Meléndez' political affiliation, preferences involvement and activism, were known to all Defendants in this case (and by their agents and employees of their political trust).

1128. After the elections the workplace became very tense. Co-workers affiliated to the NPP stopped talking or greeting her in the mornings. Ortiz Meléndez was subjected to continuous comments stating that she was going to be fired and/or replaced because of her political affiliation to the PPD.

1129. Defendants terminated Ortiz Meléndez' employment without warning and without cause, by way of a letter of

February 15, 2017. Her termination was effective on the same day.

1130. Defendants terminated and dismissed Ortiz Meléndez from her job without evaluating her job performance and efficiency.

1131. At no time prior to her dismissal did the Defendants discipline Ortiz Meléndez or issue a reprimand related to the performance of her duties.

1132. The reason that Ortiz Meléndez' job was terminated was because the Defendants knew that she belonged to – or otherwise perceived her to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1133. In the alternative, Defendants terminated her because they knew that she was not an active supporter of the NPP.

1134. As a result of this termination, Defendants have deprived Ortiz Meléndez of the income and benefits by which she sustained herself and her family; have subjected her to personal pain and suffering; and have punished her in the exercise of her civil rights by terminating her employment – all because she is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not

having voted for the NPP or for the NPP candidates in the 2016 election; and or being a known supporter of the PDP.

1135.   Defendants' actions have resulted in a chilling effect and have had a compromising effect on Ortiz Meléndez' exercise of her First Amendment rights and her desires to engage in activities protected by the First Amendment.

### Plaintiff Omar Padró Pagán

1136.   Plaintiff Omar Padró Pagán ("Padró Pagán ") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1137.   Plaintiff Padró Pagán began working at the Office of the Superintendent in October 2016, and was performing duties as a Conservation and Facility Repair Technician when he was dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates.

1138.   Party affiliation is not an appropriate requirement for Padró Pagán's position. At all times relevant and material hereto, Padró Pagán was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions.

1139.   Padró Pagán did not perform functions of proximity to policy-making employees, or otherwise have access to

politically sensitive information or confidential information related to public policy matters.

1140. Padró Pagán engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1141. Padró Pagán principal duties were diverse manual labor for the maintenance, conservation and repair of the facilities, equipment, buildings and green areas of the Capitol District. Padró Pagán performed duties similar to a "handyman" assigned to exterior paint brigade for the Office of the Superintendent.

1142. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) believed that Padró Pagán was considered to be an active member of the PDP. It was believed at the Office of the Superintendent (and by Defendants themselves and by their agents and employees of their political trust) that Padró Pagán supported the PDP during the 2016 elections and was believed to be active during the PDP's electoral campaign for the 2016 elections. Moreover, these individuals also assumed that Padró Pagán had voted for the PDP.

1143. Padró Pagán actively participated in the 2016 electoral race by attending meetings and activities in

support of the PDP party such as the painting of "La Pava"
in Caguas. He also participated in various activities with
the President of House of Representatives, Jaime Perelló in
Mayaguez, Barceloneta and Caguas, among others.

1144. Padró Pagán was recommended for the position at the
Office of the Superintendent by the PPD affiliate Jose Sosa
with whom he had worked at the Municipality of Carolina.

1145. Like some co-workers and the other Plaintiffs, Padró
Pagán was also seen by Defendants (and their agents and
employees of their political trust), and other NPP-
affiliated employees of the Office of the Superintendent,
in photos and/or videos participating of political events
or issuing political commentary during the 2016 electoral
campaign, including in those posted on public Facebook
accounts.

1146. Padró Pagán himself had a public Facebook account
where he was friends with some of his NPP affiliated co-
workers, and posted statuses regarding his political
affiliation.

1147. These facts, as well as others provided throughout
this complaint relating to or tending to show Padró Pagán's
political affiliation, preferences involvement and
activism, were known to all Defendants in this case (and
their agents and employees of their political trust).

1148.  After election day, The Conservation and Facility Repair brigades were overloaded with work related to the remodeling and preparation of the offices for the NPP elected senators to move in. The brigades were ordered to work overtime, weekends and holidays during the Christmas Season.

1149.  After election day, Padró Pagán felt that they were pressured to work all the extra time because of all the comments that if they did not do the work they would be fired. There was a lot of uncertainty.

1150.  After January 2, 2017, there was a meeting with the new Superintendent Wilfredo Ramos where he expressed that nobody was not going to be fired. Everyone felt relieved by his expressions.

1151.  On February 15, 2017, Padró Pagán was given a letter of termination without warning and without cause. The letter was effective immediately.

1152.  The letter stated that he was fired because his position was of trust.

1153.  Defendants terminated and dismissed Padró Pagán from his job without evaluating his job performance and efficiency.

1154.  At no time prior to his dismissal did the Defendants discipline Padró Pagán or issue a reprimand related to the performance of his duties.

1155.  The reason that Padró Pagán's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1156.  In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1157.  As a result of this termination, Defendants have deprived Padró Pagán of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or Defendants knew of his political affiliation with the PDP.

1158.  Defendants' actions have resulted in a chilling effect and have had a compromising effect on Padró Pagán 's

exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

***Plaintiff Gilberto Pagán Resto***

1159. Plaintiff Gilberto Pagán Resto ("Pagán Resto") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1160. Plaintiff Pagán Resto commenced working at the Office of the Superintendent in April 28, 2013, as an Internal Security Officer and worked as low level security guard when he was terminated on February 15, 2017 because of his political affiliation.

1161. Party affiliation is not an appropriate requirement for Pagán Resto's position. At all times relevant and material hereto, Pagán Resto was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions. Pagán Resto did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1162. Pagán Resto engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1163.  Pagán Resto's principal duties were similar to a
security guard providing security services and watch for
the safety of all the areas, buildings, equipment and
property of the Office of the Superintendent and the
Capitol area to preserve, keep these safe and to watch for
the safety and security of all persons in the Capitol
District.

1164.  For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) were aware that Pagán Resto was
considered to be an active member of the PDP. It was of
common knowledge at the Office of the Superintendent (and
by Defendants themselves and by their agents and employees
of their political trust) that Pagán Resto supported the
PDP during the 2016 elections and believed to be active
during the PDP's electoral campaign for the 2016 elections.
Moreover, these individuals also knew or assumed that Pagán
Resto had voted for the PDP.

1165.  Pagán Resto's was recommended for the position by the
Sargent in Arms Luis López and the President of the House
of Representatives Jaime Perello identified both with the
PDP. Pagan's Resto's friendship with both was common
knowledge within the Office of the Superintendent.

1166. Pagán Resto also actively participated in the 2016 political campaign of PDP candidate Jaime Perelló.

1167. Pagan Resto actively participated of the PDP 2016 political primary and campaign in rallies, meetings, and campaign closings of the PDP. He also attended the PDP General Assembly.

1168. Pagán Resto also participated of activities of the Office of the Superintendent that was honored with the participation of PPD party politicians including the President of the House of Representatives.

1169. These facts, as well as others provided throughout this complaint relating to or tending to show Pagán Resto's presumed political affiliation were known to all Defendants in this case.

1170. Like some co-workers and the other Plaintiffs, Pagán Resto was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

1171. Pagán Resto himself had a public Facebook account and Snapchat where he was friends with some of his PDP

affiliated co-workers that posted statuses regarding political affiliation.

1172. After Election Day, Pagán Resto was asked in several occasions when he had started to work at the Office of the Superintendent.

1173. Pagán Resto noticed that Mr. Roy Sanchez continuously visited the area taking notes in a little notebook.

1174. After Election Day, the working environment became tense, hostile and uncertain, NPP employees where constantly making comments as to who was going to be terminated.

1175. Defendants terminated and dismissed Pagán Resto from his job without evaluating his job performance or efficiency.

1176. At no time prior to his dismissal did the Defendants discipline Pagán Resto or issue a reprimand related to the performance of his duties.

1177. Defendants terminated Pagán Resto's employment without warning and without cause, by way of a letter of February 15, 2017. His termination was effective on the same day.

1178. The reason that Pagán Resto's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated

with – a political party other than the NPP, particularly the PDP.

1179. In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1180. As a result of this termination, Defendants have deprived Pagán Resto of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or because he is a known supporter of the PDP.

### *Plaintiff Wilfrido Palacio Camacho*

1181. Plaintiff Wilfrido Palacio Camacho ("Palacio Camacho") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1182. Plaintiff Palacio Camacho began working at the Office of the Superintendent in February 2013, and was performing duties as a Conservation and Facility Repair Technician when he was dismissed on February, 15 2017, because of his

political affiliation with the PDP and his support of PDP candidates.

1183. Party affiliation is not an appropriate requirement for Palacio Camacho's position. At all times relevant and material hereto, Palacio Camacho was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions.

1184. Palacio Camacho did not perform functions of close proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1185. Palacio Camacho engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1186. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) believed that Palacio Camacho was considered to be an active member of the PDP. It was believed at the Office of the Superintendent (and by Defendants themselves and by their agents and employees of their political trust) that Palacio Camacho supported the PDP during the 2016 elections and was believed to be active during the PDP's electoral campaign for the 2016 elections.

Moreover, these individuals also assumed that Palacio Camacho had voted for the PDP.

1187. Palacio Camacho was recommended for the position by Miguel Arana, Director of Human Resources at the Office of Superintendent of The Capitol Building, who is also his father in law.

1188. Palacio Camacho also participated in the 2016 electoral race by attending some meetings, rallies, and activities in support of the PDP Representative candidate Jaime Perello.

1189. Palacio Camacho participated in discussions were co-workers expressed affiliation with the PDP.

1190. These facts, as well as others provided throughout this complaint relating to or tending to show Palacio Camacho's presumed political affiliation were known to all Defendants in this case.

1191. Palacio Camacho himself had a public Facebook account where he was friends with some of his PDP affiliated co-workers, and posted statuses regarding his political affiliation.

1192. These facts, as well as others provided throughout this complaint relating to or tending to show Palacio Camacho's political affiliation, preferences involvement

and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

1193. After Election Day, The Conservation and Facility Repair brigades were overloaded with work related to the remodeling and preparation of the offices for the NPP legislators to move in. The brigades were ordered to work overtime, weekends and holidays during the Christmas Season.

1194. After January 2, 2016, the new NPP administration requested employees identification batches. Palacio Camacho's supervisor requested his identification badge and made a copy of it.

1195. Sometime after January 2, 2017 when the new NPP administration commenced, there was a meeting with the new Superintendent, Mr. Pablo Sastre and Dennis Justiniano where the employees were reassured that they would not be fired no matter their political affiliation. Employees were told that they just had to keep up doing good work and not to be concerned because of the change in administration.

1196. On February 15, 2017, Palacio Camacho was given a letter of termination without warning and without cause. The letter was effective immediately.

1197. The letter stated that he was fired because his position was of trust.

1198.   Defendants terminated and dismissed Palacio Camacho
from his job without evaluating his job performance and
efficiency.

1199.   At no time prior to his dismissal did the Defendants
discipline Palacio Camacho or issue a reprimand related to
the performance of his duties.

1200.   The reason that Palacio Camacho's job was terminated
was because the Defendants knew that he belonged to – or
otherwise perceived him to be a member of and/or affiliated
with – a political party other than the NPP, particularly
the PDP.

1201.   In the alternative, Defendants terminated him because
they knew that he was not an active supporter of the NPP.

1202.   As a result of this termination, Defendants have
deprived Palacio Camacho of the income and benefits by
which he sustained himself and his family; have subjected
him to personal pain and suffering; and have punished him
in the exercise of his civil rights by terminating his
employment – all because he is not a member of or
affiliated with the NPP, and did not vote for the NPP or
for NPP candidates in the 2016 election; and/or is
perceived by Defendants as not being a member of or
affiliated with the NPP and/or not having voted for the NPP

or for the NPP candidates in the 2016 election; and/or
Defendants knew of his political affiliation with the PDP.

1203. Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Palacio Camacho's
exercise of her First Amendment rights and his desires to
engage in activities protected by the First Amendment.

### Plaintiff Kevin Paredes Sanchez

1204. Plaintiff Kevin Paredes Sanchez ("Paredes Sanchez") is
of legal age, a resident of Puerto Rico and a citizen of
the United States of America.

1205. Plaintiff Paredes Sanchez began working at the Office
of the Superintendent in February 2016, and was performing
duties as a Conservation and Facility Repair Technician
when he was dismissed on February 15, 2017, because of his
political affiliation with the PDP and his support of PDP
candidates.

1206. Party affiliation is not an appropriate requirement
for Paredes Sanchez 's position. At all times relevant and
material hereto, Paredes Sanchez was a public employee
whose position was not a public-policy-making position, or
one that required him to perform public-policy functions.

1207. Paredes Sanchez did not perform functions of proximity
to policy-making employees, or otherwise have access to

politically sensitive information or confidential information related to public policy matters.

1208. Paredes Sanchez engaged in functions of a routine nature that required manual competence and efficient performance, not political affiliation.

1209. Paredes Sanchez's principal duties consisted on diverse manual labor for the maintenance, conservation and repair of the facilities, equipment, buildings and green areas of the Capitol District. His duties included: painting, cleaning, maintenance, repair and construction of the facilities, equipment and furniture; as well as planting, trimming, and maintenance of the trees, grass and green areas of the Capitol District.

1210. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Paredes Sanchez is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Paredes Sanchez avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Paredes Sanchez had voted for the PDP.

1211.  Paredes Sanchez actively participated during the PDP
2016 Electoral campaign in rallies, meetings and attended
campaign closings of the PDP. He actively participated of
the campaign for Representative Jaime Perello.

1212.  Paredes Sanchez participated in discussions where his
NPP co-workers expressed how they were going to "fire them
all" once they won the 2016 elections. Political
discussions were frequent between the Office of the
Superintendent employees during the 2016 political race.

1213.  Like some co-workers and the other Plaintiffs, Paredes
Sanchez was also seen by Defendants (and their agents and
employees of their political trust), and other NPP-
affiliated employees of the Office of the Superintendent,
in photos and/or videos participating of political events
or issuing political commentary during the 2016 electoral
campaign, including in those posted on public Facebook
accounts.

1214.  Paredes Sanchez himself had a public Facebook account
where he was friends with some of his NPP affiliated co-
workers, and posted statuses regarding his political
affiliation.

1215.  During the 2016 electoral campaign, Paredes Sanchez
participated of the required training to act as an

electoral poll officer authorized by the State Electoral Commission as a representative of the PDP party.

1216. Electoral poll officers are required to train and register before the State Electoral Commission identifying the individual's political affiliation.

1217. These facts, as well as others provided throughout this complaint relating to or tending to show Paredes Sanchez's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

1218. After the 2016 General Elections, the atmosphere in the Office of the Superintendent became tense because of the rumors that NPP administration was going to fire the employees that had been identified as recruited by the PDP administration. NPP affiliated employees continuously mocked and harassed presumed PDP affiliated employees with derogatory comments.

1219. After January 2, 2017, Paredes Sanchez's duties were changed. He was assigned additional work to be done with less resources and under continuous vigilance. Employees were overworked under humiliating conditions.

1220. Paredes Sanchez was asked when he started to work at the Office of the Superintendent. A NPP affiliated

supervisor, Dennis Justiniano, told Paredes Sanchez not to be concerned and to continue doing good work.

1221.   Paredes Sanchez was informed by a friend to be ready because the new NPP administration was recruiting new personnel to star working on February 16, 2017.

1222.   Paredes Sanchez noticed a lot of new people around the Office of the Superintendent asking for work.

1223.   On February 15, 2017, Paredes Sanchez was given a letter of termination without warning and without cause. The letter was effective immediately.

1224.   The letter stated that he was fired because her position was of trust.

1225.   Defendants terminated and dismissed Paredes Sanchez from his job without evaluating his job performance and efficiency.

1226.   At no time prior to his dismissal did the Defendants discipline Paredes Sanchez or issue a reprimand related to the performance of her duties.

1227.   The reason that Paredes Sanchez 's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1228. In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1229. As a result of this termination, Defendants have deprived Paredes Sanchez of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or Defendants knew of his political affiliation with the PDP.

1230. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Paredes Sanchez 's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

### *Plaintiff Ady Paz Otero*

1231. Plaintiff Ady Paz Otero ("Paz Otero") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1232. Plaintiff Paz Otero commenced working at the Office of the Superintendent in March 2013, as an Internal Security

Supervisor when she was terminated on February 15, 2017
because of her political affiliation.

1233. Plaintiff Paz Otero was under treatment before the
Puerto Rico State Insurance Fund Corporation when her
employment was terminated due to a work-place related
incident.

1234. Party affiliation is not an appropriate requirement
for Paz Otero's position. At all times relevant and
material hereto, Paz Otero was a public employee whose
position was not a public-policy-making position, or one
that required her to perform public-policy functions. Paz
Otero did not perform functions of proximity to policy-
making employees, or otherwise have access to politically
sensitive information or confidential information related
to public policy matters.

1235. Paz Otero engaged in functions of a routine nature
that required competence and efficient performance, not
political affiliation.

1236. Paz Otero's principal duties were to supervise,
coordinate and develop the different activities related to
the security services, protection and watch for the
preservation and safety of the property, employees and
visitors of the Office of the Superintendent and the
Capitol District.

1237.  For the reasons set forth in the Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Paz Otero is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves and by their agents and employees of their political trust) that Paz Otero avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, these individuals also knew or assumed that Paz Otero had voted for the PDP.

1238.  Paz Otero actively participated of the PDP campaign in activities such as the "Abrazo Popular", among others. She also participated with the political campaign activities of the PPD candidates such as: Representative Jaime Perello and Roberto Santiago.

1239.  Like some co-workers and the other Plaintiffs, Paz Otero was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

1240. Paz Otero herself had a public Facebook account where he was friends with some of her NPP affiliated co-workers, and posted statuses regarding her political affiliation.

1241. Paz Otero participated in political discussions were co-workers expressed their party affiliation and spoke in favor of their candidates. Paz Otero expressed her views in favor the PDP and the candidate for Governor David Bernier.

1242. These facts, as well as others provided throughout the complaint relating to or tending to show Paz Otero's political affiliation, preferences involvement and activism, were known to all Defendants in the case.

1243. After Election Day, the working environment changed and became very loaded and tense. Employees were concerned about losing their jobs. There were multiple rumors that lists were being compiled by the NPP that identified the PDP employees to be fired. Co-workers affiliated with the NPP said that PDP employees were going to be fired

1244. Paz Otero was called into a meeting with many of her co-workers assigned to Internal Security on February 15, 2017. Most of the Office of the Superintendent Internal Security Officers was terminated.

1245. Defendants terminated and dismissed Paz Otero from her job without evaluating her job performance or efficiency.

1246.   At no time prior to her dismissal did the Defendants discipline Paz Otero or issue a reprimand related to the performance of her duties.

1247.   Defendants terminated Paz Otero's employment without warning and without cause, by way of a letter of February 15, 2017. Her termination was effective on the same day.

1248.   The reason that Paz Otero's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived her to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1249.   In the alternative, Defendants terminated her because they knew that she was not an active supporter of the NPP.

1250.   As a result of the  termination, Defendants have deprived Paz Otero of the income and benefits by which he sustained herself and her  family; have subjected her to personal pain and suffering; and have punished her  in the exercise of her  civil  rights  by  terminating  her employment – all because she is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP

or for the NPP candidates in the 2016 election; and/or because she is a known supporter of the PDP.

1251. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Paz Otero's exercise of her First Amendment rights and her desires to engage in activities protected by the First Amendment.

### *Plaintiff Catherine Quiñones Pimentel*

1252. Plaintiff Catherine Quiñones Pimentel ("Quiñones Pimentel") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1253. Plaintiff Quiñones Pimentel commenced working at the Office of the Superintendent in January of 2013 and worked as an Auditor when she was terminated on February 15, 2017 because of her political affiliation.

1254. Party affiliation is not an appropriate requirement for Quiñones Pimentel's position. At all times relevant and material hereto, Quiñones Pimentel was a public employee whose position was not a public-policy-making position, or one that required her to perform public-policy functions. Quiñones Pimentel did not perform functions of close proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1255. Quiñones Pimentel engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1256. Quiñones Pimentel's principal duties consisted in the examination and intervention of the operations and procedures performed by the different units of the Office of the Superintendent in order to verify compliance and effective performance.

1257. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Quiñones Pimentel is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Quiñones Pimentel avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Quiñones Pimentel voted for the PDP.

1258. During the 2016 electoral campaign, Quiñones Pimentel trained to work as an electoral polling officer authorized by the State Electoral Commission as a representative of the PDP party.

1259. Electoral polling officers are required to train and register before the State Electoral Commission identifying

the individual's political affiliation and making it a
matter of public records.

1260. Quiñones Pimentel actively participated in the
primary, rallies, meetings, activities and the PDP campaign
closing celebrated at the Hiram Bithorn Stadium. She also
participated with the political campaign activities of the
PPD candidate for governor, David Bernier, and for Jaime
Perelló.

1261. Like some co-workers and the other Plaintiffs,
Quiñones Pimentel was also seen by Defendants (and their
agents and employees of their political trust), and other
NPP-affiliated employees of the Office of the
Superintendent, in photos and/or videos participating of
political events or issuing political commentary during the
2016 electoral campaign, including in those posted on
public Facebook accounts.

1262. Quiñones Pimentel herself had a public Facebook
account where she was friends with some of his NPP
affiliated co-workers, and posted statuses regarding her
political affiliation.

1263. Quiñones Pimentel also engaged in friendly political
discussions with non-PDP co-workers with regards to the
2016 elections and her political affiliation.

1264.  Quiñones Pimentel in occasion wore red clothing to the Office of the Superintendent that symbolized her affiliation and support to the PDP.

1265.  After January 2, 2017, when the new NPP administration took over the Office of the Superintendent, Quiñones Pimentel was asked on several occasions when she was going to be done with the work she had been assigned before their arrival. She was not assigned any new tasks.

1266.  After the elections the workplace became very tense. Co-workers affiliated to the NPP stopped talking or greeting her in the mornings Quiñones Pimentel was subjected to continuous comments stating that she was going to be fired and/or replaced because of her political affiliation to the PPD.

1267.  These facts, as well as others provided throughout this complaint relating to or tending to show Quiñones Pimentel's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and by their agents and employees of their political trust).

1268.  Defendants terminated Quiñones Pimentel's employment without warning and without cause, by way of a letter of February 15, 2017. Her termination was effective on the same day.

1269.  Defendants terminated and dismissed Quiñones Pimentel
from her job without evaluating her job performance and
efficiency.

1270.  At no time prior to her dismissal did the Defendants
discipline Quiñones Pimentel or issue a reprimand related
to the performance of her duties.

1271.  The reason that Quiñones Pimentel's job was terminated
was because the Defendants knew that she belonged to – or
otherwise perceived her to be a member of and/or affiliated
with – a political party other than the NPP, particularly
the PDP.

1272.  In the alternative, Defendants terminated her because
they knew that she was not an active supporter of the NPP.

1273.  As a result of this termination, Defendants have
deprived Quiñones Pimentel of the income and benefits by
which she sustained herself and her family; have subjected
her to personal pain and suffering; and have punished her
in the exercise of her civil rights by terminating her
employment – all because she is not a member of or
affiliated with the NPP, and did not vote for the NPP or
for NPP candidates in the 2016 election; and/or is
perceived by Defendants as not being a member of or
affiliated with the NPP and/or not having voted for the NPP

or for the NPP candidates in the 2016 election; and or being a known supporter of the PDP.

1274.    Defendants' actions have resulted in a chilling effect and have had a compromising effect on Quiñones Pimentel's exercise of her First Amendment rights and her desires to engage in activities protected by the First Amendment.

### Plaintiff Neftalí Ramos Lozada

1275.    Plaintiff Neftalí Ramos Lozada ("Ramos Lozada") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1276.    Plaintiff Ramos Lozada commenced working at the Office of the Superintendent in September of 2016, and was a Certified Electrician when he was terminated on February 15, 2017 because of his political affiliation.

1277.    Party affiliation is not an appropriate requirement for Ramos Lozada's position. At all times relevant and material hereto, Ramos Lozada was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions. Ramos Lozada did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1278.   In fact, political affiliation is not a requirement
        for Ramos Lozada's position.

1279.   Ramos Lozada engaged in functions of a routine nature
        that required competence and efficient performance, not
        political affiliation.

1280.   Ramos Lozada's principal duties were related to
        electrical and illumination repairs, maintenance and
        installations within the Capitol District.

1281.   For the reasons set forth in this Complaint, all
        Defendants (and employees of the Office of the
        Superintendent in general) presumed that Ramos Lozada was
        an active member of the PDP. It was of common knowledge at
        the Office of the Superintendent (and by Defendants
        themselves and by their agents and employees of their
        political trust) that Ramos Lozada supported the PDP during
        the 2016. Moreover, these individuals also knew or assumed
        that Ramos Lozada had voted for the PDP.

1282.   Ramos Lozada actively participated of the Senates
        Softball Team that was sponsored by the President Eduardo
        Bahtia who in occasion played with the,

1283.   Ramos Lozada was recommended for the position at the
        Office of the Superintendent by the Senate's Sergeant in
        Arms who is a known PDP affiliate and a close friend of

316

Ramos Lozada. This was common knowledge within the Office of the Superintendent.

1284. Like some co-workers and the other Plaintiffs, Ramos Lozada was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of events with known PDP affiliates.

1285. Ramos Lozada himself had a public Facebook account where he was friends with some of his NPP affiliated co-workers, and posted or liked statuses regarding his political affiliation.

1286. These facts, as well as others provided throughout this complaint relating to or tending to show Ramos Lozada's political affiliation, presumed preferences and involvement, were known to all Defendants in this case.

1287. After January 2, 2017, when the new NPP administration created uncertainty and a difficult environment for the employees who were presumed or identified as PDP affiliates.

1288. Ramos Lozada was informed by co-workers that supervisors had been asking when he had been employed at the Office of the Superintendent and who had recommended him.

1289. Defendants terminated and dismissed Ramos Lozada from his job without evaluating his job performance or efficiency.

1290. At no time prior to his dismissal did the Defendants Ramos Lozada or issue a reprimand related to the performance of his duties.

1291. Defendants terminated Ramos Lozada's employment without warning and without cause, by way of a letter of February 15, 2017. His termination was effective on the same day.

1292. The reason that Ramos Lozada's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1293. In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1294. As a result of this termination, Defendants have deprived Ramos Lozada of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in

the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or because he is a known supporter of the PDP.

1295. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Ramos Lozada's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

### Plaintiff Arnaldo Reyes Pérez

1296. Plaintiff Arnaldo Reyes Pérez ("Reyes Pérez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1297. Plaintiff Reyes Pérez commenced working at the Office of the Superintendent in January of 2015, and was an Electrician Assistant when he was terminated on February 15, 2017 because of his political affiliation.

1298. Party affiliation is not an appropriate requirement for Reyes Pérez' position. At all times relevant and material hereto, Reyes Pérez was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions. Reyes Pérez did not perform functions of proximity to policy-making employees, or otherwise have access to politically

sensitive information or confidential information related
to public policy matters.

1299. In fact, political affiliation is not a requirement of
Reyes Pérez' position as an Electricians Assistant.

1300. Reyes Pérez engaged in functions of a routine nature
that required competence and efficient performance, not
political affiliation.

1301. Reyes Pérez's principal duties were electrical repairs
and installations in the Capitol District.

1302. For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) were aware that Reyes Pérez is
an active member of the PDP. It was of common knowledge at
the Office of the Superintendent (and by Defendants
themselves and by their agents and employees of their
political trust) that Reyes Pérez avidly supported the PDP
during the 2016 elections and was active during the PDP's
electoral campaign for the 2016 elections. Moreover, these
individuals also knew or assumed that Reyes Pérez had voted
for the PDP.

1303. Reyes Pérez also actively participated in the 2016
electoral race by attending meetings, rallies and
activities in support of the PDP party.

1304.   Reyes Pérez actively supported the 2016 political campaign of candidates Jaime Perello, as well as the candidate for Governor David Bernier.

1305.   Reyes Pérez actively participated as a PDP affiliate of activities such as "Abrazo Popular" and the painting of "La Pava" in Caguas.

1306.   Like some co-workers and the other Plaintiffs, Reyes Pérez was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or liking political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

1307.   Reyes Pérez himself had a public Facebook account where he was friends with some of his NPP affiliated co-workers, and liked statuses regarding his political affiliation.

1308.   These facts, as well as others provided throughout this complaint relating to or tending to show Reyes Pérez' political affiliation, preferences involvement and activism, were known to all Defendants in this case.

1309.   After January 2, 2017, when the new NPP administration created uncertainty and a difficult environment for the

employees who were presumed or identified as PDP affiliates.

1310. Reyes Pérez witnessed as the new NPP affiliate Director's removed employees from their brigades because of their political affiliation to the PDP. These employees were all terminated.

1311. After January 2, 2017, the new NPP administration assigned more work to the brigades. Reyes Perez had to work on late afternoons, Saturdays, Sundays and holidays during the Christmas Season. He was told to do good work and put in the effort so he would not be terminated.

1312. Defendants terminated and dismissed Reyes Pérez from his job without evaluating his job performance or efficiency.

1313. At no time prior to his dismissal did the Defendants Reyes Pérez or issue a reprimand related to the performance of his duties.

1314. Defendants terminated Reyes Pérez' employment without warning and without cause, by way of a letter of February 15, 2017. His termination was effective on the same day.

1315. The reason that Reyes Pérez' job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated

with – a political party other than the NPP, particularly the PDP.

1316. In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1317. As a result of this termination, Defendants have deprived Reyes Pérez of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or because he is a known supporter of the PDP.

1318. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Reyes Perez' exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

### *Plaintiff Augusto B. Rivera Falú*

1319. Plaintiff Augusto B. Rivera Falú ("Rivera Falú") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1320. Plaintiff Rivera Falú commenced working at the Office of the Superintendent in February 2013, as an Internal Security Officer when he was terminated on February 15, 2017 because of his political affiliation.

1321. Party affiliation is not an appropriate requirement for Rivera Falú's position. At all times relevant and material hereto, Rivera Falú was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions. Rivera Falú did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1322. Rivera Falú engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1323. Rivera Falú's principal duties were to watch the areas, buildings, equipment and property of the Office of the Superintendent to preserve and keep these safe; to notify immediately any irregularity that may happen during his shift; to maintain order in the areas of public access; to keep watch and secure all visitors at the Capitol District.

1324. For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) were aware that Rivera Falú is
an active member of the PDP. It was of common knowledge at
the Office of the Superintendent (and by Defendants
themselves and by their agents and employees of their
political trust) that Rivera Falú avidly supported the PDP
during the 2016 elections and was active during the PDP's
electoral campaign for the 2016 elections. Moreover, these
individuals also knew or assumed that Rivera Falú had voted
for the PDP.

1325. During the 2016 electoral campaign, Rivera Falú worked
as an electoral poll officer authorized by the State
Electoral Commission as a representative of the PDP party.

1326. Electoral poll officers are required to train and
register before the State Electoral Commission identifying
the individual's political affiliation and making it a
matter of public records.

1327. Rivera Falú actively participated of the PDP campaign
in rallies, meetings, and activities, among others. He also
participated with the political campaign activities of the
PPD candidate for: governor candidate, David Bernier; and
was in the advanced team of Representative Rafael Rivera.

1328. Like some co-workers and the other Plaintiffs, Rivera Falú was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

1329. Rivera Falú himself had a public Facebook account where he was friends with some of his NPP affiliated co-workers, and posted statuses regarding his political affiliation.

1330. Rivera Falú on several occasions wore color red shirts to work on specific days that identified him as an affiliate of the PDP.

1331. These facts, as well as others provided throughout this complaint relating to or tending to show Rivera Falú's political affiliation, preferences involvement and activism, were known to all Defendants in this case.

1332. After Election Day, the working environment changed and became tense. Rivera Falú focused on his work.

1333. After Election Day, and during the transition period, Rivera Falú approached Mr. Roy Sanchez, who acted as in charge of decisions, and asked if he should be concerned

about losing his job because of his political affiliation. He was told not to worry because he did a good job.

1334. Roy Sanchez and Luis Vega prepared lists of security employees and told Rivera Falu that they were evaluating who would stay and who would "go".

1335. Luis Vega requested that Rivera Falú stayed working for the Internal Security Office but told him that it was not approved. Luis Vega informed him that decisions regarding employees where coming from the office of the President of the Senate.

1336. Rivera Falú was called into a meeting with many of his co-workers assigned to Internal Security on February 15, 2017. Most of the Office of the Superintendent Internal Security Officers were terminated. Luis Vega told him that he tried to "save" him and that he was not in favor of terminating him.

1337. Defendants terminated and dismissed Rivera Falú from his job without evaluating his job performance or efficiency.

1338. At no time prior to his dismissal did the Defendants discipline Rivera Falú or issue a reprimand related to the performance of his duties.

1339. Defendants terminated Rivera Falú's employment without warning and without cause, by way of a letter of February 15, 2017. His termination was effective on the same day.

1340. The reason that Rivera Falú's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1341. In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1342. As a result of this termination, Defendants have deprived Rivera Falú of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or because he is a known supporter of the PDP.

1343. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Rivera Falu's

exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

### *Plaintiff Felix Rivera González*

1344.  Plaintiff Felix Rivera González ("Rivera González") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1345.  Plaintiff Rivera González commenced working at the Office of the Superintendent in September 1, 2016, as an Internal Security Officer and worked as low level security guard when he was terminated on February 15, 2017 because of his political affiliation.

1346.  Party affiliation is not an appropriate requirement for Rivera González's position. At all times relevant and material hereto, Rivera González was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions. Rivera González did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1347.  Rivera González engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1348. Rivera González's principal duties were similar to a
security guard providing security services and watch for
the safety of all the areas, buildings, equipment and
property of the Office of the Superintendent and the
Capitol area to preserve, keep these safe and to watch for
the safety and security of all persons in the Capitol
District. At times Rivera Gonzalez was assigned the North
Entry bag check point.

1349. For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) were aware that Rivera González
was considered to be an active member of the PDP. It was of
common knowledge at the Office of the Superintendent (and
by Defendants themselves and by their agents and employees
of their political trust) that Rivera González supported
the PDP during the 2016 elections and believed to be active
during the PDP's electoral campaign for the 2016 elections.
Moreover, these individuals also knew or assumed that
Rivera González had voted for the PDP.

1350. Rivera González's was recommended for the position by
the 2016 PDP candidate for Mayor in the Municipality of
Vega Alta, Oscar Santiago, for whom he had managed the
security and logistics during the campaign as a volunteer.

1351. Rivera González also actively participated in the 2016 political campaign of PDP candidate Oscar Santiago and was invited to his Installation Ceremony as Mayor of the Municipality of Vega Alta after he won the 2016 election.

1352. Rivera González actively participated of the PDP 2016 political campaign attending rallies, meetings, and campaign closings of the PDP.

1353. Rivera González also participated of activities of the Office of the Superintendent that was honored with the participation of PPD party politicians including the President of the House of Representatives.

1354. These facts, as well as others provided throughout this complaint relating to or tending to show Rivera González's presumed political affiliation were known to all Defendants in this case.

1355. Like some co-workers and the other Plaintiffs, Rivera González was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

1356.   Rivera González himself had a public Facebook account where he was friends with some of his PDP affiliated co-workers that posted statuses regarding political affiliation.

1357.   After Election Day, Rivera González was asked by Roy Sanchez when he had started to work at the Office of the Superintendent. Mr. Sanchez sat with the security officers at lunchtime and asked about work and when they started at the Office of the Superintendent.

1358.   Rivera González noticed that during the transition process Mr. Roy Sanchez continuously visited the area taking notes, in a little notebook he carried around, with regards to the punctuality of the employees, the use of the uniforms, work schedules, among others. Roy Sanchez had no position at the Office of the Superintendent but acted as a Director.

1359.   After Election Day, the working environment became tense, hostile and uncertain, NPP employees where constantly making comments as to who was going to be terminated. Sometime during the transition the night shift security supervisor, Luis Vega, stated that they were going to fire some of them.

1360.   After Election Day, Rivera González was concerned with allegations that the NPP was compiling information from the

Human Resources office illegally that resulted in the removal of a NPP affiliated employee that was saving such information in a USB Drive.

1361. After Election Day, Rivera González witnessed how NPP affiliated employees requested transfers and better positions at the Office of the Superintendent. Those that were friends with Roy Sanchez were moved to better positions. Luis Vega who was the night shift supervisor was moved to work during the day shift.

1362. After January 2, 2017, when the new NPP administration created uncertainty and a difficult environment for the employees who were presumed or identified as PDP affiliates. On January 30, 2017, all employees were called into a meeting and rumors that they were going to be fired surrounded the Capitol District. After more than an hour of wait, the meeting was cancelled. The next day, January 31, 2017, they were called again to a meeting and there were rumors that the termination letters were ready, the meeting was canceled once again. They were told by NPP co-workers that they were not fired because the local press had taken notice of the termination of Senate employees and were at the Capitol District.

1363.   Defendants terminated and dismissed Rivera González from his job without evaluating his job performance or efficiency.

1364.   At no time prior to his dismissal did the Defendants discipline Rivera González or issue a reprimand related to the performance of his duties.

1365.   Defendants terminated Rivera González's employment without warning and without cause, by way of a letter of February 15, 2017. His termination was effective on the same day.

1366.   The reason that Rivera González's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1367.   In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1368.   As a result of this termination, Defendants have deprived Rivera González of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or

for NPP candidates in the 2016 election; and/or is
perceived by Defendants as not being a member of or
affiliated with the NPP and/or not having voted for the NPP
or for the NPP candidates in the 2016 election; and/or
because he is a known supporter of the PDP.

1369.  Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Rivera Gonzalez's
exercise of his First Amendment rights and his desires to
engage in activities protected by the First Amendment.

### *Plaintiff Luis A. Rivera González*

1370.  Plaintiff Luis A. Rivera González ("Rivera González")
is of legal age, a resident of Puerto Rico and a citizen of
the United States of America.

1371.  Plaintiff Rivera González commenced working at the
Office of the Superintendent in February of 2013, and was a
Certified Electrician when he was terminated on February
15, 2017 because of his political affiliation.

1372.  Party affiliation is not an appropriate requirement
for Rivera González' position. At all times relevant and
material hereto, Rivera González was a public employee
whose position was not a public-policy-making position, or
one that required him to perform public-policy functions.
Rivera González did not perform functions of proximity to
policy-making employees, or otherwise have access to

politically sensitive information or confidential
information related to public policy matters.

1373. In fact, political affiliation is not a requirement
for Rivera González' position

1374. Rivera González engaged in functions of a routine
nature that required competence and efficient performance,
not political affiliation.

1375. Rivera González' principal duties were to perform
electrical and illumination repairs, maintenance and
installations in the Capitol District.

1376. For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) presumed and were aware that
Rivera González was an active member of the PDP. It was of
common knowledge at the Office of the Superintendent (and
by Defendants themselves and by their agents and employees
of their political trust) that Rivera González family
avidly supported the PDP during the 2016 elections and were
active during the PDP's electoral campaign for the 2016
elections. Moreover, these individuals also knew or assumed
that Rivera González had voted for the PDP.

1377. Rivera González was recommended for the position at
the Office of the Superintendent by the office of the
President of the Senate, Eduardo Bahtia.

1378. Rivera González sister was the Human Resources Director for the office of the President of the Senate, Eduardo Bahtia; His sister, Dennisse Rivera, is an activist within the PDP party and actively participated in the 2016 electoral campaign. This was common knowledge between Rivera Gonzalez' co-workers at the Office of the Superintendent who presumed he was an activist like his sister.

1379. Rivera González' niece was also an employee of the office of the President of the Senate Eduardo Bahtia and a political supporter of the PDP who actively participated of the PDP political campaign during the 2016 electoral race. This was common knowledge between Rivera Gonzalez' co-workers at the Office of the Superintendent who presumed he was an activist like his niece.

1380. Rivera Gonzalez participated of activities in support of Eduardo Bahtia, PDP President of the Senate in Ponce and Playa Santa. He also participated of activities with Jaime Perello, President of the PDP House of Representatives in the Capitol District and in Juncos.

1381. Like some co-workers and the other Plaintiffs, Rivera González was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent,

337

in photos and/or videos participating of events or issuing commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

1382.  Rivera González himself had a public Facebook account where he was friends with some of his NPP affiliated co-workers, and posted or liked statuses regarding the 2016 elections.

1383.  These facts, as well as others provided throughout this complaint relating to or tending to show Rivera González' political affiliation, preferences involvement and activism, were known to all Defendants in this case.

1384.  After January 2, 2017, when the new NPP administration created uncertainty and a difficult environment for the employees who were presumed or identified as PDP affiliates.

1385.  Rivera Gonzalez was informed by his NPP affiliated co-workers that they had "tried to help him stay" but the political activism of his sister and niece was common knowledge and nothing could be done about it.

1386.  After January 2, 2017, the new Superintendent, Wilfredo Ramos, called to a meeting where he informed that employees that were doing their work correctly were not going to be terminated. This expression calmed the employees concerns and motivated them to do the extra work

338

that was being imposed on them in order to finish the offices for the new NPP Senators to move in.

1387. Rivera Gonzalez witnessed as NPP affiliated employees were transferred to new and better positions. Some of these employees did not have the credentials to perform the work.

1388. Rivera Gonzalez was stressed and concerned because of the continuous comments that presumed PDP affiliates were going to be terminated.

1389. Defendants terminated and dismissed Rivera González from his job without evaluating his job performance or efficiency.

1390. At no time prior to his dismissal did the Defendants Rivera González or issue a reprimand related to the performance of his duties.

1391. Defendants terminated Rivera González' employment without warning and without cause, by way of a letter of February 15, 2017. His termination was effective on the same day.

1392. The reason that Rivera González' job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1393. In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1394. As a result of this termination, Defendants have deprived Rivera González of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or because he is a known supporter of the PDP.

1395. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Rivera González's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

### Plaintiff Priscilla Rivera González

1396. Plaintiff Priscilla Rivera González ("Rivera González") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1397. Plaintiff Rivera González commenced working at the Office of the Superintendent in January of 2014 and worked

as a Receptionist ("Recepcionista Telefonista") when she was terminated on February 15, 2017 because of her political affiliation.

1398. Party affiliation is not an appropriate requirement for Rivera González' position. At all times relevant and material hereto, Rivera González was a public employee whose position was not a public-policy-making position, or one that required her to perform public-policy functions. Rivera González did not perform functions of close proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1399. Political affiliation is not a requirement for Rivera González' position.

1400. Rivera González engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1401. Rivera González' principal duties were to answer telephones, and provide orientation to the public that called or visited the Capitol District. She also performed clerical tasks.

1402. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Rivera González

is an active member of the PDP. It was of common knowledge
at the Office of the Superintendent (and by Defendants
themselves) that Rivera González avidly supported the PDP
during the 2016 elections and was active during the PDP's
electoral campaign for the 2016 elections. Moreover,
Defendants also knew or assumed that Rivera González voted
for the PDP.

1403. During the 2012 and 2016 electoral campaigns, Rivera
González registered to work in the primaries and trained in
order to work as an electoral poll officer as a
representative of the PDP party. She also worked as a poll
officer at the PDP primaries.

1404. Electoral poll officers are required to train and
register before the State Electoral Commission identifying
the individual's political affiliation.

1405. Rivera Gonzalez actively participated in the PDP
political campaign for the Municipality of Hatillo. She
actively supported PDP candidate Jose "Cheli" Rodriguez.

1406. Rivera González actively participated in rallies,
meetings, and activities including campaign closings for
the PDP, among others. She also participated with the
political campaign activities of the PPD candidate for
governor, David Bernier.

1407. Like some co-workers and the other Plaintiffs, Rivera
González was also seen by Defendants (and their agents and
employees of their political trust), and other NPP-
affiliated employees of the Office of the Superintendent,
in photos and/or videos participating of political events
or issuing political commentary during the 2016 electoral
campaign, including in those posted on public Facebook
accounts.

1408. Rivera González herself had a public Facebook account
where she was friends with some of his NPP affiliated co-
workers, and posted statuses regarding her political
affiliation.

1409. Rivera González also engaged in friendly political
discussions with non-PDP and NPP affiliated co-workers
demonstrating her support for the PDP party and its
candidates.

1410. These facts, as well as others provided throughout
this complaint relating to or tending to show Rivera
González' political affiliation, preferences involvement
and activism, were known to all Defendants in this case
(and by their agents and employees of their political
trust).

1411. After the elections, the workplace became very tense.
Co-workers affiliated to the NPP stopped talking or

343

greeting her in the mornings. Rivera González was subjected to continuous comments stating that she was going to be fired and/or replaced because of her political affiliation to the PPD.

1412. After January 2, 2017, Rivera González was asked on several occasions when she had started to work for the Office of the Superintendent.

1413. Rivera González was informed that there was a list of employees that identified them by party affiliation. It was rumored that employees identified with the PDP were going to be terminated.

1414. Defendants terminated Rivera González' employment without warning and without cause, by way of a letter of February 15, 2017. Her termination was effective on the same day.

1415. Defendants terminated and dismissed Rivera González from her job without evaluating her job performance and efficiency.

1416. At no time prior to her dismissal did the Defendants discipline Rivera González or issue a reprimand related to the performance of her duties.

1417. The reason that Rivera González' job was terminated was because the Defendants knew that she belonged to – or otherwise perceived her to be a member of and/or affiliated

with – a political party other than the NPP, particularly the PDP.

1418. In the alternative, Defendants terminated her because they knew that she was not an active supporter of the NPP.

1419. As a result of this termination, Defendants have deprived Rivera González of the income and benefits by which she sustained herself and her family; have subjected her to personal pain and suffering; and have punished her in the exercise of her civil rights by terminating her employment – all because she is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and or being a known supporter of the PDP.

1420. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Rivera González' exercise of her First Amendment rights and her desires to engage in activities protected by the First Amendment.

***Plaintiff Nery Luz Rivera Melendez***

1421. Plaintiff Nery Luz Rivera Melendez ("Rivera Melendez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

345

1422.   Plaintiff Rivera Melendez began working at the Office of the Superintendent in February 15, 2013, and was performing duties as a Maintenance Services Assistant ("Auxiliar de Servicios de Mantenimiento") when she was dismissed on February 15, 2017, because of her political affiliation with the PDP and her support of PDP candidates.

1423.   Party affiliation is not an appropriate requirement for Rivera Melendez's position. At all times relevant and material hereto, Rivera Melendez was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions.

1424.   Rivera Melendez did not perform functions of close proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1425.   Rivera Melendez engaged in functions of a routine nature that required manual competence and efficient performance, not political affiliation.

1426.   Rivera Melendez's principal duties were to perform cleaning and maintenance services to the first response area of the Capitol building and was in charge of cleaning and maintenance of the infirmary. Her duties required: sweeping, mopping, washing, dusting, collecting and disposing of trash, among other.

1427. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Rivera Melendez is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Rivera Melendez avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Rivera Melendez had voted for the PDP.

1428. During the 2016 electoral campaign, Rivera Melendez worked as an electoral inspector authorized by the State Electoral Commission as a representative of the PDP party at Luis Llorens Torres in the Municipality of San Juan.

1429. Electoral inspectors are required to train and register before the State Electoral Commission identifying the individual's political affiliation and making it a matter of public records.

1430. Rivera Melendez actively participated in rallies, meetings, the "Abrazo Popular", among others. She also participated with the political campaign activities of the PPD candidate for governor, David Bernier, Hector Ferrer and for Jaime Perelló.

1431.  Like some co-workers and the other Plaintiffs, Rivera
    Melendez was also seen by Defendants (and their agents and
    employees of their political trust), and other NPP-
    affiliated employees of the Office of the Superintendent,
    in photos and/or videos participating of political events
    or issuing political commentary during the 2016 electoral
    campaign, including in those posted on public Facebook
    accounts.

1432.  Rivera Melendez herself had a public Facebook account
    where she was friends with some of his NPP affiliated co-
    workers, and posted statuses regarding her political
    affiliation.

1433.  These facts, as well as others provided throughout
    this complaint relating to or tending to show Rivera
    Melendez's political affiliation, preferences involvement
    and activism, were known to all Defendants in this case
    (and their agents and employees of their political trust).

1434.  After the 2016 General Elections, the atmosphere in
    the Office of the Superintendent became tense and
    politically charged. NPP affiliated employees made
    continuous comments as to the termination of all presumed
    PDP affiliated employees.

1435.  After the 2016 General Elections, Rivera Melendez
    approached Mr. Darwin Santiago with regards to her

permanency at the Office of the Superintendent. Mr. Santiago assured her that maintenance personnel were never terminated and she shouldn't be concerned.

1436. On December 2016, Rivera Melendez fractured her foot and was off work for some time. When she returned to work after the new NPP administration was in place, Mr. Pablo Sastre informed her that she would be removed from her work area a reassigned to a different building. When Rivera Melendez inquire about the motives for the move, Sastre informed her that it was because he wanted to make the new supervisor more comfortable in his area. It was very difficult for Rivera Melendez because with her fractured foot she had to walk between buildings to punch in her time card.

1437. Rivera Melendez once again, was moved to a different work area. When she inquired about the new change Pablo Sastre informed her that she shouldn't be concerned because he had very good references about her work. Also, Ana Alvarez her supervisor, inquired as to why they were changing Rivera Melendez work area and she was informed that instructions came from "above".

1438. Rivera Melendez was concerned because she had received information that there were 150 employees that were going

to be fired and 20 of these were maintenance employees like
her.

1439.  After January 2, 2017, Rivera Melendez and her fellow
co-workers had a meeting with the new Superintendent
Wilfredo Ramos and Mr. Pablo Sastre, where they all were
reassured that they would not be terminated if they
performed their duties accordingly and kept up the good
quality of their work.

1440.  They were informed by fellow co-workers that the new
NPP administration was reviewing all their files at the
Human Resources Office at night and that they were checking
employees Facebook accounts.

1441.  Rivera Melendez noticed favorable position changes for
NPP affiliate personnel, such as the two grandchildren of
Roberto "Junior" Maldonado, who was the Administrator of
the Senate under the NPP prior Presidency of Tomas Rivera
Schatz, that were moved from maintenance work to the
infirmary and one Internal Security. There was also
information regarding the hiring a private company for the
maintenance and security services so it wouldn't seem like
the NPP was replacing them with their "people".

1442.  On February 15, 2017, Rivera Melendez was given a
letter of termination without warning and without cause.
The letter was effective immediately.

1443. As Rivera Melendez was handed the letter of termination, Mr. Miguel Flores Caro and Eddie Nuñez apologized for having to terminate her employment. Eddie Nuñez gave her a hug and told her that it was "nothing personal" and that order for firing them came from "above".

1444. The letter stated that she was fired because her position was of trust.

1445. Rivera Melendez noticed that a letter was handed to a NPP affiliate employee, María Alarcón, who was later called back to work.

1446. Defendants terminated and dismissed Rivera Melendez from her job without evaluating her job performance and efficiency.

1447. At no time prior to her dismissal did the Defendants discipline Rivera Melendez or issue a reprimand related to the performance of her duties.

1448. The reason that Rivera Melendez's job was terminated was because the Defendants knew that she belonged to – or otherwise perceived her to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1449. In the alternative, Defendants terminated her because they knew that she was not an active supporter of the NPP.

1450. As a result of this termination, Defendants have deprived Rivera Melendez of the income and benefits by which she sustained herself and her family; have subjected her to personal pain and suffering; and have punished her in the exercise of her civil rights by terminating her employment – all because she is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or Defendants knew of her political affiliation with the PDP.

1451. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Rivera Melendez's exercise of her First Amendment rights and her desires to engage in activities protected by the First Amendment.

### *Plaintiff Diego Rivera Ortíz*

1452. Plaintiff Diego Rivera Ortíz ("Rivera Ortíz") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1453. Plaintiff Rivera Ortíz began working at the Office of the Superintendent in March 2013, and was performing duties as a Maintenance Services Assistant ("Auxiliar de Servicios de Mantenimiento") when he was dismissed on February 15,

2017, because of his political affiliation with the PDP and his support of PDP candidates.

1454. Party affiliation is not an appropriate requirement for Rivera Ortíz's position. At all times relevant and material hereto, Rivera Ortíz was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions.

1455. Rivera Ortíz did not perform functions of close proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1456. Rivera Ortíz engaged in functions of a routine nature that required manual competence and efficient performance, not political affiliation.

1457. Rivera Ortíz's principal duties were to perform maintenance services to the facilities, furniture and equipment of the areas assigned. He was assigned to interior paint crew of the Office of the Superintendent.

1458. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Rivera Ortíz is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Rivera Ortíz avidly supported the PDP

during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Rivera Ortíz had voted for the PDP.

1459. Rivera Ortíz actively participated during the PDP 2016 Electoral campaign in rallies, meetings and attended campaign closings of the PDP.

1460. Rivera Ortíz frequently commented and discussed with co-workers his views on the 2016 political race and expressed his support for the PDP candidate for Governor, David Bernier.

1461. Like some co-workers and the other Plaintiffs, Rivera Ortíz was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

1462. Rivera Ortíz himself had a public Facebook account where he was friends with some of his NPP affiliated co-workers, and posted statuses regarding his political affiliation.

1463.   These facts, as well as others provided throughout this complaint relating to or tending to show Rivera Ortíz's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

1464.   After the 2016 General Elections, the atmosphere in the Office of the Superintendent became tense because of the rumors that NPP administration was going to fire the employees that had been identified as recruited by the PDP administration.

1465.   After January 2, 2017, the new Superintendent Wilfredo Ramos and Pablo Sastre called employees to a meeting where they were informed that they should keep up doing good work and they would not be fired; that there was a lot of work to be done with less resources and they should continue with the good work.

1466.   Rivera Ortíz was asked when he started to work at the Office of the Superintendent. A NPP affiliated co-worker, José Guzmán, informed him that he would probably be fired because he was hired by the PDP administration.

1467.   Rivera Ortíz was assigned additional duties in order to support other brigades. The new NPP administration changed the system and increased the workload in order to

prepare the offices of the new NPP legislators. There was a lot of pressure to do the work.

1468.  Rivera Ortíz noticed a lot of new people around the Office of the Superintendent asking for work.

1469.  On February 15, 2017, Rivera Ortíz was given a letter of termination without warning and without cause. The letter was effective immediately.

1470.  The letter stated that he was fired because her position was of trust.

1471.  Defendants terminated and dismissed Rivera Ortíz from his job without evaluating his job performance and efficiency.

1472.  At no time prior to his dismissal did the Defendants discipline Rivera Ortíz or issue a reprimand related to the performance of her duties.

1473.  The reason that Rivera Ortíz's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1474.  In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1475.  As a result of this termination, Defendants have deprived Rivera Ortíz of the income and benefits by which

he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or Defendants knew of his political affiliation with the PDP.

1476.   Defendants' actions have resulted in a chilling effect and have had a compromising effect on Rivera Ortíz's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

### Plaintiff Iván G. Rivera Ríos

1477.   Plaintiff Iván G. Rivera Ríos ("Rivera Ríos") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1478.   Plaintiff Rivera Ríos began working at the Office of the Superintendent in July 2016, and was performing duties as a Conservation and Facility Repair Technician when he was dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates.

1479.  Party affiliation is not an appropriate requirement for Rivera Ríos's position. At all times relevant and material hereto, Rivera Ríos was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions.

1480.  Rivera Ríos did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1481.  Rivera Ríos engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1482.  Rivera Ríos principal duties were several manual tasks related the maintenance, conservation and repair of the facilities, equipment, buildings and green areas of the Capitol District. He performed wood-work and cleaning services at Commission Building I.

1483.  For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) believed that Rivera Ríos was considered to be an active member of the PDP. It was believed at the Office of the Superintendent (and by Defendants themselves and by their agents and employees of their political trust) that Rivera Ríos supported the PDP

during the 2016 elections and was believed to be active during the PDP's electoral campaign for the 2016 elections. Moreover, these individuals also assumed that Rivera Ríos had voted for the PDP.

1484. Rivera Ríos also actively participated in the 2016 electoral race by attending meetings, rallies and activities in support of the PDP party.

1485. Rivera Rios attended PDP campaign closings and actively participated in the campaign of PDP candidate for Governor David Bernier.

1486. During 2016 Election Day, Rivera Ríos worked at the PDP main offices providing assistance to the persons in charge of transportation and mobilization of buses that were arriving from the different Municipalities.

1487. Like some co-workers and the other Plaintiffs, Rivera Ríos was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, as he liked photos and/or videos related to political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

1488. Rivera Ríos was asked by his supervisor, Millie Fuentes, when he had started to work at the Office of the

Superintendent. She informed him that she had orders from the Human Resources Office to gather the information.

1489. After January 2, 2017, when the NPP administration arrived, Rivera Ríos witnessed as other supervisors gathered information and prepared lists including information on employee's tasks. Employees were also asked to bring their resumes.

1490. These facts, as well as others provided throughout this complaint relating to or tending to show Rivera Ríos' political affiliation, preferences involvement and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

1491. On February 15, 2017, Rivera Ríos was given a letter of termination without warning and without cause. The letter was effective immediately.

1492. The letter stated that he was fired because his position was of trust.

1493. Defendants terminated and dismissed Rivera Ríos from his job without evaluating his job performance and efficiency.

1494. At no time prior to his dismissal did the Defendants discipline Rivera Ríos or issue a reprimand related to the performance of his duties.

1495.   The reason that Rivera Ríos's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1496.   In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1497.   As a result of this termination, Defendants have deprived Rivera Ríos of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or Defendants knew of his political affiliation with the PDP.

1498.   Defendants' actions have resulted in a chilling effect and have had a compromising effect on Rivera Ríos exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

**Plaintiff Ramón Riverón Muñoz**

1499.  Plaintiff Ramón Riverón Muñoz ("Riverón Muñoz") is of legal age, a resident of Puerto Rico and a Cuban national with legal immigration status in the United States of America.

1500.  Plaintiff Riverón Muñoz began working at the Office of the Superintendent in 2013, and was performing duties as a Cabinetmaker when he was dismissed on February, 15 2017, because of his presumed political affiliation with the PDP and his support of PDP candidates.

1501.  Party affiliation is not an appropriate requirement for Riverón Muñoz's position. At all times relevant and material hereto, Riverón Muñoz was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions.

1502.  Riverón Muñoz did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1503.  Riverón Muñoz engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1504.  Riverón Muñoz principal duties were repair and reconstruct pieces of furniture and cabinet components, conservation and repair of the facilities, equipment, of

362

the Capitol District. Riverón Muñoz performed duties
similar to a "cabinetmaker" for the Office of the
Superintendent.

1505.  For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) believed that Riverón Muñoz was
considered to be an active member of the PDP. It was
believed at the Office of the Superintendent (and by
Defendants themselves and by their agents and employees of
their political trust) that Riverón Muñoz supported the PDP
during the 2016 elections and was believed to be active
during the PDP's electoral campaign for the 2016 elections.
Moreover, these individuals also assumed that Riverón Muñoz
had voted for the PDP.

1506.  Riverón Muñoz also actively participated in activities
of the Office of the Superintendent where the PDP President
of the House of Representatives, Jaime Perello, was present
as well as other candidates.

1507.  Riverón Muñoz is an avid supporter of Jaime Perello,
PDP President of the House of Representatives, and
supported him every time he had the opportunity. This was
common knowledge between co-workers at the Office of the
Superintendent.

1508.   Like some co-workers and the other Plaintiffs, Riverón
Muñoz was also seen by Defendants (and their agents and
employees of their political trust), and other NPP-
affiliated employees of the Office of the Superintendent,
in photos and/or videos participating of events with Javier
Vazquez, the PDP administration Superintendent, and Jaime
Perello, including in those posted on public Facebook
accounts.

1509.   These facts, as well as others provided throughout
this complaint relating to or tending to show Riverón
Muñoz's presumed political affiliation, preferences and
involvement, were known to all Defendants in this case (and
their agents and employees of their political trust).

1510.   After election day, there were continuous rumors that
the NPP administration was going to terminate all employees
that were recruited by the PDP. Riverón Muñoz was told by
the new Superintendent Wilfredo Ramos that nobody was going
to be fired, he gave "his word" that no one would be fired
if they did their work and performed well.

1511.   On February 15, 2017, Riverón Muñoz was given a letter
of termination without warning and without cause. The
letter was effective immediately.

1512.   The letter stated that he was fired because his
position was of trust.

1513.   Defendants terminated and dismissed Riverón Muñoz from
his job without evaluating his job performance and
efficiency.

1514.   At no time prior to his dismissal did the Defendants
discipline Riverón Muñoz or issue a reprimand related to
the performance of his duties.

1515.   The reason that Riverón Muñoz's job was terminated was
because the Defendants knew that he belonged to – or
otherwise perceived him to be a member of and/or affiliated
with – a political party other than the NPP, particularly
the PDP.

1516.   In the alternative, Defendants terminated him because
they knew that he was not an active supporter of the NPP.

1517.   As a result of this termination, Defendants have
deprived Riverón Muñoz of the income and benefits by which
he sustained himself and his family; have subjected him to
personal pain and suffering; and have punished him in the
exercise of his civil rights by terminating his employment
– all because he is not a member of or affiliated with the
NPP, and did not vote for the NPP or for NPP candidates in
the 2016 election; and/or is perceived by Defendants as not
being a member of or affiliated with the NPP and/or not
having voted for the NPP or for the NPP candidates in the

2016 election; and/or Defendants knew of his political affiliation with the PDP.

1518. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Riverón Muñoz's exercise of her First Amendment rights and his desires to engage in activities protected by the First Amendment.

### *Plaintiff José Rodríguez Concepción*

1519. Plaintiff José Rodríguez Concepción ("Rodríguez Concepción") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1520. Plaintiff Rodríguez Concepción commenced working at the Office of the Superintendent in March 2013, and was an Event Coordinator when he was terminated on February 15, 2017 because of his political affiliation.

1521. Party affiliation is not an appropriate requirement for Rodríguez Concepción's position. At all times relevant and material hereto, Rodríguez Concepción was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions. Rodríguez Concepción did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1522.   Rodríguez Concepción engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1523.   Rodríguez Concepción's principal duties were to coordinate and develop the different activities and events at the Capitol District for the Office of the Superintendent.

1524.   For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Rodríguez Concepción is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves and by their agents and employees of their political trust) that Rodríguez Concepción avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, these individuals also knew or assumed that Rodríguez Concepción had voted for the PDP.

1525.   During the 2000, 2004, 2008 electoral campaigns, worked as an electoral poll officer authorized by the State Electoral Commission as a representative of the PDP party.

1526.   Electoral poll officers are required to train and register before the State Electoral Commission identifying

the individual's political affiliation and making it a matter of public records.

1527. Rodríguez Concepción actively participated in rallies, meetings, and activities such as the "Abrazo Popular" and PDP campaign closings, among others. She also participated with the political campaign activities of the PPD candidate for governor, David Bernier, Hector Ferrer and for Jaime Perelló.

1528. Rodríguez Concepción actively participated of the 2016 PDP Elections in support of PDP candidates. This was common knowledge within the Office of the Superintendent.

1529. Like some co-workers and the other Plaintiffs, Rodríguez Concepción was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

1530. Rodríguez Concepción himself had a public Facebook account where he was friends with some of his NPP affiliated co-workers, and posted or liked statuses regarding his political affiliation.

1531. These facts, as well as others provided throughout this complaint relating to or tending to show Rodríguez Concepción's political affiliation, preferences involvement and activism, were known to all Defendants in this case.

1532. After January 2, 2017, when the new NPP administration created uncertainty and a difficult environment for the employees who were presumed or identified as PDP affiliates. There were rumors that termination of PDP employees was soon.

1533. After January 2, 2017 Rodríguez Concepción's Supervisor was Sylvia Rivera Schatz, the Senate's President Thomas Rivera Schatz sister.

1534. Defendants terminated and dismissed Rodríguez Concepción from his job without evaluating his job performance or efficiency.

1535. At no time prior to his dismissal did the Defendants discipline Rodríguez Concepción or issue a reprimand related to the performance of his duties.

1536. Defendants terminated Rodríguez Concepción's employment without warning and without cause, by way of a letter of February 15, 2017. His termination was effective on the same day.

1537. The reason that Rodríguez Concepción's job was terminated was because the Defendants knew that he belonged

to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1538. In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1539. As a result of this termination, Defendants have deprived Rodríguez Concepción of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or because he is a known supporter of the PDP.

1540. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Rodríguez Concepción's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

***Plaintiff Joseph Rodríguez Rodríguez***

1541. Plaintiff Joseph Rodríguez Rodríguez ("Rodríguez Rodríguez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1542. Plaintiff Rodríguez Rodríguez commenced working at the Office of the Superintendent in October 2016, as an Internal Security Officer with low level duties as a security guard when he was terminated on February 15, 2017 because of his political affiliation.

1543. Party affiliation is not an appropriate requirement for Rodríguez Rodríguez's position. At all times relevant and material hereto, Rodríguez Rodríguez was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions. Rodríguez Rodríguez did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1544. Rodríguez Rodríguez engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1545. Rodríguez Rodríguez's principal duties were to watch the areas, buildings, equipment and property of the Office of the Superintendent to preserve and keep these safe; to notify immediately any irregularity that may happen during

his shift; to maintain order in the areas of public access specifically the administration and parking area; to keep watch over possible violations of the rules and regulations regarding conduct in the areas under his watch; and to answer the questions visitors may pose about the location of areas in the Capitol Building; etc.

1546. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Rodríguez Rodríguez is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves and by their agents and employees of their political trust) that Rodríguez Rodríguez avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, these individuals also knew or assumed that Rodríguez Rodríguez had voted for the PDP.

1547. Rodríguez Rodríguez's was recommended for the position by Javier Vázquez Collazo, the Superintendent of The Capitol Building, who is identified and a political activist for the PDP party. This was common knowledge within the Office of the Superintendent.

1548. Rodríguez Rodríguez also actively participated in the 2016 electoral race by attending meetings, rallies, and

activities in support of the PDP party and for Representative Manuel Natal Alvelo.

1549.  Rodríguez Rodríguez discussed politics with co-workers where he expressed his affiliation with the PDP. On Friday's Rodríguez Rodríguez wore a red shirt that is the color identified with the PDP party.

1550.  These facts, as well as others provided throughout this complaint relating to or tending to show Rodríguez Rodríguez 's political affiliation, preferences involvement and activism, were known to all Defendants in this case.

1551.  Rodríguez Rodríguez himself had a public Facebook account where he was friends with some of his PDP affiliated co-workers, and posted statuses regarding his political affiliation.

1552.  Immediately after Election Day, office personnel working at the Senate began to celebrate in front of Rodríguez Rodríguez that PDP personnel would be fired. On multiple occasions they were told that "the same thing the red's did to us we are going to do to you", with regards to firing all PDP recruited employees.

1553.  After Election Day, Rodríguez Rodríguez was asked in several occasions when he had started to work at the Office of the Superintendent and who had recruited him by NPP affiliates such as Mr. Roy Sanchez and Mr. Wilfredo Ramos.

There were rumors that information was being gathered and reviewed to create lists of employees identifying their affiliation and who had recommended them to work at the Office of the Superintendent.

1554. After January 2, 2017, Rodríguez Rodríguez duties where changed and he was moved around from station to station area until he was placed in a cleaning storage area without a desk, fan and with a broken chair.

1555. After Election Day, the working environment became extremely tense, NPP employees where constantly making comments and teasing PDP employees asking, "why are you still here", "you will be gone soon", among other remarks. NPP employees stopped wearing their uniforms and put pressure in other employees to do the same. Another employee even told him that he was going to take his place when he got fired.

1556. After January 2, 2017, Rodríguez Rodríguez was asked in multiple occasions for whom he had voted for, to what political party he belonged and who had recommended him to work at the Office of the Superintendent. Mr. Roy Sanchez acted as in charge of decisions and supervising the Internal Security area.

1557. Rodríguez Rodríguez was called into a meeting with many of his co-workers assigned to Internal Security on

February 15, 2017. Most of the Office of the Superintendent
Internal Security Officers were terminated and he noticed
that the NPP affiliated co-workers were not terminated, and
the NPP affiliated employees that received letters were
latter called to revoke their termination and reinstall
them to work.

1558.   Defendants    terminated    and    dismissed    Rodríguez
Rodríguez   from   his   job   without   evaluating   his   job
performance or efficiency.

1559.   At no time prior to his dismissal did the Defendants
discipline Rodríguez Rodríguez or issue a reprimand related
to the performance of his duties.

1560.   Defendants terminated Rodríguez Rodríguez's employment
without warning and without cause, by way of a letter of
February 15, 2017. His termination was effective on the
same day.

1561.   The    reason    that    Rodríguez    Rodríguez's    job    was
terminated was because the Defendants knew that he belonged
to – or otherwise perceived him to be a member of and/or
affiliated with – a political party other than the NPP,
particularly the PDP.

1562.   In the alternative, Defendants terminated him because
they knew that he was not an active supporter of the NPP.

1563. As a result of this termination, Defendants have deprived Rodríguez Rodríguez of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or because he is a known supporter of the PDP.

1564. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Rodriguez Rodriguez's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

### *Plaintiff Juan Rodríguez Saure*

1565. Plaintiff Juan Rodríguez Saure ("Rodríguez Saure") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1566. Plaintiff Rodríguez Saure commenced working at the Office of the Superintendent in February of 2016 and worked as a Human Resources Analyst when she was terminated on February 15, 2017 because of her political affiliation.

1567. Party affiliation is not an appropriate requirement for Rodríguez Saure's position. At all times relevant and material hereto, Rodríguez Saure was a public employee whose position was not a public-policy-making position, or one that required her to perform public-policy functions. Rodríguez Saure did not perform functions of close proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1568. Rodríguez Saure engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1569. Rodríguez Saure's principal duties were administrative work in support of matters related to human resources administration at the Office of the Superintendent.

1570. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Rodríguez Saure is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Rodríguez Saure avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover,

Defendants also knew or assumed that Rodríguez Saure voted for the PDP.

1571. Rodríguez Saure is a PDP party affiliate and is actively involved in PDP party activities. This fact was common knowledge at the Office of the Superintendent and was known to all Defendants in this case (and by their agents and employees of their political trust).

1572. Rodríguez Saure actively participated in rallies, meetings, and activities in support of the PDP electoral campaign. He also participated with the political campaign activities of the PPD candidate for Representative Jaime Perelló.

1573. Like some co-workers and the other Plaintiffs, Rodríguez Saure was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

1574. Rodríguez Saure himself had a public Facebook account where he was friends with some of his NPP affiliated co-workers, and posted statuses regarding her political affiliation.

1575. These facts, as well as others provided throughout this complaint relating to or tending to show Rodríguez Saure's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and by their agents and employees of their political trust).

1576. After the elections the workplace became very tense. Co-workers, affiliated to the NPP, stopped talking or greeting him in the mornings. Rodríguez Saure was subjected to continuous derogatory comments related to the termination of his employment.

1577. Ernesto Luciano expressly told Rodriguez Saure that the NPP administration was coming to "massacre" them all, referring to PDP presumed affiliates at the Office of the Superintendent.

1578. After January 2, 2017, the working environment at the Office of the Superintendent became tense and hostile.

1579. After January 2, 2017, Rodríguez Saure witnessed as the NPP affiliates were benefited with better positions at the Office of the Superintendent.

1580. After January 2, 2017, there were rumors that there was a list prepared by the NPP affiliated employees that identified PDP affiliates to be terminated.

1581.  Ernesto Luis Luciano told Rodriguez Saure that there was a list of employees identifying them by party affiliation.

1582.  Samuel Diaz, Rodriguez Saure's Supervisor, informed him that his name was not on the list and he shouldn't be concerned about termination.

1583.  Defendants terminated Rodríguez Saure's employment without warning and without cause, by way of a letter of February 15, 2017. His termination was effective on the same day.

1584.  Defendants terminated and dismissed Rodríguez Saure from his job without evaluating his job performance and efficiency.

1585.  At no time prior to his dismissal did the Defendants discipline Rodríguez Saure or issue a reprimand related to the performance of his duties.

1586.  The reason that Rodríguez Saure's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived his to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1587.  In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1588. As a result of this termination, Defendants have deprived Rodríguez Saure of the income and benefits by which she sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and or being a known supporter of the PDP.

1589. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Rodríguez Saure's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

### Plaintiff Raúl Sánchez

1590. Plaintiff Raúl Sánchez ("Raúl Sánchez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1591. Plaintiff Raúl Sánchez began working at the Office of the Superintendent in July 2013, and was performing duties as a Warehouse Supervisor when he was dismissed on February

15, 2017, because of his political affiliation with the PDP
and his support of PDP candidates.

1592. Party affiliation is not an appropriate requirement
for Raúl Sánchez 's position. At all times relevant and
material hereto, Raúl Sánchez was a public employee whose
position was not a public-policy-making position, or one
that required him to perform public-policy functions.

1593. Raúl Sánchez did not perform functions of proximity to
policy-making employees, or otherwise have access to
politically sensitive information or confidential
information related to public policy matters.

1594. Raúl Sánchez engaged in functions of a routine nature
that required competence and efficient performance, not
political affiliation.

1595. Raúl Sánchez principal duties were to supervise the
delivery and dispatch of materials to the warehouse
facility, in charge of inventory and warehouse employee
supervision.

1596. For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) believed that Raúl Sánchez was
considered to be an active member of the PDP. It was
believed at the Office of the Superintendent (and by
Defendants themselves and by their agents and employees of

their political trust) that Raúl Sánchez supported the PDP during the 2016 elections and was believed to be active during the PDP's electoral campaign for the 2016 elections. Moreover, these individuals also assumed that Raúl Sánchez had voted for the PDP.

1597. During the 2016 electoral campaign, Raúl Sánchez trained to serve as an electoral polling officer authorized by the State Electoral Commission as a representative of the PDP party.

1598. Electoral polling officers are required to train and register before the State Electoral Commission identifying the individual's political affiliation and making it a matter of public records.

1599. Raúl Sánchez was recommended for the position at the Office of the Superintendent by the Superintendent Javier Vazquez a known PPD affiliate.

1600. Raúl Sánchez and the Superintendent Javier Vazquez had a friendship that was known by NPP affiliated employees of the Office of the Superintendent.

1601. These facts, as well as others provided throughout this complaint relating to or tending to show Raúl Sánchez's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

1602. After election day, the working environment turned
hostile and NPP affiliate co-workers made continuous
comments about the PDP employees being fired.

1603. After January 2, 2017, Lynette Gonzalez who is a NPP
affiliated employee of the Office of the Superintendent was
moved from an assistant position to Sub-director in General
Services. Lynnette Gonzalez continuously mocked Raúl
Sánchez telling him that she had prepared the "lists" of
the employees that were going to be fired; that he had
"little time left"; "soon you all will be gone"; among
other comments.

1604. On February 14, 2017, the warehouse employees had a
luncheon celebrating Valentine's Day. At the table, Roberto
Díaz made several comments telling him: "wait and see that
my time has come" and "soon you will know my thing".

1605. After Raúl Sánchez was terminated, Roberto Díaz who is
NPP affiliates, was made warehouse supervisor.

1606. On February 15, 2017, Raúl Sánchez was given a letter
of termination without warning and without cause. The
letter was effective immediately.

1607. The letter stated that he was fired because his
position was of trust.

1608.  Defendants terminated and dismissed Raúl Sánchez from his job without evaluating his job performance and efficiency.

1609.  At no time prior to his dismissal did the Defendants discipline Raúl Sánchez  or issue a reprimand related to the performance of his duties.

1610.  The reason that Raúl Sánchez's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1611.  In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1612.  As a result of this termination, Defendants have deprived Raúl Sánchez  of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP

or for the NPP candidates in the 2016 election; and/or
Defendants knew of his political affiliation with the PDP.

1613. Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Raúl Sánchez's
exercise of his First Amendment rights and his desires to
engage in activities protected by the First Amendment.

### Plaintiff Luis Santaella Díaz

1614. Plaintiff Luis Santaella Díaz ("Santaella Díaz") is of
legal age, a resident of Puerto Rico and a citizen of the
United States of America.

1615. Plaintiff Santaella Díaz began working at the Office
of the Superintendent on July 24, 2016, and was performing
duties as an Internal Security Officer when he was
dismissed on February 15, 2017, because of his political
affiliation with the PDP and his support of PDP candidates.

1616. Party affiliation is not an appropriate requirement
for Santaella Díaz's position. At all times relevant and
material hereto, Santaella Díaz was a public employee whose
position was not a public-policy-making position, or one
that required him to perform public-policy functions.

1617. Santaella Díaz did not perform functions of close
proximity to policy-making employees, or otherwise have
access to politically sensitive information or confidential
information related to public policy matters.

1618. Santaella Díaz engaged in functions of a routine nature that required manual competence and efficient performance, not political affiliation.

1619. Santaella Díaz's principal duties are similar to a security guard, such as: security services and watch for the safety of all the areas, buildings, equipment and property of the Office of the Superintendent to preserve and keep these safe; to watch for the safety and security of all persons in the Capitol District, among other.

1620. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Santaella Díaz is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Santaella Díaz avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Santaella Díaz had voted for the NPP.

1621. During the 2016 electoral campaign, Santaella Díaz actively participated in the campaign of Jose Luis Cruz Cruz for Mayor of the Municipality of Trujillo Alto.

1622. Santaella Díaz actively participated in rallies, meetings, and campaign closings of the PDP.

1623. Like some co-workers and the other Plaintiffs, Santaella Díaz was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

1624. Santaella Díaz himself had a public Facebook account where he was friends with some of his NPP affiliated co-workers, and posted statuses regarding his political affiliation.

1625. These facts, as well as others provided throughout this complaint relating to or tending to show Santaella Díaz's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

1626. After the 2016 General Elections, the atmosphere in the Office of the Superintendent became tense and politically charged. NPP affiliated employees made continuous comments as to the termination of all presumed PDP affiliated employees specially those hired after the 2012 election. Also, NPP employees refused to use their uniforms (because they had red integrated in the uniform)

and made comments with regards to the security officers
that remained using their uniforms claiming that they were
PDP affiliates.

1627.  Santaella Díaz became aware by friends that worked at
the Human Resources Office and Finance Division, of the
existence of some "lists" prepared by the NPP new
administration that identified the presumed PDP affiliated
employees to be terminated.

1628.  Sometime after January 2, 2017, Santaella Díaz was
removed from his position and moved to the night shift.

1629.  After January 2, 2017, Santaella Díaz noticed a lot of
NPP affiliate personnel requesting changes in working
conditions and positions. Mr. Roy Sanchez determined to
move NPP affiliated employees from the night shift to
Santaella Díaz day shift provoking the change. Santaella
Díaz also noticed a lot of new people requesting to be
hired by the NPP administration.

1630.  Santaella Díaz noticed that Mr. Pablo Sastre and Mr.
Roy Sanchez were making decisions with regards to
employees, their duties, working areas and conditions.

1631.  On February 15, 2017, Santaella Díaz was given a
letter of termination without warning and without cause.
The letter was effective immediately.

1632.   The letter stated that he was fired because his position was of trust.

1633.   Defendants terminated and dismissed Santaella Díaz from his job without evaluating his job performance and efficiency.

1634.   At no time prior to his dismissal did the Defendants discipline Santaella Díaz or issue a reprimand related to the performance of his duties.

1635.   The reason that Santaella Díaz's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with a political party other than the NPP, particularly the PDP.

1636.   In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1637.   As a result of this termination, Defendants have deprived Santaella Díaz of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or

affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or Defendants knew of his political affiliation with the PDP.

1638. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Santaella Díaz's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

**Plaintiff Giancarlo Santiago Martinez**

1639. Plaintiff Giancarlo Santiago Martinez ("Santiago Martinez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1640. Plaintiff Santiago Martinez commenced working at the Office of the Superintendent in August 2015, as an Internal Security Officer and worked as low level security guard when he was terminated on February 15, 2017 because of his political affiliation.

1641. Party affiliation is not an appropriate requirement for Santiago Martinez's position. At all times relevant and material hereto, Santiago Martinez was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions. Santiago Martinez did not perform functions of proximity to policy-making employees, or otherwise have access to

politically sensitive information or confidential information related to public policy matters.

1642. Santiago Martinez engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1643. Santiago Martinez 's principal duties were to provide security services and watch for the safety of all the areas, buildings, equipment and property of the Office of the Superintendent to preserve and keep these safe; to watch for the safety and security of all persons in the Capitol District.

1644. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Santiago Martinez was considered to be an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves and by their agents and employees of their political trust) that Santiago Martinez was friends with the Superintendent, Javier Vazquez Collazo who avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, these individuals also knew or assumed that Santiago Martinez had voted for the PDP.

1645. Santiago Martinez's was recommended for the position by an advisor to the House of Representatives and Javier Vázquez Collazo, the Superintendent of The Capitol Building, who is identified and a political activist for the PDP party. This was common knowledge within the Office of the Superintendent. Also, his brother in la worked for the House of Representatives providing services to the President's office.

1646. Santiago Martinez also actively participated together with the Superintendent Javier Vazquez Collazo in activities that were honored with the participation of PPD party politicians including the President of the House of Representatives.

1647. Santiago Martinez participated in discussions were co-workers expressed affiliation with the PDP.

1648. These facts, as well as others provided throughout this complaint relating to or tending to show Santiago Martinez's presumed political affiliation were known to all Defendants in this case.

1649. Like some co-workers and the other Plaintiffs, Santiago Martinez was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of

events  or  issuing  political  commentary  during  the  2016
electoral  campaign,  including  in  those  liked  on  public
Facebook accounts.

1650.  Santiago  Martinez  himself  had  a  public  Facebook
account  where  he  was  friends  with  some  of  his  PDP
affiliated  co-workers,  that  posted  statuses  regarding
political affiliation.

1651.  Santiago  Martinez  worked  during  the  night  shift  and
his supervisor Luis Vega was a known NPP affiliate.

1652.  After  Election  Day,  Santiago  Martinez  was  asked  in
several occasions when he had started to work at the Office
of the Superintendent.

1653.  After  Election  Day,  the  working  environment  became
extremely  tense  and  uncertain,  there  were  comments  with
regards to the termination of presumed PDP employees hired
after 2013 by the new NPP administration.

1654.  Luis  Vega  reassured  Santiago  Martinez  that  the  night
shift  was  not  going  to  be  fired  and  that  he  shouldn't  be
concerned.

1655.  Defendants  terminated  and  dismissed  Santiago  Martinez
from  his  job  without  evaluating  his  job  performance  or
efficiency.

1656.  At no time prior to his dismissal did the Defendants discipline Santiago Martinez or issue a reprimand related to the performance of his duties.

1657.  Defendants terminated Santiago Martinez's employment without warning and without cause, by way of a letter of February 15, 2017. His termination was effective on the same day.

1658.  The reason that Santiago Martinez's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1659.  In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1660.  As a result of this termination, Defendants have deprived Santiago Martinez  of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP

or for the NPP candidates in the 2016 election; and/or
because he is a known supporter of the PDP.

1661. Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Santiago Martinez's
exercise of his First Amendment rights and his desires to
engage in activities protected by the First Amendment.

### *Plaintiff Pablo Santiago Rodríguez*

1662. Plaintiff Pablo Santiago Rodríguez ("Santiago
Rodríguez") is of legal age, a resident of Puerto Rico and
a citizen of the United States of America.

1663. Plaintiff Santiago Rodríguez began working at the
Office of the Superintendent in September 2013, and was
performing duties as a Conservation and Facility Repair
Technician when he was dismissed on February 15, 2017,
because of his political affiliation with the PDP and his
support of PDP candidates.

1664. At the time of the termination, Plaintiff Santiago
Rodriguez had an open case before the Puerto Rico State
Insurance Fund because of a work-place related accident.

1665. Party affiliation is not an appropriate requirement
for Santiago Rodríguez's position. At all times relevant
and material hereto, Santiago Rodríguez was a public
employee whose position was not a public-policy-making

position, or one that required him to perform public-policy
functions.

1666. Santiago Rodríguez did not perform functions of
proximity to policy-making employees, or otherwise have
access to politically sensitive information or confidential
information related to public policy matters.

1667. Santiago Rodríguez engaged in functions of a routine
nature that required manual competence and efficient
performance, not political affiliation.

1668. Santiago Rodríguez's principal duties consisted on
diverse manual labor for the maintenance, conservation and
repair of the facilities, equipment, buildings and green
areas of the Capitol District. Santiago Rodriguez at first
was assigned to the green areas maintenance ("ornato") and
his duties included on 2016 he was assigned duties
pertaining the maintenance and repair of refrigeration
systems.

1669. For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) were aware that Santiago
Rodríguez is an active member of the PDP. It was of common
knowledge at the Office of the Superintendent (and by
Defendants themselves) that Santiago Rodríguez avidly
supported the PDP during the 2016 elections and was active

during the PDP's electoral campaign for the 2016 elections.
Moreover, Defendants also knew or assumed that Santiago
Rodríguez had voted for the PDP.

1670. Santiago Rodríguez actively participated during the
PDP 2012 Electoral campaign in rallies, meetings and
attended campaign closings of the PDP. He actively
participated of the campaign for the governor Alejandro
Garcia Padilla.

1671. During the 2016 electoral campaign, Santiago Rodriguez
participated of the required training to act as an
electoral poll officer authorized by the State Electoral
Commission as a representative of the PDP party.

1672. Electoral poll officers are required to train and
register before the State Electoral Commission identifying
the individual's political affiliation.

1673. These facts, as well as others provided throughout
this complaint relating to or tending to show Santiago
Rodríguez's political affiliation, preferences involvement
and activism, were known to all Defendants in this case
(and their agents and employees of their political trust).

1674. After the 2016 General Elections, the atmosphere in
the Office of the Superintendent became tense because of
the rumors that NPP administration was going to terminate

the employees that had been identified as recruited by the PDP administration.

1675. After January 2, 2017, Paredes Sanchez's participated of a meeting called by Pablo Sastre where they were told that the new NPP administration was going to have a private contract for the maintenance of the new equipment and they would be reassigned.

1676. Santiago Rodríguez was asked on several occasions when he started to work at the Office of the Superintendent. NPP affiliated co-workers identified him with the PDP because he was recruited during the PDP administration.

1677. On February 15, 2017, Santiago Rodríguez was given a letter of termination without warning and without cause. The letter was effective immediately.

1678. 20. The letter stated that he was fired because her position was of trust.

1679. Defendants terminated and dismissed Santiago Rodríguez from his job without evaluating his job performance and efficiency.

1680. At no time prior to his dismissal did the Defendants discipline Santiago Rodríguez or issue a reprimand related to the performance of her duties.

1681. The reason that Santiago Rodríguez's job was terminated was because the Defendants knew that he belonged

to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1682. In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1683. As a result of this termination, Defendants have deprived Santiago Rodríguez of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or Defendants knew of his political affiliation with the PDP.

1684. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Santiago Rodríguez's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

***Plaintiff Jean Santiago Torres***

1685. Plaintiff Jean Santiago Torres ("Santiago Torres") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1686. Plaintiff Santiago Torres began working at the Office of the Superintendent in February 2013, and was performing duties as a Maintenance Services Assistant ("Auxiliar de Servicios de Mantenimiento") when he was dismissed on February 15, 2017, because of his political affiliation with the PDP and his support of PDP candidates.

1687. Party affiliation is not an appropriate requirement for Santiago Torres 's position. At all times relevant and material hereto, Santiago Torres was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions.

1688. Santiago Torres did not perform functions of close proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1689. Santiago Torres engaged in functions of a routine nature that required manual competence and efficient performance, not political affiliation.

1690. Santiago Torres 's principal duties were to perform cleaning and maintenance services to the facilities, furniture and equipment of the areas assigned. His duties

required: sweeping, mopping, washing toilets and basins,
collecting and disposing of trash, among other.

1691. For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) were aware that Santiago Torres
is an active member of the PDP. It was of common knowledge
at the Office of the Superintendent (and by Defendants
themselves) that Santiago Torres avidly supported the PDP
during the 2016 elections and was active during the PDP's
electoral campaign for the 2016 elections. Moreover,
Defendants also knew or assumed that Santiago Torres had
voted for the PDP.

1692. Santiago Torres was recommended for employment at the
Office of the Superintendent by Miguel Arana.

1693. Santiago Torres actively participated during the PDP
2016 Electoral campaign in rallies. He also participated
with the political campaign activities of the PPD candidate
for representative Jaime Perelló.

1694. Santiago Torres frequently commented and discussed
with co-workers his views on the 2016 political race and
expressed his support for the PDP candidate for Governor,
David Bernier.

1695. Like some co-workers and the other Plaintiffs,
Santiago Torres was also seen by Defendants (and their

agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

1696. Santiago Torres himself had a public Facebook account where he was friends with some of his NPP affiliated co-workers, and posted statuses regarding his political affiliation.

1697. These facts, as well as others provided throughout this complaint relating to or tending to show Santiago Torres 's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

1698. After the 2016 General Elections, the atmosphere in the Office of the Superintendent became tense and politically charged. Santiago Torres' supervisor, Isabel Robles of NPP affiliation, warned him "to be careful" because NPP administration was going to fire the employees that had been identified as recruited by the PDP administration.

1699.  Santiago Torres was asked by his supervisor, Isabel Robles, of NPP affiliation, when he started to work at the Office of the Superintendent.

1700.  Santiago Torres noticed favorable position changes for NPP affiliate personnel, and many changes that seemed to be authorized by Pablo Sastre.

1701.  On February 15, 2017, Santiago Torres was given a letter of termination without warning and without cause. The letter was effective immediately.

1702.  As Santiago Torres was handed the letter of termination, Mr. Miguel Flores Caro made an expression stating that the determination for her termination was "out of his hands".

1703.  The letter stated that he was fired because her position was of trust.

1704.  Defendants terminated and dismissed Santiago Torres from his job without evaluating his job performance and efficiency.

1705.  At no time prior to his dismissal did the Defendants discipline Santiago Torres or issue a reprimand related to the performance of her duties.

1706.  The reason that Santiago Torres 's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated

with – a political party other than the NPP, particularly the PDP.

1707.  In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1708.  As a result of this termination, Defendants have deprived Santiago Torres  of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or Defendants knew of his political affiliation with the PDP.

1709.  Defendants' actions have resulted in a chilling effect and have had a compromising effect on Santiago Torres 's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

### Plaintiff Carlos Santos Figueroa

1710.  Plaintiff Carlos Santos Figueroa ("Santos Figueroa") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1711.   Plaintiff Santos Figueroa began working at the Office
of the Superintendent in 2013, and was performing duties as
a Conservation and Facility Repair Technician when he was
dismissed on February 15, 2017, because of his political
affiliation with the PDP and his support of PDP candidates.

1712.   Party affiliation is not an appropriate requirement
for Santos Figueroa's position. At all times relevant and
material hereto, Santos Figueroa was a public employee
whose position was not a public-policy-making position, or
one that required him to perform public-policy functions.

1713.   Santos Figueroa did not perform functions of proximity
to policy-making employees, or otherwise have access to
politically sensitive information or confidential
information related to public policy matters.

1714.   Santos Figueroa engaged in functions of a routine
nature that required competence and efficient performance,
not political affiliation.

1715.   Santos Figueroa principal duties were several manual
tasks related the maintenance, conservation and repair of
the facilities, equipment, buildings and green areas of the
Capitol District. He was assigned to an interior painting
brigade.

1716.   For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the

Superintendent in general) believed that Santos Figueroa
was considered to be an active member of the PDP. It was
believed at the Office of the Superintendent (and by
Defendants themselves and by their agents and employees of
their political trust) that Santos Figueroa supported the
PDP during the 2016 elections and was believed to be active
during the PDP's electoral campaign for the 2016 elections.
Moreover, these individuals also assumed that Santos
Figueroa had voted for the PDP.

1717. Santos Figueroa also actively participated in the 2016
electoral race by attending meetings, rallies and
activities in support of the PDP party.

1718. Santos Figueroa actively supported the 2016 political
campaign of candidates Eduardo Bahtia and Jaime Perello, as
well as the candidate for Governor David Bernier.

1719. Santos Figueroa actively participated within his
community as a PDP affiliate and on Election Day helped
deliver food and water to Electoral Poll Officers that were
working on his district.

1720. Like some co-workers and the other Plaintiffs, Santos
Figueroa was also seen by Defendants (and their agents and
employees of their political trust), and other NPP-
affiliated employees of the Office of the Superintendent,
in photos and/or videos participating of political events

or issuing political commentary during the 2016 electoral campaign, including in those he posted on public Facebook accounts.

1721. On several occasions, Santos Figueroa, wore red clothing to work showing his support and affiliation with the PDP party.

1722. These facts, as well as others provided throughout this complaint relating to or tending to show Santos Figueroa's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

1723. After Election Day, the working environment became extremely tense, NPP employees where constantly making comments and teasing PDP employees regarding their termination.

1724. After election day, the Conservation and Facility Repair brigades were overloaded with work related to the remodeling and preparation of the offices for the NPP elected senators to move in. The brigades were ordered to work overtime, weekends and holidays during the Christmas Season.

1725. After Election Day, Santos Figueroa felt that they were pressured to work all the extra time because of all

the comments that if they did not do the work they would be
fired. There was a lot of uncertainty.

1726. On February 15, 2017, Santos Figueroa was given a
letter of termination without warning and without cause.
The letter was effective immediately.

1727. The letter stated that he was fired because his
position was of trust.

1728. Defendants terminated and dismissed Santos Figueroa
from his job without evaluating his job performance and
efficiency.

1729. At no time prior to his dismissal did the Defendants
discipline Santos Figueroa or issue a reprimand related to
the performance of his duties.

1730. The reason that Santos Figueroa's job was terminated
was because the Defendants knew that he belonged to – or
otherwise perceived him to be a member of and/or affiliated
with – a political party other than the NPP, particularly
the PDP.

1731. In the alternative, Defendants terminated him because
they knew that he was not an active supporter of the NPP.

1732. As a result of this termination, Defendants have
deprived Santos Figueroa of the income and benefits by
which he sustained himself and his family; have subjected
him to personal pain and suffering; and have punished him

in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or Defendants knew of his political affiliation with the PDP.

1733. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Santos Figueroa exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

### *Plaintiff Antonio Solá Martí*

1734. Plaintiff Antonio Solá Martí ("Solá Martí") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1735. Plaintiff Solá Martí commenced working at the Office of the Superintendent in September of 2014, and was a Certified Electrician when he was terminated on February 15, 2017 because of his political affiliation.

1736. Party affiliation is not an appropriate requirement for Solá Martí's position. At all times relevant and material hereto, Solá Martí was a public employee whose position was not a public-policy-making position, or one

that required him to perform public-policy functions. Solá Martí did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1737. In fact, political affiliation is not a requirement of Solá Martí's position.

1738. Solá Martí engaged in functions of a routine nature that required competence, specific electrical knowledge and efficient performance, not political affiliation.

1739. Solá Martí's principal duties were related to electrical repairs and installations in the Capitol District.

1740. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Solá Martí is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves and by their agents and employees of their political trust) that Solá Martí avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, these individuals also knew or assumed that Solá Martí had voted for the PDP.

1741.   Solá Martí actively participated of the 2016 PDP
political campaign in support of PDP candidates. This was
common knowledge within the Office of the Superintendent.

1742.   Solá Martí also actively participated in the 2016
electoral race by attending meetings, rallies and
activities in support of the PDP party. He attended private
activities in support of PDP party and attended the PDP
closing.

1743.   Solá Martí actively supported the 2016 political
campaign of candidates, as well as the candidate for
Governor David Bernier.

1744.   Solá Martí actively participated within his community
as a PDP affiliate and and during the campaign served as a
driver for the Jaime Perello campaign.

1745.   Like some co-workers and the other Plaintiffs, Solá
Martí was also seen by Defendants (and their agents and
employees of their political trust), and other NPP-
affiliated employees of the Office of the Superintendent,
in photos and/or videos participating of political events
or issuing political commentary during the 2016 electoral
campaign, including in those posted on public Facebook
accounts.

1746.   Solá Martí himself had a public Facebook account where
he was friends with some of his NPP affiliated co-workers,

and posted or liked statuses regarding his political affiliation.

1747. These facts, as well as others provided throughout this complaint relating to or tending to show Solá Martí's political affiliation, preferences involvement and activism, were known to all Defendants in this case.

1748. After January 2, 2017, when the new NPP administration created uncertainty and a difficult environment for the employees who were presumed or identified as PDP affiliates.

1749. Solá Martí working conditions changed and he was overworked. He had to work on late afternoons, Saturdays, Sundays and holidays. They were told that the brigades would not be terminated if they performed well and he felt obligated to work all the extra hours in order to keep his employment and demonstrate the quality of his work.

1750. Defendants terminated and dismissed Solá Martí from his job without evaluating his job performance or efficiency.

1751. At no time prior to his dismissal did the Defendants Solá Martí or issue a reprimand related to the performance of his duties.

1752.  Defendants terminated Solá Martí's employment without warning and without cause, by way of a letter of February 15, 2017. His termination was effective on the same day.

1753.  The reason that Solá Martí's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1754.  In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1755.  As a result of this termination, Defendants have deprived Solá Martí of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or because he is a known supporter of the PDP.

1756.  Defendants' actions have resulted in a chilling effect and have had a compromising effect on Solá Martí's exercise

of his First Amendment rights and his desires to engage in
activities protected by the First Amendment.

***Plaintiff Emanuel Soto Ramos***

1757. Plaintiff Emanuel Soto Ramos ("Soto Ramos") is of
legal age, a resident of Puerto Rico and a citizen of the
United States of America.

1758. Plaintiff Soto Ramos commenced working at the Office
of the Superintendent in October of 2014, and was a Project
Management Officer when he was terminated on February 15,
2017 because of his political affiliation.

1759. Party affiliation is not an appropriate requirement
for Soto Ramos' position. At all times relevant and
material hereto, Soto Ramos was a public employee whose
position was not a public-policy-making position, or one
that required him to perform public-policy functions. Soto
Ramos did not perform functions of proximity to policy-
making employees, or otherwise have access to politically
sensitive information or confidential information related
to public policy matters.

1760. In fact, political affiliation is not a requirement
Soto Ramos' position

1761. Soto Ramos engaged in functions of a routine nature
that required competence, specific engineering knowledge
and efficient performance, not political affiliation.

1762.   Soto Ramos' is an engineer and his principal duties
were to coordinate construction projects in the facilities
of the Capitol District.

1763.   For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) were aware that Soto Ramos is an
active member of the PDP. It was of common knowledge at the
Office of the Superintendent (and by Defendants themselves
and by their agents and employees of their political trust)
that Soto Ramos avidly supported the PDP during the 2016
elections and was active during the PDP's electoral
campaign for the 2016 elections. Moreover, these
individuals also knew or assumed that Soto Ramos had voted
for the PDP.

1764.   Soto Ramos also actively participated in the 2016
electoral race by attending meetings, rallies and
activities in support of the PDP party.

1765.   Soto Ramos participated as a PDP affiliate of
activities such as "Abrazo Popular" and the painting of "La
Pava" in Caguas.

1766.   Soto Ramos actively participated of the 2016 PDP
primaries in support of PDP candidates. This was common
knowledge within the Office of the Superintendent.

1767. Like some co-workers and the other Plaintiffs, Soto
Ramos was also seen by Defendants (and their agents and
employees of their political trust), and other NPP-
affiliated employees of the Office of the Superintendent,
in photos and/or videos participating of political events
or issuing political commentary during the 2016 electoral
campaign, including in those posted on public Facebook
accounts.

1768. Soto Ramos himself had a public Facebook account where
he was friends with some of his NPP affiliated co-workers,
and posted or liked statuses regarding his political
affiliation.

1769. These facts, as well as others provided throughout
this complaint relating to or tending to show Soto Ramos'
political affiliation, preferences involvement and
activism, were known to all Defendants in this case.

1770. After January 2, 2017, when the new NPP administration
created uncertainty and a difficult environment for the
employees who were presumed or identified as PDP
affiliates.

1771. After January 2, 2017, Pablo Sastre and the new NPP
Superintendent, Wilfredo Ramos, told the employees at the
Office of the Superintendent that they were not going to

417

terminate any employees and they should not be worried. These statements relieved the employee's concerns.

1772. Soto Ramos was asked by the new NPP affiliate Director when he had started to work at the Office of the Superintendent.

1773. After January 2, 2017, Soto Ramos was assigned additional duties outside the scope of his work and he was removed from his parking space.

1774. Defendants terminated and dismissed Soto Ramos from his job without evaluating his job performance or efficiency.

1775. At no time prior to his dismissal did the Defendants Soto Ramos or issue a reprimand related to the performance of his duties.

1776. Defendants terminated Soto Ramos' employment without warning and without cause, by way of a letter of February 15, 2017. His termination was effective on the same day.

1777. The reason that Soto Ramos' job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1778. In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1779. As a result of this termination, Defendants have deprived Soto Ramos of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or because he is a known supporter of the PDP.

1780. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Soto Ramos's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

### Plaintiff Nelson M. Torres Maldonado

1781. Plaintiff Nelson M. Torres Maldonado ("Torres Maldonado ") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1782. Plaintiff Torres Maldonado commenced working at the Office of the Superintendent in August 2014, as an Internal Security Officer and worked as a security guard when he was

terminated on February 15, 2017 because of his political affiliation.

1783.  Party affiliation is not an appropriate requirement for Torres Maldonado's position. At all times relevant and material hereto, Torres Maldonado was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions. Torres Maldonado did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1784.  Torres Maldonado engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1785.  Torres Maldonado 's principal duties were to provide security services and watch for the safety of all the areas, buildings, equipment and property of the Office of the Superintendent to preserve and keep these safe; to watch for the safety and security of all persons in the Capitol District.

1786.  For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Torres Maldonado was an active member of the PDP. It was of common knowledge

at the Office of the Superintendent (and by Defendants
themselves and by their agents and employees of their
political trust) that Torres Maldonado supported the PDP
during the 2016 elections and was believed to be active
during the PDP's electoral campaign for the 2016 elections.
Moreover, these individuals also knew or assumed that
Torres Maldonado had voted for the PDP.

1787.  Torres Maldonado was recommended for the position by
Mr. Miguel Arana, the Human Resources Director for the
Office of the Superintendent designated under PDP party.
This was common knowledge within the Office of the
Superintendent.

1788.  Torres Maldonado was a retired Police Officer with 30
years active in the force. He met Mr. Miguel Arana while
teaching martial arts.

1789.  Torres Maldonado participated in discussions were co-
workers expressed affiliation with the PDP.

1790.  These facts, as well as others provided throughout
this complaint relating to or tending to show Torres
Maldonado's political affiliation were known to all
Defendants in this case.

1791.  Torres Maldonado worked the night shift from 10:00pm
to 6:00am. His supervisor was Luis Vega who is affiliated
to the NPP. Luis Vega had knowledge of Torres Maldonado's

political affiliation with the PPD. Luis Vega informed him that he "tried to help him stay" and that he had recommended him "even when you belong to the other party".

1792. Torres Maldonado's supervisor, Luis Vega, informed him and others that their employee file contains information that identifies the person that recommended the employee for the job at the Office of the Superintendent. Luis Vega and Torres Maldonado had a very good and respectful working relationship.

1793. After January 2, 2017, Luis Vega was moved to a better position during the day shift. In an effort to "help" Torres Maldonado, Vega moved him to the day shift and assigned him to watch the Reception area at the Office of the President of the Senate.

1794. Luis Vega informed Torres Maldonado that in a meeting on the 13 or 14 of February 2017 he had reviewed a list of employees that were going to be fired from the Office of the Superintendent and that his name was included in a list of employees identified with the PPD. Luis Vega claimed that he asked for Torres Maldonado's name to be removed from the list because he wanted to keep him because of his good work. Luis Vega expressed to Torres Maldonado that he was told not to interfere o his behalf because he would get in "trouble".

1795.   After Election Day, the working environment became extremely tense and hostile, NPP employees where constantly making comments and mocking PDP employees telling them they would be gone soon ("pa' fuera es que van"), among other remarks. NPP employees stopped wearing their uniforms.

1796.   After Election Day, Torres Maldonado witnessed how NPP affiliated employees requested transfers and better positions at the Office of the Superintendent. Those that were friends with Roy Sanchez were moved to better positions.

1797.   When Torres Maldonado was posted at the Office of the President of Senate he witnessed how matters related to the Office of the Superintendent employees were attended at the office of the President of the Senate by Gabriel Hernández, the Chief of Staff, and William "Billy" Sanchez.

1798.   On February 15, 2017 Torres Maldonado had lunch and returned to his post at the Office of the President of the Senate. He noticed that the 2:00pm watchmen did not report to his post and that there were additional personnel from the private security company. Also, there were state police officers posted throughout the Capitol building. Around 2:30pm, Luis Vega came to Torres Maldonado and asked him if he had received a call. Torres Maldonado stated that he did not, Luis Vega proceeded to inform him that he had to

report himself downstairs to get his "letter". Luis Vega
seemed saddened by the situation and expressed to Torres
Maldonado that he tried to interfere for him and others at
the "meeting" but that their names where already on the
"list". Torres Maldonado proceeded to go downstairs where
he was handed his letter of termination by Mr. Jorge Diaz
and Mr. Reyes Ortiz.

1799.  Defendants terminated and dismissed Torres Maldonado
from his job without evaluating his job performance or
efficiency.

1800.  At no time prior to his dismissal did the Defendants
discipline Torres Maldonado or issue a reprimand related to
the performance of his duties.

1801.  Defendants terminated Torres Maldonado's employment
without warning and without cause, by way of a letter of
February 15, 2017. His termination was effective on the
same day.

1802.  The reason that Torres Maldonado's job was terminated
was because the Defendants knew that he belonged to – or
otherwise perceived him to be a member of and/or affiliated
with – a political party other than the NPP, particularly
the PDP.

1803.  In the alternative, Defendants terminated him because
they knew that he was not an active supporter of the NPP.

1804. As a result of this termination, Defendants have deprived Torres Maldonado of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or because he is a known supporter of the PDP.

1805. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Torres Maldonado's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

### Plaintiff Altagracia Torres Marrero

1806. Plaintiff Altagracia Torres Marrero ("Torres Marrero") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1807. Plaintiff Torres Marrero commenced working at the Office of the Superintendent in March 2013 and worked as an Administrative Assistant when she was terminated on February 15, 2017 because of her political affiliation.

1808.   Party affiliation is not an appropriate requirement
for Torres Marrero' position. At all times relevant and
material hereto, Torres Marrero was a public employee whose
position was not a public-policy-making position, or one
that required her to perform public-policy functions.
Torres Marrero did not perform functions of close proximity
to policy-making employees, or otherwise have access to
politically sensitive information or confidential
information related to public policy matters.

1809.   Torres Marrero engaged in functions of a routine
nature that required competence and efficient performance,
not political affiliation.

1810.   Torres Marrero' principal duties were administrative
and secretarial and provided support to the purchase area
of the Office of the Superintendent and in management and
confidentiality of the filing system.

1811.   For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) were aware that Torres Marrero
is an active member of the PDP. It was of common knowledge
at the Office of the Superintendent (and by Defendants
themselves) that Torres Marrero avidly supported the PDP
during the 2016 elections and was active during the PDP's
electoral campaign for the 2016 elections. Moreover,

Defendants also knew or assumed that Torres Ríos voted for the PDP.

1812.  Torres Marrero actively participated in the PDP 2016 electoral campaign. She took part in rallies, meetings, concentrations, and activities in support of PDP candidate for the House of Representatives Jaime Perello.

1813.  In previous elections, Torres Marrero had worked as an electoral poll officer authorized by the State Electoral Commission as a representative of the PDP party.

1814.  Electoral poll officers are required to train and register before the State Electoral Commission identifying the individual's political affiliation and making it a matter of public records.

1815.  Torres Marrero had worked in a previous PDP administration for the Senate, at the office of the Sub-secretary of the Senate under Antonio Faz Alzamora.

1816.  Several of her NPP affiliated co-workers at the Office of the Superintendent remembered her from her days in the House of Representatives.

1817.  Like some co-workers and the other Plaintiffs, Torres Marrero was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events

or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

1818. Torres Marrero herself had a public Facebook account where she was friends with some of his NPP affiliated co-workers, and posted or liked statuses regarding her political affiliation.

1819. These facts, as well as others provided throughout this complaint relating to or tending to show Torres Marrero's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and by their agents and employees of their political trust).

1820. After the elections, the workplace became very tense. Co-workers affiliated to the NPP stopped talking or greeting her in the mornings. Torres Marrero was subjected to continuous derogatory comments with regards of what she was still doing working there, that there were too many PDP affiliated employees there and they had to "go".

1821. Torres Marrero was asked on several occasions when she had stated to work at the Office of the Superintendent, by the new Superintendent Wilfredo Ramos and by Mr. Redondo, among others.

1822. The new NPP administration Superintendent Wilfredo Ramos met with the employees and informed them that they should not worry about their employment because he was not going to fire any employee that performed their duties responsibly and efficiently.

1823. Torres Marrero was made aware by an NPP affiliated co-worker, Emmanuel Rosado, that there was a "list" identifying the employees affiliated to the PDP that were going to be fired. Rosado told her that she shouldn't be concerned because her name was not on the list.

1824. After the election, Torres Marrero received comments from Emanuel Rosado that she was going to stay on her position, then he mocked her with physical gestures and said, "Out they go!" ("pa' fuera es que van").

1825. Emmanuel Rosado created a hostile environment in their working area. The situation was so intense that co-worker Nancy Rivera requested Pablo Sastre to move her to a different area if the situation was not resolved.

1826. Defendants terminated Torres Marrero's employment without warning and without cause, by way of a letter of February 15, 2017. Her termination was effective on the same day.

1827. Luis Carrozini handed Torres Marrero her termination letter at the same time he said he was "sorry" for the situation but "orders" had come from "above".

1828. Defendants terminated and dismissed Torres Marrero from her job without evaluating her job performance and efficiency.

1829. At no time prior to her dismissal did the Defendants discipline Torres Marrero or issue a reprimand related to the performance of her duties.

1830. The reason that Torres Marrero's job was terminated was because the Defendants knew that she belonged to – or otherwise perceived her to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1831. In the alternative, Defendants terminated her because they knew that she was not an active supporter of the NPP.

1832. As a result of this termination, Defendants have deprived Torres Marrero of the income and benefits by which she sustained herself and her family; have subjected her to personal pain and suffering; and have punished her in the exercise of her civil rights by terminating her employment – all because she is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not

being a member of or affiliated with the NPP and/or not
having voted for the NPP or for the NPP candidates in the
2016 election; and or being a known supporter of the PDP.

1833. Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Torres Marrero's
exercise of her First Amendment rights and her desires to
engage in activities protected by the First Amendment.

### *Plaintiff Isalí Torres Martínez*

1834. Plaintiff Isalí Torres Martínez ("Torres Martínez") is
of legal age, a resident of Puerto Rico and a citizen of
the United States of America.

1835. Plaintiff Torres Martínez commenced working at the
Office of the Superintendent in April of 2015 and worked as
an Administrative Assistant when she was terminated on
February 15, 2017 because of her political affiliation.

1836. Party affiliation is not an appropriate requirement
for Torres Martínez' position. At all times relevant and
material hereto, Torres Martínez was a public employee
whose position was not a public-policy-making position, or
one that required her to perform public-policy functions.
Torres Martínez did not perform functions of close
proximity to policy-making employees, or otherwise have
access to politically sensitive information or confidential
information related to public policy matters.

1837.   Torres Martínez engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1838.   Torres Martínez' principal duties were administrative, clerical and secretarial at the Office of the Superintendent.

1839.   For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Torres Martínez is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Torres Martínez avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Torres Martínez voted for the PDP.

1840.   During the 2016 elections Torres Martínez was elected to the Municipal Legislation in representation of the PDP for the Municipality of San Germán.

1841.   During the 2016 electoral campaign, Torres Martínez registered and trained in order to work as an electoral poll coordinator as a representative of the PDP party.

1842. Electoral poll coordinators are required to train and register before the State Electoral Commission identifying the individual's political affiliation.

1843. During the 2016 electoral campaign, Torres Martínez actively participated in rallies, meetings, and PDP political activities. She also participated with the political campaign activities of the PPD candidate for governor, David Bernier, Hector Ferrer and for the Mayor of San German.

1844. Torres Martinez also campaigned for herself to be elected as a PDP representative for the Municipal Legislature. This was well known at the Office of the Superintendent by NPP affiliates.

1845. Torres Martínez also engaged in friendly political discussions with non-PDP co-workers expressing her affiliation and support to the PDP party.

1846. These facts, as well as others provided throughout this complaint relating to or tending to show Torres Martínez' political affiliation, preferences involvement and activism, were known to all Defendants in this case (and by their agents and employees of their political trust).

1847. After the elections the workplace became very tense. Co-workers affiliated to the NPP stopped talking or

greeting her in the mornings. Torres Martínez was subjected to continuous comments stating that she was going to be fired and/or replaced because of her political affiliation to the PPD.

1848. Defendants terminated Torres Martínez' employment without warning and without cause, by way of a letter of February 15, 2017. Her termination was effective on the same day.

1849. Defendants terminated and dismissed Torres Martínez from her job without evaluating her job performance and efficiency.

1850. At no time prior to her dismissal did the Defendants discipline Torres Martínez or issue a reprimand related to the performance of her duties.

1851. The reason that Torres Martínez' job was terminated was because the Defendants knew that she belonged to – or otherwise perceived her to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1852. In the alternative, Defendants terminated her because they knew that she was not an active supporter of the NPP.

1853. As a result of this termination, Defendants have deprived Torres Martínez of the income and benefits by which she sustained herself and her family; have subjected

her to personal pain and suffering; and have punished her in the exercise of her civil rights by terminating her employment – all because she is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and or being a known supporter of the PDP.

1854. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Torres Martínez' exercise of her First Amendment rights and her desires to engage in activities protected by the First Amendment.

### Plaintiff Myriam Torres Ríos

1855. Plaintiff Myriam Torres Ríos ("Torres Ríos") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1856. Plaintiff Torres Ríos commenced working at the Office of the Superintendent in August of 2014 and worked as an Administrative Assistant when she was terminated on February 15, 2017 because of her political affiliation.

1857. Party affiliation is not an appropriate requirement for Torres Ríos' position. At all times relevant and material hereto, Torres Ríos was a public employee whose

position was not a public-policy-making position, or one that required her to perform public-policy functions. Torres Ríos did not perform functions of close proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1858. Torres Ríos engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1859. Torres Ríos' principal duties were administrative and secretarial and provided support to the Auction Office and served as a connection with the Auction Board.

1860. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Torres Ríos is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Torres Ríos avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Torres Ríos voted for the PDP.

1861. Torres Ríos actively participated in the PDP 2016 electoral campaign in support of the candidate for

Governor, David Bernier. She took part in meetings, concentrations, tele marathons, manifestations and the PDP Assembly.

1862. Torres Ríos, in 2013, also worked in the office of Representative Narden Jaime Espinosa and participated in his advance team during the 2016 campaign.

1863. From 1995 to 2006 Torres Ríos worked for Representative Carlos Vizcarrondo who was the President of the House of Representatives for the PDP. Torres Ríos actively campaigned for Carlos Vizcarrondo.

1864. Several of her NPP affiliated co-workers at the Office of the Superintendent remembered her from her days in the House of Representatives.

1865. Torres Ríos also engaged in friendly political discussions with non-PDP co-workers.

1866. These facts, as well as others provided throughout this complaint relating to or tending to show Torres Ríos' political affiliation, preferences involvement and activism, were known to all Defendants in this case (and by their agents and employees of their political trust).

1867. After the elections, the workplace became very tense. Co-workers affiliated to the NPP stopped talking or greeting her in the mornings. Torres Ríos was subjected to continuous comments stating that she was going to be fired

and/or replaced because of her political affiliation to the
PPD.

1868. Torres Ríos was made aware by other co-workers that
Human Resources personnel were reviewing all employees'
files to compile information on employees affiliated to the
PDP.

1869. Defendants terminated Torres Ríos' employment without
warning and without cause, by way of a letter of February
15, 2017. Her termination was effective on the same day.

1870. Defendants terminated and dismissed Torres Ríos from
her job without evaluating her job performance and
efficiency.

1871. At no time prior to her dismissal did the Defendants
discipline Torres Ríos or issue a reprimand related to the
performance of her duties.

1872. The reason that Torres Ríos' job was terminated was
because the Defendants knew that she belonged to – or
otherwise perceived her to be a member of and/or affiliated
with – a political party other than the NPP, particularly
the PDP.

1873. In the alternative, Defendants terminated her because
they knew that she was not an active supporter of the NPP.

1874. As a result of this termination, Defendants have
deprived Torres Ríos of the income and benefits by which

she sustained herself and her family; have subjected her to personal pain and suffering; and have punished her in the exercise of her civil rights by terminating her employment – all because she is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and or being a known supporter of the PDP.

1875.  Defendants' actions have resulted in a chilling effect and have had a compromising effect on Torres Ríos's exercise of her First Amendment rights and her desires to engage in activities protected by the First Amendment.

### Plaintiff Frances Vázquez Rodríguez

1876.  Plaintiff Frances Vázquez Rodríguez ("Vázquez Rodríguez") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1877.  Plaintiff Vázquez Rodríguez commenced working at the Office of the Superintendent in August 16, 2014, as an Internal Security Officer and worked as a security guard when he was terminated on February 15, 2017 because of his political affiliation.

1878.  Party affiliation is not an appropriate requirement for Vázquez Rodríguez's position. At all times relevant and

material hereto, Vázquez Rodríguez was a public employee
whose position was not a public-policy-making position, or
one that required her to perform public-policy functions.
Vázquez Rodríguez did not perform functions of proximity to
policy-making employees, or otherwise have access to
politically sensitive information or confidential
information related to public policy matters.

1879. Vázquez Rodríguez engaged in functions of a routine
nature that required competence and efficient performance,
not political affiliation.

1880. Vázquez Rodríguez's principal duties were to provide
security services, protection and watch for the safety of
all the areas, buildings, equipment and property of the
Office of the Superintendent to preserve and keep these
safe; to watch for the safety and security of all persons
in the Capitol District.

1881. For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) were aware that Vázquez
Rodríguez was an active member of the PDP. It was of common
knowledge at the Office of the Superintendent (and by
Defendants themselves and by their agents and employees of
their political trust) that Vázquez Rodríguez supported the
PDP during the 2016 elections and was believed to be active

during the PDP's electoral campaign for the 2016 elections.
Moreover, these individuals also knew or assumed that
Vázquez Rodríguez had voted for the PDP.

1882.    Vázquez Rodríguez was recommended for the position by
Mr. Miguel Arana, the Human Resources Director for the
Office of the Superintendent designated under PDP party.
This was common knowledge within the Office of the
Superintendent.

1883.    Like some co-workers and the other Plaintiffs, Vázquez
Rodríguez was also seen by Defendants (and their agents and
employees of their political trust), and other NPP-
affiliated employees of the Office of the Superintendent,
in photos and/or videos participating of political events
or issuing political commentary during the 2016 electoral
campaign, including in those posted on public Facebook
accounts.

1884.    Vázquez Rodríguez herself had a public Facebook
account where she was friends with some of his NPP
affiliated co-workers, and posted statuses regarding her
political affiliation.

1885.    Vázquez Rodríguez actively participated in the 2016
political campaign for PDP candidates running in the
Municipality of Trujillo Alto such as: Jose Luis Cruz, PDP
candidate for Mayor; Roberto Rivera, PDP candidate for

Representative; and Pedrito Rodriguez, candidate for PDP Senator. She also supported PDP candidate Javier Aponte in Carolina.

1886.   Vázquez Rodríguez actively participated in the PDP primaries and of many political activities such as: rallies, meetings, the "Abrazo Popular", "Maratón Arrescostao" among others. She also participated with the political campaign activities of the PPD candidate for governor, David Bernier, Senator Eduardo Bahtia, Manuel Natal, Miguel Pereira, among others.

1887.   Vázquez Rodríguez participated in discussions were co-workers expressed affiliation with the PDP.

1888.   These facts, as well as others provided throughout this complaint relating to or tending to show Vázquez Rodríguez's political affiliation were known to all Defendants in this case.

1889.   After Election Day, the working environment became extremely tense and hostile, NPP employees where constantly making comments and mocking PDP employees telling them they would be fired soon, among other remarks.

1890.   After Election Day, Vázquez Rodríguez witnessed a flood of new persons at the Office of the Superintendent and how NPP affiliated employees requested transfers and better positions at the Office of the Superintendent. Mr.

Roy Sanchez and his brother "Billy" Sanchez were continuously watching the employees creating a hostile environment.

1891. After Election Day and during the transition period, the transition team gathered information regarding each security shift and the assigned employees. Employees were cited to a meeting at the "Leopoldo Figueroa" Room were the new Superintendent Wilfredo Ramos and Roy Sanchez assured them that if they did a good job they would not be fired.

1892. Luis Vega the night shift security supervisor, who is identified with the NPP, made comments that Vázquez Rodríguez was going to be fired. After January 2, 2017, Luis Vega was moved to a better position during the day shift.

1893. Vázquez Rodríguez was aware that a list of employees was being compiled by the NPP new administration in order to identify PDP affiliated employees. Mrs. Zuleyka Rivera, the Auxiliary Director of the Human Resources Office and affiliated with the NPP, was removed from her post because she was caught downloading private employee information into a pen-drive. This was witnessed by Brian Medina and Juan Carlos Suare.

1894. After January 2, 2017, Vázquez Rodríguez was asked on several occasions when she had started working at the Office of the Superintendent.

1895. Defendants terminated and dismissed Vázquez Rodríguez from her job without evaluating her job performance or efficiency.

1896. At no time prior to his dismissal did the Defendants discipline Vázquez Rodríguez or issue a reprimand related to the performance of her duties.

1897. Defendants terminated Vázquez Rodríguez's employment without warning and without cause, by way of a letter of February 15, 2017. Her termination was effective on the same day.

1898. The reason that Vázquez Rodríguez's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived her to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1899. In the alternative, Defendants terminated her because they knew that she was not an active supporter of the NPP.

1900. As a result of this termination, Defendants have deprived Vázquez Rodríguez of the income and benefits by which she sustained herself and her family; have subjected her to personal pain and suffering; and have punished her

in the exercise of her civil rights by terminating her
employment - all because she is not a member of or
affiliated with the NPP, and did not vote for the NPP or
for NPP candidates in the 2016 election; and/or is
perceived by Defendants as not being a member of or
affiliated with the NPP and/or not having voted for the NPP
or for the NPP candidates in the 2016 election; and/or
because she is a known supporter of the PDP.

1901.    Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Vázquez Rodríguez's
exercise of her First Amendment rights and her desires to
engage in activities protected by the First Amendment.

### Plaintiff Raquel Vega López

1902.    Plaintiff Raquel Vega López ("Vega López") is of legal
age, a resident of Puerto Rico and a citizen of the United
States of America.

1903.    Plaintiff Vega López began working at the Office of
the Superintendent in September 2014, as an Internal
Security Officer and was performing duties as an
Administrative Assistant when she was dismissed on February
15, 2017, because of her political affiliation with the PDP
and her support of PDP candidates.

1904.    Party affiliation is not an appropriate requirement
for Vega López 's position. At all times relevant and

material hereto, Vega López was a public employee whose position was not a public-policy-making position, or one that required him to perform public-policy functions.

1905. Vega López did not perform functions of proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1906. Vega López engaged in functions of a routine nature that required manual competence and efficient performance, not political affiliation.

1907. Vega López 's principal duties were to perform security services, protection and watch for the preservation and safety of the property, employees and visitors of the Office of the Superintendent and the Capitol District. As an administrative assistant she performed clerical work, answered the telephones, made copies and filed, among other tasks.

1908. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Vega López is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Vega López avidly supported the PDP during the 2016 elections and was active during the PDP's electoral

446

campaign for the 2016 elections. Moreover, Defendants also knew or assumed that Vega López had voted for the PDP.

1909. During the 2016 electoral campaign, Vega López actively participated in the PDP primaries.

1910. Vega Lopez participated of discussions with her co-workers regarding the political campaign where it was known to her coworkers that she favored the PDP party.

1911. Vega López herself had a public Facebook account where she was friends with some of his NPP affiliated co-workers, and liked statuses regarding her political affiliation.

1912. These facts, as well as others provided throughout this complaint relating to or tending to show Vega López's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and their agents and employees of their political trust).

1913. After the 2016 General Elections, the atmosphere in the Office of the Superintendent became tense and uncertainty worried all the PDP affiliated employees.

1914. After the 2016 General Elections, NPP affiliated employees made continuous comments as to the termination of all presumed PDP affiliated employees. Luis Vega, the night shift supervisor, told her not to be concerned because he was going to help her. Luis Vega is NPP affiliate.

1915.   Vega López was concerned because she had received information that there was a list of employees identifying who would be terminated. Edialis Martinez informed her that the lists divided the employees by party affiliation.

1916.   After January 2, 2017, Vega López received pressure from the new administration. Roy Sanchez was continuously giving orders in an effort to "test" her loyalty.

1917.   After January 2, 2017, Vega Lopez was asked by the new Superintendent Wilfredo Ramos and Angel Redondo, to compile a list of employees, their assigned tasks and performance. She prepared a table with all the requested information for about fifty employees.

1918.   On February 14, 2017, the new administration handed the employees cards with regards to Valentine's Day celebrating friendship and flowers. Vega López felt comfort with this act believing it was sincere and that the rumors of being fired were untrue.

1919.   On February 15, 2017, Vega López was given a letter of termination without warning and without cause. The letter was effective immediately.

1920.   As Vega López was handed the letter of termination, she was very nervous and began to cry. They hurried her to sign and leave.

1921.  The letter stated that she was fired because her position was of trust.

1922.  Defendants terminated and dismissed Vega López from her job without evaluating her job performance and efficiency.

1923.  At no time prior to her dismissal did the Defendants discipline Vega López or issue a reprimand related to the performance of her duties.

1924.  The reason that Vega López 's job was terminated was because the Defendants knew that she belonged to – or otherwise perceived her to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1925.  In the alternative, Defendants terminated her because they knew that she was not an active supporter of the NPP.

1926.  As a result of this termination, Defendants have deprived Vega López of the income and benefits by which she sustained herself and her family; have subjected her to personal pain and suffering; and have punished her in the exercise of her civil rights by terminating her employment – all because she is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not

having voted for the NPP or for the NPP candidates in the
2016 election; and/or Defendants knew of her political
affiliation with the PDP.

1927. Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Vega López's exercise
of her First Amendment rights and her desires to engage in
activities protected by the First Amendment.

**Plaintiff Christian E. Vega Villalba**

1928. Plaintiff Christian E. Vega Villalba ("Vega Villalba")
is of legal age, a resident of Puerto Rico and a citizen of
the United States of America.

1929. Plaintiff Vega Villalba commenced working at the
Office of the Superintendent in January 2016, and was a
Pre-Intervention Officer (Oficial de Pre-Intervención) when
he was terminated on February 15, 2017 because of his
political affiliation.

1930. Party affiliation is not an appropriate requirement
for Vega Villalba's position. At all times relevant and
material hereto, Vega Villalba was a public employee whose
position was not a public-policy-making position, or one
that required him to perform public-policy functions. Vega
Villalba did not perform functions of proximity to policy-
making employees, or otherwise have access to politically

sensitive information or confidential information related to public policy matters.

1931.   Vega Villalba engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1932.   Vega Villalba's principal duties were to study and analyze a great variety of accounting and financial transaction in order to verify compliance with operating procedures.

1933.   For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware that Vega Villalba is an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves and by their agents and employees of their political trust) that Vega Villalba avidly supported the PDP during the 2016 elections and was active during the PDP's electoral campaign for the 2016 elections. Moreover, these individuals also knew or assumed that Vega Villalba had voted for the PDP.

1934.   Vega Villalba actively participated of the 2012 and 2016 PDP Electoral Campaign in support of PDP candidates in the Municipality of Carolina. This was common knowledge within the Office of the Superintendent.

1935.   Vega Villalba was recommended for the position at the Office of the Superintendent by Javier Walker a known PDP affiliate and close friend of the Superintendent Javier Vazquez. These facts were known by NPP affiliates at the Office of the Superintendent.

1936.   Like some co-workers and the other Plaintiffs, Vega Villalba was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

1937.   Vega Villalba himself had a public Facebook account where he was friends with some of his NPP affiliated co-workers, and posted or liked statuses regarding his political affiliation.

1938.   Vega Villalba expressed his PDP affiliation during conversations among co-workers that included NPP affiliates.

1939.   Vega Villalba on several occasions wore red clothing expressing his affiliation and support to the PDP.

1940.   These facts, as well as others provided throughout this complaint relating to or tending to show Vega

Villalba's political affiliation, preferences involvement and activism, were known to all Defendants in this case.

1941.  After January 2, 2017, when the new NPP administration created uncertainty and a difficult environment for the employees who were presumed or identified as PDP affiliates.

1942.  Defendants terminated and dismissed Vega Villalba from his job without evaluating his job performance or efficiency.

1943.  At no time prior to his dismissal did the Defendants Vega Villalba or issue a reprimand related to the performance of his duties.

1944.  Defendants terminated Vega Villalba's employment without warning and without cause, by way of a letter of February 15, 2017. His termination was effective on the same day.

1945.  The reason that Vega Villalba's job was terminated was because the Defendants knew that he belonged to – or otherwise perceived him to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1946.  In the alternative, Defendants terminated him because they knew that he was not an active supporter of the NPP.

1947. As a result of this termination, Defendants have deprived Vega Villalba of the income and benefits by which he sustained himself and his family; have subjected him to personal pain and suffering; and have punished him in the exercise of his civil rights by terminating his employment – all because he is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and/or because he is a known supporter of the PDP.

1948. Defendants' actions have resulted in a chilling effect and have had a compromising effect on Vega Villalba's exercise of his First Amendment rights and his desires to engage in activities protected by the First Amendment.

### Plaintiff Kassandra I. Vela Calo

1949. Plaintiff Kassandra I. Vela Calo ("Vela Calo") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1950. Plaintiff Vela Calo commenced working at the Office of the Superintendent in January 2015 and worked as a Human Resources Assistant when she was terminated on February 15, 2017 because of her political affiliation.

454

1951.  Party affiliation is not an appropriate requirement
for Vela Calo's position. At all times relevant and
material hereto, Vela Calo was a public employee whose
position was not a public-policy-making position, or one
that required her to perform public-policy functions. Vela
Calo did not perform functions of close proximity to
policy-making employees, or otherwise have access to
politically sensitive information or confidential
information related to public policy matters.

1952.  Vela Calo engaged in functions of a routine nature
that required competence and efficient performance, not
political affiliation.

1953.  Vela Calo's principal duties were administrative,
clerical and secretarial and provided support to the Human
Resources Office of the Office of the Superintendent.

1954.  For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) were aware that Vela Calo is an
active member of the PDP. It was of common knowledge at the
Office of the Superintendent (and by Defendants themselves)
that Vela Calo avidly supported the PDP during the 2016
elections and was active during the PDP's electoral
campaign for the 2016 elections. Moreover, Defendants also
knew or assumed that Vela Calo voted for the PDP.

1955.  Vela Calo is the daughter of the PDP administration Auxiliary Superintendent and was recruited by PDP administration Superintendent Javier Vazquez.

1956.  Vela Calo actively participated of the PDP electoral campaign including the primaries, rallies, meetings in activities such as the "Abrazo Popular", among others. She also participated with the political campaign activities of the PPD candidates such as: Representative Jaime Perello and Candidate for Governor David Bernier.

1957.  Like some co-workers and the other Plaintiffs, Vela Calo was also seen by Defendants (and their agents and employees of their political trust), and other NPP-affiliated employees of the Office of the Superintendent, in photos and/or videos participating of political events or issuing political commentary during the 2016 electoral campaign, including in those posted on public Facebook accounts.

1958.  Vela Calo herself had a public Facebook account where she was friends with some of his NPP affiliated co-workers.

1959.  These facts, as well as others provided throughout this complaint relating to or tending to show Vela Calo's political affiliation, preferences involvement and activism, were known to all Defendants in this case (and by their agents and employees of their political trust).

1960.  After the elections, the workplace became very tense and hostile. Co-workers affiliated to the NPP stopped talking to her and continuously made comments with regards to the termination of the PDP employees. Vela Calo was subjected to continuous derogatory comments.

1961.  Vela Calo was informed by Ivelisse Sanchez, assistant to Superintendent Wilfredo Ramos for NPP administration, that there were preparing a list to identify when each employee had been recruited to work at the Office of the Superintendent.

1962.  Defendants terminated Vela Calo's employment without warning and without cause, by way of a letter of February 15, 2017. Her termination was effective on the same day.

1963.  Defendants terminated and dismissed Vela Calo from her job without evaluating her job performance and efficiency.

1964.  At no time prior to her dismissal did the Defendants discipline Vela Calo or issue a reprimand related to the performance of her duties.

1965.  The reason that Vela Calo's job was terminated was because the Defendants knew that she belonged to – or otherwise perceived her to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1966.  In the alternative, Defendants terminated her because they knew that she was not an active supporter of the NPP.

1967.  As a result of this termination, Defendants have deprived Vela Calo of the income and benefits by which she sustained herself and her family; have subjected her to personal pain and suffering; and have punished her in the exercise of her civil rights by terminating her employment – all because she is not a member of or affiliated with the NPP, and did not vote for the NPP or for NPP candidates in the 2016 election; and/or is perceived by Defendants as not being a member of or affiliated with the NPP and/or not having voted for the NPP or for the NPP candidates in the 2016 election; and or being a known supporter of the PDP.

1968.  Defendants' actions have resulted in a chilling effect and have had a compromising effect on Vela Calo's exercise of her First Amendment rights and her desires to engage in activities protected by the First Amendment.

### Plaintiff Wanda Vicenti Latorre

1969.  Plaintiff Wanda Vicenti Latorre ("Vicenti Latorre") is of legal age, a resident of Puerto Rico and a citizen of the United States of America.

1970.  Plaintiff Vicenti Latorre commenced working at the Office of the Superintendent in April of 2013 and worked as

a Accounting when she was terminated on February 15, 2017 because of her political affiliation.

1971. Party affiliation is not an appropriate requirement for Vicenti Latorre's position. At all times relevant and material hereto, Vicenti Latorre was a public employee whose position was not a public-policy-making position, or one that required her to perform public-policy functions. Vicenti Latorre did not perform functions of close proximity to policy-making employees, or otherwise have access to politically sensitive information or confidential information related to public policy matters.

1972. Vicenti Latorre engaged in functions of a routine nature that required competence and efficient performance, not political affiliation.

1973. Vicenti Latorre's principal duties were related to the analysis of accounting and financing transactions to verify compliance by the Office of the Superintendent.

1974. For the reasons set forth in this Complaint, all Defendants (and employees of the Office of the Superintendent in general) were aware and presumed that Vicenti Latorre was an active member of the PDP. It was of common knowledge at the Office of the Superintendent (and by Defendants themselves) that Vicenti Latorre supported the PDP during the 2016 elections and had been recommended

for the position at the Office of the Superintendent by the
Municipality of Carolina that has a PDP affiliated Major
Moreover, Defendants also knew or assumed that Vicenti
Latorre voted for the PDP.

1975.  These facts, as well as others provided throughout
this complaint relating to or tending to show Vicenti
Latorre's political affiliation, presumed preferences and
involvement, were known to all Defendants in this case (and
by their agents and employees of their political trust).

1976.  Vicenti Latorre participated of multiple activities
together with the President of the House of
Representatives, Jaime Perello.

1977.  Like some co-workers and the other Plaintiffs, Vicenti
Latorre was also seen by Defendants (and their agents and
employees of their political trust), and other NPP-
affiliated employees of the Office of the Superintendent,
in photos and/or videos participating of events or issuing
political commentary during the 2016 electoral campaign,
including in those posted on public Facebook accounts.

1978.  Vicenti Latorre herself had a public Facebook account
where she was friends with some of his NPP affiliated co-
workers, and posted statuses regarding her political
affiliation.

1979. Defendants terminated Vicenti Latorre's employment without warning and without cause, by way of a letter of February 15, 2017. Her termination was effective on the same day.

1980. Defendants terminated and dismissed Vicenti Latorre from her job without evaluating her job performance and efficiency.

1981. At no time prior to her dismissal did the Defendants discipline Vicenti Latorre or issue a reprimand related to the performance of her duties.

1982. The reason that Vicenti Latorre's job was terminated was because the Defendants knew that she belonged to – or otherwise perceived her to be a member of and/or affiliated with – a political party other than the NPP, particularly the PDP.

1983. In the alternative, Defendants terminated her because they knew that she was not an active supporter of the NPP.

1984. As a result of this termination, Defendants have deprived Vicenti Latorre of the income and benefits by which she sustained herself and her family; have subjected her to personal pain and suffering; and have punished her in the exercise of her civil rights by terminating her employment – all because she is not a member of or affiliated with the NPP, and did not vote for the NPP or

461

for NPP candidates in the 2016 election; and/or is
perceived by Defendants as not being a member of or
affiliated with the NPP and/or not having voted for the NPP
or for the NPP candidates in the 2016 election; and or
being a known supporter of the PDP.

1985. Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Vicenti Latorre's
exercise of her First Amendment rights and her desires to
engage in activities protected by the First Amendment.

***Plaintiff Javier Walker Carraquillo***

1986. Plaintiff Javier Walker Carraquillo ("Walker
Carraquillo") is of legal age, a resident of Puerto Rico
and a citizen of the United States of America.

1987. Plaintiff Walker Carraquillo commenced working at the
Office of the Superintendent in January 2013, and was a
General Services Coordinator when he was terminated on
February 15, 2017 because of his political affiliation.

1988. Party affiliation is not an appropriate requirement
for Walker Carraquillo's position. At all times relevant
and material hereto, Walker Carraquillo was a public
employee whose position was not a public-policy-making
position, or one that required him to perform public-policy
functions. Walker Carraquillo did not perform functions of
proximity to policy-making employees, or otherwise have

access to politically sensitive information or confidential
information related to public policy matters.

1989.  Walker Carraquillo engaged in functions of a routine
nature that required competence and efficient performance,
not political affiliation.

1990.  Walker Carraquillo's principal duties were to
coordinate and develop the different activities related to
the general services of the Office of the Superintendent.

1991.  For the reasons set forth in this Complaint, all
Defendants (and employees of the Office of the
Superintendent in general) were aware that Walker
Carraquillo is an active member of the PDP. It was of
common knowledge at the Office of the Superintendent (and
by Defendants themselves and by their agents and employees
of their political trust) that Walker Carraquillo avidly
supported the PDP during the 2016 elections and was active
during the PDP's electoral campaign for the 2016 elections.
Moreover, these individuals also knew or assumed that
Rodríguez Concepción had voted for the PDP.

1992.  Walker Carraquillo actively participated of the 2016
PDP primaries in support of PDP candidates.

1993.  Walker Carrasquillo actively participated of the 2016
Electoral Campaign as a PDP affiliate in support of PDP
candidates such as Jaime Perello.

1994.   Walker Carrasquillo as a PDP affiliate was in charge
of organizing PDP affiliates in his area in order to
participate of PDP political activities. This was common
knowledge within the Office of the Superintendent.

1995.   Walker Carrasquillo wore red clothing on occasions
that identified him as a PDP affiliate at the Office of the
Superintendent.

1996.   Walker Carrasquillo discussed politics with fellow co-
workers affiliated to the NPP and expressed his support for
the PDP and PDP candidates.

1997.   Like some co-workers and the other Plaintiffs, Walker
Carraquillo was also seen by Defendants (and their agents
and employees of their political trust), and other NPP-
affiliated employees of the Office of the Superintendent,
in photos and/or videos participating of political events
or issuing political commentary during the 2016 electoral
campaign, including in those posted on public Facebook
accounts.

1998.   Walker Carraquillo himself had a public Facebook
account where he was friends with some of his NPP
affiliated co-workers, and posted or liked statuses
regarding his political affiliation.

1999.   These facts, as well as others provided throughout
this complaint relating to or tending to show Walker

Carraquillo's political affiliation, preferences involvement and activism, were known to all Defendants in this case.

2000. After January 2, 2017, when the new NPP administration created uncertainty and a difficult environment for the employees who were presumed or identified as PDP affiliates.

2001. After January 2, 2017, Walker Carrasquillo was removed from his office by the new NPP administration and no work station was assigned so he had no desk or chair to work from. Also, he was removed from his assigned parking spot.

2002. After January 2, 2017, the working environment became hostile and uncertain. Walker Carrasquillo received continuous derogatory comments from NPP affiliate co-workers. Miguel Flores informed him that he was being "surveilled" by NPP affiliates and that he was going to be fired.

2003. Miguel Flores informed Walker Carrasquillo that he had seen his name on "the list" and he was going to be fired.

2004. Walker Carrasquillo was asked on several occasions when he had started to work at the Office of the Superintendent.

2005.   Defendants terminated and dismissed Walker Carraquillo
   from his job without evaluating his job performance or
   efficiency.

2006.   At no time prior to his dismissal did the Defendants
   Walker Carraquillo or issue a reprimand related to the
   performance of his duties.

2007.   Defendants terminated Walker Carraquillo's employment
   without warning and without cause, by way of a letter of
   February 15, 2017. His termination was effective on the
   same day.

2008.   The reason that Walker Carraquillo's job was
   terminated was because the Defendants knew that he belonged
   to – or otherwise perceived him to be a member of and/or
   affiliated with – a political party other than the NPP,
   particularly the PDP.

2009.   In the alternative, Defendants terminated him because
   they knew that he was not an active supporter of the NPP.

2010.   As a result of this termination, Defendants have
   deprived Walker Carraquillo of the income and benefits by
   which he sustained himself and his family; have subjected
   him to personal pain and suffering; and have punished him
   in the exercise of his civil rights by terminating his
   employment – all because he is not a member of or
   affiliated with the NPP, and did not vote for the NPP or

for NPP candidates in the 2016 election; and/or is
perceived by Defendants as not being a member of or
affiliated with the NPP and/or not having voted for the NPP
or for the NPP candidates in the 2016 election; and/or
because he is a known supporter of the PDP.

2011. Defendants' actions have resulted in a chilling effect
and have had a compromising effect on Walker Carrasquillo's
exercise of his First Amendment rights and his desires to
engage in activities protected by the First Amendment.

## CAUSES OF ACTION

### I. FIRST AMENDMENT VIOLATIONS

#### (POLITICAL DISCRIMINATION AND RETALIATION)

2012. Plaintiffs incorporate by reference all previous
paragraphs contained in this Complaint.

2013. The First Amendment of the United States Constitution
guarantees the right to freedom of speech, freedom of
expression, the right to assemble and to petition the
Government for redress, and the right to vote and to
affiliate with a political party of one's choosing.

2014. It is well established that government bodies or
officials are forbidden by the First Amendment from taking
adverse action against public employees on the basis of
political affiliation, unless political affiliation is an

appropriate requirement of the employment. Similarly the First Amendment protects public employees from suffering adverse employment consequences in retaliation for engaging in political activity unless political affiliation is an appropriate requirement of the employment.

2015. Moreover, dismissals, demotions, denials of promotions, transfers and rehires constitute actionable adverse employment actions protected by the First Amendment. Plaintiffs are entitled to the protection of the provisions of the First Amendment of the U.S. Constitution because their termination was due to political discrimination for their not belonging to Defendants' political party.

2016. Political activity, political affiliation, political beliefs, the right of political association and the right to vote are also matters of public concern.

2017. It is clear that the Plaintiffs' First Amendment speech and activities were a substantial or motivating factor in the adverse employment actions complained of herein. By subjecting Plaintiffs to adverse employment actions and/or retaliating against them on the basis of their political affiliation or beliefs, and/or for engaging in political activity and/or based on the Defendants' perception of their political affiliation of beliefs,

Defendants deprived Plaintiffs of their First Amendment
Rights.

**II. FOURTEENTH AMENDMENT VIOLATIONS**

    **(DUE PROCESS VIOLATIONS)**

2018. Plaintiffs incorporate by reference all previous
paragraphs contained in this Complaint.

2019. The provisions of the First and the Fourteenth
Amendments of the U.S. Constitution, provide, inter alia,
that an employee who is discharged, or in any other manner
discriminated against for political reasons shall be
entitled to all relief necessary to make him whole, and
that he should be afforded due process of law.

2020. Plaintiffs are entitled to the protection of the
provisions of the Fourteenth Amendment of the U.S.
Constitution because their termination constituted a
deprivation of their proprietary rights without due process
of law by a state or a state actor.

2021. For the purposes of the Fourteenth Amendment, Puerto
Rico is considered as a State.

**III. VIOLATIONS TO CONSTITUTION AND LAWS OF THE
COMMONWEALTH OF PUERTO RICO**

2022. Plaintiffs incorporate by reference all previous
paragraphs contained in this Complaint.

2023. Defendants' actions also constitute a violation of Plaintiffs' rights secured by Article II, Sections 1, 2, 4, 6 and/or 7 of the Puerto Rico Constitution.

2024. Defendants' actions also constitute violations of and Articles 1802 and 1803 of the Civil Code, §5141-5142 of Title 31.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs request the following relief, jointly and severally against all Defendants:

2025. That this Court determines and declares that the actions by all Defendants were in violation of the Constitution and laws of the United States and of Puerto Rico;

2026. Compensatory damages and punitive damages in excess of $117,000,000.00, which request for compensation is made up of the following amounts:

a. An amount in excess of $1,000,000.00 for each plaintiff, for a total of $78,000,000.00 in compensatory damages for the harm done to the Plaintiffs, due to the actions taken against them;

b. Punitive damages in excess of $500,000.00 for each plaintiff, for a total of $39,000,000.00, due to the malicious and wanton nature of the violations of the

Plaintiffs' constitutional rights by Defendants alleged herein.

c. Equitable relief in the form of a preliminary and a permanent injunction ordering: a) Defendants to reinstate Plaintiffs to their positions, with all corresponding privileges and benefits; b) back pay retroactive to February 15th, 2017; and, c) Defendants to refrain from further engaging in adverse employment action on the basis of the Plaintiffs' political affiliations and beliefs.

2027. Attorneys' fees, costs and litigation expenses incurred in connection to this action pursuant to, inter alia, 42 U.S.C. §1988, and other applicable statutes.

2028. All applicable interest, including pre- and post-judgment interest.

2029. That the Court retain jurisdiction over this action in order to ensure compliance with any decree issued by this Court.

2030. Plaintiffs demand trial by jury.

2031. APlaintiffs also ask for any other relief the Court may deem appropriate.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 8th day of June, 2017.


/s/David A. Carrión Baralt
David Carrión Baralt Law
USDC No: 207214
PO Box 364463
San Juan, PR 00936-4463
Tel. (787) 758-5050
Fax (787) 296-3434
Email: davidcarrionb@aol.com