# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>    Debtors.[1] | PROMESA Title III<br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>    Debtor. | Case No. 17-BK-3567-LTS |
| ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION,<br><br>    Movants,<br><br>v. | **Re: Case No. 17-BK-3567-LTS, ECF No. 633, 673, 680, 778.** |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY,

     Respondent.

**SUR-REPLY OF
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO IN OPPOSITION TO MOTION OF ASSURED GUARANTY
CORP., ASSURED GUARANTY MUNICIPAL CORP., AMBAC ASSURANCE
CORPORATION, NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION,
AND FINANCIAL GUARANTY INSURANCE COMPANY FOR RELIEF FROM
<u>THE AUTOMATIC STAY, OR, IN THE ALTERNATIVE, ADEQUATE PROTECTION</u>**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................. 1

SUR-REPLY ........................................................................................................................ 4

    I.    MOVANTS' FACTUAL ARGUMENTS CANNOT CHANGE THE PLAIN MEANING
OF THE STATUTES AND CONTRACTS LIMITING THEIR PROPERTY INTERESTS TO
THE PLEDGED FUNDS AT HTA ....................................................................................... 4

        A.   Accounting Principles and Administrative Documents Cannot Change the Meaning of
the HTA Allocable Revenue Statutes and HTA Bond Resolutions ........................................ 4

        B.   Movants' Alleged Facts Do Not Undermine the Oversight Board's Arguments ........... 7

    II.   THE FACTUAL RECORD DOES NOT SUPPORT MOVANTS ................................. 10

        A.   Movants Misrepresented the Facts, Which Are Inconsistent with Movants' Arguments
10

        B.   The Facts Do Not Support Movants' Allegations They Have a Constructive Trust .... 24

        C.   The Facts Are Inconsistent With Movants' Claim They Have A Resulting Trust ....... 27

        D.   The HTA Allocable Revenues Are Not Made Available to HTA Until Received by
HTA, and Cannot Be Earlier Pledged by HTA .................................................................. 28

        E.   The Factual Record Does Not Assist Movants' Arguments They Have a Statutory Lien
29

        F.   Movants Cannot Bootstrap The Facts Into Their Preemption Argument .................... 30

CONCLUSION .................................................................................................................. 31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio
v. Flores Galrza,*
484 F.3d 1 (1st Cir. 2007) ................................................................................20

*Bexar Cty. Hosp. Dist. v. Crosby,*
160 Tex. 116 (Tex. 1959) ................................................................................24

*Brueseqitz v. Wyeth LLC,*
562 U.S. 223 (2011) ..........................................................................................7

*City of Wilmington v. Fraternal Order of Police Lodge 1,*
2015 WL 4035616 (Del. Ch. June 30, 2015) ....................................................6

*Commonwealth Ins. Co. v. Casellas,*
3 P.R. Offic. Trans. 750 (1975) ........................................................................5

*Cope v. Childers,*
170 P.2d 210 (Okla. 1946) ..............................................................................15

*County of Orange v. Merrill Lynch & Co. (In re County of Orange),*
191 B.R. 1005 (Bankr. C.D. Cal. 1996) ..........................................................18

*Distral Energy Corp. v. Michigan Boiler & Eng'g Co. (In re Michigan Boiler &
Eng'g Co.),*
171 B.R. 565 (Bankr. E.D. Mich. 1993) ..........................................................18

*Ferris, Baker Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.),*
371 F.3d 397 (8th Cir. 2004) ..........................................................................26

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Andalusian Global Designated
Activity Co. (In re Fin. Oversight & Mgmt. Bd.),*
948 F.3d 457 (1st Cir. 2020) ..........................................................................16

*First Federal of Michigan v. Barrow,*
878 F.2d 912 (6th Cir. 1989) ..........................................................................26

*First Nat'l Bank of Boston v. Maine Turnpike Auth.,*
136 A.2d 699 (Me. 1957) ................................................................................17

*Fleet Nat'l Bank v. Valente (In re Valente),*
360 F.3d 256 (1st Cir. 2004) ..........................................................................27

ii

*Fletcher v. Peck*,
10 U.S. 87 (1810) ...................................................................................................17

*Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R.*,
939 F.3d 340 (1st Cir. 2019) .................................................................................27

*Hearts with Haiti, Inc. v. Kendrick*,
2015 U.S. Dist. LEXIS 86211 (D. Maine Jul. 2, 2015) .........................................8

*Hernandez Torres v. Hernandez Colon*,
129 D.P.R. 824 (P.R. 1992) ..................................................................................24

*Howard v. Burlington Northern & Santa Fe Ry. (In re Bangor & Aroostook R.R.)*,
320 B.R. 226 (Bankr. D. Maine 2005) ..................................................................26

*In re City of Columbia Falls, Mont., Special Imp. Dist. No. 25*,
143 B.R. 750 (Bankr. D. Mont. 1992) ...................................................................19

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
361 F. Supp. 3d 203 (D.P.R. 2019) .......................................................................17

*In re Fonseca*,
534 B.R. 261 (Bankr. D.P.R. 2015), *aff'd*, 542 B.R. 628 (B.A.P. 1st Cir. 2015) ...................29

*In re Howard's Alliance Corp.*,
874 F.2d 88 (2d Cir. 1989) ....................................................................................25

*In re Las Vegas Monorail Co.*,
429 B.R. 317 (Bankr. D. Nev. 2010) .....................................................................11

*In re MarketXT Holdings Corp.*,
2007 WL 680763 (Bankr. S.D.N.Y. Mar. 1, 2007) .................................................6

*In re Morales Travel Agency*,
667 F.2d 1069 (1st Cir. 1981) ...............................................................................21

*In re Plaza Resort at Palmas, Inc.*,
741 F.3d 269 (1st Cir. 2014) ...................................................................................5

*Lindsey v. Tacoma-Pierce Cty. Health Dep't*,
195 F.3d 1065 (9th Cir. 1999) ...............................................................................10

*Luperena v. P.R. Transp. Auth.*,
79 D.P.R. 464, 1956 PR Sup. LEXIS 186 (P.R. 1956)..........................................24

*Luperena v. Transp. Auth.*, 79 D.P.R. 464 (1956) .......................................................25

*Midland Nat'l Life Ins. Co. v. Citizens & Southern Nat'l Bank*,
641 F. Supp. 516 (M.D. Ga. 1986) ..........................................................................6

*New Jersey Sports & Exposition Auth. v. McCrane*,
    61 N.J. 1 (1972) ......................................................................................................24

*Pittman v. Chicago Bd. of Educ.*,
    64 F.3d 1098 (7th Cir. 1995) ...................................................................................5

*Porrata Doria v. Fajardo Sugar Co.*,
    57 D.P.R. 628 (1940) ..............................................................................................25

*Reed & Reed, Inc. v. Weeks Marine, Inc.*,
    431 F.3d 384 (1st Cir. 2005) .....................................................................................6

*Regions Bank v. Parish of Caddo*,
    978 So.2d 494 (La. Ct. App. 2008) ..........................................................................6

*Rentas v. Claudio (In re Garcia)*,
    484 B.R. 1 (Bankr. D.P.R. 2012) .......................................................................24, 25

*Rice v. City of Milwaukee*,
    100 Wis. 516 (1898) ...............................................................................................17

*Roig Commercial Bank v. Buscaglia Tes.*,
    74 P.R. 986 (1953) ................................................................................................5, 7

*Rossy v. Superior Court*,
    80 D.P.R. 729 (P.R. 1958) ......................................................................................20

*San Diegans for Open Gov't v. City of San Diego*,
    242 Cal. App. 4th 416 (2015) ...................................................................................6

*Saratoga Harness Racing Ass'n v. Agric. & N.Y. State Horse Breeding Dev.*
    *Fund*,
    22 N.Y. 2d 119 (N.Y. 1968) ...................................................................................24

*Shattuck v. Kincaid*,
    49 P. 758 (Or. 1897) ...............................................................................................15

*State ex rel. Spink v. Kemp*,
    365 Mo. 368 (Mo. 1955)........................................................................................6, 7

*Steslow v. Citicorp Mortg., Inc. (In re Steslow)*,
    225 B.R. 883 (Bankr. E.D. Pa. 1998) .....................................................................11

*SX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*,
    654 F.3d 276 (2d Cir. 2011)....................................................................................26

*United Shoe Workers v. Bedell*,
    506 F.2d 174 (D.C. Cir. 1974) .................................................................................6

iv

*United States v. Pleau*,
   662 F.3d 1 (1st Cir. 2011), *vacated on other grounds*, 663 F.3d 542 (1st Cir.
   2011) ........................................................................................................................21

*Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re Fin.
   Oversight & Mgmt. Bd. for P.R.)*,
   945 F.3d 3 (1st Cir. 2019) .......................................................................................30

*Von Hoffman v. City of Quincy*,
   71 U.S. 535 (1866) ...................................................................................................17

*W. Air Lines, Inc. v. Bd. of Equalization of State of S.D.*,
   480 U.S. 123 (1987) ...................................................................................................7

*Whitmore Union Elementary Sch. Dist. v. Cty. of Shasta*,
   104 Cal. Rptr. 2d 227 (Cal. Ct. App. 2001) ..........................................................6, 7

## STATUTES

3 L.P.R.A. § 283b(a) ......................................................................................................15

9 L.P.R.A. § 2002 .........................................................................................................22

9 L.P.R.A. § 2004(l) ................................................................................................27, 28

9 L.P.R.A. § 2015 ...............................................................................................1, 25, 29

9 L.P.R.A. § 2021 ...........................................................................................................9

9 L.P.R.A. § 5681 .................................................................................................9, 10, 11

13 L.P.R.A. § 12 .............................................................................................................9

13 L.P.R.A. § 31751 ............................................................................................. passim

26 L.P.R.A. § 8055 .......................................................................................................20

26 L.P.R.A. § 8055(c)(4) ..............................................................................................20

26 L.P.R.A. § 8055(j) ....................................................................................................20

26 L.P.R.A. § 8055(l) ....................................................................................................20

PROMESA § 202 ..........................................................................................................11

## OTHER AUTHORITIES

P.R. Const. Article VI, § 2 ............................................................................................2, 9

P.R. Const. Article VI, § 8 ...............................................................................16, 21, 25

Restatement (Third) of Suretyship & Guaranty § 1(1) (Am. Law. Inst. 1996) ............................29

Restatement (Second) of Trusts § 76 (1959) ...............................................................................26

The Debtors,[2] by the Oversight Board, respectfully submit this sur-reply (the "Sur-Reply") to Movants' reply [ECF No. 778] (the "Reply").[3]  The Oversight Board respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Movants want to seize the revenues collected annually by the Commonwealth which prior to PROMESA's enactment were then appropriated to HTA for its corporate purposes subject to the Commonwealth's retention power.  Movants contend those revenues are either not the Commonwealth's property, or are Commonwealth property subject to some type of property interest of Movants, for which stay relief should be granted so Movants can seize them.  In their Reply, Movants now ask the Court to make inferences from accounting entries made after the Commonwealth receives the revenues and channels them into various accounts.  In two briefs totaling over 125 pages, Movants have been unable to point to any deal document—credit agreement, security agreement, financing statement, or offering statement for billions of dollars of HTA Bond debt—showing the Commonwealth collateralized the bonds with its property, was liable for the debt, or transferred to Movants or HTA the Commonwealth's rights to the revenues.  That is the unsurprising consequence of the Commonwealth having enacted statutes negating its liability on the HTA Bonds.  In addition, the documents and statutes prove beyond dispute that: (1) the Commonwealth never entered into a security agreement granting security interests in its property (or any property) collateralizing the HTA Bonds for which it was not liable; (2) no financing statement was ever filed to seek to perfect any security interest in Commonwealth assets securing the HTA Bonds; (3) none of the official statements disclosed Commonwealth property was pledged or held in trust for HTA Bondholders; (4) Movants have no agreement granting them control over the Commonwealth's

---

[2]  Capitalized terms used but not defined herein shall have the meaning given them in the Oversight Board's opposition [Case No. 17-BK-3567-LTS, ECF No. 680] (the "Opposition").

[3]  The fact the Sur-Reply does not address all arguments contained in the Reply should not be construed as waiver or concession of any argument.  The Oversight Board reserves all rights.

deposit accounts (which control is necessary to perfect a security interest); (5) the HTA Allocable Revenue Statutes do not provide the HTA Allocable Revenues are held in trust; (6) the HTA Allocable Revenue Statutes do not grant any statutory lien; (7) the HTA Allocable Revenue Statutes were enacted by a prior legislature and only provide for transfers of the HTA Allocable Revenues to HTA for "its corporate purposes"; and (8) the HTA Allocable Revenues are levied pursuant to the Commonwealth's inalienable taxing power (P.R. Const. Art. VI, § 2) and are its available resources subject to retention.

2.      Unable to find their alleged property rights in any binding legal documents, Movants newly argue on reply that accounting entries made by the Commonwealth evince or create property rights retroactively as of the time the Commonwealth receives revenues.  Movants offer no authority using accounting designation to create retroactive and present property rights.  This is not surprising because the argument makes no sense.  Movants are grasping at snippets of evidence to claim legal rights to hundreds of millions of dollars where those rights cannot be found in the governing documents.  The Commonwealth's accounting for the revenues after they are deposited says nothing about who owned them when the Commonwealth received them and before they were deposited.

3.      Moreover, as explained in more detail below, Movants' accounting expert does not opine otherwise.  He expresses no opinion as to ownership of any revenues before or after they are deposited into a bank account. Financial statements report the revenues in the account as of a certain date, not as of a prior time.   While Movants and their expert claim victory based on the Commonwealth's use of the terms "fund" and "restricted," their expert admits these terms do not in and of themselves denote an ownership interest.  Holder Report ¶ 4.  A "fund" refers to monies set aside to carry out a specific activity or to achieve certain objectives pursuant to a law, regulation, restriction, or limitation.  *Id.*  And, "restricted" refers to money constrained by, among other things, creditors' debt covenants, and laws such as the HTA Allocable Revenue Statutes.  Labeling money

2

as "restricted" when there is a contractual or statutory obligation to deploy them for a specific purpose has no impact on the existence or nonexistence of any property rights, and no impact on their prior ownership or encumbrance when the Commonwealth receives them. Thus, Movants' reference to accounting entries and their expert report are irrelevant to property rights. Moreover, Movants' arguments fly in the face of consistent jurisprudence holding that (i) administrative practice (whether in the form of accounting practice or otherwise) cannot alter a statute's or contract's plain wording, which here give Movants none of the rights they claim, and (ii) accounting treatment does not alter legal ownership.

4.      Movants' expert also admits he was instructed to assume "PROMESA does not preempt the Puerto Rico excise tax or other relevant statutes." Holder Report ¶ 8, n. 15. Given this Court's and the First Circuit's rulings that PROMESA preempts legislative appropriations, and the HTA Allocable Revenue Statutes appropriate Commonwealth money, the expert report cannot be relied on for anything because it is based on an erroneous assumption. Movants also ignore that the Commonwealth's money management system cannot confer property rights because it is self-created and voluntary, and subject to change at any time. When an employer wires an employee's salary into her bank account and, in advance of receipt, the employee has instructed the bank to use the money to pay her utility bills, the consumer does not lose ownership of her salary by providing those instructions. The salary belongs to the employee who can change the instructions at any time. There is simply no legal principle that converts the Commonwealth's disclosure of its intended or required use of funds into an ownership transfer or a security interest. The Commonwealth's obligation to transfer money to HTA was an unsecured obligation at most, and accounting methods do nothing to change that immutable fact.

5.      Finally, Movants materially mischaracterize the facts.[4]  For instance, Movants claim HTA had independent authority to withdraw HTA Allocable Revenues from Commonwealth accounts.  They omit that the documents upon which they rely prove the revenues could not be disbursed without Commonwealth authorization.  But again, it is irrelevant as the Commonwealth decides in the first instance where to put the revenues and whether HTA at one point could have independent access to the money.   Movants suggest "Fund 278" is a "segregated" pot of money, in which money is held, or out of which money can be conveyed.  Movants are contradicted by the very documents and testimony they cite.  *Infra* Section II.A.  The facts are consistent with the statutory requirements: the Commonwealth owns the HTA Allocable Revenues until it transfers them to HTA.

### SUR-REPLY

**I.    MOVANTS' FACTUAL ARGUMENTS CANNOT CHANGE THE PLAIN MEANING OF THE STATUTES AND CONTRACTS LIMITING THEIR PROPERTY INTERESTS TO THE PLEDGED FUNDS AT HTA**

**A. Accounting Principles and Administrative Documents Cannot Change the Meaning of the HTA Allocable Revenue Statutes and HTA Bond Resolutions**

6.      In their Motion, Movants argued the HTA Allocable Revenue Statutes gave them a litany of different property interests never mentioned in the HTA Allocable Revenue Statutes, HTA Bond Resolutions or the official statements.  The Opposition demonstrated Movants are wrong.  The HTA Allocable Revenue Statutes do not give Movants any property interest in the HTA Allocable Revenues (Opp. ¶¶ 83-103)—they create an annual appropriation, subject to retention, of the HTA Allocable Revenues to HTA for HTA's "corporate purposes."  Opp. ¶¶ 3, 5-6, 15, 41 n. 16, 67, 90. The only documents granting Movants property interests are the HTA Bond Resolutions adopted by HTA, not the Commonwealth, and they grant a security interest only in HTA Allocable Revenues both received by HTA and then deposited in the Pledged Funds (which are deposit accounts held by

---

[4]  This Sur-Reply does not cite to a single document not cited by Movants in the Reply.

the Fiscal Agent).  Opp. ¶¶ 70-82.   As the HTA Allocable Revenue Statutes appropriate Commonwealth money outside an Oversight Board certified budget, they are preempted by PROMESA.  Opp. ¶¶ 83-88.

7.     In the Reply, Movants pivot from the statutes themselves to the Commonwealth's accounting practices to argue the statutes mean something other than what they say.  Citing various Commonwealth accounting documents and records, Movants argue "the Commonwealth knew the Excise Taxes to be HTA's property" and "took steps to ensure that it protected that property interest."  *See, e.g.,* Reply ¶ 23.  Movants argue the Commonwealth's "course of performance" should color the statute's construction.  *See, e.g.,* Reply ¶¶ 19, 23.  But Movants nowhere explain why the Commonwealth's deposit of the HTA Allocable Revenues in an account Movants wrongly contend HTA could access is inconsistent with the Commonwealth's ownership of the HTA Allocable Revenues and intent to carry out its obligation to transfer the monies to HTA when the Commonwealth was paying all its obligations in full.  Movants ask the Court to make inferences from the way the Commonwealth accounted for the money.   In doing so, Movants ignore that the Commonwealth's decision to transfer HTA Allocable Revenues to HTA to satisfy its unsecured obligation to appropriate money does not negate the Commonwealth's ownership.  Movants give no explanation why determinations to no longer transfer the revenues do not demonstrate Commonwealth ownership.

8.     The binding legal documents are clear and unambiguous.  Movants have not identified one document stating HTA or HTA Bondholders have a lien against the HTA Allocable Revenues, or a trust interest or any other form of property interest in them.  Extrinsic accounting documents and practices cannot supersede the plain text of the governing legal documents.[5]

---

[5]   *In re Plaza Resort at Palmas, Inc.*, 741 F.3d 269, 274 (1st Cir. 2014) ("Statutory construction in Puerto Rico begins with the text of the underlying statute, and ends there as well if the text is unambiguous.").

9.      Even assuming the applicable statutes were ambiguous (and Movants do not contend they are), Movants' arguments make no sense.  While "course of performance may be instructive in contract interpretation," Reply ¶ 23, "[i]t has long been understood that statutes are not contracts."[6] Movants cite no decisions construing statutes based on performance because none exist.[7]  Movants rely on *Reed & Reed, Inc. v. Weeks Marine, Inc.*, 431 F.3d 384, 388 (1st Cir. 2005), but that case holds only that course of performance may be relevant to contract interpretation.  431 F.3d at 388.  There is no analogous rule for statutes, because there are no "parties" who "perform" under them.  It "is the intent of the legislature and not of any other 'party' which is decisive in [statutory] construction."[8]  Nor do Movants cite any cases demonstrating a government's accounting practices and documents can define or grant property rights where they do not otherwise exist.[9]

10.      Movants' authority (Reply ¶ 23, n. 33) suggesting fund accounting is commonplace does not speak to property rights.[10]  Indeed, Movants' cases prove the point.  In *State ex rel. Spink v.*

---

[6]  *Pittman v. Chicago Bd. of Educ.*, 64 F.3d 1098, 1104 (7th Cir. 1995).

[7]  Movants' authority relating to administrative practice does not support them.  *See* Reply ¶ 19, n. 18.  According to one case, the Debtors' purported practices cannot alter the clear meaning of the HTA Allocable Revenue Statutes.  *Roig Commercial Bank v. Buscaglia Tes.*, 74 P.R. 986, 1001-02 (1953).  *Commonwealth Ins. Co. v. Casellas*, 3 P.R. Offic. Trans. 750, 756 (1975), similarly does not avail them.  There, the Puerto Rico Supreme Court held the legislature's decision, "with full knowledge of the existing administrative practice," not to alter a statute's construction when amending the statute, demonstrated the legislature intended to retain the existing practice.  The court did not rely on administrative practice to construe the statute, but looked to the legislature's conduct as evidence of its intent.  Similarly, in *United Shoe Workers v. Bedell*, 506 F.2d 174, 185 (D.C. Cir. 1974), Congress amended an act and specifically rejected an amendment that would have altered decades of administrative practice interpreting that statute.  The court held Congress's decision essentially endorsed the Tariff Commission's interpretation of the statute made contemporaneously with the enactment of the statute.  Here, there is no indication that the Puerto Rico legislature was even aware of, let alone endorsed, the Commonwealth's accounting processes in connection with the HTA Allocable Revenue Statutes.

[8]  *Midland Nat'l Life Ins. Co. v. Citizens & Southern Nat'l Bank*, 641 F. Supp. 516, 520 (M.D. Ga. 1986) (citation omitted).

[9]  *See, e.g.*, *San Diegans for Open Gov't v. City of San Diego*, 242 Cal. App. 4th 416, 439 (2015) (holding "a public agency's adherence to GASB and GAAP guidelines does not override California law or delineate the legal rights and responsibilities of this state's public agencies"); *see also In re MarketXT Holdings Corp.*, 2007 WL 680763, at *4 (Bankr. S.D.N.Y. Mar. 1, 2007) ("the manner in which … accountants treat[] transactions is not determinative" of "dominion and ownership."); *Regions Bank v. Parish of Caddo*, 978 So.2d 494, 496 (La. Ct. App. 2008) (affirming court decision based in part on expert testimony that "the proprietary fund accounting method did not confer ownership of public funds…."); *Delaware v. New York*, 507 U.S. 490, 502 (1993) (stating "bookkeeping phenomena" do not determine property rights).

[10]  Nor do Movants explain how the particular method of accounting some other governmental entity uses, or definitions that entity applies, are relevant to the particular accounting methodologies and defined terms used by the Commonwealth. For example, the definition of "fund" that Movants cite from *Whitmore Union Elementary Sch. Dist. v. Cty. of Shasta*, 104 Cal. Rptr. 2d 227, 231 (Cal. Ct. App. 2001), is merely one set forth in the California School Accounting Manual, approved

*Kemp*, 365 Mo. 368, 381 (Mo. 1955), Kansas City argued certain funds were not part of the city's "general revenues," relying in part on the city's "accounting practice" and budget. *Id.* at 374-79, 388. The Missouri Supreme Court held instead that moneys must be classified based on the requirements of "express or clearly implied constitutional or statutory authority," *id.* at 381, and then reclassified certain revenues into the city's "general revenues" based solely on the requirements of the governing statutes, overriding "accounting practices." *Id.* at 388.

11.    Movants' attempt to characterize the Commonwealth's accounting records as "administrative practice," Reply ¶ 19, n. 18, is irrelevant. The Commonwealth's accounting methods cannot enlarge or inform the rights, if any, granted by the HTA Allocable Revenue Statutes.[11] Even assuming the Commonwealth's accounting methods could be construed as an interpretation of the HTA Allocable Revenue Statutes (they cannot), Treasury's supposed "interpretation" of those statutes would be irrelevant post-enactment assertions by entities uninvolved in the statutes' passage. The Supreme Court has condemned such ex-post commentary as a "hazardous," illegitimate basis for statutory interpretation.[12]

### B.  Movants' Alleged Facts Do Not Undermine the Oversight Board's Arguments

12.    Even assuming they are (i) relevant (as explained above, they are not), *and* (ii) correct (as explained below, they are not), Movants' factual assertions do not undermine the Oversight Board's case. All the facts alleged by Movants could be true and the Oversight Board's position

---

by the California State Board of Education. *Id.* n. 14. On the other hand, in *City of Wilmington v. Fraternal Order of Police Lodge 1*, 2015 WL 4035616, at *5-6 (Del. Ch. June 30, 2015), the City viewed its funds as "subsidiaries of a major conglomerate corporation," each "responsible for its own operational results and strategy."

[11] *See, e.g., Roig Commercial Bank v. Buscaglia Tes.*, 74 P.R. 986, 1001-02 (1953) ("when a statute is clear no interested party can take refuge in the administrative interpretation or regulation to the contrary, and an administrative interpretation or regulation which is in conflict with the explicit terms of a statute, cannot stand."); *see also Whitmore Union Elementary Sch. Dist. v. Cty. of Shasta*, 104 Cal. Rptr. 2d 227 (Cal. Ct. App. 2001) (court based decision on governing statutes, not accounting practices).

[12] *Brueseqitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) (rejecting bondholders' reliance on statements from the former Treasury Secretary in interpreting the Emergency Economic Stabilization Act); *see also W. Air Lines, Inc. v. Bd. Of Equalization of State of S.D.*, 480 U.S. 123, 131 (1987) (giving no weight to "post hoc statements of interested onlookers" in interpreting a statute).

would remain the far better (and more sensible) reading of the statutes. For example, Movants argue
the HTA Allocable Revenues are HTA's property as "[p]rior to the unlawful diversion of funds to the
Commonwealth, amounts from Fund 278 were withdrawn **at the direction of HTA**." Reply ¶ 22.
This is not true. *Infra* ¶¶ 28-31. But even if it were, it would make no difference. Every day,
consumers provide landlords with the power to initiate transfers from their accounts to pay rent. No
one contends this makes the landlord the owner of the money in the consumers' account. Even if the
Commonwealth gave HTA a transfer power, HTA's alleged receipt of that authority only further
proves the money is the Commonwealth's in the first place.

13.     Similarly, the contention in the expert report of Mr. Holder [ECF No. 781-1] (the
"Holder Report") that the HTA Allocable Revenues are "restricted" resources *of the Commonwealth*
does not show any property interest in the HTA Allocable Revenues. Indeed, Movants affirmatively
allege the HTA Allocable Revenues are not accounted as "HTA resources," or "Bondholder
resources," but as Commonwealth resources. [13] This is consistent with the HTA Allocable Revenue
Statutes and HTA Bond Resolutions, which make clear the HTA Allocable Revenues are available
resources of the Commonwealth. According to the Holder Report "restricted" simply means there is
some sort of "constraint" imposed on their use, either (1) from external actions such as debt covenants,
or (2) "imposed by law though constitutional provisions or enabling legislation." Holder Report ¶ 4.
This is perfectly consistent with the Oversight Board's arguments: the HTA Allocable Revenues were
Commonwealth property appropriated to HTA, subject to retention, under the HTA Allocable
Revenue Statutes. Accounting for the revenues as "restricted" and in a "fund," according to Mr.

---

[13] *See* Holder Report ¶¶ 4 (referring to restricted resources as the government's resources that must be used in a specific manner), 5 (conceding that most but not all of the "Commonwealth's resources" are accounted for under the General Fund), 6 (referring to "government resources" as being classified into different funds and giving no indication that they lose their status as government resources if classified in a "special revenue fund"), 8 (referring to the HTA Allocable Revenues as restricted Commonwealth resources throughout).

Holder's definitions, means nothing more than that the Commonwealth disclosed its preexisting obligation to appropriate the money to HTA.[14]   The Holder Report makes no suggestion any classification of revenues as "restricted" could give more rights than the statutes and HTA Bond Resolutions do.

14.   Moreover, even if the revenues are accounted for in a "special revenue fund" (Reply ¶ 10) (as explained below, these assertions are misleading), this does not help Movants.   If a consumer sets aside a portion of her salary to pay her utility bill, the act of setting it aside does not convey ownership to the utility.   Similarly, the Commonwealth's commingling or setting aside of HTA Allocable Revenues and its use of the label "restricted" does not transfer property interests.   It simply discloses that the Commonwealth has an intended use for the revenues—here, appropriation to HTA. The Puerto Rico Constitution vests the Commonwealth with exclusive taxation powers, which can "***never be surrendered or suspended***."   P.R. Const. Art. VI, § 2 (emphasis added).   The HTA Allocable Revenues are collections of taxes levied pursuant to this power, and are designated "available resources" of the Commonwealth.   9 L.P.R.A. §§ 2021, 5681; 13 L.P.R.A. § 31751.   It is undisputed they are collected into Commonwealth bank accounts.   There is no language transferring ownership away from the Commonwealth, like there is regarding COFINA.[15]   At most, Movants can argue the Commonwealth is violating a promise to appropriate the HTA Allocable Revenues, but this

---

[14]   In paragraph 8, the Holder Report states that "[a]ccounting for the HTA Excise Tax Revenues in that special revenue fund [Fund 278] conveys, in this matter, that the revenues are restricted for debt service purposes."   The Holder Report cites nothing to support this conclusion, which is inconsistent with the Holder Report's own view of what "restricted" "special revenue funds" are—that is, that they are either "restricted or committed to expenditures for specified purposes," not necessarily used for debt service.   Moreover, this conclusion is built on the false assumption that Fund 278 consists of only HTA Allocable Revenues—it does not.   Ahlberg Tr. 58:4-9.   Regardless, to the extent the Holder Report expresses the view that the funds are "restricted for debt service purposes," the expert report improperly offers testimony as to a legal conclusion, and it should be disregarded.   *See, e.g., Hearts with Haiti, Inc. v. Kendrick*, 2015 U.S. Dist. LEXIS 86211, *8 (D. Maine Jul. 2, 2015) ("Her opinion . . . is little more than a legal conclusion and well beyond the bounds of permissible expert testimony").

[15]   *See* 13 L.P.R.A. § 12 ("FIA shall be funded each fiscal year from the following sources, the proceeds of which shall be directly deposited in FIA at the time of receipt and **shall not be deposited in the Treasury of Puerto Rico, nor shall these constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico**") (emphasis added).

is a far cry from any ownership interest.

## II.   THE FACTUAL RECORD DOES NOT SUPPORT MOVANTS

### A.  Movants Misrepresented the Facts, Which Are Inconsistent with Movants' Arguments

15.    Movants mischaracterize evidence to support their ownership claims.  Specifically, Movants assert the factual record shows: (i) the "Treasury . . . has always collected the [HTA Allocable Revenues] as HTA's agent" (Reply ¶ 2); (ii) those HTA Allocable Revenues are "covered [] into Fund 278," (*id.* ¶ 2), a "segregated special revenue fund" (*id.* ¶ 23); and (iii) Fund 278 "has been treated as HTA's property," and that "amounts from Fund 278 were withdrawn **at the direction of HTA**."  *Id.* ¶ 22.  Notably, Movants cannot decide whether this means the Bondholders own the HTA Allocable Revenues retained by the Commonwealth, HTA owns them, or whether there is some (ill-defined) joint ownership between HTA and the Bondholders.[16]  No matter: every one of Movants' statements are false or misleading.  Moreover, the argument fails to overcome the gating issue.

### i.    *The Gating Issue*

16.    The Holder Report ignores the HTA Allocable Revenues are collected by the Commonwealth pursuant to an inalienable taxing power before being transferred to HTA.  Apparently recognizing this problem, Movants argue the Commonwealth is solely a collection agent for HTA, but that does align with the HTA Allocable Revenue Statutes.  For example, 9 L.P.R.A. § 5681 provides license fees shall be paid at any place designated by the Treasury.  Then, subject to retention rights, the amount of the license fees shall be covered into (deposited in) a special deposit for HTA.[17]

---

[16]  *See* Reply ¶ 2 (stating the HTA Allocable Revenue Statutes "grant HTA and the Bondholders full beneficial ownership of the pledged tax revenues"), 8 (same), 9 (stating the HTA Allocable Revenues are held in a deposit "for HTA's benefit"), 21 (stating the Commonwealth "historically treated the Excise Taxes as property of HTA"), 48 (stating "the Excise Taxes are *HTA*'s property."), at 19 (heading stating "Under Established Municipal Finance Principles, the Pledged Revenues Are Held in Trust for Bondholders"), ¶ 73 (arguing the HTA Allocable Revenues are HTA's property for the purpose of section 928(a)).

[17]  The obligation under the HTA Allocable Revenue Statutes to transfer money to a "special deposit" in HTA's favor simply requires that the Commonwealth appropriate money to HTA.  That is made clear by the fact the HTA Allocable Revenue Statutes require that the Commonwealth transfer the money on a "monthly basis" to HTA.  *See, e.g.,* 13 L.P.R.A. §

10

Then, § 5681 (i) authorizes HTA to pledge the proceeds to secure HTA Bonds, subject to retention, and (ii) provides the Commonwealth commits to HTA Bondholders not to reduce the license fees.

17.     The gating issue defeating all Movants' property claims is that the license fees are paid to the Commonwealth, and HTA's subsequent receipt of them is dependent on the Commonwealth's satisfying its unsecured obligation to transfer them to HTA.[18]   The statute recognizes the Commonwealth's ongoing power to reduce the fees and therefore includes the Commonwealth's unsecured commitment not to do so.  As explained in the Opposition (¶¶ 83-103): (a) when the Commonwealth receives the fees, they are unencumbered, and (b) the Commonwealth's obligations to impose and transfer the fees to HTA are (i) not binding because they were enacted by a prior legislature, and in any event are (ii) preempted by (i) PROMESA § 202's grant to the Oversight Board of power over all Commonwealth's appropriation, and (ii) Title III's absence of a priority for HTA's claims or the bondholders' claims to the fees.  Thus, even if the Commonwealth were acting as HTA's agent (it is not), the Commonwealth cannot be compelled to impose and collect the license fees.

---

31751(a)(1)(A), (a)(3)(A).  This is further acknowledged by the fact a special deposit is a bank account.  *See, e.g.,* 13 L.P.R.A. § 31751(a)(3)(A) ("covered into a special deposit *account*") (emphasis added).  Movants argue that "the Commonwealth uses a special fund to implement Treasury's obligation . . . to cover the [HTA Allocable Revenues] into a 'special deposit' for the benefit of HTA" and thereby creates property rights.  Reply ¶ 20.  This is wrong: the requirement that the moneys be deposited in a special deposit for HTA constitutes the obligation to appropriate funds to HTA that has been preempted by PROMESA.  The HTA Allocable Revenues are at all times commingled with other taxes in accounts held for the Commonwealth's benefit.  This is true regardless of whether Movants are correct on the basic equivalence of the terms "special deposit" and "special fund."  *See* Reply ¶ 12, n. 5.  Nonetheless, Movants are incorrect on that point— "Deposito" and "Fondo" are different words with different meanings that should be respected by the Court.  *Lindsey v. Tacoma-Pierce Cty. Health Dep't,* 195 F.3d 1065, 1074 (9th Cir. 1999).  Similarly, the statutes make clear "special deposit" means a "deposit account."  *See, e.g.,* 13 L.P.R.A. § 31751(a)(3)(A).  Fund 278, as it simply is a designation of revenues, not an account holding money, cannot be "held for the benefit of HTA"—indeed, it cannot be "held" at all.  *See* Ahlberg Tr. 57:23-58:3.

[18]  A promise to secure a debt does not itself create a security interest, and its breach only gives rise to an unsecured claim.  *In re Las Vegas Monorail Co.*, 429 B.R. 317, 338-39 (Bankr. D. Nev. 2010) (breach of promise to continue depositing money in accounts in which creditor had security interest did not enlarge creditors' collateral, court stating "the Trustee made a conscious choice to leave to LVMC the task of collecting and transferring it revenues, thus taking the risk of diversion and breach.");  *Steslow v. Citicorp Mortg., Inc. (In re Steslow),* 225 B.R. 883, 886 n.4 (Bankr. E.D. Pa. 1998) ("[A] covenant without a pledge granting additional security is simply a promise, not a security interest.").  An obligation to transfer money to HTA for its corporate purposes is even more remote than an obligation to secure a debt.  Thus, it cannot possibly give rise to a security interest or other property interest.

>     ii.    **The Commonwealth Does Not Act as HTA's Agent, and the HTA
>            Allocable Revenues Are Appropriated to HTA**

18.    The sole documents Movants cite that refer to the Commonwealth as an "agent" for

anyone are the Commonwealth's financial statements.  Movants argue:

> The Commonwealth's Financial Statements define 'Special Deposit Fund' as a fund
> with respect to which the Commonwealth 'acts in a fiduciary capacity.' The term
> includes 'revenue collections and agency accounts for which the Commonwealth acts
> in an agent's capacity.' A 'Special Deposit' is used to account for funds held by the
> Commonwealth in a trustee capacity, or as an agent for others, including 'other
> governmental units.'

Reply, ¶ 12 (quoting 2012 CW Financial Statement at 256, Natbony Reply Dec. Ex. 1).  But, contrary

to the impression Movants try to make with their selective quotation, the document they cite does not

list the HTA Allocable Revenues as falling within the definition of "Special Deposits" held "in a

fiduciary capacity" that Movants quote.  Movants' quotation comes from a page discussing "Fiduciary

Funds."  The Commonwealth financial statement defines "Fiduciary Funds" as *either* the "Pension

Trust Funds" or the "Agency Fund."  2012 CW Financial Statement at 256.  HTA Allocable Revenues

are not part of the Pension Trust Funds.  And according to the Commonwealth financial statement:

> Agency funds consist of **the** Special Deposits Fund. **This** agency fund includes
> deposits under the custody of the Courts of Justice, Minors Support Administration for
> child support payments, deposits under the custody of the Commissioner of Insurance
> of the Commonwealth for escheated property, for insurance companies under
> liquidation and an allocated share of the sales and use tax corresponding to the
> municipalities.

*Id.* at 7 (emphasis added).[19]  The definition in the document they rely on describes "**the** Special

Deposits Fund" as a single fund that includes items like child support, but does not mention HTA

---

[19] *See also* 2012 CW Financial Statement at 6, Natbony Reply Dec. Ex. 1 ("FIDUCIARY OPERATIONS.  Fiduciary funds
are used to account for assets held by the Commonwealth in a trustee capacity or as an agent for individuals, private
organizations, and other governmental units. **These include the pension and agency funds.** Pension trust funds are
established through trust agreements specifying how the fund will operate. **Agency funds are custodial in nature and
do not report fund balances** . . . Agency funds consist of the Special Deposits Fund. This agency fund includes deposits
under the custody of the Courts of Justice, Minors Support Administration for child support payments, deposits under the
custody of the Commissioner of Insurance of the Commonwealth for escheated property, for insurance companies under
liquidation and an allocated share of the sales and use tax corresponding to the municipalities.") (emphasis added).

Allocable Revenues (or anything like the HTA Allocable Revenues). There is no excuse for Movants'

slick wordsmithing.[20] That the Commonwealth does not list the HTA Allocable Revenues as being

held in a fiduciary capacity is inconsistent with Movants' arguments.

19.     Movants then cite a different document with no connection to the financial statements,

arguing "[s]pecial deposits fall into the broader category of 'Special Revenue Funds.'" Reply ¶ 12;

*see also id.* ¶ 20 (referring to HTA Allocable Revenues as "Special Revenue Funds"), ¶ 21, n. 24.

This is not true. As demonstrated above, the financial statements have their own definition of "special

deposit," and it does not include HTA Allocable Revenues.[21] The "Special Revenue Funds" referred

to by Movants come from TSA cash flow reports, which begin with an express disclaimer stating

parties should not rely on them. *See* TSA Cash Flow for October & November FY2018,

CW_STAY0000229-242 at 230, Natbony Reply Dec. Ex. 8. The cash flow reports define "Special

Revenue Funds" as:

> Commonwealth governmental funds separate from the General Fund that are created
> by law, are not subject to annual appropriation and have specific uses established by
> their respective enabling legislation. Special Revenue Funds are funded from, among
> other things, revenues from federal programs, tax revenues assigned by law to public
> corporations and other third parties, fees and charges for services by agencies,
> dividends from public corporations and financing proceeds.

*Id.* at 231. The possibility HTA Allocable Revenues are "Special Revenue Funds" does not advance

Movants' claims to property interests. The cash flow report is a layperson's understanding. It

provides the HTA Allocable Revenues are "not subject to annual appropriation and have specific uses

established by their respective enabling legislation." *Id.* at 231. The report does not deal with the

---

[20] *See also* 2015 CW Financial Statement, CW_STAY0009784-10167 at 9869, 10154-65, Natbony Reply Dec. Ex. 2*;* 2016 CW Financial Statement, CW_STAY0010168-10543 at 10249, 10530-31, Natbony Reply Dec. Ex. 3.

[21] Notably, when the Commonwealth financial statements do mention "special revenue funds," they expressly state that such funds are **not** used for debt service: "Special Revenue Funds are used to account for and report the proceeds of specific revenue sources that are restricted or committed to expenditure for specified purposes **other than debt service** or capital projects." *See* 2012 CW Financial Statement at 74, 247, Natbony Reply Dec. Ex. 1 (emphasis added); *see also* 2012 CW Financial Statement at 22, 58, 74, 128, Natbony Reply Dec. Ex. 1 (referring to a "special revenue fund" related to COFINA); *id.* at 129 (referring to a "special revenue fund" related to PBA); *id.* at 247 (referring to "The Children's Trust Special Revenue Fund" and the "Public Buildings Authority Special Revenue Fund").

legal implications of the Commonwealth imposing and collecting the taxes and then being obligated to transfer them to HTA.  It nowhere speaks of a trust or agency; it refers to "Special Revenues Funds" as "Commonwealth governmental funds"; it does not address whether a prior legislature can impose appropriations binding future legislatures.  That HTA Allocable Revenues may "have specific uses established by their respective enabling legislation" fails to support Movants' ownership argument—the HTA Allocable Revenues have a specific use under territorial law: appropriation to HTA for HTA's corporate purposes.  That refutes any notion the revenues are held in trust for Bondholders.  The cash flow reports demonstrate special revenue funds are not necessarily used for debt service, but for a variety of purposes.[22]  Movants elide the obvious distinction between resources having a designated "purpose" and resources being "owned" by Bondholders.[23]

20.     For the same reasons, Movants' argument the HTA Allocable Revenues are HTA's property because they "are *not* subject to annual budgetary appropriations" (Reply ¶ 21) falls flat. The HTA Allocable Revenues do not need to be appropriated to HTA in the General Fund budget, as the HTA Allocable Revenue Statutes create a "standing" appropriation of those revenues.  As discussed in Secretary of Justice Opinion 2005-14, there are two kinds of Puerto Rico appropriation

---

[22] *See* TSA Cash Flow for October & November FY2018, CW_STAY0000229-242 at 231, 240-41, Natbony Reply Dec. Ex. 8 (listing the following expenditures under "Special Revenue Funds": "Education," "Correction & Rehab," "Health," "Justice," and "Other"); TSA Cash Flow as of July 14, 2017, CW_STAY0000409-421 at 418-419, Natbony Reply Dec. Ex. 11 (same); TSA Cash Flow as of September 15, 2017, CW_STAY0000500-515 at 512-13, Natbony Reply Dec. Ex. 22 (same).

[23] Movants make the same mistake when they cite Government Accounting Standards that simply describe certain attributes of fund accounting to assert that HTA owns the HTA Allocable Revenues.  Reply, ¶ 23, n. 32.  The quotes from the Government Accounting Standards Board do not deal with ownership before the Commonwealth transfers them to HTA, and do not make any remarks suggestive that fund accounting determines ownership.  *Id.*  Similarly, Movants' arguments that fund accounting is used "to help ensure and demonstrate compliance with finance-related legal requirements," Reply ¶ 20, shows the accounting assumes the Commonwealth and HTA will satisfy all debt and statutory obligations.  Moreover, while the Holder Report relies on GASB (*see, e.g.*, Holder Report ¶¶ 2, n 10), it ignores GASB Statement No. 48, ¶ 75 which better describes the arrangement between the Commonwealth and HTA:

> The security arrangements that the Board has observed generally do not place the primary government in a position of directly guaranteeing the debt of the component unit. Rather, the component unit is the sole obligor and secures the debt by pledging the payments that the primary government has pledged and appropriated to it from a specific revenue stream. The debt is characterized as payable solely from those appropriations with no explicit recourse to the primary government.

statutes: those intended to cover a defined period of time, and standing appropriations of indefinite (although not necessarily permanent) duration enacted pursuant to laws like the HTA Allocable Revenue Statutes.[24]  Standing appropriations require funding from future annual revenues—both the raising of the future revenues and the appropriation can be eliminated by a later legislature, as has occurred.

21.    This Court and the First Circuit ruled PROMESA preempts prior appropriations of post-PROMESA revenues.  Any statute using, appropriating or transferring Commonwealth revenues is preempted regardless of the verb used.[25]  In any event, the wording of 13 L.P.R.A. § 31751, states the HTA Allocable Revenues are "appropriated" (*asignar*) to HTA.  Movants concede 13 L.P.R.A. § 31751 uses inflected forms of *asignar*, but they dispute this word means "appropriation," stating "[b]ut Dictionary definitions for *asignacion* include 'allocation, allotment, attribution, allowance.'" Reply ¶ 17 (quoting *Asignacion*, MCGRAW-HILL'S SPANISH AND ENGLISH LEGAL DICTIONARY (2003), Natbony Reply Dec. Ex. 16).  Movants offer no reason why use of a synonym makes a difference and fail to mention the first, main definition of *asignar* listed in the very dictionary they quote is "appropriation."  *See* Natbony Reply Dec. Ex. 16 ("**Asignacion.**  Appropriation, allocation, allotment, attribution, allowance.").  They then contradict themselves, citing 3 L.P.R.A. § 283b(a) as an authoritative definition of the word "appropriation," *see* Reply ¶ 17, n. 16 ("3 L.P.R.A. § 283b(a) (defining "Appropriation")"), apparently oblivious to the fact the Spanish word used in 3 L.P.R.A. § 283b(a) that Movants concede means "Appropriation" is "Asignacion"—the same word used in 13

---

[24]  *See P.R. Sec. Just. Op.* 2005-14, 2005 WL 6431018, at 18-19, 25 (P.R. Atty. Gen.), a certified translation of which is attached as Exhibit K to the *Declaration of Colin R. Kass Regarding the Sur-Reply of Commonwealth of Puerto Rico Regarding CCDA Bondholder Motion to Lift Automatic Stay [ECF No. 10104]*, filed concurrently herewith in the Commonwealth's Title III case.

[25]  *See, e.g.*, *Cope v. Childers*, 170 P.2d 210, 213 (Okla. 1946) ("To 'allocate' and to 'appropriate' have the same significance. The former means to distribute, to assign, to allot, to apportion…."); *see also Shattuck v. Kincaid*, 49 P. 758, 760 (Or. 1897) ("Webster defines 'appropriation' as 'the act of setting apart or assigning to a particular use or person in exclusion of all others; application to a special use or purpose, as of money to carry out some public object.'").

L.P.R.A. § 31751 to describe the "appropriation" of the HTA Allocable Revenues.  Movants cannot

escape from the fact 13 L.P.R.A § 31751 appropriates the HTA Allocable Revenues to HTA.[26]

22.    Movants' argument "[t]he title of [13 L.P.R.A. § 31751] makes plain that it concerns

'Disposition of Funds' (*Disposicion de Fondos*), not appropriation," Reply ¶ 17, is similarly

unconvincing as is its premise that synonyms for appropriation make a difference.  It is clear law that

the title of a section cannot change its plain text, which, here, simply appropriates money to HTA.[27]

Further, while the word "*Disposicion*" is used throughout the text 13 L.P.R.A. § 31751, it does not

mean "transfer" as used in the text of 13 L.P.R.A. § 31751.  While Movants' cite the definition for a

related but different word, "*disponer*," *id.* (citing *Disponer*, McGRAW-HILL'S SPANISH AND ENGLISH

LEGAL DICTIONARY (2003), Natbony Reply Dec. Ex. 17), Movants fail to mention that "*Disposicion*"

has its own entry in Movants' dictionary, which reads: "**Disposicion.**  Disposition, clause, provision,

proviso.  Decree, order, ruling.  State of mind, character."  Natbony Reply Dec. Ex. 17.  The main

meaning of "Disposicion" according to Movants' own dictionary is "provision" or "clause," and that

is how the word is used throughout 13 L.P.R.A. § 31751—"*disposicion*" appears several times in the

body of 13 L.P.R.A. § 31751, each time with the meaning "provision."  *See, e.g.,* 13 L.P.R.A. §

31751(a)(1)(A) ("according to the provisions [*disposiciones*] of §§ 31669 and 31670 of this title"),

(a)(1)(G) ("Notwithstanding any other legal provision [*disposicion*]"), (a)(3)(C) ("subject to the

provisions [*disposicion*] of Section 8 of Article VI of the Constitution of Puerto Rico").

23.    Similarly, Movants' attempt to distinguish *Fin. Oversight & Mgmt. Bd. for Puerto*

---

[26] Movants argue that "*asignar*" is not used with certain other taxes, showing those taxes are not subject to appropriation.
Reply ¶ 18.  This argument has no merit.  Given the main text, it is indisputable that the Puerto Rico legislature was
appropriating the taxes detailed in 13 L.P.R.A. § 31751(a)(1).  The other taxes listed in 13 L.P.R.A. § 31751 (and 9
L.P.R.A. §§ 2021, 5681) are treated in essentially an identical manner by the applicable statutes.  There is no indication
the Puerto Rico legislature intended for there to be a distinction between how the taxes were treated—they were all
conditionally appropriated to HTA.

[27] *Trainmen* v. *Baltimore & Ohio R. Co.*, 331 U.S. 519, 528-529 (1947) (referring to "the wise rule that the title of a statute
and the heading of a section cannot limit the plain meaning of the text."); *Demore v. Hyung Joon Kim*, 538 U.S. 510, 535
(2003) (the "title of a statute has no power to give what the text" does not already provide).

*Rico v. Andalusian Global Designated Activity Co. (In re Fin. Oversight & Mgmt. Bd.)*, 948 F.3d 457, 469-70 (1st Cir. 2020), based on the fact the HTA Allocable Revenues were not subject to "annual appropriations" falls flat.  First, they were implicitly subject to annual appropriations because every legislature is free to change prior legislatures' appropriations.  Second, while Movants create a convoluted argument about the supposed difference between appropriation bonds and revenue bonds, such a distinction is nowhere present in the First Circuit's opinion.  The ERS statutes required that the Commonwealth appropriate money to ERS each year.  *Id.* at 469.  According to the First Circuit, this made no difference, because "[a]lthough required by Section 2-116(g), this directive [to appropriate money to ERS] could be disregarded by a subsequent legislature (to the Bondholders' detriment)."  *Id.*  Here, there is no material difference—the HTA Allocable Revenues were automatically appropriated to HTA for its corporate purposes pursuant to one act of the legislature.  As the First Circuit held, any future legislature was competent to disregard that appropriation.[28]

### iii.    All HTA Allocable Revenues are Commingled in the Commonwealth's Accounts From the Moment They are Collected

---

[28] Movants' argument also misses the mark, because even if Movants hold a revenue bond *vis-à-vis* HTA, they certainly do not hold a revenue bond *vis-à-vis* the Commonwealth, and are clearly dependent on Commonwealth appropriations.  Movants argue a future legislature could not remove it because "[w]here the Commonwealth simultaneously imposes a tax and assigns the proceeds to a public corporation, the Puerto Rico Supreme Court upholds such assignments as valid if enacted for a public purpose."  Reply ¶ 16.  But the HTA Allocable Revenues have not been assigned to another entity, but are subject to standing appropriations.  *P.R. Telephone* relates to whether a tax could validly be levied at all.  It has nothing to do with repeal, and this is irrelevant to these facts.  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 361 F. Supp. 3d 203, 241 (D.P.R. 2019) is the same.  Moreover, *Fletcher v. Peck*, 10 U.S. 87, 135 (1810) states that "one legislature is competent to repeal any act which a former legislature was competent to pass; and that one legislature cannot abridge the powers of a succeeding legislature."  The case also said "if an act be done under a law, a succeeding legislature cannot undo it.  "Act," however, cannot mean everything a legislature enacts; or the exception would swallow the rule.  A sale of a building may not be undone.  But an obligation to continue to impose and to appropriate future taxes is completely different.  *Rice v. City of Milwaukee*, 100 Wis. 516 (1898) did not involve the repeal of a statute.  Similarly, *Von Hoffman v. City of Quincy*, 71 U.S. 535, 544-55 (1866) involved the state of Illinois giving a specific taxing power to a municipal corporation to (a) issue bonds, and then (b) levy a tax sufficient to pay those bonds, and use the proceeds of that tax solely to pay the bonds.  Later, the state eliminated approximately 50% of the taxing power, leaving the city without enough money to pay its debt.  The Supreme Court held the state's removal of legislative power to levy a sufficient tax violated the contracts clause.  Exactly.  The state impaired the bonds, giving rise to a claim of the bondholders.  That the HTA Bondholders may have claims against the Commonwealth for terminating the appropriations to HTA is not the issue here.  According to Movants, *First Nat. Bank of Boston v. Maine Turnpike Auth.*, 136 A.2d 699, 722 (Me. 1957) involved the "transfer [of] a vested property right from one person to another by pure fiat of the Legislature."  That has not happened here.

24.     While Movants talk about "Fund 278" as if it were a bank account that moneys can be "covered into" (Reply ¶ 2), contained or held "in" (Reply ¶¶ 9, 27), or conveyed out of (Reply ¶ 31), and which is "segregated" from other funds (Reply ¶ 23), this is not, in fact, the case.  Fund 278 is not a bank account, nor does it correspond to any bank account or account balance.[29]  Fund 278 is solely a designation to classify revenue arising from various statutes.[30]  The "General Fund" is the same—it does not correspond to a bank account, but is a designation classifying revenue from other statutes.[31]  "Funds" do not correspond to or track money sitting in specific accounts.[32]  Both revenues classified as Fund 278 and revenues classified under the "General Fund" code in the Commonwealth's accounting system are collected each day into the Commonwealth's main collection account and commingled.[33]  At the end of each day, the entire balance of the Commonwealth's collection account is transferred into the TSA operational account, where it is commingled with other revenues.[34]  The

---

[29]  *See* Ahlberg Tr. 54:17-22 ("Q. Okay. What's the difference between a Fund and an account, in your understanding, of how they are used in the Commonwealth? A. Generally, in my work with the Commonwealth, including management and tax reporting, I understand accounts as having balances, bank accounts, **and Funds do not have a -- do not -- do not correspond with the bank account**.") (emphasis added); Ahlberg Tr. 58:13-17 ("Q. Now, at any particular time, how would the Commonwealth go about determining what monies are classified as part of Fund 278? A. Again, we don't really think about Funds in that way.").  The Holder Report states funds refer to certain revenue streams that may be deposited in multiple accounts.  *See generally* Holder Report.

[30]  Ahlberg Tr. 57:23-58:3 ("Fund 278 is a specific Fund number within the PRIFAS system, Puerto Rico Information and Financial Accounting System what I'll refer to as PRIFAS going forward, is a Fund number within the PRIFAS system used to classify revenue at this time.").

[31]  Ahlberg Tr. 59:6-7 ("Q. So you don't know what the purpose is of creating separate Funds within the Commonwealth, correct? A. I know that Funds are -- different Funds are used to record different revenues."); Ahlberg Tr. 64:8-19 ("Q. Right. And using a Fund like Fund 278 or the General Fund is a way that the Commonwealth uses to track particular monies, correct? A. **It is not a way that they use to track money. It is a way that they use to track revenue.**") (emphasis added); Ahlberg Tr. 71:4-8 ("Q. So is it fair that you don't know of a way to determine today how much is sitting in the General Fund? A. The General Fund is not a bank account in which monies get—[*sic*, answer cut off].").

[32]  *See supra* n. 29; *see also* Ahlberg Tr. 54:10-12 ("Q. Is the General Fund a designation of monies that are contained in the TSA? A. The General Fund designation does not necessarily mean Funds are contained within the TSA.").

[33]  Ahlberg Tr. 61:5-16 ("Q. So at this time that excise revenues come into a collection account at the Commonwealth, that's when they're given the designation? A. When they enter it into the collection sweep account called Collecteria, they receive that designation. Q. And is there a time that the Fund 278 designation gets removed? A. **So Collecteria, the sweep account that I mentioned, collects other various taxes every day besides the excise taxes in question.**") (emphasis added).

[34]  Ahlberg Tr. 61:17-22 ("At the end of every day, there would be a sweeping transfer to the TSA operational account. That transfer would be a batch transfer of all the Funds collected that day, and there would be no Fund designation associated with that transfer.").

revenue fund code does not remain with or track moneys that are deposited in the TSA operational account.[35] HTA Allocable Revenues form only "part" of the revenues classified as Fund 278.[36] Thus, Fund 278 is not a bank account "into" or "out of" which money can be transferred, and revenues classified as Fund 278 are at all times commingled in Commonwealth accounts and treated no differently than the Commonwealth's other moneys, giving yet another reason why Movants' trust argument fails.[37]

25.    Movants' misunderstanding of what a "fund" is leads them into various errors.[38] Movants argue the Oversight Board was wrong when it stated the HTA Allocable Revenues are "deposit[ed] in the Treasury Single Account."  Reply ¶ 11, *see also* Reply ¶¶ 19, 20.  Movants argue instead the HTA Allocable Revenue Statutes prohibit the HTA Allocable Revenues from being "deposited in the General Fund."  Reply ¶ 11.  But Movants make this argument in the face of testimony stating (i) the General Fund and the TSA are not the same thing, (ii) the General Fund is not a bank account, and (iii) the HTA Allocable Revenues are all deposited into the TSA operational account.  *Supra* ¶ 24.  13 L.P.R.A. § 31751 does not prohibit the HTA Allocable Revenues being

---

[35] Ahlberg Tr. 62:6-13 ("Q. So it's possible that Fund 278 designation remains, you know, even though the Funds were transferred into the TSA, correct? MS. McKEEN: Objection. THE WITNESS: **That designation does not remain once the Funds are comingled into the TSA.**") (emphasis added); *see also* Ahlberg Tr. 70:17-18.

[36] *See* Ahlberg Tr. 58:4-9 ("Q. And what kind of revenue is classified as part of Fund 278? A. **Part of** Fund 278 are -- revenues that would be classified with Fund 278 would be Funds -- or revenues that had previously been allocated to HTA.") (emphasis added).

[37] *See, e.g., County of Orange v. Merrill Lynch & Co. (In re County of Orange)*, 191 B.R. 1005, 1016 (Bankr. C.D. Cal. 1996) ("We cannot believe . . . that Congress contemplated that if trust funds are commingled with other assets of one subsequently declared bankrupt under federal law, a state statute may impress a trust on all assets of the bankrupt's estate to the extent of the amount due the beneficiary.") (quoting *Elliott v. Bumb*, 356 F.2d 749, 755 (9th Cir. 1966)); *Distral Energy Corp. v. Michigan Boiler & Eng'g Co. (In re Michigan Boiler & Eng'g Co.)*, 171 B.R. 565, 568-69 (Bankr. E.D. Mich. 1993) ("in a commingling situation, if the trust fund cannot be identified or traced in its original or substituted form the trust beneficiary becomes a general creditor. The trust beneficiary must trace the trust funds through the commingled account(s) and it is not enough to simply show that trust funds went into the commingled account.") (internal quotes and cites).

[38] Movants state the Commonwealth uses "fund accounting" to "track[s] financial resources (i.e., monies)."  Reply ¶ 20. However, to the extent this argues the Commonwealth uses funds to track *moneys* through bank accounts, this is directly contradicted by deposition testimony.  Ahlberg Tr. 64:8-19 ("Q. Right. And using a Fund like Fund 278 or the General Fund is a way that the Commonwealth uses to track particular monies, correct? A. **It is not a way that they use to track money. It is a way that they use to track revenue.**").

deposited in the TSA, it simply provided that the HTA Allocable Revenues are not to be recorded as General Fund revenues upon collection.[39]  It is a matter of accounting, not substance.  13 L.P.R.A. § 31751's requirement for moneys to be transferred to a special deposit for HTA is simply a standing appropriation of the HTA Allocable Revenues to HTA that could give rise to an unsecured claim against the Commonwealth.  All of this accords with the Oversight Board's arguments.[40]

26.      For similar reasons, Movants' attempt to establish a "trust" based on the facts and *Flores Galarza*, 484 F.3d 1 (1st Cir. 2007), must fail.[41]  *See* Reply ¶¶ 8, 10, 13.  *Flores Galarza* involved a statute (26 L.P.R.A. § 8055) that provided:

(i) the Treasury was acting "in its fiduciary capacity," 26 L.P.R.A. § 8055(j);
(ii) the Treasury was acting in essentially a purely ministerial capacity transferring money around and otherwise providing reports and information to the Joint Underwriting Association ("JUA"), 26 L.P.R.A. § 8055(l), to the point that the statute was amended to specifically provide that Treasury was acting as a mere "collection service performed in favor of the [JUA]," *Flores Galarza*, 484 F.3d at 29;
(iii) the money held by Treasury was not tax money collected for Commonwealth use and,

---

[39] While the English version of 13 L.P.R.A. § 31751 suggests that moneys are "deposited in" the General Fund, the Spanish version does not use the specific term for deposit ("se depositara"), but rather the word "ingresara," which, while it can be rendered "deposited," more basically means "entered."  As the General Fund is not a bank account into which money can be deposited, a better translation would be that "[t]he proceeds of the taxes and license fees collected by virtue of this part shall be entered in [the books as part of] the General Fund."  In any case, the restriction on recording the HTA Allocable Revenues as part of the General Fund in no way conveys ownership to HTA or any other party.

[40] As a result, Movants' arguments that "HTA acquires a statutory property interest in the Excise Taxes from the moment they are collected . . . and, further, HTA acquires an interest in the Excise Taxes when they are designated into Fund 278," so as to trigger the application of section 928(a), *see* Reply ¶ 73, are wrong.  Similarly, while Movants attempt to rely on *In re City of Columbia Falls, Mont., Special Imp. Dist. No. 25*, 143 B.R. 750, 762-63 (Bankr. D. Mont. 1992), Reply ¶ 9, the case does not support their argument, as it involved money that, pursuant to Montana law, was undisputedly subject to a trust in favor of bondholders.  Here, that is precisely the dispute.

[41] Moreover, contrary to Movants' arguments, the flow of funds revealed in discovery only confirms the accuracy of the Oversight Board's flow of funds chart (Opp. Ex. A (the "Flow of Funds Chart")).  Movants criticize the Flow of Funds Chart, stating it "simply ignores the distinction between the Commonwealth's General Fund and Fund 278, as well as the accounting by the Commonwealth of Fund 278 money as designated for HTA." Reply ¶ 20, n. 23.  Movants ignore the distinction between a fund and a bank account.  As the testimony shows, the HTA Allocable Revenues are all collected into a commingled Commonwealth collection account, then transferred to the TSA operational account (where they are further commingled), to then be transferred to HTA "on a monthly basis" according to the HTA allocable Revenue Statutes.  13 L.P.R.A. § 31751(a)(1)(B), (a)(1)(A) (providing for transfers to HTA "every month").  The Flow of Funds Chart is accurate.  Similarly, Movants' argument that they have standing to bring this lift stay seeking adequate protection based on certain unsecured commitments they allege the Commonwealth made and documents they signed (Reply ¶ 116) is wrong.  Movants do not allege (and could not allege) the Commonwealth granted them a security interest.  Even if the Commonwealth had breached its unsecured commitments (it has not), Movants cannot use standing on account of an unsecured claim to seek to lift the stay as a secured creditor against the Commonwealth based on their claims as HTA creditors. Opp. ¶ 69.

indeed, the Treasury had to pay interest to the JUA if the Treasury kept the premiums longer than permitted by the statute, 26 L.P.R.A. § 8055(c)(4); and

(iv) the Treasury was paid a fee for performing its collection services.   26 L.P.R.A. § 8055(c)(4) ("The Secretary of the Treasury shall deduct from the funds or premiums transferred to the Joint Underwriting Association a service fee for the collection of the premiums collected directly by the Department of the Treasury.").

Thus, in *Flores Galarza* the Treasury was acting solely in a collection agent capacity.  Not so here. The Commonwealth imposes, owns, and collects the HTA Allocable Revenues pursuant to its power to levy taxes and then appropriates the money.  Treasury is executing its governmental role.  The HTA Allocable Revenue Statutes provide the HTA Allocable Revenues are Commonwealth "available resources," they are collected into the same account as other Commonwealth taxes, at all times commingled, and are treated indistinguishably from other Commonwealth moneys.  Any inference of a trust must be explicit—it's long been true Puerto Rico law prohibits "secret trusts."[42]

27.     Similarly, Movants cannot distinguish *In re Morales Travel Agency*, 667 F.2d 1069, 1071 (1st Cir. 1981).  *See* Reply ¶ 30.  The Commonwealth manages the HTA Allocable Revenues the same as all of its other tax revenues and is free to use the HTA Allocable Revenues to pay GO debt when necessary.  P.R. Const. Art. VI, § 8.  Similarly, HTA receives all HTA Allocable Revenues for HTA's "corporate purposes," and can use the HTA Allocable Revenues to pay **any** obligations.[43]

---

[42] *See Rossy v. Superior Court*, 80 D.P.R. 729 (P.R. 1958).  Movants appear to argue that the words "shall transfer," on their own, create a property interest.  *See* Reply ¶ 10.  As a simple matter of common sense, this is wrong.  If the words "shall transfer" create a property interest, then there could be no unsecured claims, as any promise to pay a debt or transfer money would, without more, create a trust or other property interest.  That is clearly not the law.

[43] Movants attempt to get around this by arguing that, in line with the provisions' "context and purpose," the HTA Allocable Revenue Statutes must be construed so as to adopt the waterfalls laid out in the HTA Bond Resolutions, subordinating other creditors' interests to Bondholders.  Reply ¶ 15.  This is wrong.  Notably, Movants cite nothing to suggest that the Puerto Rico legislature's purpose was to subordinate the wording of the HTA Allocable Revenue Statutes to the HTA Bond Resolutions.  Moreover, the HTA Allocable Revenue Statutes are clear that the HTA Allocable Revenues are appropriated to HTA for HTA's "corporate purposes" and to pay "principal of and interest on the bonds and other obligations of the Authority and to meet any stipulation agreed on by the Authority to the holders of its bonds and other obligations."  The statute does not even reference the HTA Bond Resolutions, let alone adopt a waterfall provision found in it.  Had the Puerto Rico legislature intended to subordinate payment of other creditors to Bondholders, it could easily have amended the statute to say so.  But it did not, and its clear words are not susceptible of the meaning Movants give them, even if it was the legislature's purpose (it was not).  *United States v. Pleau*, 662 F.3d 1, 11-12 (1st Cir. 2011), *vacated on other grounds*, 663 F.3d 542 (1st Cir. 2011) (cannot deviate from "plain language" based on purpose).

Fund 278 only categorizes revenues from certain statutes when collected—it does not segregate any money.   Neither do the HTA Allocable Revenue Statutes require segregation.[44]   As the Commonwealth and HTA can use the HTA Allocable Revenues for their own purposes, and the revenues are always commingled, Movants cannot establish they are subject to a trust.  Opp. ¶ 94.

### iv. HTA Allocable Revenues Are Not Withdrawn at HTA's Direction

28.    Movants claim Fund 278 "has been treated as HTA's property," and that "amounts from Fund 278 were withdrawn **at the direction of HTA**." Reply ¶ 22 (citing Natbony Reply Dec. Ex. 29).  This is misleading.  Movants ignore that the very documents upon which they rely make clear Treasury's approval was required before any transfer took place—the money was not transferred at the direction of HTA, but only *after* approval by the Commonwealth.  *See* Natbony Reply Dec. Ex. 29 (demonstrating Treasury approved HTA's request for a transfer days after HTA made request).[45] Moreover, deposition testimony confirmed that HTA had no authority to direct transfers of any moneys without Treasury approval.[46]

---

[44] *Compare* 13 L.P.R.A. § 31751(a)(1)(G) ("on or after the effective date of the lien . . . the special deposit [for crude oil excise taxes . . . shall belong to the Highways and Transportation Authority for the benefit of the holders of the bonds").

[45] The same is true of all the transfer authorizations cited by Movants.  *See* Transfer Authorizations dated March-May 2015, HTA_STAY0000454-466, Natbony Reply Dec. Ex. 30 (same); Transfer Authorizations dated July-October 2015, HTA_STAY0000493-512, Natbony Reply Dec. Ex. 31 (same); Transfer Authorizations dated June 2015, HTA_STAY0000513-515, Natbony Reply Dec. Ex. 32 (same); Transfer Authorizations dated May-June 2015, HTA_STAY0000516-531, Natbony Reply Dec. Ex. 33 (same); Transfer Authorizations dated July-October 2015, HTA_STAY0000532-545, Natbony Reply Dec. Ex. 34 (same); Transfer Authorizations dated July-August 2015, HTA_STAY0000546-549, Natbony Reply Dec. Ex. 35 (same); Transfer Authorizations dated January-June 2015, HTA_STAY0000556-602, Natbony Reply Dec. Ex. 36 (same); Transfer Authorizations dated December 2015-March 2016, HTA_STAY0000603-613, Natbony Reply Dec. Ex. 37 (same); Transfer Authorizations dated March 2015-March 2016, HTA_STAY0000614-627, Natbony Reply Dec. Ex. 38 (same); Transfer Authorizations dated June 2015-December 2016, HTA_STAY0000628-653, Natbony Reply Dec. Ex. 39 (same); Transfer Authorizations dated November 2014-July 2016, HTA_STAY0007985-8024, Natbony Reply Dec. Ex. 40 (same).

[46] Ahlberg Tr. 112:7-10 ("Q. Has HTA ever had the ability to direct transfers of monies from the TSA based on reported revenues in Fund 278? A. No."); Ahlberg Tr. 548:23-549:8 ("Q. Did vouchers like this have to be approved by the Puerto Rico Treasury Department? A. Yes. Q. Does this document reflect that approval anywhere? A. Yes.  Q. And in your experience, would payment in connection with a voucher like this have been made without Treasury's approval? A. No.").  Movants state that "[t]he withdrawals were authorized by HTA officials." Reply ¶ 22, n. 30.  This misleadingly gives the impression the Treasury did not have to authorize the transactions, when it did.  For example, the document Movants cite to support this statement, HTA_STAY0000513-515, Natbony Reply Dec. Ex. 32, contains a signature from an HTA official dated June 16, 2015.  *Id.* at 513.  The Treasury did not approve the transfer until over a month later.  *Id.* at 515 (Treasury approval dated July 23, 2015).

29.     The Treasury circular letter cited by Movants does not help them.  It cannot alter the fact that, as the transfer authorizations show, all transfers had to be approved by Treasury.  But regardless, the Treasury circular letter states a payment voucher related to HTA Allocable Revenues is a "[d]ocument[] for which data entry and approval have been delegated to the agencies."  Treasury Circular Letter 1300-01-99, App. 3, Natbony Reply Dec. Ex. 41.  HTA is not an "agency" "within" the Commonwealth, it is a public corporation separate from the Commonwealth.  *See* 9 L.P.R.A. § 2002 (creating HTA as "public corporation"); Treasury Circular Letter 1300-01-99, App. 3, Natbony Reply Dec. Ex. 41 (defining "Agency" as "Any department, division, office or body **within** the Executive, Legislative or Judicial branch, the funds of which are under the custody of the Secretary of the Treasury.") (emphasis added).  Moreover, even if HTA were an "agency," the letter only suggests ministerial tasks of "data entry and approval" have been delegated.  It does not suggest the "agency" has authority to do whatever it wishes with the HTA Allocable Revenues.

30.     Movants' other arguments fail.  Movants cite draft budgets prepared by HTA referring to the HTA Allocable Revenues as HTA's "Own Income" to supposedly show HTA Allocable Revenues are owned by HTA.[47]  But that suggests nothing of the sort.  Before the Commonwealth retained the revenues, they formed part of HTA's income—once they were actually transferred to HTA.  As Movants themselves note (Reply ¶ 21, n. 26), once HTA stopped receiving the HTA Allocable Revenues, HTA stopped describing them as HTA's "own income."[48]  This only confirms

---

[47] PRHTA Budget Recommendations Memorandum for Fiscal Year 2014-2015, HTA_STAY0000387-402 at 394, Natbony Reply Dec. Ex. 25 (proposed HTA budget for fiscal year 2014–2015 listing the Excise Taxes under the category of "Own Income and Other Resources", and as "the income generated by the Agency"), and PRHTA Budget Recommendations Memorandum for Fiscal Year 2015-2016, HTA_STAY0000403-416, Natbony Reply Dec. Ex. 27 (proposed HTA budget for fiscal year 2015–2016 stating that HTA's "own income comes from the excise taxes on gasoline and diesel, toll collections, licenses, license plates, and cigarettes").

[48] *See* Letter from Carmen A. Villar Prados to Jose M. Orta Valdez dated June 13, 2016, HTA_STAY0000417-453 at 418, 427, Natbony Reply Dec. Ex. 26 (proposed HTA budget for fiscal year 2016–2017 not counting HTA Allocable Revenues as "own income" and explaining that the "Authority's income decreased during this fiscal year as a result of the clawback that came into force on December 1, 2015, under Executive Order 2015-046").

23

the Oversight Board's position.  Indeed, it is inconsistent with Movants' position—if HTA still owned the HTA Allocable Revenues, then it would presumably still account for them as its "Own Income" under Movants' theory.[49]  It does not—a fact consistent only with the Oversight Board's theory.

31.     Similarly, Movants claim "the Commonwealth's implementation" of the applicable statutes confirm the Bondholders own the HTA Allocable Revenues in line with a "century of authority."  Reply ¶ 25.  In the Opposition (¶ 93) the Oversight Board distinguished all twelve cases cited by Movants.  Movants fail to respond to the Oversight Board's arguments except for a single case, *Bexar Cty. Hosp. Dist. v. Crosby*, 160 Tex. 116, 199 (Tex. 1959).  But the Texas statute at issue there limited the use of revenues solely to paying bonds.  Here, there is no such limitation—the Commonwealth can use the revenues to pay its debt; HTA for any corporate purposes.[50]

### B.  The Facts Do Not Support Movants' Allegations They Have a Constructive Trust

32.     Movants argue they are entitled to a constructive trust because "the Commonwealth

---

[49] Movants also cite a Commonwealth financial statement purportedly "excluding the Excise Taxes from the Commonwealth's Statement of Revenue."  Reply ¶ 21, n.26 (citing 2015 CW Financial Statement, CW_STAY0009784-10167 at 9818-19, Natbony Reply Dec. Ex. 2).  This document actually states that the HTA Allocable Revenues "are not included as revenues *for the purpose of calculating the debt limit*, although they may be available for the payment of debt service" (emphasis added).  Similarly, Movants cite an internal HTA spreadsheet from years when HTA still received transfers of the HTA Allocable Revenues that contained a heading referring to "Puerto Rico Highways and Transportation's Fund 278" to argue the HTA Allocable Revenues are owned by HTA.  *See* Reply ¶ 22, n. 27 (citing HTA_STAY0000207, Natbony Reply Dec. Ex. 27 (spreadsheet maintained by HTA titled "Puerto Rico Highways and Transportation's Fund 278"); ¶ 22 n. 31 (making the same point).  Movants also cite deposition testimony that the same document does contain a heading phrased in the possessive.  *Id.* (citing Ahlberg Tr. 49:2-50:4 (conceding the document uses possessive grammar)).  The fact Movants feel compelled to rely on such thin reeds says much more about the power of their argument than the use of a possessive word in an accounting document to refer to HTA Allocable Revenues that HTA actually received.

[50] Movants also argue that "as with similar special-revenue financing for municipalities on the mainland, dedicated revenue streams fall outside the Commonwealth's General Fund appropriation process and are treated as the public corporations' 'own income' (*ingresos propios*)."  Reply ¶ 21.  The argument that the HTA Allocable Revenues are not subject to "annual appropriations" is dealt with above.  *See supra* ¶ 20.  The only authority Movants cite that fund money is "treated as the public corporations' 'own income'" is a dissenting opinion in *Hernandez Torres v. Hernandez Colon*, 129 D.P.R. 824, 872 (P.R. 1992), which does not contain any such statement anywhere in the opinion.  *See* Natbony Reply Dec. Ex. 23.  The case did not involve the HTA Allocable Revenues but rather various obligations of PREPA, and was decided by the majority on standing grounds.  It has no applicability to the case at hand.  Similarly, Movants other cites (Reply ¶ 25, n. 25) do not help them.  *Saratoga Harness Racing Ass'n v. Agric. & N.Y. State Horse Breeding Dev. Fund*, 22 N.Y. 2d 119, 123-24 (N.Y. 1968) (holding under New York law that moneys collected by an entity separate to the central New York government into segregated accounts and held for specific purposes was not covered by New York's part of New York's constitutional appropriations clause); *New Jersey Sports & Exposition Auth. v. McCrane*, 61 N.J. 1, 18 (1972) (discussing whether legislation authorizing building of sports complex was consistent with New Jersey constitution).

began diverting the Excise Taxes in Fund 278 away from HTA-held bank accounts."  Reply ¶ 27.

Movants are wrong.  The Commonwealth has not "diverted" anything[51]—before the Commonwealth

began retaining the HTA Allocable Revenues, it collected and commingled them all with other

Commonwealth resources; after the Commonwealth started retaining them, it continued doing the

exact same thing, only it no longer appropriated the moneys to HTA.  Movants' constructive trust

argument cannot work under any theory.  If, as Movants claim, they have property interests in the

HTA Allocable Revenues upon collection, then no property has been diverted from them.  If, on the

other hand, Movants do not have security interests until HTA at least receives the revenues, Movants

cannot use the constructive trust doctrine to enlarge their security interests.[52]

33.     Movants are wrong that *In re Howard's Alliance Corp.*, 874 F.2d 88, 95 (2d Cir. 1989)

is on all fours with the facts.  Reply ¶¶ 26-27.  In *In re Howard's*, the secured creditor had an attached

security interest in the debtor's inventory pursuant to a contract with the debtor.  The debtor then

intentionally transferred its inventory to a different state where the security interest had not been

---

[51] Movants argue that "[i]n a misguided effort to avoid accountability, the Commonwealth has taken to describing the illegally diverted Pledged Revenues as 'withheld' or 'retained' in its financial records" and cite a number of documents that refer to the HTA Allocable Revenues as "withheld" or "retained."  Reply ¶ 27.  It is unclear what difference the use of "retained" or "withheld" in accounting documents makes.

[52] *See, e.g., Rentas v. Claudio (In re Garcia)*, 484 B.R. 1, 17 (Bankr. D.P.R. 2012) ("The constructive trust equitable doctrine was incorporated in Puerto Rico . . . to prevent unjust enrichment. The doctrine of unjust enrichment, however, is not applicable in Puerto Rico when there is a written contract between the parties. When there is a contract, there is no need to resort to equity for only the contract governs."); *Luperena v. P.R. Transp. Auth.*, 79 D.P.R. 464, 1956 PR Sup. LEXIS 186, *13 (P.R. 1956) (constructive trusts "must be confined, in any event, to situations unforeseen by our positive law.").  Movants argue constructive trusts can be imposed even in the face of contracts and statutes providing other remedies, citing *Porrata Doria v. Fajardo Sugar Co.*, 57 D.P.R. 628, 643-44 (1940).  However, *Porrata Doria* did not state constructive trusts could be used to circumvent contracts and statutes, and involved facts relating to a deceitful land sale with no similarity to the facts here.  Moreover, the Puerto Rico Supreme Court later clarified that constructive trusts cannot be imposed so as to undermine contracts and statutes.  *See Luperena v. Transp. Auth.*, 79 D.P.R. 464 at 448-49 (1956) (constructive trusts "must be confined, in any event, to situations unforeseen by our positive law."); *In re Garcia*, 484 B.R. 1 (Bankr. D.P.R. 2012), *rev'd on other grounds*, 507 B.R. 32 (B.A.P. 1st Cir. 2014) ("**The doctrine of unjust enrichment, however, is not applicable in Puerto Rico when there is a written contract between the parties** . . . It then follows that in *Luperena v. Autoridad de Transporte*, 79 P.R.R. 438, 79 D.P.R. 464 (1956), the Supreme Court circumscribed the use of constructive trusts to 'situations not foreseen by strict law.' *Id.* at 573, 1956 PR Sup. LEXIS 186 at *13.") (emphasis added).  Movants contend these cases do not apply because "Movants are not seeking to undo or 'overrule' an existing contractual commitment."  Reply ¶ 32, n. 43.  But this is not true—Movants seek to overrule the limitations imposed on their security interests by the HTA Bond Resolutions and obtain property interests against moneys held by an entity that expressly disclaimed liability on the HTA Bonds.  9 L.P.R.A. § 2015.  Movants' requested relief would subvert the entire statutory and contractual landscape, and give them property rights they never bargained for.

perfected, to defeat the creditor's interest. Here, unlike in *In re Howard's*, Movants have no security agreement with the Commonwealth—the Commonwealth expressly negated liability on the Bonds. 9 L.P.R.A. § 2015. Movants insured bonds stating their only security interest was money deposited into the Pledged Funds. Opp. ¶ 74. Unlike *In re Howard's*, Movants' security interests never attached at all—the debtors did not take actions to defeat the perfection of attached security interests. And while Movants assert the Commonwealth acted "to frustrate the Bondholders' interest in these funds," Reply ¶ 27, not a single fact supports this assertion. The Commonwealth retained the revenues to pay GO debt under the Puerto Rico Constitution. P.R. Const. Art. VI, § 8.

34.    Moreover, Movants endow accounting with fact-changing power it does not have when they state "the Commonwealth's allocation of Excise Tax Revenues to Fund 278 is sufficient to establish a traceable trust *res*." Reply ¶ 28. As discussed above, a "fund" is not a bank account, does not correspond to bank account balances, and does not track money through bank accounts.[53] As made clear in the Ahlberg testimony, HTA Allocable Revenues comprise only "part" of the revenues classified as Fund 278, not all of it, and thus cannot be used as a trust *res*. *Supra* ¶ 24. The facts show HTA Allocable Revenues are always commingled and never held by the Commonwealth in a separate account away from other Commonwealth revenues. *Supra* ¶ 24. There is never an identifiable trust *res* showing Movants have no trust.[54]

---

[53] *Supra* ¶ 24. Movants argue that "[t]he government parties' Rule 30(b)(6) witness conceded that cash transfers out of the TSA could be identified to Fund 278." Reply ¶ 24, n. 34. Movants overstate the testimony. As the witness stated, fund designation "is not a way that they use to track money. It is a way that they use to track revenue" when it is collected. Ahlberg Tr. 64:8-19. The fact that the government would record a certain amount of collections as part of Fund 278, then later transfer a corresponding amount to HTA and state that such transfer, as a matter of business common sense, fulfilled the government's obligation to transfer the HTA Allocable Revenues to HTA does not mean the HTA Allocable Revenues ever constituted a traceable and identifiable trust corpus or ever could be matched to specific dollars in specific accounts. As demonstrated above, *supra* ¶ 24, they do not, and as the witness noted, "we use the Fund code to identify the source of funds, **not necessarily to tag exact dollars in the TSA that are transferred**"). Ahlberg Tr. 204:13-21 (emphasis added). As Movants concede, tracing is not before the Court at this time, and the Oversight Board reserves all rights to demonstrate Movants cannot trace any trust corpus in the future. Suffice it to say, as specific dollars in specific accounts cannot be identified as part of Fund 278, Fund 278 does not assist Movants in tracing their purported trust corpus.

[54] *See, e.g., First Federal of Michigan v. Barrow*, 878 F.2d 912, 915 (6th Cir. 1989) ("Since the purported constructive trust consisted of money, which had no extrinsic identifiable characteristics of its own, that was initially deposited and

35.     For similar reasons, Movants' assertion commingling in the TSA makes no difference
as the TSA is "simply a cash management tool" and thus commingling "in no way impacts their
beneficial ownership" is wrong.  While beneficial ownership is a legal conclusion,[55] Movants do not
cite any legal authority for this proposition, only the Holder Report—which does not say anything
about ownership, nor could it.  As shown above, Movants can have no trust because the money is not
segregated (even for accounting purposes) nor identifiable as particular dollars in particular accounts.

36.     *Gracia-Gracia v. Fin. Oversight & Mgmt. Bd.*, 939 F.3d 340, 351 (1st Cir. 2019),
contradicts Movants position.  *Cf.* Reply ¶ 28.  There, the First Circuit held movants failed to show a
trust relationship existed with moneys that had been commingled with other Commonwealth moneys.
*Id.*  The only money the First Circuit recognized could be subject to a trust was the money segregated
"in a separate account."  *Id.*  Yet here the HTA Allocable Revenues are never segregated "in a separate
account"—they are at all times commingled in general Commonwealth accounts—indeed, HTA
Allocable Revenues form only part of Fund 278.  *Supra* ¶ 26.  Movants' trust arguments fail.

**C. The Facts Are Inconsistent With Movants' Claim They Have A Resulting Trust**

37.     Movants concede "'[r]esulting trusts . . . arise where there is a conveyance without
consideration, and . . . it is apparent that the grantor was still to retain his beneficial ownership.'"
Reply ¶ 31 (quoting *Fleet Nat'l Bank v. Valente (In re Valente)*, 360 F.3d 256, 263 (1st Cir. 2004)).

---

commingled into [one of the debtor's bank accounts] with unidentifiable funds received from innumerable and diverse
other sources and daily redeposited and again commingled in [another of the debtor's bank accounts], appellants' funds
irretrievably lost their identity."); *see also Howard v. Burlington Northern & Santa Fe Ry. (In re Bangor & Aroostook
R.R.)*, 320 B.R. 226, 232 (Bankr. D. Maine 2005) (citing *First Federal of Michigan v. Barrow* approvingly); *Ferris, Baker
Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.)*, 371 F.3d 397, 402 (8th Cir. 2004) ("Thus, like a common-law trust,
a constructive trust creates a trust in specific property, not an amorphous 'amount.'").  Contrary to Movants'
contentions (Reply ¶ 28), they are not protected by the "lowest intermediate balance" rule unless they can first establish a trust exists
on specific trust property.  As there is never any identifiable property that could be subject to a trust in their favor, Movants
fail at the first hurdle, and the "lowest intermediate balance" rule cannot be used to create a trust that does not otherwise
exist.  *See, e.g.,* Restatement (Second) of Trusts § 76 (1959) ("A trust cannot be created unless the subject matter is definite
or definitely ascertainable.").

[55]  *See, e.g., SX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276 297, n. 8 (2d Cir. 2011) ("beneficial ownership
is a legal question").

Movants argue they have a resulting trust because "the Commonwealth has attempted to unlawfully convey special revenues in Fund 278 to itself." Reply ¶ 31. Movants are wrong. Fund 278 simply is not something "out of" which money can be "conveyed." "Fund 278" is an accounting classification tool—it does not track money in accounts. *See supra* ¶ 24. Stating there has been "a conveyance of the Excise Taxes out of Fund 278" makes no sense. Similarly, resulting trusts only give beneficial interests to the "transferor" of property. *Valente*, 360 F.3d at 263. Here, the only possible transferor is the Commonwealth—thus the only possible beneficiary of a resulting trust is the Commonwealth, not Movants, who transferred nothing to the Commonwealth.

**D. The HTA Allocable Revenues Are Not Made Available to HTA Until Received by HTA, and Cannot Be Earlier Pledged by HTA**

38.    9 L.P.R.A. § 2004(l) stops HTA from granting security interests in HTA Allocable Revenues not "made available" to HTA. Movants argue the HTA Allocable Revenues are "made available" to HTA "by the Fund 278 designation and the ability of HTA to approve Fund 278 transactions." *See* Reply ¶ 41, n. 48. This is incorrect. As explained above, *supra* ¶ 24, Fund 278 is just a name used to classify certain Commonwealth revenues. The classification of revenues as "Fund 278" revenues does nothing to make the money available to HTA (indeed, HTA Allocable Revenues form only part of Fund 278). Similarly, HTA never had "the ability . . . to approve Fund 278 transactions." *Supra* ¶¶ 28-31. HTA no longer even records the HTA Allocable Revenues as its income. *Supra* ¶ 30. As Movants concede, "available" means "able to be used or obtained; at someone's disposal." Reply ¶ 41, n. 48. It is impossible to state money HTA cannot access, use, or obtain, and which it does not count as its own income, has been "made available" to HTA.[56] Movants

---

[56] Movants argue the "Spanish text of section 2004(l) uses the term 'disposición' (where the English text uses 'available'). Section 31751, which requires the Commonwealth to cover certain Excise Tax proceeds into a special deposit in HTA's favor, is entitled . . . in Spanish, 'Disposición de Fondos.' The identical Spanish language wording in section 2004(l) and section 31751 shows that section 31751 places the Excise Taxes at the disposition of HTA and that section 2004(l) in turn authorizes HTA to pledge these funds." Reply ¶ 41, n. 48. But this is incorrect for many reasons. *First*, 9 L.P.R.A. § 2004(l) does not simply use the word "disposicion," but rather the phrase "que puedan ser puestos a la disposicion," which

fail to explain why the Commonwealth would stop HTA from granting security interests on HTA

Allocable Revenues before HTA receives them, while at the same time granting Bondholders property

interests in that money before it gets to HTA.

### E. The Factual Record Does Not Assist Movants' Arguments They Have a Statutory Lien

39.       The Opposition explained Movants do not have statutory liens against the HTA

Allocable Revenues.  *See* Opp. ¶¶ 16, 100-02.  Movants argue they do because, given their factual

arguments, the HTA Allocable Revenues "are *HTA's* property," and thus there is no inconsistency

with the Commonwealth excluding liability on the Bonds and granting a statutory lien on the

Commonwealth's property, because according to Movants the HTA Allocable Revenues are not the

Commonwealth's property.  Reply ¶ 48.  But nothing in the record shows the Commonwealth does

not annually impose the taxes and fees, collect them, and own them until it transfers them away.

40.       This further sinks Movants' statutory lien arguments.  Not only does nothing in the

applicable statutes suggest Bondholders have statutory liens,[57] but it makes no sense the

Commonwealth would exclude liability on the Bonds pursuant to 9 L.P.R.A. § 2015, but then grant a

statutory lien on its property to secure debt it does not owe.  While Movants are correct that it is

---

means "that may be made available."  13 L.P.R.A. § 31751 does not use that phrase.  *Second*, as discussed above, *supra* ¶ 22, the word "disposicion," as used throughout 13 L.P.R.A. § 31751, means "provision," in the sense of "section," or "article," not "available."  *Third*, even if 13 L.P.R.A. § 31751 is entitled "Disposition of Funds," the title alone does not make those funds available to HTA.  Rather, the section provides how funds are conditionally required to be appropriated (and thus, eventually, made available) to HTA—it does not effect an *ipso facto* transfer.

[57] Movants suggest that the Oversight Board failed to address their arguments relating to *In re Fonseca*, 534 B.R. 261, 268-69 (Bankr. D.P.R. 2015), *aff'd*, 542 B.R. 628 (B.A.P. 1st Cir. 2015), by focusing its argument in stating that the "HTA Enabling Act" creates no statutory lien, when Movants argued the HTA Allocable Revenue Statutes do.  Reply ¶ 51.  This is manifestly not true, as the Oversight Board made very clear throughout its Opposition that none of the HTA Allocable Revenue Statutes contain language sufficient to create a statutory lien.  *See, e.g.,* Opp. ¶¶ 16, 102.  *Fonseca* is not applicable to the HTA Allocable Revenue Statutes.  *Fonseca* involved set-off by a bank on bank accounts that were held by that bank, as expressly authorized by statute.  There is no similarity between *Fonseca* and the facts here.  Moreover, Movants are wrong that the word "shall" somehow creates a lien—if it did, there would be no unsecured claims.  Finally, the HTA Allocable Revenue Statutes do not anywhere mandate the transfer of the HTA Allocable Revenues to pay Bondholders—the HTA Allocable Revenue Statutes conditionally appropriate funds to HTA for HTA's corporate purposes, including the payment of bonds "and other obligations."  13 L.P.R.A. § 31751.  It is telling Movants cite to a non-impairment covenant to argue they have a statutory lien.  Opp. ¶ 46.  Movants are confusing a contractual commitment and a lien.

possible to grant a lien to secure another person's debt, Reply ¶ 51, that is just another way of becoming liable for that debt. *See* Restatement (Third) of Suretyship & Guaranty § 1(1) (Am. Law. Inst. 1996) ("a secondary obligor has suretyship status whenever . . . an obligee has recourse against . . . that person's property with respect to the obligation . . . of another person . . . ."). Movants' argument hinges on the contention the Commonwealth expressly refused to guarantee the HTA Bonds (9 L.P.R.A. § 2015), but nonetheless surreptitiously guaranteed them through winks and nods.

### F.  Movants Cannot Bootstrap The Facts Into Their Preemption Argument

41.     The Opposition demonstrated the HTA Allocable Revenues have been preempted. *See*, *e.g.*, Opp. ¶¶ 10-12, 83-88.  Movants attempt to rebut this by assuming all their trust and lien arguments, which hinge on their factual allegations, are correct, and by mischaracterizing the Oversight Board's position as an attempt to preempt property rights.  Reply ¶¶ 81-106.  Movants misrepresent the Oversight Board's arguments.  The Oversight Board does not contend that either PROMESA Titles II or III eliminate unsecured obligations or secured property rights.  Instead, as this Court and the First Circuit have held before, PROMESA Title II preempts any territorial law appropriating Commonwealth money.  Opp. ¶¶ 83-88; *Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3 (1st Cir. 2019) ("if a certified budget is to have 'full force and effect' . . . there can be no spending from sources not listed in that budget, regardless of what any territorial laws say.").  The HTA Allocable Revenue Statutes give Bondholders neither ownership interests nor statutory liens in the HTA Allocable Revenues; they simply constitute standing appropriations of Commonwealth money to HTA.  PROMESA's grant of budgetary authority to the Oversight Board is inconsistent with statutes appropriating revenues independent of the Oversight Board's certification.  Movants fail to address this argument in the twenty five paragraphs they dedicate to attacking an argument the Oversight Board never made.

[*Remainder of page intentionally left blank*]

## **CONCLUSION**

For the reasons stated herein, the Motion should be denied.


Dated: May 18, 2020                       Respectfully submitted,
    San Juan, Puerto Rico

                                        */s/ Martin J. Bienenstock*

                                        Martin J. Bienenstock
                                        Ehud Barak
                                        (Admitted *Pro Hac Vice*)
                                        **PROSKAUER ROSE LLP**
                                        Eleven Times Square
                                        New York, NY 10036
                                        Tel:  (212) 969-3000
                                        Fax:  (212) 969-2900

                                        *Attorneys for the Financial Oversight and*
                                        *Management Board as representative of the*
                                        *Debtor*

                                        */s/ Hermann D. Bauer*

                                        Hermann D. Bauer
                                        USDC No. 215205
                                        **O'NEILL & BORGES LLC**
                                        250 Muñoz Rivera Ave., Suite 800
                                        San Juan, PR 00918-1813
                                        Tel:  (787) 764-8181
                                        Fax:  (787) 753-8944

                                        *Co-Attorneys for the Financial Oversight and*
                                        *Management Board as representative of the*
                                        *Debtor*