**Preliminary Hearing:** June 4, 2020, at 9:30 a.m. (AST)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>      as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>      Debtors.[1] | PROMESA Title III<br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| AMBAC ASSURANCE CORPORATION, FINANCIAL GUARANTY INSURANCE COMPANY, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., and U.S. BANK TRUST NATIONAL ASSOCIATION,<br><br>      Movants,<br>v.<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>      as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>      Respondent. | Case No. 17-BK-3283-LTS<br><br>**Re: ECF Nos. 10602, 12995** |

## SUR-REPLY OF COMMONWEALTH OF PUERTO RICO IN OPPOSITION TO AMENDED PRIFA BONDHOLDER MOTION TO LIFT AUTOMATIC STAY [ECF NO. 10602]

---

[1] The Debtors in the jointly-administered Title III cases, along with each Debtor's respective Title III case number (listed as a bankruptcy case number due to software limitations) and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (*i*) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (*ii*) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (*iii*) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (*iv*) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (*v*) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19 BK 5523-LTS) (Last Four Digits of Federal Tax ID: 3801).

## **TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT ............................................................................................1

SUR-REPLY ........................................................................................................................6

I. THE COMMONWEALTH'S ACCOUNTING SYSTEM IS IRRELEVANT AND IMMATERIAL TO PRIFA OR BONDHOLDER RIGHTS ...........................................6

 A. Accounting Treatment Does Not Determine Ownership or Substantive Rights.................6

 B. "Course of Performance" Is Irrelevant to Statutory Interpretation. ....................................7

 C. The Commonwealth's "Course of Performance" Is Irrelevant to Interpretation of the Trust Agreement, to Which it is Not a Party ......................................................................10

 D. References to "Restricted" Funds Are Irrelevant to Movants' Purported Trust Interests..10

II. MOVANTS FAIL TO DEMONSTRATE ANY PROPERTY OR SECURITY INTEREST IN THE RETAINED RUM TAX REMITTANCES .................................................................11

 A. The Rum Tax Remittances are the Commonwealth's Property .........................................11

 B. Movants Mischaracterize Ahlberg's Testimony Regarding the Infrastructure Fund.........14

 C. Movants' New "Special Deposit" Argument is Irrelevant and Incorrect...........................18

III. EVEN ACCEPTING MOVANTS' ASSERTED "FACTS" AS TRUE, THEY MAKE NO DIFFERENCE TO MOVANTS' PROPERTY INTERESTS.......................................................21

 A. The TSA Account is Not, and Cannot Be, the Infrastructure Fund ...................................21

 B. Movants Have No Security Interest in Monies in the Infrastructure Fund .......................24

 C. Movants' "Facts" Do Not Create a Trust Relationship......................................................26

 D. Movants' Alleged New "Facts" Do Not Affect the Preemption Analysis.........................29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza*,
484 F.3d 1 (1st Cir. 2007) ........................................................................................ 26

*Brueseqitz v. Wyeth LLC*,
562 U.S. 223 (2011) ..................................................................................................... 9

*Connecticut Gen. Life Ins. Co. v. Universal Ins. Co.*,
838 F.2d 612 (1st Cir. 1988) ..................................................................................... 29

*Delaware v. New York*,
507 U.S. 490 (1993) ...................................................................................................... 7

*Demore v. Hyung Joon Kim*,
538 U.S. 510 (2003) ................................................................................................... 19

*Fed. Crop Ins. Corp. v. Merrill*,
332 U.S. 380 (1947) ...................................................................................................... 9

*Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. For P.R.*,
939 F.3d 340 (1st Cir. 2019) ............................................................................... 26, 27

*Hearts with Haiti, Inc. v. Kendrick*,
2015 U.S. Dist. LEXIS 86211 (D. Me. July 2, 2015) ................................................... 3

*In re Friese*,
28 B.R. 953 (Bankr. D. Conn. 1983) ......................................................................... 11

*In re MarketXT Holdings Corp.*,
2007 WL 680763 (Bankr. S.D.N.Y. Mar. 1, 2007) ...................................................... 7

*In re Plaza Resort at Palmas, Inc.*,
741 F.3d 269 (1st Cir. 2014) .............................................................................. 6, 7, 8

*Industrias Metalicas Marva v. Lausell*,
1997 U.S. Dist. LEXIS 13773 (D.P.R. Aug. 28, 1997) ............................................... 2

*Knott v. Shepherdstown Mfg. Co.*,
5 S.E. 266 (W.Va. 1888) ............................................................................................ 11

*Maeso v. Chase Manhattan Bank*,
133 D.P.R. 196 (1993) ................................................................................................. 2

*Marx & Co. v. Diners' Club, Inc.*,
    550 F.2d 505 (2d Cir. 1977) ................................................................................................. 3

*Matamoros v. Starbucks Corp.*,
    699 F.3d 129 (1st Cir. 2012) ................................................................................................. 7

*Midland Nat'l Life Ins. Co. v. Citizens & S. Nat'l Bank*,
    641 F. Supp. 516 (M.D. Ga. 1986) ....................................................................................... 9

*Miller v. Wells Fargo Bank Int'l Corp.*,
    540 F.2d 548 (2d Cir. 1976) ........................................................................................... 20, 21

*Nat'l R.R. Passenger Corp. v. Atchison, T. & S.F.R. Co.*,
    470 U.S. 451 (1985) ............................................................................................................. 10

*Perez v. Mortg. Bankers Ass'n*,
    135 S. Ct. 1199 (2015) .......................................................................................................... 9

*Pittman v. Chicago Bd. of Educ.*,
    64 F.3d 1098 (7th Cir. 1995) (Posner, J.) .......................................................................... 8

*Reed & Reed, Inc. v. Weeks Marine, Inc.*,
    431 F.3d 384 (1st Cir. 2005) ................................................................................................. 8

*Regions Bank v. Par. of Caddo*,
    978 So. 2d 494 (La. Ct. App. 2008) ..................................................................................... 7

*Roig Commercial Bank v. Buscaglia*,
    74 D.P.R. 986 (P.R. 1953) .................................................................................................... 9

*Rossy v. Superior Court*,
    80 D.P.R. 729 (P.R. 1958) .............................................................................................. 2, 27

*San Diegans for Open Gov't v. City of San Diego*,
    242 Cal. App. 4th 416 (2015) ............................................................................................... 7

*State ex rel. Spink v. Kemp*,
    283 S.W.2d 502 (Mo. 1955) ................................................................................................. 7

*TOLIC v. Rodriguez Febles*,
    170 D.P.R. 804 (P.R. 2007) ................................................................................................. 28

*Trainmen* v. *Baltimore & Ohio R.R. Co.*,
    331 U.S. 519 (1947) ............................................................................................................. 19

*Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R.*,
    945 F.3d 3 (1st Cir. 2019) ............................................................................................. 29, 30

## STATUTES

3 L.P.R.A. § 1907(a) ........................................................................................................... 1

3 L.P.R.A § 1910 ................................................................................................................ 5

3 L.P.R.A. § 1911 ............................................................................................................. 28

3 L.P.R.A. § 1913 ............................................................................................................. 10

3 L.P.R.A. § 1914 ....................................................................................................... *passim*

3 L.P.R.A. § 1923(b) ........................................................................................................ 27

7 L.P.R.A. § 587 ............................................................................................................... 24

13 L.P.R.A. § 4(a) ............................................................................................................ 23

13 L.P.R.A. § 4(b) ...................................................................................................... 22, 23

13 L.P.R.A. § 4(c) ............................................................................................................ 23

13 L.P.R.A § 12 ............................................................................................................... 30

13 L.P.R.A § 1906(m) ..................................................................................................... 30

18 L.P.R.A. § 1026 .......................................................................................................... 22

18 L.P.R.A. § 3871 .......................................................................................................... 22

18 L.P.R.A. § 3873 .......................................................................................................... 22

19 L.P.R.A. § 2233(b)(2) ................................................................................................. 12

26 L.P.R.A. § 8055 .......................................................................................................... 26

31 L.P.R.A. § 2561 .......................................................................................................... 28

32 L.P.R.A. § 3351 .......................................................................................................... 28

32 L.P.R.A. § 3352f ......................................................................................................... 28

26 U.S.C. § 7652(e)(1) ............................................................................................. *passim*

P.R. Act No. 219-2012 ..................................................................................................... 28

## OTHER AUTHORITIES

GASB Statement No. 48 NO. 258-A (2006) ..................................................................... 14

The Commonwealth, by and through the Oversight Board, respectfully submits this sur-reply (the "Sur-Reply") to Movants' reply [ECF No. 12995] (the "Reply").[1]  Because, as discussed below, Movants' portrayal of information they obtained through discovery (even if it were accurate) does not alter the reality the Enabling Act and Trust Agreement provide them no property or security interest beyond  Rum Tax Remittances deposited in the Sinking Fund, the Motion should be denied.[2]

## PRELIMINARY STATEMENT

1.      Despite numerous rounds of briefing, Movants have not and cannot overcome the plain meaning of the relevant statutes and the Trust Agreement. First, 26 U.S.C. § 7652(e)(1) provides the rum taxes collected by the United States "shall be covered into the treasuries of Puerto Rico and the Virgin Islands."  Movants cannot refute that each year the United States transfers the Rum Taxes to the Commonwealth—not PRIFA and not Bondholders.  Second, 3 L.P.R.A. § 1914  provides that each fiscal year, certain amounts of the Rum Tax Remittances "herein appropriated," shall be covered into the Puerto Rico Infrastructure Fund when received.  Movants premise their entire case on the contention that the Commonwealth does not own the Rum Tax Remittances that the statute requires it to appropriate each year.  Third, while 3 L.P.R.A. § 1907(a) authorizes PRIFA to secure Bonds with all or any part of its revenues, PRIFA did not  pledge everything the statute permitted.  Rather, Trust Agreement § 401 provides: "The Authority shall not pledge or create any liens upon any moneys in the Puerto Rico Infrastructure Fund."  Section 601 of the Trust Agreement (i) pledges only "Pledged Revenues" to the extent provided in the Trust Agreement, (ii) provides the Bonds "are payable solely from the Pledged Revenues," and (iii) expressly negates the Commonwealth's liability on the Bonds.  Trust Agreement § 101 defines "Pledged Revenues" to mean: "the Special Tax

---

[1]  The Oversight Board does not concede or waive any argument not discussed in this Sur-Reply, and reserves all rights to oppose all Movants' arguments in future filings and at oral argument.

[2]  Capitalized terms used but not defined herein shall have the meaning given them in the Oversight Board's supplemental opposition [ECF No. 10611] (the "Supplemental Opposition"). References to Exhibits in this reply, unless otherwise specified, refer to the *Declaration of Michael T. Mervis* ("Mervis Decl."), filed concurrently herewith, as appropriate.

Revenues and any other moneys that have been deposited to the credit of the Sinking Fund," and

defines Special Tax Revenues to mean the Rum Tax Remittances "deposited to the credit of the Puerto

Rico Infrastructure Fund pursuant to the Act."  Thus, the Trust Agreement only pledges the excise

taxes transferred into the Sinking Fund, while Movants' argument depends on a pledge of the taxes

before they are transferred to the Sinking Fund.  Moreover, the Trust Agreement and Enabling Act

expressly provide all pledges are subject to Commonwealth retention, thereby making clear the

Commonwealth retains an interest in the Rum Tax Remittances even after they are deposited in the

Sinking Fund.  Fourth, Movants point to nothing in the Official Statements to support any of their

ownership, trust, and statutory lien arguments.  Similarly, Movants do not cite to any attorneys'

opinions given at closing.  Put differently, Movants are contending their means of payment on billions

of dollars of bonds was kept secret from investors solicited to buy the bonds and not even the lawyers

knew the supposed legal effects.  Movants' argument flies in the face of common sense and clear

Puerto Rico law, which prohibits secret trusts[3] and includes a presumption against encumbrances.[4]

  2. Movants concede the Enabling Act and Trust Agreement are unambiguous.

Nevertheless, to support their theories regarding ownership, equitable liens, and trusts, Movants

misuse accounting tools and deposition testimony to ask this Court to create property rights in

contravention of the plain meaning of statutes enacted by the Legislature (the Enabling Act) and a

contract to which the Commonwealth is not a party (the Trust Agreement).  Moreover, it cannot be

that the Commonwealth's accounting tools confer a property interest.  Movants' "government fund

accounting expert" acknowledges the Commonwealth can change its accounting at its discretion.[5]

---

[3] *See Rossy v. Superior Court*, 80 D.P.R. 729 (P.R. 1958).

[4] *See Maeso v. Chase Manhattan Bank*, 133 D.P.R. 196 (1993).

[5] *See Declaration of William H. Holder* and the expert report attached thereto [ECF No. 13017-1] (the "Holder Report") ¶ 46.  For reasons explained herein, the report does not advance Movants' case even if accepted at face value.  It is also (1) irrelevant and immaterial to the legal issues, (2) improper in a reply brief, and (3) clearly invalid insofar as its legal conclusions and interpretations.  *See, e.g.*, *Industrias Metalicas Marva v. Lausell*, 1997 U.S. Dist. LEXIS 13773, *50 (D.P.R. Aug. 28, 1997) ("patent law expert's opinion on the ultimate legal conclusion is neither required nor indeed

3.       Most significantly, the expert report does not help Movants one bit, even if taken at face value.  Bottom line, the Holder Report (¶¶ 9-12 and 40-46) concludes the Rum Tax Remittances can be accounted for as "restricted" and as part of a special revenue fund even if recorded in a general fund.  The report's definitions show those conclusions have zero legal significance here.  Mr. Holder admits a "fund" refers to monies set aside to carry out a specific activity or to achieve certain objectives pursuant to a law, regulation, restriction, or limitation.[6]  And, "restricted" refers to a fund balance constrained by, among other things, contractual debt covenants, and laws such as enabling legislation.[7]  Labeling funds "restricted" because of a contractual or statutory obligation to deploy them for a specific purpose has no impact on  who owns them or if a perfected security interest, trust, or lien exists.  The accounting statements simply served the normal function of disclosing to readers that certain funds were supposed to be used for certain purposes due to Puerto Rico statutes and the Trust Agreement.  Mr. Holder does not and could not opine the restrictions override PROMESA, Title III, the Enabling Act, laws of secured transactions, and preemption.  Those are the issues and the accounting opinion is immaterial and irrelevant to them.

4.       Moreover, Movants' expert admits he was instructed to assume "PROMESA does not preempt the Puerto Rico excise tax or other relevant statutes."  Holder Report ¶ 8 n.15.  Given this Court's ruling that PROMESA preempts legislative appropriations has been affirmed by the First Circuit, and the statute obligating the Commonwealth to transfer annually certain excise taxes to the

---

evidence at all") (internal citations and quotations omitted); *Hearts with Haiti, Inc. v. Kendrick*, 2015 U.S. Dist. LEXIS 86211, *8 (D. Me. July 2, 2015) ("Her opinion is little more than a legal conclusion and well beyond the bounds of permissible expert testimony"); *see also Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir. 1977) (same).  Discussion of the Holder Report herein is without waiver of this objection.

[6]  *See* Holder Report ¶ 2 (defining "fund" as "[a]n amount of money or other resource set aside for the purpose of carrying out a specific activity or to achieve certain objectives pursuant to the special laws, regulations, restrictions or limitations and which constitute an independent fiscal and accounting entity. It includes the accounts created to keep record of the proceeds of the issuance of bonds that may be authorized).

[7]  *See* Holder Report ¶ 4 (defining "restricted" as constraints on resources that are (1) "externally imposed by creditors (such as through debt covenants), grantors, contributors, or laws or regulations of other governments," or (2) "imposed by law though constitutional provisions or enabling legislation.").

Infrastructure Fund is a "relevant statute," the expert report cannot be relied on by this Court for anything because it is expressly based on erroneous assumptions.

5.      Movants have not produced documents or put forth facts showing any trust relationship between the Commonwealth and PRIFA or its Bondholders.  The facts confirm the Commonwealth uses a single revenue code—"R4420"—to account for *all* Rum Tax Remittances in the TSA,[8] that such monies are "recorded in PRIFAS as General Fund revenue" (Holder Report ¶ 45), and that the Commonwealth must appropriate Rum Tax Remittances to PRIFA before those monies can be transferred to it (*infra* § II.A).[9]  Movants' emphasis on the "restricted" label is of no help for the reasons explained above.  While accounting may help trace funds, there is no need to trace funds Movants have no interest in.

6.      In their Reply, Movants serially distort the facts.  For example:

- Movants cite the description of PRIFA in the 2016 Financial Statements to argue "PRIFA bonds are not appropriation bonds….."  Reply ¶ 95.  Movants miss the point: absent (now-preempted) appropriations to PRIFA, PRIFA has no monies to pledge.  The same financial statement states exactly what happened: "For the year ended June 30, 2016, the Legislature originally ***appropriated*** the $117 million required by Act No. 44-1988 but it was subsequently amended to decrease such appropriation to a total amount of $4 million."  Ex. C at 161 (the "2016 Financial Statements").  The fact the Commonwealth (prior to creation of the Oversight Board) could increase or decrease appropriations to PRIFA shows that PRIFA is dependent on appropriations, which are subject to change by future legislatures.

- In an effort to override 26 U.S.C. § 7652(e)(1) which makes clear the United States transfers the Rum Taxes to the Commonwealth and not to PRIFA, Movants repeatedly misrepresent testimony from the Commonwealth's 30(b)(6) witness, Timothy Ahlberg, stating "The Infrastructure Fund is, rather, understood to refer to 'the first $117 million of rum revenues' received by the Commonwealth each fiscal year."  Reply ¶ 5 (citing Miller Decl., Ex. 26 ("Ahlberg Tr.") 331:15-332:21).  But Mr. Ahlberg never testified the Infrastructure Fund referred to monies *received by the Commonwealth*.  Instead, when asked "whether it is understood to generally refer to the first $117 million of rum revenues *in the TSA*," he answered, "No."  *Id.* 331:25-332:3 (emphasis added).  He further testified that the

---

[8]  Holder Report ¶ 45. ("Documents produced by the Commonwealth and testimony indicate that when the Treasury receives rum tax collections from the United States, revenues are recorded in the General Fund (Fund 111) in Account R4220, the revenue account used by the Treasury to 'record the revenues of rum taxes.'").

[9]  Documents Movants rely on define "General Fund" as "the Commonwealth principal operating fund; disbursements from such fund are generally approved through the Commonwealth's annual budgeting process."  *See Declaration of Atara Miller* [ECF No. 12998] ("Miller Decl."), Exs. 31-33.

Infrastructure Fund was not a Commonwealth account at all.  Ahlberg Tr.  310:10-12 ("There is no account number or Fund identified as the Puerto Rico Infrastructure Fund.").

- Without testimonial or documentary support, Movants concoct a theory that the Infrastructure Fund is somehow in the TSA, arguing "the title of [3 L.P.R.A. § 1914]—'Special Deposit'— makes plain that the Commonwealth transferred ownership of the Pledged Rum Taxes, and intended only to hold them in a fiduciary capacity for PRIFA and its bondholders."  Reply ¶ 28.  To try and reach that result, Movants pluck, out of context, partial phrases from the definition of a "special deposit" fund from one page of the Commonwealth's 2016 financial statements.  Not only does that definition not stand for what Movants represent, the title of a statute is irrelevant to its interpretation. Moreover, how an executive branch official defines a term for accounting purposes has no bearing on the Legislature's intended use of that term.

7.     Movants' discovery attempts to establish the Infrastructure Fund is maintained by the Commonwealth on behalf of PRIFA.  This argument ignores that (1) the United States transfers Rum Taxes to the Commonwealth; (2) according to the Enabling Act and the Trust Agreement, the Rum Tax Remittances are "available resources" of the Commonwealth, subject to retention under Article VI section 8 of the Commonwealth Constitution; (3) PROMESA preempts the appropriations to PRIFA under the Enabling Act; (4) the Infrastructure Fund cannot be in the TSA because the Enabling Act requires PRIFA to have control over it, and PRIFA does not have control over the TSA (*see infra* § III.A); (5) Movants are barred by the Trust Agreement (§ 401) from holding a lien against monies in the Infrastructure Fund; (6) Movants' security interests are confined to monies in the Sinking Fund; (7) 3 L.P.R.A. § 1914 provides appropriated Rum Tax Remittances are to be used by PRIFA for its "corporate purposes," and (8) Trust Agreement § 601 provides Bondholders can only be paid out of Pledged Revenues—defined to include only monies in the Sinking Fund, not the Infrastructure Fund.

8.     Finally, the Reply is notable for what it does not contest: the Commonwealth disclaimed any liability for the PRIFA Bonds (3 L.P.R.A § 1910);[10] the Commonwealth never entered

---

[10] Movants do not address 3 L.P.R.A. § 1910 in their Reply.  It reads, "The bonds issued by the Authority shall not constitute an indebtedness of the Commonwealth nor any of its political subdivisions, and neither the Commonwealth nor any of its political subdivisions shall be liable therefor, and such bond shall be payable solely out of those funds pledged for the payment thereof."  Movants make no attempt to explain why the Commonwealth would enact a statute broadcasting it was not liable for PRIFA bonds while, with a wink and nod, supposedly render its assets liable for PRIFA bonds."

into any security agreement; none of the Official Statements indicate Commonwealth property was pledged or held in trust for PRIFA or its Bondholders; the Official Statements make clear the correct interpretation of "Pledged Revenues" is "Special Excise Taxes deposited to the credit of the Sinking Fund";[11] no financing statements were filed against the Commonwealth; Movants do not have control over the Commonwealth's deposit accounts; the Enabling Act does not anywhere expressly state that the Rum Tax Remittances are held in trust, nor that the funds are subject to a statutory lien; and 3 L.P.R.A. § 1914 is an appropriation statute as it refers to the $117 million as "amounts herein appropriated." The Motion should be denied.

## SUR-REPLY

I.  **THE COMMONWEALTH'S ACCOUNTING SYSTEM IS IRRELEVANT AND IMMATERIAL TO PRIFA OR BONDHOLDER RIGHTS**

### A. Accounting Treatment Does Not Determine Ownership or Substantive Rights.

9.      Movants concede the Enabling Act and Trust Agreement are unambiguous. Reply ¶ 53. The plain language of the statute and agreement shows (1) the Commonwealth owns the Rum Tax Remittances unless and until appropriated to PRIFA, and (2) Bondholders' security interest is confined to monies actually deposited by PRIFA in the Sinking Fund. On reply, Movants retreat from the legal documents and resort to a new theory: how "the Commonwealth accounted for" Rum Tax Remittances and treated them "for accounting purposes" indicates "PRIFA's equitable ownership." Reply ¶ 30. None of the "facts" upon which Movants rely can override the plain language of the statute and Trust Agreement. *In re Plaza Resort at Palmas, Inc.*, 741 F.3d 269, 274 (1st Cir. 2014) ("Statutory construction in Puerto Rico begins with the text of the underlying statute, and ends there

---

[11] The Official Statements define "Pledged Revenues" as "(i) such proceeds of the federal excise tax imposed on rum and other articles produced in Puerto Rico and sold in the United States that are transferred to the Commonwealth (the "Federal Excise Taxes") and deposited to the credit of the Sinking Fund, as required by the Enabling Act and the Trust Agreement; (ii) any other funds appropriated to [PRIFA] to make up a deficiency in the amount of Federal Excise Taxes required to be transferred annually to [PRIFA], as provided in the Enabling Act, that are deposited to the credit of the Sinking Fund, and (iii) investment earnings on moneys on deposit to the credit of the Sinking Fund." Official Statements at 9.

as well if the text is unambiguous.").  Neither accountants nor accounting principles can alter the legal determination of ownership, and Movants cannot use extrinsic, accounting documents and practices to supersede the plain text of the governing legal documents.[12]

10.     "[T]he manner in which … accountants treat[] transactions is not determinative" of "dominion and ownership."  *In re MarketXT Holdings Corp.*, 2007 WL 680763, at *4-5 (Bankr. S.D.N.Y. Mar. 1, 2007); *see also Regions Bank v. Par. of Caddo*, 978 So. 2d 494, 497 (La. Ct. App. 2008) (affirming trial court decision based in part on expert testimony that "the proprietary fund accounting method did not confer ownership of public funds…."); *Delaware v. New York*, 507 U.S. 490, 502 (1993) (stating that "bookkeeping phenomena" do not determine property rights).  And Holder acknowledges the Commonwealth could change its fund accounting methodologies tomorrow, and it would not impact legal rights.  *See* Holder Report ¶ 46.

11.     Nor do Movants cite any cases demonstrating a government's accounting practices and documents can define or grant property rights where they do not otherwise exist.  They cannot. *See, e.g.*, *San Diegans for Open Gov't v. City of San Diego*, 242 Cal. App. 4th 416, 439 (2015) (holding "a public agency's adherence to GASB and GAAP guidelines does not override California law or delineate the legal rights and responsibilities of this state's public agencies").[13]

**B.  "Course of Performance" Is Irrelevant to Statutory Interpretation.**

12.     Movants continue their retreat from the actual language of the Enabling Act and argue instead for an interpretation derived from what they call the Commonwealth's "course of performance."  Reply ¶ 31.  That argument too should be rejected.  As a threshold matter, it is normal

---

[12] *See, e.g.*, *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 134 (1st Cir. 2012) ("We assume that the ordinary meaning of the statutory language expresses the legislature's intent, and we resort to extrinsic aids to statutory construction … only when the wording of the statute is freighted with ambiguity or leads to an unreasonable result."); *Plaza Resort*, 741 F.3d at 274.

[13] A similar result was reached in *State ex rel. Spink v. Kemp*, 283 S.W.2d 502, 515 (Mo. 1955). There, the court rejected the argument that certain funds did not fall within the city's "general revenue" because of the city's "accounting practice" and budget, noting the governing statutes override "accounting practices."  *Id.* at 508-513, 520.

and logical that before PROMESA, and when the Commonwealth was timely paying its debts, the Commonwealth set up its money management and accounting systems to facilitate the transfers directed by appropriations set under the statutes in effect at the time. Here, that means the Commonwealth could well have determined to set aside a portion of the Rum Tax Remittances and to appropriate and channel them to PRIFA, (which would then deposit them to the Sinking Fund), while signaling to readers of the accounting statement the funds were "restricted." That is prudent, responsible money management. It says nothing about ownership, security interests, encumbrances, trust relationships, whether the Commonwealth could have changed appropriations, or any other issue Movants raise.

13.     Movants' course of performance argument is unviable for several additional reasons. *First,* "course of performance" is not relevant to statutory interpretation. While "course of performance may be instructive in contract interpretation," *Reed & Reed, Inc. v. Weeks Marine, Inc.*, 431 F.3d 384, 388 (1st Cir. 2005), "[i]t has long been understood that statutes are not contracts," *Pittman v. Chicago Bd. of Educ.*, 64 F.3d 1098, 1104 (7th Cir. 1995) (Posner, J.). As the Seventh Circuit explained, "a statue is not a commitment by the legislature never to repeal the statute." *Id.* "To treat statutes as contracts would enormously curtail the operation of democratic government. Statutes would be ratchets, creating rights that could never be retracted or even modified without buying off the groups upon which the rights had been conferred." *Id.* Movants cite no cases construing statutes based on course of performance, because none exist.[14] Indeed, it would make horrendous policy, as noncompliance with a statute would rewrite the meaning of the statute.

14.     *Second*, there is no analogous rule for interpreting statutes, because there are no "parties" who "perform" under them. The only arguable "party" to a statute is the legislature that

---

[14] Movants rely on *Reed & Reed*, but that case holds only that course of performance might be relevant to contracting *parties'* intent. *See* 431 F.3d at 388. Here, even if "course of performance" did apply for statutes (which it does not) the Enabling Act is unambiguous, and thus course of performance evidence is impermissible. *Plaza Resort.*, 741 F.3d at 274.

enacted it.  It is the *executive* that implements the statute and "performs" under it.  Such performance

is plainly irrelevant to ascertaining the intent of the legislature.  As "[s]tatutes are not contracts," "it

is the intent of the legislature and not of any other 'party' which is decisive in their

construction."  *Midland Nat'l Life Ins. Co. v. Citizens & S. Nat'l Bank*, 641 F. Supp. 516, 520 (M.D.

Ga. 1986) (citation omitted).  Here, the legislative history of the Enabling Act shows the Legislature

viewed the allocation of Rum Tax Remittances to PRIFA as annual appropriations subject to revision

and amendment.  *E.g.*, PR H.B. 2719, 2002 PR ALS 111 (2002) ("An Act to amend the first paragraph

of [the Enabling Act] in order to increase the sum to be ***appropriated*** to" PRIFA) (emphasis added);

*see also, e.g.*, PR H.B. 2791, 2006 PR ALS 119 (2006) ("In order to enable the Puerto Rico

Infrastructure Financing Authority to obtain the required financing it is indispensable that ***the annual***

***appropriations*** to the Puerto Rico Infrastructure Fund be increased…").  The financial statements

Movants cite are nothing more than post-enactment reporting documents by agencies and third parties

that had nothing to do with the Enabling Act's passage.  The Supreme Court has condemned such ex-

post commentary as a "hazardous" basis for statutory interpretation and "not [] legitimate."

*Brueseqitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) (rejecting bondholders' reliance on statements

from the former Treasury Secretary in interpreting the Emergency Economic Stabilization Act).

15.    *Third*, even if the Enabling Act were ambiguous (it is not) and Treasury accounting

and cash-management mechanisms were relevant to its interpretation (they are not), the government

is not *bound* by a prior interpretation.  Executive agencies may change their interpretation if "the

revised interpretation is consistent with the underlying regulations."[15]  The legislature—as drafters of

the statute—is not inexorably bound by a law once passed.  Statutes "are inherently subject to revision

---

[15] *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015).  Of course, "an interpretation … of an administrative officer
or government agent [that] is contrary to the law or to a statute … *is not binding* for the government, nor may it be invoked
by an individual … , even if he has acted and has changed his position on the basis of the officer's interpretation."  *Roig
Commercial Bank v. Buscaglia*, 74 D.P.R. 986, 1004 (P.R. 1953) (emphasis added) (citing *Fed. Crop Ins. Corp. v. Merrill*,
332 U.S. 380, 381 (1947)).

and repeal….” *Nat'l R.R. Passenger Corp. v. Atchison, T. & S.F.R. Co.*, 470 U.S. 451, 465-67 (1985).

### C. The Commonwealth's "Course of Performance" Is Irrelevant to Interpretation of the Trust Agreement, to Which it is Not a Party

16.     To the extent Movants attempt to use the Commonwealth's "course-of-performance" as evidence to support their *interpretation* of the Trust Agreement, this also fails.  "Course of performance" does not apply here as the parties agree the Trust Agreement is unambiguous.  Reply ¶ 53.  Moreover, the Commonwealth is not a party to the Trust Agreement, so its conduct is irrelevant.

### D. References to "Restricted" Funds Are Irrelevant to Movants' Purported Trust Interests

17.     According to Movants, the Holder Report explains that "fund accounting" allows governments to track restricted "funds" for particular purposes.  Reply ¶ 6 (citing Holder Report ¶¶ 22-25).  Movants then assert the Rum Tax Remittances are "restricted" because Movants (incorrectly contend) the Commonwealth has no choice but to transfer them to PRIFA.  Reply ¶ 60.  But, as an accounting concept, "restricted" merely reflects pre-existing legal obligations in the Enabling Act and the Trust Agreement—it cannot create additional rights.  Movants argument quickly crumbles.

18.     *First,* Movants point to no document that says the R4220 coded monies are restricted.  Instead, their entire contention rests on Holder's opinion that the funds should be labeled "restricted":

> Because the Commonwealth "pledged and agreed" with the bondholders that a defined portion of the PRIFA Rum Tax Revenues would be used for debt service on the bonds "until such bonds and the interest thereon are paid in full and such contracts are fully performed and honored" and granted PRIFA the authority to include that pledge on behalf of the Commonwealth, in my opinion, the resulting resources were "restricted," as that term of art is used in fund accounting.

Holder Report ¶ 44 (citing 3 L.P.R.A. § 1913).  As explained above, whether the Retained Rum Tax Remittances should be labeled "restricted" is irrelevant.  Disclosing that there are contractual, legal, or policy reasons to use revenues for a particular purpose does not determine ownership, trusts, liens, or security interests, let alone preemption.  The "non-impairment" covenant of 3 L.P.R.A. § 1913, creates at most, a right that can be breached, and breach of a negative covenant does not create

property rights and cannot convert an unsecured claim into a secured claim.[16]

19.     *Second,* even if the non-impairment covenant were incorporated in the Trust Agreement (it was not), it was no more than an agreement not to impair PRIFA's rights under the Enabling Act.  Under the Enabling Act, the annual appropriation to PRIFA was conditional and subject to the Commonwealth's Retention Powers.  And, to the extent 3 L.P.R.A § 1914 is inconsistent with the budget certified by the Oversight Board under PROMESA, it is preempted by PROMESA.

20.     *Finally,* Holder acknowledges "restricted" is merely a label that reflects pre-existing obligations.  Pointing to GASB 54, he opines monies should labeled restricted "only when such constraints on the resources are (1) 'externally imposed by creditors (such as through debt covenants), grantors, contributors, or laws or regulations of other governments,' or (2) 'imposed by law though constitutional provisions or enabling legislation.'"  Holder Rpt. ¶ 4.  In this way, the Commonwealth can choose to label funds as restricted if there is a covenant or a forward-looking appropriation statute.  The accounting label does not add rights.  Nor could the Commonwealth, through its accounting system, confer rights not conferred by statute or contract.  It is those documents that govern.  And if the Commonwealth had imposed restrictions on itself, it could just as easily remove them.

## II.    MOVANTS FAIL TO DEMONSTRATE ANY PROPERTY OR SECURITY INTEREST IN THE RETAINED RUM TAX REMITTANCES

### A. The Rum Tax Remittances are the Commonwealth's Property

21.     While Movants' arguments relating to accounting systems and course of performance were always an exercise in delay and futility, all Movants' discovery and expert report succeeded in doing is *supporting* the Oversight Board's position.

22.     Movants have provided no rebuttal to the fact that 26 U.S.C. § 7652(e)(1) provides a

---

[16]  *See, e.g.*, *In re Friese*, 28 B.R. 953, 955 (Bankr. D. Conn. 1983) (a negative pledge agreement "does not create a security interest"); *Knott v. Shepherdstown Mfg. Co*., 5 S.E. 266 (W.Va. 1888) ("Of course [the agreement's negative pledge covenant] creates no lien on or pledge of any property. It is simply negative; an agreement not to do a particular thing. The creation of a lien is an affirmative act, and the intention to do such act cannot be implied from an express negative.").

transfer of Rum Taxes to the Commonwealth, and not PRIFA or Bondholders.  The Rum Tax

Remittances are thus Commonwealth property, and the Commonwealth is free to use the monies as

it sees fit.  They very fact that the Commonwealth can subject the monies to its appropriation and

Retention Powers in the first instance shows the Commonwealth interpreted it the same way.

23.     While Movants try to deny the Commonwealth has any equity in the Retained Rum

Tax Remittances (Reply at 13), Movants change their property interest theory yet again, now claiming

that the Commonwealth has *pledged* the Retained Rum Tax Remittances to PRIFA.  Reply ¶ 28.  They

point to one sentence in the Commonwealth's 2011 financial statements without mentioning the very

next sentence that explains it.  Movants quote: "[t]he Commonwealth has pledged these taxes for the

repayment of PRIFA's Special Tax Revenue Bonds (the Bonds)."  *The very next sentence* explains:

"The Commonwealth has committed to *appropriate* each year, from the excise taxes, amounts

sufficient to cover the principal and interest requirements on the debt issued by PRIFA.  PRIFA has

pledged as the _sole_ security for the bonds, the *annual appropriations* from the Commonwealth."  Ex.

G (2011 Financial Statements at 140) (emphasis added).  Moreover, the financial statements do not

reference a security agreement, lien, deposit and control agreement over a bank account, the existence

of an equitable lien, or any other indicia of a secured transaction between the Commonwealth and

PRIFA or its Bondholders. The only reference to a security interest is given by PRIFA. Reading the

disclosure as a whole shows the financial statement is on all fours with the Commonwealth assertions.

24.     Moreover, Movants' new argument is absurd. In making this argument, Movants

necessarily concede the Commonwealth owns the Rum Tax Remittances, because, as Movants now

acknowledge, a debtor cannot pledge property it does not own.  *See* Reply ¶ 41 ("the debtor cannot

grant a security interest in an account the debtor does not own."); 19 L.P.R.A. § 2233(b)(2).  Movants

do not allege there is any security agreement between the Commonwealth and PRIFA granting PRIFA

security interests on the Rum Tax Remittances, or any financing agreement filed by PRIFA against

the Commonwealth to perfect such security interests. Nor do they point to any language in the Enabling Act which purports to give PRIFA a lien on the Rum Tax Remittances, including those monies not appropriated and not transferred to it.

25.     Rather than "pledge" such monies, the Commonwealth appropriated a certain amount of monies to PRIFA for its "corporate purposes." 3 L.P.R.A. § 1914.  The very first sentence of 3 L.P.R.A. § 1914 sets up an appropriation scheme whereby the Legislature committed to appropriate a certain amount of the Rum Tax Remittances in each year until the year 2056-57. *Id.*  While Movants make much of the "shall transfer … when received" language in the Enabling Act, this is no more than the Commonwealth's promise to make future appropriations, and no transfer can take effect unless and until an appropriation has been made.  *Id.*

26.     While ownership of the Retained Rum Tax Remittances, as a matter of law, cannot be determined based on accounting statements, Movants would not even succeed in proving the accounting statements help them if they disclosed what they received in discovery, namely PRIFA's own audited financing statements.  In 2015, for example, PRIFA reported "the following related party transactions: Legislative ***appropriations*** from the Commonwealth of $117 million were used for debt service payments of the bonds and operating expenses."  Ex. E (PRIFA June 30, 2015 Financial Statements at 49).  And in 2016, PRIFA reported, regarding its Debt Service Fund, "assets decreased from approximately $119.8 million in 2015 to approximately $16.1 million 2016 … *due to a non-appropriation of funds by the Commonwealth* for the repayment of principal and interest on long term liabilities."  Ex. F (PRIFA June 30, 2016 Financial Statements at 10) (emphasis added).  The Commonwealth's financial statements also describe the $117 million as appropriations.[17] Additionally, Movants ignore Commonwealth budget resolutions for fiscal years 2014, 2015, and

---

[17] *E.g.*, Ex. G (2011 Financial Statements) (describing that "[t]he Commonwealth provides financial support to PRIFA through legislative appropriations") (emphasis added).

2016, which appropriate the $117 million to PRIFA,[18] and transfer orders from the Commonwealth

to a PRIFA-named GDB account show the transfers were considered to be appropriations from the

Commonwealth.[19]  3 L.P.R.A. § 1914 is nothing more than an appropriation statute.  It refers to

"amounts herein appropriated," and its legislative history describes it as appropriations.[20]

27.    Nothing in the Holder Report or any document that Movants presented to the Court

deals with the fact that if no appropriations are made from the Commonwealth, the monies are never

transferred to the Infrastructure Fund pursuant to 3 L.P.R.A. § 1914.  While the Holder Report relies

on GASB (*e.g.*, Holder Report ¶ 2 n.10), it ignores GASB Statement No. 48:

> The security arrangements that the Board has observed generally do not place the primary
> government in a position of directly guaranteeing the debt of the component unit. Rather,
> the component unit is the sole obligor and secures the debt by pledging the payments that
> the primary government has pledged and appropriated to it from a specific revenue
> stream. The debt is characterized as payable solely from those appropriations with no
> explicit recourse to the primary government.

NO. 258-A ¶ 75 (2006).  At the end of the day, Movants' dispute over what the Infrastructure

Fund is, or even if Movants have a lien on it (they do not, per Trust Agreement § 401) does not

matter.  If there are no appropriations (by preemption, legislative amendment, or otherwise), no

money flows to the Infrastructure Fund, and all PRIFA (not its Bondholders) would have, at

most, is an unsecured claim for breach of prior commitment to make appropriations.

### B.  Movants Mischaracterize Ahlberg's Testimony Regarding the Infrastructure Fund

28.    Movants assert the April 23, 2020 deposition testimony of the Commonwealth and

PRIFA's 30(b)(6) witness Timothy J. Ahlberg "has disproved" the Oversight Board's purported

contention the Infrastructure Fund is a physical bank account at PRIFA.  Reply ¶¶ 5, 12.  They also

---

[18] Ex. H (CW_STAY0001006 at 16); Ex. I (CW_STAY0001046 at 13); Ex. J (CW_STAY0001141 at 24).

[19] Ex. K (CW_ STAY0003469) ("Last partial payment of the Legislative Allocation for servicing the debt for the bonds of
the Infrastructure Financing Authority (API), for up to a maximum of $117MM has been assigned.").

[20] *See supra* ¶ 14 (citing legislative history amending the "appropriations" under the Enabling Act).

assert Mr. Ahlberg testified the Commonwealth considers the first $117 million in Rum Tax

Remittances received by the Commonwealth in a fiscal year as the Infrastructure Fund. *Id*. Movants

then ask the Court to infer that "[t]he Treasury Department maintains the Infrastructure Fund on

PRIFA's behalf" (Reply ¶ 19) and that monies in the Infrastructure Fund "are equitably owned by

PRIFA, not the Commonwealth, and are subject to Movants' lien." Reply ¶ 6. Even though Movants

mischaracterize both the Oversight Board's contentions and Mr. Ahlberg's testimony about the

Infrastructure Fund, the supposed inconsistency makes no difference, especially in view of Trust

Agreement § 401 which bars PRIFA from granting any liens against the Infrastructure Fund.

Movants' argument is factually wrong, without legal support, and should be rejected.

> **i.** <u>Movants Fail to Rebut the Flow of Funds Chart that Demonstrates Their
> Security Interest is Confined to the Sinking Fund</u>

29.     Movants' attempted "gotcha"—arguing the Infrastructure Fund is not a bank account

but actually a fund of a different name used only by accountants—is meaningless. The Oversight

Board's opposition never claimed the Infrastructure Fund is a bank account (and Movants provide no

cite to support this assertion).[21] Instead, the Oversight Board has always relied on the plain language

of the Enabling Act and the Trust Agreement. The Enabling Act appropriates a certain portion of

Rum Tax Remittances to the Infrastructure Fund, which is "maintained by or on behalf of [PRIFA],"

subject to the Commonwealth's retention powers under Article VI, section 8. Supp. Opp. ¶¶ 5, 33,

66, 67. And Trust Agreement section 401 provides the Infrastructure Fund would be maintained by

PRIFA, with PRIFA able to withdraw monies from it. Trust Agreement § 401 ("[t]he Authority shall

---

[21] *See* Reply ¶ 4 (stating, without citation, "[the Oversight Board] claims that the Infrastructure Fund (which it acknowledges is owned by PRIFA) is not a special revenue fund held on the Commonwealth's books—as reported in the Commonwealth's audited financial statements—but was instead a specific bank account held by PRIFA into which the Pledged Rum Taxes were, but no longer are, transferred."). Movants (Reply ¶ 11) later point to Supp. Opp. ¶ Ex. A to argue the Oversight Board describes the Infrastructure Fund as a bank account held by PRIFA. Exhibit A, which is a graphical demonstration of the flow of funds as established by the legal documents, merely states "PRIFA Infra. Fund (held by PRIFA)." Nothing in the document says it is a bank account.

maintain with a Qualified Depositary the Puerto Rico Infrastructure Fund [and] … upon the receipt of Special Tax Revenues or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund … shall withdraw an amount … to make the following deposits….").

30.     This is precisely what the Oversight Board represented in its illustrative flow of funds as Exhibit A to its Supplemental Opposition (the "Flow of Funds Exhibit").  Because Movants cannot, and do not, otherwise assail the Flow of Funds Exhibit—which, among other things, demonstrates that their security interest is confined to monies deposited in the Sinking Fund—Movants attempt to discredit it by arguing "the Commonwealth's corporate representative testified that the exhibit was not consistent with the Commonwealth's understanding of the Infrastructure Fund."  Reply ¶ 19 (citing Ahlberg Tr. 339:23-340:2.).  Mr. Ahlberg did no such thing. Movants asked Mr. Ahlberg, "Is it your understanding, based on all of the work that you've done, that money flowed historically from the TSA account *into a PRIFA bank account called the Infrastructure Fund*?"  Ahlberg Tr. 339:23-340:3 (emphasis added).  Mr. Ahlberg answered simply "No."  *Id.*  This is consistent with the Oversight Board's exhibit, which never represented that the moneys flowed into a "PRIFA *bank account* called the Infrastructure Fund."  Mr. Ahlberg's deposition testimony did not contradict the Oversight Board's contentions or recitation of the Enabling Act and Trust Agreement.  Further, even if the Infrastructure Fund were a bank account it would still not help Movants in substantiating they have any security interest in it. *See infra* § III.A.  No statute, contract, or document says the Infrastructure Fund is maintained by the Commonwealth.  As explained above, whether the Infrastructure Fund is a bank account or accounting concept, has no materiality or relevance here.

   **ii.**     Ahlberg Explicitly Testified the Rum Tax Remittances in the TSA are not in the Infrastructure Fund

31.     The Reply (¶ 12) claims Mr. Ahlberg "testified that the Infrastructure Fund refers to the first $117 million in Rum Taxes *received by the Commonwealth*." (emphasis added).  Not true. Movants are attempting to override 26 U.S.C. § 7652(e)(1) that transfers the Rum Taxes to the

Commonwealth and not to PRIFA or the Infrastructure Fund.  In the first place, Movants cannot override the plain meaning of a statute with witness testimony.  But in any event, Mr. Ahlberg did not testify as Movants wish he did.  When Movants asked Mr. Ahlberg whether the Infrastructure Fund refers to "the first $117 million of rum revenues received *in the TSA*," Mr. Ahlberg responded "No, I think it generally refers to the first 117 million of rum revenues *earned*."  Ahlberg Tr. 331:25-332:4 (emphasis added).  Movants did not ask, and Ahlberg did not specify, as to who earned the revenues.  Instead, Ahlberg was clear it was *not* the TSA, and stated he was only "speaking generally about the concepts of the Infrastructure Fund as understood by relevant individuals." *Id.* 332:6-8. Thus, the record is clear and consistent with 26 U.S.C. § 7652(e)(1) that the money goes from the United States to the Commonwealth, which is the entity that owns and controls the TSA.

32.     Nevertheless, Movants argue "*to this day,* 'the first $117 million of rum revenues' are recorded and tracked in a special revenue account when received by the Commonwealth." Reply ¶ 5 (emphasis in original).  The supposed "special revenue account" Movants refer to is R4220.  *See* Reply ¶ 20 ("Here, Treasury recorded incoming Rum Taxes using a specific account designation (R4220) in its internal fiscal and accounting system…").  But Movants make a giant, and wholly unsupported, leap in arguing that this "special revenue account" is actually the Infrastructure Fund.

33.     *First,* "R4220" is not named the "Puerto Rico Infrastructure Fund."

34.     *Second,* and critically, revenue code R4220 is used to track receipts of **_all_** Rum Tax Remittances from the federal government, not just the portion historically appropriated to PRIFA.[22] The Holder Report confirms this, acknowledging that R4220 is (1) a General Fund account, (2) used

---

[22] *Compare* Ex. A (PRIFA_STAY0001572) (showing transfers with revenue code R4220 on May 8, 2015 for $17,362,112 for Fondo General and $9,860,296 for 46% Promociones de Ron) *with* Ex. B (PRIFA_STAY0000151) (showing these same amounts represent subsequent steps on the rum tax waterfall for April 2015).

to track *all* Rum Tax Remittances, and (3) recorded as "General Fund revenue."[23]  Holder also never

opines that R4220 is the Infrastructure Fund.  Instead, he merely states: "[t]he fact that incoming

PRIFA Rum Tax Revenues are recorded in PRIFAS as General Fund revenue is not inconsistent with

the Infrastructure Fund existing as a special revenue fund."  Holder Report ¶ 45.  But then he reveals

that Movants' entire inquiry into how moneys are labeled or recorded is irrelevant because, while

"accounts used in accounting systems like PRIFAS are helpful for tracking funds subject to particular

restrictions, [] those accounts are not, in and of themselves, ultimately determinative of which moneys

are held as special funds or otherwise subject to restrictions." *Id.* ¶ 46.

### C.  Movants' New "Special Deposit" Argument is Irrelevant and Incorrect.

35.     In a last-ditch effort to override 26 U.S.C. § 7652(e)(1)'s plain meaning that the United

States transfers the Rum Taxes it collects to the Commonwealth, and not to PRIFA, Movants attempt

to transform the Commonwealth's TSA account into a trust on behalf of PRIFA.  Movants turn to the

title of 3 L.P.R.A. § 1914 – "Special Deposit."  Reply ¶ 28.  Movants then pluck a partial description

of a specific fund accounting entity titled "Special Deposits" from a page of the Commonwealth's

2016 financial statements as somehow giving meaning to § 1914.  Movants' efforts are futile.

36.     *First*, Movants overlook a basic truism.  Namely, based on 26 U.S.C. 7652(e)(1), the

Commonwealth is the first owner of the Rum Taxes from the United States, regardless of how the

Commonwealth controls them.  By analogy, an individual might instruct her bank, when it receives

her salary, to transfer portions of it to pay her mortgage and utility bills.  Or, the individual might

instruct her employer to pay a portion of her salary directly to her creditors.  The fact that the

individual's bank account may only hold her salary for a second, or may not receive her salary at all,

does not mean the individual does not own her salary once she earns it.  It simply means the individual

---

[23] Holder Report ¶ 45 ("when the Treasury receives rum tax collections from the United States, revenues are recorded in the
General Fund (Fund 111) in Account R4220, the revenue account used by Treasury to 'record the revenues of rum taxes.'").

has channeled it to the payees she desires to pay.  Thus, Movants' efforts to show the Rum Tax

Remittances go directly to the Infrastructure Fund (whether it is a bank account or an accounting

concept for monies in other account(s)) are immaterial and irrelevant to whether the taxes are first

owned by the Commonwealth.  And, one only needs to look at 26 U.S.C. 7652(e)(1) and 3 L.P.R.A.

§ 1914 to see that the taxes are paid to the Commonwealth, and the Commonwealth knew that and

drafted § 1914 to provide for future appropriations to the Infrastructure Fund.

37.    *Second*, even if the Commonwealth Treasury or its accountants had set out to define

the term "special deposit" as used in the Enabling Act—a dubious proposition at best—it would have

no bearing whatsoever on what the Legislature meant.  *See supra* § I.A.  Movants' "special deposit"

argument is just another irrelevance raised to obscure their lack of property interests.[24]

38.    *Third,* Movants gain nothing from the title Special Deposit in 3 L.P.R.A.  § 1914

because the only deposit referred to is the deposit the Commonwealth makes when and if it

appropriates and transfers a portion of the Rum Tax Remittances to the Infrastructure Fund.  That is

the only deposit it can control.  The Commonwealth cannot control the United States' transfer of Rum

Taxes to the Commonwealth.

39.    *Fourth,* Movants omit material parts of the definition of special deposit that

demonstrate it is inapplicable in the first place.   Movants represent "a 'special deposit' fund as one

that 'acts in a fiduciary capacity in order to account for moneys received with specified purposes for

which the law does not specify its recording in any other fund. It mainly includes … agency accounts

for which the Commonwealth acts in an agent's capacity.'"  Reply ¶ 28.  But the financial statements

describe the "Special Deposits" fund this way: "This fund acts in a fiduciary capacity in order to

---

[24] Moreover, the title of the Enabling Act is irrelevant to its interpretation, and even more irrelevant to 26 U.S.C. § 7652(e)(1).
Courts have long followed "the wise rule that the title of a statute and the heading of a section cannot limit the plain
meaning of the text." *Trainmen* v. *Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-529 (1947).  A "title of a statute has no
power to give what the text" does not already provide.  *Demore v. Hyung Joon Kim*, 538 U.S. 510, 535 (2003).

account for moneys received with specified purposes for which the law does not specify its recording in any other fund.  It mainly includes **deposits under the custody of the courts of justice for alimony payments, escrows, revenue collections, and** agency accounts for which the Commonwealth act[s] in an agent's capacity."  Miller Decl., Ex. 34 (2016 Financial Statements at 357) (emphasis on omitted portions).[25]  Contrary to Movants' deceptive quotation, the document they cite does not list the Rum Tax Remittances as falling within the definition of "Special Deposits" held "in a fiduciary capacity."[26] The Commonwealth financial statement defines "Fiduciary Funds" as *either* the "Pension Trust Funds" or the "Agency Fund."  2012 CW Financial Statement at 256.  The Puerto Rico Infrastructure Fund does not appear to fall within the document's definition of either.

40.     In addition, Rum Tax Remittances are not "moneys received with specified purposes" – they are remitted to the Commonwealth from the federal government with no strings attached.  The definition in the document they rely on describes "**this** Special Deposits Fund" as a single fund that includes items like child support, but does not mention Rum Tax Remittances (or anything like the Rum Tax Remittances).  Moreover, if as Movants allege, the Commonwealth was required to transfer them to the Infrastructure Fund, then the definition Movants' use would still be inapplicable because they are not monies "for which the law does not specify its recording in any other fund" (since the law would require recording in the Infrastructure Fund).  Finally, to the extent the definition has any relevance (it does not), it is clear the monies in the TSA are not in "agency accounts for which the

---

[25] The common understanding of a "special deposit" is that the "the title thereto remain[s] in the depositor." *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548, 561 (2d Cir. 1976)

[26] *See also Natbony Reply Decl.* [ECF No. 13004], Ex. 1 (2012 CW Financial Statement at 6)  ("FIDUCIARY OPERATIONS.  Fiduciary funds are used to account for assets held by the Commonwealth in a trustee capacity or as an agent for individuals, private organizations, and other governmental units. **These include the pension and agency funds.** Pension trust funds are established through trust agreements specifying how the fund will operate. **Agency funds are custodial in nature and do not report fund balances**…. Agency funds consist of the Special Deposits Fund. This agency fund includes deposits under the custody of the Courts of Justice, Minors Support Administration for child support payments, deposits under the custody of the Commissioner of Insurance of the Commonwealth for escheated property, for insurance companies under liquidation and an allocated share of the sales and use tax corresponding to the municipalities.") (emphasis added).

Commonwealth act[s] in an agent's capacity," but are "revenue collections."

41.     At bottom, Movants' attempt to establish a trust by twisting and stitching together definitions, falls flat where, as here, the Enabling Act contains none of the indicia of a trust relationship[27] and the supposed trust *res*—the Retained Rum Tax Remittances—(1) comprises *all* Rum Tax Remittances (not just the first $117 million); (2) is commingled with other monies in the TSA; and (3) constitutes "available resources" of the Commonwealth.

### III.   EVEN ACCEPTING MOVANTS' ASSERTED "FACTS" AS TRUE, THEY MAKE NO DIFFERENCE TO MOVANTS' PROPERTY INTERESTS.

#### A.  The TSA Account is Not, and Cannot Be, the Infrastructure Fund

42.     Not only do Movants fail to show that Treasury maintains the Infrastructure Fund on behalf of PRIFA, their theory is dispelled by the relevant legal documents.[28]

43.     While the Enabling Act provides the Infrastructure Fund is "maintained by or on behalf of" PRIFA (3 L.P.R.A. § 1914), it also requires PRIFA to have control over it.  For example, the Rum Tax Remittances appropriated to PRIFA are covered into the Infrastructure Fund for PRIFA's "corporate purposes."  *Id.*  The Enabling Act also permits PRIFA "to segregate a portion of said Funds into one (1) or more sub-accounts, subject to the provisions of Section 8 of Article VI … for the payment of the principal and interest on bonds … or for any other legal purpose of the Authority."  *Id.*  Finally, Trust Agreement § 401 requires PRIFA to (1) "maintain with a Qualified Depositary the Puerto Rico Infrastructure Fund," (2) "not pledge or create any liens upon any moneys in the Puerto Rico Infrastructure Fund," and (3) "withdraw an amount of such Special Tax Revenues and other moneys" from the Infrastructure Fund to deposit into the Sinking Fund.  Trust Agreement

---

[27] While 3 L.P.R.A. § 1914 provides that the Infrastructure Fund may be maintained "on behalf of" PRIFA, this language, by itself, does not give birth to a trust relationship, and certainly not a trust with the Commonwealth at the TSA (as it leaves open who could maintain the fund).  It merely means that PRIFA can choose to have the Infrastructure Fund maintained by another party, but that relationship must be separately established.

[28] A person does not own another's deposit account unless the person has "control" of the account. *Miller*, 540 F.2d at 558.

§ 401.  PRIFA cannot comply with these provisions without control of the Infrastructure Fund.

44.     Movants point to no provision in the Enabling Act that gives PRIFA permission to access monies in the Commonwealth's TSA.  Movants make no allegation they or PRIFA have control over, or any DACA with respect to, any TSA account.  Movants also point to no provision in law enabling PRIFA to segregate funds in the TSA or alter the Commonwealth's accounting system.

45.     PRIFA's lack of access to the TSA stands in stark contrast to the statutes Movants cite as "examples under Puerto Rico law of 'special funds' created by Commonwealth statute that are simply held *at the Puerto Rico Treasury Department* 'to the credit of' a particular identified special fund."  Reply ¶ 51 (citing 18 L.P.R.A. § 1026; 13 L.P.R.A. § 4(b)).  For example, Movants rely on a repealed law,[29] 18 L.P.R.A. § 1026, that provided, in relevant part:

> The sum of forty-four thousand dollars (44,000) is hereby **appropriated** to the public corporation 'Industries for the Blind, for the Mentally Retarded and for Other Disabled Persons of Puerto Rico' from any available funds in the Treasury of Puerto Rico not otherwise appropriated, to carry out the purposes of [this Act. The said sum shall be transferred to a special fund to be known as "Special Fund of the Public Corporation, Industries for the Blind, for the Mentally Retarded and Other Disabled Persons of Puerto Rico", and **shall be placed at the disposal of the Secretary of the Family** as **paid in capital** for the development of the activities thereof. All moneys under the control of the corporation shall be covered into the Treasury of Puerto Rico, **to the credit of** said Fund**, to be drawn upon by the corporation against vouchers therefor**. **The corporation is hereby authorized to use the said Fund and any donation or benefits hereafter accrued, as a revolving fund.**

18 L.P.R.A. § 1026 (emphasis added).  First, nothing in this statute shows that the monies are held in the TSA (as opposed to Treasury) or that a corporation can have an interest in commingled funds in a TSA operational account. Even if 18 L.P.R.A. § 1026 created such a relationship, the Enabling Act does not because it merely provides the Infrastructure Fund could be maintained by PRIFA or on behalf of PRIFA.  In contrast, 18 L.P.R.A. § 1026 expressly creates a mechanism whereby (1) "all

---

[29] Act 139-2014 repealed the statute and created a new program annexed to the Vocational Rehabilitation Administration. The funds in the Special Fund of the corporation for Industries for the Blind, for the Mentally Retarded and for Other Disabled Persons of Puerto Rico were transferred to the newly created fund.  *See* 18 L.P.R.A. §§ 3871, 3873.

moneys under control of the corporation shall be covered into the Treasury"; (2) the appropriated amounts are "placed at the disposal of the Secretary of the Family as paid in capital" and "to the credit of" of the fund; (3) the corporation has permission to "draw upon [the monies] … against vouchers therefor" and to use it as "a revolving fund."  No such authorization for PRIFA to access the Treasury is in the Enabling Act.  Therefore, that *other* statutes may have created an arrangement whereby Treasury holds funds on behalf of another entity (and it is not clear these statutes do so), it has no relevance because essential language to create such relationship is absent from the Enabling Act.[30]

46.     Moreover, accepting the Movants' contention that "course of dealing" is relevant to the meaning of the governing statutes (it is not), the historical flow of funds illustrates that the Infrastructure Fund is not a part of the TSA.  For example, from January 1, 2014 until approximately July 1, 2015, Treasury transferred the first $117 million in Rum Tax Remittances received by the Commonwealth across two accounts, both maintained by or on behalf of PRIFA.  Reply ¶ 18.  First, $4 million of these monies were deposited to an account held and controlled by PRIFA to fund its operations.[31]  The remaining $113 million were transferred into an account held and maintained by GDB (GDB Account -1891), and used for purposes of making debt service payments to the bond trustee.  Reply ¶ 18.  While PRIFA was not identified as the Depositary Agency in GDB Account-1891, the account was titled "AFI Debt Service" (AFI is PRIFA's Spanish acronym).  Miller Decl. Ex. 37 (account opening documents for GDB Account -1891).  In addition, GDB was PRIFA's fiscal agent and the paying agent on PRIFA's bond debt.[32]  Thus, the historical implementation comports

---

[30] The second statute Movants cite, 13 L.P.R.A. § 4(b), relates to a "penitentiary carpenter shop."  13 L.P.R.A. § 4(a) provides that it "shall be operated on a revolving fund system."  13 L.P.R.A. § 4(c) provides that "The Secretary of the Treasury of Puerto Rico shall prescribe rules and regulations for the *operation* of this institution and for the proper accounting of its income and expenditures."  Thus, this does not appear to be a separate corporation, but to be run by the Secretary of Treasury itself.  They key distinguishing characteristic is that, like the "Industries for the Blind" corporation was also run by a Commonwealth Secretary, these funds are owned by the Commonwealth and operated by Commonwealth officials.

[31] *See* Ahlberg Tr. 349:19-21; 351:24-352:7.

[32] *See* Ex. L (PRIFA_STAY0001683 at 29) (PRIFA certification noting that GDB is fiscal agent for PRIFA); Ex. M (PRIFA_STAY0001785 at 25) (official statement noting that GDB acted as financial advisor to PRIFA in connection with

with the requirements of the relevant legal documents and indicates the Infrastructure Fund was outside the TSA and may have been a combination of accounts maintained by or for PRIFA.

### B.   Movants Have No Security Interest in Monies in the Infrastructure Fund

47.     Even if the facts remotely stood for the propositions for which Movants use them (they do not), all Movants contend they would establish is the Rum Tax Remittances deposited in the TSA currently reside in the Infrastructure Fund (an absurd proposition since R4220 is used to designate all Rum Tax Remittances, not just the first $117 million).  In such circumstance, Movants acknowledge that the monies are PRIFA's property, not the Bondholders' property.[33]  Movants thus concede they would need to establish they have a valid security interest in such monies.  In doing so, Movants also demonstrate their lack of standing.  Under their theory, it is PRIFA that has the rights to the Retained Rum Remittances not Bondholders.  Movants' entire standing argument, therefore, depends on their purported claim for breach of the non-impairment covenant.  But even if the Commonwealth had breached that provision (it didn't), Movants cannot use standing on account of an unsecured claim to seek to lift the stay against the Commonwealth on account of their claims as PRIFA creditors.[34]

48.     Notably, in addition to failing to demonstrate they have a security interest beyond the Sinking Fund, Movants have no meaningful response to the Oversight Board's argument that Trust Agreement § 401 provides: "The Authority shall not pledge or create any liens upon any moneys in the Puerto Rico Infrastructure Fund."  Movants also have no response to the fact that Trust Agreement § 601 provides the sole source of payment of the bonds is the Pledged Revenues which are defined to

---

the Series 2005 bonds); 7 L.P.R.A. § 587 ("The Bank shall be and is hereby appointed and authorized to act as agent for the payment of interest and principal of bonds, notes or other evidences of indebtedness issued by any public service enterprise or authority owned or controlled by the Commonwealth.").

[33] Reply ¶ 54 n.25 ("Movants' position is clear: PRIFA is the owner of the Pledged Rum Taxes as a result of the Enabling Act, and Movants have a lien on the Pledged Rum Taxes owned by PRIFA.").

[34] *See* Supp. Opp. ¶ 129 (collecting cases demonstrating that stay relief is applicable for secured claimholders of the debtor, not unsecured claimholders or secured claimholders of a creditor of the debtor).

mean only the monies deposited in the Sinking Fund.  If Movants had a security interest against assets in the Infrastructure Fund, they would have a right to payment from those assets, which right would violate section 601 limiting the source of payment to assets in the Sinking Fund.

49.     But, ignoring that section 601 bars the Bondholders from being paid from the Infrastructure Fund because their sole source of payment is monies in the Sinking Fund, Movants argue, without support, that section 401 is "merely a forward-looking bondholder protection mechanism intended to prevent PRIFA from encumbering bondholders' collateral with an *additional* or secondary lien," Reply ¶ 49.  But the plain language does not support such argument, and if that were what the Trust Agreement sought to do, it would simply say "the Authority shall not pledge or create any *other* liens."  If Bondholders already have a lien on the Infrastructure Fund, the granting provision in the Trust Agreement in monies deposited in the Sinking Fund would become meaningless (*see* § 401).  Instead, it makes sense that PRIFA covenanted not to grant any lien on monies in the Infrastructure Fund because such lien would attach *before* the monies are deposited in the Sinking Fund, and thus could become senior to Bondholders' liens that only attach when the monies are deposited in the Sinking Fund. The restrictions in Section 401 of the Trust Agreement work hand in hand with 3 L.P.R.A. § 1914, which provides that PRIFA can "segregate a portion of said Funds [Infrastructure Fund] into … sub-accounts … for the payment of the principal and interest on bonds and other obligations of the Authority…."  There would be no point to segregating the funds if a lien for Bondholders had already attached.

50.     Recognizing the flimsiness of their argument, Movants next and last argument is that "[a]t best, the Oversight Board points to two conflicting provisions, and the *contra proferentum* canon obliges the Court to construe any such conflict against the drafter, here, the Commonwealth."  Reply ¶ 49.  Movants' argument is nonsensical.  The Commonwealth is not a party to the Trust Agreement, let alone the drafter.  If anything, the Trust Agreement was negotiated by PRIFA and the Bondholders

25

(all sophisticated parties), and any ambiguity should be interpreted against Movants.

### C. Movants' "Facts" Do Not Create a Trust Relationship

51.     Movants contend that their distorted set of facts "put this case on all fours" with

*Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza*,

484 F.3d 1, 29 (1st Cir. 2007)." Reply ¶ 27. Movants could not be more wrong. Unlike the Enabling

Act—which first requires the Rum Taxes Remittances to be appropriated to PRIFA and which

subjects the monies to Article VI, section 8 (which makes them "available resources" of the

Commonwealth)—the statute at issue in *Flores Galarza* (26 L.P.R.A. § 8055) makes clear that:

(i)      the Treasury was acting "in its fiduciary capacity," 26 L.P.R.A. § 8055(j);

(ii)     the Treasury was acting in essentially a purely ministerial capacity transferring money and
         otherwise providing reports and information of the money to the Joint Underwriting
         Association, 26 L.P.R.A. § 8055(l), to the point that the statute was amended to
         specifically provide that Treasury was acting as a mere "collection service performed in
         favor of the [JUA]," *Flores Galarza*, 484 F.3d at 29;

(iii)    the monies held by Treasury were not tax money collected for Commonwealth use, and
         Treasury had to pay interest to the Joint Underwriting Association if the Treasury kept the
         premiums for longer than permitted by the statute, 26 L.P.R.A. § 8055(c)(4); and

(iv)     the Treasury was to be paid a fee for performing its collection services in favor of the Joint
         Underwriting Association.[35]

No similar provisions are present here.

52.     Movants also sought leave to amend their entire motion on the basis of the First

Circuit's decision in *Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. For P.R.*, 939 F.3d 340 (1st Cir.

2019). They now contend that "discovery has confirmed that the Commonwealth 'segregated [the

Pledged Rum Taxes] into a separate account in the General Fund for accounting purposes'—which

is more than sufficient to make 'a *prima facie* showing of traceability.' *See Gracia-Gracia*, 939 F.3d

at 351." Reply ¶ 55. But traceability is only one aspect of one prong of the test set forth in *Gracia-*

---

[35] 26 L.P.R.A. § 8055(c)(4) ("The Secretary of the Treasury shall deduct from the funds or premiums transferred to the Joint
Underwriting Association a service fee for the collection of the premiums collected directly by the … Treasury.").

*Gracia*: "In order to establish ... a right as trust beneficiary, a claimant must make two showings: first, the claimant must prove the existence and legal source of a trust relationship; second, the claimant must identify the trust fund or property and, where the trust fund has been commingled with general property of the bankrupt, <u>sufficiently trace the property or funds</u>." *Id.* 350-351. (emphasis in original).

53.    Movants have not shown the existence and legal source of a trust relationship.  Any inference of a trust must be explicit—it's long been true Puerto Rico law prohibits "secret trusts."[36] Nothing in discovery or the Holder Report indicates any intent between the Commonwealth and PRIFA to establish a trust relationship on behalf of PRIFA.  Similarly, nowhere does 3 L.P.R.A. § 1914 provide that the Commonwealth holds the Rum Tax Remittances as a fiduciary or in trust for PRIFA's benefit.   To the contrary, where the Commonwealth has attempted to create a trust relationship, it has done so explicitly.  Section 1923(b) of the Enabling Act, for example, creates a "special fund … ***to be held in trust***,"  3 L.P.R.A. § 1923(b) (emphasis added), although not even that creates a trust if other necessary trust requirements are not satisfied.  There is no equivalent language in the Enabling Act regarding the TSA or Infrastructure Fund.  Instead, Movants appear to have abandoned their "express trust" theory in favor of theories based on constructive trusts.  Reply ¶ 59.  In doing so, Movants are left to point to irrelevant definitions such as "Special Deposit" in accounting statements (see *supra* § II.C) to stitch together a fiduciary relationship where none exists.

54.    Movants, similarly, have no response to the Oversight Board's arguments that the Trust Agreement contains no language establishing a trust relationship between the Commonwealth and PRIFA, or PRIFA and the Bondholders, in the Infrastructure Fund.  Supp. Opp. ¶ 18.  Nor do Movants have any response to the fact that the only reference in the Official Statements to any monies

---

[36] *See Rossy v. Superior Court*, 80 D.P.R. 729 (P.R. 1958).  Movants appear to argue that the words "shall transfer," on their own, create a property interest.  *See* Reply ¶ 3.  As a simple matter of common sense, this is wrong.  If the words "shall be covered into" create a property interest, then there could be no unsecured claims, as any promise to pay a debt or transfer money would, without more, create a trust or other property interest.  That is clearly not the law.

held in trust are those held by the Trustee in the Sinking Fund for the benefit of Bondholders.  Supp.

Opp. ¶ 19.  All the relevant legal documents are completely silent as to any other trust relationship.

55.    Nothing in discovery or the Holder Report rebut that, under Puerto Rico law, for

money to be held in valid trust, a public deed of trust is required to be executed.  *See* Trust Act, P. R.

Act No. 219-2012.  While Movants retort that *Gracia-Gracia* expressed doubt that a deed of trust

would be needed where a trust was created by statute, (Reply ¶ 56), Movants fail to show that the

Enabling Act creates such a trust and eliminates the requirement for a public deed.[37]  Instead, Movants

argue, pointing to 3 L.P.R.A. § 1911, that  "the Enabling Act expressly states that the trust agreement

securing the PRIFA Bonds 'need not be constituted pursuant to a public deed in order to be a valid

trust under the laws of the Commonwealth.'"  *Id.* (citing 3 L.P.R.A. § 1911).  But section 1911

pertains only to the Trust Agreement, which is between PRIFA and the Bondholders, and does not

contain any language purporting to create a trust between the Commonwealth and PRIFA.  If

anything, section 1911 proves that where the Legislature intended to do away with the requirement

for a deed of trust, it did so explicitly.  Its failure to do so under 3 L.P.R.A. § 1914 further evidences

that the Legislature did not create any trust relationship between the Commonwealth and PRIFA.

56.    Movants also fail the second prong of the *Gracia-Gracia* test.  Nothing in discovery

or the Holder Report indicates Retained Rum Tax Remittances reside in a "*separate account* in the

General Fund for accounting purposes."  Ironically, Movants spill much ink (incorrectly) accusing

---

[37] Moreover, Movants jump to the conclusion that the Trust Act is restricted to only *inter vivos* and testamentary trusts, but the definition of trust does not impose such limitations and specifically states that "in the absence [of contrary language in the trust instrument]…the provisions herein set forth [Trust Act]" apply.  *See* 32 L.P.R.A. § 3351.  Further, 32 L.P.R.A. § 3352e states that "[a] trust may be created for any purpose…."  More importantly, under Puerto Rico law, the trust that Movants purport to have falls under the definition of an *inter vivos* trust, as it is created and takes effect during the settlor's lifetime. *Compare TOLIC v. Rodriguez Febles*, 170 D.P.R. 804, 817 (P.R. 2007) (holding that a certain trust established via an insurance contract and restated by the insured in his will could not be considered "an *inter vivos* trust, but rather a trust mortis causa, since it would have effect upon his death").  Movants' additional argument that the Trust Act deed requirement does not apply because it was enacted after the debt was issued also fails. Prior to 2012 the deed requirement was in Articles 834-874 of the PR Civil Code. Under both the Civil Code (former 31 L.P.R.A. § 2561) and the Trust Act (32 L.P.R.A. § 3352f), the settlor can be either a natural or a juridical person; and such settlor –if he intended to have a trust in effective during its lifetime, had to set forth the intent to create a trust in a public deed.

the Oversight Board of representing that the Infrastructure Fund is a "bank account" even though the Oversight Board consistently represented it as a "fund."  Reply ¶ 4.  Now Movants use a sleight of hand to say that what they proclaim is the "Infrastructure Fund" is, indeed, a "separate account."  But all discovery has shown is that revenue code R4220 is used to track receipts of **_all_** Rum Tax Remittances from the federal government, not just the portion historically appropriated to PRIFA. *See supra* ¶ 34.  And such monies are recorded as "General Fund revenue[s]" Holder Rep. ¶ 45. Therefore, there is clearly no *segregation* of the first $117 million in each fiscal year.  Moreover, R4220 is not a bank account.  It is a revenue code used to denote the source of the incoming funds. *See* Ahlberg Tr. at 346:9-347:5.  Since at least January 2014, the first $117 million are deposited into the TSA Operational Account where they are commingled with other Commonwealth tax receipts. *See* Ahlberg Tr. 343:15-344:6.  Simply put, all code R4220 does is track the source of funds.

57.     Finally, Movants' tracing exercise is irrelevant and not properly before the Court at the preliminary hearing stage because Movants must first prove a property or security interest in the Retained Rum Tax Remittances.[38]  And Movants' concede they do not need to trace anything because the TSA balance is greater the amount of Retained Rum Tax Remittances.  Holder Report Ex. 1.

**D.  Movants' Alleged New "Facts" Do Not Affect the Preemption Analysis**

58.     The Supplemental Opposition demonstrated the Commonwealth's appropriations to PRIFA under 3 L.P.R.A. § 1914 have been preempted by PROMESA.  *See, e.g.*, Supp. Opp. at 34-38.  The Court need only follow its own decision, as affirmed by the First Circuit,[39] to find that the Rum Tax Remittances are the Commonwealth's property in the first instance, which were never

---

[38]  Movants are not protected by the "lowest intermediate balance" rule unless they can first establish a trust exists on specific trust property.  As there is never any identifiable property that could be subject to a trust in their favor, Movants fail at the first hurdle, and the "lowest intermediate balance" rule cannot be used to create a trust that does not otherwise exist.  *See, e.g., Connecticut Gen. Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 620 (1st Cir. 1988) ("The point of tracing is to follow the particular entrusted assets, not simply to identify some assets.").

[39]  *See Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R.*, 945 F.3d 3 (1st Cir. 2019).

conveyed to PRIFA,[40] and, because Commonwealth's certified budget does not provide for their appropriation, never enter the Infrastructure Fund, but instead remain Commonwealth property.

59.     Movants attempt to rebut this by (1) assuming the correctness of all their trust and lien arguments, which hinge on the supposed factual record, and (2) mischaracterizing the Oversight Board's argument as an attempt to preempt property rights.  Reply ¶ 97.  But Movants misconceive the Oversight Board's arguments.  The Oversight Board does not contend that either PROMESA eliminates unsecured obligations or secured property rights.  Instead, as this Court and the First Circuit have held, PROMESA Title II preempts any territorial law appropriating Commonwealth money.  Supp. Opp. ¶ 75; *Vázquez*-Garced, 945 F.3d at 3 ("Simply put, if a certified budget is to have 'full force and effect,' subsection 202(e)(3)(C), there can be no spending from sources not listed in that budget, ***regardless of what any territorial laws say***.") (emphasis added).  The obligation to appropriate is not eliminated—it persists in the form of an unsecured claim that PRIFA holds against the Commonwealth if the Commonwealth recognizes such a claim.  Neither the Enabling Act nor the Trust Agreement give PRIFA or its Bondholders property or ownership interests in the Retained Rum Tax Remittances in the TSA.  The statutes must be preempted if PROMESA's grant of authority over the budget to the Oversight Board is to have any meaning.  Movants fail to address this argument in the over 25 paragraphs they dedicate to attacking an argument the Oversight Board never made.

---

[40] Indeed, where the Commonwealth has seemingly attempted to transfer property rights in tax revenues to an instrumentality, it deployed language to accomplish it.  For example, in COFINA, the relevant statute expressly stated the taxes are "***hereby transferred to, and shall be the property of COFINA***" and shall not "***constitute resources available to the Commonwealth of Puerto Rico***." 13 L.P.R.A § 12 (emphasis added).  Here, the Trust Agreement and the Enabling Act state the opposite. 13 L.P.R.A § 1906(m) makes clear that that any pledge by PRIFA is subject to Section 8 Article VI of the Puerto Rico Constitution, and the Rum Tax Remittances appropriated by the Commonwealth to PRIFA are available resources.

Further, Movants attempt to explain that the only difference between the COFINA statute and the PRIFA Enabling Act (Reply ¶ 70) is the fact that in COFINA the SUTs were exempt from the Section 8 Article VI.  But Movants confuse cause with causation.  The reason the statutes provided the SUTs were not subject to clawback is because the Commonwealth attempted to sell and remove the SUTs from the Commonwealth's property.  The same could not be said about the Rum Tax Remittances, which remain Commonwealth property and subject to the clawback.

Dated: May 18, 2020
        San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*
Martin J. Bienenstock
Jeffrey W. Levitan
Ehud Barak
David A. Munkittrick
Daniel S. Desatnik
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900
Email: mbienenstock@proskauer.com
          jlevitan@proskauer.com
          ebarak@proskauer.com
          dmunkittrick@proskauer.com
          ddesatnik@proskauer.com

Michael A. Firestein
Lary Alan Rappaport
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
2029 Century Park East
Suite 2400
Los Angeles, CA 90067-3010
Tel: (310) 557-2900
Fax: (310) 557-2193
Email: mfirestein@proskauer.com
          lrappaport@proskauer.com

*Attorneys for the Financial Oversight and
Management Board as representative of the
Debtor*

*/s/ Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative of the
Debtor*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF

participants in this case.

*/s/ Hermann D. Bauer*

Hermann D. Bauer
