## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| AMBAC ASSURANCE CORPORATION, FINANCIAL GUARANTY INSURANCE COMPANY, ASSURED GUARANTY CORPORATION, ASSURED GUARANTY MUNICIPAL CORP., and THE BANK OF NEW YORK MELLON, as Fiscal Agent,<br><br>    Movants,<br>v.<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO<br><br>    Respondent. | PROMESA<br>Title III<br><br>**Re: ECF No. 10104, 10615, 12997** |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**SUR-REPLY OF THE COMMONWEALTH OF PUERTO RICO IN OPPOSITION TO MOTION OF AMBAC ASSURANCE CORPORATION, FINANCIAL GUARANTY INSURANCE COMPANY, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND THE BANK OF NEW YORK MELLON <u>CONCERNING APPLICATION OF AUTOMATIC STAY [ECF NO. 10104]</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     PRELIMINARY STATEMENT ........................................................................1

II.    THE AUTOMATIC STAY APPLIES............................................................4

III.   MOVANTS HAVE NO PROPERTY INTEREST IN THE RETAINED
       OCCUPANCY TAXES. ................................................................................8

       A.    The Retained Occupancy Taxes Have Not Been Deposited in the Transfer
             Account. ..............................................................................................9

       B.    Movants Do Not Have a Property Interest in the Retained Occupancy
             Taxes. ...............................................................................................17

             1.    The Tourism Company Did Not Grant a Security Interest in the
                   Occupancy Taxes Not Deposited in the Transfer Account.......................17

             2.    Movants Do Not Have Equitable Ownership or a Statutory Lien in
                   the Retained Occupancy Taxes. ...............................................20

IV.    PROMESA PREEMPTS ANY OBLIGATION TO USE THE RETAINED
       OCCUPANCY TAXES TO PAY CCDA BONDHOLDERS...........................24

       A.    PROMESA Preempts Any Territorial Law Purporting to Require the Use
             of Retained Occupancy Taxes for CCDA Debt Service.......................24

       B.    PROMESA Preemption is Not Unconstitutional.................................28

V.     CONCLUSION....................................................................................30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Ambac Assurance Corp. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
297 F. Supp. 3d 269 (D.P.R. 2018), *affirmed,* 927 F.3d 597 (1st Cir. 2019),
*cert. denied,* 2020 WL 129572 (2020) .................................................................................... 28

*Asociacion de Subscripcion Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza,* 484 F.3d 1 (1st Cir. 2007) ................................................................ 22, 23

*Grella v. Salem Five Cent Sav.*
42 F.3d 26 (1st Cir. 1994) .......................................................................................................... 7

*In re Elmira Litho, Inc.*,
174 B.R. 892 (Bankr. S.D.N.Y. 1994) ....................................................................................... 9

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
582 B.R. 579 (D.P.R. 2018) ................................................................................................. 7, 22

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
361 F. Supp. 3d 203 (D.P.R. 2019) ........................................................................................... 6

*In re Teleservices Grp., Inc.*,
469 B.R. 713 (Bankr. W.D. Mich. 2012) ................................................................................. 15

*Maine Cmty. Health Options v. United States*,
140 S. Ct. 1308 (2020) ............................................................................................................. 26

*Miller v. Wells Fargo Bank Int'l Corp.*,
540 F.2d 548 (2d Cir. 1976) ..................................................................................................... 14

*Philbrick v. eNom, Inc.*,
593 F. Supp. 2d 352 (D.N.H. 2009) ......................................................................................... 15

**STATUTES**

13 L.P.R.A. § 12 ................................................................................................................... 3, 6

13 L.P.R.A. § 2271v ...................................................................................................... 6, 21, 26

13 L.P.R.A. § 2271v(a)(1) ................................................................................................ 21, 24

13 L.P.R.A. § 2271v(a)(4) ....................................................................................................... 23

13 L.P.R.A. § 2271v(b) ............................................................................................................ 21

19 L.P.R.A. § 2282(b) ...................................................................................................12

26 L.P.R.A. § 8055 ......................................................................................................23

11 U.S.C. § 362(d)(1) ....................................................................................................9

11 U.S.C. § 362(d)(2) ....................................................................................................9

11 U.S.C. § 365 ...........................................................................................................30

11 U.S.C. § 365(g)(1) ..................................................................................................30

PROMESA § 4 .............................................................................................................25

PROMESA § 106(e) .....................................................................................................25

PROMESA § 201(b)(1)(N) ...........................................................................................25

PROMESA § 202 ..........................................................................................................25

PROMESA § 407 ..........................................................................................................27

Room Occupancy Rate Tax Act, 2003 PR H.B. 3820, No. 272 (LEXIS) ............................ passim

UCC § 9-332(b) ...........................................................................................................12

**CONSTITUTIONAL PROVISIONS & OTHER AUTHORITIES**

P.R. Const. art. VI, § 2 ..................................................................................................5

P.R. Const. art. VI, § 8 .........................................................................................4, 7, 8, 10

P.R. Op. Sec. Just. 2005-14, 2005 WL 6431018 (P.R. Atty. Gen.) ................................................26

**To the Honorable United States District Judge Laura Taylor Swain:**

The Commonwealth of Puerto Rico (the "Commonwealth" or the "Debtor"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or "FOMB"), as sole representative of Debtor pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"), respectfully submits this sur-reply (the "Sur-Reply") in opposition to the *Motion of Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and the Bank of New York Mellon Concerning the Application of the Automatic Stay to the Revenues Securing the CCDA Bonds* [ECF No. 10104] (the "Motion" or "M. Br."):[2]

## I.  PRELIMINARY STATEMENT[3]

1.       Hotel Occupancy Taxes are available resources the Commonwealth may use to pay general obligation debt when necessary.  This undisputed fact emblazoned into the Bond Documents and the Tax Act means the Commonwealth's automatic stay applies.

2.       In May 2016, the Tourism Company took steps, as the instrumentality charged with administering the tax, to preserve the Commonwealth's ability to use these funds for this purpose. It stopped depositing Occupancy Taxes in the accounts established by the Bond Documents for CCDA debt service and retained them in its own accounts.  In their Reply, Movants do not gainsay the Tourism Company intended that the funds not be used for CCDA debt service.  But they say "newly discovery evidence" shows the Tourism Company botched the effort because, per

---

[2] Unless otherwise noted, all emphasis added and internal citations and quotation marks omitted.  Capitalized terms not defined herein have the same meaning as in the Commonwealth's Opposition, ECF No. 10615.  Movants' Reply brief [ECF No. 12997] is referred as "M. R. Br."  References to Exhibits are attached to the Declaration of Colin R. Kass filed concurrently herewith or the Hughes Declaration, ECF No. 13007, as described therein.

[3] The fact the Sur-Reply does not deal with all arguments contained in the Reply should not be construed as waiver or concession of any argument.  The Oversight Board reserves all rights.

Movants, it supposedly continued to fund the first account in the debt service chain, the "Transfer Account." Movants are wrong. They mislabel as the Transfer Account the Tourism Company's *tax collection account* – which has nothing to do with CCDA debt service.

3.      Under the Bond Documents, *after* the Tourism Company collects Occupancy Taxes, it is required to deposit them in the Transfer Account before transferring the funds to the Pledge Account. All parties agree the Pledge Account is GDB 9947. All parties also agree the Pledge Account was funded by GDB 9758. And all parties agree that, in May 2016, the Tourism Company ceased depositing Occupancy Taxes in GDB 9758. Movants have spent months searching for an account other than the near-empty GDB 9758 to label the Transfer Account because their security interest in the Transfer Account matters only if it contains taxes. Movants settled on Scotiabank 5142, into which hoteliers currently deposit funds to pay hotel tax obligations. It was created in 2011, five years after the bond issuance and the *actual* Transfer Account was required to be "established." The timing of its opening, its usage, and the exercise of control and dominion over Scotiabank 5142 prove it is not the Transfer Account. Put simply, when the Tourism Company ceased depositing Retained Occupancy Taxes in GDB 9758, it simultaneously ensured those funds were not deposited in a CCDA debt service account.

4.      Movants' mistaken account identity theory infects their entire Reply because, if GDB 9758 is the Transfer Account (as it is), Movants do not have a plausible claim to secured status in any of the Retained Occupancy Taxes. Their claims then reduce to an unsecured claim based on a failure to fund the Transfer Account beginning in May 2016. Holders of unsecured claims are not entitled to stay relief.

5.      In response, Movants first argue the automatic stay does not apply because the Commonwealth has no interest in the Retained Occupancy Taxes. But Movants do not deny the

funds are subject to the Commonwealth's retention powers and the Occupancy Taxes emanate from the Commonwealth's sole and exclusive taxation authority, and, as such, the Commonwealth is the original owner of any collected taxes. Movants' only response is that, by designating the Tourism Company as its administrative agent to levy and collect taxes, the Commonwealth *implicitly* transferred ownership to the Tourism Company. But, where the Commonwealth has seemingly wanted to transfer *ownership* – as opposed to administrative responsibilities – it has done so explicitly, as in the case of COFINA. *See* 13 L.P.R.A. § 12. The Commonwealth did the opposite here, making clear that it has first claim on these funds for purposes of paying the public debt. Movants' reply – that the delegation of administrative authority to levy and collect the taxes was not "improper" – side-steps the ownership question; it does not respond to it.

6. In any event, under any scenario, the Commonwealth expressly retained a reversionary interest to use the funds when needed to pay GO debt. Movants do not deny that any rights Movants may have (whether secured or unsecured) are subordinate to the Commonwealth's retention rights, or that reversionary interests trigger the automatic stay. Instead, they say the Commonwealth's rights do not qualify as a "reversionary interest" because GO bondholders ultimately benefit from it. There is no logic to that argument. All revenue the Commonwealth receives benefits some or all of its people, creditors, and other stakeholders. There would be no need to have the Commonwealth if its revenues would not benefit its stakeholders. Moreover, property interests are not determined based on who will receive the ultimate benefit from the property and Movants cite no case saying they are. Movants also argue the Commonwealth does not have a reversionary interest because that right has not been triggered. While that is not true, it also does not matter. A contingent retention right is an interest in the revenues, whether the contingency is triggered or not. And while unnecessary for present purposes, the sole condition

precedent in the Commonwealth Constitution – that "appropriations" exceed "revenues" – has certainly been met.

7.      Movants next ask for stay relief based on (i) the argument that their security interest extends beyond amounts deposited in the Transfer Account, and reaches funds that *should have been* so deposited; or (ii) the argument that they are original equitable owners of all collected taxes regardless of what the Bond Documents say.  The first argument is based on a misreading of the Bond Documents.  The second has no merit whatsoever.  The Bond Documents give Movants a secured claim in certain funds actually deposited in GDB 9758 (the Transfer Account), and an unsecured claim for any alleged failure to properly fund that account.  Movants offer no reason for the Court to disregard those express terms.

8.      Finally, Movants assert Commonwealth law compels immediate release of the Retained Occupancy Taxes.  But PROMESA preempts any existing territorial law purporting to require use of the Retained Occupancy Taxes to service CCDA debt.  While Movants argue PROMESA cannot be used to destroy or discharge their claims, their desperate attempt to establish a secured claim demonstrates they understand their rights have no value unless they show an entitlement to compensation under the Fifth Amendment, which they cannot do.

## II.   THE AUTOMATIC STAY APPLIES

9.      The automatic stay applies because the Commonwealth has two distinct property interests in the Retained Occupancy Taxes.  First, it owns the funds because they emanate directly from its sovereign and exclusive taxing power, which has not been conveyed (and cannot be surrendered), and second, it has an express reversionary interest under Article VI, Section 8 of the Commonwealth Constitution.  Whether the interest is contingent and whether the contingency has occurred is immaterial.  In their Reply, Movants do not dispute that any Commonwealth property interest is sufficient to trigger the automatic stay.  Instead, Movants deny the existence of a

4

Commonwealth interest in such funds regardless of their own documents providing the funds are subject to the Commonwealth's retention rights.

10.     Movants acknowledge the Puerto Rico Constitution vests the Commonwealth with sole and exclusive taxation powers, which can "***never be surrendered or suspended***."  P.R. Const. art. VI, § 2.  The Retained Occupancy Taxes were undeniably levied pursuant to this power. Movants recognize the Commonwealth never expressly transferred the property interest it had in these funds to the Tourism Company.  Instead, Movants say the delegation to the Tourism Company of the obligation to "levy and collect" these taxes also *impliedly* transferred ownership. That contradicts common sense that the Commonwealth can have its tourism instrumentality levy and collect hotel taxes and is inconsistent with the history and purpose of the Tax Act.

11.     Prior to the Tax Act's enactment in 2003, Occupancy Taxes were collected directly by the Department of Treasury.  The Treasury, however, did not make enforcement of these taxes a priority, leading to shortfalls and prompting the Legislature to transfer administrative tax enforcement responsibility to the Tourism Company.  As the Act's official "STATEMENT OF MOTIVES" explains:

> "Notwithstanding . . . the significant increase in available rooms, the revenues derived under this scheme have not significantly increased. . . .  [An investigation] revealed that over the past years, there has been confusion regarding the imposition, enforcement, and collection of the Tax. . . .  It has likewise become evident that the ***supervision of the Tax does not constitute a priority within the [Treasury]*** Department's wide range of responsibilities and ministerial duties.  [As such,] it is essential that the [Tourism] Company exercise a more prominent role in the ***collection and supervision*** of [the Tax] so that it may continue its ***ministerial*** role to promote . . .  tourism."

Room Occupancy Rate Tax Act, 2003 PR H.B. 3820, No. 272 (LEXIS).  As this makes clear, the legislature itself wrote it was transferring responsibilities for "collection and supervision" of the taxes.  Nothing says ownership of the taxes was transferred, and such a transfer would have been preposterous in view of the taxes being subject to retention.  The Commonwealth would be unable

5

to claw back taxes if it had transferred ownership of them in the first place.

12.     Movants cite no case establishing that the Commonwealth's appointment of a tax collection agent transfers (implicitly or otherwise) ownership to the agent.  An agent in possession of property for its principal has no ownership rights in that property, which belongs to the principal. Restatement of Agency (Third) § 8.12 (Am. Law Inst.); *see also* 31 P.R. Laws Annot. § 4425 ("An agency stated in general terms only includes acts of administration. In order to compromise, alienate, mortgage, or to execute any other act of strict ownership, **an express commission is required.**").   Indeed, where the Commonwealth seemingly wanted to transfer property rights in tax revenues to an instrumentality, it at least attempted to do so expressly.  For example, with respect to COFINA, the relevant statute expressly stated that the taxes are "***hereby transferred to, and shall be the property of COFINA***" and shall not "***constitute resources available to the Commonwealth of Puerto Rico***." 13 L.P.R.A § 12.  Here, the Tax Act states the opposite – making clear the Occupancy Taxes are "available resources" of the Commonwealth.  13 L.P.R.A § 2271v. Similarly, the Bond Offering Statement for CCDA Bonds makes clear, Occupancy Taxes "are available [resources] under the Constitution." Offering Statement at 1, 22.

13.     Movants do not deny that, unlike in COFINA, the Retained Occupancy Taxes constitute available resources of the Commonwealth.  M. R. Br. ¶ 32; *cf.* Official Statement, at 21 (Occupancy Taxes are "available revenues under the Constitution" that "may be applied ***first*** to the payment of debt service on public debt of the Commonwealth.").   Instead, they assert ownership was *implicitly* transferred because the "delegation … of the power to impose and collect the Hotel Taxes is a legitimate use of [the Commonwealth's] taxing power." M. R. Br. ¶ 45. They do not explain why a legitimate use transfers ownership, because it does not.  The propriety of the delegation to levy and collect is not in dispute.

6

14.     Movants, thus, misplace reliance on *In re Financial Oversight & Management Board for Puerto Rico*, 361 F. Supp. 3d 203, 242 (D.P.R. 2019) ("*COFINA*").  As noted, *COFINA* dealt with a statute *expressly transferring* ownership to an instrumentality.  Movants acknowledge this distinction, but argue that because of the nature of the statutorily prescribed flow of funds here, the Commonwealth "did not have to make clear, as it did in COFINA, that the funds were the property of the Tourism Company."  M. R. Br. ¶ 43.  Movants are wrong.  The Tax Act and Bond Documents refer to Article VI, section 8 of the Puerto Rico constitution and expressly provide the Occupancy Taxes are "available resources" of the Commonwealth.  Therefore, this is not a matter of clarification.  This is a matter of Movants contending the documents accomplished the opposite of what they said – that the Occupancy Taxes are available resources of the Commonwealth – without there being a need for any legislative indication to the contrary.  Movants' position makes no sense and flies in the face of elemental statutory interpretation.

15.     Movants next argue that, even if the Commonwealth had a reversionary interest, the "automatic stay does not apply" because their proposed enforcement action against CCDA or the Tourism Company will "have no effect" on that interest.  M.R. Br. ¶¶ 36-37.  Not so.  Once the CCDA Bondholders take the funds, the reversionary interest is extinguished.

16.     Next Movants argue they have a "colorable claim" that the Commonwealth's contingent reversionary interest has not yet been triggered.  M. R. Br. ¶ 38.  But the automatic stay protects reversionary interests, regardless of whether they have been triggered.  Were it otherwise, no reversionary interest would be protected, since all such interests are contingent.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 582 B.R. 579, 598-99 n. 17 (D.P.R. 2018).  Further, Movants offer no authority to support the idea that the "colorable claim" standard they invoke applies to requests like Movants' for a judicial declaration that the automatic stay does not apply to certain

7

property, and Movants neglect to acknowledge that their "colorable claim" standard was explained
by the First Circuit to require the showing of a probability of success. *Grella v. Salem Five Cent
Sav.* Bank, 42 F.3d 26, 32–33 (1st Cir. 1994).

17.     In any event, the Commonwealth's reversionary interest has been, and remains,
triggered.  The 2015 Emergency Order expressly invoked the protection of Article VI, Section 8.
Movants do not deny this.  Nor can Movants legitimately deny that the condition precedent to
triggering this right – that "appropriations" exceed "available resources" – has existed since then.
If it were otherwise, GO creditors would have been paid the full amount due to them, but that has
not happened.  Indeed, in the proposed plan of adjustment, the GO creditors are not paid in full,
and amounts they are paid are funded out of the retained revenues.

18.     Movants try to avoid this result by injecting an imaginary condition precedent into
the retention right, something they call the "last dollars" protection.  M. R. Br. ¶ 40 n.9.  Pointing
to the Tax Act and the Bond Documents, they say that Article VI, Section 8 cannot be invoked
unless there are no other available resources to pay GO debt.  But this is inconsistent with the
Constitution, which ***only*** requires that annual appropriations exceed available resources.  Once that
occurs, the Commonwealth can use the Occupancy Taxes for payment of public debt.  In any event,
the Court need not reach the issue of whether the rights afforded by the Constitution are qualified
by Movants' "last dollars" theory because, either way, Commonwealth still has a reversionary
interest sufficient to trigger the automatic stay.

## III.    MOVANTS HAVE NO PROPERTY INTEREST IN THE RETAINED OCCUPANCY TAXES.

19.     Movants' claims to Retained Occupancy Taxes going forward are cut off as a matter
of law by the Commonwealth's power under PROMESA not to appropriate the taxes to pay CCDA
debt.  As explained in the Commonwealth's Opposition, the First Circuit affirmed this Court's

holding that pre-PROMESA appropriations are preempted.  Opposition ¶¶ 77-89.  Additionally, a prior Puerto Rico legislature cannot bind future legislatures to make appropriations.  Moreover, the appropriations Movants want would pay their claims in full and there is no such priority in the Commonwealth's Title III case to use its taxing power and taxes to pay that debt, for which the Commonwealth is not liable in the first place.

20.     Movants' contentions about which account is the Transfer Account in which they hold a security interest only apply to monies currently in the Transfer Account.  Movants contend the Commonwealth did not realize which account was the Transfer Account and has mistakenly been passing these funds through the Transfer Account after determining in 2016 not to apply them to CCDA debt service because they were subject to retention.  Movants cannot dispute that the account they now anoint as the real Transfer Account (a) did not exist for five years after it was required to be created under the Bond Documents, and (b) is the account into which the hoteliers send the taxes.  Plain and simple.  Movants are staging a ruse designed for delay.  But the documents, logic, and common sense totally repudiate Movants' allegation.

21.     Movants are not entitled to stay relief under either Bankruptcy Code Section 362(d)(1) or (d)(2) because they lack a property interest in the Retained Occupancy Taxes.  Movants do not deny that Section 362(d)(1) requires proof of a secured interest, and they fail to respond to the case law establishing that the same is true under Section 362(d)(2).  *In re Elmira Litho, Inc.*, 174 B.R. 892, 900 (Bankr. S.D.N.Y. 1994).  Instead, they say they have a secured interest because "discovery has revealed" the funds "are still being deposited in the Transfer Account," and, even if not, the Tourism Company has either *implicitly* granted them a security interest in those funds or else Movants are equitable owners of them.  These arguments fail.

**A.    *The Retained Occupancy Taxes Have Not Been Deposited in the Transfer Account.***

9

22.     Movants do not seriously dispute that the Bond Documents provide them with a security interest only in a portion of funds actually deposited in the Transfer Account.  Their argument is the Tourism Company has unwittingly continued to deposit Occupancy Taxes into the Transfer Account.  That is based on their mistaken assertion as to which account is the "Transfer Account."  Movants assert it is Scotiabank 5142, when in reality it is GDB 9758.  That GDB 9758 is the Transfer Account is evident from the Bond Documents, the timing of the account openings, and who exercises control over the accounts.

23.     The parties do not dispute how the relevant flow of funds was supposed to work under the Bond Documents.  Specifically, the Tourism Company was required to establish a Transfer Account in March 2006, into which it was to deposit the taxes, "as collected," and then transfer the debt service amounts to the Pledge Account "on a monthly basis."  Assignment Agreement §§ 1, 2, 4.  Excess amounts were to be transferred to the Surplus Account.[4]  *Id*. § 4

24.     The parties also do not dispute the *actual* flow of funds.  Prior to May 2016, the Tourism Company transferred the Occupancy Taxes, as collected, from Scotiabank 5142 to GDB 9758, and, on a monthly basis, transferred the debt service amount from GDB 9758 to the Pledge Account (GDB 9947).[5]  Excess amounts were then transferred to Scotiabank 5144.

25.     The following chart depicts the required flow of funds under the Bond Documents, and the actual flow of funds:

---

[4] The parties dispute whether funds exceeding the required certified debt service amounts should have been deposited directly in the Surplus Account, or whether they were to first be deposited in the Transfer Account and transferred from there.  As explained below, the difference is immaterial in terms of the legal rights at issue here.  Nonetheless, the dispute is reflected by the blue dotted lines in the "Specified Flow of Funds under the Bond Documents" diagram below.

[5] Between December 2015 and April 2016, a total of approximately $12 million was transferred from GDB 9758 to other accounts, pursuant to the Governors' emergency orders implementing the retention under Art. VI, Section 8.



26.     After May 2016, the Tourism Company retained the Occupancy Taxes, and ceased depositing them in GDB 9758.  As such, the funds bypassed GDB entirely, going from Scotiabank 5142 to 5144.  Movants argue, however, that the Tourism Company failed in its effort to cease making debt payments because it continued to deposit the revenues into what Movants claim is the Transfer Account.

27.     Movants' argument requires the Court to suspend disbelief.  Under Movants' new naming convention, the Scotiabank collections account (Scotiabank 5142) would be the "Transfer Account" and GDB 9758 would be the Surplus Account.  Under that view, the flow of funds looks as follows:



28.    Movants' hypothesized flow of funds is *fundamentally* inconsistent with the Bond Documents.  The Bond Documents require the Pledge Account be funded by the Transfer Account, and that any amounts in excess of the certified debt service amounts be transferred to the Surplus Account.  Assignment Agreement §§ 4, 6.  If Scotiabank 5142 were the Transfer Account and GDB 9758 were the Surplus Account, then the Pledge Account would be funded – not by the Transfer Account – but by the Surplus Account, an account in which neither GDB, CCDA nor Movants have ***any interest***.  Likewise, the Surplus Account, which is supposed to be used solely for non-debt services purposes, would impermissibly hold the entire debt service amount.  *See* Assignment Agreement § 4.

29.    This is no mere technical issue.  The Assignment Agreement clearly states the "Assignment and the right of the Tourism Company ***to pledge the Transfer Account*** shall be deemed an agreement made for the benefit of the Owners of the Bonds."  Assignment Agreement, § 15.  This gives the Bondholders a security interest (through the Pledge Agreement) in the Transfer Account.  But it does *not* say that the Surplus Account may be pledged, or that Bondholders have ***any interest*** in that account.  As such, if Movants were correct, their security interests would be released as a matter of law as soon as the funds were transferred from the Scotiabank account (as the asserted Transfer Account) and deposited in GDB 9758,[6] only to attach again when the funds are later transferred to the Pledge Account.  This mechanism is not only inconsistent with the Bond Documents, it is contrary to common sense and the norms of customary commercial practice.

---

[6] *See* 19 L.P.R.A. § 2282(b) ("A transferee of funds from a deposit account takes the funds free of a security interest in the deposit account . . . ."); UCC § 9-332(b).

30.     Movants' argument is also inconsistent with the timing of the opening of these accounts.  The Trust Agreement defines the Transfer Account as the account "established pursuant to the Assignment Agreement," and both the Assignment Agreement and Pledge Agreement were entered into in March 2006.  Scotiabank 5142, however, was opened in June 2011, five years later. *See* Ex. F to Kass Decl.  As such, Scotiabank 5142 cannot be the Transfer Account.  In contrast, while the account opening statement for GDB 9758 has not been located, other GDB accounts relating to the CCDA Bonds were opened in March 2006, including the Pledge Account (GDB 9947) and an account for CCDA bond insurance (GDB 9785).  Ex. 43 to Hughes Decl.; Ex. G. to Kass Decl.  This further suggests that the Transfer Account was opened in 2006, as required by the Bond Documents.  Because GDB 9758 is also the only account that could have been opened in March 2006, "by process of elimination," to use Movants' words, GDB 9758 must be the Transfer Account.

31.     Movants' assertion that Scotiabank 5142 is the Transfer Account is also inconsistent with its usage as a collection point, in which hoteliers directly deposit tax funds. Occupancy Taxes were collected long before the CCDA Bonds were issued, and such funds were necessarily deposited in a predecessor Tourism Company account, and Scotiabank 5142, thereafter.  The Assignment Agreement did not purport to change the account to which hoteliers deposited taxes.  Rather, it merely called for an additional "holding fund" where those amounts could be temporarily held after being collected by the Tourism Company, but prior to being deposited in the Pledge Account.  Assignment Agreement §§ 1, 2 (describing "Holding Fund").  If Movants were correct that Scotiabank 5142 (or its predecessor account) were the Transfer Account, then the Tourism Company would have had to change the way it collected taxes, and hoteliers would have had to change the way they paid taxes after March 2006, lest hoteliers have

13

responsibility for making deposits directly into the Transfer Account.  There is no indication that such drastic changes in the collection process were ever contemplated or occurred.[7]

32.     Movants' position is impossible under the terms of the Assignment Agreement. Under Section 6 of the Assignment Agreement, the Tourism Company transfers "to GDB" all of the Tourism Company's rights in "amounts deposited in the Transfer Account … up to the amounts certified by GDB."  Tourism Company, as the owner of the Transfer Account, would not have the ability to transfer to *GDB* "amounts deposited" into an account at Scotiabank because, upon deposit at Scotiabank (unlike a deposit to GDB), the amounts deposited would become the property of Scotiabank.  *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548, 560 (2d Cir. 1976).   Further, because GDB 9758 was, by definition, a GDB account, GDB had control over it.  Further, because GDB 9758 was, by definition, a GDB account, GDB had control over it.  In contrast, GDB had neither possession, custody, nor control over Scotiabank 5142.  In the absence of a complete "divest[ment] of all control" over the putatively assigned account, the assignment does not occur. *Miller*, 540 F.2d at 558.  The Tourism Company retained complete control over the Scotiabank account and GDB had and has no control over that account.  Nor does any document purport to give GDB possession, custody, or control over Scotiabank 5142 *by name*.  That is, no one could look at any document with the account number Scotiabank 5142 and conclude that GDB had any

---

[7] Movants argue that Scotiabank 5142 must be the Transfer Account because the Tourism Company is required to deposit the taxes, "as collected," into the Holding Fund (which consists of the Transfer Account and the Surplus Account), and the taxes are *first* deposited into Scotiabank 5142.  M. R. Br. ¶ 55.  But the Tourism Company uses Scotiabank 5142 as the collection point for the taxes into which many hoteliers directly deposit their payments.  Ex. 44 to Hughes Decl., Ahlberg Dep.453:1-455:15.  Since funds are transferred from others *to the Tourism Company*, Scotiabank 5142 cannot be the Transfer Account, because only the Tourism Company can make deposits into that Account.  Movants are also incorrect that the Tourism Company did not make deposits, "as collected," into GDB 9758.  Prior to early 2016, the Tourism Company deposited the collected taxes on a near *daily basis* into GDB 9758. *See* Ex. J to Kass Decl. (showing daily deposits). Nothing in the Assignment Agreement requires that the Transfer Account serve as the *collection point* from hoteliers.  Indeed, Section 4 of the Assignment Agreement only requires the Tourism Company to fund the Transfer Account on "a monthly basis."  *See* Assignment Agreement § 4.  As such, the Tourism Company was free to collect the funds in one account, and *then* deposit them in the Transfer Account.

rights in it.  As such, GDB could not claim ownership in that account, and that account cannot be
the Transfer Account because the Transfer Account had to be owned by GDB.  The only logical
inference, therefore, is that the two GDB accounts (GDB 9758 and 9947) were the ones in which
bondholders have a security interest through GDB, and the two Scotiabank accounts (Scotiabank
5142 and 5144) are the ones in which they do not.

33.     Unable to reconcile their arguments with the specified flow of funds, Movants turn
to *inferences* derived from the naming conventions used to describe certain accounts.  But the
name given to an account is not as important as the nature of account activity.  *See In re*
*Teleservices Grp., Inc.*, 469 B.R. 713, 735 n. 64 (Bankr. W.D. Mich. 2012) ("[T]he name placed
on the account is not dispositive" since the "realities of ownership" govern).  Rather, the Court
must look to the function of these accounts in the flow of funds under the Bond Documents to
determine which one is the Transfer Account.  But even if account names were important, Movants
concede that no account opening statement, other document, or percipient witness has identified
Scotiabank 5142 as the Transfer Account.[8]  Indeed, Scotiabank 5142 is simply referred to as the
"Room Tax Deposits" account, consistent with its administrative function as a collection point for
taxes and not an account described in the Bond Documents.  M. R. Br. ¶ 23 n.5; s*ee, e.g.*, Ex. F to
Kass Decl.

34.     Despite the lack of any affirmative evidence showing that Scotiabank 5142 is the

---

[8] Movants concede that, according to the Tourism Company's Rule 30(b)(6) deposition witness, the Tourism Company
considered GDB 9758 to be the Transfer Account.  *See* Ex. 44 to Hughes Decl., Ahlberg Dep. 429:3-16, 431:19-25,
489:10-14, 497:19-25, 545:21-546:5.  Movants seek to strike this testimony because the deponent did not have
personal knowledge, but instead relied on his investigation.  M. R. Br. ¶ 53.  But "[i]t is axiomatic that a corporate
representative may testify and submit affidavits based on knowledge gained from a review of books and
records." *Philbrick v. eNom, Inc.*, 593 F. Supp. 2d 352, 364 (D.N.H. 2009).  Here, the account the *Tourism Company*
considered the Transfer Account is not hearsay; it is the Tourism Company's understanding.  A corporate
representative is fully qualified to testify as to that fact.  While Movants speculate that some Tourism Company
employees might have a different view, or might not be sufficiently informed, such speculation does not create a
material dispute concerning which account is the Transfer Account.

Transfer Account, Movants hang their hat on the fact that certain documents call GDB 9758 the "Room Tax – Concentration Surplus" account.  M. R. Br. ¶¶ 53-55.  Not all documents refer to the account this way, and many documents do not include the word "surplus."  *See, e.g.,* Ex. H to Kass Decl.  The account statements, for example, describe the account as the "Room Tax Concentration" Account. Ex. I to Kass Decl.  That is, the key word is "concentration," meaning that it is the bank account in which the funds were concentrated before being transferred to the Pledge Account or the Surplus Account.

35.    Movants incorrectly deduce that GDB 9758 must be the Surplus Account because, in their view, the Transfer Account can *never* hold a penny of surplus.  Not so.  The Assignment Agreement allows the Transfer Account to hold funds exceeding the required debt service amounts, but only conveys an interest in that account "up to amounts" needed for debt service. *See* Assignment Agreement § 6.  If the Transfer Account could only contain debt service funds and no surplus, the "up to" qualifying language would be superfluous.  Moreover, if Movants' deductions were correct – and the mere fact that an account contains both debt service and non-debt service funds disqualified it from being the Transfer Account – then neither Scotiabank 5142 nor GDB 9758 would qualify as the Transfer Account because those accounts both contained debt service and non-debt service funds.  M. R. Br. ¶ 22 n.4.

36.    Movants next argue that GDB 9758 must be the Surplus Account because that is the only account that could serve that function.  That is also untrue.  As the Tourism Company's representative testified, Scotiabank 5144 is the Surplus Account. Ex. 44 to Hughes Decl., Ahlberg Dep. 485:9-25.  In response, Movants say that Scotiabank 5144 cannot be the Surplus Account because it contains commingled funds from other sources in addition to surplus Occupancy Taxes, in supposed contradiction of the Assignment Agreement.  But the Assignment Agreement simply

16

notes that funds deposited in the Surplus Account can be utilized for any purpose authorized by the Tax Act. *See* Assignment Agreement § 4. Nothing requires that the funds in the Surplus Account be segregated from other Tourism Company revenues. *Id.* Indeed, since it is undisputed that Surplus Account funds are not subject to any liens, surplus funds need not be segregated and disbursements can be handled as a matter of simple accounting. Because nothing precludes Scotiabank 5144 from being the Surplus Account, Movants' "process of elimination" does not lead to the conclusion that Scotiabank 5142 must be the Transfer Account.[9]

37.     In sum, Movants have not shown that the Tourism Company continued to fund the Transfer Account after it changed the flow of funds in May 2016 in order to retain these funds and not fund CCDA debt service.

**B.     *Movants Do Not Have a Property Interest in the Retained Occupancy Taxes.***

38.     Movants argue that, even if not deposited in the Transfer Account, they still have a property interest in the Retained Occupancy Taxes for two reasons. First, they say the Bond Documents give them a security interest in funds that "should have been," but were not, deposited in the Transfer Account. Second, they say the Tax Act transferred "equitable ownership" in those funds upon collection regardless of what the Bond Documents say. Both arguments fail.

**1.     *The Tourism Company Did Not Grant a Security Interest in the Occupancy Taxes Not Deposited in the Transfer Account.***

39.     The Bond Documents only grant bondholders a security interest in amounts actually deposited in the Transfer Account, and at most an *unsecured* claim for any failure to properly fund the Transfer Account. Movants incorrectly argue their security interest extends to amounts that

---

[9] Movants also argue that Scotiabank 5144 cannot be the Surplus Account because it was not created at the time of the Bond Documents. Of course, that would preclude Scotiabank 5142 (opened in 2011) from being the Transfer Account too. In any event, Movants are wrong because, although the Trust Agreement defines the Transfer Account as an account "established by the Assignment Agreement," there is no similar definition for the Surplus Agreement. Trust Agreement, Art. I. This is no surprise because CCDA Bondholders have no property interest in that account.

17

"were required to be" deposited in the Transfer Account.

40.     Movants' argument rests on sleight of hand.  Specifically, even though only CCDA
and GDB (and not the Tourism Company) pledged their rights to monies required to be transferred
into the Pledge Account, Movants pretend they have a security interest in the Tourism Company's
obligation to transfer money to the Transfer Account.  But, CCDA was only granted a security
interest in funds actually transferred into the Transfer Account, not in funds required to be
transferred into the Transfer Account.

41.     All parties agree the Pledge Agreement confers a security interest in amounts
"deposited in or required to be deposited in the *Pledge Account*."  M. R. Br. ¶ 60 (citing Pledge
Agreement, § 2(b)(ii)).  But that does not help Movants because the question is whether Movants
have a security interest in amounts required to be deposited in the *Transfer Account, not the
Pledge Account*.  Movants skip over this important distinction, and indeed, the section title to their
brief does not even indicate to which account they are referring.

42.      The Bond Documents make clear the security interest does not extend to amounts
*required to be deposited* in the Transfer Account, but rather only to amounts *actually deposited* in
that account.  Movants do not dispute that Section 2(b)(ii) of the Pledge Agreement reflects a
pledge granted by CCDA and GDB, acting on behalf of CDDA.  It does not reflect a grant of a
security interest made by the Tourism Company.  Movants also do not deny that GDB and CCDA
*do not* have any property interest in amounts that the Tourism Company should have, but did not,
deposit in the Transfer Account.  Nor do Movants dispute that GDB/CCDA are powerless to grant
a security interest in property they do not own.

43.     Movants' argument to the contrary misconstrues Section 2(b)(ii) of the Pledge
Agreement.  Section 2(b)(ii) does not cover amounts required to be deposited in the Transfer

Account, but – as it says – amounts required to be deposited in the Pledge Account.  This provision is necessary because GDB/CCDA possessed proceeds of Occupancy Taxes that had not been deposited in the Pledge Account.  Section 2(b)(ii) ensures that, if a default occurs, bondholders may reach funds received by GDB/CCDA but not yet deposited in the Pledge Account.

44.     The specific terms of Section 2(b)(ii) further demonstrate it does not reach funds beyond the Transfer Account.  Section 2(b)(ii) refers to "moneys deposited in or required to be deposited in the Pledge Account pursuant to the provisions of this Pledge Agreement."  Pledge Agreement § 2(b)(ii).  This requires reference to another provision of the Pledge Agreement, namely Section 3(a).  Section 3(a), in turn, simply requires GDB to "deposit or cause to be deposited into the Pledge Account, all **Hotel Occupancy Taxes Funds** received from the Tourism Company as **received** . . . ."  *Id*. § 3(a).   Section 3(a) is limited to amounts actually deposited in the Transfer Account for two reasons.  First, the term "Hotel Occupancy Tax Funds" is defined as "Hotel Occupancy Tax Revenues that **are deposited in the Transfer Account** . . . ."  Trust Agreement, Art. I.  Movants do not claim this definition reaches amounts not so deposited. Second, Section 3(a) only requires the deposit of funds after they have been *received* by GDB. But GDB never received any funds until they were deposited in the Transfer Account (GDB 9758). As such, the Pledge Agreement does not grant any security interest in funds that should have been, but were not, deposited in the Transfer Account.

45.     To overcome this limited express grant, Movants contend the Tourism Company is a party to a security agreement it is not a party to!  Movants argue that, because the Tourism Company approved the Bond Documents, it is "bound by the Pledge Agreement to the same extent as if it had signed it directly."  M. R. Br. ¶ 66.  However, even if the Tourism Company were "bound by the terms of the Pledge Agreement," nothing in the Pledge Agreement, the Assignment

Agreement, or any other document purports to require the Tourism Company to transfer a property interest, or grant a security interest, in funds prior to depositing them into the Transfer Account. As noted, the provision Movants rely upon – Section 2(b)(ii) – speaks only to the security interests granted by GDB/CCDA, and is limited to amounts received by GDB/CCDA. As such, even if the Tourism Company were somehow bound generally to the Pledge Agreement, the provision Movants cite would not impose any obligation on the Tourism Company or reach funds beyond those deposited in the Transfer Account.

46.     Movants' contrary argument also contradicts the limited nature of the Tourism Company's consent. As the Assignment Agreement states, the Tourism Company's consent to the pledge of taxes only extended to amounts deposited in the Transfer Account. *See* Assignment Agreement § 7 ("The Tourism Company hereby expressly … consents to GDB entering into that certain Pledge Agreement … under which the Hotel Occupancy Funds" – which, again, are definitionally limited to amounts actually deposited in the Transfer Account – "transferred to GDB [are] further pledged . . . ."); §15 (referring to the "pledge [of] the Transfer Account").

47.     Nothing in the Bond Documents provides for the grant by the Tourism Company of a security interest in funds before they have been deposited in the Transfer Account.

### 2.     *Movants Do Not Have Equitable Ownership or a Statutory Lien in the Retained Occupancy Taxes.*

48.     Unable to point to a security interest, Movants alternatively argue that they are the "equitable owners" of the Retained Occupancy Taxes immediately upon collection. But the Commonwealth (acting through its agent, the Tourism Company) is the original owner of the collected taxes, and has not *statutorily* transferred any ownership – equitable or otherwise – in them prior to deposit in the Transfer Account. Put simply, the statute provides no reason to override the express terms of bargained-for contracts and the bankruptcy law abhors equitable

rights that create priorities not provided in the Bankruptcy Code.

49.     Movants contrary view rests on the mistaken belief that Tourism Company lacks any statutory discretion as to the disposition of the funds and is, thus, a "mere conduit." Specifically, Movants point to Section 2271v, stating that the taxes must first be used to satisfy any "bonds, notes or other obligations issued, assumed or incurred by [CCDA] . . . , with the prior written authorization of the [Tourism] Company" before they can be used for other purposes, such as "promoting, marketing, developing and strengthening the tourist industry." 2271v(a)(1), (b)(5). This establishes an order of distribution for the funds, but it does not purport to transfer *ownership* to anticipated beneficiaries.

50.     Ownership transfer is inconsistent with the statutory scheme because the statute identifies many potential uses for the Occupancy Taxes. 13 L.P.R.A. 2271v(b). If Movants were, every potential beneficiary could lay claim to a contingent *property* interest in every collected dollar, depending on how much is actually collected and how the funds are spent. And even if equitable ownership transferred to the *first* in line, that would provide Movants no solace, since they are ***second*** in line, not ***first***. Movants do not deny that their rights are subordinate to the right to use the funds to pay GO debt in years where appropriations exceed available resources. Because no one knows whether that condition will exist until the end of any given fiscal year, equitable ownership could not transfer to Movants immediately upon collection.

51.     More fundamentally, the Tax Act does not transfer ***any*** equitable ownership because the Tourism Company is not a "mere conduit." Under the Tax Act, the Tourism Company's "written authorization" is required prior to any disposition of funds, including any pledge of property to bondholders. 13 L.P.R.A. § 2271v(a)(1), (b). This consent requirement makes it a decision-maker with respect to the disposition of the property. At a minimum, by

21

requiring Tourism Company's consent, the Tax Act respects – it does not disregard – the terms of

that consent and the limits such consent imposes on any property transfer. *Id*. 2271v(a) (noting

that disbursement must "comply with any *stipulations agreed* to with the bondholders.").

52.     Ignoring the critical role of the Tax Act's "consent" requirement, Movants rely on

cases in which agreements are wholly absent, namely *Gracia-Gracia* and *Flores Galarza*. But as

the First Circuit has held, the "assertion of a lien is inconsistent with the assertion of [a] title

interest." *See Assured Guar. Corp. v. Puerto Rico*, 582 B.R. 579, 597 (D.P.R. 2018) (quoting

*William W. Bierce, Ltd. v. Hutchins*, 205 U.S. 340, 347 (1907). Thus, cases in which there is no

governing security agreement are inapposite.

53.     But even if the "conduit theory" could override express security agreements, neither

*Gracia-Gracia* nor *Flores Galarza* would justify the application of such a theory here. *Gracia-*

*Gracia* does not apply because the claimants were the *original owners* of the disputed funds,

namely duplicate insurance premiums, and thus had ownership rights *independent* of any statute.

Movants do not claim they are original owners of the Occupancy Taxes, nor could they since those

funds belonged to the hotels until transferred to the Tourism Company to satisfy tax obligations.

54.     In Reply, Movants abandon reliance on *Gracia-Gracia* and place all their eggs in

the *Flores Galarza* basket. Movants say that under the logic of that case, the Tax Act strips the

Tourism Company of ownership (even for a nano-second), turning it into a mere custodian. But

*Flores Galarza* does not establish the broad principle that statutory beneficiaries obtain ownership

of earmarked funds, let alone in contravention of express contracts to the contrary.

55.     The Claimants in *Flores Galarza* provided insurance to the insureds, pursuant to a

statutory obligation to "provide[] compulsory liability insurance *to all drivers*." 484 F.3d at 7.

Though there was direct statutory privity between the insureds and the insurers, rather than pay

insurers directly for coverage, insureds deposited the premiums with the Commonwealth, which was then required to transfer the money to the insurers, if the insureds did not have other coverage. All this occurred by operation of the statute – there were no contractual provisions governing the flow of funds.  The statute further provided the Commonwealth was merely holding the funds "*in its fiduciary capacity*," not as owner.  26 L.P.R.A. § 8055; *see also Flores Galarza,* 484 F. 3d at 29 (the "Secretary has no entitlement to the premiums" and is "merely the custodian").  Because the Commonwealth acted as mere custodian and the insurers' insurance coverage was already in effect showing that the premiums were already earned, the court held title transferred directly from insured to insurer.   To hold otherwise would have meant that ownership vested in the Commonwealth even though the insured owed no debt to the Commonwealth. Put simply, the premiums were not tax revenues.  They were insurance premiums earned by the insurers.

56.     In contrast, the funds here derive from the Commonwealth's taxing authority, making it the original owner of the funds.  While the Tax Act establishes an order of priority for disbursement, it does not turn the Tourism Company (acting for the *Commonwealth*) into a mere bailee of the *Bondholders*.  Unlike in *Flores Galarza*, the statute does not say the government parties are holding the taxes only in a "fiduciary capacity."[10]  Nor is there privity between hoteliers and Bondholders.  Hoteliers neither received any benefit from the Bondholders nor owed them anything.   Most importantly, unlike in *Galarza*, there are express contracts governing all ownership questions, and thus, there is no need to resort to jurisprudential gap filling.

57.     Movants offer no reason to disregard the express limitations in the Bond

---

[10] Movants misquote the Tax Act when they say they say that it requires "the taxes be held 'for the benefit of the bondholders.'" M. R. Br. ¶ 71.  The Act actually states that the taxes "shall be deposited *in a special account* to be maintained by the Bank *in the name of [CCDA] for the benefit of the bondholders*...." 13 L.P.R.A. § 2271v(a)(4). This is a *descriptive* term that identifies the **Pledge Account** by its characteristics.  It says nothing about whether the Tourism Company is acting in a fiduciary capacity with respect to taxes *not* deposited in such an account.

23

Documents.  And doing so would only inject confusion into an otherwise well-ordered statutory scheme.  The problem is that CCDA bondholders are not the only third parties who could claim priority.  The Tax Act gives (second) priority to not just bondholders, but others to whom the CCDA owes a specified "*obligation,*" such as brick-layers, architects, and ushers.  13 L.P.R.A. § 2271v(a)(1).  Movants acknowledge this problem.  But they say they have a solution – just give all potential claimants "pro rata" shares in each dollar collected.  M. R. Br. ¶ 72.  The cure is worse than the disease.  Under that view, a secured and unsecured creditor, for example, would each be entitled to claim ownership rights *pari passu* to these funds, as the Tax Act makes no distinction among them.  The Commonwealth's position, in contrast, avoids this problem because ownership transfers only in accordance with the governing agreements.

58.     In sum, Movants cannot escape the fundamental truth that ***all*** they have is a security interest in Transfer Account deposits, and a potential unsecured claim for any alleged failure to fund the Transfer Account.  Notably, Movants point to nothing in the official offering statement or attorneys' closing opinions identifying the equitable rights Movants claim.  Because they have such a material impact, it would have been mandatory to disclose them if they existed.

## IV.     PROMESA PREEMPTS ANY OBLIGATION TO USE THE RETAINED OCCUPANCY TAXES TO PAY CCDA BONDHOLDERS.

59.     Movants also cannot compel disbursement of the Retained Occupancy Taxes outside of Title III because PROMESA preempts any Commonwealth laws purporting to require such distributions.  Movants acknowledge PROMESA preempts any inconsistent Commonwealth law.  But they say there is no inconsistency between PROMESA and their demand for payment, or that, if there is, PROMESA preemption is itself unconstitutional.  Movants are twice wrong.

### A.     *PROMESA Preempts Any Territorial Law Purporting to Require the Use of Retained Occupancy Taxes for CCDA Debt Service.*

60.     Movants argue that "[n]othing in PROMESA is 'inconsistent with' Movants'
[claimed] property and contractual rights." M. R. Br. ¶ 82. As Movants know, however, use of the
taxes to pay Movants is inconsistent with the appropriations in the Oversight Board's certified
budgets and inconsistent with the lack of a priority for them in Title III. Movants do not deny that
any successful enforcement action would divert funds that would otherwise be used to pay GO
debt under a Title III plan of adjustment. Nor do Movants deny that any immediate disbursement
of funds to CCDA Bondholders would require expenditure of available resources not contemplated
under the Commonwealth's certified Fiscal Plans and Budgets.

61.     Movants nonetheless say there is no inconsistency because "PROMESA expressly
commands that existing property and contractual rights are to be respected," citing to PROMESA
Section 201(b)(1)(N). M. R. Br. ¶ 82. As Movants well know, they cannot force a deviation for
a certified fiscal plan as the Court lacks subject matter jurisdiction to order it, PROMESA § 106(e),
and in substance, that is what Movants are requesting. To the extent Movants have valid security
interests, they may be entitled to compensation for use of their collateral. Indeed, they are
prosecuting their instant stay relief motions to procure the value of their collateral, but for the
reasons above, they do not have valid security interests.

62.     Movants next argue PROMESA preemption does not apply because Section 202
only preempts "appropriation" statutes and the Tax Act is not an "appropriation" statute. This is
a word game. PROMESA Section 4 extends its preemptive effect to "any [inconsistent] general
or specific provisions of territory law." Any statute using, appropriating or transferring
Commonwealth revenues is preempted regardless of the verb used. Nothing limits PROMESA
preemption to "appropriation" statutes, and so the characterization of a statute as an
"appropriation" statute or something else is irrelevant. Likewise, the number of times the word

25

"appropriation" appears in the Tax Act is a red herring.  The only relevant fact is that use of the

Retained Occupancy Taxes for CCDA debt service is inconsistent with the Commonwealth's

certified Budget.  That is the end of the matter.[11]

63.      Movants say otherwise because the Commonwealth's powers to establish budgets

or make appropriations does not include the "power to rescind, repudiate, or alter pre-existing

property or contract rights."  M. R. Br. ¶¶ 93-97.  Movants' contention swallows the rule and

disproves itself.  Every state and territory has laws enforcing breach of contract claims and

providing remedies.  If Movants were correct, all debt in all bankruptcies would have to be paid in

full because it arises from contracts enforceable under nonbankruptcy law.  It is hornbook law that

bankruptcy law preempts all such law and PROMESA § 4 makes that extra clear.  Movants'

argument also misstates the preemption the Commonwealth asserts.  The Commonwealth does not

assert that Movants lack an unsecured claim (whether meritorious or not) for failure to fund the

Transfer Account, or that Movants cannot assert such claims within the confines, or as permitted,

under Title III.  And, if Movants have a secured claim, the Commonwealth has not requested its

forfeiture.  Rather, the Commonwealth is litigating whether Movants have a secured claim.

Whether they do or not, for now the Commonwealth simply says territorial law cannot force the

Commonwealth to use the Retained Occupancy Taxes for CCDA debt service.[12]  Any allowed

---

[11] In any case, in the section titled "Disposition of Funds," the Tax Act directs how occupancy taxes are to be disbursed. 13 L.P.R.A.§ 2271v.  This makes it an appropriation statute because, as Movants concede, the term "appropriate" simply means to "assign to a particular purpose or use."  M. R. Br. ¶ 90. Movants' argument that the Tax Act cannot be an appropriation statute because the CCDA Bonds are "revenue bonds" is a non sequitur.  How CCDA bonds are funded may impact the nature of Movants' claims, but it does immunize a statute from preemption.  PROMESA preemption applies regardless of whether claimants' rights are dependent on annual appropriations or automatic operation of territorial law.  Indeed, a standing appropriation of indefinite duration is still an appropriation.  *See* Ex. K to Kass Decl., P.R. Op. Sec. Just. 2005-14, 2005 WL 6431018 (P.R. Atty. Gen.).

[12] *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308 (2020), is inapposite.  There, the question was ***not*** whether an appropriation law must provide for payment of statutory obligations, but whether the insurance companies would have damages claims in the absence of appropriations.  The question here is the opposite: Whether Movants can force the Commonwealth to make the appropriation in the first place so as to avoid a purported breach.  Movants

26

secured claim will be treated under a plan of adjustment, but for all the reasons advanced in this contested matter, the Commonwealth submits Movants have no secured claim and therefore no basis for stay relief.

64.     For the same reason, Movants' argument that the Commonwealth's "claimed preemption power under Title II . . . [is] inconsistent with . . . PROMESA," M. R. Br. ¶¶ 98-102, fails  The fact that the Commonwealth's "budgetary powers will remain in effect" for many years, Movants say, "confirm[s] that those powers were not intended to be a means for discharging the Commonwealth's debts." *Id*.  Movants simply misstate the Commonwealth's position.  The Commonwealth has never contended the Oversight Board can discharge debt outside Title III by using its budget powers or anything else.  Whatever allowable claims the certified budgets do not pay, will have to be treated in a plan of adjustment.  While the Commonwealth does not believe Movants have any allowable claims here because the bonds were always subject to retention, if Movants do have allowable claims against the Commonwealth for the retention amounts, they will obtain whatever Title III requires.  Similarly, if Movants have allowable claims under PROMESA § 407, those claims will be treated under a plan of adjustment.[13]

65.     Turning to Title III, Movants argue that PROMESA preemption is impossible because "PROMESA incorporates specific provisions of the Bankruptcy Code that protect the rights of special revenue bondholders."  M. R. Br. ¶ 103.  Several Movants have already unsuccessfully litigated up to the Supreme Court their interpretations of the rights of special

---

may have an unsecured claim for failure to fund the Transfer Account as required by prepetition Commonwealth law, but they cannot rely on territorial law to force specific performance of a funding obligation.

[13] Movants argue "the Oversight Board's claimed 'preemption' power would render PROMESA § 407 nugatory and ineffective."  M. R. Br. ¶ 101.  But nothing in Section 407 precludes the Commonwealth from using the Retained Occupancy Taxes for payment of public debt.  Whether such usage gives rise to an allowable claim – that is whether doing so "violates applicable law" – is irrelevant to preemption analysis.

revenue bondholders under the Bankruptcy Code. *Ambac Assurance Corp. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.),* 297 F. Supp. 3d 269 (D.P.R. 2018), *affirmed,* 927 F.3d 597 (1st Cir. 2019)*, cert. denied,* 2020 WL 129572 (2020).  It is now clear in the First Circuit that the automatic stay applies to them and they are not entitled, as of right, to a turnover of special revenues.  *Id.*   If they have any allowable claims against the Commonwealth for its failure to appropriate Occupancy Taxes to CCDA, those claims will be treated in a plan of adjustment.  None of that is inconsistent with PROMESA's preemption of the pre-PROMESA appropriations to CCDA.   Thus, Movants' argument that preemption is impossible is simply unsupportable.  Moreover, it is contrary to over seventy years of bankruptcy jurisprudence.  Outside bankruptcy, many secured claimholders have rights to streams of payment from their debtors.  Reorganization statutes have resulted in involuntary restructurings of the method of payment.   While the Commonwealth submits Movants have no allowable secured claims in the first place because, due to preemption, it is not appropriating hotel taxes to CCDA and those taxes were Movants' only collateral, if the Commonwealth is wrong, Movants will obtain the treatment Title III requires for whatever allowable secured claims they have.  Thus, far from precluding preemption, Title III requires preemption of territorial laws purporting to require redemption of CCDA debt using Commonwealth property outside the context of Title III.  Movants have no answer to this basic principle.[14]

## B.   *PROMESA Preemption is Not Unconstitutional.*

66.    Movants alternatively argue that, if PROMESA preempts Commonwealth law, PROMESA itself is unconstitutional.  M. R. Br. ¶ 103.  In essence, Movants seek to set up a

---

[14] Giving Movants priority over the Commonwealth's GO Bondholders would violate PROMESA because PROMESA recognizes no such priority.  Movants do not deny that they seek priority, but they say it is normal to prioritize secured claimants over unsecured.  Movants ignore that, under the *Puerto Rico Constitution*, the normal priority is *reversed*, with public debt having the superior claim.  CCDA bonds are also not Commonwealth debt.

conflict between the Supremacy Clause, on the one hand, and the Due Process or Takings Clauses, on the other, saying the latter must win out. As explained above, there is no such conflict because whatever allowable secured claim Movants have will be treated as required in the Title III plan of adjustment. Notably, the Commonwealth has not appropriated the Occupancy Taxes to CCDA for several years, yet Movants are only raising now their unconstitutional contention.

67. Movants' due process arguments fail because they are not complaining about a lack of *process*. They seek to use the Due Process clause to gain substantive rights, namely, the right to specific performance of the obligation to fund the Transfer Account. The Due Process Clause does not protect that supposed right. All the cases Movants cite involve alleged deprivation of rights due to the arbitrary exercise of agency discretion without, or in violation of required, procedural protections. None involved a *change in law* (such as the enactment of PROMESA, with its preemption provisions) creating new procedures that affected substantive legal rights. Procedural Due Process does not play a role in that context; the new law must be followed, unless the law itself is constitutionally infirm. Here, Movants do not actually challenge the adequacy of any of PROMESA's procedural provisions. Nor can they. PROMESA allows Movants to file proofs of claims against the Commonwealth (which they have done), and assert their rights in the Title III case (which they are doing).

68. Movants cite no authority suggesting that such procedural remedies are constitutionally infirm. At most, Movants argue in a footnote that, "[a]n after-the-fact judicial proceeding does not cure a Due Process violation caused by a governmental agency decision that deprived someone of their property or contract rights . . . ." M. R. Br. ¶ 114. But, as explained above, all Movants' allowable secured and unsecured claims will be treated in accordance with Title III. There is no deprivation here. PROMESA preempts all spending inconsistent with

29

certified budgets. Due process does not require that each beneficiary under pre-PROMESA Commonwealth law be given a hearing before such budgets take effect.

69.     Nor is there merit to Movants' claim that repeal or "preemption of the Hotel Occupancy Tax Act would constitute a Fifth Amendment violation." M. R. Br. ¶ 116. Movants fail to acknowledge the infirmities in their position. Movants are only secured by the Transfer Account and Pledge Account. Movants' arguments against preemption, however, come into play in connection with their claim that the Commonwealth is not causing the Tourism Company to transfer the Occupancy Taxes into the Transfer Account. That claim is a claim against the Commonwealth, and that claim is not secured by anything. This does not constitute a taking because Movants do not have a security interest in those funds. Movants say that, even if they had no security interest, the Tax Act creates binding statutory contract that gives rise to a constitutionally protected property interest. At most, however, that would give rise to an unsecured claim, as demonstrated by the rejection of executory contracts under Bankruptcy Code section 365. The Bankruptcy Code authorizes debtors to deprive contract parties of their contractual rights by rejecting the contracts. The result of those rejections are unsecured damage claims under Bankruptcy Code section 365(g)(1), nothing more.

## V.     CONCLUSION

For the foregoing reasons, Movants' motion should be denied on the ground the Commonwealth owns or has interests in the Hotel Occupancy Taxes and Movants have no security interests or other property interests in such property.

Dated: May 18, 2020
San Juan, Puerto Rico

Respectfully submitted,

*/s/ Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:    (787) 764-8181
Fax:    (787) 753-8944
Email: hermann.bauer@oneillborges.com

*/s/ Carla García Benítez*
Carla García Benítez
USDC No. 203708
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:    (787) 764-8181
Fax:    (787) 753-8944
Email: carla.garcia@oneillborges.com

*/s/ Martin J. Bienenstock*
Martin J. Bienenstock
Jeffrey Levitan
Timothy W. Mungovan
Ehud Barak
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:    (212) 969-3000
Fax:    (212) 969-2900
Email: mbienenstock@proskauer.com
        jlevitan@proskauer.com
        tmungovan@proskauer.com
        ebarak@proskauer.com

Michael A. Firestein
Lary Alan Rappaport
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
2029 Century Park East
Suite 2400
Los Angeles, CA 90067-3010

Tel:    (310) 557-2900
Fax:    (310) 557-2193
Email: mfirestein@proskauer.com
 lrappaport@proskauer.com

Colin R. Kass
(Admitted *Pro Hac Vice)*
**PROSKAUER ROSE LLP**
1001 Pennsylvania Ave, N.W.
Washington, DC 20004
Tel: (202) 416-6800
Fax: (202) 416-6899
Email:  ckass@proskauer.com

*Attorneys for the Financial
Oversight and Management Board
as Representative of the Commonwealth*

32

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

<u>/s/ Hermann D. Bauer</u>
Hermann D. Bauer