# EXHIBIT M

**Preliminary Official Statement**



Commonwealth of Puerto Rico
Puerto Rico Infrastructure Financing Authority

(9)

## CERTIFICATE OF SECRETARY OF THE
## BOARD OF DIRECTORS OF THE AUTHORITY
## AS TO THE PRELIMINARY OFFICIAL STATEMENT

**I, OLGA L. ORTIZ,** Secretary of the Board of Directors of Puerto Rico Infrastructure

Financing Authority (the "Authority"), **DO HEREBY CERTIFY** that attached hereto is a true and

correct copy of the Preliminary Official Statement, dated May 23, 2005, which is the same as the

Preliminary Official Statement which was ratified by the Board of Directors of the Authority on

June 2, 2005 by Resolution of said Board duly adopted on said date.

**WITNESS MY HAND** this 16th day of June, 2005.

**OLGA L. ORTIZ**
**SECRETARY**

(SEAL)

*Capital Center II North Tower, 16th Floor, Hato Rey, Puerto Rico 00918 • (787) 763-5757 Fax: (787) 763-4415*

CONFIDENTIAL

**PRELIMINARY OFFICIAL STATEMENT DATED MAY 23, 2005**
**SUBJECT TO COMPLETION AND AMENDMENT**

**NEW ISSUE**
**Book-Entry Only**

Under no circumstances shall this Preliminary Official Statement constitute an offer to sell or the solicitation of an offer to buy, nor shall there be a sale of these securities, in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to qualification or registration under the securities laws of such jurisdiction. This Preliminary Official Statement and the information contained herein are subject to completion and amendment.

**$500,000,000\***
# PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
### Special Tax Revenue Bonds, Series 2005A
### Special Tax Revenue Bonds, Series 2005B
### Special Tax Revenue Refunding Bonds, Series 2005C

The Special Tax Revenue Bonds, Series 2005A, the Special Tax Revenue Bonds, Series 2005B, and the Special Tax Revenue Refunding Bonds, Series 2005C, are being issued by Puerto Rico Infrastructure Financing Authority pursuant to a Trust Agreement, dated as of October 1, 1988, as amended, with U.S. Bank Trust National Association, successor trustee.

The Series 2005 Bonds, together with any outstanding bonds that the Authority has issued and may issue from time to time under said Trust Agreement, are payable solely from and secured by a pledge of the revenues of the Authority, consisting of a specified amount of the first proceeds received by the Commonwealth of Puerto Rico of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States, which taxes are collected by the United States Treasury and returned to the Commonwealth, and other moneys deposited in the Sinking Fund established under the Trust Agreement. If the federal excise taxes returned to the Commonwealth in any fiscal year fall below such specified amount, the deficiency shall be payable from appropriations which the Legislature of Puerto Rico may, but is not legally required to, make upon request by the Authority. Such federal excise taxes, however, are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if other Commonwealth revenues are not sufficient therefor.

The Series 2005 Bonds will have the following characteristics:

- The Series 2005 Bonds will be dated their date of delivery.

- The Series 2005 Bonds will be registered under The Depository Trust Company's book-entry only system. Purchasers of the Series 2005 Bonds will not receive definitive Series 2005 Bonds.

- Interest on the Series 2005 Bonds (other than the Capital Appreciation Bonds) will be payable on January 1 and July 1 of each year, commencing January 1, 2006 and, in the case of the Series 2005C Bonds, July 1, 2005. Interest on the Capital Appreciation Bonds will accrue but will not be paid semi-annually. Instead, it will be paid at maturity or earlier redemption as part of the Bonds' Accreted Value.

- The Series 2005 Bonds are subject to redemption as described herein.

- The inside cover page contains information concerning the maturity schedule, interest rates, and yields of the Series 2005 Bonds.

- The issuance of the Series 2005 Bonds and the purchase of the Series 2005 Bonds by the Underwriters are subject to approval and legality by Sidley Austin Brown & Wood LLP, New York, New York, Bond Counsel, and certain conditions.

- In the opinion of Bond Counsel, under existing federal laws and regulations, interest on the Series 2005 Bonds will not be includable in gross income for federal income tax purposes and the Series 2005 Bonds and interest thereon will be exempt from state, Commonwealth and local income taxation. However, see *Tax Matters*, beginning on page 23 of this Official Statement, for alternative minimum tax consequences with respect to interest on the Series 2005 Bonds, a description of certain rules that must be complied with to preserve federal tax exemption of interest, and other tax considerations.

- McConnell Valdés, San Juan, Puerto Rico, will pass upon certain legal matters for the Underwriters.

- It is expected that settlement for the Series 2005 Bonds will occur on or about June   , 2005.

**UBS FINANCIAL SERVICES INC.**   **BANC OF AMERICA SECURITIES LLC**   **MERRILL LYNCH & CO.**
**Citigroup**                        **Goldman, Sachs & Co.**                 **JP Morgan**
**Lehman Brothers**                  **Morgan Stanley**                       **Raymond James & Associates, Inc.**
**Samuel A. Ramírez & Co.**                                                   **Wachovia Bank, National Association**

May   , 2005

$
**Special Tax Revenue Bonds, Series 2005A**

$ **Serial Bonds**

| Maturity July 1, | Principal Amount | Interest Rate | Yield | Maturity July 1, | Principal Amount | Interest Rate | Yield |
|---|---|---|---|---|---|---|---|
| | $ | % | % | | $ | % | % |

| | | | |
|---|---|---|---|
| $ | **Term Bonds due** | yield | %. |
| $ | **Term Bonds due** | yield | %. |

$
**Special Tax Revenue Bonds, Series 2005B**

$ **Serial Bonds**

| Maturity July 1, | Principal Amount | Interest Rate | Yield | Maturity July 1, | Principal Amount | Interest Rate | Yield |
|---|---|---|---|---|---|---|---|
| | $ | % | % | | $ | % | % |

| | | | |
|---|---|---|---|
| $ | **Term Bonds due** | yield | %. |
| $ | **Term Bonds due** | yield | %. |

$ **Capital Appreciation Bonds**

| Maturity July 1, | Initial Principal Amount | Interest Rate | Yield | Amount Due at Maturity |
|---|---|---|---|---|
| | | % | % | |

$
**Special Tax Revenue Refunding Bonds, Series 2005C**

$ **Serial Bonds**

| Maturity July 1, | Principal Amount | Interest Rate | Yield | Maturity July 1, | Principal Amount | Interest Rate | Yield |
|---|---|---|---|---|---|---|---|
| | $ | % | % | | $ | % | % |

| | | | |
|---|---|---|---|
| $ | **Term Bonds due** | yield | %. |
| $ | **Term Bonds due** | yield | %. |

No dealer, broker, sales representative or other person has been authorized by the Authority, the Commonwealth or the Underwriters to give any information or to make any representations other than those contained or incorporated by reference herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Authority, the Commonwealth or the Underwriters. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of the Series 2005 Bonds by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information set forth or incorporated by reference herein has been obtained from the Authority, the Commonwealth and other official sources that are believed to be reliable, but is not guaranteed as to accuracy or completeness and is not to be construed as a representation by any Underwriter. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Commonwealth since the date hereof. This Official Statement is submitted in connection with the sale of the Series 2005 Bonds and may not be reproduced or used, in whole or in part, for any other purpose. The Underwriters have provided the following sentence and paragraph for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE SERIES 2005 BONDS AND THE OTHER OUTSTANDING SPECIAL TAX REVENUE BONDS OF THE AUTHORITY AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

## TABLE OF CONTENTS

| | Page |
|---|---|
| SUMMARY STATEMENT | S-1 |
| INTRODUCTORY STATEMENT | 1 |
| THE AUTHORITY | 2 |
| PLAN OF FINANCING | 4 |
| THE SERIES 2005 BONDS | 5 |
| SECURITY FOR THE BONDS | 9 |
| FEDERAL EXCISE TAXES | 13 |
| THE PUERTO RICO RUM INDUSTRY | 16 |
| ADDITIONAL COMMONWEALTH APPROPRIATIONS | 19 |
| AUTHORITY DEBT | 20 |
| FINANCIAL ASSISTANCE TO BENEFITTED ENTITIES | 22 |
| TAX MATTERS | 23 |
| VERIFICATION OF MATHEMATICAL COMPUTATIONS | 24 |
| ELIGIBILITY OF SERIES 2005 BONDS | 25 |
| UNDERWRITING | 25 |
| COMMONWEALTH COVENANT | 25 |

| | Page |
|---|---|
| GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO | 25 |
| LEGAL MATTERS | 26 |
| RATINGS | 26 |
| CONTINUING DISCLOSURE | 26 |
| MISCELLANEOUS | 28 |
| Appendix I - Summary of the Trust Agreement | I-1 |
| Appendix II - Audited Financial Statements of the Authority, dated June 30, 2004 | II-1 |
| Appendix III - Commonwealth of Puerto Rico Financial Information and Operating Data Report, May 1, 2005 | III-1 |
| Appendix IV - Proposed Form of Opinions of Bond Counsel | IV-1 |
| Appendix V - Table of Accreted Values for the Capital Appreciation Bonds | V-1 |

CONFIDENTIAL

PRIFA_STAY0001788

[This page intentionally left blank]

CONFIDENTIAL

# SUMMARY STATEMENT

*The following is subject in all respects to the additional information contained in this Official Statement including the Appendices attached hereto. Certain capitalized terms used in this Summary Statement and elsewhere in this Official Statement are defined in "Definitions of Certain Terms" in Summary of the Trust Agreement in Appendix I. Certain other capitalized terms are used in this Official Statement as defined in this Summary Statement.*

**The Authority** . . . . . . . . . . . . . . . Puerto Rico Infrastructure Financing Authority (the "Authority"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), was created on June 21, 1988, for the purpose of providing financial, administrative and other types of assistance to political subdivisions, public corporations, instrumentalities and municipalities of the Commonwealth that develop and operate infrastructure facilities.

**Plan of Financing** . . . . . . . . . . . The bonds offered hereby, when and if issued (collectively, the "Series 2005 Bonds"), will be issued to finance certain capital projects of Puerto Rico Aqueduct and Sewer Authority ("PRASA") and other instrumentalities and municipalities of the Commonwealth; provide working capital assistance to certain instrumentalities of the Commonwealth authorized to provide infrastructure facilities; repay certain advances made to the Authority by Government Development Bank for Puerto Rico; refund a portion of the Authority's outstanding Special Tax Revenue Bonds, Series          ; capitalized interest on the Series 2005A and Series 2005B Bonds; and pay certain costs of issuance of the Series 2005 Bonds.  See *Plan of Financing*.

**Security for the Bonds** . . . . . . . . The Authority's Special Tax Revenue Bonds, Series          , Series          , and Series     , in the aggregate principal amount of $          , which will remain outstanding after the refunding described above (collectively, the "Remaining Bonds"), the Series 2005 Bonds, and any additional bonds that the Authority may from time to time issue under the Trust Agreement (collectively, the "Bonds") are payable solely from and secured by a pledge of Federal Excise Taxes (as defined below) and other moneys deposited to the credit of the Sinking Fund, as follows:

**Federal Excise Taxes** . . . . . . . . . Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended (the "Enabling Act"), requires that in each fiscal year after fiscal 1998, through fiscal 2006, the first $70 million, and in each fiscal year thereafter through fiscal 2052, the first $90 million, of certain federal excise taxes received by the Commonwealth be deposited in the Authority's Infrastructure Fund. Such taxes consist of the Federal Excise Taxes levied on rum and other articles produced in Puerto Rico and sold in the United States, which taxes are collected by the United States Treasury and returned to the Commonwealth (the "Federal Excise Taxes"). Rum is the only article currently produced in Puerto Rico subject to federal excise taxes, the proceeds of which are required to be returned to the Commonwealth. The Trust Agreement requires the Authority to deposit in the Sinking Fund the Federal Excise Taxes and other moneys deposited in the Infrastructure Fund in such amounts as are required to meet the debt service requirement for all Bonds issued under the Trust Agreement.

Federal Excise Taxes have been transferred to the Commonwealth since 1917 in accordance with certain Acts of Congress. The amount of Federal Excise Taxes transferred to the Commonwealth is $13.25 per proof gallon during the period after June 30, 1999 and before January 1, 2006. Beginning January 1,

S-1

CONFIDENTIAL

PRIFA_STAY0001790

2006, such amount will return to the lesser of $10.50 per proof gallon and the actual excise tax imposed, unless a proposed one-year extension is approved by Congress. See "Pledged Revenues" under *Security for the Bonds* and "Imposition of Tax" under *Federal Excise Taxes.*

The table below shows the Federal Excise Taxes received by the Commonwealth in each of the last five fiscal years:

| Fiscal Year | Federal Excise Taxes |
|---|---|
| 2000 | $235,397,855 |
| 2001 | 296,472,248 |
| 2002 | 307,906,661 |
| 2003 | 299,045,613 |
| 2004 | 302,785,007 |

The maximum Principal and Interest Requirements (net of capitalized interest) on the Series 2005 Bonds and the Remaining Bonds in any fiscal year is $        million. During each of the last five fiscal years and during the current fiscal year, the Commonwealth has received at least $90 million of Federal Excise Taxes by the end of the fifth month of each fiscal year.

The Federal Excise Taxes securing the Bonds are subject to a number of factors, including the continued imposition and remittance by the United States of such taxes to the Commonwealth and conditions affecting the Puerto Rico rum industry. See *Federal Excise Taxes* and *The Puerto Rico Rum Industry.*

**Additional Commonwealth Appropriations** . . . . . . . . . . . . . .
If the Federal Excise Taxes received by the Commonwealth in any fiscal year are insufficient to deposit $90 million ($70 million before fiscal 2007) in the Infrastructure Fund, the Enabling Act authorizes the Secretary of the Treasury to advance funds to cover such insufficiency from any available funds and requires the Director of the Office of Management and Budget, upon the Authority's request, to include in the recommended budget of the Commonwealth for the corresponding fiscal year the appropriation needed to cover such insufficiency. The Commonwealth Legislature, however, is not legally obligated to make any appropriation to cover such insufficiency. There has never been any insufficiency in the Infrastructure Fund requiring any action from the Commonwealth Legislature. See *Additional Commonwealth Appropriations.*

**Additional Bonds** . . . . . . . . . . . .
Additional Bonds secured on a parity with the Bonds may be issued for any purpose authorized by the Enabling Act, subject to compliance with certain financial tests provided in the Trust Agreement.

**Prior Payment of Full Faith and Credit Obligations of the Commonwealth** . . . . . . . .
The Federal Excise Taxes and other revenues received from the Commonwealth and deposited in the Infrastructure Fund are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if other Commonwealth revenues are not sufficient therefor. The Commonwealth has never used Federal Excise Taxes for the payment of its

CONFIDENTIAL

PRIFA_STAY0001791

general obligation debt or its guaranteed debt. The incurrence by the Commonwealth of general obligation debt is subject to a constitutional debt limit described herein.

Maximum annual debt service for the Commonwealth's outstanding general obligation debt plus debt service for fiscal 2005 on bonds for which the Commonwealth is currently making payments under its guaranty equals $741,648,153. This amount is equal to 9.97% of $7,439,000,000, which is the average of the adjusted annual internal revenues of the Commonwealth (which excludes Federal Excise Taxes) for the two fiscal years ended June 30, 2003 and 2004. See "Prior Payment of Full Faith and Credit Obligations of the Commonwealth" under *Security for the Bonds*.

**Interest** . . . . . . . . . . . . . . . . . . . Interest on the Series 2005 Bonds (other than the Capital Appreciation Bonds) will be payable on January 1 and July 1 of each year, commencing January 1, 2006 and, in the case of the Series 2005C Bonds, July 1, 2005. Interest on the Capital Appreciation Bonds will accrue but will not be paid semi-annually. Instead, it will be paid at maturity or earlier redemption as part of the Bonds' Accreted Value.

**Optional Redemption** . . . . . . . . . The Series 2005 Bonds maturing after July 1, 20   , may be redeemed by the Authority prior to maturity, upon not less than 30 days' prior notice, either in whole or in part, and if in part, as directed by the Authority. See "Optional Redemption" under *Redemption Provisions*.

**Trustee** . . . . . . . . . . . . . . . . . . . . U.S. Bank Trust National Association, successor trustee.

**Ratings** . . . . . . . . . . . . . . . . . . . . Standard & Poor's: "     ;" Moody's: "Baa2." See *Ratings*.

**Tax Matters** . . . . . . . . . . . . . . . . In the opinion of Bond Counsel, under existing federal laws and regulations, interest on the Series 2005 Bonds will not be includable in gross income for federal income tax purposes and the Series 2005 Bonds and interest thereon will be exempt from all state, Commonwealth and local income taxes. However, see *Tax Matters* beginning on page 23 of this Official Statement, for alternative minimum tax consequences with respect to interest on the Series 2005 Bonds, a description of certain rules that must be complied with to preserve federal tax exemption of interest, and other tax considerations.

CONFIDENTIAL

PRIFA_STAY0001792

[This page intentionally left blank]

CONFIDENTIAL

**$500,000,000[*]**

**Puerto Rico Infrastructure Financing Authority**
**Special Tax Revenue Bonds, Series 2005A**
**Special Tax Revenue Bonds, Series 2005B**
**Special Tax Revenue Refunding Bonds, Series 2005C**

## INTRODUCTORY STATEMENT

The purpose of this Official Statement is to provide certain information in connection with the issuance and sale by Puerto Rico Infrastructure Financing Authority (the "Authority") of its Special Tax Revenue Bonds, Series 2005A, in the aggregate principal amount of $            (the "Series 2005A Bonds"), its Special Tax Revenue Bonds, Series 2005B, in the aggregate principal amount of $            (the "Series 2005B Bonds"), and its Special Tax Revenue Refunding Bonds, Series 2005C, in the aggregate principal amount of $            (the "Series 2005C Bonds" and together with the Series 2005A Bonds and the Series 2005B Bonds, the "Series 2005 Bonds"). A portion of the Series 2005 Bonds (as shown on the inside cover) will be issued as Capital Appreciation Bonds (as defined in the Trust Agreement hereinafter mentioned).

The Series 2005 Bonds are being issued pursuant to Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended (the "Enabling Act"), a Trust Agreement, dated as of October 1, 1988, as amended (the "Trust Agreement"), between the Authority and U.S. Bank Trust National Association, successor trustee (the "Trustee"), and a resolution of the Board of Directors of the Authority adopted on May      , 2005 (the "Bond Resolution"). The Series 2005 Bonds are expected to be delivered on or about June    , 2005.

This Official Statement includes brief descriptions of the Enabling Act, the Series 2005 Bonds (and the other outstanding Bonds of the Authority secured on a parity with the Series 2005 Bonds), the Bond Resolution and the Trust Agreement. Such descriptions do not purport to be complete and are qualified in their entirety by reference to such documents. All references to the Series 2005 Bonds are qualified in their entirety by reference to the definitive forms thereof contained in the Bond Resolution. Copies of all such documents and agreements are available for inspection during regular business hours at the offices of Government Development Bank for Puerto Rico ("Government Development Bank"), located at 140 Broadway, 38th Floor, New York, New York 10005 and at the Government Development Bank for Puerto Rico Building, Minillas Government Center, San Juan, Puerto Rico 00940, or at the corporate trust office of the Trustee at 100 Wall Street, Suite 1600, New York, New York 10005.

This Official Statement, which includes the cover page and the Appendices hereto, incorporates by reference the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2004, together with the independent auditor's report thereon, dated April 8, 2005, of KPMG LLP ("KPMG"), certified public accountants (collectively, the "CAFR"). The CAFR has been filed by the Commonwealth with each nationally recognized municipal securities information repository ("NRMSIR"). KPMG did not audit the financial statements of the Public Buildings Authority capital project fund (a major fund), and certain activities, funds and component units separately identified in their report. Those financial statements were audited by other auditors whose reports have been furnished to KPMG, and their opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors. This Official Statement also includes the Commonwealth of Puerto Rico Financial Information and Operating Data Report, dated as of May 1, 2005 (the "Commonwealth Report"), attached hereto as Appendix III.

Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth containing any revision to the Commonwealth Report or to the CAFR that is filed with each NRMSIR and the Municipal Securities Rulemaking Board ("MSRB"), or any new or revised Commonwealth Report or CAFR, or other document containing information that modifies or supersedes the information contained in the Commonwealth Report or in the CAFR that is filed with each NRMSIR, in each case after the date hereof and prior to the termination of the offering of the Series 2005 Bonds, shall be deemed to be incorporated by reference into this Official Statement and to be part of this

---

[*] Preliminary, subject to change.

CONFIDENTIAL

Official Statement from the date of filing of such document. Any statement contained in the CAFR shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained in the Commonwealth Report or elsewhere herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of any or all of the foregoing documents incorporated herein by reference. Requests for such documents should be directed to Director-New York Office, Government Development Bank for Puerto Rico, 140 Broadway, 38th Floor, New York, New York 10005, telephone number (212) 422-6420, or to Director-General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the CAFR may be obtained by contacting a NRMSIR. The address of each NRMSIR is set forth in *Continuing Disclosure* below. The address of the MSRB is 1900 Duke Street, Suite 600, Alexandria, Virginia 22314, telephone number (703) 797-6600.

Certain capitalized terms used in this Official Statement are defined in "Definition of Certain Terms" in *Summary of Trust Agreement* in Appendix I. Certain other capitalized terms are defined in the Summary Statement.

This Official Statement, including information incorporated in this Official Statement by reference, contains certain "forward-looking statements" concerning the Authority's and the Commonwealth's operations and financial condition. These statements are based upon a number of assumptions and estimates which are subject to significant uncertainties, many of which are beyond the control of the Authority and the Commonwealth. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

## THE AUTHORITY

### General

The Commonwealth recognizes the importance of developing, maintaining and improving its infrastructure to promote Puerto Rico's economic development. Accordingly, the Commonwealth has established the Authority as a public corporation and instrumentality with two principal functions: (i) providing financial, administrative and other types of assistance to political subdivisions, public corporations, instrumentalities and municipalities of the Commonwealth responsible for developing and operating infrastructure facilities, and (ii) providing an alternative means for directly financing those facilities.

The Enabling Act defines "infrastructure" to include public works and facilities of a substantial public interest, such as aqueduct and sewer systems including water supply systems, waste water treatment and disposal systems, improvements financed under the provisions of Title VI of the Federal Clean Water Act and Title I of the Federal Safe Drinking Water Act, solid and hazardous waste disposal systems, resource recovery systems, electric power systems, highways, roads, pedestrian walkways, parking facilities, airports, convention centers, bridges, maritime ports, tunnels, transportation systems including mass transportation, communication systems including telephones, industrial facilities, land and natural resources, public housing projects, and tourist, medical and agro-industrial infrastructure facilities.

The Authority has all the necessary and convenient powers to accomplish and effectuate the purposes and provisions of the Enabling Act, including the power to negotiate and enter into assistance agreements with political subdivisions, public corporations, instrumentalities and municipalities of the Commonwealth authorized to provide

2

PRIFA_STAY0001795

infrastructure for the purpose of carrying out necessary financing programs for the development of infrastructure and providing consulting, technical, administrative, advisory, and other assistance in all matters related to such facilities. Any such entity receiving assistance from the Authority (a "Benefitted Entity") may be required to comply with all operational, administrative and budgetary requirements that the Authority considers pertinent to achieve the purposes of said assistance.

At its creation in 1988, the Authority's principal undertaking was to provide financial and other assistance to Puerto Rico Aqueduct and Sewer Authority ("PRASA") pursuant to the terms of an assistance agreement, as amended, between PRASA and the Authority. More recently, however, the Authority has signed assistance agreements with other Commonwealth instrumentalities and municipalities involved in infrastructure projects, including the Department of Education, the Department of Natural and Environmental Resources, the Highway and Transportation Authority, the Courts Administration Office, the Department of Transportation and Public Works, the Institute of Puerto Rican Culture, the Department of Sports and Recreation, the Fine Arts Center Corporation and the Special Communities Perpetual Trust. See *Plan of Financing* and *Financial Assistance to Benefitted Entities*.

The executive offices of the Authority are located at the Capital Center Building II, 235 Arterial Hostos Avenue, Suite 1601, San Juan, Puerto Rico 00918. The telephone number is (787) 763-5757.

## Powers

The Authority has broad powers under the Enabling Act, including, among others, the power to: sue and be sued; make contracts; acquire properties by eminent domain or otherwise; borrow money and issue bonds for any of its corporate purposes, including the financing of the construction, rehabilitation, acquisition, repair, preservation and replacement of portions of the infrastructure of Puerto Rico; mortgage or pledge any property and pledge all or a portion of the Authority's revenues, including Federal Excise Taxes (see "Pledged Revenues" under *Security for the Bonds*) or other funds transferred by the Commonwealth to the Authority for the payment of the principal of and interest on any bonds issued by the Authority or bonds issued by a Benefitted Entity; provide assistance to Benefitted Entities as permitted by and consistent with the purposes of the Enabling Act; and fix, impose and collect rents, fees, rates and other charges for the use of any of its properties.

## Management

The Enabling Act provides that the Board of Directors of the Authority (the "Board") shall be composed of the Board of Directors of Government Development Bank and the Secretary of the Treasury of Puerto Rico (in the event the Secretary of the Treasury is not a member of Government Development Bank's Board of Directors). Members of the boards or officers of any Benefitted Entity are specifically excluded from serving on the Board. The Secretary of the Treasury is the Chairman of the Board. The Board currently has one vacancy. The members of the Board are:

| Name | Term Ends | Occupation |
|------|-----------|------------|
| Juan C. Méndez | Indefinite | Secretary of the Treasury |
| Alfredo Salazar | September 22, 2008 | Chairman of the Board of Directors of Government Development Bank |
| Jorge P. Silva | September 22, 2006 | Secretary of Commerce and Economic Development |
| Ileana I. Fas | September 22, 2007 | Director of the Office of Management and Budget |
| José F. Rodríguez | September 20, 2008 | Businessman |
| Rafael Martínez | September 22, 2006 | Certified Public Accountant |

3

CONFIDENTIAL

The Board appoints officers and employs agents and employees who are responsible for the general operation of the Authority. Set forth below is a brief biographical description of the Acting Executive Director of the Authority. The Authority currently does not have any other designated officers.

Magda L. Aguiar-Serrano, Esq. was appointed to the office of Acting Executive Director effective December 15, 2004. She is an attorney with over 22 years of experience working in several government entities, mainly in the areas of construction law, land acquisition and contracts. Ms. Aguiar-Serrano has been the Authority's Legal Director since February 2001. As such, she oversees all legal matters related to the Authority's construction projects on behalf of PRASA and other Benefitted Entities.

## PLAN OF FINANCING

### Series 2005A and 2005B Bonds

The Authority is issuing the Series 2005A and 2005B Bonds to (i) provide approximately $           million in financial assistance to PRASA and other Commonwealth instrumentalities and municipalities in connection with certain capital projects, including the repayment of approximately $23 million for certain advances made to the Authority by Government Development Bank for the purpose of providing funds to pay certain capital improvements by the Authority or other Commonwealth instrumentalities, (ii) provide approximately $           million in working capital assistance to certain instrumentalities of the Commonwealth authorized to provide infrastructure facilities, and (iii) pay capitalized interest and costs of issuance of the Series 2005A and 2005B Bonds. The Bond proceeds earmarked for PRASA and non-PRASA projects will be deposited into a special construction fund administrated by the Authority on behalf of the applicable Benefitted Entities.

### Series 2005C Bonds

The Authority is issuing the Series 2005C Bonds to refund its Special Tax Revenue Bonds, Series        , on            in the amounts and maturities identified in the table below (the "Refunded Bonds") and pay costs of issuance of the Series 2005C Bonds.

| Maturity Date July 1, | Principal Amount to be Refunded | Interest Rate | Redemption Price |
|---|---|---|---|
| | $ | % | |
| Total . . . . | $ | | |

This refunding will permit the Authority to realize present value savings on its debt service requirements on certain Bonds outstanding under the Trust Agreement. The Authority will deposit the net proceeds of the Series 2005C Bonds, together with certain other available moneys, with the Trustee, as escrow agent, under the terms of an Escrow Deposit Agreement. Such net proceeds, together with such other available moneys, will be invested in Government Obligations the principal of and interest on which when due, together with any moneys deposited with the Trustee

4

CONFIDENTIAL

PRIFA_STAY0001797

remaining uninvested, will provide moneys sufficient to pay the principal of and redemption premium and interest on the Refunded Bonds on the date of redemption and the interest to accrue on such Bonds through the date of redemption.

Upon the deposit with the Trustee referred to above, in the opinion of Bond Counsel, the Refunded Bonds will no longer be outstanding under the provisions of the Trust Agreement. After such refunding, $ _____ aggregate principal amount of the Authority's Special Tax Revenue Bonds, Series _____ , Series _____ , and Series _____ , will remain outstanding (the "Remaining Bonds").

## Use of Proceeds

Sources:

| | | |
|---|---|---|
| Principal Amount of Series 2005A Bonds | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ |
| Principal Amount of Series 2005B Bonds | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| Principal Amount of Series 2005C Bonds | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| Deposit from Bond Service Account | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| Net Original Issue Discount | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| Total | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ |

Uses:

| | | |
|---|---|---|
| Deposit into escrow for Refunded Bonds | . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ |
| Deposit to Commonwealth's General Fund | . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| Deposit to Special Construction Fund | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| Deposit to Bond Service Account (capitalized interest) | . . . . . . . . . . . . . . . . . . . . | |
| Underwriter's Discount, Legal, Printing and Other Issuance Expenses | . . . . . . . . . . | |
| Total | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ |

A portion (approximately $ _____ million) of the proceeds of the Series 2005A and Series 2005B Bonds, as set forth in the table above, will be allocated to capitalized interest. This amount of capitalized interest, which will be irrevocably set aside for this purpose, will have the effect, by virtue of the definition of Principal and Interest Requirements (see paragraph (g) of said definition in *Summary of the Trust Agreement* in Appendix I), of reducing total annual debt service requirements to $ _____ million, which is lower than the annual amounts of Special Tax Revenues deposited in the Infrastructure Fund, as described in "Pledged Revenues" under *Security for the Bonds*, during the period ending June 30, 2006, thereby enabling the Authority to satisfy the coverage tests for the issuance of additional Bonds. See "Additional and Refunding Bonds" under *Security for the Bonds*.

## THE SERIES 2005 BONDS

### General

The Series 2005 Bonds (except for the Capital Appreciation Bonds) will bear interest at the rates, payable on January 1 and July 1 in each year, beginning January 1, 2006 and, in the case of the Series 2005C Bonds, July 1, 2005. The Capital Appreciation Bonds will accrue interest payable at maturity or earlier redemption as part of their "Accreted Value" based on the yields set forth on the inside cover. The Accreted Value (per $5,000 maturity amount) of each maturity and series of the Capital Appreciation Bonds on each January 1 and July 1 is set forth in Appendix V hereof. The Series 2005 Bonds mature on the dates and in the principal amounts set forth on the inside cover. The Series 2005 Bonds will be dated the date of their delivery, which is expected to be on or about June , 2005. The Series 2005 Bonds will be issued in fully registered form, will be in denominations of $5,000 and any multiple thereof ($5,000 maturity amount and any multiple thereof in the case of the Capital Appreciation Bonds), and when issued will initially be

CONFIDENTIAL

PRIFA_STAY0001798

registered only in the name of Cede & Co., as nominee of The Depository Trust Company ("DTC"), New York, New York, which will act as securities depository for the Series 2005 Bonds. The Series 2005 Bonds are subject to redemption at the times and in the manner set forth below in "Redemption Provisions."

## Book-Entry Only System

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Authority and the Underwriters believe to be reliable, but the Authority and the Underwriters take no responsibility for the accuracy thereof.

DTC will act as securities depository for the Series 2005 Bonds. The Series 2005 Bonds will be issued as fully-registered bonds registered in the name of Cede & Co. (DTC's partnership nominee) or such other nominee as may be requested by an authorized representative of DTC. One fully-registered Series 2005 Bond will be issued in the aggregate principal amount of each maturity and series, and will be deposited with DTC.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 2 million issuers of U.S. and non-U.S. equity, corporate and municipal debt issues, and money market instruments from over 85 countries that DTC's participants (the "Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions, in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Government Securities Clearing Corporation, MBS Clearing Corporation, and Emerging Markets Clearing Corporation (NSCC, GSCC, MBSCC, and EMCC are also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly (the "Indirect Participants"). DTC has Standard & Poor's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission (the "SEC"). More information about DTC can be found at www.dtcc.com.

Purchases of the Series 2005 Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series 2005 Bonds on DTC's records. The ownership interest of each actual purchaser of each Series 2005 Bond (a "Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Series 2005 Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive definitive Series 2005 Bonds, except in the event that use of the book-entry system for the Series 2005 Bonds is discontinued.

To facilitate subsequent transfers, all Series 2005 Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. or such other nominee as may be requested by an authorized representative of DTC. The deposit of Series 2005 Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Series 2005 Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

6

CONFIDENTIAL

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Neither DTC nor Cede & Co. (or such other DTC nominee) will consent or vote with respect to the Series 2005 Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Series 2005 Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, interest and other principal payments on the Series 2005 Bonds will be made to Cede & Co, or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts, upon DTC's receipt of funds and corresponding detail information from the Authority, on the payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee or the Authority, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, interest and other principal payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Trustee or the Authority, disbursement of such payments to Direct Participants is the responsibility of DTC, and disbursement of such payments to the Beneficial Owners is the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Series 2005 Bonds at any time by giving reasonable notice to the Authority or the Trustee. Under such circumstances, in the event that a successor securities depository is not obtained, definitive Series 2005 Bonds are required to be printed and delivered.

The Authority may decide to discontinue use of the system of book-entry transfers through DTC (or a successor securities depository). In that event, also definitive Series 2005 Bonds will be printed and delivered to DTC.

In the event that such book-entry only system is discontinued, the following provisions will apply: principal of and interest on the Series 2005 Bonds will be payable at maturity in lawful money of the United States of America upon presentation and surrender of Series 2005 Bonds at the principal office of the Trustee in New York, New York. The Series 2005 Bonds will be issued only as registered bonds without coupons in denominations of $5,000 and any multiple thereof ($5,000 maturity amount and any multiple thereof in the case of the Capital Appreciation Bonds). The transfer of the Series 2005 Bonds will be registrable and they may be exchanged at the principal office of the Trustee in New York, New York, upon the payment of any taxes or other governmental charges required to be paid with respect to such registration of transfer or exchange.

7

CONFIDENTIAL

**Redemption Provisions**

*Optional Redemption.* The Series 2005 Bonds maturing on or after July 1, 20__ may be redeemed at the option of the Authority prior to maturity, upon not less than thirty (30) days' prior notice, either in whole or in part, and if in part, as directed by the Authority, on any date not earlier than July 1, 20__, from any moneys available therefor (other than moneys held by the Trustee in respect of an Amortization Requirement), at the following prices expressed as percentages of the principal amount, plus accrued interest to the redemption date:

| Period During Which Redeemed (both dates inclusive) | | Redemption (Price) |
|---|---|---|
| to | . . . . . . . . . . . . . . . . . . . . . . | % |
| to | . . . . . . . . . . . . . . . . . . . . . . | |
| and thereafter . . . . . . . . . . . . . . . . . . . . . . | | |

*Amortization Requirements.* The Series 2005 Bonds maturing July 1, __ and July 1, __ shall be redeemed in part on January 1, __ and July 1, __, respectively, and each July 1 thereafter in the principal amounts equal to the Amortization Requirements (less the principal amount of any Series 2005 Bonds retired by purchase) from moneys in the Redemption Account at par plus accrued interest on July 1 of the years and in the principal amounts set forth below:

| | Amortization Requirements for Series 2005 Bonds due July 1, | |
|---|---|---|
| **Year** | | |
| | (dollars in thousands) | |
| | $ | $ |
| | | |
| | | |
| | | |
| | | * |
| Average life (years) . . . . . . . . . . . . . | | |

---

\* Final maturity.

*Notice of Redemption.* At least thirty (30) days prior to any redemption, notice thereof will be sent by certified mail or other agreed method to DTC or if the book-entry only system is discontinued as described above, by first class mail, postage prepaid to the registered owners of the Series 2005 Bonds to be redeemed and to the national information services whose names and addresses are included in the most recent list thereof furnished to the Trustee by the Authority, as set forth in the Trust Agreement. Each notice of redemption shall contain, among other things, the CUSIP identification number and the numbers of the Series 2005 Bonds (or portions thereof) being called for redemption, the

8

PRIFA_STAY0001801

redemption date and price and the address at which Series 2005 Bonds are to be surrendered for payment of the redemption price. Any defect in such notice or the failure so to mail any such notice to DTC in respect of, or the registered owner of, any Series 2005 Bond will not affect the validity of the proceedings for the redemption of any other Series 2005 Bond. Any defect in such notice or the failure so to mail any such notice to any such national information service will not affect the effectiveness of a call for redemption.

*Selection of Series 2005 Bonds to be Redeemed.* If less than all of the Series 2005 Bonds of any one maturity and series are called for redemption, the particular Series 2005 Bonds or portions thereof to be redeemed will be selected by the Trustee by such method as it deems fair and appropriate, except that so long as the book-entry only system shall remain in effect, in the event of any such partial redemption, DTC shall reduce the credit balances of the applicable DTC Participants in respect of the Series 2005 Bonds and such DTC Participants shall in turn select those Beneficial Owners whose ownership interests are to be extinguished by such partial redemption, each by such method as DTC or such DTC Participant, as the case may be, in its sole discretion deems fair and appropriate.

*Effect of Redemption.* On the date designated for redemption, notice having been given as described above and moneys for payment of the principal of and redemption premium, if any, and accrued interest on the Series 2005 Bonds or portions thereof so called for redemption being held by the Trustee, interest on the Series 2005 Bonds or portions thereof so called for redemption shall cease to accrue. Subject to certain provisions of the Trust Agreement, Series 2005 Bonds and portions of Series 2005 Bonds which have been duly called for redemption under the provisions of the Trust Agreement, or with respect to which irrevocable instructions to call for redemption or to pay at maturity have been given, and for the payment of the principal of and redemption premium, if any, and the accrued interest on which sufficient moneys or investments permitted by law shall be held in separate trust for the owners of the Series 2005 Bonds or portions thereof to be paid or redeemed, shall not be deemed to be outstanding under the Trust Agreement, and the registered owners thereof shall have no rights in respect thereof except to receive payment of the principal thereof and the redemption premium, if any, and the accrued interest thereon from said separate trust.

## SECURITY FOR THE BONDS

The Bonds (including the Series 2005 Bonds) are payable solely from, and secured by a pledge of, the revenues and other moneys deposited in the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund (the "Sinking Fund") established under the Trust Agreement (the "Pledged Revenues"). The Sinking Fund includes the Bond Service Account, the Redemption Account and the Reserve Account. The last remaining outstanding Bonds secured by a pledge of the moneys on deposit in the Reserve Account will mature on July 1, 2005, at which time the Reserve Account will no longer apply to the Bonds. Consequently, no further reference will be made to the Reserve Account in this Official Statement.

**Pledged Revenues**

Pledged Revenues consist of: (i) such proceeds of the federal excise tax imposed on rum and other articles produced in Puerto Rico and sold in the United States that are transferred to the Commonwealth (the "Federal Excise Taxes") and deposited to the credit of the Sinking Fund, as required by the Enabling Act and the Trust Agreement; (ii) any other funds appropriated by the Authority to make up a deficiency in the amount of Federal Excise Taxes required to be transferred annually to the Authority, as provided in the Enabling Act, that are deposited to the credit of the Sinking Fund, and (iii) investment earnings on moneys on deposit to the credit of the Sinking Fund.

Under the provisions of Section 9 of the Puerto Rican Federal Relations Act and Section 7652(a) (3) of the United States Internal Revenue Code of 1986, as amended (the "Code"), any excise tax imposed and collected by the United States on articles produced in Puerto Rico and transported to the United States (less the estimated amount necessary for payments of refunds and drawbacks) is required to be transferred to the Commonwealth. Rum is the only article currently produced in Puerto Rico that is subject to the Federal Excise Tax. The United States Treasury is required by federal law to transfer to the Commonwealth the lesser of $10.50 per proof gallon ($13.25 per proof gallon during the period July 1, 1999 through December 31, 2005) or excise tax imposed on each proof gallon of rum produced

9

PRIFA STAY0001802

in Puerto Rico and sold in the United States, currently set at the rate of $13.50 per proof gallon. For fiscal year 2004, the amount of Federal Excise Taxes transferred to the Commonwealth was $302,785,007. See *Federal Excise Taxes*.

The Enabling Act requires the Secretary of the Treasury of the Commonwealth to transfer to the Authority for deposit to the credit of the Puerto Rico Infrastructure Fund (the "Infrastructure Fund"), a special fund created by the Enabling Act to be maintained by or on behalf of the Authority, the first $70 million of Federal Excise Taxes received by the Commonwealth in each fiscal year after fiscal 1998 through fiscal 2006, and the first $90 million received in each fiscal year thereafter through fiscal 2052 (the Federal Excise Taxes deposited to the credit of the Infrastructure Fund are referred to as the "Special Tax Revenues"). During each of the last five fiscal years and during the current fiscal year, the Commonwealth has received the first $90 million of Federal Excise Taxes by the end of the fifth month of each fiscal year. See "Federal Excise Tax Revenues" under *Federal Excise Taxes*.

If the Federal Excise Taxes received in any fiscal year are insufficient to make the required deposit to the Infrastructure Fund, the Enabling Act authorizes the Secretary of the Treasury to advance funds to cover such insufficiency from any available funds and requires the Director of the Office of Management and Budget to include, upon the Authority's request, in the recommended budget for the corresponding fiscal year the appropriation needed to cover such insufficiency. The Commonwealth Legislature, however, is not legally obligated to make the necessary appropriation to cover such insufficiency. There has never been any insufficiency in the Infrastructure Fund requiring any action from the Commonwealth Legislature. For more information on the budgetary process of the Commonwealth, see *Additional Commonwealth Appropriations*.

Federal Excise Taxes have represented a stable source of revenues for the Commonwealth. The federal law requiring the transfer of Federal Excise Taxes to the Commonwealth has been in effect since 1917. In addition, since fiscal year 1988 Federal Excise Taxes have been no less than $166 million ($180 million if adjusted to take into account a change made by the Puerto Rico Department of the Treasury in June 1993 in the method used to report the collection of Federal Excise Taxes from an accrual to a cash basis). The level of Federal Excise Taxes transferred in the future may be affected by factors beyond the control of the Commonwealth, such as changes in federal legislation affecting the imposition or transfer of such taxes and conditions in the Puerto Rico rum industry.

Pursuant to the proposed Highway Reauthorization and Excise Tax Simplification Act of 2005 pending before Congress (the "2005 Highway Reauthorization Act"), the amount of Federal Excise Taxes per proof gallon transferred to the Commonwealth would increase from $13.25 to $13.50 after December 31, 2005 and before January 1, 2007. After December 31, 2006, the Federal Excise Taxes transferred to the Commonwealth would revert to the lesser of $10.50 per proof gallon and the actual excise tax imposed. If the 2005 Highway Reauthorization Act becomes law, it will require the Commonwealth to transfer, until December 31, 2006, an amount equal to 50 cents per proof gallon of such Federal Excise Taxes to the Puerto Rico Conservation Trust Fund, a Puerto Rico charitable trust (the "Conservation Trust Fund"). Based on 2004 sales of rum, the amount that would be required to be transferred to the Conservation Trust Fund in 2006 is approximately $13.6 million. The Conservation Trust Fund was established pursuant to a Memorandum of Understanding, dated December 24, 1968, between the U.S. Department of the Interior and the Commonwealth to protect and enhance the natural resources and beauty of Puerto Rico through the acquisition and active management of lands possessing great ecological, aesthetic or historical value in Puerto Rico. See *Federal Excise Taxes* and *The Puerto Rico Rum Industry*.

**Prior Payment of Full Faith and Credit Obligations of the Commonwealth**

*Provision for Prior Payment.* The Constitution of Puerto Rico provides that public debt of the Commonwealth constitutes a first lien on available Commonwealth taxes and revenues. Public debt includes bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged and, according to opinions rendered by the Secretary of Justice of the Commonwealth, any payments that are required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public corporations. The Bonds do not constitute public debt of the Commonwealth.

CONFIDENTIAL

PRIFA_STAY0001803

Prior to their application to pay principal of and interest on the Bonds, the Special Tax Revenues are available revenues under the Constitution. Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth. Under the Enabling Act, however, such revenues are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth under the Constitution are insufficient for such purpose. The Commonwealth has never used Federal Excise Taxes for the payment of debt service on its public debt.

Under the provisions of Act No. 39 of the Legislature of Puerto Rico, approved May 13, 1976, as amended, the Secretary of the Treasury is obligated to fund annual debt service on general obligation bonds and notes of the Commonwealth by making prescribed monthly deposits into the Commonwealth Redemption Fund. As of April 30, 2005, the amount on deposit in the Redemption Fund was $299.5 million, which is the required amount for the payment of the July 1, 2005 period.

*Debt Limitation.* Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued which is payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceeds 15% of the average annual internal revenues of the Commonwealth for the two preceding fiscal years. The Constitution does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded. Internal revenues (revenues raised under the provisions of Commonwealth legislation) consist principally of income taxes and excise taxes. Certain revenues, such as Federal Excise Taxes and customs duties, which are collected by the United States Government and returned to the Commonwealth, and motor vehicle fuel taxes and license fees, which are allocated to the Highway and Transportation Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they are available for the payment of debt service.

As of December 31, 2004, $2.9 billion of Commonwealth guaranteed bonds of the Public Buildings Authority and $267 million of Commonwealth guaranteed obligations of Government Development Bank were outstanding. No payments under the Commonwealth guaranty have been required to date for bonds of the Public Buildings Authority or obligations of Government Development Bank.

As of December 31, 2004, the aggregate outstanding amount of the Series 1995 revenue bonds of PRASA guaranteed by the Commonwealth (the "PRASA Guaranteed Bonds") was $305.3 million. On January 2, 1997, the Commonwealth began to make debt service payments under the Commonwealth guaranty and expects to make all debt service payments required on these revenue bonds.

In April 2000, the Commonwealth extended its guaranty to all the outstanding bonds issued by PRASA to the United States Department of Agriculture, Rural Development, and to all of the outstanding loans by the State Revolving Funds for the benefit of PRASA. The guaranty will also cover any additional bonds and loans that may be issued until June 30, 2005. In February 2004, this guaranty was extended through new legislation to cover PRASA's debt obligations issued until 2010. As of June 30, 2004, the principal amount outstanding on these bonds was $180.3 million and the principal amount outstanding of these loans was $150.9 million.

Maximum annual debt service for the Commonwealth's general obligation debt outstanding as of December 31, 2004, is $600.6 million in fiscal 2020. This calculation does not take into account debt service on certain general obligation bonds refunded with refunding bonds the proceeds of which, pending the redemption of the refunded bonds, were invested in guaranteed investment contracts or other securities not eligible to effect a legal defeasance. Such refunded bonds are considered to be outstanding under their respective authorizing resolutions and for purposes of calculating the Commonwealth's constitutional debt limitation. If such bonds are included therein, maximum annual debt service for the Commonwealth's general obligation debt outstanding would be $711.5 million in fiscal 2005. Debt service for the PRASA Guaranteed Bonds in fiscal 2005 (including for this purpose debt service payments due July 1, 2005) is $30.1 million. The sum of those amounts ($741.6 million) is equal to 9.97% of $7.439 billion, which is the average of the Commonwealth's adjusted internal revenues for the two fiscal years ended June 30, 2003 and 2004. See

11

PRIFA_STAY0001804

"Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt" under *Debt* in the Commonwealth Report.

**Flow of Funds**

Under the Trust Agreement, the Authority must withdraw Special Tax Revenues and other moneys from the Infrastructure Fund and make the following deposits:

(a)    first, to the credit of the Bond Service Account, such amount as may be required to make the total amount to the credit of the Bond Service Account equal to the sum of (i) the amount of interest then or to become within the current Fiscal Year due and payable on the Bonds of each series then Outstanding and (ii) the amount of principal of the Bonds of each series then or to become within the current Fiscal Year due and payable; and

(b)    second, to the credit of the Redemption Account, such amount as may be required to make the total amount then to the credit of the Redemption Account equal to the Amortization Requirement for such Fiscal Year for the term Bonds of each series then Outstanding.

If an interest payment date or a principal payment date for any series of Bonds is the first day of a Fiscal Year, such payment date shall be included for purposes of the above deposits as if occurring on the last day of the preceding Fiscal Year.

If the Authority has incurred Debt Service Components, the Authority may withdraw moneys from the Infrastructure Fund on a pro rata basis to make the deposits required in clauses (a) and (b) above and the deposits required to be made to the credit of comparable accounts established for the Debt Service Components. Notwithstanding the foregoing order of priorities, the Authority shall withdraw moneys from the Infrastructure Fund to make (i) any payment necessary to satisfy then current arbitrage rebate requirements under the Code for Bonds and Debt Service Components and (ii) any required deposit into an Arbitrage Rebate Fund or comparable fund for a Debt Service Component. After making the foregoing applications, the Authority may apply any moneys to the credit of the Infrastructure Fund to any lawful purpose. See *Summary of the Trust Agreement* in Appendix I.

**Additional and Refunding Bonds**

Under the Trust Agreement, the Authority may issue additional Bonds for any lawful purpose of the Authority, provided that, among other things, the following coverage tests are met:

(a)    the amount of the average annual Federal Excise Taxes for the two (2) full Fiscal Years preceding the date of issuance of such additional Bonds, adjusted to give effect to legislation enacted on or prior to the date of issuance of such additional Bonds that would have changed the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years, shall not be less than 200% of the maximum aggregate Principal and Interest Requirements for any Fiscal Year after the issuance of such additional Bonds on account of the Bonds then Outstanding, the Debt Service Components then Outstanding, and the additional Bonds to be issued; and

(b)    the amount of the average annual Special Tax Revenues and other moneys deposited to the credit of the Infrastructure Fund for the two (2) full Fiscal Years preceding the date of issuance of such additional Bonds, adjusted to give effect to legislation enacted on or prior to the date of original issuance of such Bonds that would have increased the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years and that requires such increased amount, if received from the federal government, to be deposited to the credit of the Infrastructure Fund until the Bonds theretofore issued and the Bonds to be issued are no longer Outstanding, shall not be less than 100% of the maximum aggregate Principal and Interest Requirements for any Fiscal Year after the issuance of such additional Bonds on account of the Bonds then Outstanding, the Debt Service Components then Outstanding and the additional Bonds to be issued.

CONFIDENTIAL

PRIFA_STAY0001805

The average annual Federal Excise Taxes for the two Fiscal Years in the period ended June 30, 2004, computed on the basis of $13.25 per proof gallon, is equal to $303,539,000. That amount is more than 200% of $          , which is the maximum aggregate Principal and Interest Requirements for any Fiscal Year on all Bonds currently Outstanding and the Series 2005 Bonds, after taking into account the reduction in Principal and Interest Requirements resulting from the capitalized interest deposit described above in "Use of Proceeds" under *Plan of Financing*. In addition, the average annual Special Tax Revenues and other moneys deposited to the credit of the Infrastructure Fund for the two Fiscal Years in the period ended June 30, 2004 is $90 million adjusted as permitted by the Trust Agreement to reflect the increase of Special Tax Revenues deposited to the Infrastructure Fund that will occur beginning in fiscal 2007. That amount is more than 100% of $          million, which is the maximum aggregate Principal and Interest Requirements on the Remaining Bonds and the Series 2005 Bonds after taking into account the reduction in Principal and Interest Requirements resulting from the capitalized interest deposit described above in "Use of Proceeds" under *Plan of Financing*.

Additional Bonds may also be issued for the purpose of refunding all or a portion of any series of Bonds then Outstanding by meeting the coverage tests described in paragraphs (a) and (b) above or if (i) the Principal and Interest Requirements on account of all Bonds and Debt Service Components Outstanding for each applicable Fiscal Year following the issuance of such refunding bonds are equal to or less than the Principal and Interest Requirements for each such Fiscal Year on account of all Bonds and Debt Service Components Outstanding immediately prior to such issuance of such refunding Bonds; or (ii) the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of the Bonds and Debt Service Components Outstanding after the issuance of such refunding Bonds shall be equal to or less than the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of the Bonds and Debt Service Components Outstanding prior to the issuance of such refunding Bonds.

## FEDERAL EXCISE TAXES

### Background

The imposition of excise taxes has a long history under United States law, as does the transfer of Federal Excise Taxes to Puerto Rico. Such transfer is required under certain Acts of Congress that establish the unique political and legal relationship between Puerto Rico and the United States.

Excise taxes were first imposed in the United States in 1790 and have remained in force since then except for a short period in the early part of the 19th century. The transfer of Federal Excise Taxes to Puerto Rico began with the Organic Act of 1917, popularly known as the Jones Act, passed by Congress on March 2, 1917. Section 9 of the Jones Act provided that "all taxes collected under the revenue laws of the United States on articles produced in Puerto Rico and transported to the United States, or consumed in the Island shall be covered into the Treasury of Puerto Rico." This transfer was intended to provide revenues for Puerto Rico government expenditures.

In 1950, when Congress enacted legislation providing for the establishment of a constitutional government in Puerto Rico, Section 9 of the Jones Act was incorporated as Section 9 of the Puerto Rican Federal Relations Act. The Puerto Rican Federal Relations Act is one of the federal statutes in force that defines the nature of the political and legal relationship between Puerto Rico and the United States.

A provision similar to Section 9 of the Puerto Rican Federal Relations Act also appears in Section 7652(a)(3) of the Code and currently reads as follows: "[all] taxes collected under the internal revenue laws of the United States on articles produced in Puerto Rico and transported to the United States (less the estimated amount necessary for payment of refunds and drawbacks), or consumed in the island, shall be covered into the treasury of Puerto Rico."

### Imposition of Tax

Section 7652(a)(l) of the Code provides that "articles of merchandise of Puerto Rican manufacture coming into the United States and withdrawn for consumption or sale shall be subject to a tax equal to the internal revenue tax

13

PRIFA_STAY0001806

imposed in the United States upon the like articles of merchandise of domestic manufacture." Rum is the only article currently produced in Puerto Rico subject to federal excise tax.

Section 5001(a)(1) of the Code currently imposes a tax on all distilled spirits produced in or imported into the United States at the rate of $13.50 per proof gallon. A "proof gallon" is a liquid gallon consisting of 50% alcohol. Section 5001(a)(10) of the Code provides that, with certain exceptions, the tax upon any article containing distilled spirits brought from Puerto Rico into the United States for consumption or sale shall be at the same rate as the rate imposed on distilled spirits produced in the United States.

From 1951 until the enactment of the Deficit Reduction Act of 1984 (the "DRA"), the federal excise tax on distilled spirits produced in or imported into the United States was $10.50 per proof gallon. The DRA increased the tax to $12.50 per proof gallon, and amended Section 7652 of the Code to limit the amount of Federal Excise Taxes transferred to Puerto Rico to the lesser of $10.50 per proof gallon and the actual excise tax imposed under Section 5001 of the Code. Effective January 1,1991, Section 5001(a)(l) was amended to increase the tax to $13.50 per proof gallon. The amount of Federal Excise Taxes transferred to Puerto Rico remained at $10.50 per proof gallon. In 1993, however, Section 7652 was amended to increase the amount of Federal Excise Taxes transferred to Puerto Rico to $11.30 per proof gallon during the five fiscal year period ended on September 30,1998. In 1999 and 2004, Section 7652 was further amended to raise the amount of Federal Excise Taxes transferred to Puerto Rico to $13.25 per proof gallon during the period after June 30, 1999 and before January 1, 2006. Beginning January 1, 2006, the amount of Federal Excise Taxes transferred to Puerto Rico will return to the lesser of $10.50 per proof gallon and the actual excise tax imposed.

If it becomes law, the 2005 Highway Reauthorization Act will increase the amount of Federal Excise Taxes per proof gallon transferred to Puerto Rico to $13.50 after December 31, 2005 and before January 1, 2007. After December 31, 2006, such amount will revert to the lesser of $10.50 per proof gallon and the actual excise tax imposed. The Act will also require the Commonwealth to transfer, until December 31, 2006, an amount equal to 50 cents per proof gallon of such Federal Excise Taxes to the Conservation Trust Fund within 30 days of each such Federal Excise Tax transfer to Puerto Rico. See "Conservation Trust Fund" below. Each transfer payment is to be treated as principal for an endowment, the income from which is to be used by the Conservation Trust Fund for the purposes for which it was established. If Puerto Rico fails to make a timely payment to the Conservation Trust Fund, the U.S. Secretary of the Treasury will deduct and withhold such unpaid amount from the next Federal Excise Tax transfer payment, plus interest, and will transfer such amounts directly to the Conservation Trust Fund. Such deduction, withholding, and direct payment will not be made if the U.S. Secretary of the Interior, after consultation with the Governor of Puerto Rico, finds that the failure of the Commonwealth to make the transfer payment was for good cause.

The United States has never reduced the amount of Federal Excise Taxes transferred to Puerto Rico below $10.50 per proof gallon. For a five-month period in 1986, however, Federal Excise Taxes were subject to sequestration under the Gramm-Rudman-Hollings Act ("GRH"). This sequestration ended when Congress enacted a law requiring that, notwithstanding GRH or any other provision of law, amounts required to be transferred to Puerto Rico under the Puerto Rican Federal Relations Act be paid in full to Puerto Rico.

There can be no assurance that the excise tax rate on distilled spirits will not be reduced or that such taxes will not be eliminated in the future or that there will not be a reduction in the amounts transferred to the Commonwealth.

**Collection of Taxes**

In the case of rum shipped in bulk to the United States, Federal Excise Taxes are paid by distributors and importers on a semi-monthly basis, each payment representing the taxes on rum withdrawn from bonded warehouses during the immediately preceding two-week period for consumption in the United States. In the case of rum bottled in Puerto Rico and shipped to the United States, Federal Excise Taxes are paid by producers in Puerto Rico when the rum is shipped to the United States.

The United States Department of the Treasury makes monthly transfers of Federal Excise Taxes to Government Development Bank for the account of the Puerto Rico Department of the Treasury consisting of: (i) excise taxes paid

14

PRIFA STAY0001807

on rum bottled in Puerto Rico and shipped to the United States during the immediately preceding month, and (ii) excise taxes paid on rum shipped in bulk to the United States and retired for consumption two months prior to the date of such transfer.

The period elapsed between the time that a producer, distributor or importer pays the excise tax and the time that the United States Department of the Treasury remits such taxes to the Puerto Rico Department of the Treasury ranges between 30 and 90 days.

## Conservation Trust Fund

Under a policy to protect and enhance the natural resources of Puerto Rico, the Commonwealth has transferred annually since 1999 to the Conservation Trust Fund an amount of Federal Excise Taxes equal to approximately 45 cents per proof gallon. During fiscal 2004, approximately $12.2 million was so transferred. Under the proposed 2005 Highway Reauthorization Act and based on 2004 rum sales, such transfer would increase to approximately $13.6 million in 2006. Given that the proposed federal mandate for such transfers to the Conservation Trust Fund would expire on December 31, 2006, the Authority believes that the deposit to the Infrastructure Fund has and will thereafter come ahead of any transfer to the Conservation Trust Fund in the event that the Federal Excise Taxes, net of such transfer, are insufficient to cover the required annual Infrastructure Fund deposit.

## Federal Excise Tax Revenues

Throughout the 1950's and 1960's Federal Excise Taxes consisted principally of excise taxes on rum and tobacco. Since 1986, however, with the phasing out of the manufacture of tobacco products in Puerto Rico, all Federal Excise Taxes have consisted of taxes imposed on rum produced in Puerto Rico.

The table below shows the Federal Excise Taxes received with respect to rum during each of the five fiscal years ended June 30, 2004 and in the current fiscal year through May 2005. The figures shown represent the Federal Excise Taxes actually received by Government Development Bank for the account of the Puerto Rico Department of the Treasury in each month. In each case, the amounts shown are net of: (i) operational expenses incurred by the United States Department of the Treasury in processing and accounting for Federal Excise Taxes (approximately $8.9 million in fiscal 2004); (ii) amounts transferred by the Commonwealth Treasury to the Conservation Trust Fund (approximately $12.2 million in fiscal 2004); and (iii) federal excise taxes received in connection with rum produced in other countries (approximately $51.1 million in fiscal 2004), which are also transferred to the Commonwealth but are not deposited in the Infrastructure Fund pursuant to the terms of the Enabling Act and the Trust Agreement.

15

CONFIDENTIAL

**Federal Excise Tax Revenues Per Fiscal Year**
(in thousands)

|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|
| July . . . . . . . . . . . . | $ 15,935 | $ 21,532 | $ 36,178 | $ 22,220 | $ 26,853 | $ 20,822 |
| August . . . . . . . . . | 21,682 | 25,018 | 23,583 | 27,167 | 21,896 | 18,545 |
| September . . . . . . . | 17,299 | 31,570 | 26,291 | 24,821 | 27,259 | 17,831 |
| October . . . . . . . . . | 13,572 | 22,942 | 26,850 | 24,545 | 28,676 | 19,233 |
| November . . . . . . . | 19,767 | 24,460 | 23,632 | 26,408 | 23,219 | 39,610 |
| December . . . . . . . | 25,533 | 37,266 | 34,071 | 28,671 | 36,530 | 26,468 |
| January . . . . . . . . . | 21,875 | 24,490 | 19,242 | 24,262 | 25,037 | 31,386 |
| February . . . . . . . . | 13,652 | 20,308 | 21,086 | 23,524 | 22,241 | 23,590 |
| March . . . . . . . . . . | 16,364 | 20,728 | 24,265 | 15,258 | 19,555 | 9,889 |
| April . . . . . . . . . . . | 16,372 | 22,394 | 25,883 | 26,337 | 20,537 | 31,760 |
| May . . . . . . . . . . | 29,618 | 16,521 | 23,834 | 32,417 | 23,344 | 63,739 |
| June . . . . . . . . . . | 32,729 | 29,244 | 22,990 | 23,415 | 27,638 | — |
| Total[(1)(2)] . . . . . | $235,398 | $296,473 | $307,907 | $299,046 | $302,785 | $302,873 |

(1)    If the excise tax transfer rate had been $10.50 per proof gallon, it is estimated that the total Federal Excise Taxes (in thousands) received would have been $186,542, $234,941, $244,002, $236,980 and $239,943 for fiscals 2000, 2001, 2002, 2003 and 2004, respectively.

(2)    Totals may not add due to rounding.

*Source: Puerto Rico Department of the Treasury, Office of Economic and Financial Affairs*

As a result of administrative delays in the monthly reporting and payment of Federal Excise Taxes to the United States Treasury by certain U.S. rum importers and distributors, which delays are beyond the Commonwealth's control, the Federal Excise Taxes transferred to the Commonwealth in recent months have fluctuated. This caused the March 2005 Federal Excise Tax transfer to the Commonwealth to be less than the transfers for the same month in each of the last five fiscal years. During April and May 2005, however, the amount transferred was substantially higher than the amounts transferred in the same months in each of such fiscal years. Consequently, Federal Excise Tax transfers to the Commonwealth in fiscal 2005 have already surpassed the transfers for fiscal 2004.

### THE PUERTO RICO RUM INDUSTRY

**United States Rum Market**

Rums produced in Puerto Rico dominate the United States rum market according to data collected by the Distilled Spirits Council of the United States. In 2004, Puerto Rico rums accounted for over 70% of total rum shipments to the United States.

16

CONFIDENTIAL

PRIFA_STAY0001809

The following table shows the consumption of Puerto Rico rums in the United States relative to total consumption of rum in calendar 1995 and from calendar 2000 to 2004:

| | United States Rum Consumption by Brands (in thousands of gallons) | | | | | |
|---|---|---|---|---|---|---|
| | 1995 | 2000 | 2001 | 2002 | 2003 | 2004 |
| Bacardí . . . . . . . . . . . . . . | 15,097 | 17,594 | 18,212 | 18,545 | 19,353 | 20,090 |
| Castillo . . . . . . . . . . . . . . | 2,164 | 2,615 | 2,734 | 2,775 | 2,841 | 2,853 |
| Captain Morgan . . . . . . . . | 2,496 | 6,835 | 7,446 | 8,281 | 8,970 | 11,400 |
| Ron Rico . . . . . . . . . . . . | 1,438 | 1,182 | 1,270 | 1,331 | 1,331 | 1,284 |
| Other P.R. Brands[1] . . . . . | 413 | 166 | — | 12 | 19 | — |
| Total P.R. Brands . . . . . . . | 21,610 | 28,680 | 29,843 | 31,317 | 32,824 | 35,628 |
| Percent . . . . . . . . | 75.2% | 71.0% | 70.2% | 71.0% | 70.8% | 72.0% |
| Other Brands . . . | 7,142 | 11,718 | 12,643 | 12,816 | 13,560 | 13,825 |
| Total Rum Consumption . | 28,752 | 40,398 | 42,486 | 44,133 | 46,384 | 49,453 |

(1) Includes Don Q, Palo Viejo and Matusalem rums.

*Source: Adams Media Liquor Handbook 1995 and 2000-2004.*

One of the factors that has contributed to the success of Puerto Rico rums in the United States market is the strong advertising effort carried out by the Government of Puerto Rico directed at promoting the high quality of Puerto Rico rums. Pursuant to legislation adopted in 1971 and incorporated into the Puerto Rico Internal Revenue Code of 1994, up to ten percent (10%) of the Federal Excise Taxes attributable to bulk shipments of rum is deposited in a special fund (after the deposit to the Infrastructure Fund required by the Enabling Act) and used to promote the sale and consumer recognition of Puerto Rico rums in the United States. Also, for three decades Commonwealth law has imposed strict standards on production and aging requirements as a means of assuring the high quality of Puerto Rico rums.

Most rums that compete with Puerto Rico rums in the United States are produced in the United States Virgin Islands and other Caribbean countries. Some of these rums enjoy duty-free access to the United States under the Caribbean Basin Trade Partnership Act. To date such duty-free access has not had a significant impact on the market share enjoyed by Puerto Rico rums.

According to information obtained from Adams Media Liquor Handbook 2004, during the period from 1990 to 2004, rum's share of the distilled spirits market in the United States increased from 8.5% to 12.6%. One factor that accounts for the increase in market share of rum is the overall shift in consumer preference from heavier brown spirits, such as whiskey and bourbon, to white spirits, such as gin, vodka and rum. The following table shows this shift in consumer preference on a calendar year basis:

17

CONFIDENTIAL

PRIFA_STAY0001810

|  | **Distilled Spirits Market Share** | | | | | | |
|---|---|---|---|---|---|---|---|
|  | 1995 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005[1] |
| Brown Spirits . . . . . . . . . . | 34.6% | 29.6% | 28.9% | 28.4% | 27.5% | 27.0% | 26.3% |
| American Whiskies . . . | 15.1 | 12.8 | 12.4 | 12.1 | 11.8 | 11.6 | 11.4 |
| Imported Whiskies . . . . | 19.5 | 16.9 | 16.5 | 16.2 | 15.7 | 15.4 | 14.9 |
| White Spirits . . . . . . . . . . | 65.4 | 70.4 | 71.1 | 71.6 | 72.5 | 73.0 | 73.7 |
| Rums . . . . . . . . . . . . . | 8.8 | 11.4 | 11.9 | 12.1 | 12.3 | 12.6 | 12.7 |
| Tequila . . . . . . . . . . . . | — | 4.9 | 4.4 | 4.7 | 4.8 | 5.0 | 5.2 |
| Vodka . . . . . . . . . . . . . | 23.4 | 24.2 | 25.1 | 25.7 | 26.2 | 26.6 | 26.9 |
| Gin . . . . . . . . . . . . . . . | 8.6 | 7.5 | 7.4 | 7.2 | 6.9 | 6.6 | 6.4 |
| Others[2] . . . . . . . . . . . | 24.6 | 22.2 | 22.4 | 21.9 | 22.4 | 22.2 | 22.4 |

(1) Estimated by Government Development Bank based on preliminary figures.

(2) Includes brandies, cordials, liqueurs, and prepared cocktails. Tequila is included only for 1995.

*Source: Adams Media Liquor Handbook 1995 and 2000-2004.*

Sales of distilled spirits in the United States have increased from 326.5 million gallons in 1995 to 394.0 million gallons in 2004. This increase is attributable to new brands and subsegments within the industry and increases in consumer spending and in the drinking age population. In 2004, the consumption of distilled spirits increased by 4.1%. This is the largest increment seen in the industry in more than 20 years. Also in 2004, rum consumption increased by 6.6%. The Commonwealth attributes this growth to new product flavors introduced into the United States market.

It is expected that Puerto Rico rums will continue to play a dominant role in the United States market. According to Adams Media Liquor Handbook 2004, it is expected that rum consumption in the United States will continue to increase in the period through 2008.

**Puerto Rico Rum Distillers**

The two Puerto Rico distillers that produce rum for sale in the United States are Bacardí Corporation ("Bacardí") and Destilería Serrallés, Inc. ("Serrallés"). Serrallés has been producing rum in Puerto Rico since the mid 1800's and Bacardí since the 1930's. Bacardí has the largest operation, accounting for more than 60% of the total Puerto Rico rums sold in the United States. During the last decade, Bacardí has been the top selling brand of distilled spirits in the United States.

The distilling operations of Bacardí and Serrallés in Puerto Rico are affected by various economic, regulatory and other factors that are beyond the control of the Commonwealth and that could influence their decision to maintain or expand these operations, which in turn could affect the level of Federal Excise Taxes transferred to Puerto Rico. For example, labor and environmental compliance costs are higher in Puerto Rico than in neighboring Caribbean countries. Distilling operations in Puerto Rico, however, enjoy federal and Puerto Rico income tax benefits and benefit from the goodwill associated with rum produced in Puerto Rico.

CONFIDENTIAL

PRIFA_STAY0001811

## ADDITIONAL COMMONWEALTH APPROPRIATIONS

Under the Enabling Act the Authority may request appropriations from the Commonwealth if Federal Excise Taxes in the amounts authorized by the Enabling Act are not received by the Commonwealth for deposit in the Infrastructure Fund, as described above, and the Director of the Office of Management and Budget is required, upon the Authority's request, to include such appropriations in the recommended budget for the corresponding fiscal year. The Commonwealth Legislature, however, is not legally obligated to make such appropriations. Since the enactment of the Enabling Act, the full amount of the Federal Excise Taxes required to be deposited in the Infrastructure Fund has been so deposited and no such appropriations have been requested by the Authority. Following is a brief description of the budgetary process of the Commonwealth.

### Budgetary Process

The fiscal year of the Commonwealth begins each July 1. The Governor is constitutionally required to submit to the Legislature an annual budget of capital improvements and operating expenses of the central government for the ensuing fiscal year. The annual budget is prepared by the Office of Management and Budget, in coordination with the Planning Board, the Department of the Treasury, and other government offices and agencies. Section 7 of Article VI of the Constitution provides that "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenues and other sources for the ensuring fiscal year under (i) laws existing at the time the budget is estimated, and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board.

The Legislature may amend the budget submitted by the Governor but may not increase any item so as to cause a deficit without imposing taxes to cover such deficit. Upon passage by the Legislature, the budget is referred to the Governor, who may decrease or eliminate any item but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislature with his objections. The Legislature, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the beginning of a fiscal year, the annual budget for the preceding fiscal year as originally approved by the Legislature and the Governor is automatically renewed for the ensuing fiscal year until a new budget is approved by the Legislature and the Governor. This permits the Commonwealth to continue to make payments of its operating and other expenses until a new budget is approved.

### Financial Control and Adjustment Procedures

Revenue estimates for budgetary purposes are prepared by the Department of the Treasury, except for estimates of federal grants, which are prepared by the Office of Management and Budget based on information received from the various departments and other recipients of such grants. Revenue and federal grant estimates are under continuous review and, if necessary, are revised at least quarterly during the fiscal year. Fiscal control over expenditures is exercised by the Governor, through the Director of the Office of Management and Budget, and the Secretary of the Treasury. Monthly reviews and expenditure cut-off procedures are followed to prevent expenditures in excess of appropriations.

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislature a detailed report of any adjustment necessary to balance the budget, make recommendations to the Legislature for new taxes, authorize borrowings under provisions of existing legislation, or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments shall give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority: first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and

19

CONFIDENTIAL

guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare and retirement systems; and fourth, all other purposes.

A Budgetary Fund was created by Act No. 147 of June 18, 1980, as amended (the "Budgetary Fund Act"), to cover the appropriations approved in any fiscal year in which the revenues available for such fiscal year are insufficient, to secure the payment of public debt, and to provide for unforeseen circumstances in the provision of public services. Currently, an amount equal to one percent of the General Fund net revenues of the preceding fiscal year is deposited annually into the Fund. In addition, other income (not classified as revenues) that is not assigned by law to a specific purpose is also required to be deposited in the Budgetary Fund. The maximum balance of the Budgetary Fund may not exceed six percent of the total appropriations included in the budget for the preceding fiscal year. As of May 1, 2005, the balance in the Budgetary Fund was $16.7 million. The Budgetary Fund's year-end balance is expected to be $40 million.

An Emergency Fund was created by Act No. 90 of June 21, 1966, as amended (the "Emergency Fund"), to cover unexpected public needs caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods and plagues, and to protect people's lives and property and the public sector credit. The Emergency Fund is capitalized annually with an amount totaling no less than one percent of the General Fund net revenues of the preceding fiscal year. Act No. 91 was amended on August 28, 2003, to set an upper limit to the Emergency Fund of $150 million at the beginning of any fiscal year. As of May 1, 2005, the balance in the Emergency Fund was $62.4 million.

## AUTHORITY DEBT

The following table sets forth the bond and note obligations of the Authority as of April 30, 2005, and as adjusted for the issuance of the Series 2005 Bonds and the refunding of the Refunded Bonds.

| | Outstanding as of April 30, 2005[1] | As Adjusted |
|---|---|---|
| Notes[2] ....................... | $    22,973,949 | $ |
| Series 1988A Bonds ............ | 1,635,000 | |
| Series 1997A and 1997B Bonds ... | 773,025,000 | |
| Series 1998A Bonds ............ | 134,660,000 | |
| Total ................. | $  932,293,949 | $ |

(1)   Excludes $1.058 billion of the Authority's Series 2000A and 2000B Bonds, which are payable solely from the investment income of funds on deposit in the Authority's Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

(2)   Line of credit of Government Development Bank to the Authority.

CONFIDENTIAL

PRIFA_STAY0001813

**Debt Service Requirements**

The following table sets forth the Principal and Interest Requirements on the Bonds for each fiscal year. Principal and Interest Requirements for any fiscal year comprise the sum of principal, including Amortization Requirements, and interest that is payable on January 1 in such fiscal year and on July 1 in the next fiscal year.

| Years Ending June 30, | Remaining Bonds Debt Service Requirements | Series 2005 Bonds | | | Total Net Debt Service Requirements |
|---|---|---|---|---|---|
| | | Principal | Interest[1] | Total Debt Service | |
| 2005 | $ | $ | $ | $ | $ |
| 2006 | | | | | |
| 2007 | | | | | |
| 2008 | | | | | |
| 2009 | | | | | |
| 2010 | | | | | |
| 2011 | | | | | |
| 2012 | | | | | |
| 2013 | | | | | |
| 2014 | | | | | |
| 2015 | | | | | |
| 2016 | | | | | |
| 2017 | | | | | |
| 2018 | | | | | |
| 2019 | | | | | |
| 2020 | | | | | |
| 2021 | | | | | |
| 2022 | | | | | |
| 2023 | | | | | |
| 2024 | | | | | |
| 2025 | | | | | |
| 2026 | | | | | |
| 2027 | | | | | |
| 2028 | | | | | |
| 2029 | | | | | |
| 2030 | | | | | |
| 2031 | | | | | |
| 2032 | | | | | |
| 2033 | | | | | |
| 2034 | | | | | |
| 2035 | | | | | |

PRIFA_STAY0001814

CONFIDENTIAL

| Years Ending June 30, | Remaining Bonds Debt Service Requirements | Series 2005 Bonds | | | Total Net Debt Service Requirements |
| --- | --- | --- | --- | --- | --- |
| | | Principal | Interest[1] | Total Debt Service | |
| 2036 | | | | | |
| 2037 | | | | | |
| 2038 | | | | | |
| 2039 | | | | | |
| 2040 | | | | | |
| 2041 | | | | | |
| 2042 | | | | | |
| 2043 | | | | | |
| 2044 | | | | | |
| 2045 | | | | | |
| Total[2] | $ | $ | $ | $ | $ |

(1)    $              of the interest shown in fiscal 2005 and 2006 will be paid from the portion of Series 2005 Bond proceeds deposited to the capitalized interest account, which amount is irrevocably set aside for the payment of interest on the Series 2005 Bonds (after taking into effect the refunding of the Refunded Bonds), plus earnings thereon. See " Use of Proceeds" under *Plan of Financing*.

(2)    Totals may not add due to rounding.

## FINANCIAL ASSISTANCE TO BENEFITTED ENTITIES

The Enabling Act empowers the Authority to provide financial, administrative, consulting, technical, advisory, and other assistance to political subdivisions, public corporations, instrumentalities and municipalities of the Commonwealth. In connection therewith, the Authority has executed assistance agreements with several Benefitted Entities, including PRASA, the Department of Education, the Department of Environmental and Natural Resources, the Highway and Transportation Authority, the Courts Administration Office, the Department of Transportation and Public Works, the Institute of Puerto Rican Culture, the Department of Sports and Recreation, the Fine Arts Center Corporation, and the Special Communities Perpetual Trust (collectively, the "Assistance Agreements"). The Authority has agreed to provide additional assistance to some of such Benefitted Entities by issuing the Series 2005 Bonds and utilizing the net proceeds as described under *Plan of Financing*.

The Assistance Agreements provide a contractual framework for the Authority to provide financial and other assistance to the Benefitted Entities in connection with their respective capital projects and working capital needs. In general, under the Assistance Agreements with Benefitted Entities other than PRASA, the Benefitted Entity assumes responsibility for the development of its capital project and agrees to indemnify and hold harmless the Authority in connection with the design, engineering and construction thereof. Under the PRASA Assistance Agreement, the Authority provides administrative support and assistance with respect to the undertaking and implementation of PRASA's on-going projects, and pending attainment of certain objectives, PRASA is subject to a "special period" during which the Authority is authorized to review and comment about any necessary changes to operating and capital budgets and capital improvement programs of PRASA. Pursuant to a proposed amendment to this agreement, the Authority will continue to provide financial, administrative, technical and other assistance to PRASA; however, PRASA will assume primary responsibility for all new capital projects, including certain projects to be financed with proceeds of the Series 2005 Bonds.

CONFIDENTIAL

PRIFA STAY0001815

# TAX MATTERS

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements regarding the use, expenditure and investment of bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, which requirements the Authority, PRASA and certain other Benefitted Entities receiving proceeds of the Series 2005 Bonds must continue to meet after the issuance of the Series 2005 Bonds in order that interest on the Series 2005 Bonds is not included in gross income for federal income tax purposes. The failure of any of the foregoing entities to meet these requirements may cause interest on the Series 2005 Bonds to be included in gross income for federal income tax purposes, retroactive to their date of issuance. Each of the Authority and the other entities mentioned above has covenanted to comply with the requirements of the Code, to the extent permitted by the Constitution and the laws of the Commonwealth, so that interest on the Series 2005 Bonds will remain excluded from gross income for federal income tax purposes. Bond Counsel is not aware of any provision of the Constitution or laws of the Commonwealth, which would prevent any of the foregoing entities from complying with the requirements of the Code.

In the opinion of Sidley Austin Brown & Wood LLP, Bond Counsel, subject to continuing compliance by the Authority and the other entities mentioned above with the tax covenant referred to above, under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, interest on the Series 2005 Bonds will not be includable in gross income for federal income tax purposes. Interest on the Series 2005 Bonds is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Series 2005 Bonds will be includable in the computation of the alternative minimum tax on corporations imposed by the Code. No opinion is rendered by Sidley Austin Brown & Wood LLP on the effect of any action taken or not taken after the date of its opinion without its approval (except for such action or omission to act as is otherwise provided for in the documents pertaining to the Series 2005 Bonds) or in reliance upon the advice of counsel other than such firm on the exclusion from gross income of the interest on the Series 2005 Bonds for federal income tax purposes. Bond Counsel is further of the opinion that, under the provisions of the Acts of Congress now in force, the Series 2005 Bonds and the interest thereon will be exempt from state, Commonwealth and local income taxation.

Ownership of tax-exempt obligations may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations, certain S Corporations with excess passive income, individual recipients of Social Security or Railroad Retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations and taxpayers who may be eligible for the earned income tax credit.

Ownership of tax-exempt obligations may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in the Commonwealth.

Prospective purchasers of the Series 2005 Bonds should consult their tax advisors as to applicability and impact of any collateral consequences.

Legislation affecting municipal securities is constantly being considered by the United States Congress. There can be no assurance that legislation enacted after the date of issuance of the Series 2005 Bonds will not have an adverse effect on the tax-exempt status of the Series 2005 Bonds. Legislative or regulatory actions and proposals may also affect the economic value of tax exemption or the market prices of the Series 2005 Bonds.

## Discount Bonds

The excess, if any, of the amount payable at maturity of any maturity and series of the Series 2005 Bonds over the issue price corresponding thereto constitutes original issue discount. The amount of original issue discount that has accrued and is properly allocable to an owner of any maturity and series of the Series 2005 Bonds with original issue discount (a "Discount Bond") will be excluded from gross income for federal income tax purposes to the same extent as interest on the Series 2005 Bonds. In general, the issue price of a maturity and series of the Series 2005 Bonds is the

23

first price at which a substantial amount of Series 2005 Bonds of that maturity and series was sold (excluding sales to bond houses, brokers or similar persons or organizations acting in the capacity of underwriters, placement agents, or wholesalers) and the amount of original issue discount accrues in accordance with a constant yield method based on the compounding of interest. A purchaser's adjusted basis in a Discount Bond is to be increased by the amount of such accruing discount for purposes of determining taxable gain or loss on the sale, redemption or other disposition of such Discount Bond for federal income tax purposes.

A portion of the original issue discount that accrues in each year to an owner of a Discount Bond that is a corporation will be included in the calculation of the corporation's federal alternative minimum tax liability. In addition, original issue discount that accrues in each year to an owner of a Discount Bond is included in the calculation of the distribution requirements of certain regulated investment companies and may result in some of the collateral federal income tax consequences discussed above. Consequently, an owner of a Discount Bond should be aware that the accrual of original issue discount in each year may result in an alternative minimum tax liability, additional distribution requirements or other collateral federal income tax consequences although the owner of such Discount Bond has not received cash attributable to such original issue discount in such year.

The accrual of original issue discount and its effect on the redemption, sale or other disposition of any maturity of a Discount Bond that is not purchased in the initial offering at the first price at which a substantial amount of Discount Bonds of that maturity is sold to the public may be determined according to rules that differ from those described above. An owner of a Discount Bond should consult with his tax advisor with respect to the determination for federal income tax purposes of the amount of original issue discount relating to such Discount Bond and with respect to state, Commonwealth and local tax consequences of owning and disposing of such Discount Bond.

**Premium Bonds**

The excess, if any, of the tax basis of a Series 2005 Bond to a purchaser (other than a purchaser who holds such Bond as inventory, stock in trade or for sale to customers in the ordinary course of business) who purchases such Bond as part of the initial offering and at the applicable initial offering price as set forth on the inside cover page of this Official Statement over the amount payable at maturity of such Bond is "Bond Premium." Bond Premium is amortized over the term of such Bond for federal income tax purposes (or in the case of a Series 2005 Bond with Bond Premium callable prior to its stated maturity, the amortization period and yield may be required to be determined on a basis of a call date that results in the lowest yield on such Bond). No deduction is allowed for such amortization of Bond Premium; however, United States Treasury regulations provide that Bond Premium is treated as an offset to qualified stated interest received on the Series 2005 Bonds. An owner of such Bond is required to decrease his adjusted basis in such Bond by the amount of amortizable Bond Premium attributable to each taxable year such Bond is held. An owner of such Bond should consult with his tax advisor with respect to the precise determination for federal income tax purposes of the treatment of Bond Premium upon sale, redemption or other disposition of such Bond and with respect to the state, Commonwealth and local tax consequences of owning and disposing of such Bond.

### VERIFICATION OF MATHEMATICAL COMPUTATIONS

_____ will verify from the information provided to them the mathematical accuracy, as of the date of the closing on the Series 2005C Bonds, of the computations contained in the provided schedules to determine that the anticipated receipts from the securities and cash deposits listed in such schedules, to be held in escrow, will be sufficient to pay, when due, the principal of and interest, and redemption premium, if any, on the Refunded Bonds. _____ will express no opinion on the assumptions provided to them, nor as to the exclusion from gross income the interest on the Series 2005 Bonds.

CONFIDENTIAL

PRIFA STAY0001817

## ELIGIBILITY OF SERIES 2005 BONDS

The Series 2005 Bonds will be eligible for deposit by banks in Puerto Rico to secure public funds and will be approved investments for insurance companies to qualify them to do business in Puerto Rico as required by law.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Series 2005 Bonds from the Authority at an aggregate discount of $                    from the initial public offering prices for such Bonds, set forth (or derived from information set forth) on the inside cover hereof. The obligations of the Underwriters are subject to certain conditions precedent. The Underwriters will be obligated to purchase all Series 2005 Bonds if any such Bonds are purchased. The Bonds may be offered and sold to certain dealers (including dealers depositing such Bonds into investment trusts) and institutional purchasers at prices lower than the public offering prices which may be changed, from time to time, by the Underwriters.

Banc of America Securities LLC ("Banc of America Securities"), a co-senior underwriter, has entered into a written agreement with Oriental Financial Services Corp. ("Oriental Financial Services") pursuant to which Oriental Financial Services has agreed to act as a consultant to Banc of America Securities in connection with Banc of America Securities' provision of underwriting and investment banking services to the Authority with respect to the Series 2005 Bonds. Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), a co-senior underwriter, has entered into a written agreement with BBVA Securities of Puerto Rico, Inc. ("BBVA Securities") pursuant to which BBVA Securities has agreed to act as a consultant to Merrill Lynch, in connection with Merrill Lynch's provision of underwriting and investment banking services to the Authority with respect to the Series 2005 Bonds. Pursuant to these agreements, the existence of which has been disclosed to the Authority and Government Development Bank, Oriental Financial Services and BBVA Securities will be entitled to receive, respectively, a portion of Banc of America Securities' and Merrill Lynch's actual net profits, if any, in connection with the underwriting of the Series 2005 Bonds. Other similar agreements with respect to the sharing of underwriting net profits have been entered into and disclosed to the Authority and Government Development Bank by: J.P. Morgan Securities, Inc. and R-G Investments Corporation, Goldman, Sachs & Co. and FirstBank Puerto Rico, Lehman Brothers, Inc. and Santander Securities Corporation, Morgan Stanley & Co. Incorporated and Popular Securities, Inc., and Wachovia Bank, National Association and Doral Securities, Inc.

The Authority has agreed to indemnify the Underwriters against certain liabilities, including liabilities under the federal securities laws.

## COMMONWEALTH COVENANT

Pursuant to the Enabling Act, the Commonwealth has pledged to all holders of the Series 2005 Bonds that it will not limit or alter the rights or powers vested in the Authority by the Enabling Act so as to impair the rights of such holders until the Series 2005 Bonds and the interest thereon are fully met and discharged.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the offering of the Series 2005 Bonds. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Series 2005 Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates also participate in other financial transactions with Government Development Bank.

25

## LEGAL MATTERS

Legal matters incident to the authorization, issuance, sale and delivery of the Series 2005 Bonds are subject to the unqualified approving legal opinion of Sidley Austin Brown & Wood LLP, New York, New York, Bond Counsel. The form of the proposed opinions of Bond Counsel is set forth in Appendix IV.  Certain legal matters will be passed upon for the Underwriters by McConnell Valdés, San Juan, Puerto Rico.

## RATINGS

The Series 2005 Bonds have been assigned a rating of "Baa2," with a negative credit outlook, by Moody's Investors Service, and a rating of _____ by Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. The "Baa2" rating was assigned by Moody's on May 19, 2005, and was lowered from the "Baa1" rating that the Authority's bonds had immediately prior to such date.  This new Moody's rating is the same rating assigned to the Commonwealth's general obligations on such date, which was also revised downward from "Baa1" to "Baa2."

Any explanation regarding the reasons for and the significance of such ratings must be obtained only from the respective rating agency furnishing the same.  The ratings reflect only the respective opinions of such rating agencies. There is no assurance that the ratings will continue for any given period of time or will not be revised downward or withdrawn entirely by either or both of such rating agencies.  Any such downward revision or withdrawal of the ratings could have an adverse effect on the market prices of the Series 2005 Bonds.

## CONTINUING DISCLOSURE

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the SEC, the Commonwealth (the "Obligated Person") and the Authority, as specifically stated hereinbelow, have agreed to the following for the benefit of the Beneficial Owners (generally the tax owners of the Series 2005 Bonds):

(a) The Obligated Person has agreed to file within 305 days after the end of each fiscal year beginning after its fiscal year 2005, with each NRMSIR and with any Commonwealth state information depository ("SID"), core financial information and operating data for the prior fiscal year, including (i) the Obligated Person's audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Obligated Person (including such data concerning the Authority and any other entity to the extent it has a material impact on the Obligated Person) and revenues, expenditures, operations and indebtedness generally found in the Commonwealth Report;

(b) The Authority has agreed to file within 305 days after the end of each fiscal year beginning after its fiscal year 2005, with each NRMSIR and with any Commonwealth SID, the Authority's audited financial statements for the prior fiscal year prepared in accordance with generally accepted accounting principles in effect from time to time together with data of the type presented in this Official Statement under *Federal Excise Taxes, The Puerto Rico Rum Industry,* and *Authority Debt* for the preceding fiscal year; and

(c) The Authority has agreed to file in a timely manner, with each NRMSIR or with the MSRB, and with any Commonwealth SID, notice of failure of the Obligated Person to comply with clause (a) above and of the Authority to comply with clause (b) above and notice of any of the following events with respect to the Series 2005 Bonds, if material:

    (i)   principal and interest payment delinquencies;

    (ii)   non-payment related defaults;

    (iii)   unscheduled draws on debt service reserves reflecting financial difficulties;

    (iv)   unscheduled draws on credit enhancements reflecting financial difficulties;

26

(v)     substitution of credit or liquidity providers, or their failure to perform;
(vi)    adverse tax opinions or events affecting the tax-exempt status of Series 2005 Bonds;
(vii)   modifications to rights of security holders;
(viii)  Series 2005 Bond calls;
(ix)    defeasances;
(x)     release, substitution, or sale of property securing repayment of the Series 2005 Bonds; and
(xi)    rating changes.

Event (iii) may not be applicable, since the terms of the Series 2005 Bonds do not provide for "debt service reserves." For a description of the Series 2005 Bonds, see *The Series 2005 Bonds*.

In addition, with respect to the following events:

Events (iv) and (v). The Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Series 2005 Bonds, unless the Authority applies for or participates in obtaining the enhancement.

Event (vi). For information on the tax status of the Series 2005 Bonds, see *Tax Matters*.

Event (viii). The Authority does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if the terms, dates and amounts of redemption are set forth in detail in this Official Statement in "Redemption Provisions" under *The Series 2005 Bonds*, the only open issue is which Series 2005 Bonds will be redeemed in the case of a partial redemption, notice of redemption is given to the Bondholders as required under the terms of the Series 2005 Bonds, and public notice of the redemption is given pursuant to Securities Exchange Act of 1934 Release No. 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or Bond purchases.

The Obligated Person expects to provide the information described in clause (a) above by delivering its first bond official statement that includes its financial statements for the preceding fiscal year or, if no such official statement is issued by the 305-day deadline, by delivering its Comprehensive Annual Financial Report by such deadline.

As of the date of this Official Statement, there is no Commonwealth SID, and the name and address of each NRMSIR is: Bloomberg Municipal Repository, 100 Business Park Drive, Skillman, New Jersey 08558; Standard & Poor's J.J. Kenny Repository, 55 Water Street, 45th Floor, New York, New York 10041; FT Interactive Data, Attn: NRMSIR, 100 William Street, New York, New York 10038; and DPC Data Inc., One Executive Drive, Fort Lee, New Jersey 07024.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Authority, such other events are material with respect to the Series 2005 Bonds, but the Authority does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

The Obligated Person and the Authority acknowledge that their respective undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners of the Series 2005 Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific enforcement of the Authority's or the Obligated Person's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants in paragraphs (a), (b) or (c) above (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Authority or the Obligated Person, as applicable, written notice of any request to cure such breach, and the Authority or the Obligated Person, as applicable, shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located

27

PRIFA_STAY0001820

in the Municipality of San Juan, for the equal benefit of all Beneficial Owners of the outstanding Series 2005 Bonds benefitted by the Covenants, and no remedy shall be sought or granted other than specific performance of the Covenant at issue. Notwithstanding the foregoing, no challenge to the adequacy of the information provided in accordance with the filings mentioned in paragraphs (a), (b) or (c) above may be prosecuted by any Beneficial Owner except in compliance with the remedial and enforcement provisions contained in Article VII of the Trust Agreement. See "Remedies of Bondholders" under *Summary of the Trust Agreement* in Appendix I. Moreover, proceedings filed by Beneficial Owners against the Obligated Person may be subject to the sovereign immunity provisions of Section 2 of Act No. 104, approved June 29, 1955, as amended (32 L.P.R.A. § 3077 and § 3077a), which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if:

(1) the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority or the Obligated Person, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Series 2005 Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners, as determined by parties unaffiliated with the Authority or the Obligated Person; or

(2) all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such resolution, ceases to be in effect for any reason, and the Authority or the Obligated Person, as applicable, elects that the Covenant shall be deemed amended accordingly.

The Authority and the Obligated Person have further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

These Covenants have been made in order to assist the Underwriters to comply with the Rule.

## MISCELLANEOUS

The foregoing references to and summaries of certain provisions of the Trust Agreement, the Bond Resolution, the Escrow Deposit Agreement, the Assistance Agreements, the Enabling Act, the Constitution of Puerto Rico and the Series 2005 Bonds are subject to all the detailed provisions thereof. Such references and summaries do not purport to be complete and are qualified in their entirety by reference to such acts, laws, documents, agreements or decisions. Copies of the Trust Agreement, the Bond Resolution and the Escrow Deposit Agreement are available for inspection during regular business hours at the offices of Government Development Bank or at the principal corporate trust office of the Trustee.

Any statements in this Official Statement involving matters of opinion, whether or not expressly so stated, are intended as such and not as representations of fact.

There is appended to this Official Statement a summary of the Trust Agreement (Appendix I), the audited financial statements of the Authority for the fiscal year ended June 30, 2004, together with the independent auditor's report of KPMG (Appendix II), the Commonwealth Report (Appendix III), the proposed form of opinions of Sidley Austin Brown & Wood LLP, Bond Counsel (Appendix IV), and the table of accreted values for the Capital Appreciation Bonds (Appendix V).

28

PRIFA_STAY0001821

The information set forth in this Official Statement, except the information appearing in *Underwriting* and the information pertaining to DTC, was supplied by the Acting Executive Director of the Authority in her official capacity as such and is included in this Official Statement on her authority. The information set forth in the Commonwealth Report was supplied by certain officials of the Commonwealth, in their respective official capacities, or was obtained from publications of the Commonwealth, and is included in this Official Statement on the authority of such officials or the authority of such publications as public official documents, respectively. The information pertaining to DTC was supplied by DTC.

This Official Statement will be filed with each NRMSIR and with the MSRB.

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

By:

Magda L. Aguíar-Serrano
Acting Executive Director

29

CONFIDENTIAL

PRIFA_STAY0001822

The information set forth in this Official Statement, except the information appearing in *Underwriting* and the information pertaining to DTC, was supplied by the Acting Executive Director of the Authority in her official capacity as such and is included in this Official Statement on her authority.  The information set forth in the Commonwealth Report was supplied by certain officials of the Commonwealth, in their respective official capacities, or was obtained from publications of the Commonwealth, and is included in this Official Statement on the authority of such officials or the authority of such publications as public official documents, respectively.  The information pertaining to DTC was supplied by DTC.

This Official Statement will be filed with each NRMSIR and with the MSRB.

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

By:_____

Magda L. Aguiar-Serrano
Acting Executive Director

29

CONFIDENTIAL

PRIFA_STAY0001823

[This page intentionally left blank]

CONFIDENTIAL

APPENDIX I

## SUMMARY OF THE TRUST AGREEMENT

The following is a summary of certain provisions of the Trust Agreement. This summary does not purport to be complete and is qualified in its entirety by reference to the Trust Agreement. Inasmuch as the last remaining outstanding Bonds having the benefit of the Reserve Account mature on July 1, 2005, the summary below no longer makes reference to the Reserve Account in the Sinking Fund.

### Definitions of Certain Terms

The following words and terms shall have the following meanings, unless the context otherwise requires. Words importing the singular number shall include the plural number in each case and vice versa, and words importing persons shall include firms and corporations, including public bodies.

"Accreted Value" shall mean, with respect to any Capital Appreciation Bond, an amount equal to the principal amount of such Capital Appreciation Bond on its date of original issuance plus the interest accrued on such Capital Appreciation Bond from such original issue date to the date of calculation, compounded on the dates and in the manner provided for in the resolution authorizing the issuance of such Capital Appreciation Bond.

"Amortization Requirement" for the term Bonds of any series for any Fiscal Year shall mean the amount fixed or computed for the retirement by purchase or redemption of term Bonds in such Fiscal Year. If at or prior to the close of any Fiscal Year the total amount of term Bonds of any series retired by purchase or redemption or called for redemption with Redemption Account moneys exceeds the Amortization Requirement for such term Bonds for such Fiscal Year, then future Amortization Requirements for such term Bonds shall be reduced for subsequent Fiscal Years in such amounts aggregating the amount of such excess as shall be determined by the Executive Director of the Authority in an order filed with the Trustee on or before the 10th day following the close of such Fiscal Year. If at the close of any Fiscal Year the total principal amount of term Bonds of any series retired by purchase or redemption or called for redemption with Redemption Account moneys is less than the Amortization Requirement for such term Bonds for such Fiscal Year, then the Amortization Requirement for such term Bonds for the next Fiscal Year shall be increased by the amount of such deficiency.

"Appreciated Value" shall mean, (i) with respect to any Capital Appreciation and Income Bond until the Interest Commencement Date, an amount equal to the Accreted Value of such Bond and, (ii) as of any date of computation on and after the Interest Commencement Date, an amount equal to the Accreted Value of such Bond on the Interest Commencement Date.

"Arbitrage Rebate Fund" shall mean a fund or funds established by the Authority with a Qualified Depositary for the deposit of moneys necessary for payments required to be made to the United States of America in connection with any series of Bonds subject to arbitrage rebate requirements under the Code. The moneys in such fund or funds shall be applied only for the purposes for which such fund or funds are established and shall not be subject to a lien or charge in favor of the holders of any Bonds and shall not be pledged as security for the payment of any Bonds.

"Balloon Bonds" shall mean any Bonds, interest on which is payable periodically and twenty-five percent (25%) or more of the original principal amount of which matures during any one Fiscal Year and for which maturing principal amount Amortization Requirements have not been designated.

"Capital Appreciation Bonds" shall mean any Bonds as to which interest is compounded on each of the dates designated for compounding and payable in an amount equal to the then current Accreted Value only at the maturity, earlier redemption or other payment date therefor, all as so provided by the resolution authorizing said Bonds.

I-1

CONFIDENTIAL

"Capital Appreciation and Income Bonds" shall mean any Bonds as to which accruing interest is not paid prior to the Interest Commencement Date and the Appreciated Value for which is compounded periodically on the specified dates prior to the Interest Commencement Date for such Bonds, all as provided in the resolution authorizing such Bonds.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder and applicable regulations promulgated under the Internal Revenue Code of 1954, as amended.

"Credit Facility" shall mean an irrevocable letter of credit, policy of municipal bond insurance, guaranty, purchase agreement, credit agreement or similar facility in which the person providing such facility irrevocably agrees to provide funds to make payment of the principal of and premium, if any and interest on Bonds to which such Credit Facility relates.

"Debt Service Component" shall mean indebtedness incurred by the Authority which complies with the tests for the issuance of additional series of Bonds in the Trust Agreement and which is payable from moneys withdrawn from the Puerto Rico Infrastructure Fund on a pro rata basis with the deposits required to be made to the credit of the Bond Service Account and Redemption Account of the Sinking Fund under the Trust Agreement.

"Extendible Maturity Bonds" shall mean Bonds the maturities of which, by their terms, may be extended at the option of the holders of the Bonds or the Authority.

"Fiscal Year" shall mean the period commencing on the first day of July of any year and ending on the last day of June of the following year or any other twelve consecutive month period designated by the Board.

"Government Obligations" shall mean (i) direct obligations of, or obligations the payment of the principal of and interest on which are unconditionally guaranteed by, the United States of America; (ii) qualifying evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clause (i) above; (iii) municipal obligations whose payment is irrevocably secured by non-callable and non-prepayable obligations described in clause (i) or (ii) above deposited in an escrow account irrevocably pledged to the payment of such municipal obligations; and (iv) qualifying evidences of ownership of proportionate interests in fixture interest or principal payments on obligations specified in clause (in) above.

"Interest Commencement Date" shall mean, with respect to any Capital Appreciation and Income Bond, the specified date after which interest accruing on such Bond shall be payable periodically, with the first such payment date being the applicable interest payment date immediately succeeding such Interest Commencement Date.

"Interim Bonds" shall mean any Bonds issued on an interim basis that are expected to be repaid from the proceeds of Bonds or other indebtedness.

"Investment Obligations" shall mean any of the following, to the extent that the same is legal for the investment of public funds under the laws of the Commonwealth:

(i)     Government Obligations;

(ii)    obligations issued or guaranteed by an agency of the United States of America or person controlled by or supervised by and acting as an instrumentality of the United States of America pursuant to authority granted by Congress, whether now existing or hereafter organized, including but not limited to those of the Federal Home Loan Mortgage Corporation, Federal Home Loan Banks, Farm Credit System, Student Loan Marketing Association and Federal National Mortgage Association and qualifying evidences of ownership of proportionate interests in future interest or principal payments in obligations specified in this clause (ii);

(iii)   bankers acceptances, certificates of deposit or time deposits of any bank (including the Trustee), trust company or savings and loan association (including any investment in pools of such obligations), which

I-2

CONFIDENTIAL

PRIFA_STAY0001826

to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation, are either (A) issued by a depository institution having, on the date of investment, a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by obligations described in clauses (i) or (ii) above held free and clear of claims by third parties, having a market value at least equal to the principal amount of such bankers acceptances, certificates of deposit or time deposits (or portion thereof not so insured), provided that the Trustee has a perfected security interest in the collateral;

(iv)    obligations issued by any state or territory of the United States of America or any political subdivision or instrumentality thereof, which are rated on the date of investment therein, in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto;

(v)     any repurchase, reverse repurchase or investment agreement with any bank (including the Trustee) or trust company, insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any of the obligations described in (i) or (ii) above, provided that the Trustee has a perfected security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(vi)    commercial paper rated, or backed by a letter of credit or line of credit rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto; and

(vii)   any other obligations, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto.

"Liquidity Facility" shall mean a letter of credit, policy of municipal bond insurance, guaranty, purchase agreement or similar facility in which the person providing such facility agrees to provide funds to pay the purchase price of Put Bonds upon their tender by the holders of Put Bonds.

"Federal Excise Taxes" shall mean the federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States that are collected by the United States government and remitted to the Puerto Rico Treasury Department pursuant to the Code and other provisions of law.

"Outstanding" when used with reference to the Bonds shall mean, as of any date of determination, all Bonds authenticated and delivered except:

(i)     Bonds cancelled by the Trustee or delivered to the Trustee for cancellation;

(ii)    Bonds that are deemed paid and no longer Outstanding under the Trust Agreement;

(iii)   Destroyed, mutilated, stolen or lost Bonds in lieu of which other Bonds have been issued pursuant to the provisions of the Trust Agreement, unless evidence satisfactory to the Trustee has been received that any such Bond is held by a bona fide purchaser, and

(iv)    for purposes of any consent or other action to be taken under the Trust Agreement by the holders of a specified percentage of principal amount of Bonds, Bonds held by or for the account of the Authority.

"Pledged Revenues" shall mean the Special Tax Revenues and any other moneys that have been deposited to the credit of the Sinking Fund.

I-3

CONFIDENTIAL

PRIFA_STAY0001827

"Principal and Interest Requirements" for any Fiscal Year, as applied to the Bonds of any series, shall mean the sum of:

(i)    the amount required to pay the interest on all Bonds of such series then Outstanding that is payable on each interest payment date in such Fiscal Year,

(ii)   the amount required to pay the principal of all serial Bonds of such series then Outstanding that is payable upon the maturity of such serial Bonds in such Fiscal Year, and

(iii)  the Amortization Requirement for the Outstanding term Bonds of such series for such Fiscal Year.

If an interest payment date or a principal payment date for any series of Bonds is the first day of a Fiscal Year, such payment date shall be included for purposes of this definition as if occurring on the last day of the preceding Fiscal Year.

The following rules shall apply in determining the amount of the Principal and Interest Requirements:

(a)    The interest on Variable Rate Bonds shall be the interest to accrue on such Variable Rate Bonds for such Fiscal Year; provided, however, that (1) for purposes of determining the maximum Principal and Interest Requirements under the projected tests for the issuance of additional series of Bonds, the interest on Variable Rate Bonds shall be assumed to be the greater of (A) one hundred ten percent (110%) of the average interest rate on such Variable Rate Bonds during the twelve months ending with the month preceding the date of calculation or such shorter period that such Variable Rate Bonds shall have been Outstanding, and (B) the actual rate of interest on such Variable Rate Bonds on the date of calculation and if a series of Variable Rate Bonds had not been Outstanding prior to the date of computation, the test set forth in clause (A) above shall be calculated as though said Variable Rate Bonds had been Outstanding for the twelve-month period by using the average interest rate for comparable securities for such period as certified by an underwriting or investment banking firm experienced in marketing such securities;

(b)    In the case of Put Bonds, the "put" date shall be ignored if a source for payment of said "put" is a Credit Facility or a Liquidity Facility, and the stated Fiscal Years for Amortization Requirements and dates for principal payments shall be used, and in the case of Bonds secured by a Credit Facility or a Liquidity Facility, the repayment terms of each Credit Facility or Liquidity Facility shall be ignored, unless the issuer of the Credit Facility or the Liquidity Facility has advanced funds thereunder and such amount has not been repaid, in which case the repayment obligation shall be used rather than the stated terms of the Bonds, if the repayment obligation is secured on a parity with Bonds;

(c)    In the case of Extendible Maturity Bonds, the Bonds shall be deemed to mature on the later of the stated maturity date and the date to which such stated maturity date has been extended;

(d)    In the case of Capital Appreciation Bonds, the principal and interest portions of the Accreted Value payable in any year shall be included in the year in which said payment is due;

(e)    In the case of Capital Appreciation and Income Bonds, the principal and interest portions of the Appreciated Value shall be included in the year in which said principal and interest portions are due;

(f)    In the case of Balloon Bonds or Interim Bonds, the debt service requirements may be excluded and instead such Bonds may be treated as debt securities having a comparable federal tax status as such Bonds, maturing in substantially equal annual payments of principal and interest over a period of not more than 30 years (as determined in the certificate described below), bearing a fixed interest rate equal to the average interest rate per annum for such debt securities on the date of issuance of the Balloon Bonds or Interim Bonds rated by Moody's Investors Services, Inc. or any successors thereto or Standard

I-4

& Poor's Corporation or any successors thereto comparably to that of the Authority, all as shown by a certificate of an underwriting or investment banking firm experienced in marketing such securities; and

(g)     If all or a portion of a series of Bonds is payable from funds irrevocably set aside or deposited for such purpose, together with projected earnings thereon to the extent such earnings are projected to be from Investment Obligations, such principal or interest shall not be included in determining Principal and Interest Requirements.

The Principal and Interest Requirements for any Fiscal Year, as applied to Debt Service Components, shall mean the payments due and payable for such Fiscal Year and to the extent applicable, shall be determined in accordance with the foregoing rules.

"Put Bonds" shall mean Bonds that by their terms may be tendered at the option of the holder thereof for payment prior to maturity.

"Qualified Depositary or Depositories" shall mean one or more banks or trust companies designated or permitted to be designated by the Secretary of the Treasury of the Commonwealth as a depository for public funds, which institutions have been designated as depositories of the Authority by resolution.

"Special Tax Revenues" shall mean the Federal Excise Taxes deposited to the credit of the Puerto Rico Infrastructure Fund pursuant to the Act.

"Variable Rate Bonds" shall mean Bonds issued with an interest rate that is not fixed in percentage at the date of issue for the term thereof.

**Puerto Rico Infrastructure Fund**

The Authority shall maintain with a Qualified Depositary the Puerto Rico Infrastructure Fund. The Authority shall not pledge or create any liens upon any moneys in the Puerto Rico Infrastructure Fund. All moneys deposited to the credit of the Puerto Rico Infrastructure Fund will be applied for the purposes and in the order set forth in the Trust Agreement.

**Sinking Fund and Accounts**

A special fund is created under the Trust Agreement and designated the "Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund" (the "Sinking Fund") to be held by the Trustee. Two separate accounts are created in the Sinking Fund and designated "Bond Service Account" and "Redemption Account." Subject to the terms and conditions set forth in the Trust Agreement, moneys held to the credit of the Sinking Fund shall be held in trust and disbursed by the Trustee for the purposes set forth below.

As promptly as practicable upon the receipt of Special Tax Revenues or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund, the Authority shall withdraw an amount of such Special Tax Revenues and other moneys sufficient to make the following deposits in the following order:

(a)     to the Bond Service Account, the amount required to make the total amount then in the Bond Service Account equal to the sum of (i) the amount of interest then or to become within the current Fiscal Year due and payable on the Bonds of each series then Outstanding and (ii) the amount of principal of the Bonds of each series then or to become within the current Fiscal Year due and payable; and

(b)     to the Redemption Account, the amount required to make the total amount deposited in the then current Fiscal Year in the Redemption Account equal to the Amortization Requirement for such Fiscal Year for the term Bonds of each series then Outstanding plus the premium, if any, payable on such Bonds if such Bonds were to be redeemed in such Fiscal Year from moneys held in the Sinking Fund.

I-5

PRIFA_STAY0001829

If an interest payment date or a principal payment date for any series of Bonds is the first day of a Fiscal Year, such payment date shall be included for purposes of the above deposits as if occurring on the last day of the preceding Fiscal Year.

If the Authority has incurred Debt Service Components, the Authority may withdraw moneys from the Puerto Rico Infrastructure Fund on a pro rata basis to make the deposits required in clauses (a) and (b) above and the deposits required to be made to the credit of comparable accounts established for the Debt Service Components. Notwithstanding the foregoing order of priorities, the Authority shall withdraw moneys from the Puerto Rico Infrastructure Fund to make any payment or deposit necessary to satisfy the then current arbitrage rebate requirements under the Code for Bonds and Debt Service Components.

After making the foregoing required applications and subject to the Authority's obligation to repay issuers of any Credit Facility any amounts owed to them, the Authority may apply any balance remaining to the credit of the Puerto Rico Infrastructure Fund for any lawful purpose.

**Withdrawals from Bond Service Account**

The Trustee shall on each date for the payment of principal of or interest on Bonds, withdraw from the Bond Service Account and (1) remit by mail (or by wire transfer if so provided by resolution of the Board) to each holder of Bonds the amounts required for paying interest upon such Bonds as such interest becomes due and (2) set aside sufficient moneys for paying the principal of Bonds as such principal becomes due.

**Withdrawals from Redemption Account**

Moneys held for the credit of the Redemption Account shall be applied to the retirement of Bonds as follows:

(a) subject to the provisions of paragraph (c) below, by purchase at a price not to exceed the principal of such Bonds plus the amount of the premium, if any, that would be payable on the next redemption date to the holders of such Bonds if such Bonds or portions of Bonds should be called for redemption on such date from the moneys in the Redemption Account. No such purchase shall be made by the Trustee within the period of forty-five (45) days immediately preceding the date on which such Bonds are subject to call for redemption in part except from moneys other than the moneys set aside or deposited for the redemption of Bonds; or

(b) subject to the provisions of paragraph (C) below, by redemption pursuant to the redemption provisions of the Trust Agreement from moneys in the Redemption Account such amount of Bonds or portions of Bonds then subject to redemption as, with the redemption premium, if any, will exhaust the moneys then in the Redemption Account as nearly as may be; provided, however, that not less than One Hundred Thousand Dollars ($100,000) principal amount of Bonds shall be called for redemption at any one time.

(c) Moneys in the Redemption Account shall be applied by the Trustee in each Fiscal Year to the retirement of Bonds of each series then Outstanding in the following order:

*first*, the term Bonds of each such series to the extent of the related Amortization Requirement, if any, for such Fiscal Year, plus the applicable premium, if any, and, if the amount available in such Fiscal Year shall not be equal thereto, then in proportion to the Amortization Requirement, if any, for such Fiscal Year for the term Bonds of each such series then Outstanding plus the applicable premium, if any;

*second*, any balance then remaining shall be applied to the purchase in accordance with paragraph (a) above of any Outstanding term Bonds whether or not they are then subject to redemption;

CONFIDENTIAL

PRIFA_STAY0001830

*third*, any balance then remaining shall be applied to the redemption of the term Bonds of each such series in proportion to the Amortization Requirement, if any, for such Fiscal Year for the term Bonds of each such series then Outstanding, plus the applicable premium, if any; and

*fourth*, after the retirement of all term Bonds, any balance still remaining shall be applied to the retirement of the serial Bonds of each series in proportion to the aggregate principal amount of the serial Bonds of each such series originally issued under the provisions of the Trust Agreement.

## Additional and Refunding Bonds

Bonds may be issued and secured by the Trust Agreement, subject to certain conditions, for any lawful purpose of the Authority, including paying any costs of issuance of such Bonds.

Among such conditions are the delivery to the Trustee of

(a)    a certificate of the Secretary of the Treasury of the Commonwealth setting forth:

(i)    the amount of the average annual Federal Excise Taxes for the two (2) full Fiscal Years preceding the date of issuance of such Bonds, adjusted to give effect to legislation enacted on or prior to the date of original issuance of such Bonds that would have changed the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years;

(ii)    the amount of the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of the Bonds then Outstanding, the Debt Service Components then Outstanding and the Bonds to be issued; and

(iii)    the percentage derived by dividing the amount in item (i) above by the amount in item (ii) above, which percentage shall not be less than 200%; and

(b)    a certificate of the Executive Director of the Authority setting forth:

(i)    the amount of the average annual Special Tax Revenues and other moneys deposited to the credit of the Puerto Rico Infrastructure Fund for the two (2) full Fiscal Years preceding the date of issuance of such Bonds, adjusted to give effect to legislation enacted on or prior to the date of original issuance of such Bonds that would have increased the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years and that required such increased amount, if received from the federal government, to be deposited to the credit of the Puerto Rico Infrastructure Fund until the Bonds theretofore issued and the Bonds to be issued are no longer Outstanding;

(ii)    the amount of the maximum aggregate Principal and Interest Requirements for any Fiscal Year on account of Bonds then Outstanding, Debt Service Components then Outstanding, and the Bonds to be issued; and

(iii)    the percentage derived by dividing the amount in item (i) above by the amount in item (ii) above, which percentage shall not be less than 100%.

The above certificates need not be delivered for the issuance of refunding Bonds if the Executive Director of the Authority certifies that (i) the Principal and Interest Requirements on account of all Bonds and Debt Service Components Outstanding for each applicable Fiscal Year following the issuance of such refunding Bonds are equal to or less than the Principal and Interest Requirements for each such Fiscal Year on account of all Bonds and Debt Service Components Outstanding immediately prior to such issuance of refunding Bonds; or (ii) the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of all Bonds and Debt Service Components

I-7

CONFIDENTIAL

Outstanding after the issuance of such refunding Bonds shall be equal to or less than the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of all Bonds and Debt Service Components Outstanding prior to the issuance of such refunding Bonds.

**Investment of Moneys**

Moneys in the Bond Service Account and the Redemption Account shall, to the extent possible, be continuously invested at the written direction of the Authority, in Government Obligations that shall mature, or that shall be subject to redemption at the option of the holder thereof, not later than the respective dates when moneys held for the credit of said accounts will be required for the purposes intended.

Any investment earnings and profit or loss realized on the sale or maturity of such Obligations shall be credited or debited to the holding fund or account. If the required deposit to any account in the Sinking Fund has been made for the current Fiscal Year, investment earnings on moneys in such account shall be deposited to any other account of the Sinking Fund for which a required deposit has not been made, in the order provided above (see "Sinking Fund and Accounts"), and thereafter shall be credited to the Puerto Rico Infrastructure Fund.

**No Impairment**

So long as any of the Bonds shall be Outstanding, none of the Pledged Revenues will be used for any purpose other than as provided in the Trust Agreement, and no contract or contracts will be entered into or any action taken by which the rights of the Trustee or of the holders to such Pledged Revenues might be impaired or diminished.

**Inclusion of Shortfall in Budget; Request for Advances**

If the amount of projected Special Tax Revenues in any fiscal year of the Commonwealth is less than the maximum amount required to be so deposited under the Act, the Authority shall request the Director of the Office of Budget and Management of the Commonwealth to include in the budget the necessary appropriations to cover such deficiency. If in any fiscal year the amount of Special Tax Revenues deposited to the credit of the Infrastructure Fund are insufficient to permit the Authority to make the required deposits into the Sinking Fund, the Authority shall immediately notify the Secretary of the Treasury of the amount of such insufficiency and shall request said Secretary to make in accordance with the Act one or more advances to the Authority aggregating the amount of such insufficiency from and to the extent of any available funds under the control of said Secretary. The Authority shall deposit all such advances as and if received to the credit of the appropriate accounts in the Sinking Fund.

**Enforcement of Remedies**

There are no events of default under the Trust Agreement and the principal of the Bonds Outstanding is not subject to acceleration. At the request of the holders of not less than twenty percent (20%) of the aggregate principal amount of Bonds then Outstanding, the Trustee shall proceed to protect and enforce its rights and the rights of the holders under the laws of the Commonwealth or under the Trust Agreement.

**Supplemental Agreements Without Bondholder's Consent**

The Authority and the Trustee may from time to time and at any time, enter into agreements supplemental to the Trust Agreement, as shall not be inconsistent with the terms and provisions thereof, for the following purposes, among others:

(a)     to cure any ambiguity or formal defect or omission in the Trust Agreement or to correct or supplement any provision contained therein that may be defective or inconsistent with any other provisions contained therein; or

(b)     to grant to or confer upon the Trustee for the benefit of the Bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the Bondholders or the Trustee; or

CONFIDENTIAL

PRIFA_STAY0001832

(c)     to add to the conditions, limitations and restrictions on the issuance of Bonds under the provisions of the Trust Agreement, other conditions, limitations and restrictions thereafter to be observed; or

(d)     to add to the covenants and agreements of the Authority in the Trust Agreement other covenants and agreements thereafter to be observed by the Authority or to surrender any right or power therein reserved to or conferred upon the Authority, or

(e)     to qualify the Bonds or any of the Bonds for registration under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, to qualify the Trust Agreement as an "indenture" under the Trust Indenture Act of 1939, as amended; or

(f)     to make such changes as may be necessary to adjust the terms of the Trust Agreement so as to facilitate the issuance of Variable Rate Bonds, Capital Appreciation Bonds, Capital Appreciation and Income Bonds, Put Bonds, Extendible Maturity Bonds, Balloon Bonds, Interim Bonds and such other Bonds as may be marketable from time to time; or

(g)     to make such changes as may evidence the right and interest of an issuer of a Credit Facility or a Liquidity Facility that secures any series of Bonds.

**Modification with Consent of Holders of Majority of Bonds**

All other modifications to the Trust Agreement may be made only upon obtaining the consent and approval of the holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding (or in case less than all of several series of Bonds then Outstanding are affected by the proposed supplemental agreement, the holders of not less than a majority in principal amount of the Bonds of each series so affected and Outstanding at the time the consent is given). Nothing contained in the Trust Agreement shall permit, or be construed as permitting, without the consent of the holders of one hundred percent (100%) of the Bonds Outstanding (a) an extension of the maturity of any Bond issued under the Trust Agreement (other than as provided by the terms of an Extendible Maturity Bond), or (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, or (c) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (d) a reduction in the aggregate principal amount of the Bonds required for consent to such supplemental agreement. In lieu of the holders of Bonds secured by a Credit Facility or a Liquidity Facility, the provider thereof shall be viewed as the holder of such Bonds for purposes of consents to modifications.

**Defeasance**

If all the Outstanding Bonds shall have been paid or deemed to have been paid as provided below and all amounts due and owing to any provider of a Credit Facility or a Liquidity Facility shall have been paid, then and in that case the right, title and interest of the Trustee under the Trust Agreement shall cease, terminate and become void, and such Bonds shall cease to be entitled to any benefit or security under the Trust Agreement. In such event, the Trustee shall transfer and assign to the Authority all property then held by the Trustee, shall execute such documents as may be reasonably required by the Authority to evidence such transfer and assignment and shall turn over to the Authority any surplus in any account in the Sinking Fund.

Any Outstanding Bond shall be deemed to have been paid within the meaning and with the effect expressed in the Trust Agreement when the whole amount of the principal of and interest on such Bond shall have been paid or when (a) there shall have been deposited with the Trustee or another fiduciary institution acting as escrow agent for the holder of such Bond either moneys in an amount which shall be sufficient, or sufficient Government Obligations or obligations issued by the Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Farm Credit System, Federal Home Loan Banks or Student Loan Marketing Association, to pay when due the principal of and premium, if any, and interest due and to become due on such Bond on or prior to the redemption date or maturity date thereof, as the case may be, and (b) in the event such Bond does not mature and is not to be redeemed within the next succeeding sixty (60) days, the Authority shall have given the Trustee irrevocable instructions to give, as soon as

CONFIDENTIAL

practicable, a notice to the holder of such Bond by first-class mail, postage prepaid, stating that the deposit of moneys or sufficient Government Obligations or other obligations mentioned in clause (a) of this paragraph has been made for the holder of such Bond and that such Bond is deemed to have been paid in accordance with the Trust Agreement and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal of and premium, if any, and interest on such Bond.

CONFIDENTIAL

PRIFA_STAY0001834

**APPENDIX II**

# PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
(A Component Unit of the Commonwealth of Puerto Rico)

Basic Financial Statements, Required Supplementary Information,
and Supplementary Information

June 30, 2004

(With Independent Auditors' Report Thereon)

CONFIDENTIAL

## PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
(A Component Unit of the Commonwealth of Puerto Rico)

### Table of Contents

| | Page |
|---|---|
| Independent Auditors' Report | 1 |
| Management's Discussion and Analysis | 3 |
| Basic Financial Statements: | |
| Statement of Net Assets – Governmental Activities | 10 |
| Statement of Activities | 11 |
| Balance Sheet – Governmental Funds | 12 |
| Statement of Revenues, Expenditures, and Changes in Fund Balances – Governmental Funds | 13 |
| Reconciliation of the Statement of Revenues, Expenditures and Changes in Fund Balances of Governmental Funds to the Statement of Activities and Governmental Funds | 14 |
| Notes to Basic Financial Statements | 15 |
| **Schedule** | |
| Schedule of Special Obligation Bonds 2000 Series A and B | 30 |

CONFIDENTIAL

**Independent Auditors' Report**

The Board of Directors
Puerto Rico Infrastructure Financing Authority:

We have audited the accompanying financial statements of the governmental activities and each major fund of Puerto Rico Infrastructure Financing Authority (the Authority) (a component unit of the Commonwealth of Puerto Rico) as of and for the year ended June 30, 2004, which collectively comprise the Authority's basic financial statements as listed in the table of contents. These financial statements are the responsibility of the Authority's management. Our responsibility is to express opinions on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinions.

In our opinion, the financial statements referred to above present fairly, in all material respects, the respective financial position of the governmental activities and each major fund of Puerto Rico Infrastructure Financing Authority as of June 30, 2004, and the respective changes in financial position thereof for the year then ended in conformity with accounting principles generally accepted in the United States of America.

The management's discussion and analysis on pages 3 through 9 is not a required part of the basic financial statements but is supplementary information required by accounting principles generally accepted in the United States of America. We have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the required supplementary information. However, we did not audit the information and express no opinion on it.

CONFIDENTIAL

Our audit was conducted for the purpose of forming opinions on the financial statements that collectively comprise the Authority's basic financial statements. The supplementary information included in this Schedule of Special Obligation Bonds 2000 Series A and B is presented for purposes of additional analysis and is not a required part of the basic financial statements. Such information has been subjected to the auditing procedures applied in the audit of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

*KPMG LLP*

February 11, 2005

Stamp No. 1988685 of the Puerto Rico
Society of Certified Public Accountants
was affixed to the record copy of this report.

CONFIDENTIAL

PRIFA_STAY0001838

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

June 30, 2004

This Management's Discussion and Analysis (MD&A) of Puerto Rico Infrastructure Financing Authority (the Authority) is designed to (a) assist the reader in focusing on significant financial issues, (b) provide an overview of the Authority's financial activity, (c) identify changes in the Authority's financial position, and (d) identify individual issues or concerns.

Since the MD&A is designed to focus on the current year's activities, resulting changes, and currently known facts, please read it in conjunction with the Authority's financial statements, which follow this section.

**Financial Highlights**

- The Authority's net assets decreased by $255 million or 34% to $504 million as of June 30, 2004.

- The Authority's net change from governmental activities decreased by $437 million, from an increase of $182 million in 2003 to a decrease of $(255) million in 2004, of which $340 million is related to the net decrease in fair value of investments in the Permanent Fund, from a $183 million increase in 2003 to $(157) million decrease in 2004.

- The General Fund (the primary operating fund) and the Capital Projects Fund reflected on a modified-accrual basis, report an increase in fund balance of $20 million and a decrease of $192 million, respectively.

**Overview of the Financial Statements**

The financial statements consist of two parts—management's discussion and analysis (this section) and the basic financial statements, including the notes to the basic financial statements. The basic financial statements include two kinds of statements that present different views of the Authority:

- The first two statements are government-wide financial statements that provide information about the Authority's overall financial position and results. These statements, which are presented on an accrual basis, consist of the statement of net assets and the statement of activities.

- The remaining statements are fund financial statements of the Authority's four major governmental funds (general, capital projects, debt service, and permanent), for which activities are funded primarily from Commonwealth of Puerto Rico appropriations and investment income for which the Authority follows a modified-accrual basis of accounting.

- The basic financial statements also include a section of notes to basic financial statements that explains some of the information in the government-wide and fund financial statements and provides more detailed data.

- The notes to the basic financial statements are followed by a supplementary Schedule of the Special Obligation Bonds 2000 Series A and B.

The remainder of this overview section of the management's discussion and analysis explains the structure and contents of each of these statements.

The government-wide financial statements report information about the Authority as a whole using accounting methods similar to those used by private sector companies. The statement of net assets includes all of the

3                                                                                    (Continued)

CONFIDENTIAL

PRIFA_STAY0001839

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

June 30, 2004

Authority's assets and liabilities. All the current year's revenues and expenses are accounted for in the statement of activities regardless of when cash is received or paid.

The fund financial statements provide more detailed information about the Authority's major funds and not the Authority as a whole. All the Authority's funds are governmental funds. These funds' statements focus on how cash and other financial assets flowing into the funds have been used.

**Financial Analysis of the Authority as a Whole (Government-wide Financial Statements Analysis)**

The government-wide financial statements were designed so that the user could determine if the Authority is in a better or worse financial condition from the prior year.

The following is a condensed summary of net assets for the Authority compared to the prior year:

| | June 30 | | Increase |
| --- | --- | --- | --- |
| | **2004** | **2003** | **(decrease)** |
| Current and other assets | $ 1,770,213,347 | 2,128,266,816 | (358,053,469) |
| Capital assets | 837,486,012 | 774,278,462 | 63,207,550 |
| Total assets | 2,607,699,359 | 2,902,545,278 | (294,845,919) |
| Other liabilities | 145,861,121 | 157,880,222 | (12,019,101) |
| Noncurrent liabilities | 1,957,974,402 | 1,985,317,765 | (27,343,363) |
| Total liabilities | 2,103,835,523 | 2,143,197,987 | (39,362,464) |
| Net assets: | | | |
| Invested in capital assets, net of debt | 115,268,280 | 214,553,334 | (99,285,054) |
| Restricted | 1,289,418,616 | 1,457,344,891 | (167,926,275) |
| Unrestricted | (900,823,060) | (912,550,934) | 11,727,874 |
| Total net assets | $ 503,863,836 | 759,347,291 | (255,483,455) |

As can be seen from the table above, the Authority's total net assets as of June 30, 2004 decreased by $255 million or 34% when compared to total net assets as of June 30, 2003. The assets decreased by $295 million or 10.2% compared to the prior year. This decrease resulted mostly from the net decrease in fair value of investments of $157 million and capital project transfers to the Puerto Rico Aqueduct and Sewer Authority (PRASA), another component unit of the Commonwealth of Puerto Rico (the Commonwealth), of $97 million.

4

(Continued)

PRIFA_STAY0001840

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

June 30, 2004

For the year ended June 30, 2004, the net increase of $63,207,550 in capital assets is mostly affected by a net change in construction in progress of $63,312,412, which was the result of the following construction works:

| | | |
|---|---|---:|
| Port of the Americas | $ | 5,412,720 |
| Education | | 238,037 |
| Water and Sewer Projects | | 160,170,262 |
| Less: | | |
| Projects transferred to PRASA | | (96,932,515) |
| Abandoned projects | | (5,576,092) |
| Change in construction work in progress | $ | 63,312,412 |

The total liabilities of the Authority decreased by $39 million or 2%. Such net decrease is mainly related to an increase in accounts payable and accrued expenses of $14 million, a decrease in due to PRASA of $22 million, and a decrease in long-term liabilities of $27 million, which is mainly related to the payment of maturing bonds and notes of $26 million.

The following schedule compares revenues and expenses of the Authority for the years ended June 30, 2004 and 2003.

| | | Year ended June 30 | | Increase |
|---|---|---:|---:|---:|
| | | **2004** | **2003** | **(decrease)** |
| Revenues: | | | | |
| Program revenues: | | | | |
| Operating grants and contributions, and earnings (loss) on investments | $ | (887,519) | 363,929,203 | (364,816,722) |
| General revenue: | | | | |
| Contribution not restricted to specific programs | | 4,000,000 | 4,000,000 | — |
| Investment income | | 10,202 | 20,332 | (10,130) |
| Total revenue | | 3,122,683 | 367,949,535 | (364,826,852) |
| Expenses: | | | | |
| Program activities: | | | | |
| General government | | 1,637,599 | 2,769,226 | (1,131,627) |
| Aqueduct and sewer | | 254,417,272 | 177,498,742 | 76,918,530 |
| Compliance, Section 301(h) | | 781,570 | 4,753,260 | (3,971,690) |
| Revolving fund | | 748,836 | 1,038,711 | (289,875) |
| Other | | 1,020,861 | — | 1,020,861 |
| Total expenses | | 258,606,138 | 186,059,939 | 72,546,199 |
| Change in net assets | $ | (255,483,455) | 181,889,596 | (437,373,051) |

5                                                                 (Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

June 30, 2004

Operating grants and contributions and earnings (loss) on investments from governmental activities decreased by $365 million resulting from a net decrease of $340 million in the net change in fair value of investments, a decrease of $12 million in interest income from investments and interest-bearing demand deposits, a decrease of $18 million in contributions from PRASA, and an increase of $6.5 million in contributions from the Commonwealth.

### Expenses

Net increase in expenses of $73 million includes a reduction of $1 million in the general government program mostly due to the termination of PRASA's contract administration, now becoming the responsibility of PRASA's executive office, and the termination of the tasks corresponding to the evaluation committee for the new PRASA administration contract. The increase of $77 million in the aqueduct and sewer program is mostly related to the transfers of water and sewer projects and contributions made to PRASA, as well as an increase in contributions made to the "Agua Para Todos" program. The reduction of $4 million in the environmental program [Compliance, Section 301 (h)] is due to the fact that PRASA absorbed most of these expenditures during fiscal year 2004.

During fiscal year 2003-2004, the Authority signed various assistance programs with other governmental entities including the Department of Transportation and Public Works, Department of Natural Resources, Puerto Rico Highway Authority, and Department of Education, among others. The Authority made contributions of $1,020,861 for the year ended June 30, 2004.

### Governmental Funds Financial Analysis

Governmental funds are comprised of the General, Capital Projects, Debt Service, and Permanent Funds. Governmental funds use the current financial resources measurement focus that concentrates on near-term inflows and outflows. The General Fund is the general operating fund that is used to account for all financial resources, except those required to be accounted for in another fund. The following are facts and changes from the prior year:

### (a) General Fund

The General Fund expenditures decreased by $6 million from 2003 resulting from the termination of PRASA's contract administration and reduction in Section 301(h) expenses (environmental) and State Revolving Fund expenses due to the fact that PRASA and the Department of Health, respectively, absorbed most of these expenses during 2004. Also, a contribution from PRASA of $18 million was recorded as revenue in 2004 (presented as deferred revenue in 2003).

### (b) Capital Projects Fund

The Capital Projects Fund expenditures increased by $32 million mostly from a result of an increase of $11 million in capital outlays for water and sewer projects, an increase of $1 million in capital outlays for the Port of the Americas, and an increase of $20 million in contributions made to PRASA including the "Agua Para Todos" program. Also, revenue decreased by $6 million as a result of a $6 million increase in contributions from the Commonwealth and a $12 million decrease in investment income.

(Continued)

CONFIDENTIAL

PRIFA_STAY0001842

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

June 30, 2004

*(c)*   *Debt Service Fund*

No major changes were observed in the Debt Service Fund during the fiscal year ended June 30, 2004.

*(d)*   *Permanent Fund*

The Permanent Fund earnings on investments decreased by $340 million due to a decrease in the net change in fair value of investments.

**Capital Assets and Debt Administration**

*Capital Assets*

Nondepreciable capital assets include construction work in process. Depreciable assets include furniture and equipment, vehicles, and leasehold improvements.

The following is a schedule of the Authority's capital assets as of June 30, 2004 and 2003:

|  | June 30 | | Increase (decrease) |
|---|---|---|---|
|  | 2004 | 2003 | |
| Construction in progress | $   837,296,416 | 773,984,004 | 63,312,412 |
| Vehicles, furniture, and equipment | 667,948 | 597,401 | 70,547 |
| Leasehold improvements | 620,847 | 620,847 | — |
| Total assets | 838,585,211 | 775,202,252 | 63,382,959 |
| Accumulated depreciation | (1,099,199) | (923,790) | (175,409) |
| Total | $   837,486,012 | 774,278,462 | 63,207,550 |

The Authority was created, among other things, to provide financial, administrative, and other assistance to municipalities, political subdivisions, public corporations, and instrumentalities of the Commonwealth to enable them to fulfill their public purpose of providing, preserving, operating, maintaining, repairing, replacing, and improving portions of the infrastructure. Infrastructure includes, among other things, water supply systems, and waste water treatment and disposal systems.

(Continued)

CONFIDENTIAL

PRIFA STAY0001843

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

June 30, 2004

This year's major additions related to construction projects are as follows:

| Description | Location | Additions |
|---|---|---|
| Regional aqueduct | Fajardo | $ 30,136,676 |
| Regional aqueduct | North East | 18,823,557 |
| Cerrillos dam | Ponce | 11,621,812 |
| Transmission System | Juncos | 10,851,388 |
| Pump station and transmission line | Carolina | 10,599,084 |
| Regional aqueduct | Villalba | 8,643,886 |
| Interconnections | North Coast | 7,490,012 |
| Regional aqueduct | Fajardo | 7,431,275 |
| Rehabilitation of Incinerator (Puerto Nuevo) | San Juan | 5,793,594 |
| El Paraiso water distribution system | Ponce | 3,711,318 |
| Distribution System – Miramar | San Juan | 3,483,760 |
| Regional Sewer | Dorado | 3,426,472 |
| Rehabilitation Water Treatment Plant | Juncos | 2,547,540 |
| Sabana Eneas Sewer System | San Germán | 1,755,192 |
| | | $ 126,315,566 |

*Debt Outstanding*

At June 30, 2004, the Authority had approximately $2 billion in debt (bonds and notes) outstanding. The following is a schedule of outstanding bonds and notes as of June 30, 2004 and 2003:

| | June 30 | | Increase |
| | 2004 | 2003 | (decrease) |
|---|---|---|---|
| Bonds payable | $ 1,994,355,000 | 2,018,935,000 | (24,580,000) |
| Less bond discount and premium | 33,677,211 | 34,043,650 | (366,439) |
| Total bonds payable | 1,960,677,789 | 1,984,891,350 | (24,213,561) |
| Notes payable | 19,298,697 | 20,130,816 | (832,119) |
| Total bonds and notes payable | $ 1,979,976,486 | 2,005,022,166 | (25,045,680) |

8

(Continued)

CONFIDENTIAL

PRIFA_STAY0001844

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Basic Financial Statements, Required Supplementary Information,
and Supplementary Information

June 30, 2004

The following is a schedule of ratings for obligation debt:

|  | Moody's | Standard & Poor's |
|---|---|---|
| Special Tax Revenue Bonds, Series 1988A | Baa1 | BBB+ |
| Special Tax Revenue Bonds, Series 1997A | Baa1 | BBB+ |
| Special Tax Revenue Bonds, Series 1997B | Baa1 | BBB+ |
| Special Tax Revenue Bonds, Series 1998A | Baa1 | BBB+ |
| Special Obligation Bonds Series 2000A | Aaa | AAA |
| Special Obligation Bonds Series 2000B | Aaa | AAA |

Additional information on the Authority's long-term obligations can be found in note 6 to the basic financial statements.

**Financial Contact**

The Authority's financial statements are designed to present users with a general overview of the Authority's finances and to demonstrate accountability. If you have questions about the report or need additional financial information, contact Puerto Rico Infrastructure Financing Authority, Capital Center (Tower 2), 235 Ave. Arterial Hostos, Suite 1601, San Juan, PR 00918-1433.

CONFIDENTIAL

PRIFA_STAY0001845

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Statement of Net Assets – Governmental Activities

June 30, 2004

| | |
|---|---:|
| **Assets:** | |
| Cash and cash equivalents and interest-bearing demand deposits | $   133,244,048 |
| Investments and investment contracts | 324,958,500 |
| Accrued interest receivable, including $17,229,190 on nonexpendable restricted assets | 20,016,923 |
| Due from Puerto Rico Aqueduct and Sewer Authority | 370,492 |
| Prepaid expenses | 1,419,035 |
| Bond issue costs | 19,276,770 |
| Other assets | 650,572 |
| Assets held in trust | 1,270,277,007 |
| Capital assets: | |
| Nondepreciable – construction in progress | 837,296,416 |
| Depreciable, net | 189,596 |
| Total assets | 2,607,699,359 |
| **Liabilities:** | |
| Accounts payable and accrued expenses | 77,877,774 |
| Deferred revenue | 920,000 |
| Accrued interest payable | 38,799,697 |
| Long-term liabilities: | |
| Due in one year | 28,263,650 |
| Due in more than one year | 1,957,974,402 |
| Total liabilities | 2,103,835,523 |
| **Net assets:** | |
| Invested in depreciable capital assets, net of related debt | 115,268,280 |
| Restricted for: | |
| Capital projects | — |
| Debt service | 19,961,572 |
| Trust – nonexpendable | 1,287,506,196 |
| Other purposes | 13,181,416 |
| Unrestricted | (932,053,628) |
| Total net assets | $   503,863,836 |

See accompanying notes to basic financial statements.

CONFIDENTIAL

PRIFA_STAY0001846

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Statement of Activities

Year ended June 30, 2004

| Functions/programs: | | Expenses | Program revenues | | Net (expenses) revenues and change in net assets governmental activities |
|---|---|---|---|---|---|
| | | | Operating grants and contributions | Net loss on investments | |
| Governmental activities: | | | | | |
| General government | $ | 1,637,599 | — | — | (1,637,599) |
| Aqueduct and sewer (including interest on long-term debt of $103,908,748) | | 254,417,272 | 72,558,319 | (77,201,992) | (259,060,945) |
| Port | | — | 3,700,000 | — | 3,700,000 |
| Compliance, Section 301(h) | | 781,570 | — | — | (781,570) |
| Revolving Fund | | 748,836 | — | 56,154 | (692,682) |
| Other | | 1,020,861 | — | — | (1,020,861) |
| Total government activities | $ | 258,606,138 | 76,258,319 | (77,145,838) | (259,493,657) |

| General revenues: | | |
|---|---|---|
| Contribution not restricted to specific programs | $ | 4,000,000 |
| Investment income | | 10,202 |
| Total general revenues | | 4,010,202 |
| Change in net assets | | (255,483,455) |
| Net assets, beginning of year | | 759,347,291 |
| Net assets, end of year | $ | 503,863,836 |

See accompanying notes to basic financial statements.

CONFIDENTIAL

PRIFA STAY0001847

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Balance Sheet – Governmental Funds

June 30, 2004

| Assets | | General | Capital projects | Debt service | Permanent | Total governmental funds |
|---|---|---|---|---|---|---|
| Cash and cash equivalents and interest-bearing demand deposits | $ | 13,855,857 | 60,652,188 | 58,736,003 | — | 133,244,048 |
| Investments and investment contracts | | — | 324,958,500 | — | 1,270,277,007 | 1,595,235,507 |
| Interest receivable | | 4,213 | 2,758,255 | 25,265 | 17,229,190 | 20,016,923 |
| Due from Puerto Rico Aqueduct and Sewer Authority | | 370,492 | — | | | 370,492 |
| Other assets | | 650,572 | — | — | — | 650,572 |
| Total assets | $ | 14,881,134 | 388,368,943 | 58,761,268 | 1,287,506,197 | 1,749,517,542 |
| **Liabilities and Fund Balances** | | | | | | |
| Liabilities: | | | | | | |
| Accounts payable and accrued expenses | $ | 2,081,829 | 75,795,945 | — | — | 77,877,774 |
| Deferred revenue | | 920,000 | — | — | — | 920,000 |
| Total liabilities | | 3,001,829 | 75,795,945 | — | — | 78,797,774 |
| Fund balances: | | | | | | |
| Reserved for: | | | | | | |
| Capital projects | | — | 312,572,998 | — | — | 312,572,998 |
| Debt service | | — | — | 58,761,268 | — | 58,761,268 |
| Trust | | — | — | — | 1,287,506,197 | 1,287,506,197 |
| Other purposes | | 13,181,416 | — | — | — | 13,181,416 |
| Unreserved – general fund | | (1,302,111) | — | — | — | (1,302,111) |
| Total fund balances | | 11,879,305 | 312,572,998 | 58,761,268 | 1,287,506,197 | 1,670,719,768 |
| Total liabilities and fund balances | $ | 14,881,134 | 388,368,943 | 58,761,268 | 1,287,506,197 | |

Amounts reported for governmental activities in the statement of net assets are different because:

| | |
|---|---|
| Capital assets used in governmental activities are not financial resources and, therefore, are not reported in the funds | 837,486,012 |
| Prepaids and bonds issuance costs are not available to pay for current period expenditures and, therefore, are no deferred in the funds | 20,695,805 |
| Liabilities, including bonds payable and notes payable, accrued interest payable, and other liabilities are not due and payable in the current period and, therefore, are not reported in the funds | (2,025,037,749) |
| Net assets of governmental activities | $ 503,863,836 |

See accompanying notes to basic financial statements.

CONFIDENTIAL

PRIFA_STAY0001848

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Statement of Revenues, Expenditures, and Changes in Fund Balances – Governmental Funds

Year ended June 30, 2004

| | General | Capital projects | Debt service | Permanent | Total governmental funds |
|---|---:|---:|---:|---:|---:|
| **Revenues:** | | | | | |
| Interest and investment income: | | | | | |
| Interest-bearing demand deposits | $ 66,355 | 295,329 | — | — | 361,684 |
| Investments and investment contracts, net | — | 10,528,125 | 226,910 | 68,966,012 | 79,721,047 |
| Net decrease in fair value of investments | — | — | — | (157,202,624) | (157,202,624) |
| Contribution from the Commonwealth of Puerto Rico | 70,000,000 | 10,258,319 | — | — | 80,258,319 |
| Contribution from the Puerto Rico Aqueduct and Sewer Authority | 18,000,000 | — | — | — | 18,000,000 |
| Total revenues | 88,066,355 | 21,081,773 | 226,910 | (88,236,612) | 21,138,426 |
| **Expenditures:** | | | | | |
| Current: | | | | | |
| General government | 302,924 | 928,579 | — | — | 1,231,503 |
| Aqueduct and sewer | 94,871 | 48,063,364 | — | — | 48,158,235 |
| Compliance, Section 301(h) | 781,570 | — | — | — | 781,570 |
| State Revolving Funds | 748,836 | — | — | — | 748,836 |
| Buildings | — | 43,304 | — | — | 43,304 |
| Arts and entertainment | — | 639,151 | — | — | 639,151 |
| Transportation | — | 338,406 | — | — | 338,406 |
| Capital outlays: | | | | | |
| Aqueduct and sewer | — | 160,170,262 | — | — | 160,170,262 |
| Ports | — | 5,412,720 | — | — | 5,412,720 |
| Education | — | 238,037 | — | — | 238,037 |
| Other | — | 70,547 | — | — | 70,547 |
| Debt service: | | | | | |
| Payment of maturing bonds | — | — | 24,580,000 | — | 24,580,000 |
| Repayment of notes payable to Government Development Bank for Puerto Rico | — | — | 1,152,209 | — | 1,152,209 |
| Interest | — | — | 103,162,480 | — | 103,162,480 |
| Debt issue costs | — | — | 320,090 | — | 320,090 |
| Total expenditures | 1,928,201 | 215,904,370 | 129,214,779 | — | 347,047,350 |
| Excess (deficiency) of revenues over (under) expenditures | 86,138,154 | (194,822,597) | (128,987,869) | (88,236,612) | (325,908,924) |
| **Other financing sources (uses):** | | | | | |
| Refunding bond issued | — | — | 4,678,509 | — | 4,678,509 |
| Payment to refunding bond escrow agent | — | — | (4,358,419) | — | (4,358,419) |
| Transfers in | 2,421,626 | 5,030,336 | 132,670,346 | — | 140,122,308 |
| Transfers out | (68,783,923) | (2,421,626) | — | (68,916,759) | (140,122,308) |
| Total other financing sources (uses) | (66,362,297) | 2,608,710 | 132,990,436 | (68,916,759) | 320,090 |
| Net changes in fund balances | 19,775,857 | (192,213,887) | 4,002,567 | (157,153,371) | (325,588,834) |
| Fund balances, beginning of year | (7,896,552) | 504,786,885 | 54,758,701 | 1,444,659,568 | 1,996,308,602 |
| Fund balances, end of year | $ 11,879,305 | 312,572,998 | 58,761,268 | 1,287,506,197 | 1,670,719,768 |

See accompanying notes to basic financial statements.

CONFIDENTIAL

PRIFA_STAY0001849

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Reconciliation of the Statement of Revenues, Expenditures, and Changes in Fund Balances of
Governmental Funds to the Statement of Activities – Governmental Funds

Year ended June 30, 2004

Amounts reported for governmental activities in the statement of activities are different because:

| | |
|---|---:|
| Net changes in fund balances – total governmental funds | $ (325,588,834) |
| Governmental funds report capital outlays as expenditures. However, in statement of activities the cost of those assets is allocated over their estimated useful lives and reported as depreciation expense. This is the amount by which capital outlays exceeded transfers and depreciation in the current period | 63,207,550 |
| The issuance of long-term debt provides current financial resources to governmental funds, while the repayment of the principal of long-term debt consumes the current financial resources of governmental funds. Neither transaction, however, has any effect on net assets. Also governmental funds report the effect of issuance costs, premiums, discounts, and similar items when debt is first issued, whereas these amounts are deferred and amortized in the statement of activities. This amount is the net effect of these differences in the treatment of long-term debt and related items | 23,968,234 |
| Deferred revenue recorded in 2003 and revised against revenues in the governmental funds in 2004; however, reported as revenues in the 2003 statement of activities | (18,000,000) |
| Some expenses reported in the statement of activities do not require the use of current financial resources and, therefore, are not reported as expenditures in governmental funds | 929,595 |
| Changes in net assets of governmental activities | $ (255,483,455) |

See accompanying notes to basic financial statements.

14

CONFIDENTIAL

PRIFA_STAY0001850

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

**(1)    Summary of Significant Accounting Policies**

**(a)    *Reporting Entity***

Puerto Rico Infrastructure Financing Authority (the Authority) is a component unit of the Commonwealth of Puerto Rico (the Commonwealth) created by Act No. 44 (the Act) of the Legislature of the Commonwealth on June 21, 1988. The Authority was organized to provide financial, administrative, and other types of assistance to public corporations of the Commonwealth that develop and operate infrastructure facilities. The Authority is exempt from taxation in Puerto Rico.

The accompanying basic financial statements present the combined financial position and results of operations of the entity as a whole, by major fund, that are governed by the Authority.

**(b)    *Government-Wide and Fund Financial Statements***

**_Government-Wide Financial Statements_** – The statement of net assets and the statement of activities report information on all nonfiduciary activities of the Authority. The Authority has only governmental activities. The effect of interfund balances has been removed from the statement of net assets. Governmental activities generally are financed through intergovernmental revenues and other nonexchange revenues. Following is a description of the Authority's government-wide financial statements:

The statement of net assets presents the Authority's assets and liabilities, with the difference reported as net assets. Net assets are reported in three categories:

- Invested in capital assets consists of capital assets, net of accumulated depreciation and reduced by outstanding balances for bonds, notes, and other debt, if any, that are attributed to the acquisition, construction, or improvement of those assets.

- Restricted net assets result when constraints placed on net assets use are either externally imposed by creditors, grantors, contributors, and the like, or imposed by law through constitutional provisions or enabling legislation.

- Unrestricted net assets consist of net assets which do not meet the definition of the two preceding categories. Unrestricted net assets often are designated to indicate that management does not consider them to be available for general operations. Unrestricted net assets often have constraints on resources which are imposed by management, but can be removed or modified.

The statement of activities demonstrates the degree to which the direct expenses of a given function or segment is offset by program revenues. Direct expenses are those that are clearly identifiable within a specific function. Program revenues include: (1) earnings (loss) on investments and changes in the fair value of investments and (2) grants and contributions that are restricted to meeting the operational or capital requirements of a particular function. Other items not meeting the definition of program revenue are instead reported as general revenue.

(Continued)

CONFIDENTIAL                                                    PRIFA_STAY0001851

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

***Funds Financial Statements*** – Separate financial statements are provided for governmental funds. Major individual governmental funds are reported as separate columns in the fund financial statements. All funds of the Authority are major funds.

*(c)*   ***Measurement Focus, Basis of Accounting, and Financial Statements Presentation***

***Government-Wide Financial Statements*** – The government-wide financial statements are reported using the economic resources measurement focus and the accrual basis of accounting. Revenues are recorded when earned and expenses are recorded when a liability is incurred, regardless of the timing of related cash flows. Grants and similar items are recognized as revenue as soon as all eligibility requirements have been met.

***Governmental Funds' Financial Statements*** – The governmental funds' financial statements are reported using the current financial resources measurement focus and the modified-accrual basis of accounting. Revenues are recognized as soon as it is both measurable and available. Revenues are considered to be available when it is collectible within the current period or soon enough thereafter to pay liabilities of the current period. For this purpose, the Authority considers revenues to be available if they are collected within 60 days at the end of the current fiscal year-end. Other revenues are considered to be measurable and available only when cash is received by the Authority. Expenditures generally are recorded when a liability is incurred, as under accrual accounting. Modifications to the accrual basis of accounting include:

- Interest on general long-term obligations is recognized when paid.
- Debt service expenditures and claims and judgments are recorded only when payment is due.

*(d)*   ***Fund Accounting***

The financial activities of the Authority are recorded in individual funds, each of which is deemed to be a separate accounting entity. Fund accounting is designed to demonstrate legal compliance and to aid financial management by segregating transactions related to certain government functions or activities. A fund is a separate accounting entity with a self-balancing set of accounts. The financial activities of the Authority that are reported in the accompanying basic financial statements have been classified into the following major governmental funds:

**(i)**   **General Fund**

The General Fund is the general operating fund of the Authority that is used to account for all financial resources, except those required to be accounted for in another fund.

**(ii)**   **Capital Projects**

The Capital Projects Fund accounts for resources used or contributed for the acquisition or construction of capital assets and capital improvements.

16                                                                   (Continued)

PRIFA_STAY0001852

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

**(iii)   Debt Service**

The Debt Service Fund accounts for the accumulation of resources for payment of interest and principal on long-term obligations.

**(iv)   Permanent Fund**

The Permanent Fund is used to account for assets held by the Authority in which the trust principal (corpus) may not be expended but must be kept intact, that is, the capital must be maintained.

When both restricted and unrestricted resources are available for use, it is the Authority's policy to use restricted resources first, and then unrestricted resources as they are needed.

**(e)   Budgetary Accounting**

The Authority is not required by the Act to submit a budget for approval by the Legislature of the Commonwealth; consequently, no formal budgetary accounting procedures are followed.

**(f)   Investments and Investment Contracts**

Investments and investment contracts are carried at fair value, except for money market investments and participating investment contracts with a remaining maturity at the time of purchase of one year or less and nonparticipating investment contracts, which are carried at cost. Fair value is determined based on quoted market prices whenever available. For securities without quoted price, fair value represents quoted market prices for comparable instruments. Realized gains and losses from the sale of investments and unrealized changes in fair value are recorded as investment income.

**(g)   Prepaid Expenses**

Certain payments to vendors represent costs applicable to future accounting periods and are recorded as prepaid items in the government-wide financial statements.

(Continued)

CONFIDENTIAL

PRIFA_STAY0001853

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

**(h)    Capital Assets**

Capital assets include construction in progress, furniture and equipment, vehicles, and leasehold improvements. Capital assets are reported in the government-wide financial statements. The threshold for capitalizing furniture and equipment, vehicles, and leasehold improvements is $750. Major capital outlays for capital assets and improvements are capitalized as projects are constructed. Capital assets are recorded at cost or estimated historical cost. Contributed assets are recorded at estimated fair market value at the time received. Depreciation is calculated using the straight-line method over the estimated useful lives of the related assets. The ranges of the useful lives are as follows:

| Assets | Years |
|---|---|
| Furniture and equipment | 3-5 |
| Vehicles | 3-5 |
| Leasehold improvements | Lesser of 5 years or lease term |

The costs of normal maintenance and repairs that do not add value to the asset or materially extend assets lives are not capitalized.

**(i)    Compensated Absences**

The Authority maintains a policy that permits employees to accumulate earned but unused vacation and sick pay benefits that will be paid to employees upon separation from Authority service if certain criteria are met. These benefits plus their related tax and retirement costs are classified as compensated absences. The Authority policy permits employees to either bank unused sick pay benefits or receive a cash buyout on an annual basis. Both the current and long-term portion of compensated absences are accrued and reported in the government-wide financial statements.

A liability for these amounts is reported in the governmental funds only if these have matured, for example as a result of employee resignations and retirements.

**(j)    Deferred Bond Issue Costs and Bond Discounts**

Discounts and issue costs related to long-term debt are amortized over the life of the debt principally by the effective-interest method. Notes payable, general obligation bonds payable, and revenue bonds payable in the government-wide financial statements are shown net of unamortized premium or discount. Bond issue costs are reported as deferred charges in the government-wide financial statements. Discount and issue costs related to general long-term debt in the governmental fund financial statements are recorded as expenditures when paid and, therefore, are not accounted for in subsequent periods. The net proceeds from bond issuances are presented as other financing sources in the governmental fund financial statements.

18                                                                                      (Continued)

CONFIDENTIAL                                                                           PRIFA_STAY0001854

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

**(k)     Interfund Transactions**

The Authority has operating transfers which are legally required transfers that are reported when incurred as "Transfer-in" by the recipient fund and as "Transfer-out" by the disbursing fund. Interfund receivables and payables have been eliminated from the statement of net assets.

**(l)     Reservations of Fund Balance**

Reservations of fund balance represent portions of fund balances that are limited for specific purpose, not appropriable, or not available for expenditure. The Authority has the following reservations of fund balance:

- **Capital Projects** – Represents net assets available to finance future capital outlays.

- **Debt Service** – Represents net assets available to finance future debt service payments.

- **Trust – Nonexpendable** – Represents net assets held in trust in which the principal (corpus) may not be expended. Investment earnings from the net assets held in Trust have been pledged for the debt service of long-term debt.

- **Other Purposes** – Represent cash reserved for future contributions to the Revolving Loan Funds (note 8).

**(m)     Use of Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenditures during the reporting period. Actual results could differ from those estimates.

**(n)     Risk Management**

The Authority is responsible for assuring that the Authority's property is properly insured. Annually, the Authority compiles the information of all property owned and its respective market value and purchases the property and casualty insurance policies for the Authority. Insurance coverage for fiscal year 2004 remained similar to those of prior years. For the last three years, insurance settlements have not exceeded the amount of coverage.

**(o)     Deferred Revenue**

Deferred revenue arises when potential revenue does not meet the available criterion for recognition in the current period. Available is defined as due at June 30 and collected within 60 days thereafter to pay obligations due at June 30. Deferred revenue at the government-wide level arises only when the Authority receives resources before it has a legal claim to them.

19                                                      (Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

### (2) Cash and Cash Equivalents

The Authority's cash and cash equivalents are considered to be cash on hand, demand deposits, and short-term investments with original maturities of three months or less from the date of acquisition. The table presented below discloses the level of custody credit risk assumed by the Authority based upon how its deposits were insured or secured with collateral at June 30, 2004:

- **Category 1** – Insured or collateralized with securities held by the Authority or by its agent in the Authority's name.

- **Category 2** – Collateralized with securities held by the pledging financing institution's trust department or its agent in the Authority's name.

- **Category 3** – Uninsured and uncollateralized.

The following table presents the reported amount and depository bank balances of deposits with financial institutions at June 30, 2004:

|  | Category | | | Bank balance | Carrying amount |
|---|---|---|---|---|---|
|  | 1 | 2 | 3 |  |  |
| Deposits with Government Development Bank for Puerto Rico (GDB) | $ — | — | 80,832,805 | 80,832,805 | 74,508,045 |
| Deposits with commercial banks | 58,736,003 | — | — | 58,736,003 | 58,736,003 |
| Total cash | $ 58,736,003 | — | 80,832,805 | 139,568,808 | 133,244,048 |

The Commonwealth requires that public funds deposited in commercial banks operating in Puerto Rico must be fully collateralized for the amount deposited in excess of federal depository insurance. All securities pledged as collateral are held by the Secretary of the Treasury of the Commonwealth. GDB (a component unit of the Commonwealth) is exempt from the collateral requirements.

### (3) Investments and Investment Contracts

In accordance with investment guidelines promulgated by GDB for agencies and public corporations of the Commonwealth under the authority provided by Act No. 113 of August 3, 1995 and Executive Order 1995-50A (the investment guidelines), the Authority is authorized to purchase or enter into the following investment instruments:

- U.S. government and agencies obligations

- Certificates of deposit

- Bankers' acceptances

- Commercial paper

- Participations in the Puerto Rico Government Investment Trust Fund

CONFIDENTIAL                                                          PRIFA STAY0001856

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

- Obligations of the Commonwealth of Puerto Rico, its agencies, municipalities, public corporation obligations, and instrumentalities

- Obligations of state and local governments of the United States

- Mortgage and asset-backed securities

- Corporate debt, including investment contracts

The investment guidelines also establish limitations and others guidelines

The Authority's investments and investment contracts are categorized into three levels to provide an indication of custodial risk assumed. These categories are as follows:

- *Category 1* – Insured or registered in the name of the Authority, or securities held by the Authority or its agent in the Authority's name.

- *Category 2* – Uninsured and unregistered in the name of the Authority, with securities held by the counterparty's trust department or agent in the Authority's name.

- *Category 3* – Uninsured and unregistered in the name of the Authority, with securities held by the counterparty, or by its trust department or agent but not in the Authority's name.

The following table shows the category, carrying amount, and fair value as of June 30, 2004 of investments:

| Type | Category | | | Carrying amount | Fair value |
| | 1 | 2 | 3 | | |
|---|---|---|---|---|---|
| State and local government securities (SLGS) | $ 1,270,277,007 | — | — | 1,270,277,007 | 1,270,277,007 |
| Investment in the Puerto Rico Government Investment Trust Fund | — | 461,049 | — | 461,048 | 461,048 |
| Total categorized investments | $ 1,270,277,007 | 461,049 | — | 1,270,738,055 | 1,270,738,055 |
| Noncategorized investments: Guaranteed investment contracts | | | | 324,497,452 | |
| Total investments (including assets held in trust) | | | | $ 1,595,235,507 | |

The Puerto Rico Government Investment Trust Fund (the Investment Fund) is a collective investment trust created by the Secretary of the Treasury of the Commonwealth, as setter, and GDB, as a trustee, pursuant to Act No. 176 of August 11, 1995 of the Commonwealth for the purpose of providing eligible investors a way to invest in a money market portfolio.

(Continued)

CONFIDENTIAL

PRIFA_STAY0001857

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

**(4)   Capital Assets**

Capital assets activity for the fiscal year ended at June 30, 2004, was as follows:

| Governmental activities | Beginning balance | Increases | Decreases | Ending balance |
|---|---|---|---|---|
| Capital assets not depreciated: | | | | |
| Construction work in process | $ 773,984,004 | 165,821,019 | (102,508,607) | 837,296,416 |
| Capital assets being depreciated: | | | | |
| Furniture and equipment | 533,913 | 70,547 | — | 604,460 |
| Vehicles | 63,488 | — | — | 63,488 |
| Leasehold improvements | 620,847 | — | — | 620,847 |
| Total assets being depreciated | 1,218,248 | 70,547 | — | 1,288,795 |
| Less accumulated depreciation and amortization: | | | | |
| Furniture and equipment | (427,858) | (63,757) | — | (491,615) |
| Vehicles | (51,544) | (11,944) | — | (63,488) |
| Leasehold improvements | (444,388) | (99,708) | — | (544,096) |
| Total accumulated depreciation and amortization | (923,790) | (175,409) | — | (1,099,199) |
| Total capital assets being depreciated, net | 294,458 | (104,862) | — | 189,596 |
| Total governmental activities capital assets, net | $ 774,278,462 | 165,716,157 | (102,508,607) | 837,486,012 |

Total depreciation expense for the year ended June 30, 2004 amounted to $175,409 and was charged to general government activity.

(Continued)

CONFIDENTIAL

PRIFA_STAY0001858

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

*Construction Commitments*

The Authority has active construction projects as of June 30, 2004. Commitments (in millions) on significant contracts were as follows:

| Description | | Commitments | Expended | Remaining commitments |
|---|---|---|---|---|
| Regional projects | $ | 853 | 643 | 210 |
| Short-term projects | | 248 | 236 | 12 |
| Supplementary projects | | 82 | 82 | — |
| Capital expenditures | | 155 | 150 | 5 |
| | $ | 1,338 | 1,111 | 227 |

(5) **Interfund Transfers**

Interfund transfers for the year ended June 30, 2004, consist of the following:

| | | Transfers in | | | |
|---|---|---|---|---|---|
| Transfers out | | General Fund | Capital Projects | Debt Service | Total |
| General Fund | $ | — | 5,030,336 | 63,753,587 | 68,783,923 |
| Capital Projects | | 2,421,626 | — | — | 2,421,626 |
| Permanent | | — | — | 68,916,759 | 68,916,759 |
| | $ | 2,421,626 | 5,030,336 | 132,670,346 | 140,122,308 |

The majority of the interfund transfers were for recurring operating expenditures.

23 (Continued)

CONFIDENTIAL

PRIFA_STAY0001859

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

**(6)   Long-Term Debt**

**(a)   *Changes in Long-Term Liabilities***

Long-term liability activity in the governmental activities for the year ended June 30, 2004, was as follows:

| | Beginning balance | Additions | Reductions | Ending balance | Due within one year |
|---|---|---|---|---|---|
| Series 1988 A Bonds | $   18,270,450 | — | (13,960,000) | 4,310,450 | 2,675,000 |
| Series 1997 A and B Bonds | 791,824,550 | — | (2,805,000) | 789,019,550 | 15,995,000 |
| Series 1998 A Bonds | 134,660,000 | — | — | 134,660,000 | — |
| Series 2000 A and B Bonds | 1,074,180,000 | — | (7,815,000) | 1,066,365,000 | 8,285,000 |
| | 2,018,935,000 | — | (24,580,000) | 1,994,355,000 | 26,955,000 |
| Less bond discounts | 34,043,650 | — | (366,439) | 33,677,211 | — |
| Total bonds payable | 1,984,891,350 | — | (24,213,561) | 1,960,677,789 | 26,955,000 |
| Notes payable | 20,130,816 | 4,678,509 | (5,510,628) | 19,298,697 | 1,176,764 |
| Liabilities for claims and other contingencies | 6,000,000 | — | — | 6,000,000 | — |
| Accrued compensated absences | 238,169 | 23,397 | — | 261,566 | 131,886 |
| Long-term liabilities | $ 2,011,260,335 | 4,701,906 | (29,724,189) | 1,986,238,052 | 28,263,650 |

**(b)   *Special Tax Revenue Bonds***

The Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds, Series 1988A Bonds (the Series 1988A Bonds) were issued to provide financial assistance, in the form of a capital contribution, to the Puerto Rico Aqueduct and Sewer Authority (PRASA). The assistance provided was to facilitate PRASA's financing of its capital improvement program. The Series 1988A Bonds bear interest, payable semiannually in January 1 and July 1, at rates, which range between 7.60% and 7.90% and mature at various dates through July 1, 2005. These Bonds are entitled to the benefits of a $17,001,500 irrevocable direct pay letter of credit issued by a commercial bank, which expires on August 28, 2005.

On December 4, 1997, the Authority issued $771,485,000 Special Tax Revenue Bonds, Series 1997A and $30,275,000 Special Tax Revenue Bonds, Series 1997B (the Series 1997A and 1997B Bonds). The proceeds thereof were used to repay the outstanding principal and interest under various lines of credit provided by GDB to PRASA ($640,366,537) and to establish a special construction fund, to be administered by the Authority on behalf of PRASA, to finance additional projects of PRASA's capital improvement program ($121,235,185). The Series 1997A and 1997B Bonds bear interest, payable semiannually on January 1 and July 1 at rates which range between 5.00% and 6.30% and mature at various dates through July 1, 2028. The Series 1997A Bonds maturing on or after July 1, 2008 may be redeemed at the option of the Authority prior to maturity at 101% from January 1, 2008 to December 31, 2008, 100.5% from January 1, 2009 to December 31, 2009, and 100% thereafter.

(Continued)

CONFIDENTIAL                                                              PRIFA STAY0001860

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

On April 2, 1998, the Authority issued $134,660,000 Special Tax Revenue Refunding Bonds, Series 1998A (the Series 1998A Bonds). The Series 1998A Bonds bear interest, payable semiannually on January 1 and July 1 at rates, which range between 4.30% and 5.50% and mature at various dates through July 1, 2010. The Series 1998A Bonds maturing on July 1, 2009 and 2010 may be redeemed at the option of the Authority prior to maturity at 101% from July 1, 2008 to June 30, 2009 and 100.5% from July 1, 2009 to June 30, 2010.

Payment of principal of and interest on the Series 1997A Bonds, and the Series 1998A Bonds is insured by separate municipal bond insurance policies issued by an unrelated, insurance company.

The Series 1988 A Bonds, Series 1997 A Bonds, Series 1997 B Bonds, and the Series 1998 A Bonds (collectively, the Bonds) are payable solely from and secured by a pledge of federal excise taxes and other moneys deposited to the credit of a sinking fund established pursuant to a trust agreement.

The Act, as amended, requires that the first $70 million, up to fiscal year 2028, of federal excise taxes received by the Commonwealth be transferred to the Authority. Federal excise taxes consist of taxes received by the Commonwealth from the United States in connection with rum and other articles produced in Puerto Rico and sold in the United States that are subject to federal excise tax. The trust agreement requires the Authority to deposit to the credit of the sinking fund the federal excise taxes and other moneys deposited as are required to meet debt service requirements with respect to the Bonds. Rum is the only article currently produced in Puerto Rico subject to federal excise tax, the proceeds of which are required to be transferred from the federal government to the Commonwealth.

The federal excise taxes securing the Bonds are subject to a number of factors, including the continued imposition and remittance of such taxes to the Commonwealth and conditions affecting the Puerto Rico rum industry. If the federal excise taxes received by the Commonwealth in any fiscal year are insufficient, the Act requires that the Authority request and the Director of the Office of Management and Budget of the Commonwealth include in the budget of the Commonwealth for the corresponding fiscal year an appropriation necessary to cover such deficiency. The Commonwealth's Legislature, however, is not legally obligated to make the necessary appropriation to cover such deficiency.

The Authority is required under the trust agreement to establish a reserve account in the sinking fund to deposit and maintain therein an amount equal to the reserve requirement, as defined. Alternatively, the Authority may deposit to the credit of such reserve account an insurance policy or a letter of credit in lieu of any required deposit or in substitution of moneys on deposit in the reserve account. On the date of the issuance of the Series 1988A Bonds, the reserve account was fully funded in an amount equal to the reserve requirement from the proceeds of the Series 1988A Bonds and certain other moneys. In connection with the issuance of the 1997A and 1997B Bonds, the trust agreement was amended to eliminate the requirement that the Authority establish and maintain a reserve account in the sinking fund with respect to any bonds issued under the trust agreement, other than the Series 1988A bonds remaining outstanding after the advanced refunding described above.

(Continued)

CONFIDENTIAL

PRIFA_STAY0001861

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

Additional bonds, secured on parity with the Bonds, may be issued for any purpose authorized by the Act, subject to compliance with certain financial tests in the trust agreement.

*(c)* ***Special Obligation Bonds***

On September 28, 2000, the Authority issued $1,037,750,000 Special Obligation Bonds, 2000 Series A and $54,800,000 Special Obligation Bonds, 2000 Series B (collectively, the 2000 Series Bonds) for the purpose of repaying certain notes issued by the Authority to GDB and financing certain aqueduct and sewer infrastructure development projects. The 2000 Series Bonds are limited obligations of the Authority payable solely from, and secured by, a pledge of all interest received by the Authority from U.S. Treasury securities and other eligible obligations deposited in a special account of the Trust Fund held by a trustee under an irrevocable and permanent trust. The 2000 Series A bonds bear fixed interest rates ranging from 4.10% to 5.50% payable semiannually on each April 1 and October 1. The 2000 Series B bonds bear a variable interest rate during each index rate period, as defined, at a rate equal to the sum of (i) the average of the Bond Market Association Municipal Swap Index for each day during such period and (ii) 0.65% (the Index Rate). The Index Rate on the 2000 Series B bonds may not be less than 1% nor more than 7.5% per annum. The 2000 Series A Bonds are subject to redemption, at the option of the Authority, on or after October 1, 2010 through September 30, 2011 at a redemption price of 101% and 100% thereafter. The 2000 Series B Bonds are subject to redemption, at the option of the Authority, at a price equal to the principal balance plus accrued interest to the date of redemption, on any date not earlier than October 1, 2010.

Debt service requirements at June 30, 2004, for bonds outstanding are as follows:

| Fiscal year ending June 30: | Principal | Interest | Total |
|---|---|---|---|
| 2005 | $ 26,955,000 | 104,593,334 | 131,548,334 |
| 2006 | 29,165,000 | 103,117,316 | 132,282,316 |
| 2007 | 30,695,000 | 101,729,623 | 132,424,623 |
| 2008 | 32,225,000 | 100,198,390 | 132,423,390 |
| 2009 | 34,050,000 | 98,473,383 | 132,523,383 |
| 2010-2014 | 200,095,000 | 463,733,753 | 663,828,753 |
| 2015-2019 | 260,215,000 | 405,841,216 | 666,056,216 |
| 2020-2024 | 337,560,000 | 328,859,572 | 666,419,572 |
| 2025-2029 | 437,830,000 | 228,944,734 | 666,774,734 |
| 2030-2034 | 203,535,000 | 142,394,588 | 345,929,588 |
| 2035-2039 | 271,070,000 | 76,300,050 | 347,370,050 |
| 2040-2041 | 130,960,000 | 7,436,225 | 138,396,225 |
| | $ 1,994,355,000 | 2,161,622,184 | 4,155,977,184 |

*(d)* ***Notes Payable***

On February 26, 2002, the Authority entered into a loan agreement with GDB where GDB lent the Authority the amount of $47,381,332 for the purpose of paying additional costs incurred or to be incurred by the Authority in the acquisition, construction, equipping, installation, and development

(Continued)

CONFIDENTIAL

PRIFA_STAY0001862

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

of certain aqueduct and sewer projects of PRASA. This loan matures on October 1, 2021 and bears an annual interest rate of 7.5%. Principal outstanding under this loan agreement amounted to $8,647,310 at June 30, 2004.

On January 16, 2002 (refinancing date), the Authority entered into a loan agreement (the Note). The note payable was originally a loan granted by GDB (the Old Note), but which, pursuant to Act No. 164 of December 17, 2001, the Puerto Rico Public Finance Corporation (PFC) acquired and restructured through the issuance of PFC Commonwealth Appropriation Bonds (PFC Bonds). The PFC Bonds were issued under trust indenture agreements where PFC pledged and sold the Note, along with other notes under the Act No. 164, to certain trustees and created a first lien on the pledged revenue (consisting of annual Commonwealth appropriations earmarked to repay the Note). In substance, the notes are payable to the corresponding trustees to which PFC pledged the notes.

During June 2004, PFC advance refunded a portion of certain of its outstanding Commonwealth appropriation bonds issued in 2001 under Act No. 164 of January 16, 2002. The Authority recognizes a mirror effect of this advance refunding by PFC in its own note payable in proportion to the portion of the Authority's note payable included in the PFC refunding. As a result, the Authority considered defeased and therefore removed from the balance sheet the portion refunded of $4,358,419. Refunding proceeds and bond issue costs of $4,678,509 and $320,090, respectively, were recognized and capitalized within the new refunding note and deferred through the note term. The aggregate debt service requirements of the refunding and unrefunded notes will be funded with annual appropriations from the Commonwealth.

As a result of this advance refunding, the Authority has decreased its aggregate debt service payments by approximately $2.5 million over the next 27 years and obtained an economic gain (the difference between the present values of the debt service payments of the refunded and refunding notes) of approximately $300,000. At June 30, 2004, approximately $4.4 million of the notes refunded during June 2004 remain outstanding and are considered defeased.

The amount outstanding of the Note at June 30, 2004 was $10,651,387 and matures in July 2031. Interest on the unpaid principal amount of the Note is equal to the applicable percentage of the aggregate interest payable on PFC Bonds. The applicable percentage is the percentage representing the proportion of the amount paid by PFC on the Note to the aggregate amount paid by PFC on all the notes acquired by PFC under Act No. 164.

(Continued)

CONFIDENTIAL

PRIFA_STAY0001863

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

Debt service requirements at June 30, 2004, for notes payable outstanding are as follows:

| Fiscal year ending June 30: | Principal | Interest | Total |
|---|---|---|---|
| 2005 | $ 1,176,764 | 225,756 | 1,402,520 |
| 2006 | 987,552 | 594,626 | 1,582,178 |
| 2007 | 970,973 | 960,379 | 1,931,352 |
| 2008 | 898,604 | 1,024,503 | 1,923,107 |
| 2009 | 952,669 | 1,077,736 | 2,030,405 |
| 2010-2014 | 3,588,157 | 5,464,110 | 9,052,267 |
| 2015-2019 | 2,400,580 | 4,151,623 | 6,552,203 |
| 2020-2024 | 2,015,530 | 2,326,908 | 4,342,438 |
| 2025-2029 | 3,101,325 | 1,114,741 | 4,216,066 |
| 2030-2032 | 3,206,543 | 191,323 | 3,397,866 |
| | $ 19,298,697 | 17,131,705 | 36,430,402 |

**(7)    Transactions with Related Parties**

For the fiscal year 2003-2004, the Commonwealth contributed to the Authority $70,000,000 that will be used for debt service payments of the Bonds (note 6) and operating expenses plus $10,258,319 for other purposes.

Interest income on interest-bearing demand deposits with GDB amounted to $361,684 for the year ended June 30, 2004. Also, the Bank provides payroll services to the Authority at no cost.

The Authority transferred to PRASA during 2004 aqueduct and sewer projects amounting to $96,932,515, included as expenses of aqueduct and sewer in the accompanying statement of activities.

**(8)    Revolving and Rotating Funds**

The Act, which created the Authority, as amended, provided for the establishment of the Puerto Rico Water Pollution Control Revolving Fund (the Revolving Fund), which is administered by the Puerto Rico Environmental Quality Board (EQB) and by the Authority in accordance with Title VI of the Water Pollution Control Act (Clean Water Act) of 1972. The EQB, as the designated instrumentality of the Commonwealth, is empowered to enter into capitalization grant agreements with the U.S. Environmental Protection Agency (EPA), to accept capitalization grant awards made under Title VI of the Clean Water Act and, in conjunction with the Authority, to manage the Revolving Fund in accordance with the requirements of the Clean Water Act, the Act which created the Authority, as amended, and the Memorandum of Understanding entered into by and among EQB, PRASA, GDB, and the Authority.

On July 7, 1997, the Legislature of the Commonwealth enacted legislation, which, among other things, establishes the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund (the Drinking Water Fund) with the purpose of receiving financial assistance under the Clean Water Act and provides for the participation of the Authority in the administration of said fund.

(Continued)

CONFIDENTIAL

PRIFA_STAY0001864

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

The net assets, revenues, and expenses of these loan funds are not included in the accompanying basic financial statements since the Authority acts only as administrator of the Revolving Fund and Drinking Water Fund.

**(9)  Permanent Fund**

Act No. 92 of June 24, 1998 of the Legislature of the Commonwealth provides, among other things, for the creation of the Permanent Fund to be administered by the Authority. The Permanent Fund consists of a corpus account funded with a portion of the proceeds from the sale of assets of Puerto Rico Telephone Authority (PRTA) and additional accounts created or to be created by the Authority. Act No. 92 provides that the principal of the corpus account may not be reduced for any reason and that income received from the investment of moneys in the corpus account and other moneys received may be deposited in any of the additional accounts. On March 2, 1999, the Authority received $1.2 billion in connection with the sale of certain assets of PRTA which were deposited in the corpus account. Moneys deposited in the additional accounts are to be used first to pay the principal, premium, and interest of any bonds outstanding or to be issued by the Authority and then for the expansion, development, and modernization of infrastructure related to the aqueduct and sewer systems of Puerto Rico.

The moneys deposited in the Permanent Fund shall be invested up to $1 billion in: (1) direct obligations of the U.S. government; (2) obligations, the payment of principal and interest of which are unconditionally guaranteed by the U.S. government; (3) certificates of deposit of any bank, national bank association, or trust company organized and existing under the laws of the Commonwealth, the United States of America, or any of its states, on which the excess over the federal deposit insurance is secured by investments of the types described in (1) and (2) above; or (4) tax-exempt obligations of any state, instrumentality, agency, or political subdivision of Puerto Rico or the United States, the payment of principal and interest of which is secured by investments of the types described in (1) and (2) above.

Moneys in excess of $1 billion shall be invested in any of the instruments mentioned above or in any other instruments, including publicly traded common and preferred stock, not prohibited by investment guidelines adopted by GDB.

**(10)  Commitments**

*Operating Leases*

The Authority leases office space under noncancelable operating leases expiring in fiscal year 2005. Rent expense for the year ended June 30, 2004 amounted to $440,447.

At June 30, 2004, the minimum annual future rentals under noncancelable leases are $218,025 for fiscal year ending June 30, 2005.

(Continued)

CONFIDENTIAL

PRIFA_STAY0001865

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

**(11)  Contingencies**

At June 30, 2004, the Authority is a defendant in various legal proceedings arising from its normal operations. Management, based on the advice of its legal counsel, is of the opinion that the ultimate liability, if any, resulting from these pending proceedings and legal actions in the aggregate will not have a material effect on the Authority's financial statements. However, management is of the opinion that they will reach some settlements in certain cases; therefore, management recorded in the accompanying statement of net assets a liability for claims and other contingencies amounting to $6 million.

**(12)  Subsequent Event**

On August 26, 2004, the Authority entered into a loan agreement with GDB related to a nonrevolving line of credit in an amount not to exceed $125,000,000 for the acquisition, construction, equipping, installation, and development of various infrastructure projects for municipalities, public corporations, political subdivisions, and Commonwealth's instrumentalities included within the Authority's Capital Improvements Program for fiscal year 2004-2005. The principal amount of the loan is due and payable on June 30, 2005.

CONFIDENTIAL

PRIFA_STAY0001866

Schedule

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Schedule of Special Obligation Bonds 2000 Series A and B – $1,092,550,000

Year ended June 30, 2004

1. Deposits to the credit of, and withdrawals from, each fund or account created under the provisions of the Trust Indenture:

| Account number<br>Account name | | 125912-011<br>Special<br>corpus | 125912-099<br>Trust<br>agreement | 125912-002<br>Bond service<br>account | 125912-008<br>Rebate Fund<br>account | 125912-005<br>Construction<br>Fund |
|---|---|---|---|---|---|---|
| Deposits, beginning balance | $ | 21,236,838 | 1,200,000,000 | 10,277,858 | 1,979,159 | 496,534,445 |
| Operating transfers in | | 67,754,609 | — | 68,335,685 | 581,075 | — |
| Interest earned from July 1, 2003 to June 30, 2004 | | 1,162,150 | 67,754,609 | 48,614 | 12,231 | 10,409,129 |
| Total deposits | | 90,153,597 | 1,267,754,609 | 78,662,157 | 2,572,465 | 506,943,574 |
| Less: | | | | | | |
| Operating transfers out | | 68,916,759 | 67,754,609 | — | — | — |
| Trust management charges and fees | | — | — | — | — | 3,475 |
| Payment of loan to Government Development Bank for Puerto Rico | | — | — | 1,152,209 | — | — |
| Payment of interest to Government Development Bank for Puerto Rico | | — | — | 143,791 | — | — |
| Interest payment to bondholders | | — | — | 55,600,594 | — | — |
| Principal payment to bondholders | | — | — | 7,815,000 | — | — |
| Total disbursements | | 68,916,759 | 67,754,609 | 64,711,594 | — | 3,475 |
| Requisition amounts for projects, takedowns | | — | — | — | — | 182,442,648 |
| Deposits as of June 30, 2004 | $ | 21,236,838 | 1,200,000,000 | 13,950,563 | 2,572,465 | 324,497,451 |

2. Description of the bonds issued, paid, purchased, or redeemed during each fiscal year and the outstanding principal amount of the bonds:

|  |  |
|---|---|
| (a) Issued | $ — |
| (b) Paid: | |
| Series A | 7,405,000 |
| Series B | 410,000 |
| (c) Purchased or redeemed | — |
| (d) Outstanding principal amount at June 30, 2004: | |
| Series A | 1,012,680,000 |
| Series B | 53,685,000 |

See accompanying independent auditors' report.

31

PRIFA_STAY0001867

[This page intentionally left blank]

CONFIDENTIAL

APPENDIX III

COMMONWEALTH OF PUERTO RICO
Financial Information and Operating Data Report
May 1, 2005

**TABLE OF CONTENTS**

| | Page |
|---|---|
| INTRODUCTION | 1 |
| Geographic Location and Demography | 1 |
| Relationship with the United States | 1 |
| Governmental Structure | 1 |
| Political Trends | 2 |
| THE ECONOMY | 3 |
| General | 3 |
| Economic Development Program for the Private Sector | 6 |
| Employment and Unemployment | 9 |
| Economic Performance by Sector | 10 |
| Higher Education | 19 |
| Tax Incentives | 20 |
| DEBT | 23 |
| Public Sector Debt | 23 |
| Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt | 24 |
| Commonwealth Guaranteed Debt | 26 |
| Trends of Public Sector Debt | 27 |
| PUBLIC CORPORATIONS | 29 |
| Government Development Bank for Puerto Rico | 31 |
| Other Public Corporations | 32 |
| INSURANCE MATTERS | 37 |
| RETIREMENT SYSTEMS | 38 |
| COMMONWEALTH FINANCIAL STATEMENTS | 42 |
| PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES | 42 |
| Summary and Management's Discussion of General Fund Results | 42 |
| Major Sources of General Fund Revenues | 47 |
| Collections of Income and Excise Taxes | 50 |
| Proposed Fiscal Reform | 50 |
| Transfers to General Obligation Redemption Fund | 51 |
| Components of General Fund Expenditures | 51 |
| Federal Grants | 52 |
| BUDGET OF THE COMMONWEALTH OF PUERTO RICO | 53 |
| Office of Management and Budget | 53 |
| Budgetary Process | 53 |
| Financial Control and Adjustment Procedures | 53 |
| Appropriations | 54 |
| Fiscal Year 2005 Budget | 55 |
| Fiscal Year 2006 Budget | 57 |
| Differences between Budget and Basic Financial Statements | 59 |
| LITIGATION | 60 |

CONFIDENTIAL

[This page intentionally left blank]

CONFIDENTIAL

# COMMONWEALTH OF PUERTO RICO

## Financial Information and Operating Data Report
## May 1, 2005

## INTRODUCTION

### Geographic Location and Demography

Puerto Rico, the fourth largest of the Caribbean islands, is located approximately 1,600 miles southeast of New York City. It is approximately 100 miles long and 35 miles wide.

According to the United States Census Bureau, the population of Puerto Rico was 3,808,610 in 2000, compared to 3,522,000 in 1990. As of 2000, the population of San Juan, the island's capital and largest city, was 434,375.

### Relationship with the United States

Puerto Rico was discovered by Columbus in 1493, and shortly thereafter the island was conquered and settled by the Spaniards. It remained a Spanish possession for four centuries.

Puerto Rico came under United States sovereignty pursuant to the Treaty of Paris, signed on December 10, 1898, which ended the Spanish-American War. Puerto Ricans have been citizens of the United States since 1917. In 1950, after a long evolution toward greater self-government for Puerto Rico, the Congress of the United States enacted Public Law 600, which is "in the nature of a compact" and which became effective upon its acceptance by the electorate of Puerto Rico. It provides that those sections of existing law which defined the political, economic, and fiscal relationship between Puerto Rico and the United States would remain in full force. It also authorized the people of Puerto Rico to draft and adopt their own Constitution. The Constitution was drafted by a popularly elected constitutional convention, overwhelmingly approved in a special referendum by the people of Puerto Rico and approved by the United States Congress and the President of the United States, becoming effective upon proclamation of the Governor of Puerto Rico on July 25, 1952. Puerto Rico's relationship with the United States is referred to herein as commonwealth status.

The United States and the Commonwealth of Puerto Rico (the "Commonwealth") share a common defense, market, and currency. The Commonwealth exercises virtually the same control over its internal affairs as do the fifty states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but no vote. Most federal taxes, except those such as Social Security taxes which are imposed by mutual consent, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries.

The official languages of Puerto Rico are Spanish and English.

### Governmental Structure

The Constitution of the Commonwealth provides for the separation of powers of the executive, legislative, and judicial branches of government. The Governor is elected every four years. The Legislature consists of a Senate and a House of Representatives, the members of which are elected for four-year terms. The highest court within the local jurisdiction is the Supreme Court of Puerto Rico. Puerto Rico constitutes a District in the Federal Judiciary and has its own United States District Court.

CONFIDENTIAL

Decisions of this court may be appealed to the United States Court of Appeals for the First Circuit and from there to the Supreme Court of the United States.

Governmental responsibilities assumed by the central government of the Commonwealth are similar in nature to those of the various state governments. In addition, the central government assumes responsibility for local police and fire protection, education, public health and welfare programs, and economic development.

Anibal Acevedo Vilá was sworn in as Governor of Puerto Rico on January 2, 2005. He is a graduate of the University of Puerto Rico, where he obtained a Bachelor's degree in Political Science and a Juris Doctor degree. He obtained an LL.M. from Harvard Law School. Since 1982, he has worked in the public sector as legislative advisor to the Governor of Puerto Rico, a member of the Puerto Rico House of Representatives and Resident Commissioner. From 1987 to 1989, he worked as a law clerk for Puerto Rico Supreme Court Judge Federico Hernández Denton and later for Judge Levin Campbell of the First Circuit Court of Appeals.

Juan C. Méndez, Secretary of the Treasury, took office in January 2005. He is a certified public accountant and a graduate of the University of Puerto Rico, where he obtained a Bachelor's degree in Accounting and a Juris Doctor degree. He obtained an LL.M. in tax law from the Georgetown University Law Center. During the second half of 2004 and prior to his appointment as Secretary of the Treasury, he worked as a senior tax manager for a Puerto Rico accounting firm. From 2002 to mid-2004, he worked as a technical advisor to the Secretary of the Treasury. Prior to 2002, he worked as a tax attorney at a major Puerto Rico law firm.

Ileana F. Fas Pacheco, Director of the Office of Management and Budget ("OMB"), took office in January 2005. She is a graduate of the University of Puerto Rico, where she obtained a Bachelor's degree in Science with a major in Electrical Engineering. She obtained a Master's degree in Business Administration in International Management from Thunderbird, the American Graduate School of International Management. Since 2001, she has worked in the public sector as Special Assistant to the Puerto Rico Secretary of State, legislative assistant to the Resident Commissioner and Director of the Office of Federal Affairs of the Puerto Rico Department of Education. Prior to 2001, she worked as an electrical engineer at a major electronics company.

William Lockwood Benet was appointed President of Government Development Bank for Puerto Rico ("GDB") effective February 1, 2005. He is a graduate of Brown University and the Institute of Development Studies at the University of Sussex, where he became a development finance economist specialized in financing strategy, economic policy innovation, private equity, and life sciences. Prior to his appointment, he was managing director of Lockwood Financial Advisors and Generans Life Sciences and Chairman of the Board of Directors of Grupo Guayacán, a venture capital firm. From 1996 to 2000, he served as Director of the Center for the New Economy and Secretary of the PR Community Foundation. Prior to 1993, he served as Vice President and Assistant to three Presidents of the GDB.

**Political Trends**

For many years there have been two major views in Puerto Rico with respect to Puerto Rico's relationship with the United States: one favoring commonwealth status, represented by the Popular Democratic Party, and the other favoring statehood, represented by the New Progressive Party. The following table shows the percentages of the total vote received by the gubernatorial candidates of the various parties in the last five elections. While the electoral choices of Puerto Rico's voters are not based solely on preferences regarding Puerto Rico's relationship with the United States, candidates who support a continuing relationship between Puerto Rico and the United States have prevailed in elections for many years.

CONFIDENTIAL                                                                                                       PRIFA_STAY0001872

|                                  | **1988** | **1992** | **1996** | **2000** | **2004** |
|----------------------------------|----------|----------|----------|----------|----------|
| Popular Democratic Party         | 48.7%    | 45.9%    | 44.5%    | 48.6%    | 48.4%    |
| New Progressive Party            | 45.8     | 49.9     | 51.1     | 45.7     | 48.2     |
| Puerto Rico Independence Party   | 5.4      | 4.2      | 3.8      | 5.2      | 2.7      |
| Others                           | 0.1      | --       | 0.6      | 0.5      | 0.6      |

With the results of the 2004 election, control of the executive branch continued under the Popular Democratic Party while the legislative branch is now controlled by the New Progressive Party. The composition of the Senate and House of Representatives by political party is as follows:

|                                  | **Senate** | **House** |
|----------------------------------|------------|-----------|
| Popular Democratic Party         | 9          | 18        |
| New Progressive Party            | 17         | 32        |
| Puerto Rico Independence Party   | 1          | 1         |
|                                  | 27         | 51        |

The next general election (gubernatorial, municipal, and legislative) in Puerto Rico will be held in November 2008. Voter participation in Puerto Rico is substantially higher than in the United States, averaging 82% since 1972.

## THE ECONOMY

**General**

The Commonwealth has established policies and programs directed principally at developing the manufacturing and services sectors of the economy and expanding and modernizing the Commonwealth's infrastructure. Domestic and foreign investments have been stimulated by selective tax exemptions, development loans, and other financial and tax incentives. Infrastructure expansion and modernization have been to a large extent financed by bonds and notes issued by the Commonwealth, its public corporations, and municipalities. Economic progress has been aided by significant increases in the levels of education and occupational skills of the population.

Puerto Rico has enjoyed more than two decades of almost continuous economic expansion. Almost every sector of the economy has participated in this expansion, and record levels of employment have been achieved. Factors contributing to this expansion included government-sponsored economic development programs, increases in the level of federal transfer payments, a significant expansion in construction investment driven by infrastructure projects and private investment, primarily in housing, the relatively low cost of borrowing, and low oil prices in many years during this period.

Personal income, both aggregate and per capita, has increased consistently each fiscal year from 1985 to 2004. In fiscal year 2004, aggregate personal income was $46.8 billion ($43.8 billion in 2000 prices) and personal income per capita was $12,031 ($11,260 in 2000 prices).[*] Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total federal payments to Puerto Rico, which include transfers to local government entities and expenditures of federal agencies in Puerto Rico, in addition to federal transfer payments to individuals, are lower on a per capita basis in Puerto Rico than in any state of the United States. Transfer payments to individuals in fiscal year 2004 were $9.7 billion, of which $7.5 billion, or 77%, represented entitlements to individuals who had previously performed services or made contributions under programs such as Social Security, Veterans' Benefits, Medicare and U.S. Civil Service retirement pensions.

---

[*] Different price deflators are used for gross product and personal income statistics. The year 2000 is used as a basis for comparison because that is the year used by the U.S. Department of Commerce.

CONFIDENTIAL

PRIFA_STAY0001873

Total average monthly employment (as measured by the Department of Labor and Human Resources Household Employment Survey) has also increased.  From fiscal year 2000 to fiscal year 2004, average monthly employment increased from 1,150,291 to 1,205,602.

The dominant sectors of the Puerto Rico economy are manufacturing and services.  The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher wage, high technology industries, such as pharmaceuticals, biotechnology, electronics, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment.  The services sector, including finance, insurance, real estate, wholesale and retail trade, and tourism, also plays a major role in the economy.  It ranks second only to manufacturing in contribution to the gross domestic product and leads all sectors in providing employment.

The following table shows the gross product for the five fiscal years ended June 30, 2004.

### Commonwealth of Puerto Rico
### Gross Product

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004**[1] |
| Gross product - $ millions[2] | $ 41,419 | $ 44,047 | $ 45,071 | $ 47,439 | $50,320 |
| Real gross product - $ millions (2000 prices) | 41,419 | 42,044 | 41,901 | 42,756 | 43,937 |
| Annual percentage increase in real gross product (2000 prices) | 3.0% | 1.5% | (0.3%) | 2.0% | 2.8% |
| U.S. annual percentage increase in real gross product (2000 prices) | 4.6% | 2.1% | 0.7% | 2.3% | 4.6% |

(1)    Preliminary.
(2)    In current dollars.

*Sources:*  P.R. Planning Board and Global Insight Inc.

The economy of Puerto Rico is closely linked to the United States economy.*  Factors affecting the United States economy usually have a significant impact on the performance of the Puerto Rico economy.  These include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the level of oil prices, the rate of inflation, and tourist expenditures.  Consequently, the economic slowdown in the United States in 2001 and 2002, and the subsequent recovery in 2003 and 2004 (which continues in 2005) has also been reflected in the Puerto Rico economy.

The graph on the following page compares the growth rate of real gross product (or GNP) for the Puerto Rico and United States economies since fiscal 1990, and the forecast of the growth rate for fiscal years 2005 and 2006.

---

* During fiscal year 2004 (from July 2003 to June 2004) approximately 82% of Puerto Rico's exports went to the United States mainland, which was also the source of approximately 45% of Puerto Rico's imports.

CONFIDENTIAL

PRIFA STAY0001874

# Real GNP Growth Rate



* P.R. Planning Board
** Global Insight

Since the 1950s, the Puerto Rico Planning Board (the "Planning Board") has prepared a complete set of macroeconomic measures like those prepared for the United States by the Bureau of Economic Analysis ("BEA") of the Department of Commerce. In contrast with the BEA, which computes the economic accounts on a quarterly basis, the Planning Board computes the economic accounts on an annual basis. Like the BEA, the Planning Board revises the macroeconomic numbers on a regular basis. The Planning Board has always classified the latest annual numbers as preliminary until they are revised and made final in conjunction with the release of new data each year. At present, all macroeconomic accounts for fiscal year 2004 are preliminary until the revised figures are released.

*Fiscal Year 2004*

The Planning Board's preliminary reports of the performance of the Puerto Rico economy during fiscal year 2004 indicate that the economy registered an increase of 2.8% in real gross product. Gross product was $50.3 billion in fiscal year 2004 ($43.9 billion in 2000 prices) compared to $47.4 billion in fiscal year 2003 ($42.8 billion in 2000 prices). This represents an increase in nominal gross product of 6.1%. Aggregate personal income increased from $44.7 billion in fiscal year 2003 ($42.4 billion in 2000 prices) to $46.8 billion in fiscal year 2004 ($43.8 billion in 2000 prices), and personal income per capita increased from $11,566 in fiscal year 2003 ($10,962 in 2000 prices) to $12,031 in fiscal year 2004 ($11,260 in 2000 prices). According to the Department of Labor and Human Resources Household Employment Survey (the "Household Survey"), total monthly employment averaged 1,205,602 in fiscal year 2004 compared to 1,188,015 in fiscal year 2003, an increase of 1.5%. Concurrently, the unemployment rate decreased from 12.1% during fiscal year 2003 to 11.4% during fiscal year 2004.

*Fiscal Year 2005*

According to the Household Survey, total monthly seasonally adjusted employment for the first nine months of fiscal year 2005 averaged 1,233,100, an increase of 2.9% compared to 1,198,900 for the same period in fiscal year 2004. The seasonally adjusted unemployment rate for the first nine months of fiscal year 2005 was 10.8%, a decrease from 11.6% for the same period in fiscal year 2004. As in the past, the economy of Puerto Rico followed the performance of the United States economy.

CONFIDENTIAL                                                                              PRIFA_STAY0001875

The Planning Board's current real gross national product forecast for fiscal year 2005, released in February 2004, projected an increase of 2.3%. The Planning Board confirmed this projection in February 2005. The major short-term factors that could have an adverse effect on the economy of Puerto Rico include the persistent high level of oil prices, the upward turn of short-term interest rates, and the devaluation of the United States dollar, which affects the value of imports to Puerto Rico. Although interest rates began to increase slightly at the end of fiscal year 2004, they still remain at relatively low levels, which could stimulate economic activity in Puerto Rico for the short and medium-term.

*Fiscal Year 2006*

The Planning Board's current real gross national product forecast for fiscal year 2006, released in February 2005, projects an increase of 2.5%. The major short-term factors that could have an adverse effect on the economy include those presented for fiscal year 2005 and the possibility of a deceleration of public investment due to the Commonwealth's fiscal difficulties, which could reduce activity in the construction sector. The continued upward trend of interest rates may also contribute to a possible slowing of economic activity in the construction sector. Although the current administration is working to maintain public investment, no assurance can be given that the Commonwealth will succeed in these efforts. For a discussion of the Commonwealth's fiscal difficulties, see "Fiscal Year 2005 Budget" and "Fiscal Year 2006 Budget" under *Budget of the Commonwealth of Puerto Rico*.

**Economic Development Program for the Private Sector**

The Commonwealth's economic development program for the private sector is now focused on initiatives aimed at producing a more diversified and sustainable economic development. The three principal elements of these initiatives are: (i) the promotion of foreign investment focused on life sciences and computing and information technology; (ii) the promotion of local investment in order to facilitate the development of a local entrepreneurial culture that builds upon the Commonwealth's competitive advantages in, among others, life sciences, tourism, commerce and services; and (iii) investment in infrastructure and human capital to complement the promotion of foreign and local investment and focus on the current and future needs for human capital.

The Commonwealth has formulated a strategic plan to enhance its competitiveness in knowledge-based economic sectors, such as research and development of science and technology products. Four major components of this strategic plan are: (i) build on the strong presence in Puerto Rico of multinational companies in the science and technology sectors; (ii) build on Puerto Rico's skilled workforce to promote the expansion of research and development facilities by companies currently operating in Puerto Rico; (iii) attract new companies in such sectors; and (iv) provide incentives for companies and entrepreneurs to engage in the process of innovation and commercialization of new products, and establish research and development facilities in Puerto Rico. The latter initiative includes the creation of the Puerto Rico Science & Technology Trust, a government-sponsored trust that will provide grants and financing to companies, entrepreneurs, and universities that engage in these activities.

The Commonwealth is also providing incentives to promote the establishment of distribution and call centers, the acquisition and development of patents, and the development of a local entrepreneurial class. Distribution and call centers located in the Commonwealth will benefit from special incentives such as: (i) an excise tax exemption on machinery and equipment acquired by a call center; and (ii) a preferential tax rate of 4% for call centers located in Puerto Rico if they offer services to Latin America and a preferential tax rate of 2% if they offer hemisphere or worldwide services. The Commonwealth has decided to focus on this type of industry because it is labor intensive, presents no environmental concerns, and is generally able to start operations quickly.

The Commonwealth is also promoting and developing the acquisition and development of patents. According to newly enacted legislation, the Secretary of the Treasury may (i) negotiate the payment of taxes on patent royalties; and (ii) reduce the tax rate on patent royalties to a rate as low as 2%.

III-6

CONFIDENTIAL

These incentives are in addition to those already enacted for research and development carried out in the Commonwealth.

The Commonwealth has also taken action to further develop a local entrepreneurial class. To this end, the Commonwealth has enacted legislation providing local entrepreneurs with the following benefits: (i) tax incentives to retailers that use their distribution channels to sell products made in Puerto Rico in other jurisdictions; (ii) require that at least 15% of products and services purchased by public agencies be locally manufactured or provided; and (iii) the use of government-sponsored financing, marketing and/or training to promote the production of economically feasible products or services for Puerto Rico markets.

*Puerto Rico Tax Incentives*

One of the benefits enjoyed by the Commonwealth is that corporations operating in Puerto Rico (other than corporations organized in the United States with a local branch) and individuals residing in Puerto Rico generally are not subject to federal income taxes. This enables the Commonwealth to utilize local tax legislation as a tool for stimulating economic development in Puerto Rico. See "Tax Incentives" below.

In this regard, the Commonwealth has enacted legislation extending certain benefits of its most recent tax incentive law, Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to all eligible businesses operating under previous tax incentives laws. These benefits include a 200% deduction for research and development expenses and worker training expenses, the ability to deduct as a current expense investments in machinery and equipment, and the ability to claim a tax credit equal to 25% of the purchase price of a product manufactured in the Commonwealth (in excess of a base amount) or 35% of the purchase price of a locally manufactured recycled product.

The 1998 Tax Incentives Act was also amended to allow a credit against the Puerto Rico tax liability of investors that acquire the majority of the stock, partnership interests or operational assets of an exempted business that is in the process of closing operations in Puerto Rico. A credit against the Puerto Rico tax liability is also provided to investors that contribute cash to such exempted business for the construction or improvement of its physical facilities and the purchase of machinery and equipment. The amount of the credit is equal to 50% of the cash invested for such purposes, not to exceed $5,000,000 per exempted business. The maximum amount of such credits that may be authorized by the Secretary of the Treasury for any fiscal year is $15,000,000.

The Commonwealth has also enacted legislation which (i) reduces the capital gains tax from 20% to 10% in the case of individuals and estates and trusts, and from 25% to 12.5% in the case of corporations and partnerships organized under the laws of the Commonwealth or engaged in trade or business in the Commonwealth, for gains from the sale of eligible Commonwealth investments; and (ii) allows income tax credits for extraordinary investment in housing infrastructure. In addition, legislation was enacted that reduces the tax payable on interest on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to resident individuals, trusts and estates to 10% under certain circumstances.

For fiscal year 2005, the Commonwealth enacted a "sunset provision" that lowered all long-term capital gains tax rates by 50%. In particular, gains realized from July 1, 2004 to June 30, 2005 from the sale or exchange of a capital asset by resident individuals, if held for more than six months, will be taxed at a rate of 5% (6.25% in the case of corporate taxpayers) if located in Puerto Rico and at a rate of 10% (12.5% in the case of corporate taxpayers) if located outside Puerto Rico. However, as part of the package of legislative measures proposed to increase General Fund revenues for fiscal years 2006 and 2007, the preferential capital gains rates will be eliminated and all capital gains will be taxed at a rate of 20%. See "Summary and Management's Discussion of General Fund Results" under *Puerto Rico Taxes, Other Revenues and Expenditures.*

III-7

PRIFA_STAY0001877

In addition, legislation has been enacted: (i) amending the 1998 Tax Incentives Act to provide special income tax rates ranging from 0% to 2% to companies that establish operations in Puerto Rico in "core pioneer industries" which utilize innovative technology not used in Puerto Rico prior to January 1, 2000; (ii) granting tax credits with respect to eligible investments made in the construction or substantial rehabilitation of housing units to be rented to low income families; (iii) reducing to 7% the capital gains rate applicable to gains realized on the sale of the stock of Puerto Rico corporations sold in an initial public offering made prior to December 31, 2007, or acquired in public offerings made prior to December 31, 2007; (iv) granting income tax exemption to the fees and interest income received by financial institutions in connection with loans or guarantees of loans made to finance tourism development projects; (v) granting an exemption to qualified associations administering timesharing rights or vacation clubs and to owners' associations of areas designated as tourism enhancement districts; (vi) granting income tax exemption to financial institutions for charges collected on obligations issued for the financing of tourism projects; (vii) granting tax exemption for investments in infrastructure made by housing developers; (viii) granting tax credits to Puerto Rico businesses that acquire products manufactured in Puerto Rico for exportation; and (ix) rehabilitating urban centers through the development of housing projects, community areas, commercial areas, parks and recreational spaces, construction and renovation of structures and the development of undeveloped or under-developed sites.

*Reduction of the Costs of Doing Business*

The Commonwealth believes that, to make Puerto Rico more competitive and foster investment, it needs to reduce the cost of doing business in Puerto Rico. In order to reduce the cost of doing business in Puerto Rico, the Commonwealth proposes to (i) promote the creation of more cogeneration power plants to diversify energy fuel sources and limit the dependence on oil imports for electric power generation; (ii) streamline the permitting process to accelerate and reduce the cost of investment in Puerto Rico; and (iii) create a multi-agency task force to expedite critical projects in the life sciences sector.

The Commonwealth is in the process of diversifying its energy fuel sources. Two cogeneration power plants, one of which is fueled by coal and the other by liquefied natural gas, have reduced Puerto Rico's dependence on oil imports for the generation of electricity by approximately 25%, from 99% to 74%. Currently, as part of the Electric Power Authority's capital improvement plan, the Authority is considering building an additional cogeneration power plant fueled by liquefied natural gas in the municipality of Mayagüez.

*Federal Tax Incentives*

In order to enhance the attractiveness for United States companies of establishing operations in Puerto Rico, the Commonwealth is seeking to provide for a new tax regime applicable to U.S.-based businesses that have operations in the Commonwealth or other U.S. possessions. In connection with the phase-out of Sections 30A and 936 of the United States Internal Revenue Code of 1986, as amended (the "Code") (see "Tax Incentives – Incentives Under the Code" below), the United States Senate requested the Joint Commission on Taxation ("JCT") and the General Accounting Office ("GAO") study the economic impact of said phase-out and present recommendations on alternative tax incentives for U.S.-based companies operating in Puerto Rico. Due to the one-year delay in the release of the GAO/JCT report, the Commonwealth plans to seek a temporary, one-year extension of Sections 30A and 936 of the Code, until the United States Congress has had an opportunity to evaluate and act upon the report. In anticipation of the final phase-out of Sections 30A and 936 of the Code, most U.S.-based companies operating under Sections 30A and 936 of the Code have converted from United States corporations to either Puerto Rico or foreign corporations, thus lessening the impact of the phase-out of those sections.

CONFIDENTIAL

PRIFA STAY0001878

**Employment and Unemployment**

The number of persons employed in Puerto Rico during fiscal year 2004 averaged 1,205,602, a 1.5% increase from 1,188,015 in fiscal year 2003. Unemployment, although at relatively low historical levels, remains above the United States average. The average unemployment rate increased from 11.0% in fiscal year 2000 to 11.4% in fiscal year 2004. This increase in the unemployment rate is a result of the sluggish labor market following the economic recession experienced during fiscal years 2002 and 2003. For the first nine months of fiscal year 2005, the average monthly unemployment rate (seasonally adjusted) was 10.8%.

The following table presents annual statistics of employment and unemployment for fiscal year 2000 through fiscal year 2004 and monthly statistics for fiscal year 2005. These employment figures are based on the Household Survey, which includes self-employed individuals, instead of the non-farm payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 17% of civilian employment in Puerto Rico, more than double the level in the United States.

**Commonwealth of Puerto Rico**
**Employment and Unemployment [1]**

| Fiscal Years Ended June 30 | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2000 | 1,292 | 1,150 | 142 | 11.0% |
| 2001 | 1,277 | 1,144 | 134 | 10.5 |
| 2002 | 1,309 | 1,152 | 158 | 12.1 |
| 2003 | 1,352 | 1,188 | 164 | 12.1 |
| 2004 | 1,360 | 1,206 | 155 | 11.4 |
| **Fiscal Year 2005** | | (Seasonally Adjusted) | | |
| July | 1,410 | 1,273 | 137 | 9.7% |
| August | 1,423 | 1,271 | 152 | 10.7 |
| September | 1,416 | 1,269 | 147 | 10.4 |
| October | 1,391 | 1,238 | 153 | 11.0 |
| November | 1,365 | 1,202 | 163 | 11.9 |
| December | 1,387 | 1,235 | 152 | 11.0 |
| January | 1,381 | 1,227 | 154 | 11.2 |
| February | 1,354 | 1,223 | 131 | 9.7 |
| March | 1,379 | 1,225 | 154 | 11.2 |

(1)  Thousands of persons 16 years of age and over. Totals may not add due to rounding.
(2)  Unemployed as percentage of labor force.

*Source:* Department of Labor and Human Resources - Household Survey

CONFIDENTIAL

PRIFA_STAY0001879

**Economic Performance by Sector**

During the period between fiscal year 2000 and 2004, the manufacturing and services sectors generated the largest portion of gross domestic product. The three sectors of the economy that provide the most employment are manufacturing, services and government.

The following table presents annual statistics of gross domestic product by sector and gross product for the five fiscal years ended June 30, 2004.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross Product**
**(in millions at current prices)**

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004**[1] |
| Manufacturing | $24,079 | $29,037 | $31,243 | $32,501 | $34,078 |
| Services[2] | 24,920 | 26,615 | 26,913 | 28,688 | 30,505 |
| Government[3] | 5,478 | 5,992 | 6,303 | 7,006 | 7,389 |
| Transportation, communication and public utilities | 4,237 | 4,698 | 4,948 | 5,205 | 5,350 |
| Agriculture, forestry and fisheries | 529 | 348 | 277 | 314 | 435 |
| Construction[4] | 1,875 | 1,802 | 1,648 | 1,614 | 1,741 |
| Statistical discrepancy | 585 | 717 | 292 | (493) | (654) |
| Total gross domestic product[5] | $61,702 | $69,208 | $71,624 | $74,834 | $78,842 |
| Less: net payment abroad | (20,283) | (25,162) | (26,552) | (27,396) | (28,522) |
| Total gross product[5] | $41,419 | $44,046 | $45,071 | $47,439 | $50,320 |

(1) Preliminary.
(2) Includes wholesale and retail trade, finance, insurance and real estate, tourism, and other services.
(3) Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain other public corporations, like the Electric Power Authority and the Aqueduct and Sewer Authority.
(4) Includes mining.
(5) Totals may not add due to rounding.

*Source:* Planning Board

The data for employment by sector or industries presented here, like in the United States, is based on the Payroll Survey, which is designed to measure employment by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

The following table presents annual statistics of average employment based on the North American Industry Classification System (NAICS) for fiscal years 2000 to 2004.

CONFIDENTIAL

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Economic Sector[1]**
**(persons age 16 and over)**

| | **Fiscal Years Ended June 30** | | | | |
| | **2000** | **2001** | **2002** | **2003** | **2004**[2] |
|---|---|---|---|---|---|
| Natural Resources and Mining | 1,425 | 1,455 | 1,292 | 1,173 | 1,182 |
| Construction | 73,492 | 73,729 | 69,208 | 68,701 | 68,355 |
| Manufacturing | | | | | |
| Durable Goods | 57,383 | 56,249 | 49,348 | 47,534 | 45,886 |
| Non-Durable Goods | 85,550 | 82,236 | 72,595 | 69,319 | 70,000 |
| Sub Total | 142,933 | 138,485 | 121,943 | 116,853 | 115,886 |
| | | | | | |
| Trade, Transportation, | | | | | |
| Warehouse & Utilities | | | | | |
| Wholesale Trade | 32,000 | 32,327 | 31,489 | 31,218 | 32,344 |
| Retail Trade | 131,817 | 133,821 | 127,716 | 128,189 | 131,873 |
| Transportation, | | | | | |
| Warehouse & Utilities | 19,458 | 19,285 | 17,603 | 17,124 | 16,926 |
| Sub Total | 183,275 | 185,433 | 176,808 | 176,531 | 181,144 |
| | | | | | |
| Information | 21,108 | 20,597 | 21,943 | 21,216 | 21,347 |
| Finance | 45,583 | 44,974 | 43,963 | 42,128 | 41,584 |
| Professional & Business | 96,750 | 97,164 | 95,223 | 96,938 | 95,006 |
| Educational & Health | 80,692 | 84,202 | 84,452 | 87,590 | 90,561 |
| Leisure & Hospitality | 65,942 | 66,435 | 64,273 | 66,200 | 68,263 |
| Other Services | 17,408 | 17,330 | 16,602 | 16,338 | 15,967 |
| Government | 286,133 | 282,723 | 288,679 | 298,751 | 303,914 |
| Total Non-Farm | 1,014,742 | 1,012,528 | 984,385 | 992,418 | 1,003,208 |

(1) The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.
(2) Preliminary.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey
(Establishment Survey – NAICS Codes)

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board estimates that in fiscal year 2004 manufacturing generated $34.1 billion, or 43.2%, of gross domestic product. During fiscal year 2004, payroll employment for the manufacturing sector was 115,886, a decrease of 0.8% compared with fiscal year 2003, with most of the job losses occurring in labor-intensive industries. Most of the island's manufacturing output is shipped to the United States mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. The United States minimum wage laws are applicable in Puerto Rico. As of July 2004, the average hourly manufacturing wage rate in Puerto Rico was 66.9% of the average mainland United States rate.

Manufacturing in Puerto Rico is now more diversified than during the earlier phases of its industrial development and includes several industries less prone to business cycles. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by the large investment over the last decade in the pharmaceutical, scientific instruments, computers and electrical products industries in Puerto Rico. One of the factors assisting the

III-11

CONFIDENTIAL

PRIFA_STAY0001881

development of the manufacturing sector has been the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the Code, phases out the federal tax incentives during a ten-year period. See "Tax Incentives - Incentives Under the Code" under *The Economy.*

The following table sets forth gross domestic product by manufacturing sector for the five fiscal years ended June 30, 2004.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Manufacturing Sector**
**(in millions at current prices)**

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004**[1] |
| Pharmaceuticals | $13,580 | $16,620 | $18,681 | $19,072 | $20,138 |
| Machinery and metal products: | | | | | |
|   Machinery, except electrical | 2,031 | 3,376 | 3,845 | 3,528 | 3,499 |
|   Electrical machinery | 1,525 | 1,874 | 1,757 | 1,915 | 1,821 |
|   Professional and scientific instruments | 1,758 | 2,100 | 2,191 | 3,026 | 3,325 |
|   Other machinery and metal products | 341 | 316 | 312 | 291 | 313 |
| Food products | 1,912 | 1,974 | 2,092 | 2,289 | 2,332 |
| Other chemical and allied products | 777 | 765 | 578 | 496 | 475 |
| Apparel | 610 | 569 | 530 | 466 | 620 |
| Other[2] | 1,543 | 1,444 | 1,258 | 1,418 | 1,555 |
| Total gross domestic product of manufacturing sector[3] | $24,079 | $29,037 | $31,243 | $32,501 | $34,078 |

(1)  Preliminary.
(2)  Includes petroleum products; petrochemicals; tobacco products; stone, clay and glass products; textiles and others.
(3)  Totals may not add due to rounding.

*Source:* Planning Board

CONFIDENTIAL

PRIFA STAY0001882

The following table presents annual statistics of average manufacturing employment by industry based on the North American Industry Classification System (NAICS) for fiscal years 2000 to 2004.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Manufacturing Employment by Industry Group[1]**
**(persons age 16 years and over)**

| Industry Group | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004**[2] |
| **Durable Goods** | | | | | |
| Nonmetallic Mineral Products Manufacturing | 4,833 | 4,726 | 4,447 | 4,255 | 4,312 |
| Cement and Concrete Products Manufacturing | 3,700 | 3,723 | 3,494 | 3,373 | 3,409 |
| Fabricated Metal Products | 7,267 | 7,218 | 6,403 | 6,054 | 5,780 |
| Computer and Electronic | 14,958 | 14,316 | 11,471 | 11,549 | 11,271 |
| Navigational, Measuring | 4,617 | 4,330 | 4,661 | 4,186 | 4,409 |
| Electrical Equipment | 8,917 | 8,225 | 7,064 | 6,927 | 6,606 |
| Electrical Equipment Manufacturing | 4,992 | 4,564 | 4,030 | 3,630 | 3,854 |
| Miscellaneous Manufacturing | 11,725 | 12,046 | 11,299 | 12,147 | 11,683 |
| Medical Equipment and Supplies Manufacturing | 10,300 | 10,784 | 10,110 | 11,187 | 10,781 |
| Other Durable Goods Manufacturing | 9,683 | 9,718 | 8,255 | 6,602 | 6,234 |
| Total – Durable Goods | 57,383 | 56,249 | 49,348 | 47,534 | 45,886 |
| **Non-Durable Goods** | | | | | |
| Food Manufacturing | 17,417 | 17,109 | 14,469 | 13,213 | 12,567 |
| Beverage and Tobacco Products Manufacturing | 3,425 | 3,571 | 3,423 | 3,352 | 3,757 |
| Apparel Manufacturing | 17,517 | 16,265 | 11,872 | 8,935 | 8,646 |
| Cut and Sew Apparel Manufacturing | 16,358 | 15,162 | 11,174 | 8,914 | 8,642 |
| Chemical Manufacturing | 29,450 | 29,124 | 30,265 | 31,621 | 31,868 |
| Pharmaceutical and Medicine Manufacturing | 24,300 | 24,275 | 25,707 | 27,337 | 28,157 |
| Plastics and Rubber Products | 4,108 | 3,820 | 3,399 | 3,154 | 3,007 |
| Plastics Product Manufacturing | 3,675 | 3,412 | 3,105 | 2,875 | 2,686 |
| Other Non-Durable Goods Manufacturing | 13,633 | 12,347 | 9,206 | 9,044 | 10,155 |
| Total – Non-Durable Goods | 85,550 | 82,236 | 72,595 | 69,319 | 70,000 |
| Total Manufacturing Employment | 142,933 | 138,485 | 121,943 | 116,853 | 115,886 |

(1) Totals may not add due to rounding.
(2) Preliminary.

*Sources:* Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 27,047 from fiscal year 2000 to fiscal year 2004. This reduction in manufacturing employment occurred during a period of significant expansion in real manufacturing output, as reflected in the growth of exports. This trend suggests a significant increase in manufacturing investment and productivity. Most of the decrease in employment has been concentrated in labor intensive industries, particularly apparel, textiles, tuna canning, and leather products.

CONFIDENTIAL

PRIFA_STAY0001883

**Leading United States and Foreign Companies with Manufacturing Operations in Puerto Rico** [1]

| Employment 2,500 and over | Product | Employment 200 to 499 | Product |
|---|---|---|---|
| Baxter International, Inc. | Medical Devices | Alcan Finance (BDA) LTC | Plastics |
| Johnson and Johnson | Surgical Products | Atlantron Inc. | Computers |
| Pfizer Pharmaceuticals LLC | Pharmaceuticals | Bacardi Limited | Food |
| Wyeth | Pharmaceuticals | Biovail Corporation International | Pharmaceuticals |
| | | CEMEX | Cement |
| **Employment 1,000 to 2,499** | **Product** | Checkpoint Systems Inc. | Electronic Instruments |
| | | Coca Cola Company | Food |
| Abbot Laboratories | Pharmaceuticals | Colgate-Palmolive Company | Consumer Products |
| Altadis | Cigars | C.R. Bard | Surgical Instruments |
| Amgen, Inc. | Pharmaceuticals | Curtis Instruments Inc. | Electrical Instruments |
| Eaton Corporation | Electronic Instruments | Davis Creek Managing Partners | Metal Products |
| Edwards Lifesciences LLC | Surgical Instruments | E.I. DuPont de Nemours & Co. | Chemicals |
| Eli Lilly and Company | Pharmaceuticals | Eastern Canvas Products | Textile Products |
| General Electric Industrial Systems | Electronic Instruments | Espace Europee de Lenterprise | Pharmaceuticals |
| Glaxo Smithkline | Pharmaceuticals | Essilor International | Ophthalmic Products |
| Hewlett-Packard Co. | Computers | Hershey Foods Corp. | Food |
| Medtronic Europe SA | Surgical Instruments | ICN Pharmaceuticals Inc. | Pharmaceuticals |
| Merck & Co., Inc. | Pharmaceuticals | Loctite Corporation | Chemicals |
| Propper International Company | Apparel | Lutron Electronics Co. Inc. | Electronic Instruments |
| Sare Lee Corp | Apparel | Millipore Corporation | Surgical Instruments |
| Schering Plough Corporation | Pharmaceuticals | Mylan Laboratories, Inc. | Chemicals |
| Solectron Corporation | Electronic Instruments | Northrop Grumman Corporation | Electrical Instruments |
| Zimmer Holdings, Inc. | Pharmaceuticals | Novartis Holding AG | Ophthalmic Products |
| | | Nypro International | Medical Devices |
| | | Owens Illinois Inc. | Glass and Plastics |
| **Employment 500 to 999** | **Product** | Packaging Coordinators Inc. | Packaging Products |
| | | PepsiCo, Inc. | Food |
| Advanced Medical Optics, Inc. | Ophthalmic Products | Pilgrim's Pride Corporation | Food |
| Astra Zeneca PLC | Pharmaceuticals | Procter & Gamble Co. | Pharmaceuticals |
| Becton-Dickinson & Co. | Surgical Instruments | Rocky Shoes & Boots | Footwear |
| Cardinal Health, Inc. | Pharmaceuticals | Siemens AG | Electrical Instruments |
| Connors Bros. | Food | Sitnasuak Native Corporation | Apparel |
| Dean Foods Company | Food | St. Jude Medical, Inc. | Surgical Instruments |
| Guidant Corp. | Medical Instruments | Standard Motor Products Inc. | Motor Vehicle Parts |
| Hamilton Sundstrand Corp. | Electrical Instruments | Storage Technology Corp. | Electronics |
| Hubbel Incorporated | Electrical Instruments | Symmetricom Inc. | Electronic Equipment |
| Ingersoll-Rand Co. | Electrical Instruments | Thomas & Betts Corporation | Electrical Instruments |
| Ivax Pharmaceutical | Pharmaceuticals Ophthalmic | Timberland Company | Leather |
| Pall Corporation | Filters | Watson Pharmaceutical, Inc. | Pharmaceuticals |
| Pharmacia Corporation | Pharmaceuticals | | |
| Stryker Corp. | Surgical Instruments | | |
| Tyco, Int. | Security System | | |
| Tyco International | Surgical Products | | |
| Unilever PLC | Consumer Products | | |
| Warner-Lamber Company | Pharmaceuticals | | |
| Wellco Enterprise, Inc. | Leather | | |

(1)   Based on the last employment figures reported by each company to PRIDCO.

*Source:* PRIDCO, Office of Economic Research

## Services

Puerto Rico has experienced significant growth in the services sector, which includes finance, insurance, real estate, wholesale and retail trade, tourism and other services, in terms of both income and employment over the past decade, showing a favorable trend as compared with certain other industrialized economies. During the period between fiscal years 2000 and 2004, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 5.2%, while payroll employment in this sector increased at an average annual rate of 1.1%. It should also be noted that in the Puerto Rico labor market self-employment, which is not accounted for in the Payroll Survey, represents approximately 17% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. For example, in fiscal year 2003, the number of self-employed individuals was 180,464, out of which 46.0% were in the service sector and 10.5% were in the construction sector. The development of the services sector has been positively

CONFIDENTIAL

PRIFA_STAY0001884

affected by demand generated by other sectors of the economy, such as manufacturing, construction and agriculture. The services sector in Puerto Rico has a diversified base.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The services sector ranks second to manufacturing in its contribution to gross domestic product, and it is the sector with the greatest employment. In fiscal year 2004, services generated $30.5 billion of gross domestic product, or 38.7%, of the total. Services employment grew from 510,758 in fiscal year 2000 to 513,872 in fiscal year 2004 (representing 51.2% of total employment). This represents a cumulative increase of 0.6%. Wholesale and retail trade, finance, insurance and real estate experienced significant growth in fiscal years 2000 to 2004, as measured by gross domestic product. From fiscal year 2000 to 2004, gross domestic product increased in wholesale and retail trade from $8.3 billion to $9.6 billion and in finance, insurance, and real estate from $10.0 billion to $13.0 billion. There are sixteen commercial banks and trust companies currently operating in Puerto Rico. Total assets of these institutions as of December 31, 2004 were $94.3 billion. As of December 31, 2004, there were approximately thirty-five international banking entities operating in Puerto Rico licensed to conduct offshore banking transactions with total assets of $66.8 billion.

The following tables set forth gross domestic product and employment for the services sector for fiscal years 2000 to 2004.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Service Sector**
**(in millions at current prices)**

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004**[1] |
| Wholesale and retail trade | $ 8,340 | $ 8,338 | $ 8,623 | $ 9,005 | $ 9,582 |
| Finance, insurance and real estate | 9,977 | 11,294 | 11,212 | 12,425 | 13,024 |
| Other services[2] | 6,603 | 6,982 | 7,078 | 7,257 | 7,899 |
| Total[3] | $24,920 | $26,615 | $26,913 | $28,688 | $30,505 |

(1) Preliminary.
(2) Includes tourism.
(3) Totals may not add due to rounding.

*Source:* Planning Board

CONFIDENTIAL

PRIFA_STAY0001885

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Service Sector**
**(thousands of persons age 16 and over)**

| | Fiscal Years Ended June 30 | | | | |
| | 2000 | 2001 | 2002 | 2003 | 2004[1] |
|---|---|---|---|---|---|
| Wholesale Trade | 32,000 | 32,327 | 31,489 | 31,218 | 32,344 |
| Retail Trade | 131,817 | 133,821 | 127,716 | 128,189 | 131,873 |
| Transportation, Warehouse & Utilities | 19,458 | 19,285 | 17,603 | 17,124 | 16,926 |
| Trade, Transportation, Warehouse & Utilities | 183,275 | 185,433 | 176,808 | 176,531 | 181,144 |
| Information | 21,108 | 20,597 | 21,943 | 21,216 | 21,347 |
| Finance | 45,583 | 44,974 | 43,963 | 42,128 | 41,584 |
| Professional and Business | 96,750 | 97,164 | 95,223 | 96,938 | 95,006 |
| Educational & Health | 80,692 | 84,202 | 84,452 | 87,590 | 90,561 |
| Leisure & Hospitality | 65,942 | 66,435 | 64,273 | 66,200 | 68,263 |
| Other Services | 17,408 | 17,330 | 16,602 | 16,338 | 15,967 |
| Total | 510,758 | 516,135 | 503,264 | 506,941 | 513,872 |

(1)   Preliminary

*Source:* Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services - Tourism*

During fiscal year 2004, the number of persons registered in tourist hotels was 1,788,800, an increase of 3.3% over the number of persons registered during fiscal year 2003. The average occupancy rate in tourist hotels during fiscal year 2004 was 72.3% compared to 68.0% in fiscal year 2003. The average number of rooms rented in tourist hotels increased 4.8% during fiscal year 2004 compared with fiscal year 2003. The average number of rooms available in tourist hotels decreased 1.4% during fiscal year 2004 compared with fiscal year 2003.

In the first eight months of fiscal year 2005, the number of persons registered in tourist hotels was 1,189,900, an increase of 3.9% over the number of persons registered during the same period in fiscal year 2004. The number of non-resident tourists registered in tourist hotels during the first eight months of fiscal year 2005 increased 3.7% in comparison with the same period of fiscal year 2004. The average number of rooms rented in tourist hotels increased 2.3% during the first eight months of fiscal year 2005 compared to the same period in fiscal year 2004. The average occupancy rate in tourist hotels during the first eight months of fiscal year 2005 was 69.4% compared to 70.8% for the same period in fiscal year 2004. The decrease in the occupancy rate in tourist hotels during fiscal year 2005 was due to the introduction of new hotel rooms into the market.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

CONFIDENTIAL

PRIFA_STAY0001886

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five fiscal years ended June 30, 2004.

### Commonwealth of Puerto Rico
### Tourism Data

| | Number of Visitors | | | | Total Visitors' Expenditures (in millions) |
|---|---|---|---|---|---|
| Fiscal Years Ended June 30 | Tourist Hotels[1] | Cruise Ship | Other[2] | Total | |
| 2000 | 1,050,100 | 1,224,600 | 2,291,300 | 4,566,000 | $2,387.9 |
| 2001 | 1,186,800 | 1,356,600 | 2,364,400 | 4,907,800 | 2,728.1 |
| 2002 | 1,147,800 | 1,277,000 | 1,939,300 | 4,364,100 | 2,486.4 |
| 2003 | 1,239,200 | 1,163,900 | 1,999,200 | 4,402,300 | 2,676.6 |
| 2004[3] | 1,307,000 | 1,348,200 | 2,234,000 | 4,889,200 | 3,024.0 |

(1)   Includes visitors in guesthouses.
(2)   Includes visitors in homes of relatives, friends, and in hotel apartments.
(3)   Preliminary.

*Sources:* Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Convention Center District Authority, is in the process of finishing the development of a convention center. The convention center, which will be the largest in the Caribbean, is the centerpiece of a 100-acre private development including hotels, restaurants, cinemas, office space and housing. The convention center district is being developed at a total cost of $1.3 billion to complement and improve Puerto Rico's competitive position in the convention and group travel segments. The convention center is expected to open by the end of calendar year 2005, and seventeen conventions have already been booked for the first year.

The Convention Center District Authority also owns a multi-purpose coliseum located in San Juan, Puerto Rico. The coliseum, known as the Jose Miguel Agrelot Coliseum, was inaugurated in 2004 and has been host to various successful artistic events.

*Government*

The government sector of Puerto Rico plays an important role in the economy. In fiscal year 2004, government accounted for $7.4 billion of Puerto Rico's gross domestic product, or 9.4%, of the total. The government is also a significant employer, providing jobs for 303,914 workers, or 30.3%, of total non-farm payroll employment in fiscal year 2004. The government's share of non-farm payroll employment (including the central government, the public corporations and the municipalities, but excluding the federal government), measured according to the payroll survey, had decreased from 34.9% in fiscal year 1980 to 26.4% in fiscal year 2000.

On February 25, 1998, legislation was enacted permitting the unionization of employees of the central government (excluding municipal employees). Under this law, government employees are given collective bargaining rights subject to a number of limitations. Among those limitations are: employees are prohibited from striking; salary increases are contingent on the availability of budgeted revenues; employees cannot be required to become union members and pay union dues; and collective bargaining negotiations cannot occur in an election year. During fiscal year 2006, the Commonwealth and its instrumentalities will begin to negotiate the economic and non-economic terms of at least forty collective bargaining agreements, which could have a material impact on the General Fund.

CONFIDENTIAL

PRIFA_STAY0001887

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations on the island including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Luis Muñoz Marín International Airport is currently served by twenty-five United States and international airlines. At present, there is daily direct service between San Juan and Atlanta, Boston, Chicago, Dallas, Miami, New York, Philadelphia, and numerous other destinations within the United States. There is also regularly scheduled service between Puerto Rico and other Caribbean islands and certain Latin American and European cities. A major United States airline uses San Juan as a hub for its intra-Caribbean airline service. Several smaller airports serve intra-island traffic.

The island's major cities are connected by a modern highway system, which, as of December 31, 2004, totaled approximately 4,607 miles. The highway system comprises 379 miles of primary system highways, 230 miles of primary urban system highways, 954 miles of secondary system highways and 3,043 miles of tertiary highways and roads.

The first phase of a new mass transit system, known as Tren Urbano, has been completed. Tren Urbano serves a portion of metropolitan San Juan and is expected to eventually serve the municipalities of Carolina and Caguas. Currently, Tren Urbano is operating free of charge until the first week of June 2005 as part of an education and familiarization program to introduce Tren Urbano to the population.

The Port of the Americas Authority, created by legislation, is responsible for the development and operation of the Port of the Americas, a deep draft port on the south coast of Puerto Rico. In fiscal year 2004, the first phase of the Port of the Americas was completed. This initial phase included the improvement and expansion of the Port of Ponce at a cost of $40 million. During calendar year 2005, the Port of the Americas will begin its second phase relying on a $70 million line of credit provided by GDB. This second phase includes (i) dredging the entrance channel and adjacent areas of the Port of Ponce to a depth of 50 feet; (ii) reconstruction of container terminals at the Port of Ponce; (iii) commencement of certain required environmental mitigation procedures; and (iv) preparation of final construction schematics. Partial operation of the Port of the Americas could begin as early as calendar year 2006.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity. However, during the period from fiscal year 2000 through fiscal year 2004, real construction investment decreased 3.3%. This decline is relatively small when compared to the relatively high levels of construction activity.

The total value of construction permits increased 21.2% for the same five-year period. Public investment has been an important component of construction investment. During fiscal year 2004, approximately 41% of the total investment in construction was related to public projects. During fiscal year 2004, the total value of construction permits increased 8.2% compared with fiscal year 2003. Average payroll employment in the construction sector during fiscal year 2004 was 68,355, a decrease of 0.5% from fiscal year 2003.

During fiscal year 2004, total sales of cement, including imports, decreased 1.9% compared with fiscal year 2003. This decrease in total sales of cement was attributable in part to heavy rains that affected the island in November 2003, causing a 31% decrease in sales as compared to November 2002. Excluding November 2003, total sales of cement for fiscal year 2004 increased 0.9%.

CONFIDENTIAL

PRIFA_STAY0001888

Total construction investment for fiscal year 2004 increased (in real terms) by 1.5%, which was the first increase in three years. For fiscal years 2005 and 2006, the Planning Board forecasts construction investment increases (in real terms) of 1.3% for each year. Public investment will be primarily in housing, new schools (and school reconstruction programs), water projects, and other public infrastructure projects. However, public investment in construction could be negatively affected by the Commonwealth's fiscal difficulties.

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. During fiscal year 2004, gross income from agriculture was $780.7 million, an increase of 2.8% compared with fiscal year 2003. Agriculture gross income consists of the total value of production in the principal agricultural sectors, which include traditional crops, livestock and poultry, grains, vegetables, fruits, and other products. During fiscal year 2004, traditional crops, livestock products, starchy vegetables, ornamental plants and other products contributed a higher percentage of the sector's income.

The Commonwealth supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225, approved on December 1, 1995, increased the tax benefits available to bona fide farmers. Act No. 225 provides a 90% income tax exemption for income derived from agricultural operations, an investment tax credit equal to 50% of the investment in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses. Subsequent legislation imposed an aggregate annual limit of $15 million on the investment tax credits available under Act No. 225.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

**Higher Education**

During the five decades from 1950 to 2000, Puerto Rico made significant advances in the field of education, particularly at the college and graduate school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher wage, higher technology industries became more prominent in Puerto Rico. More recently, employment in the services sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing proportion of college attendance by such population. During the 1990s, college attendance and college attendance as a percentage of the college age population continued to increase.

The following table presents comparative trend data for Puerto Rico and the United States with respect to college age population and the percentage of such population attending institutions of higher learning.

CONFIDENTIAL

PRIFA_STAY0001889

**Commonwealth of Puerto Rico**
**Trend in College Enrollment**

| Academic Year | Commonwealth of Puerto Rico | | | Mainland United States | | |
|---|---|---|---|---|---|---|
| | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 .................. | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 .................. | 397,839[2] | 130,105 | 32.7 | 30,022,000[2] | 12,096,895 | 40.3 |
| 1990 .................. | 417,636[2] | 156,147 | 37.4 | 26,961,000[2] | 13,621,000 | 50.5 |
| 2000 .................. | 428,892[2] | 176,015 | 41.0 | 27,143,455[2] | 15,312,000 | 56.4 |
| 2001 .................. | 425,519[3] | 185,015 | 43.5 | 27,831,000[3] | 15,873,000 | 57.0 |
| 2002 .................. | 422,549[3] | 190,776 | 45.1 | 28,342,000[3] | 15,608,000 | 55.1 |
| 2003 .................. | 418,390[3] | 199,842 | 47.8 | 28,899,571[3] | 15,756,000 | 54.5 |

(1)   Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
(2)   Based on census population as of April 1.
(3)   Estimated population (reference date July 1).

*Sources:*   United States Census Bureau (Mainland United States Population), United States National Center for Education Statistics, Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2003-2004 was 68,627 students. The Commonwealth is legally bound to appropriate annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources for each of the two fiscal years immediately preceding the current fiscal year.

In addition to the University of Puerto Rico, there are 43 public and private institutions of higher education located in Puerto Rico. Such institutions have a current enrollment in excess of 130,285 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

**Tax Incentives**

One factor that has promoted and continues to promote the development of the manufacturing sector in Puerto Rico has been the various local and federal tax incentives available, particularly those under Puerto Rico's Industrial Incentives Program and, until recently, Sections 30A and 936 of the Code. Tax and other incentives have also been established to promote the development of the tourism industry. These incentives are summarized below.

*Industrial Incentives Program*

Since 1948, Puerto Rico has had various industrial incentives laws designed to stimulate industrial investment in the island. Under these laws, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes. The most recent of these industrial incentives laws is the 1998 Tax Incentives Act, a law aimed at promoting investment in Puerto Rico.

The benefits provided by the 1998 Tax Incentives Act are available to new companies as well as companies currently conducting tax exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grant. The activities eligible for tax exemption include manufacturing; certain designated services performed for markets outside Puerto Rico, the production of energy from local

CONFIDENTIAL

PRIFA_STAY0001890

renewable sources for consumption in Puerto Rico and laboratories for scientific and industrial research. For companies qualifying thereunder, the 1998 Tax Incentives Act imposes income tax rates ranging from 2% to 7% for periods ranging from 10 to 25 years. In addition, it grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and between 80% and 60% thereafter, and 100% exemption from excise taxes with respect to raw materials and certain machinery and equipment used in the exempt activities. The 1998 Tax Incentives Act also provides various special deductions designed to stimulate employment and productivity, research and development and capital investment in Puerto Rico.

Under the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. In addition, passive income derived from the investment of eligible funds in Puerto Rico financial institutions, obligations of the Commonwealth and other designated investments are fully exempt from income and municipal license taxes. Individual shareholders of an exempted business are allowed a credit against their Puerto Rico income taxes equal to 30% of their proportionate share of the exempted business's income tax liability. Gain from the sale or exchange of shares of an exempted business by its shareholders during the exemption period is subject to a 4% income tax rate.

*Tourism Incentives Program*

For many years, Puerto Rico has also had incentives laws designed to stimulate investment in hotel operations on the island. The most recent of these laws, the Tourism Incentives Act of 1993, provides partial exemptions from income, property, and municipal license taxes for a period of up to ten years. The Tourism Incentives Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. Recently enacted legislation provides further tourism incentives by granting certain tax exemptions on interest income received from permanent or interim financing of tourism development projects and fees derived from credit enhancements provided to the financing of such projects.

As part of the incentives to promote the tourism industry, the Commonwealth established the Tourism Development Fund as a subsidiary of GDB with the authority to (i) make investments in or provide financing to entities that contribute to the development of the tourism industry and (ii) provide financial guarantees and direct loans for financing hotel development projects. To date, the Fund has provided direct loans and financial guarantees for loans made or bonds issued to finance the development of seventeen hotel projects representing over 3,800 new hotel rooms.

*Incentives under the Code*

United States corporations operating in Puerto Rico have been subject to special tax provisions since the Revenue Act of 1921. Prior to enactment of the Tax Reform Act of 1976, under Section 931 of the Code, United States corporations operating in Puerto Rico (and meeting certain source of income tests) were taxed only on income arising from sources within the United States.

The Tax Reform Act of 1976 created Section 936 of the Code, which revised the tax treatment of United States corporations operating in Puerto Rico by taxing such corporations on their worldwide income in a manner similar to that applicable to any other United States corporation but providing such corporations a full credit for the federal tax on their business and qualified investment income in Puerto Rico. The credit provided an effective 100% federal tax exemption for operating and qualifying investment income from Puerto Rico sources.

As a result of amendments to Section 936 of the Code made in 1996 (the "1996 Amendments"), the tax credit is being phased out over a ten-year period for companies that were operating in Puerto Rico in 1995 and is no longer available for corporations that establish operations in Puerto Rico after October 13, 1995. The 1996 Amendments also eliminated the credit previously available for income derived from certain qualified investments in Puerto Rico.

CONFIDENTIAL

PRIFA_STAY0001891

*Section 30A*.  The 1996 Amendments added Section 30A to the Code.  Section 30A permits a "qualifying domestic corporation" ("QDC") that meets certain gross income tests to claim a credit (the "Section 30A Credit") against the federal income tax imposed on taxable income derived from sources outside the United States from the active conduct of a trade or business in Puerto Rico or from the sale of substantially all the assets used in such business ("possession income").  The Section 30A Credit will not be available for taxable years commencing on or after January 1, 2006.

The Section 30A Credit is limited to the sum of (i) 60% of qualified possession wages as defined in the Code, which includes wages up to 85% of the maximum earnings subject to the OASDI portion of Social Security taxes plus an allowance for fringe benefits of 15% of qualified possession wages; (ii) a specified percentage of depreciation deductions ranging between 15% and 65%, based on the class life of tangible property; and (iii) a portion of Puerto Rico income taxes paid by the QDC, up to a 9% effective tax rate (but only if the QDC does not elect the profit-split method for allocating income from intangible property).

In the case of taxable years beginning after December 31, 2001, the amount of possession income that qualifies for the Section 30A Credit is subject to a cap based on the QDC's possession income for an average adjusted base period ending before October 14, 1995 (the "income cap").

*Section 936*.  Under Section 936 of the Code, as amended by the 1996 Amendments, United States corporations that meet certain requirements and elect its application ("Section 936 Corporations") are entitled to credit against their United States corporate income tax the portion of such tax attributable to income derived from the active conduct of a trade or business within Puerto Rico ("active business income") and from the sale or exchange of substantially all assets used in the active conduct of such trade or business.

Under Section 936 of the Code, a Section 936 Corporation may elect to compute its active business income, eligible for the Section 936 credit, under one of three formulas: (i) a cost-sharing formula, whereby it is allowed to claim all profits attributable to manufacturing intangibles and other functions carried out in Puerto Rico provided it makes a cost sharing payment in the amount required under Section 936 of the Code; (ii) a profit-split formula, whereby it is allowed to claim 50% of the combined net income of its affiliated group from the sale of products manufactured in Puerto Rico; or (iii) a cost-plus formula, whereby it is allowed to claim a reasonable profit on the manufacturing costs incurred in Puerto Rico.

The Section 936 credit is now only available to companies that were operating in Puerto Rico on October 13, 1995, and had elected the percentage of income credit provided by Section 936 of the Code. Such percentage of income credit is equal to 40% of the federal income tax otherwise imposable on the Puerto Rico active business income or derived from the sale or exchange of substantially all assets used in such business.

In the case of taxable years beginning on or after 1998, the possession income subject to the Section 936 credit is subject to a cap based on the Section 936 Corporation's possession income for an average adjusted base period ending on October 14, 1995.  The Section 936 credit is eliminated for taxable years commencing on or after January 1, 2006.

*Controlled Foreign Corporations*

Because of the credit limitations and impending phase out of Sections 30A and 936 of the Code, many corporations previously operating thereunder have reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs").  A CFC is a corporation that is organized outside the United States and is controlled by United States shareholders.  In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United

CONFIDENTIAL

States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from over 120 corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics companies manufacturing in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to corporations operating under Sections 30A and 936 of the Code. In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost sharing payments they might have opted to make, but CFCs are subject to a ten percent Puerto Rico withholding tax on royalty payments.

## DEBT

### Public Sector Debt

Public sector debt comprises bonds and notes of the Commonwealth, its municipalities, and public corporations ("notes" as used in this section refers to certain types of non-bonded debt regardless of maturity), subject to the exclusions described below. The Constitution of Puerto Rico limits the amount of general obligation (full faith and credit) debt that can be issued or guaranteed by the Commonwealth. The Commonwealth's policy has been and continues to be to maintain the amount of such debt prudently below the constitutional limitation. Direct debt of the Commonwealth is supported by Commonwealth taxes. Debt of municipalities, other than bond anticipation notes, is supported by real and personal property taxes and municipal license taxes. Debt of public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations from rates charged for services or products. See *Public Corporations*. However, certain debt of public corporations is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Direct debt of the Commonwealth is issued pursuant to specific legislation approved in each particular case. Debt of the municipalities is issued pursuant to resolutions adopted by the respective municipal assemblies. Debt of public corporations is issued pursuant to resolutions adopted by the governing bodies of the public corporations in accordance with their enabling statutes. GDB, as fiscal agent of the Commonwealth and its municipalities and public corporations, must approve the specific terms of each issuance.

The following table presents a summary of public sector debt as of December 31, 2004. Excluded from the table is debt not primarily payable from either Commonwealth or municipal taxes, Commonwealth appropriations or rates charged by public corporations for services or products. Also excluded from the table is debt the inclusion of which would reflect double counting including, but not limited to, $1.237 billion of outstanding bonds issued by the Municipal Finance Agency to finance its purchase of bonds of Puerto Rico municipalities, and $1.444 billion of obligations of GDB issued to purchase certain Commonwealth public sector debt and for other purposes, of which $267 million is guaranteed by the Commonwealth.

III-23

CONFIDENTIAL

## Commonwealth of Puerto Rico
## Public Sector Debt
### (in thousands)

|  | December 31, 2004 |
|---|---|
| Puerto Rico direct debt[1] | $ 9,734,936 |
| Municipal debt | 2,016,106 |
| Public corporations debt |  |
| Puerto Rico guaranteed debt[2] | 636,558 |
| Debt supported by Puerto Rico appropriations or taxes[3] | 15,595,095 |
| Other non-guaranteed debt[4] | 7,966,971 |
| Total public corporations debt | 24,198,624 |
| Total public sector debt | $35,949,666 |

---

(1) Includes general obligation bonds, tax and revenues anticipation notes, and lines of credit provided by GDB. Excludes certain Commonwealth general obligation bonds that have been refunded with proceeds that were invested in guaranteed investment contracts or other securities not eligible to effect a legal defeasance, even though such bonds will be considered outstanding under their respective authorizing resolutions and for purposes of calculating the Commonwealth's constitutional debt limitation.

(2) Consists of $485.7 million of bonds issued by the Aqueduct and Sewer Authority and $150.9 million of State Revolving Fund Loans, incurred under various federal water laws. Excludes Public Buildings Authority bonds in the principal amount of $2.920 billion as of December 31, 2004 and $267 million of GDB bonds payable from available moneys of GDB.

(3) Represents, among others, bonds and notes issued by the Aqueduct and Sewer Authority, the Highway and Transportation Authority, the Housing Finance Authority, the Infrastructure Financing Authority, the Public Buildings Authority and the Public Finance Corporation.

(4) Excludes the following: $1.058 billion of Infrastructure Financing Authority bonds, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company; $1.143 billion of Children's Trust bonds which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $663 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development; $153 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by the Ports Authority, which are solely payable from by the pledge of certain payments made by a private corporation under a special facilities agreement; $97 million of Qualified Zone Academy Bonds issued by the Public Finance Corporation, which are payable from securities purchased with funds assigned by the Children's Trust to the Department of Education; $87 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, which are payable from rent payments made by the University of Puerto Rico; and approximately $113.4 million of bonds issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities. If these amounts were included, total public corporation debt would be $27,667,431,000 and total public sector debt would be $39,419,727,000.

*Source:* Government Development Bank for Puerto Rico

No deductions have been made in the above table for debt service funds and debt service reserve funds. The table above and the amounts shown throughout this section as representing outstanding debt include outstanding capital appreciation bonds at their respective original principal amounts and do not include any accretion thereon.

### Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt

The following table presents the debt service requirements for Commonwealth general obligation bonds outstanding as of December 31, 2004 and bonds of the Aqueduct and Sewer Authority for which debt service payments are being made under the Commonwealth guaranty.

CONFIDENTIAL

PRIFA STAY0001894

The table excludes debt service on certain general obligation bonds refunded with refunding bonds the proceeds of which, pending the redemption of the refunded bonds, were invested in guaranteed investment contracts or other securities not eligible to effect a legal defeasance. Such refunded bonds will be considered to be outstanding under their respective authorizing resolutions and for purposes of calculating the Commonwealth's constitutional debt limitation. Had such bonds been included in the table, maximum annual principal and interest on all outstanding general obligation bonds would have been $711,522,695 during the fiscal year ending June 30, 2005. With respect to other debt of the Aqueduct and Sewer Authority, see *Public Corporations*. Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

**Puerto Rico**
**Debt Service Requirements***
**(In thousands)**

**Outstanding Bonds**

| Fiscal Year Ending June 30 | Principal | Interest | Total Debt Service | PRASA Bonds Debt Service | Grand Total |
|---|---|---|---|---|---|
| 2005 | 132,585 | 357,776 | 490,361 | 30,127 | 520,489 |
| 2006 | 174,484 | 387,535 | 562,019 | 30,121 | 592,140 |
| 2007 | 161,722 | 400,175 | 561,897 | 30,126 | 592,024 |
| 2008 | 200,027 | 371,611 | 571,638 | 30,131 | 601,769 |
| 2009 | 238,840 | 328,465 | 567,304 | 30,123 | 597,428 |
| 2010 | 252,795 | 314,693 | 567,488 | 29,984 | 597,472 |
| 2011 | 264,197 | 300,913 | 565,110 | 29,928 | 595,039 |
| 2012 | 283,795 | 281,166 | 564,961 | 30,127 | 595,088 |
| 2013 | 301,335 | 263,690 | 565,025 | 30,128 | 595,152 |
| 2014 | 299,023 | 268,096 | 567,119 | 30,125 | 597,244 |
| 2015 | 313,125 | 254,313 | 567,437 | 30,126 | 597,563 |
| 2016 | 328,230 | 239,472 | 567,702 | 30,121 | 597,823 |
| 2017 | 343,802 | 224,283 | 568,084 | 30,122 | 598,206 |
| 2018 | 361,120 | 208,346 | 569,466 | 30,126 | 599,591 |
| 2019 | 394,356 | 175,751 | 570,107 | 30,125 | 600,231 |
| 2020 | 452,165 | 148,395 | 600,560 | 0 | 600,560 |
| 2021 | 322,480 | 126,181 | 448,661 | 0 | 448,661 |
| 2022 | 247,400 | 111,409 | 358,809 | 0 | 358,809 |
| 2023 | 214,650 | 100,363 | 315,013 | 0 | 315,013 |
| 2024 | 200,845 | 90,886 | 291,731 | 0 | 291,731 |
| 2025 | 209,670 | 82,365 | 292,035 | 0 | 292,035 |
| 2026 | 209,880 | 73,792 | 283,672 | 0 | 283,672 |
| 2027 | 219,380 | 64,555 | 283,935 | 0 | 283,935 |
| 2028 | 229,265 | 54,947 | 284,212 | 0 | 284,212 |
| 2029 | 239,770 | 44,716 | 284,486 | 0 | 284,486 |
| 2030 | 251,355 | 33,301 | 284,656 | 0 | 284,656 |
| 2031 | 263,020 | 21,752 | 284,772 | 0 | 284,772 |
| 2032 | 96,645 | 9,518 | 106,163 | 0 | 106,163 |
| 2033 | 68,080 | 5,111 | 73,191 | 0 | 73,191 |
| 2034 | 33,105 | 1,655 | 34,760 | 0 | 34,760 |
| | $ 7,307,144 | $ 5,345,232 | $ 12,652,376 | $ 451,540 | $ 13,103,915 |

*Totals may not add due to rounding.

*Sources:* GDB and Department of the Treasury

**III-25**

CONFIDENTIAL

## Commonwealth Guaranteed Debt

As of December 31, 2004, $2.920 billion of Commonwealth guaranteed bonds of the Public Buildings Authority were outstanding. Maximum annual debt service on these bonds is $219.5 million in fiscal year ending June 30, 2011, with their final maturity being July 1, 2036. No payments under the Commonwealth guaranty have been required to date for bonds of the Public Buildings Authority.

As of December 31, 2004, $267 million of Commonwealth guaranteed obligations of GDB were outstanding. No payments under the Commonwealth guaranty have been required for any obligations of GDB to date.

As of December 31, 2004, the aggregate outstanding principal amount of the Series 1995 revenue bonds of the Aqueduct and Sewer Authority guaranteed by the Commonwealth was $305.3 million. On January 2, 1997, the Commonwealth began to make debt service payments under the Commonwealth guaranty and expects to make all debt service payments required on these revenue bonds.

In addition, in April 2000, the Commonwealth extended its guaranty to all of the outstanding bonds issued by the Aqueduct and Sewer Authority to the United States Department of Agriculture, Rural Development, and to all of the outstanding loans by the State Revolving Funds for the benefit of the Aqueduct and Sewer Authority. The guaranty will also cover any additional bonds and loans that may be issued until June 30, 2005. In February 2004, this guaranty was extended through new legislation to cover debt obligations issued until 2010. As of June 30, 2004, the principal amount outstanding on these bonds was $180.3 million and the principal amount outstanding of these loans was $150.9 million.

CONFIDENTIAL

PRIFA STAY0001896

**Trends of Public Sector Debt**

The following table shows the growth rate of short-term and long-term public sector debt and the growth rate of gross product (in current dollars) for the five fiscal years ended June 30, 2004 and the first six months of fiscal year 2005. As of December 31, 2004, outstanding short-term debt, relative to total debt, was 8.7%.

**Commonwealth of Puerto Rico**
**Public Sector Debt and Gross Product**
**(dollars in millions)***

| June 30 | Public Sector Debt | | | | | Gross Product[1] | |
| | Long Term | Short Term[2] | Short Term as % of Total | Total | Rate of Increase | Amount | Rate of Increase |
|---|---|---|---|---|---|---|---|
| 2000..................... | $21,620 | $2,202[3] | 9.2% | $23,822 | 5.0% | $41,419 | 8.2% |
| 2001[4].................. | 22,345 | 2,870[5] | 11.4 | 25,215 | 5.8 | 44,047 | 6.3 |
| 2002[6].................. | 26,737 | 1,250[3] | 4.5 | 27,987 | 11.0 | 45,071 | 2.3 |
| 2003[7].................. | 28,102 | 1,605[3] | 5.4 | 29,707 | 6.1 | 47,439 | 5.3 |
| 2004[8].................. | 31,767 | 2,175 | 6.4 | 33,942 | 14.3 | 50,320 | 6.1 |
| December 31, 2004[9]... | 32,823 | 3,126 | 8.7 | 35,949 | 5.9 | N/A | N/A |

*Totals may not add due to rounding.
(1) In current dollars.
(2) Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.
(3) Does not include the tax and revenue anticipation notes that were outstanding at the close of the indicated fiscal years because prior to the end of said fiscal years sufficient funds had been set aside for the payment of such notes in full.
(4) Excludes $397.0 million of bonds of Children's Trust outstanding on this date. If these bonds had been included, the rate of growth of public sector debt for fiscal year 2001 would have been 12.1%. Excludes $1.093 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.
(5) Includes a $164 million line of credit from GDB to the Secretary of the Treasury the proceeds of which were applied to pay debt service on general obligation bonds in lieu of funds available therefor in the General Fund.
(6) Excludes $390.1 million of bonds of Children's Trust outstanding on this date. Excludes $1.082 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.
(7) Excludes $1.171 billion of bonds of Children's Trust outstanding on this date. Excludes $1.074 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.
(8) Excludes $1.155 billion of bonds of Children's Trust outstanding on this date. Excludes $1.066 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.
(9) Excludes the following: $1.058 billion of Infrastructure Financing Authority bonds, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company; $1.143 billion of Children's Trust bonds which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $153 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by the Ports Authority, which are solely payable from by the pledge of certain payments made by a private corporation under a special facilities agreement; $97 million of Qualified Zone Academy Bonds issued by the Public Finance Corporation, which are payable from securities purchased with funds assigned by the Children's Trust to the Department of Education; $87 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, which are payable from rent payments made by the University of Puerto Rico; and approximately $113.4 million of bonds issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

*Source:* Government Development Bank for Puerto Rico

III-27

The following table shows the trend of public sector debt by major category for the five fiscal years ended June 30, 2004 and the first six months of fiscal year 2005.

### Commonwealth of Puerto Rico
### Public Sector Debt by Major Category
### (dollars in millions)*

| June 30 | Commonwealth | | | Municipalities | | | Public Corporations[1] | | | Total | | | Grand Total[4] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Long Term[4] | Short Term[2] | Total | Long Term | Short Term[2] | Total | Long Term | Short Term[2] | Total | Long Term | Short Term[2] | | |
| 2000 | $5,349 | $ 0[3] | $5,349 | $1,396 | $ 68 | $1,464 | $14,875 | $2,134 | $17,008 | $21,620 | $2,202 | | $23,822 |
| 2001 | 5,674 | 164[5] | 5,838 | 1,469 | 163 | 1,632 | 15,201[6] | 2,543 | 17,744 | 22,345 | 2,870 | | 25,215 |
| 2002 | 6,025 | 91[3] | 6,116 | 1,618 | 177 | 1,795 | 19,094[7] | 982 | 20,076 | 26,737 | 1,250 | | 27,987 |
| 2003 | 6,709 | 177[3] | 6,886 | 1,754 | 201 | 1,955 | 19,639[8] | 1,227 | 20,866 | 28,102 | 1,605 | | 29,707 |
| 2004 | 7,758 | 761 | 8,519 | 1,820 | 226 | 2,046 | 22,190[9] | 1,187 | 23,377 | 31,768 | 2,174 | | 33,942 |
| December 31, 2004 | 8,212 | 1,523 | 9,735 | 1,795 | 221 | 2,016 | 22,816[10] | 1,382 | 24,198 | 32,823 | 3,126 | | 35,949 |

*Totals may not add due to rounding.

(1) Includes Commonwealth guaranteed debt.

(2) Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.

(3) Does not include the tax and revenue anticipation notes which were outstanding at the close of the indicated fiscal years because prior to the end of said fiscal years sufficient funds had been set aside for the payment of such notes in full.

(4) Includes the Transferred CRUV Debt.

(5) Includes a $164 million line of credit from GDB to the Secretary of the Treasury the proceeds of which were applied to pay debt service on general obligation bonds in lieu of funds available therefor in the General Fund.

(6) Excludes the following: $397.0 million original principal amount of bonds issued by Children's Trust; and $1.093 billion original principal amount of bonds issued by Infrastructure Financing Authority, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

(7) Excludes the following: $390.1 million of bonds of Children's Trust outstanding on this date; and $1.082 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

(8) Excludes the following: $1.171 billion original principal amount of bonds of Children's Trust; and $1.074 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

(9) Excludes the following: $1.155 billion original principal amount of bonds of Children's Trust; and $1.066 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

(10) Excludes the following: $1.143 billion original principal amount of bonds of Children's Trust; $1.058 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company; $153 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by the Ports Authority, which are solely payable from by the pledge of certain payments made by a private corporation under a special facilities agreement; $97 million of Qualified Zone Academy Bonds issued by the Public Finance Corporation, which are payable from securities purchased with funds assigned by the Children's Trust to the Department of Education; $87 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, which are payable from rent payments made by the University of Puerto Rico; and approximately $113.4 million of bonds issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

*Source:* Government Development Bank for Puerto Rico

CONFIDENTIAL   PRIFA STAY0001898

## PUBLIC CORPORATIONS

In Puerto Rico, many governmental or quasi-governmental functions are performed by public corporations. These are governmental entities created by the Legislature with varying degrees of independence from the central government. Public corporations are generally created to perform a single function or a limited number of related functions. Most public corporations obtain revenues from rates charged for services or products, but many are subsidized to some extent by the central government. Most public corporations are governed by boards appointed by the Governor with the advice and consent of the Senate, but some public corporations are subsidiaries of departments of the central government. Capital improvements of most of the larger public corporations are financed by revenue bonds under trust agreements or bond resolutions or notes under loan agreements. The following table presents the outstanding bonds and notes of certain of the public corporations as of December 31, 2004 ("notes" as used in this section refers primarily to certain types of non-bonded debt regardless of maturity). Debt of certain other public corporations is excluded from this table because such debt is payable primarily from funds or grants provided by the federal government or is payable from sources other than Commonwealth appropriations or taxes or revenues of public corporations, or is payable from revenues derived from private sector services or products, such as industrial development bonds. Also excluded from this table is debt of certain public corporations the inclusion of which would reflect double counting. No deductions have been made in the table for debt service funds and debt service reserve funds. More detailed information about the major public corporations is presented in the following sections.

CONFIDENTIAL

PRIFA_STAY0001899

## Commonwealth of Puerto Rico
## Outstanding Debt of Public Corporations
### December 31, 2004
### (in thousands)

| | Bonds | | | Notes | | | Total Bonds and Notes | | |
|---|---|---|---|---|---|---|---|---|---|
| | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total |
| Aqueduct and Sewer Authority | $ 485,668 | $ 0 | $ 485,668 | $150,890 | $ 142,082[1] | $ 292,972 | $ 636,558 | $ 142,082[1] | $ 778,640 |
| Electric Power Authority | 0 | 4,878,508 | 4,878,508 | 0 | 330,459 | 330,459 | 0 | 5,208,967 | 5,208,967 |
| Highway and Transportation Authority | 0 | 5,770,009[2] | 5,770,009 | 0 | 110,037 | 110,037 | 0 | 5,880,046 | 5,880,046 |
| Housing Finance Authority[3] | 0 | 627,012 | 627,012 | 0 | 89,623 | 89,623 | 0 | 716,635 | 716,635 |
| Industrial Development Company | 0 | 295,449 | 295,449 | 0 | 35,242 | 35,242 | 0 | 330,691 | 330,691 |
| Infrastructure Financing Authority | 0 | 909,320[4] | 909,320 | 0 | 23,325 | 23,325 | 0 | 932,645 | 932,645 |
| Public Buildings Authority | 2,920,327 | 0 | 2,920,327 | 0 | 3,561 | 3,561 | 2,920,327 | 3,561 | 2,923,888 |
| Public Finance Corporation | 0 | 4,311,827[5] | 4,311,827 | | 0 | 0 | 0 | 4,311,827[4] | 4,311,827 |
| Ports Authority | 0 | 74,985[6] | 74,985 | 0 | 387,786 | 387,786 | 0 | 462,771 | 462,771 |
| University of Puerto Rico | 0 | 409,108[7] | 409,108 | 0 | 30,035 | 30,035 | 0 | 439,143 | 439,143 |
| Others | 0 | 0 | 0 | 0 | 2,213,371 | 2,213,371 | 0 | 2,213,371 | 2,213,371 |
| Total[8] | $3,405,995 | $17,276,218 | $20,682,213 | $150,890 | $3,365,521 | $3,516,411 | $3,556,885 | $20,641,739 | $24,198,624 |

(1) Principal of and interest on this debt is reimbursed from Commonwealth appropriations.

(2) Excludes $153 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge.

(3) Excludes the $663 million of Housing Finance Authority bonds, which are payable solely from Puerto Rico Public Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development.

(3) Excludes $1.058 billion of outstanding bonds of Infrastructure Financing Authority, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

(4) Payable primarily from Commonwealth appropriations.

(5) Excludes $96 million of Qualified Zone Academy Bonds issued by the Public Finance Corporation, which are payable from securities purchased with funds assigned by the Children's Trust to the Department of Education.

(6) Excludes $155 million of Special Facilities Bonds issued by the Ports Authority, which are solely payable from by the pledge of certain payments made by a private corporation under a special facilities agreement.

(7) Excludes $85 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, which are payable from rent payments made by the University of Puerto Rico

(8) Excludes accretion of interest from the respective issuance dates on capital appreciation bonds. Also excludes $1.155 billion original principal amount of Children's Trust Tobacco Settlement Asset-Backed Bonds, Series 2002, issued on October 10, 2002, which will be repaid from payments made by certain tobacco companies under a master settlement agreement. See "Other Public Corporations" below.

*Source:* Government Development Bank for Puerto Rico.

CONFIDENTIAL

PRIFA_STAY0001900

**Government Development Bank for Puerto Rico**

The principal functions of GDB are to act as financial advisor to and fiscal agent for the Commonwealth, its municipalities and public corporations in connection with the issuance of bonds and notes, to make loans and advances to public corporations and municipalities, and to make loans to private enterprises to aid in the economic development of Puerto Rico.

As of December 31, 2004, $1.4 billion of bonds and notes of GDB were outstanding. As of said date, GDB also had $4.7 billion in loans to the central government of the Commonwealth and its public corporations and municipalities. Act No. 12 of May 9, 1975, as amended, provides that the payment of principal of and interest on specified notes and other obligations of GDB, not exceeding $550 million, may be guaranteed by the Commonwealth, of which $267 million were outstanding as of December 31, 2004.

Act No. 82 of June 16, 2002, authorizes GDB to transfer every year to the Commonwealth's General Fund up to 10% of its audited net income or $10,000,000, whichever is greater.

Act No. 271 of November 21, 2002, requires GDB to provide the Special Communities Perpetual Trust with a $500 million line of credit and to make a capital contribution to the Trust of $500 million. As of December 31, 2004, the Trust's GDB line of credit had an outstanding balance of $425.1 million. As of April 18, 2005, GDB had disbursed to the Trust $320 million from two investment accounts held by GDB for the benefit of the Trust. GDB expects to replenish its equity capital with future net operating income. See "Other Public Corporations – Special Communities Perpetual Trust" below.

GDB has the following principal subsidiaries:

*Housing Finance Authority* (formerly known as Housing Finance Corporation) was originally created in November 1977 to provide needed rental-housing units and stimulate the construction industry under federally subsidized programs. Effective February 8, 2002, the Housing Finance Corporation became the Housing Finance Authority and the Housing Bank and Finance Agency was dissolved and its powers transferred to the Authority. The Authority is engaged in insuring and servicing mortgages originated by the Urban Renewal and Housing Corporation. It also provides financing for rental housing units, stimulates the construction industry under federally subsidized programs and provides interim financing for low-income housing projects and single-family homeownership programs. Housing Finance Corporation had issued tax-exempt revenue bonds and notes to finance the construction of housing units approved for federal rental subsidies and to finance home ownership of single family housing units, which bonds and notes are now limited obligations of the Housing Finance Authority payable solely from revenues collected in respect of such housing units. The Federal Housing Administration has insured mortgages on certain of the housing units. As of December 31, 2004, $716.6 million of Housing Finance Authority bonds and notes were outstanding (excluding bonds payable solely from securities pledged to the payment of such bonds and bonds payable solely from federal funds).

As of December 31, 2004, the Authority also had outstanding $637.3 million of bonds issued to (i) pay obligations of the Commonwealth under law, (ii) fund certain payments of the Commonwealth under its mortgage subsidy program for low and moderate income families, (iii) guarantee certain insurance obligations of the Housing Bank and Finance Agency under certain programs.

*Tourism Development Fund* was created in November 1993 to promote Puerto Rico's hotel and tourism industry, primarily by making available direct loans and guarantees to secure the payment of private financing used for new hotel development projects. The Tourism Development Fund is also authorized to make capital investments and provide direct financing to tourism related projects. As of December 31, 2004, the Tourism Development Fund had outstanding direct loans and guarantees with

CONFIDENTIAL

respect to the financing of fourteen hotel and tourism-related projects in an aggregate amount in excess of $572.6 million. See "Tax Incentives – Tourism Incentives Program" under *The Economy*.

The Tourism Development Fund has made payments under its guarantees and letters of credit in the aggregate amount of approximately $216.7 million with respect to several projects, including repayment in full of the bonds of three projects, which bonds had been declared due and payable at the direction of the Tourism Development Fund due to the failure of the borrowers of such projects to comply with their obligations under the related reimbursement agreements. After taking these payments and all related recoveries into consideration, the unrestricted net assets of the Tourism Development Fund as of December 31, 2004 were approximately $96.7 million (unaudited), and its allowance for loan losses on guarantees, loans, OREO and letters of credit was approximately $34.6 million (unaudited).

*Development Fund* was created in 1977 to provide an alternate source of financing to private enterprises in Puerto Rico that have difficulties in obtaining financing from traditional sources. The Development Fund may also guarantee obligations of these enterprises and invest in their equity securities.

*Capital Fund* was created in November 1993 for trading in debt obligations and publicly traded shares of domestic and foreign corporations.

*Public Finance Corporation* was created in December 1984 to provide agencies and instrumentalities of Puerto Rico with alternate means of meeting their financing requirements. As of December 31, 2004, the Corporation had $4.264 billion aggregate principal amount of bonds outstanding, substantially all of which have been issued to purchase debt of agencies and instrumentalities of the Commonwealth, and are payable from Commonwealth appropriations.

A description of certain other affiliates of GDB is provided in "Other Public Corporations" below.

## Other Public Corporations

*Aqueduct and Sewer Authority*. Puerto Rico Aqueduct and Sewer Authority ("PRASA") owns and operates a system of public water supply and sanitary sewer facilities.

PRASA needs to make a substantial investment in infrastructure and a major overhaul of its operations to maintain the viability of the existing system and to finance its expansion for new users. Funds for this investment are expected to be provided through a combination of revenues from PRASA, bond issues, legislative appropriations, and federal grants. Debt service on revenue bonds is payable from net revenues of the system after payment of current expenses. Due to PRASA's financial difficulties (discussed below) and its inability to access the bond market, Act No. 45 was enacted in July 1994 to provide a Commonwealth guaranty of the principal and interest payments to the bondholders of all outstanding revenue bonds issued by PRASA. In addition, Act No. 45 was amended in 2000 to extend the Commonwealth payment guaranty to all outstanding bonds issued by PRASA to the United States Department of Agriculture, Rural Development, and loans granted by the Clean Water and Drinking Water State Revolving Funds for the benefit of PRASA. The guaranty will cover additional debt obligations issued by PRASA prior to July 1, 2005. In February 2004, this guaranty was extended through new legislation to include debt obligations issued until 2010. The total debt of PRASA was $778.6 million as of December 31, 2004.

From May 1995 until March 2004, the operation, management, repair, and maintenance of PRASA's systems were in the hands of private companies. The most recent agreement for the private management of PRASA's systems was entered into in May 2002 with Ondeo Puerto Rico, Inc. ("Ondeo"). In January 2004, Ondeo and PRASA agreed to terminate their agreement and in April 2004, the operation, management, repair, and maintenance of the PRASA systems returned to PRASA.

CONFIDENTIAL

PRIFA_STAY0001902

As part of the plan for the return of the operation and management of the PRASA systems to PRASA, legislation was enacted in March 2004 to restructure PRASA and provide further powers to improve its operational and financial management. The main areas of this restructuring included (i) decentralizing the administration of PRASA by creating five regions to provide greater efficiency in, and financial control of, the day to day administration and operational decision making process and execution; (ii) creating the positions of five Executive Regional Directors and an Executive Director for Infrastructure, who will, respectively, manage each region and manage capital improvement projects; and (iii) providing for six-year appointments for each of the Executive Regional Directors, Executive Director for Infrastructure and Executive Director in order to provide continuity to top management and better implement, supervise and revise as needed the ten-year plan and goals identified for PRASA in 2002. Further powers granted include the authority to make certain determinations and take certain actions with respect to compliance of the water and sewer system with various federal environmental laws.

PRASA has reported operational losses of $76.6 million, $152.4 million, $281.3 million, $209.7 million and $282.5 million during fiscal years 2000, 2001, 2002, 2003 and 2004, respectively. For fiscal year 2005, it is expected that PRASA will incur another operational loss, which will be covered with financial assistance provided by the Commonwealth's General Fund.

Beginning in fiscal year 2006, the Commonwealth's General Fund will cease to provide financial assistance to PRASA in order to alleviate the financial demands on the General Fund. In order to achieve fiscal independence, PRASA will have to implement various changes, such as (i) aggressive cost savings programs; (ii) a new and aggressive enforcement policy to identify and process delinquent customers; and (iii) rate increases for industrial, commercial and residential customers. Although PRASA will require GDB financial assistance until these measures are fully implemented, these measures are intended to allow PRASA to become financially independent in the future.

*Children's Trust* is a not-for-profit corporate entity created in 1999 as a public instrumentality of the Commonwealth. The Commonwealth has transferred to Children's Trust all of its rights, title and interest under the tobacco litigation Master Settlement Agreement, including the Commonwealth's right to receive initial, annual and strategic contribution payments to be made by the participating cigarette manufacturers under the Master Settlement Agreement.

Children's Trust issued $1.171 billion aggregate principal amount of Tobacco Settlement Asset-Backed Bonds in October 2002. The bond proceeds were used, among other things, to pay the cost of certain capital expenses of the Commonwealth and certain capital and working capital expenses of PRASA. As of December 31, 2004, the outstanding principal amount of the bonds was $1.143 billion. These bonds and any other additional senior bonds issued by Children's Trust are secured by a statutory pledge of the payments made and to be made by participating manufacturers under the Master Settlement Agreement. To date, all payments required to be made under the Master Settlement Agreement have been made on a timely basis and Puerto Rico's share thereof has been received by Children's Trust.

*Convention Center District Authority* was created to own, develop, finance, plan, design, build, operate, maintain, administrate and promote the Convention Center and designated private parcels located within the Convention Center District in San Juan. The Authority currently has lines of credit with GDB totaling $415.7 million, of which $252.3 million was outstanding as of December 31, 2004.

The Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA") financed the construction of a multi-purpose coliseum in San Juan, known as the Jose Miguel Agrelot Coliseum, with a line of credit provided by GDB. The Jose Miguel Agrelot Coliseum was recently completed and transferred to the Convention Center District Authority. Pursuant to Act No. 185 of August 3, 2004, AFICA also transferred the line of credit to the Convention Center District Authority. As of December 31, 2004, the line of credit had an outstanding balance of $136.2 million.

CONFIDENTIAL

PRIFA_STAY0001903

*Electric Power Authority* owns and operates the island's electric system. The capital improvement program for the five-year period ending June 30, 2009, is estimated to cost approximately $2.1 billion and will be financed primarily by borrowed funds, supplemented by internally generated funds. The Authority's bonded debt consists of Power Revenue Bonds, secured by a lien on net revenues of the electric system. As of December 31, 2004, the Authority's total debt was $5.209 billion, including $4.879 billion of bonds outstanding (not including accretion of interest from the respective issuance dates on capital appreciation bonds). As a means of reducing its dependency on oil, the Authority has entered into long-term power purchase contracts with the operators of two cogeneration plants that use fuels other than oil. These two cogeneration projects consist of EcoElectrica LP's 507 megawatts liquefied natural gas plant at Guayanilla and a 454 megawatts clean coal facility at Guayama operated by an affiliate of Applied Energy Systems ("AES"). EcoElectrica's and AES's plants started commercial operations in March 2000 and November 2002, respectively. Currently, these two cogeneration plants provide approximately 26% of the Authority's energy needs.

*Health Insurance Administration* was created in 1993 to implement the health reform by negotiating and contracting for the provision of comprehensive health insurance coverage for qualifying (generally low income) Puerto Rico residents. Under this system, the government selects, through a bidding system, one private health insurance company in each of several designated regions of the island and pays such insurance company the insurance premium for each eligible beneficiary within such region. The health insurance system covers all of the municipalities, and approximately 1.5 million persons were covered by the system during fiscal year 2004.

The total cost of the health insurance program for fiscal year 2005 is estimated at $1.354 billion, compared to $1.234 billion for fiscal year 2004 and $1.248 billion for fiscal year 2003. For fiscal year 2005, the General Fund covered $984 million of the total cost of the health insurance program, while the remaining $370 million was expected to be paid from federal, municipal and other sources. The fiscal year 2006 budget estimates the cost of the health insurance program to be $1.418 billion, of which the General Fund is estimated to cover $994 million, while the remaining $424 million is expected to be paid from federal, municipal and other sources.

*Highway and Transportation Authority* is responsible for highway construction in Puerto Rico. Such construction is financed by debt (interim notes and revenue bonds), revenues of the Authority, and federal and Commonwealth grants. Debt service on the Authority's revenue bonds constitutes a first lien on its gross revenues, which consist currently of all the proceeds of the gasoline tax; one-half of the proceeds of the tax on gas oil or diesel oil; all the proceeds of the excise taxes on crude oil, unfinished oil and derivative products, up to $120 million per fiscal year; highway toll revenues; and the gross receipts of $15.00 per vehicle per year from certain motor vehicle license fees. Such revenues (except for toll revenues) may be applied first to the payment of debt service on general obligation bonds and notes of the Commonwealth and payments required to be made by the Commonwealth under its guarantees of bonds and notes to the extent that no other revenues are available for such purpose. The Commonwealth has never applied such revenues for such payment. In April 2004, the Authority issued approximately $140 million of bonds secured solely by Federal Highway Aid grant revenues. As of December 31, 2004, the Authority's total debt was $5.880 billion, including $5.770 billion of bonds outstanding.

The Authority has completed the first phase of a new mass transit system, known as Tren Urbano, to serve a portion of metropolitan San Juan. The first phase of Tren Urbano was constructed under several design/build contracts, including a design/build/operate contract covering the design and construction of the system and the operation of Tren Urbano for five years with an additional five-year option at the Authority's election. The cost of the first phase was $2.25 billion, which cost was financed by Federal Transit Administration grants, other federal funding sources and the Authority's own resources, including bond financings. Currently, the Authority is conducting an education and familiarization program to introduce Tren Urbano to the population. As part of this program, Tren Urbano is operating free of charge until the first week of June 2005.

CONFIDENTIAL

PRIFA_STAY0001904

The Authority is a party to a concession agreement under which a private company designed, constructed and currently is operating a toll bridge spanning the San José Lagoon. The toll bridge was financed with special facility revenue bonds of the Authority, the outstanding principal balance of which was $153.2 million as of December 31, 2004, payable by the private operator of the bridge principally from toll revenues. The concession is for a term of 35 years, subject to earlier termination or extension. The bridge opened for traffic in February 1994. In certain circumstances as described in the concession agreement, including where toll revenues are insufficient to generate certain rates of return to the private operator, the private operator may require the Authority, among other things, to assume the operator's obligations with respect to the special facility revenue bonds. Some of those circumstances, including low toll revenues, exist at this time, but the Authority does not currently anticipate that the operator will exercise its remedy against the Authority.

*Puerto Rico Industrial Development Company* participates in the Commonwealth-sponsored economic development program by providing physical facilities, general assistance, and special incentive grants to manufacturers. The Company was merged with the Economic Development Administration in January 1998. Rentals derived from the leasing of specified facilities of the Company are pledged to the payment of the Company's revenue bonds. As of December 31, 2004, the Company's total debt was $330.7 million.

*Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority* was created in June 1977. The Authority has issued revenue bonds to finance industrial, tourist, educational, medical, and environmental control facilities in Puerto Rico for the use of private companies, non-profit entities, or government agencies. The bonds are payable solely from payments to be made to the Authority by such private companies, non-profit entities, or government agencies, and do not constitute a debt of the Commonwealth or any of its other public corporations or municipalities. As of December 31, 2004, approximately $2.2 billion of the Authority's bonds were outstanding.

*Infrastructure Financing Authority* was created in June 1988 to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other public corporations, governmental instrumentalities, political subdivisions and municipalities (collectively, "Benefited Entities") authorized to develop infrastructure facilities and to establish alternate means for financing infrastructure facilities. The Authority is authorized to issue bonds and provide loans, grants and other financial assistance for the construction, acquisition, repair, maintenance and reconstruction of infrastructure projects by Benefited Entities. The Authority's enabling act also established the Puerto Rico Infrastructure Fund, funded with annual fixed amounts from the first proceeds of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States which are transferred to Puerto Rico pursuant to the United States Internal Revenue Code of 1986, as amended. Currently, this amount is $70 million, and it will increase to $90 million for fiscal years 2007 to 2052. Rum is the only article currently produced in Puerto Rico subject to federal excise taxes, the proceeds of which are required to be returned to the Treasury of Puerto Rico. The Authority is using these amounts to provide financial support for various infrastructure and other projects. As of April 30, 2005, the Authority's total debt was $1.990 billion.

The Authority is providing assistance to the Aqueduct and Sewer Authority, among other Benefited Entities, with regards to (i) the design and construction of various strategic regional water and sewer projects intended to provide improved services to targeted regions throughout the island; (ii) the implementation of an action plan to address a number of small water and sewer rehabilitation projects; (iii) the achievement of compliance with certain environmental laws; and (iv) the establishment of a prioritized capital program.

In June 1998, the Authority's enabling act was amended to establish the Infrastructure Development Fund, a permanent trust fund to be utilized by the Authority for the purpose of financing infrastructure projects. The Infrastructure Development Fund was initially funded in March 1999 with $1.2 billion of proceeds received by the Telephone Authority from the sale of a controlling interest in

CONFIDENTIAL

PRIFA_STAY0001905

Puerto Rico Telephone Company. This initial amount will remain permanently deposited in a segregated, perpetual account, denominated the "corpus account," and must be invested exclusively in U.S. government or U.S. government-backed obligations. The income from such investment may only be used to finance infrastructure projects related to the Commonwealth's water and sewer systems. Other moneys in the Infrastructure Development Fund not attributable to the corpus account or the investment income thereon may be used for other infrastructure projects. The Authority is the custodian and administrator of the Infrastructure Development Fund. In October 2000, the Authority issued $1.093 billion of bonds payable from and secured by a pledge of the interest received by the Authority from the investments of the Infrastructure Development Fund. The proceeds of this bond issue are being used to finance certain aqueduct and sewer infrastructure development projects.

*Maritime Shipping Authority* commenced operations in 1974 upon the acquisition of three shipping lines serving Puerto Rico and the United States mainland. In 1995, the assets and operations of the Maritime Shipping Authority were sold to a private investor group. The remaining debt of the Authority was refinanced through the issuance of bonds by Public Finance Corporation, a subsidiary of GDB. The aggregate principal amount of such bonds outstanding as of December 31, 2004, was $328.5 million (not including accreted values of capital appreciation bonds outstanding). The bonds are payable from funds to be appropriated annually by the Legislature of Puerto Rico.

*Municipal Finance Agency* was created in 1972 as a municipal "bond bank" for Puerto Rico. The Agency is authorized to issue bonds to purchase general obligation bonds and notes of Puerto Rico municipalities and to fund a debt service reserve. Debt service on the Agency's bonds is payable from debt service payments on municipal bonds held by the Agency and from the debt service reserve, including investment income thereon. The Commonwealth has agreed to pay such amounts to the debt service reserve as may be necessary to maintain it at its required level, subject to appropriation by the Legislature, which appropriation is authorized but not legally required to be made. To date no such payments have been required. As of December 31, 2004, the Agency had $1.237 billion of bonds outstanding.

*Ports Authority* owns and operates the major airport and seaport facilities in Puerto Rico. The Authority derives revenues from a variety of sources, including charges on airplane fuel sales, air terminal space rentals, landing fees, wharfage, dockage and harbor fees, and rentals for the lease of seaport equipment and property. Act No. 1 of January 1, 2000, authorized the transfer of the Authority's maritime ferry operations to Puerto Rico Maritime Transportation Authority, a newly created government agency. As of December 31, 2004, the Authority had $462.8 million in debt, including $314.8 million under a line of credit with GDB.

*Public Buildings Authority* is authorized to construct, purchase or lease office, school, health, correctional and other facilities for lease to departments, public corporations, and instrumentalities of the Commonwealth. Bonds that have been issued by the Authority to finance such facilities (through retirement of interim notes or otherwise) are payable from lease payments, which are largely derived from legislative appropriations and are further secured by the Commonwealth's guaranty. The Authority is authorized by law to have outstanding at any one time up to $3.325 billion of bonds guaranteed by the Commonwealth. As of December 31, 2004, $2.920 billion of such bonds of the Authority was outstanding (not including accretion of interest from the respective issuance dates on capital appreciation bonds).

*Special Communities Perpetual Trust* is an irrevocable and permanent trust created in November 2002 as a public corporation. The Trust's principal purpose is to fund development projects which address the infrastructure and housing needs of underprivileged communities. Act No. 271 of November 21, 2002, requires GDB to provide the Trust with a $500 million line of credit and to make a capital contribution to the Trust of $500 million. In December 2004, GDB transferred to the Trust the $500 million capital contribution required by Joint Resolution No. 1027 of November 21, 2002 and $270.7 million, the amount remaining in the GDB $500 million line of credit. The amounts transferred to

CONFIDENTIAL

the Trust were deposited in two investment accounts held by GDB for the benefit of the Trust, $320 million of which have been disbursed to the Trust as of April 18, 2005.  As of December 31, 2004, the Trust's GDB line of credit had an outstanding balance of $425.1 million.

*Telephone Authority* was created in July 1974 when the Commonwealth purchased the Puerto Rico Telephone Company ("PRTC") from International Telephone and Telegraph Corporation.  PRTC operates the principal telephone system in Puerto Rico.

In March 1999, the Telephone Authority sold a controlling interest in PRTC to a consortium led by GTE International Telecommunications Incorporated, which was acquired by Verizon Communications, Inc.  The net proceeds of the sale received at closing were applied to defease outstanding bonds of the Authority in the principal amount of $756 million, to make a $1.2 billion deposit to the Infrastructure Development Fund held by the Infrastructure Financing Authority and to pay certain benefits to PRTC employees.  In January 2002, Verizon exercised its option to purchase an additional 15% of PRTC stock for $172 million.  The Commonwealth retains a 28% stock participation in PRTC. The proceeds from the Verizon stock option exercise and the remaining 28% ownership interest were transferred to the Employees Retirement System of the Commonwealth and its instrumentalities.

*University of Puerto Rico* (the "University"), with 68,627 students in academic year 2003-2004, is by far the largest institution of higher education on the island.  Government appropriations are the principal source of University revenues, but additional revenues are derived from tuition, student fees, auxiliary enterprises, interest income, federal grants, and other sources.  University capital improvements have been financed mainly by revenue bonds.  As of December 31, 2004, the University's total debt was $439.1 million.

On December 21, 2000, AFICA issued its $86,735,000 Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) for the purpose of financing the construction of additional student housing and parking and office space for the University.  The project is being built and will be operated by Desarrollos Universitarios, Inc., a Puerto Rico not-for-profit corporation, and will be leased to the University for a term equal to the term of the bonds with lease payments being in sufficient amounts to pay debt service on said bonds as they become due.

*Other public corporations* (not described above) have outstanding debt in the aggregate amount of $1.140 billion as of December 31, 2004.  Debt service on $484.3 million of such outstanding debt is being paid from legislative appropriations.  However, the Commonwealth is not obligated to make any such appropriations.  Additional legislative appropriations are made to enable certain of such corporations to pay their operating expenses.

## INSURANCE MATTERS

Government-owned property is insured through policies obtained by the Secretary of the Treasury and through self-insurance, except for property owned by the Electric Power Authority and the Aqueduct and Sewer Authority, which is insured through arrangements and policies obtained by the respective Authorities.  Personal injury awards against the Commonwealth are limited by law to $150,000 per occurrence.

CONFIDENTIAL

PRIFA_STAY0001907

## RETIREMENT SYSTEMS

Public employees of the Commonwealth and its instrumentalities are covered by five retirement systems: the Employees Retirement System of the Commonwealth of Puerto Rico (the "Employees Retirement System"), the Puerto Rico System of Annuities and Pensions for Teachers (the "Teachers Retirement System"), the Commonwealth Judiciary Retirement System (the "Judiciary Retirement System"), the Retirement System of the University of Puerto Rico (the "University Retirement System"), and the Employees Retirement System of Puerto Rico Electric Power Authority (the "Electric Power Authority Retirement System").

The University Retirement System and the Electric Power Authority Retirement System apply to employees of the University of Puerto Rico and Electric Power Authority, respectively. The Commonwealth is not required to contribute directly to those two systems, although a large portion of University revenues is derived from legislative appropriations.

The Teachers Retirement System covers public and private school teachers (primarily from the public sector) and employees, the Judiciary Retirement System covers judges, and the Employees Retirement System covers all other employees of the Commonwealth, its municipalities and instrumentalities. As of June 30, 2004, the total number of active members of the three systems was as follows: Employees Retirement System, 157,179; Teachers Retirement System, 78,500; and Judiciary Retirement System, 338. The three systems are financed by contributions made by employers (the Commonwealth, public corporations, and municipalities) and employees, and investment income. The central government is responsible for approximately 67% of total employer contributions to the Employees Retirement System, and the other 33% is the responsibility of public corporations and municipalities. The central government is also responsible for 100% and 99% of total employer contributions to the Judiciary and Teachers Retirement Systems, respectively. Retirement and related benefits provided by the systems and required contributions to the systems by employees are determined by law. Required employers' contributions to the systems are determined by law and are not actuarially determined. For the Employees Retirement System, required employer contributions consist of 9.275% of applicable payroll in the case of municipalities, central government and public corporations. Required employee contributions for the Employees Retirement System vary according to salary and how the individual employee's retirement benefits are coordinated with social security benefits. For the Judiciary Retirement System, required contributions consist of 20% of applicable payroll for the employer and 8% for the employees.

According to the most recent actuarial valuation of the Employees Retirement System and Judiciary Retirement System submitted by a firm of independent consulting actuaries, as of June 30, 2003, the total pension benefit obligation for the Employees Retirement System and Judiciary Retirement System was $11.2 billion and $166.7 million, respectively. The unfunded pension benefit obligation of the Employees Retirement System and Judiciary Retirement System for the same period was $9.2 billion and $105 million, respectively, representing a funding ratio of 17.4% and 37.1%, respectively. This actuarial valuation was completed in accordance with the "Projected Unit Credit" method and assumed an investment return of 8.5% per year and a salary increase of 5% per year.

In the case of the Employees Retirement System, Act No. 10 of May 21, 1992 provided for benefit increases of 3% every three years. The first 3% increase was granted to retirees who had been receiving their annuities for three or more years as of that date. The second 3% increase was granted to retirees who had been receiving their annuities for three or more years as of January 1, 1995. This increase is being financed by additional contributions from the employers. The third 3% increase was granted to retirees who had been receiving their annuities for three or more years as of January 1, 1998. This third increase is being partially funded with additional contributions from some of the employers. In June 2001, the Legislature approved a law providing a fourth 3% increase, effective as of January 1, 2001, in post-retirement annuity payments granted on or prior to January 1, 1998. This increase will be funded by the General Fund for retirees who were employees of the central government and by

CONFIDENTIAL

PRIFA_STAY0001908

municipalities and public corporations for retirees who were their employees. In June 2003, the Legislature approved a law providing a fifth increase of 3% in post retirement benefits effective January 1, 2004. This increase will also be funded by the General Fund for retirees who were employees of the central government and by municipalities and public corporations for retirees who were their employees. Subsequent increases will depend upon the explicit approval of the System's Board of Trustees and the Legislature, and must provide a funding source. In the case of the Judiciary Retirement System, Act No. 41 of June 13, 2001 provides a 3% increase in annuity payments, commencing on January 1, 2002 and every three years thereafter, to retirees who have been receiving their annuities for three or more years as of that date. This increase will be funded by the General Fund.

In 1990, the organic act of the Employees Retirement System was amended to reduce the future pension liabilities of the Employees Retirement System. Among other provisions, the legislation increased the level of contribution to the System and limited the retirement benefits for new employees by increasing the length of time for the vesting of certain benefits and reducing the level of benefits in the case of early retirement. The legislation also reduced the level of occupational disability benefits and death benefits received by new employees.

In 1999, the organic act of the Employees Retirement System was further amended to change it, prospectively, from a defined benefit system to a defined contribution system. This amendment provides for the establishment of an individual account for each employee hired by the Commonwealth after December 31, 1999 and for those current employees who elect to transfer from the existing defined benefit system. The individual account of each current employee is credited initially with an amount equal to his aggregate contributions to the Employees Retirement System, plus interest. Current employees who did not elect to transfer to the new defined contribution system will continue accruing benefits under the current defined benefit system. The individual account of each participant of the new defined contribution system is credited monthly with the participant's contribution and is credited semiannually with a rate of return based on either of two notional investment returns. Such accounts are not credited with any contribution by the employer. Instead, employer contributions will now be used completely to reduce the accumulated unfunded pension liability of the Employees Retirement System.

The law approving the sale of a controlling interest in PRTC to a consortium led by GTE International Telecommunications Incorporated (subsequently acquired by Verizon Communications Inc.) provides that any future proceeds received by the government from the sale of its then remaining 43% stock ownership in PRTC will be transferred to the Employees Retirement System to reduce its accumulated unfunded pension benefit obligation. In January 2002, Verizon exercised its option to purchase an additional 15% of the stock of PRTC for $172 million. The proceeds of the sale were transferred to the Employees Retirement System.

The Employees Retirement System's disbursements of benefits during fiscal years 2002, 2003, and 2004 exceeded contributions and investment income for those years. The cash shortfall for fiscal year 2002 was covered with a portion of the proceeds from the sale to Verizon of the 15% stock ownership in PRTC. The cash shortfall for fiscal year 2003 was covered with a portion of the proceeds from the sale to Verizon of the 15% stock ownership in PRTC and an advance from the Department of the Treasury. The cash shortfall for fiscal year 2004 was also covered with advances received from the Department of the Treasury. A cash shortfall, which will be covered either by a sale of assets or advances from the Department of the Treasury, is also expected for fiscal year 2005.

The Employees Retirement System anticipates that its future cash flow needs for disbursement of benefits to participants may exceed the sum of the employer and employee contributions received and its investment and other recurring income. The Employees Retirement System expects to cover this cash flow imbalance in the next few fiscal years with the proceeds from the sale of the remaining shares of PRTC stock. The Employees Retirement System is also evaluating other measures to improve its cash flows and funding ratio. Some of these measures include, but are not limited to, the establishment of a maximum salary to calculate pension benefits, aggressive collection efforts with respect to employer

CONFIDENTIAL

PRIFA_STAY0001909

contributions owed by the Commonwealth, the municipalities and public corporations, the transfer to the Employees Retirement System of any amounts remaining in the Children's Trust after payment of all the outstanding bonds, and the assignment to the Employees Retirement System of a percentage of General Fund revenues and/or excess proceeds derived from the proposed tax reform being considered by the Commonwealth.   See "Proposed Fiscal Reform" under *Puerto Rico Taxes, Other Revenues and Expenditures*.

In addition, legislation has been submitted that if enacted will authorize the issuance of pension obligation bonds ("POBs").   The POBs will contribute approximately $2 billion in assets to the Employees Retirement System and will be payable solely from the Commonwealth's General Fund. While the POBs are outstanding and the Commonwealth is paying debt service, General Fund transfers to the Employees Retirement System in any fiscal year will be reduced by an amount equal to the lesser of $100 million and the debt service on the POBs payable in such fiscal year.   The proposed legislation also includes a measure that would increase employee and employer contributions to the Employees Retirement System from 8.275% and 9.275%, respectively, to 10% each.   The Employees Retirement System projects that current contributions, together with investment and other recurring income, earnings on the $2 billion raised by the issuance of the POBs, and the proposed increase in employee and employer contributions will allow it to improve its funding ratio.

According to the most recent actuarial valuation of the Teachers Retirement System submitted by a firm of independent consulting actuaries, as of June 30, 2004, the accrued actuarial liability of the system was $4.702 billion and the value of its assets amounted to $2.403 billion, representing a funding ratio of 51%, and the resulting unfunded accrued liability was $2.299 billion.   This funding ratio takes into account the recent turn around in the equities market, which has provided an investment return of 16.5%, and the restructuring of the portfolio's asset composition.   The actuarial valuation assumed an investment return of 8%, yearly salary increases of 5%, employee and employer contributions of 9% and 8.5%, respectively, and a remaining amortization period of 16 years for the unfunded accrued liability.

The following table presents, in summary form, the income and expenses of the retirement systems for fiscal years 2002, 2003, and 2004.   The investment income figures presented in the table include unrealized gains and losses.

CONFIDENTIAL

PRIFA STAY0001910

**Commonwealth of Puerto Rico**
**Retirement Systems**
**Income and Expenses**
**(in thousands)**

| | Employees Retirement System | Judiciary Retirement System | Teachers Retirement System |
|---|---|---|---|
| **Fiscal Year Ending June 30, 2004** | | | |
| Income: | | | |
| Employers' contributions | $344,889 | $ 5,556 | $159,152 |
| Employee contributions | 294,013 | 2,578 | 110,548 |
| Investment income | 312,992 | 9,223 | 341,313 |
| Total | 951,894 | 17,357 | 611,013 |
| Expenses: | | | |
| Benefit payments | 718,219 | 9,927 | 324,611 |
| Administrative and other expenses | 39,635 | 1,360 | 26,069 |
| Total | 757,854 | 11,287 | 350,680 |
| Net Income | $194,040 | $ 6,070 | $260,333 |
| | | | |
| **Fiscal Year Ended June 30, 2003** | | | |
| Income: | | | |
| Employers' contributions | $330,404 | $ 5,536 | $ 140,264 |
| Employee contributions | 276,347 | 2,479 | 104,403 |
| Investment income | 57,132 | 4,131 | 51,998 |
| Total | 663,883 | 12,146 | 296,665 |
| Expenses: | | | |
| Benefit payments | 667,390 | 9,330 | 298,529 |
| Administrative and other expenses | 28,768 | 1,473 | 22,565 |
| Total | 696,158 | 10,803 | 321,094 |
| Net (Loss) Income | ($ 32,275) | $ 1,343 | ($ 24,429) |
| | | | |
| **Fiscal Year Ended June 30, 2002** | | | |
| Income: | | | |
| Employers' contributions | $308,228 | $ 5,412 | $124,152 |
| Employee contributions | 259,203 | 2,448 | 99,454 |
| Investment income | (306,008) | (7,791) | (41,068) |
| Total | 261,423 | 69 | 182,538 |
| Expenses: | | | |
| Benefit payments | 683,106 | 8,462 | 278,168 |
| Administrative and other expenses | 27,304 | 1,072 | 20,833 |
| Total | 710,410 | 9,534 | 299,001 |
| Net Loss | ($448,987) | ($ 9,465) | ($116,463) |

*Sources:* Employees Retirement System, Judiciary Retirement System, and Teachers Retirement System

CONFIDENTIAL

PRIFA STAY0001911

## COMMONWEALTH FINANCIAL STATEMENTS

For fiscal year 2004, the financial statements of the Commonwealth were audited by KPMG LLP. KPMG LLP did not audit the financial statements of the Public Buildings Authority capital project fund (a major fund), and certain activities, funds and component units identified separately in their report. Those financial statements were audited by other auditors whose reports were furnished to KPMG LLP, and its opinion on the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, was based solely on the reports of the other auditors.

The Comprehensive Annual Financial Report of the Commonwealth for fiscal year 2004, which includes the basic financial statements of the Commonwealth for fiscal year 2004, was filed by the Commonwealth with each nationally recognized municipal securities information repository on May 17, 2005.

## PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES

The Secretary of the Treasury has custody of the funds of the central government and is responsible for the accounting, disbursement and investment of such funds. Central government funds are grouped into three major categories or "types" of funds, as follows: (i) Governmental Fund Types, which include the General, Special Revenue, Debt Service (also referred to herein as Redemption), and Capital Project Funds; (ii) Proprietary Fund Types, which include the Enterprise and Internal Service Funds; and (iii) Fiduciary Fund Types, which include the Trust and Agency Funds. These funds do not include funds of the municipalities, because the municipalities are governmental entities with independent treasuries. The Special Revenue Fund is incorporated into the General Fund for financial reporting purposes (but not for budgetary purposes).

The General Fund is the primary operating fund of the Commonwealth. General Fund revenues are broadly based and include revenues raised internally as well as those from non-Puerto Rico sources. Internal revenues consist principally of income taxes and excise taxes. Revenues from non-Puerto Rico sources are derived from federal excise taxes and customs duties returned to the Commonwealth. The primary expenditures of the Commonwealth through the General Fund are for grants and subsidies, and personal and other services.

### Summary and Management's Discussion of General Fund Results

The following table presents the actual revenues and expenditures of the General Fund on a cash basis for fiscal year 2002 through fiscal year 2004, the estimated revenues and expenditures for fiscal years 2005, and the budgeted revenues and expenditures for fiscal year 2006. The information relating to fiscal year 2005 is based on the estimate of revenues and expenditures for that fiscal year. The information relating to fiscal year 2006 is based on the proposed budget of revenues and expenditures for that fiscal year, which is currently under review by the Legislature.

The amounts shown on the table as expenditures may be different than those reflected in the budget or in the Commonwealth's financial statements because the table shows only cash disbursements, while the budget includes all authorized expenditures, regardless of when the related cash is actually disbursed. In addition, transfers to the Redemption Fund (used to pay debt service on the Commonwealth's bonds), which are included in the budget under "debt service," are shown as a deduction from total revenues in calculating "adjusted revenues" in the table and are not included under "expenditures." Finally, certain expenditures incurred in excess of budgeted amounts may not be reflected in the table as expenditures to the extent they are paid from reserve funds, such as moneys in the Budgetary Fund. For example, in fiscal years 2003 and 2004, there were approximately $150 million and $85 million, respectively, of such expenditures that are not reflected in the table. A discussion of the

CONFIDENTIAL

PRIFA_STAY0001912

budget for fiscal year 2005 and the proposed budget for fiscal year 2006 appears below under "Budget of the Commonwealth of Puerto Rico."

Amounts listed under "Other Income" represent recurring General Fund revenues not appropriately attributable to other revenue line items, such as repayment of General Fund advances to municipalities and government agencies and funds. "Other Expenditures" represent recurring General Fund expenditures not appropriately attributable to other expenditures line items, such as advances to government agencies and municipalities, which advances are to be reimbursed to the General Fund by law. Amounts listed under "Capital Outlays and Other Debt Service" represent debt service on obligations and capital expenditures for which the Legislature has by resolution agreed to appropriate funds. "Transfers to Agencies" represents moneys appropriated for the operation of the Health Facilities and Services Administration or, after the dissolution of that Administration, the Department of Health. General Fund revenues, expenditures and transfers as presented in the table differ from the General Fund revenues, expenditures and transfers as presented in the financial statements of the Commonwealth, as the latter statements reflect an expanded General Fund entity in accordance with generally accepted accounting principles.

CONFIDENTIAL

PRIFA_STAY0001913

**Commonwealth of Puerto Rico**
**General Fund Revenues, Expenditures, and Changes in Cash Balance**
**(in thousands)**

| | 2002 | 2003 | 2004(p) | 2005(e) | 2006(b) |
|---|---|---|---|---|---|
| Beginning cash balance | $ 125,154 | $ 350,284 | $ 179,058 | $ 108,512 | $ 41,264 |
| **Revenues from internal sources:** | | | | | |
| Income Taxes: | | | | | |
| Individuals | 2,449,982 | 2,767,678 | 2,720,920 | 2,868,000 | 3,127,000 |
| Corporations | 1,706,137 | 1,776,985 | 1,831,027 | 2,005,000 | 2,252,000 |
| Partnerships | 2,670 | 2,101 | 3,005 | 2,000 | 3,000 |
| Withheld from non-residents | 583,256 | 517,141 | 631,100 | 575,000 | 628,000 |
| Tollgate taxes | 59,515 | 45,321 | 31,579 | 23,000 | 17,000 |
| Interest | 14,310 | 11,278 | 10,108 | 10,000 | 11,000 |
| Dividends | 62,548 | 49,790 | 70,192 | 74,000 | 74,000 |
| Total income taxes | 4,878,418 | 5,170,299 | 5,297,931 | 5,557,000 | 6,112,000 |
| **Commonwealth excise taxes:** | | | | | |
| Alcoholic beverages | 249,705 | 299,582 | 296,302 | 302,000 | 316,000 |
| Cigarettes | 116,055 | 149,487 | 144,733 | 146,000 | 152,000 |
| Motor vehicles | 418,024 | 499,252 | 551,181 | 585,000 | 614,000 |
| Other excise taxes | 681,344 | 703,029 | 701,129 | 746,000 | 1,481,000 |
| Total Commonwealth excise taxes | 1,465,128 | 1,651,350 | 1,693,345 | 1,779,000 | 2,563,000 |
| Property taxes | - | - | - | - | - |
| Inheritance and gift taxes | 1,962 | 2,825 | 15,691 | 5,000 | 2,000 |
| Licenses | 82,575 | 85,876 | 84,231 | 89,000 | 123,000 |
| **Other:** | | | | | |
| Lottery | 61,358 | 67,621 | 65,387 | 70,000 | 63,000 |
| Electronic Lottery | 57,897 | 89,443 | 86,115 | 73,000 | 83,000 |
| Miscellaneous non-tax revenues | 562,213[(1)] | 438,457 | 379,501 | 370,000 | 362,000 |
| Total Other | 681,468 | 595,521 | 531,003 | 513,000 | 508,000 |
| Total revenues from internal sources | 7,109,551 | 7,255,866 | 7,622,201 | 7,943,000 | 9,308,000 |
| **Revenues from non-Commonwealth sources:** | | | | | |
| Federal excise taxes[(2)] | 314,253 | 309,958 | 328,921 | 337,000 | 350,000 |
| Customs | 30,595 | 25,918 | 34,266 | 24,000 | 26,000 |
| Total revenues from non-Commonwealth sources | 344,848 | 335,876 | 363,187 | 361,000 | 376,000 |
| Total net revenues | 7,454,399 | 7,841,742 | 7,985,388 | 8,304,000 | 9,684,000 |
| Other Income (refunds)[(3)] | 111,411 | (78,927) | 62,789 | (55,409) | - |
| Transfers to Redemption Fund[(4)] | (274,773) | (331,925) | (341,538) | (369,985) | (435,000) |
| Proceeds of notes and other borrowings[(5)] | 1,161,856 | 2,259,775 | 3,940,397 | 4,925,595 | - |
| Repayment of notes and other borrowings[(6)] | (1,201,084) | (2,021,832) | (3,713,634) | (3,909,434) | - |
| Adjusted revenues | 7,251,622 | 7,418,833 | 7,933,402 | 8,894,767 | 9,249,000 |
| **Expenditures:** | | | | | |
| Grants and subsidies | 2,862,288 | 3,773,579 | 3,468,531 | 3,617,386 | 2,809,310 |
| Personal services | 2,884,636 | 3,119,476 | 3,951,387 | 4,783,567 | 5,667,093 |
| Other services | 764,655 | 583,343 | 400,594 | 389,346 | 595,637 |
| Materials and supplies | 106,294 | 80,491 | 73,757 | 72,411 | 143,521 |
| Equipment purchases | 20,397 | 33,170 | 20,572 | 20,707 | 33,439 |
| Capital outlays and other debt service | 73,806 | - | 675 | 78,598 | - |
| Transfers to agencies | 314,416 | - | - | - | - |
| Prior year disbursements | - | - | 88,432 | - | - |
| Total expenditures | 7,026,492 | 7,590,059 | 8,003,948 | 8,962,015 | 9,249,000 |
| Adjusted revenues less expenditures | 225,130 | (171,226) | (70,546) | (67,248) | - |
| Ending cash balance | $ 350,284 | $ 179,058 | $ 108,512 | $ 41,264 | $ 41,264 |

(p) Preliminary.
(e) Estimated; represents actual revenues as of April 2005 plus budgeted revenues for the months remaining in fiscal year 2005.
(b) Budget, as proposed.
(1) Includes certain non-recurring revenues totaling $244.1 million.
(2) Excludes transfers by the Commonwealth to the Conservation Trust Fund and amounts deposited by the Secretary of the Treasury into a separate account for the promotion of Puerto Rico rums in foreign markets.
(3) Consists of net revenue from General Fund's non budgetary funds plus a reserve for future tax refunds reduced by estimated tax refunds.
(4) Consists of amounts to pay principal of and interest on general obligation bonds and notes of the Commonwealth.  Does not include amounts deposited directly to the Redemption Fund from non-General Fund revenues.
(5) Consists of proceeds of Commonwealth tax and revenue anticipation notes and borrowings from GDB .
(6) Consists of repayment of Commonwealth tax and revenue anticipation notes and borrowings from GDB .

*Source:* Department of the Treasury

CONFIDENTIAL

PRIFA_STAY0001914

*Proposed Budget Fiscal Year 2006 Compared to Current Budget Fiscal Year 2005*

General Fund total revenues for fiscal year 2006 are projected to be $9.684 billion, representing an increase of $1.4 billion, or 16.6%, from budgeted fiscal year 2005 revenues. The major changes from fiscal year 2005 are expected to be: (i) projected increases in income taxes from individuals of $259 million and income taxes from corporations of $247 million; and (ii) projected increases in motor vehicle excise taxes of $29 million and Commonwealth excise taxes of $784 million.

The projection of General Fund revenues for fiscal year 2006 is based on a projected nominal and real growth in gross national product of 5.9% and 2.5%, respectively. The projection of General Fund revenues assumes additional revenues of $1.004 billion from the following new legislative and administrative measures: (i) the elimination of the exemption for food, medicine, and certain other goods from the 5% general excise tax ($639 million); (ii) an increase in license fees for luxury cars ($30 million); (iii) a temporary surtax on financial institutions ($180 million); (iv) the elimination of the preferential capital gains rates ($60 million); and (v) an intensification of efforts to detect excise tax evasion through the purchase of X-Ray machines to monitor ship containers at ports of entry, the implementation of a program to improve collections, and heightened scrutiny on the payment of excise taxes on crude oil and its derivatives ($95 million).

Proposed expenditures for fiscal year 2006 total $9.684 billion, which is $830 million, or 9.4%, higher than the $8.854 billion budgeted for fiscal year 2005. The principal reasons for the differences are (i) education related expenditures, which are proposed to be approximately $448.3 million higher; (ii) health related expenditures, which are proposed to be approximately $74.5 million higher; (iii) public safety and protection related expenditures, which are proposed to be approximately $164.6 million higher; and (iv) debt service which will be $54.8 million higher.

*Estimated Fiscal Year 2005 Compared to Preliminary Fiscal Year 2004*

The General Fund budget for fiscal year 2005, which commenced on July 1, 2004, provides for total net revenues of $8.304 billion, which represents an increase of $319 million, or 4%, over the budget for fiscal year 2004. Total budgeted net revenues and estimated net revenues of the General Fund for fiscal year 2004, which ended on June 30, 2004, were $7.925 billion and $7.985 billion, respectively.

The major changes in estimated revenues for fiscal year 2005 compared to preliminary revenues for fiscal year 2004 are: (i) projected increases in total income taxes of $259 million; (ii) projected increases in total excise taxes of $85 million; and (iii) projected decreases in non-tax revenues of $10 million. The revised budget of General Fund revenues for fiscal year 2005, which revised budgeted items but not the total budget amount, assumes a 6.0% nominal and 2.3% real growth in gross product, and additional revenues of $81 million from the legislative measures described below. The original budget of General Fund revenues for fiscal year 2005 assumed a 5.7% nominal and 2.9% real growth in gross product. Budgeted revenues also include the proceeds of a $550 million loan from GDB secured by tax receivables. Such loan has a maximum term of ten years.

As a means of increasing revenues for fiscal year 2005, the following laws were enacted: (i) a "sunset provision" which enables early retirement or "rollover" of certain individual retirement account funds without penalties under the Commonwealth's income tax law; (ii) a one-year "sunset provision" for variable annuities by insurance companies in the United States held by Puerto Rico citizens for "rollovers" to variable annuities by Puerto Rico insurance companies; (iii) a transfer to the General Fund of compulsory motor vehicle insurance premiums for which reimbursement has not been claimed; and (iv) a "sunset provision" to lower all long-term capital gains tax rates by 50%. In particular, gains realized on or prior to June 30, 2005 by resident individuals from the sale or exchange of a capital asset, if the asset is held for more than six months, will be taxed at a rate of 5% (6.25% in the case of corporate taxpayers) if the asset is located in Puerto Rico and at a rate of 10% (12.5% in the case of corporate

CONFIDENTIAL

PRIFA_STAY0001915

taxpayers) if located outside Puerto Rico. Similarly, lump sum distributions by resident individuals on income from pensions will be taxed at a rate of 10%.

As of April 30, 2005, General Fund estimated total revenues for fiscal year 2005 were within the amount originally budgeted. According to the rate of collections as of April 30, 2005, total income taxes, license fees and revenues from non-Commonwealth sources are expected to be under budget. However, such reduction is expected to be offset by collections in excess of budgeted amounts of Commonwealth excise taxes, inheritance and gift taxes and other revenues from internal sources.

*Preliminary Fiscal Year 2004 Compared to Fiscal Year 2003*

General Fund total net revenues for fiscal year 2004 were $7.985 billion, representing an increase of $143 million, or 1.8%, from fiscal year 2003 net revenues. This amount excludes proceeds of a loan of $233 million obtained from GDB, which is included as part of "Proceeds of notes and other borrowings." The loan has a term of ten years, and may be repaid sooner to the extent that sufficient revenues are available for such purpose. This amount also excludes $82 million of additional non-recurring revenues. The major changes in revenues from fiscal year 2003 were: (i) increases in total income taxes of $128 million, mainly resulting from decreases in income taxes from individuals of $203 million and in income taxes withheld from non-residents of $114 million; (ii) increases in total excise taxes of $42 million; and (iii) decreases in other revenues of $65 million, mainly as a result of a decrease in miscellaneous non-tax revenues of $59 million. Approximately $170 million of the increase in total income taxes for fiscal year 2004 relates to the collection of past taxes as a result of an incentives plan implemented by the Secretary of the Treasury.

Total cash expenditures for fiscal year 2004 were $8.004 billion, which amount excludes certain amounts related to fiscal year 2004 but to be disbursed in fiscal year 2005. This amount also excludes approximately $293 million of additional expenditures that were not originally budgeted and are expected to be covered with reserve funds ($50 million), the reimbursement of certain federal education funds ($141 million), and other sources. After considering (i) debt service payments (separately identified in the table as "Transfers to Redemption Fund"), (ii) $227 million in net borrowings from GDB and other sources, and (iii) $63 million in other income from the General Fund's non-budgetary funds, the ending cash balance of the General Fund decreased from $179 million at the end of fiscal year 2003 to $109 million at the end of fiscal year 2004.

*Fiscal Year 2003 Compared to Fiscal Year 2002*

General Fund total net revenues for fiscal year 2003 were $7.842 billion, representing an increase of $388 million, or 5.2%, from fiscal year 2002 revenues. This amount includes proceeds of a loan of $250 million obtained from GDB, which is included as part of "Proceeds of notes and other borrowings." The loan has a term of five years, and may be repaid sooner to the extent that sufficient revenues are available for such purpose. The major changes from fiscal year 2002 were: (i) increases in income taxes from individuals of $318 million and in corporate income taxes of $71 million; (ii) increases in excise taxes on alcoholic beverages and cigarettes of $83 million, and increases in motor vehicle excise taxes of $81 million; (iii) an increase in electronic lottery revenues of $32 million; and (iv) a decrease in miscellaneous non-tax revenues of $124 million and in income taxes withheld from non-residents of $66 million. The decrease in miscellaneous non-tax revenues relates to certain special administrative measures that had been implemented by the Secretary of the Treasury in fiscal year 2002 and that do not apply to fiscal year 2003.

Total cash expenditures for fiscal year 2003 were $7.590 billion, which amount excludes certain amounts related to fiscal year 2003 but disbursed in fiscal year 2004. This amount also excludes $150 million of additional expenditures that were not originally budgeted and were covered with reserve funds, federal fiscal relief funds and other sources. The principal reason for these higher expenditures was higher than anticipated education costs. After considering (i) $332 million in debt service payments

CONFIDENTIAL

PRIFA_STAY0001916

(separately identified on the table as "Transfers to Redemption Fund"), (ii) $238 million in net borrowings from GDB (which includes the $250 million loan mentioned above) and other sources, and (iii) $79 million in reserves for future tax refunds reduced by estimated tax refunds (separately identified on the table as "Other Income (refunds)"), the ending cash balance of the General Fund was reduced from $350 million at the end of fiscal year 2002 to $179 million at the end of fiscal year 2003.

## Major Sources of General Fund Revenues

*Income Taxes*

The Commonwealth's income tax law, the Internal Revenue Code of 1994, as amended (the "PR Code"), imposes a tax on the income of individual residents of Puerto Rico, trusts, estates, and domestic and foreign (if engaged in a trade or business in Puerto Rico) corporations and partnerships at graduated rates. A flat tax is imposed on certain payments made to non-residents of Puerto Rico, which is collected through an income tax withholding.

*Individuals.* Resident individuals are subject to tax on their taxable income from all sources. The PR Code has five tax brackets for individuals with tax rates of 7%, 10%, 15%, 28%, and 33%. Dividend income from Puerto Rico corporations and certain qualifying foreign corporations is taxed at a rate of 10%.

Gain realized from the sale or exchange of a capital asset by resident individuals, if held for more than six months, is taxed at a rate of 20%. It is taxed at a rate of 10% if the capital asset consists of certain property located or deemed located in Puerto Rico. Gains realized by Puerto Rico resident individuals, trusts and estates from the sale of stock of certain Puerto Rico corporations in an initial public offering made prior to January 1, 2008 are subject to a special capital gains rate of 7%.

On August 22, 2004, the Governor signed into law Act 226 to provide a temporary reduction in the long-term capital gains tax rate. Act 226 reduces the long-term capital gains tax rates by 50% for transactions that take place from July 1, 2004 through June 30, 2005, provided that the net long-term capital gain is reinvested in Puerto Rico.

Interest income in excess of $2,000 on deposits with Puerto Rico financial institutions is taxed at a rate of 17%; the first $2,000 of interest income from such institutions is exempt from taxation. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to resident individuals, trusts, and estates qualifies for a special 10% tax rate.

*Corporations and Partnerships.* Puerto Rico corporations and partnerships are subject to tax on income from all sources; foreign corporations and partnerships that are engaged in a trade or business in Puerto Rico are subject to tax on their income from Puerto Rico sources and on income from sources outside Puerto Rico that is effectively connected with the conduct of their trade or business in Puerto Rico. Unless a corporation or partnership qualifies for partial exemption from corporate income and other taxes under the industrial incentives program (see "Tax Incentives" under *The Economy* above), it is subject to tax at graduated rates.

The PR Code provides for six income tax brackets for corporations and partnerships, with the highest rate (39%) applicable to net taxable income in excess of $300,000. Gains realized from the sale or exchange of a capital asset, if held for more than six months, are taxed at a maximum rate of 25% or 12.5% if the capital asset consists of certain property located or deemed located in Puerto Rico sold or exchanged after December 31, 2000. Act 226 reduces the long-term capital gains tax rates by 50% for transactions that take place from July 1, 2004 through June 30, 2005. Dividends received by Puerto Rico corporations and partnerships of foreign corporations and partnerships engaged in trade or business in Puerto Rico are subject to general income tax rates. A dividends received credit may be available. A

III-47

PRIFA_STAY0001917

special tax rate of 17% is applicable to dividend distributions of REITs received by corporations. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to resident corporations and partnerships qualifies for a special tax rate.

Certain corporations and partnerships covered by the tax incentives acts continue to be subject to a maximum tax rate of 45% on their taxable income. Corporations and partnerships covered by the Puerto Rico Tourism Incentives Act of 1993, as amended, are subject to a maximum tax rate of 42% on their taxable income. The PR Code also provides for an alternative minimum tax of 22%. Corporations and partnerships operating under a new grant of tax exemption issued under the 1998 Tax Incentives Act are subject to a maximum income tax rate of 7% during their basic exemption period.

The PR Code imposes a branch profits tax on resident foreign corporations less than 80% of whose gross income qualifies as income effectively connected with a Puerto Rico trade or business. The branch profits tax is 10% of an annual dividend equivalent amount, and it applies without regard to the Puerto Rico source of income rules.

Interest from Puerto Rico sources paid to non-resident non-affiliated corporate recipients is not subject to any income or withholding tax. Interest paid to certain related non-resident recipients is subject to a withholding tax of 29%. Dividends paid to non-resident corporate recipients are subject to a withholding tax of 10%. Dividends distributed by corporations (including Section 936 Corporations) operating under new grants of tax exemption issued under the 1998 Tax Incentives Act are not subject to Puerto Rico income tax. However, royalty payments made by such corporations to non-resident recipients are subject to a 10% withholding tax. The basic tax on dividends paid to foreign corporate shareholders of Section 936 Corporations operating under grants of tax exemption issued under prior incentives laws is 10% but is subject to reduction if a percentage of the profits are invested in certain eligible instruments for specified periods of time.

Subject to certain exceptions, payments in excess of $1,500 during a calendar year made by the Commonwealth and persons engaged in a trade or business in Puerto Rico in consideration of the receipt of services rendered in Puerto Rico are subject to a 7% withholding tax.

*Excise Taxes*

The PR Code imposes a tax on articles and commodities that are imported into or manufactured in Puerto Rico for consumption in Puerto Rico and a tax on certain transactions, such as hotel occupancy, public shows, and horse racing. The excise tax on certain articles and commodities, such as cigarettes, alcohol and petroleum products, is based upon the quantity of goods imported. The excise tax on motor vehicles is based on its suggested retail price. The PR Code imposes a tax at an effective rate of 6.6% of the F.O.B. factory price for imported goods and 3.6% of the sales price of goods manufactured in Puerto Rico, except sugar, cement, cigarettes, motor vehicles and certain petroleum products, which are taxed at different rates. Goods to be used by the government, except for motor vehicles and construction equipment, are not exempt. Exemptions apply to certain articles, such as food and medicines, and to articles designated for certain users.

The Department of the Treasury, in an effort to balance the fiscal year 2006 budget, is proposing the elimination of the excise tax exemptions that apply to certain articles, such as food and medicines. The Department of the Treasury expects to raise approximately $630 million through this legislative initiative less approximately $100 million which would be returned to certain low income segments of the population.

CONFIDENTIAL

PRIFA STAY0001918

*Other Taxes and Revenues*

Motor vehicle license plate and registration fees comprise the major portion of license tax receipts.

Non-tax revenues consist principally of lottery proceeds, documentary stamps, permits, fees and forfeits, proceeds of land sales and receipts from public corporations in lieu of taxes.

Revenues from non-Commonwealth sources include customs duties collected in Puerto Rico and excise taxes on shipments of rum from the island to the United States mainland. The customs duties and excise taxes on shipments are imposed and collected by the United States and returned to the Commonwealth. The excise tax on shipments of rum from Puerto Rico and other rum producing countries is $13.50 per gallon. Of this amount, $13.25 per proof gallon has been or will be returned to the Treasury of Puerto Rico during the period from July 1, 1999 to December 31, 2005. Effective January 1, 2006, the amount returned will be reduced to the lesser of $10.50 per proof gallon and the actual excise tax imposed. Legislation is currently pending in both houses of the United States Congress, however, that would increase the amount of federal excise taxes per proof gallon transferred to the Commonwealth to $13.50 after December 31, 2005 and before January 1, 2007. This legislation would also allocate $0.50 of the total tax so returned to the Conservation Trust Fund, a charitable trust established in 1968 pursuant to a Memorandum of Understanding between the United States Department of the Interior and the Commonwealth whose mission is to protect natural resources in Puerto Rico.

*Property Taxes*

Personal property, which accounts for approximately 53% of total collections of taxable property, is self-assessed. Real property taxes are assessed based on 1958 property values. No real property reassessment has been made since 1958, and construction taking place after that year has been assessed on the basis of what the value of the property would have been in 1958. Accordingly, the overall assessed valuation of real property for taxation purposes is substantially lower than the actual market value. Also, an exemption on the first $15,000 of assessed valuation in owner-occupied residences is available.

Property taxes are assessed, determined and collected for the benefit of the municipalities by the Municipal Revenues Collection Center ("CRIM"), a government instrumentality of the Commonwealth. However, a special 1.03% tax on the assessed value of all property (other than exempted property) imposed by the Commonwealth for purposes of paying the Commonwealth's general obligation debt is deposited in the Commonwealth's Redemption Fund.

The following table presents the assessed valuations and real and personal property taxes collected for the fiscal years ending June 30, 2000 through 2004.

**Commonwealth of Puerto Rico**
**Assessed Valuations and Real and Personal Property Taxes**
**(Commonwealth and Municipalities Combined)**
**(in thousands)**

| Fiscal Years Ended June 30 | Assessed Valuations[1] | Taxes Levied | Collections of Current Year | Collections of Previous Years | Total Collections |
|---|---|---|---|---|---|
| 2000 | 20,514,014 | 704,568 | 594,151 | 64,812 | 658,963 |
| 2001 | 21,575,063 | 736,667 | 614,411 | 70,496 | 684,907 |
| 2002 | 22,743,568 | 792,799 | 645,117 | 60,677 | 705,794 |
| 2003 | 23,138,903 | 824,933 | 671,163 | 79,421 | 750,584 |
| 2004 | 23,540,237 | 836,734 | 706,677 | 79,772 | 786,449 |

_____

(1) Valuation set as of July 1 of each fiscal year.

*Source:* Municipal Revenues Collection Center

CONFIDENTIAL

PRIFA_STAY0001919

**Collections of Income and Excise Taxes**

The Department of the Treasury has continued its program for improving tax collections, which began in fiscal year 1986. The program has consisted, in part, of taking the initiative in sponsoring and implementing tax reform, particularly in the areas of excise taxes and income taxes, in order to decrease the incidences of nonpayment of taxes and to expand the taxpayer base. The program has also included (i) improving the methods by which delinquent taxpayers are identified, primarily through the use of computer analyses, (ii) computerizing the processing of tax returns, and (iii) identifying and eliminating taxpayer evasion.

**Proposed Fiscal Reform**

The Department of the Treasury has completed its evaluation of a plan formulated by its outside consultants to reform the Commonwealth's tax system. The objective of this reform would be to reduce the income tax rates for individuals and corporations while expanding the tax base by taxing persons not currently participating in the income tax system and simplifying the tax system in order to make its administration more effective.

On April 30, 2005, the Fiscal Reform Evaluation Commission, a group appointed by the Governor to review the proposed fiscal reform proposals and comprised of various representatives from the private and public sectors, delivered to the Governor a comprehensive report containing its recommendations with respect to the proposed fiscal reform. The Governor is currently analyzing the Commission's recommendations in order to prepare and present fiscal reform legislation. Although the final form of the proposed fiscal reform is uncertain, the Department of the Treasury expects the fiscal reform will be implemented beginning on January 1, 2007. The Department of the Treasury expects that the fiscal reform will have a positive net effect on General Fund revenues.

In an attempt to completely restructure the current tax system, the Commission recommends the imposition of a 10% flat tax rate on income earned by individuals and corporations. As a result, individual taxpayers would see a reduction in available income tax deductions, an increase in income exempt from taxation, and the creation of tax credits for the benefit of retirees and certain salaried workers. Although income tax deductions available to corporations would also be reduced, the Commission proposes certain special incentives to corporate taxpayers and a 10% tollgate tax on the repatriation by foreign corporations of earning and royalties.

Another key element of the Commission's recommendations includes the implementation of a hybrid consumption-based tax. The hybrid system would be composed of a value-added tax and a sales tax. Initially, consumption would be taxed at a rate of 10%, with a subsequent reduction to 9% five years after implementation. During the first five years, 1% of collections would be transferred to the municipalities. This transfer would be eliminated upon the reduction of the consumption tax rate to 9%.

The Commission also provided recommendations for fiscal reform at the municipal level. Some of these recommendations include the elimination of taxes on personal property and the reappraisal of real property values, which are currently assessed on the basis of 1958 property values. Also, the Commission recommended the regional consolidation of municipalities in an effort to share expenses.

Finally, the Commission provided non-tax based recommendations. For example, the Commission recommends a reduction in the current size of the government and the development and implementation of advanced technological systems in order to make government more efficient and effective.

CONFIDENTIAL

**Transfers to General Obligation Redemption Fund**

These consist of transfers from the General Fund to the Redemption Fund for the amortization of the principal of and interest on general obligation bonds and notes of the Commonwealth.

**Components of General Fund Expenditures**

*Grants and Subsidies*

This category includes grants and contributions to municipalities, public corporations with independent treasuries, and charitable institutions. It also includes items for or included in court awards, damage awards for personal injury or property damage, and payment of taxes and payments in lieu of taxes.

*Personal Services*

This category includes compensation paid for personal services rendered to the Commonwealth and its public instrumentalities by individuals or firms in the form of salaries, wages, *per diems*, fees, commissions, or other forms of compensation.

*Other Services*

This category includes compensation for services other than the services referred to above, including advertising, printing, communications, legal expenses, utilities, building and equipment rental and maintenance expenses, insurance premiums and miscellaneous services.

*Materials and Supplies*

This category includes all articles that ordinarily have a short life and durability, lose their characteristic identity in the process of use, have only nominal value ($25 or less), or are not otherwise chargeable as equipment.

*Equipment Purchases*

This category includes items that have three special characteristics distinguishing them from materials: durability, long useful life, and high unit cost. In addition, these items are subject to centralized inventory control as fixed assets.

*Capital Outlays and Other Debt Service*

Capital outlays are made primarily for land acquisition or interests in land, construction of buildings, roads, bridges and other structures, and permanent improvements and additions. Other debt service includes payments on notes held by GDB to be paid from the General Fund and payments for the amortization of the principal of and interest on non-general obligations payable from Commonwealth appropriations.

CONFIDENTIAL

PRIFA STAY0001921

*Transfers to Agencies*

These transfers include the repayment of loans and advances to other funds, certain refunds, advances from other funds and other receipts, repayment of advances from other funds, grants and contributions to other funds under the custody of the Secretary of the Treasury and other items. The major portion of grants and contributions in recent fiscal years has consisted of transfers to cover the costs of health reform and advances to the municipalities.

*Other Expenditures*

This category represents recurring General Fund expenditures not appropriately attributable to other expenditure line items, such as advances to government agencies and municipalities, which advances are to be reimbursed to the General Fund by law.

**Federal Grants**

Puerto Rico receives grants under numerous federal programs. Federal grants to the agencies and instrumentalities of the Commonwealth government, including public corporations, are estimated to be $5.279 billion for fiscal year 2006, an increase of $83.5 million, or 1.6%, from fiscal year 2005. The following table presents revenues from federal grants by broad program areas, which are accounted in the central accounting system of the Department of the Treasury. The figures for fiscal years 2002, 2003 and 2004 are actual figures. The estimated figures for fiscal years 2005 and 2006 are based on the information submitted by each agency to the Office of Management and Budget.

**Commonwealth of Puerto Rico**
**Federal Grants[1]**
**(in thousands)**

|  | 2002 | 2003 | 2004 | 2005[1] | 2006[1] |
|---|---|---|---|---|---|
| Education | $ 734,917 | $ 828,992 | $1,081,236 | $992,658 | $1,046,439 |
| Social Services | 1,711,360 | 1,848,910 | 1,792,203 | 1,884,298 | 1,878,945 |
| Health | 333,154 | 367,916 | 444,348 | 478,068 | 489,556 |
| Labor and Human Resources[2] | 376,119 | 334,350 | 204,679 | 214,679 | 208,973 |
| Crime | 15,689 | 32,479 | 37,988 | 29,313 | 29,593 |
| Housing[3] | 385,592 | 312,869 | 366,408 | 383,219 | 629,228 |
| Drug and Justice | 9,822 | 11,995 | 31,349 | 13,071 | 32,811 |
| Agriculture and Natural Resources | 13,119 | 7,883 | 10,378 | 8,183 | 10,115 |
| Contributions to Municipalities | 59,191 | 59,191 | 59,002 | 56,371 | 53,744 |
| Other | 13,538 | 25,874 | 39,879 | 33,168 | 40,721 |
| TOTAL | $3,652,501 | $3,830,459 | $4,067,470 | $4,093,028 | $4,420,125 |

(1)   Estimated.
(2)   Amounts include grants to the Right to Work Administration, the Occupational Development and Human Resources Council.
(3)   Amounts include grants to the Public Housing Administration.

*Source:* Office of Management and Budget

III-52

PRIFA_STAY0001922

## BUDGET OF THE COMMONWEALTH OF PUERTO RICO

**Office of Management and Budget**

OMB's predominant mission is to assist the Governor in overseeing the preparation of the budget of the Commonwealth and supervise its administration in the agencies of the Executive Branch. In helping to formulate the Governor's budget, OMB evaluates the effectiveness of agency programs, policies, and procedures, assesses competing funding demands among agencies, and sets funding priorities.

In addition, OMB oversees and coordinates the Administration's initiatives in financial management, information technology, general management and organizational structure, and supervises the agencies' compliance with the Governor's program and regulatory policies. In each of these areas, OMB's role is to help improve administrative management, develop better performance measures and coordinating mechanisms, and promote efficiency in the use of public funds.

**Budgetary Process**

The fiscal year of the Commonwealth begins each July 1. The Governor is constitutionally required to submit to the Legislature an annual balanced budget of capital improvements and operating expenses of the central government for the ensuing fiscal year. The annual budget is prepared by OMB, in coordination with the Planning Board, the Department of the Treasury, and other government offices and agencies. Section 7 of Article VI of the Constitution provides that "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenues and other resources for the ensuing fiscal year under (i) laws existing at the time the budget is submitted, and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board.

The Legislature may amend the budget submitted by the Governor but may not increase any items so as to cause a deficit without imposing taxes to cover such deficit. Upon passage by the Legislature, the budget is referred to the Governor, who may decrease or eliminate any item but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislature with the Governor's objections. The Legislature, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the beginning of the fiscal year, the annual budget for the preceding fiscal year as originally approved by the Legislature and the Governor is automatically renewed for the ensuing fiscal year until a new budget is approved by the Legislature and the Governor. This permits the Commonwealth to continue making payments of its operating and other expenses until a new budget is approved.

**Financial Control and Adjustment Procedures**

Revenue estimates for budgetary purposes are prepared by the Department of the Treasury, except for estimates of federal grants, which are prepared by OMB based on information received from the various departments and other recipients of such grants. Revenue and federal grant estimates are under continuous review and, if necessary, are revised at least quarterly during the fiscal year. Fiscal control over expenditures is exercised by the Governor, through the Director of OMB, and the Secretary of the Treasury. Monthly reviews and expenditure cut-off procedures are followed to prevent expenditure in excess of appropriations.

CONFIDENTIAL

PRIFA_STAY0001923

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislature a detailed report of any adjustment necessary to balance the budget, or make recommendations to the Legislature for new taxes or authorize borrowings under provisions of existing legislation or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments shall give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority; first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare and retirement systems; and fourth, all other purposes.

A Budgetary Fund was created by Act No. 147 of June 18, 1980, as amended (the "Budgetary Fund"), to cover the appropriations approved in any fiscal year in which the revenues available for such fiscal year are insufficient, to secure the payment of public debt, and to provide for unforeseen circumstances in the provision of public service. Currently, an amount equal to one percent of the General Fund net revenues of the preceding fiscal year is deposited annually into the Fund. In addition, other income (not classified as revenues) that is not assigned by law to a specific purpose is also required to be deposited in the Budgetary Fund. The maximum balance of the Budgetary Fund may not exceed 6% of the total appropriations included in the budget for the preceding fiscal year. As of May 1, 2005, the balance in the Budgetary Fund was $16.7 million. The Budgetary Fund's fiscal year-end balance is expected to be $40 million.

An Emergency Fund was created by Act No. 91 of June 21, 1966, as amended (the "Emergency Fund"), to cover unexpected public needs caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods and plagues, and to protect people's lives and property and the public sector credit. The Emergency Fund is capitalized annually with an amount totaling no less than one percent of the General Fund net revenues of the preceding fiscal year. Act No. 91 was amended on August 28, 2003, to set an upper limit to the Emergency Fund of $150 million at the beginning of the fiscal year. As of May 1, 2005, the balance in the Emergency Fund was $62.4 million.

**Appropriations**

Appropriations in the central government budget of Puerto Rico consist of the following:

(i)      General Fund appropriations for recurring ordinary operating expenses of the central government and for contributions to public corporations, municipalities, and private organizations. Such appropriations are made by a single annual law known as the Joint Resolution of the General Budget.

(ii)     General Fund appropriations for special operating expenses and for capital expenditures. Such appropriations are authorized by separate law for one or more years for special programs or activities, which may be permanent or transitory.

(iii)    Disbursements of Special Funds for operating purposes and for capital improvements. For the most part, such disbursements do not require annual legislative authorization, because they are authorized by previous legislation or by the United States Congress. Federal grants constitute the major part of the resources of the Special Funds.

(iv)     Bond Fund appropriations for capital expenditures financed by bonds. Such expenditures occur in one or more years.

CONFIDENTIAL

In Puerto Rico, the central government has many functions, which in the fifty states are the responsibility of local government, such as providing public education, police and fire protection. The central government provides significant annual grants to the University of Puerto Rico and to the municipalities, as well as to PRASA, although these grants are expected to diminish shortly. See "Other Public Corporations – Aqueduct and Sewer Authority" under *Public Corporations*.

In the summaries of the central government budgets presented below, grants to the University of Puerto Rico are included in current expenses for education and debt service on general obligation bonds is included in current expenses for debt service. Debt service on Sugar Corporation notes paid by the Commonwealth is included in current expenses for economic development, and debt service on Urban Renewal and Housing Corporation bonds and notes and on Housing Finance Authority mortgage subsidy bonds paid by the Commonwealth is included in current expenses for housing.

For fiscal year 2005, it is projected that approximately 57% and 9% of the General Fund is committed for payment of the central government payroll and debt service on the direct debt of the Commonwealth, respectively. For fiscal year 2006, it is proposed that approximately 56% and 7% of the General Fund be committed for payment of the central government payroll and debt service on the direct debt of the Commonwealth, respectively. In the case of the judiciary branch, legislation approved in December of 2002 provides that, commencing with fiscal year 2004, the Commonwealth will appropriate annually to the judiciary branch an amount initially equal to 3.3% of the average annual revenue from internal sources for each of the two preceding fiscal years. This percentage will increase until it reaches 4% in fiscal year 2008, and may be further increased upon review, with scheduled reviews every five years.

**Fiscal Year 2005 Budget**

The consolidated budget for fiscal year 2005 totaled $24.842 billion. This amount includes General Fund total resources and appropriations of $8.854 billion, which represents an increase of $602 million, or 7.3%, over budgeted amounts for fiscal year 2004. These total resources include $8.304 billion of total revenues and $550 million of additional resources relating to a GDB loan secured by tax receivables. The budget for fiscal year 2005 was approved July 1, 2004.

**Commonwealth of Puerto Rico**
**Summary of Central Government Annual Budget**
**Fiscal Year Ending June 30, 2005**
**(in thousands)**

| | General Fund[(1)] | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| Revenues from internal sources: | | | | |
| Property taxes | $         0 | - | $ 112,977 | $112,977 |
| Personal income taxes | 2,868,000 | - | - | 2,868,000 |
| Retained non-resident income tax | 575,000 | - | - | 575,000 |
| Corporate income taxes | 2,005,000 | - | - | 2,005,000 |
| Partnership income taxes | 2,000 | - | - | 2,000 |
| Tollgate taxes | 23,000 | - | - | 23,000 |
| 17% withholding tax on interest | 10,000 | - | - | 10,000 |
| 10% withholding tax on dividends | 74,000 | - | - | 74,000 |
| Inheritance and gift taxes | 5,000 | - | - | 5,000 |
| Excise taxes: | | | | |
| Alcoholic beverages | 302,000 | - | - | 302,000 |
| Motor vehicles and accessories | 585,000 | - | - | 585,000 |
| Cigarettes | 146,000 | - | - | 146,000 |
| Special excise tax on certain petroleum products | 0 | - | - | 0 |
| General 5% excise tax | 573,000 | - | - | 573,000 |
| Other | 173,000 | - | 47,100 | 220,100 |

III-55

| | General Fund[1] | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| Licenses | 89,000 | - | - | 89,000 |
| Miscellaneous non-tax revenues: | | | | |
| Contributions from lottery fund | 70,000 | - | - | 70,000 |
| Electronic lottery | 73,000 | - | - | 73,000 |
| Registration and document certification fees | 218,000 | - | - | 218,000 |
| Other | 152,000 | - | 296,907 | 448,907 |
| Total revenues from internal sources | 7,943,000 | - | 456,984 | 8,399,984 |
| Revenues from non-Commonwealth sources: | | | | |
| Federal excise taxes on off-shore shipments | 337,000 | - | - | 337,000 |
| Federal grants | 0 | - | 4,093,028 [2] | 4,093,028 |
| Customs | 24,000 | - | - | 24,000 |
| Total revenues from non-Commonwealth sources | 361,000 | - | 4,093,028 | 4,454,028 |
| Total revenues | 8,304,000 | - | 4,550,012 | 12,854,012 |
| Other: | | | | |
| Other Income | 550,000 | - | - | 550,000 |
| Balance from previous year | 0 | - | 576,600 | 576,600 |
| Bonds authorized | 0 | 550,000 | - | 550,000 |
| Total other sources | 550,000 | 550,000 | 576,600 | 1,676,600 |
| Total resources | 8,854,000 | $ 550,000 | 5,126,612 | 14,530,612 |
| Appropriations: | | | | |
| Current expenses: | | | | |
| General government | 824,929 | - | 51,224 | 876,153 |
| Education | 2,838,544 | - | 1,191,151 | 4,029,695 |
| Health | 1,431,130 | - | 542,622 | 1,973,752 |
| Welfare | 434,990 | - | 2,101,620 | 2,536,610 |
| Economic development | 198,925 | - | 66,478 | 265,403 |
| Public safety and protection | 1,558,232 | - | 89,497 | 1,647,729 |
| Transportation and communications | 92,636 | - | 51,342 | 143,978 |
| Housing | 26,539 | - | 206,341 | 232,880 |
| Contributions to municipalities | 369,835 | - | 2,031 | 371,866 |
| Special pension contributions | 239,684 | - | 0 | 239,684 |
| Debt service | 380,201 | - | 112,977 | 493,178 |
| Other debt service | 457,939 | - | 25,000 | 482,939 |
| Total appropriations-current expenses | 8,853,584 | - | 4,440,283 | 13,293,867 |
| Capital improvements | 0 | 550,000 | 242,632 | 792,632 |
| Total appropriations | 8,853,584 | 550,000 | 4,682,915 | 14,086,499 |
| Year-end balance | 416 | - | 443,697 | 444,113 |
| Total appropriations and year-end balance | $ 8,854,000 | $ 550,000 | $ 5,126,612 | $14,530,612 |

(1) Law No. 93 of August 20, 1997 establishes that resources that do not represent revenues become part of the Budgetary Fund.
(2) Does not include grants received by agencies whose accounting systems are not centralized in the Department of the Treasury.

*Sources*: Department of the Treasury and Office of Management and Budget.

In the fiscal year 2005 budget, revenues and other resources of all budgetary funds total $13.405 billion, excluding balances from the previous fiscal year and general obligation bonds authorized. The net increase in General Fund revenues in the fiscal year 2005 budget, as compared to fiscal year 2004 preliminary results, is accounted mainly by increases in personal income taxes (up $52 million), corporate income taxes (up $ 179 million), 10% withholding tax on dividends (up $27 million), excise taxes on motor vehicles and accessories (up $42 million), general 5% excise tax (up $30 million), registration and document certification fess (up $47 million) and other miscellaneous non-tax revenues (up $31 million) and decreases in excise taxes on alcoholic beverages (down $11 million), cigarettes (down $13 million), and certain petroleum products (down $22 million), and electronic lottery (down $15 million).

Current expenses and capital improvements of all budgetary funds total $14.086 billion, an increase of $911 million from fiscal year 2004. The major changes in General Fund expenditures by program in fiscal year 2005 are: education (up $286.1 million), public safety and protection (up $163.5

CONFIDENTIAL

PRIFA_STAY0001926

million), special pension contributions (up $52.5 million), debt service on Commonwealth's general obligation and guaranteed debt (up $37.7 million), welfare (up $31.0 million), health (up $27.4 million), economic development (up $16.0 million), transportation and communications (up $9.1 million), contributions to municipalities (up $7.0 million), housing (up $1.7 million), and a decrease in other debt service, consisting principally of Commonwealth appropriation debt (down $29.7 million), and general government (down $43.5 million).

Expenditures for fiscal year 2005 are projected at $9.332 billion, which exceeds the General Fund budget by $478 million. The higher expenditures are in the areas of education, public safety and protection and health. The government expects to cover this budget imbalance with several financing mechanisms that will generate approximately $402 million in funds. These mechanisms include the use of a portion of the proceeds of a bond issue by Infrastructure Financing Authority to replace a General Fund budgetary allocation to the University of Puerto Rico in the amount of $200 million, income generated through debt service deposit (forward delivery) agreements, the release of excess funds held in various Commonwealth reserve funds, and the transfer of excess moneys deposited in various government trust funds, such as the Children's Trust. The remaining imbalance, if any, will be covered by expenditure reductions in various agencies.

The general obligation bond authorization for the fiscal year 2005 budget was $550 million.

**Fiscal Year 2006 Proposed Budget**

The proposed consolidated budget for fiscal year 2006 totals $25.662 billion. This includes General Fund total resources and appropriations of $9.684 billion, which represents an increase of $830 million, or 9.4%, over budgeted amounts for fiscal year 2005. This consolidated budget also includes several revenue raising alternatives, some of which require legislative approval. These revenue raising measures consist of: (i) the elimination of the exemption for food, medicine, and certain other goods from the 5% general excise tax; (ii) an increase in license fees for luxury cars; (iii) a temporary surtax on financial institutions; (iv) the elimination of the preferential capital gains rates; and (v) strengthening efforts to detect excise tax evasion through the purchase of X-Ray machines to monitor ship containers at ports of entry, the implementation of a program to improve collections, and heightened scrutiny on the payment of excise taxes on crude oil and its derivatives.

The following table presents a summary of the Commonwealth's proposed central government budget for the fiscal year ending June 30, 2006.

**Commonwealth of Puerto Rico**
**Summary of Central Government Annual Budget**
**Fiscal Year Ending June 30, 2006**
**(in thousands)**

| | General Fund | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| Revenues from internal sources: | | | | |
| Property taxes | $        0 | - | $  113,825 | $  113,825 |
| Personal income taxes | 3,127,000 | - | - | 3,127,000 |
| Retained non-resident income tax | 628,000 | - | - | 628,000 |
| Corporate income taxes | 2,252,000 | - | - | 2,252,000 |
| Partnership income taxes | 3,000 | - | - | 3,000 |
| Tollgate taxes | 17,000 | - | - | 17,000 |
| 17% withholding tax on interest | 11,000 | - | - | 11,000 |
| 10% withholding tax on dividends | 74,000 | - | - | 74,000 |
| Inheritance and gift taxes | 2,000 | - | - | 2,000 |
| Excise taxes: | | | | |
| Alcoholic beverages | 316,000 | - | - | 316,000 |
| Motor vehicles and accessories | 614,000 | - | | 614,000 |

III-57

CONFIDENTIAL

PRIFA_STAY0001927

| | | | | |
|---|---|---|---|---|
| Cigarettes | 152,000 | - | - | 152,000 |
| Special excise tax on certain products | 30,000 | - | | 30,000 |
| General 5% excise tax | 1,273,000 | - | | 1,273,000 |
| Other | 178,000 | - | 47,100 | 225,100 |
| Licenses | 123,000 | - | - | 123,000 |
| Miscellaneous non-tax revenues: | | | | |
| Contributions from lottery fund | 63,000 | - | - | 63,000 |
| Electronic lottery | 83,000 | - | - | 83,000 |
| Registration and document certification fees | 231,000 | - | - | 231,000 |
| Other | 131,000 | - | 309,200 | 440,200 |
| Total revenues from internal sources | 9,308,000 | - | 470,125 | 9,778,125 |
| Revenues from non-Commonwealth sources: | | | | |
| Federal excise taxes on off-shore shipments | 350,000 | - | 0 | 350,000 |
| Federal grants | 0 | - | 4,420,125 | 4,420,125 |
| Customs | 26,000 | - | 0 | 26,000 |
| Total revenues from non-Commonwealth sources | 376,000 | - | 4,420,125 | 4,796,125 |
| Total revenues | 9,684,000 | - | 4,890,250 | 14,574,250 |
| Other: | | | | |
| Balance from previous year | 416 | - | 443,697 | 444,113 |
| Bonds authorized | 0 | 575,000 | 0 | 575,000 |
| Total other sources | 416 | 575,000 | 443,697 | 1,019,113 |
| Total resources | 9,684,416 | 575,000 | 5,333,947 | 15,593,363 |
| Appropriations: | | | | |
| Current expenses: | | | | |
| General government | 931,843 | - | 51,844 | 983,687 |
| Education | 3,206,842 | - | 1,315,482 | 4,522,324 |
| Health | 1,610,519 | - | 508,895 | 2,119,414 |
| Welfare | 414,314 | - | 2,190,033 | 2,604,347 |
| Economic development | 258,116 | - | 69,252 | 327,368 |
| Public safety and protection | 1,722,809 | - | 93,860 | 1,816,669 |
| Transportation and communications | 113,232 | - | 58,605 | 171,837 |
| Housing | 24,793 | - | 323,818 | 348,611 |
| Contributions to municipalities | 411,134 | - | 1,985 | 413,119 |
| Special pension contributions | 278,631 | - | 0 | 278,631 |
| Debt service | 435,000 | - | 113,825 | 548,825 |
| Other debt service | 229,967 | - | 19,000 | 248,967 |
| Total appropriations-current expenses | 9,637,200 | - | 4,746,599 | 14,383,799 |
| Capital improvements | 46,800 | 575,000 | 487,149 | 1,108,949 |
| Total appropriations | 9,684,000 | 575,000 | 5,233,748 | 15,492,748 |
| Year-end balance | 416 | - | 100,199 | 100,615 |
| Total appropriations and year-end balance | $ 9,684,416 | $ 575,000 | $ 5,333,947 | $15,593,363 |

(1)   Does not include grants received by agencies whose accounting systems are not centralized in the Department of the Treasury.

*Sources*: Department of the Treasury and Office of Management and Budget.

In the fiscal year 2006 budget, revenues and other resources of all budgetary funds total $14.574 billion, excluding balances from the previous fiscal year and general obligation bonds authorized. The net increase in General Fund revenues in the fiscal year 2006 budget, as compared to fiscal year 2005 budget, is accounted mainly by increases in corporate income taxes (up $247 million), personal income taxes (up $259 million), general excise of 5% (up $700.0 million), licenses (up $34 million), excise taxes on motor vehicles and accessories (up $29 million), federal excise taxes on offshore shipments (up $13 million), excise taxes on alcoholic beverages (up $14 million), excise taxes on cigarettes (up $6 million) and decreases in tollgate taxes (down $6 million), contributions from lottery fund (down $7 million) and other miscellaneous non-tax revenues (down $21 million).

The approval of the proposed budget for fiscal year 2006, together with the different alternatives presented to address the Commonwealth's financial condition, is currently being debated at the Legislature. The president of the budget committee of the Legislature has indicated that he proposes to

CONFIDENTIAL

PRIFA STAY0001928

approve a different budget that would include expenditure reductions totaling $1.3 billion, making it unnecessary to implement the tax measures being proposed to balance the budget. The Governor has indicated he would not approve a budget with such expenditure reductions. In light of the ongoing public debate over the budget, it is possible that a budget will not be approved by the Legislature by June 30, 2005, the end of the current fiscal year. In the event that the budget is not approved prior to the start of the new fiscal year, the Commonwealth's Constitution provides that the previous fiscal year's budget is automatically renewed until a new budget is developed and approved by the Legislature and signed by the Governor. In the event the budget is not approved and the prior fiscal year's budget is automatically renewed, OMB would have to implement new cost-cutting measures. OMB would likely recommend (i) cuts to all new projects or initiatives; (ii) the elimination of any incremental expenditures in existing projects; and (iii) the reduction of working hours for all non-essential employees. Such cost-cutting measures would be intended to achieve a reduction in expenditures of approximately $1.04 billion.

Current expenses and capital improvements of all budgetary funds total $15.493 billion, an increase of $1,406 million from fiscal year 2005. The major changes in General Fund expenditures by program in fiscal year 2006 are: education (up $368.3 million), health (up $179.4 million), public safety and protection (up $164.6 million), general government (up $106.9 million), economic development (up $59.2 million), debt service on Commonwealth's general obligation and guaranteed debt (up $54.8 million), contributions to municipalities (up $41.3 million), special pension contributions (up $38.9 million), transportation and communications (up $20.6 million), and a decrease in housing (down $1.7 million), welfare (down $20.7 million), and other debt service, consisting principally of Commonwealth appropriation debt (down $228.0 million).

The general obligation bond authorization for the proposed fiscal year 2006 budget is $575 million.

**Differences between Budget and Basic Financial Statements**

Revenue and expenditures, as reported by the Department of the Treasury in its Basic Financial Statements, may differ substantially from resources and appropriations in the annual budget for a number of reasons, including the following:

(i)     The budgetary accounts are on a cash basis, while financial statements prepared by the Department of the Treasury include accruals and other adjustments as required by government accounting standards.

(ii)     Expenditures for current purposes in a particular fiscal year may include amounts appropriated for earlier periods but not previously expended and, conversely, may exclude amounts appropriated for such fiscal year but not expended until later periods.

(iii)     Bonds are authorized by the Commonwealth in accordance with a four-year capital improvement program. Since bond sales are determined by bond market conditions and other factors, the amounts of bonds sold for these improvements are financed by advances from the General Fund to the Capital Projects Fund, which are later reimbursed from proceeds of bond or notes sales.

CONFIDENTIAL

PRIFA_STAY0001929

## LITIGATION

The Commonwealth is a defendant in numerous legal proceedings pertaining to matters incidental to the performance of routine governmental operations. Under Act No. 104 of the Legislature of Puerto Rico, approved on June 25, 1955, as amended ("Act No. 104"), persons are authorized to sue the Commonwealth only for causes of actions specified in said Act. The Commonwealth may be liable under Act No. 104 for damages up to a maximum amount of $75,000 or $150,000 if the suit involves actions for damages to more than one person or where a single injured party is entitled to several causes of action. Under certain circumstances, as provided in Act No. 9 of the Legislature of Puerto Rico, approved on November 26, 1975, as amended ("Act No. 9"), the Commonwealth may provide its officers and employees, including directors of public corporations and government instrumentalities and mayors of the municipalities of the Commonwealth, with legal representation, as well as assume the payment of any judgment that may be entered against them. There is no limitation on the amount of the judgment that may be paid under Act No. 9.

With respect to pending and threatened litigation, as of June 30, 2004, the Commonwealth has included in its financial statements reported liabilities of approximately $219 million for awarded and anticipated unfavorable judgments. This amount represented the amount estimated at the time as a probable liability or a liability with a fixed or expected due date, which would require future available financial resources for its payment. The Commonwealth believes that the ultimate liability in excess of amounts provided in the financial statements, if any, would not be significant.

The Commonwealth is a defendant in a lawsuit filed by an association of primary care health centers seeking to recover from the Commonwealth $120 million of Medicaid funds retained by the Department of Health since 1997. In June 2004, the First Circuit Court of San Juan determined that the Commonwealth must return these funds. The Commonwealth appealed this decision. As of June 30, 2004, the Commonwealth has accrued $120 million for this legal contingency.

The Commonwealth is a defendant in two lawsuits filed in local and federal district court by an association of insurance companies seeking to recover from the Commonwealth approximately $74 million of compulsory motor vehicle insurance premiums allegedly belonging to the insurance companies or their policyholders, which were transferred by the Secretary of the Treasury to the General Fund. The Commonwealth believes that its ultimate liability, if any, would not be significant.

The Commonwealth is also a defendant in a lawsuit filed in local court by the Municipality of Ponce seeking to recover from the Commonwealth approximately $40 million for capital improvements promised to such municipality. The Commonwealth settled these claims out of court as follows: (i) a $5 million cash payment; and (ii) an increase of $20 million in the municipality's existing line of credit for capital improvements.

The Commonwealth and various component units are defendants in other lawsuits alleging violations of civil rights and other damages. Preliminary hearings and discovery proceedings are in progress. The amounts claimed exceed $7.8 billion; however, the ultimate liability cannot be presently determined. It is the opinion of the Commonwealth that the claims are excessive and exaggerated. No provision for any liability that may result upon adjudication of these lawsuits has been recognized by the Commonwealth. The Commonwealth believes that the ultimate liability in excess of amounts provided, if any, would not be significant.

CONFIDENTIAL

PRIFA_STAY0001930

# SIDLEY AUSTIN BROWN & WOOD LLP

**APPENDIX IV**

BEIJING

BRUSSELS

CHICAGO

DALLAS

GENEVA

HONG KONG

LONDON

787 SEVENTH AVENUE
NEW YORK, NEW YORK 10019
TELEPHONE 212 839 5300
FACSIMILE 212 839 5599
www.sidley.com

FOUNDED 1866

June ___, 2005

LOS ANGELES

NEW YORK

SAN FRANCISCO

SHANGHAI

SINGAPORE

TOKYO

WASHINGTON, D.C.

Puerto Rico Infrastructure Financing Authority
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined the Puerto Rico Infrastructure Financing Authority Act (Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended) creating Puerto Rico Infrastructure Financing Authority (the "Authority"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"). We have also examined certified copies of the legal proceedings of the Board of Directors of the Authority in authorizing the execution and delivery of that certain Trust Agreement, dated as of October 1, 1988, as amended (the "Trust Agreement"), by and between the Authority and U.S. Bank Trust National Association, successor trustee (the "Trustee"), and certified copies of the proceedings and the proofs submitted relative to the authorization, issuance and sale of the following described bonds (the "Series 2005A Bonds"):

$

## PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
## SPECIAL TAX REVENUE BONDS, SERIES 2005A
### Dated: June __, 2005.

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, and subject to redemption prior to maturity, all as set forth in the resolution of the Authority authorizing the issuance of the Series 2005A Bonds.

We have also examined one of the Series 2005A Bonds as executed and authenticated.

From such examination we are of the opinion that:

1.    The Puerto Rico Infrastructure Financing Authority Act is valid.

2.    Said proceedings have been validly and legally taken.

3.    The Series 2005A Bonds have been duly authorized and issued to provide funds to (i) provide financial assistance to PRASA and other Commonwealth instrumentalities or municipalities in connection with certain capital projects, (ii) repay certain advances made to the Authority by Government Development Bank, and (iii) pay capitalized interest and costs of issuance of the Series 2005A Bonds.

4.    As authorized by the Puerto Rico Infrastructure Financing Authority Act and by said proceedings, the Trust Agreement has been duly authorized, executed and delivered by the Authority and contains reasonable and sufficient covenants and provisions in accordance with law with respect to the custody and application of the proceeds of bonds (including the Series 2005A Bonds) issued thereunder, the collection and disposition of revenues, the conservation and application of all funds, the safeguarding of moneys on hand or on deposit and the rights and remedies of the Trustee and the holders of all bonds (including the Series 2005A Bonds) issued thereunder.

SIDLEY AUSTIN BROWN & WOOD LLP IS A DELAWARE LIMITED LIABILITY PARTNERSHIP
PRACTICING IN AFFILIATION WITH OTHER SIDLEY AUSTIN BROWN & WOOD PARTNERSHIPS

CONFIDENTIAL

PRIFA STAY0001931

5.     The Trust Agreement provides for the issuance of additional Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds under the conditions and limitations therein set forth.

6.     The Series 2005A Bonds are valid and binding special obligations of the Authority, payable solely from the Pledged Revenues (as defined in the Trust Agreement).  Under the Trust Agreement, the Authority has agreed to deposit to the credit of the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund, a special fund created under the Trust Agreement, a sufficient amount of the Special Tax Revenues (as defined in the Trust Agreement) or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund (as defined in the Trust Agreement) to pay the principal of and the interest on all bonds issued under the provisions of the Trust Agreement, including the Series 2005A Bonds, as the same become due and payable.

7.     The bonds issued under the provisions of the Trust Agreement, including the Series 2005A Bonds, do not constitute an indebtedness of the Commonwealth of Puerto Rico or of any of its political subdivisions, other than the Authority, and neither the Commonwealth of Puerto Rico nor any of its political subdivisions, other than the Authority, are liable therefor, and such bonds, including the Series 2005A Bonds, are payable solely from the Pledged Revenues, as further described in the Trust Agreement.

8.     Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to continuing compliance with the covenants referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), regarding the use, expenditure and investment of Series 2005A Bond proceeds (and the proceeds of other Puerto Rico Infrastructure Financing Authority, Special Tax Revenue Bonds Series 2005B and Puerto Rico Infrastructure Financing Authority, Special Tax Revenue Refunding Bonds Series 2005C issued concurrently with the Series 2005A Bonds) and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Series 2005A Bonds is not includable in gross income for federal income tax purposes; and (ii) the Series 2005A Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.

Interest on the Series 2005A Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code.  Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code.  The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of the Series 2005A Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income.

Each of the Authority, Puerto Rico Aqueduct and Sewer Authority and certain other benefitted entities receiving proceeds of the Series 2005A Bonds and said Series 2005B and Series 2005C Bonds has covenanted to comply, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, with the requirements of the Code so that interest on the Series 2005A Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Series 2005A Bonds.  We are not aware of any provisions of the Constitution or laws of the Commonwealth of Puerto Rico which would prevent any of the foregoing entities from complying with the requirements of the Code.

Respectfully submitted,

[To be signed "Sidley Austin Brown & Wood LLP"]

IV-2

CONFIDENTIAL

# SIDLEY AUSTIN BROWN & WOOD LLP

| | | |
|---|---|---|
| BEIJING | 787 SEVENTH AVENUE | LOS ANGELES |
| BRUSSELS | NEW YORK, NEW YORK 10019 | NEW YORK |
| CHICAGO | TELEPHONE 212 839 5300 | SAN FRANCISCO |
| DALLAS | FACSIMILE 212 839 5599 | SHANGHAI |
| GENEVA | www.sidley.com | SINGAPORE |
| HONG KONG | FOUNDED 1866 | TOKYO |
| LONDON | June ___, 2005 | WASHINGTON, D.C. |

Puerto Rico Infrastructure Financing Authority
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined the Puerto Rico Infrastructure Financing Authority Act (Act No.44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended) creating Puerto Rico Infrastructure Financing Authority (the "Authority"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"). We have also examined certified copies of the legal proceedings of the Board of Directors of the Authority in authorizing the execution and delivery of that certain Trust Agreement, dated as of October 1, 1988, as amended (the "Trust Agreement"), by and between the Authority and U.S. Bank Trust National Association, successor trustee (the "Trustee"), and certified copies of the proceedings and the proofs submitted relative to the authorization, issuance and sale of the following described bonds (the "Series 2005B Bonds"):

$

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
SPECIAL TAX REVENUE BONDS, SERIES 2005B
Dated: June ___, 2005.**

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, all as set forth in the resolution of the Authority authorizing the issuance of the Series 2005B Bonds.

We have also examined one of the Series 2005B Bonds as executed and authenticated.

From such examination we are of the opinion that:

1.     The Puerto Rico Infrastructure Financing Authority Act is valid.

2.     Said proceedings have been validly and legally taken.

3.     The Series 2005B Bonds have been duly authorized and issued to provide funds to (i) provide working capital assistance to certain instrumentalities of the Commonwealth authorized to provide infrastructure facilities, and (ii) pay capitalized interest and costs of issuance of the Series 2005B Bonds.

4.     As authorized by the Puerto Rico Infrastructure Financing Authority Act and by said proceedings, the Trust Agreement has been duly authorized, executed and delivered by the Authority and contains reasonable and sufficient covenants and provisions in accordance with law with respect to the custody and application of the proceeds of bonds (including the Series 2005B Bonds) issued thereunder, the collection and disposition of revenues, the conservation and application of all funds, the safeguarding of moneys on hand or on deposit and the rights and remedies of the Trustee and the holders of all bonds (including the Series 2005B Bonds) issued thereunder.

5.     The Trust Agreement provides for the issuance of additional Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds under the conditions and limitations therein set forth.

SIDLEY AUSTIN BROWN & WOOD LLP IS A DELAWARE LIMITED LIABILITY PARTNERSHIP
PRACTICING IN AFFILIATION WITH OTHER SIDLEY AUSTIN BROWN & WOOD PARTNERSHIPS

IV-3

CONFIDENTIAL

PRIFA STAY0001933

6.      The Series 2005B Bonds are valid and binding special obligations of the Authority, payable solely from the Pledged Revenues (as defined in the Trust Agreement). Under the Trust Agreement, the Authority has agreed to deposit to the credit of the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund, a special fund created under the Trust Agreement, a sufficient amount of the Special Tax Revenues (as defined in the Trust Agreement) or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund (as defined in the Trust Agreement) to pay the principal of and the interest on all bonds issued under the provisions of the Trust Agreement, including the Series 2005B Bonds, as the same become due and payable.

7.      The bonds issued under the provisions of the Trust Agreement, including the Series 2005B Bonds, do not constitute an indebtedness of the Commonwealth of Puerto Rico or of any of its political subdivisions, other than the Authority, and neither the Commonwealth of Puerto Rico nor any of its political subdivisions, other than the Authority, are liable therefor, and such bonds, including without limitation, the Series 2005B Bonds, are payable solely from the Pledged Revenues, as further described in the Trust Agreement.

8.      Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to continuing compliance with the covenants referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), regarding the use, expenditure and investment of Series 2005B Bond proceeds (and the proceeds of other Puerto Rico Infrastructure Financing Authority, Special Tax Revenue Bonds Series 2005A and Puerto Rico Infrastructure Financing Authority, Special Tax Revenue Refunding Bonds Series 2005C issued concurrently with the Series 2005B Bonds) and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Series 2005B Bonds is not includable in gross income for federal income tax purposes; and (ii) the Series 2005B Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.

Interest on the Series 2005B Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code. Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code. The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of the Series 2005B Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income.

Each of the Authority, Puerto Rico Aqueduct and Sewer Authority and certain other benefitted entities receiving proceeds of the Series 2005B Bonds and said Series 2005A and Series 2005C Bonds has covenanted to comply, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, with the requirements of the Code so that interest on the Series 2005B Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Series 2005B Bonds. We are not aware of any provisions of the Constitution or laws of the Commonwealth of Puerto Rico which would prevent any of the foregoing entities from complying with the requirements of the Code.

Respectfully submitted,

[To be signed "Sidley Austin Brown & Wood LLP"]

IV-4

CONFIDENTIAL

PRIFA_STAY0001934

# SIDLEY AUSTIN BROWN & WOOD LLP

| | | |
|---|---|---|
| BEIJING | 787 SEVENTH AVENUE | LOS ANGELES |
| BRUSSELS | NEW YORK, NEW YORK 10019 | NEW YORK |
| CHICAGO | TELEPHONE 212 839 5300 | SAN FRANCISCO |
| DALLAS | FACSIMILE 212 839 5599 | SHANGHAI |
| GENEVA | www.sidley.com | SINGAPORE |
| HONG KONG | FOUNDED 1866 | TOKYO |
| LONDON | June ___, 2005 | WASHINGTON, D.C. |

Puerto Rico Infrastructure Financing Authority
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined the Puerto Rico Infrastructure Financing Authority Act (Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended) creating Puerto Rico Infrastructure Financing Authority (the "Authority"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"). We have also examined certified copies of the legal proceedings of the Board of Directors of the Authority in authorizing the execution and delivery of that certain Trust Agreement, dated as of October 1, 1988, as amended (the "Trust Agreement"), by and between the Authority and U.S. Bank Trust National Association, successor trustee (the "Trustee"), and certified copies of the proceedings and the proofs submitted relative to the authorization, issuance and sale of the following described bonds (the "Series 2005C Bonds"):

$

## PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
## SPECIAL TAX REVENUE REFUNDING BONDS, SERIES 2005C
### Dated: June __, 2005.

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, all as set forth in the resolution of the Authority authorizing the issuance of the Series 2005C Bonds.

We have also examined one of the Series 2005C Bonds as executed and authenticated.

From such examination we are of the opinion that:

1.  The Puerto Rico Infrastructure Financing Authority Act is valid.

2.  Said proceedings have been validly and legally taken.

3.  The Series 2005C Bonds have been duly authorized and issued to (i) provide funds to refund the Authority's Special Tax Revenue Bonds, Series _____, and (ii) pay costs of issuance of the Series 2005C Bonds.

4.  As authorized by the Puerto Rico Infrastructure Financing Authority Act and by said proceedings, the Trust Agreement has been duly authorized, executed and delivered by the Authority and contains reasonable and sufficient covenants and provisions in accordance with law with respect to the custody and application of the proceeds of bonds (including the Series 2005C Bonds) issued thereunder, the collection and disposition of revenues, the conservation and application of all funds, the safeguarding of moneys on hand or on deposit and the rights and remedies of the Trustee and the holders of all bonds (including the Series 2005C Bonds) issued thereunder.

5.  The Trust Agreement provides for the issuance of additional Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds under the conditions and limitations therein set forth.

SIDLEY AUSTIN BROWN & WOOD LLP IS A DELAWARE LIMITED LIABILITY PARTNERSHIP
PRACTICING IN AFFILIATION WITH OTHER SIDLEY AUSTIN BROWN & WOOD PARTNERSHIPS

CONFIDENTIAL   PRIFA STAY0001935

6.    The Series 2005C Bonds are valid and binding special obligations of the Authority, payable solely from the Pledged Revenues (as defined in the Trust Agreement). Under the Trust Agreement, the Authority has agreed to deposit to the credit of the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund, a special fund created under the Trust Agreement, a sufficient amount of the Special Tax Revenues (as defined in the Trust Agreement) or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund (as defined in the Trust Agreement) to pay the principal of and the interest on all bonds issued under the provisions of the Trust Agreement, including the Series 2005C Bonds, as the same become due and payable.

7.    The bonds issued under the provisions of the Trust Agreement, including the Series 2005C Bonds, do not constitute an indebtedness of the Commonwealth of Puerto Rico or of any of its political subdivisions, other than the Authority, and neither the Commonwealth of Puerto Rico nor any of its political subdivisions, other than the Authority, are liable therefor, and such bonds, including without limitation, the Series 2005C Bonds, are payable solely from the Pledged Revenues, as further described in the Trust Agreement.

8.    Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to continuing compliance with the covenants referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), regarding the use, expenditure and investment of Series 2005C Bond proceeds (and the proceeds of other Puerto Rico Infrastructure Financing Authority, Special Tax Revenue Bonds Series 2005A and Puerto Rico Infrastructure Financing Authority, Special Tax Revenue Bonds Series 2005B issued concurrently with the Series 2005C Bonds) and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Series 2005C Bonds is not includable in gross income for federal income tax purposes; and (ii) the Series 2005C Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.

Interest on the Series 2005C Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code. Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code. The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of the Series 2005C Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income.

Each of the Authority, Puerto Rico Aqueduct and Sewer Authority and certain other benefitted entities receiving proceeds of the Series 2005C Bonds and said Series 2005A and Series 2005B Bonds has covenanted to comply, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, with the requirements of the Code so that interest on the Series 2005C Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Series 2005C Bonds. We are not aware of any provisions of the Constitution or laws of the Commonwealth of Puerto Rico which would prevent any of the foregoing entities from complying with the requirements of the Code.

Respectfully submitted,

[To be signed "Sidley Austin Brown & Wood LLP"]

CONFIDENTIAL                                              PRIFA_STAY0001936

**APPENDIX V**

## TABLE OF ACCRETED VALUES FOR THE
## CAPITAL APPRECIATION BONDS

[To be determined at pricing]

CONFIDENTIAL

PRIFA_STAY0001937

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

PRIFA STAY0001938

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

PRIFA_STAY0001939

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL


Recycled Paper - Printed by
IMAGEMASTER 800.452.5152

CONFIDENTIAL

PRIFA_STAY0001941