# EXHIBIT K



P.R. Op. Sec. Just. 2005-14, 2005 WL 6431018 (P.R. Atty. Gen.)

Opiniones del Secretario de Justicia de Puerto Rico Número 2005-14

Puerto Rico Attorney General
Núm. 2005-14
Consulta Núm. 164-05-A
30 de Agosto de 2005

**Presupuesto del Gobierno de Puerto Rico**

**1. Presupuesto, Concepto Jurídico-Asignación, Concepto Jurídico-Desembolso, Concepto Jurídico**

El término "presupuesto" es un concepto legal que se refiere al conjunto de leyes de asignaciones que están, o continúan, vigentes para un año fiscal en particular. *Véase Diario de Sesiones de la Convención Constituyente* 889 ("El presupuesto comprende todas las leyes de asignaciones, que no necesariamente tienen que hacerse en una sola pieza legislativa, que no necesariamente tienen que hacerse mediante un proyecto de ley y que ni siquiera tienen que hacerse a través, en el curso de una sesión legislativa".); Op. Sec. Just. Núm. 13 de 1984 a la pág. 85 ("El concepto 'presupuesto' . . . comprende todas las leyes de asignaciones..."); *Hernández Torres v. Hernández Colón*, 129 D.P.R. 824, 859 (1992) (Opinión disidente del Juez Asociado señor Negrón García) ("Según la Asamblea Constituyente, el presupuesto no es una ley unitaria, sino que comprende todas las leyes de asignaciones".).

El término "asignación", por su parte, es un concepto igualmente jurídico que se refiere a la "cantidad de dinero autorizada por la Asamblea Legislativa con el propósito de llevar a cabo una actividad específica o lograr ciertos objetivos". *Véase* Art. 3 de la Ley Núm. 230 de 23 de julio de 1974, *según enmendada*, conocida como "Ley de Contabilidad", 3 L.P.R.A. § 283b. *Véase además New England Division of American Cancer Society v. Commissioner of Administration*, 769 N.E.2d 1248, 1256 (Mass. 2002).

Por otra parte, el término "desembolso" alude a la "[e]ntrega de una porción de dinero efectivo y al contado" o a un "dispendio, gasto, [o] coste".

**2. Presupuesto-Contenido y Procedimiento para la Preparación-Presentación a la Rama Legislativa para su Aprobación-Firma del Gobernador**

Al confeccionar el presupuesto gubernamental, se deben dar dos pasos esenciales: (i) estimar los recursos que se espera recibir durante el año fiscal para el que se somete el presupuesto (lo cual

Case:17-03283-LTS Doc#:13162-6 Filed:05/18/20 Entered:05/18/20 17:04:48 Desc:
Hon. Aníbal Acevedo Vilá, P.R. Op. Sec. Just. 2005-14 (2005)

Exhibit K Page 3 of 140

realiza el Departamento de Hacienda); y (ii) confeccionar asignaciones (gastos autorizados) con cargo a esos recursos calculados por el Departamento de Hacienda (lo que finalmente realizan la Rama Legislativa y la Rama Ejecutiva al aprobar las correspondientes leyes de asignaciones). Una vez el Gobernador somete a la Asamblea Legislativa el presupuesto recomendado, corresponde a dicha Rama Legislativa aprobar los proyectos pertinentes de asignaciones y de recaudos, y remitir los mismos al Primer Ejecutivo para que, tras su firma, se conviertan en ley.

Como mencionáramos anteriormente, una vez el Gobernador somete a la Asamblea Legislativa el presupuesto recomendado, corresponde a dicha Rama Legislativa aprobar los proyectos pertinentes de asignaciones, y de recaudos, y remitir los mismos al Primer Ejecutivo para que, tras su firma, se conviertan en ley.

### 3. Presupuesto-Balance, Requisito-Gastos Autorizados-Recursos Calculados-Presupuesto, Múltiples Proyectos de Leyes de Asignaciones

Ahora bien, este proceso de aprobación presupuestaria encuentra su limitación más significativa en el texto constitucional. Por virtud del Artículo VI, Sección 7, de la Constitución, el presupuesto ha de estar balanceado. Esto es, los gastos autorizados (asignaciones) *no* pueden exceder los recursos calculados.

Adviértase que no se trata de una sola pieza legislativa presupuestaria sino de múltiples proyectos de leyes de asignaciones que formarán el presupuesto gubernamental para el año fiscal correspondiente. Claro está, el que existan múltiples leyes de asignaciones no implica que nuestro ordenamiento carezca de una pieza legislativa principal que recoja la gran mayoría de los gastos de funcionamiento del gobierno para cada año fiscal. Como cuestión de realidad, dicha pieza legislativa es la "Resolución Conjunta del Presupuesto General", la cual, por exigencia constitucional, "sólo podrá contener asignaciones y reglas para el desembolso de las mismas". Art. III, Sec. 17, Const. E.L.A., L.P.R.A., Tomo 1.

### 4. Presupuesto-Ente Dinámico

En este punto es importantísimo y esencial resaltar que el presupuesto es un ente dinámico. Por ello, aunque a principio de cada año fiscal se aprueba un presupuesto (un grupo de leyes de asignaciones en conjunto), el mismo está sujeto a modificación continua, ya que cada ley de asignación ulterior que sea aprobada durante el año fiscal formará parte del presupuesto de dicho periodo.

### 5. Presupuesto-Facultad del Gobernador para Administrar el Presupuesto

Aprobadas las leyes de asignaciones pertinentes, corresponde al Gobernador administrar el presupuesto. Con respecto a la administración del presupuesto, cabe resaltar que nuestro ordenamiento le concede al Gobernador amplias facultades. A tales efectos, el Artículo 4(e) de la Ley Núm. 147.

## 6. Presupuesto-Falta de Aprobación-Presupuesto Constitucional

En tales casos, nuestra Constitución dispone que, en cuanto a las asignaciones cuya vigencia culmina al final del año fiscal, se reactivarán únicamente aquéllas que sean "necesarias para los gastos ordinarios de funcionamiento del gobierno". Específicamente, la Sección 6 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico dispone: Cuando a la terminación de un año económico no se hubieren aprobado las asignaciones necesarias para los gastos ordinarios de funcionamiento del gobierno y para el pago de intereses y amortización de la deuda pública durante el siguiente año económico, continuarán rigiendo las partidas consignadas en las últimas leyes aprobadas para los mismos fines y propósitos, en todo lo que fueren aplicables, y el Gobernador autorizará los desembolsos necesarios a tales fines hasta que se aprueben las asignaciones correspondientes.

El Presupuesto Constitucional para efectos del Artículo VI, Sección 6, de la Constitución es un concepto muy amplio que no se limita a la Resolución Conjunta del Presupuesto General, sino que incluye todas aquellas leyes que asignan partidas para el funcionamiento del gobierno

## 7. Presupuesto-Presupuesto Constitucional Operante-Situación de Déficit-Facultad del Gobernador para Ajustar Desembolsos de Fondos Públicos-Normas de Prioridad-Facultad de Delegación del Gobernador en la Oficina de Presupuesto

Art. VI, Secs. 7 y 8, Const. E.L.A., L.P.R.A., Tomo 1. Cuando el gobierno se encuentra en una situación deficitaria, el Gobernador tiene el deber y la autoridad constitucional para, al amparo de los poderes establecidos en la Sección 8 del Artículo VI de la Constitución, ajustar los mismos con flexibilidad para poder cumplir con el mandato constitucional del Artículo VI, Sección 7, de la Constitución de mantener un presupuesto balanceado.

Dicho ajuste no sólo está constitucionalmente compelido, sino que procede, igualmente, como una cuestión práctica, toda vez que, aunque el gobierno cuenta con autoridad para incurrir en cierta cantidad de gastos (por virtud de las leyes de asignaciones), carece de recursos suficientes para desembolsar todas las asignaciones. Por ello, el Artículo VI, Sección 8, de la Constitución requiere que en situaciones deficitarias el Gobernador proceda, en primer término, con el pago de intereses y amortización de la deuda pública y, luego, con los demás desembolsos, de acuerdo con la "norma de prioridades" que se establezca por ley.

Esta norma de prioridades a la que alude la Sección 8 ha sido implantada por el Artículo 4(c) y (d) de la Ley Núm. 147, 23 L.P.R.A. § 104(c) y (d), el cual establece:

(c) En armonía con la Sección 8, Artículo VI de la Constitución del ELA, el Gobernador procederá conforme a las siguientes normas de prioridad en el desembolso de fondos públicos, cuando los recursos disponibles para un año económico no basten para cubrir las asignaciones aprobadas para ese año. Podrá delegar las mismas en el Director de Gerencia y Presupuesto

Art. VI, Secs. 7 y 8, Const. E.L.A., L.P.R.A., Tomo 1. Cuando el gobierno se encuentra en una situación deficitaria, el Gobernador tiene el deber y la autoridad constitucional para, al amparo de los poderes establecidos en la Sección 8 del Artículo VI de la Constitución, ajustar los mismos con flexibilidad para poder cumplir con el mandato constitucional del Artículo VI, Sección 7, de la Constitución de mantener un presupuesto balanceado.

Dicho ajuste no sólo está constitucionalmente compelido, sino que procede, igualmente, como una cuestión práctica, toda vez que, aunque el gobierno cuenta con autoridad para incurrir en cierta cantidad de gastos (por virtud de las leyes de asignaciones), carece de recursos suficientes para desembolsar todas las asignaciones. Por ello, el Artículo VI, Sección 8, de la Constitución requiere que en situaciones deficitarias el Gobernador proceda, en primer término, con el pago de intereses y amortización de la deuda pública y, luego, con los demás desembolsos, de acuerdo con la "norma de prioridades" que se establezca por ley. Esta norma de prioridades a la que alude la Sección 8 ha sido implantada por el Artículo 4(c) y (d) de la Ley Núm. 147, 23 L.P.R.A. § 104(c) y (d).

(c) En armonía con la Sección 8, Artículo VI de la Constitución del ELA, el Gobernador procederá conforme a las siguientes normas de prioridad en el desembolso de fondos públicos, cuando los recursos disponibles para un año económico no basten para cubrir las asignaciones aprobadas para ese año. Podrá delegar las mismas en el Director de Gerencia y Presupuesto.

## 8. Presupuesto-Presupuesto Constitucional Operante-Situación de Déficit-Facultad del Gobernador para Hacer Transferencias entre Partidas-Facultad del Gobernador para Hacer Ajustes a la Rama Legislativa

El Gobernador tiene amplia facultad bajo la Resolución Conjunta Núm. 927 de 2004 para realizar transferencias entre las asignaciones para las distintas agencias, incluyendo la Asamblea Legislativa y todas sus dependencias. El Artículo VI, Sección 6, de la Constitución por ser una ley de asignaciones para gastos de funcionamiento del gobierno, dispone en su Sección 2: Cuando los intereses del servicio y necesidades apremiantes de las agencias lo requieran, así como para asegurar que al cierre de cada año fiscal las operaciones de las agencias terminen con un presupuesto balanceado, se podrán realizar transferencias entre las asignaciones de un mismo organismo, así como entre las asignaciones hechas en esta Resolución Conjunta. Se excluye la transferencia de fondos de las asignaciones consignadas para los siguientes propósitos.

El ajuste realizado no puede ser de tal grado que le impida a la Asamblea Legislativa ejercer sus funciones constitucionales; lo cual, por definición, no ocurre cuando dicha Rama provoca el ajuste. Valga advertir que, si bien es cierto que el Gobernador tiene facultad para ajustar los desembolsos de la Rama Legislativa en situaciones como las de autos, cualquier ajuste en los desembolsos de dicha Rama *no* puede ser de tal grado que le impida a ésta ejercer su función constitucional. *Véase, por analogía*, *Williams v. State Legislature of State of Idaho*, 722 P.2d 465, 470 n.4 (Idaho 1986)

Por virtud de la Sección 7 del Artículo VI de la Constitución, el Primer Ejecutivo tiene la obligación de "cuadrar" el presupuesto deficitario mediante ajustes a los **desembolsos** de acuerdo a la norma de prioridades que dispone la Sección 8 del Artículo VI de la Constitución, según implantada por el Artículo 4(c) y (d) de la Ley Núm. 147, **23 L.P.R.A**. § **104**(c) y (d). Adviértase que nada en el texto de la citada ley de prioridades o en el texto de las mencionadas disposiciones constitucionales da trato preferencial, o de inmunidad, a la Rama Legislativa en situación de déficit presupuestario.

La Sección 2 de la Resolución Conjunta Núm. 927 de 2004 heredada es una "regla de desembolso", de la misma forma que un mandato rígido que ordena un desembolso para un fin específico también lo es. La diferencia entre la regla de desembolso de la Sección 2 de la Resolución Conjunta Núm. 927 de 2004 y la regla de desembolso básica que se limita a establecer el uso específico que se le dará a una asignación es que la primera es más flexible que la segunda. Si por virtud de la Sección 6 del Artículo VI de la Constitución se transfiere una partida con una regla de desembolso de mandato rígido, por imperativo lógico también se transfiere una partida con una regla de desembolso de mandato flexible (como es la Sección 2 de la Resolución Conjunta Núm. 927 de 2004). Por ello, determinar que se transfieren las partidas según restringidas, pero no según flexibilizadas por la ley, es contradictorio. Puesto a la inversa: si no se transfieren las reglas flexibles de desembolso de asignaciones, tampoco se transferirían aquellos mandatos que restringen la discreción del Ejecutivo. Esto implicaría que sólo se transferiría una partida "desnuda", sin regla de desembolso alguna (restrictiva o liberal), dejándola en un vacío ilógico y, por lo tanto, insostenible.

En vista de que la gran mayoría de las asignaciones para la Rama Legislativa están sujetas a las reglas de desembolso dispuestas en la Resolución Conjunta Núm. 927 de 2004, toda vez que están comprendidas en la misma, procedería estatutariamente que el Gobernador ajustara los desembolsos a realizarse con cargo a dichas asignaciones.

El esquema específicamente dispuesto por nuestra Constitución, el cual expresamente permite los ajustes propuestos, de forma alguna suscita un problema de "separación de poderes"; al contrario, la mejor política pública, analizada a la luz de dicha doctrina, dicta que el Gobernador debe tener la facultad reclamada.

Como cuestión de derecho, dado que la Rama Legislativa ostentaría remedios políticos y legislativos para resolver cualquier potencial reclamo, no procedería una alegación de que se le estaría impidiendo ejercer su función constitucional. Para resaltar aún más que, como cuestión práctica, los ajustes propuestos no le impedirían a la Asamblea Legislativa ejercer su función constitucional, valga destacar que dicha Rama recibe fondos adicionales bajo la partida de "Actividades Conjuntas", identificada en la Resolución Conjunta Núm. 927 de 2004, para ejercer sus funciones. Dicha partida, según los ajustes propuestos, alcanzaría $10.78 millones. Así pues,

Case:17-03283-LTS Doc#:13162-6 Filed:05/18/20 Entered:05/18/20 17:04:48 Desc:
Hon. Aníbal Acevedo Vilá, P.R. Op. Sec. Just. 2005-12 (2005)

Exhibit K Page 7 of 140

resulta importante aclarar que la referida partida es adicional al presupuesto de ambos cuerpos legislativos, el cual sólo recibiría ajustes mínimos. Además, y de particular importancia, es el hecho que la Asamblea Legislativa está en completa libertad para utilizar la porción que crea necesaria y conveniente de los otros $74.5 millones del presupuesto de ambas Cámaras para financiar las actividades que normalmente se cubren con esta partida, y viceversa. Exactamente cómo la Asamblea Legislativa distribuye su presupuesto total es un asunto de la estricta competencia de la Asamblea Legislativa. La determinación de cuánto dinero otorgar a cada renglón de gastos de la partida de Actividades Conjuntas y del presupuesto total de la Asamblea Legislativa (que aun luego de los ajustes propuestos ascendería a un desembolso de $102.96 millones) recae, como cuestión legal, en los presidentes de cada cuerpo.

## 9. Presupuesto-Presupuesto Constitucional Operante-Situación de Déficit-Facultad del Gobernador para Hacer Transferencias entre Partidas-Facultad del Gobernador para Hacer Ajustes a la Rama Legislativa-Problema de Separación de Poderes

El esquema específicamente dispuesto por nuestra Constitución, el cual expresamente permite los ajustes propuestos, de forma alguna suscita un problema de "separación de poderes"; al contrario, la mejor política pública, analizada a la luz de dicha doctrina, dicta que el Gobernador debe tener la facultad reclamada

El balance entre los Poderes Ejecutivo y Legislativo está trazado en nuestra Constitución y en la interpretación que de ella hagan los tribunales puertorriqueños. Por eso, el hecho de que en circunstancias ordinarias el balance establecido por la Constitución promueva una mejor coordinación entre las Ramas al aprobar un presupuesto no excluye que los forjadores del texto escogiesen un arreglo de poderes alterno y secundario, un "Plan B", ante un tranque presupuestario o ante una situación de déficit. Precisamente ésa fue la decisión que se tomó. La Constitución decidió este asunto por todos nosotros y, precisamente para evitar reproducir las circunstancias que hayan conducido a la falta de consenso, se dirigió a una sola Rama, provisionalmente, no para que sustituya al Poder Legislativo en casos de crisis política o económica, sino para que evite que el país se vaya a la deriva en la tempestad, y lo navegue cuidadosamente entre fronteras claramente definidas hasta llegar a puerto seguro: hasta que se balancee el déficit, "hasta que se aprueben las asignaciones correspondientes", Art. VI, Sec. 6, Const. E.L.A., L.P.R.A., Tomo 1, o ambas.

Así pues, vemos que nuestra Constitución estableció de forma expresa el alcance de las facultades y obligaciones del Poder Ejecutivo para atender ciertas circunstancias extraordinarias como, por ejemplo, una situación fiscal deficitaria como la planteada en la presente consulta. Por ello, el hecho de que el Gobernador ejerza cierta discreción en cuanto a cómo manejar una situación presupuestaria deficitaria y que, al ejercer esta discreción, tome decisiones de política pública dentro de límites estatutarios y constitucionales, no le coloca en un terreno constitucionalmente indebido. El traslapo entre funciones constitucionales no sólo es permitido, sino que es parte integral de nuestro sistema constitucional.

La ambición, o esperanza, es que el Poder Ejecutivo y el Poder Legislativo aprovechen esas oportunidades para dialogar y así intentar lograr un consenso que pueda mover el País hacia adelante. De ahí que una visión excesivamente rígida de la separación de poderes tiene el efecto nocivo de inhibir la conversación cívica que la Constitución intenta fomentar entre los representantes del Pueblo. La inhibición de esa conversación nos empobrece a todos.

## 10. Presupuesto-Presupuesto Constitucional Operante-Situación de Déficit-Facultad del Gobernador para Hacer Transferencias entre Partidas-Facultad del Gobernador para Hacer Ajustes a la Rama Legislativa-Ajustes del Gobernador, No Revisables por un Tribunal-Controversia Justiciable-Legitimación Activa-Cuestión Política-Discreción Legislativa del Ejecutivo

Los ajustes propuestos por el Primer Ejecutivo no serían revisables por un tribunal ya que no resultarían en la creación de una controversia justiciable. Es nuestra opinión que los ajustes a los desembolsos con cargo a las partidas presupuestarias del Presupuesto Constitucional que se propone hacer el Gobernador no serían revisables por un tribunal ya que no resultarían en la creación de una controversia justiciable. En primer lugar, la Rama Legislativa, potencial reclamante en esta situación, carecería de legitimación activa. En segundo lugar, cualquier reclamo anticipable a estos efectos configuraría una clásica cuestión política porque: (i) la Asamblea Legislativa tiene la autoridad política y constitucional para evaluar la magnitud y naturaleza de cualquier supuesto agravio y proveerse el remedio pertinente; y (ii) no existirían criterios judicialmente manejables para pasar juicio sobre la cantidad de un ajuste impugnado. En tercer lugar, como han resuelto múltiples tribunales en situaciones análogas, no es revisable judicialmente un ejercicio por el Ejecutivo de discreción legislativa expresamente delegada por la Constitución, tal como ocurriría con la decisión de vetar o firmar un proyecto de ley.

## 11. Presupuesto-Presupuesto Constitucional Operante-Situación de Déficit-Facultad del Gobernador para Hacer Transferencias entre Partidas-Facultad del Gobernador para Hacer Ajustes a la Rama Legislativa-Acción No Arbitraria Ni Caprichosa-Presunciones de Corrección Aplicables

La Rama Ejecutiva cuenta con suficiente información para tomar decisiones informadas, razonadas y justificadas sobre cómo hacer los ajustes propuestos. Como se puede constatar del propio texto de la ley, tanto la OGP como el Departamento de Hacienda cuentan con un caudal de información sobre las finanzas, los presupuestos, los ingresos y los gastos de todos los organismos gubernamentales, incluyendo la Rama Legislativa. Los deberes asignados a estas agencias requieren que las mismas cuenten con toda la información y el peritaje necesario para recomendarle al Gobernador precisamente qué ajustes a los desembolsos son los más recomendables. Así pues, entendemos que el Ejecutivo está muy conciente, al momento de proponer los ajustes a los desembolsos, de que la Asamblea Legislativa tiene sobrantes de más de $18 millones que dejó la Asamblea Legislativa anterior. Es precisamente basándose en toda la información financiera

y económica disponible a la Rama Ejecutiva que el Gobernador ha formulado su propuesta de ajustes a los desembolsos para la Asamblea Legislativa por una cantidad muy cercana al total de los sobrantes anteriormente mencionados. Por todas estas razones, entendemos que sería errado determinar que el Gobernador estaría actuando arbitrariamente.

Por último, cabe resaltar que la propuesta actuación del Gobernador estaría protegida por presunciones de corrección. Por su parte, la Regla 16 de las de Evidencia establece un sinnúmero de presunciones. En particular, se presume "[q]ue los deberes de un cargo han sido cumplidos con regularidad" y "[q]ue la ley ha sido acatada". 32 L.P.R.A. Ap. IV, R. 16(15) y (32). Estas dos presunciones serían aplicables a la situación objeto de la presente consulta. De hecho, ausente desfile de prueba en contrario, las mismas obligarían a un tribunal a determinar que el Gobernador actuó de acuerdo con la ley y dentro de su sana discreción al hacer los ajustes propuestos a los desembolsos con cargo a las asignaciones presupuestarias vigentes.


Hon. Aníbal Acevedo Vilá

Gobernador

Estado Libre Asociado de Puerto Rico

La Fortaleza

San Juan, Puerto Rico


Estimado señor Gobernador:

## I. *INTRODUCCIÓN*

El manejo de asuntos gerenciales y administrativos en el gobierno conlleva prestar atención a un sinnúmero de peculiaridades que distinguen la gestión pública de los procedimientos análogos que forman parte del devenir diario de una empresa en el sector privado. En particular, la preparación y gerencia de un presupuesto gubernamental se ven enmarcadas en una serie de importantes características y regulaciones que surgen de la naturaleza misma de lo que es un sistema de gobierno. En este sentido, es primordial entender que el presupuesto de una entidad gubernamental como lo es el Estado Libre Asociado de Puerto Rico es, al fin y al cabo, una creación del derecho, y existe sólo en virtud de la legitimidad legal y política que le brinda nuestro ordenamiento jurídico y social. Así pues, a la hora de hablar sobre el presupuesto del Estado Libre Asociado de Puerto Rico, hemos de sujetarnos a la manera en que la Constitución del Estado Libre Asociado de Puerto Rico ha decidido, valga la redundancia, constituir nuestro esquema de gobierno y, en particular, a

la manera en que nuestra Constitución, y los estatutos y demás autoridades legales promulgadas a su amparo, regulan la aprobación por los distintos componentes del gobierno democráticamente electo de los gastos a cubrirse con los fondos públicos recaudados del pueblo por ese mismo gobierno.

En esta opinión, profundizamos en una multiplicidad de asuntos pertinentes al derecho presupuestario que rige en el Estado Libre Asociado de Puerto Rico, a tenor de la política pública que se estableció en nuestra Constitución, y en las demás autoridades legales promulgadas a su amparo. Así pues, explicamos lo que, como cuestión de derecho, viene a ser un presupuesto gubernamental, y las disposiciones más importantes de ley que regulan su administración. En términos más especializados, abordamos también un sinnúmero de cuestiones pertinentes a algunos supuestos fácticos específicos, como lo son la falta de aprobación de un presupuesto al comenzar un nuevo año fiscal, y a los relativos deberes y facultades que nuestra Constitución delega a los actores gubernamentales cuando el gobierno se enfrenta a un presupuesto deficitario. Además, atendemos diversos otros asuntos sobre derecho constitucional pertinentes al ejercicio de tales deberes y facultades, como lo son la doctrina de separación de poderes y varias doctrinas relativas a la justiciabilidad de potenciales disputas sobre tal ejercicio.

En fin, la presente opinión pretende proveer asesoramiento al señor Gobernador sobre los cursos de acción que serían consistentes con la implantación de posturas legales constitucionales que beneficien el interés público a largo plazo. En la misma, nos hemos dado a la tarea de establecer reglas y propuestas que comulguen tanto con nuestra mejor interpretación de la intención que encarna nuestra Constitución como con el sentido común y un atemperado sentido de los balances y contrapesos que deben regir en un sistema de gobierno republicano como el nuestro, en aras de proteger al pueblo de la tiranía y el abuso gubernamental de cualquiera de los componentes del mismo.

## II. *MARCO JURÍDICO APLICABLE*

### *A. Delimitación de la controversia*

Las controversias planteadas en esta consulta están enmarcadas en una serie de conceptos fundamentales de derecho presupuestario puertorriqueño cuyo entendimiento es crucial. Como en nuestra jurisdicción carecemos de una cultura jurídica que cultive esta especializada disciplina del derecho, primeramente ofreceremos una descripción de ciertos entendidos básicos. El contexto histórico en que se desenvuelve la presente consulta reúne dos eventos noveles que con sabia previsión fueron contemplados por nuestra Constitución: de un lado, la falta de aprobación de asignaciones presupuestarias al cabo de un año fiscal; y, concurrentemente, la existencia de un presupuesto deficitario. Esta situación requiere considerar dos cuestiones esenciales que establecen el marco constitucional pertinente: en primer lugar, ¿a qué institución gubernamental la

Constitución le ha delegado la competencia de realizar los desembolsos necesarios para mantener la marcha constante del gobierno?; y, en segundo lugar, especialmente en el contexto deficitario, ¿cuánta flexibilidad ostenta constitucionalmente dicha institución en aras de cumplir con el mandato constitucional de mantener un presupuesto balanceado? Las contestaciones a ambas interrogantes están dispuestas explícitamente por la Constitución del Estado Libre Asociado de Puerto Rico. Veamos.

### B. El concepto jurídico de "presupuesto" en nuestro ordenamiento y el proceso para su aprobación en circunstancias ordinarias

#### 1. El término presupuesto es un concepto legal que se refiere al conjunto de leyes de asignaciones que están, o continúan, vigentes para un año fiscal en particular

El término "presupuesto" es un concepto **legal** que se refiere al **conjunto de leyes de asignaciones** que están, o continúan, vigentes para un año fiscal en particular. *Véase Diario de Sesiones de la Convención Constituyente* 889 ("El presupuesto comprende todas las leyes de asignaciones, que no necesariamente tienen que hacerse en una sola pieza legislativa, que no necesariamente tienen que hacerse mediante un proyecto de ley y que ni siquiera tienen que hacerse a través, en el curso de una sesión legislativa".); Op. Sec. Just. Núm. 13 de 1984 a la pág. 85 ("El concepto 'presupuesto' . . . comprende todas las leyes de asignaciones..."); *Hernández Torres v. Hernández Colón*, 129 D.P.R. 824, 859 (1992) (Opinión disidente del Juez Asociado señor Negrón García) ("Según la Asamblea Constituyente, el presupuesto no es una ley unitaria, sino que comprende todas las leyes de asignaciones".).

El término "asignación", por su parte, es un concepto igualmente **jurídico** que se refiere a la "cantidad de dinero autorizada por la Asamblea Legislativa con el propósito de llevar a cabo una actividad específica o lograr ciertos objetivos". *Véase* Art. 3 de la Ley Núm. 230 de 23 de julio de 1974, *según enmendada*, conocida como "Ley de Contabilidad", 3 L.P.R.A. § 283b. *Véase además New England Division of American Cancer Society v. Commissioner of Administration*, 769 N.E.2d 1248, 1256 (Mass. 2002) ("We have defined the power of appropriation as the authority 'to set apart from the public revenue a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object and for no other.' . . . It is beyond question that [t]he power to appropriate money of the Commonwealth is a legislative power.") [1] Una asignación es, en fin, una ley o resolución conjunta que autoriza a la Rama Ejecutiva a desembolsar y gastar dinero para cumplir ciertos objetivos específicos dispuestos por la Asamblea Legislativa.

---

[1] Para fines de precisión lingüística, se aclara que el concepto en inglés de "appropriation" se refiere a "[a] legislative body's act of setting aside a sum of money for a public purpose.

If the sum is earmarked for a precise or limited purpose, it is sometimes called a specific appropriation." *Black's Law Dictionary* (8va ed. 2004). Ello es equivalente al concepto jurídico de "asignación" referente a autorizaciones que hace la Rama Legislativa al Ejecutivo para que desembolse dinero con ciertos fines. La equivalencia de estos conceptos no es controversial, y así lo entendió también la Asamblea Constituyente. *Véase Diario de Sesiones* a la pág. 899 (refiriéndose al constitucionalmente descartado concepto de *General Appropriations Bill* para describir una modalidad particular de ley de asignaciones).

Por otra parte, el término "desembolso" alude a la "[e]ntrega de una porción de dinero efectivo y al contado" o a un "dispendio, gasto, [o] coste". *Véase Diccionario de la Real Academia Española* (21ra ed.). *Véase además Black's Law Dictionary* (8va ed. 2004) ("Disbursement- The act of paying out money, commonly from a fund or in settlement of a debt or account payable."). Los desembolsos son, por tanto, las erogaciones de fondos que en efecto realiza la Rama Ejecutiva de conformidad con las asignaciones legisladas.

De ordinario, de existir recursos suficientes, procede desembolsar la totalidad de los fondos autorizados por la correspondiente ley de asignación. Sin embargo, de no existir recursos suficientes, resulta necesario restringir los desembolsos autorizados. Por supuesto, en tales casos la asignación permanece inalterada y podrá ser desembolsada en su totalidad una vez existan recursos suficientes.

### 2. *De ordinario, la aprobación de un presupuesto es una tarea compartida entre las Ramas Ejecutiva y Legislativa que incluye la aprobación de un conjunto de leyes durante el transcurso de un año fiscal que autorizan a la Rama Ejecutiva a desembolsar fondos para determinados fines y que generan ingresos*

El "presupuesto", como conjunto de leyes de asignaciones, se aprueba, esencialmente, como todas las demás leyes; esto es, a tenor de lo dispuesto en la Sección 19 del Artículo III de la Constitución, relativo a la aprobación de proyectos por la Asamblea Legislativa y la firma o veto de éstos por el Gobernador. Sin embargo, por su complejidad, su tramitación sigue un proceso muy particular. Este proceso comienza con la presentación de un presupuesto recomendado, compuesto de "anteproyectos de leyes de asignaciones y para generar ingreso"[2], por parte del Gobernador a la Asamblea Legislativa, a tenor del Artículo IV, Sección 4, de la Constitución del Estado Libre Asociado de Puerto Rico. Dicha sección establece:

---

[2] *Véase* Art. 4(b) de la Ley Núm. 147 de 18 de junio de 1980, *según enmendada*, 23 L.P.R.A. § 104(b).

Los deberes, funciones y atribuciones del Gobernador serán:

........

Presentar a la Asamblea Legislativa, al comienzo de cada sesión ordinaria, un mensaje sobre la situación del Estado y someterle además un informe sobre las condiciones del Tesoro de Puerto Rico y los desembolsos propuestos para el año económico siguiente. Dicho informe contendrá los datos necesarios para la formulación de un programa de legislación.

Art. IV, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1.

Además, el proceso de aprobación del presupuesto ha sido delimitado estatutariamente por el Artículo 4 de la Ley Núm. 147 de 18 de junio de 1980, *según enmendada*, conocida como "Ley Orgánica de la Oficina de Gerencia y Presupuesto", 23 L.P.R.A. § 104, que dispone que el Gobernador someterá a la Asamblea Legislativa, entre otras cosas, "[l]as asignaciones y egresos que se recomiendan o proponen con cargo a todos los recursos calculados". Art. 4(a)(7) de la Ley Núm. 147, 23 L.P.R.A. § 104(a)(7). Específicamente, el referido artículo establece, en lo pertinente:

(a) En armonía con el Artículo IV, Sección 4 de la Constitución del Estado Libre Asociado de Puerto Rico, el Gobernador someterá a la Asamblea Legislativa al comienzo de cada sesión ordinaria, un Presupuesto Anual de Mejoras Capitales y Gastos de Funcionamiento del Estado Libre Asociado, sus instrumentalidades y corporaciones públicas, con cargo al Fondo General, los fondos especiales, las aportaciones del Gobierno de los Estados Unidos, emisiones de bonos y préstamos, recursos propios de las corporaciones públicas y cualesquiera otras fuentes de ingresos, indicativos de los objetivos y de los programas de gobierno que el Primer Ejecutivo propone para el año fiscal siguiente, con base en la orientación y las metas a más largo plazo del Plan de Desarrollo Integral, el Programa de Inversiones de Cuatro Años y del Plan de Usos de Terrenos, formulados y adoptados por la Junta de Planificación.

El presupuesto deberá contener la siguiente información, en la forma, extensión o detalle que el Gobernador estimare conveniente:

(1) Un mensaje del Gobernador exponiendo sus recomendaciones programáticas, fiscales y presupuestarias.

(2) Una exposición general de los objetivos, planes y programas en los cuales está enmarcado el presupuesto así como la forma en que, con los recursos que se recomiendan en el documento de presupuesto, se logran dichos objetivos, planes y programas.

(3) Descripciones de las funciones, programas y actividades del Gobierno y sus agencias, incluyendo, cuando ello resultare factible o conveniente, información sobre los costos de

los programas en vigor y propuestos, de los logros alcanzados y de las mejoras gerenciales efectuadas y en proyectos.

(4) Todos los recursos y egresos del Gobierno del Estado Libre Asociado de Puerto Rico y de sus instrumentalidades y corporaciones públicas, durante el último año fiscal terminado.

**(5) Un estimado de todos los recursos que se esperan recibir durante el año fiscal en vigor al someterse el presupuesto**, y de los gastos estimados a incurrirse durante el mismo período, del Gobierno del Estado Libre Asociado y de sus instrumentalidades y corporaciones públicas.

(6) Cálculos de todos los recursos probables del Gobierno del Estado Libre Asociado y de sus instrumentalidades y corporaciones públicas, independientemente de su origen, durante el siguiente año fiscal según:

(A) las leyes existentes a la fecha en que se someta el presupuesto;

(B) las propuestas legislativas que afecten dichos ingresos, si las hubiere;

(C) los programas federales en vigor, y

(D) por otros conceptos.

**(7) Las asignaciones y egresos que se recomiendan o proponen con cargo a todos los recursos calculados**, . . . excepto la Asamblea Legislativa y la Oficina del Contralor del Estado Libre Asociado de Puerto Rico, que estarán exentas de someter peticiones presupuestarias, las cuales el Gobernador incluirá en el presupuesto que recomiende, un presupuesto para gastos ordinarios de funcionamiento igual al vigente. . . . Comenzando con el año fiscal 2003-2004, a la Rama Judicial se le asignará una cantidad equivalente al tres punto tres (3.3%) por ciento del promedio del monto total de las rentas anuales obtenidas de acuerdo con las disposiciones de las leyes del Estado Libre Asociado de Puerto Rico e ingresadas en el Fondo General del Tesoro de Puerto Rico en los dos (2) años económicos anteriores al año corriente. . . . . Las recomendaciones y peticiones para asignaciones de cantidades englobadas en el proyecto de presupuesto general para cada organismo gubernamental estarán respaldadas en el presupuesto que se someta por cálculos detallados, por partidas de gastos y por programas o actividades.

(8) Los estados financieros y cualquiera otra información y datos económicos incluyendo los presupuestos de las empresas y corporaciones públicas que a su juicio fueren necesarios o convenientes, a fin de dar a conocer tan detalladamente como fuere factible:

(A) El estado económico del Gobierno Estatal a la terminación del último año fiscal;

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    13

(B) su situación fiscal calculada al finalizar el año fiscal en curso, incluyendo todos los balances disponibles para gastarse, y

(C) su situación fiscal estimada al finalizar el siguiente ejercicio, si se adoptaren las proposiciones contenidas en el presupuesto.

(b) El Gobernador someterá los anteproyectos de leyes de asignaciones y para generar ingreso, de acuerdo con el presupuesto que recomienda, en el curso de la sesión ordinaria de la Asamblea Legislativa dentro del término establecido por ley.

Art. 4 de la Ley Núm. 147, 23 L.P.R.A. § 104 (énfasis suplido).

Al confeccionar el presupuesto gubernamental, se deben dar dos pasos esenciales: (i) estimar los **recursos** que se espera recibir durante el año fiscal para el que se somete el presupuesto (lo cual realiza el Departamento de Hacienda)[3]; y (ii) confeccionar **asignaciones** (gastos autorizados)[4] con cargo a esos recursos calculados por el Departamento de Hacienda (lo que finalmente realizan la Rama Legislativa y la Rama Ejecutiva al aprobar las correspondientes leyes de asignaciones).[5] Una vez el Gobernador somete a la Asamblea Legislativa el presupuesto recomendado, corresponde a dicha Rama Legislativa aprobar los proyectos pertinentes de asignaciones y de recaudos, y remitir los mismos al Primer Ejecutivo para que, tras su firma, se conviertan en ley.

[3]  Al realizar un estimado de todos los recursos que se espera recibir durante el año fiscal pertinente al someterse el presupuesto, el Gobernador cuenta con el peritaje especializado del Secretario de Hacienda, quien, conforme a la ley y la Constitución, debe asesorarle en todos los asuntos bajo su competencia. Art. IV, Sec. 5, Const. E.L.A., L.P.R.A., Tomo 1 (el Secretario de Hacienda es miembro del Consejo Constitucional de Secretarios); 3 L.P.R.A. Ap. VII, Art. II(a). Por otra parte, es al Secretario de Hacienda a quien, como cuestión de derecho, se le ha delegado la facultad de administrar todo lo relacionado con los recaudos del Estado Libre Asociado de Puerto Rico. *Véase* Código de Rentas Internas de 1994, 13 L.P.R.A. §§ 8001-9750.

[4]  Estas nuevas asignaciones que el Gobernador propone al presentar un presupuesto, por lo general, son adicionales a otras leyes preexistentes que asignan fondos por tiempo indefinido y que, por sus propios términos, se mantienen vigentes durante todo año fiscal que comienza. Este tipo de leyes de asignaciones de tiempo indefinido son las que más adelante denominamos "leyes ineludibles" y que, a no ser que se revoquen, permanecen vigentes año tras año.

5

La Asamblea Legislativa y el Gobernador también aprueban nuevas leyes y resoluciones conjuntas con posterioridad a la confección del presupuesto al inicio del año fiscal que, por lo tanto, varían el total de los recursos disponibles durante el año fiscal, según discutiremos en más detalle más adelante.

### 3. *Por mandato constitucional, el presupuesto ha de estar balanceado*

Ahora bien, este proceso de aprobación presupuestaria encuentra su limitación más significativa en el texto constitucio- nal. Por virtud del Artículo VI, Sección 7, de la Constitución, el presupuesto ha de estar balanceado:

Las asignaciones hechas para un año económico no podrán exceder de los recursos totales calculados para dicho año económico, a menos que se provea por ley para la imposición de contribuciones suficientes para cubrir dichas asignaciones.

**Esto es, los gastos autorizados (asignaciones) *no* pueden exceder los recursos calculados**. En este punto, resulta pertinente abundar brevemente en cuanto a varios asuntos de derecho importantes para así tener un cuadro más diáfano del alcance sustantivo del concepto de "presupuesto".

### 4. *El presupuesto se compone, no de una sola ley, sino de un conjunto de leyes aprobadas en el transcurso de un año fiscal que autorizan a la Rama Ejecutiva a desembolsar fondos para determinados fines*

Como mencionáramos anteriormente, una vez el Gobernador somete a la Asamblea Legislativa el presupuesto recomendado, corresponde a dicha Rama Legislativa aprobar los proyectos pertinentes de asignaciones, y de recaudos, y remitir los mismos al Primer Ejecutivo para que, tras su firma, se conviertan en ley. Adviértase que **no** se trata de una sola pieza legislativa presupuestaria sino de múltiples proyectos de leyes de asignaciones que formarán el presupuesto gubernamental para el año fiscal correspondiente. Claro está, el que existan múltiples leyes de asignaciones no implica que nuestro ordenamiento carezca de una pieza legislativa principal que recoja la gran mayoría de los gastos de funcionamiento del gobierno para cada año fiscal. Como cuestión de realidad, dicha pieza legislativa es la "Resolución Conjunta del Presupuesto General", la cual, por exigencia constitucional, "sólo podrá contener asignaciones y reglas para el desembolso de las mismas". Art. III, Sec. 17, Const. E.L.A., L.P.R.A., Tomo 1.[6]

6

Conforme a la precitada disposición constitucional, esta Resolución Conjunta del Presupuesto General no puede contener otra cosa que no sea "asignaciones y reglas para el

desembolso de las mismas". De esta forma, por ejemplo, las leyes que autoricen al Secretario de Hacienda a imponer contribuciones para allegar recaudos adicionales deben consignarse en leyes independientes. Como estas asignaciones no pueden exceder los recursos calculados conforme al mandato constitucional de mantener un presupuesto balanceado, si las Ramas políticas desean incurrir en gastos que excedan los recursos calculados, la Constitución exige que las mismas legislen para obtener más recaudos por vía de contribuciones - es decir, "que se provea por ley para la imposición de contribuciones suficientes para cubrir dichas asignaciones". Art. VI, Sección 7, Const. E.L.A., L.P.R.A., Tomo 1.

Valga advertir que, por la extensión de su vigencia, las leyes de asignaciones pueden ser de dos clases: (i) extensión **definida**; o (ii) extensión **indefinida**. Esto es, la Asamblea Legislativa puede efectuar una asignación con vigencia delimitada (por ejemplo, por un año fiscal en específico) o efectuar asignaciones prolongadas en el tiempo de forma indefinida.

El primer tipo de asignación se efectúa mediante "resolución conjunta", por ésta no tener vigencia permanente. *Véase* Sección 1 de la Ley Núm. 2 de 4 de marzo de 1953, 2 L.P.R.A. § 200 ("Toda legislación que haya de perder su fuerza al realizarse la obra, o cumplirse la finalidad que persigue, será objeto de consideración por la Asamblea Legislativa mediante resolución conjunta y no formará parte de los estatutos permanentes de Puerto Rico. Estas resoluciones seguirán el mismo trámite que los proyectos de ley".). De esta forma, y a modo de ejemplo, una resolución conjunta que asigna fondos para el proyecto de salas especializadas en casos de sustancias controladas ("Drug Courts"), Resolución Conjunta Núm. 1110 de 2004, es una ley de asignación de vigencia delimitada circunscrita a un año fiscal particular. Asimismo, la propia Resolución Conjunta del Presupuesto General es una ley de asignaciones de tiempo definido.

Por su parte, el segundo tipo de asignación se extiende en el tiempo de forma indefinida y no requiere de legislación ulterior para continuar en vigor. Se trata, pues, de una ley que está vigente y que debe ser acatada hasta que no sea derogada. Algunos ejemplos de esta segunda clase de asignaciones lo son: la asignación dispuesta para la Rama Judicial por virtud de la Ley Núm. 286 de 20 de diciembre de 2002, la cual establece la fórmula para fijar el presupuesto de dicha Rama; o asignación dispuesta por la Ley Núm. 62 de 20 de febrero de 2004, la cual consigna una pensión vitalicia a Carmen Belén Richardson.

### 5. *El presupuesto es un ente dinámico que cambia durante el transcurso del año fiscal*

**En este punto es importantísimo y esencial resaltar que el presupuesto es un ente dinámico**. Por ello, aunque a principio de cada año fiscal se aprueba un presupuesto (un grupo de leyes de asignaciones en conjunto), **el mismo está sujeto a modificación continua, ya que cada ley de asignación ulterior que sea aprobada durante el año fiscal formará parte del presupuesto de dicho período**. *Véase Diario de Sesiones* a la pág. 889. Así pues, aunque el presupuesto total para

un año fiscal al comienzo del mismo (el 1 de julio) sea de una cantidad X, cuando la Asamblea Legislativa y el Gobernador aprueban leyes de asignaciones adicionales **durante el transcurso** de dicho año fiscal, el presupuesto aumenta. [7] Por tanto, **el presupuesto para un año fiscal, al finalizar el año, va a ser fundamentalmente distinto al presupuesto inicial, precisamente debido a todas estas asignaciones nuevas que se aprueban durante el transcurso de dicho año**. [8]

[7] Valga destacar que este tipo de situación es precisamente la que se presta, y como cuestión de hecho se ha prestado por décadas, para ocasionar un déficit cuando la Asamblea Legislativa no cumple con la Sección 7 del Artículo VI de la Constitución y no aprueba medidas de recaudos. Esta lamentable realidad de que se apruebe legislación con impacto fiscal, pero sin proveer para el aumento en recursos necesarios para costear tal impacto, continúa aun hoy día. *Véase* P. del S. 1143 de 13 de octubre de 2005 (anteproyecto de administración proponiendo establecer como la política pública gubernamental que no se podrá aprobar legislación que imponga obligaciones económicas a las entidades gubernamentales sin identificar y asignar los recursos para atender dichas obligaciones, y requerir que OGP y el Departamento de Hacienda emitan un informe sobre el "Impacto Fiscal" de toda medida legislativa, entre otros asuntos).

[8] Aunque se citará completamente más adelante, resulta oportuno consignar en este punto las palabras del delegado señor Negrón López en los debates de la Asamblea Constituyente: "El presupuesto comprende todas las leyes de asignaciones, que no necesariamente tienen que hacerse en una sola pieza legislativa, que no necesariamente tienen que hacerse mediante un proyecto de ley y que ni siquiera tienen que hacerse a través, en el curso de una sesión legislativa." *Diario de Sesiones* a la pág. 889.

Aprobadas las leyes de asignaciones pertinentes, corresponde al Gobernador administrar el presupuesto. Con respecto a la administración del presupuesto, cabe resaltar que nuestro ordenamiento le concede al Gobernador amplias facultades. A tales efectos, el Artículo 4(e) de la Ley Núm. 147 dispone:

(e) Con respecto a la administración y control del presupuesto, el Gobernador tendrá las siguientes facultades que podrá delegar en el Director de Gerencia y Presupuesto:

(1) Aprobar los detalles presupuestarios, mediante presupuestos ejecutivos, de las asignaciones englobadas autorizadas en la Resolución Conjunta del Presupuesto General o en cualesquiera otras leyes; y de recursos disponibles en fondos especiales de origen estatal o de origen federal. Estos detalles podrán ser preparados a base de años fiscales determinados o a base de cuotas por períodos determinados de tiempo dentro de un año fiscal.

(2) Enmendar los detalles presupuestarios en la forma que crea necesario sin que ello afecte la cuantía total asignada a los organismos, con excepción de lo dispuesto en los incisos (c) y (d) de esta sección o cuando por otras leyes se disponga lo contrario.

(3) Aprobar y refrendar, mediante presupuestos ejecutivos o autorizaciones de puestos y gastos, las autorizaciones especiales para incurrir en gastos y crear puestos, contra cualesquiera fondos o asignaciones, independientemente de su origen. Se entenderán como especiales las autorizaciones no cubiertas en los presupuestos ejecutivos señalados en la cláusula (1) de este inciso.

(4) Determinar qué puestos vacantes o que puedan vacar luego, no deben cubrirse durante el período de tiempo que sea necesario.

(5) Establecer reservas presupuestarias y **restringir los recursos a disposición de los organismos en la forma que crea pertinente cuando en la ejecución y control del presupuesto lo estime necesario**, independientemente de las circunstancias establecidas en los incisos (c) y (d) de esta sección [, relativas a situaciones deficitarias].

(6) Incluir en los detalles presupuestarios, con cargo a las diferentes fuentes de ingresos, las partidas necesarias para el pago de deudas incurridas en años anteriores por los organismos y reducir en esas cantidades los recursos a la disposición del organismo para el año fiscal en el que se hace el ajuste. El ejercicio de esta función no será aplicable a los organismos o empresas que operen con tesoro independiente, ni aquellos organismos a los que se les proveen asignaciones sobre las cuales la Oficina no ejerce control presupuestario, los cuales tomarán las medidas que correspondan para satisfacer las deudas de años anteriores.

(7) Autorizar al Secretario de Hacienda a anticipar recursos a las agencias con cargo al Fondo General para obligaciones o desembolsos de programas con aportaciones del Gobierno de Estados Unidos aprobadas pero pendientes de recibirse y para el pago de mejoras permanentes contratadas en proceso de construcción, en lo que se hacen efectivas nuevas asignaciones.

23 L.P.R.A. § 104(e) (énfasis suplido).

La anterior discusión describe, en términos generales, el proceso de aprobación presupuestaria bajo circunstancias ordinarias. En este contexto, ausente otros problemas constitucionales, el proceso presupuestario es un trámite compartido en el que participan la Asamblea Legislativa y el Ejecutivo, quedando la ejecución del mismo en manos del Gobernador, y el establecimiento de las políticas públicas esenciales en manos de la Rama Legislativa.

### *C. La falta de aprobación de un presupuesto*

**1.** *Cuando no se aprueba un presupuesto al final de un año fiscal, la Constitución dispone que aquellas leyes de asignaciones para gastos de funcionamiento del gobierno vigentes al final de dicho año fiscal se reactivarán para evitar que se detenga la marcha de las funciones esenciales del gobierno*

Como hemos visto, el presupuesto se compone de **todas** las leyes de asignaciones. Ahora bien, ¿qué sucede cuando en un año específico el proceso político no logra formular un presupuesto? En tales casos, nuestra Constitución dispone que, en cuanto a las asignaciones cuya vigencia culmina al final del año fiscal, se reactivarán **únicamente** aquéllas que sean "necesarias para los gastos ordinarios de funcionamiento del gobierno". Específicamente, la Sección 6 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico dispone:

Cuando a la terminación de un año económico no se hubieren aprobado las asignaciones necesarias para los gastos ordinarios de funcionamiento del gobierno y para el pago de intereses y amortización de la deuda pública durante el siguiente año económico, continuarán rigiendo las partidas consignadas en las últimas leyes aprobadas para los mismos fines y propósitos, en todo lo que fueren aplicables, y el Gobernador autorizará los desembolsos necesarios a tales fines hasta que se aprueben las asignaciones correspondientes.

Art. VI, Sec. 6, Const. E.L.A., L.P.R.A., Tomo 1.

Como se puede apreciar, de no aprobarse un presupuesto, la Constitución ordena que mantengan vigencia todas las "partidas consignadas en las últimas leyes aprobadas [para los gastos ordinarios de funcionamiento del gobierno]". *Id.* Por tanto, al identificar este Presupuesto Constitucional, la tarea principal consiste en determinar cuáles son las últimas leyes de asignación para estos fines. Cabe recalcar que la Constitución específica y textualmente establece que son "**las últimas leyes**" de asignación las que mantendrán vigencia en estas situaciones. *Id.* (énfasis suplido). Así pues, el presupuesto para el año fiscal anterior pertinente al momento de determinar el Presupuesto Constitucional para el año que comienza es **aquél que está vigente** *al concluir* el año fiscal anterior (el 30 de junio del año calendario corriente), y **no** el que estaba vigente al comienzo del mismo (el 1 de julio del año calendario anterior).

**2.** *El Presupuesto Constitucional para efectos del Artículo VI, Sección 6, de la Constitución es un concepto muy amplio que no se limita a la Resolución Conjunta del Presupuesto General, sino que incluye todas aquellas leyes que asignan partidas para el funcionamiento del gobierno*

Por otra parte, es esencial delimitar qué implica la Constitución cuando habla de aquellas partidas para "los gastos de funcionamiento del gobierno". De los debates de la Convención Constituyente queda claro que la frase "gastos ordinarios de funcionamiento del gobierno" *no* se limita a la Resolución Conjunta del Presupuesto General. Al considerar el texto de la Sección 6, se discutió una propuesta específica del delegado señor Iriarte para que "todos los gastos necesarios del gobierno durante un año económico [sean] consignados en ... una ley todos, en una ley para que sean conocidos perfectamente". *Diario de Sesiones* a la pág. 888. Esta propuesta fue rechazada, descartándose expresamente la idea de un *General Appropriations Bill* que englobe todos y cada uno de los gastos del gobierno. *Id.* a las págs. 888-89, 899.

Esta propuesta desató una iluminadora discusión en cuanto a **cuáles** leyes constituyen parte del presupuesto que se transfiere en el caso en que no se aprueben las asignaciones necesarias para el funcionamiento del gobierno al cabo de un año fiscal. El delegado señor Negrón López destacó la visión imperante que prevaleció en este debate:

> Deseo contestar al delegado señor Iriarte explicándole que no es necesario, no me parece necesario ni tampoco aconsejable, que la constitución exprese que las leyes de presupuesto, las asignaciones, se harán constar en una sola ley. Digo, no es lo más conveniente como disposición constitucional establecer que el presupuesto debe estar contenido en una sola ley. El término "presupuesto" es un término que tiene una gran vaguedad. En Puerto Rico se ha utilizado para significar la ley que asigne los fondos para los gastos ordinarios del funcionamiento del gobierno. Sin embargo, el programa de gobierno contenido en el mensaje de presupuesto a que alude el señor Iriarte es una cosa que comprende mucho más que la mera ley que asigna los gastos para el funcionamiento ordinario del gobierno. **El presupuesto comprende mucho más que la mera ley que asigna los gastos para el funcionamiento ordinario del gobierno. El presupuesto comprende todas las leyes de asignaciones, que no necesariamente tienen que hacerse en una sola pieza legislativa, que no necesariamente tienen que hacerse mediante un proyecto de ley y que ni siquiera tienen que hacerse a través, en el curso de una sesión legislativa.** Si adoptáramos una disposición como la que expresa el delegado señor Iriarte y se le olvidara por casualidad a la Asamblea Legislativa incluir la partida para cualquier función o menester público en la ley general de presupuesto, habría un obstáculo constitucional que impediría que se aprobara una ley separada. Si se decide iniciar un programa de gastos del Gobierno de Puerto Rico, de desembolsos de fondos públicos para cualquier fin después de haberse consignado el presupuesto, habría un obstáculo constitucional para hacer una ley complementaria de presupuesto, una ley distinta de asignaciones.

*Id.* a la pág. 889 (énfasis suplido). *Véanse además id.* a la pág. 896; Op. Sec. Just. Núm. 13 de 1984. Por otra parte, y en cuanto al ámbito sustantivo de las leyes de asignaciones que se transfieren al año siguiente, al aprobarse una enmienda relativa al Artículo III, Sección 17, de la Constitución, la cual versa sobre el contenido de la ley de presupuesto general, se aclaró que el concepto de presupuesto incluye "**no solamente los gastos ordinarios de funcionamiento, sino también**

mejoras permanentes, asignaciones a empresas públicas y otras asignaciones, incluyendo, desde luego, el principal e intereses de la deuda pública, de manera que se pueda utilizar una mejor técnica de presupuesto". *Diario de Sesiones* a la pág. 2009 (énfasis suplido).

En fin, el Presupuesto Constitucional, para efectos del Artículo VI, Sección 6, de la Constitución es un concepto muy amplio que no se limita a la Resolución Conjunta del Presupuesto General, sino que incluye todas aquellas leyes que asignan partidas para el funcionamiento del gobierno. Se trata de una visión dilatada de lo que es el presupuesto que, a su vez, refleja la preocupación principal de esta cláusula constitucional de que, ante un tranque entre los poderes políticos del gobierno, la Rama Ejecutiva cuente con aquellas asignaciones presupuestarias destinadas a atender las necesidades reales de la población, según las prioridades establecidas en los más recientes pactos democráticamente acordados entre las ramas políticas. Una visión restringida del Presupuesto Constitucional sería contraria el objetivo de la Sección 6, que es "no dejar que quede en suspenso el funcionamiento del gobierno en tanto la Asamblea Legislativa actúa con los poderes que a ese efecto tiene". *Diario de Sesiones* a la pág. 890.

Por tal razón, se ha indicado que el Artículo VI, Sección 6, de la Constitución "se refiere al concepto de presupuesto amplio, esto es, **al conjunto de todas las asignaciones aprobadas, las cuales forman parte del programa de gobierno, conforme a la misión que se espera que el gobierno cumpla y que son necesarias para el sostenimiento y funcionamiento del mismo y el pago de la deuda pública**". Op. Sec Just. Núm. 13 de 1984 a la pág. 86 (énfasis suplido). [9]

---

[9] *Véase* Orden Ejecutiva de 30 de junio de 1984, Boletín Administrativo Núm. 4308, para un ejemplo de las partidas que se reactivaron del presupuesto del año fiscal 1983-1984 para el año fiscal 1984-1985.

Por todo lo anterior, al activarse las disposiciones de la Sección 6, recobran vigencia tanto la última Resolución Conjunta del Presupuesto General aprobada como todas aquellas leyes especiales que consignen asignaciones de fondos necesarios para el sostenimiento y funcionamiento del gobierno y que estuvieran vigentes durante el año fiscal anterior. Ello trasciende una concepción limitada de lo que son gastos "ordinarios" de gobierno, e incluye una gama mayor de leyes que asignan partidas para cumplir con las funciones de un gobierno moderno.

### 3. *Las asignaciones que comprenden el Presupuesto Constitucional surgen tanto de leyes vigentes por sus propios términos como de aquellas de extensión definida que son reactivadas por virtud constitucional*

A tenor de los criterios anteriormente expuestos, es posible identificar las siguientes categorías de leyes de asignaciones presupuestarias que, de no aprobarse un presupuesto, han de mantenerse en vigor.

### a. *Leyes de extensión indefinida*

Las leyes de extensión indefinida, que pueden denominarse como "ineludibles", son leyes de asignaciones de partidas que por sus propios términos tienen vigencia durante el año fiscal que comienza. Estas leyes serían parte del presupuesto independientemente de que exista un tranque en la aprobación del mismo. En este grupo se incluyen todas las leyes que: (i) asignan cuantías por fórmulas de modo repetitivo por un tiempo indefinido (como, por ejemplo, las leyes que asignan dinero a la Universidad de Puerto Rico, al Fondo Presupuestario, al Fondo de Emergencia, a la Rama Judicial, y a los municipios); (ii) asignan cantidades monetarias específicas anuales indefinidamente; (iii) asignan partidas en un calendario de años (como, por ejemplo, la Resolución Conjunta Núm. 557 de 2000, la cual establece un plan de pago para la deuda de la Universidad de Puerto Rico); y (iv) asignan dinero en cantidades contingentes a otros factores (como, por ejemplo: las leyes que legislan aumentos salariales, pero cuya cuantía depende de la cantidad de empleados, *véase* Ley Núm. 168 de 12 de julio de 2004; y las leyes que hacen una asignación indefinida y permanente para garantizar el servicio de la deuda, según sea requerido por el Banco Gubernamental de Fomento o por los bonistas, *véase* Ley Núm. 216 de 19 de agosto de 2004). Obsérvese que en este renglón *no* opera el Artículo VI, Sección 6, de la Constitución pues las leyes tienen vigencia por sus propios términos sin necesidad de empuje constitucional.

### b. *Leyes de extensión definida*

### i. La Resolución Conjunta del Presupuesto General

Aunque esta ley tiene una vigencia limitada y, bajo circunstancias normales, carecería de fuerza de ley a partir del final de un año fiscal, al no ser aprobado un presupuesto general de gastos, la misma se transfiere al año siguiente y forma parte del Presupuesto Constitucional, pues se trata del caso paradigmático de una ley de asignaciones que consigna partidas para el funcionamiento del gobierno.

### ii. Leyes de asignaciones especiales aprobadas para un año fiscal específico

Bajo esta categoría se encuentran todas las leyes de asignaciones especiales aprobadas para un año fiscal específico que, aunque su vigencia también culminaría al ocaso del año fiscal, se benefician del empuje constitucional, trasladándose al año fiscal siguiente por ser leyes que asignan partidas "para los gastos ordinarios de funcionamiento del gobierno" - concebida esta frase con la latitud

seleccionada por los delegados de la Convención Constituyente, según discutido. Este grupo de leyes incluye una variedad de resoluciones conjuntas que generalmente consisten de asignaciones especiales para el funcionamiento de programas de las agencias del gobierno. *Véase, por ejemplo*, Resolución Conjunta Núm. 1110 de 2004 (asignando dinero al programa de "Drug Courts").

### 4. *Por virtud constitucional, continúa rigiendo la ley de asignación en su totalidad, y no meramente la cuantía dispuesta*

Cabe destacar que, por virtud constitucional, al reactivarse una asignación por virtud constitucional, continúa rigiendo la ley de asignación **en su totalidad**, y no meramente la cuantía dispuesta, toda vez que las reglas de desembolsos de cada asignación son parte integral de la misma. Véase, por analogía, la Sección 17 del Artículo III de la Constitución, la cual, para el caso de la "ley de presupuesto general", concibe las reglas de desembolso como parte íntegra de la asignación. ("La ley de presupuesto general sólo podrá contener asignaciones y reglas para el desembolso de las mismas".). Art. III, Sec. 17, Const. E.L.A., L.P.R.A., Tomo 1.

### D. *Para el año fiscal 2005-2006 no se aprobó un presupuesto por lo que, por operación de ley, entró en vigor un Presupuesto Constitucional según lo dispuesto en la Sección 6 del Artículo VI de la Constitución*

Durante el año fiscal corriente no se aprobó la Resolución Conjunta del Presupuesto General para el año fiscal 2005-2006, Resolución Conjunta de la Cámara Núm. 445 de 2005. Ello ocasionó que, por operación de ley, se activara la Sección 6 del Artículo VI de la Constitución. Por esto, al 1 de julio de 2005, entró en vigor un Presupuesto Constitucional que, con cargo al Fondo General, totalizó $9,489 millones. *Véase* Anejo A. El mismo estaba compuesto de las siguientes leyes de asignaciones:

(i) La Resolución Conjunta del Presupuesto General para el año fiscal 2004-2005, cuyas asignaciones ascendieron a $5,522 millones, aproximadamente.

(ii) Las leyes de extensión indefinida o "ineludibles", que incluyen todas aquellas leyes de asignaciones de partidas que por sus propios términos tienen vigencia durante el año fiscal 2005-2006 y que, ante cualquier escenario, serían parte del presupuesto, a no ser que la Resolución Conjunta del Presupuesto General, u otra ley, las derogue o enmiende. Las asignaciones contenidas en estas leyes ascendieron a $2,504 millones, aproximadamente.

(iii) Todas aquellas leyes aprobadas durante el año fiscal 2004-2005 que, aunque su vigencia normalmente culminaría el 30 de junio de 2005, por disposición constitucional se reactivan para el año fiscal siguiente por tratarse de leyes que asignan partidas "para los gastos ordinarios de

funcionamiento del gobierno". Las asignaciones contenidas en este grupo de leyes ascendieron a $1,462 millones, aproximadamente.

Ahora bien, y según mencionamos, toda vez que el presupuesto es un ente dinámico y que nada impide que, heredado el presupuesto anterior, se aprueben leyes de asignaciones nuevas o **sustitutivas** de las anteriores, al 30 de agosto de 2005, el "retrato" en el tiempo de un presupuesto dinámico revela que las asignaciones vigentes con cargo al Fondo General totalizan $9,284 millones, aproximadamente. *Véase* Anejo A.

Por lo tanto, al identificar las leyes que configuran el Presupuesto Constitucional, *véase* Anejo A, debemos tener en mente exclusivamente el criterio rector de leyes que asignan partidas para gastos de funcionamiento del gobierno. En este sentido, el Presupuesto Constitucional identificado en el Anejo A de esta opinión **excluye** todas aquellas leyes que no cumplen con este criterio jurídico esencial. Por ello, luego de un análisis **legal** exhaustivo de más de mil (1,000) leyes y resoluciones conjuntas, además de la Resolución Conjunta del Presupuesto General y aquellas leyes ineludibles que tienen vigencia propia, en el Presupuesto Constitucional que identificamos en el Anejo A de esta opinión sólo se incluyen aquellas leyes que autorizan desembolsos para gastos de funcionamiento del gobierno. Sólo éstas reciben el impulso constitucional y se reactivaron este año.

### 1. *La determinación sobre cuál es el Presupuesto Constitucional es una cuestión pura de derecho*

Como surge de nuestra anterior discusión, la determinación sobre cuál es el Presupuesto Constitucional es una cuestión pura de derecho que sólo tiene que ver: (i) con los criterios sustantivos utilizados para identificar las leyes que se transfieren; y (ii) con la evaluación jurídica de si, en efecto, las leyes identificadas cumplen con esos criterios. Identificado el Presupuesto Constitucional por la Rama Ejecutiva, correspondería a cualquiera que lo deseara cuestionar demostrar afirmativamente que éste no es el Presupuesto Constitucional correcto, ya sea porque: (i) el criterio utilizado no es el que impone la Constitución; o (ii) al identificar las leyes no se utilizó el criterio correctamente. *Véase* Regla 10(B) de las de Evidencia, 32 L.P.R.A. Ap. IV R. 10(B) ("La obligación de presentar evidencia primeramente recae sobre la parte que sostiene la afirmativa en la cuestión en controversia"); *Ibáñez v. Molinos*, 114 D.P.R. 42, 48 (1983) (el peso de la prueba recae sobre la parte demandante); Regla 16(15) de las de Evidencia, 32 L.P.R.A. Ap. IV R. 16 (15) (se presume "[q]ue los deberes de un cargo han sido cumplidos con regularidad"); Regla 16(32) de las de Evidencia, 32 L.P.R.A. Ap. IV R. 16(32) (se presume "[q]ue la Ley ha sido acatada").

### 2. *Por definición el Presupuesto Constitucional es parcial e insuficiente*

Por otra parte, debe aclararse en este punto que, toda vez que lo que se transfiere son las **leyes de asignaciones**, el Presupuesto Constitucional está compuesto de piezas legislativas reactivadas y no contempla aquellos gastos gubernamentales **reales** que puedan razonablemente anticiparse. En este sentido, toda vez que las necesidades reales del país normalmente aumentan (pues el nivel de gasto anticipado aumenta año tras año por el crecimiento natural de las obligaciones de las entidades públicas y por el aumento natural de las necesidades de la población), el remedio que provee la Constitución ante el tranque presupuestario es **parcial e insuficiente**. La Constitución sólo provee para que se reactiven las asignaciones legales aprobadas para satisfacer las necesidades del **año anterior** y, por ende, el Presupuesto Constitucional refleja necesidades económicas anacrónicas de un momento específico situado en un tiempo y espacio distinto. A tales efectos, valga advertir que, aun tomando en cuenta una serie de recortes propuestos y la eliminación de varias agencias (economías que requerían la aprobación de legislación), las necesidades reales del gobierno para el presente año fiscal se estimaron en $9,684 millones en el presupuesto recomendado por el Gobernador. *21ease* <http:// www.presupuesto.gobierno.pr/ Tomo _I ensajes/ gobernador.htm>. Sin embargo, el Presupuesto Constitucional heredado es mucho menor.

### 3. *El Presupuesto Constitucional heredado para el año fiscal 2005-2006 resulta deficitario, a tenor de la determinación de carácter técnico sobre la cantidad de recursos disponibles que hiciera el Secretario de Hacienda*

Ahora bien, y según mencionamos, toda vez que el presupuesto es un ente dinámico, y que nada impide que, heredado el presupuesto anterior, se aprueben leyes de asignaciones nuevas o **sustitutivas** de las anteriores, al 30 de agosto de 2005, el "retrato" en el tiempo de un presupuesto dinámico revelaba que las asignaciones vigentes con cargo al Fondo General totalizaban $9,284 millones, aproximadamente.[10] *Véase* Anejo A. Por otra parte, es importante recalcar que la determinación sobre los recursos disponibles para un año fiscal es una de carácter técnico que las leyes y la Constitución han delegado al Secretario de Hacienda.[11] En este sentido, el extenso e histórico peritaje técnico del Departamento de Hacienda en aquellos complejos asuntos contributivos y contables que le permiten determinar con un grado confiable de certeza cuáles son los recursos disponibles al Estado Libre Asociado de Puerto Rico merece deferencia. Véase, sobre la deferencia al peritaje administrativo,James Landis, *The Administrative Process* (1938); *Luce & Co. v. Junta de Salario Mínimo*, 62 D.P.R. 452 (1944); *Hilton Hotels v. Junta de Salario Mínimo*, 74 D.P.R. 670 (1953), *López Salas v. Junta de Planificación*, 80 D.P.R. 646 (1958).

---

[10] Valga resaltar, no obstante, que esta aprobación de nuevas partidas presupuestarias discretas con asignación prospectiva hacia el año fiscal 2005-2006 no inhabilita la Sección 6 porque dichas nuevas partidas no son cercanamente suficientes para cubrir los gastos de funcionamiento del gobierno y el objetivo de esta cláusula es "no dejar que quede en suspenso

el funcionamiento del gobierno en tanto la Asamblea Legislativa actúa con los poderes que a ese efecto tiene". *Diario de Sesiones* a la pág. 890. Por supuesto, en tal caso, las partidas consignadas en estas nuevas leyes deben **sustituir** las partidas heredadas del Presupuesto Constitucional del año anterior, siempre que realmente se trate de asignaciones por el mismo concepto.

11    *Véase* nota al calce 3.

A tenor de dicha pericia, el Departamento de Hacienda, ha calculado que los recursos disponibles para este año fiscal sólo ascienden a $8,945 millones. Dicha cantidad no es suficiente para cubrir las asignaciones presupuestarias que han quedado (o advenido) vigentes ($9,284 millones). Por ello, para cumplir con la exigencia constitucional de mantener un presupuesto balanceado, el Gobernador debe realizar los ajustes necesarios a los desembolsos de fondos autorizados mediante las asignaciones con cargo al Fondo General que se encuentran vigentes para el año fiscal 2005-2006, autorizando, de esta forma, desembolsos sólo hasta la cantidad de recursos disponibles ($8,945 millones). *Id.* Esto, pues los recursos disponibles *no* son suficientes para desembolsar la totalidad de las asignaciones vigentes ($9,284 millones). Al así actuar, el Gobernador cumpliría cabalmente con sus facultades y deberes constitucionales. Veamos.

### E. El Gobernador tiene facultad constitucional para ajustar desembolsos en situaciones deficitarias

**1. *Por virtud constitucional, el Gobernador queda investido de la facultad legal para autorizar los desembolsos de suerte que no quede en suspenso el funcionamiento del gobierno hasta tanto las Ramas políticas logren un acuerdo sobre el particular***

Conforme al esquema dispuesto por las Secciones 6 a 8 del Artículo VI de la Constitución y por la Ley Orgánica de la Oficina de Gerencia y Presupuesto ("OGP"), y al amparo del deber constitucional del Gobernador de poner en vigor las leyes y la Constitución, es el Gobernador el llamado, en la situación de que no se apruebe un nuevo presupuesto, a poner en vigor el anterior y, en situación de déficit, realizar aquellos ajustes necesarios para que los gastos no excedan los recaudos proyectados.

En cuanto a la situación que impera cuando no se aprueba un nuevo presupuesto, a tenor de la Sección 6 del Artículo VI de la Constitución, la cual ha sido activada durante este año fiscal, "**el Gobernador [es quien] autorizará los desembolsos necesarios**" cuando no se apruebe un presupuesto. Art. VI, Sec. 6, Const. E.L.A., L.P.R.A., Tomo 1. Nótese que la referida sección provee para una "reasignación automática de fondos en el caso de que en un año determinado no se aprueben las asignaciones necesarias". *Véase Diario de Sesiones* a la pág. 2587. Esto sucede como parte de un "plan mínimo para mantener la estabilidad económica del gobierno". *Diario de Sesiones* a la pág. 2587. En dichas instancias, el Gobernador es el funcionario encargado de

efectuar los desembolsos hasta que se aprueben las asignaciones correspondientes. En este sentido, uno de los delegados de la Convención Constituyente, señor García Méndez, tras comentar sobre el rol del Gobernador, indicó que:

Hasta tanto la Asamblea Legislativa no se reúna para aprobar las nuevas asignaciones, **el Gobernador autorizará los desembolsos** . . . ¿de qué? De esas asignaciones que automáticamente vuelven a regir por no haber la [Asamblea] Legislativa aprobado las asignaciones de ese año económico que terminó.

*Diario de Sesiones* a la pág. 891 (énfasis suplido). Así, por virtud de dicha sección, y como cuestión de competencia institucional, es el Gobernador, y no la Rama Judicial o la Rama Legislativa, quien queda investido de la facultad legal eminentemente ejecutiva para autorizar los desembolsos de suerte que no quede en suspenso el funcionamiento del gobierno hasta tanto las Ramas políticas logren un acuerdo sobre el particular. En este sentido, adviértase que aquella parte de la sección de referencia que le reconoce al Gobernador la facultad para autorizar desembolsos realmente es un derivado de su poder constitucional de "hacer cumplir las leyes" y denota el rol particular que dicho funcionario tiene en la implantación de los poderes presupuestarios que comparte con la Asamblea Legislativa.

Contrario a lo que ocurre con, por ejemplo, el caso de nombramientos rechazados por el Senado de Puerto Rico y la duración del término de interinatos, donde la vacante crea irremediablemente una "falta de dirección en un departamento del gobierno [que] puede resultar altamente perjudicial para el país", *Hernández Agosto v. López Nieves*, 114 D.P.R. 601, 622 (1983), en materia de la continuidad presupuestaria, la Constitución dispuso expresamente que la falta de acuerdo entre las Ramas políticas no creará un vacío que impida la marcha del gobierno, y es al Ejecutivo a quien se le delegó la competencia de realizar el desembolso de fondos para los gastos de funcionamiento del gobierno. Claro está, esto tiene que hacerlo el Ejecutivo dentro de los límites constitucionales que impone nuestro sistema de pesos y contrapesos, según luego elaboraremos. Esa es la voluntad constitucional inexpugnable.

Así, pues, **cuando *no* se apruebe el correspondiente presupuesto**, la Constitución le habla a la figura del Gobernador y, con voz firme, le delega la autoridad directiva de establecer el "plan mínimo para mantener la estabilidad económica del gobierno", *Diario de Sesiones* a la pág. 2587, insertándolo como actor principal en el mismo mediante la concesión expresa de facultad para autorizar los desembolsos necesarios para el funcionamiento del gobierno.

En cuanto a una situación de déficit, también aquí es la figura del Gobernador la llamada a poner en vigor las Secciones 7 y 8 del Artículo VI de la Constitución y la ley de prioridades aprobada al amparo de dichas secciones. De hecho, la propia ley de prioridades expresamente delega en el Gobernador dicha función. *Véase* Art. 4(c) de la Ley Núm. 147, 23 L.P.R.A. § 104(c). Más

aún, la facultad del Gobernador para autorizar desembolsos es también un derivado de su poder constitucional de "hacer cumplir las leyes". Veamos.

Sabido es que el poder de efectuar asignaciones, definido como la autoridad para separar cierta suma de dinero para un fin específico, recae en la Asamblea Legislativa. *Véase* Art. 3 de la Ley Núm. 230, 3 L.P.R.A. § 283b ("Asignación -- Cantidad de dinero autorizada por la Asamblea Legislativa con el propósito de llevar a cabo una actividad específica o lograr ciertos objetivos."); *Pueblo v. Márquez*, 62 D.P.R. 13, 20 (1943) ("Al así tener el dominio de las erogaciones, el poder legislativo controla toda la materia con toda la amplitud que bajo la Constitución le exigen sus funciones."); *New England Division of American Cancer Society v. Commissioner of Administration*, 769 N.E.2d 1248, 1256 (Mass. 2002) ("We have defined the power of appropriation as the authority 'to set apart from the public revenue a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object and for no other. . . .' It is beyond question that [t]he power to appropriate money of the Commonwealth is a legislative power.").

Sin embargo, **el poder de efectuar desembolsos es una facultad del Poder Ejecutivo**. *Véase Opinion of the Justices*, 376 N.E.2d 1217, 1222 (Mass. 1978) ("the activity of spending money is essentially an executive task."); 63C Am. Jur. 2d, *Public Funds* § 45 ("Spending money appropriated by the legislature is essentially an executive task, and regardless of how minutely appropriations are itemized, some scope is left to the executive for the exercise of judgment and discretion in making expenditures within the limits of the appropriation. Allocation of resources and establishment of priorities are the essence of management."); *Opinion of the Justices*, 892 So. 2d 332, 338 n.6 (Ala. 2004) (citando a *Alexander et al. v. State*, 441 So. 2d 1329, 1341 (Miss. 1983) ("Once taxes have been levied and appropriation made, the legislative prerogative ends and the executive responsibility begins.")); *State ex rel. McLeod v. McInn*, 295 S.E.2d 633, 637 (S.C. 1982) ("[A]dministration of appropriations ... is the function of the executive department."); *State ex rel. Meyer v. State Board*, 176 N.W.2d 920, 926 (Neb. 1970) ("[The legislature] cannot through the power of appropriation exercise or invade the constitutional rights and powers of the executive branch of the government. It cannot administer the appropriation once it has been made.").

Claro, esto no implica que el Gobernador tenga un poder absoluto para congelar, en cualquier circunstancia, fondos designados expresamente por ley. *Véanse Noriega v. Hernández Colón*, 135 D.P.R. 406, 454 (1994); *Opinion of the Justices to the Senate*, 376 N.E.2d 1217, 1221-22 (Mass. 1978) ("Once a bill has been duly enacted, however, the Governor is obliged to execute the law as it has emerged from the legislative process. He is not free to circumvent that process by withholding funds or otherwise failing to execute the law on the basis of his views regarding the social utility or wisdom of the law. [However], such a refusal to expend funds for the purpose of amending or defeating legislative objectives is to be distinguished from the exercise of executive judgment that the full legislative objectives can be accomplished by a lesser expenditure of funds

than appropriated."). Se trata, pues, de una zona en que, **de ordinario**, la Rama Ejecutiva y la Legislativa comparten el poder presupuestario. *Véase Hunter v. State*, 865 A.2d 381, 392 (Vt. 2004) ("[A]ppropriation is a legislative power, but spending is an executive power. Rather than dealing with one branch's clear encroachment on another's core function, we are instead dealing here with the area in which the powers of the branches overlap."); *New England Division of American Cancer Society v. Commissioner of Administration*, 769 N.E.2d 1248, 1256 (Mass. 2002) ("It is beyond question that '[t]he power to appropriate money of the Commonwealth is a legislative power. . . .' It is equally clear, however, that 'the activity of spending money is essentially an executive task. . . .' Thus, we speak in abstract terms of separation of powers; in reality, some overlap is inevitable, and may well be desirable.").

Ahora bien, **cuando *no* se aprueba el correspondiente presupuesto**, la Constitución le habla a la figura del Gobernador y, con voz firme, le delega la autoridad directiva de establecer el "plan mínimo para mantener la estabilidad económica del gobierno", *Diario de Sesiones* a la pág. 2587, insertándolo como actor principal en el mismo mediante la concesión expresa de facultad para autorizar los desembolsos necesarios para el funcionamiento del gobierno.

### 2. *Cuando existe un déficit, y en ausencia de acción legislativa para eliminarlo, la Constitución requiere que el Gobernador tome las medidas necesarias para balancear el presupuesto al amparo de las Secciones 7 y 8 del Artículo VI; ello de acuerdo a las prioridades dispuestas en la Sección 8 y en la ley*

**En situaciones deficitarias**, la Constitución requiere que el Gobernador **tome las medidas necesarias para balancear el presupuesto** al amparo de las Secciones 7 y 8 del Artículo VI de la Constitución. Dichas secciones disponen, respectivamente:

§ 7. [Asignaciones no excederán de los recursos]

Las asignaciones hechas para un año económico no podrán exceder de los recursos totales calculados para dicho año económico, a menos que se provea por ley para la imposición de contribuciones suficientes para cubrir dichas asignaciones.

§ 8. [Prioridad de desembolsos cuando recursos no basten]

Cuando los recursos disponibles para un año económico no basten para cubrir las asignaciones aprobadas para ese año, se procederá en primer término, al pago de intereses y amortización de la deuda pública, y luego se harán los demás desembolsos de acuerdo con la norma de prioridades que se establezca por ley.

Art. VI, Secs. 7 y 8, Const. E.L.A., L.P.R.A., Tomo 1. Cuando el gobierno se encuentra en una situación deficitaria, el Gobernador tiene el deber y la autoridad constitucional para, al amparo de los poderes establecidos en la Sección 8 del Artículo VI de la Constitución, ajustar los mismos con flexibilidad para poder cumplir con el mandato constitucional del Artículo VI, Sección 7, de la Constitución de mantener un presupuesto balanceado.

Dicho ajuste no sólo está **constitucionalmente compelido**, sino que procede, igualmente, como una cuestión práctica, toda vez que, aunque el gobierno cuenta con autoridad para incurrir en cierta cantidad de gastos (por virtud de las leyes de asignaciones), carece de recursos suficientes para desembolsar **todas** las asignaciones. Por ello, el Artículo VI, Sección 8, de la Constitución requiere que en situaciones deficitarias el Gobernador proceda, en primer término, con el pago de intereses y amortización de la deuda pública y, luego, con los demás desembolsos, de acuerdo con la "norma de prioridades" que se establezca por ley.

Esta norma de prioridades a la que alude la Sección 8 ha sido implantada por el Artículo 4(c) y (d) de la Ley Núm. 147, **23 L.P.R.A.** § **104**(c) y (d), el cual establece:

(c) En armonía con la Sección 8, Artículo VI de la Constitución del ELA, **el Gobernador procederá** conforme a las siguientes normas de prioridad en el **desembolso** de fondos públicos, cuando los recursos disponibles para un año económico no basten para cubrir las asignaciones aprobadas para ese año. Podrá delegar las mismas en el Director de Gerencia y Presupuesto:

(1) Ordenar el pago de los intereses y amortizaciones correspondientes a la deuda pública.

(2) Ordenar que se atiendan los compromisos contraídos en virtud de contratos legales en vigor, Sentencias de los tribunales en casos de expropiación forzosa, y obligaciones ineludibles para salvaguardar el crédito, y la reputación y el buen nombre del Gobierno del ELA.

(3) Ordenar que con cargo a las asignaciones para gastos ordinarios se atiendan preferentemente los desembolsos relacionados con:

(A) La conservación de la salud pública;

(B) la protección de personas y de la propiedad;

(C) los programas de instrucción pública;

(D) los programas de bienestar público.

(E) El pago de las aportaciones patronales a los sistemas de retiro y el pago de pensiones a individuos concedidas por leyes especiales y luego los demás servicios públicos en el

orden de prioridades que el Gobernador determine; Disponiéndose, que los desembolsos relacionados con los servicios aquí enumerados no tendrán prelación entre sí, sino que podrán atenderse en forma simultánea; Disponiéndose, además, que **los ajustes por reducción podrán hacerse en cualquiera de las asignaciones para gastos ordinarios** incluyendo las áreas de servicios indicadas en este inciso.

(4) Ordenar que se construyan las obras o mejoras permanentes cuyos contratos hayan sido debidamente formalizados; Disponiéndose, que se dará preferencia a obras de emergencia motivadas por catástrofes o actos de la naturaleza, accidentes fortuitos; y luego se procederá a la ejecución de aquellas que mejor respondan al desenvolvimiento de la vida normal y económica de Puerto Rico.

(5) Ordenar que se atienda el pago de los contratos y compromisos contraídos con cargo a asignaciones especiales de funcionamiento y luego se atienda preferentemente aquellas fases de los programas que están en proceso de desarrollo o en una etapa de planificación cuya posposición afecte directa o indirectamente los intereses de la clientela servida por el programa.

(d) En la implantación de las normas de prioridad establecidas anteriormente podrán adoptarse las medidas administrativas que más adelante se detallan. El Gobernador, o el Director de Gerencia y Presupuesto por delegación de éste, someterá a los Presidentes del Senado y de la Cámara de Representantes, así como a las Comisiones de Hacienda de ambos Cuerpos Legislativos, un informe detallado de los ajustes que hayan sido necesarios efectuar para balancear el presupuesto en virtud de lo dispuesto en esta sección. Con dicho informe, el Gobernador someterá sus recomendaciones en cuanto a la forma de atender las obras y actividades cuya ejecución quede pospuesta. Las obligaciones correspondientes a las obras pospuestas se cancelarán para los efectos del año objeto de ajuste y se llevarán a los libros del Director de Hacienda contra los recursos disponibles para asignarse en años subsiguientes, mediante el correspondiente libramiento de asignaciones:

(1) Ajustar las asignaciones para gastos ordinarios de funcionamiento provistas a las distintas agencias e instrumentalidades del Estado, según las normas de prioridad establecidas en el inciso (c) de esta sección.

(2) Ajustar las asignaciones aprobadas para el desarrollo de mejoras permanentes cuya ejecución no se haya llevado a pública subasta, posponiendo aquella parte de la obra autorizada por ley que no pueda realizarse por limitación de recursos.

(3) Ajustar las asignaciones para programas especiales cuya posposición no afecte ni conflija con los compromisos y obligaciones contraídos, reduciendo o ajustando las cantidades autorizadas por ley.

(énfasis suplido). "Expresamente establece dicha disposición legal que será el Gobernador ... quien tendrá las facultades de poner en vigor las normas de prioridades establecidas por el legislador". Op. Sec. Just. Núm. 16 de 1984.

Como se puede apreciar, ante una situación deficitaria, la Constitución delega **al Gobernador** la facultad de realizar ágil y eficientemente los ajustes necesarios para satisfacer aquellas asignaciones prioritarias, comenzando con el pago de la deuda. Constitucionalmente es el Ejecutivo quien realiza los desembolsos necesarios luego de la aprobación de las leyes correspondientes. En una situación deficitaria, esa función constitucional se acentúa en la medida en que la propia Constitución le autoriza y requiere al Gobernador priorizar en cuanto a cuáles asignaciones debe satisfacer primero, brindándole parámetros claros para ello. La ley de prioridades sencillamente confirma y reitera **en su primera oración** lo que es constitucionalmente lógico y natural: "el Gobernador procederá", y nadie más, a realizar los desembolsos necesarios conforme a varios límites sustantivos. [12]

[12]   Ello queda igualmente enfatizado con el hecho de que la ley de prioridades dispone que la Directora de OGP le "informará" (no "consultará" o "negociará") a la Asamblea Legislativa los ajustes que hayan sido necesarios para balancear el presupuesto. Art. 4(d) de la Ley Núm. 147, 23 L.P.R.A. § 104(d).

   3. *Por expreso mandato constitucional, la facultad del Gobernador para ajustar desembolsos en situaciones deficitarias es particularmente amplia y abarca todas las asignaciones aprobadas (ya sea que provengan de la Resolución Conjunta del Presupuesto General o de asignaciones especiales) y no sólo las de la Rama Ejecutiva*

Por virtud de las citadas disposiciones, el Gobernador tiene amplios poderes constitucionales para efectuar desembolsos en aquellas instancias en que no se aprueba un presupuesto, viniendo **obligado** a ajustar los mismos en situaciones deficitarias, de suerte que se pueda mantener un presupuesto balanceado y atender las prioridades mencionadas. "[E]s el Gobernador quien hace los ajustes pertinentes o determina la acción a seguir cuando el ingreso es menor que las asignaciones presupuestarias". Op. Sec. Just. Núm. 16 de 1984.

Nótese que la normativa imperante en Puerto Rico, que mira hacia el Primer Ejecutivo al momento de ajustar los desembolsos en situaciones deficitarias, encuentra eco en el ordenamiento de otras jurisdicciones estatales. Así pues, en *New England Division of American Cancer Society v. Commissioner of Administration*, 769 N.E.2d 1248, 1257 (Mass. 2002), el Tribunal Supremo de Massachusetts señaló:

   [Massachusetts' law] permits the Governor to use her executive judgment to reduce public expenditures in a time of true financial emergency.. . . This obligation conforms to the constitutional requirement for a balanced budget.. . . It reflects a legislative determination that

the Commonwealth's need to remain solvent overrides particular statements of social policy contained in those appropriation items subject to [certain budget] allotment [s]. . . It is an expression of the Legislature's **recognition that the executive branch has the "detailed and contemporaneous knowledge regarding spending decisions" to enable necessary reductions to be made on an expedited basis**, and the Legislature's confidence that they will be made in a manner that will not compromise the achievement of underlying legislative purposes and goals.

(énfasis suplido).

De forma similar, en *Hunter v. State*, 865 A.2d 381, 392-393 (Vt. 2004), el Tribunal Supremo de Vermont, **tras validar que el Poder Ejecutivo ajustara los desembolsos para atender una situación deficitaria**, sintetizó de la siguiente forma la normativa prevaleciente en las distintas jurisdicciones estatales:

In reaching this decision, **we have consulted the decisions from other states and find that they almost uniformly support the conclusion that we reach**. In *University of Connecticut Chapter AAUP v. Governor*, 200 Conn. 386, 512 A.2d 152, 159 (1986), for example, the Supreme Court of Connecticut upheld legislation authorizing the Governor to reduce budgetary allotments by up to five percent when, due to decreases in anticipated state revenues, it was necessary to prevent a deficit. The court held that such authority did "not delegate a strictly legislative function," did "not delegate the legislative authority to appropriate" and was not inconsistent with the executive's traditional control over budgetary expenditures.

........

Similarly, in *New England Division of American Cancer Society v. Commissioner of Administration*, 437 Mass. 172, 769 N.E.2d 1248 (2002), the plaintiffs challenged the constitutionality of a statute under which the executive branch, in response to revenue shortfalls, reduced allotments for expenditures on certain specific appropriations in the legislature's general appropriations act. The court rejected the challenge, noting that the statute comported with the general principle that the "spending [of] money is essentially an executive task," . . . reflected a pragmatic recognition of the executive's superior ability to make "necessary reductions . . . on an expedited basis," . . . and represented the legislature's considered judgment "that the Commonwealth's need to remain solvent overrides particular statements of social policy contained in those appropriat[ed] items.. . ." The court also stressed that the potential for executive abuse was limited because the statute authorized such reductions only "in a time of true financial emergency," and restricted reductions to an "amount equal to such [revenue] deficiency."

**.......**

Other decisions respond similarly to the argument that the executive has encroached on the power of the legislature. *See Opinion of the Justices*, 892 So.2d at __, 2004 WL 693431, at *3 (stating that legislature may grant governor discretion on how to spend appropriated funds); *State v. Fairbanks N. Star Borough*, 736 P.2d 1140, 1142 (Alaska 1987) (explaining that legislature can delegate to executive branch the discretion to spend or not spend appropriated funds as long as there are standards for the exercise of discretion); *Chiles v. Children A, B, C, D, E, & F*, 589 So.2d 260, 268 (Fla. 1991) (observing that legislature can delegate power to executive to reduce spending in case of a budget crisis as long as there are adequate standards); *Legislative Research Comm'n v. Brown*, 664 S.W.2d 907, 926 (Ky. 1984) (concluding that legislature can delegate to executive power to cut budgets to avoid a deficit); *North Dakota Council of School Adm'rs*, 458 N.W.2d at 286 (explaining that statute allowing state Office of Management and Budget Director to reduce budgets uniformly in response to predicted deficit grants "only the authority to execute the law within the parameters established by the Legislature" and is not unconstitutional delegation of legislative power to executive branch). (énfasis suplido).

En Puerto Rico, además, es **por expreso mandato constitucional**, que la facultad del Gobernador para ajustar desembolsos en situaciones deficitarias es particularmente amplia y abarca **todas** las asignaciones aprobadas (ya sea que provengan de la Resolución Conjunta del Presupuesto General o de asignaciones especiales); no sólo las de la Rama Ejecutiva. *Véase* Art. VI, Sec. 8, Const. E.L.A., L.P.R.A., Tomo 1 ("Cuando los recursos disponibles para un año económico **no basten para cubrir las asignaciones aprobadas** para ese año, se procederá en primer término, al pago de intereses y amortización de la deuda pública, y luego se harán los demás desembolsos de acuerdo con la norma de prioridades que se establezca por ley") (énfasis suplido). *Véase además* Art. 4 de la Ley Núm. 147, 23 L.P.R.A. § 104 ("los ajustes por reducción podrán hacerse en **cualquiera** de las asignaciones para gastos ordinarios") (énfasis suplido); Op. Sec. Just. Núm. 16 de 1984 ("Los desembolsos relacionados con los servicios antes enumerados **no tendrán prelación entre sí**, sino que podrán atenderse en forma simultánea. Así también se dispone que los ajustes por reducción podrán hacerse en **cualquiera** de las asignaciones para gastos ordinarios, incluyendo las áreas de servicios indicadas") (énfasis suplido). Incluso, como veremos a continuación, el particular rol presupuestario que desempeña el Gobernador en nuestro ordenamiento es tal que tiene facultad estatutaria para, en circunstancias apropiadas, realizar ajustes aun en situaciones *no* deficitarias.

### F. El Gobernador tiene facultad estatutaria para ajustar desembolsos, incluso fuera de situaciones deficitarias

### 1. *El Gobernador tiene facultad para restringir el desembolso de fondos bajo la Ley Orgánica de la Oficina de Gerencia y Presupuesto*

A tenor de nuestra estructura constitucional, y según mencionamos, el Art. 4 de la Ley Núm. 147, 23 L.P.R.A. § 104, delinea de forma amplia los poderes estatutarios del Gobernador en relación con el presupuesto. Específicamente, dicho artículo dispone:

> Con respecto a la administración y control del presupuesto, el Gobernador tendrá las siguientes facultades que podrá delegar en el Director de Gerencia y Presupuesto:
>
> **........**
>
> [e]stablecer reservas presupuestarias y **restringir** los recursos a disposición de los organismos en la forma que crea pertinente cuando en la ejecución y control del presupuesto lo estime necesario, independientemente de las circunstancias establecidas en los incisos (c) y (d) de esta sección [referente a situaciones deficitarias].

*Id.* (énfasis suplido).

### 2. *El Gobernador tiene amplia facultad bajo la Resolución Conjunta Núm. 927 de 2004 para realizar transferencias entre las asignaciones para las distintas agencias, incluyendo la Asamblea Legislativa y todas sus dependencias*

De otra parte, la Resolución Conjunta Núm. 927 de 2004 (30 de junio de 2004), sobre el Presupuesto General de Gastos del Gobierno para el año fiscal 2004-2005, la cual está vigente por virtud del Artículo VI, Sección 6, de la Constitución por ser una ley de asignaciones para gastos de funcionamiento del gobierno, dispone en su Sección 2:

> Cuando los intereses del servicio y necesidades apremiantes de las agencias lo requieran, así como para asegurar que al cierre de cada año fiscal las operaciones de las agencias terminen con un presupuesto balanceado, **se podrán realizar transferencias** entre las asignaciones de un mismo organismo, así como **entre las asignaciones hechas en esta Resolución Conjunta.**
>
> Se excluye la transferencia de fondos de las asignaciones consignadas para los siguientes propósitos:
>
> a. Pago de principal e intereses de deuda pública y otras deudas administrativas autorizadas por la Asamblea Legislativa; o por planes de financiamiento aprobados por el Banco Gubernamental de Fomento.

b. Pago de los servicios públicos de agua, energía y otros servicios provistos por instrumentalidades públicas, con excepción de aquellas asignaciones que excedan los estimados de consumo certificados por las corporaciones públicas.

c. Pago de obligaciones establecidas por ley.

Ninguna transferencia de fondos tendrá el efecto de posponer para el año fiscal siguiente el pago de obligaciones que comprometan de antemano los recursos de futuros presupuestos.

No se realizarán transferencias de fondos para otorgar contratos o asumir obligaciones que rebasen el año fiscal y, por ende, comprometan los recursos de años fiscales subsiguientes.

(énfasis suplido).

En virtud de la citada Resolución Conjunta Núm. 927 de 2004, la facultad del Gobernador para realizar transferencias es amplia y se activa cuando: (i) "los intereses del servicio y necesidades apremiantes de las agencias lo requieran", lo cual, por ejemplo, **existe cuando, como en la situación de autos, se hereda el presupuesto anterior**, por entenderse una necesidad apremiante realizar ajustes para atender los intereses del servicio al país, proveer los servicios públicos prioritarios, y así cumplir con la política pública encarnada en la legislación vigente, ya que dichos ajustes no se pudieron hacer mediante el proceso legislativo ordinario; o (ii) cuando sea necesario para "asegurar que al cierre de cada año fiscal las operaciones de las agencias terminen con un presupuesto balanceado". *Id.*

Al cumplirse estas condiciones, el Gobernador puede "realizar transferencias entre las asignaciones de un mismo organismo, así como entre las asignaciones hechas en esta Resolución Conjunta". *Id.* Nótese que la propia Resolución Conjunta Núm. 927 de 2004, la cual contiene incluso la asignación presupuestaria correspondiente a la Asamblea Legislativa y a otras entidades adscritas a la Rama Legislativa, autoriza al Gobernador a que, ante necesidades apremiantes, pueda realizar transferencias. Así, cumplidas las condiciones impuestas, existe base estatutaria para efectuar transferencias que permitan nutrir las arcas de las agencias existentes según lo requieran las necesidades del servicio e intereses apremiantes **para que éstas cumplan con los mandatos de política pública establecidos por la Asamblea Legislativa en las leyes orgánicas de las agencias y en leyes especiales**. Estas trasferencias permitirían realizar desembolsos para que las entidades gubernamentales identificadas en la Resolución Conjunta Núm. 927 de 2004 puedan cumplir con la política pública, según previamente legislada.

### G. Los poderes del Ejecutivo no se agrandan irrazonablemente, ya que existen limitaciones a sus poderes presupuestarios frente a otras Ramas constitucionales

### 1. *El ajuste realizado no puede ser de tal grado que le impida a la Asamblea Legislativa ejercer sus funciones constitucionales; lo cual, por definición, no ocurre cuando dicha Rama provoca el ajuste*

Valga advertir que, si bien es cierto que el Gobernador tiene facultad para ajustar los desembolsos de la Rama Legislativa en situaciones como las de autos, cualquier ajuste en los desembolsos de dicha Rama *no* puede ser de tal grado que le impida a ésta ejercer su función constitucional. *Véase, por analogía*, *Williams v. State Legislature of State of Idaho*, 722 P.2d 465, 470 n.4 (Idaho 1986) ("courts have held the Legislature cannot reduce the level of appropriations to a constitutional officer below the level necessary to carry out the constitutional duties of the office."); Gary D. Spivey, *Inherent power of court to compel appropriation or expenditure of funds for judicial purposes*, 59 A.L.R.3d 569, § 4 ("court may, under circumstances necessitating protection of its capacity to perform its constitutional functions, require county to provide funds");[13] *State ex rel. McGraw v. Burton*, 569 S.E.2d 99, 117 (W. Va. 2002) ("to ensure that the Office of the Attorney General can perform its inherent constitutional functions, the Legislature has the implicit obligation to provide sufficient funding to the office."); D. Peterson, *Controlling the Federal Courts Through the Appropriations Process*, 1998 Wis. L. Rev. 993, 1049 ("When appropriations restrictions impinge on the ability of another branch to perform its constitutional functions, then Congress's interest in protecting the public fisc must be weighed against the impact on the other branch. If there is less impact on Congress's constitutional prerogatives, then the appropriations power must yield."); *Board of Elementary and Secondary Ed. v. Nix*, 347 So. 2d 147, 155 (La. 1977) ("The legislature cannot deprive a constitutional agency of its ability to perform its constitutional function by depriving it of the means to do so."); *Hoag v. State ex rel. Kennedy*, 836 So. 2d 207, 226 (1st Cir. 2002) ("It is fundamental to the existence of our constitutional regime of separation of powers that one branch shall not exercise its powers in a manner that limits or deprives another branch of its ability to perform its constitutional functions.").

---

[13] Sobre los distintos estándares que se han elaborado para identificar las instancias en que procede otorgar fondos adicionales para la operación de los tribunales estatales se ha indicado que:

> Many states recognize that courts have the inherent authority to order payment of expenses that are reasonably necessary for the administration of justice. These jurisdictions, however, have developed different interpretations about the breadth of the doctrine. Jurisdictions that have applied the inherent powers doctrine can be divided into three groups. First, a number of states have adopted the broad view that a court's inherent power extends to incurring and ordering payment of all debts necessary to administer the duties of a court. Under this view, the judicial branch is seen as having a constitutional mandate to maintain its independence and fulfill its duties. Therefore, the courts' inherent powers

are constitutional in nature and may not be limited by legislation. Second, a number of jurisdictions . . . have restricted the breadth of the inherent powers doctrine, holding in "less sweeping language" that the judiciary can only compel funding necessary for the performance of judicial duties. Under this interpretation, funding can be compelled "to remove obstructions to [the courts'] successful and convenient operation, to secure the free and untrammeled exercise of their functions, or to properly perform their business." The legislature, however, may limit the courts' ability to compel funding under this view. Finally, other courts have taken a more limited approach to the inherent powers doctrine and applied it only to specific expenses, without indicating whether the doctrine might have greater application.

Gabrielle Tracey Letteau, *Crisis in California: Constitutional Challenges to Inadequate Trial Court Funding*, 22 Hastings Const. L.Q. 557, 575-576 (1995).

Valga advertir, no obstante, que la Asamblea Legislativa, **a diferencia de la Rama Judicial**, ostenta remedios políticos y legislativos para unilateralmente corregir la situación de autos. [14] Por ello, en el contexto presupuestario, sólo aquel tipo de reducción que plantee una situación que no pueda ser atendida por la Asamblea Legislativa como cuerpo (entiéndase, que no pueda ser corregido ni aun con una ley que pase por encima del veto del Gobernador) amerita la intervención judicial. **Adviértase que si la Asamblea Legislativa puede corregir por legislación la situación que ha ocasionado el ajuste impugnado, por definición, y como cuestión de derecho, no se le ha impedido ejercer su función constitucional**.

[14] De hecho, cabe resaltar que no hemos encontrado ningún caso en que un tribunal, estatal o federal, haya enfrentado un argumento a los efectos de, ni mucho menos resuelto, que un ajuste presupuestario realizado por un Primer Ejecutivo le impide a una Asamblea Legislativa ejercer su función constitucional.

Entre los remedios que tiene la Asamblea Legislativa para unilateralmente atender una determinación Ejecutiva que les afecte en este contexto presupuestario están: (i) aprobar leyes de recaudos; (ii) aprobar asignaciones nuevas sustitutivas; (iii) proponer enmiendas constitucionales sin intervención del Ejecutivo para disponer mecanismos alternos a la estructura constitucional presupuestaria vigente, *véase* Artículo VII, Secs. 1 y 2, Const. E.L.A., L.P.R.A., Tomo 1; y (iv) enmendar la ley de prioridades para (A) incluir a la Asamblea Legislativa en la lista de prioridades, (B) excluir por completo a dicha Rama de la referida ley, o (C) disponer en la ley de prioridades que su presupuesto quedará inalterado según el año precedente o a tenor de alguna fórmula.

Claro está, todos estos remedios políticos que la Asamblea Legislativa ostenta serán revisados mediante un mecanismo igualmente político: el proceso democrático electoral. El remedio judicial, en cambio, carece de este importante contrapeso al interés de la Asamblea Legislativa de inmunizarse del problema presupuestario del país. Los remedios políticos - no judiciales -que tiene

a su haber la Asamblea Legislativa son, por lo tanto, constitucionalmente, más completos que el remedio judicial porque involucran de forma más directa el proceso democrático en la evaluación de sus acciones.

### 2. *Los ajustes a los desembolsos que puede hacer el Gobernador están claramente limitados por guías y principios inteligibles contenidos en múltiples leyes orgánicas y especiales*

Asimismo, y fuera de los límites impuestos por la doctrina de separación de poderes ante la posibilidad de que se reduzca el presupuesto funcional de otra Rama al punto de afectar sustancialmente su funcionamiento esencial, otros límites constitucionales restringen la facultad del Poder Ejecutivo al realizar ajustes. En ningún caso carece la Rama Ejecutiva de criterios, guías o principios inteligibles que dirijan el ejercicio de su discreción al realizar los desembolsos y los ajustes que las leyes y la Constitución permiten; criterios que, dentro de la doctrina constitucional de delegación de poderes, pueden ser amplios y generales siempre que la Rama Ejecutiva ostente principios inteligibles de forma que pueda ejercer su discreción dentro de parámetros sustantivos. *Véanse Luce & Co. v. Junta de Salario Mínimo*, 62 D.P.R. 452 (1944); *Hilton Hotels v. Junta de Salario Mínimo*, 74 D.P.R. 670 (1953), *López Salas v. Junta de Planificación*, 80 D.P.R. 646 (1958); *Amalgamated Meat Cutters v. Connally*, 337 F. Supp. 737 (1971); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935); *A.L.A. Schechter Poultry v. United States*, 293 U.S. 498 (1935).

En primer lugar, y con relación a la ley de prioridades, nótese que la misma le autoriza al Gobernador a realizar ajustes **dentro de las asignaciones legisladas**, y le autoriza a dejar de realizar (total o parcialmente) aquellos desembolsos menos prioritarios, de manera que pueda realizar totalmente aquellos desembolsos que están dentro de la lista de prioridades. Dentro de la ley de prioridades, por tanto, su discreción está sustancialmente delimitada por: (i) los criterios sustantivos de la lista de prioridades de la ley; y (ii) las asignaciones preexistentes que el Gobernador debe satisfacer en el orden de prioridades. *Véanse Luce & Co. v. Junta de Salario Mínimo*, 62 D.P.R. 452 (1944); *Hilton Hotels v. Junta de Salario Mínimo*, 74 D.P.R. 670 (1953), *López Salas v. Junta de Planificación*, 80 D.P.R. 646 (1958).

En segundo lugar, y específicamente con relación a la cláusula de flexibilidad en la Sección 2 de la Resolución Conjunta Núm. 927 de 2004 heredada, el ejercicio de discreción en el ajuste de partidas entre las asignaciones está igualmente encerrado entre parámetros sustantivos inteligibles por demás. Así, por un lado, la propia Resolución Conjunta Núm. 927 de 2004 permite la transferencia de partidas entre asignaciones dentro de la misma solamente cuando ello sea requerido por "intereses del servicio y necesidades apremiantes de las agencias" o "para asegurar que al cierre de cada año fiscal las operaciones de las agencias terminen con un presupuesto balanceado". Además, no puede ignorarse el hecho de que esta flexibilidad sólo puede ejercerse **en el marco de un universo de parámetros de política pública previamente legislados que impiden que el Gobernador destine fondos a prioridades de política pública que no estén contempladas**

**en el ordenamiento jurídico**. Nótese que la transferencia de partidas ocurre entre agencias preexistentes cargadas de consideraciones de política pública ya legisladas, tanto a través de sus respectivas leyes orgánicas como mediante legislación especial.[15]

15     Adviértase que, como cuestión de derecho constitucional, los tribunales deben hacer un esfuerzo por identificar, aun fuera del texto de la ley, principios inteligibles en aquella legislación que delegue facultades discrecionales a la Rama Ejecutiva. *Véase Amalgamated Meat Cutters v. Connally*, 337 F. Supp. 737 (1971); *Industrial Union Department v. American Petroleum Institute*, 448 U.S. 607 (1980).

### III. DISCUSIÓN Y ANÁLISIS

Expuesto y discutido a grandes rasgos el marco jurídico aplicable a las interrogantes planteadas en su consulta, podemos ahora analizar más específicamente algunas de las dudas particulares objeto de esta opinión. Veamos.

### A. Al existir una situación deficitaria, el Primer Ejecutivo no está obligado a desembolsar la totalidad de los fondos autorizados por virtud de la asignación para la Rama Legislativa y sus dependencias accesorias

### 1. Las autoridades legales aplicables, el sentido común y un sentido sano de justicia social requieren que, al existir una situación deficitaria, el Primer Ejecutivo pueda ajustar los desembolsos con cargo a las asignaciones para la Rama Legislativa y sus dependencias accesorias

A tenor de la normativa antes transcrita, el Gobernador está facultado y obligado a ajustar los desembolsos con cargo a las asignaciones vigentes. Este mandato constitucional abarca **todas** las asignaciones, por lo que resulta improcedente excluir a la Rama Legislativa del mismo. Adviértase que si el Gobernador viene obligado a excluir a dicha Rama de los ajustes, requiriéndosele que desembolse la totalidad de la asignación vigente, ello implicaría que el peso de los ajustes recaería desmedidamente en las otras Ramas de gobierno, comprometiendo la facultad para cumplir con el pago de la deuda pública y el resto de las normas de prioridades a las que alude la Constitución.

La Asamblea Legislativa no puede pretender excluirse del grave problema fiscal que afronta el gobierno arguyendo que **cualquier** ajuste que se realice en los desembolsos con cargo a sus asignaciones debe ser vedado. Un estándar legal que, al amparo de una equivocada interpretación de la doctrina de separación de poderes, impediría cualquier ajuste, por mínimo que sea, no encuentra apoyo ni en las autoridades legales ni en el sentido común ni en un sentido sano de justicia social. Veamos.

En primer lugar, dicha teoría no surge del **texto** de la Constitución. Si los constituyentes hubiesen querido adoptar una teoría tan radical como ésta la hubiesen hecho constar por escrito sin dejarla como un derivado difuso y genérico de la doctrina de separación de poderes. Adviértase que la referida propuesta es tan extrema e infundada que tendría la inevitable consecuencia de **exigirle** a la Rama Legislativa que siempre le asigne a la Rama Ejecutiva, y a la Judicial, un presupuesto igual o mayor al que rigió el año anterior, aunque exista una situación deficitaria, pues cualquier disminución, por mínima que fuera, constituiría una actuación presuntamente inconstitucional de su parte.

En segundo lugar, tal teoría legal tampoco encuentra apoyo alguno en el **historial** de la Asamblea Constituyente. Por el contrario, tanto el texto como el historial de la Constitución demuestran que la intención específica de los constituyentes fue que el Gobernador fuera el funcionario con la competencia legal para autorizar y ajustar los desembolsos en situaciones como la de autos.

En tercer lugar, la referida teoría resulta totalmente improcedente **como cuestión de política pública**, toda vez que impondría a las otras Ramas de gobierno el peso de los recortes y crearía un incentivo para que la Asamblea Legislativa nunca llegue a un acuerdo con la Rama Ejecutiva sobre la aprobación de un presupuesto de compromiso o de nuevas leyes de recaudos, en tanto siempre disfrutaría de la totalidad de su asignación, aunque haya un déficit. Por todas estas razones, entendemos que no procedería excluir a la Rama Legislativa del poder del Ejecutivo de ajustar los desembolsos.

### 2. El Gobernador tiene facultad legal para realizar el ajuste cuestionado a tenor de los poderes deficitarios que le otorga la Constitución y de la facultad estatutaria que le concede la Sección 2 de la Resolución Conjunta Núm. 927 de 2004

El Gobernador tiene facultad legal para realizar el ajuste cuestionado a tenor de los poderes deficitarios que le otorgan las Secciones 7 y 8 del Artículo VI de la Constitución, y de la facultad estatutaria que le concede la Sección 2 de la Resolución Conjunta Núm. 927 de 2004.

### a. Al amparo del texto de las Secciones 7 y 8 del Artículo VI de la Constitución, el Gobernador está autorizado, y obligado, a realizar los ajustes requeridos para balancear el presupuesto de acuerdo a las prioridades establecidas por ley. Nada en dichas secciones o en la ley de prioridades excluye a la Rama Legislativa de los organismos que pueden sufrir un ajuste en sus desembolsos

Por virtud de la Sección 7 del Artículo VI de la Constitución, el Primer Ejecutivo tiene la obligación de "cuadrar" el presupuesto deficitario mediante ajustes a los **desembolsos** de acuerdo a la norma

de prioridades que dispone la Sección 8 del Artículo VI de la Constitución, según implantada por el Artículo 4(c) y (d) de la Ley Núm. 147, **23 L.P.R.A**. § **104**(c) y (d). Adviértase que nada en el texto de la citada ley de prioridades o en el texto de las mencionadas disposiciones constitucionales da trato preferencial, o de inmunidad, a la Rama Legislativa en situación de déficit presupuestario.

Así pues, aunque las asignaciones permanezcan inalteradas, los desembolsos que se hacen con cargo a éstas deben ser ajustados para balancear el presupuesto y atender prioritariamente lo dispuesto en la citada Sección 8 del Artículo VI de la Constitución y en el Artículo 4 de la Ley Núm. 147. Claro, en la medida en que los recursos del estado aumenten, sería posible desembolsar la totalidad de las asignaciones. *Véase, por ejemplo*, *New England Division of American Cancer Society v. Commissioner of Administration*, 769 N.E.2d 1248, 1257 (Mass. 2002) ("[Since] the Governor can reduce only the allotment; the underlying appropriation remains fully in force to establish an upper limit on what may be spent for that line item, should sufficient revenue be forthcoming."). Sin embargo, mientras los recursos no aumenten, procede acatar el mandato constitucional de cuadrar el presupuesto. De tal mandato, la Rama Legislativa no se puede eximir.

### b. La Sección 2 de la Resolución Conjunta Núm. 927 de 2004 constituye una regla de desembolso vigente que concede facultad estatutaria independiente al Gobernador para realizar las transferencias propuestas

Con independencia de los poderes y deberes constitucionales del Gobernador en situaciones deficitarias, la Sección 2 de la Resolución Conjunta Núm. 927 de 2004 expresamente le concede facultad estatutaria al Gobernador para realizar las transferencias propuestas. Según mencionamos, dicho estatuto contiene una regla de desembolso que dispone:

> Cuando los intereses del servicio y necesidades apremiantes de las agencias lo requieran, así como para asegurar que al cierre de cada año fiscal las operaciones de las agencias terminen con un presupuesto balanceado, se podrán realizar transferencias entre las asignaciones de un mismo organismo, así como entre las asignaciones hechas en esta Resolución Conjunta.

Resolución Conjunta Núm. 927 de 2004. En este sentido, vale recalcar que sería incorrecto, a nuestro juicio, concluir que por virtud de la Sección 6 del Artículo VI de la Constitución únicamente continúan rigiendo las partidas de las leyes de asignaciones, mas no todas las reglas para su desembolso.

Las leyes de asignaciones presupuestarias cuya vigencia se activa automáticamente en virtud de la Sección 6 del Artículo VI de la Constitución no son simples cifras matemáticas. Dichas leyes establecen los propósitos específicos de cada asignación y las directrices en cuanto a sus desembolsos y transferencias. De hecho, como indicamos previamente, la definición propia del término "asignación" establece que ésta constituye una cantidad de dinero separada **para un fin**

**específico**. Sería, pues, equivocado concluir que, al entrar en vigor el Presupuesto Constitucional y, por ende, la Resolución Conjunta Núm. 927 de 2004, únicamente permanecieron vigentes las cuantías allí establecidas y no las reglas de desembolso de dicha resolución. Esta determinación sería errónea por dos razones.

En primer lugar, alegar que se transfiere la vigencia de las partidas y no de las **directrices** en torno a la utilización de las asignaciones sería contrario al lenguaje expreso de nuestra Constitución, la cual dispone: "La ley de presupuesto general[, en este caso, la Resolución Conjunta Núm. 927 de 2004,] sólo podrá contener asignaciones **y reglas para el desembolso de las mismas**". Art. III, Sec. 17, Const. E.L.A., L.P.R.A., Tomo 1 (énfasis suplido). En este sentido, véanse también los siguientes casos de jurisdicciones estatales donde se indica que una regla de desembolso no puede ser separada de las partidas (cantidades de dinero asignadas): *Commonwealth v. Dodson*, 11 S.E.2d 120, 127 (Va. 1940) ("An item [partida] in an appropriation bill is an indivisible sum of money dedicated to a stated purpose.. . . [W]here conditions are attached, they must be observed; where none are attached, none may be added."); 63C Am. Jur. 2d, *Public Funds* § 42 ("In the constitutional sense, an 'item' in an appropriation bill is a specific or indivisible sum of money **dedicated to a stated purpose**."); *In re Opinion of the Justices*, 2 N.E.2d 789, 791 (Mass. 1936) ("We are of opinion that the power conferred upon him by said article 63 [poder de veto] does not extend to the removal of restrictions imposed upon the use of the items appropriated. It is plain that no other provision of the Constitution confers power upon the Governor to disapprove the condition attached to the item in question.").

En segundo lugar, aceptar tal razonamiento conllevaría que el Presupuesto Constitucional se convertiría en meras cantidades de dinero, sin especificaciones sobre sus propósitos o el método para los desembolsos. El presupuesto constituye la enumeración de las obligaciones que el estado debe satisfacer para cubrir la prestación de los servicios y el cálculo de los recursos disponibles para pagar dichas obligaciones. *Véase* Guillermo Cabanellas, *Diccionario Enciclopédico de Derecho Civil*, Tomo IV, a la pág. 394 (1981). Por definición, el concepto legal del presupuesto no puede reducirse estrictamente a números. Resulta indispensable que el mandato legislativo establezca unas guías sobre los fines a los cuales serán destinadas las asignaciones y la forma en que se llevarán a cabo los desembolsos.

Tampoco procedería, a nuestro juicio, invocar la Sección 6 del Artículo VI de la Constitución para aducir, por un lado, que las asignaciones establecidas en la Resolución Conjunta Núm. 927 de 2004 para ciertas entidades gubernamentales quedaron vigentes en cuanto a las partidas y, por otro lado, rechazar la vigencia de la Resolución Conjunta Núm. 927 de 2004 en lo concerniente a las directrices aplicables a tales asignaciones. Esta distinción es ajena al precepto constitucional y debe ser rechazada. Concluir que al transferirse una "partida" sólo se transfiere un número sin regla de desembolsos es inherentemente contradictorio. Si se transfiere una partida con las reglas de desembolso que **restringen** la discreción del Ejecutivo al efectuar los desembolsos, de igual

forma deben transferirse aquellas reglas de desembolso que otorgan **flexibilidad** a la discreción del Ejecutivo. Al transferirse la partida, se transfiere un número con un **propósito** y aquellas normas que con mayor o menor fuerza (según sea el caso) obliguen al Ejecutivo a desembolsar para esos fines. Piénsese, por ejemplo, en dos tipos de partidas que se transfieren. Primero, una partida que simple y claramente asigne una cantidad de dinero a una agencia u organismo. Segundo, una resolución conjunta que asigne $50,000.00 a ser distribuidos entre la agencia "A" o la agencia "B" según las necesidades del servicio a ser determinadas por el Gobernador a tenor de ciertos parámetros legales. En ambos casos se transfiere la partida, el número, acompañada de la regla para su desembolso que se haya establecido en la asignación. Concluir que sólo se transfiere la partida con las restricciones a la discreción del Ejecutivo, y no las reglas que conceden flexibilidad en el desembolso, ignoraría el hecho de que los mandatos legales que rigen el desembolso de dinero no son de una sola y rígida clase cuando éstos pueden ser de variados matices.

La Sección 2 de la Resolución Conjunta Núm. 927 de 2004 heredada es una "regla de desembolso", de la misma forma que un mandato rígido que ordena un desembolso para un fin específico también lo es. La diferencia entre la regla de desembolso de la Sección 2 de la Resolución Conjunta Núm. 927 de 2004 y la regla de desembolso básica que se limita a establecer el uso específico que se le dará a una asignación es que la primera es más flexible que la segunda. Si por virtud de la Sección 6 del Artículo VI de la Constitución se transfiere una partida con una regla de desembolso de mandato rígido, por imperativo lógico también se transfiere una partida con una regla de desembolso de mandato flexible (como es la Sección 2 de la Resolución Conjunta Núm. 927 de 2004). Por ello, determinar que se transfieren las partidas según restringidas, pero no según flexibilizadas por la ley, es contradictorio. Puesto a la inversa: si no se transfieren las reglas flexibles de desembolso de asignaciones, tampoco se transferirían aquellos mandatos que restringen la discreción del Ejecutivo. Esto implicaría que sólo se transferiría una partida "desnuda", sin regla de desembolso alguna (restrictiva o liberal), dejándola en un vacío ilógico y, por lo tanto, insostenible.

Por ello, vigente la regla de desembolso de la referida Sección 2 de la Resolución Conjunta Núm. 927 de 2004, resulta permisible efectuar transferencias entre las asignaciones contenidas en dicha resolución conjunta cuando existan "necesidades apremiantes", en este caso, producto de la falta de aprobación de un presupuesto y del imperativo de atender los "intereses de [los] servicio[s]" prioritarios, para así cumplir con la política pública encarnada en la legislación vigente. Así, aunque la asignación englobada de la Resolución Conjunta Núm. 927 de 2004 permanece igual ($5,522 millones), la distribución interna puede ser ajustada por el Gobernador, al amparo de la Sección 2, para atender las necesidades del servicio producto de unas asignaciones heredadas que no son suficientes para atender parte de los gastos actuales del país.

En vista de que la gran mayoría de las asignaciones para la Rama Legislativa están sujetas a las reglas de desembolso dispuestas en la Resolución Conjunta Núm. 927 de 2004, toda vez

que están comprendidas en la misma, procedería estatutariamente que el Gobernador ajustara los desembolsos a realizarse con cargo a dichas asignaciones.

### 3. *El esquema específicamente dispuesto por nuestra Constitución, el cual expresamente permite los ajustes propuestos, de forma alguna suscita un problema de "separación de poderes"; al contrario, la mejor política pública, analizada a la luz de dicha doctrina, dicta que el Gobernador debe tener la facultad reclamada*

Sin duda alguna, las controversias legales planteadas en la presente consulta resaltan asuntos de fundamental importancia para la democracia y para nuestro sistema constitucional de gobierno. El espectro de la concentración excesiva de poder en cualquier Rama de gobierno no debe tomarse livianamente y debe ser asumido con toda seriedad y responsabilidad por cada una.

Como evidencia el proceso ordinario de aprobación presupuestaria, la separación absoluta de poderes entre las diversas Ramas del gobierno "nunca ha existido y nunca se pretendió que existiera". *Banco Popular v. Corte*, 63 D.P.R. 66, 71 (1944). Realmente, la división departamental del poder aspira a proteger a los ciudadanos contra el trato arbitrario y abusivo en manos de un solo ente que ostente autoridad impune y no verificada efectivamente por otros.

La acumulación de todos los poderes, legislativo, ejecutivo y judicial, en las *mismas* manos, bien de una, algunas o muchas personas, y ya sea por herencia, nombramiento propio o electivo, puede declararse con razón que es la definición exacta de la tiranía.

*Id.* a la pág. 72 (citando a *El Federalista*) (énfasis en original).

Por eso, todo análisis constitucional debe tener en perspectiva que los problemas de separación de poderes no necesariamente se limitan a examinar si hay traslapo entre funciones legislativas y ejecutivas. Después de todo, "hay funciones de gobierno que traspasan la línea divisoria y son ejercidas por una rama de naturaleza distinta a dichas funciones". *P.P.D. v. Gobernador*, 98 D.P.R. 338, 454 (1970) (Opinión Disidente del Juez Asociado señor Rigau). [16] La Constitución del Estado Libre Asociado de Puerto Rico concibió la relación entre las Ramas constitucionales como una de carácter dinámico y fluido, particularmente entre las Ramas Ejecutiva y Legislativa en lo concerniente a la aprobación del presupuesto.

---

[16]    Según se expuso en *P.P.D. v. Gobernador*, 98 D.P.R. a las págs. 455-456 (Opinión Disidente del Juez Asociado señor Rigau):

Algunos ejemplos de estos son los siguientes:

El Gobernador, jefe de la rama ejecutiva, participa de la función legislativa (a) al someter anualmente a la Asamblea Legislativa el ante proyecto de presupuesto y un informe que,

por mandato constitucional, "contendrá los datos necesarios para la formulación de un programa de legislación". Además, (b) puede convocar a la Asamblea Legislativa o al Senado a sesión extraordinaria cuando a su juicio los intereses públicos así lo requieran. Y (c) aprueba o desaprueba los proyectos de ley que la Asamblea Legislativa decreta. Participa en la función judicial al suspender la ejecución de Sentencias en casos criminales, al conmutar penas, condonar multas y al conceder indultos.

El Senado, la cámara alta de la rama legislativa, participa de la función ejecutiva al confirmar o rechazar nombramientos hechos por el Gobernador. El Tribunal Supremo, el más alto cuerpo de la rama judicial, participa de la función legislativa al adoptar reglas de evidencia y códigos de procedimiento civil y criminal. El Juez Presidente, el más alto funcionario judicial, participa de la función ejecutiva al tener a su cargo una de las responsabilidades administrativas mayores del gobierno: ser responsable de la administración de los tribunales. Constitución, Art. IV, sec. 4; Art. V, sec. 7. Además, las Juntas y Comisiones autónomas creadas por ley ejercen funciones legislativas al promulgar reglas y reglamentos, judiciales al celebrar vistas, decidir casos e imponer sanciones, y ejecutivas al supervisar la administración de sus respectivas leyes.

No existe un "derecho natural" o "idea platónica" del concepto de separación de poderes. Por el contrario, existe una multiplicidad de variaciones sobre el mismo tema. Cuando Montesquieu describió la separación de poderes en la Inglaterra de sus tiempos, enfatizó en la separación de poderes, pero también reconoció que la separación ni era rígida ni era absoluta. *Véase* Charles Louis de Secondat, señor de la Brède y barón de Montesquieu, *El Espíritu de las Leyes* (1748). Por su parte, los fundadores de los Estados Unidos de América explícitamente decidieron que las Ramas del gobierno serían más interdependientes que independientes; por ejemplo, James Madison explica que el esquema de la Constitución de los Estados Unidos de América es que "sus poderes estuvieran divididos y equilibrados de tal modo entre distintos cuerpos de oficiales, que ninguno pasara de sus límites legales sin ser contenido y reprimido eficazmente por los otros". *El Federalista Núm. 51* (James Madison). A su vez, los estados de los Estados Unidos de América han adoptado una gran variedad de modelos particulares de separación de poderes. *Véase en general* G. Alan Tarr, *Interpreting the Separation of Powers in State Constitutions*, 59 N.Y.U. Ann. Surv. Am. L. 329 (2003). El Estado Libre Asociado de Puerto Rico escogió su propia versión, la cual, entre otras cosas, contiene unas disposiciones específicas en lo concerniente al manejo del presupuesto del gobierno. Por lo tanto, la determinación de si las decisiones del Poder Ejecutivo en Puerto Rico en un caso en particular son consistentes con la versión de separación de poderes que rige en Puerto Rico, debe ser evaluada en atención a las disposiciones específicas de la Constitución del ELA. No se puede recurrir a una visión idealizada de la separación de poderes para anular las disposiciones de nuestras leyes y nuestra Constitución, pues ***la Constitución no puede ser inconstitucional***.

Así pues, vemos que nuestra Constitución estableció de forma expresa el alcance de las facultades y obligaciones del Poder Ejecutivo para atender ciertas circunstancias extraordinarias como, por ejemplo, una situación fiscal deficitaria como la planteada en la presente consulta. Por ello, el

hecho de que el Gobernador ejerza cierta discreción en cuanto a cómo manejar una situación presupuestaria deficitaria y que, al ejercer esta discreción, tome decisiones de política pública dentro de límites estatutarios y constitucionales, no le coloca en un terreno constitucionalmente indebido. El traslapo entre funciones constitucionales no sólo es permitido, sino que es parte integral de nuestro sistema constitucional.

El concepto de separación de poderes generalmente ha sido justificado principalmente a base de su virtud "negativa"; es decir, por su función protectora, que busca evitar que se concentre excesivamente el poder gubernamental en una de sus Ramas. Esa justificación establece el límite mínimo al cual se aspira. Pero la separación de poderes tiene una ambición adicional y más positiva: fomentar la deliberación democrática entre las Ramas del gobierno. Dado que el sistema de pesos y contrapesos dispersa el poder entre las Ramas y requiere que éstas actúen en concierto para lograr sus objetivos, de esa forma genera una serie de oportunidades para que los protagonistas de este proceso entablen conversaciones y deliberaciones en cuanto al bien común. *Véase en general* Cass R. Sunstein, *The Partial Constitution* 23 (1993) ("The system of checks and balances -- the cornerstone of the system -- was designed to encourage discussion among different governmental entities."); Laura S. Fitzgerald, *Cadenced Power: The Kinetic Constitution*, 46 Duke L.J. 679, 741-42 (1997). La ambición, o esperanza, es que el Poder Ejecutivo y el Poder Legislativo aprovechen esas oportunidades para dialogar y así intentar lograr un consenso que pueda mover el País hacia adelante. De ahí que una visión excesivamente rígida de la separación de poderes tiene el efecto nocivo de inhibir la conversación cívica que la Constitución intenta fomentar entre los representantes del Pueblo. La inhibición de esa conversación nos empobrece a todos.

Como indicó el ex Juez Presidente del Tribunal Supremo de Puerto Rico, Hon. José Trías Monge:

[L]a versión de Montesquieu de la teoría de separación de poderes sería lamentablemente desfigurada más tarde, cuando se le entendió como referencia a una separación absoluta y rígida en que cada poder ejerce facultades que ningún otro puede asumir, aunque sea en forma complementaria.

José Trías Monge, *Teoría de la Adjudicación* 360 (2000). A renglón seguido, el ex Juez Presidente rechazó "[e]sa concepción espuria de la teoría de Montesquieu", *id.*, y explicó:

No cabe hablar de tres ramas del gobierno con funciones diferentes correspondientes de modo exclusivo a cada una. De lo que se trata es de tres *procesos*, parte de los cuales se dividen entre las mismas ramas. Una porción del propio proceso de adjudicar controversias, como las de género administrativo, tiene por asiento la rama ejecutiva, sujeto a revisión por la rama judicial. La parte del proceso legislativo que tiene que ver con el establecimiento de normas generales le corresponde a la rama legislativa propiamente dicha, pero la parte concernida con la particularización en casos concretos de las normas estatuidas es provincia primaria de la rama judicial.

*Id.* a la pág. 401 (énfasis en original). Lo realmente importante es que, en la atribución de facultades, ninguna Rama de gobierno reclame para sí facultades que representen un agrandamiento de funciones de tal magnitud que provoque una concentración tendente al abuso de poder o que reduzca sustancialmente las funciones esenciales de otra Rama. Con ello en mente, en esta ocasión debemos examinar las controversias legales planteadas considerando varias dimensiones constitucionales en diversos niveles de generalidad.

Por un lado, a un nivel de generalidad específico, hemos expuesto ya extensamente en esta opinión sobre las diferentes disposiciones constitucionales específicas que, con impresionante previsión, atienden precisamente el contexto histórico presente: (i) la falta de aprobación de un presupuesto al cerrar un año fiscal, Art. VI, Sec. 6, Const. E.L.A., L.P.R.A., Tomo 1; y, concurrentemente, (ii) una situación deficitaria, Art. VI, Sec. 8, Const. E.L.A., L.P.R.A., Tomo 1. El balance entre los Poderes Ejecutivo y Legislativo está trazado en nuestra Constitución y en la interpretación que de ella hagan los tribunales puertorriqueños. Por eso, el hecho de que en circunstancias ordinarias el balance establecido por la Constitución promueva una mejor coordinación entre las Ramas al aprobar un presupuesto no excluye que los forjadores del texto escogiesen un arreglo de poderes alterno y secundario, un "Plan B", ante un tranque presupuestario o ante una situación de déficit. Precisamente ésa fue la decisión que se tomó. La Constitución decidió este asunto por todos nosotros y, precisamente para evitar reproducir las circunstancias que hayan conducido a la falta de consenso, se dirigió a una sola Rama, provisionalmente, no para que sustituya al Poder Legislativo en casos de crisis política o económica, sino para que evite que el país se vaya a la deriva en la tempestad, y lo navegue cuidadosamente entre fronteras claramente definidas hasta llegar a puerto seguro: hasta que se balancee el déficit, "hasta que se aprueben las asignaciones correspondientes", Art. VI, Sec. 6, Const. E.L.A., L.P.R.A., Tomo 1, o ambas.

A un nivel de generalidad más alto, debemos considerar cuál es el efecto de estas facultades constitucionales del Ejecutivo en un análisis integral que intente medir el balance correlativo de las fuerzas. Es decir, en lugar de concentrarse sólo microscópicamente en los poderes constitucionales conferidos por las cláusulas presupuestarias, debemos considerar con mayor perspectiva cómo quedan alineadas las fuerzas entre los poderes en un nivel más general. Un análisis honesto y desapasionado de esta configuración demuestra que el Poder Ejecutivo, lejos de acercarse al poderoso Leviatán imperturbado por otras fuerzas o límites estructurales y democráticos, queda en una posición similar o incluso de mayor desventaja a la que estaba antes de utilizar los referidos poderes. En este sentido, el espectro de una concentración de poderes avasalladora por el Ejecutivo a expensas de la Rama Legislativa **es una ilusión**.

Como se ha descrito, las cláusulas presupuestarias de la Constitución proveen un remedio minimalista, temporal y provisional ante un tranque presupuestario. Toda vez que lo que se transfieren son leyes de asignaciones particulares pertenecientes a un año anterior, el Presupuesto

Constitucional que se hereda no contempla aquellos gastos gubernamentales reales que, como es natural, incrementarán progresiva y exponencialmente al pasar el tiempo. Así, aun en el caso hipotético en que el gobierno tenga más recursos que los necesarios para satisfacer las asignaciones legisladas, si se hereda un presupuesto a causa de un tranque, la Rama Ejecutiva estaría impedida de gastar más allá de las asignaciones heredadas, e imposibilitada de satisfacer las necesidades **reales** de la población.

En este sentido, lo que superficialmente podría parecer un poder que permite prescindir de la Asamblea Legislativa, no es tal. Por un lado, la discreción del Ejecutivo está limitada por claros parámetros legislativos y constitucionales. **Ello impide que establezca prioridades de política pública nuevas de envergadura y evita que se concentre el poder excesivamente**. Sólo le permite al Gobernador mantener la marcha del gobierno y evitar mayores debacles.

De otro lado, toda vez que la Constitución confía en el Gobernador la responsabilidad de mantener la viabilidad de la gestión pública cotidiana, la responsabilidad política o "accountability" se diluye y se confunden las señales tradicionales que normalmente dirigirían a la población hacia **todos** los responsables de las decisiones importantes de política pública. De no existir una cláusula de continuidad presupuestaria, la población sentiría un golpe muy duro, rudo e inmediato que provocaría una reacción hacia los responsables políticos visibles del tranque (razón por la cual, tal vez, no se produciría el tranque en primera instancia). Cuando se hereda un presupuesto que, por definición, es insuficiente para satisfacer necesidades incrementales, el golpe y la visibilidad política se diluyen, **y se redirige la atención casi exclusivamente hacia el depositario de la responsabilidad de resolver la crisis: el Ejecutivo**. Así pues, se opaca la responsabilidad política de otros actores constitucionales. En la medida en que la Constitución delega funciones en este contexto a una Rama principalmente, el costo político de las decisiones difíciles ante un presupuesto insuficiente lo sentirá casi exclusivamente esa Rama que ostenta la responsabilidad. [17]
De ahí que **la idea de que el Ejecutivo se beneficie de administrar el País varios años con un mismo presupuesto heredado es irreal**. El incentivo está en la Rama Legislativa para negarse a ponerse de acuerdo en un presupuesto para que la población dirija su atención hacia quien en última instancia tiene que tomar las decisiones. Por eso, de limitarse o interpretarse restrictivamente la flexibilidad constitucional que en esta situación presupuestaria extraordinaria tiene el Ejecutivo, se acentuaría este incentivo que tiene la Rama Legislativa de secuestrar al Poder Ejecutivo con un presupuesto de antaño. Ello, porque la Rama Legislativa podría amarrar al Poder Ejecutivo con cortes presupuestarios sustanciales y progresivos, mientras que preservaría para sí al menos un presupuesto funcional sustancial que, en el balance de poderes y a la larga, le colocaría en una posición de fuerzas correlativas ventajosa. Así pues, sería tal interpretación restrictiva de los poderes presupuestarios extraordinarios del Ejecutivo la que amenazaría con concentrar el poder indebidamente en la Rama Legislativa.

17    En la jurisdicción federal, especialmente al evaluar problemas relacionados con el arreglo vertical de poderes, el Tribunal Supremo ha mostrado preocupación con arreglos constitucionales que opaquen la transparencia que debe imperar entre la población y el gobierno. *Véase New York v. U.S.*, 505 U.S. 144 (1992) ("where the federal government directs the states to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devise the regulatory program may remain insulated from the electoral ramifications of their decisions."); *Printz v. U.S.*, 521 U.S. 898 (1997) ("even when the States are not forced to absorb the costs of implementing a federal program, they are still put in the position of taking the blame for its burdensomeness and for its defects").

### B. Los ajustes propuestos por el Primer Ejecutivo no serían revisables por un tribunal ya que no resultarían en la creación de una controversia justiciable

Es nuestra opinión que los ajustes a los desembolsos con cargo a las partidas presupuestarias del Presupuesto Constitucional que se propone hacer el Gobernador no serían revisables por un tribunal ya que no resultarían en la creación de una controversia justiciable. En primer lugar, la Rama Legislativa, potencial reclamante en esta situación, carecería de legitimación activa. En segundo lugar, cualquier reclamo anticipable a estos efectos configuraría una clásica cuestión política porque: (i) la Asamblea Legislativa tiene la autoridad política y constitucional para evaluar la magnitud y naturaleza de cualquier supuesto agravio y proveerse el remedio pertinente; y (ii) no existirían criterios judicialmente manejables para pasar juicio sobre la cantidad de un ajuste impugnado. En tercer lugar, como han resuelto múltiples tribunales en situaciones análogas, no es revisable judicialmente un ejercicio por el Ejecutivo de discreción legislativa expresamente delegada por la Constitución, tal como ocurriría con la decisión de vetar o firmar un proyecto de ley.

### 1. La Rama Legislativa, potencial reclamante en esta situación, carecería de legitimación activa

La Rama Legislativa, potencial reclamante en esta situación, no ha visto sus poderes constitucionales disminuidos. Por tanto, ante la ausencia de un daño real, carece de legitimación activa. Según explicó el Tribunal Supremo escasamente hace unos meses:

> Por último, en cuanto al Hon. Aníbal Acevedo Vilá, aun cuando reconocemos su facultad para acudir en casos apropiados al cauce judicial con el fin de vindicar sus prerrogativas constitucionales, entendemos que en este caso no se ha alegado y menos establecido de qué manera la ausencia de confirmación de la señora Pont Marchese como Secretaria de Estado ha violentado sus facultades ejecutivas constitucionales. El Hon. Aníbal Acevedo Vilá ha sufrido

la pérdida de una nominada a su gabinete por falta de confirmación, sin embargo, ello es consecuencia del sistema de pesos y contrapesos que es intrínseco a la separación de poderes de nuestro ordenamiento constitucional. En *Hernández Agosto v. López Nieves*, 114 D.P.R. 601, 620 (1983), indicamos claramente, respecto a la facultad de nombramiento del Gobernador y en atención precisamente a la doctrina de separación de poderes, que "la Rama Ejecutiva no puede despojar a la Rama Legislativa del poder de confirmación que le confiere la Constitución y las leyes. Tampoco puede el Senado o la Rama Legislativa usurpar el poder de nominación del señor Gobernador mediante afirmaciones indicativas de que confirmará únicamente a determinado candidato". Sin embargo, en la petición de *mandamus* presentada ante esta Curia, el Gobernador no alega que la falta de confirmación de la señora Pont Marchese constituya una usurpación de su poder constitucional de nominación, ni que lo ocurrido demuestre que la Cámara de Representantes intenta de esta manera que se nomine a un candidato determinado. El Gobernador, de hecho, ejerció su poder al nominar a la señora Pont Marchese y a su vez, la Cámara de Representantes descargó su obligación constitucional.

*Acevedo Vilá v. Meléndez Ortiz*, 2005 T.S.P.R. 79, 164 D.P.R. 875 (2005). La Rama Legislativa no podría argumentar un despojo de sus prerrogativas constitucionales. Todo lo contrario, la Rama Legislativa, de estar insatisfecha con los ajustes realizados por el Gobernador, podría inmediatamente aprobar legislación que acabe con el tranque presupuestario, imponiéndose sobre el Gobernador, si así lo quisieran dos terceras partes de los legisladores. De hecho, si la Rama Legislativa estuviera inconforme con la facultad legal que ella misma autorizó mediante la aprobación del Artículo 4 de la Ley Núm. 147 y la Sección 2 de la Resolución Conjunta Núm. 927 de 2004, ésta tiene varias alternativas para evitar los ajustes válidos hechos por el Primer Ejecutivo.

Primero, en términos generales, la Asamblea Legislativa **podría cambiar el marco legal aplicable**: (i) derogando o enmendando la Sección 2 de la Resolución Conjunta Núm. 927 de 2004, la cual concede al Gobernador la autoridad para hacer ciertos ajustes en los desembolsos; o (ii) enmendando el Artículo 4 de la Ley Núm. 147, cambiando así las prioridades allí esbozadas.

Segundo, en términos prácticos, la Asamblea Legislativa **también podría cambiar los hechos, y así acabar con el déficit**: aprobando medidas contributivas para aumentar los recaudos del gobierno; o aprobando medidas que reduzcan los gastos del gobierno, tales como, por ejemplo, derogando la ley orgánica de una agencia. De cualquiera de estas dos maneras, al subsanar el déficit, no se activarían los poderes del Gobernador bajo las Secciones 7 y 8 del Artículo VI de la Constitución. Claro está, estas decisiones conllevarían un costo político para la Asamblea Legislativa. Solamente si la Asamblea Legislativa decidiera no escoger una de estas opciones sería que entraría en vigor la potestad del Gobernador de ajustar los desembolsos, al amparo de las Secciones 7 y 8 del Artículo VI de la Constitución. Es cierto que la Rama Legislativa podría optar por no aprobar las leyes de recaudos o de derogación de asignaciones que podrían sacar al presupuesto del déficit en el cual se encuentra. Sin embargo, **tal inacción sería totalmente**

**voluntaria**, ya que las prerrogativas constitucionales de la Rama Legislativa permanecerían intactas. De hecho, sólo ante la inacción de la Rama Legislativa en aprobar medidas de recaudos es que el sistema de pesos y contrapesos de nuestra Constitución permitiría que el Ejecutivo tomara las medidas necesarias para cumplir con el mandato constitucional a los efectos de que el presupuesto esté balanceado. *Véase* Art. VI, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1 ("Las asignaciones hechas para un año económico no podrán exceder de los recursos totales calculados para dicho año económico, **a menos que se provea por ley para la imposición de contribuciones suficientes para cubrir dichas asignaciones"**.) (énfasis suplido).

Por otra parte, y dado que la Asamblea Legislativa goza de un remedio tan completo, a nuestro juicio, no procedería que un tribunal expidiera una orden concediendo un remedio extraordinario, máxime cuando ello implicaría intervenir judicialmente con una controversia política. *Véase Acevedo Vilá*, 2005 T.S.P.R. 79, 164 D.P.R. 875 (determinando en una situación similar a la que hoy nos concierne que "este Tribunal **no puede confeccionar un remedio judicial que no conlleve una intromisión indebida en el poder legislativo**") (énfasis suplido). Nótese que constituye un abuso de discreción que un tribunal ejerza sus poderes en equidad cuando ello no sea necesario para evitar un daño que no pueda ser evitado por otros medios (asumiendo, únicamente para propósitos del argumento, que constituyese un "daño" a la Asamblea Legislativa lo que el Gobernador propone hacer). Al no existir un remedio adecuado que conceder a la Rama Legislativa, un tribunal no debería reconocer legitimación activa a ésta. Por tanto, ausente un daño real, claro y palpable, cualquier reclamación de ese tipo no debería prosperar.

## 2. *Cualquier reclamo anticipable presentaría una cuestión política no justiciable*

Somos de la opinión que cualquier reclamo anticipable en este contexto presentaría una cuestión política no justiciable. Entendemos que no existiría, en esta situación, un remedio judicial adecuado que no conllevara una intromisión indebida en los poderes asignados a las otras dos Ramas por la Constitución. La Rama Legislativa, como hemos discutido, tendría a su alcance la habilidad política y constitucional de juzgar la acción ejecutiva que encontraran inadecuada y, más importante aún, de concederse el remedio pertinente. Además, no existirían criterios judicialmente manejables para revisar la cantidad del ajuste objetado.

Así pues, como parte de cualquier reclamo anticipable habría al menos un asunto neurálgico que sencillamente no sería justiciable por constituir cuestión política: la forma en que el Gobernador decida utilizar su discreción al hacer los ajustes necesarios para poner en vigor las prioridades de la Ley Núm. 147, y al realizar los ajustes correspondientes en las asignaciones contenidas en la Resolución Conjunta Núm. 927 de 2004, conforme a su Sección 2. Veamos.

Las cuestiones que se podrían presentar en este contexto, por necesidad, ostentarían una dimensión política que, como mínimo, deberían animar la mayor cautela de un tribunal y motivar

la consideración más ponderada antes de colocar al Poder Judicial en el fuego cruzado de controversias de política pública carentes de criterios adjudicativos manejables. Después de todo "el concepto de separación de poderes es más 'una doctrina política' que 'una regla técnica de derecho'". *Colón Cortés v. Pesquera*, 150 D.P.R. 724, 751 (2000). Claro está, el hecho de que un asunto tenga dimensiones políticas no equivale a la claudicación del poder judicial. *Silva v. Hernández Agosto*, 118 D.P.R. 45, 54 (1986) (citando a *Baker v. Carr*, 369 U.S. 186 (1962) ) ("El mero hecho que el pleito busca la protección de un derecho político no quiere decir que el mismo presenta una cuestión política").

La doctrina de cuestión política tiene su base en consideraciones de separación de poderes. El entendido básico de la doctrina es que existen razones prudenciales que requieren que los tribunales no intenten resolver ciertos asuntos debido a su carácter eminentemente político, para así evitar enfrentamientos con otras Ramas constitucionales. Nuestro Tribunal Supremo se ha hecho eco de los criterios que en la jurisdicción federal apuntan a que un asunto no sea justiciable por considerarse cuestión política:

> para determinar la aplicabilidad de la doctrina de cuestión política [debe existir] uno de los siguientes elementos: (1) una delegación expresa del asunto en controversia a otra rama del gobierno; (2) la ausencia de criterios o normas judiciales apropiadas para resolver la controversia; (3) la imposibilidad de decidir sin hacer una determinación inicial de política pública que no le corresponde a los tribunales; (4) la imposibilidad de tomar una decisión sin expresar una falta de respeto hacia otra rama de gobierno; (5) una necesidad poco usual de adherirse, sin cuestionar, a una decisión política tomada previamente; y (6) potencial de confusión proveniente de pronunciamientos múltiples de varios departamentos del Gobierno sobre un punto.

*Silva v. Hernández Agosto*, 118 D.P.R. a la pág. 54. *Véanse además Acevedo Vilá*, 2005 T.S.P.R. 79, 164 D.P.R. 875; *Noriega Rodríguez v. Jarabo*, 136 D.P.R. 497 (1994); *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977).

Según los criterios mencionados, es apropiado que un tribunal se abstenga de resolver un asunto por constituir cuestión política en tres instancias principales: (i) cuando un asunto esté delegado por la Constitución a una Rama Política, ya sea expresa o estructuralmente, de manera que con su intervención los tribunales estarían interfiriendo con el ejercicio de las facultades constitucionales de esa Rama; (ii) cuando no existan criterios sustantivos manejables para resolver el asunto; o (iii) cuando sea imposible resolver el asunto judicialmente sin que los tribunales tengan que tomar una decisión de política pública enteramente inapropiada para la Rama Judicial. *Baker v. Carr*, 369 U.S. a la pág. 217. Todos estos factores se juntarían en este contexto. Veamos.

Según mencionamos, la competencia legal y constitucional para ajustar los desembolsos en momentos en que se hereda un Presupuesto Constitucional deficitario recae en el Primer Ejecutivo.

[E]xpresamente la Asamblea Legislativa ha facultado al Gobernador **de una manera amplia y flexible** para eliminar o reducir partidas y asignaciones en la forma que crea pertinente cuando en la ejecución y control del presupuesto lo estime necesario.

Op. Sec. Just. Núm. 16 de 1984 (énfasis suplido). La intervención judicial, en este contexto, implicaría inmiscuirse en un ejercicio de política pública expresamente delegado por la Constitución al Ejecutivo. Sencillamente, se trata de una función delegada contundentemente al Ejecutivo por la Constitución, en cuanto a lo cual los tribunales no tienen criterios sustantivos manejables para juzgar su corrección y para lo cual, de efectuar tal revisión, tendría el tribunal que tomar decisiones de política pública que trascienden sus funciones institucionales.

En particular, ante el hecho de que la Asamblea Legislativa tendría la capacidad política y constitucional para remediar la situación de la cual se podría quejar, la intervención de la Rama Judicial sería particularmente inapropiada e imprudente. Adviértase que, en términos generales, la Asamblea Legislativa **podría cambiar el marco legal aplicable**: (i) derogando o enmendando la Sección 2 de la Resolución Conjunta Núm. 927 de 2004, la cual concede al Gobernador la autoridad para hacer ciertos ajustes en los desembolsos; o (ii) enmendando el Artículo 4 de la Ley Núm. 147, cambiando así las prioridades esbozadas en ella. Segundo, en términos prácticos, la Asamblea Legislativa **también podría cambiar los hechos, y así acabar con el déficit**: (i) aprobando medidas contributivas para aumentar los recaudos del gobierno; o (ii) aprobando medidas que reduzcan los gastos del gobierno, tales como, por ejemplo, derogando la ley orgánica de una agencia. Lo anterior lo podría hacer la Rama Legislativa unilateralmente, contando con el voto de dos terceras partes de los integrantes de cada cámara legislativa o, si lo aprobado adelanta el bien común, se podría hacer con una mayoría simple en las cámaras y la firma del Gobernador.

De esta forma, pues, la Asamblea Legislativa tendría la autoridad para juzgar los ajustes realizados por el Gobernador y, de entenderlo apropiado, servirse del remedio pertinente. De hecho, el sentido común y la abundante experiencia histórica demuestran contundentemente que, cuando de amenazas a prerrogativas legislativas o a beneficios o poderes al legislador se trata, la Asamblea Legislativa actúa celosamente y vigorosamente en protección de sus intereses, sin distinción partidista alguna. Por tanto, es inconcebible, en términos prácticos y reales, que una Asamblea Legislativa no actúe para remediar una situación que verdaderamente resultara lesiva a su habilidad de descargar sus funciones constitucionales.

Dado que la Asamblea Legislativa gozaría de un remedio tan completo, a nuestro entender, no procedería que un tribunal expidiera una orden concediendo un remedio extraordinario, ya que, en este contexto, ello implicaría intervenir judicialmente con una controversia política. *Véase Acevedo Vilá*, 2005 T.S.P.R. 79, 164 D.P.R. 875 ("este Tribunal no puede confeccionar un remedio judicial que no conlleve una intromisión indebida en el poder legislativo".).

**3.** *Por tratarse del ejercicio de la discreción que la Constitución y los estatutos*
*pertinentes expresamente le delegan al Gobernador, los ajustes propuestos, al igual*
*que la decisión de vetar o firmar un proyecto de ley, no serían revisables judicialmente*

Como se ha resuelto en múltiples instancias por diversos tribunales estatales y federales,
precisamente en situaciones similares, los tribunales no deben intervenir con una actuación del
Ejecutivo en el ejercicio de la discreción que le delegan la Constitución y los estatutos pertinentes.
Por tanto, al amparo de dicha jurisprudencia, no resultaría justiciable una controversia sobre la
forma en que el Gobernador hubiese decidido ejercer su discreción al hacer los ajustes necesarios
para poner en vigor las prioridades de la Ley Núm. 147 y al realizar los ajustes correspondientes en
las asignaciones contenidas en la Resolución Conjunta Núm. 927 de 2004, conforme a su Sección
2. Veamos.

En *Judy v. Schaeffer*, 627 A.2d 1039, 1052-54 (Cir. Ap. Md. 1993), **expresamente** se concluyó
que cuando la ley y la Constitución autorizan al Gobernador a reducir los desembolsos de las
partidas asignadas, se entiende que el ejercicio de dicha facultad legal **no está sujeto a revisión
judicial** por abuso de discreción ni tampoco procede examinar si éste actuó de manera arbitraria,
caprichosa o sin contar con evidencia substancial. ("[T]he action by the Governor . . . was not the
type of administrative determination which has been deemed "adjudicatory" or "quasi-judicial"
under our cases. Consequently, the action is **not subject to judicial review** to determine whether
it was arbitrary, capricious, or unsupported by substantial evidence.. . . The determination of the
Governor . . . was quasi-legislative in nature. Our review, consequently, "is limited to assessing
whether the [Governor was] acting within [his] legal boundaries.") (énfasis suplido). *Véase además*
Edward A. Tomlinson, *The Maryland Administrative Procedure Act: Forty Years Old in 1997*, 56
Md. L. Rev. 196 (1997).

Más importante aún, en *Dalton v. Specter*, 511 U.S. 462, 471, 477 (1994), el Tribunal Supremo
de los Estados Unidos de América específicamente estableció que, cuando un estatuto concede
discreción al Ejecutivo para actuar de cierta manera, el ejercicio de tal discreción no es revisable
judicialmente: "Where a statute, such as the 1990 Act, commits decisionmaking to the discretion
of the President, judicial review of the President's decision is not available.". En dicha ocasión,
explicó:

> As we stated in *Dakota Central Telephone Co. v. South Dakota ex rel. Payne*, 250 U.S. 163, 184,
> 39 S. Ct. 507, 509, 63 L. Ed. 910 (1919), where a claim "concerns not a want of [Presidential]
> power, **but a mere excess or abuse of discretion in exerting a power given, it is clear that it
> involves considerations which are beyond the reach of judicial power**. This must be since,
> as this court has often pointed out, **the judicial may not invade the legislative or executive
> departments so as to correct alleged mistakes or wrongs arising from asserted abuse of
> discretion**."

........

> How the President chooses to exercise the discretion Congress has granted him is not a matter
> for our review. "[N]o question of law is raised when the exercise of [the President's] discretion
> is challenged."

*Id*. a las págs. 474 y 476 (citas omitidas y énfasis suplido). Además, el Tribunal Supremo federal
aclaró que igual sería el caso si la discreción del Ejecutivo en cuestión surgiera de una disposición
constitucional, en lugar de una estatutaria. *Id.* a la pág. 475 ("Although the President's discretion
in *Waterman S.S. Corp.* derived from the Constitution, we do not believe the result should be
any different when the President's discretion derives from a valid statute.") (citando a *Chicago &
Southern Air Lines, Inc. v. Waterman S. S. Corp.*, 333 U.S. 103, 114 (1948), en el cual estableció
que una decisión discrecional del Presidente tomada bajo los auspicios de uno de sus poderes
constitucionales no era revisable ya que "the final orders embody Presidential discretion as to
political matters beyond the competence of the courts to adjudicate."). Cabe destacar que el
Tribunal Supremo no llegó a tal conclusión de manera apresurada ni liviana:

> Respondents tell us that failure to allow judicial review here would virtually repudiate
> *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803), and nearly two centuries
> of constitutional adjudication. But our conclusion that judicial review is not available for
> respondents' claim follows from our interpretation of an Act of Congress, by which we and
> all federal courts are bound. The judicial power of the United States conferred by Article III
> of the Constitution is upheld just as surely by withholding judicial relief where Congress has
> permissibly foreclosed it, as it is by granting such relief where authorized by the Constitution
> or by statute.

*Id.* Así pues, el Tribunal Supremo llegó a estas conclusiones conciente de que estaba privando
totalmente a la parte quejosa de la revisión judicial de las determinaciones del Ejecutivo. *Id*. ("We
fully recognized that the consequence of our decision was to foreclose judicial review".).

Es decir, al amparo de la jurisprudencia reseñada, concluimos que no es revisable judicialmente
cómo el Gobernador pueda ejercer su discreción legal de ajustar desembolsos de diversas agencias
u organismos gubernamentales, incluyendo los de la Rama Legislativa. Toda vez que el Poder
Ejecutivo tiene la misión constitucional de encargarse de realizar los ajustes necesarios en
momentos de déficit y de hacer los desembolsos necesarios al heredarse un presupuesto, es de
su competencia constitucionalmente exclusiva cómo es que -en efecto, caso a caso y centavo
por centavo - decide cumplir con la ley de prioridades o cómo realiza las transferencias entre
las partidas de la Resolución Conjunta Núm. 927 de 2004. En efecto, la competencia legal
y constitucional para ajustar los desembolsos en momentos en que se hereda un Presupuesto
Constitucional deficitario recae en el Primer Ejecutivo. "[E]xpresamente la Asamblea Legislativa

ha facultado al Gobernador **de una manera amplia y flexible** para eliminar o reducir partidas y asignaciones en la forma que crea pertinente cuando en la ejecución y control del presupuesto lo estime necesario". Op. Sec. Just. Núm. 16 de 1984 (énfasis suplido).

Si bien es cierto que la ley de prioridades le encomienda al Primer Ejecutivo atender las áreas de la "conservación de la salud pública", la "protección de personas y de la propiedad", los "programas de instrucción pública" y los "programas de bienestar público", entre otras, la forma en que el Gobernador cumple con éstas, mediante los ajustes correspondientes en los desembolsos, no está sujeta a revisión judicial. "**[E]l Gobernador tiene discreción** para determinar cuál ha de ser el mecanismo a utilizarse para realizar dicha eliminación o reducción de conformidad con las disposiciones de la mencionada Ley Núm. 147". Op. Sec. Just. Núm. 16 de 1984 (énfasis suplido). ¿Acaso podría interponerse un recurso para revisar judicialmente si el Primer Ejecutivo está cumpliendo eficazmente con "los programas de bienestar social"? Entendemos que no. *Véase Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) ("in general this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.").

Así, pues, como cuestión de derecho, es irrelevante en este contexto el criterio personal y particular que pueda tener un tribunal a los efectos de que la Rama Ejecutiva haya podido actuar, incluso, de forma arbitraria. En lo que concierne a la interacción entre las dos Ramas políticas, especialmente en lo concerniente a los méritos de un asunto de naturaleza legislativa, la Rama Judicial no puede intervenir, independientemente de lo desacertada que pueda entender que es una acción particular de una de las Ramas.

La no intervención de la Rama Judicial en este contexto es análoga a lo que ocurriría si se pretendiera impugnar, por ejemplo, la determinación de una Asamblea Legislativa de aprobar o no un proyecto de ley. Ello no es revisable. Como tampoco lo es la decisión de un Gobernador de vetar o no un proyecto. Tampoco lo es la decisión de una Asamblea Legislativa de ir por encima de un veto del Gobernador. Tampoco lo es la decisión de Cámara o Senado de no confirmar a un jefe de agencia. Tampoco lo es una decisión del Gobernador sobre un veto de partida. Al igual que ocurre con el ajuste impugnado, los méritos de este tipo de determinación legislativa no son revisables, no importa cuán detestable le pueda parecer a un tribunal la decisión de la Rama política en torno a este tipo de asunto.

### C. Los ajustes propuestos por el Gobernador serían válidos porque no afectarían la capacidad de la Rama Legislativa para descargar su función constitucional y sus prerrogativas permanecerían inalteradas

**1.** *Como cuestión de derecho, dado que la Rama Legislativa ostentaría remedios políticos y legislativos para resolver cualquier potencial reclamo, no procedería una alegación de que se le estaría impidiendo ejercer su función constitucional*

Los ajustes propuestos por el Gobernador serían válidos porque no le impedirían a la Rama Legislativa ejercer su función constitucional. Según mencionamos, dado que la Rama Legislativa ostentaría remedios políticos y legislativos para corregir cualquier insatisfacción con los ajustes (por ejemplo, aumentar los recaudos), como cuestión de derecho no procedería una alegación de que se le estaría impidiendo ejercer su función constitucional. **Dado que la Rama Legislativa podría corregir mediante legislación cualquier insatisfacción que le hubiese podido ocasionar un ajuste hecho por el Gobernador, por definición, no se le habría impedido ejercer su función constitucional.** Esto es, aun con el ajuste, las prerrogativas constitucionales de la Asamblea Legislativa quedarían intactas ya que dicho cuerpo poseería facultades legales para atender la situación.

En cuanto a este asunto, valga advertir que, como mencionamos anteriormente, la Rama Legislativa estaría situada de forma muy distinta a, por ejemplo, la Rama Judicial porque, a diferencia de la primera, ésta última no ostentaría remedios políticos ni legislativos para corregir la situación que ocasionaría cualquier ajuste a los desembolsos correspondientes.

**2.** *Como cuestión de hecho, los ajustes propuestos por el Gobernador no le impedirían a la Asamblea Legislativa ejercer su función constitucional*

De todas formas, debe tenerse presente que los ajustes propuestos por el Gobernador, como cuestión de hecho, no le impedirían a la Asamblea Legislativa ejercer su función constitucional. En este sentido, valga destacar que el ajuste que el Gobernador propone hacer a la Cámara de Representantes sería de sólo cerca de un trece por ciento (13%) en comparación con su presupuesto del año anterior. En cuanto al Senado, el ajuste propuesto para dicho Cuerpo sería de menos de un doce por ciento (12%) (de $38 millones a $33.5 millones).[18] Entendemos que, como cuestión de hecho, no procedería concluir que unos ajustes de este tipo serían de tal grado que le impedirían a la Asamblea Legislativa ejercer su función constitucional.

---

[18]    En lo que respecta al presupuesto total para las distintas actividades de la Asamblea Legislativa, que incluye el presupuesto de cada cuerpo así como las partidas de Actividades Conjuntas y de Donativos, el ajuste fue menor de veinte por ciento (20%); es decir, de alrededor de $126 millones a alrededor de $102 millones. *Véase* <http://www.presupuesto.gobierno.pr/Tomo_II/asambleaLegislativa.htm>; y Anejo A.

Para resaltar aún más que, como cuestión **práctica**, los ajustes propuestos no le impedirían a la Asamblea Legislativa ejercer su función constitucional, valga destacar que dicha Rama recibe fondos **adicionales** bajo la partida de "Actividades Conjuntas", identificada en la Resolución Conjunta Núm. 927 de 2004, para ejercer sus funciones. Dicha partida, según los ajustes propuestos, alcanzaría $10.78 millones. [19] Así pues, resulta importante aclarar que la referida partida es **adicional** al presupuesto de ambos cuerpos legislativos, el cual sólo recibiría ajustes mínimos. Además, y de particular importancia, es el hecho que la Asamblea Legislativa está en completa libertad para utilizar la porción que crea necesaria y conveniente de los otros $74.5 millones del presupuesto de ambas Cámaras para financiar las actividades que normalmente se cubren con esta partida, y viceversa. Exactamente cómo la Asamblea Legislativa distribuye su presupuesto total es un asunto de la estricta competencia de la Asamblea Legislativa. **La determinación de cuánto dinero otorgar a cada renglón de gastos de la partida de Actividades Conjuntas y del presupuesto total de la Asamblea Legislativa (que aun luego de los ajustes propuestos ascendería a un desembolso de $102.96 millones) recae, como cuestión legal, en los presidentes de cada cuerpo.**

[19] Valga destacar, no obstante, que esta cifra no incluye la cantidad de $17.684 millones a desembolsarse con cargo a asignaciones especiales para otras actividades conjuntas de la Asamblea Legislativa. *Véase* Anejo A.

De todas formas, aun tomando en consideración el ajuste a los desembolsos con cargo a la partida de Actividades Conjuntas, en conjunto con el ajuste a los desembolsos a Cámara y Senado, el ajuste total sería sólo de aproximadamente un veinte por ciento (20%), lo cual no podría validar un reclamo de privación de facultad de ejercer funciones constitucionales, especialmente en vista del significativo sobrante de más de $18 millones con el cual la Asamblea Legislativa ahora mismo cuenta, el cual reduciría ese por ciento total de ajuste de veinte por ciento (20%) a cuatro punto siete por ciento (4.7%). [20]

[20] $102 millones (desembolsos totales luego de los ajustes propuestos para la Asamblea Legislativa) 🔑 $18.4 millones de sobrantes = $120.4 millones. Dado que el presupuesto total para la Asamblea Legislativa el año pasado ascendió a alrededor de $126 millones, el cambio porcentual entre dicho presupuesto y el dinero que tendrían disponible este año aun después de los ajustes propuestos ($120.4 millones) refleja una reducción de sólo cuatro punto siete por ciento (4.7%).

De hecho, una determinación de este tipo, relativa a que un ajuste presupuestario le ha impedido a otra Rama ejercer sus funciones constitucionales, es particularmente **excepcional** y requeriría circunstancias realmente **extraordinarias** que tendrían que ser probadas por la Rama solicitante. No bastan meras alegaciones sobre dificultades especulativas en sus trabajos. *Véase, por analogía*,

*Rose v. Palm Beach County*, 361 So. 2d 135, 138 (Fla. 1978) ("The doctrine of inherent power [to compel funding] should be invoked only in situations of **clear necessity.** . . . [I]t is with **extreme caution** that this Court approaches the issue of the power of trial courts to order payments by local governments for expenditures deemed essential to the fair administration of justice.") (énfasis suplido); *Matter of Salary of Juvenile Director*, 552 P.2d 163, 176 (Wash. 1976) ("Lacking **clear, cogent and convincing proof** of a reasonable need for additional funds, it is unlikely the court would be willing to use its contempt power to enforce compliance with its fiscal determination.") (énfasis suplido); *Beckert v. Warren*, 439 A.2d 638, 647 (Pa. 1981) ("the burden is on the plaintiff court to prove the 'reasonably necessity' of its funding requests.... [A]n expenditure which is 'reasonably necessary' for constitutional purposes is one absent which the judiciary will be unable 'to carry out its mandated responsibilities, and its powers and duties to administer Justice.'").

Como cuestión de hecho, debe subrayarse que las diferentes dependencias de la Rama Ejecutiva recibirían ajustes y recortes similares, y aun mayores, a los de la Rama Legislativa y la Rama Judicial (como, por ejemplo, la Administración de Servicios Generales, con un recorte de más de un sesenta por ciento (60%); la Autoridad para el Manejo de Desperdicios Sólidos de Puerto Rico, con un recorte del treinta y tres por ciento (33%); y el Departamento del Trabajo, con un recorte de más de un veintisiete por ciento (27%)).

### 3. *La propuesta actuación del Gobernador no podría considerarse arbitraria ni caprichosa*

Como se ha explicado, el ajuste propuesto de forma alguna privaría a la Rama Legislativa de su capacidad para ejercer su función constitucional. En este sentido, entendemos que la propuesta actuación del Gobernador no podría considerarse arbitraria ni caprichosa por varias razones. Veamos.

#### a. *La Rama Ejecutiva cuenta con suficiente información para tomar decisiones informadas, razonadas y justificadas sobre cómo hacer los ajustes propuestos*

**Como se puede constatar del propio texto de la ley**, tanto la OGP como el Departamento de Hacienda cuentan con un caudal de información sobre las finanzas, los presupuestos, los ingresos y los gastos de **todos** los organismos gubernamentales, **incluyendo la Rama Legislativa**. Esto es incuestionable dado que la propia Ley de Contabilidad dispone que el Secretario de Hacienda "será el funcionario encargado de custodiar todos los fondos públicos de las dependencias y de llevar la contabilidad central de tales fondos", incluyendo los fondos de la Rama Legislativa. Art. 6 de la Ley Núm. 230, 3 L.P.R.A. § 283e. De igual modo, la propia Ley Orgánica de la OGP establece:

La Oficina de Gerencia y Presupuesto bajo las reglas, reglamentos, instrucciones y órdenes que el Gobernador prescribiere, asesorará al Primer Ejecutivo, **a la Asamblea Legislativa** y

a los organismos gubernamentales en los asuntos de índole presupuestarios, programáticos y de gerencia administrativa, así como en asuntos de naturaleza fiscal relativos a sus funciones; llevará a cabo las funciones necesarias que permitan al Gobernador someter a la Asamblea Legislativa el Presupuesto Anual de Mejoras Capitales y Gastos de Funcionamiento del Gobierno, incluyendo las corporaciones públicas; velará por que la ejecución y administración del presupuesto por parte de los organismos públicos se conduzcan de acuerdo con las leyes y resoluciones de asignaciones, con las más sanas y adecuadas normas de administración fiscal y gerencial, y en armonía con los propósitos programáticos para los cuales se asignan o proveen los fondos públicos. Evaluará los programas y actividades de los organismos públicos en términos de economía, eficiencia y efectividad y le someterá al Gobernador informes con recomendaciones para la implantación de las mismas. **Preparará y mantendrá el control de todos aquellos documentos fiscales y presupuestarios que sean necesarios para la administración del presupuesto y efectuará los cambios, enmiendas o ajustes que se ameriten, sujeto a las disposiciones legales y normas establecidas por la *Asamblea Legislativa* y el Gobernador.** Se mantendrá atento a las nuevas corrientes y tendencias en el ámbito presupuestario y gerencial de la administración pública para evaluar y adaptar aquellas técnicas, métodos y enfoques que apliquen al campo administrativo local, tanto en la formulación y ejecución del presupuesto como en la evaluación de programas, el análisis gerencial y la auditoría operacional y administrativa. Además, deberá proponer aquella legislación que se considere necesaria y conveniente para incorporar dichos enfoques y tendencias a nuestro proceso presupuestario y administrativo.

Art. 3(a) de la Ley Núm. 147, 23 L.P.R.A. § 103(a) (énfasis suplido).

Los deberes asignados a estas agencias requieren que las mismas cuenten con toda la información y el peritaje necesario para recomendarle al Gobernador precisamente qué ajustes a los desembolsos son los más recomendables. Así pues, entendemos que el Ejecutivo está muy conciente, al momento de proponer los ajustes a los desembolsos, de que la Asamblea Legislativa tiene sobrantes de más de $18 millones que dejó la Asamblea Legislativa anterior. Es precisamente basándose en toda la información financiera y económica disponible a la Rama Ejecutiva que el Gobernador ha formulado su propuesta de ajustes a los desembolsos para la Asamblea Legislativa por una cantidad muy cercana al total de los sobrantes anteriormente mencionados. Por todas estas razones, entendemos que sería errado determinar que el Gobernador estaría actuando arbitrariamente.

### b. La propuesta actuación del Gobernador estaría protegida por presunciones de corrección

Por último, cabe resaltar que la propuesta actuación del Gobernador estaría protegida por presunciones de corrección. Por su parte, la Regla 16 de las de Evidencia establece un sinnúmero de presunciones. En particular, se presume "[q]ue los deberes de un cargo han sido cumplidos con regularidad" y "[q]ue la ley ha sido acatada". 32 L.P.R.A. Ap. IV, R. 16(15) y (32). Estas

dos presunciones serían aplicables a la situación objeto de la presente consulta. De hecho, ausente desfile de prueba en contrario, las mismas obligarían a un tribunal a determinar que el Gobernador actuó de acuerdo con la ley y dentro de su sana discreción al hacer los ajustes propuestos a los desembolsos con cargo a las asignaciones presupuestarias vigentes.

## IV. *CONCLUSIÓN*

En esencia, entendemos que los ajustes propuestos por el Gobernador a los desembolsos con cargo al Presupuesto Consti-tucional vigente para el año fiscal 2005-2006 serían válidos en derecho. Primero, opinamos que el Gobernador ostenta la facultad constitucional para, en situación de déficit, realizar los ajustes propuestos. Segundo, entendemos que un tribunal carecería de jurisdicción para atender cualquier reclamo sobre los ajustes propuestos, por tratarse de una controversia no justiciable. Tercero, aun de entenderse que procedería la revisión judicial en este contexto, lo cierto es que, como cuestión de derecho, los ajustes propuestos deberían ser considerados válidos porque los mismos de ninguna forma privan a la Rama Legislativa de descargar su función constitucional y, aun luego de los mismos, permanecerían intactas sus prerrogativas constitucionales.

Cabe destacar que la autoridad del Gobernador para ajustar desembolsos en situaciones de déficit se extiende a la Asamblea Legislativa. No hay apoyo alguno en el texto o historial constitucional para darle trato distinto a la Rama Legislativa en situaciones de déficit. Tampoco lo hay en el texto o historial de las leyes pertinentes. Adviértase que una conclusión contraría aislaría perniciosamente a una de las Ramas políticas de las consecuencias del déficit. Tal determinación le brindaría una licencia a la Rama Legislativa para actuar irresponsablemente y, a la vez, no sentir de forma alguna el impacto de su decisión, ni en su operación interna ni en términos de responsabilidad política.

En última instancia, es errónea una perspectiva superficial de separación absoluta de poderes, en lo concerniente a una supuesta "independencia" y a un supuesto principio de "no intervención". Dicha "visión" es contraria a las múltiples instancias en que la Constitución expresamente faculta a cada una de las Ramas a intervenir con la otra (la aprobación de legislación, con la intervención del Gobernador a través del veto y el veto de partidas, es el ejemplo más contundente). La propia Constitución expresamente rechaza una rígida concepción de separación absoluta de poderes al autorizar la mezcla de funciones y la interdependencia entre las Ramas.

De hecho, una determinación a los efectos de prohibir al Ejecutivo realizar ajustes a los desembolsos para la Rama Legislativa en este contexto conllevaría una inconsistencia interna insalvable: si, al amparo de una visión absolutista y arbitraria de la separación de poderes, el Ejecutivo no puede, en tiempos de déficit, ajustar los desembolsos de las partidas asignadas a la Rama Legislativa, ¿significa ello que la Rama Legislativa no puede rehusarse a aprobar suficientes recaudos para que también se puedan realizar los desembolsos completos a las agencias del

Ejecutivo? ¿O es que la Asamblea Legislativa no estaría "interviniendo indebidamente con la independencia" de la Rama Ejecutiva al no aprobar los recaudos que permitirían desembolsar la totalidad de lo asignado el año pasado a las distintas agencias del Ejecutivo? ¿Sería eso también revisable judicialmente?

Más aún, dado que el Ejecutivo no tiene la facultad para generar recaudos sin el concurso de la Asamblea Legislativa, mientras que ésta sí tiene la facultad para aprobar recaudos que permitan que se desembolse la totalidad de su presupuesto del año pasado (incluso, sin el concurso del Gobernador, a través del voto de dos terceras partes de los legisladores de cada cámara), ¿ no sería todavía más fuerte el reclamo del Ejecutivo en cuanto a "intervención indebida", que el de la Rama Legislativa? Es decir, ¿bajo qué concepto razonable de la doctrina de separación de poderes se legitima un planteamiento legal sobre un problema cuya solución está al fácil alcance, y bajo el absoluto control, del reclamante? Si la Asamblea Legislativa entiende que no se deben aprobar recaudos adicionales esa es su prerrogativa política, pero lo que, a nuestro juicio, constitucionalmente no podría hacer es reclutar a la Rama Judicial para que le asista en aislarse totalmente de las consecuencias de dicha postura.

En cuanto a este asunto, no debe subestimarse, en términos del análisis correcto sobre el ámbito de las funciones de cada Rama de gobierno, la importancia de tomar en consideración las facultades que la Constitución textualmente le concede a cada una de dichas Ramas. Así pues, es de suma importancia recalcar que la Rama Legislativa estaría solicitando un remedio judicial a una situación que ésta tiene facultad para resolver por sí misma. En este sentido, su reclamo sería, a nuestro juicio, mucho más débil que un reclamo hipotético de la Rama Judicial ante una situación similar, ya que dicha Rama no tiene las herramientas políticas para solucionar dicho problema.

Por otra parte, entendemos que cualquier reclamo en este contexto no sería justiciable. Ello, en esencia, ante el hecho indiscutible de que la Rama Legislativa cuenta con los medios políticos y constitucionales para juzgar la actuación del Gobernador y, de entenderla verdaderamente onerosa, remediar la situación mediante legislación. Adviértase que la indisposición para aprobar suficientes medidas de recaudos por parte de la Asamblea Legislativa es precisamente la razón por la cual existe un déficit. Esto, a su vez, es la única razón por la que el Ejecutivo tendría que efectuar ajustes en los desembolsos de las asignaciones de varias agencias de la Rama Ejecutiva y de la Asamblea Legislativa. En fin, está en manos de la propia Rama Legislativa el aprobar medidas de recaudo adicionales, lo cual solucionaría el déficit y permitiría al Ejecutivo desembolsar la totalidad del presupuesto anterior de la Asamblea Legislativa y de todas las agencias del Ejecutivo. En este contexto, sería altamente impropia e imprudente la intervención judicial en esta controversia política.

Por último, aun si procediera revisar judicialmente la cantidad de los ajustes propuestos, los mismos resultarían válidos, como cuestión de derecho, por no privar a la Asamblea Legislativa

de su capacidad para descargar su función constitucional. El simple, pero indisputable, hecho de que la Asamblea Legislativa no actuara para remediar el supuesto agravio a sus funciones constitucionales indudablemente implicaría que, verdaderamente, dicho agravio no se materializó.

Cordialmente,

Roberto Sánchez RamosAnejo

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.



---

# CERTIFIED TRANSLATION

CERTIFIED TRANSLATION                    BY OLGA M. ALICEA, FCCI, NJITCE-S

P.R. Sec. Just. Op. 2005-14, 2005 WL 6431018 (P.R. Atty. Gen.)

Opinions of the Secretary of Justice of Puerto Rico Number 2005-14

Puerto Rico Attorney General

No. 2005-14

Reference No. 164-05-A

August 30, 2005

**Budget of the Government of Puerto Rico**

**1. Budget, Legal Concept-Allocation, Legal Concept-Disbursement, Legal Concept**

The term "budget" is a legal concept that refers to the set of laws on appropriations that are, or continue, in effect for a particular fiscal year. *See, Diary of Sessions of the Constitutional Convention* 889 ("The budget includes all of the laws on appropriations, that do not necessarily have to be done in a single piece of legislation, they do not necessarily have to be done through a bill, and that do not even have to be done through, in the course of a legislative session."); Sec. Just. Op. No. 13 of 1984 at p. 85 ("The concept 'budget' … it includes all of the laws on appropriations..."); *Hernández Torres v. Hernández Colón*, 129 D.P.R. 824, 859 (1992) (Dissenting opinion of Associate Justice Mr. Negrón García) ("According to the Constitutional Assembly, the budget is not a unitary law, rather it comprises all laws on appropriations.").

The term "appropriation," on its part, is an equally legal concept that refers to the "amount of money authorized by the Legislature for the purpose of carrying out a specific activity or achieving certain goals." *See,* Article 3 of Law No. 230 of July 23, 1974, *as amended*, known as the "Accounting Act," 3 L.P.R.A. § 283b. *See, also, New England Division of American Cancer Society v. Commissioner of Administration*, 769 N.E.2d 1248, 1256 (Mass. 2002).

On the other hand, the term "disbursement" refers to the "[d]elivery of a portion of money and cash" or to an "outlay, expense, [or] cost."

**2. Budget-Content and Procedure for Preparation-Presentation to the Legislative Branch for Approval-Governor's Signature**

In preparing the government budget, two essential steps must be taken: (i) estimate the resources expected to be received during the fiscal year for which the budget is submitted (which is done by the Department of the Treasury); and (ii) make appropriations (authorized expenses)

*CERTIFIED TRANSLATION*                                    BY OLGA M. ALICEA, FCCI, NJITCE-S

charged to those resources calculated by the Department of the Treasury (which is finally done by the Legislative Branch and the Executive Branch when approving the pertinent laws on appropriations). Once the Governor submits the recommended budget to the Legislature, it is up to said Legislative Branch to approve the pertinent appropriations and collections bills, and remit the same to the Chief Executive so that, after his signature, they become law.

As previously mentioned, once the Governor submits to the Legislature the recommended budget it is up to said Legislative Branch to approve the relevant appropriations, and collections, bills and to send them to the Chief Executive so that, after his signature, they become law.

## 3. Budget-Balance, Requirement-Authorized Expenses-Calculated Resources-Budget, Multiple Allocation Laws Bills

Now then, this budget approval process finds its most significant limitation in the constitutional text. Pursuant to Article VI, Section 7 of the Constitution, the budget must be balanced. That is, authorized expenses (appropriations) *cannot* exceed calculated resources.

Note that this is not a single piece of budgetary legislation rather multiple appropriations bills that will form the government budget for the pertinent fiscal year. Of course, the fact that there are multiple laws on appropriations does not imply that our system lacks a main piece of legislation that includes the vast majority of government operating expenses for each fiscal year. As a matter of reality, said piece of legislation is the "Joint Resolution on the General Budget," which, by constitutional requirement, "may only contain appropriations and rules for the disbursement thereof." Art. III, Sec. 17, Const. Common. of P.R., L.P.R.A., Tome1.

## 4. Budget-Dynamic Entity

At this point it is very important and essential to emphasize that the budget is a dynamic entity. Thus, although a budget (a group of appropriation laws together) is approved at the beginning of each fiscal year, it is subject to continuous modification, since each subsequent law on

appropriations law that it is approved during the fiscal year will form part of the budget for said period.

**5. Budget-Authority of the Governor to Manage the Budget**

Once the pertinent appropriations laws have been approved, the Governor is responsible for managing the budget.  With respect to the management of the budget, it should be noted that our legal system grants the Governor ample authorities.  To those ends, Article 4(e) of Law No. 147.

**6. Budget-Lack of Approval-Constitutional Budget**

In such cases, our Constitution provides that, regarding the appropriations whose effectiveness culminates at the end of the fiscal year, only those that are "necessary for the ordinary government operating expenses" will be reactivated.  Specifically, Section 6 of Article VI of the Constitution of the Commonwealth of Puerto Rico provides: When at the end of an economic year the appropriations necessary for the government's ordinary operating expenses and for the payment of interest and debt repayment during the following financial year have not been approved, the items consigned in the latest laws approved for the same ends and purposes will continue in force, in all that may be applicable, and the Governor will authorize the necessary disbursements for such purposes until the pertinent appropriations are approved.

The Constitutional Budget for purposes of Article VI, Section 6, of the Constitution is a very broad concept that is not limited to the Joint Resolution on the General Budget, but includes all of those laws that allocate items for the government's operation.

**7. Budget-Constitutional Operating Budget-Deficit Situation-Authority of the Governor to Adjust Disbursements of Public Fund-Priority Standards-Authority of Delegation of the Governor to the Office of Budget**

Art. VI, Secs. 7 and 8, Const. of the Comm., L.P.R.A., Tome 1. When the government is in a deficit situation, the Governor has the duty and the constitutional authority to, under the powers established in Section 8 of Article VI of the Constitution, adjust them with flexibility to comply with the constitutional mandate of Article VI, Section 7, of the Constitution to maintain a balanced budget.

Said adjustment is not only constitutionally compelled, but is also warranted as a practical matter, since, although the government has the authority to incur a certain amount of expenses (under the laws on appropriations), it lacks sufficient resources to disburse all of the appropriations. Therefore, Article VI, Section 8, of the Constitution requires that in deficit situations the Governor proceed, in the first place, with the payment of interest and amortization of the public debt and, then with the other disbursements, in accordance with the "standard of priorities" that is established by law.

This standard of priorities referred to in Section 8 has been implemented by Article 4(c) and (d) of Law No. 147, 23 L.P.R.A. § 104(c) and (d), which establishes:

(c) In accordance with Section 8, Article VI of the Const. of the Comm., the Governor will proceed in accordance with the following standards of priority in the disbursement of public funds, when the resources available for an economic year are not sufficient to cover the approved appropriations for said year. He may delegate them to the Director of Management and Budget Art. VI, Secs. 7 and 8, Const. of the Comm., L.P.R.A., Tome 1. When the government is in a deficit situation, the Governor has the duty and the constitutional authority to, under the powers established in Section 8 of Article VI of the Constitution, adjust them with flexibility to comply with the constitutional mandate of Article VI, Section 7, of the Constitution to maintain a balanced budget.

Said adjustment is not only constitutionally compelled, but it is also warranted as a practical matter, since, although the government has the authority to incur a certain amount of expenses (under the laws on appropriations), it lacks sufficient resources to disburse all appropriations. Therefore, Article VI, Section 8, of the Constitution requires that in deficit situations the Governor proceed, first of all, with the payment of interest and amortization of public debt and, then, with the other disbursements, in accordance with the "standard of priorities" that is established by law. This standard of priorities referred to in Section 8 has been implemented by Section 4(c) and (d) of Law. 147, 23 L.P.R.A. § 104(c) and (d).

(c) Consonant with Section 8, Article VI of the Const. of the Comm., the Governor will proceed in accordance with the following standards of priority in the disbursement of public funds, when

the resources available for an economic year are not sufficient to cover the appropriations approved for said year.  He may delegate them to the Director of Management and Budget.

## 8. Budget-Constitutional Operating Budget-Deficit Situation-Authority of the Governor to Carry Out Transfers between Items-Authority of the Governor to Make Adjustments to the Legislative Branch

The Governor has ample authority under Joint Resolution No. 927 of 2004 to carry out transfers between the appropriations for the different agencies, including the Legislature and all of its agencies. Article VI, Section 6, of the Constitution for being an appropriations law for government operating expenses, provides in its Section 2:  When the interests of the service and pressing needs of the agencies so require, as well as to ensure that at the close of each fiscal year the operations of the agencies end with a balanced budget, transfers may be made between appropriations of the same body, as well as among the appropriations made in this Joint Resolution. Excluded is the transfer of funds from appropriations allocated for the following purposes.

The adjustment made cannot be such that it prevents the Legislature from exercising its constitutional functions; which, by definition, does not occur when said Branch causes the adjustment.  It should be noted that, although it is true that the Governor has the authority to adjust the disbursements of the Legislative Branch in situations such as this one, any adjustment in the disbursements of said Branch *cannot* be such that it prevents it from exercising its constitutional function. *See, by analogy*, *Williams v. State Legislature of State of Idaho*, 722 P.2d 465, 470 n. 4 (Idaho 1986)

Pursuant to Section 7 of Article VI of the Constitution, the Chief Executive has the obligation to "balance" the deficit budget by adjusting the disbursements according to the standard of priorities provided by Section 8 of Article VI of the Constitution, as implemented by Section 4(c) and (d) of Law No. 147, 23 L.P.R.A. § 104(c) and (d).  Note that nothing in the text of the aforementioned law of priorities or in the text of the aforementioned constitutional provisions gives preferential treatment, or immunity, to the Legislative Branch in a situation of budget deficit.

*CERTIFIED TRANSLATION*                                    BY OLGA M. ALICEA, FCCI, NJITCE–S

Section 2 of the inherited Joint Resolution No. 927 of 2004 is a "disbursement rule," the same way that a rigid mandate that orders a disbursement for a specific purpose is also. The difference between the disbursement rule in Section 2 of Joint Resolution No. 927 of 2004 and the basic disbursement rule that is limited to establishing the specific use that will be given to an appropriation is that the former is more flexible than the latter. If pursuant to Section 6 of Article VI of the Constitution an item with a rigid mandate disbursement rule is transferred, by logical imperative an item with a flexible mandate disbursement rule (such as Section 2 of Joint Resolution No. 927 of 2004) is also transferred. Therefore, determining that the items are transferred as restricted, but not as relaxed by law, is contradictory. Conversely: if the flexible appropriation disbursement rules are not transferred, those mandates that restrict the discretion of the Executive would not transfer either. This would imply that only one "naked" item would be transferred, without any disbursement rule (restrictive or liberal), leaving it in an illogical vacuum and, therefore, unsustainable.

Given that the vast majority of appropriations to the Legislative Branch are subject to the disbursement rules provided in Joint Resolution No. 927 of 2004, each time they are included therein, it would be statutorily warranted for the Governor to adjust the disbursements to be made from these appropriations.

The blueprint specifically provided by our Constitution, which expressly allows proposed adjustments, in no way raises a problem of "separation of powers"; on the contrary, the best public policy, analyzed in light of this doctrine, dictates that the Governor must have the authority claimed.

As a matter of law, given that the Legislative Branch would have political and legislative remedies to resolve any potential claim, an allegation that it would be prevented from exercising its constitutional function would not be warranted. To further emphasize that, as a practical matter, the proposed adjustments would not prevent the Legislature from exercising its constitutional function, it is worth noting that said Branch receives additional funds under the item of "Joint Activities," identified in Joint Resolution No. 927 of 2004, to exercise its functions. Said item, according to the proposed adjustments, would reach $10.78 million. Thus, it is important to clarify that said item is in addition to the budget of both legislative bodies,

which would only receive minimal adjustments.  Furthermore, and of particular importance, is the fact that the Legislature is totally free to use the portion it deems necessary and convenient of the other $74.5 million from the budget of both Houses to finance the activities that are normally covered by this item, and vice versa.  Exactly how the Legislature distributes its total budget is a matter of the strict competence of the Legislature.  Determining how much money to allocate to each expense line under the item of Joint Activities and of the total budget of the Legislature (which even after the proposed adjustments would amount to a disbursement of $102.96 million) falls, as a legal issue, on the presidents of each body.

**9. Budget-Constitutional Operating Budget-Deficit Situation-Authority of the Governor to carry out Transfers Between Parties-Authority of the Governor to make Adjustments to the Legislative Branch-Problem of Separation of Powers**

The blueprint specifically provided by our Constitution, which expressly allows proposed adjustments, in no way raises a problem of "separation of powers"; on the contrary, the best public policy, analyzed in light of said doctrine, dictates that the Governor must have the authority claimed.

The balance between the Executive and Legislative Powers is outlined in our Constitution and in the interpretation made thereof by the Puerto Rican courts.  Thus, the fact that under ordinary circumstances the balance established by the Constitution promotes a better coordination between the Branches when approving a budget does not exclude that the forgers of the text choose an alternative and secondary arrangement of powers, a "Plan B," before a budget impasse or in a deficit situation. That was precisely the decision that was made. The Constitution decided this matter for all of us and, precisely to avoid reproducing the circumstances that have led to a lack of consensus, it addressed a single Branch, provisionally, not to replace the Legislative Power in cases of political or economic crisis, but to prevent the country from drifting during the storm, and carefully navigating it across clearly defined borders until reaching a safe harbor: until the deficit is balanced, "until the pertinent appropriations are approved," Art. VI, Sec. 6, Const. of the Comm., L.P.R.A., Tome 1, or both.

Thus, we see that our Constitution expressly established the scope of the authorities and obligations of the Executive Power to address certain extraordinary circumstances such as, for

BY OLGA M. ALICEA, FCCI, NJITCE-S

example, a situation of fiscal deficit like the one raised in this consultation. Therefore, the fact that the Governor exercises certain discretion as to how to handle a budget deficit situation and that, in exercising this discretion, makes public policy decisions within statutory and constitutional limits, does not place him on constitutionally improper ground. The overlap between constitutional functions is not only permitted, but is an integral part of our constitutional system.

The ambition, or hope, is that the Executive Power and the Legislative Power take advantage of those opportunities to dialogue and thus try to reach a consensus that can move the country forward. Hence, an excessively rigid view of the separation of powers has the harmful effect of inhibiting the civic conversation that the Constitution tries to encourage among the representatives of the People. The inhibition of that conversation impoverishes us all.

**10. Budget-Constitutional Operating Budget-Deficit Situation-Authority of the Governor to carry out Transfers Between Parties-Authority of the Governor to Make Adjustments to the Legislative Branch-Governor's Adjustments, Not Reviewable by a Court-Actionable Controversy-Standing-Political Issue-Legislative Discretion of the Executive Branch**

The adjustments proposed by the Chief Executive would not be reviewable by a court as they would not result in the creation of an actionable issue. It is our opinion that adjustments to the disbursements charged to the budget items of the Constitutional Budget that the Governor intends to do would not be reviewable by a court as they would not result in creating an actionable issue. First, the Legislative Branch, potential claimant in this situation, would lack standing. Second, any foreseeable claim to these effects would constitute a classic political question because: (i) the Legislature has the political and constitutional authority to evaluate the magnitude and nature of any alleged grievance and provide the pertinent remedy; and (ii) there would be no judicially manageable criteria to pass judgment on the amount of a contested adjustment. Third, as multiple courts have decided in analogous situations, an exercise by the Executive of legislative discretion expressly delegated by the Constitution is not judicially reviewable, just as it would happen with the decision to veto or sign a bill.

**11. Budget-Constitutional Operating Budget-Deficit Situation-Authority of Governor to carry out Transfers between Parties-Authority of the Governor to Make Adjustments to**

*CERTIFIED TRANSLATION*          BY OLGA M. ALICEA, FCCI, NJITCE-S

**the Legislative Branch-Non-arbitrary or Capricious Action-Presumptions of Applicable Correctness**

The Executive Branch has sufficient information to make informed, reasoned, and justified decisions as to how to make the proposed adjustments. As can be confirmed from the very text of the law, both the OMB and the Department of the Treasury have a wealth of information regarding the finances, budgets, income, and expenses of all of the government agencies, including the Legislative Branch. The duties assigned to these agencies require that they have all of the information and expertise necessary to recommend to the Governor precisely what adjustments to disbursements are most recommended. Thus, we understand that the Executive Branch is well aware, when proposing adjustments to the disbursements, that the Legislature has surpluses of more than $18 million that the previous Legislature left. It is precisely based on all of the financial and economic information available to the Executive Branch that the Governor has formulated his proposal for adjustments to the disbursements for the Legislature for an amount very close to the total of the surpluses mentioned above. For all of these reasons, we understand that it would be wrong to determine that the Governor would be acting arbitrarily.

Finally, it should be noted that the Governor's proposed action would be protected by presumptions of correctness. On its part, Rule 16 of Evidence establishes a number of presumptions. In particular, it is presumed "[t]hat the duties of a position have been fulfilled regularly" and "[t]hat the law has been obeyed." 32 L.P.R.A. App. IV, R. 16(15) and (32). These two assumptions would be applicable to the situation object of this consultation. In fact, absent a display of evidence to the contrary, they would compel a court to determine that the Governor acted in accordance with the law and within his sound discretion in making the proposed adjustments to the disbursements charged to current budgetary appropriations.

Hon. Aníbal Acevedo Vilá

Governor

Commonwealth of Puerto Rico

Strength

San Juan Puerto Rico

*CERTIFIED TRANSLATION*                               BY OLGA M. ALICEA, FCCI, NJITCE-S

Dear Governor,

## I. *INTRODUCTION*

The handling of managerial and administrative matters in the government involves paying attention to countless peculiarities that distinguish public endeavors from analogous procedures that form part of the daily evolution of an enterprise in the private sector. In particular, the preparation and management of a government budget are framed within a series of important characteristics and regulations that stem from the very nature of what a government system is. In this sense, it is essential to understand that the budget of a government entity as is the Commonwealth of Puerto Rico, is, after all, a creation of law, and it exists only by virtue of the legal and political legitimacy provided by our legal and social system. Thus, when it comes to talking about the budget of the Commonwealth of Puerto Rico, we must submit to the manner in which the Constitution of the Commonwealth of Puerto Rico has decided, it is worth repeating, to constitute our government blueprint and, in particular, to the manner in which our Constitution, and the statutes and other legal authorities promulgated thereunder, regulate the approval by the different components of the democratically elected government from the expenses to be covered with the public funds collected from the people by that same government.

In this opinion, we delve into a multiplicity of issues relevant to the budgetary law that governs the Commonwealth of Puerto Rico, pursuant to the public policy that was established in our Constitution, and in the other legal authorities promulgated thereunder. Thus, we explain what, as a matter of law, amounts to a government budget, and the most important provisions of law that regulate its administration. In more specialized terms, we also address countless issues relevant to some specific factual assumptions, such as failure to approve a budget at the start of a new fiscal year, and the relative duties and authorities that our Constitution delegates to government actors when the government faces a budgetary deficit. In addition, we address various other issues regarding constitutional law relevant to the exercise of such duties and authorities, such as the doctrine of separation of powers and various doctrines relating to the actionability of potential disputes regarding such exercise.

Finally, this opinion is intended to provide advice to the Governor on the courses of action that would be consistent with the implementation of constitutional legal positions that benefit the

*CERTIFIED TRANSLATION*                                  BY OLGA M. ALICEA, FCCI, NJITCE-S

long-term public interest.  In it, we have taken on the task of establishing rules and proposals that agree both with our best interpretation of the intention that embodies our Constitution and with common sense and a tempered sense of the weights and balances and that should govern in a republican system of government such as ours, for the sake of protecting the people from tyranny and government abuse by any of the components thereof.

## II. *APPLICABLE LEGAL FRAMEWORK*
### *A. Definition of the Issue*

The issues raised in this consultation are framed within a series of fundamental concepts of Puerto Rican budgetary law the understanding of which is crucial.  Since our jurisdiction lacks a legal culture that cultivates this specialized discipline of law, first we will offer a description of certain basic understandings. The historical context in which this consultation takes place brings together two novel events that with wise foresight were contemplated by our Constitution: on the one hand, the lack of approval of budgetary appropriations at the end of a fiscal year; and, concurrently, the existence of a budget deficit. This situation requires considering two essential questions that establish the pertinent constitutional framework: first, to which government institution has the Constitution delegated the power to make the necessary disbursements to maintain the constant operation of the government?; and, secondly, especially in the context of deficit, how much flexibility does said institution constitutionally have in order to comply with the constitutional mandate to maintain a balanced budget?  The answers to both questions are explicitly provided by the Constitution of the Commonwealth of Puerto Rico. Let us see.

### *B. The legal concept of "budget" in our legal system*
### *and the approval process under ordinary circumstances*

#### 1. *The term budget is a legal concept that refers to the set of laws on appropriations that are, or continue, in effect for a particular fiscal year*

The term "budget" is a **legal** concept that refers to the set of laws on appropriations that are, or continue, in effect for a particular fiscal year.  *See, Diary of Sessions of the Constitutional Convention* 889 ("The budget includes all of the laws on appropriations, that do not necessarily have to be done in a single piece of legislation, they do not necessarily have to be done through a bill, and that do not even have to be done through, in the course of a legislative session.")  Sec.

*CERTIFIED TRANSLATION*                                    BY OLGA M. ALICEA, FCCI, NJITCE-S

Just. Op. No. 13 of 1984 at p. 85 ("The concept 'budget' … includes all of the laws on appropriations..."); *Hernández Torres v. Hernández Colón*, 129 D.P.R. 824, 859 (1992) (Dissenting opinion of the Associate Justice Mr. Negrón García) ("According to the Constitutional Assembly, the budget is not a unitary law, rather it comprises all of the laws on appropriations.").

The term "appropriation," on its part, is an equally **legal** concept that refers to the "amount of money authorized by the Legislature for the purpose of carrying out a specific activity or achieving certain goals." *See,* Article 3 of Law No. 230 of July 23, 1974, *as amended*, known as the "Accounting act," 3 L.P.R.A. § 283b. *See, also, New England Division of American Cancer Society v. Commissioner of Administration*, 769 N.E.2d 1248, 1256 (Mass. 2002) ("We have defined the power of appropriation as the authority 'to set apart from the public revenue a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object and for no other.' … It is beyond question that [t]he power to appropriate money of the Commonwealth is a legislative power.")[1] An appropriation is, in short, a joint law or resolution that authorizes the Executive Branch to disburse and spend money to meet certain specific objectives provided by the Legislature.

On the other hand, the term "disbursement" refers to the "[d]elivery of a portion of money and cash" or to an "outlay, expense, [or] cost." *See, Dictionary of the Spanish Royal Academy* (21st Ed.). *See, also, Black's Law Dictionary* (8th Ed. 2004) ("Disbursement- The act of paying out money, commonly from a fund or in settlement of a debt or account payable."). Disbursements are, therefore, the outlaying of funds that the Executive Branch in effect does in conformity with the legislated appropriations.

---

[1] For purposes of linguistic precision, it is clarified that the English concept of "appropriation" refers to "[a] legislative body's act of setting aside a sum of money for a public purpose. If the sum is earmarked for a precise or limited purpose, it is sometimes called a specific appropriation." *Black's Law Dictionary* (8th ed. 2004). This is equivalent to the concept of legal "appropriation" referring to authorizations made by the Legislative Branch to the Executive Branch to disburse money for certain purposes. The equivalence of these concepts is not controversial, and it was understood as such by the Constitutional Assembly. *See, Diary of Sessions* at p. 899 (referring to the constitutionally discarded concept of *General Appropriations Bill* to describe a particular form of law on appropriations).

*CERTIFIED TRANSLATION*                    BY OLGA M. ALICEA, FCCI, NJITCE–S

Ordinarily, if sufficient resources exist, it is appropriate to disburse all of the funds authorized by the pertinent laws on appropriations. However, in the absence of sufficient resources, it is necessary to restrict authorized disbursements. Of course, in such cases the appropriation remains unaltered and may be paid in full once there are sufficient resources.

**2.** *Ordinarily, the approval of a budget is a shared task between the Executive and Legislative Branches that includes the approval of a set of laws during the course of a fiscal year that authorize the Executive Branch to disburse funds for certain purposes and that generate revenue*

The "budget," as a set of laws on appropriations, is approved, essentially, like all other laws; that is, pursuant to the provisions of Section 19 of Article III of the Constitution, relative to the approval of bills by the Legislature and the signing or vetoing thereof by the Governor. However, due to its complexity, its processing follows a very particular process. This process begins with the presentation of a recommended budget, consisting of "draft appropriation laws and to generate revenue,"[2] by the Governor to the Legislature, pursuant to Article IV, Section 4, of the Constitution of the Commonwealth of Puerto Rico. This section establishes:

The duties, functions, and responsibilities of the Governor will be:

........

To present to the Legislature, at the beginning of each ordinary session, a message regarding the status of the State and also to submit a report on the conditions of the Puerto Rico Treasury and the proposed disbursements for the following financial year. Such report will contain the data necessary for the formulation of a program of legislation.

Art. IV, Sec. 4, Const. of the Comm., L.P.R.A., Tome 1.

In addition, the budget approval process has been statutorily delimited by Article 4 of Law No. 147 of June 18, 1980, *as amended*, known as the "Organic Act of the Office of Management and Budget," 23 L.P.R.A. § 104, which provides that the Governor will submit to the Legislature, among other things, "[t]he appropriations and expenses that are recommended or

---

[2] *See,* Section 4 (b) of Law No. 147 of June 18, 1980, *as amended*, 23 L.P.R.A. § 104(b).

BY OLGA M. ALICEA, FCCI, NJITCE–S

proposed charged to all of the calculated resources." Art. 4(a)(7) of Law No. 147, 23 L.P.R.A. § 104(a)(7). Specifically, said article establishes, in pertinent part:

a) Consonant with Article IV, Section 4 of the Constitution of the Commonwealth of Puerto Rico, the Governor will submit to the Legislature at the beginning of each ordinary session an Annual Budget of Capital Improvements and Operating Expenses of the Commonwealth, its instrumentalities and public corporations, charged to the General Fund, the special funds, contributions from the United States Government, bond issues and loans, equity of the public corporations, and any other sources of revenue, indicative of the objectives and government programs that the Chief Executive proposes for the following fiscal year, based on the orientation and longer-term goals of the Comprehensive Development Plan, the Four-Year Investment Program, and the Land Use Plan, formulated and adopted by the Planning Board.

The budget must contain the following information, in the form, extent, or detail that the Governor deems convenient:

(1) A message from the Governor setting forth his programmatic, fiscal, and

Budgetary recommendations.

(2) A general statements of the objectives, plans, and programs in which the budget is framed as well as the manner in which, with the resources recommended in the budget document, these objectives, plans, and programs are achieved.

(3) Descriptions of the functions, programs, and activities of the Government and its agencies, including, when feasible or convenient, information as to the costs of current and proposed programs, of the achievements reached and of the managerial improvements carried out and in projects.

(4) All resources and expenses of the Government of the Commonwealth of Puerto Rico and of its instrumentalities and public corporations, during the last fiscal year ended.

(5) **An estimate of all of the resources expected to be received during the fiscal year in force when submitting the budget**, and the estimated expenses to be incurred during the same period, of the Government of the Commonwealth and of its instrumentalities and public corporations.

(6) Calculations of all of the probable resources of the Government of the Commonwealth and of its instrumentalities and public corporations, regardless of their origin, during the following fiscal year according to:

   (A) the laws existing as of the date the budget is submitted;

   (B) the legislative proposals that affect such revenues, if any;

   (C) the federal programs in effect, and

   (D) for other concepts.

**(7) The appropriations and expenses that are recommended or proposed charged to all of the calculated resources**, … except the Legislature and the Office of the Comptroller of the Commonwealth of Puerto Rico, which will be exempted from submitting budgetary requests, for which the Governor will include in the budget that he recommends, a budget for ordinary operating expenses equal to the one in force…. Starting with fiscal year 2003-2004, the Judiciary will be assigned an amount equivalent to three point three percent (3.3%) of the average of the total amount of the annual revenues obtained according to the provisions of the laws of the Commonwealth of Puerto Rico and deposited in the General Treasury Fund of Puerto Rico in the two (2) economic years prior to the current year…. Recommendations and requests for appropriations of quantities included in the draft general budget for each government agency will be supported in the budget that is submitted by detailed calculations, by expense items, and by programs or activities.

*CERTIFIED TRANSLATION*                                    BY OLGA M. ALICEA, FCCI, NJITCE–S

(8) The financial statements and any other information and economic data including the budgets of the public companies and corporations that in his opinion are necessary or convenient, in order to make known in as much detail as possible:

(A) The economic status of the State Government at the end of the last fiscal year;

(B) its fiscal status calculated at the end of the current fiscal year, including all balances available to be spent, and

(C) its estimated fiscal status at the end of the following year, if the proposals contained in the budget are adopted.

(b) The Governor will submit the draft laws on appropriations and to generate revenue, in accordance with the budget that he recommends, during the Legislature's ordinary session within the term established by law.

Art. 4 of Law No. 147, 23 L.P.R.A. § 104 (emphasis ours).

In drawing up the government budget, two essential steps must be taken: (i) estimate the **resources** expected to be received during the fiscal year for which the budget is submitted (which is done by the Department of the Treasury)[3]; and (ii) prepare **appropriations** (authorized expenses)[4] charged to those resources calculated by the Department of the Treasury (which is ultimately carried by the Legislative Branch and the Executive Branch when approving the

---

[3] When estimating all of the resources expected to be received during the pertinent fiscal year when submitting the budget, the Governor has the specialized expertise of the Secretary of the Treasury, who, according to the law and the Constitution, must advise him on all matters under his responsibility. Art. IV, Sec. 5, Const. of the Comm., L.P.R.A., Tome 1 (the Secretary of the Treasury is a member of the Constitutional Council of Secretaries); 3 L.P.R.A. App. VII, Art. II(a). On the other hand, it is the Secretary of the Treasury who, as a matter of law, has been delegated the authority to manage everything related to collections of the Commonwealth of Puerto Rico. *See,* Internal Revenue Code of 1993, 13 L.P.R.A. §§ 8001-9750.

[4] These new appropriations that the Governor proposes when presenting a budget, generally, are in addition to other pre-existing laws that allocate funds for an indefinite period of time and that, by their own terms, remain in force during any fiscal year that begins. These types of indefinite time appropriation laws are those that later on we call "inescapable laws" and that, unless they are repealed, remain in force year after year.

pertinent appropriation and collections laws).[5]    Once the Governor submits the recommended budget to the Legislature, it is up to said Legislative Branch to approve the pertinent appropriations and collections bills, and remit the same to the Chief Executive so that, upon the signing thereof, they become law.

### 3. *By constitutional mandate, the budget must be balanced*

Now then, this budget approval process finds its most significant limitation in the constitutional text.  Pursuant to Article VI, Section 7 of the Constitution, the budget must be balanced:

> The appropriations made for an economic year cannot exceed the total resources calculated for said fiscal year, unless the imposition of sufficient taxes to cover such appropriations is provided by law.

**That is, the authorized expenses (appropriations)** *cannot* **exceed the calculated resources.** At this point, it is pertinent to briefly delve into various important matters of law in order to have a clearer picture of the substantive scope of the concept of "budget,"

### 4. *The budget is made up, not of a single law, but of a set of laws enacted during the course of a fiscal year that authorize the Executive Branch to disburse funds for certain purposes*

As previously mentioned, once the Governor submits the recommended budget to the Legislature, it is up to said Legislative Branch to approve the pertinent appropriations and collections bills, and to remit them to the Chief Executive so that, upon the signing thereof, they become law.  Note that this is **not** a single piece of budgetary legislation rather multiple bills of laws on appropriations that will form the government's budget for the pertinent fiscal year. Of course, the fact that there are multiple laws on appropriations does not imply that our system lacks a main piece of legislation that includes the vast majority of government operating expenses for each fiscal year.  As a matter of reality, said piece of legislation is the "Joint

---

[5] The Legislature and the Governor also enact new laws and joint resolutions after the preparation of the budget at the beginning of the fiscal year that, therefore, vary the total resources available during the fiscal year, as we will discuss in more detail below.

*CERTIFIED TRANSLATION*                              BY OLGA M. ALICEA, FCCI, NJITCE-S

Resolution on the General Budget," which, by constitutional requirement, "may only contain appropriations and rules for the disbursement thereof." Art. III, Sec. 17, Const. of the Comm., L.P.R.A., Tome 1.[6]

It is worth noting that, due to the extent of their effectiveness, there can be two classes of appropriation laws: (i) **definite** extent; or (ii) **indefinite** extent. That is, the Legislature can make an appropriation with a limited duration (for example, for a specific fiscal year) or make appropriations over time indefinitely.

The first type of appropriation is made through a "joint resolution," because it does not have a permanent term. *See,* Section 1 of Law No. 2 of March 4, 1953, 2 L.P.R.A. § 200 ("All legislation that will lose its effectiveness when the work is carried out, or the purpose pursued is fulfilled, will be considered by the Legislature through a joint resolution and will not form part of the permanent statutes of Puerto Rico. These resolutions will follow the same process as bills."). This way, and by way of example, a joint resolution that allocates funds for the project of courtrooms specializing in controlled substances ("Drug Courts"), Joint Resolution No. 1110 of 2004, is an appropriations law with a delimited effectiveness limited to a particular fiscal year. Likewise, the Joint Resolution on the General Budget is a law of appropriation of a definite time frame.

On its part, the second type of appropriation extends over time indefinitely and does not require further legislation to remain in force. It is, therefore, a law that is in force and that must be followed until it is repealed. Some examples of this second class of appropriations are: the appropriation provided for the Judiciary pursuant to Law No. 286 of December 20, 2002, which establishes the formula to set the budget of said Branch; or appropriation provided by Law

---

[6] Pursuant to the aforementioned constitutional provision, this Joint Resolution of the on the General Budget General Budget cannot contain anything other than "appropriations and rules for the disbursement thereof." Thus, for example, the laws that authorize the Secretary of the Treasury to impose taxes to collect additional revenues must be contained in independent laws. Since these appropriations cannot exceed the calculated resources pursuant to the constitutional mandate to maintain a balanced budget, if the political Branches wish to incur expenses that exceed the calculated resources, the Constitution requires that they legislate to obtain more collections through taxes - that is, "that the law provide for the imposition of sufficient taxes to cover said appropriations." Art. VI, Section 7, Const. of the Comm., L.P.R.A., Tome 1.

No. 62 of February 20, 2004, which provides for a lifetime pension for life for Carmen Belén Richardson.

### 5. *The budget is a dynamic entity that changes during the course of the fiscal year*

**At this point it is very important and essential to highlight that the budget is a dynamic entity.**  Thus, although at the beginning of each fiscal year a budget is approved (a group of laws on appropriations together), **the same is subject to continuous modification, since each subsequent law of appropriations that is enacted during the fiscal year will form part of the budget for said period**.  *See, Diary of Sessions*, at p. 889.  Thus, although the total budget for a fiscal year at the beginning thereof (July 1) is of X amount, when the Legislature and the Governor enact additional appropriation laws during the course of said fiscal year, the budget increases.[7]     Therefore**, the budget for a fiscal year, at the end of the year, will be fundamentally different from the initial budget, precisely due to all these new appropriations that are approved during the course of that year**.[8]

Once the pertinent laws on appropriation laws have been enacted, the Governor is responsible for managing the budget. With respect to the management of the budget, it should be noted that our legal system grants the Governor ample authorities.  To those ends, Article 4(e) of Law No. 147 provides:

> (e) With respect to the management and control of the budget, the Governor will have the
> following authorities that may be delegated to the Director of Management and Budget:

---

[7] It is worth noting that this type of situation is precisely the one that lends itself, and as a matter of fact has been lending itself for decades, to cause a deficit when the Legislature fails to comply with Section 7 of Article VI of the Constitution and does not approve collections measures.  This unfortunate reality that legislation with a fiscal impact is enacted, but without providing for the increase in resources necessary to pay for such an impact, continues even today.  *See,* S. B. 1143 of October 13, 2005 (draft of administration proposing to establish as government public policy that laws cannot be approved that impose financial obligations on government entities without identifying and allocating resources to meet these obligations, and requiring that the OMB and the Department of the Treasury issue a report on the "Fiscal Impact" of any legislative measure, among other matters).

[8] Although it will be fully cited below, it is appropriate to include at this point the words of delegate Mr. Negrón López in the debates of the Constitutional Assembly: "The budget encompasses all of the laws on appropriations, which do not necessarily have to be done in a single piece of legislation, which does not necessarily have to be done through a bill, and which do not even have to be done through, in the course of a legislative session."  *Diary of Sessions,* at p. 889.

BY OLGA M. ALICEA, FCCI, NJITCE-S

(1) Approve the budget details, through executive budgets, of the appropriations included authorized in the Joint Resolution on the General Budget or in any other laws; and from resources available in special funds of state origin or of federal origin. These details may be prepared based on specific fiscal years or based on quotas for certain periods of time within a fiscal year.

(2) To amend the budgetary details as necessary without affecting the total amount allocated to the organizations, with the exception of the provisions in subsections (c) and (d) of this section or when other laws provide otherwise.

(3) Approve and endorse, through executive budgets or authorizations of positions and expenses, the special authorizations to incur expenses and create positions, versus any funds or appropriations, regardless of their origin. Authorizations not covered in the executive budgets indicated in clause (1) of this subsection will be deemed to be special authorizations.

(4) Determine which vacant positions or which ones that can be vacated later, should not be filled during the period of time that may be necessary.

(5) Establish budgetary reserves and restrict the resources available to the agencies in the manner deemed pertinent when in the execution and control of the budget it is deemed necessary, regardless of the circumstances established in subsections (c) and (d) of this section [, relative to deficit situations].

(6) Include in the budgetary details, charged to the different sources of revenue, the items necessary for the payment of debts incurred in previous years by the agencies and reduce by those amounts the resources available to the agency for the fiscal year in which the adjustment is made. The exercise of this function will not be applicable to the agencies or companies that operate with an independent treasury, or those agencies that are provided with appropriations over which the Office does not exercise budgetary control, which will take the appropriate measures to satisfy the debts of previous years.

(7) Authorize the Secretary of the Treasury to anticipate resources to the agencies charged to the Fund General for obligations or disbursements of programs with contributions from the United States Government approved but pending receipt and for the payment of permanent improvements contracted in the construction process, while new appropriations become effective.

23 L.P.R.A. § 104(e) (emphasis ours).

The preceding discussion describes, in general terms, the budget approval process under ordinary circumstances. In this context, absent other constitutional problems, the budgetary process is a shared process in which the Legislature and the Executive Branch participate, leaving the execution thereof in the hands of the Governor, and the establishment of essential public policies in the hands of the Legislative Branch.

### C. Lack of Approval of a Budget

**1. *When a budget is not approved at the end of a fiscal year, the Constitution provides that those laws on appropriations for expenses of government operations in force at the end of said fiscal year will be reactivated to prevent the halting the ongoing essential government functions***

As we have seen, the budget is made up of **all** of the laws on appropriations. Now then, what happens when in a specific year the political process fails to formulate a budget? In such cases, our Constitution provides that, with regard to the appropriations whose effectiveness concludes at the end of the fiscal year, **only** those that are "necessary for the ordinary of the government's operations" will be reactivated. Specifically, Section 6 of Article VI of the Constitution of the Commonwealth of Puerto Rico provides:

When at the end of an economic year the necessary appropriations have not been approved for ordinary government operating expenses and for the payment of interest and amortization of the public debt during the following financial year, the items included in the last laws approved for the same ends and purposes, in all that is applicable, will continue to be in force and the Governor will authorize the necessary disbursements to those ends until the pertinent appropriations are approved.

*CERTIFIED TRANSLATION*                        BY OLGA M. ALICEA, FCCI, NJITCE-S

Art. VI, Sec. 6, Const. of the Comm., L.P.R.A., Tome 1.

As can be seen, if a budget is not approved, the Constitution orders that all of the "items included in the last laws enacted [for ordinary government expenses]" remain in force. *Id.* Therefore, when identifying this Constitutional Budget, the main task is to determine which are the latest appropriations laws for these purposes.  It should be noted that the Constitution specifically and textually establishes that "**the last laws**" on appropriations are the ones that will remain in force in these situations. *Id.* (emphasis ours).  Thus, the budget for the previous fiscal year pertinent at the time of determining the Constitutional Budget for the year that begins is **the one that is in force** *at the end of* the previous fiscal year (June 30 of the current calendar year), and **not** the one in force at the beginning of the same (July 1 of the previous calendar year).

**2.** *The Constitutional Budget for purposes of Article VI, Section 6,*
*of the Constitution, is a very broad concept that is not limited to the*
*Joint Resolution on the General Budget, but includes all*
*of those laws that allocate items for the operation of the government*

On the other hand, it is essential to define what the Constitution implies when it speaks of those items for "government operating expenses."  From the debates of the Constitutional Convention it is clear that the phrase "ordinary government operating expenses" is *not* limited to the Joint Resolution on the General Budget.  In considering the text of Section 6, a specific proposal of delegate Mr. Iriarte was discussed so that "all of the necessary government expenses for an economic year [be] included in ... a law all, in a law so that they are perfectly known." *Diary of Sessions,* at p. 888. This proposal was rejected, expressly discarding the idea of a *General Appropriations Bill* that encompasses each and every one of the government expenses. *Id.* at pp. 888-89, 899.

This proposal sparked an illuminating discussion as to **which** laws constitute part of the budget that is transferred in the event that the necessary appropriations for the government's operation after one fiscal year are not approved. Delegate Mr. Negrón López emphasized the predominant view that prevailed in this debate:

BY OLGA M. ALICEA, FCCI, NJITCE-S

I wish to respond to delegate Mr. Iriarte explaining that it is not necessary, it does not seem either necessary or advisable to me that the constitution state that the budget laws, the appropriations, will be included in a single law. I mean, it is not the most convenient as a constitutional provision to establish that the budget must be contained in a single law. The term "budget" is a term that is very vague. In Puerto Rico it has been used to signify the law that allocates funds for the ordinary expenses of the government's operation. However, the government program contained in the budget message to which Mr. Iriarte alludes is something that includes much more than the mere law that allocates expenses for the government's ordinary operation. **The budget includes much more than the mere law that allocates the expenses for the government's ordinary operation. The budget encompasses all of the appropriations laws, which do not necessarily have to be done in one piece of legislation, which do not necessarily have to be done through a bill, and which do not even have to be done through, in the course of a legislative session.** If we adopt a provision such as the one expressed by delegate Mr. Iriarte and the Legislature forgot by chance to include the item for any function or public need in the general budget law, there would be a constitutional obstacle that would prevent the enactment of a separate law. If we decide to start a program on spending of the Government of Puerto Rico, of disbursements of public funds for any purpose after if the budget had been included, there would be a constitutional obstacle to making a supplementary budget law, a different law of appropriations.

*Id.* At p. 889 (emphasis ours). *See, also, id,.* at p. 896; Sec. Just. Op. No. 13 of 1984. On the other hand, and regarding the substantive scope of the laws of appropriations that are transferred to the following year, upon approval of an amendment relative to Article III, Section 17, of the Constitution, which deals with the content of the general budget law, it was clarified that the concept of budget includes "**not only ordinary operating expenses, but also permanent improvements, appropriations to public enterprises, and other appropriations, including, of course, the principal and interest of the public debt, so that a better budgeting technique can be used**." *Diary of Sessions,* at p. 2009 (emphasis ours).

CERTIFIED TRANSLATION                                BY OLGA M. ALICEA, FCCI, NJITCE-S

In short, the Constitutional Budget, for the purposes of Article VI, Section 6, of the Constitution is a very broad concept that is not limited to the Joint Resolution on the General Budget, but that includes all of those laws that allocate items for the government's operation. This is about a long drawn out view of what the budget is, which, in turn, reflects the main concern of this constitutional clause that, faced with an impasse between the government's political powers, the Executive Branch has those budgetary appropriations destined to address the actual needs of the population, according to the priorities established in the most recent pacts democratically agreed upon between the political branches. A restricted view of the Constitutional Budget would be contrary to the objective of Section 6, which is "not to let the government's operations be left hanging while the Legislature acts with the powers that it has to those ends." *Diary of Sessions*, at p. 890.

For this reason, it has been indicated that Article VI, Section 6 of the Constitution "refers to the concept of ample budget, that is, **to the set of all of the approved appropriations, which form part of the government's program, according to the mission that the government is expected to fulfill and that are necessary for the maintenance and operation thereof and the payment of public debt**." Op. Sec Just. No. 13 of 1984 at p. 86 (emphasis ours).[9]

On the basis of the foregoing, when the provisions of Section 6 are activated, both the last Joint Resolution on the General Budget approved and all of those special laws that allocate funds necessary for the maintenance and operation of the government and that were in force during the previous fiscal year will recover their effectiveness. This transcends a limited concept of what the government's "ordinary" expenditures are, and includes a broader range of laws that allocate items to fulfill the functions of a modern government.

---

[9] *See,* Executive Order of June 30, 1984, Administrative Bulletin No. 4308, for an example of the items that were reactivated from the budget of fiscal year 1983-1984 for fiscal year 1984-1985.

**3.** *The appropriations that comprise the Constitutional Budget stem from both*
*The laws in effect by their own terms and from those of definite extent*
*that are reactivated pursuant to the Constitution*

Pursuant to the preceding criteria, it is possible to identify the following categories of budget appropriations laws that, if a budget is not approved, must remain in force.

### a. *Laws of Indefinite Extent*

Laws of indefinite extent, which can be referred to as "inescapable," are laws on appropriations of items that by their own terms are valid during the fiscal year that begins. These laws would be part of the budget regardless of whether there is a stalemate to the approval thereof. This group includes all of the laws that: (i) allocate amounts by formulas repetitively for an indefinite period of time (such as, for example, the laws that allocate money to the University of Puerto Rico, the Budgetary Fund, the Emergency Fund, to the Judiciary, and to the municipalities); (ii) allocate specific annual monetary amounts indefinitely; (iii) allocate items in a calendar of years (such as Joint Resolution No. 557 of 2000, which establishes a payment plan for the debt of the University of Puerto Rico); and (iv) allocate money in contingent amounts to other factors (such as, for example: laws that legislate wage increases, but whose amount depends on the number of employees, *see,* Law No. 168 of July 12, 2004; and the laws that make an indefinite and permanent appropriation to guarantee debt service, as required by the Government Development Bank or by the bondholders, *see,* Law No. 216 of August 19, 2004). Note that Article VI, Section 6 of the Constitution *does not* operate in this item, since the laws are valid on their own terms without the need for a constitutional boost.

### b. *Laws of Definite Extent*

### i. The Joint Resolution on the General Budget

Although this law has a limited effective term and, under normal circumstances, it would lack the force of law as of the end of a fiscal year, when a general expense budget is not approved, the same is transferred to the following year and forms part of the Constitutional Budget, since it is the paradigmatic case of a law on appropriations that contains items for the government's operation.

## ii. Special Allocation Laws Enacted for a Specific Fiscal Year

Under this category are all of the special appropriations laws enacted for a specific fiscal year that, although its effectiveness would also conclude at the end of the fiscal year, they benefit from the constitutional boost, transferring to the following fiscal year for being laws that allocate items "for the ordinary expenses of government operation" - this phrase conceived with the latitude selected by the delegates of the Constitutional Convention, as discussed. This group of laws includes a variety of joint resolutions that generally consist of special appropriations for the operation of government agency programs. *See, for example*, Joint Resolution No. 1110 of 2004 (allocating money to the "Drug Courts" program).

### 4. *By virtue of the Constitution, the law on appropriations continues to be in force in its entirety, and not merely the amount provided*

It should be noted that, by virtue of the Constitution, upon reactivation of an appropriation by virtue of the Constitution, the law on appropriations continues to be inforce **in its entirety**, and not merely the amount provided, since the disbursement rules for each appropriation are an integral part thereof. See, by analogy, Section 17 of Article III of the Constitution, which, in the case of the "general budget law," develops the rules of disbursement as an integral part of the appropriation. ("The general budget law may only contain appropriations and rules for the disbursement thereof.").  Art. III, Sec. 17, Const. of the Comm., L.P.R.A., Tome 1.

### D. *For fiscal year 2005-2006, a budget was not approved, therefore, by operation of law, a Constitutional Budget entered into effect as provided in Section 6 of Article VI of the Constitution*

During the current fiscal year, the Joint Resolution on the General Budget was not approved for fiscal year 2005-2006, House Joint Resolution No. 445 of 2005. This caused that, by operation of law, the activation of Section 6 of Article VI of the Constitution. Therefore, at July 1, 2005, a Constitutional Budget entered into effect which, charged to the General Fund, totaled $9,489 million. *See,* Exhibit A. It was comprised of the following laws on appropriations:

(i) The  Joint Resolution on the General Budget for fiscal year 2004-2005, whose appropriations amounted to approximately $5,522 million.

*CERTIFIED TRANSLATION*                                    BY OLGA M. ALICEA, FCCI, NJITCE-S

(ii) The laws of indefinite or "inescapable" extent, which include all of those laws on appropriations of items that by their own terms are valid during fiscal year 2005-2006 and that, under any scenario, would be part of the budget, unless the Joint Resolution on the General Budget, or another law, repeals or amends them. The appropriations contained in these laws amounted to approximately $2,504 million.

(iii) All of those laws approved during fiscal year 2004-2005 that, although their effectiveness normally would end on June 30, 2005, by constitutional provision are reactivated to the following fiscal year as these are laws that allocate items "for the ordinary expenses of the government's operation." The appropriations contained in this group of laws amounted to $1,462 million, approximately.

Now then, and as we mentioned, since the budget is a dynamic entity and that nothing impedes that, having inherited the previous budget, new appropriations laws or **substitutes** of the previous ones, as of August 30, 2005, be enacted, the "portrait" in the time of a dynamic budget reveals that the current appropriations charged to the General Fund total $9,284 million, approximately. *See,* Exhibit A.

Therefore, when identifying the laws that make up the Constitutional Budget, *see* Exhibit A, we must bear in mind exclusively the guiding criteria of laws that allocate items for the government's operating expenses. In this sense, the Constitutional Budget identified in Exhibit A of this opinion **excludes** all of those laws that do not meet this essential legal criterion. Therefore, after a comprehensive **legal** analysis of more than a thousand (1,000) laws and joint resolutions, in addition to the Joint Resolution on the General Budget and those unavoidable laws that have their own validity, the Constitutional Budget that we identify in Exhibit A of this opinion only includes those laws that authorize disbursements for government operation expenses. Only these receive the constitutional boost and they were reactivated this year.

**1. *The Determination as to what is the Constitutional Budget***
***is a Sheer Question of Law***

*CERTIFIED TRANSLATION*                                    BY OLGA M. ALICEA, FCCI, NJITCE-S

As is evident from our previous discussion, the determination as to what is the Constitutional Budget is a sheer question of law that only has to do: (i) with the substantive criteria used to identify the laws that are transferred; and (ii) with the legal evaluation of whether, in fact, the laws identified meet those criteria.  The Constitutional Budget having been identified by the Executive Branch, it would be up to anyone who wished to question it to affirmatively demonstrate that this is not the correct Constitutional Budget, either because: (i) the criterion used is not the one imposed by the Constitution; or (ii) when identifying the laws the criterion was not used correctly. *See,* Rule 10 (B) of the Evidence, 32 L.P.R.A. Ap. IV R. 10(B) ("The obligation to present evidence falls first on the party that sustains the affirmative in the question at issue"); *Ibáñez v. Mills*, 114 D.P.R. 42, 48 (1983) (the burden of proof falls on the plaintiff); Rule 16 (15) of the Rules of Evidence, 32 L.P.R.A. Ap. IV R. 16 (15) (it is presumed "[t]hat the duties of a position have been regularly fulfilled"); Rule 16 (32) of the Rules of Evidence, 32 L.P.R.A. Ap. IV R. 16 (32) (it is presumed "[t]hat the Law has been complied with").

## 2. *By definition, the Constitutional Budget is partial and insufficient*

On the other hand, it should be clarified at this point that, since what is transferred are the **laws on appropriations**, the Constitutional Budget is made up of reactivated legislative pieces and does not include those **actual** government expenditures that can reasonably be anticipated. In this sense, whenever the country's actual needs normally increase (since the level of anticipated spending increases year after year due to the natural growth of the obligations of the public entities and due to the natural increase in the needs of the population), the remedy that the Constitution provides for the budgetary stalemate is partial and insufficient. The Constitution only provides for the reactivation of approved legal appropriations to meet the needs of the **previous year** and, therefore, the Constitutional Budget reflects outdated economic needs of a specific moment located in a different time and space. To this end, it is worth noting that, even taking into account a series of proposed cuts and the elimination of various agencies (savings that required the enactment of legislation), the actual needs of the government for the current fiscal year were estimated at $9,684 million in the budget recommended by the Governor. *Please* <http://www.presupuesto.gobierno.pr/Tomo_Iensajes/gobernador.htm>. However, the inherited Constitutional Budget is much less.

CERTIFIED TRANSLATION                    BY OLGA M. ALICEA, FCCI, NJITCE-S

### 3. *The inherited Constitutional Budget for fiscal year 2005-2006 is in deficit, according to the technical determination regarding the amount of available resources made by the Secretary of the Treasury*

Now then, and as we mentioned, since the budget is a dynamic entity, and that nothing impedes that, having inherited the previous budget, the enactment of new appropriations laws or **substitutes** of the previous ones, as of August 30, 2005, the "portrait" in the time of a dynamic budget revealed that the current appropriations charged to the General Fund totaled $9,284 million, approximately.[10] *See,* Exhibit A. On the other hand, it is important to emphasize that the Determination of the resources available for a fiscal year is a technical one that the laws and the Constitution have delegated to the Secretary of the Treasury.[11] In this sense, the extensive and historical technical expertise of the Department of the Treasury in those complex tax and accounting matters that allow it to determine with a reliable degree of certainty which are the resources available to the Commonwealth of Puerto Rico deserve deference. See, on the deference to administrative expertise, James Landis, *The Administrative Process* (1938); *Luce & Co. v. Minimum Wage Board*, 62 D.P.R. 452 (1944); *Hilton Hotels v. Minimum Wage Board*, 74 D.P.R. 670 (1953), *López Salas v. Planning Board*, 80 D.P.R. 646 (1958).

Pursuant to such expertise, the Department of the Treasury has calculated that the available resources for this fiscal year only amount to $8,945 million. This amount is not enough to cover the budgetary appropriations that have remained in effect (or have become effective) ($9,284 million). Thus, in order to comply with the constitutional requirement of maintaining a balanced budget, the Governor must make the necessary adjustments to authorized disbursements of funds through the appropriations charged to the General Fund that are in effect for fiscal year 2005-2006, thereby authorizing disbursements only up to the amount of available resources ($8,945

---

[10] It is worth noting, however, that this approval of new discrete budgetary items with prospective appropriation toward fiscal year 2005-2006 does not disqualify Section 6 because these new items are not close enough to cover the government's operating expenses and the objective of this clause is "not to let the government's operations be left hanging while the Legislature acts with the powers that it has to those ends." *Diary of Sessions*, at p. 890. Of course, in such a case, the items included in these new laws must **substitute** the items inherited from the Constitutional Budget of the previous year, as long as it actually has to do with appropriations for the same concept.

[11] See, footnote 3.

million).  *Id.* This, since the available resources are ***not*** sufficient to disburse the totality of the current appropriations ($9,284 million).  In doing so, the Governor would fully comply with his constitutional authorities and duties. Let us see.

### E. The Governor has constitutional authority
### to adjust disbursements in deficit situations

**1.** *Pursuant to the Constitution, the Governor is vested with the legal authority to authorize disbursements so that the government's operations are not left hanging until the political branches reach an agreement on the matter*

In accordance with the blueprint established by Sections 6 to 8 of Article VI of the Constitution and by the Organic Act of the Office of Management and Budget ("OMB"), and under the protection of the constitutional duty of the Governor to enforce the laws and the Constitution, it is up to the Governor, in the event that a new budget is not approved, to put into effect the previous one and, in a deficit situation, to make whatever adjustments may be necessary so that the expenses do not exceed the projected revenues.

Regarding the situation that prevails when a new budget is not approved, pursuant to Section 6 of Article VI of the Constitution, which has been activated during this fiscal year, "**the Governor [is the one] who will authorize the necessary disbursements**" when a budget is not approved. Art. VI, Sec. 6, Const. of the Comm., L.P.R.A., Tome 1.  Note that the mentioned section provides for an "automatic re-appropriation of funds in the event that in a given year the necessary appropriations are not approved."  *See, Diary of Sessions* at p. 2587. This happens as part of a "minimum plan to maintain the government's economic stability." *Diary of Session, at* p. 2587.  In these instances, the Governor is the official in charge of making the disbursements until the pertinent appropriations are approved. In this sense, one of the delegates of the Constitutional Convention, Mr. García Méndez, after commenting on the role of the Governor, indicated that:

Until the Legislature meets to approve the new appropriations, **the Governor will authorize disbursements**... of what? Of those appropriations that automatically become effective again

because the Legislative [Assembly] has not approved the appropriations for that economic year that ended.

*Diary of Sessions,* at p. 891 (emphasis ours). Thus, pursuant to said section, and as a matter of institutional competence, it is the Governor, and not the Judiciary or the Legislative Branch, who is vested with the eminently executive legal authority to authorize the disbursements so that the government's operations will not be left hanging until the political Branches reach an agreement on the matter. In this sense, note that the part of the referenced section that gives the Governor the power to authorize disbursements is actually a derivative of his constitutional power to "enforce the laws" and it denotes the particular role that said official has in the implementation of the budgetary powers that he shares with the Legislature.

Contrary to what happens with, for example, the case of appointments rejected by the Puerto Rico Senate and the duration of the term of internships, where the vacancy irremediably creates a "lack of direction in a government department [that] can be highly prejudicial to the country," *Hernández Agosto v. López Nieves*, 114 D.P.R. 601, 622 (1983), in the matter of budgetary continuity, the Constitution expressly provided that the lack of agreement between the Political branches will not create a vacuum that prevents the government's progress, and it is the Executive who was delegated the authority to disburse funds for the government's operating expenses. Of course, doc must to be done by the Executive within the constitutional limits imposed by our system of checks and balances, as we will elaborate later. That is the unwavering constitution will.

Thus, **when the pertinent budget is *not* approved**, the Constitution speaks to the figure of the Governor and, with a firm voice, it delegates to him the directive authority to establish the "minimum plan to maintain the government's economic stability," *Diary of Sessions*, at p. 2587, inserting him as the main actor therein by expressly granting the power to authorize the necessary disbursements for the government's operation.

As for a deficit situation, here also it is the figure of the Governor who is called on to put in effect Sections 7 and 8 of Article VI of the Constitution and the law on priorities enacted under those sections. In fact, the law of priorities itself expressly delegates to the Governor said function. *See,* Art. 4(c) of Law No. 147, 23 L.P.R.A. § 104 (c). Moreover, the power of the

*CERTIFIED TRANSLATION*                                    BY OLGA M. ALICEA, FCCI, NJITCE-S

Governor to authorize disbursements is also a by-product of his constitutional power to "enforce the laws." Let us see.

It is well known that the power to make appropriations, defined as the authority to separate a certain sum of money for a specific purpose, falls on the Legislature. *See,* Art. 3 of Law No. 230, 3 L.P.R.A. § 283b ("Allocation - Amount of money authorized by the Legislature for the purpose of carrying out a specific activity or achieving certain objectives."); *Pueblo v. Márquez*, 62 D.P.R. 13, 20 (1943) ("By thus having dominion over the expenditures, the legislative power controls the entire subject with all the amplitude that under the Constitution is required of its functions."); *New England Division of American Cancer Society v. Commissioner of Administration*, 769 N.E.2d 1248, 1256 (Mass. 2002) ("We have defined the power of appropriation as the authority 'to set apart from the public revenue a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object and for no other.... ' It is beyond question that [t]he power to appropriate money of the Commonwealth is a legislative power.").

However, **the power to make disbursements is a power of the Executive Branch**. *See, Opinion of the Justices*, 376 N.E. 2d 1217, 1222 (Mass. 1978) ("the activity of spending money is essentially an executive task."); 63C Am. Jur. 2d, *Public Funds* § 45 ("Spending money appropriated by the legislature is essentially an executive task, and regardless of how minutely appropriations are itemized, some scope is left to the executive for the exercise of judgment and discretion in making expenditures within the limits of the appropriation. Allocation of resources and establishment of priorities are the essence of management."); *Opinion of the Justices*, 892 So. 2d 332, 338 n.6 (Ala. 2004) (quoting *Alexander et al. v. State*, 441 So. 2d 1329, 1341 (Miss. 1983) ("Once taxes have been levied and appropriation made, the legislative prerogative ends and the executive responsibility begins.")); *State ex rel. McLeod v. McInn*, 295 SE2d 633, 637 (S.C. 1982) ("[A]dministration of appropriations... is the function of the executive department."); *State ex rel. Meyer v. State Board*, 176 N.W.2d 920, 926 (Neb. 1970) ("[The legislature] cannot through the power of appropriation exercise or invade the constitutional rights and powers of the executive branch of the government. It cannot administer the appropriation once it has been made.").

*CERTIFIED TRANSLATION*                                    BY OLGA M. ALICEA, FCCI, NJITCE-S

Of course, this does not imply that the Governor has absolute power to freeze, under any circumstance, funds expressly designated by law. *See, Noriega v. Hernández Colón*, 135 D.P.R. 406, 454 (1994); *Opinion of the Justices to the Senate*, 376 N.E. 2d 1217, 1221-22 (Mass. 1978) ("Once a bill has been duly enacted, however, the Governor is obliged to execute the law as it has emerged from the legislative process. He is not free to circumvent that process by withholding funds or otherwise failing to execute the law on the basis of his views regarding the social utility or wisdom of the law. [However], such a refusal to expend funds for the purpose of amending or defeating legislative objectives is to be distinguished from the exercise of executive judgment that the full legislative objectives can be accomplished by a lesser expenditure of funds than appropriated."). This is, therefore, an area in which, **ordinarily**, the Executive Branch and the Legislative Branch share budgetary power. *See, Hunter v. State*, 865 A.2d 381, 392 (Vt. 2004) ("[A]ppropriation is a legislative power, but spending is an executive power. Rather than dealing with one branch's clear encroachment on another's core function, we are instead dealing here with the area in which the powers of the branches overlap."); *New England Division of American Cancer Society v. Commissioner of Administration*, 769 N.E. 2d 1248, 1256 (Mass. 2002) ("It is beyond question that '[t]he power to appropriate money of the Commonwealth is a legislative power.... 'It is equally clear, however, that 'the activity of spending money is essentially an executive task....'  Thus, we speak in abstract terms of separation of powers; in reality, some overlap is inevitable, and may well be desirable.").

Now then, **when the pertinent budget is *not* approved**, the Constitution speaks to the figure of the Governor and, with a firm voice, delegates the directive authority to establish the "minimum plan to maintain the government's economic stability," *Diary of Sessions*, at p. 2587, inserting him as the main actor therein by expressly granting the power to authorize the necessary disbursements for the government's operations.

> **2. *When there is a deficit, and in the absence of legislative action to eliminate it,***
> ***the Constitution requires the Governor to take the necessary measures***
> ***to balance the budget under Sections 7 and 8 of Article VI;***
> ***this according to the priorities set forth in Section 8 and in the law***

**In deficit situations**, the Constitution requires that the Governor **take the necessary measures to balance the budget** under Sections 7 and 8 of Article VI of the Constitution. These sections provide, respectively:

§ 7. [Allocations will not exceed resources]

The appropriations made for an economic year cannot exceed the total resources calculated for said fiscal year, unless the imposition of sufficient taxes to cover these appropriations is provided by law.

§ 8. [Priority of disbursements when resources are not sufficient]

When the resources available for an economic year are not sufficient to cover the appropriations approved for that year, the payment of interest and amortization of the public debt will be paid first, and then the other disbursements will be made according to the norm of priorities that is established by law.

Art. VI, Secs. 7 and 8, Const. of the Comm., L.P.R.A., Tome 1. When the government is in a deficit situation, the Governor has the duty and the constitutional authority to, under the powers established in Section 8 of Article VI of the Constitution, adjust them with flexibility to comply with the constitutional mandate of Article VI, Section 7, of the Constitution of maintaining a balanced budget.

Said adjustment is not only **constitutionally compelled**, but it is also warranted as a practical matter, since, although the government has the authority to incur a certain amount of expenses (under the laws on appropriations), it lacks sufficient resources to disburse all of the appropriations.  Therefore, Article VI, Section 8, of the Constitution requires that in deficit situations the Governor proceed, first of all, with the payment of interest and amortization of the public debt and, then with the other disbursements, in accordance with the "standard of priorities" that is established by law.

This standard of priorities referred to in Section 8 has been implemented by Article 4(c) and (d) of Law No. 147, 23 L.P.R.A. § 104(c) and (d), which states:

CERTIFIED TRANSLATION

BY OLGA M. ALICEA, FCCI, NJITCE-S

(c)     Consonant with Section 8, Article VI of the Const. of the Common., **the Governor will proceed** in accordance with the following standards of priorities in the **disbursement** of public funds, when the resources available for an economic year are not sufficient to cover the appropriations approved for said year.  He may delegate them to the Director of Management and Budget:

(1) Order the payment of interest and amortizations corresponding to the public debt.

(2) Order that the commitments contracted under legal contracts in force, Court judgments in cases of inverse expropriation, and unavoidable obligations to safeguard the credit, and the reputation and good name of the Government of the Commonwealth be addressed.

(3) Order that the following be addressed from the appropriations for ordinary expenses preferably disbursements related to:

(A) The preservation of the public health;

(B) the protection of persons and property;

(C) public education programs;

(D) public welfare programs.

(E) The payment of the employer contributions to retirement systems and the payment of pensions to individuals granted by special laws and then the other public services in the order of priorities that the Governor determines; Provided, that disbursements in connection with the services listed here will not have priority among themselves, rather they may be addressed simultaneously; Provided, further, that **the adjustments due to reduction may be made in any of the appropriations for ordinary expenses** including the service areas indicated in this subsection.

(4) Order the construction of permanent works or improvements whose contracts have been duly formalized; Provided, that preference will be given to emergency works motivated by catastrophes or acts of nature, fortuitous accidents; and then it will proceed to the execution of those that best respond to the development of the normal and economic life of Puerto Rico.

(5) Order that the payment of contracts and commitments contracted charged to special operating appropriations be addressed and then preferably address those phases of the programs that are under development or in the planning stage the postponement of which directly or indirectly affects the interests of the clientele served by the program.

(d) In the implementation of the standards of priorities established above, the administrative measures that are detailed below may be adopted. The Governor, or the Director of Management and Budget by delegation of the latter, will submit to the Presidents of the Senate and of the House of Representatives, as well as to the Finance Commissions of both Legislative Bodies, a detailed report of the adjustments that needed to be done to balance the budget under the provisions of this section. With this report, the Governor will submit his recommendations regarding the way to address the works and activities whose execution is postponed. The obligations corresponding to the works postponed will be canceled for purposes of the year object of the adjustment and will be carried on the books of the Director of the Treasury against the resources available to be allocated in subsequent years, through the pertinent release of appropriations:

(1) Adjust the appropriations approved for the ordinary operating expenses provided to the different State agencies and instrumentalities, according to the standard of priorities established in subsection (c) of this section.

(2) Adjust the appropriations approved for the development of permanent improvements whose execution has not been put up for public bid, postponing that part of the work authorized by law that cannot be carried out due to limitations of resources.

*CERTIFIED TRANSLATION*                                    BY OLGA M. ALICEA, FCCI, NJITCE-S

(3) Adjust the appropriations for special programs whose postponement does not affect or conflict with the commitments and obligations contracted, reducing or adjusting the amounts authorized by law.

(emphasis ours). "Said legal provisions expressly establishes that the Governor will be... the one who will have the authorities to put into effect the standards of priorities established by the legislator." Sec. Just. Op. No. 16 of 1984.

As can be seen, in a deficit situation, the Constitution delegates **to the Governor** the authority to quickly and efficiently make the necessary adjustments to satisfy those priority appropriations, starting with the payment of the debt. Constitutionally, it is the Executive who makes the necessary disbursements after the enactment of the pertinent laws. In a deficit situation, that constitutional function is accentuated to the extent that the Constitution itself authorizes and requires the Governor to prioritize regarding which appropriations must be satisfied first, giving clear parameters therefor. The law of priorities simply confirms and reiterates **in its first sentence** what is constitutionally logical and natural: "the Governor will proceed," and no one else, to make the necessary disbursements according to various substantive limits.[12]

Pursuant to the aforementioned provisions, the Governor has ample constitutional powers to make disbursements in those instances in which a budget is not approved, being **forced** to adjust them in deficit situations, so that a balanced budget can be maintained and to address the aforementioned priorities. "[T]he Governor is the one who makes the pertinent adjustments or determines the action to take when the revenues are less than the budgetary appropriations." Sec. Just. Op. No. 16 of 1984.

Note that the regulations in force in Puerto Rico, which look to the First Executive at the time disbursements are adjusted in deficit situations, finds an echo in the legal systems of other state jurisdictions. Thus, in the *New England Division of American Cancer Society v. Commissioner*

---

[12] This is also emphasized by the fact that the priority law provides that the law of priorities provides that the Director of the OMB will "report" (not "consult" or "negotiate") to the Legislature the adjustments that may have been necessary to balance the budget. Art. 4 (d) of Law No. 147, 23 L.P.R.A. § 104 (d).

3. *By express constitutional mandate, the authority of the Governor to adjust disbursements in deficit situations is particularly broad and encompasses all approved appropriations (whether from the Joint Resolution on the General Budget or special appropriations) and not only those of the Executive Branch[.]*

*CERTIFIED TRANSLATION*                          BY OLGA M. ALICEA, FCCI, NJITCE-S

*of Administration*, 769 N.E. 2d 1248, 1257 (Mass. 2002), the Massachusetts Supreme Court noted:

> [Massachusetts' law] permits the Governor to use her executive judgment to reduce public expenditures in a time of true financial emergency.... This obligation conforms to the constitutional requirement for a balanced budget.... It reflects a legislative determination that the Commonwealth's need to remain solvent overrides particular statements of social policy contained in those appropriation items subject to [certain budget] allotment [s]… It is an expression of the Legislature's **recognition that the executive branch has the "detailed and contemporaneous knowledge regarding spending decisions "to enable necessary reductions to be made on an expedited basis**, and the Legislature's confidence that they will be made in a manner that will not compromise the achievement of underlying legislative purposes and goals.

(emphasis ours).

Similarly, in *Hunter v. State*, 865 A.2d 381, 392-393 (Vt. 2004), the Supreme Court of Vermont**, after validating that the Executive Branch adjusted the disbursements to address a deficit situation**, summarized as follows the regulations norms in the different state jurisdictions:

> In reaching this decision, **we have consulted the decisions from other states and find that they almost uniformly support the conclusion that we reach**. In *University of Connecticut Chapter AAUP v. Governor*, 200 Conn. 386, 512 A.2d 152, 159 (1986), for example, the Supreme Court of Connecticut upheld legislation authorizing the Governor to reduce budgetary allotments by up to five percent when, due to decreases in anticipated state revenues, it was necessary to prevent a deficit. The court held that such authority did "not delegate to strictly legislative function, "did" not delegate the legislative authority to appropriate "and was not inconsistent with the executive's traditional control over budgetary expenditures.

> ........

> Similarly, in the *New England Division of American Cancer Society v. Commissioner of Administration*, 437 Mass. 172, 769 N.E. 2d 1248 (2002), the plaintiffs challenged the

constitutionality of a statute under which the executive branch, in response to revenue shortfalls, reduced allotments for expenditures on certain specific appropriations in the legislature's general appropriations act. The court rejected the challenge, noting that the statute behaved with the general principle that the "spending [of] money is essentially an executive task," ... reflected a pragmatic recognition of the executive's superior ability to make "necessary reductions… on an expedited basis," … and represented the legislature's considered judgment "that the Commonwealth's need to remain solvent overrides particular statements of social policy contained in those appropriat[ed] items...."   The court also stressed that the potential for executive abuse was limited because the statute authorized such reductions only "in a time of true financial emergency," and restricted reductions to an" amount equal to such [revenue] deficiency."

........

Other decisions respond similarly to the argument that the executive has enrolled on the power of the legislature.  *See, Opinion of the Justices*, 892 So.2d at __, 2004 WL 693431, at *3 (stating that legislature may grant governor discretion on how to spend appropriated funds); *State v. Fairbanks N. Star Borough*, 736 P.2d 1140, 1142 (Alaska 1987) explaining that legislature can delegate to executive branch the discretion to spend or not spend appropriated funds as long as there are standards for the exercise of discretion); *Chiles v. Children A, B, C, D, E, & F,* 589 So.2d 260, 268 (Fla. 1991) (observing that legislature can delegate power to executive to reduce spending in case of a budget crisis as long as there are adequate standards); *Legislative Research Comm'n v. Brown*, 664 S.W.2d 907, 926 (Ky. 1984) (concluding that legislature can delegate to executive power to cut budgets to avoid a deficit); *North Dakota Council of School Adm'rs*, 458 N.W.2d at 286 (explaining that statute allowing state Office of Management and Budget Director to reduce budgets uniformly in response to predicted deficit grants "only the authority to execute the law within the parameters established by the Legislature "and is not unconstitutional delegation of legislative power to executive branch).

(emphasis ours).

*CERTIFIED TRANSLATION*                                    BY OLGA M. ALICEA, FCCI, NJITCE-S

In Puerto Rico, moreover, it is **by express constitutional mandate** that the authority of the Governor to adjust disbursements in deficit situations is particularly broad and encompasses **all** of the approved appropriations (whether from the General Budget Joint Resolution or special appropriations); not only those of the Executive Branch. *See,* Art. VI, Sec. 8, Const. of the Comm., L.P.R.A., Tome 1 ("When the resources available for an economic year **are not enough to cover the appropriations approved** for that year, first the interest and amortization of public debt will be paid, and then the other disbursements will be made according to the standard of priorities established by law") (emphasis ours). *See, also,* Art. 4 of Law No. 147, 23 L.P.R.A. § 104 ("the adjustments for reduction may be made in **any** of the appropriations for ordinary expenses") (emphasis ours); Sec. Just. Op. No. 16 of 1984 ("The disbursements relative to the services listed above **will not take precedence over each other**, rather they may be addressed simultaneously.  It is also provided that the adjustments for reduction may be made in **any** of the appropriations for ordinary expenses, including the areas of indicated services") (emphasis ours). Moreover, as we will see below, the particular budgetary role that the Governor plays in our legal system is such that he has the statutory power to, under appropriate circumstances, make adjustments even in ***non***- deficit situations.

**F.  The Governor has statutory power to adjust
disbursements, even outside of deficit situations**
**1.** *The Governor has the power to restrict the disbursement of
funds under the Organic Act of the Office of Management and Budget*

Pursuant to our constitutional structure, and as mentioned, Article 4 of Law No. 147, 23 L.P.R.A. § 104, broadly outlines the statutory powers of the Governor in connection with the budget. Specifically, said article provides:

> With respect to the administration and control of the budget, the Governor will have the following authorities that he may delegate to the Director of Management and Budget:
>
> ........
>
> [e]stablish budgetary reserves and **restrict** the resources available to the agencies in the manner he deems pertinent when in the execution and control of the budget he considers

it necessary, regardless of the circumstances established in subsections (c) and (d) of this section [referring to deficit situations].

*Id.* (Emphasis ours).

### 3. *The Governor has ample authority under Joint Resolution No. 927 of 2004 to make transfers among appropriations for different agencies, including the Legislature and all of its agencies*

On the other hand, Joint Resolution No. 927 of 2004 (June 30, 2004), on the General Budget on Government Expense for fiscal year 2004-2005, which is in force pursuant to Article VI, Section 6, of the Constitution as it is a law on appropriations for government operating expenses, provides in its Section 2:

When the interests of the service and pressing needs of the agencies so require, as well as to ensure that at the end of each fiscal year the operations of the agencies end with a balanced budget, **transfers may be made** between the appropriations of the same body, as well as **among the appropriations made in this Joint Resolution**.

Excluded is the transfer of funds of the appropriations included for the following purposes:

a. Payment of principal and interest on public debt and other administrative debts authorized by the Legislature; or by financing plans approved by the Government Development Bank.

b. Payment of public water, energy and other services provided by public agencies, with the exception of those appropriations that exceed the estimates of consumption certified by the public corporations.

c. Payment of obligations established by law.

No transfer of funds will have the effect of postponing the payment for the following fiscal year the payment of obligations that commit in advance the resources of future budgets.

*CERTIFIED TRANSLATION*                                    BY OLGA M. ALICEA, FCCI, NJITCE-S

> The transfer of funds will not be made to grant contracts or to assume obligations that exceed the fiscal year and, therefore, commit the resources of subsequent fiscal years.

(emphasis ours).

Pursuant to the aforementioned Joint Resolution No. 927 of 2004, the authority of the Governor to make transfers is ample and is activated when: (i) "the interests of service and the pressing needs of the agencies so require," which, for example, **exists when, as in the instant situation, the previous budget is inherited**, because it is understood that a pressing need is to make adjustments to meet the interests of service to the country, to provide priority public services, and thus comply with public policy embodied in the current legislation, since such adjustments could not be made through the ordinary legislative process; or (ii) when necessary to "ensure that at the end of each fiscal year the operations of the agencies end with a balanced budget." *Id.*

When these conditions are met, the Governor can "make transfers between appropriations of the same body, as well as among the appropriations made in this Resolution Joint." *Id.* Note that Joint Resolution No. 927 of 2004 itself, which even contains the pertinent budget appropriation to the Legislature and other entities ascribed to the Legislative Branch, authorizes the Governor to, given pressing needs, make transfers. Thus, once the conditions imposed are met, there is a statutory basis for making transfers to fund the coffers of the existing agencies as required by the needs for the service and pressing interests **so that they comply with the mandates of public policy established by the Legislature in the organic laws of the agencies and in special laws**. These transfers would allow disbursements to be made so that the government entities identified in Joint Resolution No. 927 of 2004 can comply with the public policy, as previously legislated.

### G. The powers of the Executive Branch are not unreasonably enlarged, since there are limitations to its budgetary powers vis-à-vis other constitutional Branches

#### 1. *The adjustment made cannot be such that it impedes the Legislature from exercising its constitutional functions; which, by definition, does not happen when said Branch causes the adjustment*

It is worth noting that, although it is true that the Governor has the authority to adjust disbursements of the Legislative Branch in situations such as the instant one, any adjustment in the disbursements of said Branch ***cannot*** be such that it prevents the latter from exercising its constitutional function. *See, by analogy*, *Williams v. State Legislature of State of Idaho*, 722 P.2d 465, 470 n.4 (Idaho 1986) ("courts have held the Legislature cannot reduce the level of appropriations to a constitutional officer below the level necessary to carry out the constitutional duties of the office."); Gary D. Spivey, *Inherent power of court to compel appropriation or expenditure of funds for judicial purposes*, 59 A.L.R.3d 569, § 4 ("court may, under circumstances necessitating protection of its capacity to perform its constitutional functions, require county to provide funds");[13] *State ex rel. McGraw v. Burton*, 569 SE2d 99, 117 (W. Va. 2002) ("to ensure that the Office of the Attorney General can perform its inherent constitutional functions, the Legislature has the implicit obligation to provide sufficient funding to the office."); D. Peterson, *Controlling the Federal Courts Through the Appropriations Process*, 1998 Wis. L. Rev. 993, 1049 ("When appropriations restrictions impinge on the ability of another branch to perform its constitutional functions, then Congress's interest in protecting the public fisc must be weighed against the impact on the other branch. If there is less impact on Congress's constitutional prerogatives, then the appropriations power must yield."); *Board of Elementary and Secondary Ed. V. Nix*, 347 So. 2d 147, 155 (La. 1977) ("The legislature cannot deprive a constitutional agency of its ability to perform its constitutional function by depriving it

---

[13] As to the different standards that have been developed to identify the instances in which it is warranted to grant additional funds for the operation of the state courts it has been indicated that:

Many states recognize that courts have the inherent authority to order payment of expenses that are reasonably necessary for the administration of justice. These jurisdictions, however, have developed different interpretations about the breadth of the doctrine. Jurisdictions that have applied the inherent powers doctrine can be divided into three groups. First, a number of states have adopted the broad view that a court's inherent power extends to incurring and ordering payment of all debts necessary to administer the duties of a court. Under this view, the judicial branch is seen as having a constitutional mandate to maintain its independence and fulfill its duties. Therefore, the courts' inherent powers are constitutional in nature and may not be limited by legislation. Second, a number of jurisdictions ... have restricted the breadth of the inherent powers doctrine, holding in "less sweeping language" that the judiciary can only compel funding necessary for the performance of judicial duties. Under this interpretation, funding can be compelled "to remove obstructions to [the courts'] successful and convenient operation, to secure the free and untrammeled exercise of their functions, or to properly perform their business." The legislature, however, may limit the courts' ability to compel funding under this view. Finally, other courts have taken a more limited approach to the inherent powers doctrine and applied it only to specific expenses, without indicating whether the doctrine might have greater application.
Gabrielle Tracey Letteau, *Crisis in California: Constitutional Challenges to Inadequate Trial Court Funding*, 22 Hastings Const. LQ 557, 575-576 (1995).

of the means to do so."); *Hoag v. State ex rel. Kennedy*, 836 So. 2d 207, 226 (1st Cir. 2002) ("It is fundamental to the existence of our constitutional regime of separation of powers that one branch shall not exercise its powers in a manner that limits or deprives another branch of its ability to perform its constitutional functions.").

It is worth noting, however, that the Legislature, **unlike the Judiciary**, has political and legislative remedies to unilaterally correct the instant situation.[14]  Thus, in the budgetary context, only that type of reduction that raises a situation that cannot be served by the Legislature as a body (meaning, that it cannot be corrected even with a law that overrides the Governor's veto) warrants judicial intervention. **Note that if the Legislature can correct through legislation the situation that has caused the contested adjustment, by definition, and as a matter of law, the exercise of its constitutional function has not been impeded**.

Among the remedies that the Legislature has to unilaterally address an Executive determination that affects them in this budgetary context are: (i) to pass laws on collections; (ii) to approve new substitute appropriations; (iii) to propose constitutional amendments without the intervention of the Executive Branch to provide alternate mechanisms to the current budgetary constitutional structure, *see,* Article VII, Secs. 1 and 2, Const. of the Comm., L.P.R.A., Tome 1; and (iv) to amend the law of priorities to (A) include the Legislature in the list of priorities, (B) to completely exclude said Branch from said law, or (C) to provide in the law of priorities that its budget will remain unaltered according to the previous year or pursuant to some formula.

Of course, all of these political remedies that the Legislature holds will be reviewed through an equally political mechanism: the democratic electoral process. The judicial remedy, instead, it lacks this important counterbalance to the interest of the Legislature of immunizing itself from the country's budgetary problem. The political – not judicial – remedies that the Legislature has available to it are, therefore, constitutionally, more complete than the judicial remedy because they involve more directly the democratic process in the evaluation of their actions.

---

[14] In fact, it should be noted that we have not found any case in which a court, state or federal, has faced an argument to the effects of, much less decided, that a budget adjustment made by a Chief Executive impedes a Legislature from exercising its constitutional function.

*CERTIFIED TRANSLATION*                                    BY OLGA M. ALICEA, FCCI, NJITCE-S

**2.** *Adjustments to the disbursements that the Governor may make are clearly limited*
*by intelligible guidelines and principles contained in multiple organic and special laws*

Likewise, and outside the limits imposed by the doctrine of separation of powers given the possibility that the functional budget of another Branch will be reduced to the point of substantially affecting its essential operation, other constitutional limits restrict the authority of the Executive Power when making adjustments. In no case does the Executive Branch lack criteria, guidelines, or intelligible principles that guide the exercise of its discretion when making disbursements and adjustments that the laws and the Constitution allow; criteria that, within the constitutional doctrine of delegation of powers, can be broad and general as long as the Executive Branch holds intelligible principles so that it can exercise its discretion within substantive parameters. *See, Luce & Co. v. Minimum Wage Board*, 62 D.P.R. 452 (1944); *Hilton Hotels v. Minimum Wage Board*, 74 D.P.R. 670 (1953), *López Salas v. Planning Board*, 80 D.P.R. 646 (1958); *Amalgamated Meat Cutters v. Connally*, 337 F. Supp. 737 (1971); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935); *ALA Schechter Poultry v. United States*, 293 U.S. 498 (1935).

In the first place, and with regard to the law of priorities, note that it authorizes the Governor to make adjustments **within legislated appropriations**, and it authorizes him to stop making (totally or partially) those least priority disbursements, so that he can fully make those disbursements that are within the priority list. Within the law of priorities, therefore, his discretion is substantially delimited by: (i) the substantive criteria of the list of priorities of the law; and (ii) the pre-existing appropriations that the Governor must satisfy in order of priority. *See, Luce & Co. v. Minimum Wage Board*, 62 D.P.R. 452 (1944); *Hilton Hotels v. Minimum Wage Board*, 74 D.P.R. 670 (1953), *López Salas v. Planning Board*, 80 D.P.R. 646 (1958).

Second, and specifically in relation to the flexibility clause in inherited Section 2 of Joint Resolution No. 927 of 2004, the exercise of discretion in the adjustment of items between appropriations is also enclosed between highly intelligible substantive parameters. Thus, on the one hand, Joint Resolution No. 927 of 2004 itself allows the transfer of items between appropriations within itself only when required by "service interests and pressing agency needs" or "to ensure that at the close of each fiscal year, the agencies' operations end with a balanced

*CERTIFIED TRANSLATION*                         BY OLGA M. ALICEA, FCCI, NJITCE–S

budget." Furthermore, one cannot ignore the fact that this flexibility can only be exercised **within the framework of a universe of previously legislated public policy parameters that prevent the Governor from allocating funds to priorities of public policy that are not contemplated in the legal system**. Note that the transfer of items occurs between pre-existing agencies, loaded with considerations of public policy already legislated, both through their respective organic acts as well as through special legislation.[15]

### III. DISCUSSION AND ANALYSIS

Having stated and discussed in broad strokes the legal framework applicable to the questions raised in your consultation, we can now analyze more specifically some of the particular doubts object of this opinion. Let us see.

> *A. When there is a deficit situation, the Chief Executive is not obligated to disburse all of the funds authorized pursuant to the appropriation for the Legislative Branch and its ancillary agencies*

> *1. The applicable legal authorities, common sense, and a sound sense of social justice require that, in a deficit situation, the Chief Executive may adjust disbursements charged to the appropriations for the Legislative Branch and its accessory dependencies*

Pursuant to the norms transcribed above, the Governor is authorized and obligated to adjust the disbursements charged to the current appropriations. This constitutional mandate encompasses **all** of the appropriations, thus it is unwarranted to exclude the Legislative Branch therefrom. Be advised that if the Governor is obligated to exclude said Branch from the adjustments, being required to disburse the entire current appropriation, this would imply that the burden of the adjustments would fall inordinately in the other Branches of government, compromising the

---

[15] Note that, as a matter of constitutional law, the courts must make an effort to identify, even outside the text of the law, intelligible principles in that legislation that delegates discretionary powers to the Executive Branch. *See, Amalgamated Meat Cutters v. Connally*, 337 F. Supp. 737 (1971); *Industrial Union Department v. American Petroleum Institute*, 448 US 607 (1980).

*CERTIFIED TRANSLATION*                                     BY OLGA M. ALICEA, FCCI, NJITCE-S

authority to comply with the payment of the public debt and the rest of the standards of priorities mentioned in the Constitution.

The Legislature cannot pretend to exclude itself from the serious fiscal problem facing the government arguing that **any** adjustments made to the disbursements from its appropriations must be prohibited. A legal standard that, under the wrong interpretation of the doctrine of separation of powers, would prevent any adjustment, however small, not finds support either in the legal authorities or in common sense or in a sound sense of social justice. Let us see.

In the first place, said theory does not stem from the **text** of the Constitution. If the constituents had wanted to adopt a theory as radical as this one it would have been put in writing without leaving it as a vague and generic derivative of the doctrine of separation of powers. Note that said proposal is so extreme and unfounded that it would have the inevitable consequence of **demanding** of the Legislative Branch that it always assign to the Executive Branch, and to the Judiciary, a budget equal to or greater than that which was in force the previous year, even if there is a deficit situation, since any reduction, however small, would constitute an allegedly unconstitutional action on its part.

Second, such a legal theory does not finds any support either in the **history** of the Constitutional Assembly. On the contrary, both the text and the history of the Constitution show that the specific intent of the constituents was for the Governor to be the official with the legal competence to authorize and adjust disbursements in situations such as the instant one.

Third, the aforementioned theory is totally unwarranted **as a matter of policy public**, since it would impose on the other government Branches the burden of the cuts and it would create an incentive for the Legislature to never reach an agreement with the Executive Branch regarding the approval of a budget of commitment or of new collections laws, while it would always enjoy its entire appropriation, even if there is a deficit. For all of these reasons, we understand that it would not be warranted to exclude the Legislative Branch from the power of the Executive Branch to adjust disbursements.

**2.** *The Governor has the legal authority to make the questioned adjustment pursuant to the deficit powers granted to him by the Constitution and of the statutory authority granted to him by Section 2 of Joint Resolution No. 927 of 2004*

The Governor has the legal authority to make the questioned adjustment pursuant to the deficit powers granted by Sections 7 and 8 of Article VI of the Constitution, and of the statutory authority granted by Section 2 of Joint Resolution No. 927 of 2004.

*a. Under the text of Sections 7 and 8 of Article VI of the Constitution, the Governor is authorized, and obligated, to make the required adjustments to balance the budget according to the priorities established by law. Nothing in these sections or in the law of priorities excludes the Legislative Branch from the bodies that may suffer an adjustment in their disbursements*

Pursuant to Section 7 of Article VI of the Constitution, the Chief Executive has the obligation to "balance" the deficit budget by adjusting the **disbursements** according to the standards of priorities provided in Section 8 of Article VI of the Constitution, as implemented by Article 4(c) and (d) of Law No. 147, 23 L.P.R.A. § 104(c) and (d). Note that nothing in the text of the aforementioned priority law or in the text of the aforementioned constitutional provisions gives preferential treatment, or immunity, to the Legislative Branch in a situation of budget deficit.

Thus, even though the appropriations remain unaltered, the disbursements made charged to the latter should be adjusted to balance the budget and address as a priority what is provided in the aforementioned Section 8 of Article VI of the Constitution and in Article 4 of Law No. 147. Of course, to the extent that the state's resources increase, it would be possible to disburse all of the appropriations. *See, for example*, *New England Division of American Cancer Society v. Commissioner of Administration*, 769 N.E. 2d 1248, 1257 (Mass. 2002) ("[Since] the Governor can reduce only the allotment; the underlying appropriation remains fully in force to establish an upper limit on what may be spent for that line item, should sufficient revenue be forthcoming."). However, as long as the resources do not increase, it is necessary to abide by the constitutional mandate to balance the budget. The Legislative Branch cannot be exempted from such mandate.

***b. Section 2 of Joint Resolution No. 927 of 2004 constitutes***
***a current disbursement rule that grants independent statutory***
***power to the Governor to make the proposed transfers***

Regardless of the constitutional powers and duties of the Governor in deficit situations, Section 2 of Joint Resolution No. 927 of 2004 expressly grants statutory authority to the Governor to make the proposed transfers. As we mentioned, said statute contains a disbursement rule that provides:

> When the interests of the service and pressing needs of the agencies so require, as well as to ensure that at the end of each fiscal year the operations of the agencies end with a balanced budget, transfers may be made between appropriations of the same body, as well as between the appropriations made in this Joint Resolution.

Joint Resolution No. 927 of 2004. In this sense, it is worth emphasizing that it would be incorrect, in our opinion, to conclude that pursuant to Section 6 of Article VI of the Constitution only the items of the laws on appropriations continue to be in effect, but not all of the rules for their outlay.

The budgetary appropriations laws whose effectiveness is automatically activated pursuant to Section 6 of Article VI of the Constitution are not mere mathematical figures. These laws establish the specific purposes of each appropriation and the guidelines regarding their disbursements and transfers. In fact, as we indicated previously, the definition of the term "appropriation" states that it constitutes a separate amount of money **for a specific purpose**. It would, then, be wrong to conclude that, when the Constitutional Budget and, therefore, Joint Resolution No. 927 of 2004, enter into effect only the amounts established therein and not the disbursement rules of said resolution will remain in effect. This determination would be wrong for two reasons.

First, to allege that the effectiveness of the items is transferred and not the **guidelines** regarding the use of the appropriations would be contrary to the express language of our Constitution, which provides: "The general budget law [, in this case, Joint Resolution No. 927 of 2004,] may only contain appropriations and **rules for the disbursement thereof**." Art. III, Sec. 17, Const. of the Comm., L.P.R.A., Tome 1 (emphasis ours). In this regard, see also the following cases

from state jurisdictions where it is indicated that a disbursement rule cannot be separated from the items (amounts of money allocated): *Commonwealth v. Dodson*, 11 S.E.2d 120, 127 (Va. 1940) ("An item [item] in an appropriation bill is an indivisible sum of money dedicated to a stated purpose.... [W]here conditions are attached, they must be observed; where none are attached, none may be added."); 63C Am. Jur. 2d, *Public Funds* § 42 ("In the constitutional sense, an 'item' in an appropriation bill is a specific or indivisible sum of money dedicated to a stated purpose."); *In re Opinion of the Justices*, 2 N.E. 2d 789, 791 (Mass. 1936) ("We are of opinion that the power conferred upon him by said article 63 [veto power] does not extend to the removal of restrictions imposed upon the use of the items appropriated. It is plain that no other provision of the Constitution confers power upon the Governor to disapprove the condition attached to the item in question.").

Second, accepting such reasoning would entail that the Constitutional Budget be converted to mere amounts of money, without specifications as to its purposes or the method for the disbursements. The budget constitutes the list of the obligations that the state must satisfy to cover the rendering of services and the calculation of the resources available to pay those obligations. *See,* Guillermo Cabanellas, *Encyclopedic Dictionary of Civil Law*, Tome IV, at p. 394 (1981). By definition, the legal concept of the budget cannot be strictly reduced to numbers. It is essential that the legislative mandate establish certain guidelines as to the purposes for which the appropriations will be destined and the manner in which the disbursements will be carried out.

Nor would it be warranted, in our opinion, to invoke Section 6 of Article VI of the Constitution to argue, on the one hand, that the appropriations established in Joint Resolution No. 927 of 2004 for certain government entities remained in force regarding the items and, on the other hand, reject the effectiveness of Joint Resolution No. 927 of 2004 regarding the guidelines applicable to such appropriations. This distinction is foreign to the constitutional precept and it must be rejected. To conclude that when transferring an "item" only a number without a disbursement rule is transferred is inherently contradictory. If an item is transferred with rules disbursements that restrict the Executive's discretion when making disbursements, in the same way those disbursement rules that grant **flexibility** at the discretion of the Executive Branch should be transferred. When the item is transferred, a number is transferred with a **purpose** and those rules

BY OLGA M. ALICEA, FCCI, NJITCE-S

that with greater or lesser force (as the case may be) compel the Executive Branch to disburse for those purposes. Consider, for example, two types of items that are transferred. First, an item simply and clearly allocates an amount of money to an agency or body. Second, a joint resolution allocating $50,000.00 to be distributed between agency "A" or agency "B" according to the service needs to be determined by the Governor pursuant to certain legal parameters. In both cases the item, the number, is transferred, accompanied by the rule for their disbursement that has been established in the appropriation. To conclude that the item is transferred only with the restrictions at the discretion of the Executive Branch, and not the rules that grant flexibility in the disbursement would ignore the fact that the legal mandates governing the disbursement of money are not of a single and rigid class when they can be of various shades.

Section 2 of the inherited Joint Resolution No. 927 of 2004 is a "disbursement rule," in the same way as a rigid mandate that orders a disbursement for a specific purpose is also. The difference between the disbursement rule in Section 2 of the Joint Resolution No. 927 of 2004 and the basic disbursement rule that is limited to establishing the specific use that will be given to an appropriation is that the former is more flexible than the latter. If pursuant to Section 6 of Article VI of the Constitution an item with a rigid mandate disbursement rule is transferred, by logical imperative an item is also transferred with a flexible mandate disbursement rule (as is Section 2 of Joint Resolution No. 927 of 2004). Thus, to determine that the items are transferred as restricted, but not as relaxed by law, is contradictory. Conversely: if the flexible appropriation rules are not transferred, those mandates that restrict the discretion of the Executive Branch would not transfer either. This would imply that only one "naked" item would be transferred, without any disbursement rule (restrictive or liberal), leaving it in an illogical vacuum and, therefore, unsustainable.

Thus, the disbursement rule of the aforementioned Section 2 of Joint Resolution No. 927 of 2004 being in effect, it is permissible to make transfers between the appropriations contained in said joint resolution when there are "pressing needs," in this case, the product of the lack of approval of a budget and the imperative to address the "interests of [the] priority service[s]," in order to comply with public policy embodied in current legislation. So, although the appropriation included in Joint Resolution No. 927 of 2004 remains the same ($5.522 million), the internal distribution can be adjusted by the Governor, under Section 2, to address the needs of the service

*CERTIFIED TRANSLATION*                                           BY OLGA M. ALICEA, FCCI, NJITCE-S

resulting from inherited appropriations that are not sufficient to address part of the country's current expenses.

Given that the vast majority of the appropriations for the Legislative Branch are subject to the disbursement rules provided in Joint Resolution No. 927 of 2004, as long as they are included therein, it would be statutorily warranted for the Governor to adjust the disbursements to be made from these appropriations.

> **3.** ***The blueprint specifically provided by our Constitution, which***
> ***expressly allows the proposed adjustments, in no way raises a problem***
> ***of "separation of powers"; on the contrary, the best public policy, analyzed at the***
> ***In light of this doctrine, it dictates that the Governor must have the power requested***

Undoubtedly, the legal issues raised in this consultation highlight issues of fundamental importance for democracy and for our constitutional system of government. The specter of excessive concentration of power in any branch of government should not be taken lightly and must be assumed with all seriousness and responsibility by each one.

As evidenced by the ordinary budget approval process, the absolute separation of powers among the various branches of government "has never existed and was never intended to exist." *Banco Popular v. Court*, 63 D.P.R. 66, 71 (1944). Actually, the departmental division of power aspires to protect citizens against arbitrary and abusive treatment at the hands of a single entity that holds authority with impunity and not effectively verified by others.

> The accumulation of all powers, legislative, executive, and judicial, in the *same* hands, either of one, some, or many people, and whether by inheritance, one's own or elective appointment, can rightly be declared to be the exact definition of tyranny.

*Id.*, at p. 72 (quoting *The Federalist*) (emphasis in original).

Therefore, any constitutional analysis must have in perspective that the problems of separation of powers are not necessarily limited to examining whether there is overlap between legislative and executive duties. After all, "there are government functions that cross the dividing line and are exercised by a branch of a different nature to said duties." *PPD v. Governor*, 98 D.P.R. 338, 454

BY OLGA M. ALICEA, FCCI, NJITCE-S

(1970) (Dissenting Opinion of the Associate Justice, Mr. Rigau).[16] The Constitution of the Commonwealth of Puerto Rico conceived the relationship between the constitutional branches as one of a dynamic and fluid nature, particularly between the Executive and Legislative Branches regarding the approval of the budget.

There is no "natural law" or "platonic idea" of the concept of separation of powers. On the contrary, there is a multiplicity of variations on the same theme. When Montesquieu described the separation of powers in the England of his time, he emphasized the separation of powers, but he also recognized that the separation was neither rigid nor absolute. *See,* Charles Louis de Secondat, Lord of the Brède and Baron of Montesquieu, *The Spirit of the Laws* (1748). On their part, the founders of the United States of America explicitly decided that the Branches of government would be more interdependent than independent; for example James Madison explains that the outline of the Constitution of the United States of America is that "its powers were divided and balanced in such a way among different corps of officials that none of them will go beyond their legal limits without being contained and effectively repressed by the others." *The Federalist No. 51* (James Madison). In turn, the states of the United States of America have adopted a great variety of particular models of separation of powers. *See, generally,* G. Alan Tarr, *Interpreting the Separation of Powers in State Constitutions*, 59 N.Y.U. Ann. Surv. Am. L. 329 (2003). The Commonwealth of Puerto Rico chose its own version, which, among other things, contains specific provisions regarding management of the government's

---

[16] As stated in *PPD v. Governor*, 98 D.P.R. at pp. 455-456 (Dissenting Opinion of the Associate Justice, Mr. Rigau): Some examples of these are as follows:

The Governor, head of the executive branch, participates in the legislative function (a) by submitting annually to the Legislature the preliminary draft budget and a report that, by constitutional mandate, "it will contain the necessary data for the formulation of a program of laws." In addition, (b) he can call the Legislature or the Senate to an extraordinary session when, in his opinion, the public interests so require. And (c) he approves or disapproves the bills that the Legislature decrees. He participates in the judicial function by suspending the execution of Sentences in criminal cases, by commuting sentences, condoning fines, and granting pardons.

The Senate, the upper house of the legislative branch, participates in the executive function by confirming or rejecting appointments made by the Governor. The Supreme Court, the highest body of the judiciary, participates in the legislative function by adopting rules of evidence and codes of civil and criminal procedure. The Presiding Justice, the highest judicial officer, participates in the executive function by having under his charge one of the government's major administrative responsibilities: being responsible for the administration of the courts. Constitution, Art. IV, sec. 4; Art. V, sec. 7. Furthermore, the autonomous Boards and Commissions created by law exercise legislative functions by promulgating rules and regulations, judicial when holding hearings, deciding cases and imposing sanctions, and executive when supervising the administration of their respective laws.

budget. Therefore, the determination of whether the decisions of the Executive Power in Puerto Rico in a particular case are consistent with the version of separation of powers that prevails in Puerto Rico must be evaluated pursuant to the specific provisions of the Constitution of the Commonwealth. One cannot resort to an idealized view of the separation of powers to override the provisions of our laws and our Constitution, because **the Constitution cannot be unconstitutional**.

Thus, we see that our Constitution expressly established the scope of the authorities and obligations of the Executive Power to address certain extraordinary circumstances such as, for example, a fiscal deficit situation like the one raised in this consultation. Therefore, the fact that the Governor exercises certain discretion as to how to handle a budgetary deficit situation and that, in exercising such discretion, he makes public policy decisions within the statutory and constitutional limits, does not place him on constitutionally improper ground. The overlap between constitutional functions is not only permitted, but is an integral part of our constitutional system.

The concept of separation of powers has generally been mainly justified on the basis of its "negative" virtue; that is, for its protective function, which seeks to prevent it from concentrating excessively governmental power in one of its branches. That justification establishes the minimum limit to which it aspires. But the separation of powers has an additional, more positive ambition: to encourage democratic deliberation among the Branches of government. Since the system of checks and balances disperses power among the Branches and requires them to act in concert to achieve their objectives, thus generating a series of opportunities for the protagonists of this process to engage in conversations and deliberations regarding the common good. *See, generally,* Cass R. Sunstein, *The Partial Constitution* 23 (1993) ("The system of checks and balances - the cornerstone of the system - was designed to encourage discussion among different governmental entities."); Laura S. Fitzgerald, *Cadenced Power: The Kinetic Constitution*, 46 Duke LJ 679, 741-42 (1997). The ambition, or hope, is that the Executive Power and the Legislative Power take advantage of these opportunities to dialogue and thus try to reach a consensus that can move the Country forward. Hence, an excessively rigid vision of the separation of powers has the deleterious effect of inhibiting the civic conversation that the

Constitution seeks to foster among representatives of the People. The inhibition of that conversation impoverishes us all.

As former Chief Justice of the Supreme Court of Puerto Rico, Hon. José Trías Monge indicated:

> [T]he Montesquieu's version of the separation of powers theory would unfortunately be disfigured later, when it was understood as a reference to an absolute and rigid separation in that each power exercises authorities that no other can assume, even if it is in a c complementary manner.

José Trías Monge, *Teoría de la Adjudicación* 360 (2000). Immediately thereafter, the former Presiding Justice rejected "[t]his spurious concept of Montesquieu's theory," *id.,* and explained:

> There are no three branches of government with correspondingly different functions exclusive to each one. What is involved is three *processes*, part of which are divided among the same branches. A portion of the dispute settlement process itself, such as the administrative one, has as seat the executive branch, subject to review by the judiciary. The part of the legislative process that has to do with the establishment of general norms corresponds to the legislative branch itself, but the part concerned with the particularization in specific cases of statutory norms is the primary province of the judiciary. *Id.,* at p. 401 (emphasis in original). The really important thing is that, in the attribution of authorities, no Branch of government claims for itself powers that represent an enlargement of functions of such magnitude that it causes a concentration tending to abuse of power or that substantially reduces the essential functions of another Branch. With that in mind, this time we must examine the legal issues raised considering various constitutional dimensions at different levels of generality.

On the one hand, at a specific level of generality, we have already explained at length in this opinion about the different specific constitutional provisions that, with impressive foresight, address precisely the current historical context: (i) the lack of approval of a budget at the close of a fiscal year, Art. VI, Sec. 6, Const. of the Comm., L.P.R.A., Tome 1; and, concurrently, (ii) a deficit situation, Art. VI, Sec. 8, Const. of the Comm., L.P.R.A., Tome 1. The balance between the Executive and Legislative Powers is outlined in our Constitution and in the interpretation that

made thereof by the Puerto Rican courts. Thus, the fact that under ordinary circumstances the balance established by the Constitution promotes better coordination between the Branches when approving a budget does not exclude the that forgers of the text chose an alternate and secondary arrangement of powers, a "Plan B," before a budget impasse or before a deficit situation. That was precisely the decision that was made. The Constitution decided this matter for all of us and, precisely to avoid reproducing the circumstances that have led to the lack of consensus, it addressed a single Branch, provisionally, not to replace the Legislative Branch in cases of political or economic crisis, but to prevent the country from drifting in the storm, and navigate it carefully between clearly defined borders until reaching safe harbor: until the deficit is balanced, "until the pertinent appropriations are approved," Art. VI, Sec. 6, Const. of the Comm., L.P.R.A., Tome 1, or both.

At a higher level of generality, we must consider what the effect of these constitutional powers of the Executive Branch is in a comprehensive analysis that attempts to measure the correlative balance of forces. That is, instead of concentrating only microscopically on the constitutional powers conferred by the budgetary clauses, we must consider with greater perspective of how the forces between the powers are aligned on a more general level. Honest and dispassionate analysis of this configuration shows that the Executive Branch, far from approaching the powerful Leviathan undisturbed by other structural and democratic forces or limits, remains in a similar position or even of greater disadvantage than the one it was in before using the aforementioned powers. In this sense, the specter of an overwhelming concentration of powers by the Executive Branch at the expense of the Legislative Branch **is an illusion**.

As has been described, the budgetary clauses of the Constitution provide a minimalist, temporary, and provisional remedy given a budget impasse. Since what are transferred are laws on specific appropriations belonging to a previous year, the Constitutional Budget that is inherited does not contemplate those actual government expenses that, as is natural, will increase progressively and exponentially over time. Thus, even in the hypothetical case that the government has more resources than necessary to satisfy the appropriations legislated, if a budget is inherited due to an impasse, the Executive Branch would be prevented of spending beyond the inherited appropriations, and unable to meet the **actual** needs of the population.

*CERTIFIED TRANSLATION*                                              BY OLGA M. ALICEA, FCCI, NJITCE-S

In this sense, what might superficially seem like a power that allows dispensing with the Legislature, is not such.  On the one hand, the discretion of the Executive Branch is limited by clear legislative and constitutional parameters. **That impedes establishing significant new priorities of public policy and prevents the power from being concentrated excessively.**  It only allows the Governor to keep the government operating and avoid major debacles.

On the other hand, whenever the Constitution entrusts the Governor with the responsibility of maintaining the viability of the daily public endeavors, the political responsibility or "accountability" becomes diluted and it confuses the traditional signals that would normally direct the population toward **all** of those responsible for the important public policy decisions.  If a budgetary continuity clause does not exist, the population would feel a very hard, sharp, and immediate blow that would provoke a reaction towards the visible politicians responsible for the impasse (which is why, perhaps, the impasse would not occur in the first place). When a budget is inherited that, by definition, it is insufficient to meet incremental needs, the political brunt and visibility are diluted, **and attention is redirected almost exclusively to the depositary of the responsibility for resolving the crisis: the Executive Branch**.  Thus, the political responsibility of other constitutional actors is overshadowed. To the extent that the Constitution delegates functions in this context to one Branch mainly, the political cost of difficult decisions given an insufficient budget will be felt almost exclusively by that Branch that holds the responsibility.[17] Hence **the idea that the Executive Branch benefits from managing the Country for several years with the same inherited budget is unreal**. The incentive is in the Legislative Branch to refuse to agree on a budget so that the population turns its attention to the one who ultimately must make the decisions.  Therefore, if the constitutional flexibility that the Executive Branch has in this extraordinary budgetary situation is restrictively limited or interpreted, this incentive that the Legislative Branch has to sequester the Executive Power with a budget of yesteryear would be accentuated. This, because the Legislative Branch could tie up the Executive Power

---

[17] In federal jurisdiction, especially when evaluating problems relative to the vertical arrangement of powers, the Supreme Court has shown concern with constitutional arrangements that overshadow the transparency that must prevail between the population and the government. See, *New York v. U.S.*, 505 U.S. 144 (1992) ("where the federal government directs the states to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devise the regulatory program may remain insulated from the electoral ramifications of their decisions."); *Printz v. U.S.*, 521 U.S. 898 (1997) ("even when the States are not forced to absorb the costs of implementing a federal program, they are still put in the position of taking the blame for its burdensomeness and for its defects").

*CERTIFIED TRANSLATION*                    BY OLGA M. ALICEA, FCCI, NJITCE-S

with substantial and progressive budgetary cuts, while preserving for itself at least a substantial functional budget that, in the balance of powers and in the long run, would place it in a position of advantageous correlative forces. Thus, such a restrictive interpretation of the extraordinary budgetary powers of the Executive Branch would be what would threaten with improperly concentrating power in the Legislative Branch.

### *B. The adjustments proposed by the Chief Executive would not be reviewable by a court as they would not result in the creation of an actionable issue*

It is our opinion that the adjustments to the disbursements charged to the budgetary items of the Constitutional Budget that the Governor proposes to make would not be reviewable by a court since they would not result in the creation of an actionable issue. First of all, the Legislative Branch, potential claimant in this situation, would lack standing. Second, any foreseeable claim to this effect would include a classic political question because: (i) the Legislature has the political and constitutional authority to evaluate the magnitude and nature of any alleged grievance and provide itself with the pertinent remedy; and (ii) there would be no judicially manageable criteria to pass judgment on the amount of a contested adjustment. Third, as multiple courts have resolved in similar situations, an exercise by the Executive Branch of legislative discretion expressly delegated by the Constitution is not judicially reviewable, as would happen with the decision to veto or sign a bill.

### 1. *The Legislative Branch, potential claimant in this situation would lack standing*

The Legislative Branch, a potential claimant in this situation, has not seen its constitutional powers diminished. Therefore, in the absence of actual damage, it lacks standing. As the Supreme Court explained just a few months ago:

> Finally, regarding the Hon. Aníbal Acevedo Vilá, even though we recognize his authority to resort in appropriate cases to the judicial channel in order to vindicate is constitutional prerogatives, we understand that in this case it has not been alleged, must less established, how the absence of confirmation of Mrs. Pont Marchese as Secretary of State has violated his constitutional executive powers. The Hon. Aníbal Acevedo Vilá has

suffered the loss of a nominee to his cabinet for lack of confirmation, however, this is the consequence of the system of checks and balances that is intrinsic to the separation of powers of our constitutional order. In *Hernández Agosto v. López Nieves*, 114 D.P.R. 601, 620 (1983), we clearly indicate, with respect to the Governor's power of appointment and precisely pursuant to the doctrine of separation of powers, that "the Executive Branch cannot strip the Legislative Branch of the power of confirmation conferred on it by the Constitution and the laws. Nor can the Senate or the Legislative Branch usurp the power of nomination from the Governor through affirmations indicative of the fact that it will only confirm specific candidate." However, in the request for *mandamus* filed before this Curia, the Governor does not allege that the lack of confirmation of Mrs. Pont Marchese constitutes a usurping of his constitutional power of nomination, or that what occurred shows that the House of Representatives attempts in this way to have nominated a specific candidate. The Governor, in fact, exercised his power by nominating Mrs. Pont Marchese and, in turn, the House of Representatives discharged its constitutional obligation.

*Acevedo Vilá v. Meléndez Ortiz*, 2005 T.S.P.R. 79, 164 D.P.R. 875 (2005). The Legislative Branch could not argue a stripping of its constitutional prerogatives. On the contrary, the Legislative Branch, if dissatisfied with the adjustments made by the Governor, could immediately approve legislation that puts an end to the budgetary impasse, imposing itself over the Governor, if that is what two thirds of the legislators wanted. In fact, if the Legislative Branch was dissatisfied with the legal authority that it authorized itself through the approval of Article 4 of Law No. 147 and Section 2 of Joint Resolution No. 927 of 2004, it has several alternatives to avoid the valid adjustments made by the Chief Executive.

First, in general terms, the Legislature **could change the applicable legal framework**: (i) repealing or amending Section 2 of Joint Resolution No. 927 of 2004, which grants the Governor the authority to make certain adjustments in the disbursements; or (ii) amending Section 4 of Law No. 147, thereby changing the priorities outlined therein.

Second, in practical terms, the Legislature **could also change the facts, and thus end the deficit**: approving tax measures to increase the government's revenues; or approving measures

*CERTIFIED TRANSLATION*                                    BY OLGA M. ALICEA, FCCI, NJITCE-S

that reduce government spending, such as, for example, repealing an agency's organic act. Either way, by rectifying the deficit, the Governor's powers under Sections 7 and 8 of Article VI of the Constitution would not be activated. Of course, these decisions would entail a political cost to the Legislature. Only if the Legislature decided not to choose one of these options would the power of the Governor to adjust the disbursements, pursuant to Sections 7 and 8 of Article VI of the Constitution, enter into effect. It is true that the Legislative Branch could choose to not approve the laws on revenues of on the repeal of appropriations that could take the budget out of the deficit it is in. However, **such inaction would be entirely voluntary**, since the constitutional prerogatives of the Legislative Branch would remain intact. In fact, it is only due to the inaction of the Legislative Branch in approving revenue measures that the system of checks and balances of our Constitution would allow the Executive Branch to take the necessary measures to comply with the constitutional mandate to the effects that the budget be balanced. *See,* Art. VI, Sec. 7, Const. of the Comm., L.P.R.A., Tome 1 ("The appropriations made for an economic year may not exceed the total resources calculated for such fiscal year, **unless the law provides for the imposition of sufficient taxation to cover such appropriations**.") (emphasis ours).

On the other hand, and given that the Legislature has such a complete remedy, in our opinion, it would not be warranted for a court to issue an order granting an extraordinary remedy, especially when that would imply judicial intervention with a political question. *See, Acevedo Vilá*, 2005 T.S.P.R. 79, 164 D.P.R. 875 (determining in a situation similar to the one that concerns us today that "this Court **cannot prepare a judicial remedy that does not involve undue interference with the legislative branch**") (emphasis ours). Note that it constitutes an abuse of discretion for a court to exercise its powers in equity when that is not necessary to avoid a damage that cannot be avoided by other means (assuming, solely for argument's sake, that what the Governor proposes to do constitutes a "damage" to the Legislature). In the absence of an adequate remedy to be granted to the Legislative Branch, a court should not acknowledge that the latter has standing. Therefore, absent an actual, clear, and palpable damage, any such claim should not prevail.

### 2. *Any foreseeable claim would present a non-actionable political question*

We are of the opinion that any foreseeable claim in this context would present a non-actionable political question. We understand that, in this situation, there would be no adequate judicial remedy that did not entail undue interference with the powers assigned to the other two Branches by the Constitution. The Legislative Branch, as we have discussed, would have at its disposal the political and constitutional ability to judge the executive action that they found inappropriate and, more important yet, if the pertinent remedy were granted. Furthermore, there would be no judicially manageable criteria to review the amount of the objected adjustment.

Thus, as part of any foreseeable claim there would be at least one crucial issue that simply would not be actionable as it constitutes a political question: the manner in which the Governor decides to use his discretion when making the necessary adjustments to enforce the priorities of Law No. 147, and when making the pertinent adjustments in the appropriations contained in Joint Resolution No. 927 of 2004, pursuant to its Section 2. Let us see.

The issues that could arise in this context, by necessity, would have a political dimension that, at a minimum, should encourage the greatest caution of a court and motivate the most pondered consideration before placing the Judiciary in the crossfire of public policy issues lacking manageable adjudication criteria. After all "the concept of separation of powers is more 'a political doctrine' than 'a technical rule of law.'" *Colon Cortés v. Pesquera*, 150 D.P.R. 724, 751 (2000). Of course, the fact that an issue has political dimensions is not equivalent to surrendering the judicial power. *Silva v. Hernández Agosto*, 118 D.P.R. 45, 54 (1986) (quoting *Baker v. Carr*, 369 U.S. 186 (1962)) ("The mere fact that the lawsuit seeks the protection of a political right does not mean that the same presents a political question").

The doctrine of political question is based on considerations of separation of powers. The basic understanding of the doctrine is that there are prudential reasons that require that the courts not attempt to resolve certain issues due to their eminently political nature, in order to avoid confrontations with other constitutional Branches. Our Supreme Court has echoed the criteria that in the federal jurisdiction point to an issue not being actionable because it is considered a political question:

to determine the applicability of the doctrine of political question one of the following elements [must exist]: (1) an express delegation of the issue in dispute to another branch of the government; (2) the absence of appropriate judicial criteria or norms to resolve the controversy; (3) the impossibility of deciding without making an initial determination of public policy that is not up to the courts; (4) the impossibility of making a decision without expressing a lack of respect toward another branch of government; (5) an unusual need to adhere, without question, to a political decision previously made; and (6) potential confusion stemming from multiple pronouncements of various government departments on a point.

*Silva v. Hernández Agosto*, 118 D.P.R. at p. 54. *See, also, Acevedo Vilá*, 2005 T.S.P.R. 79, 164 D.P.R. 875; *Noriega Rodríguez v. Jarabo*, 136 D.P.R. 497 (1994); *Santa Aponte v. Sec. of the. Senate*, 105 D.P.R. 750 (1977).

According to the foregoing criteria, it is appropriate for a court to refrain from deciding an issue because it constitutes a political question in three main instances: (i) when an issue is delegated by the Constitution to a Political Branch, either expressly or structurally, so that with their intervention the courts would be interfering with the exercise of the constitutional powers of that Branch; (ii) when there are no manageable substantive criteria to resolve the issue; or (iii) when it is impossible to resolve the issue judicially without the courts having to make a decision of public policy that is entirely inappropriate for the Judiciary. *Baker v. Carr*, 369 U.S. at p. 217. All of these factors would come together in this context. Let us see.

As we mentioned, the legal and constitutional competence to adjust disbursements in moments when a deficit Constitutional Budget is inherited falls on the Chief Executive.

> [E]xpressly the Legislature has empowered the Governor **in a broad and flexible manner** to eliminate or reduce items and appropriations in the manner he deems pertinent when in the execution and control of the budget he deems it necessary.

Sec. Just. Op. No. 16 of 1984 (emphasis ours). Judicial intervention, in this context, would involve meddling in an exercise of public policy expressly delegated by the Constitution to the Executive Branch. Quite simply, this is a function conclusively delegated to the Executive

BY OLGA M. ALICEA, FCCI, NJITCE-S

Branch by the Constitution, in which the courts do not have manageable substantive criteria to judge its correctness and for which, if such review is carried out, the court would have make decisions of public policy that transcend their institutional functions.

In particular, given the fact that the Legislature would have the political and constitutional capacity to remedy the situation of which they might complain, intervention by the Judiciary would be particularly inappropriate and imprudent. Note that, in general terms, the Legislature **could change the applicable legal framework**: (i) repealing or amending Section 2 of Joint Resolution No. 927 of 2004, which grants the Governor the authority to make certain adjustments to the disbursements; or (ii) amending Article 4 of Law No. 147, thus changing the priorities outlined therein. Second, in practical terms, the Legislature **could also change the facts, and thus end the deficit**: (i) approving tax measures to increase government revenues; or (ii) approving measures that reduce government spending, such as, for example, repealing an agency's organic act. The foregoing could be done by the Legislative Branch unilaterally, with the vote of two thirds of the members of each legislative chamber or, if what is approved advances the good common, it could be done with a simple majority in the chambers and the signature of the Governor.

This way, then, the Legislature would have the authority to judge the adjustments made by the Governor and, if deemed appropriate, use the pertinent remedy. In fact, common sense and the abundant historical experience conclusively prove that when dealing with threats to legislative prerogatives or benefits or powers to the legislator, the Legislature acts zealously and vigorously to protect their interests, without any partisan distinction. Therefore, it is inconceivable, in practical and actual terms, for a Legislature not to act to remedy a situation that is truly damaging to its ability to discharge its constitutional functions.

Given that the Legislature would enjoy such a complete remedy, in our opinion, it would not be warranted for a court to issue an order granting an extraordinary remedy, since, in this context, that would imply judicial intervention with a political controversy. *See, Acevedo Vilá*, 2005 T.S.P.R. 79, 164 D.P.R. 875 ("this Court cannot devise a judicial remedy that does not involve undue interference in the legislative power.").

CERTIFIED TRANSLATION                                    BY OLGA M. ALICEA, FCCI, NJITCE–S

**3.** *Because it deals with the exercise of discretion that the Constitution and the pertinent statutes expressly delegate to the Governor, the proposed adjustments, as well as the decision to veto or sign a bill would not be judicially reviewable*

As has been resolved in multiple instances by various state and federal courts, precisely in similar situations, the courts should not intervene in an action of the Executive Branch in the exercise of the discretion delegated to it by the Constitution and the pertinent statutes. Therefore, under this jurisprudence, a controversy over the manner in which the Governor would have decided to exercise his discretion in making the necessary adjustments to put into effect the priorities of Law No. 147 and to make the pertinent adjustments in the appropriations contained in Joint Resolution No. 927 of 2004, pursuant to its Section 2 would not be actionable. Let us see.

In *Judy v. Schaeffer*, 627 A.2d 1039, 1052-54 (Cir. Ap. Md. 1993), **expressly** concluded that when the law and the Constitution authorize the Governor to reduce the disbursements of appropriated items, it is understood that the exercise of such legal power **is not subject to judicial review** for abuse of discretion nor is it warranted to examine whether he acted arbitrarily, capriciously, or without substantial evidence. ("[T]he action by the Governor... was not the type of administrative determination which has been deemed "adjudicatory" or "quasi-judicial" under our cases. Consequently, the action is **not subject to judicial review** to determine whether it was arbitrary, capricious, or unsupported by substantial evidence.... The determination of the Governor... was quasi-legislative in nature. Our review, consequently, "is limited to assessing whether the [Governor was] acting within [his] legal boundaries.") (emphasis ours). *See, also,* Edward A. Tomlinson, *The Maryland Administrative Procedure Act: Forty Years Old in 1997*, 56 Md. L. Rev. 196 (1997).

More importantly, in *Dalton v. Specter*, 511 U.S. 462, 471, 477 (1994), the Supreme Court of the United States of America specifically established that, when a statute grants discretion to the Executive Branch to act in a certain manner, the exercise of such discretion is not judicially reviewable: "Where a statute, such as the 1990 Act, commits decision making to the discretion of the President, judicial review of the President's decision is not available." On that occasion, it explained:

> As we stated in *Dakota Central Telephone Co. v. South Dakota ex rel. Payne*, 250 US 163, 184, 39 S. Ct. 507, 509, 63 L. Ed. 910 (1919), where a claim "concerns not a want of [Presidential] power, **but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves considerations which are beyond the reach of judicial power**. This must be since, as this court has often pointed out, **the judicial may not invade the legislative or executive departments so as to correct alleged mistakes or wrongs arising from asserted abuse of discretion**."

> ........

> How the President chooses to exercise the discretion Congress has granted him is not a matter for our review. "[N]o question of law is raised when the exercise of [the President's] discretion is challenged."

*Id*. at pp. 474 and 476 (cites omitted and emphasis ours). In addition, the Federal Supreme Court clarified that the same would be the case if the discretion of the Executive Branch in question stemmed from a constitutional provision, rather than a statutory one. *Id.* At p. 475 ("Although the President's discretion in *Waterman SS Corp.* derived from the Constitution, we do not believe the result should be any different when the President's discretion derives from a valid statute.") (quoting *Chicago & Southern Air Lines, Inc. v. Waterman SS Corp.*, 333 U.S. 103, 114 (1948), which established that a discretionary decision of the President made under the auspices of one of his constitutional powers was not reviewable since "the final orders embody Presidential discretion as to political matters beyond the competence of the courts to adjudicate."). It should be noted that the Supreme Court did not reach such a conclusion hastily or lightly:

> Respondents tell us that failure to allow judicial review here would virtually repudiate *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803), and nearly two centuries of constitutional adjudication. But our conclusion that judicial review is not available for respondents' claim follows from our interpretation of an Act of Congress, by which we and all federal courts are bound. The judicial power of the United States conferred by Article III of the Constitution is upheld just as surely by withholding

judicial relief where Congress has permissibly foreclosed it, as it is by granting such relief where authorized by the Constitution or by statute.

*Id.* Thus, the Supreme Court reached these conclusions aware that it was totally depriving the complainant of the judicial review of the determinations of the Executive Branch. *Id.* ("We fully recognized that the consequence of our decision was to foreclose judicial review.").

That is, under the jurisprudence identified, we conclude that how the Governor can exercise his legal discretion to adjust disbursements of various agencies or government agencies, including those of the Legislative Branch is not judicially reviewable. Since the Executive Power has the constitutional mission to be in charge of making the necessary adjustments in moments of deficit and of making the necessary disbursements when inheriting a budget, it is its constitutionally exclusive competence how it is that - in effect, case by case and penny per penny – it decides to comply with the law of priorities or how it carries out transfers between the items of Joint Resolution No. 927 of 2004. In effect, the legal and constitutional competence to adjust the disbursements at times when a deficit Constitutional Budget is inherited falls on the Chief Executive. "[E]xpressly the Legislature has empowered the Governor **amply and flexibly** to eliminate or reduce items and appropriations in the manner he deems appropriate when in the execution and control of the budget he deems it necessary." Sec. Just. Op. No. 16 of 1984 (emphasis ours).

Although it is true that the law of priorities entrusts the Chief Executive with addressing the areas of the "preservation of public health," the "protection of persons and property," "public education programs," and "public welfare programs," among others, the manner in which the Governor complies with these, through the pertinent adjustments in disbursements, is not subject to judicial review. "**[T]he Governor has discretion** to determine what will be the mechanism to be used to carry out such elimination or reduction in accordance with the provisions of the aforementioned Law No. 147." Sec. Just. Op. No. 16 of 1984 (emphasis ours). Could an appeal be filed to judicially review whether the Chief Executive is effectively complying with "social welfare programs?" We understand that no. *See, Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) ("in general this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.").

*CERTIFIED TRANSLATION*                              BY OLGA M. ALICEA, FCCI, NJITCE–S

Thus, as a matter of law, the personal and particular criteria that a court may have to the effects that the Executive Branch may have acted, even, arbitrarily are irrelevant in this context. Insofar as the interaction between the two political Branches is concerned, especially with regard to the merits of an issue of a legislative nature, the Judiciary cannot intervene, regardless of how mistaken one may understand a particular action of one of the Branches can be.

The non-intervention of the Judiciary in this context is analogous to what would occur if one intended to contest, for example, the determination of a Legislature to approve or not a bill. That is not reviewable. Nor is the decision of a Governor to veto or not a bill. Nor is the decision of a Legislature to go above a Governor's veto. Nor is the decision of the House or Senate not to confirm an agency head. Nor is a Governor's decision on a line item veto. Just as occurs with the contested adjustment, the merits of this type of legislative determination are not reviewable, no matter how detestable the decision of the political Branch may seem to a court regarding this type of issue.

### C. The adjustments proposed by the Governor would be valid because they would not affect the ability of the Legislative Branch to discharge its constitutional function and its prerogatives would remain unaltered

### 1. As a matter of law, given that the Legislative Branch would show political and legislative remedies to resolve any potential claim, an allegation that it was being prevented from exercising its constitutional role would be unwarranted

The adjustments proposed by the Governor would be valid because they would not prevent the Branch Legislative from exercising its constitutional function. As we mentioned, given that the Legislative Branch would have political and legislative remedies to correct any dissatisfaction with the adjustments (for example, increase collections), as a matter of law it would be unwarranted to claim that it would be impeded from exercising its constitutional function. **Given that the Legislative Branch could correct through legislation any dissatisfaction that an adjustment made by the Governor may have caused to it, by definition, this would not have prevented it from exercising its constitutional function.** That is, even with the adjustment, the constitutional prerogatives of the Legislature would remain intact since said body would have legal powers to address the situation.

Regarding this issue, it is worth noting that, as we mentioned previously, the Legislative Branch would be located very differently from, for example, the Judiciary because, unlike the former, the latter would have no political or legislative remedies to correct the situation that would be caused by any adjustment to the pertinent disbursements.

## **2.** *As a matter of fact, the adjustments proposed by the Governor would not prevent the Legislature from exercising its constitutional function*

In any event, it should be borne in mind that the adjustments proposed by the Governor, as a question of fact, would not prevent the Legislature from exercising its constitutional function. In this sense, it is worth noting that the adjustment that the Governor intends to make to the House of Representatives would be only about thirteen percent (13%) compared to their budget from the previous year.  As for the Senate, the proposed adjustment for said Body would be less than twelve percent (12%) (from $38 million to $33.5 million).[18]  We understand that, as a matter of fact, it would not be warranted to conclude that such adjustments would be of such a degree that they would prevent the Legislature from exercising its constitutional function.

To further emphasize that, as a practical matter, the proposed adjustments would not prevent the Legislature from exercising its constitutional function, it should be noted that said Branch receives **additional** funds under the heading "Joint Activities," identified in Joint Resolution No. 927 of 2004, to exercise its functions. This item, according to the proposed adjustments, would come to $10.78 million.[19]  Thus, it is important to clarify that the mentioned item is **in addition** to the budget of both legislative bodies, which would only receive minimal adjustments. Furthermore, and of particular importance, is the fact that the Legislature is totally free to use the portion it deems necessary and convenient from the other $74.5 million of the budget of both Houses to finance the activities that are normally covered under this item, and vice versa. Exactly how the Legislature distributes its total budget is a matter that is strictly up to the

---

[18] With regard to the total budget for the Legislature's different activities, which includes the budget of each body as well as the items of Joint Activities and Donations, the adjustment was less than twenty percent (20%); that is, from around $126 million to around $102 million. *See,* <http://www.presupuesto.Gobierno.pr/Tomo_II/ asambleaLegislativa.htm>; and Exhibit A.

[19] It is worth noting, however, that this figure does not include the sum of $17,684 million to be disbursed out of special appropriations for other joint activities of the Legislature. *See,* Exhibit A.

*CERTIFIED TRANSLATION*                                    BY OLGA M. ALICEA, FCCI, NJITCE–S

Legislature. **The determination of how much money to grant to each line of expenses of the item on Joint Activities and of the total budget of the Legislature (that even after the proposed adjustments would total a disbursement of $102.96 million) falls, as a legal matter, on the presidents of each body.**

In any event, even taking into consideration the adjustment to the disbursements charged to the item of Joint Activities, together with the adjustment to the disbursements to the House and Senate, the total adjustment would only be approximately twenty percent (20%), which could not validate a claim of deprivation of power to exercise constitutional functions, especially in view of the significant surplus of more than $18 million which the Legislature has right now, which would reduce that total adjustment percent from twenty percent (20%) to four point seven percent (4.7%).[20]

In fact, a determination of this type, in that a budgetary adjustment has prevented another Branch from exercising its constitutional functions, is particularly **exceptional** and would require really **extraordinary** circumstances that would have to be proven by the requesting Branch. Mere allegations about speculative difficulties in their works are not enough.  *See, by analogy*, *Rose v. Palm Beach County*, 361 So. 2d 135, 138 (Fla. 1978) ("The doctrine of inherent power [to compel funding] should be invoked only in situations of **clear necessity**.... [I]t is with extreme caution that this Court approaches the issue of the power of trial courts to order payments by local governments for expenditures deemed essential to the fair administration of justice.") (emphasis ours); *Matter of Salary of Juvenile Director*, 552 P.2d 163, 176 (Wash. 1976) ("Lacking **clear, cogent and convincing proof** of a reasonable need for additional funds, it is unlikely the court would be willing to use its contempt power to enforce compliance with its fiscal determination.") (emphasis ours); *Beckert v. Warren*, 439 A.2d 638, 647 (Pa. 1981) ("the burden is on the plaintiff court to prove the 'reasonably necessity' of its funding requests.... [A]n expenditure which is 'reasonably necessary' for constitutional purposes is one absent which the

---

[20] $102 million (total disbursements after proposed adjustments to the Assembly Legislative) ☞ $18.4 million surplus = $ 120.4 million.  Given that the total budget for the Legislature last year came to around $126 million, the percentage change between that budget and the money they would have available this year even after the proposed adjustments ($120.4 million) reflects a reduction of only four point seven percent (4.7%).

*CERTIFIED TRANSLATION*                                    BY OLGA M. ALICEA, FCCI, NJITCE-S

judiciary will be unable 'to carry out its mandated responsibilities, and its powers and duties to administer Justice.'").

As a matter of fact, it should be emphasized that the different agencies of the Executive Branch would receive similar adjustments and cuts, and even greater than those of the Legislative Branch and the Judiciary (such as the General Services Administration, with a cut of more than sixty percent (60%); the Puerto Rico Solid Waste Management Authority, with a cut of thirty-three percent (33%); and the Department of Labor, with a cut of more than twenty-seven percent (27%)).

### 3. *The Governor's proposed action could not be considered arbitrary or capricious*

As has been explained, the proposed adjustment would not in any way deprive the Legislative Branch of its ability to exercise its constitutional function. In this sense, we understand that the Governor's proposed action could not be considered arbitrary or capricious for various reasons. Let us see.

#### *a. The Executive Branch has sufficient information to make informed, reasoned and justified decisions as to how to make the proposed adjustments*

**As can be seen from the text of the law**, both the OMB and the Department of the Treasury have a wealth of information regarding the finances, budgets, income, and expenses of all of the government agencies, **including the Legislative Branch**. This is unquestionable given that the very Accounting Act provides that the Secretary of the Treasury "will be the official in charge of the custody of all pf the public funds of the agencies and of keeping the central accounting of such funds," including the funds of the Legislative Branch. Art. 6 of the Law No. 230, 3 L.P.R.A. § 283e.  Similarly, the Organic Act of the OMB establishes:

> The Office of Management and Budget under the rules, regulations, instructions, and orders that the Governor prescribes, will advise the Chief Executive, **the Legislature**, and the government agencies on budgetary, programmatic, and of administrative management, as well as in matters of a fiscal nature relative to its functions; it will carry out the necessary functions that allow the Governor to submit to the Legislature the Annual Budget of the Capital Improvements and Operating Expenses of the Government,

including the public corporations; it will ensure that the implementation and administration of the budget by the public bodies are conducted in accordance with the laws and appropriations resolutions, with the soundest and most adequate norms of fiscal and managerial administration, and consonant with the programmatic purposes for which they are allocated or provided with public funds. It will evaluate the programs and activities of the public agencies in terms of economy, efficiency, and effectiveness and will submit to the Governor reports with recommendations for the implementation thereof. **It will prepare and maintain control over all of those fiscal and budgetary documents that may be necessary for the administration of the budget and it will carry out the changes, amendments, or adjustments that are warranted, subject to the legal provisions and norms established by the *Legislature* and the Governor.** It will remain alert to new currents and trends in the budgetary and managerial area of public administration to evaluate and adapt those techniques, methods, and approaches that apply to the local administrative field, both in the formulation and execution of the budget and in the evaluation of programs, managerial analysis, and operational and administrative audit. In addition, it must propose the legislation deemed necessary and convenient to incorporate such approaches and trends into our budget and administrative process.

Art. 3 (a) of Law No. 147, 23 L.P.R.A. § 103 (a) (emphasis ours).

The duties assigned to these agencies require that they have all of the information and the necessary expertise to recommend to the Governor precisely what adjustments to disbursements are the most recommended. Thus, we understand that the Executive Branch is very aware, when proposing adjustments to the disbursements, that the Legislature has surpluses of more than $18 million left by the previous Legislature. It is precisely based on all of the financial and economic information available to the Executive Branch that the Governor has formulated his proposal for adjustments to the disbursements for the Legislature by an amount very close to the total of the surpluses mentioned above. For all of these reasons, we understand that it would be wrong to determine that the Governor was acting arbitrarily.

BY OLGA M. ALICEA, FCCI, NJITCE-S

### *b. The Governor's proposed action would be protected by presumptions of correctness*

Finally, it should be noted that the Governor's proposed action would be protected by presumptions of correctness. On its part, Rule 16 of the Rules of Evidence establishes a number of presumptions. In particular, it is presumed "[t]hat the duties of a position have been fulfilled regularly" and "[t]hat the law has been obeyed." 32 L.P.R.A. App. IV, R. 16 (15) and (32). These two presumptions would be applicable to the situation object of this consultation. In fact, absent a display of evidence to the contrary, they would compel a court to determine that the Governor acted in accordance with the law and in his sound discretion in making the proposed adjustments to the disbursements charged to current budgetary appropriations.

### IV. *CONCLUSION*

Essentially, we understand that the adjustments proposed by the Governor to the disbursements charged to the Constitutional Budget in effect for fiscal year 2005-2006 would be legally valid. First, it is our opinion that the Governor has the constitutional power to, in a deficit situation, carry out the proposed adjustments. Second, we understand that a court would lack jurisdiction to address any claim regarding the proposed adjustments, since it is a non-actionable issue. Third, even if it is understood that judicial review would be warranted in this context, the truth is that, as a matter of law, the proposed adjustments should be considered valid because they do not in any way deprive the Legislative Branch from discharging its constitutional function and, even thereafter, its constitutional prerogatives would remain intact.

It should be noted that the Governor's authority to adjust disbursements in deficit situations extends to the Legislature. There is no support whatsoever in the text or constitutional history to treat the Legislative Branch differently in deficit situations. Nor is there any in the text or history of the relevant laws. Note that a conclusion to the contrary would perniciously isolate one of the political branches from the consequences of the deficit. Such a determination would give leave to the Legislative Branch to act irresponsibly and, at the same time, not feel in any way the impact of its decision, either in its internal operation or in terms of political responsibility.

Finally, a superficial viewpoint of absolute separation of powers is wrong, with respect to a supposed "independence" and a supposed principle of "non-intervention." This "vision" is

contrary to the multiple instances in which the Constitution expressly empowers each of the branches to intervene with the other (the approval of legislation, with the intervention of the Governor through the veto and the line item veto, is the most conclusive example). The very Constitution expressly rejects a rigid conception of absolute separation of powers when authorizing the mixing of functions and interdependence among the Branches.

In fact, a determination to the effect of prohibiting the Executive Branch from carrying out adjustments to the disbursements for the Legislative Branch in this context would entail an unsurmountable internal inconsistency: if, under an absolutist and arbitrary vision of the separation of powers, the Executive Branch cannot, in times of deficit, adjust the disbursements of the items allocated to the Legislative Branch, does that mean that the Legislative Branch cannot refuse to approve sufficient collections of funds so that full disbursements can also be made to the agencies of the Executive Branch? Or is it that the Legislature would not be "unduly intervening with the independence" of the Executive Branch by not approving the collections of funds that would allow the disbursement of all of what was allocated last year to the different agencies of the Executive Branch? Would that also be judicially reviewable?

Moreover, given that the Executive Branch does not have the power to generate revenues without the concurrence of the Legislature, while the latter does have the power to approve collections of funds that allow the totality of its budget from last year to be disbursed (even without the concurrence of the Governor, through a vote of two thirds of the legislators of each chamber), wouldn't the claim of the Executive Branch regarding "undue intervention" be even stronger than that of the Legislative Branch? That is, under what reasonable concept of the doctrine of separation of powers can one legitimize a legal argument regarding a problem whose solution is within easy reach, and under the absolute control of the claimant? If the Legislature understands that additional collection of funds should not be approved that is its political prerogative, but what, in our opinion, constitutionally it could not do is recruit the Judiciary to assist it in isolating itself totally from the consequences of such position.

As for this matter, it should not be underestimated, in terms of the correct analysis regarding the scope of the functions of each Branch of government, the importance of taking into consideration the powers that the Constitution textually grants to each of such Branches. Thus, it is extremely

*CERTIFIED TRANSLATION*                                     BY OLGA M. ALICEA, FCCI, NJITCE–S

important to emphasize that the Legislative Branch would be requesting a judicial remedy to a situation that it has the power to resolve by itself.  In this sense, its claim would be, in our opinion, much weaker than a hypothetical claim of the Judiciary given a similar situation, since said Branch does not have the political tools to solve said problem.

On the other hand, we understand that any claim in this context would not be actionable.  That, in essence, given the undisputable fact that the Legislative Branch has the political and constitutional means to judge the performance of the Governor and, if it truly finds it onerous, to remedy the situation through legislation.  Note that unwillingness to approve sufficient collection measures by the Legislature is precisely the reason why there is a deficit. This, in turn, is the only reason why the Executive Branch would have to carry out adjustments to the disbursements of appropriations of various agencies of the Executive Branch and the Legislature. In short, it is in the hands of the very Legislative Branch to approve measures for additional collections, which would solve the deficit and allow the Executive Branch to disburse the entire previous budget of the Legislature and of all of the agencies of the Executive Branch.  In this context, judicial intervention in this political controversy would be highly improper and imprudent.

Finally, even if it were warranted to judicially review the amount of the proposed adjustments, they would be valid, as a matter of law, for not depriving the Legislature of its ability to discharge its constitutional function.  The simple, but indisputable, fact that the Legislature did not act to remedy the alleged injury to its constitutional functions indubitably would imply that, truly, such injury did not materialize.

Cordially,

Roberto Sánchez Ramos   Exhibit *[sic]*

**CERTIFICATION**

I, Olga M. Alicea, an English-Spanish Interpreter and Translator certified to that effect by the Administrative Office of the U.S. Courts and by the National Association of Judiciary Interpreters & Translators (NAJIT), do hereby certify that I have personally translated the foregoing document from Spanish to English and that the translation is true and accurate to the best of my knowledge and abilities.

S/    **Olga M. Alicea**                                          **May 16, 2020**
Olga M. Alicea, FCCI, NJITCE-S                                          Date
Fed. Cert. No. 98-005                                          Ref.: P1701.000(CGB)