**Hearing Date**: June 3, 2020 at 9:30 a.m. (AST).

# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors. [1] | PROMESA<br>Title III<br><br>No.  17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY ("PREPA"),<br><br>Debtor. | PROMESA<br>Title III<br><br>No.  17 BK 4780-LTS |
| PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Movant,<br><br>v.<br><br>WINDMAR RENEWABLE ENERGY, | **Re: ECF Nos. 1951, 1973, 1974** |

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

UNIÓN DE TRABAJADORES DE LA INDUSTRIA
ELÉCTRICA Y RIEGO, INC., COMITÉ DIÁLOGO
AMBIENTAL, INC., EL PUENTE DE
WILLIAMSBURG, INC. - ENLACE LATINO DE
ACCIÓN CLIMÁTICA, COMITÉ YABUCOEÑO
PRO-CALIDAD DE VIDA, INC., ALIANZA
COMUNITARIA AMBIENTALISTA DEL
SURESTE, INC., SIERRA CLUB PUERTO RICO,
INC., MAYAGÜEZANOS POR LA SALUD Y EL
AMBIENTE, INC., COALICIÓN DE
ORGANIZACIONES ANTI INCINERACIÓN,
INC., AMIGOS DEL RÍO GUAYNABO, INC.,
CAMPAMENTO CONTRA LAS CENIZAS EN
PEÑUELAS, INC., and CAMBIO PR, INC.

Respondents.

**PREPA'S OMNIBUS REPLY TO OBJECTIONS TO
PREPA`S URGENT MOTION FOR ENTRY OF AN ORDER
AUTHORIZING PREPA TO ASSUME CERTAIN CONTRACTS WITH
ECOELÉCTRICA, L.P. AND GAS NATURAL APROVISIONAMIENTOS SDG, S.A.**

## <u>TABLE OF CONTENTS</u>

**PAGE**

PRELIMINARY STATEMENT ................................................................................................. 1

LEGAL STANDARD ............................................................................................................. 6

ARGUMENT ...................................................................................................................... 12

   I.   ASSUMPTION OF THE CONTRACTS CONSTITUTES AN EXERCISE OF SOUND
GOVERNMENTAL JUDGMENT ............................................................................... 12

      i.   The Contracts provide clear benefits to PREPA both economically and operationally. 12

      ii.   PREPA achieved all these benefits through a robust approval process with no evidence
of bad faith. ......................................................................................................... 16

      iii.   The Contracts are the Result of a Competitive Process. ............................................. 18

   II.   THE AMENDMENTS TO THE PRE-RESTATEMENT CONTRACTS DO NOT
RADICALLY CHANGE THE NATURE OF THE CONTRACTS SUFFICIENT TO
CONSITUTE A NOVATION UNDER PUERTO RICO LAW ............................................. 20

   III.   PREPA'S FINAL ASSUMPTION MOTION IS NOT THE VEHICLE TO SECOND
GUESS PREB'S APPROVAL ................................................................................... 24

   IV.   OBJECTORS FAIL TO DEMONSTRATE STANDING TO OBJECT ...................... 26

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Exec. Leasing Corp. v. Banco Popular de Puerto Rico*,
48 F.3d 66 (1st Cir. 1995) ........................................................................22

*FDIC v. P.L.M. Int'l, Inc.*,
834 F.2d 248 (1st Cir. 1987) ...........................................................3, 21, 23

*In re Airlift International, Inc.*,
18 B.R. 787 (Bankr. S.D. Fla. 1982) .............................................................7

*In re ANC Rental Corp., Inc.*,
277 B.R. 226 (Bankr. D. Del. 2002) ........................................................ 30

*In re BankVest Capital Corp.*,
290 B.R. 443 (B.A.P. 1st Cir. 2003), *aff'd*, 360 F.3d 291 (1st Cir. 2004) ................................6

*In re BankVest Capital Corp.*,
360 F.3d 291 (1st Cir. 2004), *cert. denied*, 542 U.S. 919 (2004) ...........................................26

*In re C.P. Hall Co.*,
750 F.3d 659 (7th Cir. 2014) ......................................................................28

*In re Caribbean Petroleum Corp.*,
444 B.R. 263 (Bankr. D. Del. 2020) ...........................................................11

*In re Curlew Valley Assocs.*,
14 B.R. 506 (Bankr. D. Utah 1981) .............................................................7

*In re Dein Host, Inc.*,
835 F.2d 402 (1st Cir. 1987) ......................................................................28

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
No. 17 BK 3283-LTS, 2020 WL 114518 (D.P.R. Jan. 7, 2020), *aff'd*, 954 F.3d
1 (1st Cir. 2020) ...................................................................................7, 20

*In re FirstEnergy Sols. Corp.*,
945 F.3d 431 (6th Cir. 2019) .................................................................8, 9

*In re Global Indus. Techs.*,
645 F.3d 201 (3d Cir.2011).........................................................................28

*In re James Wilson Assocs.*,
965 F.2d 160 (7th Cir.1992) ......................................................................28

iv

*In re Mirant*,
   378 F.3d 511 (5th Cir. 2004) ..................................................................8, 9

*In re Old Carco LLC*,
   406 B.R. 180 (Bankr. S.D.N.Y 2009) ..........................................................11

*In re Orion Pictures Corp.*,
   4 F.3d 1095 (2d Cir. 1993)...................................................................7, 26

*In re Pilgrim's Pride Corp.*
   403 B.R. 413 (Bankr. N.D. Tex. 2009)..........................................................10

*In re Sw. Equip. Rental*,
   152 B.R. 207 (Bankr. E.D. Tenn. 1992) .........................................................28

*In re Tower Park Properties, LLC*,
   803 F.3d 450 (9th Cir. 2015) ...................................................................27

*In re Trans World Airlines, Inc.*,
   261 B.R. 103 (Bankr. D. Del. 2001) ......................................................4, 6, 17

*In re Vent Alarm Corp.*,
   No. 15-09316-MCF11, 2016 WL 1599599 (Bankr. D.P.R. Apr. 18, 2016)............................13

*Jorge Rivera Surillo & Co. v. Cerro Copper Prods. Co.*,
   885 F. Supp. 358 (D.P.R. 1995)...............................................................3, 21

*Marina Indus. Inc. v. Brown Boveri Corp.*,
   14 P.R. Offic. Trans. 86 (P.R. 1983)...........................................................21

*N.L.R.B. v. Bildisco and Bildisco*,
   465 U.S. 513 (1984)...........................................................................8

*Richmond Leasing Co. v. Capital Bank, N.A.*,
   762 F.2d 1303 (5th Cir. 1985) ...............................................................6, 7

*United States v. Tit's Cocktail Lounge*,
   873 F.2d 141 (7th Cir. 1989) .................................................................28

*Warner Lambert Co. v. Superior Court of P.R.*,
   1 P.R. Offic. Trans. 527 (P.R. 1973)...........................................................21

**STATUTES**

22 L.P.R.A. § 196 ................................................................................5

31 L.P.R.A § 3242 ...............................................................................20

31 L.P.R.A § 3471 ...............................................................................22

11 U.S.C. § 365(a) ...................................................................................................................6

11 U.S.C. § 1109(b) ..............................................................................................................27

16 U.S.C. § 824(b)(1) ...........................................................................................................10

PROMESA § 301 ...............................................................................................................6, 20

PROMESA § 305 .....................................................................................................................7

PROMESA § 315 .....................................................................................................................5

**OTHER AUTHORITIES**

*3 Collier on Bankruptcy* ¶ 365.03. ....................................................................................27

*5 Collier on Bankruptcy* ¶ 1109.02 ...................................................................................27

To the Honorable United States District Court Judge Laura Taylor Swain:

The Puerto Rico Electric Power Authority ("PREPA"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as PREPA's representative pursuant to section 315(b) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"),[3] respectfully submits this omnibus reply (the "Reply") to *Response to PREPA's Urgent Motion for Entry of an Order Authorizing PREPA to Assume Certain Contracts With Ecoelectrica, L.P., and Gas Natural Aprovisionamientos SDG, S.A.* [ECF No. 1973] (the "Windmar Response"), filed by Windmar Renewable Energy ("Windmar") and *Motion in Opposition to PREPA's Urgent Motion for Entry of an Order Authorizing PREPA to Assume Certain Contracts With Ecoelectrica, L.P., and Gas Natural Aprovisionamientos SDG, S.A.* [ECF No. 1974] (the "UTIER Opposition", and together with the Windmar Response, the "Objections"), filed by Unión de Trabajadores de la Industria Eléctrica y Riego, Inc. ("UTIER") and various environmental organizations (collectively with Windmar and UTIER, the "Objectors"). In support of the Reply, PREPA respectfully represents as follows:

### PRELIMINARY STATEMENT[4]

1.      Through their Objections, PREPA's primary union, various environmental groups, and a renewable power provider seek to substitute the considered judgment of PREPA, the Oversight Board, and PREB (PREPA's independent regulator) with their own agendas. Nonetheless, PREPA exercised sound judgment in seeking to assume the Contracts with the sole supplier of natural gas to PREPA's Costa Sur Generation Facility and the adjacent EcoEléctrica,

---

[3]   PROMESA is codified at 48 U.S.C. §§ 2101-2241.

[4]   Capitalized terms used but not otherwise defined herein shall have the meaning given to them in *PREPA's Urgent Motion for Entry of an Order Authorizing PREPA to Assume Certain Contracts With EcoEléctrica, L.P. and Gas Natural Aprovisionamientos SDG. S.A.* [ECF No. 1951] (the "Motion").

L.P. ("ECO") Generation Facility that (1) are compliant with PREPA's certified Fiscal Plans (Mot. ¶ 8), (2) are vital to PREPA's operations and PREPA's ability to comply with the energy public policy of Puerto Rico (Mot. ¶ 22), (3) will provide a reliable source of natural gas for the ECO Generation Facility for over a decade and for the Costa Sur Generation Facility until its retirement or replacement, and (4) will save PREPA hundreds of millions of dollars over the course of the Contracts (Mot. ¶ 9). PREPA's judgment has been confirmed by the independent approval of the Contracts by the Oversight Board and PREB. The Objections should therefore be overruled and the Court should approve the Motion.

2.      As a preliminary matter, Objectors have not demonstrated that they have standing to object to the assumption of the Contracts. Indeed, the environmental advocacy groups are not parties in interest in PREPA's Title III case under Bankruptcy Code section 1109 and therefore do not have a right to be heard on the Motion. Although both Windmar and UTIER are parties in interest, neither party attempts to make any showing that the assumption of the Contracts will cause them any injury or grievance. Instead, their Objections are not on account of their claims, but driven by considerations addressable in other forums (PREB for example) such as PREPA's compliance with renewable energy portfolio targets under the *Puerto Rico Energy Public Policy Act*, Act No. 17-2019, the pace of solar energy development on the Island, and their own future business prospects. If the Court does not first require parties to make some threshold showing of injury relating to their claims, then even summary proceedings, such as contract assumption or rejection motions, will devolve into debates on public policy, bog down the administration of the Title III Case, and improperly divert PREPA's attention as well as scarce resources.

3.      As to the merits, Objectors generally raise some form of five arguments, all of which have no bearing on the narrow inquiry before the Court. *First,* Objectors argue the Court

does not have jurisdiction to hear the motion because the Contracts are not amended, but entirely new contracts.  UTIER Opposition ¶¶ 30, 56, 61, 77–78; Windmar Response at 4.  Objectors are wrong.  Under Puerto Rico law, "[t]he novation of an agreement is primarily an issue of motive and intent of the parties."  *Jorge Rivera Surillo & Co. v. Cerro Copper Prods. Co.*, 885 F. Supp. 358, 363 (D.P.R. 1995).  Here, the parties to the Contracts agree that this is an amendment, not a novation.  Their clear intention to amend and extend the Pre-Restatement Contracts, rather than enter into new contracts, is substantially determinative on the novation issue.  Further, a novation requires a "radical change in the nature of the underlying obligations."  *FDIC v. P.L.M. Int'l, Inc.*, 834 F.2d 248, 251 (1st Cir. 1987).  While the amendments alter the mechanics of the Contracts in meaningful and beneficial ways, the fundamental nature of the Contracts remain the same: (a) ECO will continue to sell, and PREPA will continue to purchase, generating capacity made available by the ECO Generation Facility, and (b) Naturgy will continue to sell, and PREPA will continue to purchase, natural gas for use to generate power.

4.      *Second,* Objectors argue—against the heavy weight of authority—that the Court should take the novel approach of abandoning the business judgment standard in favor of applying a "balance of the equities" standard to the Motion.  The cases Objectors cite are inapposite as they involve (a) contract *rejection* motions by (b) chapter 11 debtors that (c) the contract counterparty or regulator opposed and (d) which implicated federal statutory and regulatory considerations that allegedly conflicted with application of the business judgment rule.  None of these concerns are implicated here, as the Oversight Board and PREB have approved the Contracts, there are no competing federal statutory or regulatory considerations, and the contract counterparties support *assumption* of the Contracts.

5.     *Third,* the Objectors cherry-pick certain features of the Contracts, while ignoring

their benefits, in trying to make a case that the "business judgment" standard is not met.  As shown

below, the substantial benefits of the Contracts, coupled with the rigorous approval processes the

Contracts underwent—from the PREPA Governing Board, the Oversight Board, and PREB—

demonstrate that the Contracts easily meet the business judgment standard as they provide a benefit

to the debtor and are not "the product of 'bad faith, or whim or caprice.'" *In re Trans World

Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) (citation omitted).  Moreover, each of

Objectors' critiques is misguided.

6.     *Fourth*, Objectors argue the Contracts are not the product of a competitive bidding

process and that PREPA was somehow "strong-armed" into accepting unfair terms.  In advancing

their arguments, Objectors contend that ECO and Naturgy have violated the Sherman Act.  But

the Title III Court is not the proper forum to hear antitrust disputes, and such issues certainly have

no place in a proceeding on a summary contract assumption motion.  Moreover, Objectors'

arguments miss the mark yet again. As Objectors seem to concede, in the absence of the Naturgy

GSPA, PREPA would have no viable supplier of natural gas to produce power from the Generation

Facilities, which have generated as much as 40% of the electricity consumed in Puerto Rico.

Objectors do not proffer any alternate solution.  If Objectors' argument is that PREPA had no

choice other than to do this deal, then how can it not be an appropriate exercise of PREPA's

judgment to do this deal?  This does not mean, however, that PREPA did not have bargaining

power.  Objectors ignore that ECO and Naturgy also did not have realistic alternatives to amending

and extending the Pre-Restatement Contracts.  PREPA, in its role as the only practical purchaser

of power and gas from EcoEléctrica and Naturgy, respectively, had substantial leverage, and

exercised it in extracting valuable savings and concessions under the Contracts.  Ample evidence

4

supports its judgment that these savings and concessions support an amendment and extension of the Pre-Restatement Contracts and warrant the assumption of the Contracts.

7.    *Fifth*, Objectors attempt to cast doubt on the finality of PREB's approval of the Contracts.  In doing so, Objectors effectively seek to use this Court as a forum in which to appeal a PREB decision which they otherwise have no right to challenge.  As shown below, the Court should disregard these arguments because only PREPA, and not the Objectors or even the counterparties to the Contracts, has the legal right to seek reconsideration of PREB's decision. Nevertheless, to nullify any of these concerns, the Oversight Board respectfully submits a revised proposed order, attached as **Exhibit A**, expressly stating PREPA's assumption of the Contracts will not override PREB's process regarding the approval of the Contracts (the "Revised Proposed Order"), and the amended Contracts will nonetheless require PREB approval to the extent required under applicable law and regulations.[5]

8.    *Finally*, Objectors ask the Court to delay consideration of the assumption motion in light of the COVID-19 pandemic and recent earthquakes on the Island. While PREPA acknowledges the gravity of these developments, it is PREPA, and not its union, PPOA counterparties, or environmental advocacy groups, that is charged with "promot[ing] the general welfare and increasing] commerce and prosperity" of the Commonwealth.  22 L.P.R.A. § 196. Moreover, it is the Oversight Board that has the sole authority under PROMESA to prosecute the Title III case.  PROMESA § 315.  PREPA already accommodated a considerable extension of both the hearing and the objection deadline to provide parties ample time to consider and object to the motion and to permit UTIER to review the non-confidential materials PREPA shared with PREB.

---

[5]    The Oversight Board's consent to PREPA's assumption of the Contracts being contingent on final PREB approval is limited to the current facts and circumstances and is not a waiver of PREPA's or the Oversight Board's right to enter into, assume, or reject other contracts with or without PREB's approval.

PREPA has weighed the various relevant considerations and has determined that there is no reason to delay realizing the savings under the amended Contracts, something it cannot do under the terms of the Contracts absent Court approval. Accordingly, PREPA respectfully requests that the Objections be overruled, and that the Court grant the Motion.

## **LEGAL STANDARD**

9.      Under Bankruptcy Code section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease." 11 U.S.C. § 365(a); PROMESA § 301 (incorporating 11 U.S.C. § 365). Section 365 of the Bankruptcy Code is intended to enable a debtor to "force others to continue to do business with it when the bankruptcy filing might otherwise make them reluctant to do so" in order to "make[] the debtor's rehabilitation more likely." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1310 (5th Cir. 1985) (per curiam). It is expected that "if anyone objects to the debtor's assumption of the contract it will be the other party to the executory contract, not the debtor's creditors who are strangers to the transaction." *Id.* at 1310–11.

10.      In light of this purpose, assumption of an executory contract is subject to review under the business judgment rule. Under this standard, a debtor's decision "must be summarily approved unless it is the product of bad faith, or whim or caprice." *In re Trans World Airlines, Inc.*, 261 B.R. at 121; *see also In re BankVest Capital Corp.*, 290 B.R. 443, 447–48 (B.A.P. 1st Cir. 2003), *aff'd*, 360 F.3d 291 (1st Cir. 2004) (A motion to assume an executory contract "should be considered a summary proceeding," and "the only issue properly before a court is whether the assumption or rejection of the subject contract is based upon a debtor's business judgment."). More exacting scrutiny would merely "slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the

6

estate, and threaten the court's ability to control a case impartially." *Richmond*, 762 F.2d at 1311;

*see also In re Airlift International, Inc.*, 18 B.R. 787, 789 (Bankr. S.D. Fla. 1982); *In re Curlew*

*Valley Assocs.*, 14 B.R. 506, 509–514 (Bankr. D. Utah 1981).  Accordingly, courts have long

recognized that a proceeding on a motion to assume "is not the time or place for prolonged

discovery or a lengthy trial with disputed issues." *In re Orion Pictures Corp.*, 4 F.3d 1095, 1098–

99 (2d Cir. 1993) (vacating bankruptcy court judgment regarding merits of breach of contract claim

as beyond the scope of the inquiry on a motion to assume).

11.    Such considerations are amplified in Title III, where the Oversight Board's

governmental discretion is afforded deference beyond considerations such as returns for creditors,[6]

and the Court's ability to interfere with the debtor's operations is limited to those circumstances

where the Oversight Board consents. *See* PROMESA § 305.

12.    In contravention of the well-settled body of case law applying the business

judgment rule to motions to assume contracts, the Objectors attempt to inject a host of issues

outside the scope of the narrow business judgment inquiry and, in doing so, attempt to turn a

summary proceeding into a litigation circus.  They ask the Court to sit as an appeal forum for

PREB's approval of the Contracts (UTIER Opposition ¶¶ 48–55; Windmar Response at 13–21,

23), to examine the effects the Contracts would have on UTIER's members (UTIER Opposition ¶

93), determine whether the purchase of LNG is consistent with renewable energy goals in light of

"the imminent threat of climate change" (*Id*. ¶ 95), to determine the "short, medium, and long-

term repercussions" on ratepayers (*Id*. ¶ 94), and to consider the effects of the Contracts on the

public interest in general (*Id*. ¶ 98).  To justify these improper inquiries, UTIER advocates the

---

[6]    *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, No. 17 BK 3283-LTS, 2020 WL 114518, at *3 (D.P.R. Jan. 7, 2020), *aff'd*, 954 F.3d 1 (1st Cir. 2020) ("The Oversight Board has been given the responsibility of balancing and prioritizing the relevant issues and concerns in developing fiscal arrangements and plans of adjustment, and it is entitled to a measure of deference in carrying out this responsibility.").

Court discard the "business judgment" standard and instead apply a "balance of the equities" standard.  *See* UTIER Opposition ¶¶ 42–47, 80–88, 171–80 (relying on *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513 (1984); *In re Mirant*, 378 F.3d 511 (5th Cir. 2004); *In re FirstEnergy Sols. Corp.*, 945 F.3d 431 (6th Cir. 2019)).   None of the cases UTIER cites supports such a drastic deviation from the settled standard.

13.     UTIER first points to *Bildisco* for the proposition that "courts have carved out an exceptional standard for unique contracts" such as collective bargaining agreements.  UTIER Opposition ¶ 42.  UTIER's reliance is misplaced.  In *Bildisco*, the Supreme Court held that given policies and regulatory scheme underlying the National Labor Relations Act (NLRA), Congress intended a higher standard than the business judgment rule to apply to review of a decision to *reject* a collective bargaining agreement, and, as such, the debtor should instead be required to show that the equities weigh in favor of *rejecting* the labor contract.  465 U.S. at 526.  Specifically, the Court held that before a debtor may reject a collective bargaining agreement, it must show "efforts to negotiate a voluntary modification have been made and are not likely to produce a prompt satisfactory solution."  *Id. Bildisco* is inapt for at least two reasons.  First, *Bildisco* dealt with the unilateral rejection of a CBA in the face of the NLRA's stated federal policy to protect the process of labor negotiations.  *Id*. at 534.  UTIER points to no federal statute (or any statute) to allege that PREPA's assumption is in direct contravention of Congressional intent or that Congress intended a more rigorous standard be applied.  Second, the case is devoid of any suggestion that the "balance of equities" standard would apply if the debtor sought to *assume* rather than reject the contract.[7]  The opposite is true: if the debtor had obtained a voluntary modification

---

[7]     On May 18, 2020, Magistrate Judge Judith Dein entered an Order on Motion for Protective Order [ECF No. 1995] ("Order on Motion for Protective Order").  The order recognizes "to date, the balancing of the equities test apparently has been applied only to private debtor motions to reject executory contracts that have been implemented under a

and sought to assume the CBA as amended (as is proposed here), it would have met the more exacting standard set forth by the *Bildisco* court.  Seen another way, the test in *Bildisco* simply cannot be applied to PREPA because PREPA cannot show efforts to negotiate a voluntary modification were unsuccessful when, in fact, they were successful.

14.     UTIER also cites to *Mirant* and *First Energy* for the proposition that power purchase agreements are unique contracts.  But these cases also dealt with a federal scheme that disfavors the unilateral rejection of a contract, not assumption.  In *Mirant,* the Fifth Circuit held that application of the business judgment standard to the decision to reject a FERC-regulated contract for the sale of electric energy in interstate commerce would be inappropriate because the lower court needed to "ensure that rejection does not cause any disruption in the supply of electricity to other public utilities or to consumers."  378 F.3d at 525.  The appellate court further suggested that FERC participate in the proceeding "to assist the court in balancing these equities." *Id.* at 525–26.  In *FirstEnergy*, the Sixth Circuit likewise held that the business judgment standard does not apply to a debtor's motion to reject a FERC-approved power purchase agreement.  945 F.3d at 454–55 ("[W]hen a Chapter 11 debtor moves the bankruptcy court for permission to reject a filed energy contract *that is otherwise governed by FERC*, via the FPA, the bankruptcy court must consider the public interest and ensure that the equities balance in favor of rejecting the contract, *and it must invite FERC to participate* and provide an opinion in accordance with ordinary FPA approach . . . .") (emphasis added).

15.     Here PREB, not FERC is the relevant regulatory body with jurisdiction and PREB has approved the Contracts.  Unlike the cases cited by the Objectors, PREPA is acting in accord

---

federal regulatory system. In those circumstances, the debtor's decision conflicted with the decision of the regulatory agency entrusted to protect the public policy at issue." *Id.* at 8

with its regulator, PREB,[8] not against it.[9]  And, as explained above, any authorization by the Court

to assume the Contracts will be explicitly subject to PREB approval.  Moreover, PREPA seeks to

assume Contracts that have also been approved by the Oversight Board as compliant with

PREPA's certified Fiscal Plan.  Simply put, the public policy concerns present in the cases cited

by UTIER are not implicated here (and even if they were implicated, the concerns have been fully

addressed by PREB and Oversight Board approval).  Indeed, although Magistrate Judge Dein did

not rule on the correct standard for approving contract assumption, she recognized, "[t]he

application of the balancing of the equities standard to the instant situation, where the agency

entrusted with enforcing the public policy behind the transmission and sale of electricity agrees

with the debtor's position, would be a novel situation." Order on Motion for Protective Order at 9.

16.      Finally, UTIER argues that the balance of equities standard should be applied

because PREPA is the provider of an essential service and "the main energy provider and exclusive

distributor of energy in Puerto Rico."  UTIER Opposition ¶ 46.  But public impact alone does not

justify application of a heightened standard of review of a contract assumption or rejection.  As

the Court in *In re Pilgrim's Pride Corp.* observed, "[i]f the bankruptcy court must second-guess

every choice by a trustee or debtor in possession that may economically harm any given locale,

the business judgment rule applicable to contract rejection and many other decisions . . . will be

swallowed by a public policy exception."  403 B.R. 413, 425 (Bankr. N.D. Tex. 2009).  The court

---

8   *See generally* Resolution and Order, *In re: Request for Approval of Amended and Restated Power Purchase and Operating Agreement with EcoEléctrica and Natural Gas Sale and Purchase Agreement with Naturgy*, Case No. NEPR-AP-2019-0001 (March 11, 2020) (https://energia.pr.gov/wp-content/uploads/2020/03/Resolution-and-Order-NEPR-AP-2019-0001-1.pdf) ("PREB Resolution and Order").

9   *Mirant* and *First Energy* are also not applicable here because, unlike the wholesale electric power purchase and sale agreements at issue in those cases, the agreements PREPA seeks to assume are not contracts for the transmission or sale of electric energy in interstate commerce and hence are not subject to FERC's jurisdiction under the Federal Power Act.  *See* 16 U.S.C. §824(b)(1).  Electric energy produced and transmitted within Puerto Rico does not move in interstate commerce.

went on to make clear the "balance of equities" standard articulated in *Bildisco* and *Mirant* applies in one limited context:  where a debtor's decision to *reject* a regulator-approved contract poses a potential conflict between the regulator's authority and that of the bankruptcy court.  *Id.* at 423 (distinguishing *Bildisco* and *Mirant* because those cases involved "a potential conflict between the power to reject contracts under the Code and the role of a regulatory agency" and approving contract rejection under the business judgment rule); *accord In re Old Carco LLC*, 406 B.R. 180, 189 (Bankr. S.D.N.Y 2009) (distinguishing *Bildisco* and *Mirant* because in those cases "the authority to reject under § 365(a) conflicted with the policies designed to protect the national public interest underlying other federal regulatory schemes"); *see also In re Caribbean Petroleum Corp.*, 444 B.R. 263, 269 (Bankr. D. Del. 2020) (policy concerns reflected in Federal Petroleum Marketing Practices Act to protect franchisees from arbitrary or capricious termination do not justify deviating from business judgment rule).

17.     Consistent with the principle that the "balance of the equities" test should only be applied in limited circumstances and where the debtor seeks to *reject* a contract, the Bankruptcy Court for the Northern District of California has approved PG&E's motion to assume amendments to power purchase agreements under the business judgment rule notwithstanding that PG&E is the energy provider for nearly 16 million California residents.  *See* Order Approving Utility's Sixth Omnibus Motion to Assume Certain Contract Price Discounted Energy Procurement Agreements at 2, *In re PG&E Corp*, No. 19–30088 (Bankr. N.D. Cal. Nov. 4, 2019), ECF No. 4574 (approving assumption as "a sound exercise of the Utility's business judgment").  Finally, this court has previously employed the business judgment standard in approving PREPA's assumption of fuel supply contracts.  *See* ECF No. 1624 at 2 (the assumption of the Amendment to the Fuel Supply Contract represents a sound exercise of PREPA's judgment.).

## ARGUMENT

I.   **ASSUMPTION OF THE CONTRACTS CONSTITUTES AN EXERCISE OF SOUND GOVERNMENTAL JUDGMENT[10]**

    **A.  THE CONTRACTS PROVIDE CLEAR BENEFITS TO PREPA BOTH ECONOMICALLY AND OPERATIONALLY.**

18.     As demonstrated in the Urgent Motion, the Contracts provide a clear benefit to PREPA in the form of millions of dollars of savings that will benefit PREPA's operations and restructuring efforts.  Padilla Decl. ¶ 16.  Through amendments to the Pre-Restatement PPOA, PREPA obtained a reduction in the capacity payment that will yield approximately $108 million in annual savings in this category of costs.  *Id.* ¶ 12. This was accomplished by reducing PREPA's aggregate payment obligations from approximately $230 million per year at 507 MW to approximately $128 million per year at 530 MW and increasing the availability bonus with reasonable limitations to avoid payment of excessive compensation.  Sargent & Lundy Report, *EcoEléctrica and Naturgy Contract Negotiations* (Nov. 19, 2019) ("S&L Report"), UTIER Opposition, Ex. 2 at 48 [ECF No. 1974-2].  While this amount is partially offset by increases to variable costs which PREPA will bear under the Naturgy GSPA, the net price reduction under the Contracts has been estimated as approximately $35 million annually.  Padilla Decl. at ¶ 12.  At the time it concluded the Contract negotiations and submitted the final draft Contracts to PREB for its approval, PREPA estimated that taken together the Contracts would lower the cost of power from the Eco Generation Facility, already one of Puerto Rico's lowest cost generators, by approximately

---

[10] The Order on Motion for Protective Order provides "PREPA will need to establish that the procedure it followed was reasonable, identify the public policy factors it considered, and explain the reasons why it determined that '[t]he assumption by PREPA of the Contracts will benefit PREPA due to (1) the economic benefits of the Contracts to PREPA, particularly as compared to the prior terms, (see Padilla Decl. ¶¶ 11-18) and (2) the lack of reasonably available alternatives for replacement of the power and fuel provided under the Contracts (see id. ¶ 10).'"  Order on Motion for Protective Order at 12.  The Oversight Board submits its submissions in this matter, including the description of the benefits of the Contracts to PREPA described in this section, satisfy these requirements in all respects.

1.7 cents per kWh. *Id.* ¶ 13.  Savings of this magnitude are a "benefit to the Debtor's estate" that alone satisfies the business judgment standard (*In re Vent Alarm Corp.*, No. 15-09316-MCF11, 2016 WL 1599599, at *3 (Bankr. D.P.R. Apr. 18, 2016)), and, moreover, can be directly passed on to Puerto Rico ratepayers in the form of lower power costs.  Padilla Decl. ¶ 12.

19.     Ignoring these savings, Objectors contend that the changes in capacity payments under the ECO PPOA, and changes in take or pay obligations under the Naturgy GSPA, add "greater variability and less certainty in PREPA's contractual obligations."  UTIER Opposition ¶ 15.  This argument misconceives that the modifications to the Contracts are designed to afford PREPA *greater certainty and operational flexibility* by increasingly tying PREPA's payments under the Contracts to the amount of energy that it actually calls on ECO to generate, which allows PREPA's payments under the Contracts to decrease when it becomes less dependent upon ECO's generation capacity.  The ECO PPOA modified the capacity payment provisions of the Pre-Restatement PPOA by (1) reducing PREPA's aggregate payment obligations annually from approximately $230 million per year at 507 MW to approximately $128 million per year at 530 MW (subject to an availability adjustment); and (2) increasing the availability bonus with reasonable limitations to avoid payment of excessive compensation.  S&L Report at 36–37, 48. The amendment to the availability bonus further incentivizes ECO to maximize the availability of the ECO Generation Facility during base load operation and, as intermittent renewable sources scale-up over time, cycling mode of operation during daytime hours.  The agreed changes permit the more flexible dispatch that will be required to accommodate the addition of variable solar generation to the PREPA system, and align the parties' incentives by rewarding ECO for increased availability when PREPA requires it.

13

20.     The Naturgy GSPA allows for significantly increased flexibility for PREPA in terms of take-or-pay obligations when compared to the Pre-Restatement GSPA.  *Id.* at 38–39. PREPA gains the ability to (i) receive gas at either of the Generation Facilities, depending on availability, (ii) subject to Naturgy's confirmation of technical feasibility, redirect LNG cargoes to other facilities around the island, (iii) receive full relief from take-or-pay liability to the extent that an outage occurs at either of the Generation Facilities, which prevents or limits natural gas offtake, and (iv) with six months' notice, reduce its overall take-or-pay commitment for natural gas.  *Id.*  In addition, PREPA may increase or decrease the quantity of natural gas it purchases from Naturgy between a maximum of 106 Tbtu and a minimum of 55 Tbtu.  *Id.* at 50.  It may also reduce the minimum required amount for any scheduled maintenance, forced outages, routine maintenance or other unit limitations that constrain either of the Generation Facilities from generating at maximum capacity.  *Id.* at 50–51.

21.     The more flexible terms under the Contracts make PREPA *less*, rather than more, vulnerable to risks associated with possible facility outages, LNG supply interruptions, variability in dispatch of the Generation Facilities, and the eventual retirement of the Costa Sur Generation Facility.  This benefit cannot be overstated as PREPA attempts to mitigate the risks of any disruption to its power or natural gas supply.  Greater flexibility, reliability, and resilience for the grid system at significantly lower costs cannot be construed as anything but a benefit to PREPA and its ratepayers.

22.     Because the business judgment standard does not require that the Contracts represent the best possible deal, but only that PREPA demonstrate some benefit to the debtor (which it has more than done), Objectors' critiques of cherry-picked provisions of voluminous

14

contracts are irrelevant. Moreover, Objectors' arguments are misguided. Following is a summary

of the most significant of Objectors' numerous misstatements regarding the Contracts:

| Objector Assertion | PREPA Response |
|---|---|
| The Contracts lack "provisions to protect PREPA from liability and losses if Naturgy fails to deliver the product." UTIER Opposition ¶ 103. | The Naturgy GSPA includes a number of provisions (§ 9.3 & § 9.4) that permit PREPA to mitigate the risk of gas supply interruptions, including liquidated damages in PREPA's favor. |
| The Naturgy GSPA "includes natural gas prices that are more expensive than they should be." UTIER Opposition ¶ 106. | What natural gas prices "should be" is quintessentially a matter of business judgment for PREPA. PREPA secured what it has concluded are reasonable prices given the flexibility it requires and the volumetric risk (*i.e.*, the risk of declining purchases of gas with the retirement of the Costa Sur Generation Facility) which Naturgy has accepted. |
| Eliminating the "hedge" element of the Naturgy GSPA will yield higher prices for natural gas than those PREPA would pay under the Pre-Restatement GSPA. Windmar Response at 8; UTIER Opposition ¶ 69. | At the time PREPA concluded the Naturgy GSPA negotiations, PREPA and its advisors estimated that removing the hedge to oil would result in substantial savings. Given historic relationships between oil and gas prices and widely held expectations regarding future gas prices, it was reasonable at that time for PREPA to bargain to remove the hedge. |
| "PREPA contractually obligated itself to supply LNG to Ecoeléctrica without back-to-back indemnity for lost power if Naturgy fails to deliver the LNG." UTIER Opposition ¶ 110. | Naturgy must reimburse PREPA for (a) any capacity payments that PREPA must make to ECO in excess of actual power received as a result of Naturgy's failure to deliver natural gas, and (b) all costs associated with the purchase of back-up fuel for the generation of electricity, in each case under the Naturgy GSPA (§ 9.4). |

| Objector Assertion | PREPA Response |
|---|---|
| "[T]he force majeure ('FM') provisions in the new Naturgy GSPA to deliver gas for PREPA, and in the new Ecoeléctrica PPOA do not match . . . . Under certain circumstances, Naturgy can fail to supply LNG but PREPA would not be excused from supplying LNG to Ecoeléctrica. PREPA would then be required to make capacity payments but have no power from Ecoeléctrica, and/ or no methane gas at Costa Sur, with no recourse and no capacity payment refund." UTIER Opposition ¶ 111. | This risk scenario will never happen under the Contracts. The Force Majeure provisions of the ECO PPOA (§17.2(e)) incorporate by reference Force Majeure events arising under the Naturgy GSPA. |
| "[C]omparing the [Contracts] with the Integrated Resource Plan ('IRP') reveals that the [Contract]s' terms will not yield any benefits to ratepayers." UTIER Opposition ¶ 119. | PREPA and Siemens, PREPA's IRP consultant, performed just such a comparison. They found replacing the Pre-Restatement PPOA with the ECO PPOA to be the most economic option under the scenario which PREPA and Siemens identified as the basis for PREPA's preferred resource plan. PREB Resolution and Order at 5 (citing Siemens' Memorandum at 1). The analysis showed that the ECO PPOA would yield savings having a net present value of $705 million (a 5% reduction in NPV) over the study period. *Id.* at 4. |

## B. PREPA ACHIEVED ALL THESE BENEFITS THROUGH A ROBUST APPROVAL PROCESS WITH NO EVIDENCE OF BAD FAITH.

23.     Windmar points to the PREPA Governing Board meeting approving the Contracts as evidence that PREPA did not exercise sound judgment because the meeting supposedly lasted nine minutes. Windmar Response at 12–13. In addition to ignoring the fact that PREPA purchased capacity and net electrical output under the Pre-Restatement PPOA for almost 19 years and nominated/purchased natural gas under the Pre-Restatement GSPA for more than seven (7) years, and therefore its Governing Board had a deep understanding of both of the Pre-Restatement Contracts, PREPA Management began the process of gaining approval for the Contracts in July

2019, and the process culminated in the Governing Board giving its final approval on October 29,

2019.[11]  In the interim, PREPA Management engaged in the following approval-related activities:

*July 30:*  PREPA met with FOMB and Advisors in San Juan to discuss FOMB approval of Contracts;

*July 31:*  PREPA finalized GSPA and PPOA Term Sheets with Naturgy and ECO;

*Aug. 5:*  PREPA answered commercial questions on Contract term sheets raised by FOMB consultants during conference call;

*Aug. 8:*  PREPA answered commercial questions on Contract term sheets raised by FOMB consultants during conference call;

*Aug. 9:*  PREPA Management presented agreed form Term Sheets to PREPA Governing Board as an update on status of Contracts;

*Aug. 16:*  Sargent & Lundy ("S&L") issued first version of Report in support of Contracts to PREPA Management;

*Sep. 14:*  PREPA Management updated Independent Governing Board Members on status of Contract negotiations;

*Sep. 26:*  PREPA Management updated the Governing Board on status of Contracts;

*Oct. 15:*  S&L issued a second version of its Report in support of Contracts to PREPA Management with reduced forecasted annual savings, based on input and analysis of transactions by FOMB; and

*Oct. 29:*  PREPA Management (through Fernando Padilla) addressed a Memorandum to José F. Ortiz Vázquez, PREPA's Chief Executive Officer entitled "Request for Approval of EcoEléctrica / Naturgy Transactions" in which Management sought the approval of PREPA's Governing Board to (1) submit the Contracts to the Oversight Board and PREB, and (2) finalize the Contracts subject to relevant approvals.

24.     This thorough evaluation and approval process demonstrates the decision to assume

the Contracts is not "the product of bad faith, or whim or caprice."  *In re Trans World Airlines,*

---

[11] *See* PREPA's *Request for Approval of Amended and Restated Power Purchase and Operating Agreement with EcoEléctrica and Natural Gas Sale and Purchase Agreement with Naturgy* filed under seal before the Government of Puerto Rico Public Regulatory Board, Puerto Rico Energy Bureau, *In re Request for Approval of Amended and Restated Power Purchase and Operating Agreements with EcoElectrica and Natural Gas Sale and Purchase Agreement with Naturgy*, Case No. NEPR-AP-2019-0001 on November 5, 2019 (the "Petition to PREB"), Attachment 3. On December 12, 2019, PREPA filed a redacted version of the Petition to PREB. The redacted version the Petition to PREB is available at https://energia.pr.gov/wp-content/uploads/2019/12/CEPR-AP-2019-0001-Motion-to-submit-redacted-versions-of-the-petition-and-its-attachements-1.pdf.

*Inc.*, 261 B.R. at 121.  It also refutes each of Windmar's claims that the S&L report "was not yet final" nor "submitted to the board," that the PREPA Board only considered the Contracts for a "total of 11 minutes of discussion," and that the Oversight Board did not evaluate the merits of the Contracts.  Windmar Response at 14.  The S&L report was submitted to the PREPA Board twice (on August 16, 2019 and again on October 29, 2019).  The second time, the report – updated to reflect input and analysis of the Contracts from the PREPA Board – was submitted two weeks before the PREPA Governing Board's approval.  Additionally, the conferences and revisionary activities listed over the course of months demonstrate that the parties were actively engaged and purposeful in the process of approving the Contracts.

### C.  THE CONTRACTS ARE THE RESULT OF A COMPETITIVE PROCESS

25.     Finally, Objectors resort to arguing that the Contracts are the result of bad faith because, they claim, there was no competitive process (UTIER Opposition ¶ 168) and PREPA was somehow strong-armed by ECO and Naturgy into amending and extending the Pre-Restatement Contracts (UTIER Opposition ¶ 143).  As a preliminary matter, the Title III Court is not the forum, and an objection to an assumption motion is not the vehicle, for Objectors to air process objections or their theories regarding PREPA's counterparties' supposed violations of the Sherman Act.  In any event, these arguments are unsupported by the facts.  *First*, there was no need to engage in a competitive process to amend the Pre-Restatement Contracts.  PREPA correctly determined that as a result of a competitive procurement process completed in the mid-1990s, Naturgy's predecessor was the only source for natural gas delivered in the vicinity of the EcoEléctrica and Costa Sur generating facilities, by virtue of its control of the capacity of the ECO LNG Terminal (developed together with the ECO Generation Facility).  Petition to PREB at Sec. III.  The Naturgy GSPA therefore qualifies under the "sole source" exception to Act No. 83 of May 2, 1941, the Puerto Rico Electric Power Authority Act, as amended, Section 15(2)(d).  Further, a "competitive

process" would not have been feasible or its results meaningful, since ECO as the owner of the ECO LNG Terminal exercised its legal right to grant Naturgy exclusive access to the terminal's capacity. *Id.*

26.     *Second*, there is no evidence to support the Objectors' claims that PREPA was strong-armed into negotiating by ECO and Naturgy.  The "corporate LNG framework" under which EcoEléctrica and Naturgy operate is a private contractual arrangement that originated with the development of the EcoEléctrica LNG receiving terminal and power generation project in the mid-1990s.  That they have exclusive rights to the capacity of the LNG receiving facility is nothing new; this has been true since project inception.  PREPA was not "strong-armed" into accepting a "framework" that has been in place for the entire term of the PPOA and that the parties have agreed to amend and restate.  UTIER implies that PREPA could not have made a choice "with sound business judgment if it did not have alternatives."  UTIER Opposition ¶ 140.  This suggests that PREPA had no choice but to accept terms ECO and Naturgy demanded, and that PREPA had nothing to which to apply its business judgment.  But this is belied by the success PREPA actually achieved in the negotiations.  PREPA, in its role as the only practical power offtaker and gas purchaser for EcoEléctrica and Naturgy, had bargaining power.  PREPA was able to leverage this position and obtain terms in the Contracts that are more favorable to PREPA than the Pre-Restatement Contracts in many respects, as described above.  PREPA did not merely secure nominal benefits in this negotiation; it obtained terms that will generate savings that will exceed by a substantial margin the savings which the Oversight Board established as targets from the renegotiation of *both* of the Pre-Restatement PPOA and a PPOA with AES Puerto Rico, the other large independent power supplier to PREPA.

27. Finally, Objectors argue the Contracts were "negotiated behind closed doors and without the benefit of public scrutiny."  UTIER Opposition ¶ 23.  There is no legal requirement that PREPA negotiate contracts in public.  Nonetheless, the Contracts were publicly submitted to the Oversight Board for approval, and were approved as compliant with PREPA's certified Fiscal Plan.  The Contracts were then submitted to PREB for its approval, which it granted.  These facts refute Objectors' claims that the process of approving the Contracts was defective and amounts to bad faith or abuse of discretion.

## II.   THE AMENDMENTS TO THE PRE-RESTATEMENT CONTRACTS DO NOT RADICALLY CHANGE THE NATURE OF THE CONTRACTS SUFFICIENT TO CONSITUTE A NOVATION UNDER PUERTO RICO LAW

28. Objectors next contend the Court does not have jurisdiction to authorize PREPA to assume the Contracts as amended because—in their judgment—the Contracts are "new" contracts, not merely amended contracts.  UTIER Opposition ¶¶ 30, 56, 61, 77–78; Windmar Response at 4. Ironically, if that were true, UTIER and Windmar's objections would be moot because PREPA would be able enter into both Contracts without Court approval, given that Bankruptcy Code section 363 is not included in PROMESA (*see* PROMESA § 301), and the presence of PROMESA section 305 (prohibiting the Court from interfering with the debtor's property without Oversight Board consent).  *See, e.g.  In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, No. 17 BK 3283-LTS, 2020 WL 114518, at *3 (D.P.R. Jan. 7, 2020), *aff'd*, 954 F.3d 1 (1st Cir. 2020) (noting the absence of section 363 from PROMESA in opining "PROMESA provides for significant deference to the prerogatives of the governmental debtors and of their statutory representative and makes clear that Congress intended to preserve governmental debtors' ability to initiate transactions affecting their assets."). That is, if the Contracts were indeed new contracts, Objectors would have no ability to challenge PREPA's entry into the Contracts before this Court, nor to propound voluminous and burdensome discovery, as they have done.  But PREPA and the Contract

counterparties did not enter into new contracts.  Instead, they amended the terms of a pre-existing GSPA and PPOA, contracts that were not set to expire until December 2020 and March 2022, respectively.

29.    Under Puerto Rico law, "not every modification of an agreement produces extinction."  *P.L.M. Int'l*, 834 F.2d at 251 (1st Cir. 1987).  Instead, "[t]he Civil Code of Puerto Rico establishes stringent requirements for novation[,]" and an extinctive novation may only occur in one of two ways.  *Id.*; 31 L.P.R.A § 3242.  *First*, the parties may expressly state their intention to create a new agreement.  *Marina Indus. Inc. v. Brown Boveri Corp.*, 14 P.R. Offic. Trans. 86, 95–103 (P.R. 1983).  *Second*, extinctive novation occurs through the creation of a new agreement that is "absolutely incompatible" with the original one.  *P.L.M. Int'l*, 834 F.2d at 251.  Indeed, Objectors agree that to work an extinctive novation, modifications to the agreement "must reflect such a radical change in the nature of the new obligation when compared with the old as to make them mutually excludable and unable to coexist."  *Id.* (citing 31 L.P.R.A § 3242); UTIER Opposition ¶ 63; Windmar Response at 5.

30.    In the first instance, the intent of the parties to amend the Pre-Restatement Contracts is substantially determinative.  Extinctive novation must be established "without any trace of doubt."  *Warner Lambert Co. v. Superior Court of P.R.*, 1 P.R. Offic. Trans. 527, 544.  "The novation of an agreement is primarily an issue of motive and intent of the parties."  *Jorge Rivera Surillo & Co. v. Cerro Copper Prods. Co.*, 885 F. Supp. 358, 363 (D.P.R. 1995).  Therefore, the intention of the parties to amend existing contracts, rather than enter into new contracts, is entitled to considerable deference on the issue of novation.

31.    Here, the parties to the Contracts stated in unequivocal terms their intention to amend and restate the ECO PPOA and Naturgy GSPA.  *See* ECO PPOA at 4 (Seller and PREPA

21

". . . hereby agree to amend and restate the Pre-Restatement PPOA in its entirety as follows."); Naturgy GSPA at 2 ("The Parties desire to enter into this Agreement, which amends and restates the Pre-Restatement GSPA in its entirety.").  This language evidences the intention of the parties to continue performing (rather than extinguish) their original primary obligations under the Pre-Restatement Contracts.  As shown below, these statements are not mere lip service, but are supported by the fact that the fundamental nature of each of the Contracts and the obligations contained therein remain the same. Accordingly, the Pre-Restatement Contracts remain in place in their entirety, subject only to the amendments and no extinctive novation has occurred.  ECO PPOA at 4; Naturgy GSPA at 2.

32.     Objectors attempt to contest the parties' express intentions by pointing to one PREPA official's characterization of the agreements as evidence of the intent and will of the parties to create new contracts rather than amend existing contracts.  *See* Windmar Response at 5–6.  But unilateral, *post-facto* statements cannot override the parties' clear expression of their mutual intent to amend the agreements, nor can it alter the nature of the amendments.  Puerto Rico law provides that if "the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed."  31 L.P.R.A. § 3471; *see also Exec. Leasing Corp. v. Banco Popular de Puerto Rico,* 48 F.3d 66, 69 (1st Cir.1995) ("[y]et to consider the extrinsic evidence at all, the court must first find the relevant terms of the agreement unclear.").  In this case, there is no question as to the interpretation of the provisions of the contracts maintaining the original contracts unchanged except for the amendments.  There is no need to consider extrinsic evidence, and in fact, it would be improper for the Court to do so.  This is further emphasized by the fact that the Contracts contain "merger clauses" specifying that the written

Contracts themselves express the entire agreement of the parties. *See* ECO PPOA § 24.13[12]; Naturgy GSPA § 32.1.[13]  There is simply no basis to second-guess the parties' intentions as they each continue to agree that their intent was only to amend the Pre-Statement Contracts.  Therefore, cherry-picked statements made outside the Contracts cannot be used in place of the language of the Contracts themselves to interpret the intention of the parties.

33.    *Second*, the amendments to the Pre-Restatement Contracts do not meet the "stringent requirements" necessary for implicit or tacit "extinctive novation" under Puerto Rico law.  Here, while the Contracts modify a number of commercial terms of the Pre-Restatement Contracts, the Contracts also continue (rather than extinguish) the original primary obligations under the Pre-Restatement Contracts.  Thus, ECO will continue to sell, and PREPA will continue to purchase, dependable electric generating capacity made available by the ECO Generation Facility under the ECO PPOA as they did under the Pre-Restatement PPOA.  Naturgy will continue to sell, and PREPA will continue to purchase, natural gas under the Naturgy GSPA for supply to the Costa Sur Generation Facility as they did under the Pre-Restatement GSPA.  The fundamental purpose of the contracts remains the same.  Accordingly, Objectors cannot show there has been a "radical change" in the nature of the Contracts necessary to demonstrate an extinctive novation.  *See P.L.M. Int'l*, 834 F.2d at 251 (Rather than working a radical change in the nature of the underlying obligations, "the agreements at issue here complement and build upon one another.").

---

[12]  ECO PPOA § 24.13 ("This agreement is intended by the Parties as the final expression of their agreement and is intended as a complete and exclusive statement of the terms of their agreement . . . .  All prior written or oral understandings, offers or other communications of every kind pertaining to the sale of Dependable Capacity hereunder to PREPA by Seller (including under the Pre-Restatement PPOA) are hereby superseded.").

[13]  Naturgy GSPA § 32.1 ("The terms and conditions contained herein constitute the entire agreement between Buyer and Seller with respect to the subject matter of this Agreement, and supersede all communications, negotiations, and agreements of the Parties, whether written or oral, other than these, made prior to the signing of this Agreement.

### III.   PREPA'S ASSUMPTION MOTION IS NOT THE VEHICLE TO SECOND-GUESS PREB'S APPROVAL

34.     While Objectors argue the Title III Court lacks jurisdiction to approve assumption of the Contracts, they demand that the Court act as an appellate forum to review the PREB process that resulted in regulatory approval of the Contracts.  Windmar goes so far as to argue that "[t]he statutory standard that should have been approved by PREB is lowest reasonable cost, not 'lower cost than the status quo' and lack our competition project [*sic*]."  Windmar Response at 15.  The Title III Court is simply not the forum for reviewing or second-guessing PREB Resolutions, and the concerns that UTIER and Windmar have advanced in their objections are not germane to a contract assumption motion.[14]  In any event, such concerns are not implicated because (a) PREB has approved the Contracts, and (b) should PREB entertain the motion to reconsider its approval (which to date it has not done), the Revised Proposed Order would make assumption subject to PREB's final approval of the Contracts.

35.     PREB issued a Resolution and Order on March 11, 2020 in which it approved the Contracts pursuant to Article 6.32 of Act 57-2014 and the *Puerto Rico Energy Public Policy Act*, Act No. 17-2019.[15]  Following its consideration of PREPA's request for approval of the Contracts, numerous PREPA submissions, expert reports, responses to information requests and information shared through a technical hearing, PREB determined that "the benefits of approving the [Contracts] are greater than the costs, when compared to not approving the [Contracts]."[16]  It also determined that the Contracts are economically beneficial over the various scenarios considered

---

[14]   *See, e.g.,* July 11, 2019 H'rg Tr. (prohibiting parties from proffering "[e]vidence and arguments that go only to . . . whether the matters requiring further action by Puerto Rico's elected government officials and agencies of the Puerto Rico government ought to be approved" on PREPA's Bankruptcy Rule 9019 motion).

[15]   PREB Resolution and Order, note 5, *supra*.

[16]   *Id.* at 12.

in PREPA's proposed and currently pending Integrated Resource Plan.[17]  PREB concluded that the Contracts are consistent both with PREPA's approved Integrated Resource Plan and Puerto Rico's energy public policy as established in Act No. 19-2019.[18]

36.     The proceeding in which PREPA sought, and PREB ultimately granted, approval of  the Contracts (the "Contract Review Proceeding") was conducted pursuant to Article 6.32 of Act 57-2014, which empowers PREB to regulate processes PREPA follows in entering into power purchase agreements and approve those agreements as well as other transactions involving electric power service companies.[19]  Accordingly, the Contract Review Proceeding was non-adjudicative in nature; it was an *ex parte* process through which PREB reviewed the Contracts and information relating to them in order to assess their compliance with the requirements of the governing law and Puerto Rico energy public policy.  More than a month after PREB's issuance of its Resolution and Order in the Contract Review Proceeding, and almost six months after PREPA first petitioned PREB for that approval, UTIER and other organizations filed in Case No. NEPR-AP-2019-0001 a "Joint Petition for Intervention and Motion for Reconsideration" of PREB's approval.[20]  PREPA has opposed that Joint Petition and has requested that it be stricken from the record,[21] because the intervenor status UTIER and its fellow petitioners have sought is not consistent with the non-adjudicative nature of the Contract Review Proceeding.  PREPA has argued that, since PREB has already determined that there is no right for a party to intervene in the Contract Review

---

[17]  *Id.*

[18]  *Id.* at 13.

[19]  *Id.* at 7–8 .

[20]  UTIER has submitted that Petition in this proceeding as Exhibit 1 to the UTIER Opposition [ECF No. 1974-1].

[21]  Opposition to Joint Petition for Intervention and Request for Reconsideration to be Stricken from the Record, Case No. NEPR-AP-2019-0001 (filed May 11, 2020) (https://energia.pr.gov/wp-content/uploads/2020/05/2020-05-11-AP20190001-Opposition-to-UTIER-et-al-Petition-for-Intervention.pdf) (the "PREPA Opp. to UTIER Pet.").

Proceeding,[22] PREB has established the law of the case and on this basis should conclude that the Joint Petition must be denied.[23]   The Joint Petition and PREPA's opposition to it are pending before PREB.

37.     PREPA expects that PREB will deny the Joint Petition and that, with this denial, the PREB's approval of the Contracts will become final.   Nevertheless, with this Reply PREPA is submitting a proposed order authorizing PREPA's assumption of the Contracts subject to the outcome of the PREB reconsideration process.

## IV.     OBJECTORS FAIL TO DEMONSTRATE THEIR STANDING TO OBJECT

38.     Even though a motion to assume a contract is a summary proceeding "intended to efficiently review the trustee's or debtor's decision to adhere to or reject a particular contract in the course of the swift administration of the bankruptcy estate,"[24]  Objectors seek in this matter to impose burdensome discovery on PREPA[25] and litigate issues ranging from questions of Puerto Rico energy policy to allegations of Sherman Act violations.   They do this without making even a minimal showing that the assumption of the Contracts would cause them pecuniary injury sufficient to afford them standing.   Instead, they make conclusory[26] and incorrect statements about

---

[22]   Resolution, *In re: Request for Approval of Amended and Restated Power Purchase and Operating Agreement with EcoEléctrica and Natural Gas Sale and Purchase Agreement with Naturgy*, Case No. NEPR-AP-2019-0001 (Jan. 28, 2020) at IV (denying EcoEléctrica's motion to intervene but permitting it to participate on a limited basis).   PREB denied EcoEléctrica party status in that proceeding (notwithstanding "EcoEléctrica's expertise and industry knowledge [which] may benefit the review process, particularly considering its participation in the negotiation of the [Contracts] and its vast experience as an independent power producer.").   *Id.* at III. (https://energia.pr.gov/wp-content/uploads/2020/01/Resolution-NEPR-AP-2019-0001.pdf).

[23]   *See* PREPA Opp. to UTIER Pet. at 7–8.

[24]   *In re BankVest Capital Corp.*, 360 F.3d 291, 302 (1st Cir. 2004), *cert. denied*, 542 U.S. 919 (2004) (quoting *In re Orion Pictures Corp.*, 4 F.3d 1095, 1098–99 (2d Cir.1993)).

[25]   UTIER seeks "all documents and communications" relating to over three dozen topics, 94 interrogatories (since consolidated into 25 no less burdensome requests), and 38 deposition topics (inclusive of subtopics).   *See Urgent Motion for Protective Order* (ECF No. 1978) (the "Protective Order Motion").

[26]   For example, Windmar's representation regarding standing is limited to a single sentence that "[i]ts PPOA's with PREPA, are *directly* affected by PREPA's economic decision in the Ecoelectrica contracts."   Windmar Response at 2.   Windmar offers no explanation as to how the Contracts affect its PPOAs at all, let alone *directly*.

harm,[27] while demonstrating throughout their briefs that their true concerns relate to how PREPA's planned restructuring and future operations affect their broader interests.[28]  As explained below, the Court should not permit Objectors to impose a substantial strain on PREPA's time and resources absent a demonstration of injury *on account of their claims*, not their alleged policy and business concerns.  Unless Objectors are required to meet some standing threshold, there is nothing preventing even administrative motions from devolving into forums for policy debate, bogged down by burdensome discovery and litigation of issues not properly before the Title III Court.

39.    Bankruptcy Code section 1109(b) provides "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."  A "'party in interest,'" however, does not mean "'anyone who might be affected by the bankruptcy proceedings'; rather, a party in interest is one who has a '*legally protected interest* that could be affected by a bankruptcy proceeding.'"  *In re Tower Park Properties, LLC*, 803 F.3d 450, 457 (9th Cir. 2015) (quoting *In re James Wilson Assocs.*, 965 F.2d

---

[27]   UTIER asserts that "UTIER has an interest in the restructuring of PREPA's debt and the assumption of the ARAs will impair PREPA's ability to restructure its debt."  UTIER Opposition ¶ 5.  It makes no attempt to explain how revised contractual arrangements with one of PREPA's power suppliers and fuel suppliers would impair PREPA's restructuring, while rejecting the Contracts would facilitate it.

UTIER also incorrectly argues that "The ECO PPOA establishes that PREPA's Capacity Payment will cover operating expenses, among other costs. [Docket No. 1951 at 7] PREPA's operating expenses include labor costs, including compensation to UTIER's membership, PREPA's workers.  Thus, the ARAs affect UTIER's members' property rights."  UTIER Opposition ¶ 3.  But this Capacity Payment is made by PREPA to EcoEléctrica and covers EcoEléctrica's operating expenses, not PREPA's.  Moreover, UTIER's concerns about future labor costs are, by definition, not on account of its claims in PREPA's Title III proceeding.

[28]   For example, UTIER, while styling itself as the defender of PREPA's workers, states that it is "cognizant and supportive of the *Puerto Rico Energy Public Policy Act*, Act No. 17-2019 provision that establishes a 100% renewable energy goal by 2050.  The ARAs will impair PREPA's capacity to comply with the Renewable Portfolio Standard ("RPS").  Therefore, UTIER's interests are directly affected by the assumption of the ARAs . . . UTIER's members are also ratepayers of PREPA."  UTIER Opposition ¶¶ 4, 6.

Windmar's lead argument is that PREPA has not demonstrated the Contracts are beneficial for "ratepayers or the overall progress of Puerto Rico's economic or energy needs."  Windmar Response at 2.

27

160, 169 (7th Cir. 1992)) (emphasis added); *see also In re Global Indus. Techs.*, 645 F.3d 201, 210 (3d Cir. 2011). Thus, an entity "that may suffer collateral damage" but does not have a legally protected interest does not have standing under § 1109(b). *In re C.P. Hall Co.*, 750 F.3d 659, 661 (7th Cir. 2014).

40.    Moreover, "the right to raise an issue and to appear and be heard is not the same as standing." *In re Sw. Equip. Rental*, 152 B.R. 207, 209 (Bankr. E.D. Tenn. 1992). According to Collier, "only a party who is aggrieved has standing to object to the assumption" of a contract under section 365(a). *3 Collier on Bankruptcy* ¶ 365.03. As Judge Posner recognized in *Matter of James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992):

> [W]e do not think that [section 1109] was intended to waive other limitations on standing, such as that the claimant be within the class of intended beneficiaries of the statute that he is relying on for his claim, although a literal reading of section 1109(b) would support such an interpretation. We think all the section means is that anyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains, thus making explicit what is implicit in an *in rem* proceeding—that everyone with a claim to the *res* has a right to be heard before the *res* is disposed of since that disposition will extinguish all such claims. *Cf.* 5 *Collier on Bankruptcy* ¶ 1109.02, at pp. 1109–16 to 1109–32 (Lawrence P. King ed., 15th ed. 1991); *United States v. Tit's Cocktail Lounge,* 873 F.2d 141, 143 (7th Cir.1989) (per curiam)…[S]ection 1109(b) therefore does not entitle Metropolitan to make an issue of the assumption of the lease.

In that case, a creditor was attempting to enforce a rule in section 365(d)(1) that gives a debtor a fixed amount of days to assume a nonresidential lease, otherwise the lease would be considered rejected. The Seventh Circuit denied the motion, holding that "we find it very difficult to see who might be an intended beneficiary of this provision other than the lessor, and we therefore side with the First Circuit[29] . . . . If as here the lessor is content to allow the lease to continue, no other creditors suffer a harm of the kind that the provision was intended to head off." *Id.*

---

[29] The First Circuit case the Seventh Circuit sided with is *In re Dein Host, Inc.*, 835 F.2d 402 (1st Cir. 1987). There, a shareholder of the lessor attempted to object to the assumption of the lease on the basis that the time to assume the

41.    These cases demonstrate that section 1109(b) status alone is not sufficient to confer standing.  Objectors must make some showing as to how they are aggrieved by the assumption and what, if anything, is their interest in the *res* affected by the Motion.

42.    As a preliminary matter, the environmental advocacy groups fail any standing-related test as they do not even allege they are parties-in-interest.  As this Court observed in denying environmental advocacy groups request to participate in PREPA's Rule 9019 motion:

> Because the issues presented in this motion practice, that is, the 9019 motion practice, are narrow and do not turn on the major public policy questions that the nonprofits wish to address, the Court grants the government parties' motion to exclude the testimony offered by these 16 nonprofit advocacy groups which are not creditors or official committees and whose concerns are directed to future broad economic and environmental effects of full implementation of the measures contemplated by the RSA. The Court concludes that the nonprofit advocacy groups lack sufficient direct interest in the subset of measures presented for court approval in the present 9019 motion practice to warrant their participation as parties entitled to present evidence and oral argument in connection with the 9019 motion.

July 11, 2019 H'rg Tr. at 9:15-23.

43.    For these same reasons, Windmar and UTIER, although potentially parties-in-interest in the cases, also fail to demonstrate they have standing in this motion.  Windmar makes no more than a conclusory statement that its PPOAs with PREPA are affected by the assumption of the Contracts.  Windmar Response at 2.  But the balance of its brief belies this contention and shows that Windmar's true concerns stem from its belief that the Contracts are not beneficial for "ratepayers or the overall progress of Puerto Rico's economic or energy needs."  *Id.*  In the context of the Rule 9019 motion, the Court prohibited Windmar from proffering evidence "about the potential impact of full implementation of the RSA on solar energy development and on its own future business prospects."  July 11, 2019 H'rg Tr. at 12:3-7.  To the extent Windmar's objection

---

least had expired.  The First Circuit ruled that the shareholder was not a "person aggrieved" by bankruptcy court's order to assume the lease because his injury is "indirect."  *Id.* at 405.

is animated by its concern for the future of solar energy development, or as a competitor to Naturgy and ECO, such motives are insufficient to confer it standing to object.  *See In re ANC Rental Corp., Inc*., 277 B.R. 226, 229 (Bankr. D. Del. 2002) (holding that Avis and Hertz did not have standing to object to an assumption motion by National and Alamo because they did not have any contractual relationship with the debtor but were merely competitor in the same industry.).

44.     While UTIER represents the interests of most of PREPA's workers, it is not a statutory committee entrusted to monitor the bankruptcy cases on behalf of a constituency.  And although it is a claimant in the Title III case, its objection demonstrates that its true concerns relate to workers' *future* prospects and overarching energy policy considerations in Puerto Rico.  These concerns do not derive from UTIER's alleged claims against PREPA.  Accordingly, UTIER has failed to demonstrate it is "aggrieved" by PREPA's Motion to assume the Contracts and thus has no standing to oppose it.  As a result, the Court should dismiss the Objections in their entirety for lack of standing.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, PREPA respectfully requests the Court (1) overrule the Objections and (2)

enter the Revised Proposed Order (a) granting the Urgent Motion, (b) authorizing PREPA to

assume the Contracts, and (c) granting PREPA such other relief as is just and proper.

Dated: May 18, 2020
       San Juan, Puerto Rico

Respectfully submitted,

*/s/   Martin J. Bienenstock*

Martin J.  Bienenstock (*pro hac vice*)
Paul V.  Possinger (*pro hac vice*)
Ehud Barak (*pro hac vice*)
Daniel S.  Desatnik *(pro hac vice)*
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Commonwealth of Puerto Rico and the Puerto
Rico Electric Power Authority*

**LUIS F. DEL VALLE-EMMANUELLI**

*/s/ Luis F. del Valle-Emmanuelli*
Luis F. del Valle-Emmanuelli
USDC-PR No. 209514
P.O. Box 79897
Carolina, Puerto Rico 00984-9897
Tel. 787.647.3503
Fax N/A
dvelawoffices@gmail.com

OF COUNSEL FOR
A&S LEGAL STUDIO, PSC
434 Avenida Hostos
San Juan, PR 00918
Tel. (787) 751-6764/763-0565
Fax (787) 763-8260

*Co-Attorney for the Financial Oversight and
Management Board as representative of the
Debtor*