# EXHIBIT A

# (PRIFA Reply Brief, originally filed as ECF 13000)

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>      as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>      Debtors.[1] | PROMESA Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**REPLY OF AMBAC ASSURANCE CORPORATION, FINANCIAL GUARANTY INSURANCE COMPANY, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND U.S. BANK TRUST NATIONAL ASSOCIATION, IN SUPPORT OF THEIR AMENDED MOTION CONCERNING APPLICATION OF THE AUTOMATIC STAY TO THE REVENUES SECURING PRIFA RUM TAX BONDS**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19 BK 5233-LTS) (Last Four Digits of Federal Tax ID: 3801).

## TABLE OF CONTENTS

Page

**PRELIMINARY STATEMENT** ................................................................................. 1

**SUPPLEMENTAL BACKGROUND** ...................................................................... 4

I.    The Commonwealth's Pre-Default Implementation of the Enabling Act
Shows That the Pledged Rum Taxes are Property of PRIFA and Its
Bondholders, Not the Commonwealth.................................................................... 4

II.    Post-Default, the Commonwealth Continues to Receive Moneys Deposited
"to the Credit of PRIFA." ......................................................................... 10

**ARGUMENT** ....................................................................................................... 12

I.    The Court Should Lift the Automatic Stay Under Bankruptcy Code Section
362(d)(2) Because the Commonwealth Has No Equity in the Pledged Rum
taxes and They Are NOT necessary to an Effective Reorganization.................. 13

A.    Movants Are Entitled to Relief Under 11 U.S.C. § 362(d)(2) Because
the Commonwealth Lacks Equity in the Pledged Rum Taxes................. 13

1.    The Enabling Act and the Trust Agreement Confirm that the
Commonwealth Is a Mere Conduit for the Pledged Rum
Taxes. ...................................................................................... 17

a.    The Oversight Board's Tortured, Made-for-Litigation
Interpretation of the Enabling Act Is Belied By the
Statute's Plain Text. ..................................................... 17

b.    The Oversight Board's Reinterpretation of the Trust
Agreement Renders Its Terms Superfluous and
Circular. ......................................................................... 20

2.    The Oversight Board Fails to Rebut that the Commonwealth,
at Most, Holds the Pledged Rum Taxes in Trust or Custody for
PRIFA (and Its Bondholders). ....................................................... 29

3.    The Pledged Rum Taxes are "Restricted Funds" that the
Commonwealth Must Transfer to PRIFA.................................... 32

B.    The Puerto Rico Constitution Does Not Give the Commonwealth
Equity In the Pledged Rum Taxes. ......................................................... 33

C.    Because the Commonwealth Lacks Equity in the Pledged Rum Taxes, the Oversight Board Cannot Show They Are Necessary for an Effective Reorganization. ............................................................. 38

II.    Alternatively, the Court Should Lift the Stay for "Cause" Pursuant to Bankruptcy Code Section 362(d)(1). .................................................... 38

A.    "Cause" Exists to Lift the Automatic Stay Because Movants' Lien on the Pledged Rum Taxes Is Not Adequately Protected. ............................ 39

1.    Contrary to the Oversight Board's Assertions, Movants Have a Valid Lien. ................................................................................... 39

2.    Movants' Liens Were Properly Perfected. .................................... 42

3.    Section 552(a) Does Not Apply to Movants' Lien. ...................... 44

III.    Neither PROMESA's Title III Provisions Nor the Oversight Board's Budgetary Powers Preempt Bondholders' Pre-Existing Legal Rights. ................ 46

A.    The Plain Text of PROMESA Limits the Scope of Preemption to Cases of Actual Conflict, Which Does Not Exist Here. .......................... 46

B.    Neither of the Oversight Board's Asserted Bases for "Preemption" Withstands Scrutiny. ..................................................................................... 48

1.    The Oversight Board's Title II Budgetary Powers Under PROMESA Have No Preemptive Effect on Movants' Rights. ...... 48

a.    The Commonwealth's Transfer of the Pledged Rum Taxes to PRIFA Is Valid and Legally Binding, Not a Mere "Appropriation" Subject to Repeal Without Consequence. ........................................................... 48

b.    There Is No Inconsistency Between the Oversight Board's Budget Powers and Movants' Legal Rights Because, Under Settled Law, the Legislative Power over the "Budget" or "Appropriations" Does Not Include Any Power to Rescind, Repudiate, or Alter Pre-Existing Property or Contract Rights. ....................... 51

c.    The Oversight Board's Claimed Preemption Powers Is Inconsistent with the Structure and Purpose of PROMESA. ..................................................................... 53

2.    There is no Inconsistency Between the Enabling Act and PROMESA Title III or Bankruptcy Policy. .................................. 56

a.      Far from Preempting Them, PROMESA Title III
        Expressly Protects the Legal Rights of Revenue
        Bondholders. ................................................................ 56

b.      There Is No "Inconsistency" Between the Concept of a
        Restructuring and Protecting Property Rights. ................ 56

C.      The Oversight Board's Interpretation Must Be Rejected Because It
        Would Be Unconstitutional ....................................................... 60

1.      The Oversight Board's Claimed Preemption Power Would
        Violate the Due Process Clause. .................................. 60

2.      Any Repeal or Preemption of the Enabling Act Under
        PROMESA Would Effect a Fifth Amendment Taking Without
        Just Compensation. ..................................................... 61

a.      Preempting Property Rights Under a Lien or Trust
        Violates the Fifth Amendment. ......................................... 61

b.      Preempting a Statutory Covenant Pledging Specific
        Special Revenues to Bondholders Violates the Fifth
        Amendment ....................................................................... 62

c.      Just Compensation Requires that Bondholders Be
        Made Whole. ..................................................................... 64

IV.     Movants Have Standing to Bring this Motion. .................................... 64

CONCLUSION ..................................................................................................... 67

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acevedo v. Solivellas & Co.*,
 49 D.P.R. 633, 1936 PR Sup. LEXIS 51 (P.R. 1936)...............................................................40

*Acosta v. Local Union 26, Unite Here*,
 895 F.3d 141 (1st Cir. 2018)...........................................................................................25

*Albany Sav. Bank, F.S.B. v. Novak*,
 151 Misc. 2d 956 (N.Y. Sup. Ct. 1991)...........................................................................41

*Altair Global Credit Opportunities Fund (A), LLC v. U.S.*,
 138 Fed. Cl. 742 (Fed. Cl. 2018)....................................................................................59

*Ambac Assurance Corp. v. P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
 927 F.3d 597 (1st Cir. 2019)...........................................................................................45

*American Fidelity Fire Insurance Co. v. Contrucciones Werl, Inc.*,
 407 F. Supp. 164 (D.V.I. 1975) ......................................................................................40

*Armstrong v. United States*,
 364 U.S. 40 (1960)..........................................................................................................61

*Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio
 v. Flores Galarza*,
 484 F.3d 1 (1st Cir. 2007)...................................................................................14, 15, 17

*Barnhart v. Thomas*,
 540 U.S. 20 (2003)....................................................................................................24, 25

*Bd. of Regents v. Roth*,
 408 U.S. 564 (1972).........................................................................................................61

*Brown Transp. Truckload v. Humbolt Express (In re Brown Transp. Truckload,
 Inc.)*,
 118 B.R. 889 (Bankr. N.D. Ga. 1990) ............................................................................66

*Brown v. United Airlines, Inc.*,
 720 F.3d 60 (1st Cir. 2013)..............................................................................................46

*Chemical Bank N.Y. Tr. Co. v. Kheel*,
 369 F.2d 845 (2d Cir. 1966) (concurring opinion) .........................................................57

*Citibank, N.A. v. Allied Mgmt. Grp.*,
 491 F. Supp. 2d 232 (D.P.R. 2007)..................................................................................19

*City of Springfield v. LAN Tamers, Inc. (In re LAN Tamers, Inc.)*,
   281 B.R. 782 (Bankr. D. Mass. 2002), *aff'd*, 329 F.3d 204 (1st Cir. 2003) ...........................32

*Claudio-De Leòn v. Sistema Universitario Ana G. Mèndez*,
   775 F.3d 41 (1st Cir. 2013)...................................................................................18

*Clay v. United Parcel Serv., Inc.*,
   501 F.3d 695 (6th Cir. 2007) ...............................................................................12

*Cleveland Bd. of Educ. v. Loudermill*,
   470 U.S. 532 (1985)..............................................................................................61

*Coffin v. Bowater, Inc.*,
   501 F.3d 80 (1st Cir. 2007)..................................................................................24

*Cohen v. Wasserman*,
   238 F.2d 683 (1st Cir. 1956).................................................................................41

*Columbia Falls, García-Rubiera v. Calderón*,
   570 F.3d 443 (1st Cir. 2009).................................................................................32

*Demko v. United States*,
   44 Fed. Cl. 83 (Fed. Cl. 1999), *aff'd*, 216 F.3d 1049 (Fed. Cir. 2000)...................25

*Diaz v. Dep't of Educ.*,
   823 F. Supp. 2d 68 (D.P.R. 2011)........................................................................44

*Dimino v. Sec'y of Commonwealth*,
   695 N.E.2d 659 (Mass. 1998) .........................................................................45, 63

*Enrique Lopez Delgado v. South Porto Rico Sugar Co. of P.R.*,
   62 D.P.R. 238, 242-43 (P.R. 1943)......................................................................31

*Estate of Romero v. Willoughby*,
   10 D.P.R. 71, 1906 PR Sup. LEXIS 152 (P.R. 1906)...........................................40

*Ferris v. United States*,
   27 Ct. Cl. 542 (1892) ...........................................................................................52

*Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Glob. Designated Activity Co.*,
   948 F.3d 457 (1st Cir. 2020)..............................................................25, 43, 44, 50

*First National Bank of Boston v. Maine Turnpike Authority*,
   136 A.2d 699 (Me. 1957)......................................................................................63

*First Union Nat'l Bank v. Diamond (In re Diamond)*,
   196 B.R. 635 (Bankr. S.D. Fla. 1996) ..................................................................42

*Fletcher v. Peck,*
    10 U.S. 87 (1810)..................................................................................................................51

*Flores Rodriguez v. Flores Toledo,*
    101 D.P.R. 61, 68-69 (P.R. 1973)..........................................................................................24

*Foster v. Mfrs.' Fin. Co.,*
    22 F.2d 609 (1st Cir. 1927)....................................................................................................41

*Francisco Levy, Jr., Inc. v. Caribe Gen. Elec., Inc.,*
    2003 WL 21047205 (P.R. Cir. Feb. 28, 2003).......................................................................17

*Franklin Cal. Tax-Free Tr. v. Puerto Rico,*
    85 F. Supp. 3d 577 (D.P.R. 2015), *judgment entered*, 2015 WL 574008
    (D.P.R. Feb. 10, 2015), *aff'd*, 805 F.3d 322 (1st Cir. 2015), *aff'd*, 136 S. Ct.
    1938 (2016)............................................................................................................................62

*Gen. Ins. Co. of Am. v. Lowry,*
    570 F.2d 120 (6th Cir. 1978) .................................................................................................41

*Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &*
*Mgmt. Bd. for P.R.),*
    939 F.3d 340 (1st Cir. 2019) ........................................................................... *passim*

*Grella v. Salem Five Cent Sav. Bank,*
    42 F.3d 26 (1st Cir. 1994).................................................................................................12, 13

*Haesloop v. United States,*
    2000 WL 1607316 (Bankr. E.D.N.Y. Aug. 30, 2000)..........................................................57

*Hatton v. Municipality de Ponce,*
    134 D.P.R. 1001, 1010 (P.R. 1994) ......................................................................................32

*Hibbs v. Winn,*
    542 U.S. 88 (2004).................................................................................................................19

*Hoseman v. Weinschneider,*
    322 F.3d 468 (7th Cir. 2003) .................................................................................................58

*Hunter v. Bank of N.Y. (In re Anderson),*
    266 B.R. 128 (Bankr. N.D. Ohio 2001) .................................................................................41

*In re Airadigm Commc'ns, Inc.,*
    519 F.3d 640 (7th Cir. 2008) .................................................................................................44

*In re City of Columbia Falls, Mont., Special Imp. Dist. No. 25,*
    143 B.R. 750 (Bankr. D. Mont. 1992) ...................................................................................31

*In re Comcoach Corp.*,
    698 F.2d 571 (2d Cir. 1983)...............................................................................66, 67

*In re CRS Steam*,
    217 B.R. 365 (Bankr. D. Mass. 1998) ............................................................................25

*In re Czebotar*,
    5 B.R. 379 (Bankr. E.D. Wash. 1980) .............................................................................40

*In re DeCora*,
    396 B.R. 222 (W.D. Wisc. 2008).....................................................................................44

*In re El Comandante Management Co., LLC*,
    359 B.R. 410 (Bankr. D.P.R. 2006) ...........................................................................65, 66

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    2019 WL 4735362 (D.P.R. June 28, 2019).....................................................................12

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    931 F.3d 111 (1st Cir. 2019) ...........................................................................................45

*In re Fluge*,
    57 B.R. 451 (Bankr. D.N.D. 1985) .................................................................................44

*In re Garcia*,
    484 B.R. 1 (Bankr. D.P.R. 2012) ....................................................................................19

*In re Heffernan Mem'l Hosp. Dist.*,
    202 B.R. 147 (Bankr. S.D. Cal. 1996) ............................................................................45

*In re Hernandez*,
    244 B.R. 549 (Bankr. D.P.R. 2000) ................................................................................12

*In re Horton*,
    595 B.R. 1 (Bankr. D.D.C. 2019) ...................................................................................66

*In re Irving Tanning Co.*,
    496 B.R. 644 (B.A.P. 1st Cir. 2013)................................................................................53

*In re Jones*,
    No. 02-17125-SR, 2002 WL 34560880 (Bankr. E.D. Pa. Sept. 27, 2002)............................65

*In re Kang Jin Hwang*,
    396 B.R. 757 (Bankr. C.D. Cal. 2008), *rev'd and remanded on other grounds*,
    438 B.R. 661 (C.D. Cal. 2010) .......................................................................................65

*In re Las Vegas Monorail Co.*,
    429 B.R. 317 (Bankr. D. Nev. 2010) ...............................................................................29

*In re Las Vegas Monorail Co.*,
   429 B.R. 770 (Bankr. D. Nev. 2010) ........................................................................59

*In re Mefford*,
   18 B.R. 853 (Bankr. S.D. Ind. 1982) ........................................................................42

*In re Morales Travel Agency*,
   667 F.2d 1069 (1st Cir. 1981) ..................................................................................32

*In re Overview Equities*,
   240 B.R. 683 (Bankr. E.D.N.Y. 1999) ......................................................................65

*In re Palmas del Mar Country Club, Inc.*,
   443 B.R. 569 (Bankr. D.P.R. 2010) ..........................................................................27

*In re S. Biotech, Inc.*,
   37 B.R. 318 (Bankr. M.D. Fla. 1983) .......................................................................39

*In re Sanchez*,
   429 B.R. 393 (Bankr. D.P.R. 2010) ..........................................................................18

*In re Sweports, Ltd.*,
   476 B.R. 540 (Bankr. N.D. Ill. 2012) .......................................................................66

*In re T. Brady Mech. Servs., Inc.*,
   129 B.R. 559 (Bankr. N.D. Ill. 1991) .......................................................................41

*In re Tap, Inc.*,
   52 B.R. 271 (Banrk. D. Mass. 1985) .....................................................................30, 32

*In re Trask*,
   462 B.R. 268 (B.A.P. 1st Cir. 2011) .........................................................................44

*In re Vieland*,
   41 B.R. 134 (Bankr. N.D. Oh. 1984) ........................................................................65

*In re Weisband*,
   427 B.R. 13 (Bankr. D. Az. 2010) ............................................................................65

*In re Zhejiang Topoint Photovoltaic Co.*,
   2015 WL 2260647 (Bankr. D.N.J. May 12, 2015) ....................................................67

*Knightsbridge Mktg. Servs., Inc. v. Promociones Y Proyectos, S.A.*,
   728 F.2d 572 (1st Cir. 1984) ....................................................................................11

*Kokoszka v. Belford*,
   417 U.S. 642 (1974), *reh'g denied*, 419 U.S. 886 (1974) ..........................................58

*Kungys v. United States,*
    485 U.S. 759 (1988)........................................................................................................54

*La. Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986)........................................................................................................28

*Lingle v. Chevron U.S.A. Inc.,*
    544 U.S. 528 (2005)........................................................................................................61

*Local Initiative Health Auth. for L.A. Cty. v. United States,*
    142 Fed. Cl. 1 (Fed. Cl. 2019) .....................................................................................52

*Lockhart v. United States,*
    136 S. Ct. 958 (2016)...............................................................................................24, 26

*Louisiana ex rel. Hubert v. City of New Orleans,*
    215 U.S. 170 (1909)...................................................................................................21, 63

*Logan v. Zimmerman Brush Co.,*
    455 U.S. 422 (1982)........................................................................................................61

*Lopez del Valle v. Gobierno de la Capital,*
    855 F. Supp. 34 (D.P.R. 1994).....................................................................................19

*LPP Mortg., Ltd. v. Sugarman,*
    565 F.3d 28 (1st Cir. 2009)...........................................................................................17

*Maine Cmty. Health Options v. United States,*
    2020 WL 1978706 (U.S. Apr. 27, 2020) ...................................................................4, 52

*Martin v. United States,*
    130 Fed. Cl. 578 (Fed. Cl. 2017) .................................................................................52

*Mastrobuono v. Shearson Lehman Hutton, Inc.,*
    514 U.S. 52 (1995)..........................................................................................................23

*McGraw v. Hansbarger,*
    301 S.E.2d 848 (W. Va. 1983).......................................................................................18

*McRoberts v. Transouth Fin. (In re Bell),*
    194 B.R. 192 (Bankr. S.D. Ill. 1996) ...........................................................................42

*Mèndez-Nùñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.),*
    916 F.3d 98 (1st Cir. 2019)...........................................................................................46

*Missouri v. Jenkins,*
    495 U.S. 33 (1990)..........................................................................................................21

*Murphy v. Smith*,
    138 S. Ct. 784 (2018)..........................................................................................................18

*Murray v. City of Charleston*,
    96 U.S. 432 (1877)..............................................................................................................63

*New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy
    Mart Convenience Stores, Inc.)*,
    351 F.3d 86 (2d Cir. 2003)..................................................................................................39

*P.R. Tel. Co. v. Advanced Cellular Sys. (In re Advanced Cellular Sys., Inc.)*,
    483 F.3d 7 (1st Cir. 2007)....................................................................................................19

*Pare v. Natale (In re Natale)*,
    174 B.R. 362 (Bankr. D.R.I. 1994).....................................................................................41

*Parella v. Ret. Bd. of R.I. Emps' Ret. Sys.*,
    173 F.3d 46 (1st Cir. 1999).............................................................................................62, 63

*Paroline v. United States*,
    572 U.S. 434 (2014)........................................................................................................25, 26

*Peaje Investments LLC v. Financial Oversight & Management Board for Puerto
    Rico*,
    899 F.3d 1 (1st Cir. 2018)....................................................................................................13

*Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*,
    91 F. Supp. 3d 267 (D.P.R. 2015).......................................................................................18

*Porto Rico Tel. Co. v. Tax Court*,
    1960 PR Sup. LEXIS 72 (P.R. June 30, 1960) ..................................................................49

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
    136 S. Ct. 1938 (2016)....................................................................................................46, 48

*Quasar Energy Group, LLC v. VGBLADS, LLC*,
    No. 2:16-CV-00402-NT, 2017 WL 3206940 (D. Me. July 28, 2017)...................................17

*Ramis v. The Registrar*,
    19 D.P.R. 747, 1913 PR Sup. LEXIS 140 (P.R. 1913).......................................................40

*Reed & Reed, Inc. v. Weeks Marine, Inc.*,
    431 F.3d 384 (1st Cir. 2005)................................................................................................17

*Rice v. City of Milwaukee*,
    100 Wis. 516 (1898) ...........................................................................................................51

*Riley v. Joint Fiscal Comm. of Ala. Legislature*,
   26 So. 3d 1150 (Ala. 2009)...................................................................................................15

*Roslyn Savings Bank v. Comcoach Corp. (In re Comcoach Corp.)*,
   19 B.R. 231 (Bankr. S.D.N.Y. 1982).............................................................................66, 67

*Rotman Elec. Co. v. Cullen (In re Vappi & Co.)*,
   145 B.R. 719 (Bankr. D. Mass. 1992) ................................................................................41

*Salazar v. Ramah Navajo Chapter*,
   567 U.S. 182 (2012).....................................................................................................52, 54

*Semaphore Entm't Grp. Sports Corp. v. Gonzalez*,
   919 F. Supp. 543 (D.P.R. 1996)..........................................................................................61

*Slodov v. United States*,
   436 U.S. 238 (1978).............................................................................................................28

*Sovran Bank v. United States (In re Aumiller)*,
   168 B.R. 811 (Bankr. D.D.C. 1994) ...................................................................................42

*State ex rel. Hunter v. Lippold*,
   142 S.W.3d 241 (Mo. Ct. App. 2004).................................................................................18

*State v. Sherman*,
   46 Iowa 415 (1877).............................................................................................................15

*Stowe v. Bologna (In re Bologna)*,
   206 B.R. 628 (Bankr. D. Mass. 1997) ................................................................................32

*Systemized of New England, Inc. v. SCM, Inc.*,
   732 F.2d 1030 (1st Cir. 1984).............................................................................................23

*Thomas Jefferson Classical Acad. Charter Sch. v. Cleveland Cty. Bd. of Educ.*,
   763 S.E.2d 288 (N.C. Ct. App. 2014).................................................................................33

*Thomas v. Commissioner of Social Security*,
   294 F.3d 568 (3d Cir. 2002)................................................................................................25

*Ticonic Nat'l Bank v. Sprague*,
   303 U.S. 406 (1938).............................................................................................................57

*U.S. Bank N.A. v. Vertullo (In re Vertullo)*,
   610 B.R. 399 (B.A.P. 1st Cir. 2020)...................................................................................12

*U.S. Fid. & Guar. Co. v. Maxon Eng'g Servs. (In re Maxon Eng'g Servs. Inc.)*,
   332 B.R. 495 (Bankr. D.P.R. 2005)....................................................................................41

*U.S. Tr. Co. of N.Y. v. New Jersey,*
   431 U.S. 1 (1977)..................................................................................................................62

*UBS Fin. Servs., Inc. of P.R. v. XL Specialty Ins. Co.,*
   929 F.3d 11 (1st Cir. 2019)..................................................................................................26

*Union Tr. Co. of Maryland v. Townshend,*
   101 F.2d 903 (4th Cir. 1939) ...............................................................................................42

*Uniroyal, Inc. v. Universal Tire & Auto Supply Co.,*
   557 F.2d 22 (1st Cir. 1977)..................................................................................................41

*United States v. Friedman,*
   143 F.3d 18 (1st Cir. 1998)..................................................................................................41

*United States v. Kerley,*
   416 F.3d 176 (2d Cir. 2005).................................................................................................25

*United States v. Santoro,*
   359 F. Supp. 3d 122 (D. Me. 2019) .....................................................................................26

*United States v. Sec. Indus. Bank,*
   459 U.S. 70 (1982)...............................................................................................................64

*United States v. Ven-Fuel, Inc.,*
   758 F.2d 741 (1st Cir. 1985).................................................................................................26

*United States v. Winstar Corp.,*
   518 U.S. 839 (1996) (Souter, J., plurality)..........................................................................51

*Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &
   Mgmt. Bd. for P.R.),*
   945 F.3d 3 (1st Cir. 2019)....................................................................................................53

*Vázquez-Velázquez v. Puerto Rico Highway & Transp. Auth.,*
   2016 WL 183653 (D.P.R. Jan. 14, 2016) ............................................................................63

*Von Hoffman v. City of Quincy,*
   71 U.S. 535 (1867).................................................................................................21, 30, 51, 63

*W. Auto Supply Co. v. Savage Arms (In re Savage Indus., Inc.),*
   43 F.3d 714 (1st Cir. 1994)..................................................................................................66

*Warren Tool Co. v. Stephenson,*
   161 N.W.2d 133 (Mich. 1968)..............................................................................................40

*Wertheim, LLC v. Currency Corp.,*
   2017 WL 3668985 (Cal. Ct. App. Aug. 25, 2017)...............................................................27

*Whitfield v. Municipality of Fajardo,*
  2007 WL 6894782 (D.P.R. May 29, 2007)...............................................................44

**Statutes**

3 L.P.R.A. § 1906(m)...............................................................................................20

3 L.P.R.A. § 1907(a).......................................................................................41, 43, 49

3 L.P.R.A. § 1911 ....................................................................................................31

3 L.P.R.A. § 1913 .................................................................................14, 49, 51, 62

3 L.P.R.A. § 1914 ...........................................................................................*passim*

13 L.P.R.A. § 12.......................................................................................................37

19 L.P.R.A. § 402......................................................................................................40

19 L.P.R.A. § 2212(29)............................................................................................43

19 L.P.R.A. § 2212(61)............................................................................................43

19 L.P.R.A. § 2219(c)(2)....................................................................................42, 43

19 L.P.R.A. § 2260...................................................................................................43

19 L.P.R.A. § 2262(b)(1).........................................................................................43

19 L.P.R.A. § 2265(d)(2).........................................................................................43

31 L.P.R.A. § 3 .......................................................................................................31

11 U.S.C. § 101(5)(A)..............................................................................................65

11 U.S.C. § 101(10)(A)............................................................................................65

11 U.S.C. § 361...................................................................................................39, 47

11 U.S.C. § 362(d)...........................................................................................*passim*

11 U.S.C. § 362(d)(1).......................................................................................*passim*

11 U.S.C. § 362(d)(2).........................................................................................14, 38

11 U.S.C. § 362(e)....................................................................................................38

11 U.S.C. § 502(d)....................................................................................................41

11 U.S.C. § 544.........................................................................................................44

11 U.S.C. § 544(a) ..............................................................................................44

11 U.S.C. § 544(a)(1)..........................................................................................44

11 U.S.C. § 552.............................................................................................44, 45

11 U.S.C. § 552(a) ..............................................................................................44

11 U.S.C. § 922(d).............................................................................................45

11 U.S.C. § 928.....................................................................................28, 43, 59

11 U.S.C. § 928(a) ..............................................................................................59

11 U.S.C. § 1109(b).............................................................................................66

11 U.S.C. § 1123.................................................................................................48

11 U.S.C. § 1129(b)(2)(B) ...................................................................................58

48 U.S.C. § 2103.................................................................................................47

48 U.S.C. § 2141.................................................................................................56

48 U.S.C. § 2141(b)(1)(N)...................................................................................47

48 U.S.C. § 2149...........................................................................................53, 55

48 U.S.C. § 2161.................................................................................................47

48 U.S.C. § 2161(a) ......................................................................................35, 56

48 U.S.C. § 2195.................................................................................................55

48 U.S.C. § 2195(a) .............................................................................................65

P.R. CONST. art. VI, § 8............................................................................ *passim*

P.R. Laws Ann. tit. 22 § 215................................................................................62

U.S. CONST. amend. V .........................................................................................64

**Other Authorities**

A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS
    144 (2012)...........................................................................................24, 25, 26

BLACK'S LAW DICTIONARY (11th ed. 2019) ........................................................24

David A. Skeel, *The Education of Detroit's Pension and Bond Creditors*, 24 U. PA. PUB. POL'Y INITIATIVE 1, 3 (2014) ..................................................................................58

Elizabeth Bauer, *Is Chicago the Next Detroit?*, FORBES (Jan. 16, 2019) .....................................60

*Rating Methodology:  Lease, Appropriation, Moral Obligation and Comparable Debt of US State and Local Governments*, MOODY'S INV. SERV. (July 26, 2016) ............................................................................................................................49

Restatement (Second) of Contracts § 202 (1981) ................................................................. *passim*

Richard Porter, *Commentary: Bankruptcy Looms for Chicago If There's No Pension Fix*, CHI. TRIB. (Sept. 26, 2019) ................................................................60

Statement of Motives, No. 44. July 7, 1997, No. 32 (June 21, 1988)...........................................49

Wigmore on Evidence § 291..............................................................................................11

Movants respectfully submit this reply (the "Reply") in further support of their Motion[2] and to respond to: (i) the Supplemental Opposition filed by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") (ECF No. 10611, the "Opposition" or "Opp."); (ii) the Limited Joinder to the Opposition filed by AAFAF (ECF No. 10641); and (iii) the Partial Joinder filed by the Official Committee of Unsecured Creditors in Support of the Opposition (ECF No. 10635).  In support of their Reply, Movants state as follows:

## PRELIMINARY STATEMENT

1.       The Motion established multiple independent bases for lifting the stay.  Each boils down to the simple fact that the Commonwealth is interfering with Movants' property, and Movants should not be deprived of the ability to enforce their rights.  The Oversight Board's arguments in opposition are legally meritless, and, as discovery has now revealed, based on false factual premises.

2.       The Enabling Act mandates that the Pledged Rum Taxes "*shall be covered into*" the Puerto Rico Infrastructure Fund (the "Infrastructure Fund") for PRIFA's benefit, "when received."  And the Commonwealth contracted by legislation with PRIFA bondholders not to limit or impair PRIFA's rights to the Pledged Rum Taxes.  Those actions alone, under *Flores Galarza*, make the Pledged Rum Taxes PRIFA's money and subject to bondholders' liens the moment the Commonwealth receives them.

---

[2] Unless otherwise specified, defined terms have the same meaning given to them in the Motion.  Unless otherwise indicated, all ECF numbers referenced in this Reply refer to the docket in Case No. 17-3283-LTS.  All references to Exhibits in this Reply, other than Exhibit A attached to the Motion, refer to the Exhibits attached to the Motion and to the *Declaration of Atara Miller* (the "Miller Decl."), as appropriate.  Also submitted with Movants' Reply is the accompanying declaration of William H. Holder, dated April 30, 2020, along with the expert report of Mr. Holder attached thereto (the "Holder Report").  The Holder Report is submitted in response to arguments made in the Opposition, issues raised by documents produced since that time, and arguments raised through the deposition testimony of the Rule 30(b)(6) representative for PRIFA and the Commonwealth.  All arguments in the Motion are reincorporated herein by reference and not waived.

3.      To avoid the parallels between *Flores Galarza* and this case, the Oversight Board invents convenient—but wildly illogical—constructions of the governing documents and, now, PROMESA.   It claims that the Enabling Act does not mandate anything, as if "shall transfer" means "may transfer," and "when received" means "whenever (or never)."   But the First Circuit has already held that such mandatory language effects a transfer of property rights.   And the Oversight Board's main argument—that the Trust Agreement grants a lien to the PRIFA Trustee only on moneys deposited into the Sinking Fund (*i.e.*, the trust account held by the Trustee)— would render the basic pledge underlying the PRIFA Trust Agreement meaningless.   Basic numerous canons of construction require, this Court to read the Trust Agreement to give effect to the intent of the parties and its terms— and avoid constructions, like the Oversight Board's, that would render the agreement nugatory or ineffective.

4.      Recognizing the infirmities in its legal arguments, the Oversight Board tries to rewrite the facts.   It claims that the Infrastructure Fund (which it acknowledges is owned by PRIFA) is not a special revenue fund held on the Commonwealth's books—as reported in the Commonwealth's audited financial statements—but was instead a specific bank account held by PRIFA into which the Pledged Rum Taxes were, but no longer are, transferred.

5.      Discovery has disproved this contention.   The Commonwealth's corporate representative admitted that the Infrastructure Fund is not (and never has been) a physical bank account in PRIFA's name. (Ex. 26, Ahlberg Tr. 339:23-340:3.)   The Infrastructure Fund is, rather, understood to refer to "the first $117 million of rum revenues" received by the Commonwealth each fiscal year. (Ex. 26, Ahlberg Tr. 331:15-332:21.)   And, *to this day*, "the first $117 million of rum revenues" are recorded and tracked in a special revenue account when received by the Commonwealth. (Ex. 26, Ahlberg Tr. 349:8-13.)   This testimony is consistent with the disclosures

and description of the PRIFA special revenue fund in the Commonwealth's audited financial statements.

6.      As Movants' accounting expert, Professor William Holder, explains, this structure is standard in governmental "fund accounting," which allows governments to centrally manage cash for operational purposes (such as to maximize the rate of return on available cash, and ensure proper accountability), while also tracking "funds" that are restricted to particular purposes. (*See* Holder Report ¶¶ 22-25.)  This segregation and tracking of restricted or committed moneys is effectuated through unique fund designations, account numbers within the General Fund, and other designations.  As the Commonwealth continues to record the Pledged Rum Taxes was a unique internal revenue account number, the Infrastructure Fund continues to exist on the Commonwealth's internal books and records in precisely the same manner that it has since at least 2014.  Moneys in the Infrastructure Fund are equitably owned by PRIFA, not the Commonwealth, and are subject to Movants' lien.

7.      Recognizing that neither law nor fact could excuse the Commonwealth's unlawful seizure of the Pledged Rum Taxes, the Oversight Board ultimately resorts to brazen declarations that its power to limit budgetary appropriations under Title II of PROMESA has given it free rein to preempt statutes, repudiate contracts, and seize property—to disregard "any prepetition obligation to pay" the Commonwealth might have had (or will have).  This claim is meritless.  While Title II grants the Oversight Board the power to certify Commonwealth budgets and thereby impose restrictions on the Commonwealth's appropriations, that does not create a power to destroy pre-existing legal obligations.  More than a century of case law, reaffirmed by the Supreme Court just days ago, makes that clear.  *See Maine Cmty. Health Options*, 2020 WL 1978706, at *9-10 (U.S. Apr. 27, 2020) (affirming that the failure to make a budget appropriations has no effect on

the Government's legal obligations to third parties or the third parties' ability to enforce that obligation in court).  The failure of a government to appropriate funds to pay a legal obligation does not discharge the obligation or constitute a cognizable defense in a court proceeding.

8.      Movants are now entitled to enforce their property interests in, and liens on, the pledged special revenue stream—those Pledged Rum Taxes that the Commonwealth unlawfully took without ever satisfying the conditions of Article VI, Section 8, and, under Section 928(a) of the Bankruptcy Code, those that the Commonwealth receives in the future.  The notion that Movants, who are asserting direct claims against the Commonwealth, lack "party-in-interest" standing under any analysis, fails on its own weight.

9.      For the reasons set forth in the Motion and below, Movants are entitled to stay relief under Sections 362(d)(2) and (d)(1).

## SUPPLEMENTAL BACKGROUND

10.      On February 14, 2020, after Movants had filed their Motion and the Oversight Board its Opposition, the Court ordered the Oversight Board and AAFAF to provide "limited discovery" into the factual representations the Oversight Board made in paragraphs 29, 38, 69, 103, and 124-25 of the Opposition.  (*See* ECF No. 11057 at 2.)  The limited discovery to date proves that the Commonwealth lacks equity in the Pledged Rum Taxes.

**I.      The Commonwealth's Pre-Default Implementation of the Enabling Act Shows That the Pledged Rum Taxes are Property of PRIFA and Its Bondholders, Not the Commonwealth.**

11.      In its Opposition, the Oversight Board contends that PRIFA bondholders have no rights to any "Retained Rum Taxes" held by the Commonwealth because, historically, PRIFA only received those moneys the Commonwealth "appropriated" to it on an annual basis.  According to the Oversight Board, the appropriated money, after being deposited in the Treasury's Single Account ("TSA"), was then transferred to and "deposited in" the "PRIFA Infrastructure Fund"—

4

which the Oversight Board describes as a bank account "held by PRIFA." (Opp. ¶ 5 & Ex. A.)
The Oversight Board argues that neither PRIFA nor its bondholders have any rights to the Pledged
Rum Taxes until the Commonwealth transfers them to a PRIFA-held bank account called the
Infrastructure Fund—at which point PRIFA owned the money and was obligated to transfer it to
the Sinking Fund. (*Id.* ¶ 5.)

12.     Discovery has disproved the Oversight Board's assertions. (Ex. 26, Ahlberg Tr.
339:23-340:3.) The Commonwealth's Rule 30(b)(6) witness testified that the Infrastructure Fund
never referred to a specific bank account held by PRIFA. (Ex. 26, Ahlberg Tr. 339:23-340:3.)
Instead, he testified that the Infrastructure Fund refers to the first $117 million in Rum Taxes
received by the Commonwealth. (Ex. 26, Ahlberg Tr. 331:15-332:21; Ex. 27, *Commonwealth of
Puerto Rico, Basic Financial Statements and Required Supplementary Information, June 30, 2014*,
at 323.) [3]

13.     Indeed, consistent with principles of governmental fund accounting, the
Infrastructure Fund is an accounting entity that, by operation of law, holds the first $117 million
annually of Rum Taxes. It is accounted for on the Commonwealth's books and records as a special
revenue fund.   The Commonwealth's audited financial statements publicly disclosed the

---

[3] In obvious recognition of how devastating this admission was to their case, the Oversight Board has
already tried to run away from it—claiming that Mr. Ahlberg, the Commonwealth's designated corporate
representative, merely testified "to his layperson understanding" of what the Infrastructure Fund *used* to
mean. (*See Memorandum of the Commonwealth of Puerto Rico, by and through the Financial Oversight
and Management Board, in Support of Motion Pursuant to Bankruptcy Rule 7056 for Partial Summary
Judgment Disallowing Claims* ¶ 34, No. 20-00003 (ECF No. 44).) Mr. Ahlberg, however,  explicitly
testified, without objection, that he was describing the Commonwealth's present understanding of the
Infrastructure Fund, as shared by "relevant individuals":

> [The Puerto Rico Infrastructure Fund] is understood to *generally* refer to the first 117
> million of rum Funds, rum revenues. . . . I'm speaking generally about the concepts of the
> Infrastructure Fund as understood by relevant individuals.

(Ex. 26, Ahlberg Tr. 331:19-332:8 (emphasis added); *see also id*. at 271:20-23 ("Q: Mr. Ahlberg, you're
here testifying on behalf of the Commonwealth; isn't that right? A: Yes.").)

Infrastructure Fund's separate existence as a special fund and accounting entity.  For instance, the

audited financial statement for fiscal year 2014 describes the Infrastructure Fund as follows:

> **Puerto Rico Infrastructure Financing Authority's Special Revenue Fund** – The
> **special revenue fund** of the Puerto Rico Infrastructure Financing Authority, a
> blended component unit, **is used to account** principally for the moneys received by
> the Commonwealth, up to $117 million, of certain federal excise taxes levied on
> rum and other articles produced in Puerto Rico and sold in the United States, which
> are collected by the U.S. Treasury and returned to the Commonwealth. Under Act
> No. 44 of June 21, 1988, as amended, **the Commonwealth transfers to this fund
> the first $117 million** of these federal excise taxes reimbursed, **which are
> subsequently transferred to the Puerto Rico Infrastructure Financing
> Authority's Debt Service Fund** to provide for the debt service of its special tax
> revenue bonds. . . .

(Ex. 27, at 323; *see also* Ex. 28, *Commonwealth of Puerto Rico, Basic Financial Statements and

Required Supplementary Information, June 30, 2013*, at 256; and Ex. 29, CW_STAY0009784, at

357) (emphasis added).)[4]

14.     The Commonwealth has consistently defined "Special Revenue Funds" as:

Commonwealth governmental funds *separate from the General Fund* that are
created by law, *are not subject to annual appropriation* and have specific uses
established by their respective enabling legislation.   Special Revenue Funds are
funded from, among other things, revenues from federal programs, tax revenues
assigned by law to public corporations and other third parties, fees and charges for
services by agencies, dividends from public corporations and financing proceeds.

---

[4] In its audited financial statements for the fiscal year ending June 30, 2015—issued on June 29, 2018—the
Commonwealth, for the first time, stated that it "*conditionally allocates*" to [the Special Revenue Fund] the
first $117 million of [] federal excises taxes reimbursed, which are subsequently transferred to [PRIFA's]
Debt Service Fund to provide for the debt service of it special tax revenue bonds." (Ex. 29,
CW_STAY00009784 at 357 (emphasis added).)  This *ex post facto* addition to the Commonwealth's
financial statements—added after PROMESA was passed and related litigation had been initiated—is
belied by the Commonwealth's pre-litigation financial statements, in which the phrase "conditionally
allocated" appeared nowhere. (*See, e.g.*, Ex. 27, at 323; Ex. 30, *Comprehensive Annual Financial Report:
Fiscal Year Ended June 30, 2011* at 140 ("Act No. 44, as amended, *requires* that in each fiscal year through
fiscal year 2057, the first $117 million, of certain federal excise taxes received by the Commonwealth be
transferred to [PRIFA]. . . *The Commonwealth has pledged these taxes for the repayment of PRIFA's Special
Tax Revenue Bonds*.") (emphasis added).)

(*See* Ex. 31, CW_STAY0000229 at 3 (emphasis added); Ex. 32, CW_STAY0000914 at 3 (emphasis added); Ex. 33, TSA Cash Flow as of March 8, 2019 at 3 (emphasis added); *see also* Ex. 29, CW_STAY0009784 at 367; Ex. 34, CW_STAY0010168 at 357 (defining Special Revenue Funds as funds that "are used to account for funds held by the Commonwealth in a trustee capacity, or as an agent for individuals, organizations, and other governmental units."); (Holder Report ¶¶ 45-46.)

15.     The manner in which the Commonwealth described the Infrastructure Fund in its audited financials is consistent with fundamental principles of "governmental fund accounting." Accounting expert Bill Holder explains in his report that government accounting systems "are organized and operated on a fund basis. Fund accounting calls for the financial resources of a government to be accounted for and reported in appropriate funds." (Holder Report ¶ 2.) Moreover, he explains, "Moneys received and restricted to use for specific activities can be, and in practice often are, pooled in a single bank account along with unrestricted moneys or moneys to be used for other purposes," such as the Commonwealth TSA. (*Id.* ¶ 25.) Doing so "does not extinguish or affect restrictions on those resources" imposed by enabling legislation. (*Id.* ¶ 26.) Governmental funds are simply the manner in which the Commonwealth tracks restrictions on particular funds, even while cash is held in a pooled account like the TSA.

16.     The Commonwealth's pre-default implementation of the Enabling Act and Trust Agreement and internal accounting of the Rum Taxes as they flowed through Treasury accounts demonstrates that the Pledged Rum Taxes were at all times treated as for the benefit of PRIFA and its bondholders, even though they never flowed through any PRIFA-controlled account. The following chart reflects the pre-default flow-of-funds by bank account for the period January 2014

to June 2015 (the earliest period for which Movants have obtained flow-of-funds discovery). As

shown below, the Pledged Rum Taxes never passed through a PRIFA bank account.



**Rum Taxes – January 2014 to June 2015**

**Footnotes:**

- Account contains pooled funds, but rum taxes remain traceable on the Commonwealth's books and records
- Denotes transfers of rum taxes made to PRIFA for its operational expenses.
- The Government Parties' flow chart identifies this account as "PRIFA GDB -1891"

17.    During this period, when the U.S. Treasury transferred Rum Taxes to the

Commonwealth, the funds were deposited into one of the bank accounts that comprised the TSA,

specifically GDB Account Number [Redacted]000-6 (the "GDB -0006 Account"). (*See* Ex. 26, Ahlberg

Tr. 355:4-14). This is the only bank account through which the entirety of the first $117 million

of Rum Taxes flowed, making clear that the Infrastructure Fund existed as a fund on the

Commonwealth's books and records (with the corresponding cash held in the TSA). (Ex. 26,

Ahlberg Tr. 370:21-371:2; *see also* Ex. 36, Government Parties' Flow of Funds Charts at 3.)

18.    After the $117 million was deposited into the GDB-0006 Account, $4 million of

the Rum Taxes was transferred to the PRIFA operational account (GDB Account No. [Redacted]0704).

(*See, e.g.*, Ex. 26, Ahlberg Tr. 353:15-20.)  The remaining $113 million was transferred to a GDB-held PRIFA debt service account (GDB Account No. [Redacted]189-1 (the "GDB -1891 Account)), before being transferred to the bond trustee's account at U.S. Bank (Account Number [Redacted]0-002).  (*See* Ex. 36, Government Parties' Flow of Funds Charts at 3; *see also* Ex. 26, Ahlberg Tr. 344:7-23; Ex. 27, at 323 ("the Commonwealth transfers to [PRIFA's Special Revenue Fund] the first $117 million of these federal excise taxes reimbursed, which are subsequently transferred to the Puerto Rico Infrastructure Financing Authority's Debt Service Fund to provide for the debt service of its special tax revenue bonds.").)

19.    The Oversight Board's and AAFAF's (collectively, the "Government Parties") representation of the pre-default flow of funds, (*see* Ex. 36, Government Parties' Flow of Funds Charts at 3), is wrong in at least one respect:  The account labeled "PRIFA GDB-1891" was not a PRIFA bank account.  It was in the name of the Government Development Bank for Puerto Rico ("GDB").  (*See* Ex. 37, PRIFA_STAY0004737 at PRIFA_STAY0004737, PRIFA_STAY0004741-42; Ex. 26, Ahlberg Tr. 362:19-363:5, 368:13-369:2 (confirming that, while the account is named "AFI DEBT SERVICE" for internal reference, that does not mean that PRIFA was the actual accountholder).)  In other words, the moneys used to pay the PRIFA bonds never flowed through any PRIFA-controlled bank account.[5]  When asked about Exhibit A to the Opposition that the Oversight Board submitted to this Court, representing that the Infrastructure Fund is "held by PRIFA" (ECF No. 10611-1), the Commonwealth's corporate representative testified that the exhibit was not consistent with the Commonwealth's understanding of the Infrastructure Fund. (Ex. 26, Ahlberg Tr. 339:23-340-2.)  The Treasury Department maintains the Infrastructure Fund

---

[5] This is consistent with the PRIFA Enabling Act, which requires only that that the Fund "be maintained by *or on behalf of* [PRIFA]." 3 L.P.R.A. § 1914.

on PRIFA's behalf. The Commonwealth holds, at most, legal title, and PRIFA enjoys equitable ownership (but with PRIFA's equitable ownership of the Infrastructure Fund subject to the Trustee's lien for the benefit of all bondholders).

20.     Here, Treasury recorded incoming Rum Taxes using a specific account designation (R4220) in its internal fiscal and accounting system (coincidentally known by the abbreviation PRIFAS). (*See* Ex. 38, PRIFA_STAY00001065-66; Ex. 39, AAFAF Mar. 13, Ltr. at 4 ("Account value R4220 refers to the account used for the Rum Cover Over received from the Alcohol and Tobacco Tax and Trade Bureau for rum exported to the United States"); Ex. 26, Ahlberg Tr. 349:8-13, 372:19-373:2.)

## II.     Post-Default, the Commonwealth Continues to Receive Moneys Deposited "to the Credit of PRIFA."

21.     The current manner in which the Pledged Rum Taxes are being accounted for as they are deposited into the TSA makes clear that they are owned by PRIFA. The Lockbox Agreement, dated May 5, 2015, between the Commonwealth and Rum Producers,[6] provides that the first $117 million in Rum Taxes received each year should be sent to Treasury, with a direction that the moneys are "**for deposit to the credit of PRIFA**."[7] (Opp. ¶ 29 (emphasis added); *see*

---

[6] Two rum producers—Bacardí International Limited and Bacardi Corporation and Destileria Sérralles, Inc. (together, the "Rum Producers")—filed joinders to the Opposition. (ECF No. 10616, "Bacardí Br."); (ECF No. 10612, "Sérralles Br."). The Rum Producers' joinders should be disregarded because the Rum Producers lack standing. The Rum Producers have no claim to the Pledged Rum Taxes. Their joinder motions do nothing more than make assertions about the putative merits of claims that are not before this Court. This is something the Rum Producers freely admit in their joinder motions. (*See, e.g.*, Bacardí Br. at 4-5 (stating that because the Oversight Board has "thoroughly" addressed the issues of standing and property interests, they only address in their filing whether the facts alleged "give rise to claims against the Commonwealth and Rum Producers").) One thing Movants and the Rum Producers do agree on, however, is that the first $117 million of Rum Taxes are Movants' property.

[7] The Oversight Board tries to trivialize the "Disbursement Details" as "merely a description of how the disbursements were calculated," rather than "an instruction," because "the Lockbox Bank has no power to create any property interest in the monies . . . ." (Opp. ¶ 29.) There is no merit to this argument. The Lockbox Agreement expressly recognizes PRIFA's entitlement to the first $117 million, and thus, it is the Lockbox Agreement (not the purported power of the Lockbox Bank) that requires the moneys to be

*also* Ex. 40, PRIFA_STAY0001515; Sérrales Br. ¶ 6; Bacardí Br., Ex. D, ECF 10609-4 (Lockbox Agreement), § 5(a); Ex. 26, Ahlberg Tr. 391:9-17; Miller Decl. ¶ 18.) This is consistent with the statutory requirement that the Pledged Rum Taxes "shall be covered into a Special Fund maintained by *or on behalf of* the Authority." 3 L.P.R.A. § 1914 (emphasis added).

22. Treasury accepts the deposits and records the incoming Pledged Rum Tax proceeds in the General Fund, with the same fund and account designations that allow separate tracing of the Rum Taxes, the first $117 million of which constitute the Infrastructure Fund as used prior to the implementation of the Lockbox Agreement. (Ex. 26, Ahlberg Tr. 349:8-13.) And it does so at the express direction of the Commonwealth.[8] (Lockbox Agreement § 5(a).) The funds can be identified from these accounting designations. (Ex. 26, Ahlberg Tr. 344:7-16.) In other words, as in *Gracia-Gracia*, Pledged Rum Taxes are "segregated into a separate account in the general fund for accounting purposes." *Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 939 F.3d 340, 351 (1st Cir. 2019).

---

delivered "to the credit of" PRIFA. While the Oversight Board argues that, under Section 15 of the Lockbox Agreement, the disbursements are subject to change if the amount "appropriated" to PRIFA is changed (Opp. ¶ 29 and n.19), the Oversight Board does not dispute that this provision has never been invoked and the Lockbox Bank is continuing to deposit the first $117 million with the Treasury Department "to the credit of PRIFA." (Ex. 26, Ahlberg Tr. 390:23-391:8.)

[8] Any effort by the Government Parties to dispute these facts cannot be entertained in the context of this Motion. The Court must assume the facts alleged in favor of the Movants on this record because the Government Parties did not comply with the Court's discovery orders. Following motion to compel briefing, Judge Dein ordered the Government Parties to produce internal accounting records, specifically "transmittal information . . . including, without limitation . . . documents showing any sub-accounts or other designations used to track Rum Taxes in the [TSA]." (ECF No. 12080 at 4.) The Government Parties refused to provide a complete set of such records. Where, as here, a party fails to comply with a discovery order, the Court must presume that the unproduced discovery would be unfavorable to the party that failed to produce it. (*See* 2 Wigmore on Evidence § 291, at 228 ("The failure or refusal to produce a relevant document. . . . is evidence from which alone its contents may be inferred to be unfavorable to the possessor . . . ."); *Knightsbridge Mktg. Servs., Inc. v. Promociones Y Proyectos, S.A.*, 728 F.2d 572, 575 (1st Cir. 1984) ("The district court was entitled, as are we, to draw an adverse inference against the defendant for its failure to produce . . . ."); *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 716 (6th Cir. 2007) (concluding that "the district court should have drawn an adverse inference against [defendant] for its failure to turn over" critical documents).) This alone confirms that Movants have a "colorable claim."

## ARGUMENT

23.     The Oversight Board's attempt to heighten Movants' burden or to suggest that Movants must prove secured status (Opp. ¶¶ 56, 58) is baseless. "Adjudication of a motion for relief from the automatic stay 'is not a proceeding for determining the merits of the underlying substantive claims, defenses, or counterclaims.'" *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 2019 WL 4735362, at *4 (D.P.R. June 28, 2019) (quoting *In re Bos. Language Inst., Inc.*, 593 B.R. 381, 395 (Bankr. D. Mass. 2018)). Rather, *Grella*'s "colorable claim" standard applies. *See Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 32-33 (1st Cir. 1994); *see also Gracia-Gracia*, 939 F.3d at 352 (quoting *Grella*, 42 F.3d at 33); *U.S. Bank N.A. v. Vertullo (In re Vertullo)*, 610 B.R. 399, 403-04 (B.A.P. 1st Cir. 2020).

24.     Likewise, "[a] hearing on relief from the automatic stay is typically not the proper forum for the assertion of defenses and counterclaims against the party seeking relief. In an automatic stay proceeding, the Court should limit itself to a narrow frame of inquiry." *In re Hernandez*, 244 B.R. 549, 553-54 (Bankr. D.P.R. 2000) (finding that the movant had a colorable claim to the property, notwithstanding "Debtor's defenses and counterclaims [that] attack the validity of the Movant's claim . . . In view of the First Circuit Court of Appeals' opinion in *Grella v. Salem, supra*, we hold that the appropriate forum for the Debtor's affirmative defenses and counterclaims is the trial court in the foreclosure action."). Although "a more expansive approach to what may be asserted in opposition to a relief from stay motion has evolved, the First Circuit Court of Appeals has adopted the more restrictive approach." *Id.* at 554 (citations omitted). The Court need not—and should not—adjudicate the merits of the underlying claims at this stage.

25.     While *Grella* drew a loose analogy between a lift-stay and a preliminary injunction hearing, it did not suggest that the same burden of proof applies to each. Quite the contrary, *Grella* explicitly stated that a lift-stay movant need only show a "***reasonable likelihood*** that a creditor

has a legitimate claim or lien," and the Court must make "only a determination that the creditor's claim is ***sufficiently plausible*** to allow its prosecution elsewhere." *Grella*, 42 F.2d at 33-34 (emphasis added). Contrary to the Oversight Board's suggestion (Opp. ¶ 60), a lift-stay hearing does "not involve a full adjudication on the merits of claims, defenses, or counterclaims." *Grella*, 42 F.2d at 32.

26.     *Peaje Investments LLC v. Financial Oversight & Management Board for Puerto Rico*, 899 F.3d 1 (1st Cir. 2018), is not to the contrary. While the First Circuit concluded that it could not evaluate the Title III court's finding of lack of "cause" without the court's "view as to the precise nature and extent of [movant's] collateral," it did not require lift-stay movants to "establish[]" the nature and extent of the collateral to prevail. *Id.* at 13. To the contrary, the First Circuit has emphasized that the Court makes only a "preliminary determination" of a movant's claim to the debtor's property. *Gracia-Gracia.*, 939 F.3d at 352.

I.     **THE COURT SHOULD LIFT THE AUTOMATIC STAY UNDER BANKRUPTCY CODE SECTION 362(D)(2) BECAUSE THE COMMONWEALTH HAS NO EQUITY IN THE PLEDGED RUM TAXES AND THEY ARE NOT NECESSARY TO AN EFFECTIVE REORGANIZATION.**

    A.     **Movants Are Entitled to Relief Under 11 U.S.C. § 362(d)(2) Because the Commonwealth Lacks Equity in the Pledged Rum Taxes.[9]**

27.     As Movants have previously shown (Mot. § III.A), the Enabling Act statutorily requires the Commonwealth to assign any rights to the Pledged Rum Taxes to PRIFA and mandates that the Pledged Rum Taxes "***when received*** by the Department of the Treasury of Puerto Rico, ***shall be covered*** into" the Infrastructure Fund by operation of law. 3 L.P.R.A. § 1914

---

[9] Contrary to the Oversight Board's argument (Opp. ¶¶ 56, 58), relief under 11 U.S.C. § 362(d)(2) does not require Movants to show secured status. None of the cases the Oversight Board cites suggests otherwise. (Opp. ¶¶ 57-58, nn.28-29.) These cases—all outside the First Circuit—simply did not address the distinction between § 362(d)(1) and 362(d)(2). In *Gracia Gracia*, the First Circuit squarely held that these two prongs are very different and the court's analysis under Section 362(d)(2) is less "arduous" than the "cause" standard under Section 362(d)(1). 939 F.3d at 347.

(emphasis added).[10]   The Commonwealth further covenanted with PRIFA bondholders not to impair the flow of funds or PRIFA's rights under the Enabling Act.  3 L.P.R.A. §§ 1913, 1914. This statute granted PRIFA and its bondholders a property interest in the special restricted fund, and rendered Treasury a mere conduit.  (Mot. ¶¶ 45-49.)  These facts put this case on all fours with *Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza*, (referred to herein as the "JUA Cases").  484 F.3d 1, 29 (1st Cir. 2007) ("Law 253 . . . provides that the JUA 'shall receive' premiums from the Secretary of Treasury and that the Secretary '***shall transfer***' these premiums to the JUA . . . ***The JUA has successfully alleged an entitlement to the Earned Premiums under Law 253, and therefore a property interest in those funds***") (emphasis added).

28.    The Oversight Board tries to distinguish the JUA Cases by misstating the flow of funds mandated by the Enabling Act and by injecting the words "conditional" or "contingent" into the Enabling Act.[11]  From that false premise, the Oversight Board argues that, unlike the insurance premiums at issue in the JUA Cases, the Commonwealth "has authority to retain and use the funds as it sees fit."  (Opp. ¶ 69.)  There is nothing conditional about the provisions of the Enabling Act, which, in Section 1914, uses the term "shall."  3 L.P.R.A. § 1914.[12]  Indeed, the title of that

---

[10] Movants' interpretation of the Enabling Act is confirmed by the Commonwealth's pre-PROMESA publicly disclosed audited financial statements, in which the Commonwealth wrote that it "has pledged [the first $117,000,000 of Rum Taxes] for the repayment of PRIFA's Special Tax Revenue Bonds." *See, e.g.*, Ex. 30, at 140.

[11] The Oversight Board uses "contingent" or "contingently" twice in its brief (Opp. ¶¶ 85, 124 n.74) and "conditional" or "conditionally" eight times (Opp. ¶¶ 11 n.9, 25, 72 n.38, 103, 113, 123, 124).  By contrast, those words are not found once in the Enabling Act.

[12] Article VI, Section 8 of the Enabling Act does not change the result in that any limitation contained therein does not render the statute subject to the legislature's whim.  In other words, unless the specific clawback conditions have been met (which they have not), Article VI, Section 8 does not provide the Commonwealth with blanket authority to disregard fiscal mandates in its existing statutes.  Indeed, fiscal mandates cannot be ignored even when they are subject to provisions calling for hypothetical reductions in the event of a budgetary shortfall.  *See Riley v. Joint Fiscal Comm. of Ala. Legislature*, 26 So. 3d 1150, 1156-57 (Ala. 2009) (fiscal mandate was absolute even in face of constitutional provision that called for

section—"Special Deposit"—makes plain that the Commonwealth transferred ownership of the Pledged Rum Taxes, and intended only to hold them in a fiduciary capacity for PRIFA and its bondholders.  (*See* Ex. 34, CW_STAY0010168 at 357 (defining a "special deposit" fund as one that "acts in a fiduciary capacity in order to account for moneys received with specified purposes for which the law does not specify its recording in any other fund.  It mainly includes . . . agency accounts for which the Commonwealth act in an agent's capacity.").)  This is also consistent with the Commonwealth's discussion of the transfer of the Pledged Rum Taxes to PRIFA as one of the Commonwealth's "*Pledges* of Receivables and Future Revenues" (Ex. 28, at 122 (emphasis added)), and its representation to rum producers.[13]  What mattered in *Flores Galarza* was that Law 253 obligated Treasury to transfer the premiums, once received, to the legal owner.  So too here.  The Enabling Act obligates Treasury to transfer the Pledged Rum Taxes to PRIFA when received.  The Commonwealth thus possesses no equitable interest in those funds.[14]

29.     That the Enabling Act unequivocally mandates Treasury to remit the Pledged Rum Taxes to PRIFA is further proved by the fact that the Enabling Act separately gives Treasury the authority (but does not require it) to appropriate funds to PRIFA in any year that the Rum Tax Remittances fall short of the pledged $117 million.  *See* 3 L.P.R.A. § 1914.  If the full $117 million

---

blanket reductions in appropriations in the event of hypothetical budgetary shortfalls); *State v. Sherman*, 46 Iowa 415, 420 (1877) (requirement that specified sums be paid to the state university if there was "any money in the State treasury, not otherwise appropriated," was "[b]y its language . . . absolute and not conditional").  *See infra* Argument § I.B.

[13] (*See, e.g.*, Bacardí Br., Ex. B, ECF 10609-2 (Bacardí Agreement), § 4.6 ("*the first $117 million* of Cover Over Revenues *received by the Government* . . . *are pledged and have to be transferred to [PRIFA]*" (emphasis added)); Sérralles Br., Ex. A, ECF No. 10612-1 (Sérralles Agreement), § 4.6 ("*the first $117 million* of Cover Over Revenues *received by the Government* . . . *are pledged and have to be transferred to [PRIFA]*" (emphasis added)).)

[14] The Oversight Board also emphasizes that, unlike with Law 253, the Enabling Act does not contain "trustee" or "fiduciary" language, and thus does not render Treasury a "mere custodian" of the funds.  (Opp. ¶ 69.)  But, as detailed in the Motion, the statute need not contain certain magic words to create a custodial or trust relationship.  (Mot. ¶ 58 n.18.)

15

were a conditional appropriation subject to the whim of the legislature, there would be no need to specify that the Commonwealth legislature is *not* obligated to cover any deficit amount. The plain implication is that such legislative discretion does not exist with respect to the first $117 million of annual Rum Taxes.

30.     Discovery to date, albeit incomplete, confirms that the Commonwealth implemented the Enabling Act in a manner that reflects PRIFA's equitable ownership of the Infrastructure Fund. Pre-default, the Commonwealth (a) accounted for the first $117 million in Rum Taxes in the Infrastructure Fund, *i.e.*, "the first $117 million of rum revenues" that the Commonwealth receives "in each fiscal year," (Ex. 26, Ahlberg Tr. 332:9-21); (b) "segregated [the moneys] in a separate account in the General Fund for accounting purposes," *Gracia-Gracia*, 939 F.3d 340, 351 (1st Cir. 2019)—as is commonplace in governmental accounting—to ensure they are traceable while in the custody of Treasury and delivered to their rightful owner, PRIFA; and (c) transferred the moneys through its own accounts and to trust accounts for the PRIFA bondholders without the moneys ever touching a PRIFA-held account. And, through the Lockbox Agreement, the Commonwealth expressly acknowledged that the first $117 million in Rum Taxes were to be transferred "to the credit of" PRIFA, *and consistently records them as such to this day.* (*See* Ex. 26, Ahlberg Depo. Tr. 349:8-13.)

31.     Under settled law, the Commonwealth cannot argue for a different interpretation of the Enabling Act given its "course of performance," which courts treat as powerful evidence of the parties' agreement.[15] *See Reed & Reed, Inc. v. Weeks Marine, Inc.*, 431 F.3d 384, 388 (1st Cir.

---

[15] "Course of performance" evidence is admissible even if there is no ambiguity in the Trust Agreement or other governing documents. *See Quasar Energy Group, LLC v. VGBLADS, LLC*, 2017 WL 3206940, at *7 (D. Me. July 28, 2017), *report and recommendation adopted sub nom. Quasar Energy Grp. v. Vgblads LLC*, 2017 WL 4274159 (D. Me. Sept. 26, 2017); *see also Francisco Levy, Jr., Inc. v. Caribe Gen. Elec., Inc.*, 2003 WL 21047205, at *8 (P.R. Cir. Feb. 28, 2003) (applying the Restatement (Second) of Contracts to a contract dispute that arose under the Commonwealth law). And more generally, applying the law of

2005) ("'The parties to an agreement know best what they meant,' and thus the parties' subsequent course of performance may be instructive in contract interpretation.") (quoting Restatement (Second) of Contracts § 202 cmt. g (1981)). This evidence further confirms the Commonwealth's understanding that, like the insurance premiums in *Flores Galarza*, the Pledged Rum Taxes were PRIFA's (subject to bondholders' liens) upon receipt by the Commonwealth.

1.   **The Enabling Act and the Trust Agreement Confirm that the Commonwealth Is a Mere Conduit for the Pledged Rum Taxes.**

a.   **The Oversight Board's Tortured, Made-for-Litigation Interpretation of the Enabling Act Is Belied By the Statute's Plain Text.**

32.     Unable to avoid the compelling similarities between the Enabling Act and Law 253, the Oversight Board twists the PRIFA statute beyond its plain meaning.

33.     *First*, the Oversight Board "commit[s] the cardinal error of reading the statute in pieces rather than as a whole," (something the Oversight Board wrongly accuses Movants of doing (Opp. ¶ 65)). The Oversight Board breaks apart the phrases "shall be covered into" and "when received" in an attempt to strip them of their plain meaning. (*See* Opp. ¶ 65 (addressing "shall be covered into") and ¶ 66 (addressing "when received").) The Oversight Board claims that, read in isolation, the language "shall be covered into" simply "identifies where any Rum Tax Remittances appropriated to PRIFA are to be deposited." (Opp. ¶ 65.) The Oversight Board then disavows the plain import of the words "when received," asserting: "'When received' does not mandate immediate transfer, as Movants argue, or transfer of any particular amount. It just means the Commonwealth is *not* obligated to send any appropriated funds to PRIFA *before* the Rum Tax Remittances are received." (Opp. ¶ 66.)

---

other jurisdictions, the First Circuit has noted the trend has been to relax the traditional "four corners" rule and to allow extrinsic evidence, even in the absence of ambiguity. *LPP Mortg., Ltd. v. Sugarman*, 565 F.3d 28, 31 (1st Cir. 2009).

34.     "[I]t is axiomatic that the word 'shall' has a mandatory connotation." *Claudio-De Leòn v. Sistema Universitario Ana G. Mèndez*, 775 F.3d 41, 46 (1st Cir. 2013); *see also Murphy v. Smith*, 138 S. Ct. 784, 787 (2018) ("[T]he word 'shall' usually creates a mandate, not a liberty.").[16]  Use of the word "when" indicates a temporal requirement—it operates as a directive regarding timing of moneys entering the fund.  Thus, the directive that the moneys "when received . . . shall be covered into" the Infrastructure Fund requires that the moneys enter the fund at the moment they are received.  The Oversight Board's construction of the statute effectively would render nugatory the language "when received."[17]  The Commonwealth obviously could not be obligated to send the Rum Taxes to PRIFA "*before* the Rum Tax Remittances are received"; it would be impossible to do so.  "When received" must mean more than simply eliminating the impossible.

35.     *Second*, the Oversight Board tries to escape the Act's description of PRIFA's right as a "participation"—which Movants explained means "ownership" (Mot. ¶ 56)—by arguing that, "in this context," it "translates to a 'portion' or 'share.'" (Opp. ¶ 67); *but see In re Garcia*, 484

---

[16] *See also In re Sanchez*, 429 B.R. 393, 399 (Bankr. D.P.R. 2010) ("[T]he inclusion of the term 'shall' is considered mandatory and imperative, hence inconsistent with the idea of discretion."); *Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*, 91 F. Supp. 3d 267, 285-86 (D.P.R. 2015) ("Certainly, the Puerto Rico Code's use of the word 'shall' in Section 6189(b) is meant to impose restrictions on how the municipalities can spend and use the IVUM funds collected.  Contrary to Plaintiff's contention, the court finds that Section 6189 does not *suggest* certain uses for the monies collected.") (emphasis in original); *State ex rel. Hunter v. Lippold*, 142 S.W.3d 241, 243-46 (Mo. Ct. App. 2004) (statutory language mandating an appropriation was not permissive; it said the commission "shall" include this line item in the specified amount in its budget); *McGraw v. Hansbarger*, 301 S.E.2d 848, 857-60 (W. Va. 1983) (statute mandating use of funds "for the purpose of providing revenue for care, treatment, and rehabilitation of alcoholics" created trust fund held by the legislature for the benefit of those who seek treatment).

[17] It is well-settled that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]" *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (internal quotations omitted); *see also P.R. Tel. Co. v. Advanced Cellular Sys. (In re Advanced Cellular Sys., Inc.)*, 483 F.3d 7, 12 (1st Cir. 2007) (rejecting an interpretation that would render certain contractual provisions surplusage); *Citibank, N.A. v. Allied Mgmt. Grp.*, 491 F. Supp. 2d 232, 237 (D.P.R. 2007) (same).

B.R. 1, 3 (Bankr. D.P.R. 2012) (with respect to the funds derived from an asset sale, the debtor's "participation" was its ownership interest of those funds). The argument is a non-sequitur, but even the Oversight Board's preferred definition supports Movants. The term "share" connotes ownership—consider, for example, shares of a stock corporation (which represent the *portion* of the corporation owned by particular investors). *See Lopez del Valle v. Gobierno de la Capital*, 855 F. Supp. 34, 35 (D.P.R. 1994) (equating "shares" with "ownership interest"). At a minimum, the words "share" or "portion" can refer to ownership interests—and thus the Oversight Board's preferred definitions do nothing to undermine Movants' ownership rights. The Enabling Act transfers ownership of a portion of the Rum Taxes to PRIFA—specifically, the first $117 million, which constitutes PRIFA's "participation" (or the "share" or "portion" that PRIFA owns).

36.     *Third*, the Oversight Board contends that PRIFA does not own the Pledged Rum Taxes because Section 1096(m) of the Enabling Act states that "PRIFA 'may receive' federal excise taxes." (Opp. ¶ 34.) The Oversight Board misconstrues that provision—which states that PRIFA has the power to "pledge all or a portion of such revenues as [PRIFA] may receive, *including, but not limited to,* . . . all or any portion of the federal excise taxes *or other funds which should have been transferred by the Commonwealth to the Authority*." 3 L.P.R.A. § 1906(m) (emphasis added). This section authorizes PRIFA to pledge any revenues it *might* receive—specifically including (but not limited to) the Pledged Rum Taxes, which it *will* or is legally entitled to receive.[18]

37.     Indeed, if anything, Section 1906(m) reflects the Commonwealth's recognition that the Pledged Rum Taxes are held in a special fund for PRIFA when the Commonwealth receives

---

[18] Moreover, while PRIFA owns the Pledged Rum Taxes, it is nevertheless accurate to state that PRIFA merely "may receive" such taxes: As the Oversight Board acknowledges, there is no guarantee that the federal government will transfer Rum Taxes to the Commonwealth in every fiscal year. (*E.g.*, Opp. ¶ 125.)

them (whether or not they are transferred to any particular account). Section 1906(m) states that

any Rum Taxes "which should have been transferred" are included among the revenues PRIFA

"receive[s]." *See id.* (the "revenues" PRIFA "may receive include[es], [are] not limited to, . . .

federal excise taxes . . . which should have been transferred").

> **b.    The Oversight Board's Reinterpretation of the Trust Agreement Renders Its Terms Superfluous and Circular.**

38.    As Movants have shown (Mot. ¶ 50-51), the Trust Agreement makes clear that the

first proceeds of the Rum Taxes are PRIFA's property, and subject to the Trustee's liens on behalf

of bondholders, once covered into the Infrastructure Fund by Treasury. "Pledged Revenues" are

defined to include "Special Tax Revenues and any other moneys deposited to the credit of the

Sinking Fund." In turn, "Special Tax Revenues" are defined as "the Offshore Excise Taxes

deposited to the credit of the Puerto Rico Infrastructure Fund ***pursuant to the Act***." (Mot. Ex. 2,

ECF 10602-2, at 18 (emphasis added).) The Oversight Board does not contest that "the Act" refers

to, *inter alia*, 3 L.P.R.A. § 1914, which created the Puerto Rico Infrastructure Fund, and requires

that the first proceeds of the Rum Taxes, "when received" by Treasury, "shall be covered into the

[Infrastructure Fund]." 3 L.P.R.A. § 1914;[19] (Mot. Ex. 3, ECF 10602-3, at 42, 17 (Trust

Agreement §§ 601, 101).)

---

[19] Statutes like this one create a mandatory and binding continuing duty. *See Von Hoffman v. City of Quincy*, 71 U.S. 535, 554-55 (1867) ("where a State has authorized a municipal corporation to contract and to exercise the power of local taxation to the extent necessary to make its engagements, the power thus given cannot be withdrawn until the contract is satisfied."); *see also Louisiana ex rel. Hubert v. City of New Orleans*, 215 U.S. 170, 177-78 (1909) ("The contract creditors of the Police Board were entitled to rely upon the benefit of the laws imposing taxation to make their obligations effectual. They could not, constitutionally, be deprived of such benefit."); *Missouri v. Jenkins*, 495 U.S. 33, 55-56 (1990) (reaffirming *Von Hoffman* and *Hubert* as "a long and venerable line of cases in which this Court held that federal courts could issue the writ of mandamus to compel local governmental bodies to levy taxes adequate to satisfy their debt obligations.").

39.     The Oversight Board nevertheless assumes that only "Special Tax Revenues" that have been "deposited to the credit of the Sinking Fund" constitute "Pledged Revenues."  (Opp. ¶ 89.)  This reading violates several basic principles of contractual interpretation—including by rendering critical portions of the Trust Agreement nugatory and others nonsensical.

40.     ***First*, the pledge of revenues under the Trust Agreement would become a nullity—rendering the entire Trust Agreement nonsensical and defeating its evident purpose.**  The absurdity of the Oversight Board's position is highlighted by the fact that the PRIFA bondholder trustee is the legal owner of the Sinking Fund.  The trustee holds the Sinking Fund in trust for the benefit of bondholders.  (*See* Mot. Ex. 3, ECF 10602-3, at 42, 17 (Trust Agreement § 401) (Sinking Fund "to be held by the Trustee . . . in trust")).  PRIFA's pledge of revenues—which created the security interest—is likewise made to the trustee.  Under the Oversight Board's interpretation, PRIFA "pledge[d] to the Trustee . .  as security for the payment of the Bonds," moneys deposited to the credit of the Sinking Fund—which is the account that the trustee itself owns.  *Id.* at 9.  This reading is analogous to suggesting that a customer of a bank borrowed money from the bank, and pledged as "security," in case the debt was not repaid, the bank's own money sitting in the vault.

41.     Such an interpretation must be rejected, because the debtor cannot grant a security interest in an account the debtor does not own—and construing the Trust Agreement in this manner plainly would defeat its basic objective:  to provide a security interest in a revenue stream from which bondholders would be paid.  Both the Trust Agreement itself and the offering documents are replete with references to the "pledge" and provisions intended to protect the "Pledged Revenues."  (*See* Mot. Ex. 3, ECF 10602-3, at 42, 17 (Trust Agreement §§ 601, 602; *id.* at 9); Mot. Ex. 17, ECF 10602-17, at 9-10 (Official Statement, Puerto Rico Infrastructure Financing Authority

Series 2005 Bonds).)   All of these provisions would be inoperative and nonsensical if the agreement is construed as merely giving the trustee a security interest in an account owned by the trustee, not the debtor.

42.    *Second,* **"Special Tax Revenues" would become nugatory.**  Specific definitions in the text also become nugatory under the Oversight Board's reading.  As argued in the Motion, and not addressed in the Opposition, the Oversight Board's interpretation would negate the reference to "Special Tax Revenues" in the definition of "Pledged Revenues."[20]  (*See* Mot. ¶ 52.) Under the Oversight Board's reading, Pledged Revenues could have been defined simply as "moneys that have been deposited to the credit of the Sinking Fund."  There would be no need to mention "Special Tax Revenues," which would become mere surplusage.  (*See* Mot. ¶¶ 51-55.) Courts, however, "must favor interpretation[s] which give meaning and effect to every part of a contract and reject those which reduce words to mere surplusage." *Systemized of New England, Inc. v. SCM, Inc.*, 732 F.2d 1030, 1034 (1st Cir. 1984); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995).

43.    Unlike the Oversight Board's proposed construction, Movants' reading appropriately gives effect to all the Trust Agreement's terms.  Pledged Revenues are (i) "Special Tax Revenues" (a kind of "moneys") ***plus*** (ii) any "other moneys" that "have been deposited to the credit of the Sinking Fund."  By way of example, "other moneys" might be deposited to the credit of the Sinking Fund if less than $117 million is received from the U.S. Treasury in a given

---

[20] The Oversight Board emphasizes that Section 601 of the Trust Agreement states that the bonds are payable only from Pledged Revenues. We agree. But the Oversight Board then reads out of the definition of Pledged Revenues the language it does not like. (*See* Opp. ¶ 88 ("Pledged Revenues are defined as ' . . . moneys that *have been deposited to the credit of the Sinking Fund.*'") (omitting "Special Tax Revenues and any other . . .").)

fiscal year.  In that instance, "the Secretary of the Treasury is authorized to cover said deficiency with any funds available," even funds that are not Special Tax Revenues.  3 L.P.R.A. § 1914.

44.    ***Third***, **other portions of the Bond Resolution would become absurd.**  The governing bond resolution provides:  "The [Trust] Agreement also provides for the creation of a special fund designated 'Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund' (the '*Sinking Fund*') and for the *deposit to the credit of said special fund* of a sufficient amount of the Pledged Revenues (as defined in the Trust Agreement) to pay the principal of and interest on all bonds issued under the Agreement as the same become due and payable . . . ."  (Mot. Ex. 2, ECF 10602-2, at 5-6 (emphasis added).)  The Oversight Board's interpretation would render this sentence nonsensical and circular:  Because the Oversight Board defines "Pledged Revenues" as money deposited into an account entitled "Sinking Fund," under the Oversight Board's interpretation, this sentence would require PRIFA to deposit ***into an account designated the Sinking Fund*** "a sufficient amount of" funds ***that have been deposited to the credit of the Sinking Fund***—an absurdity.  *See Flores Rodriguez v. Flores Toledo*, 101 D.P.R. 61, 68-69 (P.R. 1973) (contractual interpretations that result in an absurdity should be rejected).

45.    ***Fourth***, **the Oversight Board's reading violates the last-antecedent canon.**  The Oversight Board's interpretation—that Special Tax Revenues are moneys deposited "to the credit of the Sinking Fund"—violates the last-antecedent canon.  "[A] limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows[.]"  *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003); *see also Lockhart v. United States*, 136 S. Ct. 958, 960 (2016); *Rule of the Last Antecedent*, BLACK'S LAW DICTIONARY (11th ed. 2019); A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 144 (2012) (hereinafter READING LAW).  Under the canon, the limiting phrase—"that have been deposited to the credit of

23

the Sinking Fund"—modifies only the phrase that it immediately follows—"any other moneys"—and **not** "Special Tax Revenues." *See Barnhart*, 540 U.S. at 27-28.  In other words, the Pledged Revenues include (a) Special Tax Revenues *and* (b) "any other moneys that have been deposited to the credit of the Sinking Fund."

46.     The Oversight Board invents a "commas" exception to the last-antecedent canon: that the canon applies only to clauses offset by commas.  (Opp. ¶ 89, n.44.)  No such exception exists.  While *Barnhart* and *Lockhart* happened to involve lists of three or more items, the *Barnhart* court explicitly noted that the canon applies to a list of two items not offset by commas.  *See* 540 U.S. at 27 (illustrating the last-antecedent canon with a clause containing two items not separated by a comma: "'You will be punished if you throw a party or engage in any other activity that damages the house.'  If [you] nevertheless throw[] a party and [are] caught, [you] should hardly be able to avoid punishment by arguing that the house was not damaged.").  Numerous courts have applied the canon to lists of just two items not offset by a comma.  *See, e.g.*, *Coffin v. Bowater, Inc.*, 501 F.3d 80, 93-96 (1st Cir. 2007) (finding that application of the canon to such a list produced a "significantly more persuasive" interpretation); *Acosta v. Local Union 26, Unite Here*, 895 F.3d 141, 143 n.2 (1st Cir. 2018); *United States v. Kerley*, 416 F.3d 176, 179-80 (2d Cir. 2005).

47.     In arguing to the contrary, the Oversight Board relies on *Thomas v. Commissioner of Social Security*, 294 F.3d 568, 572 (3d Cir. 2002), for the exact proposition that the Supreme Court overruled in *Barnhart* (the appeal of *Thomas* under a different name).  *Barnhart*, 540 U.S. at 26 ("'When,' [the Third Circuit] said, 'a sentence sets out one or more specific items followed

by 'any other' and a description, the specific items must fall within the description.' **We disagree.**" (citation omitted) (emphasis added)).[21]

48.     The Oversight Board also incorrectly claims that the recent First Circuit decision in the *ERS* case, which applied the "series-qualifier" canon, confirms its reading. (Opp. ¶ 89 (quoting *Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Glob. Designated Activity Co.*, 948 F.3d 457, 467-68) ("ERS").) Not so. The "series-qualifier" canon instructs: "When several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." *Paroline v. United States*, 572 U.S. 434, 447 (2014) (citation and internal quotation marks omitted). That canon, however, "perhaps more than most of the other canons," is "highly sensitive to context . . . and subject to defeasance by other canons." READING LAW at 150. Here, unlike in *ERS*, applying the series-qualifier canon would defeat the objective of the Trust Agreement (as evident from its plain text) to confer a security interest, would render the first part of the Pledged Revenues definition entirely nugatory, and also would render the definition elsewhere in the document nonsensical. Movants' reading harmonizes all provisions and thus avoids both problems, and therefore, the context here plainly favors application of the last-antecedent canon. *Cf. Lockhart*, 136 S. Ct. at 968 ("Lockhart contends that if we applied . . . his 'series-qualifier principle[,]' we would arrive at an alternative construction of [the statute]. *But . . . [h]ere, the rule of the last antecedent is well supported by context and Lockhart's alternative is not. We will not apply the*

---

[21] The other cases cited by the Oversight Board (*see* Opp. ¶ 89, n.44) are inapposite because, in each, unlike here, application of the last-antecedent rule would have rendered the statute at issue nonsensical. *See In re CRS Steam* 217 B.R. 365, 374 (Bankr. D. Mass. 1998) ("I am faced with a statute made nonsensical by application of the [last-antecedent] rule."); *Demko v. United States* 44 Fed. Cl. 83, 89-90 (Fed. Cl. 1999) (declining to apply last-antecedent rule, not because the list of two was not separate by commas, but because doing so would "impair the meaning of the sentence"), *aff'd,* 216 F.3d 1049 (Fed. Cir. 2000).

*rule of lenity to override a sensible grammatical principle buttressed by the statute's text and structure*." (emphasis added)).[22]

49.     ***Fifth*, the Oversight Board misconstrues Section 401.**  The Oversight Board argues that Section 401 "prohibits PRIFA from granting a security interest to any party in the PRIFA Infrastructure Fund." (Opp. ¶ 95.) That distorts the meaning of the provision, which is merely a forward-looking bondholder protection mechanism intended to prevent PRIFA from encumbering bondholders' collateral with an *additional* or secondary lien, beyond the pledge created under the Trust Agreement itself.  It also violates several canons of interpretation.  For one, Section 401 is a general provision, which cannot trump the specific provision defining Pledged Revenues.  *See UBS Fin. Servs., Inc. of P.R. v. XL Specialty Ins. Co.*, 929 F.3d 11, 24 (1st Cir. 2019) ("Nevertheless, it is a well-known precept of contract interpretation in Puerto Rico law that *specific provisions in a contract trump general provisions*." (emphasis added)); READING LAW at 183 ("If there is a conflict between a general provision and a specific provision, the specific provision prevails.").  At best, the Oversight Board points to two conflicting provisions, and the *contra proferentum* canon obliges the Court to construe any such conflict against the drafter, here, the Commonwealth.  (*See* Mot. ¶ 51, n.16 (collecting authorities).)

50.     ***Sixth*, the Oversight Board too narrowly construes "to the credit of" and ignores the nature of "special funds."**  The Oversight Board invents false tension between Movants' interpretation of the language—"to the credit of" in Section 601 and the usage of that

---

[22] *See also United States v. Ven-Fuel, Inc.*, 758 F.2d 741, 751-52 (1st Cir. 1985) (applying the last-antecedent canon and rejecting an alternative interpretation where such interpretation would "render nugatory [an] entire phrase" and where "[t]he modifying phrase *cannot be rationally construed* to refer distributively to the more remote antecedent words or phrases." (emphasis added)); *United States v. Santoro*, 359 F. Supp. 3d 122, 124-25 (D. Me. 2019) (declining to apply the series-qualifier canon over the last-antecedent canon where "the limitation phrase cannot be applicable to the second category in the list," and following *Lockhart* over *Paroline*).

phrase in Section 401 and elsewhere in the Trust Agreement. (Opp. ¶ 92.) Section 401 mandates that "moneys held to the credit of the Sinking Fund shall be held in trust and disbursed by the Trustee." The Oversight Board argues that "[t]he Trustee cannot hold in trust or disburse funds that reside in an account that lies beyond the Trustee's control," so funds cannot be "to the credit of" an entity unless they are in a bank account controlled by that entity. (Opp. ¶ 92.) In fact, there is no inconsistency: While it is true that money held in Jane Doe's account is held "to the credit of" Jane Doe, that is not, as the Oversight Board suggests, the *only* situation in which property can be held "to the credit of" Jane Doe. The formulation "deposited to the credit of" by its plain terms can reach tangible property or cash held to the credit of a particular entity—or moneys held by a third party for the benefit of another. *See In re Palmas del Mar Country Club, Inc.*, 443 B.R. 569, 574 (Bankr. D.P.R. 2010) ("'Deposit' has been defined as 'money given as a pledge or down payment', 'anything laid away or entrusted to another for safekeeping', 'anything given as security or in part payment', and 'the act of giving money or property to another who promises to preserve it or to use it and return it in kind.'"); *Wertheim, LLC v. Currency Corp.*, 2017 WL 3668985, at *7 (Cal. Ct. App. Aug. 25, 2017) (deeming a check to pay a judgment "deposited" when it was delivered, and therefore entrusted, to the trial court).[23]

51.    The Oversight Board has no response to numerous examples under Puerto Rico law of "special funds" created by Commonwealth statute that are simply held *at the Puerto Rico Treasury Department* "to the credit of" a particular identified special fund. (*See* Mot. ¶ 53 n.17 (citing 18 L.P.R.A. § 1026; 13 L.P.R.A. § 4(b)).) In such instances, the property held by the

---

[23] The Oversight Board's interpretation is also contradicted by the express terms of other agreements to which the Commonwealth is a party. (*See, e.g.*, Lockbox Agreement, Mot. Ex. 10 (ECF No. 10602-10) at Section 2(d) (providing that "Deposited Funds held in, or credited to, the Account shall not be invested"); Section 3(b) ("The Lockbox Bank . . . shall not commingle the Deposit Funds in or credited to, or designated for deposit in, the Account . . . .").)

Treasury Department is "to the credit of" the special fund—whether held in the TSA or in a segregated bank account bearing the fund's name. *See, e.g.*, *Slodov v. United States*, 436 U.S. 238, 243 (1978) (noting that an employer's tax withholdings are "deemed to be a special fund in trust for the United States" notwithstanding that "[t]here is no general requirement that the withheld sums be segregated from the employer's general funds" or "deposited in a separate bank account" (internal quotations omitted)); Trust Agreement § 401 (providing that moneys held in the Sinking Fund be "to the credit of" multiple accounts); (Holder Report ¶¶ 23-25); *see also La. Pub. Serv. Comm'n. v. FCC*, 476 U.S. 355, 372 (1986) (applying the "rule of construction that technical terms of art should be interpreted by reference to the trade or industry to which they apply").

52.     ***Finally*, the *Las Vegas Monorail* decision on which the Oversight Board principally relies supports Movants' position.** The Oversight Board attempts to support its argument by citing the *Las Vegas Monorail* decision and then claiming that, "the debtor issued bonds secured by monies deposited in certain accounts." (Opp. ¶ 96.) But the court in that case reached the same conclusion that Movants urge here, finding that the creditor's security interest in monorail revenues attached when the revenues were collected (even before being transferred to the bond trustee). *See In re Las Vegas Monorail Co.*, 429 B.R. 317, 339 (Bankr. D. Nev. 2010). And even though the bonds at issue were not Section 928 special revenue bonds—and, thus, not entitled to heightened protection as in the present case—the court nevertheless ordered the debtor to follow "the procedures and obligations for handling and applying cash contained in the Indenture." *Id.* at 345-46. Thus, the court required the debtor to continue transferring funds into the segregated accounts, as required under the indenture. The ruling in *Las Vegas Monorail* is entirely consistent with the relief Movants seek here.

*   *   *

53.    For these reasons, the Oversight Board's attempt to equate "Pledged Revenues" with moneys deposited to the Sinking Fund must be rejected.  Movants submit that the Enabling Act and Trust Agreement unambiguously support their position.  The only possible reading of the Trust Agreement is that "Special Tax Revenues," whether deposited to the credit of the Sinking Fund or not, are "Pledged Revenues," and that "other moneys" deposited to the credit of the Sinking Fund (such as Commonwealth appropriations to make up a shortfall) also become Pledged Revenues.[24]  The failure by the Treasury Department to assign physical control of the funds to PRIFA does not alter PRIFA's beneficial ownership of the funds, nor does it prevent those funds from becoming part of the Infrastructure Fund and PRIFA's property.  But even were the Court to find ambiguity, the Oversight Board does not dispute that, as argued in the Motion, such ambiguity must be construed against PRIFA and the Commonwealth, which drafted them.  (*See* Mot. ¶ 51, n.16 (collecting authorities stating the rule of *contra proferentum*, which requires courts to construe ambiguity against the drafter).)

**2.    The Oversight Board Fails to Rebut that the Commonwealth, at Most, Holds the Pledged Rum Taxes in Trust or Custody for PRIFA (and Its Bondholders).**

54.    As detailed in the Motion, the Enabling Act "manifests a legislative intent to impose a trust relationship that equally binds the Commonwealth and PRIFA." (*See* Mot. ¶¶ 58-67.); *see also Von Hoffman v. City of Quincy*, 71 U.S. 535, 555 (1866) ("The State and the corporation, in such cases, are equally bound. The power given becomes a trust which the donor cannot annul,

---

[24] The Oversight Board's reliance on the form of bonds (Opp. ¶ 39) and offering statements (*id.* ¶ 40) is a red herring; those are mere summaries. (*See* Offering Statement at 1 (noting that descriptions therein "do not purport to be complete and qualified in their entirety by reference to such documents").)

and which the donee is bound to execute[.]").  The Oversight Board's arguments to the contrary fail.[25]

55.     As an initial matter, discovery has confirmed that the Commonwealth "segregated [the Pledged Rum Taxes] into a separate account in the General Fund for accounting purposes"—which is more than sufficient to make "a *prima facie* showing of traceability."  *See Gracia-Gracia*, 939 F.3d at 351.  And even if the moneys were indistinguishably commingled with other moneys in the TSA (which it is not), it would still give rise to a trust *res* traceable under the lowest intermediate balance test.[26]  (Holder Report ¶¶ 50-54.)

56.     The Oversight Board is wrong to suggest (Opp. ¶ 99) that the Puerto Rico Trust Act, 32 L.P.R.A. §§ 3351-3355a (the "Trust Act"), has any bearing here.  The Trust Act applies only to *inter vivos* and testamentary trusts, 32 L.P.R.A. §§ 3352, 3355, not to statutory or constructive trusts.  Indeed, the Enabling Act expressly states that the trust agreement securing the PRIFA Bonds "need not be constituted pursuant to a public deed in order to be a valid trust under the laws of the Commonwealth."  3 L.P.R.A. § 1911.  The First Circuit expressed skepticism of the Oversight Board's "public deed" argument on precisely this ground:  "Why [the public deed] requirement would apply equally to a trust relationship created by statute, the Commonwealth does not say."  *Gracia Gracia*, 939 F.3d at 351-52.

---

[25] The Oversight Board seeks to confuse the issue of PRIFA's trust ownership of the Pledged Rum Taxes with Movants' security interest.  Movants' position is clear:  PRIFA is the owner of the Pledged Rum Taxes as a result of the Enabling Act, and Movants have a lien on the Pledged Rum Taxes owned by PRIFA.

[26] The Oversight Board suggests that "commingling" of funds may present an obstacle to establishing a trust for the benefit of PRIFA.  (Opp. ¶ 103 n.58.)  Commingling is not the death knell to a trust argument; rather, it is "a factor [that] a Court . . . must weigh[, but] its presence does not dictate the finding of an absence of a trust relationship."  *In re Tap, Inc.*, 52 B.R. at 276.  Regardless, discovery confirms that there is no commingling.  What the Oversight Board calls "commingling" is instead a pooled bank account that is nonetheless segregated by internal funds and general ledger accounts maintained by Treasury.  These fund and account designations allow moneys to be traced in Treasury's fiscal and accounting systems.

57.     In any event, the Trust Act imposed a public reporting requirement in 2012—*years* after the PRIFA trust relationship formed—and its requirements do not apply retroactively.  *See* 31 L.P.R.A. § 3 ("Laws shall not have a retroactive effect unless they expressly so decree.  In no case shall the retroactive effect of a law operate to prejudice rights acquired under previously legislative action."); *Enrique Lopez Delgado v. South Porto Rico Sugar Co. of P.R.*, 62 D.P.R. 238, 242-43 (P.R. 1943).  The Office of the Director of Notary Inspections ("<u>ODIN</u>") has issued a General Instruction pursuant to Article 5 of the Trust Act, informing all notaries that "[t]he effectiveness of the Registry [created in 2012] is prospective."  (Ex. 41, Office of the Director of Notary Inspections, *General Instructions for the Notaries* (Oct. 1, 2012).)

58.     Contrary to the Oversight Board's contention (Opp. ¶ 100), *Columbia Falls* is directly on point.  There, the court precluded the debtors from diverting funds designated for the repayment of bonds to pay delinquent property taxes, despite a statute that generally allowed municipalities to use excess funds to pay delinquent property taxes.  *In re City of Columbia Falls, Mont., Special Imp. Dist. No. 25*, 143 B.R. 750, 762 (Bankr. D. Mont. 1992).  Because the specifically identifiable funds were to be used for a specific purpose—debt repayment—the municipal officers held them in trust as "mere[] custodians" for the benefit of the bondholders.  *Id.* at 762-63.  The same rationale applies here.  Treasury is the "mere custodian" of an identifiable revenue stream designated for a specific purpose—PRIFA's operating expenses and debt service. 3 L.P.R.A. § 1914.[27]

---

[27] *In re Morales Travel Agency*, 667 F.2d 1069 (1st Cir. 1981), is inapposite.  (*See* Opp. ¶ 103, and n.58.) In that case, a resolution that specified that travel agencies hold funds for payment of airline tickets "in trust" for the benefit of the airlines was insufficient to give rise to a trust relationship because the resolution did not put restrictions on how the agencies could use the funds.  667 F.2d at 1070.  The Enabling Act expressly mandates, however, that the transfer of the Pledged Rum Taxes and designates them to be used for PRIFA's corporate purposes—namely, securing debt.  *In re Tap, Inc.*, 52 B.R. 271, 276-77 (Bankr. D. Mass. 1985) (distinguishing *Morales* where debtor was "not free to use the money for its own benefit").

59.     The fact that the Enabling Act does not use the word "trust" with respect to PRIFA's

ownership of the Pledged Rum Taxes is immaterial:  A statute that manifests the requisite elements

of a trust need not use the word "trust" to create a trust relationship.  *See Stowe v. Bologna (In re*

*Bologna)*, 206 B.R. 628, 632 (Bankr. D. Mass. 1997).[28]

> **3.      The Pledged Rum Taxes are "Restricted Funds" that the Commonwealth Must Transfer to PRIFA.**

60.     The Oversight Board does not meaningfully respond to Movants' argument that the

Pledged Rum Taxes are "restricted funds" (Mot. at 25-26), except to claim, as they do repeatedly,

that moneys are mere appropriations subject to repeal (Opp. ¶ 108 n.67).  But the Commonwealth's

disclosure in its own audited financial statements that the Infrastructure Fund is a special revenue

fund comprised of "restricted funds" (*see* Holder Report ¶ 42-44) refutes the Oversight Board's

assertions to the contrary.   The Pledged Rum Taxes are "restricted funds" because the

Commonwealth cannot lawfully use or dispose of any Pledged Rum Taxes, except by transferring

them to PRIFA.  *See, e.g.*, *Thomas Jefferson Classical Acad. Charter Sch. v. Cleveland Cty. Bd.*

*of Educ.*, 763 S.E.2d 288, 293 (N.C. Ct. App. 2014) ("restricted funds" are those with "a limited

use and specific purpose, such as to fund a special program").   Indeed, fund accounting is the

---

The Oversight Board misleadingly cites *Hatton v. Municipality de Ponce,* 134 D.P.R. 1001, 1010 (P.R. 1994), for the proposition that equitable remedies are not available against the government when such a remedy would undermine public policy. (Opp. ¶ 107 n.66.)  *Hatton* merely held, however, that a plaintiff cannot recover on a theory of unjust enrichment where he conferred a benefit under an illegal contract that he knew was formed illegally.  134 D.P.R. at 1007.  And the Oversight Board's argument that unjust enrichment does not apply when a contract governs the dispute, without any further explanation, is inapplicable to the case at hand. (Opp. ¶ 107.)

[28] The Oversight Board attacks Movants' reliance on *In re Bologna*, but mistakes why Movants cited it. Movants do not seek to use the Enabling Act to bring fiduciary breach claims against the Commonwealth; but the general concept that statutory obligations can give rise to trusts is supported by *Bologna* (as well as *Columbia Falls, García-Rubiera v. Calderón*, 570 F.3d 443 (1st Cir. 2009), *City of Springfield v. LAN Tamers, Inc. (In re LAN Tamers, Inc.)*, 281 B.R. 782 (Bankr. D. Mass. 2002), *aff'd*, 329 F.3d 204 (1st Cir. 2003), and the numerous other cases cited in the Movants' Motion, *see* Mot. ¶¶ 58, 63 (collecting cases)). The Oversight Board also argues at length that the Enabling Act does not give rise to a "technical trust," (Opp. ¶¶ 101-02), which Movants never argued.  (Mot. ¶¶ 58-67; *Gracia-Gracia*, 939 F.3d at 350-51.)

framework governmental entities use to track resources, and the Commonwealth can hold funds in the TSA that are restricted to or owned by instrumentalities such as PRIFA. (*See* Holder Report ¶ 22-26.) The Commonwealth has no discretion over how such restricted funds are used.

**B.     The Puerto Rico Constitution Does Not Give the Commonwealth Equity In the Pledged Rum Taxes.**

61.     The Oversight Board's argument that the Pledged Rum Taxes belong to the Commonwealth, not PRIFA, pursuant to the Commonwealth's purported "retention powers" under Article VI, Section 8 of the Puerto Rico Constitution plainly misconstrues the limited scope of that provision.[29] The PRIFA bondholders' lien is subject to Article VI, Section 8, but Commonwealth law does not give the Commonwealth carte blanche to withhold Pledged Rum Taxes.

62.     Pledged Rum Taxes subject to the PRIFA bondholders' lien may be used for payment of general obligation ("GO") debt only if (i) the conditions of Article VI, Section 8 have been triggered; (ii) there are no other available resources (as that term is used in Article VI, Section 8 to include all resources of the Commonwealth) other than the Pledge Rum Taxes; and (iii) the money is used to pay public debt in a manner consistent with Article VI, Section 8.

63.     This scheme does not give the Commonwealth equity in the Pledged Rum Taxes. (Opp. ¶ 82.) If Article VI, Section 8 creates any interest in the Pledged Rum Taxes at all, it is an interest in favor of the *GO bondholders*. Any Pledged Rum Taxes transferred to the Commonwealth can only be for the limited and specific purpose of paying GO debt. The moneys would therefore be restricted funds, and the Commonwealth itself would not have a beneficial

---

[29] The provision provides: "In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." P.R. CONST., art. VI, § 8.

interest in those funds and could not use them for any purpose except applying them to GO debt.

P.R. CONST., art. VI, § 8.

64.     Notably, the Oversight Board makes no factual showing that the conditions necessary for triggering Article VI, Section 8 have been satisfied. (*See* Mot. ¶ 92 n.28.) Nor could it. As the Commonwealth has not paid any GO debt since 2016, it cannot credibly claim that revenues were needed in prior fiscal years to pay GO bondholders. (Mot. ¶ 26.) Article VI, Section 8 is part of a suite of constitutional provisions addressing budgeting and payments in a fiscal year. By its terms, it applies only to resources and payment obligations within a particular fiscal year. Nothing in Article VI, Section 8 would allow moneys to be retained in one fiscal year to make payment, even on public debt, in another fiscal year. The analysis is required to be done on an annualized basis. The Oversight Board offers no response to this point.

65.     Instead, the Oversight Board argues that the fact that "the Retained Rum Tax Remittances are not being applied to the public debt *now* does not mean they will not be needed to pay off the public debt under a plan (where GOs will not be paid in full)." (Opp. ¶ 85 (emphasis in original)); Ex. 26, Ahlberg Tr. 407:8-21.) This confuses the operation of PROMESA with the Commonwealth's state law rights under Article VI, Section 8. That provision is a limitation on the scope of bondholders' lien that provides for an additional permitted use of the funds in certain limited circumstances. Nothing about Article VI, Section 8 modifies the obligation for the money to continue to be deposited to the credit of PRIFA. PROMESA incorporates 11 U.S.C. § 362(d), which requires the court to determine whether the Commonwealth had equity in the Pledged Rum Taxes under pre-PROMESA state law. PROMESA § 301(a), 48 U.S.C. § 2161(a). Because Article VI, Section 8 is in no way tied to the treatment of claims in a bankruptcy, the proposed

plan is irrelevant to whether that constitutional provision gives the Commonwealth equity.[30]  As Movants have explained, the prerequisites for Article VI, Section 8 were not satisfied in this or any prior fiscal year, so Movants are entitled to at least Pledged Rum Taxes held by the Commonwealth that were not validly retained in compliance with Article VI, Section 8.  And Article VI, Section 8 does not give the Commonwealth equity in the Pledged Rum Taxes going forward, because (i) the Commonwealth has made no showing that its conditions were or will be triggered, and (ii) any purported triggering would, at most, give rise to an interest in favor of the GO bondholders, not the Commonwealth.  (Mot. ¶ 93.)

66.     In any event, the Enforcement Actions that Movants seek to bring will not affect or impair whatever purported reversionary right the Commonwealth claims to have in future moneys. If the Commonwealth has rights under Article VI, Section 8, those rights will remain intact and unimpaired, and the Commonwealth will be able to assert them in any year when the conditions for those rights are satisfied.  The PRIFA Enforcement Actions are thus not an "act to obtain possession of property of the" Commonwealth "or to exercise control over property of the" Commonwealth.  11 U.S.C. § 362(a)(3).

67.     Ultimately, though, this Court need not decide here whether the conditions for applying Pledged Rum Taxes to payment of public debt have been satisfied, nor whether the retained moneys have been used for such a purpose.  That question, to the extent implicated by the PRIFA Enforcement Actions, is a substantive factual question that should be presented and decided in that case.  It is clear that Movants have shown at least a colorable claim that (i) the

---

[30] There is also no authority in the Puerto Rico Constitution or otherwise for the proposition that moneys clawed back in one fiscal year can be retained and used to pay public debt in *another* fiscal year.  Such a position would be contrary to the very structure and annual budgeting requirements of the Puerto Rico Constitution.

conditions of Article VI, Section 8 have not been satisfied in one or more years, and (ii) that there are other available resources of the Commonwealth from which public debt can be paid.  The Opposition offers nothing more than bald assertions, devoid of factual support, on these points.

68.    The Oversight Board's arguments to the contrary turn the entire Puerto Rico constitutional scheme, and the statutory and contractual protections embodied in the property interests granted to PRIFA bondholders, on their head.  According to the Oversight Board, the proposed Amended Plan of Adjustment (which does not provide for payment in full of public debt) proves that the Commonwealth is without sufficient available resources to meet all appropriations and thus has an interest in the Pledged Rum Taxes.  This is the exact inverse of the required inquiry under Puerto Rico law.

69.    Puerto Rico law allows the Commonwealth to use Pledged Rum Taxes for the payment of public debt only if there are no other "available resources."  The Amended Plan of Adjustment is based on a Fiscal Plan that provides for payment of all Commonwealth appropriations and expenses (in fact, according to the Oversight Board, it defines the precise parameters of permitted appropriations).  The proposed Plan of Adjustment addresses only the allocation and distribution of the excess remaining value.  It does not account for all of the "available resources" of the Commonwealth, as that term is used in Article VI, Section 8, and certainly does not prove that there are no available resources other than the Pledged Rum Taxes that can be used for payment of public debt.  That the Oversight Board is proposing to impair GO debt under the proposed Plan of Adjustment does not prove that the Pledged Rum Taxes are the only available resources that could be used to pay that debt.[31]  The question is not, as the Oversight

_____

[31] To the extent the full amount of GO debt payments is not included in the annual budget, any shortfall would not even factor into the Article VI, Section 8 analysis, which considers only whether available resources in a particular fiscal year are insufficient to meet appropriations for that year.  Section

Board suggests, whether available resources are sufficient to meet all appropriations; rather, it is whether there are any available resources other than the Pledged Rum Taxes that could be used (before considering other appropriations) for payment of public debt.

70.     Lastly, the Oversight Board's separate argument that ownership of the Pledged Rum Taxes was not transferred to PRIFA because the Enabling Act lacks certain provisions found in the COFINA Enabling Act (Opp. ¶¶ 83 and n.42) ignores material differences between PRIFA and COFINA. The COFINA structure transferred ownership of the taxes to COFINA, ***and*** it rendered those taxes beyond the reach of Article VI, Section 8. Here, the PRIFA structure merely transferred ownership of the Pledged Rum Taxes, without exempting them from the Article VI, Section 8. *Compare* 13 L.P.R.A. § 12 ("FIA shall be funded each fiscal year from the following sources, the proceeds of which shall be directly deposited in FIA at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall these constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico"), *with* 3 L.P.R.A. § 1914 ("The Authority is hereby empowered to segregate a portion of said Funds into one (1) or more sub-accounts, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico for the payment of the principal and interest on bonds and other obligations of the Authority, or for the payment of bonds and other obligations issued by a benefited entity, or for any other legal purpose of the Authority."). The Oversight Board's argument in this regard fails in light of these differences.[32]

---

201(b)(1)(D) of PROMESA, by requiring that the Fiscal Plan (with which any budget must be consistent) to eliminate structural deficits, prevents Article VI, Section 8 from being triggered in this manner.

[32] Notably, the Commonwealth publicly disclosed the pledge and transfer of revenues to COFINA and to PRIFA in the same manner and in the same section of its annual audited financial statements. (*See, e.g.*, Ex. 28, at 122 (notes to 2013 audited financial statements).)

**C.    Because the Commonwealth Lacks Equity in the Pledged Rum Taxes, the Oversight Board Cannot Show They Are Necessary for an Effective Reorganization.**

71.    As explained in the Motion, if this Court were to determine that the Commonwealth lacks equity in the Pledged Rum Taxes, then it must conclude they are not necessary to an effective reorganization; they are PRIFA's property, not to be used to pay the Commonwealth's debts. (Mot. ¶ 68.) The Oversight Board fails to address this point, arguing that this topic is reserved for a subsequent hearing, but then points to Movants' purported "admission" that "pursuant to its public reports the Commonwealth has over $8.7 billion cash and the total amount of all retained Allocable Revenues is considerably smaller." (Opp. ¶ 119.) But that misses the point regarding the Pledged Rum Taxes' necessity for the reorganization. To the extent the Oversight Board is asserting that Movants are adequately protected, that is irrelevant to the equity inquiry and, in any event, wrong. (Mot. § III.A.) Thus, the stay should be lifted under Section 362(d)(2).[33]

**II.    ALTERNATIVELY, THE COURT SHOULD LIFT THE STAY FOR "CAUSE" PURSUANT TO BANKRUPTCY CODE SECTION 362(d)(1).**

72.    Even if the Court were to find that the Commonwealth has equity in the Pledged Rum Taxes, "cause" exists to lift the stay under Section 362(d)(1). (Mot. § III.) The Oversight Board has not meaningfully responded to any of Movants' "cause" arguments under Section 362(d)(1), claiming that that issue is relevant only if the motion proceeds to a final hearing. (Opp.

---

[33] Movants reiterate their position that the stay terminated by operation of law thirty days after November 30, 2019, for the reasons set forth in the Motion (Mot. ¶ 120 n.33), and on the record at the January 29, 2020, omnibus hearing. Movants additionally assert that, for the reasons set forth herein and in the Motion, the Oversight Board has failed to establish a likelihood of success under Section 362(d)(2) or (d)(1), and this Court is thus precluded from extending the time to hear and decide the lift-stay motion under Section 362(e) of the Bankruptcy Code.

¶ 120.) That said, Movants will reply to certain of the Oversight Board's arguments, as applicable to Section 362(d)(1).[34]

**A.    "Cause" Exists to Lift the Automatic Stay Because Movants' Lien on the Pledged Rum Taxes Is Not Adequately Protected.**

73.    Movants have a lien on the Pledged Rum Taxes that either must be enforced pursuant to its terms, or adequately protected, during the restructuring proceedings. The Oversight Board's arguments to the contrary each fail.

**1.    Contrary to the Oversight Board's Assertions, Movants Have a Valid Lien.**

74.    *First*, **PRIFA bondholders, through their Trustee, have an equitable lien on the Pledged Rum Taxes.** As explained in the Motion, the Enabling Act "shows an intention" that "specific funds," *i.e.*, the Pledged Rum Taxes, will be transferred to PRIFA in order for PRIFA to pay debt service on the PRIFA bonds—enough to create an equitable lien. (Mot. ¶ 78 (collecting cases).) The Oversight Board claims that equitable principles cannot expand bondholders' rights under the Trust Agreement. (Opp. ¶ 109.) But even the case the Oversight Board cites for that proposition shows otherwise. *See American Fidelity Fire Insurance Co. v. Contrucciones Werl, Inc.*, 407 F. Supp. 164, 203 (D.V.I. 1975). In *American Fidelity*, the court accepted an equitable lien theory, noting that "[t]he legal obligations [found in the contract] are not set aside; they are surmounted and transcended by equitable considerations." *Id.* at 184.

---

[34] Movants seek stay relief for "cause" under 11 U.S.C. § 362(d)(1) on multiple independent grounds. Contrary to the Oversight Board's argument (Opp. ¶¶ 120, 129 n.77), only Movants' "adequate protection" ground would require a showing of secured status. Even the Oversight Board's own cases cited for this proposition tie the requirement of showing "secured status" specifically to entitlement to *adequate protection*, rather than addressing the additional question of "secured status" as a prerequisite to stay relief more generally. (*Id.* at ¶ 129 n.77.) *See, e.g.*, *In re S. Biotech, Inc.*, 37 B.R. 318, 323-24 (Bankr. M.D. Fla. 1983) ("[T]here is no express statutory requirement that holders of unsecured claims be provided *adequate protection* . . . ." (emphasis added)); *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 90 (2d Cir. 2003) ("The *adequate protection provision* of 11 U.S.C. § 361 protects only secured creditors." (emphasis added)).

75.     *Second*, **Puerto Rico recognizes equitable liens.**   Contrary to the Oversight Board's argument (Opp. ¶ 106), Puerto Rico law does not reject the equitable lien doctrine.  The Oversight Board's misquotes *Acevedo v. Solivellas & Co.*, 49 D.P.R. 633, 1936 PR Sup. LEXIS 51 (P.R. 1936).  The Oversight Board, the Oversight Board cited to a lower court decision that was overturned; the Supreme Court expressly declined to foreclose the application of the equitable lien doctrine in Puerto Rico.  (Opp. ¶ 106 (citing *id.* at *1 ("We[shall]not follow the parties in their full and interesting argument[s] about the existence or non-existence in this island of the so called equitable liens.")).)  The other cases cited by the Oversight Board (Opp. ¶ 106) do not address equitable liens.  *See Estate of Romero v. Willoughby*, 10 D.P.R. 71, 1906 PR Sup. LEXIS 152, *1 (P.R. 1906) (statute did not create lien on taxpayers' personal property); *Ramis v. The Registrar*, 19 D.P.R. 747, 1913 PR Sup. LEXIS 140, *1 (P.R. 1913) (noting presumption in favor of free use of property).

76.     And, contrary to the Oversight Board's argument, (*see* Opp. ¶ 106 and n.61.), even were Article 9 of the UCC applicable (which it is not), courts have consistently concluded that equitable liens are independent of, and not foreclosed by, that provision.[35]  *See* 19 L.P.R.A. § 402 ("Unless displaced by the particular provisions of §§ 401 et seq. of this title, the general principles of law of our jurisdiction shall supplement its provisions."); *Gen. Ins. Co. of Am. v. Lowry*, 570 F.2d 120, 122 (6th Cir. 1978) (evaluating equivalent non-displacement provision and concluding that UCC Article 9 did not supplant equitable liens).[36]

---

[35] *See, e.g.*, *U.S. Fid. & Guar. Co. v. Maxon Eng'g Servs. (In re Maxon Eng'g Servs. Inc.)*, 332 B.R. 495, 500 (Bankr. D.P.R. 2005) (recognizing equitable lien under Puerto Rico law *after* Article 9 of the UCC was adopted); *In re Czebotar*, 5 B.R. 379, 381 (Bankr. E.D. Wash. 1980) (noting survival of equitable lien doctrine after enactment of Article 9 of the UCC); *Warren Tool Co. v. Stephenson*, 161 N.W.2d 133, 148-49 (Mich. 1968) (same); *Albany Sav. Bank, F.S.B. v. Novak*, 151 Misc. 2d 956, 957 (N.Y. Sup. Ct. 1991) ("[E]quitable liens are independent of the Uniform Commercial Code").

[36] The Oversight Board's reliance on *Uniroyal, Inc. v. Universal Tire & Auto Supply Co.*, 557 F.2d 22, 23 (1st Cir. 1977), is similarly misplaced.  (*See* Opp. ¶ 106 n.61.)  That case stands for the unremarkable

77.    *Third*, **equitable liens are routinely recognized in bankruptcy.**  The Oversight

Board's argument that equitable liens are not recognized in bankruptcy is undercut by *Maxon*, in

which the court was tasked with determining whether equitable lienholders were entitled to

adequate protection.  332 B.R. at 500.  Numerous other cases recognize that "valid equitable liens

. . . are enforceable in bankruptcy." *Foster v. Mfrs.' Fin. Co.*, 22 F.2d 609, 610 (1st Cir. 1927);

*see also United States v. Friedman*, 143 F.3d 18, 23-24 (1st Cir. 1998) (equitable lienholder was

"no ordinary unsecured trade creditor"); *Cohen v. Wasserman*, 238 F.2d 683, 688 (1st Cir. 1956)

(equitable lien arising pre-petition recognized after debtor filed bankruptcy); *Pare v. Natale (In re

Natale)*, 174 B.R. 362, 364-65 (Bankr. D.R.I. 1994) (same).[37]

78.    *Last*, **Movants' lien is not disallowable.**  The Oversight Board argues that, even if

Movants proved an equitable lien (which at a minimum they do), it would be disallowable under

section 502(d) and subordinate to the Commonwealth's clawback powers.  However, *In re Bell*,

cited by the Oversight Board in support of this argument (Opp. ¶ 110), held that the trustee could

avoid the security interests at issue because they were not perfected. *McRoberts v. Transouth Fin.

(In re Bell)*, 194 B.R. 192, 196 (Bankr. S.D. Ill. 1996).  Numerous other cases demonstrate that an

equitable lien is not automatically disallowable in bankruptcy. *See Union Tr. Co. of Maryland v.

Townshend*, 101 F.2d 903, 914 (4th Cir. 1939) (regarding an equitable lien, the Court found that

statutes requiring registration of liens did not avoid unregistered conveyances); *First Union Nat'l*

---

proposition that if a lien must be perfected by filing a UCC financing statement, failure to follow filing
instructions renders the lien unperfected and unenforceable. *Id.*  Here, the bondholders' equitable lien is
automatically perfected by virtue of the Enabling Act. 3 L.P.R.A. § 1907(a).

[37] The Oversight Board also contends, more generally, that equitable constructs are disfavored in
bankruptcy. (Opp. ¶ 106 n.62.)  The cases the Oversight Board cites do not say that. In *Hunter v. Bank of
N.Y. (In re Anderson)*, 266 B.R. 128, 135 (Bankr. N.D. Ohio 2001), the court never reached the issue of
whether an equitable lien existed.  And both *Rotman Elec. Co. v. Cullen (In re Vappi & Co.)*, 145 B.R. 719
(Bankr. D. Mass. 1992), and *In re T. Brady Mech. Servs., Inc.*, 129 B.R. 559 (Bankr. N.D. Ill. 1991), dealt
with contract, not lien, disputes and are plainly inapplicable here.

*Bank v. Diamond (In re Diamond)*, 196 B.R. 635, 641 (Bankr. S.D. Fla. 1996) (finding Chapter 7 debtors could not avoid mortgagee's equitable lien on homestead property based on unrecorded mortgage); *Sovran Bank v. United States (In re Aumiller)*, 168 B.R. 811, 822 (Bankr. D.D.C. 1994) (reserving on determination on whether equitable lien was avoidable); *In re Mefford*, 18 B.R. 853, 855 (Bankr. S.D. Ind. 1982) (noting that the creditor's lien was an equitable lien arising out of conduct of debtor and concluding that, if debtor should become sole, separate and exclusive owner of the real estate, mortgage lien might attach to her interest in property, and, therefore, lien was not avoidable).

**2.      Movants' Liens Were Properly Perfected.**

79.      The Oversight Board's arguments that the bondholders' liens were not "perfected" (Opp. ¶¶ 20, 86, 120), or that the liens did not comply with the Uniform Commercial Code ("P.R. UCC") (Opp. ¶¶ 4 n.5, 106 n.61), fail for three separate reasons:

80.      *First*, the P.R. UCC by its express terms "does not apply to the extent that . . . another statute of this state expressly governs the creation, perfection, priority, or enforcement of a security interest created by this state or a governmental unit of this state[.]"   19 L.P.R.A. § 2219(c)(2).  Here, the Enabling Act "expressly governs" the perfection of Movants' security interest, providing that, when PRIFA makes a pledge of its property, that property "shall immediately be subject to said lien without the need of the physical delivery thereof or any other act."  3 L.P.R.A. § 1907(a).  Because another statute expressly governs perfection of the PRIFA security interest, the UCC is inapplicable according to its plain text.[38]  19 L.P.R.A. § 2219(c)(2).

---

[38] For this reason, this case is nothing like *ERS*, where, unlike here, there was no separate statute governing perfection.  *See Op. & Order Granting & Denying in Part Cross Mots. for Summ. J.*, No. 17-00213-LTS, ECF No. 215 at 11 (under Commonwealth law, security interests of this kind "must be perfected by filing financing statements pursuant to the Uniform Commercial Code (as adopted by Puerto Rico) on the secured transactions registry maintained by the Department of State").

81.    *Second*, even if the P.R. UCC were applicable, Movants properly perfected their security interests.  Movants' collateral—the Pledged Rum Taxes—is a payment intangible, a monetary obligation of PRIFA.  19 L.P.R.A. § 2212(61).  Under the P.R. UCC, a security interest in a payment intangible is enforceable against a debtor and third parties if an authenticated financing statement is filed with the Commonwealth Department of State.  *See* 19 L.P.R.A. § 2260.  Movants filed financing statements with the Department of State on September 18, 2015, (*see* UCC-1 Statement, ECF No. 10602-16), perfecting their interest as against PRIFA and third parties in accordance with the P.R. UCC.[39]

82.    *Third*, even if Movants' lien had not been perfected, the Oversight Board could not avoid the lien under 11 U.S.C. § 544 because a hypothetical creditor of the Commonwealth could not have obtained "a judicial lien on" the Pledged Rum Taxes (or any other property of the Commonwealth) as of the commencement of the case.  11 U.S.C. § 544(a)(1).  The Pledged Rum Taxes are not property of the Commonwealth at all, *see supra* Argument § I.A, and even if they

---

[39] To the extent the Oversight Board argues that Movants' collateral includes a deposit account (Opp. ¶ 28)—a convenient argument, as a deposit account generally requires the secured party to have control of the collateral in order to perfect its interest (19 L.P.R.A. § 2262(b)(1))—the Oversight Board is incorrect.  A deposit account is "a demand, time, savings, passbook, or similar account maintained with a bank."  19 L.P.R.A. § 2212(29).  Movants' collateral is not mere accounts with a bank but the Pledged Revenues themselves, and the rules governing perfection of security interests in deposit accounts do not apply.

Even if Movants' collateral was deemed to include a deposit account, however, the funds in those deposit accounts would be proceeds of Movants' perfected interest in the Pledged Revenues themselves.  As discussed *infra* ¶ 112, the Pledged Revenues acquired by the debtor after the commencement of the case are pledged special revenues that remain subject to the Movants' lien under 11 U.S.C. § 928.  Thus, there is a perfected security interest in Pledged Revenues received by the debtor both before and after commencement of the case.  Where this collateral generates "identifiable cash proceeds," a secured creditor's lien continues to attach to such proceeds.  19 L.P.R.A. § 2265(d)(2).  The Oversight Board has admitted that the Pledged Revenues may be traced from account to account.  (Opp. ¶ 29 (the Pledged Revenues are identified by a "Disbursement Detail"); *see also* Ex. 42, CCDA_STAY0000001 (Bank Account Information Request demonstrating detailed tracing of funds by bank account).)  So the Pledged Rum Taxes are easily identifiable when they arrive at any deposit account.  Accordingly, Movants' lien continues to attach to the identifiable cash proceeds of the Pledged Rum Taxes when such revenues arrive in any deposit accounts at issue.

were, Commonwealth property cannot be attached through a judicial lien.[40]  Section 544(a) "does

not give the Trustee any greater rights than he, or any person, would have as a . . . judicial lien

creditor under applicable state law." *In re Trask*, 462 B.R. 268, 273 (B.A.P. 1st Cir. 2011).

Therefore, the lien cannot be avoided.[41]

> **3.     Section 552(a) Does Not Apply to Movants' Lien.**

83.     The Oversight Board's argument that Section 552 cuts off Movants' lien (Opp. ¶¶

122-23) is wrong.  The PRIFA bonds do not create "merely an expectancy," (Opp. ¶ 124), and

numerous provisions make clear that—unlike the bonds at issue in *ERS*—PRIFA bondholders had

legally enforceable rights.

84.     *ERS* was premised on the fact that the ERS Enabling Act "***does not include any***

***covenant by the Legislature of the Commonwealth not to amend the act in a way adverse to***

***Bondholders***."  (Ex. 46, ERS Bond Offering Statements (emphasis added).)  PRIFA bonds are the

opposite:  backed by specific revenue streams and a covenant of the Commonwealth not to

interfere with the flow of revenues, subject only to limited clawback rights under Article VI,

Section 8.[42]

---

[40] *See, e.g.*, *Diaz v. Dep't of Educ.*, 823 F. Supp. 2d 68, 77 (D.P.R. 2011) ("[T]he Puerto Rico Supreme
Court has held that as a matter of public policy governmental entities ought not be subject to the
inconveniencies of attachment, which interfere with the execution of public functions."); *Whitfield v.
Municipality of Fajardo*, 2007 WL 6894782, at *3 (D.P.R. May 29, 2007) ("[G]overnmental entities are
exempt from attachment procedures, because as a matter of public policy, governmental activities ought
not to be subject to the inconveniences of such procedures, which interfere with the execution of public
functions, in the detriment of the common good.") (quoting *Stump Corp. v. Tribunal Superior*, 99 D.P.R.
179, 181 (P.R. 1970)).

[41] *See, e.g.*, *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 652 (7th Cir. 2008) (holding that avoidance of
Federal Communications Commission's lien on debtor's licenses was not permitted under Section 544
because, under applicable non-bankruptcy law, no judgment creditor could obtain superior lien against the
debtor's property); *In re DeCora*, 396 B.R. 222 (W.D. Wisc. 2008); *In re Fluge*, 57 B.R. 451, 456 (Bankr.
D.N.D. 1985) ("A trustee as a hypothetical holder of a judicial lien under Section 544(a)(1) can avoid a
superior interest *only if an actual creditor could have obtained a judicial lien against the property*.").

[42] The Oversight Board's argument that the "continued flow of Rum Taxes was contingent on future federal
government allocations" (Opp. ¶ 124 n.74) is beside the point.  Revenue bonds are frequently contingent

44

85.     Pledged Rum Taxes are "pledged special revenues" under Section 922(d) in any event, and thus not subject to Section 552. The Oversight Board argues that the Pledged Rum Taxes "are not a special excise tax of the Commonwealth, but a mere appropriation from the United States," and they are "not derived from PRIFA's operations or the Commonwealth's operations." (Opp. ¶ 125.) The Oversight Board has no answer to case law holding that there is no requirement that the party that imposes and collects the tax be the same as the party that pledges the tax for the payment of bonds, in order for the tax revenues to be considered "special revenues." *In re Heffernan Mem'l Hosp. Dist.*, 202 B.R. 147, 148 (Bankr. S.D. Cal. 1996) (*cited in* Mot. ¶ 86 n.24).

*       *       *

86.     As noted above, the Oversight Board addresses, albeit superficially, Movants' argument for "cause" based on adequate protection, but fails to address Movants' other two bases for cause under Section 362(d)(1). The Motion established that (a) Movants have due process rights that require a forum for litigating their constitutional claims, (Mot. ¶¶ 99-103); *see Ambac Assurance Corp. v. P.R., (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 927 F.3d 597, 605 (1st Cir. 2019); and (b) all applicable *Sonnax* factors favor lifting the stay, (Mot. ¶¶ 122-32); *see Gracia-Gracia*, 939 F.3d at 347. Movants reiterate those independent bases for stay relief.

---

on future revenues derived from third parties; special revenue bonds for toll roads (quintessential revenue bonds, *see In re Fin. Oversight & Mgmt. Bd. for P.R.*, 931 F.3d 111, 122 (1st Cir. 2019) ("[r]evenue bonds are bonds issued to finance projects or programs [] such as toll roads . . . .") (internal quotations omitted)), are dependent on motorists continuing to drive on the roads and paying tolls. To the extent such revenues are received—as they indisputably are here—they must be used to repay bondholders. *See Dimino v. Sec'y of Commonwealth*, 695 N.E.2d 659, 708-09 (Mass. 1998) (bondholders of revenue bonds secured by toll revenues had a "right to the authority's [toll] revenues").

III.    NEITHER PROMESA'S TITLE III PROVISIONS NOR THE OVERSIGHT
        BOARD'S BUDGETARY POWERS PREEMPT BONDHOLDERS' PRE-
        EXISTING LEGAL RIGHTS.[43]

        A.    The Plain Text of PROMESA Limits the Scope of Preemption to Cases of
              Actual Conflict, Which Does Not Exist Here.

        87.    The Oversight Board's arguments that PROMESA gives it unrestrained powers to

preempt statutes and destroy pre-existing legal rights based on its budgetary appropriation powers

are meritless. (Opp. ¶¶ 73-75, 80.)  Where, as here, a "statute contains an express pre-emption

clause," courts "focus on the plain wording of the clause, which necessarily contains the best

evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct.

1938, 1946 (2016).  "Congressional intent is the principal resource to be used in defining the scope

and extent of an express preemption clause." *Brown v. United Airlines, Inc.*, 720 F.3d 60, 63 (1st

Cir. 2013) (internal quotation marks omitted).

        88.    PROMESA § 4, entitled "Supremacy," is such an express clause.  It states: "The

provisions of this Act shall prevail over any general or specific provisions of territory law, State

law, or regulation that is ***inconsistent with*** this Act." *Id*.  The effect of this language is to limit the

scope of preemption under PROMESA to cases of conflict, as the First Circuit has previously

found. *See Mèndez-Nùñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt.*

*Bd. for P.R.)*, 916 F.3d 98, 104 (1st Cir. 2019) (addressing preemption under PROMESA § 4)

(quoting *United States v. Acosta-Martinez*, 252 F.3d 13, 18 (1st Cir. 2001) ("[A] provision of the

Puerto Rico Constitution cannot prevail where it conflicts with applicable federal law.")).

---

[43] Movants' arguments in this section are substantially similar to those made in the contemporaneously-
filed reply briefs filed in further support of the *Ambac Assurance Corporation, Financial Guaranty
Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and The Bank Of New
York Mellon's Motion Concerning Application of the Automatic Stay to the Revenues Securing the CCDA
Bonds*, (ECF No. 10104).  Movants include the arguments in each brief to ensure the record on each motion
is complete.

89. Nothing in PROMESA is "inconsistent with" Movants' property and contractual rights, which predate PROMESA. Far from rescinding or repudiating property or contract rights (or authorizing the Oversight Board to do so), PROMESA expressly commands that existing property and contractual rights are to be respected: Section 201, which the Oversight Board suggests is somehow inconsistent with Movants' contractual rights, expressly required the Oversight Board to "respect the relative lawful priorities or lawful liens . . . in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of this Act" when formulating fiscal plans and budgets. PROMESA § 201(b)(1)(N); 48 U.S.C. § 2141(b)(1)(N). Moreover, PROMESA's supremacy clause provides only that "the provisions of this Act" shall prevail over inconsistent Commonwealth law. PROMESA § 4, 48 U.S.C. § 2103. The Oversight Board's fiscal plan or budget is not a "*provision of this Act*," and nothing in PROMESA suggests that Congress intended to grant the Oversight Board the power to issue preemptive edicts in its sole and absolute discretion through its budgetary or fiscal plan certification powers.

90. There is likewise no inconsistency between Movants' property and contractual rights and the Title III restructuring process. (*See* Opp. ¶ 75.) The Bankruptcy Code provisions made applicable here under Title III expressly protect the rights of secured creditors. *See* PROMESA § 301, 48 U.S.C. § 2161 (making the adequate protection provisions of 11 U.S.C. § 361 and other creditor protection provisions applicable in PROMESA). And as in any bankruptcy, both secured and unsecured creditors' rights remain intact unless and until they are addressed as part of a confirmed plan of adjustment that complies with the requirements of PROMESA. *Id.* (making provisions of 11 U.S.C. §§ 362, 1123 and other provisions applicable in PROMESA).

There is thus no inconsistency between Movants' property and contractual rights and either the Title II budgetary process or the Title III restructuring.

91.     Because there is no conflict between the Enabling Act and PROMESA, there is no statutory basis for this Court to find that the Enabling Act has been preempted.  "[T]he plain wording" of PROMESA's supremacy clause, "which necessarily contains the best evidence of Congress' pre-emptive intent[,]" precludes any such finding.  *See Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1946 (2016) (internal quotation marks omitted).

**B.     Neither of the Oversight Board's Asserted Bases for "Preemption" Withstands Scrutiny.**

92.     The Oversight Board premises its argument to the contrary on its budgetary appropriation powers under Title II of PROMESA (Opp. ¶¶ 73-75, 80) and the Title III restructuring process (Opp. ¶ 75).  Neither Title of PROMESA preempts Movants' legal rights.

**1.     The Oversight Board's Title II Budgetary Powers Under PROMESA Have No Preemptive Effect on Movants' Rights.**

**a.     The Commonwealth's Transfer of the Pledged Rum Taxes to PRIFA Is Valid and Legally Binding, Not a Mere "Appropriation" Subject to Repeal Without Consequence.**

93.     As a threshold matter, the Oversight Board cavalierly and erroneously asserts that the Enabling Act merely "authorized appropriation of certain portions of the Rum Tax Remittances . . . to PRIFA," which appropriations "the Commonwealth is free to . . . change . . . if it chooses to do so."  (Opp. ¶ 63; *see also id.* ¶¶ 62-70.)  The PRIFA bonds are legally enforceable special revenue bonds, not mere "appropriation" bonds as the Oversight Board claims.

94.     "Appropriation" bonds are bonds backed by nothing more than discretionary governmental appropriations; bondholders expect that municipal debtors will pay such bonds in

order to maintain access to capital markets,[44] but in the event that a municipality experiences

financial distress, bondholders have no legally enforceable right to payment. Such appropriation

bonds *explicitly* state at issuance that the legal remedies for nonpayment are limited. The

Commonwealth indeed issued some appropriation bonds with warnings of these kinds.[45] These

bonds are classified separately in the Oversight Board's proposed Plan of Adjustment, and receive

a recovery of 0.0% by virtue of the fact that they are not legally enforceable. (*See Amended Title*

*III Plan of Adjustment of the Commonwealth of Puerto Rico*, et al., Case No. 17-03283, ECF No.

11946, Article 50.1.)

95.     The PRIFA bonds share none of these characteristics. Far from warning that

payment is limited to discretionary appropriations, the PRIFA bonds were (and are) secured by an

express pledge of a specific revenue stream (the Pledged Rum Taxes), which the Enabling Act

makes subject to a "valid and binding" lien in favor of bondholders. 3 L.P.R.A. § 1907(a). The

stated purpose of the Act was to "endow[] the Authority with the needed resources to *ensure* the

payment of the principal and interest on bonds." The Enabling Act, Statement of Motives, No. 44.

July 7, 1997, No. 32 (June 21, 1988) (emphasis added). The Commonwealth also covenanted with

PRIFA bondholders that it would not limit or alter the rights or powers vested in PRIFA until the

PRIFA bonds are fully repaid. 3 L.P.R.A. § 1913; *Porto Rico Tel. Co. v. Tax Court*, 1960 PR Sup.

---

[44] *See Rating Methodology: Lease, Appropriation, Moral Obligation and Comparable Debt of US State and Local Governments*, MOODY'S INV. SERV. (July 26, 2016), https://www.ncsl.org/Portals/1/Documents/fiscal/LAMethodologyfiscal2016.pdf ("[T]he failure of a government to appropriate for debt service on a[n] . . . appropriation obligation is often an indicator of severe stress and typically leads to a default on the obligation shortly thereafter. A non-appropriation decision would likely result in negative rating action on the government's GO rating since it would call into question the government's willingness to honor commitments made to investors.").

[45] *See, e.g.*, Ex. 44, Puerto Rico Public Finance Corporation 2003 Series A Bonds Official Statement, at 15 ("The Legislature of Puerto Rico is not legally bound to appropriate sufficient amount to timely pay the principal of, redemption premium, if any, and any interest due on the Act 164 Bonds. There is no assurance that sufficient funds will be appropriated or otherwise made available to make such payments on the Act 164 Bonds.").

LEXIS 72 (P.R. June 30, 1960) (assignment of special revenues to a special fund of a public authority is "perfectly valid" under Puerto Rico law). These features make clear that PRIFA bonds are not appropriation bonds, but enforceable special revenue bonds, as even the Oversight Board has recognized in previously distinguishing the PRIFA bonds from appropriation bonds. (*See* Ex. 34, CW_STAY0010168 at 53 ("PRIFA's total debt outstanding, mostly Special Tax Revenue Bonds comprising over 95% of its total debt is payable from federal excise taxes levied on the rum . . . **PRIFA's remaining debt, other than the Special Tax Revenue Bonds, is payable from Commonwealth legislative appropriations**.") (emphasis added).)

96.    The Oversight Board's comparison of the PRIFA bonds with the ERS bonds (Opp. ¶ 79) only highlights the hollowness of Oversight Board's argument. The Official Statements for the ERS bonds expressly provide: "The Bonds are being issued pursuant to general authority contained in the Act, *which does not include any covenant by the Legislature of the Commonwealth not to amend the Act in a way adverse to Bondholders*." (See Ex. 46, (ERS Bond Offering Statements for Series A at 37, Series B at 38; and Series C at 40.)) The ERS Bond Resolution also "explicitly states that *the legislature of the Commonwealth might reduce (or, by implication, eliminate) Employers' Contributions, and so 'adversely affect[]' the Bondholders*." *ERS*, at 468-69 (emphasis added); (*see* Ex. 43, ERS Bond Resolution at VI-16.) That language convinced the First Circuit that ERS bondholders were "on notice that the Employers' Contributions stem from *appropriations that the Commonwealth legislature could, and likely would, reduce if it could not fully fund its planned appropriations*." (*Id.* (emphasis added).) The PRIFA bonds are the exact opposite, because they are backed by an express pledge of revenues and a statutory non-impairment covenant that assures PRIFA bondholders' legal rights to payment

from the Pledged Rum Taxes so long as any are received by the Commonwealth. (*See* 3 L.P.R.A. § 1913.)[46]

> **b.   There Is No Inconsistency Between the Oversight Board's Budget Powers and Movants' Legal Rights Because, Under Settled Law, the Legislative Power over the "Budget" or "Appropriations" Does Not Include Any Power to Rescind, Repudiate, or Alter Pre-Existing Property or Contract Rights.**

97.   The Oversight Board's argument that its budgetary powers under PROMESA § 202, 11 U.S.C. § 2142, would allow it to preempt even legally binding bonds and pledges of revenues (Opp. ¶ 4) is based on basic conceptual confusion about the relationship between budgetary appropriations and the government's legal obligations to third parties.  As the Oversight Board itself repeatedly acknowledges, its "budgetary" power under PROMESA § 202 is nothing more than the power to make (or not make) appropriations.  (*See, e.g.,* Opp. ¶ 45 ("PROMESA section 202 gives the Oversight Board the exclusive power to certify budgets for the Commonwealth and its instrumentalities over all appropriations . . . .").)

98.   Under more than a century of well-settled precedent—which no doubt was well-known to the congressional drafters of PROMESA—a budgetary appropriation (or its absence)

---

[46] In arguing that legislatures are free simply to repudiate secured debt at will, the Oversight Board misconstrues *Fletcher v. Peck*, 10 U.S. 87 (1810) (cited in Opp. ¶ 79).  That case held explicitly that "if an act be done under a law, a succeeding legislature cannot undo it.  The past cannot be recalled by the most absolute power. . . . When, then, a law is in its nature a contract, when absolute rights have vested under that contract, a repeal of the law cannot divest those rights."  *Id.* at 135; *see United States v. Winstar Corp.*, 518 U.S. 839, 873-76 (1996) (Souter, J., plurality) (analyzing *Fletcher*) ("[T]he National Government has some capacity to make agreements binding future Congresses by creating vested rights."); *see also Von Hoffman v. City of Quincy*, 71 U.S. 535, 554-55 (1866) ("It is equally clear that where a State has authorized a municipal corporation to contract and to exercise the power of local taxation to the extent necessary to meet its engagements, the power thus given cannot be withdrawn until the contract is satisfied.  The State and the corporation, in such cases, are equally bound."); *Rice v. City of Milwaukee*, 100 Wis. 516 (1898) ("It would seem to be very clear that when money is raised for a special purpose, under an express limitation to a particular use, it cannot lawfully be used for any other purpose . . . Any other holding would commit us to the palpable absurdity of saying that a person may pay his debts by taking money from one pocket, and putting it in the other.").

cannot change the legal rights of third parties against the government. "An appropriation per se merely imposes limitations upon the Government's own agents; it is a definite amount of money intrusted [sic] to them for distribution; but its insufficiency does not pay the Government's debts, nor cancel its obligations, nor defeat the rights of other parties." *Ferris v. United States*, 27 Ct. Cl. 542, 546 (1892); *see Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 191 (2012) ("Although the agency itself cannot disburse funds beyond those appropriated to it, the Government's 'valid obligations will remain enforceable in the courts.'").

99.     In fact, the Supreme Court has recently reaffirmed, in *Maine Community Health Options*, that the lack of a budget appropriation has no effect on the Government's obligations to third parties (or a third party's capacity to enforce that obligation). 2020 WL 1978706, at *9-10. The Court held that where the government has incurred an obligation the "failure or refusal by Congress to make the necessary appropriation would not defeat the obligation[.]" *Id.* at *7 (quoting 2 GAO, Principles of Federal Appropriations Law, p. 2-4 to -5 (4th ed. 2016), *available at* https://www.gao.gov/legal/appropriations-law-decisions/red-book (hereinafter "Redbook") (Ex. 45). Similarly, the Supreme Court reaffirmed that where a government "create[s] an obligation directly by statute . . . [a] subsequent failure to appropriate enough funds neither abrogated nor suspended the Government's pre-existing commitment to pay." *Id.* As the Court's analysis makes clear, appropriations or a lack of appropriations do not change the property or contract rights of third parties. *See also Local Initiative Health Auth. for L.A. Cty. v. United States*, 142 Fed. Cl. 1, 19 (Fed. Cl. 2019) ("Congress' mere refusal to pay has not modified its contractual obligation in any way."); *Martin v. United States*, 130 Fed. Cl. 578, 585-86 (Fed. Cl. 2017) (lack of appropriations not a viable legal defense to the government's legal obligations to pay third parties).

100.    Nothing in this Court's decisions regarding the Oversight Board's budgetary powers, or those of the First Circuit, are in any way inconsistent with these principles.    The Commonwealth government cannot reprogram funds in contravention of the Commonwealth budget. *Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3, 8 (1st Cir. 2019).  But that does not change the fact that governmental budgets and appropriations are mere internal instructions to Treasury that have no effect on the legal rights of third parties.[47]

> ### c.    The Oversight Board's Claimed Preemption Powers Is Inconsistent with the Structure and Purpose of PROMESA.

101.    The Oversight Board's claimed preemption power under Title II also must be rejected as inconsistent with the structure and purpose of PROMESA for several reasons:

102.    *First*, the Oversight Board's budgetary powers under PROMESA § 202, 48 U.S.C. § 2142, are distinct from the restructuring provisions of Title III.  Indeed, the budgetary powers will remain in effect—potentially for many years—even after the Commonwealth emerges from Title III, confirming that those powers were not intended to be a means for discharging the Commonwealth's debts. *See* PROMESA § 209, 48 U.S.C. § 2149.  Under the Oversight Board's theory that its certification decisions have preemptive effect, there is no principled reason it would not be able to preempt any and all legal rights to payment, even post-Title III, as long as an Oversight Board remains in existence.  Obviously, post-Title III, Congress envisioned that the Oversight Board would continue to control the Commonwealth's budget until it regains access to financial markets—but like any government, the Commonwealth would be obligated to uphold

---

[47] Indeed, the First Circuit has made clear that in the context of a restructuring it will find the power to preempt property rights only where Congress gives a "clear and specific indication of [its] intent" to grant "power to appropriate the property of third parties." *In re Irving Tanning Co.*, 496 B.R. 644, 664-65 (B.A.P. 1st Cir. 2013).  There is no such statement here.

approved contracts it makes.  The Oversight Board cannot approve a long-term contract one year,

and then the next decide to "preempt" it under PROMESA § 202 with the next year's certified

fiscal plan and budget.  If that were possible, particularly given that the Oversight Board's

composition can change every few years, it would be impossible for the Commonwealth to regain

access to credit markets.  *See Salazar*, 567 U.S. at 191 (explaining that being a reliable contract

partner protects "the long-term fiscal interests of the United States").

103.     *Second*, the Oversight Board's arguments would render the Title III process

essentially irrelevant.  Under the Oversight Board's theory, "***Any prepetition obligations to pay***

***are inconsistent with*** . . . PROMESA's grant to the Oversight Board of power over uses of the

Debtor's revenues in Title II."[48]  But if that were true, most of the provisions in Title III would be

superfluous.  According to the Oversight Board, the mere enactment of PROMESA, the beginning

of the covered period for Puerto Rico and its instrumentalities, and the appointment of the

Oversight Board, gave the Oversight Board free rein to decide which debts would be paid and

which would not be paid, which decisions are not subject to review even by this Court.  The

restructuring and elimination of all revenue bond debt, according to the Oversight Board, has

already been effectuated through the certification of fiscal plans.  If true, there would be no need

for this Court to consider and approve a plan of adjustment.  The elaborate procedures for both a

consensual (Title VI) and a non-consensual (Title III) restructuring make clear that the

Commonwealth's debt obligations can only be accomplished through a proceeding under one of

those provisions, not surreptitiously through fiscal plans.  *See Kungys v. United States*, 485 U.S.

---

[48] Opposition of the to the Financial Oversight Management Board to the *Urgent Motion of Assured
Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public
Finance Guarantee Corporation, and Financial Guaranty Insurance Company to Adjourn Hearing on
Motions for Relief from the Automatic Stay and Extend Deadline for Replies in Support of Motions for
Relief from the Automatic Stay*, ECF No. 10958 ¶ 20.

759, 778 (1988) (noting that it is a "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant").

104. *Third*, the Oversight Board's claimed "preemption" power would render PROMESA § 407 nugatory and ineffective. The Oversight Board contends that there is no "applicable law" pursuant to which creditors could bring claims under PROMESA § 407, 48 U.S.C. § 2195, because PROMESA itself preempted applicable law. *See* Docket No. 20-00003, ECF No. 44, ¶ 151 ("[T]here can be no violation of applicable law because the Enabling Act was preempted by PROMESA, which *is* the applicable law. Thus, the Commonwealth is not violating 'applicable law' by retaining Rum Tax Remittances.") (emphasis in original). In other words, the Oversight Board would have the Court conclude that Congress expressly included a statutory provision to give creditors the ability to sue for violations of applicable law—but simultaneously preempted any "applicable law," such that PROMESA § 407 was nullified by the same legislation that created it.

105. *Fourth*, the fact that the Oversight Board's budgets cover only individual fiscal years while the Oversight Board remains in effect further undermines any suggestion that those powers could be used to destroy existing contract or property rights. Movants' rights to payments extend to the year 2044. PROMESA expressly contemplates that the Oversight Board will terminate when the Commonwealth regains access to capital markets, at which point the Oversight Board's powers over the Commonwealth government will be extinguished entirely. *See* PROMESA § 209; 48 U.S.C. § 2149. The Oversight Board offers no textual basis for extending the preemptive effect of its budgetary powers beyond the specific fiscal years that the Oversight Board remains in effect.

2.    **There is no Inconsistency Between the Enabling Act and PROMESA Title III or Bankruptcy Policy.**

a.    **Far from Preempting Them, PROMESA Title III Expressly Protects the Legal Rights of Revenue Bondholders.**

106.    The Oversight Board's argument that Title III preempts Movants' legal rights (Opp. ¶ 75) is equally meritless. PROMESA incorporates specific provisions of the Bankruptcy Code that protect the rights of special revenue bondholders and those of secured claimants generally. *See* PROMESA § 301, 48 U.S.C. § 2161(a).

107.    While the Oversight Board claims that PROMESA recognizes "no priority claims other than administrative claims provided by Bankruptcy Code section 507(a)(2)" (Opp. ¶ 75), it simply ignores the express provisions confirming that contractual and property rights would be part of (and not disposed of prior to) the Title III process. *See* PROMESA § 301, 48 U.S.C. § 216 (incorporating secured and unsecured creditor protection provisions); PROMESA § 201(b)(1)(N), 48 U.S.C. § 2141 (requiring a fiscal plan to respect "lawful priorities and lawful liens . . . effect prior to the date of enactment of this Act.") and §314(b)(7) (requiring a Title III plan of adjustment comply with existing fiscal plans).

b.    **There Is No "Inconsistency" Between the Concept of a Restructuring and Protecting Property Rights.**

108.    The Oversight Board argues that Movants' property rights would violate the "equality" principle and render the Commonwealth's entire restructuring regime futile. (Opp. ¶¶ 2, 4, 7.) The Oversight Board has it backwards: Finding that Movants have *no* property rights in their pledged collateral will upend decades of municipal financing and market expectations, with consequences that will reverberate far beyond the Commonwealth.

109.    The "equality" principle regarding unsecured creditors has no application here, as the treatment Movants request is entirely ordinary and commonplace for *any* secured creditor. *See*

*Ticonic Nat'l Bank v. Sprague*, 303 U.S. 406, 412 (1938) ("[T]o the extent that one debt is secured and another is not there is manifestly an inequality of rights between the secured and unsecured creditors, which cannot be affected by the principle of equality of distribution."); *Chemical Bank N.Y. Tr. Co. v. Kheel*, 369 F.2d 845, 848 (2d Cir. 1966) (concurring opinion) ("Equality among creditors who have lawfully bargained for different treatment is not equity but its opposite[.]").

110.    It is axiomatic that secured creditors and unsecured creditors are not of equal priority and therefore should not share equally in a *pro rata* division of a debtor's property. *See Haesloop v. United States*, 2000 WL 1607316, at *3 (Bankr. E.D.N.Y. Aug. 30, 2000) (secured claims are scheduled separately from unsecured claims when a debtor files bankruptcy). Nearly every complex restructuring involves some secured claims and some unsecured claims, where payouts to each differ based on the value of the secured claimants' collateral.

111.    The secured nature of revenue bonds is the primary reason investors purchase such bonds. And perhaps the key feature of revenue bonds' security is the protection it provides in bankruptcy—a feature generally absent from most GO bonds. As Professor David Skeel, a member of the Oversight Board, explains:

> [T]he belief that GO bonds are protected and revenue bonds are vulnerable is upside-down from a bankruptcy perspective: ***in bankruptcy, revenue bonds are protected and GO bonds aren't***. With revenue bonds, the bankruptcy laws treat the specified revenue source as truly belonging to the bondholders, and as securing their repayment. Unlike most other creditors, revenue bondholders are explicitly permitted to continue collecting the payments even during the bankruptcy case, thanks to a 1988 reform that sought to make sure that bankruptcy does not interfere with the payment of revenue bonds. GO bonds are not entitled to any such protection. The "full faith and credit" protection is not treated as giving GO bondholders a right to any particular source of revenue. They are simply general creditors, and [a debtor's] obligations to them can be restructured just as its obligations to other creditors can be.

57

*See* David A. Skeel, *The Education of Detroit's Pension and Bond Creditors*, 24 U. PA. PUB. POL'Y INITIATIVE 3 (2014) (emphasis added).[49]  The Oversight Board's claim that granting revenue bonds their due protections in bankruptcy would violate equality among creditors is false, but the converse is true:  Proper classification among creditors is preserved only by respecting the protections unique to revenue bonds.

112.    Moreover, the notion that respecting property rights undermines the goals of a restructuring regime is nonsensical in light of the decades of precedent in which the current U.S. bankruptcy regime has operated.  The Bankruptcy Code strikes a balance between respect for the rights of secured creditors in their collateral and affording the debtor the opportunity to restructure its affairs and reduce its debt load to a sustainable level—these "twin goals" are of equal importance. *See Hoseman v. Weinschneider*, 322 F.3d 468, 475 (7th Cir. 2003) ("The administration of bankruptcy estates has twin goals of maximization of realization on creditors' claims and of prompt and efficient administration of the estate") (internal quotation marks omitted); *see also Kokoszka v. Belford*, 417 U.S. 642, 645–46 (1974) ("It is the twofold purpose of the bankruptcy act to convert the estate of the bankrupt into cash and distribute it among creditors and then to give the bankrupt a fresh start with such exemptions and rights as the statute left untouched."), *reh'g denied*, 419 U.S. 886 (1974)  (internal quotation marks omitted).

---

[49] Notwithstanding the fact that GO bonds are unsecured obligations in many jurisdictions, Assured takes the position that the Commonwealth's GO bonds are secured by a special property tax under Act 83 of 1991. (*See Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corp. to Dismiss Adversary Complaint*, Adv. Proc. No. 19-291-LTS, ECF No. 53 ¶¶ 27-30.) In addition, Assured takes the view that the Commonwealth's GO bonds enjoy a first-priority status under Article VI, Section 8 of the Puerto Rico Constitution, which first-priority status is incorporated into PROMESA, among other things, through PROMESA § 201(b)(1)(N) and Section 1129(b)(2)(B) of the Bankruptcy Code (as incorporated by PROMESA § 301(a)).

113.    And these twin aims inherent in our bankruptcy regime have far-reaching effects. In today's global economy, where capital can move freely around the world in search of the greatest risk-adjusted returns, U.S. municipalities historically have enjoyed some of the lowest borrowing costs in the world—precisely because the U.S. has strong respect for the rule of law and property rights. The special protections for revenue bond creditors built into the Bankruptcy Code (§ 928) are a classic example of this respect for property rights, ensuring that even in a restructuring, the rights of revenue bond creditors in their collateral will be respected. *See* 6 Collier on Bankruptcy ¶ 928.02 (16th ed. 2020) (observing that, in general, § 928(a) prevents special revenues that secure revenue bonds from being made available for the municipality's general expenses or obligations); *Altair Global Credit Opportunities Fund (A), LLC v. U.S.*, 138 Fed. Cl. 742, 779 (Fed. Cl. 2018) (noting that § 928 requires that "postpetition special revenues remain subject to any lien created before the commencement of the municipal bankruptcy proceeding"); *In re Las Vegas Monorail Co.*, 429 B.R. 770, 782 (Bankr. D. Nev. 2010) (holding that § 928 was enacted to prevent special revenues from being diverted for the municipality's general expenses or obligations).

114.    But in this case, the biggest municipal restructuring in U.S. history, the Oversight Board asks the Court to abandon the federal courts' traditional respect for property rights and the rule of law, resorting to tortured readings of the bond documents in an effort to argue that revenue bond creditors in fact have no legal rights. It is impossible to overstate the consequences of this Court adopting such an approach. Such a decision would meaningfully impair investor confidence in the enforceability of municipal debt in the United States and increase borrowing costs for financially troubled municipalities across the country. Investors require legal predictability and

the ability to enforce their rights; without these, municipalities will be unable to raise funds at anything but astronomical rates.

115. While this Court has been confronted with certain novel municipal financing structures in these Title III cases that investors understood would carry some risk, like ERS, revenue bonds like those at issue here have always been understood to enjoy increased protections, even—and especially—in bankruptcy. A decision eviscerating this principle, in contravention of congressional intent, would increase borrowing costs for struggling municipalities. And some of these struggling municipalities, at the margin, that otherwise might have avoided a bankruptcy filing will find it all the more difficult to do so—ultimately forcing untold numbers of additional citizens to endure the hardships that the citizens of Puerto Rico have unfortunately already had to face.[50]

116. Thus, any consideration of "policy" rationales leads inexorably to one conclusion: This Court must uphold property rights and the rule of law.

**C.     The Oversight Board's Interpretation Must Be Rejected Because It Would Be Unconstitutional.**

117. Construing PROMESA to allow the Oversight Board to rescind and repudiate contract or property rights, at its whim, would violate the U.S. Constitution.

**1.      The Oversight Board's Claimed Preemption Power Would Violate the Due Process Clause.**

118. The Oversight Board's reading of PROMESA § 202 would violate the Due Process Clause. In the Oversight Board's view, if it decides not to appropriate funds in a budget, that

---

[50] *See, e.g.*, Richard Porter, *Commentary: Bankruptcy Looms for Chicago If There's No Pension Fix*, CHI. TRIB. (Sept. 26, 2019), https://www.chicagotribune.com/opinion/commentary/ct-opinion-bankruptcy-chicago-pensions-crisis-20190926-4iwzdnfcjzh2tac7pw6i5fbgea-story.html (discussing how Chicago is teetering on the brink of bankruptcy); Elizabeth Bauer, *Is Chicago the Next Detroit?*, FORBES (Jan. 16, 2019), https://www.forbes.com/sites/ebauer/2019/01/16/is-chicago-the-next-detroit/#1bc755ee6894 (noting that, without reform, Chicago could be headed for bankruptcy)).

decision deprives any individuals whose debts were not funded of any property or contract rights they previously had. *See generally Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). Due process requires that a deprivation of a protected property interest "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (citation and internal quotation marks omitted). As contract rights are "property" under the Due Process Clause, *Semaphore Entm't Grp. Sports Corp. v. Gonzalez*, 919 F. Supp. 543, 549 (D.P.R. 1996), any Oversight Board rescission of property rights *or* contractual rights would constitute a deprivation, which requires pre-deprivation notice and an opportunity to be heard.[51]

> ## 2.   Any Repeal or Preemption of the Enabling Act Under PROMESA Would Effect a Fifth Amendment Taking Without Just Compensation.
>
> ### a.   Preempting Property Rights Under a Lien or Trust Violates the Fifth Amendment.

119.   The Oversight Board's seizure of Pledged Rum Taxes on which Movants have a lien is a direct appropriation of Movants' property and constitutes a "paradigmatic" taking requiring just compensation. *See Armstrong v. United States*, 364 U.S. 40, 48 (1960) ("We hold that there was a taking of these liens for which just compensation is due under the Fifth Amendment."); *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) (holding that a "paradigmatic taking . . . is a direct government appropriation or physical invasion of private property.").

---

[51] An after-the-fact judicial proceeding does not cure a Due Process Clause violation caused by a governmental agency decision that deprived someone of their property or contract rights without due process. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982) (noting that a post-deprivation hearing is "constitutionally inadequate" "absent necessity of quick action . . . or impracticality of providing any pre-deprivation process") (internal quotation marks omitted).

> **b.      Preempting a Statutory Covenant Pledging Specific Special
> Revenues to Bondholders Violates the Fifth Amendment.**

120.    Even if Movants did not have a security interest in the Pledged Rum Taxes (which

they plainly do, *see supra* Argument § II.A.), any preemption of the Enabling Act and the Trust

Agreement would constitute a Fifth Amendment violation.   A statutory covenant that makes a

pledge of specific special revenues to bondholders creates a protected property interest under the

Fifth Amendment, whether or not the covenant is properly characterized as a "security interest" or

a "contract" under the Bankruptcy Code.

121.    The statutory covenant at issue here is plainly not merely legislative, but is at least

a binding contractual commitment of the Commonwealth, pledging to make available to

bondholders a specific set of revenues.   "[A] statute is itself treated as a contract when the ***language***

and ***circumstances*** evince a legislative intent to create private rights of a contractual nature

enforceable against the State."   *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 17 n.14 (1977)

(emphasis added).   In the Enabling Act, "[t]he Commonwealth ***pledges*** and ***agrees*** with the holders

of any bonds issued under this chapter . . . that it ***shall not*** limit or alter the rights hereby conferred

to [PRIFA]" (3 L.P.R.A. § 1913)—a "clear indication" that the Commonwealth legislature

"intend[ed] to bind itself contractually" to bondholders.   *See Parella v. Ret. Bd. of R.I. Emps' Ret.

Sys.*, 173 F.3d 46, 60 (1st Cir. 1999).   This court has found similar statutory language evidenced

an unmistakable intent to form a contract.   *See Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 85 F.

Supp. 3d 577, 604 (D.P.R. 2015), *judgment entered*, 2015 WL 574008 (D.P.R. Feb. 10, 2015),

*aff'd*, 805 F.3d 322 (1st Cir. 2015), *aff'd*, 136 S. Ct. 1938 (2016) (P.R. Laws Ann. tit. 22 § 215

evidenced a "clear intent" to form a contract where it provided, "The Commonwealth Government

does hereby pledge to, and agree with, any person, firm or corporation . . . subscribing to or

acquiring bonds of [PREPA] . . . ."); *see also U.S. Trust*, 431 U.S. at 18 (holding that the "intent

62

to make a contract is clear from the statutory language," where two states had "covenant[ed] and agree[d] with each other and with the holders of any affected bonds.") (internal quotation marks omitted). That the Commonwealth committed not to alter PRIFA's rights until the bonds are repaid "also evince[s] an unmistakable intent to contract." *Parella*, 173 F.3d at 60. The surrounding "circumstances"—that the Commonwealth's instrumentalities were offering bonds, a quintessential contractual instrument—further confirms "a clear and unequivocal intent to contract." *Id.* at 61.

122.   This statutory contract, pledging specific revenues to bondholders, gives rise to a constitutionally protected property interest—whether or not it also creates a "security interest" within the meaning of the Bankruptcy Code. The statutory covenant creates a legitimate claim of entitlement to specifically identifiable property (the Pledged Rum Taxes)—which is the touchstone of a protected property interest. *Vázquez-Velázquez v. Puerto Rico Highway & Transp. Auth.*, 2016 WL 183653, at *3 (D.P.R. Jan. 14, 2016) ("plaintiffs [must] have a '***legitimate claim of entitlement***.'") (emphasis added) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)); *see also Louisiana ex rel. Hubert v. City of New Orleans*, 215 U.S. 170, 177-78 (1909); *Murray v. City of Charleston*, 96 U.S. 432, 445 (1877); *Von Hoffman v. City of Quincy*, 71 U.S. 535, 554-55 (1866) ("[W]here a State has authorized a municipal corporation to contract and to exercise the power of local taxation to the extent necessary to meet its engagements, the power thus given cannot be withdrawn until the contract is satisfied.").

123.   Moreover, revenue bonds that, like PRIFA's bonds, are backed by *specific* pledged revenues create property rights. *See Dimino v. Sec'y of Commonwealth*, 695 N.E.2d 659, 705 (Mass. 1998) (proposed elimination of toll revenues "constitutes an appropriation of the bondholders' private property"); *First National Bank of Boston v. Maine Turnpike Authority*, 136

A.2d 699, 722 (Me. 1957) (impairing a rate covenant would unconstitutionally "transfer a vested property right from one person to another by the pure fiat of the Legislature").

### c.       Just Compensation Requires that Bondholders Be Made Whole.

124.     The Oversight Board does not contest that any taking of private property, including contractual property rights, requires just compensation. *See* U.S. CONST. amend. V. Nor does it dispute that a requirement to provide "just compensation" cannot be impaired by the operation of the Bankruptcy Code but instead requires payment for the full value of the property taken. *See United States v. Sec. Indus. Bank*, 459 U.S. 70, 75 (1982) ("The bankruptcy power is **subject to** the Fifth Amendment's prohibition against taking private property without compensation.") (emphasis added). Absent the payment of just compensation, Movants' property rights cannot be impaired in this proceeding.

## IV.     MOVANTS HAVE STANDING TO BRING THIS MOTION.

125.     As the Court is aware, Movants have, by joinder of the Trustee, mooted the heart of the Oversight Board's arguments against their standing to bring this Motion. (Opp. ¶¶ 126-9.) Recognizing the weakness of its last-remaining argument—that Movants are "creditors of a creditor"—the Oversight Board relegates it to a few thinly supported paragraphs that attempt to rehash their merits arguments. (Opp. ¶¶ 126-9.)

126.     Contrary to the Oversight Board's half-hearted argument, Movants are not seeking to bring PRIFA's claims. They are requesting stay relief to safeguard their own constitutionally-protected interest in the Pledged Rum Taxes. Movants have shown a colorable claim to the Pledged Rum Taxes in the hands of the Commonwealth. (*Supra* Argument § II.) In any event, Movants have direct standing under Section 407 of PROMESA, which grants creditors standing to sue over transfers "which deprive[] any . . . territorial instrumentality [of Puerto Rico] of property in violation of applicable law assuring the transfer of such property to such territorial

64

instrumentality for the benefit of its creditors[.]" PROMESA § 407(A); 48 U.S.C. § 2195(a). And, contrary to the Oversight Board's argument that Movants lack contractual privity with the Commonwealth (Opp. ¶ 126), Movants seek to enforce the non-impairment covenant between the Commonwealth and PRIFA's bondholders—which the Oversight Board simply ignores.

127.    These are, each and together, more than sufficient to establish Movants' "party in interest" standing to move to lift the stay.  Section 362(d) of the Bankruptcy Code grants standing to a "party in interest" to "request . . . relief from the stay."  11 U.S.C. § 362(d).  "Party in interest" is a broad concept that encompasses *all* parties affected by the automatic stay, including but not limited to "a creditor."[52]  "Creditor" in turn is broadly defined as *any* "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor[.]" *Id.* § 101(10)(A).  And "claim" is similarly expansive:  "a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]"  *Id.* § 101(5)(A).  Movants each qualify as a "creditor" of the Commonwealth in their own right, since they hold claims to enforce

---

[52] *See, e.g.*, *In re Weisband*, 427 B.R. 13, 17 (Bankr. D. Az. 2010) ("Any party affected by the stay should be entitled to seek relief"); *In re Jones*, No. 02-17125-SR, 2002 WL 34560880, at *2 (Bankr. E.D. Pa. Sept. 27, 2002) ("the better approach is to recognize that any party affected by the stay should be entitled to relief. This avoids the anomalous situation in which a party is subject to the automatic stay but is unable to seek relief even if damage may result from its continuance" (citation omitted)); *In re Vieland*, 41 B.R. 134, 138 (Bankr. N.D. Oh. 1984) (holding that a party in interest under Section 362(d) is determined on a case-by-case basis "with reference to the interest asserted and how said interest is affected by the automatic stay"); *see also*, *e.g.*, *In re Kang Jin Hwang*, 396 B.R. 757, 768 (Bankr. C.D. Cal. 2008), *rev'd and remanded on other grounds*, 438 B.R. 661 (C.D. Cal. 2010) ("In general, a party in interest, in the bankruptcy context, is anyone who is entitled to express a view with respect to a matter before the court"); *In re El Comandante Management Co., LLC*, 359 B.R. 410, 416-18 (Bankr. D.P.R. 2006) ("party in interest" generally refers to any person or entity that "holds a financial stake in the outcome of the debtor's estate . . ."); *In re Overview Equities*, 240 B.R. 683, 686-87 (Bankr. E.D.N.Y. 1999) (holding that a party with a legal interest in property, rather than a claim, was a party in interest).

their constitutional, statutory, and contractual rights against the Commonwealth; even their "disputed" claims suffice.[53]

128.   The Oversight Board nevertheless relies on the out-of-circuit, widely criticized decision, *Roslyn Savings Bank v. Comcoach Corp. (In re Comcoach Corp.)*, 19 B.R. 231 (Bankr. S.D.N.Y. 1982), for the proposition that "[a] noncreditor of a debtor, even though owed a debt by a creditor of the debtor, does not have standing to seek relief from the automatic stay for the purpose of recovering on its claim." (Opp. ¶ 129 n.77 (quoting *Comcoach*, 19 B.R. at 234).) There, the Second Circuit held that the mortgagee bank was not a party-in-interest for purposes of seeking stay relief, because the debtor was just a tenant of the mortgagor landlord, and had no obligation to the mortgagee. *In re Comcoach Corp.*, 698 F.2d 571, 573 (2d Cir. 1983).

129.   *Comcoach* has been widely criticized as being (i) too restrictive and (ii) incompatible with Section 362(d)'s use of the term "party in interest" rather than "creditor."[54] And

---

[53] Movants need not even qualify as "creditors," though they do, since courts consistently construe "party-in-interest" to include not only those parties listed within Section 1109(b), but also, more generally, "*any* person or entity[] who *holds a financial stake* in the outcome of the debtor's estate . . . ." *In re El Comandante Mgmt. Co.*, 359 B.R. 410, 416-17 (citations omitted) (emphasis added); *see also W. Auto Supply Co. v. Savage Arms (In re Savage Indus., Inc.)*, 43 F.3d 714, 720-21 (1st Cir. 1994) ("The term 'parties in interest' encompasses not only entities holding 'claims' against the debtor, but *any* entity *whose pecuniary interests might be directly and adversely affected* by the proposed action." (emphasis added) (citations omitted)). Movants obviously have a direct financial stake in the resolution of issues related to the Commonwealth's bankruptcy, which is enough for Section 1109(b). *See In re El Comandante Mgmt. Co.*, 359 B.R. at 416-17. They insure (or, in the case of the Trustee, represent the interests of) holders of hundreds of millions of dollars in PRIFA bonds secured by collateral sitting in Treasury accounts or wrongfully diverted to Rum Companies.

[54] *See, e.g.*, *In re Horton*, 595 B.R. 1, 4 (Bankr. D.D.C. 2019) (referring to *Comcoach*'s "misguided discussion"); *In re Sweports, Ltd.*, 476 B.R. 540, 543 (Bankr. N.D. Ill. 2012) (stating that "[a]s an exercise in statutory interpretation, *Comcoach* leaves something to be desired" and noting "[h]ad Congress wanted to limit standing under section 362(d) to creditors, it could have used the term 'creditor'"); *Brown Transp. Truckload v. Humbolt Express (In re Brown Transp. Truckload, Inc.)*, 118 B.R. 889, 893 (Bankr. N.D. Ga. 1990) ("In many instances the mechanical application of the *Comcoach* rule would leave a party without . . . recourse, creating 'an anomalous situation where a party is subject to the automatic stay but is unable to seek relief even if damage may result from its continuance[.]'"); *see also* Collier on Bankruptcy ¶ 362.07[2] (noting that "the better approach is to recognize that any party affected by the stay should be entitled to move for relief").

were this Court to follow its logic, it would create "an anomalous situation in which a party is subject to the automatic stay but is unable to seek relief even when damage may result from its continuance." 2 Collier on Bankruptcy (16th ed.) ¶ 362.07. That is why courts have declined to follow *Comcoach* where doing so would, as here, leave the lift-stay movant without a remedy. *See In re Zhejiang Topoint Photovoltaic Co.*, 2015 WL 2260647, at *4 (Bankr. D.N.J. May 12, 2015) (noting that "[t]here are distinguishing characteristics between ['creditor of a creditor' cases] and the instant case," because "in *Comcoach* . . . the non-party mortgagee . . . was *not left without a remedy* because it could appoint a receiver in its *state court action*, and the receiver would subsequently have rights as a party in interest" (emphasis added)). Hence, "the better approach," reflected in 362(d), "is to recognize that any party affected by the stay should be entitled to move for relief." *Id.* Movants easily meet the test.

## CONCLUSION

130.   For the foregoing reasons, the Court should (i) overrule the Oversight Board's standing challenge, (ii) find that Movants have stated "colorable claims," and (iii) grant the Motion.

**CERTIFICATION**

In accordance with paragraph 9 of the *Final Case Management Order for Revenue Bonds* (ECF No. 12186), Movants certify that (i) they have taken reasonable efforts to avoid duplication and submit a brief that is no longer than necessary, and (ii) they have used reasonable efforts to draft a single brief and coordinate to minimize duplicative briefs.

Dated: April 30, 2020
San Juan, Puerto Rico

**FERRAIUOLI LLC**

By:     */s/ Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
Sonia Colón (USDC-PR No. 213809)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001
Email: rcamara@ferraiuoli.com
        scolon@ferraiuoli.com

**MILBANK LLP**

By:     */s/ Atara Miller*
Dennis F. Dunne (admitted *pro hac vice*)
Atara Miller (admitted *pro hac vice*)
Grant R. Mainland (admitted *pro hac vice*)
John J. Hughes, III (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219
Email: ddunne@milbank.com
        amiller@milbank.com
        gmainland@milbank.com
        jhughes2@milbank.com

**ARENT FOX LLP**

By:     */s/ David L. Dubrow*
David L. Dubrow (admitted *pro hac vice*)
Mark A. Angelov (admitted *pro hac vice*)
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 484-3900
Facsimile:  (212) 484-3990
Email: david.dubrow@arentfox.com
        mark.angelov@arentfox.com
Randall A. Brater (admitted *pro hac vice*)
1717 K Street, NW
Washington, DC  20006
Telephone: (202) 857-6000
Facsimile: (202) 857-6395
Email: randall.brater@arentfox.com

***Attorneys for Ambac Assurance Corporation***

**REXACH & PICÓ, CSP**

By: */s/ María E. Picó*
   María E. Picó
   (USDC-PR No. 123214)
   802 Ave. Fernández Juncos
   San Juan, PR 00907-4315
   Telephone: (787) 723-8520
   Facsimile: (787) 724-7844
   Email: mpico@rexachpico.com

**CASELLAS ALCOVER & BURGOS P.S.C.**

By: */s/ Heriberto Burgos Pérez*
   Heriberto Burgos Pérez
   (USDC-PR No. 204809)
   Ricardo F. Casellas-Sánchez
   (USDC-PR No. 203114)
   Diana Pérez-Seda
   (USDC-PR No. 232014)
   P.O. Box 364924
   San Juan, PR 00936-4924
   Telephone: (787) 756-1400
   Facsimile: (787) 756-1401
   Email: hburgos@cabprlaw.com
      rcasellas@cabprlaw.com
      dperez@cabprlaw.com

**BUTLER SNOW LLP**

By: */s/ Martin A. Sosland*
   Martin A. Sosland (admitted *pro hac vice*)
   5430 LBJ Freeway, Suite 1200
   Dallas, TX 75240
   Telephone: (469) 680-5502
   Facsimile: (469) 680-5501
   Email: martin.sosland@butlersnow.com
   Jason W. Callen (admitted *pro hac vice*)
   150 3rd Ave., S., Suite 1600
   Nashville, TN 37201
   Telephone: (615) 651-6774
   Facsimile: (615) 651-6701
   Email: jason.callen@butlersnow.com

***Attorneys for Financial Guaranty
Insurance Company***

**CADWALADER, WICKERSHAM & TAFT LLP**

By: */s/ Mark C. Ellenberg*
   Howard R. Hawkins, Jr. (admitted *pro hac vice*)
   Mark C. Ellenberg (admitted *pro hac vice*)
   William J. Natbony (admitted *pro hac vice*)
   Ellen M. Halstead (admitted *pro hac vice*)
   Thomas J. Curtin (admitted *pro hac vice*)
   Casey J. Servais (admitted *pro hac vice*)
   200 Liberty Street
   New York, NY 10281
   Telephone: (212) 504-6000
   Facsimile: (212) 504-6666
   Email: howard.hawkins@cwt.com
      mark.ellenberg@cwt.com
      bill.natbony@cwt.com
      ellen.halstead@cwt.com
      thomas.curtin@cwt.com
      casey.servais@cwt.com

***Attorneys for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.***

COR                                      **RIVERA, TULLA AND FERRER, LLC**

By: */s/ Eric A. Tulla*
Eric A. Tulla
(USDC-DPR No. 118313)
Email: etulla@ riveratulla.com
Iris J. Cabrera-Gómez
(USDC-DPR No. 221101)
Email: icabrera@ riveratulla.com
Rivera Tulla & Ferrer Building
50 Quisqueya Street
San Juan, PR 00917-1212
Telephone: (787) 753-0438
Facsimile: (787) 767-5784

**HOGAN LOVELLS US LLP**

By: */s/ Robin E. Keller*
Robin E. Keller, Esq.
Ronald Silverman, Esq.
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
robin.keller@hoganlovells.com
ronald.silverman@hoganlovells.com

***Attorneys for U.S. Bank National Association, in its Capacity as Trustee***

[*Remainder of Page Intentionally Omitted*]

## CERTIFICATE OF SERVICE

I hereby certify that on this same date a true and exact copy of this notice was filed with the Clerk of Court using the CM/ECF system, which will notify a copy to counsel of record.

/s/ *Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001
Email: rcamara@ferraiuoli.com