**Hearing Date: June 4, 2020 9:30 AM AST**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>Debtor.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY ("HTA"),<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3567-LTS |

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**RESPONSE OF ASSURED GUARANTY CORP., ASSURED
GUARANTY MUNICIPAL CORP., AMBAC ASSURANCE CORPORATION,
NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, AND FINANCIAL
GUARANTY INSURANCE COMPANY TO SUR-REPLY OF FINANCIAL
OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO IN
OPPOSITION TO MOTION OF ASSURED GUARANTY CORP., ASSURED
GUARANTY MUNICIPAL CORP., AMBAC ASSURANCE CORPORATION,
NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, AND FINANCIAL
GUARANTY INSURANCE COMPANY FOR RELIEF FROM THE AUTOMATIC
<u>STAY, OR, IN THE ALTERNATIVE, ADEQUATE PROTECTION [ECF NO. 13157]</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ........................................................................................................................5

    I.    Movants Have Established That The Excise Tax Statutes Make
The Excise Taxes Property Of HTA And Its Bondholders, And
The Factual Record Corroborates Movants' Position...............................................5

    II.    FOMB's Appropriation Argument Is Without Merit...........................................12

    III.    A Future Legislature Cannot Simply Repeal The Excise Tax
Statutes....................................................................................................................14

    IV.    FOMB's Preemption Arguments Are Irrelevant To The
Preliminary Hearing...............................................................................................15

CERTIFICATION .................................................................................................................16

CERTIFICATE OF SERVICE ................................................................................................22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

Armstrong v. U.S.,
  364 U.S. 40 (1960) ................................................................................15

Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores
Galarza,
  484 F.3d 1 (1st Cir. 2007) ......................................................................4

Assured Guaranty Corp. v. García-Padilla, 214 F.Supp.3d 117 (D.P.R. Oct. 14, 2016)
Commonwealth Ins. Co. v. Casellas,
  3 P.R. Offic. Trans. 750 (1975) ..............................................................8

Cruz-Vargas v. R.J. Reynolds Tobacco Co.,
  348 F.3d 271 (1st Cir. 2003) ..................................................................8

Darr v. Muratore,
  8 F.3d 854 (1st Cir. 1993) ......................................................................2

Dimino v. Sec'y of Commw,
  695 N.E.2d 659 (Mass. 1998) ...............................................................15

Ecker v. Sw. Tampa Storm Sewer Drainage Dist.,
  75 F.2d 870 (5th Cir. 1935) ...................................................................9

Fin. Oversight & Mgmt. Bd. v. Andalusian Global Designated Activity Co.,
  948 F.3d 457 (1st Cir. 2020) ..........................................................13, 14

First Nat'l Bank of Boston v. Maine Turnpike Auth.,
  136 A.2d 699 (Me. 1957) ......................................................................15

Fletcher v. Peck,
  10 U.S. 87 (1810) ..................................................................................14

Gracia-Gracia v. Fin. Oversight & Mgmt. Bd.,
  939 F.3d 340 (1st Cir. 2019) ................................................................12

In re Dole Food Co.,
  No. CV 8703-VCL, 2017 WL 624853 (Del. Ch. Feb. 15, 2017) .............10

In re Fonseca,
  542 B.R. 628 (B.A.P. 1st Cir. 2015) .......................................................2

In re Howard's Appliance Corp.,
  874 F.2d 88 (2d Cir. 1989) ...................................................................12

## TABLE OF AUTHORITIES, cont'd

**Page(s)**

Liter v. City of Baton Rouge,
    258 La. 175 (1971) ...........................................................................................4

Maine Cmty. Health Options v. United States,
    140 S. Ct. 1308 (2020) .................................................................................15

Matter of Dairy Stores, Inc.,
    148 B.R. 6 (Bankr. D.N.J. 1992) ................................................................10

Mendez-Nunez v. Fin. Oversight & Mgmt. Bd. for P.R (In re Fin. Oversight & Mgmt. Bd. for
P.R.),
    916 F.3d 98 (1st Cir. 2019) ........................................................................15

Missouri v. Jenkins,
    495 U.S. 33 (1990) .......................................................................................14

Puget Sound Power & Light Co. v. City of Seattle,
    271 F. 958 (W.D. Wash. 1921) .....................................................................9

Quintana-Ruiz v. Hyundai Motor Corp.,
    303 F.3d 62 (1st Cir. 2002) ...........................................................................9

R.C.A. v. Gobierno de la Capital,
    91 D.P.R. 416 (1964) ....................................................................................4

Roig Commercial Bank v. Buscaglia Tes.,
    74 P.R. 986 (1953) ........................................................................................8

Smith v. Boise City,
    18 F. Supp. 385 (D. Idaho 1937) ................................................................10

State of Louisiana ex rel. Hubert v. City of New Orleans,
    215 U.S. 170 (1909) .....................................................................................14

State v. City of Coral Gables,
    248 So.2d 641 (Fla. 1971) ...........................................................................15

Switzer v. City of Phoenix,
    86 Ariz. 121 (1959) .......................................................................................4

The Idaho,
    93 U.S. 575 (1876) .......................................................................................12

## TABLE OF AUTHORITIES, cont'd

Page(s)

Thompson v. Emmett Irr. Dist.,
    227 F. 560 (9th Cir. 1915) ......................................................................9

U.S. Tr. Co. of N.Y. v. N.J.,
    431 U.S. 1 (1977) ......................................................................2

United Shoe Workers of Am., AFL-CIO v. Bedell,
    506 F.2d 174 (D.C. Cir. 1974) ......................................................................8

Von Hoffman v. City of Quincy,
    71 U.S. 535 (1867) ......................................................................2

Wolff v. New Orleans,
    103 U.S. 358 (1881) ......................................................................15

Ziegler v. Witherspoon,
    331 Mich. 337 (1951) ......................................................................4

**Statues  & Other Authorities:**

UCC § 9-109(a)(1) ......................................................................2

9 L.P.R.A.

    § 2013(a) ......................................................................15
    § 2021 ......................................................................6, 14
    § 5681 ......................................................................6, 14

13 L.P.R.A.

    § 31751(a) ......................................................................6, 13
    § 31751(a)(1)(D) ......................................................................14

19 L.P.R.A. § 2219(a)(1) ......................................................................2

Movants respectfully submit this response (the "<u>Response</u>") to FOMB's sur-reply (ECF No. 13157, the <u>Sur-Reply</u>" or "<u>SR</u>").[2]

## **PRELIMINARY STATEMENT**

1.      FOMB's own Sur-Reply roadmap demonstrates that Movants have (i) a clear property interest in pledged tolls and excise taxes and (ii) standing. <u>See</u> SR ¶ 1.  FOMB's first assertion—that Movants are seeking to "seize" revenues collected by the Commonwealth that were merely appropriated to HTA—crystallizes the problem underlying FOMB's entire opposition.  Quite simply, Movants cannot "seize" property that was theirs to begin with.  The bond issues before the Court are standard municipal revenue bond financings.  Bondholders gave up recourse to the general credit of the Commonwealth in exchange for irrevocable recourse to two streams of revenues—tolls and excise taxes.  The irrevocable pledge of these revenues to Bondholders was the essence of the bond issues.  Movants merely seek to enforce their rights to have the pledged revenues applied in accordance with the priorities of payment, or waterfall, prescribed by the bond documents.  The party seeking to "seize" revenues is the Commonwealth, which collected those tax revenues as an agent, but now effectively seeks court approval to keep them as if it were the principal.  FOMB and the Commonwealth want to have their cake and eat it too—asserting the Commonwealth's immunity from general liability for repayment of the Bonds, while simultaneously denying Bondholders recourse to the pledged collateral that enabled the Commonwealth to be free of such general liability.

---

[2] Capitalized terms used in this Response but not defined herein shall have the meanings ascribed to them in Movants' motion (ECF No. 10102, the "<u>Motion</u>" or "<u>Mot.</u>"), FOMB's opposition (ECF Nos. 10613 and 10618, "<u>Opposition</u>" or "<u>Opp.</u>"), Movants' Reply (ECF Nos. 12994 and 12996, the "<u>Reply</u>"), and/or the Sur-Reply, as applicable.  Unless otherwise indicated, all ECF numbers referenced in this Response refer to the docket in Case No. 17-3283-LTS.  All references to Exhibits, other than Exhibit A attached to the Motion, refer to the Exhibits attached to the *Declaration of William J. Natbony* (ECF No. 10107, the "<u>Natbony Decl.</u>"), the *Reply Declaration of William J. Natbony* (ECF No. 13004, the "<u>Natbony Reply Decl.</u>"), the *Sur-Reply Declaration of William J. Natbony* ("<u>Natbony SR Decl.</u>"), or the *Declaration of William W. Holder* (ECF No. 13005, the "<u>Holder Decl.</u>").

2.      The Sur-Reply continues with eight additional assertions, each erroneous. See id. FOMB first says that the Commonwealth "never entered into a security agreement granting security interests in its property (or any property) collateralizing the HTA Bonds." Id. But Movants rely on the existence of a *statutory* lien enforceable against Excise Taxes held by the Commonwealth as custodian.[3] Statutory liens are based on the statute, not an agreement. Movants do claim, in addition, that a consensual lien was granted by HTA.[4] Based on that security agreement, which FOMB does not deny, an enforceable security interest exists with respect to all Pledged Revenues that constitute HTA property, wherever held. FOMB next asserts that "no financing statement was ever filed to seek to perfect any security interest in Commonwealth assets securing the HTA Bonds." SR ¶ 1. But again, the Pledged Revenues are not "Commonwealth assets," and, even if they were, there are no perfection requirements with respect to statutory liens.[5] FOMB next asserts that "none of the official statements disclosed Commonwealth property was pledged or held in trust for HTA Bondholders." SR ¶ 1. The Official Statements, however, state with great clarity that the Excise Tax revenue stream secures the HTA Bonds.[6] As noted, the

---

[3] Movants have established that the Excise Tax Statutes create a statutory lien under the standard this Court previously adopted from In re Fonseca, 542 B.R. 628 (B.A.P. 1st Cir. 2015), which the Sur-Reply once again fails to distinguish. FOMB repeats its old canard that Fonseca "involved set-off" (SR ¶ 40 n. 57), but the Fonseca court expressly stated that set-off was "not at issue" in its opinion. See Reply ¶ 51 n.60 (quoting Fonseca, 542 B.R. at 636). Instead, Fonseca involved a statutory lien that allowed (i) the Savings and Loan to recover assets held by (ii) "the government" to pay off the debt of (iii) Fonseca (see Reply ¶ 50 (quoting Fonseca, 542 B.R. at 636)); there can be no "set-off" between three parties, because set-off requires a "mutuality" of debts owed reciprocally between the same *two* parties. See e.g., Darr v. Muratore, 8 F.3d 854, 860 (1st Cir. 1993). FOMB also suddenly denies "that the word 'shall' somehow creates a lien" (SR ¶ 40 n.57), but FOMB reiterated in its summary judgment motion filed just last month that "**[a] hallmark of a statutory lien is the use of mandatory 'shall' language creating property rights in favor of a specified entity or class of entities.**" Plaintiff's Memo. of Law ISO Mot. for Partial Summary Judgment ¶ 103, Fin. Oversight & Mgmt. Bd. v. Ambac Assurance Corp., Adv. Proc. No. 20-00005-LTS (D.P.R. Apr. 28, 2020) (ECF No. 56) (emphasis added); see also Reply ¶ 53 n.64. FOMB also makes a bizarre argument that the Commonwealth in 9 L.P.R.A. § 2015 "expressly refused to guarantee the HTA Bonds" (SR ¶ 40), but in reality the first clause of 9 L.P.R.A. § 2015 expressly contemplates that HTA Bonds can be "guaranteed by the Commonwealth," in which case 9 L.P.R.A. § 2015 does not apply.

[4] It is fundamental that state statutes, which here establish a special revenue stream assigned to HTA to secure a bond issue, are incorporated into the consensual lien imposed by the bond contract. See Von Hoffman v. City of Quincy, 71 U.S. 535, 550, 555 (1866); see also U.S. Tr. Co. of N.Y. v. New Jersey, 431 U.S. 1, 19-21 (1977).

[5] The UCC's perfection requirements do not apply to statutory liens, because the UCC applies only to "security interest[s]" that arise "by contract." 19 L.P.R.A. § 2219(a)(1) (UCC § 9-109(a)(1)).

[6] See, e.g., Natbony Decl. Ex. EE at 16, 29; Natbony Reply Decl. Ex. 18 at HTA_STAY0008159.

pledge of this revenue stream was the essence of the transaction, and the Official Statements unequivocally so confirm.[7]   FOMB also asserts that "Movants have no agreement granting them control over the Commonwealth's deposit accounts (which control is necessary to perfect a security interest)." SR ¶ 1.  But Movants' security interests under the Resolutions are not in deposit accounts, they are in pledged revenue streams, which are general intangibles and money (see Reply ¶ 67 & n.81).[8]   FOMB similarly fails to refute Movants' showing that the UCC's perfection requirements do not apply to liens established by or pursuant to special statutes or to security interests in deposit accounts created prior to 2013, the year of Puerto Rico's enactment of the revised UCC.  See Reply ¶ 66.

3.     The Sur-Reply next asserts that "the [Excise Tax Statutes] do not provide that the [Excise Taxes] are held in trust." SR ¶ 1.  Movants have, however, previously established that the Excise Tax Statutes, which granted beneficial ownership of the tax proceeds to HTA and its Bondholders, do give rise to a trust relationship.  See Mot. § II.A; Reply § I.  FOMB also asserts that the Excise Tax Statutes were enacted by a prior legislature and only provide for transfers of the Excise Taxes to HTA for its "corporate purposes."  SR ¶ 1.  The fact that the Excise Tax Statutes were enacted by a prior legislative session changes nothing.  Such is true of every legislative enactment—if that could defeat the existence of a statutory lien, none could exist. Similarly, the reference to "corporate purposes" in the Excise Tax Statutes reflects only that after Pledged Revenues are applied to the waterfall in the Resolutions, the excess becomes available to

---

[7] See also Von Hoffman, 71 U.S. at 555 ("The [taxing] power given becomes a trust which [the Commonwealth] cannot annul, and which [HTA] is bound to execute[.]").

[8] FOMB cites nothing to support its theory that Movants' security interest is in "deposit accounts."  Under the UCC, a security interest in revenues is a security interest in a general intangible (see Reply ¶ 67), and a security interest in "money" is not converted into a security interest in a deposit account merely because the money is deposited into a deposit account (see Reply ¶ 67 n.81).  Section 601 of the Resolutions creates a security interest in "Revenues and other funds" (see Natbony Decl. Ex. C at 50; Natbony Decl. Ex. D at 58); and Section 401 separately creates a supplemental security interest in "moneys" in the Sinking Fund.  See Natbony Decl. Ex. C at 41; Natbony Decl. Ex. D at 47.  Moreover, the supplemental resolutions unambiguously pledge the full amount of the Excise Taxes and Toll Revenues, not the Sinking Fund.  See Resolution 83-01, Natbony Reply Decl. Ex. 54; Resolution 98-08, Natbony Reply Decl. Ex. 55.

HTA for its general corporate purposes.  See Reply ¶ 15.  Finally, FOMB asserts that the Excise

Taxes are levied "pursuant to the Commonwealth's inalienable taxing power" and "are its available

resources subject to retention."  SR ¶ 1.  But in transferring to HTA and its Bondholders beneficial

ownership of the Excise Taxes, the Commonwealth did not alienate its taxing power—it simply

conveyed a property interest in the proceeds of that taxing power.[9]  Moreover, the Excise Taxes

are not generally "available" to be used by the Commonwealth as it wishes.  They only become

available to pay the public debt under very limited constitutional clawback conditions.  FOMB has

failed to demonstrate or even claim that these conditions have ever been met.[10]

> 4.   FOMB errs most egregiously in its attempt to discount the evidence

regarding the Commonwealth's internal accounting and revenue flow practices.  Movants do not

rely on this evidence to "create retroactive and present property rights," as FOMB incorrectly

---

[9] For the first time in the Sur-Reply, FOMB attempts to base the Commonwealth's otherwise unfounded claim to ownership of the Excise Taxes on its "taxation powers" under Article VI, Section 2 of the Puerto Rico Constitution. SR ¶¶ 1, 14, 16.  But Article VI, Section 2 does not restrict the Legislative Assembly's ability to designate specific revenues for a specific purpose.  See, e.g., Liter v. City of Baton Rouge, 258 La. 175, 186, 194-96 (1971) (municipal bonds backed by sales tax revenues did not violate state constitutional provision stating that "[t]he power of taxation shall be vested in the Legislature [and] shall never be surrendered, suspended or contracted away"); Switzer v. City of Phoenix, 86 Ariz. 121, 127-28 (1959) (earmarking motor vehicle taxes for the life of bonds did not violate state constitutional "prohibition against the surrender or relinquishment of the right to impose a tax" because "the legislature is not contracting away the right to impose a tax," but rather "[t]he legislature has imposed a tax and has simply applied the proceeds of the tax to a particular purpose"); Ziegler v. Witherspoon, 331 Mich. 337, 354-55 (1951) (highway bonds backed by three municipalities' shares of state highway tax did not violate state constitution provision that "[t]he power of taxation shall never be surrendered or suspended").  Rather, it merely prevents other branches of government from interfering with the legislative branch's decision.  See R.C.A. v. Gobierno de la Capital, 91 D.P.R. 416, 440 (1964), Natbony SR Decl. Ex. i.  This Court has already found, in confirming the COFINA plan, that the Legislative Assembly's transfer of ownership of tax proceeds to a public corporation is consistent with Article VI, Section 2.  See ECF No. 5053 ¶ 120.  FOMB attempts to distinguish COFINA based on the different language of the COFINA statutes (see SR ¶ 14), but no specific "magic words" are required for a statute to convey a property interest. Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza, 484 F.3d 1, 29 (1st Cir. 2007), establishes that the language of the Excise Tax Statutes is sufficient for that purpose.

[10] In the Sur-Reply, FOMB suddenly asserts that "[t]he Commonwealth retained the revenues to pay GO debt under the Puerto Rico Constitution.  P.R. Const. Art. VI, § 8."  SR ¶ 33.  But FOMB never alleges, much less establishes, that the conditions to a "clawback" under P.R. Const. Art. VI, § 8 and the Excise Tax Statutes have been satisfied, and Movants established that these conditions were not satisfied.  See Mot. ¶ 15 n.6.  In any event, it is not true, as a factual matter, that the Commonwealth "retained" the Pledged Revenues pursuant to Article VI, Section 8.  The Commonwealth only invoked (albeit invalidly) that provision in the 2015 Clawback Order; the later Moratorium Laws do not invoke that provision.  Compare Natbony Decl. Ex. Y at 6 with Natbony Decl. Ex. BB.  Indeed, in 2016 the Commonwealth admitted the Commonwealth was no longer purporting to claw back revenues under Article VI, Section 8, and instead had implemented "other measures," i.e. the Moratorium Laws.  See Notice of Automatic Stay ¶¶ 6-8, Assured Guaranty Corp. v. García-Padilla, Case No. 3:16-cv-01037-FAB (D.P.R. Oct. 14, 2016) (ECF No. 59).  It is uncontested that PROMESA § 303 preempts the Clawback Order and Moratorium Laws.  See Mot. ¶ 25.

4

suggests.  SR ¶ 2.  Rather, Movants rely on these newly discovered, undisputed facts to corroborate

what the Excise Tax Statutes, Resolutions, and Official Statements already establish—that the

Excise Taxes were pledged to pay the HTA Bonds, and that the Commonwealth and HTA plainly

understood that fact and acted consistently with it.

## ARGUMENT

I.  **Movants Have Established That The Excise Tax Statutes Make The Excise
    Taxes Property Of HTA And Its Bondholders, And The Factual Record
    Corroborates Movants' Position.**

5.      The Motion and Reply established that the Excise Tax Statutes give HTA

and its Bondholders property interests in the Excise Taxes.  These property interests are confirmed

by (i) the text of the statutes, (ii) controlling First Circuit precedent, including Flores Galarza,[11]

(iii) decades of municipal finance case law, and (iv) the factual record.  FOMB's basic—and, in

many respects, only—contention in the face of this mountain of authority and evidence is that the

Excise Taxes belong to the Commonwealth until they are transferred into an HTA bank account.

That is not what the statutes say.  Quite to the contrary, they say that, upon collection, the Excise

Taxes must be deposited into a "special deposit" in favor of HTA, meaning that they are property

---

[11] The Sur-Reply attempts to distinguish Flores Galarza based on various provisions of Law 253 that were not central to, and in many cases not even cited in, the First Circuit's decision.  See SR ¶ 26.  But these additional provisions do not detract from the basic similarity between Law 253 and the Excise Tax Statutes here.  The First Circuit focused on certain core provisions giving rise to a property interest, namely those providing that "the JUA 'shall receive' premiums from the Secretary of Treasury and that the Secretary **'shall transfer'** these premiums to the JUA."  Flores Galarza, 484 F.3d at 29 (emphasis added); see also Reply ¶ 10.  In any event, FOMB's efforts to distinguish Flores Galarza are based on provisions of Law 253 that (i) are irrelevant, (ii) are mischaracterized by FOMB, and/or (iii) have analogues in the Excise Tax Statutes.  For example, FOMB cites a provision of Law 253 providing that Treasury is acting "in its fiduciary capacity" (SR ¶ 26), but (i) the Excise Tax Statutes also indicate that Treasury is acting in a fiduciary capacity by requiring that the Excise Taxes be placed in a "special deposit" in favor of HTA, and (ii) the cited Law 253 provision applies only to "Duplicate Premiums," not to the "Earned Premiums"—a point already made by Movants.  See Reply ¶ 13 n.7.  FOMB also asserts that under Law 253 Treasury acts in a "ministerial capacity," but the same could be said of Treasury's role in collecting and applying the Excise Taxes.  FOMB asserts without support that the compulsory insurance premiums were not "tax money collected for Commonwealth use," but (i) FOMB fails to establish that those compulsory premiums were not imposed pursuant to the Commonwealth's taxing power, and (ii) Law 253 does in fact authorize the Commonwealth to transfer premiums "to the General Fund" and use them for its general purposes after a specified period (26 L.P.R.A. § 8055(j)), whereas the Excise Taxes may *not* be placed in the General Fund or used for the Commonwealth's general purposes.  Finally, FOMB notes that following a 2002 *amendment* to Law 253 (Flores Galarza, 484 F.3d at 10), the Treasury was paid a fee for performing its collection services; prior to the amendment, however, Treasury performed its role as collection agent with respect to the insurance premiums without receiving a fee, just as it does now for the Excise Taxes.  Cf. id.

of HTA from the time they are collected.  See Mot. ¶ 8.  As such, they can be (and were) pledged

by HTA to its Bondholders.[12]  The factual record establishes that the "special deposit" referred to

in the statutes is "Fund 278," a special revenue fund that, consistent with standard principles of

governmental fund accounting and with the Excise Tax Statutes themselves, the Treasury uses to

identify the Excise Taxes as HTA's property and to segregate them from the General Fund.

> 6.     Notwithstanding the fact that Excise Taxes are systematically credited to

Fund 278,[13] FOMB insists that the "special deposit" referenced in the statutes must be a *bank*

account rather than a fund.  SR ¶ 16 n.17.  FOMB's position has no textual or factual support.

Under the Excise Tax Statutes, tax proceeds "shall be deposited" (*ingresará*) into the General Fund

(which is itself a fund, not a bank account), except for the Excise Taxes, which "shall be covered"

(*ingresarán*) into the special deposit, a special revenue fund.  13 L.P.R.A. § 31751(a).[14]  Given

this parallel structure, the special deposit, like the General Fund, is also a fund.[15]  Though FOMB

cites § 31751(a)(3), which in the English translation requires Treasury to cover cigarette taxes into

"a special deposit account," the Spanish text refers to a special deposit, not to a special deposit

"account."  Id. (taxes "shall enter into a special deposit" (*ingresarán en un depósito especial*)).

Even if the special deposit were an "account," Fund 278, while not a *bank* account, consists of

various "accounts" as a matter of accounting.[16]  FOMB's position that there must be a special bank

---

[12] Movants' consensual lien attached to revenues covered into the special deposit.  The Enabling Act empowered HTA
to pledge proceeds "made available" to HTA, 9 L.P.R.A. § 2004(*l*), and HTA pledged proceeds "received by [HTA]."
Each of the Excise Tax Statutes describes the revenues credited to the special deposit as "the collection thus received."
See 13 L.P.R.A. § 31751(a)(1)(C); 9 L.P.R.A. §§ 2021, 5681.  The Official Statements likewise confirm that Excise
Taxes in the special fund can be and were pledged.  See, e.g., Natbony Decl. Ex. EE at 29 (representing that statute
requires gas taxes and vehicle license fees to be deposited in a special fund, that HTA is authorized to pledge "such
amounts," and that HTA has "pledged such tax receipts"); Natbony Decl. Ex. FF at 38.

[13] See Natbony Reply Decl. Ex. 21 (Ahlberg Tr.) at 157:3–19 (explaining "no excise taxes . . . would have been
reported other than in Fund 278" from January 2015 to present); id. at 215:2–5, 217:10–18 (expecting the same flow
of funds to continue in future).

[14] The Spanish version's use of the verb *ingresar* (to enter) instead of *depositar* (to deposit) further establishes that
the special deposit is an (accounting) entry into a special revenue fund and not a physical deposit into a bank account.

[15] It is undisputed that the General Fund is not a bank account.  See Natbony Reply Decl. Ex. 21 (Ahlberg Tr.) at 71:7–
8.

[16] See Natbony Reply Decl. Ex. 28 (listing various Fund 278 accounts that HTA keeps at Treasury).

account also contradicts the Official Statements, which represented that the Excise Taxes would be placed in a "fund," not a bank account.  See infra note 25.

7.      FOMB argues that Fund 278 has no legal significance and serves no substantive purpose.  This defies common sense and is contrary to the record .[17]  In addition to the statutory language, statutory history, and Official Statements, Treasury's own Cash Flow Reports define Special Revenue Funds[18] as funds "created by law," separate from the Commonwealth's General Fund, having "specific uses established by their respective enabling statutes," and "funded by," among other things, "tax revenues assigned by law to public corporations."[19]  Fund 278's sub-designations all contain a specific code (0660000) tying such monies to HTA.[20]  As Professor Holder states, "[a]ccounting for the HTA Excise Tax Revenues in that special fund conveys that the revenues are restricted for debt service purposes."  Holder Decl. Ex. 1 ¶ 8.  If Fund 278 was,

---

[17] FOMB asserts monies designated part of "Funds" such as Fund 278 are "treated no differently than the Commonwealth's other moneys." SR ¶ 24.  However, the Debtors' own documents and testimony establish that Funds "segregate financial information for the purpose of carrying on specific activities and attaining certain objectives in accordance with regulations, restrictions and limitations."  Natbony Reply Decl. Ex. 66 at 5; Natbony Reply Decl. Ex. 21 at 84:18-85:8.

[18] Early Cash Flow Reports reflected that the Excise Taxes were held in a special revenue fund.  See, e.g., Natbony Reply Decl. Exs. 8-12; see also Natbony Reply Decl. Ex. 66 at 5; Holder Decl. Ex. 1 ¶ 31; Commonwealth of P.R. Fin. Info. & Operating Data Report at 95 (Dec. 18, 2016), http://www.aafaf.pr.gov/publicationsreports.html, Natbony SR Decl. Ex. ii (stating that the gasoline, diesel, and crude oil taxes "assigned to HTA and pledged as collateral to HTA obligations" are "recorded in a Special Revenue Fund").

[19] See, e.g., Natbony Reply Decl. Ex. 11 at CW_STAY0000412.  HTA is a "public corporation," as the Sur-Reply admits.  SR ¶ 29.  The Sur-Reply also states that the "cash flow report is a layperson's understanding" unrelated to property ownership, with an "express disclaimer stating parties should not rely on them."  SR ¶ 19.  None of that language appears as FOMB represents.  A general disclaimer as to representations and warranties to third parties appears, but the TSA Reports on their face actually assume that readers **will** rely on the accuracy of capitalized terms that are defined therein, such as "Special Revenue Funds," by warning readers not to make assumptions about "capitalized terms that are not defined herein."  See, e.g., Natbony Reply Decl. Ex. 8 at CW_STAY0000230; see also Natbony Reply Decl. Exs. 9-12.  Moreover, the Reports reflect that the source of the various financial schedules is "various systems" within the Department of Treasury of Puerto Rico, not layperson opinion.  See id. at CW_STAY0000232; see also Natbony Reply Decl. Exs. 9-12.  The Sur-Reply also asserts that Commonwealth Financial Statements reflect that "special revenue funds" are "not used for debt service."  The cited language does not support FOMB's position—the language cited recognizes that "Special Revenue Funds are used to account for and report the proceeds of specific revenues that are restricted . . . ."  Natbony Reply Decl. Ex. 1; SR ¶ 19, n. 21.

[20] See Natbony Reply Decl. Ex. 66 at 5; Natbony Reply Decl. Exs. 29-40 (vouchers and transfer letters); Natbony Reply Decl. Ex. 28 (Commonwealth Treasury representing to its auditors in November 2016 that HTA maintains numerous Fund 278 accounts within the Treasury Department relating to the Excise Taxes, all using the "0660000" HTA code); Natbony Reply Decl. Ex. 21 at 86:10-14 (Ahlberg testimony that value 66000 refers to HTA in the Treasury accounting system).

as FOMB suggests, merely a tracking of "appropriations" to HTA from the Commonwealth, there would have been no reason to track Excise Taxes in a separate fund **upon receipt by the Commonwealth** as FOMB admits was done.[21]   What was done is consistent with only one conclusion—the Commonwealth holds the taxes as custodian.

8.     A recurring and remarkable theme of the Sur-Reply is that the Commonwealth's fund accounting is "not substance."  See, e.g., SR ¶ 25.  Apart from the astonishing proposition that the financial statements and internal controls of the Commonwealth and HTA lack substantive significance, these administrative practices properly guide statutory interpretation.[22]  More importantly, a debtor's accounting practices can establish an identifiable trust *res* under binding First Circuit authority, and here they corroborate Movants' reading of the Excise Tax Statutes and arguments regarding Movants' property interests in the Excise Taxes. FOMB cannot explain away the existence and treatment of Fund 278 as "snippets of evidence," or irrelevant "accounting entries," or "a designation of revenues" that "say nothing" about property rights.  SR ¶¶ 2, 16 n.17.  As Movants' expert opines, the Debtors' actions undermine FOMB's positions and are consistent with Movants' arguments.  Holder Decl. Ex. 1 ¶¶ 1, 7-8.  The import of Fund 278 and Movants' unrebutted expert opinion cannot be overcome by mere lawyers' rhetoric.[23]

---

[21] FOMB suggests that Movants are alleging that certain "Special Deposit Fund" component definitions in the Commonwealth Financial Statements, such as "Pension Trust Funds" and "Agency Fund," constitute the Special Deposit into which HTA Excise Taxes are to be "covered" under the Excise Tax Statutes.  SR ¶ 18.  But Movants merely referred to such definitions and accounts as demonstrative examples of Special Revenue Funds and instances in which the Commonwealth has established and followed restrictive processes for certain revenues.

[22] Administrative practice has long been invoked as an aid to statutory interpretation under Puerto Rico law.  See, e.g., Roig Commercial Bank v. Buscaglia Tes., 74 P.R. 986, 1001–02 (1953), Natbony Reply Decl. Ex. 20.  Administrative practice is instructive in its own right, not merely (as FOMB contends) as a foil for the Legislature's subsequent amendment of a statute.  See Commonwealth Ins. Co. v. Casellas, 3 P.R. Offic. Trans. 750, 755-56 (1975) (holding that a statute's "contemporary construction" by executive officials was "a relevant factor" and "**also**" that a legislature's decision not to change those practices when amending the law further strengthened the "legislative intent consecrated in the *existing practice*" (emphases added)); United Shoe Workers of Am., AFL-CIO v. Bedell, 506 F.2d 174, 185 (D.C. Cir. 1974).

[23] As a general rule, a trier of fact cannot disregard the uncontroverted, unimpeached testimony of an expert.  See Cruz-Vargas v. R.J. Reynolds Tobacco Co., 348 F.3d 271, 277 (1st Cir. 2003) (rule that testimony standing

9.      The unrebutted Holder Declaration also disposes of FOMB's repeated argument that the Excise Taxes could not be held by the Commonwealth as an agent for HTA because such taxes are pooled in the Commonwealth's TSA bank account.  As Professor Holder notes, governments are not required to use separate bank accounts for money held in trust or as an agent for someone else.  Instead, fund accounting is used to identify and track cash collected and held in pooled bank accounts before the agent transfers the cash to the principal.[24]  The Excise Tax Statutes and Official Statements recognize this reality—they mandate or describe funds, not bank accounts, such that the taxes are "collected by the Department of Treasury" and deposited into the Commonwealth's General Fund, *except for the Excise Taxes*.[25]  A special deposit, which is a "special fund" (as legislative history, representations to Bondholders, and actual practice show),[26] is utilized to separately designate HTA monies.[27]  HTA has beneficial rights to the Excise Tax

_____

uncontradicted and unimpeached must be permitted to stand "is particularly applicable to testimony of an expert witness"); Quintana-Ruiz v. Hyundai Motor Corp., 303 F.3d 62, 76-7 (1st Cir. 2002) ("[The factfinder is] not at liberty to disregard arbitrarily the unequivocal, uncontradicted and unimpeached testimony of an expert witness . . . .").

[24] See Holder Decl. Ex. 1 ¶ 8(b). Indeed, such transfers to HTA were commonly documented by the Treasury as transfers of monies designated part of Fund 278.  Natbony Reply Decl. Ex. 29-36, 39 (vouchers within), 40 ("278" part of account numbers).

[25] See, e.g., Natbony Decl. Ex. EE, at 16 (proceeds of taxes "are not to be deposited in the General Fund of the Commonwealth when collected, but are deposited instead in the Special Fund for the benefit of the Authority"); id. at 29 (fees are "collected by the Department of Treasury"); Natbony Reply Decl. Ex. 4 at 175-76 (taxes "shall not be covered into the Treasury of Puerto Rico, but deposited in a Special Fund in the name of and for the benefit of" HTA); Natbony Reply Decl. Ex. 5 at 127; Natbony Reply Decl. Ex. 6 at 930-31 (gas taxes to be deposited to Special Deposit in favor of HTA); Natbony Reply Decl. Ex. 18 at HTA_STAY0008159 (additional Official Statement).

[26] See, e.g., Natbony Decl. Ex. EE at 16 ("the proceeds of the taxes and license fees allocated to the Authority are deposited by the Department of the Treasury in a special fund (the "Special Fund") in favor of the Authority"); id. at 29 (providing for "deposit" of gasoline, oil and diesel tax and motor vehicle license fee increases in the "Special Fund"); Natbony Reply Decl. Ex. 4 at 175-76 (gas taxes); Natbony Reply Decl. Ex. 5 at 128 (using "Special Fund" and "Special Deposit" interchangeably); see also Reply ¶ 12 n.5.

[27] It is an accepted principle of the law of municipal finance that monies designated by statute as part of a special fund cannot legally be diverted for uses inconsistent with the purpose of that designation.  See, e.g., 87 C.J.S. Towns § 211 (special funds cannot be transferred to a general fund); 15 McQuillin Municipal Corp. § 43:132 (monies required to be deposited into the special fund are subject to a lien "for the life of the pledge" and cannot be diverted); 4 Local Government Law, § 259 ("[A] special fund permits the least discretion to local legislative or executive authorities in reallocating or redistributing public monies.").  Such funds are "trust funds . . . [and] may not be otherwise applied." Ecker v. Sw. Tampa Storm Sewer Drainage Dist., 75 F.2d 870, 872–73 (5th Cir. 1935); see also Thompson v. Emmett Irr. Dist., 227 F. 560, 566 (9th Cir. 1915) ("The moneys collected by them . . . constitute a trust fund *which cannot be applied or diverted to any other purpose.*") (emphasis added).  Where, as here, the municipality attempts to divert those special funds for other purposes, bondholders have the ability to reach the diverted funds.  See, e.g., Puget Sound Power & Light Co. v. City of Seattle, 271 F. 958, 963-64 (W.D. Wash. 1921) (rejecting city's contention that it was not obligated to deposit gross revenues into a special fund, because the gross revenues were security for the bonds and

9

monies in Fund 278, the special fund (which are pledged to the Bondholders), regardless of whether they are held in the pooled TSA.[28]  Monies do not lose their restricted status merely because a municipality chooses to place them in a pooled account like the TSA for convenience. Holder Decl. Ex. 1 ¶¶ 10, 22-27, 32-33.

        10.     The approval process for transfer of Fund 278 monies through Voucher SC735 further confirms that they belong to HTA.  The voucher "indicate[s] that the HTA Excise Tax Revenues and related assets represented the assets of HTA from initial accounting recognition through their expenditure."  Holder Report ¶ 36.  If HTA had no interest in the Excise Taxes in Fund 278, it would not have had the authority to approve withdrawals from Fund 278.  FOMB relies upon the unremarkable fact that a Treasury signature was needed before transfers out of the TSA took place.  SR ¶¶ 5, 28.[29]  This fact is not surprising.  It merely shows that Treasury was implementing the necessary steps to carry out the transactions initiated and authorized by HTA.[30] FOMB has not come forward with any evidence that Treasury exercised independent control by

---

"holding the money in trust, it is bound to handle it in the manner agreed"); Smith v. Boise City, 18 F. Supp. 385, 388 (D. Idaho 1937) (authorizing bondholders to reach diverted special assessments that were required to be deposited into a special fund because the assessments were private property of the bondholders, and the duty imposed on the city "by the statute was to apply them to the special fund to be used in the payment of the bonds and on its failure to do so the bondholders are entitled to the interposition of a court of equity to reach the fund and an accounting had").

[28] See, e.g., Natbony Decl. Ex. EE at 29 (authorizing the Authority to "pledge" gas, oil and diesel taxes and motor vehicle license fee increases and recognizing that the Excise Taxes are "pledged to the holders of the Highway Revenue Bonds"); Natbony Reply Decl. Ex. 4 at 175-6 (authorizing gas taxes to be pledged by HTA).

[29] FOMB cites Ahlberg deposition testimony for this proposition.  SR ¶ 28 n.46.  However Mr. Ahlberg's full testimony (ignored by FOMB) revealed that Mr. Ahlberg (i) was not personally involved in the voucher approval process, (ii) was unwilling to speculate on whether there were payment vouchers that did not require Commonwealth sign-off to effectuate a withdrawal, and (iii) was "unsure" who has, or historically, who had authority to direct withdrawals from Fund 278.  Natbony Reply Decl. Ex. 21 at 110:12-111:20, 112:16-25.

[30] See, e.g., In re Dole Food Co., No. CV 8703-VCL, 2017 WL 624843, at *3 (Del. Ch. Feb. 15, 2017) (custodial banks to allow traders to borrow shares from owner for short selling but ownership remains with holder of shares); In re Dairy Stores, Inc., 148 B.R. 6, 9 (Bankr. D.N.J. 1992) (one can serve "merely as [a] custodian" when acting as an agent in disbursing money but have no claim to the underlying accounts).  FOMB suggests that these circumstances are analogous to when "consumers provide landlords with the power to initiate transfers from their accounts to pay rent" because such action would not make the landlord the owner of the money in the consumers' account.  SR ¶ 12. This analogy has no application here.  Movants are not asserting that the delegation of authority created an ownership interest in the HTA Excise Taxes.  Rather, the Debtors' recognition of HTA's authority to approve transfers from Fund 278 serves as confirmation of a pre-existing property interest.

rejecting or blocking any of the Fund 278 withdrawals directed by HTA.[31]  Treasury clearly acted

merely as a custodian remitting funds at the direction of the beneficiary.

> 11.     FOMB next argues that Treasury Circular Letter 1300-01-99 (Natbony

Reply Decl. Ex. 41) "does not help" Movants because the Circular's delegation of approval

authority applies only to a Commonwealth "Agency," defined broadly in the Circular as "any

department, division, office or body within the Executive, Legislative or Judicial branch," and

notes that 9 L.P.R.A § 2002 created HTA as a "public corporation."  SR ¶ 29.  But Section 2002

clearly provides that HTA is a "public corporation and government instrumentality of the

Commonwealth," exercising "public and essential functions of the Government."  Moreover, the

Commonwealth's own "Fundamental Organizational Structure" chart depicts HTA as part of the

"Executive Branch," under the auspices of the Puerto Rico Department of Transportation and

Public Works, an "Executive" Department of the Puerto Rico government.[32]  In any event, it is

undisputed that Treasury implemented numerous SC735 vouchers for Fund 278 transfers directed

by HTA, with clear language on the face of each voucher noting that HTA was an "Agency."[33]

This fact evidences Treasury's own understanding (as well as HTA's) that the Circular's authority

delegation applied to HTA.    FOMB misleadingly suggests that the Circular delegates only

ministerial tasks of "data entry and approval" to HTA  (SR ¶ 29), but  the Circular unambiguously

---

[31] FOMB also asserts without support that "[e]ven if the Commonwealth gave HTA a transfer power, HTA's alleged receipt of that authority only further proves the money is the Commonwealth's in the first place."  SR ¶ 12.  But the Circular Letter explains why HTA was given that authority:  It was because HTA is an "agenc[y] whose funds [*not* the Commonwealth's funds] are under the custody of the Treasury Secretary."  Natbony Reply Decl. Ex. 41 at 17.

[32] Natbony Reply Decl. Ex. 1 at 15.  The most recent version of such chart, with the same depiction, can be found at http://www.presupuesto.pr.gov/PresupuestoAprobado2019-2020/Certificaciones%20y%20Estructura%20 Gubernamental/ESTRUCTURAFUNCIONALDEL%20GOBIERNODE%20PUERTO%20RICO.pdf.  HTA is "part of the Department of Transportation and Public Works" and its "powers and duties have been conferred on the Secretary of Transportation and Public Works."  Natbony Reply Decl. Ex. 18 at HTA_STAY0008158.  "The Secretary of Transportation and Public Works . . . has ultimate managerial power over" HTA.  Natbony Decl. Ex. EE at 28.

[33] Each SC735 voucher contains the following language:  "COMMONWEALTH OF PUERTO RICO, HIGHWAYS AND TRANSPORTATION AUTHORITY – Agency"  E.g., Natbony Reply Decl. Ex. 29-32, 36, 39.

provides that "data entry, **as well as approval of certain financial transactions**, has been delegated." Natbony Reply Decl. Ex. 41 at 15 (emphasis added).[34]

12. FOMB finally argues that Fund 278 does not constitute an identifiable trust *res* under the First Circuit's decision in Gracia-Gracia v. Fin. Oversight & Mgmt. Bd., 939 F.3d 340, 351–52 (1st Cir. 2019), because Excise Taxes were "commingled in general Commonwealth accounts." SR ¶ 36.[35] But Gracia-Gracia found funds to be an identifiable trust *res* based solely on the Commonwealth's accounting: "'[A]pproximately $76.1 million corresponding to unclaimed funds from 2006 to present' are 'segregated into a *separate account* in the General Fund *for accounting purposes*.'" 939 F.3d at 351. Fund 278 serves precisely the same purpose.[36]

## II.   **FOMB's Appropriation Argument Is Without Merit.**

13. In its Opposition, FOMB argued that the Excise Tax Statutes "appropriate the Commonwealth's tax revenues to HTA" (Opp. ¶ 86) based on a few portions of 13 L.P.R.A. § 31751(a) using the term *asignados*, which FOMB opines should be translated as "appropriated" rather than "allocated." See id. n.36. One thing FOMB does not dispute is that the pledged Excise Taxes never appear in the Commonwealth budget. This, alone, undermines any appropriation theory, including one based on a supposed standing appropriation. Further, the Reply demonstrated that, in context, the term *asignados* plainly means "assigned" or "allocated," including because 13 L.P.R.A. § 31751(a), entitled *Disposición de Fondos* ("Disposition of

---

[34] FOMB also attempts to explain away HTA's draft budgets describing the Excise Taxes as HTA's "Own Income" by stating that such descriptions occurred "[b]efore the Commonwealth retained the revenues." SR ¶ 30. But the fact that such Excise Taxes were considered HTA's "Own Income" does not magically change merely because the Commonwealth is improperly "retaining" revenues. See The Idaho, 93 U.S. 575 (1876) ("It is hardly necessary to say that the title of the true owner of personal property cannot be impaired by the unauthorized acts of one not the owner.").

[35] FOMB also argues that "Puerto Rico law prohibits 'secret trusts'" (SR ¶ 26), but the trust relationship created by the Excise Tax Statutes is not secret, it was created by publicly enacted statutes. See Reply ¶ 31 n.42.

[36] FOMB contends that In re Howard's Appliance Corp., 874 F.2d 88, 94-95 (2d Cir. 1989), does not support imposition of a constructive trust because Movants do not have a security agreement with the Commonwealth. SR ¶ 33. But In re Howard's was based on constructive trust principles and did not express any such limiting principle. Rather, the court reasoned from the general proposition that when "the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." Id. at 94. The Commonwealth argues liens are invalid based on its own bad acts even though it has no right to the funds. In re Howard's is directly on point.

Funds"), deals with "disposition" of the Excise Taxes, not their appropriation.  Reply ¶ 17.  FOMB implausibly counters that *disposición* can mean "provision," as in a statutory or contractual clause or "provision."  SR ¶ 22.  But no one would translate the statute's title as "Clause of Funds" or "Provision of Funds."  Movants' translations of *asignados* and *disposición* align with the statutory text, while FOMB's appropriation theory does not.

14.     FOMB also argues that the Excise Tax Statutes create a standing appropriation, citing a Justice Secretary opinion proving just the opposite.  SR ¶ 20 (citing P.R. Sec. Just. Op. 2005-14, 2005 WL 6431018 (Aug. 30, 2005)).  The opinion states that a budget can include special appropriations of "indefinite extent" pursuant to previously enacted "inescapable" laws (Op. 2005-14, at 17–28, 25–26), but makes clear that special appropriation laws permit recurring annual appropriations *in the General Fund Budget*.  See Op. 2005-14, at 21.[37]  By the plain terms of the Excise Tax Statutes, the Excise Taxes fall *outside* of the General Fund and thus outside of the General Fund Budget.[38]  For that reason, the Excise Taxes are not and could not be an appropriation (not even a special appropriation), but rather are HTA's "own income."[39]

15.     FOMB also incorrectly equates HTA's special revenue bonds with those payable from annual budget appropriations, such as the ERS bonds at issue in Fin. Oversight & Mgmt. Bd. v. Andalusian Global Designated Activity Co., 948 F.3d 457, 464 (1st Cir. 2020).  Here, the mandatory language in the HTA Excise Tax Statutes eliminates budgetary risk, as do other provisions that maintain the Excise Taxes, ensure they are covered into HTA's special deposit,

---

[37] The 2005–2006 budget at issue in the opinion, which carried over $9.489 billion from the previous year, was "**charged to the General Fund**."  Id. at 26–27 (emphasis added).  It did not include the Excise Taxes as a revenue or expenditure item.  FOMB's own budget documents recognize a difference between appropriations and "assignments of Puerto Rico tax or other revenues."  Natbony Decl. Ex. I (Fin. Oversight & Mgmt. Bd. for P.R., FY18 Budget at 14 n.1 (June 30, 2017)); see also id. at 19 (characterizing special appropriations as expenditures of the General Fund).

[38] See, e.g., 13 L.P.R.A. § 31751(a) (providing that the Excise Taxes are not to be deposited in the General Fund).

[39] See Debt Service by Sector and Source of Resources, Fiscal Year 2006, at 4, 8, Natbony SR Decl. Ex. iii (showing payment of HTA's debt service came exclusively from "Own Income" and none from "J.R." (the Joint Resolution on the General Budget) or "Special Appropriations"); Natbony Reply Decl. Ex. 25, HTA_STAY0000403 at 413 (defining "own income" to include the Excise Taxes).

and require catch-up payments if a clawback were ever to occur.  See 13 L.P.R.A. § 31751(a)(1)(D), 9 L.P.R.A. §§ 2021, 5681.  HTA's Official Statements disclose no appropriation risk either.[40]  While FOMB points to Treasury's obligation to make monthly transfers of certain tax proceeds (SR ¶ 16 n.17), Treasury must first cover collected taxes into HTA's special deposit before making the monthly transfer.[41]  The monthly transfer obligation is not an appropriation, but rather reflects Treasury's duty as a custodial agent to channel the Excise Taxes to HTA.[42]  Finally, the Andalusian court explicitly stated that "special revenues . . . remain subject to any [prepetition] lien."  Andalusian, 948 F.3d at 463.  The ERS bonds were not special revenue bonds (id. at 473–75); HTA's Bonds indisputably are special revenue bonds.

## III.    A Future Legislature Cannot Simply Repeal The Excise Tax Statutes.

16.     FOMB baldly argues that "an obligation to continue to impose and to appropriate future taxes" is "repeal[able]" by "a future legislature."  SR ¶ 23 n.28.  This is directly contradicted by a "long and venerable line" of Supreme Court decisions that compel governmental bodies to honor prior laws imposing and appropriating taxes to pay public debts.  Missouri v. Jenkins, 495 U.S. 33, 55–56 (1990) (collecting cases).  Such laws create vested rights that may not be disregarded by future legislatures.  Von Hoffman, 71 U.S. 535 (1867).  A future legislature's impairment of that vested right is unconstitutional and a nullity.  Louisiana ex rel. Hubert v. City of New Orleans, 215 U.S. 170, 175 (1909).  FOMB cites a single sentence from Fletcher v. Peck,

---

[40] See, e.g., Official Statement, Series Y&Z Highway Bonds at 20-21 (Apr. 9, 1996), Natbony SR Decl. Ex. iv (noting that the costs of operating and maintaining Puerto Rico's highway system are borne in the first instance by the Department of Transportation "with moneys appropriated annually by the Legislature of Puerto Rico," whereas HTA contributes to operation and maintenance costs if necessary using its own "Revenues," including the Excise Taxes, available in the Construction Fund after debt service).

[41] FOMB refers to the cover-into obligation under § 31751(a)(1) as an "obligation . . . to transfer money to a 'special deposit in HTA's favor," SR ¶ 16 n.17, but the verbs "cover[] into" and "transfer" are not synonymous.  As the statute makes clear, the collected Excise Taxes are covered into HTA's special deposit at Treasury, and, on a monthly basis, the proceeds "covered into said special deposit" are transferred to HTA.  In other words, the transfer is from, not to, the special deposit.  Compare § 31751(a)(1) with id. § 31751(a)(1)(A).

[42] The other Excise Tax Statutes specify no transfer obligation, but similarly require that license fees be covered into the special deposit made available to HTA for pledging to its Bondholders.  See 9 L.P.R.A. §§ 2021, 5681.

10 U.S. 87, 135 (1810), to argue that "one legislature is competent to repeal any act which a former legislature was competent to pass" (SR ¶ 23 n.28), but Peck also states that "if an act be done under a law, a succeeding legislature cannot undo it," and the Supreme Court has cited Peck to hold that an obligation to exercise taxing powers for the benefit of bondholders "cannot be withdrawn until the contract is satisfied." Von Hoffman, 71 U.S. at 549-550, 555.[43]

## IV.   FOMB's Preemption Arguments Are Irrelevant To The Preliminary Hearing.

17.    FOMB has effectively abandoned its preemption argument, acknowledging now that PROMESA cannot "eliminate unsecured obligations or secured property rights."  SR ¶ 41.  FOMB's preemption arguments are thus irrelevant to the preliminary hearing issues, which are limited to "standing to sue and security or other property interests."  ECF No. 12186 ¶ 1.d.[44]

## CONCLUSION

18.    WHEREFORE, the Court should rule in favor of Movants on the preliminary issues before the Court.

---

[43] FOMB also incorrectly presumes that repeal of the Excise Tax Statutes would only give rise to a general unsecured claim, but the Supreme Court has repeatedly held that the remedy is mandamus. See, e.g., Von Hoffman, 71 U.S. at 555; Wolff v. New Orleans, 103 U.S. 358, 369 (1881); Hubert, 215 U.S. at 181. This is consistent with Bondholders' statutory mandamus remedy. 9 L.P.R.A. § 2013(a). Moreover, courts have recognized that covenants concerning disposition of pledged revenues, including statutory non-impairment covenants like those protecting HTA Bondholders (see Mot. ¶¶ 9-11), are themselves protected property interests protected by the Takings Clause and are not severable from the revenue pledge. See, e.g., U.S. Tr. Co. of N.Y., 431 U.S. at 19 & n.16; Dimino v. Sec'y of Commonwealth, 695 N.E.2d 659, 663-664 (Mass. 1998); State v. City of Coral Gables, 248 So.2d 641 (Fla. 1971); First Nat'l Bank of Boston v. Maine Tpk. Auth., 136 A.2d 699, 718-722 (Me. 1957). Statutory liens are also protected by the Takings Clause. See Armstrong v. U.S., 364 U.S. 40, 48 (1960).

[44] If FOMB is suggesting that it can effectively deprive Movants of their rights to the Pledged Revenues by not including them in its fiscal plans and budgets (which were adopted without giving Movants any notice or opportunity to be heard), PROMESA would violate the Due Process Clause, and FOMB's fiscal plans and budgets would be invalid. See, e.g., Mendez-Nunez v. Fin. Oversight & Mgmt. Bd. for P.R (In re Fin. Oversight & Mgmt. Bd. for P.R.), 916 F.3d 98 (1st Cir. 2019). Additionally, Movants must have an opportunity to show that the fiscal plans and budgets do not comply with PROMESA—an additional reason the fiscal plans and budgets are invalid and cannot preempt Movants' rights. See Reply § III.E. Even assuming arguendo that PROMESA could constitutionally preempt the Excise Tax Statutes as "appropriations" (which they are not), that would not preclude Movants from seeking a judgment confirming their rights to the Pledged Revenues, because the absence of appropriations to pay a debt does not discharge the debt or otherwise constitute a cognizable defense to enforcement of an obligation against the government. See Maine Cmty. Health Options v. United States, 140 S. Ct. 1308, 1319-20 (2020).

## <u>CERTIFICATION</u>

In accordance with paragraph 9 of the *Final Case Management Order for Revenue Bonds* (ECF No. 12186), Movants certify that (i) they have taken reasonable efforts to avoid duplication and submit a brief that is no longer than necessary, and (ii) they have used reasonable efforts to draft a single brief and coordinate to minimize duplicative briefs.

Dated:     New York, New York
           May 26, 2020

CASELLAS ALCOVER & BURGOS P.S.C.   CADWALADER, WICKERSHAM & TAFT LLP

By: _/s/ Heriberto Burgos Pérez_            By: _/s/ Mark C. Ellenberg_
    Heriberto Burgos Pérez                     Howard R. Hawkins, Jr.*
    USDC-PR 204809                             Mark C. Ellenberg*
    Ricardo F. Casellas-Sánchez               William J. Natbony*
    USDC-PR 203114                             Ellen M. Halstead*
    Diana Pérez-Seda                           Thomas J. Curtin*
    USDC-PR 232014                             Casey J. Servais*
    P.O. Box 364924                            200 Liberty Street
    San Juan, PR 00936-4924                    New York, NY 10281
    Telephone:  (787) 756-1400                 Telephone:  (212) 504-6000
    Facsimile:  (787) 756-1401                 Facsimile:  (212) 504-6666
    Email:      hburgos@cabprlaw.com           Email:      howard.hawkins@cwt.com
                rcasellas@cabprlaw.com                     mark.ellenberg@cwt.com
                dperez@cabprlaw.com                        bill.natbony@cwt.com
                                                           ellen.halstead@cwt.com
    _Attorneys for Assured Guaranty Corp._                 thomas.curtin@cwt.com
    _and Assured Guaranty Municipal Corp._                 casey.servais@cwt.com

                                               * Admitted _pro hac vice_

                                               _Attorneys for Assured Guaranty Corp. and_
                                               _Assured Guaranty Municipal Corp._

ADSUAR MUNIZ GOYCO SEDA &
PEREZ-OCHOA PSC

WEIL, GOTSHAL & MANGES LLP

By:/s/ *Eric Perez-Ochoa*
    Eric Pérez-Ochoa
    USDC-PR No. 206,314
    E-mail:    epo@amgprlaw.com


By:/s/*Luis A. Oliver-Fraticelli*
    Luis A.  Oliver-Fraticelli
    USDC-PR NO. 209,204
    E-mail:    loliver@amgprlaw.com

    208 Ponce de Leon Ave., Suite 1600
    San Juan, PR 00936
    Tel.:    (787) 756-9000
    Fax:    (787) 756-9010

*Attorneys for National Public Finance
Guarantee Corp.*

By:/s/ *Robert Berezin*
    Jonathan Polkes*
    Gregory Silbert*
    Robert Berezin*
    Kelly Diblasi*
    Gabriel A. Morgan*
    767 Fifth Avenue
    New York, New York 10153
    Tel.:    (212) 310-8000
    Fax:    (212) 310-8007
    Email:    jonathan.polkes@weil.com
        gregory.silbert@weil.com
        robert.berezin@weil.com
        kelly.diblasi@weil.com
        gabriel.morgan@weil.com

* admitted *pro hac vice*

*Attorneys for National Public Finance
Guarantee Corp.*

FERRAIUOLI LLC                          MILBANK LLP


By:/s/ *Roberto Cámara-Fuertes*         By:/s/ *Atara Miller*
   ROBERTO CÁMARA-FUERTES              DENNIS F. DUNNE*
   USDC-PR NO. 219,002                   ATARA MILLER*
   E-mail:   rcamara@ferraiuoli.com      GRANT R. MAINLAND*
       JOHN J. HUGHES*
       55 Hudson Yards
       New York, New York 10001
By:/s/ *Sonia Colón*                       Tel.:   (212) 530-5000
   SONIA COLÓN                           Fax:   (212) 530-5219
   USDC-PR NO. 213809                    Email:   ddunne@milbank.com
   E-mail:   scolon@ferraiuoli.com           amiller@milbank.com
       gmainland@milbank.com
   221 Ponce de Leon Ave., 5th Floor           jhughes2@milbank.com
   San Juan, PR 00917
   Tel.:   (787) 766-7000
   Fax:   (787) 766-7001            *admitted *pro hac vice*

*Counsel for Ambac Assurance Corporation*   *Counsel for Ambac Assurance Corporation*

ARENT FOX LLP


By: /s/ *David L. Dubrow*
    DAVID L. DUBROW*
    MARK A. ANGELOV*
    1301 Avenue of the Americas
    New York, New York 10019
    Tel.:    (212) 484-3900
    Fax:    (212) 484-3990
    Email:    david.dubrow@arentfox.com
            mark.angelov@arentfox.com


By: /s/ *Randall A. Brater*
    RANDALL A. BRATER*
    1717 K Street, NW
    Washington, DC 20006
    Tel.:    (202) 857-6000
    Fax:    (202) 857-6395
    Email:    randall.brater@arentfox.com

*admitted pro hac vice

*Counsel for Ambac Assurance Corporation*

REXACH & PICÓ, CSP

BUTLER SNOW LLP


By:*/s/ María E. Picó*
    María E. Picó
    USDC-PR 123214
    802 Ave. Fernández Juncos
    San Juan PR 00907-4315
    Telephone:   (787) 723-8520
    Facsimile:   (787) 724-7844
    E-mail:       mpico@rexachpico.com

    *Attorney for Financial Guaranty
    Insurance Company*

By:*/s/ Martin A. Sosland*
    Martin A. Sosland (*pro hac vice*)
    5430 LBJ Freeway, Suite 1200
    Dallas, TX 75240
    Telephone:   (469) 680-5502
    Facsimile:   (469) 680-5501
    E-mail:       martin.sosland@butlersnow.com

    *Admitted pro hac vice in Case No. 17-BK-
    03283-LTS and Case No. 17-BK-03567-LTS*

    Jason W. Callen
    150 3rd Ave., S., Suite 1600
    Nashville, TN 37201
    Telephone:  615-651-6774
    Facsimile:   615-651-6701
    Email:       jason.callen@butlersnow.com

    *Admitted pro hac vice in Case No. 17-BK-
    03283-LTS and Case No. 17-BK-03567-LTS*

    *Attorneys for Financial Guaranty Insurance
    Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed this document electronically with the Clerk of the Court

using the CM/ECF System, which will send notification of such filing to all parties of record in

the captioned case.

At New York, New York, the 26th day of May, 2020.


By: _/s/ Howard R. Hawkins, Jr._____
        Howard R. Hawkins, Jr.
        * admitted *pro hac vice*