**NATBONY RESPONSE TO SUR REPLY DECLARATION**

**<u>Exhibit iv</u>**

(14)

## CERTIFICATE AS TO OFFICIAL STATEMENT

I, Alba L. Pabón, Secretary of Puerto Rico Highway and Transportation Authority, DO HEREBY CERTIFY, that attached hereto is a true and correct copy of the Official Statement, which is the same in all material respects as the Official Statement relating to the $890,235,000 Puerto Rico Highway and Transportation Authority Highway Revenue Bonds (Series Y) and $185,040,000 Puerto Rico Highway and Transportation Authority Highway Revenue Refunding Bonds (Series Z) which was presented to the Secretary of Transportation and Public Works of the Commonwealth of Puerto Rico on March 28, 1996, and which was approved by him by resolution duly adopted on said date and which was executed by the Executive Director of the Authority.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Authority, this 9th day of April, 1996.

_____
Secretary
Puerto Rico Highway and
Transportation Authority

(SEAL)

04/11//96/NY\REISMANM\0092146.07

**NEW ISSUES—BOOK ENTRY ONLY**

*In the opinion of Bond Counsel, subject to continuing compliance with certain tax covenants, interest on the 1996 Bonds is not includable in gross income for federal income tax purposes under existing statutes, regulations, rulings and court decisions. However, see "Tax Exemption" for a description of the alternative minimum tax and environmental tax on corporations and certain other federal tax consequences of ownership of the 1996 Bonds. Bond Counsel is further of the opinion that the 1996 Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.*

# $1,075,275,000

# Puerto Rico Highway and Transportation Authority

## $890,235,000 Highway Revenue Bonds (Series Y)
## $185,040,000 Highway Revenue Refunding Bonds (Series Z)

Dated: March 1, 1996 (except for the Series Y Cap RITES℠ Bonds which are dated their date of delivery)   Due: July 1, as shown on the inside cover

The Series Y Bonds and the Series Z Bonds (collectively, the "1996 Bonds") are issuable as registered bonds without coupons and will be initially registered only in the name of Cede & Co., as nominee of The Depository Trust Company ("DTC"), New York, New York, which will act as securities depository for the 1996 Bonds. Purchasers will not receive delivery of the 1996 Bonds. **So long as any purchaser is the beneficial owner of a 1996 Bond, such purchaser must maintain an account with a broker or dealer who is, or acts through, a DTC Participant to receive payment of principal of and interest on such Bond.** See "Book-Entry Only System" under *The Bonds.*

The 1996 Bonds will be available to purchasers in denominations of $5,000 and any multiple thereof, except for the Series Y Cap RITES℠ Bonds which, until the Conversion Date as described herein, will be available to purchasers in denominations of $100,000 and any multiple thereof and thereafter in denominations of $5,000 and any multiple thereof. Interest on the 1996 Bonds will be payable on each January 1 and July 1, commencing July 1, 1996 (four months' interest).

The 1996 Bonds are subject to redemption prior to maturity as set forth herein, the earliest redemption date being July 1, 2006.

By purchasing the 1996 Bonds, the owners of such Bonds will have consented to the adoption of a supplemental resolution to be adopted once the consent of the owners of 100 percent of the 1996 Bonds and the outstanding bonds of the Authority has been obtained. See "Proposed Supplemental Resolution" and "Consent of Bondholders" under *The Bonds.*

The Bonds, including the 1996 Bonds, are secured by a pledge of Revenues of the Authority, which include all current gasoline taxes, a portion of the current gas oil and diesel oil taxes, a portion of the current motor vehicle license fees, all toll revenues of the Traffic Facilities, and certain investment earnings. Such taxes and license fees only are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth of Puerto Rico, if and to the extent that other Commonwealth revenues are not sufficient therefor.

**The 1996 Bonds are not a debt of the Commonwealth of Puerto Rico or any of its political subdivisions, other than the Authority, and neither the Commonwealth of Puerto Rico nor any such subdivision, other than the Authority, shall be liable thereon.**

**The payment when due of the principal of and interest on certain maturities of the 1996 Bonds as set forth on the inside cover page will be insured by separate municipal bond insurance policies to be issued by MBIA Insurance Corporation and Financial Security Assurance Inc.**

**The inside cover page contains information respecting the maturity schedules, interest rates and yields for the 1996 Bonds.**

*The 1996 Bonds are offered for delivery when, as and if issued and accepted by the Underwriters, subject to the approval of legality by Greenberg Traurig Hoffman Lipoff Rosen & Quentel, New York, New York, Bond Counsel, and certain other conditions. Certain legal matters will be passed upon for the Underwriters by Brown & Wood, New York, New York. It is expected that the 1996 Bonds will be available for delivery to DTC in New York, New York, on or about April 9, 1996.*

## Merrill Lynch & Co.

### Bear, Stearns & Co. Inc.

#### Goldman, Sachs & Co.

##### PaineWebber Incorporated

Citicorp Securities, Inc.      Clark Melvin Securities Corporation      Lehman Brothers

Morgan Stanley & Co. Incorporated      Oriental Financial Services Corp.

Prudential Securities Incorporated      Smith Barney Inc.

March 28, 1996

℠ Service mark of Merrill Lynch & Co.

$1,075,275,000

**Puerto Rico Highway and Transportation Authority**

$890,235,000
**Highway Revenue Bonds (Series Y)**

**$213,190,000 Serial Bonds**

| Maturity (July 1) | Principal Amount | Interest Rate | Yield | Maturity (July 1) | Principal Amount | Interest Rate | Yield |
|---|---|---|---|---|---|---|---|
| 1997 | $ 6,095,000 | 5.00% | 4.100% | 2007* | $10,630,000 | 6.25% | 5.125% |
| 1998 | 6,400,000 | 5.00 | 4.350 | 2008* | 11,295,000 | 6.25 | 5.200 |
| 1999 | 6,720,000 | 5.25 | 4.500 | 2009* | 12,000,000 | 6.25 | 5.275 |
| 2000 | 7,070,000 | 5.25 | 4.650 | 2012* | 14,325,000 | 6.25 | 5.425 |
| 2001* | 7,440,000 | 6.00 | 4.525 | 2013 | 15,225,000 | 6.25 | 5.750 |
| 2002* | 7,890,000 | 6.00 | 4.625 | 2014 | 16,175,000 | 6.25 | 5.775 |
| 2003* | 8,360,000 | 6.00 | 4.725 | 2015† | 17,185,000 | 5.25 | 5.625 |
| 2004* | 8,865,000 | 6.25 | 4.825 | 2016† | 18,090,000 | 5.00 | 5.650 |
| 2005* | 9,420,000 | 6.25 | 4.925 | 2022 | 20,000,000 | 6.00 | 6.030 |
| 2006* | 10,005,000 | 6.25 | 5.025 | | | | |

**$677,045,000 Term Bonds**

$26,260,000 6% Term Bonds due July 1, 2011* - NRO
$39,025,000 5½% Term Bonds due July 1, 2018 - Yield 5.97%
$67,300,000** 6¼% Term Bonds due July 1, 2021† - NRO
$121,780,000 5½% Term Bonds due July 1, 2026 - Yield 6.04%
$225,000,000 5% Term Bonds due July 1, 2036 - NRO
$197,680,000 5½% Term Bonds due July 1, 2036 - NRO

$185,040,000
**Highway Revenue Refunding Bonds (Series Z)**

**$142,440,000 Serial Bonds**

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield | Maturity (July 1) | Principal Amount | Interest Rate | Yield |
|---|---|---|---|---|---|---|---|
| 1996 | $ 740,000 | 4.00% | 100% | 2007* | $ 2,405,000 | 6.25% | 5.125% |
| 1997 | 250,000 | 4.10 | 100 | 2008* | 2,560,000 | 6.25 | 5.200 |
| 1998 | 260,000 | 4.35 | 100 | 2009* | 2,710,000 | 6.25 | 5.275 |
| 1999 | 275,000 | 4.50 | 100 | 2010* | 2,890,000 | 6.25 | 5.325 |
| 2000 | 285,000 | 4.65 | 100 | 2011* | 3,100,000 | 6.25 | 5.375 |
| 2001* | 5,875,000 | 6.00 | 4.525 | 2012* | 3,305,000 | 6.25 | 5.425 |
| 2002* | 6,210,000 | 6.00 | 4.625 | 2013* | 8,685,000 | 6.25 | 5.475 |
| 2003* | 2,675,000 | 6.00 | 4.725 | 2014* | 17,205,000 | 6.25 | 5.525 |
| 2004* | 20,990,000 | 6.25 | 4.825 | 2015* | 18,280,000 | 6.25 | 5.550 |
| 2005* | 22,020,000 | 6.25 | 4.925 | 2016† | 19,460,000 | 6.25 | 5.575 |
| 2006* | 2,260,000 | 6.25 | 5.025 | | | | |

**$42,600,000 6% Term Bonds due July 1, 2018† - Yield 5.625%**

---

\* Insured by MBIA Insurance Corporation.
† Insured by Financial Security Assurance Inc.
** Issued as Cap RITES℠ Bonds, dated their date of delivery. See *Appendix VI* hereto.
℠ Service mark of Merrill Lynch & Co.

No dealer, broker, sales representative or other person has been authorized by the Authority or the Underwriters to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Authority or any Underwriter. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of the 1996 Bonds by any person in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale. The information set forth herein has been obtained from the Authority and other official sources that are believed to be reliable, but is not guaranteed as to accuracy or completeness and is not to be construed as a representation by any Underwriter. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Authority since the date hereof.

IN CONNECTION WITH THE OFFERING OF THE 1996 BONDS, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE 1996 BONDS AND ANY OTHER OUTSTANDING HIGHWAY REVENUE OR REVENUE REFUNDING BONDS OF THE AUTHORITY AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL ON THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

## TABLE OF CONTENTS

| | Page |
|---|---|
| Introduction | 1 |
| Financing Plan | 2 |
| Series Y Bonds | 2 |
| Series Z Bonds | 2 |
| Uses of Funds | 3 |
| The Bonds | 4 |
| Description of the 1996 Bonds | 4 |
| General | 4 |
| Cap RITES Bonds | 4 |
| Redemption Provisions | 4 |
| Optional Redemption | 4 |
| Mandatory Redemption | 5 |
| Notice of Redemption | 6 |
| Selection of Bonds to be Redeemed | 6 |
| Security for the Bonds | 6 |
| Pledged Revenues | 6 |
| Reserve Account | 7 |
| Prior Payment of Full Faith and Credit | |
| Obligations of the Commonwealth | 8 |
| Additional Bonds | 9 |
| The MBIA Policy | 9 |
| The FSA Policy | 11 |
| Book-Entry Only System | 12 |
| Payments and Transfers | 14 |
| Discontinuance of Book-Entry Only System | 14 |
| Proposed Supplemental Resolution | 14 |
| Consent of Bondholders | 15 |
| The Authority | 15 |
| General Description | 15 |
| Organization | 16 |
| Management | 16 |
| Employee Relations | 16 |
| Highway System Revenues and Expenditures | 17 |
| Revenues | 17 |
| General | 17 |
| Sources of Revenues | 17 |
| Historical Revenues | 19 |
| Projected Revenues | 19 |
| Operating Expenses and Capital | |
| Expenditures | 20 |
| Operation and Maintenance | 20 |
| Priorities Construction Program | 22 |
| Public-Private Capital Improvement | |
| Projects | 24 |

| | Page |
|---|---|
| Debt | 25 |
| Authority Debt | 25 |
| Principal and Interest Requirements | 26 |
| Summary of Certain Provisions of the | |
| Resolution | 27 |
| Definition of Certain Terms | 27 |
| Sinking Fund | 31 |
| Redemption | 33 |
| Construction Fund | 33 |
| Defeasance | 34 |
| Issuance of Additional Bonds | 35 |
| Other Indebtedness | 35 |
| Investment of Funds | 36 |
| Modifications | 37 |
| Miscellaneous Covenants | 38 |
| Summary of Certain Provisions of the | |
| Proposed Supplemental Resolution | 38 |
| Modification with Consent of Holders | |
| of Majority of Bonds | 39 |
| Parity Liens to Providers of Credit | |
| Facilities and Liquidity Facilities | 40 |
| Tax Exemption | 40 |
| Discount Bonds | 40 |
| Premium Bonds | 41 |
| Verification of Mathematical Computations | 41 |
| Underwriting | 41 |
| Litigation | 42 |
| Legal Matters | 42 |
| Legal Investment | 42 |
| Government Development Bank | 42 |
| Ratings | 42 |
| Continuing Disclosure | 43 |
| Relationships Among the Parties | 45 |
| Miscellaneous | 45 |
| Appendix I -- Commonwealth of Puerto Rico | I-1 |
| Appendix II -- Commonwealth of Puerto Rico, | |
| General Purpose Financial Statements, | |
| June 30, 1995 | II-1 |
| Appendix III -- Audited Financial Statements | |
| of the Authority, June 30, 1995 | III-1 |
| Appendix IV -- Letter of Traffic | |
| Engineers | IV-1 |
| Appendix V -- Form of Opinion of | |
| Bond Counsel | V-1 |
| Appendix VI--Cap RITES Bonds | VI-1 |
| Appendix VII--Specimen MBIA Policy | VII-1 |
| Appendix VIII--Specimen FSA Policy | VIII-1 |

[This page intentionally left blank]

# $1,075,275,000
# PUERTO RICO HIGHWAY AND TRANSPORTATION AUTHORITY
### $890,235,000 Highway Revenue Bonds (Series Y)
### $185,040,000 Highway Revenue Refunding Bonds (Series Z)

This Official Statement sets forth information in connection with the sale by Puerto Rico Highway and Transportation Authority (the "Authority") of $890,235,000 aggregate principal amount of its Puerto Rico Highway and Transportation Authority Highway Revenue Bonds (Series Y) (the "Series Y Bonds") and $185,040,000 aggregate principal amount of its Puerto Rico Highway and Transportation Authority Highway Revenue Refunding Bonds (Series Z) (the "Series Z Bonds"). The Series Y Bonds and Series Z Bonds (collectively, the "1996 Bonds") will be issued pursuant to Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended (the "Authority Act"), Resolution No. 68-18, adopted by the Authority on June 13, 1968, as amended (the "Resolution"), and Resolution No. 96-12, adopted by the Authority on March 28, 1996 (the "1996 Resolution"). The Chase Manhattan Bank (National Association) serves as Fiscal Agent under the Resolution. A portion of the 1996 Bonds will be delivered as Highway Revenue Cap RITES* Bonds, Series Y (the "Cap RITES Bonds"). See "Description of the 1996 Bonds-Cap RITES Bonds" under *The Bonds* and *Appendix VI* hereto. The principal of and interest on the Series Y Bonds maturing July 1 of the years 2001 through 2009, 2011 and 2012 and the principal of and interest on the Series Z Bonds maturing July 1 of the years 2001 through 2015 (collectively, "MBIA Insured Bonds") will be insured by a municipal bond insurance policy (the "MBIA Policy") issued to the Fiscal Agent by MBIA Insurance Corporation ("MBIA"). The principal of and interest on the Series Y Bonds maturing July 1 of the years 2015, 2016 and 2021 and the principal of and interest on the Series Z Bonds maturing July 1 of the years 2016 and 2018 (collectively, "FSA Insured Bonds") will be insured by a municipal bond insurance policy (the "FSA Policy") issued to the Fiscal Agent by Financial Security Assurance Inc. (the "FSA Policy"). The MBIA Insured Bonds and the FSA Insured Bonds are herein collectively called the "Insured Bonds", and the MBIA Policy and the FSA Policy are herein collectively called the "Policies". Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them under *Summary of Certain Provisions of the Resolution* or in *Appendix VI.*

The 1996 Bonds, the outstanding bonds of the Authority and any additional bonds to be issued under the Resolution are herein collectively referred to as the "Bonds". All Bonds are secured equally and ratably under the Resolution. See "Security for the Bonds" under *The Bonds*. The Authority proposes to adopt a supplemental resolution (the "Proposed Supplemental Resolution"), which would supplement and amend the Resolution, upon receipt of the consent of the owners of 100 percent of the Bonds. See "Proposed Supplemental Resolution" under *The Bonds.*

The Authority is issuing the Series Y Bonds to finance or refinance certain highway system improvements, and to make a deposit to the Reserve Account hereinafter mentioned. The Authority is issuing the Series Z Bonds to achieve annual debt service savings by refunding a portion of the Authority's outstanding Puerto Rico Highway Authority Highway Revenue Bonds (Series Q) (the "Series Q Bonds") and Puerto Rico Highway Authority Highway Revenue Refunding Bonds (Series R) (the "Series R Bonds") and all of the Authority's outstanding Puerto Rico Highway and Transportation Authority Highway Revenue Bonds (Series T) (the "Series T Bonds").

### INTRODUCTION

The Commonwealth of Puerto Rico (the "Commonwealth") established the Authority in 1965 as a public corporation and governmental instrumentality to design and oversee the construction, reconstruction and improvement of the Commonwealth highway system. The Commonwealth highway system now consists of 4,572 miles of roads, highways, bridges and tunnels, including the Luis A. Ferré (PR-52), De Diego (PR-22) and PR-53 tollways. The Authority operates and maintains these tollways and related connecting roads. Through its Public Works Directorate, the Department of Transportation and Public Works of the Commonwealth (the "Department") operates and maintains all other portions of the Commonwealth highway system. There are also 9,845 miles of local streets and adjacent

---

SM   Service mark of Merrill Lynch & Co.

roads in Puerto Rico operated and maintained at the municipal level which are not part of the Commonwealth highway system. Recent legislation has expanded the Authority's power to contract for the private design, construction, operation and maintenance of roads, highways, bridges and tunnels and to implement public policy relating to the development of a multimodal transportation system for the Commonwealth.

Since 1968, pursuant to a master plan for the long-range development of the highway system, which is supplemented as necessary, and an ongoing five-year priorities construction program (the "Priorities Construction Program"), the Authority has carried out the planning, construction, improvement and equipping of all Commonwealth roads, highways, bridges and tunnels. During this time, the Authority has constructed highway system facilities with a total cost of more than $5,053.9 million. This amount includes approximately $2,179.8 million financed with internally generated funds, $1,807.2 million financed through the issuance of Bonds, $998.5 million paid with federal highway assistance funds and $68.4 million paid with funds provided by the Commonwealth.

The Bonds are payable solely from, and secured by a pledge of, all Revenues and other moneys held for the credit of the Sinking Fund established under the Resolution. Neither the credit of the Commonwealth nor that of any of its political subdivisions is pledged for the payment of the Bonds. Revenues include all current gasoline taxes, a portion of the current gas oil and diesel oil taxes and a portion of the current motor vehicle license fees imposed by the Commonwealth, all toll revenues of the Traffic Facilities, and certain investment earnings. Such taxes and license fees only are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if and to the extent that other Commonwealth revenues are insufficient therefor. The Commonwealth has never applied taxes or fees allocated to the Authority to the payment of such Commonwealth debt. See "Security for the Bonds" under *The Bonds* and "Debt" in *Appendix I*.

The financial condition of the Commonwealth and economic conditions in Puerto Rico, including gasoline and oil prices, affect the level of Revenues available to the Authority. In addition, Commonwealth appropriations for the Department affect the level of maintenance for the portion of the Commonwealth highway system which is the responsibility of the Department. Certain information regarding the Commonwealth is set forth in *Appendix I* hereto.

This Official Statement includes brief descriptions of the Authority, the Commonwealth and the highway system, together with other information, including summaries of the terms of the 1996 Bonds, the Resolution, the Proposed Supplemental Resolution, and the various statutes affecting the Authority. Such summaries and the references to all documents referred to herein do not purport to be complete, and each summary and reference is qualified in its entirety by reference to each such document, copies of which are available from the Authority. All references to the 1996 Bonds are qualified in their entirety by reference to the definitive forms thereof and the information with respect thereto contained in the Resolution and the 1996 Resolution.

## FINANCING PLAN

### Series Y Bonds

The Authority is issuing the Series Y Bonds to finance or refinance a portion of the costs of various highway projects under the Authority's current Priorities Construction Program, including the payment of $250 million notes (the "Outstanding Notes") held by Government Development Bank for Puerto Rico ("Government Development Bank"), and to make a deposit to the Reserve Account. See "Priorities Construction Program" under *Highway System Revenues and Expenditures* and "Security for the Bonds — Reserve Account" under *The Bonds*.

### Series Z Bonds

The Authority is issuing the Series Z Bonds to advance refund a portion of the outstanding Series Q Bonds and Series R Bonds and all of the outstanding Series T Bonds. The Bonds being refunded are herein collectively referred to as the "Refunded Bonds". $194,476,570 of the proceeds of the Series Z Bonds, together with other available moneys, will be deposited into an Escrow Deposit Trust Fund (the "Escrow Fund") pursuant to the Escrow Deposit

Letter, dated April 9, 1996 (the "Escrow Deposit Letter"), from the Authority to The Chase Manhattan Bank (National Association), Fiscal Agent under the Resolution (the "Fiscal Agent"), in order to refund the Refunded Bonds on the dates and at the redemption prices set forth below:

| Series | Amount to be Refunded | Interest Rate | Maturity Date | Redemption Date | Redemption Price |
|---|---|---|---|---|---|
| Highway Revenue | $3,355,000 | 7.500% | July 1, 2001 | July 1, 2000 | 102% |
| Bonds (Series Q) | 3,610,000 | 7.600 | July 1, 2002 | July 1, 2000 | 102 |
| Highway Revenue | 2,220,000 | 7.200 | July 1, 2001 | July 1, 2000 | 102 |
| Refunding Bonds | 2,360,000 | 7.250 | July 1, 2002 | July 1, 2000 | 102 |
| (Series R) | 45,300,000 | 6.750 | July 1, 2005 | July 1, 2000 | 102 |
| Highway Revenue | | | | | |
| Bonds | 19,815,000 | 6.625 | July 1, 2012 | July 1, 2002 | 101½ |
| (Series T) | 108,285,000 | 6.625 | July 1, 2018 | July 1, 2002 | 101½ |

The refunding will permit the Authority to realize annual savings on its debt service requirements on outstanding Bonds. The moneys deposited in the Escrow Fund will be invested in Government Obligations (as defined in the Resolution) maturing in amounts and bearing interest at rates sufficient to pay, when due, without any reinvestment, the principal of and premium, if any, and interest on the Refunded Bonds as described above. Such Government Obligations will be purchased on the open market at interest rates which will cause the yield thereon (computed in accordance with the relevant provisions of the Internal Revenue Code of 1986, as amended, and the regulations applicable thereto) not to exceed the yield permitted thereby. All amounts held in the Escrow Fund will be held in trust solely for the benefit of the holders of the Refunded Bonds. Upon the deposit into the Escrow Fund, the Refunded Bonds will no longer be deemed to be outstanding under the Resolution.

## Uses of Funds

The proceeds of the sale of the 1996 Bonds (exclusive of any accrued interest received upon delivery, which will be deposited in the Bond Service Account established under the Resolution) are expected to be applied as follows:

| | |
|---|---|
| Deposit into Escrow Fund . . . . . . . . . . . . . . . | $ 194,476,570 |
| Deposit into Construction Fund . . . . . . . . . . . | 523,162,448 |
| Payment of Outstanding Notes . . . . . . . . . . . . | 250,000,000 |
| Reserve Account Deposit . . . . . . . . . . . . . . . | 55,367,425 |
| Underwriting discount, net original issue discount, bond insurance premium and legal, printing and financing expenses . . . . . . . . . . . . . . . . . . . . | 52,268,557 |
| Total Uses . . . . . . . . . . . . . . . . . . . . . . . | $1,075,275,000 |

On the date of delivery of the 1996 Bonds, the sum of $2,066,883, representing deposits made in respect of interest due on the Refunded Bonds payable July 1, 1996, will be withdrawn from the Bond Service Account and deposited into the Escrow Fund. Pending expenditure from the Construction Fund, moneys deposited therein from the proceeds of the Series Y Bonds will be invested under an investment agreement with Bayerische Landesbank Girozentrale, acting through its Cayman Islands Branch.

# THE BONDS

## Description of the 1996 Bonds

### General

The 1996 Bonds will be issued as registered bonds without coupons, will be dated, will bear interest at the rates, payable at the times, and will mature on the dates and in the principal amounts set forth on the inside cover of this Official Statement. Principal of and premium, if any, and interest on the 1996 Bonds will be payable in the manner described below under "Book-Entry Only System". The 1996 Bonds are subject to redemption as described below under "Redemption Provisions".

### Cap RITES Bonds

The Cap RITES Bonds will be delivered in the principal amount and will mature on the date indicated on the inside cover page of this Official Statement. Interest with respect to the Cap RITES Bonds will be payable on each January 1 and July 1, commencing July 1, 1996, and will accrue from the date of initial delivery through July 1, 1999 (the "Scheduled Conversion Date") at a rate equal to 5.73% per annum (the "Set Rate") plus the amount, if positive, obtained by subtracting 4½% (the "Level Rate") from the Variable Rate, subject to the application of the Maximum Cap RITES Rate of 11.48% per annum (the "Maximum Cap Rites Rate") (computed as described in *Appendix VI* hereto) and thereafter at 6¼% per annum (the "Constant Rate"). Owners of the Cap RITES Bonds may elect on any business day prior to the applicable Scheduled Conversion Date to convert the interest on the Cap RITES Bonds to the Constant Rate upon payment by or to such Owners of the Conversion Adjustment, and subject to certain other conditions. See "Optional Conversion of the Cap RITES Bonds to the Constant Rate" in *Appendix VI* hereto. The Cap RITES Bonds will be dated their date of delivery and issued in denominations of $100,000 and any multiple thereof until the Scheduled Conversion Date or the Optional Conversion Date described under "Optional Conversion of the Cap RITES Bonds to the Constant Rate" in *Appendix VI* hereto and thereafter the Cap RITES Bonds will be issued in denominations of $5,000 and any multiple thereof. The Cap RITES Bonds are more fully described in *Appendix VI* hereto.

## Redemption Provisions

### Optional Redemption

The Series Z Bonds are not subject to optional redemption.

The Series Y Bonds at the time outstanding maturing after July 1, 2014, other than the Series Y Bonds maturing July 1, 2021 and July 1, 2036, may be redeemed on or after July 1, 2006 at the option of the Authority from any available moneys (other than moneys deposited in the Sinking Fund in respect of an Amortization Requirement) on any date either in whole or, as the Authority may direct, in part at the following prices (expressed as percentages of the principal amount) plus accrued interest to the redemption date:

| Period During Which Redeemed | Redemption Price |
|---|---|
| July 1, 2006 through June 30, 2007  . . . . | 101½% |
| July 1, 2007 through June 30, 2008  . . . . | 100¾ |
| July 1, 2008 and thereafter . . . . . . . . . . . | 100 |

The Series Y Bonds at the time outstanding maturing July 1, 2036 may be redeemed on or after July 1, 2016 at the option of the Authority from any available moneys (other than moneys deposited in the Sinking Fund in respect of an Amortization Requirement) on any date either in whole or in part at a redemption price equal to the principal amount thereon plus accrued interest to the redemption date, without premium.

4

*Mandatory Redemption*

The 1996 Bonds issued as term bonds are subject to redemption on each July 1 immediately after the fiscal year for which there is an Amortization Requirement to the extent of the respective Amortization Requirements for said 1996 Bonds (less the amount of moneys in the Sinking Fund used to retire bonds by purchase) from moneys in the Sinking Fund at par plus accrued interest in the years and amounts set forth below:

| | | | Amortization Requirements for Series Y Bonds due July 1, | | | |
|---|---|---|---|---|---|---|
| Year | 2011 | 2018 | 2021 | 2026 | 2036(5%) | 2036(5½%) |
| 2010 . . . . . . . . . | $12,750,000 | | | | | |
| 2011 . . . . . . . . . | 13,510,000* | | | | | |
| 2017 . . . . . . . . . | | $18,990,000 | | | | |
| 2018 . . . . . . . . . | | 20,035,000* | | | | |
| 2019 . . . . . . . . . | | | $21,100,000 | | | |
| 2020 . . . . . . . . . | | | 22,400,000 | | | |
| 2021 . . . . . . . . . | | | 23,800,000* | | | |
| 2022 . . . . . . . . . | | | | $ 5,260,000 | | |
| 2023 . . . . . . . . . | | | | 26,835,000 | | |
| 2024 . . . . . . . . . | | | | 28,310,000 | | |
| 2025 . . . . . . . . . | | | | 29,865,000 | | |
| 2026 . . . . . . . . . | | | | 31,510,000* | | |
| 2027 . . . . . . . . . | | | | | $17,890,000 | $15,350,000 |
| 2028 . . . . . . . . . | | | | | 18,785,000 | 16,195,000 |
| 2029 . . . . . . . . . | | | | | 19,720,000 | 17,090,000 |
| 2030 . . . . . . . . . | | | | | 20,710,000 | 18,025,000 |
| 2031 . . . . . . . . . | | | | | 21,745,000 | 19,020,000 |
| 2032 . . . . . . . . . | | | | | 22,830,000 | 20,065,000 |
| 2033 . . . . . . . . . | | | | | 23,970,000 | 21,175,000 |
| 2034 . . . . . . . . . | | | | | 25,170,000 | 22,335,000 |
| 2035 . . . . . . . . . | | | | | 26,430,000 | 23,565,000 |
| 2036 . . . . . . . . . | | | | | 27,750,000* | 24,860,000* |
| Average life (years) | 14.74 | 21.74 | 24.27 | 28.68 | 36.13 | 36.17 |

\* Maturity

| Year | Amortization Requirements for Series Z Bonds due July 1, 2018 |
|---|---|
| 2017 | $20,680,000 |
| 2018 | 21,920,000* |
| Average life (years) | 21.74 |

\* Maturity

*Notice of Redemption*

Notice of redemption of the 1996 Bonds shall be given not less than 30 days prior to the redemption date by first-class mail, postage prepaid, to The Depository Trust Company ("DTC"), New York, New York (or if the book-entry only system has been discontinued as described below, to the registered owners of the 1996 Bonds or portions thereof to be redeemed at their addresses appearing upon the registration books, but failure to mail such notice to the registered owner of any 1996 Bond or any defect in such notice will not affect the redemption of any other 1996 Bonds as to which proper notice shall have been duly mailed). If notice of redemption shall have been duly mailed as aforesaid, and if on the redemption date moneys or Government Obligations which will provide moneys sufficient for the redemption of all 1996 Bonds or portions thereof to be redeemed, together with interest to the redemption date, shall be held by the Fiscal Agent for such payment, then interest on such 1996 Bonds or portions thereof shall cease to accrue.

*Selection of Bonds to be Redeemed*

If less than all of the 1996 Bonds of any one maturity shall be called for redemption, the particular 1996 Bonds or portions thereof to be redeemed shall be selected by the Fiscal Agent in such manner as it in its discretion may determine to be appropriate and fair. If during any fiscal year the total principal amount of term Bonds of a particular maturity retired by purchase or redemption exceeds the Amortization Requirement for such term Bonds for such year, the Amortization Requirements for such term Bonds shall be reduced for subsequent fiscal years in amounts aggregating such excess as shall be determined by the Authority.

**Security for the Bonds**

*Pledged Revenues*

The Bonds are payable solely from, and secured by a pledge of, Revenues and all other moneys held for the credit of the Sinking Fund, which includes the Bond Service Account, the Redemption Account and the Reserve Account.

As defined in the Resolution, Revenues include (i) the gross receipts of the current $0.16 per gallon tax on gasoline and $0.04 of the current $0.08 per gallon tax on gas oil and diesel oil imposed by the Commonwealth and allocated to the Authority (after any deductions for taxes on fuels used in sea and air transportation that are required to be reimbursed under certain circumstances) by Subtitle B of Act No. 120 of the Legislature of Puerto Rico, approved October 31, 1994, as amended (the "Excise Act"); (ii) the gross receipts derived from the $15 per vehicle increase of annual motor vehicle license fees imposed by the Commonwealth and allocated to the Authority by Act No. 9 of the Legislature of Puerto Rico, approved August 12, 1982 ("Act No. 9"); (iii) any tolls or other charges imposed by the Authority for the use of any of the traffic facilities; (iv) the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority in the future and which the Authority may pledge to the payment of the Bonds; and (v) investment earnings on deposits to the credit of funds and accounts established under the Resolution, except for the Construction Fund. The Excise Act replaced prior similar legislation. Revenues do not include gasoline taxes, gas oil and diesel oil taxes and motor vehicle license fees which may be levied or collected from time to time other than the amounts of the taxes and fees described in this paragraph unless allocated by the Commonwealth to the Authority and pledged by the Authority to the Bonds.

The Commonwealth has agreed and committed in the Excise Act that it will not reduce the gasoline tax below $0.16 per gallon or the tax on gas oil and diesel oil below $0.04 per gallon and that it will not reduce the amount of such taxes allocated to the Authority until all obligations of the Authority, including the Bonds, secured by the pledge thereof are fully paid. The Commonwealth has also agreed and pledged in Act No. 9 that it will not reduce the motor vehicle license fees allocated and pledged to the payment of obligations of the Authority, including the Bonds, so long as the proceeds of such increase remain pledged to the payment of such obligations. Any tolls or other charges for the use of the Traffic Facilities may be reduced or eliminated by the Authority unless such tolls and other charges have been taken into account in the calculation of Revenues for purposes of satisfying the tests for the issuance of additional Bonds under the Resolution, in which case such tolls and other charges may be reduced

only in limited circumstances. See "Issuance of Additional Bonds" under *Summary of Certain Provisions of the Resolution*. The Authority expects to take such tolls and other charges into account for purposes of satisfying the tests for the issuance of the 1996 Bonds. See "Projected Revenues" under *Highway System Revenues and Expenditures*.

Under the Excise Act and Act No. 9, the proceeds of the taxes and fee increase allocated to the Authority are deposited by the Department of the Treasury in a special fund (the "Special Fund") in favor of the Authority. In accordance with the Constitution of Puerto Rico, the proceeds of such taxes and fee increase are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if and to the extent that other Commonwealth revenues are insufficient therefor. The Commonwealth has never applied the proceeds of such taxes or fee increase allocated to the Authority to the payment of such debt nor has the Commonwealth ever defaulted on the payment of principal of or interest on any of such debt. For information with respect to Commonwealth debt and the economic and financial condition of the Commonwealth, see "Prior Payment of Full Faith and Credit Obligations of the Commonwealth" below and in *Appendix I*.

Under the Excise Act, if moneys in the Reserve Account are applied to cover a deficiency in the amounts necessary for payment of the principal of and interest on the Bonds, the amounts used from the Reserve Account to cover said deficiency shall be reimbursed to the Authority from the first amounts received in the next fiscal year or subsequent years by the Commonwealth derived from (i) any other taxes which may then be in effect on any other fuel or propellant which is used, among other purposes, to propel highway vehicles and (ii) any remaining portion of the tax then imposed on gasoline and gas oil or diesel oil then in effect. The proceeds of said other taxes and the remainder of the gasoline tax and gas oil or diesel oil tax to be used to reimburse the Reserve Account shall not be deposited in the General Fund of the Commonwealth when collected, but shall be deposited in the Special Fund for the benefit of the Authority, and, subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, shall be used to reimburse said Reserve Account.

Moneys in the Special Fund are transferred by the Department of the Treasury to the Authority at least monthly. Upon receipt, the Authority is required under the Resolution to deposit such moneys, together with any toll receipts that are received directly by the Authority, into the Bond Service Account and the Redemption Account to provide for the payment of principal of and interest and premium, if any, on the Bonds and for required deposits to the Reserve Account. Any remaining Revenues (other than investment earnings) are deposited into the Construction Fund and are available to the Authority for any of the authorized purposes of the Authority, but subject to the payment of certain operation and maintenance expenses and repair, renewal and replacement costs, as required by the Resolution. See *Summary of Certain Provisions of the Resolution*.

**The Bonds are not a debt of the Commonwealth or any of its political subdivisions (other than the Authority), and neither the Commonwealth nor any such subdivision (other than the Authority) shall be liable thereon.**

**The Resolution does not provide for the acceleration of the maturities of the Bonds upon default.**

*Reserve Account*

The Resolution establishes a Reserve Account, the moneys in which are to be applied to the payment of interest on the Bonds and maturing principal of serial Bonds whenever moneys in the Bond Service Account are insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the Redemption Account to satisfy any Amortization Requirements for the term Bonds whenever Revenues are insufficient for such purpose. The Authority covenants to accumulate and maintain in the Reserve Account an amount equal to the lesser of the maximum annual Principal and Interest Requirements for any fiscal year on all outstanding Bonds and 10% of the original principal amount of each Series of Bonds outstanding (the "Reserve Requirement").

On March 1, 1996, approximately $133,075,000 was on deposit in the Reserve Account. The Reserve Requirement will be $189,190,849 upon the issuance of the 1996 Bonds (and the refunding of the Refunded Bonds), and $189,094,067 will be on deposit in the Reserve Account following the issuance of the 1996 Bonds. The Resolution permits any increase in the Reserve Requirement to be funded over not more than five years and allows

7

the Authority to use a letter of credit or insurance policy to fund the Reserve Requirement. See *Summary of Certain Provisions of the Resolution* below.

Excess moneys in the Reserve Account are transferred to the Construction Fund, the Bond Service Account or the Redemption Account, as directed by the Authority.

If the moneys in the Reserve Account are used to cover any deficiency in the Bond Service Account or the Redemption Account established under the Resolution, the Excise Act provides that the Reserve Account shall be reimbursed, subject to the provisions of the Constitution of Puerto Rico relating to payment of Commonwealth debt, from the first proceeds received by the Commonwealth in the next fiscal year or years derived from (i) any remaining portion of the gasoline tax and gas oil and diesel oil tax then in effect and (ii) any other taxes which may then be in effect on any other fuels or propellants which are used, among other purposes, to propel highway vehicles.

### Prior Payment of Full Faith and Credit Obligations of the Commonwealth

*Provision for Prior Payment.* The Constitution of Puerto Rico provides that public debt of the Commonwealth constitutes a first lien on available Commonwealth taxes and revenues. Public debt includes bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged, and, according to opinions heretofore rendered by the Secretary of Justice of the Commonwealth, any payments which are required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public corporations. The Bonds do not constitute public debt.

The proceeds of the gasoline tax, the gas oil and diesel oil tax and the motor vehicle license fees allocated to the Authority by the Excise Act and Act No. 9 are available taxes and revenues under the Constitution. Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth but, under the Excise Act and Act No. 9, such taxes and fees are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth under the Constitution are insufficient for such purpose. Tolls collected by the Authority and investment earnings are not available Commonwealth taxes and revenues.

The Commonwealth has never applied taxes or fees allocated to the Authority to the payment of its public debt nor has the Commonwealth ever defaulted on the payment of principal of or interest on any of its public debt. See *Debt* in *Appendix I*.

Under the provisions of Act No. 39 of the Legislature of Puerto Rico, approved May 13, 1976, as amended ("Act No. 39"), the Secretary of the Treasury of Puerto Rico is obligated to fund annual debt service on general obligation bonds and notes of the Commonwealth by monthly deposits into the Commonwealth Redemption Fund. On February 29, 1996, the amount on deposit in the Commonwealth Redemption Fund was $167,335,095, as required. Moneys in the Commonwealth Redemption Fund may also be applied to payment of other Commonwealth guaranteed obligations outstanding prior to adoption of Act No. 39. Such moneys are not available to pay the Bonds.

*Debt Limitation.* Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued which is payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceeds 15% of the average annual internal revenues of the Commonwealth for the two preceding fiscal years. The Constitution of Puerto Rico does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded. Internal revenues (that is, revenues raised under the provisions of Commonwealth legislation) consist principally of income taxes, excise taxes, property taxes, licenses and miscellaneous non-tax revenues. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Department of the Treasury, and motor vehicle fuel taxes and license fees, which are allocated to the Authority as described above, are not included as internal revenues for the purpose of calculating the debt limit, although they are available for the payment of debt service.

Future combined maximum annual debt service for the Commonwealth's currently outstanding general obligation debt will be $426,360,823 in the fiscal year ending June 30, 1997. See "Debt Service Requirements for Commonwealth General Obligation Bonds" under *Debt* in *Appendix I.* That amount is equal to 9.33% of $4,569,021,000 (which is equal to the average of the adjusted internal revenues for the two fiscal years ended June 30, 1994 and June 30, 1995). On December 21, 1995, Puerto Rico Aqueduct and Sewer Authority issued $400,340,000 Puerto Rico Aqueduct and Sewer Authority Refunding Bonds, Series 1995, Guaranteed by the Commonwealth of Puerto Rico (the "PRASA Guaranteed Bonds"). The Commonwealth expects to make all payments on the PRASA Guaranteed Bonds under the full faith and credit guarantee of the Commonwealth. In the event the Commonwealth makes such payments, the amount paid will be taken into account in future years as an additional amount of debt service on the Commonwealth's general obligation debt for purposes of computing the above percentage.

## Additional Bonds

The Authority may issue additional Bonds under the Resolution to provide funds to pay all or any part of the cost of Traffic Facilities (including the payment of any outstanding notes of the Authority issued for the purpose of paying all or a part of such cost); provided, however, the Revenues for any 12 consecutive months of the 15 months immediately preceding the issuance of such Bonds shall be not less than 150% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Bonds and the additional Bonds then to be issued. See "Issuance of Additional Bonds" under *Summary of Certain Provisions of the Resolution.*

The Authority may also issue additional Bonds to refund all or any part of the outstanding Bonds of any Series without satisfying such requirement, provided that the Authority certifies that the maximum annual Principal and Interest Requirements on the Bonds to be outstanding after the issuance of such additional Bonds will be equal to or less than the maximum annual Principal and Interest Requirements on the Bonds outstanding prior to the issuance of the additional Bonds.

Any additional Bonds issued under the Resolution will be on a parity with the outstanding Bonds and will be entitled to the equal benefit, protection and security of the provisions, covenants and agreements of the Resolution.

In certain circumstances relating to the Teodoro Moscoso Bridge, the Authority's ability to issue additional Bonds under the Resolution may be restricted. See "Public-Private Capital Improvement Projects" under *Highway System Revenues and Expenditures.*

## The MBIA Policy

The following information has been furnished by MBIA for use in this Official Statement. Reference is made to *Appendix VII* for a specimen of the MBIA Policy.

The MBIA Policy unconditionally and irrevocably guarantees the full and complete payment required to be made by or on behalf of the Authority to the Fiscal Agent or its successor of an amount equal to (i) the principal of (either at the stated maturity or by an advancement of maturity pursuant to a mandatory sinking fund payment) and interest on the MBIA Insured Bonds as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed by the MBIA Policy shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration), and (ii) the reimbursement of any such payment which is subsequently recovered from any owner of the MBIA Insured Bonds pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law (a "Preference").

The MBIA Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any MBIA Insured Bond. The MBIA Policy does not, under any circumstance, insure against loss relating to (i) optional or mandatory redemptions (other than mandatory sinking fund redemptions), (ii) any payments

9

to be made on an accelerated basis, (iii) payments of the purchase price of MBIA Insured Bonds upon tender by an owner thereof, or (iv) any Preference relating to (i) through (iii) above. The MBIA Policy also does not insure against nonpayment of principal of or interest on the MBIA Insured Bonds resulting from the insolvency, negligence or any other act or omission of the Fiscal Agent or any other paying agent for the MBIA Insured Bonds.

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by MBIA from the Fiscal Agent or any owner of an MBIA Insured Bond the payment of an insured amount for which is then due, that such required payment has not been made, MBIA on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with State Street Bank and Trust Company, N.A. , in New York, New York, or its successor, sufficient for the payment of any such insured amounts which are then due. Upon presentment and surrender of such Bonds or presentment of such other proof of ownership thereof, together with any appropriate instruments of assignment to evidence the assignment of the insured amounts due on such Bonds as are paid by MBIA, and appropriate instruments to effect the appointment of MBIA as agent for such owners of such Bonds in any legal proceeding related to payment of insured amounts on such Bonds, such instruments being in a form satisfactory to State Street Bank and Trust Company, N.A., State Street Bank and Trust Company, N.A. shall disburse to such owners or the Fiscal Agent payment of the insured amounts due on such Bonds, less any amount held by the Fiscal Agent for the payment of such insured amounts and legally available therefor.

MBIA Insurance Corporation, formerly known as Municipal Bond Investors Assurance Corporation, is the principal operating subsidiary of MBIA Inc., a New York Stock Exchange listed company. MBIA, Inc. is not obligated to pay the debts of or claims against MBIA Insurance Corporation. MBIA Insurance Corporation is domiciled in the State of New York and licensed to do business in all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, the Virgin Islands of the United States and the Territory of Guam. MBIA Insurance Corporation has one European branch in the Republic of France.

As of September 30, 1995 MBIA Insurance Corporation had admitted assets of $3.7 billion (unaudited), and total capital and surplus of $1.2 billion (unaudited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. As of December 31, 1994, MBIA Insurance Corporation had admitted assets of $3.4 billion (audited), total liabilities of $2.3 billion (audited), and total capital and surplus of $1.1 billion (audited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. All information regarding MBIA Insurance Corporation, a wholly owned subsidiary of MBIA, Inc., including the financial statements of MBIA Insurance Corporation for the year ended December 31, 1994, prepared in accordance with generally accepted accounting principles, included in the Annual Report on Form 10-K of MBIA Inc. for the year ended December 31, 1994, is hereby incorporated by reference herein and shall be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any other subsequently filed document which also is incorporated by reference herein modifies or supersedes such statement. Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

Furthermore, copies of the year end financial statements of MBIA Insurance Corporation prepared in accordance with statutory accounting practices are available from MBIA Insurance Corporation. A copy of the Annual Report on Form 10-K of MBIA, Inc. is available from MBIA or the Securities Exchange Commission. The address of MBIA Insurance Corporation is 113 King Street, Armonk, New York 10504.

Moody's Investors Service ("Moody's") rates the claims paying ability of MBIA Insurance Corporation "Aaa".

Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc. ("Standard & Poor's") rates the claims paying ability of MBIA Insurance Corporation "AAA".

Fitch Investors Services, L.P. rates the claims paying ability of MBIA Insurance Corporation "AAA".

Each rating of MBIA Insurance Corporation should be evaluated independently. The ratings reflect the respective rating agency's current assessment of the creditworthiness of MBIA Insurance Corporation and its ability to pay claims on its policies of insurance. Any further explanation as to the significance of the above ratings may be obtained only from the applicable rating agency.

The above ratings are not recommendations to buy, sell or hold the MBIA Insured Bonds, and such ratings may be subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the MBIA Insured Bonds. MBIA Insurance Corporation does not guaranty the market price of the 1996 Bonds (including the MBIA Insured Bonds) nor does it guaranty that the ratings on the 1996 Bonds (including the MBIA Insured Bonds) will not be revised or withdrawn.

## The FSA Policy

Concurrently with the issuance of the 1996 Bonds, FSA will issue the FSA Policy. The FSA Policy unconditionally guarantees the payment of that portion of the principal of and interest on the FSA Insured Bonds that has become due for payment, but shall be unpaid by reason of nonpayment by the Authority. On the later of the day on which such principal and interest is due and the business day next following the business day on which FSA shall have received notice by telephone or telecopy, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from an owner of any FSA Insured Bonds or the Fiscal Agent, of the nonpayment of such amount by the Authority, FSA will disburse such amount due on any FSA Insured Bond to the Fiscal Agent, for the benefit of the owners thereof or, at the election of FSA, directly to each such owner, in either case upon receipt by FSA in form reasonably satisfactory to it of (a) evidence of such owner's right to receive payment of the principal and interest that is due for payment and (b) evidence, including any appropriate instruments of assignment, that all of such owner's rights to payment of such principal and interest shall be vested in FSA. The term "nonpayment" in respect of any FSA Insured Bond includes any payment of principal or interest that is insured by FSA made to an owner of an FSA Insured Bond that has been recovered from such an owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

The FSA Policy is non-cancelable and the premium will be fully paid at the time of delivery of the 1996 Bonds. The FSA Policy covers failure to pay principal of the any FSA Insured Bonds on their respective stated maturity dates, or dates on which the same shall have been duly called for mandatory sinking fund redemption, and not on any other date, unless FSA shall elect, in its sole discretion, to pay such principal together with any interest accrued thereon, and covers the failure to pay an installment of interest on the stated date for its payment. Payment by FSA of principal due upon any advancement of maturity and interest accrued to such date (to the extent unpaid by the Authority) shall fully discharge FSA's obligations under the Policy.

FSA may appoint a fiscal agent ("FSA's Fiscal Agent") for purposes of the FSA Policy by giving written notice to the Fiscal Agent specifying the name and notice address of FSA's Fiscal Agent. From and after the date of receipt of such notice by the Fiscal Agent, (i) copies of all notices required to be delivered to FSA pursuant to the FSA Policy shall be simultaneously delivered to FSA's Fiscal Agent and to FSA and shall not be deemed received until received by both and (ii) all payments required to be made by FSA under the FSA Policy may be made directly by FSA or by FSA's Fiscal Agent on behalf of FSA. FSA's Fiscal Agent is the agent of FSA only and FSA's Fiscal Agent shall in no event be liable to owners of the 1996 Bonds (including the FSA Insured Bonds) for any acts of the FSA's Fiscal Agent or any failure of FSA to deposit or cause to be deposited sufficient funds to make payments due under the FSA Policy.

Under the FSA Policy, FSA will, to the extent permitted by applicable law, waive, only for the benefit of the owners of 1996 Bonds (including the FSA Insured Bonds), all rights and defenses that might otherwise have been available to FSA to avoid payment of its obligations under the FSA Policy in accordance with its terms.

THE FSA POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

*Financial Security Assurance Inc.* FSA is a wholly owned subsidiary of Financial Security Assurance Holdings Ltd. ("Holdings"), a New York Stock Exchange listed company. Holdings is owned approximately 51% by U S WEST Capital Corporation ("U S WEST"), 8% by Fund American Enterprises Holdings, Inc. ("Fund American"), and 6% by The Tokio Marine and Fire Insurance Co., Ltd. ("Tokio Marine"). U S WEST is a subsidiary of U S WEST, Inc., which operates businesses involved in communications, data solutions, marketing services and capital assets, including the provision of telephone services in 14 states in the Western and Midwestern United States. Fund American is a financial services holding company whose principal operating subsidiary is one of the nation's largest mortgage servicers. Tokio Marine is a major Japanese property and casualty insurance company. U S WEST has announced its intention to dispose of its remaining interest in Holdings as part of its strategic plan to withdraw from businesses not directly involved in telecommunications. Fund American has certain rights to acquire and vote additional shares of Holdings from U S WEST and Holdings. No shareholder of Holdings is obligated to pay any debt of FSA or any claim under any insurance policy issued by FSA or to make any additional contribution to the capital of FSA.

FSA is domiciled in the State of New York and is subject to regulation by the State of New York Insurance Department. At December 31, 1995, FSA's total policyholders' surplus and contingency reserves were approximately $644,653,000 and its total unearned premium reserve was approximately $376,597,000 in accordance with statutory accounting principles. At December 31, 1995, FSA's total shareholders' equity was approximately $789,986,000 and its total net unearned premium reserve was approximately $330,349,000 in accordance with generally accepted accounting principles.

The financial statements of FSA included in, or as exhibits to, the Annual Report on Form 10-K for the year ended December 31, 1995, which has been filed with the Securities and Exchange Commission (the "Commission") by Holdings, are hereby incorporated by reference in this Official Statement.

All financial statements of FSA included in documents filed by Holdings pursuant to Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, subsequent to the date of this Official Statement and prior to the termination of the offering of the Bonds shall be deemed to be incorporated by reference into this Official Statement and to be a part hereof from the respective dates of filing such documents.

Copies of FSA's financial statements and other information regarding FSA are included in, or as exhibits to, documents filed by Holdings with the Commission and may also be obtained by writing to FSA at 350 Park Avenue, New York, New York 10022, Attention: Communications Department. FSA's telephone number is (212) 826-0100.

FSA's claims-paying ability is rated "Aaa" by Moody's Investors Service, Inc. and "AAA" by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. Such ratings reflect only the views of the respective rating agencies, are not recommendations to buy, sell or hold securities and are subject to revision or withdrawal at any time by such rating agencies.

The FSA Policy does not protect investors against changes in market value of the 1996 Bonds (including the FSA Insured Bonds). The market value of the 1996 Bonds (including the FSA Insured Bonds) may be impaired as a result of changes in prevailing interest rates, changes in applicable ratings or other causes.

FSA makes no representation regarding the Bonds (including the FSA Insured Bonds) or the advisability of investing in the 1996 Bonds (including the FSA Insured Bonds). FSA makes no representation regarding this Official Statement, nor has it participated in the preparation thereof, except that FSA has provided to the Authority the information presented under this caption for inclusion in this Official Statement.

**Book-Entry Only System**

The following information concerning DTC and DTC's book-entry system has been obtained from DTC and neither the Authority nor the Underwriters take any responsibility for the accuracy thereof.

DTC will act as securities depository for the 1996 Bonds. The 1996 Bonds will be issued as fully registered Bonds in the name of Cede & Co. (DTC's partnership nominee). One fully registered 1996 Bond will be issued for each maturity of each series of the 1996 Bonds in the aggregate principal amount of such maturity, and, except for the Cap RITES Bonds, will be deposited with DTC. With respect to the Series Y Bonds maturing July 1, 2036 and bearing interest at the rate of 5% per annum, in accordance with the rules of DTC, one fully registered Series Y Bond in the aggregate principal amount of $200 million and one fully registered Series Y Bond in the aggregate principal amount of $25 million will be issued and deposited with DTC.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds securities that its participants (the "Participants") deposit with DTC. DTC also facilitates the settlement among Participants of securities transactions, such as transfers and pledges, in deposited securities through electronic computerized book-entry changes in Participants' accounts, thereby eliminating the need for physical movement of securities certificates. Direct Participants include securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations (the "Direct Participants"). DTC is owned by a number of its Direct Participants and by the New York Stock Exchange, Inc., the American Stock Exchange, Inc. and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as securities brokers and dealers, banks and trust companies that clear through or maintain a custodial relationship with a DTC Participant, either directly or indirectly (the "Indirect Participants"). The Rules applicable to DTC and its Participants are on file with the Securities and Exchange Commission.

Purchases of the 1996 Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the 1996 Bonds on DTC's records. The ownership interest of each actual purchaser of a 1996 Bond (under this caption, a "Beneficial Owner") will in turn be recorded in the Direct or Indirect Participants' records. Beneficial Owners will not receive written confirmations from DTC of their purchases, but Beneficial Owners are expected to receive written confirmation providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the 1996 Bonds will be accomplished by entries made on the books of Participants acting on behalf of the Beneficial Owners. Beneficial Owners will not receive definitive 1996 Bonds except in the event that use of the book-entry system for the 1996 Bonds is discontinued.

To facilitate subsequent transfers all 1996 Bonds deposited by Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. The deposit of 1996 Bonds with DTC and their registration in the name of Cede & Co. effect no change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the 1996 Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may not be the Beneficial Owners. The Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices will be sent to Cede & Co. If less than all of the 1996 Bonds within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in the 1996 Bonds to be redeemed.

Neither DTC nor Cede & Co. will consent or vote with respect to the 1996 Bonds. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the 1996 Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

13

Principal, redemption premium, if any, and interest payments on the 1996 Bonds will be made to DTC. DTC's practice is to credit Direct Participants' accounts on the payable date in accordance with their respective holdings shown on DTC's records unless DTC has reason to believe that it will not receive payment on the payable date. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name", and will be the responsibility of such Participant and not of DTC, the Authority, or the Fiscal Agent, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to DTC is the responsibility of the Authority or the Fiscal Agent, disbursement of such payments to Direct Participants shall be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners shall be the responsibility of Direct and Indirect Participants. See "Optional Conversion of the Cap RITES Bonds to the Constant Rate" in *Appendix VI* with respect to the payment of the Conversion Adjustment described therein.

DTC may discontinue providing its services as securities depository with respect to the 1996 Bonds at any time by giving reasonable notice to the Authority or the Fiscal Agent. Under such circumstances, in the event that a successor securities depository is not obtained, definitive 1996 Bonds are required to be printed and delivered.

The Authority may decide to discontinue use of the system of book-entry transfers through DTC (or a successor securities depository). In that event, definitive 1996 Bonds will also be printed and delivered.

**Payments and Transfers**

No assurance can be given by the Authority that DTC will make prompt transfer of payments to the Participants or that Participants will make prompt transfer of payments to Beneficial Owners. The Authority is not responsible or liable for payment by DTC or Participants or for sending transaction statements or for maintaining, supervising or reviewing records maintained by DTC or Participants.

*The Authority and the Fiscal Agent will have no responsibility or obligation to such DTC Participants, Indirect Participants, or the persons for whom they act as nominees with respect to the payments to or the providing of notice for the DTC Participants, the Indirect Participants, or the Beneficial Owners. Payments made to DTC or its nominee shall satisfy the obligations of the Authority to the extent of such payments.*

For every transfer of the 1996 Bonds, the Beneficial Owner may be charged a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto.

**Discontinuance of Book-Entry Only System**

In the event that such book-entry only system is discontinued for the 1996 Bonds, the following provisions will apply to the 1996 Bonds: principal of the 1996 Bonds and redemption premium, if any, thereon will be payable in lawful money of the United States of America at the principal corporate trust office of the Fiscal Agent in New York, New York. Interest on the 1996 Bonds will be payable on each January 1 and July 1, by check mailed to the respective addresses of the registered owners thereof as shown on the registration books of the Authority maintained by the Fiscal Agent as of the close of business on the record date therefor as set forth in the Resolution. The 1996 Bonds will be issued only as registered bonds without coupons in authorized denominations. The transfer of the 1996 Bonds will be registrable and the 1996 Bonds may be exchanged at the principal corporate trust office of the Fiscal Agent in New York, New York upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

**Proposed Supplemental Resolution**

The Authority proposes to adopt a supplemental resolution when the consent of the owners of 100% of the Bonds outstanding has been obtained. Such Proposed Supplemental Resolution will provide, among other things, for certain modifications to the amendment provisions of the Resolution, including a reduction from 66 2/3% to a majority for consent to certain amendments. In addition, the Authority will be permitted to grant a parity lien on

Revenues to secure reimbursement agreements with the providers of any credit facility or liquidity facility securing Bonds. For a more complete description of the Proposed Supplemental Resolution, see *Summary of Certain Provisions of the Proposed Supplemental Resolutions*.

## Consent of Bondholders

By purchasing the 1996 Bonds, the owners of such Bonds will have consented to and approved, for themselves and future owners of such Bonds, the adoption of the Proposed Supplemental Resolution. Upon the issuance of the 1996 Bonds and the refunding of the Refunded Bonds, the owners of 97.925% of the aggregate principal amount of the Bonds outstanding will have consented to the adoption of such Proposed Supplemental Resolution. The Authority reserves the right to make insubstantial changes to the Proposed Supplemental Resolution without obtaining any additional consents from the owners of Bonds who have consented thereto.

## THE AUTHORITY

### General Description

The Authority was created in 1965 to assume responsibility for the construction of roads and highways and related transportation facilities in Puerto Rico. The Authority has adopted a long-range master plan for development of a transportation infrastructure necessary to foster and sustain Puerto Rico's economic growth and a five-year Priorities Construction Program to implement that plan. As required by the Resolution, the Authority supplements the master plan as necessary and annually updates the five-year Priorities Construction Program.

The Authority is a separate entity from the Department for purposes of financing and constructing the Commonwealth highway system, but since 1971, the Secretary of Transportation and Public Works (the "Secretary"), appointed by the Governor, has overseen the management of the Authority and exercises the powers of the Governing Board of the Authority.

The Authority Act gives the Authority broad powers to carry out its responsibilities in accordance with the Department's overall transportation policies. These powers include, among other things, the complete control and supervision of any highway facilities owned, operated or constructed by it; the ability to set tolls for the use of the highway facilities; and the power to issue bonds, notes or other obligations. The Authority plans and manages the construction of all major projects relating to the Commonwealth highway system, undertakes major repairs and maintains the tollways. The Department maintains the Commonwealth highway system other than the tollways and undertakes construction of smaller projects. In August 1990, the Authority Act was amended to empower the Authority to enter into franchise contracts, subject to approval by a government board of adjudications, with private parties for the final design, construction, operation and maintenance of highway projects. Such projects, to be owned by the Authority and the Commonwealth, may be financed by such private parties by the imposition of tolls or otherwise. See "Public-Private Capital Improvement Projects" under *Highway System Revenues and Expenditures*.

In March 1991, the Authority Act was further amended to authorize the Authority to work with and implement policies established by the Secretary for the purpose of developing a multimodal transportation system for the Commonwealth to alleviate traffic congestion. See "Operating Expenses and Capital Expenditures -- Priorities Construction Program" under *Highway System Revenues and Expenditures*.

As of December 31, 1994, the highway system of Puerto Rico totalled 14,417 miles, consisting of 4,572 miles of Commonwealth highway system and 9,845 miles of municipal system of local streets and adjacent roads. The Commonwealth highway system comprises 674 miles of primary system highways, which are the more important inter-regional traffic routes and include the Luis A. Ferré (PR-52), the De Diego (PR-22) and PR-53 tollways, 1,334 miles of secondary system highways serving the needs of intra-regional traffic and 2,564 miles of tertiary highways and public housing development roads serving local, intra-regional traffic.

**Organization**

To carry out its responsibilities to develop the Commonwealth transportation system, the Authority is organized into the Executive Director's Office, which provides overall management of the Authority, to whom report three Assistant Executive Directors. The Assistant Executive Director for Infrastructure oversees the Planning Area, which oversees the development of the Priorities Construction Program as well as long-range planning; the Design Area, which is responsible for designing and supervising the design by consultants of Authority projects; the Property Acquisition Area, which acquires necessary easements and rights-of-way for Authority projects; and the Construction Area, which supervises and inspects the construction work performed by the Authority's contractors. The Assistant Executive Director for Administration and Finance oversees the Finance Area, which oversees the financial affairs of the Authority, including budgetary services; the Human Resources Area, which provides personnel services; the Administration Area, which provides administrative support to the Authority; the Toll Roads Administration Area, which oversees all aspects of the operation, maintenance, and repair of the Luis A. Ferré, De Diego and PR-53 tollways; and the Information Technologies Area, which oversees computer operations. The Assistant Executive Director for Traffic Engineering is responsible for projects specifically designed to alleviate urban congestion. Most construction, renovation and improvement of highway facilities is performed by private contractors selected through a public bidding process mandated by the Authority Act. The Authority plans, inspects and supervises such work.

**Management**

The Secretary of Transportation and Public Works, who has ultimate managerial power over the Authority, is Dr. Carlos I. Pesquera. Dr. Pesquera was appointed Secretary by the Governor of the Commonwealth in January 1993. Prior to his appointment as Secretary, Dr. Pesquera, who received a B.S. degree in civil engineering from the University of Puerto Rico and a masters degree and a Ph.D. degree in structural engineering from Cornell University, was the Director of the Center for Research in Infrastructure at the University of Puerto Rico.

The Executive Director of the Authority, who oversees the Authority's operations, is Dr. Sergio L. González, who received a B.S. degree in civil engineering from the University of Puerto Rico. In 1980, he received a masters degree in Transportation from the Massachusetts Institute of Technology ("M.I.T.") and in 1985, a Ph.D. degree in Civil Engineering Systems, also from M.I.T. Dr. González was appointed Executive Director by the Secretary in 1993. Prior to joining the Authority, Dr. González was Associate Professor and Director of the Traffic Engineering Laboratory of the Civil Engineering Department at the University of Puerto Rico.

The Authority retains the firm of Roy Jorgensen Associates, Inc. as independent Traffic Engineers to carry out certain responsibilities under the Resolution. These include an annual evaluation of the Authority's master plan and Priorities Construction Program for capital improvements and the maintenance activities of the Department and the Authority with respect to the Commonwealth highway system. The Authority employs Ernst & Young LLP as independent accountants responsible for auditing the Authority's books and accounts.

The administrative offices of the Authority are in the Minillas Government Center, De Diego Avenue, Stop 22, San Juan, Puerto Rico. The mailing address is P.O. Box 42007, San Juan, Puerto Rico 00940-2007. The telephone number is (787) 721-8787.

**Employee Relations**

As of February 2, 1996, the Authority employed 2,927 persons, of whom 402 were professionals, 647 were office workers and 1,878 were field supervisors and laborers. Approximately 2,000 persons are regular employees and the remainder are temporary employees. The Authority believes that relations with its employees are good.

In 1987, the Puerto Rico Supreme Court classified the Authority as a "private employer" for purposes of the Puerto Rico labor law provisions, permitting the Authority's employees to engage in collective bargaining. An independent union, representing approximately 1,180 of the Authority's full-time employees, has been certified for collective bargaining purposes. The current collective bargaining agreement expires on June 30, 1999.

## HIGHWAY SYSTEM REVENUES AND EXPENDITURES

**Revenues**

*General*

The major sources of the Authority's Revenues are the gasoline tax and the gas oil and diesel oil tax allocated to the Authority pursuant to the Excise Act, motor vehicle license fees allocated to the Authority pursuant to Act No. 9 and toll charges. In fiscal 1995, Revenues were derived 54% from gasoline taxes, 29% from toll charges, 9% from motor vehicle license fees, 4% from investment earnings and 4% from gas oil and diesel oil taxes.

Various factors affect the level of Revenues available to the Authority, including, in particular, economic conditions and the supply and cost of gasoline and other oil-derived fuels. These factors have an impact on motor vehicle usage and fuel consumption and are discussed further under "Historical Revenues" and "Projected Revenues" below.

*Sources of Revenues*

*Taxes.* The Excise Act currently imposes a $0.16 per gallon tax on gasoline and an $0.08 per gallon tax on gas oil and diesel oil and authorizes the Authority to pledge the entire $0.16 tax on gasoline and $0.04 of the tax on gas oil and diesel oil to the payment of the principal of and interest on the Bonds and other obligations of the Authority or for any other lawful purpose of the Authority. The Authority has pledged such tax receipts to the holders of the Bonds, but such pledge is subject to the Constitution of Puerto Rico, which permits the Commonwealth to apply such taxes to payment of certain Commonwealth debts to the extent other Commonwealth moneys are insufficient therefor. See "Security for the Bonds -- Prior Payment of Full Faith and Credit Obligations of the Commonwealth" under *The Bonds.* The Commonwealth has agreed and committed, however, in the Excise Act that the tax on gasoline will not be reduced below $0.16 per gallon and the tax on gas oil and diesel oil will not be reduced below $0.04 per gallon and that the amount of such taxes allocated to the Authority will not be reduced until all obligations of the Authority secured by the pledge thereof (including the Bonds), together with the interest thereon, are fully paid. Gasoline taxes and gas oil and diesel oil taxes which may be levied or collected from time to time other than the amounts of the taxes and fees described in this paragraph are not required to be allocated to the Authority or pledged by the Authority to the Bonds.

Gasoline taxes, gas oil and diesel oil taxes and motor vehicle license fees are collected by the Department of the Treasury. The portions of such taxes and fees allocated to the Authority are credited to the Authority at least monthly as such revenues are collected by the Commonwealth.

The Department of the Treasury periodically conducts an audit of gasoline, gas oil and diesel oil importers, producers and wholesalers to verify amounts reported and paid. In addition to the Commonwealth audit procedures, the Authority reviews monthly the records of the Department of the Treasury for consistency with monthly reports provided to the Authority by distributors of oil and gasoline.

*Motor Vehicle License Fees.* Under the Vehicle and Traffic Law (Act No. 141 of the Legislature of Puerto Rico, approved July 20, 1960, as amended), the Commonwealth imposes annual license fees on various classes of motor vehicles. The current license fees range from $25 to $40 for passenger cars and vary for other vehicles. Act No. 9 increased the per vehicle annual motor vehicle license fees by $15 and provided that the proceeds of the $15 increase shall be deposited in the Special Fund for the Authority, which may pledge such proceeds to the payment of debt service on obligations of the Authority or any other legal purpose of the Authority. As with the taxes described above, the Authority has pledged such fees to the holders of the Bonds. The Commonwealth has agreed and pledged that the license fees allocated to the Authority, as described herein, will not be reduced so long as such proceeds remain pledged to the payment of such obligations.

17

Motor vehicle licenses initially issued prior to July 1, 1989 are renewable as of each June 30. Motor vehicle licenses initially issued on or after July 1, 1989 are currently renewable on an annual basis from the month of initial registration. The portion of such license fees attributable to the unexpired term of returned licenses is refundable.

*Tolls on Traffic Facilities.* The Authority is authorized to impose tolls on Traffic Facilities, and all tolls collected on Traffic Facilities are pledged to the payment of the Bonds. The Authority has covenanted that it will not reduce the tolls or other charges imposed by it for the use of its Traffic Facilities if, as of the proposed effective date of any such reduction, the Revenues for any 12 consecutive months out of the 15 months immediately preceding such effective date, adjusted to reflect toll revenues the Authority would have received based on the volume of traffic for such 12 months if such reduction had been in effect for such 12 months, is less than 150% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all Bonds then outstanding.

Tolls are currently imposed on the Luis A. Ferré tollway (PR-52), which extends 60 miles from San Juan to Ponce, the De Diego tollway (PR-22), which extends 62 miles from San Juan to Arecibo, and PR-53, which will connect Fajardo and Salinas upon completion, a distance of 57 miles. Approximately 24 miles of PR-53 are completed; the Authority expects to finish construction of the balance of this tollway in stages through 2001. The Luis A. Ferré tollway has four toll stations in the northerly direction and three toll stations in the southerly direction, and the total minimum toll for a vehicle making a round-trip between San Juan and Ponce is currently $3.65. An extension of the Luis A. Ferré tollway bypassing Ponce is currently under construction and will be completed by August 1996. A toll station will be included in this segment with a minimum toll of $0.50. The De Diego tollway has six toll stations, and the total minimum toll for a vehicle passing through all six stations is $2.40. PR-53 currently has four toll stations with a total minimum toll of $1.20. The Authority expects to add an additional toll station on PR-53 with a minimum toll of $0.50 by the end of 1996. The Authority Act grants to the Authority plenary power to fix, impose, alter and collect tolls and other reasonable charges for the use of the Traffic Facilities operated by the Authority or for services rendered thereby. The Authority is obligated to take into account in setting or changing such tolls and other charges such factors as will promote the use of the Traffic Facilities in the broadest and most varied manner economically possible. Prior to fixing or altering such tolls or other charges, the Authority must hold a public hearing to receive comments with respect thereto.

Currently, the toll collection and data processing equipment in place at existing toll stations of the Authority is furnished and maintained by a private entity pursuant to a lease contract that expires on June 30, 2002. This lease contract provides for the furnishing, installation and maintenance of an electronic toll collection and data processing system for both its existing toll stations and all new toll stations. The new system has certain security features which include, among others, a device for the collection of tolls without manual operation, a device installed in each toll lane to verify the classification of a vehicle passing through the lane, computer systems which receive, store and process toll data from the toll plazas and the toll lanes for verification, and electronic gates located as a barrier across each toll station. The new tollway security system has virtually eliminated uncollected tollway revenues.

The Authority's tollway revenues have always exceeded its tollway operation and maintenance expenses. Tollway revenues and expenses for fiscal 1995 were $80.7 million and $19.9 million, respectively, compared to $67.8 million and $19.6 million, respectively, for fiscal 1994.

*Investment Earnings.* Moneys held for the credit of the Bond Service Account and the Redemption Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Government Obligations. Moneys held for the credit of the Reserve Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Investment Obligations. Such Government Obligations and Investment Obligations shall mature, or be subject to redemption, at the option of the holder, not later than the respective dates when moneys held for the credit of such Accounts will be required for the purposes intended; provided, however, that the amounts on deposit in the Reserve Account shall be invested in Investment Obligations which mature not later than the final maturity date of any Bonds outstanding. Income from investments of moneys held for the credit of the Construction Fund is not considered Revenues under the Resolution.

18

*Historical Revenues*

The following table presents Revenues available for debt service on the Bonds and debt service coverage in each of the five fiscal years ended June 30, 1991 to 1995, inclusive, and the first six months of fiscal years 1995 and 1996, respectively. See "Security for the Bonds -- Pledged Revenues" under *The Bonds.*

### HISTORICAL REVENUES AND DEBT SERVICE COVERAGE

| | Fiscal Year Ended June 30 | | | | | First Six Months of Fiscal Year | |
|---|---|---|---|---|---|---|---|
| | **1991** | **1992** | **1993** | **1994** | **1995** | **1995** | **1996** |
| | (dollars in thousands) | | | | | | |
| Gasoline taxes . . . . . . . . . . . | $127,354 | $133,305 | $141,846 | $147,868 | $152,052 | $ 76,742 | $ 80,937 |
| Gas oil and diesel oil taxes . . . . | 2,199 | 2,969 | 3,683 | 4,365 | 11,129 | 4,477 | 6,996 |
| Subtotal . . . . . . . . . . . . . . | $129,553 | $136,274 | $145,529 | $152,233 | $163,181 | $ 81,219 | $ 87,933 |
| Motor vehicle license fees . . . . . | 25,357 | 21,955 | 23,169 | 24,391 | 25,016 | 12,304 | 12,134 |
| Subtotal . . . . . . . . . . . . . . | $154,910 | $158,229 | $168,698 | $176,624 | $188,197 | $ 93,523 | $100,067 |
| Toll receipts . . . . . . . . . . . . | 37,676 | 55,255 | 59,028 | 67,780 | 80,703 | 38,643 | 45,198 |
| Investment income . . . . . . . . | 10,194 | 5,534 | 10,130 | 8,206 | 11,000 | 5,819 | 5,206 |
| Total Revenues . . . . . . . . . . . | $202,780 | $219,018 | $237,856 | $252,610 | $279,900 | $137,985 | $150,471 |
| Debt service on the Bonds . . . . | $ 80,635 | $ 78,536 | $115,507 | $129,018 | $132,936 | | |
| Coverage ratio . . . . . . . . . . . | 2.51 | 2.79 | 2.06 | 1.96 | 2.11 | | |

The Authority's Revenues have risen at a compound annual rate of 8.4% during the period from fiscal 1991 through fiscal 1995. The increase in the amount of Revenues during this period is attributable primarily to the growth in receipts of excise taxes and toll receipts. Gasoline taxes, which accounted for approximately 54% of Revenues as of June 30, 1995, experienced compound annual increases of 4.5% during this five-year period. The growth in gas oil and diesel oil tax receipts beginning in fiscal 1995 reflects, among other factors, a rise in the portion of gas oil and diesel oil consumption subject to tax. The number of vehicles in Puerto Rico increased from 1.62 million to 1.76 million from 1991 to 1995.

Motor vehicle license fees accounted for approximately 9% of annual Revenues as of June 30, 1995, and declined by 13.4% from fiscal 1991 to fiscal 1992. Fee collections in fiscal 1991 increased by 19.7% over fiscal 1990 due to the implementation of a new policy to collect motor vehicle license fees on an annual basis from the month of original registration. Beginning in fiscal 1992, fee collections have risen at a compound annual rate of 4.4% through fiscal 1995. The number of licensed taxable vehicles grew from nearly 1.46 million in fiscal 1992 to approximately 1.67 million in fiscal 1995.

Toll revenues rose at a compound annual rate of 21% during the period from fiscal 1991 through fiscal 1995. Toll revenues have grown as a percentage of total Revenues over the last five fiscal years and comprised 29% of total Revenues as of June 30, 1995. The increase in toll receipts from 1991 corresponded principally to the growing number of vehicles using these roads, an increase in toll rates in 1991 and the expansion of the tollway network. The number of paying vehicles which used the tollways rose from 128.0 million in fiscal 1991 to 191.2 million in fiscal 1995.

*Projected Revenues*

The following table presents the Authority's estimates of Revenues expected to be available for debt service on the Bonds and debt service coverage for each of the five fiscal years ending June 30, 1996 to 2000, inclusive, after taking into account the issuance of the 1996 Bonds and the refunding of the Refunded Bonds. The projected Revenues below are based on tax rates and allocations to the Authority now in effect. The projected Revenues

19

below are subject to periodic review and may be adjusted to reflect such factors as changes in economic conditions and future demand for gasoline or other petroleum products.

## PROJECTED REVENUES AND DEBT SERVICE COVERAGE

| | Fiscal Year Ending June 30 | | | | |
|---|---|---|---|---|---|
| | 1996 | 1997 | 1998 | 1999 | 2000 |
| | (dollars in thousands) | | | | |
| Gasoline taxes . . . . . . . . . . . . . . . | $156,600 | $160,200 | $163,100 | $166,800 | $171,300 |
| Gas oil and diesel oil taxes . . . . . . . | 11,200 | 11,300 | 11,400 | 11,500 | 11,600 |
| Subtotal . . . . . . . . . . . . . . . . . | $167,800 | $171,500 | $174,500 | $178,300 | $182,900 |
| Motor vehicle license fees . . . . . . . . | 26,000 | 26,700 | 27,400 | 28,000 | 28,300 |
| Subtotal . . . . . . . . . . . . . . . . . | $193,800 | $198,200 | $201,900 | $206,300 | $211,200 |
| Toll receipts . . . . . . . . . . . . . . . | 90,900 | 98,700 | 102,500 | 105,900 | 109,200 |
| Investment income . . . . . . . . . . . . | 10,800 | 14,260 | 14,489 | 14,489 | 15,509 |
| Total Revenues . . . . . . . . . . . . . | $295,500 | $311,160 | $318,889 | $326,689 | $335,909 |
| Debt service on the Bonds(1) . . . . . . | $143.965 | $188,129 | $190,398 | $191,542 | $203,029 |
| Coverage ratio(2) . . . . . . . . . . . . | 2.05 | 1.65 | 1.67 | 1.71 | 1.65 |
| Additional Bonds test (3) . . . . . . . . | 1.54 | 1.56 | 1.61 | 1.65 | 1.57 |

(1)      Assumes issuance of additional Bonds (approximately $44 million in fiscal 1998 and approximately $196 million in fiscal 2000) reflected in the Authority's current Priorities Construction Program at an average interest rate of 7% per annum.

(2)      Equals ratio of total revenues to debt service on the Bonds for the fiscal year in question.

(3)      This test uses as its denominator maximum annual debt service on all Bonds outstanding under the Resolution (including the Bonds then proposed to be issued) and as its numerator the Revenues of the Authority for any 12 consecutive months out of the 15 months preceding the issuance of the Bonds in question. See "Additional Bonds" under *The Bonds*. The ratio in the above table has been computed using the Revenues from the fiscal year preceding the fiscal year to which such ratio relates and maximum annual debt service taking into account the issuance of the 1996 Bonds and the projected issuance of additional Bonds as set forth in footnote (1) above.

Total Revenues for the period from fiscal 1996 through fiscal 2000 are projected by the Authority to grow at a compound annual rate of 3.3%. The compound annual growth for the period from fiscal 1991 through fiscal 1995 was 8.4%. Gasoline taxes are projected to grow at a compound annual rate of 2.3%, while for the prior five-year period for this category grew at a 4.5% rate. Motor vehicle license fees are expected to grow at a compound annual rate of 2.1%, compared to 4.4% from fiscal 1992 to fiscal 1995. See "Historical Revenues and Debt Service Coverage" above. The compound annual growth rate for toll receipts is projected at 4.7%, compared to 21% for the prior five-year period, due to the increase in tollway usage and the completion of additional segments of the De Diego (PR-22) and the Luis A. Ferré (PR-52) tollways. Two toll plazas currently are planned to open before the end of 1996, one on PR-53 and the other on the Ponce South Bypass on the Luis A. Ferré tollway.

## Operating Expenses and Capital Expenditures

### Operation and Maintenance

The Department has the responsibility for maintaining the Commonwealth highway system, except for the Luis A. Ferré (PR-52), the De Diego (PR-22) and PR-53 tollways and related connecting roads, which are maintained by and at the expense of the Authority. The maintenance expenses of the Department are paid with moneys appropriated annually by the Legislature of Puerto Rico. On occasion the Authority advances funds to pay the costs of emergency repairs which are the responsibility of the Department. It is subsequently reimbursed for these

advances. To the extent funds are not provided by the Commonwealth, the Authority agrees under the Resolution that it will pay from available moneys in the Construction Fund the costs of maintenance of the Traffic Facilities financed with Bond proceeds. In addition, the Resolution requires the Authority to pay from available moneys in the Construction Fund the costs of any necessary repairs to, or renewals or replacements of, Traffic Facilities financed with Bond proceeds, as recommended by the Traffic Engineers.

The Authority's operation and maintenance expenses payable from available moneys in the Construction Fund consist of the expenses of operating and maintaining the tollways and related roads. Under the Resolution, these expenses are payable from available moneys in the Construction Fund after payment of debt service on the Bonds and any required deposits to the Reserve Account. Other expenses of the Authority, including its administration costs, are included in the Priorities Construction Program and are capitalized.

The following table sets forth the annual maintenance expenses paid by the Department and the annual tollway operation and maintenance expenses paid by the Authority for each of the five fiscal years ended June 30, 1995 and the projected annual maintenance expenses to be paid by the Department and projected annual tollway operation and maintenance expenses to be paid by the Authority for the five fiscal years ending June 30, 2000.

## OPERATION AND MAINTENANCE EXPENSES

| | Department | Authority | | |
| | Highway System | Tollway | Tollway | |
| Fiscal Year Ended June 30 | Maintenance(1) | Maintenance | Operation | Total |
| | | (in thousands) | | |
| 1991 ................. | $26,101 | $ 7,534 | $5,236 | $12,770 |
| 1992 ................. | 26,254 | 8,388 | 6,267 | 14,655 |
| 1993 ................. | 26,010 | 9,289 | 7,008 | 16,297 |
| 1994 ................. | 27,540 | 12,238 | 7,362 | 19,600 |
| 1995 ................. | 27,932 | 12,321 | 7,552 | 19,873 |
| 1996(p) ............. | 28,880 | 14,446 | 8,854 | 23,300 |
| 1997(p) ............. | 29,600 | 14,880 | 9,120 | 24,000 |
| 1998(p) ............. | 30,500 | 15,500 | 9,500 | 25,000 |
| 1999(p) ............. | 31,400 | 16,120 | 9,880 | 26,000 |
| 2000(p) ............. | 32,400 | 16,120 | 9,880 | 26,000 |

(p)    Projected.

(1)    For fiscal years 1991 through 1995, the Authority contributed $5.0 million annually to the Department for the maintenance of the Commonwealth highway system, and this amount is also taken into account each year in the Authority's and the Department's projections for fiscal years 1996 through 2000.

In certain years, emergency repairs to the Commonwealth highway system have been necessary, particularly as a result of storm or flood damage. The cost of these repairs is borne by the Department, except for the cost of repairs to the tollways, which is borne by the Authority. The Department and the Authority have been reimbursed from the Federal Emergency Management Agency for the portion of the costs of such repairs attributable to federally designated disaster areas. The Commonwealth also appropriates funds from time to time for emergency repairs by the Department in addition to amounts appropriated for maintenance.

The Traffic Engineers conduct an annual evaluation of the level of maintenance of the Commonwealth highway system. In their most recent evaluation completed in January 1995, the Traffic Engineers found that the current level of maintenance was generally adequate. The projected maintenance budgets for the next five fiscal years show a steady increase for both toll and non-toll roads. When adjusted for inflation (assuming current trends continue), the maintenance program will be sustained at current levels, which the Traffic Engineers believe represents an adequate level of maintenance to preserve the investment and provide an acceptable level of service. The results of

the Traffic Engineers' most recent maintenance evaluation are summarized in the letter of the Traffic Engineers included as *Appendix IV*.

### Priorities Construction Program

As required by the Resolution, the Authority has developed a master plan to serve as the basis for the long-range planning of the Commonwealth highway facilities, which it supplements as necessary. To implement the plan, the Authority prepares a five-year Priorities Construction Program which is updated annually. The Authority has focused the Priorities Construction Program on improving the primary highway facilities, while also addressing the most essential needs of secondary and tertiary roads. The Authority also includes in its Priorities Construction Program the cost of repairs, renewals and replacements to the Commonwealth highway system, as well as its non-tollway operating expenses. The Priorities Construction Program also includes plans for dealing with urban congestion and for local improvements.

The Authority has included in its current Priorities Construction Program a proposed urban rail mass transit system ("Tren Urbano") which has been selected by the U.S. Department of Transportation as one of four transit projects nationwide to participate in a special fast-track "Turnkey Demonstration" program. The project will operate between Bayamón and Santurce via Rio Piedras and Hato Rey in its first phase and will have the flexibility to permit future expansion. During the fiscal year ended June 30, 1995, the Authority spent approximately $22 million from unencumbered funds in its Construction Fund for costs associated with the first phase of the project, including planning and design. The Authority has included approximately $1,169 million (including $194.4 million in federal aid) in its current five-year Priorities Construction Program for the project. On March 13, 1996, the Authority and the federal government executed a full funding grant agreement to secure discretionary federal funds for $307 million to cover a portion of the capital expenditures for the first phase. Notwithstanding such agreement, the Authority cannot give any assurances as to the ultimate level of federal funds available for the project. The difference between the $307 million and the $194.4 million included in the current five-year Priorities Construction Program is expected to be received pursuant to said agreement during fiscal year 2001. Other federal formula funds may also be available for the project. The Authority's portion of the capital construction costs of the project will be provided from internally generated funds or financed by obligations of the Authority. Such obligations will not be secured by a pledge on a parity with or senior to the pledge of Revenues provided for the Bonds by the Resolution. Unencumbered moneys in the Construction Fund may be applied to such portion or to the payment of debt service on the obligations of the Authority financing such portion, subject to certain prior contingent obligations of the Authority. See clause (4) of the third paragraph under "Sinking Fund" and "Miscellaneous Covenants -- Costs of Maintenance, Repair and Operation of Traffic Facilities" and "-- Annual Report of Traffic Engineers" under *Summary of Certain Provisions of the Resolution* and "Public-Private Capital Improvement Projects" below. No portion of the proceeds of the 1996 Bonds will be used for the project.

The Authority is procuring a number of design and construction contracts for Tren Urbano, including a turnkey design, construction and operating and maintenance contract covering vehicles and operating systems for the project and part of the facilities, and certain design-build contracts for the remaining facilities of the project. It is expected that construction will commence in mid-1996. The Authority expects the project to be fully operational in 2001.

The following table presents the Authority's current Priorities Construction Program for the five fiscal years ending June 30, 2000 and the sources of funds required to finance such program. The Priorities Construction Program is subject to various changing factors, including cost increases, variations in availability of internal and external funds, availability of qualified construction resources, the need for emergency repairs and changing traffic patterns. The Authority's projections assume no changes in the statutory taxes and fees currently allocated to the Authority, see the table entitled "Projected Revenues and Debt Service Coverage" above, and that the Authority will not be required to assume any obligations in connection with the Teodoro Moscoso Bridge, see "Public-Private Capital Improvement Projects" below.

## PRIORITIES CONSTRUCTION PROGRAM

| | Fiscal Year Ending June 30 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 1996 | 1997 | 1998 | 1999 | 2000 | Total |
| | (dollars in thousands) | | | | | |
| Sources of Funds: | | | | | | |
| Internally generated funds(1) | $131,270 | $100,321 | $ 56,729 | $ 47,774 | $ 22,116 | $ 358,210 |
| Federal aid for highways . | 88,200 | 90,000 | 92,000 | 93,000 | 93,000 | 456,200 |
| Federal aid for Tren Urbano . . . . . . . . . . . | 12,440 | 10,000 | 30,000 | 60,000 | 82,000 | 194,440 |
| External financing(2) . . . . | 275,024 | 436,155 | 526,807 | 447,034 | 183,443 | 1,868,463 |
| Total . . . . . . . . . . | $506,934 | $636,476 | $705,536 | $647,808 | $380,559 | $2,877,313 |
| | | | | | | |
| Uses of Funds: | | | | | | |
| Design . . . . . . . . . . . | $ 22,725 | $ 6,941 | $ 5,026 | $ 3,720 | $ 3,537 | $ 41,949 |
| Rights of way . . . . . . . | 48,875 | 46,831 | 11,300 | 4,910 | 3,610 | 115,526 |
| Construction . . . . . . . . | 304,534 | 300,004 | 239,010 | 140,778 | 87,112 | 1,071,438 |
| Capitalized expenditures . | 97,500 | 97,000 | 95,000 | 95,000 | 95,000 | 479,500 |
| Tren Urbano . . . . . . . | 33,300 | 185,700 | 355,200 | 403,400 | 191,300 | 1,168,900 |
| Total . . . . . . . . . . | $506,934 | $636,476 | $705,536 | $647,808 | $380,559 | $2,877,313 |

_____

(1)   Includes funds on hand, current Revenues available after provision for debt service and reserve requirements for Bonds and tollway maintenance and operating expenses and investment income. To the extent such funds are held in the Construction Fund, the holders of the special facility revenue bonds issued by the Authority to finance the Teodoro Moscoso Bridge have a claim on such funds in certain circumstances. See "Public–Private Capital Improvement Projects" below.

(2)   Includes interim financing, net proceeds of borrowings, including Bonds, and other. Of the amounts shown above, the Authority expects that approximately $954 million will be incurred as permanent financing for Tren Urbano over the period shown in the above table. Any such financing will not be secured by a pledge on a parity with or senior to the pledge of Revenues provided for the Bonds by the Resolution.

In the five-year period from fiscal 1991 through fiscal 1995 the Authority expended approximately $1.9 billion on the Priorities Construction Program. The current Priorities Construction Program involves an expenditure of about $2.9 billion from fiscal 1996 through fiscal 2000.

Highway construction projects planned by the Authority in its current Priorities Construction Program are designed to enhance the economic development of Puerto Rico. The major portion of the program consists of new highway construction, principally of primary roads and tollways. It also includes reconstruction of existing highways, a bridge program and installation of safety features and other projects. Specific major projects include construction of various sections of PR-53 from Ceiba to Yabucoa, the completion of the Ponce South Bypass to extend the Luis A. Ferré Tollway, the construction of additional lanes on PR-2 between Arecibo and Ponce, the relocation of PR-167 from Bayamón to Comerío and Naranjito and of PR-10 from Arecibo to Ponce, the conversion to an expressway of Baldorioty de Castro Avenue (PR-26) in San Juan and a section of PR-17 in Hato Rey, the completion of the Martínez Nadal Expressway in Guaynabo, the relocation of PR-137 in Morovis and PR-156 in Aguas Buenas, and the construction of PR-142 from Dorado to Corozal and Las Cumbres Avenue (PR-199) from Guaynabo to Bayamón.

The Authority's internally generated funds available to finance its Priorities Construction Program consist primarily of current Revenues after payment of debt service and provision of reserve requirements for the Bonds and payment of expenses for operating and maintaining the tollways. Such amounts are estimated to aggregate

23

approximately $358.2 million during the five-year period from fiscal 1996 through 2000, which includes investment income, estimated at approximately $69.5 million for the five-year period.

The Priorities Construction Program contemplates new construction borrowings, in addition to the 1996 Bonds, aggregating $1.171 billion net proceeds from fiscal 1996 to fiscal 2000.

The Authority receives highway aid for construction from the Federal Highway Administration of the U.S. Department of Transportation. Such aid is recorded as related costs which are billed to the Federal Highway Administration, regardless of the year of appropriation. In the three fiscal years ended June 30, 1993, 1994 and 1995, such aid amounted to $55.8 million, $54.2 million and $90.8 million, respectively.

Federal aid for highway construction is received under a number of federal programs, including those directed to construction of new roads and repair and reconstruction of existing roads. The programs provide for matching federal assistance, ranging generally from 80% to 90% of the cost of a project. The level of federal highway aid is dependent upon Congressional authorizations that are apportioned to the states, including the Commonwealth. The U.S. Department of Transportation has broad discretion to release funds for spending within the limits set by Congress. Upon its approval of a state's program, funds are reserved but not committed. Federal-aid funds are committed when the U.S. Department of Transportation approves the detailed plans for specific projects. Congress has authorized funding for the federal highway programs through fiscal 1998 depending on the program. Federal highway legislation has liberalized certain types of federal highway aid and granted more flexibility to the states, including the Commonwealth, in the use of such aid in highway or other transportation projects. No assurance can be given that the level of federal highway aid will be maintained at the levels projected in the above table. Press reports indicate that legislative proposals advanced by members of Congress may adversely affect a portion of the federal highway aid received by the states, including the Commonwealth. In the event of material reductions in such aid, the Priorities Construction Program will be appropriately adjusted in the absence of internally generated funds, external financing or other sources of funds shown in the above table to offset any such reductions.

The federal government conducts periodic audits of the federal aid it provides to the Authority to ascertain that funds are being expended consistently with the federal programs pursuant to which they are provided. Audit findings of a failure by the Authority to expend funds in compliance with federal programs could result in the withholding of federal aid for the project involved or could result in offset claims by the federal government for funds previously received by the Authority.

The Traffic Engineers annually review the Priorities Construction Program and the Authority's estimates of revenue sources available for its implementation. In their most recent evaluation, the Traffic Engineers concluded that the Authority's current Priorities Construction Program is a reasonable response to the immediate and short-term highway needs and is generally consistent with the Authority's long-range highway program. The Traffic Engineers also concluded that revenue projections have been reasonably accurate and provide a sound basis for determining the size of future programs. The results of that review are summarized in the Traffic Engineers' letter included as *Appendix IV*.

**Public-Private Capital Improvement Projects**

The two principal projects of privatization are the Teodoro Moscoso Bridge and the PR-66 tollway from Río Piedras to Río Grande. These projects do not constitute Traffic Facilities under the Resolution and will have no effect on the toll revenues of any existing Traffic Facilities.

The Authority is a party to a concession agreement with Autopistas de Puerto Rico y Compañía, S.E. ("APR"), a Puerto Rico partnership, for the design, construction, operation and maintenance of the Teodoro Moscoso Bridge. A bond issue of $116.8 million for the financing of this project was completed in April 1992, and the bridge opened in February 1994. The approximate cost of the bridge was $109.5 million.

The proceeds of the bonds were loaned to APR, and APR has agreed to repay the loan in amounts sufficient to pay the principal of and interest on the bonds. Pursuant to the concession agreement with the Authority, APR

is also obligated to operate and maintain the bridge for a term of 35 years, subject to extension or to earlier termination. APR's obligation in respect of the bonds will be payable solely from the net toll revenues of the bridge, after payment of current operating expenses.

Since operations commenced, traffic using the bridge has been considerably less than the levels specified in the concession agreement with APR. As a result, APR currently has the right, but not the obligation, to require the Authority, under the terms of the concession, to assume the obligation to pay principal of and interest on the bonds, in the first instance from such net toll revenues. If such net toll revenues are insufficient to make such payment, the Authority has agreed to apply unencumbered moneys in the Construction Fund, available pursuant to clause (4) of the third paragraph under "Sinking Fund" in *Summary of Certain Provisions of the Resolution*, subject to the Authority's prior obligation to pay costs of maintenance, repair and operation of its Traffic Facilities consisting of tollways and to the extent the Commonwealth does not appropriate moneys therefor and repairs, renewals and replacements of its other Traffic Facilities recommended by the Traffic Engineers (see "Miscellaneous Covenants—Costs of Maintenance, Repair and Operation of Traffic Facilities" and "—Annual Report of Traffic Engineers" under *Summary of Certain Provisions of the Resolution*), to cover any such insufficiency. The Authority has further agreed that, upon the occurrence of such insufficiency and for so long as it shall exist, the Authority shall not make any withdrawal and expenditure, pledge or encumbrance of such unencumbered Construction Fund moneys other than to satisfy such prior obligations, and has further agreed that until such insufficiency is cured, such unencumbered Construction Fund moneys will be subject to the lien and pledge in favor of the holders of the bonds, subject to the satisfaction of such prior obligations.

The Authority has further agreed (1) to use its best efforts, after any such assumption, to issue additional Bonds under Section 208 of the Resolution to the extent permitted by said Section and to redeem any such outstanding bonds or to exchange such bonds for the additional Bonds so issued and (2) until such outstanding bonds are redeemed or such outstanding bonds are so exchanged, not to issue other additional Bonds under said Section 208 except (i) Bonds authorized to be issued by resolutions of the Authority then in effect and (ii) Bonds issued to pay outstanding notes of the Authority that were issued to finance temporarily the costs of Traffic Facilities or to reimburse the Authority for expenditures incurred in respect thereof which may be reimbursed from the proceeds of long-term financing under the Internal Revenue Code of 1986, as amended, or to pay all or part of the cost of additional Traffic Facilities for which construction contracts have been awarded.

The Authority is currently in negotiations with APR concerning the privatization of the PR-66 tollway from Río Piedras to Río Grande.

## DEBT

### Authority Debt

The outstanding debt of the Authority as of December 31, 1995 and as adjusted for the issuance of the 1996 Bonds and the refunding of the Refunded Bonds is as follows:

|  | As of December 31, 1995 | As Adjusted |
|---|---|---|
|  | (in thousands) | |
| Bonds(1) | $1,616,890 | $2,507,220 |
| Notes(2) | 193,702 | 0 |
| Total | $1,810,592 | $2,507,220 |

(1) Includes $4,510,000 Bonds sold to the Farmers Home Administration, of which $3,765,000 is currently outstanding. Does not include the special facility revenue bonds issued by the Authority in April 1992 to finance the Teodoro Moscoso Bridge. See "Public-Private Capital Improvement Projects" under *Highway System Revenues and Expenditures*.

(2) Notes payable to Government Development Bank for Puerto Rico for interim financing for certain capital improvements, which notes are being repaid from a portion of the proceeds of the 1996 Bonds.

**Principal and Interest Requirements**

The Principal and Interest Requirements for the outstanding Bonds and the 1996 Bonds (after taking into account the refunding of the Refunded Bonds) as of the date hereof are set forth in the following table:

## Principal and Interest Requirements*

| Year Ending June 30 | Outstanding Bonds(1) Debt Service | 1996 Bonds | | | | | | Total Debt Service |
|---|---|---|---|---|---|---|---|---|
| | | Series Y Bonds | | | Series Z Bonds | | | |
| | | Principal | Interest(2) | Total | Principal | Interest | Total | |
| 1996 | $81,332,268 | | $15,979,878 | $15,979,878 | $740,000 | $3,795,088 | $4,535,088 | $101,847,234 |
| 1997 | 121,157,097 | $6,095,000 | 49,271,613 | 55,366,613 | 250,000 | 11,355,663 | 11,605,663 | 188,129,372 |
| 1998 | 121,120,161 | 6,400,000 | 48,966,863 | 55,366,863 | 260,000 | 11,345,413 | 11,605,413 | 188,092,436 |
| 1999 | 121,011,946 | 6,720,000 | 48,646,863 | 55,366,863 | 275,000 | 11,334,103 | 11,609,103 | 187,987,911 |
| 2000 | 122,220,059 | 7,070,000 | 48,294,063 | 55,364,063 | 285,000 | 11,321,728 | 11,606,728 | 189,190,849 |
| 2001 | 116,377,374 | 7,440,000 | 47,922,888 | 55,362,888 | 5,875,000 | 11,308,475 | 17,183,475 | 188,923,736 |
| 2002 | 116,035,409 | 7,890,000 | 47,476,488 | 55,366,488 | 6,210,000 | 10,955,975 | 17,165,975 | 188,567,871 |
| 2003 | 119,966,789 | 8,360,000 | 47,003,088 | 55,363,088 | 2,675,000 | 10,583,375 | 13,258,375 | 188,588,251 |
| 2004 | 85,050,994 | 8,865,000 | 46,501,488 | 55,366,488 | 20,990,000 | 10,422,875 | 31,412,875 | 171,830,356 |
| 2005 | 85,368,213 | 9,420,000 | 45,947,425 | 55,367,425 | 22,020,000 | 9,111,000 | 31,131,000 | 171,866,638 |
| 2006 | 94,576,738 | 10,005,000 | 45,358,675 | 55,363,675 | 2,260,000 | 7,734,750 | 9,994,750 | 159,935,163 |
| 2007 | 94,547,475 | 10,630,000 | 44,733,363 | 55,363,363 | 2,405,000 | 7,593,500 | 9,998,500 | 159,909,338 |
| 2008 | 94,544,281 | 11,295,000 | 44,068,988 | 55,363,988 | 2,560,000 | 7,443,188 | 10,003,188 | 159,911,456 |
| 2009 | 94,544,588 | 12,000,000 | 43,363,050 | 55,363,050 | 2,710,000 | 7,283,188 | 9,993,188 | 159,900,825 |
| 2010 | 94,582,150 | 12,750,000 | 42,613,050 | 55,363,050 | 2,890,000 | 7,113,813 | 10,003,813 | 159,949,013 |
| 2011 | 94,405,869 | 13,510,000 | 41,848,050 | 55,358,050 | 3,100,000 | 6,933,188 | 10,033,188 | 159,797,106 |
| 2012 | 94,402,531 | 14,325,000 | 41,037,450 | 55,362,450 | 3,305,000 | 6,739,438 | 10,044,438 | 159,809,419 |
| 2013 | 89,221,188 | 15,225,000 | 40,142,138 | 55,367,138 | 8,685,000 | 6,532,875 | 15,217,875 | 159,806,200 |
| 2014 | 81,250,838 | 16,175,000 | 39,190,575 | 55,365,575 | 17,205,000 | 5,990,063 | 23,195,063 | 159,811,475 |
| 2015 | 81,247,138 | 17,185,000 | 38,179,638 | 55,364,638 | 18,280,000 | 4,914,750 | 23,194,750 | 159,806,525 |
| 2016 | 81,213,613 | 18,090,000 | 37,277,425 | 55,367,425 | 19,460,000 | 3,772,250 | 23,232,250 | 159,813,288 |
| 2017 | 81,207,150 | 18,990,000 | 36,372,925 | 55,362,925 | 20,680,000 | 2,556,000 | 23,236,000 | 159,806,075 |
| 2018 | 81,207,975 | 20,035,000 | 35,328,475 | 55,363,475 | 21,920,000 | 1,315,200 | 23,235,200 | 159,806,650 |
| 2019 | 105,239,325 | 21,100,000 | 34,226,550 | 55,326,550 | | | | 160,565,875 |
| 2020 | 105,238,438 | 22,400,000 | 32,907,800 | 55,307,800 | | | | 160,546,238 |
| 2021 | 68,518,000 | 23,800,000 | 31,507,800 | 55,307,800 | | | | 123,825,800 |
| 2022 | 68,523,000 | 25,260,000 | 30,020,300 | 55,280,300 | | | | 123,803,300 |
| 2023 | | 26,835,000 | 28,531,000 | 55,366,000 | | | | 55,366,000 |
| 2024 | | 28,310,000 | 27,055,075 | 55,365,075 | | | | 55,365,075 |
| 2025 | | 29,865,000 | 25,498,025 | 55,363,025 | | | | 55,363,025 |
| 2026 | | 31,510,000 | 23,855,450 | 55,365,450 | | | | 55,365,450 |
| 2027 | | 33,240,000 | 22,122,400 | 55,362,400 | | | | 55,362,400 |
| 2028 | | 34,980,000 | 20,383,650 | 55,363,650 | | | | 55,363,650 |
| 2029 | | 36,810,000 | 18,553,675 | 55,363,675 | | | | 55,363,675 |
| 2030 | | 38,735,000 | 16,627,725 | 55,362,725 | | | | 55,362,725 |
| 2031 | | 40,765,000 | 14,600,850 | 55,365,850 | | | | 55,365,850 |
| 2032 | | 42,895,000 | 12,467,500 | 55,362,500 | | | | 55,362,500 |
| 2033 | | 45,145,000 | 10,222,425 | 55,367,425 | | | | 55,367,425 |
| 2034 | | 47,505,000 | 7,859,300 | 55,364,300 | | | | 55,364,300 |
| 2035 | | 49,995,000 | 5,372,375 | 55,367,375 | | | | 55,367,375 |
| 2036 | | 52,610,000 | 2,754,800 | 55,364,800 | | | | 55,364,800 |

*Totals may not add up due to rounding.

(1)   Includes $4,510,000 Bonds sold to the Farmers Home Administration, of which $3,765,000 is currently outstanding, which mature in the year 2020. Does not include the special facility revenue bonds issued by the Authority in April 1992 to finance the Teodoro Moscoso

(footnotes continued on next page)

Bridge. See "Public-Private Capital Improvement Projects" under *Highway System Revenues and Expenditures*. The interest on certain variable rate Highway Revenue Bonds (Series W), issued in August 1993 has been calculated on the basis of the fixed interest rate payable by the Authority under a related interest rate swap agreement as permitted by the Resolution.

(2) The interest on the Cap RITES Bonds has been calculated on the basis of the effective fixed interest rate equal to the Constant Rate payable by the Authority after taking into account the Rate Cap Transaction to be entered into by the Authority upon the delivery of the 1996 Bonds. See *Appendix VI* hereto.

Upon the issuance of the 1996 Bonds (and the refunding of the Refunded Bonds), the remaining average life of the Bonds will be approximately 19.2 years.

## SUMMARY OF CERTAIN PROVISIONS OF THE RESOLUTION

The following are brief summaries of certain provisions of the Resolution. Such statements do not purport to be complete and reference is made to the Resolution, copies of which are available from the Authority or the Fiscal Agent. The Authority proposes to amend the Resolution as described in "Proposed Supplemental Resolution" under *The Bonds*.

### Definition of Certain Terms

"Accreted Value" means, with respect to any Capital Appreciation Bond or Capital Appreciation and Income Bond, an amount equal to the principal amount of such Bond on the date of original issuance plus the interest accrued on such Capital Appreciation Bond or Capital Appreciation and Income Bond from the date of original issuance to the date of calculation or the Interest Commencement Date, as the case may be, compounded on the dates and in the manner provided for in the resolution authorizing the issuance of such Capital Appreciation Bond or Capital Appreciation and Income Bond.

"Balloon Bonds" means any Bonds, the interest on which is payable periodically and twenty-five percent (25%) or more of the original principal amount of which matures during any one fiscal year and for which maturing principal amount Amortization Requirements have not been fixed.

"Capital Appreciation Bonds" means any Bonds as to which interest is compounded periodically on each of the applicable dates designated for compounding in the resolution authorizing said Bonds and payable in an amount equal to the then current Accreted Value only at the maturity (or extended maturity date for Extendible Maturity Bonds), earlier redemption or other payment date therefor, all as so provided by such resolution, and which may be either serial bonds or term bonds.

"Capital Appreciation and Income Bonds" means any Bonds as to which accruing interest is not paid prior to the interest payment date immediately succeeding the Interest Commencement Date specified in the resolution authorizing such Bonds and the interest on which is compounded periodically on the dates designated in such resolution prior to the Interest Commencement Date for such Capital Appreciation and Income Bonds, and which may be either serial bonds or term bonds.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder and applicable regulations promulgated under the Internal Revenue Code of 1954, as amended.

"Extendible Maturity Bonds" means Bonds the maturities of which, by their terms, may be extended by and at the option of the holders of the Bonds or the Authority.

"Fiscal Agent" means the bank or trust company appointed by the Authority and acting as Fiscal Agent whether original or successor pursuant to the provisions of the Resolution.

"fiscal year" means the period commencing on the first day of July of any year and ending on the last day of June of the following year or any other twelve month period designated by the Authority.

27

"Government Obligations" means (i) direct obligations of, or obligations the payment of the principal of and interest on which are unconditionally guaranteed by, the United States of America; (ii) municipal obligations, the payment of the principal of and interest and redemption premium, if any, on which are irrevocably secured by obligations described in clause (i) above and which obligations are not subject to redemption prior to the date on which the proceeds attributable to the principal of the obligations are to be used and have been deposited in an escrow account which is irrevocably pledged to the payment of the principal of and interest and redemption premium, if any, on such municipal obligations; (iii) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clauses (i) and (ii) above held by a bank (including the Fiscal Agent) or trust company as custodian, under which the owner of said interests is the real party in interest and has the right to proceed directly and individually against the issuer of the underlying obligations described in said clauses (i) and (ii) and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated; and (iv) secured time deposits.

"Interest Commencement Date" means, with respect to any particular Capital Appreciation and Income Bonds, the date specified in the resolution authorizing the issuance of such Bonds after which interest accruing on such Bonds shall be payable on a periodic basis prior to maturity, with the first such payment date being the applicable interest payment date immediately succeeding such Interest Commencement Date.

"Interim Bonds" means any Bonds issued under the Resolution on an interim basis which are expected to be repaid from the proceeds of Bonds or other indebtedness.

"Investment Obligations" means any of the following, to the extent that the same is legal for the investment of public funds under the laws of the Commonwealth:

(i)      Government Obligations;

(ii)     obligations issued or guaranteed by any instrumentality or agency of the United States of America, whether now existing or hereafter organized, including but not limited to those of the Federal Financing Bank, Federal Home Loan Banks, the Export-Import Bank, Government National Mortgage Association and the Tennessee Valley Authority;

(iii)    bankers' acceptances, certificates of deposit or time deposits of any bank, national banking association (including the Fiscal Agent), trust company or savings and loan association (including any investment in pools of such bankers acceptances, certificates of deposit or time deposits), which to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation, are either (A) issued by a bank, trust company, or savings and loan association having a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by such securities as are described in clause (i) or (ii) above or (iv) or (v) below, having a market value at least equal to the principal amount of such bankers' acceptances, certificates of deposit or time deposits (or portion thereof not so insured); provided that the Fiscal Agent has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(iv)     obligations issued by any state or territory of the United States, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's Investors Service or any successors thereto and Standard & Poor's Ratings Group or any successors thereto;

(v)      municipal obligations, the payment of the principal of and the interest on which is insured, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's Investor Service, Inc. or any successors thereto and Standard & Poor's Ratings Group or any successors thereto;

(vi)     any repurchase, reverse repurchase or investment agreement with any bank or trust company organized under the laws of any state of the United States or the Commonwealth or any national banking association (including the Fiscal Agent), insurance company, or government bond dealer reporting to, trading

with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any one or more of the securities described in clause (i) or (ii) above, provided that the Fiscal Agent has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(vii)  commercial paper rated, or backed by a letter of credit or line of credit the issuer of which is rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's Investors Service or any successors thereto and Standard & Poor's Ratings Group or any successors thereto; and

(viii) any other investment obligations, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's Investors Service or any successors thereto and Standard & Poor's Ratings Group or any successors thereto.

"Principal and Interest Requirements" for any period, as applied to the Bonds of any Series, means the sum of:

(i)  the amount required to pay interest on all Bonds of such Series then outstanding which is payable on each interest payment date in such period;

(ii)  the amount required to pay principal of all serial Bonds of such Series then outstanding which is payable upon the stated maturity of such serial Bonds in such period; and

(iii)  the Amortization Requirements for the term Bonds of such Series for such period.

To the extent that the period for calculating Principal and Interest Requirements shall be a fiscal year and the first day of the next fiscal year shall be an interest or principal payment date, such first day of the next fiscal year shall be included in the preceding fiscal year and not in the current fiscal year for purposes of calculating Principal and Interest Requirements.

The following rules apply in determining the amount of the Principal and Interest Requirements for any period:

(a)  in the case of Variable Rate Bonds the interest rate thereon shall be assumed to be the greater of (A) one hundred ten percent (110%) of the average interest rate on such Variable Rate Bonds during the twelve months ending with the month preceding the date of calculation or such shorter period that such Variable Rate Bonds shall have been outstanding, (B) the actual rate of interest on such Variable Rate Bonds on the date of calculation and (C) the lesser of the maximum rate then permitted by law and the maximum rate permitted on such Variable Rate Bonds by the resolution authorizing the issuance thereof; provided, however, that if the Authority has notified the Fiscal Agent that a Swap agreement is in effect in respect of such Variable Rate Bonds, then for all purposes of this paragraph the interest rate on such Variable Rate Bonds shall be the Swap rate under such Swap agreement.

(b)  in the case of Put Bonds, the "tender" date or dates shall be ignored if the source for payment of said tender is a liquidity facility and the stated periods for Amortization Requirements and the stated dates for principal payments shall be used, and in the case of Bonds secured by a credit facility or a liquidity facility, the terms of the reimbursement obligation to the issuers thereof shall be ignored and the stated periods for Amortization Requirements and the stated dates for principal payments shall be used; provided, however, that during any period after the issuer of a credit facility or a liquidity facility, as the case may be, has advanced funds thereunder, the reimbursement obligation of which is payable from and secured on a parity with the Bonds and before such amount is repaid, Principal and Interest Requirements shall include the principal amount so advanced and interest thereon, in accordance with the principal repayment schedule and interest rate or rates specified in the credit facility or liquidity facility, as the case may be, in lieu of the stated principal of and Amortization Requirements and interest on such Bonds;

(c)  in the case of Extendible Maturity Bonds, the Bonds shall be deemed to mature on the later of the stated maturity date and the date to which such stated maturity date shall have been extended;

(d) in the case of Capital Appreciation Bonds, the Accreted Value of Capital Appreciation Bonds becoming due at maturity or by virtue of an Amortization Requirement shall be included during such period in which said principal and interest portions are due;

(e) in the case of Capital Appreciation and Income Bonds, the principal and interest portions of the Appreciated Value of Capital Appreciation and Income Bonds shall be included during the period in which said principal and interest portions are due;

(f) in the case of Balloon Bonds or Interim Bonds, the debt service requirements of the Balloon Bonds or Interim Bonds may be excluded and in lieu thereof the Balloon Bonds or Interim Bonds shall be viewed as debt securities having a comparable federal tax status as such Balloon Bonds or Interim Bonds, maturing in substantially equal annual payments of principal and interest over a period of not more than 30 years from the date of issuance thereof, bearing interest at a fixed rate per annum equal to the average interest rate per annum for such debt securities on the date of issuance of the Balloon Bonds or Interim Bonds and issued by issuers having a credit rating, issued by Moody's Investors Service or any successors thereto or Standard & Poor's Ratings Group or any successors thereto comparable to that of the Authority, as shown by a certificate of an underwriting or investment banking firm experienced in marketing such securities; and

(g) if all or a portion of the principal of or interest on a Series of Bonds is payable from moneys irrevocably set aside or deposited for such purpose, together with projected earnings thereon to the extent such earnings are projected to be from Investment Obligations irrevocably set aside or deposited for such purpose on the date of computation, such principal or interest shall not be included in determining Principal and Interest Requirements; provided that the above computation shall be supported by a verification report from a nationally recognized independent certified public accountant as to the sufficiency of such moneys set aside and projected earnings.

"Put Bonds" means Bonds which by their terms may be tendered by and at the option of the holder thereof for payment prior to the stated maturity thereof.

"Reserve Account Insurance Policy" means the insurance policy, surety bond or other acceptable evidence of insurance, which policy, bond or other evidence of insurance constitutes an unconditional senior obligation of the issuer thereof. The issuer shall be a municipal bond insurer whose senior debt obligations, ranking *pari passu* with its obligations under such policy, bond or other evidence of insurance, are rated at the time of deposit to the credit of the Reserve Account in any of the three highest rating categories (without regard to any gradation within any such category) of either Moody's Investors Service or any successors thereto or Standard & Poor's Ratings Group or any successors thereto.

"Reserve Account Letter of Credit" means the irrevocable, transferable letter of credit, if any, which letter of credit constitutes an unconditional senior obligation of the issuer thereof. The issuer shall be a banking association, bank or trust company or branch thereof whose senior debt obligations, ranking pari passu with its obligations under such letter of credit, are rated at the time of deposit to be credit of the Reserve Account in any of the three highest rating categories (without regard to any gradation within any such category) of either Moody's Investors Service or any successors thereto or Standard & Poor's Ratings Group or any successors thereto.

"Reserve Requirement" means the lesser of (a) the maximum Principal and Interest Requirements for any fiscal year on account of the outstanding Bonds and (b) ten percent (10%) of the original principal amount of each Series of Bonds outstanding (determined on the basis of their initial offering prices to the public).

"Revenues" means (a) all moneys received by the Authority on account of the gasoline tax allocated to the Authority by Act No. 75, approved June 23, 1965; (b) Toll Revenues; (c) the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico has allocated or may hereafter allocate to the Authority and expressly authorize the Authority to pledge to the payment of the principal of and interest on Bonds or other obligations of the Authority and which are pledged by the Authority to the payment of the principal of and interest on Bonds or other obligations issued under the provisions of the Resolution; provided that written notice of such pledge has been delivered to Standard & Poor's Ratings Group, Moody's Investors Service and any other rating agency then rating the Bonds and (d) investment earnings on deposits to the credit of funds and accounts established under the Resolution, except for the Construction Fund.

"Swap agreement" means an agreement between the Authority and a Swap party whereby the Swap party agrees to pay to the Authority amounts calculated on the basis of all or a portion of the interest on Variable Rate Bonds at or prior to the times such interest is due and payable in consideration of the Authority's payment to the Swap party of amounts set forth in the Swap agreement.

"Swap party" means a person who is party to a Swap agreement and whose senior obligations are rated at the time of the execution and delivery of such Swap agreement in one of the three highest rating categories (without regard to gradations within a category) by (i) Standard & Poor's Ratings Group or its successor and (ii) Moody's Investors Service or its successor.

"Swap rate" means the fixed rate per annum on the principal amount of Variable Rate Bonds covered by a Swap agreement equal to the percentage derived by dividing (i) the sum of the amounts in the last twelve months paid by the Authority in respect of interest on such bonds and to the Swap party less the amount paid to the Authority by the Swap party by (ii) such principal amount of Variable Rate Bonds; provided, however, that if such Swap agreement has been in effect for less than twelve months, such percentage shall be multiplied by 360 divided by the number of days between the effective date of such Swap agreement and the date of calculation determined on the basis of 30-day month; provided, further, that if no amount has been paid under the Swap agreement, the Swap rate shall be deemed to be the fixed rate per annum contracted to be paid by the Authority to the Swap party.

"Toll Revenues" means the tolls or other charges, if any, imposed by the Authority for the use of any of its Traffic Facilities.

"Traffic Facilities" means any of the following facilities for which Bonds or other obligations shall be issued under the Resolution the cost of which facilities paid from the proceeds of such Bonds or other obligations shall not have been reimbursed to the Authority from funds not encumbered by the Resolution: (1) roads, avenues, streets, thoroughfares, speedways, bridges, tunnels, channels, stations, terminals, and any other land or water facilities necessary or desirable in connection with the movement of persons, freight, vehicles or vessels; (2) parking lots and structures and other facilities necessary or desirable in connection with the parking, loading or unloading of all kinds of vehicles and vessels; and (3) all property, rights, easements, and interests therein necessary or desirable for the construction, maintenance, control, operation or development of such traffic facilities.

"Variable Rate Bonds" means Bonds issued with a variable, adjustable, convertible or similar interest rate which is not fixed in percentage at the date of issue for the term thereof, but which may or may not be convertible to a fixed interest rate for the remainder of their term. (Section 101).

*Sinking Fund*

The Resolution creates the "Puerto Rico Highway Authority Highway Revenue Bonds Interest and Sinking Fund" (the "Sinking Fund"). The "Bond Service Account", "Redemption Account" and "Reserve Account" are created within the Sinking Fund. (Section 401).

The moneys in each Account are held by the Fiscal Agent in trust and, pending application, are subject to a lien in favor of the holders of the outstanding Bonds and for the further security of such holders until paid out or transferred as provided in the Resolution. (Section 401).

All Revenues (other than investment earnings), and any other funds of the Commonwealth allocated to the Authority for the payment of principal of and interest on any Bonds, are deposited monthly with the Fiscal Agent as follows:

(1) To the Bond Service Account, an amount equal to 1/6th of the amount of interest payable on all Bonds of each Series on the next succeeding interest payment date and an amount equal to 1/12th of the next maturing installment of principal of any serial bonds; provided, however, that the amount so deposited on account of the interest in each month after the delivery of the Bonds of any Series up to and including the month immediately preceding the first interest payment date thereafter of the Bonds of such Series shall be that amount which when multiplied by the number of such deposits will be equal to the amount of interest payable on such Bonds on such first interest payment

date less the amount of any accrued interest paid on such Bonds and deposited to the credit of the Bond Service Account;

(2)  To the Redemption Account, an amount equal to 1/12th of the Amortization Requirement for such fiscal year for the term bonds of each Series then outstanding plus an amount equal to 1/12th of the premium, if any, which would be payable on the first redemption date in the following fiscal year on a like principal amount of Bonds if such principal amount of Bonds should be redeemed prior to their maturity from moneys in the Sinking Fund;

(3)  To the Reserve Account, such amount as is required to make the amount deposited to the credit of said Account in the then current fiscal year at least equal to 20% of the Reserve Requirement; provided, however, that such deposits shall only be made to the extent necessary to make the amount then in the Reserve Account equal to the Reserve Requirement; provided, further, that in the event of an increase in the Reserve Requirement due to the issuance of additional Series of Bonds, such increase may be funded by deposits in each of the five (5) years, commencing in the fiscal year in which such additional Series of Bonds is issued, of 20% of such increase in the Reserve Requirement; and

(4)  Any Revenues remaining after making the deposits referred to above shall be deposited to the credit of the Construction Fund for use by the Authority for any of its authorized purposes. (Section 401).

The requirements specified in paragraphs (1), (2) and (3) above are cumulative. (Section 401).

In lieu of any required deposit of Revenues into the Reserve Account, or in substitution for all or a portion of the moneys then on deposit in the Reserve Account, the Authority may deposit into the Reserve Account a Reserve Account Insurance Policy or a Reserve Account Letter of Credit for the benefit of the holders in an amount equal to the required deposit, which Reserve Account Insurance Policy or Reserve Account Letter of Credit shall be payable or available to be drawn upon, as the case may be (upon the giving of notice as required thereunder), on any interest payment date on which a deficiency exists which cannot be cured by moneys in any other fund or account held by the Fiscal Agent pursuant to the Resolution and available for such purpose. If a disbursement is made under the Reserve Account Insurance Policy or the Reserve Account Letter of Credit, the Authority shall be obligated either to reinstate the limits of such Reserve Account Insurance Policy or Reserve Account Letter of Credit following such disbursement, or to deposit into the Reserve Account from Revenues, funds in the amount of the disbursement made under such Reserve Account Insurance Policy or Reserve Account Letter of Credit. (Section 401).

Moneys in the Redemption Account shall be applied to the retirement of Bonds as follows:

(a)  Subject to the provisions of paragraph (c) below, the Fiscal Agent shall endeavor to purchase outstanding Bonds, whether or not such Bonds shall then be subject to redemption, at the most advantageous price obtainable with reasonable diligence, having regard to interest rate and price, such price not to exceed the principal of such Bonds plus the amount of the premium, if any, which would be payable on the next redemption date to the holders of such Bonds if such Bonds should be called for redemption on such date from moneys in the Sinking Fund. The Fiscal Agent shall pay the interest accrued on such Bonds to the date of delivery thereof from the Bond Service Account and the purchase price from the Redemption Account, but no such purchase shall be made within 45 days next preceding any interest payment date on which such Bonds are subject to redemption except from moneys in excess of the amounts set aside or deposited for the redemption of Bonds.

(b)  Subject to the provisions of paragraph (c) below, the Fiscal Agent shall call for redemption on each interest payment date on which Bonds are subject to redemption from moneys in the Sinking Fund such amount of Bonds then subject to redemption as, with the redemption premium, if any, will exhaust the Redemption Account as nearly as may be; provided, however, that not less than $50,000 principal amount of Bonds shall be called for redemption at any one time.

32

(c) Moneys in the Redemption Account shall be applied to the purchase or redemption of Bonds in the following order:

First, the term Bonds of each Series, if any, in the order of their issuance, to the extent of the Amortization Requirement, if any, of the then current fiscal year for such term Bonds and any deficiency in preceding fiscal years in the purchase or redemption of such term Bonds under the provisions of this subdivision; provided, however, that if none of the term Bonds of a Series shall be subject to redemption from moneys in the Sinking Fund and if the Fiscal Agent shall at any time be unable to exhaust the moneys applicable to the Bonds of any such Series in the purchase of such Bonds under the provisions of paragraph (a) above, such moneys or the balance of such moneys, as the case may be, shall be retained in the Redemption Account and, as soon as it is feasible, applied to the retirement of the Bonds of such Series;

Second, to the purchase of any outstanding Bonds, whether or not such Bonds shall then be subject to redemption, in accordance with the provisions of paragraph (a) above;

Third, term Bonds of each Series in proportion (as nearly as practicable) to the aggregate principal amount of the Bonds of each such Series originally issued; and

Fourth, after the retirement of all term Bonds, serial Bonds in the inverse order of their maturities, and to the extent that serial Bonds of different Series mature on the same date, in proportion (as nearly as practicable) to the principal amount of each Series maturing on such date. (Section 403).

All expenses in connection with such purchase or redemption shall be paid from the Construction Fund. (Section 403).

Moneys in the Reserve Account shall be used for the purpose of paying interest on the Bonds and maturing principal of serial Bonds whenever and to the extent that the moneys held for the credit of the Bond Service Account shall be insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the Redemption Account pursuant to the requirements mentioned in paragraph (2) above whenever and to the extent that the Revenues are insufficient for such purpose. Excess moneys in the Reserve Account shall be transferred to the Construction Fund, the Bond Service Account or the Redemption Account, as directed by the Authority. (Section 404).

*Redemption*

At least thirty (30) days before the redemption date of any Bonds, the Fiscal Agent shall cause a notice of any such redemption, signed in the name of the Authority by the Fiscal Agent, to be mailed, by first class mail, postage prepaid, to all registered owners of Bonds to be redeemed at their addresses as they appear on the registration books of the Authority held by the Fiscal Agent, but failure to mail any such notice or any defect in any such notice shall not affect the validity of the proceedings for redemption of any other Bonds notice of which redemption was properly given. Each such notice shall set forth the date fixed for redemption, the redemption price to be paid, that on the date fixed for redemption, the redemption price will become due and payable upon each Bond called for redemption, if moneys for the payment of the redemption price shall be on deposit on such date, that interest thereon shall cease to accrue on and after said redemption date, the place where such bonds are to be surrendered for payment of such redemption price, and, if less than all of the Bonds then outstanding shall be called for redemption, the maturities and the numbers of such Bonds. (Sections 302 and 303).

*Construction Fund*

Moneys in the Construction Fund may be used for any authorized purpose of the Authority, including the payment of the cost of maintaining, repairing and operating the Traffic Facilities and the cost of necessary renewals and replacements of Traffic Facilities. (Sections 401, 604 and 605). Before any payment or withdrawal shall be made from moneys in the Construction Fund there shall be filed with the Fiscal Agent a certificate signed by a designated officer of the Authority setting forth the amount of money to be so disbursed and stating that such money will be used to pay the costs of constructing Traffic Facilities or for other purposes permitted by the Resolution. Upon receipt of such certificate the Fiscal Agent shall withdraw from the Construction Fund and deposit to the credit

33

of a special checking account in its commercial department in the name of the Authority the amount so specified in such certificate. The Fiscal Agent shall also at any time at the written direction of the Authority transfer any part of the moneys in the Construction Fund to the credit of the Redemption Account. (Section 405).

### Defeasance

If all the outstanding Bonds shall have been paid or deemed to have been paid as provided below, then and in that case the right, title and interest of the bondholders under the Resolution shall cease, terminate and become void, and such Bonds shall cease to be entitled to any lien, benefit or security under the Resolution. In such event, the Authority shall repeal and cancel the Resolution and may apply any surplus in the Sinking Fund and all balances remaining in any other funds and accounts other than moneys held for the redemption or payment of Bonds to any lawful purposes of the Authority as the Secretary shall determine.

Any outstanding Bond shall be deemed to have been paid within the meaning and with the effect expressed in the Resolution when the whole amount of the principal of, redemption premium, if any, and interest on such Bond shall have been paid or duly provided for and the conditions set forth in clause (c) below have been satisfied or when (a) in case such Bond has been called for redemption or the Authority has given to the Fiscal Agent irrevocable instructions to call such Bond for redemption, (b) there shall have been deposited with the Fiscal Agent or other appropriate fiduciary institution acting as escrow agent for the holder of such Bond and the holders of other Bonds being defeased and specifically designated for the purpose of defeasance either moneys in an amount which shall be sufficient, or Government Obligations the principal of and interest on which are sufficient, to pay when due the principal of and premium, if any, and interest due and to become due on such Bond on or prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event such Bond does not mature and is not to be redeemed within the next succeeding sixty (60) days, the Authority shall have given the Fiscal Agent irrevocable instructions to give, as soon as practicable, a notice to the holder of such Bond by first-class mail, postage prepaid, stating that the deposit of moneys or such time deposits or Government Obligations required by clause (b) of this paragraph has been made with the Fiscal Agent or other appropriate fiduciary institution acting as escrow agent for the holder of such Bond, and that such Bond is deemed to have been paid in accordance with the Resolution and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal of and premium, if any, and interest on such Bond.

Neither the moneys nor Government Obligations deposited with the Fiscal Agent or other appropriate fiduciary institution acting as escrow agent nor principal or interest payments on any such obligations shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal of and redemption premium, if any, and interest on the Bonds which have been defeased.

As to Variable Rate Bonds, the amount required for the interest thereon shall be calculated at the maximum rate permitted by the terms of the provisions of the resolution which authorized the issuance of such Variable Rate Bonds.

Notwithstanding any of the provisions of the Resolution to the contrary, Put Bonds and Extendible Maturity Bonds may only be fully discharged and satisfied either by paying the principal of and interest on said Bonds as they become due and payable or by depositing moneys which shall be sufficient at the time of such deposit to pay when due the maximum amount of principal of and redemption premium, if any, and interest on such Put Bonds and Extendible Maturity Bonds which could become payable to the holders of such Bonds upon the exercise of any options provided to the holders of such Bonds and the Authority; provided, however, that if, at the time a deposit is made pursuant to this paragraph, the options originally exercisable on the Put Bonds and Extendible Maturity Bonds are no longer exercisable, such Bonds shall not be considered Put Bonds or Extendible Maturity Bonds for these purposes.

If any portion of the moneys deposited for the payment of the principal of and redemption premium, if any, and interest on any portion of Bonds is not required for such purpose, the Authority may use the amount of such excess, subject to certain tax covenants contained in the Resolution, free and clear of any trust, lien, security interest, pledge or assignment securing said Bonds or otherwise existing under the Resolution. (Section 901).

*Issuance of Additional Bonds*

Bonds may be issued under and secured by the Resolution, subject to the conditions hereinafter described, at any time or times for the purpose of providing funds to pay the cost of Traffic Facilities, to refund all or any part of the outstanding Bonds of any one or more Series by payment at maturity or redemption at a selected redemption date or dates, including the payment of any redemption premium thereon, to fund a deposit to the Reserve Account and to pay any costs of issuance of such Bonds. (Sections 208 and 209).

Before such Bonds shall be authenticated and delivered by the Fiscal Agent, there shall be filed with the Fiscal Agent, among other things, a certificate dated the date of original issuance of the Bonds, signed by the Executive Director, setting forth:

(i) the amount of the Revenues for any twelve (12) consecutive calendar months out of the fifteen (15) calendar months immediately preceding the month in which such certificate is signed;

(ii) the amount of the Toll Revenues for the twelve (12) calendar months for which the Revenues are shown in item (i) above;

(iii) the difference between the amounts set forth in items (i) and (ii) above;

(iv) the amount of the maximum Principal and Interest Requirement for any fiscal year thereafter on account of the Bonds then outstanding and the Bonds then requested to be delivered;

(v) the percentage derived by dividing the amount in item (i) above by the amount in item (iv) above; and

(vi) the percentage derived by dividing the amount in item (iii) above by the amount in item (iv) above. (Section 208).

The Fiscal Agent may only deliver such additional Bonds if the percentage shown in either item (v) or item (vi) is not less than 150%. (Section 208). The Authority need not deliver said certificate in connection with the issuance of refunding bonds if the Executive Director delivers a certificate to the effect that the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of the Bonds to be outstanding after the issuance of the refunding Bonds shall be equal to or less than the maximum Principal and Interest Requirements for any fiscal year thereafter on account of the Bonds outstanding prior to the issuance of such refunding Bonds. (Section 209).

If the percentage shown in item (vi) of the certificate mentioned above and filed with the Fiscal Agent in connection with the issuance of any additional Bonds is less than 150%, the Authority may not reduce the tolls or other charges imposed by it for the use of its Traffic Facilities such that, as of the effective date of such reduction, the amount of Revenues for any twelve (12) consecutive calendar months out of the fifteen (15) calendar months immediately preceding such effective date, adjusted to reflect the Toll Revenues it would have received, based on the volume of traffic for such twelve (12) months, if such reduction had been in effect for such twelve (12) months, is less than 150% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all Bonds then outstanding. (Section 609).

Any increase in the Reserve Requirement resulting from the issuance of such additional Bonds may be satisfied by equal deposits of 20% of such increase into the Reserve Account in each of the next five years beginning with the fiscal year in which such additional Bonds were issued. (Section 401).

*Other Indebtedness*

The Authority will not incur any indebtedness nor create or cause or suffer to be created any debt, lien, pledge, assignment, encumbrance or any other charge having a priority to or being on a parity with the lien on Revenues of the Bonds issued under the Resolution, except upon the conditions and in the manner provided in the Resolution. Any other indebtedness incurred by the Authority shall contain an express statement that such indebtedness is junior,

inferior and subordinate in all respects to the Bonds. For purposes of the above limitation in incurrence of indebtedness, indebtedness shall not be deemed to include contracts entered into in the ordinary course of business or agreements to repay advances received from the federal government. Nothing in the Resolution shall be deemed to prohibit the Authority from entering into currency swaps, interest rate swaps or other arrangements for hedging of interest rates on any indebtedness. (Section 602).

Nothing in the Resolution is to be construed as preventing the Authority from financing any facilities authorized by the act creating the Authority by the issuance of bonds or other obligations which are not secured under the provisions of the Resolution. (Section 1001).

*Investment of Funds*

Moneys held for the credit of the Bond Service Account and the Redemption Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Government Obligations, and moneys held for the credit of the Construction Fund and the Reserve Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Investment Obligations, which Government Obligations and Investment Obligations shall mature, or which shall be subject to redemption by the holder thereof at the option of such holder, not later than the respective dates when moneys held for the credit of such Fund or Accounts will be required for the purposes intended. Amounts on deposit in the Reserve Account shall be invested in Investment Obligations which mature not later than the final maturity date of any Bonds outstanding. (Section 502).

Investment earnings on moneys on deposit to the credit of the following Fund and Accounts shall be applied as follows:

(a) investment earnings on moneys on deposit to the credit of the Construction Fund shall be retained to the credit of said Fund;

(b) investment earnings on moneys on deposit to the credit of the Reserve Account shall be retained in said Account at any time that the amounts on deposit to the credit of said Account are less than the Reserve Requirement and, if moneys on deposit therein are sufficient for such purposes, then such earnings shall be withdrawn and deposited to the credit of the Construction Fund, the Bond Service Account or the Redemption Account, as the Authority shall direct; and

(c) investment earnings on moneys on deposit to the credit of the Bond Service Account and the Redemption Account shall be transferred to the Construction Fund or at the option of the Authority retained in such Account. (Section 502).

In computing the amount in any Fund or Account created pursuant to the provisions of the Resolution, obligations purchased as an investment of moneys therein shall be valued at par if purchased at par or at amortized value if purchased at other than par, plus, in each case, accrued interest. Amortized value, when used with respect to an obligation purchased at a premium above or a discount below par, means the value as of any given time obtained by dividing the total premium or discount at which such obligation was purchased by the number of days remaining to maturity on such obligation at the date of such purchase and by multiplying the amount thus calculated by the number of days having passed since such purchase; and (1) in the case of an obligation purchased at a premium by deducting the product thus obtained from the purchase price, and (2) in the case of an obligation purchased at a discount by adding the product thus obtained to the purchase price. Valuation on any particular date shall include the amount of interest then earned or accrued to such date on any moneys or investments in such Fund or Account. The computation of the amount on deposit in or credited to the Fund and Accounts created under the Resolution and the valuation of the investments of such amount shall be performed by the Fiscal Agent as of the close of business on the last day of each fiscal year and at such other times as the Authority shall request, and such computation and valuation shall not be required to be performed at other times. (Section 503).

*Modifications*

The Authority may adopt resolutions supplemental to the Resolution without the consent of the bondholders to cure any ambiguity, formal defect or omission, or to correct any inconsistent provisions or errors in the Resolution or any supplemental resolution, or to grant or confer upon the bondholders any additional rights, remedies, powers, authority or security, or to add to the conditions, limitations and restrictions on the issuance of Bonds under the provisions of the Resolution, or to add to the covenants and agreements of the Authority in the Resolution or to surrender any right or power reserved to or conferred upon the Authority, or to make necessary changes to facilitate the issuance of Variable Rate Bonds, Capital Appreciation Bonds, Capital Appreciation and Income Bonds, Put Bonds, Extendible Maturity Bonds, Balloon Bonds, Interim Bonds and such other bonds as may be marketable from time to time, or to make changes as may evidence the right and interest of an issuer of a Credit Facility or a Liquidity Facility that secures any Series of Bonds. (Section 801).

The holders of not less than two-thirds in aggregate principal amount of the Bonds then outstanding shall have the right to consent to and approve the adoption of such resolution or resolutions supplemental to the Resolution as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to or rescinding any of the terms and provisions contained in the Resolution or in any supplemental resolution; provided, however, that nothing contained in the Resolution shall permit, or be construed as permitting, (a) an extension of the maturity of the principal of or the interest on any Bond, or (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, or (c) the creation of a lien upon or a pledge of Revenues other than the lien and pledge created by the Resolution, or (d) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (e) a reduction in the aggregate principal amount of the Bonds required for consent to such supplemental resolution. (Section 802).

If at any time the Authority shall determine that it is necessary or desirable to adopt any supplemental resolution for any of the purposes of the above paragraph, the Fiscal Agent at the expense and request of the Authority shall cause notice of the proposed adoption of such supplemental resolution to be published once in each week for two successive weeks in a daily newspaper of general circulation published in San Juan, Puerto Rico, and in a daily newspaper of general circulation or a financial journal published in the Borough of Manhattan, City and State of New York, and, on or before the date of the first publication of such notice, it shall also cause a similar notice to be mailed, postage prepaid, to all registered owners of Bonds at their addresses as they appear on the registration books and all other bondholders who shall have filed their names and addresses with the Fiscal Agent for such purpose. Such notice shall briefly set forth the nature of the proposed supplemental resolution and shall state that copies thereof are on file at the office of the Fiscal Agent for inspection by all bondholders. The Fiscal Agent shall not, however, be subject to any liability to any bondholder by reason of its failure to cause the notice required by Section 802 of the Resolution to be mailed, and any such failure shall not affect the validity of such supplemental resolution when consented to and approved as provided in Section 802. (Section 802).

Whenever, at any time after the date of the first publication of such notice, the Authority shall obtain an instrument or instruments in writing purporting to be executed by the holders of not less than two-thirds in aggregate principal amount of the Bonds then outstanding, which instrument or instruments shall refer to the proposed supplemental resolution described in such notice and shall specifically consent to and approve the adoption thereof in substantially the form of the copy thereof referred to in such notice, and the Authority shall deliver to the Fiscal Agent a certificate signed by the Executive Director that the holders of such required percentage of Bonds have filed such consents; thereupon, but not otherwise, the Authority may adopt such supplemental resolution in substantially such form, without liability or responsibility to any holder of any Bond, whether or not such holder shall have consented thereto. (Section 802).

If the holders of not less than two-thirds in aggregate principal amount of the Bonds outstanding at the time of the adoption of such supplemental resolution shall have consented to and approved the adoption thereof, no holder of any Bond shall have any right to object to the adoption of such supplemental resolution, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the adoption thereof, or to enjoin or restrain the Authority from adopting the same or from taking any action pursuant to the provisions thereof and such consent shall be binding on the holder giving such consent and upon any subsequent holder whether or not he has notice thereof. (Section 802).

Upon the adoption of any supplemental resolution pursuant to the provisions of the Resolution, the Resolution shall be and be deemed to be modified and amended in accordance therewith, and the respective rights, duties and obligations under the Resolution of the Authority, the Fiscal Agent and all holders of Bonds then outstanding shall thereafter be determined, exercised and enforced in all respects under the provisions of the Resolution as so modified and amended. (Section 802).

### Miscellaneous Covenants

*Master Plan.* The Authority covenants that the master plan for the construction of required Traffic Facilities in Puerto Rico will be supplemented periodically as necessary and that the five-year Priorities Construction Program will be updated each year to cover the Traffic Facilities to be constructed by the Authority in the ensuing five-year period. (Section 603).

*Costs of Maintenance, Repair and Operation of Traffic Facilities.* The Authority covenants that, if and to the extent funds for the purpose of maintaining, repairing and operating all Traffic Facilities financed by the Authority in whole or in part by the issuance of Bonds of the Authority under the provisions of the Resolution are not provided by the Commonwealth, the Authority will pay such costs from unencumbered funds then on deposit in the Construction Fund or from the Revenues thereafter deposited to the credit of the Construction Fund pursuant to the Resolution. (Section 604).

The Authority covenants that it will cause an annual general evaluation to be made by the Traffic Engineers of the level of maintenance of Traffic Facilities financed in whole or in part by the issuance of Bonds, which Traffic Facilities shall be, in the judgment of the Authority with the approval of the Traffic Engineers, material to the overall system of traffic facilities operated by the Authority. This evaluation is to be directed towards surface and shoulder conditions and condition of structures and signs on the Traffic Facilities. The annual report delivered by the Traffic Engineers under Section 605 of the Resolution and the Authority's obligations to cause repairs, renewal or replacements to be made to Traffic Facilities, shall pertain to the Traffic Facilities financed in whole or in part with Bond proceeds and adjudged to be material to the overall system of traffic facilities operated by the Authority. (Section 604).

*Annual Report of Traffic Engineers.* The Authority covenants that it will cause the Traffic Engineers to prepare a report each year promptly after the completion of their general evaluation of the level of maintenance of the Traffic Facilities referred to in the preceding paragraph setting forth (i) their comments with respect to any supplements or revisions made by the Authority in the master plan or in the five-year Priorities Construction Program referred to above under "Master Plan" and their recommendations as to any supplements or revisions which should be made in such plan or in the Priorities Construction Program, and (ii) their findings as to whether the Traffic Facilities have been maintained in good repair, working order and sound condition and their recommendations as to necessary repairs, renewals or replacements. (Section 605).

If it appears from such report that repairs, renewals or replacements of any such Traffic Facilities are necessary, the Authority shall promptly cause the same to made and if and to the extent that funds for such purpose have not been made available by the Commonwealth, moneys on deposit to the credit of the Construction Fund which have not theretofore been encumbered for other purposes, and moneys which are thereafter deposited to the credit of the Construction Fund pursuant to the Resolution shall first be applied for such purpose. (Section 605).

## SUMMARY OF CERTAIN PROVISIONS
## OF THE PROPOSED SUPPLEMENTAL RESOLUTION

The following is a brief summary of certain provisions of the Proposed Supplemental Resolution which will be adopted when the consent of the owners of 100% of the Bonds has been obtained. Such statements do not purport to be complete and reference is made to the Proposed Supplemental Resolution, copies of which are available from the Authority or the Fiscal Agent.

The Proposed Supplemental Resolution will provide as follows:

*Modification with Consent of Holders of Majority of Bonds*

Subject to the terms and provisions contained below, and not otherwise, the holders of not less than a majority in aggregate principal amount of the Bonds at the time outstanding (or in case less than all of several Series of Bonds then outstanding are affected by the supplement thereto, the holders of a majority or more in principal amount of the Bonds of the Series so affected and outstanding at the time the consent and approval are given) shall have the right, from time to time, anything contained in the Resolution to the contrary notwithstanding, to consent to and approve the adoption by the Authority of such resolution or resolutions supplemental thereto as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained in the Resolution or in any supplemental resolution; provided, however, that nothing contained in the Resolution shall permit, or be construed as permitting, without the consent of the holders of one hundred percent (100%) of the Bonds outstanding (a) an extension of the maturity of the principal of or interest on any Bond issued thereunder (other than as provided for by the terms of an Extendible Maturity Bond), or (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, or (c) the creation of a lien upon or a pledge of Revenues ranking prior to or on a parity with the lien or pledge created by the Resolution, except for a parity lien on or pledge of Revenues given to any provider of a credit facility or liquidity facility under any reimbursement or similar agreement, or (d) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (e) a reduction in the aggregate principal amount of the Bonds required for consent to and approval of such supplemental resolution. Nothing contained in the Resolution, however, shall be construed as making necessary the approval by bondholders of the adoption of any supplemental resolutions that would otherwise not require their consent. Except as to supplemental resolutions containing changes described in clauses (a) through (e) of the proviso to the first sentence of this paragraph, the provider of any credit facility or liquidity facility shall have the right, in lieu of the holders of Bonds secured thereby, to give consent and approval to any supplemental resolution for which the consent of the holders of such Bonds is required under the Resolution, and all references to bondholders for purposes of such consent and approval shall mean instead the provider of said credit facility or liquidity facility; provided, however, that said provider of a credit facility or liquidity facility shall not be in default on its obligations in connection with said credit facility or liquidity facility.

If at any time the Authority shall so request the Fiscal Agent, the Fiscal Agent shall cause a notice to be mailed, postage prepaid, to all registered owners of Bonds then outstanding at their addresses as they appear on the registration books and to be published as further provided in the Resolution. Such notice shall briefly set forth the nature of the proposed supplemental resolution and shall state that a copy thereof is on file at the principal office of the Fiscal Agent for inspection by all Bondholders. The Fiscal Agent shall not, however, be subject to any liability to any Bondholder by reason of its failure to mail such notice, and any such failure shall not affect the validity of such supplemental resolution when consented to or approved as provided in the Resolution.

Whenever, at any time after the date of first publication of such notice, the Authority shall deliver an instrument or instruments purporting to be executed by the holders of at least a majority in aggregate principal amount of the Bonds then outstanding, which instrument or instruments shall refer to the proposed supplemental resolutions described in such notice and shall specifically consent to and approve the adoption thereof in substantially the form of the copy thereof referred to in such notice, and the Authority shall deliver to the Fiscal Agent a certificate signed by the Executive Director that the holders of such required percentage of Bonds have filed such consents thereupon, but not otherwise the Authority may adopt such supplemental resolution in substantially such form without liability or responsibility to any holders of any Bond, whether or not such holders shall have consented thereto. It shall not be necessary for the consent of the holders to approve the particular form of any proposed supplemental resolution, but it shall be sufficient if such consent shall approve the substance thereof.

The consent of the holders of any Series of additional Bonds shall be deemed given if the underwriters or initial purchasers for resale consent in writing to such supplemental resolution and the nature of the amendment effected by such supplemental resolution is disclosed in the official statement or other offering document pursuant to which such series of additional Bonds is offered and sold to the public.

39

*Parity Liens to Providers of Credit Facilities and Liquidity Facilities*

In connection with the execution and delivery of a reimbursement or similar agreement in which the Authority agrees to reimburse a provider of a credit facility or a liquidity facility for amounts drawn on any such facility or to pay fees for any such facility, the Authority can grant a security interest and lien upon all or any portion of the Revenues to secure said reimbursement obligation on a parity with the Bonds.

## TAX EXEMPTION

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements which the Authority must continue to meet after the issuance of the 1996 Bonds in order that interest on the 1996 Bonds not be included in gross income for federal income tax purposes. The Authority's failure to meet these requirements may cause interest on the 1996 Bonds to be included in gross income for federal income tax purposes retroactive to their date of issuance. The Authority has covenanted to comply to the extent permitted by the Constitution and the laws of the Commonwealth with the requirements of the Code in order to maintain the exclusion from gross income for federal income tax purposes of interest on the 1996 Bonds. Bond Counsel is aware of no provision of the Constitution or laws of the Commonwealth which would prevent the Authority from complying with the requirements of the Code.

In the opinion of Bond Counsel, subject to continuing compliance by the Authority with the tax covenant referred to above, under existing statutes, regulations, rulings and court decisions, interest on the 1996 Bonds is not includable in gross income for federal income tax purposes. Interest on the 1996 Bonds is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the 1996 Bonds will be includable in the computation of the alternative minimum tax and the environmental tax on corporations imposed by the Code. Bond Counsel is further of the opinion that the 1996 Bonds and the interest thereon are exempt from state, Commonwealth and local income taxation. Bond Counsel will express no opinion on the Federal, state, Commonwealth or local income tax treatment of the Conversion Adjustment (as defined in the Resolution).

Ownership of tax-exempt obligations may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations, certain S Corporations with excess passive income, individual recipients of Social Security or Railroad Retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations and taxpayers who may be eligible for the earned income tax credit. Companies which qualify for and which have elected the benefits of Section 936 of the Code should consult their tax advisors as to whether interest on the 1996 Bonds constitutes income eligible for the credit provided by Section 936 of the Code.

Ownership of tax-exempt obligations may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in Puerto Rico.

Prospective purchasers of the 1996 Bonds should consult their tax advisors as to applicability and impact of any collateral consequences.

Legislation affecting municipal securities is constantly being considered by the United States Congress. There can be no assurance that legislation enacted after the date of issuance of the 1996 Bonds will not have an adverse effect on the tax-exempt status of the 1996 Bonds. Legislative or regulatory actions and proposals may also affect the economic value of tax exemption or the market price of the 1996 Bonds.

### Discount Bonds

Under the Code, the difference between the principal amount of the Series Y Bonds and the initial offering price to the public (excluding bond houses and brokers) at which price a substantial amount of such Bonds maturing July 1 of the years 2015, 2016, 2018, 2022 and 2026 was sold (collectively the "Discount Bonds"), is original issue discount. Original issue discount on the Discount Bonds represents interest which is not includable in federal gross income. A portion of such interest that accrues to the Beneficial Owner of such Discount Bonds in each year, as

described below, is, however, included in the calculation for determining a corporate taxpayer's alternative minimum tax and environmental tax and the distribution requirements of certain regulated investment companies and may result in some of the collateral federal income tax consequences described above under the caption "Tax Exemption" in the year of accrual. Consequently, Beneficial Owners of Discount Bonds should be aware that the accrual of original issue discount in each year may result in an alternative minimum tax liability, environmental tax liability, additional distribution requirements or other collateral federal income tax consequences although the Beneficial Owner may not have received cash in such year. Original issue discount on Discount Bonds will accrue over the terms of such Bonds at a constant interest rate compounded in a manner similar to that used in computing accreted values on capital appreciation bonds. Interest not includable in federal gross income equal to the original issue discount accruing during the period a Beneficial Owner holds such Discount Bond will increase the adjusted basis in such Discount Bond by the amount of such accruing discount for purposes of determining taxable gain or loss on the sale or other disposition of such Discount Bond. The accrual of original issue discount and its effect on the redemption, sale or other disposition of Discount Bonds which are not purchased in the initial offering at the initial offering price may be determined according to rules which differ from those described above. Beneficial Owners of Discount Bonds should consult their tax advisors with respect to the precise determination for federal income tax purposes of interest accrued upon sale, redemption or other disposition of Discount Bonds and with respect to the state and local tax consequences of owning and disposing of Discount Bonds.

**Premium Bonds**

The difference between the amount payable at maturity of the Series Y Bonds maturing July 1 of the years 1997 through 2009 and 2012 through 2014 and the Series Z Bonds maturing July 1 of the years 2001 through 2016 and 2018, and the tax basis of such Bonds to a purchaser (other than a purchaser who holds such Bonds as inventory, stock in trade or for sale to customers in the ordinary course of business) is "bond premium". Bond premium is amortized over the term of such Bonds for federal income tax purposes. Beneficial Owners of such Bonds are required to decrease their adjusted basis in such Bonds by the amount of amortizable bond premium attributable to each taxable year such Bonds are held. The amortizable bond premium on such Bonds attributable to a taxable year is not deductible for federal income tax purposes. Beneficial Owners of such Bonds should consult their tax advisors with respect to the precise determination for federal income tax purposes of the treatment of bond premiums upon sale or other disposition of such Bonds and with respect to the state and local tax consequences of owning and disposing of such Bonds.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Deloitte & Touche LLP will verify from the information provided to it the mathematical accuracy as of the date of the delivery of the 1996 Bonds of (1) the computations contained in schedules provided to it to determine that the anticipated receipts from the Government Obligations and cash deposits listed in such schedules, to be held in escrow, will be sufficient to pay, when due, the principal, interest and call premium payment requirements of the Refunded Bonds (see "*Plan of Financing*") and (2) the computations of yield on both such Obligations and the 1996 Bonds contained in such schedules and used by Bond Counsel in its determination that the interest on the 1996 Bonds is exempt from tax. Deloitte & Touche LLP will express no opinion on the assumptions provided to it, nor as to the exemption from taxation of the interest on the 1996 Bonds.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the 1996 Bonds from the Authority at an aggregate discount of $7,549,767.05 from the initial offering prices of the 1996 Bonds set forth or derived from information set forth on the inside cover page hereof. The obligations of the Underwriters are subject to certain conditions precedent, and they will be obligated to purchase all the 1996 Bonds if any 1996 Bonds are purchased. The 1996 Bonds may be offered and sold to certain dealers (including dealers depositing 1996 Bonds into investment trusts) and institutional purchasers at prices lower than such public offering prices and such offering prices may be changed, from time to time, by the Underwriters.

Morgan Stanley & Co. Incorporated ("Morgan Stanley"), a managing underwriter, has entered into a written agreement with BP Capital Markets, a subsidiary of Banco Popular de Puerto Rico ("BP Capital Markets"), pursuant to which BP Capital Markets has agreed to cooperate in connection with Morgan Stanley's provision of underwriting and investment banking services to the Commonwealth with respect to the 1996 Bonds. Pursuant to these arrangements, the existence of which has been disclosed to the Commonwealth and Government Development Bank, BP Capital Markets will be entitled to receive a portion of Morgan Stanley's actual net profits, if any, in connection with the underwriting of the 1996 Bonds.

## LITIGATION

There is no pending litigation of any nature restraining or enjoining or seeking to restrain or enjoin the issuance, sale or delivery of the 1996 Bonds or in any way contesting or affecting the validity of the 1996 Bonds, the resolutions or the proceedings of the Authority taken with respect to the authorization, issuance or sale thereof, or the pledge or application of any moneys under the Resolution or the existence or powers of the Authority.

The Authority is involved in various legal proceedings arising in the normal course of its business. The Authority and its General Counsel do not believe that liability from any legal proceedings, in excess of available insurance coverage and the provision for losses not covered by insurance, as shown on the financial statements, will have a material adverse effect on the financial condition of the Authority.

## LEGAL MATTERS

The forms of opinion of Greenberg Traurig Hoffman Lipoff Rosen & Quentel, New York, New York, Bond Counsel, are set forth in *Appendix V* to this Official Statement. Certain legal matters will be passed upon for the Underwriters by Brown & Wood, New York, New York.

## LEGAL INVESTMENT

The 1996 Bonds will be eligible for deposit by banks in Puerto Rico to secure public funds and will be approved investments for insurance companies to qualify them to do business in Puerto Rico, as required by law.

## GOVERNMENT DEVELOPMENT BANK

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the 1996 Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the 1996 Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank. See also *Relationships Among the Parties*.

## RATINGS

Moody's Investors Service ("Moody's") and Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies ("S&P"), have given the 1996 Bonds ratings of Baa1 and A, respectively. These ratings do not reflect the Policies. Moody's and S&P have given the Insured Bonds ratings of Aaa and AAA, respectively. The ratings reflect only the respective views of the rating agencies and an explanation of the significance of each rating may be obtained only from the respective rating agency.

Such rating agencies were provided with materials relating to the Authority, the Commonwealth and the 1996 Bonds and other relevant information, and no application has been made to any other rating agency for the purpose of obtaining a rating on the 1996 Bonds.

There is no assurance that such ratings will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by either or both of such rating agencies, if in the judgment of either or both, circumstances so warrant. Any such downward revision or withdrawal of such ratings, or either of them, may have an adverse effect on the market prices of the 1996 Bonds.

## CONTINUING DISCLOSURE

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC"), the Commonwealth and the Authority, as specifically stated hereinbelow, will agree to the following:

1. Each of the Authority and the Commonwealth will agree to file within 305 days after the end of each fiscal year beginning after its fiscal year 1996, with each nationally recognized municipal securities information repository ("NRMSIR") and with any Commonwealth state information depository ("SID"), core financial information and operating data for the prior fiscal year, including (i) its audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Authority and the Commonwealth, as the case may be, and information as to revenues, expenditures, financial operations and indebtedness of the Authority and the Commonwealth, as the case may be, generally found in this Official Statement; and

2. The Authority will agree to file, in a timely manner, with each NRMSIR or with the Municipal Securities Rulemaking Board and with any SID, notice of the occurrence of any of the following events with respect to the 1996 Bonds if, in the judgment of the Authority or its agent, such event is material:

a. principal and interest payment delinquencies;
b. non-payment related defaults;
c. unscheduled draws on debt service reserves reflecting financial difficulties;
d. unscheduled draws on credit enhancements reflecting financial difficulties;
e. substitution of credit or liquidity providers, or their failure to perform;
f. adverse opinions or events affecting the tax-exempt status of the 1996 Bonds;
g. modifications to rights of the holders (including Beneficial Owners) of the 1996 Bonds;
h. bond calls;
i. defeasances;
j. release, substitution, or sale of property securing repayment of the Series 1996 Bonds;
k. rating changes; and
l. any failure to comply with paragraph 1 above.

Events (d) and (e) are included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers, dated September 19, 1995. However, events (d) and (e) may not be applicable, since the terms of the 1996 Bonds do not provide for "credit enhancements" or "credit or liquidity providers". For a description of the 1996 Bonds, see *The Bonds*. In addition, with respect to the following events:

Events (d) and (e). The Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the 1996 Bonds, unless the Authority applies for or participates in obtaining the enhancement.

Event (f). For information on the tax status of the 1996 Bonds, see "Tax Exemption".

Event (h). The Authority does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under "Description of the Series 1996 Bonds --

Redemption Provisions -- Mandatory Redemption" under *The Bonds*, (ii) the only open issue is which 1996 Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Bondholders as required under the terms of the 1996 Bonds and the Resolution, and (iv) public notice of the redemption is given pursuant to Securities Exchange Act of 1934 Release No. 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or purchases of 1996 Bonds.

The Commonwealth expects to provide the information described in clause (1) above by delivering its first bond official statement that includes its financial statements for the preceding fiscal year or, if no such official statement is issued by the 305-day deadline, by delivering its Comprehensive Annual Financial Report by such deadline.

As of March 6, 1996, there is no Commonwealth SID, and the nationally recognized municipal securities information repositories are: Bloomberg Municipal Repository, P.O. Box 840, Princeton, New Jersey 08542-0840; Kenny Information Systems, Inc., 65 Broadway-16th Floor, New York, New York 10006; Disclosure, Inc., 5161 River Road, Bethesda, Maryland 20816, Attn: Document Acquisitions/Municipal Securities; Moody's NRMSIR Public Finance Information Center, 99 Church Street, New York, New York 10007; The Bond Buyer, 395 Hudson Street, New York, New York 10004, Attn: Municipal Disclosure and R.R. Donnelly Financial, Municipal Securities Disclosure Archive, 559 Main Street, Hudson, Massachusetts 01749.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Authority, such other events are material with respect to the 1996 Bonds, but the Authority does not undertake to provide any such notice of the occurrence of any material event, except those events listed above.

The Commonwealth and the Authority acknowledge that their respective undertakings pursuant to the Rule described above are intended to be for the benefit of the beneficial owners of the 1996 Bonds, and shall be enforceable by any such beneficial owners; provided that the right to enforce the provisions of their respective undertakings shall be limited to a right to obtain specific enforcement of the Authority's or the Commonwealth's obligations hereunder.

No beneficial owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such beneficial owner shall have filed with the Authority and the Commonwealth written notice of any request to cure such breach, and the Authority or the Commonwealth, as applicable, shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan for the equal benefit of all beneficial owners of the outstanding 1996 Bonds benefitted by the Covenants, and no remedy shall be sought or granted other than specific performance of any of the Covenants at issue. Moreover, Proceedings filed by beneficial owners against the Commonwealth may be subject to the sovereign immunity provisions of Sections 2 and 2A of Act No. 104, approved June 29, 1955, as amended (32 L.P.R.A. §3077 and §3077a), which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if:

(1) the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority or the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the 1996 Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of beneficial owners, as determined by parties unaffiliated with the Authority or the Commonwealth; or

(2) all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Authority or the Commonwealth, as applicable, elects that the Covenants shall be deemed amended accordingly.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

These Covenants have been made in order to assist the Underwriters in complying with the Rule.

## RELATIONSHIPS AMONG THE PARTIES

Merrill Lynch & Co. is acting as financial advisor to the Authority in connection with the Tren Urbano project. Lehman Brothers Inc. is acting as financial advisor to the Authority and PaineWebber Incorporated is acting as financial advisor to a private partnership in connection with the private design, construction and operation of a proposed tollway which the Authority expects will not be financed by Bonds.

## MISCELLANEOUS

The foregoing references to and summaries of certain provisions of the Resolution, the various acts and the 1996 Bonds are made subject to all the detailed provisions thereof, to which reference is hereby made for further information, and do not purport to be complete statements of any or all of such provisions.

There are appended to this Official Statement certain information concerning the Commonwealth *(Appendix I)*, the general purpose financial statements of the Commonwealth for the fiscal year ended June 30, 1995, together with the report of Deloitte & Touche LLP, San Juan, Puerto Rico *(Appendix II)*, the audited financial statements of the Authority for the fiscal year ended June 30, 1995 with comparative totals for the fiscal year ended June 30, 1994, together with the report of Ernst & Young LLP *(Appendix III)*, the letter of the Traffic Engineers *(Appendix IV)*, the proposed forms of opinion of Bond Counsel *(Appendix V)*, information concerning the Cap RITES Bonds *(Appendix VI)*, a specimen of the MBIA Policy *(Appendix VII)* and a specimen of the FSA Policy *(Appendix VIII)*.

The general purpose financial statements of the Commonwealth included in *Appendix II* and financial statements of the Authority included in *Appendix III* have been audited by Deloitte & Touche LLP, San Juan, Puerto Rico, and Ernst & Young LLP, as set forth in their respective reports therein. The information set forth in *Appendix I* was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included in this Official Statement on the authority of such officials or the authority of such publications as public official documents, respectively. The information pertaining to DTC, MBIA and FSA was supplied, respectively, by DTC, MBIA and FSA. The remaining information set forth in this Official Statement, except the information appearing in *Underwriting, Relationships Among the Parties* and in *Appendices I, II, V, VII and VIII*, was supplied by the Executive Director of the Authority in his official capacity as such Executive Director and is included in this Official Statement on his authority.

This Official Statement will be filed with each nationally recognized municipal securities information repository and with the MSRB.

PUERTO RICO HIGHWAY AND
TRANSPORTATION AUTHORITY

By: /s/Sergio L. González
    *Executive Director*

45

[This page intentionally left blank]

# COMMONWEALTH OF PUERTO RICO

**Geography and Population**

Puerto Rico, the fourth largest of the Caribbean islands, is located approximately 1,600 miles southeast of New York, New York and 1,000 miles east-southeast of Miami, Florida. It is approximately 100 miles long and 35 miles wide.

According to the United States Census Bureau, the population of Puerto Rico was approximately 3,522,000 in 1990 compared to 3,196,520 in 1980. According to estimates of the Planning Board, the population of Puerto Rico increased to 3,703,000 in fiscal 1995. As of 1990, the population of San Juan, the island's capital and largest city, was approximately 437,000.

**Relationship with the United States**

Puerto Rico was discovered by Columbus in 1493, and the island was conquered and settled by the Spaniards shortly thereafter. It remained a Spanish possession for four centuries. Although the culture of Puerto Rico is primarily Hispanic, a considerable intermingling of Hispanic and United States cultures has occurred.

Puerto Rico came under United States sovereignty by the Treaty of Paris, signed on December 10, 1898, terminating the Spanish-American War. Puerto Ricans have been citizens of the United States since 1917. In July 1950, after a lengthy period of evolution toward greater self-government for Puerto Rico, the Congress of the United States enacted Public Law 600, which provided that those sections of existing law which defined the political, economic and fiscal relationship between Puerto Rico and the United States should remain in full force. It also authorized Puerto Rico to draft and approve its own Constitution in the same manner as is required by the United States Constitution for states. The Constitution was drafted by a popularly elected constitutional convention, approved in a special referendum by the people of Puerto Rico, amended and ratified by the United States Congress and subsequently approved by the President, becoming effective on July 25, 1952. Puerto Rico's constitutional status is that of a territory of the United States and the ultimate source of power over Puerto Rico, pursuant to the Territories Clause of the Federal Constitution, is the United States Congress. The relationship between the United States and Puerto Rico is referred to herein as commonwealth status. Notwithstanding the current relationship, Congress by statute and the United States federal courts by interpretation have modified and may modify this relationship.

The official languages of Puerto Rico are Spanish and English. The Commonwealth exercises virtually the same control over its internal affairs as do the fifty states; however, it differs from the states in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives and limited voting powers. Most federal taxes, except those such as social security taxes, are not levied in Puerto Rico. No federal income tax is collected from Commonwealth residents on ordinary income earned from sources in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries. Income earned from sources outside of Puerto Rico is, however, subject to federal income tax. Federal excise taxes on shipments of alcoholic beverages from Puerto Rico at $11.30 per gallon through October 1, 1998 and thereafter at $10.50 per gallon and on shipments of tobacco products from Puerto Rico to the mainland are returned to the Commonwealth Treasury.

Legislation introduced in the U.S. House of Representatives on March 6, 1996 ("H.R. 3024") proposes a mechanism to resolve permanently the political relationship between Puerto Rico and the United States, either through statehood or independence (including, as an alternative, free association via a bilateral treaty). Failure to settle on any of these alternatives after a three-referenda process, will result in retention of the current

Commonwealth status. H.R. 3024 is in its early stages, and it is not possible at this time to determine its ultimate outcome.

**Governmental Structure**

The Commonwealth's Constitution provides for the separation of powers of the executive, legislative and judicial branches of government. The Governor is elected every four years. The bicameral Legislature consists of a Senate and a House of Representatives and is elected for four-year terms. The highest court within the local judicial branch is the Supreme Court of Puerto Rico. Decisions of the Supreme Court of Puerto Rico may be appealed to the Supreme Court of the United States in the same manner and under the same terms and conditions that decisions may be appealed from state courts. Puerto Rico has a District Court of the United States for the District of Puerto Rico. Decisions of this court may be appealed to the United States Court of Appeals for the First Circuit and to the Supreme Court of the United States.

Governmental responsibilities assumed by the Commonwealth are similar in nature to those of the various state governments. In addition, the Commonwealth assumes responsibility for local police and fire protection, education, public health and welfare programs and economic development.

Pedro J. Rosselló was sworn in as Governor of Puerto Rico on January 2, 1993. He obtained a medical degree from Yale University in 1970, after completing his undergraduate studies at Notre Dame University in 1966, and specialized in General and Pediatric Surgery at Harvard University. In 1985 he was appointed Director of San Juan's Health Department, a position which he held for three years. As a member of the New Progressive Party, he was the party's candidate for Resident Commissioner to the United States Congress in 1988. In 1991 he was elected President of the New Progressive Party.

Manuel Díaz Saldaña, Secretary of the Treasury, took office in January 1993. He is a certified public accountant and a graduate of the University of Puerto Rico where he obtained a bachelor's degree in Business Administration and Accounting. Prior to his appointment, he worked for nineteen years as an accountant and auditor for various accounting firms.

Jorge E. Aponte Hernández, Director of the Office of Management and Budget, took office in January 1993. He is a certified public accountant and a graduate of the University of Puerto Rico, where he obtained a bachelor's degree in Business Administration and Accounting. Prior to his appointment, he worked for 20 years as an accountant and auditor for various accounting firms.

Marcos Rodríguez-Ema, President of Government Development Bank for Puerto Rico, took office in January 1993. He obtained a Bachelor of Science degree (Cum Laude) in foreign service and a law degree from Georgetown University. Prior to his appointment, he worked for five years as a lawyer in a San Juan law firm and for six years as an investment banker for two major securities firms.

**Political Trends**

For many years there have been two major views in Puerto Rico with respect to the island's relationship to the United States, one favoring statehood, represented by the New Progressive Party, and the other essentially favoring the existing commonwealth status, represented by the Popular Democratic Party. The following table shows the percentages of the total vote received by the gubernatorial candidates of the various parties in the last five elections by voter preference with respect to statehood, commonwealth status and independence. While the electoral choices of Puerto Rico's voters are not made solely on the basis of preferences regarding the island's relationship with the United States, candidates who support a continuing relationship between Puerto Rico and the United States have dominated elections for many years.

|  | 1976 | 1980 | 1984 | 1988 | 1992 |
|---|---|---|---|---|---|
| New Progressive Party . . . . . . . . . . . . . . | 48.3% | 47.3% | 45.5% | 45.8% | 49.9% |
| Popular Democratic Party . . . . . . . . . . . . | 45.3 | 47.0 | 48.5 | 48.7 | 45.9 |
| Puerto Rico Independence Party . . . . . . . . . | 6.4 | 5.4 | 3.9 | 5.4 | 4.2 |
| Others . . . . . . . . . . . . . . . . . . . . . . | -- | 0.3 | 2.1 | 0.1 | -- |

The 1992 election saw control of the executive and legislative branches pass to the New Progressive Party. The composition of the Senate and House by the several political parties is as follows:

|  | Senate | House |
|---|---|---|
| New Progressive Party . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21 | 36 |
| Popular Democratic Party . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | 16 |
| Puerto Rico Independence Party . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | 1 |
|  | 29 | 53 |

The next general election (gubernatorial, municipal and legislative) in Puerto Rico will be held in November 1996. Voter participation in the Commonwealth has been substantially higher than in the rest of the United States, averaging 85% since 1972.

## THE ECONOMY

### General

The Commonwealth has established policies and programs directed at the development of manufacturing and the expansion and modernization of the island's infrastructure. The investment of mainland United States, foreign and local funds in new factories has been stimulated by selective tax exemption, development loans, and other financial and tax incentives. Infrastructure expansion and modernization have been to a large extent financed by bonds and notes issued by the Commonwealth, its public corporations and municipalities. Economic progress has been aided by significant increases in the levels of education and occupational skills of the island's population.

The economy of Puerto Rico is fully integrated with that of the mainland United States. During fiscal 1995 approximately 89% of Puerto Rico's exports went to the United States mainland, which was also the source of approximately 65% of Puerto Rico's imports. In fiscal 1995, Puerto Rico experienced a $4.6 billion positive adjusted merchandise trade balance.

The economy of Puerto Rico is dominated by the manufacturing and service sectors. The manufacturing sector has experienced a basic change over the years as a result of increased emphasis on higher wage, high technology industries such as pharmaceuticals, electronics, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The service sector, including finance, insurance and real estate, wholesale and retail trade, and hotel and related services, also plays a major role in the economy. It ranks second only to manufacturing in contribution to the gross domestic product and leads all sectors in providing employment. In recent years, the service sector has experienced significant growth in response to the expansion of the manufacturing sector.

### Fiscal 1991 to 1995

Puerto Rico's more than decade-long economic expansion continued throughout the five-year period from fiscal 1991 through fiscal 1995. Almost every sector of the economy participated, and record levels of employment were achieved. While trends in the Puerto Rico economy usually follow those in the United States, Puerto Rico did not experience a recession as did the United States in fiscal 1991, primarily because of low oil prices, low interest rates, and Puerto Rico's strong manufacturing base which has a large component of non-cyclical industries.

Other factors behind this expansion included Commonwealth-sponsored economic development programs, periodic declines in the exchange value of the United States dollar, the level of federal transfers and the relatively low cost of borrowing.

Gross product in fiscal 1991 was $22.8 billion ($19.3 billion in 1987 prices), and gross product in fiscal 1995 was $28.4 billion ($21.2 billion in 1987 prices). This represents an increase in gross product of 24.4% from fiscal 1991 to 1995 (10.3% in 1987 prices).

Since fiscal 1985, personal income, both aggregate and per capita, has increased consistently each fiscal year. In fiscal 1995, aggregate personal income was $27.0 billion ($22.5 billion in 1987 prices) and personal income per capita was $7,296 ($6,074 in 1987 prices).

Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total federal payments to Puerto Rico, which include transfers to Commonwealth government entities and expenditures of federal agencies in Puerto Rico, in addition to federal transfer payments to individuals, are lower on a per capita basis in Puerto Rico than in any state. Transfer payments to individuals in fiscal 1995 were $5.9 billion, of which $4.0 billion, or 67.6%, represent entitlements to individuals who had previously performed services or made contributions under programs such as Social Security, Veterans' Benefits and Medicare.

Average employment increased from 977,000 in fiscal 1991 to 1,051,300 in fiscal 1995. Average unemployment decreased from 15.2% in fiscal 1991 to 13.8% in fiscal 1995.

The following table shows the gross product for the five fiscal years ended June 30, 1995.

## Commonwealth of Puerto Rico
## Gross Product

| | Fiscal Year Ended June 30 | | | | |
|---|---|---|---|---|---|
| | 1991 | 1992 | 1993 | 1994 | 1995(p) |
| Gross product — $ millions . . . . . . . | $22,809 | $23,696 | $25,133 | $26,592 | $28,371 |
| Real gross product — $ millions (1987 prices) . . . . . . . . . . . . . . | 19,260 | 19,409 | 20,054 | 20,553 | 21,248 |
| Annual percentage increase in real gross product (1987 prices) . . . . . | 0.9% | 0.8% | 3.3% | 2.5% | 3.4% |
| U.S. annual percentage increase in real gross product (1987 prices)(1) . . . | (0.1%) | 0.5% | 3.0% | 3.4% | 3.7% |

(p)    Preliminary.

(1)    Restated to correspond to the Commonwealth's fiscal year ending June 30.

*Sources:* Planning Board and Data Resources Inc.

*Fiscal 1995 and Fiscal 1996*

The Planning Board's Economic Activity Index, a composite index of thirteen economic indicators, increased 2.7% for fiscal 1995 compared to fiscal 1994, and 1.7% for fiscal 1994 compared to fiscal 1993. During the first six months of fiscal 1996 the Index increased 1.9% compared to the same period of fiscal 1995, which period showed an increase of 2.9% over the same period of fiscal 1994. The thirteen economic indicators are: total

employment, manufacturing employment, manufacturing payroll, electric energy consumption, external trade, tourist hotel registrations, retail sales, excise taxes, electric energy production, new housing unit permits, hours worked, cement production, and new motor vehicle registrations. The Index may not necessarily change at the same percentage rate as the gross product of Puerto Rico.

According to the Labor Department's Household Employment Survey, during fiscal 1995, total employment increased 4.0% over fiscal 1994. Total employment averaged 1,051,000 in fiscal 1995 compared to 1,010,900 in fiscal 1994. This increase caused the unemployment rate for fiscal 1995 to decrease from 16.0% to 13.8%. During the first eight months of fiscal 1996, total employment (seasonally adjusted) averaged 1,093,500 compared to 1,051,400 in the same period in fiscal 1995, an increase of 4.0%. For the first eight months of fiscal 1996 the unemployment rate was 13.7%, a decrease of 1.0% in comparison with the same period of fiscal 1995.

The Planning Board's gross product forecast for fiscal 1996, made in February 1995, showed an increase of 2.7%. Further growth in the Puerto Rico economy in fiscal 1996 will depend on several factors, including the state of the United States economy and the relative stability in the price of oil imports, increases in visitors to the island and in exports, the exchange value of the U.S. dollar, the level of federal transfers and the cost of borrowing.

**Economic Development Program**

The present administration envisions major economic reforms and has developed a new economic development model to be implemented during the next few years. This program is structured on the premise that the private sector will be the primary vehicle for economic development and growth. It promotes changing the role of the government from one of being a provider of most basic services to serving as a facilitator for private sector initiatives and will encourage private sector investment by reducing regulatory restraints imposed by government.

The program contemplates the development of initiatives that will foster private investment in sectors that are served more efficiently and effectively by private enterprise. The program also contemplates a general revision of the tax system to expand the tax base, reduce top personal and corporate tax rates and simplify a highly complex system. On October 31, 1994 legislation was enacted which provides for comprehensive revisions to Puerto Rico's income tax system. See "Major Sources of General Fund Revenues" under *Commonwealth Taxes, Other Revenues and Expenditures*.

Another important goal for the new program is to reduce the size of the government's direct contribution to gross domestic product. This would be realized through a reduction in government consumption and an increase in government investment in order to improve and expand Puerto Rico's infrastructure to facilitate private sector development and growth.

The new economic plan is designed to identify and promote those economic areas in which Puerto Rico can compete more effectively in the global markets. Tourism has been targeted as a top priority because of its potential for job creation and for an increased contribution to the gross product stemming from Puerto Rico's natural competitive advantages.

In February 1994, as part of the government's health reform program to facilitate the provision of private services, a pilot health insurance program was started in the Fajardo region of the island to provide residents with comprehensive health insurance coverage. The program has since expanded to include the Guayama and Arecibo regions as well. In conjunction with this program, the operations of certain public health facilities are being privatized. The administration's goal is to provide universal health insurance for qualifying Puerto Rico residents. The total cost of this program will be dependent on the areas included within the program, the number of participants receiving coverage and the date coverage commences. As of June 30, 1995, over 300,000 persons were participating in the program. For fiscal 1996, it is anticipated that over 750,000 persons will be participating in the program at a cost to the General Fund of the Commonwealth of approximately $370 million.

In addition, the government is negotiating the sale of certain governmental assets and the transferring to private parties of certain governmental operations. On March 3, 1995, the government completed the sale of the assets of the Maritime Shipping Authority to a private purchaser. On May 26, 1995, the Aqueduct and Sewer Authority executed a five-year agreement pursuant to which the management, operation, repair and maintenance of the Authority's water and waste water treatment systems will be provided by a private company. On January 31, 1996, the Aqueduct and Sewer Authority executed a construction and operating agreement with a private consortium for the design, construction and operation of an approximately 75 million gallon per day pipeline to deliver water to the San Juan metropolitan area from Dos Bocas reservoir in Utuado. The Electric Power Authority has entered into certain power purchase agreements with private power producers under which two cogenerating plants (with a total capacity of approximately 800 megawatts) using fuels other than oil will be constructed in Puerto Rico, and the Electric Power Authority will purchase the electricity produced by such plants. In addition, other privatization transactions are being undertaken and pursued, including the private operations of certain correctional facilities. See "Other Public Corporations" under *Public Corporations* for a discussion of certain of these actions.

## Employment and Unemployment

The number of persons employed in Puerto Rico during fiscal 1995 averaged 1,051,300. Unemployment, although at relatively low historical levels, remains above the average for the United States. The following table presents annual statistics of employment and unemployment from fiscal 1991 through fiscal 1995 and monthly statistics for July 1995 to February 1996.

### Commonwealth of Puerto Rico

### Employment and Unemployment

| Fiscal Year Ended June 30 | Labor Force(1) | Employed(1) | Unemployed(1) | Unemployment Rate (2) |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 1991 . . . . . . . . . . . . . . . . . . . . . | 1,152 | 977 | 175 | 15.2% |
| 1992 . . . . . . . . . . . . . . . . . . . . . | 1,170 | 977 | 193 | 16.5 |
| 1993 . . . . . . . . . . . . . . . . . . . . . | 1,201 | 999 | 202 | 16.8 |
| 1994 . . . . . . . . . . . . . . . . . . . . . | 1,204 | 1,012 | 192 | 16.0 |
| 1995 . . . . . . . . . . . . . . . . . . . . . | 1,220 | 1,051 | 169 | 13.8 |
| **Fiscal 1996** | | (Seasonally Adjusted) | | |
| July . . . . . . . . . . . . . . . . . . . . . | 1,245 | 1,065 | 179 | 14.4% |
| August . . . . . . . . . . . . . . . . . . . . | 1,251 | 1,086 | 162 | 12.9 |
| September . . . . . . . . . . . . . . . . . . | 1,236 | 1,062 | 174 | 14.0 |
| October . . . . . . . . . . . . . . . . . . . | 1,278 | 1,087 | 191 | 15.0 |
| November . . . . . . . . . . . . . . . . . . | 1,265 | 1,095 | 170 | 13.4 |
| December . . . . . . . . . . . . . . . . . . | 1,280 | 1,105 | 175 | 13.7 |
| January . . . . . . . . . . . . . . . . . . . | 1,291 | 1,118 | 173 | 13.4 |
| February . . . . . . . . . . . . . . . . . . | 1,291 | 1,130 | 162 | 12.5 |

(1)   Thousands of persons age 16 years and over.

(2)   Unemployed as percentage of labor force.

*Source:* Department of Labor and Human Resources — Household Survey.

**Economic Performance by Sector**

Puerto Rico has a diversified economy. During the fiscal years 1991-1995, the manufacturing and service sectors generated the largest portion of gross domestic product. Three sectors of the economy provide the most employment: manufacturing, services and government.

The following table presents annual statistics of gross domestic product by sector and gross product for the five fiscal years ended June 30, 1995.

## Commonwealth of Puerto Rico
## Gross Domestic Product by Sector and Gross Product
### (in millions at current prices)

|  | Fiscal Year Ended June 30 | | | | |
|---|---|---|---|---|---|
|  | 1991 | 1992 | 1993 | 1994 | 1995(p) |
| Manufacturing | $12,661 | $14,183 | $15,428 | $16,580 | $17,719 |
| Services(1) | 12,142 | 12,817 | 14,109 | 15,086 | 15,892 |
| Government(2) | 3,522 | 3,672 | 3,881 | 4,071 | 4,471 |
| Transportation, communication and public utilities | 2,671 | 2,828 | 3,009 | 3,115 | 3,264 |
| Agriculture, forestry and fisheries | 449 | 420 | 411 | 377 | 366 |
| Construction(3) | 770 | 798 | 874 | 907 | 959 |
| Hotels and related services | 320 | 351 | N.A. | N.A. | N.A. |
| Statistical discrepancy | (248) | (439) | (789) | (605) | (306) |
| Total gross domestic product(4) | 32,287 | 34,630 | 36,922 | 39,531 | 42,364 |
| Less: net payments abroad | 9,478 | 10,934 | 11,790 | 12,945 | 13,992 |
| Total gross product(4) | $22,809 | $23,696 | $25,133 | $26,586 | $28,371 |

(p)  Preliminary.

N.A.  Data is included in Services for fiscal years 1993 through 1995.

(1)  Includes wholesale and retail trade; finance, insurance and real estate; and other services; excludes services in hotels in fiscal years 1991 and 1992.

(2)  Includes the Commonwealth, its municipalities and the federal government; excludes the public corporations.

(3)  Includes mining.

(4)  Totals may not add due to rounding.

*Source:*  Planning Board.

The following table presents annual statistics of average employment by sector for the five fiscal years ended June 30, 1995.

I-7

## Commonwealth of Puerto Rico
## Average Employment by Sector
## (thousands of persons age 16 and over)

|  | Fiscal Year Ended June 30 | | | | |
|---|---|---|---|---|---|
|  | 1991 | 1992 | 1993 | 1994 | 1995 |
| Manufacturing . . . . . . . . . . . . . . . . . . | 164 | 164 | 168 | 166 | 172 |
| Services(1) . . . . . . . . . . . . . . . . . . . . | 448 | 449 | 467 | 478 | 496 |
| Government(2) . . . . . . . . . . . . . . . . . . | 217 | 219 | 217 | 224 | 232 |
| Transportation, communication and public utilities . . . . . . . . . . . . . . . . | 58 | 55 | 54 | 55 | 60 |
| Construction(3) . . . . . . . . . . . . . . . . . | 55 | 56 | 59 | 54 | 57 |
| Agriculture, forestry and fisheries . . . . . . | 35 | 34 | 34 | 34 | 34 |
| Total(4) . . . . . . . . . . . . . . . . . . . . . . | 977 | 977 | 999 | 1,012 | 1,051 |

(1) Includes wholesale and retail trade; finance, insurance and real estate; services in hotels; and other services.

(2) Includes the Commonwealth, its municipalities and federal government; excludes the public corporations.

(3) Includes mining.

(4) Totals may not add due to rounding.

*Source:* Department of Labor and Human Resources — Household Survey.

*Manufacturing*

Manufacturing is the largest sector in the economy of Puerto Rico in terms of gross domestic product. In fiscal 1995, the Planning Board estimates that manufacturing generated $17.7 billion, or 41.8% of gross domestic product. The manufacturing sector employed 153,450 workers as of March 1995 (as reported in the Department of Labor and Human Resources — Monthly Survey on Employment Hours and Earnings). Most of the island's manufacturing output is shipped to the mainland United States, which is also the principal source of semifinished manufactured articles on which further manufacturing operations are performed in Puerto Rico. The United States minimum wage laws are generally applicable in Puerto Rico. As of November 1995, the average hourly manufacturing wage rate in Puerto Rico was approximately 61% of the average mainland United States rate.

Manufacturing in Puerto Rico is now more diversified than during the earlier phases of the industrial development program. In the last two decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by the heavy investment in the pharmaceuticals, scientific instruments, computers, microprocessors, medical products, and electrical products industries over the last decade. The following table sets forth gross domestic product by manufacturing industry for the five fiscal years ended June 30, 1995.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Manufacturing Industry**
**(in millions at current prices)**

| | Fiscal Year Ended June 30 | | | | |
|---|---|---|---|---|---|
| | 1991 | 1992 | 1993 | 1994 | 1995(p) |
| Pharmaceuticals . . . . . . . . . . . . . . . | $5,763 | $6,460 | $7,249 | $8,158 | $8,781 |
| Machinery and metal products . . . . . . . | 2,804 | 2,935 | 3,226 | 3,255 | 3,618 |
| Food products . . . . . . . . . . . . . . . . | 2,032 | 2,413 | 2,456 | 2,555 | 2,550 |
| Apparel . . . . . . . . . . . . . . . . . . . | 491 | 536 | 548 | 522 | 559 |
| Other(1) . . . . . . . . . . . . . . . . . . . | 1,572 | 1,840 | 1,949 | 2,095 | 2,210 |
| Total gross domestic product of manufacturing sector(2) . . . . . . . . . | $12,661 | $14,183 | $15,428 | $16,584 | $17,719 |

_____

(p)       Preliminary.

(1)       Includes petroleum products; petrochemicals and other chemical products; tobacco products; stone, clay and glass products; textiles; and others.

(2)       Totals may not add due to rounding.

*Source:*  Planning Board.

I-9

The following table sets forth manufacturing employment by industry group as of March for the last five years.

**Commonwealth of Puerto Rico**
**Manufacturing Employment by Industry Group**
**(persons age 16 years and over)**

|  | As of March | | | | |
| --- | --- | --- | --- | --- | --- |
| Industry Group | 1991 | 1992 | 1993 | 1994 | 1995 |
| Apparel and related products | 29,841 | 30,875 | 29,018 | 25,213 | 25,676 |
| Food and related products | 20,059 | 20,928 | 20,608 | 20,471 | 20,528 |
| Electrical machinery, equipment and supplies | 19,361 | 17,923 | 17,721 | 19,676 | 22,387 |
| Chemicals and related products | 23,130 | 24,015 | 26,141 | 27,174 | 27,505 |
| Professional and scientific instruments | 16,341 | 15,838 | 16,437 | 15,495 | 15,091 |
| Machinery, except electrical and transportation equipment | 4,562 | 4,452 | 4,241 | 4,262 | 4,012 |
| Petroleum refining and related industries; rubber and miscellaneous plastic products | 6,296 | 5,763 | 5,294 | 5,593 | 5,558 |
| Leather and leather products | 5,904 | 6,057 | 7,196 | 7,260 | 7,041 |
| Paper and related products; printing, publishing and related industries | 6,056 | 5,991 | 5,944 | 6,118 | 6,645 |
| Metal products | 5,078 | 4,768 | 4,632 | 4,648 | 4,733 |
| Stone, clay and glass products | 4,808 | 4,755 | 4,410 | 4,716 | 4,570 |
| Lumber and wood products; furniture and fixtures | 2,787 | 2,953 | 2,937 | 2,927 | 2,918 |
| Textile mill products | 3,596 | 3,860 | 3,876 | 3,503 | 3,490 |
| Tobacco products | 917 | 935 | 850 | 763 | 800 |
| Miscellaneous manufacturing industries | 2,698 | 2,347 | 2,221 | 2,443 | 2,496 |
| Total | 151,434 | 151,460 | 151,526 | 150,262 | 153,450 |

*Sources:* Department of Labor and Human Resources — Census of Manufacturing, except for March 1995 statistics which were derived from the "Monthly Survey on Employment, Hours and Earnings."

I-10

**Leading United States and Foreign Companies With Manufacturing Operations In Puerto Rico**

| Employment 2,500 and over | Product |
|---|---|
| Abbott Laboratories, Inc. | Pharmaceuticals |
| American Home Products | Pharmaceuticals |
| Baxter International | Pharmaceuticals |
| General Electric Co. | Electronics |
| H. J. Heinz Co. | Food |
| Intel | Computers |
| Johnson and Johnson | Pharmaceuticals |
| Motorola Inc. | Electronic Components |
| Sara Lee Corp. | Apparel |

| Employment 1,500 to 2,499 | |
|---|---|
| Bristol Myers Squibb | Pharmaceuticals |
| Dexter Shoe | Footwear |
| Eaton Corp. | Electrical Instruments |
| P.L. Industries, Inc. | Apparel |
| Schering-Plough Corp. | Pharmaceuticals |
| UniGroup | Food |
| Warner-Lambert Co. | Pharmaceuticals |
| Westinghouse Electric Co. | Electrical Instruments |

| Employment 1,000 to 1,499 | |
|---|---|
| Avon Products Inc. | Costume Jewelry |
| Dooney & Bourke | Leather |
| General Instruments Corp. | Communications |
| Merck & Co. | Chemicals |
| Pfizer | Pharmaceuticals |
| Propper International | Apparel |
| Sea Board Corp. | Food |
| Sensormatic Electronics | Electronics |
| U.S. Surgical | Scientific Instruments |

| Employment 500 to 999 | |
|---|---|
| ARA Holding Group | Apparel |
| Becton-Dickinson & Co. | Scientific Instruments |
| Conagra | Food |
| Checkpoint Systems Inc. | Electronics |
| Dero Industries | Canvas |
| DSC Communication Corp. | Electronics |
| DuPont (E.I.) de Nemours | Chemicals |
| Echlin Mfg. | Motor Vehicles Parts |
| Eli Lilly and Co. | Pharmaceuticals |
| Garment Corp. of America | Apparel |
| H.H. Brown Shoes Co. Inc. | Footwear |
| Haflund Nycomed Corp. | Pharmaceuticals |
| Hampshire Designers Group | Textiles |
| Hewlett-Packard | Computers |
| Hubbell Incorporated | Electrical Instruments |
| Insilco Corporation | Office Equipment |
| MacAndrews & Forbes Holdings | Tobacco Products |
| Maidenform | Apparel |
| McGaw Inc. | Medical Instruments |
| Medtronics | Surgical and Medical Instruments |

| Employment 500 to 999 | Product |
|---|---|
| Monsanto | Pharmaceuticals |
| NCC Industries | Apparel |
| Owens Illinois | Glass and Plastics |
| Pall Corp. | Filters |
| Penn-State Coats & Aprons | Apparel |
| Phillips Van-Heusen | Apparel and Footwear |
| RJR Nabisco | Food and Cigarettes |
| SmithKline Beecham | Pharmaceuticals |
| Storage Technology | Electronics |
| Syntex Corp. | Pharmaceuticals |
| Timberland Company (The) | Leather |
| Unilever PLC | Consumers & Medicals |
| Upjohn Co. | Pharmaceuticals |
| Wolverine World Wide | Footwear |

| Employment 300 to 499 | |
|---|---|
| Amity Leather Products | Leather |
| Carnival Creations | Apparel |
| Carolina Underwear Co. | Apparel |
| Coca-Cola | Food |
| Collin & Alterman Group Inc. | Stockings |
| Dade International | Chemicals |
| Eagle Work Clothes | Apparel |
| Eastern Canvas Products | Leather |
| Emerson Electric | Electronic and Scientific Instruments |
| Essilor International | Ophthalmic Products |
| Farley Industries | Footwear |
| Filtertek Inc. | Filters |
| G.T.E. Products | Electrical Instruments |
| Goya Foods | Food |
| Granada Sales | Apparel |
| Hoffman - La Roche | Pharmaceuticals |
| Isla Verde Investment | Apparel |
| Loctite Corp. | Chemicals |
| Matsushita Electric | Electrical Instruments |
| Minnetonka Moccasin | Footwear |
| Miss Alma Inc. | Apparel |
| Nestle S.A. | Pharmaceuticals |
| Nypro | Plastics |
| Ocular Science-American Hydron | Ophthalmic Products |
| Phillips Petroleum Co. | Petroleum Products |
| Procter & Gamble Co. | Pharmaceuticals |
| Productos del Tropico | Food |
| Power One | Electrical Instruments |
| R.E. Phelon & Co. | Electronics |
| Standard Motor Products | Motor Vehicles Parts |
| Sun Co. | Oil Refining |
| Sundstrand Corp. | Electrical Instruments |
| Thomas & Betts | Electrical Instruments |
| Unifirst Corp. | Work Garment |
| Wheaton Industries | Plastics Products |
| Zeneca Group PLC | Pharmaceuticals |

---

*Source:* Economic Development Administration, Office of Economic Research (as of August 1995).

*Services*

Puerto Rico has experienced significant growth in the services sector in terms of both income and employment over the past decade, showing a favorable trend as compared with certain other industrialized economies. During the period between 1991 and 1995, the gross domestic product in the services sector increased at an annual average rate of 6.3%. Employment in this sector (including finance, insurance, real estate, wholesale and retail trade and other services) increased at an annual average rate of 2.1% during the same period. The development of the services sector in the local economy has shown a strong interaction among the following important sectors: manufacturing, tourism, construction and agriculture. The services sector in Puerto Rico has a diversified base.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places Puerto Rico in a favorable competitive position with respect to Latin America and other trading countries throughout the world. A major element in the economic program of the present administration is the further development of the local services sector which has the capacity to increase its export potential and to generate more income and jobs during the coming years.

The service sector ranks second to manufacturing in its contribution to gross domestic product, and it is the sector with the greatest employment. In fiscal 1995, services generated $15.9 billion of gross domestic product, or 37.5% of the total. Service employment grew from 448,000 in fiscal 1991 to 496,000 in fiscal 1995, a cumulative increase of 10.7%, which increase was greater than the 7.5% cumulative growth in total employment over the same period. Wholesale and retail trade and finance, insurance and real estate have experienced significant growth in the fiscal 1991 to 1995 period, as measured by gross domestic product. Gross domestic product in the wholesale and retail trade increased from $4.8 billion in fiscal 1991 to $5.9 billion in fiscal 1995. In finance, insurance and real estate, gross domestic product increased from $4.3 billion in fiscal 1991 to $5.5 billion in fiscal 1995. There are 22 commercial banks and trust companies currently operating in Puerto Rico of which two are U.S. major money center banks, three are foreign banks and seventeen are local banks and trust companies. Total assets of these institutions as of June 30, 1995 were $32.1 billion. In addition, two federal thrift institutions operate on the island and nine major investment banks maintain operations in Puerto Rico. The following tables set forth gross domestic product and service sector employment for the five fiscal years ended June 30, 1995.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Service Industry
### (in millions at current prices)

|                                      | 1991     | 1992     | 1993     | 1994     | 1995(p)  |
|--------------------------------------|----------|----------|----------|----------|----------|
| Wholesale and retail trade           | $ 4,832  | $ 4,990  | $ 5,303  | $ 5,642  | $ 5,895  |
| Finance, insurance and real estate   | 4,308    | 4,596    | 4,897    | 5,160    | 5,451    |
| Hotels                               | 320      | 351      | N.A.     | N.A.     | N.A.     |
| Other services                       | 3,002    | 3,231    | 3,909    | 4,284    | 4,546    |
| Total(1)                             | $12,461  | $13,168  | $14,109  | $15,086  | $15,892  |

N.A.   Data is included in Other services in fiscal years 1993 through 1995.

(p)   Preliminary

(1)   Totals may not add due to rounding.

*Source:* Planning Board.

**Commonwealth of Puerto Rico**
**Average Employment by Service Sector**
**(thousands of persons age 16 and over)**

| | Fiscal Year Ended June 30 | | | | |
| --- | --- | --- | --- | --- | --- |
| | 1991 | 1992 | 1993 | 1994 | 1995 |
| Wholesale and retail trade | 195 | 193 | 201 | 201 | 211 |
| Finance, insurance and real estate | 32 | 32 | 32 | 33 | 36 |
| Other services(1) | 221 | 224 | 234 | 244 | 249 |
| Total | 448 | 449 | 467 | 478 | 496 |

---

(1)     Including hotels and related services.

*Source:* Department of Labor and Human Resources — Household Survey.

*Government*

    The government sector of the Commonwealth plays an important role in the economy of the island.  In fiscal 1995 government accounted for $4.5 billion of Puerto Rico's gross domestic product, or 10.6% of the total. Government is also a significant employer, providing jobs for 232,000 workers, or 22.1% of total employment in fiscal 1995.  The government sector employment does not include data relating to certain public corporations which are included in other sectors.  These public corporations include such significant employers as the Electric Power Authority, the Telephone Authority and the Aqueduct and Sewer Authority.

*Tourism*

    Total visitors' expenditures accounted for 6.4% of the island's gross product in fiscal 1995.  Visitors' expenditures and the number of visitors have grown consistently since 1985, reaching $1.8 billion and more than 4.1 million, respectively, in fiscal 1995.  Since fiscal 1987 a number of major hotels have undergone substantial renovation and more than 2,860 new rooms have been added with the opening of several major hotels.  Several international hotel corporations have recently made or are expected to make substantial capital investments to develop additional tourist facilities.  The government has developed an economic package that encourages private development in tourism projects.  The average number of total rooms available in January 1996 was 8,524.

    San Juan has become the largest home port for cruise ships in the Caribbean and the second largest home port for cruise ships in the world.  The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five fiscal years ended June 30, 1995.

I-13

**Commonwealth of Puerto Rico**
**Tourism Data**

| Fiscal Year Ended June 30 | Tourist Hotel(1) | Cruise Ship | Other(2) | Total | Total Visitors' Expenditures (in millions) |
|---|---|---|---|---|---|
| 1991 | 650,115 | 891,348 | 1,962,876 | 3,504,339 | $1,436 |
| 1992 | 653,545 | 1,063,370 | 2,003,083 | 3,719,998 | 1,520 |
| 1993 | 688,509 | 1,014,490 | 2,165,959 | 3,868,958 | 1,628 |
| 1994 | 721,427 | 980,220 | 2,320,948 | 4,022,595 | 1,728 |
| 1995(p) | 766,019 | 954,132 | 2,388,274 | 4,108,425 | 1,826 |

(The "Number of Visitors" header spans the Tourist Hotel, Cruise Ship, Other, and Total columns.)

(p)    Preliminary.

(1)    Includes tourists in guest houses.

(2)    Including visitors in homes of relatives, friends and in hotel apartments.

*Sources:* Puerto Rico Tourism Company and the Planning Board.

During the first seven months of fiscal 1996, the number of persons registered in tourist hotels was 691,200, a 13.9% increase compared with the same period in fiscal 1995. The average of the occupancy rate in tourist hotels was 69.2% in the first seven months of fiscal 1996. The average number of rooms rented in tourist hotels increased 7.0% in the first seven months of fiscal 1996 compared with the same period in fiscal 1995. These increases are due in part to increased marketing of Puerto Rico by the Government and increased hotel usage by Puerto Rico residents.

Hotel operations are eligible for certain tax incentives under Commonwealth law. See "Tax Incentives" below.

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations on the island including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques and Yabucoa.

The San Juan Luis Muñoz Marín International Airport is currently served by 28 United States and international airlines. At present, there is daily direct service between San Juan and New York, Chicago, Dallas, Los Angeles, Miami, Atlanta, Boston and numerous other United States cities. There is also regularly scheduled service between Puerto Rico and other Caribbean islands and major Latin American and European cities. A major United States airline uses San Juan as a hub for its intra-Caribbean service. Several smaller airports serve intra-island traffic.

The island's major cities are connected by a modern highway system which, as of December 31, 1995, totaled approximately 4,575 miles.

*Agriculture*

The Commonwealth has traditionally supported the agricultural sector. The efforts of the Department of Agriculture and related agencies are directed to increase and improve local agricultural production, increase efficiency and quality of produce and stimulate import substitution where economically feasible. During fiscal 1995, gross income from agriculture was $689.7 million, an increase of $19.0 million in comparison with fiscal 1994 and first increase in the last six years. Agriculture gross income consists of the total value of production in the principal agricultural sectors, which include: traditional crops, cattle products, farinaceous, vegetables, fruits and other products. In the last few fiscal years, cattle products, non-traditional crops and livestock products have contributed a higher percentage of the sector's income.

The Commonwealth supports agricultural activities through incentives, subsidies and technical and support services, in addition to income tax exemptions for qualified income derived by *bona fide* farmers. Act No. 225, approved December 1, 1995, increases the benefits to bona fide farmers. The most important benefits of this Act are the granting of full (100%) tax exemption in excise taxes, real and personal property taxes, municipal patents, tariff payments, and interest income from bonds, notes and other debt instruments to be issued by financial institutions that provide financing to agricultural businesses. The Act also exempts 90% of the income derived from agricultural business from Commonwealth taxes.

*Construction*

The construction industry has experienced substantial real growth since fiscal 1987. In fiscal 1995, the investment in construction rose to a record $3.3 billion, an increase of 10.5%, as compared to $2.9 billion for fiscal 1994. The construction sector experienced a 33.1% increase in total value of construction permits and an increase of 3.5% in local cement consumption for fiscal 1995 when compared to fiscal 1994. During the first seven months of fiscal 1996, the total value of construction permits decreased 21.9% and local cement consumption increased 1.4% in comparison with the same period in fiscal 1995. Construction employment increased to 56,600 in fiscal 1995 from 53,700 in fiscal 1994 an increase of 5.4%. In the first six months of fiscal 1996 the average employment in the construction sector was 60,455.

**Higher Education**

During the past four decades, Puerto Rico has made significant advances in the field of education, particularly at the college and graduate school level. The transformation of Puerto Rico during the 1950's and 1960's from an agricultural economy to an industrial economy brought about an increased demand for education at all levels. During the 1970's and 1980's, certain higher wage, higher technology industries became more prominent in Puerto Rico. More recently service sector employment has increased significantly. This has resulted in an increased demand for workers having a higher level of education in general and, in particular, greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population and the increasing proportion of college attendance by the college-age population.

The University of Puerto Rico, the only public university in the Commonwealth, includes eleven campuses located throughout the island. Total enrollment of the University was approximately 55,800 as of August 1994. The Commonwealth is legally obligated to annually appropriate to the University an amount equal to 9.33% of the average of the annual revenues from internal sources in each of the two fiscal years immediately preceding the current fiscal year.

I-15

The following table presents comparative trend data for Puerto Rico and the United States with respect to college age population and percentage of such population attending institutions of higher learning.

### Trend in College Enrollment

| | Puerto Rico | | | Mainland United States | | |
|---|---|---|---|---|---|---|
| Academic Year | Population 18-24 Years of Age | Higher Education Enrollment | Percent(1) | Population 18-24 Years of Age | Higher Education Enrollment | Percent(1) |
| 1970 . . . . . . . . . . . . . . . | 341,448 | 57,340 | 16.8% | 23,989,000 | 8,580,887 | 35.8% |
| 1980 . . . . . . . . . . . . . . . | 397,839 | 130,105 | 32.7 | 29,252,000 | 12,096,895 | 41.4 |
| 1990 . . . . . . . . . . . . . . . | 417,636 | 156,147 | 37.4 | 27,038,000 | 13,820,000 | 51.1 |
| 1993 . . . . . . . . . . . . . . . | 438,390 | 161,187 | 36.8 | 26,063,000 | 14,994,000 | 57.5 |

(1)     Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.

*Sources:*   Planning Board, U.S. Bureau of the Census, U.S. National Center for Education Statistics and Council on Higher Education of Puerto Rico.

The table demonstrates that higher education enrollment in Puerto Rico has continued to increase despite slower growth in the college-age population and despite a slight drop in the proportion of attendance by the college-age population.

In addition to the University of Puerto Rico, there are 37 private institutions of higher education located in Puerto Rico. Such institutions have current enrollment of approximately 100,000 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine and law. Degrees are offered by these institutions at the associate, bachelor, master and doctoral levels.

## Tax Incentives

Much of the development of the manufacturing sector in Puerto Rico can be attributed to various federal and Commonwealth tax incentives, particularly Section 936 of the Internal Revenue Code, as amended (the "Code"), and the Commonwealth's Industrial Incentives Program.

### Section 936

Under Section 936 of the Code, United States corporations that meet certain requirements and elect its application ("Section 936 Corporations") are entitled to credit against their United States corporate income tax the portion of such tax attributable to (i) income derived from the active conduct of a trade or business within Puerto Rico ("active business income") or from the sale or exchange of substantially all assets used in the active conduct of such trade or business and (ii) qualified possession source investment income ("passive income").

To qualify under Section 936 in any given taxable year a corporation must derive (i) for the three-year period immediately preceding the end of such taxable year 80% or more of its gross income from sources within Puerto Rico and (ii) for taxable years beginning after December 31, 1986, 75% or more of its gross income from the active conduct of a trade or business in Puerto Rico.

A Section 936 Corporation may elect to compute its active business income eligible for the Section 936 credit under one of three formulas: (A) a cost sharing formula, whereby it is allowed to claim all profits attributable to manufacturing intangibles and other functions carried out in Puerto Rico, provided it contributes to the research and development expenses of its affiliated group or pays certain royalties; (B) a profit split formula, whereby it is

I-16

allowed to claim 50% of the net income of its affiliated group from the sale of products manufactured in Puerto Rico; or (C) a cost plus formula, whereby it is allowed to claim a reasonable profit on the manufacturing costs incurred in Puerto Rico. To be eligible for the first two formulas, the Section 936 Corporation must have a significant business presence for purposes of the Section 936 rules.

Pursuant to amendments to the Code adopted in August of 1993, and effective for taxable years commencing after 1993, two alternative limitations apply to the Section 936 credit against active business income and sale of assets income previously described. The first option limits (the "percentage limitation") the credit against such income to 40% of the credit allowable previous to the amendments of 1993, with a five year phase-in period starting at 60% of the current allowable credit. The second option limits (the "economic limitation") the allowable credit against such income to the sum of (i) 60% of qualified compensation paid to employees as defined in the Code, which includes wages up to 85% of the maximum earnings subject to the OASDI portion of Social Security taxes ($61,200 for 1995) plus an allowance for fringe benefits of 15% of qualified wages, (ii) a specified percentage of depreciation deductions ranging between 15% and 65%, based on the class life of the property claimed by Section 936 Corporation for tangible property located in Puerto Rico and used in its trade or business and (iii) a portion of Puerto Rico income taxes paid by the Section 936 Corporation, up to a 9% effective tax rate (but only if the Section 936 Corporation does not elect the profit-split method for allocating income from intangible property).

At present, while it is difficult to forecast what the long term effects of the 1993 limitations to the Section 936 credit will be on the economy of Puerto Rico, econometric studies by the Planning Board and private sector economists on the economic effects of such limitations, assuming no enhancements to the existing Industrial Incentives Program (described below), projected only a slight reduction in average annual growth rates. Despite no changes in the Industrial Incentives Program, no adverse economic impact has been observed. Data on the performance of the Puerto Rico economy since the 1993 limitations became effective bear out these studies by showing no reductions in the economic growth rate or employment in the industries expected to be adversely affected by the 1993 amendments to Section 936 (generally pharmaceuticals and beverages due to their higher profit margins). The data suggest that the effect of the performance of the United States economy on the performance of the Puerto Rico economy as described under the "Economy — General" is and will be greater than the effect thereon of the 1993 changes in the Section 936 credit. In addition, the above limitations do not reduce the tax credit currently enjoyed by certain labor-intensive, lower profit-margin industries, which represent approximately 40% of the total employment by Section 936 corporations in Puerto Rico.

On November 17, 1995 the United States Congress adopted, as part of its larger federal income tax legislative package a ten-year phase out of the current 936 credit for companies that are existing credit claimants and the elimination of the credit for companies establishing new operations in Puerto Rico and for existing companies that add a substantial new line of business. The credit based on the economic limitation will continue as under current law without change until tax years beginning in 2002, during which years the possession business income will be subject to a cap based on the corporation's possession income for an average adjusted base period. The credit based on the percentage limitation will continue as under current law until tax years beginning in 1998. In that year and thereafter, the credit based on the percentage limitation will be 40%, but the possession business income will be subject to a cap based on the corporation's possession income for an average adjusted base period. The 936 credit is eliminated for taxable years beginning in 2006. However, the credit granted to passive income (QPSII) is eliminated for taxable years beginning after December 31, 1995.

The Governor of Puerto Rico has proposed to the Congress a modification of the total elimination of the Section 936 credit by offering qualifying companies the option of the existing 936 credit plan, as amended by the House proposal, or a new incentive program, to be available in Puerto Rico, that would provide to such companies a credit based on qualifying wages paid, other wage related expenses, such as fringe benefits, depreciation expenses for certain tangible assets, research and development expenses and the credit granted to passive income under current law. The credit granted to qualifying companies would continue in effect until Puerto Rico shows, among other things, substantial economic improvements in terms of the certain economic parameters. These provisions are not currently in the legislation adopted by the United States Congress on November 17, 1995.

The President vetoed the legislation submitted by the United States Congress on December 7, 1995. The Administration has proposed a modification to the 936 credit that would phase out the credit based upon the percentage limitation over a five year period beginning in 1997, retain the credit based upon the economic limitation under current law, allow a five year carry forward of excess credit based upon the economic limitation and retain the credit granted to passive income under current law.

It is not possible at this time to determine the final legislative changes that may be made to Section 936, or the effect on the long-term outlook on the economy of Puerto Rico. The Government of Puerto Rico does not believe there will be short-term or medium-term material adverse effects on Puerto Rico's economy as a result of the changes to Section 936 currently proposed by Congress or by the Administration. The Government of Puerto Rico further believes that even if the Congressional proposal became law, sufficient time exists to put additional incentive programs in place to safeguard Puerto Rico's competitive position.

*Industrial Incentives Program*

Since 1948 Puerto Rico has had various industrial incentives laws designed to stimulate industrial investment in the island. Under these laws, companies engaged in manufacturing and certain other designated activities (such as hotel operations) were eligible to receive full or partial exemption from income, property and certain local taxes.

On January 24, 1987, the Governor of Puerto Rico signed into law the most recent industrial incentives law, Act No. 8 of January 24, 1987, known as the Puerto Rico Tax Incentives Act (the "1987 Act"). The tax exemption benefits provided by the 1987 Act are generally more favorable than those provided by its predecessor, the Industrial Incentives Act of 1978 (the "1978 Act"). The activities eligible for exemption under the 1987 Act include manufacturing, certain designated services for markets outside Puerto Rico, the production of energy from local renewable sources for consumption in Puerto Rico, and laboratories for scientific and industrial research.

The 1987 Act provides a fixed 90% exemption from income and property taxes and a 60% exemption from municipal license taxes during a 10, 15, 20 or 25 year period, depending on the zone where the operations are located. This initial exemption period may be extended for an additional 10 years at lower exemption rates. The 1987 Act also provides a special deduction equal to 15% of the production payroll for companies whose net income from operations is less than $20,000 per production job. This special benefit is designed to attract and maintain labor intensive operations in Puerto Rico. The passive income from certain qualified investments in Puerto Rico and the instruments evidencing such investments are fully exempt from income tax. In addition, companies making such investments for fixed periods of not less than five years are eligible to reduce the tollgate tax imposed on dividend and liquidating distributions from a maximum rate of 10% to 5%, depending on the amount and term of the investment.

This bottom limit of 5% was approved in a 1993 amendment of the 1987 Act (the "1993 amendments"). The 1993 amendments also impose a new 5% estimated tax on annual industrial development income, subject to reduction in the event certain long-term qualified investments with such income are made. The Department of Treasury is collecting an additional amount annually as a result of the implementation of the bottom limit. As a result of the 1993 amendments, the Department of the Treasury has increased its ability to predict tax revenues from corporations with greater accuracy. The 1993 amendments also contain an option to pay a flat 14% tax on annual industrial development income, which would allow eligible companies to repatriate profits free of tollgate taxes. Under this option, if a company invests 25% or 50% of its profits in qualified industrial development investments, the 14% rate drops to 11% or 9%, respectively.

The 1987 Act imposes a special surtax on sales volume designed to raise revenues to fund a special government program of scientific and technical research for the development of new products and industrial processes and the creation of special training programs for the chronically unemployed.

The 1987 Act applies to newly established operations as well as to existing operations that elect to convert their tax exemption grants to the provisions of the 1987 Act. Companies with existing operations that elect not to convert remain subject to the provisions of the 1978 Act or any of the predecessor industrial incentives laws.

Since 1983 hotel operations have been covered by a special incentives law, the Tourism Incentives Act of 1983, which provides exemptions from income, property and municipal license taxes for a period of 10 years. The income tax exemption rates vary depending on the zone where the business is located. In 1993, legislation was enacted providing for an additional set of tax incentives for new hotel development projects. This legislation also provides exemptions from income, property and municipal license taxes for a period of up to 10 years. In addition, it provides certain tax credits for qualifying investments in such projects. Upon meeting certain prescribed conditions, businesses exempted under the 1983 special incentives law may elect instead to be covered by the 1993 law.

## Caribbean Basin Initiative

In August, 1983, the President of the United States signed into law the Caribbean Basin Economic Recovery Act. The Tax Reform Act of 1986 amended Section 936 to allow Puerto Rico financial institutions, including Government Development Bank and Puerto Rico Economic Development Bank, to invest funds representing earnings accumulated under Section 936, in active business assets or development projects in a qualified Caribbean Basin country. Such investments must be in accordance with a specific authorization from the Commissioner of Financial Institutions pursuant to regulations issued by the Secretary of the Treasury. As of December 1995, 185 projects under the Puerto Rico Caribbean Development Program have been promoted in fourteen Caribbean Basin countries, representing 37,272 jobs and over $2,095 million in loan commitments, of which $1,288 million of Section 936 funds have been disbursed.

## North American Free Trade Agreement

The United States, Canada and Mexico have entered into the North American Free Trade Agreement ("NAFTA"), which agreement is designed to eliminate restrictions on trade and investment flows among the three countries. KPMG Peat Marwick conducted a study in 1992 of the potential economic impact of NAFTA on the economy of Puerto Rico for Government Development Bank and concluded that, once NAFTA is fully implemented, certain of the Commonwealth's industries, including those that are lower salaried and labor intensive, may face increased competition from Mexico, while Puerto Rico's favorable investment environment, highly skilled work force, infrastructure development and tax structure (mainly Section 936) would tend to create expanded trade opportunities for Puerto Rico in such areas as pharmaceuticals and high technology manufacturing. KPMG Peat Marwick updated the analysis of the original study to incorporate the changes to Section 936 enacted in 1993 and concluded that the reductions in after-tax rates of return resulting from such changes do not eliminate Puerto Rico's competitive advantage in certain key industries over Mexico. The after-tax rate of return advantages are maintained in pharmaceuticals, electronics and scientific instruments. In addition, said changes have no significant effect on the other major industries analyzed in the original study (tuna canning, textiles, apparel and footwear).

## DEBT

## Public Sector Debt

Public sector debt comprises bonds and notes of the Commonwealth and its municipalities and public corporations ("notes" as used in this Section is intended to refer to certain types of non-bond debt regardless of maturity), subject to the exclusions described in the following paragraph. Direct debt of the Commonwealth is supported by Commonwealth taxes. Debt of municipalities, other than bond anticipation notes, is supported by real and personal property taxes and municipal license taxes. Debt of public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations from charges for services or products. *See Public*

*Corporations.* However, certain debt of public corporations is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

The following table presents a summary of public sector debt as of December 31, 1995. Excluded from this table is debt not primarily payable from either Commonwealth or local taxes, or Commonwealth appropriations or public corporation charges for services or products. Also excluded from the following table is debt the inclusion of which would reflect double counting, including, but not limited to, $449,909,219 of bonds issued by Municipal Finance Agency to finance its purchase of bonds of Commonwealth municipalities; and $1,503,681,000 of obligations of Government Development Bank issued to purchase certain Commonwealth public sector debt and for other purposes, of which $267,000,000 are guaranteed by the Commonwealth.

### Commonwealth of Puerto Rico
### Public Sector Debt
### (in thousands)

| | December 31, 1995 |
|---|---|
| Commonwealth direct debt(1) . . . . . . . . . . . . . . . . . . . . . . . | $ 4,028,186 |
| Municipal debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 742,992 |
| Public corporations debt: . . . . . . . . . . . . . . . . . . . . . . . . . | |
| Commonwealth guaranteed debt(2) . . . . . . . . . . . . . . . . . . | 466,005 |
| Debt supported by Commonwealth appropriations or taxes(3) . . | 5,219,279 |
| Other non-guaranteed debt . . . . . . . . . . . . . . . . . . . . . . . . | 5,763,844 |
| Total public corporations debt . . . . . . . . . . . . . . . . . . . . . | 11,449,128 |
| Total public sector debt . . . . . . . . . . . . . . . . . . . . . . . . . | $16,220,306 |

---

(1) Includes $186,370,000 loan from Government Development Bank to the Department of Treasury to settle certain property tax claims of the municipalities (the "GDB tax claims loan") and $146,527,000 of certain indebtedness originally issued by Urban Renewal and Housing Corporation that was transferred to the Commonwealth by virtue of Act No. 134 of the Legislature of Puerto Rico, approved December 13, 1994 ("Act No. 134 of 1994") (such indebtedness being called the "transferred CRUV debt"). Does not reflect the issuance on February 1, 1996 of $350,440,000 Public Improvement Bonds of 1996 and $57,155,000 Public Improvement Refunding Bonds, Series 1996 (collectively, the "1996 Public Improvement Bonds") and the refunding of a portion of the Public Improvement Bonds of 1987 due July 1, 2006 (the "1987 Refunded Bonds").

(2) Excludes $1,335,611,000 of Public Buildings Authority bonds and notes which are primarily payable from Commonwealth appropriations and $267,000,000 of Government Development Bank bonds payable from available moneys of Government Development Bank. Includes bonds issued by Housing Bank and Finance Agency and Aqueduct and Sewer Authority.

(3) Represents, among others, bonds and notes issued by Aqueduct and Sewer Authority, Highway and Transportation Authority, Public Buildings Authority, Maritime Shipping Authority, Infrastructure Financing Authority, Economic Development Bank (and its affiliate, the Agriculture and Commercial Development Corporation), Health Facilities and Services Administration and Housing Bank and Finance Agency, including certain of the bonds issued by the former Urban Renewal and Housing Corporation.

*Source:* Government Development Bank.

No deductions have been made in the above table for debt service funds and debt service reserve funds. The table above and the amounts shown throughout this section as representing outstanding debt include outstanding capital appreciation bonds at their respective original principal amounts and do not include any accretion thereon.

## Debt Service Requirements for Commonwealth General Obligation Bonds

The following table presents debt service requirements for outstanding general obligation bonds. Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 of the next fiscal year.

**Commonwealth of Puerto Rico**
**Debt Service Requirements***
**(in thousands)**

| Fiscal Year Ending June 30 | Outstanding Bonds | | Total |
|---|---|---|---|
| | Principal | Interest | |
| 1996 . . . . . . | $ 203,645 | $ 112,092(1) | $ 315,738 |
| 1997 . . . . . . | 207,980 | 218,381 | 426,361 |
| 1998 . . . . . . | 208,876 | 209,780 | 418,656 |
| 1999 . . . . . . | 198,536 | 202,733 | 401,269 |
| 2000 . . . . . . | 190,150 | 186,695 | 376,845 |
| 2001 . . . . . . | 192,166 | 175,307 | 367,473 |
| 2002 . . . . . . | 191,329 | 166,570 | 357,900 |
| 2003 . . . . . . | 120,594 | 235,026 | 355,621 |
| 2004 . . . . . . | 123,255 | 231,155 | 354,409 |
| 2005 . . . . . . | 197,647 | 153,201 | 350,847 |
| 2006 . . . . . . | 158,393 | 167,538 | 325,932 |
| 2007 . . . . . . | 131,489 | 174,182 | 305,670 |
| 2008 . . . . . . | 107,848 | 136,069 | 243,917 |
| 2009 . . . . . . | 112,770 | 112,894 | 225,663 |
| 2010 . . . . . . | 121,190 | 104,009 | 225,199 |
| 2011 . . . . . . | 127,327 | 97,383 | 224,710 |
| 2012 . . . . . . | 134,475 | 83,185 | 217,660 |
| 2013 . . . . . . | 123,740 | 76,254 | 199,994 |
| 2014 . . . . . . | 111,545 | 67,781 | 179,327 |
| 2015 . . . . . . | 118,085 | 61,423 | 179,507 |
| 2016 . . . . . . | 124,075 | 55,364 | 179,440 |
| 2017 . . . . . . | 131,965 | 47,651 | 179,616 |
| 2018 . . . . . . | 139,005 | 40,512 | 179,517 |
| 2019 . . . . . . | 126,165 | 32,426 | 158,592 |
| 2020 . . . . . . | 134,250 | 25,478 | 159,728 |
| 2021 . . . . . . | 98,650 | 17,825 | 116,474 |
| 2022 . . . . . . | 82,185 | 12,248 | 94,433 |
| 2023 . . . . . . | 63,695 | 7,455 | 71,150 |
| 2024 . . . . . . | 43,950 | 3,700 | 47,650 |
| 2025 . . . . . . | 23,145 | 1,250 | 24,395 |
| Total | $4,048,124 | $3,215,568 | $7,263,692 |

(1)     Represents six months' interest through June 30, 1996.
*       Totals may not add due to rounding.
*Sources:* Government Development Bank and Department of the Treasury.

**Commonwealth Guaranteed Debt**

Annual debt service on outstanding Commonwealth guaranteed bonds issued by Urban Renewal and Housing Corporation and assumed in fiscal year 1992 by Housing Bank and Finance Agency is $13,254,048 in the fiscal year ending September 30, 1996, which constitutes the maximum annual debt service on such bonds. The final maturity of such bonds is October 1, 2001. As of December 31, 1995, $65,665,000 of Commonwealth guaranteed bonds of Housing Bank and Finance Agency were outstanding. Annual debt service on Commonwealth guaranteed bonds of Public Buildings Authority is $114,777,000 in fiscal year ending June 30, 1996 with the final maturity on July 1, 2025. As of December 31, 1995, $1,335,611,000 of Commonwealth guaranteed bonds of Public Buildings Authority were outstanding.

No payments under the Commonwealth guaranty have been required to date for bonds of Housing Bank and Finance Agency or Public Buildings Authority.

As of December 31, 1995, $267,000,000 of Commonwealth guaranteed obligations of Government Development Bank were outstanding. No payments under the Commonwealth guaranty have been required for any obligations of Government Development Bank to date.

The Farm Credit Corporation ("Farm Credit"), created pursuant to Act No. 68, approved June 8, 1960, as amended, assumed responsibility in 1971 for the administration of the Farm Credit Security Fund (the "Security Fund") from the Department of Agriculture. The Security Fund has guaranteed, under the good faith and credit of the Commonwealth, certain loans made by financial institutions and Farm Credit to farmers. The Security Fund is authorized to guarantee loans of which approximately $14,431,681 has been committed as of December 31, 1995. As of December 31, 1995, $1,410,019 was available in the Security Fund to cover loan payment defaults by farmers. The Commercial and Agricultural Credit and Development Corporation has been created to provide, among other things, loans to the commercial and agricultural sectors. The functions of Farm Credit and the administration of the Security Fund have been transferred to the new public corporation, which is an affiliate of Economic Development Bank. Simultaneously with the creation of the new corporation, the amount of guarantees was limited to the outstanding loans which carry such guaranty. A joint resolution adopted by the Legislature on August 19, 1990 appropriates $8,000,000 per year beginning fiscal 1993 for five years to provide funds for the Security Fund. The proceeds of these appropriations will be used to pay a $40,000,000 loan made to the Security Fund by Government Development Bank which is being used to cover payment on loans guaranteed by the Security Fund.

As of December 31, 1995, the Commonwealth had guaranteed certain outstanding revenue bonds of the Aqueduct and Sewer Authority in the aggregate principal amount of $400,340,000. No payments under the Commonwealth guaranty have been required for such revenue bonds to date.

**Trends of Public Sector Debt**

Historically, the Commonwealth has maintained a fiscal policy which provides for a prudent relationship between the growth of public sector debt and the growth of the economic base required to service that debt. The Commonwealth has also sought opportunities to realize debt service savings by refunding outstanding debt with obligations bearing lower interest rates. In certain years, this policy has had the effect of increasing the rate of growth of public sector debt above that of gross product. Over fiscal years 1991 to 1995, public sector debt increased 24.7% while gross product rose 24.4%. This slightly greater increase in the rate of public sector debt relative to the rate of increase in gross product over the subject period was principally the result of refinancings to achieve debt service savings. Short term debt outstanding relative to total debt was 7.9% as of December 31, 1995.

The following table shows the trends in gross product (in current dollars) and public sector debt for the five fiscal years ended June 30, 1995 and at December 31, 1995.

**Commonwealth of Puerto Rico**
**Public Sector Debt and Gross Product**
**(dollars in millions)**

| | Public Sector Debt | | | | | Gross Product(1) | |
|---|---|---|---|---|---|---|---|
| June 30 | Long Term | Short Term(2) | Short Term as % of Total | Total | Rate of Increase | Amount | Rate of Increase |
| 1991 . . . . . . . . . . . . . . . | $12,041 | $ 784(3) | 6.1% | $12,825 | 2.1% | $22,809 | 5.5% |
| 1992 . . . . . . . . . . . . . . . | 13,108 | 713 | 5.2 | 13,821 | 7.8 | 23,696 | 3.9 |
| 1993 . . . . . . . . . . . . . . . | 13,257 | 985(3) | 6.9 | 14,242 | 3.0 | 25,133 | 6.1 |
| 1994 . . . . . . . . . . . . . . . | 14,077 | 1,181(3) | 7.7 | 15,258 | 7.1 | 26,592 | 5.8 |
| 1995 . . . . . . . . . . . . . . . | 14,688 | 1,305 | 8.2 | 15,993 | 4.8 | 28,371 | 6.7 |
| 1996(4) . . . . . . . . . . . . . | 14,946 | 1,274 | 7.9 | 16,220(5) | 0.9 | N/A | N/A |

(1)     In current dollars.

(2)     Obligations issued with a maturity of three years or less are considered short-term debt.

(3)     Does not include the tax and revenue anticipation notes which were outstanding at the close of the indicated fiscal years because sufficient funds had been set aside for the payment of such notes in full prior to the end of said fiscal years.

(4)     As of December 31, 1995.

(5)     Does not include the 1996 Public Improvement Bonds and the refunding of the 1987 Refunded Bonds.

*Source:* Government Development Bank.

The following table shows the trend of public sector debt by major category for the five fiscal years ended June 30, 1995 and at December 31, 1995.

**Commonwealth of Puerto Rico**
**Public Sector Debt by Major Category**
**(dollars in millions)**

| | Commonwealth(1) | | | Municipalities | | | Public Corporations(2) | | | Total Long Term | Total Short Term(3) | Grand Total* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| June 30 | Long Term | Short Term(3) | Total* | Long Term | Short Term(3) | Total* | Long Term | Short Term(3) | Total* | | | |
| 1991 . . . | $3,260 | $ 54(4) | $3,314 | $386 | $ 30 | $416 | $ 8,395 | $ 700 | $ 9,095 | $12,041 | $ 784 | $12,825 |
| 1992 . . . | 3,402 | -- | 3,402 | 460 | 39 | 499 | 9,246 | 675 | 9,921 | 13,108 | 713 | 13,821 |
| 1993 . . . | 3,483 | 120(4) | 3,603 | 497 | 39 | 536 | 9,276 | 826 | 10,102 | 13,257 | 985 | 14,242 |
| 1994 . . . | 3,713 | 120(4) | 3,833 | 571 | 47 | 618 | 9,792 | 1,014 | 10,807 | 14,076 | 1,181 | 15,258 |
| 1995 . . . | 4,236 | 30 | 4,266(5) | 679 | 53 | 732 | 9,773 | 1,222 | 10,995 | 14,688 | 1,305 | 15,993 |
| 1996(6) . . | 4,028(7) | 0 | 4,028(5)(6) | 695 | 48 | 743 | 10,222 | 1,227 | 11,449 | 14,946 | 1,275 | 16,220 |

(1)     General obligation and other direct debt; Special Promissory Notes are included in Long Term portion for fiscal years 1991 and 1992.

(2)     Includes Commonwealth guaranteed debt.

(3)     Obligations with a maturity of three years or less are considered short-term debt.

(4)     Does not include the tax and revenue anticipation notes which were outstanding at the close of the indicated fiscal years because sufficient funds had been set aside for the payment of such notes in full prior to the end of said fiscal years.

(5)     Includes the Treasury Department tax claims loan and the transferred CRUV debt.

(6)     As of December 31, 1995.

(7)     Does not include the 1996 Public Improvement Bonds and the refunding of the 1987 Refunded Bonds.

* Totals may not add due to rounding.

*Source:* Government Development Bank.

I-23

# PUBLIC CORPORATIONS

In Puerto Rico, many governmental or quasi-governmental functions are performed by public corporations. These are governmental entities of the Commonwealth created by the Legislature but with varying degrees of independence from the central government. Public corporations are generally created to perform a single function or a limited number of related functions. Most public corporations obtain revenues from charges for services or products, but many are subsidized to some extent by the central government. Most public corporations are governed by boards appointed by the Governor with the advice and consent of the Senate, but some public corporations are subsidiaries of departments of the central government. Capital improvements of most of the larger public corporations are financed by revenue bonds under trust agreements or bond resolutions or notes under loan agreements. The following table presents the outstanding bonds and notes of certain of the public corporations as of December 31, 1995 ("notes" as used in this Section is intended to refer principally to certain types of non-bonded debt regardless of maturity). Debt of certain other public corporations is excluded from this table because such debt is payable primarily from the Federal government or is payable from sources other than Commonwealth appropriations or taxes or revenues of public corporations derived from services or products, such as industrial development bonds. Also excluded from this table is the debt of certain public corporations the inclusion of which would reflect double counting. More detailed information about the major public corporations is presented in following sections.

## Outstanding Debt
### December 31, 1995
### (in thousands)

| | Bonds | | | Notes | | | Total Bonds and Notes | | |
|---|---|---|---|---|---|---|---|---|---|
| | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total |
| Agricultural Services Administration . . . . . . . . . . | $0 | $0 | $0 | $0 | $53,306 | $53,306 | 0 | $53,306 | $53,306 |
| Aqueduct and Sewer Authority(1) . . . . . . . . . . . | 400,340 | 69,571 | 469,911(2) | 0 | 441,669 | 441,669 | 400,340 | 511,240 | 911,580 |
| Agricultural and Commercial Credit and Development Corporation . . . . . . . . . . | 0 | 0 | 0 | 0 | 60,752 | 60,752 | 0 | 60,752 | 60,752 |
| Electric Power Authority(1) . . . | 0 | 3,261,854 | 3,261,854 | 0 | 145,000 | 145,000 | 0 | 3,406,854 | 3,406,854 |
| Health Facilities and Services Administration . . . . . . . . . . | 0 | 0 | 0 | 0 | 287,810 | 287,810 | 0 | 287,810 | 287,810(3) |
| Highway and Transportation Authority . . . . . . . . . . . . . | 0 | 1,616,890 | 1,616,890 | 0 | 193,702 | 193,702 | 0 | 1,810,592 | 1,810,592 |
| Housing Bank . . . . . . . . . . . | 65,665 | 607,120(3) | 672,785 | 0 | 17,000 | 17,000 | 65,665 | 624,120 | 689,785 |
| Industrial Development Company(1) . . . . . . . . . . . | 0 | 155,034 | 155,034 | 0 | 24,978 | 24,978 | 0 | 180,012 | 180,012 |
| Infrastructure Financing Authority . . . . . . . . . . . . . | 0 | 247,045 | 247,045 | 0 | 0 | 0 | 0 | 247,045 | 247,045(3) |
| Maritime Shipping Authority (4) . . . . . . . . . . . | 0 | 298,524 | 298,524 | 0 | 0 | 0 | 0 | 298,524 | 298,524(3) |
| Office for the Improvement of Public Schools . . . . . . . . | 0 | 0 | 0 | 0 | 136,670 | 136,670 | 0 | 136,670 | 136,670 |
| Ports Authority . . . . . . . . . . | 0 | 133,805 | 133,805 | 0 | 93,886 | 93,886 | 0 | 227,691 | 227,691 |
| Public Buildings Authority(1) . . . . . . . . . . . | 1,335,611 | 0 | 1,335,611 | 0 | 20,447 | 20,447 | 1,335,611 | 20,447 | 1,356,058 |
| Sugar Corporation . . . . . . . . | 0 | 0 | 0 | 0 | 22,175 | 22,175 | 0 | 22,175 | 22,175(3) |
| Telephone Authority . . . . . . . | 0 | 969,950 | 969,950 | 0 | 12,105 | 12,105 | 0 | 982,055 | 982,055 |
| University of Puerto Rico . . . . | 0 | 354,051 | 354,051 | 0 | 185 | 185 | 0 | 354,236 | 354,236 |
| Others . . . . . . . . . . . . . . . | 0 | 14,633 | 14,633 | 0 | 409,350 | 409,350 | 0 | 423,983 | 423,983 |
| Total . . . . . . . . . . . . . . . | $1,801,616 | $7,728,477 | $9,530,093 | $0 | $1,919,035 | $1,919,035 | $1,801,616(5) | $9,647,512 | $11,449,128 |

(1)   Does not include accretion of interest from the respective issuance dates on capital appreciation bonds as follows: Electric Power Authority $76,500,000 as of December 31, 1995; Industrial Development Company $5,957,043 as of December 31, 1995; and Public Buildings Authority $30,459,705 as of December 31, 1995.

(2)   Principal of and interest on $62,107,084 of this debt is reimbursed from Commonwealth appropriations.

(3)   Payable primarily from Commonwealth appropriations.

(4)   On March 3, 1995, the assets of the Authority were transferred to a private purchaser which also assumed certain of the Authority's liabilities. The outstanding debt was refinanced by Government Development Bank, but it remains an obligation of the Authority. Such debt is now payable solely from Commonwealth appropriations.

(5)   Authorization for Commonwealth guarantee of debt as of December 31, 1995 was $3,483,000,000. Excludes $14,431,681 of loans from lending institutions to farmers guaranteed by Farm Credit Security Fund as of December 31, 1995.

*Source:* Government Development Bank.

No deductions have been made in the above table for debt service funds and debt service reserve funds.

**Government Development Bank for Puerto Rico**

The principal functions of Government Development Bank are to act as financial advisor to and fiscal agent for the Commonwealth, its municipalities and public corporations in connection with the issuance of bonds and notes, to make loans and advances to public corporations and municipalities, and to make loans to private enterprises to aid in the economic development of Puerto Rico.

As of December 31, 1995, $1,503,681,000 of bonds and notes of Government Development Bank were outstanding. Government Development Bank has loaned $2,173,466,000 to Commonwealth public corporations and municipalities. Act No. 12, approved May 9, 1975, as amended, provides that the payment of principal of and interest on specified notes and other obligations of Government Development Bank, not exceeding $550,000,000, may be guaranteed by the Commonwealth, of which $267,000,000 were outstanding as of December 31, 1995.

Government Development Bank has the following principal subsidiaries:

*Higher Education Assistance Corporation* was established in May 1981 for the purpose of guaranteeing loans made to post-secondary school students under Federal insurance programs. The operations of this Corporation were transferred to the Great Lakes Higher Education Corporation, a guarantee agency based in Wisconsin, and the Corporation is in the process of liquidation.

*Housing Finance Corporation* was created in November 1977 for the purposes of providing needed rental housing units and stimulating the construction industry under federally subsidized programs. The Corporation has issued tax-exempt revenue bonds and notes to finance the construction of housing units approved for federal rental subsidies, which bonds and notes are limited obligations of the Corporation payable solely from revenues collected in respect of such housing units. The Federal Housing Administration has insured mortgages on certain of the housing units. As of December 31, 1995, $1,336,854,851 of bonds were outstanding.

*Tourism Development Fund* was created in November 1993 to promote the hotel and tourism industry of the Commonwealth, primarily through letters of credit or guarantees. The Tourism Development Fund is also authorized to make capital investments and provide direct financing to tourism related projects.

*Development Fund* was created in 1977 to provide an alternate source of financing to private enterprises in Puerto Rico that have difficulties in obtaining financing from traditional sources. The Development Fund may also guarantee obligations of these enterprises and invest in their equity securities.

*Capital Fund* was created in November 1993 for trading in debt obligations and publicly traded shares of domestic and foreign corporations.

*Public Finance Corporation* was established in December 1984 for the purpose of providing the agencies and instrumentalities of the Commonwealth with alternate means of meeting their financing requirements. The Corporation issued on June 30, 1995, $298,524,000 of bonds to purchase certain debt issued by Maritime Shipping Authority to Government Development Bank.

A description of certain other subsidiaries and affiliates of Government Development Bank is provided in "Other Public Corporations."

**Other Public Corporations**

*Aqueduct and Sewer Authority* owns and operates a system of public water supply and sanitary sewer facilities. Capital expenditures are financed by revenues of the system, debt issuances, and federal and Commonwealth grants. Debt service on revenue bonds is payable from net revenues of the system after payment of current expenses. As of December

31, 1995, the Authority had bonds outstanding in the amount of $469,911,000 (not including accretion of interest from the respective issuance dates on capital appreciation bonds) and notes outstanding in the amount of $441,669,000.

Facilities and operations of the Authority's system are subject to regulation under numerous federal and Commonwealth environmental laws, including the federal Clean Water Act administered by the United States Environmental Protection Agency ("EPA"). The Authority has embarked on an extensive capital improvement program for the five-year period ending June 30, 2000 that is estimated to cost approximately $1.6 billion. A portion of the capital improvement program is designed to enable the Authority to comply with federal and Commonwealth laws and regulations.

A report prepared for the Governor of the Commonwealth calls for substantially greater investments in infrastructure and a major overhaul of the Authority's operations to maintain the viability of the existing system and to finance its expansion to new users. It is contemplated that funds for these capital improvements will be provided through a combination of bond issues, legislative appropriations and federal grants.

The Authority reported net losses of approximately $64 million in fiscal 1994 and $60.5 million in fiscal 1995. The net losses are the result of continuing financial and operating difficulties that the Authority has experienced in recent years.

In response to these difficulties and to the report mentioned above, in July 1994, the Governor signed legislation designed to enhance the Authority's credit position in the capital markets by providing a Commonwealth guaranty of the Authority's outstanding indebtedness of approximately $388 million (which previously had been sold in public markets) and a guaranty of any indebtedness that may be issued to refinance this debt, and further providing for annual Commonwealth appropriations to the Authority to pay a portion of the principal and interest on the Authority's indebtedness and/or to defray a portion of the Authority's operating and maintenance expenses as follows: $20 million for fiscal year 1995, $25 million for fiscal year 1996, $30 million for fiscal year 1997 and $35 million for fiscal year 1998. In the event the Authority continues to require financial assistance after 1998, the legislation contemplates future direct contributions by the Commonwealth to the Authority of up to $35 million annually.

On May 26, 1995, the Authority and Professional Services Group, Inc., a subsidiary of Compagnie Generale Des Eaux of France ("PSG"), entered into a five-year agreement under which PSG will provide management, operation, repair and maintenance services for the water and waste water treatment systems of the Authority (collectively, the "Authority System"). The Authority retains control over strategic planning, environmental compliance and long-term financing of its facilities, among other things. The agreement includes terms and conditions that are expected to result in improved efficiency of the Authority System. The Authority will pay PSG a fixed annual fee of $93,750,000 for the above services based on the Authority's current operating budget. Of this amount $83,750,000 will be used for the payment of energy costs, chemical products and other operating items (but not labor costs and repairs in excess of $2,000 per repair), and the remaining $10,000,000 will be for the payment of administrative and management expenses of PSG. This fixed annual fee may be adjusted up or down under certain events and circumstances. Penalties will be assessed against PSG if certain efficiency standards (including total employment at the Authority) are not met, and bonuses may be earned by PSG for improvement in certain criteria, including increased revenue collections from existing customers, reductions in total employment and other productivity measures. The agreement gives the Authority the right without penalty to terminate it after three years.

On January 31, 1996, the Authority and Thames-Dick Superaqueduct Partners, Inc. (the "Company"), entered into a Master Agreement under which the Company will build and maintain the North Coast Superaqueduct Project (the "Project"). The Company is jointly owned by Thames Water PLC and Dick Corporation. The Master Agreement provides for a twenty-nine month construction period with an initial Guaranteed Maximum Price of $264,740,000. The Guaranteed Maximum Price includes a value engineering savings component which is designed to provide incentives for the Company to complete construction at below the Guaranteed Maximum Price by allowing the Company to share in such savings. The Company will also operate and maintain the Project for an initial period of five years for a fixed fee of $4,484,244 per year, subject to adjustment for changes in inflation covering the cost of certain operation and maintenance services, such as sludge disposal, spares and plant maintenance, and general maintenance services. The Company will also

I-26

be entitled to charge the Authority for certain pass through costs related to operating the Project, such as electricity, chemicals and insurance. These pass through costs are currently estimated at approximately $5,853,000 per year. The Master Agreement gives the Authority the right to terminate the Company without cause after three years, without penalty to the Authority.

On December 21, 1995, the Authority issued $400,340,000 Puerto Rico Aqueduct and Sewer Authority Refunding Bonds, Series 1995, Guaranteed by the Commonwealth of Puerto Rico to refund all of the Authority's outstanding revenue and revenue refunding bonds previously guaranteed by the Commonwealth.

Notwithstanding the issuance of said Series 1995 Bonds, the execution of the agreement with PSG discussed above and the legislative appropriations previously discussed, it is likely that additional substantial legislative appropriations may need to be made to the Authority over the next few years in order to support the financial and operational viability of the Authority and allow the Authority to finance its capital improvement program.

*Economic Development Bank* was created in July 1985 to engage primarily in granting small direct loans, providing loan guarantees to private enterprises and making equity investments in such enterprises. Its initial capital was provided by a transfer of loans in the principal amount of $15,000,000 previously administered by a now inactive subsidiary of Government Development Bank. As of December 31, 1995, the Economic Development Bank had $24,000,000 principal amount of Capital Notes payable from Commonwealth appropriations and $72,000,000 collateralized Promissory Notes.

*Electric Power Authority* owns and operates the island's electric system. Capital improvements are financed primarily by borrowed funds, supplemented by internally generated funds. The Authority's bonded debt consists of Power Revenue Bonds. The Bonds are secured by a lien on net revenues of the electric system. As of December 31, 1995, the Authority had $3,261,854,000 in bonds outstanding (not including accretion of interest from the respective issuance dates on capital appreciation bonds). The Authority has entered into power purchase contracts relating to the construction of certain cogenerating plants that will use fuels other than oil. See "Economic Development Program" under *The Economy* above.

*Health Facilities and Services Administration* ("AFASS") was created by Act No. 26, approved on November 13, 1975, as amended, with the objectives of planning, evaluation and development of health services, alleviation of environmental contamination, operation of public hospitals and other health facilities, prevention and treatment of mental illness, administration of family planning programs and maternal and child care activities. The operations of AFASS are funded substantially by appropriations from the Commonwealth. AFASS' outstanding indebtedness to Government Development Bank as of December 31, 1995 was $287,810,000. In addition, AFASS has a line of credit with Government Development Bank for $200 million to be used by AFASS to pay operational expenses related to health care reform programs in the Commonwealth. As of December 31, 1995, AFASS has no outstanding amount drawn on such line of credit.

*Highway and Transportation Authority* is responsible for highway construction in Puerto Rico. Such construction is financed by debt (interim notes and revenue bonds), revenues of the Authority, and federal and Commonwealth grants. Debt service on the Authority's revenue bonds constitutes a first lien on its gross revenues, which consist currently of all the proceeds of the gasoline tax, one-half of the proceeds of the tax on gas oil or diesel oil, highway toll revenues and the gross receipts of $15.00 per vehicle per year from certain motor vehicle license fees. Such revenues (except for toll revenues) may be applied first to the payment of debt service on general obligation bonds and notes of the Commonwealth and payments required to be made by the Commonwealth under its guarantees of bonds and notes to the extent that no other revenues are available for such purpose. The Commonwealth has never applied such revenues for such payment. As of December 31, 1995, the Highway and Transportation Authority had $1,616,890,000 in bonds outstanding.

The Authority is a party to a concession agreement under which a private company designed, constructed and currently is operating a toll bridge spanning the San José Lagoon. The toll bridge was financed with special facility

revenue bonds of the Authority payable by the private company principally from toll revenues. The concession is for a term of 35 years, subject to earlier termination or extension. The bridge opened for traffic in February 1994. In certain circumstances as described in the agreement, including where toll revenues are insufficient to generate certain rates of return to the private operator, the private company may require the Authority, among other things, to assume the private company's obligations with respect to the special facility revenue bonds. Certain of those circumstances, including low toll revenues, exist at this time but the Authority does not currently anticipate that the private company will exercise its remedy against the Authority.

The Authority is exploring the possibility of undertaking other transactions to privatize the construction and operation of additional traffic facilities.

The Authority has issued a request for proposals seeking responses from qualified firms for the planning, design, construction and operation of a light-rail mass transit system to serve a portion of the San Juan metropolitan area.

*Housing Bank and Finance Agency* is engaged in insuring mortgages and servicing mortgages originated by Urban Renewal and Housing Corporation and issues bonds and notes to provide interim and permanent financing for low-income housing projects and single-family home ownership programs. The Agency obtains funds from legislative appropriations, sales of mortgages, mortgage repayments and other sources.

As of December 31, 1995, the Agency had outstanding $672,785,000 of bonds (of which $65,665,000, originally issued by the Urban Renewal and Housing Corporation, are guaranteed by the Commonwealth) issued to pay obligations of the Commonwealth under law, otherwise payable from Commonwealth appropriations, to fund certain payments of the Commonwealth under its mortgage subsidy program for low and moderate income families, to guaranty certain insurance obligations of the Agency under certain programs and to refund bonds originally issued by Urban Renewal and Housing Corporation to carry out activities related to the provision of low-cost housing for moderate income families, federally aided public housing for low income families, and urban renewal, housing and related activities. These bonds are payable principally from appropriations in substantially the amount that the Commonwealth would otherwise have been obligated to appropriate for such purposes.

*Industrial Development Company* participates in the Commonwealth-sponsored economic development program by providing physical facilities, general assistance, and special incentive grants to manufacturers. The Company has issued interim notes and revenue bonds to finance factories and other facilities. Rentals derived from the leasing of specified facilities of the Company are pledged to the payment of the Company's revenue bonds. As of December 31, 1995, the Company had $155,034,000 in bonds outstanding (not including accretion of interest from the respective issuance dates on capital appreciation bonds). On March 23, 1994, the hotel properties were sold to the Tourism Company in order to facilitate the further sale to the private sector.

*Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority* was created in June 1977. The Authority has issued revenue bonds to finance industrial, pollution control, medical and educational facilities in Puerto Rico for the use of private companies, non-profit entities or government agencies. The bonds are payable solely from payments to be made to the Authority by such private companies, non-profit entities or government agencies and do not constitute a debt of the Commonwealth or any of its other public corporations or municipalities. As of December 31, 1995, $3,715,890,060 of the Authority's bonds had been issued, of which $2,288,118,522 were outstanding.

*Infrastructure Financing Authority* was created in June 1988 for the purpose of providing financial, administrative, consulting, technical, advisory and other types of assistance to other public corporations and governmental instrumentalities of the Commonwealth authorized to develop infrastructure facilities and to establish alternate means for financing infrastructure facilities. The legislation establishes a Puerto Rico Infrastructure Fund funded in the amount of $30 million during fiscal 1989 and $40 million for the following 29 fiscal years with the first proceeds of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States which are transferred to the

Commonwealth pursuant to the Internal Revenue Code of 1986, as amended. In November 1988 the Authority issued $327,740,000 of Special Tax Revenue Bonds, Series 1988A to refund in advance certain outstanding revenue bonds and other debt of the Aqueduct and Sewer Authority. As of December 31, 1995, $247,045,000 of such bonds were outstanding. The Authority's Special Tax Revenue Bonds, Series 1988A are secured by a pledge of a portion of such federal excise taxes, subject to the rights of the owners of the Commonwealth's general obligation bonds and notes and certain other obligations guaranteed by the Commonwealth.

*Maritime Shipping Authority* commenced operations in 1974 upon the acquisition of three shipping lines serving Puerto Rico and the United States mainland. The Authority acquired vessels and other equipment financed by the issuance of notes on a secured basis to the previous owners. As of the date of the sale of the Authority's assets referred to below, the Authority carried approximately 30% of the total cargo shipped between Puerto Rico and the United States mainland.

On March 3, 1995, the assets and operations of Maritime Shipping Authority were acquired by an investor group headed by BTIP, a subsidiary of Bankers Trust New York Corporation, under the terms and conditions approved by the Legislature of Puerto Rico and signed by the Governor on September 27, 1994.

Act No. 112 of September 27, 1994 restructured the operations and administration of the Authority by creating the Maritime Shipping Authority as a public corporation affiliated with the Government Development Bank for Puerto Rico, subject to the control of the President of the Bank, but as a separate legal entity, apart from the Bank and any of its other affiliates and subsidiaries. The remaining debt of the Authority was refinanced, as allowed under Act No. 113 of September 27, 1994, by the issuance of bonds by the Public Finance Corporation, a subsidiary of the Bank. The current aggregate initial principal amount of such bonds as of December 31, 1995, was $298,523,973.65. The Bonds are payable from funds to be appropriated annually by the Legislature of Puerto Rico. The Public Finance Corporation purchased the note of the Authority from the Bank with the proceeds of the bonds issued.

*Municipal Finance Agency* was created in 1972 as a municipal "bond bank" for Puerto Rico. The Agency is authorized to issue bonds to purchase general obligation bonds and notes of Puerto Rico municipalities and to fund a debt service reserve. Debt service on the Agency's bonds is payable from debt service payments on municipal bonds held by the Agency and from the reserve, including investment income thereon. The Commonwealth has agreed to pay such amounts to the reserve as may be necessary to maintain it at its required level, subject to appropriation by the Legislature, which appropriation is not legally required to be made. To date no such payments have been required.

*Ports Authority* owns and operates the major airport and seaport facilities in the Commonwealth. The Authority derives revenues from a variety of sources, including charges on airplane fuel sales, air terminal space rentals, landing fees, wharfage, dockage and harbor fees and rentals for the lease of seaport equipment and property. The Authority has a $73.3 million line of credit from Government Development Bank for capital improvements, of which approximately $70.2 million was outstanding as of December 31, 1995. In addition, Government Development Bank has approved a $33 million line of credit for the Authority to finance the construction of a new multi-level parking facility at the Luis Muñoz Marín International Airport. The Authority has had total net losses of approximately $70 million during fiscal years 1993 and 1994 and as a result, was not in compliance with its rate covenant with bondholders. The Authority is, however, currently in compliance with this requirement. The Authority is implementing a plan to restructure its operations which, among other things, encompasses revisions to its capital improvement program and to the rate charges for the use of its facilities, measures to increase collections from certain users of its facilities and proposals to improve the efficiency of its operations. As of December 31, 1995, the Authority had $133,805,000 in bonds outstanding.

*Public Buildings Authority* is authorized to construct, purchase or lease office, school, health and social welfare facilities for lease to Commonwealth departments, public corporations and instrumentalities. Bonds that have been issued by the Authority to finance such facilities (through retirement of interim notes or otherwise) are payable from lease payments, which are largely derived from Commonwealth appropriations, and are further secured by the Commonwealth's guaranty. The Authority is authorized by Act No. 17 of 1968, as amended, to have outstanding at any one time up to

I-29

$1,500,000,000 of bonds guaranteed by the Commonwealth. As of December 31, 1995, $1,335,611,000 of such bonds of the Authority were outstanding (not including accretion of interest from the respective issuance dates on capital appreciation bonds).

The Authority is undertaking a program to construct additional correctional facilities to be completed by the end of fiscal 1998 at an estimated cost of $160,000,000. The Authority has previously issued $126,972,552 in bonds to finance the construction of three correctional facilities, which will be operated by private companies.

The Commonwealth is a defendant in a lawsuit in United States federal court charging, among other things, that the constitutional rights of correctional system inmates have been violated because of severe overcrowding in the Commonwealth's correctional system. Fines to assure compliance with minimum space standards have in the past been assessed against the Commonwealth. Most of these fines have been earmarked for improving the conditions of inmates but not for construction of additional correctional facilities to alleviate prison overcrowding. In April 1995, the district court judge overseeing the above lawsuit imposed an additional series of fines against the Commonwealth for noncompliance with the minimum space standards which fines may exceed $30 million. These fines are required to be paid to the United States Treasury and also may not be used to construct additional facilities. The fines are payable during the current fiscal year. The Commonwealth can give no assurance that additional fines will not be levied in connection with the above lawsuit.

*Sugar Corporation* was created in 1973 to consolidate ownership and management of the Commonwealth's interests in Puerto Rico's sugar industry. Sugar Corporation owns or leases and operates virtually all the sugar production facilities on the island. Sugar Corporation buys all cane grown by private growers, processes the cane, and sells the crude and refined sugar and molasses.

Puerto Rico's sugar industry has for many years been a deficit operation. From July 1974 to June 30, 1995, the Corporation's cash deficit totaled approximately $1,000,335,000. The Corporation's objective is to maintain sugar production at 40,000 tons of sugar per year for local consumption only.

Appropriations of approximately $14,000,000 for the current fiscal year have been made to cover the operating deficit. In order to insure that the annual cash deficit will not exceed $30,000,000, Sugar Corporation is required to present quarterly reports to the Legislature and implement cutbacks if necessary. As of December 31, 1995, the total debt of the Corporation was $22,175,000.

The Commonwealth continues with the process of evaluating the sale of the operations of the Corporation to a private buyer.

*Telephone Authority*, in July 1974, purchased Puerto Rico Telephone Company from International Telephone and Telegraph Corporation. The Company operates the principal telephone system in Puerto Rico. The Telephone Authority acquired the assets of the Puerto Rico Communications Authority on May 30, 1990. Capital improvements at present are financed by internally generated funds, although in the past they were also financed with revenue bonds. The Authority's revenue bonds are payable from net revenues, which consist primarily of moneys received after payment of the Company's operating expenses. As of December 31, 1995, the Authority had $982,055,000 of bonds and other obligations outstanding, none of which was supported by the guaranty of the Commonwealth.

*University of Puerto Rico*, with approximately 55,800 students, is by far the largest institution of higher education on the island. Commonwealth appropriations are the principal source of University revenues, but additional revenues are derived from tuition, student fees, auxiliary enterprises, interest income, Federal grants and other sources. University capital improvements have been financed mainly by revenue bonds of which $354,051,000 were outstanding as of December 31, 1995.

I-30

*Public corporations* in addition to those mentioned above have issued debt in the aggregate amount of $578,711,000 as of December 31, 1995. Debt service on $68,592,000 of such outstanding debt is being paid from Commonwealth appropriations. However, the Commonwealth is not obligated to make any such appropriations. Additional appropriations are made by the Commonwealth to enable certain of such corporations to pay their operating expenses.

## INSURANCE MATTERS

Commonwealth-owned property is insured through policies obtained by the Secretary of the Treasury and through self-insurance, except for property owned by the Electric Power Authority, the Aqueduct and Sewer Authority and the Telephone Authority, which are insured through arrangements and policies obtained by the respective Authorities. Personal injury awards against the Commonwealth are limited by law to $150,000 per occurrence.

## RETIREMENT SYSTEMS

Public employees of the Commonwealth and its instrumentalities are covered by five retirement systems: the Employees Retirement System of the Government of Puerto Rico and its Instrumentalities (the "Employees Retirement System"), the Annuity and Pension System for the Teachers of Puerto Rico (the "Teachers Retirement System"), the Commonwealth of Puerto Rico Judiciary Retirement System (the "Judiciary Retirement System"), the Retirement System of the University of Puerto Rico (the "University Retirement System"), and the Employees Retirement System of Puerto Rico Electric Power Authority (the "Electric Power Authority Retirement System").

The University Retirement System and the Electric Power Authority Retirement System apply, respectively, to employees of the University of Puerto Rico and Puerto Rico Electric Power Authority. The Commonwealth is not required to contribute directly to those two systems, but a large proportion of University revenues are derived from central government appropriations.

The Teachers Retirement System covers public school teachers, the Judiciary Retirement System covers judges, and the Employees Retirement System covers all other employees of the Commonwealth and its municipalities and instrumentalities. As of June 30, 1995, the total number of active members of the three systems was as follows: Employees Retirement System, 153,978; Teachers Retirement System, 46,998 and Judiciary Retirement System, 283. These three systems are financed by contributions by the employers (the Commonwealth, public corporations or municipalities), employees, and investment income. The Commonwealth is responsible for approximately 66% of total employer contributions to the Employees Retirement System and 100% and 99% of total employer contributions to the Judiciary and Teachers Retirement Systems, respectively. Retirement and related benefits provided by the systems and required contributions to the systems by employees are determined by statute. Required contributions to the systems by employers are determined by statute with respect to the Teachers Retirement System and, with respect to the Employees and Judiciary Retirement Systems, by the Administrator of the Systems. In fiscal 1996, the Commonwealth has budgeted approximately $225,100,000 as its contribution to the Employees Retirement System, $3,357,000 as the contribution to the Judiciary Retirement System and $78,402,000 as its contribution to the Teachers Retirement System.

The most recent actuarial valuation of the Employees Retirement System and Judiciary Retirement System was submitted by a firm of independent consulting actuaries as of June 1994. As of June 30, 1994, the total pension benefit obligation for the Employees Retirement System and Judiciary Retirement System was $5,542,000,000 and $58,900,000, respectively. The unfunded pension benefit obligation of the Employees Retirement System and Judiciary Retirement System for the same period was $4,588,374,000 and $23,293,000, respectively. The actuarial valuation was done in accordance with the "Projected Unit Credit" method. An investment return of 8.5% per year, a salary increase of 5% per

year and a post-retirement benefit increase for the Employees Retirement System of 3% every third year were assumed. This benefit increase was provided by the Legislature of Puerto Rico, on May 10, 1992, by Act No. 10. The first 3% increase was granted to retirees who have been receiving their annuities for three or more years as of that date. The second 3% increase was granted to retirees who have been receiving their annuities for three or more years as of January 1, 1995. This increase is being financed by additional contributions from the employers. Subsequent increases will depend upon the explicit approval of the System's Board of Trustees and the Legislature, based on a favorable recommendation from the System's independent consulting actuary and given a minimum of 24 months of benefit payment reserves.

The Legislature of Puerto Rico, on February 1, 1990, enacted Act No. 1 which is directed at ensuring the solvency of the Employees Retirement System for the next fifty years. Among other provisions, the legislation increases the level of contribution to the System and limits benefits for new employees by increasing the length of time for the vesting of certain benefits and reducing the level of benefits in the case of early retirement. The legislation also reduces the level of occupational injury and death benefits received by new employees.

The most recent actuarial valuation of the Teachers Retirement System was submitted by a firm of independent consulting actuaries in March 1994. As of June 30, 1992 the total pension benefit obligation of the system was $2,407,007,700, assets amounted to $1,104,050,500 and the resulting unfunded pension benefit obligation was $1,302,957,200. The Teachers Retirement System is undertaking a comprehensive review of its data base for current and retired covered employees. Initial indications are that the System's information concerning system participants has historically overstated the number of beneficiaries. In addition, certain assumptions used in predicting future benefit growth have been shown to be too conservative, particularly assumptions about future price level changes. As a result, the System expects to show a sizeable reduction in its unfunded pension benefit obligation in its actuarial valuation expected to be released in February 1996.

Nonetheless, it is recognized that it will be necessary further to strengthen the finances of the Teachers Retirement System in order to assure that combined contributions and investment income continue to exceed benefit payments, avoiding the possible future drawdown of assets.

The following table presents in summary form income and expenses of the retirement systems for the fiscal years ended June 30, 1994 and 1995 and estimates for the fiscal year ending June 30, 1996.

**Retirement Systems**
**Income and Expenses**
**(in thousands)**

| | Employees Retirement System | Judiciary Retirement System | Teachers Retirement System |
|---|---|---|---|
| **Fiscal Year Ended June 30, 1994** | Actual | Actual | Actual |
| Income: | | | |
| Employers contributions | $203,747 | $2,996 | $ 62,777 |
| Employee contributions | 150,121 | 1,280 | 51,718 |
| Investment income | 24,533 | 175 | 90,902 |
| Total | 378,401 | 4,451 | 205,397 |
| Expenses: | | | |
| Benefit payments | 350,259 | 4,946 | 134,968 |
| Administrative and other expenses | 17,585 | 534 | 9,845 |
| Total | 367,844 | 5,480 | 144,813 |
| Net Income | $ 10,557 | $(1,029) | $ 60,584 |
| **Fiscal Year Ended June 30, 1995** | Actual | Actual | Actual |
| Income: | | | |
| Employers contributions | $218,520 | $3,228 | $ 74,668 |
| Employee contributions | 162,225 | 1,346 | 60,068 |
| Investment income | 138,035 | 7,332 | 152,040 |
| Total | 518,780 | 11,906 | 286,776 |
| Expenses: | | | |
| Benefit payments | 372,923 | 5,194 | 143,634 |
| Administrative and other expenses | 22,007 | 262 | 11,654 |
| Total | 394,930 | 5,456 | 155,288 |
| Net Income | $123,850 | $6,450 | $131,488 |
| **Fiscal Year Ending June 30, 1996** | Estimated | Estimated | Estimated |
| Income: | | | |
| Employers contributions | $225,100 | $3,357 | $ 78,402 |
| Employee contributions | 168,725 | 1,399 | 63,071 |
| Investment income | 140,715 | 7,655 | 101,991 |
| Total | 534,540 | 12,411 | 243,464 |
| Expenses: | | | |
| Benefit payments | 395,298 | 5,435 | 150,816 |
| Administrative and other expenses | 23,105 | 270 | 12,237 |
| Total | 418,403 | 5,705 | 163,053 |
| Net Income | $116,137 | $6,706 | $ 80,411 |

*Sources:* Employees Retirement System, Judiciary Retirement System and Teachers Retirement System.

I-33

## SUMMARY OF COMMONWEALTH FINANCIAL STATEMENTS

Since fiscal 1990 the complete financial statements of the Commonwealth are audited. For fiscal 1995, such financial statements were audited by Deloitte & Touche LLP, whose report thereon is dated December 1, 1995 (January 22, 1996 as to Notes 19 and 20 of such report). Preparation of the audited financial statements of the Commonwealth involves the collection and combination of audited financial statements from 44 separate reporting entities.

## COMMONWEALTH TAXES, OTHER REVENUES AND EXPENDITURES

The Secretary of the Treasury has custody of the funds of the Central Government of the Commonwealth and is responsible for the disbursement and investment of and accounting for such funds. Central government funds are grouped into three major categories or "types" of funds, as follows: (i) Governmental Fund Types, which include the General, Special Revenue, Debt Service (also referred to herein as Redemption), and Capital Project Funds; (ii) Proprietary Fund Types, which include the Enterprise and Internal Service Funds; and (iii) Fiduciary Fund Types, which include the Trust and Agency Funds. These funds do not include funds of the municipalities, because the municipalities are governmental entities with independent treasuries. The Special Revenue Fund was incorporated into the General Fund commencing in fiscal 1993.

The General Fund is the primary operating fund of the Commonwealth. General Fund revenues are broadly based and include revenues raised internally as well as those from non-Commonwealth sources. Internal revenues consist principally of income taxes and excise taxes. Revenues from non-Commonwealth sources are derived from federal excise taxes and customs duties returned to the Commonwealth. The primary expenditures of the Commonwealth through the General Fund are for grants and subsidies and personal and other services.

### Summary and Management Discussion of General Fund Results

The following table presents the Commonwealth revenues and expenditures of the General Fund on a cash basis for fiscal 1991 through fiscal 1996. Insofar as the information relates to fiscal 1996, it is based on estimates provided by the Secretary of the Treasury as of October 9, 1995. The information for fiscal 1991 through fiscal 1995 is based on actual year end results (the fiscal 1995 information is, however, still subject to year-end audit adjustments; see footnote 1 to the following table). General Fund revenues, expenditures and transfers as presented in the table differ from the General Fund revenues, expenditures and transfers as presented in the financial statements, as the latter statements reflect an expanded General Fund entity in accordance with generally accepted accounting principles.

**Commonwealth of Puerto Rico**
**General Fund Revenues, Expenditures, and Changes in Cash Balance**
*(in thousands)*

Fiscal Year

| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996(1) |
|---|---|---|---|---|---|---|
| Beginning cash balance . . . . . . . . . . . . . | $ 112,251 | $ 105,475 | $ (62,359) | $ (116,501) | $ 309,055 | $ 534,929 |
| **Revenues from internal sources:** | | | | | | |
| Income taxes: | | | | | | |
| Individuals . . . . . . . . . . . . . . . . . . . . . | 1,123,733 | 1,122,335 | 1,241,924 | 1,409,824 | 1,578,269 | 1,589,000 |
| Corporations . . . . . . . . . . . . . . . . . . . | 931,912 | 1,019,468 | 975,134 | 1,107,265 | 1,304,612 | 1,370,000 |
| Partnerships . . . . . . . . . . . . . . . . . . . | 4,001 | 1,167 | 1,165 | 1,802 | 3,391 | 2,000 |
| Withheld from non-residents . . . . . . . . . . . | 48,312 | 62,066 | 50,531 | 73,626 | 79,072 | 61,000 |
| Tollgate taxes . . . . . . . . . . . . . . . . . . | 176,851 | 98,502 | 98,771 | 224,356 | 220,873 | 192,000 |
| Interest . . . . . . . . . . . . . . . . . . . . . . | 15,060 | 8,505 | 6,076 | 5,293 | 6,070 | 6,000 |
| Dividends . . . . . . . . . . . . . . . . . . . . . | 25,644 | 23,588 | 27,678 | 33,968 | 28,650 | 34,000 |
| Total income taxes . . . . . . . . . . . | 2,325,513 | 2,335,631 | 2,401,279 | 2,856,134 | 3,220,937 | 3,254,000 |
| Commonwealth excise taxes: | | | | | | |
| Alcoholic beverages . . . . . . . . . . . . . . . | 219,055 | 216,890 | 215,035 | 220,882 | 222,187 | 236,000 |
| Cigarettes . . . . . . . . . . . . . . . . . . . . | 104,454 | 102,400 | 106,740 | 115,453 | 107,943 | 118,000 |
| Motor vehicles . . . . . . . . . . . . . . . . . . | 172,272 | 178,329 | 217,012 | 275,654 | 319,676 | 328,000 |
| Other excise taxes . . . . . . . . . . . . . . . | 432,941 | 460,702 | 528,748 | 588,411 | 602,521 | 636,000 |
| Total Commonwealth excise taxes . . . . . | 928,722 | 958,321 | 1,067,535 | 1,200,400 | 1,252,327 | 1,318,000 |
| | | | | | | |
| Property taxes . . . . . . . . . . . . . . . . . . | 132,360 | 15,003 | 12,877 | 4,568 | 7,889 | 0 |
| Inheritance and gift taxes . . . . . . . . . . . . | 1,421 | 1,148 | 1,072 | 934 | 1,535 | 1,000 |
| Licenses . . . . . . . . . . . . . . . . . . . . . . | 39,483 | 46,842 | 48,251 | 49,084 | 49,100 | 51,000 |
| Other: | | | | | | |
| Lottery . . . . . . . . . . . . . . . . . . . . . . | 68,327 | 60,597 | 70,821 | 62,348 | 63,317 | 61,000 |
| Electronic Lottery . . . . . . . . . . . . . . . . | 0 | 59,091 | 56,284 | 52,193 | 59,414 | 57,000 |
| Miscellaneous non-tax revenues . . . . . . . . | 92,984 | 96,437 | 109,713 | 131,909 | 125,973 | 122,000 |
| Total other . . . . . . . . . . . . . . . . | 161,311 | 216,125 | 236,818 | 246,450 | 248,704 | 240,000 |
| Total revenues from internal sources . . . . | 3,588,810 | 3,573,070 | 3,767,832 | 4,357,570 | 4,780,492 | 4,864,000 |
| | | | | | | |
| **Revenues from non-Commonwealth sources:** | | | | | | |
| Federal excise taxes . . . . . . . . . . . . . . . | 198,787 | 195,028 | 167,732 | 185,285 | 187,494 | 193,000 |
| Customs . . . . . . . . . . . . . . . . . . . . . . | 94,384 | 93,038 | 89,741 | 122,477 | 112,153 | 74,000 |
| Total revenues from non-Commonwealth sources . . . . . . . | 293,171 | 288,066 | 257,473 | 307,762 | 299,647 | 267,000 |
| Sub-total revenues . . . . . . . . . . . . . . . | 3,881,981 | 3,861,136 | 4,025,305 | 4,665,332 | 5,080,139 | 5,131,000 |
| Proceeds from special funds . . . . . . . . . . | 72,956 | 53,983 | 37,286 | 56,527 | 11,131 | 0 |
| Total revenues . . . . . . . . . . . | 3,954,937 | 3,915,119 | 4,062,591 | 4,721,859 | 5,091,270 | 5,131,000 |
| Other income . . . . . . . . . . . . . . . . . . . | 391,872 | 440,667 | 553,954 | 562,354 | 307,931 | 67,500 |
| Less tax refunds — previous years . . . . . . . | 0 | (7,503) | (12,784) | (4,285) | (8,337) | (8,304) |
| | | | | | | |
| Total revenues — net . . . . . . . . . | 4,346,809 | 4,348,283 | 4,603,761 | 5,279,928 | 5,390,864 | 5,190,196 |
| | | | | | | |
| Transfers to debt service fund(2) . . . . . . . . | (273,859) | (283,236) | (298,358) | (284,346) | (331,195) | (359,638) |
| Revenues from 1992 tax amnesty . . . . . . . | 0 | 189,877 | 0 | 0 | 0 | 0 |
| Other non-revenue sources . . . . . . . . . . . | 30,000(3) | 0 | 0 | 0 | 0 | 0 |
| Note proceeds(4) . . . . . . . . . . . . . . . . | 400,236 | 0 | 401,917 | 700,000 | 0 | 0 |
| Repayment of notes(5) . . . . . . . . . . . . . | (408,120) | 0 | (413,788) | (717,850) | 0 | 0 |
| Adjusted revenues . . . . . . . . . . . | 4,095,066 | 4,254,924 | 4,293,532 | 4,977,732 | 5,059,669 | 4,830,558 |
| **Expenditures:** | | | | | | |
| Grants and subsidies . . . . . . . . . . . . . . | 1,197,664 | 1,217,157 | 1,156,498 | 1,251,879 | 1,328,511 | 1,327,221 |
| Personal services . . . . . . . . . . . . . . . . | 1,332,459 | 1,405,472 | 1,418,697 | 1,559,152 | 1,805,996 | 2,248,849 |
| Other services . . . . . . . . . . . . . . . . . . | 348,237 | 448,239 | 453,658 | 492,653 | 579,568 | 549,226 |
| Materials and supplies . . . . . . . . . . . . . | 60,118 | 67,474 | 59,741 | 64,945 | 82,701 | 71,049 |
| Equipment purchased . . . . . . . . . . . . . . | 26,834 | 31,152 | 43,939 | 41,885 | 54,288 | 189,096 |
| Capital outlays . . . . . . . . . . . . . . . . . | 50,490 | 41,235 | 13,850 | 40,646 | 34,691 | 0 |
| Other debt service . . . . . . . . . . . . . . . | 194,275 | 146,304 | 86,183 | 87,750 | 0 | 163,717 |
| Transfers to agencies . . . . . . . . . . . . . . | 501,205 | 543,444 | 523,826 | 565,696 | 537,649 | 468,113 |
| Other expenditures . . . . . . . . . . . . . . . | 390,560 | 522,281 | 591,282 | 447,570 | 410,391 | 85,700 |
| Total expenditures . . . . . . . . . . . | 4,101,842 | 4,422,758 | 4,347,674 | 4,552,176 | 4,833,795 | 5,102,971 |
| | | | | | | |
| Adjusted revenues less expenditures . . . . . . . | (6,776) | (167,834) | (54,142) | 425,556 | 225,874 | (272,413) |
| | | | | | | |
| Ending cash balance . . . . . . . . . . . . . . | $ 105,475 | $ (62,359) | $(116,501) | $ 309,055 | $ 534,929 | $ 262,516 |

*(footnotes appear on following page)*

---

(1)        Budget, as proposed.

(2)        Consists of amounts to pay principal and interest on general obligation bonds and notes of the Commonwealth.  Does not include amounts deposited
           directly to the debt service fund from non-General Fund revenues.

(3)        Consists of moneys received by the Commonwealth from the reoffering of certain notes of the Sugar Corporation.

(4)        Consists of proceeds from Commonwealth tax and revenue anticipation notes issued in each such fiscal year.

(5)        Consists of repayment of Commonwealth tax and revenue anticipation notes in each such fiscal year.

*Source:* Department of Treasury.

*Estimated Fiscal 1996 Compared to Fiscal 1995*

General Fund estimated total revenues for fiscal 1996 are forecast at $5,131 million, an increase of $50.8 million (1.0%) over fiscal 1995.  Major projected changes are:  an increase in income taxes of $33.0; an increase in excise taxes of $65.6 million; and decreases of $38.1 million in customs and $8.7 million in miscellaneous non-tax revenues.

Total projected expenditures for fiscal 1996 are estimated to increase by $305.9 million.  The ending cash balance for the General Fund for fiscal year 1996 is estimated to be reduced by $314.1 million.

*Fiscal 1995 Compared to Fiscal 1994*

General Fund total revenues for fiscal 1995 were $5,080 million, an increase of $414.7 million (8.17%) over fiscal 1994.  Major changes were the following:  total income taxes and excise taxes increased by $364.8 million and $51.9 million, respectively.

Total expenditures for fiscal 1995 increased by $281.6 million (6.2%), when compared to fiscal 1994.  The ending cash balance for the General Fund for fiscal 1995 increased by $225.8 million.

*Fiscal 1994 Compared to Fiscal 1993*

General Fund total revenues for fiscal 1994 were $4,665 million, an increase of $640 million (15.9%) over fiscal 1993.  Major changes were the following:  total income taxes, excise taxes, federal excise taxes and customs increased by $454.9 million, $132.9 million, $17.5 million and $32.7 million, respectively.

Total expenditures for fiscal 1994 increased by $204.5 million (4.7%) when compared to fiscal 1993.  The ending cash balance for the General Fund for fiscal 1994 increased by $425.6 million as compared to fiscal 1993.

*Fiscal 1993 Compared to Fiscal 1992*

General Fund total revenues for fiscal 1993 were $4,025 million, an increase of $164.2 million (4.25%) over fiscal 1992.  Major changes were the following: total income taxes and excise taxes increased by $65.6 million and $109.2 million, respectively, and federal excise taxes decreased by $27.3 million.

Beginning in fiscal 1992, municipal property taxes were no longer included as revenue of the General Fund.  This revenue source was transferred to the municipalities pursuant to Act No. 80.

In general terms, the revenue increase for fiscal 1993 was tied to the economic expansion projected for fiscal 1993. The economy of the Commonwealth of Puerto Rico grew at a real rate of 3.1% for fiscal 1993.

Total expenditures for fiscal 1993 decreased to $4,347.7 million, a 1.7% decrease, when compared to fiscal 1992. The ending cash balance for the General Fund for fiscal 1993 decreased by $54.1 million as compared with fiscal 1992.

*Fiscal 1992 Compared to Fiscal 1991*

Total revenues for fiscal 1992 were 0.5% below fiscal 1991. This was due to the transfer of municipal property taxes to the municipalities under Act No. 80. Although this was partly offset by minor increases in income taxes, excise taxes and licenses, there were slight decreases in revenues from customs duties and federal excise taxes. The ending cash balance for the General Fund for fiscal 1992 decreased by $167.8 million as compared with fiscal 1991.

Total expenditures for fiscal 1992 were $4,422.8 million, compared with $4,101.8 million for fiscal 1991, a 7.8% increase. This increase resulted from a $73 million increase in personal services due to salary increases granted to government employees and increases in public pension contributions and a $131.7 million increase in other expenditures primarily due to certain accounting adjustments.

**Major Sources of General Fund Revenues**

*Income Taxes*

The Commonwealth's Internal Revenue Code of 1994 (the "1994 Internal Revenue Code"), adopted on October 31, 1994, imposes a tax on the income of individual residents of Puerto Rico, trusts, estates, and domestic and foreign (if engaged in a trade or business in Puerto Rico) corporations and partnerships. The 1994 Internal Revenue Code represented a major revision to the existing income tax structure. The purpose of the 1994 Internal Revenue Code is to establish a more equitable tax structure that lowers tax rates and simplifies and enhances compliance.

*Individuals.* Resident individuals are subject to tax on their taxable income from all sources. Prior to the 1994 Internal Revenue Code, the five tax bracket rates for individuals ranged from 9% to 36%. The 1994 Internal Revenue Code maintains five tax brackets but reduces tax rates to 8%, 12%, 18%, 31% and 33%. However, blended rates are applicable for 1995 to give effect to these rate reductions after June 30, 1995. Dividend income from Puerto Rico sources, previously taxed at the rate of 20%, is now taxed at a rate of 10%. Gains realized from the sale or exchange of a capital asset, if held for more than 6 months, are taxed at a rate of 20%.

Interest income in excess of $2,000 on deposits with Puerto Rico financial institutions is taxed at a rate of 17%; the first $2,000 of interest income is exempt from taxation. In addition, certain deductions and exclusions were expanded. These changes are effective for taxable years commencing after June 30, 1995.

*Corporations and Partnerships.* Puerto Rico corporations and partnerships are subject to tax on income from whatever source; foreign corporations and partnerships that are engaged in a trade or business in Puerto Rico are subject to tax on their income from Puerto Rico sources and on income from sources outside Puerto Rico that is effectively connected with the conduct of a trade or business in Puerto Rico. Unless a corporation or partnership qualifies for partial exemption from corporate income and other taxes under the industrial incentives program (see "Tax Incentives" under *The Economy*), it is subject to tax at graduated rates.

I-37

The 1994 Internal Revenue Code maintains the six income tax brackets for corporations and partnerships, with a reduction in tax rates being effective July 1, 1995. The 1994 Internal Revenue Code provides for the highest rate applicable to taxable income in excess of $275,000 to be 39%, a 3% reduction from prior law. Certain corporations and partnerships covered by the tax incentives act will continue to be subject to a maximum tax rate of 45% on their taxable income. Corporations and partnerships covered by the Puerto Rico Tourism Incentives Acts will be subject to a maximum tax rate of 42% on their taxable income. The 1994 Internal Revenue Code maintains the alternative minimum tax at 22%.

The 1994 Internal Revenue Code maintains the branch profits tax applicable to resident foreign corporations. The tax is, however, reduced to 10% (from 25%) of an annual dividend equivalent amount, and it applies without regard to the Puerto Rico source of income rules.

Interest from Puerto Rico sources paid to non-resident corporate recipients generally are no longer subject to any withholding tax. The basic tax on dividends paid to foreign corporate shareholders of Section 936 Corporations is 10% but is subject to reduction with respect to dividends paid from profits invested in certain eligible instruments for specified periods of time. Gains realized from the sale or exchange of a capital asset, if held for more than six months, is taxed at a maximum rate of 25%. Payments in excess of $1,000 made by the Government of Puerto Rico and persons engaged in a trade or business in consideration of the receipt of services are now subject to a 7% withholding tax.

*Excise Taxes*

Puerto Rico imposes a tax on articles and commodities that are imported into or manufactured in Puerto Rico for consumption in Puerto Rico and a tax on certain transactions, such as hotel occupancy, public shows, and horse racing. The excise tax on certain articles and commodities, such as cigarettes and petroleum products, is based upon the quantity of goods imported. The excise tax on motor vehicles is based on the suggested retail prices. The Excise Tax Act imposes a tax at an effective rate of 6.6% of the F.O.B. factory price for imported goods and 3.6% of the sales price of goods manufactured in Puerto Rico, except sugar, cement, cigarettes, motor vehicles and certain petroleum products which are taxed at different rates. The Excise Tax Act contains no exemption applicable to goods to be used by the government, except for motor vehicles and construction equipment. Exemptions apply to certain articles, such as food and medicines, and to articles designated for certain users.

*Other Taxes and Revenues*

Motor vehicle license plate and registration fees comprise the major portion of license tax receipts.

Non-tax revenues consist principally of lottery proceeds, documentary stamps, permits, fees and forfeits, proceeds of land sales and receipts from certain public corporations in lieu of taxes.

Revenues from non-Commonwealth sources include customs duties collected in Puerto Rico and excise taxes on shipments of alcoholic beverages from the island to the mainland United States. The customs duties and excise taxes on shipments are imposed and collected by the United States and returned to the Commonwealth.

*Property Taxes*

Personal property, which accounts for approximately 37% of total assessed valuation of taxable property, is self-assessed. Real property taxes are currently assessed at 1958 values. No real property reassessment has been made since 1958, and construction taking place after that year has been assessed on the basis of what the value of the property would have been

in 1958. Accordingly, the overall assessed valuation of real property for taxation purposes is substantially lower than the actual market value. Also, an exemption on the first $15,000 of assessed valuation in owner-occupied residences is available.

On August 30, 1991, legislation was adopted in the Commonwealth providing a municipal reform program which involves the creation of the Municipal Revenues Collection Center to collect property taxes. The program transfers the previous functions of the Department of the Treasury with respect to real and personal property tax assessment, notification, determination and collection to the Municipal Revenues Collection Center, as of July 1, 1993. Special provisions have been made so that $1.03 per $100 of property tax collections continues to be deposited in the Redemption Fund.

<div align="center">

**Commonwealth of Puerto Rico**
**Assessed Valuations and Real and Personal Property Taxes**
**(Commonwealth and Municipalities Combined)**
**(in thousands)**

</div>

| Fiscal Year Ended June 30 | Assessed Valuations(1) | Taxes Levied | Collections of Current Year | Collections of Previous Years | Total |
|---|---|---|---|---|---|
| 1991 . . . . . . . . . . . . . . . . . . . . . . . . | $11,359,276 | $374,834 | $275,603 | $76,015 | $351,618 |
| 1992 . . . . . . . . . . . . . . . . . . . . . . . . | 11,209,804 | 368,209 | 276,185 | 22,234 | 298,419 |
| 1993 . . . . . . . . . . . . . . . . . . . . . . . . | 11,337,421 | 378,750 | 267,220 | 21,579 | 288,799 |
| 1994 . . . . . . . . . . . . . . . . . . . . . . . . | 11,735,626 | 443,448 | 329,058 | 32,654 | 361,712 |
| 1995 . . . . . . . . . . . . . . . . . . . . . . . . | 12,508,656 | 508,275 | 376,567 | 36,299 | 412,866 |

_____

(1)   Valuation set as of January 1 of preceding fiscal year.

*Source:* Municipal Revenues Collection Center.

**Collections of Income and Excise Taxes**

The Department of the Treasury has continued its program for improving tax collections which began in fiscal 1986. The program has consisted, in part, of taking the initiative in sponsoring and implementing tax reform, particularly in the areas of excise taxes and income taxes, in order to decrease the incidences of nonpayment of taxes and to expand the taxpayer base. The program has also included (a) improving the methods by which delinquent taxpayers are identified, primarily through the use of computer analyses, (b) computerizing the processing of tax returns, and (c) identifying and eliminating taxpayer abuses of the existing tax laws.

**Transfers to General Obligation Debt Service Fund**

These consist of transfers from the General Fund to the Debt Service Fund for the amortization of the principal of and interest on general obligation bonds and notes of the Commonwealth.

**Components of General Fund Expenditures**

*Grants and Subsidies*

This category includes grants and contributions to municipalities, public corporations with independent treasuries and contributions to charitable institutions. It also includes items for or included in court awards, damage awards for personal injury or property damage as well as payment of taxes and payment in lieu of taxes.

*Personal Services*

This category includes compensation paid for personal services rendered to the Commonwealth and its public instrumentalities by individuals or firms in the form of salaries, wages, per diems, fees, commissions or other forms of compensation.

*Other Services*

This category includes the payment of services other than the services referred to above, including advertising, printing, communication services, legal expenses, utility services, building and equipment rental and maintenance expenses, insurance premiums and miscellaneous services.

*Materials and Supplies*

This category includes all articles which ordinarily have short life and durability, lose their characteristic identity in the process of use, have only nominal value ($25 or less), or are not otherwise chargeable as equipment.

*Equipment Purchases*

The category includes items which have three special characteristics which distinguish them from materials; durability, long useful life and high unit cost. In addition, these items are subject to centralized inventory control as fixed assets.

*Capital Outlays*

This category includes the acquisition of land and interests in land, the construction of buildings, roads and bridges, and other structures, as well as permanent improvements and additions.

*Other Debt Service*

Includes payments for the amortization of the principal of and interest on non-general obligation special promissory notes to be paid from collections of past due taxes and, if necessary, from Commonwealth appropriations received in and after fiscal 1990 and payments on notes to Government Development Bank to be paid from the balance in the General Fund.

*Transfers to Agencies*

Includes repayment of loans and advances to other funds, certain refunds, advances from other funds and other receipts, repayment of advances from other funds, grants and contributions to other funds under the custody of the Secretary of the Treasury and other items. The major portion of grants and contributions in recent fiscal years consists of transfers to the Health Facilities and Services Administration and advances to the municipalities.

**Federal Grants**

The Commonwealth receives federal grants under numerous programs. The following table presents revenues from federal grants by broad program areas which are accounted in the central accounting system of the Treasury Department.

**Commonwealth of Puerto Rico**
**Federal Grants**
(in thousands)
Fiscal Year Ending June 30

|  | 1994 | 1995 | 1996(p) | 1997(1) |
|---|---|---|---|---|
| Education . . . . . . . . . . . . . . . . . . | $ 427,407 | $ 473,400 | $ 516,180 | $ 473,844 |
| Social Services . . . . . . . . . . . . . . . | 1,329,671 | 1,439,248 | 1,474,517 | 1,479,880 |
| Health . . . . . . . . . . . . . . . . . . . . . | 399,056 | 392,547 | 388,301 | 385,580 |
| Labor and Human Resources . . . . . . . | 32,942 | 39,186 | 40,502 | 37,945 |
| Public Works and Transportation(2) . . | 45 | 330 | 20 | 0 |
| Crime . . . . . . . . . . . . . . . . . . . . . | 11,161 | 15,514 | 21,190 | 20,546 |
| Housing(3) . . . . . . . . . . . . . . . . . . | 201,695 | 221,605 | 223,167 | 209,369 |
| Drug and Justice . . . . . . . . . . . . . . . | 6,417 | 6,053 | 6,329 | 6,996 |
| Agriculture and Natural Resources . . . | 6,764 | 11,009 | 14,666 | 14,550 |
| Contributions to Municipalities . . . . . . | 61,801 | 65,893 | 66,389 | 66,346 |
| Other . . . . . . . . . . . . . . . . . . . . . . | 180,549 | 127,018 | 84,746 | 70,862 |
| TOTAL | $2,657,508 | $2,791,879 | $2,836,007 | $2,765,918 |

(p)   Preliminary.

(1)   Estimated.

(2)   Amounts of federal grants to the Highway and Transportation Authority are not included in the Public Works and Transportation area. For fiscal 1994, 1995, 1996 and 1997 the federal grants to this agency are $75.9 million, $90.8 million, $100.7 million and $134.6 million, respectively.

(3)   Amounts include grants to the Public Housing Administration.

## COMMONWEALTH BUDGET

**Office of Management and Budget**

The fundamental objective of the Office of Management and Budget ("OMB") is to improve and strengthen the relationship between policy formulation and budgetary and fiscal management. The law creating OMB also strengthened budgetary controls and created an Operational Audit Division with the primary function of evaluating government operations and programs.

The annual budget includes the public corporations as well as the Commonwealth government, however, the following describes only the Commonwealth budget.

**Budgetary Process**

The fiscal year of the Commonwealth begins on July 1. The Governor is constitutionally required to submit to the Legislature an annual balanced budget of capital improvements and operating expenses of the Commonwealth for the ensuing

fiscal year. The annual budget is prepared by OMB, working with the Planning Board, the Department of the Treasury, and other government offices and agencies. Section 7 of Article VI of the Constitution provides that "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

The annual budget, which is developed utilizing elements of program budgeting and zero-base budgeting, includes an estimate of revenues and other resources for the ensuing fiscal year under (i) laws existing at the time the budget is submitted and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board.

The Legislature may amend the budget submitted by the Governor but may not increase any items so as to cause a deficit without imposing taxes to cover such deficit. Upon passage by the Legislature, the budget is referred to the Governor who may decrease or eliminate any item but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislature with his objections. The Legislature, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the end of the fiscal year, the annual budget for the preceding fiscal year as originally approved by the Legislature and the Governor is automatically renewed for the ensuing fiscal year until a new budget is approved by the Legislature and the Governor. This permits the Commonwealth to continue to make payments of its operating and other expenses until a new budget is approved.

**Financial Control and Adjustment Procedures**

Revenue estimates for budgetary purposes are prepared by the Department of the Treasury, except for estimates of federal grants, which are prepared by OMB and various departments and other recipients of such grants. Revenue and federal grant estimates are under continuous review and, if necessary, are revised at least quarterly during the fiscal year. Fiscal control over expenditures is exercised severally by the Governor, through the Director of OMB, and the Secretary of the Treasury. Quarterly reviews and expenditure cut-off procedures are designed to prevent expenditures in excess of appropriations.

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislature a detailed report of any adjustment necessary to balance the budget, or make recommendations to the Legislature for new taxes, or take any other necessary action to meet the estimated deficiency, or authorize borrowings under provisions of existing legislation. Any such proposed adjustments shall give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority: first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain and certain commitments to protect the name, credit and good faith of the Commonwealth government; third, current expenditures in the areas of health, protection of persons and property, education, welfare and retirement systems; and fourth, all other purposes.

A Budgetary Fund was created by Act No. 147, as amended, approved by the Legislature of Puerto Rico on June 18, 1980 (the "Budgetary Fund Act"). The Budgetary Fund is used to cover the appropriations approved in any fiscal year in which the revenues available for such fiscal year are insufficient, to honor the public debt and to provide for unforeseen circumstances in the provision of public services. The Budgetary Fund Act was amended in 1994 to provide for annual legislative appropriations from the General Fund to be deposited in the Budgetary Fund in an amount not less than one third of one percent (.33%) of the total budgeted appropriations in the budget joint resolution. The maximum balance of the Budgetary Fund shall not exceed six percent (6%) of the total appropriations in the budget joint resolution for any fiscal year.

I-42

**Appropriations**

Appropriations in the Central Government Budget of the Commonwealth consist of the following:

(i)     General Fund appropriations for recurring ordinary operating expenses of the Central Government and for contributions to public corporations, municipalities, and private organizations. Such appropriations are made by a single annual law known as the Joint Resolution of the General Budget.

(ii)     General Fund appropriations for special operating expenses and for capital expenditures. Such appropriations are authorized by separate laws for one or more years for special programs or activities, which may be permanent or transitory.

(iii)     Disbursements of Special Funds for operating purposes and for capital improvements. For the most part, such disbursements do not require annual legislative authorization, because they are authorized by previous legislation or by the United States Congress. Federal grants constitute the major part of the resources of the Special Funds.

(iv)     Bond Fund appropriations for capital expenditures financed by bonds. Such expenditures may occur in one or more years.

In Puerto Rico, the Central Government has many functions which in the 50 states are the responsibility of local government, such as providing public education and police and fire protection. The Central Government also makes large annual grants to the University of Puerto Rico and to the municipalities. See "Property Taxes" under *Commonwealth Taxes, Other Revenues and Expenditures.* In the summaries of the budgets of the Central Government presented below, grants to the University of Puerto Rico are included in current expenses for education and debt service on general obligation bonds is included in current expenses for debt service. Debt service on Sugar Corporation notes paid by the Commonwealth is included in current expenses for economic development, and debt service on Urban Renewal and Housing Corporation bonds and notes and on Housing Bank and Finance Agency mortgage subsidy bonds paid by the Commonwealth is included in current expenses for housing.

Approximately 23.5% of the General Fund is committed, including debt service on direct debt of the Commonwealth and on the debt of the Sugar Corporation, municipal subsidies, grants to the University of Puerto Rico, contributions to Aqueduct and Sewer Authority and rental payments to Public Buildings Authority, among others.

Fiscal 1996 Budget

The following table presents a summary of the budget for the Commonwealth for the fiscal year ending June 30, 1996.

## COMMONWEALTH OF PUERTO RICO
### Summary of Central Government Annual Budget
### Fiscal Year Ending June 30, 1996
(in thousands)

| | General Fund | Bond Fund | Special Funds | Total |
|---|---:|---:|---:|---:|
| Resources: | | | | |
| Revenues from internal sources: | | | | |
| Property taxes | $0 | $0 | $65,000 | $65,000 |
| Personal income taxes | 1,589,000 | 0 | 0 | 1,589,000 |
| Retained non-resident income tax | 61,000 | 0 | 0 | 61,000 |
| Corporation income taxes | 1,370,000 | 0 | 0 | 1,370,000 |
| Partnership income taxes | 2,000 | 0 | 0 | 2,000 |
| Tollgate taxes | 192,000 | 0 | 0 | 192,000 |
| Interest subject to 17% withholding tax | 6,000 | 0 | 0 | 6,000 |
| Interest on dividend 20% withholding tax | 34,000 | 0 | 0 | 34,000 |
| Inheritance and gift taxes | 1,000 | 0 | 0 | 1,000 |
| Excise taxes: | | | | |
| Alcoholic beverages | 236,000 | 0 | 0 | 236,000 |
| Motor vehicles and accessories | 328,000 | 0 | 200 | 328,200 |
| Cigarettes | 118,000 | 0 | 0 | 118,000 |
| Special excise tax on certain petroleum products | 146,000 | 0 | 0 | 146,000 |
| General 5% Excise | 393,000 | 0 | 0 | 393,000 |
| Other | 97,000 | 0 | 59,700 | 166,700 |
| Licenses | 51,000 | 0 | 0 | 51,000 |
| Miscellaneous non-tax revenues: | | | | |
| Contributions from lottery fund | 61,000 | 0 | 0 | 61,000 |
| Electronic lottery | 57,000 | 0 | 0 | 57,000 |
| Registration and document certification fees | 85,000 | 0 | 0 | 85,000 |
| Other | 37,000 | 0 | 102,952 | 139,952 |
| Total revenues from internal sources | 4,864,000 | 0 | 237,852 | 5,101,852 |
| Revenues from non-Commonwealth sources: | | | | |
| Federal excise taxes on off-shore shipments | 193,000 | 0 | 14,200 | 207,200 |
| Federal grants | 0 | 0 | 2,836,007 | 2,836,007 |
| Customs | 74,000 | 0 | 0 | 74,000 |
| Total revenues from non-Commonwealth sources | 267,000 | 0 | 2,850,207 | 3,117,207 |
| Total revenues | 5,131,000 | 0 | 3,088,059 | 8,219,059 |
| Other: | | | | |
| Surplus from prior year appropriations and encumbrances | 5,000 | 0 | 0 | 5,000 |
| Miscellaneous income | 96,067 | 0 | 0 | 96,067 |
| Payment in lieu of taxes PRTC | 23,000 | 0 | 0 | 23,000 |
| Assets sales | 12,000 | 0 | 0 | 12,000 |
| Balance from previous year | 126,086 | 0 | 485,314 | 611,400 |
| Bonds authorized | 0 | 355,000 | 0 | 355,000 |
| Total other sources | 262,153 | 355,000 | 485,314 | 1,102,467 |
| Total resources | 5,393,153 | 355,000 | 3,573,373 | 9,321,526 |

I-44

Appropriations:

Current expenses:

| | | | |
|---|---:|---:|---:|---:|
| Reserve to reimburse the General Fund | $30,000 | $0 | $0 | $30,000 |
| General government | 536,050 | 0 | 21,667 | 557,717 |
| Education | 1,644,200 | 0 | 632,800 | 2,277,000 |
| Health | 907,320 | 0 | 419,681 | 1,327,001 |
| Welfare | 313,421 | 0 | 1,713,581 | 2,027,002 |
| Economic development | 350,711 | 0 | 36,936 | 387,647 |
| Public safety and protection | 832,323 | 0 | 57,540 | 889,863 |
| Transportation and communications | 81,808 | 0 | 4,566 | 88,374 |
| Housing | 58,032 | 0 | 126,210 | 184,242 |
| Contributions to municipalities | 240,768 | 0 | 2,381 | 243,149 |
| Special pension contributions | 22,638 | 0 | 0 | 22,638 |
| Debt service | 359,638 | 0 | 65,000 | 424,638 |
| Total appropriations—current expenses | 5,376,909 | 0 | 3,080,362 | 8,457,271 |
| Capital improvements | 0 | 355,000 | 168,856 | 523,856 |
| Total appropriations | 5,376,909 | 355,000 | 3,249,218 | 8,981,127 |
| Year-end balance | 16,244 | 0 | 324,155 | 340,399 |
| Total appropriations and year-end balance | $5,393,153 | $355,000 | $3,673,373 | $9,321,526 |

(a)  Does not include grants received by agencies whose accounting systems are not centralized in the Department of Treasury.

Sources:  Department of the Treasury resources and Office of Management and Budget as reported on March 14, 1996.

In the fiscal 1996 budget proposal revenues and other resources of all budgetary funds total $8,355,126,000 excluding balances from the previous fiscal year and general obligation bonds authorized.  The estimated net increase in General Fund revenues in fiscal 1996 is accounted for by increases in corporation income taxes (up $65,388,000), general 5% excise taxes (up $25,455,000), alcoholic beverages (up $13,813,000), personal income taxes (up $10,731,000), motor vehicles and accessories (up $8,324,000), special excise tax on certain petroleum products (up $6,407,000) and cigarettes (up $10,057,000); decreases in retained non-resident income taxes (down $18,072,000), tollgate taxes (down $28,873,000), customs (down $38,153,000) and other revenue decreases ($4,216,000).

Current expenses and capital improvements other than those financed by bonds of all budgetary funds total $8,626,127,000, an increase of $139,813,000 from fiscal 1995.  The major changes in General Fund expenditures by program categories in fiscal 1996 are: health (up $138,210,000), education (up $65,618,000), debt service (up $42,871,000), public safety and protection (up $9,780,000), special pension contributions (up $3,319,000), welfare (up $2,514,000), transportation and communications (down $8,475,000), contributions to municipalities (down $10,387,000), economic development (down $34,186,000), housing (down $58,365,000) and general government (down $115,131,000).

The general obligation bond authorization for the fiscal 1996 budget is $355,000,000.

**Fiscal 1997 Budget**

The following table presents a summary of the budget for the Commonwealth for the fiscal year ending June 30, 1997.

### COMMONWEALTH OF PUERTO RICO
### Summary of Central Government Annual Budget
### Fiscal Year Ended June 30, 1997
(in thousands)

| | General Fund | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| Resources: | | | | |
| Revenues from internal sources: | | | | |
| Property taxes | $0 | $0 | $65,000 | $65,000 |
| Personal income taxes | 1,744,000 | 0 | 0 | 1,744,000 |
| Retained non-resident income tax | 50,000 | 0 | 0 | 50,000 |
| Corporation income taxes | 1,452,000 | 0 | 0 | 1,452,000 |
| Partnership income taxes | 2,000 | 0 | 0 | 2,000 |
| Tollgate taxes | 204,000 | 0 | 0 | 204,000 |
| Interest subject to 17% withholding tax | 6,000 | 0 | 0 | 6,000 |
| Interest on dividend 20% withholding tax | 24,000 | 0 | 0 | 24,000 |
| Inheritance and gift taxes | 1,000 | 0 | 0 | 1,000 |
| Excise taxes: | | | | |
| Alcoholic beverages | 246,000 | 0 | 0 | 246,000 |
| Motor vehicles and accessories | 340,000 | 0 | 200 | 340,200 |
| Cigarettes | 122,000 | 0 | 0 | 122,000 |
| Special excise tax on certain petroleum products | 153,000 | 0 | 0 | 153,000 |
| General 5% Excise | 420,000 | 0 | 0 | 420,000 |
| Other | 102,000 | 0 | 73,025 | 175,025 |
| Licenses | 53,000 | 0 | 0 | 53,000 |
| Miscellaneous non-tax revenues: | | | | |
| Contributions from lottery fund | 62,000 | 0 | 0 | 62,000 |
| Electronic lottery | 60,000 | 0 | 0 | 60,000 |
| Registration and document certification fees | 86,000 | 0 | 0 | 86,000 |
| Other | 40,000 | 0 | 48,935 | 88,935 |
| Total revenues from internal sources | 5,167,000 | 0 | 187,160 | 5,354,160 |
| Revenues from non-Commonwealth sources: | | | | |
| Federal excise taxes on off-shore shipments | 196,000 | 0 | 14,400 | 210,400 |
| Federal grants | 0 | 0 | 2,765,918 | 2,765,918 |
| Customs | 71,000 | 0 | 0 | 71,000 |
| Total revenues from non-Commonwealth sources | 267,000 | 0 | 2,780,318 | 3,047,318 |
| Total revenues | 5,434,000 | 0 | 2,967,478 | 3,401,478 |
| Other: | | | | |
| Surplus from prior year appropriations and encumbrances | 0 | 0 | 0 | 0 |
| Miscellaneous income | 48,975 | 0 | 0 | 48,975 |
| Payment in lieu of taxes PRTC | 33,000 | 0 | 0 | 33,000 |
| Assets sales | 25,000 | 0 | 0 | 25,000 |
| Balance from previous year | 16,243 | 0 | 324,155 | 340,398 |
| Bonds authorized | 0 | 355,000 | 0 | 355,000 |
| Total other sources | 123,218 | 355,000 | 324,155 | 802,373 |
| Total resources | $5,557,218 | $355,000 | $3,291,633 | $9,203,851 |

Appropriations:

| Current expenses: | | | | |
|---|---|---|---|---|
| General government | $540,390 | $0 | $22,904 | $563,294 |
| Education | 1,759,014 | 0 | 555,044 | 2,314,058 |
| Health | 823,742 | 0 | 400,897 | 1,224,030 |
| Welfare | 340,718 | 0 | 1,657,207 | 1,997,925 |
| Economic development | 316,701 | 0 | 35,227 | 351,928 |
| Public safety and protection | 942,319 | 0 | 56,959 | 999,278 |
| Transportation and communications | 82,226 | 0 | 4,468 | 86,694 |
| Housing | 88,780 | 0 | 128,931 | 215,711 |
| Contributions to municipalities | 262,241 | 0 | 2,338 | 264,579 |
| Special pension contributions | 28,087 | 0 | 0 | 28,087 |
| Debt service | 375,000 | 0 | 65,000 | 440,000 |
| Total appropriations-current expenses | 5,557,218 | 0 | 2,928,975 | 8,486,193 |
| Capital improvements | 0 | 355,000 | 152,082 | 507,082 |
| Total appropriations | 5,557,218 | 355,000 | 3,081,057 | 8,993,275 |
| Year end balance | 0 | 0 | 210,576 | 210,576 |
| Total appropriations and year-end balance | $6,667,218 | $355,000 | $3,291,633 | $9,203,851 |

(a)  Does not include grants received by agencies whose accounting systems are not centralized in the Department of Treasury.

Sources:  Department of the Treasury resources and Office of Management and Budget as reported on March 14, 1996.

In the fiscal 1997 budget proposal revenues and other resources of all budgetary funds total $8,508,455,000 excluding balances from the previous fiscal year and general obligation bonds authorized.  The estimated net increase in General Fund revenues in fiscal 1997 are accounted for by increases in personal income taxes (up $155,000,000), corporation income taxes (up $82,000,000), general 5% excise taxes (up $27,000,000), motor vehicles and accessories (up $12,000,000), tollgate taxes (up $12,000,000), alcoholic beverages (up $10,000,000), special excise tax on certain petroleum products (up $7,000,000) and other revenues increase (up $9,000,000); decrease in retained non-resident income taxes (down $11,000,000).

Current expenses and capital improvements other than those financed by bonds of all budgetary funds total $8,638,275,000, a decrease of $12,148,000 from fiscal 1996.  The major changes in General Fund expenditures by program category in fiscal 1997 are: education (up $114,814,000), public safety and protection (up $109,996,000), housing (up $28,748,000), welfare (up $27,297,000), contributions to municipalities (up $21,473,000), debt service (up $15,362,000), special pension contributions (up $5,449,000), general government (up $4,340,000), transportation and communications (up $418,000), reserve to reimburse the General Fund (down $30,000,000), economic development (down $34,010,000), and health (down $83,578,000).

The general obligation bond authorization for the fiscal 1997 budget is $355,000,000.

I-47

**Differences between Budget and General Purpose Financial Statements**

Revenues and expenditures, as reported by the Department of the Treasury in its General Purpose Financial Statements, may differ substantially from resources and appropriations in the annual budget for a number of reasons, including the following:

(i) The budgetary accounts are on a cash basis, while the financial statements prepared by the Department of the Treasury include accruals and other adjustments as required by government accounting standards.

(ii) Expenditures for current purposes in a particular fiscal year may include amounts appropriated for earlier periods but not previously expended and, conversely, may exclude amounts appropriated for such fiscal year but not expended until later periods.

(iii) Bonds are authorized by the Commonwealth in accordance with a four-year capital improvement program. Since bond sales are determined by bond market conditions and other factors, the amount of bonds sold in any year does not necessarily equal the amount of bonds authorized in the budget for that year. Expenditures for capital improvements are financed by advances from the General Fund to the Capital Projects Fund, which are later reimbursed from proceeds of bond or note sales.



**Deloitte &
Touche LLP**

Hato Rey Tower - Suite 1200          Telephone: (809) 759-7171
268 Muñoz Rivera Avenue           Facsimile: (809) 756-6340
San Juan, PR 00918-2511

## INDEPENDENT AUDITORS' REPORT

The Honorable Governor of the
Commonwealth of Puerto Rico
San Juan, Puerto Rico

(1)  We have audited the accompanying general purpose financial statements of the Commonwealth of
Puerto Rico (the Commonwealth) as of June 30, 1995, and for the year then ended, listed in the
foregoing table of contents.  These general purpose financial statements are the responsibility of the
management of the Commonwealth.  Our responsibility is to express an opinion on these general
purpose financial statements based on our audit.  We did not audit the financial statements of the
Public University funds, the Office for the Liquidation of the Accounts of the Puerto Rico Urban
Renewal and Housing Corporation, and of the following component units.  Except as discussed in
paragraphs three and four, those statements were audited by other auditors whose reports (which as to
the University of Puerto Rico is qualified because of the matter discussed in paragraph five) have been
furnished to us, and our opinion, insofar as it relates to the amounts included for the Public University
funds, the Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing
Corporation, and the other component units, is based solely on the reports of the other auditors:

- Puerto Rico Highway and Transportation Authority, a blended component unit, which represents
  the following indicated percentages of total assets and total revenues, respectively, of the debt
  service funds (35.7% and 50%), the capital projects funds (10.3% and 70.2%), the enterprise
  funds (6% and .3%); total assets of the general fixed assets account group (1.9%); and of total
  liabilities of the long-term debt account group (11.3%).

- Health Facilities and Services Administration of Puerto Rico, a blended component unit, which
  represents 55.2% and 21.7%, respectively, of total assets and total revenues of the enterprise
  funds.

- Entities identified in Note 2, which are presented as component units - other, represent 65.7% and
  56.8%, respectively, of the total assets and total revenues of the component units - other column.

(2)  We conducted our audit in accordance with generally accepted auditing standards.  Those standards
require that we plan and perform the audit to obtain reasonable assurance about whether the general
purpose financial statements are free of material misstatement.  An audit includes examining, on a test
basis, evidence supporting the amounts and disclosures in the general purpose financial statements.
An audit also includes assessing the accounting principles used and significant estimates made by
management, as well as evaluating the overall financial statement presentation.  We believe that our
audit and the reports of other auditors provide a reasonable basis for our opinion.

**Deloitte Touche
Tohmatsu
International**

(3)   The auditors of the Health Facilities and Services Administration of Puerto Rico, a component unit blended in the enterprise funds, were unable to extend audit procedures sufficient to substantiate financial statement assertions for approximately $178 million of net patient service revenues for the year ended June 30, 1995, approximately $43 million of accounts receivable, approximately $21 million of inventories and approximately $18 million due from the Federal Government as of June 30, 1995.

(4)   The auditors of the Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation were unable to confirm or otherwise satisfy themselves as to the net realizable value of approximately $55 million of housing units and land lots held for sale at June 30, 1995.

(5)   As discussed in Note 14 to the general purpose financial statements, the University of Puerto Rico (the University) accounts for pension costs on a predetermined basis. In the opinion of the auditors of the University, generally accepted accounting principles require that pension costs be accounted for on the accrual method based on actuarial determinations. If such amount had been accrued in accordance with generally accepted accounting principles, the expenditures for the year ended June 30, 1995 would have increased by approximately $4 million, and the fund balance would have decreased by approximately $174 million at June 30, 1995.

(6)   In our opinion, based on our audit and on the reports of the other auditors, except for the effects on the June 30, 1995 financial statements of accounting for pension costs as discussed in the preceding paragraph, and the effects of such adjustments, if any, as might have been determined to be necessary:

- had such other auditors of the Health Facilities and Services Administration of Puerto Rico been able to satisfy themselves about net patient service revenues, accounts receivable, inventories and amounts due from the Federal Government reported in the enterprise funds; and

- had such other the auditors of the Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation been able to satisfy themselves about the net realizable value of the housing units and land lots held for sale

the general purpose financial statements referred to in paragraph one present fairly, in all material respects, the financial position of the Commonwealth of Puerto Rico as of June 30, 1995 and the results of its operations and the cash flows of its proprietary fund types, similar trust funds and discretely presented component units-other for the year then ended in conformity with generally accepted accounting principles.

(7)   As discussed in Notes 1, 8 and 11 to the general purpose financial statements in fiscal 1995:

- the Commonwealth changed its financial reporting policies regarding the blending method for the Public Buildings Authority and the Puerto Rico Land Administration

- the Commonwealth changed its capitalization policy for financial reporting purposes for equipment owned by the Central Government of the Commonwealth to $100,000 per unit.

- the Puerto Rico Telephone Authority changed its method of accounting for pension costs to conform Accounting Principles Board Opinion No. 8, *Accounting for the Costs of Pension Plans*

- the Puerto Rico Electric Power Authority changed its method of accounting for risk financing and insurance to conform to Governmental Accounting Standards Board Statement No. 10, *Accounting and Financial Reporting for Risk Financing and Related Insurance Issues,*

and, accordingly, the July 1, 1994 opening balances of the Commonwealth have been retroactively restated for these changes.

- 2 -

(8) As discussed in Note 11 to the general purpose financial statements the beginning fund balances/retained earnings of the enterprise funds, expendable trust funds, pension trust funds, public university funds and component units-other have been restated to correct for accounting errors.

(9) As discussed in Note 1 to the general purpose financial statements, the Commonwealth approved the liquidation of the Puerto Rico Urban Renewal and Housing Corporation (PRURHC), through the Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation. The Commonwealth may be contingently responsible for the settlement of any liabilities that are not satisfied by the liquidation of PRURHC's assets.

(10) As discussed in Note 1 to the general purpose financial statements, on March 3, 1995 the Commonwealth sold its maritime transportation business, formerly administered by the Puerto Rico Maritime Shipping Authority (PRMSA), a discretely presented component unit. As part of the sale agreement, the Commonwealth assumed liabilities for approximately $292 million due by PRMSA which are recorded as liabilities in the general long-term debt account group.

(11) Our audit was conducted for the purpose of forming an opinion on the general purpose financial statements taken as a whole. The combining and individual fund and account group financial statements and schedules listed in the table of contents, are presented for the purpose of additional analysis and are not a required part of the general purpose financial statements of the Commonwealth. These financial statements and schedules are also the responsibility of the management of the Commonwealth. Such additional information has been subjected to the auditing procedures applied in our audit of the general purpose financial statements and based on our audit and the reports of other auditors, in our opinion, except for the effects of adjustments, which may be necessary as discussed in paragraphs three, four and five, is fairly stated in all material respects when considered in relation to the general purpose financial statements taken as a whole.

(12) The introductory and statistical sections of this report listed in the table of contents are presented for purposes of additional analysis and are not a required part of the general purpose financial statements of the Commonwealth. Such additional information has not been subjected to the auditing procedures applied in the audit of the general purpose financial statements and, accordingly, we express no opinion on it.

*Deloitte & Touche LLP*

December 1, 1995
(January 22, 1996 as to Notes 19 and 20)

Stamp No.
affixed to original.

- 3 -

**COMMONWEALTH OF PUERTO RICO**

COMBINED BALANCE SHEET - ALL FUND TYPES, ACCOUNT GROUPS AND DISCRETELY PRESENTED COMPONENT UNITS
JUNE 30, 1995 (Expressed in Thousands)

| ASSETS AND OTHER DEBITS | Governmental Fund Types | | | Proprietary Fund Types | | Fiduciary Fund Types | Account Groups | | Totals Primary Government (Memorandum Only) | Component Units | | | Totals Reporting Entity (Memorandum Only) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | General | Debt Service | Capital Projects | Enterprise | Internal Service | Trust and Agency | General Fixed Assets | General Long-Term Debt | | Public University Funds | Office for the Liquidation | Other | |
| **Assets:** | | | | | | | | | | | | | |
| Cash, cash equivalents and investments | $ 59,186 | $ 250,449 | $ 92,141 | $ 35,626 | $3,793,663 | $2,094,808 | $ | $ | $ 6,325,873 | $ 450,531 | $ 589 | $ 1,225,215 | $ 8,002,208 |
| Cash, cash equivalents and investments in governmental banks | 821,818 | 283,929 | 431,032 | 14,775 | | 1,032,433 | | | 2,583,987 | 16,343 | 19,777 | 1,017,484 | 3,637,591 |
| Receivables, net: | | | | | | | | | | | | | |
| Taxes | 79,558 | | | | | 59,737 | | | 139,295 | | | | 139,295 |
| Intergovernmental | 52,585 | | 19,782 | 17,696 | | | | | 90,063 | | | 9,126 | 99,189 |
| Accounts | 16,530 | 58,856 | | 42,251 | | 41,812 | | | 159,449 | 2,878 | | 807,935 | 970,262 |
| Loans and advances | 81,976 | | 16,675 | | 239,286 | 539,236 | | | 877,173 | 108,402 | 35,997 | 116,579 | 1,138,151 |
| Accrued interest | 1,192 | 6,912 | 2,456 | | 95,402 | 13,319 | | | 119,281 | 3,605 | 380 | 30,823 | 154,089 |
| Other | 7,141 | 5,000 | 23,425 | 2,017 | | 74,708 | | | 112,291 | 5,603 | 16 | 27,404 | 145,314 |
| Due from: | | | | | | | | | | | | | |
| Other funds | 15,508 | 3,829 | 32,907 | 2,781 | 40,069 | 12,316 | | | 107,410 | | | | 107,410 |
| Primary government | | | | | | | | | | 50,059 | | 171,368 | 221,427 |
| Component units | | | | | | | | | | 17,425 | 2,382 | 31,788 | 51,595 |
| Other governmental entities | | | | | | | | | | | 1,776 | 59,583 | 61,359 |
| Advances to: | | | | | | | | | | | | | |
| Other funds | | | 18,025 | | 939,043 | | | | 957,068 | | | | 957,068 |
| Component units | | | | | 945,447 | | | | 945,447 | | | 355 | 945,802 |
| Other governmental entities | 37,684 | | | | 232,006 | | | | 269,690 | | | | 269,690 |
| Inventories | | | | 20,935 | | | | | 20,935 | 4,837 | | 404,414 | 430,186 |
| Restricted assets | 30,000 | 74,855 | 36,849 | 140,493 | 1,850,398 | | | | 2,132,595 | 28,698 | 18,320 | 2,137,434 | 4,317,047 |
| Housing units and land lots held for sale | | | 43,706 | | | | 78,997 | | 122,703 | | 203,708 | | 326,411 |
| Fixed assets, net | | | | 183,131 | | 19,632 | 2,007,347 | | 2,210,110 | 535,480 | 78 | 9,040,488 | 11,786,156 |
| Other assets | | | 6,825 | 1,443 | 30,105 | 21,065 | | | 59,438 | 68 | 977 | 144,699 | 205,182 |
| **Other Debits:** | | | | | | | | | | | | | |
| Amount available in debt service funds | | | | | | | | 208,512 | 208,512 | | | 373,175 | 581,687 |
| Amount to be provided for retirement of bonds and notes payable | | | | | | | | 6,783,249 | 6,783,249 | | | 11,359 | 6,794,608 |
| Amount to be provided for payment of due to other funds, accrued compensated absences, and other long-term liabilities | | | | | | | | 8,076,578 | 8,076,578 | | | 10,410 | 8,086,988 |
| **TOTAL ASSETS AND OTHER DEBITS** | $1,203,178 | $ 683,830 | $ 723,823 | $ 461,148 | $8,165,419 | $3,909,066 | $2,086,344 | $15,068,339 | $32,301,147 | $1,223,929 | $ 284,000 | $15,619,639 | $49,428,715 |

See notes to general purpose financial statements.

(Continued)

# COMMONWEALTH OF PUERTO RICO

**COMBINED BALANCE SHEET - ALL FUND TYPES, ACCOUNT GROUPS AND DISCRETELY PRESENTED COMPONENT UNITS**
**JUNE 30, 1995 (Expressed in Thousands)**

| LIABILITIES, EQUITY (DEFICIT) AND OTHER CREDITS | Governmental Fund Types — General | Debt Service | Capital Projects | Proprietary Fund Types — Enterprise | Internal Service | Fiduciary Fund Types — Trust and Agency | Account Groups — General Fixed Assets | General Long-Term Debt | Totals Primary Government (Memorandum Only) | Component Units — Public University Funds | Office for the Liquidation | Other | Totals Reporting Entity (Memorandum Only) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Liabilities:** | | | | | | | | | | | | | |
| Accounts payable and accrued liabilities | $386,265 | $10,130 | $160,429 | $137,986 | $66,764 | $97,499 | $ | $ | $859,073 | $32,411 | $2,202 | $2,153,156 | $3,046,842 |
| Tax refunds payable | 133,351 | | | | | | | | 133,351 | | | | 133,351 |
| Deposits | | | | | 4,291,694 | 17,059 | | | 4,308,753 | | 1,165 | 384,126 | 4,694,044 |
| Due to: | | | | | | | | | | | | | |
| Other funds | 55,626 | 28,357 | | 15,441 | | 7,986 | | | 107,410 | | | | 107,410 |
| Primary government | | | | | | | | | | | 65 | 12,722 | 12,787 |
| Component units | | | | 82,524 | | | | 129,126 | 211,650 | | | 40,578 | 252,228 |
| Other governmental entities | | | | | | | | 3,596 | 3,596 | | | 2,572 | 6,168 |
| Advances from: | | | | | | | | | | | | | |
| Primary government | | | | | | | | | | | 26,695 | 986,320 | 1,013,015 |
| Other funds | | | | 298,815 | | | | 870,741 | 1,169,556 | | | | 1,169,556 |
| Component units | | | | | | | | | | | 67,108 | 12,850 | 79,958 |
| Securities sold under agreement to repurchase | | | | | 78,515 | 10,904 | | | 89,419 | | | 616,438 | 705,857 |
| Interest payable | | 165,771 | 7,589 | 23,905 | 51,630 | | | | 248,895 | 2,781 | 20,002 | 152,637 | 424,315 |
| Deferred revenues | | | | 14,173 | | | | | 14,173 | | | 62,037 | 76,210 |
| Lottery prizes payable | | | | 142,513 | | | | | 142,513 | | | | 142,513 |
| Notes payable | | | 17,445 | 1,299,501 | | | | 30,424 | 1,347,370 | 185 | 61,868 | 279,857 | 1,689,280 |
| Bonds payable | | 264,805 | | 1,326,513 | | | | 6,961,337 | 8,552,655 | 345,732 | 80,230 | 5,724,362 | 14,622,749 |
| Accrued compensated absences | 4,415 | | 10,119 | 69,421 | 4,288 | 867 | | 625,790 | 714,900 | | 112 | 241,990 | 1,037,232 |
| Other liabilities | 15,741 | 1,255 | 11,830 | 19 | | 365,298 | | | 394,143 | | 10,054 | 18,782 | 423,189 |
| Other long-term liabilities | | | 1,625 | 89,675 | | | | 594,340 | 685,640 | | | 130,704 | 816,344 |
| Unfunded pension liability | | | | | | | | 5,852,985 | 5,852,985 | | | | 5,852,985 |
| Total liabilities | 595,398 | 470,318 | 209,037 | 874,472 | 7,118,905 | 499,613 | | 15,068,339 | 24,836,082 | 471,393 | 179,427 | 10,819,131 | 36,306,033 |
| **Equity (Deficit) and Other Credits:** | | | | | | | | | | | | | |
| Investment in general fixed assets | | | | | | | 2,086,344 | | 2,086,344 | 280,179 | | 241,651 | 2,608,174 |
| Contributed capital | | | | 28,486 | 1,025,000 | | | | 1,053,486 | | | 3,247,493 | 4,300,979 |
| Retained earnings (deficit) | | | | (441,810) | 21,904 | | | | (419,906) | | | 1,063,659 | 643,753 |
| Unrealized gain (loss) in value of debt securities | | | | | (390) | | | | (390) | | | 19,496 | 19,096 |
| Net assets in liquidation | | | | | | | | | | | 96,298 | | 96,298 |
| Fund balances: | | | | | | | | | | | | | |
| Reserved for: | | | | | | | | | | | | | |
| Encumbrances | 146,783 | | 25,956 | | | 2,744 | | | 175,483 | 25,542 | | 4,025 | 205,050 |
| Debt service | | 208,512 | | | | | | | 208,512 | 20,712 | | 77,762 | 306,986 |
| Employees retirement | | | | | | 2,471,526 | | | 2,471,526 | 382,934 | | | 2,854,460 |
| Unemployment benefits | | | | | | 861,299 | | | 861,299 | | | | 861,299 |
| Advances and other specified purposes | 17,197 | 5,000 | 202,278 | | | 13,414 | | | 237,889 | 8,107 | 8,275 | 72,712 | 326,983 |
| Unreserved | 443,800 | | 286,552 | | | 60,470 | | | 790,822 | 35,062 | | 73,720 | 899,604 |
| Total equity (deficit) and other credits | 607,780 | 213,512 | 514,786 | (413,324) | 1,046,514 | 3,409,453 | 2,086,344 | | 7,465,065 | 752,536 | 104,573 | 4,800,508 | 13,122,682 |
| **TOTAL LIABILITIES, EQUITY (DEFICIT) AND OTHER CREDITS** | $1,203,178 | $683,830 | $723,823 | $461,148 | $8,165,419 | $3,909,066 | $2,086,344 | $15,068,339 | $32,301,147 | $1,223,929 | $284,000 | $15,619,639 | $49,428,715 |

See notes to general purpose financial statements.

(Concluded)

## COMMONWEALTH OF PUERTO RICO

**COMBINED STATEMENT OF REVENUES, EXPENDITURES AND CHANGES IN FUND BALANCES -
ALL GOVERNMENTAL FUND TYPES AND EXPENDABLE TRUST FUNDS
YEAR ENDED JUNE 30, 1995 (Expressed in Thousands)**

| | Governmental Fund Types | | | Fiduciary Fund Type | Totals (Memorandum Only) |
|---|---|---|---|---|---|
| | General | Debt Service | Capital Projects | Expendable Trust | |
| **REVENUES:** | | | | | |
| Taxes: | | | | | |
| Income | $ 3,242,876 | $ | $ | $ | $ 3,242,876 |
| Excise | 1,488,141 | 176,388 | | | 1,664,529 |
| Unemployment | | | | 215,038 | 215,038 |
| Other | 56,556 | | | | 56,556 |
| Charges for services | 142,506 | 299,575 | 13,419 | 4,890 | 460,390 |
| Intergovernmental | 2,335,891 | 65,348 | 91,204 | 54,557 | 2,547,000 |
| Other | 120,380 | 18,670 | 30,975 | 52,489 | 222,514 |
| Total revenues | 7,386,350 | 559,981 | 135,598 | 326,974 | 8,408,903 |
| **EXPENDITURES:** | | | | | |
| Current: | | | | | |
| General government | 451,275 | | | | 451,275 |
| Public safety | 878,673 | | | 43 | 878,716 |
| Health | 231,212 | | | 1,815 | 233,027 |
| Public housing and welfare | 1,681,688 | | | 336,747 | 2,018,435 |
| Education | 1,760,784 | | | | 1,760,784 |
| Economic development | 154,796 | | | 334 | 155,130 |
| Intergovernmental | 207,389 | | | | 207,389 |
| Capital outlay | 63,077 | | 785,724 | 10,645 | 859,446 |
| Debt service: | | | | | |
| Principal | 380,299 | 279,834 | | 196 | 660,329 |
| Interest and other | 27,654 | 407,245 | 650 | 963 | 436,512 |
| Total expenditures | 5,836,847 | 687,079 | 786,374 | 350,743 | 7,661,043 |
| Excess (deficiency) of revenues over (under) expenditures | 1,549,503 | (127,098) | (650,776) | (23,769) | 747,860 |
| **OTHER FINANCING SOURCES (USES):** | | | | | |
| Proceeds from long-term debt issues | | | 324,906 | | 324,906 |
| Proceeds of refunding bonds | | 92,975 | | | 92,975 |
| Advances from internal service fund | 207,893 | | 127,808 | | 335,701 |
| Operating transfers-in from other funds | 238,296 | 372,843 | 225,106 | 8,600 | 844,845 |
| Other sources | 28,813 | | 81,164 | 874 | 110,851 |
| Operating transfers-out to other funds | (983,743) | (243,313) | (72,736) | (8,100) | (1,307,892) |
| Operating transfers-out to component units | (927,510) | | (79,635) | | (1,007,145) |
| Payment of refunded bond escrow agent | | (91,318) | | | (91,318) |
| Capital leases | 1,207 | | | | 1,207 |
| Other uses | (21,283) | (1,867) | (94,897) | (7,709) | (125,756) |
| Total other financing sources (uses) | (1,456,327) | 129,320 | 511,716 | (6,335) | (821,626) |
| Excess (deficiency) of revenues and other financing sources over (under) expenditures and other financing uses | 93,176 | 2,222 | (139,060) | (30,104) | (73,766) |
| FUND BALANCES AT BEGINNING OF YEAR (as restated) | 514,604 | 186,867 | 653,846 | 968,031 | 2,323,348 |
| RESIDUAL EQUITY TRANSFER | | 24,423 | | | 24,423 |
| FUND BALANCES AT END OF YEAR | $ 607,780 | $ 213,512 | $ 514,786 | $ 937,927 | $ 2,274,005 |

See notes to general purpose financial statements.

**COMMONWEALTH OF PUERTO RICO**

COMBINED STATEMENT OF REVENUES AND EXPENDITURES - BUDGET AND ACTUAL -
STATUTORY BASIS - GENERAL, DEBT SERVICE, AND CAPITAL PROJECTS FUNDS
YEAR ENDED JUNE 30, 1995 (Expressed in Thousands)

| | General Fund | | | Debt Service Fund | | | Capital Projects Fund | | |
|---|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance Favorable (Unfavorable) | Budget | Actual | Variance Favorable (Unfavorable) | Budget | Actual | Variance Favorable (Unfavorable) |
| REVENUES: | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| Income taxes | $ 3,202,000 | $ 3,221,119 | $ 19,119 | | | | | | |
| Intergovernmental taxes | 510 | 8,038 | 7,528 | | | | | | |
| Excise taxes | ◦1,450,500 | 1,432,531 | (17,969) | | 13,207 | 13,207 | | | |
| Other taxes | 52,883 | 56,030 | 3,147 | | | | | | |
| Charges for services | 98,892 | 94,670 | (4,222) | | | | | | |
| Intergovernmental | 122,000 | 112,201 | (9,799) | 66,709 | 65,348 | (1,361) | | 185 | 185 |
| Other | 125,285 | 116,016 | (9,269) | | 4,091 | 4,091 | | 3 | 3 |
| Total revenues | 5,052,070 | 5,040,605 | (11,465) | 66,709 | 82,646 | 15,937 | | 188 | 188 |
| EXPENDITURES: | | | | | | | | | |
| Current: | | | | | | | | | |
| General government | 381,419 | 351,737 | 29,682 | | | | | | |
| Public safety | 868,510 | 863,677 | 4,833 | | | | | | |
| Health | 124,334 | 123,640 | 694 | | | | | | |
| Public housing and welfare | 276,632 | 268,627 | 8,005 | | | | | | |
| Education | 1,129,988 | 1,130,299 | (311) | | | | | | |
| Economic development | 177,627 | 175,720 | 1,907 | | | | | | |
| Intergovernmental | 251,100 | 250,749 | 351 | | | | | | |
| Capital outlay | | | | | | | 213,506 | 50,094 | 163,412 |
| Debt service: | | | | | | | | | |
| Principal | | | | 186,470 | 261,474 | (75,004) | | | |
| Interest and other | | | | 190,679 | 237,061 | (46,382) | | | |
| Total expenditures | 3,209,610 | 3,164,449 | 45,161 | 377,149 | 498,535 | (121,386) | 213,506 | 50,094 | 163,412 |
| Excess (deficiency) of revenues over (under) expenditures | 1,842,460 | 1,876,156 | 33,696 | (310,440) | (415,889) | (105,449) | (213,506) | (49,906) | 163,600 |
| OTHER FINANCING SOURCES (USES): | | | | | | | | | |
| Proceeds from long-term debt issues | | | | | | | 325,000 | 330,454 | 5,454 |
| Proceeds of refunding bonds | | | | 310,440 | 92,975 | (217,465) | | 1,600 | 1,600 |
| Payment of refunded bond escrow agent | | | | | (91,318) | (91,318) | | | |
| Operating transfers-in from other funds | 145,555 | 202,226 | 56,671 | 390,997 | 390,997 | | | | |
| Other sources (uses) | 255,218 | 265,988 | 10,770 | | (1,721) | (1,721) | | | |
| Operating transfers-out to other funds | (1,094,682) | (1,094,682) | | | (12,635) | (12,635) | (31,859) | (31,859) | |
| Operating transfers-out to component units | (938,682) | (938,682) | | | | | (79,635) | (79,635) | |
| Total other financing sources (uses) | (1,632,591) | (1,565,150) | 67,441 | 310,440 | 378,298 | 67,858 | 213,506 | 220,560 | 7,054 |
| Excess (deficiency) of revenues and other sources over (under) expenditures and other uses | $ 209,869 | $ 311,006 | $ 101,137 | $ | $ (37,591) | $ (37,591) | $ | $ 170,654 | $ 170,654 |

See notes to general purpose financial statements.

COMBINED STATEMENT OF REVENUES, EXPENSES AND CHANGES IN RETAINED
EARNINGS (DEFICIT)/FUND BALANCES - ALL PROPRIETARY FUND TYPES,
PENSION TRUST FUNDS AND SIMILAR DISCRETELY PRESENTED COMPONENT UNITS
YEAR ENDED JUNE 30, 1995 (Expressed in Thousands)

| | Proprietary Fund Types | | Fiduciary Fund Types | Totals Primary Government (Memorandum Only) | Other Discretely Presented Component Units | Totals Reporting Entity (Memorandum Only) |
|---|---|---|---|---|---|---|
| | Enterprise | Internal Service | Pension Trust | | | |
| **OPERATING REVENUES:** | | | | | | |
| Charges for services | $ 874,500 | $ 32,597 | $ | $ 907,097 | $3,876,514 | $4,783,611 |
| Financing income | | 158,953 | | 158,953 | 5,683 | 164,636 |
| Investment earnings | | 297,786 | 268,975 | 566,761 | 105,301 | 672,062 |
| Contributions to retirement systems | | | 530,313 | 530,313 | | 530,313 |
| Other | 15,355 | | 3,823 | 19,178 | 19,894 | 39,072 |
| Total operating revenues | 889,855 | 489,336 | 803,111 | 2,182,302 | 4,007,392 | 6,189,694 |
| **OPERATING EXPENSES:** | | | | | | |
| Cost of services | 1,435,701 | 58,196 | 34,501 | 1,528,398 | 3,115,093 | 4,643,491 |
| Retirement benefits | | | 510,729 | 510,729 | | 510,729 |
| Interest | | 327,601 | | 327,601 | 89,448 | 417,049 |
| Depreciation and amortization | 14,613 | 1,387 | 210 | 16,210 | 507,082 | 523,292 |
| Other | | 1,972 | | 1,972 | 3,180 | 5,152 |
| Total operating expenses | 1,450,314 | 389,156 | 545,440 | 2,384,910 | 3,714,803 | 6,099,713 |
| OPERATING INCOME (LOSS) | (560,459) | 100,180 | 257,671 | (202,608) | 292,589 | 89,981 |
| **NON-OPERATING REVENUES (EXPENSES):** | | | | | | |
| Intergovernmental | 176,333 | | | 176,333 | 10,011 | 186,344 |
| Interest income | 410 | | | 410 | 130,322 | 130,732 |
| Interest expense | (34,646) | | (8,901) | (43,547) | (368,931) | (412,478) |
| Other, net | 1,650 | (13,478) | 157 | (11,671) | (104,705) | (116,376) |
| Total non-operating revenues (expenses) | 143,747 | (13,478) | (8,744) | 121,525 | (333,303) | (211,778) |
| INCOME (LOSS) BEFORE OPERATING TRANSFERS | (416,712) | 86,702 | 248,927 | (81,083) | (40,714) | (121,797) |
| **TRANSFERS:** | | | | | | |
| Transfers from component units | | | | | 10,500 | 10,500 |
| Operating transfers from other funds | 573,586 | | | 573,586 | | 573,586 |
| Primary government | | | | | 93,200 | 93,200 |
| Operating transfers to other funds | (157,461) | | (430) | (157,891) | | (157,891) |
| Transfers to other component units | | | | | (36,399) | (36,399) |
| TRANSFERS, net | 416,125 | | (430) | 415,695 | 67,301 | 482,996 |
| NET INCOME (LOSS) | (587) | 86,702 | 248,497 | 334,612 | 26,587 | 361,199 |
| EXCESS OF REVENUES OVER EXPENDITURES FROM GOVERNMENTAL OPERATIONS | | | | | 36,468 | 36,468 |
| CONTRIBUTIONS | | | | | 5,115 | 5,115 |
| DEPRECIATION ON FIXED ASSETS ACQUIRED THROUGH CAPITAL CONTRIBUTIONS | 1,246 | | | 1,246 | 42,459 | 43,705 |
| INCREASE IN RETAINED EARNINGS/ FUND BALANCES | 659 | 86,702 | 248,497 | 335,858 | 110,629 | 446,487 |
| RETAINED EARNINGS (DEFICIT)/ FUND BALANCES AT BEGINNING OF YEAR (as restated) | (424,510) | 35,202 | 2,223,029 | 1,833,721 | 785,701 | 2,619,422 |
| RESIDUAL EQUITY TRANSFER | | | | | 267,916 | 267,916 |
| TRANSFERS (TO) FROM CONTRIBUTED CAPITAL | (17,959) | (100,000) | | (117,959) | 127,632 | 9,673 |
| RETAINED EARNINGS (DEFICIT)/ FUND BALANCES AT END OF YEAR | $ (441,810) | $ 21,904 | $2,471,526 | $2,051,620 | $1,291,878 | $3,343,498 |

See notes to general purpose financial statements.

# COMMONWEALTH OF PUERTO RICO

**COMBINED STATEMENT OF CASH FLOWS -**
**ALL PROPRIETARY FUND TYPES AND SIMILAR DISCRETELY PRESENTED COMPONENT UNITS**
**YEAR ENDED JUNE 30, 1995 (Expressed in Thousands)**

| | Proprietary Fund Types | | Totals Primary Government (Memorandum Only) | Other Discretely Presented Component Units | Totals Reporting Entity (Memorandum Only) |
|---|---|---|---|---|---|
| | Enterprise | Internal Service | | | |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | | |
| Operating income (loss) | $ (560,459) | $ 100,180 | $ (460,279) | $ 292,589 | $ (167,690) |
| Adjustments to reconcile operating income (loss) to | | | | | |
| net cash provided by (used in) operating activities: | | | | | |
| Depreciation and amortization | 14,617 | 1,126 | 15,743 | 505,100 | 520,843 |
| Provision for uncollectible accounts | | 26,661 | 26,661 | 101,458 | 128,119 |
| Amortization of debt discount | | | | 1,808 | 1,808 |
| Net loss (gain) on disposition of fixed assets | | | | 1 | 1 |
| Net loss (gain) on sale of investments and fixed assets | | (18,536) | (18,536) | (13,207) | (31,743) |
| Contribution of in lieu of taxes | | | | (160,614) | (160,614) |
| Net cash flow effect of noncapital financing, | | | | | |
| capital and related financing and investing | | | | | |
| activities included in operating income (loss) | | (113,110) | (113,110) | (11,720) | (124,830) |
| Other | 248 | (13,478) | (13,230) | 86,344 | 73,114 |
| Change in assets and liabilities: | | | | | |
| Increase in: | | | | | |
| Receivables, net | (8,072) | | (8,072) | (131,732) | (139,804) |
| Due from other funds | (352) | | (352) | | (352) |
| Due from primary government | | | | (77) | (77) |
| Restricted assets | | | | (5,485) | (5,485) |
| Other assets | | | | (4,669) | (4,669) |
| Accounts payable and accrued liabilities | | 10,515 | 10,515 | 18,615 | 29,130 |
| Due to other funds | 8,271 | | 8,271 | 1,858 | 10,129 |
| Interest payable | | | | 619 | 619 |
| Deferred revenues | | | | 4,319 | 4,319 |
| Accrued compensated absences | | | | (29,310) | (29,310) |
| Other liabilities | 59,181 | | 59,181 | 7,349 | 66,530 |
| Decrease in: | | | | | |
| Receivables | | 1,647 | 1,647 | | 1,647 |
| Due from other funds | | | | 271 | 271 |
| Inventories | 5,062 | | 5,062 | 14,168 | 19,230 |
| Other assets | 263 | 670 | 933 | | 933 |
| Accounts payable and accrued liabilities | (730) | | (730) | | (730) |
| Deposits | | | | (11,226) | (11,226) |
| Deferred revenues | (1,413) | | (1,413) | | (1,413) |
| Accrued compensated absences | (74) | | (74) | | (74) |
| Other long-term liabilities | | | | (9,434) | (9,434) |
| Total adjustments | 77,001 | (104,505) | (27,504) | 364,436 | 336,932 |
| Net cash provided by (used in) operating activities, (carried forward) | $ (483,458) | $ (4,325) | $ (487,783) | $ 657,025 | $ 169,242 |

(Continued)

## COMMONWEALTH OF PUERTO RICO

**COMBINED STATEMENT OF CASH FLOWS -**
**ALL PROPRIETARY FUND TYPES AND SIMILAR DISCRETELY PRESENTED COMPONENT UNITS**
**YEAR ENDED JUNE 30, 1995 (Expressed in Thousands)**

| | Proprietary Fund Types | | Totals Primary Government (Memorandum Only) | Other Discretely Presented Component Units | Totals Reporting Entity (Memorandum Only) |
|---|---|---|---|---|---|
| | Enterprise | Internal Service | | | |
| Net cash provided by (used in) operating activities, (brought forward) | $ (483,458) | $ (4,325) | $ (487,783) | $ 657,025 | $ 169,242 |
| CASH FLOWS FROM NONCAPITAL FINANCING ACTIVITIES: | | | | | |
| Proceeds from notes and loans | | 739,911 | 739,911 | 1,529,517 | 2,269,428 |
| Principal paid on notes and loans | | (215,392) | (215,392) | (1,214,363) | (1,429,755) |
| Interest paid on notes and loans | | (258,274) | (258,274) | (121,950) | (380,224) |
| Operating grants received | 774,797 | | 774,797 | 82,108 | 856,905 |
| Operating transfers-in from other funds | 19,089 | | 19,089 | 41,721 | 60,810 |
| Operating transfers-out to other funds | (157,461) | | (157,461) | (114,158) | (271,619) |
| Capital contributions | | | | 78,130 | 78,130 |
| Net cash provided by noncapital financing activities | 636,425 | 266,245 | 902,670 | 281,005 | 1,183,675 |
| CASH FLOWS FROM CAPITAL AND RELATED FINANCING ACTIVITIES: | | | | | |
| Acquisition and construction of capital assets | (20,731) | | (20,731) | (729,199) | (749,930) |
| Proceeds from issuance of bonds and notes | | | | 445,116 | 445,116 |
| Principal paid on bonds and notes | (31,784) | | (31,784) | (173,111) | (204,895) |
| Interest paid on bonds and notes | (37,116) | | (37,116) | (265,153) | (302,269) |
| Proceeds from sale of equipment | | | | 73,113 | 73,113 |
| Capital contributions | (17,074) | | (17,074) | 122,917 | 105,843 |
| Net cash used in capital and related financing activities | (106,705) | | (106,705) | (526,317) | (633,022) |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | | | |
| Purchase of investment securities | (34,808) | (6,600,571) | (6,635,379) | (2,561,014) | (9,196,393) |
| Proceeds from sales and maturities of investments and securities | 327 | 6,986,591 | 6,986,918 | 2,087,167 | 9,074,085 |
| Interest and dividends on investments | 1,826 | 241,055 | 242,881 | 195,510 | 438,391 |
| Principal collected on loans to: | | | | | |
| Public entities of the Commonwealth of Puerto Rico | | 475,825 | 475,825 | | 475,825 |
| Private sector | | 19,022 | 19,022 | | 19,022 |
| Loans originated to: | | | | | |
| Public entities of the Commonwealth of Puerto Rico | | (1,206,105) | (1,206,105) | | (1,206,105) |
| Private sector | | (13,505) | (13,505) | | (13,505) |
| Net cash used in investing activities | (32,655) | (97,688) | (130,343) | (278,337) | (408,680) |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 13,607 | 164,232 | 177,839 | 133,376 | 311,215 |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | 44,111 | 32,464 | 76,575 | 361,363 | 437,938 |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $ 57,718 | $ 196,696 | $ 254,414 | $ 494,739 | $ 749,153 |

*See notes to general purpose financial statements.*

(Concluded)

# COMMONWEALTH OF PUERTO RICO

COMBINED STATEMENT OF CHANGES IN FUND BALANCES (DEFICIT) -
PUBLIC UNIVERSITY FUNDS
YEAR ENDED JUNE 30, 1995 (Expressed in Thousands)

| | Current Funds | | | | Plant Funds | | | | |
| | Unrestricted | Restricted | Loan Funds | Endowment and Similar Funds | Unexpended | Renewal and Replacement | Retirement of Indebtedness | Investment in Plant | Retirement System |
|---|---|---|---|---|---|---|---|---|---|
| **REVENUES AND OTHER ADDITIONS:** | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| Unrestricted current fund revenues | 473,659 | | | | | | | | |
| Commonwealth of Puerto Rico appropriations, grants and contracts | | 71,793 | | | 264 | | | | |
| Federal grants and contracts | | 108,377 | | | 128 | | 311 | | |
| Private gifts, grants and contracts | | 5,803 | | 30 | | | | | |
| Investment income | | 173 | | | 543 | | 2,425 | | 44,652 |
| Interest on loans receivable | | | 174 | | | | | | |
| Contributions to retirement system | | | | | | | | | 50,797 |
| Expended for plant facilities | | | | | | | | 22,922 | |
| Retirement of indebtedness | | | | | | | | 6,924 | |
| Other | | 14,298 | 64 | | 120 | 9 | | | |
| Total revenues and other additions | 473,659 | 200,444 | 238 | 30 | 1,055 | 9 | 2,736 | 29,846 | 95,449 |
| **EXPENDITURES AND OTHER DEDUCTIONS:** | | | | | | | | | |
| Educational and general expenditures | 406,272 | 222,330 | | | | | | | |
| Auxiliary enterprises expenditures | 7,604 | | | | | | | | |
| Refunded to grantors | | 413 | 79 | | | | | | |
| Loan cancellations and assignments | | | 26 | | | | | | |
| Administrative and collection costs | | | 33 | | | | | | 2,196 |
| Retirement benefits | | | | | | | | | 48,216 |
| Expended for plant facilities | | | | | 3,206 | 1 | | 925 | |
| Retirement of indebtedness | | | | | | | 6,924 | | |
| Interest on indebtedness | | | | | | | 14,454 | | |
| Disposal of plant facilities | | | | | | | | 5,207 | |
| Loss on bond defeasance | | | | | | | | 10,424 | |
| Other | | | 10 | | | | | 664 | |
| Total expenditures and other deductions | 413,876 | 222,743 | 148 | - | 3,206 | 1 | 21,378 | 17,220 | 50,412 |
| **TRANSFERS AMONG FUNDS-ADDITIONS (DEDUCTIONS):** | | | | | | | | | |
| Mandatory: | | | | | | | | | |
| Principal and interest | (18,736) | | | | | | 15,282 | 3,454 | |
| Restricted current fund matching grants | (4,678) | 4,678 | | | | | | | |
| Other transfers: | | | | | | | | | |
| Unrestricted current funds | (14,526) | 14,274 | | | 252 | | | | |
| Restricted current fund | | (80) | | | 80 | | | | |
| Plant funds | | | | | 257 | (257) | | | |
| Total transfers | (37,940) | 18,872 | - | - | 589 | (257) | 15,282 | 3,454 | - |
| NET INCREASE (DECREASE) FOR THE YEAR | 21,843 | (3,427) | 90 | 30 | (1,562) | (249) | (3,360) | 16,080 | 45,037 |
| FUND BALANCES (DEFICIT) AT BEGINNING OF YEAR - (As Restated) | 18,462 | 26,803 | 6,466 | 1,520 | (1,866) | 601 | 24,073 | 264,100 | 337,898 |
| FUND BALANCES (DEFICIT) AT END OF YEAR | $ 40,305 | $ 23,376 | $6,556 | $1,550 | $ (3,428) | $ 352 | $ 20,713 | $ 280,180 | $ 382,935 |

See notes to general purpose financial statements.

## COMMONWEALTH OF PUERTO RICO

**COMBINED STATEMENT OF CURRENT FUNDS REVENUES, EXPENDITURES
AND OTHER CHANGES - PUBLIC UNIVERSITY FUNDS
YEAR ENDED JUNE 30, 1995 (Expressed in Thousands)**

|  | Unrestricted | Restricted | Total |
|---|---|---|---|
| **REVENUES:** |  |  |  |
| Tuition and fees | $ 51,110 | $ 4,296 | $ 55,406 |
| Commonwealth of Puerto Rico appropriations, grants and contracts | 408,002 | 71,793 | 479,795 |
| Federal grants and contracts |  | 125,584 | 125,584 |
| Private gifts, grants and contracts |  | 5,803 | 5,803 |
| Sales and services of educational departments | 1,894 | 5,101 | 6,995 |
| Sales and services of auxiliary enterprises | 5,826 |  | 5,826 |
| Investment income | 3,885 | 173 | 4,058 |
| Other sources | 2,942 | 4,902 | 7,844 |
| Total current revenues | 473,659 | 217,652 | 691,311 |
| **EXPENDITURES AND MANDATORY TRANSFERS:** |  |  |  |
| Educational and general: |  |  |  |
| Instruction | 170,064 | 19,672 | 189,736 |
| Research | 6,129 | 49,998 | 56,127 |
| Public service | 1,380 | 41,451 | 42,831 |
| Academic support | 51,101 | 3,004 | 54,105 |
| Student services | 23,718 | 1,695 | 25,413 |
| Institutional support | 80,916 | 5,162 | 86,078 |
| Operation and maintenance of plant | 62,048 | 799 | 62,847 |
| Scholarships and fellowships | 1,406 | 87,527 | 88,933 |
| Hospitals |  | 11,620 | 11,620 |
| Independent operations | 3 | 604 | 607 |
| Other | 9,507 | 798 | 10,305 |
| Educational and general expenditures | 406,272 | 222,330 | 628,602 |
| Mandatory transfers for: |  |  |  |
| Principal and interest | 18,736 |  | 18,736 |
| Restricted current fund matching grants | 4,678 | (4,678) |  |
| Total educational, general and mandatory transfers | 429,686 | 217,652 | 647,338 |
| Auxiliary enterprises - expenditures | 7,604 |  | 7,604 |
| Total expenditures and mandatory transfers | 437,290 | 217,652 | 654,942 |
| **OTHER TRANSFERS AND ADDITIONS (DEDUCTIONS):** |  |  |  |
| Excess (deficit) of restricted receipts over transfers to revenues |  | (17,208) | (17,208) |
| Refunded to grantors |  | (413) | (413) |
| Nonmandatory transfers | (14,526) | 14,194 | (332) |
| Total other transfers and additions (deductions) | (14,526) | (3,427) | (17,953) |
| NET INCREASE (DECREASE) IN FUND BALANCE | $ 21,843 | $ (3,427) | $ 18,416 |

*See notes to general purpose financial statements.*

- 12 -

# COMMONWEALTH OF PUERTO RICO

**COMBINED STATEMENT OF CHANGES IN NET ASSETS IN LIQUIDATION**
**OFFICE FOR THE LIQUIDATION OF THE ACCOUNTS OF THE**
**PUERTO RICO URBAN RENEWAL AND HOUSING CORPORATION**
**YEAR ENDED JUNE 30, 1995 (Expressed in Thousands)**

| | Operating | Housing Management | Low Cost Housing | Combined |
|---|---|---|---|---|
| ADDITIONS TO NET ASSETS IN LIQUIDATION: | | | | |
| Mortgage collections and other | $   3,703 | $ | $ | $   3,703 |
| Interest and other | 1,017 | | 6,471 | 7,488 |
| Contributed capital | 332 | | | 332 |
| Total additions | 5,052 | | 6,471 | 11,523 |
| DEDUCTIONS TO NET ASSETS IN LIQUIDATION: | | | | |
| General and administrative expenses | 14,455 | | 18,271 | 32,726 |
| Interest on notes and bonds | | | 3,799 | 3,799 |
| Other expenses | 461 | | 3 | 464 |
| Amortization of deferred financing cost | | | 304 | 304 |
| Loss on disposition of assets | | | 36 | 36 |
| Total deductions | 14,916 | | 22,413 | 37,329 |
| DEDUCTIONS TO NET ASSETS IN LIQUIDATION BEFORE ADJUSTMENTS | (9,864) | | (15,942) | (25,806) |
| ADJUSTMENTS OF ESTIMATED VALUES | (19,501) | (400) | (12,755) | (32,656) |
| DEDUCTIONS TO NET ASSETS IN LIQUIDATION | (29,365) | (400) | (28,697) | (58,462) |
| NET ASSETS IN LIQUIDATION AT BEGINNING OF YEAR, as previously reported | 106,072 | 11,377 | 25,014 | 142,463 |
| PRIOR PERIOD ADJUSTMENTS | (16,840) | | 29,139 | 12,299 |
| NET ASSETS IN LIQUIDATION AT BEGINNING OF YEAR, as restated | 89,232 | 11,377 | 54,153 | 154,762 |
| NET ASSETS IN LIQUIDATION AT END OF YEAR | $  59,867 | $ 10,977 | $ 25,456 | $ 96,300 |

See notes to general purpose financial statements.

- 13 -

# COMMONWEALTH OF PUERTO RICO

## NOTES TO GENERAL PURPOSE FINANCIAL STATEMENTS
## YEAR ENDED JUNE 30, 1995

### 1.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The Commonwealth of Puerto Rico (the Commonwealth) was constituted on July 25, 1952, under the provisions of its Constitution as approved by the people of Puerto Rico and the United States Congress. The Commonwealth's Constitution provides for the separation of powers of the executive, legislative and judicial branches of the government. The Commonwealth assumes responsibility for public safety, public health, public housing, welfare, education and economic development.

#### A.   The Financial Reporting Entity

Except where noted, the accompanying general purpose financial statements have been prepared in conformity with generally accepted accounting principles (GAAP) as applicable to governmental units. The Governmental Accounting Standards Board (GASB) is the accepted standard-setting body for governmental accounting and financial reporting. In addition, GAAP requires that the Commonwealth's proprietary activities apply GAAP as it is applied by similar business activities in the private sector. As a result, the financial statements of certain component units follow the specialized reporting practices for financial institutions and hospitals, as prescribed by the GASB and other authoritative sources, including pronouncements of the Financial Accounting Standards Board (FASB). The financial statements of the Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation, a discretely presented component unit, have been presented on the liquidation basis of accounting, as required by generally accepted accounting principles, for an entity under a liquidation process.

Except where noted, the accompanying general purpose financial statements include all departments, agencies and governmental entities whose funds are under the custody and control of the Secretary of Treasury, and the Commonwealth's component units by Act No. 230 of July 23, 1974, as amended, known as *Commonwealth of Puerto Rico Accounting Law*. The component units discussed below are included as part of the Commonwealth's reporting entity because they are financially accountable to the Commonwealth pursuant with GASB Statement No. 14, *The Financial Reporting Entity*.

#### B.   Component Units

GAAP defines component units as those entities which are legally separate organizations for which the Commonwealth's elected officials are financially accountable, or other organizations for which the nature and significance of their relationship with the Commonwealth are such that exclusion would cause the Commonwealth's general purpose financial statements to be misleading and incomplete. GAAP details two methods of presentation: blending the financial data of the component units' balances and transactions in a manner similar to the presentation of the Commonwealth's balances and transactions; or discrete presentation of the component units' financial data in columns separate from the Commonwealth's balances and transactions.

- 14 -

The financial statements of the component units discussed below have been included in the financial reporting entity either as blended component units or as discretely presented component units in accordance with GAAP.

1. **Blended Component Units:**

The following entities, while legally separate from the Commonwealth, meet the criteria to be reported as part of the primary government because they provide services entirely or almost entirely to the Commonwealth.

### Government Development Bank for Puerto Rico and Subsidiaries (GDB)

The Government Development Bank for Puerto Rico and Subsidiaries are governed by a seven-member board appointed by the Governor. The Secretary of Treasury is the Chairman. It is a legally separate entity defined by the Constitution and its activities are blended within the primary government because GDB acts as the financial advisor and fiscal agent for the Commonwealth and its public corporations in connection with the issuance of bonds and notes and it also makes loans and advances funds to public corporations. GDB is the first governmental entity in Puerto Rico to obtain the *Certificate of Achievement for Excellence in Financial Reporting* for its comprehensive annual financial report for the year ended June 30, 1994.

### Puerto Rico Infrastructure Financing Authority (PRIFA)

The Puerto Rico Infrastructure Financing Authority board is comprised of the same board members as the Government Development Bank for Puerto Rico. Its operations are to provide financial, administrative, consulting, technical, advisory and other types of assistance to other component units and governmental instrumentalities of the Commonwealth which are authorized to develop infrastructure facilities and to establish alternate means of financing them.

### Puerto Rico Highway and Transportation Authority (PRHTA)

The Puerto Rico Highway and Transportation Authority is governed by the Secretary of the Department of Transportation and Public Works (DTPW), who is appointed by the Governor with the consent of the Senate. PRHTA has broad powers to carry out its responsibilities in accordance with the DTPW's overall transportation policies. These powers include, among other things, the complete control and supervision of any highway facilities constructed, owned or operated by PRHTA, the ability to set tolls for the use of the highway facilities and the power to issue bonds, notes or other obligations. PRHTA plans and manages the construction of all major projects relating to the Commonwealth toll highway system, undertakes major repairs and maintains the tollways.

### Public Buildings Authority (PBA)

The Public Buildings Authority is governed by a seven-member board. Six members are appointed by the Governor with the consent of the Senate, and the Secretary of Transportation and Public Works. It is a legally separate entity, whose activities are blended within the primary government because it exists to construct, purchase or lease office, school, health, jails, and social welfare facilities for lease to the Commonwealth's departments, component units and instrumentalities. Bonds issued by PBA to finance such facilities are payable from lease collections, which are largely derived from Commonwealth appropriations and are generally secured by the Commonwealth's guarantee. The Commonwealth changed its method of blending PBA in the general purpose financial statements.

- 15 -

## Puerto Rico Land Administration (PRLA)

The Puerto Rico Land Administration is governed by an eleven-member board comprised by the Secretary of Economic Development, who serves as Chairman, the Secretary of Treasury, the Secretary of Agriculture, the Secretary of Transportation and Public Works, the Secretary of Housing, the Economic Development Administrator, the President of the Planning Board, and four other members appointed by the Governor with the consent of the Senate. It is a legally separate entity whose activities are blended within the primary government because PRLA acquires, through negotiation or expropriation, parcels of land, on behalf of government instrumentalities. The Commonwealth changed its method of blending PRLA in the general purpose financial statements.

For fiscal year 1994-95, the Commonwealth changed the blending method for the Public Buildings Authority (PBA) and the Puerto Rico Land Administration (PRLA) by blending their activities within the debt service funds, capital project funds, general fixed assets and general long-term debt account groups. These were previously reported in the internal service funds. Management believes that this presentation better reflects the relationship of the transactions of PBA and PRLA at the general purpose financial statements level. Accordingly, as discussed in Note 11, the effect of this change results in the restatement of the capital projects, internal service funds, general fixed assets and general long-term debt account groups. However, this change does not affect the financial reporting of PBA or PRLA stand alone financial statements.

Complete financial statements of the blended component units can be obtained directly by contacting their respective administrative office or the Secretary of the Treasury of the Commonwealth.

Administrative offices:

Government Development Bank for
  Puerto Rico and Subsidiaries
PO Box 42001
San Juan, PR 00940-2001

Public Buildings Authority
PO Box 41029 Minillas Station
San Juan, PR 00940-1029

PR Infrastructure Financing Authority
PO Box 42001
San Juan, PR 00940-2001

Puerto Rico Land Administration
PO Box 363767
San Juan, PR 00936-3767

PR Highway and Transportation Authority
PO Box 42007
San Juan, PR 00940-2007

2. **Discretely Presented Component Units:**

The following component units, consistent with GASB Statement No. 14, are discretely presented in the general purpose financial statements because of the nature of the services they provide and the Commonwealth's ability to impose its will. The public university funds financial information is presented in a separate column due to its reporting model being different from that followed by the other component units. The Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation is presented in a separate column and separate statement of activity due to its basis of accounting being on a liquidation-basis.

- 16 -

### Public University Funds

### University of Puerto Rico (UPR)

The University of Puerto Rico is governed by a thirteen-member Board of Trustees of which ten are appointed by the Governor and confirmed by the Senate, one full-time student and two term professors. Board members are appointed for a period of six years. The terms for the student and professors are one year.

### University of Puerto Rico Retirement System (UPRRS)

The University of Puerto Rico Retirement System is the administrator of the retirement system for the employees of the University of Puerto Rico. It is governed by the Council of Higher Education of the University.

### Office for the Liquidation of the Accounts of the Puerto Rico
### Urban Renewal and Housing Corporation (the Office)

The Office was created for the purpose of carrying out the liquidation process of the Puerto Rico Urban Renewal and Housing Corporation and is administered by a Trustee appointed by the Governor. The Trustee is responsible for obtaining the maximum realization from the sale of assets in order to meet outstanding obligations. On December 13, 1994, the Commonwealth approved a law transferring certain assets to the Puerto Rico Public Housing Administration, and certain debt obligations to the Puerto Rico Treasury Department, which are part of the primary government.

### Component Units - Other

### Puerto Rico Electric Power Authority (PREPA)

The Puerto Rico Electric Power Authority board is composed of nine members. Seven members are appointed by the Governor with the consent of the Senate, and the remaining two members by the Puerto Rico Consumer Affairs Department. PREPA is responsible for conserving, developing and utilizing the power resources of Puerto Rico and owns and operates the Commonwealth's electric system. PREPA's powers include, among others, the ability to issue bonds for any of its corporate purposes and is required, under the terms of a 1947 Indenture and a 1974 Agreement, to determine and collect reasonable rates for electric service in order to produce revenues sufficient to cover all operating and financing obligations.

### Puerto Rico Aqueduct and Sewer Authority (PRASA)

The Puerto Rico Aqueduct and Sewer Authority board is composed of seven members. Four members are appointed by the Governor and the remaining three members, one should be the Secretary of Transportation and Public Works and two members appointed by the Puerto Rico Consumer Affairs Department. PRASA owns and operates the system of public water supply and sanitary sewer facilities. PRASA's powers include, among others, to borrow money and issue revenue bonds for any of its corporate purposes. PRASA is required, under the terms of

its Trust Agreements, to determine and collect reasonable rates for water services to produce revenues sufficient to cover all operating and financing obligations. PRASA's capital is generated by non-reimbursable legislative appropriations from the Commonwealth, grants from various agencies of the Federal government, donations in-kind or other operating cash transfers from various governmental agencies and instrumentalities of the Commonwealth, other customers of PRASA, and internally generated funds. As discussed in Note 12, the Commonwealth guarantees the principal and interest payments of certain outstanding bonds and of all future bond issue to refinance these outstanding bonds.

## Puerto Rico Telephone Authority and Subsidiaries and Puerto Rico Telephone Company (PRTA)

The Puerto Rico Telephone Authority, Subsidiaries and Puerto Rico Telephone Company are governed by a five-member board appointed by the Governor with the consent of the Senate. PRTA is responsible for acquiring, developing and operating telephone, radio, cable or other communication systems. PRTA is obliged, as defined in certain Trust Agreement, to determine and collect reasonable rates for the use of its communication facilities in order to produce revenues sufficient to cover all operating and financing obligations.

## State Insurance Fund Corporation (SIFC)

The State Insurance Fund Corporation board is composed of five members appointed by the Governor with the consent of the Senate. SIFC provides worker's compensation and disability insurance to public and private employees who suffer accidents during the course, or as a consequence of functions which are inherent to their work.

## Puerto Rico Housing Bank and Finance Agency (PRHBFA)

The Puerto Rico Housing Bank and Finance Agency is governed by the Secretary of Housing who is appointed by the Governor with the consent of the Senate. PRHBFA issues bonds and notes to provide interim and permanent financing for low-income housing projects and single-family home ownership programs. It is also engaged in insuring and servicing mortgages originated by the former Puerto Rico Urban Renewal and Housing Corporation which ceased operations effective August 9, 1991. PRHBFA obtains funds from legislative appropriations, sale of mortgages, collection of mortgage repayments, and other sources.

## Economic Development Bank for Puerto Rico (EDB)

The Economic Development Bank for Puerto Rico is governed by a nine-member board comprised by the President of the Government Development Bank for Puerto Rico, who is the Chairman, the Secretary of Agriculture, the Secretary of Commerce, the Economic Development Administrator, the Executive Director of the Tourism Company of Puerto Rico and four other members appointed by the Governor with the consent of the Senate. EDB is responsible for the promotion and development of the private sector economy of the Commonwealth. This purpose is to be met by making direct loans, loan guarantees, loan participation, and/or direct investments available to any person or business organization devoted to manufacturing, agriculture, trade, tourism or other service enterprises, whose economic activity may have the effect of substituting imports.

### Puerto Rico Industrial Development Company (PRIDCO)

The Puerto Rico Industrial Development Company is governed by the Economic Development Administrator as appointed by the Governor with the consent of the Senate. PRIDCO operates the Commonwealth-sponsored economic development program by providing facilities, general assistance, and special incentive grants to manufacturers. PRIDCO has issued interim notes and revenue bonds to finance factories and other facilities. Rentals derived from the leasing of specified facilities of PRIDCO are pledged for the payment of PRIDCO's revenue bonds.

### Puerto Rico Ports Authority (PRPA)

The Puerto Rico Ports Authority is governed by a five-member board consisting of the Secretary of Transportation and Public Works, as the Chairman, the Secretary of Commerce, the Economic Development Administrator, the Executive Director of the Tourism Company of Puerto Rico and one private citizen appointed by the Governor with the consent of the Senate. The purpose of PRPA is to administer all ports and aviation transportation facilities of the Commonwealth and to render other related services.

### Puerto Rico Municipal Finance Agency (PRMFA)

The Puerto Rico Municipal Finance Agency is governed by a five-member board composed of the Secretary of the Treasury, the President of the Government Development Bank for Puerto Rico and three additional members appointed by the Governor, one of whom shall be either the mayor or chief financial officer of a municipality. PRMFA was organized to create a capital market to assist the municipalities of Puerto Rico in financing their public improvement programs.

### Puerto Rico Maritime Shipping Authority (PRMSA)

The Puerto Rico Maritime Shipping Authority board is composed of the President of the Government Development Bank for Puerto Rico. As discussed in Note 18, on March 3, 1995, the Commonwealth sold to private investors its maritime transportation business.

### Sugar Corporation of Puerto Rico (SCPR)

The Sugar Corporation of Puerto Rico is administered by the Governing Board of the Land Authority of Puerto Rico consisting of the Secretary of Agriculture as Chairman, and four other members appointed by the Governor with the consent of the Senate. SCPR was created to consolidate ownership and management of the Commonwealth's interests in Puerto Rico's sugar industry. SCPR owns or leases and operates the majority of all the sugar production facilities in Puerto Rico. SCPR buys all the cane grown by private growers, processes the cane, and sells the raw and refined sugar and molasses. The Commonwealth is presently evaluating the sale of SCPR to private investors.

- 19 -

**Puerto Rico Industrial, Tourist, Educational, and Medical, and Environmental Control Facilities Financing Authority (AFICA)**

The Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority board is composed of five members consisting of the Economic Development Administrator, the President of the Government Development Bank for Puerto Rico, the Executive Director of the Puerto Rico Aqueduct and Sewer Authority and two private citizens appointed by the Governor with the consent of the Senate. AFICA is authorized to issue revenue bonds to finance industrial, pollution control, medical, and educational facilities in Puerto Rico for the use by private companies, non-profit entities or governmental agencies. The bonds are payable solely from collections from such private companies, non-profit entities or governmental agencies, and do not constitute a debt of the Commonwealth or any of its other components units.

**Caribbean Basin Projects Financing Authority (CBPFA)**

The Caribbean Basin Projects Financing Authority board is composed of five members consisting of the Economic Development Administrator, the President of the Government Development Bank for Puerto Rico, the President of the Economic Development Bank for Puerto Rico and two private citizens appointed by the Governor with the consent of the Senate. CBPFA is authorized to issue revenue bonds and to loan the proceeds thereof to finance the projects for the development of the Caribbean Basin countries that are authorized to receive investments of funds under the provisions of Section 936 of the US Internal Revenue Code.

**Automobile Accident Compensation Administration (AACA)**

The Automobile Accident Compensation Administration board is composed of one member of the Cabinet of the Governor and four members appointed by the Governor with the consent of the Senate. AACA operates a system of compulsory insurance coverage for all the registered automobiles and compensates for injuries arising from automobile accidents.

**Puerto Rico Metropolitan Bus Authority (PRMBA)**

The Puerto Rico Metropolitan Bus Authority has a nine-member board appointed by the Governor with the consent of the Senate. The PRMBA provides public land transportation to passengers within the San Juan Metropolitan Area. This service is principally financed by Commonwealth and Federal government appropriations, and passenger fares.

**Puerto Rico Public Broadcasting Corporation (PRPBC)**

The Puerto Rico Public Broadcasting Corporation board of directors is composed of four members of the public sector and five private citizens on behalf of the public interest, appointed by the Governor with the consent of the Senate. PRPBC was created with the purpose of integrating, developing and operating the radio, television and electronic communication facilities that belong to the Commonwealth.

**Solid Waste Authority of Puerto Rico (SWAPR)**

The Solid Waste Authority of Puerto Rico board is composed of eleven members appointed by the Governor with the consent of the Senate. SWAPR provides alternatives in the processing of solid waste and encourages recycling, reuse and recovery of resources from waste.

**Tourism Company of Puerto Rico (TCPR)**

The Tourism Company of Puerto Rico is governed by an eleven-member board comprised by the Secretary of Economic Development who serves as Chairman, the Secretary of Treasury, the Secretary of Agriculture, the Secretary of Transportation and Public Works, the Secretary of Housing, the Economic Development Administrator, the President of the Planning Board, and four other members appointed by the Governor with the consent of the Senate.

**Commercial and Farm Credit and Development Corporation for Puerto Rico (CFCDCPR)**

The Commercial and Farm Credit and Development Corporation for Puerto Rico board is composed of the members of the Economic Development Bank for Puerto Rico board of directors. CFCDCPR has as its purpose the promotion of the development of the productivity, competitiveness and profits of commercial, manufacturing, services and agro-industrial enterprises, including, without limitation, agriculture, livestock, fishing industries, aquatic and marine resources, as well as forestry and terrestrial. Such purpose is to be met by providing financing through diverse credit mechanisms and granting loans to commercial entities, and entities related to agriculture in general.

**Employment and Training Enterprises Corporation (ETEC)**

The Employment and Training Enterprises Corporation is governed by a ten-member board comprised of the Administrator of Correction, the Administrator of Youth Correctional Institutions, the Secretary of Justice, the Secretary of Education, the Executive Director of the Right to Employment Administration, the Administrator of the Administration of Mental Health and Anti-Addiction, the Sub-Administrator for the Promotion of Puerto Rico Industries of the Economic Development Administration, the Director of Volunteer Corps and two private citizens appointed by the Governor with the consent of the Senate. The purpose of ETEC is to provide training, management development and employment for convicts in the correctional institutions of the Commonwealth.

**Industries for the Blind, Mentally Retarded and Other Disabled Persons of Puerto Rico**

The Industries for the Blind, Mentally Retarded and Other Disabled Persons of Puerto Rico is governed by the Secretary of the Department of Social Services, who is its President. The purpose of the entity is to provide economic and social rehabilitation for the blind, mentally retarded and other disabled persons through job opportunities within the public and private industries.

- 21 -

**Institutional Trust of the National Guard of Puerto Rico (ITNGPR)**

The Institutional Trust of the National Guard of Puerto Rico is administered by a seven-member board comprised of the General Assistant of Puerto Rico, the President of the Government Development Bank for Puerto Rico, the Secretary of Justice and four members of the Puerto Rico National Guard appointed by the Governor with the consent of the Senate. ITNGPR has as its purpose to provide life insurance benefits to the active members of the Puerto Rico National Guard, provide economic assistance for the members of the Puerto Rico National Guard and their families and to provide retirement benefits.

**Musical Arts Corporation and Subsidiaries (MAC)**

The Musical Arts Corporation and Subsidiaries are governed by a seven-member board appointed by the Governor with the consent of the Senate. MAC was created to promote the development of the arts and cultural programs of the Commonwealth.

**Corporation of Stocks and Deposits Insurance for the Savings and Loans Cooperatives (CSDISLC)**

The Corporation of Stock and Deposits Insurance for the Savings and Loans Cooperatives is governed by an eleven-member board composed of the Commissioner of Financial Institutions of Puerto Rico, the Inspector of Cooperatives of Puerto Rico, the Administrator of Cooperative Development Administration, a representative of the Puerto Rico Treasury Department, a representative of the Government Development Bank for Puerto Rico, five citizens in the name of the cooperative movement, and one private citizen. CSDISLC has the responsibility of providing to all the cooperatives, and the Federation of Cooperatives of Puerto Rico, insurance coverage over the stocks and deposits, for monitoring the financial condition of the insured cooperatives, and of uninsured cooperatives when requested by the Commissioner of Financial Institutions of Puerto Rico.

**Puerto Rico Health Insurance Administration (PRHIA)**

The Puerto Rico Health Insurance Administration board is composed of the Secretary of Health, the Secretary of Treasury, the Commissioner of Insurance and four additional members appointed by the Governor, with the consent of Senate. PRHIA was created for the purpose of implementing, administering and negotiating a health insurance system, through contracts with insurance underwriters, to provide quality medical and hospital care to qualified individuals.

**Fine Arts Center Corporation (FACC)**

The Fine Arts Center Corporation is governed by a seven-member board of which five are appointed by the President of the Board of Directors of the Arts and Cultural Development Administration and two are appointed by the President of the Board of Directors of the Puerto Rico Culture Institute. FACC was created with the purpose of administering the Fine Arts Center.

### Land Authority of Puerto Rico (LAPR)

The Land Authority of Puerto Rico is governed by a five-member board consisting of the Secretary of Agriculture and four members appointed by the Governor with the consent of the Senate. LAPR was created to carry out the provisions of the Land Law of Puerto Rico.

### Right to Employment Administration

The Right to Employment Administration is governed by an Administrator appointed by the Governor with the consent of the Senate. In addition, a Consultative Board composed of the Secretary of Labor, the Secretary of Agriculture, the Secretary of Transportation and Public Works, the Secretary of Education and five additional members appointed by the Governor, with the consent of the Senate, will advice the Administrator in the implementation of the Right to Employment Act.

### Farm Insurance Corporation of Puerto Rico (FICPR)

The Farm Insurance Corporation of Puerto Rico is composed of a five-member board consisting of the Secretary of Agriculture, the Director of the Agriculture Sciences Faculty of the Mayagüez Campus of the University of Puerto Rico, a representative of the Government Development Bank for Puerto Rico and two bona fide farmers appointed by the Governor with the consent of the Senate. The purpose of the FICPR is to provide insurance to farmers against losses in their farms caused by natural disasters.

### Puerto Rico Medical Services Administration

The Puerto Rico Medical Services Administration is governed by the Secretary of Health who is appointed by the Governor with the consent of the Senate. It was created to plan, organize, operate and administer the centralized health services, provided in support of the hospital and other functions offered by the member institutions and consumers of the medical complex known as *Puerto Rico Medical Center*.

### Trust for the Development, Operation and Conservation of National Parks of Puerto Rico

The Trust for the Development, Operation and Conservation of National Parks of Puerto Rico board is composed of the President of the Recreational Development Company of Puerto Rico, and four representatives from the state government, the private sector, the advisory council and the trustees, all of which are appointed by the Governor with the consent of the Senate. The Trust has the obligation to develop, operate and provide maintenance to the national parks of Puerto Rico.

### Puerto Rico and Caribbean Cardiovascular Center Corporation (PRCCCC)

The Puerto Rico and Caribbean Cardiovascular Center Corporation is governed by a seven-member board comprised of the Secretary of Health, the Director of the Medical Sciences Department of the University of Puerto Rico, the Executive Director of the Puerto Rico Medical Services Administration and four additional members, one of which should be from the

Cardiology Society of Puerto Rico, and another member of a cardiology foundation properly registered in the Department of State, appointed by the Governor with the consent of the Senate. The purpose of the PRCCCC is to provide special treatment in cardiovascular diseases in Puerto Rico and the Caribbean.

## Recreational Development Company of Puerto Rico

The Recreational Development Company of Puerto Rico is in charge for developing a program for the construction and operation of recreational facilities which shall contribute to the physical and mental development of the communities, family welfare and improvement of the quality of life.

## Farm Credit Guarantee Fund and Guarantee Loan Fund for Eligible Businesses of Puerto Rico

Pursuant to Act No. 1 of October 4, 1954, as amended, the Farm Credit Guarantee Fund was empowered to secure loans granted by financial institutions to farmers and agricultural entities for agricultural purposes for a maximum of $120 million under the guarantee of the good faith and credit of the Commonwealth of Puerto Rico. It is governed by the Secretary of Agriculture who is appointed by the Governor with the consent of the Senate. Pursuant to Act No. 87 of July 9, 1985, as amended, the Guarantee Loan Fund for Eligible Businesses of Puerto Rico was empowered to guarantee the payment of loans granted by legally established credit institutions to certain eligible business organizations. It is administered by an Executive Committee that is composed of the President of the Commercial Development Company and the President of the Government Development Bank for Puerto Rico.

## Homemakers Service Corporation

The Homemakers Service Corporation is a public corporation created in 1990 for the purpose of providing homemaking service to the elderly and disabled aging population of Puerto Rico. The Company is governed by a five member board including the Secretary of the Department of Social Services, the Executive Director of the Office of the Governor for Elderly Affairs and three members representing the public interest, appointed by the Governor with the consent of the Senate.

## Agricultural Services and Development Administration (ASDA)

The Agricultural Services and Development Administration was created by Law No. 5 effective on July 1, 1994 in accordance with a Reorganization Plan for the Department of Agriculture. The plan created ASDA and transferred to this structure the power and legal functions of the former Agricultural Services Administration, and the Agricultural Development Administration. Also, the personnel, property and funds were transferred to the new organization. It is governed by the Secretary of Agriculture who is appointed by the Governor with the consent of the Senate to provide a wide variety of services and incentives to the agricultural sector.

Complete financial statements of the discretely presented component units can be obtained directly by contacting their administrative offices:

Administrative offices:

PR Electric Power Authority
PO Box 364267
San Juan, PR 00936-4267

PR Aqueduct and Sewer Authority
PO Box 7066
San Juan, PR 00916

Economic Development Bank for PR
PO Box 5009
San Juan, PR 00919-5009

PR Maritime Shipping Authority
PO Box 71105
San Juan, PR 00936

Puerto Rico Ports Authority
PO Box 2829
San Juan, PR 00936-2829

Sugar Corporation of PR
PO Box 9477
San Juan, PR 00908-9477

Puerto Rico Telephone Authority
PO Box 360998
San Juan, PR 00936-0998

PR Industrial Development Co.
PO Box 362350
San Juan, PR 00936-2350

State Insurance Fund Corporation
PO Box 365028
San Juan, PR 00936-5028

PR Housing Bank and Finance Agency
PO Box 190345
San Juan, PR 00919-0345

Puerto Rico Industrial, Tourist,
Educational, Medical and
Environmental Control Facilities
Financing Authority
PO Box 42001 Minillas Station
San Juan, PR 00940-2001

Corporation of Stocks and Deposits
Insurance for the Savings and Loans
Cooperatives
PO Box 195449
San Juan, PR 00919-5449

Automobile Accident Compensation
Administration
PO Box 4847
San Juan, PR 00936-4847

PR Metropolitan Bus Authority
PO Box 195349
San Juan, PR 00919-5349

Puerto Rico Public
Broadcasting Corporation
PO Box 190909
San Juan, PR 00919-0909

Solid Waste Authority of PR
PO Box 40285
San Juan, PR 00940-0285

Tourism Company of Puerto Rico
PO Box 4435
Old San Juan Station
San Juan, PR 00902-4435

PR Municipal Finance Agency
PO Box 42001
San Juan, PR 00940-2001

Caribbean Basin Projects
Financing Authority
PO Box 3271
San Juan, PR 00904

Employment and Training
Enterprises Corporation
PO Box 366505
San Juan, PR 00936-6105

- 25 -

Commercial and Farm
  Credit and Development Corp. for Puerto Rico
PO Box 19509
San Juan, PR 00919

Institutional Trust of the
  National Guard of PR
PO Box 3786
San Juan, PR 00904

Industries for the Blind,
  Mentally Retarded and Other
  Disabled Persons of PR
PO Box 13382
San Juan, PR 00908-3382

Musical Arts Corporation and Subsidiaries
PO Box 41227
San Juan, PR 00940-1227

Land Authority of Puerto Rico
PO Box 9745
San Juan, PR 00908-9745

Puerto Rico Medical Services Administration
PO Box 2129
San Juan, PR 00922-2129

Farm Insurance Corporation of Puerto Rico
PO Box 9200
Santurce, PR 00908-9200

Fine Arts Center Corporation
PO Box 41287
Santurce, PR 00940-1287

Farm Credit Guarantee Fund and Guarantee
  Loan Fund for Eligible Businesses of PR
PO Box 5009
San Juan, PR 00919-5009

Homemakers Services Corp.
1058 Muñoz Rivera Avenue
San Juan, PR 00928

Recreational Development Company
  of Puerto Rico
PO Box 2089
San Juan PR 00902-2089

University of Puerto Rico
  Retirement System
PO Box 21769
University Station
San Juan, PR 00931

University of Puerto Rico
PO Box 364984
San Juan, PR 00936-4984

Puerto Rico Health Insurance
  Administration
PO Box 4264
San Juan, PR 00902/4264

Right to Employment Administration
PO Box 364452
San Juan, PR 00936-4452

Puerto Rico and Caribbean
  Cardiovascular Center Corporation
PO Box 366528
San Juan, PR 00936

Trust for the Development, Operation
  and Conservation of National Parks
PO Box 363332
San Juan, PR 00936-3332

Office for the Liquidation of the
  Accounts of the PR Urban Renewal
  and Housing Corporation
PO Box 21365
San Juan, PR 00928-1365

Agricultural Services and
  Development Administration
PO Box 9200
San Juan, PR 00908-0202

All the financial statements of the discretely presented component units have a year end of June 30, 1995 except for Puerto Rico Telephone Authority, Puerto Rico Public Broadcasting Corporation and Sugar Corporation of Puerto Rico which have a year end of December 31, 1994.

**C.   Basis of Presentation**

The Commonwealth reports its financial position and results of operations in funds and account groups, each of which is considered an independent fiscal entity, and discrete presentations of component units.   The operations of each fund are accounted for within a set of self-balancing accounts that comprise its assets, liabilities, fund equity, revenues and expenditures/expenses.   Fund accounting segregates funds according to their intended purpose and is used to aid management in demonstrating compliance with finance-related legal and contractual provisions.   The minimum number of funds are maintained consistent with legal and managerial requirements.   Account groups are a reporting device to account for certain assets and liabilities of the governmental funds not recorded directly in those funds. They are not considered funds because they do not report expendable available financial resources and related liabilities.   For financial reporting purposes, the Commonwealth's reporting entity is divided into the primary government and its component units. Individual funds of the primary government are classified into three type categories:   governmental funds, proprietary funds and fiduciary funds.   Discretely presented component units are classified into public university funds, the Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation (an entity reported on the liquidation basis) and component units - other.

The Commonwealth has established the following fund categories, fund types, account groups and discrete presentation of component units:

1.   **Governmental Fund Types:**

Governmental funds are used to account for the general government functions of the Commonwealth.   The following are the Commonwealth's governmental fund types:

General Fund - The general fund is the primary operating fund of the Commonwealth.   It is used to account for all financial transactions, except those required to be accounted for in another fund.

Debt Service Funds - The debt service funds are used to account for the accumulation of resources for, and the payment of, general long-term debt principal, interest, and related costs other than bonds payable from the operations of proprietary fund types, nonexpendable trust funds and discretely presented component units.   Long-term debt and interest due on July 1 of the following fiscal year are accounted for as a fund liability if resources are available as of June 30 for its payment.

Capital Projects Funds - Capital projects funds are used to account for the financial resources used for acquisition or construction of major capital facilities not being financed by proprietary fund types, nonexpendable trust funds and discretely presented component units.

2.   **Proprietary Fund Types:**

Proprietary funds are used to account for activities that are similar to those found in the private sector where net income and capital maintenance are measured.   The following are the Commonwealth's proprietary fund types:

- 27 -

Enterprise Funds - Enterprise funds are used to account for operations that are financed and operated in a manner similar to private business enterprises. Costs of providing goods and services to the general public on a continuing basis, including depreciation, are financed or recovered primarily through user charges.

Internal Service Funds - Internal service funds are used to account for goods or services provided by blended component units or agencies to other blended or discretely presented component units, departments or agencies on a cost-reimbursement basis. The only operations included in this fund are for the Government Development Bank for Puerto Rico and its component units.

3.   **Fiduciary Fund Types:**

Fiduciary funds are used to account for assets held by the Commonwealth in a trustee capacity, or as an agent for individuals, private organizations, other governmental units, and/or other funds. The following are the Commonwealth's fiduciary fund types:

Expendable Trust Funds - are used to account for trusts which principal and income may be expended for their designated purpose.

Pension Trust Funds - are used to account for the assets, liabilities and fund equities held in trust for the public employees retirement systems. They account for assets of which the principal may not be spent for general government purposes.

Agency Funds - are custodial in nature (assets equal liabilities) and do not involve measurement of the results of operations.

4.   **Account Groups:**

Account groups establish control and accountability over the Commonwealth's general fixed assets and general long-term obligations.

General Fixed Assets Account Group - This account group is used to account for general fixed assets of the Commonwealth, which exclude the fixed assets held by the proprietary funds and discretely presented component units.

General Long-Term Debt Account Group - This account group is used to account for long-term obligations of the Commonwealth including bonds, appropriations and revenue bonds and notes payable, obligations under lease/purchase agreements, and other long-term liabilities excluding the liabilities of proprietary funds and discretely presented component units.

5.   **Discretely Presented Component Units:**

Discrete presentation of component units is used to include the financial information of entities that do not qualify to be blended with the funds and account groups of the primary government. The following are the Commonwealth's discrete presentation columns:

Public University Funds - are used to account for the activities of the University of Puerto Rico and the University of Puerto Rico Retirement System. Accordingly, the public university funds are an aggregate of the following funds: current funds - restricted and unrestricted; loan funds; endowment and similar funds; plant funds; and agency funds; and the activities of the retirement system.

Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation - This discretely presented component unit is reported in a separate column and a separate statement of activity because its financial statements have been prepared in accordance with the liquidation basis of accounting, as required by generally accepted accounting principles.

Component Units - Other - are used to account for the financial activities of the Commonwealth's discretely presented component units, excluding public university funds and the Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation. The financial statements of these component units are presented in accordance with the appropriate accounting methods as discussed below.

**D.   Basis of Accounting**

The basis of accounting determines when the Commonwealth recognizes revenues and expenditures or expenses and related assets and liabilities.

The modified accrual basis of accounting is followed by governmental fund types, expendable trust funds and agency funds. Under the modified accrual basis of accounting, revenues are recorded when they become measurable and available to pay liabilities of the current period. Tax revenues, net of estimated overpayments (refunds), are recorded by the Commonwealth as taxpayers earn income (income and unemployment), as sales are made (consumption and use taxes) and as cash is received (miscellaneous taxes).

During the year ended June 30, 1995, the Commonwealth adopted the provisions of Statement No. 22 of the Governmental Accounting Standards Board *"Accounting for Taxpayer - Assessed Tax Revenues in Governmental Funds"*. This Statement requires revenue from taxpayer-assessed taxes, such as sales and income taxes, net of estimated refunds, to be recognized in governmental funds in the accounting period in which they become susceptible to accrual; that is, when they become both measurable and available to finance expenditures of the fiscal period. The adoption of this Statement did not have a material effect on the general purpose financial statements.

In applying the susceptible to accrual concept to intergovernmental revenues, there are essentially two types of revenues. For the majority of grants, monies must be expended by the Commonwealth on the specific purpose or project before any amounts will be reimbursed. Revenues are, therefore, recognized as expenditures are incurred. For the other revenues, monies are virtually unrestricted and are generally revocable only for failure to comply with prescribed compliance requirements. These resources are reflected as revenues at the time of receipt or earlier if the susceptible to accrual criteria is met.

Expenditures and related liabilities are recorded in the accounting period in which the liability is incurred, except for (1) principal payment and interest on long-term obligations, which is recorded when due, except for principal and interest due during July of the following fiscal year which is recorded when resources are available in the debt service funds and (2) vacation, sick leave, federal funds cost disallowances and amounts subject to judgments under litigation which are recorded in the general long-term debt account group.

The Commonwealth reports deferred revenues on its combined balance sheet. Deferred revenues arises when a potential revenue does not meet both the "measurable" and "available" criteria for recognition in the current period. Deferred revenues also arises when resources are received before the Commonwealth has a legal claim to them, as when grant monies are received prior to incurring the qualifying expenditures. In subsequent periods, when the revenue recognition criteria is met, or when the Commonwealth has a legal claim to the resources, the liability for deferred revenues is removed from the combined balance sheet and the revenue is recognized.

The accrual basis of accounting is used by proprietary fund types and pension trust funds. Under the accrual basis, revenue is recognized when earned and expenses are recorded as liabilities when incurred, without regard to receipt or payment of cash. The accrual basis is also used by the public university funds, except that depreciation of fixed assets is not required to be recorded and that pension contributions are not recorded in accordance with generally accepted accounting principles.

The financial statements of the Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation have been prepared on the liquidation basis of accounting, as required by generally accepted accounting principles, for entities under a liquidation process. Under this basis, assets held for sale are accounted for at its net realizable value, and liabilities at its current values. When liquidation concludes, fixed assets not held for sale will be transferred to the Commonwealth's general fixed assets account group. In addition, an allowance should be recognized to account for the estimated expenses to be incurred in the disposition of assets. Additions and deductions to net assets are accounted for under the accrual basis of accounting. Additions are recorded when earned, and deductions are recorded at the time liabilities are incurred.

The Commonwealth's primary government and the blended component units have elected not to follow Financial Accounting Standards Board (FASB) pronouncements issued subsequent to November 30, 1989 for its proprietary fund types, as allowed by Statement No. 20 of the Governmental Accounting Standards Board, *Accounting and Financial Reporting for Proprietary Funds and Other Governmental Entities That Use Proprietary Fund Accounting*. However, the Government Development Bank for Puerto Rico, the internal service fund, elected to apply all FASB Statements issued subsequent to November 30, 1989. Certain discretely presented component units have disclosed their election in their separately issued financial statements.

The component units - other follow generally accepted accounting principles as issued by the Governmental Accounting Standards Board (GASB), and the Financial Accounting Standards Board (FASB) as applicable to each component unit based on the nature of their operations.

E.   Statutory (Budgetary) Accounting

The Commonwealth's budget is adopted in accordance with a statutory basis of accounting which is not in accordance with GAAP. Revenues are generally recognized when cash is received. However, revenues receivable for federal grants and reimbursements are recognized when related expenditures are incurred. Amounts due from certain political subdivisions of the Commonwealth are recognized when considered measurable and available at year end.

Expenditures generally are recorded when the related cash disbursement occurs. At year end, payroll is accrued and payables are recognized, to the extent of approved encumbrances, provided that the goods or services have been received by June 30. Available appropriations and encumbrances lapse three years after the end of the fiscal year. Amounts required to settle claims and judgments against the Commonwealth, and certain other liabilities are not recognized until they are encumbered or otherwise processed for payment.

Under the statutory basis of accounting, the Commonwealth uses encumbrance accounting to record the full amount of purchase orders, contracts and other commitments of appropriated resources as deductions from the appropriation prior to actual expenditure. In the governmental funds, encumbrance accounting is a significant aspect of budgetary control.

The combined statement of revenues and expenditures-budget and actual - statutory basis-general, debt service, and capital projects funds only present the information for those funds for which there is a legally adopted budget, as required by generally accepted accounting principles. See Note 3 for a reconciliation of the combined statement of revenues and expenditures - budget and actual - statutory basis-general, debt service, and capital projects with the combined statement of revenues, expenditures and changes in fund balance (deficit), for the general, debt service and capital projects funds.

F.   Cash, Cash Equivalents and Short Term-Investments

The Commonwealth follows the practice of pooling cash and cash equivalents. The balance in the pooled cash accounts is available to meet current operating requirements and any excess is invested in various interest bearing accounts with the Government Development Bank for Puerto Rico, the internal service fund.

Cash and cash equivalents include investments with original maturities of ninety days or less.

Cash and short-term investments, and cash equivalents of the component units are maintained in separate bank accounts, from those of the primary government, in their own names. Cash equivalents include investments with original maturities of ninety days or less.

Short-term investments are stated at cost or amortized cost.

The cash and cash equivalents at end of year on the combined statement of cash flows - all proprietary fund types and similar discretely presented component units do not agree with the combined balance sheet amounts because, in the latter, the amounts also include investments that do not qualify as cash equivalents as established by Governmental Accounting Standards Board Statement No. 9, *Reporting Cash Flows of Proprietary and Nonexpendable Trust Funds and Governmental Entities That Use Proprietary Fund Accounting.*

- 31 -

G. **Investments**

As described in Note 4, investments include US Government and agencies obligations, mortgage-backed securities, repurchase agreements, commercial paper, local government obligations, and corporate debt and equity obligations. Investments are reported at cost or amortized cost, as appropriate, except for investments in the mutual funds, equity obligations, individually allocated annuities and the deferred compensation funds (included in the pension trust funds) and the University of Puerto Rico Retirement System (included in the public university funds) that are reported at market value.

During the year ended June 30, 1995, certain component units adopted the provisions of the Financial Accounting Standards Board Statement No. 115, *Accounting for Certain Investments in Debt and Equity Securities*. This Statement addresses accounting and reporting for investments in equity securities that have readily determinable fair values and for all investments in debt securities. It requires that investments classified as held to maturity be reported at amortized cost; those classified as trading securities be reported at fair value, with unrealized gains and losses included in earnings; and those classified as available for sale be reported at fair value, with unrealized gains and losses reported as a separate component of capital. This Statement also provides additional guidance on criteria for classifying securities as held to maturity.

The effect of adopting this Statement is shown as "Unrealized Gain (Loss) in Value of Debt Securities" in the fund equity section of the accompanying combined balance sheet - all fund types, account groups, and discretely presented component units.

H. **Receivables**

Receivables are stated net of estimated allowances for uncollectible accounts, which are determined based upon past collection experience and current economic conditions. Intergovernmental receivables represent amounts owed to the Commonwealth for reimbursement of expenditures incurred pursuant to federally funded programs.

The loan funds of the public university funds are stated net of uncollectible amounts.

The mortgage notes receivable of the Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation are stated net of uncollectible amounts. Interest income on mortgage notes receivable is recorded on the cash basis of accounting due to the high delinquency rate of the related loans and the risk of possible losses in the collection of such interest.

The accounts receivable from nongovernmental customers of the component units - other are net of estimated uncollectible amounts. These receivables arise primarily from service charges to users. Accounts receivable from the primary government and other component units that arise from service charges do not have allowances for uncollectible accounts.

I. **Inventories**

The proprietary fund types, public university funds and component units - other recognize an asset when the inventory is purchased and an expense when it is consumed. Inventories in proprietary fund types are primarily valued at the lower of cost or market using the first-in, first-out method.

- 32 -

J. **Restricted Assets**

Restricted assets in the general fund include amounts set aside for the payment of principal and interest on special promissory notes. Restricted assets in the proprietary fund types include amounts set aside for the payment of long-term obligations, construction funds and payment of lottery prizes. Restricted assets in the public university funds and in the component units - other column are set aside primarily for the payment of bonds, notes, construction funds, and other specific purposes. See Note 7.

K. **Housing Units and Land Lots Held for Sale**

Housing units and land lots held for sale of the Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation are stated at its estimated value determined by the Office's management based on previous housing units sales or appraisal values.

L. **Fixed Assets**

For governmental fund types, general fixed asset acquisitions are recorded as expenditures in the acquiring fund and capitalized in the general fixed assets account group in the year purchased. General fixed assets are recorded at historical cost, or at estimated historical cost if actual historical cost is not available. Donated fixed assets are recorded at fair market value at the time of donation. Interest costs are capitalized during the construction period. The costs of normal maintenance and repairs that do not add value to the asset or materially extend asset lives are not capitalized. Public domain general fixed assets (infrastructure) consisting of roads, bridges, streets, sidewalks, drainage and lighting systems are not capitalized as these assets are immovable and of value only to the government.

As discussed in Note 12, the Commonwealth's central government restated the general fixed assets account group as of July 1, 1994 to report equipment with a unit cost of $100,000 or greater.

In addition, for the year ended June 30, 1995, and as discussed in Note 12, the beginning balance of the general fixed assets account group has been restated because the Commonwealth changed its blending method for the Public Buildings Authority and the Puerto Rico Land Administration. The fixed assets of these blended component units were previously reported in the internal service fund.

Fixed assets of the proprietary fund types and similar trust funds are stated at cost or estimated historical cost. Contributed fixed assets are recorded at estimated fair market value at the time received. Interest costs are capitalized on projects during the construction period. Depreciation is provided using the straight-line method over estimated useful lives of the assets. The estimated useful lives of fixed assets are as follows:

| | |
|---|---|
| Buildings | 25 - 50 years |
| Building improvements | 10 - 20 years |
| Equipment, furniture, fixtures and vehicles | 3 - 10 years |

Fixed assets of the public university funds are stated at cost or fair value at the date of donation in the case of gifts. Interest costs are capitalized during the construction period. Depreciation on physical plant and equipment is not recorded, except for equipment in auxiliary enterprises and on the University Pediatric Hospital.

- 33 -

Fixed assets not held for sale of the Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation are stated at cost. Depreciation is provided over the estimated useful lives of the assets using the straight-line method. At liquidation, these assets will be transferred at book value to the Puerto Rico Housing Department, an executive department of the primary government.

The fixed assets of the component units - other were recorded in accordance with the applicable Governmental Accounting Standards Board and Financial Accounting Standards Board statements. Depreciation has been recorded when required by these standards based on the types of assets, use, and estimated useful lives of the respective assets and on the nature of each of the component unit's operations.

## M. Tax Refunds Payable

During the calendar year, the Commonwealth collects individual income taxes through withholdings and payments from taxpayers. At June 30, the Commonwealth estimates the amount owed to taxpayers for overpayments during the first half of the calendar year. These estimated amounts are recorded as tax refunds payable and as a reduction of tax revenues. During the year ended June 30, 1995, the Commonwealth adopted the provisions of Statement No. 22 of the Governmental Accounting Standards Board, *"Accounting for Taxpayers-Assessed Tax Revenues in Governmental Funds"*. See Note 1D. The adoption did not have a material effect in the general purpose financial statements.

## N. Long-Term Debt

The liabilities reported in the general long-term debt account group include the Commonwealth's general obligation bonds and notes, advances from other funds, due to component units, obligations under lease/purchase agreements and other long-term liabilities including vacation, sick leave, litigation, long-term liabilities to other governmental entities, unfunded pension liability and federal fund cost disallowances related to expenditures of federal grants. Long-term obligations financed by proprietary fund types, public university funds, Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation, and component units - other are recorded as liabilities in those funds and discretely presented component unit columns.

## O. Reservations of Fund Balance

Reservations of fund balance represent portions of fund balances that are legally segregated for a specific future use or are not appropriable for expenditure. The Commonwealth has the following reservations of fund balance:

Encumbrances - Represent future expenditures under purchase orders and other commitments. These committed amounts generally will become liabilities in future periods as the goods are received.

Debt Service - Represents net assets available to finance future debt service payments.

Employees Retirement - Represents the public employees retirement systems net assets available to finance future benefit obligations.

Unemployment Benefits - Represent net assets available to fund future unemployment benefits payments.

- 34 -

Advances and Other Specified Purposes - Represent the reservation of monies set aside for long-term receivables which are not considered current financing resources, the guarantee of notes payable, disability, drivers insurance, long-term assets, construction commitments, endowment and amounts available to fund various fiduciary arrangements.

**P.  Net Assets in Liquidation**

The net assets in liquidation for the Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation represent the dollar amount of the net assets available for sale or transfer, as required by generally accepted accounting principles applicable to entities under liquidation. As established by Law 181 of August 12, 1995, any surplus of funds that remain after the final sale and transfer of assets and after the payment of operational expenses, shall be transferred to the General Fund of the primary government.

**Q.  Bond Premiums, Discounts and Issuance Cost**

For governmental fund types, bond premiums and discounts, as well as issuance costs, are recognized during the current period. Bond proceeds are reported as other financing sources net of the applicable premium or discount. Issuance cost, whether or not withheld from the actual net proceeds received, are reported as debt service expenditures. For proprietary fund types, bond premiums and discounts, as well as issuance costs, are deferred and amortized over the life of the bonds using the effective interest method. Bonds payable are reported net of the applicable bond premium or discount. Issuance costs are reported as deferred charges. Public university funds and component units - other follow appropriate statements issued by the Governmental Accounting Standards Board and the Financial Accounting Standards Board.

**R.  Postemployment Benefits**

In addition to the pension benefits described in Note 14, the Commonwealth provides postemployment health care benefits and a Christmas bonus for its retired employees in accordance with local law. Substantially all of the employees may become eligible for these benefits if they reach normal retirement age while working for the Commonwealth. Health care benefits are provided through insurance companies whose premiums are paid by the retiree and by the Commonwealth for a fixed amount of $40 per month for each retiree. During the year ended June 30, 1995, the cost of providing health care benefits amounted to approximately $26.8 million. The Christmas bonus paid to the retired employees during the year ended June 30, 1995 was $150 per retiree and the total amount was approximately $10.9 million. These benefits are recorded as expenditures when paid. The plan covers approximately 79,000 retirees.

**S.  Compensated Absences**

The vacation policy of the Commonwealth generally provides for the accumulation of 2.5 days per month, except for the teachers who accrue 4 days per month. Vacation time accumulated is fully vested to the employees from the first day of work up to a maximum of 60 days. Employees accumulate sick leave generally at a rate of 1.5 days per month up to a maximum of 90 days. Upon retirement, an employee receives compensation for all accumulated unpaid sick leave at the current rate, if the employee has at least ten years of service with the Commonwealth.

Compensated absence accumulation policies for the blended component units, the public university funds, the Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation, and component units - other vary from entity to entity depending upon negotiated bargaining agreements and other factors agreed upon between the management of these entities and its employees.

**T.   Interfund and Intra-Entity Transactions**

The Commonwealth has the following types of transactions among funds:

Operating Transfers - Legally required transfers that are reported when incurred as "Operating transfers-in" by the recipient fund and as "Operating transfers-out" by the disbursing fund.

Interfund Payments (Quasi-external Transactions) - Charges or collections for services rendered by one fund to another that are recorded as revenues of the recipient fund and as expenditures or expenses of the disbursing fund.

Intra-Entity Transactions - These are transactions between the primary government and its component units, and among the component units. Transfers between the primary government and its blended component units are reported as interfund transfers. Similarly, receivables and payables between the primary government and its blended component units are reported as amounts due to and due from other funds, except for long-term balances which are shown as advances to and from other funds. Balances and transfers between the primary government and discretely presented component units (and among those component units) are reported separately.

Residual Equity Transfers - These are nonrecurring or non routine transfers of equity between funds.

**U.   Lottery Revenues and Prizes**

The revenues, expenses and prizes awarded by the Lottery of Puerto Rico, and the Additional Lottery System, are reported within the enterprise funds and are recognized as drawings are held. Monies collected prior to June 30 for tickets related to drawings to be conducted subsequent to June 30 are reported as deferred revenues. Unpaid prizes awarded as of June 30 are reported as a fund liability. For certain prizes payable in installments, the Commonwealth purchases annuities through the Government Development Bank for Puerto Rico, an internal service fund, which are reported as restricted assets and lottery prizes payable in the enterprise funds.

**V.   Public University Funds**

Financial activities of the University of Puerto Rico (the University) and the University of Puerto Rico Retirement System (the System) are reported in the public university funds. Such funds are discretely presented in a separate column in the general purpose financial statements and represent the combination of the following funds of the University:

Current Funds - Account for resources that may be used for any purpose in carrying out the primary objectives of the University.

Loan Funds - Account for resources available for loans to students, faculty, or staff of the University.

Endowment and Similar Funds - Account for endowment and quasi-endowment transactions. These funds are similar to trust funds and the University must comply with the terms of any applicable agreement.

Plant Funds - Account for transactions involving physical properties of the University. The investment in plant accounts for funds that the University has expended and, thus, has invested for property and any related outstanding debt.

Agency Funds - Account for resources held by the University as custodian or agent for others.

The combined statement of current funds revenues, expenditures and other changes - public university funds is a statement of financial activities related to the current reporting period. It does not purport to present the results of operations or the net income or loss for the period as would a statement of income or a statement of revenues and expenses.

The measurement focus in the public university funds of the operations of the University is upon determination of resources received and used. Current funds used to finance plant assets are accounted for as (1) expenditures, for normal replacement of movable equipment and library books; (2) mandatory transfers, for required provisions for debt amortization/interest and equipment renewal and replacement; and (3) transfers of a nonmandatory nature for all other cases.

Public university funds record expenditures when they acquire fixed assets and capitalize those assets within the plant funds. These funds capitalize interest expenditures during construction but do not record depreciation.

The financial activities of the System include the net assets available for plan benefits to participants.

W. **Future Adoption of Accounting Pronouncements**

The Governmental Accounting Standards Board has issued the following statements which the Commonwealth, or its component units, have not yet adopted.

| Statement No. | | Adoption required in fiscal year |
|---|---|---|
| 24 | Accounting and Financial Reporting for Certain Grants and Other Financial Assistance | 1996 |
| 25 | Financial Reporting for Defined Benefit Pension Plans and Note Disclosures for Defined Contribution Plans | 1997 |
| 26 | Financial Reporting for Postemployment Healthcare Plans Administered by Defined Benefit Pension Plans | 1997 |
| 27 | Accounting for Pensions by State and Local Governmental Employers | 1998 |
| 28 | Accounting and Financial Reporting for Securities Lending Transactions | 1996 |
| 29 | The Use of Not-for-Profit Accounting and Financial Reporting Principles by Governmental Entities | 1996 |

The impact of these statements has not yet been determined.

### X.   Risk Financing

The Commonwealth purchases commercial insurance to cover for casualty, theft, tort claims and other losses. The current insurance policies have not been canceled or terminated. For workers' compensation, the Commonwealth has a discretely presented component unit, the State Insurance Fund Corporation, which provides workers' compensation to both, public and private employees.

### Y.   Reclassifications

The presentation of the separately issued financial statements of certain component units included within the enterprise funds, internal service funds, expendable trust funds, pension trust funds, public university funds, the Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation, and discretely presented component units column have been reclassified to conform to the accounting classifications used by the Commonwealth in the general purpose financial statements.

### Z.   Totals Columns (Memorandum Only)

Total columns on the combined financial statements are captioned "Memorandum Only" to indicate that they are presented only to facilitate financial analysis. Data in these columns does not present consolidated financial position, results of operations, or cash flows in conformity with generally accepted accounting principles. Such data is not comparable to a consolidation since interfund eliminations have not been made.

## 2.   COMPONENT UNITS

The Commonwealth follows the provisions of Governmental Accounting Standards Board Statement No. 14, *The Financial Reporting Entity*. The general purpose financial statements include the financial activities or specified financial statements of the following discretely presented component units that were audited by other auditors:

Agricultural Services and Development Administration
Automobile Accident Compensation Administration
Employment and Training Enterprises Corporation
Farm Credit Guarantee Fund and Guarantee Loan Fund for Eligible Businesses of Puerto Rico
Farm Insurance Corporation of Puerto Rico
Fine Arts Center Corporation
Homemakers Services Corp.
Industries for the Blind, Mentally Retarded and Other Disabled Persons of Puerto Rico
Institutional Trust of the National Guard of Puerto Rico
Land Authority of Puerto Rico
Musical Arts Corporation and Subsidiaries
Office for the Liquidation of the Accounts of the PR Urban Renewal and Housing Corporation
Puerto Rico Aqueduct and Sewer Authority
Puerto Rico and Caribbean Cardiovascular Center Corporation
Puerto Rico Electric Power Authority
Puerto Rico Housing Bank and Finance Agency

- 38 -

Puerto Rico Industrial Development Company
Puerto Rico Medical Services Administration
Puerto Rico Metropolitan Bus Authority
Puerto Rico Public Broadcasting Corporation
Recreational Development Company of Puerto Rico
Right to Employment Administration
Solid Waste Authority of Puerto Rico
Sugar Corporation of Puerto Rico
Tourism Company of Puerto Rico
Trust for the Development, Operation and Conservation of National Parks of Puerto Rico
University of Puerto Rico
University of Puerto Rico Retirement System

Condensed financial information of all discretely presented component units, other than the Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation is as follows:

Condensed financial statements of discretely presented component units are as follows (expressed in thousands):

| Balance Sheet | Puerto Rico Electric Power Authority | Puerto Rico Aqueduct and Sewer Authority | Puerto Rico Telephone Authority | Puerto Rico Housing Bank and Finance Agency | State Insurance Fund Corporation | Economic Development Bank for Puerto Rico | Puerto Rico Industrial Development Company | Puerto Rico Ports Authority | Puerto Rico Municipal Finance Agency | Other Entities | Total Other Component Units |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets and Other Debits** | | | | | | | | | | | |
| Current assets | $1,083,807 | $ 226,076 | $ 642,247 | $ 702,075 | $983,688 | $740,064 | $ 96,718 | $121,142 | $510,617 | $ 814,679 | $ 5,921,113 |
| Due from: | | | | | | | | | | | |
| Primary government | 95,820 | 5,812 | | | | | | | | 69,736 | 171,368 |
| Other component units | | | | | | 1,109 | | | | 30,679 | 31,788 |
| Other governmental entities | | | | | | | | | | 59,583 | 59,583 |
| Advances to discrete component units | | | | | | | | | | 355 | 355 |
| Fixed assets, net | 2,806,762 | 3,006,931 | 1,659,733 | 1,124 | 11,715 | 1,252 | 495,745 | 457,197 | | 600,029 | 9,040,488 |
| Amount available in debt service funds | | | | 373,175 | | | | | | | 373,175 |
| Amount to be provided for the retirement of bonds and notes payable | | | | | | | | | | 11,359 | 11,359 |
| Amount to be provided for payment of accrued compensated absences and other long-term debt | | | | | | | | | | 10,410 | 10,410 |
| Total | $3,986,389 | $3,238,819 | $2,301,980 | $1,076,374 | $995,403 | $742,425 | $592,463 | $578,339 | $510,617 | $1,596,830 | $15,619,639 |
| **Liabilities and Fund Equity** | | | | | | | | | | | |
| Current liabilities | $ 614,012 | $ 310,306 | $ 351,743 | $ 270,515 | $962,434 | $586,865 | $ 33,619 | $ 76,684 | $ 14,196 | $ 539,496 | $ 3,759,870 |
| Due to: | | | | | | | | | | | |
| Primary government | | | | | | | | | | 12,722 | 12,722 |
| Other component units | | | | | | | | | | 40,578 | 40,578 |
| Other governmental entities | | | | | | | | | | 2,572 | 2,572 |
| Advances from: | | | | | | | | | | | |
| Primary government | 98,900 | 402,590 | | | | | 25,632 | 95,319 | | 363,879 | 986,320 |
| Component units | | | | 12,361 | | | | | | 489 | 12,850 |
| Notes payable | 110,000 | 19,815 | 14,660 | | | 83,200 | 6,350 | | | 45,832 | 279,857 |
| Bonds payable | 2,847,679 | 436,027 | 981,063 | 655,045 | | | 187,919 | 132,711 | 483,536 | 382 | 5,724,362 |
| Total liabilities | 3,670,591 | 1,168,738 | 1,347,466 | 937,921 | 962,434 | 670,065 | 253,520 | 304,714 | 497,732 | 1,005,950 | 10,819,131 |
| Fund equity | 315,798 | 2,070,081 | 954,514 | 138,453 | 32,969 | 72,360 | 338,943 | 273,625 | 12,885 | 590,880 | 4,800,508 |
| Total | $3,986,389 | $3,238,819 | $2,301,980 | $1,076,374 | $995,403 | $742,425 | $592,463 | $578,339 | $510,617 | $1,596,830 | $15,619,639 |

**Statement of Operations**

| | Puerto Rico Electric Power Authority | Puerto Rico Aqueduct and Sewer Authority | Puerto Rico Telephone Authority | Puerto Rico Housing Bank and Finance Agency | State Insurance Fund Corporation | Economic Development Bank for Puerto Rico | Puerto Rico Industrial Development Company | Puerto Rico Ports Authority | Puerto Rico Municipal Finance Agency | Other Entities | Total Other Component Units |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Operating revenues | $1,447,139 | $277,204 | $960,010 | $30,114 | $381,956 | $53,985 | $48,506 | $113,112 | $27,996 | $667,370 | $4,007,392 |
| Operating expenses | 1,167,238 | 355,057 | 737,368 | 22,431 | 435,762 | 55,704 | 39,820 | 113,985 | 24,329 | 763,109 | 3,714,803 |
| Operating income (loss) | 279,901 | (77,853) | 222,642 | 7,683 | (53,806) | (1,719) | 8,686 | (873) | 3,667 | (95,739) | 292,589 |
| Non-operating revenues (expenses) | (259,900) | (26,685) | (120,641) | 4,353 | 44,646 | 3,285 | (4,057) | (4,656) | (2,746) | 33,098 | (333,303) |
| Income (loss) before operating transfers | 20,001 | (104,538) | 102,001 | 12,036 | (9,160) | 1,566 | 4,629 | (5,529) | 921 | (62,641) | (40,714) |
| Transfers from (to): | | | | | | | | | | | |
| Primary government | | 45,484 | | | (17,596) | | | | | 65,312 | 93,200 |
| Component units | | | | | | | | | | (25,899) | (25,899) |
| Transfers, net | | 45,484 | | | (17,596) | | | | | 39,413 | 67,301 |
| Net income (loss) | 20,001 | (59,054) | 102,001 | 12,036 | (26,756) | 1,566 | 4,629 | (5,529) | 921 | (23,228) | 26,587 |
| Excess of revenues over (under) expenditures from governmental operations | | | | 18,057 | | | | | | 18,411 | 36,468 |
| Contributions | | | | 5,090 | | | | | | 25 | 5,115 |
| Depreciation on fixed assets acquired through contributed capital | | 38,928 | | | | | | | | 3,531 | 42,459 |
| Increase (decrease) in retained earnings (deficit) fund balance | 20,001 | (20,126) | 102,001 | 35,183 | (26,756) | 1,566 | 4,629 | (5,529) | 921 | (1,261) | 110,629 |
| Retained earnings (deficit) fund balance at beginning of year | 179,056 | 387,197 | 792,829 | 103,484 | 58,529 | 18,992 | 32,252 | (35,596) | 11,964 | (762,410) | 786,297 |
| Restatement | (3,973) | (22,231) | 34,722 | (214) | | | | | | (8,900) | (596) |
| As restated | 175,083 | 364,966 | 827,551 | 103,270 | 58,529 | 18,992 | 32,252 | (35,596) | 11,964 | (771,310) | 785,701 |
| Residual equity transfer | | | | | | | | | | 267,916 | 267,916 |
| Transfer to contributed capital | | | | | | | | | | 127,632 | 127,632 |
| Retained earnings (deficit)/ fund balance at end of year | $195,084 | $344,840 | $929,552 | $138,453 | $31,773 | $20,558 | $36,881 | $(41,125) | $12,885 | $(377,023) | $1,291,878 |

The following component units were not included in the discrete component units columns because they could not prepare financial statements nor could they arrange for independent audits:

- Puerto Rico Development of Film Arts Corp.
- Plastic Arts School
- Puerto Rico Culture Institute
- Culebra Conservation and Development Authority
- Cooperative Development Company of Puerto Rico
- Rural Development Corporation

The management of the Commonwealth believes that the exclusion of the financial activities of these component units is not material in relation to the other component units column.

Condensed financial statements of the public university funds are as follows (expressed in thousands):

|  | University of Puerto Rico | Retirement System | Eliminations | Total |
|---|---|---|---|---|
| **ASSETS** |  |  |  |  |
| Current assets | $232,355 | $389,541 | $(931) | $ 620,965 |
| Due from primary government | 46,068 | 3,991 |  | 50,059 |
| Due from other component units | 17,425 |  |  | 17,425 |
| Fixed assets - net | 535,268 | 212 |  | 535,480 |
| Total Assets | $831,116 | $393,744 | $(931) | $1,223,929 |
| **LIABILITIES AND FUND EQUITY** |  |  |  |  |
| Current liabilities | $34,433 | $ 1,690 | $(931) | $ 35,192 |
| Notes payable | 185 |  |  | 185 |
| Bonds payable | 345,732 |  |  | 345,732 |
| Other long term liabilities | 81,164 | 9,120 |  | 90,284 |
| Total Liabilities | 461,514 | 10,810 | (931) | 471,393 |
| Fund Equity | 369,602 | 382,934 |  | 752,536 |
| Total Liabilities and Fund Equity | $831,116 | $393,744 | $(931) | $1,223,929 |

3.  **STEWARDSHIP, COMPLIANCE AND ACCOUNTABILITY**

A.  **Budgetary Control**

Commonwealth law requires that a balanced budget be approved by the Legislature. The Governor presents an annual budget to the Legislature which includes estimates of revenues, expenditures and other financing sources and uses anticipated during the coming fiscal year.

Before signing the appropriation act, the Governor may veto any specific item, subject to legislative override. Further changes to the budget established in the annual appropriation account may be made via supplemental appropriation or other legislative acts. These also must be approved by the Legislature and signed by the Governor and are subject to the line item veto.

The appropriated budget is prepared by fund, function and department. Commonwealth's department heads may transfer appropriations within a department. The legal level of budgetary control is the department level.

Encumbrance accounting is employed in governmental funds. For budgetary purposes, the encumbrances (i.e., purchase orders, contracts) are considered expenditures when incurred. For GAAP reporting purposes, encumbrances outstanding at year end are reported as reservations of fund balances and do not constitute expenditures or liabilities because the commitments will be honored during the subsequent year.

The unencumbered balance of any appropriation at the end of the fiscal year will lapse three years after the end of such fiscal year or at the date prescribed by the Secretary of the Treasury. Others are continuing accounts for which the Legislature has authorized that an unspent balance from the prior year be carried forward and made available for current spending. In addition, the Legislature may direct that certain revenues be retained and made available for spending within a specific appropriation account.

Generally, expenditures may not exceed the level of spending authorized for an individual appropriation account. However, the Commonwealth is statutorily required to pay debt service, regardless of whether such amounts are appropriated.

Appropriations are enacted for certain of the funds included in the combined balance sheet for the general fund, debt service funds and capital projects funds. For these funds, a Combined Statement of Revenues and Expenditures - Budget and Actual - Statutory Basis - General, Debt Service, and Capital Projects funds is included. See below for the required reconciliation.

The Commonwealth's Treasury Department and the Office of Management and Budget have the responsibility to ensure that budgetary spending control is maintained on an individual appropriation account basis. Budgetary control is exercised through the Commonwealth Integrated Financial Accounting System (CIFAS). CIFAS ensures that encumbrances or expenditures are not processed if they exceed the appropriation account's total available spending authorization, which is considered its budget.

**B.   Budget/GAAP Reconciliation**

The following schedule presents comparisons of the legally adopted budget with actual data on a budgetary basis. Because accounting principles applied for purposes of developing data on a budgetary basis differ significantly from those used to present financial statements in conformity with GAAP, a reconciliation of entity, timing and basis differences in the excess (deficiency) of revenues

and other sources of financial resources over expenditures and other uses of financial resources for the year ended June 30, 1995 is presented below for the general, debt service, and capital projects funds (expressed in thousands):

|  | General | Debt Service | Capital Projects |
|---|---|---|---|
| Excess (deficiency) of revenues and other sources over expenditures and other uses - statutory basis | $ 311,006 | $ (37,591) | $ 170,654 |
| Entity differences:<br>Excess (deficiency) of revenues and other sources over expenditures and other uses for: |  |  |  |
| Non-budgeted funds | (135,026) |  | (118,430) |
| Inclusion of blended component units |  | 36,637 | (196,607) |
| Timing differences:<br>Adjustment to encumbrances | (29,083) |  | 8,127 |
| Basis of accounting differences:<br>Net decrease in taxes receivable | (21,001) |  |  |
| Net increase (decrease) in other receivables and other assets | (33,174) | 1,923 |  |
| Net (increase) decrease in accounts payable and other liabilities | 454 | 1,253 | (2,804) |
| Excess (deficiency) of revenues and other financing sources over expenditures and other financing uses (GAAP basis) | $ 93,176 | $ 2,222 | $(139,060) |

## C. Deficit Fund Equity

The following component units reflect a deficit fund balance or retained earnings at June 30, 1995 (expressed in thousands):

Enterprise Funds:

| Health Facilities and Services Administration of Puerto Rico | $440,485 |
|---|---|
| Additional Lottery | 1,365 |

Public University Funds:

| Unexpended plant funds | $ 3,428 |
|---|---|

Component Units - Other:

| | |
|---|---:|
| Tourism Company of Puerto Rico | $172,830 |
| Puerto Rico Land Authority | 142,362 |
| Sugar Corporation of Puerto Rico | 142,161 |
| Puerto Rico Metropolitan Bus Authority | 50,662 |
| Puerto Rico Ports Authority | 41,125 |
| Corporation of Stocks and Deposits Insurance for the Savings and Loan Cooperatives | 35,703 |
| Farm Credit Guarantee Fund | 23,990 |
| Agricultural Services and Development Administration | 18,403 |
| Commercial Farm Credit and Development Corporation of Puerto Rico | 15,333 |
| Employment and Training Enterprises Corporation | 4,348 |
| Puerto Rico and Caribbean Cardiovascular Center Corporation | 4,337 |
| Musical Arts Corporation and Subsidiaries | 1,599 |
| Fine Arts Center Corporation | 1,288 |
| Homemakers Services Corp. | 756 |
| Industries for the Blind, Mentally Retarded, and Other Disabled Persons of Puerto Rico | 137 |

The Commonwealth and these entities are designing plans that will either increase revenues or decrease expenditures in order for them to cover these deficits.

## 4.   DEPOSITS AND INVESTMENTS

Under Commonwealth statutes, public funds deposited in commercial banks must be fully collateralized for the amount deposited in excess of federal depository insurance. All securities pledged as collateral are held by the Secretary of the Treasury, or an agent, in the Commonwealth's name. In addition, the Commonwealth maintains deposits with the Government Development Bank for Puerto Rico, the internal service fund, the Economic Development Bank for Puerto Rico, a discretely presented component unit, and the United States Government (for unemployment insurance).

Cash, cash equivalents and investments of the primary government at June 30, 1995 consist of (expressed in thousands):

### Primary Government

| | Unrestricted | Included in Debt Service | Included in Capital Projects | Included in Restricted Assets | Total |
|---|---:|---:|---:|---:|---:|
| Cash and cash equivalents | $3,119,447 | $286,901 | $508,678 | $ 602,729 | $ 4,517,755 |
| Investments | 4,732,862 | 247,477 | 14,495 | 1,529,866 | 6,524,700 |
| Total | $7,852,309 | $534,378 | $523,173 | $2,132,595 | $11,042,455 |

The carrying amount of deposits of the primary government at June 30, 1995 consists of (expressed in thousands):

| | |
|---|---:|
| Carrying amounts of deposits in governmental banks | $ 1,970,485 |
| Carrying amount of deposits in commercial banks | 1,884,535 |
| Carrying amount of deposits in US Government | 662,712 |
| | |
| Total carrying amount of deposits | $ 4,517,732 |
| | |
| Bank balance of deposits in commercial banks: | |
| Insured or collateralized | $ 558,788 |
| Uninsured or uncollateralized | 1,144,570 |
| | |
| Total bank balance of deposits in commercial banks | $ 1,703,358 |

The amount of the bank balance of deposits in commercial banks uninsured or uncollateralized at June 30, 1995 shown above, mainly correspond to the Government Development Bank for Puerto Rico (GDB), the internal service fund.

The deposit of approximately $663 million with the US Government represents unemployment insurance taxes collected from employers which are transferred to the Federal Unemployment Insurance Trust Fund in the US Treasury.

Deposits in governmental banks represent the balance of interest and noninterest bearing accounts in GDB. The deposit liability at GDB is substantially related to deposits from other component units and of the Commonwealth. Such deposit liability is not in agreement with governmental cash balances shown because of reconciling items such as outstanding checks, and deposits in transit.

The bank balance of GDB's deposits at June 30, 1995 is broken down as follows (expressed in millions):

| | |
|---|---:|
| Primary government | $ 2,078 |
| Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation | 20 |
| Public university funds | 8 |
| Other discretely presented components units | 940 |
| | |
| Total reporting entity | 3,046 |
| | |
| Municipalities of Puerto Rico | 569 |
| Other non-governmental entities | 198 |
| | |
| Total deposits per GDB | $ 3,813 |

No collateral is maintained for cash accounts in GDB at June 30, 1995.

Pursuant to statutory authority, the Secretary of the Treasury may invest in obligations of the Commonwealth, obligations of the United States, or in pools of obligations of the municipalities of Puerto Rico. The component units and the retirement systems may invest in those securities authorized by the legal provisions set forth in their organic acts such as stocks, corporate bonds, obligations of the United

States, mortgage loans and others. The Commonwealth's investments are categorized to provide an indication of the level of collateral risk assumed by the Commonwealth at year end. Risk categories are described as follows:

Category 1: Insured or registered, or securities held by the Commonwealth or its agent in the Commonwealth's name.

Category 2: Uninsured and unregistered, with securities held by the counterparty's trust department or agent in the Commonwealth's name.

Category 3: Uninsured and unregistered, with securities held by the counterparty, or by its trust department or agent but not in the Commonwealth's name.

Collateral risk classification for short-term investments and investments of the primary government are as follows (expressed in thousands):

| | 1 | Category 2 | 3 | Carrying Amount | Market Value |
|---|---|---|---|---|---|
| **Unrestricted** | | | | | |
| US Government and agencies securities | $2,049,080 | $ 271,463 | $ 8,781 | $ 2,329,324 | $2,364,970 |
| Mortgage-backed securities | 491,785 | 40,974 | 2,798 | 535,557 | 540,736 |
| Stocks | 487,015 | 347,126 | | 834,141 | 871,133 |
| Corporate bonds | 280,133 | 106,064 | | 386,197 | 398,397 |
| Repurchase agreements | 13,100 | | 30,000 | 43,100 | 43,884 |
| Trading securities | 107,527 | | | 107,527 | 107,527 |
| Commonwealth securities | 198,153 | 115 | 9,005 | 207,273 | 207,936 |
| Short-term investments | 2,771 | 279,053 | | 281,824 | 316,868 |
| Other | | | 210 | 210 | 210 |
| | 3,629,564 | 1,044,795 | 50,794 | 4,725,153 | 4,851,661 |
| Mortgage loans | | | | 7,709 | 7,709 |
| Total - unrestricted | | | | 4,732,862 | 4,859,370 |
| **Restricted** | | | | | |
| US Government and agencies securities | 33,177 | 145,839 | 220,661 | 399,677 | 400,810 |
| Mortgage-backed securities | | 422,761 | | 422,761 | 430,455 |
| Commercial paper | 26,816 | 10,595 | | 37,411 | 37,411 |
| Repurchase agreements | | 14,494 | | 14,494 | 14,494 |
| | 59,993 | 593,689 | 220,661 | 874,343 | 883,170 |
| Annuity contracts | | | | 133,175 | 141,208 |
| Fixed rate contracts | | | | 784,320 | 826,441 |
| Total - restricted | | | | 1,791,838 | 1,850,819 |
| Total | $3,689,557 | $1,638,484 | $ 271,455 | $6,524,700 | $6,710,189 |

Annuity contracts are purchased from the Government Development Bank for Puerto Rico (GDB) to fund Loto prizes of $200 thousand or more payable on an installment basis. Investments in zero coupon US Treasury strips (with maturity dates that coincide with pay-out schedules of the Loto prizes) constitute collateral for the annuities. As of June 30, 1995, market value of such collateral amounts to approximately $141 million. Annuity contracts are recorded at present value of future installment prize payments. Interest earned is not recognized as revenue, but credited to obligations for unpaid prize awards.

Local laws require that annuity contracts be held until maturity, unless the prizes to which they relate are not claimed within the statutory period. If not claimed, the annuities are canceled and proceeds thereof are transferred to the General Fund.

## Public University Funds

Cash, cash equivalents and investments of the public university funds at June 30, 1995 consist of (expressed in thousands):

|  | Unrestricted | Restricted | Total |
|---|---|---|---|
| Cash and cash equivalents | $ 168,142 | $ 1,876 | $ 170,018 |
| Investments | 298,732 | 219 | 298,951 |
| Total | $466,874 | $ 2,095 | $ 468,969 |

The carrying amount and the bank balances of deposits of the public university funds at June 30, 1995 consists of (expressed in thousands):

| Carrying amount of deposits in: | |
|---|---|
| Commercial banks | $ 153,676 |
| Deposits in governmental banks | 16,342 |
| Total carrying amount of deposits | $ 170,018 |
| | |
| Bank balance of deposits in: | |
| Commercial banks | $ 174,053 |
| Governmental banks | 12,391 |
| Total bank balance of deposits | $ 186,444 |
| | |
| Amount of deposits uninsured or uncollateralized (mainly deposits in GDB and EDB) | $ 13,422 |

Short-term investments and investments of the public university funds are as follows (expressed in thousands):

| Unrestricted | Carrying Amount | Market Value |
|---|---|---|
| Stocks | $ 100,098 | $ 128,694 |
| US Government and agencies securities | 98,485 | 101,227 |
| Corporate bonds | 28,670 | 29,415 |
| Foreign and municipal bonds | 14,455 | 15,963 |
| Short-term investments | 10,616 | 10,616 |
| Mortgage-backed securities | 6,774 | 7,056 |
| Mortgage loans | 4,762 | 4,572 |
| Others | 532 | 532 |
| Total unrestricted | $264,392 | $ 298,075 |

Unrestricted investments of the public university funds include approximately $240 million in investments at the University of Puerto Rico Retirement System. Such investments have been presented in the combined financial statements at their market value, which as of June 30, 1995 amounts to approximately $274 million. Unrestricted investments are classified as Category 1.

Restricted investments included in the public university funds have a carrying amount which approximates market, and are classified as Category 1.

The University of Puerto Rico Retirement System uses derivative financial instruments to manage its foreign currency investments which consists of forward contracts. Gain or losses are recognized in the same period in which gains or losses arising from the transaction being hedged are recognized. It is possible that the market price before or at the specified time to purchase the foreign currency may be lower than the price at which the System is committed to buy. This would reduce the value of the contract.

The market value of investments held in foreign currencies are translated into US dollars generally using current rates of exchange and the related translation adjustments in addition to the unrealized appreciation (depreciation) in fair value of investments is recorded in the statement of changes in net assets available for plan benefits as unrealized appreciation (depreciation) in fair value of investments.

**Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation**

Cash, cash equivalents and investments of the Office at June 30, 1995 consist of (expressed in thousands):

| | Unrestricted | Restricted | Total |
|---|---|---|---|
| Cash and cash equivalents | $ 20,366 | $ 6,583 | $ 26,949 |
| Investments | | 11,737 | 11,737 |
| Total | $ 20,366 | $ 18,320 | $ 38,686 |

The carrying amount of deposits of the Office at June 30, 1995 consists of (expressed in thousands):

| | | |
|---|---|---:|
| In commercial banks | $ | 6,560 |
| In governmental banks | | 20,389 |
| Total carrying amount of deposits | $ | 26,949 |

Bank balance of deposits in commercial banks fully insured or collateralized amount to approximately $843 thousand.

The bank balance of deposits in governmental banks consist of deposits maintained in Government Development Bank for Puerto Rico amounting approximately $20 million. No insurance or collateral is held for such deposits.

Investments of the Office are included as restricted assets held by a trustee and consist of US Treasury Bills with interest rates ranging from 5.125% to 5.86%.

Restricted investments included in the Office have a carrying amount of approximately $11.7 million, which approximates market, and are classified as Category 1.

### Component Units - Other

Cash, cash equivalents and investments of the component units - other at June 30, 1995 consist of (expressed in thousands):

| | Unrestricted | Restricted | Total |
|---|---:|---:|---:|
| Cash and cash equivalents | $1,151,381 | $ 777,105 | $1,928,486 |
| Investments | 1,091,318 | 1,360,329 | 2,451,647 |
| Total | $2,242,699 | $2,137,434 | $4,380,133 |

The carrying amount of the component units - other at June 30, 1995 consist of (expressed in thousands):

| | |
|---|---:|
| In commercial banks | $ 944,232 |
| In governmental banks | 982,119 |
| Total carrying amount of deposits | $1,926,351 |

At June 30, 1995, the bank balance of deposits with governmental banks amount to approximately $986 million was uninsured and uncollateralized.

| Bank balance of deposits in commercial banks: | |
|---|---:|
| Insured or collateralized | $ 622,306 |
| Uninsured or uncollateralized | 266,639 |
| Total banks balance of deposits in commercial banks | $ 888,945 |

Collateral risk classification for short-term investments and investments of component units - other are as follows (expressed in thousands):

| | Category | | | Carrying | Market |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | Amount | Value |
| **Unrestricted** | | | | | |
| US Government and agencies securities | $ 244,499 | $ 238,965 | $ | $ 483,464 | $ 481,635 |
| Repurchase agreements | 291,097 | | | 291,097 | 291,114 |
| Mortgage-backed securities | 90,270 | | 9,864 | 100,134 | 100,022 |
| Stocks | 744 | 103,592 | 8,957 | 113,293 | 113,293 |
| Commercial paper | 15,369 | 36,589 | 2,010 | 53,968 | 53,980 |
| Corporate bonds | | 36,804 | | 36,804 | 36,830 |
| Other | 9,500 | | | 9,500 | 7,419 |
| | 651,479 | 415,950 | 20,831 | 1,088,260 | 1,084,293 |
| Mortgage loans | | | | 2,121 | 2,121 |
| Real estate | | | | 937 | 937 |
| **Total - unrestricted** | | | | 1,091,318 | 1,087,351 |
| **Restricted** | | | | | |
| US Government and agencies securities | 390,010 | 35,148 | | 425,158 | 420,161 |
| Repurchase agreements | 153,054 | 1,400 | | 154,454 | 154,453 |
| Mortgage-backed securities | 10,000 | | 6,855 | 16,855 | 16,740 |
| Corporate Bonds | 423,121 | | | 423,121 | 423,121 |
| Other | 6,850 | | | 6,850 | 6,850 |
| | 983,035 | 36,548 | 6,855 | 1,026,438 | 1,021,325 |
| Fixed rate contracts | | | | 333,891 | 333,891 |
| **Total - restricted** | | | | 1,360,329 | 1,355,216 |
| **Total** | $1,634,514 | $ 452,498 | $27,686 | $ 2,451,647 | $2,442,567 |

## 5. RECEIVABLES

Taxes receivable at June 30, 1995 for the general fund was composed of approximately $56.6 and $23 million of income tax and excise tax, respectively. The tax receivable in the Trust and Agency funds of approximately $59.7 million corresponds to unemployment taxes receivable of the expendable trust fund.

On July 1, 1992, the functions of levying and collections of property taxes were transferred to the Municipal Revenues Collection Center, a separate legal entity that is not a component unit of the Commonwealth. The real and personal property tax is levied each July 1 and May 15, respectively, on the assessed values as of the prior January 1, for all properties located in Puerto Rico. Assessed values of real property are established at the estimated current value existing in the year 1957, and of personal property at the current value at the date of the assessment. From the assessed value not subject to exoneration from taxation, 1.03% of real and personal property tax collections is recorded in the debt service funds and is restricted for the payment of Commonwealth general obligation bonds and notes.

The Commonwealth, by statute, grants exoneration over real and personal property tax on the first $15 thousand of the assessed value of residential units occupied by the owner, and on the first $50 thousand in personal property of business enterprises if the taxpayer does not exceed $150 thousand in sales volume and makes payments to the municipalities for such exonerated amounts. The amount paid by the Commonwealth to the municipalities through the Municipal Revenues Collection Center for this exoneration during the year ended June 30, 1995 was approximately $137 million and was recorded as intergovernmental expenditures in the general fund.

## 6.  INTERFUND TRANSACTIONS

Interfund receivables and payables at June 30, 1995 are summarized as follows (expressed in thousands):

|  | Primary Government | Public University Funds | Office for the Liquidation | Component Units - Other |
|---|---|---|---|---|
| Due from: |  |  |  |  |
| Other funds | $107,410 | $ | $ | $ |
| Primary government |  | 50,059 |  | 171,368 |
| Component units - other |  | 17,425 | 2,382 | 31,788 |
| Total | $107,410 | $67,484 | $2,382 | $203,156 |
| Due to: |  |  |  |  |
| Other funds | $107,410 | $ | $ | $ |
| Primary government |  |  | 65 | 12,722 |
| Component units - other | 161,591 |  |  | 40,578 |
| Public university funds | 50,059 |  |  |  |
| Total | $319,060 | $ - | $ 65 | $ 53,300 |

The amount of advances to and from the different funds are summarized as follows (expressed in thousands):

|  | Primary Government | Office for the Liquidation | Component Units - Other |
|---|---|---|---|
| Advances to: |  |  |  |
| Other funds | $ 957,068 | $ | $ |
| Component units - other | 945,447 |  | 355 |
| Total | $1,902,515 |  | $ 355 |
| Advances from: |  |  |  |
| Other funds | $1,169,556 | $ | $ |
| Primary government |  | 26,695 | 986,320 |
| Component units - other |  | 67,108 | 12,850 |
| Total | $1,169,556 | $ 93,803 | $ 999,170 |

The difference between due and advances to/from is mainly due to:

a. Differences reported by the blended and discretely presented component units in their separately issued financial statements.

b. Reconciling items between component units with different fiscal years.

## 7. RESTRICTED ASSETS

Restricted assets of the primary government is comprised of the following cash, cash equivalents and investments (expressed in thousands):

### Primary Government

| | |
|---|---:|
| **General Fund** | |
| Cash and cash equivalents for the payment of special promissory notes | $ 30,000 |
| | |
| **Debt Service Funds** | |
| Cash and cash equivalents for the payment of long-term debt | 74,033 |
| Investments for the payment of long-term debt | 822 |
| | |
| Total restricted assets in the debt service funds | 74,855 |
| | |
| **Capital Project Funds** | |
| Cash and cash equivalents for the payment of construction | 4,495 |
| Investments for the payment of construction | 32,354 |
| | |
| Total restricted assets in the capital project funds | 36,849 |
| | |
| **Internal Service Funds** | |
| Investments for the payment of long-term debt | 1,363,515 |
| Cash and cash equivalents for the payment of long-term debt | 486,883 |
| | |
| Total restricted assets in the internal service funds | 1,850,398 |
| | |
| **Enterprise Funds** | |
| Investments for the payment of lottery prizes | 133,175 |
| Cash and cash equivalents for purchase of assets | 7,318 |
| | |
| Total restricted assets in the enterprise funds | 140,493 |
| | |
| Total restricted assets of the primary government | $2,132,595 |

### Public University Funds

Restricted assets of public university funds include cash and cash equivalents, investments, receivables and other assets, as follows (expressed in thousands):

| | |
|---|---:|
| Pediatric Hospital operations | $15,813 |
| Federal grants and contracts | 10,673 |
| Other | 2,212 |
| | |
| Total | $28,698 |

- 53 -

**Office for the Liquidation of the Accounts of the
Puerto Rico Urban Renewal and Housing Corporation**

Restricted assets of the Office include cash and investments which are restricted for the following purposes (expressed in thousands):

| | |
|---|---|
| Debt service and sinking fund requirements | $11,977 |
| Housing Projects | 6,343 |
| Total | $18,320 |

## Component Units - Other

Restricted assets of the component units - other includes cash, cash equivalents and investments for the following purposes (expressed in thousands):

### Cash and Cash Equivalents

| | |
|---|---|
| Debt service and sinking fund requirements | $ 309,244 |
| Construction funds | 164,077 |
| Payment of repurchase agreement* | 95,739 |
| Renewal and replacement funds | 87,431 |
| Death and disability funds | 69,598 |
| Purchase of assets | 11,761 |
| Other | 39,255 |
| Total cash and cash equivalents | 777,105 |

### Investments

| | |
|---|---|
| Debt service and sinking fund requirements | 1,137,346 |
| Payment of repurchase agreement* | 145,000 |
| Construction funds | 15,012 |
| Renewal and replacement funds | 8,618 |
| Other | 54,353 |
| Total investments | 1,360,329 |
| Total restricted assets of  component units - other | $2,137,434 |

\* The net interest income generated by these funds must be used mainly to subsidize low-income housing mortgage activities.

- 54 -

8.  **FIXED ASSETS**

**Primary Government:**

Activity in the general fixed assets account group for the fiscal year ended June 30, 1995, was as follows (expressed in thousands):

| | Balance July 1, 1994 (As previously reported) | Adjustments | Additions | Retirements | Balance June 30, 1995 |
|---|---|---|---|---|---|
| Land | $ 114,626 | $ (52,248) | $ 4,223 | $ 5,526 | $ 61,075 |
| Buildings | 498,172 | 747,884 | 48,022 | 177 | 1,293,901 |
| Equipment | 1,097,745 | (767,575) | 10,594 | 216,560 | 124,204 |
| Construction in progress | 586,957 | (160,048) | 168,655 | 67,779 | 527,785 |
| Other assets | 106,081 | (105,718) | 67 | 48 | 382 |
| Total | $2,403,581 | $(337,705) | $ 231,561 | $290,090 | $2,007,347 |

As discussed in Notes 1 and 11, the general fixed assets account group beginning balance at July 1, 1994 was restated to give effect to the following:

- change in the blending method of the Public Buildings Authority and of the Puerto Rico Land Administration.

- change in the capitalization policy financial reporting purposes for equipment owned by the central government of the Commonwealth to $100,000 per unit.

Fixed assets for the proprietary and fiduciary fund types as of June 30, 1995, were as follows (expressed in thousands):

| | Enterprise Funds | Fiduciary Funds |
|---|---|---|
| Land | $128,114 | $ 2,917 |
| Buildings | 65,130 | 8,993 |
| Equipment | 115,553 | 14,215 |
| Construction in progress | 21,623 | 366 |
| Other | 33 | |
| Total | 330,453 | 26,491 |
| Less  Accumulated depreciation | 147,322 | 6,859 |
| Fixed assets, net | $183,131 | $19,632 |

- 55 -

**Discretely Presented Component Units:**

|  | Public University Funds | Office for the Liquidation | Component Units - Other |
|---|---|---|---|
| Land | $   18,139 | $ | $      383,237 |
| Buildings and improvements | 280,073 | | 7,477,814 |
| Equipment | 184,758 | 148 | 2,127,859 |
| Construction in progress | 50,429 | | 1,453,241 |
| Other assets | 3,156 | | 1,632,094 |
| Total | 536,555 | 148 | 13,074,245 |
| Less accumulated depreciation and amortization | 1,075 | 70 | 4,033,757 |
| Fixed assets - net | $ 535,480 | $          78 | $9,040,488 |

## 9.   OBLIGATIONS UNDER LEASE/PURCHASE ARRANGEMENTS

The Commonwealth is obligated under capital leases with third parties that expire through 2018 for buildings and equipment used by certain Commonwealth departments. At June 30, 1995, the capitalized cost of the buildings and equipment amounted to approximately $25 million and is included in the general fixed assets account group. The present value of future minimum capital lease payments as of June 30, 1995, included in other long-term liabilities in the general long-term debt account group is as follows (expressed in thousands):

| Year Ending June 30, | Amount |
|---|---|
| 1996 | $  3,895 |
| 1997 | 3,914 |
| 1998 | 3,121 |
| 1999 | 2,814 |
| 2000 | 2,845 |
| Thereafter | 37,847 |
| Total minimum lease payments | 54,436 |
| Less:  amount representing interest | 32,111 |
| Present value of minimum lease payments | $22,325 |

The Commonwealth is also committed under numerous operating leases, excluding those with the Public Buildings Authority, covering real property and equipment. Rental expenditures within the general fund for the year ended June 30, 1995, under such operating leases were approximately $239 million. Management believes that the summary of the future minimum rental commitments under noncancelable real property and equipment leases with terms exceeding one year is not significant.

## 10.  LONG-TERM DEBT

### Governmental Funds Operations

### Summary of General Long-Term Debt

The following schedule shows the changes in the general long-term debt account group for the year ended June 30, 1995 (expressed in thousands):

| | Balance at July 1, 1994 (As restated) | Debt Issued | Debt paid and defeased | Other Net Increases (Decreases) | Balance at June 30, 1995 |
|---|---|---|---|---|---|
| Bonds payable | $6,750,020 | $ 415,180 | $   367,065 | $   163,202 | $ 6,961,337 |
| Notes payable | 120,424 | | 90,000 | | 30,424 |
| Due to component units | 159,709 | | 30,583 | | 129,126 |
| Advances from other funds | 279,439 | 335,701 | 76,807 | 332,408 | 870,741 |
| Due to other governmental entities | 190,788 | | 187,192 | | 3,596 |
| Compensated absences | 658,659 | | | (32,869) | 625,790 |
| Other long-term liabilities | 633,289 | | | (38,949) | 594,340 |
| Unfunded pension liability | | | | 5,852,985 | 5,852,985 |
| Total | $8,792,328 | $750,881 | $  751,647 | $6,276,777 | $15,068,339 |

Balances at July 1, 1994 were restated to include the long-term obligations of the Public Buildings Authority and the Puerto Rico Land Administration. See Note 11.

### A.  Debt Limitation

The Constitution authorizes the contracting of debts as determined by the Legislature.  Nevertheless, the Constitution provides that direct obligations of the Commonwealth evidenced by bonds or notes and backed by the full faith, credit and taxing power of the Commonwealth, shall not be issued if the amount of the principal of, and interest on, such bonds and notes and on all such bonds and notes issued thereafter which is payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and conveyed into the Treasury (hereinafter "internal revenues") in two fiscal years preceding the then current fiscal year.  Section 2, Article VI of the Constitution does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded.  Internal revenues consist principally of income taxes and excise taxes.  Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages, tobacco products and customs duties, which are collected by the United States Government and returned to the Commonwealth, and motor vehicle fuel taxes and license fees, which are allocated to the Puerto Rico Highway and Transportation Authority, a blended component unit, are not included as revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service.  The Commonwealth has never defaulted on the payment of principal or interest on any of its general long-term debt obligations.

At June 30, 1995, the Commonwealth is in compliance with the debt limitation requirement.

**B.   Bonds Payable**

The Constitution of the Commonwealth provides that public debt will constitute a first claim on the available revenues of the Commonwealth.  Public debt includes general obligations and notes of the Commonwealth and any payment required to be made by the Commonwealth under its guarantees of bonds issued by blended or discretely presented component units.  The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal and interest of the general obligation bonds.

Law No. 83 of August 30, 1991, as amended, provides for the levy of an annual special tax of 1.03% of the assessed value of all real and personal property not exonerated from taxation.  The levy is performed by the Municipal Revenues Collection Center (MRCC), a municipal corporation.  MRCC is required to remit the 1.03% of property tax collected to the Commonwealth to be used by the Commonwealth's debt service funds for payment of debt service on general obligations and notes of the Commonwealth.

For financial reporting purposes, long-term bonds are carried at their face amount, without premium or discount.  The outstanding amount represents the total principal to be repaid; for capital appreciation bonds, it represents total principal and interest to be repaid.

Bonds payable outstanding at June 30, 1995 are as follows (expressed in thousands):

| | General Obligation | Revenue Bonds | Total |
|---|---|---|---|
| Term bonds payable through 2023; interest payable semiannually at rates varying from 3% to 9% | $ 1,712,855 | $1,355,795 | $ 3,068,650 |
| Serial bonds payable through 2011; interest payable semiannually at rates varying from 3.75% to 8.0% | 1,407,000 | 1,436,587 | 2,843,587 |
| Capital appreciation bonds payable through 2011; no interest rate, yield ranging from 7% to 7.8%. Net of unaccreted discount of $275 million | 262,611 | 85,477 | 348,088 |
| Appropriation Refunding Bonds for Low Income Housing payable through 2005, interest rate from 6.9% to 8%. | 163,472 | | 163,472 |
| Bond payment obligation payable through 2008; interest payable at rates varying from 3.5% to 5.5% | 33,450 | | 33,450 |
| Bond payment obligation payable through 2009; interest payable at rates varying from 3.5% to 5.5% | 44,240 | | 44,240 |
| Bond payment obligation payable through 2010; interest payable at rates varying from 1.5% to 5.5% | 48,220 | | 48,220 |
| Auction rate notes payable from 2007 through 2008; interest payable in arrears from 2007 through 2008 at rates varying from 2.65% to 11.564% | 26,700 | | 26,700 |
| Auction rate notes payable from 2015 through 2020; interest payable in arrears from 2015 through 2020 at rates varying from 2.65% to 11.662% | 94,900 | | 94,900 |
| Yield curve notes payable from 2007 through 2008; no interest rate, yield of 8.914% | 26,700 | | 26,700 |
| Yield curve notes payable from 2015 through 2020; no interest rate, yield of 9.012% | 94,900 | | 94,900 |
| Tax-exempt components maturing through 2007 and 2008 interest rates range from 5.5% to 5.6% | | 72,160 | 72,160 |
| Deferred interest bonds payable through 2002; interest payable semiannually at 8% | 50,000 | | 50,000 |
| Indexed inverse floaters maturing through 2016 interest rate at 5.70% | | 46,000 | 46,000 |
| Total | 3,965,048 | 2,996,019 | 6,691,067 |
| Savings Bonds | 270 | | 270 |
| Total bonds payable | $ 3,965,318 | $2,996,019 | $ 6,961,337 |

From the serial revenue bonds payable, approximately $263 million of bonds issued by the Puerto Rico Infrastructure Financing Authority (PRIFA), a blended component unit, are payable solely from, and secured by, a pledge of federal excise taxes and other monies deposited to the credit of a sinking fund established pursuant to a trust agreement. Up to fiscal year ending June 30, 2018, the first $40 million of federal excise taxes received by the Commonwealth will be transferred to PRIFA for deposit to PRIFA's infrastructure fund (Infrastructure Fund). The maximum principal and interest requirements on these revenue bonds in any fiscal year is approximately $37 million. Federal excise taxes consist of taxes received by the Commonwealth from the United States in connection with rum and other articles subject to federal excise tax produced in Puerto Rico and sold in the United States. Rum is the only article currently produced in Puerto Rico subject to federal excise tax, the proceeds of which are required to be transferred back to the Commonwealth.

The federal excise taxes securing the bonds are subject to a number of factors, including the continued imposition and remittance of such taxes to the Commonwealth and conditions affecting the Puerto Rico rum industry. If the federal excise taxes received by the Commonwealth in any fiscal year are insufficient to deposit $40 million into the Infrastructure Fund, PRIFA shall request, and the Commonwealth shall include in the budget for the corresponding fiscal year, the appropriation needed to cover the deficiency. The Legislature, however, is not legally obligated to make the necessary appropriation to cover the deficiency.

The appropriation refunding bonds for low income housing is the balance of bonds payable assumed by the Commonwealth as a result of Law No. 134 dated December 13, 1994. This Law authorized the assumption of bonds payable by the former Puerto Rico Urban Renewal and Housing Corporation. The Commonwealth had been funding this liability.

During the year ended June 30, 1995, the following changes occurred in the bonds payable (expressed in thousands):

| | Outstanding July 1, 1994 (As restated) | Issued | Discount Accretion (Redeemed) | Outstanding June 30, 1995 |
|---|---|---|---|---|
| Term bonds | $2,977,230 | $ 188,030 | $    (96,610) | $3,068,650 |
| Serial bonds | 2,911,265 | 227,150 | (294,828) | 2,843,587 |
| Capital appreciation bonds | 323,985 | | 24,103 | 348,088 |
| Appropriation refunding bonds | | | 163,472 | 163,472 |
| Bond payment obligations | 125,910 | | | 125,910 |
| Auction rate notes | 121,600 | | | 121,600 |
| Yield curve notes | 121,600 | | | 121,600 |
| Tax-exempt components | 72,160 | | | 72,160 |
| Deferred interest bonds | 50,000 | | | 50,000 |
| Indexed inverse | 46,000 | | | 46,000 |
| Savings bonds | 270 | | | 270 |
| Total | $6,750,020 | $ 415,180 | $  (203,863) | $6,961,337 |

Fixed maturities of general obligations and of revenue bonds payable principal, including accrued interest of capital appreciation bonds are as follows (expressed in thousands):

| Year Ending June 30 | Principal | Interest | Total |
|---|---|---|---|
| 1996 | $ 333,255 | $ 397,120 | $ 730,375 |
| 1997 | 317,036 | 423,848 | 740,884 |
| 1998 | 319,759 | 415,371 | 735,130 |
| 1999 | 326,854 | 361,399 | 688,253 |
| 2000 | 331,800 | 334,206 | 666,006 |
| Thereafter | 5,226,346 | 3,716,180 | 8,942,526 |
| Total | 6,855,050 | $5,648,124 | $12,503,174 |
| Plus accreted discount | 106,287 | | |
| Total | $6,961,337 | | |

## C. Notes Payable

Notes payable of $30 million include a special promissory note due during fiscal 1995-96. The note is payable from the revenues received from taxes levied, due and to be collected by the Commonwealth and revenues segregated pursuant to joint resolution Number 3 approved on October 16, 1985. Such resolution was enacted to reimburse to the general fund advances made to certain entities in previous fiscal years. The note bears interest at rates from 82.5% to 85% of the applicable London Interbank Bid Quotation Rate (LIBID), but not to exceed 12% per annum. Interest is payable quarterly. The general fund includes restricted assets of approximately $30 million in interest bearing accounts which guarantee payment of the special promissory note (see Note 7). Also, the Public Buildings Authority has a note payable for approximately $400 thousand.

## D. Due to Component Units

The amounts due to component units include the following (expressed in thousands):

| | |
|---|---|
| Puerto Rico Electric Power Authority | $ 95,820 |
| University of Puerto Rico | 33,306 |
| Total | $129,126 |

The amount due to the Puerto Rico Electric Power Authority (PREPA), a discretely presented component unit, consists of the following (expressed in thousands):

| | |
|---|---|
| Fuel adjustment subsidy | $ 75,947 |
| Rural irrigation system cost reimbursement | 19,873 |
| Total | $ 95,820 |

On October 29, 1991, the Commonwealth entered into an agreement with PREPA for the payment of the outstanding fuel adjustment subsidy as of June 30, 1991 whereas the Commonwealth will pay the outstanding balance over a fifteen-year period in *installments* of approximately $6 million per annum, without interest. On August 29, 1994 and September 6, 1994, the Commonwealth made payments amounting to approximately $12.7 million for fiscal years 1994 and 1995.

The rural irrigation system cost reimbursement debt is repaid by the Commonwealth by offsetting certain contributions in lieu of taxes that PREPA must remit to the Commonwealth. The yearly amortization will vary depending on the electric gross sales for the year. The amortized amount for the year ended June 30, 1995 was approximately $14.6 million.

The amount due to the University of Puerto Rico, included in the public university fund, consist of the following (expressed in thousands):

| | |
|---|---|
| Crude oil taxes | $ 16,000 |
| Reimbursement for Pediatric Hospital | 17,306 |
| | $ 33,306 |

The Commonwealth agreed to pay the University of Puerto Rico $46 million for certain taxes imposed and collected under Act No. 2 of October 8, 1987 related to the sale of crude oil that should have been included in the annual revenues used to determine the appropriation to the University of Puerto Rico. The Commonwealth paid $16 million during the year ended June 30, 1995, and will pay one installment of $16 million for the year ending June 30, 1996.

The University administered the Pediatric Hospital (the Hospital) under a contract between the University and the Puerto Rico Department of Health whereby the Hospital was reimbursed by the Department for patient and outpatient services.

During August 1994, an agreement was reached with the Puerto Rico Department of Health pursuant to which the Department agreed to pay to the University $17,306 as a settlement of a claim related to unreimbursed costs of providing medical services in excess of the contracted amounts and the transfer of the Hospital to the Puerto Rico Department of Health, including the transfer of medicines, materials and equipment. The amount is payable in six annual installments of $2,884 commencing on June 30, 1996.

E.  **Advances from Other funds**

The advances from other funds at June 30, 1995, consist of loans owed by the Commonwealth to the Government Development Bank for Puerto Rico (GDB), the internal service fund, for the following purposes (expressed in thousands):

| | |
|---|---|
| Promissory note | $ 292,339 |
| Construction credit lines | 194,169 |
| Property tax settlement loan | 190,738 |
| Public schools infrastructure improvement loan | 91,070 |
| Disaster assistance loan | 86,397 |
| Law 71 loan | 16,028 |
| Total | $ 870,741 |

The promissory note payable of approximately $292 million is the amount owed as a result of the sale of the maritime shipping business by the Puerto Rico Maritime Shipping Authority (PRMSA). The Commonwealth assumed this liability formerly owed by PRMSA to GDB. However, since GDB, through one of its subsidiaries, issued bonds to restructure this liability, the note receivable of GDB from PRMSA, together with the bonds payable, are considered to be "no-commitment" debt since GDB pledged the note for the payment of the bonds outstanding. The promissory note bears interest of 8.25% and is payable in 48 semi-annual installments approximately $6.1 million.

The outstanding balance of the construction credit lines amounting to approximately $194.2 million is composed of the following amounts owed by blended component units:

Puerto Rico Highway and Transportation (PRHTA) has an authorized line of credit of $200 million expiring on December 1, 1996. Advances outstanding and the interest rate under the line of credit amounted to approximately $74.4 million and 5.32%.

Public Buildings Authority (PBA) has an authorized line of credit of $243 million, due December 31, 1996. Advances outstanding and the interest rate under the line of credit amounted to approximately $119.8 million of 5.32%.

During the year, the Commonwealth paid to the municipalities of Puerto Rico approximately $191 million to cover the Commonwealth's debt for property tax collected, and the exonerated property tax reimbursements which were in arrears as of June 30, 1993. The Commonwealth financed this amount by taking a line of credit from the Government Development Bank for Puerto Rico, the internal service fund.

Debt service requirements in future years are as follows (expressed in thousands):

| Year Ending June 30 | Principal | Interest | Total |
|---|---|---|---|
| 1996 | $ 3,846 | $ 11,154 | $ 15,000 |
| 1997 | 4,509 | 14,952 | 19,461 |
| 1998 | 4,870 | 14,591 | 19,461 |
| 1999 | 5,260 | 14,201 | 19,461 |
| 2000 | 5,680 | 13,781 | 19,461 |
| Thereafter | 166,573 | 125,337 | 291,910 |
| Total | $ 190,738 | $ 194,016 | $ 384,754 |

The public schools infrastructure improvement loan was taken to provide additional funds for major repairs and improvements of the public schools in Puerto Rico. This activity is administered by the Office for the Improvement of the Public Schools of Puerto Rico. The loan will be paid by the Commonwealth using the contributions in lieu of taxes that the Commonwealth will collect from the Puerto Rico Telephone Authority, a discretely presented component unit, of at least $20 million per year.

Debt service requirements in future years are as follows (expressed in thousands):

| Year Ending June 30, | Principal | Interest | Total |
|---|---|---|---|
| 1996 | $ 12,259 | $ 7,741 | $ 20,000 |
| 1997 | 13,301 | 6,699 | 20,000 |
| 1998 | 14,431 | 5,569 | 20,000 |
| 1999 | 15,658 | 4,342 | 20,000 |
| 2000 | 16,989 | 3,011 | 20,000 |
| Thereafter | 18,432 | 1,568 | 20,000 |
| Total | $ 91,070 | $ 28,930 | $ 120,000 |

Subsequent to June 30, 1995, the Commonwealth refinanced this advance, and obtained an additional advance of $100 million, for the same purposes. The new advance will be repaid from the educational fund which will be funded by contributions in lieu of taxes from the Puerto Rico Telephone Authority.

The disaster assistance loan consists of the amount owed to GDB of approximately $86.4 million to repay a debt for such amount to the Federal Emergency Management Agency, which covered the Commonwealth's share for the relief grants for the residents of Puerto Rico as a result of Hurricane Hugo. Debt service requirements in future years are as follows (expressed in thousands):

| Year Ending June 30, | Principal | Interest | Total |
|---|---|---|---|
| 1996 | $ 7,835 | $ 4,320 | $ 12,155 |
| 1997 | 8,227 | 3,928 | 12,155 |
| 1998 | 8,638 | 3,517 | 12,155 |
| 1999 | 9,070 | 3,085 | 12,155 |
| 2000 | 9,524 | 2,631 | 12,155 |
| Thereafter | 43,103 | 5,517 | 48,620 |
| Total | $ 86,397 | $22,998 | $109,395 |

Law 71 authorizes the Department of Education to take a loan up to $25 million from GDB to pay the remaining of the back pay owed to the teachers and other employees as stated in Law 89. Law 89 established that any employee that had not received a salary raise in five years, the sixth year there is an obligation to provide a pay raise. Sixteen million of the credit line were transferred during the fiscal year 94-95. The credit line will be paid on July 1, 1995 and 1996 and accrues interest at 6.5% per annum. Subsequent to June 30, 1995, the Commonwealth entered into new financing agreements with GDB to refinance this advance.

F.  **Due to Other Governmental Entities**

The amounts due to other governmental entities include the amount owed to the Federal Emergency Management Agency for approximately $3.6 million.

The Federal Emergency Management Agency approved two loans to the Commonwealth for a total of approximately $14.5 million. The proceeds of said loans were used to cover the non-federal share of the Individual and Family Grant Program related to floods occurred in January 1992. Debt service requirements in future year is approximately $3.6 million, including approximately $214 thousand in interest, to be paid during fiscal year 1995-96.

### G.  Compensated Absences

General long-term debt includes approximately $323 million of accrued sick leave benefits, and approximately $303 million of accrued vacation benefits, representing the Commonwealth's commitment to fund such costs from future operations.

### H.  Other Long-Term Liabilities

The remaining long-term liabilities include (expressed in thousands):

| | |
|---|---:|
| Deposits for construction | $288,081 |
| Provisions for legal claims and judgments | 240,959 |
| Provision for federal cost disallowances | 40,636 |
| Obligations under capital lease | 22,325 |
| Other | 2,339 |
| Total | $594,340 |

### I.  Advance Refunding and Defeased Bonds

The Commonwealth advance refunded certain general obligation bonds through the issuance of approximately $90.2 million of general obligation public improvements refunding bonds during the year ended June 30, 1995.  The Commonwealth used $91.3 million from the net proceeds of the issued bonds which were used to purchase US Government securities which were deposited in an irrevocable trust fund with an escrow agent to provide for all future debt service payments of the refunded bonds.  As a result, the refunded bonds are considered to be defeased, and the liabilities therefore have been removed from the general long-term debt account group.  As a result of these advance refunding, the Commonwealth decreased current year debt service payments and has taken advantage of lower interest rates, and it has decreased its aggregate debt service payments by approximately $7 million over the next 6 years and obtained an economic gain (the difference between the present values of the debt service payments of the refunded and refunding bonds) of approximately $4.5 million.  At June 30, 1995 approximately $87.2 million of the bonds refunded remain outstanding and are considered defeased.

In prior years, the Commonwealth also defeased certain general obligation and other bonds by placing the proceeds of bonds in an irrevocable trust to provide for all future debt service payments on the refunded bonds.  Accordingly, the trust account assets and liabilities for the defeased bonds are not included in the general purpose financial statements.  At June 30, 1995 approximately $1,511 million of bonds outstanding from prior years advance refundings are considered defeased.

In addition, the Public Buildings Authority (PBA) and the Puerto Rico Highway and Transportation Authority (PRHTA) blended component units, have defeased certain revenue bonds by placing the proceeds of new bonds in irrevocable trusts to provide for all future debt service payments on the old debts.  Accordingly, the trust account assets and liabilities for the defeased bonds are not included in the general purpose financial statements.  As of June 30, 1995, approximately $1.326 billion for PBA and $613 million for PRHTA are considered defeased.

**J.**  **Internal Service Fund Operations - Government Development Bank for Puerto Rico**

Revenue Bonds - Revenue bonds are those bonds that are paid out from resources pledged in the internal service fund. These revenue bonds do not constitute a liability or debt of the Commonwealth. Revenue bonds outstanding at June 30, 1995, amount to approximately $1.3 billion.

Fixed future amounts required to pay principal on revenue bonds at June 30, 1995, are as follows (expressed in thousands):

| Year Ending June 30 | Principal |
|---|---|
| 1996 | $ 230,000 |
| 1997 | 71,500 |
| 2000 | 331,990 |
| Thereafter | 693,023 |
| Total | $ 1,326,513 |

Notes Payable - Internal service fund notes payable consists of promissory notes, mortgages and revenue notes. Notes payable outstanding at June 30, 1995, amounted to approximately $1.3 billion, of which approximately $1.2 billion is commercial paper. The notes bear interest at variable rates ranging from 7.25% to 7.50%.

Future fixed amounts required to pay principal on notes payable at June 30, 1995, are as follows (expressed in thousands):

| Year Ending June 30, | Total |
|---|---|
| 1996 | $ 1,223,251 |
| 1998 | 3,600 |
| 1999 | 9,500 |
| 2000 | 63,150 |
| Total | $ 1,299,501 |

**K.**  **Discretely Presented Component Units**

Public University Funds

The University of Puerto Rico has issued revenue bonds designated as *University System Revenue Bonds*, the proceeds of which have been used mainly to finance new activities in connection with its educational facilities construction program and to cancel and refinance previous debts.

Revenue bonds outstanding at June 30, 1995, were approximately $345.7 million net of discounts of approximately $39.1 million with interest rates varying from 2.75% to 8% and a final maturity date of 2025.

Future amounts required to pay principal and interest on University System Revenue Bonds at June 30, 1995, are as follows (expressed in thousands):

| Year Ending June 30, | Principal | Interest | Total |
|---|---|---|---|
| 1996 | $ 10,920 | $ 18,817 | $ 29,737 |
| 1997 | 12,801 | 16,931 | 29,732 |
| 1998 | 13,312 | 16,420 | 29,732 |
| 1999 | 13,878 | 15,864 | 29,742 |
| 2000 | 14,652 | 15,083 | 29,735 |
| Thereafter | 319,277 | 165,117 | 484,394 |
| Subtotal | 384,840 | 248,232 | 633,072 |
| Discounts | (39,108) | | (39,108) |
| Total | $ 345,732 | $ 248,232 | $ 593,964 |

The agreements underlying the above bonds payable provide for various covenants.

In May 1995, the University issued approximately $177.7 million of University System Revenue Bonds Series M (Revenue Bonds), and $142.8 million of University System Revenue Refunding Bonds Series N (Refunding Bonds) totalling $320.5 million.

The Revenue Bonds were issued principally to repay the line of credit to the Government Development Bank for Puerto Rico of approximately $74.4 million and make a deposit to the Construction Fund of approximately $90.6 million for the Capital Improvement Program.

The Refunding Bonds were issued to advance refund and defease approximately $143.9 million of other University's revenue bonds and revenue refunding bonds outstanding. The proceeds were used to purchase US government securities which were deposited in an irrevocable trust with an escrow agent to provide debt service payments until the bonds mature or are called. The advance refunding met the requirements of an in-substance debt defeasance. As a result of this advance refunding, the University reduced its total debt service requirements by approximately $24.2 million, which resulted in an economic gain (difference between the present value of the debt service payments on the old and new debt) of approximately $12 million. The advance refunding resulted in a loss between the reacquisition price and the net carrying amount of the old debt of approximately $10 million. The outstanding balance of the bond issues defeased by the University at June 30, 1995 was approximately $143 million.

Office for the Liquidation of the Accounts of the
Puerto Rico Urban Renewal and Housing Corporation

Long-term debt of the Office at June 30, 1995 consisted of approximately $61.9 million mortgage notes payable to the Farmer Home Administration and the US Department of Housing and Urban Development, secured by land. The notes are due in monthly installments of varying amounts, including interest through the year 2032, and bear interest of 3% to 11.25%.

Future amounts required to pay principal balances at June 30, 1995 are as follows (amounts expressed in thousands):

| | |
|---|---|
| 1996 | $ 1,345 |
| 1997 | 1,412 |
| 1998 | 1,508 |
| 1999 | 1,610 |
| 2000 | 1,719 |
| Thereafter | 54,274 |
| Total | $61,868 |

Component Units - Other

Bonds and notes payable are those liabilities that are paid out of resources pledged in the other component units. These revenue bonds do not constitute a liability or debt of the Commonwealth. Bonds payable and notes payable outstanding at June 30, 1995, are as follows (expressed in thousands):

| | Final Maturity Date | Interest Rates | Balance |
|---|---|---|---|
| **Bonds Payable:** | | | |
| Puerto Rico Electric Power Authority | 2028 | 3% to 8.7% | $ 2,847,679 |
| Puerto Rico Telephone Authority | 2022 | 3.4% to 9.875% | 981,063 |
| Puerto Rico Housing Bank and Finance Agency | 2029 | 3.8% to 7.5% | 655,045 |
| Puerto Rico Municipal Finance Agency | 2008 | 4.10% to 9.25% | 483,537 |
| Puerto Rico Aqueduct and Sewer Authority | 2034 | 5% to 8.8% | 436,026 |
| Puerto Rico Industrial Development Company | 2016 | 3.88% to 8.27% | 187,919 |
| Puerto Rico Ports Authority | 2021 | 5% to 7.3% | 132,711 |
| Recreational Development Company of Puerto Rico | 1997 | 4% to 5.40% | 382 |
| Total bonds payable | | | $ 5,724,362 |
| **Notes Payable:** | | | |
| Puerto Rico Electric Power Authority | 1997 | 3.09% to 2.54% | $ 110,000 |
| Economic Development Bank for Puerto Rico | 2000 | 5% to 5.98% | 83,200 |
| Puerto Rico Aqueduct and Sewer Authority | 2001 | 5.75%-7.25% | 19,815 |
| Corporation of Stocks and Deposit | 2000 | 6.0% | 15,538 |
| Puerto Rico Telephone Authority | 1999 | 6.78% | 14,660 |
| Sugar Corporation of Puerto Rico | 1998 | Variable | 13,200 |
| Automobile Accident Compensation Administration | 1999 | 5.92% to 6.32% | 12,006 |
| Puerto Rico Industrial and Development Corp. | 1998 | 5.85% to 7.125% | 6,350 |
| Tourism Company of Puerto Rico | 2002 | 4% to 8.35% | 4,472 |
| Corporation of Stocks and Deposit Insurance for the Savings and Loans Cooperatives | 2003 | N/A | 616 |
| Total notes payable | | | $ 279,857 |

Fixed maturities required to pay principal and interest on other component units bonds payable and notes payable with fixed maturities at June 30, 1995, were as follows (expressed in thousands):

| Bonds Payable Year Ending June 30, | Principal | Interest | Total |
|---|---|---|---|
| 1996 | $ 300,167 | $ 323,946 | $ 624,113 |
| 1997 | 249,042 | 324,868 | 573,910 |
| 1998 | 268,624 | 310,942 | 579,566 |
| 1999 | 271,304 | 297,107 | 568,411 |
| 2000 | 259,565 | 284,141 | 543,706 |
| Thereafter | 4,602,459 | 2,911,774 | 7,514,233 |
| | 5,951,161 | 4,452,778 | 10,403,939 |
| Discounts | (226,799) | | (226,799) |
| Total | $5,724,362 | $4,452,778 | $10,177,140 |

- 68 -

| Notes Payable Year Ending June 30, | Principal | Interest | Total |
|---|---|---|---|
| 1996 | $ 107,197 | $ 9,439 | $ 116,636 |
| 1997 | 79,033 | 6,893 | 85,926 |
| 1998 | 45,102 | 4,656 | 49,758 |
| 1999 | 11,964 | 2,806 | 14,770 |
| 2000 | 28,298 | 1,827 | 30,125 |
| Thereafter | 8,263 | 259 | 8,522 |
| Total | $ 279,857 | $ 25,880 | $ 305,737 |

## 11.  RECLASSIFICATIONS AND RESTATEMENTS

Certain reclassifications have been made to the beginning fund balances in the component units-other column. The amount reported as fund balances/retained earnings at beginning of the year in the statement of revenues and expenses and changes in retained earnings (deficit) / fund balances - all proprietary fund types, pension trust funds and similar discretely presented component units was restated as follows:

|  | Component Units Other |
|---|---|
| Ending fund balances/retained earnings (deficit) as previously reported | $ 1,024,166 |
| Reclassifications to: |  |
| Contributed capital | (81,579) |
| Deficit | (123,190) |
| Ending fund balances/retained earnings as restated | $ 819,397 |

The Commonwealth has also restated its beginning balances of the following fund types to reflect the change in accounting policies and the adoption of new accounting pronouncements (expressed in thousands):

|  | Capital Projects | Internal Service | Component Units |
|---|---|---|---|
| Beginning fund balances/ retained earnings, as previously reported (adjusted as above for component units columns) | $ 440,980 | $ 98,201 | $ 819,397 |
| Restatement to reflect: Change in presentation of blended component units (See Note 1) | 212,866 | (62,999) |  |
| Adoption of accounting pronouncements |  |  | 29,316 |
| Beginning fund balances/ retained earnings, as restated | $ 653,846 | $ 35,202 | $ 848,713 |

The effect of adoption of accounting pronouncements for approximately $29.3 million include approximately $34.7 million to reflect the adoption of Accounting Principles Board Opinion No. 8, *Accounting for the Cost of Pension Plans* by the Puerto Rico Telephone Authority, and approximately ($5.4) million to reflect the adoption of Governmental Accounting Standards Board Statement No. 10, *Accounting and Financial Reporting for Risk Financing and Related Insurance Issues* by the Puerto Rico Electric Power Authority.

In addition, the Commonwealth has also restated its beginning balances to adjust for correction of accounting errors at certain component units as follows (expressed in thousands):

| | Enterprise | Expendable Trust Fund | Pension Trust | Public University | Component Units |
|---|---|---|---|---|---|
| Beginning fund balances/retained earnings (deficit) as previously reported (adjusted as above for component units column) | $(472,948) | $952,068 | $2,220,637 | $684,938 | $848,713 |
| Restatement to reflect: Correction of errors | 48,438 | 15,963 | 2,392 | (6,881) | (29,912) |
| Inclusion of component units: | | | | | |
| Homemakers Service Corporation | | | | | 436 |
| Farm Credit Guarantee Fund and Guarantee Loan Fund for Eligible Businesses | | | | | (33,536) |
| Beginning fund balances/retained earnings (deficit) as restated | $(424,510) | $968,031 | $2,223,029 | $678,057 | $785,701 |

For the enterprise, expendable trust, pension trust funds, and component units, the correction of errors arise because the financial activities included in the 1994 general purpose financial statements were drawn from the internal accounting records of the Health Facilities and Services Administration (enterprise funds), Unemployment Trust Fund (expendable trust), and the Pension and Annuity System for the Teachers of Puerto Rico (pension trust). Accordingly, those activities were not subjected to auditing procedures as of June 30, 1994.

For the enterprise funds, the correction of errors is also due to the recording of accumulated depreciation not previously recorded by the Lottery of Puerto Rico.

More than $20 million of the correction of errors in the component units column arises from the inclusion of the financial activities of Puerto Rico Aqueduct and Sewer Authority that were presented unaudited on June 30, 1994.

In addition, the component units restatements includes $11.4 million from the Puerto Rico Health Insurance Administration which represent $7.0 million from appropriations previously recorded as other sources which should have been deferred and $4.4 million from capitalization fees previously recorded as revenue which should have been deferred, and ($1.9) million from the Agricultural Service and Development Administration due to correction of other errors.

- 70 -

The restatement of the general fixed assets and the general long-term debt account groups result from the change in the Commonwealth's central government reporting policies regarding equipment, and the inclusion of the fixed assets and long-term liabilities of the Public Buildings Authority and Puerto Rico Land Administration. See Notes 1 and 8.

| (In Thousands) | General Fixed Assets Account Group | General Long-Term Debt Account Group |
|---|---|---|
| Beginning total assets/liabilities | $ 2,403,581 | $ 7,200,732 |
| Restatement to present change in: Presentation of blended component units | 1,702,981 | 1,699,528 |
| Accounting policy for equipment | (2,318,839) | |
| Beginning total assets/liabilities as restated | $ 1,787,723 | $ 8,900,260 |

## 12. GUARANTEED AND APPROPRIATION DEBT

### Guaranteed Debt

The Commonwealth may provide guarantees for the repayment of certain borrowings of components units to carry out designated projects. At June 30, 1995, the following component unit debts are guaranteed by the Commonwealth (expressed in thousands):

| | Maximum Guarantee | Outstanding Balance |
|---|---|---|
| Public Buildings Authority | $ 1,500,000 | $ 1,152,579 |
| Puerto Rico Aqueduct and Sewer Authority | 397,061 | 388,446 |
| Government Development Bank for Puerto Rico | 550,000 | 267,000 |
| Puerto Rico Housing Bank and Finance Agency | 325,000 | 74,775 |
| Total | $2,772,061 | $ 1,882,800 |

Law 45 of July 28, 1994, states that the Commonwealth guarantees the payment of principal and interest of all outstanding bonds at the date the Law was enacted and of all future bond issues to refinance these outstanding bonds of the Puerto Rico Aqueduct and Sewer Authority (PRASA). During December 1995, PRASA issued refunding bonds to refinance all outstanding bonds amounting to $388 million.

The Farm Credit Guarantee Fund, administered by the Commercial and Agricultural Credit and Development Corporation of Puerto Rico, a discretely presented component unit, has guaranteed, under the full faith, credit and taxing power of the Commonwealth, certain loans made by private institutions, by the former component unit Farm Credit Corporation and the Guarantee Loan Fund for Eligible Businesses. This fund guarantees loans for approximately $16 million as of June 30, 1995.

The Puerto Rico Housing Bank and Finance Agency insures mortgages granted to low and moderate income families through its mortgage loan insurance program. The Commonwealth guarantees up to $75 million of such mortgage loans. As of June 30, 1995, the mortgage loan insurance program was insuring loans aggregating $283 million and had not issued any debenture bonds. Currently, the Commonwealth has not been called to make any direct payments pursuant to the above guarantees.

The Commonwealth guarantees the Adjustable Refunding Bonds, Series 1985, issued by the Government Development Bank for Puerto Rico (GDB), the internal service fund.

The Commonwealth has guaranteed the payments of rentals of its departments, agencies and component units to the Public Buildings Authority (PBA), a blended component unit, under various lease agreements executed pursuant to the law that created PBA. Such rental payments include the amounts required by PBA for the payment of principal and interest on the guaranteed debt as authorized by law. The rental commitment to cover principal and interest on the guaranteed debt as of June 30, 1995 for the next five years and thereafter follows (expressed in thousands):

| Year Ending June 30, | Principal | Interest |
|---|---|---|
| 1996 | $    40,605 | $    60,130 |
| 1997 | 40,620 | 57,583 |
| 1998 | 45,795 | 55,135 |
| 1999 | 61,405 | 52,431 |
| 2000 | 60,000 | 55,000 |
| Thereafter | 867,744 | 555,526 |
| Total | $1,116,169 | $ 835,805 |

## Appropriation Debt

The following represents the outstanding balances of debt payable by appropriations as set forth in enacted legislation of the Commonwealth at June 30, 1995 and which are included in the individual financial statements of these entities (expressed in thousands):

Enterprise Funds:

   Health Facilities and Services Administration of Puerto Rico

$   338,884

Component Units - Other:

| | |
|---|---|
| Puerto Rico Housing Bank and Finance Agency | $580,785 |
| Sugar Corporation of Puerto Rico | 33,422 |
| Puerto Rico Ports Authority | 19,740 |
| Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation | 15,024 |
| Commercial and Farm Credit and Development Corporation for Puerto Rico | 14,920 |
| Puerto Rico Industrial Development Company | 13,657 |
| Puerto Rico Metropolitan Bus Authority | 11,980 |
| Agricultural Services and Development Administration | 10,952 |
| Puerto Rico Aqueduct and Sewer Authority | 8,582 |
| Tourism Company of Puerto Rico | 5,327 |
| Recreational Development Company of Puerto Rico | 1,714 |
| Puerto Rico and Caribbean Cardiovascular Center Corporation | 507 |
| Total | $716,610 |

## 13. COMMITMENTS AND CONTINGENCIES

### Primary Government

The Commonwealth is a defendant in numerous legal proceedings pertaining to matters incidental to the performance of routine governmental operations. Under Act No. 104 of June 25, 1955, as amended, persons are authorized to sue the Commonwealth only for causes of actions set forth in said Act to a maximum amount of $75 thousand or $150 thousand if it involves actions for damages to more than one person or where a single injured party is entitled to several causes of action. Under certain circumstances, as provided in Act No. 9 of November 26, 1975, as amended, the Commonwealth may provide its officers and employees with legal representation, as well as assume the payment of any judgment that may be entered against them. There is no maximum amount on the payment of such judgment.

With respect to pending and threatened litigation, excluding the litigation mentioned in the following two paragraphs, the Commonwealth has reported liabilities of approximately $106 million for awarded and anticipated unfavorable judgments. This amount was included as other long-term liabilities in the general long-term debt account group and represents the amount estimated as a probable liability or a liability with a fixed or expected due date which will require future available financial resources for its payment. Management believes that the ultimate liability in excess of amounts provided would not be significant.

The Commonwealth and various component units are defendants in a lawsuit alleging violations of individuals' civil rights. Preliminary hearings and discovery proceedings are in progress. The amounts claimed exceed $50 billion; however, the ultimate liability cannot be presently determined. It is the opinion of management that the plaintiff's damage claim is excessive and exaggerated. No provisions for any liability that may result upon adjudication of this lawsuit has been recognized in the general purpose financial statements.

On July 28, 1994, the Legislature signed Law No. 45 (the Law) and Joint Resolution No. 298 (Joint Resolution) through which the Commonwealth guarantees the principal, premium and interest payments to the bondholders of all outstanding bonds issued by PRASA at the effective date of this law (approximately $388 million) and of all future bond issued or any other obligations incurred by PRASA to refinance all outstanding bonds covered by the guarantee. According to the Law, if PRASA's funds are not available for bond payments of principal, premium and interest, the Commonwealth will provide such funds to cover all required payments.

Also, PRASA will receive, through the Joint Resolution, a subsidy from the Commonwealth of $25 million, $30 million and $35 million for fiscal years ending 1996, 1997 and 1998 respectively, to subsidize PRASA's financial and operational restructuring.

The Commonwealth's escheated bank accounts regulations require from the financial institutions doing business in Puerto Rico the remittance to the Commonwealth of all deposit accounts under their custody that have remained inactive for a period of five years. The Commonwealth is responsible for reimbursing any claims received from the owners of those accounts for a period of 10 years from the date of receipt from the financial institution. The balance of unclaimed escheated bank account as of June 30, 1995 is approximately $31 million. No liability has been recorded at June 30, 1995 because subsequent payments are immaterial.

The Commonwealth's minimum annual payments related to unpaid awards for the Additional Lottery, an enterprise fund, during the next five years amounts to approximately $13 million from 1996 through 2000 inclusive, and $165 million thereafter. Imputed interest amounts to approximately $98 million at June 30, 1995.

The Government Development Bank for Puerto Rico (GDB), the internal service fund, entered into various interest rate swaps during 1995. These interest rate swaps are hedging investments in mortgage-backed securities. Interest rate swaps involve the exchange of fixed and floating rate interest payment obligations without the exchange of the underlying principal amounts. Entering into interest rate agreements involves the risk of dealing with counterparties and their ability to meet the terms of the contracts and the interest rate risk associated with unmatched positions. Notional principal amounts often are used to express the volume of these transactions, but the amounts potentially subject to credit risk are much smaller. The notional principal amount of interest rate swap contracts outstanding at June 30, 1995 was approximately $583 million where GDB is the fixed rate payer and the counterparties are the floating rate payer using Libor or S&P rates. Settlements are made monthly.

Public Buildings Authority (PBA), a blended component unit, has entered into an interest rate swap agreement with Government Development Bank for Puerto Rico (GDB), the internal service fund, to reduce the impact of changes in interest rate on certain of its Series M Public Education and Health Facilities Refunding Bonds with an outstanding balance of $46 million at June 30, 1995, and which bear interest at a variable rate. Under the swap agreement, PBA is obligated to pay GDB a fixed amount equal to 5.64% and GDB is obligated to pay a variable amount equal to the interest rate that PBA is required to pay on said variable rate bonds. The swap agreement is for a notional amount equal to principal amount outstanding of said variable rate bonds and expires on July 1, 1998.

The provision for losses on letters of credit and guarantees relating to the Tourism Fund, which is part of the Government Development Bank for Puerto Rico, an internal service fund, is charged to income to the extent that losses are not recoverable from the Commonwealth. The Executive Director of the Tourism Fund shall certify each year to the Director of the Office of Management and Budget of the Commonwealth the amount, if any, that is necessary to reimburse the Tourism Fund for disbursements made during the previous year in excess of its earnings to cover the payment of principal and interest on obligations guaranteed by the Tourism Fund. The Director of the Office of Management and Budget shall include the amount required to be reimbursed to the Tourism Fund in the general budget of the Commonwealth for the following fiscal year for the Legislature's consideration and approval.

In March 1992, the Puerto Rico Highway and Transportation Authority (PRHTA), a blended component unit, issued Special Facility Revenue Bonds amounting to approximately $117 million for facilitating the construction of a toll bridge which spans the San José Lagoon between the municipalities of San Juan and Carolina. PRHTA entered into a Concession Agreement with a private entity for the operation and maintenance of the bridge. The initial term of this agreement is 35 years. Under certain circumstances, the Concession Agreement may be terminated and PRHTA is then to assume all the obligations of the principal and interest on the Bonds which, pursuant to the Loan Agreement, will be paid from the proceeds of the use and operation of the toll bridge. At June 30, 1995, the outstanding balance of the debt, including interest, and the sinking fund balances are $121 and $15 million, respectively.

The Additional Lottery entered into a service contract with G-Tech Corporation (the service organization) on April 10, 1990, which requires the Additional Lottery to pay servicing and marketing fees based on weekly volume of retailers' ticket sales within a range of terminals in operation. The contract was

scheduled to expired on November 8, 1995, and the Additional Lottery has negotiated an extension, with certain modifications, for the next three years. Minimum estimated payments under the contract for fiscal years 1996 through 1998 are for approximately $20 million per year and include servicing fees and reimbursement of marketing expenses.

The Commonwealth receives financial assistance from the federal government in the form of grants and entitlements. Non-cash federal financial assistance programs received by the Commonwealth amounted to approximately $15.2 million. Receipt of grants is generally conditioned upon compliance with terms and conditions of the grant agreements and applicable federal regulations, including the expenditure of resources for eligible purposes. Substantially all grants are subject to audit under the Single Audit Act of 1984 all of which are performed at the individual agency level. Disallowances as a result of these audits may become liabilities of the Commonwealth. At June 30, 1995, based on an evaluation of pending disallowances, the Commonwealth has recorded approximately $40.6 million as other long-term liabilities in the general long-term debt account group for this purpose. The United States Congress is studying several cost-reduction measures to balance the federal budget deficit. As part of this process, the Congress is considering reductions to the federal financial assistance programs in which the Commonwealth, together with the States, participates. Management of the Commonwealth believes that the future outcome of any changes in federal financial assistance programs does not have a material effect on the general purpose financial statements.

The Puerto Rico Highway and Transportation Authority's construction commitments as of June 30, 1995 amounted to approximately $438 million.

The Public Buildings Authority's construction commitments as of June 30, 1995 amounted to $250 million.

### Public University Funds

The University of Puerto Rico (UPR) capital construction program for educational facilities for the fiscal year ending on June 30, 1995 amounts to approximately $26.9 million. This program is intended to be permanently financed substantially with a future bond issuance.

UPR participates in a number of federal financial assistance programs. These programs are subject to audits in accordance with the provisions of the Single Audit Act of 1984 or to compliance audit by grantor agencies. Although these programs have been audited through June 30, 1995 under the Single Audit Act of 1984 and through various dates by grantor agencies, the resolution of certain previously identified questioned costs has not occurred. The amount, if any, of expenditures which may be disallowed by the granting agencies cannot be determined at this time, although, UPR's management expects such amounts, if any, to be immaterial.

### Office for the Liquidation of the Accounts of the Puerto Rico
### Urban Renewal and Housing Corporation

The Office is a party to a number of lawsuits and claims, which it is vigorously defending. Such matters arise out of the normal course of operations related to construction projects deficiencies, government regulations and other issues. These actions seek damages amounting to approximately $29 million. While the results of litigation cannot be predicted, the likelihood of loss as defined by Financial Accounting Standards Board No. 5 is considered remote for $3 million, reasonably possible for $24

million and probable for $2 million of the total claims. A provision of $3.2 and $4 million has been established in the Operating and Low Cost Housing Funds respectively, which exceed the required reserve, as of June 30, 1995 to cover for the ultimate outcome of those legal claims which are considered probable loss as required by generally accepted accounting principles.

## Component Units - Other

### Puerto Rico Electric Power Authority (PREPA)

Retained earnings at June 30, 1995 include approximately $80.8 million to provide a self insurance reserve for damaged or destroyed property of the electric system not fully covered by insurance as required by the 1947 Bond Indenture. Funds set aside for self insurance purposes are deposited in the General Reserve Fund held by the trustee. In addition, PREPA is self-insured for its transmission and distribution lines. Transmission and distribution plant amounted to approximately $1.8 billion at June 30, 1995. PREPA considers its General Reserve Fund to provide for its self-insurance risk. This fund represents, principally retained earnings set aside for self insurance amounting to approximately $92.8 million in 1995.

Facilities and operations of PREPA are subject to regulations under numerous Federal and Commonwealth environmental laws, including the Clean Air Act, Clean Water Act, and the National Pollutant Discharge Elimination System. In February 1992, the Environmental Protection Agency (EPA) performed an inspection of various facilities of PREPA and noted deficiencies in air opacity; water quality; spill prevention control and countermeasures; and underground storage tanks. EPA is claiming alleged civil violations for $50 million. Since 1993 the EPA, the Federal Department of Justice (DOJ) and PREPA have been involved in negotiations to pursue a comprehensive settlement of the case and assure future compliance with applicable regulatory provisions. Among other things, the settlement proposal considers investment in capital improvements and Supplemental Environmental Projects estimated at approximately $81 million during the five fiscal years ending June 30, 1998. Also, PREPA agreed to use fuel oil not exceeding a sulfur content of 1.5%, a vanadium content of 150 PPM and aspheltenes content of 8% at the generating plants with an additional annual fuel oil cost of approximately $54 million.

On October 27, 1993, DOJ and EPA filed a complaint in the United States District Court for the District of Puerto Rico based upon the above violations. At June 30, 1995, it is not possible to estimate the ultimate liability to PREPA for civil penalties. However, management will continue settlement negotiations and based on discussions with legal counsel, believes that ultimate liability, if any, will not have a material effect on the PREPA's financial position.

On August 25, 1992, PREPA entered into an agreement with the Cambalache Limited Partnership, S.P. for the construction of a 249 MW generation plant of open cycle combustion turbines. PREPA's estimated obligation under this agreement amounts to approximately $147.3 million, as amended. The total obligation under the agreement will be subject to price adjustments. At June 30, 1995, the Authority had incurred construction costs amounting to approximately $79.5 million.

### Puerto Rico Aqueduct and Sewer Authority (PRASA)

PRASA is a defendant or co-defendant in various claims for damages and lawsuits for approximately $88.2 million. Most of the cases are pending trial or final judgment. Management of PRASA and legal counsel are of the opinion that any liability that may result from such claims and lawsuits would not have a material adverse effect on PRASA's financial position as of June 30, 1995.

- 76 -

Facilities and operations of PRASA's system are subject to regulation under numerous Federal and Commonwealth environmental laws, including the Federal Clean Water Act (the "Act"), administered by the Environmental Protection Agency ("EPA"). In January 1978, the United States, acting on behalf of EPA initiated litigation against PRASA and the Commonwealth to enforce compliance with the Act, with respect to violations of the Act occurring at numerous plants in the Authority's sewer system. On April 20, 1988, PRASA and EPA reached an agreement to settle and resolve all the outstanding and claimed assessment amounts embodied in a Supplemental Consent Order modifying the Final Order (the "1988 Supplemental Order"). The 1988 Supplemental Order was entered by the Court on September 27, 1988, in substantially the form lodged. Provisions of the 1985 Order not amended or replaced by the 1988 Supplemental Order remain in effect. The outstanding noncompliance penalty requests pending before the Court amounts to approximately $3.3 million as of June 30, 1995. PRASA estimates that the capital cost of complying with the terms of the 1988 Supplemental Order will be approximately $56 million through December 31, 1999. These costs are included in PRASA's capital improvement program. Amounts required to insure compliance with the 1988 Supplemental Order are expected to be derived from a combination of appropriations to be made by the Commonwealth, Federal Government grants and loans and future revenue bonds of PRASA.

On May 26, 1995, PRASA and Professional Services Group, Inc. (PSG) entered into an agreement (Agreement) for the operation, management, repair and maintenance of PRASA's aqueduct, sewer and customer services systems (System). The Agreement commencing on September 1, 1995 is for a five-year term, but is cancelable at PRASA's option, without cause, at the third anniversary date of the operations date, as defined. PRASA will pay PSG for reimbursement of expenses and for administrative fees between $93.7 million in year one and $91.3 million in year five. A portion of PRASA's payment obligations to PSG will be guaranteed by GDB up to $10 million in each of the first three years, if PRASA does not otherwise have the cash available for such payments.

The estimated cost of construction contracts in progress at June 30, 1995 amounted to approximately $64 million.

## Puerto Rico Telephone Authority, Subsidiaries and Puerto Rico Telephone Company (PRTA)

The consolidated construction program for the year 1995 amounts to approximately $36.5 million.

In September 1993, the National Exchange Carrier Association informed PRTA that they would not accept the inclusion of the additional in-lieu-of taxes payment corresponding to 1992, for interstate settlement purpose unless the PRTA obtains approval from the Federal Communications Commission (FCC). On November 30, 1993, the PRTA submitted a request for ruling by the FCC on the issue. If the FCC does not approve the inclusion of the additional payment in-lieu-of taxes, a settlement adjustment will be required to the PRTA financial statements amounting to approximately $32 million. As of the date of the December 31, 1994 PRTA's financial statements, no decision has been issued by the FCC.

PRTA has entered into an interest rate swap agreement to reduce the impact of changes in interest rates on its variable interest rate subordinated notes. The interest rate swap agreement requires PRTA to pay a fixed rate while receiving amounts at a variable rate based on LIBOR, settled every six months, on notional principal amounts ranging from a high of $11.3 million up to February 15, 1995, to a low of $1.3 million from February 15, 1999 to August 15, 1999, dates of maturity of the notes and the swap agreement. As a result of this agreement, the effective rate on the variable interest rate subordinated notes of $14.7 million was 6.77% for the year ended December 31, 1993. The obligations of the other party in the agreement have been guaranteed by its parent company. PRTA is exposed to credit loss in the event of nonperformance by the other party to the interest rate swap agreement. However, PRTA does not anticipate nonperformance by the counterparty.

- 77 -

PRTA is organized under the laws of the state of Delaware, USA. As such, PRTA is subject to United States federal income taxes. The United States Internal Revenue Code Section 936 allows certain income tax benefits to United States corporations deriving substantially all of their income from sources within possessions of the United States, including Puerto Rico. PRTA has exercised the corresponding election to claim these benefits and has complied with the requirements of the United States Internal Revenue Code; accordingly, liability for US federal income taxes, if any, would arise only on income from sources outside Puerto Rico. Income tax relief from this exemption approximated $87 million for year ended December 31, 1994.

On August 10, 1993, the President of the United States signed into law The Omnibus Budget Reconciliation Act of 1993 (the Act). The Act enacts significant tax changes including a provision that the Section 936 credit allowed to a possession corporation for a taxable year against US tax on its business income would be computed as under present laws, but would be subject to one of two alternative limitations. Under the alternative limitation method selected by PRTA, there was no tax liability for the year ended December 31, 1994.

### Puerto Rico Industrial Development Company (PRIDCO)

PRIDCO is party to various claims and lawsuits relating, among other matters, to the Federal Environmental Protection Agency and the Environmental Quality Board of the Commonwealth. These claims and lawsuits include various environmental issues where PRIDCO may be held liable under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA) and other federal legislation including the Clean Water Act and the National Pollutants Discharge Elimination (NPDES). CERCLA establishes procedures and standards for responding to releases of hazardous substances, pollutants and contaminants.

Under CERCLA and its regulations, liability for the clean-up costs from damage to natural resources and any health assessment or health effects may be imposed on the present and past owner or operator of a facility from which there was a release of hazardous substances in addition to any person who arranged for disposal or treatment of hazardous substances at a site from which there was a release.

For the year ending June 30, 1996, PRIDCO estimates expenditures of approximately $20.6 million for construction, land acquisition and development. The expenditures will be financed through internally generated funds, federal grants and external financing sources. Commitments (some extending beyond June 30, 1996) primarily for construction approximated $81.3 million.

### Commercial and Farm Credit and Development Corporation for Puerto Rico

The Corporation is the defendant in various lawsuits assumed from the former Commercial Development Company (the Company) for alleged negligence, brought by insurance companies in connection with a fire. These lawsuits involve various defendants and a series of cross claims and counter claims instituted against the Company for approximately $32 million including legal fees and interest. Management of the Corporation, after consultation with legal counsel, recorded a provision in the Corporation's financial statements for the estimated liability that could result from these legal cases.

Construction commitments at June 30, 1995 amount to approximately $3.3 million.

### Automobile Accident Compensation Administration (AACA)

As of June 30, 1995, the Automobile Accident Compensation Administration is defendant in a lawsuit filed by a professional services firm for alleged unpaid additional work related to a professional contract. The suit asks for damages totaling approximately $10.6 million. AACA's management and its legal advisor believe the suit is without merit and are vigorously defending its position.

### Land Authority of Puerto Rico (LAPR)

LAPR owns agricultural lands, mills and refinery which are operated by its subsidiary, the Sugar Corporation of Puerto Rico, a discretely presented component unit. These assets and the related debt incurred in their acquisition are recorded in the books of the subsidiary which has assumed responsibility for payment of principal and interest on the loans, as well as all other expenses incidental to ownership, including property taxes and repairs and maintenance. LAPR is contingently liable to third parties for loans which are secured by properties transferred to the Sugar Corporation of Puerto Rico and guaranteed by the Commonwealth.

LAPR is a defendant under a claim brought by a group of pineapple growers amounting to approximately $43 million. LAPR is in the process of litigating these actions, but the ultimate outcome cannot be presently determined due to the stage of proceedings. Accordingly, no provisions for any liability that may result upon a final resolution of these actions has been made in the financial statements of LAPR.

On May 26, 1995, an asset purchase agreement was signed by LAPR (seller) and Norpro, Inc. (buyer). With this agreement, the seller intends to sell and lease some of the assets related to the fresh-pack operation, a division of the pineapple program, to the buyer. Under the terms of the agreement, it is stated that some equipment and all pineapple plantations and crops existing as the closing date of the agreement would be sold to buyer. Also, the seller would lease the buyer some real property and machinery. Total purchase price of the assets is $1.1 million. The buyer would pay a portion in cash and remaining balance with a promissory note bearing interest at a rate of 7.5% per year. With this agreement, the pineapple program expects to reduce the substantial losses it has been suffering for several years.

### Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority (AFICA)

AFICA has sold, since inception, revenue bonds aggregating approximately $3,561 million, of which $2,290 million remain outstanding as of June 30, 1995. The revenue bonds do not constitute a debt or a pledge of the good faith and credit of AFICA or the Commonwealth or any political subdivision thereof (non-commitment debt). However, the Government Development Bank for Puerto Rico (GDB), an internal service fund, and one of its subsidiaries have issued a letter of credit and a guarantee totaling $140 million in connection with two tourism related revenue bond issuances.

### Caribbean Basin Projects Financing Authority (CBPFA)

Since inception and up to June 30, 1994, CBPFA has sold revenue bonds aggregating approximately $676 million all of which were outstanding at June 30, 1995. Pursuant to the loan agreements covering the issuances of these bonds, the proceeds from the sales were borrowed from CBPFA by corporations and partnerships operating in qualified Caribbean Basin countries. The revenue bonds are special and limited obligations of the CBPFA and, except to the extent payable from bond proceeds and investments thereof, will be payable solely from and secured by a pledge and assignment of the amounts payable under the loan agreements between the CBPFA and the borrowers. Furthermore, payment of the principal and interest on the revenue bonds is unconditionally guaranteed by the borrowers, their parent companies and/or letters of credit from major United States banks or United States branches of international banks. The revenue bonds do not constitute a debt or a pledge of the good faith and credit of CBPFA or the Commonwealth or any political subdivision thereof (non-commitment debt).

### Corporation of Stocks and Deposit Insurance for the Savings and Loans Cooperatives (CSDISLC)

CSDISLC is a defendant in a case where the plaintiffs claim $10 million in damages allegedly suffered due to the imposition by CSDISLC of a special premium and request that the special premium be deemed

illegal and therefore eliminated. Management, based on advice from legal counsel, believes that CSDISLC will be able to successfully defend this case. However, the amount of approximately $5.3 million regarding the special premium assessed to the insured cooperatives has been recorded as deferred revenue in CSDISLC's balance sheet until a final determination is reached by the Superior Court of Puerto Rico.

At June 30, 1995, the maximum limit of the insurance coverage was $50 thousand per member or depositor, and may be increased annually to a maximum of $100 thousand. The total shares and deposits of insured cooperatives as of June 30, 1995 approximated $2.9 billion.

CSDISLC and the insured cooperatives hold certain cash and cash equivalents and investments in equity in the Cooperative Bank. The Cooperative Bank incurred an operating loss of approximately $2.7 million in 1994 and had a stockholders' deficiency of approximately $6 million at December 31, 1994, according to its latest audited financial statements. The financial condition of CSDISLC and the insured cooperatives could be adversely affected if the Cooperative Bank is not able to continue as a going concern because these entities could potentially be unable to recover the carrying value of their deposits and investments in the Cooperative Bank. In June, 1994, the Legislative Assembly authorized the Commonwealth to guarantee the payment of debt securities to be issued by the Cooperative Bank, up to a maximum of $10 million. This guarantee became effective in the amount of $8.3 million when an additional investment in common stock for the same amount was made by the Cooperative Bank's stockholders. This guarantee will be in effect for a period of 10 years. Management is of the opinion that the ultimate effect resulting from this condition will not have a material effect on CSDISLC's financial condition.

Under the terms of certain merger agreements for troubled cooperatives, CSDISLC has agreed to repurchase certain assets. At June 30, 1995, the loan portfolios sold subject to recourse had a remaining unpaid principal balance of approximately $34.5 million, which is the amount of potential risk associated with these particular loans. Certain loans are collateralized and the recourse provisions range for periods of 1 to 3 years. CSDISLC has established a loss reserve to cover this exposure.

**Economic Development Bank for Puerto Rico (EDB)**

At June 30, 1995, EDB is defendant in various lawsuits. Management, after consultation with legal counsel, is of the opinion that the ultimate liability, if any, resulting from such lawsuits would not be material in relation to the Bank's financial position and results of operations.

At June 30, 1995, total outstanding loan guarantees amounted to $6.2 million.

The EDB enters into interest rate swaps as part of its asset/liability management. Interest rate swaps involve the exchange of fixed and floating rate payment obligations without the exchange of the underlying principal amounts. Entering into interest rate exchange agreements involves the risk of dealing with counterparties and their ability to meet the terms of the contracts. Notional principal amounts often are used to express the volume of these transactions, but the amounts potentially subject to credit risk are much smaller. The notional principal amount of interest rate swap contracts outstanding at June 30, 1995 was approximately $40 million where the Bank is the fixed rate payer and the counterparties are the floating rate payer using Libor rate. Settlements are made monthly. EDB is exposed to credit loss in the event of nonperformance by the other parties to the interest rate swap agreements. However, the Bank does not anticipate nonperformance by the conterparties.

- 80 -

**Sugar Corporation of Puerto Rico (SCPR)**

SCPR is a defendant in various legal actions and has recorded a reserve for possible losses of approximately $10 million; however, the ultimate outcome of these actions cannot presently be determined and it is not presently known whether this reserve will be sufficient to provide for possible losses as a result of the final outcome of such claims. SCPR depends on subsidies from the Commonwealth to provide the necessary funds to cover cash deficits. During the year, subsidies to finance cash deficit amounted to $19 million.

In early 1994, the Board of Directors of SCPR adopted a strategy that resulted in the closing of a sugar mill. As such, all productive assets such as fixed assets and materials and supplies were written-off in 1994. The total write-off was approximately $8.6 million ($6.4 million for fixed assets and $2.2 million for materials and supplies). As a result of the closing, the Corporation laid off a number of employees related with this operation, resulting in a severance commitment of approximately $6 million which will be covered with legislative assignment advances in fiscal year 1995-1996.

**Tourism Company of Puerto Rico (TCPR)**

TCPR has entered into several agreements with private third parties to make capital contributions and to purchase unsold capital equity participation in several hotel development projects. At June 30, 1995, capital contributions made, agreements to contributed additional capital, and commitments to purchase unsold capital equity amounted to approximately $12.3, $21.4 and $5.2 million, respectively.

**Recreational Development Company of Puerto Rico (RDCPR)**

RDCPR is defendant or co-defendant in various complaints alleging damages for a total amount of approximately $15 million. RDCPR's management, after consultation with legal counsel, has made a provision for losses on this litigation. However, the ultimate amount payable in excess of the amount provided, if any, cannot be determined.

## 14. RETIREMENT SYSTEMS

The Commonwealth has three contributory defined benefit pension plans:

- Employees' Retirement System of the Government of Puerto Rico and Its Instrumentalities (ERS),

- Puerto Rico Judiciary Retirement System (JRS), and

- Annuity and Pension System for the Teachers of Puerto Rico (TRS).

Each system is independent, thus assets may not be transferred from one system to another or used for any purpose other than to benefit each system's participants. In addition, the University of Puerto Rico Retirement System audited financial statements are included in the public university funds.

The pension plans engaged from time to time in securities lending transactions as authorized by local laws and regulations. Credit risk is controlled and monitored by the securities brokers and dealers contracted by the pension plans.

**Plan Descriptions**

**A.** **Employees' Retirement System of the Government of PR and Its Instrumentalities (ERS)**

The Employees' Retirement System of the Government of Puerto Rico and Its Instrumentalities (ERS) is the administrator of a defined benefit cost-sharing multiple-employer retirement system established by the Commonwealth. The System was created under Act 447, approved on May 15, 1951, as amended, and became effective on January 1, 1952. ERS covers all regular employees of the Commonwealth and its instrumentalities and of certain municipalities and components units not covered by their own retirement systems.

Employees include those in the following categories:

- Police of Puerto Rico
- Justices of the Peace of Puerto Rico
- Members and employees of the Legislature
- Officers and employees of the Government of Puerto Rico, most components units and municipalities
- Members of the Employees Association of the Commonwealth of Puerto Rico
- Irregular employees fulfilling the requirements of a regular employee

Participation is mandatory except for members of the Legislature, Government Secretaries, Heads of Agencies and Public Instrumentalities, Assistants to the Governor, the Comptroller of Puerto Rico, Gubernatorial Board and Committee appointees and Experimental Service Station employees.

The System provides retirement, death and disability benefits. Disability retirement benefits are available to members for occupational and non-occupational disabilities. Retirement benefits depend upon age at retirement and number of years of credited service. Benefits vest after ten years of plan participation.

Members who have attained an age of at least fifty-five (55) years and have completed at least twenty-five (25) years of creditable service or members who have attained an age of at least fifty-eight (58) years and have completed at least ten (10) years of creditable service, are entitled to an annual benefit, payable monthly for life.

The amount of the annuity shall be one and one-half percent of the average compensation multiplied by the number of years of creditable service up to twenty years, plus two percent of the average compensation multiplied by the number of years of creditable service in excess of twenty years. In no case will the annuity be less than $200 per month.

Participants who have completed at least thirty years of creditable service are entitled to receive the Merit Annuity. Participants who have not attained fifty-five (55) years of age will receive 65% of the average compensation or if they have attained fifty-five (55) years of age will receive 75% of the average compensation. Disability retirement benefits are available to members for occupational and non-occupational disability. However, for non-occupational disability a member must have at least ten (10) years of service.

No benefit is payable if the participant receives a refund of his accumulated contributions.

Commonwealth legislation requires employees to contribute 5.775% for the first $550 of their monthly gross salary and 8.275% for the salary in excess of $550. The Commonwealth contributions are 9.275% of gross salary. Contributions requirements are established by law. Total employee and employer contributions during the year ended June 30, 1995 amounts to approximately $162 million and approximately $202 million, respectively. Total payroll covered for the year was approximately *$2.1 billion.*

- 82 -

**B.  Puerto Rico Judiciary Retirement System (JRS)**

The Puerto Rico Judiciary Retirement System (JRS) is a single-employer defined benefit plan which is administered by the ERS.  The System was created under Act 12, approved on October 19, 1954. The membership includes all individuals holding a position as Justice of the Supreme Court, Judge of the Superior Court or the District Court or Municipal Judges of the Commonwealth of Puerto Rico. The System provides retirement as well as death and disability benefits.

Participants are eligible for monthly benefit payments determined by the application of stipulated benefit ratios to the participant's average compensation.  Average compensation is computed based on the last three years of service (effective July 28, 1993, highest annual salary), except for the judges of the Supreme Court for whom it is based on the last month of compensation.  The annuity for which a participant is eligible is limited to a minimum of 25% and a maximum of 100% of the average compensation.

All participants are required to make contributions to the plan equal to 8% of gross salary.  The Commonwealth must contribute 20% of the applicable payroll.  For the year ended June 30, 1995, judges made contributions, amounting to approximately $1.3 million.  The amount contributed by the Commonwealth was approximately $3.2 million.  Payroll covered for the year was approximately $15.8 million.  Contribution requirements are established by law.  Benefits vest after 10 years of credited service.

**C.  Annuity and Pension System for the Teachers of Puerto Rico (TRS)**

The Annuity and Pension System for the Teachers of Puerto Rico (TRS) is a cost-sharing multiple-employer plan which was created under Act 218 approved on May 6, 1951.

TRS provides retirement benefits to all teachers of the Department of Education of the Commonwealth, those holding positions in the Retirement Board, all pensioned teachers, all teachers transferred to an administrative position in the Department of Education, teachers who work in the Teachers' Association of Puerto Rico, and those who practice in private institutions accredited by the Department of Education.

The Plan provides retirement, death and disability benefits.  Members are eligible for retirement benefits upon:

    (a)    completion of 30 years of credited service, or

    (b)    attainment of age 52 and completion of 25 years of credited service or

    (c)    attainment of age 60 and completion of 10 years of credited service.

The amount of the annuity shall be computed based on the teacher's final average salary, which is the highest salary over three years.  The minimum service annuity is $300 per month and the maximum is 75% of final average salary. Benefits vest after ten years of plan participation.

Participants must have at least five years of creditable service to be eligible for a non-occupational disability pension.

- 83 -

The disability retirement annuity is 1.8% of final average salary times years of credited service, but not less than the amount payable as a service retirement annuity.

A member should contribute to the plan 7% of it's total salary. The Commonwealth matches the member's contribution at a rate of 8.5% of total salary. For the year ended June 30, 1995, the employees and employer's contributions amounted to $60 and $85 million respectively. Total payroll covered for the year was approximately $935 million.

**Funding Status and Progress**

The pension benefit obligation is a standardized disclosure measure of the present value of defined pension benefits, adjusted for the effects of projected salary increases and step-rate benefits, estimated to be payable in the future as a result of employee service to date. The measure is the actuarial present value of credited projected benefits and is intended to help users access funding status on a going-concern basis, assess progress made in accumulating sufficient assets to pay benefits when due, and make comparisons with other public retirement systems. The measure is independent of the funding method used to determine contributions to the plans.

The following table presents the date of the most recent actuarial valuation used to determine the pension benefit obligation and significant assumptions used in the actuarial valuation:

|  | ERS | JRS | TRS |
|---|---|---|---|
| Date of latest actuarial valuation | June 30, 1995 | June 30, 1995 | June 30, 1994 |
| Significant assumptions: |  |  |  |
| Investment rate of return per year | 8.5% | 8.5% | 8% |
| Salary increases due to inflation, merit and longevity | 5% | 5% | 6% |
| Mortality rates table | GA'51 | GA'51 | GA'83 |

The standardized measure of the unfunded pension benefit obligation as of June 30, 1995 for the ERS, and the JRS, and as of June 30, 1994 for TRS is as follows (expressed in thousands):

|  | ERS | JRS | TRS |
|---|---|---|---|
| Pension benefit obligation: |  |  |  |
| Retirees and beneficiaries currently receiving benefits and terminated employees not yet receiving benefits | $ 3,003,000 | $ 34,200 | $1,161,000 |
| Current employees: |  |  |  |
| Accumulated employee contributions, including allocated investment income | 1,331,000 | 11,000 | 297,000 |
| Employer-financed vested | 1,624,000 | 12,700 | 282,000 |
| Employer-financed nonvested | 75,000 | 2,900 | 368,000 |
| Total pension benefit obligation | $ 6,033,000 | $ 60,800 | $2,108,000 |

- 84 -

|  | ERS | JRS | TRS |
|---|---|---|---|
| Total pension benefit obligation | $6,033,000 | $ 60,800 | $2,108,000 |
| Net assets available for benefits, at market for ERS and JRS, and at cost for TRS | 1,075,000 | 42,057 | 1,291,000 |
| Unfunded pension benefit obligation | $4,958,000 | $ 18,743 | $ 817,000 |

The membership at June 30, 1995 of ERS, JRS and TRS consisted of:

|  | ERS | JRS | TRS |
|---|---|---|---|
| Retirees and beneficiaries currently receiving benefits and terminated employees entitled to benefits, but not yet receiving benefits | 60,912 | 155 | 18,631 |
| Active employees | 153,699 | 271 | 46,997 |
| Total members | 214,611 | 426 | 65,628 |

The distribution of active employees between vested and nonvested is not readily available.

## Contributions Made and Actuarial Computation

Contributions in 1995 and prior years were made based on percentages established by the law. Such percentages have not been based on actuarial studies. An actuarial computation of the annual contribution applicable to the Commonwealth as of June 30, 1995 have not been prepared. Accordingly, the amounts by which the actual contributions are under the required actuarial contribution are not known.

## Trend Information

Historical trend information gives an indication of the progress made in accumulating sufficient assets to pay benefits when due. An analysis of funding progress for the three latest available years is presented below:

|  | ERS | JRS | TRS |
|---|---|---|---|
| Net assets available for benefits as a percentage of total pension benefit obligation: |  |  |  |
| June 30, 1995 | 18% | 70% | 62% |
| June 30, 1994 | 17% | 60% | 58% |
| June 30, 1993 | 18% | 64% | N/A |
| Unfunded pension benefit obligation as a percentage of annual covered payroll: |  |  |  |
| June 30, 1995 | 238% | 118% | 93% |
| June 30, 1994 | 245% | 185% | 120% |
| June 30, 1993 | 230% | 158% | N/A |

|  | ERS | JRS | TRS |
|---|---|---|---|
| Employer contributions (not actuarially determined) as a percentage of annual covered payroll: | | | |
| June 30, 1995 | 10% | 20% | 8.5% |
| June 30, 1994 | 10% | 24% | 8.5% |
| June 30, 1993 | 10% | 22% | 8.5% |

N/A = Not Available

For a ten-year trend information, refer to the separately issued financial statements of ERS, JRS and TRS.

**D.   University of Puerto Rico Retirement System - Plan Description**

The University of Puerto Rico (the University) contributes to the University of Puerto Rico Retirement System (the System), a single-employer defined benefit public employee retirement system that acts as a common investment and administrative agent for the University.  The System is the administrator of the plan created under Act No. 135, approved on May 7, 1942, and became effective on January 1, 1945.  The University's payroll for employees covered by the System and total payroll for the year ended June 30, 1995 was approximately $262 and $423 million, respectively.

All full-time employees and employees contracted for a period of 9 months by the University are eligible to participate in the System.  Benefits vest after 10 years of service.  University employees who retire at or after age 58 with 10 years of credited service are entitled to an annual retirement benefit, payable monthly for life, in an amount equal to 15% of their average compensation for the highest 36 months.  Maximum benefits equal to 75% of average compensation and generally require 30 years of service and attainment of age 55.  The System also provides death and disability benefits.  These benefit provisions and all other requirements are established by law.

University employees are required to contribute 4% to 8% of their annual salary to the System.  The University is required to contribute 14% of applicable payroll.

Certain amendments have been made to the System's plan for which the actuaries are suggesting increasing the University's contributions to 15% and 16% for years ending June 30, 1995 and 1996, respectively, and the increase in pension benefits of 3%.  These changes have resulted in a significant increase of the pension benefit obligation.

**Funding Status and Progress**

The pension benefit obligation was computed as part of an actuarial valuation performed as of June 30, 1995.  Significant actuarial assumptions used in the valuation include (a) a rate of return on the investment of present and future assets of 7.5% a year compounded annually, (b) projected salary increases of 5% a year compounded annually, (c) mortality rates based on UP-1984 Group Annuity Mortality Table, (d) fixed retirement ages based on age at hire date.  The information as of June 30, 1995 was prepared by the actuaries based on the results of the actuarial valuation.

Total unfunded pension benefit obligation applicable to the University's employees at June 30, 1995 follows (expressed in thousands):

| | |
|---|---:|
| Pension benefit obligation: | |
| Retirees, beneficiaries, and terminated employees not yet receiving benefits | $ 399,708 |
| Current employees: | |
| Accumulated employee contributions including allocated investment earnings | 126,468 |
| Employer-financed vested | 271,407 |
| Employer-financed non-vested | 50,913 |
| Total pension benefit obligation | 848,496 |
| Net assets available for benefits, at market value | (382,934) |
| Unfunded pension benefit obligation | $ 465,562 |

## Actuarially Determined Contribution Requirements and Contributions Made

The System's funding policy requires actuarially determined periodic contributions at rates that, for individual employees, increase gradually over time so that sufficient assets will be available to pay benefits when due. However, the contributions are made on a predetermined basis instead of the actuarially determined basis.

The actuarial valuation as of June 30, 1995 revealed an actuarially accrued liability of approximately $848 million and an unfunded accrued liability of approximately $426 million. During the year the University contributed approximately $36.6 million to its retirement plan and recognized such amount as expenditure. The required contribution was approximately $40.6 million. The difference of approximately $4 million has not been accrued in the public university funds as required by generally accepted accounting principles. If such amount had been accrued together with prior years cumulative unfunded amount, the expenditures and accrued liabilities in the public university funds would have increased and the fund balance decreased by approximately $174 million.

## Trend Information

Trend information gives an indication of the progress made in accumulating sufficient assets to pay benefits when due. For the year ended June 30, 1995 assets were sufficient to fund 45.1% of the pension benefit obligation. Unfunded pension benefit obligation represented 178.1% of the annual payroll for employees covered by the System. Showing unfunded pension benefit obligation as a percentage of annual covered payroll approximately adjusts for the effects of inflation for analysis purposes. For a five-year historical trend, refer to the separately issued System's financial statements.

An analysis of funding progress for the three latest years is presented below:

| | | June 30, | |
|---|:---:|:---:|:---:|
| | 1995 | 1994 | 1993 |
| Net assets available for benefits as a percentage of total pension benefit obligation | 45.1% | 43.8% | 45.3% |
| Unfunded pension benefit obligation as a percentage of annual covered payroll | 178.1% | 185.9% | 183.2% |
| Employer contributions (not actuarially determined) as a percentage of annual covered payroll | 14.6% | 14.6% | 14.6% |

## 16. SEGMENT INFORMATION - Enterprise Funds

The enterprise funds are composed of the following entities which generally follow the accrual basis of accounting:

### Health Facilities and Services Administration of Puerto Rico (HFSA)

Health Facilities and Services Administration of Puerto Rico (HFSA) was created as an executive agency in 1975 to lease and operate hospitals and other health facilities and to provide for the improvement, alteration or repair of such facilities. HFSA is authorized to borrow money and issue notes or other obligations for the purpose of financing the costs of improvements and providing health services to the general public. Patients, admitted to an institution under the jurisdiction of HFSA who are indigent, receive hospital and medical services free of charge; otherwise, payments for services rendered are required.

### Lottery of Puerto Rico

The Lottery of Puerto Rico (the Lottery) was created under Law No. 465 of May of 1947. The Lottery is an operational unit of the Commonwealth of Puerto Rico Treasury Department and is engaged in the sale of tickets to authorized agents throughout the Commonwealth. It was created to help those authorized agents with an additional source of revenues and to supplement revenues for the general fund of the Commonwealth. The revenues obtained by the Lottery from the sale of tickets are distributed pursuant to the approved budget to cover the payment of prizes and general and administrative expenses. The excess of revenues over prizes and expenses must be transferred to the general fund of the Commonwealth.

### The Additional Lottery System

The Additional Lottery System was created by Law No. 10 of May 24, 1989, as amended, and commenced operations on June 1, 1990. The Additional Lottery is an operational unit of the Commonwealth of Puerto Rico Treasury Department. Presently, two games (Pick 3 and Loto) with several betting alternatives are offered by the Additional Lottery. Also, Law No. 10 requires the Additional Lottery to remit the excess of revenues over expenses to the Commonwealth. Deficits are not allowed to be offset against the excess of revenues over expenses. Remittances are earmarked as follows: 5% of the excess of revenues over expenses (net revenues) to a Contingency fund, 35% of remaining balance to the Municipal Autonomy fund, and the rest to the Commonwealth. All prize winners have 180 days to claim their prizes. After 180 days unclaimed prizes are transferred to the Commonwealth; during 1995, such transfers approximated $2.5 million.

### Puerto Rico Highway and Transportation Authority (Enterprise fund only)

The Puerto Rico Highway and Transportation Authority (PRHTA) is a blended component unit of the Commonwealth, created by Act No. 74 of June 23, 1965, as amended, to provide roads and other transportation facilities for the planning, promotion and feasibility of mass transportation systems. The powers normally exercised by a Board of Directors are vested with the Commonwealth's Secretary of the Department of Transportation and Public Works (DTPW). PRHTA is exempt from the payment of any taxes on its revenues and properties.

Segment information for the enterprise funds is as follows (expressed in thousands):

|  | HFSA | Lottery of PR | Additional Lottery | PRHTA |
|---|---|---|---|---|
| Operating revenues | $ 193,454 | $457,485 | $236,250 | $   2,666 |
| Depreciation and amortization | 13,346 | 570 | 21 | 676 |
| Operating income (loss) | (708,258) | 63,842 | 86,648 | (2,691) |
| Non-Operating revenues (expenses): | 143,206 | 541 |  |  |
| Operating transfers-in (out) | 554,497 | (70,813) | (86,648) | 19,089 |
| Net income (loss) | (10,555) | (6,430) |  | 16,398 |
| Current capital contribution |  |  |  | 676 |
| Property, plant and equipment: |  |  |  |  |
| Additions and adjustments | 16,309 | 471 | 4 | 21,623 |
| Deletions and adjustments |  |  |  | 262 |
| Total assets | 254,675 | 38,057 | 140,715 | 27,701 |
| Total equity (deficit) | (440,485) | 844 | (1,365) | 27,682 |

## 17. SUBSEQUENT EVENTS

### Primary Government

The Commonwealth created in December 1995 an investment fund called "Project Globe" with an initial capitalization of $440.8 million; $300 million provided by the general fund and $140.8 million by the Government Development Bank for Puerto Rico (GDB), the internal service fund. The objective of the Fund is to maximize yield while reducing investment risk through diversification of the investment portfolio. The Fund is administered by GDB, and will be part of the Commonwealth's enterprise funds beginning in fiscal year 1995-96.

On July 6, 1995, Public Buildings Authority (PBA), a blended component unit, issued approximately $224.8 Government Facilities Revenue Bonds, Series A, Guaranteed by the Commonwealth of Puerto Rico (the "Series A Bonds"). The Series A Bonds were issued under the provisions of Resolution No. 468, adopted on June 22, 1995 and provided funds to pay notes issued by PBA and to finance the construction of facilities to be leased to certain agencies of the Commonwealth of Puerto Rico.

### Office for the Liquidation of the Accounts of the Puerto Rico Urban Renewal and Housing Corporation (the Office)

On August 3, 1995, the Legislature of Puerto Rico approved Law No. 106, which authorized the transfer of Urbanization Mínima (UM) projects to the Puerto Rico Administration of Development and Improvement of Housing. Such law established that 70% of the collections received from the disposition of those projects will be distributed to the Office and 30% to the Administration of Development and Improvement of Housing.

Based on such law, Offices' management deducted from the Operating Fund housing units and land lots held for sale by approximately $5.6 million which represents the 30% of the total of UM projects estimated housing units values as of June 30, 1995.

**Component Units - Other**

**Puerto Rico Electric Power Authority (PREPA)**

On July 3, 1995, PREPA, the Government Development Bank for Puerto Rico (the internal service fund), and certain banks entered into a new agreement for a revolving line of credit to be used for financing of fuel purchases. Under the agreement PREPA borrowed $125 million at an interest rate of 6.19%.

On August 15, 1995, and September 1, 1995, PREPA issued $1,050.4 million Revenue Bonds of which $723.8 million were used to advance refund outstanding Electric Revenue Bonds and Power Revenue Bonds. the proceeds of $739.6 million were used to purchase US securities which were deposited in an irrevocable trust with an escrow agent to provide for all future debt service payments. The Authority defeased the bonds to reduce its total debt service payments over the next 11 years by almost $40.6 million and to obtain an economic gain (difference between the net present values of the debt service payments on the old and new debt) of $31.8 million. The remainder proceeds of Revenue Bonds (after payment of $12.9 million in underwriting fees, insurance, and other issuance costs) were deposited in the Construction Fund and used to pay $83.9 million of Bond Anticipation Notes.

**Solid Waste Authority of Puerto Rico (SWAPR)**

Subsequent to June 30, 1995, SWARP was granted two lines of credit from the Government Development Bank for Puerto Rico (GDB), the internal service fund, for $43 and $5 million. These credit lines will be used to finance the development and implementation of a regional recycling plan and will be repaid from appropriations of the Office of Management and Budget of the Commonwealth.

**Puerto Rico Health Insurance Administration (PRHIA)**

Subsequent to June 30, 1995, the Commonwealth appropriated $128 million to repay certain amounts owed to the Health Facilities and Services Administration, an enterprise fund.

## 18.  SALE OF MARITIME SHIPPING OPERATION

Pursuant to the authority conferred by the Executive Order OE-1993-25 issued by the Governor of Puerto Rico, on March 3, 1995, the Commonwealth sold the assets and operations of the Puerto Rico Maritime Shipping Authority (PRMSA) to a group of private investors.

On September 27, 1994, the Legislature, by Act 113 (the Act), authorized the Commonwealth to negotiate and execute with the Government Development Bank (GDB), the internal service fund and other financial institutions, the financing agreements required to restructure and/or refund the existing debt obligations of the PRMSA. The Act provides that such restructuring and/or refunding, together with the expenses incurred in connection therewith and any required deposits to a reserve account, shall not exceed $310 million. The Act also provides that the Commonwealth shall honor the payment of principal of an interest on the debt and the funds to be provided by the Commonwealth to make the payments required under the debt are subject to and conditioned upon the appropriation of such funds by the Legislature of Puerto Rico in the annual budget of the Commonwealth commencing with the budget for fiscal year 1995-96.

Pursuant to the authority conferred by the Act, Puerto Rico Public Finance Corporation ("PRPFC") issued 1995 Series A and B Bonds and the Authority, GDB and PRPFC entered into a Debt Restructuring and Assignment Agreement whereby GDB and the Authority agreed to restructure the existing debt by substituting the Authority's obligations under an existing loan agreement with GDB in the principal amount of approximately $292 million at June 30, 1995 for the obligation arising under a new promissory note and PRPFC purchased the promissory note from GDB.

## 19.  ISSUANCE OF BONDS

On January 18, 1996, the Commonwealth issued approximately $350.4 million in Public Improvements Bonds of 1996 and approximately $57.2 million in Public Improvements Refunding Bonds, Series 1996.

## 20.  PARTIAL SETTLEMENT OF CONTINGENCY

On January 22, 1996, the US District Court in Puerto Rico consolidated all cases against the Commonwealth related to the complaints filed in 1979 by the inmates of the correctional facilities in Puerto Rico.  The Court ruled a permanent order requiring the Commonwealth to comply with the requirement of the minimum fixed living space per inmate.  In the opinion of management, based on advice of their legal counsel, this order will limit the imposition of further fines and the fines already paid together with accrued liability in the general fixed assets account group, (which amount to approximately $134 million at June 30, 1995) shall be sufficient to carry out the Court requirements.

[This page intentionally left blank]

# COMBINING AND INDIVIDUAL FUND FINANCIAL STATEMENTS

[This page intentionally left blank]

# General Fund

The general fund is used to account for resources traditionally associated with government which are not required legally or by sound financial management to be accounted for in another fund.

# COMMONWEALTH OF PUERTO RICO

**COMPARATIVE BALANCE SHEETS – GENERAL FUND**
**JUNE 30, 1995 AND 1994**
**(Expressed in Thousands)**

|  | 1995 | 1994 |
|---|---|---|
| **ASSETS** | | |
| Cash, cash equivalents and investments | $59,186 | $116,482 |
| Cash, cash equivalents and investments in governmental banks | 821,818 | 498,036 |
| Taxes receivable | 79,558 | 76,793 |
| Intergovernmental receivable | 52,585 | 3,822 |
| Accounts receivable | 16,530 | 14,665 |
| Loans and advances receivable | 81,976 | 948 |
| Accrued interest receivable | 1,192 | 5,657 |
| Other receivable | 7,141 | 4,455 |
| Due from other funds | 15,508 | 20,396 |
| Due from component units | | 45,601 |
| Due from other governmental entities | | 17,430 |
| Advances to other governmental entities | 37,684 | 54,881 |
| Restricted assets | 30,000 | 837,484 |
| Other assets | | 17 |
| **TOTAL ASSETS** | **$1,203,178** | **$1,696,667** |
| **LIABILITIES AND FUND BALANCE** | | |
| **Liabilities:** | | |
| Accounts payable and accrued liabilities | $386,265 | $289,216 |
| Tax refunds payable | 133,351 | 104,948 |
| Due to other funds | 55,626 | 32,475 |
| Interest payable | | 15,922 |
| Deferred revenues | | 757 |
| Notes payable | | 704,746 |
| Accrued compensated absences | 4,415 | 4,413 |
| Other liabilities | 15,741 | 29,586 |
| Total liabilities | 595,398 | 1,182,063 |
| **Fund balance:** | | |
| Reserve for encumbrances | 146,783 | 29,864 |
| Reserve for debt service | | 223,665 |
| Reserve for advances and other specified purposes | 17,197 | 45,601 |
| Unreserved | 443,800 | 215,474 |
| Total fund balance | 607,780 | 514,604 |
| **TOTAL LIABILITIES AND FUND BALANCE** | **$1,203,178** | **$1,696,667** |

See notes to general purpose financial statements.

# COMMONWEALTH OF PUERTO RICO

**COMPARATIVE STATEMENTS OF REVENUES, EXPENDITURES AND
CHANGES IN FUND BALANCE - GENERAL FUND
YEARS ENDED JUNE 30, 1995 AND 1994
(Expressed in Thousands)**

| | 1995 | 1994 |
|---|---|---|
| **REVENUES:** | | |
| Income taxes | $3,242,876 | $2,876,542 |
| Excise taxes | 1,488,141 | 1,426,728 |
| Other taxes | 56,556 | 53,521 |
| Charges for services | 142,506 | 144,429 |
| Intergovernmental | 2,335,891 | 2,209,445 |
| Other | 120,380 | 123,374 |
| Total revenues | 7,386,350 | 6,834,039 |
| **EXPENDITURES:** | | |
| Current: | | |
| General government | 451,275 | 341,066 |
| Public safety | 878,673 | 798,367 |
| Health | 231,212 | 192,118 |
| Public housing and welfare | 1,681,688 | 1,524,344 |
| Education | 1,760,784 | 1,511,610 |
| Economic development | 154,796 | 235,915 |
| Intergovernmental | 207,389 | 184,261 |
| Capital outlays | 63,077 | 49,168 |
| Debt service: | | |
| Principal | 380,299 | 35,055 |
| Interest and other | 27,654 | 27,321 |
| Total expenditures | 5,836,847 | 4,899,225 |
| Excess of revenues over expenditures | 1,549,503 | 1,934,814 |
| **OTHER FINANCING SOURCES (USES):** | | |
| Advances from internal service fund | 207,893 | |
| Operating transfers-in from other funds | 238,296 | 224,407 |
| Other sources | 28,813 | 176,907 |
| Operating transfers-out to other funds | (983,743) | (1,066,021) |
| Operating transfers-out to component units | (927,510) | (721,816) |
| Other sources - capital leases | 1,207 | |
| Other uses | (21,283) | (14,057) |
| Total other financing uses | (1,456,327) | (1,400,580) |
| Excess of revenues and other financing sources over expenditures and other financing uses | 93,176 | 534,234 |
| **FUND BALANCE (DEFICIT) AT BEGINNING OF YEAR** | 514,604 | (47,420) |
| **RESTATEMENT** | | 27,790 |
| **FUND BALANCE AT END OF YEAR** | $607,780 | $514,604 |

See notes to general purpose financial statements.

**COMMONWEALTH OF PUERTO RICO**

**STATEMENTS OF REVENUES AND EXPENDITURES**
**BUDGET AND ACTUAL - STATUTORY BASIS - GENERAL FUND**
**YEAR ENDED JUNE 30, 1995**
**(With Comparative Totals for the Fiscal Year Ended June 30, 1994)**
**(Expressed in Thousands)**

| | 1995 | | | 1994 |
|---|---|---|---|---|
| | **Budget** | **Actual** | **Variance Favorable (Unfavorable)** | **Actual** |
| **REVENUES:** | | | | |
| Income taxes | $3,202,000 | $3,221,119 | $19,119 | $2,856,169 |
| Intergovernmental taxes | 510 | 8,038 | 7,528 | 4,573 |
| Excise taxes | 1,450,500 | 1,432,531 | (17,969) | 1,378,212 |
| Other taxes | 52,883 | 56,030 | 3,147 | 53,182 |
| Charges for services | 98,892 | 94,670 | (4,222) | 98,052 |
| Intergovernmental | 122,000 | 112,201 | (9,799) | 122,491 |
| Other | 125,285 | 116,016 | (9,269) | 197,332 |
| Total revenues | 5,052,070 | 5,040,605 | (11,465) | 4,710,011 |
| **EXPENDITURES:** | | | | |
| Current: | | | | |
| General government | 381,419 | 351,737 | 29,682 | 314,211 |
| Public safety | 868,510 | 863,677 | 4,833 | 760,512 |
| Health | 124,334 | 123,640 | 694 | 70,252 |
| Public housing and welfare | 276,632 | 268,627 | 8,005 | 161,461 |
| Education | 1,129,988 | 1,130,299 | (311) | 1,037,152 |
| Economic development | 177,627 | 175,720 | 1,907 | 265,178 |
| Intergovernmental | 251,100 | 250,749 | 351 | 231,760 |
| Total expenditures | 3,209,610 | 3,164,449 | 45,161 | 2,840,526 |
| Excess of revenues over expenditures | 1,842,460 | 1,876,156 | 33,696 | 1,869,485 |
| **OTHER FINANCING SOURCES (USES):** | | | | |
| Operating transfers-in from other funds | 145,555 | 202,226 | 56,671 | 105,855 |
| Other sources | 255,218 | 265,988 | 10,770 | |
| Operating transfers-out to other funds | (1,094,682) | (1,094,682) | | (921,932) |
| Operating transfers-out to component units | (938,682) | (938,682) | | (721,816) |
| Total other financing uses | (1,632,591) | (1,565,150) | 67,441 | (1,537,893) |
| Excess of revenues and other sources over expenditures and other uses | $209,869 | $311,006 | $101,137 | $331,592 |

See notes to general purpose financial statements.

# Debt Service Funds

The debt service fund is used to account for the accumulation of resources and payment of general obligation bond principal and interest from governmental resources and special assessment bond principal and interest from special assessment levies when the government is obligated in some manner for the payment.

[This page intentionally left blank]

**COMMONWEALTH OF PUERTO RICO**
**COMBINING BALANCE SHEETS - DEBT SERVICE FUNDS**
**JUNE 30, 1995**
**(With Comparative Totals for the Fiscal Year Ended June 30, 1994)**
**(Expressed in Thousands)**

| | Debt Redemption Fund | Puerto Rico Highway and Transportation Authority | Public Buildings Authority | Puerto Rico Infrastructure Financing Authority | Other Funds | Totals 1995 | 1994 (As Restated) |
|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | |
| Cash, cash equivalents and investments | $ | $222,722 | $ | $26,816 | $911 | $250,449 | $314,813 |
| Cash, cash equivalents and investments in governmental banks | 240,508 | 17,134 | | | 26,287 | 283,929 | 271,862 |
| Intergovernmental receivable | 31,310 | | 26,270 | | 1,276 | 58,856 | 36,070 |
| Accounts receivable | 6,273 | 639 | | | | 6,912 | 4,350 |
| Accrued interest receivable | | | | | 5,000 | 5,000 | |
| Other receivable | | 3,829 | | | | 3,829 | |
| Due from other funds | | | 74,855 | | | 74,855 | 71,708 |
| Restricted assets | | | | | | | |
| **TOTAL ASSETS** | $278,091 | $244,324 | $101,125 | $26,816 | $33,474 | $683,830 | $698,803 |
| **LIABILITIES AND FUND BALANCE** | | | | | | | |
| **Liabilities:** | | | | | | | |
| Accounts payable and accrued liabilities | $278 | $ 362 | $ 27,995 | $ | $9,852 | $10,130 | $280 |
| Due to other funds | | | | | | 28,357 | 34,653 |
| Interest payable | 89,650 | 44,756 | 31,365 | | | 165,771 | 170,086 |
| Bonds payable | 186,470 | 36,570 | 41,765 | | | 264,805 | 306,425 |
| Other liabilities | 1,255 | | | | | 1,255 | 492 |
| **Total liabilities** | 277,653 | 81,688 | 101,125 | | 9,852 | 470,318 | 511,936 |
| **Fund balance:** | | | | | | | |
| Reserved for: | | | | | | | |
| Debt service | 438 | 162,636 | | 26,816 | 18,622 | 208,512 | 186,867 |
| Other specified purposes | | | | | 5,000 | 5,000 | |
| **Total fund balance** | 438 | 162,636 | | 26,816 | 23,622 | 213,512 | 186,867 |
| **TOTAL LIABILITIES AND FUND BALANCE** | $278,091 | $244,324 | $101,125 | $26,816 | $33,474 | $683,830 | $698,803 |

See notes to general purpose financial statements.

**COMMONWEALTH OF PUERTO RICO**

**COMBINING STATEMENTS OF REVENUES,
EXPENDITURES AND CHANGES IN FUND BALANCE -
DEBT SERVICE FUNDS
YEAR ENDED JUNE 30, 1995
(With Comparative Totals for Fiscal Year Ended June 30, 1994)
(Expressed in Thousands)**

| | Debt Redemption Fund | Puerto Rico Highway and Transportation Authority | Public Buildings Authority | Puerto Rico Infrastructure Financing Authority | Other Funds | Totals 1995 | 1994 (As Restated) |
|---|---|---|---|---|---|---|---|
| **REVENUES:** | | | | | | | |
| Taxes: | | | | | | | |
| Excise | $13,207 | $163,181 | $ | $ | $ | $176,388 | $163,042 |
| Charges for services | | 105,718 | 193,857 | | | 299,575 | 92,171 |
| Intergovernmental | 65,348 | | | | | 65,348 | 63,509 |
| Other | 6,014 | 11,361 | | 1,295 | | 18,670 | 186,573 |
| **Total Revenues** | 84,569 | 280,260 | 193,857 | 1,295 | | 559,981 | 505,295 |
| **EXPENDITURES:** | | | | | | | |
| Debt Service: | | | | | | | |
| Principal | 186,470 | 40,520 | 39,420 | 13,420 | 4 | 279,834 | 311,741 |
| Interest and other | 202,808 | 116,893 | 61,742 | 24,761 | 1,041 | 407,245 | 372,110 |
| **Total Expenditures** | 389,278 | 157,413 | 101,162 | 38,181 | 1,045 | 687,079 | 683,851 |
| **EXCESS/(DEFICIENCY) OF REVENUES OVER (UNDER) EXPENDITURES** | (304,709) | 122,847 | 92,695 | (36,886) | (1,045) | (127,098) | (178,556) |
| **OTHER FINANCING SOURCES (USES):** | | | | | | | |
| Proceeds from long-term debt issues | | | | | | | 734,927 |
| Proceeds from refunded bonds | 92,975 | | | | | 92,975 | 967,891 |
| Operating transfers-in from other funds | 307,747 | 23,341 | | 41,755 | | 372,843 | 407,066 |
| Other sources | | | | | | | 3,669 |
| Operating transfers-out to other funds | (12,635) | (134,811) | (92,695) | (3,172) | | (243,313) | (225,767) |
| Payment of refunded bond escrow agent | (91,318) | | | | | (91,318) | (1,689,579) |
| Other uses | (1,721) | (122) | | | (24) | (1,867) | |
| **Total other financing sources (uses)** | 295,048 | (111,592) | (92,695) | 38,583 | (24) | 129,320 | 198,207 |
| Excess (deficiency) of revenues and other financing sources over (under) expenditures and other financing sources (uses) | (9,661) | 11,255 | | 1,697 | (1,069) | 2,222 | 19,651 |
| **FUND BALANCE AT BEGINNING OF YEAR** | 10,099 | 151,381 | | 25,119 | 268 | 186,867 | 167,216 |
| **RESIDUAL EQUITY TRANSFER** | | | | | 24,423 | 24,423 | |
| **FUND BALANCE AT END OF YEAR** | $438 | $162,636 | $ | $26,816 | $23,622 | $213,512 | $186,867 |

See notes to general purpose financial statements.

**COMMONWEALTH OF PUERTO RICO**

**STATEMENTS OF REVENUES AND EXPENDITURES**
**BUDGET AND ACTUAL - STATUTORY BASIS - DEBT SERVICE FUNDS**
**YEAR ENDED JUNE 30, 1995**
**(With Comparative Actual Totals for the Fiscal Year Ended June 30, 1994)**
**(Expressed in Thousands)**

| | | 1995 | | 1994 |
|---|---|---|---|---|
| | Budget | Actual | Variance Favorable (Unfavorable) | Actual |
| **REVENUES:** | | | | |
| Taxes: | | | | |
| Intergovernmental | $ | $ | $ | $55,366 |
| Excise | | 13,207 | 13,207 | 10,809 |
| Other | | | | 6,975 |
| Intergovernmental | 66,709 | 65,348 | (1,361) | |
| Other | | 4,091 | 4,091 | |
| Total revenues | 66,709 | 82,646 | 15,937 | 73,150 |
| **EXPENDITURES:** | | | | |
| Debt service: | | | | |
| Principal | 186,470 | 261,474 | (75,004) | 224,691 |
| Interest and other | 190,679 | 237,061 | (46,382) | 213,381 |
| Total expenditures | 377,149 | 498,535 | (121,386) | 438,072 |
| Deficiency of revenues under expenditures | (310,440) | (415,889) | (105,449) | (364,922) |
| **OTHER FINANCING SOURCES (USES):** | | | | |
| Proceeds of refunding bonds | 310,440 | 92,975 | (217,465) | 967,891 |
| Payment of refunded bonds escrow agent | | (91,318) | (91,318) | (959,296) |
| Operating transfers-in from other funds | | 390,997 | 390,997 | 359,545 |
| Other uses | | (1,721) | (1,721) | 3,150 |
| Operating transfers-out to other funds | | (12,635) | (12,635) | (10,387) |
| Total other financing sources | 310,440 | 378,298 | 67,858 | 360,903 |
| Deficiency of revenues and other financing sources under expenditures and other uses | $ | ($37,591) | ($37,591) | ($4,019) |

See notes to general purpose financial statements.

[This page intentionally left blank]

# Capital Projects Funds

Capital projects funds are used to account for the acquisition and construction of major capital facilities other than those financed by proprietary funds and trust funds.

**COMMONWEALTH OF PUERTO RICO**
**COMBINING BALANCE SHEETS - CAPITAL PROJECTS FUNDS**
**JUNE 30, 1995**
(With Comparative Totals for the Fiscal Year Ended June 30, 1994)
(Expressed in Thousands)

| | 1994 Public Improvements Fund | 1993 Public Improvements Fund | Puerto Rico Highway and Transportation Authority | Public Buildings Authority | Puerto Rico Land Administration | Puerto Rico Infrastructure Financing Authority | Other Funds | Totals 1995 | 1994 |
|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | |
| Cash, cash equivalents and investments | $ | $ | $31,612 | $29,518 | $6,563 | $ | $24,448 | $92,141 | $202,626 |
| Cash, cash equivalents and investments in governmental banks | 118,664 | 102,352 | 1,267 | 101,463 | 16,639 | 7,825 | 82,622 | 431,032 | 454,113 |
| Intergovernmental receivable | | | 19,782 | | | | | 19,782 | 13,677 |
| | | | | | | | | | 26,274 |
| Accounts receivable | | | | | 16,639 | | 36 | 16,675 | 41,451 |
| Loans and advances receivable | | | 2,456 | | | | | 2,456 | 4,868 |
| Accrued interest receivable | | | | | 23,425 | | | 23,425 | |
| Other receivable | 2,271 | 795 | 343 | 27,995 | | | 1,503 | 32,007 | 1,961 |
| Due from other funds | | | 18,025 | | | | | 18,025 | |
| Advances to other funds | | | | | | | | | 12,387 |
| Advances to Office for the Liquidation | | | | | | | | | 914 |
| Advances to other governmental entities | | | | | 36,849 | | | 36,849 | 39,512 |
| Restricted assets | | | | | 43,706 | | | 43,706 | |
| Property held for sale | | | 1,090 | 4,665 | 1,066 | 4 | | 6,825 | 7,394 |
| Other assets | | | | | | | | | |
| **TOTAL ASSETS** | $121,135 | $103,147 | $74,575 | $217,129 | $91,399 | $7,829 | $108,609 | $723,823 | $805,157 |
| **LIABILITIES AND FUND BALANCE** | | | | | | | | | |
| **Liabilities:** | | | | | | | | | |
| Accounts payable and accrued liabilities | $3,674 | $11,717 | $34,912 | $105,234 | $2,502 | $ | $2,390 | $160,429 | $112,923 |
| | | | | | | | | | 36,246 |
| Due to other funds | | | | | 7,589 | | | 7,589 | |
| Interest payable | | | | | | | | | 1,380 |
| Deferred revenues | | | | | 17,445 | | | 17,445 | |
| Notes payable | | | 10,119 | | | | | 10,119 | 6,778 |
| Accrued compensated absences | 138 | 1,813 | 5,013 | | 1,428 | | 3,438 | 11,830 | 19,348 |
| Other liabilities | | | 1,625 | | | | | 1,625 | |
| Other long term liabilities | | | | | | | | | |
| **Total liabilities** | 3,812 | 13,530 | 51,669 | 105,234 | 28,964 | 0 | 5,828 | 209,037 | 178,675 |
| **Fund balance:** | | | | | | | | | |
| Reserved for: | | | | | | | | | |
| Encumbrances | 6,742 | 15,916 | | | | | 3,298 | 25,956 | 1,019 |
| Advances and other specified purposes | | | 27,948 | 111,895 | 62,435 | | | 202,278 | 211,009 |
| Unreserved | 110,581 | 73,701 | (5,042) | | | 7,829 | 99,483 | 286,552 | 414,454 |
| Total fund balance | 117,323 | 89,617 | 22,906 | 111,895 | 62,435 | 7,829 | 102,781 | 514,786 | 626,482 |
| **TOTAL LIABILITIES AND FUND BALANCE** | $121,135 | $103,147 | $74,575 | $217,129 | $91,399 | $7,829 | $108,609 | $723,823 | $805,157 |

See notes to general purpose financial statements.

**COMMONWEALTH OF PUERTO RICO**

**COMBINING STATEMENTS OF REVENUES,**
**EXPENDITURES AND CHANGES IN FUND BALANCE -**
**CAPITAL PROJECTS FUNDS**
**YEAR ENDED JUNE 30, 1995**
**(With Comparative Totals for Fiscal Year Ended June 30, 1994)**
**(Expressed in Thousands)**

| | 1994 Public Improvements Fund | 1993 Public Improvements Fund | Puerto Rico Highway and Transportation Authority | Public Buildings Authority | Puerto Rico Land Administration | Puerto Rico Infrastructure Financing Authority | Other Funds | Totals 1995 | 1994 (As Restated) |
|---|---|---|---|---|---|---|---|---|---|
| **REVENUES:** | | | | | | | | | |
| Charges for services | $ | $ | $ | $ | $13,419 | $ | $ | $13,419 | $1,316 |
| Intergovernmental | | | 91,019 | | | | 185 | 91,204 | 55,473 |
| Other | | | 4,200 | 17,967 | 8,805 | | 3 | 30,975 | 21,447 |
| Total revenues | | | 95,219 | 17,967 | 22,224 | | 188 | 135,598 | 78,236 |
| **EXPENDITURES:** | | | | | | | | | |
| Capital outlay | 97,679 | 56,401 | 418,221 | 160,637 | 8,933 | | 43,853 | 785,724 | 659,097 |
| Debt service: | | | | | | | | | |
| Principal | | | | | | | | | 735 |
| Interest and other | | | | | 280 | 370 | | 650 | 746 |
| Total expenditures | 97,679 | 56,401 | 418,221 | 160,637 | 9,213 | 370 | 43,853 | 786,374 | 660,578 |
| Excess (deficiency) of revenues over (under) expenditures | (97,679) | (56,401) | (323,002) | (142,670) | 13,011 | (370) | (43,665) | (650,776) | (582,342) |
| **OTHER FINANCING SOURCES (USES):** | | | | | | | | | |
| Proceeds from long-term debt issues | 324,906 | | | | | | | 324,906 | 713,412 |
| Advances from internal service fund | | | 74,341 | 53,467 | | | | 127,808 | 66,175 |
| Operating transfers-in from other funds | | 30 | 92,381 | 92,695 | | 40,000 | | 225,106 | 223,630 |
| Other sources | | 40,205 | | 34,359 | 5,281 | 552 | 767 | 81,164 | 146,644 |
| Operating transfers-out to other funds | (30,260) | (2) | | | | (41,756) | (718 | (72,736) | (90,113) |
| Operating transfers-out to component units | (79,635) | | | | | | | (79,635) | (53,700) |
| Other uses | (1) | | | (86,046) | (8,633) | (217) | | (94,897) | (159,827) |
| Total other financing sources (uses) | 215,010 | 40,233 | 166,722 | 94,475 | (3,352) | (1,421) | 49 | 511,716 | 846,221 |
| Excess (deficiency) of revenues and other financing sources over (under) expenditures and other financing sources (uses) | 117,331 | (16,168) | (156,280) | (48,195) | 9,659 | (1,791) | (43,616 | (139,060) | 263,879 |
| **FUND BALANCE (DEFICIT) AT BEGINNING OF YEAR (AS RESTATED)** | (8) | 105,785 | 179,186 | 160,090 | 52,776 | 9,620 | 146,397 | 653,846 | 362,603 |
| **FUND BALANCE AT END OF YEAR** | $117,323 | $89,617 | $22,906 | $111,895 | $62,435 | $7,829 | $102,781 | $514,786 | $626,482 |

See notes to general purpose financial statements.

# COMMONWEALTH OF PUERTO RICO

**STATEMENTS OF REVENUES AND EXPENDITURES -
BUDGET AND ACTUAL - STATUTORY BASIS -
CAPITAL PROJECTS FUNDS
YEAR ENDED JUNE 30, 1995
(With Comparative Totals for Fiscal Year Ended June 30, 1994)
(Expressed in Thousands)**

| | 1995 | | | 1994 |
|---|---|---|---|---|
| | **Budget** | **Actual** | **Variance Favorable (Unfavorable)** | |
| **REVENUES :** | $ | $185 | $185 | $ |
| Intergovernmental | | 3 | 3 | |
| Other | | | | |
| Total revenues | | 188 | 188 | |
| **EXPENDITURES :** | | | | |
| Capital outlays | 213,506 | 50,094 | 163,412 | 83,778 |
| Deficiency of revenues under expenditures | (213,506) | (49,906) | 163,600 | (83,778) |
| **OTHER FINANCING SOURCES (USES):** | | | | |
| Proceeds from long-term debt issues | 325,000 | 330,454 | 5,454 | 305,812 |
| Proceeds of refunding bonds | | 1,600 | 1,600 | |
| Operating transfers-out to other funds | (31,859) | (31,859) | | (27,087) |
| Operating transfers-out to component units | (79,635) | (79,635) | | (53,700) |
| Total other financing sources | 213,506 | 220,560 | 7,054 | 225,025 |
| Excess of revenues and other financing sources over expenditures and other financing uses | $ | $170,654 | $170,654 | $141,247 |

See notes to general purpose financial statements.

# Enterprise Funds

Enterprise funds are used to account for operations that are financed and operated in a manner similar to private business enterprises-where the intent of the government's council is that the costs of providing goods or services to the general public on a continuing basis be financed or recovered primarily through user charges; or where the government's council has decided that periodic determination of net income is appropriate for accountability purposes.

**Health Facilities and Services Administration of Puerto Rico:** Created as an executive agency in 1975 to lease, operate hospitals and other health facilities and to provide for the improvement, alteration or repair of such facilities. Accounts for the cost of providing health services to the general public.

**The Additional Lottery System:** Created by Law No. 10 of May 24, 1989, as amended, and commenced operations on June 1, 1990. The Additional Lottery is an operational unit of the Commonwealth of Puerto Rico Treasury Department. Presently, two games (Pick 3 and Loto) with several betting alternatives are offered by the Additional Lottery.

**Lottery of Puerto Rico:** Created under Law No. 465 of May of 1947. The Lottery is an operational unit of the Commonwealth of Puerto Rico Treasury Department and is engaged in the sale of tickets to authorized agents throughout the Commonwealth. It was created to help those authorized agents with an additional source of revenues and to supplement revenues for the general fund of the Commonwealth.

**Puerto Rico Highway and Transportation Authority:** Created by Act No. 74 of June 23, 1965, as amended, to provide roads and other transportation facilities for the planning, promotion and feasibility of mass transportation systems.

[This page intentionally left blank]

**COMMONWEALTH OF PUERTO RICO**

**COMBINING BALANCE SHEETS - ENTERPRISE FUNDS**
**JUNE 30, 1995**
**(With Comparative Totals for the Fiscal Year Ended June 30, 1994)**
**(Expressed in Thousands)**

| | Health Facilities and Services Administration of Puerto Rico | The Additional Lottery System | Lottery of Puerto Rico | Puerto Rico Highway and Transportation Authority | Totals 1995 | 1994 |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Cash, cash equivalents and investments | $9,526 | $5,429 | $20,669 | $ | $35,626 | $33,819 |
| Cash, cash equivalents and investments in governmental banks | | | 14,775 | | 14,775 | 21,708 |
| Receivables, net: | | | | | | |
| Intergovernmental | 17,696 | | | | 17,696 | |
| Accounts | 40,122 | 2,075 | 54 | | 42,251 | 52,919 |
| Other | 2,017 | | | | 2,017 | 33,205 |
| Due from other funds | 2,762 | | | 19 | 2,781 | 19,283 |
| Inventories | 20,645 | | 290 | | 20,935 | 27,640 |
| Restricted assets | 7,318 | 133,175 | | | 140,493 | 109,814 |
| Fixed assets, net | 153,166 | 14 | 2,269 | 27,682 | 183,131 | 157,696 |
| Other assets | 1,421 | 22 | | | 1,443 | 105 |
| **TOTAL ASSETS** | $254,675 | $140,715 | $38,057 | $27,701 | $461,148 | $456,191 |
| **LIABILITIES AND FUND EQUITY (DEFICIT)** | | | | | | |
| Liabilities: | | | | | | |
| Accounts payable and accrued liabilities | $133,381 | $3,344 | $1,261 | $ | $137,986 | $207,772 |
| Due to: | | | | | | |
| Other funds | | 4,152 | 11,289 | | 15,441 | 7,168 |
| Component units | 82,524 | | | | 82,524 | 73,297 |
| Advances from other funds | 298,815 | | | | 298,815 | 326,245 |
| Interest payable | 23,905 | | | | 23,905 | 26,100 |
| Deferred revenues | | | 14,173 | | 14,173 | 15,586 |
| Lottery prizes payable | | 134,501 | 8,012 | | 142,513 | 110,627 |
| Accrued compensated absences | 68,301 | 83 | 1,037 | | 69,421 | 61,709 |
| Other liabilities | | | | 19 | 19 | 92,588 |
| Other long-term liabilities | 88,234 | | 1,441 | | 89,675 | 1,725 |
| **Total liabilities** | 695,160 | 142,080 | 37,213 | 19 | 874,472 | 922,817 |
| Fund equity (deficit): | | | | | | |
| Contributed capital | | | 804 | 27,682 | 28,486 | 6,322 |
| Retained earnings (deficit) | (440,485) | (1,365) | 40 | | (441,810) | (472,948) |
| **Total fund equity (deficit)** | (440,485) | (1,365) | 844 | 27,682 | (413,324) | (466,626) |
| **TOTAL LIABILITIES AND FUND EQUITY** | $254,675 | $140,715 | $38,057 | $27,701 | $461,148 | $456,191 |

See notes to general purpose financial statements.

**COMMONWEALTH OF PUERTO RICO**

**COMBINING STATEMENTS OF REVENUES, EXPENSES AND
CHANGES IN RETAINED EARNINGS (DEFICIT) - ENTERPRISE FUNDS
YEAR ENDED JUNE 30, 1995
(With Comparative Totals for Fiscal Year Ended June 30, 1994)
(Expressed in Thousands)**

| | Health Facilities and Services Administration of Puerto Rico | The Additional Lottery System | Lottery of Puerto Rico | Puerto Rico Highway and Transportation Authority | Total 1995 | Total 1994 |
|---|---|---|---|---|---|---|
| **OPERATING REVENUES:** | | | | | | |
| Charges for services | $178,099 | $236,250 | $457,485 | $2,666 | $874,500 | $787,112 |
| Other | 15,355 | | | | 15,355 | 9,544 |
| Total operating revenues | 193,454 | 236,250 | 457,485 | 2,666 | 889,855 | 796,656 |
| **OPERATING EXPENSES:** | | | | | | |
| Cost of services | 888,366 | 149,581 | 393,073 | 4,681 | 1,435,701 | 1,445,974 |
| Depreciation and amortization | 13,346 | 21 | 570 | 676 | 14,613 | 12,532 |
| Total operating expenses | 901,712 | 149,602 | 393,643 | 5,357 | 1,450,314 | 1,458,506 |
| **OPERATING INCOME (LOSS)** | (708,258) | 86,648 | 63,842 | (2,691) | (560,459) | (661,850) |
| **NON-OPERATING REVENUES (EXPENSES)** | | | | | | |
| Intergovernmental | 176,333 | | | | 176,333 | 179,108 |
| Interest income | | | 410 | | 410 | 2,481 |
| Interest expense | (34,518) | | (128) | | (34,646) | (37,050) |
| Other, net | 1,391 | | 259 | | 1,650 | |
| Total non-operating revenues, net | 143,206 | | 541 | | 143,747 | 144,539 |
| **INCOME (LOSS) BEFORE OPERATING TRANSFERS** | (565,052) | 86,648 | 64,383 | (2,691) | (416,712) | (517,311) |
| Operating transfers from (to) other funds | 554,497 | (86,648) | (70,813) | 19,089 | 416,125 | 425,669 |
| **NET INCOME (LOSS)** | (10,555) | | (6,430) | 16,398 | (587) | (91,642) |
| **DEPRECIATION ON FIXED ASSETS ACQUIRED THROUGH CAPITAL CONTRIBUTION** | | | 570 | 676 | 1,246 | 667 |
| **INCREASE (DECREASE) IN RETAINED EARNINGS (DEFICIT)/FUND BALANCE** | (10,555) | | (5,860) | 17,074 | 659 | (90,975) |
| **RETAINED EARNINGS (DEFICIT) AT BEGINNING OF YEAR:** | | | | | | |
| As restated | (429,930) | (1,365) | 6,785 | | (424,510) | (381,973) |
| **TRANSFER TO CONTRIBUTED CAPITAL** | | | (885) | (17,074) | (17,959) | |
| **RETAINED EARNINGS (DEFICIT) AT END OF YEAR** | ($440,485) | ($1,365) | $40 | $ | ($441,810) | ($472,948) |

See notes to general purpose financial statements.

**COMMONWEALTH OF PUERTO RICO**

**COMBINING STATEMENTS OF CASH FLOWS - ENTERPRISE FUNDS**
**YEAR ENDED JUNE 30, 1995**
**(With Comparative Totals for the Fiscal Year Ended June 30, 1994)**
**(Expressed in Thousands)**

| | Health Facilities and Services Administration of Puerto Rico | The Additional Lottery System | Lottery of Puerto Rico | Puerto Rico Highway and Transportation Authority | Totals 1995 | 1994 |
|---|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | | | |
| Operating income (loss) | ($708,258) | $86,648 | $63,842 | ($2,691) | ($560,459) | ($661,850) |
| Adjustments to reconcile operating income (loss) to net cash provided by (used in) operating activities: | | | | | | |
| Depreciation and amortization | 13,346 | 25 | 570 | 676 | 14,617 | 12,532 |
| Other | | | 248 | | 248 | 2 |
| Changes in assets and liabilities: | | | | | | |
| (Increase) decrease in: | | | | | | |
| Receivables, net | (7,641) | (431) | | | (8,072) | (23,899) |
| Due from other funds | (352) | | | | (352) | (34,569) |
| Inventories | 4,972 | | 90 | | 5,062 | (5,697) |
| Other assets | 180 | 83 | | | 263 | (71) |
| Increase (decrease) in: | | | | | | |
| Accounts payable and accrued liabilities | (638) | 1,143 | (1,235) | | (730) | 110,240 |
| Due to other funds | | (3,017) | 11,288 | | 8,271 | (8,763) |
| Deferred revenues | | | (1,413) | | (1,413) | 5,728 |
| Accrued compensated absences | | | (74) | | (74) | (3,658) |
| Other liabilities | 26,193 | 32,988 | | | 59,181 | 39,134 |
| Total adjustments | 36,060 | 30,791 | 9,474 | 676 | 77,001 | 90,979 |
| Net cash provided by (used in) operating activities | (672,198) | 117,439 | 73,316 | (2,015) | (483,456) | (570,871) |
| **CASH FLOWS FROM NONCAPITAL FINANCING ACTIVITIES:** | | | | | | |
| Operating grants received | 774,797 | | | | 774,797 | 190,859 |
| Operating transfers-in from other funds | | | | 19,089 | 19,089 | 576,082 |
| Operating transfers-out to other funds | | (86,648) | (70,813) | | (157,461) | (150,413) |
| Net cash provided by (used in) noncapital financing activities | 774,797 | (86,648) | (70,813) | 19,089 | 636,425 | 616,528 |
| **CASH FLOWS FROM CAPITAL AND RELATED FINANCING ACTIVITIES:** | | | | | | |
| Acquisition and construction of capital assets | (19,855) | (4) | (872) | | (20,731) | (14,896) |
| Principal paid on bonds and notes | (31,784) | | | | (31,784) | (4,481) |
| Interest paid on bonds and notes | (37,116) | | | | (37,116) | (26,100) |
| Capital contributions | | | | (17,074) | (17,074) | |
| Net cash used in capital and related financing activities | (88,755) | (4) | (872) | (17,074) | (106,705) | (45,477) |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | | | |
| Purchase of investments securities | | (34,808) | | | (34,808) | (31,544) |
| Proceeds from sales and maturities of investments and securities | 327 | | | | 327 | |
| Interest and dividends on investments | 1,416 | | 410 | | 1,826 | 2,482 |
| Net cash provided by (used in) investing activities | 1,743 | (34,808) | 410 | | (32,655) | (29,062) |
| **NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS** | 15,587 | (4,021) | 2,041 | | 13,607 | (28,882) |
| **CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR** | 1,259 | 9,449 | 33,403 | | 44,111 | 79,027 |
| **CASH AND CASH EQUIVALENTS AT END OF YEAR** | $16,846 | $5,428 | $35,444 | $ | $57,718 | $50,145 |

See notes to general purpose financial statements.

[This page intentionally left blank]

# Internal Service Fund

---

Internal service funds are used to account for the financing of goods or services provided by one department or agency to other departments or agencies of the government and to other government units, on a cost reimbursement basis.

---

**Government Development Bank for Puerto Rico and Subsidiaries:** Created in 1948 to act as a fiscal agent for the Commonwealth and its component units and to make loans to component units, and private enterprises which will further the economic development of Puerto Rico.

**COMMONWEALTH OF PUERTO RICO**
**BALANCE SHEETS - INTERNAL SERVICE FUND**
**JUNE 30, 1995**
**(With Comparative Totals for the Fiscal Year Ended June 30, 1994)**
**(Expressed in Thousands)**

| | Total | |
|---|---|---|
| | 1995 | 1994 (As Restated) |
| **ASSETS** | | |
| Cash, cash equivalents and investments | $3,793,663 | $3,586,063 |
| Loans and advances receivable | 239,286 | 230,010 |
| Accrued interest receivable | 95,402 | 82,937 |
| Due from other funds | 40,069 | |
| Advances to other funds | 939,043 | 539,429 |
| Advances to component units | 945,447 | 1,126,629 |
| Advances to other governmental entities | 232,006 | 212,043 |
| Restricted assets | 1,850,398 | 1,610,765 |
| Other assets | 30,105 | 63,332 |
| **TOTAL ASSETS** | $8,165,419 | $7,451,208 |
| | | |
| **LIABILITIES AND FUND EQUITY** | | |
| **Liabilities:** | | |
| Accounts payable and accrued liabilities | $66,764 | $33,312 |
| Deposits | 4,291,694 | 3,680,358 |
| Securities sold under agreement to repurchase | 78,515 | 200,276 |
| Interest payable | 51,630 | 38,422 |
| Notes payable | 1,299,501 | 1,234,777 |
| Bonds payable | 1,326,513 | 1,304,095 |
| Accrued compensated absences | 4,288 | 3,923 |
| Total liabilities | 7,118,905 | 6,495,163 |
| **Fund Equity:** | | |
| Contributed capital | 1,025,000 | 925,000 |
| Retained earnings | 21,904 | 31,045 |
| Unrealized loss in value of debt securities | (390) | |
| Total fund equity | 1,046,514 | 956,045 |
| **TOTAL LIABILITIES AND FUND EQUITY** | $8,165,419 | $7,451,208 |

See notes to general purpose financial statements.

# COMMONWEALTH OF PUERTO RICO

**STATEMENTS OF REVENUES, EXPENSES AND
CHANGES IN RETAINED EARNINGS- INTERNAL SERVICE FUND
YEAR ENDED JUNE 30, 1995
(With Comparative Totals for Fiscal Year Ended June 30, 1994)
(Expressed in Thousands)**

|  | Total | |
|---|---|---|
|  | 1995 | 1994 (As Restated) |
| **OPERATING REVENUES:** |  |  |
| Charges for services | $32,597 | $12,318 |
| Financing income | 158,953 | 112,796 |
| Investment earnings | 297,786 | 263,059 |
| Total operating revenues | 489,336 | 388,173 |
| **OPERATING EXPENSES:** |  |  |
| Cost of services | 58,196 | 39,906 |
| Interest | 327,601 | 265,287 |
| Depreciation and amortization | 1,387 | 2,637 |
| Other | 1,972 | 7,961 |
| Total operating expenses | 389,156 | 315,791 |
| **OPERATING INCOME** | 100,180 | 72,382 |
| **NON-OPERATING REVENUES (EXPENSES):** |  |  |
| Other, net | (13,478) | 37,747 |
| Total non-operating revenues (expenses) | (13,478) | 37,747 |
| **NET INCOME** | 86,702 | 110,129 |
| **RETAINED EARNINGS AT BEGINNING OF YEAR:** |  |  |
| As previously reported | 31,045 | 45,916 |
| Restatement | 4,157 |  |
| As restated | 35,202 | 45,916 |
| **TRANSFER TO CONTRIBUTED CAPITAL** | (100,000) | (125,000) |
| **RETAINED EARNINGS AT END OF YEAR** | $21,904 | $31,045 |

See notes to general purpose financial statements.

# COMMONWEALTH OF PUERTO RICO

**STATEMENTS OF CASH FLOWS - INTERNAL SERVICE FUND**
**YEAR ENDED JUNE 30, 1995**
**(With Comparative Totals for the Fiscal Year Ended June 30, 1994)**
**(Expressed in Thousands)**

|  | Totals | |
|---|---|---|
|  | 1995 | 1994 (As Restated) |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Operating income | $100,180 | $72,382 |
| Adjustments to reconcile operating income to | | |
| net cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 1,126 | 2,637 |
| Provision for uncollectible accounts | 26,661 | 18,298 |
| Net loss (gain) on sale of investments and fixed assets | (18,536) | 3,355 |
| Net cash flow effect of noncapital financing, | | |
| capital and related financing and investing | | |
| activities included in operating income | (113,110) | (78,094) |
| Other | (13,478) | |
| Changes in assets and liabilities: | | |
| (Increase) decrease in: | | |
| Receivables, net | 1,647 | (1,539) |
| Other assets | 670 | 2,669 |
| Increase (decrease) in: | | |
| Accounts payable and accrued liabilities | 10,515 | (5,942) |
| Total adjustments | (104,505) | (58,616) |
| Net cash provided by (used in) operating activities | (4,325) | 13,766 |
| **CASH FLOWS FROM NONCAPITAL FINANCING ACTIVITIES:** | | |
| Proceeds from notes and loans | 739,911 | 601,354 |
| Principal paid on notes and loans | (215,392) | (848,568) |
| Interest paid on notes and loans | (258,274) | (231,753) |
| Net cash provided by (used in) | | |
| noncapital financing activities | 266,245 | (478,967) |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Purchase of investment securities | (6,600,571) | (5,993,976) |
| Proceeds from sales and maturities of investments | | |
| and securities | 6,986,591 | 6,228,180 |
| Interest and dividends on investments | 241,055 | 250,068 |
| Principal collected on loans to: | | |
| Public entities of the Commonwealth of Puerto Rico | 475,825 | |
| Private sector | 19,022 | |
| Loans originated to: | | |
| Public entities of the Commonwealth of Puerto Rico | (1,206,105) | |
| Private sector | (13,505) | |
| Net cash provided by (used in) investing activities | (97,688) | 484,272 |
| **NET INCREASE IN CASH AND CASH EQUIVALENTS** | 164,232 | 19,071 |
| **CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR** | 32,464 | 13,393 |
| **CASH AND CASH EQUIVALENTS AT END OF YEAR** | $196,696 | $32,464 |

See notes to general purpose financial statements.

# Trust and Agency Funds

---

Trust funds are used to account for assets held by the government in a trustee capacity. Agency funds are used to account for assets held by the government as an agent for individuals, private organizations, other governments and/or other funds.

---

**Health Facilities and Services Administration Trust Fund**: This specific purpose fund accounts for monies received by the Administration on a fiduciary basis to acquire certain goods or render certain services, or monies to be kept on behalf of inpatients or outpatients attended in the facilities administered by the Administration. The patient funds are used to acquire personal goods or services for specific patients.

**Public Buildings Authority Fiduciary Fund**: This fund acts in a fiduciary capacity relating to advances received from agencies of the Commonwealth for construction purposes on their behalf.

**Unemployment Trust Fund**: The unemployment trust funds account for funds received from the United States Department of Labor to reimburse fifty percent of the Administrative costs of extended benefits paid under the provisions of Puerto Rico laws, which conform to the provisions of the Federal Social Security and Unemployment Tax Acts. Also, they account for contributions received to reimburse the benefits paid to unemployed ex-military and civilian ex-federal employees, whose unemployment is caused by a presidentially declared disaster under the Disaster Relief Act, and adversely affected works under the Trade Act.

**Special Deposits Fund**: This agency fund acts in a fiduciary capacity in order to account for monies received with specific purposes collections for which the law does not address any other fund. It mainly includes deposits under the custody of the courts of justice for alimony payments, deposits under the custody of the Insurance Commissioner for escheated property and for insurance companies under bankruptcy.

[This page intentionally left blank]

**COMMONWEALTH OF PUERTO RICO**

**COMBINING BALANCE SHEETS -**
**EXPENDABLE TRUST AND AGENCY FUNDS**
**JUNE 30, 1995**
**(With Comparative Totals for the Fiscal Year Ended June 30, 1994)**
**(Expressed in Thousands)**

| | Unemployment Trust Fund | Special Deposits Fund | Health Facilities and Services Administration of Puerto Rico Trust Fund | Other Funds | Totals 1995 | 1994 |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Cash, cash equivalents and investments | $36,647 | $274,657 | $ | $1,614 | $312,918 | $287,344 |
| Cash, cash equivalents and investments in governmental banks | 792,073 | 67,575 | 12,533 | 28,630 | 900,811 | 948,899 |
| Taxes receivable | 59,737 | | | | 59,737 | 54,789 |
| Accounts receivable | 125 | 4,014 | | 7,196 | 11,335 | 11,195 |
| Loans and advances receivable | | | | 3 | 3 | 3 |
| Accrued interest receivable | 789 | | | | 789 | 103 |
| Other receivable | | | | 62,650 | 62,650 | |
| Due from other funds | | | 3,998 | 5,725 | 9,723 | 8,380 |
| Fixed assets, net | 3,014 | 1,133 | | 6,024 | 10,171 | 13,650 |
| Other assets | | | | 3,822 | 3,822 | |
| **TOTAL ASSETS** | $892,385 | $347,379 | $16,531 | $115,664 | $1,371,959 | $1,324,363 |
| **LIABILITIES AND FUND BALANCE (DEFICIT)** | | | | | | |
| **Liabilities:** | | | | | | |
| Accounts payable and accrued liabilities | $7,939 | $31,941 | $355 | $36,268 | $76,503 | $302,282 |
| Due to other funds | | | 2,762 | 4,219 | 6,981 | 6,658 |
| Deferred revenues | | | | | | 15,963 |
| Accrued compensated absences | | | | | | 671 |
| Other liabilities | 69 | 315,438 | | 35,041 | 350,548 | 46,721 |
| Total liabilities | 8,008 | 347,379 | 3,117 | 75,528 | 434,032 | 372,295 |
| **Fund balance (deficit):** | | | | | | |
| Reserved for: | | | | | | |
| Encumbrances | 1,908 | (513) | | 1,349 | 2,744 | 2,499 |
| Unemployment benefits | 861,299 | | | | 861,299 | 871,459 |
| Other specified purposes | | | 13,414 | | 13,414 | 15,111 |
| Unreserved | 21,170 | 513 | | 38,787 | 60,470 | 62,999 |
| Total fund balance | 884,377 | | 13,414 | 40,136 | 937,927 | 952,068 |
| **TOTAL LIABILITIES AND FUND BALANCE** | $892,385 | $347,379 | $16,531 | $115,664 | $1,371,959 | $1,324,363 |

See notes to general purpose financial statements.

**COMMONWEALTH OF PUERTO RICO**

COMBINING STATEMENTS OF REVENUES,
EXPENDITURES AND CHANGES IN FUND BALANCE -
EXPENDABLE TRUST FUNDS
YEAR ENDED JUNE 30, 1995
(With Comparative Totals for the Fiscal Year Ended June 30, 1994)
(Expressed in Thousands)

| | Unemployment Trust Fund | Health Facilities and Services Administration of Puerto Rico Trust Fund | Other Funds | Totals 1995 | Totals 1994 |
|---|---|---|---|---|---|
| **REVENUES:** | | | | | |
| Unemployment taxes | $215,038 | $ | $ | $215,038 | 199,109 |
| Charges for services | 1,927 | 118 | 2,845 | 4,890 | 3,793 |
| Intergovernmental | 44,015 | | 10,542 | 54,557 | 97,270 |
| Other | 51,802 | | 687 | 52,489 | 53,914 |
| Total revenues | 312,782 | 118 | 14,074 | 326,974 | 354,086 |
| **EXPENDITURES:** | | | | | |
| Current: | | | | | |
| General government | | | | | 29 |
| Public safety | | | 43 | 43 | 41 |
| Health | | 1,815 | | 1,815 | 2,310 |
| Public housing and welfare | 336,747 | | | 336,747 | 360,447 |
| Economic development | | | 334 | 334 | 9 |
| Capital outlays | | | 10,645 | 10,645 | 7,439 |
| Debt service: | | | | | |
| Principal | 196 | | | 196 | 157 |
| Interest and other | 963 | | | 963 | 980 |
| Total expenditures | 337,906 | 1,815 | 11,022 | 350,743 | 371,412 |
| Excess (deficiency) of revenues over (under) expenditures | (25,124) | (1,697) | 3,052 | (23,769) | (17,326) |
| **OTHER FINANCING SOURCES (USES):** | | | | | |
| Operating transfers in from other funds | 8,101 | | 499 | 8,600 | |
| Other sources | 10 | | 864 | 874 | 16,816 |
| Operating transfers out to other funds | (8,100) | | | (8,100) | |
| Other uses | (5,618) | | (2,091) | (7,709) | (15,010) |
| Total other financing sources (uses) | (5,607) | | (728) | (6,335) | 1,806 |
| Excess (deficiency) of revenues and other financing sources over (under) expenditures and other financing uses | (30,731) | (1,697) | 2,324 | (30,104) | (15,520) |
| **FUND BALANCE AT BEGINNING OF YEAR (AS RESTATED)** | 915,108 | 15,111 | 37,812 | 968,031 | 967,533 |
| **FUND BALANCE AT END OF YEAR** | $884,377 | $13,414 | $40,136 | $937,927 | $952,013 |

See notes to general purpose financial statements.

# Pension Trust Funds

Pension trust funds are used to account for assets held by the government in a trustee capacity.

**Employees Retirement System of the Government of Puerto Rico and Its Instrumentalities:** Is the administrator of a cost-sharing multiple-employer retirement system established by the Commonwealth. The System was created under Act 477, approved on May 15, 1951, as amended, and became effective on January 1, 1952. The System covers all regular employees of the Commonwealth and its instrumentalities and of certain municipalities and component units not covered by their own retirement systems.

**Judiciary Retirement System:** Is a single-employer defined benefit plan which is administered by the Employee Retirement System mentioned above. It was created under Act 12, approved on October 19, 1954. The membership includes all individuals holding a position as Justice of the Supreme Court, Judge of the Superior Court or the District Court or Municipal Judge of the Commonwealth of Puerto Rico. The System provides retirement as well as death and disability benefits.

**Annuity and Pension System for the Teachers of Puerto Rico:** Is a cost-sharing multiple-employer plan which was created under Act 218 approved on May 6, 1951. The System provides retirement benefits to all teachers of the Department of Education of the Commonwealth, those holding positions in the Retirement Board, all pensioned teachers, all teachers transferred to an administrative position in the Department of Education, teachers who work in the Teachers' Association of Puerto Rico, and those who practice in private institutions accredited by the Department of Education.

[This page intentionally left blank]

**COMMONWEALTH OF PUERTO RICO**

**COMBINING BALANCE SHEETS - PENSION TRUST FUNDS**
JUNE 30, 1995
(With Comparative Totals for the Fiscal Year Ended June 30, 1994)
(Expressed in Thousands)

| | Employees Retirement System | Judiciary Retirement System | Teachers Retirement System | Eliminations | Totals 1995 | 1994 |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Cash, cash equivalents and investments | $699,526 | $43,504 | $1,049,860 | $ | $1,781,890 | $1,573,648 |
| Cash, cash equivalents and investments in governmental banks | 89,684 | | 41,938 | | 131,622 | 117,828 |
| Accounts receivable | 21,132 | | 9,345 | | 30,477 | 16,101 |
| Loans and advances receivable | 271,472 | 620 | 267,141 | | 539,233 | 526,777 |
| Accrued interest receivable | 3,419 | 228 | 8,883 | | 12,530 | 11,645 |
| Other receivable | 6,015 | 107 | 5,936 | | 12,058 | 10,661 |
| Due from other funds | 3,314 | | | (721) | 2,593 | 5,709 |
| Fixed assets, net | 8,127 | | 1,334 | | 9,461 | 8,629 |
| Other assets | 17,093 | | 150 | | 17,243 | 16,839 |
| **TOTAL ASSETS** | $1,108,782 | $44,459 | $1,384,587 | ($721) | $2,537,107 | $2,287,837 |
| **LIABILITIES AND FUND BALANCE** | | | | | | |
| Liabilities: | | | | | | |
| Accounts payable and accrued liabilities | $19,278 | $154 | $1,564 | $ | $20,996 | $24,339 |
| Deposits | | | 17,059 | | 17,059 | 16,227 |
| Due to other funds | | 1,726 | | (721) | 1,005 | 448 |
| Securities sold under agreement to repurchase | | | 10,904 | | 10,904 | 21,202 |
| Accrued compensated absences | | | 867 | | 867 | |
| Other liabilities | 14,228 | 522 | | | 14,750 | 4,984 |
| Total liabilities | 33,506 | 2,402 | 30,394 | (721) | 65,581 | 67,200 |
| **FUND BALANCE:** | | | | | | |
| Reserved for employee's retirement | 1,075,276 | 42,057 | 1,354,193 | | 2,471,526 | 2,220,637 |
| **TOTAL LIABILITIES AND FUND BALANCE** | $1,108,782 | $44,459 | $1,384,587 | ($721) | $2,537,107 | $2,287,837 |

See notes to general purpose financial statements.

Case:17-03283-LTS  Doc#:13224-4  Filed:05/26/20  Entered:05/26/20 16:11:23   Desc:
Exhibit iv   Page 226 of 290

**COMMONWEALTH OF PUERTO RICO**

**COMBINING STATEMENTS OF REVENUES, EXPENSES
AND CHANGES IN FUND BALANCES - PENSION TRUST FUNDS
YEAR ENDED JUNE 30, 1995
(With Comparative Totals for the Fiscal Year Ended June 30, 1994)
(Expressed in Thousands)**

| | Employees Retirement System | Judiciary Retirement System | Teachers Retirement System | Totals 1995 | 1994 |
|---|---|---|---|---|---|
| **OPERATING REVENUES:** | | | | | |
| Investment earnings | $132,237 | $7,107 | $129,631 | $268,975 | $112,857 |
| Contributions to retirement systems | 380,745 | 4,574 | 144,994 | 530,313 | 472,620 |
| Other | 3,598 | 225 | | 3,823 | 2,748 |
| Total operating revenues | 516,580 | 11,906 | 274,625 | 803,111 | 588,225 |
| **OPERATING EXPENSES:** | | | | | |
| Cost of services | 22,007 | 262 | 12,232 | 34,501 | 28,504 |
| Retirement benefits | 372,923 | 5,194 | 132,612 | 510,729 | 490,149 |
| Depreciation and amortization | | | 210 | 210 | |
| Total operating expenses | 394,930 | 5,456 | 145,054 | 545,440 | 518,653 |
| **OPERATING INCOME** | 121,650 | 6,450 | 129,571 | 257,671 | 69,572 |
| **NON-OPERATING REVENUES (EXPENSES):** | | | | | |
| Interest | | | (8,901) | (8,901) | |
| Other, net | | | 157 | 157 | |
| Total operating expenses | | | (8,744) | (8,744) | |
| **INCOME BEFORE OPERATING TRANSFER** | 121,650 | 6,450 | 120,827 | 248,927 | 69,572 |
| Operating transfers to other funds | | | (430) | (430) | |
| **NET INCOME** | 121,650 | 6,450 | 120,397 | 248,497 | 69,572 |
| **FUND BALANCE AT BEGINNING OF YEAR (as restated)** | 953,626 | 35,607 | 1,233,796 | 2,223,029 | 2,151,065 |
| **FUND BALANCE AT END OF YEAR** | $1,075,276 | $42,057 | $1,354,193 | $2,471,526 | $2,220,637 |

See notes to general purpose financial statements.

# Public University Funds

---

The public university funds are used to account for the activities of the public university and the public employee retirement system of the university. Funds are an aggregate of the funds required by the American Institute of Certified Public Accountants, Industry Audit Guide, *Audits of Colleges and Universities*.

---

**University of Puerto Rico:** The University of Puerto Rico is the largest institution of higher education in Puerto Rico.

**University of Puerto Rico Retirement System:** The University of Puerto Rico Retirement System is the administrator of the retirement system of the employees of the University of Puerto Rico, created under Act No. 135 approved on May 7, 1942 and became effective on January 1, 1945. Its a single-employer defined-benefit retirement system.

[This page intentionally left blank]

**COMMONWEALTH OF PUERTO RICO**

**COMBINING BALANCE SHEETS - PUBLIC UNIVERSITY FUNDS**
**JUNE 30, 1995**
**(With Comparative Totals for the Fiscal Year Ended June 30, 1994)**
**(Expressed in Thousands)**

| | University of Puerto Rico Retirement System | University of Puerto Rico | Eliminations | Totals 1995 | 1994 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash, cash equivalents and investments | $275,437 | $175,094 | $ | $450,531 | $294,479 |
| Cash, cash equivalents and investments in governmental banks | 3,952 | 12,391 | | 16,343 | |
| Accounts receivable | | 2,878 | | 2,878 | 3,343 |
| Loans and advances receivable | 106,054 | 2,348 | | 108,402 | 102,987 |
| Accrued interest receivable | 3,129 | 476 | | 3,605 | 2,568 |
| Other receivable | 3,990 | 1,613 | | 5,603 | 8,822 |
| Due from other funds | 931 | | (931) | | 32,000 |
| Due from primary government | 39 | 50,020 | | 50,059 | 32,276 |
| Due from component units | | 17,425 | | 17,425 | |
| Inventories | | 4,837 | | 4,837 | 4,321 |
| Restricted assets | | 28,698 | | 28,698 | 64,957 |
| Fixed assets, net | 212 | 535,268 | | 535,480 | 496,971 |
| Other assets | | 68 | | 68 | 383 |
| **TOTAL ASSETS** | $393,744 | $831,116 | ($931) | $1,223,929 | $1,043,107 |
| **LIABILITIES AND FUND BALANCE** | | | | | |
| **Liabilities:** | | | | | |
| Accounts payable and accrued liabilities | $1,690 | $30,721 | $ | $32,411 | $110,566 |
| Due to other funds | | 931 | (931) | | 58,982 |
| Advances from primary government | | 2,781 | | 2,781 | |
| Interest payable | | 185 | | 185 | 542 |
| Notes payable | | 345,732 | | 345,732 | 174,046 |
| Bonds payable | 202 | 80,028 | | 80,230 | |
| Accrued compensated absences | 8,918 | 1,136 | | 10,054 | 14,033 |
| Other liabilities | | | | | |
| **Total liabilities** | 10,810 | 461,514 | (931) | 471,393 | 358,169 |
| **Fund Balance:** | | | | | |
| Investment in fixed assets | | 280,179 | | 280,179 | 264,100 |
| Fund balance: | | | | | |
| Reserve for encumbrances | | 25,542 | | 25,542 | 21,979 |
| Reserve for debt service | | 20,712 | | 20,712 | 24,074 |
| Reserve for employee's retirement | 382,934 | | | 382,934 | 344,778 |
| Reserve for advances and other specified purposes | | 8,107 | | 8,107 | 23,750 |
| Unreserved | | 35,062 | | 35,062 | 6,257 |
| **Total fund balance** | 382,934 | 369,602 | | 752,536 | 684,938 |
| **TOTAL LIABILITIES AND FUND BALANCE** | $393,744 | $831,116 | ($931) | $1,223,929 | $1,043,107 |

See notes to general purpose financial statements.

[This page intentionally left blank]

# Component Units - Other

---

The component units - other column are a combination of all of the public corporations that should be reported in the general purpose financial statements as required by generally accepted accounting principles. These entities are presented because of the nature and significance of their relationship with the primary government are such that their exclusion would cause the general purpose financial statements to be misleading. These are discretely presented in a separate column in the general purpose financial statements due to the nature of the services they provide. The accounting principles followed by each of the component units included herein may vary depending on the type of industries these are involved (i.e. banking, construction, public utilities, etc..). The detailed information for each of these entities may be obtained directly from the administrative offices of the corresponding entities, as described in Note 1, pages 25 to 26 of the general purpose financial statements included in the Financial Section of this report.

---

**COMMONWEALTH OF PUERTO RICO**

**COMBINING BALANCE SHEETS - OTHER COMPONENT UNITS**
**JUNE 30, 1995**
**(With Comparative Totals for the Fiscal Year Ended June 30, 1994)**
**(Expressed in Thousands)**

| | Puerto Rico Electric Power Authority | Puerto Rico Aqueduct and Sewer Authority | Puerto Rico Telephone Authority | Puerto Rico Housing Bank and Finance Agency | State Insurance Fund Corporation | Economic Development Bank |
|---|---|---|---|---|---|---|
| **ASSETS AND OTHER DEBITS** | | | | | | |
| **Assets:** | | | | | | |
| Cash, cash equivalents and investments | $57,092 | $32,815 | $96,334 | $31,637 | $124 | $598,275 |
| Cash, cash equivalents and investments in governmental banks | 23 | | 6,196 | 13,229 | 844,893 | 50,000 |
| Intergovernmental receivable | | | | | | |
| Accounts receivable | 339,431 | 51,562 | 244,675 | 9,110 | 55,846 | |
| Loans and advances receivable | | | | 44,642 | | 55,302 |
| Accrued interest receivable | | | | | 8,495 | 4,725 |
| Other receivable | | | | | | |
| Due from primary government | 95,820 | 5,812 | | | | |
| Due from component units | | | | | | 1,109 |
| Due from other governmental entities | | | | | | |
| Advances to component units | | | | | | |
| Inventories | 167,106 | 14,006 | 58,580 | 4,596 | 4,732 | |
| Restricted assets | 485,338 | 106,988 | 202,099 | 598,463 | 69,598 | 24,605 |
| Fixed assets, net | 2,806,762 | 3,006,931 | 1,659,733 | 1,124 | 11,715 | 1,252 |
| Other assets | 34,817 | 20,705 | 34,363 | 398 | | 7,157 |
| **Other Debits:** | | | | | | |
| Amount available in debt service fund | | | | 373,175 | | |
| Amount to be provided for retirement of bonds and notes payable | | | | | | |
| Amount to be provided for payment of due to other funds, accrued compensated absences and other long term liabilities | | | | | | |
| **TOTAL ASSETS AND OTHER DEBITS** | $3,986,389 | $3,238,819 | $2,301,980 | $1,076,374 | $995,403 | $742,425 |

See notes to general purpose financial statements.                                                                 (Continued)

**COMMONWEALTH OF PUERTO RICO**

COMBINING BALANCE SHEETS - OTHER COMPONENT UNITS
JUNE 30, 1995
(With Comparative Totals for the Fiscal Year Ended June 30, 1994)
(Expressed in Thousands)

| | Puerto Rico Industrial Development Company | Puerto Rico Ports Authority | Puerto Rico Municipal and Finance Agency | Other Entities | Total Other Component Units 1995 | Total Other Component Units 1994 |
|---|---|---|---|---|---|---|
| **ASSETS AND OTHER DEBITS** | | | | | | |
| **Assets:** | | | | | | |
| Cash, cash equivalents and investments | $20,104 | $16,823 | $ | $372,011 | $1,225,215 | $1,174,804 |
| Cash, cash equivalents and investments in governmental banks | 1,587 | 2,192 | 5,895 | 93,469 | 1,017,484 | 956,596 |
| Intergovernmental receivable | | | | 9,126 | 9,126 | 13,460 |
| Accounts receivable | 21,061 | 37,463 | | 48,767 | 807,935 | 841,736 |
| Loans and advances receivable | | | | 16,635 | 116,579 | 134,082 |
| Accrued interest receivable | | | 13,415 | 4,188 | 30,823 | 14,074 |
| Other receivable | | | | 27,404 | 27,404 | 21,060 |
| Due from primary government | | | | 68,736 | 171,368 | 215,546 |
| Due from component units | | | | 30,679 | 31,788 | 2,414 |
| Due from other governmental entities | | | | 59,583 | 59,583 | |
| Advances to component units | | | | 355 | 355 | |
| Inventories | | 2,326 | | 153,088 | 404,414 | 336,761 |
| Restricted assets | 51,002 | 52,471 | 486,632 | 60,238 | 2,137,434 | 1,680,847 |
| Fixed assets, net | 495,745 | 457,197 | | 600,029 | 9,040,465 | 8,828,890 |
| Other assets | 2,944 | 9,867 | 4,675 | 29,773 | 144,699 | 150,014 |
| **Other Debits:** | | | | | | |
| Amount available in debt service fund | | | | | 373,175 | 340,729 |
| Amount to be provided for retirement of bonds and notes payable | | | | 11,359 | 11,359 | 73,756 |
| Amount to be provided for payment of due to other funds, accrued compensated absences and other long term liabilities | | | | 10,410 | 10,410 | 10,585 |
| **TOTAL ASSETS AND OTHER DEBITS** | $592,463 | $578,339 | $510,617 | $1,596,830 | $15,619,639 | $14,797,155 |

See notes to general purpose financial statements.

(Continued)

COMMONWEALTH OF PUERTO RICO

COMBINING BALANCE SHEETS - OTHER COMPONENT UNITS
JUNE 30, 1995
(With Comparative Totals for the Fiscal Year Ended June 30, 1994)
(Expressed in Thousands)

| | Puerto Rico Electric Power Authority | Puerto Rico Aqueduct and Sewer Authority | Puerto Rico Telephone Authority | Puerto Rico Housing Bank and Finance Agency | State Insurance Fund Corporation | Economic Development Bank |
|---|---|---|---|---|---|---|
| **LIABILITIES, EQUITY (DEFICIT) AND OTHER CREDITS** | | | | | | |
| **Liabilities:** | | | | | | |
| Accounts payable and accrued liabilities | $284,513 | $210,403 | $254,018 | $17,628 | $946,783 | $3,896 |
| Deposits | 83,526 | 44,629 | 34,764 | | | 209,464 |
| Due to primary government | | | | | | |
| Due to component units | | | | | | |
| Due to other governmental entities | 98,900 | 402,590 | | | | |
| Advances from primary government | | | | 12,361 | | |
| Advances from component units | | | | 250,000 | | 366,438 |
| Securities sold under agreement to repurchase | 84,126 | 30,542 | 4,076 | | | 5,863 |
| Interest payable | | | | | 13,651 | |
| Deferred revenues | 110,000 | 19,815 | 14,660 | | | 83,200 |
| Notes payable | 2,847,679 | 436,027 | 981,063 | 655,045 | | |
| Bonds payable | 155,139 | 24,732 | 23,300 | 653 | | 1,404 |
| Accrued compensated absences | | | | | | |
| Other liabilities | 6,708 | | 35,585 | 2,234 | | |
| Other long term liabilities | | | | | | |
| **Total liabilities** | 3,670,591 | 1,168,738 | 1,347,466 | 937,921 | 962,434 | 670,065 |
| **Equity (deficit) and other credits:** | | | | | | |
| Investment in general fixed assets | | | | | | |
| Contributed capital | 120,714 | 1,725,241 | 24,962 | | | 53,491 |
| Retained earnings (deficit) | 195,084 | 344,840 | 929,552 | | 31,773 | 20,558 |
| Unrealized gain (loss) in value of debt securities | | | | | 1,196 | (1,689) |
| **Fund balances:** | | | | | | |
| Reserved for: | | | | | | |
| Encumbrances | | | | | | |
| Debt service | | | | 77,762 | | |
| Other specified purposes | | | | 15,575 | | |
| Unreserved | | | | 45,116 | | |
| **Total equity and other credits** | 315,798 | 2,070,081 | 954,514 | 138,453 | 32,969 | 72,360 |
| **TOTAL LIABILITIES, EQUITY AND OTHER CREDITS** | $3,986,389 | $3,238,819 | $2,301,980 | $1,076,374 | $995,403 | $742,425 |

See notes to general purpose financial statements.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

**COMBINING BALANCE SHEETS - OTHER COMPONENT UNITS**
**JUNE 30, 1995**
**(With Comparative Totals for the Fiscal Year Ended June 30, 1994)**
**(Expressed in Thousands)**

| | Puerto Rico Industrial Development Company | Puerto Rico Ports Authority | Puerto Rico Municipal and Finance Agency | Other Entities | Total Other Component Units 1995 | Total Other Component Units 1994 |
|---|---|---|---|---|---|---|
| **LIABILITIES, EQUITY (DEFICIT) AND OTHER CREDITS** | | | | | | |
| **Liabilities:** | | | | | | |
| Accounts payable and accrued liabilities | $24,803 | $50,590 | $675 | $356,047 | $2,153,156 | $2,161,240 |
| Deposits | | 1,822 | | 9,921 | 364,126 | 474,657 |
| Due to primary government | | | | 12,722 | 12,722 | 45,601 |
| Due to component units | | | | 40,578 | 40,578 | 40,700 |
| Due to other governmental entities | | | | 2,572 | 2,572 | 278 |
| Advances from primary government | 25,632 | 95,319 | | 363,879 | 986,320 | 875,829 |
| Advances from component units | | | | 489 | 12,850 | |
| Securities sold under agreement to repurchase | | | | | 616,438 | 449,812 |
| Interest payable | 6,909 | 4,438 | 13,521 | 3,162 | 152,637 | 132,644 |
| Deferred revenues | | 1,053 | | 47,333 | 62,037 | 43,673 |
| Notes payable | 6,350 | | | 45,832 | 279,857 | 360,546 |
| Bonds payable | 187,919 | 132,711 | 483,536 | 382 | 5,724,362 | 5,463,385 |
| Accrued compensated absences | 1,907 | 6,988 | | 27,867 | 241,990 | 275,117 |
| Other liabilities | | 11,793 | | 6,989 | 18,782 | 8,241 |
| Other long term liabilities | | | | 86,177 | 130,704 | 143,048 |
| **Total liabilities** | 253,520 | 304,714 | 497,732 | 1,005,950 | 10,819,131 | 10,474,773 |
| **Equity (deficit) and other credits:** | | | | | | |
| Investment in general fixed assets | | | | 241,651 | 241,651 | 218,706 |
| Contributed capital | 302,062 | 314,750 | | 706,273 | 3,247,493 | 3,296,915 |
| Retained earnings (deficit) | 36,881 | (41,125) | 12,885 | (466,769) | 1,063,659 | 680,182 |
| Unrealized gain (loss) in value of debt securities | | | | 19,979 | 19,486 | |
| Fund balances: | | | | | | |
| Reserved for: | | | | | | |
| Encumbrances | | | | 4,025 | 4,025 | 4,629 |
| Debt service | | | | | 77,762 | 452 |
| Other specified purposes | | | | 57,137 | 72,712 | 39,300 |
| Unreserved | | | | 28,604 | 73,720 | 102,198 |
| Total equity and other credits | 338,943 | 273,625 | 12,885 | 590,880 | 4,800,508 | 4,322,382 |
| **TOTAL LIABILITIES, EQUITY AND OTHER CREDITS** | $592,463 | $578,339 | $510,617 | $1,596,830 | $15,619,639 | $14,797,155 |

See notes to general purpose financial statements.

**COMMONWEALTH OF PUERTO RICO**

**COMBINING STATEMENTS OF REVENUES, EXPENSES AND CHANGES IN**
**RETAINED EARNINGS (DEFICIT) / FUND BALANCE -**
**OTHER COMPONENT UNITS**
**JUNE 30, 1996**
**(With Comparative Totals for the Fiscal Year Ended June 30, 1994)**
**(Expressed in Thousands)**

| | Puerto Rico Electric Power Authority | Puerto Rico Aqueduct and Sewer Authority | Puerto Rico Telephone Authority | Puerto Rico Housing Bank and Finance Agency | State Insurance Fund Corporation | Economic Development Bank |
|---|---|---|---|---|---|---|
| **OPERATING REVENUES:** | | | | | | |
| Charges for services | $1,447,139 | $277,204 | $960,010 | $1,485 | $381,956 | $ |
| Financing income | | | | 28,119 | | 4,799 |
| Investment earnings | | | | 510 | | 49,186 |
| Other | | | | | | 624 |
| Total operating revenues | 1,447,139 | 277,204 | 960,010 | 30,114 | 381,956 | 53,985 |
| **OPERATING EXPENSES:** | | | | | | |
| Cost of services | 1,024,659 | 276,706 | 534,797 | 3,984 | 433,657 | 11,224 |
| Interest | | | | 18,360 | | 40,891 |
| Depreciation and amortization | 142,579 | 78,351 | 202,571 | 87 | 2,105 | 624 |
| Other | | | | | | 2,965 |
| Total operating expenses | 1,167,238 | 355,057 | 737,368 | 22,431 | 435,762 | 55,704 |
| **OPERATING INCOME (LOSS)** | 279,901 | (77,853) | 222,642 | 7,683 | (53,806) | (1,719) |
| **NON-GOVERNMENTAL REVENUES (EXPENSES):** | | | | | | |
| Intergovernmental | 36,206 | | 17,093 | | 42,853 | |
| Interest income | (200,976) | (26,685) | (57,041) | | | |
| Interest expense | (95,129) | | (80,693) | 4,353 | 1,793 | 3,285 |
| Other, net | | | | | | |
| Total non-operating revenues (expenses) | (259,900) | (26,685) | (120,641) | 4,353 | 44,646 | 3,285 |
| **INCOME (LOSS) BEFORE OPERATING TRANSFERS** | 20,001 | (104,538) | 102,001 | 12,036 | (9,160) | 1,566 |
| **OPERATING TRANSFERS:** | | | | | | |
| From primary government | | 45,484 | | | | |
| From other component units | | | | | | |
| To primary government | | | | | (17,596) | |
| To other component units | | | | | | |
| **OPERATING TRANSFERS, net** | | 45,484 | | | (17,596) | |
| **NET INCOME (LOSS)** | 20,001 | (59,054) | 102,001 | 12,036 | (26,756) | 1,566 |
| **EXCESS OF REVENUES OVER EXPENDITURES FROM GOVERNMENTAL OPERATIONS** | | | | 18,057 | | |
| **CONTRIBUTIONS** | | | | 5,090 | | |
| **DEPRECIATION OF FIXED ASSETS ACQUIRED THROUGH CONTRIBUTED CAPITAL** | | 38,928 | | | | |
| **RETAINED EARNINGS (DEFICIT) / FUND BALANCE AT BEGINNING OF YEAR (as restated)** | 175,083 | 364,966 | 827,551 | 103,270 | 58,529 | 18,992 |
| **RESIDUAL EQUITY TRANSFER** | | | | | | |
| **TRANSFER TO CONTRIBUTED CAPITAL** | | | | | | |
| **RETAINED EARNINGS (DEFICIT) / FUND BALANCE AT END OF YEAR** | $195,084 | $344,840 | $929,552 | $138,453 | $31,773 | $20,558 |

See notes to general purpose financial statements.

(Continued)

COMMONWEALTH OF PUERTO RICO

COMBINING STATEMENTS OF REVENUES, EXPENSES AND CHANGES IN
RETAINED EARNINGS (DEFICIT) / FUND BALANCE -
OTHER COMPONENT UNITS
JUNE 30, 1995
(With Comparative Totals for the Fiscal Year Ended June 30, 1994)
(Expressed in Thousands)

| | Puerto Rico Industrial Development Company | Puerto Rico Ports Authority | Puerto Rico Municipal and Finance Agency | Other Entities | Total Other Component Units 1995 | Total Other Component Units 1994 |
|---|---|---|---|---|---|---|
| OPERATING REVENUES: | | | | | | |
| Charges for services | $48,506 | $113,112 $ | | $647,102 | $3,876,514 | $3,708,739 |
| Financing income | | | | 684 | 5,683 | 4,368 |
| Investment earnings | | | 27,996 | | 105,301 | 67,977 |
| Other | | | | 19,384 | 19,894 | 38,264 |
| Total operating revenues | 48,506 | 113,112 | 27,996 | 667,370 | 4,007,392 | 3,819,368 |
| OPERATING EXPENSES: | | | | | | |
| Cost of services | 27,644 | 92,198 | 24,329 | 710,224 | 3,115,093 | 2,907,180 |
| Interest | | | | 5,868 | 89,448 | 57,464 |
| Depreciation and amortization | 12,176 | 21,787 | | 46,802 | 507,082 | 469,979 |
| Other | | | | 215 | 3,180 | 4,317 |
| Total operating expenses | 39,820 | 113,985 | 24,329 | 763,109 | 3,714,803 | 3,438,940 |
| OPERATING INCOME (LOSS) | 8,686 | (873) | 3,667 | (95,739) | 292,589 | 380,428 |
| NON-OPERATING REVENUES (EXPENSES): | | | | | | |
| Intergovernmental | | | | 10,011 | 10,011 | 8,835 |
| Interest income | 3,481 | 4,515 | | 26,175 | 130,322 | 107,266 |
| Interest expense | (16,845) | (14,545) | | (52,839) | (368,931) | (359,963) |
| Other, net | 9,307 | 5,374 | (2,746) | 49,751 | (104,705) | (263,240) |
| Total non-operating revenues (expenses) | (4,057) | (4,656) | (2,746) | 33,098 | (333,303) | (507,102) |
| INCOME (LOSS) BEFORE OPERATING TRANSFERS | 4,629 | (5,529) | 921 | (62,641) | (40,714) | (126,674) |
| OPERATING TRANSFERS: | | | | | | |
| From primary government | | | | 119,910 | 165,394 | 66,309 |
| From other component units | | | | 10,500 | 10,500 | 9,500 |
| To primary government | | | | (54,598) | (72,194) | |
| To other component units | | | | (36,399) | (36,399) | |
| OPERATING TRANSFERS, net | | | | 39,413 | 67,301 | 75,809 |
| NET INCOME (LOSS) | 4,629 | (5,529) | 921 | (23,228) | 26,587 | (50,865) |
| EXCESS OF REVENUES OVER EXPENDITURES FROM GOVERNMENTAL OPERATIONS | | | | 18,411 | 36,468 | 39,798 |
| CONTRIBUTIONS | | | | 25 | 5,115 | 1,384 |
| DEPRECIATION OF FIXED ASSETS ACQUIRED THROUGH CONTRIBUTED CAPITAL | | | | 3,531 | 42,459 | 42,120 |
| RETAINED EARNINGS (DEFICIT) / FUND BALANCE AT BEGINNING OF YEAR (as restated) | 32,252 | (35,596) | 11,964 | (771,310) | 785,701 | 991,749 |
| RESIDUAL EQUITY TRANSFER | | | | 267,916 | 267,916 | |
| TRANSFER TO CONTRIBUTED CAPITAL | | | | 127,632 | 127,632 | |
| RETAINED EARNINGS (DEFICIT) / FUND BALANCE AT END OF YEAR | $36,881 | ($41,125) | $12,885 | ($377,023) | $1,291,878 | $1,024,166 |

See notes to general purpose financial statements.

**COMMONWEALTH OF PUERTO RICO**

**COMBINING STATEMENTS OF CASH FLOWS - OTHER COMPONENT UNITS**
**JUNE 30, 1995**
(With Comparative Totals for the Fiscal Year Ended June 30, 1994)
(Expressed in Thousands)

| | Puerto Rico Electric Power Authority | Puerto Rico Aqueduct and Sewer Authority | Puerto Rico Telephone Authority | Puerto Rico Housing Bank and Finance Agency | State Insurance Fund Corporation | Economic Development Bank |
|---|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | | | |
| Operating income (loss) | $279,901 | ($77,853) | $222,642 | $7,683 | ($53,806) | ($1,719) |
| Adjustments to reconcile operating income (loss) to | | | | | | |
| net cash provided by (used in) operating activities: | | | | | | |
| Depreciation and amortization | 142,579 | 76,351 | 202,571 | 87 | 2,105 | 624 |
| Provision for uncollectible accounts | 2,685 | 11,931 | | | 69,777 | 3,635 |
| Amortization of debt discount | | 704 | | 63 | | |
| Net loss (gain) on disposition of fixed assets | | | | (4,117) | | (325) |
| Net (gain) on sale of investments and fixed assets | (95,129) | | (65,485) | | | |
| Contribution of in lieu of taxes | | | | | | |
| Capital and related financing and investing activities | | | | 598 | | (13,094) |
| included in operating income (loss) | | | 25,335 | 4,117 | 2,411 | 3,815 |
| Other | | | | | | |
| Changes in assets and liabilities | | | | | | |
| Increase in: | | | | | | |
| Receivable | (15,122) | (2,045) | (36,052) | (4,104) | (20,716) | |
| Due from: | | | | (13) | | |
| Other funds | | | | | | |
| Primary government | (11,352) | | | | (1,772) | |
| Inventories | (5,485) | | | | | |
| Restricted assets | | | (6,170) | (23) | | (2,239) |
| Other assets | 40,357 | | | 579 | 5,215 | |
| Accounts payable and accrued liabilities | | | 3,861 | | | |
| Deposits | | | | | | |
| Due to other funds | | | | | | |
| Interest payable | | | | | 4,993 | |
| Deferred revenues | | 6,815 | (36,305) | | | |
| Accrued compensated absences | | | | 144 | | 860 |
| Other liabilities | | | | | | |
| Other long term liabilities | | | | | | |
| Decrease in: | | | | | | |
| Receivable | | | | | | |
| Due from other funds | 15,992 | 2,117 | | | | |
| Inventories | 1,006 | 4,134 | | | | |
| Other assets | | (21,647) | 39,011 | | (15,821) | |
| Accounts payable and accrued liabilities | (16,635) | (385) | | | | |
| Deposits | | | | | | |
| Due to other funds | | | | | | |
| Interest payable | | | | | | |
| Deferred revenues | | | | | | |
| Other liabilities | | | (9,434) | | | |
| Other long term liabilities | | | | | | |
| **Total adjustments** | 58,896 | 79,975 | 117,332 | (2,669) | 46,192 | (6,724) |
| **Net cash provided by (used in) operating activities** | $338,797 | $2,122 | $339,974 | $5,014 | ($7,614) | ($8,443) |

See notes to general purpose financial statements.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

**COMBINING STATEMENTS OF CASH FLOWS - OTHER COMPONENT UNITS**
**JUNE 30, 1995**
**(With Comparative Totals for the Fiscal Year Ended June 30, 1994)**
**(Expressed in Thousands)**

| | Puerto Rico Industrial Development Company | Puerto Rico Ports Authority | Puerto Rico Municipal and Finance Agency | Other Entities | Total Other Component Units 1995 | Total Other Component Units 1994 |
|---|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | | | |
| Operating income (loss) | $8,686 | ($873) | $3,667 | ($95,739) | $292,589 | $400,656 |
| Adjustments to reconcile operating income (loss) to | | | | | | |
| net cash provided by (used in) operating activities: | | | | | | |
| Depreciation and amortization | 12,176 | 21,787 | | 44,820 | 505,100 | 473,398 |
| Provision for uncollectible accounts | 4,000 | 2,677 | | 6,753 | 101,458 | 88,182 |
| Amortization of debt discount | 918 | 123 | | | 1,808 | 3,516 |
| Net loss (gain) on disposition of fixed assets | | | | 1 | 1 | (3,931 |
| Net (gain) on sale of investments and fixed assets | (8,765) | | | | (13,207 | (5,323 |
| Contribution of in lieu of taxes | | | | | (160,614 | (219,769 |
| Capital and related financing and investing activities | | | | | | |
| included in operating income (loss) | | | | 776 | (11,720 | (7,805 |
| Other | 9,307 | (6,199) | (2,745) | 50,303 | 86,344 | (75,553 |
| Changes in assets and liabilities | | | | | | |
| Increase in: | | | | | | |
| Receivable | (8,112) | (12,212) | | (35,369 | (131,732 | (95,200 |
| Due from: | | | | | | |
| Other funds | | | | 13 | | |
| Primary government | | | | (77 | (77 | (59 |
| Inventories | | | | 13,124 | | (8,338 |
| Restricted assets | | | | | (5,485 | |
| Other assets | | | (4,159) | 7,922 | (4,669 | (8,860 |
| Accounts payable and accrued liabilities | | 233 | 142 | (27,911 | 18,615 | 77,550 |
| Deposits | | 158 | | (4,019 | | 4,120 |
| Due to other funds | | | | 1,858 | 1,858 | |
| Interest payable | 619 | | | | 619 | |
| Deferred revenues | | | | (674 | 4,319 | 7,849 |
| Accrued compensated absences | | | | 180 | (29,310 | 40,639 |
| Other liabilities | | 63 | | 6,282 | 7,349 | |
| Other long term liabilities | | | | | | 9,966 |
| Decrease in: | | | | | | |
| Receivable | | | | | | |
| Due from other funds | | | | 271 | 271 | |
| Inventories | | 80 | | (4,021 | 14,168 | 3,762 |
| Other assets | | 328 | | (6,402 | | |
| Accounts payable and accrued liabilities | 934 | | | 1,216 | | |
| Deposits | (2,759) | | | 5,794 | | |
| Due to other funds | | | | | (11,226 | |
| Interest payable | | | | | | (20,525 |
| Deferred revenues | | | | | | (1,834 |
| Other liabilities | | (69) | | 69 | | |
| Other long term liabilities | | | | | (9,434 | (1,160 |
| | | | | | | |
| Total adjustments | 10,318 | 6,969 | (8,762) | 60,909 | 364,438 | 280,625 |
| Net cash provided by (used in) operating activities | $19,004 | $6,096 | ($3,095) | ($34,830) | $657,025 | $681,281 |

See notes to general purpose financial statements.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

**COMBINING STATEMENTS OF CASH FLOWS - OTHER COMPONENT UNITS**
**JUNE 30, 1995**
**(With Comparative Totals for the Fiscal Year Ended June 30, 1994)**
**(Expressed in Thousands)**

| | Puerto Rico Electric Power Authority | Puerto Rico Aqueduct and Sewer Authority | Puerto Rico Telephone Authority | Puerto Rico Housing Bank and Finance Agency | State Insurance Fund Corporation | Economic Development Bank |
|---|---|---|---|---|---|---|
| **CASH FLOWS FROM NONCAPITAL FINANCING ACTIVITIES:** | $ | $ | $ | $836,046 $ | | $39,041 |
| Proceeds from notes and loans | (12,744) | | | (741,259) | | |
| Principal paid on notes and loans | (13,917) | (933) | | (4,018) | | (36,648) |
| Interest paid on notes and loans | | | | 8,510 | | |
| Operating grants received | | | | 5,801 | | |
| Operating transfers in from other funds | | | | (5,565) | (17,596) | |
| Operating transfers out to other funds | | | | | | |
| Capital contributions | | | | | | |
| Net cash provided by (used in) noncapital financing activities | (26,661) | (933) | | 99,517 | (17,596) | 2,393 |
| **CASH FLOWS FROM CAPITAL AND RELATED FINANCING ACTIVITIES:** | | | | | | |
| Acquisition and construction of capital assets | (180,242) | (196,755) | ($282,552) | (5) | (1,215) | (680) |
| Proceeds from issuance of bonds and notes | 73,900 | 153,552 | 368 | 200,000 | | |
| Principal paid on bonds and notes | (82,335) | (21,675) | (38,176) | | | |
| Interest paid on bonds and notes | (156,675) | (41,598) | (56,280) | | | |
| Proceeds from sale of equipment | | | 7,532 | 2,801 | | |
| Capital contributions | | 116,885 | | | | 505 |
| Net cash provided by (used in) capital and related financing activities | (345,352) | 8,409 | (369,108) | 202,796 | (1,215) | (175) |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | | | |
| Purchase of investments securities | (33,887) | | (477,578) | (622,054) | (105,425) | (929,911) |
| Proceeds from sales and maturities of investments and securities | 26,737 | | 488,683 | 404,692 | 64,490 | 885,493 |
| Interest and dividends on investments | 34,408 | 3,583 | 13,852 | | 67,109 | 51,021 |
| Net cash provided by (used in) investing activities | 27,258 | 3,583 | 25,157 | (217,362) | 26,174 | 6,603 |
| **NET INCREASE(DECREASE) IN CASH AND CASH EQUIVALENTS** | (5,958) | 13,181 | (3,977) | 89,965 | (251) | 376 |
| **CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR** | 63,073 | 19,634 | 17,427 | 68,812 | 13,026 | 703 |
| **CASH AND CASH EQUIVALENTS AT END OF YEAR** | $57,115 | $32,815 | $13,450 | $158,777 | $12,775 | $1,081 |

See notes to general purpose financial statements.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

**COMBINING STATEMENTS OF CASH FLOWS - OTHER COMPONENT UNITS**
**JUNE 30, 1995**
**(With Comparative Totals for the Fiscal Year Ended June 30, 1994)**
**(Expressed in Thousands)**

| | Puerto Rico Industrial Development Company | Puerto Rico Ports Authority | Puerto Rico Municipal and Finance Agency | Other Entities | Total Other Component Units 1995 | Total Other Component Units 1994 |
|---|---|---|---|---|---|---|
| **CASH FLOWS FROM NONCAPITAL FINANCING ACTIVITIES:** | | | | | | |
| Proceeds from notes and loans | $ | $48,243 | $269,341 | $338,844 | $1,529,517 | $207,892 |
| Principal paid on notes and loans | | | (57,850) | (402,510) | (1,214,369) | (278,688) |
| Interest paid on notes and loans | (16,845) | (5,848) | (21,278) | (22,463) | (121,950) | (87,071) |
| Operating grants received | 2,014 | | | 71,584 | 82,106 | 31,558 |
| Operating transfers in from other funds | | | | 35,920 | 41,721 | 178,974 |
| Operating transfers out to other funds | | | | (90,997) | (114,158) | (92,652) |
| Capital contributions | | | | 78,130 | 78,130 | 7,978 |
| Net cash provided by (used in) noncapital financing activities | (14,831) | 42,395 | 190,213 | 8,508 | 281,005 | (32,031) |
| **CASH FLOWS FROM CAPITAL AND RELATED FINANCING ACTIVITIES:** | | | | | | |
| Acquisition and construction of capital assets | (16,336) | (29,134) | | (20,280) | (729,199) | (934,006) |
| Proceeds from issuance of bonds and notes | 9,975 | | | 7,321 | 445,116 | 1,676,060 |
| Principal paid on bonds and notes | (24,213) | (4,905) | | (1,807) | (173,111) | (1,353,350) |
| Interest paid on bonds and notes | | (8,844) | | (1,758) | (265,153) | (268,639) |
| Proceeds from sale of equipment | 21,921 | | | 40,659 | 73,113 | 54,685 |
| Capital contributions | | 16,276 | | (10,749) | 122,917 | 122,334 |
| Net cash provided by (used in) capital and related financing activities | (8,653) | (26,607) | | 13,586 | (526,317) | (722,916) |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | | | |
| Purchase of investments securities | | | (238,312) | (153,847) | (2,561,014) | (3,972,821) |
| Proceeds from sales and maturities of investments and securities | | | 55,694 | 161,178 | 2,087,167 | 3,540,720 |
| Interest and dividends on investments | 3,481 | 4,515 | | 17,541 | 195,510 | 328,551 |
| Net cash provided by (used in) investing activities | 3,481 | 4,515 | (182,618) | 24,872 | (278,337) | (103,550) |
| **NET INCREASE(DECREASE) IN CASH AND CASH EQUIVALENTS** | (999) | 26,399 | 4,500 | 10,138 | 133,376 | (197,216) |
| **CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR** | 21,753 | 37,407 | 1,394 | 118,134 | 361,363 | 570,457 |
| **CASH AND CASH EQUIVALENTS AT END OF YEAR** | $20,754 | $63,806 | $5,894 | $128,272 | $494,739 | $373,241 |

See notes to general purpose financial statements.

[This page intentionally left blank]

≣ll ERNST & YOUNG LLP

■ 1000 Scotiabank Plaza          ■ Phone:   809 759 8212
273 Ponce de Leon Avenue          Fax:      809 753 0808
Hato Rey                          Fax:      809 753 0813
Puerto Rico 00917-1989

## Report of Independent Auditors

Hon. Carlos Pesquera, Secretary
Commonwealth of Puerto Rico
Department of Transportation and Public Works

We have audited the financial statements of the Puerto Rico Highway and Transportation Authority (the "Authority") as of and for the year ended June 30, 1995 as listed in the preceding table of contents.   These financial statements are the responsibility of the Authority's management.  Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Puerto Rico Highway and Transportation Authority at June 30, 1995, and the results of its operations and the cash flows of its proprietary fund for the year then ended in conformity with generally accepted accounting principles.

*Ernst & Young LLP*

August 28, 1995

Stamp No.   1314096
affixed to
original of
this report.

## Puerto Rico Highway and Transportation Authority

### Combined Balance Sheet - All Funds Types and Account Groups

June 30, 1995
with comparative totals at June 30, 1994

| | Governmental Fund Types | | Proprietary Fund Type |
| --- | --- | --- | --- |
| | Debt Service | Capital Projects | Enterprise Fund |
| **Assets** | | | |
| Cash and investments (Note 3) | $ 19,195,424 | $ 32,874,093 | - |
| Cash and investments with trustee (Notes 3 and 5) | 220,661,197 | 4,757 | - |
| Receivables (net of allowance for estimated uncollectible amounts of $32,538,545): | | | |
| Puerto Rico Treasury Department | 3,828,730 | - | - |
| Federal grants | - | 19,782,136 | - |
| Accrued interest and other | 639,106 | 2,456,280 | - |
| Advances to governmental entities for construction projects | - | 18,025,370 | - |
| Due from other funds | - | 343,058 | $ 19,058 |
| Prepaid expenses | - | 1,090,076 | |
| Property and equipment (Note 4) | - | - | 6,058,459 |
| Construction in progress | - | - | 21,623,170 |
| Amount available for retirement of general long-term debt | - | - | - |
| Amount to be provided for retirement of general long-term debt | - | - | - |
| Amount to be provided for payment of vacation and sick leave | - | - | - |
| Amount to be provided for payment of claims and judgements | - | - | - |
| Amount to be provided for payment of advances under line of credit | - | - | - |
| Total assets | $244,324,457 | $74,575,770 | $27,700,687 |

| Account Groups | | Totals | |
| General Fixed Assets | General Long-term debt | (Memorandum Only) 1995 | 1994 |
|---|---|---|---|
| - | - | $   52,069,517 | $   46,964,973 |
| - | - | 220,665,954 | 373,888,594 |
| - | - | 3,828,730 | 217,284 |
| - | - | 19,782,136 | 13,677,381 |
| - | - | 3,095,386 | 3,072,259 |
| - | - | 18,025,370 | 25,507,324 |
| - | - | 362,116 | - |
| - | - | 1,090,076 | 967,603 |
| $40,279,020 | - | 46,337,479 | 46,050,954 |
| | - | 21,623,170 | |
| - | $   162,636,150 | 162,636,150 | 151,380,507 |
| - | 1,454,253,850 | 1,454,253,850 | 1,506,029,493 |
| - | 4,200,000 | 4,200,000 | 7,700,000 |
| - | 6,795,000 | 6,795,000 | 8,420,000 |
| - | 74,340,549 | 74,340,549 | - |
| $40,279,020 | $1,702,225,549 | $2,089,105,483 | $2,183,876,372 |

III-3

# Puerto Rico Highway and Transportation Authority

## Combined Balance Sheet - All Funds Types and Account Groups

### June 30, 1995
### with comparative totals at June 30, 1994

| | Governmental Fund Types | | Proprietary Fund Type |
| --- | --- | --- | --- |
| | Debt Service | Capital Projects | Enterprise Fund |
| **Liabilities and Fund Equity** | | | |
| Liabilities: | | | |
| Matured interest payable | $ 44,756,191 | - | - |
| Matured bonds (Note 5) | 36,570,000 | - | - |
| Accounts payable | - | $ 30,597,200 | - |
| Amounts retained from contractors | - | 4,315,209 | - |
| Due to other funds | 362,116 | - | - |
| Other liabilities | - | 5,013,587 | $ 19,058 |
| Accrued legal claims | - | 1,625,000 | - |
| Accrued vacation and sick leave | - | 10,119,159 | - |
| Advances under line of credit (Note 6) | - | - | - |
| Bonds payable (Notes 5 and 9): | | | |
| Term bonds | - | - | - |
| Serial bonds | - | - | - |
| Total liabilities | 81,688,307 | 51,670,155 | 19,058 |
| | | | |
| Commitments and contingent liabilities (Notes 7 and 9) | | | |
| | | | |
| Fund Equity: | | | |
| Investment in general fixed assets | - | - | - |
| Contributed capital | - | | 27,681,629 |
| | | | |
| Fund balances: | | | |
| Reserved for: | | | |
| Advances | - | 18,025,370 | - |
| Long-term accounts receivable | - | 9,922,746 | - |
| | | 27,948,116 | - |
| Unreserved | 162,636,150 | (5,042,501) | |
| Total fund balance | 162,636,150 | 22,905,615 | - |
| Total fund equity | 162,636,150 | 22,905,615 | 27,681,629 |
| | | | |
| Total liabilities and fund equity | $244,324,457 | $74,575,770 | $27,700,687 |

*See accompanying notes.*

| Account Groups | | Totals (Memorandum Only) | |
| General Fixed Assets | General Long-term debt | 1995 | 1994 |
|---|---|---|---|
| - | - | $ 44,756,191 | $ 44,806,909 |
| - | - | 36,570,000 | 32,350,000 |
| - | - | 30,597,200 | 28,213,926 |
| - | - | 4,315,209 | 4,526,934 |
| - | - | 362,116 | - |
| - | - | 5,032,645 | 15,051,881 |
| - | $ 6,795,000 | 8,420,000 | 8,420,000 |
| - | 4,200,000 | 14,319,159 | 16,478,415 |
| - | 74,340,549 | 74,340,549 | - |
| - | 955,890,000 | 955,890,000 | 959,265,000 |
| - | 661,000,000 | 661,000,000 | 698,145,000 |
| - | 1,702,225,549 | 1,835,603,069 | 1,807,258,065 |
| $40,279,020 | - | 40,279,020 | 39,729,311 |
| - | - | 27,681,629 | 6,321,643 |
| - | - | 18,025,370 | 25,507,324 |
| - | - | 9,922,746 | - |
| - | - | 27,948,116 | 25,507,324 |
| - | - | 157,593,649 | 305,060,029 |
| - | - | 185,541,765 | 330,567,353 |
| 40,279,020 | - | 253,502,414 | 376,618,307 |
| $40,279,020 | $1,702,225,549 | $2,089,105,483 | $2,183,876,372 |

## Puerto Rico Highway and Transportation Authority

### Combined Statement of Revenues, Expenditures and Changes in Fund Balance - All Governmental Fund Types

Year ended June 30, 1995
with comparative totals for the year ended June 30, 1994

| | Governmental Fund Types | | | Totals Memorandum Only | |
| | General | Debt Service | Capital Projects | 1995 | 1994 |
|---|---|---|---|---|---|
| **Revenues (Note 2 and 5):** | | | | | |
| Excise taxes: | | | | | |
| Gasoline | - | $152,052,340 | - | $152,052,340 | $147,868,060 |
| Diesel oil | - | 11,128,784 | - | 11,128,784 | 4,364,747 |
| Vehicle license fees | - | 25,015,697 | - | 25,015,697 | 24,390,891 |
| Toll fares | - | 80,702,957 | - | 80,702,957 | 67,780,142 |
| Grants: | | | | | |
| Federal government | - | - | $ 90,835,885 | 90,835,885 | 54,203,811 |
| Commonwealth of Puerto Rico, municipalities and other | - | - | 182,980 | 182,980 | 1,269,563 |
| Interest income | - | 10,993,193 | 4,199,957 | 15,193,150 | 16,153,366 |
| Other | $   368,288 | - | - | 368,288 | 151,446 |
| Total revenues | 368,288 | 279,892,971 | 95,218,822 | 375,480,081 | 316,182,026 |
| **Other financing sources/(uses) (Notes 2, 5 and 6):** | | | | | |
| Net proceeds from bond issuance | - | - | - | - | 1,129,927,451 |
| Payment to refunded bond escrow agent | - | - | - | - | (730,283,342) |
| Proceeds from credit line advances | - | - | 74,340,549 | 74,340,549 | 12,600,000 |
| Payment of credit line advances | - | - | - | - | (51,400,000) |
| Transfers from/(to) other funds | 23,341,111 | (117,737,030) | 92,380,818 | (2,015,101) | (1,863,545) |
| Total revenues and other financing sources/(uses) | 23,709,399 | 162,155,941 | 261,940,189 | 447,805,529 | 675,162,590 |
| **Expenditures:** | | | | | |
| Toll highways administration and maintenance | 19,872,750 | | | 19,872,750 | 19,599,897 |
| Acquisition of operating property and equipment | 3,836,649 | | - | 3,836,649 | 2,599,626 |
| Expenditures for traffic facilities | - | | 417,828,026 | 417,828,026 | 354,938,663 |
| Other | - | 122,271 | - | 122,271 | 429,143 |
| Redemption of bonds (Note 5): | | | | | |
| Serial bonds | - | 37,145,000 | - | 37,145,000 | 32,350,000 |
| Term bonds | - | 3,375,000 | - | 3,375,000 | 4,375,000 |
| Interest | - | 93,184,215 | 393,394 | 93,577,609 | 89,534,273 |
| Total expenditures | 23,709,399 | 133,826,486 | 418,221,420 | 575,757,305 | 503,826,602 |
| Excess (deficiency) of revenues and other financing sources/(uses) over/(under) expenditures | - | 28,329,455 | (156,281,231) | (127,951,776) | 171,335,988 |
| Fund balances at beginning of year | - | 151,380,507 | 179,186,846 | 330,567,353 | 159,231,365 |
| Residual equity transfer (Note 8) | - | (17,073,812) | | (17,073,812) | |
| Fund balances at end of year | $            - | $162,636,150 | $22,905,615 | $185,541,765 | $330,567,353 |

*See accompanying notes.*

Puerto Rico Highway and Transportation Authority

Combined Statement of Revenues and Expenditures

Budget and Actual - All Governmental Fund Types

Year ended June 30, 1995

| | Budget (Cash Basis) | Actual (Cash Basis) | Variance Favorable (Unfavorable) |
|---|---|---|---|
| **Revenues:** | | | |
| Excise taxes and vehicle license fees | $183,400,000 | $184,585,375 | $ 1,185,375 |
| Toll fares | 76,140,000 | 80,702,957 | 4,562,957 |
| Grants: | | | |
| Federal Government | 82,000,000 | 84,731,130 | 2,731,130 |
| Commonwealth of Puerto Rico, municipalities and other | 2,500,000 | 182,980 | (2,317,020) |
| Interest and other revenue | 17,870,000 | 15,538,311 | (2,331,689) |
| Total revenues | 361,910,000 | 365,740,753 | 3,830,753 |
| **Other financing sources/(uses):** | | | |
| Proceeds from credit line advances | 85,011,000 | 74,340,549 | (10,670,451) |
| Total revenues and other financing sources/(uses) | 446,921,000 | 440,081,302 | (6,839,698) |
| **Expenditures:** | | | |
| Construction, and administrative expenditures | 424,972,000 | 404,551,743 | 20,420,257 |
| Acquisitions of operating property and equipment | - | 3,836,649 | (3,836,649) |
| Toll highways administration and maintenance | 20,200,000 | 19,872,750 | 327,250 |
| Redemption of bonds: | | | |
| Serial bonds | 32,925,000 | 32,925,000 | - |
| Term bonds | 3,375,000 | 3,375,000 | - |
| Interest | 97,015,000 | 93,628,327 | 3,386,673 |
| Other | 6,250,000 | 122,271 | 6,127,729 |
| Advances to Department of Transportation and Public Works | 10,000,000 | 10,817,803 | (817,803) |
| Metrobus administrative and operating expenses | 3,500,000 | 1,996,043 | 1,503,957 |
| Transfer to propietary fund | 28,000,000 | 17,073,812 | 10,926,188 |
| Total expenditures | 626,237,000 | 588,199,398 | 38,037,602 |
| Excess of revenues and other financing sources/(uses) over expenditures | (179,316,000) | (148,118,096) | 31,197,904 |
| Fund balance at beggining of year | 179,316,000 | 179,316,000 | - |
| Fund balance at end of year | $ - | $31,197,904 | $31,197,904 |

*See accompanying notes.*

## Puerto Rico Highway and Transportation Authority

## Combined Statement of Revenues, Expenses and Changes
## in Retained Earnings - Enterprise Fund

### Year ended June 30, 1995

| | |
|---|---:|
| Operating revenues – user charges | $2,665,709 |
| Operating expenses: | |
|   General and administrative | 4,680,810 |
|   Depreciation | 676,326 |
| Operating loss | 2,691,427 |
| Transfers from other funds | 2,015,101 |
| Net loss | 676,326 |
| Add depreciation on contributed equipment | 676,326 |
| Retained earnings at end of year | $          - |

*See accompanying notes.*

## Puerto Rico Highway and Transportation Authority

## Combined Statement of Cash Flows - Enterprise Fund

## Year ended June 30, 1995

**Operating activities**

| | |
|---|---:|
| Cash received from customers | $ 2,665,709 |
| Cash paid for services | (4,680,810) |
| Net cash used in operating activities | (2,015,101) |

**Investing activities**

| | |
|---|---:|
| Investment in Tren Urbano | (22,035,297) |
| Acquisition of operating equipment - Metrobus | (1,015) |
| Net cash used in investment activities | (22,036,312) |

**Financing activities**

| | |
|---|---:|
| Transfers from other funds | 2,015,101 |
| Contributed capital | 22,036,312 |
| Net cash provided by financing activities | 24,051,413 |

| | |
|---|---:|
| Increase in cash | $            - |

*See accompanying notes.*

III-9

## Puerto Rico Highway and Transportation Authority

### Notes to Financial Statements

### June 30, 1995

### 1. Organization and Significant Accounting Policies

The Puerto Rico Highway and Transportation Authority (the "Authority") is a public corporation and instrumentality of the Commonwealth of Puerto Rico, created by Act No. 74 of June 23, 1965, as amended, to provide roads and other facilities for the movement of persons, vehicles, and vessels and for the planning, promotion and feasibility of mass transportation systems. The Authority is a component unit of the Commonwealth of Puerto Rico and accordingly is included in the general purpose financial statements of the Commonwealth. The powers normally exercised by a Board of Directors are vested with the Commonwealth Secretary of the Department of Transportation and Public Works ("DTPW"). The Authority is exempt from the payment of any taxes on its revenues and properties.

The accounting policies of the Authority conform to generally accepted accounting principles as applicable to governmental units  The following is a summary of the significant accounting policies:

### Fund Accounting

The accounts of the Authority are organized on the basis of funds and account groups, each of which is considered to be a separate accounting entity. The operations of each fund are accounted for with a separate set of self-balancing accounts that comprise its assets, liabilities, fund balance, revenues, and expenditures. The various funds are summarized by type in the financial statements. The following fund types and account groups are used by the Authority:

### Governmental Fund Types

Governmental funds are those through which most governmental functions of the Authority are financed. The acquisition, use, and balances of the Authority's expendable financial resources and the related liabilities are accounted for through governmental funds. The measurement focus is upon determination of changes in financial position, rather than upon net income determination. The following are the Authority's governmental fund types:

The General Fund is the general operating fund of the Authority. It is used to account for all financial resources except those required to be accounted for in another fund.

The Debt Service Fund is used to account for the accumulation of resources for, and the payment of, general long-term debt principal, interest and related costs, except those required to be accounted for in the General Fund. Long-term debt and interest due July 1 of the following fiscal year are accounted for as fund liabilities if there are available financial resources as of June 30.

# Puerto Rico Highway and Transportation Authority

## Notes to Financial Statements (continued)

### 1. Organization and Significant Accounting Policies (continued)

#### Governmental Fund Types (continued)

The Capital Projects Fund is used to account for financial resources to be used for the acquisition or construction of major capital facilities.

#### Proprietary Fund Type

Proprietary funds are used to account for activities that are similar to those often found in the private sector. The measurement focus is upon determination of net income and capital maintenance. The Authority has one proprietary funds, the Enterprise Fund, which is used to account for operations that are financed through user charges and management has decided that determination of net income is appropriate.

During 1995, the Authority established the Tren Urbano Fund to account for the costs incurred for the development of a mass rail transportation project ("Tren Urbano"). Tren Urbano is classified as an enterprise fund since, upon completion of construction and commencement of operations, the primary focus of the Tren Urbano will be on net income and capital maintenance.

#### Account Groups

Account groups are used to establish accounting control and accountability for the Authority's general fixed assets and general long-term debt. The following are the Authority's account groups:

The General Fixed Assets Account Group reflects the accumulation of expenditures for property and equipment used in the operations of the Authority. Since the General Fixed Assets Account Group is a memorandum account no depreciation is being provided.

The General Long-term Debt Account Group accounts for all long-term debt of the Authority.

#### Basis of Accounting

The modified accrual basis of accounting is followed by the governmental funds. Under the modified accrual basis of accounting, revenues are recorded when susceptible to accrual, i.e., both measurable and available. Available means collectible within the current period or soon enough thereafter to be used to pay liabilities of the current period. Expenditures and related liabilities are recorded in the accounting period in which the liability is incurred, except for interest on long-term obligations, which is recorded when due, except for interest due July 1 of the following year which is recorded when resources are available in the debt service fund, and litigation which is recorded in the long-term debt account group.

## Puerto Rico Highway and Transportation Authority

## Notes to Financial Statements (continued)

### 1. Organization and Significant Accounting Policies (continued)

#### Basis of Accounting (continued)

The accrual basis of accounting is used by proprietary funds. Under the accrual basis, revenues are recorded when earned, and expenses are recorded as liabilities when incurred, without regard to receipt or payment of cash.

In applying the susceptible to accrual concept to intergovernmental revenues, the legal and contractual requirements of the programs are used as guidance. There are, however, essentially two types of these revenues. In one, funds must be expended for the specific purpose or project before any amount will be paid to the Authority; therefore, revenues are recognized based upon the expenditures recorded. In the other, funds are virtually unrestricted as to purpose of expenditure and are usually revocable only for failure to comply with prescribed compliance requirements. These resources are reflected as revenues at the time of receipt or earlier if the susceptible to accrual criteria is met.

#### Investments

Investments are stated at amortized cost, which approximates market value.

#### Advances to the Department of Transportation and Public Works

The Authority periodically advances funds to the Department of Transportation and Public Works ("DTPW") to carry out its participation in the construction program of the Authority. Also, the Authority makes contributions to DTPW for the maintenance program carried out by DTPW. A reservation of fund balance is provided for balances advanced to DTPW.

#### Property and Equipment

Property and equipment purchases are recorded as expenditures in the governmental funds and capitalized at cost in the general fixed assets account group.

Equipment acquired by the proprietary fund is stated at cost. Depreciation is provided using the straight-line method over an estimated useful life of 12 years. Depreciation on equipment acquired from contributed capital is reflected as reduction from contributed capital.

Expenditures incurred on the Tren Urbano project are recorded at cost in the proprietary fund. Funds provided by the Authority are recorded as residual equity transfers in the accompanying statement of Revenues, Expenditures and Changes in Fund Balance - All Governmental Fund Types. Funds provided by the Authority for the project, as well as grants provided by the Federal Government, are recorded as contributed capital in the proprietary fund.

# Puerto Rico Highway and Transportation Authority

## Notes to Financial Statements (continued)

### 1. Organization and Significant Accounting Policies (continued)

### Property and Equipment (continued)

Capital expenditures for infrastructure are not capitalized in the General Fixed Assets Account Group. Unaudited cumulative infrastructure expenditures through June 30, 1995 follow:

|  | (Unaudited) |
|---|---|
| Balance at June 30, 1994 | $4,400,456,493 |
| Plus: expenditures during the year ended June 30, 1995 | 417,828,026 |
| Balance at June 30, 1995 | $4,818,284,519 |

### Vacation and Sick Leave

Employees earn annual vacation leave at the rate of 30 days per year up to a maximum permissible accumulation of 60 days for regular employees. Employees accumulate sick leave at the rate of 18 days per year. Sick leave is only payable if the regular employee resigns and has more than 10 years of employment, or retires and takes a pension. Maximum permissible accumulation is 90 days for all employees and the excess is paid within the next year.

The liability for the vested accumulated vacation and sick leave is recorded in the capital projects fund and the long-term debt account group.

### Claims and Judgments

The estimated amount of the liability for claims and judgments which is due on demand, such as from adjudicated or settled claims, is recorded in the capital projects fund. The general long-term debt account group includes the amount estimated as a contingent liability and the liability with a fixed or expected due date which will require future available financial resources for its payment.

### Totals Memorandum Only

Totals columns in the accompanying financial statements are captioned Memorandum Only to indicate that they are presented only to facilitate financial analysis. Data in these columns do not present financial position or results of operations in conformity with generally accepted accounting principles. Such data is not comparable to a consolidation since interfund eliminations have not been made.

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

## 1. Organization and Significant Accounting Policies (continued)

### Budgetary Data

The Authority prepares its annual budget following the cash basis of accounting while the financial statements are presented under generally accepted accounting principles ("GAAP"). The actual results of operations presented in the Statement of Revenues, Expenditures and Changes in Fund Balance - Budget and Actual - All Governmental Fund Types are in accordance with the budgetary basis of accounting to provide a meaningful comparison of actual with budget.

The Authority uses the following procedures in establishing the budgetary data reflected in the financial statements:

1. The Executive Director submits to the Commonwealth Secretary of Transportation and Public Works (the "Secretary") a proposed operating budget for the fiscal year commencing the following July 1. The operating budget includes proposed expenditures and the means of financing them.

2. The budget is approved through a resolution by the Secretary.

3. After the approval of the operating budget, the Secretary is authorized to transfer budgeted amounts within any funds.

The major differences between the budgetary basis of accounting and GAAP are:

1. Revenues are recorded when payments are received (budgetary), as opposed to when susceptible to accrual (GAAP).

2. Expenditures are recorded when payments are made (budgetary) as opposed to when the liability is incurred (GAAP).

3. Advances to governmental entities for construction projects are recorded when paid (budgetary) as opposed to being recognized as expenditures for traffic facilities when the advances are used (GAAP).

## Puerto Rico Highway and Transportation Authority

## Notes to Financial Statements (continued)

### 1. Organization and Significant Accounting Policies (continued)

**Budgetary Data (continued)**

Adjustments necessary to convert the excess of revenues and other financing sources/(uses) over expenditures from the GAAP basis to the budgetary basis are as follows:

| | |
|---|---:|
| Per Statement of Revenues, Expenditures and Changes in Fund Balances - All Governmental Fund Types (GAAP) | $(127,951,776) |
| Adjustments: | |
| Changes in accounts receivable, accrued interest and other | (2,238,316) |
| Changes in accounts payable and accrued liabilities | (4,901,001) |
| Change in matured interest and bonds payable | 4,169,282 |
| Residual equity transfer from Debt Service Fund | (17,073,812) |
| Other | (122,473) |
| Per Statement of Revenues, Expenditures and Changes in Fund Balances - Budget and Actual - All Governmental Fund Types (Budgetary) | $(148,118,096) |

### 2. Debt Service Fund

Debt service fund revenue is generated from gasoline and diesel oil excise taxes, certain motor vehicles license fees and toll charges which are deposited with a Fiscal Agent, as described in Note 5. The Fiscal Agent withholds the amounts necessary for the Authority's debt service requirements on the revenue bonds and transfers the excess to the General, Capital Projects and Enterprise Funds.

### 3. Cash and Investments

Cash and investments at June 30, 1995 consisted of the following:

| | |
|---|---:|
| Cash held by the Puerto Rico Department of the Treasury | $ 17,134,072 |
| Interest-bearing deposits with commercial banks | 21,415,652 |
| Restricted cash held by escrow agent | 8,000,000 |
| Securities acquired under agreements to resell | 14,493,962 |
| | 61,043,686 |
| Less checks issued in excess of bank balance | (8,974,169) |
| | $ 52,069,517 |

## Puerto Rico Highway and Transportation Authority

## Notes to Financial Statements (continued)

### 3.  Cash and Investments (continued)

Cash with the Department of the Treasury is uninsured and uncollateralized.  The interest-bearing deposits with commercial banks are covered by federal depository insurance or collateralized.  The securities acquired under agreements to resell are held by the broker but not in the Authority's name and consist of certificates of deposit issued by either private banks, which are secured by federal depository insurance or collateralized, or by governmental banks, which are uninsured and uncollateralized, and of local governmental bonds which are secured by investments in the sinking funds of the different agencies.

The bank balance is covered by federal depository insurance or collateral.  In this account checks are issued in excess of the bank balance, and subsequent deposits are made from cash transfers to cover such checks.

Cash and investments with trustee in the Debt Service Fund amounting to $220,661,197 at June 30, 1995 (market value of approximately $221,948,000) consist of U.S. Treasury Bills and Treasury Bonds held by the trustee in the Authority's name.

The Authority is authorized to deposit funds only in institutions approved by the Department of the Treasury and such deposits should be maintained in separate accounts in the name of the Authority.  Resolution 68-18 (Bond Resolution) requires that funds in the Debt Service Fund be held by the fiscal agent  (The Chase Manhattan Bank, N.A.) in trust and applied as provided in the Bond Resolution.  The law governing the Authority does not limit the type of securities in which the Authority may invest; however, funds in the Debt Service Fund must be invested only in direct obligations of the United States government, or obligations unconditionally guaranteed by the United States government, and/or interest bearing time deposits, or other similar arrangements, as provided by the Bond Resolution.

Restricted cash represents funds held in an escrow fund under an agreement with the U.S. Army Corps of Engineers (the "Agreement").  Under terms of the Agreement, the Authority is required to maintain escrow funds to secure performance in connection with a mitigation plan related to a construction project.  The escrow funds will be released as performance is demonstrated.  Final release of the escrow funds will occur upon compliance of the survival of mitigation (approximately May 2001).

### 4.  General Fixed Assets

A summary of changes in property and equipment recorded in the General Fixed Assets Account Group for the year ended June 30, 1995 follows:

|  | Balance June 30, 1994 | Additions | Retirements | Balance June 30, 1995 |
|---|---|---|---|---|
| Property and equipment: |  |  |  |  |
| Land | $    290,000 | - | - | $    290,000 |
| Machinery and equipment | 26,207,989 | $3,822,853 | $3,286,375 | 26,744,467 |
| Buildings | 13,231,322 | 13,796 | 565 | 13,244,553 |
|  | $39,729,311 | $3,836,649 | $3,286,940 | $40,279,020 |

## Puerto Rico Highway and Transportation Authority

### Notes to Financial Statements (continued)

## 5. Bonds Payable

Resolution No. 68-18 (Bond Resolution) of the Authority authorizes the issuance of revenue bonds to obtain funds to accelerate the construction of traffic facilities. Bonds outstanding at June 30, 1995 were as follows:

| | Issue Date | Original Amount | Maturing July 1 | Interest Rate | Outstanding Amount |
|---|---|---|---|---|---|
| Term bonds: | | | | | |
| A | Jan. 1, 1968 | $  20,000,000 | 1998 | 5.25% | $    6,750,000 |
| G | Jan. 1, 1973 | 45,000,000 | 2003 | 5.50 | 41,500,000 |
| Q | Oct. 1, 1990 | 137,475,000 | 2010-2020 | 6.00-7.75 | 30,000,000 |
| R | Nov. 1, 1990 | 45,300,000 | 2005 | 6.75 | 45,300,000 |
| T | June 4, 1992 | 285,000,000 | 2012-2022 | 6.50-6.63 | 128,100,000 |
| V | June 4, 1992 | 123,585,000 | 2007-2018 | 5.75-6.63 | 123,585,000 |
| W | July 15, 1993 | 292,090,000 | 2013-2020 | 5.62-5.72 | 292,090,000 |
| X | July 15, 1993 | 288,565,000 | 2013-2021 | 5.62-5.72 | 288,565,000 |
| | | $1,237,015,000 | | | 955,890,000 |

| | Issue Date | Original Amount | Maturing July 1 | Interest Rate | Outstanding Amount |
|---|---|---|---|---|---|
| Serial bonds: | | | | | |
| N | Sept. 14, 1988 | 98,295,000 | 1990-2001 | 6.40-7.65 | 29,110,000 |
| O | Sept. 14, 1988 | 28,315,000 | 1990-2001 | 6.40-7.60 | 9,860,000 |
| Q | Oct. 1, 1990 | 32,525,000 | 1992-2003 | 6.40-7.70 | 22,820,000 |
| R | Nov. 1, 1990 | 19,115,000 | 1992-2002 | 6.20-7.25 | 15,300,000 |
| U | June 4, 1992 | 53,225,000 | 1997-1999 | 3.50-5.88 | 41,220,000 |
| V | June 4, 1992 | 9,960,000 | 2000-2005 | 3.50-5.88 | 8,830,000 |
| W | July 15, 1993 | 24,700,000 | 2009 | MCS | 24,700,000 |
| | July 15, 1993 | 46,750,000 | 2010 | FLOATS | 46,750,000 |
| | July 15, 1993 | 46,750,000 | 2006-2010 | RITES | 46,750,000 |
| X | July 15, 1993 | 228,695,000 | 1994-2022 | 2.85-5.10 | 214,360,000 |
| | July 15, 1993 | 101,730,000 | 1995-1999 | Variable | 101,730,000 |
| | July 15, 1993 | 66,150,000 | 2010 | FLOATS | 66,150,000 |
| | July 15, 1993 | 66,150,000 | 2003-2010 | RITES | 66,150,000 |
| FMHA-C | Jan. 27, 1981 | 4,510,000 | 1983-2020 | 5.00 | 3,840,000 |
| Total serial bonds | | $   826,870,000 | | | 697,570,000 |
| Less serial bonds payable on July 1, 1995 | | | | | 36,570,000 |
| Serial bonds payable thereafter | | | | | 661,000,000 |
| Total bonds payable after July 1, 1995 | | | | | $1,616,890,000 |

## Puerto Rico Highway and Transportation Authority

### Notes to Financial Statements (continued)

### 5. Bonds Payable (continued)

The variable rate serial bonds mature from 1995 to 1999. On July 15, 1993 the Authority entered into an Interest Swap Agreement (the "Swap Agreement"). Under the terms of the Swap Agreement, which expires in 1999, the Authority will pay fixed interest rates on the $101,730,000 bonds at rates ranging from 2.8% to 3.769%.

A portion of the Series W Bonds were delivered as Multiple Component Securities ("MCS") which allow the investors to receive the separate payments of all or a portion of the principal and interest on fixed coupon bonds. Potential MCS components include principal only, interest only, floating rate, inverse floating rate, and combinations thereof. Regardless of the combination on any MCS, the Authority will pay a Linked Fixed Rate of 9%.

A portion of the Series W and Series X were issued as Residual Interest Tax-Exempt ("RITES") and as Floating Auction Tax-Exempt ("FLOATs") Securities. FLOAT/RITES are variable securities consisting of a dutch-auction based floater (FLOATs) and a companion inverse floater (RITES) that together produce fixed-rate interest payments for the Authority ranging from 5.20% to 5.55%.

The 1993 Bonds, other than the MCS, the FLOAT/RITES, and the bonds maturing on July 1, 2013 and 2015, may be redeemed on or after July 1, 2003 at the option of the Authority at the following prices (expressed as percentages of the principal amount):

| Period during which redeemed | Redemption Price |
|---|---|
| July 1, 2003 through June 30, 2004 | 101 1/2 % |
| July 1, 2004 through June 30, 2005 | 100 3/4 |
| July 1, 2005 and thereafter | 100 |

The FLOATS may be redeemed on or after July 1, 2003 at the option of the Authority at a redemption price equal to the principal amount, plus accrued interest, without premium.

The RITES may be redeemed on or after July 1, 2003 at the option of the Authority at the following prices (expressed as percentages of the principal amount):

| Period during which redeemed | Redemption Price |
|---|---|
| July 1, 2003 through June 30, 2004 | 103      % |
| July 1, 2004 through June 30, 2005 | 101 1/2 |
| July 1, 2005 and thereafter | 100 |

## Puerto Rico Highway and Transportation Authority

## Notes to Financial Statements (continued)

### 5. Bonds Payable (continued)

Changes in term and serial bonds during fiscal year 1995 were as follows:

|  | Outstanding Beginning of Year | Redeemed | Outstanding End-of-Year |
|---|---|---|---|
| Term | $ 959,265,000 | $ 3,375,000 | $ 955,890,000 |
| Serial | 698,145,000 | 37,145,000 | 661,000,000 |
|  | $1,657,410,000 | $40,520,000 | $1,616,890,000 |

The term and serial bonds require future payments of principal and interest as follows:

| Year ending June 30 | Principal | Interest | Total |
|---|---|---|---|
| 1996 | $ 43,015,000 | $ 90,527,364 | $ 133,542,364 |
| 1997 | 45,165,000 | 88,393,397 | 133,558,397 |
| 1998 | 47,455,000 | 86,066,461 | 133,521,461 |
| 1999 | 49,865,000 | 83,548,246 | 133,413,246 |
| 2000 | 53,465,000 | 81,156,359 | 134,621,359 |
| Thereafter | 1,377,925,000 | 975,174,622 | 2,353,099,622 |
|  | $1,616,890,000 | $1,404,866,449 | $3,021,756,449 |

The bonds are secured by a pledge of the gross receipts of the gasoline excise taxes and one half of the diesel oil excise taxes, $15 per vehicle per year from certain motor vehicle license fees, the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority in the future and which the Authority may pledge, and proceeds of any tolls or other charges which the Authority may impose for the use of any of its traffic facilities. The proceeds of the gasoline tax, the gas oil tax, diesel oil tax, and the motor vehicle license fees allocated to the Authority are available taxes and revenues under the Constitution of the Commonwealth of Puerto Rico. Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth but such taxes and fees are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth under the Constitution are insufficient for such purpose. The Commonwealth has not applied these revenues for such payments. The Bond Resolution requires that proceeds from bonds issued be used to retire bond anticipation notes and for the construction of traffic facilities.

# Puerto Rico Highway and Transportation Authority

## Notes to Financial Statements (continued)

### 5. Bonds Payable (continued)

The Bond Resolution further provides that receipts of pledged revenues be deposited with the Fiscal Agent to the credit of the following accounts in the following order:

A. To the Bond Service Account in an amount equal to 1/6th of the amount of interest payable on all bonds of each series issued under the Bond Resolution on the next succeeding interest payment date and an amount equal to 1/12th of the next maturing installment of any serial bonds; provided, however, that the amount so deposited on account of the interest in each month after the delivery of the bonds of any series up to and including the month immediately preceding the first interest payment date thereafter of the bonds of such series, shall be that amount which when multiplied by the number of such deposits will be equal to the amount of interest payable on such bonds on such first interest payment date less the amount of any accrued interest paid on such bonds and deposited to the credit of the Bond Service Account. In the case of variable rate bonds, the actual interest on such bonds is deposited monthly with the Fiscal Agent.

B. To the Redemption Account, in an amount equal to 1/12th of the amortization requirement as defined in the Bond Resolution for such fiscal year for the term bonds of each series then outstanding plus an amount equal to 1/12th of the premium, if any, which would be payable on the first redemption date in the following fiscal year on a like principal amount of bonds if such principal amount of bonds should be redeemed prior to their maturity from moneys in the Sinking Fund.

C. To the Reserve Account, the amount required to make the amount deposited during the current fiscal year equal to the lesser of the maximum annual principal and interest requirements (as defined in the Bond Resolution) in any fiscal year on all outstanding bonds and 10% of the original amount of each Series of Bonds outstanding, permit any increase in the Reserve Requirement to be funded over five years and allow the Authority to use a letter of credit or insurance policy to fund the Reserve Requirement. Excess funds in the Reserve Account can be transferred to the Construction Fund, the Bond Service Account or the Redemption Account, as determined from time to time by the Authority.

If funds in the Reserve Account are used to cover any deficiency in the Bond Service Account or the Redemption Account established under the Resolution, the Excise Act provides that the Reserve Account shall be reimbursed, subject to the provisions of the Constitution of the Commonwealth relating to payment of Commonwealth debt, from the first proceeds received by the Commonwealth in the next fiscal year or years derived from (i) any remaining portion of the tax on gasoline and gas oil and diesel oil then in effect and (ii) any other taxes which may then be in effect on any other fuels or propellants which are used, among other purposes, to propel highway vehicles.

D. Any revenues remaining after making the deposits referred to above are deposited in the Construction Fund for use by the Authority for any of its authorized purposes.

# Puerto Rico Highway and Transportation Authority

## Notes to Financial Statements (continued)

### 5.  Bonds Payable (continued)

The requirements specified in paragraphs A., B. and C. above are cumulative.

The following analysis summarizes the transactions during the year ended June 30, 1995 in the Debt Service Accounts (in thousands).

| | Bond Service Account | Reserve Account | Redemption Account | Other Accounts | Total Debt Service Fund |
|---|---|---|---|---|---|
| Balance at June 30 1994 | $  83,415 | $119,079 | $    475 | $597 | $ 203,566 |
| Increases: | | | | | |
| Revenues transferred | 111,676 | - | 24,296 | - | 135,972 |
| Investment income | 2,768 | 8,214 | 666 | - | 11,648 |
| | 197,859 | 127,293 | 25,437 | 597 | 351,186 |
| | | | | | |
| Decreases: | | | | | |
| Bond principal payments | 32,925 | - | 3,375 | - | 36,300 |
| Bond interest payments | 93,628 | - | - | - | 93,628 |
| Transfer to construction fund | - | - | - | 597 | 597 |
| | 126,553 | - | 3,375 | 597 | 130,525 |
| Balance at June 30, 1995 | $ 71,306 | $127,293 | $ 22,062 | $  - | $ 220,661 |

The Bond Resolution provides that additional bonds may be issued for the purpose of providing funds for completing payment of the cost of any traffic facilities or for paying all or any part of the cost of any additional traffic facilities, including the payment of any outstanding notes of the Authority which were issued to temporarily finance the costs of the traffic facilities for which such bonds are to be issued, and for refunding at or prior to their maturity or maturities all of the outstanding bonds of any series, or a portion thereof (as defined in the second Supplemental Resolution).  However, the Authority must comply with certain requirements included in the Bond Resolution related to revenues and maximum amounts of principal and interest prior to any additional bond issuance.

Nothing in the Bond Resolution is to be construed as preventing the Authority from financing any facilities authorized by the Authority Act through the issuance of bonds or other obligations which are not secured under the provisions of the Bond Resolution.

In prior years, the Authority defeased certain bonds by placing the proceeds of new bonds in irrevocable trusts to provide for all future debt service payments on the defeased bonds. Accordingly, the trust account assets and the liability for the defeased bonds are not included in the Authority's financial statements.  At June 30, 1995 $612,525,000 of defeased bonds are outstanding.

## Puerto Rico Highway and Transportation Authority

### Notes to Financial Statements (continued)

#### 6. Line of Credit

The Authority has an authorized line of credit of $200,000,000 with the Government Development Bank for Puerto Rico ("GDB") expiring on December 1, 1996. Advances outstanding and the interest rate under the line of credit amounted to $74,340,549 and 5.32%, respectively, at June 30, 1995.

#### 7. Pension Plan

Regular employees participate in the Retirement System of the Commonwealth of Puerto Rico (the "System"), a cost-sharing multiple-employer public employee retirement system. The payroll for employees covered by the System for the year ended June 30, 1995 was approximately $38,119,000 and the Authority's total payroll cost was approximately $56,100,000.

All regular employees who at the time of employment are 55 years old or less are eligible to participate in the System. Employees who retire at or after age 55 with 25 years of credited service, or at age 58 with 10 years of credited service or at age 65 with 10 years of credited service if hired after April, 1990, are entitled to a retirement benefit payable each month for life, computed based on a benefit rate set forth by Commonwealth statute. The System also provides death and disability benefits established by Commonwealth statute.

Covered employees are required by Commonwealth Law Number 447 of 1951, as amended, to contribute 5.775 percent or 8.275 percent of their salary to the System. The Authority is required to contribute 9.275 percent of the participants' salaries. The contribution requirement for the year ended June 30, 1995 was approximately $6,600,000, which consisted of approximately $3,600,000 from the Authority and $3,000,000 from employees.

The "pension benefit obligation" is a standardized disclosure measure of the present value of pension benefits adjusted for the effects of projected salary increases and step-rate benefits, estimated to be payable in the future as a result of employee service to-date. The measure, which is the actuarial present value of credited projected benefits, is intended to help users assess the System's funding status on a going concern basis, assess progress made in accumulating sufficient assets to pay benefits when due, and make comparisons between public employee retirement systems and employers.

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

**7. Pension Plan (continued)**

The actuarial present value of pension benefit obligation at June 30, 1994, the latest date available for the System as a whole, follows (amounts in millions):

| | |
|---|---:|
| Pension benefit obligation: | |
|   Retirees, beneficiaries and terminated | |
|     employees not yet receiving benefits | $ 2,888 |
| Current employees: | |
|   Vested | 2,556 |
|   Nonvested | 98 |
| Total pension benefit obligation | 5,542 |
| Net assets available for benefits | 953 |
| Unfunded pension benefit obligation | $ 4,589 |

The following assumptions were used in the actuarial valuation:

| | |
|---|---:|
| Investment rate of return per year | 8.5% |
| Salary increase | 5% |
| Mortality rate table | GA'51 |

Trend information gives an indication of the progress made in accumulating sufficient assets to pay benefits when due. Trend information for the available years is as follows (amounts in millions):

| | |
|---|---:|
| Net assets available for benefits as a percentage | |
| of total pension benefit obligation: | |
|   June 30, 1994 | 17% |
|   June 30, 1993 | 18% |
|   June 30, 1992 | 18% |
| Unfunded pension benefit obligation as a | |
| percentage of annual covered payroll: | |
|   June 30, 1994 | 245% |
|   June 30, 1993 | 230% |
|   June 30, 1992 | 236% |

Showing unfunded pension benefit obligation as a percentage of annual covered payroll approximately adjusts for the effects of inflation for analysis purposes.

## Puerto Rico Highway and Transportation Authority

### Notes to Financial Statements (continued)

### 7. Pension Plan (continued)

The Company is subject to a possible claim by the System based on the provisions of Law Number 447 of 1951 ("Law 447"). Law 447 provides that government instrumentalities shall pay to the System actuarial deficiencies related to the accrued benefits from the respective instrumentality. The System is in the process of completing an actuarial valuation to determine the deficiency of each agency, if any. When the actuarial valuation is completed the source of funds and methods of payments will be determined. Accordingly, no provision for the liability, if any, that may result has been made in the accompanying financial statements.

The Authority has a labor union contract that provides all union employees who work for the Authority through their retirement date with the following benefits:

| Years worked | Amount |
|--------------|--------|
| 10-15 years | $125 per year of service |
| 16-20 | $155 per year of service |
| 21-25 | $165 per year of service |
| 26 and over | $175 per year of service |

In addition, management employees have similar benefits under the same conditions granted to labor union personnel, as follows:

| Years worked | Amount |
|--------------|--------|
| 10-15 years | $135 per year of service |
| 16-20 | $165 per year of service |
| 21-25 | $180 per year of service |
| 26 and over | $200 per year of service |

### 8. Enterprise Funds

The Authority maintains separate enterprise funds to account for the operations of the Metrobus system and the Tren Urbano project.

The Metrobus consists of bus operations which are conducted by a private company.

The Tren Urbano project will be a mass rail transportation project. Since this project is still in the development stage, no operating statement is presented in the accompanying financial statements.

# Puerto Rico Highway and Transportation Authority

## Notes to Financial Statements (continued)

### 8. Enterprise Funds (continued)

The following summarizes the components of the enterprise funds included in the Combined Balance Sheet - All Fund Types and Account Groups:

|  | Metrobus | Tren Urbano | Total |
|---|---|---|---|
| Due from other funds | $   19,058 | - | $   19,058 |
| Property and equipment - net | 5,646,332 | $   412,127 | 6,058,459 |
| Construction in progress | - | 21,623,170 | 21,623,170 |
|  | $5,665,390 | $22,035,297 | $27,700,687 |
|  |  |  |  |
| Other liabilities | $   19,058 | $        - | $   19,058 |
| Contributed capital: |  |  |  |
| Federal government | 4,370,527 | 4,962,500 | 9,333,027 |
| Authority's funds | 1,275,805 | 17,072,797 | 18,348,602 |
|  | $5,665,390 | $22,035,297 | $27,700,687 |

All revenues and expenses shown in the Combined Statement of Revenues, Expenses and Changes in Retained Earnings - Enterprise Fund are attributable to the Metrobus operations.

During 1995, the Authority transferred $1,015 and $17,072,797 to the Metrobus and the Tren Urbano Projects, respectively, for a total residual equity transfer of $17,073,812.

### 9. Commitments and Contingent Liabilities

#### Construction

As of June 30, 1995, the Authority had commitments for approximately $438,000,000 related to construction contracts.

# Puerto Rico Highway and Transportation Authority

## Notes to Financial Statements (continued)

### 9.  Commitments and Contingent Liabilities (continued)

<u>Leases</u>

The Authority has various noncancellable operating leases for office spaces with the Puerto Rico Public Buildings Authority and other lessors expiring from 2004 to 2090.  The rental expenditure for the year ended June 30, 1995 was approximately $1,565,800.  Future rental payments as of June 30, 1995 under these leases are as follows:

| Year | Amount |
|------|--------|
| 1996 | $ 1,580,800 |
| 1997 | 1,495,400 |
| 1998 | 1,495,400 |
| 1999 | 1,484,100 |
| 2000 | 1,431,400 |
| Thereafter | 6,997,600 |
| Total minimum payments required | $14,484,700 |

<u>Litigation</u>

The Authority is defendant or co-defendant in various lawsuits for alleged damages. Substantially all of these cases are in connection with construction projects which are generally either fully or partially covered by insurance.  The contractors are required, under the terms of the construction agreements, to carry adequate public liability insurance and to hold harmless the Authority from lawsuits brought on account of damages relating to the construction of the projects.

The Authority, based on legal advice, has recorded an adequate provision to cover probable losses on those claims not fully covered by insurance.  In the opinion of legal counsel any liability, in excess of the insurance coverage and/or the recorded provision, that may arise from such claims would not be significant in relation to the Authority's financial position.

In March 1992, the Authority issued Special Facility Revenue Bonds amounting to approximately $117 million for the purpose of facilitating the construction of a toll bridge which traverses the San Jose Lagoon between the municipalities of San Juan and Carolina.

The proceeds from the sale of the bonds were transferred by the Authority to Autopistas de Puerto Rico y Compañía S.E. (the "Borrower") pursuant to a loan agreement by and between the Borrower and the Authority.

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

## 9.  Commitments and Contingent Liabilities (continued)

Special Facility Revenue Bonds

The Authority and the Borrower entered into a build/transfer/operate concession agreement for the design, construction, operation and maintenance of the Teodoro Moscoso Bridge (the "Bridge"). The initial term of this agreement is 35 years. Under certain circumstances, the Concession Agreement may be terminated and the Authority is then to assume all of the Borrower's obligations of the principal of and interest on the Bonds, which pursuant to the Loan Agreement will be paid from the proceeds of the use and operation of the Bridge. The outstanding debt (including accrued interest) and the sinking fund balances at June 30, 1995 amounted to approximately $121,270,000 and $15,330,000, respectively.

Metrobus

In connection with the responsibilities of the Authority for mass transportation systems, the Metrobus project was developed. The project consists of bus operations which are conducted by a private company under an agreement expiring in September 1, 1998.

The contract for the operation of the Metrobus Project provides for fixed payments to the operator. Operators' compensation is based on monthly payments amounting to one-twelfth of the total annual operating cost. Tollfares, which are retained by the operator, are reduced from such payments based on tollfare estimates. In addition, the Operator has various incentive fees for meeting or exceeding various performance standards.

[This page intentionally left blank]

# JORGENSEN
Roy Jorgensen Associates, Inc.

*Corporate Offices*

3735 Buckeystown Pike
Post Office Box 70
Buckeystown, MD 21717-0070

Telephone 1-301-831-1000
Facsimile 1-301-874-2876

March 28, 1996

Dr. Sergio L. Gonzalez Quevedo, Executive Director
Puerto Rico Highway and Transportation Authority
P.O. Box 42007
San Juan, Puerto Rico  00940-2007

Dear Dr. Gonzalez:

This letter summarizes the results of our evaluation of the level of maintenance of the Puerto Rico Highway and Authority's Traffic Facilities and our review of the Construction Improvement Program for the period 1996-2000.  Our study was conducted in accordance with Resolution No. 68-18, adopted June 13, 1968, as amended.  Results of the study are documented in our Final Report, dated November 1995.

Based on our field inspections in January 1996 and in earlier years, we find that the overall level of maintenance has generally been adequate to preserve the investment and provide an acceptable level of service.  Maintenance work methods and levels of service are in general conformance to widely accepted maintenance practices in many transportation and public works departments in North America.

We have reviewed the proposed Construction Improvement Program for the period 1996-2000.  In our opinion, the program is a reasonable response to the immediate and short-term transportation needs of the Commonwealth and is generally consistent with the Authority's long-range transportation master plan.  Revenue projections have been reasonably accurate in the past and provide a sound basis for determining the size of future programs.

Sincerely,

William C. Grenke
Vice President

[This page intentionally left blank]

APPENDIX V

April __, 1996

Hon. Dr. Carlos I. Pesquera Morales
Secretary of Transportation and Public Works
San Juan, Puerto Rico

Dear Sir:

We have examined Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended, creating Puerto Rico Highway and Transportation Authority (hereinafter sometimes called the "Authority"), as a body corporate and politic constituting a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, Subtitle B of the Puerto Rico Internal Revenue Code of 1994 (Act No. 120 of the Legislature of Puerto Rico, approved October 31, 1994, as amended) (the "Excise Act"), which allocated the proceeds of the sixteen cents per gallon tax imposed on gasoline and four cents of the eight cents per gallon tax on gas oil and diesel oil to the Authority for use for its corporate purposes, the Vehicle and Traffic Law of Puerto Rico (Act No. 141 of the Legislature of Puerto Rico, approved July 20, 1960, as amended) which allocated the proceeds of the fifteen dollar increase in the motor vehicle license fees for public and private service automobiles imposed by Act No. 9 of the Legislature of Puerto Rico, approved August 12, 1982 (the "Additional License Fees"), to the Authority for use for its corporate purposes and the Reorganization Plan of 1971 (Act No. 113 of the Legislature of Puerto Rico, approved June 21, 1968) which attached the Authority to the Department of Transportation and Public Works.

We have also examined certified copies of the proceedings of the Authority, including Resolution No. 68-18, adopted on June 13, 1968, as amended by Resolution No. 72-08, adopted on February 17, 1972, Resolution No. 90-42, adopted on October 29, 1990, Resolution No. 92-42, adopted on June 23, 1992, Resolution No. 93-25, adopted on July 15, 1993 and effective on September 8, 1993, and Resolution No. 93-30, adopted on August 10, 1993 (collectively, the "Resolution"), and a resolution adopted on March 28, 1996 with respect to the Bonds described below and other proofs submitted relative to the authorization, sale and issuance of

$890,235,000
PUERTO RICO HIGHWAY AND TRANSPORTATION AUTHORITY
HIGHWAY REVENUE BONDS
(SERIES Y)

Maturing in such principal amounts, subject to redemption and bearing interest at the rates, all as set forth in said resolution adopted on March 28, 1996.

We have also examined one of said Series Y Bonds as executed and authenticated.

From such examination we are of the opinion that:

1. Said Act No. 74, as amended, the Excise Act and the Vehicle and Traffic Law of Puerto Rico are valid.

2. Said proceedings have been validly and legally taken.

3. The Series Y Bonds have been duly authorized and issued to pay the cost of constructing highways and other traffic facilities, including the payment of notes heretofore issued by the Authority for such purpose, and to make a deposit to the credit of the Reserve Account in the Interest and Sinking Fund hereinafter mentioned.

4. The Series Y Bonds are valid and binding special obligations of the Authority payable solely from the special fund created by the Resolution and designated "Puerto Rico Highway Authority Highway Revenue Bonds Interest and Sinking Fund". The Authority has covenanted to deposit to the credit of said Interest and Sinking Fund

a sufficient amount of the Revenues (as defined in the Resolution), together with any other funds of the Commonwealth of Puerto Rico allocated to the Authority for the payment of principal of the interest on its bonds, to pay the principal of and interest on all bonds issued under the provisions of the Resolution as the same may become due and payable and to create and maintain a reserve therefor.

The proceeds of the gasoline and gas oil and diesel oil taxes and the Additional License Fees so allocated to the Authority by the Excise Act and the Vehicle and Traffic Law of Puerto Rico, and any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority are subject to being applied first to the payment of interest and amortization of the public debt in accordance with the provisions of, and to the extent provided by, Section 8 of Article VI of the Constitution of Puerto Rico if needed for such purpose. Said Interest and Sinking Fund is pledged to and charged with the payment of the principal of and the interest on all bonds issued by the Authority under the provisions of the Resolution, including the Series Y Bonds.

5. The Resolution provides for the issuance, from time to time, under the conditions, limitations and restrictions therein set forth, of additional bonds for the purpose of paying all or a part of the cost of additional traffic facilities and for the purpose of refunding any bonds issued by the Authority under the provisions of the Resolution.

6. The Series Y Bonds do not constitute a debt of the Commonwealth of Puerto Rico or of any of its municipalities or other political subdivisions, and neither the Commonwealth of Puerto Rico nor any such municipality or other political subdivision is liable thereon, and the Series Y Bonds are payable only out of the Revenues of the Authority, to the extent provided in the Resolution.

7. Under the provisions of the Acts of Congress now in force and under existing regulations and judicial decisions, (i) subject to compliance with the covenant referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), regarding the use, expenditure and investment of bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Series Y Bonds is not includable in gross income for federal income tax purposes, and (ii) the Series Y Bonds and the interest thereon are exempt from state, Commonwealth and local income taxation. We express no opinion in the Federal, state, Commonwealth or local income tax treatment of the Conversion Adjustment (as defined in the Resolution).

Interest on the Series Y Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code. Such interest will, however, be includable in the computation of the alternative minimum tax and the environmental tax on corporations imposed by the Code. The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of the Series Y Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax and environmental tax) of interest that is excluded from gross income.

The Authority has covenanted to comply with the requirements of the Code, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, so that interest on the Series Y Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Series Y Bonds.

Respectfully submitted,

[To be signed "Greenberg Traurig Hoffman Lipoff Rosen & Quentel"]

V-2

April __, 1996

Hon. Dr. Carlos I. Pesquera Morales
Secretary of Transportation and Public Works
San Juan, Puerto Rico

Dear Sir:

We have examined Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended, creating Puerto Rico Highway and Transportation Authority (hereinafter sometimes called the "Authority"), as a body corporate and politic constituting a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, Subtitle B of the Puerto Rico Internal Revenue Code of 1994 (Act No. 120 of the Legislature of Puerto Rico, approved October 31, 1994, as amended) (the "Excise Act"), which allocated the proceeds of the sixteen cents per gallon tax imposed on gasoline and four cents of the eight cents per gallon tax on gas oil and diesel oil to the Authority for use for its corporate purposes, the Vehicle and Traffic Law of Puerto Rico (Act No. 141 of the Legislature of Puerto Rico, approved July 20, 1960, as amended) which allocated the proceeds of the fifteen dollar increase in the motor vehicle license fees for public and private service automobiles imposed by Act No. 9 of the Legislature of Puerto Rico, approved August 12, 1982 (the "Additional License Fees"), to the Authority for use for its corporate purposes and the Reorganization Plan of 1971 (Act No. 113 of the Legislature of Puerto Rico, approved June 21, 1968) which attached the Authority to the Department of Transportation and Public Works.

We have also examined certified copies of the proceedings of the Authority, including Resolution No. 68-18, adopted on June 13, 1968, as amended by Resolution No. 72-08, adopted on February 17, 1972, Resolution No. 90-42, adopted on October 29, 1990, Resolution No. 92-42, adopted on June 23, 1992, Resolution No. 93-25, adopted on July 15, 1993 and effective on September 8, 1993, and Resolution No. 93-30, adopted on August 10, 1993 (collectively, the "Resolution"), and a resolution adopted on March 28, 1996 with respect to the Bonds described below and other proofs submitted relative to the authorization, sale and issuance of

<div align="center">

**$185,040,000**
**PUERTO RICO HIGHWAY AND TRANSPORTATION AUTHORITY**
**HIGHWAY REVENUE REFUNDING BONDS**
**(SERIES Z)**

</div>

Maturing in such principal amounts, subject to redemption and bearing interest at the rates, all as set forth in said resolution adopted on March 28, 1996.

We have also examined one of said Series Z Bonds as executed and authenticated.

From such examination we are of the opinion that:

1. Said Act No. 74, as amended, the Excise Act and the Vehicle and Traffic Law of Puerto Rico are valid.

2. Said proceedings have been validly and legally taken.

3. The Series Z Bonds have been duly authorized and issued to refund a portion of the outstanding Puerto Rico Highway Authority Revenue Bonds (Series Q) and Puerto Rico Authority Highway Revenue Refunding Bonds (Series R) and all of the outstanding Puerto Rico Highway and Transportation Authority Highway Revenue Bonds (Series T).

<div align="center">V-3</div>

4. The Series Z Bonds are valid and binding special obligations of the Authority payable solely from the special fund created by the Resolution and designated "Puerto Rico Highway Authority Highway Revenue Bonds Interest and Sinking Fund". The Authority has covenanted to deposit to the credit of said Interest and Sinking Fund a sufficient amount of the Revenues (as defined in the Resolution), together with any other funds of the Commonwealth of Puerto Rico allocated to the Authority for the payment of principal of the interest on its bonds, to pay the principal of and interest on all bonds issued under the provisions of the Resolution as the same may become due and payable and to create and maintain a reserve therefor.

The proceeds of the gasoline and gas oil and diesel oil taxes and the Additional License Fees so allocated to the Authority by the Excise Act and the Vehicle and Traffic Law of Puerto Rico, and any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority are subject to being applied first to the payment of interest and amortization of the public debt in accordance with the provisions of, and to the extent provided by, Section 8 of Article VI of the Constitution of Puerto Rico if needed for such purpose. Said Interest and Sinking Fund is pledged to and charged with the payment of the principal of and the interest on all bonds issued by the Authority under the provisions of the Resolution, including the Series Z Bonds.

5. The Resolution provides for the issuance, from time to time, under the conditions, limitations and restrictions therein set forth, of additional bonds for the purpose of paying all or a part of the cost of additional traffic facilities and for the purpose of refunding any bonds issued by the Authority under the provisions of the Resolution.

6. The Series Z Bonds do not constitute a debt of the Commonwealth of Puerto Rico or of any of its municipalities or other political subdivisions, and neither the Commonwealth of Puerto Rico nor any such municipality or other political subdivision is liable thereon, and the Series Z Bonds are payable only out of the Revenues of the Authority, to the extent provided in the Resolution.

7. Under the provisions of the Acts of Congress now in force and under existing regulations and judicial decisions, (i) subject to compliance with the covenant referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), regarding the use, expenditure and investment of bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Series Z Bonds is not includable in gross income for federal income tax purposes, and (ii) the Series Z Bonds and the interest thereon are exempt from state, Commonwealth and local income taxation.

Interest on the Series Z Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code. Such interest will, however, be includable in the computation of the alternative minimum tax and the environmental tax on corporations imposed by the Code. The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of the Series Z Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax and environmental tax) of interest that is excluded from gross income.

The Authority has covenanted to comply with the requirements of the Code, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, so that interest on the Series Z Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Series Z Bonds.

Respectfully submitted,

[To be signed "Greenberg Traurig Hoffman Lipoff Rosen & Quentel"]

APPENDIX VI

## THE CAP RITES BONDS

**Certain Definitions**

The following are certain definitions of words and terms contained in this Official Statement relating to the Cap RITES Bonds.

"Authorized Denomination" shall mean the authorized denominations of the Cap RITES Bonds which denominations shall be $100,000 or any multiple thereof during the period commencing on the Effective Date and ending on the Conversion Date and shall be $5,000 or any multiple thereof thereafter.

"Award Resolution" shall mean Resolution No. 96-12 adopted by the Authority on March 28, 1996.

"Bondholders" or "Holders" shall mean the registered owners of Cap RITES Bonds.

"Business Day" shall mean any day other than a Saturday, a Sunday, a day on which commercial banks in New York City are required to be closed or a day on which the New York City Stock Exchange is closed.

"Calculation Period" shall mean each period from and including one Cap RITES Interest Payment Date to but excluding the next following Cap RITES Interest Payment Date, except that the initial Calculation Period will commence on and include the Effective Date and end on, but exclude, the first Cap RITES Interest Payment Date.

"Cap RITES Bond" shall mean any bond that bears interest at the applicable Cap RITES Rate to the applicable Conversion Date and at the applicable Constant Rate thereafter.

"Cap RITES Interest Payment Date" shall mean each interest payment date on the Cap RITES Bonds.

"Cap RITES Market Agent" shall mean initially Merrill Lynch & Co., Inc., or any successor thereto, or any successor Cap RITES Market Agent appointed by the Authority pursuant to the Award Resolution.

"Cap RITES Rate" shall mean a per annum rate equal to the applicable Set Rate plus the amount, if positive, obtained by subtracting the Level Rate from the Variable Rate, determined in accordance with the Award Resolution.

"Constant Rate" shall mean 6¼ % per annum.

"Conversion Adjustment" shall mean, in respect of the conversion of a Cap RITES Bond on an Optional Conversion Date to the Constant Rate pursuant to the Award Resolution, the amount payable, in immediately available funds, either (i) by the Bondholder to the Authority equal to such amount as is payable by the Authority to MLCS, or (ii) by the Authority to the Bondholder equal to such amount as is payable by MLCS to the Authority upon the termination of a notional amount of the Rate Cap Transaction equal to the principal amount of the Cap RITES Bonds being converted, including, without limitation, any accrued amounts payable by the Authority to MLCS, or by MLCS to the Authority, in respect of such notional amount of such Rate Cap Transaction for the period ending on such Optional Conversion Date.

"Conversion Date" shall mean the applicable Scheduled Conversion Date or the Optional Conversion Date on which the interest rate is converted to the applicable Constant Rate.

"DTC" shall mean The Depository Trust Company, New York, New York, and any successor thereto.

"Effective Date" shall mean the first date from which the Cap RITES Bonds bear interest, which shall be the date of their original issuance and delivery.

"Level Rate" shall mean 4½% per annum.

"Master Agreement" shall mean the Master Interest Rate Exchange Agreement, dated as of July 14, 1993, between the Authority and MLCS.

"Maximum Cap RITES Rate" shall mean 11.48% per annum, the maximum rate payable on Cap RITES Bonds.

"MLCS" shall mean Merrill Lynch Capital Services, Inc., a corporation duly organized and existing under the laws of the State of Delaware.

"Optional Conversion Date" shall mean any Business Day prior to the applicable Scheduled Conversion Date on which the interest rate payable on any Cap RITES Bond is converted to the applicable Constant Rate pursuant to the Award Resolution.

"PSA Index Rate" shall mean, for any day, a per annum rate, expressed as a decimal, equal to:

(a)(i) If such day is a Reset Date, a per annum rate in respect of the Reset Date equal to the index (the "PSA Index") determined on the basis of the seven-day high grade market index of tax-exempt variable rate demand obligations, as produced by Municipal Market Data and published or made available to the Public Securities Association ("PSA").

(ii) If PSA no longer publishes or makes available the PSA Index, the Cap RITES Market Agent shall be appointed as the successor indexing agent (the "Indexing Agent") and shall determine the PSA Index Rate on each Reset Date. The PSA Index Rate so determined shall equal the prevailing rate determined by the Indexing Agent for bonds that are rated in the highest short-term rating category by Moody's and S&P in respect of issuers most closely resembling the high grade component issuers to have been selected by PSA pursuant to clause (i) above and that are subject to tender by holders thereof for purchase on not more than seven (7) days notice and the interest on which is (a) variable on a weekly basis, (b) excludable from gross income for federal income tax purposes, and (c) not subject to an "alternative minimum tax" or similar tax unless all tax-exempt bonds are subject to such tax.

(iii) If such day is not a Reset Date, the PSA Index Rate determined pursuant to clauses (i) or (ii) above for the next preceding Reset Date.

(b) If PSA fails or is unable to make available the PSA Index Rate for any Reset Date or the Cap RITES Market Agent reasonably concludes that the PSA Index Rate will not be announced in a timely manner, the Cap RITES Market Agent shall determine the PSA Index Rate for each day in the manner specified in clause (a) (ii) above until PSA makes available the PSA Index Rate.

"Rate Cap Transaction" shall mean the interest rate cap transaction between the Authority and MLCS, dated as of March 26, 1996, entered into pursuant to the Master Agreement, allocated to Cap RITES Bonds, with a notional amount equal to the principal amount of the Cap RITES Bonds, pursuant to the terms of which the Authority is required to pay to MLCS a fixed rate equal to the difference between the Constant Rate and the Set Rate and is entitled to receive from MLCS a variable rate equal to the Variable Rate minus the applicable Level Rate (provided that such Variable Rate plus the applicable Set Rate shall not exceed the Maximum Cap RITES Rate) for the period to the Scheduled Conversion Date of such Cap RITES Bonds.

"Reset Date" shall mean each Thursday (and, if the Effective Date is a day other than a Thursday, the Thursday next preceding the Effective Date) or, if any Thursday is not a Business Day, the first succeeding Business Day.

"Scheduled Conversion Date" shall mean July 1, 1999 the date as of which the Cap RITES Bonds, other than a Cap RITES Bond converted earlier pursuant to the Award Resolution, cease to bear interest at the applicable Cap RITES Rate and commence to bear interest at the applicable Constant Rate.

"Set Rate" shall mean 5.73% per annum.

"Variable Rate" shall mean, in respect of any Calculation Period, a per annum rate equal to the arithmetic mean of the PSA Index Rate in effect for each day in that Calculation Period, calculated by multiplying each such PSA Index Rate by the number of days such PSA Index Rate is in effect, determining the sum of such products and dividing such sum by the number of days in the Calculation Period.

**General**

The Cap RITES Bonds will be executed and delivered as fully registered Bonds in Authorized Denominations of: (1) $100,000 or any multiple thereof, until the Conversion Date, and (2) thereafter, $5,000 or any multiple thereof. Ownership interests may be acquired in book-entry form only. See "Book-Entry Only System" under *The Bonds* in this Official Statement.

Interest with respect to the Cap RITES Bonds will accrue from the Effective Date and will be payable in arrears on January 1 and July 1 of each year, commencing July 1, 1996, to the Holders thereof as of the 15th day of the month next preceding each such January 1 and July 1 (such 15th day, the "Record Date"). The Cap RITES Bonds will mature in the principal amount and on the date set forth on the inside cover page hereof and will be subject to redemption prior to maturity as set forth in "Redemption Provisions" under *The Bonds* in this Official Statement. From the date of initial delivery of the Cap RITES Bonds through the day prior to the Conversion Date, interest will accrue for each Calculation Period at a per annum rate equal to the Set Rate, calculated on the basis of a 360-day year of twelve 30-day months, plus the amount, if positive, obtained by subtracting the Level Rate from the Variable Rate, calculated on the basis of the actual number of days in such Calculation Period divided by 365 (or, if any portion of that Calculation Period falls in a leap year, the sum of (A) the actual number of days in that portion of the Calculation Period falling in a leap year divided by 366 and (B) the actual number of days in that portion of the Calculation Period falling in a non-leap year divided by 365); provided that the rate so determined shall not be greater than the Cap RITES Maximum Rate. From and after the applicable Conversion Date, the interest rate with respect to the Cap RITES Bonds will be the Constant Rate and will be computed using a year of 360 days consisting of twelve 30-day months.

Subject to certain other conditions as described below under the caption "Optional Conversion of the Cap RITES Bonds to the Constant Rate" including the ability of the Authority and MLCS to agree to terminate a portion of the Rate Cap Transaction relating to such Cap RITES Bonds, Holders of the Cap RITES Bonds may elect prior to the Scheduled Conversion Date to convert the interest on their Cap RITES Bonds to the Constant Rate upon payment by or to such Holders of the Conversion Adjustment. For these purposes, while the Cap RITES Bonds are held in book-entry only system, Holders shall mean Beneficial Owners.

**Prospective purchasers of Cap RITES Bonds should note that the interest rate with respect to the Cap RITES Bonds prior to the applicable Conversion Date will only exceed the Set Rate if, and in an amount equal to the amount by which, the Variable Rate exceeds the Level Rate, subject to the Maximum Cap RITES Rate.**

**Cap Agreement**

Simultaneously with, and as a condition to, the delivery of the Cap RITES Bonds, the Authority will enter into a Rate Cap Transaction, pursuant to the Master Agreement with MLCS, an affiliate of Merrill Lynch & Co., Inc., an Underwriter of the 1996 Bonds and the initial Cap RITES Market Agent, pursuant to the terms of which the Authority will pay to MLCS an amount equal to the difference between the Constant Rate and the Set Rate. MLCS is required to pay to the Authority a variable rate equal to the amount by which the Variable Rate exceeds the Level Rate (provided, that such Variable Rate plus the Set Rate shall not exceed the Maximum Cap RITES Rate), in each case on a notional amount equal to the principal amount of the Cap RITES Bonds, and in each case for the period to the Scheduled Conversion Date of the Cap RITES Bonds. The agreement by MLCS to pay amounts to the Authority under the Rate Cap Transaction does not affect the obligation of the Authority under the Resolution to pay the principal of and interest on the 1996 Bonds (including the Cap RITES Bonds) from Revenues (and any such payments by MLCS are not Revenues and are not pledged under the Resolution).

The Authority has agreed in the Award Resolution that it will not take action to terminate the Rate Cap Transaction (except in connection with an optional conversion of any Cap RITES Bonds as described below) unless the Authority shall have received an opinion of counsel nationally recognized on the subject of municipal bonds to the effect that such termination will not cause interest on the 1996 Bonds (including the Cap RITES Bonds) to be includable in gross income for federal income tax purposes (the "Tax Termination Opinion"). If an Early Termination Date (as defined in the Master Agreement) shall occur or if MLCS is in default thereunder, the Authority has also agreed to obtain Tax Termination Opinion, or if it is unable to obtain such Opinion, then it may elect to seek a ruling from the Internal Revenue Service to the effect that the failure to take any action in respect of the terminated Master Agreement will not cause interest on the 1996 Bonds (including the Cap RITES Bonds) to be includable in gross income for federal income tax purposes. If the Authority is unable to obtain such letter ruling within one year of the receipt of any termination payment as a result of the early termination of the Master Agreement, or if the Authority elects not to seek such ruling, then the Authority shall pay in the manner and within the time specified in the Award Resolution to the Holders of the Cap RITES Bonds the amount of the termination payment, together with any investment earnings thereon, and other amounts that are necessary to be paid to the Holders of the Cap RITES Bonds in order to retain the tax exempt nature of the interest on the 1996 Bonds (including the Cap RITES Bonds).

**Optional Conversion of the Cap RITES Bonds to the Constant Rate**

On any Business Day prior to the Scheduled Conversion Date, the Holder of a Cap RITES Bond may elect to convert the interest rate payable on such Cap RITES Bond to the Constant Rate. In the event of such conversion, the interest rate payable on such Cap RITES Bond from the Cap RITES Interest Payment Date next preceding the date of such conversion (or, in the event the Optional Conversion Date is a Cap RITES Interest Payment Date, from such Cap RITES Interest Payment Date) to the maturity thereof shall be the applicable Constant Rate, with interest calculated on the basis of a 360-day year consisting of twelve 30-day months. Such election shall be made by delivery by such Holder of written or telephonically communicated notice to the Authority and to Merrill Lynch & Co., Inc. (Attention: Swap Group, World Financial Center, 250 Vesey Street, New York, New York 10281, Telex No. 6716341, Answerback: MLBSCTR, telephone: (212) 449-7358 or such other number as Merrill Lynch & Co., Inc. shall designate to the Authority), as Cap RITES Market Agent or to any successor Cap RITES Market Agent by 11:00 A.M., New York City time, specifying (i) the principal amount of Cap RITES Bonds which such Holder is electing to convert, (ii) the Business Day next succeeding the date on which such notice is given as the Optional Conversion Date, (iii) the method by which the Cap RITES Market Agent will be able to notify such Holder between 11:00 A.M. and 2:00 P.M., New York City time, on the date of such notice, and (iv) evidence satisfactory to the Cap RITES Market Agent that such Holder is the Beneficial Owner of the Cap RITES Bonds which such Holder is electing to convert.

Prior to 2:00 P.M., New York City time, the Cap RITES Market Agent shall make reasonable efforts to notify the Holder using the method specified by the Holder in the preceding paragraph, of the determination by the Cap RITES Market Agent as to (i) whether conversion will be effected, (ii) the Optional Conversion Date and (iii) the

amount of the Conversion Adjustment. Any such determination shall be binding, until 3:00 P.M., New York City time, on the date such determination is made, provided there shall have been, in the exclusive judgment of the Cap RITES Market Agent, no material adverse change in market conditions prior to such time. If, in the exclusive judgment of the Cap RITES Market Agent, such material adverse change in market conditions shall have occurred, the Cap RITES Market Agent may rescind such determination by not providing the telephonic confirmation referred to in the following paragraph.

In order to elect to convert its Cap RITES Bonds, the Holder shall provide telephonic notice to the Cap Rites Market Agent to such effect not later than 3:00 P.M., New York City time, on the date that the Holder is contacted by the Cap Rites Market Agent with respect to the determination described in clauses (i), (ii) and (iii) of the preceding paragraph, which notice shall be irrevocable with respect to such Holder, but shall be revocable and shall be deemed revoked if the Cap Rites Market Agent does not, upon receipt of such telephonic notice from such Holder, telephonically confirm the determination described in clauses (i), (ii) and (iii) of the preceding paragraph. Immediately thereafter, the Holder shall provide the DTC Participant through which such Holder holds such Cap RITES Bonds irrevocable written instructions to convert the interest rate on such Cap RITES Bonds. As soon as practicable thereafter, but not later than 5:00 P.M., New York City time, on such Business Day, the Holder shall provide to the Authority, the Fiscal Agent and the Cap RITES Market Agent irrevocable written notice (i) specifying the Cap RITES Bonds which the Holder has elected to convert on the Optional Conversion Date, (ii) containing an acknowledgment that the Holder will, if applicable, pay the Conversion Adjustment as determined by the Cap RITES Market Agent in immediately available funds not later than 11:00 A.M., New York City time, on the Optional Conversion Date and (iii) providing evidence satisfactory to the Authority, the Fiscal Agent and the Cap RITES Market Agent that (x) such Holder is the Beneficial Owner of the Cap RITES Bonds which such Holder is electing to convert and (y) in the event that the Cap RITES Bonds are registered in the name of Cede & Co., as nominee for DTC, the DTC Participant through which such Holder holds such Cap RITES Bonds has been provided irrevocable written instructions to convert the interest rate on such Cap RITES Bonds or authorizing the Cap RITES Market Agent to provide such instructions, or in any other event, such Holder shall surrender for conversion its Cap RITES Bonds. Failure by the Holders to deliver the notice described in the preceding sentence shall not affect the irrevocability and finality of the conversion made in the telephonic notice provided by the Holder in this paragraph.

Notwithstanding anything to the contrary, the Optional Conversion Date for any Cap RITES Bonds for which the Holder has provided notice of conversion (as described in the third preceding paragraph) during the period beginning on a Record Date and ending on the next succeeding interest payment date shall be a date not earlier than such next succeeding interest payment date.

Not later than 11:00 A.M., New York City time, on the Optional Conversion Date, the Authority shall, in immediately available funds, pay to the Holder, or the Holder shall pay to the Authority, as applicable, the Conversion Adjustment. If the Holder is required to pay the Conversion Adjustment but fails to make such payment at such time, the Authority shall notify the Fiscal Agent and the Fiscal Agent shall retain the beneficial ownership in such Holder's converted Cap RITES Bonds, or if the Cap RITES Bonds are no longer registered in the name of Cede & Co., as nominee of DTC, the Fiscal Agent shall retain registered ownership of such Holder's converted Cap RITES Bond, in each case until such time as it has deducted such amount with interest at a rate determined on the Optional Conversion Date from any subsequent payment of principal and interest on the Cap RITES Bonds to the Holder. If the Holder is to receive the Conversion Adjustment, and the Authority fails to make such payment on such Optional Conversion Date, such Cap RITES Bond shall not be converted to the Constant Rate. For purposes of optional conversions, for so long as the Cap RITES Bonds are registered in the name of Cede & Co., as nominee of DTC, the term Holder shall mean the Beneficial Owner of a Cap RITES Bond.

**Notwithstanding anything to the contrary, the conversion of any Cap RITES Bonds to the applicable Constant Rate at the election of the Holder thereof shall not occur if the Authority and MLCS fail to agree to the termination of the Rate Cap Transaction or if the payment of the Conversion Adjustment would cause the interest on the Cap RITES Bonds to exceed the maximum rate of interest permitted by applicable law.**

Notwithstanding anything to the contrary in this Official Statement, payments of the Conversion Adjustment to the Holder of a Cap RITES Bond shall be made directly to the Beneficial Owner thereof and will not be handled by DTC and the DTC Participants.

In addition, no Cap RITES Bonds shall be converted on any Business Day if prior to such day (i) there shall have occurred an enactment, promulgation, execution or ratification of, or any change in or amendment to, any law, regulation or ruling (or in the application or official interpretation of any law, regulation or ruling) as a result of which the Authority shall be in receipt of an opinion of nationally recognized bond counsel to the effect that a conversion of any Cap RITES Bonds would cause the interest payable on such Bonds to cease to be excludable from gross income for Federal income tax purposes, or (ii) the payment of any of the Cap RITES Bonds shall have been duly provided for pursuant to the Resolution. See *Summary of Certain Provisions of the Resolution* - Defeasance above in this Official Statement.

Prospective Holders of the Cap RITES Bonds should note that it is not possible to determine at this time the amount of the Conversion Adjustment. Such amount is subject to conditions in the tax-exempt interest rate exchange market at the time of conversion. Such amount is expected, however, to approximate the replacement cost for MLCS of the notional amount of the Rate Cap Transaction being terminated in order to effect such conversion. Such replacement cost is expected to be approximately equal to the cost of preserving for MLCS the economic equivalent of the payment obligations of the Authority following the Optional Conversion Date. If such amount would be payable by the Authority to MLCS, the resulting payment of the Conversion Adjustment will be made by the Holder of the Cap RITES Bond being converted; if such amount would be payable by MLCS to the Authority, the payment will be made to the converting Holder of the Cap RITES Bond. Generally, upon the conversion of a Cap RITES Bond, (i) a payment of the Conversion Adjustment will be made to the Holder if fixed payor rates in the market for interest rate exchange transactions based on tax-exempt market interest rates exceed the Level Rate and (ii) a payment of the Conversion Adjustment will be made by the Holder if fixed payor rates in the market for interest rate exchange transactions based on tax-exempt market interest rates are less than the Level Rate; provided, however, that other market factors will affect the payment of the Conversion Adjustment in respect of a Cap RITES Bond.

In addition, prospective purchasers of the Cap RITES Bonds should note that:

(i)    although payments upon conversion of any Cap RITES Bond to the Constant Rate cannot be determined at this time, such payments could, under certain market conditions described above, be substantial; and

(ii)   payments to the Holders of the Cap RITES Bonds of the Conversion Adjustment, as described above, are not insured by the FSA Policy.

**Prospective Holders of the Cap RITES Bonds should consult their financial advisors regarding the consequences of conversion.**

APPENDIX VII

# MBIA

## FINANCIAL GUARANTY INSURANCE POLICY

### MBIA Insurance Corporation
### Armonk, New York 10504

Policy No. [NUMBER]

MBIA Insurance Corporation (the "Insurer"), in consideration of the payment of the premium and subject to the terms of this policy, hereby unconditionally and irrevocably guarantees to any owner, as hereinafter defined, of the following described obligations, the full and complete payment required to be made by or on behalf of the Issuer to [PAYING AGENT/TRUSTEE] or its successor (the "Paying Agent") of an amount equal to (i) the principal of (either at the stated maturity or by any advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Obligations (as that term is defined below) as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed hereby shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law. The amounts referred to in clauses (i) and (ii) of the preceding sentence shall be referred to herein collectively as the "Insured Amounts." "Obligations" shall mean:

### [PAR]
### [LEGAL NAME OF ISSUE]

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by the Insurer from the Paying Agent or any owner of an Obligation the payment of an Insured Amount for which is then due, that such required payment has not been made, the Insurer on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with State Street Bank and Trust Company, N.A., in New York, New York, or its successor, sufficient for the payment of any such Insured Amounts which are then due. Upon presentment and surrender of such Obligations or presentment of such other proof of ownership of the Obligations, together with any appropriate instruments of assignment to evidence the assignment of the Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for such owners of the Obligations in any legal proceeding related to payment of Insured Amounts on the Obligations, such instruments being in a form satisfactory to State Street Bank and Trust Company, N.A., State Street Bank and Trust Company, N.A. shall disburse to such owners, or the Paying Agent payment of the Insured Amounts due on such Obligations, less any amount held by the Paying Agent for the payment of such Insured Amounts and legally available therefor. This policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Obligation.

As used herein, the term "owner" shall mean the registered owner of any Obligation as indicated in the books maintained by the Paying Agent, the Issuer, or any designee of the Issuer for such purpose. The term owner shall not include the Issuer or any party whose agreement with the Issuer constitutes the underlying security for the Obligations.

Any service of process on the Insurer may be made to the Insurer at its offices located at 113 King Street, Armonk, New York 10504 and such service of process shall be valid and binding.

This policy is non-cancellable for any reason. The premium on this policy is not refundable for any reason including the payment prior to maturity of the Obligations.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed in facsimile on its behalf by its duly authorized officers, this         day of

COUNTERSIGNED:                                    **MBIA Insurance Corporation**

_____                  _____
Resident Licensed Agent                           President

_____          Attest:  _____
City, State                                       Assistant Secretary

SPECIMEN

STD-RCS-6
4/95

[This page intentionally left blank]

APPENDIX VIII


**FINANCIAL SECURITY ASSURANCE**<sub>SM</sub>

# MUNICIPAL BOND INSURANCE POLICY

ISSUER:

BONDS:

Policy No.:

Effective Date:

Premium:

FINANCIAL SECURITY ASSURANCE INC. ("Financial Security"), for consideration received, hereby UNCONDITIONALLY AND IRREVOCABLY agrees to pay to the trustee (the "Trustee") or paying agent (the "Paying Agent") (as set forth in the documentation providing for the issuance of and securing the Bonds) for the Bonds, for the benefit of the Owners or, at the election of Financial Security, directly to each Owner, subject only to the terms of this Policy (which includes each endorsement hereto), that portion of the principal of and interest on the Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

On the later of the day on which such principal and interest becomes Due for Payment or the Business Day next following the Business Day on which Financial Security shall have received Notice of Nonpayment, Financial Security will disburse to or for the benefit of each Owner of a Bond the face amount of principal of and interest on the Bond that is then Due for Payment but is then unpaid by reason of Nonpayment by the Issuer, but only upon receipt by Financial Security, in a form reasonably satisfactory to it, of (a) evidence of the Owner's right to receive payment of the principal or interest then Due for Payment and (b) evidence, including any appropriate instruments of assignment, that all of the Owner's rights with respect to payment of such principal or interest that is Due for Payment shall thereupon vest in Financial Security. A Notice of Nonpayment will be deemed received on a given Business Day if it is received prior to 1:00 p.m. (New York time) on such Business Day; otherwise, it will be deemed received on the next Business Day. If any Notice of Nonpayment received by Financial Security is incomplete, it shall be deemed not to have been received by Financial Security for purposes of the preceding sentence and Financial Security shall promptly so advise the Trustee, Paying Agent or Owner, as appropriate, who may submit an amended Notice of Nonpayment. Upon disbursement in respect of a Bond, Financial Security shall become the owner of the Bond, any appurtenant coupon to the Bond or right to receipt of payment of principal of or interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by Financial Security hereunder. Payment by Financial Security to the Trustee or Paying Agent for the benefit of the Owners shall, to the extent thereof, discharge the obligation of Financial Security under this Policy.

Except to the extent expressly modified by an endorsement hereto, the following terms shall have the meanings specified for all purposes of this Policy. "Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York or the Insurer's Fiscal Agent are authorized or required by law or executive order to remain closed. "Due for Payment" means (a) when referring to the principal of a Bond, payable on the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity unless Financial Security shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration and (b) when referring to interest on a Bond, payable on the stated date for payment of interest.

"Nonpayment" means, in respect of a Bond, the failure of the Issuer to have provided sufficient funds to the Trustee or, if there is no Trustee, to the Paying Agent for payment in full of all principal and interest that is Due for Payment on such Bond. "Nonpayment" shall also include, in respect of a Bond, any payment of principal or interest that is Due for Payment made to an Owner by or on behalf of the Issuer which has been recovered from such Owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction. "Notice" means telephonic or telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from an Owner, the Trustee or the Paying Agent to Financial Security which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment. "Owner" means, in respect of a Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof, except that "Owner" shall not include the Issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Bonds.

Financial Security may appoint a fiscal agent (the "Insurer's Fiscal Agent") for purposes of this Policy by giving written notice to the Trustee and the Paying Agent specifying the name and notice address of the Insurer's Fiscal Agent. From and after the date of receipt of such notice by the Trustee and the Paying Agent, (a) copies of all notices required to be delivered to Financial Security pursuant to this Policy shall be simultaneously delivered to the Insurer's Fiscal Agent and to Financial Security and shall not be deemed received until received by both and (b) all payments required to be made by Financial Security under this Policy may be made directly by Financial Security or by the Insurer's Fiscal Agent on behalf of Financial Security. The Insurer's Fiscal Agent is the agent of Financial Security only and the Insurer's Fiscal Agent shall in no event be liable to any Owner for any act of the Insurer's Fiscal Agent or any failure of Financial Security to deposit or cause to be deposited sufficient funds to make payments due under this Policy.

To the fullest extent permitted by applicable law, Financial Security agrees not to assert, and hereby waives, only for the benefit of each Owner, all rights (whether by counterclaim, setoff or otherwise) and defenses (including, without limitation, the defense of fraud), whether acquired by subrogation, assignment or otherwise, to the extent that such rights and defenses may be available to Financial Security to avoid payment of its obligations under this Policy in accordance with the express provisions of this Policy.

This Policy sets forth in full the undertaking of Financial Security, and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto. Except to the extent expressly modified by an endorsement hereto, (a) any premium paid in respect of this Policy is nonrefundable for any reason whatsoever, including payment, or provision being made for payment, of the Bonds prior to maturity and (b) this Policy may not be cancelled or revoked. THIS POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

In witness whereof, FINANCIAL SECURITY ASSURANCE INC. has caused this Policy to be executed on its behalf by its Authorized Officer.

FINANCIAL SECURITY ASSURANCE INC.

By____________________________
Authorized Officer

A subsidiary of Financial Security Assurance Holdings Ltd.
350 Park Avenue, New York, N.Y. 10022-6022

(212) 826-0100

SPECIMEN

[This page intentionally left blank]

[This page intentionally left blank]

[This page intentionally left blank]