**Hearing Date: June 4, 2020 9:30 AM AST**

# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**AMBAC ASSURANCE CORPORATION, FINANCIAL GUARANTY INSURANCE COMPANY, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND THE BANK OF NEW YORK MELLON'S RESPONSE TO THE OVERSIGHT BOARD'S SUR-REPLY IN FURTHER SUPPORT OF  THEIR MOTION CONCERNING APPLICATION OF THE AUTOMATIC STAY TO THE REVENUES SECURING THE CCDA BONDS**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

**PAGE**

**PRELIMINARY STATEMENT** ........................................................................................... 1

**ARGUMENT** .................................................................................................................. 2

I. The Oversight Board Fails to Establish That the Proposed CCDA Action
Would Implicate Property of a Debtor .................................................................. 3

II. None of the Oversight Board's New Factual Assertions Are Inconsistent
With the Scotiabank -5142 Account Being the Transfer Account ........................ 6

    A. The Oversight Board Offers Nothing But Bald Assertions to Support
Its Claim That the "Room Tax Concentration Surplus" Account Was
Not the "Surplus Account," But the "Transfer Account." ......................... 6

        1. The Admissible Evidence Establishes That the GDB-9758
Account Is the Surplus Account, Not the Transfer Account. ......... 6

        2. The Oversight Board's Attempt to Redefine the Surplus
Account As the Transfer Account Does Not Withstand
Scrutiny. ....................................................................................... 7

    B. The Oversight Board Does Not Come Close to Showing That
Movants' Contentions Regarding the Transfer Account Are Not
"Colorable." .............................................................................................. 9

III. None of the Oversight Board's Legal Arguments Regarding Movants'
Secured Status Withstand Scrutiny ...................................................................... 12

    A. The Pledge Agreement Creates a Security Interest Enforceable
Against Any Pledged Hotel Taxes Held by the Tourism Company. ........ 12

    B. Movants' Equitable Ownership Over the Pledged Hotel Taxes
Derives From the Specific Language of the Hotel Occupancy Tax
Act. .......................................................................................................... 13

IV. The Oversight Board's Preemption Arguments Are Irrelevant to the Issues of
Secured Status and Standing ................................................................................ 15

**CONCLUSION** ............................................................................................................. 15

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Assured Guar. Corp. v. Garcia-Padilla*,
  214 F. Supp. 3d 117 (D.P.R. 2016)........................................................................4

*Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &
  Mgmt. Bd. for P.R.)*,
  939 F.3d 340 (1st Cir. 2019) ..................................................................2, 14 n.7

*Maine Cmty. Health Options v. United States*,
  140 S. Ct. 1308 (2020)..........................................................................................15

*Mendez-Nunez v. Fin. Oversight & Mgmt. Bd. For P.R.. (In re Fin. Oversight &
  Mgmt. Bd. For P.R.)*,
  916 F.3d 98 (1st Cir. 2019) ...................................................................................15

*Nat'l Wildlife Fed'n v. I.C.C.*,
  850 F.2d 694 (D.C. Cir. 1988) ...............................................................................5

*Puget Sound Power & Light Co. v. City of Seattle*,
  271 F. 958 (W.D. Wash. 1921)..............................................................................7

*Smith v. Boise City*,
  18 F. Supp. 385 (D. Idaho 1937) ..........................................................................7

*Stryker Corp. v. Ridgeway*,
  2016 WL 6585007 (W.D. Mich. Feb. 1, 2016).....................................................9

*Union Pump Co. v. Centrifugal Tech. Inc.*,
  404 F. App'x 899 (5th Cir. 2010) .........................................................................9

*United States v. Doe*,
  438 F. Supp. 2d 796 (S.D. Ohio 2006) ...............................................................11

**Statutes**

13 L.P.R.A. § 2271*o* ........................................................................................................5

13 L.P.R.A. § 2271v ............................................................................................... *passim*

Management and Budget Office Organic Act, Act No. 147-1980 (June 1980) ............4

**Other Authorities**

4 *Local Government Law*, § 25:9................................................................................7

5 *McQuillin Mun. Corp.* § 43:132 (3d ed.) ...............................................................7

Movants[2] respectfully submit this response to the sur-reply filed by the Oversight Board (the "Board") (ECF No. 13160) (the "Sur-Reply").  In support, Movants state as follows:

## PRELIMINARY STATEMENT

1.      The fact that the Oversight Board felt compelled to submit a 30-page Sur-Reply describing factual disputes over which accounts in the CCDA flow of funds are the Transfer Account and Surplus Account only confirms that Movants have already gone far beyond their limited burden of showing a "colorable" claim.  Indeed, the Oversight Board does not once argue in its Sur-Reply that Movants' legal and factual arguments are not "colorable" (nor even that they show no likelihood of success).  The Oversight Board's silence on these issues speaks volumes.

2.      Critically, the Oversight Board does not dispute that Movants do not need to prove "secured status" to prevail, because the CCDA Enforcement Action does not name the Commonwealth or any Title III debtor.  The Oversight Board also does not show that any property right of the Commonwealth would be implicated in the CCDA Enforcement Action.  Thus, the automatic stay either does not apply at all, or relief is clear under § 362(d)(2).

3.      The Oversight Board offers no meaningful response to the facts that (i) the Tourism Company, not the Commonwealth, has legal title to the Pledged Hotel Taxes before they are transferred to the CCDA bondholders, who have equitable ownership; (ii) whatever rights the Commonwealth has to future Pledged Hotel Taxes under Article VI, Section 8 would remain unimpaired by the CCDA Enforcement Action; (iii) Movants have not just "colorable" claims, but compelling and persuasive factual evidence that the Pledged Hotel Taxes are being deposited to this day into the Transfer Account (which even the Oversight Board concedes is subject to

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the CCDA Stay Motion (ECF No. 10104) (the "Mot.") and the Reply (ECF No. 12997) (the "Reply").  All references to Exhibits in this Reply are attached to the *Supplemental Declaration of John J. Hughes, III* (the "Supp. Hughes Decl."), as described therein. Arguments in the Motion and Reply are incorporated herein and not waived.

Movants' lien); and (iv) Movants have compelling and persuasive arguments that the Pledged Hotel Taxes are subject to Movants' lien, as a matter of law, or equitably owned by them, whether or not the Pledged Hotel Taxes have actually been deposited in the Transfer Account.

4.      In response, the Oversight Board mischaracterizes Movants' arguments and the discovery record, and makes factual claims without evidentiary support.  For instance, the Oversight Board argues that the Scotiabank -5142 account cannot be the Transfer Account because it was opened in 2011, after the CCDA bonds were issued.  Even if that assertion had sufficient evidentiary support (it does not), the Oversight Board does not dispute that there is no evidence as to when the GDB -9758 account (which the Oversight Board says is the Transfer Account) was opened.  So far as the factual record shows, the GDB -9758 account could have been opened in 2011 or even later.  Thus, this—and many other factual assertions the Oversight Board throws against the wall—amount to nothing more than speculation about what *might* have happened.

5.      In this procedural posture, the Court is not to decide the merits on an incomplete and strictly limited discovery record.  The mere fact that the briefing has progressed to the point where the Oversight Board is arguing about the significance of hypothetical facts (into which Movants have had no discovery, and on which the Oversight Board has put forward no evidence) confirms beyond all doubt that Movants have carried their burden of showing colorable (indeed, persuasive) claims.  This Court thus should lift the stay and afford the parties an opportunity to litigate these issues—on the basis of a complete factual record in the appropriate forum.

## **ARGUMENT**

6.      The Sur-Reply misapplies the standard of review—asserting that Movants have not shown "a material dispute" (Sur-Reply ¶ 33 n.8), as if this were a motion for summary judgment after discovery rather than a preliminary hearing on a lift-stay motion.  To be clear, the question here is "'whether the party seeking relief has a colorable claim to [the] property.'"  *Gracia-Gracia*

*v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 939 F.3d 340,

352 (1st Cir. 2019) (quoting *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 33 (1st Cir. 1994)).

## I.   THE OVERSIGHT BOARD FAILS TO ESTABLISH THAT THE PROPOSED CCDA ACTION WOULD IMPLICATE PROPERTY OF A DEBTOR.

7.    As Movants have shown (Reply ¶¶ 3, 29-39), the CCDA Enforcement Action will

have no effect on property of the Commonwealth.  The Oversight Board's argument to the contrary

conflates two distinct concepts:  (i) whether Art. VI, § 8 was triggered in this fiscal or any *prior*

fiscal year (a knowable historical fact), and (ii) what contingent or reversionary interest the

Commonwealth may have under Art. VI, § 8 in *future* fiscal years.  (Sur-Reply ¶ 15.)

8.    ***Current and Past Years.***  The CCDA Enforcement Action merely seeks to enforce

Movants' present possessory right to the Pledged Hotel Taxes in this fiscal year and the prior four

fiscal years, in which payments have not been made to CCDA bondholders.  For this and the prior

fiscal years, the requirements of Article VI, Section 8 have not been satisfied as a matter of

historical fact.  Thus the Commonwealth has no rights in the Pledged Hotel Taxes for those years.

9.    The financial distress and declaration of fiscal emergency the Oversight Board cites

(Sur-Reply ¶ 17) is insufficient to vest a right in the Pledged Hotel Taxes in the Commonwealth.

As Movants have shown (Reply ¶¶ 3, 32-33, 40-42), the Pledged Hotel Taxes have "last dollars"

protection.  To prevail, the Oversight Board must show that there was not a dollar of other

Commonwealth resources that could be used to satisfy payment of the public debt due in *every*

fiscal year at issue, and it could not.  (The Oversight Board does not dispute that in any given year

in which the clawback conditions are not met, Movants are entitled to enforce the required

payments for that year *and* any arrears for earlier years, up to the full amount of Hotel Taxes

collected in that year.  (Mot. ¶ 35; Reply ¶¶ 41-42, 92.))  The Oversight Board does not, and cannot,

make this factual showing.   Accordingly, the Oversight Board has failed to demonstrate any Commonwealth interest in Pledged Hotel Taxes that have already been diverted.

10.     The Oversight Board suggests that the statutory "last dollars" protection adopted by the Commonwealth legislature is inconsistent with the constitution.  (Sur-Reply ¶ 18.)  Just the opposite.  The last dollars protection is a statutory reinforcement of Article VI, Section 8, which explicitly requires that, after the general obligation bonds are paid, "other disbursements shall thereafter be made in accordance with the order of priorities established by law."   The statute affording "last dollars" protection to CCDA bondholders was a constitutional exercise of the legislature's authority to establish an order of priorities.   13 L.P.R.A. § 2271v(a)(4); *see also* Management and Budget Office Organic Act, Act No. 147-1980 (June 1980); *Assured Guar. Corp. v. Garcia-Padilla*, 214 F. Supp. 3d 117, 120 (D.P.R. 2016).  Because the Commonwealth had sufficient available resources to pay the GO bonds in full for each year at issue (along with many other expenses), the conditions precedent for the Commonwealth's interest (if any) in the Pledged Hotel Taxes have not been trigged in this fiscal year or the prior four fiscal years.

11.     The Oversight Board argues that Article VI, Section 8 permitted the Commonwealth to stop paying the CCDA bonds because (i) certain Emergency Orders invoked Art. VI, § 8, and (ii) GO bondholders are not being paid in full under the plan.  But (i) mere *ipse dixit* in the Emergency Orders does not establish that the constitutional requirements are met, when the facts show otherwise, and (ii) no provision of Art. VI, § 8 gives the Commonwealth any rights on account of plans of adjustment under PROMESA or a consensual restructuring with a subset of GO bondholders.  Article VI, Section 8 applies *only* if "available resources" are insufficient.  That certain general obligation bondholders appear to have voluntarily agreed to receive less than the full face value of their debt as part of a litigation settlement, does not trigger Article VI, Section 8

4

(particularly where the settlement, if confirmed, would replace the existing general obligation bonds and thereby reduce the public debt relevant to the Art. VI, § 8 analysis in future fiscal years).

12.     The Oversight Board also asserts that Article VI, Section 8 evidences that the Commonwealth did not transfer legal title of the Hotel Taxes to the Tourism Company.  (Sur-Reply ¶ 11.)  That argument reflects a misunderstanding of property law.  As the Oversight Board has recognized elsewhere (Opp. ¶¶ 12, 55, 60-62, 67; Sur-Reply ¶¶ 17-18), a transfer of ownership, subject to a right of reversion, is a valid transfer that merely preserves a "reversionary interest" for the transferor.  *See, e.g.*, *Nat'l Wildlife Fed'n v. I.C.C.*, 850 F.2d 694, 703 (D.C. Cir. 1988) (mere reversionary interest does not stop property rights from vesting in transferee).  The Tourism Company has legal interest to the Hotel Taxes, subject to the Commonwealth's reversionary interest, meaning that if and when the conditions of Art. VI, § 8, and the Hotel Occupancy Tax Act are met in a given fiscal year, *then* the Pledged Hotel Taxes for that fiscal year can be applied to payment of GO debt.  Indeed, the Bond Documents specifically contemplate that, if Article VI, Section 8 is triggered, monies in the Pledge Account (to which Movant' lien has already concededly attached) are to be applied to the payment of public debt.  (Pledge Agreement § 3(b)(1).)

13.     The Oversight Board's suggestion that the Commonwealth's transfer of taxing authority to the Tourism Company was only implicit (Sur-Reply ¶¶ 12-13) is also wrong.  The Hotel Occupancy Tax Act expressly authorizes the Tourism Company to "levy, charge, and collect" Hotel Taxes, granting the Tourism Company legal title to them.  13 L.P.R.A. § 2271*o*. The Oversight Board does not dispute that Hotel Taxes are collected into bank accounts that the Tourism Company alone owns and controls.  (Reply ¶¶ 22-24.)  Moreover, it was the Tourism Company that was required to consent to any pledge of the Hotel Taxes, not the Commonwealth.

5

13 L.P.R.A. § 2271v(a).  The Tourism Company indisputably has legal title to the Hotel Taxes, and does not merely act as the Commonwealth's agent in collection and enforcement.

14.     *Future Years.*  The Oversight Board has no answer to Movants' argument that whatever contingent or reversionary interest the Commonwealth may have in *future* fiscal years will remain intact and unimpaired by the CCDA Enforcement Action.  The CCDA Enforcement Action does not name the Commonwealth as a party.  Even if the Movants prevail in the CCDA Enforcement Action, whatever rights the Commonwealth has under Art. VI, § 8 would remain undisturbed.  The Commonwealth can assert its interest in future fiscal years as appropriate.

## II.     NONE OF THE OVERSIGHT BOARD'S NEW FACTUAL ASSERTIONS ARE INCONSISTENT WITH THE SCOTIABANK -5142 ACCOUNT BEING THE TRANSFER ACCOUNT.

### A.     The Oversight Board Offers Nothing But Bald Assertions to Support Its Claim That the "Room Tax Concentration Surplus" Account Was Not the "Surplus Account," But the "Transfer Account."

#### 1.     The Admissible Evidence Establishes That the GDB-9758 Account Is the Surplus Account, Not the Transfer Account.

15.     The Oversight Board's claim that the GDB -9758 account ("Room Tax – Concentration Surplus") is the Transfer Account, not the Surplus Account, is refuted by three facts:

16.     *One,* this account was regularly referred to in official documents as the "Concentration Surplus" account.  The Oversight Board disclaims the significance of the account title, but offers no cogent explanation why the account was called the "Room Tax Concentration Surplus Account" if it was not the Surplus Account but the Transfer Account.

17.     *Two,* the Assignment Agreement creates the Holding Fund, a special fund for the Tourism Company, consisting of two accounts, the Transfer Account and the Surplus Account.  Under Movants' interpretation, there are (consistent with the Assignment Agreement) two Tourism Company-held accounts (Scotiabank -5142 and GDB -9758) that hold the Hotel Taxes.

6

The Oversight Board invents a *third* account (for "collections"), referenced nowhere in the Assignment Agreement (or any of the other Bond Documents). If there was in fact a third Tourism Company collection account in the flow of funds, one would expect it to have been mentioned in the Assignment Agreement.

18.    *Three*, under the Oversight Board's reading, only one of the Holding Fund accounts held solely Hotel Taxes; what the Oversight Board says is the Surplus Account in the Holding Fund (Scotiabank -5144) is an account containing a hodgepodge of commingled Tourism Company receipts that have nothing to do with Hotel Taxes. The Oversight Board does not explain why the Tourism Company would deposit unrelated funds in the Holding Fund, "a special fund" pursuant to the Assignment Agreement. (*See* Assignment Agreement § 1). Such designation means that any monies held in the Holding Fund would be subject to restrictions that would not apply to an ordinary bank account—for example, an obligation to account for the use of funds. 5 *McQuillin Mun. Corp.* § 43:132 (3d ed.); 4 *Local Government Law*, § 25:9 ("[A] special fund permits the least discretion to local legislative or executive authorities in reallocating or redistributing public monies."); *Smith v. Boise City*, 18 F. Supp. 385, 388 (D. Idaho 1937); *Puget Sound Power & Light Co. v. City of Seattle*, 271 F. 958, 963-64 (W.D. Wash. 1921). It makes no sense that the Tourism Company would needlessly subject unrelated revenues to the accounting requirements and restrictions of a special fund.

### 2.    The Oversight Board's Attempt to Redefine the Surplus Account As the Transfer Account Does Not Withstand Scrutiny.

19.    In an attempt to justify its designation of the GDB -9758 account as the Transfer Account, the Oversight Board offers three arguments, none of which withstand scrutiny.

20.    *First*, the Oversight Board surmises that the Tourism Company must have had a separate "collection" point for the Hotel Taxes—because, in the Oversight Board's view, the

Holding Fund was merely used to hold the Hotel Taxes "*after* being collected." (Sur-Reply ¶ 31 (emphasis added).) The Bond Documents refute this assertion. There is no mention of a separate "collection" account, and the Assignment Agreement says the opposite of what the Oversight Board claims. The Assignment Agreement mandates that the Hotel Taxes be "deposited *as* collected" into the Holding Fund, not deposited "*after* being collected," as the Oversight Board speculates. The Oversight Board's argument invents a third account without any factual basis or support, and in contradiction to the Assignment Agreement which refers to two bank accounts.

21.     *Second*, the Oversight Board speculates that the word "Concentration" in the account title ("Room Tax – Concentration Surplus") might be consistent with the account being the Transfer Account because the Transfer Account is (according to the Oversight Board) "the bank account where funds were concentrated before being transferred." (Sur-Reply ¶ 34.) This too is pure conjecture, and ignores that the title of the account was "Concentration *Surplus*," not just "Concentration."

22.     *Third*, the Oversight Board falls back on the self-serving *ipse dixit* of the Commonwealth's Rule 30(b)(6) witness, who testified, in inadmissible hearsay, that he had been told the GDB -9758 account was the Transfer Account. The Oversight Board argues a corporate representative can testify "based on knowledge gained from a review of *books and records*" (Sur-Reply ¶ 33 n.8 (emphasis added)), but Mr. Ahlberg testified explicitly that his testimony was *not* based on a review of books and records, and instead on what he was told by someone else. He did not know the basis for the assertion.[3]  A corporate representative's testimony based only on what

---

[3] *See* Reply Ex. 44, Ahlberg Tr. 489:15-17 ("Q. Okay. And what is the basis for that testimony? A. Conversations with Tourism."); *id.* at 546:6-547:5 ("So there is nothing specific about the nature of the moneys that flowed into [the GDB -9758 account], how the account was used or any documents that makes you confident that it's the transfer account. It's based exclusively on conversations that you had with Gustavo?  THE WITNESS: Me, personally, it's based on my conversations with Gustavo, but I can't say that Gustavo didn't consider various factors when determining that.").

an individual told him is inadmissible hearsay.  *See Union Pump Co. v. Centrifugal Tech. Inc.*, 404 F. App'x 899, 907–08 (5th Cir. 2010); *Stryker Corp. v. Ridgeway*, 2016 WL 6585007, at *2 (W.D. Mich. Feb. 1, 2016).

23.     In any event, even assuming *arguendo* that the GDB -9758 account was the Transfer Account while it existed, that does not mean that the Hotel Taxes are not being deposited into a successor Transfer Account.  The GDB -9758 account was closed in 2016.  The Oversight Board's own "flow of funds" chart shows that the position previously occupied by the GDB -9758 account was taken over by a Banco Popular account ending in -2306 (referred to as "BPPR -2306").  Given that the Tourism Company has not explicitly labeled in the account registration which accounts it considers part of the Holding Fund, the Court can infer from the Tourism Company's historical practice that whichever accounts the Hotel Taxes are deposited into are part of the Holding Fund.  Given the Oversight Board's view that the Scotiabank -5144 account is the Surplus Account, it would follow that the BPPR account is the successor Transfer Account to the closed GDB -9758 account.  Thus, even under the Oversight Board's distorted factual arguments, Movants' lien is still attaching to the Pledged Hotel Taxes.

**B.     The Oversight Board Does Not Come Close to Showing That Movants' Contentions Regarding the Transfer Account Are Not "Colorable."**

24.     The Oversight Board fails to refute Movants' showing that the Scotiabank -5142 account is the Transfer Account.

25.     *First*, the Oversight Board asserts for the first time in the Sur-Reply that the Scotiabank -5142 account cannot be the Transfer Account because it was opened in June 2011, while the CCDA bonds were issued in 2006.  The factual record does not support the Oversight Board's assertions.  There is no clear evidence of when the Scotiabank -5142 account was opened, and the Oversight Board does not dispute that there is *no* evidence of when the GDB -9758 account

9

(which it says is the Transfer Account) was opened.  (Sur-Reply ¶ 30.)[4]  Moreover, the Oversight Board does not dispute that the Scotiabank -5144 account (which it says was the Surplus Account) was *also* not opened when the CCDA bonds were issued in 2006.  (Sur-Reply ¶ 36 n.9.)  Hence, the Oversight Board's theory suffers from the same deficiency of which it accuses Movants.[5]

26.     In a futile effort to overcome its contradictory theory, the Oversight Board argues that, while the Trust Agreement says the "Transfer Account [was] established pursuant to the Assignment Agreement," it does not say that of the Surplus Account.  (*Id.*)  But the Trust Agreement does not define the term "Surplus Account" because it is not used therein.  *Both* accounts were "established pursuant to" the same sections of the Assignment Agreement (§§ 1, 2). There is no basis for suggesting that one but not the other had to be opened in 2006.  The only rational conclusion is that there were "predecessor Tourism Company account[s]" that were later replaced.  (Sur-Reply ¶ 31.)  Indeed, the Tourism Company has switched banks to maximize the interest earned on deposits.  (Ex. 52; Supp. Hughes Decl., CCDA_STAY000001 (account "used to deposit Debt Service Payments . . . was transferred to another financial institution which provided better interest").)

---

[4] The Oversight Board's unsubstantiated speculation about the GDB -9758 account, and its belated attempts to put at issue when the Scotiabank -5142 account was opened, should be rejected.  Movants were not afforded discovery into these factual assertions (ECF. No. 11057), and the "limited discovery" covered only 2015 to present.  (ECF No. 12080; Mar. 4, 2020 Hearing at 241:10-21; 245:6-11.)

The  only "evidence" offered about when Scotiabank -5142 was opened is a bank account application that does not list the Scotiabank -5142 account number or its name from bank account statements.  (*See* Exhibit F to Kass Decl., ECF No. 13162-1.)  Documents show that the Scotiabank -5142 account was referred to in different documents using different titles.  (*See* Resolution 13-087 (CCDA_STAY0006920) dated March 4, 2013 (referring to the account as the "Room Tax Target Balance Account").)  It is thus impossible to know which of the many Tourism Company accounts were at issue in Exhibit F to the Kass Declaration.

For the same reason, the Oversight Board's argument that there is "no indication" that the Tourism Company ever changed the account into which the Hotel Taxes were collected (Sur-Reply ¶ 31) is meritless.  The Court has not authorized discovery into that, so there is no evidence on the point one way or the other.

[5] Contrary to the Oversight Board's claims, Movants did not previously argue (i)  the Transfer Account cannot lawfully hold "a penny of surplus" (Sur-Reply ¶ 35), and (ii)  "Scotiabank 5144 cannot be the Surplus Account because it was not created at the time of the Bond Documents."  (Sur-Reply ¶ 36 n.9.)  The Oversight Board simply assumed Movants had argued the latter point—presumably cognizant of the fatal inconsistencies in its theories.

27.     *Second*, the Oversight Board argues that the Scotiabank -5142 account cannot be the Transfer Account because (at least in 2015 and early 2016) Pledged Hotel Taxes moved from Scotiabank -5142 to the GDB -9758 account before going to the Pledge Account—not directly from Scotiabank -5142 to the Pledge Account.  (Sur-Reply ¶ 28.)  But nothing in the Bond Documents precludes this arrangement.  The Assignment Agreement requires that the Tourism Company simultaneously collect and deposit the Hotel Taxes into the Holding Fund (which consists of the Transfer Account and the Surplus Account), and transfer them to the Pledge Account.  (Assignment Agreement §§ 4, 7.)  The Bond Documents do not state that the Pledged Hotel Taxes cannot also move through the Surplus Account on their way to the Pledge Account.

28.     The Board's claim to the contrary rests on its mistaken belief that, under Movants' reading, Movants' lien would attach in the Scotiabank -5142 account, detach in the GDB -9758 account, only to reattach in the Pledge Account.  (Sur-Reply ¶ 29.)  This is not how liens work.  When the Pledged Hotel Taxes are in the Transfer Account, they become subject to Movants' lien (even under the Oversight Board's theory).  When moved to the Surplus Account, they remain subject to the lien.  *See United States v. Doe*, 438 F. Supp. 2d 796, 803 (S.D. Ohio 2006) ("The transfer of property subsequent to the attachment of the lien does not affect the lien[.]").  The lien is on the Pledged Hotel Taxes, not the Transfer Account itself.  (Pledge Agreement § 2(b)(i).)

29.     *Third*, the Oversight Board's suggestion that Scotiabank-5142 cannot be the Transfer Account because the Tourism Company did not make deposits directly into it (Sur-Reply ¶ 32 n.7) is baseless.  The Bond Documents do not require the Tourism Company to itself make deposits into the Holding Fund, as opposed to simply directing or causing the payments to be made into that account.  Even if that were required, moreover, there is no evidence that the Tourism Company did not make the deposits to the Scotiabank -5142 account (which it could do by utilizing

lockbox or cash management services, pursuant to which Scotiabank deposits the funds on the Tourism Company's behalf, as its agent).  Indeed, the Oversight Board itself argued in the revenue bond adversary proceedings that there is no dispute that "[f]rom at least January 2015 to the present, ***the Tourism Company*** first deposits collected Occupancy Taxes in a Tourism Company account (Scotiabank account ending in 5142) before transferring those funds elsewhere."[6]

30.     *Finally*, the Oversight Board's speculation that changing the account into which monies were transferred by hoteliers would have involved insurmountable administrative burdens (Sur-Reply ¶ 31) is also baseless.  There is no evidence that changing the account would have been difficult at all.  According to the Oversight Board itself, this was done in 2011.

## III.   NONE OF THE OVERSIGHT BOARD'S LEGAL ARGUMENTS REGARDING MOVANTS' SECURED STATUS WITHSTAND SCRUTINY.

### A.   The Pledge Agreement Creates a Security Interest Enforceable Against Any Pledged Hotel Taxes Held by the Tourism Company.

31.     The Oversight Board concedes that GDB granted a lien on the Pledged Hotel Taxes (whether deposited into the Pledge Account or not), but argues that this lien does not reach the "Retained Occupancy Taxes" held by the Tourism Company, because "the question is whether Movants have a security interest in amounts required to be deposited in the Transfer Account, not the Pledge Account."  (Sur-Reply ¶ 41.)  The Oversight Board ignores that the Pledged Hotel Taxes must be deposited into *both* accounts.  While the Assignment Agreement requires that the Pledged Hotel Taxes be deposited "as collected" into the Holding Fund (and specifically, the Transfer Account), the Pledge Agreement independently requires that the Pledged Hotel Taxes be

---

[6] *See The Commonwealth of Puerto Rico's Statement of Undisputed Material Facts in Support of Motion Pursuant to Bankruptcy Rules 7056 for Partial Summary Judgment Disallowing Claims* (Case No. 20-00004, ECF No. 42) ¶ 45 (emphasis added).  The Oversight Board's contention that Hotel Taxes deposited into the Tourism Company's account at Scotiabank become "property" of Scotiabank is mere misdirection.  The case the Oversight Board cites makes clear that the Tourism Company, as depositor, owns the right to withdraw the amounts deposited.  (Sur-Reply ¶ 32 (citing *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548, 560 (2d Cir. 1976)).)

deposited into the Pledge Account. Thus, the "Retained Occupancy Taxes" are "required to be deposited in the Pledge Account pursuant to the provisions of th[e] Pledge Agreement," and fall squarely within the security interest granted under Pledge Agreement § 2(b)(ii).

32. The Oversight Board's fallback argument—that the Tourism Company is not "a party" to the Pledge Agreement (Sur-Reply ¶ 45)—is equally meritless. The Tourism Company's board resolution consenting to the Pledge Agreement binds the Tourism Company, making it a party to the Pledge Agreement. There is no requirement that the Tourism Company sign the Pledge Agreement; a board resolution consenting to it is more than sufficient. (Reply ¶¶ 65-69.) The Tourism Company also expressly consented to the pledge made to bondholders in the Pledge Agreement, thereby accepting an impairment of its own property rights. (*See* Reply Ex. 49, Tourism Company Board of Directors Resolution 06-47 §§ 2; Assignment Agreement § 7 (consenting specifically to the pledge of Pledged Hotel Taxes to CCDA bondholders).)

33. Even setting aside the Tourism Company's express consent to the Pledge Agreement, the Oversight Board has no answer to the fact that the Commonwealth agreed in the Hotel Occupancy Tax Act to comply with all agreements made in favor of the CCDA bondholders (including the Pledge Agreement). 13 L.P.R.A. § 2271v. Because the Tourism Company's rights to the Hotel Taxes arise from the delegation by the Commonwealth provided in the Act, the Tourism Company's own interest in the Hotel Taxes is necessarily subject to the other provisions of the Act—which obligates the Tourism Company to the terms of the Pledge Agreement granting Movants a lien on the "Retained Occupancy Taxes."

**B.    Movants' Equitable Ownership Over the Pledged Hotel Taxes Derives From the Specific Language of the Hotel Occupancy Tax Act.**

34. The Oversight Board fails to refute Movants' showing that bondholders equitably own the Pledged Hotel Taxes, arguing only that, under Movants' theory, "every potential

beneficiary" could assert equitable ownership. (Sur-Reply ¶ 50.) This ignores that bondholders' ownership derives from the portion of the Act requiring the Pledged Hotel Taxes to be held "for the benefit of the **bondholders**." 13 L.P.R.A. § 2271v(a)(4) (emphasis added). The statute does not similarly confer equitable ownership on any other party.

35. The Oversight Board argues that the Tourism Company is "a decision-maker" with respect to the Hotel Taxes, not a mere conduit, because it has discretion on whether to pledge them. (Sur-Reply ¶ 51.) But while the Tourism Company has discretion over *whether* to pledge the Hotel Taxes in the first place, once it chooses to do so, it alienates its rights and becomes a mere conduit.

36. The Oversight Board is also wrong to suggest that Movants obtain equitable ownership only *after* the Pledged Hotel Taxes are deposited into a specific account. (Sur-Reply ¶ 56 n.10.) The statute uses mandatory language to require that the Pledged Hotel Taxes be deposited into a special account for the benefit of bondholders. Because the required transfers are mandatory under the statute, failing to make the transfers is simply a violation of the statute that must be remedied; it does not excuse or avoid the equitable ownership rights granted thereunder.

37. Finally, the Oversight Board selectively quotes from official statements in an effort to support a tendentious reading of bondholders' rights. (Sur-Reply ¶ 58.) The statements are explicit that they are mere "summaries," not "complete statements" of the Bond Documents, which are controlling. (Reply Ex. 50, Official Statement at 38.) In any event, the official statements support Movants' reading, not the Oversight Board's. They state the CCDA bonds are backed by an enforceable pledge. Nowhere do they disclose that the pledge arises only if the Tourism Company deposits money in a particular account.[7] (*See* Reply Ex. 50, Official Statement.)

---

[7] The Oversight Board rehashes two other arguments without adding to them: (1) "Original ownership" is not required under *Gracia-Gracia* or *Flores Galarza*. (Mot. ¶ 76; Reply ¶ 73; Sur-Reply ¶ 53.) In both cases, and here, the key is that the claimant has an investment-backed entitlement. (2) The Oversight Board had no answer to Movants' point that the statute only allows the Hotel Taxes to be pledged to obligations incurred to *finance construction of the*

IV.    **THE OVERSIGHT BOARD'S PREEMPTION ARGUMENTS ARE IRRELEVANT
TO THE ISSUES OF SECURED STATUS AND STANDING.**

38.    The Oversight Board has reversed course on its preemption argument,
acknowledging now that PROMESA cannot "eliminate unsecured obligations or secured property
rights." (Sur-Reply ¶ 78.)  The Oversight Board's preemption argument is thus irrelevant to the
current proceeding, which the Court expressly limited to standing and secured status. (*Final Case
Management Order for Revenue Bonds*, ECF No. 12186 at 5.)

39.    To the extent that the Oversight Board suggests it can effectively deprive Movants
of their rights to the Pledged Hotel Taxes by not including them in the fiscal plan and budget
(which were adopted without giving Movants any notice or opportunity to be heard), PROMESA
would violate the Due Process Clause—and the fiscal plans and budgets would be invalid insofar
as they purport to affect Movants' rights.  *See, e.g., Mendez-Nunez v. Fin. Oversight & Mgmt. Bd.
For P.R.. (In re Fin. Oversight & Mgmt. Bd. For P.R.)*, 916 F.3d 98 (1st Cir. 2019).  Additionally,
Movants must have an opportunity to show that the fiscal plans and budgets do not comply with
PROMESA, and thus are invalid and cannot preempt Movants' rights.

40.    Even assuming *arguendo* that the Oversight Board is right that PROMESA can
constitutionally preempt "appropriations," that would not preclude Movants from seeking a
judgment confirming their rights to the Pledged Hotel Taxes obligated to bondholders.  The
absence of appropriations to disburse funds in satisfaction of a debt does not discharge the debt or
constitute a cognizable defense in a court proceeding seeking to enforce an obligation against the
government.  *See Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1319 (2020).

## CONCLUSION

41.    For the foregoing reasons, the Court should grant the Motion.

---

*Convention Center*, pursuant to the CCDA Enabling Act.  (Reply ¶¶ 71, 72.)  Thus, "brick-layers, architects, and
ushers" do not have a pledge or ownership rights.  (Sur-Reply ¶ 57.)

## <u>CERTIFICATION</u>

In accordance with paragraph 9 of the *Final Case Management Order for Revenue Bonds* (ECF No. 12186), Movants certify that (i) they have taken reasonable efforts to avoid duplication and submit a brief that is no longer than necessary, and (ii) they have used reasonable efforts to draft a single brief and coordinate to minimize duplicative briefs.


[*Remainder of Page Intentionally Omitted*]

Dated: May 26, 2020
San Juan, Puerto Rico

**FERRAIUOLI LLC**

By:     */s/ Roberto Cámara-Fuertes*
        Roberto Cámara-Fuertes (USDC-PR No. 219002)
        Sonia Colón (USDC-PR No. 213809)
        221 Ponce de León Avenue, 5th Floor
        San Juan, PR 00917
        Telephone: (787) 766-7000
        Facsimile: (787) 766-7001
        Email: rcamara@ferraiuoli.com
               scolon@ferraiuoli.com

**MILBANK LLP**

By:     */s/ Atara Miller*
        Dennis F. Dunne (admitted *pro hac vice*)
        Atara Miller (admitted *pro hac vice*)
        Grant R. Mainland (admitted *pro hac vice*)
        John J. Hughes, III (admitted *pro hac vice*)
        55 Hudson Yards
        New York, NY 10001
        Telephone: (212) 530-5000
        Facsimile:  (212) 530-5219
        Email: ddunne@milbank.com
               amiller@milbank.com
               gmainland@milbank.com
               jhughes2@milbank.com

**ARENT FOX LLP**

By:     */s/ David L. Dubrow*
        David L. Dubrow (admitted *pro hac vice*)
        Mark A. Angelov (admitted *pro hac vice*)
        1301 Avenue of the Americas
        New York, NY 10019
        Telephone: (212) 484-3900
        Facsimile:  (212) 484-3990
        Email: david.dubrow@arentfox.com
               mark.angelov@arentfox.com
        Randall A. Brater (admitted *pro hac vice*)
        1717 K Street, NW
        Washington, DC  20006
        Telephone: (202) 857-6000
        Facsimile: (202) 857-6395
        Email: randall.brater@arentfox.com

*Attorneys for Ambac Assurance Corporation*

**REXACH & PICÓ, CSP**

By: */s/ María E. Picó*
    María E. Picó
    (USDC-PR No. 123214)
    802 Ave. Fernández Juncos
    San Juan, PR 00907-4315
    Telephone: (787) 723-8520
    Facsimile: (787) 724-7844
    Email: mpico@rexachpico.com

**CASELLAS ALCOVER & BURGOS P.S.C.**

By: */s/ Heriberto Burgos Pérez*
    Heriberto Burgos Pérez
    (USDC-PR No. 204809)
    Ricardo F. Casellas-Sánchez
    (USDC-PR No. 203114)
    Diana Pérez-Seda
    (USDC-PR No. 232014)
    P.O. Box 364924
    San Juan, PR 00936-4924
    Telephone: (787) 756-1400
    Facsimile: (787) 756-1401
    Email: hburgos@cabprlaw.com
        rcasellas@cabprlaw.com
        dperez@cabprlaw.com

**BUTLER SNOW LLP**

By: */s/ Martin A. Sosland*
    Martin A. Sosland (admitted *pro hac vice*)
    5430 LBJ Freeway, Suite 1200
    Dallas, TX 75240
    Telephone: (469) 680-5502
    Facsimile: (469) 680-5501
    Email: martin.sosland@butlersnow.com
    Jason W. Callen (admitted *pro hac vice*)
    150 3rd Ave., S., Suite 1600
    Nashville, TN 37201
    Telephone: (615) 651-6774
    Facsimile: (615) 651-6701
    Email: jason.callen@butlersnow.com

***Attorneys for Financial Guaranty Insurance Company***

**CADWALADER, WICKERSHAM & TAFT LLP**

By: */s/ Howard R. Hawkins, Jr.*
    Howard R. Hawkins, Jr. (admitted *pro hac vice*)
    Mark C. Ellenberg (admitted *pro hac vice*)
    William J. Natbony (admitted *pro hac vice*)
    Ellen M. Halstead (admitted *pro hac vice*)
    Thomas J. Curtin (admitted *pro hac vice*)
    Casey J. Servais (admitted *pro hac vice*)
    200 Liberty Street
    New York, NY 10281
    Telephone: (212) 504-6000
    Facsimile: (212) 504-6666
    Email: howard.hawkins@cwt.com
        mark.ellenberg@cwt.com
        bill.natbony@cwt.com
        ellen.halstead@cwt.com
        thomas.curtin@cwt.com
        casey.servais@cwt.com

***Attorneys for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.***

**SEPULVADO, MALDONADO & COURET**

By: */s/ Albéniz Couret Fuentes*
Albéniz Couret Fuentes
(USDC-PR No. 222207)
304 Ponce de León Ave. Suite 990
San Juan, PR 00918
Telephone: (787) 765-5656
Facsimile: (787) 294-0073
Email: acouret@smclawpr.com

**REED SMITH LLP**

By: */s/ Eric A. Schaffer*
Eric A. Schaffer (admitted *pro hac vice*)
Luke A. Sizemore (admitted *pro hac vice)*
Jared S. Roach (admitted *pro hac vice*)
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
Telephone: (412) 288-3131
Facsimile: (412) 288-3063
Email: eschaffer@reedsmith.com
         lsizemore@reedsmith.com
         jroach@reedsmith.com

*Attorneys for The Bank of New York*
*Mellon, in its Capacity as Trustee*

[*Remainder of Page Intentionally Omitted*]

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this same date a true and exact copy of this notice was filed with

the Clerk of Court using the CM/ECF system, which will notify a copy to counsel of record.

<u>/s/ *Roberto Cámara-Fuertes*</u>
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email:  rcamara@ferraiuoli.com