**Hearing Date: June 4, 2020 9:30 AM AST**

## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | PROMESA Title III |
| as representative of | No. 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO, et al., | (Jointly Administered) |
| Debtors.[1] | |

**AMBAC ASSURANCE CORPORATION, FINANCIAL GUARANTY INSURANCE COMPANY, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND U.S. BANK TRUST NATIONAL ASSOCIATION'S RESPONSE TO THE OVERSIGHT BOARD'S SUR-REPLY IN SUPPORT OF THEIR AMENDED MOTION CONCERNING APPLICATION OF THE AUTOMATIC STAY TO THE <u>REVENUES SECURING PRIFA RUM TAX BONDS</u>**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "<u>Commonwealth</u>") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("<u>COFINA</u>") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("<u>HTA</u>") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("<u>ERS</u>") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("<u>PREPA</u>") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("<u>PBA</u>") (Bankruptcy Case No. 19 BK 5233-LTS) (Last Four Digits of Federal Tax ID: 3801).

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** ................................................................................... 1

**ARGUMENT** .......................................................................................................... 3

I.    The Sur-Reply Confirms That Movants Have Shown Their Security Interest
      Extends Past the Sinking Fund to the Infrastructure Fund. .................................. 3

II.   The Oversight Board Fails to Rebut That the Enabling Act Transferred to
      PRIFA Beneficial Ownership of the Pledged Rum Taxes. ................................... 5

III.  The Infrastructure Fund Comprises the First $117 Million of Rum Taxes the
      Commonwealth Receives Each Year. .................................................................. 7

      A.    The Enabling Act Created the Infrastructure Fund as a Fiscal and
            Accounting Entity Comprised of the First $117 Million of Rum Taxes
            the Commonwealth Receives. ................................................................. 8

      B.    Mr. Ahlberg's Testimony and Commonwealth Accounting Confirm
            Movants' Theory. ................................................................................. 10

      C.    There is No Requirement that PRIFA Hold or Control the Moneys in
            the Infrastructure Fund. ........................................................................ 14

IV.   The Oversight Board's Preemption Arguments Are Irrelevant. .......................... 15

**CONCLUSION** ...................................................................................................... 15

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Almendarez–Torres v. United States*,
  523 U.S. 224 (1998).................................................................................9

*Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio
  v. Flores Galarza*,
  484 F.3d 1 (1st Cir. 2007).........................................................................6

*Brown v. Maryland*,
  114 U.S. 598 (1885)...................................................................................4

*Ecker v. Sw. Tampa Storm Sewer Drainage Dist.*,
  75 F.2d 870 (5th Cir. 1935).......................................................................13

*Fernández v. Laloma*,
  56 D.P.R. 367 (P.R. 1940).........................................................................9

*Franklin California Tax-Free Trust v. Puerto Rico*,
  85 F. Supp. 3d 577 (D.P.R. 2015).............................................................11

*Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &
  Mgmt. Bd. for P.R.)*,
  939 F.3d 340 (1st Cir. 2019)....................................................................2, 12

*Maine Cmty. Health Options v. United States*,
  140 S. Ct. 1308 (2020)..............................................................................15

*Mendez-Nunez v. Fin. Oversight & Mgmt. Bd. for P.R (In re Fin. Oversight &
  Mgmt. Bd. for P.R.)*,
  916 F.3d 98 (1st Cir. 2019).......................................................................15

*Midland Nat'l Life Ins. Co. v. Citizens & So. Nat'l Bank*,
  641 F. Supp. 516 (M.D. Ga 1986)............................................................11

*Nat'l Educ. Association-Rhode Island v. Retirement Bd. of Rhode Island
  Employees' Ret. Sys.*,
  890 F. Supp. 1143 (D.R.I. 1995)...............................................................11

*Paragon Resources, Inc. v. Nat'l Fuel Gas Dist. Corp.*,
  695 F.2d 991 (5th Cir. 1983).....................................................................10

*Pittman v. Chicago Bd. of Educ.*
  64 F.3d 1098 (7th Cir. 1995).....................................................................11

*Puget Sound Power & Light Co. v. City of Seattle*,
    271 F. 958 (W.D. Wash. 1921) ................................................................... 13

*Smith v. Boise City*,
    18 F. Supp. 385 (D. Idaho 1937) ................................................................ 13

*State v. City of Lakeland*,
    154 Fla. 137 (Fla. 1943) .............................................................................. 6

*Thompson v. Emmett Irr. Dist.*,
    227 F. 560 (9th Cir. 1915) .......................................................................... 13

*Von Hoffman v. City of Quincy*,
    71 U.S. 535 (1866) ...................................................................................... 6

**Statutes**

3 L.P.R.A. § 283b ............................................................................................... 5

3 L.P.R.A. § 283h ............................................................................................... 5

3 L.P.R.A. § 1906 .............................................................................................. 6

3 L.P.R.A. § 1913 .......................................................................................... 4, 6

3 L.P.R.A. § 1914 ..................................................................................... *passim*

32 L.P.R.A. § 3355 ............................................................................................ 9

26 U.S.C. § 7652 ............................................................................................... 7

**Other Authorities**

4 Local Government Law § 25:9 ...................................................................... 13

AICPA, *Audit and Accounting Guide State and Local Governments* § 2.87 ............... 14

Restatement (Second) of Contracts § 202 ..................................................... 10

Movants respectfully submit this response to the sur-reply filed by the Oversight Board (ECF No. 13159, the "Sur-Reply" or "SR").[2]  In support, Movants state as follows:

## PRELIMINARY STATEMENT

1.      That the Oversight Board found it necessary to respond at length in Sur-Reply briefing to Movants' legal and factual arguments is proof positive that Movants have demonstrated a colorable claim to the Pledged Rum Taxes.  The Oversight Board has now relegated to an afterthought what was once its marquee argument that Movants' lien attaches only to the Sinking Fund (which is facially absurd, since it would mean that the only security interest granted to the bond trustee was a lien on the bond trustee's own account), and submitted 30 pages and 14 exhibits engaging with governmental fund accounting principles and factual disputes about what the Infrastructure Fund is or "*may be*."  Those issues are not dispositive of this Motion; but the Oversight Board's tussle with them confirms Movants have met their burden.

2.      The Sur-Reply wishes away the fundamental protections of the PRIFA revenue bonds and addresses strawmen—like the notion that Movants' rights arise from accounting principles, as opposed to the bond documents.  Movants have never argued that accounting creates Movants' legal rights; the Enabling Act and Trust Agreement did that.  The Trust Agreement, however, defines the scope of Movants' lien by reference to a "special fund"—the Puerto Rico Infrastructure Fund—which is an accounting entity.  As the Holder Report confirms, governments routinely use special funds to account for moneys held on behalf of their beneficial owner.  Indeed, the Commonwealth intentionally titled the Enabling Act section that transferred property interests

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion (ECF No. 10602) and Reply (ECF No. 12995).  All references to Exhibits, other than Exhibit A attached to the Motion, refer to the Exhibits attached to the Motion, the *Declaration of Atara Miller* (the "Miller Decl.") (ECF No. 12998), or the *Supplemental Declaration of Atara Miller* (the "Supplemental Miller Decl."), filed herewith, as appropriate.

in the Infrastructure Fund, "Special Deposit," an accounting term of art that the Commonwealth concedes refers to funds that it holds in a fiduciary capacity for other agencies and instrumentalities. Thus, while accounting is not the source of Movants' rights, it is important to the understanding that the Enabling Act created the Infrastructure Fund as PRIFA's property subject to Movants' lien.

3. To avoid that reality, the Oversight Board squirms away from the Commonwealth's own testimony and advances a series of new arguments why the Infrastructure Fund cannot be a special revenue fund of the Commonwealth. The Oversight Board argues that the Infrastructure Fund must be held and controlled by PRIFA. Such a requirement is nowhere in the Enabling Act or the Trust Agreement. The Enabling Act merely requires that the Fund "be maintained by *or on behalf of* [PRIFA]."[3] 3 L.P.R.A. § 1914 (emphasis added). This condition is plainly satisfied by the PRIFA special fund maintained by the Commonwealth for the first $117 million of rum tax revenues. As Mr. Ahlberg testified, the Infrastructure Fund is "[g]enerally understood as the first 117 million of rum revenues in each fiscal year." (Ex. 26, Ahlberg Tr. 332:19-21.) Given multiple opportunities to qualify his answer and testify that the Infrastructure Fund is understood to be "controlled," "received," "earned," or "held" by PRIFA, he never did. The Oversight Board cannot walk back this glaring admission or the documents that prove the Commonwealth "segregated [the Pledged Rum Taxes] in a separate account in the General Fund for accounting purposes." (Reply ¶ 30 (quoting *Gracia-Gracia*, 939 F.3d 340, 351 (1st Cir. 2019)).)

---

[3] This is further confirmed by the fact that pre-default, the Pledged Rum Taxes never flowed through a bank account held or controlled by PRIFA.

4.      Nor can the Oversight Board succeed in transforming Movants' special revenue bonds into mere appropriation bonds.  The Enabling Act and Trust Agreement created legally enforceable obligations that cannot be rescinded without consequence.

## ARGUMENT

## I.  THE SUR-REPLY CONFIRMS THAT MOVANTS HAVE SHOWN THEIR SECURITY INTEREST EXTENDS PAST THE SINKING FUND TO THE INFRASTRUCTURE FUND.

5.      Until the Sur-Reply, the Oversight Board's principal argument was that Movants have no rights to anything but moneys deposited in the Sinking Fund.  (Opp. ¶¶ 86-97.)  Movants' Reply exposed the absurdity of the Oversight Board's "Sinking Fund" theory—which would mean that PRIFA granted the bondholder trustee a security interest in nothing but an account that the trustee itself owned.  (Reply ¶¶ 40-43.)  Beyond that, the Oversight Board's theory selectively reads "Pledged Revenues"—to which Movants' lien attaches—to omit the portion that extends the lien to "Special Tax Revenues," *i.e.*, "the Offshore Excise Taxes deposited to the credit of the Puerto Rico Infrastructure Fund pursuant to the [PRIFA Enabling] Act."  (Mot. Ex. 2, ECF 10602-2, at 18 (Trust Agreement § 101).)  The Oversight Board's "Sinking Fund" theory is thus refuted by the Trust Agreement's plain text.  (Reply ¶¶ 39-48.)

6.      The Oversight Board had no answer to these points.  (*See* SR ¶¶ 1, 7.)  Again ignoring the inclusion of "Special Tax Revenues," the Oversight Board erroneously claims that Section 401 prevents liens on the Infrastructure Fund.  Section 401 lends no support to the Oversight Board's theory.  That section does not define the pledge granted to bondholders.  (SR ¶¶ 48-49.)  The actual pledge is on page nine of the Trust Agreement (PRIFA "has pledged and does hereby pledge to the Trustee the Pledged Revenues (as defined herein)").  The language that the Oversight Board hijacks in Section 401 is nothing more than a negative covenant for the benefit of bondholders, prohibiting PRIFA from granting any secondary or additional liens on the

3

collateral.  Section 401 also is not a condition precedent to the attachment of bondholders' lien.  If

PRIFA violated section 401 by pledging the Infrastructure Fund, it would not negate bondholders'

security interest.

7.      The Oversight Board also relies on a selective reading of the Official Statements,

ignoring that these expressly state that the Trust Agreement is controlling.  (*See* Mot. Ex. 17,

Official Statement at 1, 9, IV-2, IV-4, IV-5.)  In any event, the Official Statements support

Movants' reading, defining the pledge the same way Movants do *on the very first page*:

> The [PRIFA bonds] . . . are payable solely from and secured by a pledge of the
> revenues of the Authority, consisting of a specified amount of *the first proceeds [of*
> *Rum Taxes] received by the Commonwealth of Puerto Rico* . . . , which taxes are
> collected by the United States Treasury and returned to the Commonwealth, *and*
> *other moneys deposited in the Sinking Fund* established under the Trust Agreement.

(Mot. Ex. 17, Official Stmt. at i (emphasis added).)  The Official Statements make clear that the

pledge includes *both* the Infrastructure Fund (the first $117 million) *and* any other moneys

deposited to the credit of the Sinking Fund.

8.      That the Commonwealth did not pledge its full faith and credit to the PRIFA bonds

(SR ¶ 8 n.10) is irrelevant.  In exchange for giving up recourse to the Commonwealth, the

bondholders were pledged an irrevocable revenue stream.  That irrevocable pledge is the essence

of special revenue bonds.  Movants are merely seeking to enforce their rights to the specific

property pledged to them.  3 L.P.R.A. §§ 1913, 1914.  The provision the Oversight Board cites

makes clear that revenue bondholders assume the risk that the pledged revenues may be

insufficient to pay the debt, and bondholders cannot demand payment from the Commonwealth if

that occurs.  But bondholders retain the ability to enforce their rights against the pledged revenues.[4]

---

[4] For that reason, the Oversight Board's claim that the Holder Report ignores GASB 48 (which Professor
Holder voted to enact while he served on GASB) is misplaced.  (SR ¶ 27.)  As even the language the
Oversight Board quotes makes clear, the Commonwealth, *both* "pledged *and* appropriated" the Pledged
Rum Taxes, which gave the PRIFA bondholders legally enforceable rights to those specific revenues.  *See*

## II.   THE OVERSIGHT BOARD FAILS TO REBUT THAT THE ENABLING ACT TRANSFERRED TO PRIFA BENEFICIAL OWNERSHIP OF THE PLEDGED RUM TAXES.

9.   Movants have already established that the Enabling Act (i) transferred to PRIFA beneficial ownership of the Infrastructure Fund, (ii) authorized PRIFA to grant liens thereon (which it did), and (iii) pledged and agreed that PRIFA's property rights to the Infrastructure Fund would not be limited or altered until the PRIFA bonds were repaid in full.  (Mot. §§ II.A., III.A.; Reply §§ I.A., III.B.)  To get around this, the Oversight Board claims that "[r]ather than 'pledge' such monies," the Commonwealth merely "appropriated a certain amount of monies to PRIFA for its 'corporate purposes.'"  (SR ¶ 25 (quoting 3 L.P.R.A. § 1914).)[5]  The Oversight Board mischaracterizes the Enabling Act as a mere appropriation—littering the Sur-Reply with references to "appropriations," as if that word renders the statutory pledge entirely discretionary. (*See, e.g.*, SR ¶¶ 14, 26.)

10.   The Oversight Board's argument reflects a basic misunderstanding about appropriations.  The Puerto Rico Government Accounting Act distinguishes appropriations that authorize an "obligation"—a "pledge which is represented by a . . . contract or similar document . . . to encumber the appropriations," 3 L.P.R.A. § 283b(k)—from those that authorize a "disbursement," *i.e.*, an actual payment of funds (either in connection with an expenditure incurred or to satisfy a pre-existing obligation).  *Id.* § 283h.  An appropriation is simply the mechanism by which treasury obtains authorization to disburse moneys in compliance with the government's

---

*Brown v. Maryland*, 114 U.S. 598, 599, 606 (1885) (revenue bondholders could enjoin an unsecured judgment creditor from receiving a municipal corporation's revenues already "pledged and appropriated" to revenue bondholders).

[5] Of course there is no "security agreement between the Commonwealth and PRIFA granting PRIFA security interests on the Rum Tax Remittances, or any financing agreement filed by PRIFA against the Commonwealth to perfect such security interests."  (SR ¶ 24.)  PRIFA is the beneficial owner, not the secured lienholder, of the Pledged Rum Taxes.

obligations.  It does not itself create or define the obligation or rights.

11.     Once a legal obligation is incurred, pursuant to legislative authorization, the government cannot avoid it by simply failing to appropriate a disbursement of funds to pay the obligation.  Under well-settled law, reaffirmed by the Supreme Court, if the government pledges a tax and incurs a debt obligation but does not perform the ministerial appropriation, the aggrieved party can sue to mandate the tax proceeds be used in accordance with the pledge.  *Von Hoffman v. City of Quincy*, 71 U.S. 535, 555 (1866) ("The power given becomes a trust which the donor cannot annul, and which the donee is bound to execute"); (Reply ¶¶ 7, 97-100).

12.     Here, the Commonwealth obligated the first $117 million in Rum Taxes to PRIFA.  *See* 3 L.P.R.A. § 1914.  Moreover, the Commonwealth expressly "pledge[d] and agree[d]" with bondholders, not to "limit or alter" PRIFA's rights in the Pledged Rum Taxes until the bonds are "paid in full."  *Id.* § 1913.  And the Commonwealth authorized PRIFA to pledge these moneys to bondholders.  *Id.* §§ 1906(m), 1914; *see Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1, 29 (1st Cir. 2007).

13.     Thus, the Enabling Act "appropriated" funds in the sense that it authorized PRIFA to obligate and pledge the Pledged Rum Taxes.  The subsequent annual appropriations merely authorize *disbursements*—i.e., an actual payment of the funds out of the Treasury in compliance with the pre-existing legal obligations.  The pre-existing obligations that exist under the Trust Agreement and Enabling Act are not subject to change at the government's whim.  It is a legally binding obligation, and a grant of a security interest in the obligated funds.  *See, e.g.*, *State v. City of Lakeland*, 154 Fla. 137, 139-40 (Fla. 1943) ("an express pledge of revenues to be derived from a particular source does something different than this.  Such pledge creates a lien or charge upon the specific revenues designated, whether then or thereafter collected, to the extent, and for the

6

life, of the pledge; and until the underlying obligation is satisfied, precludes the lawful appropriation of such revenues to any other governmental function. . . .").  The Oversight Board's utility bill analogy (SR ¶ 36) thus falls flat.  A promise to pay an invoice is not an assignment of rights to specific property (*i.e.*, a revenue stream).  Where, as here, one transfers rights to specific property, it holds the property for the benefit of the assignee.

14.     The Oversight Board bizarrely claims victory from the fact that the federal cover-over statute, 26 U.S.C. § 7652(e)(1), transferred ownership of the rum taxes to the Commonwealth, not PRIFA.  (*See, e.g.*, SR ¶¶ 22, 31, 35.)  That the Commonwealth owned the Rum Taxes *before* it obligated them to PRIFA and its bondholders is not in dispute.  But the Commonwealth alienated its rights to the first $117 million through the Enabling Act—using nearly identical language as in the federal statute.  3 L.P.R.A. § 1914; *cf.* 26 U.S.C. § 7652(e)(1).  Thus, the Commonwealth altered its role to mere custodian, trustee, or fiduciary of the Pledged Rum Taxes.

## III.   THE INFRASTRUCTURE FUND COMPRISES THE FIRST $117 MILLION OF RUM TAXES THE COMMONWEALTH RECEIVES EACH YEAR.

15.     In the Opposition, the Oversight Board argued that the $117 million in "Rum Tax Remittances [had been] retained in the TSA since the Commonwealth's Title III case commenced."  (Opp. ¶ 24.)  Now that the Commonwealth's own corporate representative has testified that the Infrastructure Fund refers to the first $117 million of Rum Taxes, not a particular bank account (Ex. 26, Ahlberg Tr. 331:15-332:21), the Oversight Board reverses course and argues that the Infrastructure Fund cannot possibly consist of funds held in the TSA.  (SR § III.A.)  Notably absent from the Sur-Reply is an explanation of what the Infrastructure Fund *is.*  The Oversight Board accuses Movants of mischaracterizing its theory—but the Oversight Board has never even stuck to one.  Even in the Sur-Reply, the Oversight Board cannot make up its mind.  At one point, the Oversight Board claims it has always maintained that it is a "fund" rather than a

bank account  (SR ¶ 56.), but at another point it claims that the Infrastructure Fund "*may* have been a combination of accounts maintained by or for PRIFA."  (SR ¶ 46 (emphasis added).)

16.     This head-spinning evasiveness is what led Movants to seek discovery and retain an expert to clarify for the Court that the Infrastructure Fund is and has always been an accounting entity that, by operation of and consistent with the law, is comprised of "the first $117 million of rum revenues" (Ex. 26, Ahlberg Tr. 332:19-21), accounted for on the Commonwealth's books and records as a special revenue fund.  (*See* Reply ¶¶ 13-22.)  The Oversight Board offers no plausible alternative explanation.

**A.     The Enabling Act Created the Infrastructure Fund as a Fiscal and Accounting Entity Comprised of the First $117 Million of Rum Taxes the Commonwealth Receives.**

17.     Professor Holder's unrebutted expert report disposes of the Oversight Board's argument that the Pledged Rum Taxes cannot be held by the Commonwealth in pooled TSA bank accounts.  Governments use fund accounting to identify and track cash held in pooled accounts, even when that cash belongs to different legal entities.  (*See* Holder Report ¶ 9(b); § III.)  As shown in the Reply and *infra*, discovery has confirmed that is precisely what the Commonwealth does.

18.     The Oversight Board argues that "a government's accounting practices and documents can[not] define or grant property rights where they do not otherwise exist."  (SR ¶ 11.) Movants do not claim otherwise.  It is the PRIFA Enabling Act and bond documents that pledge to bondholders a security interest in the Puerto Rico Infrastructure Fund, which is a "fiscal and accounting entit[y]."  (Reply Ex. 39 at 4 [ECF No. 12998-15]).

19.     The Enabling Act mandates that the Pledged Rum Taxes "shall be covered into" the Infrastructure Fund—a "Special Deposit," 3 L.P.R.A. § 1914, which is an accounting term of art routinely used and understood generally and by the Commonwealth to refer to moneys held in a fiduciary capacity in a special fund.  (*See* Reply ¶ 28 (citing Ex. 34 at 357).)  The Oversight

Board, frightened by the import of that title, spends six paragraphs urging this Court to ignore it, arguing that the Infrastructure Fund is not a pension trust fund or an agency fund.  (SR ¶¶ 35-41.) None of this refutes the basic point that a "special deposit" fund is a term of art used to refer to a fund held by the Commonwealth in a fiduciary capacity.  (Reply ¶ 28 (citing Ex. 34 at 357).)

20.      The Oversight Board's argument that the title of a statute cannot be considered (SR ¶ 37 n.24) is contrary to well-settled law that "'the title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." *Almendarez–Torres v. United States,* 523 U.S. 224, 234 (1998) (quoting *Brotherhood of R.R. Trainmen v. Baltimore & O. R. Co.,* 331 U.S. 519 at 528–529)).  The cases the Oversight Board cites (SR ¶ 37 n.24) stand for the unexceptional proposition that a statute's title cannot contradict the unambiguous text of the statute itself.  Here, however, the title is consistent with the text and the revenue bond structure contemplated therein.   Together with all the other indicia of a trust relationship—including, as the Oversight Board admits (SR ¶ 41 n.27), that Section 1914 provides that the Infrastructure Fund may be maintained "on behalf of PRIFA"—the "Special Deposit" title is powerful evidence that the Commonwealth meant to form a trust relationship.[6]  (Mot. ¶ 58 ; Reply ¶¶ 28, 54-59.)

---

[6] The Oversight Board's secret trust and Trust Act arguments are a distraction.  Movants do not allege a secret trust, but rather a trust created by public legislation.  Similarly, the Trust Act is inapplicable.  (Reply ¶¶ 56-57.)  The Oversight Board argues that whether the Trust Act applies retroactively is immaterial because the Civil Code applied beforehand and included the same public deed requirement.  However, the Supreme Court of Puerto Rico recognized constructive trusts under equitable principles under Article 7 of the Civil Code *while* the Civil Code provisions were in effect.  *See, e.g.*, *Fernández v. Laloma*, 56 D.P.R. 367, 377 (P.R. 1940) ("The case could be decided under section 7 of the Civil Code by taking the rules about resulting or constructive trusts from equity and applying them.").  Even if the Trust Act did apply, it contains a provision comparable to Article 7 of the Civil Code that supports the recognition of the continued vitality of the constructive trust doctrine and, thus, does not require a public deed.  *See* 32 L.P.R.A. § 3355 ("Should there be any issue that this chapter fails to provide for, or if any of its provisions require interpretation, U.S. doctrines and case law regarding trusts shall govern unless something else is necessarily inferred from any of the provisions of this Act or if there is an express referral to Puerto Rico legislation.").

**B.**   **Mr. Ahlberg's Testimony and Commonwealth Accounting Confirm Movants'
Theory.**

21.   Mr. Ahlberg, testifying for the Commonwealth and PRIFA, admitted that the
Infrastructure Fund is not held by PRIFA, but rather "understood by relevant individuals" to refer
to "the first 117 million of rum revenues." (Ex. 26, Ahlberg Tr. 332:3-8.)  Just days after his
testimony, the Oversight Board already started running away from it—claiming it was just "his
layperson understanding." (*See* Reply ¶ 12 n.3.)  Now in their Sur-Reply, they try a new gloss:
that Mr. Ahlberg was not referring to rum taxes received in the TSA, but to "the first 117 million
of rum revenues *earned*" (by whom he did not say). (SR ¶ 31 (quoting Ahlberg Tr. 332:3-4).)

22.   Not once did Mr. Ahlberg testify that the Infrastructure Fund is held, maintained,
or "earned" by PRIFA, as the Oversight Board now claims.  Nor did he say that moneys in the
Infrastructure Fund could never exist in TSA accounts.   Rather, he testified, consistent with
Movants' theory and fund accounting principles, that the Infrastructure Fund is "understood to
generally refer to the first 117 million of rum [f]unds, rum revenues," without qualifications. (Ex.
26, Ahlberg Tr. 331:19-21; *see also id.* 332:19-21 ("Generally understood as the first 117 million
of rum revenues in each fiscal year."); Holder Report ¶¶ 42-44).  Thus, the Infrastructure Fund is
the first $117 million of rum taxes received, whether in the TSA or elsewhere.

23.   The Commonwealth's accounting practices and reporting confirm what Mr.
Ahlberg actually admitted.  Contrary to the Oversight Board's suggestion (SR ¶¶ 13-14), the Court
is free to consider such evidence to aid its interpretation of contracts, even in the absence of
ambiguity (*See* Reply ¶ 31 & n.15); *Paragon Resources, Inc. v. Nat'l Fuel Gas Dist. Corp.*, 695
F.2d 991, 997-8 (5th Cir. 1983) (acts performed by a contracting party's agent constitute
admissible course of performance evidence); Restatement (Second) of Contracts § 202(4) (1981).
And under settled law, statutory contracts—such as the statutory covenant between the

10

Commonwealth and PRIFA bondholders in the PRIFA Enabling Act—are no different.  *See Nat'l Educ. Association-Rhode Island v. Retirement Bd. of Rhode Island Employees' Ret. Sys.*, 890 F. Supp. 1143, 1157 (D.R.I. 1995) ("The application of traditional contract law principles serves to demonstrate the actual structure and content of the [statutory] contract"); *Franklin California Tax-Free Trust v. Puerto Rico*, 85 F. Supp. 3d 577, 612 (D.P.R. 2015) (rejecting the Commonwealth's interpretation of a statutory contract as "unpersuasive and misunderstand[ing] [of] the basics of contracts law"), *judgment entered*, No. 14-1518 FAB, 2015 WL 574008 (D.P.R. Feb. 10, 2015), *and aff'd*, 805 F.3d 322 (1st Cir. 2015), *aff'd*, 136 S. Ct. 1938 (2016).  Neither case cited by the Oversight Board involved a statutory covenant or held otherwise.  (SR ¶¶ 13-14; *Pittman v. Chicago Bd. of Educ.* 64 F.3d 1098, 1104 (7th Cir. 1995) (interpreting a statute to determine whether it created a contract); *Midland Nat'l Life Ins. Co. v. Citizens & So. Nat'l Bank*, 641 F. Supp. 516, 520 (M.D. Ga 1986) (interpreting a state statute that regulated life insurance contracts).)

24.     As shown in the Reply, the Commonwealth has historically recorded, and continues to record, "incoming Rum Taxes using a specific account designation (R4220) in its internal fiscal and accounting system."  (Reply ¶ 20.)  Movants never claimed that R4220 "is actually the Infrastructure Fund."  (SR ¶ 32.)  Movants simply demonstrated that, through a combination of fund and account designations, the Commonwealth identifies and tracks moneys in the Infrastructure Fund.  This is clear from Exhibit A to the Sur-Reply which shows that, within account code R4220, Treasury accounts for PRIFA's portion differently, assigning PRIFA's portion to the General Fund (Fondo 111), and allocating portions to be transferred to the Rum Producers through a different fund-account designation.  (SR Ex. A (PRIFA_STAY0001572).)  It is thus not inconsistent with Movants' arguments that "R4220 is used to track receipts of ***all*** Rum Tax Remittances from the federal government," rather than only the first $117 million.  (SR ¶ 34.)

25.     That the Infrastructure Fund is an account within the General Fund is also consistent with *Gracia-Gracia*.  There the First Circuit found significant the fact that, as the Oversight Board conceded, moneys can be "segregated . . . in a separate account in the General Fund for accounting purposes."  *Gracia-Gracia*, 939 F.3d at 351 (1st Cir. 2019); *see also Supplemental Brief and Declaration in Compliance with March 9th, 2018 Order* [ECF No. 2795] ¶ 11; *Commonwealth of Puerto Rico's Reply to Movants' Supplementary Memorandum in Compliance with Order of March 9th and March 13th, 2018* [ECF No. 2820] ¶ 6.  So too here.  The Commonwealth implemented the Enabling Act to reflect PRIFA's equitable ownership of the Infrastructure Fund, and segregated the Pledged Rum Taxes in a separate account in the General Fund.  (Reply ¶ 30.)

26.     The Commonwealth's segregation of PRIFA's money is further confirmed by the Commonwealth's audited financials, which accounted for the Pledged Rum Taxes in a special revenue fund and reported the resources as "restricted."  (Holder Report ¶¶ 40-44; Mot. ¶ 57; Reply ¶ 60.)  The Oversight Board does not dispute or rebut any of Professor Holder's key conclusions regarding the financials—instead claiming that accounting is irrelevant and subject to change.  But "[f]inancial statements . . . represent management's *assertions* regarding an entity's finances," 2020 GAAFR, Ch 44 (emphasis added), and thus the Commonwealth's statement in its financials that the resources are "restricted" is a party admission.  "Restricted" is not a meaningless "label." (SR ¶¶ 3, 20.)  It is an admission that there are "constraints on resources that are (1) 'externally imposed by creditors (such as through debt covenants), grantors, contributors, or laws or regulations of other governments,' or (2) 'imposed by law through constitutional provisions or enabling legislation.'"  (Holder Report ¶ 4 (citing GASB Statement No. 54 ¶¶ 8-9).)[7]

---

[7] Indeed, if the Commonwealth had discretion to re-appropriate the Pledged Rum Taxes, GASB 54 precludes the use of the "restriction" designation and would have required use of the "committed" designation.  GASB 54, ¶ 11 ("In contrast to fund balance that is restricted by enabling legislation . . . amounts in the committed fund balance classification may be redeployed for other purposes with

27.     Moneys do not lose their restricted status merely because the Commonwealth holds them in a pooled account.  (Holder Report, ¶¶ 10, 22-27.)[8]  Nor can moneys designated by statute as part of a special fund legally be diverted for uses inconsistent with the purpose of that fund.  As numerous courts have recognized, these funds are "trust funds . . . [and] may not be otherwise applied."  *Ecker v. Sw. Tampa Storm Sewer Drainage Dist.*, 75 F.2d 870, 872–73 (5th Cir. 1935); *Thompson v. Emmett Irr. Dist.,* 227 F. 560, 566 (9th Cir. 1915) ("The moneys collected by them . . . constitute a trust fund which cannot be applied or diverted to any other purpose.").

28.     Indeed, the Commonwealth admits that Rum Taxes transferred to the TSA operational account "for deposit to the credit of the S&T Trust" are considered in the S&T Trust while in the TSA.  *See Decl. of Timothy H. Ahlberg in Respect of Commonwealth Mot. for Partial S.J.*, Case No. 20-00003-LTS [ECF No. 49] ¶ 5.[9]  So too then are the Pledged Rum Taxes, which are transferred into the TSA in precisely the same manner—"for deposit to the credit of PRIFA"—in the Infrastructure Fund and held in trust while in the TSA.

---

appropriate due process[.]")  Thus, the restricted designation was a Commonwealth representation and admission that the it could not redeploy the Pledged Rum Taxes because of the binding enabling legislation.

[8] *See also* 4 Local Government Law § 25:9 ("[A] special fund permits the least discretion to local legislative or executive authorities in reallocating or redistributing public monies.").  And where, as here, the municipality attempts to divert those special funds for other purposes, courts have held that the bondholders have the ability to reach the diverted funds.  *See, e.g.*, *Puget Sound Power & Light Co. v. City of Seattle*, 271 F. 958, 963-64 (W.D. Wash. 1921) (rejecting city's contention that it was not obligated to deposit gross revenues into a special fund, because the gross revenues were security for the bonds and "holding the money in trust, it is bound to handle it in the manner agreed"); *Smith v. Boise City*, 18 F. Supp. 385, 388 (D. Idaho 1937) (authorizing bondholders to reach diverted special assessments that were required to be deposited into a special fund because the assessments were private property of the bondholders, and the duty imposed on the city "by the statute was to apply them to the special fund to be used in the payment of the bonds and on its failure to do so the bondholders are entitled to the interposition of a court of equity to reach the fund and an accounting had").

[9] (*See also* Suppl. Miller Decl., Ex. 47, PRIFA_STAY0001344 at 1346 (Disbursement Detail "for deposit to the credit of the S&T Trust"); Ex. 48, PRIFA_STAY0004792 at 4793 (deposit of S&T Trust payments into TSA operational account); Ex. 49, CW_STAY0007574 at 7600 (same).)

13

C.     **There is No Requirement that PRIFA Hold or Control the Moneys in the Infrastructure Fund.**

29.     In a last-ditch effort to put the Infrastructure Fund outside the TSA, the Oversight Board argues for the first time that Section 401 of the Trust Agreement (providing that PRIFA "shall maintain with a Qualified Depositary the Puerto Rico Infrastructure Fund") requires that PRIFA control the Infrastructure Fund moneys (SR ¶¶ 42-46).  This argument fails.

30.     *First*, the Enabling Act, not the Trust Agreement, establishes the Infrastructure Fund and contemplates that it could be "maintained by or *on behalf of* [PRIFA]," *i.e.*, that another entity may control the Infrastructure Fund while PRIFA enjoys equitable ownership.  3 L.P.R.A. § 1914 (emphasis added); *see also* Suppl. Miller Decl., Ex. 50, AICPA, *Audit and Accounting Guide State and Local Governments* § 2.87 ("Legal and contractual provisions may sometimes use the terminology *separate funds* or *separate accounts*, when the intention of the of those provisions is a separate accounting for restricted resources, which does not necessarily require the government to establish separate funds or bank accounts for the resources." (emphasis in original).)

31.     *Second*, Section 401 merely contains provisions to assure bondholders that their collateral will be kept in trustworthy, Treasury-approved financial institutions, unencumbered by junior liens.  (*See* Mot. Ex. 2, ECF 10602-2, at 17 (Trust Agreement § 101) (defining "Qualified Depositary" as "banks or trust companies designated or permitted to be designated by the Secretary of the Treasury of the Commonwealth as a Depositary for funds of agencies and instrumentalities of the Commonwealth").)  That is what happened: the Infrastructure Fund was at all times maintained in Treasury-controlled pooled bank accounts at Qualified Depositaries.  (Reply ¶ 16.)

32.     The Oversight Board speculates, without any factual support, that the Infrastructure Fund "*may* have been a combination of" the GDB -1891 Account and PRIFA's operational account.  (SR ¶ 46 (emphasis added).)  Fatal to this theory is that there is no evidence that PRIFA

14

either opened or controlled the GDB -1891 Account.  (*See* Reply ¶ 19.)  And the Commonwealth
has publicly disclosed that it "maintains a special revenue fund" for PRIFA that is "used to account
principally for the moneys received by the Commonwealth, up to $117 million."  (Holder Report
¶ 42.)  The Oversight Board asks this Court to believe that this special revenue fund is *not* the
Infrastructure Fund, while at the same time ignoring this disclosure in its Sur-Reply.

## IV.   THE OVERSIGHT BOARD'S PREEMPTION ARGUMENTS ARE IRRELEVANT.

33.    The Oversight Board has reversed course on its preemption argument,
acknowledging now that PROMESA cannot, through preemption, "eliminate[] unsecured
obligations or secured property rights."  (SR ¶ 59.)  The Oversight Board's preemption argument
is thus irrelevant to the preliminary hearing issues of  "standing to sue and security or other
property interests."  *Final Case Management Order for Revenue Bonds* at 5 [ECF No. 12186].[10]

### CONCLUSION

34.    For the foregoing reasons, the Court should grant the Motion.

---

[10] To the extent the Oversight Board is suggesting, however, that it can effectively deprive Movants of their
rights to the Pledged Rum Taxes by not including them in its fiscal plans and budgets (which were adopted
without giving Movants any notice or opportunity to be heard), PROMESA would violate the Due Process
Clause—and the Oversight Board's fiscal plans and budgets would be invalid.  *See, e.g., Mendez-Nunez v.
Fin. Oversight & Mgmt. Bd. for P.R (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 916 F.3d 98 (1st Cir.
2019).  Additionally, Movants must have an opportunity to show that the fiscal plans and budgets do not
comply with PROMESA—an additional reason the fiscal plans and budgets are invalid and cannot preempt
Movants' rights.  (*See* Reply ¶¶ 101-05.).  Moreover, even assuming *arguendo* that PROMESA
could constitutionally preempt any obligation under the Enabling Act to *disburse* funds owed to PRIFA, that
would not preclude Movants from seeking a judgment or other judicial remedies establishing their rights to
the Pledged Rum Taxes under the Commonwealth's pre-PROMESA legal obligation of those funds.  The
absence of appropriations to pay a debt does not discharge the debt or otherwise constitute a cognizable
defense to a court proceeding seeking enforcement of an obligation of the government.  *See Maine Cmty.
Health Options v. United States*, 140 S. Ct. 1308, 1319 (2020).

## <u>CERTIFICATION</u>

In accordance with paragraph 9 of the *Final Case Management Order for Revenue Bonds* (ECF No. 12186), Movants certify that (i) they have taken reasonable efforts to avoid duplication and submit a brief that is no longer than necessary, and (ii) they have used reasonable efforts to draft a single brief and coordinate to minimize duplicative briefs.

16

Dated: May 26, 2020
San Juan, Puerto Rico

**FERRAIUOLI LLC**

By:    /s/  *Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No.
219002)
Sonia Colón (USDC-PR No. 213809)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001
Email: rcamara@ferraiuoli.com
        scolon@ferraiuoli.com

**MILBANK LLP**

By:    /s/  *Atara Miller*
Dennis F. Dunne (admitted *pro hac vice*)
Atara Miller (admitted *pro hac vice*)
Grant R. Mainland (admitted *pro hac
vice*)
John J. Hughes, III (admitted *pro hac
vice*)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219
Email: ddunne@milbank.com

        amiller@milbank.com
        gmainland@milbank.com
        jhughes2@milbank.com

***Attorneys for Ambac Assurance Corporation***

17

**REXACH & PICÓ, CSP**

By: /s/ *María E. Picó*
    María E. Picó
    (USDC-PR No. 123214)
    802 Ave. Fernández Juncos
    San Juan, PR 00907-4315
    Telephone: (787) 723-8520
    Facsimile: (787) 724-7844
    Email: mpico@rexachpico.com

**CASELLAS ALCOVER & BURGOS P.S.C.**

By: /s/ *Heriberto Burgos Pérez*
    Heriberto Burgos Pérez
    (USDC-PR No. 204809)
    Ricardo F. Casellas-Sánchez
    (USDC-PR No. 203114)
    Diana Pérez-Seda
    (USDC-PR No. 232014)
    P.O. Box 364924
    San Juan, PR 00936-4924
    Telephone: (787) 756-1400
    Facsimile: (787) 756-1401
    Email: hburgos@cabprlaw.com
        rcasellas@cabprlaw.com
        dperez@cabprlaw.com

**BUTLER SNOW LLP**

By: /s/ *Martin A. Sosland*
    Martin A. Sosland (admitted *pro hac vice*)
    5430 LBJ Freeway, Suite 1200
    Dallas, TX 75240
    Telephone: (469) 680-5502
    Facsimile: (469) 680-5501
    Email: martin.sosland@butlersnow.com
    Jason W. Callen (admitted *pro hac vice*)
    150 3rd Ave., S., Suite 1600
    Nashville, TN 37201
    Telephone: (615) 651-6774
    Facsimile: (615) 651-6701
    Email: jason.callen@butlersnow.com

**CADWALADER, WICKERSHAM & TAFT LLP**

By: /s/ *Mark C. Ellenberg*
    Howard R. Hawkins, Jr. (admitted *pro hac vice*)
    Mark C. Ellenberg (admitted *pro hac vice*)
    William J. Natbony (admitted *pro hac vice*)
    Ellen M. Halstead (admitted *pro hac vice*)
    Thomas J. Curtin (admitted *pro hac vice*)
    Casey J. Servais (admitted *pro hac vice*)
    200 Liberty Street
    New York, NY 10281
    Telephone: (212) 504-6000
    Facsimile: (212) 504-6666
    Email: howard.hawkins@cwt.com
        mark.ellenberg@cwt.com
        bill.natbony@cwt.com
        ellen.halstead@cwt.com
        thomas.curtin@cwt.com
        casey.servais@cwt.com

*Attorneys for Financial Guaranty Insurance Company*

*Attorneys for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

18

**RIVERA, TULLA AND FERRER, LLC**

By:  /s/  *Eric A. Tulla*
     Eric A. Tulla
     (USDC-DPR No. 118313)
     Email: etulla@ riveratulla.com
     Iris J. Cabrera-Gómez
     (USDC-DPR No. 221101)
     Email: icabrera@ riveratulla.com
     Rivera Tulla & Ferrer Building
     50 Quisqueya Street
     San Juan, PR 00917-1212
     Telephone: (787) 753-0438
     Facsimile: (787) 767-5784

**HOGAN LOVELLS US LLP**

By:  /s/  *Robin E. Keller*
     Robin E. Keller, Esq.
     Ronald Silverman, Esq.
     390 Madison Avenue
     New York, NY 10017
     Telephone: (212) 918-3000
     Facsimile: (212) 918-3100
     robin.keller@hoganlovells.com
     ronald.silverman@hoganlovells.com

*Attorneys for U.S. Bank National*
*Association, in its Capacity as Trustee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this case.

/s/  *Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email:  rcamara@ferraiuoli.com