# EXHIBIT A

EXECUTION VERSION

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Escrow Agreement"), dated as of September 22, 2011, by and among **PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**, a body corporate and politic constituting a public corporation and government instrumentality created pursuant to the provisions of Act No.74 of June 23, 1965, as amended (the "Authority"), the **CONCESSIONAIRES** of toll roads listed in Exhibit A to this Escrow Agreement, as such schedule may be amended from the time to time to add additional concessionaires of toll roads in Puerto Rico (collectively, the "Concessionaires" and each, a "Concessionaire"), pursuant to their respective concession agreements (the "Concession Agreements"), **BANCO POPULAR DE PUERTO RICO**, a Puerto Rico banking corporation (the "Bank"), and **BANCO POPULAR DE PUERTO RICO, FIDUCIARY SERVICES DIVISION**, a Puerto Rico banking corporation, as escrow agent (the "Escrow Agent"). The Authority and the Concessionaires are sometimes referred to herein collectively as the "Contracting Parties" or individually as a "Contracting Party."

## RECITALS

WHEREAS, the Authority is the owner and operator of the Puerto Rico toll road system (the "PR Toll Roads"); and

WHEREAS, pursuant to, and under the terms and conditions contained in Act No. 29 of the Legislative Assembly of Puerto Rico approved on June 8, 2009 (the "Act"), the Authority is authorized to enter into public-private partnerships with private entities, including entering into concession agreements for the operation and maintenance of any or all of the PR Toll Roads; and

WHEREAS, the Authority entered into a New Toll Collection System Acquisition & Installation, NTCS Maintenance and Customer Service Center Management & Operations (Contract No. AC-800197) (the "TransCore Contract"), dated as of March 14, 2003, with the Authority, TransCore Atlantic, Inc. ("TransCore") and TransCore Holdings, Inc. (including, without limitation, the Master Agreement, the Contract Documents specified in Appendix II to the Master Agreement, the Special Provisions – Acquisition and Installation attached to the Master Agreement as Appendix III and the Special Provisions – System Maintenance and Customer Service Center Operation attached to the Master Agreement as Appendix IV), as amended pursuant to that certain Contract Amendment and Change Order Agreement, dated as of June 22, 2007, for the acquisition, installation, maintenance and operation of an electronic toll collection ("ETC") system for the PR Toll Roads under the brand name "AutoExpreso," which will expire no later than 2015; and

WHEREAS, as part of the ETC system developed by TransCore for the Authority, customers are required to (i) open an account, (ii) acquire a transponder that must be affixed to the customer's motor vehicle, and (iii) prepay tolls with cash or through debit or credit card payments made at designated participating merchants, through the AutoExpreso website operated and maintained by TransCore, at the TransCore Customer Service Center at Metro Office Park, at toll plazas and at all the in-lane replenishment lanes installed throughout the PR Toll Roads network; and

**WHEREAS**, the Contracting Parties acknowledge that the Authority may designate a successor to TransCore to operate and maintain an ETC system for the PR Toll Roads (TransCore or such successor, as the case may be, the "ETC Service Provider"; and

**WHEREAS**, the Authority desires to establish an escrow account mechanism for the purpose of allocating among, and distributing to, the Authority and each Concessionaire all the prepaid tolls collected through the existing ETC system, such allocation to be based on the traffic passing through the toll plazas operated by the Authority and each Concessionaire, respectively, and the relevant toll rates all as hereinafter provided; and

**NOW THEREFORE**, for and in consideration of the premises, the mutual covenants, representations, warranties and agreements contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Contracting Parties covenant and agree as follows:

**Section 1.**     **Appointment of the Escrow Agent and Representatives**

(a)     The Contracting Parties hereby designate and appoint the Escrow Agent to serve as escrow agent hereunder and the Escrow Agent hereby confirms its agreement to act as escrow agent upon the terms, conditions and provisions of this Escrow Agreement.

(b)     The individuals listed in Exhibit B (as amended from time to time as provided in Section 1(c) below) hereto are hereby designated by the corresponding Contracting Party to act on their respective behalf (such persons, the "Authorized Representatives") in connection with the transactions contemplated by this Escrow Agreement and shall be the only persons authorized to execute any notice to be provided by any of them to any person pursuant to the provisions of this Escrow Agreement, except to the extent this Escrow Agreement expressly provides that another person is entitled to provide such notice on its behalf.

(c)     Any Contracting Party may substitute any of their respective Authorized Representatives by providing at least five (5) Business Days advanced written notice thereof in accordance with the notice provisions of this Escrow Agreement. Each Contracting Party shall provide the Escrow Agent with specimen signatures of their respective Authorized Representatives in such manner as the Escrow Agent shall reasonably require in accordance with its internal procedures, including corporate resolutions evidencing their authority.

**Section 2.**     **Establishment of Escrow Accounts**

(a)     The Contracting Parties hereby establish the following escrow accounts with the Escrow Agent and the Authority will deposit or cause to be deposited into such accounts the funds described in Section 2(a)(i) and 2(a)(ii), respectively:

(i)     a sweep escrow account designated as account number ██████0303, which will be dedicated to the operations of the Customer Service Center ("CSC") and will receive all prepayments made into AutoExpreso accounts through automatic electronic funds replenishment transactions or individual automated clearing house

("ACH"), debit card (ATH) or credit card transactions originating at point of sale
("POS") terminals at the CSC or at any of the external retailers, and certain minor cash
replenishment transactions at the CSC and at any of the external retailers (the "CSC
Escrow Account"),

(ii)    a sweep escrow account designated as account ███6438, which will
be dedicated to in-lane replenishment ("ILR") operations and will receive all
prepayments into AutoExpreso accounts through (a) cash debit card (ATH) and credit
card transactions originating at the integrated POS terminals at each of the ILR lanes and
(b) cash transactions in connection with prepayments into AutoExpreso accounts and for
the replenishment of temporary prepaid cash cards to be used during the transition to full
electronic tolling (the "ILR Escrow Account" and, together with the CSC Escrow
Account, the "Sweep Escrow Accounts"), and

(iii)   a consolidated escrow account designated as account number ███
██6411 that, subject to the provisions of this Section 2, will receive a daily sweep of all
amounts on deposit in the Sweep Escrow Accounts (the "Consolidated Escrow
Account").

(b)    Each of the Sweep Escrow Accounts and the Consolidated Escrow
Account (collectively, the "Escrow Accounts") shall be jointly owned by, and is for the
exclusive benefit of, the Contracting Parties.  The CSC Escrow Account shall be
governed by the provisions of this Escrow Agreement, the Commercial Deposit Accounts
Agreement (the "CSC Deposit Account Agreement") and the Merchants Contract for
Card Services (the "Merchant Agreement") entered into by and between the Bank and the
Authority in connection with account number ███0303, which are attached as
Schedules 1 and 2.  The ILR Escrow Account shall be governed by the provisions of this
Escrow Agreement, the Merchant Agreement, and the Commercial Deposit Accounts
Agreement (the "ILR Deposit Account Agreement" and, together with the CSC Deposit
Account Agreement, the "Deposit Account Agreements") entered into by and between
the Bank and the Authority, which is attached as Schedule 3.  The Consolidated Escrow
Account shall be governed by the provisions of this Escrow Agreement.  Any and all
amounts on deposit in all the Escrow Accounts from time to time (as reduced by any
automatic transfers as described hereinafter, disbursements and amounts withdrawn under
Section 5) are referred to herein as the "Escrow Fund".

(c)    On the Closing Date (as defined in the Concession Agreement), the
Contracting Parties and the Bank agree as follows:

(i)     account numbers ███0303 and ███6438, which are
currently solely owned by the Authority, will become the CSC Escrow Account
and the ILR Escrow Account, respectively, and the Authority will cease to be the
sole owner of said accounts;

(ii)    the Merchant Agreement will be applicable to both the CSC
Escrow Account and the ILR Escrow Account;

3

(iii)    all electronic fund transfers generated by POS terminals located at currently established ILR lanes and any ILR lane established in the future currently deposited to the credit of the CSC Escrow Account will be redirected and deposited to the credit of the ILR Escrow Account;

(iv)    any reference to the Authority as the sole owner of any of the Sweep Escrow Accounts in the Merchant Agreement or the corresponding Deposit Account Agreements shall be deemed to have been replaced with a reference to the Contracting Parties;

(v)    the ETC Service Provider shall be authorized to (A) designate external retailers for the processing of ETC related replenishment and sales transactions and (B) activate and deactivate such designated external retailers, at its discretion; and

(vi)    the provisions of Section 16.1 of the Merchant Agreement creating a security interest over the funds on deposit in the Sweep Escrow Accounts shall be inapplicable and no lien, security interest or other encumbrance in favor of the Bank will exists over the funds on deposit in the Sweep Escrow Accounts other than as provided in this Escrow Agreement; and (ii) neither the Deposit Account Agreements nor the Merchant Agreements may be amended without the written consent of the Contracting Parties, the Bank and the Escrow Agent; provided, that, after reasonable prior written notice to the Contracting Parties, the Bank is entitled to modify the fees payable thereunder on a yearly basis in order to reflect then current market rates for such services.

(d)    Any and all amounts on deposit in the Sweep Escrow Accounts will be swept daily into the Consolidated Escrow Account; provided, that the CSC Escrow Account and the ILR Escrow Account will each retain a balance of $5,000 for reconciliation and electronic fund transfer adjustment to be made by the ETC Service Provider as the operator of the ETC system. The Consolidated Escrow Account will hold the funds received from the Sweep Escrow Accounts. The Consolidated Escrow Account will only receive electronic funds transfers from the Sweep Escrow Accounts. The Escrow Agent will distribute amounts on deposit in the Consolidated Escrow Account as provided in Section 5 of this Escrow Agreement.

(e)    The Consolidated Escrow Account will be debited on a monthly basis directly by (i) the Bank for the fees related to the services provided under the Merchant Agreements and the Deposit Account Agreements, including any debit and credit card payments and cash (deposit) fees described in Exhibit C (the "Merchant Fees"), and (ii) the Escrow Agent fees provided in Section 7(h) of this Escrow Agreement (the "Escrow Agent Fees" and, together with the Merchant Fees, the "Fees"). Such debit shall be made concurrently with the deduction made for the weekly Transfer payment referred to in Section 5(g).

Section 3.      No Investment of Funds

The Escrow Fund shall not be invested except as otherwise instructed by the Authority and the Concessionaires pursuant to joint written instructions to the Escrow Agent detailing the manner and form in which such Escrow Fund shall be invested. The investment income, if any, shall be apportioned monthly between the Authority and the Concessionaires in the same proportion that the Earned Tolls (as defined below) are apportioned among the Contracting Parties for such month.

Section 4.      Reports

On or before the tenth (10th) day of each month, the Escrow Agent shall deliver to each Contracting Party a monthly report of (a) all amounts received by the Escrow Agent for deposit in each of the Sweep Escrow Accounts and the Consolidated Escrow Account during the preceding month, (b) all amounts disbursed in accordance with Section 5 below during the preceding month; (c) all amounts disbursed to the Bank to cover the Merchant Fees and to the Escrow Agent to cover the Escrow Agent Fees; and (d) the balance held in the Consolidated Escrow Account on the last day of the preceding month.

Section 5.      Disbursements

(a)      Subject to the provisions of Section 5(g) below, each week during the term of this Escrow Agreement, within two (2) Business Days after the receipt by the Escrow Agent of the ETC Service Provider traffic report for the preceding week in the form attached hereto as Exhibit D (the "Traffic Report"), the Escrow Agent shall transfer (a "Transfer") to each Contracting Party, by crediting such Contracting Party's bank account listed in Exhibit A and, in the case of the Authority, account number ▮▮▮▮5116 at Banco Popular de Puerto Rico, an amount equal to the value of the tolls due from vehicles passing through the ETC toll lanes at each toll plaza (without regard to whether such vehicles were violators or exempt vehicles) *less* the value of unpaid tolls (the "Unpaid Tolls") recorded at the ETC toll lanes (such resultant amount, the "Earned Tolls"). Earned Tolls shall be payable to each Contracting Party (based on the toll plazas operated by each such Contracting Party) according to the Traffic Report, such Transfer to be made from (and only to the extent of) the funds on deposit in the Consolidated Escrow Account.      Upon making such Transfer, the Escrow Agent shall provide electronically a notice (a "Notice of Transfer") to each Contracting Party in the form attached as Exhibit E. The Escrow Agent shall Transfer to the Authority any Unpaid Tolls recovered and deposited in the CSC Escrow Account in the next weekly Transfer payment following the deposit of such Unpaid Tolls in the CSC Escrow Account. The Authority shall pay each Concessionaire its portion of the Unpaid Tolls as, when, and to the extent, payable in accordance with such Concessionaire's Concession Agreement. For purposes of this Section 5(a), each calendar month has four "weeks" as follows: 1st day of the month to the 7th day of the month, 8th day of the month to the 14th day of the month, 15th day of the month to the 21st day of the month, and 22nd day of the month until the applicable month end.

(b)    Upon receipt of a Notice of Transfer, each Contracting Party shall promptly send electronically a written acknowledgement of the same to the Escrow Agent and the Authority.  If the Escrow Agent has not received an acknowledgment from each Contracting Party within two (2) Business Days after the Escrow Agent's delivery of the Notice of Transfer, the Escrow Agent shall send (by personal delivery) a copy of the same to the Contracting Party(ies) that has (have) failed to acknowledge the Notice of Transfer.

(c)    If any Contracting Party gives notice to the Escrow Agent (with a copy delivered contemporaneously to each other Contracting Party) disputing the amounts of any Transfer (a "Counter Notice") within thirty (30) Business Days following the earlier of (i) receipt of electronic written acknowledgement or (ii) personal delivery, as applicable pursuant to Section 5(b) above, by the Escrow Agent of the Notice of Transfer regarding such Transfer, such dispute shall be resolved as provided in Section 5(f) below.  Any Counter Notice shall set forth in reasonable detail the basis for the objection to the Transfer.

(d)    If no Counter Notice is received by the Escrow Agent within such 30-day period or if the Counter Notice applies only to a portion of the Notice of Transfer, then the dollar amount of Transfers set forth in the Notice of Transfer, to the extent undisputed, shall be deemed agreed to for purposes of this Escrow Agreement.

(e)    On or before the fifteenth (15th) day of each month, the Authority shall cause the ETC Service Provider to deliver to each Contracting Party a reconciled monthly traffic report encompassing all the Traffic Reports of the preceding month with any and all adjustments. On or before the fifteenth (15th) day of each month, the Escrow Agent shall provide each Contracting Party with a copy of the Escrow Agent report required by Section 4 of this Escrow Agreement.  Any debit or credit resulting from the information provided in the reports referred to in this Section 5(e) will be reconciled in the first weekly Transfer payment following the issuance of the reconciled monthly traffic report.

(f)    Contracting Parties shall resolve the matters disputed on the Counter Notice according to the dispute resolution procedure set forth in Section 17.  The Order issued in such procedure shall specify how the Escrow Agent shall apply Earned Tolls in the Escrow Fund or future Earned Tolls received to resolve the dispute.  The Escrow Agent shall act in accordance with such Order without further instruction.

(g)    Each Contracting Party will be responsible for that portion of the monthly Fees equal to the proportion that its Earned Tolls for such month bears to total Earned Tolls for such month. The Escrow Agent shall deduct each Contracting Party's share of the Fees for the preceding month from the first weekly Transfer payment following the issuance of the Escrow Agent report pursuant to Section 4 of this Escrow Agreement.

(h)    The Authority has the right to receive any moneys on deposit in the Consolidated Escrow Account as a result of transactions other than tolls due from vehicles passing through the ETC toll lanes, including, but not limited to, any fee payable to the Authority for the sale of ETC tags and any administrative fee charged to an account

as a result of ETC lane use violations such as speeding. The Bank will transfer these amounts to the Authority together with any Earned Tolls due to the account set forth in Section 5(a) above.

**Section 6.     Termination of Escrow**

This Escrow Agreement shall terminate when all the Contracting Parties have agreed to such termination by express written consent. Upon termination, any undisbursed Escrow Funds shall be distributed as directed by all the Contracting Parties in joint written instructions.

**Section 7.     Duties of the Escrow Agent**

(a)     The Escrow Agent shall not be under any duty to give the Escrow Fund held by it hereunder any greater degree of care than it gives its own similar property and shall not be required to invest any funds held hereunder except as directed jointly in writing by the Contracting Parties.

(b)     The Escrow Agent shall not be liable for any loss or damage, except to the extent that such loss or damage is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from the bad faith, gross negligence or willful misconduct of the Escrow Agent. The Contracting Parties shall severally and not jointly indemnify and hold harmless the Escrow Agent (and any successor Escrow Agent) from and against any and all losses, liabilities, claims, actions, damages and expenses, including reasonable attorneys' fees and disbursements, arising out of and in connection with this Escrow Agreement, except to the extent that such loss or damage is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from the bad faith, gross negligence or willful misconduct of the Escrow Agent. Without limiting the foregoing, the Escrow Agent shall in no event be liable in connection with its investment or reinvestment of any cash held by it hereunder, in accordance with the Contracting Parties' written instructions. This Section 7(b) shall survive notwithstanding any termination of this Escrow Agreement or the resignation of the Escrow Agent.

(c)     The Escrow Agent shall be entitled to rely upon any order, judgment, certification, demand, notice, instrument or other writing delivered to it hereunder without being required to determine the authenticity or the correctness of any fact stated therein or the propriety or validity of the service thereof. The Escrow Agent may act in reliance upon any instrument or signature of an Authorized Representative believed by it to be genuine and may assume that the person purporting to give receipt or advice or make any statement or execute any document in connection with the provisions hereof has been duly authorized to do so. The Escrow Agent may conclusively presume that the Authorized Representative of any Contracting Party has full power and authority to instruct the Escrow Agent on behalf of that Contracting Party unless written notice to the contrary is delivered to the Escrow Agent.

(d)     THE ESCROW AGENT MAY CONSULT WITH COUNSEL OF ITS OWN CHOICE AND SHALL HAVE FULL AND COMPLETE AUTHORIZATION AND PROTECTION FOR ANY ACTION TAKEN OR SUFFERED BY IT

7

HEREUNDER IN GOOD FAITH AND IN ACCORDANCE WITH THE OPINION OF SUCH COUNSEL, AND THE REASONABLE FEES AND EXPENSES OF ITS COUNSEL OR ANY ACCOUNTANT IT ENGAGES HEREUNDER SHALL BE PAID DIRECTLY BY THE CONTRACTING PARTIES IN EQUAL PROPORTIONS.

(e)     The Escrow Agent does not have any interest in the Escrow Fund deposited hereunder but is serving as escrow holder only and having only possession thereof. Any payments of income from this Escrow Fund shall be subject to withholding regulations then in force with respect to United States and Commonwealth of Puerto Rico taxes. The Contracting Parties will provide the Escrow Agent with appropriate Internal Revenue Service and Puerto Rico Department of the Treasury forms for tax identification number certification, or non-resident alien certifications, and the Escrow Agent shall accept such form in the manner provided by the Contracting Parties.

(f)     The Escrow Agent (and any successor Escrow Agent) may at any time resign as such by delivering the Escrow Fund to any successor Escrow Agent jointly designated by all the Contracting Parties in writing, or to any court of competent jurisdiction, whereupon the Escrow Agent shall be discharged of and from any and all further obligations arising in connection with this Escrow Agreement, except for claims arising from events occurring before the effective date of the Escrow Agent's resignation, which shall survive such resignation. The resignation of the Escrow Agent will take effect on the earlier of (a) the appointment of a successor (including a court of competent jurisdiction) or (b) the day which is thirty (30) days after the date of delivery of its written notice of resignation to the Contracting Parties. If at that time the Escrow Agent has not received a designation of a successor Escrow Agent, the Escrow Agent's sole responsibility after that time shall be to retain and safeguard the Escrow Fund until receipt of a designation of successor Escrow Agent or a joint written disposition instruction by all the Contracting Parties hereto or a final non-appealable Order.

(g)     In the event of any disagreement between the Contracting Parties resulting in adverse claims or demands being made in connection with all or a portion of the Escrow Fund or in the event that the Escrow Agent is in doubt as to what action it should take hereunder, the Escrow Agent shall be entitled to retain such disputed portion of the Escrow Fund until the Escrow Agent shall have received (i) a final non-appealable Order directing delivery of the disputed portion of the Escrow Fund or (ii) a written agreement executed by all the Contracting Parties directing delivery of the disputed portion of the Escrow Fund, in which event the Escrow Agent shall disburse the disputed portion of the Escrow Fund in accordance with such Order or agreement. The Escrow Agent shall act on such Order without further question. THE ESCROW AGENT MAY, AT ITS SOLE DISCRETION, FILE AN ACTION IN INTERPLEADER TO RESOLVE ANY SUCH DISAGREEMENT. THE ESCROW AGENT SHALL BE INDEMNIFIED SEVERALLY (IN EQUAL PERCENTAGES) AND NOT JOINTLY BY THE CONTRACTING PARTIES FOR ALL OF ITS REASONABLE CHARGES AND COSTS, INCLUDING REASONABLE ATTORNEY'S FEES IN CONNECTION WITH SUCH INTERPLEADER OR IN ANY MATTER BEING ARBITRATED.

(h)    As full compensation for the services to be rendered by the Escrow Agent hereunder, the Contracting Parties agree to pay the Escrow Agent the Escrow Agent Fees described in Exhibit F attached hereto. After reasonable prior written notice to the Parties, the Escrow Agent may modify the Escrow Agent Fees described in Exhibit F on a yearly basis in order to reflect then current market rates for such services. The Escrow Agent Fee shall be divided among the Contracting Parties in the manner set forth in Section 5(g) above. In addition, each Contracting Party shall be responsible for the payment of the individual activity fees incurred by such Contracting Party. Any fees or expenses of the Escrow Agent or its counsel that are not paid directly by the responsible Contracting Party as provided for herein may be deducted from any Transfer payable to such Contracting Party out of the Consolidated Escrow Account. If the Escrow Agent is unable to obtain full reimbursement from the Transfers due to such Contracting Party out of the Consolidated Escrow Account, the responsible Contracting Party shall promptly reimburse the Escrow Agent directly.

**Section 8.    Limited Responsibility**

This Escrow Agreement expressly sets forth all the duties of the Escrow Agent with respect to any and all matters pertinent hereto. No implied duties or obligations shall be read into this Escrow Agreement against the Escrow Agent. The Escrow Agent shall not be bound by the provisions of any agreement among the other parties hereto except this Escrow Agreement.

**Section 9.    Ownership for Tax Purposes**

The Contracting Parties agree that, for purposes of federal, Commonwealth of Puerto Rico and, except as provided in Section 5(a) and (b), other taxes based on income, each Contracting Party will be treated as the owner of its respective portion of the Escrow Fund and each Contracting Party will report all income, if any, that is earned on, or derived from, its portion of the Escrow Fund as its income in the taxable year or years in which such income is properly includible and pay any taxes attributable thereto.

**Section 10.    Notices**

All notices, consents, waivers and other communications under this Escrow Agreement must be in writing and shall be given personally or sent by internationally recognized overnight delivery service. Any such notice shall be deemed to have been given when received, if delivered in person or sent by such overnight delivery service, in any such case to the address set forth beside each Contracting Party's name on Exhibit A or as set forth below (or to such other address or addresses as a Contracting Party may have advised the other in the manner provided in this Section 10):

| If to the Authority: | Puerto Rico Highways and Transportation Authority |
| | Roberto Sánchez Vilella Government Center |
| | De Diego Avenue, Stop 22 |
| | Santurce, Puerto Rico 00940 |
| | Attention: General Counsel |
| | Telephone:   (787) 721-8787 |
| | Facsimile:    (787) 727-5456 |
| with a copy to: | Government Development Bank for Puerto Rico |
| | Roberto Sánchez Vilella Government Center |
| | De Diego Avenue, Stop 22 |
| | Santurce, Puerto Rico 00940 |
| | Attention:     President |
| | Telephone:   (787) 722-8460 |
| | Facsimile:    (787) 721-1443 |
| If to the Escrow Agent: | Banco Popular de Puerto Rico |
| | Fiduciary Services Division |
| | 153 Ponce de Leon Ave. |
| | 8th Floor |
| | San Juan, PR 00918 |

**Section 11.    Governing Law, Jurisdiction; Service of Process**

This Escrow Agreement shall be interpreted, construed, enforced and administered in accordance with the internal substantive laws (and not the choice of law rules) of the Commonwealth of Puerto Rico. Each of the parties hereto submits to the personal jurisdiction of the courts located in the Commonwealth of Puerto Rico and each agrees that, subject to the dispute resolution mechanism provided in Section 17, all proceedings relating hereto must be brought in a local Commonwealth of Puerto Rico court. To the extent that any party may be entitled to claim, for itself or its assets, immunity from suit (whether before or after judgment) or other legal process, each hereby irrevocably agrees not to claim, and hereby waives, such immunity.

**Section 12.    Counterparts**

This Escrow Agreement may be executed in one or more counterparts, each of which will be deemed to be an original and all of which, when taken together, will be deemed to constitute one and the same.

**Section 13.    Section Headings**

The headings of sections in this Escrow Agreement are provided for convenience only and will not affect its construction or interpretation.

Section 14.    Waiver

The rights and remedies of the parties to this Escrow Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Escrow Agreement or the documents referred to in this Escrow Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Escrow Agreement or the documents referred to in this Escrow Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by each other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Escrow Agreement or the documents referred to in this Escrow Agreement.

Section 15.    Exclusive Agreement and Modification

This Escrow Agreement supersedes all prior agreements among the parties with respect to its subject matter and constitutes (along with the documents referred to in this Escrow Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This Escrow Agreement may not be amended except by a written agreement executed by the Contracting Parties and the Escrow Agent; provided, that the Authority may include an additional Concessionaire as a Contracting Party to this Escrow Agreement by (a) having such Concessionaire execute a Joinder Agreement in the form of Exhibit G and (b) providing the Escrow Agent reasonable advance written notice thereof and (c) providing the information required to update Exhibits A and B with the new Concessionaire's information.

Section 16.    Merger or Consolidation or Change of Name of the Bank

Any corporation into which the Escrow Agent or any successor Escrow Agent may be merged or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Escrow Agent or any successor Escrow Agent is a party, or any corporation succeeding to the trust business of the Escrow Agent, will be the successor to the Escrow Agent under this Escrow Agreement without the execution or filing of any paper or any further act by any of the parties hereto.

Section 17.    Procedure to Resolve Disputes Arising in Connection with a Counter Notice

If any Contracting Party shall dispute the amount of a Transfer by means of a Counter Notice as set forth in Section 5(c), the Contracting Parties shall first attempt to reconcile their differences, and any written resolution by them as to any disputed amounts shall be final, binding and conclusive on the Contracting Parties. During such period, the Authority shall provide any Contracting Party with reasonable access to all books and records regarding the applicable Traffic Report it may have in its possession. The Authority shall only be required to provide

11

information or records regarding a Traffic Report to the extent such information or records are in the Authority's possession on the date the Counter Notice was issued; *provided that*, at such Concessionaire's sole expense, the Authority shall promptly acquire such information or records as is reasonably requested by the Concessionaire that the Authority is entitled to obtain from the ETC Service Provider pursuant to its contract for ETC services with such ETC Service Provider.

If the Contracting Parties are unable to reach a resolution with respect to all of the items specified in a Counter Notice within ten (10) Business Days after the date of receipt by the Contracting Parties of such notice, then any Contracting Party may submit the items remaining in dispute for resolution to a nationally or locally (must be among the top five (5) local accounting firms) recognized accounting firm that does not provide services to any of the Contracting Parties and that is mutually acceptable to the Contracting Parties (the "Independent Accountants"), which shall, within thirty (30) Business Days after such submission or such longer period as the Independent Accountants may require, determine and report to the Contracting Parties upon such remaining disputed items, and such determination shall be final, binding and conclusive on the Contracting Parties. The fees and disbursements of the Independent Accountants shall be borne by the Contracting Party(ies) that is (are) not favored by the Independent Accountants' final determination. If more than one Contracting Party is not favored by such determination, such fees and disbursements shall be shared in the proportion that their shares of the adjustment to the Transfer bears to the total adjustment.

Any payments due as a result of the Independent Accountants' final determination, if any, including fees and disbursements due to the Independent Accountants, shall be made by the Escrow Agent from the Consolidated Escrow Account by wire transfer or delivery of other immediately available funds to the account set forth in Exhibit A no later than three (3) Business Days after the date on which the Contracting Parties reach an agreement or, if applicable, the date on which the Independent Accountants' report is delivered to the Contracting Parties. The amount paid shall be deducted from the next Transfer payment due to the Contracting Party which had wrongfully received the amounts of the Transfer being disputed.

**Section 18.**     **Certain Defined Terms**

As used herein, "Business Day" means any day that is neither a Saturday, a Sunday nor a day observed as a holiday by either the Commonwealth or the United States government.

**[SIGNATURE PAGE FOLLOWS]**

12

IN WITNESS WHEREOF, the parties have executed and delivered this Escrow Agreement as of the date first written above.

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

By:

Name: Eng. Rubén Hernández Gregorat
Title: Executive Director

**AUTOPISTAS METROPOLITANAS DE PUERTO RICO, LLC /**

By:

Name: JORGE GRAELLS FERRANDEZ
Title: Authorized Representative

**BANCO POPULAR DE PUERTO RICO, FIDUCIARY SERVICES DIVISION, as Escrow Agent**

By:

Name: Hector Rivera Rivera
Title: Vice-President

**BANCO POPULAR DE PUERTO RICO**

By:

Name: Mauricio Guerra-Mondragon
Title: Assistant Vice-President

*[Escrow Agreement Signature Page]*

## SCHEDULE 1
## MERCHANT AGREEMENT

(attached)



**BANCO POPULAR**

Contrato con Comerciante para el
Servicio de Tarjetas - Anejo I

Merchant Tracking

| ☐ Nuevo | ☑ Tienda Adicional | ☐ Añadir Productos | ☐ Equipo Adicional | |
|---|---|---|---|---|
| Organización | Número de Comerciante | Nombre del Comerciante PRAJE REMCT-AC-PAYMENT GATEWAY | | Fecha Tandem |

Dirección Física (Asegúrese de escribir el código postal.)
Centro Servicio Al Cliente AubExpreso
Ctro. Gubernamental Minillas
Pda. 22 Santurce P.R. 00910

Dirección Postal (Asegúrese de escribir el código postal.)
PO Box 42007
S.J. P.R. 00940-2007

| Persona Contacto en Oficina Principal Jack Allison | Gerente de Tienda | | Teléfono en Tienda 620-3770 | Número de Fax Oficina |
|---|---|---|---|---|
| Número Representante BPPR | Tipo de Comerciante Gobierno | Tienda en Cadena 3239 ✓ | | Held Statement |
| Average Ticket (cantidad) $25 | Volumen Mensual (cantidad) $35,000 | Agent Bank 628 | | Merchant Category / SIC Code 4784 X |

| Términos y Condiciones | ☑ VISA ☑ Mastercard | ☑ ATH N/A | ☐ MonetCard | ☐ EBT Cash Food | ☐ E-CHECK | ☐ Otro (Indique el Nombre) |
|---|---|---|---|---|---|---|
| DDA Cuenta Depósito (Escriba el número) | 0003 | | | | | |
| DDA Cuenta Operacional (Si aplica) N/A | | | | | | |
| Número de Comerciante | 0013 | | | | | |
| Límite de Piso | 0 | | | | | |
| Cuota de Miembro Mensual | 0 | | | | | |
| Cargo por Servicio (%) o Transacción | 2.50 | 2.50 | 0 N/A | + 0.25 per transaction | | |
| Solicitud para Recibir Órdenes por Consumo Telefónico (Indique Sí/No) | | | | | | |
| Aseguramiento en cuestiones mediante Información, según se establece en el Contrato para Comerciante para el Servicio de Tarjeta (Indique Sí/No) | | | | | | |

| Términos y Condiciones | ☐ 1 - Impresora (IMP) | ☐ 2 - Terminal Autorización (POS) P | ☐ 3 - Terminal Captura (POS) D | ☑ Restituidos | ☐ Check Reader | Información para Piso (Número de Comerciante Distinto) |
|---|---|---|---|---|---|---|
| Cantidad por Equipo | | | | | | Número AX |
| Cargo por unidad (Escriba la Cantidad) | | | | | | |
| Modelo de Terminal (Escriba el código correspondiente) | | | | | | |

**Instrucciones Especiales o Adicionales**

| | Banco Electrónico | ☐ Adiestramiento | ☐ Línea Disponible |
|---|---|---|---|
| Entrada de Datos SET-UP FEE $250.00 | N/A | ☐ Registro Otra | |
| Observaciones ☐ Propias ☐ Para | ☐ Cash Back ☐ Otro N/A | ☐ Uso / Cashier | [signature] Payment Gateway |
| Persona Contacto en Tienda | Teléfono en Tienda | Teléfono Oficial de "Beepe" | Número de Fax |

El Comerciante autoriza al Banco a efectuar una Investigación / verificación de su crédito, ingresos y referencias de crédito como requisito previo a la aprobación de este Contrato. El banco se reserva el derecho de aprobar este Contrato sujeto a las normas vigentes del Banco para el Servicio de Tarjetas.

El Comerciante certifica que toda la expuesta es cierta y correcto y confirma haber recibido el contrato con Comerciante para el Servicio de tarjetas, el Folleto Operacional del Sistema Pagoelexpreso (si aplica) y el Anejo I de este Contrato, haberlas leído y estar de acuerdo con todas sus partes.

| Banco Popular de Puerto Rico | Comerciante AUTORIDAD DE CARR y TRANSP |  Seguro Social Patronal |
|---|---|---|
| [signature] | Nombre en letra de molde | |
| Firma Autorizada [4/21/04] | [signature] Jack Allison | Seguro Social    Fecha |
| Firma del Representante de Venta [signature]   Fecha 2004 | Nombre / Firma Autorizada | Seguro Social    Fecha |

| Código | | Para Uso de Data Entry | | | | | | Banco Electrónico | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 Modelo de Terminal | | Vídeo | Data24 | Estadísticas | Proofreading Vídeo Data24 | | Banc24 | TNMS | ☐ MAPP | ☐ AMBX |
| V-330 - Verifone 330 | RD Autorizado | | | | | | | | | |
| H-7 - Hypercom T-7 | | | | | | | | | | |
| AX - American Expres 3200 | TD Adicional | | | | | | | | | |
| ECR - Caja Registradora | Iniciales | | | | | | | | | |
| O - Otro (Conlra el Banco) | Fecha | | | | | | | | | |

PRODUCTOS DE TARJETAS

# Merchants

# Contract for

# Cards Service


**BANCO POPULAR** ®

TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Definitions | 1 |
| II. | General Obligations and Agreements of Merchant | 4 |
| III. | Authorizations for Card Transactions | 6 |
| IV. | Normal Transactions | 6 |
| V. | High Risk Transactions | 6 |
| VI. | Card Payment of Insurance Policy Premiums | 10 |
| VII. | Chargebacks, Claims by Merchant, Fines for Chargebacks | 11 |
| VIII. | Merchandise Returns and Voiding or Cancellation of Credit Transactions | 12 |
| IX. | Deposit of Sales Slips and Credit Slips | 14 |
| X. | Special Provisions for Express Pay Service | 15 |
| XI. | Reserve Account and Guaranties | 19 |
| XII. | Deposit Account or Operational Account | 20 |
| XIII. | Guaranties by Merchant | 21 |
| XIV. | Indemnities of the Merchant | 22 |
| XV. | Charges | 24 |
| XVI. | Security Interest | 25 |
| XVII. | Record Retention, Foreclosure Orders, Confidentiality, Privacy | 26 |
| XVIII. | Advertising, Promotion | 26 |
| XIX. | Term and Termination of the Contract | 27 |
| XX. | Other General Terms and Conditions | 28 |

APPENDIX I
 Procedure for Normal Transactions with Cards ......... 31

APPENDIX II
 Procedure for Normal Transactions with Cards ......... 33

APPENDIX III
 Procedures for Guaranteed Hotel Reservation
 Service and Delayed Charges ......... 33

 **BANCO POPULAR**

Contract with Merchant
for Card Services

This Contract between Banco Popular of Puerto Rico (the Bank) and the person or legal entity identified in Addendum I of this Contract (the Merchant), sets forth the terms and conditions upon which the Bank will provide the Merchant with services consisting of the processing of payments by using credit or debit cards, in order to allow Merchants' customers to pay with such cards for the goods or services offered by the Merchant at its establishment.

**TERMS AND CONDITIONS**

I.   **DEFINITIONS**

1.1   "Alert Notices" are the written warnings sent by the Bank to the Merchant from time to time, either with the account statement or otherwise, regarding prevention of fraudulent or illegal situations concerning use of the Cards.

1.2   "ATH Card" is the debit card issued by the Bank to its clients to access the ATH Network and to conduct POS Transactions.

1.3   "ATH Network" is the network for electronic processing of transactions made through automatic teller machines owned or operated by Participating Entities, POS Terminals and the Internet Network.

1.4   "Authorization Center" is the authorization center to be maintained by the Bank for the approval of transactions made with the Cards, which will be open during such hours as the Bank shall specify.

1.5   "Authorization Equipment" refers to the electronic systems used by the Bank for the authorization of transactions.

1.6   "Authorized Issuers" are the institutions with which the Bank has in effect an exchange program for the acceptance of Cards.

1.7   "Authorization Number" is the code assigned by the Bank to transactions submitted for authorization by the Merchant.

1.8   "Bank" is Banco Popular of Puerto Rico. For purposes of the indemnities and releases provided in Section XIV of this Contract in favor of the Bank, the term A Bank also includes affiliates, subsidiaries, parent corporations, general partners, officers, directors, agents, assignees, third party information suppliers and successors in interest of Banco Popular of Puerto Rico.

i

1.9   "Card" refers to the Credit Cards and the Debit Cards.

1.10  "Cardholder" is a person to whom a Card has been issued or a person authorized by said person to use the Card.

1.11  "Cards Organizations" are the national and international associations of cards such as VISA International or MasterCard International Incorporated, that promulgate operational rules and operate a system to exchange Sale slips or Credit Slips between Merchant's, the Bank and Authorized Issuers. In the case of Debit Cards, the term Cards Organizations includes debit networks.

1.12  "Card Transaction Statement" (Merchant Statement) is the monthly report sent by the Bank to the Merchant reflecting all the credits, debits and other charges resulting from Card transactions by the Merchant during the month in question.

1.13  "Code 10" is a key code to be used by the Merchant in the event of suspicion of irregular or fraudulent transactions.

1.14  "Contract" refers to this Contract with Merchant for Credit Card Services, including the attachments, appendices and addenda incorporated herein and made a part of the same, as well as the operational rules of the Bank regarding the Cards, the Operations Brochure for Express Pay Service and the regulations issued by the Card Organizations.

1.15  "Credit Card" is a credit card or mechanism issued by the Bank or by an Authorized Issuer to obtain credit.

1.16  "Credit Slip" is the printed form provided by the Bank that may be manually or electronically processed, to evidence the reimbursement or adjustment in price to be credited to the acount of a Cardholder by reason of any return.

1.17  "Deposit Account" means the deposit account to be kept by the Merchant with the Bank pursuant to Section XII of this Contract.

1.18  "Debit Card" is an ATH Card or a debit card issued by a Participating Entity to its customers to access the ATH Network and to conduct debit transactions at POS Terminals.

1.19  "Express Pay Service" is the service offered by the Bank for the electronic processing of payments by using the Cards.

1.20  "Floor Limit" is the maximum amount authorized by the Bank to the Merchant to process a transaction without the need to obtain prior authorization of the Bank.

1.21  "High Risk Transactions" are transactions with a Card in which the Cardholder does not present the Card when making the transaction, or in relation to which the Merchant shows no evidence of the presence of the Card, and other transactions described in Section V of this Contract.

1.22  "Internet Network" is the World Wide Web.

1.23  "Manual Transaction" is the transaction made using the manual printer requiring authorization of the Authorization Center and documents in support of its validity.

1.24  "Merchant" is the natural person or legal entity identified as Amerchant in Addendum I incorporated herein and made a part of this Contract and its assignees, successors and permitted designees.

1.25  "Normal Transactions" are all the transactions with Cards that may be Manual Transactions or POS Transactions that are not High Risk Transactions.

1.26  "Operational Account" is the account that Merchant will maintain with the Bank pursuant to Section VI of this Contract, as further identified in Attachment I.

1.27  "Operational Brochure" of the Express Pay Service is the compilation of operational norms relative to the Express Pay Service.

1.28  "Participating Entities" are financial institutions who have signed a contract to participate in the ATH Network and to share automatic teller machines.

1.29  "Personal Identification Number" (PIN) is a secret code number selected by the Cardholder or by the institution issuing the Card which acts as the Cardholder's key for using the Express Pay Service.

1.30  "POS Equipment" are the POS Terminals and related equipment used in the Express Pay Service.

1.31  "POS Terminal" is the electronic equipment used at the sales points in the Merchant's business establishment in connection with the Express Pay Service.

1.32  "POS Transaction" is an electronic transaction made through the Express Pay Service's POS Terminals, wherein the Card's magnetic band is read by the POS Terminal.

1.33 "Premiums Deposit Account" is the account in which Merchant's payments for premiums of insurance policies financed with the Card will be deposited. The Premiums Deposit Account will be governed exclusively by the provisions in Section VI of this Contract.

1.34 "Quasi-Cash Transaction" is a transaction representing the sale of articles directly convertible into cash, such as gambling chips, money orders and similar transactions.

1.35 "Reserve Account" is the account that Merchant agrees to establish to cover overdrafts and other amounts payable to the Bank under this Contract pursuant to Section XI of this Contract.

1.36 "Sale Slip" is the printed form provided by the Bank or printed by the POS terminal to evidence each transaction made by the Merchant with a Card.

1.37 A "Transaction with Deferred Effect" ocurrs when the Cardholder makes a transaction using a Card and the goods are delivered or the services are rendered on a later date.

1.38 "Truncated Account Number" refers to a security characteristic whereby the first twelve digits of the Cardholder's account number are omitted from the Sale Slip.

## II. GENERAL OBLIGATIONS AND AGREEMENTS OF THE MERCHANT

2.1 General Obligations of the Merchant

a) The Merchant will honor and accept only in its establishments located in Puerto Rico, the United States Virgin Islands and the British Virgin Islands or others agreed to with the Bank, all the Cards issued by the Bank or by Authorized Issuers, that are presented by a Cardholder, in accordance with the terms of this Contract, without discriminating in any manner among the Cardholders and clients of Merchant paying in cash.

b) The Merchant agrees to comply with all laws and regulations applicable to the Cards, with the regulations promulgated by the Cards Organizations and with the operational procedures that the Bank may establish from time to time for Card transactions, as set forth below in this Contract. Similarly, the Merchant agrees to observe the procedures established in the Operational Brochure of the Express Pay Service that the Merchant acknowledges having received from the Bank, as the same may be amended by the Bank from time to time.

2.2 General Agreements of the Merchant

a) The Merchant agrees:

i) Not to charge the Cardholder any part or all of the discount fee that under this Contract may be charged to the Merchant.

ii) Not to increase the cost of goods and services because they are paid for with the Card.

iii) Not to refuse to conduct a transaction only because a Cardholder that has complied with the requirements to have its Card accepted, refuses to provide additional identification such as identification with photo, telephone, address, etc., unless such information is necessary to complete the transaction, is required by the Authorized Issuers or the Card is not signed, in which case the Merchant must require that it be signed.

iv) To adequately display the promotional material provided by the Bank to inform the public that the Card is accepted at the Merchant's establishment.

v) Regarding electronic commerce transactions, not to refuse to complete a transaction solely because the Cardholder does not have a digital certificate.

vi) Not to require a minimum transaction amount to accept the Card.

vii) To display the notices issued by the Bank to protect and preserve the rights of the Bank under this Contract.

b) The Bank will provide the Merchant with printed forms of Sales Slips and Credit Slips, compatible printers, promotional posters, affiliation logo for the Merchant and any other promotional material containing the symbol and corporate name authorized by each Authorized Issuer of a Card. The Merchant acknowledges that the Bank is the owner of all the terminals, printers and equipment installed and identified in Addendum I of this Contract and that the Bank may reclaim such equipment at any time.

c) To conduct a transaction with the Card, the Merchant will use the form of the Sales Slip provided by the Bank. The Bank will accept and consider as evidence of a Card transaction the Sales Slips signed by the Cardholder, as provided in this Contract, and that have been filled out according to the terms and conditions set forth in this Contract.

d) In the event that Floor Limit is authorized the Merchant will not use more than one Sales Slip, nor divide the Sales Slip to avoid having to request authorization for the transaction.

## III. AUTHORIZATIONS FOR CARD TRANSACTIONS

### 3.1 Authorizations Required

The Bank authorizes the Floor Limit stipulated in Attachment I of this Contract, if any. The Bank reserves the right to modify the Floor Limit from time to time, by written notice. The Merchant agrees to obtain the authorization of the Authorization Center to process any Card transaction when the Floor Limit is zero. In those cases in which a Floor Limit is authorized, the authorization of the Authorization Center must be obtained when the transaction amount exceeds the Floor Limit; when issuing more than one Sales Slips; and in other circumstances set forth in Section IV and Section V of this Contract. In all cases in which the Authorization Center authorizes a transaction, the Merchant will write the date and Authorization Number assigned by the Bank to the transaction in the space provided on the Sales Slip.

### 3.2 Authorization Does Not Excuse the Merchant

The Merchant acknowledges that obtaining the Bank's authorization for a transaction does not assure that the person using the Card is the Cardholder, therefore even upon obtaining authorization, the Merchant will be obligated to reimburse the Bank for certain transactions, including but not limited to, the use of the Card by an unauthorized Cardholder, for claims or defenses of the Cardholder related to the charges made to the Cardholder's Card by the Merchant or for High Risk Transactions, as provided below in this Contract.

## IV. NORMAL TRANSACTIONS

### 4.1 Procedure

For any Normal Transaction, the Merchant agrees to comply with the procedure set forth in Appendix I to this Contract.

## V. HIGH RISK TRANSACTIONS

### 5.1 General Procedure

The Merchant may authorize High Risk Transactions, at its own and sole risk and discretion and hereby guarantees to the Bank the payment of same, and that the person making the transaction is the person whose name appears as Cardholder on the Sale Slip. Regarding High Risk Transactions, the Merchant will carry out the general procedure set forth in Appendix II of this Contract and will also comply with any other additional requirement or procedure established for each High Risk Transaction, as set forth in this Contract. The Merchant agrees and recognizes that the Bank's authorization of any High Risk Transaction does not release the Merchant from its guaranty to the Bank concerning such transactions.

### 5.2 Quasi-Cash Transactions

For Quasi-Cash Transactions the Merchant must follow the following general procedure:

a) Identify the Cardholder by photo identification. If the Card does not have a photo, prior to completing the transaction, the Merchant shall: review identification of the Cardholder bearing a signature; verify that the signatures on the identification produced, the Card and the Sale Slip are reasonably similar; write down the type of identification and its identifying number on the Sale Slip and process the Personal Identification Number of the Cardholder, if applicable. If the Card bears a photo, it is not necessary to require production of another type of identification. In that case, the Merchant shall verify that the Cardholder is reasonably similar in appearance to the person in the photo, write on the Sale Slip "Photo Card Provided" and verify that signatures match.

b) In addition to the foregoing, Merchant shall compare the first four (4) digits of the engraved account number with the four (4) printed digits above or below the account number and write down the four (4) printed digits on the Sale Slip for the Quasi-Cash Transaction in question.

c) If the digits do not match, the Merchant shall not accept the transaction and shall try to withhold the Card by peaceful means. If unable to withhold the Card, the Merchant must notify the Authorization Center immediately.

### 5.3 Pre-authorized Transactions

The Merchant may authorize a pre-authorized Card transaction in which the Cardholder, through a written notice, authorizes the delivery of goods or services on a future date, without having to fill out a Sale Slip at the time of the delivery or rendering of services by following the procedure established in Section 5.5. The authorization will identify the goods to be delivered or the services to be rendered, the total amount of the transaction and the due dates of the balance of the transaction. In the event that the Cardholder presents a Card to authorize one of

such transactions, the Merchant will follow the procedure established in Section IV of this Contract and said transaction will not be considered a High Risk Transaction.

5.4 Transactions with Deferred Effect

The Merchant may process a Transaction with Deferred Effect by completing a Sale Slip that represents an initial partial payment and a second Sale Slip representing the remainder of the sale price. The second sale slip shall become effective only upon delivery of the merchandise or the rendering of services. In Transactions with Deferred Effect, authorization is required if the total amount of both slips exceeds the applicable Floor Limit. If authorization is obtained, the authorization will be valid for both Sale Slips. In that case, the Merchant will indicate on the Sale Slips "Deposit" or "Pay-off", as may be appropriate. The Sale Slip marked A Pay off will not be deposited until the merchandise has been delivered or the services rendered.

5.5 Transactions by Telephone or Mail and Transactions for Special Services

The Merchant may process transactions for orders placed by telephone or mail when expressly authorized to do so in Attachment I of this Contract and the Merchant agrees to comply with the procedures established herein below. For any transaction made by telephone, or by mail and for pre-authorized orders, reservation service, express check-out, advance deposit for stay and electronic commerce transactions in which the Cardholder does not sign the Sale Slip, the Merchant agrees to comply with the procedure established in Appendix II of this Contract and with the following additional procedures:

a) Write legibly, in the space provided for the signature of the Cardholder in the Sale Slip, as applicable: "TO" for telephone orders, "MO" for mail orders, "PO" for pre-authorized orders, "Guaranteed Reservation/No Show" for reservation services, "Signature on File-Express Check-Out" for express check-out order, or "Advanced Deposit" for deposit in advance for stay or "EC" for electronic commerce transactions;

b) Print legibly in the Sale Slip the inscription of the Card and the identification plate of the Merchant in a printer acceptable to the Bank (this is an indispensable requirement for all express check-out sales).

c) Verify the address to which the merchandise will be sent and write in the space provided for the date on the Sale Slip, the shipment date of the merchandise;

d) Retain the documents related to the authorization of the transaction by the Cardholder for review by the Bank upon request; and

e) Stop the delivery of goods or the rendering of services corresponding to a pre-authorized order upon receipt of notice that the pre-authorization was cancelled or the Card used for the pre-authorized sale was not accepted.

5.6 Guaranteed Hotel Reservation Service

For any transaction regarding guaranteed hotel reservation service, the Merchant agrees to comply with the requirements set forth in Appendix III of this Contract.

5.7 Delayed Charges

The Merchant may process delayed or amended charges if the cardholder has consented to be liable for delayed or amended transactions such as room charges, meals, beverages or taxes in hotels and motels; insurance charges, damages to property, parking tickets, traffic violations in leasing and rental companies for cars and goods and services on cruise lines. For such transactions, the Merchant agrees to comply with the requirements set forth in Appendix III of this Contract.

5.8 Transactions Without Sale Slip in POS/Manual Printer

Any transaction in which the Cardholder presents the Card and the transaction is processed without the Sale Slip being printed, the Merchant accepts the transaction at its own risk as a High Risk Transaction and agrees to write the following legibly on the Sale Slip:

a) The information necessary to identify the Cardholder, the Merchant and the Authorized Issuer (name and address of Merchant and the business name of the Authorized Issuer, as it appears on the Card);

b) The Cardholder's account number;

c) The issue date and expiration date of the Card (if available);

d) The name of the Cardholder;

e) Any other printed or recorded information on the Card such as security symbols or codes.

5.9 Electronic Commerce Transactions

For any transaction made through the Internet Network in which Merchant processes a Sale Slip not signed by the Cardholder, the Merchant agrees to comply with the requirements set forth in Section 5.5 of this Contract.

## VI. CARD PAYMENTS OF INSURANCE POLICY PREMIUMS

6.1 Entire Premium

For transactions using Cards to pay insurance policy premiums, the Merchant agrees that premiums charged to the Card shall have been approved by the Commissioner of Insurance if required by law. For each such transaction, the Merchant represents and warrants to the Bank that the premium charged is the entire premium approved by the Commissioner of Insurance and that it has not been subject to any charge, surcharge, or discount by the Merchant. The Bank is neither authorized nor obligated to accept instructions by the Merchant to debit, freeze or set-off the Premiums Deposit Account of the Merchant for charges, surcharges or discounts owed the Bank under this Contract.

6.2 Premiums Deposit Account

For transactions governed by this Section VI, the Merchant will maintain the Premiums Deposit Account with the Bank into which all payments of insurance policy premiums financed with the Card will be credited. No other funds shall be deposited in the Premiums Deposit Account. The provisions of Section XII of this Contract regarding the Deposit Account will not be applicable, and the Premiums Deposit Account will be governed exclusively by the provisions this Section VI.

6.3 Operational Account

In addition to the Premiums Deposit Account, for transactions governed by this Section VI and pursuant to Attachment I, the Merchant shall maintain with the Bank the Operational Account with sufficient funds at all times to cover the following charges: all the charges under this Contract authorized by the Merchant to be debited by the Bank from said account from time to time, as agreed in Addendum I, or elsewhere in this Contract including, but not limited to, service charges, membership fees, chargebacks, equipment rental fees, any expense related to the installation of equipment in the event the equipment is returned before the term of one year from the date of execution of this Contract and any other fee related to the services offered under this Contract. The Merchant authorizes the Bank to credit or debit the

Operational Account as appropriate under the Contract. The Bank may issue and process these charges without prior notice to Merchant. The Operational Account will be subject to the usual terms and conditions applicable to deposit accounts of the Bank.

## VII. CHARGEBACKS, CLAIMS BY MERCHANT, FINES FOR CHARGEBACKS

7.1 Chargebacks

The Merchant agrees to reimburse the Bank through an adjustment to the Deposit Account, or Operational Account in the case of the transactions contemplated by Section VI of this Contract, the total amount evidenced by any Sale Slip that is charged back to the Bank for any reason by means of the procedures of the Card Organizations or claimed validly by a Cardholder, including, but not limited to, transactions:

a) Signed for by a person other than the Cardholder or that were not authorized by the Cardholder;

b) Issued for an amount in excess of the Floor Limit and not authorized by the Bank, or in which the Merchant has failed to comply with any other term of this Contract, including any representation or warranty by the Merchant;

c) Signed for by a person whose signature does not match reasonably the signature on the back of the Card;

d) That have not been filled out, authorized or deposited following the terms and conditions of this Contract;

e) That are illegible, incomplete or incorrect as to the name and signature of the Cardholder, account number, amount, authorization code and date of transaction;

f) Issued against a forged or altered Card or a cancelled or expired Card;

g) Involving a Card whose account number is registered in the Alert Notices issued by the Bank;

h) That are contrary to law;

i) Where the Merchant knew or should have known through the observation of appropriate practices that the Card should not have been accepted;

j) Involving a duplicate of another Sale Slip or representing one or more charges for the same transaction;

k) Where the Cardholder claims not to have participated in or approved the transaction; not to have signed the Sale Slip; not to have received the goods or services acquired with the Card or disputes their/its quality; that the return of the goods represented by the Sale Slip was unduly rejected or that a Credit Slip was never processed and credited to Merchant's account;

l) Was presented to the Bank outside the terms established under this Contract for its processing; and

m) Which constitute High Risk Transactions.

7.2  Claims by Merchant

In the event that the Merchant has any dispute or claim regarding any charge made by the Bank pursuant to this Section, it must submit such claim to the Bank in writing with all the pertinent documents or evidence as soon as it has knowledge of such claim, but in no event later than ten (10) days from the date of receipt of the statement of account for the Deposit Account or the Operational Account of the Merchant, in which the disputed item appears. After said ten (10) days have elapsed, if Merchant has not submitted its claim, the Bank will not be responsible to Merchant for reimbursement of the charge, regardless of the results of any investigation conducted with regard to said claim.

7.3  Fines for Excessive Chargebacks

In the event the Merchant has fifteen (15) or more chargebacks over a period of one month, the Bank will charge Merchant a fee in the amount set from time to time by the Bank as a recovery cost for each transaction charged back to the Merchant, during a minimum of one year, starting from the day following the month in which Merchant has exceeded the limit.

VIII.  **MERCHANDISE RETURNED AND VOIDING OR CANCELLATION OF CREDIT TRANSACTIONS**

8.1  Policy on Returns

The Merchant agrees to maintain a uniform policy for exchanges, returns and price adjustments for goods or services related to Card transactions. The Merchant also agrees that it will exchange merchandise, accept returns and make adjustments in the sale price of merchandise purchased by the Cardholder, to the extent required by this Contract.

8.2  Disclosures Required

The Merchant, at the time of the transaction, will disclose to the Cardholder that it will not make any reimbursement in cash to the Cardholders for Card transactions, including High Risk Transactions. The Merchant shall, additionally, disclose the Merchant's policy for exchanges, returns and adjustments and any additional terms required by law will appear printed legibly, in letters approximately 1/4" high, in a space close to the space provided for the Cardholder's signature on all copies of the invoice issued at the time of the transaction and if applicable, in the invoice provided by Merchant. According to the policy selected by the Merchant, the disclosure will indicate:

a) No Returns Allowed - no merchandise accepted for return or for exchange; therefore, no reimbursements to Cardholder will be made;

b) Exchange Only - Merchant accepts only returned merchandise in exchange for other merchandise; no cash or credit refunds;

c) In-Store Credit Only - Merchant accepts merchandise for return and will give the Cardholder a credit voucher for the value of the merchandise returned to be used exclusively at the store;

d) Any terms permitted by or required by applicable law regarding delayed delivery, charges for insurance, etc.

8.3  Processing Returns

a) The Merchant will fill out legibly a Credit Slip to evidence the return, reimbursement, termination or cancellation of a service or a price adjustment for the Cardholder's account when the Cardholder (i) requests an exchange, return or adjustment in the price for goods or services obtained through a Card transaction or (ii) claims that the person receiving the goods or services through a High Risk Transaction is not the Cardholder. The Merchant will identify in the Credit Slip the reason for the return or the adjustment and after signing it, will give a copy to the Cardholder. The Merchant will not reimburse the Cardholder in cash, check or money order for a Credit Slip.

b) The Merchant will deliver to Cardholder a copy of the Credit Slip issued to process the claim and will deposit the Credit Slip with

the Bank within the next three (3) working days from the date of issue.

8.4   Void Transactions

The Merchant may void a Credit Card transaction provided the void is made prior to making the deposit which includes the transaction in question. Voiding the transaction must occur at the Merchant's own establishment and through the same POS Terminal in which the original transaction was made.

8.5   Cancellation of Timeshare Transactions

In case the Cardholder requests the cancellation of a timeshare transaction, the Merchant agrees to provide the Cardholder a full credit reimbursement, provided: (i) the Sale Slip has been processed by the Merchant and (ii) the Cardholder requested the cancellation of the transaction within ten (10) calendar days from the date on which the transaction was made.

IX.   **DEPOSIT OF SALE SLIPS AND CREDIT SLIPS**

9.1   Processing Sale Slips and Credit Slips

a)   The Merchant shall deposit with the Bank the Sale Slips and Credit Slips issued by the Merchant for Manual Transactions made by the Cardholder and signed by the Cardholder, as agreed to in this Contract and that comply with the other requirements set forth herein. The Merchant will deposit the Sale Slips and Credit Slips with the Bank not later than three (3) working days after the transaction date, except in the cases of Transactions with Deferred Effect, authorized deferred presentation or as required by law. For Transactions with Deferred Effect, the Merchant will give the Bank the Sale Slip identified as "Deposit" within the three (3) working days from the date of the transaction and the Sale Slip identified as "Pay off" within the three (3) working days from the date in which the goods were delivered or the services rendered.

b)   The Bank may review and verify the Sale Slips, the Credit Slips and any other credit or debit corresponding to the Deposit Account or the Operational Account of the Merchant, as the case may be, and will determine if these are acceptable. In case of error, the Bank is hereby authorized to credit or debit the Deposit Account or the Operational Account, as the case may be, or to adjust the amount previously credited to the Deposit Account or the Operational Account of the Merchant, as the case may be, without prior notice to the Merchant.

c)   The Bank will pay the Merchant the net amount of all the Sale Slips deposited by the Merchant less the amount of the Credit Slips presented during said period, not later than the next working day after the date of deposit of the Sale Slips and Credit Slips with the Bank. The Bank will credit the Deposit Account or the Operational Account of the Merchant, as the case may be, for any deposit consisting of validly issued Sale Slips.

9.2   Sale Slips Not Acceptable for Payment

The Merchant agrees not to deposit for payment or credit any Sales Slip for:

a)   Transactions where the Cardholder is the Merchant;

b)   Obligations of the Cardholder for returned checks;

c)   Refinancing or transfer of existing obligations of the Cardholder, (unless the transaction is a transfer of balances outstanding as a result of the conversion of credit card program);

d)   Sales and services of Cardholder previously charged to the Card and subsequently charged by the Bank;

e)   Transactions that the Merchant knows or should know were fraudulent or not authorized by the Cardholder.

9.3   Transactions Partially Paid with Card

The Merchant will not accept the Card when only a part of the price of the transaction was paid with the Card, except when a Transaction with Deferred Effect is authorized.

9.4   Exclusive Right of Bank to Payments

The Bank has the exclusive right to receive payments from the Cardholders for the Sale Slips accepted by the Bank. The Merchant will not bill nor accept such payments from Cardholders.

X.   **SPECIAL PROVISIONS FOR EXPRESS PAY SERVICE**

10.1   POS Terminals and Related Equipment

The Merchant agrees to lease or purchase from the Bank the equipment related to the Express Pay Service, under the following terms and conditions:

a) The POS Equipment will be installed at all the available cashier stations or check out lanes at the Merchant's establishments selected for the Express Pay Service.

b) All documents, software and materials will remain the property of the Bank and will not be copied, used or put at the disposal of others without prior consent in writing of the Bank.

c) The Merchant agrees to lease the POS Equipment from the Bank at the monthly rate established in Addendum I of this Contract.

d) The Bank or a contractor hired by the Bank shall perform the installation and certification of the POS Equipment (including necessary wires, lines, PIN pad holders and other accessories required). The Bank or its contractors will perform all the connections and telecommunication arrangements (excluding the installation of telephone lines) necessary to operate the Express Pay Service. The Merchant will pay the Bank for all the costs related to the installation of the wiring, lines, POS Equipment and accessories, per the invoice sent by the Bank, as stipulated in Addendum I of this Contract.

e) The Bank or its contractors will provide maintenance service for the POS Equipment leased from the Bank. The Merchant shall pay the Bank for all costs related to repair or maintenance of the POS Equipment leased, per the invoice sent by the Bank or the maintenance service contract between the Merchant and the Bank, as stipulated in Addendum I of this Contract.

f) The Bank will maintain of all the software. The Bank will coordinate with the Merchant any anticipated changes to the POS Equipment or the software that may affect the Express Pay Service and will make the necessary changes at the Merchant's convenience. The Merchant will pay for any special programming, reports or additional features not deemed by the Bank to be necessary to comply with the terms of this Contract, which are not stipulated in Addendum I of this Contract, and which are requested by the Merchant, per the invoice sent by the Bank.

10.2 Terminals and Equipment of the Merchant

The Bank may allow the Merchant, at the latter's request and at the entire discretion of the Bank, to install its own terminals and POS Equipment to process transactions, in accordance with the following terms and conditions:

a) The POS Equipment will be installed at all available cashier stations or checkout lanes in the establishments selected for the Express Pay Service.

b) The Merchant will coordinate the installation of the equipment and software with the Bank and will not activate an application until it has been certified in writing by the Bank.

c) The Merchant will not make changes or modifications to the equipment or the software unless authorized by the Bank.

d) The Bank will not be responsible for the maintenance or service of the equipment and the software owned by the Merchant.

e) The Merchant acknowledges that the programming of the POS Terminals installed under the terms of this section may affect the Bank's POS platform. The Merchant agrees to hold harmless and indemnify the Bank for any damage caused to the Bank and/or the customers of the Bank as a result of changes not authorized by the Bank or of programming failures in the Merchant's system.

10.3 Return of Equipment

The Merchant agrees to return the leased equipment identified in Addendum I of this Contract, when the Bank so requires or the Merchant so decides, in good condition (except for normal depreciation) failing which, the Bank may charge the Merchant's Deposit Account or Operational Account for the cost of replacing or repairing such equipment.

10.4 Communication Lines

The Merchant will be responsible for the installation, service and monitoring of the telephone/communication lines linking the establishments of the Merchant with the Bank's data center. The Merchant will pay the cost of installation, servicing and monitoring of the telephone/communication lines.

10.5 Operational Brochure of the Express Pay Service

The Merchant acknowledges receipt of the Operational Brochure of the Express Pay Service pertaining to the equipment described in Addendum I of this Contract, which shall include guidelines for the different operations and functions the Merchant is authorized to conduct and obligated to execute through its Express Pay Service terminal to process all Card transactions. The Bank may amend from

time to time the Operational Brochure of the Express Pay Service, by sending the amendment to the Merchant. The amended brochure will be effective on the date it is delivered to the Merchant. The Merchant agrees to comply with the procedures established in the Operational Brochure of the Express Pay Service in effect from time to time.

10.6   Transmission of Transactions

The Merchant agrees to transmit, each working day, to the Bank's data center all the transactions processed by each POS Terminal installed in the Merchant's establishments pursuant to the provisions in the Operational Brochure of the Express Pay Service. The Merchant acknowledges and agrees that its failure to comply with the provisions of this section may result in the imposition of fines and reversed charges, pursuant to applicable laws and regulations.

10.7   Hold Harmless

a)   The Bank will exercise ordinary care in the provision of the Express Pay Service, provided, however, that the Bank shall not be liable to the Merchant or to any third person (including the Cardholder) for any damage, cost or loss of any nature related to said service or for the failure to effect or make any transfer of funds; unless such errors are due to the willful acts or gross negligence of the Bank and shall have caused damage to the Merchant. In no event will the Bank be liable to the Merchant for indirect, consequential, special or punitive damages.

b)   The Merchant agrees to be liable for and to indemnify and hold harmless the Bank from any claim, lawsuits, costs, fees, losses or expenses of any nature to which the Bank may be subjected due to any claim, in connection with transactions initiated by the Merchant through the Express Pay Service including, but not limited to those related to: the return of merchandise, adjustments in price, warranties of the Merchant, and copies of Sale Slips or Credit Slips differing from the originals, whether the Sale Slip or Credit Slip has been issued or not. The Bank may debit any such obligation of the Merchant to it from (without limitation), the Merchant's Deposit Account or Operational Account, as the case may be, make deductions from other payments owed the Merchant for other Sale Slips deposited and pending payment.

c)   The Bank will not be responsible to the Merchant or to any third party (including the Cardholder) for the failure to execute or process any transfer of funds. The Bank's only obligation to the Merchant or to any third party for any claim arising out of delays or interruptions of the Express Pay Service shall be limited to

making reasonable efforts to reinstate the Express Pay Service as soon as reasonably practical. The Bank's only obligation for claims arising out of errors or omissions in the performance of the Express Pay Service shall be limited to correcting the error, if said error can be corrected. If the error cannot be corrected, the Bank's liability will be limited to the amount of the error. Any liability or obligation of the Bank pursuant to this Section is subject to the indemnities of the Merchant at Section 14 of this Contract.

## XI.   RESERVE ACCOUNT AND GUARANTIES

11.1   Reserve Account

a)   If agreed pursuant to Addendum I of this Contract, when the Bank so requires, the Merchant will establish a Reserve Account with the Bank in which it will keep funds in the amounts agreed to by the Bank and the Merchant, to cover any overdrafts in the Deposit Account or Operational Account of the Merchant, as the case may be, and any other amounts payable by the Merchant to the Bank under this Contract. If agreed to, the Reserve Account will accrue interest at an annual rate agreed between the Bank and the Merchant at the time of its creation. The Merchant hereby authorizes the Bank to deduct from the Reserve Accounts sufficient amounts to cover any overdrafts in the Deposit Account or the Operational Account of the Merchant, as the case may be, for chargebacks, payment of charges or any other amounts to which the Bank is entitled pursuant to this Contract. The Reserve Account will be subject to the usual terms and conditions applicable to deposit accounts of the Bank.

b)   Should the Merchant fail to deposit sufficient funds to cover any deficit in the minimum balance in the Reserve Account required by the Bank, not later than the day following the day in which the Bank so requests, whether the request is verbal or in writing, the Bank may, without prior notice to the Merchant, deposit funds to cover the deficit, thereby reducing the Bank's payments to the Merchant pursuant to this Contract, or the Bank may deduct such deficiency from any other funds of the Merchant on deposit with the Bank, including but not limited to funds in the Deposit Account, or the Operational Account in the case of transactions governed by Section VI of this Contract. Should there be insufficient funds to cover such deficit, the Bank may, at its option, without prior notice, cancel the processing of Sale Slips under to this Contract until the balance of the Reserve Account has reached the minimum balance required.

c)  If the Bank has reason to believe that the Merchant will be responsible for chargebacks exceeding the balance in the Reserve Account, the Bank may require the Merchant to deposit additional amounts in the Reserve Account to compensate for the amount of said chargebacks, during the term the Bank deems necessary to ensure the collection of the amount of such chargebacks.

d)  The Merchant agrees to maintain the Reserve Account for the benefit of the Bank after the termination of this Contract, regardless of whether the termination is attributable to the Merchant or the Bank. The Merchant agrees that even after the termination of this Contract the Bank may require the establishment of a Reserve Account if not previously established. All the provisions regarding the Reserve Account pursuant to this Section 11.1 will be applicable to a Reserve Account opened after the termination of this Contract. The Bank will pay the Merchant the balance of the Reserve Account when the Bank, reasonably concludes that the risk of chargebacks has ceased (but not later than 18 months from the effective date of the Contract's termination) after deducting all the amounts owed by the Merchant pursuant to this Contract.

11.2  Security

If stipulated in Addendum I of this Contract, the Merchant agrees to give to the Bank additional acceptable guaranties or security for the obligations of the Merchant under this Contract, where and when the Bank so requires. Such security will be in addition to any security interest or guaranty the Bank may have pursuant to the law or to this Contract.

## XII.  DEPOSIT ACCOUNT OR OPERATIONAL ACCOUNT

12.1  Regarding the Deposit Account or Operational Account

The Merchant will maintain the Deposit Account with the Bank to which amounts corresponding to the charges stipulated in Addendum I of this Contract will be credited, except that in the case of transactions related to the payment of insurance policy premiums, such charges will be debited from the Operational Account pursuant to Section VI of this Contract. The Merchant authorizes the Bank to credit or debit the Deposit Account or Operational Account that is identified in Addendum I of this Contract, all charges or credits authorized by this Contract. The Bank may originate and process these charges without prior notice to the Merchant. The Deposit Account will be subject to the terms and conditions usually applicable to deposit accounts of the Bank.

12.2  Right to Compensate the Deposit Account or Operational Account

The Bank may freeze and/or set-off against funds available in the Deposit Account or Operational Account of the Merchant, as the case may be, in order to: (i) secure and/or collect the amounts the Merchant owes the Bank pursuant to the terms of this Contract; or (ii) ensure the collection of the amounts of particular transactions in cases where there is any question as to the legality or legitimacy of such transactions. The Bank will not be liable and is hereby released from any responsibility or claim for any damage suffered by the Merchant as the result of the Bank's set off or freeze of Merchant's funds.

12.3  Waiver of Notice

The Merchant waives notice of default, protest, demand for payment and any other demand or notice with regard to any Card transactions, Sale Slips, Credit Slips or this Contract. The Merchant agrees to any extension of time or concession granted to any Cardholder and acknowledges that these will not affect the Bank's right to debit the Deposit Account or Operational Account, as the case may be, in the amount of any Sale Slip.

## XIII.  REPRESENTATIONS AND WARRANTIES OF MERCHANT

13.1  Bank Acting as Agent

The Merchant agrees that when the Bank receives from the Merchant the Sale Slips to be deposited in the Merchant's Deposit Account, the Bank acts exclusively as collecting agent of the Merchant and shall in no way be considered as an assignor of said Sale Slips or of retail installment contracts.

13.2  Warranties and Representations

The Merchant warrants and represents that on the date any Sale Slip is presented or deposited with the Bank for collection, the Merchant has no knowledge or notice of any reason, event or fact that may affect its validity and in addition represents and warrants the following:

a)  The Card transaction includes only the goods and services described on the Sale Slip;

b)  The Sale Slip is genuine, represents a merchandise or bona fide service transaction in the ordinary course of business and has not been assigned or transferred to any party and the Merchant has legal authority to present it at the Bank for its processing;

c) Merchant has complied with all its obligations to the Cardholder related to the transaction represented by the Sale Slip;

d) The Sale Slip does not represent a cash advance nor any other transaction not described on it and has not been previously presented to the Bank for processing;

e) Merchant has complied with all the terms and conditions set forth in this Contract, including, but not limited to, obtaining the proper authorizations and Merchant has complied with all applicable laws and regulations, and a true and correct copy of each Sale Slip issued to the Cardholder has been delivered on the date on which the transaction was made;

f) Merchant has no knowledge or notice, nor has it been warned of any condition, reason, event or fact that could jeopardize the enforcement of this Contract, or of any dispute or claim or any other fact that may affect the validity or the collection of a Sale Slip;

g) No material changes have occurred in the financial condition of the Merchant since this Contract was signed; and

h) The Merchant has not changed the nature of its business or its product line.

## XIV. INDEMNITIES OF THE MERCHANT

14.1 Indemnities of the Merchant

a) The Bank shall not be liable in any manner to any person acquiring goods or services of the Merchant by means of a Card. The Merchant hereby covenants and agrees to indemnify and hold harmless the Bank from liability for any claim whatsoever that may be brought against the Bank by any such person, whether by reason of breach of contract or warranties or for any other reason, including a direct action or through defense, set off or counterclaim.

b) The Merchant shall be liable and obligated to indemnify and hold harmless the Bank from and against any claim, demand, suit, cost, fee, loss or expenses of any kind to which the Bank may be subject for breach by Merchant of any provision of this Contract, or for errors or negligent or intentional actions of the Merchant or personnel hired by it.

c) The Merchant, at the request of the Bank, shall pay the Bank the amount credited to the Merchant for High Risk Transactions that are not accepted. The Merchant will be liable and obligated to indemnify and hold harmless the Bank for any claim, demand, suit, cost, fee, loss or expense of any kind to which the Bank may be subject in connection with such transactions. The Bank may credit the Deposit Account or the Operational Account of the Merchant, as the case may be or, except for transactions governed by Section VI of this Contract, set off against payments owed the Merchant from other Sale Slips deposited pending payment, the amount corresponding to each of said transactions that is not accepted.

d) The Merchant shall be liable and obligated to indemnify and hold harmless the Bank for any claim, demand, suit, cost, fee, loss or expense of any kind to which the Bank may be subjected a third party as the result of false representations made by the Merchant or breach of any federal or state law or regulation as the result of an act or omission by the Merchant, including the Merchant's illegally charging the Cardholder a price different from the price charged to clients paying in cash.

14.2 Non Liability of Bank

The Bank shall not be liable for delays or noncompliance with any provision of this Contract, if such delays or noncompliance by the Bank are due in whole or in part to force majeure or Acts of God or a public enemy; fire, weather conditions, flooding, earthquakes, natural disasters, explosions or other catastrophes; epidemics or quarantine restrictions; labor strikes, delays, differences with workmen of any type; or other causes beyond the control of the Bank including, but not limited to any unforeseen or unavoidable failure related to changes in the capacity of the infrastructure or traffic, failures of any equipment or systems, or failures in any machinery, equipment or programming. In any of these events, the obligation and responsibility of the Bank will be limited to the use of reasonable commercial efforts to restore the services within a reasonable period of time once the unforeseen event has been rectified and to provide reasonable communication media to orient and give instructions to the Merchant about the procedure to be followed while the service remains interrupted, if possible under the circumstances. The Merchant shall be liable for any claim that may be filed as the result of having processed a Card transaction without the Bank's authorization while service was interrupted. The Bank will not be liable in any manner for reimbursing the Merchant for any fees paid with regard to the period in which the services were not available.

14.3   Survival of Indemnifications

The indemnifications of the Merchant under this Section XIV shall survive any cancellation or termination of this Contract.

## XV.   CHARGES

15.1   Membership Fees

The Merchant will pay the Bank the montly membership fee set forth in Addendum I of this Contract.

15.2   Credit Card Discount Fee

The Merchant shall pay the Bank a monthly service charge based on Credit Card sales as agreed in Addendum I, as per one or both of the following formulas:

The Merchant shall pay the Bank a monthly service charge based on gross dollar volume of sales made with Credit Cards. The service charge shall equal the percentage (%) set forth in Addendum I of this Contract times the aggregate dollar value of all the Sales Slips deposited by the Merchant during the corresponding monthly period;

And/or the Merchant shall pay the Bank a monthly service charge for each Credit Card transaction. The service charge shall equal to the amount per transaction set forth in Addendum I of this Contract times the sum of all Credit Card transactions processed by the Merchant during the corresponding monthly period.

15.3   Debit Card Fee

The Merchant shall pay the Bank a monthly service charge based on Debit Card sales as agreed in Addendum I, as per one or both of the following formulas:

The Merchant shall pay the Bank a monthly service charge based on gross dollar volume of sales made with Debit Cards. The service charge shall equal the percentage (%) set forth in Addendum I of this Contract times the aggregate dollar value of all the Sales Slips deposited by the Merchant during the corresponding monthly period.

And/or the Merchant shall pay the Bank a monthly service charge for each Debit Card transaction. The service charge shall equal to the amount per transaction set forth in Addendum I of this Contract times the sum of all Debit Card transactions processed by the Merchant during the corresponding monthly period.

15.4   Authorization to Debit, Card Transactions Statement

Charges may be debited from the Deposit Account or Operational Account, pursuant to Section 12 of the Contract. Authorized charges may also be collected by set off against Sale Slips pending payment to the Merchant, provided no such setoff shall be made against Sale Slips required to be deposited to the Premiums Deposit Account. The Bank reserves the right to modify the charges set forth herein, from time to time, by sending the Merchant a written notice thirty (30) days prior to the effective date of the change. The Bank will send the Merchant a Card Transaction Statement showing all the charges made pursuant to this Section XV.

15.5   Additional or Special Service Charges

The Merchant agrees that the service charges stipulated in Addendum I of this Contract do not include additional or special services that may be requested by the Merchant and that are not specifically provided for by this Contract. Any change to procedures established under this Contract, or additional or special requirements, such as handling and service of the Deposit Account, or the Operational Account, and/or the Reserve Account that Merchant may request, may entail the revisions to or additions to the charges stipulated in Addendum I of this Contract.

## XVI.   SECURITY INTEREST

16.1   To secure the payment of and timely compliance with its obligations under this Contract and interest thereon, the Merchant hereby grants the Bank a security interest over all of the rights, title and interest of the Merchant to each Sale Slip and the proceeds of same, the Deposit Account, or the Operational Account, the Reserve Account and any other funds of the Merchant on deposit with the Bank, existing or hereinafter existing and on the proceeds of such accounts, all pursuant to the provisions of the Commercial Transactions Act of the Commonwealth of Puerto Rico, Act No. 208 of August 17,1995, (if Contract was executed in Puerto Rico), and pursuant to the provisions of the Virgin Islands Uniform Commercial Code, 11 A V.I.C. § 1-101 et seq. (if Contract was executed in the Virgin Islands), as amended from time to time. The lien established herein will continue in force and effect in the event of termination of this Contract, until payment in full of all the obligations of the Merchant to the Bank.

## XVII. RECORD RETENTION, FORECLOSURE ORDERS, CONFIDENTIALITY, PRIVACY

### 17.1 Record Retention

a) The Merchant agrees to retain the records related to transactions made with Cards including Sale Slips and Credit Slips for at least eighteen (18) months, or for such longer period as is required by law, and will allow the Bank access to them during working hours and/or copies of them within a period of three (3) months subsequent to the date of request by the Bank.

b) The records mentioned in the above paragraph will be kept in a safe place and their contents will remain confidential except as provided in this Contract or required by authorized personnel of the Merchant.

### 17.2 Foreclosure Order and Confidentiality

The Bank will have no obligation to intervene in negotiations or to conduct any investigation regarding the validity of an attachment order, seizure, lien, or any other possessory action, related to any instrument in possession of the Bank pursuant to this Contract, that may be issued or entered against the Merchant by any court or government agency. The Bank will promptly notify the Merchant of any such order, except when prohibited by the Court or agency issuing the order.

### 17.3 Privacy

The Merchant will not sell, purchase, provide or exchange information related to the account of a Cardholder to any third party other than the Bank and its subsidiaries or parents or in accordance with a government request.

## XVIII. ADVERTISING, PROMOTION

### 18.1 Promotional Material

The Merchant will display only such promotional material bearing the name of the Bank as is authorized by the Bank. The Merchant, at the request of the Bank or upon the termination of this Contract, will return to the Bank all the promotional material, labels, stickers, printers, equipment, Sale Slips, Credit Slips and any other material furnished by the Bank and that has not yet been used.

### 18.2 Advertisements

a) The Merchant agrees that all the advertisement in the media, and all public notices and disclosures by the Merchant or its employees

or agents related to this Contract or its contents, including, but not limited to, promotional or marketing material, but not including any notice intended solely for internal distribution by Merchant or any disclosure for legal, accounting or regulatory requirements beyond the reasonable control of Merchant, must be coordinated and approved by the Bank prior to its launching or its disclosure, which approval will not be unreasonably denied.

b) The Merchant authorizes the Bank to use Merchant's name in advertisements and Card promotions, such as lists of businesses that accept the Card. Such advertisements and Bank promotions will be of a general nature and will not include references to the availability of particular merchandise from Merchant. The Bank may, at its discretion, provide the Merchant, at the latter's request, with lists of Cardholder's names to permit Merchant to mail them advertising and promotional material. The Merchant will pay for this service, at the rate established by the Bank.

## XIX. TERM AND TERMINATION OF THE CONTRACT

### 19.1 Term

This Contract will be effective upon its execution by the parties and will continue in force for a period of one (1) year or until its termination pursuant to the provision in this Section XIX. The Contract will be automatically renewed for successive periods of one (1) year unless written notification of non-renewal from one of the parties to the other is given at least sixty (60) days prior to expiration.

### 19.2 Immediate Termination by The Parties

Either party may immediately terminate this Contract, by means of verbal or written notice to the other party if: (i) any representation, agreement or guaranty made or relating to this Contract is false; (ii) a violation or breach of any of the terms and conditions of this Contract, including the terms of payment of this Contract ocurrs and the breach is not corrected or cured within ten (10) working days after notice.

### 19.3 Immediate Termination by The Bank

Unless otherwise provided in this Contract, the Bank may immediately terminate this Contract, by means of written notice to the Merchant, if the Merchant: (i) is suspected or accused of fraudulent or illegal conduct or practices, (ii) suspends or retires from its business, (iii) makes a substantial reduction in its operations or implements considerable changes in its business approach or the scope of goods or services offered, (iv) declares itself or is declared insolvent or unable

to pay its debts, (v) calls a meeting of creditors, (vi) gives notice of its intention to sell all or part of its business or assets, (vii) makes any general assignment, transfer or conveyance for the benefit of its creditors, (viii) files any application to initiate a bankruptcy procedure, arrangement, reorganization, or any procedure under any provision of the Bankruptcy Act, (ix) appoints or has appointed for it a trustee or fiduciary for this or any or all of its properties, or (x) if any law or regulation of the U.S. Virgin Islands, Puerto Rico or the United States or its agncies makes providing any of the services contemplated under this Contract illegal, and said violation cannot reasonably be corrected without termination of this Contract.

19.4    Effect of Termination

The Merchant will be responsible, at the termination of this Contract, for all the obligations, guaranties and agreements existing with respect to Card transactions contracted prior to the termination of this Contract and the Credit Slips related to said transactions shall remain in full force and effect. The Merchant, additionally, shall be liable for all the charges billed for services offered until the termination of the Contract, for the actual damages caused by the breach of any duty or obligation arising prior to the date of termination. The provisions in Section 11.1, of Section XIV and Section XVI shall survive any termination of this Contract.

XX.    **OTHER GENERAL TERMS AND CONDITIONS**

20.1    Final Agreement

This Contract and any other document or certification issued pursuant to the terms established herein, constitute the final agreement between the Parties for the rendering of the services contemplated herein and will be effective upon signature by authorized representatives of the Bank and the Merchant. Any written or verbal agreement, promise, contract, arrangements, communications, representations and guaranties by any officer, employee or representative of any of the Parties prior to the signing of this Contract is expressly rescinded and superseded by this Contract.

20.2    Independent Contractor

None of the parties shall enter into any contract or representation, or incur any obligation on behalf of or in favor of the other party. Except for the limited purpose set forth in Section 13.1, no provision in this Contract will be interpreted as designating or constituting either party as the agent of the other. In carrying out the services contemplated

by this Contract, the Bank will act as an independent contractor of the Merchant. No employee or contractor of the Bank will be deemed to be an employee of the Merchant or vice versa.

20.3    Assignees

This Contract obligates and inures to the benefit of both parties and their respective successors and permitted assigns, but none of the rights, interests or obligations established under this Contract may be assigned or transferred by any party (whether by provision of law or in any other manner) without the consent in writing of the other party, which consent will not be unreasonably denied. Notwithstanding the foregoing, the Bank may, without prior consent of the Merchant, assign or delegate this Contract or any right or obligation established in it to its holding company or to any of its subsidiaries or affiliates. The impossibility of any party complying at any time with the provisions in this Contract will not be interpreted as a waiver of the obligation to comply, or the subsequent right of any party to enforce compliance with any and all of said provisions.

20.4    Amendments

The Bank reserves the right to amend, from time to time, the terms and conditions set forth in this Contract, upon written notice to the Merchant given thirty (30) days in advance of the effective date of the amendment. However, the Bank may amend this Contract by giving advanced notice of less than thirty (30) days, if the Bank determines that immediate modification is required by virtue of any law, any applicable regulation of the Card Organizations or by any adverse situation in the Merchant's financial condition.

20.5    Submitting Financial Statements

Merchant agrees to provide, upon request of the Bank, within 120 days of the closing of each fiscal year of the Merchant, a balance sheet and a statement of profits and losses and of the cash flow of the Merchant signed by an authorized officer of the Merchant.

20.6    Cumulative Rights

The Bank's rights pursuant to this Contract will be deemed cumulative, not exclusive, and the election to exercise a right by the Bank will not affect or limit any other right or remedy available to the Bank. Any waiver by the Bank of any terms or conditions of this Contract on any one occasion will not constitute a waiver of any other term, condition or right of the Bank, or of the same term, condition or right on any

other occasion. The Bank's delay in exercising its rights and remedies under this Contract will not be deemed a waiver of the Bank's right to exercise said rights and remedies in the future.

20.7   Notifications

All notices, demands and communications required or permitted in this Contract, except as otherwise specified, will be in writing, addresses to the Parties as indicated below:

To the Bank:

Banco Popular of Puerto Rico
Merchant Business Division
PO Box 362708
San Juan, PR 00936-2708

With a Copy to:

Banco Popular of Puerto Rico
Legal Division
PO Box 362708
San Juan, PR 00936-2708

To the Merchant:

to the address in Addendum I of this Contract. A change of address may be effected by notice to the other party and shall be effective upon receipt.

20.8   Interpretation

This Contract will be construed under the laws of the Commonwealth of Puerto Rico, (if executed in Puerto Rico), or under the laws of the Virgin Islands, (if executed in the Virgin Islands), and under applicable provisions of federal laws and regulations. If any of the clauses in this Contract are declared null, invalid, illegal or in conflict with a statute, rule, regulation or other applicable law by a Court with competent jurisdiction or authority, this clause will be deemed modified or altered to conform with applicable law or, if this should not be possible, it will be excluded from this Contract and the other clauses will maintain their full force and effect.

## APPENDIX I

### Procedure for Normal Transactions with Cards

For Normal Transactions with Cards, whether POS Transactions or Manual Transactions, the Merchant agrees to follow the procedures established below, as the case may be:

A)   For with each POS Transaction with a Card, the Merchant shall:

1.   Examine the Card to verify its authenticity, verify the date of issue and expiration date engraved on the Card and verify that it complies with the security characteristics of the Card. Merchant shall retain by reasonable and peaceful means any Card on which the printed or embossed account number on the front of the Card and the number on the reverse of the Card (when provided) do not match, or when the Card lacks the official logo of the authorized Issuer, or which is used in any suspicious transaction. In such cases, the Merchant must immediately notify the Authorization Center to receive instructions.

2.   Swipe the magnetic band of the Card through the reader of the POS Terminal so that the Authorization Equipment assigns an Authorization Number. The Authorization Number will appear on the screen of the POS Terminal.

3.   Compare the Truncated Account Number with the last four digits of the account number embossed on the front side of the Card, in applicable cases.

4.   Require the Cardholder to sign the Sale Slip in the presence of an authorized representative of the Merchant or obtain a successful validation of the Personal Identification Number, as the case may be. Verify that the Cardholder's signature is reasonably similar to that appearing on the reverse side of the Card.

5.   Provide a true and correct copy of the Sale Slip to the Cardholder when the transaction is completed.

6.   Retain the original and one copy of the Sale Slip to process the collection of the transaction by the Bank.

7.   If the application for authorization is denied, it will be reflected in a negative response at the POS Terminal.

8.   In those cases in which (i) the Authorization Equipment may be out of service, (ii) the Cardholder presents a Card but the Sale Slip did not print, (iii) the magnetic band of the Card is damaged, or (iv) the

Merchant believes or suspects that the Card may be forged or stolen or the transaction is identified as a "Code 10" transaction, the Merchant will conduct the Manual Transaction process pursuant to section B of this Appendix I.

B) For each Manual Transaction with a Card that is a Normal Transaction, the Merchant must:

1. Examine the Card to verify its authenticity and to verify the date of issue and the expiration date engraved on the Card.

2. In cases in which the Merchant believes or suspects the Card to be forged or stolen or that the transaction is suspicious, the Merchant will indicate to the designated officer in the Authorizations Center that it is a "Code 10" transaction and will await instructions. Retain the Card while the Authorization Number is sought or when the Authorization Center gives instructions to retain it.

3. Print legibly in the Sale Slip the information embossed on the Card and the the Merchant's Identification plate in a printer acceptable to the Bank. If, for any reason, the Sale Slip cannot be printed, Merchant will write legibly in it the information necessary to identify the Cardholder and the Merchant. It will include the name and address of the Merchant, the name of the Cardholder, the account number, date of issue and date of expiration of the Card (when both dates appear), and any other information engraved on the Card such as security symbols, etc.

4. Write on a single Sale Slip the transaction date, the total amount including tips and taxes, if applicable, a brief description of all the goods or services purshased and any other information required to conduct the transaction pursuant to this Contract.

5. Communicate with the Authorization Center during the service hours established by the Bank, to request authorization of the transaction by the designated officer. If approval is granted, the Merchant must legibly write the approval number on the Sale Slip.

6. Retain by reasonable and peaceful means any Card in which the account number printed or engraved thereon and the number on the reverse of the Card (when provided) do not match, or where the Card lacks the official logo of the authorized Issuer, or is used in any suspicious transaction. In such cases, the Merchant must immediately notify the Authorizations Center to receive instructions.

7. Require the Cardholder to sign the Sale Slip in the presence of an authorized representative of the Merchant or obtain a successful

validation of the Personal Identification Number, as the case may be. Verify that the Cardholder's signature is reasonably similar to that appearing on the reverse side of the Card.

8. Provide a true and correct copy of the Sale Slip to the Cardholder when the transaction is completed.

9. Retain the original and one copy of the Sale Slip to process the collection of the transaction by the Bank.

## APPENDIX II

### General Procedure for High Risk Transactions

To perform High Risk Transactions the Merchant must have available a printer provided by the Bank and follow these instructions:

1. Obtain the name and account number of the Cardholder and write them, in typeset or in legible print, on the Sale Slip;

2. Contact the Authorizations Center to report that the transaction is a High Risk Transaction and to obtain approval of the transaction. If approval is granted, the Merchant must legibly write the approval number, the transaction amount and the legend that appears on the printing plate of the Merchant's printer on the Sale Slip;

3. Identify the Cardholder through proper identification;

4. Conduct the additional process detailed in Section V for the corresponding High Risk Transaction.

5. Retain the evidence necessary to validate the transaction along with the Sale Slip for the retention period provided in Section XVII.

## APPENDIX III

### Procedure for Guaranteed Hotel Reservation Service and Delayed Charges

A) Procedure for Guaranteed Hotel Reservation

1. Explain to the Cardholder, when he/she calls to guaranty the hotel reservation using a Card, the terms of the guaranteed hotel reservation system, including the cancellation notice required in order to avoid any penalty;

2. Obtain the account number, expiration date of the Card, and name and address embossed on the Card;

3. Confirm the rate per room and the location; issue the confirmation number for the reservation and advise the Cardholder to retain it. The Merchant may, at its discretion or at the request of the Cardholder, confirm in writing to the Cardholder the reservation number and the procedure to cancel the reservation;

4. Issue a cancellation number for the reservation when the Cardholder cancels his/her reservation. The Merchant must advise the Cardholder that he/she must retain the cancellation number because it will be useful in verifying the cancellation. The Merchant may, at its discretion or when the Cardholder so requests, confirm in writing to the Cardholder the cancellation number;

5. Provide a room when the Cardholder arrives at the hotel prior to the check out time of the next day following the reserved date. If the hotel cannot provide a room it is obligated to provide the Cardholder, at no additional cost, a room at another hotel comparable to that for which the reservation was made, transportation to the other hotel and a three minute telephone call to communicate the change of location;

6. Prepare a registration card and assign a room number prior to the estimated time of arrival of the Cardholder at the hotel;

7. Cancel a hotel reservation free of charge for no-show when the Cardholder cancels a reservation: (i) 72 hours before the anticipated day of arrival, or (ii) before 6:00 p.m. of the anticipated day of arrival, when the reservation is made within the 72 hours before the arrival date;

8. Fill out a Sale Slip to charge the Cardholder's Card for a rate equivalent to a one night stay for no-shows, when the Cardholder does not cancel the reservation and does not show, as set forth hereinbelow:

   a) Write the name of the Cardholder, account number and expiration date on the Card, date in which the Cardholder failed to appear, number of assigned room, identification of the Merchant and the words "Guaranteed Reservation/No-Show" in the space provided for the Cardholder's signature.

   b) Follow the applicable procedures established for Card transactions according Appendix II of this Contract; and

   c) Retain the registration card for the reservation, containing the room number assigned, for the six (6) months following the date in which the Sale Slip is deposited.

B) Procedure for Delayed Charges

The Merchant may process Delayed Charges if the Cardholder has agreed to be liable for them in the case of hotel charges, vehicle leasing and cruise lines, using the following procedures:

1. Process the Sale Slip corresponding to the transaction in question within 90 calendar days from the date in which the event occurred.

2. Provide, according to the reason for the charge, the following documents:

   a) If the charge is for a parking ticket or an infraction of the traffic laws in the case of leased cars, the details of the date, time and location, statute violated and amount of the fine and a copy of the leased vehicle license including number;

   b) If the charge is for damages to a leased car, a copy of the lease agreement, estimated cost of the damages issued by a local company, the police report, a document evidencing that the Cardholder agreed to pay for the damages with the Card, a document showing that the Cardholder is obligated to make the payment, a copy of the Merchant's insurance policy when the Cardholder is required to pay a deductible or a copy of the lease agreement signed by the Cardholder evidencing that the Cardholder agreed to be liable for the amount of the deductible.

3. For any Delayed Charge Transaction, the Merchant shall prepare a Sale Slip including the words Signature on File and send a copy to the Cardholder at his/her address of record.

4. For any Delayed Charges Transaction, the Merchant must keep in its records all the information related to the charge evidencing that the procedures established in this Contract have been observed.

# Supplementary Merchants Service Contracts

Miembro FDIC

COM 698A (4-01)



**BANCO POPULAR** ®

Se puede

# BANCO POPULAR DE PUERTO RICO

## SUPPLEMENTARY SERVICE CONTRACTS FOR MERCHANT'S

### TABLE OF CONTENTS

AGREEMENT                                                                    Pag.

ATTACHMENT (2) TO MERCHANT CARD
SERVICE AGREEMENT ................................................................. 1

EBT  25% RETAILER AGREEMENT ..................................................... 3

EBT 75% RETAILER AGREEMENT ...................................................... 6

MERCHANT AGREEMENT FOR E-CHECK SERVICES ........................... 9

CHECKOUT WEB SITE(S) AGREEMENT ............................................. 13

OTHER PROCEDURES

MERCHANT PROCESSING TELEPHONE, MAIL ORDER AND
MANUAL ENTRY, HIGH RISK TRANSACTIONS .................................... 18

THE CORRECT WAY TO USE THE TERMINAL ..................................... 20

PROCEDURES FOR CAR RENTAL INDUSTRY ....................................... 21

CREDIT CARD INFORMATION ........................................................... 22

## ATTACHMENT (2) TO MERCHANT CARD SERVICE AGREEMENT

This Attachment amends the Merchant Card Service Agreement executed on this same date between Banco Popular de Puerto Rico (the "Bank") and the person or entity (the "Merchant").

A. On this same date the parties entered into a Merchant Card Service Agreement (hereinafter, the "Agreement")

B. Said Agreement is amended as follows:

1. Section 1 ("Definitions") subsection 1.30 is amended to add the following sentence "May include a debit card with a Visa or MasterCard logo issued by another financial institution."

2. Subsection 2.2 (iii) of Section II (General Merchant Obligations and Agreements) is amended and replaced by the following:

   "The Merchant shall not refuse to perform a transaction solely because a Cardholder, who has complied with all the requirements for acceptance of the Card, refuses to provide additional identification information such as, Photo ID, unless such information is necessary to complete the transaction or is required under Merchant Policies, or if the Merchant suspects that the transaction is not authorized."

   A subsection (viii) is added to paragraph 2.2 (a):

   "Keep confidential all information related to a Floor Limit or the amount of same."

3. A subsection (ix) is added to paragraph 2.2 (a): "Not presenting a Sales Voucher made out to another merchant or originated by another business."

4. A new subsection 3.2 is added to Section III ("Authorizations of Card Transactions"): "The Merchant agrees that even if it has an approved floor limit, it must obtain authorization for the following types of transactions:

   a) Debit Card transactions

   b) Cash advance transactions

   c) Recurring transactions

   d) Self-service terminal transactions

   e) Transactions with expired cards

   f) Transactions with an unsigned card

   g) Suspicious transactions

   h) Manual transactions

5. Subsection 3.2 is renumbered Subsection 3.3

6. Subsection 5.2(a) of Section V is replaced by the following:

   "Verify the identity of the cardholder by means of a current photo ID issued by a government agency of Puerto Rico or of any state of the United States of America (such as a driver's license) or passport issued by the United States or another country prior to completing the transaction."

7. Subsection 5.5 is amended by adding the following sentence:

   "The Merchant shall request from the Cardholder, and provide to the authorization center or send through its terminal, the verification number or security code of the card which is printed on the cardholder signature panel."

8. Subsection 7.1 (d) of Section VII (Chargebacks, Merchant Claims, Chargeback Fees) is amended to read as follows: "That has not been completed, authorized, or deposited in accordance with the terms and conditions of this Agreement, including its appendices and attachments;"

9. An item (n) is added at the end of subsection 7.1 that reads as follows:

   "Exceeding the chargeback limit established by VISA and MasterCard."

10. A subsection 8.6 is added at the end of section VIII that reads as follows:

    "8.6 Responsibility for credits made. All credits processed through the Merchant's terminals, without exception, shall be the responsibility of the Merchant and will be charged to its account."

11. The following sentence is added to subsection 14.1 (b) of Section XIV:

    "Should the Bank initiate judicial collection of any amount owed under this Agreement, the Merchant agrees to pay all the costs related to the procedure, plus attorney's fees in an amount equal to ten (10) percent (%) of the amount owed."

12. The following sentence is added to subsection 15.2 of Section XV:

    "An additional .50% above the discount rate agreed upon in Addendum I shall apply to all Visa and MasterCard transactions that are processed manually through the electronic terminals (P.O.S.), to transactions that are not deposited within 3 days after the date of the transaction, and to all transactions carried out with the Visa Infinite, Visa Signature, Visa Business, Visa Corporate, MasterCard Business, MasterCard Corporate y MasterCard Black cards."

13. Section XVII ("Retention of Documents, Embargo Orders, Confidentiality, Privacy") is amended as follows:

    (a) Subsection 17.1 is amended by adding the following item (c):

        (c) "The Merchant shall make these records available to the Bank whenever the Bank may need to obtain a copy of the records or obtain information from the records in order to address customer claims, even after the expiration of this Agreement due to closure of the business, because the Merchant transferred its business to another bank, or for any other reason."

(b) The following item (d) is added to Subsection 17.1:

(d) "The Merchant agrees that it will not use the names, account numbers, or any other Cardholder transaction information, whether printed, taped, codified, or present on the card in any other form or manner, for any purpose except, exclusively, helping the Merchant complete the transaction, or in any way specifically required by law. Further, the Merchant agrees that it will not disclose or provide the names, account numbers, or any other Cardholder transaction information, whether printed, taped, codified, or present on the card in any other form or manner, or any form or document containing such information to any third party, except to the Bank or its Authorized Agent. The Merchant further agrees, that it will not store or keep materials that contain the names, account numbers, or any other Cardholder transaction information, whether printed, taped, codified or present on the card in any other form or manner, including, without limitation, sales receipts, credit transaction receipts, car rental or other agreements, as well as carbon copies, except as necessary to complete the transactions and/or to comply with the delivery of information required by the Bank. Should it be necessary to keep any material, it must do so in a secure area, limited to selected personnel, and to ensure the security of the information through access control and/or the use of cryptographic keys in the case of electronic information. Prior to disposing of the materials they must be destroyed and rendered illegible.

"The Merchant agrees to allow the Bank and its Agents to inspect its facilities, locations, and computers, and the facilities, locations, and computers of any company which the Merchant has contracted with, in order to verify that the account and transaction information is stored and processed in a secure manner."

14. The following subsection 19.5 is added to Section XIX ("Terms and Termination of the Agreement"):

"19.5 Should the Merchant cancel this Agreement prior to the initial expiration date or any renewal term, for any cause other than those stipulated in subsection 19.2, the Merchant shall pay a penalty equal to 5% of the total sales deposited during the term of the Agreement, which shall not exceed the last twelve months or the total effective months up to the date of cancellation."

15. A new Section XX (Account Statement) is added which shall read as follows:

"20.1 The Bank shall send to the Merchant, on a monthly basis, in addition to the Deposit Account Statement or Operational Account Statement, a Merchant Statement. The Merchant Statement will include a detail of the Card Transactions made through the Card Service under this Agreement. The Merchant must carefully verify the Statement and report any error in the statement or any discrepancy between the Sales Vouchers information in the statement and its sales records within 30 days of the date of the statement. Should the Merchant not notify any error in the account to the Bank within said term, and should it be determined that due to the time elapsed the Bank is unable to correct the error, the Merchant shall be barred from claiming the amount of such error."

16. Current Section XX is renumbered Section XXI.

17. The "Manual Transactions" defined in paragraphs A 8 and B of Appendix I, are reclassified as "High-Risk Transactions". Therefore, the provisions of Section V 5.1 shall be applicable to the" Manual Transactions".

C.   The remaining terms and conditions of the Agreement shall remain in full force and effect.

2

## EBT 25% RETAILER AGREEMENT

1. Engagement of Processor

    A. ("Retailer") wishes to engage BANCO POPULAR DE PUERTO RICO (the "Bank") to provide services related to Point-of-Sale "POS" transactions initiated through Retailer for the authorization of the delivery of Government of Puerto Rico's Benefits in the form of cash.

    B. Program benefits for which delivery is authorized include U.S. Department of Agriculture, Food and Nutrition Service, Nutritional Assistance Benefits (NAP); U. S. Department of Health and Human Services, Administration for Children and Families, Temporary Assistance to Needy Families (TANF) benefits and other government administered cash assistance ('Cash Benefits") to benefit recipients through the use of a Government-issued EBT card.

    C. Subject to the terms and conditions hereof, Retailer agrees to deliver Benefits at each of the retail locations identified in Appendix A, attached hereto and made a part hereof, during Retailer's normal business hours.

    D. Retailer agrees to maintain adequate cash on hand to deliver confirmed Cash Benefits to Recipients in the same manner and to the same extent cash is provided to the other customers. Retailer will not require, and will not in its advertising suggest, that any Recipient must purchase goods or services at Retailer's facilities as a condition to the delivery of Cash Benefits to such Recipient, unless such condition applies to other commercial customers as well. Retailer will not designate special checkout lanes restricted to use by Recipients, provided that if Retailer designates special checkout lanes for electronic debit or credit cards and/or other payment methods such as checks or other than cash, Recipients may be directed to such lanes so long as other commercial customers are directed there as well.

    E. Retailer agrees to give at least fifteen (15) days written notice to "Bank" of any planned cessation of services, or inability to comply with the terms of this Agreement.

2. Delivery of Benefits

    A. Subject to the provisions hereof, Retailer agrees to deliver Cash Benefits to Recipients. Retailer will provide each recipient a printed receipt for each benefit access transaction initiated by the Recipient at the Retailer's location. Retailer will be solely responsible for the Retailer's incorrect delivery of Benefits that are directly attributable to Retailer's negligence.

    B. Retailer will deliver Cash Benefits to Recipients in accordance with the procedures set forth in the Rules (as hereinafter defined), in the amount authorized through its point-of-sale POS") terminal, with personal identification number ("PIN") pad and printer ("Equipment"), upon presentation by Recipient of an EBT Card and Recipient entry of a valid PIN. Retailer agrees that in the event of failure of the equipment that prints Benefit access information as approved and validated as a legitimate transaction, retailer will comply with the procedures set forth in the Rules, in such instance.

    C. Retailer agrees to make available informational materials, as provided by "Bank", such as schedules, Recipient notices and procedures, if any, and to post signage of the type and in the manner reasonably requested by "Bank" and by any applicable Government of Puerto Rico regulations and requirements pertaining to the delivery of EBT Cash Benefits.

    D. Retailer agrees to comply with all applicable laws, rules and regulations in the performance of its obligations under this Agreement, including without limitation, laws pertaining to delivery of services to benefit recipients and benefit recipient confidentiality, and the federal Civil Rights Act of 1964 Rehabilitation Act of 1973, Americans with Disabilities Act of 1990, Clean Air Act, Immigration Reform and Control Act of 1986.

    E. Retailer agrees to comply with the EBT Policies and procedure and with the Quest Operating Rules (jointly named the "Rules"), as amended from time to time, issued by the National Automated Clearing House Association (NACHA) as approved by the Federal Reserve Bank and such other rules and regulations as may be applicable to the delivery of EBT Benefits by Retailer hereunder. The Rules sets forth Government of Puerto Rico policies applicable to the delivery of benefits and the Contractor's procedures for such delivery of Benefits. Retailer agrees to comply with all additional procedures specified by the Government of Puerto Rico, regarding lost EBT Cards, forgotten PINs, discrepancies in benefit authorized and other related matters by providing Recipients with information such as telephone numbers and addresses of Government of Puerto Rico and other appropriate agencies.

    F. Retailer will not accept any EBT Card for any purpose other than the delivery of Benefits, including without limitation as security for repayment of any Recipient obligation to Retailer. In the event of any violation of this provision, Retailer will be obligated to reimburse the Government of Puerto Rico for any Benefits unlawfully received by the Recipient and the Retailer.

3. Access to and maintenance of records

    A. Retailer will be furnished instructions concerning records to be made and kept.

    B. Retailer agrees to separately maintain such records as may be reasonably requested or required by the Government of Puerto Rico or its Contractor and to promptly make such records available for audit upon request to representatives of the Government or its Contractor, or other authorized Government of Puerto Rico or Federal government agency representatives or their agents during normal business hours, provided reasonable notice is given.

    C. To assure compliance with this Agreement, the Government of Puerto Rico, its Contractor or other authorized Government or Federal governmental agency, will at all times, and with advance notice, except in instances of suspected fraud or similar activity, have the right to enter, during normal business hours, Retailer's premises to inspect or evaluate any work performed under this Agreement, or to obtain any other information required to be provided by Retailer or otherwise related to this Agreement.

    D. Retailer agrees to maintain and preserve all financial records and reports arising hereunder during the course of this Agreement for a period of three (3) years following the date of Benefit delivery, or for an additional period as applicable regulations may require. Records involving an audit and matters in litigation will be kept for a period of not less than three (3) years following the termination of the audit or litigation. Copies of any documents in media other than paper (e.g. microfilm, etc.) related to this Agreement may be substituted for the originals with the prior written approval of the Government of Puerto Rico or its Contractor provided that the media type, storage and retrieval procedures are accepted by the Government of Puerto Rico.

4.  Training

    Retailer will be furnished necessary and reasonable training in policies and procedures by the "Bank". Retailer agrees to cooperate and to train or permit its employees to receive such training at retailers expense; at such times as is reasonable and mutually convenient to the parties.

5.  Reimbursement of Retailer for Benefit Delivery

    A.  Settlement to Retailer for its delivery of Cash Benefits disbursements in the form of authorized food purchases or cash to Recipients pursuant to this Agreement, and settlement for other transactions as permitted in accordance with the Rules will be via electronic credit or debit to Bank's designated financial institution account on behalf of Retailer. Retailer shall authorize such transfers to or from said account as may be required to correct any erroneous or unauthorized transfers or benefit deliveries. Retailer will be promptly notified of any such corrective transfers. This authorization will remain in effect until withdrawn by Retailer upon thirty (30)- days written notice to the Government of Puerto Rico and its Contractor.

    B.  Credit or debit to Bank's Receiving Depository Financial Institution (RDFI) for the account of Bank on behalf of Retailer will be made by the Government's Contractor the next business day, but no later than two (2) business days, following receipt by the Government's Contractor or Retailer's end-of-day POS settlement information. Settlement Information received after the Government's Contractor's processing deadline, as stated in the Rules will be processed for credit or debit the following business day (credit or debit to be made no later than two (2) business days after processing). Such credit or debit will be electronic via the Automated Clearing House (NACHA) to the Bank's RDFI account.

    C.  In the event that the credit received by Retailer for benefit delivery is less than Retailer believes is otherwise due, Retailer or "Bank" shall promptly notify the Government's Contractor and Retailer or "Bank" shall compare records to determine the source of such discrepancy. The Government's Contractor and Retailer or "Bank" will negotiate in good faith to resolve any discrepancies in accordance with the Rules.

6.  Required Licenses

    Retailer agrees to secure and maintain at its own expense all necessary licenses, permits, franchises, or other authorities required to lawfully effect the delivery of Benefits under this Agreement, including without limitation, any applicable franchise tax certificate and non-governmental contractor's certificate, and covenants that Retailer will not deliver Benefits at any time during which Retailer is not in compliance with the requirements of any applicable law.

7   Term and Termination

    A.  Retailer's authority to deliver benefits hereunder shall be effective from the date hereof, and shall continue in effect for a period of one year after the date, and thereafter for consecutive one-year periods, unless terminated at the end of any such period pursuant to written notice given by either party to the party at least sixty (60) days prior to the end of that period, or at such other time as may be mutually agreed upon, or unless otherwise terminated in accordance with Section 6

    B.  If Retailer is disqualified for cause or withdrawn from the Cash Program, Retailer's authority to deliver NAP Benefits as defined herein will terminate contemporaneously therewith. Such disqualification or withdrawal will be deemed a breach of this Agreement with respect to Retailer's authority to deliver Cash Benefits.

    C.  With respect to the delivery of Cash Benefits only, Retailer's authority to deliver Cash Benefits may be suspended or terminated by the Government of Puerto Rico or its Contractor effective upon delivery of a notice of suspension or termination specifying the reasons for such suspension or termination of the Government's Contractor authority to provide EBT services to the Government of Puerto Rico; (ii) failure by Retailer, upon not less than thirty (30) day prior written notice, to cure any breach by Retailer of the provisions of these terms and conditions, including without limitation, Retailer's failure to support the delivery of Benefits during Retailer's normal business hours consistent with Retailer's normal business practices, Retailer's failure to comply with benefit delivery procedures, Retailer's impermissible acceptance of an EBT Card, or Retailer's disqualification or withdrawal from the NAP Program, and the failure by Retailer to cure the same within thirty (30) days after notice of same from the Government or its Contractor (iii), based on the Government's or its Contractor's investigation of the relevant facts, evidence that Retailer or any of its agents or employees is committing, participating in, or has knowledge of fraud or theft in connection with the dispensing of Benefits. In the event that Retailer fails to cure any breach as set forth above, Retailer may appeal such suspension or termination to the Government through its Contractor. Final determination will be at the Governments sole discretion.

    D.  This Agreement may also be suspended or terminated by Retailer, the Government or its Contractor, in their sole discretion, effective upon delivery of a notice of suspension or termination specifying the reasons therefor if (i) any of them shall have commenced, or shall have commenced against it without dismissal within ninety (90) days, any case or proceeding relating to bankruptcy, insolvency or relief of debtors or seeking the appointment of a receiver, trustee or similar official, or (ii) any of them shall make a general assignment for the benefit of creditors, or (iii) any of them shall admit its inability to generally pay its debts as they become due.

    C.  Retailer acknowledges that the Government of Puerto Rico has the right to terminate its agreement with its Contractor at will. If this occurs Retailer further acknowledges that their authority to deliver Benefits may be suspended or terminated effective at the time of delivery by an authorized representative of the Government of Puerto Rico to Retailer of a notice of suspension or termination.

8.  Force Majeure

    Neither Retailer, the Government of Puerto Rico nor its Contractor will be responsible for errors, delays or nonperformance due to events beyond their reasonable control, including, but not limited to, acts of God; interruption, fluctuation or non-availability of power or communications; changes in law or regulation or other acts, orders or omissions of governmental authority or compliance therewith; acts of sabotage; strikes; weather conditions; fires; or explosions.

9.  Confidentiality of EBT System Information

    A.  Retailer, its directors, officers, employees, and agents will treat all information, with particular emphasis on information relating to Recipients and applicants for Benefits, which is obtained by it through its performance under this Agreement, as confidential information to the extent required by the laws of the Government of Puerto Rico wherein Retailer delivers Benefits pursuant hereto and of the Government of Puerto Rico and any regulations promulgated thereunder.

4

B. Individually identifiable information relating to any eligible Recipient or applicant for Benefits will be held confidential and will not be disclosed by Retailer, its directors, officers, employees or agents, without the prior written approval of the Government of Puerto Rico.

C. The use of information obtained by Retailer in the performance of its duties under this Agreement will be limited to purposes directly connected with such duties.

D. Retailer will promptly advise the Government of Puerto Rico or its Contractor of all requests made to Retailer for information described in paragraph (a) above.

E. Retailer will be responsible for assuring that any agreement between Retailer and any of its directors, officers, employees or agents contains a provision which appropriately addresses the confidentiality of the class of information covered by this Section 9.

F. If Retailer delivers Benefits in more jurisdictions than the Commonwealth of Puerto Rico pursuant to this Agreement, the laws of the Government of Puerto Rico in will apply to all information arising out of an EBT transaction.

10. EBT Service Marks

Retailer will adequately display the Government of Puerto Rico's service mark and other licensed marks, including the Quest™ mark, and other materials supplied by the Government's Contractor in accordance with the standards set by the Government. Retailer will use the service marks only to indicate that Benefits are delivered at Retailer's location(s) and will not indicate that the Government or its Contractor endorses Retailer's goods or services. Retailer's right to use such service marks pursuant to this Agreement will continue only so long as this Agreement remains in effect or until Retailer is notified by the Government of Puerto Rico or its Contractor to cease their use or display.

11. Indemnification and Liability

A. Each of the parties agrees to indemnify and hold the other party (including its directors, officers, agents and representatives), harmless from any and all losses, damages, claims, complaints, judgments and expenses (including reasonable attorneys', witnesses' and expert witnesses' fees) arising out of such party's performance or failure to perform any of its obligations as provided in this Agreement; provided, however, that (I) the party seeking indemnification shall notify the other party promptly in writing after it obtains notice of any claim or action for which indemnification will be sought; (ii) the indemnifying party shall have sole control of the defense of such claim or action and all negotiations of its settlement or compromise; and (iii) the party seeking indemnification shall cooperate with the indemnifying party in the defense of such claim or action. In no event will either party be responsible or liable to the other party for special, indirect, incidental or consequential damages which such other party may incur or experience on account of entering into or relying on this Agreement, even if the indemnifying party has been advised of the possibility of such damages.

B. Notwithstanding anything contained in paragraph A above, neither party shall be liable to the other party for any losses or damages resulting from its failure to perform its obligations under this Agreement if such failure arises from or is the result of Force Majeure.

C. "Bank" agree to hold Retailer harmless of any and all claims, liabilities, damages, losses or expenses arising under this contract, attributable to those parties' negligence or willful misconduct, including but not limited to, claims by Beneficiaries due to cash benefit denials or any other incidents.

12. Miscellaneous

A. Amendments If any of these terms and conditions are found to conflict with Federal or Government of Puerto Rico law, regulation or policy, these terms and conditions are subject to amendment by the Government of Puerto Rico or its Contractor upon ninety (90) days written notice to Retailer.

B. Assignment Retailer agrees not to convey, assign, delegate, subcontract, novate, or otherwise transfer in any manner whatsoever any of Retailer's rights or obligations under these terms and conditions without prior written approval of the Government of Puerto Rico, its Contractor or "GM". Retailer agrees that "Bank" may assign its rights and obligation under this agreement to a subsidiary.

C. Severability. If any term or condition contained herein is held invalid by a court of competent jurisdiction, such term or condition will be inoperative but all other terms and conditions will remain in full force and effect.

D. No Third Party Beneficiaries These terms and conditions, do not create, and will not be construed as creating, any rights enforceable by any person not having any rights directly hereunder, except that the Government of Puerto Rico and its Contractor will be deemed third party beneficiaries of the representations, warranties, covenants and agreements of Retailer hereunder.

E. Notices All notices, requests and approvals required by this Agreement will:  (a) be in writing; (b) be addressed to the parties as indicated below unless notice is given in writing of a change in address; and (c) be deemed to have been given either when personally delivered or, if sent by mail (in which event it will be sent by registered mail, return receipt requested), upon deposit in the mail to the parties at the following addresses:

To: BANCO POPULAR DE PUERTO RICO
Merchant Business
PO Box 364527
San Juan, PR  00936-4527

**With a copy to:**

F. Government Action Nothing contained herein shall preclude the Government of Puerto Rico wherein Retailer delivers Benefits pursuant hereto from commencing appropriate administrative, civil or criminal actions against Retailer or from a referral for such action to the appropriate Government of Puerto Rico or local agency.

G. Governing Law. These terms and conditions will be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without giving effect to conflict of laws.

5

### EBT 75% RETAILER AGREEMENT

1. Engagement of Bank

   a. Retailer has engaged Banco Popular de Puerto Rico to provide settlement and switching services for various Point-of-Sale transactions initiated through Retailer. Bank has entered into an agreement with Contractor whereby Bank may initiate transactions for the authorization of the delivery of Government of Puerto Rico's targeted Nutritional Assistance Benefits (NAP). ) Benefit recipients will purchase allowable food through the use of a Government-issued EBT card at NAP-authorized retailers' locations.

   b. Subject to the terms and conditions hereof, Retailer agrees to deliver Benefits at each of the retail locations identified in Appendix A attached hereto and made a part hereof, during Retailer's normal business hours.

   c. Retailer will require, and may in its advertising suggest, that Government Benefit Recipients must purchase allowable food at Retailer's facilities as a condition to the delivery of targeted NAP Benefits to such Recipient. Retailer will not designate special checkout lanes restricted to use by Recipients, provided that if Retailer designates special checkout lanes for electronic debit or credit cards and/or other payment methods such as checks or other than cash, Recipients may be directed to such lanes so long as other commercial customers are directed there as well.

   d. Retailer agrees to give at least fifteen (15) days written notice to Bank of any planned cessation of services, or inability to comply with the terms of this Agreement.

2. Delivery of Benefits

   a. Subject to the provisions hereof, Retailer agrees to deliver targeted NAP Benefits, to Recipients. Retailer will provide each recipient a printed receipt for each benefit access transaction initiated by the Recipient at the Retailer's location. Retailer will be solely responsible for Retailer's incorrect delivery of Benefits.

   b. Retailer will deliver targeted NAP Benefits to Recipients, in accordance with the procedures set forth in the Bank's Rules (as hereinafter defined), in the amount authorized through its point-of-sale ("POS") terminal, with personal identification number ("PIN") pad and printer ("Equipment"), upon presentation by Recipient of an EBT Card and Recipient entry of a valid PIN. Retailer agrees that in the event of the failure of the Equipment to print Benefit access information as approved and validated as a legitimate transaction, Retailer will comply with the procedures set forth in the Rules for authorization of Benefits in such instance.

   c. Retailers shall not charge Recipients for any POS EBT Transaction including redeeming Cash benefits.

   d. Retailer agrees to make available Informational materials, as provided by Bank, such as schedules, Recipient notices and procedures, if any, and to post signage of the type and in the manner reasonably requested by Bank and by any applicable Government of Puerto Rico regulations and requirements pertaining to the delivery of NAP Benefits.

   e. Retailer agree to comply with all applicable laws, rules and regulations in the performance of its obligations under this Agreement, including without limitation, laws pertaining to delivery of services to benefit recipients and benefit recipient confidentiality, and the federal Civil Rights Act of 1964 Rehabilitation Act of 1973, Americans with Disabilities Act of 1990, Clean Air Act, Immigration Reform and Control Act of 1986., and Government of Puerto Rico regulations, policies and procedures related to the delivery and use of Targeted NAP benefits.

   f. Retailer agrees to comply with the EBT policies and procedures and with the Quest™ Operating Rules (jointly named the "Rules"), as amended from time to time, issued by the National Automated Clearing House Association as approved by the Federal Reserve Bank and such other rules and regulations as may be applicable to the delivery of Benefits by Retailer hereunder. The Rules set forth Government of Puerto Rico policies applicable to the delivery of benefits and the Contractor's procedures for such delivery of Benefits. Retailer agrees to comply with all additional procedures specified by the Government of Puerto Rico, such as those related to lost/stolen EBT Card, forgotten PINs, discrepancies in benefit authorized/accessed and other matters by providing Recipients with information such as telephone numbers and addresses of Government of Puerto Rico or other appropriate agencies.

   g. Retailer will not accept the EBT Card for any purpose other than the delivery of Benefits, including without limitation as security for repayment of any Recipient obligation to Retailer. In the event of any violation of this provision, Retailer will be obligated to reimburse the Government of Puerto Rico for any Benefits unlawfully received by either Recipient or Retailer.

   h. The Retailer shall pay the Bank a service charge equivalent to the rate per EBT Transaction, as stated in Addendum I to the Merchant's Contract for Card Services. The Bank shall send to the Retailer a monthly statement for the transaction fees applicable to the POS Services. The Retailer authorizes the Bank to debit the Retailer's Account monthly for the amount corresponding to the service charges for the transaction fee applicable to the POS Service, as stipulated in Addendum I of this Contract. The Bank may change the service charge, from time to time, upon sending a written notice to the Retailer thirty-(30) days before the effective date of the change.

3. Access to and maintenance of records

   a. Retailer will be furnished instructions concerning records to be made and kept.

   b. Retailer agrees to separately maintain such records as may be reasonably requested or required by the Government of Puerto Rico or Government Contractor and to promptly make such records available for audit upon request to representatives of the Government or its Contractor, or to other authorized Government of Puerto Rico or Federal government agency representatives or their agents during normal business hours.

6

c. To assure compliance with this Agreement, the Government of Puerto Rico, its Contractor or other authorized Government or Federal governmental agency, will at all times, with advance notice, except in instances of suspected fraud or other similar activity, have the right to enter, during normal business hours, Retailer's premises to inspect or evaluate any work performed under this Agreement, or to obtain any other information required to be provided by Retailer or otherwise related to this Agreement.

d. Retailer agrees to maintain and preserve all financial records and reports arising hereunder during the course of this Agreement and for a period of three (3) years following Benefit delivery, or for an additional period as applicable regulations may require. Records involving an audit and matters in litigation will be kept for a period of not less than three (3) years following the termination of the audit or litigation. Copies of any documents in media other than paper (e.g. microfilm, etc.) related to this Agreement may be substituted for the originals with the prior written approval of the Government of Puerto Rico or its Contractor provided that the media type, storage and retrieval procedures are accepted by the Government of Puerto Rico.

4. Training

Retailer will be furnished necessary and reasonable training in policies and procedures. Retailer agrees to cooperate and to train or permit its employees to receive such training at retailer's expense; at such times as is reasonably and mutually convenient to the parties.

5. Reimbursement of Retailer for Benefit Delivery

a. Settlement to Retailer for its delivery of Targeted NAP benefits to Recipients pursuant to this Agreement, and settlement for other transactions as permitted in accordance with the Rules will be via electronic credit or debit to Bank's designated financial institution account on behalf of Retailer. Retailer shall authorize such transfers to said account as may be required to correct any erroneous or unauthorized transfers or benefit deliveries Retailer will be promptly notified of any such corrective transfers. This authorization will remain in effect until withdrawn by Retailer upon thirty-(30) days written notice to the Government of Puerto Rico or its Contractor. Retailer agrees to deliver to Bank a Retailer Settlement Authorization Form and voided check for the Retailer account.

b. Credit or debit to Bank's Receiving Depository Financial Institution (RDFI) for the account of Bank on behalf of Retailer will be made by the Government's Contractor the next business day, but no later than two (2) business days, following receipt by the Government's Contractor of Retailer's end-of-day POS settlement information. Settlement information received after the Contractor's processing deadline as stated in the Rules will be processed for credit or debit the following business day (credit or debit to be made no later than two (2) business days after processing). Such credit or debit will be electronic via the Automated Clearing House (ACH)

c. In the event that the credit received by Retailer for benefit delivery is less than Retailer believes is otherwise due, Retailer or Bank shall promptly notify the Government's Contractor and Retailer or Bank shall compare records to determine the source of such discrepancy. The Government's Contractor and Retailer or Bank will negotiate in good faith to resolve any discrepancies in accordance with the Rules.

6. Required Licenses

If Retailer delivers Targeted NAP Benefits under this Agreement, Retailer represents and warrants to Bank that Retailer is a Government of Puerto Rico authorized retailer and is not currently disqualified or withdrawn from redeeming targeted-NAP benefits or otherwise disqualified or withdrawn by the Government of Puerto Rico. Retailer agrees to secure and maintain at its own expense all necessary licenses, permits, franchises, or other authorities to lawfully effect the delivery of Benefits under this Agreement, including without limitation, any applicable franchise tax certificate and non-governmental contractor's certificate, and covenants that Retailer will not deliver Benefits at any time during which Retailer is not in compliance with the requirements of any applicable law.

7. Terms and Termination

a. Retailer's authority to deliver benefits hereunder shall be effective from the date hereof, and shall continue in effect for a period of one year after the date, and thereafter for consecutive one-year periods, unless terminated at the end of any such period pursuant to a notice given by either party to the party at least ninety (90) days prior to the end of that period, or at such other time as may be mutually agreed upon, or unless otherwise terminated in accordance with this Section 6.

b. If Retailer is disqualified for cause or withdrawn from the NAP Program, Retailer's authority to deliver Cash Benefits will terminate contemporaneous therewith. Such disqualification or withdrawal will be deemed a breach of this Agreement with respect to Retailer's authority to also deliver Cash Benefits.

c. With respect to the delivery of Targeted NAP Benefits Retailer's authority to deliver Targeted NAP Benefits may be suspended or terminated by the Government of Puerto Rico or its Contractor effective upon delivery of a notice of suspension or termination specifying the reasons for such suspension or termination of the Government's Contractor's authority to provide EBT services to the Government of Puerto Rico; (ii) failure by Retailer, upon not less than Thirty (30) day prior written notice, to cure any breach by Retailer of the provisions of these terms and conditions, including without limitation, Retailer's failure to support the delivery of Benefits during Retailer's normal business hours consistent with Retailer's normal business practices, Retailer's failure to comply with benefit delivery procedures, Retailer's impermissible acceptance of an EBT Card, or Retailer's disqualification or withdrawal from the NAP Program, and the failure by Retailer to cure the same within thirty (30) days after notice of same from the Government or its Contractor (iii), based on the Government's or its Contractor's investigation of the relevant facts, evidence that Retailer or any of its agents or employees is committing, participating in, or has knowledge of fraud or theft in connection with the dispensing of Benefits. In the event, that Retailer fails to cure any breach as set forth above, Retailer may appeal such suspension or termination to the Government through its Contractor. Final determination will be at the Governments sole discretion.

d. Retailer may, in its sole discretion, suspend or terminate this Agreement and its authority to deliver Benefits, effective upon delivery of a notice of suspension or termination, for any breach of this Agreement.

e. This Agreement may also be suspended or terminated by Retailer, the Government or its Contractor in their sole discretion, effective upon delivery of a notice of suspension or termination specifying the reasons therefor if (i) any of them shall have commenced, or shall have commenced against it without dismissal within ninety (90) days, any case or proceeding relating to bankruptcy, insolvency or relief of debtors or seeking the appointment of a receiver, trustee or similar official, or (ii) any of them shall make a general assignment for the benefit of creditors, or (iii) any of them shall admit its inability to generally pay its debts as they become due

f. Retailer acknowledges that the Government of Puerto Rico has the right to terminate its agreement with its Contractor at will. As a result, Retailers acknowledge their authority to deliver Benefits may be suspended or terminated effective at the time of delivery by an authorized representative of the Government of Puerto Rico to Retailer of a notice of suspension or termination.

8. Force Majeure

Neither Retailer, the Government of Puerto Rico nor its Contractor will be responsible for errors, delays or nonperformance due to events beyond their reasonable control, including, but not limited to, acts of God; interruption, fluctuation or non-availability of power or communications; changes in law or regulation or other acts, orders or omissions of governmental authority or compliance therewith; acts of sabotage; strikes; weather conditions; fires; or explosions.

9. Confidentiality of EBT System Information

Retailer, its directors, officers, employees, and agents will treat all information, with particular emphasis on information relating to Recipients and applicants for Benefits, which is obtained by it through its performance under this Agreement, as confidential information to the extent required by the laws of the Government of Puerto Rico wherein Retailer delivers benefits pursuant hereto and of the Government of Puerto Rico and any regulations promulgated thereunder.

a. Individually identifiable information relating to any eligible Recipient or applicant for Benefits will be held confidential and will not be disclosed by Retailer, its directors, officers, employees or agents, without the prior written approval of the Government of Puerto Rico.

b. The use of information obtained by Retailer in the performance of its duties under this Agreement will be limited to purposes directly connected with such duties.

c. Retailer will promptly advise the Government of Puerto Rico or its Contractor of all requests made to Retailer for information described in paragraph (a) above.

d. Retailer will be responsible for assuring that any agreement between Retailer and any of its directors, officers, employees or agents contains a provision that appropriately addresses the confidentiality of the class of information covered by this Section 9.

If Retailer delivers Benefits in more jurisdictions than Commonwealth of Government of Puerto Rico pursuant to this Agreement, the law of the Government of Puerto Rico in which the Benefits were delivered will apply to all information arising out of an EBT transaction.

10. EBT Service Marks

Retailer will adequately display the Government of Puerto Rico's service mark and other licensed marks, including the Quest™ mark, and other materials supplied by the Government's Contractor in accordance with the standards set by the Government of Puerto Rico. Retailer will use the service marks only to indicate that Benefits are delivered at Retailer's location(s) and will not indicate that the Government or its Contractor endorses Retailer's goods or services. Retailer's right to use such service marks pursuant to this Agreement will continue only so long as this Agreement remains in effect or until Retailer is notified by the Government of Puerto Rico or its Contractor to cease their use or display.

11. Miscellaneous

a. Amendments. If any of these terms and conditions are found to conflict with Federal or Government of Puerto Rico law, regulation or policy, these terms and conditions are subject to amendment by the Government of Puerto Rico or its Contractor upon ninety (90) days notice to Retailer.

b. Assignment. Retailer agrees not to convey, assign, delegate, subcontract, novate, or otherwise transfer in any manner whatsoever any of Retailer's rights or obligations under these terms and conditions without prior written approval of the Government of Puerto Rico or its Contractor.

c. Severability. If a court of competent jurisdiction holds any term or condition contained herein invalid, such term or condition will be inoperative but all other terms and conditions will remain in full force and effect.

d. No Third Party Beneficiaries. These terms and conditions, do not create, and will not be construed as creating, any rights enforceable by any person not having any rights directly hereunder, except that the Government of Puerto Rico and its Contractor will be deemed third party beneficiaries of the representations, warranties, covenants and agreements of Retailer hereunder.

e. Government Action. Nothing contained herein shall preclude the Government of Puerto Rico wherein Retailer delivers Benefits pursuant hereto from commencing appropriate administrative, civil or criminal actions against Retailer from making a referral for such action to the appropriate Government of Puerto Rico or local agency.

f. Governing Law. These terms and conditions will be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without giving effect to conflict of laws.

8

## MERCHANT AGREEMENT FOR E-CHECK SERVICES

This MERCHANT AGREEMENT FOR E-CHECK SERVICES (the "Agreement") is made between Merchant, a Puerto Rico corporation ("Merchant"), and Banco Popular de Puerto Rico, Inc., a corporation organized and validly existing under the laws of the Commonwealth of Puerto Rico ("Banco Popular").

### RECITALS

WHEREAS, Banco Popular desires to provide to Merchant and Merchant desires to obtain from Banco Popular check verification and check conversion services; and

WHEREAS, the parties agree that it is in their respective best interest that Banco Popular provide the Services to Merchant;

NOW THEREFORE, in consideration of the mutual covenants contained herein, the parties agree as follows:

### ARTICLE 1

### DEFINITIONS

**Section 1.01.** Definitions

As used in this Agreement, the following terms have the definitions indicated herein (terms defined in the singular or the plural include the plural or the singular, as the case may be):

"ATH Network" shall mean a network comprised of automated teller machines and off-site premises throughout Puerto Rico.

"System" shall mean a system for check conversion services.

"Services" shall have the meaning set forth in Section 2.01.

"P.O.S. Equipment" shall mean the P.O.S. Terminals and related equipment, as fully described in Section 3.01 hereof.

"POS Terminal" shall mean certain electronic equipment that will be installed at the cashier stations or checkouts lanes at Merchant stores used for the authorization and performance of a Transaction.

"Transaction" shall mean a check verification or authorization effected at any Merchant cashier station or checkout lane using a check. The term Transaction shall also include a negative response to an authorization request made by Merchant, according to the provisions of Sections 2.01(a) of this Agreement.

"Void Stamp" shall mean device used for voiding paper check at point of sale before converting to electronic transaction.

### ARTICLE 2

### DESCRIPTION OF SERVICES

**Section 2.01.** Operation

In connection with the operation of the System to provide check verification and check conversion services, Banco Popular shall, upon the transmission by electronic means of an authorization request for a Transaction, provide the means to do a negative file check and approve or decline a Transaction. If authorized an authorization number shall be transmitted to Merchant, which shall be displayed on the screen of the P.O.S. Terminal and printed on the receipt issued by such P.O.S. Terminal (the "Service").

**Section 2.02.** Obligations of Merchant.

(a) Merchant agrees that customers may use their checks to purchase goods and services at Merchant's stores located throughout Puerto Rico and in such additional locations as Merchant and Banco Popular may agree to from time to time.

(b) Merchant shall not discriminate in any aspect of a Transaction. Merchant expressly states and agrees that sales of goods or services will be made to all customers at regular cash prices, including any discount sales prices effective on the date or at the moment of the Transaction, without charging any service charges for the use of the System and without requiring from the customers the payment of the Transaction fee charged to Merchant hereunder. Merchant further agrees that it will exchange merchandise, accept returns of merchandise and, if necessary, make adjustments in the price of any purchase made by a customer, if it customarily does so with respect to other transactions.

(c) Merchant's employees shall obtain by electronic means authorization for each Transaction and shall return the check to customer every time.

(d) Merchant shall provide terminal receipts to each customer, clearly stating the exact amount of the purchase transaction, the date and time of the transaction and the authorization approval number.

(e) Merchant shall retain copies of the sale slips, for not less than seven (7) year, and agrees to provide copies of such documents to Banco Popular within five (5) days of date of request so that Banco Popular may solve customer disputes.

(f) Each business day, Merchant shall transmit to the data center of Banco Popular all transactions processed and consummated at each P.O.S. Terminal installed at Merchant's premises.

(g) Merchant agrees to adequately display the logotype and promotional material provided by Banco Popular to inform the public that the System is used by Merchant.

(h) Merchant agrees to complete the e-check application form provided to customer and forward same to bank on a daily basis through bank's internal mail service non-compliance will result in chargeback to merchant.

(i) Merchant shall display all decals and promotional materials provided by Banco Popular informing customers of check conversion services.

**Section 2.03.** Obligations of BANCO POPULAR

(a) Banco Popular is the licensor of the System throughout Puerto Rico for the Services. Banco Popular agrees with Merchant that, in their respective best interests, it will provide the Services to Merchant. The Services consists of the following components: (i) the P.O.S. Terminals and related equipment that is described in Section 3.01(b)(2) of this Agreement; (ii) the Services provided by Banco Popular which are identified in Section 2.01 of this Agreement; (iii) the electronic equipment that is described in Section 3.01(b)(2) of this Agreement, and that shall be installed at the cashier stations or checkout lanes at Merchant's stores which shall be used for the authorization and performance of Transactions.

(b) Banco Popular shall supply Merchant with the appropriate sale slips, advertising displays, decals, and other point of sale promotional materials bearing the trademark symbol and name. Merchant recognizes that Banco Popular is the owner of all the P.O.S. Equipment installed for the Services and that Banco Popular may claim it at any time.

9

ARTICLE 3

## INSTALLATION, USE, AND MAINTENANCE OF TERMINALS

**Section 3.01.** Lease of P.O.S. Terminals and Related Store Equipment

(a) The P.O.S. Equipment shall be installed at all available Merchant cashier stations or checkouts lanes in the stores selected for the Services.

(b) Merchant shall lease from Banco Popular the P.O.S. Equipment, subject to the following terms and conditions:

1. All documentation, software and materials shall remain the sole property of Banco Popular and may not be copied, used or made available to others without the prior written consent of Banco Popular.

2. Merchant agrees to lease the P.O.S. Equipment from Banco Popular described in Schedule B and to pay fees to Banco Popular set out in Schedule A to this Agreement which is incorporated and made part hereof. Banco Popular may change the monthly rate per unit specified in Schedule A upon thirty (30) days' prior written notice to Merchant.

3. The installation and certification of the P.O.S. Equipment shall be performed by Banco Popular or contractors hired by Banco Popular. Banco Popular or its contractors shall also perform all the connections and telecommunication arrangements (other than the installation of the telephone lines) necessary for the performance of the Services. All costs related to the installation of the wiring, lines, P.O.S. Equipment and accessories shall be paid by Merchant.

4. The maintenance services for the P.O.S. Equipment leased from Banco Popular will be performed by Banco Popular or its contractors.

5. Merchant agrees to acquire and use void stamp noted in Schedule B.

6. Merchant shall return to Banco Popular the P.O.S. Equipment leased identified in Schedule B of this Agreement, when Banco Popular requires it, or Merchant decides it, in good condition (except normal depreciation); otherwise, Banco Popular will require a payment to indemnify Banco Popular for the installed equipment based on book value. Said payment will be charged to depository account of merchant.

(c) Software maintenance shall be the responsibility of Banco Popular . Any special programming (additional reports or features not contemplated at the time of execution of this Agreement) requested by Merchant after the signing of this Agreement, which is not deemed essential to comply with the terms of the Agreement, shall be paid for by Merchant. Banco Popular will inform and coordinate with Merchant any intended P.O.S. Equipment or software changes that would directly affect the Services.

**Section 3.02.** Communication Lines

Merchant shall procure, cause to install and service, monitor, and pay for the telephone lines linking Merchant's operations with Banco Popular 's data center.

ARTICLE 4

## FEES

**Section 4.01.** Fees/Monthly Statements

(a) Merchant agrees to pay fees to Banco Popular set out in Schedule A to this Agreement which is incorporated and made part hereof.

(b) Banco Popular shall render to Merchant monthly statements for the transaction fees applicable to the Services. All transaction fees will be debited from the Designated Account. Thereafter, Banco Popular may change the transaction fees upon thirty (30) days' prior written notice to Merchant.

ARTICLE 5

## TERM AND TERMINATION

**Section 5.01.** Term

The term of this Agreement shall commence on the Effective Date and end twelve (12) months following the Effective Date, unless earlier terminated as provided herein. This Agreement will be automatically extended for an additional one (1) year term at the anniversary date of the Effective Date

**Section 5.02.** Termination

(a) Banco Popular may terminate this Agreement upon the occurrence of any of the following events:

(i) a violation or noncompliance by Merchant in the execution of any of the terms and conditions, including the payment terms of this Agreement that is not corrected within the ten (10) business days following the notice;

(ii) Merchant is accused of fraudulent or illegal practices or conduct;

(iii) Merchant suspends or retires from business;

(iv) Merchant makes a substantial reduction in its operations;

(v) Merchant declares itself insolvent or incapable of complying with its debts;

(vi) Merchant convokes a creditors meeting;

(vii) Merchant makes any general surrender or trust mortgage to benefit creditors;

(viii) Merchant submits any application for or against any of the parties to start a bankruptcy procedure, arrangement, reorganization, or any procedure under the dispositions of the Bankruptcy Law; or

(ix) Merchant appoints an assignee or trustee for any or all of its properties.

(x) Upon the issuance of any ruling by Commonwealth of Puerto Rico or Federal governmental authority declaring that the implementation of the Services system shall have been or shall be conducted at any time in a manner contrary to any Commonwealth of Puerto Rico or Federal law or regulation, and such violation cannot be corrected.

(xi) Non-delivery of e-check application on a daily basis.

(b) Either party shall have the option to terminate the Agreement by providing written notice to the other party of at least sixty (60) days before the intended termination date.

## ARTICLE 6

### INDEMNIFICATION AND LIMITATION OF LIABILITY

**Section 6.01.** Indemnification

(a) Merchant shall indemnify and hold Banco Popular harmless from any and all claims, liabilities, losses, Banco Popular ents, costs or expenses (including, without limitation, reasonable attorneys fees) arising out of any suit or proceeding commenced by third parties as a consequence of any misrepresentation of Merchant or breach of Merchant's obligations under this Agreement or Merchant's non compliance with any law, or federal or local regulation as consequence of an act, or omission of Merchant, including that Merchant illegally charges the cardholders a price different from the price charged to customers paying in cash. Notwithstanding anything to the contrary contained herein, Banco Popular shall not be responsible for delays in receipt of Merchant information because of causes beyond its reasonable control, including, without limitation, equipment malfunction, limitations on the availability of telephone or other transmission facilities, failures of communications equipment or Merchant's failure to properly transmit the information. Merchant also agrees that Banco Popular shall not be responsible for errors in data entry or other services, programs, hardware, data files or output provided to, or maintained for Merchant resulting from errors in Merchant's input data.

**Section 6.02.** Limitation of Liability

Banco Popular shall use reasonable care and diligence in performing its duties under this Agreement. Banco Popular will have no liability to Merchant or to any third party (including customers) for the failure to effect or make any authorization or verification of checks. In no case, will Banco Popular be liable to Merchant for indirect (consequential), special, or punitive damages. BANCO POPULAR's sole liability to Merchant or a third party for any claims arising out of the delay or interruption of the Services provided by Banco Popular shall be to make its best efforts to commence or resume such services as promptly as reasonably practicable. Banco Popular 's sole liability for any claims arising out of errors or omissions in the performance of the P.O.S. services shall be limited to the correction of such error if such error can be corrected. If the error cannot be corrected, Banco Popular 's liability shall be limited to the face value of the check.

## ARTICLE 7

### OTHER TERMS

**Section 7.01.** Confidentiality

All systems, programs, operating instructions, documentation and know how utilized in or by the System shall be and remain the property of Banco Popular or have been licensed to Banco Popular. Merchant hereby agrees to hold in the highest confidence all information which Merchant may receive from the System (the "Banco Popular Information"). Merchant shall disclose or provide the Banco Popular Information only on a need to know basis. Merchant's obligations apply to all Banco Popular Information, whether oral or written, in drawings or machine readable form, whether or not expressly marked "confidential", except

(i) to the extent Banco Popular Information was lawfully in Merchant's possession prior to its disclosure to Merchant hereunder or it enters the public domain through no fault of Merchant; or

(ii) upon reasonable prior notice to Banco Popular and opportunity to seek protective provisions with respect therein if the Banco Popular Information is required to be disclose in connection with any kind of adversarial proceeding; or

(iii) if the Banco Popular Information is legally required to be disclosed in connection with the resolution of any dispute that may arise in connection with this Agreement provided that Merchant shall cooperate within reasonable measures to protect the Banco Popular Information from disclosure into the public record. Merchant acknowledges that it may not use any of the Banco Popular Information for its own account except in the furtherance of its activities under this Agreement.

**Section 7.02.** Force Majeure; Emergency Situations

Banco Popular shall not be liable to Merchant for, and Merchant agrees to indemnify and hold Banco Popular harmless against any claims, damages, losses or expenses arising out of any error by Banco Popular in the performance of the Services and/or any failure to effect a Transaction, if such error or failure is due, in whole or in part, to war, fire, explosion, flood, hurricane, accident, riot, act of governmental authority, Act of God, labor strike, failure of communications, equipment malfunctions, other civil disturbance or other contingency beyond Banco Popular 's control.

**Section 7.03.** Independent Relationship

Neither party shall make any contract or representation nor incur any obligation in the name or on behalf of the other party. Nothing in this Agreement shall be construed as appointing or constituting an appointment of either party as the agent of the other. In performing services, Banco Popular shall act as an independent contractor of Merchant. All employees and independent contractors of Banco Popular shall be its employees and independent contractors and not those of Merchant.

**Section 7.04.** Severability

If any portion of this Agreement is at any time found to be invalid or in conflict with any applicable statute, rule, regulation or other applicable law, such portion shall be deemed to be modified or altered to conform thereto or, if that is not possible, to be omitted from this Agreement; the invalidity of any such portion shall not affect the force, effect and validity or remaining portion hereof.

**Section 7.05.** Amendments; Waivers

This Agreement may be amended or modified by Banco Popular upon thirty (30) days' prior written notice to Merchant. The failure of any party to enforce at any time any of the provisions of this Agreement shall in no way be construed to be a waiver of any such provision, or the right of any party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to be a waiver of any other or subsequent breach.

**Section 7.06.** Media Releases; Promotions

(a) Merchant authorizes Banco Popular to use its trade name in advertisements and promotions such as the listing of businesses that accept the Services. Such Banco Popular advertisements and promotions will be of general scope and will not include an offer of particular goods or any other similar offers.

(b) Merchant agrees that all media releases, public announcements, and public disclosures by Merchant or its employees or agents relating to this Agreement or its subject matter, including, without limitation, promotional or marketing material, but not including any announcement intended solely for internal distribution by such party or any disclosure required by legal, accounting, or regulatory requirements beyond the reasonable control of such Party, shall be coordinated with, and approved by Banco Popular prior to release, which approval shall not be unreasonably withheld.

11

**Section 7.07.** Notices

Except as otherwise specified, all notices, requests, demands and other communications required or permitted hereunder shall be in writing, addressed to the parties as follows:

> **Banco Popular de Puerto Rico**
>
> Merchant Business
>
> P.O. Box 364527
>
> San Juan, Puerto Rico 00936-4527

**Section 7.08.** Assignment

This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned or delegated by any party hereto (whether by operation of law or otherwise) without the prior written consent of the other party hereto, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, Banco Popular may, without the prior written consent of Merchant, assign this Agreement or any right or obligation thereof to its parent company or any of its subsidiaries or affiliates.

**Section 7.09.** Governing Law

This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Puerto Rico.

**Section 7.10.** Headings

The headings of the Sections of this Agreement are inserted for convenience only and shall not constitute a part hereof or affect in any way the meaning or interpretation of this Agreement.

**Section 7.11.** Entire Agreement

This Agreement and any other documents and certificates delivered pursuant to the terms hereof set forth the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein, and supersede all prior agreements, promises, covenants, arrangements, communications, representations and warranties, whether oral or written by any officer, employee or representative of either party hereto.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

**SCHEDULE A**

**FEES**

Transaction Fee

A monthly transaction fee of $0.25 will be charged for each electronic check conversion effected at any merchant cashier station.

**SCHEDULE B**
**EQUIPMENT**

CHECK READER

The rental for the Mag-Tek Micr Mini Magnetic ink reader shall be $5.00 per month per device.  Service of said equipment covers repairs, maintenance and replacement of equipment during normal usage.

KWIK STAMP XL1

BANCO POPULAR  shall provide to merchant one (1) Kwik Stamp XL1 free of charge for usage of voiding check at point of sales.  Any additional replacement of said stamp shall render a cost of $10.00 per device.

12

## CHECKOUT WEB SITE(S) AGREEMENT
## BANCO POPULAR DE PUERTO RICO

The person or legal entity identified in the Affiliate Application and Business Checklist ("Merchant") is currently affiliated with Banco Popular de Puerto Rico as a merchant for the processing of payments with cards. Merchant wishes to obtain Internet Payment Processing Services for its Web Site. Banco Popular de Puerto Rico agrees to provide Merchant with the aforementioned services subject to the following terms and conditions. These terms and conditions supplement the Merchant's Contract for Card Services and Addendum 1 thereto. The Merchant's Contract for Card Services, together with this Checkout Web Site(s) Agreement, shall hereinafter be referred to as the "Merchant Agreement".

### APPEAR

AS PARTY OF THE FIRST PART: (hereinafter referred to as "Merchant")

AS PARTY OF THE SECOND PART: Banco Popular de Puerto Rico (hereinafter referred to as "Bank") with main offices at 209 Muñoz Rivera Avenue, Hato Rey, Puerto Rico.

### SET FORTH

WHEREAS, Merchant desires to obtain Internet Payment Processing Services for Merchant's Web Site.

WHEREAS, Bank desires to provide Merchant with the aforementioned services.

NOW THEREFORE, the PARTIES hereby agree to the following:

### TERMS AND CONDITIONS

### SECTION 1 – DEFINITIONS

The following terms shall mean as follows:

1.1     ACH – Automated Clearing House.

1.2     Bank – Banco Popular de Puerto Rico or any of its affiliates that could be a successor in interest of this contract.

1.3     Bank Person – the Bank affiliates, subsidiaries, holding company, general partners, officers, directors, agents, assigns, suppliers, third party information providers and successor in interest.

1.4     Banking Day – means the Bank's business days from Monday through Friday, with the exception of holidays. Holidays are established by the Bank at the beginning of each year and are subject to change, from time to time, at the Bank's discretion.

1.5     Batch – a set of transactions with a particular effective date.

1.6     Debit Card – any ATH card that the Bank may issue, and all ATH cards issued by members of the "Red ATH" that agree to offer this service in the future. The term does not include ATH cards that are processed as credit cards, see Credit Card definition.

1.7     Credit Card – any credit card, which the Bank's payment processing systems can process. The term includes Debit cards that are processed as credit cards (which bear Visa or Master Card logos).

1.8     Confirmation – the confirmation of a payment.

1.9     Confirmation Screen – the screen appearing on the Web Site where the users receive a confirmation.

1.10    Cardholder – a person to whom a Credit or Debit Card has been issued or the individual authorized to use such card.



1.11    Merchant Account – an account maintained by Merchant with the Bank against which all credits and debits will be charged pursuant to this agreement.

1.12    NACHA – National Automated Clearing House Association.

1.13    Web Site Users – person that registered with, and was duly authenticated by, Merchant to use the Web Site.

1.14    Web Site – Merchant's Web Site.

1.15    Checkout Web Site – The Web Site where the payment transaction is initiated by the Web Site users. The checkout Web Site is developed and hosted by Banco Popular on behalf of Merchant.

1.16    Merchant Agreement – This Checkout Web Site(s) Agreement supplements the Merchant's Contract for Card Services and Addendum 1 thereto. The Merchant's Contract for Card Services, together with this Checkout Web Site(s) Agreement, shall hereinafter be referred to as the "Merchant Agreement" entered into by and between Merchant and the Bank in connection with the honoring by Merchant of payments on its Web Site.

### SECTION 2.   Description of Responsibilities

2.1     Bank Responsibilities

2.1.1   The Bank will provide Merchant the following services under this contract in exchange for payment as specified in Exhibit A.

2.1.1.1 Provide the Software and/or specifications that are necessary for the integration of the Web Site to Merchant's Checkout Web Site at Banco Popular. Bank will offer all the support required during the process of integrating the Web Site with its Checkout Web Site. Bank will offer Merchant, but not Web Site Users, ongoing support beyond integration with all issues related to the Checkout Web Site.

2.1.1.2 Process payments made by Web Site Users via any of the accepted payment methods. The accepted payment methods for this service are indicated by a mark in the corresponding box in the appropriate line or lines:

- Debit Cards (ATH)

- Credit Cards (Visa, Master Card)

- ACH*

- Individual Clients- WEB Transactions

- Commercial Clients- CCD**(Commercial Cash Concentration & Disbursement) Transactions.

Only those clauses in this Agreement pertaining to the accepted payment methods indicated above will apply.

2.1.2   ATH Debit Card and Credit Card transactions will be processed through the Bank's payment processing systems in accordance with Visa,

---

* Requires contract for origination of Electronic Funds Transfer Services through the Automated Clearing House (ACH). Addendum 1

** See description of the SEC (Standard Entry Class)

Master Card and ATH Network rules. Debit transactions to checking or savings accounts (ACH transactions) will be processed through the ACH Network in accordance to NACHA rules. Other payment methods that could be available in the future would be provided upon agreement of the parties. Operational and technical details along with account settlement procedures will be established, documented and incorporated to this agreement as Exhibits.

2.1.3    Debit Card and Credit Card transactions will be captured by the Bank, and forwarded to the card's issuer for authorization or rejection on a real-time basis. Merchant must close batches on a daily basis. Funds from all authorized Debit and Credit Card transactions that were closed (included) in a batch will be deposited to the Merchant Account, on the next Banking Day after the transactions' batch is closed.

ACH transactions will be captured by the Bank, and will be processed offline on a batch basis. Funds from all ACH transactions that were included in a file will be deposited to the Merchant's Account on the second Banking Day after the transaction's file is processed.

Detailed diagrams of the process for each payment method are available in Exhibits B, C and D, which are attached hereto and made part of this agreement. Operational Instructions for Settlement are provided in Exhibit E.

Merchant acknowledges that batches of ATH/Credit Card transactions that are not closed within seven (7) days from the date they were authorized shall be automatically purged and erased from the processing system, and will not be recoverable. Merchant hereby releases the Bank from any losses, including attorney's fees and costs that it may sustain from any source caused by this event.

This process may vary to reflect industry standards, regulatory requirements or processing developments. The Bank will notify those modifications that would entail changes to the Web Site prior to taking into effect, with no less than thirty (30) calendar days in advance unless modifications are required to be implemented sooner per regulations.

2.1.4    The Bank will include Debit Card, Credit Card and ACH transaction data on daily files. Funds collected through the Web Site will be deposited into the Merchant Account with the Bank.

2.1.5    The Bank is responsible for the maintenance and security of its own systems.

2.2    Merchant's Responsibilities

2.2.1.    Merchant will develop and maintain the Web Site at its own cost. Merchant will be responsible for: (a) accomplishing the programming required in order for the Web Site to properly communicate with the Bank's payment processing system (b) technical support of the Web Site (c) maintenance and security of its own systems and the Web Site and (d) compliance with Visa, Master Card and NACHA rules (see 2.3). The Merchant will maintain telecommunications connection to the Internet.

2.2.2.    The Web Site shall contain: a complete description of goods and/or services, customer service contact information, including e-mail address or telephone number, Return, Refund and Cancellation policy if applicable, Delivery Policy if applicable, Transaction

Currency or Currencies.

2.2.3.    Merchant will perform all steps necessary, and will be responsible, to properly authenticate the Web Site Users.

2.2.4    Merchant shall provide Web Site Users an ACH authorization receipt that shall appear on the Confirmation Screen. Such transaction receipts must show at a minimum the concealed card or account number, transaction ID (which must be unique for each transaction and generated by Merchant), the service provided, the amount of the transaction, the date of the transaction, the authorization code, the website address, a recommendation stating that the Web Site User should print or save the transaction receipt for his records, and any other information established by Merchant or reasonably agreed to by the parties (which could include information required by applicable law or regulation).

2.2.5    Merchant must retain the records for ACH authorized transactions submitted through the Web Site for no less than the period required under NACHA operating rules and regulations, which at the date of this agreement is twenty four (24) months, and will provide the Bank such information necessary to verify claims made by Web Site Users. For Debit Card and Credit Card transactions, Merchant must retain records for no less than eighteen (18) months.

2.2.6.    Merchant will follow the operational instructions provided by the Bank in Exhibit E to settle daily transactions or as agreed to from time to time with the Bank or as required by regulation or industry standards.

2.2.7.    Merchant recognizes that authorization shall not, by itself: (1) satisfy Merchant's obligation to exercise due diligence, (2) constitute a waiver by the Bank of any other procedure that Merchant must follow pursuant to the Merchant Agreement.

2.2.8.    Merchant will perform an Annual Security Audits at least once a year as specified by NACHA Rules. This audits are to assure adequate security levels of:

A)    Physical security to protect against theft, tampering, or damage.

B)    Personnel and access controls to protect against unauthorized access and use.

C)    Network security to ensure secure capture, storage and distribution of financial information.

Merchant shall be solely responsible for processing any request for its services and for handling Web Site User's inquiries and/or complaints arising there from. Merchant shall also be responsible for the security and confidentiality of any Web Site User information (including, without limitation, card number or bank account information and social security number) that Merchant receives in connection with its service.

2.3    Processing Funds Transfers

2.3.1.    The Bank and Merchant agree to be subject to the following terms and conditions and the applicable rules of the Automated Clearing House Association (NACHA).

With regard to those debit and credit entries (together, the Entries) that Merchant originates and transmits, Merchant guarantees the Bank the following:

14

2.3.1.1 It will originate the Entries to the Bank following ACH instructions and within the amount limits for each WEB transaction established in such addendum.

2.3.1.2 Each person identified as the receiver of the Entry has authorized the transaction for the amount and on the effective date indicated in the Entry (the Authorization).

2.3.1.3 A debit Entry: (1) will be carried out as specified in the Authorization and (2) does not exceed any applicable limits regarding dollar amount for the transaction.

2.3.1.4 It has used commercially reasonable procedures to verify that route and transit numbers are valid.

2.3.1.5 The Authorization and agreement for each Entry has not been cancelled by Merchant, by Merchant's client or by any legal provision.

2.3.1.6 It will retain an electronic copy of the original of each client's authorization for two (2) years after the effective date of authorization.

2.3.1.7 Upon the Bank's request, Merchant will provide the original or a copy of the original receiving client's authorization 10 days following the request.

2.3.1.8 It will comply with applicable federal or local laws and regulations, including the laws on sanctions imposed by OFAC; (Office of Foreign Assets Control).

2.3.1.9 The Bank will not be responsible for transactions it does not receive.

2.3.2. The Bank will not be required to process transactions that Merchant transmits through ACH that do not comply with NACHA Rules or with the terms and conditions of this Agreement.

2.3.3. The Bank will process each Entry according to the account number registered in the transmission file.

Merchant agrees that the Bank is not under any obligation to detect inconsistencies between the name of the recipient of the entry and the account number provided by Merchant. Merchant will hold the Bank harmless from any responsibility in regard to any omission, discrepancy or error in the client information record.

2.3.4. Merchant will maintain sufficient funds in the Merchant Account at all times to cover the amount of debit entries to the Account. If funds in the Account are not sufficient, the Merchant will have a debt toward the Bank in the amount of the deficiency which is due and payable and subject to all offset and other rights that the Bank may have.

2.3.5. Merchant has no right to cancel or amend an instruction after the Bank receives it. However, if the Bank allows it and Merchant complies with the Bank's procedures and NACHA rules to cancel or amend entries, the Bank will exercise reasonable efforts to try to cancel or amend the instructions if it has not already transmitted them, but has no obligation to do so and will not incur in liability if the cancellation or amendment cannot be done. Merchant will reimburse the Bank and hold it harmless for any expense, loss or damage the Bank may incur in effecting or attempting to affect Merchant's request for the reversal of an entry.

2.3.6. The Bank will notify Merchant of the receipt of a returned Entry no later the one business day after such receipt. Unless Merchant has requested the ACH Return Items Collection Service from the Bank, the Bank has no obligation to reprocess transactions that have been returned for whatever reason.

2.4 Obligations and Responsabilities

2.4.1. The Bank and Merchant agree to be bound by and to comply with NACHA regulations. You commit yourself to obtain at least once a year during the term of this service the "ACH Operating Rules – Corporate Edition" publication. This booklet may be requested through the web page http://www.nacha.org/.

2.4.2 Merchant accepts that all documentation and electronic programs identified in the ACH Addendum and materials related to the ACH Service are property of the Bank. Merchant will not copy, use or make available to other persons or legal entities without prior consent from the Bank and that the Bank may claim that said documents be returned at any time.

2.4.3 Merchant and the Bank agree that they may electronically file and save all telephone conversations or data transmitted between them or their agents related to the Service.

2.4.4 In the event of an ACH failure or delay, the Bank will be entitled to use any other payment method having a substantially similar time frame for collection and settlement as the Bank in its sole discretion may choose.

2.4.5 Merchant will use the ACH Addenda for lawful purposes only and will not provide to the Bank information that is obscene, threatening, harassing or that is prohibited under any provision of any applicable Federal, State or Puerto Rico statute or regulation. Merchant warrants that all information Merchant provides to Bank to be transmitted as ACH Addenda is complete and accurate and is intended to be transmitted to the third party recipient the Company has designated for that third party's internal use only and to the best of the Company's knowledge will only be so used.

2.5 Charged back and rejected transactions.

2.5.1 Merchant agrees to allow the Bank to debit the Merchant Account for charged back or rejected transactions that could occur for any valid reason provided under Regulation E and/or NACHA Rules as applicable and as may be amended or substituted. Valid reasons include, but are not limited to: Insufficient Funds, Closed Account, No Account / Unable to Locate Account, Invalid Account Number, Stopped Payment, Uncollected Funds, Customer Advises Transaction was Not Authorized, Branch Sold to Another Financial Institution, Deceased Customer, Non-Transaction Account, Duplicate Entry, or Unauthorized Transaction.

2.5.2 Merchant will manage claims addressed by Web Site Users according to the procedures established and according to applicable regulations. The Bank will manage claims addressed by Web Site Users to their card issuers or their banks in the same manner, and using the same procedures per applicable regulations, the Bank currently uses for claims for payments offline, through Points of Sale in the physical world.

2.5.3   Charged Back and Debit Notification Process

2.5.3.1   For Debit and Credit Card transactions, Merchant will receive by fax, debit notifications as the charge backs occur on a day-to-day basis.

2.5.3.2   For ACH transactions, Merchant will receive a daily rejected transaction file via the Vector application or via Web Cash Manager.

2.6   Payment for Services

2.6.1   Merchant will pay the Bank the Fees for the Checkout Web Site(s) stated in Exhibit A, which is attached hereto and made a part of this agreement. The fees stated in this contract will be debited from the Merchant Account.

**SECTION 3,**   Other Duties and Obligations

3.1   Compliance with Rules and Regulations.

3.1.1   Both parties acknowledge that Merchant's payment for Banco Popular's Service is subject to federal and local laws and regulations applicable to electronic funds transfer transactions. The payment could also be subject to the National Automated Clearing House Association's Operating Rules and Guidelines that govern the ACH Network and any other regulations that may apply and that may be adopted or amended in the future. Furthermore, the ACH Network has established operational procedures.

3.1.2   The Bank must comply with regulatory requirements for handling claims from cardholders regarding electronic funds transfers, which include resolving the claims within specified time limits. Therefore, if the Bank requests transaction information from Merchant, Merchant has the responsibility to provide the information requested by the Bank in ten (10) days or less.



3.2   Merchant hereby authorizes the Bank to test its Web Site to verify compliance with agreed upon technical, security and content standards.

3.3   Merchant is hereby granted a non-exclusive, non-transferable, right to use the Bank's Checkout Web Site(s). Merchant may not and shall not allow any party to copy, modify, create a derivative work of the specifications and programming provided to integrate the Web Site to the Checkout Web Site or reverse engineer, reverse assemble, any software that may be provided in the future. Merchant acknowledges and accepts that the specifications, and/or software that are here provided, or that may be provided in the future, are the exclusive and confidential property of the Bank. Accordingly, Merchant shall not disclose or reveal the specifications and/or software to any third party or use them for its own benefit, other than pursuant to this agreement, except with the Bank's prior written consent or as required by law or by a judicial order. Merchant further agrees to take all reasonable precautions to preserve the confidentiality of the Bank's payment processing system and shall assume the responsibility to make sure that its employees, contractors, representatives and other related parties will similarly preserve this information against third parties. The provisions of this paragraph except for the first sentence shall survive termination of this Agreement.

**SECTION 4,**   Warranties and Indemnies

4.1   Bank will guarantee that the pin number used in Debit Card transactions is securely transmitted to the Bank, and that the pin does not pass through or reside at Merchant's server.

4.2   Bank will exercise due care and diligence in the execution of the Service. It warrants that the services will be performed according to industry standards.

4.3   Neither the Bank nor any Bank Person shall be liable for delays or defaults in furnishing the Internet Payment Service hereunder, if such delays or defaults on the part of the Bank are due to: acts of God or of a public enemy; fires, severe weather, floods, earthquakes, natural disasters, explosions or other catastrophes; embargoes, epidemics or quarantine restrictions; labor disputes of any kind; other causes beyond the control of the Bank including, but not limited to any unforeseen failure related to changes in the infrastructure or traffic capabilities, failure or breakdown of the Internet, the World Wide Web, any related telecommunications equipment or systems, failure of any machinery, equipment or software or delay in completing the Web Site integration and certification. In such event, the Bank's obligation and liability shall be limited to using commercially reasonable efforts to reinstate the Service within a reasonable period of time once the unforeseen event has been rectified. The Bank shall not be under any obligation to refund to Merchant for any fees paid related to the period the Service were unavailable due to these reasons.

4.4   The Bank shall only be liable to Merchant for direct damages due to non-compliance with the terms of this agreement or those stated in Section 4.3. In no event, will the Bank be liable to Merchant for indirect, consequential, special, or punitive damages.

4.5   The parties will be liable and agree to indemnify and release each other from and against any claim, demand, suit, cost, fees, loss, or expenses of any kind to which they may be subjected due to any suit or proceeding that is a consequence of any misrepresentation, a breach of obligation under this Agreement, or non compliance with any law or federal or local regulation.

4.6   The indemnifications under this Section shall survive the termination of this Agreement until the statutes of limitations have expired.

**SECTION 5,**   Term of the Agreement; Termination

5.1   The term of this Agreement shall commence on the date it is signed by the Parties and last for three (3) years (the Initial Term). This Agreement shall be considered automatically renewed on a yearly basis commencing on the day after the third anniversary of the date of the contract and thereafter.

5.2   Except as otherwise herein provided, this agreement shall terminate and have no further force or effect as between the parties, (except as to liability arising prior to the date of termination). The Service shall be discontinued and, at the Bank's option, the Merchant Agreement terminated, upon the occurrence of any of the following:

5.2.1 A breach by either party of any material term or condition and such default is not cured within thirty (30) days after receipt of notification from the other party.

5.2.2 After the Initial Term, either party shall have the option to terminate this agreement without cause by providing written notice to the other party with at least sixty (60) days prior to the intended termination date.

5.3 Notwithstanding the provisions of Section 5.2, the Bank may terminate this agreement without notice to Merchant and without any liability whatsoever, discontinue providing the Service and at the Bank's option, terminate the Merchant's Agreement, immediately, if:

5.3.1 A Commonwealth or Federal governmental authority declares that the Services as rendered by the Bank are contrary to any Commonwealth or Federal law or regulation;

5.3.2 Merchant becomes insolvent, or enters into a bankruptcy, receivership, or dissolution proceeding;

5.3.3 Merchant significantly changes the scope or focus of the product or services offered or sold by the Merchant;

5.3.4 Merchant makes gross misrepresentations to actual or prospective customers about the services offered or sold;

5.3.5 The Bank determines that Merchant's security standards do not comply with the Bank's requirements or the Bank feels that the manner in which the Merchant conducts its business at any given time would materially expose Merchant to fraud by its customers; and

5.3.6 A breach by Merchant of its obligations under Section 5.1 hereof occurs.

5.4 Upon discontinuance of the Service, Merchant shall erase or destroy any of the Bank's intellectual property contained in the computer memory or data storage apparatus under the control of Merchant and return the Software to the Bank. In the event the Bank terminates the Service, the Bank may, at its option, declare any fees owed hereunder immediately due and payable. It is understood and agreed that termination shall not entitle Merchant to any compensation by the Bank on any grounds whatsoever, including, but not limited to, lost profits, loss of goodwill, or any direct, consequential, indirect, punitive, or exemplary damages.

**SECTION 6.** General Provisions

6.1 Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Bank without the prior written consent of Merchant. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, and no other person shall have any right, benefit or obligation hereunder. Notwithstanding the foregoing, Banco Popular may, without the prior consent of Merchant, assign this Agreement or any right or obligation thereof to its parent company or any of its subsidiaries or affiliates.

6.2 This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Puerto Rico. Any valid consent by any party to waive any term or provision of this Agreement, or excuse of a breach by the other part, shall not constitute a waiver of, or an excuse for any other different or subsequent breach.

6.3 The judicial invalidation of any Clause or term of this Agreement by a Court with jurisdiction will not be deemed to invalidate any other Clause, term or condition of the Agreement. The Agreement shall remain in full force for the parties, except for the Clause or term declared invalid.

6.4 Any substantial change or modification that the parties agree regarding the terms and conditions of this Agreement shall be incorporated to the same, through formal amendment.

Note:

(1) Each change request after acceptance of the original proposal will be billed according to the programming hours required to implement the change. An estimate will be provided in writing and work will be undertaken after acceptance of the estimate. The hourly rate for programming hours is $125 per hour.

## MERCHANT PROCESSING TELEPHONE, MAIL ORDER AND MANUAL ENTRY HIGH RISK TRANSACTIONS

### ACCEPTANCE GUIDE

(For complete information refer to Merchant Contract for Card Services)

### MERCHANT PROCESSING FOR TELEPHONE OR MAIL ORDER TRANSACTION (HIGH RISK)

Transaction where cardholder and card are not present.

The merchant will accept this sale transaction at its own risk and discretion. Merchant hereby guarantees to the Bank the payment of the same (Section V 5.5 Appendix II Page 9).

1. The following procedure should be completed
   a. Obtain the name, account number, expiration date and additional information to identify the cardholders.
   b. Call for authorization at our Call Center and report the transaction is a "Code 10".
2. Write legible on the sales slip
   a. Cardholder account number (16 digit)
   b. Customer name
   c. Authorization number – Does not assure or guarantee the person using the card is the cardholder.
   d. Amount of transaction
   e. On the space provided for signature write
      TO - Telephone order
      MO – Mail Order

These are high risk transactions. If at any time a chargeback is originated these charges will be debited from your commercial account.

### MANUAL TRANSACTION

The following procedure should be a completed:

1. An imprinter plate should have:
   a) Merchant number
   b) City of business location
2. Identify the cardholder.
3. Request identification with photo that shows the signature.
4. Compare one or more security characteristics.
5. Print sales slip using imprinter.
6. Verify cardholder account number (16) digit and customer name.
7. Call our Authorization Center: (787) 622-4901 Metro 1-877-238-4446 Island
8. Write the authorization number on the sales slip.
9. Amount of transaction
10. Customer must sign the sales slip (verification of signature should be done). Sales slip should be deposited using the envelope on a daily basis at any Branch of Banco Popular.

### IMPORTANT SECTIONS OF MERCHANT CONTRACT THAT NEED TO BE REVIEWED WITH MERCHANT AND AFFILIATION PROCESS IS BEING PERFORMED.

**SECTION 2.2**

(i) Not to charge customer the discount fee in whole or in part

(ii) Not to increase the cost of goods and services to customer

(vi) Not to require a minimum transaction amount to accept the debit / credit card from customer

**SECTION III**

3.2 The merchant acknowledges that obtaining the Bank authorization for a transaction does not guarantee that the person using the card is the cardholder.

**SECTION V** High risk transactions are transactions with no card or customer present the card when making the transaction or in relation to which the merchant shows no evidence of the presence of the card at the merchant business.

Example:

• Internet Sales

• Internal Sales

• Mail and Telephone Orders

• Manual Transaction

1.22 High risk transactions are transactions with card present and no signature. (Unattended Terminal Transactions).

Example:

• Pay at the Pump

• Vending Machine

5.1 The merchant may authorize high risk transaction at its own and sale risk and discretion and hereby guarantees to the Bank the payment of the same.

Confirm receiving the Merchant's Contract for Card Services.

## HOTEL CASINO AFFILIATION PROCEDURES

1.34.1   Quasi – Cash Transaction is a transaction representing the sale of articles directly convertible into cash such as gambling chips, money order and similar transactions.

For Quasi – Cash transaction the Merchant must comply with the following procedures:

1. Identify the cardholder. If the card does not have a photo before completing transaction merchant should:

   a) Request identification with photo that shows a signature.

   b) Compare one or more security characteristics of the card before completing the Quasi – Cash transaction. When card is swiped verify that the cardholder account is the same that appear on the terminal.

   c) Write down the first four (4) digits engraved on credit card as part of the sales slip of the Quasi – Cash receipt. If these digits do not match, the merchant shall not accept the transaction and shall try to withhold the card by peaceful means. If unable to withhold the card, the merchant must notify the Authorization Center immediately. (Code 10).

   d) If electronic system is inoperable or merchant suspects card could be false or stolen, he or she must call our Authorization Center and request approved.

   e) Verify that signature and identification, on credit card and receipt are reasonably similar.

   f) Write down what type of identification and its identifying number on the sales slip.

   g) Merchant must compare the first four (4) printed digits above or below the account number.

   h) Process the Pin Number of the card, if requested.

2. If the card has a photo, merchant does not have to verify another identification but should comply with the following:

   a) Merchant shall verify that the cardholder is reasonably similar in appearance to the person in the photo.

   b) Compare one or more security characteristics of the card before we complete a Quasi-Cash transaction.

   c) Write down on the sale slip "Photo Card Provided", this will indicate that the identity of the cardholder was verified.

   d) Verify that signature on card and sales slips are reasonably similar in appearance.

   e) Write down the four (4) digits engraved on credit card as part of sales slip.



## CARD PAYMENTS OF INSURANCE POLICY PREMIUMS

### SECTION VI

Insurance Company must have two commercial accounts as required by the Commissioner of Insurance.

1. **Premium Deposit Account**

   Account exclusively for deposits.

2. **Operational Account**
   All debits and charges are done to this account.

3. **Merchant Agreement must be completed**
   Merchant Contract for Card Service was received and the above regulation above explained.

## THE CORRECT WAY TO USE THE TERMINAL

### When using your (POS) Terminal, remember:

You cannot process the merchant's cards at the POS Terminal. (Section IX 9.2, p. 17)

If you need to transfer money from any account to your Flexi-Cuenta you must do so at a Banco Popular Branch or through Tele-Pago. You may not make transfers using a POS Terminal.

It is solely for processing commercial sales transactions. Processing transactions other than sales can lead to chargebacks to your account because the cardholder will not recognize the name of your business. The cardholder may question the charge and the resulting investigation could lead to a charge to your account. (Section VII 7.1, p. 12)

Remember, the merchant is charged a fee for processing credit card transactions, a loss which he must absorb for this type of service.

### High risk transactions

High risk transactions are manual sales, including telephone and mail orders. Merchants are responsible for any chargeback resulting from this type of transaction. When making these transactions, you must evaluate the following:

The manual printer (card swipe) should be used for all manual transactions. It is the only way of proving the card was presented.

The merchant is responsible for paying the Bank for the transaction in case of a claim. (Section V5.5, Attachment II, p. 8).

Obtaining the Bank's authorization for a manual transaction does not guarantee that the individual is the rightful owner of the card.

Sales slips that do not have the cardholder's signature are high-risk transactions. It is important to obtain the signature and to a request photo ID from the customer to minimize risks.

Faxed copies of credit cards and merchant authorization forms are not considered acceptable evidence of presentation of the card in your business.

If the terminal is out of order, you must call the Authorization Center and request an authorization (does not apply to debit or ATM cards). You must print the card on a sales slip using the manual printer (provided by the Bank) and verify that the printout is legible. Use this function to include the sale on the terminal prior to transmitting the deposit to the Bank. You must always write the authorization number on the sale slip, (If you speak with an operator, you must write there name).

To verify the validity of the transaction, you may:

1.  Request the full name of the cardholder and his/her billing address.

2.  Validate the name and address with the issuing bank before accepting the order. You may call the telephone number on the back of the card or the Voice Authorization Center at (787) 622-4901 or at 1-877-238-4446.

3.  Request the 3-digit security code printed on the signature panel after the card number (CVV2 or CVC2), as applicable.

4.  If you are still suspicious about the transaction, you may call our Risk Control Unit at (787) 751-9800, extensions 4523, 4522 or 2256.

When performing credit transactions, remember that:

Credits must be related to a previous sale. They cannot be used to pay employees or to make loans to customers.

The maximum amount that may be credited to an ATM card is $500. If the credit is for a higher amount, credits must be done in multiples of $500.00. This maximum does not apply to credit cards.

You need a secret code for making credits, for which you are responsible. You decide who will be allowed to process credits. Remember that as a result of this procedure, money is withdrawn from your bank account.

Credits must be made to the same card used for the sale.

20

## PROCEDURES FOR CAR RENTAL INDUSTRY

This guide describes the steps that a Car Rental Company needs to follow when a Card holder arrives to rent a vehicle.

Request authorization for the entire rental period.

All other charges must be submitted as a Separate transaction.

In event of a dispute regarding delayed charges or damage to the rented vehicle the following documents should be completed.

1. Copy of the car rental agreement
2. Copy of the police report
3. An itemized cost estimate for repair of the damages provided by an Authorized Dealer.
4. Copy of the Merchant Insurance Policy.
5. Documentation or letter signed by the cardholder which authorizes the merchant to charge damages with his credit card.
6. Copy of the certified letter sent to the cardholder.

**Important:**

A Certified Communication must be sent to the card holder with the following documents.

1. Copy of itemized invoice detailing cost of damages.
2. Total which will be charged to the cardholder.

TO REQUEST AN AUTHORIZATION YOU MUST HAVE YOUR MERCHANT NUMBER, CREDIT CARD NUMBER, AND EXPIRATION DATE ON HAND.

Service Directory
Authorization Center
Metro Area 787-622-4901
Non-metro Area 1-877-238-4446

Technical Materials and Services (8:00 AM–7:00 PM)
Metro Area 787- 751-1401
Non-metro Area 1-800-981-9401

Technical Services (After 7:00 PM) Saturday, Sunday, Holidays
787-494-0140, Unit 1-787-389-0911

Sales and Services
787-773-5150, ext. 3214 or 3215

Risk Control
787-751-9800, ext. 4523, 4522 or 2256





**1**

All Visa Card numbers start with 4. The embossing should be clear and uniform in size and spacing and extend into the hologram.

**2** A three-diemnsional dove hologram should reflect light and seem to changes as you rotate the card.



**4** Visa cards have a stylized "V" security character embossed to the right of the expiration date.

**3**

The Bank Identification Number (BIN) is pre-printed above or below the embossed account number and must match the first four digits of the card number.

**5** The card may not be accepted for use after expiration date.

**6** The card number embossed on the card or the last four digits must match the card number printed on the sales draft or displayed on the terminal (if equipment allows).



**2** The signature panel should have a repetitive pattern of the word "Visa" printed in color at an angle.

**3** The account number or the last four digits and the three-digit validation code are underu-printed on the panel in reverse italics.

**1** The signature of the sales draft should match the signature on the back of the card

**4** The magnetic stripe should appear smooth and straight, with no signs of tampering.

All Visa cards must be signed before they are valid. If the card is not signed, ask the cardholder to provide a valid government ID (e.g., driver's license), then have the cardholder sign the card. Check to be sure the signatures match.

**Are you suspicious about a card?**
**Call for a Code 10 Authorization.**

22

**BANCO POPULAR**

**1**

All MasterCard numbers start with 5. The embossing should be clear and uniform in size and spacing and extend into the hologram.

**2** A three-dimensional hologram with interlocking globes should reflect light and seem to changes as you rotate the card. The word "MasterCard" is printed repeatedly in the background of the hologram. The letters "MC" are micro-engraved around the two rings.

**3**

The pre-printed Bank Identification Number (BIN) must match the first four digits of the embossed account number.



**4** MasterCard cards have a stylized "MC" security character embossed to the right of the valid dates.

**5** The card may not be accepted for use after expiration date.

**6** The card number embossed on the card or the last four digits must be exactly the same as the 16-digit account number indent-printed on the signature panel, printed on the sales draft, or displayed on the terminal (if equipment allows).



**2** The word "MasterCard" is printed repeatedly in multicolors at an angle on a tamper-evident signature panel.

**3**

The account number or the last four digits and the three-digit validation code are indent-printed on the panel in reverse italics.

**1**

The back of the card must be signed and signature should match the signature on the sales draft.

**4** The magnetic stripe should appear smooth and straight, with no signs of tampering.

All MasterCard cards must be signed before they are valid. If the card is not signed, ask the cardholder to provide a valid government ID (e.g., driver's license), then have the customer sign the card. Check to be sure the signatures match.

Are you suspicious about a card?
**Call for a Code 10 Authorization.**

RECEIVED
MAR 0 4 2004
CORPORATE BANKING
PUBLIC SECTOR

## BANCO POPULAR DE PUERTO RICO
## PAYMENT GATEWAY SERVICE TERMS AND CONDITIONS

The following terms and conditions serve as a supplement of the Merchant's Contract for Card

Services and Addendum I thereto (which together with these Supplemental Terms and Conditions, shall

hereinafter be referred to as the "Merchant Agreement") entered into by and between the Merchant and the

Bank in connection with the honoring by Merchant of Cards issued by the Bank on its place of business.

These Supplemental Terms and Conditions relate to Merchant's honoring Cards using the Bank's Payment

Gateway Service as more fully described herein below.

1.      Description of Service.  Banco Popular's Payment Gateway Service (the "Service") is an online card

processing system that allows the Merchant's customers that hold Cards (hereinafter, a "customer" or

"cardholder") to pay online and provides the Merchant with a system to authorize, process and manage its

customer's card transactions directly from their web sites.

2.      Eligible Merchants.  To be eligible for the Service, the Merchant must maintain an online storefront

that complies with the technical and security standards specifications set forth herein below.  Merchants that

offer adult content or offensive material, are in the gambling business or sell lottery tickets on the World Wide

Web (the "Web") will not be eligible for the Service.

3.      Systems Requirements.

        3.1 In order to be able to subscribe to the Service, the Merchant shall have and maintain, while the

Service is in effect, an operating system and telecommunications connection to the Internet capable of

supporting a site in the  Web (the "Web Site") that complies, to the Bank's satisfaction, with the following

requirements:

        3.1.1  The Web Site must provide a complete description of the goods and/or services offered by the

Merchant online.

2

3.1.2   The Web Site must provide customers with clear information regarding shipping,
handling and delivery prices and timeline. Such information must be displayed before
the customer is offered the option on the Web Site's confirmation screen (the
"Confirmation Screen") to confirm a purchase (a "Confirmation").

3.1.3   Clear and precise return, refund and cancellation policies, acceptable to the Bank, must
be included on the Web Site.

3.1.4   The Web Site must provide customers with customer service contact information,
including both the Merchant's electronic mail address and telephone number.

3.1.5   The Web Site shall contain a checkout section where customers' credit card
information will be provided. This check out section will be the only place on the
Web Site where customers' credit card information will be requested or obtained.
This checkout component shall be protected at all times by Secure Socket Layers
(SSL) encryption technology or such other security standards required by the Bank
from time to time. The minimum SSL encryption must be 128 bits.

3.1.6   The Web Site shall provide for a customer transaction receipt that shall
appear on the Confirmation Screen, with a reference number for each
completed purchase. Such customer transaction receipt must conceal the
cardholder's account number, provide a unique identification number for
each transaction and show the Merchant's Web Site address.

3.2     The Service must be integrated to the server software used for the Merchant's Web
Site. The Merchant shall be responsible to integrate the Web Site with the Service using the
Application Program Interface provided to the Merchant by the Bank (the "Software") in accordance

3

with Section 3.1 hereof. The Merchant has the sole responsibility to select and employ a competent programmer to accomplish the programming required to make the Web Site function correctly with the Software. The Merchant shall be solely responsible for the programming of the Web Site, its functionality and for all technical support for Web Site related issues.

3.3     The Bank shall have the right to terminate the Service to the Merchant if it does not comply with all the required technical and security standards set forth above. The Merchant hereby authorizes the Bank to, from time to time, test the Web Site to verify compliance with such technical and security standards.

4.  Duties and Obligations of the Merchant. In addition to any duty or obligation of the Merchant set forth in the Merchant Agreement or in MasterCard/VISA rules, the Merchant agrees to:

4.1     At all times while this agreement is in effect, comply with the systems requirements set forth in Section 3 above.

4.2     Inform the Bank of its product or service offering prior the commencement of the Service and to notify the Bank prior to effecting any changes to such product or service offering.

4.3     When requested by the Bank, if the Bank at its sole option deems it necessary to protect its interest, to provide the Bank with a copy of the Merchant's original web site source code and to authorize the Bank or its agents to perform periodic reviews and comparisons. Should major differences be found, at the Bank's sole discretion, the Bank will have the option to terminate the Service pursuant to Section 8 hereof.

4.4     At and when the Bank so requests, the Merchant agrees to establish a reserve account (the "Reserve Account") at the Bank where funds will be maintained in the amounts agreed to by the Bank and the Merchant, to cover any chargebacks and such other amounts owed by the Merchant

4

to the Bank hereunder. The Reserve Account shall bear interest at the annual rate agreed upon by the Bank and the Merchant at the time it is established. The Merchant hereby grants to the Bank a security interest in and to any and all funds deposited from time to time in the Reserve Account as security for the performance of the Merchant's obligations hereunder and the Bank's right to collect fees or chargebacks under this Agreement.

4.5     Maintain a Merchant Account with the Bank (the "Merchant Account") which is identified in Addendum __1__ hereof, in which the card sales processed shall be credited and from which the following charges as per Addendum __1__ hereof, shall be debited:  a set-off fee, a monthly fee, a discount charge equal to a specific percentage of the aggregate sum of all the sales transactions processed during the corresponding monthly period, a processing fee per transaction, a Merchant membership fee (not applicable to current credit card Merchants of the Bank), any and all chargebacks, and any other fee relating to the Service established by the Bank from time to time upon prior written notice to the Merchant. The Merchant hereby authorizes the Bank to debit or credit the Merchant Account, as  stated herein, without need of previous notice to the Merchant. The Merchant Account shall be subject to the terms and conditions set forth in the specific deposit account agreement pursuant to which it was opened.

4.6     Deliver to the Bank personal guarantees acceptable to the Bank as security for the Merchant's obligations hereunder, if required by the Bank.

4.7     Comply with and be subject to, the laws and regulations applicable to card sales and with the operational procedures established by the Bank for the Service and for card sales.

4.8     Retain records relating to the card sales made through the Service for no less than 18 months, allow the Bank to examine such documents during reasonable hours, and provide copies of

5

such documents, as provided in the Merchant Agreement.

4.9     Follow the operational instructions provided by the Bank to settle daily transactions. In this connection, the Merchant shall close and transmit, each business day, to the data center of the Bank, all transactions processed through the Service during the day. Batches of transactions received after 4:00 A.M. will be settled on the next banking working day. The Merchant shall not complete a transaction until after the goods and/or services have been dispatched to customers. The Merchant acknowledges that Batches of transactions that are not closed and transmitted within seven (7) days from the date they were authorized shall be automatically purged and erased from the processing system, and are not recoverable. The Merchant hereby releases the Bank from any loss that it may sustain as a result of such erasure and agrees to indemnify the Bank for any losses, including attorney's fees and costs that it may sustain from any source caused by this event.

4.10     The Merchant shall not indicate on the Web Site or in any advertisement promoting its products or services that the Bank endorses any of the Merchant's products or services offered on the Web Site.

4.11     The Merchant agrees not to create any transaction that the Merchant knows or should have known to be fraudulent.

4.12     The products or services described for sale by the Merchant must be delivered or performed immediately or within the fully disclosed time frame otherwise specified by the Merchant to its customers.

4.13     The Merchant agrees not to require personal information about the customer, such as the home or work address (other than as necessary for the shipping of the purchased goods), telephone or driver's license number or Social Security number, as a condition of sale.

6

4.14   Before shipping any goods ordered, the Merchant shall:

4.14.1  Review status reports to verify the positive authorization of all payment types
and appropriate response. The Merchant acknowledges that in connection
with the Service, the Merchant shall have a floor limit of ZERO dollars.

4.14.2  Recognize t hat a uthorization shall not, by itself, satisfy the Merchant's
obligation to exercise due diligence. Neither shall authorization constitute a
waiver by Bank of any other procedure required of the Merchant by the
Merchant Agreement or any MasterCard or VISA rules or regulation.
Authorization shall not validate a transaction which would otherwise be
invalid. The Merchant shall remain fully liable for any chargeback and fees
related to an invalid transaction, whether or not prior authorization was
obtained.

4.15   The Merchant shall establish and maintain a fair and uniform policy for the exchange
and return of products or services sold.

5.   **Bank's Rights and Obligations.**

5.1   Within five (5) business days of the Bank's approval of the Merchant's application
for the Service, the Bank shall assign the Merchant a Merchant Number and a Terminal
Identification Number . The Bank shall also provide the Merchant the Software. The Merchant is
hereby granted a non-exclusive, non-transferable, royalty free right to use of the Software exclusively
in connection with the Service, provided that the Merchant does not (and does not allow any party
to) copy, modify, create a derivate work of, reverse engineer, reverse assemble, the Software. The
Merchant acknowledges and accepts that the Software is the exclusive and confidential property of

7

the Bank.  Accordingly, the Merchant shall not, without the prior express written consent of the
Bank, disclose or reveal to any third party or utilize for its own benefit, other than pursuant to this
Agreement, the Software.  The Merchant further agrees to take all reasonable precautions to preserve
the confidentiality of the Software and shall assume responsibility that its employees and other
related parties, will similarly preserve this information against third parties.  The Merchant agrees
not to access the Service by any means other than through the interface that is provided by the Bank
for use in accessing the Service.   The provisions of this paragraph shall survive termination of the
Service.

5.2     The Bank shall have the right, upon reasonable notice, to inspect the Merchant's
financial records and all other documents and material in the Merchant's control or possession with
respect to the subject matter hereof.  Also, the Bank shall have the right, during reasonable hours,
to inspect the Merchant's physical business and review the Merchant's Web Site as provided
hereunder.

5.3     The Bank reserves the right to delay funds and availability to the Merchant, as
deemed necessary by the Bank, in order to review transactions and deposits.

6.     Chargebacks; Refusal or Revocation of Credit.

6.1     The Merchant hereby agrees to pay to the Bank, through an adjustment to the
Merchant Account, for the total amount of any transaction record, plus any applicable fees, if any
one or more of the following circumstances exist:

6.1.1   The transaction record is subject to chargeback by the Bank in accordance
with the Merchant Agreement, with the Master Card/VISA rules or with
applicable law.

8

6.1.2   The customer account number was declined or was not authorized on the transaction date and the Merchant failed to reject the transaction.

6.1.3   The transaction was one for which prior credit authorization was required and was not obtained or a valid authorization number is not correctly and legibly included on the transaction record.

6.1.4   The transaction record is a duplicate of an item previously paid.

6.1.5   The customer disputes the execution of the underlying data contained in the transaction record, the sale, delivery, quality or performance of the goods or services purchased, or alleges that a credit adjustment was requested and refused or that a credit adjustment was issued by the Merchant but not posted to customer's account.

6.1.6   The Bank reasonably determines that the Merchant has violated any term, condition, covenant, warranty or other provision of the Merchant Agreement in connection with the transaction record or the transaction to which it relates.

6.1.7   The Bank reasonably determines that the transaction is fraudulent or that the related transaction is not a bona fide transaction in the Merchant's ordinary course of business, or is subject to a claim of illegality, cancellation, rescission, avoidance, or offset for any reason whatsoever, including without limitation, negligence, fraud, dishonesty on the part of the Merchant or the Merchant's agents or employees.

6.1.8   The transaction record arises from an Internet order transaction that the customer disputes entering into or authorizing, or that involves an account

9

number that never existed or that has expired and has not been renewed.

6.1.9   Multiple authorization attempts were made by the Merchant for a single transaction.

6.2     The Merchant covenants and agrees that the right of the Merchant to receive any amounts due or to become due it from Bank is expressly subject and subordinate to any chargeback, setoff, lien or security interest rights of the Bank, without regard to whether such chargeback, setoff, lien and security interest rights are being applied to claims that are liquidated, unliquidated, fixed, contingent, matured or unmatured.

6.3     Without derogating any of its other rights, the Bank may refuse to accept any online order or revoke its prior acceptance thereof in any one or more of the following circumstances:

6.3.1   The customer disputes his or her liability to the Bank for any reason including, but not limited to, the Bank's chargeback rights; or

6.3.2   The transaction giving rise to the online order was not a bona fide transaction directly between the Merchant and the customer.  The Merchant shall not accept any transaction on behalf of any other person or persons.

If such refusal or revocation by the Bank occurs, the Merchant shall, immediately repay the Bank, through an adjustment to the Merchant Account, the full amount credited by the Bank to the Merchant Account on the basis of such transaction.

7.    Disclaimer of Warranty, Limitation of Liability and Indemnification.

7.1     THE MERCHANT EXPRESSLY UNDERSTAND AND AGREES THAT:

7.1.1   THE MERCHANT'S USE OF THE SERVICE IS AT ITS OWN RISK.  THE SERVICE IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE"

10

BASIS. THE BANK EXPRESSLY DISCLAIMS ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED, TO THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT.

7.1.2   THE BANK MAKES NO WARRANTY THAT (i) THE SERVICE WILL MEET THE MERCHANT'S REQUIREMENTS; (ii) THE SERVICE WILL BE UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE, (iii) THE RESULTS THAT MAY BE OBTAINED FROM THE USE OF THE SERVICE WILL BE ACCURATE OR RELIABLE, (iv) THE QUALITY OF ANY PRODUCTS, SERVICES, INFORMATION, OR OTHER MATERIAL SOLD BY THE MERCHANT IN CONNECTION WITH THE SERVICE, (v) ANY ERRORS IN THE RELATED SOFTWARE WILL BE ABLE TO BE CORRECTED.

7.2   The Bank shall exercise due care and diligence in the execution of the Service. However, the Bank shall not be liable to the Merchant or to any third party (including the Cardholder) for any damage, cost, or loss of any nature relating to the Service or for the failure to effect or make any transfer of funds; except, that these errors be due to willful acts or gross negligence of the Bank, and the same shall have cause material damages to the Merchant. In no event, will the Bank be liable to the Merchant for indirect (consequential), special, or punitive damages.

7.3   The Merchant shall be liable for, and obligated to indemnify and release the Bank,

11

its affiliates, subsidiaries, holding company, general partners, officers, directors, agents, assigns, suppliers, third party information providers and successors in interest (each, a "Bank Person") from and against any claim, demand, suit, cost, fees, loss, or expenses of any kind to which a Bank Person may be subjected due to any claim, surrender, or delivery of the effects in possession of the Bank for the rendering of the Service such as: the return of merchandise, price adjustments, or sales made under the warranty of the Merchant, and record of Confirmation has been issued. The Bank may debit the Merchant's Account for any Indebtedness arising under this paragraph.

7.4    The Merchant shall be liable for, and obligated to indemnify and release a Bank Person from and against any claim, demand, suit, cost, fees, loss, or expenses of any kind to which a Bank Person may be subjected due to any suit or proceeding commenced by third parties as a consequence of any misrepresentation of the Merchant, a breach of the Merchant's obligation under this Agreement, or the Merchant's non compliance with any law or federal or local regulation as consequence of an act or omission of the Merchant.

7.5    The Merchant shall be solely responsible for processing and filling any and all customer orders and for handling customer inquiries and/or complaints arising therefrom. A Bank Person shall have no responsibility whatsoever in connection with the fulfillment of any customer order generated at Merchant's Web Site. The Merchant shall also be responsible for the security and confidentiality of any customer information (including, without limitation, customer credit card number) that the Merchant may receive in connection with its sale of products or services over the Internet.

7.6    The Merchant shall be liable for, and obligated to indemnify and release a Bank Person from and against any claim, demand, suit, cost, fees, loss or expenses of any kind to which

12

a Bank Person may be subjected related in any way to any product or service sold or offered by the Merchant at its Web Site, including, without limitation, product or service quality, performance, fitness or availability. The Merchant's indemnification under this Section shall survive any termination of the Service.

7.7     No Bank Person shall be liable for delays or defaults in furnishing the Service hereunder, if such delays or defaults on the part of the Bank are due to: acts of God or of a public enemy; fires, severe weather, floods, earthquakes, natural disasters, explosions or other catastrophes; embargoes, epidemics or quarantine restrictions; labor strikes, slowdowns, differences with workmen or labor stoppages of any kind; other causes beyond the control of the Bank including, but not limited to any unforseen or preventable failure related to changes in the infrastructure or traffic capabilities, failure or breakdown of the Internet, the World Wide Web, any related telecommunications equipment or systems, failure of any machinery, equipment or software or delay in completing the Web Site integration and certification. In such event, the Bank's obligation and liability shall be limited to using commercially reasonable efforts to reinstate the Service within a reasonable period of time once the unforseen event has been rectified. The Bank shall not be under any obligation to refund to the Merchant for any fees paid related to the period the Service were unavailable.

7.8     The Merchant's indemnifications under this Section 7 shall survive any termination.

8.    Termination.

8.1     These Supplemental Terms and Conditions shall be effective when subscribed by both parties and will continue in effect for one (1) year, or until terminated pursuant to Section 8.2 below. These Supplemental Terms and Conditions will automatically renew for successive one (1)

15

waived and no breach excused unless such waiver or consents is in writing and signed by the party claimed to have waived or consented. A waiver by either of the parties of any of the covenants, conditions or agreements to be performed by the other hereunder shall not be construed to be a waiver of any succeeding breach thereof.

9.3   Nothing contained herein will be construed as creating any agency, partnership, joint venture or other form of joint enterprise between the parties.

9.4   The parties acknowledge that the Bank will perform its obligations hereunder as an independent contractor. The manner and method of performing such obligations will be under the Bank's sole control and discretion and the Merchant acknowledges that the Bank may subcontract with other party of its own choosing any part or all of the Service, Merchant's sole interest is in the result of the Service.

9.5   This Agreement will be governed by the and subject to the laws and exclusive jurisdiction of the courts of the Commonwealth of Puerto Rico.

9.6   All notices to the Bank or to the Merchant required to be sent hereunder shall be delivered to the respective addresses of the parties in accordance with per Section VI(12) of the Merchant's Agreement which provisions are hereby incorporated by reference.

9.7   The Merchant Agreement (including these Supplemental Terms and Conditions) and any other documents and certificates issued pursuant to the terms hereof set forth constitutes the final agreement between the Parties as to the Service and will be effective when signed by the authorized representatives of the Bank and the Merchant. Any written or verbal agreement, promises, covenants, arrangements, communications, representations, and warranties by any officer, employee, or representative of either Party concerning the Service prior to the effective date hereof is hereby

16

rescinded and superseded.

9.8    These Supplemental Terms and Conditions are made to form an integral part of the Merchant's Agreement. Except as otherwise stated herein, in the event of a discrepancy between the terms hereof and those the Merchant's Agreement, the provisions hereof shall prevail.

10.   Definitions.

As used in these Supplemental Terms and Conditions the following terms shall mean as follows:

10.1    Bank – Banco Popular de Puerto Rico.

10.2    Bank Person - the Bank and persons directly or indirectly related or associated thereto as defined in Section 7.3 of these Supplemental Terms and Conditions.

10.3    Batch - a set of records within the Merchant's closing transmission through the Web Site.

10.4    Cards - VISA, MasterCard and any other credit or debit card that from time the Bank may issue and for which the Service will be available.

10.5    Confirmation - the confirmation of a purchase by a Customer on Merchant's Web Site.

10.6    Confirmation Screen - the confirmation screen appearing on Merchant's Web Site.

10.7    Customer or Cardholder - a person to whom a Card has been issued or the individual authorized to use the Card.

10.8    Merchant - the person or legal entity identified as Merchant in Addendum I of the Merchant Agreement.

10.9    Merchant Account - the account maintained by the Merchant with the Bank referred

17

to in Section 4.5 of these Terms and Conditions.

10.10   Merchant Agreement - the Merchant Agreement entered into by and between the Merchant and the Bank in connection with the honoring by Merchant of Cards issued by the Bank, including these Supplemental Terms and Conditions.

10.11   Reserve Account - the reserve account referred to in Section 4.4 of these Supplemental Terms and Conditions.

10.12   Service - the Bank's Payment Gateway Service as described in these Supplemental Terms and Conditions.

10.13   Software -the Application Program Interface provided to the Merchant by the Bank pursuant to Section 3.2 of these Supplemental Terms and Conditions.

10.14   Supplemental Terms and Conditions - the terms and conditions set forth herein which are a part of the Merchant Agreement.

10.15   Web - the World Wide Web.

10.16   Web Site - Merchant's site on the Web.

**BANCO POPULAR DE PUERTO RICO**

_____
NOMBRE  FIRMA AUTORIZADA

_____
FIRMA AUTORIZADA

_____
FECHA

NOMBRE  DEL COMERCIO

_____
NOMBRE  FIRMA  AUTORIZADA

_____
FIRMA AUTORIZADA

_____
FECHA

## SCHEDULE 2
## CSC DEPOSIT ACCOUNT AGREEMENT

**(attached)**



**BANCO POPULAR.**

**Corporate Account Opening**

| Account Number | Account Title | | Accounting Responsible Unit | | Bank Number |
|---|---|---|---|---|---|
| ███0303 | Banco Popular As Escrow Agent - CSC Account | | 651 | | 001 |

| Account Type | Federal Tax ID | NEW | SIC Code | Entity Code | Account Group |
|---|---|---|---|---|---|
| Sweep Escrow | | ☐ Customer   ☐ Account | | 004 | |

| Business Address | Mailing Address |
|---|---|
| | PO BOX 42007<br>SAN JUAN PR 00940-2007 |

| Phone Numbers | Fax Number | E-Mail Address |
|---|---|---|
| | | |

**Purpose of Account**

AutoExpreso Customer Service Center, prepayments and replenishments

| FLEXINVERSION ☐ Yes | ☑ No | Automatic ☐ Yes | ☑ No | Compensatory Balance in the Checking Account | |
|---|---|---|---|---|---|

**General Dispositions**

The terms and conditions stated previously and those contained in the Deposit Accounts Agreement (of which this Document is part) and the Schedule of Rates will constitute the complete agreement between the Bank and the Signatories. Banco Popular reserves the right to change or revise any of the terms and conditions contained in this Document, the Deposit Accounts Agreement, or the Schedule of Rates, with prior notification to the Signatories.

The Signatories accept having received the Deposit Accounts Agreement, the Schedule of Rates and copy of this Document, and confirm being in agreement with the terms and conditions stated in said documents.

**AUTHORIZED SIGNATURES**

——————— Required Signatures Quantity

Signatory: make sure of signing in the corresponding space, use black ink and do not exceed the limits of the marks.

Name _____

Social Security _____ Birth Date  MM/DD/YY

┌                                                          ┐

└                                                          ┘

Required Signature ☐ Yes ☐ No

Name _____

Social Security _____ Birth Date  MM/DD/YY

┌                                                          ┐

└                                                          ┘

Required Signature ☐ Yes ☐ No

Name _____

Social Security _____ Birth Date  MM/DD/YY

┌                                                          ┐

└                                                          ┘

Required Signature ☐ Yes ☐ No

Name _____

Social Security _____ Birth Date  MM/DD/YY

┌                                                          ┐

└                                                          ┘

Required Signature ☐ Yes ☐ No

Authorized Signature _____    Signature Code _____    Date (MM/DD/YY) _____

Customer/Corporate Banking/CMS

BC-1 (5-02) (PDP)

# Commercial

# Deposit

# Accounts

# Agreement

Member FDIC

BANCO POPULAR DE PUERTO RICO

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

### TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | GENERAL PROVISIONS | 1 |
| II. | PROVISIONS THAT RULE THE ACCOUNT AND SERVICES | 11 |
| III. | METHODS OF ACCESSING THE ACCOUNT AND SECURITY MEASURES | 20 |
| IV. | SPECIAL PROVISIONS FOR THE FLEXICUENTA DE NEGOCIOS AND BSMART ACCOUNT | 24 |
| V. | SPECIAL PROVISIONS APPLICABLE TO THE ESCROW ACCOUNT FOR REALTORS AND REAL ESTATE COMPANIES | 29 |
| VI. | OTHER COMMERCIAL ACCOUNTS | 30 |
| VII. | FUNDS TRANSFERS | 30 |
| VIII. | DISCLOSURE RELATED TO THE AVAILABILITY OF FUNDS DEPOSITED IN TRANSACTION ACCOUNTS (REGULATION CC) | 34 |



This Commercial Deposit Accounts Agreement (the "Agreement") is made between Banco Popular de Puerto Rico (the "Bank") and the account owner ("You") of the commercial deposit account (the "Account") as specified in the attached Account Opening Addendum.

**READ THIS AGREEMENT AND THE APPLICABLE ADDENDUMS CAREFULLY.** They contain the terms, conditions, and disclosures that apply to the Account and the Services (as defined herein), and govern your relationship with the Bank.

## I.   GENERAL PROVISIONS

### A.   Service Contracting

The Bank may offer You various services from time to time that are bound to the Account (the "Services"). You must maintain your Account with the Bank in order to receive these Services. You may request each Service, by subscribing to the forms provided or accepted by the Bank (each will be a "Service Addendum"). All Service Addendums will be subject to the terms and conditions of this Agreement.

### B.   Interpretation of this Agreement

1.   The general terms and conditions of this Agreement and the Exhibits, Addendums, and Schedules made a part hereof from time to time will be interpreted as a single document. However, in the event of conflict between the general terms and conditions of this Agreement and the terms of any Exhibit, Addendum, or Schedule hereto, the terms of the Schedules, Addendums, and Exhibits will prevail and control the interpretation of the Agreement with respect to the subject matter of the applicable Schedules, Addendums, and/or Exhibits.

2.   If any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future law, such provision will be fully severable, and this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision were never a part hereof, and the remaining provisions of this Agreement will remain in full force and effect.

3.   In the event of conflict between the Spanish and English versions of this Agreement, the Spanish version will prevail.

### C.   Information about You

1.   The Bank may request your credit report in relation to the establishment of your Account at any time and afterwards as permitted by the applicable regulation.

2.   In order to comply with applicable laws and regulations, the Bank may require from time to time that You provide the Bank with documents and information concerning your business, including periodic financial information, whether You are a corporation, partnership, association, non-profit entity, or any other entity or individual doing business under a commercial name or trade name.

### D.   Business Days, Business Hours, and Effective Date of Transactions

The Bank's business days are: Monday through Friday, except holidays ("Business Day"). Although the Bank may open for business certain Saturdays and holidays, these days are not considered Business Days. The Bank's business hours are posted at each branch, and may be subject to change. "Cut-off Time" refers to the time limit established by the Bank for receipt, processing, transmission, cancellation, and amendment of payment orders.

### E.   Applicable Law

This Agreement will be governed by and interpreted in accordance to the laws of the Commonwealth of Puerto Rico and any pertinent federal laws and regulations.

### F.   Final Agreement

This Agreement and its Service Addendums constitute the final agreement between the parties. Any written or verbal agreement made prior to this Agreement is hereby expressly cancelled and revoked. Any addendum, exhibit or attachment to this Agreement will be considered included herein and will become part of this Agreement. You acknowledge and agree that your contractual relationship with the Bank is subject to the provisions of this Agreement.

### G.   Amendments

Unless otherwise indicated in this Agreement, the Bank reserves the right to amend the terms and conditions established in this Agreement and the Service Addendums. Such amendments will be effective as soon as they are notified to You, or as established in the written notification.

### H.   Transfer of Agreement

You may not transfer or assign this Agreement or your participation in any of the Bank's Services to any other person or entity. You may not transfer or assign to any person or entity the authority to issue instructions to the Bank regarding any Services except when expressly authorized by the Bank. The Bank may transfer its rights to any of its affiliates, in which case You will be notified.

### I.   Termination

1.   The provisions of this Agreement shall remain in full force and effect until any of the parties terminates this Agreement by written notice sent via regular mail or facsimile. The Bank reserves the right to cancel this Agreement or a Service Addendum at any time, without prior notice to any of the parties, if any of the following events or circumstances occur: a) You violate or fail to comply with any applicable laws or regulations or any of the terms, covenants, representations or warranties included in this Agreement or a Service Addendum; b) You do not fulfill payment or any other reimbursement agreed

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

upon; c) a court or competent government authority issues a writ of attachment, pledge order, or lien for any share of your Account, assets, or properties; d) your business closes, becomes insolvent, or bankrupt; and (e) You fail to comply with other agreements made with the Bank or any other document that evidences your debt to the Bank.

2. The Bank shall not be liable for fulfilling payment orders after said notice of termination is mailed. You will be responsible for all transactions in progress, obligations under this Agreement, and all fees for Services rendered until the date of termination of this Agreement. Any service charges owed by You on the date of termination, must be paid immediately. However, the Bank may exercise its right to setoff any such owed amounts against the Account.

3. The terms for each Service will be established in each corresponding Service Addendum. The Bank reserves the right to cancel any Service at any time. Any such cancellations will be notified by regular mail. Unless otherwise indicated in the notification, all other Services will continue in full force and effect.

4. Upon termination of this Agreement or any Service Addendum, You will delete or destroy any corresponding intellectual property of the Bank that may be stored in your computer memory or any other data bank in your possession. If the Bank terminated this Agreement because you incurred in a violation, it has the option to declare due and payable immediately any fees or service charges pending payment under this Agreement. The parties understand and agree that termination of this Agreement does not give You the right to any compensation from the Bank, under any pretext, including, but not limited to, loss of income, loss of good-faith, or any direct, indirect, consequential, punitive, or exemplary damages.

5. All warranties, representations, and covenants will remain valid and binding, after the termination of this Agreement.

J. **Announcements and Notifications**

1. You must notify the Bank, in writing, of any changes in your mailing address (the address at which You receive Account Statements, reports, notices, and any other Bank mail). The effective date of any changes will depend on the date when the Bank receives your notification and, as such, any such changes may be effective during the current cycle or the next. The Bank shall not be liable for delays in the receipt of Account Statements, reports, or any other notice or mail, if You do not notify your change of address as established herein.

2. Unless indicated otherwise in the corresponding Service Addendum, or as required by applicable laws or regulations, the parties agree that all announcements, messages, and notifications will be made in writing and delivered via: (1) fax, followed by delivery of the original document; (2) personal delivery; or (3) certified mail with return

receipt. All announcements, messages, and notifications will be sent to the address specified in the Service Addendums or to the last address submitted in writing, and will be effective 10 Business Days after the date of delivery, or as established in the notification.

K. **Account Statement: Reports and Forms**

1. The Bank will send You a periodic Account Statement, reporting all transactions made against the Account during the Account Statement period.

2. With the Account Statement, You will receive substitute checks or an electronic version of all cleared checks, and any other item processed during the Account cycle. The Bank reserves the right to retain and destroy original checks and documents, substitute checks, or other original effects.

3. The Bank shall retain a copy of both sides (front and back) of all items stored in microfilm or electronic media for the retention period required by law. You may request certified copies of checks, substitute checks, or other items at any branch of the Bank in Puerto Rico, or by calling TeleBanco Comercial. The Bank will send You the copies within a reasonable period of time after receipt of your request. You will be responsible for payment of any fees for reproduction and delivery of documents.

4. The Bank will produce and send You the reports listed in this Agreement and the applicable Service Addendums. The frequency and method of delivery will be set forth in the corresponding Service Addendum.

5. Unless otherwise required by applicable law or regulations, You are responsible for notifying the Bank immediately, in writing, if You have not received your Account Statement within fifteen (15) days of the closing date of the cycle.

6. You agree that You are responsible for verifying all information provided by the Bank in order to identify any unauthorized charges, including altered checks, checks issued with forged or unauthorized signatures, or any omission or discrepancy. To this effect, You will promptly revise and reconcile all reports, Account Statements and any attached documents, files, announcements, correspondence, or notification (in general, the "report") received from the Bank.

7. If You find any omissions or discrepancies between your records and the information provided by the Bank, or if You have any objections, You must notify the Bank, in writing, within ten (10) days of the date of the report, so that the Bank may investigate the claim and take any necessary action. Should You fail to notify the Bank within this period, the reports will be deemed correct and accepted by You, and the Bank will have no liability with respect to such omissions, discrepancies, or objections.

8. The Bank will process the investigation according to ordinary procedures for management of claims. The Bank reserves the right to request any documents or sworn statements needed for processing a claim under this section; and You agree to provide any such documents. The Bank will inform You of the results of the investigation within a reasonable period of time.

9. To facilitate the prompt processing of your transactions, You must use the forms provided by the Bank, including printed deposit slips. Although the Bank may, at its discretion, contact You to verify this information, it is agreed that the Bank will not be responsible for any errors due to incomplete or illegible information provided by You on such forms. It will be your responsibility to obtain checks from appropriate check-supplying companies that comply with the Bank's processing and quality requirements.

L. **Resolution of Claims made by Your Clients**

1. You will be responsible for handling and solving claims made by your own clients, providers, or creditors, even if they are consequence of a Service provided by the Bank. Any claims You make must be submitted, in writing, to the Officer in charge of your Account. The Bank will inform You of the results of this investigation within a reasonable period of time.

2. Any complaints received directly by the Bank will be referred to You. You must notify the Bank the result of your investigation within five (5) days following the date the claim was referred to You.

3. Should the Bank need information from You to resolve a claim by a mutual client, regarding payment of a check issued against an account in the Bank, You will provide the requested information within ten (10) Business Days of the date the information was requested.

4. The Bank will not adjust accounts with your clients, or accept service requests or deposits from them.

M. **Charges**

1. You shall pay the Bank the corresponding monthly service charges stipulated in the Account Opening Addendum to this Agreement and any other charges for Services requested by You, as stipulated in the corresponding Service Addendums (collectively referred to as "Service Charges").

2. You understand that Service Charges do not include any additional or special services that You may request, not established in this Agreement or a Service Addendum, such as check printing charges, or copies and delivery of documents and information.

3. You are also required to pay the Bank on demand, any rent charges, contributions, or any other taxes on Services provided by the Bank under this Agreement. Taxes on municipal licenses or on the Bank's net taxable income are excluded.

4. You authorize the Bank to debit the Account every month for the corresponding Service Charges and fees for any other additional services You request. Any unpaid balance will accrue interest in accordance to the Bank's rates in effect at the moment. If necessary, the Bank may use any other lawful method to collect unpaid amounts owed to the Bank.

5. The Bank may change Service Charges from time to time. Any change and its effective date will be notified to You, in writing, by the Bank.

6. Any changes or requirements requested by You for this Agreement or a Service Addendum may result in changes to Service Charges. You must maintain sufficient funds in the Account to cover payment of charges imposed by the Bank under any clause in this Agreement and the Service Addendums. The Bank will not be responsible for any check or withdrawal order that is rejected due to insufficient funds in the Account as result of Service Charges debited to the Account.

N. **Arbitration**

1. You and the Bank agree that any controversy or claim between yourselves or against any agent, employee, successor, or designated agent, whether or not related or not to this Agreement and/or Service, and any claim or dispute related with this Agreement, Service, or to the relation or duties established in this Agreement, including the validity of this arbitration clause (the "Claim"), shall be resolved by mandatory arbitration, administered by the American Arbitration Association, in accordance to the Commercial Arbitration Rules in force, and must be held in the Commonwealth of Puerto Rico. The arbitration will be governed by the Federal Arbitration Act of FAA, Title 9 of the United States Code, Sections 1 through 16 (9 U.S.C. §§ 1-16) excluding any local rights provision that is inconsistent with or will produce a different result. Only one neutral arbitrator will determine the Claim and make a final decision, according to applicable law. Strict confidentiality will rule arbitration procedures, including the information submitted by the arbitrator and the decision or indemnification granted by the arbitrator. Any court with jurisdiction may dictate sentence once the arbitrator makes a decision. The aforementioned terms will not limit the obligation of a party to defend, indemnify, or release the other party of any judicial procedure or other claims, losses, damages, or expenses.

2. The procedures specified in this article will be unique and exclusive for the resolution of disputes between You and the Bank that arise or are related to this Agreement; disposing, however, that a party can request temporary injunctive relief in a court of competent jurisdiction in order to maintain statu quo, or for the protection of goods or property until the arbitration process is initiated and the selected arbitrators have had the opportunity to resolve the request for temporary relief.

3. Each party is responsible of fulfilling their obligations under this Agreement while final resolution of a Claim is pending, unless doing so is impossible or impractical under the circumstances.

## O. Compliance

You agree to use the Account and its Services only for lawful purposes and in accordance with applicable laws and regulations, including anti-money laundering laws. You acknowledge and agree that in order to comply with the Bank's internal policies and/or applicable law [including the executive orders and regulations of the U. S. Department of Treasury's Office of Foreign Assets Control (OFAC)], the Bank may be required to block funds, freeze funds, and/or forfeit funds to appropriate authorities.

## P. Representations and Warranties

1. The Bank does not represent or warrant, explicitly or implicitly, that the Services will be suitable for You for a particular interest or use. You agree that the Bank provided You with adequate information regarding each Service and that You have decided, freely and voluntarily, to subscribe to this Agreement.

2. You represent and warrant the Bank that You do not intend to use, and will not use, any of the Services for the purpose of providing, directly or indirectly, any service, including, but not limited to, financial accounting services, data processing, management, or other related services, to any other individual or entity.

## Q. Computer Software

1. The Bank uses software created by third parties, bearing no relation to the Bank, which are commercially available to provide Internet Banking Services to commercial accounts.

2. By agreeing to use said software, You are accepting the non-exclusive, non-transferable licenses of the aforementioned third parties. No employee of the Bank is authorized or has the power to make any amendments, changes, or deletions to any of the terms or conditions of said licenses.

3. You agree to use the software as is. The Bank makes no representations or warrants with respect to the software, including, but not limited to, any implicit guarantee that it will be suitable for a specific purpose, interest, or use.

4. If the software is defective, or damaged, the Bank will provide repair, correction, or replacement services, provided that You have used it properly.

## R. Limitation of Liability and Indemnity

1. The Bank shall exercise due care and diligence when rendering the Services. However, the Bank shall not be responsible for compensating You for any damage, expense, cost, or loss of any kind that may occur as a direct or indirect result of rendering the Services, except when the Bank's intentional acts or gross negligence cause

You direct financial damage. In such case, the Bank's responsibility shall be limited to the amount of the transactions in controversy; and to the extent that the resulting damages could have been avoided or mitigated if You reasonably verified the information provided by the Bank, pursuant to the provisions of this Agreement. Under no circumstances shall the Bank be responsible to You for indirect, emotional, special, or punitive damages, even though the Bank may have been advised of the possibility of such damages.

2. You assume responsibility, and commit to indemnify and hold the Bank harmless of any claims, suits, costs, fees, loss, or expenses of whatever nature to which the Bank may be subject, whether directly or indirectly, on account of: (a) your failure to comply with its guarantees or any provision of this Agreement; (b) mistakes, or negligent, or intentional acts carried out by You, your employees, agents, representatives, or contractors arising from the use of the Service provided by the Bank, and (c) the Bank's compliance with any instructions given by You and related to the Services.

3. The Bank shall not be responsible, nor shall it be under any obligation, to third parties (including, but not limited to, any of your partners, stockholders, directors, officers, agents, employees, clients, or providers) for rendering the Services to You in compliance with the terms and conditions of this Agreement. Under no circumstances shall the Bank be responsible to You or third parties for damages arising from, or allegedly caused by, any act or omission by the Bank under this Agreement. You agree to indemnify and hold the Bank harmless from any claim or threat against the Bank that may seek to impose liability against the Bank in these cases.

4. The Bank shall not be responsible for non-compliance with any provision of this Agreement if said non-compliance is caused, in whole or in part, by circumstances beyond the control and responsibility of the Bank, including, but not limited to: communication failures, telephone or electric power services interruptions, mechanical defects in the equipment used in rendering the Services, explosions, accidents, fires, floods, war, criminal, or terrorist acts of government agencies, third persons, or any other acts of God or force majeure. In any of these events, the Bank's responsibility shall be limited to restoring Services as soon as possible and to provide reasonable means of communication to guide and instruct You the procedures to be followed while Services remain interrupted due to the emergency, all this if possible under the circumstances.

5. In addition to the limitations on responsibility provided in the terms and conditions of this Agreement, and except as provided by law, the Bank shall not be bound nor responsible for (a) any interruption in the Services that may result from government restrictions, market, or exchange regulations, (b) any act, failure to act, insolvency, or notification of insolvency to the Bank from the National Automated Clearing House Association (NACHA) and any of its members, or from

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

any other financial or third party institution; or (c) any error, omission, lack of accurate information in any notice or communication that the Bank receives from another financial institution, automated clearing house operator, or the Federal Reserve Bank.

5. The Bank shall not be responsible or liable if your instructions for transfer of funds (a) mistakenly direct payment to a person other than the one intended by You; (b) mistakenly allocate payment for an amount larger than You intended; (c) mistakenly duplicate transmission of instructions previously given by You. In such cases, You are responsible for payment of the amount requested in the fund-transfer instructions.

7. The Bank will not be liable for your mistakes regarding the amount, certitude, timing, or proper authorization of any instructions received from You, or from any other person, including, but not limited to, any Federal Reserve Bank, transmission or communication facility, any deposit-receiving individual or financial institution, including the return of a request by such deposit-receiving individual or financial institution; and such person will not be considered an agent of the Bank.

8. DISCLAIMER OF WARRANTIES. THE SERVICES, AND ANY EQUIPMENT PROVIDED UNDER THIS AGREEMENT, ARE PROVIDED ON AN "AS IS", "AS AVAILABLE" BASIS. THE PARTIES ACKNOWLEDGE THAT SERVICES (INCLUDING EQUIPMENT) MAY DEPEND TO SOME EXTENT ON THE COMPANY'S OWN COMPUTER SYSTEMS. EVERTEC DOES NOT GIVE ANY WARRANTIES, OF ANY KIND, EITHER EXPLICIT OR IMPLICIT, INCLUDING BUT NOT LIMITED TO WARRANTIES OF TITLE, QUIET ENJOYMENT, QUIET POSSESSION, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. FURTHERMORE, EVERTEC DOES NOT GIVE ANY WARRANTIES OF ANY KIND WITH RESPECT TO LOSS OR CORRUPTION OF DATA, LOSS OR DAMAGE TO EQUIPMENT AND/OR SOFTWARE, SYSTEM RESPONSE TIMES, TELECOMMUNICATION LINES, OR OTHER COMMUNICATION DEVICES, QUALITY, AVAILABILITY, RELIABILITY, SECURITY ACCESS DELAYS OR ACCESS INTERRUPTIONS, COMPUTER VIRUSES, BUGS, OR ERRORS. EVERTEC DOES NOT GIVE ANY WARRANTY THAT SERVICES WILL NOT BE INTERRUPTED OR ERROR FREE; OR AS TO THE RESULTS THAT MAY BE OBTAINED FROM USE OF THE SERVICES. THE BANK ASSUMES NO RESPONSIBILITY OR LIABILITY IF TELECOMMUNICATION CARRIERS ARE NOT AVAILABLE AT ANY GIVEN TIME. THE BANK, ITS AFFILIATES, AND THEIR RESPECTIVE REPRESENTATIVES ARE NOT LIABLE, AND EXPRESSLY DISCLAIM ANY LIABILITY FOR THE CONTENT OF ANY DATA TRANSFERRED EITHER TO OR FROM YOU, OR STORED BY YOU VIA THE SERVICES PROVIDED BY THE BANK. NO ORAL ADVICE OR WRITTEN INFORMATION GIVEN BY EVERTEC REPRESENTATIVES WILL CREATE A WARRANTY; NOR MAY YOU RELY ON ANY SUCH INFORMATION OR ADVICE.

The terms established in this paragraph will survive any termination of this Agreement.

9. The rights of the Bank under this Agreement shall be cumulative and not mutually exclusive, and the Bank's option to exercise a right or request a remedy shall in no way affect or limit the exercising of the other rights or remedies that the Bank may have by law or Agreement.

S. **Auditing**

The parties agree that the Bank may audit your operations to verify your compliance with the provisions of this Agreement, aided by internal or external auditors, subject to prior notification and coordination, as necessary.

T. **Intellectual Property**

1. The Bank warrants it is the sole owner of the Services and has been authorized by Popular, Inc., to use the trade marks "TeleBanco Comercial, TeleNómina Popular (all brands together known as "Bank trade marks"), of processes, manuals, and software ("Software"), names, logotypes, identification, and all intellectual property related to said Services (all together known as the "Bank's Intellectual Property"). The Web Cash Manager System or WMC ("WCM Brand") is a trade mark of Politzer & Haney. The Bank warrants that it has a valid license authorizing its use of the WCM Brand, and in turn authorize access to the customer section of the Web Cash Manager.

2. You agree that You do not have a license or any rights to Services in the Bank's Intellectual Property or WCM Brand, except as provided in this Agreement. The Bank and Politzer & Haney forbid You to use the WCM Brand except as established in this Agreement. You warrant that You will not authorize, directly or indirectly, or attempt to authorize, or in any way transfer or grant to any person the right to use the Bank's Intellectual Property or the WCM Brand.

3. You may not use the Bank's trade marks or the WCM Brand in any advertisement, promotional materials, or any presentation or financial report that You provide or send to third parties.

4. You agree that all documents and software listed in the Service Addendums and other related items are property of the Bank, and You may not copy, use, or allow other persons or legal entities to use them without prior, written authorization from the Bank; and that the Bank may claim them at any time.

5. If this Agreement or any Service is terminated, You agree to delete or destroy any Intellectual Property of the Bank contained or printed in promotional material or stored in your computer memory or data bank in your possession, and return any software to the Bank.

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

## II. PROVISIONS THAT RULE THE USE OF THE ACCOUNT AND SERVICES

In order to qualify for Services and process transactions, debits, or credits initiated or authorized by You, your Account must remain active during the life of this Agreement.

### A. Authorized Signatories and Authorized Persons

1. At the time You open the Account, You shall appoint the persons authorized to sign payment orders against it ("Authorized Signatories") in the Corporate Resolution or DBA Resolution, as applicable (the "Resolution"). The Bank may pay any item bearing an Authorized Signature.

2. You may authorize in the Resolution the use of a signature produced by a machine or artifact (Facsimile Signature) for an Authorized Signatory of the Account.

3. You shall provide the Bank with a sample of the Signature Facsimile. You are responsible for maintaining the facsimile signature machine under strict control, and verify the Account Statements and cleared checks or their electronic versions, as established in this Agreement, to identify any unauthorized use of the Signature Facsimile. You agree that the Bank may pay items bearing the authorized Signature Facsimile, even if made by a person not authorized to use it or by a counterfeit machine for the reproduction of signature facsimiles.

4. You agree to release and indemnify the Bank from any liabilities resulting from the use of Signature Facsimiles, including lawyer's fees and any litigation costs.

5. You agree to register the Authorized Signatures whenever they have deviated notably from the signatures in the Resolution. You agree to release the Bank from any liabilities for not fulfilling payment orders or issues with signatures different from the ones registered.

6. You understand that the process of creating electronic images of checks or other original items with the intent of exchanging information may result in loss of any security features the checks may have. The Bank will not be held responsible for any loss resulting from payment of a substitute check that the Bank would not have paid, had it received the original item with its corresponding security features.

7. You must appoint one or more persons ("Authorized Person"), whom You must include in the corresponding Service Addendum for each service so that the person may: (1) conduct transactions on your behalf (2) receive Bank information related to Service operations, including, but not limited to, the access code provided by the Bank; (3) issue written instructions or notify the Bank of any action or request from You; and (4) issue any document related to this Agreement that the Authorized Person may deem necessary or convenient.

8. In the event of death of an Authorized Person or Signatory in the Account, You shall notify the Bank immediately and make the necessary arrangements for a new Resolution and the corresponding changes to the Service Addendum, if applicable.

### B. Deposits

1. The Bank reserves the right to make electronic versions of checks and other original items received as deposit and to process them electronically. You understand that this process involves destruction of the original checks or items and, on occasion, creation of a substitute check. For purposes of this Agreement, the term "substitute check" refers to a paper reproduction of an electronic image of the original check that complies with the requirements set forth in a federal act known as the Check Clearing for the 21st Century Act ("Check 21"). See Disclosure Related to the Availability of Funds Deposited in Individual Account of this Agreement. These checks have the same legal properties as the original checks issued by You.

2. You may make deposits in person, by mail, or by any other method provided by the Bank, such as automated teller machines and deposit boxes. The Bank will not assume responsibility for your deposits until receipt of such deposit is acknowledged. You may not deposit cash in branch deposit boxes or automated teller machines. If You do, it will be at your own risk. The Bank's determination with respect to the amount of cash deposited shall be final.

3. The Bank recommends using personalized deposit slips to expedite credit of deposits into the Account. In You fill deposit slips by hand with the name and account number to be credited, the Bank shall rely on the account number on the slip and will be under no obligation to verify that the account number belongs to the name on the slip.

4. The Bank will credit deposits that comply with the terms and conditions of this Agreement. The Bank may refuse to credit a deposit if the information is incomplete, illegible, inconsistent with the information given when You opened your Account, or if the deposit fails to abide by any of the provisions of applicable law.

5. When a deposit is made to the Account, the Teller will only verify cash. Checks and other items deposited will be verified no later than the following Business Day after the deposit was received. Any discrepancy or omission will be notified to You by mail. The Bank's determination to this effect shall be deemed correct. The Bank may at any time refuse to accept on deposit any check or instrument with a prior endorsement or that by the account holder or its authorized representative, including bank checks or managerial checks. If the Bank determines that the cash deposited was counterfeited currency or that the checks or other items deposited were improperly or fraudulently issued or negotiated or, if the Bank receives a claim to those effects, the Bank may debit any of your Accounts for the corresponding amount. The Bank will notify You of the adjustment to your Account by mail.

6. The Bank may ignore information or legends on checks and other deposited items, other than the signature, the issuing and paying bank information, amount, endorsements, and other encoded information, according to standard banking practice.

7. Upon receipt of checks and other items for deposit or collection, the Bank acts as a collection agent on your behalf, registering items subject to final settlement by the paying bank. In this case, the Bank's responsibility is limited to exercising ordinary care. Upon final settlement the item is considered collected. If final payment is not received, or if any item deposited in cash must be reversed for any reason, the Bank is expressly authorized to debit, at any moment and without prior notification, any of your accounts for the amount of the item, the penalty fee imposed by the Bank on returned items, interest paid on the deposited items, and any other related charges.

8. The Bank reserves the right to accept or limit any deposit, and to require the withdrawal of a deposit when it deems it convenient. When the Bank requires withdrawal of a deposit or any part of it, such deposit will not accrue interest from the date of the request.

9. The Bank may require that You to provide certain warranties and indemnities as a condition to accepting as deposit a substitute check from a non-banking entity.

10. You warrant and agree to the following for every remotely created check that we receive from You for deposit or collection: (1) You have received express and verifiable authorization to create the check in the amount and to the payee that appears on the check; (2) You will maintain proof of the authorization for at least two years from the date of the authorization, and supply us the proof if we ask; and (3) if a check is returned, You owe us the amount of the check, regardless of when the check is returned. We may take funds from your account to pay the amount You owe us, and if there are insufficient funds in your account, You will owe us the remaining balance.

A remotely created check is a check that is not created by the paying bank and that does not bear a signature applied, or purported to be applied, by the person on whose account the check is drawn.

C. **Payment Orders**

1. The Bank may refuse to pay any check, substitute check, or item against the Account (payment order) if:

   a. the item (i) is incorrectly or incompletely issued or endorsed; (ii) is issued in a form that has not been approved by the Bank; (iii) is not authorized for deposit into the Account; (iv) is not authorized for payment; (v) exceeds the frequency or the amount of withdrawals allowed for the type of Account; (vi) is drawn for a smaller amount than the minimum permitted for that type of Account;

   b. if the Account is subject to a dispute; or

   c. if the Account is subject to an attachment or lien, has been pledged to secure an obligation, availability of funds cannot be verified, or the Account is subject to set-off against an amount due to the Bank.

2. The Bank is under no obligation to pay an item drawn against insufficient funds or if You are not in compliance with any provision of this Agreement. If funds are available to cover part, but not all of the items drawn against the Account, the Bank may, at its sole option, determine which items to honor.

3. If the Bank mistakenly returns a payment order, the Bank shall be liable to You only for immediate damages caused by the error, and which You are able to prove irrefutably. Damage to your reputation, business, or other activities shall not be considered.

4. The Bank is under no obligation to pay a check submitted for payment more than six (6) months after it is issued. It may, however, charge your Account for the amount of said check without incurring in any liability.

5. In compliance with the Bank's legal reserve requirements, the Bank reserves the right to require a written notice from You seven (7) days in advance if You wish to withdraw funds deposited in the investment or savings section of an account combined with checking.

D. **Overdrafts**

1. The Bank will determine if an Account has available funds to pay a given item at any time from the time of receipt of said item to the cutoff time established by the Bank for return of the item. This determination is made only once. If upon such determination, it appears that there are insufficient funds in the Account, the Bank is under no obligation to pay said item and may return it. The Bank is not required to send notice prior to returning items for insufficient funds.

2. The Bank may, at its option, pay any payment order or item against the Account even if it creates an overdraft; provided however, that the payment of one or several overdrafts shall not bind the Bank to pay subsequent overdrafts.

3. You agree to deposit sufficient funds to cover any overdraft, plus interest for the overdraft amount (at the maximum rate permitted by law, or regulation, or as established in the prevailing Addendum to this Agreement) from the date of the overdraft until the date on which complete payment is made. You also agree to reimburse the Bank for any expense incurred in collection of the overdraft including, but not limited to, legal fees and litigation expenses as authorized by law.

4. The Bank may pay items drawn against the Account, even though payment of particular items may cause insufficiency of funds to pay other items that may otherwise have been paid.

5. An insufficient balance in the Account that is not covered by a Credit Line is subject to charge as set forth in the prevailing disclosure of applicable charges. Items drawn against unavailable funds may also be subject to charge.

6. The Bank may set-off overdrafts from a joint and several (and/or) or joint (and) Account against funds deposited in any of your accounts.

### E. Availability of Funds

1. You agree that the availability of funds deposited in the Account will be governed by this Agreement, fund transfers, exchange, and banking collection rules in force, and by applicable Federal or Puerto Rico regulations.

2. You authorize the Bank to adjust, debit, or credit the Account, according to the type of transfer, for the amount of any transaction returned for whatever reason, on the same Business Day in which the Bank receives the order.

3. You authorize the Bank to debit any of your accounts with the Bank for the amount of any fund transfer the Bank may have credited to the Account and for which final payment has not been received, or which for any reason has been returned to the Bank unpaid.

4. The Bank will not be responsible for re-deposit of items, or collection efforts unless You specifically request Re-deposit and Re-collection Services for your Account. Under no circumstances, will the Bank be responsible for payment of returned checks.

5. The Bank may, at its discretion, re-attempt transferring funds into the Account, but is under no obligation to do so. If the new attempt is successful, the Bank will credit the funds to the Account without interest.

6. Whenever the Bank debits the Account for returned checks, items, or drafts, the Bank's responsibility will be limited to delivering a Notice of Return with the following information: (a) amount of payment; (b) date processed; (c) Account against which the debit was made; (d) name of the client; (e) reason for return; (f) account number of the client with You. The Bank guarantees correction and validity of the information in the Notice of Return. Nevertheless, the Bank does not represent or guarantee that the Notice of Return is admissible as evidence of the debt in an administrative or legal procedure initiated by You for the recovery of amounts owed by your customers. The Bank will send You the check, item, or returned draft.

7. For purposes of this Agreement, the Bank will handle checks with insufficient information on payment orders, as follows:

   (a) Undated checks will be considered as having the same date postmarked on the envelope, and will be deposited as such.

   (b) If the numeric figure for the amount on the check differs from the amount in writing, the numeric figure will prevail, provided it is legible.

   (c) If the numeric figure is not legible, the amount written will prevail.

   (d) If both, the numeric figure and the amount in writing are illegible, the check will be returned to You.

### F. Stop Payments

1. The Bank will accept Stop Payment Orders on checks and preauthorized debits form any of the Authorized Signatories in the Account. Stop Payment Orders must be requested on the printed forms provided by the Bank for this purpose, or by phone, via TeleBanco Comercial. A stop payment order may be subject to applicable charges.

2. If You place the Stop Payment Order by telephone, the Bank will send You a confirmation in writing on the following Business Day.

3. Stop Payment Orders will be effective on the following Business Day of their receipt, thereby allowing the Bank a reasonable period of time to process the order. A Stop Payment Order for a post-dated check will be effective from the next Business Day the stop payment is ordered until the day before the date on the check. If the Stop Payment Order is placed on a non-Business Day, it will be considered to have been requested on the next Business Day, in which case, it will become effective on the second Business Day.

4. A Stop Payment Order will be invalid and inoperative if the item is paid prior to the effective date of the request. The Bank's acceptance of a Stop Payment Order does not ensure that the item has not been paid.

5. The Bank will not be liable for Stop Payment Orders placed after the checks have been paid, or for errors or omissions in the information provided by You that prevent the Bank from carrying out the request.

6. Upon placing a Stop Payment Order, You warrant that You have not received any benefits, credit, goods, or services of any kind in exchange for the check or pre-authorized debit for which You seek a Stop Payment.

7. You agree to provide the Bank with proof of any loss You claim and a sworn statement as confirmation of the warrant required in the preceding item paragraph) if You ever submit a claim to the Bank for payment of a check or preauthorized debit while a Stop Payment Order was in effect.

8. Stop Payment Orders will be valid for six (6) months (180 days), from the date of request, unless You cancel the order prior to the expiration date, or request a renewal for an additional six (6) month (180 days) period.

9. You agree to indemnify the Bank for any loss, damage, expense, or cost incurred by the Bank as a consequence of any claim from the endorser, or any other person, for having honored the request for a Stop Payment Order.

10. For Stop Payment Orders on preauthorized debits, such as insurance policies and other payments, You shall request the cancellation of the debit first to the issuer and submit to the Bank a copy of the letter requesting cancellation. Only then will the Bank be able to proceed with a stop payment order.

### G. Loss of Blank Checks

You agree to notify the Bank immediately, in writing, of the loss or theft of any blank checks. You will have the option of closing the Account, in which case a new account will be opened with the corresponding balance, or request Stop Payment Orders for the checks, subject to the applicable provisions for Stop Payment Orders in this Agreement.

### H. Post-Dated Checks

You assume full responsibility for any post-dated checks issued by You. The Bank may charge the Account for any postdated check presented for collection before the date on the check, unless You have previously notified the Bank that You issued a postdated check and provided accurate description of it. In this case, the check will be deemed to have a Stop Payment Order until the date specified. The Bank will thus abide by the same terms and conditions for Stop Payment Orders, except the enforcement period. The Bank is not responsible for claims of loss or damages, to You or third parties, for payment of a postdated check.

### I. Pledged Funds

You may pledge any funds deposited in the Account, to the Bank as collateral security for any obligation granted to You by the Bank, if such guarantee were required and accepted by the Bank.

### J. Transfer to Third Parties

Funds deposited in the Account shall not be pledged, assigned or transferred to third parties or institutions as a guarantee for loans or other obligations, except when authorized in writing by the Bank.

### K. Confidentiality

The Bank respects your right to confidentiality regarding your Account and will only disclose your information when required by law.

### L. Legal Processes against the Account/ Writs of Attachment

1. You understand that the Bank will comply with any writ of attachment issued by a court or government authority (including but not limited to the Puerto Rico Department of the Treasury and the Internal Revenue Service), and will freeze and/or deliver any funds available in the Account at the time the order or writ is presented to the Bank, in accordance with terms thereof.

2. The Bank shall be under no obligation to contest, challenge, or question the terms of an order, notice of levy, or writ of attachment, nor shall it be under obligation to defend You or to raise any defense that You may have against the person or entity promoting the order or writ. The Bank shall strictly comply with the terms of any such order or writ, until it has been served with an order or a resolution issued by the same court or authority indicating that it be released. Presenting evidence of payment of the debt or release of the obligation that prompted the order or notice of levy, will not suffice for the Bank to release the funds.

3. If the order or writ of attachment were issued against one, one of the Authorized Signatories in a joint and several account (and/or), the Bank will proceed to freeze and/or deliver the funds as per the order or writ without the need to determine ownership of the funds or legality of the order or writ.

4. If the Account is subject to any legal proceeding, the Bank may refuse to pay any item drawn against it until final resolution of such proceeding. The Bank shall not be liable to You for amounts paid pursuant to an order, attachment, or notice of levy, even if such payment precludes payment of other items from the Account.

5. If the Bank incurs in any expense including but not limited to legal fees and other disbursements related to any legal action, that are not reimbursed, the Bank may charge the Account without prior notice to You.

6. The Bank may, at its discretion, refuse payment orders against the Account for a reasonable period after receiving notification of an existing or potential claim against the Account.

7. Any attachment, pledge, or lien against the Account is subordinate to the Bank's right of setoff and security interest.

### M. Setoff

The Bank is expressly authorized to debit your Account for any amount owed by You to the Bank, in any capacity, without prior notice, subject to the provisions of applicable law.

### N. Inactive Accounts and Unclaimed Funds

If You do not make transactions in your Account for one (1) year, the Bank could charge a fee for inactivity until such time it is reactivated or the Account is closed. All Accounts in which no transactions are made for a

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

consecutive period of five (5) years or more will be closed and the funds will be transferred to the Office of the Commissioner of Financial Institutions, or such other entity that has a right to receive such monies. The Bank will not be responsible for such transferred funds.

O. **Joint and Several Account (and/or)**

1. If your Account is a Joint and Several Account (and/or) every Authorized Signatory has the right to make deposits and withdrawals, order stop payments, and make special arrangements regarding the Account, including closing of the Account. Every Authorized Signatory guarantees the signature of other Authorized Signatures and authorizes them to endorse payment orders for deposit, if the payment order is payable to the order of any of the Authorized Signatories.

2. The Bank considers that all Authorized Signatories are deemed to be joint and several owners of the funds deposited in the Account, and to be joint and several creditors of the Bank with respect to all such funds. The Bank may release the total amount of deposited funds to any of the Authorized Signatories.

3. Each Authorized Signatory authorizes the Bank to setoff any obligation of any of the Authorized Signatories against any and all funds in the Account, even if only one Authorized Signatory is obligated there under. This right shall exist regardless of which Authorized Signatory makes deposits into the Account.

4. You agree that any court order prohibiting withdrawal of funds from the Account, issued against any one or all of the Authorized Signatories, shall be subordinate to the Bank's right to setoff and/or as secured creditor.

5. You agree that a notification sent by to one of the Authorized Signatories shall be deemed to have been sent to all the Authorized Signatories of the Account.

6. Each Authorized Signatory may have access through automatic teller machines to the Account if an ATH (ATM) card is requested.

P. **Joint Accounts (and)**

1. If You have a Joint Account (and), by definition, You authorize two or more people to sign in the Account (Authorized Signatories) and require two or more Authorized Signatures to conduct any transactions.

2. The Bank will require the presence or signature of all Authorized Signatories, as established in the Account opening document and the Signature Document or Special Resolution (when applicable) to make any transaction, or issue instructions to the Bank regarding the handling of the Account, except for requesting Stop Payment Orders, which may be submitted by any of the Authorized Signatories.

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

3. The funds deposited in the Account are property of all Authorized Signatories, who in turn become joint creditors of the Bank. The Bank will be liable to them jointly.

4. In the event of an overdraft of the Account, it is understood that the Authorized Signatories are jointly responsible to the Bank for the total amount of the overdraft.

5. Authorized Signatories will not have access to automatic teller machines.

Q. **Calls to TeleBanco Comercial**

You understand that the Bank may occasionally monitor and/or record telephone calls to TeleBanco Comercial and supervise its employees to ensure the quality of service. Every caller to TeleBanco Comercial is warned at the beginning of the conversation, and is free to terminate the call. You fully understand the rationale behind this practice and expressly consent hereby to having your calls to TeleBanco Comercial monitored or recorded for such purposes.

III. **METHODS TO ACCESS THE ACCOUNT AND SECURITY MEASURES**

A. **ATH Card (ATM)**

1. It is an essential condition for issuance and use of the ATH card to maintain an active Account with the Bank. Only Joint and Several Accounts (and/or) are eligible to receive ATH cards.

2. You may perform withdrawals from and deposits into the Account, transfer funds between different sections of the Account at Automated Teller Machines (ATMs), and purchases in Points of Sale (POS) by using the Card and the Personal Identification Number (PIN) You select. Such transactions shall be governed by the terms and conditions of this Agreement. Cash withdrawals from the FlexiCuenta de Negocios account may not exceed $500 per day for a Regular ATH card or the ATH International Visa card, and $1,000 per day if it is an ATH International Visa Gold or Platinum card.

3. The ATH card may be used to access the Bank's ATHs and other electronic teller machines affiliated to the ATH Network, inside and outside Puerto Rico, and any local or international networks to which the Bank may become affiliated. Using your ATH card may be subject to fees charged by the Bank or by other ATM operators.

4. Deposits made at the Bank's ATMs will not be available for withdrawal or transfer until verified by the Bank.

5. The Bank reserves the right to authorize cash withdrawals from an ATM or POS purchases, when the ATM or POS are not in direct communication with the Bank's central computer.

6. The Bank will process transactions made at ATMS on the next Business Day after the Cut-off time indicated on each ATM.

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

7. Subject to applicable laws, You will be liable to the Bank for any debit to the Account corresponding to withdrawn funds or purchased merchandise using the Card and the PIN or for overdrafts resulting from a transaction, or for withdrawn amounts in excess of the available fund balance in the Account due to such debits.

8. The Bank may issue additional ATH cards to all Authorized Signatories and recognize the cards and corresponding PINs selected by each Authorized Signatory. Any debit to the Account corresponding to withdrawn funds or purchased merchandise by any of the Authorized Signatories through the use of the ATH card and the PIN will be deemed valid. Each Authorized Signatory will be responsible for such withdrawal(s), and release the Bank from any responsibility arising from losses that each may suffer as a result of the use of the ATH Cards and PINs.

9. You are responsible for maintaining your PIN confidential in order to prevent unauthorized transactions. For this reason, You agree not to write the Personal Identification Number on the card.

10. You acknowledge that the card is property of the Bank at all times, and You agree to return it immediately upon request. The Bank may cancel the ATH card at any time, without prior notice. The ATH card is non-transferable.

11. The Bank is not responsible for the acceptance or rejection of the ATH card at commercial establishments or any other establishments.

12. If at any time, your FlexiCuenta de Negocios, has no available funds in the Account, funds will be automatically withdrawn from the FlexiLinea, subject to the terms and conditions of this Agreement.

B. **ATH International Visa Cards**

1. The ATH International Gold and Platinum Visa cards (ATH International Card) can be used as a regular ATH card, subject to the terms and conditions established in Section A above, as a debit card to make purchases in all establishments or POS purchases where Visa is accepted as a means of payment, and to obtain cash advances at banks, and other financial institutions, where Visa is accepted.

2. Cash withdrawals from your FlexiCuenta de Negocio or BSmart account can NOT exceed $1,000.

3. The ATH International Card IS NOT A CREDIT CARD. All transactions made with the ATH International Card will be debited from your Account.

4. When You use the ATH International Card where the Visa card is accepted, the following conditions will apply:

    a. You do not need to use the PIN. However, all payment orders corresponding to transactions made with ATH International Card must be signed by the person to whom the card was issued. The signature must be the same as the signature in the back of the card. Cards should be signed immediately upon receipt.

b. The amounts corresponding to purchase and cash advances will be debited from your Account upon receipt of the payment order by the Bank from the merchant or institution where the transaction was made.

c. It is expressly agreed that You will not make transactions for amounts exceeding the balance available in the Account. In the event that a business or financial institution, to which an ATH International Card is presented, obtains authorization from the Bank to accept one or more payment orders, provisional holds can be placed on your Account for payment of said orders. You expressly release the Bank of any liability or responsibility, for holds or debits to the Account that are made in relation to one or more payments orders authorized by the Bank, but thereafter not issued by You.

d. Payment orders resulting from transactions made with the ATH International Card shall not be subject to Stop Payment Orders. It is expressly agreed that You waive this right.

e. In case of FlexiCuenta de Negocios, when receiving a payment order corresponding to a purchase or cash advance at a moment when there are no funds available in the Account, the Bank is under no obligation to increase the available credit limit in the FlexiLinea to cover the overdraft. The Bank has the option of refusing payment order from the merchant or financial institution, and You alone will be liable for payment of the corresponding purchase or cash advance. In this case, the Bank will collect the applicable charge for insufficient funds.

C. **Your Responsibility for Using Your ATH Card and Your ATH International Card**

1. You will be responsible for all debit transactions at automatic teller machines and for purchases using your ATH Card and/or your ATH International Card. You must protect your card and your PIN number.

2. You may loose the fund deposited in your Account as well as your available credit in your FlexiLineas as a result of unauthorized access to your Account. The fastest way to notify us, thus indicating the risk of loss, is by calling us. If you believe your card or your PIN number has been lost or stolen, call us immediately at 787-724-3650 (mobiles and Metropolitan Area) or toll free 1-888-724-3650 (outside Metropolitan Area), 24 hours per day, 7 days a week. The telephone numbers available for the hearing impaired are (TDD):787-753-9677 (Metropolitan Area) or toll free 1-800-981-9666 (outside Metropolitan Area). You may also send a letter to the following address: BANCO POPULAR DE PUERTO RICO ASSETS PROTECTION DEPARTMENT P. O. BOX 362708, SAN JUAN, PUERTO RICO 00936-2708. You may also contact us in writing or by telephone to the above address and telephone numbers if you have any questions or if you believe there is an error in your account statement or in an ATM or POS receipt. When you contact us you will need to state

a. Your name and account number

b. The date of the transaction and the reference number

c. Your claim or question

d. The amount in dollars of the alleged error.

3. The Bank will NOT be responsible under the following circumstances:

a. If for any reason not attributable to the Bank, You do not have sufficient funds or available credit in your Account to make the transfer or withdrawal;

b. If the ATH machine where the transaction is made does not have enough cash;

c. If the transfer amount exceeds the available funds in Your checking, savings, reserve account;

d. If the ATH machine is not working properly and You knew it was not working properly when You started the transfer;

e. If You have not notified us the loss, theft, or possible unauthorized use of the card;

f. If circumstances beyond the Bank's control, such as fire or flood, prevent the transfer, despite reasonable precautions taken by the Bank;

g. If the funds in the account are subject to any legal process, restriction or attachment that impedes the transfer of the funds.

D. **Security Measures**

1. In order to access any Service with access control, the Authorized Person should provide the access codes or identification methods that the specific Service requires before the Bank can accept and process your instructions. You will notify the Bank immediately in writing, using the form required by the Bank, of any changes regarding Authorized Persons or their corresponding authorization limit. Until such notice is received, the Bank can accept, without further investigation, all declarations, instructions, or representations the Authorized Person makes or issues.

2. The Bank is not responsible, explicitly or implicitly, for questioning or verifying with You if persons using or accessing any Service are, in effect, Authorized, or if they are acting according to your internal procedures and policies. The Bank's responsibility will be limited to guaranteeing that any use or access attempt will be made using the access codes or other identification method required by the Service, according to the normal operational sequence of the Service.

3. You agree to pay any funds transfer, as well as any loss or damage, direct or indirect, if a transfer is initiated by instructions that include valid access codes or applicable identification methods, even if it may

have not been initiated by an Authorized Person.

4. You understand and accept that the Bank may execute instructions to debit or credit an Account in which the Authorized Person could have an interest and the Bank will not have the obligation of determining if such instruction is appropriate or not.

5. You represent that You have adopted and will be absolutely responsible for the fulfillment of any and all security measures necessary to protect access to the Bank's systems by each Authorized Person, as well as your directors, officers, employees and agents.

6. You guarantee that You have established commercially reasonable security procedures and that the purpose of said security procedures is to verify the authenticity of transactions in order to minimize the risk of fraud due to unauthorized access, and not to detect errors in the transmission or content of the entry. The parties have not agreed to establish a procedure to detect such errors.

7. You guarantee that You have established and will keep all internal procedures as are necessary to prevent unauthorized transmissions. You guarantee that You will not allow any individual to initiate transfers without due supervision and safeguards; and agree that You will take the necessary measures to maintain the confidentiality of security procedures, access codes, instructions, and security equipment provided by the Bank.

8. If You suspect that unauthorized persons have had access to codes or instructions, You must notify the Bank immediately, followed by written confirmation. Unauthorized access will not affect transfers instructions executed by the Bank before receiving said notification.

9. The Bank will take reasonable precautions to ensure that your information, remains confidential and safe from unauthorized access by third parties. Compliance with the Bank's regular security and privacy measures will satisfy the Bank's obligation in this respect.

10. You agree to perform an annual audit on security to assure that the financial information of your clients is protected through security measures and practices that include, at a minimum: (a) physical safeguards to protect against robbery, illegal manipulation or damage; (b) controls related to personnel and access to protect against unauthorized access and use and (c) security in the network transmissions in order to assure the collection, storage, and distribution of the financial information.

IV. **SPECIAL PROVISIONS FOR FLEXICUENTA DE NEGOCIOS AND BSMART ACCOUNT**

A. FlexiCuenta de Negocios and BSmart Account offer You a basic Checking Account (FlexiCuenta and BSmart, respectively), an Investment Module (FlexInversión and Savings Section respectively), and a Credit Line Module (FlexiLinea and BSmart Credit Line, respectively) in one account number. The modules are optional. You may combine the Checking Account with

one or both modules according to your needs. Also, You may choose to manage your funds personally or authorize the Bank to manage them.

B. FlexiCuenta de Negocios may be opened by corporations, partnerships, business entities or individuals operating as DBAs or under a commercial trade name. BSmart may only be opened by individuals operating as DBAs or under a commercial trade name. If You open a BSmart Account, You agree that the account will be used for commercial purpose only. For both accounts if it is established as a Joint and Several Account (and/or), You may request the Bank to issue an ATH card with the name of each one of the Authorized Signatories to have access to ATMs. In the same manner, You will also have the opportunity of requesting the ATH International Visa Card from the Bank.

C. **Checking Section FlexiCuenta and BSmart**

1. You will keep the minimum balance indicated in the Addendum to the Agreement to avoid service charges (applies only to FlexiCuenta).

2. If You select the automatic function for the savings section, You must establish a compensatory balance from which funds will be transferred between the checking and the savings section.

3. The Bank will not pay interest on the balance kept in the checking account.

D. **FlexInversión and BSmart Savings Section**

1. When opening the Account, the Bank will inform You in the Addendum to the Agreement the required minimum balance, the interest rate to be earned on the deposited funds, and the method in which the computing and payment of interest will be performed.

2. The Bank will pay interest only on funds deposited in, or transferred to the savings section.

3. Interest will be calculated and credited according to the interest rate and manner established by the Bank.

4. The funds in the Account cannot be pledged, assigned, or transferred to any person or institution as guarantee, collateral, or obligations. However, You may pledge to the Bank funds in the savings section, as guarantee for any obligation with the Bank, if said guarantee is required and accepted.

5. You have two options for managing your funds in the savings section:

a. Automatic - You establish the balance that will be kept in the checking section from which any excess will be transferred to the savings section. The minimum required as compensatory balance will be revised from time to time, at your option or the Bank's. At the closing of operations each Business Day, the Bank will transfer to the savings section the excess over the compensatory balance deposited in the checking section, as

carried in the Addendum to the Agreement. This transfer will be reflected the next Business Day. This option may be suspended at the Bank's discretion.

b. Personal - You manage your own funds and authorize each transaction between the checking and savings section.

6. You may not withdraw from the savings section any amount pledged, (for whatever reason), that guarantees an advance made from the credit line.

E. **FlexiLinea and BSmart Credit Line**

1. The credit line is subject to credit approval. Therefore, when applying for the credit line (either upon opening the account or afterwards), You authorize the Bank to inquire upon and obtain the necessary credit reports for the extension of credit under the credit line.

2. Upon opening the credit line and every year thereafter, the Bank will charge You a quota as indicated in the Promissory Note. Said quota may be changed from time to time, at the Bank's option. You must maintain sufficient funds in the checking section to cover the charges that the Bank has a right to collect under any clause of this Section.

3. You have two options for activation or use of the credit line:

a. You may issue a check or authorize a debit (e.g. to the ATH card) from the checking section for a sum in excess of the available balance in the checking and savings section, or

b. Issue a special check directly against the credit line, without considering the balance in the checking or savings section.

4. The activation date of the credit line will determine the start of minimum payment toward the principal balance. If You activate the credit line no later than the 15th of the month, payment will begin on that month. If it is activated after the 15th, payment will begin the next month.

5. You may issue checks for the total combined balance of the active modules.

6. Advances from the credit line will be for the exact amount of overdrafts or for the amount of the special check drawn directly against the credit line, but will never exceed the authorized credit limit. If You have selected to manage the savings section personally and issue checks or authorize debits that exceed the authorized credit limit, a credit line will be created against the available funds in the savings section and You will be charged interest for the amounts over said limit at the rate indicated in the Addendum to the Agreement.

7. In accordance with the promissory note and any applicable laws and regulations, the Bank will charge a financing fee over the credit's line outstanding balance, from the date in which the account is activated until the date the account is paid in full. The financing fee will be calculated based on the interest rate established in the promissory

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

note, divided by the number of days established by the Bank (360 days). This daily periodic rate will be multiplied by the daily ending balance and the result by the number of days that the line of credit had balance during the billing cycle. This balance will be determined by adding the outstanding balances each day during the billing cycle and dividing the result by the number of days that the line of credit had balance in such cycle.

8.  The Finance Charge and the corresponding interest may vary periodically. Changes in the finance charge will be subject to changes in the maximum interest rate dictated by the Financial Board or any other regulatory agency with competent authority. Changes to the Finance Charge and interest will apply to balances due prior to the effective date of said changes. The Bank will notify You, in writing, of any changes and their effective dates. The Bank may also increase the Finance Charge and corresponding interest to the differential rate over the Prime Rate, in cases of non-compliance (Default Rate), as established in the Promissory Note, whenever any of the circumstances listed in paragraph 12 occur.

9.  You are responsible for paying all Finance Charges monthly. In regard to the frequency and amount of the minimum payment toward the principal balance, for the FlexiCuenta You have the following options:

    a.  **Daily** – Every day, the system will automatically transfer funds from FlexiCuenta until FlexiLinea is paid off. The total amount of transferred funds during a billing cycle must not be less than one twenty-fourth (1/24) of the balance due at the closing date of said cycle;

    b.  **Monthly** – Once a month, the system will debit funds from FlexiCuenta according to the minimum payment previously established, which may be one third (1/3), one twelfth (1/12), one twenty-fourth (1/24), one thirty-sixth (1/36), or 100% of the balance due at the closing date of the cycle; or

    c.  **Quarterly** – Every three months, the system will debit funds from FlexiCuenta totaling one fourth (1/4) or 100% of the balance due at the closing date of the cycle.

    In regard to the frequency and amount of the minimum payment toward the principal balance for BSmart Account, every day, the system will automatically transfer funds from the checking section until the credit line is paid off. The total amount of transferred funds during a billing cycle must not be less than one twenty-fourth (1/24) of the balance due at the closing date of said cycle.

10.  Finance Charges and payment of principal balance for each billing cycle will be debited automatically from the checking section (in that same order) and notified in your monthly statement. If, during a billing cycle, You make payments to the credit line for an equal or larger sum than the minimum payment calculated by the system for that cycle, the minimum principal payment will not be debited

from the checking section during that cycle, because it has already been covered. If, however, You make payments for less than the minimum amount calculated by the system for that billing cycle, the total minimum payment amount will be debited from the checking section without taking said payments into account.

11.  You may make additional payments to the credit line at any branch of the Bank, or via electronic transfers. Payments will be applied to the principal balance, and any remaining excess will be transferred to the checking section. Also, You may pay the total amount or part of the principal balance at any moment. In this case, You must also pay any Financial Charges due at the time of payment.

12.  The Bank may cancel your credit line and declare all or part of the balance due if You:

    a.  Do not comply with payment of the principal balance or Finance Charges or any other obligations to the Bank, when said charges are due and payable (up to the due date or any other date);

    b.  Are declared insolvent or bankrupt, or You notify in writing your inability to pay your debts, or You assign assets to your creditors, or You file any bankruptcy, insolvency, reorganization, readjustment of debts, or any other proceeding under the laws and regulations of any jurisdiction;

    c.  Sell, assign, transfer, or bequeath all, or a considerable amount of your assets, except in the ordinary course of business, or if your business is merged into another entity;

    d.  Do not submit annual financial statements for You and your guarantors, compiled, revised, or audited, and signed by an authorized officer, no later than one hundred and twenty (120) days after the closing of the fiscal year, as set forth by the Bank at its absolute discretion;

    e.  Allow your financial condition to suffer a considerable adverse situation; or

    f.  Do not rectify any non-compliance with the provisions of this Agreement in a ten-day (10) period.

13.  Your credit line will be revised annually; continued use of it will only be allowed at the sole discretion of the Bank. If your credit line is cancelled, You shall pay the total sum of the principal balance and Finance Charges due at the date of cancellation. In this case, the checking section may continue to exist without any rights to cash advances from the credit line.

14.  The Bank may choose to accept payments to the credit line after initiating a judicial claim for non-compliance with the terms of this Section. In this case, the remaining balance will not be deemed cancelled.

F.  **Payment of Payment Orders**

Payment orders issued against the Account will depend on the option that You have chosen for management of the savings section. If the Account

has the automatic investment options, available funds will be used (until depleted) in each module for payment of payment orders, in the following order: checking section, savings section, and credit line (if applicable). If You have not opted for automatic investment, the order will be: checking section, credit line (if applicable), and credit line is extended by pledging funds available in the savings section.

G.   **Management of Deposits**

If the Account has its credit line paid daily (optional and subject to approval) , deposits will be used to pay the checking section day's releases first, then they will be used to pay the credit line until it is paid-off, and finally, any excess over the compensatory balance will be transferred to the savings account (if applicable).

V.   **SPECIAL PROVISIONS APPLICABLE TO THE ESCROW ACCOUNT FOR REALTORS AND REAL ESTATE COMPANIES**

A.   Pursuant to Act 10 of 1994 ("Act 10"), all realtors and real estate companies operating in Puerto Rico must open and maintain, at a bank established in the Commonwealth of Puerto Rico, a "Special Account ("Escrow Account") to deposit all down payments, good faith deposits or other deposits received by the realtor, the company or its realtors and/or real estate sales personnel in connection with a potential real estate transaction.

B.   The realtor or real estate company shall deposit and maintain the amounts received from potential buyers in the Escrow Account.

C.   The realtor or the company represents and guarantees that he/she/it has all the necessary permits to operate as a real estate professional or business in Puerto Rico, including, without any limitation, the realtor or real estate company license issued by the Puerto Rico Real Estate Board (the "Real Estate Board").

D.   The realtor or company agrees to comply with all laws and regulations applicable to the real estate business, including, without any limitation, Act 10 and all regulations approved to implement the provisions of said Act.

E.   The realtor or company agrees:

1.   that only down payments, good faith deposits or other deposits received by the realtor or company from potential buyers in relation to the acquisition of real estate property will be deposited in the Escrow Account;

2.   to maintain the funds deposited in the Escrow Account totally separated from their operational, personal or business accounts;

3.   to maintain adequate records for all funds deposited in the Escrow Account;

4.   to provide the Bank, within five (5) days, all documents requested by the Bank in relation to the funds deposited in the Escrow Account;

5.   to cooperate with the Bank during any review or inspection of the Escrow Account by the Consumer Affairs Department or the Real Estate Board;

6.   to provide, as applicable, while the Escrow Account is in existence, the names of all realtors and/or real estate sales personnel authorized to use said account; and

7.   to notify the Bank immediately when the authority conferred to any of the realtors and/or real estate sales personnel mentioned in item E. 6 is modified or revoked by the realtor or the company.

F.   The realtor or the company agrees with the Bank that the service fees pertaining to the Escrow Account and any other charge related to the compliance with this Contract will be debited from the realtor's or the company's account as indicated in the Escrow Account Addendum.

G.   In addition to the indemnities included in the Limit of Bank's Responsibility and Indemnities section of the General Provisions of this Contract, the realtor or the company hereby agrees to indemnify the Bank for any claim, lawsuit, cost, fees, loss or expense of any nature to which the Bank may, directly or indirectly, be subject to in connection with a dispute regarding the ownership of the funds deposited in the Escrow Account and/or issues arising from management by the realtor, the company, its employees, agents or representatives.

H.   The realtor or the company agrees that the funds deposited in the Escrow Account may not be used to guarantee personal or business obligations or for any other uses not authorized by Act 10.

VI.   **OTHER COMMERCIAL ACCOUNTS**

A.   In addition to FlexiCuenta, the Bank offers other types of commercial accounts designed to suit the needs of private or public entities, or entities with special circumstances that require a particular deposit account, such as, government agencies, non-profit companies, or companies undergoing bankruptcy.

B.   As a general rule, these accounts are checking accounts without ATH cards. These accounts may or may not accrue interest.

VII.   **FUNDS TRANSFERS**

A.   **General Terms and Conditions**

The following terms will apply to fund transfers You request or receive through the Bank's fund transfer service.

1.   **Authorization** - You may request or receive electronic fund transfers ("Transfer"). Transfers may be requested to transfer funds from the Account to other accounts that You own, or to other accounts owned by third parties, either with the Bank or with other financial institutions, or for receiving funds into your Account. You authorize the Bank to debit or credit any Transfer (including any charges or applicable expenses) that is transacted as set forth in this Agreement. The Bank will not search for the funds in any account other than the one specified in the Transfer request. You authorize the Bank to transfer the funds from the Account, with authorization of the signatories who have been appointed to initiate and/or confirm

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

Transfers, as set forth in Exhibit A – Designation of Accounts and Authorized Representatives.

2. **Security Measures** - You agree to abide by the security measures set forth in Exhibit B – Fund Transfer Security Measures, which is part of this Agreement. You expressly acknowledge and agree that the measures You establish are commercially reasonable and adapt to your particular circumstances. You acknowledge that these measures are designed to detect unauthorized Transfers, and not errors in the content of the instructions. You accept responsibility for the transfer, whether or not You have authorized it, provided the Bank has accepted the payment order subject to established security measures.

3. **Selection of Beneficiary Bank** - Upon requesting a fund transfer, You must designate a financial institution ("Beneficiary Bank") to receive the funds. You may instruct the Beneficiary Bank to credit the funds to an account or to hold the funds for the recipient. The Beneficiary Bank is responsible for following your instructions and for letting the recipient know when the funds are available.

4. **Selection of the Intermediary Bank** - The Bank may select the intermediary bank or transfer system ("Intermediary Bank") it deems appropriate under the circumstances in order to forward the funds to the recipient, including, but not limited to, Fedwire, SWIFT or Telex, and must operate subject to the policies and procedures of each system. If You order the Bank to use a particular Intermediary Bank or system to transfer funds, through which the Bank will process the payment order, You are assuming all responsibility for errors or failure of the Intermediary Bank to pay, as well as any loss resulting from use of the means selected. See Exhibit D – Authorization to Grant Transfer Requests Received by Fedwire or SWIFT.

5. **Discrepancies in Names and Numbers** - If You identify the recipient, the Beneficiary Bank or the Intermediary Bank with an account number or with a name and number, the Intermediary Bank and the Beneficiary Bank may rely on said number and they will not be responsible for verifying that the account number belongs to the recipient specified on the Transfer request. This same rule will apply to the Bank when the Transfer is being sent to You and when returning the Transfer to the remitting Bank. You acknowledge that the Bank will not be responsible for any delays that result from the Bank's attempt to clear any discrepancies between the name and account number, nor be obligated to investigate suspicious irregularities. You understand that any loss or delay due to lack of accurate identification will be your responsibility only, and not the Bank's.

6. **Conversion to Foreign Currency** - Upon Your request, the Bank will convert funds to the currency of the receiving country at the exchange rate in effect at the time of transfer. If the final destination of the Transfer is a foreign country, the Bank cannot guarantee that the recipient will receive the funds in US currency, even if requested. The

Beneficiary Bank may charge a currency conversion fee. The actual amount received by the recipient may be less, due to fees charged by the Beneficiary Bank, including currency conversion fees. In case of Transfers received in foreign banknotes, the Bank will convert the funds to US dollars at the prevailing exchange rate at the Bank on the day the transfer is accepted. This rate includes a commission for the conversion service. Transfers in foreign currency may be conducted up to two (2) Business Days after the Bank receives the request. If the Bank were to restitute funds that have been converted to foreign currency, it would abide by the prevailing exchange rate on the date of the restitution, after deducting applicable expenses. In case of Transfers made in US dollars to a foreign country, the Bank will not be responsible for conversion rates applied by the receiving bank.

7. **Repetitive Transfers** - If the Bank or You determine that the Transfers have become repetitive, the Bank may assign a number, name, or a combination of both, at your request, as set forth in Exhibit C – Authorization for Repetitive Transfers. In this case, You may use said number, name, or combination, to expedite future requests. The Bank may conduct all Transfers that contain this number, name, or combination. See also Exhibit E – Non-repetitive Automatic Transfers (applicable only to electronic requests).

8. **Payments to the Bank / Fees** - The amount of funds transferred, in both international transfers and transfers within the United States, could be reduced due to fees charged by the Beneficiary Bank and the Intermediary Bank, including those fees charged by the Bank. The Bank will deduct applicable fees from any Transaction, and will notify You by mail any time the Bank debits or credits your Account with a Transfer. You are responsible for returning any amount credited mistakenly to your Account. You will also be responsible for expenses caused by failure to provide identification information for the Beneficiary Bank, and for any charges billed by the selected Intermediary Bank.

9. **Statements of Account / Claims** - All Transfers will be reflected in your periodic Account Statement. You must notify the Bank of any errors, delays, or other problems with a fund transfer within thirty (30) days after receiving notification that the transfer was generated, or after receiving the Account Statement indicating the Transfer, whichever occurs first. If You do not notify the Bank of any claim concerning fund transfers within one year of having received the notification or the corresponding Account Statement, all claims shall be null and void, in compliance with applicable law.

10. **Delays or Failure to Execute Transfers** - Generally, the Bank makes Transfers electronically, although it could use other means. The Bank's responsibility is limited, according to the provisions of the Limitation of Liability and Indemnifications provisions of this Agreement. The Bank will not be responsible to You for delays or failure to execute fund transfers due to action or omission of the Intermediary Bank or Beneficiary Bank.

11. **Cancellation or Amendment of a Fund Transfer Request** - If You decide to cancel or amend a fund transfer request, You may only do so only if the funds have not yet been transferred and the Bank has sufficient time to carry out your new instructions. Generally, once the Bank has sent the funds, You cannot cancel or amend the payment order, unless the Beneficiary Bank accepts the cancellation or amendment. The Bank and/or the Beneficiary Bank may charge a fee for cancellation or amendment of fund transfers. The Bank is not responsible for any loss resulting from failure of the Beneficiary Bank to comply with the cancellation or amendment request.

12. **Rejection of a Transfer Request** - The total amount of funds needed to carry out a fund transfer and pay the service charges, or any other obligation to the Bank, must be available in the Account at the moment of executing the fund transfer request. The Bank is under no obligation to accept a fund transfer request (entirely or partially), and may delay accepting any Transfer if (a) the Transfer requested exceeds the amount available in the Account; (b) it does not comply with security measures; (c) it is not duly authorized; (d) it does not provide the information required by the Bank; (e) is impractical or impossible to accept; (f) the Bank understands that the transfer does not comply with one or more of the provisions in this Agreement, or any other federal or state law, including, but not limited to, the Office of Foreign Assets Control (OFAC); or (g) if the designated account is blocked for security reasons, or for any other reasons, such as levy or frozen assets.

13. **Acceptance of Transfers** - The Bank will not be responsible in any way for accepting a fund transfer received for your benefit. Although the current practice of the Bank is to notify You of the acceptance of a fund transfer in US dollars within two (2) Business Days after the date of receipt, if said fund transfers are made through a system other than the Automated Clearing House (ACH), the Bank is not obligated to provide such notification. The Bank will credit the account of the recipient on the date the Transfer is paid, if it is received before Cut-Off Time on a Business Day. If not, the account will be credited the next Business Day.

14. **Provisional Payment of Received Transfers** - The credit extended to You by the Bank for transferred funds is provisional until the Bank receives final payment of the amount transferred. Should the Bank not receive payment for the funds, You agree to reimburse the Bank for the Transfer amount. An unaccepted Transfer is cancelled, as provided by law, at the close of the fifth Business Day.

15. **Exhibits related to Funds Transfer Services** - The following Exhibits (as applicable), once completed and signed, will form an integral part of this Agreement:

    Exhibit A - Designation of Accounts and Authorized
    Representatives

    Exhibit B - Fund Transfers Security Procedures

    Exhibit C - Authorization for Repetitive Transfers

    Exhibit D - Authorization to Grant Requests for Transfers
    Received by Fedwire or SWIFT

    Exhibit E - Non-repetitive Automatic Transfers (applicable to
    requests made through electronic means)

    If You wish to make any changes to the Exhibits You must notify the Bank as soon as possible. Notifying the change does not obligate the Bank until a written notice describing the change has been received, and the Bank has had reasonable time to implement said change.

16. **Cut-off Time** - If the Bank receives the Transfer request at Cut-Off Time or after Cut-Off Time, the request will not be processed until the next Business Day.

17. **Law Governing Transfers** - The rights, duties, and responsibilities of the parties are governed by the provisions of Chapter 4 (Transfer of Funds) of the Puerto Rico Commercial Transaction Act and shall be subject to the laws of the Commonwealth of Puerto Rico. If any part of a transfer of funds involves the use of Fedwire, your rights and obligations as well as the Bank's in relation to the electronic transfer shall be governed by Regulation J of the Federal Reserve Board.

## VIII. DISCLOSURE RELATED TO THE AVAILABILITY OF FUNDS DEPOSITED IN TRANSACTION ACCOUNTS (REGULATION CC)

Federal Regulation requires banks to make deposited funds available to You within certain periods of time. Depending on the type of deposit, the funds may be available to You the same day, the next business day, or after several days; in the majority of cases, the longest possible delay is until the seventh (7th) business day following the day of the deposit. During the delay period (if any), You may not withdraw the funds in cash and the Bank will not use the funds to process payment orders issued by You.

The Bank establishes the limits for the availability of funds deposited according with the minimum amounts required by the Regulation CC. The following explanations are intended to provide an easy guide for determining when various types of deposits (cash, electronic transfers, etc.) will be available to You for cash withdrawals and for the payment of checks against the Account. However, periodically the Bank will review several criteria, and may provide a higher availability of funds than the limit established by the Regulation. If you need further information regarding this matter please visit any of our branches or call us through TeleBanco Popular at 787-724-3659 (mobiles and Metropolitan Area) or toll free 1-888-724-3659 (outside Metropolitan Area) and one of our service representatives will assist you.

The availability Policy only applies to funds deposited for accounts of Banco Popular in Puerto Rico and the Virgin Islands. Please inquire for information about the availability of funds deposited at other locations.

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

A. **How to Determine the Availability of Deposited Funds**

The length of the delay is counted in business days, starting on the first business day after the day of the deposit. Business days are defined as every weekday, except Saturdays, Sundays, and federal holidays. Although the Bank offers public banking services on Saturdays, Sundays, and some holidays, these are not considered business days.

B. **Availability of Funds Deposited for Purposes of Cash Withdrawals, the Purchase of Goods and Services in Establishments that Accept the ATH® Card as a Mean of Payment (Point of Sale Transactions) and for the Payment of Checks.**

1. **Deposits Available for Cash Withdrawals on the Same Day of the Deposit**

   a. Electronic fund transfers, such as: Social Security benefits and payroll payments by direct deposit.

   b. Cash: provided the telecommunications facilities of the Bank are readily available.

2. **Deposits Available for Withdrawals on the Next Business Day Following the Date of the Deposit:**

   Federal Regulation provides that certain items be available for withdrawal on the business day following the date of the deposit:

   a. Wire transfers

   b. Checks drawn against any Banco Popular branch located in Puerto Rico or the US and British Virgin Islands; US Treasury Checks; Postal Money Orders; Federal Home Loan Bank Checks; and Federal Reserve Bank Checks, notwithstanding the amount of these checks.

   c. Certified Checks, Official Checks and checks from the government of the Commonwealth of Puerto Rico made payable to the owner of the account and presented directly to a Bank Representative using the Bank's Special Deposit Slip. This slip can be obtained from any Bank Consultant. If the owner of the account does not use this slip, the funds of these checks will be available as indicated in clause 3 of this section.

   d. The first $100 of the total deposit of other checks drawn on banks other than Banco Popular.

3. **Availability of Other Checks Deposited**

   The availability of funds from other checks deposited will depend on Banco Popular's policy.

a. Deposits in Individual Transaction Accounts

The first $1,000 of the aggregate sum of other checks deposited on any business day will be available in the following manner:

   (1) If the aggregate amount of the deposit with other checks is $1,000 or less, the entire amount will be available for cash withdrawal and payment of checks on the next business day.

   (2) If the total aggregate amount of the deposit with other checks is more than $1,000, the Bank will make $1,000 available for withdrawal on the next business day. Banco Popular will have available for withdrawal up to $400 on other checks on the second business day after the deposit, whenever the aggregate amount of checks is $1,000 or more.

   (3) The remainder of the funds deposited will be available for cash withdrawals and payment of checks on the third business day following the day of the deposit.

C. **Delay on the Availability of Funds for Longer Periods**

1. The Bank may delay the availability of funds from check deposits for a longer period of time under the following circumstances:

   a. If the Bank believes that a check You deposit will not be paid.

   b. If there is an emergency, such as failure of the Bank's communication or computer equipment, or bad weather conditions (such as a hurricane or an earthquake).

2. The Bank will notify You if your availability to withdraw funds will be delayed for any of the foregoing reasons, and You will also be informed as to when the funds will be available. The funds will be available not later than the seventh (7th) business day following the day of the deposit.

D. **Special Rules for New Accounts**

If You are a new customer, electronic transfers (such as Social Security benefits and payroll payments through direct deposits) will be available for withdrawal on the same day as of the deposit. However, the following rules will apply during the first thirty (30) days after opening your Account:

1. The next business day funds available policy of $1,000 as provided in the item B (3) (a) of this disclosure, shall not be applicable.

2. US Treasury Checks; Postal Money Orders; Federal Home Loan Bank Checks; Federal Reserve Bank Checks, Certified Checks, Official Checks and checks from the Government of the Commonwealth of Puerto Rico will be available for cash withdrawal and payment of checks on the next business day.

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

The funds or other checks deposited can be delayed for a longer period as established by the regulation.

E.  **Disclosure regarding to the Check Clearing for the 21st Century or Check 21 Act ("Check 21")**

The federal law known as Check 21 was enacted to facilitate the interchange of checks between financial institutions and improve the overall efficiency of the payment system. This law allows the electronic interchange of checks eliminating the physical checks as they will only travel and be sorted electronically.

To make check processing faster, federal law allows banks to replace original checks with substitute checks. Substitute checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a substitute check states: **"This is a legal copy of your check"**. You can use it the same way you would use the original check.

You may use a substitute check as proof of payment just like the original check. A substitute check that meets the requirements for legal equivalence is subject to any provision of federal or state law that applies to original checks

## Schedules of Rates · Corporate Service


**BANCO POPULAR**

## Commercial Accounts – Special Services

| | |
|---|---|
| Automatic Investment | $140.00 monthly per account |
| Zero Balance Account | $20.00 monthly per account |
| Statements Rendered | $2.00 monthly per account cut-off |
| Balance Reporting | |
| TeleBanco Comercial℠ | Free of Charge |
| Controlled Disbursement | $100.00 monthly per account |

## Web Cash Manager℠

| | |
|---|---|
| Web Cash Manager℠ Set-up | $100.00 one time fee |
| Information Reporting | |
| 3 accounts and reports | $15.00 monthly |
| Additional Accounts | $15.00 monthly per account |
| Transaction Fees | |
| Up to 300 | Free |
| 301 to 1,500 | $0.12 each |
| 1,501 to 3,000 | $0.10 each |
| 3,001 to 5,000 | $0.08 each |
| 5,001 and over | $0.05 each |
| Wire Origination | $30.00 monthly |
| Check Inquiry | $25.00 monthly |
| Web Cash Manager℠ BA12 | $100.00 monthly per account |
| Real Time Account Transfer | $25.00 monthly |
| Sweep (Cash Concentration) | $150.00 monthly |
| Real Time Inquiry | $25.00 monthly |

## Collection Services

| | |
|---|---|
| TelePago Popular® | $0.50 per item |
| Payment Station | $1.50 per item |
| Lockbox Payment | |
| Up to 300 Payments | $150.00 minimum per month |
| Additional Transactions | $0.50 per item |
| Lockbox Internet and CD | |
| Monthly Maintenance | $125.00 |
| Image Lockbox Items | |
| 1 to 999 transactions | $0.07 per transaction |
| 1,000 to 9,999 transactions | $0.05 per transaction |
| 10,000 to 49,999 transactions | $0.03 per transaction |
| 50,000 and over | $0.02 per transaction |
| Checks Drawn on Banco Popular | $6.50 per check |
| Checks Drawn on Other Banks | $6.50 per check |
| Redeposit Checks | Flat fee by volume |
| RCK Collection | $5.00 per check |
| ACH Collection | $5.00 per ACH return |

## Electronic Data Interchange

| | |
|---|---|
| EDI Monthly Maintenance | $ 50.00 |
| File Transmission | $10.00 per file |
| File Translation | $0.35 per 1,000 characters (1 kc) |
| EDI Set-up Fee | As negotiated |

## Commercial Accounts – Standard Services

| | |
|---|---|
| Account Maintenance Fee | $25.00 monthly per account |
| Debit and Credit Advices | $1.50 each |
| Cashed Checks | $1.50 each |
| Paid Checks | $0.20 each |
| Deposit Tickets | $1.50 each |
| Checks Deposited | $0.16 each |
| Rolled Coin Issued | $0.08 per roll |
| Mixed Currency & Coin Deposit | $0.16 max. per $100.00 |
| Currency Issued | $0.08 per $100.00 |
| Cash Requisitions | $5.00 per requisition |
| Night Deposit & Special Handling | $3.50 per bag |
| Manager's Checks | $7.00 per check |
| Combined Analysis | $4.00 monthly per account |
| Stop Payments | $ 15.00 per check |
| Paid or Returned Electronic Transactions due to non-sufficient funds; (applies to TelePago Popular®, ACH and Pago Directo) | $15.00 per transaction |
| Paid or Returned Checks due to non-sufficient funds | $15.00 per transaction |
| Check Rejects (due to special handling for processing item) | $1.25 per item in excess of 1% |





## Electronic Funds Transfers

| | |
|---|---|
| ACH Maintenance | $25.00 monthly |
| ACH Transactions | $0.40 per transaction |
| ACH Returns | $2.00 per transaction |
| ACH Received | $0.50 per transaction |
| ACH Transaction Adjustment | $5.00 per occurrence |
| ACH File / Batch Adjustment | $25.00 per occurrence |
| Addenda Originated | $0.15 per item |
| Electronic Payment Authorization (EPA) | |
| Setup | $50.00 |
| First Account | $20.00 |
| Additional Accounts | $5.00 each |

## Account Reconciliation

| | |
|---|---|
| Maintenance | |
| Full (Checks and Deposits) | $140.00 per account |
| Consolidated (Checks) | $115.00 per account |
| Partial | $65.00 per account |
| Checks Reconciled | |
| Consolidated: | |
| 1 to 10,000 | $0.13 each |
| 10,001 to 20,000 | $0.11 each |
| 20,001 to 30,000 | $0.09 each |
| 30,001 and over | Special Quotation |
| Partial: | |
| 1 to 10,000 | $0.09 each |
| 10,001 to 20,000 | $0.08 each |
| 20,001 to 30,000 | 0.07 each |
| 30,001 and over | Special Quotation |
| Deposit Slips Reconciled | $0.13 each |
| Check Management (CD-ROM) | $ 20.00 per account |
| Items Captured | |
| 0 to 100 | $25.00 flat fee |
| 101 to 250 | $0.10 per effect |
| 251 to 500 | $0.07 per effect |
| 501 and over | $0.04 per effect |
| Positive Pay | $75.00 monthly per customer |

## Merchant Business

| | |
|---|---|
| POS | |
| Visa / MasterCard Transactions | Up to 3.0% discount rate (based on volume) |
| ATH® Transactions | 2.50% discount rate (based on volume) |
| EBT Transactions | Up to $0.25 per transaction |
| POS Terminal | Up to $25.00 monthly rent |
| Wireless Terminals | $65.00 monthly rent |
| Memberships | $8.00 monthly fee[2] |
| MultiMerchant Pay | |
| One Time Set-up Fee | $400.00 set-up fee $40.00 hosting fee per month |
| Visa / MasterCard Transactions | Up to 3.25% discount rate (based on volume) |
| ATH® Transactions | 2.75% discount rate (based on volume) |
| Visa / MasterCard and ATH® | $0.25 processing fee per transaction |
| Membership | $8.00 monthly fee[2] |

[1]BPPR ATH® Card only. [2]Not applicable if customer
is already a Visa / MasterCard merchant.

## International Services

| | |
|---|---|
| Wire Transfers – Outgoing Transfers | |
| Commissions | 1/4 of 1% (min. $25.00, max. $35.00) |
| Transmission Cost | $25.00 |
| Wire Transfers – Incoming Transfers | |
| For Credit to Our Clients | $15.00 |
| For a Message Transmission | $25.00 |
| Letter of Credit – Import | |
| Issuing Credit | Subject to previous arrangement |
| Negotiating Sight | Subject to previous arrangement |
| Negotiating Time | Subject to previous arrangement |
| Acceptances | |
| Transfer / Assignment of Proceeds of Credits | 1/2 of 1% (min. $100.00) for 120 days period |
| | 1/8 for additional 30 days period |
| Web Trade Access | $25.00 monthly |
| Letter of Credit – Export | |
| Advising Credits | $100.00 plus cost |
| Confirming Credits | Subject to previous arrangement. Minimum $250.00 |
| Document Examination Fee / Negotiation Fee | 1/2 of 1% (min. $50.00) |
| Stand-by Letters of Credit | Subject to previous arrangement |
| Other | |
| Payment Under Letters of Credit | 1/2 of 1% (min. $50.00) |
| Amendments | $75.00 plus cost |
| Cancellations of Unused Credits | 1/5 of 1% (min. $50.00, max. $200.00) |
| Handling Fee | Other charges |
| Discrepancies | $75.00 plus cost |
| Collections | |
| Incoming and Outgoing Collections | $50.00 min. charge plus correspondent bank charges |
| Sight Drafts | 5/8 of 15% (max. $200.00) |
| Time Drafts | 3/4 of 1% (max. $200.00) |
| Returned Drafts | 3/4 of 1% (max. $50.00) |
| Items Delivered Free of Payment | 3/4 of 1% (max. $50.00) |
| Checks on Banks Outside the U.S | 5/8 of 15% (min. $25.00, max. $125.00 plus cost) |



For more information, call **TeleBanco Comercial**℠
at **787-756-9130** or **1-888-756-9130** or contact
your Banking Officer. You can also visit **www.popular.com**

Member FDIC. Fees effective January 1st, 2010.

## SCHEDULE 3
## ILR DEPOSIT ACCOUNT AGREEMENT

**(attached)**



**BANCO POPULAR.**

**Corporate Account Opening**

| Account Number | Account Title | | Accounting Responsible Unit | Bank Number |
|---|---|---|---|---|
| ▮6438 | Autoridad de Carreteras - ILR | | 651 | 001 |

| Account Type | Federal Tax ID | NEW | SIC Code | Entity Code | Account Group |
|---|---|---|---|---|---|
| Checking | ▮-3808 | ☐ Customer  ☑ Account | | 004 | |

**Business Address**
Centro Gubernamental Minillas
Ave De Diego PDA 22
San Juan PR  00940

**Mailing Address**
PO BOX 42007
San Juan PR  00940-2007

| Phone Numbers | Fax Number | E-Mail Address |
|---|---|---|
| | | |

**Purpose of Account**
AutoExpreso In-lane Replinishments in cash and or POS transactions

FLEXINVERSION ☐ Yes   ☑ No     Automatic ☐ Yes   ☑ No     Compensatory Balance in the Checking Account

**General Dispositions**

The terms and conditions stated previously and those contained in the Deposit Accounts Agreement (of which this Document is part) and the Schedule of Rates will constitute the complete agreement between the Bank and the Signatories. Banco Popular reserves the right to change or revise any of the terms and conditions contained in this Document, the Deposit Accounts Agreement, or the Schedule of Rates, with prior notification to the Signatories.

The Signatories accept having received the Deposit Accounts Agreement, the Schedule of Rates and copy of this Document, and confirm being in agreement with the terms and conditions stated in said documents.

**AUTHORIZED SIGNATURES** ———— Required Signatures Quantity

Signatory: make sure of signing in the corresponding space, use black ink and do not exceed the limits of the marks.

| Name _____ | Name _____ |
|---|---|
| Social Security _____ Birth Date MM/DD/YY | Social Security _____ Birth Date MM/DD/YY |
| Required Signature ☐ Yes ☐ No | Required Signature ☐ Yes ☐ No |
| Name _____ | Name _____ |
| Social Security _____ Birth Date MM/DD/YY | Social Security _____ Birth Date MM/DD/YY |
| Required Signature ☐ Yes ☐ No | Required Signature ☐ Yes ☐ No |

| Authorized Signature | Signature Code | Date (MM/DD/YY) |
|---|---|---|

Customer/Corporate Banking/CMS

BC-1 (5-02) (PDF)

# Commercial Deposit Accounts Agreement

Member FDIC

BANCO POPULAR DE PUERTO RICO

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | GENERAL PROVISIONS | 1 |
| II. | PROVISIONS THAT RULE THE ACCOUNT AND SERVICES | 11 |
| III. | METHODS OF ACCESSING THE ACCOUNT AND SECURITY MEASURES | 20 |
| IV. | SPECIAL PROVISIONS FOR THE FLEXICUENTA DE NEGOCIOS AND BSMART ACCOUNT | 24 |
| V. | SPECIAL PROVISIONS APPLICABLE TO THE ESCROW ACCOUNT FOR REALTORS AND REAL ESTATE COMPANIES | 29 |
| VI. | OTHER COMMERCIAL ACCOUNTS | 30 |
| VII. | FUNDS TRANSFERS | 30 |
| VIII. | DISCLOSURE RELATED TO THE AVAILABILITY OF FUNDS DEPOSITED IN TRANSACTION ACCOUNTS (REGULATION CC) | 34 |



**BANCO POPULAR**®

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

This Commercial Deposit Accounts Agreement (the "Agreement") s made between Banco Popular de Puerto Rico (the "Bank") and the account owner ("You") of the commercial deposit account (the "Account") as specified in the attached Account Opening Addendum.

**READ THIS AGREEMENT AND THE APPLICABLE ADDENDUMS CAREFULLY.** They contain the terms, conditions, and disclosures that apply to the Account and the Services (as defined herein), and govern your relationship with the Bank.

### I.   GENERAL PROVISIONS

A.   **Service Contracting**

The Bank may offer You various services from time to time that are bound to the Account (the "Services"). You must maintain your Account with the Bank in order to receive these Services. You may request each Service, by subscribing to the forms provided or accepted by the Bank (each will be a "Service Addendum"). All Service Addendums will be subject to the terms and conditions of this Agreement.

B.   **Interpretation of this Agreement**

1.   The general terms and conditions of this Agreement and the Exhibits, Addendums, and Schedules made a part hereof from time to time will be interpreted as a single document. However, in the event of conflict between the general terms and conditions of this Agreement and the terms of any Exhibit, Addendum, or Schedule hereto, the terms of the Schedules, Addendums, and Exhibits will prevail and control the interpretation of the Agreement with respect to the subject matter of the applicable Schedules, Addendums, and/or Exhibits.

2.   If any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future law, such provision will be fully severable, and this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision were never a part hereof, and the remaining provisions of this Agreement will remain in full force and effect.

3.   In the event of conflict between the Spanish and English versions of this Agreement, the Spanish version will prevail.

C.   **Information about You**

1.   The Bank may request your credit report in relation to the establishment of your Account at any time and afterwards as permitted by the applicable regulation.

2.   In order to comply with applicable laws and regulations, the Bank may require from time to time that You provide the Bank with documents and information concerning your business, including periodic financial information, whether You are a corporation, partnership, association, non-profit entity, or any other entity or individual doing business under a commercial name or trade name.

D.   **Business Days, Business Hours, and Effective Date of Transactions**

The Bank's business days are: Monday through Friday, except holidays ("Business Day"). Although the Bank may open for business certain Saturdays and holidays, these days are not considered Business Days. The Bank's business hours are posted at each branch, and may be subject to change. "Cut-off Time" refers to the time limit established by the Bank for receipt, processing, transmission, cancellation, and amendment of payment orders.

E.   **Applicable Law**

This Agreement will be governed by and interpreted in accordance to the laws of the Commonwealth of Puerto Rico and any pertinent federal laws and regulations.

F.   **Final Agreement**

This Agreement and its Service Addendums constitute the final agreement between the parties. Any written or verbal agreement made prior to this Agreement is hereby expressly cancelled and revoked. Any addendum, exhibit or attachment to this Agreement will be considered included herein and will become part of this Agreement. You acknowledge and agree that your contractual relationship with the Bank is subject to the provisions of this Agreement.

G.   **Amendments**

Unless otherwise indicated in this Agreement, the Bank reserves the right to amend the terms and conditions established in this Agreement and the Service Addendums. Such amendments will be effective as soon as they are notified to You, or as established in the written notification.

H.   **Transfer of Agreement**

You may not transfer or assign this Agreement or your participation in any of the Bank's Services to any other person or entity. You may not transfer or assign to any person or entity the authority to issue instructions to the Bank regarding any Services except when expressly authorized by the Bank. The Bank may transfer its rights to any of its affiliates, in which case You will be notified.

I.   **Termination**

1.   The provisions of this Agreement shall remain in full force and effect until any of the parties terminates this Agreement by written notice sent via regular mail or facsimile. The Bank reserves the right to cancel this Agreement or a Service Addendum at any time, without prior notice to any of the parties, if any of the following events or circumstances occur: a) You violate or fail to comply with any applicable laws or regulations or any of the terms, covenants, representations or warranties included in this Agreement or a Service Addendum; b) You do not fulfill payment or any other reimbursement agreed

upon; c) a court or competent government authority issues a writ of attachment, pledge order, or lien for any share of your Account, assets, or properties; d) your business closes, becomes insolvent, or bankrupt; and (e) You fail to comply with other agreements made with the Bank or any other document that evidences your debt to the Bank.

2. The Bank shall not be liable for fulfilling payment orders after said notice of termination is mailed. You will be responsible for all transactions in progress, obligations under this Agreement, and all fees for Services rendered until the date of termination of this Agreement. Any service charges owed by You on the date of termination, must be paid immediately. However, the Bank may exercise its right to setoff any such owed amounts against the Account.

3. The terms for each Service will be established in each corresponding Service Addendum. The Bank reserves the right to cancel any Service at any time. Any such cancellations will be notified by regular mail. Unless otherwise indicated in the notification, all other Services will continue in full force and effect.

4. Upon termination of this Agreement or any Service Addendum, You will delete or destroy any corresponding intellectual property of the Bank that may be stored in your computer memory or any other data bank in your possession. If the Bank terminated this Agreement because you incurred in a violation, it has the option to declare due and payable immediately any fees or service charges pending payment under this Agreement. The parties understand and agree that termination of this Agreement does not give You the right to any compensation from the Bank, under any pretext, including, but not limited to, loss of income, loss of good-faith, or any direct, indirect, consequential, punitive, or exemplary damages.

5. All warranties, representations, and covenants will remain valid and binding, after the termination of this Agreement.

### J. Announcements and Notifications

1. You must notify the Bank, in writing, of any changes in your mailing address (the address at which You receive Account Statements, reports, notices, and any other Bank mail). The effective date of any changes will depend on the date when the Bank receives your notification and, as such, any such changes may be effective during the current cycle or the next. The Bank shall not be liable for delays in the receipt of Account Statements, reports, or any other notice or mail, if You do not notify your change of address as established herein.

2. Unless indicated otherwise in the corresponding Service Addendum, or as required by applicable laws or regulations, the parties agree that all announcements, messages, and notifications will be made in writing and delivered via: (1) fax, followed by delivery of the original document; (2) personal delivery; or (3) certified mail with return

receipt. All announcements, messages, and notifications will be sent to the address specified in the Service Addendums or to the last address submitted in writing, and will be effective 10 Business Days after the date of delivery, or as established in the notification.

### K. Account Statement: Reports and Forms

1. The Bank will send You a periodic Account Statement, reporting all transactions made against the Account during the Account Statement period.

2. With the Account Statement, You will receive substitute checks or an electronic version of all cleared checks, and any other item processed during the Account cycle. The Bank reserves the right to retain and destroy original checks and documents, substitute checks, or other original effects.

3. The Bank shall retain a copy of both sides (front and back) of all items stored in microfilm or electronic media for the retention period required by law. You may request certified copies of checks, substitute checks, or other items at any branch of the Bank in Puerto Rico, or by calling TeleBanco Comercial. The Bank will send You the copies within a reasonable period of time after receipt of your request. You will be responsible for payment of any fees for reproduction and delivery of documents.

4. The Bank will produce and send You the reports listed in this Agreement and the applicable Service Addendums. The frequency and method of delivery will be set forth in the corresponding Service Addendum.

5. Unless otherwise required by applicable law or regulations, You are responsible for notifying the Bank immediately, in writing, if You have not received your Account Statement within fifteen (15) days of the closing date of the cycle.

6. You agree that You are responsible for verifying all information provided by the Bank in order to identify any unauthorized charges, including altered checks, checks issued with forged or unauthorized signatures, or any omission or discrepancy. To this effect, You will promptly revise and reconcile all reports, Account Statements and any attached documents, files, announcements, correspondence, or notification (in general, the "report") received from the Bank.

7. If You find any omissions or discrepancies between your records and the information provided by the Bank, or if You have any objections, You must notify the Bank, in writing, within ten (10) days of the date of the report, so that the Bank may investigate the claim and take any necessary action. Should You fail to notify the Bank within this period, the reports will be deemed correct and accepted by You, and the Bank will have no liability with respect to such omissions, discrepancies, or objections.

8. The Bank will process the investigation according to ordinary procedures for management of claims. The Bank reserves the right to request any documents or sworn statements needed for processing a claim under this section; and You agree to provide any such documents. The Bank will inform You of the results of the investigation within a reasonable period of time.

9. To facilitate the prompt processing of your transactions, You must use the forms provided by the Bank, including printed deposit slips. Although the Bank may, at its discretion, contact You to verify this information, it is agreed that the Bank will not be responsible for any errors due to incomplete or illegible information provided by You on such forms. It will be your responsibility to obtain checks from appropriate check-supplying companies that comply with the Bank's processing and quality requirements.

L. **Resolution of Claims made by Your Clients**

1. You will be responsible for handling and solving claims made by your own clients, providers, or creditors, even if they are consequence of a Service provided by the Bank. Any claims to the Bank must be submitted, in writing, to the Officer in charge of your Account. The Bank will inform You of the results of this investigation within a reasonable period of time.

2. Any complaints received directly by the Bank will be referred to You. You must notify the Bank the result of your investigation within five (5) days following the date the claim was referred to You.

3. Should the Bank need information from You to resolve a claim by a mutual client, regarding payment of a check issued against an account in the Bank, You will provide the requested information within ten (10) Business Days of the date the information was requested.

4. The Bank will not adjust Accounts with your clients, or accept service requests or deposits from them.

M. **Charges**

1. You shall pay the Bank the corresponding monthly service charges stipulated in the Account Opening Addendum to this Agreement and any other charges for Services requested by You, as stipulated in the corresponding Service Addendums (collectively referred to as "Service Charges").

2. You understand that Service Charges do not include any additional or special services that You may request, not established in this Agreement or a Service Addendum, such as check printing charges, or copies and delivery of documents and information.

3. You are also required to pay the Bank on demand, any rent charges, contributions, or any other taxes on Services provided by the Bank under this Agreement.  Taxes on municipal licenses or on the Bank's net taxable income are excluded.

4. You authorize the Bank to debit the Account every month for the corresponding Service Charges and fees for any other additional services You request. Any unpaid balance will accrue interest in accordance to the Bank's rates in effect at the moment. If necessary, the Bank may use any other lawful method to collect unpaid amounts owed to the Bank.

5. The Bank may change Service Charges from time to time. Any change and its effective date will be notified to You, in writing, by the Bank.

6. Any changes or requirements requested by You for this Agreement or a Service Addendum may result in changes to Service Charges. You must maintain sufficient funds in the Account to cover payment of charges imposed by the Bank under any clause in this Agreement and the Service Addendums. The Bank will not be responsible for any check or withdrawal order that is rejected due to insufficient funds in the Account as result of Service Charges debited to the Account.

N. **Arbitration**

1. You and the Bank agree that any controversy or claim between yourselves or against any agent, employee, successor, or designated agent, whether or not related or not to this Agreement and/or Service, and any claim or dispute related with this Agreement, Service, or to the relation or duties established in this Agreement, including the validity of this arbitration clause (the "Claim"), shall be resolved by mandatory arbitration, administered by the American Arbitration Association, in accordance to the Commercial Arbitration Rules in force, and must be held in the Commonwealth of Puerto Rico. The arbitration will be governed by the Federal Arbitration Act or FAA, Title 9 of the United States Code, Sections 1 through 16 (9 U.S.C. §§ 1-16) excluding any local rights provision that is inconsistent with or will produce a different result. Only one neutral arbitrator will determine the Claim and make a final decision, according to applicable law. Strict confidentiality will rule arbitration procedures, including the information submitted by the arbitrator and the decision or indemnification granted by the arbitrator. Any court with jurisdiction may dictate sentence once the arbitrator makes a decision. The aforementioned terms will not limit the obligation of a party to defend, indemnify, or release the other party of any judicial procedure or other claims, losses, damages, or expenses.

2. The procedures specified in this article will be unique and exclusive for the resolution of disputes between You and the Bank that arise or are related to this Agreement; disposing, however, that a party can request temporary injunctive relief in a court of competent jurisdiction in order to maintain status quo, or for the protection of goods or property until the arbitration process is initiated and the selected arbitrators have had the opportunity to resolve the request for temporary relief.

3. Each party is responsible of fulfilling their obligations under this Agreement while final resolution of a Claim is pending, unless doing so is impossible or impractical under the circumstances.

O. **Compliance**

You agree to use the Account and its Services only for lawful purposes and in accordance with applicable laws and regulations, including anti-money laundering laws. You acknowledge and agree that in order to comply with the Bank's internal policies and/or applicable law [including the executive orders and regulations of the U. S. Department of Treasury's Office of Foreign Assets Control (OFAC)], the Bank may be required to block funds, freeze funds, and/or forfeit funds to appropriate authorities.

P. **Representations and Warranties**

1. The Bank does not represent or warrant, explicitly or implicitly, that the Services will be suitable for You for a particular interest or use. You agree that the Bank provided You with adequate information regarding each Service and that You have decided, freely and voluntarily, to subscribe to this Agreement.

2. You represent and warrant the Bank that You do not intend to use, and will not use, any of the Services for the purpose of providing, directly or indirectly, any service, including, but not limited to, financial accounting services, data processing, management, or other related services, to any other individual or entity.

Q. **Computer Software**

1. The Bank uses software created by third parties, bearing no relation to the Bank, which are commercially available to provide Internet Banking Services to commercial accounts.

2. By agreeing to use said software, You are accepting the non-exclusive, non-transferable licenses of the aforementioned third parties. No employee of the Bank is authorized or has the power to make any amendments, changes, or deletions to any of the terms or conditions of said licenses.

3. You agree to use the software as is. The Bank makes no representations or warrants with respect to the software, including, but not limited to, any implicit guarantee that it will be suitable for a specific purpose, interest, or use.

4. If the software is defective, or damaged, the Bank will provide repair, correction, or replacement services, provided that You have used it properly.

R. **Limitation of Liability and Indemnity**

1. The Bank shall exercise due care and diligence when rendering the Services. However, the Bank shall not be responsible for compensating You for any damage, expense, cost, or loss of any kind that may occur as a direct or indirect result of rendering the Services, except when the Bank's intentional acts or gross negligence cause

You direct financial damage. In such case, the Bank's responsibility shall be limited to the amount of the transactions in controversy and to the extent that the resulting damages could have been avoided or mitigated if You reasonably verified the information provided by the Bank, pursuant to the provisions of this Agreement. Under no circumstances shall the Bank be responsible to You for indirect, emotional, special, or punitive damages, even though the Bank may have been advised of the possibility of such damages.

2. You assume responsibility, and commit to indemnify and hold the Bank harmless of any claims, suits, costs, fees, loss, or expenses of whatever nature to which the Bank may be subject, whether directly or indirectly, on account of: (a) your failure to comply with its guarantees or any provision of this Agreement; (b) mistakes, or negligent, or intentional acts carried out by You, your employees, agents, representatives, or contractors arising from the use of the Service provided by the Bank, and (c) the Bank's compliance with any instructions given by You and related to the Services.

3. The Bank shall not be responsible, nor shall it be under any obligation, to third parties (including, but not limited to, any of your partners, stockholders, directors, officers, agents, employees, clients, or providers) for rendering the Services to You in compliance with the terms and conditions of this Agreement. Under no circumstances shall the Bank be responsible to You or third parties for damages arising from, or allegedly caused by, any act or omission by the Bank under this Agreement. You agree to indemnify and hold the Bank harmless from any claim or threat against the Bank that may seek to impose liability against the Bank in these cases.

4. The Bank shall not be responsible for non-compliance with any provision of this Agreement if said noncompliance is caused, in whole or in part, by circumstances beyond the control and responsibility of the Bank, including, but not limited to: communication failures, telephone or electric power services interruptions, mechanical defects in the equipment used in rendering the Services, explosions, accidents, fires, floods, war, criminal, or terrorist acts of government agencies, third persons, or any other acts of God or force majeure. In any of these events, the Bank's responsibility shall be limited to restoring Services as soon as possible and to provide reasonable means of communication to guide and instruct You the procedures to be followed while Services remain interrupted due to the emergency, all this if possible under the circumstances.

5. In addition to the limitations on responsibility provided in the terms and conditions of this Agreement, and except as provided by law, the Bank shall not be bound nor responsible for (a) any interruption in the Services that may result from government restrictions, market, or exchange regulations, (b) any act, failure to act, insolvency, or notification of insolvency to the Bank from the National Automated Clearing House Association (NACHA) and any of its members, or from

any other financial or third party institution; or (c) any error, omission, lack of accurate information in any notice or communication that the Bank receives from another financial institution, automated clearing house operator, or the Federal Reserve Bank.

6.  The Bank shall not be responsible or liable if your instructions for transfer of funds (a) mistakenly direct payment to a person other than the one intended by You; (b) mistakenly allocate payment for an amount larger than You intended; (c) mistakenly duplicate transmission of instructions previously given by You.  In such cases, You are responsible for payment of the amount requested in the fund-transfer instructions.

7.  The Bank will not be liable for your mistakes regarding the amount, certitude, timing, or proper authorization of any instructions received from You, or from any other person, including, but not limited to, any Federal Reserve Bank, transmission or communication facility, any deposit-receiving individual or financial institution, including the return of a request to such deposit-receiving individual or financial institution; and such person will not be considered an agent of the Bank.

8.  DISCLAIMER OF WARRANTIES. THE SERVICES, AND ANY EQUIPMENT PROVIDED UNDER THIS AGREEMENT, ARE PROVIDED ON AN "AS IS", "AS AVAILABLE" BASIS. THE PARTIES ACKNOWLEDGE THAT SERVICES (INCLUDING EQUIPMENT) MAY DEPEND TO SOME EXTENT ON THE COMPANY'S OWN COMPUTER SYSTEMS. EVERTEC DOES NOT GIVE ANY WARRANTIES, OF ANY KIND, EITHER EXPLICIT OR IMPLICIT, INCLUDING BUT NOT LIMITED TO WARRANTIES OF TITLE, QUIET ENJOYMENT, QUIET POSSESSION, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. FURTHERMORE, EVERTEC DOES NOT GIVE ANY WARRANTIES OF ANY KIND WITH RESPECT TO LOSS OR CORRUPTION OF DATA, LOSS OR DAMAGE TO EQUIPMENT AND/OR SOFTWARE, SYSTEM RESPONSE TIMES, TELECOMMUNICATION LINES, OR OTHER COMMUNICATION DEVICES, QUALITY, AVAILABILITY, RELIABILITY, SECURITY ACCESS DELAYS OR ACCESS INTERRUPTIONS, COMPUTER VIRUSES, BUGS, OR ERRORS. EVERTEC DOES NOT GIVE ANY WARRANTY THAT SERVICES WILL NOT BE INTERRUPTED OR ERROR FREE; OR AS TO THE RESULTS THAT MAY BE OBTAINED FROM USE OF THE SERVICES. THE BANK ASSUMES NO RESPONSIBILITY OR LIABILITY IF TELECOMMUNICATION CARRIERS ARE NOT AVAILABLE AT ANY GIVEN TIME. THE BANK, ITS AFFILIATES, AND THEIR RESPECTIVE REPRESENTATIVES ARE NOT LIABLE, AND EXPRESSLY DISCLAIM ANY LIABILITY FOR THE CONTENT OF ANY DATA TRANSFERRED EITHER TO OR FROM YOU, OR STORED BY YOU VIA THE SERVICES PROVIDED BY THE BANK. NO ORAL ADVICE OR WRITTEN INFORMATION GIVEN BY EVERTEC REPRESENTATIVES WILL CREATE A WARRANTY; NOR MAY YOU RELY ON ANY SUCH INFORMATION OR ADVICE.

The terms established in this paragraph will survive any termination of this Agreement.

9.  The rights of the Bank under this Agreement shall be cumulative and not mutually exclusive, and the Bank's option to exercise a right or request a remedy shall in no way affect or limit the exercising of the other rights or remedies that the Bank may have by law or Agreement.

S.  **Auditing**

The parties agree that the Bank may audit your operations to verify your compliance with the provisions of this Agreement, aided by internal or external auditors, subject to prior notification and coordination, as necessary.

T.  **Intellectual Property**

1.  The Bank warrants that it is the sole owner of the Services and has been authorized by Popular, Inc., to use the trade marks "TeleBanco Comercial, TeleNómina Popular (all brands together known as "Bank trade marks"), of processes, manuals, and software ("Software"), names, logotypes, identification, and all intellectual property related to said Services (all together known as the "Bank's Intellectual Property"). The Web Cash Manager System or WMC ("WCM Brand") is a trade mark of Politzer & Haney. The Bank warrants that it has a valid license authorizing its use of the WCM Brand, and in turn authorize access to the customer section of the Web Cash Manager.

2.  You agree that You do not have a license or any rights to Services or the Bank's Intellectual Property or WCM Brand, except as provided in this Agreement. The Bank and Politzer & Haney forbid You to use the WCM Brand except as established in this Agreement. You warrant that You will not authorize, directly or indirectly, or attempt to authorize, or in any way transfer or grant to any person the right to use the Bank's Intellectual Property or the WCM Brand.

3.  You may not use the Bank's trade marks or the WCM Brand in any advertisement, promotional materials, or any presentation or financial report that You provide or send to third parties.

4.  You agree that all documents and software listed in the Service Addendums and other related items are property of the Bank, and You may not copy, use, or allow other persons or legal entities to use them without prior, written authorization from the Bank; and that the Bank may claim them at any time.

5.  If this Agreement or any Service is terminated, You agree to delete or destroy any Intellectual Property of the Bank contained or printed in promotional material or stored in your computer memory or data bank in your possession, and return any software to the Bank.

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

## II.   PROVISIONS THAT RULE THE USE OF THE ACCOUNT AND SERVICES

In order to qualify for Services and process transactions, debits, or credits initiated or authorized by You, your Account must remain active during the life of this Agreement.

### A.   Authorized Signatories and Authorized Persons

1.   At the time You open the Account, You shall appoint the persons authorized to sign payment orders against it ("Authorized Signatories") in the Corporate Resolution or DBA Resolution, as applicable (the "Resolution"). The Bank may pay any item bearing an Authorized Signature.

2.   You may authorize in the Resolution the use of a signature produced by a machine or artifact (Facsimile Signature) for an Authorized Signatory of the Account.

3.   You shall provide the Bank with a sample of the Signature Facsimile. You are responsible for maintaining the facsimile signature machine under strict control, and verify the Account Statements and cleared checks or their electronic versions, as established in this Agreement, to identify any unauthorized use of the Signature Facsimile. You agree that the Bank may pay items bearing the authorized Signature Facsimile, even if made by a person not authorized to use it or by a counterfeit machine for the reproduction of signature facsimiles.

4.   You agree to release and indemnify the Bank from any liabilities resulting from the use of Signature Facsimiles, including lawyer's fees and any litigation costs.

5.   You agree to register the Authorized Signatures whenever they have deviated notably from the signatures in the Resolution. You agree to release the Bank from any liabilities for not fulfilling payment orders or issues with signatures different from the ones registered.

6.   You understand that the process of creating electronic images of checks or other original items with the intent of exchanging information may result in loss of any security features the checks may have.  The Bank will not be held responsible for any loss resulting from payment of a substitute check that the Bank would not have paid, had it received the original item with its corresponding security features.

7.   You must appoint one or more persons ("Authorized Person"), whom You must include in the corresponding Service Addendum for each service so that the person may: (1) conduct transactions on your behalf (2) receive Bank information related to Service operations, including, but not limited to, the access code provided by the Bank; (3) issue written instructions or notify the Bank of any action or request from You; and (4) issue any document related to this Agreement so that the Authorized Person may deem necessary or convenient.

8.   In the event of death of an Authorized Person or Signatory in the Account, You shall notify the Bank immediately and make the necessary arrangements for a new Resolution and the corresponding changes to the Service Addendum, if applicable.

### B.   Deposits

1.   The Bank reserves the right to make electronic versions of checks and other original items received as deposit and to process them electronically. You understand that this process involves destruction of the original checks or items and, on occasion, creation of a substitute check. For purposes of this Agreement, the term "substitute check" refers to a paper reproduction of an electronic image of the original check that complies with the requirements set forth in a federal act known as the Check Clearing for the 21st Century Act ("Check 21"). See Disclosure Related to the Availability of Funds Deposited in Individual Account of this Agreement. These checks have the same legal properties as the original checks issued by You.

2.   You may make deposits in person, by mail, or by any other method provided by the Bank, such as automated teller machines and deposit boxes. The Bank will not assume responsibility for your deposits until receipt of such deposit is acknowledged. You may not deposit cash in branch deposit boxes or automated teller machines. If You do, it will be at your own risk. The Bank's determination with respect to the amount of cash deposited shall be final.

3.   The Bank recommends using personalized deposit slips to expedite credit of deposits into the Account. In You fill deposit slips by hand with the name and account number to be credited, the Bank shall rely on the account number on the slip and will be under no obligation to verify that the account number belongs to the name on the slip.

4.   The Bank will credit deposits that comply with the terms and conditions of this Agreement. The Bank may refuse to credit a deposit if the information is incomplete, illegible, inconsistent with the information given when You opened your Account, or if the deposit fails to abide by any of the provisions of applicable law.

5.   When a deposit is made to the Account, the Teller will only verify cash. Checks and other items deposited will be verified no later than the following Business Day after the deposit was received. Any discrepancy or omission will be notified to You by mail. The Bank's determination to this effect shall be deemed correct. The Bank may at any time refuse to accept on deposit any check or instrument with a prior endorsement to that by the account holder or its authorized representative, including bank checks or managerial checks. If the Bank determines that the cash deposited was counterfeited currency or that the checks or other items deposited were improperly or fraudulently issued or negotiated or, if the Bank receives a claim to those effects, the Bank may debit any of your Accounts for the corresponding amount. The Bank will notify You of the adjustment to your Account by mail.

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

6.  The Bank may ignore information or legends on checks and other deposited items, other than the signature, the issuing and paying bank information, amount, endorsements, and other encoded information, according to standard banking practice.

7.  Upon receipt of checks and other items for deposit or collection, the Bank acts as a collection agent on your behalf, registering items subject to final settlement by the paying bank. In this case, the Bank's responsibility is limited to exercising ordinary care. Upon final settlement the item is considered collected. If final payment is not received, or if any item deposited in cash must be reversed for any reason, the Bank is expressly authorized to debit, at any moment and without prior notification, any of your accounts for the amount of the item, the penalty fee imposed by the Bank on returned items, interest paid on the deposited items, and any other related charges.

8.  The Bank reserves the right to accept or limit any deposit, and to require the withdrawal of a deposit when it deems it convenient. When the Bank requires withdrawal of a deposit or any part of it, such deposit will not accrue interest from the date of the request.

9.  The Bank may require that You to provide certain warranties and indemnities as a condition to accepting as deposit a substitute check from a non-banking entity.

10.  You warrant and agree to the following for every remotely created check that we receive from You for deposit or collection: (1) You have received express and verifiable authorization to create the check in the amount and to the payee that appears on the check; (2) You will maintain proof of the authorization for at least two years from the date of the authorization, and supply us the proof if we ask; and (3) if a check is returned, You owe us the amount of the check, regardless of when the check is returned. We may take funds from your account to pay the amount You owe us, and if there are insufficient funds in your account, You will owe us the remaining balance.

    A remotely created check is a check that is not created by the paying bank and that does not bear a signature applied, or purported to be applied, by the person on whose account the check is drawn.

C.  **Payment Orders**

1.  The Bank may refuse to pay any check, substitute check, or item against the Account (payment order) if:

    a.  the item (i) is incorrectly or incompletely issued or endorsed; (ii) is issued in a form that has not been approved by the Bank; (iii) is not authorized for deposit into the Account; (iv) is not authorized for payment; (v) exceeds the frequency or the amount of withdrawals allowed for the type of Account; (vi) is drawn for a smaller amount than the minimum permitted for that type of Account;

    b.  if the Account is subject to a dispute; or

    c.  if the Account is subject to an attachment or lien, has been pledged to secure an obligation, availability of funds cannot be verified, or the Account is subject to set-off against an amount due to the Bank.

2.  The Bank is under no obligation to pay an item drawn against insufficient funds or if You are not in compliance with any provision of this Agreement. If funds are available to cover part, but not all of the items drawn against the Account, the Bank may, at its sole option, determine which items to honor.

3.  If the Bank mistakenly returns a payment order, the Bank shall be liable to You only for immediate damages caused by the error, and which You are able to prove irrefutably. Damage to your reputation, business, or other activities shall not be considered.

4.  The Bank is under no obligation to pay a check submitted for payment more than six (6) months after it is issued. It may, however, charge your Account for the amount of said check without incurring in any liability.

5.  In compliance with the Bank's legal reserve requirements, the Bank reserves the right to require a written notice from You seven (7) days in advance if You wish to withdraw funds deposited in the investment or savings section of an account combined with checking.

D.  **Overdrafts**

1.  The Bank will determine if an Account has available funds to pay a given item at any time from the time of receipt of said item to the cutoff time established by the Bank for return of the item. This determination is made only once. If upon such determination, it appears that there are insufficient funds in the Account, the Bank is under no obligation to pay said item and may return it. The Bank is not required to send notice prior to returning items for insufficient funds.

2.  The Bank may, at its option, pay any payment order or item against the Account even if it creates an overdraft; provided however, that the payment of one or several overdrafts shall not bind the Bank to pay subsequent overdrafts.

3.  You agree to deposit sufficient funds to cover any overdraft, plus interest for the overdraft amount (at the maximum rate permitted by law, or regulation, or as established in the prevailing Addendum to this Agreement) from the date of the overdraft until the date on which complete payment is made. You also agree to reimburse the Bank for any expense incurred in collection of the overdraft including, but not limited to, legal fees and litigation expenses as authorized by law.

4. The Bank may pay items drawn against the Account, even though payment of particular items may cause insufficiency of funds to pay other items that may otherwise have been paid.

5. An insufficient balance in the Account that is not covered by a Credit Line is subject to charge as set forth in the prevailing disclosure of applicable charges. Items drawn against unavailable funds may also be subject to charge.

6. The Bank may set-off overdrafts from a joint and several (and/or) or joint (and) Account against funds deposited in any of your accounts.

### E. Availability of Funds

1. You agree that the availability of funds deposited in the Account will be governed by this Agreement, fund transfers, exchange, and banking collection rules in force, and by applicable Federal or Puerto Rico regulations.

2. You authorize the Bank to adjust, debit, or credit the Account, according to the type of transfer, for the amount of any transaction returned for whatever reason, on the same Business Day in which the Bank receives the order.

3. You authorize the Bank to debit any of your accounts with the Bank for the amount of any fund transfer the Bank may have credited to the Account and for which final payment has not been received, or which for any reason has been returned to the Bank unpaid.

4. The Bank will not be responsible for re-deposit of items, or collection efforts unless You specifically request Re-deposit and Re-collection Services for your Account. Under no circumstances, will the Bank be responsible for payment of returned checks.

5. The Bank may, at its discretion, re-attempt transferring funds into the Account, but is under no obligation to do so. If the new attempt is successful, the Bank will credit the funds to the Account without interest.

6. Whenever the Bank debits the Account for returned checks, items, or drafts, the Bank's responsibility will be limited to delivering a Notice of Return with the following information: (a) amount of payment; (b) date processed; (c) Account against which the debit was made; (d) name of the client; (e) reason for return; (f) account number of the client with You. The Bank guarantees correction and validity of the information in the Notice of Return. Nevertheless, the Bank does not represent or guarantee that the Notice of Return is admissible as evidence of the debt in an administrative or legal procedure initiated by You for the recovery of amounts owed by your customers. The Bank will send You the check, item, or returned draft.

---

7. For purposes of this Agreement, the Bank will handle checks with insufficient information on payment orders, as follows:

   (a) Undated checks will be considered as having the same date postmarked on the envelope, and will be deposited as such.

   (b) If the numeric figure for the amount on the check differs from the amount in writing, the numeric figure will prevail, provided it is legible.

   (c) If the numeric figure is not legible, the amount written will prevail.

   (d) If both, the numeric figure and the amount in writing are illegible, the check will be returned to You.

### F. Stop Payments

1. The Bank will accept Stop Payment Orders on checks and preauthorized debits form any of the Authorized Signatories in the Account. Stop Payment Orders must be requested on the printed forms provided by the Bank for this purpose, or by phone, via TeleBanco Comercial. A stop payment order may be subject to applicable charges.

2. If You place the Stop Payment Order by telephone, the Bank will send You a confirmation in writing on the following Business Day.

3. Stop Payment Orders will be effective on the following Business Day of their receipt, thereby allowing the Bank a reasonable period of time to process the order. A Stop Payment Order for a post-dated check will be effective from the next Business Day the stop payment is ordered until the day before the date on the check. If the Stop Payment Order is placed on a non-Business Day, it will be considered to have been requested on the next Business Day, in which case, it will become effective on the second Business Day.

4. A Stop Payment Order will be invalid and inoperative if the item is paid prior to the effective date of the request. The Bank's acceptance of a Stop Payment Order does not ensure that the item has not been paid.

5. The Bank will not be liable for Stop Payment Orders placed after the checks have been paid, or for errors or omissions in the information provided by You that prevent the Bank from carrying out the request.

6. Upon placing a Stop Payment Order, You warrant that You have not received any benefits, credit, goods, or services of any kind in exchange for the check or pre-authorized debit for which You seek a Stop Payment.

7. You agree to provide the Bank with proof of any loss You claim and a sworn statement as confirmation of the warrant required in the preceding item paragraph) if You ever submit a claim to the Bank for payment of a check or preauthorized debit while a Stop Payment Order was in effect.

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

8.  Stop Payment Orders will be valid for six (6) months (180 days), from the date of request, unless You cancel the order prior to the expiration date, or request a renewal for an additional six (6) month (180 days) period.

9.  You agree to indemnify the Bank for any loss, damage, expense, or cost incurred by the Bank as a consequence of any claim from the endorser, or any other person, for having honored the request for a Stop Payment Order.

10. For Stop Payment Orders on preauthorized debits, such as insurance policies and other payments, You shall request the cancellation of the debit first to the issuer and submit to the Bank a copy of the letter requesting cancellation. Only then will the Bank be able to proceed with a stop payment order.

**G.   Loss of Blank Checks**

You agree to notify the Bank immediately, in writing, of the loss or theft of any blank checks. You will have the option of closing the Account, in which case a new account will be opened with the corresponding balance, or request Stop Payment Orders for the checks, subject to the applicable provisions for Stop Payment Orders in this Agreement.

**H.   Post-Dated Checks**

You assume full responsibility for any post-dated checks issued by You. The Bank may charge the Account for any postdated check presented for collection before the date of the check, unless You have previously notified the Bank that You issued a postdated check and provided accurate description of it. In this case, the check will be deemed to have a Stop Payment Order until the date specified. The Bank will thus abide by the same terms and conditions for Stop Payment Orders, except the enforcement period. The Bank is not responsible for claims of loss or damages, to You or third parties, for payment of a postdated check.

**I.   Pledged Funds**

You may pledge any funds deposited in the Account, to the Bank as collateral security for any obligation granted to You by the Bank, if such guarantee were required and accepted by the Bank.

**J.   Transfer to Third Parties**

Funds deposited in the Account shall not be pledged, assigned or transferred to third parties or institutions as a guarantee for loans or other obligations, except when authorized in writing by the Bank.

**K.   Confidentiality**

The Bank respects your right to confidentiality regarding your Account and will only disclose your information when required by law.

**L.   Legal Processes against the Account/ Writs of Attachment**

1.  You understand that the Bank will comply with any writ of attachment issued by a court or government authority (including but not limited to the Puerto Rico Department of the Treasury and the Internal Revenue Service), and will freeze and/or deliver any funds available in the Account at the time the order or writ is presented to the Bank, in accordance with terms thereof.

2.  The Bank shall be under no obligation to contest, challenge, or question the terms of an order, notice of levy, or writ of attachment, nor shall it be under obligation to defend You or to raise any defense that You may have against the person or entity promoting the order or writ. The Bank shall strictly comply with the terms of any such order or writ, until it has been served with an order or a resolution issued by the same court or authority indicating that it be released. Presenting evidence of payment of the debt or release of the obligation that prompted the order or notice of levy, will not suffice for the Bank to release the funds.

3.  If the order or writ of attachment were issued against any one of the Authorized Signatories in a joint and several account (and/or), the Bank will proceed to freeze and/or deliver the funds as per the order or writ without the need to determine ownership of the funds or legality of the order or writ.

4.  If the Account is subject to any legal proceeding, the Bank may refuse to pay any item drawn against it until resolution of such proceeding. The Bank shall not be liable to You for amounts paid pursuant to an order attachment, or notice of levy, even if such payment precludes payment of other items from the Account.

5.  If the Bank incurs in any expense including but no limited to legal fees and other disbursements related to any legal action, that are not reimbursed, the Bank may charge the Account without prior notice to You.

6.  The Bank may, at its discretion, refuse payment orders against the Account for a reasonable period after receiving notification of an existing or potential claim against the Account.

7.  Any attachment, pledge, or lien against the Account is subordinate to the Bank's right of setoff and security interest.

**M.   Setoff**

The Bank is expressly authorized to debit your Account for any amount owed by You to the Bank, in any capacity, without prior notice, subject to the provisions of applicable law.

**N.   Inactive Accounts and Unclaimed Funds**

If You do not make transactions in your Account for one (1) year, the Bank could charge a fee for inactivity until such time it is reactivated or the Account is closed. All Accounts in which no transactions are made for a

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

consecutive period of five (5) years or more will be closed and the funds will be transferred to the Office of the Commissioner of Financial Institutions, or such other entity that has a right to receive such monies. The Bank will not be responsible for such transferred funds.

O. **Joint and Several Account (and/or)**

1. If your Account is a Joint and Several Account (and/or) every Authorized Signatory has the right to make deposits and withdrawals, order stop payments, and make special arrangements regarding the Account, including closing of the Account. Every Authorized Signatory guarantees the signature of other Authorized Signatories and authorizes them to endorse payment orders for deposit, if the payment order is payable to the order of any of the Authorized Signatories.

2. The Bank considers that all Authorized Signatories are deemed to be joint and several owners of the funds deposited in the Account, and to be joint and several creditors of the Bank with respect to all such funds. The Bank may release the total amount of deposited funds to any of the Authorized Signatories.

3. Each Authorized Signatory authorizes the Bank to setoff any obligation of any of the Authorized Signatories against any and all funds in the Account, even if only one Authorized Signatory is obligated there under. This right shall exist regardless of which Authorized Signatory makes deposits into the Account.

4. You agree that any court order prohibiting withdrawal of funds from the Account, issued against any one or all of the Authorized Signatories, shall be subordinate to the Bank's right to setoff and/or as secured creditor.

5. You agree that a notification sent by the Bank to one of the Authorized Signatories shall be deemed to have been sent to all the Authorized Signatories of the Account.

6. Each Authorized Signatory may have access through automatic teller machines to the Account if an ATH (ATM) card is requested.

P. **Joint Accounts (and)**

1. If You have a Joint Account (and), by definition, You authorize two or more people to sign in the Account (Authorized Signatories) and require two or more Authorized Signatures to conduct any transactions.

2. The Bank will require the presence or signature of all Authorized Signatories, as established in the Account opening document and the Signature Document or Special Resolution (when applicable) to make any transaction, or issue instructions to the Bank regarding the handling of the Account, except for requesting Stop Payment Orders, which may be submitted by any of the Authorized Signatories.

3. The funds deposited in the Account are property of all Authorized Signatories, who in turn become joint creditors of the Bank. The Bank will be liable to them jointly.

4. In the event of an overdraft of the Account, it is understood that the Authorized Signatories are jointly responsible to the Bank for the total amount of the overdraft.

5. Authorized Signatories will not have access to automatic teller machines.

Q. **Calls to TeleBanco Comercial**

You understand that the Bank may occasionally monitor and/or record telephone calls to TeleBanco Comercial and supervise its employees to ensure the quality of service. Every caller to TeleBanco Comercial is warned at the beginning of the conversation, and is free to terminate the call. You fully understand the rationale behind this practice and expressly consent hereby to having your calls to TeleBanco Comercial monitored or recorded for such purposes.

III. **METHODS TO ACCESS THE ACCOUNT AND SECURITY MEASURES**

A. **ATH Card (ATM)**

1. It is an essential condition for issuance and use of the ATH card to maintain an active Account with the Bank. Only Joint and Several Accounts (and/or) are eligible to receive ATH cards.

2. You may perform withdrawals from and deposits into the Account, transfer funds between different sections of the Account at Automated Teller Machines (ATMs), and purchases in Points of Sale (POS) by using the Card and the Personal Identification Number (PIN) You select. Such transactions shall be governed by the terms and conditions of this Agreement. Cash withdrawals from the FlexiCuenta de Negocios account may not exceed $500 per day for a Regular ATH card or the ATH International Visa card, and $1,000 per day if it is an ATH International Visa Gold or Platinum card.

3. The ATH card may be used to access the Bank's ATMs and other electronic teller machines affiliated to the ATH Network, inside and outside Puerto Rico, and any local or international networks to which the Bank may become affiliated. Using your ATH card may be subject to fees charged by the Bank or by other ATM operators.

4. Deposits made at the Bank's ATMs will not be available for withdrawal or transfer until verified by the Bank.

5. The Bank reserves the right to authorize cash withdrawals from an ATM or POS purchases, when the ATM or POS are not in direct communication with the Bank's central computer.

6. The Bank will process transactions made at ATMS on the next Business Day after the Cut-off time indicated on each ATM.

7.  Subject to applicable laws, You will be liable to the Bank for any debit to the Account corresponding to withdrawn funds or purchased merchandise using the Card and the PIN and for overdrafts resulting from a transaction, or for withdrawn amounts in excess of the available fund balance in the Account due to such debits.

8.  The Bank may issue additional ATH cards to all Authorized Signatories and recognize the cards and corresponding PINs selected by each Authorized Signatory. Any debit to the Account corresponding to withdrawn funds or purchased merchandise by any of the Authorized Signatories through the use of the ATH card and the PIN will be deemed valid. Each Authorized Signatory will be responsible for such withdrawal(s), and release the Bank from any responsibility arising from losses that each may suffer as a result of the use of the ATH Cards and PINs.

9.  You are responsible for maintaining your PIN confidential in order to prevent unauthorized transactions. For this reason, You agree not to write the Personal Identification Number on the card.

10.  You acknowledge that the card is property of the Bank at all times, and You agree to return it immediately upon request. The Bank may cancel the ATH card at any time, without prior notice. The ATH card is non-transferable.

11.  The Bank is not responsible for the acceptance or rejection of the ATH card at commercial establishments or any other establishments.

12.  If at any time, your FlexiCuenta de Negocios, has no available funds in the Account, funds will be automatically withdrawn from the FlexiLínea, subject to the terms and conditions of this Agreement.

B.  **ATH International Visa Cards**

1.  The ATH International Gold and Platinum Visa cards (ATH International Card) can be used as a regular ATH card, subject to the terms and conditions established in Section A above, as a debit card to make purchases in all establishments or POS purchases where Visa is accepted as a means of payment, and to obtain cash advances at banks, and other financial institutions, where Visa is accepted.

2.  Cash withdrawals from your FlexiCuenta de Negocio or BSmart account can NOT exceed $1,000.

3.  The ATH International Card IS NOT A CREDIT CARD. All transactions made with the ATH International Card will be debited from your Account.

4.  When You use the ATH International Card where the Visa card is accepted, the following conditions will apply:

a.  You do not need to use the PIN. However, all payment orders corresponding to transactions made with ATH International Card must be signed by the person to whom the card was issued. The signature must be the same as the signature in the back of the card. Cards should be signed immediately upon receipt.

b.  The amounts corresponding to purchase and cash advances will be debited from your Account upon receipt of the payment order by the Bank from the merchant or institution where the transaction was made.

c.  It is expressly agreed that You will not make transactions for amounts exceeding the balance available in the Account. In the event that a business or financial institution, to whom an ATH International Card is presented, obtains authorization from the Bank to accept one or more payment orders, provisional holds can be placed on your Account for payment of said orders. You expressly release the Bank of any liability or responsibility for holds or debits to the Account that are made in relation to one or more payments orders authorized by the Bank, but thereafter not issued by You.

d.  Payment orders resulting from transactions made with the ATH International Card shall not be subject to Stop Payment Orders. It is expressly agreed that You waive this right.

e.  In case of FlexiCuenta de Negocios, when receiving a payment order corresponding to a purchase or cash advance at a moment when there are no funds available in the Account, the Bank is under no obligation to increase the available credit limit in the FlexiLínea to cover the overdraft. The Bank has the option of refusing payment order from the merchant or financial institution, and You alone will be liable for payment of the corresponding purchase or cash advance. In this case, the Bank will collect the applicable charge for insufficient funds.

C.  **Your Responsibility for Using Your ATH Card and Your ATH International Card**

1.  You will be responsible for all debit transactions at automatic teller machines and for purchases using your ATH Card and/or your ATH International Card. You must protect your card and your PIN number.

2.  You may loose the fund deposited in your Account as well as your available credit in your FlexiLínea as a result of unauthorized access to your Account. The fastest way to notify us, thus mitigating the risk of loss, is by calling us. If you believe your card or your PIN number has been lost or stolen, call us immediately at 787-724-3650 (mobiles and Metropolitan Area) or toll free 1-888-724-3650 (outside Metropolitan Area), 24 hours per day, 7 days a week. The telephone numbers available for the hearing impaired are (TDD):787-753-9577 (Metropolitan Area) or toll free 1-800-981-9666 (outside Metropolitan Area). You may also send a letter to the following address: BANCO POPULAR DE PUERTO RICO ASSETS PROTECTION DEPARTMENT P. O. BOX 362708, SAN JUAN, PUERTO RICO 00936-2708. You may also contact us in writing or by telephone to the above address and telephone numbers if you have any questions or if you believe there is an error in your account statement or in an ATM or POS receipt. When you contact us you will need to stat

a. Your name and account number

b. The date of the transaction and the reference number

c. Your claim or question

d. The amount in dollars of the alleged error.

3. The Bank will NOT be responsible under the following circumstances:

a. If for any reason not attributable to the Bank, You do not have sufficient funds or available credit in your Account to make the transfer or withdrawal;

b. If the ATH machine where the transaction is made does not have enough cash;

c. If the transfer amount exceeds the available funds in Your checking, savings, reserve account;

d. If the ATH machine is not working properly and You knew it was not working properly when You started the transfer;

e. If You have not notified us the loss, theft, or possible unauthorized use of the card;

f. If circumstances beyond the Bank's control, such as fire or flood, prevent the transfer, despite reasonable precautions taken by the Bank;

g. If the funds in the account are subject to any legal process, restriction or attachment that impedes the transfer of the funds.

D. **Security Measures**

1. In order to access any Service with access control, the Authorized Person should provide the access codes or identification methods that the specific Service requires before the Bank can accept and process your instructions. You will notify the Bank immediately in writing, using the form required by the Bank, of any changes regarding Authorized Persons or their corresponding authorization limit. Until such notice is received, the Bank can accept, without further investigation, all declarations, instructions, or representations the Authorized Person makes or issues.

2. The Bank is not responsible, explicitly or implicitly, for questioning or verifying with You if persons using or accessing any Service are, in effect, Authorized, or if they are acting according to your internal procedures and policies. The Bank's responsibility will be limited to guaranteeing that any use or access attempt will be made using the access codes or other identification method required by the Service, according to the normal operational sequence of the Service.

3. You agree to pay any funds transfer, as well as any loss or damage, direct or indirect, if a transfer is initiated by instructions that include valid access codes or applicable identification methods, even if it may

have not been initiated by an Authorized Person.

4. You understand and accept that the Bank may execute instructions to debit or credit an Account in which the Authorized Person could have an interest and the Bank will not have the obligation of determining if such instruction is appropriate or not.

5. You represent that You have accepted and will be absolutely responsible for the fulfillment of any and all security measures necessary to protect access to the Bank's systems by each Authorized Person, as well as your directors, officers, employees and agents.

6. You guarantee that You have established commercially reasonable security procedures and that the purpose of said security procedures is to verify the authenticity of transactions in order to minimize the risk of fraud due to unauthorized access, and not to detect errors in the transmission or content of the entry. The parties have not agreed to establish a procedure to detect such errors.

7. You guarantee that You have established and will keep all internal procedures as are necessary to prevent unauthorized transmissions. You guarantee that You will not allow any individual to initiate transfers without due supervision and safeguards; and agree that You will take the necessary measures to maintain the confidentiality of security procedures, access codes, instructions, and security equipment provided by the Bank.

8. If You suspect that unauthorized persons have had access to codes or instructions, You must notify the Bank immediately, followed by written confirmation. Unauthorized access will not affect transfers instructions executed by the Bank before receiving said notification.

9. The Bank will take reasonable precautions to ensure that your information, remains confidential and safe from unauthorized access by third parties. Compliance with the Bank's regular security and privacy measures will satisfy the Bank's obligation in this respect.

10. You agree to perform an annual audit on security to assure that the financial information of your clients is protected through security measures and practices that include, at a minimum: (a) physical safeguards to protect against robbery, illegal manipulation or damage; (b) controls related to personnel and access to protect against unauthorized access and use and (c) security in the network transmissions in order to assure the collection, storage, and distribution of the financial information.

IV. **SPECIAL PROVISIONS FOR FLEXICUENTA DE NEGOCIOS AND BSMART ACCOUNT**

A. FlexiCuenta de Negocios and BSmart Account offer You a basic Checking Account (FlexiCuenta and BSmart, respectively), an Investment Module (FlexiInversión and Savings Section respectively), and a Credit Line Module (FlexiLínea and BSmart Credit Line, respectively) in one account number. The modules are optional. You may combine the Checking Account with

one or both modules according to your needs. Also, You may choose to manage your funds personally or authorize the Bank to manage them.

B. FlexiCuenta de Negocios may be opened by corporations, partnerships, business entities or individuals operating as DBAs or under a commercial trade name. BSmart may only be opened by individuals operating as DBAs or under a commercial trade name. If You open a BSmart Account, You agree that the account will be used for commercial purpose only. For both accounts if it is established as a Joint and Several Account (and/or), You may request the Bank to issue an ATH card with the name of each one of the Authorized Signatories to have access to ATMs. In the same manner, You will also have the opportunity of requesting the ATH International Visa Card from the Bank.

C. **Checking Section FlexiCuenta and BSmart**

1. You will keep the minimum balance indicated in the Addendum to the Agreement to avoid service charges (applies only to FlexiCuenta).

2. If You select the automatic function for the savings section, You must establish a compensatory balance from which funds will be transferred between the checking and the savings section.

3. The Bank will not pay interest on the balance kept in the checking account.

D. **FlexInversión and BSmart Savings Section**

1. When opening the Account, the Bank will inform You in the Addendum to the Agreement the required minimum balance, the interest rate to be earned on the deposited funds, and the method in which the computing and payment of interest will be performed.

2. The Bank will pay interest only on funds deposited in, or transferred to the savings section.

3. Interest will be calculated and credited according to the interest rate and manner established by the Bank.

4. The funds in the Account cannot be pledged, assigned, or transferred to any person or institution as guarantee, collateral, or obligations. However, You may pledge to the Bank funds in the savings section, as guarantee for any obligation with the Bank, if said guarantee is required and accepted.

5. You have two options for managing your funds in the savings section:

   a. Automatic – You establish the balance that will be kept in the checking section from which any excess will be transferred to the savings section. The minimum required as compensatory balance will be revised from time to time, at your option or the Bank's. At the closing of operations each Business Day, the Bank will transfer to the savings section the excess over the compensatory balance deposited in the checking section, as

defined in the Addendum to the Agreement. This transfer will be reflected the next Business Day. This option may be suspended at the Bank's discretion.

   b. Personal – You manage your own funds and authorize each transaction between the checking and savings section.

6. You may not withdraw from the savings section any amount pledged, (for whatever reason), that guarantees an advance made from the credit line.

E. **FlexiLinea and BSmart Credit Line**

1. The credit line is subject to credit approval. Therefore, when applying for the credit line (either upon opening the account or afterwards), You authorize the Bank to inquire upon and obtain the necessary credit reports for the extension of credit under the credit line.

2. Upon opening the credit line and every year thereafter, the Bank will charge You a quota as indicated in the Promissory Note. Said quota may be changed from time to time, at the Bank's option. You must maintain sufficient funds in the checking account to cover the charges that the Bank has a right to collect under any clause of this Section.

3. You have two options for activation or use of the credit line:

   a. You may issue a check or authorize a debit (e.g. to the ATH card) from the checking section for a sum in excess of the available balance in the checking and savings section, or

   b. Issue a special check directly against the credit line, without considering the balance in the checking or savings section.

4. The activation date of the credit line will determine the start of minimum payment toward the principal balance. If You activate the credit line no later than the 15th of the month, payment will begin on that month. If it is activated after the 15th, payment will begin the next month.

5. You may issue checks for the total combined balance of the active modules.

6. Advances from the credit line will be for the exact amount of overdrafts or for the amount of the special check drawn directly against the credit line, but will never exceed the authorized credit limit. If You have selected to manage the savings section personally and issue checks or authorize debits that exceed the authorized credit limit, a credit line will be created against the available funds in the savings section and You will be charged interest for the amounts over said limit at the rate indicated in the Addendum to the Agreement.

7. In accordance with the promissory note and any applicable laws and regulations, the Bank will charge a financing fee over the credit's line outstanding balance, from the date in which the account is activated until the date the account is paid in full. The financing fee will be calculated based on the interest rate established in the promissory

note, divided by the number of days established by the Bank (360 days). This daily periodic rate will be multiplied by the daily ending balance and the result by the number of days that the line of credit had balance during the billing cycle. This balance will be determined by adding the outstanding balances each day during the billing cycle and dividing the result by the number of days that the line of credit had balance in such cycle.

8.   The Finance Charge and the corresponding interest may vary periodically. Changes in the finance charge will be subject to changes in the maximum interest rate dictated by the Financial Board or any other regulatory agency with competent authority. Changes to the Finance Charge and interest will apply to balances due prior to the effective date of said changes. The Bank will notify You, in writing, of any changes and their effective dates. The Bank may also increase the Finance Charge and corresponding interest to the differential rate over the Prime Rate, in cases of non-compliance (Default Rate), as established in the Promissory Note, whenever any of the circumstances listed in paragraph 12 occur.

9.   You are responsible for paying all Finance Charges monthly. In regard to the frequency and amount of the minimum payment toward the principal balance, for the FlexiCuenta You have the following options:

   a.   **Daily** – Every day, the system will automatically transfer funds from FlexiCuenta until FlexiLinea is paid off. The total amount of transferred funds during a billing cycle must not be less than one twenty-fourth (1/24) of the balance due at the closing date of said cycle;

   b.   **Monthly** – Once a month, the system will debit funds from FlexiCuenta according to the minimum payment previously established, which may be one third (1/3), one twelfth (1/12), one twenty-fourth (1/24), one thirty-sixth (1/36), or 100% of the balance due at the closing date of the cycle; or

   c.   **Quarterly** – Every three months, the system will debit funds from FlexiCuenta totaling one fourth (1/4) or 100% of the balance due at the closing date of the cycle.

   In regard to the frequency and amount of the minimum payment toward the principal balance for BSmart Account, every day, the system will automatically transfer funds from the checking section until the credit line is paid off. The total amount of transferred funds during a billing cycle must not be less than one twenty-fourth (1/24) of the balance due at the closing date of said cycle.

10.   Finance Charges and payment of principal balance for each billing cycle will be debited automatically from the checking section (in that same order) and notified in your monthly statement. If, during a billing cycle, You make payments to the credit line for an equal or larger sum than the minimum payment calculated by the system for that cycle, the minimum principal payment will not be debited

from the checking section during that cycle, because it has already been covered. If, however, You make payments for less than the minimum amount calculated by the system for that billing cycle, the total minimum payment amount will be debited from the checking section without taking said payments into account.

11.   You may make additional payments to the credit line at any branch of the Bank, or via electronic transfers. Payments will be applied to the principal balance, and any remaining excess will be transferred to the checking section. Also, You may pay the total amount or part of the principal balance at any moment. In this case, You must also pay any Financial Charges due at the time of payment.

12.   The Bank may cancel your credit line and declare all or part of the balance due if You:

   a.   Do not comply with payment of the principal balance or Finance Charges or any other obligations to the Bank, when said charges are due and payable (up to the due date or any other date);

   b.   Are declared insolvent or bankrupt, or You notify in writing your inability to pay your debts, or You assign assets to your creditors, or You file any bankruptcy, insolvency, reorganization, readjustment of debts, or any other proceeding under the laws and regulations of any jurisdiction;

   c.   Sell, assign, transfer, or bequeath all, or a considerable amount of your assets, except in the ordinary course of business, or if your business is merged to another entity;

   d.   Do not submit annual financial statements for You and your guarantors, compiled, revised, or audited, and signed by an authorized officer, no later than one hundred and twenty (120) days after the closing of the fiscal year, as set forth by the Bank at its absolute discretion;

   e.   Allow your financial condition to suffer a considerable adverse situation; or

   f.   Do not rectify any non-compliance with the provisions of this Agreement in a ten-day (10) period.

13.   Your credit line will be revised annually; continued use of it will only be allowed at the sole discretion of the Bank. If your credit line is cancelled, You shall pay the total sum of the principal balance and Finance Charges due at the date of cancellation. In this case, the checking section may continue to exist without any rights to cash advances from the credit line.

14.   The Bank may choose to accept payments to the credit line after initiating a judicial claim for non-compliance with the terms of this Section. In this case, the remaining balance will not be deemed cancelled.

F.   **Payment of Payment Orders**

Payment orders issued against the Account will depend on the option that You have chosen for management of the savings section. If the Account

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

has the automatic investment options, available funds will be used (until depleted) in each module for payment of payment orders, in the following order: checking section, savings section, and credit line (if applicable). If You have not opted for automatic investment, the order will be: checking section, credit line (if applicable), and credit line is extended by pledging funds available in the savings section.

**G.   Management of Deposits**

If the Account has its credit line paid daily (optional and subject to approval), deposits will be used to pay the checking section day's releases first, then they will be used to pay the credit line until it is paid-off, and finally, any excess over the compensatory balance will be transferred to the savings account (if applicable).

**V.   SPECIAL PROVISIONS APPLICABLE TO THE ESCROW ACCOUNT FOR REALTORS AND REAL ESTATE COMPANIES**

**A.**   Pursuant to Act 10 of 1994 ("Act 10"), all realtors and real estate companies operating in Puerto Rico must open and maintain, at a bank established in the Commonwealth of Puerto Rico, a "Special Account ("Escrow Account") to deposit all down payments, good faith deposits or other deposits received by the realtor, the company or its realtors and/or real estate sales personnel in connection with a potential real estate transaction.

**B.**   The realtor or real estate company shall deposit and maintain the amounts received from potential buyers in the Escrow Account.

**C.**   The realtor or the company represents and guarantees that he/she/it has all the necessary permits to operate as a real estate professional or business in Puerto Rico, including, without any limitation, the realtor or real estate company license issued by the Puerto Rico Real Estate Board (the "Real Estate Board").

**D.**   The realtor or company agrees to comply with all laws and regulations applicable to the real estate business, including, without any limitation, Act 10 and all regulations approved to implement the provisions of said Act.

**E.**   The realtor or company agrees:

1.   that only down payments, good faith deposits or other deposits received by the realtor or company from potential buyers in relation to the acquisition of real estate property will be deposited in the Escrow Account;

2.   to maintain the funds deposited in the Escrow Account totally separated from their operational, personal or business accounts;

3.   to maintain adequate records for all funds deposited in the Escrow Account;

4.   to provide the Bank, within five (5) days, all documents requested by the Bank in relation to the funds deposited in the Escrow Account;

5.   to cooperate with the Bank during any review or inspection of the Escrow Account by the Consumer Affairs Department or the Real Estate Board;

6.   to provide, as applicable, while the Escrow Account is in existence, the names of all realtors and/or real estate sales personnel authorized to use said account; and

7.   to notify the Bank immediately when the authority conferred to any of the realtors and/or real estate sales personnel mentioned in item E. 6 is modified or revoked by the realtor or the company.

**F.**   The realtor or the company agrees with the Bank that the service fees pertaining to the Escrow Account and any other charge related to the compliance with this Contract will be debited from the realtor's or the company's account as indicated in the Escrow Account Addendum.

**G.**   In addition to the indemnities included in the Limit of Bank's Responsibility and Indemnities section of the General Provisions of this Contract, the realtor or the company hereby agrees to indemnify the Bank for any claim, lawsuit, cost, fees, loss or expense of any nature to which the Bank may, directly or indirectly, be subject to in connection with a dispute regarding the ownership of the funds deposited in the Escrow Account and/or issues arising from management by the realtor, the company, its employees, agents or representatives.

**H.**   The realtor or the company agrees that the funds deposited in the Escrow Account may not be used to guarantee personal or business obligations or for any other uses not authorized by Act 10.

**VI.   OTHER COMMERCIAL ACCOUNTS**

**A.**   In addition to FlexiCuenta, the Bank offers other types of commercial accounts designed to suit the needs of private or public entities, or entities with special circumstances that require a particular deposit account, such as, government agencies, non-profit companies, or companies undergoing bankruptcy.

**B.**   As a general rule, these accounts are checking accounts without ATH cards. These accounts may or may not accrue interest.

**VII.   FUNDS TRANSFERS**

**A.**   General Terms and Conditions

The following terms will apply to fund transfers You request or receive through the Bank's fund transfer service.

1.   **Authorization -** You may request or receive electronic fund transfers ("Transfer"). Transfers may be requested to transfer funds from the Account to other accounts that You own, or to other accounts owned by third parties, either with the Bank or with other financial institutions, or for receiving funds into your Account. You authorize the Bank to debit or credit any Transfer (including any charges or applicable expenses) that is transacted as set forth in this Agreement. The Bank will not search for the funds in any account other than the one specified in the Transfer request. You authorize the Bank to transfer the funds from the Account, with authorization of the signatories who have been appointed to initiate and/or confirm

Transfers, as set forth in Exhibit A – Designation of Accounts and Authorized Representatives.

2. **Security Measures** - You agree to abide by the security measures set forth in Exhibit B – Fund Transfer Security Measures, which is part of this Agreement. You expressly acknowledge and agree that the measures You establish are commercially reasonable and adapt to your particular circumstances. You acknowledge that these measures are designed to detect unauthorized Transfers, and not errors in the content of the instructions. You accept responsibility for the transfer, whether or not You have authorized it, provided the Bank has accepted the payment order subject to established security measures.

3. **Selection of Beneficiary Bank** - Upon requesting a fund transfer, You must designate a financial institution ("Beneficiary Bank") to receive the funds. You may instruct the Beneficiary Bank to credit the funds to an account or to hold the funds for the recipient. The Beneficiary Bank is responsible for following your instructions and for letting the recipient know when the funds are available.

4. **Selection of the Intermediary Bank** – The Bank may select the intermediary bank or transfer system ("Intermediary Bank") it deems appropriate under the circumstances in order to forward the funds to the recipient, including, but not limited to, Fedwire, SWIFT or Telex, and must operate subject to the policies and procedures of each system. If You order the Bank to use a particular Intermediary Bank or system to transfer funds, through which the Bank will process the payment order, You are assuming all responsibility for errors or failure of the Intermediary Bank to pay, as well as any loss resulting from use of the means selected. See Exhibit D – Authorization to Grant Transfer Requests Received by Fedwire or SWIFT.

5. **Discrepancies in Names and Numbers** - If You identify the recipient, the Beneficiary Bank or the Intermediary Bank with an account number or with a name and number, the Intermediary Bank and the Beneficiary Bank may rely on said number and they will not be responsible for verifying that the account number belongs to the recipient specified on the Transfer request. This same rule will apply to the Bank when the Transfer is being sent to You and when returning the Transfer to the remitting Bank. You acknowledge that the Bank will not be responsible for any delays that result from the Bank's attempt to clear any discrepancies between the name and account number, nor be obligated to investigate suspicious irregularities. You understand that any loss or delay due to lack of accurate identification will be your responsibility only, and not the Bank's.

6. **Conversion to Foreign Currency** - Upon Your request, the Bank will convert funds to the currency of the receiving country at the exchange rate in effect at the time of transfer. If the final destination of the Transfer is a foreign country, the Bank cannot guarantee that the recipient will receive the funds in US currency, even if requested. The

Beneficiary Bank may charge a currency conversion fee. The actual amount received by the recipient may be less, due to fees charged by the Beneficiary Bank, including currency conversion fees. In case of Transfers received in foreign banknotes, the Bank will convert the funds to US dollars at the prevailing exchange rate at the Bank on the day the transfer is accepted. This rate includes a commission for the conversion service. Transfers in foreign currency may be conducted up to two (2) Business Days after the Bank receives the request. If the Bank were to restitute funds that have been converted to foreign currency, it would abide by the prevailing exchange rate on the date of the restitution, after deducting applicable expenses. In case of Transfers made in US dollars to a foreign country, the Bank will not be responsible for conversion rates applied by the receiving bank.

7. **Repetitive Transfers** - If the Bank or You determine that the Transfers have become repetitive, the Bank may assign a number, name, or a combination of both, at your request, as set forth in Exhibit C – Authorization for Repetitive Transfers. In this case, You may use said number, name, or combination, to expedite future requests. The Bank may conduct all Transfers that contain this number, name, or combination. See also Exhibit E – Non-repetitive Automatic Transfers (applicable only to electronic requests).

8. **Payments to the Bank / Fees** - The amount of funds transferred, in both international transfers and transfers within the United States, could be reduced due to fees charged by the Beneficiary Bank and the Intermediary Bank, including those fees charged by the Bank. The Bank will deduct applicable fees from any Transaction, and will notify You by mail any time the Bank debits or credits your Account with a Transfer. You are responsible for returning any amount credited mistakenly to your Account. You will also be responsible for expenses caused by failure to provide identification information for the Beneficiary Bank, and for any charges billed by the selected Intermediary Bank.

9. **Statements of Account / Claims** - All Transfers will be reflected in your periodic Account Statement. You must notify the Bank of any errors, delays, or other problems with a fund transfer within thirty (30) days after receiving notification that the transfer was generated, or after receiving the Account Statement indicating the Transfer, whichever occurs first. If You do not notify the Bank of any claim concerning fund transfers within one year of having received the notification or the corresponding Account Statement, all claims shall be null and void, in compliance with applicable law.

10. **Delays or Failure to Execute Transfers** - Generally, the Bank makes Transfers electronically, although it could use other means. The Bank's responsibility is limited, according to the provisions of the Limitation of Liability and Indemnifications provisions of this Agreement. The Bank will not be responsible to You for delays or failure to execute fund transfers due to action or omission of the Intermediary Bank or Beneficiary Bank.

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

11. **Cancellation or Amendment of a Fund Transfer Request** - If You decide to cancel or amend a fund transfer request, You may only do so only if the funds have not yet been transferred and the Bank has sufficient time to carry out your new instructions. Generally, once the Bank has sent the funds, You cannot cancel or amend the payment order, unless the Beneficiary Bank accepts the cancellation or amendment. The Bank and/or the Beneficiary Bank may charge a fee for cancellation or amendment of fund transfers. The Bank is not responsible for any loss resulting from failure of the Beneficiary Bank to comply with the cancellation or amendment request.

12. **Rejection of a Transfer Request** – The total amount of funds needed to carry out a fund transfer and pay the service charges, or any other obligation to the Bank, must be available in the Account at the moment of executing the fund transfer request The Bank is under no obligation to accept a fund transfer request (entirely or partially), and may delay accepting any Transfer if (a) the Transfer requested exceeds the amount available in the Account; (b) it does not comply with security measures; (c) it is not duly authorized; (d) it does not provide the information required by the Bank; (e) is impractical or impossible to accept; (f) the Bank understands that the transfer does not comply with one or more of the provisions in this Agreement, or any other federal or state law, including, but not limited to, the Office of Foreign Assets Control (OFAC); or (g) if the designated account is blocked for security reasons, or for any other reasons, such as levy or frozen assets.

13. **Acceptance of Transfers** - The Bank will not be responsible in any way for accepting a fund transfer received for your benefit. Although the current practice of the Bank is to notify You of the acceptance of a fund transfer in US dollars within two (2) Business Days after the date of receipt, if said fund transfers are made through a system other than the Automated Clearing House (ACH), the Bank is not obligated to provide such notification. The Bank will credit the account of the recipient on the date the Transfer is paid, if it is received before Cut-Off Time on a Business Day. If not, the account will be credited the next Business Day.

14. **Provisional Payment of Received Transfers** – The credit extended to You by the Bank for transferred funds is provisional until the Bank receives final payment of the amount transferred. Should the Bank not receive payment for the funds, You agree to reimburse the Bank for the Transfer amount. An unaccepted Transfer is cancelled, as provided by law, at the close of the fifth Business Day.

15. **Exhibits related to Funds Transfer Services** – The following Exhibits (as applicable), once completed and signed, will form an integral part of this Agreement:

    Exhibit   A - Designation of Accounts and Authorized Representatives

    Exhibit   B - Fund Transfers Security Procedures

    Exhibit   C - Authorization for Repetitive Transfers

    Exhibit   D - Authorization to Grant Requests for Transfers Received by Fedwire or SWIFT

    Exhibit   E - Non-repetitive Automatic Transfers (applicable to requests made through electronic means)

    If You wish to make any changes to the Exhibits You must notify the Bank as soon as possible. Notifying the change does not obligate the Bank until a written notice describing the change has been received, and the Bank has had reasonable time to implement said change.

16. **Cut-off Time** - If the Bank receives the Transfer request at Cut-Off Time or after Cut-Off Time, the request will not be processed until the next Business Day.

17. **Law Governing Transfers** - The rights, duties, and responsibilities of the parties are governed by the provisions of Chapter 4 (Transfer of Funds) of the Puerto Rico Commercial Transaction Act and shall be subject to the laws of the Commonwealth of Puerto Rico. If any part of a transfer of funds involves the use of Fedwire, your rights and obligations as well as the Bank's in relation to the electronic transfer shall be governed by Regulation J of the Federal Reserve Board.

## VIII. DISCLOSURE RELATED TO THE AVAILABILITY OF FUNDS DEPOSITED IN TRANSACTION ACCOUNTS (REGULATION CC)

Federal Regulation requires banks to make deposited funds available to You within certain periods of time. Depending on the type of deposit, the funds may be available to You the same day, the next business day, or after several days; in the majority of cases, the longest possible delay is until the seventh (7th) business day following the day of the deposit. During the delay period (if any), You may not withdraw the funds in cash and the Bank will not use the funds to process payment orders issued by You.

The Bank establishes the limits for the availability of funds deposited according with the minimum amounts required by the Regulation CC. The following explanations are intended to provide an easy guide for determining when various types of deposits (cash, electronic transfers, etc.) will be available to You for cash withdrawals and for the payment of checks against the Account. However, periodically the Bank will review several criteria, and may provide a higher availability of funds than the limit established by the Regulation. If you need further information regarding this matter please visit any of our branches or call us through TeleBanco Popular at 787-724-3659 (mobiles and Metropolitan Area) or toll free 1-888-724-3659 (outside Metropolitan Area) and one of our service representatives will assist you.

The availability Policy only applies to funds deposited for accounts of Banco Popular in Puerto Rico and the Virgin Islands. Please inquire for information about the availability of funds deposited at other locations.

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

A.  **How to Determine the Availability of Deposited Funds**

The length of the delay is counted in business days, starting on the first business day after the day of the deposit.  Business days are defined as every weekday, except Saturdays, Sundays, and federal holidays. Although the Bank offers public banking services on Saturdays, Sundays, and some holidays, these are not considered business days.

B.  **Availability of Funds Deposited for Purposes of Cash Withdrawals, the Purchase of Goods and Services in Establishments that Accept the ATH® Card as a Mean of Payment (Point of Sale Transactions) and for the Payment of Checks.**

1.  **Deposits Available for Cash Withdrawals on the Same Day of the Deposit**

a.  Electronic fund transfers, such as: Social Security benefits and payroll payments by direct deposit.

b.  Cash: provided the telecommunications facilities of the Bank are readily available.

2.  **Deposits Available for Withdrawals on the Next Business Day Following the Date of the Deposit:**

Federal Regulation provides that certain items be available for withdrawal on the business day following the date of the deposit:

a.  Wire transfers

b.  Checks drawn against any Banco Popular branch located in Puerto Rico or the US and British Virgin Islands; US Treasury Checks; Postal Money Orders; Federal Home Loan Bank Checks; and Federal Reserve Bank Checks, notwithstanding the amount of these checks.

c.  Certified Checks, Official Checks and checks from the government of the Commonwealth of Puerto Rico made payable to the owner of the account and presented directly to a Bank Representative using the Bank's Special Deposit Slip. This slip can be obtained from any Bank Consultant. If the owner of the account does not use this slip, the funds of these checks will be available as indicated in clause 3 of this section.

d.  The first $100 of the total deposit of other checks drawn on banks other than Banco Popular.

3.  **Availability of Other Checks Deposited**

The availability of funds from other checks deposited will depend on Banco Popular's policy.

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

a.  Deposits in Individual Transaction Accounts

The first $1,000 of the aggregate sum of other checks deposited on any business day will be available in the following manner:

(1)  If the aggregate amount of the deposit with other checks is $1,000 or less, the entire amount will be available for cash withdrawal and payment of checks on the next business day

(2)  If the total aggregate amount of the deposit with other checks is more than $1,000, the Bank will make $1,000 available for withdrawal on the next business day. Banco Popular will have available for withdrawal up to $400 on other checks on the second business day after the deposit, whenever the aggregate amount of checks is $1,000 or more.

(3)  The remainder of the funds deposited will be available for cash withdrawals and payment of checks on the third business day following the day of the deposit.

C.  **Delay on the Availability of Funds for Longer Periods**

1.  The Bank may delay the availability of funds from check deposits for a longer period of time under the following circumstances:

a.  If the Bank believes that a check You deposit will not be paid.

b.  If there is an emergency, such as failure of the Bank's communication or computer equipment, or bad weather conditions (such as a hurricane or an earthquake)

2.  The Bank will notify You if your availability to withdraw funds will be delayed for any of the foregoing reasons, and You will also be informed as to when the funds will be available. The funds will be available not later than the seventh (7th) business day following the day of the deposit.

D.  **Special Rules for New Accounts**

If You are a new customer, electronic transfers (such as Social Security benefits and payroll payments through direct deposits) will be available for withdrawal on the same day as of the deposit. However, the following rules will apply during the first thirty (30) days after opening your Account:

1.  The next business day funds available policy of $1,000 as provided in the item B (3) (a) of this disclosure, shall not be applicable.

2.  US Treasury Checks; Postal Money Orders; Federal Home Loan Bank Checks, Federal Reserve Bank Checks, Certified Checks, Official Checks and checks from the Government of the Commonwealth of Puerto Rico will be available for cash withdrawal and payment of checks on the next business day.

COMMERCIAL DEPOSIT ACCOUNTS AGREEMENT

The funds of other checks deposited can be delayed for a longer period as established by the regulation.

E.  **Disclosure regarding to the Check Clearing for the 21st Century or Check 21 Act ("Check 21")**

The federal law known as Check 21 was enacted to facilitate the interchange of checks between financial institutions and improve the overall efficiency of the payment system. This law allows the electronic interchange of checks eliminating the physical checks as they will only travel and be sorted electronically.

To make check processing faster, federal law allows banks to replace original checks with substitute checks. Substitute checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a substitute check states: "**This is a legal copy of your check**". You can use it the same way you would use the original check.

You may use a substitute check as proof of payment just like the original check. A substitute check that meets the requirements for legal equivalence is subject to any provision of federal or state law that applies to original checks

## Schedules of Rates · Corporate Service



**BANCO POPULAR.**

## Commercial Accounts – Special Services

| | |
|---|---|
| Automatic Investment | $140.00 monthly per account |
| Zero Balance Account | $20.00 monthly per account |
| Statements Rendered | $2.00 monthly per account cut-off |
| Balance Reporting | |
| TeleBanco Comercial℠ | Free of Charge |
| Controlled Disbursement | $100.00 monthly per account |

### Web Cash Manager℠

| | |
|---|---|
| Web Cash Manager℠ Set-up | $100.00 one time fee |
| Information Reporting | |
| 3 accounts and reports | $15.00 monthly |
| Additional Accounts | $15.00 monthly per account |
| Transaction Fees | |
| Up to 300 | Free |
| 301 to 1,500 | $0.12 each |
| 1,501 to 3,000 | $0.10 each |
| 3,001 to 5,000 | $0.08 each |
| 5,001 and over | $0.05 each |
| Wire Origination | $30.00 monthly |
| Check Inquiry | $25.00 monthly |
| Web Cash Manager℠ BA12 | $100.00 monthly per account |
| Real Time Account Transfer | $25.00 monthly |
| Sweep (Cash Concentration) | $150.00 monthly |
| Real Time Inquiry | $25.00 monthly |

### Collection Services

| | |
|---|---|
| TelePago Popular® | $0.50 per item |
| Payment Station | $1.50 per item |
| Lockbox Payment | |
| Up to 300 Payments | $150.00 minimum per month |
| Additional Transactions | $0.50 per item |
| Lockbox Internet and CD | |
| Monthly Maintenance | $125.00 |
| Image Lockbox Items | |
| 1 to 999 transactions | $0.07 per transaction |
| 1,000 to 9,999 transactions | $0.05 per transaction |
| 10,000 to 49,999 transactions | $0.03 per transaction |
| 50,000 and over | $0.02 per transaction |
| Checks Drawn on Banco Popular | $6.50 per check |
| Checks Drawn on Other Banks | $6.50 per check |
| Redeposit Checks | Flat fee by volume |
| RCK Collection | $5.00 per check |
| ACH Collection | $5.00 per ACH return |

## Electronic Data Interchange

| | |
|---|---|
| EDI Monthly Maintenance | $ 50.00 |
| File Transmission | $10.00 per file |
| File Translation | $0.35 per 1,000 characters ( 1 kc) |
| EDI Set-up Fee | As negotiated |

## Commercial Accounts – Standard Services

| | |
|---|---|
| Account Maintenance Fee | $25.00 monthly per account |
| Debit and Credit Advices | $1.50 each |
| Cashed Checks | $1.50 each |
| Paid Checks | $0.20 each |
| Deposit Tickets | $1.50 each |
| Checks Deposited | $0.16 each |
| Rolled Coin Issued | $0.08 per roll |
| Mixed Currency & Coin Deposit | $0.16 max. per $100.00 |
| Currency Issued | $0.08 per $100.00 |
| Cash Requisitions | $5.00 per requisition |
| Night Deposit & Special Handling | $3.50 per bag |
| Manager´s Checks | $7.00 per check |
| Combined Analysis | $4.00 monthly per account |
| Stop Payments | $ 15.00 per check |
| Paid or Returned Electronic Transactions due to non-sufficient funds; (applies to TelePago Popular®, ACH and Pago Directo) | $15.00 per transaction |
| Paid or Returned Checks due to non-sufficient funds | $15.00 per transaction |
| Check Rejects (due to special handling for processing item) | $1.25 per item in excess of 1% |





## Electronic Funds Transfers

| | |
|---|---|
| ACH Maintenance | $25.00 monthly |
| ACH Transactions | $0.40 per transaction |
| ACH Returns | $2.00 per transaction |
| ACH Received | $0.50 per transaction |
| ACH Transaction Adjustment | $5.00 per occurrence |
| ACH File / Batch Adjustment | $25.00 per occurrence |
| Addenda Originated | $0.15 per item |
| Electronic Payment Authorization (EPA) | |
| Setup | $50.00 |
| First Account | $20.00 |
| Additional Accounts | $5.00 each |

## Account Reconciliation

| | |
|---|---|
| Maintenance | |
| Full (Checks and Deposits) | $140.00 per account |
| Consolidated (Checks) | $115.00 per account |
| Partial | $65.00 per account |
| Checks Reconciled | |
| Consolidated: | |
| 1 to 10,000 | $0.13 each |
| 10,001 to 20,000 | $0.11 each |
| 20,001 to 30,000 | $0.09 each |
| 30,001 and over | Special Quotation |
| Partial: | |
| 1 to 10,000 | $0.09 each |
| 10,001 to 20,000 | $0.08 each |
| 20,001 to 30,000 | 0.07 each |
| 30,001 and over | Special Quotation |
| Deposit Slips Reconciled | $0.13 each |
| Check Management (CD-ROM) | $ 20.00 per account |
| Items Captured | |
| 0 to 100 | $25.00 flat fee |
| 101 to 250 | $0.10 per effect |
| 251 to 500 | $0.07 per effect |
| 501 and over | $0.04 per effect |
| Positive Pay | $75.00 monthly per customer |

## Merchant Business

| POS | | |
|---|---|---|
| Visa / MasterCard Transactions | | Up to 3.0% discount rate (based on volume) |
| ATH® Transactions | | 2.50% discount rate (based on volume) |
| EBT Transactions | | Up to $0.25 per transaction |
| POS Terminal | | Up to $25.00 monthly rent |
| Wireless Terminals | | $65.00 monthly rent |
| Memberships | | $8.00 monthly fee[2] |
| MultiMerchant Pay | | |
| One Time Set-up Fee | | $400.00 set-up fee $40.00 hosting fee per month |
| Visa / MasterCard Transactions | | Up to 3.25% discount rate (based on volume) |
| ATH® Transactions | | 2.75% discount rate (based on volume) |
| Visa / MasterCard and ATH® | | $0.25 processing fee per transaction |
| Membership | | $8.00 monthly fee[2] |

[1]BPPR ATH® Card only. [2]Not applicable if customer is already a Visa / MasterCard merchant.



Member FDIC. Fees effective January 1st, 2010.

## International Services

| | |
|---|---|
| Wire Transfers -- Outgoing Transfers | |
|     Commissions | 1/4 of 1% (min. $25.00, max. $35.00) |
|     Transmission Cost | $25.00 |
| Wire Transfers -- Incoming Transfers | |
|     For Credit to Our Clients | $15.00 |
|     For a Message Transmission | $25.00 |
| Letter of Credit -- Import | |
|     Issuing Credit | Subject to previous arrangement |
|     Negotiating Sight | Subject to previous arrangement |
|     Negotiating Time | Subject to previous arrangement |
| Acceptances | |
|     Transfer / Assignment of Proceeds of Credits | 1/2 of 1% (min. $100.00) for 120 days period |
| | 1/8 for additional 30 days period |
|     Web Trade Access | $25.00 monthly |
| Letter of Credit -- Export | |
|     Advising Credits | $100.00 plus cost |
|     Confirming Credits | Subject to previous arrangement. Minimum $250.00 |
|     Document Examination Fee / Negotiation Fee | 1/2 of 1% (min. $50.00) |
| Stand-by Letters of Credit | Subject to previous arrangement |
| Other | |
|     Payment Under Letters of Credit | 1/2 of 1% (min. $50.00) |
|     Amendments | $75.00 plus cost |
|     Cancellations of Unused Credits | 1/5 of 1% (min. $50.00, max. $200.00) |
|     Handling Fee | Other charges |
|     Discrepancies | $75.00 plus cost |
| Collections | |
|     Incoming and Outgoing Collections | $50.00 min. charge plus correspondent bank charges |
|     Sight Drafts | 5/8 of 15% (max. $200.00) |
|     Time Drafts | 3/4 of 1% (max. $200.00) |
|     Returned Drafts | 3/4 of 1% (max. $50.00) |
|     Items Delivered Free of Payment | 3/4 of 1% (max. $50.00) |
|     Checks on Banks Outside the U.S | 5/8 of 15% (min. $25.00, max. $125.00 plus cost) |



For more information, call **TeleBanco Comercial**℠
at **787-756-9130** or **1-888-756-9130** or contact
your Banking Officer. You can also visit **www.popular.com**

Member FDIC. Fees effective January 1st, 2010.

**EXHIBIT A**

## CONCESSIONAIRES



| Name | Account No. | Address for Notice | Electronic Address |
|------|-------------|--------------------|--------------------|
| Autopistas Metropolitanas de Puerto Rico, LLC | Banco Popular de Puerto Rico Account No ███80-01-7 | c/o Autopistas de Puerto Rico S.E. P.O. Box 29227 San Juan, Puerto Rico 00929-0227 | ███@abertis.com |

The Contracting Parties shall be entitled to modify the account described in this <u>Exhibit A</u> upon prior written notice to the Bank; provided, that such modification of an account number shall be provided with at least two (2) Business Days prior written notice.

**EXHIBIT B**

## AUTHORIZED REPRESENTATIVES OF THE CONTRACTING PARTIES

| Contracting Party | Representatives | Specimen Signatures |
|---|---|---|
| The Authority | Any one of: | |
| | Saul M. Gonzalez Fonseca | |
| | Silvino Cepeda Ortiz | |
| Autopistas Metropolitanas de Puerto Rico, LLC | Both of: | |
| | Stefan Sater | |
| | Luis Palazzi | |

**EXHIBIT C**

## MERCHANT AGREEMENT FEES AND CHARGES

The fees and charges are as follows:

- 1.15% of each (deposit) transaction with a debit card
- 2.50% of each (deposit) transaction with Visa or MasterCard
- 2.60% of each (deposit) transaction with AMEX
- 0.50% of each (deposit) transaction with certain specialty credit cards (such as AMEX black card)
- $0.25 per Visa or MasterCard (deposit) transaction processed via the website (in addition to the 2.50% per transaction fee set forth above)
- $0.20 per cash (deposit) transaction

After reasonable prior written notice to the Parties, the Bank is entitled to modify the Merchant Fees on a yearly basis in order to reflect then current market rates, which for purposes of this Escrow Agreement are the rates charged by the Bank's then current service provider for such services.

EXHIBIT D

## WEEKLY ETC TRAFFIC REPORT

Starting Date: _____
Ending Date: _____
Week #: _____
Calendar Year: _____

**Earned Tolls**

Earned Tolls to Concessionaire of PR-22 & PR-5: _____
Earned Tolls to Concessionaire of PR-52: _____
Earned Tolls to Concessionaire of PR-20: _____
Earned Tolls to Concessionaire of PR-53: _____
Earned Tolls to Concessionaire of PR-66: _____
Earned Tolls to PRHTA: _____

**Recovered Unpaid Tolls**

Recovered Unpaid Tolls to the PRHTA: _____

Transactions

| Toll Plaza | Transactions from Earned Tolls | | | | | | | | | | Transactions from Unpaid Tolls | | | | | | | | | | Toll Plaza Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Class 1 | Class 2 | Class 3 | Class 4 | Class 5 | Class 6 | Class 7 | Class 8 | NonRev | Total | Class 1 | Class 2 | Class 3 | Class 4 | Class 5 | Class 6 | Class 7 | Class 8 | NonRev | Total | |
| **PR-22** | | | | | | | | | | | | | | | | | | | | | |
| Buchanan | | | | | | | | | | | | | | | | | | | | | |
| Toa Baja | | | | | | | | | | | | | | | | | | | | | |
| Vega Alta | | | | | | | | | | | | | | | | | | | | | |
| Manati | | | | | | | | | | | | | | | | | | | | | |
| Arecibo | | | | | | | | | | | | | | | | | | | | | |
| Arecibo Ramp | | | | | | | | | | | | | | | | | | | | | |
| Hatillo | | | | | | | | | | | | | | | | | | | | | |
| DTL | | | | | | | | | | | | | | | | | | | | | |
| Sub-Total | | | | | | | | | | | | | | | | | | | | | |
| **PR-5** | | | | | | | | | | | | | | | | | | | | | |
| Bayamón | | | | | | | | | | | | | | | | | | | | | |
| Sub-Total | | | | | | | | | | | | | | | | | | | | | |
| **PR-52** | | | | | | | | | | | | | | | | | | | | | |
| Montehiedra | | | | | | | | | | | | | | | | | | | | | |
| Caguas Norte | | | | | | | | | | | | | | | | | | | | | |
| Caguas Sur | | | | | | | | | | | | | | | | | | | | | |
| Salinas | | | | | | | | | | | | | | | | | | | | | |
| Salinas Sur | | | | | | | | | | | | | | | | | | | | | |
| Juana Diaz | | | | | | | | | | | | | | | | | | | | | |
| Juana Diaz Norte | | | | | | | | | | | | | | | | | | | | | |
| Juana Diaz Sur | | | | | | | | | | | | | | | | | | | | | |
| Ponce | | | | | | | | | | | | | | | | | | | | | |
| Sub-Total | | | | | | | | | | | | | | | | | | | | | |
| **PR-20** | | | | | | | | | | | | | | | | | | | | | |
| Guaynabo | | | | | | | | | | | | | | | | | | | | | |
| Sub-Total | | | | | | | | | | | | | | | | | | | | | |
| **PR-53** | | | | | | | | | | | | | | | | | | | | | |
| Humacao | | | | | | | | | | | | | | | | | | | | | |
| Guayama | | | | | | | | | | | | | | | | | | | | | |
| Ceiba | | | | | | | | | | | | | | | | | | | | | |
| Humacao Sur | | | | | | | | | | | | | | | | | | | | | |
| Humacao Norte | | | | | | | | | | | | | | | | | | | | | |
| Sub-Total | | | | | | | | | | | | | | | | | | | | | |
| **PR-66** | | | | | | | | | | | | | | | | | | | | | |
| Carolina | | | | | | | | | | | | | | | | | | | | | |
| Carolina Norte | | | | | | | | | | | | | | | | | | | | | |
| Carolina Sur | | | | | | | | | | | | | | | | | | | | | |
| Sub-Total | | | | | | | | | | | | | | | | | | | | | |
| **Total** | | | | | | | | | | | | | | | | | | | | | |

D-2



D-3

**EXHIBIT E**

## FORM OF NOTICE OF TRANSFER

In accordance with Section 5(a) of the Escrow Agreement dated as of [●], 2011 (the "Agreement") among Puerto Rico Highways and Transportation Authority (the "Authority"), a public corporation of the Commonwealth of Puerto Rico, the Contracting Parties listed in Exhibit A to the Agreement (the "Concessionaires"), [**BANCO POPULAR DE PUERTO RICO, FIDUCIARY SERVICES DIVISION**] (the "Escrow Agent"), and Banco Popular de Puerto Rico (the "Bank"), a Puerto Rico banking corporation, the Escrow Agent hereby notifies the Contracting Parties that disbursements from the Escrow Fund (as defined in the Agreement) were made to the parties, on the dates and in the amounts set forth in the table below.  Such delivery was made by wire transfer in immediately available funds by crediting the accounts specified in Exhibit A of the Agreement.

| Party | Amount | Date |
|---|---|---|
| | | |

In accordance with Section 2(e) of the Agreement, the amount of Fees deducted from the Escrow Fund and the date of such deduction are set forth in the table below.

| Type of Fee | Amount | Date |
|---|---|---|
| Merchant Fees | | |
| Escrow Agent Fees | | |

**[●], as Escrow Agent**

By: _____

      Name:
      Title:

**EXHIBIT F**

### FEE SCHEDULE

**Monthly Administration Fee** ..............................................................$2,500

This fee is not subject to pro-ration and is payable upon execution of this Escrow Agreement and upon the first Business Day of each calendar month thereafter and includes:

- Monitoring of account

- Reporting

- Investment of Funds

**Activity Fees**

     Investments / Receipts & Deliveries .....................................$25.00 per transaction

     Wire Transfers  ............................................................................ $25.00 per wire

     Checks .......................................................................................... $12.00 per check

     Tax Forms 480 & 1099 (per form) .........................................$10.00 per Tax Form

     Personal Delivery of Notice of Transfer.......................................$25.00 per Notice



**EXHIBIT G**

## FORM OF JOINDER AGREEMENT

The undersigned hereby agrees, effective as of the date hereof, to become a party to that certain Escrow Agreement (the "Agreement") dated as of [●], 2011, by and among Puerto Rico Highways and Transportation Authority (the "Authority") and the parties named therein and for all purposes of the Agreement, the undersigned shall be included within the term "Contracting Party" in its capacity as a Concessionaire (each capitalized term as defined in the Agreement). The physical and electronic address and facsimile number to which notices may be sent to the undersigned is as follows:

Date: _____

_____
Name (please print or type)

_____
Address

_____
Facsimile No.

_____
Signature