# In Re: The Financial Oversight
# and Management Board for Puerto Rico

Expert Report of

William W. Holder

April 30, 2020

Contains Information Designated as Confidential by the Government Parties

# Table of Contents

I.      Summary of Opinions .................................................................................................1

II.     Qualifications ............................................................................................................6

III.    Fund Accounting Principles Acknowledge that Proceeds from Restricted PRIFA Rum
        Tax Revenues and HTA Excise Tax Revenues May be Held in a Pooled Account (e.g.,
        the TSA) ....................................................................................................................8

IV.     The Treasury's Accounting Conveys that HTA Excise Tax Revenues Are Restricted and
        Is Inconsistent with the Assertions Made by the FOMB and Mr. Ahlberg ...........................10

        A.      HTA Excise Tax Revenues Are Recorded in a Special Revenue Fund (Fund 278),
                Distinct From the General Fund .....................................................................11

        B.      During FY 2015, HTA Had Authority to Access and Use HTA Excise Tax
                Revenue Proceeds that Were Deposited in the TSA and Designated Part of Fund
                278 .........................................................................................................13

        C.      The TSA Cash Flow Reports Continue to Convey Restrictions on the Use of HTA
                Excise Tax Revenues ....................................................................................14

V.      The Treasury's Accounting Conveys that PRIFA Rum Tax Revenues Are Restricted and
        Is Inconsistent With Assertions Made by the FOMB and Mr. Ahlberg ................................15

        A.      The Resources Generated by the Enabling Act "To Be Covered Into the
                Infrastructure Fund" Were Accounted for in PRIFA's Special Revenue Fund and
                Reported as Restricted in FY 2015 ..................................................................16

        B.      Recording PRIFA Rum Tax Revenue Proceeds in the General Fund is Not
                Inconsistent with the Infrastructure Fund Being a Special Revenue Fund .................17

VI.     The Commonwealth's Accounting Systems Should Allow For the Identification of Fund
        278 and Infrastructure Fund Moneys .............................................................................18

VII.    Analysis of the TSA's Historic Cash Position Compared to the Clawed-Back Revenues
        from the HTA and PRIFA Bonds ..................................................................................19

## I.    Summary of Opinions

1.    I have been retained by counsel for Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation., Ambac Assurance Corporation, and Financial Guaranty Insurance Company ("Movants").[1]  I have been asked to evaluate certain statements made by (1) the Financial Oversight and Management Board for Puerto Rico (the "FOMB") in the context of a preliminary hearing on certain motions and (2) Mr. Timothy Ahlberg, who testified as the representative of the Commonwealth of Puerto Rico (the "Commonwealth"), the Puerto Rico Highways and Transportation Authority ("HTA") and the Puerto Rico Infrastructure Financing Authority ("PRIFA").[2]  Specifically, I understand that the FOMB and Mr. Ahlberg have asserted that, because certain excise taxes have been held in pooled bank accounts of the Commonwealth of Puerto Rico (the "Treasury Single Account" or "TSA"), the excise taxes therefore are Commonwealth resources that may or may not be appropriated by the Commonwealth in its discretion, and that the excise taxes must be understood to be undifferentiated Commonwealth resources.  It is my opinion that based upon my review of the methods of accounting of the Department of the Treasury of the Commonwealth of Puerto Rico (the "Treasury") for the HTA Excise Tax Revenues[3] and PRIFA Rum Tax Revenues[4] in Treasury bank accounts, testimony, and other relevant documents produced by the Commonwealth and the HTA, and for the reasons set forth below, that these statements or assertions are inconsistent with the manner in which the Commonwealth has historically accounted for such taxes.

---

[1] Assured Guaranty Corp./Assured Guaranty Municipal Corp, National Public Finance Guarantee Corp., Ambac Assurance Corp., and Financial Guaranty Insurance Company are represented by Cadwalader, Wickersham & Taft, LLP; Weil, Gotshal & Manges, LLP; Milbank LLP; and Butler Snow, LLP, respectively.

[2] Deposition of Timothy H. Ahlberg ("Ahlberg Deposition"), April 21, 2020, p. 15:6–17, "Q. And you're also here today representing the Puerto Rico Highways and Transportation Authority, otherwise known as HTA? A. Correct. Q. And you're also here today representing The Puerto Rico Tourism Company? A. Correct. Q. And you're also here today representing the Puerto Rico Infrastructure Financing Authority, otherwise known as PRIFA? A. Correct."

[3] "HTA Excise Tax Revenues" for purposes herein shall mean the (i) special excise taxes consisting, among other things, of taxes on gasoline, diesel, crude oil, cigarettes, and other special excise taxes collected by Treasury and allocated to HTA through enabling legislation, including the Puerto Rico Internal Revenue Code, 13 L.P.R.A. § 31751 and (ii) special excise taxes consisting of motor vehicle license fees collected by the Commonwealth and allocated to HTA by enabling legislation, including Vehicle and Traffic Law, 9 L.P.R.A. §§ 2013(a)(2), 2021, 5681. The enabling legislation for the HTA Excise Taxes shall be referred to herein as the "HTA Excise Tax Statutes."

[4] "PRIFA Rum Tax Revenues" for purposes herein shall mean the first $117 million per year in excise taxes imposed by the government of the United States on rum products, among other products, that are remitted to the Commonwealth and allocated to PRIFA by enabling legislation, including the Puerto Rico Infrastructure Financing Authority Act (the "PRIFA Enabling Act"), 3 L.P.R.A. § 1914.

2.     As a threshold matter, it is important to recognize that generally accepted accounting principles ("GAAP" or "fund accounting") is the framework governmental entities, including the Commonwealth,[5] use to track and account for resources (e.g., moneys).  Governmental accounting systems are organized and operated on a fund basis.[6]  Fund accounting calls for the financial resources of a government to be accounted for and reported in appropriate funds.[7]  The Commonwealth uses the following definition of "fund":

> An amount of money or other resource set aside for the purpose of carrying out a specific activity or to achieve certain objectives pursuant to the special laws, regulations, restrictions or limitations and which constitute an independent fiscal and accounting entity. It includes the accounts created to keep record of the proceeds of the issuance of bonds that may be authorized.[8]

3.     A significant objective of fund accounting is to report a government's stewardship of financial resources and its compliance with restrictions and other limitations placed on the use of those resources.[9]  The Governmental Accounting Standards Board ("GASB"),[10] the authoritative body that establishes professional accounting standards for governmental entities, has referred to "accountability" as "the paramount objective from which all other objectives must flow."[11]

---

[5] McKeen Letter Dep. Exh 1 at p. 5, Ahlberg 84:18-85:8.

[6] NCGA Statement 1, Principle 2.

[7] While the term "fund" can be used in several contexts, in GAAP, "fund" is a term of art: "[A] fiscal and accounting entity with a self-balancing set of accounts recording cash and other financial resources, together with all related liabilities and residual equities or balances, and changes therein, which are segregated for the purpose of carrying on specific activities or attaining certain objectives in accordance with special regulations, restrictions, or limitations." *See* NCGA Statement 1, par 3; GASB Statement No. 34, pars 63, 64.

[8] 3 L.P.R.A. § 283b.

[9] NCGA No. 1, Principle 1, "A governmental accounting system must make it possible both: (a) to present fairly and with full disclosure the financial position and results of operations of the funds and account groups of the governmental unit in conformity with generally accepted accounting principles; and (b) to determine and demonstrate compliance with finance-related legal and contractual provisions."

[10] The GASB, established in 1984, is the independent, private-sector organization, that establishes accounting and financial reporting standards for U.S. state and local governments that follow Generally Accepted Accounting Principles (GAAP). See https://www.gasb.org/jsp/GASB/Page/GASBLandingPage&cid=1175804799024. GAAP is a set of standards, principles and practices that guide accounting and financial reporting for state and local governments and U.S. territories, such as the Commonwealth. The "GAAP hierarchy" identifies sources of GAAP, ranked by their level of authority. The most authoritative guidance includes GASB statements and interpretations, as well as statements and interpretations of the GASB's predecessor, the National Council on Governmental Accounting ("NCGA"). Other sources of GAAP include GASB Technical Bulletins, AICPA Audit and Accounting Guides, and the Government Finance Officers Association's "Governmental Accounting, Auditing and Financial Reporting" (the "GAAFR").

[11] GASB Concept Statement No. 1, par 76, "Governmental financial reporting should provide information to assist users in (a) assessing accountability and (b) making economic, social, and political decisions. The duty to be publicly accountable is more significant in governmental financial reporting than in business enterprise financial reporting. For this reason, the Board gave considerable weight to the concept of accountability. It appears throughout the discussion of the governmental environment, and assessing accountability is a pervasive use of financial reporting as indicated in the section on uses of financial reports. Although it is referred to specifically only in paragraph 77, accountability is implicit in all of the listed objectives. The Board considers it to be the paramount objective from which all other objectives must flow."

Contains Information Designated as Confidential by the Government Parties

4.      In fund accounting, governmental entities, including the Commonwealth, use terms of art
to describe limitations on the use of resources.  For example, the term "restricted" is a term of art
in fund accounting and represents a significant signal provided to financial statement users.
Assets and the related fund balance of a fund should be accounted for and reported as restricted
only when such constraints on the resources are (1) "externally imposed by creditors (such as
through debt covenants), grantors, contributors, or laws or regulations of other governments," or
(2) "imposed by law though constitutional provisions or enabling legislation."[12]  In essence, the
expenditure of restricted resources must be in conformity with the imposed restrictions
regardless of the government's desire to reallocate or redeploy those resources.

5.      Typically, most of a government's fiscal activities (i.e., revenues and expenditures) are
accounted for and reported in the general fund.  The general fund is used "to account for and
report all financial resources not accounted for and reported in another fund," and these
resources are generally expended through annual budgetary processes.[13]  A significant portion of
the Commonwealth's resources and activities were reported in the general fund of the
Commonwealth (the "General Fund").[14]

6.      Restrictions and other limitations on certain governmental resources may be conveyed in
a number of ways.  For example, restricted resources may be accounted for in the general fund,
as long as the restricted resources are separately tracked for accounting purposes and any
financial statements prepared in conformity with GAAP clearly convey the restrictions and other
limitations.  In addition, financial resources from specific revenue sources that are restricted or
committed to expenditures for specified purposes may be accounted for in special revenue or
other governmental fund types.  The Commonwealth also uses special revenue funds and debt
service funds.  The Commonwealth's use of special revenue funds and debt service funds is not

---

[12] GASB 54 par 8-9, "Fund balance should be reported as restricted when constraints placed on the use of resources are either:
a. Externally imposed by creditors (such as through debt covenants), grantors, contributors, or laws or regulations of other
governments; or b. Imposed by law through constitutional provisions or enabling legislation.
Enabling legislation, as the term is used in this Statement, authorizes the government to assess, levy, charge, or otherwise
mandate payment of resources (from external resource providers) and includes a legally enforceable requirement that those
resources be used only for the specific purposes stipulated in the legislation. Legal enforceability means that a government can be
compelled by an external party—such as citizens, public interest groups, or the judiciary—to use resources created by enabling
legislation only for the purposes specified by the legislation."
[13] GASB 54 par 29, "That definition stated that the general fund "is used to account for all financial resources except those
required to be accounted for in another fund."
[14] *See, for example*, CW_STAY0000229 at 237.

unique to Puerto Rico and is common in financial reporting for government issuers with outstanding bond debt.

7.   Based on my knowledge and experience and my analysis in this matter, and with these basic principles in mind, I have formed following additional conclusions and opinions.

8.   The HTA Excise Tax Revenues:

a.   Both prior to and following the issuance of Executive Order OE-2015-046 on November 30, 2015 (the "Clawback Order"),[15] the Treasury accounted for HTA Excise Tax Revenues in a special revenue fund (Fund 278). Specifically, since at least the fiscal year ended June 30, 2015 ("FY 2015") to the present, proceeds from HTA Excise Tax Revenues received by Treasury and deposited in Commonwealth bank accounts were recorded in Fund 278 upon collection.[16] Accounting for the HTA Excise Tax Revenues in that special revenue fund conveys, in this matter, that the revenues are restricted for debt service purposes. Likewise, the Treasury's classification of the HTA Excise Tax Revenues as part of a "Special Revenue Fund" in TSA Cash Flow Reports, in this matter, also conveys that the revenues are restricted.

b.   The Commonwealth treated Fund 278's resources as restricted even when the resources were in Treasury's bank accounts and even though they were pooled with other moneys. HTA had authority to access and use HTA Excise Tax Revenue proceeds that were deposited in the TSA and designated part of Fund 278. Under fund accounting, HTA's actions in regard to these proceeds are consistent with those revenues being restricted and not for the Commonwealth's general use while the moneys were held in Treasury bank accounts. Moreover, since at least July 2016, according to Mr. Ahlberg, the Commonwealth has continued to designate the HTA Excise Tax Revenues as Fund 278 moneys and has not expended the proceeds from HTA Excise Tax Revenues accounted for in Fund 278 even though these moneys are held in pooled Treasury accounts.

c.   Fund 278, a special revenue fund, is distinct from the General Fund. Based on Mr. Ahlberg's testimony and documents that I reviewed, the HTA Excise Tax Revenues have continued to be recorded at time of collection in Fund 278 both prior to and following the Clawback Order (i.e., have not been recorded at time of collection in the General Fund).

---

[15] The Clawback Order directed the Puerto Rico Secretary of the Treasury to retain HTA Excise Tax Revenues and Rum Excise Tax Revenues for the payment of debt service on the Commonwealth's public debt. The term "clawback" or any variation thereof is not intended to convey any opinion on whether the Commonwealth lawfully used the HTA and PRIFA Excise Tax Revenues under Section 8 of Article VI of the Puerto Rico Constitution.

I have been asked to assume that (1) the "clawback" of HTA and rum excise taxes by the Commonwealth was invalid and (2) PROMESA does not preempt the Puerto Rico excise tax or other relevant statutes.

[16] Ahlberg 157:3-19, "And during the period of January 2015 to mid-September of 2015, were any of the HTA excise taxes designated under a Fund number other than 278? A. There are no excise taxes that would have been reported other than in Fund 278 and Colecteria Account 5191. Q. Okay. Would that be true for all periods, by the way? A. Would what be true for all periods? Q. The same, that it would -- that HTA excise taxes would only be recorded in Fund 278 rather than in other Funds. MS. McKEEN: Objection. THE WITNESS: During the -- I mean, from January '15 to present, yes."

d. The accounting treatment of the HTA Excise Tax Revenues is inconsistent with the assertion that the Commonwealth had the ability to deploy the resources in an unrestricted manner.[17]

9. The PRIFA Rum Tax Revenues:

a. The PRIFA Enabling Act calls for the Commonwealth to establish the "Puerto Rico Infrastructure Fund" (the "Infrastructure Fund"). Consistent with the PRIFA Enabling Act, the resources generated by the act were accounted for and reported in a special revenue fund titled, "Puerto Rico Infrastructure Financing Authority" fund.

b. The recording of PRIFA Rum Tax Revenues in the Puerto Rico Integrated Financial Accounting System  ("PRIFAS") as General Fund revenue is not inconsistent with the Infrastructure Fund existing as a special revenue fund.  Fund accounting allows governmental entities discretion to implement tracking and accounting of moneys in different ways so long as the restrictions are properly maintained and conveyed.

10. It is further my opinion that moneys restricted to use for specific activities can be, and in practice often are, pooled in a single bank account or accounts along with unrestricted moneys or moneys to be used for other purposes.

11. Moreover, it is necessary for a government to have sufficient accounting systems and controls in place to permit the tracing of restricted resources and related expenditures.  Cash from different revenue streams—such as the HTA Excise Tax Revenues and PRIFA Rum Tax Revenues, each subject to restrictions on use—must by necessity be traceable into and out of bank accounts.  My review of testimony and documents shows an ability of the Commonwealth to trace Fund 278 and PRIFA moneys through a review of transfer details and other documents and reports.  Fund accounting is one of the tools used by governments, including the Commonwealth, to trace restricted resources.[18]

12. Finally, as shown in **Exhibits 1** and **2**, between July 2017 and November 2019, the total amount of cumulative revenues clawed back from the HTA and PRIFA bondholders (collectively, the "Clawed-Back HTA and PRIFA Tax Revenues") was approximately $1.3 billion.  The balance of the TSA exceeded this amount at all relevant times.

---

[17] I understand from the financial statements that the sole exception would be if in a given fiscal year available resources are not sufficient to repay debt service on the Commonwealth's general obligation bonds, in which case the excise taxes would be used to pay that debt service and would be reimbursed in subsequent fiscal years. *See* Ahlberg Deposition Exhibits 13 and 24.

[18] I understand that the most recent Commonwealth and HTA audited financial statements for the fiscal year ended June 30, 2016 change the reporting of certain excise tax revenues based on the Clawback Order.  Internal documents and testimony provided by the Government Parties indicate that despite the change in public reporting, the Commonwealth continued to account internally for the receipt of revenues in the same manner as in prior fiscal years.

II.    **Qualifications**

13.    I currently serve as Dean of the Leventhal School of Accounting and hold the Alan

Casden Dean's Chair of Accountancy at the University of Southern California. During the course

of my career, I have taught courses in financial and managerial accounting, auditing, and

taxation in undergraduate and graduate programs. I have twice been named as one of the "Top

100 People" in the accounting profession by Accounting Today. I also received the Gold Medal

for Distinguished Service, the highest honor awarded by the American Institute of Certified

Public Accountants ("AICPA").

14.    I have authored or co-authored a number of books, research monographs, and journal

articles on the topics of financial accounting, reporting, and auditing. My published works

include the university textbook Intermediate Accounting, published by Harcourt, Brace,

Jovanovich; the financial statement auditing practice manual Audits of Local Governments,

published by Thomson Reuters; Reducing the Incidence of Fraudulent Financial Reporting: The

Role of the Securities and Exchange Commission, published by the SEC and Financial Reporting

Institute; the practice manual Audits of Local Governments, published by Thomson Reuters;

Materiality Considerations, published by the AICPA and a number of others that address

financial accounting, reporting, and auditing issues.

15.    Over the course of my career, I have served in a number of capacities on governance and

standards-setting bodies of the accounting profession, including ten years as a member of the

Governmental Accounting Standards Board ("GASB"), the Board of Directors (Chair of the

Audit Committee) of the AICPA, and the Accounting Standards Executive Committee

("AcSEC") of the AICPA.[19] The GASB and AcSEC are professional bodies responsible for

developing authoritative financial accounting and reporting standards. In addition, I have served

on the AICPA's State and Local Government Accounting Committee serving as the senior

technical editor to that organization's state and local government audit guide, "Audits of State

and Local Governments" and performed a number of assignments relating to governmental

accounting for the National Council on Governmental Accounting ("NCGA"), the Municipal

Finance Officers Association, and the League of California Cities. Moreover, I have served as

---

[19] AcSEC is now identified as the Financial Reporting Executive Committee or "FinREC."
https://www.aicpa.org/interestareas/frc/accountingfinancialreporting/finrec.html.

Chair of the Audit Committees of the Board of Directors of both the John Wayne Cancer Institute and the John Wayne Cancer Foundation. I am a Certified Public Accountant in California and Oklahoma.

16.     I have served as an expert witness and consultant in a number of cases in state and federal courts, been retained by the U.S. Securities and Exchange Commission ("SEC") and the U.S. Department of Justice, and provided related trial testimony. In addition, I have consulted with numerous companies, public accounting firms, and governmental agencies about a variety of accounting, financial reporting, and auditing matters.

17.     A copy of my curriculum vitae, including my publications, is attached as **Appendix A**. A list of matters in which I have provided expert testimony over the past four years is included as **Appendix B**.

18.     In connection with my work, I have called on the knowledge and experience gained during my professional career. My opinions are based on my experience and expertise in governmental accounting, reporting, and auditing and my understanding of relevant facts and circumstances in this matter and are not intended to represent legal conclusions or opinions.

19.     I am being compensated at my standard hourly billing rate of $875 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I also receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

20.     I have reviewed publicly available information, documents produced, and deposition testimony in this matter to date. I also have read and considered relevant portions of the authoritative literature of the accounting profession that applies to governmental entities. Materials that I have considered in preparing this report are cited in the footnotes to this report and are contained in **Appendix C**.

21.     I understand that, at this time, the Court has authorized limited discovery into certain specific issues and that additional discovery has been requested but has not yet been provided and may be, in the future, requested or made available in connection with any final hearing on

those motions. I reserve the right to amend or supplement this report based on additional information that may be obtained.

### III.   Fund Accounting Principles Acknowledge that Proceeds from Restricted PRIFA Rum Tax Revenues and HTA Excise Tax Revenues May be Held in a Pooled Account (e.g., the TSA)

22.     In Puerto Rico, the Treasury's cash is managed on a centralized basis in the Treasury Single Account (TSA), described as "the Commonwealth's main operational account in which substantially all of the Commonwealth's public funds are deposited and from which most expenses are disbursed."[20] TSA deposits include receipts of revenues assigned to certain public corporations and pledged for the payment of their debt service:

> Receipts in the TSA include tax collections (including revenues assigned to certain public corporations and pledged for the payment of their debt service), charges for services, intergovernmental collections (such as reimbursements from Federal assistance grants), the proceeds of short and long-term debt issuances, and other receipts. Only a portion of the revenues received by the TSA is included in the annual General Fund budget presented to the Puerto Rico Legislative Assembly for approval. Other revenues are separately assigned by law to certain agencies or public corporations but still flow through the TSA.[21]

23.     Under fund accounting principles, governments have flexibility as to the manner in which they manage cash.  In other words, the Treasury may hold cash in a pooled account (e.g., the TSA) for the benefit of parties other than the Commonwealth.  Moneys received and restricted to use for specific activities may be pooled in a single bank account along with moneys to be used for other purposes:

> This requirement of a complete set of accounts for each fund refers to identification of accounts in the accounting records, and does not necessarily extend to physical segregation of assets or liabilities. For example, it is not

---

[20] 10/20/17 TSA Cash Flow Report p. 6; *see also* Id. p. 5, which further defines the TSA as follows: "Treasury Single Account means the Commonwealth's main operational account in which substantially all Commonwealth public funds are deposited and from which most expenses are disbursed. TSA receipts include tax collections, charges for services, intergovernmental collections, the proceeds of short and long-term debt issuances and amounts held in custody by the Secretary of the Treasury for the benefit of the Commonwealth's fiduciary funds. Only a portion of the revenues received by the TSA is included in the annual General Fund budget presented to the Puerto Rico Legislative Assembly for approval."

Notwithstanding this definition, I understand that there are many bank accounts that are part of the TSA. In their reports, however, the Treasury conveys the sources of resources and indicates that there are restrictions or other limitations on certain of those resources (e.g., fiduciary funds). Such restrictions and limitations require tracing of the resources to ensure their faithful expenditure and appropriate reporting.

[21] 10/20/17 TSA Cash Flow Report p. 6.

necessary to have a separate bank account for each fund unless required by law, bond indenture, or other reason.[22]

24.     Fund accounting eliminates the need to segregate resources in separate bank accounts to ensure and demonstrate compliance with restrictions and other limitations:

> At the start of the twentieth century, for example, a number of state and local governments were beset by charges of financial corruption and mismanagement. Critics of the period charged that financial misfeasance and malfeasance were abetted by poor accounting and financial reporting practices. In particular, critics argued that state and local governments needed to segregate their financial resources to ensure that monies were spent only for approved purposes. In response to these criticisms, many governments began to establish separate cash accounts to manage resources dedicated for various purposes.
>
> Of course, improvements in cash management techniques have made multiple cash accounts a thing of the past for most state and local governments. Nonetheless, governments have continued to find value in accounting separately for financial resources that are restricted or otherwise earmarked for special purposes. In this manner, the separate cash accounts of the early 20th century evolved into the funds still used today by state and local governments to ensure and demonstrate legal compliance.[23]

25.     Moneys received and restricted to use for specific activities can be, and in practice often are, pooled in a single bank account along with unrestricted moneys or moneys to be used for other purposes.[24]  It would be unremarkable for moneys held in the TSA to be restricted for a particular use.  For example, from an accounting perspective, proceeds of HTA Excise Tax Revenues and PRIFA Rum Tax Revenues can be deposited and held in the TSA, even if such proceeds are restricted for HTA and PRIFA debt service.

26.     Depositing restricted resources in a pooled bank account does not extinguish or affect restrictions on those resources. The need to expend restricted governmental resources in conformity with those restrictions does not change irrespective of whether separate or pooled bank accounts are employed.[25]

---

[22] NCGA Statement 1 par 21.

[23] GFOA, Governmental Accounting Auditing and Financial Reporting, 2005, p. 16.  *See also* GFOA, Governmental Accounting, Auditing, and Financial Reporting, 2012, Chapter 4, "At the inception of fund accounting, individual funds most often corresponded to separate bank accounts. Since that time, advances in treasury management have reduced or eliminated the need for multiple bank accounts. Accordingly, today's funds may exist only as data sets within the government's information system."

[24] NCGA Statement 1 par 21, "This requirement of a complete set of accounts for each fund refers to identification of accounts in the accounting records, and does not necessarily extend to physical segregation of assets or liabilities. For example, it is not necessary to have a separate bank account for each fund unless required by law, bond indenture, or other reason."

[25] GASB, Statement No. 54, ¶¶8-10, "Net Assets Restricted by Enabling Legislation, should be reported as restricted fund balance. Fund balance should be reported as restricted when constraints placed on the use of resources are either: a. Externally

27.     Since at least 2014, the PRIFA Rum Tax Revenues and, since at least 2015, HTA Excise

Tax Revenues were deposited into the Commonwealth's TSA.[26]  The deposit of proceeds from

PRIFA Rum Tax Revenues and HTA Excise Tax Revenues in the TSA is not inconsistent with

those amounts being restricted for PRIFA and HTA debt service, respectively.

## IV.     The Treasury's Accounting Conveys that HTA Excise Tax Revenues Are Restricted and Is Inconsistent with the Assertions Made by the FOMB and Mr. Ahlberg

28.     HTA is a public corporation and instrumentality of the Commonwealth that is responsible

for the construction, operation and maintenance of the Commonwealth's highways, toll roads,

and mass transportation systems.[27]

29.     I understand that the Movants contend that (1) HTA bonds at issue in this matter – bonds

issued under Resolutions No. 68-18 and 98-06 (collectively the "HTA Bonds") – were secured

by a lien granted by HTA on toll revenues and HTA Excise Tax Revenues, (2) the

Commonwealth granted a lien in the HTA Excise Tax Revenues, (3) the HTA Excise Tax

Statutes provide, in substance, that the Commonwealth must deposit the Excise Taxes in "special

deposit" and not in the General Fund, and (4) the Commonwealth made certain commitments to

HTA bondholders in various statutory provisions.  Specifically, the Commonwealth "pledge[d]

to, and agree with, any person…subscribing to or acquiring bonds of the Authority to finance in

whole or in part any traffic facilities or any part thereof, that it will not limit or restrict the rights

or powers hereby vested in the Authority until all such bonds at any time issued, together with

the interest thereon, are fully met and discharged."[28]

---

imposed by creditors (such as through debt covenants), grantors, contributors, or laws or regulations of other governments; or b.
Imposed by law through constitutional provisions or enabling legislation.  Enabling legislation, as the term is used in this
Statement, authorizes the government to assess, levy, charge, or otherwise mandate payment of resources (from external resource
providers) and includes a legally enforceable requirement that those resources be used only for the specific purposes stipulated in
the legislation.  Amounts that can only be used for specific purposes pursuant to constraints imposed by formal action of the
government's highest level of decision-making authority should be reported as committed fund balance.  Those committed
amounts cannot be used for any other purpose unless the government removes or changes the specified use by taking the same
type of action (for example, legislation, resolution, ordinance) it employed to previously commit those amounts.  Committed fund
balance also should incorporate contractual obligations to the extent that existing resources in the fund have been specifically
committed for use in satisfying those contractual requirements."

[26] See Ahlberg Deposition Exhibits 13 and 24.

[27] Puerto Rico Highways and Transportation Authority Financial Statements for the year ended June 30, 2015,  Note 1 -
Organization,  p. 30, "Puerto Rico Highways and Transportation Authority (the Authority) is a public corporation and
instrumentality of the Commonwealth of Puerto Rico, created by Act No. 74 of June 23, 1965, as amended, to design, construct
and administer toll roads and highways, and other facilities for the movement of persons, vehicles and vessels, and for the
planning, promotion and feasibility of mass transportation systems."

[28] See Highway and Transportation Authority Act (9 L.P.R.A. § 2019.)  See also 13 L.P.R.A. § 31751 ("The Government of
Puerto Rico … also agrees and is committed to ensure that said amounts shall be covered into a special deposit in the name and

### A. HTA Excise Tax Revenues Are Recorded in a Special Revenue Fund (Fund 278), Distinct From the General Fund

30.     Fund 278 is a fiscal and accounting entity in the Commonwealth Treasury's accounting system.[29]  I understand that fund numbers, such as Fund 278, are used to designate funds that are separate from the General Fund.[30]  Based on the deposition testimony and documents I have reviewed, HTA Excise Tax Revenues in Commonwealth bank accounts were recorded in Fund 278 since at least fiscal year 2015 to the present.[31]  It is my understanding that these revenues were not recorded in the General Fund of the Commonwealth.[32]

---

for the benefit of the Highways and Transportation Authority of Puerto Rico, as provided in this Section, until said bonds issued at any time, including their interest, have been paid in full."). 13 L.P.R.A. § 31751(a)(1)(D) ("The Government of Puerto Rico hereby agrees and is committed to any person, firm, or corporation, or any agency of the United States of America, or of any state or of the Government of Puerto Rico, that subscribes or acquires bonds of the Highways and Transportation Authority of Puerto Rico for the payment of which the proceeds of the tax on gasoline, gas oil, or diesel oil and the amount appropriated of the excise tax on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbons fixed in Section 3020.07 are thus pledged, as authorized by this section, to not reduce the tax on gasoline, gas oil, or diesel oil fixed in Section 3020.06, to an amount of less than sixteen cents (16¢) per gallon of gasoline or of four cents (4¢) per gallon of gas oil or diesel oil, respectively, and to not reduce the rates fixed in Section 3020.07 in effect by the date of approval of this Code. It also agrees and is committed to not eliminate or reduce the tax to an amount less than sixteen cents (16¢) per gallon of gasoline or of four cents (4¢) per gallon of gas oil or diesel oil fixed in Section 3020.06 of this Subtitle, nor reduce or eliminate the rates of the excise tax on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbon fixed in Section 3020.07. It also agrees and is committed to ensure that said amounts shall be covered into a special deposit in the name and for the benefit of the Highways and Transportation Authority of Puerto Rico, as provided in this Section, until said bonds issued at any time, including their interest, have been paid in full.").  9 L.P.R.A. § 2021 ("The Commonwealth of Puerto Rico hereby agrees and pledges itself to any person, firm or corporation, or to any agency of the United States of America or of any state, or the Commonwealth of Puerto Rico, who subscribes, or acquires bonds of the Highways and Transportation Authority of Puerto Rico, for the payment of which the proceeds from the increase in the fees paid for public and private service automobile licenses and others, is pignorated as authorized by this section, not to reduce these license fees.").  9 L.P.R.A. § 5681 ("The Commonwealth of Puerto Rico hereby agrees and makes a commitment to any person or agency of the United States of America, of any state or of the Government of Puerto Rico that sell or acquire bonds of the Authority for the payment of which the proceeds of the fees paid for motor vehicle and trailer licenses and others is pledged, as authorized by this section, not to reduce the license fees or the amount collected from the same that the Authority must receive.")

[29] *See* Letter from Elizabeth McKeen, "re: In re Fin. Oversight & Mgmt. Bd., No. 17-BK-3283-LTS – Discovery on Lift Stay Motions – Movants' Letters Dated February 24, 2020 and February 26, 2020," March 13, 2020 at p. 5, "Funds in Treasury's accounting system are both fiscal and accounting entities. … Fund 278 is one of the many fund numbers used to designate 'Special Revenue Funds' within the Treasury systems."

[30] *See* Letter from Elizabeth McKeen, "re: In re Fin. Oversight & Mgmt. Bd., No. 17-BK-3283-LTS – Discovery on Lift Stay Motions – Movants' Letters Dated February 24, 2020 and February 26, 2020 ." March 13, 2020 at p. 5, "Separate Fund numbers exist to designate federal funds and the PR General Fund.".  *See also* Ahlberg Deposition, April 21, 2020,  at p. 84:18-85:8, "Q. So looking at the language that I referred you to, would you agree that Funds in Treasury's accounting system are both fiscal and accounting entities? A. That's what the document says. Q. But do you agree with that statement? A. Yes. Q. The next sentence says: Funds segregate financial information for the purpose of carrying on specific activities and attaining certain objectives in accordance with regulations,  restrictions and limitation. Do you agree with that language? A. Yes."

[31] *See* Ahlberg Deposition, April 21, 2020, at pp. 57:22–58:12, "Q. What is Fund 278? A. Fund 278 is a specific Fund number within the PRIFAS system, Puerto Rico Information and Financial Accounting System what I'll refer to as PRIFAS going forward, is a Fund number within the PRIFAS system used to classify revenue at this time. Q. And what kind of revenue is classified as part of Fund 278? A. Part of Fund 278 are -- revenues that would be classified with Fund 278 would be Funds -- or revenues that had previously been allocated to HTA. Q. And those would include, for instance, the HTA excise taxes? A. Correct." Further, HTA's Treasury separately prepared a spreadsheet with HTA Excise Tax Revenues starting in November 2015 through September 2019. See HTA_STAY0008372 , a "278 Fund Accreditation" Excel file, which contains monthly amounts for HTA Excise Tax Revenues beginning July 2015 through September 2019.

[32] Ahlberg Deposition, April 21, 2020, p. 78:20-23, "Q. Do you have any reason to believe that the HTA excise taxes were reported at any time under the General Fund category? A. No."

31.     The Commonwealth's characterization of Fund 278 as a "special revenue fund"[33] also is of particular significance.  Special revenue funds are used to "account for and report the proceeds of specific revenue sources that are restricted or committed to expenditures for specified purposes."[34]  In its cash flow reports, the Treasury defines "Special Revenue Funds" as "Commonwealth governmental funds separate from the General Fund that are created by law, are not subject to annual appropriation and have specific uses established by their respective enabling legislation.  Special Revenue Funds are funded from, among other things, revenues from federal programs, tax revenues assigned by law to public corporations and other third parties, fees and charges for services by agencies, dividends from public corporations and financing proceeds."[35]  In this matter, the revenues were restricted due to the provisions of excise tax statutes and constraints externally imposed by creditors (i.e., debt covenants).[36]  The act of accounting for the HTA Excise Tax Revenues, even though proceeds from revenues are on deposit in Commonwealth bank accounts, in a special revenue fund—both prior to and subsequent to the Clawback Order—conveys, in this matter, that the resources were and continue to be restricted, i.e., the resources were limited to HTA debt service.

32.     The Commonwealth treated Fund 278's resources as if they were restricted even when the moneys were in Treasury bank accounts, irrespective of whether they were pooled with other moneys.  Since at least June 2016, based on my review of documents and the testimony of Mr. Ahlberg, the Commonwealth has continued to designate the HTA Excise Tax Revenues collected as part of Fund 278. [37]  In addition, according to Mr. Ahlberg, having searched through the

---

[33] *See* Letter from Elizabeth McKeen, "re: In re Fin. Oversight & Mgmt. Bd., No. 17-BK-3283-LTS – Discovery on Lift Stay Motions – Movants' Letters Dated February 24, 2020 and February 26, 2020," March 13, 2020 at p. 5, "Funds in Treasury's accounting system are both fiscal and accounting entities. … Fund 278 is one of the many fund numbers used to designate 'Special Revenue Funds' within the Treasury systems."

[34] GASB, Statement No. 54, ¶30.

[35] CW_STAY0000229 at 231.

[36] *See* Puerto Rico Highways and Transportation Authority Financial Statements for the year ended June 30, 2015, p. 5, defining the "Restricted for Debt Service" category as "consist[ing] of restricted assets for the principal and interest payments of the bonds payable," and noting that "[t]his restriction is imposed by the bondholders through debt covenants."; id. at 36, "Non-operating revenues consist principally of gasoline, diesel, petroleum and cigarettes taxes and vehicle license fees which are allocated to the Authority by the Commonwealth of Puerto Rico as approved by law to finance the acquisition and construction of capital assets and for the payment of the related debt."

[37] See Ahlberg Deposition, April 21, 2020, pp. 57:22–58:12, "Q. What is Fund 278? A. Fund 278 is a specific Fund number within the PRIFAS system, Puerto Rico Information and Financial Accounting System what I'll refer to as PRIFAS going forward, is a Fund number within the PRIFAS system used to classify revenue at this time. Q. And what kind of revenue is classified as part of Fund 278? A. Part of Fund 278 are -- revenues that would be classified with Fund 278 would be Funds -- or revenues that had previously been allocated to HTA. Q. And those would include, for instance, the HTA excise taxes? A. Correct."  Further, HTA's Treasury separately prepared a spreadsheet with HTA Excise Tax Revenues starting in July 2015 through September 2019. See HTA_STAY0008372 , a "278 Fund Accreditation" Excel file, which contains monthly amounts for HTA Excise Tax Revenues beginning July 2015 through September 2019.

Contains Information Designated as Confidential by the Government Parties

records, testified that "I've seen no evidence of any transfers to entities that would have used Fund source 278 as the revenue source for that transfer" since at least July 2016.[38]

33.     In its cash flow reports, the Treasury has consistently categorized the HTA Excise Tax Revenues as special-revenue collections, as opposed to General Fund collections.[39]  The fact that proceeds of the HTA Excise Tax Revenues designated as part of Fund 278 may have been pooled with other restricted and unrestricted cash in Treasury bank accounts does not alter the special-revenue and restricted nature of the HTA Excise Tax Revenues.  It is not uncommon for a government to pool cash of its various governmental entities in a centralized account while continuing to maintain accounting recognition of the restricted and special-revenue status of particular revenues with limited use.

**B.      During FY 2015, HTA Had Authority to Access and Use HTA Excise Tax Revenue Proceeds that Were Deposited in the TSA and Designated Part of Fund 278**

34.     When proceeds of HTA Excise Tax Revenues are collected by the Treasury and deposited into the Treasury's collections bank account, the Treasury records an increase in Fund 278 in those amounts.[40]  As discussed above, the revenues recorded into Fund 278 are reported as resources of HTA.

35.     The Commonwealth's accounting systems and processes indicate that HTA had the ability to access and use HTA Excise Tax Revenue proceeds while the cash was held in the Treasury's bank account.  Specifically, Commonwealth Treasury documents indicate that HTA was delegated approval authority for vouchers for the movement of HTA Excise Tax Revenue collections from Treasury operating bank accounts to HTA bank accounts.  Treasury Circular Letter 1300-01-99, App 3, identifies SC 735 payment vouchers as "[d]ocuments for which data entry and approval have been delegated to the agencies."  An HTA financial officer initiated and authorized the data entry and approval of the SC 735 vouchers related to Fund 278.[41]  And

---

[38] Ahlberg Deposition, April 23, 2020, p. 291:3–6.  *See also* Ahlberg Deposition Exhibit 13, pp. 5–6.

[39] *See* TSA Cash Flow as of July 14, 2017, CW_STAY00000409-421 at 412-413; TSA Cash Flow for October & November FY2018, CW_STAY00000229-242 at 231; TSA Cash Flow for the month of October FY20, CW_STAY0000859-878 at 861, TSA Cash Flow for the month of January FY20; CW_STAY00000914-933 at 916.

[40] Ahlberg Deposition, April 21, 2020, pp. 60:16-61:11, testifying that, when the Excise Taxes come "into the collection sweep account called [Colecturía], they receive [the Fund 278] designation."

[41] HTA_STAY0000513-515 (SC 735 payment voucher signed by César M. Gandiaga Texidor, HTA's then Assistant Executive Director); HTA_STAY0028880-8900 (identifying Mr. Gandiaga as HTA's Assistant Executive Director for Administration and Finance); see also HTA_STAY0000467-492, HTA_STAY0000454-466, HTA_STAY000493-512, HTA_STAY0000513-515,

documents also indicate that Fund 278 revenues have been withdrawn by HTA through SC 735 payment vouchers, as indicated in the Circular Letter.[42]

36.     These actions indicate that the HTA Excise Tax Revenues and related assets represented the assets of HTA from initial accounting recognition through their expenditure.

### C.     The TSA Cash Flow Reports Continue to Convey Restrictions on the Use of HTA Excise Tax Revenues

37.     Beginning in July 2017, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") and the Treasury began preparing periodic (often weekly) TSA Cash Flow Reports.[43] The TSA Cash Flow Reports continue to be prepared weekly and are publicly available on AAFAF's website.[44]

38.     In TSA each Cash Flow Reports from 2017 through the present, cash inflows from HTA Excise Tax Revenues are reported as "HTA Pass Through" or "Non-General Fund Pass-Through" collections, as opposed to General Fund collections.[45]  The HTA Pass Through amounts were consistently categorized as "Special Revenue Funds."[46]  The TSA Cash Flow Reports defines the term "Special Revenue Funds" as used in those reports as:

> Commonwealth governmental funds separate from the General Fund that are created by law, are not subject to annual appropriation and have specific uses established by their respective enabling legislation. Special Revenue Funds are

---

HTA_STAY0000516-531, HTA_STAY0000532-545, HTA_STAY0000546-549, HTA_STAY0000556-602, HTA_STAY0000603-613, HTA_STAY0000614-627, HTA_STAY0000628-653, HTA_STAY0007985-8024. *See also* Ahlberg Deposition, April 21, 2020, at p.118:15-20, "Q. Okay. And the voucher itself that you were looking at shows that the money withdrawn from Treasury's operational account comes from Fund 278, doesn't it? A. The document does list Fund 278 there."; 122:10-14, "Q. Thank you. And these also reflect that they are transfers relating to Fund 278 related to HTA, correct? A. Yeah, from -- from the other ones that I just looked at, yes."

[42] Ahlberg Deposition, April 23, 2020, p. 290:19–20, "I've seen no outflows to other entities other than HTA that identified the revenue source of Fund 278."

[43] Puerto Rico AAFAF, "Publications & Reports," http://www.aafaf.pr.gov/reports html.

[44] Puerto Rico AAFAF, "Publications & Reports," http://www.aafaf.pr.gov/reports html.

[45] *See e.g.,* See  e.g., TSA FY 2018 Cash Flow, as of November 10, 2017, p. 7.  n some of the TSA cash flow reports, HTA Pass Through funds were listed under the header "Retained Revenues" (defined as "Retained Revenues are revenues conditionally assigned to certain public corporations and the collections of those revenues are through accounts referred to as "pass through" account"). *See* TSA FY 2018 Cash Flow, as of December 19, 2017, p. 8.  Note that beginning in January 2019, HTA Pass Through Funds were reported under "Non-General Fund Pass-Through Collections." *See* Puerto Rico AAFAF, "Publications & Reports," http://www.aafaf.pr.gov/reports html *See also* Ahlberg Deposition, April 23, 2020, at pp. 278:5–280:25.

[46] *See e.g.,* CW_STAY0000409 at 415 (listing "HTA Pass Through" collections under "Special Revenue Funds"; "Special Revenue Fund Collections are pledged to specific public corporations and are known as 'pass-through' accounts."). In some of the TSA cash flow reports, HTA Pass Through funds were listed under the header "Retained Revenues" (defined as "Retained Revenues are revenues conditionally assigned to certain public corporations and the collections of those revenues are through accounts referred to as "pass through" account"). *See* TSA FY 2018 Cash Flow, as of December 19, 2017, p. 8.  Note that beginning in January 2019, HTA Pass Through Funds were reported under "Non-General Fund Pass-Through Collections." *See* Puerto Rico AAFAF, "Publications & Reports," http://www.aafaf.pr.gov/reports html.

funded from, among other things, revenues from federal programs, tax revenues
assigned by law to public corporations and other third parties, fees and charges for
services by agencies, dividends from public corporations and financing
proceeds.[47]

39.     By reporting proceeds from HTA Excise Tax Revenues under the "special revenue
funds" heading, the TSA Cash Flow Reports continue to signal that there are restrictions on the
use of HTA Excise Tax Revenues.  Over time, the language used in the heading for the HTA
Pass Through revenues changed, but the use of Fund 278 to track HTA Excise Tax Revenues in
the TSA did not.[48]  Mr. Ahlberg also indicated that HTA Excise Tax Revenues could be
identified if they were transferred out of Treasury accounts by reviewing transfer documents
reflecting the Fund 278 designation.[49]

## V.     The Treasury's Accounting Conveys that PRIFA Rum Tax Revenues Are Restricted and Is Inconsistent With Assertions Made by the FOMB and Mr. Ahlberg

40.     PRIFA is a financing authority responsible for providing financial, administrative, and
other types of assistance to other component units and instrumentalities, "which are authorized to
develop infrastructure facilities and to establish alternative means for financing them."[50]

41.     PRIFA publicly reported that its outstanding debt primarily consists of "special tax
revenue bonds" which are payable from federal excise taxes levied on rum and other items
produced in Puerto Rico and sold in the United States ("PRIFA Bonds").[51]  I understand that (1)

---

[47] See e.g. Ahlberg Deposition Exhibit 5, p. 3.

[48] See Ahlberg Deposition, April 23, 2020, pp. 288:7 – 289:22, discussing inflows and outflows of HTA revenues in the TSA as being under the Fund 278 designation.

[49] *See* Ahlberg Deposition, April 21, 2020, pp.171:17-22, "Q. And, again, with respect to all of these transfers from account to account, what did you look at to determine that there were actual transfers of HTA excise taxes? A. We would look at bank statements, transfer details or vouchers." *See also* pp. 204:22-205, "Q. But if excise taxes have gone from account to account and remain comingled, I guess your testimony is that the Fund designations still provide a mechanism for you to determine the source of revenues? A. The source of revenues would always be recorded the same in Account 5191, and that would be the information used."; and p. 289:5-22, "Q. So Fund 278 is designated on both inflows and outflows from the TSA with respect to revenues therein, correct? ...A: No, the outflows would show Fund 278 as being the source of those -- source revenues for a transfer or outflow. Q. So outflows of Fund 278 revenues would identify Fund 278 as the source of the revenue for that outflow; is that correct? A. I don't know if that's correct the way you phrased the question, but outflows to HTA that were -- that the funding source was revenue earned under 278, that transfer would show that the revenue source for that transfer was Fund 278 revenue."

[50] 2015 Commonwealth Annual Report p. 58, "PRIFA is a financing authority whose responsibilities are to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other component units and governmental instrumentalities of the Commonwealth, which are authorized to develop infrastructure facilities and to establish alternative means for financing them."

[51] See, e.g., 2015 Commonwealth Annual Report p. 58-9, "PRIFA's total debt outstanding, mostly Special Tax Revenue Bonds comprising over 95% of its total debt payable from federal excise taxes levied on the rum and other artless produced in Puerto Rico and sold in the United States, which taxes are collected by the US Treasury and returned to the Commonwealth."

the PRIFA Enabling Act provides that each year, PRIFA is to receive from the Treasury the first

$117 million in rum tax revenues (i.e.,  the PRIFA Rum Tax Revenues),[52] which is to be

"covered" into the Infrastructure Fund "to be maintained by or on behalf" of PRIFA,[53] (2),

PRIFA, in turn, pledged the PRIFA Rum Tax Revenues to the PRIFA bondholders,[54] and (3) the

Commonwealth made certain commitments to PRIFA bondholders in statutory provisions.

Specifically, the Commonwealth "pledge[d] and agree[d] with the holders of any bonds…that it

shall not limit or alter the rights hereby conferred to the Authority until such bonds and the

interest thereon are paid in full and such contracts are fully performed and honored on the part of

the Authority" and that PRIFA, "as an agent of the Commonwealth, is hereby authorized to

include this pledge on behalf of the Commonwealth on such bonds or contracts."[55]

### A. The Resources Generated by the Enabling Act "To Be Covered Into the Infrastructure Fund" Were Accounted for in PRIFA's Special Revenue Fund and Reported as Restricted in FY 2015

42.     The Commonwealth disclosed that it accounted for and reported the resources generated

by the Enabling Act in a special revenue fund for the PRIFA Rum Tax Revenues.  For example,

---

[52] See Supplemental Opposition of Commonwealth of Puerto Rico to Amended PRIFA Bondholder Motion to Lift Automatic Stay, February 03, 2020, ¶5. *See also* 3 L.P.R.A. § 1914 provides, in relevant part: "[T]he **first proceeds of the federal excise taxes remitted to the Department of the Treasury of Puerto Rico on each fiscal year,** pursuant to Section 7652(a)(3) of the United States Internal Revenue Code of 1986, as amended, for up to a maximum amount of … **one hundred and seventeen million dollars ($117,000,000),** which when received by the Department of the Treasury of Puerto Rico, shall be covered into a Special Fund to be maintained by or on behalf of the Authority, designated as the 'Puerto Rico Infrastructure Fund', and be used by the Authority for its corporate purposes, which shall include the development of the infrastructure necessary and convenient for holding the Mayaguez 2010 Central American and Caribbean Games." (emphasis added)

[53] 3 L.P.R.A. § 1914. The PRIFA Enabling Act states: "the first proceeds of the federal excise taxes remitted to the Department of the Treasury of Puerto Rico on each fiscal year, pursuant to Section 7652(a)(3) of the United States Internal Revenue Code of 1986, as amended, . . . in the case of fiscal years 2006-07 to 2008-09, and in subsequent years until fiscal year 2056-57, the participation shall be for an amount of up to one hundred and seventeen million dollars ($117,000,000), which when received by the Department of the Treasury of Puerto Rico, **shall be covered into a Special Fund to be maintained by or on behalf of the Authority, designated as the 'Puerto Rico Infrastructure Fund'**, and be used by the Authority for its corporate purposes . . . ."

[54] See Trust Agreement dated October 1, 1988, between PRIFA and U.S. Bank Trust National Association, successor trustee (the "Trust Agreement") at 9: [I]n order to secure the payment of the Bonds at any time issued and outstanding hereunder and the interest and premium, if any, thereon according to their tenor, purpose, and effect, and in order to secure the performance and observance of all the covenants, agreements and conditions therein and herein contained, the Authority has executed and delivered this Agreement and has pledged and does hereby pledge to the Trustee the Pledged Revenues (as defined herein) and as security for the payment of the Bonds and the interest and premium, if any, thereon and as security for the satisfaction of any other obligation assumed by it in connection with such bonds…."

[55] 3 L.P.R.A. § 1913, Covenant of Commonwealth with bondholders, "The Commonwealth pledges and agrees with the holders of any bonds issued under this chapter and with those persons or entities that enter into contracts with the Authority, pursuant to the provisions hereof, that it shall not limit or alter the rights hereby conferred to the Authority until such bonds and the interest thereon are paid in full and such contracts are fully performed and honored on the part of the Authority; Provided, however, That nothing provided herein shall affect or alter such limitation if adequate measures are provided by law for the protection of said holders of the Authority's bonds or of those who have entered into such contracts with the Authority. The Authority, as an agent of the Commonwealth, is hereby authorized to include this pledge on behalf of the Commonwealth on such bonds or contracts."

in its audited basic financial statements for the year ended June 30, 2015, the Commonwealth stated:

> The special revenue fund of the Puerto Rico Infrastructure Financing Authority, a blended component unit, is used to account principally for the moneys received by the Commonwealth, up to $117 million, of certain federal excise taxes levied on rum and other articles produced in Puerto Rico and sold in the United States, which are collected by the U.S. Treasury and returned to the Commonwealth. [56]

43.   As noted above, special revenue funds are used "to account for and report the proceeds of specific revenue sources that are restricted or committed to expenditures for specified purposes other than debt service or capital projects."[57]

44.   Because the Commonwealth "pledge[d] and agree[d]" with the bondholders that a defined portion of the PRIFA Rum Tax Revenues would be used for debt service on the bonds "until such bonds and the interest thereon are paid in full and such contracts are fully performed and honored"[58] and granted PRIFA the authority to include that pledge on behalf of the Commonwealth, in my opinion, the resulting resources were "restricted," as that term of art is used in fund accounting.

### B.   Recording PRIFA Rum Tax Revenue Proceeds in the General Fund is Not Inconsistent with the Infrastructure Fund Being a Special Revenue Fund

45.   Documents produced by the Commonwealth and testimony indicate that when the Treasury receives rum tax collections from the United States, revenues are recorded in the General Fund (Fund 111) in Account R4220, the revenue account used by the Treasury to "record the revenues of rum taxes."[59]   The fact that incoming PRIFA Rum Tax Revenues are

---

[56] Commonwealth of Puerto Rico, Basic Financial Statements and Required Supplementary Information for Fiscal Year Ended June 30, 2015, (With Independent Auditors' Report Thereon), p. 357.

[57] GASB No. 54 par 30. The Commonwealth's TSA Cash Flow Reports similarly recognize that Special Revenue Funds are "separate from the General Fund", "are not subject to annual appropriation", and have "specific uses established by their respective enabling legislation." *See* CW_STAY00000409 at 412-13; CW_STAY0000229 at 231; CW_STAY0000859 at 861; CW_STAY0000914 at 916.

[58] 3 L.P.R.A. § 1913, Covenant of Commonwealth with bondholders, "The Commonwealth pledges and agrees with the holders of any bonds issued under this chapter and with those persons or entities that enter into contracts with the Authority, pursuant to the provisions hereof, that it shall not limit or alter the rights hereby conferred to the Authority until such bonds and the interest thereon are paid in full and such contracts are fully performed and honored on the part of the Authority; Provided, however, That nothing provided herein shall affect or alter such limitation if adequate measures are provided by law for the protection of said holders of the Authority's bonds or of those who have entered into such contracts with the Authority. The Authority, as an agent of the Commonwealth, is hereby authorized to include this pledge on behalf of the Commonwealth on such bonds or contracts."

[59] Ahlberg Deposition, April 23, 2020, pp. 372:19–373:2, "Q. Okay. And then to the left of that it says Cuenta R4220. Do you see that? A. Yes. Q. And is that the revenue account within the General Fund that's used for rum excise taxes that we discussed earlier? A. That's the revenue account used within the PRIFA system to record the revenues of rum taxes." See also 3/31/20 McKeen Letter p. 4, "Account value R4220 refers to the account used for the Rum Cover Over Refunds received from the

recorded in PRIFAS as General Fund revenue is not inconsistent with the Infrastructure Fund existing as a special revenue fund.

46.     The accounts used in accounting systems like PRIFAS are helpful for tracking funds subject to particular restrictions, but those accounts are not, in and of themselves, ultimately determinative of which moneys are held as special funds or otherwise subject to restrictions. Fund accounting acknowledges that governmental entities have discretion to implement tracking and accounting of moneys in different ways so long as the restrictions are properly maintained and conveyed.  Fund accounting allows for PRIFA's special fund revenues to be tracked as part of the General Fund.

## VI.     The Commonwealth's Accounting Systems Should Allow For the Identification of Fund 278 and Infrastructure Fund Moneys

47.     It is necessary for a government to have sufficient accounting systems and controls in place to permit the tracing of restricted resources and related expenditures.  Management cannot responsibly make assertions about the government's finances in financial statements prepared in conformity with GAAP without having some reasonable basis for doing so.[60] A comprehensive framework of internal control provides a basis for management's assertions contained in financial statements presented in conformity with GAAP.[61]

48.     Controls to trace cash receipts and related disbursements are necessary to assure compliance with restrictions and other limitations commonly associated with streams of revenues at state or local governments. Cash from different revenue streams (including HTA Excise Tax Revenues and PRIFA Rum Tax Revenues) must by necessity be traceable into and out of bank accounts and the Commonwealth's accounting system, even if restricted cash in bank accounts are pooled with cash from other unrestricted revenue sources.[62]  Indeed, this is consistent with

---

Alcohol and Tobacco Tax and Trade Bureau for rum exported to the United States. … Fund value 'Fund 111' refers to Fondo General." See also, Ahlberg Deposition, April 23, 2020, p. 349:8–13, "Q. Okay. Do you know whether the R4220 revenue code continues to attach to rum taxes that are collected today? A. I believe that that revenue account code is still used to record rum revenues that are earned."

[60] 2012 GAAFR, Chapter 44, "Management cannot responsibly make assertions about an entity's finances without having some reasonable basis for doing so. A comprehensive framework of internal control provides that reasonable basis."

[61] 2012 GAAFR, Chapter 1. "A comprehensive framework of internal control is necessary to provide management a responsible basis for assuming responsibility for the financial statements."

[62] See, e.g., 2012 GAAFR, Chapter 42, "Records should be designed in accordance with the following principles: … a unique identifier should be assigned to each transaction to allow for easy tracing. … The information system should systematically collect the data needed for both managerial purpose (for example, cost accounting) and financial reporting)…"

the Commonwealth's ability to trace the expenditure and transfer of funds.[63] Fund accounting is one of the tools used by governments, including the Commonwealth, to trace restricted resources.

49.     Because the Commonwealth financial statements indicate that they are prepared in conformity with GAAP, the Commonwealth necessarily must track the various sources of resources it is receiving and the uses of those resources. One should be able to identify moneys accounted for in Fund 278 or held to the credit of the Infrastructure Fund by applying fund accounting principles and reviewing the Commonwealth's general ledger and other transaction records.  By applying fund accounting principles, one should also be able to identify the proceeds from HTA Excise Tax Revenues and the balance allocable to the Infrastructure Fund.

## VII.   Analysis of the TSA's Historic Cash Position Compared to the Clawed-Back Revenues from the HTA and PRIFA Bonds

50.     I have been asked to consider whether the balance of the TSA fell below the cumulative Clawed-Back HTA and PRIFA Tax Revenues.[64]

51.     In the context of this report, prepared for a preliminary hearing, I was asked to limit my analysis to the time period from July 2017 through November 2019.  The Treasury has publicly reported cash balances in the TSA since July 2017.[65]  I may be asked to extend the analysis that I

---

[63] Ahlberg Deposition, April 23, 2020, p. 289:14–22 ("Q. So outflows of Fund 278 revenues would identify Fund 278 as the source of the revenue for that outflow; is that correct? A. I don't know if that's correct the way you phrased the question, but outflows to HTA that were -- that the funding source was revenue earned under 278, that transfer would show that the revenue source for that transfer was Fund 278 revenue.") *See also*, Ahlberg Deposition, April 23, 2020, pp. 411:24–412:7 ("Q. Okay. I know that. But on the previous chart, we saw the rum tax revenues being deposited into the 006 account, which is the equivalent account to the current BPPR 9458 account, right? And we were able to identify outflows as a revenue source of rum excise taxes. Do you recall doing that exercise on the prior two terms? A. Yes.") *See also*, Ahlberg Deposition, April 23, 2020, pp. 413:12–414:21 ("Q. For the period January 2014 through March 2016, when rum taxes flowed out of the Commonwealth's main operational account, you were able to identify that, correct? A. No. We were able to identify transfers from the operational account whose fund source was rum tax revenue. Q. Okay. So for the period January 2014 through March 2016, you were able to identify transfers from the operational account whose fund source was rum tax revenue; is that correct? A. That is correct. Q. Okay. And you were not able to identify any outflow with the fund source of rum tax revenues during the period April 2016 to the present, is that correct? A. It's not that we were unable to. It's that we did not identify anything as such. Q. Okay. So to the best of your knowledge, there were no outflows from the TSA with a revenue source of rum excise taxes, correct?...Q. Sorry. During this period, from April -- let me just restate it so we have a clean question. To the best of your knowledge, there were no outflows from April 2016 to the present from the TSA with a revenue source of the rum excise taxes, correct? A. With the exception of the $1 million listed on this presentation document, that is correct.")

[64] This analysis was performed based on bank account balances rather than on fund accounting and related fund balances.

[65] The cash balances used in this analysis are those reported in the TSA cash flow reports.  See http://www.aafaf.pr.gov/reports.html; HTA_STAY0000001, CW_STAY0000156–176, CW_STAY0000203–28, CW_STAY0000297–309, CW_STAY0000467–81, CW_STAY0000422–36, CW_STAY0000535–547, CW_STAY0000590–824, CW_STAY0000846–92, CW_STAY0000934–53, ERS_LS0000954–69, ERS_LS0001018–33, ERS_LS0001469–82, ERS_LS0001540–54.

have conducted to cover the entire time period for which the HTA and PRIFA bonds have not been paid in full.

52.     In order to conduct the lowest intermediate balance test in this context, I compared the cumulative amount of Clawed-Back HTA and PRIFA Tax Revenues to the TSA cash balance at each month end from July 2017 to November 2019.  As discussed in Section III above, as part of the Treasury's cash management system, cash is pooled into multiple bank accounts that collectively comprise the TSA.[66]

53.     As shown in **Exhibits 1** and **2**, between July 2017 and November 2019, the total amount of Clawed-Back HTA and PRIFA Tax Revenues from bondholders was approximately $1.3 billion.  The balance of the TSA exceeded this amount at all relevant times.  Accordingly, for this time period, the entire amount clawed back from bondholders is traceable under the lowest intermediate balance test.

54.     I have not conducted a lowest intermediate balance test with respect to HTA and PRIFA Tax Revenues that were clawed back prior to July 2017.  I understand that the Commonwealth has not disclosed TSA Cash Flow Reports for that time period.  With additional discovery showing the Commonwealth's cash balances, I may be asked to extend this analysis to cover the additional time period prior to July 2017.

William W. Holder

Executed this 30th day of April, 2020

---

[66] See Letter from E. L. Mckeen and Michael Mervis, "Re: In re Fin. Oversight & Mgmt. Bd., No. 17-BK-3283-LTS – Discovery on Lift Stay Motions – Response to Movants' Request During Meet and Confer Conference Call on April 16, 2020," April 19, 2020, p. 1.  *See also* CW_STAY0000156–176.

# Appendix A

## William W. Holder
## Curriculum Vitae

### I.    General Information

**A.    Personal Data**

1.    Home Address:
    409 North Star Lane
    Newport Beach, CA 92660-5717
    Phone:  (949) 642-9634
    Fax:  (949) 642-9664

2.    Business Address:
    University of Southern California
    Leventhal School of Accounting
    Los Angeles, California 90089-0441
    Phone:  (213) 740-4855
    Fax:  (213) 747-2815

**B.    Academic and Professional Preparation**

1.    Formal Education

    a.    University of Oklahoma, Doctor of Business Administration, 1974. Major - Accounting, Minors - Economics and Management.  Dissertation Title - "The Impact of Third Party Reimbursement upon Capital Budgeting Decisions of Hospitals."

    b.    University of Oklahoma, Master of Accountancy, 1972.

    c.    Oklahoma State University, Bachelor of Science in Business Administration (Accounting major), 1969.

2.    Professional Certificates

    a.    Certified Public Accountant, Oklahoma and California.

**C.    Professional Experience**

1.    Academic

    a.    Dean, Leventhal School of Accounting and Alan Casden Dean's Chair in Accountancy, University of Southern California, appointed 2011 to present.

    b.    Ernst & Young Professor, University of Southern California, 1990 to 2011.

    c.    Accounting Circle Professor, University of Southern California, 1988 to 1990.

Contains Information Designated as Confidential by the Government Parties

    d.      Professor, University of Southern California, 1986 to 1988.

    e.      Associate Professor, University of Southern California, 1979 to 1986.

    f.      Associate Professor, Texas Tech University, 1977 to 1979.

    g.      Assistant Professor, Texas Tech University, 1974 to 1977.

    h.      Visiting Associate Professor, University of Tennessee, Summer, 1978.

    i.      Special Instructor, University of Oklahoma, 1970 to 1974.

2.    Professional (compensated)

Member, Governmental Accounting Standards Board, July 1, 2000 to June 30, 2010.

3.    Administrative

    a.      Director, SEC and Financial Reporting Institute
              University of Southern California, 1994 - 2011

    b.      Director, Master of Accounting Program
              University of Southern California, 1983 to 1988

4.    Other

    a.      Head of Accounting Services, 1969-1970, Oklahoma State University, Stillwater, Oklahoma.

    b.      Independent Certified Public Accountant, 1971 to 1975.

    c.      Faculty Resident, Peat, Marwick, Mitchell & Co. 1976.

    d.      Faculty Fellow, Price Waterhouse, 1980.

    e.      Faculty Fellow, Coopers & Lybrand, 1988.

    f.      Many individual consulting engagements with various public accounting firms, municipalities, industries and in litigation support.

## II.   Teaching Effectiveness

## A.   Dissertation Committees

1.    Chairman, Dissertation Committee of Salih Jadallah.  Title, Operational Auditing of Governmental Units in Saudi Arabia.

2.    Member, Dissertation Committee of John Klover.  Title, Physician's Attitudes Toward Collective Bargaining.

3.    Member, Dissertation Committee of Robert W. Ingram.  Title, Social Disclosures and Security Returns.

4.    Member, Dissertation Committee of Mary Akpovi.  Title, An Analysis of the Nigerian Economy Within the Framework of the Wedge Model.

5.    Member, Dissertation Committee of Avelina Delea.  Title, Effectiveness of Governmental Audit Functions.

2

B.    **Awards**

1.    Distinguished Scholar Alumnus, Price College of Business, University of Oklahoma, 2015.

2.    Distinguished Alumnus, Oklahoma State University. Inducted into the Wilton T. Anderson School of Accounting Hall of Fame, 2010.

3.    Award for Distinguished Service, California Society of Certified Public Accountants, 2007.

4.    Gold Medal Award for Distinguished Service, American Institute of Certified Public Accountants (AICPA) "In recognition of such a distinguished career, and with great appreciation, the Institute presents the Gold Medal for Distinguished Service, its highest award…", 2006.

5.    Distinguished Achievement in Accounting Education Award, AICPA, 2003.

6.    Selected by Accounting Today as one of the 100 most influential people in the accounting profession.  (successively 2001 and 2002)

7.    Distinguished Service Award, California Society of CPA's, 1998-1999.

8.    Robert Emmett Knox Education Achievement Award, designed to recognize outstanding activities during the recipient's lifetime, which have had a significant impact on future members of the profession, California Society of CPA, 1997.

9.    Best Professor, University of Southern California School of Accounting Master of Accounting Graduate Students, 1993.

10.   Best Professor by University of Southern California School of Accounting Student Liaison Board in the initial presentation of this award, 1990.

11.   Outstanding Discussion Leader Award, AICPA, 1988.

12.   Faculty Merit Award, made to an individual "... for outstanding contributions in curriculum and program development, teaching, research and professional service."  Federation of Schools of Accountancy, 1988

13.   Award for Instructor Excellence ". . . in recognition of a consistent record of excellence…," California Society of CPA, Education Division, 1988.

14.   Faculty Excellence Award.  This award is made annually to an accounting educator in California in recognition of ". . . exceptional achievements as a contemporary leader in accounting education", California Society of CPA, 1987.

15.   Outstanding Service Award, School of Accounting, University of Southern California.  The award is made annually by Beta Alpha Psi, the national accounting honorary fraternity, 1980.

16.   Top 20 Professor, College of Business Administration, University of Southern California. The selection was based on student evaluations, 1980.

17.   Outstanding Teaching Award as one of five professors at Texas Tech University in the Mortar Board program of recognizing excellence in teaching, 1978.

Contains Information Designated as Confidential by the Government Parties

C.    **Honors**

    1.    Fellowship

        a.    Haskins & Sells Foundation Faculty Assistance Award, University of Oklahoma.

    2.    Honorary Societies (memberships)

        a.    Beta Alpha Psi

        b.    Beta Gamma Sigma

        c.    Phi Kappa Phi

        d.    MENSA

        e.    Outstanding Young Men of America

## III.  Research and Publication

A.    **Works Published**

    1.    Books

        Guide to Audits of Local Governments, III Vols. (Fort Worth, Texas: Practitioners Publishing Company (a subsidiary of Warren, Gorham, and Lamont, 2019) (with Doug Carmichael).

        Intermediate Accounting (San Diego:  Harcourt, Brace, Jovanovich, 1998 (supplemental printing, 5th edition) (with Jan R. Williams and Keith Stanga), pp. 1328.

        "Local Government Accounting," Management Policies in Local Government Finance (5th ed.) (Washington, D.C.:  International City Management Association, 2004)  pp. 207-224.

        "Future Developments in Governmental Accounting and Reporting," Handbook of Governmental Accounting and Finance (New York, New York:  John Wiley & Sons, 1988) pp. 5.259-5.268.

        The CPA Examination:  A Complete Review, Vols. I and II (New York: Houghton, Mifflin & Co., 1986), 7th ed. (with J. Owen Cherrington, et al.).

        "Cost Accounting and Analysis in State and Local Governments," The Managerial and Cost Accountants Handbook (Homewood, Illinois:  Dow Jones-Irwin, 1979), pp. 794-839 (with Robert J. Freeman and Harold Hensold, Jr.).

    2.    Journal Articles

        "On the Desirability of Common Financial Reporting Standards for Business and Government," Australian Accounting Review No. 56, Vol. 21, Issue 1, 2011, pp 107-110.

4

"The CPA Examination:  A Vision Fulfilled," Journal of Accountancy (New York: American Institute of Certified Public Accountants, July 2005), pp. 35-39 (with Paula Thomas, PhD).

"The Computerized CPA Exam:  It's a Whole New Ballgame," <u>California CPA</u> (Redwood City, CA:  California Society of Certified Public Accountants, September 2004, pp 13-17 (With Diane Babuin).

"Materiality Considerations," <u>Journal of Accountancy</u> (New York:  American Institute of Certified Public Accountants, November 2003), pp. 61-66 (with Kenneth R. Schermann and Ray Whittington, PhD).

"Pathways to Improving the Financial Reporting System," <u>Marshall School of Business</u> <u>Magazine</u> (California: University of Southern California, Winter 2003), pp. 52-53.

"What Foreign Filers Need To Know," <u>Financial Executive</u> (New Jersey: Financial Executives International, May, 2001), pp. 22-24 (with Jerry Arnold and Joseph W. Duggan).

"Pencils Down, Computers Up —The New CPA Exam," <u>Journal of Accountancy</u> (New York:  American Institute of Certified Public Accountants, March, 2001), pp. 57-60 (with Craig Mills)

"Disclosure of Measurement Uncertainties: Guide to a Financial Reporting Evolution in Progress," <u>Journal of Accountancy</u> (New York: American Institute of Certified Public Accountants, December, 1998), pp. 99-105 (with Jerry L. Arnold).

"The SEC's Audit Requirements for Companies Acquired and Equity Investees," <u>Research in Accounting Regulation</u> (Greenwich, CN: JAI Press Inc., Vol II, 1997) pp. 145-157 (with Jerry Arnold).

"Changes in Accounting Education at the University of Southern California;" <u>Accounting and Finance</u> (Mayville, South Africa: Butterworth Publishers, Ltd., August 1997) pp. 11-14.

"Liability Considerations in Deciding to Serve Not-For-Profit Organizations," <u>Outlook</u> (Redwood City, CA: California Society of CPAs, 1996) pp. 32.

"Special Committee of Financial Reporting:  Initial Report," <u>CPA Journal</u>, (New York:  New York State Society of CPAs, 1992), pp. 8-10.

"Compliance Auditing:  The Changing State of the Art," <u>The CPA Journal</u> (New York:  The New York State Society of CPAs, September 1989), pp. 28-40 (with John R. Miller).

Contains Information Designated as Confidential by the Government Parties

"The SEC and Fraudulent Financial Reporting", Research in Accounting Regulation (Greenwich, CT:  JAI Press, Vol. 2, September 1988) pp. 167-188 (with Karen Pincus and Ted Mock).

"The Not-For-Profit Financial Reporting Entity:  An Exploratory Study of Current Practice" Financial Accountability and Management (Oxford, England: Basil Blackwell, Ltd., pp. 311-330, Winter 1987).

"Problems of Income Determination for Service Industries," The CPA Journal (New York: The New York State Society of CPAs, pp. 54-63, October 1986) (with Carolyn S. Holder).

"A New Look in Governmental Audits," Journal of Accountancy (New York: American Institute of Certified Public Accountants, pp. 82-88, April 1986) (with Gerald W. Hepp).

"Educational Requirements for Public Accounting," The CPA Journal (New York: New York State Society of Certified Public Accountants, pp. 36-48, December 1985) (with E. John Larsen and Doyle Z. Williams).

"The Use of Analytical Procedures in Review and Audit Engagements," Auditing: A Journal of Theory and Practice (Sarasota, FL:  American Accounting Association, pp. 80-92, Spring 1985) (with Frank Daroca).

"Increasing Professionalism and the Governmental Finance Officer," The Bottom Line (Piscataway, New Jersey:  Municipal Finance Officer of New Jersey, pp. 42, 43 Fall 1984) (with Carolyn S. Holder).

"The Auditor's Involvement with Additional Information," Corporate Accounting (New York:  Warren, Gorham and Lamont, pp. 72-79, Summer 1984) with Dan Guy and Carolyn S. Holder.

"Expenditure and Liability Recognition in Government," Journal of Accountancy (New York:  American Institute of Certified Public Accountants, pp. 74-84, September 1983).

"Analytical Review Procedures in Planning the Audit:  An Application Study," Auditing:  A Journal of Theory and Practice (Sarasota, FL:  American Accounting Association, pp. 100-107, Spring 1983) (Funded by Deloitte Haskins & Sells).

"A Laboratory for Establishing Financial Accounting and Reporting Standards," Management Accounting (New York:  National Association of Accountants, pp. 52-54, March 1983) (with Jerry Arnold and Jan Williams).

"Cost Accounting in Local Government:  An Idea Whose Time Has Come," Management Focus (New York:  Peat, Marwick, Mitchell & Co., pp. 28-29,

6

Contains Information Designated as Confidential by the Government Parties

May-June 1982) (with Jay Fountain).

"A Framework for Building an Accounting Constitution," <u>Journal of Accounting, Auditing, and Finance</u> (New York:  Ross Institute of New York University, pp. 110-125, Winter 1982) (with Kimberly Ham) (funded by USC).

"Financial Reporting by Nonbusiness Organizations:  A New Perspective," <u>The National Public Accountant</u> (Alexandria, Virginia:  National Society of Public Accountants, January 1982), pp. 27-31 (with Peter Griffith).

"Financial Reporting for Museums:  Current Status and Proposed Changes," <u>The Curator</u> (New York:  American Museum of Natural History,  Fall 1981), pp. 29-39 (with Nicholas Apostalou, University of Tennessee).

"Financial Reporting by Government; A Suggested Approach," <u>The Government Accountants Journal</u> (Arlington, Virginia:  Association of Government Accountants, Summer 1981), pp. 14-233 (with Alan A. Cherry, Assistant Professor, University of Southern California.

"Analytical Review Procedures:  New Relevance," <u>The CPA Journal</u> (New York: New York State Society of Certified Public Accountants, November 1980), pp. 29-35 (with Sheryl Collmer, Peat, Marwick, Mitchell & Co.).

"International Reporting Aspects of Segment Disclosure," <u>The International Journal of Accounting</u> (Champaign-Urbana, Illinois:  The University of Illinois, Fall 1980), pp. 125-135 (with Jerry Arnold and M. Herschael Mann).

"Troubled Debt Accounting:  A New Relevance," <u>The Louisiana CPA</u> (Metairie, Louisiana:  The Society of Louisiana CPAs, Summer-Fall 1980), pp. 7-10 (with Sheryl Collmer).

"The Regulation of Capital Improvements in Health Care Institutions," <u>CPA Quarterly</u> (Palo Alto, California:  California Society of CPAs, June 1980), pp. 31-35 (with W. Karen Kushner).

"Criteria for Internal Auditing." <u>Hospital Progress</u> (St. Louis, Missouri:  The Catholic Hospital Association, January 1979), pp. 50-64 (with Raymond J. Clay).

"The Usefulness of Financial Statement Disclosures:  An Information Dilemma," <u>The Louisiana CPA</u> (Metairie, LA:  The Society of Louisiana CPAs, Winter-Spring 1979), pp. 53- 60 (with Jan R. Williams).

"How to Account for Securities, Malpractice Losses," <u>Hospital Financial Management</u> (Chicago, Illinois:  Hospital Financial Management Association, November 1978), pp. 12-18 (with Jan R. Williams and Thomas A. Ratcliffe).

"A Guide to SAS #14:  Special Reports," <u>The CPA Journal</u> (New York, New

7

Contains Information Designated as Confidential by the Government Parties

York:  New York State Society of Certified Public Accountants, November 1978), pp. 79-82 (with Dan M. Guy).

"Governmental Accounting Concepts Study," Governmental Finance (Chicago, Illinois:  Municipal Finance Officers Association, November 1978), pp. 30-31.

"Capital Improvements Regulation in Health Care Institutions," Texas CPA (Dallas, Texas:  Texas Society of CPAs, August 1978), pp. 9-12 (with Larry W. Anderson).

"Graduate Level Public Sector Accounting Education:  Status and Forecast," The Accounting Review (Sarasota, Florida:  The American Accounting Association, July 1978), pp. 746-751.

"The Evaluation of Internal Control:  A Suggested Approach," Hospital Financial Management (Chicago, Illinois:  Hospital Financial Management Association, July 1978), pp. 9-12.

"Reporting the Results of Operations," The CPA Journal (New York, New York: New York State Society of Certified Public Accountants, April 1978), pp. 78-80 (with M. Herschel Mann and Thomas A. Ratcliffe).

"Hospital Budgeting:  State of the Art," Hospital and Health Services Administration (Chicago, Illinois:  The American College of Hospital Administrators, Spring 1978), pp. 51-59.

"The Role of the Internal Auditor in Responding to Crises in Local Government," The Internal Auditor (Altamonte Springs, Florida:  The Institute of Internal Auditors, December 1977), pp. 71-81.

"Unasserted Claims:  Accounting Measurement & Disclosure," The CPA Journal (New York, New York:  New York State Society of Certified Public Accountants, October 1977), pp. 83-85 (with Raymond J. Clay, Jr.).

"FASB Update:  SFAS 15 & 16," Texas CPA (Dallas, Texas:  Texas Society of CPAs, September 1977), pp. 12-17 (with M. Herschel Mann).

"A Practitioner's Guide to Accounting for Leases," Journal of Accountancy (New York, New York:  The American Institute of Certified Public Accountants, August 1977), pp. 61-68 (with Raymond J. Clay, Jr.).

"Planning for the Audit:  Logical Steps Toward Cost Containment," Financial Executive (New York, New York, Financial Executives Institute, May 1977), pp. 46-50 (with Cindy H. Nance).

Contains Information Designated as Confidential by the Government Parties

"Independence and the Governmental Auditor," Governmental Finance (Chicago, Illinois:  Municipal Finance Officers Association, February 1977), pp. 44-45.

"Revenue Recognition in Not-for-Profit Organizations," The CPA Journal (New York, New York:  New York State Society of Certified Public Accountants, November 1976), pp. 9-15.

"Flexible Budgeting and Standard Costing:  Keys to Effective Cost Control," Government Accountants Journal (Arlington, Virginia:  Association of Government Accountants, Fall 1976), pp. 24-32 (with Robert W. Ingram).

"Working Capital Analysis:  Limitations of a Valuable Tool," Banking (New York, New York:  American Bankers Association, September 1976), pp. 8-11 (with Jan R. Williams).

"A Guide to the Translation of Foreign Activities."  The National Public Accountant (Washington, D.C.:  The National Society of Public Accountants, July 1976), pp. 8-11 (with Raymond J. Clay, Jr.).

"Administrators Favor Prospective Reimbursement," Hospital Progress (St. Louis, Missouri:  The Catholic Hospital Association, June 1976), pp. 71-74.

"Better Cost Control with Flexible Budgets and Variance Analysis," Hospital Financial Management (Chicago, Illinois:  Hospital Financial Management Association, January 1976), pp. 12-20 (with Jan R. Williams).

"Proper Procedures, Yes:  Inflexible Rules, No," Texas CPA (Dallas, Texas: Texas Society of CPAs, September 1975), p. 6.

3.   Monographs

Improving Business Reporting - A Customer Focus (New York:  AICPA, 1994) pp. 202 (Special Committee on Financial Reporting, 1994).

The Information Needs of Investors and Creditors (New York:  AICPA, 1993) pp. 16 (Special Committee on Financial Reporting, 1992).

Reducing the Incidence of Fraudulent Financial Reporting:  The Role of the Securities and Exchange Commission (Los Angeles, CA: SEC and Financial Reporting Institute, 1988), pp. 130 (with Karen Pincus and Theodore J. Mock).

Impact of Statement 52 on Decisions, Financial Reports, and Attitudes (Morristown, New Jersey:  Financial Executives Research Foundation, 1986), pp. 156  (with Jerry Arnold).

The Nonbusiness Organization Reporting Entity:  An Exploratory Study of Current Practice (New Millford, Cn. Philantrophy Monthly, 1986), pp. 100.

9

Cost Accounting in California Cities (Sacramento, California: League of California Cities, 1981), pp. 66  (with Rick Kermer).

A Study of Selected Concepts for Government Financial Accounting and Reporting (Chicago, Illinois:  National Council on Governmental Accounting, 1980), pp. 69.

4.      Case Study

Pacific Electronics (Boston, Massachusetts: Intercollegiate Case Clearing House, 1981) p. 19.

News and Commentary

"Will the New GASB Pension Standards Do the Job?" *Wall Street Journal* (New York, NY:  Opinion, p. A-12), July 16, 2012.

"New World of Financial Accounting Approaches for Firms," *Orange County Business Journal* (Irvine, CA, p. 8), October 25, 2010.

"Bankruptcy Options for Small Businesses," *Business News Daily*, (August 20, 2010).

"An Overhaul or a Tweak for Pensions," *New York Times* (New York, NY, pp B1-B2, August 27, 2009.

"Public Agencies Face Health Care-Cost Crises," *Los Angeles Times* (Los Angeles, CA, pp. B-1) August 8, 2005.

"Reality Check:  Making Governments Accountable," *Marshall Magazine* (Los Angeles, CA:  University of Southern California, pp. 20-24, Fall 2005)

"O.C. Must Defend its Use of Planning Fees," *Los Angeles Times* (Los Angeles, CA: pp B-1, B-8) August 23, 2004. Also reported in: The Mercury News, (San Jose, CA) August 23, 2004.

"Next Big U.S. Accounting Scandals Have Started," Bloomberg .com (Bloomberg) July 21, 2003,

New World Order: As the PCAOB Takes Shape, the AICPA's Role is Blurred, (CA.: California CPA, Jerry Ascierto) June 2003, pp.18-20.

"No Good Defense for Being Tardy," *The Orange County Register* (Anaheim, California: pp. 1, 12.) April 6, 2003.

Enron:  A Professional's Guide to the Events, Ethical Issues, and Proposed Reforms, (N.Y.: CCH, Arthur L. Berkowitz) 2002, pp. 56 and 61.

"Questions Raised by One "Expert Witness" About Titan," TheStreet.com , (Herb Greenberg) Dec. 12, 2000, www.thestreet.com/comment/herbonthestreet/1208501.html.

10

Contains Information Designated as Confidential by the Government Parties

"Accounting Group Expected to Call for Increase in Data in Annual Reports",
*The Wall Street Journal* (New York:  Dow Jones, pp. 1,3) August 26, 1993.

"Passing the Buck," *Outlook* (Palo Alto, CA:  California Society of CPAs, Spring 1988) p. 56.

"Providing Guidance for the Professional's Future Status," *Outlook* (Palo Alto, CA:  California Society of CPAs, Spring 1987) pp. 56-58.

"Pension Accounting Deficiencies," *Los Angeles Business Journal* (Los Angeles: Scripps-Howard, August 20, 1984), p. 5.

5.    Journal Articles and Books Reprinted and Reviewed

Intermediate Accounting, reviewed in Issues in Accounting Education (Sarasota, FL:  American Accounting Association, Fall 1988),   pp. 457-458.

Guide to Audits of Local Governments, reviewed in the Journal of Accountancy (New York:  American Institute of CPAs, February 1987), pp. 118-120.

Guide to Audits of Local Governments, reviewed in Government Finance Review (Chicago, Ill.:  Governmental Finance Officers Association, February 1987), p. 38.

Impact of Statement 52 on Decisions, Financial Reports, and Attitudes, reviewed in the Journal of Accountancy (New York:  American Institute of CPAs, November 1986), pp. 186.

Intermediate Accounting, reviewed in The Accounting Review (Sarasota, Florida:  American Accounting Association, April 1986), pp. 360-362.

"Flexible Budgeting and Standard Costing:  Keys to Effective Cost Control," reprinted from Government Accountants Journal (Fall 1976); reprinted in Government and Nonprofit Accounting, Leonard Berry and Gordon Harwood (ed.) (Homewood, Illinois:  Richard D. Irwin, Inc.)  pp. 228-241 (with Rob Ingram).

"Cost Accounting in Local Governments:  An Idea Whose Time has Come," reprinted from Management Focus (May-June 1982); reprinted in The Journal of Accountancy (New York:  American Institute of CPAs, March 1983), pp. 103-104.

"Cost Accounting in Local Governments:  An Idea Whose Time has Come," reprinted from Management Focus (May-June 1982); reprinted in Management Review (New York:  American Management Association, January 1983), pp. 29-30.

"Better Cost Control with Flexible Budgets and Variance Analysis," reprinted from Hospital Financial Management; reprinted in Readings in Management Control in Nonprofit Organizations, Karasseu v. Ramarathan, and Larry Heystad (ed.) (New York:  John Wiley & Sons, Inc.) 1982, pp. 355-363.

"Revenue Recognition in Not-for-Profit Organizations,"  reprinted from The CPA Journal; reprinted in Accounting in the Public Sector:  The Changing

11

Contains Information Designated as Confidential by the Government Parties

Environment (Salt Lake City, Utah:  Brighton Publishing Company, 1979), pp. 27-34.

"Flexible Budgeting and Standard Costing:  Keys to Effective Cost Control," reprinted from The Government Accountants Journal; reprinted in Accounting in the Public Sector:  The Changing Environment (Salt Lake City, Utah:  Brighton Publishing Company, 1979), pp. 364-375 (with Rob Ingram).

"A Practitioner's Guide to Accounting for Leases," reprinted from The Journal of Accountancy; reprinted in Continuing Professional Education for Staff Accountants (Littleton, Colorado:  CPE Institute, Inc., 1979).

"The Evaluation of Internal Control:  A Suggested Approach," reprinted from Hospital Financial Management; reprinted in Controlling the Hospitals Operations (Chicago, Illinois, Hospital Financial Management Association, November 1978).

"A Practitioner's Guide to Accounting for Leases," reprinted from the Journal of Accountancy; reprinted in FASB/APB Review (New York, New York:  American Institute of CPAs), May 1978.

"A Practitioner's Guide to Accounting for Leases," reprinted from The Journal of Accountancy; reprinted in Accounting Theory:  Text and Readings (New York, New York:  Wiley/Hamilton Company, 1978), pp. 349-359.

"A Practitioner's Guide to Accounting for Leases," reprinted from The Journal of Accountancy; reprinted in Motor Freight Controller (Washington, D.C.:  American Trucking Association, Inc., November 1977), pp. 10-16.

"A Practitioner's Guide to Accounting for Leases," reprinted from The Journal of Accountancy; reprinted in New Guides for the Professional Accountant (New York, New York:  American Institute of CPAs, September 1977), pp. 5-12.

"Better Cost Control with Flexible Budgets and Variance Analysis," reprinted from Hospital Financial Management; reprinted in Readings in Governmental and Nonprofit Accounting (Belmont, California:  Wadsworth Publishing Company, 1977), pp. 320-335.

"Planning for the Audit:  Logical Steps Toward Cost Containment," reviewed from Financial Executive; reviewed in The Journal of Accountancy (New York, New York:  American Institute of CPAs, December 1977), pp. 82.

"Revenue Recognition in Not-for-Profit Organizations," reviewed from The CPA Journal; reviewed in Accounting Articles Digest (New York, New York:  American Institute of CPAs, February 1977).

6.  Reviews of Other Works

Robert W. Anthony, "Games Government Accountants Play,"  Harvard Business Review (Cambridge, MA: Harvard University, September-October 1985); reviewed Harvard Business Review (Cambridge, MA: Harvard University, November-December 1985) pp. 211-218.

12

Contains Information Designated as Confidential by the Government Parties

Tracy D. Conners, The Nonprofit Organization Handbook (New York: McGraw-Hill Book Company, Inc., 1980); reviewed in The Accounting Review (Sarasota, Florida: American Accounting Association, October 1980), pp. 693-695.

7.      Selected Continuing Professional Education Courses Published

Accounting date and Auditing Update, 29th ed. (Dallas, Texas, Texas Society of Certified Public Accountants), April 2004 (with R. J. Clay, M. H. Mann). The course has been adopted by the California, Texas, Alabama, Colorado, Illinois, New Mexico, Montana, and Idaho Societies of CPAs as well as many firms and companies.

Analytical Procedures (New York: American Institute of Certified Public Accountants) 1997 (with Carolyn S. Holder).

Governmental Accounting and Auditing Update (New York: American Institute of Certified Public Accountants) 1996 (with Douglas R. Carmichael).

Audits of Local Government Units (New York: American Institute of Certified Public Accountants) 1996 (with Douglas R.Carmichael).

Developing and Presenting Effective Proposals for Engagements of Non-Public Entities (New York: American Institute of Certified Public Accountants) 1984 (with Ray Whittington).

Accounting and Auditing Standards Refresher, 7th ed. (Auburn, AL: CPE Associates) April 1991 (a two day continuing professional educational course, with Wayne Alderman).

Accounting for Leases, 11th ed. (Auburn, AL: CPE Associates), April 1987 (a one-day continuing professional education course, with Raymond J. Clay, Professor of Accounting, North Texas State University).

Audits of Hospitals (New York: American Institute of Certified Public Accountants), December 1977 (4-hour self-study continuing professional education course prepared at the request of the AICPA, with Larry Anderson, CPA, partner, Mason, Nickels, and Warner).

Local Government Financial Accounting and Reporting (Sacramento, California, California Society of Municipal Finance Officers), September 1981.

## IV.  Professional Service

## A.    Principal Professional Service & Consulting Activities

1.      Professional Organizations

a.      Offices Held

American Institute of CPAs

Member, Board of Directors, Member and Chair of Audit Committee, 1998-2000
Member, Council, 1986-1989, 1995-2000

13

Contains Information Designated as Confidential by the Government Parties

Governmental Accounting Standards Board
      Member, July 1, 2000-2010

Los Angeles Society of CPAs
      Member, Board of Directors, 1984-86
      Vice President, 1987-1989

American Accounting Association
      Chairman, Public Sector Section, 1980-81

National Association of Accountants (Lubbock, Texas Chapter)
      President, 1977-78

b.     Committee Assignments

American Institute of CPAs
      Chairman, Board of Examiners, 2003 -2006; member 1993-1996,
      Chairman, Computerization Implementation Committee, 1997-2002
      Accounting Career Development Executive Committee, 1996-1998
      Special Committee on Financial Reporting, 1991-1994
      Nominating Committee 1992-1993
      Relations with the Judiciary Committee 1992-1994
      Accounting Standards Executive Committee, 1987-1990
      State and Local Government Committee, 1981-1985
      (Served as Senior Technical Editor of the Industry Audit Guide,
      published in 1986.)
      Compliance Auditing Task Force, Auditing Standards Board, 1986-
      1989

California Society of CPAs
      Future of the Accounting Profession 2002-present
      Chairman, Professional Conduct Committee 1987-89
      Governmental Relations Committee 1991-1997

American Accounting Association
      Assurance Services Task Force, 1995
      Chair, Financial Reporting Research Committee, 1989-1991
      Financial Accounting Standards Committee 1987-89
      Federation of Schools of Accountancy
      Financial Accounting Restructure Committee 1989

c.     Memberships in Professional Organizations
      American Accounting Association
      American Institute of Certified Public Accountants
      California Society of Certified Public Accountants

2.     Other Professional Service Activities

Member, Task Force on Bond Accountability, State of California, 2015.

14

Senior Advisor, Cornerstone Research, 2014 to Present.

Trauma Intervention Program, Member, Board of Directors, Chair, Audit Committee, Current.

John Wayne Cancer Institute, Member, Board of Directors; Chair, Audit Committee, 2004-2006.

John Wayne Foundation, Member, Board of Directors, Chair, Audit Committee, 2008.

Congressional Testimony (invited):  Corporate Accounting Practices, before the Congressional Subcommittee on Capital Markets, Insurance, and Government-Sponsored Enterprises; Committee on Financial Services; May 1, 2002

National Commission on Fraudulent Financial Reporting - commissioned to conduct research with Ted Mock and Karen Pincus.
Financial Executives Institute

Commissioned to conduct research with Jerry Arnold and prepare a monograph on the effects of foreign commerce on financial reports of U.S. companies.  See Section III, B, 1.

Financial Accounting Standards Board

Commissioned to conduct research and prepare a research report concerning the appropriate conceptual reporting entity for nonbusiness organizations.  Served on FASB Task Force on the Objectives of Financial Reporting by Nonbusiness Organizations, June 1980-1986.

League of California Cities

Commissioned to conduct research and prepare a monograph suggesting concepts, standards, and procedures for cost of services reporting by California cities.

National Council on Governmental Accounting

Commissioned to research and prepare a study suggesting a conceptual framework for financial accounting and reporting by governmental units.

Municipal Finance Officers Association

Appointed as a member of Special Review Committee for purposes of judging Comprehensive Annual Financial Reports in the Certificate of Conformance Program.

15

Contains Information Designated as Confidential by the Government Parties

a.      Editorial positions

Member, editorial board, Research in Governmental and Non-Profit Accounting, JAI Press, Inc.

Member, editorial review board, <u>Issues in Accounting Education</u>, American Accounting Association.

Member, editorial board, Auditing: A Journal of Theory and Practice

b.      Educational Consulting

Developed and presented Continuing Professional Education courses for many CPA firms, industrial and manufacturing companies, and public sector organizations.

## V.   Institutional Service

**A.    Recent Institutional Service**

1.      University

Elected to the Faculty Senate
University Administration Subcommittee for Evaluation of Administrative Costs and Structures
Faculty Tenure and Appeals committee

2.      School of Business Administration

Masters Advisory Committee
Faculty Advisory Council

3.      School of Accounting

Chair of the Curriculum Committee
Director of the Master of Accounting Program
Member of Personnel committee

Member of Academic Standards committee

Member of Awards committee

Contains Information Designated as Confidential by the Government Parties

# Appendix B

**William W. Holder**
**Previous Four Years' Testimony**

Securities and Exchange Commission, Plaintiff, v. Philip R. Jacoby, Jr., et al., Defendants, United States District Court for the District of Maryland, Case No. 17-cv-03230-CCB, Deposition 2020.

In re American Realty Capital Properties, Inc. Litigation, United States District Court for the Southern District of New York, Case No. 1:15-mc-00040-AKH, Deposition 2019.

Jet Capital Master Fund, L.P. et al, Plaintiffs, v. American Realty Capital Properties, Inc. et al, Defendants, United States District Court for the Southern District of New York, Case No. 1:15-cv-00307-AKH, Deposition 2019.

Securities & Exchange Commission, Plaintiff, v. RPM International, Inc. and Edward W. Moore, Defendants, United States District Court for the District of Columbia, Case No. 16-cv-01803, Deposition 2019.

Mark Smilovits, et al., Plaintiffs, v. First Solar, Inc., et. al., Defendants, United States District Court for the District of Arizona, Case No. 2:12-cv-00555-DGC, Deposition 2019.

Ukiah Valley Sanitation District, Plaintiff v. City of Ukiah, et al., Defendants, Superior Court of the State of California, County of Mendocino, Ukiah Branch, Case No. SCV-256737, Deposition, 2018.

City of Richmond, Plaintiff, v. Chevron Corporation et al., Defendants, Case No. C13-01654, Deposition, 2018.

Confidential Arbitration, 2017.

Securities and Exchange Commission v. Adrian D. Beamish, CPA, Administrative Proceeding File No. 3-17651, Deposition 2017, Trial 2017.

Confidential Arbitration, 2017.

ITW Global Investments Inc., Plaintiff v. American Industrial Partners Capital Fund IV, L.P. et al., Defendants, Superior Court of the State of Delaware, Case No. N14C-10-236 (JRJ), Deposition, 2016.

Securities and Exchange Commission, Plaintiff v. Larry A. Goldstone, Clarence G. Simmons, III, and Jane E. Starrett, Defendants, Case No.: 1:12-cv-00257-JB-LFG, Deposition 2014, Trial 2016.

1

Securities and Exchange Commission, Plaintiff v. City of Miami, Florida et al, Defendants, United States District Court for the Southern District of Florida, Case No. 13-cv-22600-CMA, Deposition, 2016.

Confidential Arbitration, 2016.

Sivolella, Plaintiff v. AXA Equitable Life Insurance Co., et al., Defendants, United States District Court for the District of New Jersey, Case No. 11-cv-4194, Deposition, 2014, Trial 2016.

Mahala A. Church, individually and on behalf of all similarly situated individuals, Plaintiffs vs. Accretive Health, Inc., aka, Dba Medical Financial Solutions, Defendant, United States District Court for the Southern District of Alabama, Case No. 1:14-00057-WS-B, Deposition, 2015.

The Chickasaw Nation and The Choctaw Nation, Plaintiffs, vs. United States Department of the Interior, et al, Defendants, United States District Court for the Western District of Oklahoma, Case No. 05-cv-01524-W, Deposition 2015.

Brooktrails Township Community Services District, A public Agency, Plaintiff vs. City of Willits, A General Law City, et al, Defendants, Superior Court of the State of California, County of Sonoma, Case No. SCV 253175, Deposition, 2015.

2

Contains Information Designated as Confidential by the Government Parties

# Appendix C

## Documents Considered by William W. Holder

| Document Title, Bates Numbers | Document Date |
|---|---|
| **Legal Documents** | |
| Amended Motion of Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and U.S. Bank Trust National Association, Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds, *In Re: The Financial Oversight and Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico, et al. Debtors.* | January 31, 2020 |
| Exhibit 2 to Amended Motion of Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and U.S. Bank Trust National Association, Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds, *In Re: The Financial Oversight and Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico, et al. Debtors.* | January 31, 2020 |
| Mediation:  Summary of Cash Restriction Analysis, *In Re: The Financial Oversight and Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico, et al. Debtors.* | October 2, 2019 |
| Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from the Automatic Stay, or, in the Alternative, Adequate Protection, *In Re: The Financial Oversight and Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico, et al. Debtors.* | January 16, 2020 |
| Opposition of Financial Oversight and Management Board for Puerto Rico to Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guarantee Insurance Company for Relief from Automatic Stay or, in the Alternative, Adequate Protection [Ecf No. 673], *In Re: The Financial Oversight and Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico, et al. Debtors.* | February 3, 2020 |
| Supplemental Opposition of Commonwealth of Puerto Rico to Amended PRIFA Bondholder Motion to Lift Automatic Stay [Ecf No. 10602], *In Re: The Financial Oversight and Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico, et al. Debtors.* | February 3, 2020 |

**Legal Codes**

3 L.P.R.A. § 1901

3 L.P.R.A. § 1906

3 L.P.R.A. § 1907

3 L.P.R.A. § 1913

3 L.P.R.A. § 1914

9 L.P.R.A. § 2019

9 L.P.R.A. § 2021

Contains Information Designated as Confidential by the Government Parties

| Document Title, Bates Numbers | Document Date |
|---|---|
| 9 L.P.R.A. § 5681 | |
| 13 L.P.R.A. § 31751 | |

**Depositions**

| | |
|---|---|
| Deposition of Timothy H. Ahlberg, Vol. I of II, with Exhibits | April 21, 2020 |
| Deposition of Timothy H. Ahlberg, Vol. II of II, with Exhibits | April 23, 2020 |

**Declarations**

| | |
|---|---|
| Declaration of Timothy H. Ahlberg in Respect of Commonwealth Motion for Partial Summary Judgment, *In Re: The Financial Oversight and Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico, et al. Debtors*, The Commonwealth of Puerto Rico, by and through The Financial Oversight and Management Board for Puerto Rico, Movant, v. Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation, Financial Guaranty Insurance Company, Peaje Investments LLC, and The Bank of New York Mellon, as Fiscal Agent, Respondents. | April 28, 2020 |
| Declaration of Timothy H. Ahlberg in Respect of Commonwealth Motion for Partial Summary Judgment, *In Re: The Financial Oversight and Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico, et al. Debtors*, The Commonwealth of Puerto Rico, by and through The Financial Oversight and Management Board for Puerto Rico, Movant, v. Ambac Assurance Corporation, Assured Guaranty Corp., Financial Guaranty Insurance Company, and U.S. Bank Trust National Association, as Trustee, Respondents. | April 28, 2020 |

**Accounting Literature**

| | |
|---|---|
| GASB, Concepts Statement No. 1, Objectives of Financial Reporting | May 1987 |
| GASB, Statement No. 34, Basic Financial Statements–and Management's Discussion and Analysis–for State and Local Governments | June 1999 |
| GASB, Statement No. 54, Fund Balance Reporting and Governmental Fund Type Definitions | February 2009 |
| GFOA, Governmental Accounting, Auditing, and Financial Reporting Supplement | 2014 |
| GFOA, Governmental Accounting, Auditing, and Financial Reporting | 2005 |
| GFOA, Governmental Accounting, Auditing, and Financial Reporting | 2012 |
| NCGA, Statement No. 1, Governmental Accounting and Financial Reporting Principles | March 1979 |

**Financial Statements**

| | |
|---|---|
| Commonwealth of Puerto Rico, Basic Financial Statements and Required Supplementary Information for Fiscal Year Ended June 30, 2013, (With Independent Auditors' Report Thereon) | June 30, 2014 |
| Commonwealth of Puerto Rico, Basic Financial Statements and Required Supplementary Information for Fiscal Year Ended June 30, 2014 | June 30, 2016 |

Contains Information Designated as Confidential by the Government Parties

| Document Title, Bates Numbers | Document Date |
|---|---|
| Commonwealth of Puerto Rico, Basic Financial Statements and Required Supplementary Information for Fiscal Year Ended June 30, 2015, (With Independent Auditors' Report Thereon) | June 29, 2018 |
| Commonwealth of Puerto Rico, Basic Financial Statements and Required Supplementary Information for Fiscal Year Ended June 30, 2016, (With Independent Auditors' Report Thereon) | May 3, 2019 |
| Puerto Rico HTA, Audited Financial Statements, Required Supplementary Information and Supplemental Schedules for Years Ended June 30, 2014 and 2013, With Report of Independent Auditors | December 23, 2015 |
| Puerto Rico HTA, Audited Financial Statements, Required Supplementary Information and Supplemental Schedules for Year Ended June 30, 2015, With Report of Independent Auditors | October 23, 2017 |
| Puerto Rico HTA, Independent Auditors' Report and Required Supplementary Information and Supplementary Schedules for Fiscal Year Ended June 30, 2016 | May 7, 2018 |
| Puerto Rico HTA, Independent Auditors' Report and Required Supplementary Information and Supplementary Schedules and Audit of Federal Awards for Fiscal Year Ended June 30, 2017 | April 9, 2019 |
| Puerto Rico HTA, Independent Auditors' Report and Required Supplementary Information and Supplementary Schedules and Audit of Federal Awards for Fiscal Year Ended June 30, 2018 | April 30, 2019 |

**Letters**

| | |
|---|---|
| Letter from Elizabeth McKeen and Michael Mervis to Counsel, "In re Fin. Oversight & Mgmt. Bd., No. 17-BK-3283-LTS – Discovery on Lift Stay Motions – HTA & CCDA Flow of Funds Summary" | March 25, 2020 |
| Letter from Elizabeth McKeen and Michael Mervis to Counsel, "In re Fin. Oversight & Mgmt. Bd., No. 17-BK-3283-LTS – Discovery on Lift Stay Motions – Movants' Letter Dated March 30, 2020" | April 7, 2020 |
| Letter from Elizabeth McKeen and Michael Mervis to Counsel, "In re Fin. Oversight & Mgmt. Bd., No. 17-BK-3283-LTS – Discovery on Lift Stay Motions – Response to Movants' Request During Meet and Confer Conference Call on April 16, 2020" | April 19, 2020 |
| Letter from Elizabeth McKeen and Michael Mervis to Counsel, "In re Fin. Oversight & Mgmt. Bd., No. 17-BK-3283-LTS – Discovery on Lift Stay Motions – PRIFA Flow of Funds Summary" | March 21, 2020 |
| Letter from Elizabeth McKeen to Counsel, "In re Fin. Oversight & Mgmt. Bd., No. 17-BK-3283-LTS – Discovery on Lift Stay Motions – Movants' Letters Dated February 24, 2020 and February 26, 2020" | March 13, 2020 |
| Letter from Elizabeth McKeen to Counsel, "In re Fin. Oversight & Mgmt. Bd., No. 17-BK-3283-LTS – Discovery on Lift Stay Motions – Movants' Letters Dated March 23, 2020" | March 31, 2020 |
| Letter from John Hughes to Elizabeth McKeen and Michael Mervis, "Lift-Stay Discovery" | February 26, 2020 |
| Letter from John Hughes to Elizabeth McKeen and Michael Mervis, "Lift-Stay Preliminary Hearing Issue Discovery" | March 16, 2020 |
| Letter from John Hughes to Elizabeth McKeen and Michael Mervis, "Lift-Stay Preliminary Hearing Issues Discovery" | April 12, 2020 |
| Letter from John Hughes to Elizabeth McKeen and Michael Mervis, "Summary of 4/16/2020 Meet and Confer Regarding Lift-Stay Discovery" | April 20, 2020 |

**Document Title, Bates Numbers**                                                       **Document Date**

**Other**

| | |
|---|---|
| AICPA, "Financial Reporting Executive Committee - FinRec," https://www.aicpa.org/interestareas/frc/accountingfinancialreporting/finrec.html | |
| GASB, "About Us," https://www.gasb.org/jsp/GASB/Page/GASBLandingPage&cid=1175804799024 | |
| Government of Puerto Rico Treasury, Circular Letter No 1300-1-99 | July 9, 1998 |
| Government of Puerto Rico, CC 1300-1-99, Appendices 1–3 | July 9, 1998 |
| Puerto Rico AAFAF Presentation, Technical Meeting Discussion Materials | November 16, 2016 |
| Puerto Rico AAFAF, "Publications & Reports," http://www.aafaf.pr.gov/reports.html | |
| Puerto Rico Highways and Transportation Authority, Certificate of Secretary of the Authority as to Resolution No. 68-18, as Amended | May 7, 2003 |
| Puerto Rico Highways and Transportation Authority, Certificate of Secretary of the Authority as to Resolution No. 98-06, as Amended | April 20, 2004 |
| Puerto Rico HTA Presentation, Allocable Revenue & Toll Revenues: Flow of Funds | March 31, 2020 |

**Produced Documents**

CW_RJM2004_0002208

CW_STAY0000156–76

CW_STAY0000203–28

CW_STAY0000229–42

CW_STAY0000297–309

CW_STAY0000379–85

CW_STAY0000409–21

CW_STAY-0000422–36

CW_STAY0000467–81

CW_STAY0000500–15

CW_STAY0000535–47

CW_STAY0000575–88

CW_STAY0000590–824

CW_STAY0000846–58

CW_STAY0000859–78

CW_STAY0000879–92

CW_STAY0000914–33

CW_STAY0000934–53

Contains Information Designated as Confidential by the Government Parties

| Document Title, Bates Numbers | Document Date |
|---|---|

CW_STAY0009784–10167

CW_STAY0010168-10543

CW_STAY0010548

ERS_LS0000954–69

ERS_LS0001018–33

ERS_LS0001469–82

ERS_LS0001540–54

HTA_STAY0000001

HTA_STAY0000207

HTA_STAY0000223

HTA_STAY0000234

HTA_STAY0000454–66 English Translation

HTA_STAY0000467–92 English Translation

HTA_STAY0000493–512 English Translation

HTA_STAY0000513–5 English Translation

HTA_STAY0000516–31 English Translation

HTA_STAY0000532–45 English Translation

HTA_STAY0000546–9 English Translation

HTA_STAY0000556–602 English Translation

HTA_STAY0000603–13 English Translation

HTA_STAY0000614–27 English Translation

HTA_STAY0000628–53 English Translation

HTA_STAY0000654–768

HTA_STAY0000769–833

HTA_STAY0000834–940

HTA_STAY0000941–1026

HTA_STAY0007985–8024 English Translation

HTA_STAY0008372

HTA_STAY0028471–4

HTA_STAY0028471–4 English Translation

HTA_STAY0028880

PRIFA_STAY0000472–524

**Note: In addition to the documents listed above, I considered all documents cited in the footnotes of my report.**

Contains Information Designated as Confidential by the Government Parties

## Exhibit 1
## TSA Cash Balance vs. Clawed-Back HTA and PRIFA Tax Revenues[1]



Source: HTA_STAY0000001, CW_STAY0000156–76, CW_STAY0000203–28, CW_STAY0000297–309, CW_STAY0000422–36, CW_STAY0000467–81, CW_STAY0000535–47, CW_STAY0000590–824, CW_STAY0000846–92, CW_STAY0000934–53, ERS_LS0000954–69, ERS_LS0001018–33, ERS_LS0001469–82, ERS_LS0001540–54

[1] TSA Cash Balance reflects the bank cash position of the Treasury Single Account ("TSA") at the end of each month, excluding BPPR and GDB Clawback Accounts, consistent with the disclosures made in the Puerto Rico Department of Treasury TSA Cash Flow reports. The Clawed-Back HTA and PRIFA Tax Revenues reflect the cumulative motor vehicle license fees, petroleum, cigarette excise tax, diesel, gasoline and rum tax revenues clawed back from HTA and PRIFA beginning in July 2017.

Contains Information Designated as Confidential by the Government Parties

# Exhibit 2
# Summary of Clawed-Back HTA and PRIFA Tax Revenues, and TSA Cash Balance

## July 2017 – November 2019[1]

### ($ in thousands)

| Date | Clawed-Back HTA and PRIFA Tax Revenues[2] | TSA Cash Balance[3] |
|------|------|------|
| 7/28/2017 | $51,076 | $2,112,041 |
| 8/25/2017 | $103,421 | $2,099,197 |
| 9/30/2017 | $152,769 | $2,011,217 |
| 10/20/2017 | $204,884 | $1,904,591 |
| 11/24/2017 | $248,177 | $1,739,292 |
| 12/29/2017 | $297,493 | $1,694,507 |
| 1/26/2018 | $324,199 | $1,801,932 |
| 2/23/2018 | $369,969 | $1,560,893 |
| 3/31/2018 | $408,448 | $1,951,202 |
| 4/30/2018 | $454,887 | $2,690,637 |
| 5/30/2018 | $419,314 | $2,956,129 |
| 6/30/2018 | $463,860 | $3,098,010 |
| 7/31/2018 | $526,704 | $3,110,318 |
| 8/31/2018 | $582,020 | $3,146,392 |
| 9/30/2018 | $645,398 | $3,452,098 |
| 10/31/2018 | $686,735 | $3,720,149 |
| 11/30/2018 | $712,380 | $3,729,739 |
| 12/31/2018 | $744,318 | $3,806,628 |
| 1/31/2019 | $791,074 | $4,061,000 |
| 2/28/2019 | $815,656 | $4,928,000 |
| 3/31/2019 | $879,602 | $5,644,000 |
| 4/30/2019 | $917,612 | $6,719,000 |
| 5/31/2019 | $955,481 | $6,886,000 |
| 6/30/2019 | $990,219 | $7,225,000 |
| 7/31/2019 | $1,062,148 | $7,592,000 |
| 8/31/2019 | $1,133,930 | $7,807,000 |
| 9/30/2019 | $1,189,856 | $8,134,000 |
| 10/31/2019 | $1,241,545 | $8,350,000 |
| **11/30/2019** | **$1,280,188** | **$8,237,000** |

Source: HTA_STAY0000001, CW_STAY0000156–76, CW_STAY0000203–28,
CW_STAY0000297–309, CW_STAY0000467–81, CW_STAY0000422–36,
CW_STAY0000535–47, CW_STAY0000590–824, CW_STAY0000846–92,
CW_STAY0000934–53, ERS_LS0000954–69, ERS_LS0001018–33, ERS_LS0001469–82,
ERS_LS0001540–54

Note:

[1] Balances are reported as of the last available TSA Weekly Cash Flow report of each month.
[2] Reflects the cumulative tax revenues clawed back from HTA and PRIFA under the
Moratorium Act and related executive orders that were deposited in the TSA beginning in
July 2017.
[3] Reflects the bank cash position of the Treasury Single Account ("TSA") excluding BPPR and
GDB Clawback Accounts, consistent with the disclosures made in the Puerto Rico
Department of Treasury TSA Cash Flow reports.  The report for the last week of July 2017
not being available, the balance for 7/28/2017 is the beginning TSA balance reported in the
report released for the first week of August 2017.

Contains Information Designated as Confidential by the Government Parties