Hearing Date: May 13, 2020 9:30 AM AST

## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | PROMESA<br>Title III |
| as representative of | No. 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO, et al., | (Jointly Administered) |
| Debtors.[1] | |

**AMBAC ASSURANCE CORPORATION, FINANCIAL GUARANTY
INSURANCE COMPANY, ASSURED GUARANTY CORP.,
ASSURED GUARANTY MUNICIPAL CORP., AND THE BANK OF
NEW YORK MELLON'S REPLY IN FURTHER SUPPORT OF THEIR
MOTION CONCERNING APPLICATION OF THE AUTOMATIC
<u>STAY TO THE REVENUES SECURING THE CCDA BONDS</u>**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "<u>Commonwealth</u>") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("<u>COFINA</u>") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("<u>HTA</u>") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("<u>ERS</u>") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("<u>PREPA</u>") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Buildings Authority ("<u>PBA</u>") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ............................................................................1

SUPPLEMENTAL BACKGROUND ..................................................................5

I.     Discovery Has Shown That the Scotiabank Account, Through Which the
Hotel Taxes Are Transferred to the Tourism Company, Is the Transfer
Account. ................................................................................................ 5

     A.    The Pre-Default Flow of Funds. ................................................. 5

     B.    The Scotiabank -5142 Account Is the Transfer Account. .......................... 8

ARGUMENT ....................................................................................................11

I.     The Automatic Stay Does Not Apply to the CCDA Enforcement Action
Because the Action Does Not Implicate Property of a Debtor. ........................... 13

     A.    Any Purported Reversionary Interest the Commonwealth May
Have Under Article VI, Section 8 Is Not Implicated in the CCDA
Enforcement Action. ................................................................. 13

          1.    Any Purported Reversionary Interest the Commonwealth
May Have Under Article VI, Section 8 Would Not Be
Implicated by the CCDA Enforcement Action. ........................... 15

          2.    The Conditions of Article VI, Section 8, the Enabling Act,
and the Pledge Agreement for Using Pledged Hotel Taxes
to Pay Public Debt Are Not Properly Before this Court, and
Have Not Been Satisfied. ......................................................... 16

     B.    The Commonwealth's Delegation of Authority to the Tourism
Company to Impose Hotel Taxes Did Not Reserve Any Other
Property Interest for the Commonwealth .................................... 19

II.     Although It Is Not a Necessary Element for Stay Relief, Movants Have
Clearly Shown That They Are Secured. ................................................ 20

     A.    Discovery Has Revealed That the Pledged Hotel Taxes Are Being
Deposited Into the Transfer Account and Thus Are Indisputably
Subject to CCDA Bondholders' Security Interest. ................................... 21

     B.    Movants Have a Property Interest in the "Retained" Pledged Hotel
Taxes, Whether or Not Those Funds Were Deposited into the
Transfer Account. .................................................................... 25

          1.    The Bond Documents Grant the CCDA Bondholders a Lien
on All Pledged Hotel Taxes Collected by the Tourism
Company. ............................................................................... 25

2.      The Hotel Occupancy Tax Act Makes the Tourism
Company a Mere Conduit for the Pledged Hotel Taxes,
Which CCDA Bondholders Equitably Own. ............................... 31

III.    Neither PROMESA'S Title III Provisions Nor the Oversight Board's
Budgetary Powers Preempt Bondholders' Pre-Existing Legal Rights. ............... 35

A.      The Plain Text of PROMESA Limits the Scope of Preemption to
Cases of Actual Conflict, Which Does Not Exist Here. .......................... 35

B.      Neither of the Oversight Board's Asserted Bases for "Preemption"
Withstands Scrutiny. .................................................................. 38

1.      The Oversight Board's Title II Budgetary Powers Under
PROMESA Have No Preemptive Effect on Movants'
Rights. .......................................................................... 38

2.      There is No Inconsistency Between the Hotel Occupancy
Tax Act and PROMESA Title III or Bankruptcy Policy. ............ 46

C.      The Oversight Board's Interpretation Must Be Rejected Because It
Would Be Unconstitutional .......................................................... 50

1.      The Oversight Board's Claimed Preemption Power Would
Violate the Due Process Clause. ...................................... 50

2.      Any Repeal or Preemption of the Hotel Occupancy Tax Act
Under PROMESA Would Effect a Fifth Amendment
Taking Without Just Compensation. ............................. 51

CONCLUSION ................................................................................................54

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Altair Global Credit Opportunities Fund (A), LLC v. U.S.*,
  138 Fed. Cl. 742 (Fed. Cl. 2018) ......................................................................... 48-49

*Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*,
  788 F.3d 1329 (11th Cir. 2015) ...........................................................................29 n.15

*Armstrong v. United States*,
  364 U.S. 40 (1960) .....................................................................................................51

*Bankers Tr. Co. v. Mfr. Nat. Bank of Detroit*,
  139 F.R.D. 302 (S.D.N.Y. 1991) ..............................................................................29

*Bd. of Regents of State Colleges v. Roth*,
  408 U.S. 564 (1972) ...................................................................................................50

*Brown v. United Airlines, Inc.*,
  720 F.3d 60 (1st Cir. 2013) ........................................................................................35

*Chemical Bank N.Y. Tr. Co. v. Kheel*,
  369 F.2d 845 (2d Cir. 1966) ......................................................................................46

*Cleveland Bd. of Educ. v. Loudermill*,
  470 U.S. 532 (1985) ...................................................................................................50

*Consol. Risk Servs., Inc. v. Auto. Dealers WC Self Ins. Tr.*,
  2010 WL 2735701 (N.D.N.Y. July 9, 2010) .............................................................64

*Cummings v. City of New York*,
  302 F. Supp. 3d 511 (S.D.N.Y. 2017) .......................................................................28

*Dakota Gasification Co. v. Nat. Gas Pipeline Co. of Am.*,
  964 F.2d 732 (8th Cir. 1992) ..................................................................................29 n.15

*Dimino v. Sec'y of Commonwealth*,
  695 N.E.2d 659 (Mass. 1998) ....................................................................................53

*DMS Imaging, Inc. v. United States*,
  115 Fed. Cl. 794 (Fed. Cl. 2014) ..............................................................................29

*Dukes Bridge LLC v. Beinhocker*,
  856 F.3d 186 (1st Cir. 2017) .................................................................................. 28-29

*Empacadora Puertorriquena De Carnes, Inc. v. Alterman Transp. Line, Inc.*,
  303 F. Supp. 474 (D.P.R. 1969) ............................................................................34 n.20

*Ferris v. United States*,
  27 Ct. Cl. 542 (1892) ..........................................................................................................41

*First National Bank of Boston v. Maine Turnpike Authority*,
  136 A.2d 699 (Me. 1957) .....................................................................................................53

*Fishbein v. Miranda*,
  670 F. Supp. 2d 264 (S.D.N.Y. 2009) .................................................................................28

*Fletcher v. Peck*,
  10 U.S. 87 (1810) ..........................................................................................................40 n.23

*Francisco Levy, Jr., Inc. v. Caribe Gen. Elec., Inc.*,
  2003 WL 21047205 (P.R. Cir. Feb. 28, 2003) ...............................................................24 n.13

*Franklin Cal. Tax-Free Tr. v. Puerto Rico*,
  85 F. Supp. 3d 577 (D.P.R.) ................................................................................................52

*Gold v. Rowland*,
  156 A.3d 477 (Conn. 2017) .................................................................................................29

*Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R.*,
  939 F.3d 340 (1st Cir. 2019) .......................................................................................*passim*

*Grella v. Salem Five Cent Sav. Bank*,
  42 F.3d 26 (1st Cir. 1994) .......................................................................................23, 24, 37

*Haesloop v. United States*,
  2000 WL 1607316 (Bankr. E.D.N.Y. Aug. 30, 2000) ....................................................46-47

*Holland v. United States*,
  621 F.3d 1366 (Fed. Cir. 2010) ..........................................................................................28

*Hoseman v. Weinschneider*,
  322 F.3d 468 (7th Cir. 2003) ..............................................................................................48

*In re Boomgarden*,
  780 F.2d 657 (7th Cir. 1985) .........................................................................................54 n.29

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
  2019 WL 4735362 (D.P.R. June 28, 2019) ..........................................................................11

*In re Fin. Oversight and Mgmt. Bd. for P.R.*,
  361 F. Supp. 3d 203 (D.P.R. 2019) .....................................................................................19

*In re Hernandez*,
  244 B.R. 549 (Bankr. D.P.R. 2000) ....................................................................................11

*In re Irving Tanning Co.*,
496 B.R. 644 (B.A.P. 1st Cir. 2013).........................................................................................42

*In re LAN Tamers, Inc.*,
329 F.3d 204 (1st Cir. 2003)............................................................................................32 n.18

*In re Las Vegas Monorail Co.*,
429 B.R. 770 (Bankr. D. Nev. 2010).........................................................................................49

*In re Morales Travel Agency*,
667 F.2d 1069 (1st Cir. 1981)............................................................................................32 n.18

*Klickitat Cty. Pub. Util. Dist. No. 1. v. Stewart & Stevenson Servs., Inc.*,
2006 WL 908042 (E.D. Wash. Apr. 7, 2006).........................................................................30

*Kokoszka v. Belford*,
417 U.S. 642 (1974).........................................................................................48

*Kungys v. United States*,
485 U.S. 759 (1988).........................................................................................44

*Lass v. Bank of Am., N.A.*,
695 F.3d 129 (1st Cir. 2012).........................................................................................29

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005).........................................................................................51

*Local Initiative Health Auth. for L.A. Cty. v. United States*,
142 Fed. Cl. 1 (Fed. Cl. 2019).........................................................................................42

*Logan v. Zimmerman Brush Co.*,
455 U.S. 422 (1982).........................................................................................51 n.28

*Louisiana ex rel. Hubert v. City of New Orleans*,
215 U.S. 170 (1909).........................................................................................53

*LPP Mortg., Ltd. v. Sugarman*,
565 F.3d 28 (1st Cir. 2009).........................................................................................24 n. 13

*Maine Community Health Options v. United States*,
2020 WL 1978706 (U.S. Apr. 27, 2020)........................................................................ 41-42

*Martin v. United States*,
130 Fed. Cl. 578 (Fed. Cl. 2017).........................................................................................42

*Mèndez-Nùñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
916 F.3d 98 (1st Cir. 2019).........................................................................................35

v

*Murray v. City of Charleston*,
  96 U.S. 432 (1877)..................................................................................................53

*Noble v. Corporacion Insular de Seguros*,
  738 F.2d 51 (1st Cir. 1984)................................................................................34 n.20

*Parella v. Ret. Bd. of R.I. Emps' Ret. Sys.*,
  173 F.3d 46 (1st Cir. 1999)................................................................................52

*Peaje Investments LLC v. Financial Oversight & Management Board for Puerto Rico*,
  899 F.3d 1 (1st Cir. 2018)..................................................................................12

*Porto Rico Tel. Co. v. Tax Court*,
  1960 PR Sup. LEXIS 72 (P.R. June 30, 1960) ........................................................19

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
  136 S. Ct. 1938 (2016).............................................................................35, 37, 52

*Quasar Energy Grp. v. Vgblads LLC*,
  2017 WL 4274159 (D. Me. Sept. 26, 2017) ....................................................24 n. 13

*Reed & Reed, Inc. v. Weeks Marine, Inc.*,
  431 F.3d 384 (1st Cir. 2005)..............................................................................24

*Rhode Island Higher Educ. Assistance Auth. v. Sec'y, U.S. Dep't of Educ.*,
  929 F.2d 844 (1st Cir. 1991)..............................................................................52

*Rice v. City of Milwaukee*,
  76 N.W. 341 (Wis. 1898).............................................................................40 n.23

*Salazar v. Ramah Navajo Chapter*,
  567 U.S. 182 (2012)...................................................................................41, 43

*Semaphore Entm't Grp. Sports Corp. v. Gonzalez*,
  919 F. Supp. 543 (D.P.R. 1996)...........................................................................50

*Ticonic Nat'l Bank v. Sprague*,
  303 U.S. 406 (1938).......................................................................................46

*U.S. Bank N.A. v. Vertullo (In re Vertullo)*,
  610 B.R. 399 (B.A.P. 1st Cir. 2020).......................................................................11

*U.S. Tr. Co. of N.Y. v. New Jersey*,
  431 U.S. 1 (1977)..........................................................................................52

*Union Pump Co. v. Centrifugal Tech. Inc.*,
  404 F. App'x 899 (5th Cir. 2010) ........................................................................22

vi

*United States v. Sec. Indus. Bank,*
  459 U.S. 70 (1982) ...................................................................................................... 53

*United States v. Winstar Corp.,*
  518 U.S. 839 (1996) ................................................................................................ 40 n.23

*Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.),*
  945 F.3d 3 (1st Cir. 2019) ............................................................................................. 42

*Vázquez-Velázquez v. Puerto Rico Highway & Transp. Auth.,*
  2016 WL 183653 (D.P.R. Jan. 14, 2016) ...................................................................... 53

*Von Hoffman v. City of Quincy,*
  71 U.S. 535 (1866) ........................................................................................... 40 n.23, 53

**STATUTES**

U.S. CONST. amend. V .......................................................................................................... 53

11 U.S.C. § 361 ..................................................................................................................... 36

11 U.S.C. § 362 ............................................................................................................. *passim*

48 U.S.C. § 2103 ............................................................................................................. 35, 36

48 U.S.C. § 2141 ............................................................................................................. 36, 46

48 U.S.C. § 2149 ............................................................................................................. 43, 45

48 U.S.C. § 2161 ....................................................................................................... 36, 45, 46

P.R. Const., art. VI, § 8 .................................................................................................. *passim*

13 L.P.R.A. § 2271v ....................................................................................................... *passim*

22 L.P.R.A. § 215 .................................................................................................................. 52

23 L.P.R.A. § 6404 ................................................................................................................ 31

23 L.P.R.A. § 6412 ................................................................................................................ 31

23 L.P.R.A. § 6441 ...................................................................................................... 30 n.17, 44

23 L.P.R.A. § 6443 ........................................................................................................ 33 n.19

32 L.P.R.A. § 3351 ........................................................................................................ 33 n.19

32 L.P.R.A. § 3352 ........................................................................................................ 33 n.19

OTHER AUTHORITIES

Elizabeth Bauer, *Is Chicago The Next Detroit,* FORBES (Jan. 16, 2019) .......................................63

1 GELFAND, STATE & LOCAL GOV'T DEBT FIN. §§ 3:32, 10:17, 11:15 (2d ed. 2017)..................60

Alexandra Scaggs, *Puerto Rico Debt Plan Leaves Investors With A Choice: Lose Money or Fight*, BARRON'S (June 17, 2019) .......................................................................................63

David A. Skeel, *The Education of Detroit's Pension and Bond Creditors* ..................................60

Restatement (Second) of Contracts § 202 (Am. Law. Inst. 1981)........................................ *passim*

Richard Porter, *Commentary: Bankruptcy Looms For Chicago If There's No Pension Fix*, CHICAGO TRIBUNE (Sept. 26, 2019)...........................................................................................63

Robert Whitman, *Incorporation by Reference in Commercial Contracts*, 21 MD. L. REV. 12 (1961)...............................................................................................................................47

Ambac[2], FGIC, Assured, and The Bank of New York Mellon, in its capacity as the CCDA

Bond Trustee, respectfully submit this reply in further support of the CCDA Stay Motion, and to

respond to the *Opposition of Commonwealth of Puerto Rico* (ECF No. 10615) ("Opposition," and

cited to hereinafter as "Opp."), the *Partial Joinder of Official Committee of Unsecured Creditors*

*in Support of Opposition of Commonwealth of Puerto Rico* (ECF No. 10636) ("UCC's Opposition

Joinder"), and *AAFAF's Limited Joinder to the Opposition of Financial Oversight and*

*Management Board for Puerto Rico* (ECF No. 10640) ("AAFAF's Opposition Joinder")

(collectively, the "Oppositions").  In support of their reply, Movants respectfully state as follows:

## PRELIMINARY STATEMENT

1.      When the CCDA Stay Motion was filed, Movants had received no discovery—and

nevertheless made out a clear entitlement to stay relief, both because the Commonwealth has no

equity in the Pledged Hotel Taxes (which are collected by the Tourism Company) and because

Movants are the equitable owners of the Pledged Hotel Taxes and have a lien on the legal title to

them.  The Opposition offers no persuasive response to these points, and discovery subsequently

obtained confirms Movants' entitlement to stay relief with respect to the Pledged Hotel Taxes.

2.      *First,* the Opposition fails to grapple with the basic fact that Movants do not need

to show "secured status" to prevail on this Motion, because Movants are not seeking to sue the

Commonwealth (or interfere with its property) and merely seek a decision confirming that it has

---

[2] Unless otherwise specified, defined terms have the same meanings given to them in *Ambac Assurance*
*Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty*
*Municipal Corp., and The Bank Of New York Mellon's Motion Concerning Application of the Automatic*
*Stay to the Revenues Securing the CCDA Bonds*, (ECF No. 10104) (the "CCDA Stay Motion" or "Motion,"
and cited to hereinafter as "Mot.").  All references to Exhibits in this Reply are attached to the *Declaration*
*of John J. Hughes, III* (the "Hughes Decl."), as described therein.  All arguments in the CCDA Stay Motion
are reincorporated herein by reference and not waived.

no equity in the Pledged Hotel Taxes.  Discovery has confirmed that the Pledged Hotel Taxes are held exclusively in Tourism Company accounts.[3]  The Tourism Company is not a Title III debtor and does not enjoy the protection of the automatic stay.  Movants are thus entitled to pursue their claims against the Tourism Company.

3.     In arguing to the contrary, the Oversight Board asserts that the Commonwealth has some property interest in the Pledged Hotel Taxes arising out of (i) Article VI, Section 8 of the Puerto Rico Constitution, and (ii) the delegation of the Commonwealth's taxing power to the Tourism Company to collect the Hotel Taxes.   Article VI, Section 8 does not grant the Commonwealth any property interest in the Pledged Hotel Taxes.  Article VI, Section 8 provides only an additional permitted use for money held "for the benefit of the Owners of the Bonds." Specifically, such funds may be transferred to the Commonwealth for payment of public debt in a fiscal year in which there are insufficient available resources to meet appropriations because of a shortfall in projected revenues, and only if there are no other available resources from which to pay the public debt.   The conditions of Article VI, Section 8 have not been triggered in this fiscal year because the Commonwealth has sufficient available resources to meet the appropriations set by the Legislative Assembly (in fact, it has a current surplus of more than $2.9 billion).  Moreover, the CCDA Enforcement Action will have no effect on any contingent or reversionary interest the Commonwealth may have in the Pledged Hotel Taxes.  The Commonwealth is not proposed to be named as a defendant in the CCDA Enforcement Action, and any contingent or reversionary interest it might have would remain intact and unimpaired.

---

[3] The flow of funds provided by AAFAF indicates that from December 2015 to March 2016, Pledged Hotel Taxes, after being deposited into an account identified as GDB -9758, were transferred to the TSA account. This Motion does not seek to lift the stay to pursue claims against the Commonwealth with respect to those diverted funds.  Movants reserve all rights with respect to such money.

4.   *Second*, discovery has revealed that, contrary to the Oversight Board's factual representations, Hotel Taxes are still being deposited into the Transfer Account and thus are subject to Movant's lien even under the Oversight Board's theory.   The Oversight Board's Opposition is premised on the factual assumption that, beginning on November 30, 2015, the Tourism Company stopped depositing the Hotel Taxes into the Transfer Account.   (CCDA Adv. Compl., ECF. No. 10079 ¶¶ 4, 84; Opp. ¶ 40.)   But discovery revealed that is not true. Hotel Taxes have been (and continue to be) deposited into the Transfer Account.

5.   The Assignment Agreement makes clear that Hotel Taxes must be "deposited, as collected, into the Holding Fund," which "contain[s] two accounts identified as the Transfer Account and the Surplus Account."   (Assignment Agreement § 1, attached to Mot. as Ex. 3 (ECF No. 10104-3).)   Under the Pledge Agreement, the Debt Service Amount (*i.e.*, the Hotel Taxes due to bondholders in a given year) is transferred from the Holding Fund to the Pledge Account on a monthly basis.   Prior to the Commonwealth's 2016 default, Hotel Taxes collected by hotels were transferred to a Scotiabank account (ending in account number -5142) held by the Tourism Company, titled the "Public Funds Account."   All Hotel Taxes transferred by the hotels into the Scotiabank -5142 account were then transferred to a GDB account (ending in account number -9758), held by the Tourism Company, known as the "Room Tax Concentration Surplus" account (the Surplus Account).   The Debt Service Amount was then moved on a monthly basis from the GDB -9758 account to the Pledge Account.   Those monies were then transferred out of the Holding fund into other accounts held by the Tourism Company containing funds other than Hotel Taxes.

6.   The pre-default implementation of the Bond Documents makes clear that the Scotiabank account (ending in account number -5142) is the Transfer Account.   It is undisputed that hotels continue to transfer the Hotel Taxes they collect into the Scotiabank -5142 account to

3

this day—and the Oversight Board concedes, (Opp. ¶ 70), that Movants' lien attaches to Hotel Taxes deposited in the Transfer Account.

7.      The Oversight Board's arguments to the contrary strain the factual record beyond its breaking point.  The Oversight Board and AAFAF (together, the "Government Parties") argue that the GDB -9758 account was actually the Transfer Account, such that the Pledged Hotel Taxes are no longer being deposited into the Transfer Account, thereby avoiding the attachment of the CCDA bondholders' lien.  In addition to being legally false, the Commonwealth produced no evidence supporting the contention that the GDB -9758 account was the Transfer Account.  In the thousands of pages of discovery, not a single Commonwealth, Tourism Company, or third-party bank document describes the GDB -9758 account as the Transfer Account.  To the contrary, official Tourism Company and GDB records refer to that account as the "Room Tax Concentration Surplus" account.

8.      Whatever factual disputes the Government Parties may raise are not for this Court to decide on this Motion.  The limited question before the Court is whether Movants have made out a colorable claim to secured status or another property interest.  Movants have easily cleared this hurdle, and thus are entitled to stay relief.

9.      *Third*, the Opposition fails to rebut Movants' argument that, under the Bond Documents, Movants are entitled to the Pledged Hotel Taxes, whether or not they are deposited into particular accounts.  By its express terms, the Pledge Agreement grants Movants a lien on all funds that are "deposited in ***or required to be deposited in*** the Pledge Account pursuant to the provisions of this Pledge Agreement."  (*See* Pledge Agreement § 2(b), attached to Mot. as Ex. 4 (ECF No. 10104-4) (emphasis added).)  The Opposition argues that the Tourism Company was not bound by the Pledge Agreement, but documents produced in discovery show the opposite.

The Tourism Company adopted a corporate resolution consenting to the Pledge Agreement and agreeing to its terms.  Movants' lien reaches the Pledged Hotel Taxes that are "required to be deposited in" the Pledge Account, whether or not those Pledged Hotel Taxes are in fact deposited therein.

## SUPPLEMENTAL BACKGROUND

10.     On February 14, 2020, after Movants filed their Motion and the Oversight Board filed its Opposition, the Court ordered the Government Parties to provide "limited discovery" into certain specific factual representations in the Opposition.  (*See* ECF. No. 11057.)  Specifically, the Court allowed limited discovery into the factual representations in paragraphs 39-41 of the Opposition, which addressed the flow of Hotel Taxes, the Tourism Company's diversion of the Hotel Taxes in 2015, and the Tourism Company's ongoing retention of the Pledged Hotel Taxes. (Opp. ¶¶ 39-41.)

11.     Although the "limited discovery" provided to Movants to date is incomplete and would need to be developed to fully litigate Movants' property rights, the documents produced show that the Hotel Taxes *continue to be deposited into the Transfer Account* (and are subject to the CCDA bondholders' lien, even under the Oversight Board's legal theory).

## I.      DISCOVERY HAS SHOWN THAT THE SCOTIABANK ACCOUNT, THROUGH WHICH THE HOTEL TAXES ARE TRANSFERRED TO THE TOURISM COMPANY, IS THE TRANSFER ACCOUNT.

### A.      The Pre-Default Flow of Funds.

12.     In connection with their production, the Government Parties produced a chart that purports to show the general flow of funds for hotel tax revenues for CCDA from January 2015 to the present.  The chart, which illustrates the flow of funds prior to the Commonwealth's default, is excerpted below.



(*See* Ex. 38, Ltr. from E. McKeen, Esq. and M. Mervis, Esq. to J. Hughes, Esq., *et al.*, dated April 14, 2020.)

13.     The chart shows that, between January 2015 and November 2015, incoming Hotel Taxes were deposited with the Tourism Company via Scotiabank -5142.  From there, all Hotel Taxes moved to GDB -9758, which is described in transfer records from the Tourism Company as the "Room Tax Concentration Surplus" account.  (*See, e.g.*, Ex. 22, CCDA_STAY0004005 at 1.) On a monthly basis, the Debt Service Amount of approximately $3 million (*i.e.*, the Pledged Hotel Taxes) was deducted from the Surplus Account and moved to GDB -9947, which is described in

account records as the "Hotel Occupancy Tax Pledge Account." (*See* Ex. 43, CCDA_STAY0006780-6786 at 1.)

14.    Bank account statements reflect that GDB made periodic payments from GDB -9947 to the Bond Payment Fund held at The Bank of New York Mellon (designated BONY -6334). The surplus funds remaining in the Surplus Account were removed at periodic intervals from the Holding Fund and transferred to Scotiabank -5144, which (as the chart shows and the Tourism Company's 30(b)(6) representative confirmed) is an account that holds other Tourism Company revenues, such as slot machine proceeds. (*See* Ex. 44, Ahlberg Tr. 457:7-13.) As the chart above reflects, some of the monies in Scotiabank -5144 were moved to Scotiabank -5138 and then used for "Non-Debt Service Outflow." (*See* Ex. 38.)

15.    In or around May 2016, the Tourism Company changed the flow of funds such that money no longer flowed into GDB -9758, and instead were transferred directly to the Scotiabank -5144 account. (*See* Ex. 38.) Despite this change, the Hotel Taxes continued, at all times, to be transferred from hotels into the Scotiabank -5142 account. Beginning in or around August 2016 the flow of funds changed again, and the Tourism Company transferred the Pledged Hotel Taxes in the Scotiabank -5142 (through an intervening account) into a Banco Popular account ending in -6545 (referred to as "BPPR -6545"). Those monies were then transferred into a segregated "escrow account" held at FirstBank. (*See* Opp. ¶ 13.) Although the Oversight Board represents in its Opposition that there has been no diminution in value of Movants' collateral being held in the FirstBank account, the Tourism Company's 30(b)(6) representative confirmed that at least $15 million of Pledged Hotel Taxes have been transferred out of the FirstBank account to other Commonwealth accounts and spent for unrelated purposes. (*See* Ex. 44, Ahlberg Tr. 537:24-

538:20.) The money on deposit in the FirstBank account are insufficient to pay all amounts due and owing on the CCDA bonds.

**B.      The Scotiabank -5142 Account Is the Transfer Account.**

16.      As described in more detail below, *see infra* Section II., bank account documents, including account statements, account-opening documents, and transmittal documents, as well as the Oversight Board's own admissions and the admissions of the Commonwealth's and the Tourism Company's 30(b)(6) representative have established that:  (i) The Bank of New York Mellon account, account number ⸏ 6334 ("BONY -6334"), is the **Bond Payment Fund**; (ii) the GDB account, account number ⸏Redacted⸍9947 ("GDB -9947"), is the **Pledge Account**; (iii) the GDB account, account number ⸏Redacted⸍9758 ("GDB -9758"), is the **Surplus Account**; and, by process of elimination, (iv) the Scotiabank account, account number ⸏ **Redacted** ⸍5142 ("Scotiabank -5142"), is the **Transfer Account**.

17.      *First*, it is undisputed that BONY -6334, titled "PRCCDA – Hotel OCC Bds-Ser A Bd Pymt Fd," is the Bond Payment Fund, which is the trust account used to make bond payments on the CCDA bonds.  (*See, e.g.*, Ex. 46, CCDA_STAY0013795 – CCDA_STAY0013797.) Between January 2015 and November 2015, the Debt Service Amount was transferred to BONY -6334 on a monthly basis. (*See* Ex. 38.)

18.      *Second*, it is undisputed that GDB -9947 is the Pledge Account.  The account is titled "Hotel Occupancy Tax Pledge Account" (*see* Ex. 43), and no other accounts in the CCDA flow of funds use "Pledge" in their names.  The Tourism Company's designated corporate representative testified that GDB -9947 is the Pledge Account. (*See* Ex. 44, Ahlberg Tr. at 482:9-12.)  Moreover, the Government Parties admitted that "the Pledge Account is GDB – 9947." (*See* Ex. 45, Ltr. from E. McKeen, Esq. to J. Hughes, Esq., *et al.*, dated March 31, 2020, at 5.)  Bank

account statements show transfers of the Debt Service Amount from GDB -9758 to GDB -9947, and corresponding transfers out of GDB -9947 to BONY -6334.

19.     *Third*, business records of the Tourism Company produced in discovery establish that GDB -9758 is the Surplus Account.  Transfer documents signed by the Tourism Company identify GDB -9758 as the "Room Tax – Concentration Surplus" account.  (*See* Ex. 37, CCDA_STAY0004297 at 1.)   No other account in the flow of funds is referred to in the Commonwealth or Tourism Company records with the word "Surplus."  (Hughes Decl. ¶ 8.)  The account is not referred to in *any* Commonwealth or Tourism Company document as the Transfer Account.

20.     Until December 2015, the Debt Service Amount was transferred on a monthly basis from GDB -9758 to the Pledge Account.  The remaining surplus amounts were transferred to the Scotiabank -5144 account, as well as to multiple other accounts (including accounts that are not identified in the flow of funds chart prepared by the Government Parties).  (*See* Ex. 38; Hughes Decl. ¶ 8.)  This is consistent with this account being the Surplus Account of the Holding Fund, from which surplus monies may be distributed by the Tourism Company.  *See* 13 L.P.R.A. § 2271v(b).  Such transfers are inconsistent with that account being the Transfer Account.

21.     While the Oversight Board argues that Scotiabank -5144 is the Surplus Account, the Tourism Company admitted that there is no documentation referring to that account in that way. (*See* Ex. 44, Ahlberg Tr. 497:9-13.)  Moreover, the Surplus Account is specifically described in the Bond Documents as one of two accounts that comprise "a special fund called the Assignment and Coordination Holding Fund," into which all "Hotel Occupancy Tax Revenues will be deposited, as collected."  (Assignment Agreement § 1.)  The Scotiabank -5144 is a Tourism Company account that holds funds that have nothing to do with the Hotel Taxes.  Thus, that

account plainly is not part of the Holding Fund, which was established for the express purpose of holding Hotel Taxes under the Assignment Agreement.

22. *Fourth*, discovery has established that Scotiabank -5142 is the Transfer Account. Bank account statements show that Hotel Taxes have been deposited, as collected, into Scotiabank -5142, which is held in the name of the Tourism Company, from at least January 1, 2015 to the present—consistent with the requirements in the Bond Documents that Hotel Taxes "will be deposited, as collected, into the Holding Fund," consisting of the Transfer Account and the Surplus Account. (Assignment Agreement §§ 1-2.) The Tourism Company's representative confirmed that all hotel room taxes collected by hotels are transferred to the Tourism Company through the Scotiabank -5142 account. (*See* Ex. 44, Ahlberg Tr. 455:9-14.) Moreover, because GDB -9758 was expressly described as the "Surplus" account and there is no dispute that GDB -9947 is the Pledge Account, Scotiabank -5142 is the only other Tourism Company account that held all of the Pledged Hotel Taxes. It thus, by process of elimination, must be the Transfer Account.[4]

23. Moreover, while discovery has not revealed a specific document explicitly describing any account as the "Transfer Account," it is notable that the Government Parties have not found any account opening documents for Scotiabank -5142.[5] (*See* Ex. 44, Ahlberg Tr. 500:19-501:16.)

_____

[4] The Tourism Company's corporate representative confirmed that, pre-default, exactly the same revenues flowed through the Scotiabank -5142 account and the GDB -9758 account. (*See* Ex. 44, Ahlberg Tr. 455:9-21.) The principal difference between the accounts during the pre-default period is that transfers on account of Tourism Company operations were made from the GDB -9758 account, and not from Scotiabank -5142. This is further consistent with the Scotiabank -5142 account being the Transfer Account, and the GDB -9785 account being the Surplus Account.

[5] Some documents refer to Scotiabank -5142 as the "Room Tax Deposits" account, which is consistent with that account being part of the Holding Fund into which Hotel Taxes are deposited as collected. (*See, e.g.*, Ex. 47, CCDA_STAY0001814-1819.)

24.     Thus, contrary to the Oversight Board's representation in its opposition brief (Opp.

¶ 40), Hotel Taxes are still being deposited into the Transfer Account.[6]  (Ex. 45, at 5.)

## ARGUMENT

25.     The Oversight Board's attempt to elevate Movants' burden or suggest that Movants

must prove secured status on this motion, (Opp. ¶¶ 2, 68), is baseless.  "Adjudication of a motion

for relief from the automatic stay 'is not a proceeding for determining the merits of the underlying

substantive claims, defenses, or counterclaims.'"  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 2019

WL 4735362, at *4 (D.P.R. June 28, 2019) (quoting *In re Bos. Language Inst., Inc.*, 593 B.R. 381,

395 (Bankr. D. Mass. 2018)).  Rather, *Grella*'s "colorable claim" standard applies.  *See Grella v.

Salem Five Cent Sav. Bank*, 42 F.3d 26, 32-33 (1st Cir. 1994); *see also Gracia-Gracia v. Fin.

Oversight & Mgmt. Bd. for P.R.*, 939 F.3d 340, 352 (1st Cir. 2019) (quoting *Grella*, 42 F.3d at 33);

*U.S. Bank N.A. v. Vertullo (In re Vertullo)*, 610 B.R. 399, 403-04 (B.A.P. 1st Cir. 2020).

26.     "A hearing on relief from the automatic stay is typically not the proper forum for

the assertion of defenses and counterclaims against the party seeking relief.  In an automatic stay

proceeding, the Court should limit itself to a narrow frame of inquiry."  *In re Hernandez*, 244 B.R.

549, 553-54 (Bankr. D.P.R. 2000) (finding that the movant had a colorable claim to the property

notwithstanding "Debtor's defenses and counterclaims [that] attack the validity of the Movant's

---

[6]  Movants note that while the factual record clearly supports their entitlement to stay relief, in light of the strictly "limited discovery" authorized by the Court (ECF No. 11057), a number of factual gaps remain. Among other issues, Movants have not been given any opportunity to obtain discovery into the factual premises underlying the Government Parties' suggestion that Article VI, Section 8, was triggered, nor whether any purported "preemption" was consistent with the requirements of PROMESA. *See infra*, Sections I.A and III. Even as to basic flow of funds issues, despite their diligence in seeking these materials, Movants have not yet received complete documentation regarding certain fund transfers and Movants do not have complete "course of performance" discovery. In addition, there are gaps in the account-opening document records produced by the Government Parties that could be remedied through additional discovery. In the event that the Motion is not granted at the preliminary hearing, Movants will need discovery into these and other issues in advance of the final hearing.

claim. . . .   In view of the First Circuit Court of Appeals' opinion in *Grella v. Salem*, *supra*, we hold that the appropriate forum for the Debtor's affirmative defenses and counterclaims is the trial court in the foreclosure action.").   Although "a more expansive approach to what may be asserted in opposition to a relief from stay motion has evolved, the First Circuit Court of Appeals has adopted the more restrictive approach." *Id*. at 554 (citations omitted).   The Court need not—and should not—adjudicate the merits of the underlying claims at this stage.

27.     While *Grella* drew a loose analogy between a lift-stay hearing and a preliminary injunction hearing, it never stated or suggested that the same burden of proof applies to each.   Quite the contrary, *Grella* explicitly stated a lift-stay movant need only show a "***reasonable likelihood*** that a creditor has a legitimate claim or lien," and the Court must make "only a determination that the creditor's claim is ***sufficiently plausible*** to allow its prosecution elsewhere." *Grella*, 42 F.2d at 33-34 (emphasis added).   Contrary to the Oversight Board's suggestion (Opp. ¶ 60), a lift-stay hearing does "***not*** involve a full adjudication on the merits of claims, ***defenses***, or counterclaims." *Grella*, 42 F.2d at 32 (emphasis added).

28.     *Peaje Investments LLC v. Financial Oversight & Management Board for Puerto Rico*, 899 F.3d 1 (1st Cir. 2018), is not to the contrary.   While the First Circuit concluded that it could not evaluate the Title III court's finding of lack of "cause" without the court's "view as to the precise nature and extent of [movant's] collateral," it did not require lift-stay movants to "establish[]" the nature and extent of the collateral to prevail.   To the contrary, the First Circuit has emphasized that this Court makes only a "preliminary determination" of a movant's claim to the debtor's property. *Gracia-Gracia*, 939 F.3d at 352.

## I.   THE AUTOMATIC STAY DOES NOT APPLY TO THE CCDA ENFORCEMENT ACTION BECAUSE THE ACTION DOES NOT IMPLICATE PROPERTY OF A DEBTOR.

29.     As detailed in the Motion, the automatic stay is inapplicable here.  The automatic stay covers only proceedings that implicate property of a debtor.  (Mot. ¶ 70.)  It does not stay actions in which no Title III debtor is being sued and no Title III debtor's property is implicated. Neither CCDA nor the Tourism Company is a Title III debtor.  Because Movants are not seeking to sue the Commonwealth or affect any of its property, the automatic stay simply does not apply, and Movants need not prove their secured status to prevail on this Motion.  Even if the automatic stay were applicable, because the Commonwealth has no equity in any property that would be affected by the CCDA Enforcement Action, stay relief is available under 11 U.S.C. § 362(d)(2) without regard to Movants' secured status.

30.     The Oversight Board does not, and cannot, dispute that the Tourism Company, CCDA, and the other Proposed Defendants in the CCDA Enforcement Action are not Title III debtors entitled to the protection of the automatic stay.  11 U.S.C. § 362(a).  Instead, the Oversight Board advances two arguments that the Commonwealth has a property interest:   (i) the Commonwealth has a "reversionary interest" in the Pledged Hotel Taxes under Article VI, Section 8 of the Puerto Rico Constitution, and (ii) the Pledged Hotel Taxes are levied pursuant to a delegation of authority from the Commonwealth and must be Commonwealth property because, if they were not, the delegation would constitute an improper surrender of the Commonwealth's taxing authority.  (See Opp. ¶¶ 12, 55-64.)  As discussed below, both arguments are without merit.

### A.   Any Purported Reversionary Interest the Commonwealth May Have Under Article VI, Section 8 Is Not Implicated in the CCDA Enforcement Action.

31.     The Oversight Board's suggestion (Opp. ¶ 59) that Article VI, Section 8 allows the Pledged Hotel Taxes to be diverted from bondholders, and instead used to pay general expenses

of the Commonwealth is wrong.

32.     The CCDA bondholders' lien is subject to Article VI, Section 8, but only if certain

conditions precedent are satisfied.  (*See* Assignment Agreement § 11; Pledge Agreement § 2(b));

*see also* 13 L.P.R.A. § 2271v(a).  Commonwealth law does not give the Commonwealth carte

blanche to withhold Pledged Hotel Taxes.  *See* 13 L.P.R.A. § 2271v(a).  This fact is further

reflected in the Bond Documents used to create the CCDA bondholders' consensual lien.  (Pledge

Agreement § 2(b) (Pledged Hotel Taxes can be used for payment of public debt, "but only to the

degree to which the other available resources to which reference is made in [Article VI, Section 8]

are insufficient for such purposes").)  *See also* 13 L.P.R.A. § 2271v(a).

33.     Accordingly, Pledged Hotel Taxes subject to the CCDA bondholders' lien may be

used for payment of general obligation debt only if (i) the conditions of Article VI, Section 8 have

been triggered; (ii) there are no other available resources (as that term is used in Article VI, Section

8 to include all resources of the Commonwealth) other than the Pledged Hotel Taxes; and (iii) the

money is used to pay public debt in a manner consistent with Article VI, Section 8.  Moreover, all

Pledged Hotel Taxes taken pursuant to Article VI, Section 8 must be reimbursed from future Hotel

Taxes.  *See* 13 L.P.R.A. § 2271v(a).  CCDA bondholders' lien therefore continues to attach to the

Pledged Hotel Taxes, even if they are used to pay general obligation debt.

34.     This scheme does not, as the Oversight Board argues, (Opp. ¶¶ 55-58), vest a

"reversionary" interest in the Commonwealth.  If Article VI, Section 8 creates any interest in the

Pledged Hotel Taxes at all, it is an interest in favor of the *general obligation bondholders*.  Any

Pledged Hotel Taxes transferred to the Commonwealth can only be for the limited and specific

purpose of paying general obligation debt.  The monies would therefore be restricted funds, and

the Commonwealth itself would have no beneficial interest in those funds and could not use them

for any purpose except applying them to general obligation debt. (*See* Pledge Agreement § 2(b)
(providing that monies transferred to the Commonwealth under Section 3(b) are "to be used solely
for the payment of the interest and the amortization of the public debt").) *See* 13 L.P.R.A. §
2271v(a).

> 1. **Any Purported Reversionary Interest the Commonwealth May Have
>    Under Article VI, Section 8 Would Not Be Implicated by the CCDA
>    Enforcement Action.**

35.     The CCDA Enforcement Action will have no effect on any contingent or
reversionary interest that the Commonwealth purports to have in the Pledged Hotel Taxes.

36.     Even assuming *arguendo* that the Commonwealth did have a reversionary interest
in the Pledged Hotel Taxes to which the automatic stay applies, the CCDA Stay Motion was clear
that (i) Movants do not intend to name the Commonwealth as a party to the CCDA Enforcement
Action, and (ii) the CCDA Enforcement Action would have no effect on any reversionary interest
the Commonwealth may have in the Pledged Hotel Taxes. (*See* Mot. ¶ 92.) Any reversionary
interest the Commonwealth may have in the Pledged Hotel Taxes will remain intact and
unimpaired, and the CCDA bondholders' lien will remain subject to the conditions set forth in the
Pledge Agreement.[7]

37.     The Oversight Board has no meaningful response to this point, which further
confirms that the automatic stay does not apply to limit the CCDA Enforcement Action.

---

[7] Movants have excluded from the scope of the proposed CCDA Enforcement Action (and this Motion),
Pledged Hotel Taxes transferred between December 2015 and March 2016 from the GDB -9758 account
(through other Tourism Company accounts) to Commonwealth accounts purportedly for payment of "GO
Debt Service" (but reserve all rights to pursue such claim in a separate action). Accordingly, the
Enforcement Action will not impact funds over which the Commonwealth has asserted a purported
"clawback" right under Article VI, Section 8.

2.    **The Conditions of Article VI, Section 8, the Enabling Act, and the Pledge Agreement for Using Pledged Hotel Taxes to Pay Public Debt Are Not Properly Before this Court, and Have Not Been Satisfied.**

38.    This Court need not decide whether the conditions for applying Pledged Hotel Taxes to payment of public debt have been satisfied, nor whether the retained Pledged Hotel Taxes have been used for such a purpose.  That question, to the extent implicated by the CCDA Enforcement Action at all, is a substantive factual question that should be presented to and decided in that case.  It is clear that Movants have shown at least a colorable claim that (i) the conditions of Article VI, Section 8 have not been satisfied in one or more years, (ii) that there are other available resources of the Commonwealth from which public debt can be paid, and (iii) that the Pledged Hotel Taxes have, in vast majority, not been used to pay public debt.  The Opposition offers nothing more than bald assertions devoid of factual support on these points.[8]

39.    The Oversight Board's arguments to the contrary turn the entire Puerto Rico constitutional scheme, and the statutory and contractual protections embodied in the property interests granted to CCDA bondholders, on their head.  According to the Oversight Board, the proposed Amended Plan of Adjustment (which does not provide for payment in full of public debt) proves that the Commonwealth is without sufficient available resources to meet all appropriations and thus has an interest in the Pledged Hotel Taxes.  This is the exact inverse of the required inquiry under Puerto Rico law.

---

[8] The Court should reject the Oversight Board's urging to find that the conditions of Article VI, Section 8 have been triggered because the Commonwealth issued an Executive Order redirecting use of certain funds, including the Pledged Hotel Taxes.  (Opp. ¶ 61.)  Whether that Executive Order was lawful and consistent with the Constitution and Enabling Act are factual questions that cannot be avoided by Commonwealth declaration.  That the then-Governor said it was so does not make it so.

40.     Puerto Rico law allows the Commonwealth to use Pledged Hotel Taxes for the payment of public debt only if there are no other "available resources."[9]  The Amended Plan of Adjustment is based on a Fiscal Plan that provides for payment of *all* Commonwealth appropriations and expenses (in fact, according to the Oversight Board, it defines the precise parameters of permitted appropriations).  The proposed Plan of Adjustment addresses only the allocation and distribution of the excess remaining value.  It does not account for all of the "available resources" of the Commonwealth, as that term is used in Article VI, Section 8, and certainly does not prove that there are no available resources other than the Pledged Hotel Taxes that can be used for payment of public debt.  That the Oversight Board is proposing to impair general obligation debt under the proposed Plan of Adjustment does not prove that the Pledged Hotel Taxes are the only available resources that could be used to pay that debt.[10]  Due to the CCDA bondholders' additional statutory protections, the question is not, as the Oversight Board suggests, whether available resources are sufficient to meet all appropriations; rather, it is whether there are any available resources other than the Pledged Hotel Taxes that could be used (before considering other appropriations) for payment of public debt.

41.     As a factual matter, the answer to that question is yes.  The Commonwealth's own budgets and cash flow analyses plainly demonstrate that Article VI, Section 8 has not been triggered for this fiscal year or any prior fiscal year.  (*See, e.g.,* Mot. ¶ 91 and n.8.)  In each fiscal

---

[9] The Oversight Board's argument to the contrary (Opp. ¶ 62) ignores entirely the last dollars protection provided to CCDA bondholders, which is incorporated into the defined conditions of the lien granted to the CCDA bondholders, and is an inherent component of their property interest in the Pledged Hotel Taxes.

[10] To the extent the full amount of general obligation debt payments is not included in the annual budget, any shortfall would not even factor into the Article VI, Section 8 analysis, which considers only whether available resources in a particular fiscal year are insufficient to meet appropriations for that year.  Section 201(b)(1)(D) of PROMESA, by requiring that the Fiscal Plan (with which any budget must be consistent) to eliminate structural deficits, prevents Article VI, Section 8 from being triggered in this manner.

year, the Commonwealth had sufficient available resources to pay the appropriations for that fiscal year (including the public debt, *i.e.*, general obligation bonds).[11]  (Mot. ¶¶ 52-54, 90-91); (Opp. ¶ 56.)   Even if available resources had been insufficient in some prior fiscal year, the Commonwealth currently enjoys more than a $2.9 billion *surplus* and thus plainly has sufficient available resources in this fiscal year.  (Mot. ¶ 91.)

42.     The factual record further belies any claim that the conditions of Article VI, Section 8 have been satisfied with respect to the Pledged Hotel Taxes (other than those collected in December 2015).   As noted above, the Pledged Hotel Taxes may be transferred to the Commonwealth solely for the payment of public debt.  As the Commonwealth has not paid any general obligation debt since 2016, it cannot credibly claim that the Pledged Hotel Taxes were needed in prior fiscal years to pay general obligation bondholders. (Mot. ¶ 54.)  Article VI, Section 8 is part of a suite of constitutional provisions addressing budgeting and payments in a fiscal year. By its terms, it applies only to resources and payment obligations within a particular fiscal year. Nothing in Article VI, Section 8 would allow monies to be clawed back in one fiscal year to be retained to make debt payments, even public debt payments, in another fiscal year.  The available resources analysis under Article VI, Section 8 must be performed on an annualized basis.  The Oversight Board offers no response to this point.

43.     The Oversight Board's effort to distinguish the Hotel Occupancy Tax Act from the COFINA statute (Opp. ¶ 63), is unavailing.   Unlike in COFINA, where the sales and use taxes were imposed by and collected by the Commonwealth into a jointly held account, the Pledged Hotel Taxes are collected by the Tourism Company itself and, as demonstrated by the flow of

---

[11] Movants properly sought discovery on this issue (*see* ECF Nos. 11057, 12275), but the Oversight Board has produced zero documents on this issue to date. (*See* Ex. 48, Ltr. From G. Mainland Esq. to E. McKeen, Esq. and M. Mervis, Esq., dated February 24, 2020.)

funds provided by AAFAF, never touch a Commonwealth bank account.  (*See* Ex. 38; Ex. 44, Ahlberg Tr. 452:8-25, 453:15-25, 455:9-14, 502:22-25, 503:1-9, 536:4-8, 531:2-6.)  Accordingly, the Commonwealth did not have to make clear, as it did in COFINA, that the funds were the property of the Tourism Company.  (*See supra* ¶ 4.)

> **B.      The Commonwealth's Delegation of Authority to the Tourism Company to Impose Hotel Taxes Did Not Reserve Any Other Property Interest for the Commonwealth.**

44.      As a fallback point, the Oversight Board argues that the Commonwealth has a reversionary interest in all past, present, and future Hotel Taxes because all taxes emanate from the Commonwealth's "sole constitutional power of taxation."  (*See* Opp. ¶ 56.)  According to the Oversight Board, because the Legislative Assembly cannot "surrender[] or suspend[]" this power, any restrictions on the Commonwealth's unfettered use of the Pledged Hotel Taxes would amount to an unconstitutional surrender of the Commonwealth's taxing power.  (*Id.*)

45.      But as this Court has previously held in a similar context, the Commonwealth's delegation to the Tourism Company of the power to impose and collect the Hotel Taxes is a legitimate *use* of its taxing power, not an impermissible *surrender* of it.  *See In re Fin. Oversight and Mgmt. Bd. for P.R.*, 361 F. Supp. 3d 203, 242 (D.P.R. 2019) (statutory designation of certain revenues to COFINA as collateral for new bonds "was a proper exercise of the Legislative Assembly's constitutional power to designate revenues for a legitimate public purpose").  The sovereign's power to tax inherently includes the ability to allocate or transfer tax proceeds as the government deems appropriate, limited only by the requirement that the proceeds be used for a "public purpose."  *Porto Rico Tel. Co. v. Tax Court*, 1960 PR Sup. LEXIS 72, at *14 (P.R. June 30, 1960) ("the Legislature levied the tax and determined its amount, chose the object as well as the subject thereof and fixed the purpose or use which it should be given," and validly left the execution and implementation of the Act to the municipality).

19

46.     The Oversight Board does not, and cannot, deny that the statutory delegation of the taxing power to the Tourism Company was for a legitimate public purpose.  The Hotel Tax Occupancy Act is also clear that the Commonwealth delegated its taxing powers to the Tourism Company.  13 L.P.R.A. § 2271v(a).  The Commonwealth retained no property interest in the taxes.

47.     In short, the Oversight Board fails to meet its burden of proving that Article VI, Section 8 was validly triggered, or that the Commonwealth otherwise has an interest in the hotel taxes through a retained right related to the delegation of taxing power.

## II.   ALTHOUGH IT IS NOT A NECESSARY ELEMENT FOR STAY RELIEF, MOVANTS HAVE CLEARLY SHOWN THAT THEY ARE SECURED.

48.     Movants do not need to establish secured status for stay relief because, as discussed above, the CCDA Enforcement Action is not subject to the automatic stay.  Even if it were, the CCDA Enforcement Action does not implicate any property in which the Commonwealth has equity, such that stay relief is proper under 11 U.S.C. § 362(d)(2) whether Movants have a lien enforceable against the Tourism Company or not (as the Tourism Company is not a Title III debtor, it can be sued for breach of contract without regard to any lien).

49.     In any case, Movants plainly do have an enforceable lien in the Pledged Hotel Taxes.  The Oversight Board argues that Movants' lien extends only to Hotel Taxes actually deposited in the Transfer Account—and that no Hotel Taxes have been deposited into the Transfer Account since the Commonwealth's fiscal crisis began.  (Opp. ¶ 2.)  These arguments are unavailing for three reasons:  (i) contrary to the Oversight Board's factual assertions, Hotel Taxes are still being deposited into the Transfer Account; (ii) CCDA bondholders have a lien on all funds *required to be deposited* into the Transfer Account, whether or not actually deposited; and (iii) the Oversight Board's purported policy arguments are not a legal basis for destroying CCDA bondholders' liens.

A.    **Discovery Has Revealed That the Pledged Hotel Taxes Are Being Deposited Into the Transfer Account and Thus Are Indisputably Subject to CCDA Bondholders' Security Interest.**

50.    In the Opposition, the Oversight Board argues that Hotel Taxes are no longer being deposited into the Transfer Account, which the Oversight Board contends they must be in order for CCDA bondholders' lien to attach.  (Opp. ¶ 2.)  As a preliminary matter, the Hotel Occupancy Tax Act grants CCDA bondholders equitable ownership over the Pledged Hotel Taxes, such that the issue of whether the Hotel Taxes are being deposited into the Transfer Account is not determinative of the issue of Movants' secured status.  Regardless, discovery has now revealed that the Oversight Board's factual assertion that the Hotel Taxes are no longer being deposited into the Transfer Account is false, such that the CCDA bondholders have an enforceable security interest even under the Oversight Board's legal theory.

51.    As discussed above, prior to the April 2016 change in the flow of funds, Hotel Taxes were "deposited, as collected, into the Holding Fund," (Assignment Agreement § 1), specifically Scotiabank -5142, which operated as the Transfer Account.  After hotels collected the Hotel Taxes and transferred them to the Transfer Account, the Hotel Taxes were then moved to the Surplus Account (GDB -9758) before the Debt Service Amount was transferred to the Pledge Account (GDB -9447).

52.    After April 2016, Hotel Taxes no longer moved through accounts at GDB.  But even the Oversight Board's legal theory does not prevent CCDA bondholders' lien from attaching after that time:  the Tourism Company assigned "all rights it may legally have in amounts deposited in the Transfer Account collected by the Tourism Company" (up to the Debt Service Amount to GDB) (*see* Assignment Agreement § 6), and GDB in turn "pledge[d] a security interest to the" CCDA bondholders in "all right title and interest of GDB in the Assignment Agreement."  (*See* Pledge Agreement § 2(b) (emphasis added).)  The Oversight Board concedes is thus beyond

peradventure that CCDA bondholders have a security interest in Hotel Taxes collected into the Transfer Account (up to the Debt Service Amount). (*See* Opp. ¶¶ 2-3, 70.)

53.   The Oversight Board's argument to the contrary appears to be based on confusion over which bank account is which:  the Oversight Board claims that the GDB -9758 "Room-Tax Concentration ***Surplus***" account is the Transfer Account and that the Scotiabank -5144 "Sweep Concentration" account is the Surplus Account.   (Ex. 45, at 5); (Opp. ¶¶ 7, 16-17.).   But no admissible evidence supports this claim:   The Tourism Company's corporate representative testified that his belief as to which account was which was based solely on hearsay conversations with a Tourism Company employee—not on any documentary evidence—and he did not know what materials the Tourism Company employee reviewed or relied upon in making the assertions. (*See* Ex. 44, Ahlberg Tr. 489:10-25; 545:21-547:14.)  This testimony is inadmissible hearsay. *See Union Pump Co. v. Centrifugal Tech. Inc.*, 404 F. App'x 899, 907–08 (5th Cir. 2010) ("[A] corporate representative may not testify to matters outside his own personal knowledge to the extent that information is hearsay not falling within one of the authorized exceptions.") (internal citations omitted).

54.   The Pledge Account and Surplus Account are explicitly identified ***by name*** in their bank account documents.  In particular, those bank statements identify only one account as the Pledge Account—GDB -9947—named the "Hotel Occupancy Tax ***Pledge*** Account."  (Ex. 43, at 1 (emphasis added).)  Similarly, the produced bank account documents identify only one account as the Surplus Account—GDB -9758—named the "Room Tax – Concentration ***Surplus***" account. (Ex. 22, at 1 (emphasis added).)  Produced documents also show no other accounts in the CCDA flow of funds named or referred to as "Surplus"—further confirming that the GDB -9758 "Room Tax – Concentration Surplus" account is the Surplus Account.

55.     Unlike the Pledge Account and Surplus Account, no documents produced in discovery refer to any Tourism Company bank account as the "Transfer Account."[12]  And while no flow of funds or account designations perfectly tracks the Bond Documents, for the reasons set forth below, (i) Scotiabank -5142 is the only account that can logically be the Transfer Account, (ii) GDB -9758 is the only account that can logically be the Surplus Account, and (iii) the Tourism Company consistently treated them as such:

- **The Transfer Account is the collection point for Hotel Taxes.**  As the Assignment Agreement makes clear (and the Oversight Board concedes), the Holding Fund consists of exactly two accounts:   the Transfer Account and the Surplus Account.  (Assignment Agreement § 2; Ex. 45, at 5 ("the Holding Fund is comprised of the Transfer Account and the Surplus Account").)  The Assignment Agreement makes clear that all Hotel Taxes must be "deposited, as collected," into these accounts.   (Assignment Agreement §§ 1-2.)  The Oversight Board has further confirmed that "all relevant room taxes collected under the Hotel Occupancy Tax Act were initially deposited into Scotiabank account number Redacted 5142 from at least January 1, 2015 to present."  (Ex. 45, at 5.)  Thus, Scotiabank -5142 is part of the Holding Fund, specifically the Transfer Account therein.  (*Id.*)

- **GDB -9758 cannot be the Transfer Account.**  The Oversight Board claims that the GDB -9758 "Room Tax – Concentration Surplus" account is the Transfer Account.  That cannot be.  *First*, it was expressly referred to in Tourism Company records with the word "Surplus"—which plainly indicates that it was understood to be the Surplus Account, not the Transfer Account.   *Second*, the Assignment Agreement is unambiguous that "[a]ll Hotel [Taxes] will be deposited, *as collected*, into the Holding Fund."  But Hotel Taxes are not "deposited, as collected" into GDB -9758—they are "deposited, as collected" into Scotiabank -5142.  Hence, Scotiabank -5142 must be one of the accounts in the Holding Fund; and since GDB-9758 was explicitly labeled as "Surplus," Scotiabank -5142 plainly was the Transfer Account.  *Third*, the bank account statements for GDB -9758 show multimillion-dollar transfers of monies in GDB -9758 to accounts not listed in the CCDA flow of funds.  (Hughes Decl. ¶ 10.); (*see* Ex. 44, Ahlberg Tr.  545:6-14.)  But the Bond Documents do not contemplate transfers of Hotel Taxes deposited into the Transfer Account to accounts other than the Surplus Account or Pledge Account.  It is only from the Surplus Account that Hotel Taxes can be transferred to accounts not part of the CCDA flow of funds.  (*See* Assignment Agreement §4-7); *see also* 13 L.P.R.A. 2271v(b).  Thus, the GDB -9758 "Room Tax – Concentration Surplus" account is (just as its name implies) the Surplus Account, not the Transfer Account.

---

[12] Notably, no account opening documents for the Scotiabank -5142 account were produced.  (Ex. 45, at 1-2); (Ex. 44, Ahlberg Tr. 501:7-16.)

- **Scotiabank -5144 cannot be the Surplus Account.**  The Oversight Board incorrectly claims that the Scotiabank -5144 "Sweep Concentration" account—and not the "Room Tax – Concentration Surplus" account—is the Surplus Account.  *First*, in contrast to GDB -9758, this account was never referred to in any contemporaneous record as the "Surplus Account."  *Second*, this account cannot be part of the Holding Fund at all because, as the Government Parties concede, Scotiabank -5144 did not merely contain Hotel Taxes; it had millions of dollars' worth of deposits from other revenue sources that have nothing to do with the Hotel Taxes. (Ex. 45, at 5); *see* Ex. 44, Ahlberg Tr. 457:7-13.)  The Holding Fund, which consists of the Transfer Account and the Surplus Account, is a "special fund" established specifically to hold the Hotel Taxes. (*See* Assignment Agreement § 2.)  Thus, the fact that Scotiabank -5144 holds monies other than Hotel Taxes necessarily demonstrates that it was not part of the Holding Fund (and thus was not the Surplus Account therein).

56.     Under well-settled law, the fact that Scotiabank -5142 was (and is) used in a manner more consistent with it being the Transfer Account and GDB -9758 was used in a manner more consistent with it being the Surplus Account is powerful "course of performance" evidence that provide further proof that the Tourism Company intended Scotiabank -5142 to be the Transfer Account and GDB -9758 to be the Surplus Account.[13]  *See Reed & Reed, Inc. v. Weeks Marine, Inc.*, 431 F.3d 384, 388 (1st Cir. 2005) ("The parties to an agreement know best what they meant," and "thus the parties' subsequent course of performance may be instructive in contract interpretation."); Restatement (Second) of Contracts § 202 (Am. Law. Inst. 1981) (same).

57.     Even if the Oversight Board could now come forward with some evidence to support a contrary theory (which, to date, it has failed to do), that *at most* could raise a factual dispute over whether Scotiabank -5142 is the Transfer Account or something else.  Simply raising

---

[13] "[C]ourse of performance" evidence is admissible even in the absence of ambiguity. *See Quasar Energy Group, LLC v. VGBLADS, LLC*, 2017 WL 3206940, at *6 (D. Me. July 28, 2017), *report and recommendation adopted sub nom. Quasar Energy Grp. v. Vgblads LLC*, 2017 WL 4274159 (D. Me. Sept. 26, 2017); *Francisco Levy, Jr., Inc. v. Caribe Gen. Elec., Inc.*, 2003 WL 21047205, at *8 (P.R. Cir. Feb. 28, 2003) (same).  Further, the First Circuit has explained that courts are moving away from the strict "four corners" rule. *See, e.g., LPP Mortg., Ltd. v. Sugarman*, 565 F.3d 28, 31–32 (1st Cir. 2009) ("the tendency of the courts has been to soften the rigor of the classic doctrine that extrinsic evidence cannot be admitted to override plain language").

a factual dispute is not sufficient to defeat Movants' request for stay relief.  Movants plainly have

*at least* made out a "colorable claim" of entitlement to the "retained" funds that were deposited

into Scotiabank -5142 (and later, in most cases, transferred to a FirstBank escrow account).  *Grella*,

42 F.3d at 32 (citations omitted).  To the extent that the Oversight Board seeks to dispute the

relevant facts, the Tourism Company would have an opportunity to present those disputes in the

context of the CCDA Enforcement Action, where the relevant court can allow fulsome discovery

(not the "limited discovery" that was authorized here, *see* ECF. No. 11057), and make

determinations concerning disputed issues of ownership, secured status, and the scope of Movants'

property rights on a complete factual record.

**B.     Movants Have a Property Interest in the "Retained" Pledged Hotel Taxes, Whether or Not Those Funds Were Deposited into the Transfer Account.**

58.     The Oversight Board's argument that CCDA bondholders' security interest extends

only to the Pledged Hotel Taxes deposited into the Transfer Account is wrong in any event.  As

discussed below, (i) the Bond Documents expressly give CCDA bondholders a security interest

not just in any funds that were first deposited into the Transfer Account, but also in any funds that

*should have been* deposited into the Transfer Account, and (ii) the Hotel Occupancy Tax Act

expressly granted the CCDA bondholders equitable ownership of the Pledged Hotel Taxes as

collected.  For both of the foregoing reasons, Movants have a valid property interest in the Pledged

Hotel Taxes, whether or not they were ever deposited into the Transfer Account.

**1.     The Bond Documents Grant the CCDA Bondholders a Lien on All Pledged Hotel Taxes Collected by the Tourism Company.**

59.     The CCDA Stay Motion shows that the Bond Documents grant a consensual lien

on all Pledged Hotel Taxes the moment they are collected by the Tourism Company.  (Mot.

¶¶ 33, 39, 49.)  The Oversight Board admits that Movants have a lien, but claims that the lien only

attaches to Pledged Hotel Taxes deposited in the Transfer Account.  (Opp. ¶¶ 70-76.)  As explained

below, Movants have a lien on all Pledged Hotel Taxes, whether or not they are deposited into any

particular account.

> a.  **Movants' Property Interest Expressly Extends to Monies That Were "Required to Be Deposited," Whether or Not Those Funds Actually Were Deposited.**

60.     The Pledge Agreement grants Movants a lien on any purportedly "retained" Hotel

Taxes (and as discussed below, the Tourism Company expressly consented to the Pledge

Agreement and is bound by its terms).  The lien granted to CCDA bondholders under Section

2(b)(ii) of the Pledge Agreement expressly covers "retained" Hotel Taxes:  Bondholders have a

lien on "all moneys deposited in *or required to be deposited* in the Pledge Account pursuant to the

provisions of th[e] Pledge Agreement."  (Pledge Agreement § 2(b)(ii) (emphasis added).)  Two

provisions of the Pledge Agreement *independently* require all Pledged Hotel Taxes—including the

"Retained" Pledged Hotel Taxes—be deposited into the Pledge Account.  These provisions also

work together to require the same result.

61.     *First*, Section 2(b)(iii) of the Pledge Agreement pledges to CCDA bondholders "all

right title and interest of GDB in the Assignment Agreement."  (Pledge Agreement § 2(b)(iii).)

This provision requires the Pledged Hotel Taxes to be provided to GDB and ultimately CCDA

bondholders, because GDB's "right" under the Assignment Agreement was the right to have the

Tourism Company transfer the Pledged Hotel Taxes to GDB for deposit into the Pledge Account.

(*See* Assignment Agreement §§ 1, 4 (Hotel Taxes must be deposited "as collected" into the

Transfer Account)); (*id.* §§ 5, 7 (Pledged Hotel Taxes must be transferred to GDB)); (*id.* § 9

(Tourism Company must comply with GDB's demands to make required transfers of Pledged

Hotel Taxes).)  GDB, in turn, was required to transfer the Pledged Hotel Taxes received from the

Tourism Company into the Pledge Account.  (*See* Pledge Agreement § 3(a).)

62.     Thus, Sections 2(b)(iii) and 3(a) of the Pledge Agreement require that all Pledged Hotel Taxes—including those collected by the Tourism Company, whether or not deposited into any particular account—to be provided to GDB and deposited into the Pledge Account. Accordingly, to the extent that the Tourism Company collects Hotel Taxes but does not deposit them into the Transfer Account or the Pledge Account, those retained Hotel Taxes are "moneys . . . ***required to be deposited*** in the Pledge Account pursuant to the provisions of th[e] Pledge Agreement"—which are subject to the CCDA bondholders' lien.  (*Id.* § 2(b)(ii).)

63.     *Second*, Section 5(b) of the Pledge Agreement requires GDB to "diligently enforce its rights under the Assignment Agreement including its enforcement of the . . . transfer obligation of the [Tourism] Company."  (*Id.* § (5)(b).)  This provision of the Pledge Agreement expressly recognizes that the "transfer obligation of the [Tourism] Company" is a "right" that belongs to GDB—and it requires GDB to enforce that right and to ensure that all Pledged Hotel Taxes are transferred to GDB for deposit into the Pledge Account.  (*Id.*)  Thus, Section 5(b) is an additional provision of the Pledge Agreement that requires all Pledged Hotel Taxes (including those collected by the Tourism Company, whether or not deposited into any particular account) to be deposited into the Pledge Account.

64.     The provisions discussed above make plain that transfers of the Pledged Hotel Taxes to GDB, for deposit into the Pledge Account, is required under both the Assignment Agreement *and* the Pledge Agreement.  The CCDA bondholders' lien thus attaches to all Pledged Hotel Taxes, because all such taxes are "required to be deposited" into the Pledge Account under the terms of the Pledge Agreement.  In fact, the Oversight Board conceded in prior briefing in a

27

different context that identical "required to be deposited" language resulted in a lien attaching *before* any revenues were deposited into a particular account.[14]

              **b.**        **The Tourism Company Is Bound by the Terms of the Pledge Agreement.**

65.      To avoid the broad lien granted to CCDA bondholders under the Pledge Agreement, the Oversight Board claims that the Tourism Company is not bound by the Pledge Agreement. (Opp. ¶¶ 30-32.)  Discovery has proven this false.  In particular, the Tourism Company adopted a board resolution that accepted the terms of the Pledge Agreement and consented to GDB entering into the Pledge Agreement under those terms.  (Ex. 49, Tourism Company Board of Directors Resolution 06-47 §§ 2-3.)

66.      The Tourism Company is thus bound by the Pledge Agreement to the same extent as if it had signed it directly.  Having an officer of the company physically sign a document is just one way that a corporation can manifest its consent.  The Tourism Company's board resolution is equally effective to manifest consent to the Pledge Agreement.  *See, e.g., Fishbein v. Miranda*, 670 F. Supp. 2d 264, 272 (S.D.N.Y. 2009) ("[C]ontracts may be enforced against non-signatories where the non-signing party has accepted the written agreement and has acted upon it.  In such a circumstance, a non-signatory to a written contract [is], through its own consent, . . . bound by its terms.") (citations and internal quotation marks omitted); *see also Cummings v. City of New York*, 302 F. Supp. 3d 511, 525 (S.D.N.Y. 2017) (same); *Holland v. United States*, 621 F.3d 1366, 1376 (Fed. Cir. 2010) (board resolution expressly incorporated into an agreement became "part of [that]

---

[14] (*See Reply of the Financial Oversight & Management Board of Puerto Rico In Supp. of Mot. to Dismiss*, Adv. Proc. No. 17-156-LTS, ECF. No. 86 at 24 ("In *Jefferson County I* the warrant holders had a lien against revenues *prior to their deposit with the indenture trustee*."); *id.* at 17 n.19 (noting that this lien arose prior to deposit because the indenture pledged "monies *required to be deposited* in a debt service fund and a reserve fund . . . .").)

Agreement, forming a single, unified agreement" and "manifested the [] Board's acceptance of and intent to be bound by" the terms of that agreement).

67.      Moreover, the Bond Documents were executed as part of a single contemporaneous transaction with the common purpose of (i) implementing the Hotel Occupancy Tax Act (including the transfer of equitable ownership of the Pledged Hotel Taxes to CCDA bondholders) and (ii) facilitating the secured issuance of the CCDA bonds.  (Mot. ¶¶ 14-15, 33); (Opp. ¶ 19); (Ex. 49 (consenting to and approving the terms of the CCDA bonds and the Bond Documents in order to facilitate the issuance of the CCDA bonds in accordance with the Hotel Occupancy Tax Act).) The Bond Documents therefore constitute a single unitary agreement that (i) is binding upon all parties to that transaction and (ii) must be interpreted together to implement the Hotel Occupancy Tax Act and facilitate the secured issuance of the CCDA bonds.  *See, e.g.*, *Dukes Bridge LLC v. Beinhocker*, 856 F.3d 186, 190 (1st Cir. 2017) ("[A]ll writings that are part of the same transaction are interpreted together.") (citation omitted); *Lass v. Bank of Am., N.A.*, 695 F.3d 129, 134–35 (1st Cir. 2012) (concluding that documents that do not expressly bind both parties and require only one party's signature are nevertheless binding on all parties, as if signed by all parties, if they are an essential part of the overall transaction).[15]  To hold otherwise would subject parties to "inconsistent liability" due to "the threat of 'inconsistent obligations' aris[ing] from a possible inconsistency" concerning the parties' duties because "those duties arise from within a set of transactionally

---

[15] *See also Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*, 788 F.3d 1329, 1339 (11th Cir. 2015) ("All writings that are part of the same transaction are interpreted together . . . to effectuate the same purpose[,]" "even though the parties to these documents were not the same") (citations and quotations omitted); *Dakota Gasification Co. v. Nat. Gas Pipeline Co. of Am.*, 964 F.2d 732, 735 (8th Cir. 1992) (separate contracts that "represent successive steps [] taken to accomplish a single purpose" must be read together, "even though the parties executing the contracts differ, as long as the several contracts were known to all the parties and were delivered at the same time to accomplish an agreed purpose") (citation and internal quotation marks omitted).

interrelated documents." *Bankers Tr. Co. v. Mfr. Nat. Bank of Detroit*, 139 F.R.D. 302, 309 (S.D.N.Y. 1991).

68.     The Tourism Company expressly referenced the Pledge Agreement *in* the Assignment Agreement, and physically attached the Pledge Agreement to the Assignment Agreement it executed. (Assignment Agreement §§ 7, 9, 10.) Thus, all the terms of the Pledge Agreement are incorporated into the Assignment Agreement and are binding on the Tourism Company regardless of whether it actually signed the Pledge Agreement itself. *See, e.g.*, *Gold v. Rowland*, 156 A.3d 477, 491-92 (Conn. 2017) (attaching agreements to each other creates a unitary agreement binding on all parties who signed even one component agreement); *DMS Imaging, Inc. v. United States*, 115 Fed. Cl. 794, 798 (Fed. Cl. 2014); *Consol. Risk Servs., Inc. v. Auto. Dealers WC Self Ins. Tr.*, 2010 WL 2735701, at \*5-6 (N.D.N.Y. July 9, 2010) (annexation of one agreement to another is "proof that the parties intended to treat the two agreements as one document"); *Klickitat Cty. Pub. Util. Dist. No. 1. v. Stewart & Stevenson Servs., Inc.*, 2006 WL 908042, at \*7 (E.D. Wash. Apr. 7, 2006) ("the parties to a contract may incorporate contractual terms by reference . . . , including a separate agreement to which they are not parties") (citation omitted).

69.     In any event, the Tourism Company levies and collects the taxes pursuant to the Commonwealth's delegated taxing power. (Opp. ¶ 56.) Thus, any rights the Tourism Company has in the Hotel Taxes (including the Pledged Hotel Taxes) are subject to any limitations the Commonwealth has accepted. The Commonwealth itself expressly agreed to comply with the terms of any agreement entered into in favor of bondholders—which includes the Assignment Agreement, Pledge Agreement, and Trust Agreement. 13 L.P.R.A. § 2271v(a)(4); (*see also* Mot. ¶ 48.) Because the Commonwealth's delegation to the Tourism Company of the power to impose and collect Hotel Taxes was subject to any restrictions the Commonwealth imposed or agreed to

(*see* Opp. ¶ 32), the Tourism Company is bound to comply with the terms of all the Bond Documents, just as the Commonwealth itself agreed to do.

70.     Thus, the Tourism Company is bound by the terms of the Pledge Agreement and other Bond Documents,[16] which grant the CCDA bondholders a lien on all Pledged Hotel Taxes collected by the Tourism Company.[17]

### 2.     The Hotel Occupancy Tax Act Makes the Tourism Company a Mere Conduit for the Pledged Hotel Taxes, Which CCDA Bondholders Equitably Own.

71.     As Movants demonstrate in the CCDA Stay Motion, the Hotel Occupancy Tax Act expressly granted the CCDA bondholders equitable ownership of the Pledged Hotel Taxes by requiring that the taxes be held "*for the benefit* of the bondholders[.]" 13 L.P.R.A. §2271v(a)(4) (emphasis added); (Mot. ¶¶ 16-32.)  The Oversight Board disputes that contention, arguing that the Hotel Occupancy Tax Act allows CCDA to use the Hotel Taxes to pay "other obligations." (Opp. ¶ 92.)  This selective quoting of the statute by the Oversight Board to suggest that the Hotel Taxes could be used for other CCDA corporate purposes is plainly misleading.  In full, that section provides that Hotel Taxes may be pledged to

the bonds, notes or other obligations issued, assumed or incurred by [CCDA], pursuant to [the CCDA Enabling Act], as amended, with the prior written

---

[16] The liens created by the Trust Agreement also attach to all Pledged Hotel Taxes collected by the Tourism Company.  Granting Clauses III and IV of the Trust Agreement create a lien on all of GDB's rights in both the Assignment Agreement and Pledge Agreement, which were transferred to the CCDA Bond Trustee pursuant to the Hotel Occupancy Tax Act and Bond Documents.  Moreover, even if Granting Clauses III and IV failed to convey a security interest, Granting Clause V is a catch-all that grants a lien in any Debt Service Amounts not captured by Granting Clauses III and IV.

[17] For the same reasons, the Oversight Board's argument that Movants cannot show a perfected security interest in the "Retained" Pledged Hotel Taxes also fails.  Movants' security interest in the Pledged Hotel Taxes, including in the Pledged Hotel Taxes retained by the Tourism Company, was automatically perfected by law.  23 L.P.R.A. § 6441(d) ("Any pledge of the Authority shall be binding from the moment that it was made, and any funds or property thus pledged shall be subject to the lien of the pledge without the need of its actual delivery.").  In addition, for the avoidance of doubt, a UCC Financing Statement was filed.  (*See* Mot. ¶ 46.)  Moreover, the question of whether Movants' security interest was perfected is irrelevant to the issues currently before the Court.

authorization of the Company, to ***exclusively*** carry out the development and construction of a new convention center and its related infrastructure.

13 L.P.R.A. § 2271v(a)(1) (emphasis added). The only "obligations" to which the Hotel Taxes can be pledged are those that CCDA incurs exclusively for the purposes of constructing the Convention Center. *See* 23 L.P.R.A. §§ 6404, 6412(h). Hotel Taxes cannot be pledged to bonds, notes or other debt instruments issued for CCDA's general corporate, or any other, purposes. The Hotel Occupancy Tax Act further restricts use of any Hotel Taxes that are pledged to bondholders, expressly mandating that the Pledged Hotel Taxes "shall be used solely for the payment of the principal and interest on the bonds." *See* 13 L.P.R.A. §2271v(a)(4).

72.   Under the Hotel Occupancy Tax Act, when a pledge is made pursuant to 13 L.P.R.A. § 2271v, the owners of "bonds, notes, or other obligations" issued to finance the construction of the Convention Center become the equitable owners of the Pledged Hotel Taxes by statute. The Hotel Occupancy Tax Act provides that the Pledged Hotel Taxes shall be held "for the benefit of the bondholders, noteholders or the holders of other obligations of the Authority or for the benefit of the other contracting parties under any bond related financing agreement." 13 L.P.R.A. § 2271v(a)(4). Thus, the statute makes clear that CCDA (with the approval of the Tourism Company) can pledge Hotel Taxes exclusively to the holders of bonds, notes, or other obligations (for example, commercial paper) issued to finance the construction of the Convention Center. If CCDA had issued "other obligations" such as commercial paper, the owners of those other obligations would also be equitable owners of their pro rata share of the Pledged Hotel Taxes. In fact, the bonds at issue here are the only debt that was issued pursuant to 13 L.P.R.A. §2271v

32

to finance the construction of the Convention Center, so the CCDA bondholders at issue in this motion are the sole equitable owners of the Pledged Hotel Taxes.[18]

73.     The Oversight Board attempts to distinguish *Flores Galarza* and *Gracia-Gracia* based on movants in those cases being the original owners of the funds. (Opp. ¶¶ 94-95.) But *Flores Galarza* and *Gracia-Gracia* easily refute the Oversight Board's argument that original ownership matters: While the movants in *Gracia-Gracia* were the original owners (drivers who paid excess auto insurance premiums), the movant in *Flores Galarza* (the JUA) was not. The JUA was the entity *to which the payments were ultimately owed*. (Mot. ¶ 76.) Thus, original ownership cannot be determinative. Moreover, the JUA's property rights were created through a statutory mechanism that said the Commonwealth "shall transfer" the premiums to JUA. (*Id.*) Movants here are in a virtually identical position as JUA, which should compel the same result.

74.     The Oversight Board also attempts to distinguish *Flores Galarza* and *Gracia-Gracia* from Movants' position here by seizing on differences the Court found irrelevant. *First*, the Oversight Board attempts to make hay out of the fact that the statute in *Flores Galarza* referred to the Secretary of Treasury as performing a "collection service" for JUA, while the Hotel Occupancy Tax Act does not contain such language. (Opp. ¶ 76.) That language was irrelevant

---

[18] The Oversight Board's erroneous belief that the Tourism Company is free to use the Pledged Hotel Taxes as it chooses infects much of the Opposition. For example, the Oversight Board cites *In re Morales Travel Agency*, 667 F.2d 1069 (1st Cir. 1981) in an attempt to show that no trust relationship was formed. (Opp. ¶ 96.) *Morales Travel Agency*, however, is readily distinguishable: the supposed "trustee" in *Morales Travel Agency* comingled the funds at issue and used them however it chose because there was no requirement to keep the funds in special segregated accounts and no restrictions on how the funds could be used, 667 F.2d at 1070–71, all things required by the Hotel Occupancy Tax Act. The Oversight Board's efforts to distinguish *In re LAN Tamers, Inc.*, 329 F.3d 204 (1st Cir. 2003), fail on similar grounds. There, the Court inferred a trust relationship based on the same factors present here: namely, that the funds were statutorily required to be routed through a party that could exercise no control over the funds pursuant to the terms of the statute. *In re LAN Tamers, Inc.*, 329 F.3d at 212–13 (citations omitted). This is precisely what the Hotel Occupancy Tax Act requires.

to the Court's decision, however, which turned on the mandatory transfer language cited above. (Mot. ¶ 76.) Moreover, the plain purpose of the Hotel Occupancy Tax Act is to require the Pledged Hotel Taxes to be transferred to the CCDA bondholders. *Second*, the Oversight Board attempts to imply that, because the statute in *Gracia-Gracia* uses the word "trustee," statutes that do not use that word cannot create trust relationships.[19] (Opp. ¶ 95.) That is not the law. (*See* Mot. ¶ 95.)

75.    The Oversight Board also argues that the CCDA bondholders cannot have more rights in the Pledged Hotel Taxes than GDB or the Tourism Company. (*See* Opp. ¶ 32.) In keeping with the principles identified above, however, the Commonwealth and the Tourism Company transferred equitable ownership of the Pledged Hotel Taxes to CCDA bondholders, leaving the Tourism Company and GDB as mere trustees and conduits responsible for passing along the Pledged Hotel Taxes to the CCDA bondholders. (Mot. ¶¶ 80-84.)

76.    The Oversight Board further implies that the Hotel Occupancy Tax Act fails to have any force or effect in bankruptcy. (*See* Opp. ¶ 72 n.29.) That is not the case. The Commonwealth authorized CCDA to pledge the Hotel Taxes and covenanted not to alter CCDA's rights to so pledge; this granted bondholders enforceable property rights in the Pledged Hotel Taxes. 3 L.P.R.A. § 2271v. Moreover, the Hotel Occupancy Tax Act is expressly incorporated into the

---

[19] The Oversight Board also incorrectly argues that under the Puerto Rico Trust Act, 32 L.P.R.A. §§ 3351-3355a (the "Trust Act"), trusts can be created only though public deed or trust. (Opp. ¶ 96 n.40.) In fact, the Puerto Rico Convention Center District Act clearly states that "any bond issued under the provisions of this chapter shall be secured by a trust agreement" and "said trust agreement shall not have to be constituted by means of a public deed to be deemed a valid trust under the laws of the Government of the Commonwealth of Puerto Rico," 23 L.P.R.A. § 6443. Further, the Trust Act does not apply to statutory or constructive trusts, like the one established here by the Hotel Occupancy Tax Act and CCDA Enabling Act. *See* 32 L.P.R.A. § 3352 (addressing only *inter vivos* and testamentary trusts); 32 L.P.R.A. § 3355 ("Should there be any issue that this chapter fails to provide for, or if any of its provisions require interpretation, U.S. doctrines and case law regarding trusts shall govern unless something else is necessarily inferred from any of the provisions of this Act or if there is an express referral to Puerto Rico legislation."); (*see also* Mot. ¶ 80.)

Bond Documents that define the scope of the CCDA bondholders' liens and property interests.[20]

This requires all property interests conveyed in the Bond Documents to be interpreted broadly

enough to achieve the purposes of the Hotel Occupancy Tax Act. The purpose of the Hotel

Occupancy Tax Act is to ensure that the CCDA bondholders receive their Pledged Hotel Taxes.[21]

## III. NEITHER PROMESA'S TITLE III PROVISIONS NOR THE OVERSIGHT BOARD'S BUDGETARY POWERS PREEMPT BONDHOLDERS' PRE-EXISTING LEGAL RIGHTS.[22]

### A. The Plain Text of PROMESA Limits the Scope of Preemption to Cases of Actual Conflict, Which Does Not Exist Here.

80.     The Oversight Board's arguments that PROMESA gives it unrestrained powers to

preempt statutes and destroy pre-existing legal rights based on its budgetary appropriation powers

---

[20] (*See, e.g.*, Assignment Agreement at Introduction, §§ 4-5, 8, 10, 17 (Assignment Agreement created "pursuant to the [Hotel] Occupancy Tax Act")); (Pledge Agreement § 2(a).) As a result, the Bond Documents can only be interpreted to accomplish the statute's overall objectives. *See, e.g.*, *Empacadora Puertorriquena De Carnes, Inc. v. Alterman Transp. Line, Inc.*, 303 F. Supp. 474, 478 (D.P.R. 1969) ("Where a statute is incorporated by reference its provisions [become] terms of the contract . . . and the court has the duty to construe the contract to give consistent effect, if possible, to all of its terms."); Robert Whitman, *Incorporation by Reference in Commercial Contracts*, 21 MD. L. REV. 1, 12 (1961) ("[b]y deciding to incorporate a statute into the contract, the parties make its words their own"; "[w]hen a statutory provision is incorporated into a contract, it will prevail over a conflicting provision of the contract if that construction will accomplish the purpose the law was intended to serve"). The same result is required even if the Hotel Occupancy Tax Act was *not* expressly incorporated into the Bond Documents. *See, e.g.*, *Noble v. Corporacion Insular de Seguros*, 738 F.2d 51, 53 (1st Cir. 1984) ("when parties conclude agreements on matters regulated by statute, [those] statutory provisions are implicitly incorporated into [the] contract") (citation omitted).

[21] Contrary to the Oversight Board's contention, the *Peaje* case does not undermine Movants' contention that the Hotel Occupancy Tax Act creates a statutory lien because the Hotel Occupancy Tax Act does not *require* that any revenues be pledged. (Opp. ¶ 84.) The Oversight Board ignores the mandatory language in the statute that expressly requires that the taxes *shall* be used *solely* for payment on the bonds. *See* 13 L.P.R.A. § 2271v(a).

[22] Movants' arguments in Section IV are substantially similar to those made in the contemporaneously-filed reply briefs filed in further support of the *Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Corporation, and Financial Guaranty Insurance Company for Relief from the Automatic Stay, or, in the Alternative, Adequate Protection* (ECF No. 10102) and the *Amended Motion of Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and U.S. Bank Trust National Association, Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds* (ECF No. 10602). Movants include the arguments in each brief to ensure the record on each motion is complete.

(Opp. ¶¶ 77-80) are meritless.  Where, as here, a "statute contains an express pre-emption clause,"

courts "focus on the plain wording of the clause, which necessarily contains the best evidence of

Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1946

(2016).  "Congressional intent is the principal resource to be used in defining the scope and extent

of an express preemption clause." *Brown v. United Airlines, Inc.*, 720 F.3d 60, 63 (1st Cir. 2013)

(internal quotation marks omitted).

       81.    PROMESA § 4, entitled "Supremacy," is such an express clause.  It states: "The

provisions of this chapter shall prevail over any general or specific provisions of territory law,

State law, or regulation that is ***inconsistent with*** this chapter." 48 U.S.C. § 2103 (emphasis added).

The effect of this language is to limit the scope of preemption under PROMESA to cases of

conflict, as the First Circuit has previously found. *See Mèndez-Nùñez v. Fin. Oversight & Mgmt.*

*Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 916 F.3d 98, 104 (1st Cir. 2019)

(addressing preemption under PROMESA § 4) (quoting *United States v. Maldonado-Burgos*, 844

F.3d 339, 346 (1st Cir. 2016) ("[A] provision of the Puerto Rico Constitution cannot prevail where

it conflicts with applicable federal law.") (citing *United States v. Quinones*, 758 F.2d 13, 18 (1st

Cir. 1985); *United States v. Acosta-Martinez*, 252 F.3d 13, 18 (1st Cir. 2001)).

       82.    Nothing in PROMESA is "inconsistent with" Movants' property and contractual

rights, which predate PROMESA.  Far from rescinding or repudiating property or contract rights

(or authorizing the Oversight Board to do so), PROMESA expressly commands that existing

property and contractual rights are to be respected:  Section 201, which the Oversight Board

suggests is somehow inconsistent with Movants' contractual rights, expressly required the

Oversight Board to "respect the relative lawful priorities or lawful liens . . . in the constitution,

other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior

to the date of enactment of this Act" when formulating fiscal plans and budgets.  48 U.S.C. § 2141(b)(1)(N).  Moreover, PROMESA's supremacy clause provides only that "the provisions of this Act" shall prevail over inconsistent Commonwealth law.  48 U.S.C. § 2103.  The Oversight Board's fiscal plan or budget is not a "***provision of this Act***," and nothing in PROMESA suggests that Congress intended to grant the Oversight Board the power to issue preemptive edicts in its sole and absolute discretion through its budgetary or fiscal plan certification powers.

83.    There is likewise no inconsistency between Movants' property and contractual rights and the Title III bankruptcy process.  (*See* Opp. ¶ 79.)  The Bankruptcy Code provisions made applicable here under Title III expressly protect the rights of secured creditors.  *See* 48 U.S.C. § 2161 (making the adequate protection provisions of 11 U.S.C. § 361 and other creditor protection provisions applicable in PROMESA).  And as in any bankruptcy, both secured and unsecured creditors' rights remain intact unless and until they are addressed as part of a confirmed plan of adjustment that complies with the requirements of PROMESA.  *Id.* (making provisions of 11 U.S.C. §§ 362, 1123 and other provisions applicable in PROMESA).  There is thus no inconsistency between Movants' property and contractual rights and either the Title II budgetary process or the Title III restructuring.

84.    Because there is no conflict between the Hotel Occupancy Tax Act and PROMESA, there is no statutory basis for this Court to find that the Hotel Occupancy Tax Act has been preempted.  "[T]he plain wording" of PROMESA's supremacy clause, "which necessarily contains the best evidence of Congress' pre-emptive intent[,]" precludes any such finding.  *Franklin Cal. Tax-Free Tr.*, 136 S. Ct. at 1946.

**B.      Neither of the Oversight Board's Asserted Bases for "Preemption" Withstands Scrutiny.**

85.      The Oversight Board premises its argument to the contrary on its budgetary appropriation powers under Title II of PROMESA (Opp. ¶ 77) and the Title III restructuring process. (Opp. ¶ 79.) Neither title of PROMESA preempts Movants' legal rights.

**1.      The Oversight Board's Title II Budgetary Powers Under PROMESA Have No Preemptive Effect on Movants' Rights.**

**a.      The Commonwealth's Assignment of the Hotel Taxes to CCDA Is Valid and Legally Binding, Not a Mere "Appropriation" Subject to Repeal Without Consequence.**

86.      All of the Oversight Board's preemption arguments hang on the erroneous assertion that the Hotel Occupancy Tax Act is an appropriations statute, and by extension, that the CCDA bonds are appropriation bonds. But the CCDA bonds are plainly revenue bonds, and the Hotel Occupancy Tax Act has nothing to do with the Commonwealth's budgetary appropriations process. As a result, the Oversight Board's "appropriation" arguments are dead on arrival.

87.      The Oversight Board's entire "appropriations statute" argument turns on a single instance of the word "appropriated" found in subsection 2271v(b)(5) of the Hotel Occupancy Tax Act. (Opp. ¶ 77.) The word "appropriated" appears only this one time in the *entirety* of the Hotel Occupancy Tax Act. Properly read in context, this word cannot support the arguments the Oversight Board has foisted upon it.

88.      Section 2271v of the Hotel Occupancy Tax Act relates to the "Disposition of Funds." 13 L.P.R.A. § 2271v. It describes the mandatory distribution of the Hotel Taxes, including the mandatory transfer of the *Pledged* Hotel Taxes to the Pledge Account (via sub-section 2271v*(a)*), and the permitted uses of any excess Hotel Taxes that remain after the Pledged Hotel Taxes have been transferred to the Pledge Account (via sub-section 2271v*(b)*). *Id.* § (a)-(b).

89.      The language seized upon by the Oversight Board falls at the very end of the flow of funds found in sub-section 2271v(*b*).  Assuming the entire Debt Service Amount has been transferred to the Pledge Account, and there was sufficient excess to satisfy all other required distributions clauses (1)-(4) of sub-section 2271v(*b*), the following provision is triggered:  "The remainder available after the payments provided in clauses (1)-(4) of [subsection (b)] shall be ***allocated*** to the Company.  The funds ***appropriated*** to the Company shall be used by the latter for promoting, marketing, developing and strengthening the tourist industry in Puerto Rico."   13 L.P.R.A. § 2271v(b)(5).  In context, it is clear that this provision has nothing to do with the stream of Hotel Tax revenues pledged to the CCDA bonds and does not strip the CCDA bonds of their status as revenue bonds backed by a stream of Pledged Hotel Taxes that is exempted from the annual budgetary appropriations process.  It simply directs what should happen with whatever portion of Hotel Taxes remains after every pledge and mandatory transfer of the Hotel Taxes has been satisfied.  It does not, and could not, transform the Hotel Occupancy Tax Act into an appropriations statute.

90.      The word "appropriated" here is clearly being used, in the ordinary sense, to describe the assignment of these leftover funds to the Tourism Company.  *See* Appropriate, MERRIAM WEBSTER, https://www.merriam-webster.com/dictionary/appropriate (last visited Mar. 26, 2020) ("to set apart for or assign to a particular purpose or use" / to be given "exclusive possession of").  Any other interpretation would be illogical because the statute contemplates no annual budgetary action and the statute explicitly contemplates that the Hotel Taxes could run out long before they reach the last stop in the flow of funds.

91.      Further, the fact that the CCDA bonds are revenue bonds is simply beyond dispute. Unlike general obligation bonds, which are backed by the municipal borrower's "full faith and

credit," and revenue bonds, which are backed by a dedicated revenue stream, "appropriation" bonds (sometimes referred to as "moral obligation bonds") are backed only by a promise that the municipality may seek ***during the periodic budgetary process*** to appropriate funds necessary for repayment of the debt. 1 GELFAND, STATE & LOCAL GOV'T DEBT FIN. §§ 3:32, 10:17, 11:15 (2d ed. 2017). Holders of appropriation bonds generally expect that municipal debtors will faithfully make such annual appropriations, but only as long as the municipality does not encounter severe financial distress. In the event of financial distress, appropriation bonds uniquely may allow the municipality to stop making payments and may effectively extinguish the bondholders' rights. To account for the risks, appropriation bond documents—including those issued by the Commonwealth—warn bondholders that the Legislative Assembly must make a new appropriation to pay the bonds each fiscal year as part of the Commonwealth's annual budgetary process. *See* Puerto Rico Public Finance Corporation 2003 Series A Bonds Official Statement, at 15 ("The Legislature of Puerto Rico is not legally bound to appropriate sufficient amount to timely pay the principal of, redemption premium, if any, and any interest due on the Act 164 Bonds. There is no assurance that sufficient funds will be appropriated or otherwise made available to make such payments on the Act 164 Bonds."), *available at* https://www.emma.msrb.org/IssueView/ Details/MS23647. This is in contrast to revenue bonds, which have one or more revenue streams dedicated to the bonds by statute, and those revenue streams are not part of the annual budgetary appropriations process. *See* 13 L.P.R.A. § 2271v.

92.    The CCDA bonds are backed by a specific stream of Hotel Taxes that continue to be collected each fiscal year without being re-appropriated during the Commonwealth budgetary process. Moreover, the offering documents linked to these CCDA bonds expressly state that they are "Hotel Occupancy Tax ***Revenue Bonds***" "payable primarily from certain revenues pledged

therefor and derived from a hotel occupancy tax . . . ." (*See* Ex. 50, Official Statement, Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Series A Bonds, at 1 (emphasis added).)   This stream of tax revenues continues across fiscal years with no reauthorization through the budgetary appropriations process.  This stream of tax revenues creates a vested right that survives a failure to appropriate or allocate funds (or, as the case is here, the unlawful seizure of those funds).[23]

> **b.    There Is No Inconsistency Between the Oversight Board's Budgetary Powers and Movants' Legal Rights Because, Under Settled Law, the Legislative Power Over the "Budget" or "Appropriations" Does Not Include Any Power to Rescind, Repudiate, or Alter Pre-Existing Property or Contract Rights.**

93.    The Oversight Board's argument that its budgetary powers under PROMESA § 202, 42 U.S.C. § 2142 would allow it to preempt even legally binding bonds and pledges of revenues (Opp. ¶ 7) is based on basic conceptual confusion about the relationship between budgetary appropriations and the government's legal obligations to third parties.  As the Oversight Board itself repeatedly acknowledges, its "budgetary" power under PROMESA § 202 is nothing more than the power to make (or not make) appropriations.  (*See, e.g.*, Opp. ¶ 77 ("PROMESA sections 201 and 202 give the Oversight Board alone authority to certify fiscal plans and budgets

---

[23] *See Fletcher v. Peck*, 10 U.S. 87, 135 (1810) ("[I]f an act be done under a law, a succeeding legislature cannot undo it.  The past cannot be recalled by the most absolute power. . . .  When, then, a law is in its nature a contract, when absolute rights have vested under that contract, a repeal of the law cannot devest those rights.") (cited in Opp. ¶ 7 n.10); *see United States v. Winstar Corp.*, 518 U.S. 839, 873-76 (1996) (Souter, J., plurality) (analyzing *Fletcher*) ("[T]he National Government has some capacity to make agreements binding future Congresses by creating vested rights."); *see also Rice v. City of Milwaukee*, 76 N.W. 341, 343 (1898) ("It would seem to be very clear that when money is raised for a special purpose, under an express limitation to a particular use, it cannot lawfully be used for any other purpose . . . Any other holding would commit us to the palpable absurdity of saying that a person may pay his debts by taking money from one pocket, and putting it in the other."); *Von Hoffman v. City of Quincy*, 71 U.S. 535, 554-55 (1866) ("It is equally clear that where a State has authorized a municipal corporation to contract and to exercise the power of local taxation to the extent necessary to meet its engagements, the power thus given cannot be withdrawn until the contract is satisfied. The State and the corporation, in such cases, are equally bound.").

for the Commonwealth setting all Commonwealth appropriations").)

94.     Under more than a century of precedent—which no doubt was known to the congressional drafters of PROMESA—a budgetary appropriation (or its absence) cannot change the legal rights of third parties against the government.  "An appropriation per se merely imposes limitations upon the Government's own agents; it is a definite amount of money intrusted [sic] to them for distribution; but its insufficiency does not pay the Government's debts, nor cancel its obligations, nor defeat the rights of other parties." *Ferris v. United States*, 27 Ct. Cl. 542, 546 (1892); *see Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 191 (2012) ("Although the agency itself cannot disburse funds beyond those appropriated to it, the Government's 'valid obligations will remain enforceable in the courts.'").

95.     In fact, the Supreme Court has recently reaffirmed, in *Maine Community Health Options v. United States*, 2020 WL 1978706 (U.S. Apr. 27, 2020), that the lack of a budget appropriation has no effect on the Government's obligations to third parties (or a third party's capacity to enforce that obligation).  The Court held that where the government has incurred an obligation, the "'failure or refusal by Congress to make the necessary appropriation would not defeat the obligation[.]'" *Id.* at *7 (quoting 2 GAO, Principles of Federal Appropriations Law, p. 2-4 to -5 (4th ed. 2016), *available at* https://www.gao.gov/legal/appropriations-law-decisions/red-book (hereinafter Ex. 51).  Similarly, the Court reaffirmed that where a government "create[s] an obligation directly by statute . . . [a] subsequent failure to appropriate enough funds neither abrogated nor suspended the Government's pre-existing commitment to pay." *Maine*, 2020 WL 1978706, at *8 (citation omitted).  As the Court's analysis makes clear, appropriations or a lack of appropriations do not change the property or contract rights of third parties.  *See also Local Initiative Health Auth. for L.A. Cty. v. United States*, 142 Fed. Cl. 1, 19 (Fed. Cl. 2019) ("Congress'

mere refusal to pay has not modified its contractual obligation in any way."); *Martin v. United States*, 130 Fed. Cl. 578, 585-86 (Fed. Cl. 2017) (lack of appropriations was not a viable legal defense to the government's legal obligations to pay third parties).

96.     Nothing in this Court's decisions regarding the Oversight Board's budgetary powers, or those of the First Circuit, are in any way inconsistent with these principles.   The Commonwealth government cannot reprogram funds in contravention of the Commonwealth budget. *Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3, 8 (1st Cir. 2019).  But that does not change the fact that governmental budgets and appropriations are mere internal instructions to the Commonwealth Treasury that have no effect on the legal rights of third parties.

97.     Indeed, the First Circuit has made clear that in the context of a restructuring it will find the power to preempt property rights only where Congress gives a "clear and specific indication of [its] intent" to grant "power to appropriate the property of third parties." *In re Irving Tanning Co.*, 496 B.R. 644, 659-65 (B.A.P. 1st Cir. 2013).  There is no such statement here.

   c.     **The Oversight Board's Claimed Preemption Power is Inconsistent with the Structure and Purpose of PROMESA.**

98.     The Oversight Board's claimed preemption power under Title II also must be rejected as inconsistent with the structure and purpose of PROMESA.

99.     *First*, the Oversight Board's budgetary powers under PROMESA § 202, 48 U.S.C. § 2142, are distinct from the restructuring provisions of Title III.  Indeed, the budgetary powers will remain in effect—potentially for many years—even after the Commonwealth emerges from bankruptcy, confirming that those powers were not intended to be a means for discharging the Commonwealth's debts.  *See* 48 U.S.C. § 2149.  Under the Oversight Board's interpretation, it would retain discretion to preempt any and all legal rights to payment, even post-restructuring,

until Puerto Rico regains access to financial markets. Obviously, post-restructuring, Congress envisioned that the Oversight Board would continue to control the Commonwealth's budget until it regains access to financial markets—but like any government, the Commonwealth would be obligated to uphold approved contracts it makes. The Oversight Board cannot approve a long-term contract one year, and then the next decide to "preempt" it under PROMESA § 202 with the next year's certified fiscal plan and budget. If that were possible, particularly given that the Oversight Board's composition can change every few years, it would be impossible for Puerto Rico to ever regain access to financial markets. *See Salazar*, 567 U.S. at 191 (explaining that being a reliable contract partner protects "the long-term fiscal interests of the United States").

100.    *Second*, the Oversight Board's arguments would render the Title III process essentially irrelevant. Under the Oversight Board's theory, "***Any prepetition obligations to pay*** are inconsistent with . . . PROMESA's grant to the Oversight Board of power over uses of the Debtor's revenues in Title II."[24] But if that were true, most of the provisions in Title III would be superfluous. According to the Oversight Board, the mere enactment of PROMESA, the beginning of the covered period for Puerto Rico and its instrumentalities and the appointment of the Oversight Board, gave the Oversight Board free rein to decide which debts would be paid and which would not be paid, which decisions that are not even subject to review by this Court. The restructuring and elimination of all revenue bond debt, according to the Oversight Board, has already been effectuated through the certification of fiscal plans. If true, there would be no need for this Court to consider and approve a plan of adjustment. The elaborate procedures for both a consensual

---

[24] (*Opposition of the Financial Oversight Management Board to the Urgent Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company to Adjourn Hearing on Motions for Relief from the Automatic Stay and Extend Deadline for Replies in Support of Motions for Relief from the Automatic Stay*, ECF No. 10958 at ¶ 20.)

(Title VI) and a non-consensual (Title III) restructuring make clear that the Commonwealth's debt obligations can only be accomplished through a proceeding under one of those provisions, not surreptitiously through fiscal plans. *See Kungys v. United States*, 485 U.S. 759, 778 (1988) (noting that it is a "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant").

101.   *Third*, the Oversight Board's claimed "preemption" power would render PROMESA § 407 nugatory and ineffective.   The Oversight Board contends that there is no "applicable law" pursuant to which creditors could bring claims under PROMESA § 407, 48 U.S.C. § 2195, because PROMESA itself preempted applicable law. *See Memorandum of the Commonwealth of Puerto Rico, By and Through the Financial Oversight and Management Board, In Support of Motion Pursuant to Bankruptcy Rule 7056 for Partial Summary Judgment Disallowing Claims*, Dkt. No. 20-00004, ECF No. 41, ¶ 158.   In other words, the Oversight Board would have the Court conclude that Congress expressly included a statutory provision to give creditors the ability to sue for violations of applicable law—but simultaneously preempted any "applicable law," such that PROMESA § 407 was nullified by the same legislation that created it.

102.   *Fourth*, the fact that the Oversight Board's budgets cover only individual fiscal years while the Oversight Board remains in effect further undermines any suggestion that its budget powers could be used to destroy existing contract or property rights.   Movants' rights to payments extend to the year 2044.   PROMESA expressly contemplates that the Oversight Board will terminate when the Commonwealth regains access to financial markets, at which point the Oversight Board's powers over the Commonwealth government will be extinguished entirely. *See* 48 U.S.C. § 2149.   The Oversight Board offers no textual basis for extending the preemptive effect of its budgetary powers beyond the specific fiscal years that the Oversight Board remains in effect.

2.   **There is No Inconsistency Between the Hotel Occupancy Tax Act and PROMESA Title III or Bankruptcy Policy.**

a.   **Far from Preempting Them, PROMESA Title III Expressly Protects the Legal Rights of Revenue Bondholders.**

103.   The Oversight Board's argument that Title III preempts Movants' legal rights (Opp. ¶ 79) is equally meritless.  PROMESA incorporates specific provisions of the Bankruptcy Code that protect the rights of special revenue bondholders and those of secured claimants generally. *See* 48 U.S.C. § 2161.

104.   While the Oversight Board claims that PROMESA recognizes "no priority claims other than administrative claims provided by Bankruptcy Code section 507(a)(2)" (Opp. ¶ 75), it simply ignores the express provisions confirming that contractual and property rights would be part of (and not disposed of prior to) the Title III process.[25]  *See* 48 U.S.C. § 2161 (incorporating secured and unsecured creditor protection provisions); 48 U.S.C. § 2141 (requiring a fiscal plan to respect "lawful priorities and lawful liens . . . effect prior to the date of enactment of this Act.") and § 314(b)(7) (requiring a Title III plan of adjustment comply with existing fiscal plans).

b.   **There is No "Inconsistency" Between the Concept of a Restructuring and Protecting Property Rights.**

105.   The Oversight Board argues that Movants' property rights would violate the "equality" principle and render the Commonwealth's entire restructuring regime futile.  (Opp. ¶¶ 6-7.)  The Oversight Board has it backwards:  finding that Movants have *no* property rights in their pledged collateral will upend decades of municipal finance and market expectations, with the consequences that will reverberate far beyond the Commonwealth.

---

[25] The Oversight Board premises much of its clawback argument on a purported continuing priority of general obligation bondholders.  The entire premise of the clawback argument fails if the Oversight Board is correct that PROMESA recognizes only administrative priority.

105.    The "equality" principle regarding unsecured creditors has no application here, as the treatment Movants request is entirely ordinary and commonplace for *any* secured creditor. *See Ticonic Nat'l Bank v. Sprague*, 303 U.S. 406, 412 (1938) ("[T]o the extent that one debt is secured and another is not there is manifestly an inequality of rights between the secured and unsecured creditors, which cannot be affected by the principle of equality of distribution."); *Chemical Bank N.Y. Tr. Co. v. Kheel*, 369 F.2d 845, 848 (2d Cir. 1966) ("Equality among creditors who have lawfully bargained for different treatment is not equity but its opposite[.]").

106.    It is axiomatic that secured creditors and unsecured creditors are not of equal priority and therefore should not share equally in a *pro rata* division of a debtor's property. *See Haesloop v. United States*, 2000 WL 1607316, at *3 (Bankr. E.D.N.Y. Aug. 30, 2000) (secured claims are scheduled separately from unsecured claims when a debtor files bankruptcy). Nearly every complex restructuring involves some secured claims and some unsecured claims, where payouts to each differ based on the value of the secured claimants' collateral.

107.    The secured nature of revenue bonds is the primary reason investors purchase such bonds. And perhaps the key feature of revenue bonds' security is the protection it provides in bankruptcy—a feature generally absent from most general obligation bonds. As Professor David Skeel, a member of the Oversight Board, explains:

> [T]he belief that GO bonds are protected and revenue bonds are vulnerable is upside-down from a bankruptcy perspective: ***in bankruptcy, revenue bonds are protected and GO bonds aren't***. With revenue bonds, the bankruptcy laws treat the specified revenue source as truly belonging to the bondholders, and as securing their repayment. Unlike most other creditors, revenue bondholders are explicitly permitted to continue collecting the payments even during the bankruptcy case, thanks to a 1988 reform that sought to make sure that bankruptcy does not interfere with the payment of revenue bonds. GO bonds are not entitled to any such protection. The "full faith and credit" protection is not treated as giving GO bondholders a right to any particular source of revenue. They are simply general creditors, and [a debtor's] obligations to them can be restructured just as its obligations to other creditors can be.

*See* David A. Skeel, *The Education of Detroit's Pension and Bond Creditors*, 24 U. PA. PUB. POL'Y INITIATIVE 1, 3 (2014) (emphasis added).[26] The Oversight Board's claim that granting revenue bonds their due protections in bankruptcy would violate equality among creditors is false, but the converse is true: Proper classification among creditors is preserved only by respecting the protections unique to revenue bonds.

108.    Moreover, the notion that respecting property rights undermines the goals of a restructuring regime is nonsensical in light of the decades of precedent in which the United States' current bankruptcy regime has operated. The Bankruptcy Code strikes a balance between respect for the rights of secured creditors in their collateral and affording the debtor the opportunity to restructure its affairs and reduce its debt load to a sustainable level—these "twin goals" are of equal importance. *See Hoseman v. Weinschneider*, 322 F.3d 468, 475 (7th Cir. 2003) ("The administration of bankruptcy estates has twin goals of maximization of realization on creditors' claims and of prompt and efficient administration of the estate.") (citations omitted); *Kokoszka v. Belford*, 417 U.S. 642, 645–46 (1974) ("It is the twofold purpose of the bankruptcy act to convert the estate of the bankrupt into cash and distribute it among creditors and then to give the bankrupt a fresh start with such exemptions and rights as the statute left untouched.") (internal quotation marks omitted).

109.    And these twin aims inherent in our bankruptcy regime have far-reaching effects. In today's global economy, where capital can move freely around the world in search of the

---

[26] Notwithstanding the fact that general obligation bonds are unsecured obligations in many jurisdictions, Assured takes the position that the Commonwealth's general obligation bonds are secured by a special property tax under Act 83 of 1991. (*See Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corp. to Dismiss Adversary Complaint*, Adv. Proc. No. 19-291-LTS, ECF No. 53 ¶¶ 27-30.) In addition, Assured takes the view that the Commonwealth's general obligation bonds enjoy a first-priority status under Article VI, Section 8 of the Puerto Rico Constitution, which first-priority status is incorporated into PROMESA, among other things, through PROMESA § 201(b)(1)(N) and Section 1129(b)(2)(B) of the Bankruptcy Code (as incorporated by PROMESA § 301(a)).

greatest risk-adjusted returns, U.S. municipalities historically have enjoyed some of the lowest borrowing costs in the world—precisely because the U.S. has strong respect for the rule of law and property rights. The special protections for revenue bond creditors built into the Bankruptcy Code (§ 928) are a classic example of this respect for property rights, ensuring that even in a restructuring, the rights of revenue bond creditors in their collateral will be respected. *See* 6 Collier on Bankruptcy ¶ 928.02 (16th ed. 2020) (in general, § 928(a) prevents special revenues that secure revenue bonds from being made available for the municipality's general expenses or obligations); *Altair Global Credit Opportunities Fund (A), LLC v. U.S.*, 138 Fed. Cl. 742, 779 (Fed. Cl. 2018) (§ 928 requires that "postpetition special revenues remain subject to any lien created before the commencement of the municipal bankruptcy proceeding"); *In re Las Vegas Monorail Co.*, 429 B.R. 770, 782 (Bankr. D. Nev. 2010) (the purpose of § 928 was to prevent special revenues from being diverted for the municipality's general expenses or obligations).

110.    But in this case, the biggest municipal restructuring in U.S. history, the Oversight Board asks the Court to abandon the federal courts' traditional respect for property rights and the rule of law, resorting to tortured readings of the Bond Documents in an effort to argue that revenue bond creditors in fact have no legal rights. It is impossible to overstate the consequences of this Court adopting such an approach. Such a decision would meaningfully impair investor confidence in the enforceability of municipal debt in the United States and increase borrowing costs for financially troubled municipalities across the country. Investors require legal predictability and the ability to enforce their rights; without these, municipalities will be unable to raise funds at anything but astronomical rates.

111.    While this Court has been confronted with certain novel municipal financing structures in these Title III cases that investors understood would carry some risk, like ERS,

revenue bonds like those at issue here have always been understood to enjoy increased protections, even—and especially—in bankruptcy. A decision eviscerating this principle, in contravention of congressional intent, must be expected to increase borrowing costs for struggling municipalities. And some of these, at the margin, that otherwise might have avoided a bankruptcy filing will find it all the more difficult to do so—ultimately forcing untold numbers of additional citizens to endure the hardships that the citizens of Puerto Rico have unfortunately already had to face.[27]

112.    Thus, any consideration of "policy" rationales leads inexorably to one conclusion: This Court must uphold property rights and the rule of law by respecting the rights of secured creditors. This requires granting creditors stay relief if they have at least a "colorable claim" to the property of the debtor. By this rubric, Movants are entitled to stay relief, and ask that this Court respect their rights as secured creditors.

**C.    The Oversight Board's Interpretation Must Be Rejected Because It Would Be Unconstitutional.**

113.    Construing PROMESA to allow the Oversight Board to rescind and repudiate contract or property rights, at its whim, would also violate the U.S. Constitution.

**1.    The Oversight Board's Claimed Preemption Power Would Violate the Due Process Clause.**

---

[27] *See, e.g.*, Richard Porter, *Commentary: Bankruptcy Looms For Chicago If There's No Pension Fix*, CHICAGO TRIBUNE (Sept. 26, 2019), https://www.chicagotribune.com/opinion/commentary/ct-opinion-bankruptcy-chicago-pensions-crisis-20190926-4iwzdnfcjzh2tac7pw6i5fbgea-story.html (discussing how Chicago is teetering on the brink of bankruptcy); Elizabeth Bauer, *Is Chicago The Next Detroit?*, FORBES (Jan. 16, 2019), *available at* https://www.forbes.com/sites/ebauer/2019/01/16/is-chicago-the-next-detroit/#1bc755ee6894 (noting that, without reform, Chicago could be headed for bankruptcy); Alexandra Scaggs, *Puerto Rico Debt Plan Leaves Investors With A Choice: Lose Money or Fight*, BARRON'S (June 17, 2019), https://www.barrons.com/articles/puerto-rico-bankruptcy-plan-leaves-bondholders-with-tough-choice-51560790827 (noting that the Puerto Rico bankruptcy has caused prices on some of its bonds to drop).

114.     The Oversight Board's reading of PROMESA § 202 would violate the Due Process

Clause, because in the Oversight Board's view, if it decides not to appropriate funds in a budget,

that decision deprives any individuals whose debts were not funded of any property or contract

rights they previously had. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).  Due process requires

that a deprivation of a protected property interest "be preceded by notice and opportunity for

hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532,

542 (1985) (citation and internal quotation marks omitted).  As contract rights are "property" under

the Due Process Clause, *Semaphore Entm't Grp. Sports Corp. v. Gonzalez*, 919 F. Supp. 543, 549

(D.P.R. 1996), any Oversight Board rescission of property rights *or* contractual rights would

constitute a deprivation, which requires pre-deprivation notice and an opportunity to be heard.[28]

### 2.     Any Repeal or Preemption of the Hotel Occupancy Tax Act Under PROMESA Would Effect a Fifth Amendment Taking Without Just Compensation.

#### a.     Preempting Property Rights Under a Lien or Trust Violates the Fifth Amendment.

115.     The Oversight Board's seizure of Pledged Hotel Taxes on which Movants have a

lien is a direct appropriation of Movants' property and a destruction of Movants' equitable

ownership of those funds, which constitutes a "paradigmatic" taking requiring just compensation.

*See Armstrong v. United States*, 364 U.S. 40, 48 (1960) ("We hold that there was a taking of these

liens for which just compensation is due under the Fifth Amendment."); *Lingle v. Chevron U.S.A.

Inc.*, 544 U.S. 528, 528 (2005) (a "paradigmatic taking . . . is a direct government appropriation

or physical invasion of private property").

---

[28] An after-the-fact judicial proceeding does not cure a Due Process Clause violation caused by a governmental agency decision that deprived someone of their property or contract rights without due process.  *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982) (a post-deprivation hearing is constitutionally inadequate absent necessity of quick action or impracticality of providing any pre-deprivation process).

**b.      Preempting a Statutory Covenant Pledging Specific Special Revenues to Bondholders Violates the Fifth Amendment.**

116.    Even if Movants did not have a security interest in the Pledged Hotel Taxes (which they plainly do, *see supra* Section II), any preemption of the Hotel Occupancy Tax Act would constitute a Fifth Amendment violation.  A statutory covenant that makes a pledge of specific special revenues to bondholders creates a protected property interest under the Fifth Amendment, whether or not the covenant is properly characterized as a "security interest" or a "contract" under the Bankruptcy Code.

117.    The statutory covenant at issue here is plainly not merely legislative, but is at least a binding contractual commitment of the Commonwealth, pledging to make available to bondholders a specific set of revenues.  "[A] statute is itself treated as a contract when the ***language*** and ***circumstances*** evince a legislative intent to create private rights of a contractual nature enforceable against the State." *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 17 n.14 (1977) (emphasis added).  There can be little doubt that the Hotel Occupancy Tax Act—wherein "[t]he Commonwealth of Puerto Rico [] ***agrees*** and ***makes a commitment***" with CCDA bondholders, 13 L.P.R.A. § 2271v(a)—evidenced "clear indication that the [Puerto Rico] legislature intend[ed] to bind itself contractually" to CCDA bondholders. *See Parella v. Ret. Bd. of R.I. Emps' Ret. Sys.*, 173 F.3d 46, 60 (1st Cir. 1999).  This court has found similar language to evidence an unmistakable intent to form a contract. *See Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 85 F. Supp. 3d 577, 604 (D.P.R.), *judgment entered*, 2015 WL 574008 (D.P.R. Feb. 10, 2015), *aff'd*, 805 F.3d 322 (1st Cir. 2015), *aff'd*, 136 S. Ct. 1938 (2016); 22 L.P.R.A. § 215 ("*The Commonwealth Government does hereby pledge to, and agree with, any person, firm or corporation . . . subscribing to or acquiring bonds of [PREPA] . . . .*"); *see also U.S. Tr.*, 431 U.S. at 18 ("intent to make a contract is clear from the statutory language," where two states "covenant[ed] and agree[d] with each other and

with the holders of any affected bonds."). That the Commonwealth committed not to alter CCDA's rights until the bonds are repaid—which the Oversight Board affirmatively describes as *contractual* negative covenants, (Opp. ¶ 89 n.36)—"also evince[s] an unmistakable intent to contract." *Parella*, 173 F.3d at 60; *Rhode Island Higher Educ. Assistance Auth. v. Sec'y, U.S. Dep't of Educ.*, 929 F.2d 844, 850 (1st Cir. 1991). The surrounding "circumstances"—that the Commonwealth's instrumentalities were offering bonds, a quintessential contractual instrument— further confirms "a clear and unequivocal intent to contract." *Parella*, 173 F.3d at 61.

118.   This statutory contract, pledging specific revenues to bondholders, gives rise to a constitutionally protected property interest—whether or not it also creates a "security interest" within the meaning of the Bankruptcy Code. The statutory covenant creates a legitimate claim of entitlement to specifically identifiable property (the Pledged Hotel Taxes)—which is the touchstone of a protected property interest. *Vázquez-Velázquez v. Puerto Rico Highway & Transp. Auth.*, 2016 WL 183653, at *4 (D.P.R. Jan. 14, 2016) ("plaintiffs [must] have a '*legitimate claim of entitlement*.'") (emphasis added) (quoting *Bd. of Regent*, 408 U.S. at 577; *Louisiana ex rel. Hubert v. City of New Orleans*, 215 U.S. 170, 177-78 (1909); *Murray v. City of Charleston*, 96 U.S. 432, 445 (1877); *Von Hoffman*, 71 U.S. at 554-55 ("[W]here a State has authorized a municipal corporation to contract and to exercise the power of local taxation to the extent necessary to meet its engagements, the power thus given cannot be withdrawn until the contract is satisfied.").

119.   Revenue bonds in particular that are backed by *specific* pledged revenues create property rights. *Dimino v. Sec'y of Commonwealth*, 695 N.E.2d 659, 705 (Mass. 1998) (proposed elimination of toll revenues "constitutes an appropriation of the bondholders' private property"); *First National Bank of Boston v. Maine Turnpike Authority*, 136 A.2d 699, 722 (Me. 1957)

(impairing a rate covenant would unconstitutionally "transfer a vested property right from one person to another by the pure fiat of the Legislature").

       **c.**        **Just Compensation Requires That Bondholders Be Made Whole.**

120.    The Oversight Board does not contest that any taking of private property, including contractual property rights and equitable ownership rights, requires just compensation. *See* U.S. CONST. amend. V. Nor does it dispute that a requirement to provide "just compensation" cannot be impaired by the operation of the Bankruptcy Code but instead requires payment for the full value of the property taken. *See United States v. Sec. Indus. Bank*, 459 U.S. 70, 75 (1982) ("The bankruptcy power is ***subject to*** the Fifth Amendment's prohibition against taking private property without compensation.") (emphasis added). Absent the payment of just compensation, Movants' property rights cannot be impaired in this proceeding.

## **CONCLUSION**

121.    For the foregoing reasons, the Court should overrule Respondents' objections, grant Movants' motion, and grant Movants such other and further relief as is just and proper.[29]

---

[29] The Oversight Board declined entirely to address Movants' arguments concerning why stay relief is appropriate under Sections 362(d)(1) and (d)(2) of the Bankruptcy Code, contending that these issues are not presently before the Court. (Mot. ¶¶ 93-99); (Opp. ¶¶ 103, 105.) The Oversight Board's position leaves the Court with no basis on which to extend the automatic stay beyond the preliminary hearing. Movants have raised several independent grounds for stay relief, several of which the Oversight Board has not addressed at all. Accordingly, there is no basis for finding that the debtor has a likelihood of success on all of the independent grounds on which Movants seek relief. Absent such a finding, the stay must terminate at the preliminary hearing. *In re Boomgarden*, 780 F.2d 657, 662 (7th Cir. 1985). Movants respectfully reserve all rights with respect to other issues under Section 362(d)(1) and (d) (2), including the right to submit additional briefing as appropriate and to address those and any other relevant issues at any final hearing.

**CERTIFICATION**

In accordance with paragraph 9 of the *Final Case Management Order for Revenue Bonds*

(ECF No. 12186), Movants certify that (i) they have taken reasonable efforts to avoid duplication

and submit a brief that is no longer than necessary, and (ii) they have used reasonable efforts to

draft a single brief and coordinate to minimize duplicative briefs.

[*Remainder of Page Intentionally Omitted*]

Dated: April 30, 2020
San Juan, Puerto Rico

**FERRAIUOLI LLC**

By:     */s/ Sonia Colón*
        Roberto Cámara-Fuertes (USDC-PR No. 219002)
        Sonia Colón (USDC-PR No. 213809)
        221 Ponce de León Avenue, 5th Floor
        San Juan, PR 00917
        Telephone: (787) 766-7000
        Facsimile: (787) 766-7001
        Email: rcamara@ferraiuoli.com
                 scolon@ferraiuoli.com

**MILBANK LLP**

By:     */s/ Atara Miller*
        Dennis F. Dunne (admitted *pro hac vice*)
        Atara Miller (admitted *pro hac vice*)
        Grant R. Mainland (admitted *pro hac vice*)
        John J. Hughes, III (admitted *pro hac vice*)
        55 Hudson Yards
        New York, NY 10001
        Telephone: (212) 530-5000
        Facsimile:  (212) 530-5219
        Email: ddunne@milbank.com
                 amiller@milbank.com
                 gmainland@milbank.com
                 jhughes2@milbank.com

**ARENT FOX LLP**

By:     */s/ David L. Dubrow*
        David L. Dubrow (admitted *pro hac vice*)
        Mark A. Angelov (admitted *pro hac vice*)
        1301 Avenue of the Americas
        New York, NY 10019
        Telephone: (212) 484-3900
        Facsimile:  (212) 484-3990
        Email: david.dubrow@arentfox.com
                 mark.angelov@arentfox.com
        Randall A. Brater (admitted *pro hac vice*)
        1717 K Street, NW
        Washington, DC  20006
        Telephone: (202) 857-6000
        Facsimile: (202) 857-6395
        Email: randall.brater@arentfox.com

***Attorneys for Ambac Assurance Corporation***

**REXACH & PICÓ, CSP**

By: */s/ María E. Picó*
    María E. Picó
    (USDC-PR No. 123214)
    802 Ave. Fernández Juncos
    San Juan, PR 00907-4315
    Telephone: (787) 723-8520
    Facsimile: (787) 724-7844
    Email: mpico@rexachpico.com

**CASELLAS ALCOVER & BURGOS P.S.C.**

By: */s/ Heriberto Burgos Pérez*
    Heriberto Burgos Pérez
    (USDC-PR No. 204809)
    Ricardo F. Casellas-Sánchez
    (USDC-PR No. 203114)
    Diana Pérez-Seda
    (USDC-PR No. 232014)
    P.O. Box 364924
    San Juan, PR 00936-4924
    Telephone: (787) 756-1400
    Facsimile: (787) 756-1401
    Email: hburgos@cabprlaw.com
        rcasellas@cabprlaw.com
        dperez@cabprlaw.com

**BUTLER SNOW LLP**

By: */s/ Martin A. Sosland*
    Martin A. Sosland (admitted *pro hac vice*)
    5430 LBJ Freeway, Suite 1200
    Dallas, TX 75240
    Telephone: (469) 680-5502
    Facsimile: (469) 680-5501
    Email: martin.sosland@butlersnow.com
    Jason W. Callen (admitted *pro hac vice*)
    150 3rd Ave., S., Suite 1600
    Nashville, TN 37201
    Telephone: (615) 651-6774
    Facsimile: (615) 651-6701
    Email: jason.callen@butlersnow.com

***Attorneys for Financial Guaranty Insurance Company***

**CADWALADER, WICKERSHAM & TAFT LLP**

By: */s/ Howard R. Hawkins, Jr.*
    Howard R. Hawkins, Jr. (admitted *pro hac vice*)
    Mark C. Ellenberg (admitted *pro hac vice*)
    William J. Natbony (admitted *pro hac vice*)
    Ellen M. Halstead (admitted *pro hac vice*)
    Thomas J. Curtin (admitted *pro hac vice*)
    Casey J. Servais (admitted *pro hac vice*)
    200 Liberty Street
    New York, NY 10281
    Telephone: (212) 504-6000
    Facsimile: (212) 504-6666
    Email: howard.hawkins@cwt.com
        mark.ellenberg@cwt.com
        bill.natbony@cwt.com
        ellen.halstead@cwt.com
        thomas.curtin@cwt.com
        casey.servais@cwt.com

***Attorneys for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.***

57

**SEPULVADO, MALDONADO & COURET**

By: */s/ Albéniz Couret Fuentes*
Albéniz Couret Fuentes
(USDC-PR No. 222207)
304 Ponce de León Ave. Suite 990
San Juan, PR 00918
Telephone: (787) 765-5656
Facsimile: (787) 294-0073
Email: acouret@smclawpr.com

**REED SMITH LLP**

By: */s/ Eric A. Schaffer*
Eric A. Schaffer (admitted *pro hac vice*)
Luke A. Sizemore (admitted *pro hac
vice)*
Jared S. Roach (admitted *pro hac vice*)
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
Telephone: (412) 288-3131
Facsimile: (412) 288-3063
Email: eschaffer@reedsmith.com
          lsizemore@reedsmith.com
          jroach@reedsmith.com

***Attorneys for The Bank of New York
Mellon, in its Capacity as Trustee***


[*Remainder of Page Intentionally Omitted*]

58

**CERTIFICATE OF SERVICE**

I hereby certify that on this same date a true and exact copy of this notice was filed with

the Clerk of Court using the CM/ECF system, which will notify a copy to counsel of record.

/s/ *Sonia Colón*

Sonia Colón (USDC-PR No. 213809)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001
Email: scolon@ferraiuoli.com