**<u>Exhibit B</u>**

**Hearing Date: May 13, 2020 9:30 AM AST**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>Debtor.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY ("HTA"),<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3567-LTS |

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**REPLY IN SUPPORT OF MOTION OF ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AMBAC ASSURANCE CORPORATION, NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, AND FINANCIAL GUARANTY INSURANCE COMPANY FOR RELIEF FROM THE AUTOMATIC <u>STAY, OR, IN THE ALTERNATIVE, ADEQUATE PROTECTION</u>**

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT ...........................................................................................................5

I.   The Excise Taxes Are the Property of HTA and the Bondholders, Not the Commonwealth. ..5

    A.   Movants Have a Statutory Entitlement to the Excise Taxes Under First Circuit Law. ...............................................................................5

    B.   The Commonwealth's Practices in Implementing the Excise Tax Statutes Confirm That the Excise Taxes Belong to HTA and Its Bondholders, Not the Commonwealth ...........................................13

    C.   The Pledged Revenues Are Held in a Trust or Custodial Capacity for HTA Bondholders. ..................................................................18

        1.   Under Established Municipal Finance Principles, the Pledged Revenues Are Held in Trust for Bondholders................................18

        2.   Alternatively, the Debtors' Intentional Actions to Disrupt Attachment and Perfection Subject the Pledged Revenues to a Constructive Trust.........................................................19

        3.   FOMB's Attacks on the Trust Relationship Are without Merit. ...22

II.  Movants Are Further Protected by Both Security Interests and Statutory Liens in the Pledged Revenues. ...........................................................................23

    A.   The Resolutions Grant Security Interests in All Pledged Revenues..........24

    B.   The 2002 Security Agreement And the Supplemental Resolutions Grant Additional Security Interests In Pledged Revenues.................................28

    C.   FOMB And The Debtors Are Judicially Estopped From Denying the Existence and Scope of Movants' Security Interests.................................30

    D.   The Excise Taxes Are Subject to a Statutory Lien in Favor of Bondholders, Valid against the Commonwealth. ......................................31

        1.   The Commonwealth Is Subject to the Statutory Lien, Even Though It Is Not Obligated on the Bonds. ...........................................32

        2.   The Excise Tax Statutes Can and Do Create a Statutory Lien Without Using the Word "Lien"...........................................34

        3.   Security Interests and Statutory Liens Can Exist Simultaneously.38

    E.   Movants' Security Interests Have Not Been, and Cannot Be, Avoided ....38

        1.   FOMB Has No Ability to Avoid Unperfected Liens, Because No Hypothetical Judicial Lien Creditor Could Exist.........................39

        2.   Retroactive Application Of Section 544(a) in This Case Would Violate the US Constitution. .........................................42

## TABLE OF CONTENTS (cont'd)

**Page**

3.   In Any Event, Movants' Liens Are Perfected, and FOMB Has Failed to Challenge Their Perfection. ...........................................43

F.   HTA's Pledge of Revenues Continues Postpetition Because the Bankruptcy Code's "Special Revenue" Provisions Apply .......................46

III. PROMESA Does Not "Preempt" the Excise Tax Statutes .....................................................52

A.   PROMESA Is Not "Inconsistent" With the Excise Tax Statutes .............52

1.   There Is No Inconsistency between FOMB's Budget Powers and Movants' Legal Rights...............................................................54

2.   Far from Preempting Them, PROMESA Title III Expressly Protects the Legal Rights of Revenue Bondholders. ....................57

B.   FOMB's Claimed Preemption Powers are Inconsistent with the Structure and Purpose of PROMESA........................................................................58

C.   There Is No "Inconsistency" Between the Concept of a Restructuring and Protecting Property Rights........................................................................60

D.   If Accepted, FOMB's "Preemption" Theory Renders PROMESA Unconstitutional Under the Fifth Amendment. .........................................62

E.   Even If FOMB Had Any Power to Affect Pre-Existing Property Rights Through the Budget Process, FOMB Has Not Validly Exercised Its Power in Compliance With the U.S. Constitution or PROMESA, And Its Fiscal Plans and Budgets Cannot Have Preemptive Effect ................................64

IV. Movants Need Only Demonstrate a "Colorable Claim" to be Entitled to Relief, Notwithstanding FOMB's Distortion of the Relevant Standard ...............................................66

V.  Movants Have Standing to Bring the Motion .................................................................67

CERTIFICATION ............................................................................................................71

CERTIFICATE OF SERVICE .................................................................................................77

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>Cases:</u>

<u>Acevido-Garcia v. Vera-Monroig</u>,
   368 F.3d 49 (1st Cir. 2004)................................................................41

<u>Ambac Assurance Corp. v. Commonwealth of Puerto Rico</u>,
   927 F.3d 597 (1st Cir. 2019)............................................................66

<u>Armstrong v. United States</u>,
   364 U.S. 40 (1960) ........................................................................63

<u>Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores
Galarza</u>,
   484 F.3d 1 (1st Cir. 2007) ...............................................6, 9, 19, 39

<u>Aurelius Inv., LLC, v. Puerto Rico</u>,
   915 F.3d 838 (1st Cir. 2019) ...........................................................42

<u>Bank R.I. v. Mixitforme, Inc.</u>, No. PM 06-1626,
   2007 WL 299361 (R.I. Sup. Ct. January 11, 2007) .........................45

<u>Barnhart v. Thomas</u>,
   540 U.S. 20 (2003) ........................................................................26

<u>Bd. of Regents of State Colleges v. Roth</u>,
   408 U.S. 564 (1972) ..................................................................62, 64

<u>Bexar Cnty. Hosp. Dist. v. Crosby</u>,
   160 Tex. 116 (Tex. 1959) ...............................................................19

<u>Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co.</u>,
   331 U.S. 519 (1947) ......................................................................12

<u>Bd. of Trustees v. Thompson Bldg. Materials, Inc.</u>,
   749 F.2d 1396 (9th Cir. 1984) ........................................................63

<u>Butner v. United States</u>,
   440 U.S. 48 (1979) ..........................................................................9

<u>City of Wilmington v. Fraternal Order of Police Lodge 1</u>,
   2015 WL 4035616  (Del. Ch. June 30, 2015) ..................................17

<u>Cleveland Bd. of Educ. v. Loudermill</u>,
   470 U.S. 532 (1985) ......................................................................63

## <u>TABLE OF AUTHORITIES, cont'd</u>

<u>Page(s)</u>

<u>Commoloco de Caguas Inc. v. Benitez Diaz</u>,
    126 D.P.R. 478 (1990) ..........................................................................................41

<u>Commonwealth Ins. Co. v. Casellas</u>,
    3 P.R. Offic. Trans. 750 (1975) ...........................................................................13

<u>Compania Popular de Transporte v. Dist. Ct. of Bayamon</u>,
    63 D.P.R. 121 (1944)  ..........................................................................................23

<u>Deniz v. Municipality of Guaynabo</u>,
    285 F.3d 142 (1st Cir. 2002) .................................................................................9

<u>Diaz v. Dept. of Educ.</u>,
    823 F. Supp. 2d 68 (D.P.R. 2011) ........................................................................41

<u>Dimino v. Sec'y of Commonwealth</u>,
    695 N.E.2d 659 (Mass. 1998) ...............................................................................63

<u>Ferris v. United States</u>,
    27 Ct. Cl. 542 (1892)  ...........................................................................................55

<u>Fin. Oversight Mgmt. Bd.  v. Altair Global Credit Opportunities Fund, LLC</u>, 590 B.R. 577
(D.P.R. 2018), <u>aff'd in part, vacated in part, rev'd in part</u>, 914 F.3d 694 (1st Cir. 2019), <u>cert.
denied sub nom. Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Glob. Designated Activity
Co.</u>,
    140 S. Ct. 47 (2019)  ............................................................................................42

<u>Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Global Designated Activity Co.</u>,
    948 F.3d 457 (1st Cir. 2020) .........................................................................10, 43

<u>First Nat. Bank of Boston v. Maine Turnpike Auth.</u>,
    136 A.2d 699 (Me. 1957) ...............................................................................12, 63

<u>Fla. v. City of Lakeland</u>,
    16 So. 2d 924 (Fla. 1943) .....................................................................................52

<u>Fleet Nat'l Bank v. Valente (In re Valente)</u>,
    360 F.3d 256 (1st Cir. 2004) ................................................................................23

<u>Fletcher v. Peck</u>,
    10 U.S. 87 (1810) .................................................................................................12

<u>Franklin Cal. Tax-Free Trust v. Puerto Rico</u>,
    85 F. Supp. 3d 577 (D. P.R. 2015) .......................................................................70

## TABLE OF AUTHORITIES, cont'd

**Page(s)**

García-Rubiera v. Calderón,
    570 F.3d 443 (1st Cir. 2009) ................................................................8

Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R.,
    939 F.3d 340 (1st Cir. 2019) .........................................21, 22, 23, 67

Grella v. Salem Five Cent Savings Bank,
    42 F.3d 26 (1st Cir. 1994) ..........................................................66, 69

Grinnell Corp. v. Lebron & Asociados, Inc., Civil No. 08-2077 (CVR),
    2011 WL 2728444 (D.P.R. July 12, 2011) ...............................26

Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,
    530 U.S. 1 (2000) ........................................................................58

Hernandez Torres vs. Hernandez Colon,
    129 D.P.R. 824 (1992) ...............................................................15

In re Advanced Cellular Systems, Inc.,
    483 F.3d 7 (1st Cir. 2007) ..........................................................26

In re Airadigm Commc'ns, Inc.,
    519 F.3d 640 (7th Cir. 2008) ....................................................40

In re American Consol. Transp. Companies, Inc.,
    433 B.R. 242 (Bankr. N.D.Ill. 2010) .......................................46

In re APC Const., Inc.,
    112 B.R. 89 (Bankr. D. Vt. 1990) .............................................38

In re Booth,
    19 B.R. 53 (Bankr. D. Utah 1982) ............................................63

In re Comcoach Corp.,
    698 F.2d 571 (2d Cir. 1983) ......................................................68

In re DeCora,
    396 B.R. 222 (W.D. Wisc. 2008) ..............................................40

In re Delco Oil, Inc.,
    599 F.3d 1255 (11th Cir. 2010) ................................................44

## TABLE OF AUTHORITIES, cont'd

**Page(s)**

In re El Comandante Mgmt. Co., LLC,
    359 B.R. 410 (Bankr. D.P.R. 2006) ........................................................69

In re Elmore,
    94 B.R. 670 (Bankr. C.D. Cal. 1988) ....................................................63

In re Fin. Oversight & Mgmt. Bd. for P.R.,
    931 F.3d 111 (1st Cir. 2019) ................................................................47

In re Fin. Oversight & Mgmt. Bd. for P.R.,
    361 F. Supp. 3d 203 (D.P.R. 2019) ......................................................11

In re Fin. Oversight & Mgmt. Bd. for P.R.,
    582 B.R. 579 (D.P.R. 2018) ................................................................19

In re Fin. Oversight & Mgmt. Bd. for P.R.,
    919 F.3d  121 (1st Cir. 2019) ..............................................................19

In re Fin. Oversight & Mgmt. Bd. for P.R.,
    916 F.3d 98 (1st Cir. 2019) ................................................................53

In re Fluge,
    57 B.R. 451 (Bankr. D.N.D. 1985) ......................................................40

In re Fonseca,
    534 B.R. 261 (Bankr. D.P.R.), aff'd, 542 B.R. 628 (B.A.P. 1st Cir. 2015) ..........................34

In re Garcia,
    484 B.R. 1 (Bankr. D.P.R. 2012) ........................................................23

In re General Highway Exp., Inc.,
    893 F.2d 1334 (6th Cir. 1990) ............................................................39

In re Goode,
    131 B.R. 835 (Bankr. N.D. Ill. 1991) ..................................................49

In re Harbour E. Dev., Ltd.,
    2011 WL 3035287 (Bankr. S.D. Fla. Jul. 22, 2011) ..............................45

In re Hayes,
    393 B.R. 259 (Bankr D. Mass. 2008) ..................................................68

In re Heffernan Mem'l Hosp. Dist.,
    202 B.R. 147 (Bank. S.D. Cal. 1996) ..............................................35, 36

## TABLE OF AUTHORITIES, cont'd

Page(s)

In re Hersh,
    84 B.R. 430 (Bankr. E.D.Va. 1988) ...................................................................33

In re Horton,
    595 B.R. 1 (Bankr. D.D.C. 2019) .......................................................................69

In re Howard's Appliance Corp.,
    874 F.2d 88 (2nd Cir. 1989) ...............................................................................20

In re Jefferson Cty.,
    482 B.R. 404 (Bankr. N.D. Ala. 2012) ...........................................................47, 53

In re Jones, No. 02-17125-SR,
    2002 WL 34560880 (Bankr. E.D. Pa. Sept. 27, 2002) ......................................69

In re Kang Jin Hwang,
    396 B.R. 757 (Bankr. C.D. Cal. 2008).................................................................69

In re Keise,
    564 B.R. 255 (Bankr. D.N.J. 2017) ....................................................................38

In re Las Vegas Monorail Co.,
    429 B.R. 317 (Bankr. D. Nev. 2010) .......................................................38, 50, 62

In re Laufenberg, No. 03-12989-12,
    2004 WL 2192428, (Bankr. D.Ks. 2004) ...........................................................33

In re Lifeco Inv. Grp.,
    173 B.R. 478 (Bankr. D. Del. 1994) ...................................................................68

In re Lopez,
    446 B.R. 12 (Bankr. D. Mass. 2011) ..................................................................68

In re Maisel,
    378 B.R. 19 (Bankr. D. Mass. 2007) ..................................................................69

In re Marion St. P'ship,
    108 B.R. 218 (Bankr. D. Minn. 1989) ................................................................63

In re Morales Travel Agency,
    667 F.2d 1069 (1st Cir. 1981) ............................................................................22

## TABLE OF AUTHORITIES, cont'd

**Page(s)**

In re Nichols,
440 F.3d 850 (6th Cir. 2006) ................................................................63

In re Northview Corp.,
130 B.R. 543 (9th Cir. BAP 1991) .......................................................44

In re Ocean Place Development LLC,
447 B.R. 726 (Bankr. D.N.J. 2011) .....................................................44

In re Old Cold, LLC,
602 B.R. 798 (B.A.P. 1st Cir. 2019) ....................................................67

In re Ortiz Vega,
75 B.R. 858 (Bankr. D.P.R. 1987) ........................................................35

In re Overview Equities,
240 B.R. 683 (Bankr. E.D.N.Y. 1999) .................................................69

In re Pansier, No. 18-22297-BEH,
2019 WL 1495100 (Bankr. E.D. Wis. Apr. 3, 2019) ............................67

In re Plant Insulation Co.,
469 B.R. 843 (Bankr. N.D. Cal. 2012) .................................................63

In re Rielly,
545 B.R. 435 (Bankr D. Mass. 2016) ...................................................39

In re Rones,
531 B.R. 526 (Bankr. D.N.J. 2015) ......................................................37

In re Schwartz,
954 F.2d 569 (9th Cir. 1992) ................................................................39

In re Smiley,
569 B.R. 377 (Bankr. D.N.J. 2017) ......................................................38

In re SPM Mfg. Corp.,
984 F.2d 1305 (1st Cir. 1993) ..............................................................58

In re Sweports, Ltd.,
476 B.R. 540 (Bankr. N.D. Ill. 2012) ..................................................69

In re Titan Indus., Inc., No. 00-104,
2001 WL 36381910 (B.A.P. 1st Cir. June 29, 2001) ...........................58

## <u>TABLE OF AUTHORITIES, cont'd</u>

<u>Page(s)</u>

<u>In re Trahan</u>,
  283 F. Supp. 620 (W.D. La. 1968),
  <u>aff'd per curiam</u>, 402 F.2d 796 (5th Cir. 1969) ........................................36

<u>In re Trask</u>,
  462 B.R. 268 (B.A.P. 1st Cir. 2011) ......................................................40

<u>In re Vertullo</u>,
  610 B.R. 399 (B.A.P. 1st Cir. 2020) ......................................................67

<u>In re Vieland</u>,
  41 B.R. 134 (Bankr. N.D. Oh. 1984) ......................................................69

<u>In re Vienna Park Props.</u>,
  976 F.2d 106 (2d Cir. 1992) ...................................................................45

<u>In re Weisband</u>,
  427 B.R. 13 (Bankr. D. Az. 2010) ..........................................................69

<u>JK Mullen Inv. Co. v. Town of Arvada</u>,
  261 P.2d 714 (Colo. 1953) .......................................................................35

<u>Kunkel v. Sprague Nat. Bank</u>,
  128 F.3d 636 (1997) .................................................................................48

<u>Librotex v. AAA</u>,
  138 D.P.R. 938 (1995) .............................................................................41

<u>Local Initiative Health Auth. for L.A. Cty. v. United States</u>,
  142 Fed. Cl. 1 (Fed. Cl. 2019) ................................................................56

<u>Logan v. Zimmerman Brush Co.</u>,
  455 U.S. 422 (1982) .................................................................................63

<u>Lonegan v. State</u>,
  174 N.J. 435 (2002) .................................................................................10

<u>Louisiana ex rel. Hubert v. City of New Orleans</u>,
  215 U.S. 170 (1909).................................................................................64

<u>Louisville Joint Stock Land Bank v. Radford</u>,
  295 U.S. 555 (1935).............................................................................9, 62

## <u>TABLE OF AUTHORITIES, cont'd</u>

<u>Page(s)</u>

Luperena v. Transportation Authority,
   79 D.P.R. 464 (1956) ........................................................................................23

Maine Community Health Options v. United States,
   590 U.S. _____ (April 27, 2020) ......................................................................56

Martin v. United States,
   130 Fed. Cl. 578 (Fed. Cl. 2017) ...................................................................56

Matter of Brown Transp. Truckload, Inc.,
   118 B.R. 889 (Bankr. N.D. Ga. 1990) ...........................................................69

Matter of O.P.M. Leasing Servs., Inc.,
   46 B.R. 661 (Bankr. S.D.N.Y. 1985) .............................................................45

Matter of Pubs, Inc. of Champaign,
   618 F.2d 432 (7th Cir. 1980) ..........................................................................49

McCafferty v. McCafferty (In re McCafferty),
   96 F.3d 192 (6th Cir. 1996) ............................................................................20

Members of Peanut Quota Holders Ass'n, Inc. v. USA,
   60 Fed.Cl. 524 (2004) .....................................................................................33

Moschenross v. St. Louis Cty.,
   188 S.W.3d 13 (Mo. App. E.D. 2005) ...........................................................10

New Jersey Sports & Exposition Auth. v. McCrane,
   61 N.J. 1 (1972) ..............................................................................................15

Oronoz & Co. v. Alvarez,
   23 D.P.R. 536 (1916) ......................................................................................42

Peaje Invs. LLC v. García-Padilla, No. 16-2365,
   2016 WL 6562426 (D.P.R. Nov. 2, 2016),
   aff'd in part, vacated in part, 845 F.3d 505 (1st Cir. 2017) ..........................30

Peaje Invs. LLC v. Fin. Oversight & Mgmt. Bd.,
   899 F.3d 1 (1st Cir. 2018) .................................................................25, 36, 37, 67

Porrata Doria y Veve  v. Fajardo Sugar Co.,
   57 D.P.R. 628 (1940)  .....................................................................................23

## TABLE OF AUTHORITIES, cont'd

**Page(s)**

P.R. Telephone Co. v. Tax Ct.,
81 D.P.R. 982 (1960) ................................................................................11

Reed & Reed, Inc. v. Weeks Marine, Inc.,
431 F.3d 384 (1st Cir. 2005) ...................................................................18

Regional Utility Serv. Sys. v. City of Mount Union,
874 N.W.2d 120 (Iowa 2016) .................................................................17

Reilly v. Wheatley,
68 F.2d 297 (1st Cir. 1933) .....................................................................23

Rice v. City of Milwaukee,
100 Wis. 516 (1898) ................................................................................12

Rodriguez v. Fed. Deposit Ins. Corp.,
140 S.Ct. 713 (2020) ..................................................................................9

Roig Commercial Bank v. Buscaglia, Tes.
74 D.P.R. 986 (1953) ...............................................................................13

Salazar v. Ramah Navajo Chapter,
567 U.S. 182 (2012) .................................................................................55

Saratoga Harness Racing Ass'n v. Agric. & N.Y. State Horse Breeding Dev. Fund,
22 N.Y.2d 119 (1968) ..............................................................................15

Schowalter v. State,
822 N.W.2d 292 (Minn. 2012) ................................................................10

Semaphore Entm't Grp. Sports Corp. v. Gonzalez,
919 F. Supp. 543 (D.P.R. 1996) ..............................................................62

State ex rel. Spink v. Kemp,
365 Mo. 368 (1955) .................................................................................17

Stellwagen v. Clum,
245 U.S. 605 (1918) .................................................................................53

Sturges v. Crowninshield,
17 U.S. 122 (1819) ...................................................................................53

## TABLE OF AUTHORITIES, cont'd

Page(s)

Toledo-Fernandez v. U.S.,
    2007 WL 222138 (D.P.R. 2007) ................................................50

U.S. Trust Co. v. New Jersey,
    431 U.S. 1 (1977) ................................................64, 70

United Parcel Serv., Inc. v. Flores-Galarza,
    318 F.3d 323 (1st Cir. 2003) ................................................51

United Shoe Workers of Am., AFL–CIO v. Bedell,
    506 F.2d 174 (D.C. Cir. 1974) ................................................13

United States v. Acosta-Martinez,
    252 F.3d 13 (1st Cir. 2001) ................................................53

United States v. Sec. Indus. Bank,
    459 U.S. 70  (1982) ................................................43

United States v. Quinones,
    758 F.2d 13(1st Cir. 1985) ................................................53

Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd.
    for P.R.), 945 F.3d 3 (1st Cir. 2019) ................................................56

Von Hoffman v. City of Quincy,
    71 U.S. 535 (1866) ................................................12, 64

Waggett v. Select Portfolio Serv'g, Inc. (In re Waggett),
    Nos. 09-04152-8-SWH, 4-00096-8-SWH, 2015 WL 1384087
    (Bankr. E.D.N.C. Mar. 23, 2015) ................................................53

Webb's Fabulous Pharmacies, Inc. v. Beckwith,
    449 U.S. 155 (1980) ................................................9, 18

Whitfield v. Mun. of Fajardo,
    2007 WL 6894782 (D.P.R. May 29, 2007) ................................................40

Whitmore Union Elementary School Dist. v. County of Shasta,
    104 Cal. Rptr. 2d 227 (Cal. Ct. App. 2001) ................................................17

William W. Bierce, Ltd. v. Hutchins,
    205 U.S. 340 (1907) ................................................19

 Wright v. Union Cent. Life Ins. Co.,

## TABLE OF AUTHORITIES, cont'd

**Page(s)**

311 U.S. 273 (1940) ...............................................................................................63


**Statues & Other Authorities:**

11 U.S.C.

§ 101(37) .......................................................................................................2, 32
§ 101(53) .....................................................................................................32, 37
§ 362(d) ...........................................................................................................69
§ 506 ...........................................................................................................58, 59
§ 507(a)(2) ...................................................................................................57, 59
§ 544(a)(1) .......................................................................................................40
§ 546(a)(1)(A) ..................................................................................................39
§ 902(2)(B) .......................................................................................................51
§ 902(2)(E) .......................................................................................................52
§ 928(a) .......................................................................................................47, 61
§ 1109(b) ...........................................................................................................69
§ 1123(a)(1) ......................................................................................................59


48 U.S.C.A. § 2103 .......................................................................................53, 54

PROMESA

§ 107(b)(1) .......................................................................................................57
§ 201(b)(1) ............................................................................................43, 54, 58
§ 3 ...................................................................................................................43
§ 301(a) .............................................................................................................59
§ 301(e) .............................................................................................................59

UCC

§ 9-308 .............................................................................................................45
§ 9-310 .............................................................................................................45
§ 9-502 cmt. 2 ...................................................................................................46
§ 9-506 .............................................................................................................46
§ 9-506 cmt. 2 ...................................................................................................46
§ 9-313 cmt. 2 ...................................................................................................45

3 L.P.R.A.

§ 781(g) (2012) .................................................................................................11

## TABLE OF AUTHORITIES, cont'd

**Page(s)**

§ 9102.......................................................................................................41
§ 9142.......................................................................................................41

9 L.P.R.A.

§ 2002.......................................................................................................42
§ 2012a(i) ................................................................................................52
§ 2012(e) (9) ............................................................................................40
§ 2021................................................................................................6, 22, 34, 38
§ 5681..................................................................................6, 22, 23, 32, 34, 38

13 L.P.R.A.

§ 31751 ................................................6, 7, 12, 13, 19, 22, 23, 27, 32, 34, 35, 36, 38
§ 31751(a)(1) ................................................................................22, 32, 34, 38
§ 31751(a)(1)(D) ....................................................................................32
§ 31751 (a)(3) ........................................................................................38

19 L.P.R.A.

§ 2004(l) (1998) (repealed 2012) .........................................................43
§ 2214.......................................................................................................44
§ 2219(c)(2) ............................................................................................39
§ 2122 (codifying UCC § 9-102) ...........................................................46
§ 2322 (codifying UCC § 9-502) ...........................................................46
§ 2233(a) ................................................................................................45
§ 2233(b)(2) ............................................................................................45
§ 2258.......................................................................................................45
§ 2260.......................................................................................................45

32 L.P.R.A. § 3082 .................................................................................41

Act 1-2015, §§ 2.05, 2.06, 2.07 ...........................................................13

Act 34-1997, § 1 (now codified, as amended, at 13 L.P.R.A. § 31751) .......................................13

P.R. R. Civ. P. 56.4, 32A L.P.R.A. App. III, R. 56.4 .........................42

S. Rep. No. 100-506 at 12 (1988) .........................................47, 49, 51, 52

H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 344 (1977) .................67

H.R. Rep. No. 100-1011 (1988) ...........................................................52

## TABLE OF AUTHORITIES, cont'd

**Page(s)**

2 <u>Collier on Bankruptcy</u> ¶ 362.07 ...................................................................................69

6 <u>Collier on Bankruptcy</u> ¶ 928.02 (16th ed. 2020) ...................................................70

<u>Restatement (First) Contracts § 236 (1932)</u> ....................................................26

<u>Restatement (Second) of Contracts § 202</u> (1981) ........................................18

Flachsbart, A.D. <u>Municipal Bonds in Bankruptcy: Sec. 902 (2) and the Proper Scope of Special
Revenues in Chapter 9</u>, 72 Wash. & Lee L. Rev. 955 (2015) ...............................................51

Levin, Richard B. and Lawrence P. King, <u>Bills Pertaining to Title 11 of the United States Code:
The Bankruptcy Code Hearing on S. 1626, S. 1358, S. 1863, and S. 2279 Before the
Subcomm. on Courts and Admin. Practice of the S. Comm. on the Judiciary, 100th Cong.
556 at 542 (1988) (Statement of the National Bankruptcy Conference</u>...................................49

Scalia, Antonin & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u>
(2012) ..........................................................................................................................12, 26

Spivey, G. <u>Impact of Article Nine on Revenue Bond Investments,</u>
44 Ind. L.J 624 (1969) ............................................................................................44

Movants respectfully submit this Reply in further support of the Motion (ECF No. 10102) and in response to the FOMB's Opposition thereto (ECF No. 10613) and related joinders.[2]

## **PRELIMINARY STATEMENT**

1.       Movants, as owners and insurers of HTA bonds, brought the Motion to protect their property interests in HTA revenues unlawfully diverted by the Commonwealth. Those property interests include beneficial ownership of, as well as continuing liens on, HTA's toll and excise tax revenues.  These revenues secure bonds that enabled HTA to construct and maintain Puerto Rico's highway system.  The Opposition dismisses Movants' longstanding, secured property interests as nothing more than "pre-PROMESA appropriations" by the Commonwealth legislature, which FOMB believes it can obliterate with the stroke of a pen.  Opp. ¶ 1.  To manufacture support for this remarkable assertion, the Opposition distorts the relevant statutes and bond documents, ignores decades of Commonwealth budgeting and accounting practices, badly misinterprets the decisions of this Court and the First Circuit, and even repudiates the position that FOMB's own counsel took in front of the First Circuit in Peaje I.

2.       The Opposition is built on a web of assumptions, many of which are unstated and virtually all of which are incorrect.  The lynchpin of the Opposition is the mistaken assumption that the Commonwealth owns all Excise Tax collections until they are transferred to HTA.  The Opposition contains no support for this assumption—and there is none.  Under Flores-Galarza—binding First Circuit law that FOMB tries, but fails, to distinguish—the Excise Tax

---

[2]     Capitalized terms used in this Reply but not defined herein shall have the meanings ascribed to them in the Motion or the Opposition, as applicable.  Unless otherwise indicated, all ECF numbers referenced in this Reply refer to the docket in Case No. 17-3283-LTS.  All references to Exhibits in this Reply, other than Exhibit A attached to the Motion, refer to the Exhibits attached to the *Declaration of William J. Natbony* (ECF No. 10107, the "Natbony Dec.") or the *Reply Declaration of William J. Natbony* (the "Natbony Reply Dec."), as appropriate.  Also submitted with Movants' Reply is the accompanying declaration of William H. Holder, dated April 30, 2020, along with the expert report of Mr. Holder attached thereto (the "Holder Report").  The Holder Report is submitted in response to arguments made in the Opposition, issues raised by documents produced since that time, and arguments raised through the deposition testimony of the 30(b)(6) representative for HTA and the Commonwealth.  All arguments in the Motion are reincorporated herein by reference and not waived.

Statutes grant HTA and the Bondholders full beneficial ownership of the pledged tax revenues. The Puerto Rico Department of Treasury (the "Treasury") has always collected the taxes as HTA's agent and then, as directed by statute, covered them into Fund 278, a special deposit fund in favor of HTA. These tax collections are not designated as part of the General Fund, which is the source for annual appropriations, nor does the transfer of excise taxes to HTA ever appear as an appropriation in the Commonwealth budget. The taxes, thus, are not, never were, and cannot be, Commonwealth property. See infra § I.

3.     In addition to beneficial ownership, Movants have both consensual and statutory liens on the Excise Taxes and Toll Revenues. First, HTA granted its Bondholders a consensual lien that extends to all of the Pledged Revenues—not just money deposited in the Sinking Fund or Revenue Fund, as FOMB argues. Indeed, Section 601 of the Resolutions "hereby pledge[s]" all "Revenues" to Bondholders—separate and in addition to the "*further security*" placed on "moneys" in the Sinking Fund pursuant to Section 401. And if there were any doubt, the 2002 Security Agreement expressly grants a security interest in "*all amounts required to be on deposit*" in the Sinking Fund, not just moneys actually placed there. See infra ¶ 43. FOMB's theory that it can prevent Movants' liens from attaching by misappropriating money pledged to bond repayment before the money reaches the Sinking Fund is both mistaken and unlawful.

4.     Second, the Excise Tax Statutes impose a charge[3] in favor of the Bondholders against the Excise Taxes, commanding that the taxes "shall" be deposited in a special deposit in favor of HTA, "shall" be transferred to HTA, and "shall be used solely" to pay HTA's debt, for as long as the debt is outstanding. See infra § II.D. This language easily passes the test for statutory liens established by the First Circuit in Peaje II. That lien is against the Excise Taxes wherever they may be located, including in the Treasury's hands. And although this lien is subject

---

[3] 11 U.S.C. § 101(37) ("The term 'lien' means charge against or interest in property to secure payment of a debt or performance of an obligation.").

to a carve-out for clawback under Section 8 of Article VI of the Puerto Rico Constitution, neither FOMB nor the Commonwealth has asserted (much less established) that the predicate conditions for clawback have ever existed—and the Motion established that they do not exist. <u>See</u> Mot. ¶ 15 n.6. Further, even if these conditions were met, Article VI, Section 8 does not give the Commonwealth carte blanche to seize the Pledged Revenues for expenditure on its general purposes. To the contrary, if Article VI, Section 8 creates any interest at all in the Pledged Revenues, it is an interest solely in favor of *general obligation bondholders*. Properly understood, under Article VI, Section 8, the Commonwealth has no rights to the Pledged Revenues: It merely acts as a pass-through for funds it receives on behalf of GO Bondholders.

5.     Furthermore, Movants' security interests in the Excise Taxes and Toll Revenues are not static, as are the usual prepetition liens presented in chapter 11 cases. Due to the unique nature of municipal finance, where issuers typically cannot grant liens on hard assets, such as the subway system or city hall,[4] the liens at issue here (and in countless other municipal bond issuances) apply to a perpetual stream of *future* revenues. In this case, the liens apply to the Excise Tax and toll revenues and to HTA's right to receive those revenues. While Section 552(a) of the Bankruptcy Code generally does cut off floating liens on future receivables, that provision does not apply here, where the pledged funds are special revenues within the meaning of Section 928(a) of the Bankruptcy Code. <u>See</u> <u>infra</u> § II.F. Thus, the Motion seeks to enforce the Bondholders' rights not only to existing collections, but to future collections as well. Virtually all of the Opposition's arguments focus only on the attachment and perfection of liens to date; they do not address the Bondholders' rights to future collections.

---

[4] <u>See, e.g.</u>, <u>In re Jefferson Cty</u>, 474 B.R. 228, 238-39 (Bankr. N.D. Ala. 2012) ("[M]any states do not allow municipalities to encumber their properties with liens that could be enforced by foreclosure or repossession of the properties.").

3

6.      No doubt concerned that traditional state law lien analysis does not support the Commonwealth's confiscation of collateral, FOMB posits the remarkable proposition that Congress intended PROMESA to preempt Bondholder property interests that have been recognized and relied on for decades.  However, while Title II of PROMESA empowers FOMB to certify budgets for Puerto Rico instrumentalities, even FOMB recognizes that it does *not* broadly preempt preexisting Puerto Rico laws that create property rights; indeed, PROMESA § 407 expressly preserves and respects such laws and property rights.  Here, as noted above, the statutorily mandated delivery of Excise Taxes to HTA for the Bondholders' benefit is not dependent on annual appropriations or any Commonwealth budget; on the contrary, it is a preexisting property right, the protection of which is entirely consistent with PROMESA.  PROMESA does not obliterate Movants' property interests, and it would violate the Due Process Clause and Takings Clause of the U.S. Constitution if it did.

7.      Finally, the Opposition raises standing as a defense to the Motion, based on the flawed contention that Movants are attempting to assert claims of HTA against the Commonwealth.  The Court need not linger long over this distraction.  This is a motion for relief from the stay for the purpose of enforcing liens.  Movants, by definition, are asserting their *own* liens and claims against the Commonwealth and HTA—not the claims of HTA against the Commonwealth.  That FOMB raises as a defense that the pledged revenues are owned by the Commonwealth, not HTA, does not deprive Movants of standing to protect their own liens and claims.  It simply presents a merits issue to be determined by the Court.  Moreover, Movants assert that they have both statutory lien rights and contract claims directly against the Commonwealth, as well.  Accordingly, the Court should proceed to the final lift-stay hearing and the Motion should be granted.

## ARGUMENT

**I.      The Excise Taxes Are the Property of HTA and the Bondholders, Not the Commonwealth.**

       8.     The Motion established that the Enabling Act and Excise Tax Statutes grant HTA and Bondholders a property interest in the Excise Taxes; the Treasury is a mere custodian of these funds, which remain the property of HTA and Bondholders continuously from their collection to the moment they are delivered to Bondholders.  These conclusions flow inexorably from Flores Galarza, in which the First Circuit found a statutory entitlement to government collections based on compellingly similar facts.  See Mot. ¶¶ 53-58.  The Opposition fails to squarely confront Flores Galarza and its implications.

       9.     Moreover, the discovery provided by FOMB and AAFAF in connection with the Motion only confirms Movants' position.  When the Treasury holds the Excise Taxes, it does so in a specially designated fund for HTA's benefit—consistent with the Treasury's acting as a mere custodian.  See In re City of Columbia Falls, Mont., Special Imp. Dist. No. 25, 143 B.R. 750, 762-63 (Bankr. D. Mont. 1992) (despite a statute that generally allowed municipalities to use excess funds to pay delinquent property taxes, the court precluded the debtors from diverting funds designated for the repayment of bonds for this use, because municipal officers held the funds in trust as "merely a custodian" for the benefit of the bondholders).  The same discovery has clarified the wrongful nature of the Commonwealth's diversion of these funds and provides further evidence that Movants are entitled to the imposition of a constructive trust.  In sum, Movants' beneficial ownership of the Excise Taxes—as recognized under First Circuit law and confirmed by the discovery record—entitles them to lift the stay to protect their property interests.

**A.      Movants Have a Statutory Entitlement to the Excise Taxes Under First Circuit Law.**

       10.     Movants have clearly established a property interest in the Excise Taxes under Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores

Galarza, 484 F.3d 1, 29 (1st Cir. 2007).  See Mot. ¶¶ 52-58.  FOMB cites no authority, from the

First Circuit or otherwise, that would displace Flores Galarza as the controlling precedent here.

Fatally, FOMB concedes the basic "similarity" between "[t]he statutes governing the premium

reimbursements in Flores Galarza and the statutes at issue here," in that "both use the phrase 'shall

transfer'" (Opp. ¶ 92)—the very phrase that anchored the Flores Galarza court's finding of a

property interest in favor of plaintiff JUA.  See Flores Galarza, 484 F.3d at 39; see also Mot. ¶ 57.

As the First Circuit stated, "Law 253 . . . provides that the JUA 'shall receive' premiums from the

Secretary of Treasury and that the Secretary **'shall transfer'** these premiums to the JUA . . . **The

JUA has successfully alleged an entitlement to the Earned Premiums under Law 253, and

therefore a property interest in those funds.**"  Id. at 29 (emphasis added).

    11.    In attempting to escape from Flores Galarza, FOMB misstates the flow of

funds mandated by the Excise Tax Statutes here.    FOMB erroneously asserts that "the

Commonwealth collects the [Excise Taxes] from taxpayers under its taxing authority, ***deposits

them in the [T]reasury [S]ingle [A]ccount***, and then is required by statute . . . to transfer those

funds to HTA."  Opp. ¶ 92.  To the contrary, while the statutes provide that excise tax revenues

"shall be deposited in the General Fund of the Treasury of Puerto Rico," they then add "***except as

provided below***."   "Below," the statutes require that the Excise Taxes securing HTA's Bonds

"***shall be covered into a special deposit in favor of HTA,***" that Treasury "***shall transfer***" the

Excise Taxes to HTA, and that the Excise Taxes "***shall be used solely for the payment***" of principal

and interest on the bonds and other obligations of HTA (subject only to a valid clawback in a given

fiscal year).  13 L.P.R.A. § 31751 (emphasis added); see also 9 L.P.R.A. §§ 2021, 5681.

    12.    The Commonwealth's Financial Statements define "Special Deposit Fund"

as a fund with respect to which the Commonwealth "acts in a fiduciary capacity."   The term

includes "revenue collections and agency accounts for which the Commonwealth acts in an agent's

capacity."  A "Special Deposit" is used to account for funds held by the Commonwealth in a trustee capacity, or as an agent for others, including "other governmental units."  2012 CW Financial Statement at 256, Natbony Reply Dec. Ex. 1; 2015 CW Financial Statement, CW_STAY0009784-10167 at 10154-65, Natbony Reply Dec. Ex. 2; 2016 CW Financial Statement, CW_STAY0010168-10543 at 10530-31, Natbony Reply Dec. Ex. 3.  Special deposits fall into the broader category of "Special Revenue Funds."[5]  The Commonwealth defines "Special Revenue Funds" as "Commonwealth governmental funds *separate from the General Fund* that are created by law, *are not subject to annual appropriation* and have specific uses established by their respective enabling legislation.  *Special Revenue Funds are funded from*, among other things, revenues from federal programs, tax revenues *assigned by law to public corporations* and other third parties, fees and charges for services by agencies, dividends from public corporations and financing proceeds."  TSA Cash Flow for October & November FY2018, CW_STAY0000229-242 at 231, Natbony Reply Dec. Ex. 8; 2020 TSA Cash Flow for the month of January FY20, CW_STAY0000914-933 at 916, Natbony Reply Dec. Ex. 9; TSA Cash Flow as of March 8, 2019, Natbony Reply Dec. Ex. 10 (emphasis added).  Therefore, the Excise Taxes are—at all times— required to be designated for the benefit of HTA and its Bondholders and are *not* to be considered

---

[5] The terms "special deposit" and "special fund" are synonymous in this context.  As originally enacted, the English version of 13 L.P.R.A. § 31751's predecessor statute provided that gasoline tax proceeds were to be "deposited in a Special Fund in the name and for the benefit of the Puerto Rico Highways Authority."  Act No. 75 of June 23, 1965, No. 75, sec. 3, amending Excise Act of Puerto Rico, Act No. 2 of Jan. 20, 1956, § 83, Natbony Reply Dec. Ex. 4.  A later amendment used "Special Fund" and "Special Deposit" interchangeably.  See Act No. 43 of June 21, 1971, sec. 1, amending Excise Act of Puerto Rico, Act No. 2 of Jan. 20, 1956, § 83, Natbony Reply Dec. Ex. 5, (providing that gasoline and diesel tax proceeds were to be "deposited in a Special Fund in the name and for the benefit of the Puerto Rico Highways Authority," but then referring to that special fund as "said Special Deposit").  When the Puerto Rico Legislature passed the 1987 Excise Act and repealed the 1956 Excise Act of Puerto Rico, it made a stylistic change so that "Special Deposit" replaced "Special Fund" throughout the section.  See Act No. 5 of Oct. 8, 1987, § 8.005, Natbony Reply Dec. Ex. 6.  As for the Spanish text, although it does not always track the English version, it similarly used those terms interchangeably.  See Act No. 24 of June 20, 1970, sec. 3, amending Excise Act of Puerto Rico, Act No. 2 of Jan. 20, 1956, § 83, Natbony Reply Dec. Ex. 7 (providing that the gasoline and diesel tax proceeds were to be deposited in a "Depósito Especial" in the name and for the benefit of HTA, but then referring to that special deposit as said "Fondo Especial").

as part of the General Fund.[6]  See, generally, Holder Report.  Thus, the Opposition's leading argument for evading Flores Galarza—that the Excise Tax Statutes make the collections Commonwealth property in the first instance—clearly fails.

13.     FOMB also asserts that Flores Galarza and its progeny involved only money that "had been paid to the Commonwealth by the plaintiffs themselves." (Opp. ¶ 91).  At the threshold, this is a distinction without a difference.  The source of payment played absolutely no role in the First Circuit's reasoning.  Moreover, FOMB's assertion is factually incorrect.  While some of the funds at issue in Flores Galarza were duplicate premiums paid by motorists,[7] Flores Galarza also addressed, more relevantly, the "*Earned Premiums*" that were collected *from* motorists by the Secretary of Treasury, and were then required by statute to be transferred *to the* JUA.  See id.  The JUA had not paid the Earned Premiums itself, but, rather, had earned an entitlement to them by providing insurance to motorists—just as HTA's Bondholders purchased bonds from HTA in exchange for their statutory right to be paid from the Pledged Revenues.  Try as it might, FOMB cannot find a principled response to Flores Galarza.

14.     FOMB next objects to the term "statutory entitlement," claiming that Movants have not "explain[ed] . . . how it is meant to be different from a 'statutory lien' or a trust." Opp. ¶ 89.  FOMB should lodge this objection with the First Circuit, which used this precise terminology.   As stated by the court, "an entitlement to [specific funds collected by the

---

[6] The official statements for the Bonds also confirm that the pledged taxes *are not* to be deposited into the General Fund, but rather into a special fund in favor of HTA and its Bondholders.  See Natbony Dec. Ex. EE, Official Statement for Series AA Highway Refunding Bonds, at 16 (stating that such taxes "are not deposited in the General Fund of the Commonwealth when collected, but are deposited instead in the Special Fund for the benefit of the Authority . . ."); Natbony Dec. Ex. FF, Official Statement for Series M and N Highway Refunding Bonds, at 31 (stating that such taxes "are not deposited in the General Fund of the Commonwealth when collected, but are deposited instead in the Special Fund for the benefit of the Authority . . ."); see also Opp. n. 16 (quoting statutes that provide that the pledged taxes are deposited into a special fund, not the general fund).

[7] In a similar sleight of hand, FOMB references a statute that expressly required the Secretary of Treasury to hold the *Duplicate Premiums* "as a trustee," but that statute does not apply to the *Earned Premiums*, which the First Circuit nonetheless found to constitute property in favor of the JUA by virtue of the statute providing that the Secretary of Treasury "shall transfer" the Earned Premiums to the JUA.  See Opp. ¶ 91 (citing García-Rubiera v. Calderón, 570 F.3d 443, 452 (1st Cir. 2009)).

Commonwealth] under [a statute]" is "therefore a property interest in those funds"—and the "physical appropriation of those funds . . . is sufficient to allege the taking of a constitutionally protected interest." Flores Galarza, 484 F.3d at 29-30. Indeed, FOMB itself recently acknowledged that "[p]rotectable property interests" can be "*created by statute*." ECF No. 10958 ¶ 9 (emphasis added). And when a statute requires the government to collect a specific pool of revenues in favor of a different party and then transfer them, the government "is merely the custodian of these funds," not the owner of them. Flores Galarza, 484 F.3d at 29; see also Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980) ("The deposited fund was . . . property held only for the ultimate benefit of Webb's creditors, not for the benefit of the court and not for the benefit of the county. And it was held only for the purpose of making a fair distribution among those creditors . . . The creditors *thus had a state-created property right* to their respective portions of the fund.") (emphasis added).[8]

15.    FOMB also makes much of the language in the Excise Tax Statutes that the taxes can be used not only to pay HTA Bondholders, but for other obligations of HTA. The Opposition asserts that this renders use of the taxes to pay Bondholders merely optional, thus undermining the assertion of a property interest. See, e.g., Opp. ¶ 90. Putting aside that any such optionality would belong to HTA, and in no way justifies *the Commonwealth's* misappropriation of the funds for its own purposes, the argument ignores the context and purpose of that phrase. Both the 1968 and 1998 Resolutions prescribe that when HTA receives tax collections, it runs

---

[8] FOMB further suggests that Movants' reference to a "statutory entitlement" as a type of constitutionally protected property interest recognized in case law is an "attempt to circumvent the Bankruptcy Code" (Opp. ¶ 89). However, the Bankruptcy Code does not create property interests; it merely recognizes—and, as a constitutional matter, is required to respect—property interests created by state or Commonwealth law. See Rodriguez v. Fed. Deposit Ins. Corp., 140 S. Ct. 713, 718 (2020) (noting that adoption of federal rule in bankruptcy as to property rights is improper because "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law"); see also Butner v. U.S., 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law"); Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 589 (1935) ("The bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment."); Deniz v. Municipality of Guaynabo, 285 F.3d 142, 146 (1st Cir. 2002) ("[T]he Takings Clause applies unreservedly to the Commonwealth of Puerto Rico.").

them through the waterfalls created by each of the Resolutions.  The waterfalls require that the debt service and reserve accounts from which bond payments are made must first be filled to the required level, and that the *excess* Excise Tax and toll revenues could then be used by HTA to fund its own operations.  <u>See</u> Natbony Dec. Ex. C art. IV; Natbony Dec. Ex. D art. IV.  Further, once the Bonds have been paid in full, HTA is free to use the Excise Taxes as it wishes.  Thus, the Excise Tax Statutes, which were passed in conjunction with and for the express purpose of facilitating the bond issuances, simply reflect the structure of the Bonds themselves.  Far from creating some sort of optionality, they simply reflect the *subordinate* interest of HTA in excess revenues.[9]

16.     Next, drawing a flawed analogy to employer contributions that the Commonwealth appropriated annually for the Commonwealth's Employees Retirement System ("<u>ERS</u>"), FOMB argues that the Excise Taxes "could be modified or eliminated by a subsequent legislature," and therefore "HTA has only an expectancy, . . . not a property interest," in the Excise Taxes.  <u>See</u> Opp. ¶¶ 5 n.6, 80 (citing <u>Fin. Oversight Mgmt. Bd. v. Andalusian Global Designated Activity Co. (In re Fin. Oversight Mgmt. Bd.)</u>, 948 F.3d 457, 469-70 (1st Cir. 2020)).  FOMB's reliance on <u>Andalusian</u> makes no sense.  Unlike the revenue bond financing at issue here, that decision concerned bonds expressly backed by legislative appropriations.[10]  In reaching its holding, the Court in <u>Andalusian</u> explained that the Commonwealth appropriated the employer contributions as part of its annual budget, and noted that the ERS bond resolution and official statement disclosed the related appropriation risk.  <u>See</u> <u>Andalusian</u>, 948 F.3d at 468–69.  Unlike

---

[9] To be clear, Movants are not seeking to enforce any rights not given to them by the Bond Resolutions.  Thus, to the extent tax and toll revenues are sufficient to satisfy the obligations under the Resolutions, including filling the reserve funds to the required levels, HTA would be free to use any excess funds.

[10] Revenue bonds and appropriation bonds are entirely different concepts.  Unlike revenue bonds, an appropriation bond, sometimes called a "moral obligation bond," is paid through legislative appropriations, rather than pledged special revenues, and creates no legally enforceable right.  Such bonds are often issued by municipalities that cannot issue legally binding bonds because of constitutional debt limits.  <u>See, e.g.</u>, <u>Lonegan v. State</u>, 174 N.J. 435 (2002); <u>Moschenross v. St. Louis Cty.</u>, 188 S.W.3d 13 (Mo. App. E.D. 2006); <u>Schowalter v. State</u>, 822 N.W.2d 292 (Minn. 2012).

the ERS statute, which expressly refers to appropriation of contributions through the annual budget,[11] the Excise Tax Statutes here make no reference to annual appropriations or the Commonwealth budget, and the Resolutions and official statements disclose no appropriation risk. Nor do the Commonwealth executive and legislative branches treat the Excise Taxes as mere appropriations.  The Commonwealth consistently recorded the Excise Taxes as part of Fund 278, a "Special Revenue Fund[]" that, by definition, is "not subject to annual appropriations."[12] Moreover, joint resolutions itemizing appropriations to be charged to the Commonwealth's General Fund contain line items for contributions to ERS but **no** appropriations to HTA on account of the Excise Taxes.  See, e.g., English Translation of Excerpts from Joint Resolution 87-2007, Natbony Reply Dec. Ex. 13.  In short, the HTA Bonds are classic revenue bonds, not moral obligations subject to continuing appropriations like the ERS bondholders' instruments.[13] FOMB's argument that "no appropriation of future years' revenues can bind future legislatures" fails for the same reasons.  Opp. ¶¶ 5, 92.  Where the Commonwealth simultaneously imposes a tax and assigns the proceeds to a public corporation, the Puerto Rico Supreme Court upholds such assignment as valid if enacted for a public purpose.[14]

---

[11] The ERS statute provides that employer contributions "shall be *included in the budget* and shall be *appropriated annually* together with appropriations for salaries or compensation of employees."  3 L.P.R.A. § 781(g) (2012) (emphases added).

[12] See generally Holder Report; see also TSA Cash Flow as of July 14, 2017, CW_STAY0000409-421 at 412-413, Natbony Reply Dec. Ex. 11; TSA Cash Flow for October & November FY2018, CW_STAY0000229-242 at 231, Natbony Reply Dec. Ex. 8; TSA Cash Flow for the month of October FY20, CW_STAY0000859-878 at 861; TSA Cash Flow for the month of January FY20, Natbony Reply Dec. Ex. 12; CW_STAY0000914-933 at 916, Natbony Reply Dec. Ex. 9.

[13] The Commonwealth, when issuing appropriation bonds, has shown its understanding of the legal implications of these distinct instruments.  See Puerto Rico Public Finance Corporation 2003 Series A Bonds Official Statement, p. 15 ("The Legislature of Puerto Rico is not legally bound to appropriate sufficient amounts to timely pay the principal of, redemption premium, if any, and any interest due on the Act 164 Bonds.  There is no assurance that sufficient funds will be appropriated or otherwise made available to make such payments on the Act 164 Bonds."), Natbony Reply Dec. Ex. 14.

[14] See, e.g., P.R. Telephone Co. v. Tax Ct., 81 D.P.R. 982 (P.R. 1960) (holding the statute that imposed a tax and assigned it to a public corporation was valid), Natbony Reply Dec. Ex. 15.  Moreover, "[p]ursuant to Puerto Rico case law, legislation of the Commonwealth is presumed to be valid if enacted by the Legislative Assembly of Puerto Rico and signed into law by the Governor."  In re Fin. Oversight & Mgmt. Bd. for P.R., 361 F. Supp. 3d 203, 241 (D.P.R. 2019) (citations omitted) (finding COFINA's securitization of a revenue stream to be lawful).  Furthermore, as the

17. FOMB also seizes on a few stray references to the verb *asignar* (and its inflected forms) in 13 L.P.R.A. § 31751 as an indication that the Excise Taxes are somehow "appropriations." See Opp. ¶ 86 n.36. But Dictionary definitions for *asignación* include "allocation, allotment, attribution, allowance." *Asignación*, MCGRAW-HILL'S SPANISH AND ENGLISH LEGAL DICTIONARY (2003), Natbony Reply Dec. Ex. 16. Thus, while *asignar* is used in connection with the proceeds of the crude oil tax dedicated to HTA, Section 31751 does not allude to any "budget" or annual appropriations. The title of the section makes plain that it concerns the "Disposition of Funds" (*Disposición de Fondos*), not appropriations.[15] *Disposición* in this context denotes the concept of alienation, conveyance, or sale—that is, a transfer of funds, not a discretionary appropriation, see Disponer, MCGRAW-HILL'S SPANISH AND ENGLISH LEGAL DICTIONARY (2003) ("To alienate, convey, sell."), Natbony Reply Dec. Ex. 17. And under Puerto Rico law, the term "funds" is not synonymous with "appropriations."[16]

18. FOMB also ignores that the term *asignar* is not used in Section 31751 in connection with the other taxes referenced there (taxes on gasoline, diesel, and cigarettes). That

---

U.S. Supreme Court has long recognized, "if an act be done under a law, a succeeding legislature cannot undo it. The past cannot be recalled by the most absolute power." Fletcher v. Peck, 10 U.S. 87, 135 (1810); see also Rice v. City of Milwaukee, 100 Wis. 516 (1898) ("It would seem to be very clear that when money is raised for a special purpose, under an express limitation to a particular use, it cannot lawfully be used for any other purpose . . . Any other holding would commit us to the palpable absurdity of saying that a person may pay his debts by taking money from one pocket, and putting it in the other."); Von Hoffman v. City of Quincy, 71 U.S. 535, 554-55 (1866) ("It is equally clear that where a State has authorized a municipal corporation to contract and to exercise the power of local taxation to the extent necessary to meet its engagements, the power thus given cannot be withdrawn until the contract is satisfied. The State and the corporation, in such cases, are equally bound."); see also, e.g., First Nat. Bank of Boston v. Maine Turnpike Auth., 136 A.2d 699, 722 (Me. 1957) (legislature could not amend turnpike authority's enabling act to provide for the payment of additional expenditures because such expenditures would reduce the amount of revenues pledged to the bondholders and thereby "transfer a vested property right from one person to another by pure fiat of the Legislature," in violation of the Fourteenth Amendment to the U.S. Constitution).

[15] See Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co., 331 U.S. 519, 529 (1947) (stating that titles may be used to "shed light on some ambiguous word or phrase"); Scalia, Antonin & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 221-24 (2012) (explaining that a title or heading is a permissible indicator of meaning).

[16] Compare 3 L.P.R.A. § 283b(a) (defining "Appropriation" as the "[a]mount of money *authorized by the Legislative Assembly* for the purpose of carrying out a specific activity or to achieve certain objectives" (emphasis added)), with id. § 283b(i) (defining "Fund" as the "amount of money or other resource set aside for the purpose of carrying out a specific activity or to achieve certain objectives pursuant to the special laws, regulations, restrictions or limitations and which constitute an independent fiscal and accounting entity").

fact is inconsistent with FOMB's theory that all of the Excise Taxes are subject to appropriation. Indeed, § 31751 uses inflected forms of the term *asignar* because, when the Commonwealth first provided for the transfer of crude oil tax revenues to HTA through Act 34 of 1997, it allocated up to $120 million of these revenues to HTA and required that the remaining amount be paid to the Commonwealth General Fund.  See Act 34-1997, § 1 (now codified, as amended, at 13 L.P.R.A. § 31751).  Thus, in the context of this statute, *asignar* simply reflects the allocation.[17]  Act 1 of 2015—which added new sections to the Puerto Rico Internal Revenue Code and amended § 31751, among other provisions—similarly allocates crude oil tax revenues between HTA and the Puerto Rico Infrastructure Financing Authority.  See Act 1-2015, §§ 2.05, 2.06, 2.07.

### B. The Commonwealth's Practices in Implementing the Excise Tax Statutes Confirm That the Excise Taxes Belong to HTA and Its Bondholders, Not the Commonwealth

19.     The Excise Tax Statutes expressly require the placement of the Excise Taxes into a "special deposit in favor of [HTA]" and not in the Commonwealth's General Fund.  See supra ¶ 11.  The factual record confirms that this has consistently been done.  Indeed, the Commonwealth's longstanding practices in implementing the Excise Tax Statutes show that the Excise Taxes have been treated as HTA's money, not the Commonwealth's.  That history is powerful evidence that, absent a properly triggered Constitutional clawback, HTA and its Bondholders are the beneficial owners of the Excise Taxes.[18]

---

[17] For the same reason, the definition of "Revenues" in the 1998 Resolution and HTA's bond documents refers to crude oil tax revenues as "allocated" to HTA by the statute.  1998 Resolution § 101, Natbony Dec. Ex. D; see also PRHTA 1977 Highway Revenue Bond Series L Official Statement, HTA_STAY0008154-8218 at 817, Natbony Reply Dec. Ex. 18; PRHTA Resolution 2003-23, Authorizing 2003 Revenue Refunding Bonds Series AA, HTA_STAY0002741-2846 at 2751, 2766, Natbony Reply Dec. Ex. 19, (Form of Series AA Bonds to Resolution 2003-23) (explaining that Revenues consist of all moneys "received by the Authority on account of the gasoline and gas oil or diesel oil tax heretofore **allocated** to the Authority by the Excise Act . . .") (emphasis added).

[18] See Commonwealth Ins. Co. v. Casellas, 3 P.R. Offic. Trans. 750, 756 (1975) (turning to the "existing practice" of executive officials to shed light on the meaning of statutory provisions); United Shoe Workers of Am., AFL-CIO v. Bedell, 506 F.2d 174, 185 (D.C. Cir. 1974) ("Contemporaneous interpretation of a statute by those designed to oversee it commands great respect . . . ."); Roig Commercial Bank v. Buscaglia Tes., 74 P.R. 986, 1001-02 (1953) Natbony Reply Dec. Ex. 20 ("This Court has decided that in case that a provision of law is ambiguous, the administrative practice is important, serving as an effective aid in the construction of a statute.").

20.     The Commonwealth, like most other local and state governments in the United States, uses fund accounting to ensure proper accountability and transparency in the stewardship of public finances.   See Holder Report; see also 2015 CW Statement at CW_STAY0009806, Natbony Reply Dec. Ex. 2 ("Commonwealth uses fund accounting to help ensure and demonstrate compliance with finance-related legal requirements.").   Through governmental fund accounting, the Commonwealth tracks financial resources (i.e., monies) by segregating them into "funds"—including a "general fund" and "special revenue funds"—that record revenues and expenditures in accordance with various legal requirements.[19]  Natbony Reply Dec. Ex. 66 (McKeen Letter representing "Funds segregate financial information for the purpose of carrying on specific activities and attaining certain objectives in accordance with regulations, restrictions and limitations"). As relevant here, the Commonwealth uses a special fund to implement Treasury's obligation under the Excise Tax Statutes to cover the Excise Taxes into a "special deposit" for the benefit of HTA.[20]  In Treasury's accounting system, that special fund is known as Fund 278, and it records all Excise Taxes as soon as they are collected by Treasury.[21] The same accounting system identifies the General Fund as Fund 111, which is mutually exclusive of Fund 278; indeed, the Excise Taxes are never credited to the General Fund at collection.[22] Moreover, the Commonwealth's TSA cash flow reports have consistently reported the Excise Taxes as special-revenue fund collections (now labeled as "Non General Fund Pass-Through

---

[19] See Holder Report; Ahlberg Tr. 64:4-23, Natbony Reply Dec. Ex. 21 (agreeing that the "Commonwealth does record and track revenues" using funds).

[20] See Ahlberg Tr. 65:24-65:5, Natbony Reply Dec. Ex. 21 (explaining that the Commonwealth uses a special fund to "track excise tax revenues when they're received into the sweep account" of Treasury).

[21] See Holder Report; Ahlberg Tr. 61:5-11, 85:23–86:9, Natbony Reply Dec. Ex. 21 (testifying that, upon collection, the Excise Taxes are recorded in a special-revenue fund called Fund 278); Natbony Reply Dec. Ex. 66 (McKeen Letter representing that "Fund 278 is one of the many fund numbers used to designate 'Special Revenue Funds' within the Treasury systems").

[22] See Holder Report; Ahlberg Tr. 73:5-17, Natbony Reply Dec. Ex. 21 (explaining that Fund 278 and the General Fund are mutually exclusive fund designations); id. at 78:2-23, 156:11–157:16 (testifying that the Excise Taxes are only recorded in Fund 278 and never recorded in the General Fund); Natbony Reply Dec. Ex. 66 at p. 5 (McKeen Letter representing that a separate Fund number exists for the General Fund).

Funds"), not collections of the Commonwealth's General Fund.  See TSA Cash Flow for the month of January FY20, CW_STAY0000914-933, Natbony Reply Dec. Ex. 9; Ahlberg Tr. 77:14–78:23, Natbony Reply Dec. Ex. 21.[23]

21.    Similarly, it is clear that the transfer of Excise Taxes to HTA is not, and has never been, subject to annual appropriations.  An analysis of the governing budgetary rules and practices shows that dedicated revenue streams allocated to public corporations (such as the Excise Taxes allocated to HTA) are *not* subject to annual budgetary appropriations.  Instead, as with similar special-revenue financing for municipalities on the mainland, dedicated revenue streams fall outside the Commonwealth's General Fund appropriations process[24] and are treated as the public corporations' "own income" (*ingresos propios*).  See Hernandez Torres vs. Hernandez Colon, 129 D.P.R. 824, 872 (1992) (Negrón García, J., dissenting on other grounds) ("The use of the resources of public corporations to finance programs or to cover the budget deficit is unconstitutional because it breaks the framework of autonomy and fiscal separation that serves as the basis for these instrumentalities."), Natbony Reply Dec. Ex. 23.[25]  The Commonwealth and

---

[23] See Holder Report; see also TSA Cash Flow as of July 14, 2017, CW_STAY0000409-421 at 415, Natbony Reply Dec. Ex. 11; TSA Cash Flow as of September 15, 2017, CW_STAY0000500-515 at 509, Natbony Reply Dec. Ex. 22. FOMB's "Exhibit A" to its Opposition (ECF No. 10613-1), purporting to diagram HTA's "Flow of Funds", simply ignores the distinction between the Commonwealth's General Fund and Fund 278, as well as the accounting by the Commonwealth of Fund 278 moneys as designated for HTA.

[24] The Commonwealth's Treasury Single Account Cash Flow Reports specifically recognize that Special Revenue Funds, such as Fund 278 containing HTA Excise Taxes, are "separate from the General Fund," "are not subject to annual appropriation" and have "specific uses established by their respective enabling legislation."  See TSA Cash Flow as of July 14, 2017, CW_STAY0000409-421 at 412-413, Natbony Reply Dec. Ex. 11; TSA Cash Flow for October & November FY2018, CW_STAY0000229-242 at 231, Natbony Reply Dec. Ex. 8; TSA Cash Flow for the month of October FY20, CW_STAY0000859-878 at 861, Natbony Reply Dec. Ex. 12; TSA Cash Flow for the month of January FY20, CW_STAY0000914-933 at 916, Natbony Reply Dec. Ex. 9.

[25] See also Saratoga Harness Racing Ass'n v. Agric. & N.Y. State Horse Breeding Dev. Fund, 22 N.Y.2d 119, 123-24 (1968) ("[N]ot every fund made up of public moneys raised through taxation or otherwise comes within the purview of [New York's Constitutional Appropriation Clause] . . . . The legislation specifically provides the method of raising revenue and specifically defines what proportion of the funds actually collected are to be allocated for the various programs designed to further the legislative purpose . . . . In essence all that is left to the 'Fund' is the administration of the expenditures in accordance with the legislative mandate."); New Jersey Sports & Exposition Auth. v. McCrane, 61 N.J. 1, 18 (1972) ("There is no general mandate that all revenues generated by operation of every department or agency or authority of State government be deposited in the general treasury.  In fact, history negates such a view.").

HTA historically treated the Excise Taxes as property of HTA, not property of the Commonwealth.[26]

22. Moreover, Fund 278 has been treated as HTA's property.[27] And when the Excise Taxes have been collected by the Commonwealth and deposited into the Commonwealth's collections bank account, the Treasury records an increase in Fund 278 in those amounts.[28] Prior to the unlawful diversion of funds to the Commonwealth, amounts from Fund 278 were withdrawn **at the direction of HTA**. See, e.g., Transfer Authorizations dated January-March 2015, HTA_STAY0000467-492, Natbony Reply Dec. Ex. 29 (withdrawing $6 million of Excise Taxes from Fund 278 using a Form SC 735 payment voucher and containing other similar vouchers);[29] Treasury Circular Letter 1300-01-99, App. 3 (listing Form SC 735 payment vouchers as

---

[26] Compare PRHTA Budget Recommendations Memorandum for Fiscal Year 2014-2015, HTA_STAY0000387-402 at 394, Natbony Reply Dec. Ex. 25 (proposed HTA budget for fiscal year 2014–2015 listing the Excise Taxes under the category of "Own Income and Other Resources", and as "the income generated by the Agency"), and PRHTA Budget Recommendations Memorandum for Fiscal Year 2015-2016, HTA_STAY0000403-416, Natbony Reply Dec. Ex. 27 (proposed HTA budget for fiscal year 2015–2016 stating that HTA's "own income comes from the excise taxes on gasoline and diesel, toll collections, licenses, license plates, and cigarettes"), with Letter from Carmen A. Villar Prados to Jose M. Orta Valdez dated June 13, 2016, HTA_STAY0000417-453 at 418, 427, Natbony Reply Dec. Ex. 26 (proposed HTA budget for fiscal year 2016–2017 (post-conversion) recharacterizing the sources of revenues falling under "own income" and "other income," and explaining that the "Authority's income decreased during this fiscal year as a result of the clawback that came into force on December 1, 2015, under Executive Order 2015-046"). See also 2015 CW Financial Statement, CW_STAY0009784-10167 at 9818-19, Natbony Reply Dec. Ex. 2 (excluding the Excise Taxes from the Commonwealth's Statement of Revenue).

[27] See, e.g., HTA_STAY0000207, Natbony Reply Dec. Ex. 27 (spreadsheet maintained by HTA titled "Puerto Rico Highways and Transportation's Fund 278"); HTA_STAY0028471-474, Natbony Reply Dec. Ex. 28 (Treasury letter to HTA's auditors referring to the Fund 278 "accounts that the Authority maintains in this Department"); Ahlberg Tr. 149:2–50:4, Natbony Reply Dec. Ex. 21 (conceding that the title of the Fund 278 spreadsheet was phrased in the possessive).

[28] See Holder Report; Ahlberg Tr. 60:16–61:11, Natbony Reply Dec. Ex. 21 (testifying that, when the Excise Taxes come "into the collection sweep account called [Colecturía], they receive [the Fund 278] designation").

[29] See other similar SC735 vouchers at Transfer Authorizations dated March-May 2015, HTA_STAY0000454-466, Natbony Reply Dec. Ex. 30; Transfer Authorizations dated July-October 2015, HTA_STAY0000493-512, Natbony Reply Dec. Ex. 31; Transfer Authorizations dated June 2015, HTA_STAY0000513-515, Natbony Reply Dec. Ex. 32; Transfer Authorizations dated May-June 2015, HTA_STAY0000516-531, Natbony Reply Dec. Ex. 33; Transfer Authorizations dated July-October 2015, HTA_STAY0000532-545, Natbony Reply Dec. Ex. 34; Transfer Authorizations dated July-August 2015, HTA_STAY0000546-549, Natbony Reply Dec. Ex. 35; Transfer Authorizations dated January-June 2015, HTA_STAY0000556-602, Natbony Reply Dec. Ex. 36; Transfer Authorizations dated December 2015-March 2016, HTA_STAY0000603-613, Natbony Reply Dec. Ex. 37; Transfer Authorizations dated March 2015-March 2016, HTA_STAY0000614-627, Natbony Reply Dec. Ex. 38; Transfer Authorizations dated June 2015-December 2016, HTA_STAY0000628-653, Natbony Reply Dec. Ex. 39; Transfer Authorizations dated November 2014-July 2016, HTA_STAY0007985-8024, Natbony Reply Dec. Ex. 40.

"[d]ocuments for which data entry and approval have been delegated to the agencies"), Natbony

Reply Dec. Ex. 41.[30]  Even years after the start of the Commonwealth's unlawful diversions, the

Excise Taxes collected by the Commonwealth have continued to be credited to Fund 278.  See

Spreadsheet Tracking Fund 278 from 2015-2020, HTA_STAY0008372, Natbony Reply Dec. Ex.

43 (showing Excise Taxes "[c]redited" to Fund 278 up to September 2019).[31]

23.     This use of fund accounting clearly demonstrates that the Commonwealth

knew the Excise Taxes to be HTA's property and took steps to ensure that it protected that property

interest.[32]  The Commonwealth placed the Excise Taxes in a segregated special revenue fund—

commonplace in governmental accounting[33]—designating this revenue as held by HTA to ensure

---

[30] The withdrawals were authorized by HTA officials.  See, e.g., HTA_STAY0000513-515, Natbony Reply Dec. Ex. 32 (payment voucher signed by César M. Gandiaga Texidor, HTA's then Assistant Executive Director); Letter signed by Cesar M. Gandiaga as Assistant Executive Director for HTA dated December 4, 2014, HTA_STAY0028880-8900, Natbony Reply Dec. Ex. 43 (identifying Mr. Gandiaga as HTA's Assistant Executive Director for Administration and Finance).  The 30(b)(6) representative for HTA and the Commonwealth was not involved in the voucher approval process and had no historical knowledge of whether there were vouchers that did not need Treasury approval for payment.  Ahlberg Tr. 110:1-112:20, 551:7-553:4, Natbony Reply Dec. Ex. 21.

[31] HTA's FY Year 2014-15 Fund 278 Accreditation reflects "possessory" language concerning Fund 278 generally, gasoline taxes, diesel taxes, crude oil taxes, license fees, toll fines, cigarette taxes and towing fees.  Dep. Ex. 14 - Spreadsheet Tracking Fund 278 for Fiscal Year 2014-2015, HTA_STAY0000207 at pages 1-2, 4-8 and Headings, Natbony Reply Dec. Ex. 27; Ahlberg Tr. 149:2-150:4, Natbony Reply Dec. Ex. 21.

[32] Governmental Accounting Standards Bd., Governmental Accounting Standards Series, No. 171-A, Statement No. 34: Basic Financial Statements—and Management's Discussion and Analysis—for State and Local Governments ¶ 207 (June 1999) (explaining that "the use of fund accounting—separate financial statements for each governmental fund or fund type" is designed to ensure that "the resources raised for a particular purpose were used for that purpose, as required by law, regulation, and legally adopted budgets"); id. ¶ 208 (defining a fund as a "fiscal and accounting entity with a self-balancing set of accounts recording cash and other financial resources . . . which are segregated for the purpose of carrying on specific activities or attaining certain objectives in accordance with special regulations, restrictions, or limitations").

[33] See Holder Report.  See, e.g., State ex rel. Spink v. Kemp, 365 Mo. 368, 379 (1955) ("The fiscal system of Kansas City is set up on a fund accounting basis.  Income and disbursements are accounted for through many different funds and each fund may embrace several accounts, the latter being managerial devices for ready determination of collections and disbursements."  (internal quotations omitted)); City of Wilmington v. Fraternal Order of Police Lodge 1, 2015 WL 4035616, at *5-6 (Del. Ch. June 30, 2015) (in government fund accounting a fund balance is "not an actual repository where the assets constituting that [fund] can be found, but rather it is an accounting of those assets . . . in whatever form or location they may actually exist."); Regional Utility Serv. Sys. v. City of Mount Union, 874 N.W.2d 120, 123 (Iowa 2016) (noting that a municipality held only one bank account wherein it pooled both its general funds and special funds and that the "administration and expenditure of [the special funds was] limited to specific purposes by law."); Whitmore Union Elementary Sch. Dist. v. Cty. of Shasta, 104 Cal. Rptr. 2d 227, 231 (Cal. Ct. App. 2001) (defining fund as "a fiscal and accounting entity by which the district accounts for the expenditure of its money.  It fulfills a specific legal function.  A fund is established to carry on specific activities or to attain certain objectives . . . in accordance with special regulations, restrictions, or limitations." (internal quotations omitted)).

its traceability while in the custody of Treasury before its delivery to the Excise Taxes' owners—HTA and its Bondholders.  See Reed & Reed, Inc. v. Weeks Marine, Inc., 431 F.3d 384, 388 (1st Cir. 2005) ("The parties to an agreement know best what they meant," and "thus the parties' subsequent course of performance may be instructive in contract interpretation."); Restatement (Second) of Contracts § 202 (1981) ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.").

24.    The Opposition relies heavily on the assertion that the Excise Taxes reside in the Treasury Single Account, in which cash is pooled.  See Opp. ¶¶ 41, 107.  But the TSA is simply a cash management tool.  See Holder Report.  The fact that Excise Taxes covered into Fund 278 are consolidated into the TSA with these other accounting funds in no way impacts their beneficial ownership.  Id.  Treasury simply holds them as a custodian for the purpose of efficiently investing and managing them.[34]  The need to expend restricted government resources in conformity with those restrictions does not change irrespective of whether separate or pooled bank accounts are employed.  See id.  There is nothing unusual about this arrangement.  It is not uncommon for a government to pool cash of its various governmental entities in a centralized account while continuing to maintain accounting recognition of the restricted and special-revenue status of particular revenues with limited use.  See id.; see also Webb's Fabulous Pharmacies, 449 U.S. at 161-62.[35]

[34] The government parties' Rule 30(b)(6) witness conceded that cash transfers out of the TSA could be identified to Fund 278.  See Ahlberg Tr. 155:17-156:10, 163:19-165:20, 171:17-22, 174:13-23, 190:12-23 Natbony Reply Dec. Ex. 21 (acknowledging that transfers of Excise Taxes could be tracked through "transfer details or vouchers"); see also id. at 204:13-21 (explaining that "we use the Fund code to identify the source of funds, not necessarily to tag exact dollars in the TSA that are transferred"); id. at 289:14-22 ("[O]utflows to HTA that were -- that the funding source was revenue earned under 278, that transfer would show that the revenue source for that transfer was Fund 278 revenue.").

[35] FOMB and AAFAF have not yet produced or agreed to produce certain Fund 278 accounting records, including ledgers, reports, statements, and reconciliations, which are directly relevant to the flow of funds.  Movants respectfully reserve their rights in regards to these discovery requests.

**C.** **The Pledged Revenues Are Held in a Trust or Custodial Capacity for HTA Bondholders.**

**1.** **Under Established Municipal Finance Principles, the Pledged Revenues Are Held in Trust for Bondholders.**

25.     The language of the Excise Tax Statutes and the Commonwealth's implementation of those statutes confirm not only that HTA and its Bondholders own the Excise Taxes, but also specifically that the Treasury holds those revenues as a custodian or trustee.  A century of authority supports this conclusion.  See Mot. ¶ 59.  FOMB's effort to distinguish these cases only highlights the similarity between the mandatory language dedicating specific tax revenues to the repayment of bonds in those statutes and the Excise Tax Statutes at issue here.[36]

Compare Opp. ¶ 93 n.44 with 13 L.P.R.A. § 31751 (Excise Taxes "shall be used solely for the payment of the principal and interest on bonds and other obligations of [HTA].").[37]

---

[36] FOMB urges this Court to require that all trusts be created through magic words.  See Opp. ¶ 95.  But Puerto Rico law has no such requirement.  See Flores Galarza, 484 F.3d at 29 (holding that the Commonwealth held Earned Premiums withheld from the JUA in a "custodial" capacity based on language stating that JUA "'shall receive' premiums from the [Secretary of Treasury] and that the Secretary 'shall transfer' these premiums to the JUA . . .").  FOMB's citation to Bexar confirms as much, as it held that taxes collected were held in trust for the bondholders because the statute provided that "taxes owed . . . on levies . . . shall continue to be paid . . . and applied . . . to the purposes for which such taxes originally were levied."  Bexar Cty. Hosp. Dist. v. Crosby, 160 Tex. 116, 199 (Tex. 1959).  FOMB similarly mischaracterizes Bexar in an effort to suggest that a statute must expressly use the word "trust" in order to create a trust relationship.  Indeed, Bexar demonstrates the opposite.  While the Opposition states that the *statute* in Bexar provided that "the City and County hold in trust for the bondholders taxes levied specifically to retire certain bonded indebtedness," the word "trust" in fact appeared nowhere in the statute.  Id. at 122.  Instead, the court *held* that the taxes collected were held in trust for the bondholders because the statute provided that "taxes owed . . . on levies . . . . **shall continue to be paid . . . and applied** . . . to the purposes for which such taxes originally were levied."  Id. at 119 (emphasis added).  The Court found that because the taxes were levied "to finance a specific function," they were held "in trust for the benefit of the bondholders."  Id. at 122.

[37] FOMB argues that Movants' assertion of an equitable interest as trust beneficiaries is incompatible with their assertion of liens.  Opp. ¶ 15.  In reality, it is common for bond financings to grant bondholders both (i) an equitable interest in a trust *res* and (ii) a lien to the extent a different entity might hold *legal title*, or some other property interest, in the same property.  For example, just last year the Court approved a new COFINA Master Trust Indenture dated as of February 12, 2019, which (i) establishes a "Trust Estate" "held and applied for the equal and *pro rata* benefit and security of each and every owner of the Bonds" (see Natbony Reply Dec. Ex. 44 at p. 5), but simultaneously (ii) recognizes that the Trustee holds "a Statutory Lien on the Trust Estate in favor of the Trustee for the benefit of the Holders of the Bonds" (id. § 5.01).  FOMB relies on In re Fin. Oversight & Mgmt. Bd. for P.R., 582 B.R. 579, 599 (D.P.R. 2018), which merely stands for the proposition that "the Resolutions and statutory provisions on which the Insurers relied do not suggest that PRHTA bondholders were granted an **outright ownership interest** in the Reserve Accounts or the funds therein."  In re Fin. Oversight & Mgmt. Bd. for P.R., 919 F.3d  121, 127 n.5 (1st Cir. 2019) (emphasis added).  That decision did *not* reach any conclusion as to whether Bondholders have an *equitable* interest as trust beneficiaries as opposed to an "outright" (i.e., undivided) ownership interest.  Similarly, William W. Bierce, Ltd. v. Hutchins, 205 U.S. 340, 347 (1907), merely stands for the proposition that "the assertion of a lien is inconsistent with the assertion of the title interest."  Opp. ¶ 15.  Movants are not asserting legal title, but rather an equitable interest.

2.      **Alternatively, the Debtors' Intentional Actions to Disrupt Attachment and Perfection Subject the Pledged Revenues to a Constructive Trust.**

26.      A constructive trust arises when the debtor wrongfully impairs a creditor's security interest in property.  In re Howard's Appliance Corp., 874 F.2d 88, 95 (2d Cir. 1989), is directly on point.  In Howard's, a creditor had a security interest in goods held at the debtor's business in New York.  Before filing for bankruptcy, the debtor transferred the collateral to a facility in New Jersey, without telling the creditor.  Id. at 91-92.  Because the debtor must have known that the transfer would "frustrate [the creditor's] interest in those goods," the Second Circuit imposed a constructive trust on the property.  Id. at 94-95.  Even though the constructive trust attached prior to the petition date, the court did not "concern [itself] with whether Section 544 of the Bankruptcy Code would mandate a [contrary] result."  Id. at 95 (noting that the rights of a beneficiary to a constructive trust prevail over a hypothetical judicial lienholder under § 544); see also McCafferty v. McCafferty (In re McCafferty), 96 F.3d 192, 197 (6th Cir. 1996).

27.      The Commonwealth's misappropriation of Pledged Revenues here is as clear as the wrongful conduct that led to a constructive trust in Howard's.  Between January and October 2015, HTA Excise Taxes were collected and subsequently transferred to HTA and then to various BONY trustee accounts.  Mar. 31 Flow of Funds Chart at 2-3, Natbony Reply Dec. Ex. 45.  Subsequently however, despite the requirement to transfer the Excise Taxes to HTA, the Commonwealth began diverting the Excise Taxes in Fund 278 away from HTA-held bank accounts.  Mot. ¶ 20.  Like the Howard's debtor, the Commonwealth's purpose in diverting these funds was to frustrate the Bondholders' interests in these funds.  Even after HTA's Title III filing, and notwithstanding the fact it continued to credit the Excise Taxes to HTA's Fund 278,[38] the Commonwealth continued to divert the Excise Taxes (and, later, all Pledged Revenues).  Mot.

---

[38] Dep. Ex. 18, Spreadsheet Tracking Fund 278 from 2015-2020, HTA_STAY0008372, Natbony Reply Dec. Ex. 43 (showing Excise Taxes credited to Fund 278 as late as September 2019;  Ahlberg 211:9-212:6.; 213:23-214:24, Natbony Reply Dec. Ex. 21.

¶¶ 21–23; Mar. 31 Flow of Funds Chart at 4-6, Natbony Reply Dec. Ex. 45.[39] The same diversion continues today.[40] In a misguided effort to avoid accountability, the Commonwealth has taken to describing the illegally diverted Pledged Revenues as "withheld" or "retained" in its financial records. See Spreadsheet Tracking HTA Revenues 2017-2020, HTA_STAY0000001, Natbony Reply Dec. Ex. 48 (showing withheld Excise Taxes during FT17-FY20); Dep. Ex. 17, Clawback Transfer Faxes dated 2015-2016, HTA_STAY0000603-13, Natbony Reply Dec. Ex. 37 (describing transfer of excise tax revenue to HTA as "withheld or retained funds of the Highway Authority"); TSA Cash Flow for First Quarter FY2018, CW_STAY0000297-309 at 304 ("Retained Revenues"), Natbony Reply Dec. Ex. 49; Ahlberg Tr. 187:12-188:14, 394:21-396:13, 399:10-14, 401:8-18, 401:24-402:3, Natbony Reply Dec. Ex. 21 (identifying account used to transfer funds for purported clawback use).

28. An unlawful diversion of collateral cannot be cured, or obscured, by a wrongdoer's shifting definitions. To the extent that this misconduct succeeded in preventing attachment or perfection of Movants' security interests (and, as detailed below at § II.E.3, it did not), the Commonwealth's unlawful actions gave rise to a constructive trust enforceable in bankruptcy in favor the Bondholders. And critically, under First Circuit precedent, the Commonwealth's allocation of Excise Tax Revenues to Fund 278 is sufficient to establish a traceable trust res that is subject to restitution under express, constructive, or resulting trust theories. See Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R., 939 F.3d 340, 351 (1st Cir. 2019) (holding that plaintiffs, by identifying funds held in a separate account in the General Fund

---

[39] See also, e.g., Transfer Activity Report dated May 2, 2016, HTA_STAY0001027-30, Natbony Reply Dec. Ex. 46, Transfer Activity Report dated June 1, 2016, HTA_STAY0001031-34, Natbony Reply Dec. Ex. 47 (showing diversions of Excise Taxes in contravention of the Excise Tax Statutes). Certain taxes continued to flow to HTA but were diverted from use for HTA debt service. See Spreadsheet Tracking HTA Revenues 2017-2020, HTA_STAY0000001, Natbony Reply Dec. Ex. 48.

[40] Excise Tax collections continue to the present under the same cash flow process that existed in September 2019 under which the revenues are not sent to HTA but retained by the Commonwealth in the Treasury operational bank account. Mar. 31 Flow of Funds Chart at 6, Natbony Ex. 45; Ahlberg Tr. 217:20-218:10, Natbony Reply Dec. Ex. 21.

for accounting purposes, "made a prima facie showing of traceability").[41]   Moreover, Bondholders would be protected by the lowest intermediate balance rule, even if the diversions were not otherwise traceable.   See Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R., 939 F.3d 340, 351 (1st Cir. 2019); see also Holder Report.

### 3.    FOMB's Attacks on the Trust Relationship Are without Merit.

29.    Unable to ignore that Movants' property interests fit squarely within Flores Galarza and that Movants are, at a minimum, entitled to the imposition of a constructive trust, FOMB raises a number of collateral attacks attempting to show that a trust relationship is an impossibility here.   Each of these attacks lacks merit.

30.    FOMB first asserts that "no trust can exist where no 'specific restriction [is] placed upon [the debtor's] use of the supposed trust funds,' and '[the debtor] [is] left free to use what it received for its own benefit rather than' hold it for the purported trust beneficiary."   Opp. ¶ 94 (quoting In re Morales Travel Agency, 667 F.2d 1069, 1071 (1st Cir. 1981)).   Unlike in Morales, however, the Commonwealth and HTA are *not* "free to use" the Excise Taxes for their own benefit.   Here, the Excise Tax Statutes, HTA Enabling Act, and Resolutions specifically restrict the use of the Excise Taxes to "payment of the principal and interest on bonds and other obligations of the Authority."   13 L.P.R.A. § 31751(a)(1), (a)(3); 9 L.P.R.A. §§ 2021, 5681.   As discussed above, HTA may use the Excise Taxes for other obligations only after debt service and reserve accounts have been filled.   FOMB ignores that crucial distinction.

---

[41] Given the Court's bifurcation of the lift-stay proceeding and the focus of the preliminary stage of the hearing on so-called "threshold" issues, Movants need not lay out in this reply the full record evidence supporting Movants' ability to trace the trust res in the TSA bank accounts and other separate bank accounts that hold the Excise Taxes collected since November 2015.  Nevertheless, despite the limited discovery conducted so far, Movants' expert has already opined as to the ability to trace the trust res.  See Holder Report.  It suffices at this point to note that the Government Parties' Rule 30(b)(6) witness conceded that, other than transfers to HTA, there is no evidence of outflows of Excise Taxes from the TSA and that proceeds of the Excise Taxes could be held in any of the TSA bank accounts.  See Ahlberg Tr. 46:6-9, 155:7-156:10, 163:19-165:20, 171:17-22, 174:13-23, 185:8-21, 189:6–194:7, 207:11–208:15, 289:5-–291:6, Natbony Reply Dec. Ex. 21; see also Holder Report.

31.     FOMB's reliance on <u>Fleet Nat'l Bank v. Valente (In re Valente)</u>, 360 F.3d 256, 263 (1st Cir. 2004) is also misplaced.  <u>See</u> Opp. ¶ 98.  <u>Valente</u> makes clear that "'[r]esulting trusts . . . arise where there is a conveyance without consideration, and from the surrounding facts and circumstances it is apparent that the grantor was still to retain his beneficial ownership.'"  360 F.2d at 263 (quoting <u>Reilly v. Wheatley</u>, 68 F.2d 297, 299 (1st Cir. 1933)).   Here, the Commonwealth has attempted to unlawfully convey special revenues in Fund 278 to itself.  Accordingly, based on the First Circuit cases FOMB itself cites, there has been (i) a conveyance of the Excise Taxes out of Fund 278; (ii) for no consideration; and (iii) contrary to the Excise Tax Statutes.  These are precisely the circumstances under which a resulting trust arises.[42]

32.     FOMB is equally wrong in asserting that constructive trusts cannot be imposed where contracts and statutes govern the parties' rights.  <u>See id.</u>  Puerto Rico law on the constructive trust doctrine was born out of <u>Porrata Doria v. Fajardo Sugar Co.</u>, where the court imposed a constructive trust *despite* the existence of contracts governing the transactions giving rise to the property dispute.  57 D.P.R. 628, 643-44 (1940), Natbony Reply Dec. Ex. 50 (imposing a constructive trust in favor of plaintiff where defendant led plaintiff to believe that property had been acquired for plaintiff's benefit and defendant was merely holding legal title through a contract and property deed).[43]

---

[42] FOMB also argues that a trust may only be created by public deed.  Opp. ¶ 44 n.50.  This too is wrong.  The First Circuit has found that it is questionable whether a public deed is required where a trust is established by statute.  <u>Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R.</u>, 939 F.3d 340, 351-52 (1st Cir. 2019).  The Enabling Act and Excise Tax Statutes each establish that the Pledged Revenues are to be held for the benefit of HTA and its Bondholders.  9 L.P.R.A §§ 2012, 2013, 2019, 5681; 13 L.P.R.A. § 31751.

[43] FOMB significantly overreads <u>In re Garcia</u>, 484 B.R. 1 (Bankr. D.P.R. 2012), <u>rev'd</u>, 507 B.R. 32 (B.A.P. 1st Cir. 2014).  <u>See</u> Mot. ¶ 97 n. 47.  Neither <u>Garcia</u> nor the Puerto Rico Supreme Court case it cites—<u>Compania Popular de Transporte v. Dist. Ct. of Bayamon</u>, 63 D.P.R. 121, 123 (1944), Natbony Reply Dec. Ex. 51, —stand for the proposition that the mere existence of a contract between two parties precludes the finding of a constructive trust.  Mot. ¶ 97.  What each of those cases identifies is that the doctrine of unjust enrichment should not be applied where there is contractual (or statutory) language specifically addressing an alleged wrongful acquisition.  <u>See</u> <u>In re Garcia</u>, 484 B.R. at 16-17 (defendants sought constructive trust for relief against contrary terms in contract); <u>Luperena v. Transp. Auth.</u>, 79 D.P.R. 464 at 448-49 (1956), Natbony Reply Dec. Ex. 52 (plaintiff sought remedy of constructive trust, but the need for that remedy was obviated by existing rights under statute; <u>see also</u> <u>Compania Popular</u>, 63 D.P.R. 121, 124 (P.R. 1944), Natbony Reply Dec. Ex. 51 (plaintiff sufficiently alleged unjust enrichment cause of action in absence of contract which might have otherwise resolved the dispute).  The relief Movants would seek from

## II.    Movants Are Further Protected by Both Security Interests and Statutory Liens in the Pledged Revenues.

33.    Movants' property interests are protected not only by binding First Circuit precedent establishing their beneficial ownership of the Excise Taxes, see supra § I, but also by continuing liens on all of the Pledged Revenues.  The Motion established that the Bonds are secured by a pledge of and security interest in the Pledged Revenues under the Resolutions and the 2002 Security Agreement.  Mot. ¶¶ 6-13, 66-71.  And indeed, FOMB fully acknowledges the existence of Movants' security interests.  See Opp. § I (¶¶ 70-82).  The dispute is over the *scope* of those security interests: as demonstrated below, the consensual liens granted in the Resolutions and the 2002 Security Agreement extend to *all* Revenues, not merely those held in particular accounts such as the Sinking Fund, as FOMB contends.  See infra §§ II.A-C.

34.    In addition to the consensual liens granted by HTA to its Bondholders, any interest in the Excise Taxes retained by the Commonwealth is subject to a separate statutory lien in favor of the Bondholders, created by the Excise Tax Statutes and valid against the Commonwealth.  See Mot. ¶¶ 72-74.  Indeed, the statutes' mandatory language requires that the revenues "shall" be deposited in a special deposit in favor of HTA, "shall" be transferred to HTA, and "shall be used solely" to pay HTA's debt.  See id.[44]  Contrary to FOMB's arguments, no more is needed under the governing Fonseca standard.  See infra § II.D.

35.    The Opposition challenges Movants' security interests with additional argument regarding perfection (and whether such perfection is relevant) and the application of the Bankruptcy Code's "special revenue" protections.  But in each instance, FOMB's position

---

a non-Title III court is clearly distinguishable.  Here, Movants are not seeking to undo or "overrule" an existing contractual commitment.  The Commonwealth has elected to operate well outside the bounds of the contractual and statutory limitations placed upon it, and one remedy is the creation of a constructive trust.

[44] The United States Supreme Court just this week confirmed the binding and mandatory nature of the word "shall" when used in statutes.  In Maine Community Health Options v. U.S., 590 U.S. __ (April 27, 2020), the Court enforced the mandate of Section 1342 of the Affordable Care Act that the federal government "shall pay" insurers to compensate for losses sustained from offering certain high risk health plans, and that Congress could not avoid that obligation by refusing to appropriate funds.  In so holding, the Court firmly held that "shall" is "mandatory language" that is "impervious to discretion".  That holding has plain application here.

crumbles under scrutiny.  See infra §§ II.E-F.  The law is clear that Movants' liens continue post-petition and thus that Movants may lift the stay to protect those property interests.

**A.** **The Resolutions Grant Security Interests in All Pledged Revenues.**

36.     The Resolutions clearly grant Movants a security interest in the Pledged Revenues.  The security interest is not, as the Opposition contends, limited to a lien on certain accounts held by the Fiscal Agent (i.e. the "Sinking Fund").  See Opp. ¶¶ 71-75.  FOMB's error arises from its unnatural reading of language in Section 601 of the Resolutions.  FOMB asserts that the phrase "in the manner and to the extent hereinabove particularly specified" is an implied reference to Section 401, which grants a lien on moneys in the Sinking Fund.  Section 401, however, does not limit the security interest granted in Section 601.  It supplements Section 601 by granting an *additional* lien on moneys in the Sinking Fund.  Compare Mot. ¶ 68 with Opp. ¶¶ 72-74.  Indeed, the First Circuit in Peaje II has already recognized that Section 601 of the Resolutions "**contains mandatory language suggestive of lien creation.**"  Peaje Invs. LLC v. Fin. Oversight & Mgmt. Bd., 899 F.3d 1, 12 (1st Cir. 2018) (emphasis added) (citing Section 601 of the Resolutions as the lien-granting clause).

37.     The phrase the Opposition fixates upon, in its proper context, modifies the word "payment" and refers to the payment mechanics described in the first sentence of Section 601; it does not modify the earlier word "pledged":

> Except as in this Resolution otherwise provided, such ***principal, interest and premiums*** are ***payable*** solely from Revenues and other moneys deposited to the credit of the Revenue Fund and from any funds received by the Authority for that purpose from the Commonwealth, which **Revenues, moneys and funds are hereby pledged** (with such priorities with respect to the use and disposition of Revenues as are in this Resolution specified) ***to the payment thereof*** **[i.e., of principal, interest and premiums]** ***in the manner and to the extent hereinabove particularly specified***.

Id. (emphases added).  See Barnhart v. Thomas, 540 U.S. 20, 21 (2003) (relying on the usual "grammatical" rule that "a limiting clause or phrase should be read to modify only the noun or phrase that it immediately follows"); Scalia, Antonin & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 221-24 (2012) (explaining that, under the "nearest-reasonable-referent canon," a postpositive modifier normally applies only to the nearest reasonable referent). FOMB's strained reading would require the elimination of the critical phrase "to the payment thereof," a result that would violate basic tenets of statutory construction.[45]

38.     The Opposition begs the question of why Section 601 is in the Resolutions at all.  FOMB's answer, that Section 601 is mere surplusage, runs afoul of standard canons of construction.[46]  Further, Section 601 specifically and separately pledges (i) Revenues, (ii) moneys deposited to the credit of the Revenue Fund or the Sinking Fund, and (iii) funds received by HTA for that purpose.  If the one and only actual pledge is the pre-existing lien on the Sinking Fund or the Revenue Fund, this itemization would make no sense.  On this critical point, FOMB's brief is silent.  The silence speaks volumes.

39.     The larger context of the Resolutions likewise supports the conclusion that the "in the manner" language at issue describes the manner and extent of payment, not the extent of the liens granted.  Several provisions preceding Section 601 do specify the manner and the extent to which principal, interest, and premiums will be paid to Bondholders.[47]  By contrast, no

---

[45] Moreover, had HTA intended for the phrase "to the extent hereinabove particularly specified" to cross-reference the Section 401 lien, it would have made this cross-reference explicit, as it did when cross-referencing specific provisions elsewhere in the Resolutions. See 1968 Resolution §§ 404, 604; 1998 Resolution §§ 405, 408.

[46] See, e.g., In re Advanced Cellular Systems, Inc., 483 F.3d 7, 12 (1st Cir. 2007) (citing Restatement (First) Contracts § 236 (1932)) ("It is well-established that courts should avoid interpretations that render a provision of an agreement surplusage."); Grinnell Corp. v. Lebron & Asociados, Inc., Civil No. 08-2077 (CVR), 2011 WL 2728444, at *6 (D.P.R. July 12, 2011) ("In construing a contract, we must give reasonable effect to all its terms whenever possible.").

[47] See 1968 Resolution § 402 (providing for the Fiscal Agent to withdraw monies from the Bond Service Account and to remit by mail to bondholders as to both "*principal and interest* the amount required for paying upon such bonds as interest becomes due" (emphasis added)), Natbony Dec. Ex. C;  id. § 403 (providing that to retire bonds the Fiscal Agent shall purchase bonds "at the most advantageous price, such price not to exceed the *principal* of such bonds plus the amount of the *premium*, if any which would be payable," and providing that the Fiscal Agent shall "pay the *interest*

prior section of the Resolutions describes the manner and extent of the pledge of "Revenues" granted in Section 601.

40. While Section 601 establishes a lien on all Revenues, Section 401 itself is also clear that it provides a supplemental "lien and charge" on the Sinking Fund "***for the further security of such holders* [i.e. the Bondholders]**." Opp. ¶ 24 (emphasis added). This express language establishes very clearly that Section 401 is not the sole source of the Bondholders' security interest, and that the lien created by Section 401 on the Sinking Fund is in addition to the lien on all Revenues under Section 601. "Further" means "further." FOMB's interpretation would render the Section 401 lien the ***sole*** security, rather than the "further security" provided in Section 401.

41. The conclusion that the main grant of security to Bondholders is in Section 601, and that Section 401 merely provides a supplemental lien, is firmly buttressed by the Resolutions' definition of "Revenues." In order to qualify as "Revenues," certain funds made available by the legislature after the Resolutions were passed must be "pledged to the payment of the principal of and interest on [the] Bonds." Resolutions § 101.[48] Given that Section 401 contains

---

accrued on such bonds to the date of delivery thereof from the Bond Service Account" (emphasis added)); id. § 404 ("Moneys held for the credit of the Reserve Account shall be used for the purposes of paying interest on the bonds . . . ."); id. § 407 (Moneys Set Aside for Principal and Interest Held in Trust; Moneys Unclaimed for Six Years After Maturity of Bonds and Coupons); 1998 Resolution § 401, Natbony Dec. Ex. D (providing for application of monies in amounts sufficient to cover 1/6 of interest payable on senior bonds and 1/12 of next maturing installment of principal of serial bonds); id. § 403 (application of monies to pay principal, interest, and premium if any on the senior bonds); id. § 406 (application of monies to pay principal and interest on subordinated bonds as they come due).

[48] FOMB relies on a flawed reading of 9 L.P.R.A. § 2004(l) in asserting that Excise Taxes somehow have not been "made available" to HTA and thus cannot be pledged. See Opp. ¶ 81. As explained supra § I.A, the Excise Tax statutes required the Commonwealth to levy the taxes, assigned their proceeds to HTA, and thus required the Commonwealth to make such funds "available" to HTA. The term "available" simply means "able to be used or obtained; at someone's disposal." See Available, Oxford English Dictionary (2020), Natbony Reply Dec. 53. The Spanish language texts of 9 L.P.R.A. § 2004(l) and 13 L.P.R.A. § 31751, read together, underscore the fact that the Excise Tax Statutes make revenues "available" to HTA. In Spanish, 9 LPRA § 2004(l) states: "[E]l producto de cualesquiera contribuciones u otros fondos que puedan ser puestos a la disposición de la Autoridad por el Estado Libre Asociado." The Spanish text of section 2004(l) uses the term "disposición" (where the English text uses "available"). Section 31751, which requires the Commonwealth to cover certain Excise Tax proceeds into a special deposit in HTA's favor, is entitled "Disposition of Funds," or in Spanish, "Disposición de Fondos." The identical Spanish-language wording in section 2004(l) and section 31751 shows that section 31751 places the Excise Taxes at the disposition of HTA and that section 2004(l) in turn authorizes HTA to pledge these funds. As demonstrated

its own lien-creation language with respect to moneys in the Sinking Fund, however, there would be no need to "pledge" the "Revenues" to the payment of the Bonds if the only relevant lien were the one under Section 401; in order to impose a lien on the "Revenues," HTA would simply need to deposit them into the Sinking Fund.  The fact that the Resolutions require a "pledge" in order to identify particular "Revenues" as collateral for the Bonds shows that the primary provision granting a lien on "Revenues" is Section 601.[49]

42.     Multiple additional provisions of the Resolutions refer generally to a lien on "Revenues" as opposed to merely a lien on the Sinking Fund.  These provisions include, for example, (i) provisions where HTA reaffirmed that it pledged specific revenues to "secure" the Bonds;[50] (ii) Section 602, entitled "Pledge of Revenues," which prohibits encumbrances on the Pledged Revenues "having priority to or being on a parity with **the lien on Revenues** on the Bonds" (id. § 602 (emphasis added)); and (iii) Section 802, which refers to the "lien and pledge" of "Revenues" (id. § 802).[51]  These provisions cannot be ignored.

---

previously, the Commonwealth made such revenues available to HTA by the Fund 278 designation and the ability of HTA to approve Fund 278 transactions.

[49] Similarly, category (d) of "Revenues" includes "investment earnings *on deposit* to the credit of the funds and accounts established hereunder." 1968 Resolution § 101 (emphasis added), Natbony Dec. Ex. C.  There would be no need to "pledge" those Revenues under FOMB's view because they would already be "on deposit to the credit of" the Sinking Fund and therefore subject to the lien of Section 401.

[50] See, e.g., 1998 Resolution at 2-3 (noting that HTA "has determined to pledge" certain taxes and revenues), Natbony Dec. Ex. D.

[51] FOMB asserts that the form of bond supports its interpretation of the Resolutions.  Opp. ¶ 74.  It does not.  The form of bond (which, as its name suggests, is just a "form" and nothing more) is not the granting clause.  Moreover, the full form of the bond (which FOMB does not quote) discusses how specific revenues are (i) "pledged by [HTA] to the payment of the principal and interest on the Bonds" and (ii) are to be used "to pay such principal and interest as the same shall become due."  That is a reference to the revenue pledge under Section 601.  Similarly, the 1998 bond form broadly provides that "the moneys referred to in clauses (b), (c), and . . . (d) . . . *are pledged to the extent required to the payment of the principal of and the premium, if any, and the interest*" on the Bonds.  See 1998 Resolution § 204, Natbony Dec. Ex. D (emphasis added).  Thus, the bond form supports Movants' position:  the Pledged Revenues, not only those in the Sinking Fund, are still pledged to the payment of the Bonds as they come due.

**B.     The 2002 Security Agreement And The Supplemental Resolutions Grant Additional Security Interests In Pledged Revenues.**

43.     As Movants demonstrated, the 2002 Security Agreement also expressly grants a security interest in the Pledged Revenues. Mot. ¶¶ 13, 66 & n.17.  That agreement pledged a security interest in (i) the Sinking Fund and the Pledged Revenue Fund; (ii) "***all amounts required to be on deposit therein by the terms of the resolution***"; and (iii) all proceeds thereof. <u>See</u> Natbony Dec. Ex. F (emphasis added).   The second granting clause—"required to be deposited"—plainly reaches funds that are supposed to be, but are not actually, deposited in the Sinking Fund.  That is why, in prior filings before this Court, FOMB recognized that this type of language provided for attachment of liens ***prior to*** their deposit.[52]  As FOMB admits, HTA is required to deposit the Pledged Revenues in the Sinking Fund and Revenue Fund.  <u>See</u> Opp. ¶ 73 (admitting HTA is obligated to deposit Revenues and citing Section 401).   Therefore, the lien under the 2002 Security Agreement applies to Pledged Revenues regardless of whether they are deposited in the Sinking Fund.[53]

44.     Moreover, HTA has adopted supplemental resolutions in accordance with the Resolutions, which expressly pledged additional revenues to secure the Bonds.  For example, with respect to certain Vehicle Fees, HTA adopted Resolution 83-01, which states:

> As authorized by the [Enabling] Act and subject to the terms hereinafter stated, ***the full amount of the proceeds* of the Additional**

---

[52] <u>See</u> Reply of the Financial Oversight and Management Board of Puerto Rico In Support of Motion to Dismiss, Adv. Proc. No. 17-156-LTS, ECF. No. 86 at 24 ("In <u>Jefferson County I</u> the warrant holders had a lien against revenues *prior to their deposit with the indenture trustee*."); <u>id.</u> at 17 & n. 19 (noting that this lien arose prior to deposit because the indenture pledged "monies *required to be deposited* in a debt service fund and a reserve fund . . .").

[53] FOMB contends that "on the Oversight Board's information and belief, no HTA board resolution was ever passed approving the [2002 Security Agreement]."  <u>See</u> Opp. ¶ 75.  Leaving aside that HTA's board actually did adopt a resolution approving the issuance of the 2002 bonds and the documentation in that closing binder, FOMB never shows that any resolution was needed, because the section of the Enabling Act that FOMB relies upon merely states that *bonds* "*may be* authorized by resolution," not that they "*shall* be" or "*must* be" authorized by resolution—much less that any *security agreement* securing such bonds must be authorized by resolution.  <u>Id.</u> § 2012(b).  HTA's express power to "secure repayment of bonds" is not conditioned on any resolution, nor is its power to "make contracts and to execute all instruments necessary or incidental in the exercise of *any of its powers*." <u>Id.</u> § 2004(h), (l) (emphasis added).  HTA exercised those powers by executing the 2002 Security Agreement—along with a UCC financing statement—which *is signed by HTA's Executive Director*. <u>See</u> Natbony Dec. Ex. F.

29

> *License Fees are hereby pledged by the Authority to the payment
> of the principal of, premium, if any, and interest on bonds or other
> obligations heretofore or hereafter issued under the provisions of
> Resolution 68-18 [as amended].*

See HTA Resolution 83-01, Natbony Reply Dec. Ex. 54 at 2 (emphasis added).  Similarly, with

respect to Toll Revenues, HTA adopted Resolution 98-08, which specifically pledged "all" such

revenues to secure the Bonds.  See HTA Resolution 98-08, Natbony Reply Dec. Ex. 55 at 2.

Neither Resolution makes any reference to the Sinking Fund.[54] As a result, FOMB's contractual

interpretation of the Resolutions cannot be correct.  Otherwise, these supplemental resolutions

should have limited the pledge to monies deposited into the Sinking or Revenue Fund.  They did

not, and instead pledged the full amount of the applicable revenues.

### C.  FOMB And The Debtors Are Judicially Estopped From Denying The Existence And Scope Of Movants' Security Interests

45.     In Peaje Invs. LLC v. García-Padilla, No. 16-2365, 2016 WL 6562426

(D.P.R. Nov. 2, 2016), aff'd in part, vacated in part, 845 F.3d 505 (1st Cir. 2017) (together, "Peaje

I"), FOMB opposed relief from the stay, both in the District Court and before the First Circuit, on

the grounds that HTA Bondholders were fully secured by perpetual liens on tolls and excise taxes.

See Mot. ¶ 70 n.18.  Notwithstanding FOMB's attempts to camouflage its prior admissions,[55]

FOMB *is* judicially estopped from denying (i) the existence of Movants' security interests and (ii)

the fact that Movants' security interests extend to a "perpetual" stream of future revenues.  See

---

[54] Although HTA adopted these supplemental resolutions, the 1998 Resolution alone is sufficient to establish a lien on all crude oil and cigarette taxes and motor vehicle license fees.  First, the additional crude oil tax revenues provided to HTA under Act 31-2013 fall within the 1998 Resolution's definition of Revenues, which includes "*all* moneys received by the Authority *on account of* the crude oil tax allocated to the Authority by Act No. 34, approved July 16, 1997, as amended."  Act 31 amended the successor statute to Act No. 34, and it increased crude oil tax revenues paid to HTA, meaning that those funds are collected and paid to HTA on account of Act No. 34-1997, as amended.  Second, the revenues transferred to HTA under the cigarette tax established by Act 31 and the motor vehicle license fee authorized under Act 30-2013 fall within the Revenue definition's catch-all provision, which includes the proceeds of "any other taxes, fees or charges which the Legislature . . . may hereafter allocate to the Authority . . . and which are pledged by the Authority . . . ."  Section 601, by pledging Revenues to the payment of bonds, effects that pledge.

[55] In its Opposition, FOMB first argues in the text that a different party made the relevant statements (see Opp. ¶ 82), but then concedes in a footnote that it did, in fact, make the relevant admissions regarding the Bondholders' perpetual security interests in prior litigation (id. at 33 n.34).  In all events, the facts are clear.  The argument is on tape.

Mot. ¶ 70.  Specifically, in Peaje I, in response to certain HTA Bondholders' motions for relief from the Section 405 Stay, FOMB filed briefs arguing that the Bondholders were secured by "perpetual revenue streams," not merely monies on deposit in the Sinking Fund.  Mot. ¶ 70 n.31. In addition, FOMB's counsel argued on behalf of the government parties at the First Circuit that HTA Bondholders were adequately protected because their "security interests" in taxes and tolls "are perpetual" and thus the "equity cushion in this case is different [from certain cases cited by Bondholders involving debt secured by rental revenues arising under leases of finite duration] because of the perpetual revenue."  See Informal Tr. of Oral Argument for Peaje Investments v. Garcia-Padilla, Case No. 16-2377 (1st Cir. January 4, 2017) at 61, 63-64, Natbony Reply Dec. Ex. 56.  Both the District Court and the First Circuit accepted FOMB's original position.  Mot. ¶ 70. Had FOMB argued its current position that the security interest extends only to monies in the Sinking Fund, then the courts would not have been able to conclude that the Bondholders were adequately protected by an equity cushion, because the approximately $173 million dollars then in the Sinking Fund were not sufficient to provide an equity cushion for HTA's billions of dollars of bond debt.[56]  See Case No. 3:16-cv-02384-FAB (D.P.R. Nov. 2, 2016), ECF No. 57 ¶ 2.  Not only do the facts establish a clear case of estoppel, but FOMB's flip flop severely undercuts the credibility of its current arguments.

---

[56] The Official Committee of Unsecured Creditors ("Committee") asserts that judicial estoppel cannot apply to it because the Committee did not exist prior to the filing of the Title III petitions.  ECF No. 10634 (the "Committee Joinder") ¶ 4.  However, the Committee's rights (if any) are simply derivative of the rights of the Debtors, because, as FOMB has recognized, the Committee does not own or control any causes of action.  See Adv. Proc. No. 20-00007-LTS, ECF No. 20 ¶¶ 16-17 ("Statutory committees cannot assert their own claims because they own no claims").  And as FOMB recognized, the Committee also lacks standing to interpose claim objections.  See Case No. 17-04780-LTS, ECF No. 1769 ¶ 1, n. 7, n. 8.  The Committee tellingly did not take a position on whether judicial estoppel applies to FOMB or the Debtors.  Committee Joinder ¶ 4.  Thus, if FOMB and the Debtors are estopped from challenging the Bondholders' liens (and they are), then the Committee likewise will be estopped, because it does not own any causes of action.

**D.  The Excise Taxes Are Subject to a Statutory Lien in Favor of Bondholders, Valid against the Commonwealth.**

46.  The Motion demonstrates that the Excise Tax Statutes give rise to a statutory lien on any interest of the Commonwealth in the Excise Taxes.  See Mot. ¶¶ 72-74.  The Bankruptcy Code identifies four events that give rise to a lien: (i) a "charge against . . . property to secure payment of a debt"; (ii) a "charge against . . . property to secure . . . performance of an obligation"; (iii) an "interest in property to secure payment of a debt"; and (iv) an "interest in property to secure performance of an obligation."  11 U.S.C. § 101(37).  A "statutory lien" arises solely by force of statute on specified circumstances or conditions.  11 U.S.C. § 101(53).  The Excise Tax Statutes place a "charge" against the proceeds of the Excise Taxes and direct the Treasury to "perform an obligation"—transfer such proceeds to special deposit accounts in favor of HTA for the benefit of its Bondholders.[57]  No other action by the Commonwealth is required to make this charge effective.  Moreover, this charge is further secured by the Commonwealth's covenants to Bondholders, where it agreed and committed not to impair this obligation.[58]  The Commonwealth by force of statute placed a charge against the Excise Taxes to secure the payment of HTA's bonds.  This provides Bondholders a statutory lien.

---

[57] 13 L.P.R.A. § 31751(a)(1) (providing that the "sum of the tax collected . . . *shall* be covered into a special deposit in favor of the Highways and Transportation Authority for its corporate purposes," that the Treasury Secretary "*shall* transfer . . . the amounts covered into said special deposit," and "*shall* pay . . . the total revenues derived" from the crude oil tax (emphases added)); 9 L.P.R.A. § 5681 ("[T]he amount of the fees collected . . . *shall* be covered in its entirety into a Special Deposit in the name and for the benefit of the Highways and Transportation Authority.") (emphasis added)).

[58] 13 L.P.R.A. § 31751(a)(1)(D) ("[The Government of Puerto Rico] also agrees and is committed to ensure that the said amounts shall be covered into a special deposit in the name and for the benefit of the Highways and Transportation Authority of Puerto Rico, as provided in this Section, until said bonds issued at any time, including their interest, have been paid in full."); see also 9 L.P.R.A. § 5681 ("[T]he proceeds of said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Authority and to meet any stipulation agreed upon by the Authority to the holders of its bonds and other obligations."); 9 L.P.R.A. § 2019.

**1.      The Commonwealth Is Subject to the Statutory Lien, Even
Though It Is Not Obligated on the Bonds.**

47.      FOMB suggests that it is impossible to have a statutory lien against property
in the hands of an entity that, as a contractual matter, is not the obligor on the underlying debt
secured by the lien.  See Opp. ¶ 100.  FOMB is wrong.

48.      First, FOMB's argument relies on the faulty premise that the Excise Taxes
are the Commonwealth's "own property."  As demonstrated in the Motion and above (see supra
§§ I.A-B), the Excise Taxes are *HTA*'s property.  Thus, FOMB's premise and the resulting
argument both fail.  Second, FOMB's broad-based assertion that an entity cannot grant a lien on
its own property to secure the obligation of another is plainly wrong.  It is commonplace for
creditors to be secured by a lien on property of a non-debtor, even where the non-debtor is not
formally a guarantor as a contractual matter.  Indeed, the courts have uniformly ruled that a party
who pledges its own property to support the debt of another party commits the property, but not
the person, to the repayment of the debtholder.  See, e.g., Members of Peanut Quota Holders Ass'n,
Inc. v. USA, 60 Fed.Cl. 524, 525-26 (2004) (discussing a loan structure whereby certain parties,
who were not formal guarantors or direct obligors on the loan, pledged collateral and were
therefore liable up to the value of the collateral); In re Laufenberg, No. 03-12989-12, 2004 WL
2192428, at *4 (Bankr. D.Ks. June 3, 2004) (noting that parties who pledged collateral, but who
were not personally liable on a debt, were still liable as to the property that was pledged); In re
Hersh, 84 B.R. 430, 431-32 (Bankr. E.D.Va. 1988) (a person who pledged collateral to secure a
debt, but who was not personally liable for such obligation, was liable up to the value of the
collateral).

49.      Further, a lien can secure either "payment of a debt" or "performance of an
obligation."  Even though the Bonds are solely debts of HTA and not the Commonwealth, the
Commonwealth has a clear statutory obligation to transfer the Excise Taxes to HTA and its

Bondholders.  This charge against the Excise Taxes is a statutory lien against the Commonwealth for the benefit of HTA and its Bondholders.

50.     Finally, In re Fonseca, 534 B.R. 261, 268-69 (Bankr. D.P.R. 2015), aff'd, 542 B.R. 628 (B.A.P. 1st Cir. 2015), discussed in the Motion (see Mot. ¶ 73), refutes FOMB's assertion.  In Fonseca, even though the Commonwealth was not liable *in personam* to the Savings and Loan, the Savings and Loan was nonetheless able to enforce its statutory lien *in rem* against Fonseca's *property* in the hands of the *Commonwealth*.[59]  Indeed, the Fonseca Court expressly found that the relevant statutory lien provision "allow[ed] the [Savings and Loan] to recover any asset **held by the government** to pay off **the debt [of the Savings and Loan's] members [including Fonseca].**"  Fonseca, 542 B.R. at 636 (emphasis added).

51.     FOMB has no principled way to distinguish Fonseca.  See Opp. ¶ 102 n.52.  FOMB notes that "the statute provided that a lien arising from setoff rights 'w[as] created only on the performance of certain conditions (e.g., accrual of contribution liabilities[]),' but **the HTA Enabling Act creates no automatic lien even upon the performance of conditions and does not implicate set off rights.**"  Id. (emphasis added).  FOMB misses the point.  Movants have never alleged that the HTA Enabling Act (defined in the Opposition as "9 L.P.R.A. §§ 2001-2035," see Opp. ¶ 19) creates a statutory lien.  Instead, Movants allege that the *Excise Tax Statutes* (13 L.P.R.A. § 31751(a)(1); 9 L.P.R.A. §§ 2021, 5681) create statutory liens.  And the *Excise Tax Statutes* contain language effectively identical to the language found to create a statutory lien in Fonseca.  In both instances, the relevant statute contains mandatory "shall" language requiring the

---

[59] See Fonseca, 542 B.R. at 634 ("[A] bankruptcy discharge extinguishes only one mode of enforcing a claim—namely, an action against the debtor *in personam*—while leaving intact another—namely, an action against the debt *in rem*")  (citation omitted).

same party (the Treasury) to deposit or "cover" funds into a particular account to pay a particular debt.  See Mot. ¶¶ 57, 73.[60]

### 2. The Excise Tax Statutes Can and Do Create a Statutory Lien Without Using the Word "Lien".

52. FOMB contends that the Excise Tax Statutes do not create a statutory lien because they do not "mention" the word lien.  See Opp. ¶ 101.  This is nonsense.  Courts have consistently held that statutes need not incant this magic word to create a lien.[61]  The statute in Fonseca did not expressly state that it provided for a lien—in fact, its operative language was virtually identical to the Excise Tax Statutes—yet the appellate panel held (as FOMB agrees) that it created a lien.  Similarly, in JK Mullen Inv. Co. v. Town of Arvada, 261 P.2d 714, 718 (Colo. 1953), cited in the Motion, the court found that the statute "unequivocally gives the bondholders prior lien on any and all proceeds received from the assessments" by providing that the assessments would be applied to bonds or warrants.  The statute read in relevant part:  "all moneys collected from said assessments for any improvement *shall be applied to the payment of all bonds and warrants* issued, until payment be made of all the said bonds or warrants."  JK Mullen, 261 P.2d at 718 (emphasis added).  While the statute contained no explicit reference to a lien, a statutory lien was "unequivocally" created.  Id.  Similarly, in In re Ortiz Vega, 75 B.R. 858, 861 (Bankr. D.P.R. 1987), the court found a statutory lien arising under a Commonwealth statute directing that certain funds shall be applied to the partial or full payment of a particular debt.[62]

---

[60] FOMB also attempts to distinguish Fonseca as involving "set off."  It is true that, at one point in the Fonseca decision, the Court addresses a *separate* statute—distinct from the one quoted at Mot. ¶ 73—that Fonseca alleged gave the Savings and Loan "a right to set off" with respect to the funds in his accounts *at the Savings and Loan* (as opposed to property held by the Commonwealth), but the court expressly noted that "**those funds [allegedly subject to set off in Fonseca's accounts at the Savings and Loan]** *are not at issue here*, **and we do not need to discuss them further**."  Fonseca, 542 B.R. at 636 (emphasis added).

[61] FOMB also alleges that Movants "fail to *quote* a single HTA statute to support their [statutory lien] argument," but paragraph 74 of the Motion, which is part of Movants' statutory lien argument, in fact contains a reference to paragraph 57 of the Motion, which quotes at length one of the primary Excise Tax Statutes, 13 L.P.R.A. § 31751.

[62] Other examples have been cited in FOMB's own prior briefing.  See In re Heffernan Mem'l Hosp. Dist., 202 B.R. 147, 148 n.1 (Bank. S.D. Cal. 1996) (citing Cal. Rev. & Tax Code § 7286.21, which provides that the "net proceeds of the tax imposed by Section 7286.29 shall be used exclusively for the Heffernan Memorial Hospital District."); In

53.     FOMB's reliance on <u>Peaje Investments LLC v. Fin. Oversight & Mgmt. Bd.</u>, 899 F.3d 1 (1st Cir. 2018) (<u>Peaje II</u>), is misplaced.  Indeed, <u>Peaje II</u> strongly supports the conclusion that the Excise Tax Statutes created a statutory lien in favor of Bondholders.  <u>Peaje II</u> only addressed the issue of whether the *Enabling Act* gave rise to a statutory lien on the *Toll Revenues*.[63]  There, both this Court and the First Circuit held that the Enabling Act did not give rise to a statutory lien on Toll Revenues because the Enabling Act does not contain the type of "express mandatory 'shall' language" that FOMB has always argued is the hallmark of a statutory lien.[64]

54.     But that is a different issue than the one presented here.  The Motion involves whether the *Excise Tax Statutes* give rise to a statutory lien on the *Excise Taxes*.  In contrast to the permissive language in the Enabling Act addressed by <u>Peaje II</u>, the Excise Tax Statutes here contain precisely the "mandatory 'shall' language" the <u>Peaje II</u> court was seeking: "the proceeds of said collection . . . ***shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority*** and to comply with any stipulations agreed to by the latter with the holders of said bonds or other obligations." 13 L.P.R.A. § 31751 (a)(1)(C) (emphasis added) (cited at Mot. ¶ 57), Natbony Dec. Ex. E.[65]  This text reflects both the

---

re Trahan, 283 F. Supp. 620 (W.D. La. 1968), <u>aff'd per curiam</u>, 402 F.2d 796 (5th Cir. 1969) (La.Civ.Code Art. 3227 created a statutory lien by providing "He who has sold to another any movable property, which is not paid for, *has a preference on the price of his property*, over the other creditors of the purchaser, whether the sale was made on a credit or without, if the property still remains in the possession of the purchaser.") (emphasis added).

[63] <u>See Peaje II</u>, 899 F.3d at 9 (noting that Peaje contended that "the sources that . . . established" its statutory lien were "the Enabling Act and the 1968 Resolution"); <u>see also id.</u> at 10 ("Peaje argues that it holds a statutory lien by virtue of the Enabling Act"). Notably, the First Circuit went out of its way in <u>Peaje II</u> to emphasize that "**nothing in this opinion should be read as implying any decision not expressly addressed within it**", meaning that nothing can be implied from <u>Peaje II</u> regarding the existence of statutory liens under the Excise Tax Statutes. <u>Id.</u> at 13 (emphasis added).

[64] <u>See</u> Reply Memorandum [of FOMB] in Support of Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6), Adv. Proc. No. 17-156-LTS, ECF No. 86 at p. 8 n.9 ("<u>In re Heffernan Memorial Hospital District</u>, 202 B.R. 147 (Bankr. S.D. Cal. 1996), involved a statutory lien and special tax created by two statutes containing express mandatory 'shall' language (Cal Rev. & Tax Code §§ 7286.20 and 7286.21)").

[65] As noted in the Motion, equivalent language exists restricting the Commonwealth's ability to use the Vehicle Fees for any other purpose, except upon satisfaction of the conditions set forth in Article VI, Section 8.  <u>See</u> Mot. ¶ 57 n.13. FOMB asserts that "all the statutory provisions merely 'permit [HTA] to secure the payment of bonds by making a

requisite obligation (the proceeds "shall be used") and the specified triggering condition (the Authority issues bonds or other obligations) that the First Circuit has indicated are needed to establish a statutory lien.  Peaje II, 899 F.3d at 12.  Therefore, under Peaje II, Movants' statutory lien has attached on the Excise Taxes.  And, of course, statutory liens do not require perfection and are not subject to Section 552(a) of the Bankruptcy Code.

55.     This Court embraced a very similar structure when it approved a COFINA plan of adjustment providing for "a statutory lien that arises automatically, pursuant to the terms of the New Bond Legislation, to secure the COFINA Bonds."  See ECF No. 5055 ¶ 1(B)(v).  The "New Bond Legislation" enacted in conjunction with the COFINA plan provides that "[COFINA] Plan of Adjustment Bonds shall automatically, **upon the issuance of such Plan of Adjustment Bonds**, be secured by a statutory first lien . . ."  See Natbony Reply Dec. Ex. 57, Art. 3.2 (emphasis added).  Therefore, this Court, like the First Circuit in Peaje II, recognized that the issuance of bonds can function as a "specified condition" giving rise to a statutory lien.  See 11 U.S.C. § 101(53).[66]

56.     The Bankruptcy Code also recognizes that a security interest may depend on or be made "fully effective" by a statute.  See 11 U.S.C. § 101(53) (specifying that a statutory lien "does not include security interest . . ., whether or not such interest . . . is provided by or is dependent on a statute and whether such interest . . . is made fully effective by statute").  Here, the Excise Tax Statutes, at a minimum, support and effectuate the security interest granted under the Resolutions by providing that the Excise Taxes "shall be covered into a special deposit in favor of

---

pledge of revenues, but they do not require it to do so" (Opp. ¶ 102), but FOMB conspicuously fails to quote or address the language providing that "the proceeds of said collection [the Excise Taxes], in the amount that may be necessary, *shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority*."  FOMB therefore fails to address the specific language that Movants contend creates a statutory lien.

[66] This recognition accounts for the many state statutes that expand the scope or force of a consensual lien.  In New Jersey, for example, courts have held that, where a security agreement grants a security interest to a condominium association, the state Condominium Act temporarily provides the security interest priority over prior recorded mortgages.  See In re Rones, 531 B.R. 526, 533 (Bankr. D.N.J. 2015).

[HTA]" and that the Excise Taxes, unless properly clawed back under Section 8 of Article VI of the Constitution, "shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority." 13 L.P.R.A. § 31751(a)(1), (a)(3); 9 L.P.R.A. §§ 2021, 5681. By requiring the Commonwealth to place the Excise Taxes in a special deposit for HTA and restricting the use of the funds to payment of the Bonds in accordance with HTA's obligations to Bondholders, the statutes protect the attachment of Bondholders' security interests to the Excise Taxes collected by the Commonwealth. In short, the statutes provided an express protection against the precise behavior that FOMB and the Commonwealth have employed here to disrupt the flow of collateral to the Bondholders.

### 3. Security Interests and Statutory Liens Can Exist Simultaneously.

57. FOMB implies, without directly asserting, that the existence of a security interest somehow precludes the existence of a statutory lien.[67] While it may be true that any given lien cannot fit into more than one of the various types of liens defined in the Bankruptcy Code, nothing says that it is impossible to have *both* a security interest and a statutory lien, where one arises from a contract and one arises from a statute.[68] Indeed, FOMB's Opposition itself cites at least one case involving both a statutory lien on, and a security interest in, the same property. See In re Las Vegas Monorail Co., 429 B.R. 317, 329-331 (Bankr. D. Nev. 2010) (cited at Opp. ¶ 5 n.7).[69]

---

[67] See Opp. ¶ 101 ("Movants don't explain why a transaction documented with security agreements and UCC-1 financing statements is subject to a statutory lien . . . .").

[68] See, e.g., In re Keise, 564 B.R. 255, 263-64 (Bankr. D.N.J. 2017) ("This Court views the Association's claim as secured simultaneously by two separate liens—one consensual lien created by the Declaration, and one statutory lien created by the New Jersey Condominium Act—with each lien available to the Association to enforce its claim."); see also In re Smiley, 569 B.R. 377, 393 (Bankr. D.N.J. 2017) ("the Association's secured claim is secured by both a statutory lien arising out of the Condominium Act and a consensual lien arising out of the Master Deed"); In re APC Const., Inc., 112 B.R. 89, 124 (Bankr. D. Vt. 1990) (quoting Norton's Bankruptcy Law and Practice for the proposition that "[t]he possibility also exists that two independent liens are present, each to be measured by different provisions of the Code. Where a contract is also present, the possibility of three distinct liens cannot be discounted.").

[69] FOMB attempts to impose on Movants a burden to "explain . . . how [a statutory entitlement] is meant to be different from a 'statutory lien' or a trust" (see Opp. ¶ 89), but no such burden exists. Movants are simply applying the

###### E.      Movants' Security Interests Have Not Been, And Cannot Be, Avoided

58.    FOMB next asserts that Movants' security interests are unperfected and therefore subject to avoidance under Section 544(a) of the Bankruptcy Code.  See, e.g., Opp. ¶¶ 71, 76.  First, FOMB's assertion wrongfully assumes that a governmental bond pledge is subject to commercial code perfection standards that are plainly inapplicable.[70]  And FOMB is wrong for at least three additional reasons: (i) FOMB cannot avoid any unperfected security interests under Section 544(a) because the HTA funds at issue would not have been subject to the judicial lien required by that statutory provision; (ii) Section 544(a) would be unconstitutional if applied retroactively to invalidate liens arising prior to PROMESA's enactment; and (iii) in any event, Section 544(a) is inapplicable because FOMB fails to establish that Movants' security interests are unperfected. [71]

---

terminology used in case law to describe the types of property interests found to be created by statutes similar to the Excise Tax Statutes.  See, e.g., Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza, 484 F.3d 1, 29 (1st Cir. 2007) (holding that plaintiff "has successfully alleged an entitlement to the Earned Premiums under Law 253, and therefore a property interest in those funds").

[70] The Puerto Rico UCC expressly states that it does not apply to governmental debt where, as here, another statute governs the lien.  19 L.P.R.A. § 2219(c)(2) ("This chapter does not apply to the extent that . . . the constitution or another statute of this state expressly governs the creation, perfection, priority, or enforcement of a security interest created by this state or a governmental unit of this state[.]").  The Enabling Act "expressly governs" the Movants' security interest.  The Enabling Act mandates that, when HTA makes a pledge of its property, the bonds bearing the signature of the officers of HTA "shall be valid and binding obligations" on the date of signing and be enforceable "by action or suit in equity to enjoin any acts or things which may be unlawful or in violation of the rights of the bondholders," among other enforcement rights. 9 L.P.R.A. §§ 2012(c), 2013(a).

[71] Even if FOMB's avoidance arguments are valid, they would not apply to future collections.  FOMB concedes that the relevant transfers of property at issue here are the attachment of liens on Revenues received after the petition date (meaning that the transfers occurred after the petition date).  Opp. ¶¶ 67, 79-81, 117.  But only section 549—not section 544—covers post-petition transfers of property.  If future collections were deposited into the Fiscal Agent account as the Excise Tax Statutes require, then there would be perfection at the time of deposit, and Section 928 of the Code permits this perfection to occur, Section 552(a) notwithstanding.  Further, "a decision to lift the stay is not an adjudication of the . . . avoidability of the claim," so FOMB's arguments premised on supposed avoidance powers are irrelevant and not properly before the Court.  See ¶ 108 infra (quoting Grella, 42 F.3d at 34).  And, even if FOMB had the ability to avoid Movants' liens (which it does not for the reasons stated below), they have not been avoided yet. Unlike automatic stay violations, which are void ab initio, avoidable interests remain valid unless and until they are avoided.  See e.g., In re Schwartz, 954 F.2d 569, 573-74 (9th Cir. 1992) (contrasting transactions that are void as in violation of the automatic stay with transactions that are merely avoidable under chapter 5 of the Bankruptcy Code); In re General Highway Exp., Inc., 893 F.2d 1334 (6th Cir. 1990) ("until the obligations under a transfer actually are voided, they are binding."); In re Rielly, 545 B.R. 435, 447 (Bankr D. Mass. 2016) (finding that unless and until an action is commenced and resolved in favor of avoidance, liens "remain valid and enforceable.").  Although FOMB points to its recently filed adversary complaints purporting to challenge Movants' security interests under Section 544, the Section 544 claims in those complaints are time-barred because the complaints were filed on January 16, 2020, well past the two-year statute of limitations for asserting such claims in the Commonwealth Title III case (commenced May 3, 2017) and the HTA Title III case (commenced May 21, 2017).  See 11 U.S.C. § 546(a)(1)(A).  See also Adv.

**1.      FOMB Has No Ability To Avoid Unperfected Liens, Because No Hypothetical Judicial Lien Creditor Could Exist.**

59.      FOMB's reliance upon Section 544(a)(1) of the Bankruptcy Code (see, e.g., Opp. ¶ 71) is simply wrong.  Section 544(a)(1) empowers a trustee to avoid certain security interests, but only if a hypothetical creditor "could have obtained . . . a judicial lien" against the property.  11 U.S.C. § 544(a)(1); see In re Trask, 462 B.R. 268, 273 (B.A.P. 1st Cir. 2011) (Section 544(a) "does not give the Trustee any greater rights than he, or any person, would have as a bona fide purchaser or judicial lien creditor under applicable state law").[72]  Because HTA's revenues would not have been subject to attachment by judicial lien on the petition date, Movants' security interests (even if they were unperfected) are not avoidable.

60.      To begin with, Section 602 of the Resolutions (entitled "Pledge of Revenues") expressly prohibits the imposition of liens other than the Bondholders' liens.  The Enabling Act empowered HTA to commit itself "against pledging all or any part of the revenues." 9 L.P.R.A. § 2012(e) (9).  HTA's decision to prohibit liens other than the Bondholders' liens is, in turn, "valid and binding" under Puerto Rico law.  Id. § 2012(c).  Accordingly, HTA's funds *cannot* be subject to a separate judicial lien.

61.      In any event, it is well-established in Puerto Rico that "governmental entities [like HTA] are exempt from attachment procedures, because, as a matter of public policy, governmental entities ought not to be subject to the inconveniences of such procedures, which interfere with the execution of public functions, in the detriment of the common good."  Whitfield v. Mun. of Fajardo, 2007 WL 6894782, at *3-4 (D.P.R. May 29, 2007) (citation omitted).

---

Proc. No. 20-005-LTS, ECF No. 34 § II.A (incorporated herein by reference); Adv. Proc. No. 20-007-LTS, ECF No. 35 § I.A (incorporated herein by reference)

[72] See, e.g., In re Airadigm Commc'ns, Inc., 519 F.3d 640, 652 (7th Cir. 2008) (holding that avoidance of Federal Communications Commission's lien on debtor's licenses was not permitted under Section 544 because, under applicable nonbankruptcy law, no judgment creditor could obtain superior lien against the debtor's property); In re DeCora, 396 B.R. 222 (W.D. Wisc. 2008); In re Fluge, 57 B.R. 451, 456 (Bankr. D.N.D. 1985) ("A trustee as a hypothetical holder of a judicial lien under Section 544(a)(1) can avoid a superior interest *only if an actual creditor could have obtained a judicial lien against the property*.") (emphasis added).

Case:17-03283-LTS Doc#:13314-2 Filed:06/01/20 Entered:06/01/20 22:56:50 Desc: Exhibit B Page 59 of 95

Accordingly, the Puerto Rico Supreme Court has repeatedly held that the attachment of funds to benefit a judgment creditor is not a remedy available to satisfy judgments against public entities. See Librotex v. AAA, 138 D.P.R. 938, 939-41 (1995), Natbony Reply Dec. Ex. 58; Commoloco de Caguas Inc. v. Benitez Diaz, 126 D.P.R. 478, 493 (1990), Natbony Reply Dec. Ex. 59.[73] Indeed, Act 66-2014—which has "supremacy over any other law"—codified the long-standing precedent that contract litigants are ***not*** permitted to attach judgments to funds of the Commonwealth, its municipalities, or its public corporations, and instead may only enter into repayment plans. See 3 L.P.R.A. §§ 9102, 9142. In particular, Section 29 of Act 66 provides:

> No agency or instrumentality of the Commonwealth, or public corporation or municipality, official or employee shall be compelled to make any payment whatsoever with respect to a previously authorized judgment or payment plan, when there are no funds available therefor when the legislative appropriation for such purposes has been exhausted; therefore, ***the garnishment [el embargo] of funds to enforce a judgment issued against the Commonwealth is hereby prohibited***.

3 L.P.R.A. § 9142 (emphasis added).[74]

62. Because attachment of judicial liens on public funds is not permitted under Puerto Rico law, a judgment creditor's only remedy is to seek a repayment plan to be included within the public corporation's next annual budget. See Librotex, 138 D.P.R. at 942-43. As the First Circuit has held, these permissible repayment plans are ***not*** the equivalent of judicial liens

---

[73] Attached as Natbony Reply Dec. Exs. 61 and 62 are certified translations of the Puerto Rico Supreme Court decisions cited herein. See also Diaz v. Dept. of Educ., 823 F. Supp. 2d 68, 77 (D.P.R. 2011); Acevido-Garcia v. Vera-Monroig, 368 F.3d 49, 56 (1st Cir. 2004) (noting Puerto Rico rule on attachment and holding that repayment plan was not attachment); 32 L.P.R.A. § 3082.

[74] Act 66-2014 overrides Puerto Rico's Civil Rule 56.1, which otherwise permits courts to order the attachment . . . of personal property." This is so because even though the English translation of Act 66-2014 uses the word "garnishment" and the English translation of Rule 56.1 uses the word "lien," the Spanish originals of both provisions use the same Spanish word, namely "embargo." Compare P.R.R. Civ. P. 56.1, 32A L.P.R.A. App. V., R. 56.1 (Spanish) ("El tribunal podrá conceder el *embargo*, el *embargo* de fondos en posesión de un tercero. . . .") with 3 L.P.R.A. § 9142 ("se prohíbe el *embargo* de fondos para hacer efectivo un fallo emitido contra el Estado"). Therefore, to the extent that Rule 56.1 provides for a basis for attachment, Section 29 of Act 66—which has supremacy over all other Puerto Rico laws and uses the same terminology in Spanish as Rule 56—expressly prohibits what Rule 56.1 might otherwise allow, namely attachment of a judicial lien. See 3 L.P.R.A. § 9102.

41

and do not result in attachment, which Puerto Rico law forbids.  Acevido-Garcia v. Vera-Monroig, 368 F.3d 49, 56 (1st Cir. 2004).[75]

63.    This Court previously held in connection with the Title III proceeding for the Employees Retirement System ("ERS") that, "under Puerto Rico law, a judgment creditor could have obtained a lien against ERS's assets." Fin. Oversight Mgmt. Bd.  v. Altair Global Credit Opportunities Fund, LLC, 590 B.R. 577, 594 (D.P.R. 2018), aff'd in part, vacated in part, rev'd in part, 914 F.3d 694 (1st Cir. 2019), cert. denied sub nom. Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Glob. Designated Activity Co., 140 S. Ct. 47 (2019).  However, this is a very different case.  Among other things, unlike HTA, ERS was an investment trust that merely held assets for the benefit of retirees; it was not an operating entity that provided government services. By contrast, HTA operates the Commonwealth's highway and transportation systems and therefore "exercise[s] public and essential functions of government."  9 L.P.R.A. § 2002. Moreover, FOMB has admitted on numerous occasions that HTA was in financial distress on and prior to its petition date.[76]  Notably, FOMB's original fiscal plan for HTA—adopted only one month prior to the petition date—stated that HTA's "[c]urrent fiscal situation **continues to be dire**."  Natbony Dec. Ex. L at 16 (emphasis added).  As such, it is appropriate to apply with full force the doctrine of Librotex, Commoloco, and similar cases exempting governmental entities from attachment procedures where such procedures would interfere with the execution of public functions.

---

[75] Indeed, a judicial lien requires a seizure of property, whereas a repayment plan does not.  See, e.g., Oronoz & Co. v. Alvarez, 23 D.P.R. 536, 537-38 (1916) ("Seizure or some similar measure is necessary to give priority to the judgment . . . ."), Natbony Reply Dec. Ex. 60; Librotex, 138 D.P.R. at 942-43 (equating "seizure of [PRASA's] operational funds" with the imposition of "encumbering and monumental immediate liens"), Natbony Reply Dec. Ex. 58. See also P.R. R. Civ. P. 56.4, 32A L.P.R.A. App. III, R. 56.4 (English) ("In the case of personal property. . . [an] order [of attachment] shall be carried out by depositing the personal property in question in court or with the person designated by it under the claimant's responsibility.").

[76] See Adv. Proc. No. 17-151-LTS, ECF No. 50 (June 5, 2017 Hr'g Tr.) at 32-33; Adv. Proc. No. 17-151- LTS, ECF No. 226 (Aug. 8, 2017 Hr'g Tr.) at 38-40.

**2.    Retroactive Application Of Section 544(a) In This Case Would
Violate The US Constitution.**

64.    Were the Court to find that Section 544(a) is applicable here, then the statute

violates the Takings Clause of the U.S. Constitution and should be severed and held

unconstitutional.[77]  See PROMESA § 3 (providing for severability); Aurelius Inv., LLC, v. Puerto

Rico, 915 F.3d 838, 861 (1st Cir. 2019) (severing and holding invalid an unconstitutional provision

of PROMESA).

**3.    In Any Event, Movants' Liens Are Perfected, and FOMB Has
Failed To Challenge Their Perfection.**

65.    FOMB appears to concede that Movants' security interest in the Sinking

Fund and/or the moneys deposited therein is perfected.[78]  FOMB argues instead that Movants'

security interests in deposit accounts *other than* the Sinking Fund accounts do not satisfy the

perfection requirements of the Uniform Commercial Code (the "UCC").  See Opp. 76-78.

66.    First, FOMB fails even to establish that the UCC applies to Movants'

security interests to the extent those security interests are characterized as being in deposit

accounts.  Specifically, when Movants were granted their security interests, Article 9 of the Puerto

Rico Uniform Commercial Code (the "Puerto Rico UCC") *did not cover deposit accounts* as

original collateral.  See 19 L.P.R.A. § 2004(l) (1998) (repealed 2012) ("Sections 2001-2207 of this

---

[77] In its recent decision in Fin, Oversight & Mgmt. Bd. for P.R. v. Andalusian Global Designated Activity Co., 948
F.3d 457, 476 (1st Cir. 2020), the First Circuit held that "Congress provided an explicit command at 48 U.S.C.
§ 2101(b)(2) to apply PROMESA retroactively." The First Circuit expressly did ***not*** reach the question of whether
applying Section 544(a) retroactively under PROMESA is constitutional, because the appellants in that case "frame[d]
the issue as one of constitutional avoidance," not unconstitutionality, and did "not raise[] in their initial appellate brief"
the argument that PROMESA is unconstitutional when construed to apply retroactively.  Andalusian Global
Designated Activity Co., 948 F.3d at 476 n.17 ("We do not decide an argument not presented to us."). Even so,
Movants disagree with this decision and contend that Section 544(a) should be read to apply only prospectively
because PROMESA may not "be construed to eliminate property rights which existed before the law was enacted in
the absence of an explicit command from Congress."  See U.S. v. Sec. Indus. Bank, 459 U.S. 70, 81. Movants
respectfully submit that no such explicit command appears in PROMESA, which instead requires FOMB to "respect
the relative lawful priorities or lawful liens . . . in effect prior to June 30, 2016." PROMESA § 201(b)(1)(N). Movants
respectfully preserve for appeal their argument that PROMESA should not be construed as applying Section 544(a)
retroactively.

[78] See Opp. ¶ 77 ("Movants . . . have the requisite control over . . . the Pledged Funds [i.e. the Sinking Fund
accounts].").

title do not apply to a transfer of an interest in any deposit account . . . except as provided with respect to proceeds . . . and priorities in proceeds . . .").  It was not until January 17, 2013 that Article 9 of the Puerto Rico UCC was revised to cover deposit accounts.  See 19 L.P.R.A. § 2214 (setting forth the requirements for control of a deposit account).  Significantly, revised Article 9 provided continuing validity to "transactions and liens that were not governed by former Chapter 9 of the Commercial Transactions Act."  See 19 L.P.R.A. § 2402(b).  Accordingly, the Puerto Rico UCC's current requirements regarding control of a deposit account do not apply to Movants' security interests.  On that basis alone, FOMB's avoidance arguments collapse.

67.    Moreover, in the event the UCC's perfection requirements were found to apply, Movants' liens are perfected by the timely filing of UCC-1 financing statements.  Under the UCC, a pledge of revenues is properly characterized as a security interest in "accounts" and "payment intangibles" that constitute "general intangibles."  See, e.g., In re Northview Corp., 130 B.R. 543 (9th Cir. BAP 1991) (characterizing hotel revenues as personal property consisting of "accounts" and payment intangibles, and concluding that lien was validly perfected by the filing of a UCC financing statement); In re Ocean Place Development LLC, 447 B.R. 726, 732-33 (Bankr. D.N.J. 2011) ("[T]he Court finds that the hotel room revenues are 'accounts' or 'payments intangible' as defined by Article 9."); Spivey, G. Impact of Article Nine on Revenue Bond Investments, 44 Ind. L.J 624, 630-31 (1969) (hereinafter, "Spivey") (concluding that a municipal enterprise's revenue pledge is properly characterized as an intangible that matures into accounts and yields cash proceeds, and therefore such pledge can be perfected through the filing of a financing statement).[79]  Puerto Rico's version of the UCC permits perfection through a financing

---

[79] Courts have also rejected the notion that the requirement for deposit control agreements is even applicable in bankruptcy, particularly when (i) the prepetition security agreement pledged proceeds (which the Security Agreement does) and (ii) the Bankruptcy Code provides for the survival of liens on the debtor's cash and imposes restrictions on the debtor's use of such cash.  See In re Delco Oil, Inc., 599 F.3d 1255, 1281 (11th Cir. 2010) (finding creditor's argument that bank's security interest in inventory and cash collateral was unperfected because it lacked a deposit control agreement "unpersuasive").  Section 928 imposes in municipal restructuring cases similar restrictions to those discussed in Delco.  Section 928 of the Bankruptcy Code—made applicable by PROMESA section 301—provides

statement for such "accounts" and "payment intangibles" (which are a form of "general intangibles"). See 19 L.P.R.A. §§ 2258, 2260 (UCC §§ 9-308 and 9-310); see also UCC § 9-313 cmt. 2.[80]  Movants established in the Motion that "the financing statements included in Exhibit N" (see Mot. ¶ 17; Ex. N) serve to perfect their security interests to the extent they are security interests in general intangibles, and FOMB's Opposition does not contest the validity of those UCC financing statements.[81]

68.    Finally, the DRA Parties assert without any analysis that the UCC financing statements do not properly name the secured party.  See ECF No. 12396 ¶ 55.[82]  However, this argument does not appear in the argument section of FOMB's Opposition, and therefore is not

---

that (i) the bondholders' liens continue to attach to special revenues collected after the petition date and (ii) such liens are only subject to the necessary operating expenses of the relevant project or system. 11 U.S.C. § 928.  Thus, Section 928 provides for a prohibition on unauthorized use of the secured creditor's collateral, and also provides that such revenues "shall remain subject to *any* lien." Id.  Indeed, FOMB has previously conceded that a municipal debtor's ability to apply special revenues to its necessary operating expenses is "subject to court determinations, in the event of a dispute over which expenses are necessary." See *Brief of Appellees Defendants*, Case No. 18-1165, at p. 35 (1st Cir. July 9, 2018).

[80] In addition, under Section 9-203(a) of the UCC, Movants' security interest attached to HTA's "revenues" as soon as the security interest became enforceable against HTA. 19 L.P.R.A. § 2233(a). Section 9-203(b)(2) in turn provides that, subject to value being given by the secured creditor (which has happened), a security interest becomes enforceable against a debtor once the debtor has rights to the collateral *or the power to transfer rights to the collateral*. 19 L.P.R.A. § 2233(b)(2). The Enabling Act empowered HTA to pledge its "present *and future* income" (9 L.P.R.A. § 2012(e)(1)), and that is exactly what HTA did when it pledged its "Revenues" as collateral. See Spivey at 630 (1969) ("Statutory provisions requiring the authority to set aside the proportion of revenues necessary to satisfy bond obligations and recognizing the right of the bondholder to compel payment preclude the restrictive view that the bondholder has no interest until revenues are realized.  Thus the only reasonable construction of statutes authorizing revenues bonds is the suggestion that a right in revenues ***implies a right in antecedent collateral***.") (emphasis added).

[81] In the alternative, and solely to the extent that the Court concludes that Movants' security interests would be avoidable both to the extent characterized as security interests in deposit accounts and to the extent characterized as security interests in general intangibles, Movants assert that they hold perfected security interests in "money" as such term is used in the UCC. See, e.g., See Bank R.I. v. Mixitforme, Inc., No. PM 06-1626, 2007 WL 299361 (R.I. Sup. Ct. Jan. 11, 2007) (explaining that "Article 9 draws a distinction between the deposit account—rights to payment from a bank—and the funds from that deposit account" because "a deposit account is simply a collection of rights that a depositor has with respect to his bank"); In re Vienna Park Props., 976 F.2d 106, 116-17 (2d Cir. 1992) ("there is no question that the funds held in the escrow account . . . are 'money'"); In re Harbour E. Dev., Ltd., 2011 WL 3035287 (Bankr. S.D. Fla. Jul. 22, 2011) (holding that deposits held in an escrow account were money); Matter of O.P.M. Leasing Servs., Inc., 46 B.R. 661, 670 n.5 (Bankr. S.D.N.Y. 1985) ("[T]he better view [is] that a security interest in money . . . remains protected by Article 9 even if the money is subsequently deposited in a bank account.").  FOMB has failed to challenge the perfection of any security interests Movants hold in either general intangibles or money.

[82] It is puzzling as to why the DRA Parties would adopt these arguments wholesale.  If FOMB prevails in its avoidance claims against the HTA Bondholders, then the DRA Parties' purported security interests would also be avoidable, and in any event, all of the documents attached to the DRA Parties' lift stay motion demonstrate that they would still be subordinate to the Bondholders in that scenario.  Movants reserve all rights to prosecute claims against the DRA Parties if that event were to occur.

properly raised before this Court in the context of this Motion.  In any event, the UCC merely provides that a financing statement must "provide[] the name of the secured party or a representative of the secured party."  See 19 L.P.R.A § 2322 (codifying UCC § 9-502).[83]  Here, the Resolutions plainly grant the revenue pledges to the *Bondholders* (e.g., Resolutions §§ 401, 501, 601, 602, 802), and therefore the UCC financing statements properly named the secured parties (including specifically, holders of the Bonds, including Assured and Ambac).

69.     Moreover, even assuming *arguendo* that this Court determines that the names of the secured parties on the financing statements are not correct, the statements are still effective to perfect the Movants' interests, because UCC § 9-506 provides "[a] financing statement substantially satisfying the requirements of this part is effective, even if it has minor errors or omissions, *unless the errors or omissions make the financing statement seriously misleading*."  UCC § 9-506 (19 L.P.R.A § 2326) (emphasis added).[84]  At a minimum, the financing statements were not seriously misleading and sufficed to put creditors on notice that some party held a security interest in the Pledged Revenues.  See Natbony Dec. Ex. N.

**F.     HTA's Pledge of Revenues Continues Postpetition Because the Bankruptcy Code's "Special Revenue" Provisions Apply**

70.     As explained in the Motion, Movants are entitled to the protection of the "special revenue" provisions of the Bankruptcy Code.  See Mot. ¶ 79.  Characteristic of much of

---

[83] A secured party is defined as "[a] person in whose favor a security interest is created or provided for under a security agreement, whether or not any obligation to be secured is outstanding."  See 19 L.P.R.A § 2122 (codifying UCC § 9-102).

[84] Significantly, comment 2 of UCC § 9-506, provides "[i]nasmuch as searches are not conducted under the secured party's name, and no filing is needed to continue the perfected status of [a] security interest after it is assigned, *an error in the name of the secured party or its representative will not be seriously misleading*."  UCC § 9-506 cmt. 2 (emphasis added); see also In re American Consol. Transp. Companies, Inc., 433 B.R. 242, 259 (Bankr. N.D. Ill. 2010) (" . . . any error in the name of a secured party on a financing statement is not seriously misleading . . .").  Comment 2 of UCC § 9-502 also provides "the notice itself indicates merely that a person may have a security interest in the collateral indicated.  Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs."  UCC § 9-502 cmt. 2.

the Opposition, FOMB levies a multitude of undeveloped arguments in response, hoping that some will stick.  None do.

71.     As a result of the special revenue protections, Movants' floating liens were not cut off by the filing of a Title III petition.  Section 928(a) of the Bankruptcy Code, which was incorporated by Title III, preserves prepetition liens on future "special revenues" acquired by the debtor.  In re Fin. Oversight & Mgmt Bd for P.R., 931 F.3d 111, 117 (1st Cir. 2019) (hereinafter, "HTA").[85]  Specifically, Section 928(a) provides that "special revenues acquired by the debtor after the commencement of the case **shall remain subject to any lien** resulting from any security agreement entered into by the debtor before the commencement of the case."  11 U.S.C. § 928(a) (emphasis added).  FOMB does not dispute this, arguing instead that HTA's Pledged Revenues are not "special revenues."  Its arguments are as startling as they are unpersuasive.

72.     The HTA Bonds are classic municipal revenue bonds.  This is the favored type of municipal finance for infrastructure projects, because it permits borrowing at a lower cost to the municipality.  The cost is lower because the bonds are secured by a pledge of one or more future revenue streams.  In exchange for this grant of security, bondholders give up recourse to the general credit of the municipality, and agree that their recourse is limited to the pledged collateral. For the Commonwealth and HTA, or FOMB standing in their shoes, to now challenge this

---

[85] The legislative history, which FOMB cites repeatedly in its Opposition (e.g., Opp. ¶¶ 88 & n. 61), supports Movants' position.  Congress enacted Section 928 and related "special revenue" provisions (e.g. 902(2), 922, and 927) due to constitutional concerns arising under the Contracts Clause, Takings Clause, and Tenth Amendment following the incorporation of Section 552 (cutting of post-petition liens) and other Bankruptcy Code provisions (such as 362, 547, 552, and 1111(b)) into chapter 9 in 1978.  S. REP. NO. 100-506 at 6, Natbony Reply Dec. Ex. 61.  As the First Circuit has noted, the incorporation of these Bankruptcy Code provisions into chapter 9 created "a slew of potential problems in the municipal context[,]" resulting from "termination of creditors' security interests in future special revenues." HTA, 931 F.3d at 116).  Among other problems, the incorporation of these Bankruptcy Code provisions into chapter 9 "made it possible that (1) revenue bonds would be converted into general obligation debt upon the filing of bankruptcy; (2) future streams of special revenues would be made accessible to general creditors; [and] (3) municipal debt limits would be exceeded."  Id. at 116; see also H.R. REP. NO. 95–595 at 4, Natbony Reply Dec. Ex. 62; S. REP. NO. 100-506 at 5-6, Natbony Reply Dec. Ex. 61.  The "overall goal" of Section 928 and the other special revenue provisions was to solve these problems by "retain[ing] as much as possible the pre-bankruptcy status of pledged special revenue financing transactions involving municipalities," including by "leaving intact the priority of payment of monies to those whose claims have been secured by a consensual lien against special revenues."  In re Jefferson Cty., 482 B.R. 404, 435-36 (Bankr. N.D. Ala. 2012).

financing's status as a special revenue bond financing is a remarkable breach of trust, and can only have a profoundly negative impact on the Commonwealth's and HTA's ability to issue revenue bonds in the future.

73.     FOMB first argues that Section 928(a) does not apply to the Excise Taxes[86] because they purportedly are not being "acquired by the *debtor*"—which FOMB claims can only mean HTA, notwithstanding the fact that the Commonwealth is also a Title III debtor.  See Opp. ¶ 107.[87]  But, as already explained, HTA acquires a statutory property interest in the Excise Taxes from the moment they are collected, see supra § I.A, and, further, HTA acquires an interest in the Excise Taxes when they are designated into Fund 278, see supra § I.B.  Thus, FOMB's theory that the Commonwealth can deprive an entity of ownership of funds simply by failing to effectuate a statutorily mandated transfer of those funds is wrong as a matter of law.[88]  Moreover, HTA's statutory rights to receive Excise Taxes that are collected and held in trust by the Commonwealth, and to pledge them to the repayment of the Bonds, are more than sufficient to allow the Bondholders' consensual liens to attach to those funds.  Indeed, under UCC Article 9, a debtor need not have actual possession of the subject property, nor even "outright ownership" of it, to grant a lien and for that lien to attach.[89]

---

[86] FOMB does not dispute that the Toll Revenues are special revenues, and therefore any defenses that it has in that regard are waived.  Section 928(a) plainly applies to the Toll Revenues.

[87] FOMB does not appear to contest the fact that the Toll Revenues are being "received" and "acquired" by HTA. Indeed, the Commonwealth and HTA have admitted that such revenues are collected and maintained solely within bank accounts in HTA's name and control. See, e.g., Opp. ¶¶ 17, 50, & Ex. A; Mar. 31 Flow of Funds Chart at 7-9, Natbony Reply Dec. Ex. 45 (Toll Flow of Funds); Ahlberg 82:18-83:2, Natbony Reply Dec. Ex. 21.

[88] The only purported mechanism FOMB identifies that prevents HTA from "receiving" or "acquiring" Pledged Revenues is the fiscal plan (whose compliance with PROMESA has never been established), and the fiscal plan itself is of finite duration.  Similarly, the moratorium imposed by the Moratorium Laws and Moratorium Orders is likewise of finite duration, and in any event, the Moratorium Laws and Moratorium Orders are expressly preempted by PROMESA.  See PROMESA § 303.  Consequently, any interference by way of the fiscal plan, Moratorium Laws, or Moratorium Orders with HTA's right to "receive" and "acquire" the Pledged Revenues is likewise of finite duration, and the question of what quantity of Pledged Revenues HTA is currently "receiving" or "acquiring" merely goes to the *value* (not the existence) of Movants' collateral—an issue that falls outside the scope of the briefing ordered by the Court in advance of the "preliminary hearing" (see ECF No. 12186 ¶ 1.d).

[89] See, e.g., Kunkel v. Sprague Nat. Bank, 128 F.3d 636, 641 (1997) (explaining it is "well settled" that the "rights in the collateral" sufficient to grant an enforceable lien under UCC § 9-203 "may be less than outright ownership," and

74.     Furthermore, the purpose of Section 928 is to preserve for bondholders "the benefit of their bargain with the municipal issuer . . . [namely] that they will have unimpaired rights to the project revenues pledged to them."  S. REP. NO. 100-506 at 12 (1988), Natbony Reply Dec. Ex. 61; HTA, 931 F.3d at 117 (noting that this statement applied to Section 928); see also H.R. REP. NO. 95–595 at 4, Natbony Reply Dec. Ex. 62,  (noting concern underlying section 928 was that project revenues could be diverted to the general treasury to pay general creditors, rather than flowing to revenue bondholders).  And as the National Bankruptcy Conference Statement (cited at Opp. ¶ 114) noted, "reorganization should not be at the expense of a legitimate expectation to rely on **and receive** specific collateral, **nor should it redo established procedures for handling separate municipal funds**."  Levin, Richard B. and Lawrence P. King, Bills Pertaining to Title 11 of the United States Code: The Bankruptcy Code Hearing on S. 1626, S. 1358, S. 1863, and S. 2279 Before the Subcomm. on Courts and Admin. Practice of the S. Comm. on the Judiciary, 100th Cong. 556 at 542 (1988) (Statement of the National Bankruptcy Conference (emphasis added).  In fact, the National Bankruptcy Conference Statement explicitly states that after payment of necessary operating expenses of the relevant project, pledged revenues should be applied first "to the indebtedness for which the revenues were pledged and *only then to other lawful purposes*." Id. at 556 (emphasis added).  The stated purpose of Section 928 would be completely subverted if a Title III debtor could destroy special revenue protections just by improperly shifting funds around from one account to another.[90]

---

that "[t]he concept of 'title' is not determinative"); In re Goode, 131 B.R. 835, 841 (Bankr. N.D. Ill. 1991) (beneficial owner had sufficient "rights" to property held in trust to grant an enforceable lien).  This would be true even if (as FOMB argues) the Commonwealth were the "true owner" of the Excise Taxes, because Commonwealth statutes expressly allow HTA to pledge those funds to Bondholders.  See Matter of Pubs, Inc. of Champaign, 618 F.2d 432, 436 (7th Cir. 1980) ("the debtor may clearly have sufficient 'rights' [in the collateral] for purposes of s 9-203 if the true owner *has agreed to the debtor's use of the property as security* or if the true owner has become estopped to deny creation of the security interest.") (emphasis added).

[90] FOMB's reliance on Las Vegas Monorail Co, see Opp. at 31 n.31, is misplaced and supports Movants' position. That case involved a chapter 11 debtor, so the special revenue provisions did not apply.  The court observed, however, that if the special revenue provisions had applied (i.e., if the case had been filed under chapter 9), the bondholders' "lien would be unaffected by the filing of the bankruptcy case, *and would encumber all of LVMC's revenues without*

75.     Consistent with this purpose, the First Circuit has explicitly stated that Section 928 preserves the bondholders' liens on post-petition revenues:

> [P]ost petition special revenues are still subject to the pre-petition lien created by the bondholder agreements despite the filing of a bankruptcy petition….[S]ection 928(a) does ensure that creditors receive the benefit of their bargain ***by securing their liens on <u>future streams</u> of pledged special revenues (and their right to protect their property interests in those revenues at the appropriate time and through the appropriate channels) despite the debtor's bankruptcy filing***.

<u>HTA</u>, 931 F.3d at 116-17 (emphasis added); <u>see also</u> <u>id.</u> at 132 (Lynch, J., dissenting) (noting that the special revenue provisions preserve "state law mandates" and leave "legal and contractual limitations of revenue bonds and state law intact").  Thus, the Bondholders' property rights remain intact and enforceable, notwithstanding the Debtors' misappropriation of their collateral.

76.     FOMB also disputes that the Excise Taxes fit within the Bankruptcy Code's definition of "special revenues."  But Movants established that the Excise Taxes fall within at least two categories of "special revenues" defined in Section 902(2), namely (i) "special excise taxes imposed on particular activities or transactions" (902(2)(B)) and (ii) "taxes specifically levied to finance one or more projects or systems" (902(2)(E)).  <u>See</u> Mot. ¶ 79.  Because Section 902(2) is phrased in the disjunctive, the Excise Taxes only need to fit within *one* of these Section 902(2) categories in order to qualify as "special revenues."[91]

---

*regard to the time of attachment*."  <u>Las Vegas Monorail Co.</u>, 429 B.R. at 329 n.18 (citing 11 U.S.C. § 928).  The court in <u>Las Vegas Monorail</u> also found that (i) the security interest attached to net project revenues prior to their deposit with the trustee and (ii) even though the lien was terminated under Section 552 (which cannot occur here because of Section 928), the court still ordered the debtor to follow "the procedures and obligations for handling and applying cash contained in the Indenture."  <u>Id.</u> at 339-40, 345-46.

[91] <u>See, e.g.</u>, <u>Toledo-Fernandez v. U.S.</u>, 2007 WL 222138, *32 (D.P.R. 2007) (if a "statute is written in the disjunctive[, it] should be interpreted as establishing two alternative means" of being satisfied).

77.     FOMB contends the Excise Taxes are not "special excise taxes imposed on particular activities or transactions"[92] because the Excise Taxes are not imposed by HTA.  Opp. ¶ 108.  However, there is nothing in Section 902(2)(B) that requires "special excise taxes" to be imposed by a chapter 9 or Title III debtor.[93]  FOMB also claims the Excise Taxes are not "imposed on particular activities or transactions" because they are "generally" available for HTA's corporate purposes.  Opp. ¶¶ 109.  But FOMB is confusing the subsections of 902 here; there is nothing in the plain language of Section 902(2)(B) that provides the type of exception for "generally available" taxes posited by FOMB.  Only Section 902(2)*(E)* (*not* subsection (B)) addresses taxes "levied to finance the general purposes of the debtor."  Cf. 11 U.S.C. §§ 902(2)(B), (E).  FOMB's argument about the supposed "general availability" of the Excise Taxes is therefore irrelevant to the analysis under Section 902(2)(B).

78.     FOMB's argument is not even supported by the legislative history.  As confirmed by the language immediately preceding the language quoted by FOMB from the Senate Report, special excise taxes "are taxes specifically identified and **pledged in the bond financing documents**[.]"  S. REP. NO. 100-506 at 21 (1988) (emphasis added), Natbony Reply Dec. Ex. 61.  Therefore, once the Excise Taxes were pledged pursuant to the Resolutions, the 2002 Security Agreement, and the supplemental resolutions (see supra §§ II.A-B), they are "***not*** 'generally' available to all [HTA or Commonwealth] creditors ***under state law***."  S. REP. at 23 (emphasis added).  That is the law of municipal finance:  A municipal debtor's pledge of revenues "creates a lien or charge upon the specific revenues designated, whether then or thereafter collected . . .

---

[92] As the First Circuit has recognized, excise taxes include a "'tax imposed on the manufacture, sale, or use of goods (such as a cigarette tax), or an occupation or activity (such as a license tax or an attorney occupation fee).'"  United Parcel Serv., Inc. v. Flores-Galarza, 318 F.3d 323, 326 n.1 (1st Cir. 2003) (citation omitted).

[93] FOMB's argument is not even supported by the law review note it cites.  Opp. ¶ 108 (citing Flachsbart A.D., Municipal Bonds in Bankruptcy: Sec. 902 (2) and the Proper Scope of Special Revenues in Chapter 9, 72 Wash. & Lee L. Rev. 955, 998 (2015) (hereinafter "Flachsbart")).  Aside from actually stating that tax receivables *are* special revenues (Flachsbart at 1002-03, 1008), the portion of the note cited by FOMB discusses the interplay between *Section 902(2)(A) and non-tax receivables*, as evidenced by the examples of official statements cited in the note.  See id. at 998-99 & n. 227.  The cited language did not discuss Section 902(2)(B).

and . . . precludes the lawful appropriation of such revenues to any other governmental function" that would be prejudicial to bondholders.  Fla. v. City of Lakeland, 16 So. 2d 924, 925 (Fla. 1943).[94]

79.     In any event, the Excise Tax Statutes, bond documents, and Commonwealth accounting practices all confirm that the Excise Taxes were not "generally available to *all* creditors" of HTA and the Commonwealth, as FOMB contends.  Opp. ¶ 109.  And the lien carve-out for Constitutional claw-back does not change the fundamental nature of the revenue pledge. If it did, Puerto Rico would be forever unable to finance infrastructure projects by issuing special revenue bonds.  Further, the conditions for a use of the Pledged Revenues to pay GO Bondholders have never been satisfied (and FOMB does not attempt to demonstrate, or even allege, that they have).

80.     FOMB also disputes that the Excise Taxes are "taxes specifically levied to finance one or more projects or systems"[95] under Section 902(2)(E)—even though  Puerto Rico law explicitly provides that the Excise Taxes "are imposed by the Commonwealth and allocated to [HTA] *to finance transportation and traffic facilities and systems*."  9 L.P.R.A. § 2012a(i) (emphasis added).[96]  Indeed, FOMB admits as much when it states that the pledged taxes "are allocated to HTA to fulfill its purposes—*i.e.*, to *run the system*…."  See Opp. ¶ 112 (emphasis

---

[94] The legislative history also supports the conclusion that excise taxes (which are imposed on specific products and specific activities) are special revenues under Section 902(2)(B).  H.R. Rep. No. 100-1011 at 6 (1988), Natbony Reply Dec. Ex. 65 ("The second type, described in new subsection 2(B), covers special excise taxes imposed on particular activities or transactions—*such as an excise tax on hotel or motel rooms imposed by some municipalities or an excise tax on the sale of alcoholic beverages.  A general sales tax, which is not imposed on particular activities or transactions, would not be a special revenue*.") (emphasis added).

[95] While this category excludes taxes levied to fund a debtor's "general purposes," that exception applies on its face only to "general property, sales, or income taxes."  11 U.S.C. § 902(2)(E).  Here, the pledged taxes are excise taxes on specific products (i.e., licenses, petroleum, cigarettes), *not* general property, sales, or income taxes.

[96] In addition, the Senate Report clarifies that Section 902(2)(E) would also cover "any special tax or portion of a general tax specifically levied to pay for a municipal financing[.]"  S. Rep. No. 100-506 at 21, Natbony Reply Dec. Ex. 61.  Here, Puerto Rico law makes clear that the Excise Taxes were, in fact, a special tax, and were levied for the express purpose of financing debt service on the Bonds.  See 9 L.P.R.A. § 2012a(i).

added).  By FOMB's own admission, and the plain language of the Bankruptcy Code, Section 902(2)(E) is satisfied here.[97]

### III.  PROMESA Does Not "Preempt" The Excise Tax Statutes

#### A.  PROMESA Is Not "Inconsistent" With The Excise Tax Statutes

81.  FOMB advances the novel theory that PROMESA preempted the Excise Tax Statutes.[98]  This preemption is supposedly based on PROMESA's grant to FOMB of authority over the Commonwealth budget and the supposed limitation of priority claims to administrative expenses.  See Opp. ¶¶ 5, 83-87.  Neither argument withstands scrutiny.

82.  The foundation of FOMB's novel "preemption" theory is a distortion of PROMESA § 4, entitled "Supremacy," which merely states:  "The provisions of this Act shall prevail over any general or specific provisions of territory law, State law, or regulation that is ***inconsistent with*** this Act."  48 U.S.C. § 2103 (emphasis added).  Thus, any preemptive effect Section 4 possesses is limited to cases of *conflict*, as the First Circuit has previously found.  See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico, 916 F.3d 98, 104 (1st Cir. 2019) (addressing preemption under PROMESA § 4) (quoting United States v. Maldonado-Burgos, 844 F.3d 339, 346 (1st Cir. 2016) ("[A] provision of the Puerto Rico Constitution cannot prevail where it ***conflicts*** with applicable federal law.") (citing United States v. Quinones, 758 F.2d 13, 18 (1st Cir. 1985); United States v. Acosta-Martinez, 252 F.3d 13, 18 (1st Cir. 2001)) (emphasis added).[99]

---

[97] FOMB raises a series of arguments regarding Section 928(b), which subjects special revenue liens to certain "necessary operating expenses."  11 U.S.C. § 928(b).  But FOMB also acknowledges that Section 928(b) will not be before the Court at the preliminary hearing.  Opp. ¶ 121.  Movants respectfully reserve the right to respond on this issue at a later, appropriate time.  FOMB will bear the burden of proof on Section 928(b), not Movants.  In re Jefferson Cty., 482 B.R. 404, 427-28 n.14 (Bankr. N.D. Ala. 2012).

[98] Notably, AAFAF did not join this aspect of the opposition.

[99] This reading of PROMESA is consistent with the preemption cases under the Bankruptcy Code, which uniformly hold that the Bankruptcy Code does not preempt the field, but merely preempts inconsistent state law.  See, e.g., Waggett v. Select Portfolio Serv'g, Inc. (In re Waggett), Nos. 09-04152-8-SWH, 14-00096-8-SWH, 2015 WL 1384087, at *6 (Bankr. E.D.N.C. Mar. 23, 2015) (recognizing that Congress did not "intend that the Bankruptcy Code be so pervasive that it occupy the field of debtor/creditor relations") (citation omitted); see also, e.g., Stellwagen v. Clum, 245 U.S. 605, 613 (1918) ("[S]tate laws are suspended [i.e., preempted] only to the extent of actual conflict with the system provided by the Bankruptcy Act"); Sturges v. Crowninshield, 17 U.S. 122 (1819) (same).

83.     Nothing in PROMESA is "inconsistent with" Movants' rights under the Excise Tax Statutes, which predate PROMESA.  Far from rescinding or repudiating property or contract rights (or authorizing FOMB to do so), PROMESA expressly commands that existing property and contractual rights are to be respected:   Section 201, which FOMB suggests is somehow inconsistent with Movants' contractual rights, expressly required FOMB to "respect the relative lawful priorities or lawful liens . . . in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of this Act" when formulating fiscal plans and budgets.  PROMESA § 201(b)(1)(N); 48 U.S.C. § 2141(b)(1)(N).  Moreover, PROMESA's supremacy clause provides only that "the provisions of this Act" shall prevail over inconsistent Commonwealth law.  PROMESA § 4, 48 U.S.C. § 2103.  FOMB's fiscal plan or budget is not a "***provision of this Act***," and nothing in PROMESA suggests that Congress intended to grant FOMB the power to issue preemptive edicts in its sole and absolute discretion through its budgetary or fiscal plan certification powers.

84.     There is likewise no inconsistency between Movants' property and contractual rights and the Title III bankruptcy process.  See Opp. ¶ 87.  The Bankruptcy Code provisions made applicable here under Title III expressly protect the rights of secured creditors.  See PROMESA § 301, 48 U.S.C. § 2161 (making the adequate protection provisions of 11 U.S.C. § 361 and other creditor protection provisions applicable in PROMESA).   And as in any bankruptcy, both secured and unsecured creditors' rights remain intact unless and until they are addressed as part of a confirmed plan of adjustment that complies with the requirements of PROMESA.  Id. (making provisions of 11 U.S.C. §§ 362, 1123 and other provisions applicable in PROMESA).  There is thus no inconsistency between Movants' property and contractual rights and either the Title II budgetary process or the Title III restructuring.

85.    Because there is no conflict between the Excise Tax Statutes and PROMESA, there is no statutory basis for this Court to find that the Excise Tax Statutes have been preempted. "[T]he plain wording" of PROMESA's supremacy clause, "which necessarily contains the best evidence of Congress' pre-emptive intent[,]" precludes any such finding. Puerto Rico v. Franklin Cal. Tax-Free Tr., 136 S. Ct. 1938, 1946 (2016).

### 1.    There Is No Inconsistency Between FOMB's Budget Powers and Movants' Legal Rights.

86.    FOMB's preemption argument centers around PROMESA § 202, allowing FOMB to develop and approve the Commonwealth's budget. FOMB asserts that such authority preempts any obligation to make transfers of funds that "are not certified by the Oversight Board." See Opp. ¶¶ 5, 83-87. However, as FOMB itself repeatedly acknowledges, its budgetary power under PROMESA § 202 is nothing more than the power to make (or not make) appropriations. See, e.g., Opp. ¶ 85 ("PROMESA sections 201 and 202 give the Oversight Board exclusive authority to certify fiscal plans and budgets for the Commonwealth setting all Commonwealth appropriations."). And as explained above, the HTA Bonds are not appropriation bonds, and the Commonwealth has never treated the Excise Tax Revenues as funds subject to legislative appropriation. See supra ¶¶ 12, 15-18, 21.

87.    In any event, under more than a century of well-settled precedent, a budgetary appropriation (or its absence) has no effect on the property and contract rights of third parties against the government. "An appropriation per se merely imposes limitations upon the Government's own agents; it is a definite amount of money intrusted [sic] to them for distribution; but its insufficiency does not pay the Government's debts, nor cancel its obligations, nor defeat the rights of other parties." Ferris v. U.S., 27 Ct. Cl. 542, 546 (1892); see Salazar v. Ramah Navajo Chapter, 567 U.S. 182, 191 (2012) ("Although the agency itself cannot disburse funds beyond

those appropriated to it, the Government's 'valid obligations will remain enforceable in the courts.'").

88. In fact, the Supreme Court has recently reaffirmed, in <u>Maine Community Health Options v. United States</u>, 590 U.S. ____ (April 27, 2020), that the lack of a budget appropriation has no effect on the Government's obligations to third parties (or a third party's capacity to enforce that obligation). The Court held that where the government has incurred an obligation the "'failure or refusal by Congress to make the necessary appropriation would not defeat the obligation[.]'" <u>Id.</u> (slip op. at 10) (quoting 2 GAO, Principles of Federal Appropriations Law, p. 2-4 to -5 (4th ed. 2016), *available at* https://www.gao.gov/legal/appropriations-law-decisions/red-book (hereinafter "<u>Redbook</u>") (excerpt attached hereto as Ex. 63 to the Natbony Reply Dec.). Similarly, the Court reaffirmed that where a government "create[s] an obligation directly by statute . . . [a] subsequent failure to appropriate enough funds neither abrogated nor suspended the Government's pre-existing commitment to pay." 590 U. S. ____, (slip op. at 10-11) (citation omitted). As the Court's analysis makes clear, appropriations or a lack of appropriations are a matter of the government's internal financial control and do not change the property or contract rights of third parties. <u>See also</u> <u>Local Initiative Health Auth. for L.A. Cty. v. United States</u>, 142 Fed. Cl. 1, 19 (Fed. Cl. 2019) ("Congress' mere refusal to pay has not modified its contractual obligation in any way."); <u>Martin v. United States</u>, 130 Fed. Cl. 578, 585-86 (Fed. Cl. 2017) (lack of appropriations not a viable legal defense to the government's legal obligations to pay third parties).

89. FOMB relies on <u>Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.)</u>, (cited by FOMB as <u>Rossello</u>, Opp. ¶ 85), which stands for the entirely unremarkable proposition that the *Commonwealth* cannot reprogram funds in contravention of the *Commonwealth budget* certified by FOMB. <u>See</u> 945 F.3d 3 (1st Cir. 2019)

(holding that "PROMESA prohibits the *Governor* from spending any funds that are not budgeted" (emphasis added)). The case, which clearly involved appropriations and FOMB's control over the Commonwealth budget, does not in any way address the continuing effect of preexisting Puerto Rico special revenue legislation dedicating a stream of excise taxes, segregated from the Commonwealth's General Fund, to the repayment of a public corporation's bonds. And while PROMESA empowers FOMB to certify budgets for Puerto Rico instrumentalities, it does not authorize FOMB to flout or repeal preexisting local laws dedicating specific revenue streams to these instrumentalities for the benefit of their bondholders, totally outside of the annual appropriations process. In fact, PROMESA contemplates dedicated revenue streams beyond the remit of appropriations. See, e.g., PROMESA § 107(b)(1) (providing that the Commonwealth "shall designate a dedicated funding source, not subject to subsequent legislative appropriations, sufficient to support the annual expenses of the Oversight Board").[100]

90. Indeed, the First Circuit has made clear that in the context of a restructuring it will find the power to preempt property rights only where Congress gives a "clear and specific indication of [its] intent" to grant "power to appropriate the property of third parties." In re Irving Tanning Co., 496 B.R. 644, 659-65 (B.A.P. 1st Cir. 2013). There is no such statement here.

### 2.   **Far from Preempting Them, PROMESA Title III Expressly Protects the Legal Rights of Revenue Bondholders.**

91. FOMB also argues that PROMESA preempts the Excise Tax Statutes by incorporating only "a single priority claim: administrative expenses" as set forth in 11 U.S.C. § 507(a)(2). Opp. ¶ 87. FOMB goes on to argue that PROMESA "does not recognize that any claim arising from an appropriation statute has priority." Id. As an initial matter, Movants never asserted "priority" as a basis for seeking stay relief, so FOMB's arguments about which claims

---

[100] Although the issue is not presented on this Motion, whether FOMB's exercise of these powers falls within the scope of the authority delegated to it by Congress is a matter subject to judicial review, notwithstanding PROMESA § 106(e). Movants reserve the right to seek such review at an appropriate juncture.

have priority under PROMESA are not relevant to the Motion.  In any event, FOMB's stretch to identify an inconsistency between PROMESA and the Excise Tax Statutes misses the mark.  As set forth in detail above, under the Excise Tax Statutes, the Excise Taxes are special revenues that are not subject to budgetary appropriation.  In this regard, it is immaterial whether PROMESA recognizes that "any claim arising from an appropriation statute has priority."  See supra ¶¶ 12, 15-18, 21.  This point alone is fatal to FOMB's argument.

92.     While FOMB claims that PROMESA recognizes "no priority claims other than administrative claims provided by Bankruptcy Code section 507(a)(2)" (Opp. ¶ 87), it simply ignores the express provisions confirming that contractual and property rights would be part of (and not disposed of prior to) the Title III process.  See PROMESA § 301, 48 U.S.C. § 2161 (incorporating secured and unsecured creditor protection provisions); PROMESA § 201(b)(1)(N), 48 U.S.C. § 2141 (requiring a fiscal plan to respect "lawful priorities and lawful liens . . . effect prior to the date of enactment of this Act."); and § 314(b)(7) (requiring a Title III plan of adjustment comply with existing fiscal plans).

93.     In any event, the fact that PROMESA incorporates Section 507(a)(2)—the priority of administrative expenses over *unsecured* claims—does not preempt the Excise Tax Statutes.  FOMB is comparing apples to oranges.  Section 507 governs priority of *unsecured* claims, and is not relevant to the priority of *secured* claims, such as Movants' secured claim to the Excise Taxes.  See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 5, (2000) (citing, inter alia, 11 U.S.C. §§ 506, 1129(b)(2)(A)) (stating that administrative expenses do not have priority over secured claims); In re Titan Indus., Inc., No. 00-104, 2001 WL 36381910, at *3 (B.A.P. 1st Cir. June 29, 2001) (the priorities of Section 507 do "not come into play until all valid liens on the property are satisfied") (quoting In re SPM Mfg. Corp. 984 F.2d 1305, 1312 (1st Cir. 1993)) ("Administrative expenses . . . do not have priority over secured claims.").  Moreover,

and likewise fatal to FOMB's argument, PROMESA incorporates provisions from the Bankruptcy Code that recognize the protected status of secured claims.  PROMESA § 301(a) (incorporating, inter alia, 11 U.S.C. §§ 506, 507(a)(2), 1129(b)(2)(A)).[101]   For these reasons, PROMESA's incorporation of Section 507(a)(2) does not preempt the Excise Tax Statutes.[102]

### B. FOMB's Claimed Preemption Powers are Inconsistent with the Structure and Purpose of PROMESA.

94.   FOMB's claimed preemption power under Title II also must be rejected because it is inconsistent with the structure and purpose of PROMESA.

95.   *First*, FOMB's budgetary powers under PROMESA § 202, 48 U.S.C. § 2142, are distinct from the restructuring provisions of Title III.  Indeed, the budgetary powers will remain in effect even after the Commonwealth emerges from Title III.  See PROMESA § 209, 48 U.S.C. § 2149.  Under FOMB's interpretation, it would retain discretion to preempt any and all legal rights to payment, even post-Title-III.  Obviously, post-Title-III, Congress envisioned that FOMB would continue to control the Commonwealth's budget—but like any government, the Commonwealth would be obligated to uphold approved contracts it makes.  FOMB cannot approve a long-term contract one year, and then the next decide to "preempt" it under PROMESA § 202. If that were possible, it would be impossible for Puerto Rico to ever regain access to credit markets.

---

[101] Moreover, if Congress had intended to preempt all other priorities by incorporating Section 507(a)(2), why would it have required, for purposes of classifying claims under Section 1122 of the Bankruptcy Code, consideration of whether "claims have priority over other claims"?   See PROMESA § 301(e).  Section 507(a)(2) addresses only administrative expense claims, which are *not* classified under Section 1122, so if the administrative expense priority were the only priority recognized under PROMESA, Section 301(e) would make no sense.   See 11 U.S.C. § 1123(a)(1).

[102] If anything, the fact that PROMESA itself does not establish any priority scheme, other than with respect to administrative expense claims under 11 U.S.C. § 507(a)(2), proves that PROMESA does *not* preempt Commonwealth law priorities. Unlike in chapter 11 cases, where Section 507's detailed priority scheme may conflict with, and therefore preempt, state law priorities, Congress's decision not to incorporate most of Section 507 into PROMESA means that there is no PROMESA-specific priority scheme that could conflict with or preempt Commonwealth law. Congress's decision not to establish a federal priority scheme through incorporation of Section 507 is doubtless a product of the general deference to Commonwealth law exhibited throughout PROMESA, including in Sections 201(b)(1)(M), 201(b)(1)(N), 303, and 407.

See Salazar, 567 U.S. at 191 (explaining that being a reliable contract partner protects "the long-term fiscal interests of the United States").

96.     *Second*, FOMB's arguments would render the Title III process essentially irrelevant.  Under FOMB's theory, "***Any prepetition obligations to pay*** are inconsistent with . . . PROMESA's grant to the Oversight Board of power over uses of the Debtor's revenues in Title II."[103]   But if that were true, the mere enactment of PROMESA, the beginning of the covered period for Puerto Rico and its instrumentalities, and the appointment of FOMB gave FOMB free rein to decide what debts would be paid and which would not be paid.  There would be no need for this Court to consider and approve a plan of adjustment.  However, the elaborate procedures for both a consensual (Title VI) and a non-consensual (Title III) restructuring make clear that the Commonwealth's debt obligations can only be modified or adjusted through a proceeding under one of those provisions, not surreptitiously through fiscal plans or budgets.

97.     *Third*, the fact that FOMB's budgets cover only individual fiscal years while FOMB remains in effect further undermines any suggestion that those powers could be used to permanently extinguish existing contract or property rights.  FOMB offers no textual basis for extending the preemptive effect of FOMB and its budgetary powers beyond the specific fiscal years that FOMB remains in effect.  See PROMESA § 209; 48 U.S.C. § 2149.

**C.     There Is No "Inconsistency" Between the Concept of a Restructuring and Protecting Property Rights.**

98.     FOMB argues that Movants' property rights would violate the "equality" principle.  (Opp. ¶¶ 2, 5)  FOMB has it backwards:  Finding that Movants have *no* property rights in their pledged collateral will upend decades of municipal financing practice and market

---

[103] See Opposition of the Financial Oversight Management Board to Urgent Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company to Adjourn Hearing on Motions for Relief from the Automatic Stay and Extend Deadline for Replies in Support of Motions for Relief from the Automatic Stay, ECF No. 10958 at ¶ 20.

expectations, and the consequences of such a result will reverberate far beyond the Commonwealth.

99.     The "equality" principle regarding unsecured creditors has no application here, as the treatment Movants request is entirely ordinary and commonplace for *any* secured creditor.[104]  It is axiomatic that secured creditors and unsecured creditors are not of equal priority and therefore should not share equally in a *pro rata* division of a debtor's property.  See Haesloop v. United States, 2000 WL 1607316, at *3 (Bankr. E.D.N.Y. Aug. 30, 2000) (secured claims are scheduled separately from unsecured claims when a debtor files bankruptcy).  Nearly every complex restructuring involves some secured claims and some unsecured claims, where payouts to each differ based on the value of the secured claimants' collateral.

100.    Importantly, the Bankruptcy Code strikes a balance between respect for the rights of secured creditors in their collateral and affording the debtor the opportunity to restructure its affairs and reduce its debt load to a sustainable level—these "twin goals" are of equal importance.[105]  And these twin aims inherent in our bankruptcy regime have far-reaching effects.  U.S. municipalities historically have enjoyed some of the lowest borrowing costs in the world— precisely because the U.S. has strong respect for the rule of law and property rights.  The special protections for revenue bond creditors built into the Bankruptcy Code (§ 928) are a classic example of this respect for property rights, ensuring that even in a restructuring, the rights of revenue bond

---

[104] See Ticonic Nat'l Bank v. Sprague, 303 U.S. 406, 412 (1938) ("[T]o the extent that one debt is secured and another is not there is manifestly an inequality of rights between the secured and unsecured creditors, which cannot be affected by the principle of equality of distribution."); Chemical Bank N.Y. Tr. Co. v. Kheel, 369 F.2d 845, 848 (2d Cir. 1966) (concurring opinion) ("Equality among creditors who have lawfully bargained for different treatment is not equity but its opposite[.]").

[105] See Hoseman v. Weinschneider, 322 F.3d 468, 475 (7th Cir. 2003) ("The administration of bankruptcy estates has twin goals of maximization of realization on creditors' claims and of prompt and efficient administration of the estate") (citations omitted); Kokoszka v. Belford, 417 U.S. 642, 645–46 (1974) ("It is the twofold purpose of the bankruptcy act to convert the estate of the bankrupt into cash and distribute it among creditors and then to give the bankrupt a fresh start with such exemptions and rights as the statute left untouched."), reh'g denied, 419 U.S. 886 (1974) (internal quotation marks omitted).

creditors in their collateral will be respected.[106] But in this case, the largest municipal restructuring in U.S. history, FOMB asks the Court to abandon the federal courts' traditional respect for property rights and the rule of law. Such a decision would meaningfully impair investor confidence in the enforceability of municipal debt in the United States and increase borrowing costs for financially troubled municipalities across the country. And some of these, at the margin, that otherwise might have avoided a bankruptcy filing will find it all the more difficult to do so—ultimately forcing untold numbers of additional citizens to endure the hardships that the citizens of Puerto Rico have unfortunately already had to face as a consequence of their government's mismanagement of its financial affairs.[107]

### D. If Accepted, FOMB's "Preemption" Theory Renders PROMESA Unconstitutional Under the Fifth Amendment.

101. FOMB's construction of PROMESA would also violate the Due Process Clause and Takings Clause of the Fifth Amendment, because depriving individuals of property or contract rights requires due process and just compensation—and PROMESA § 202 provides none. See Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 589 (1935) ("The bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment."); Semaphore Entm't Grp. Sports Corp. v. Gonzalez, 919 F. Supp. 543, 549 (D.P.R. 1996) ("The

---

[106] See 6 Collier on Bankruptcy ¶ 928.02 (16th ed. 2020) (in general, § 928(a) prevents special revenues that secure revenue bonds from being made available for the municipality's general expenses or obligations); Altair Global Credit Opportunities Fund (A), LLC v. U.S., 138 Fed. Cl. 742, 779 (Fed. Cl. 2018) (§ 928 requires that "postpetition special revenues remain subject to any lien created before the commencement of the municipal bankruptcy proceeding"); In re Las Vegas Monorail Co., 429 B.R. 770, 782 (Bankr. D. Nev. 2010) (the purpose of § 928 was to prevent special revenues from being diverted for the municipality's general expenses or obligations).

[107] See, e.g., Richard Porter, *Commentary: Bankruptcy Looms For Chicago If There's No Pension Fix*, CHICAGO TRIBUNE (Sept. 26, 2019), https://www.chicagotribune.com/opinion/commentary/ct-opinion-bankruptcy-chicago-pensions-crisis-20190926-4iwzdnfcjzh2tac7pw6i5fbgea-story.html (discussing how Chicago is teetering on the brink of bankruptcy); Elizabeth Bauer, *Is Chicago The Next Detroit?*, FORBES (Jan. 16, 2019), https://www.forbes.com/sites/ebauer/2019/01/16/is-chicago-the-next-detroit/#1bc755ee6894 (noting that, without reform, Chicago could be headed for bankruptcy); Alexandra Scaggs, *Puerto Rico Debt Plan Leaves Investors With A Choice: Lose Money or Fight*, BARRON'S (June 17, 2019), https://www.barrons.com/articles/puerto-rico-bankruptcy-plan-leaves-bondholders-with-tough-choice-51560790827 (noting that the Puerto Rico bankruptcy has caused prices on some of its bonds to drop).

right and liberty to contract are, thus, recognized as a liberty interest protected under the due process clause.") (citing Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 571-72 (1972)); PROMESA § 202 (c), (d), (e). Specifically, due process requires that a deprivation of a protected property interest "be preceded by notice and opportunity for hearing appropriate to the nature of the case." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985) (quotations omitted). Section 202 of PROMESA does not provide for that, and FOMB has never provided it. An after-the-fact judicial proceeding does not cure a Due Process Clause violation caused by a governmental agency decision that deprived someone of property or contract rights without due process. See Logan v. Zimmerman Brush Co., 455 U.S. 422, 436 (1982) (holding that a post-deprivation hearing is constitutionally inadequate absent necessity of quick action or impracticality of providing any pre-deprivation process).

102.    Further, the Opposition contains a section arguing that "Movants Do Not Have Property Interests Protected by the Takings Clause." See Opp. § III.G. However, the Opposition readily admits that liens are subject to the Takings Clause. It also concedes that a secured claimholder's contractual entitlements cannot be eliminated without violating the Fifth Amendment unless "*the collateral's value is in some way preserved*." Opp. at 26, 47, 48 (emphasis added). Actions that must be taken to preserve the value of liens, or that if not taken will destroy their value, are protected property interests entitled to protection under the Fifth Amendment.[108]

---

[108] See Dimino v. Sec'y of Commonwealth, 695 N.E.2d 659, 663-64 & n.4 (Mass. 1998); First National Bank of Boston v. Maine Turnpike Authority, 136 A.2d 699, 722 (Me. 1957); Armstrong v. U.S., 364 U.S. 40, 48 (1960) ("The total destruction by the Government of all value of these liens, which constitute compensable property, has every possible element of a Fifth Amendment 'taking' and is not a mere 'consequential incidence' of a valid regulatory measure."). FOMB's authority on this issue is not to the contrary. First, In re Nichols, 440 F.3d 850, 854 (6th Cir. 2006), actually supports Movants. The Sixth Circuit explained that "[w]hile the bankruptcy laws allow interference with contractual arrangements and some diminution of property rights, if the interference goes so far as to constitute 'total destruction' of the value in the property held by a creditor, it violates the Fifth Amendment and may not stand." There is a total destruction of the lien in this case. The Opposition's reliance on In re Plant Insulation Co., 469 B.R. 843, 875 (Bankr. N.D. Cal. 2012), is similarly unhelpful. Plant Insulation considered only rights to compensation for litigation claims, which are frequently discharged in bankruptcy proceedings. See id. The Opposition's citation to Bd. of Trustees v. Thompson Bldg. Materials, Inc., 749 F.2d 1396, 1406 (9th Cir. 1984), fares no better. Thompson merely explains Security Industrial Bank and finds that certain pension benefits are not property under the Takings Clause. Likewise, reliance on In re Marion St. P'ship, 108 B.R. 218, 224 (Bankr. D. Minn. 1989), In re Elmore, 94

103.     Similarly, if the Enabling Act and Excise Tax Statutes have been, as FOMB claims, preempted by PROMESA, that preemption constitutes an unconstitutional taking of Movants' statutory contract with the Commonwealth.[109]

**E.     Even If FOMB Had Any Power To Affect Pre-Existing Property Rights Through The Budget Process, FOMB Has Not Validly Exercised Its Power In Compliance With The U.S. Constitution or PROMESA, And Its Fiscal Plans And Budgets Cannot Have Preemptive Effect**

104.     Assuming *arguendo* that FOMB's interpretation of the scope of its powers under PROMESA § 202 is accurate, the deprivation of Movants' property rights would nonetheless be unlawful as wholly inconsistent with the terms of PROMESA and the U.S.

---

B.R. 670, 677 (Bankr. C.D. Cal. 1988), In re Booth, 19 B.R. 53, 61 n.18 (Bankr. D. Utah 1982) and Wright v. Union Cent. Life Ins. Co., 311 U.S. 273, 278 (1940) for the propositions that contract rights are not subject to adequate protection and Section 361 only protects collateral (Opp. at n.55) ignores the fact that Movants' security interests are property rights subject to the just compensation requirement of the Takings Clause. U.S. Tr. Co., 431 U.S at 19 n.16. FOMB's own filing recognizes that, in this circumstance, collateral must be "preserved." Opp. at 48. Because it was not, and no just compensation was provided, there is an unconstitutional taking. See, e.g., Dimino, 695 N.E. 2d at 705. Finally, the allegation that the Excise Tax Statutes are "repealable at any time" (Opp. ¶ 92) does not relieve the Commonwealth of its Constitutional obligations. To the contrary, the Supreme Court has held for over a century that, if a tax is repealed, it must be replaced by another tax sufficient to secure the debt obligation. See Von Hoffman v. City of Quincy, 71 U.S. 535, 554-55 (1866); Louisiana ex rel. Hubert v. City of New Orleans, 215 U.S. 170, 177-78 (1909).

[109] Movants possess the full suite of statutory, contractual, and property rights afforded to them under the Resolutions, Enabling Act, and Excise Tax Statutes. *In addition*, Movants are parties to a statutory contract with the Commonwealth which constitutes an independent property interest protected by the Fifth Amendment. "[A] statute is itself treated as a contract when the *language* and *circumstances* evince a legislative intent to create private rights of a contractual nature enforceable against the State." U.S. Tr. Co. of N.Y. v. New Jersey, 431 U.S. 1, 17 n.14 (1977) (emphasis added). The Commonwealth's numerous pledges and covenants to bondholders, including non-impairment covenants, see Mot. ¶¶ 9-12, evidence a "clear indication that the [Puerto Rico] legislature intend[ed] to bind itself contractually" to bondholders. See Parella v. Ret. Bd. of R.I. Emps' Ret. Sys., 173 F.3d 46, 60 (1st Cir. 1999). The surrounding "circumstances"—that the Commonwealth's instrumentalities were offering bonds, a quintessential contractual instrument—further confirms "a clear and unequivocal intent to contract." Parella, 173 F.3d at 61. The strength of these covenants, and the circumstances around bondholders reliance on these covenants, creates a legitimate claim of entitlement to specifically identifiable property (the Pledged Revenues)—which is the touchstone of a protected property interest. Vázquez-Velázquez v. Puerto Rico Highway & Transp. Auth., 2016 WL 183653, at *4 (D.P.R. Jan. 14, 2016) ("plaintiffs [must] have a '*legitimate claim of entitlement.*'") (emphasis added) (quoting Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972)). Courts have regularly found that governmental financial contracts can create property rights that mere ordinary contracts do not, and treat as suspect efforts to avoid those obligations. Rhode Island Higher Educ. Assistance Auth. v. U.S. Dep't of Educ., 929 F.2d 844, 850 (1st Cir. 1991) (noting as an "excellent example" of a vested property right in a contract prior case law in which "the [Supreme] Court struck down a statute which purported to repeal the government's obligation to pay benefits under a war risk insurance plan, holding that plaintiffs, by paying monthly premiums, had acquired vested rights protected by the fifth amendment."); Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment, 477 U.S. 41, 55 (1986) ("Congress does not have the power to repudiate its own debts, which constitute 'property' to the lender, simply in order to save money.").

Constitution. Specifically, as Ambac, Assured, and/or FGIC have previously alleged in their complaints and counterclaims in Adversary Proceeding Nos. 17-159-LTS (ECF No. 1, the "Ambac Complaint"), 18-59-LTS (ECF No. 1, the "Assured/FGIC Complaint"), and 19-363-LTS (ECF No. 4, the "FGIC Counterclaims"), respectively, FOMB's fiscal plans and the budgets based on them (i) violate the Contracts Clause of the U.S. Constitution;[110] (ii) violate the Takings Clause of the U.S. Constitution;[111] (iii) are preempted as moratorium laws[112] and/or as unlawful executive orders[113] by Section 303 of PROMESA; and (iv) violate Section 407 of PROMESA,[114] among other defects.

105. Furthermore, FOMB exceeded its statutory authority under PROMESA in purporting to develop and certify its fiscal plans and budgets, because FOMB refused to make numerous determinations necessary to determine whether the fiscal plans and budgets complied with Section 201(b) of PROMESA, including determinations as to (i) what lawful priorities and liens exist under Puerto Rico law (Section 201(b)(1)(N)); (ii) which government entities are entitled to which assets, funds, and resources (Section 201(b)(1)(M)); and (iii) which government services qualify as "essential public services" (Section 201(b)(1)(B)). See Assured/FGIC Complaint ¶¶ 120, 255-59. Because FOMB never made these and other determinations that are prerequisites to the certification of a fiscal plan and budget, FOMB has never made a "certification determination" with respect to a fiscal plan or budget as such term is used in PROMESA. Moreover, FOMB's fiscal plans and budgets in fact fail to comply with Sections 201(b)(1)(N), 201(b)(1)(M), and 201(b)(1)(B). See Assured/FGIC Complaint ¶¶ 131-153, 260-68. As such,

---

[110] See Ambac Complaint ¶¶ 174-82, 204-11; Assured/FGIC Complaint ¶¶ 169-212, 294-97; FGIC Counterclaims ¶¶ 263-274.

[111] See Ambac Complaint ¶¶ 183-85, 212-19; Assured/FGIC Complaint ¶¶ 213-22, 298-301; FGIC Counterclaims ¶¶ 275-303.

[112] See Assured/FGIC Complaint ¶¶ 157-63, 302-05; FGIC Counterclaims ¶¶ 263-274.

[113] See Ambac Complaint ¶¶ 186-92, 225-32; FGIC Counterclaims ¶¶ 263-274.

[114] See Ambac Complaint ¶¶ 193-97, 233-37; Assured/FGIC Complaint ¶¶ 154-56, 272-77.

FOMB's fiscal plans and budgets also fail to qualify as "Fiscal Plans" as defined in PROMESA, because they are not "in accordance with" Section 201 of PROMESA.  See Assured/FGIC Complaint ¶¶ 117-118, 269-271.

106.     As noted in the Motion, however, the First Circuit in Ambac Assurance Corporation v. Commonwealth of Puerto Rico, 927 F.3d 597 (1st Cir. 2019), held that Section 305 of PROMESA bars the Title III Court from hearing the types of challenges to the fiscal plans and budgets outlined above, and instead advised Movants to "seek traditional stay relief pursuant to 11 U.S.C. § 362" and then raise these "constitutional and statutory arguments in a separate action" in another forum—which is exactly what Movants did by bringing the Motion.  Id. at 605; see also Mot. ¶ 115.  Therefore, even if the Court were otherwise to find FOMB's preemption argument colorable, stay relief would still be warranted under Ambac to permit Movants to challenge the particular *manner* in which FOMB has purported to exercise its supposedly preemptive powers through its fiscal plans and budgets.  No final adjudication of the preemption issue would therefore be possible unless and until Movants have been granted stay relief to raise their "constitutional and statutory arguments" in another forum (and unless and until those arguments have in fact been adjudicated in that other forum).

## IV.    Movants Need Only Demonstrate a "Colorable Claim" to be Entitled to Relief, Notwithstanding FOMB's Distortion of the Relevant Standard

107.     FOMB urges this Court to ignore First Circuit law and convert this lift-stay proceeding into an adjudication of the merits of Movants' claims.  See Opp. at ¶¶ 59-65.  To support this position, FOMB cites to decisions from other circuits.  This Court should decline FOMB's invitation, and instead apply the First Circuit's "colorable claim" standard—which Movants easily satisfy.  See Mot. ¶¶ 43-49.

108.     FOMB's assertion that Movants "understate their burden" by invoking the colorable claim standard (Opp. ¶ 63) is based largely on a flawed interpretation of the First

Circuit's decision in <u>Grella v. Salem Five Cent Savings Bank</u>, 42 F.3d 26 (1st Cir. 1994). There, the First Circuit unequivocally held that "[a]s a matter of law, the only issue properly and necessarily before a bankruptcy court during relief from stay proceedings is whether the movant creditor has a colorable claim." <u>Id.</u> at 34. The court further emphasized that "a decision to lift the stay is not an adjudication of the validity or avoidability of the claim, but only a determination that the creditor's claim is sufficiently plausible to allow its prosecution elsewhere." <u>Id.</u>

109. Because the <u>Grella</u> court drew a parallel between a preliminary injunction hearing and a lift-stay hearing, FOMB misinterprets <u>Grella</u> to hold Movants to a "preliminary injunction" standard on the Lift-Stay Motions. Opp. ¶ 63. But the First Circuit compared a lift-stay hearing to a preliminary injunction hearing merely to illustrate the limited scope of the lift-stay proceedings, not to describe the standard of proof governing a motion for stay relief. <u>See</u> <u>Grella</u>, 42 F.3d at 33 (a lift-stay hearing requires a "***speedy*** and ***necessarily cursory determination*** of the reasonable likelihood that a creditor has a legitimate claim or lien as to a debtor's property") (emphasis added). Moreover, while the legislative history of Section 362 of the Bankruptcy Code cited in <u>Grella</u> indicates that the lift-stay *hearing* operates in a similar manner to a hearing on a preliminary injunction, the cited House report nowhere suggests that the standard of proof is the same. <u>See</u> <u>id.</u> at 33 n.8 (quoting H.R. REP. NO. 95–595, 95th Cong., 1st Sess. 344 (1977)).

110. Accordingly, courts in the First Circuit have consistently recognized that the stay relief standard is "a low threshold." <u>In re Old Cold, LLC</u>, 602 B.R. 798, 825 (B.A.P. 1st Cir. 2019) (quoting <u>In re Pansier</u>, No. 18-22297-BEH, 2019 WL 1495100, at *4 (Bankr. E.D. Wis. Apr. 3, 2019)); <u>In re Vertullo</u>, 610 B.R. 399, 404 (B.A.P. 1st Cir. 2020).[115]

---

[115]   In advocating for a higher standard, FOMB cites <u>Peaje II</u> for the proposition that a court considering cause to lift the stay must express its "view as to the precise nature and extent of [movant's] collateral." 899 F.3d at 13. But <u>Peaje</u> did not require lift-stay movants to "establish[]" the nature and extent of their collateral (Opp. ¶ 60); instead, the Title III court must make a "preliminary determination" of a movant's claim to the debtor's property, <u>Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R.</u>, 939 F.3d 340, 352 (1st Cir. 2019), and "may take into account any matter . . . that clearly refutes a creditor's claim to the property." <u>Grella</u>, 42 F.3d at 34. Thus, after considering the parties' evidence

## V.    Movants Have Standing To Bring The Motion

111.    FOMB relies on the Second Circuit's much-criticized decision in In re Comcoach Corp., 698 F.2d 571 (2d Cir. 1983), to argue that "[p]arty in interest status does not include a creditor of a creditor of a debtor."[116]  This argument depends entirely on the assumption that Movants are asserting HTA's claims against the Commonwealth.  That assumption is manifestly incorrect.  The Motion is for relief from the stay, which is preventing Bondholders from enforcing their statutory and contractual rights to the collateral securing the obligations they own (or insure).  By definition, Movants are seeking to enforce *their own rights, as secured Bondholders*, under the liens and security interests granted to secure the debts *owed to them*.  They are parties-in-interest, with everything to lose if they cannot enforce their rights to more than a billion dollars in Pledged Revenues.

112.    The Opposition's position is also entirely dependent on the assumptions that the Excise Taxes are property of the Commonwealth and that the taxes are not subject to liens valid against the Commonwealth.  Both of these assumptions are hotly contested.  They are, in fact, the crucial merits issues to be decided by the Court.  The Opposition's standing argument, in short, is merely a circular rehash of its positions on the merits.

113.    Further, Section 326(d)(1) authorizes stay relief "for cause, including the lack of adequate protection of **an interest in property.**"  Movants contend that they have liens and other "interests in property" with respect to the Pledged Revenues.  They also contend that the Excise Taxes subject to their liens are either the property of HTA, even when in Treasury's hands, or in the alternative, are subject to a statutory lien enforceable directly against the Commonwealth.  These are clearly interests in property belonging to the Movants, as Bondholders.  Section

---

regarding their relative property interests, the Court need only determine whether Movants advance a "colorable" claim.  Movants have done that and much more.

[116]    The other cases cited by FOMB for this proposition cite to and rely on the criticized principles in Comcoach.  See In re Lifeco Inv. Grp., 173 B.R. 478, 487 (Bankr. D. Del. 1994) (citing to Comcoach); In re Lopez, 446 B.R. 12, 17 n. 23 (Bankr. D. Mass. 2011) (same); In re Hayes, 393 B.R. 259, 267 (Bankr D. Mass. 2008) (same).

362(d)(2) in turn authorizes stay relief with respect to an **"act against property,"** and that is precisely what Movants are seeking stay relief to bring: an action to enforce their liens and other property interests in the Pledged Revenues.

114. In keeping with Section 362(d)'s focus on property interests as the basis for standing, Section 362(d) expressly grants standing to a "party in interest" to "request . . . relief from the stay." 11 U.S.C. § 362(d). "Party in interest" is a broad concept that encompasses *all* parties affected by the automatic stay, not just direct creditors.[117] "[T]he test for whether one is a party in interest in the First Circuit is whether a party has a colorable claim to the property," and Movants clearly have such a colorable claim. See In re Maisel, 378 B.R. 19, 21 (Bankr. D. Mass. 2007); see also Grella v. Salem Five Cent. Sav. Bank, 42 F.3d 26, 32 (1st Cir. 1994).[118] Movants are seeking to enforce their own liens and other property interests against HTA and the Commonwealth—they are clearly parties in interest.

115. Moreover, Comcoach has been criticized as being (i) too restrictive and (ii) incompatible with Section 362(d)'s use of the term "party in interest" rather than "creditor."[119]

---

[117] See, e.g., In re Weisband, 427 B.R. 13, 17 (Bankr. D. Az. 2010) ("Any party affected by the stay should be entitled to seek relief"); In re Jones, No. 02-17125-SR, 2002 WL 34560880, at *2 (Bankr. E.D. Pa. Sept. 27, 2002) ("the better approach is to recognize that any party affected by the stay should be entitled to relief. This avoids the anomalous situation in which a party is subject to the automatic stay but is unable to seek relief even if damage may result from its continuance" (citation omitted)); In re Vieland, 41 B.R. 134, 138 (Bankr. N.D. Oh. 1984) (holding that a party in interest under Section 362(d) is "determined on a case by case basis with reference to the interest asserted and how said interest is affected by the automatic stay"); see also, e.g., In re Kang Jin Hwang, 396 B.R. 757, 768 (Bankr. C.D. Cal. 2008), rev'd and remanded on other grounds, 438 B.R. 661 (C.D. Cal. 2010) ("In general, a party in interest, in the bankruptcy context, is anyone who is entitled to express a view with respect to a matter before the court"); In re El Comandante Mgmt. Co., LLC, 359 B.R. 410, 416-18 (Bankr. D.P.R. 2006) ("party in interest" generally refers to any person or entity that "holds a financial stake in the outcome of the debtor's estate . . ."); In re Overview Equities, 240 B.R. 683, 686-87 (Bankr. E.D.N.Y. 1999) (holding that a party with a legal interest in property, rather than a claim, was a party in interest).

[118] Section 1109(b) of the Bankruptcy Code itself indicates that the term "party in interest" encompasses more than merely a creditor, providing: "A party in interest, *including* the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b) (emphasis added).

[119] See, e.g., In re Horton, 595 B.R. 1, 4 (Bankr. D.D.C. 2019) (referring to Comcoach's "misguided discussion"); In re Sweports, Ltd., 476 B.R. 540, 543 (Bankr. N.D. Ill. 2012) (stating that "[a]s an exercise in statutory interpretation, Comcoach leaves something to be desired" and noting "[h]ad Congress wanted to limit standing under Section 362(d) to creditors, it could have used the term 'creditor'"); Matter of Brown Transp. Truckload, Inc., 118 B.R. 889, 893 (Bankr. N.D. Ga. 1990) ("In many instances the mechanical application of the Comcoach rule would leave a party

Given that Section 362(d) expressly uses the term "party in interest" and not "creditor," the Court should reject FOMB's flawed reliance on <u>Comcoach</u> and its progeny. Indeed, failure to follow the statutory text here would create "an anomalous situation where a party is subject to the automatic stay but is unable to seek relief even if damage may result from its continuance." 2 <u>Collier on Bankruptcy</u> ¶ 362.07. That is why "the better approach is to recognize that any party affected by the stay should be entitled to move for relief." <u>Id.</u>

116.   Finally, even if there were any merit to FOMB's unsupported suggestion that contractual "privity" with the Commonwealth is necessary to seek stay relief (Opp. ¶ 66), the Motion identifies numerous covenants made by the Commonwealth to Movants, thereby establishing such privity. <u>See</u> Mot. ¶¶ 9-12.[120] Under any analysis, Movants have standing.

## <u>CONCLUSION</u>

WHEREFORE, Movants respectfully request that the Court enter an order, substantially in the form attached to the Motion as Exhibit A, (i) lifting the automatic stay to permit Movants to enforce the application of the Pledged Revenues to the payment of the Bonds, including by permitting Movants to enforce their liens on the Pledged Revenues; or, in the alternative, (ii) ordering adequate protection of Movants' interests in the Pledged Revenues and in the repayment of the Bonds. With respect to the issues to be considered at the preliminary hearing, Movants respectfully request that the Court find that Movants have demonstrated that they have a colorable claim to a property interest in the Pledged Revenues and that they have standing to bring the Motion.

---

without . . . recourse, creating 'an anomalous situation where a party is subject to the automatic stay but is unable to seek relief even if damage may result from its continuance . . .'"); <u>see also</u> <u>Collier on Bankruptcy</u> ¶ 362.07[2] (noting that "the better approach is to recognize that any party affected by the stay should be entitled to move for relief").

[120] Numerous courts have held that such statutory non-impairment provisions create contractual privity between a state and the revenue bondholders of a public corporation. <u>See</u>, <u>e.g.</u>, <u>U.S. Trust Co. v. New Jersey</u>, 431 U.S. 1, 17-18 (1977); <u>Franklin Cal. Tax-Free Trust v. Puerto Rico</u>, 85 F. Supp. 3d 577, 604 (D. P.R. 2015). Here, moreover, the Resolutions, bond forms, and various supplemental resolutions are signed by a Commonwealth officer, the Secretary of Transportation and Public Works. <u>See</u> 1998 Resolution at 21, 75, Natbony Dec. Ex. D; Resolution 83-01, Natbony Reply Dec. Ex. 54; Resolution 2003-30, HTA_STAY0004323-4475, Natbony Reply Dec. Ex. 64.

70

## <u>CERTIFICATION</u>

In accordance with paragraph 9 of the *Final Case Management Order for Revenue Bonds* (ECF No. 12186), Movants certify that (i) they have taken reasonable efforts to avoid duplication and submit a brief that is no longer than necessary, and (ii) they have used reasonable efforts to draft a single brief and coordinate to minimize duplicative briefs.

Dated:     New York, New York
           April 30, 2020


CASELLAS ALCOVER & BURGOS P.S.C.     CADWALADER, WICKERSHAM & TAFT LLP


By: _/s/ Heriberto Burgos Pérez_____     By: _/s/ Mark C. Ellenberg_____
    Heriberto Burgos Pérez                    Howard R. Hawkins, Jr.*
    USDC-PR 204809                            Mark C. Ellenberg*
    Ricardo F. Casellas-Sánchez               William J. Natbony*
    USDC-PR 203114                            Ellen M. Halstead*
    Diana Pérez-Seda                          Thomas J. Curtin*
    USDC-PR 232014                            Casey J. Servais*
    P.O. Box 364924                           200 Liberty Street
    San Juan, PR 00936-4924                   New York, NY 10281
    Telephone:  (787) 756-1400                Telephone:  (212) 504-6000
    Facsimile:  (787) 756-1401                Facsimile:  (212) 504-6666
    Email:      hburgos@cabprlaw.com          Email:      howard.hawkins@cwt.com
           rcasellas@cabprlaw.com                      mark.ellenberg@cwt.com
           dperez@cabprlaw.com                         bill.natbony@cwt.com
                                 ellen.halstead@cwt.com
*Attorneys for Assured Guaranty Corp.*             thomas.curtin@cwt.com
*and Assured Guaranty Municipal Corp.*             casey.servais@cwt.com


    * Admitted *pro hac vice*

    *Attorneys for Assured Guaranty Corp. and*
    *Assured Guaranty Municipal Corp.*

ADSUAR MUNIZ GOYCO SEDA & PEREZ-OCHOA PSC

WEIL, GOTSHAL & MANGES LLP

By:/s/ *Eric Perez-Ochoa*
    Eric Pérez-Ochoa
    USDC-PR No. 206,314
    E-mail:    epo@amgprlaw.com

By:/s/*Luis A. Oliver-Fraticelli*
    Luis A.  Oliver-Fraticelli
    USDC-PR NO. 209,204
    E-mail:    loliver@amgprlaw.com

    208 Ponce de Leon Ave., Suite 1600
    San Juan, PR 00936
    Tel.:    (787) 756-9000
    Fax:    (787) 756-9010

*Attorneys for National Public Finance Guarantee Corp.*

By:/s/ *Robert Berezin*
    Jonathan Polkes*
    Gregory Silbert*
    Robert Berezin*
  Kelly Diblasi*
  Gabriel A. Morgan*
  767 Fifth Avenue
    New York, New York 10153
    Tel.:    (212) 310-8000
    Fax:    (212) 310-8007
    Email:    jonathan.polkes@weil.com
            gregory.silbert@weil.com
            robert.berezin@weil.com
            kelly.diblasi@weil.com
            gabriel.morgan@weil.com

* admitted *pro hac vice*

*Attorneys for National Public Finance Guarantee Corp.*

FERRAIUOLI LLC

MILBANK LLP

By: /s/ *Roberto Cámara-Fuertes*
    ROBERTO CÁMARA-FUERTES
    USDC-PR NO. 219,002
    E-mail:    rcamara@ferraiuoli.com


By: /s/ *Sonia Colón*
    SONIA COLÓN
    USDC-PR NO. 213809
    E-mail:    scolon@ferraiuoli.com

    221 Ponce de Leon Ave., 5th Floor
    San Juan, PR 00917
    Tel.:    (787) 766-7000
    Fax:    (787) 766-7001

*Counsel for Ambac Assurance Corporation*

By: /s/ *Atara Miller*
    DENNIS F. DUNNE*
    ATARA MILLER*
    GRANT R. MAINLAND*
    JOHN J. HUGHES*
    55 Hudson Yards
    New York, New York 10001
    Tel.:    (212) 530-5000
    Fax:    (212) 530-5219
    Email:    ddunne@milbank.com
        amiller@milbank.com
        gmainland@milbank.com
        jhughes2@milbank.com

*admitted *pro hac vice*

*Counsel for Ambac Assurance Corporation*

ARENT FOX LLP

By: /s/ *David L. Dubrow*
    DAVID L. DUBROW*
    MARK A. ANGELOV*
    1301 Avenue of the Americas
    New York, New York 10019
    Tel.:       (212) 484-3900
    Fax:      (212) 484-3990
    Email:    david.dubrow@arentfox.com
              mark.angelov@arentfox.com

By: /s/ *Randall A. Brater*
    RANDALL A. BRATER*
    1717 K Street, NW
    Washington, DC 20006
    Tel.:       (202) 857-6000
    Fax:      (202) 857-6395
    Email:    randall.brater@arentfox.com

*admitted pro hac vice

*Counsel for Ambac Assurance Corporation*

75

REXACH & PICÓ, CSP

BUTLER SNOW LLP


By: */s/ María E. Picó*_____
    María E. Picó
    USDC-PR 123214
    802 Ave. Fernández Juncos
    San Juan PR 00907-4315
    Telephone:  (787) 723-8520
    Facsimile:   (787) 724-7844
    E-mail:        mpico@rexachpico.com

    *Attorney for Financial Guaranty*
    *Insurance Company*

By: */s/ Martin A. Sosland*_____
    Martin A. Sosland (*pro hac vice*)
    5430 LBJ Freeway, Suite 1200
    Dallas, TX 75240
    Telephone:  (469) 680-5502
    Facsimile:   (469) 680-5501
    E-mail:        martin.sosland@butlersnow.com

    *Admitted pro hac vice in Case No. 17-BK-*
    *03283-LTS and Case No. 17-BK-03567-LTS*

    Jason W. Callen
    150 3rd Ave., S., Suite 1600
    Nashville, TN 37201
    Telephone:  615-651-6774
    Facsimile:   615-651-6701
    Email:         jason.callen@butlersnow.com

    *Admitted pro hac vice in Case No. 17-BK-*
    *03283-LTS and Case No. 17-BK-03567-LTS*

    *Attorneys for Financial Guaranty Insurance*
    *Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed this document electronically with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all parties of record in the captioned case.

At New York, New York, the 30th day of April, 2020.

By: _/s/ Howard R. Hawkins, Jr._
Howard R. Hawkins, Jr.
* admitted *pro hac vice*