**<u>Movants' HTA Exhibit 18</u>**

CERTIFICATE AS TO OFFICIAL STATEMENT

I, LUIS E. LANDRAU, Secretary of the Puerto Rico Highway Authority, DO HEREBY CERTIFY that attached hereto is a true and correct copy of the Official Statement which is the same in all material respects as the Official Statement in connection with the $75,000,000 Puerto Rico Highway Authority Highway Revenue Bonds (Series L) of the Authority which was presented to the Secretary of Transportation and Public Works on August 10, 1977, and which was approved by him by resolution duly adopted on said date.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Authority this 31st day of August, 1977.

_____
Secretary
Puerto Rico Highway Authority

(SEAL)

HTA_STAY0008154

*Under the provisions of the Acts of Congress now in force, the bonds offered hereby and the interest thereon are, in the opinion of Bond Counsel, exempt from Federal, State, Commonwealth of Puerto Rico and local taxation.*

<u>NEW ISSUE</u>

*Ratings*

Moody's:  **Baa-1**
Standard & Poor's:  **A**

# $75,000,000

# Puerto Rico Highway Authority

## Highway Revenue Bonds (Series L)

Dated July 1, 1977                                    Due July 1, as shown below

Principal and semi-annual interest (January 1 and July 1, first payment January 1, 1978) on all Series L Bonds will be payable at the principal corporate trust office of The Chase Manhattan Bank (National Association), New York, New York, or at The Chase Manhattan Bank (National Association), San Juan, Puerto Rico, or at the corporate trust offices of Bank of America National Trust and Savings Association, San Francisco and Los Angeles, California. The Series L Bonds will be issuable as coupon bonds in the denomination of $5,000, registrable only as to both principal and interest, reconvertible into coupon bonds, as provided in the Bond Resolution, at The Chase Manhattan Bank (National Association), New York, New York, as Fiscal Agent and Registrar.

The Series L Bonds may be redeemed, upon thirty days' notice, either (a) in whole on July 1, 1987, or on any date thereafter, from any moneys available therefor, or (b) in part in inverse order of maturity on July 1, 1987, or any interest payment date thereafter, from moneys in the Sinking Fund, at the following prices plus accrued interest:

| | |
|---|---|
| July 1, 1987 to June 30, 1990 ............................................................ | 103% |
| July 1, 1990 to June 30, 1993 ............................................................ | 102 |
| July 1, 1993 to June 30, 1996 ............................................................ | 101 |
| July 1, 1996 and thereafter ............................................................ | 100 |

except that an amount of the Series L Bonds equal to the respective amortization requirements may be redeemed on July 1, 1993 and on July 1 in each year thereafter at 100% and accrued interest without premium.

The Series L Bonds are being issued under the provisions of the Bond Resolution and together with $561,280,000 outstanding parity bonds are secured by a pledge of all moneys received by the Authority on account of the gasoline tax and gas oil or diesel oil tax heretofore allocated to the Authority by the Excise Act and any tolls or other charges for such period of time as they are imposed by the Authority for the use of any of its Traffic Facilities financed by bonds of the Authority issued under the Bond Resolution. All of the tax proceeds so pledged are subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico described herein.

Neither the credit of the Commonwealth of Puerto Rico nor that of any of its political subdivisions is pledged for the payment of the Series L Bonds.

### $15,000,000 Serial Bonds

| Amount | Year | Interest Rate | Price | Amount | Year | Interest Rate | Price |
|---|---|---|---|---|---|---|---|
| $ 500,000 | 1979 | 4 % | 100% | $1,000,000 | 1986 | 5.80% | 100% |
| 500,000 | 1980 | 4½ | 100 | 1,500,000 | 1987 | 6 | 100 |
| 500,000 | 1981 | 4¾ | 100 | 1,500,000 | 1988 | 6.10 | 100 |
| 500,000 | 1982 | 5 | 100 | 1,500,000 | 1989 | 6.20 | 100 |
| 1,000,000 | 1983 | 5.20 | 100 | 1,500,000 | 1990 | 6.30 | 100 |
| 1,000,000 | 1984 | 5.40 | 100 | 1,500,000 | 1991 | 6.40 | 100 |
| 1,000,000 | 1985 | 5.60 | 100 | 1,500,000 | 1992 | 6½ | 100 |

### $60,000,000 Term Bonds
### 7% due July 1, 2007 — Price 100%
#### (plus accrued interest)

*The Series L Bonds are offered for delivery when, as and if issued and delivered to the Underwriters, subject to the approval of legality by Brown, Wood, Ivey, Mitchell & Petty, New York, New York, Bond Counsel. The offering of the Series L Bonds is made only by means of the Official Statement, copies of which may be obtained from such of the Underwriters as may lawfully offer the Series L Bonds in this jurisdiction. It is expected that the Series L Bonds will be delivered in definitive form in New York, New York, on or about August 31, 1977.*

## The First Boston Corporation

| | |
|---|---|
| Blyth Eastman Dillon & Co.<br>Incorporated | Merrill Lynch, Pierce, Fenner & Smith<br>Incorporated |
| Bache Halsey Stuart Shields<br>Incorporated | Kidder, Peabody     Co.<br>Incorporated |
| Banco Popular de Puerto Rico | Salomon Brothers     Weeden & Co.<br>Incorporated |

August 10, 1977

CONFIDENTIAL

## COMMONWEALTH OF PUERTO RICO

*Secretary of Transportation and Public Works*

Elmer Olivieri Cintron

Puerto Rico Highway Authority

*Executive Director*

Juan Jose Jimenez

*Financial Advisor*

Government Development Bank for Puerto Rico

*Paying Agents*

The Chase Manhattan Bank
(National Association)
New York, New York
San Juan, Puerto Rico

Bank of America National
Trust and Savings Association
San Francisco, California
Los Angeles, California

*Fiscal Agent and Registrar*

The Chase Manhattan Bank
(National Association)
New York, New York

*Bond Counsel*

Brown, Wood, Ivey, Mitchell & Petty
New York, New York

*Traffic Engineers*

Wilbur Smith and Associates
New Haven, Connecticut
Columbia, South Carolina
Miami, Florida

CONFIDENTIAL

IN CONNECTION WITH THIS OFFERING THE UNDERWRITERS MAY OVER-ALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE SECURITIES OFFERED HEREBY AND OTHER BONDS OF THE AUTHORITY AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET.   SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

## TABLE OF CONTENTS

| | Page |
|---|---|
| Summary Statement | ii |
| Application of Proceeds | 1 |
| Security | 1 |
|    Reserve Account | 2 |
|    Additional Bonds | 2 |
| Provisions Relating to Public Debt of the Commonwealth | 2 |
|    Payment of Public Debt | 2 |
|    Special Fund for General Obligation Debt Service | 3 |
|    Debt Limitation | 3 |
|    Commonwealth General Obligation and Guaranteed Debt | 3 |
| The Authority | 4 |
|    History and Purpose | 4 |
|    Management | 4 |
|    Powers | 5 |
| Resources Available to the Authority | 5 |
|    Gasoline Tax and Gas Oil or Diesel Oil Tax | 5 |
|    Tolls | 5 |
|    Right of Way Appropriations | 6 |
|    Federal Aid | 6 |
| Data on Motor Vehicle Registration, Gasoline Consumption and Highway User Taxes and Fees | 6 |
| Authority Indebtedness | 7 |
| Revenues and Debt Service Coverage | 8 |
|    Historical Revenues and Debt Service Coverage | 8 |
|    Maximum Annual Debt Service Coverage | 8 |
|    Estimated Revenues and Debt Service Coverage | 8 |
| Commonwealth Highway System | 9 |
|    Existing System | 9 |
|    Five Year Priorities Construction Program | 9 |
|    Highway Map of Puerto Rico | 10 |
|    Maintenance | 12 |
| Principal and Interest Requirements | 13 |
| Summary of Certain Provisions of the Bond Resolution | 14 |
|    Revenues | 14 |
|    Sinking Fund | 14 |
|    Redemption | 16 |
|    Construction Fund | 16 |
|    Issuance of Additional Bonds | 16 |
|    Investment of Funds | 17 |
|    Modifications | 17 |
|    Miscellaneous Covenants | 18 |
| Note Purchase Agreement | 18 |
| Tax Exemption | 19 |
| Underwriting | 20 |
| Eligibility of Bonds | 20 |
| Legal Matters | 20 |
| Government Development Bank for Puerto Rico | 20 |
| Ratings | 20 |
| Miscellaneous | 20 |
| Appendix I | |
|    Letter of Wilbur Smith and Associates, Traffic Engineers | I-1 |
| Appendix II | |
|    Commonwealth of Puerto Rico | II-1 |
| Appendix III | |
|    Financial Statements | III-1 |
| Appendix IV | |
|    Proposed Form of Opinion | IV-1 |

i

HTA_STAY0008157

## SUMMARY STATEMENT

*(Subject in all respects to more complete information in the Official Statement)*

**The Authority**—Puerto Rico Highway Authority, a public corporation and governmental instrumentality, was created in 1965 to have complete control of any traffic facilities owned, operated, constructed or acquired by it. The Authority is part of the Department of Transportation and Public Works and the Authority's powers and duties have been conferred on the Secretary of Transportation and Public Works.

Government Development Bank for Puerto Rico, by statute, has acted as financial advisor to the Authority in connection with the Series L Bonds.

**Purpose**—The Series L Bonds are being issued to provide for the payment of $73,060,000 of notes issued as interim financing for construction of Traffic Facilities and legal, printing and financing expenses.

**Security**—The Series L Bonds are issued under the provisions of the Bond Resolution and, together with $561,280,000 outstanding parity Bonds, are secured by a pledge of the gross receipts of the gasoline tax and gas oil or diesel oil tax heretofore allocated to the Authority by the Excise Act and any tolls or other charges for such period of time as they are imposed by the Authority for the use of any of its Traffic Facilities financed by Bonds issued under the Bond Resolution. All of the tax proceeds so pledged are subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. See "Payment of Public Debt" under *Provisions Relating to Public Debt of the Commonwealth.*

Under the provisions of the Excise Act, the Commonwealth allocates to the Authority all of the proceeds of the 16¢ per gallon tax on gasoline and 4¢ of the 8¢ per gallon tax on gas oil or diesel oil. The Commonwealth Government has covenanted in the Excise Act that it will not reduce the tax on gasoline below 16¢ per gallon and the tax on gas oil or diesel oil below 4¢ per gallon and that the amount allocated to the Authority will not be reduced until all Bonds of the Authority secured by the pledge thereof, together with the interest thereon, are fully paid.

Under the Bond Resolution, all such gross receipts and tolls received by the Authority must first be applied to monthly deposits in the Sinking Fund for the payment of debt service on the Bonds and required deposits in the Reserve Account.

**Reserve Account**—Pursuant to the Bond Resolution, the Authority shall accumulate and maintain in the Reserve Account an amount equal to the maximum annual debt service in any future year on account of all Bonds outstanding. The amount in the Reserve Account at June 30, 1977 was $50,176,335 as then required. Maximum annual debt service inclusive of the Series L Bonds is $55,055,750 which the Authority estimates will be on deposit in the Reserve Account by October 1977.

**Revenues and Debt Service Coverage**—Total revenues available for debt service for the fiscal year ended June 30, 1977 amounted to $108,064,000 (unaudited) and covered maximum annual debt service on all outstanding Bonds and the Series L Bonds 1.96 times.

**Additional Bonds**—Additional parity Bonds may be issued under the Bond Resolution for the cost of any Traffic Facilities, including the payment of any outstanding notes of the Authority; provided, however, that the Revenues, excluding tolls or other charges, received by the Authority for any 12 consecutive months of the preceding 15 months shall be not less than 150% of the maximum annual debt service on all Bonds issued and outstanding and the additional Bonds then to be issued.

**Five Year Priorities Construction Program**—The Authority currently plans to expend $577,800,000 for highway construction and related costs during the five fiscal years ending June 30, 1982. It is estimated that $59,100,000 of that amount will be financed by interim borrowings, with the remainder to be provided primarily by tax and toll revenues, Federal aid, and aid from the Commonwealth of Puerto Rico. The amount of highway construction and related costs which it is estimated will be financed by borrowed funds has declined sharply in recent years, reflecting reductions in planned construction and increases in anticipated Federal and Commonwealth of Puerto Rico aid.

**Tax Exemption**—Under the provisions of the Acts of Congress now in force, the Series L Bonds and the interest thereon are, in the opinion of Bond Counsel, exempt from Federal, State, Commonwealth of Puerto Rico and local taxation.

**Commonwealth of Puerto Rico**—The Caribbean island of Puerto Rico came under United States sovereignty in 1898 upon termination of the Spanish-American War. Under a compact which governs relations between the United States and Puerto Rico, both share a common defense, a common market, a common currency and a common citizenship. The Commonwealth of Puerto Rico, as the island's government is designated, exercises virtually the same control over its internal affairs as do the states of the United States.

*Neither the credit of the Commonwealth of Puerto Rico nor that of any of its political subdivisions is pledged for the payment of the Series L Bonds.*

ii

CONFIDENTIAL

HTA_STAY0008158

# Puerto Rico Highway Authority

### San Juan, Puerto Rico

August 10, 1977

The purpose of this Official Statement of Puerto Rico Highway Authority (the "Authority"), which includes the cover page, the summary statement, the map and the appendices, is to furnish information with respect to its $75,000,000 Puerto Rico Highway Authority Highway Revenue Bonds (Series L) (the "Series L Bonds"). The Series L Bonds, the $561,280,000 outstanding parity bonds and all additional bonds hereafter issued under Resolution No. 68-18 adopted by the Authority on June 13, 1968, as amended (the "Bond Resolution"), are herein collectively called the "Bonds".

## APPLICATION OF PROCEEDS

The proceeds of the Series L Bonds will be used as follows:

| | |
|---|---|
| Payment of notes issued by the Authority as interim financing for construction of Traffic Facilities. See *Authority Indebtedness* | $73,060,000 |
| Underwriting discount and estimated legal, printing and financing expenses | 1,940,000 |
| Principal amount of the Series L Bonds | $75,000,000 |

## SECURITY

The Bonds are secured by a pledge of (i) gross receipts of the 16¢ per gallon tax on gasoline and 4¢ of the 8¢ per gallon tax on gas oil or diesel oil imposed by the Commonwealth of Puerto Rico (the "Commonwealth") and allocated to the Authority after certain deductions for gasoline used in sea and air transportation, both levied by Act No. 2 of the Legislature of Puerto Rico, approved January 20, 1956, as amended (the "Excise Act"), subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico described herein, and (ii) any tolls or other charges imposed by the Authority for the use of any of the Traffic Facilities as defined in "Revenues" under *Summary of Certain Provisions of the Bond Resolution*. The Commonwealth has covenanted in the Excise Act that the tax on gasoline will not be reduced below 16¢ per gallon and the tax on gas oil or diesel oil will not be reduced below 4¢ per gallon and that the amount of such taxes allocated to the Authority will not be reduced until all Bonds of the Authority secured by the pledge thereof, together with the interest thereon, are fully paid. See "Gasoline Tax and Gas Oil or Diesel Oil Tax" under *Resources Available to the Authority*.

Under the provisions of the Excise Act, the proceeds of the taxes imposed on gasoline and gas oil or diesel oil and allocated to the Authority shall not be deposited in the General Fund of the Treasury of the Commonwealth but shall be deposited in a Special Fund for the benefit of the Authority.

1

CONFIDENTIAL

Under the terms of the Bond Resolution, all tax proceeds deposited in a Special Fund for the benefit of the Authority and received by the Authority, and all tolls and other charges imposed by the Authority must first be applied to satisfy the required monthly deposits to the Sinking Fund for the payment of principal of and interest and premium, if any, on the Bonds and the deposits to the Reserve Account. See "Sinking Fund" under *Summary of Certain Provisions of the Bond Resolution.*

The Excise Act provides that if the moneys in the Reserve Account are used to cover any deficiency in the Bond Service Account or the Redemption Account, then the Reserve Account shall be reimbursed, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth, from the first proceeds received by the Commonwealth in the next fiscal year or years derived from (i) any other taxes which may then be in effect on any other fuels or propellants which are used, among other purposes, to propel highway vehicles and (ii) any remaining portion of the tax on gasoline and gas oil or diesel oil then in effect. The proceeds of said other taxes and the remainder of the gasoline tax and gas oil or diesel oil tax to be used to reimburse the Reserve Account shall not be deposited in the General Fund of the Treasury when collected but shall be deposited in a Special Fund for the benefit of the Authority to reimburse the Reserve Account.

Neither the credit of the Commonwealth nor that of any of its political subdivisions is pledged for the payment of the Series L Bonds.

**Reserve Account**

Pursuant to the Bond Resolution, a Reserve Account is created in the Sinking Fund for the payment of principal of and interest on all outstanding Bonds whenever moneys in the Bond Service Account are insufficient for such purpose. The Authority covenants to accumulate and to maintain in the Reserve Account, to the extent provided in the Bond Resolution, an amount equal to the maximum Principal and Interest Requirements (as defined herein) in any future year on all Bonds outstanding. Until such amount is accumulated, the deposit in the Reserve Account in each fiscal year shall equal at least 20% of that amount. The amount in the Reserve Account at June 30, 1977 was $50,176,335 as required. Maximum Principal and Interest Requirements on all outstanding Bonds and the Series L Bonds amount to approximately $55,055,750.

The Authority estimates that, at the current rate of revenue receipts, the additional $4,879,415 required to be deposited in the Reserve Account will be on deposit by October 1977. See "Sinking Fund" under *Summary of Certain Provisions of the Bond Resolution.*

**Additional Bonds**

Additional parity Bonds may be issued under the Bond Resolution for the purpose of providing funds for payment of the cost of all or any part of any Traffic Facilities; provided, however, that the Revenues (as defined in "Revenues" under *Summary of Certain Provisions of the Bond Resolution*), excluding tolls or other charges, if any, imposed by the Authority for the use of any Traffic Facilities, received by the Authority in any 12 consecutive months of the 15 months immediately preceding the issuance of such Bonds shall be not less than 150% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Bonds and the additional Bonds then to be issued. See "Issuance of Additional Bonds" under *Summary of Certain Provisions of the Bond Resolution.*

## PROVISIONS RELATING TO PUBLIC DEBT OF THE COMMONWEALTH

**Payment of Public Debt**

Section 8 of Article VI of the Constitution of Puerto Rico states that if the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law. (Public debt includes general obligation bonds and notes of the Commonwealth and payments required to be made by the Commonwealth under

2

CONFIDENTIAL

HTA_STAY0008160

its guaranty of certain bonds and notes issued by public instrumentalities.) The proceeds of the gasoline tax and gas oil or diesel oil tax so allocated to the Authority by the Excise Act and any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority are "available revenues" under said Section 8. Accordingly, if needed, they are subject to being applied first to the payment of interest and amortization of the public debt of the Commonwealth in accordance with the provisions of said Section 8, but, as specified by the Excise Act, such gasoline tax and gas oil or diesel oil tax and such other taxes, fees and charges shall be used for such payments only if and to the extent that all other available revenues of the Commonwealth referred to in said Section 8 are insufficient for such purpose.

**Special Fund for General Obligation Debt Service**

Act No. 269 of the Legislature of Puerto Rico, approved May 11, 1949, as amended, provides for the levy of an annual special tax of 1.03% of the assessed value of all real and personal property not exempt from taxation. The proceeds of said tax are required to be credited to the Special Fund for the Amortization and Redemption of General Obligations Evidenced by Bonds and Promissory Notes (the "Redemption Fund"), created by said Act No. 269, for application to the payment of general obligation bonds and notes of the Commonwealth.

Act No. 39 of the Legislature of Puerto Rico, approved May 13, 1976, as amended, is designed to enhance the security of the Commonwealth's general obligation debt by requiring the Secretary of the Treasury to transfer each month from available funds of the Commonwealth to the Redemption Fund, such amounts which together with other funds therein will be sufficient to provide for the accumulation of the amounts required to pay the principal of and interest on all bonds and notes of the Commonwealth, except "savings bonds", for which its full faith and credit are pledged as the same become due, and to pay the principal of and interest on bonds and notes of the Sugar Corporation of Puerto Rico for which the guaranty of the Commonwealth has been exercised. Moneys in the Redemption Fund are held in trust with Government Development Bank for Puerto Rico. While Act No. 39, as amended, by its terms expressly relates to direct obligations of the Commonwealth and to Commonwealth guaranteed bonds issued by the Sugar Corporation of Puerto Rico, it may under certain circumstances be deemed to apply to Commonwealth guaranteed obligations of other public corporations outstanding prior to the date of its adoption.

**Debt Limitation**

Section 2 of Article VI of the Constitution of Puerto Rico provides that no direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall be issued if the amount of the principal of and interest on such bonds and notes, and on all such bonds and notes theretofore issued, which is payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth, shall exceed 15% of the average annual internal revenues of the Commonwealth for the two preceding fiscal years. It also provides that the Commonwealth shall not guarantee any bonds or notes at any time when the 15% debt service limitation is exceeded.

Future combined maximum annual debt service for the Commonwealth's currently outstanding general obligation debt and for currently outstanding bonds of the Sugar Corporation of Puerto Rico, which are guaranteed by the Commonwealth and for which the Commonwealth is presently making payments under its guaranty, is $139,567,000, in the fiscal year ending June 30, 1980. That amount is equal to 10.2% of estimated internal revenues of $1,364,459,000 in the fiscal year ended June 30, 1977 and 10.6% of average annual internal revenues of $1,311,183,000 in the two fiscal years ended June 30, 1976 and 1977.

**Commonwealth General Obligation and Guaranteed Debt**

On June 30, 1977, there were outstanding $1,297,975,825 general obligation bonds of the Commonwealth. On the same date, Commonwealth-guaranteed debt totaled $1,234,565,000, including $273,500,000 notes and bonds of Government Development Bank for Puerto Rico, $127,005,000 bonds of Puerto Rico Public Buildings Authority, $162,060,000 bonds of Puerto Rico Urban Renewal and Housing Corporation, $93,000,000 bonds of the Sugar Corporation of Puerto Rico, and $477,000,000 notes sold under a note purchase agreement. See *Note Purchase Agreement* and *Indebtedness of the Commonwealth and its Municipalities and Public Agencies* in Appendix II.

3

CONFIDENTIAL

# THE AUTHORITY

## History and Purpose

Prior to the creation of the Authority, the construction of roads and highways was the responsibility of the Department of Public Works and was dependent on annual appropriations from the Legislature. The Authority, a body corporate and politic constituting a public corporation and governmental instrumentality of the Commonwealth, was created to assume such responsibility by Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended (the "Authority Act").

Pursuant to Act No. 113 of the Legislature of Puerto Rico, approved June 21, 1968, a reorganization plan, which became effective January 2, 1973, attached the Authority to the Department of Transportation and Public Works (the "Department") and transferred the powers and duties of the Board of Directors of the Authority to the Secretary of Transportation and Public Works. The powers and duties of the Authority are not in any manner restricted and this transfer did not modify, alter or invalidate contracts made by the Authority with the holders of its Bonds.

## Management

The Secretary of Transportation and Public Works (the "Secretary") is Elmer Olivieri Cintron, who received his bachelor's degree in engineering from the University of Puerto Rico and his master's degree in engineering from Texas A&M University. He was appointed to his present position on June 1, 1977. After receiving his master's degree, he served as an officer in the U. S. Army for two years and then taught at the University of Puerto Rico where he was first a Professor in the School of Engineering, then Director of the Engineering Materials Laboratory, and finally Dean of the School of Engineering. In addition to teaching, for the last five years, he was President of E. Olivieri and Associates.

The Executive Director of the Highway Authority (the "Executive Director") is Juan Jose Jimenez, who received his undergraduate degree in engineering from the University of Puerto Rico and his graduate degree in engineering from Texas A&M University. Prior to his appointment as Executive Director on July 1, 1977, he held various positions in government and private enterprise, including: Director of the Revision Section of the Bureau of Permits of the Planning Board, Sub-Director of the Bureau of Permits of the Planning Board, Director of Land Use and Development Bureau of the Planning Board, Chief Engineer of Levitt and Sons of Puerto Rico, Executive Director of the San Juan Model City Project, First Vice President of EHG Enterprises, and more recently as an Engineering and Planning Consultant with Jimenez and Feliciano and later as Juan Jose Jimenez and Associates.

In June 1977, the Authority had approximately 1,598 regular and 463 temporary employees, for a total of 2,061 employees. A year earlier, the Authority work force consisted of approximately 1,662 regular and 616 temporary employees, for a total of 2,278 employees, and the year before that total employment numbered 2,456. The decreases in total employment largely reflect declines in projects undertaken.

Government Development Bank for Puerto Rico ("Government Development Bank"), by statute, acts as financial advisor to the Authority. Further, pursuant to the agreement implementing the Note Purchase Agreement (as described herein), the Authority agrees to abide by controls established by Government Development Bank with respect to its capital expenditure programs and its borrowing and other indebtedness. See *Note Purchase Agreement*.

The Authority retains the firms of Wilbur Smith and Associates as Traffic Engineers (the "Traffic Engineers") and Peat, Marwick, Mitchell & Co. as Independent Accountants.

The administrative offices of the Authority are in the Minillas Government Center, De Diego Avenue, Stop 22, San Juan, Puerto Rico. The Authority is the major occupant of a 17 story building which it leases from Puerto Rico Public Buildings Authority. The mailing address is G. P. O. Box 3909, San Juan, Puerto Rico 00936. The telephone number is 809 726-8787.

4

HTA_STAY0008162

## Powers

The Authority has broad powers under the Authority Act, including among other things: to have complete control and supervision of any traffic facilities owned, operated, constructed or acquired by it; to sue and be sued; to make contracts and to execute all instruments necessary or incidental in the exercise of any of its powers; to determine, fix, impose, alter and collect tolls, rentals, assessments and other reasonable charges for the use of the traffic facilities owned, operated, constructed, acquired or financed by the Authority or for the services rendered thereby; to borrow money for any of its corporate purposes, and to issue bonds, notes or other obligations of the Authority in evidence of such indebtedness and to secure payment thereon by pledge of, or other lien on, all of its properties, revenues or other income and, subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, to pledge for the payment of said bonds and interest thereon the proceeds of any tax or other funds which may be made available to the Authority by the Commonwealth; to issue bonds for the purpose of funding, refunding, purchasing, paying or discharging any of its outstanding bonds or obligations; and to do all acts or things necessary or desirable to the carrying out of the powers granted to the Authority by the Authority Act or by any other act of the Legislature of Puerto Rico.

## RESOURCES AVAILABLE TO THE AUTHORITY

### Gasoline Tax and Gas Oil or Diesel Oil Tax

The Excise Act provides for the imposition of a per gallon tax on gasoline and a per gallon tax on gas oil or diesel oil and authorizes the Authority to pledge the portion of the proceeds of such taxes allocated to the Authority to the payment of the principal of and interest on the bonds and other obligations of the Authority or for any other lawful purpose of the Authority. From time to time the Excise Act has been amended, and may be amended in the future, either to increase the per gallon taxes on gasoline and gas oil or diesel oil, or to increase the per gallon taxes allocated to the Authority. The Commonwealth has covenanted in the Excise Act that the tax on gasoline will not be reduced below 16¢ per gallon and the tax on gas oil or diesel oil will not be reduced below 4¢ per gallon and that the amount of such taxes allocated to the Authority will not be reduced until all Bonds of the Authority secured by the pledge thereof, together with the interest thereon, are fully paid.

| | Fiscal Year Ended June 30 | | |
| --- | --- | --- | --- |
| | 1975 | 1976 | 1977 (preliminary unaudited) |
| | | (in thousands) | |
| Authority's allocation of gasoline tax revenue | $70,273 | $93,951(1) | $ 99,003 |
| Authority's allocation of gas oil or diesel oil tax revenue | 1,844 | 1,427 | 1,471 |
| Total | $72,117 | $95,378 | $100,474 |

(1) On July 1, 1975, the Authority's allocation of the gasoline tax was increased from 13¢ to 16¢ per gallon, which is the full amount of the gasoline tax now in effect.

## Tolls

The Authority is authorized to impose tolls on Traffic Facilities constructed or operated by it. While the Authority does not covenant to maintain toll charges and retains the right to change or to eliminate such tolls, any tolls collected on Traffic Facilities are pledged by the Bond Resolution to the payment of any Bonds issued thereunder.

At present tolls are being imposed on the completed section of two limited access tollways under construction. One tollway (Las Americas) will extend approximately 60 miles from San Juan to Ponce.

5

The other tollway (De Diego) is planned to be extended between San Juan and Arecibo, a distance of approximately 49 miles, of which approximately 13 miles are completed. See *Actual Revenues and Debt Service Coverage* and "Five Year Priorities Construction Program" under *Commonwealth Highway System.*

| | Fiscal Year Ended June 30 | | |
|---|---|---|---|
| | 1975 | 1976 | 1977 |
| | | | (preliminary unaudited) |
| | | (in thousands) | |
| Toll Collections: | | | |
| De Diego Tollway(1) | $  968 | $  904 | $3,430 |
| Las Americas Tollway(2) | 2,449 | 3,793 | 4,160 |
| Total | $3,417 | $4,697 | $7,590 |

(1) Two toll stations (including a new station which opened on July 1, 1976) where the toll is 25¢ per double-axle vehicle and 25¢ for each additional axle. On July 9, 1976, the tolls at the existing station were increased from 15¢ to 25¢. A parallel free road was completed in December 1974.

(2) Three toll stations where the toll is 25¢ per double-axle vehicle and 25¢ for each additional axle. One additional toll station is scheduled to be opened by October 1977.

**Right of Way Appropriations**

The Authority covenants in the Bond Resolution that on or before October 1 of each year the Authority will submit to the Planning Board, the Director of the Bureau of the Budget, the Secretary of the Treasury, the Fiscal Agent and the Traffic Engineers, a statement setting forth (i) a brief description of the program of traffic facilities to be carried out during the next fiscal year, (ii) its estimate of the total construction cost of such program, (iii) a description of the rights of way which will be needed to carry out such program and the respective dates by which they will be needed, and (iv) the estimated costs of such rights of way and the amount of general funds of the Commonwealth which the Legislature is requested to appropriate for such purpose. (Bond Resolution, Section 606).

Pursuant to the Bond Resolution, the Authority has made requests for right of way appropriations. No legislative appropriations have been specifically made for right of way costs in response to such requests since the fiscal year ended June 30, 1973, although approximately $12,000,000 of the $30,000,000 appropriated by Joint Resolution No. 1 of the Legislature of Puerto Rico, approved July 6, 1976 (see *Authority Indebtedness*), will be used for right of way costs in fiscal years 1978 and 1979. Total right of way costs for the fiscal years ending June 30, 1978, 1979, 1980, 1981 and 1982 are estimated to be $30,700,000, $29,500,000, $17,100,000, $9,500,000 and $9,000,000, respectively. To the extent funds are not appropriated by the Legislature in such years, right of way costs will be paid by the Authority.

**Federal Aid**

The Authority receives Federal aid for construction from the Federal Highway Administration, U. S. Department of Transportation. Such aid is recorded as related costs are billed to the Federal Highway Administration, regardless of the year of appropriation. In the fiscal years ended June 30, 1975, 1976, and 1977, Federal aid provided amounted to $12,997,834, $19,841,326 and $14,430,794, respectively. The Authority estimates that receipts of Federal aid will amount to $26,300,000 in the current fiscal year and $39,600,000 in the next fiscal year.

## DATA ON MOTOR VEHICLE REGISTRATION, GASOLINE CONSUMPTION AND HIGHWAY USER TAXES AND FEES

In addition to those gasoline, gas oil or diesel oil taxes which are pledged by the Authority to the payment of the principal of and interest on bonds and other obligations of the Authority, certain other taxes which are not so pledged are imposed affecting the highway user, including motor vehicle excise taxes, motor vehicle registration fees, drivers' licenses and other motor vehicle fees (such as duplicate

CONFIDENTIAL

HTA_STAY0008164

licenses, transfers and titling fees). All revenues collected from such fees and taxes are credited to the General Fund of the Commonwealth.

| Fiscal Year Ended June 30 | Motor Vehicle Registration | Gasoline Consumption (1,000 gallons) | Highway User Taxes and Fees | | | | |
|---|---|---|---|---|---|---|---|
| | | | Motor Vehicle Excise Tax | Motor Vehicle Registration Fees | Drivers' Licenses | Others | Total |
| | | | (dollars in thousands) | | | | |
| 1973 ............................. | 660,126 | 559,184 | $82,053 | $18,600 | $2,434 | $1,989 | $105,076 |
| 1974 ............................. | 715,878 | 587,719 | 64,975 | 17,311 | 3,089 | 1,798 | 87,173 |
| 1975 ............................. | 773,742 | 551,136 | 53,841 | 19,492 | 3,172 | 1,822 | 78,327 |
| 1976 ............................. | 814,472 | 604,973 | 71,203 | 17,124 | 2,319 | 1,844 | 92,490 |
| 1977 (Estimated) ....... | 830,000 | 646,156 | 89,794 | 19,477 | 2,232 | 1,959 | 113,462 |

Estimated net taxable gasoline consumption in the fiscal year ended June 30, 1977 was 5.9% above the level of the comparable year-earlier period.

## AUTHORITY INDEBTEDNESS

The bonded indebtedness of the Authority as of June 30, 1977 totaled $569,655,000 Highway Revenue Bonds Series A through K (includes principal of $8,375,000 paid July 1, 1977), exclusive of the Series L Bonds.

As of June 30, 1977, the Authority had outstanding $111,283,000 notes issued under a line of credit with Government Development Bank. Of such notes, $45,000,000 have been sold by Government Development Bank to certain commercial banks in accordance with the terms of the Note Purchase Agreement among the Authority, Government Development Bank and such commercial banks. See *Note Purchase Agreement.* As of July 1, 1977, the Authority had available $14,300,000 under its line of credit with Government Development Bank.

Proceeds of the Series L Bonds in the amount of approximately $73,060,000 will be applied to the payment of outstanding notes issued to Government Development Bank under the Note Purchase Agreement. The Authority plans to issue additional notes from time to time to finance Traffic Facilities. See "Five Year Priorities Construction Program" under *Commonwealth Highway System.*

Joint Resolution No. 1 of the Legislature of Puerto Rico, approved July 6, 1976, authorizes the Authority to incur obligations in the amount of $30,000,000 to provide matching funds for Federal highway grants for projects constructed during the three fiscal years ending June 30, 1976-78, and appropriates from unencumbered funds in the Commonwealth Treasury equal annual amounts in the fiscal years ending June 30, 1978-80 to repay such obligations and the amounts required for the payment of interest on and expenses related to the issuance of such obligations. In accordance with said Joint Resolution No. 1, Government Development Bank arranged a $30,000,000 line of credit from commercial banks to the Authority. On June 30, 1977, $3,500,000 notes under the line of credit had been issued and were outstanding.

On April 12, 1977, the Authority entered into a loan agreement with the Farmers Home Administration under which the Authority may borrow a maximum of $2.4 million to be repaid over a period of 40 years at 5%. As of June 30, 1977, $45,000 in notes representing interim financing had been borrowed by the Authority. The notes will eventually be funded with Bonds issued under the Bond Resolution.

7

HTA_STAY0008165

## REVENUES AND DEBT SERVICE COVERAGE

**Historical Revenues and Debt Service Coverage**

The following table shows the Authority's revenues available for debt service and debt service coverage in the last five fiscal years.

| | Fiscal Years Ended June 30 | | | | |
| --- | --- | --- | --- | --- | --- |
| | 1973 | 1974 | 1975 | 1976 | 1977 |
| | | | | | (preliminary unaudited) |
| | | | (in thousands) | | |
| Authority allocation of gasoline tax revenues(1) | $60,244 | $63,619 | $70,273 | $ 93,951 | $ 99,003 |
| Authority allocation of gas oil or diesel oil tax revenues(2) | 3,002 | 1,002(3) | 1,844 | 1,427 | 1,471 |
| Total Authority allocation of gasoline tax and gas oil or diesel oil tax revenues | 63,246 | 64,621 | 72,117 | 95,378 | 100,474 |
| Toll revenues | 2,675 | 3,245 | 3,417 | 4,697 | 7,590 |
| Total revenues available for debt service | $65,921 | $67,866 | $75,534 | $100,076 | $108,064 |
| Debt service on Bonds | $23,835 | $26,987 | $32,536 | $ 39,139 | $ 45,244 |
| Coverage of debt service | 2.77 | 2.51 | 2.32 | 2.56 | 2.39 |

(1) The net gasoline tax revenue allocated to the Authority in fiscal year 1971 amounted to 8¢ of the 11¢ gasoline tax. In fiscal years 1972 and 1973 the entire amount of the 11¢ gasoline tax receipts was allocated to the Authority. On May 10, 1974, the gasoline tax was increased from 11¢ to 16¢ and the Authority's allocation was increased to 13¢. On July 1, 1975, the entire amount of the 16¢ gasoline tax receipts was allocated to the Authority.

(2) The Authority's allocation of gas oil or diesel oil tax revenue is equal to 4¢ of the 8¢ tax.

(3) In fiscal 1974, the receipts from the gas oil or diesel oil tax allocated to the Authority decreased due to (a) rebates by the Commonwealth to the municipalities for gas oil or diesel oil tax paid by the municipalities during fiscal years 1971 through 1974 and (b) the adverse effect of the energy crisis. The municipalities continue to receive a similar rebate for gas oil or diesel oil tax pursuant to the Excise Act.

In February 1977, the Authority estimated for its priorities construction program for the five-year period beginning July 1, 1976 that gasoline tax revenues for fiscal 1977 would be $95,200,000. The unaudited gasoline tax revenues were higher than estimated because of a higher demand for gasoline than originally estimated.

**Maximum Annual Debt Service Coverage**

Revenues of $108,064,000 (unaudited) available for debt service for the fiscal year ended June 30, 1977 would have covered maximum annual debt service of $55,055,750 on the outstanding Bonds and the Series L Bonds, 1.96 times.

**Estimated Revenues and Debt Service Coverage**

The following table presents the Authority's estimates of revenues available for debt service and debt service coverage in each of the five fiscal years ending June 30, 1982. Such estimates are subject to periodic review and may be adjusted to reflect such factors as expected changes in business conditions, future demand for gasoline or other petroleum products, and interest rates. The revenue estimates, which have been reviewed and approved by the Traffic Engineers, are based on tax rates and allocations to the

8

Authority now in effect, assume a 2% average annual growth rate in gasoline consumption, and have been calculated to reflect the potential negative impact of prospective increases in the price of imported oil (and consequently of gasoline) and of new automobile engines designed to reduce gasoline consumption.

| | Fiscal Years Ending June 30 | | | | |
| | 1978 | 1979 | 1980 | 1981 | 1982 |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| Authority allocation of gasoline tax revenues | $102,000 | $104,400 | $106,500 | $108,100 | $109,200 |
| Authority allocation of gas oil or diesel oil tax revenues | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 |
| Total Authority allocation of gasoline tax and gas oil or diesel oil tax revenues | 103,400 | 105,800 | 107,900 | 109,500 | 110,600 |
| Toll Revenues | 9,200 | 11,100 | 11,500 | 11,800 | 12,200 |
| Total estimated revenues available for debt service | $112,600 | $116,900 | $119,400 | $121,300 | $122,800 |
| Estimated debt service on Bonds(1) | $ 54,400 | $ 57,400 | $ 57,600 | $ 59,100 | $ 59,600 |
| Coverage of estimated debt service | 2.07 | 2.04 | 2.07 | 2.05 | 2.06 |

(1) Current debt service on (i) outstanding Bonds, (ii) Series L Bonds, (iii) $2.3 million of 5% Bonds issued to the Farmers Home Administration, and (iv) $80,300,000 additional Bonds presently estimated to be issued in two series approximately midway in 1979 and 1982, at an assumed interest rate of 8% for each of the series.

On April 20, 1977, President Carter proposed that the Congress of the United States adopt legislation to implement a national energy policy which would have among its goals a ten percent reduction in gasoline consumption by 1985 and a reduction in United States dependence on imports of foreign oil. The Authority cannot predict how such legislation, if adopted, would affect Puerto Rico.

## COMMONWEALTH HIGHWAY SYSTEM

### Existing System

As of June 30, 1977, the highway system of Puerto Rico totaled 7,648 miles, consisting of 4,414 miles of Commonwealth highway system primary, secondary and municipal highways and public housing development roads, and 3,234 miles of municipal system local city streets and adjacent roads. In the Commonwealth highway system there are 628 miles of primary system highways comprising the more important routes in terms of inter-regional traffic, 1,252 miles of secondary system highways serving the needs of intra-regional traffic and 2,534 miles of municipal highways and public housing development roads serving localized traffic of an intra-regional nature.

### Five Year Priorities Construction Program

The Authority covenants in the Bond Resolution that its master plan for the construction of required Traffic Facilities will be supplemented periodically as necessary and that a five year priorities construction program will be updated each year. Since 1966 the Authority has retained the Traffic Engineers to review the Authority's five year priorities construction program and its estimates of revenues available for its implementation. The following table presents the Authority's estimates of its priorities construction program for the five years ending June 30, 1982 and the sources of funds required to finance the program. The estimates have been reviewed and approved by the Traffic Engineers. See *Appendix I*.

The program is subject to changes resulting from such factors as cost increases, variations in availability of internal and external funds, and changing traffic patterns. For estimating purposes, it has been assumed that line of credit notes will be the primary source of borrowed funds, that net proceeds of Bonds will be applied to the retirement of notes (including notes currently outstanding and those to be issued to implement the five year priorities construction program), that $155,300,000 Bonds (including the Series L Bonds but excluding $2,300,000 of 5% Bonds to be issued to the Farmers Home Administration)

9

HTA_STAY0008167



**MULTILANE HIGHWAY FACILITIES**
**COMMONWEALTH OF PUERTO RICO**

CONFIDENTIAL

HTA_STAY0008168

will be issued during the five year period beginning July 1, 1977, that the 16¢ per gallon tax allocated to the Authority will not be increased and that the consumption of gasoline will increase at an average annual rate of approximately 2% during the period. Giving effect to these and other related assumptions and to the estimates presented in the following table, as reviewed by the Traffic Engineers, the Authority would have no notes outstanding on June 30, 1982.

| | Fiscal Years Ending June 30 | | | | | |
|---|---|---|---|---|---|---|
| | 1978 | 1979 | 1980 | 1981 | 1982 | Total |
| | | | (in thousands) | | | |
| Five Year Priorities Construction Program: | | | | | | |
| Design | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 20,000 |
| Rights of way | 30,700 | 29,500 | 17,100 | 9,500 | 9,000 | 95,800 |
| Engineering | 20,100 | 19,500 | 20,000 | 20,000 | 20,000 | 99,600 |
| Construction( 1 ) | 48,500 | 51,500 | 80,300 | 78,800 | 58,200 | 317,300 |
| Administration and operation | 8,900 | 8,900 | 9,000 | 9,100 | 9,200 | 45,100 |
| Total | $112,200 | $113,400 | $130,400 | $121,400 | $100,400 | $577,800 |
| Source of Funds: | | | | | | |
| Tax, toll and other revenues( 2 ) | $ 45,800 | $ 55,000 | $ 65,100 | $ 64,400 | $ 60,900 | $291,200 |
| Legislative appropriations( 3 ) | 16,500 | 10,000 | — | — | — | 26,500 |
| Farmers Home Administration Loans | 1,400 | 900 | — | — | — | 2,300 |
| Federal aid | 26,300 | 39,600 | 49,300 | 45,500 | 38,000 | 198,700 |
| Note proceeds( 4 ) | 22,200 | 7,900 | 16,000 | 11,500 | 1,500 | 59,100 |
| Total | $112,200 | $113,400 | $130,400 | $121,400 | $100,400 | $577,800 |

( 1 ) Including new highway construction, reconstruction of existing highways, installation of safety features and other special programs.

( 2 ) After provision for debt service and reserve requirements for Bonds, interest on notes, and reimbursements to the Department of the Treasury of the Commonwealth for advances on Federal aid.

( 3 ) Borrowings under $30,000,000 line of credit, to provide matching funds for Federal grants, to be paid from Commonwealth appropriations. See *Authority Indebtedness*. Debt service on such borrowings is not included in the table.

( 4 ) Notes issued under lines of credit, including $16,100,000 notes issued but the proceeds of which were not expended prior to July 1, 1977. Net proceeds of Bonds are assumed to be applied to the retirement of such notes. Excluding borrowings under line of credit described in footnote ( 3 ).

The Authority has reduced its five year priorities construction program since approximately three years ago because of a re-evaluation of Puerto Rico's road construction requirements and to reduce borrowing requirements. For example, in August 1974 the priorities construction program then in effect, covering the five fiscal years from July 1, 1973 to June 30, 1978, totaled $782,682,000; while the program in effect in February 1976, covering the five-year period July 1, 1975 to June 30, 1980, amounted to $428,400,000. More recently the program has increased moderately, to the present level of $577,800,000 for the five years ending June 30, 1982, as shown in the table above. The recent increase in the five-year program has been made possible by anticipated increases in tax and toll revenues, Federal aid, and matching funds for Federal grants to be provided by Commonwealth legislative appropriations. Such anticipated increases have not only permitted expansion of the five-year program, they have also resulted in a reduction in estimated interim borrowing to finance the program. Interim borrowing in the current five-year program ending June 30, 1982 is estimated at $59,100,000 compared with the February 1977 estimate of $118,800,000 for the five years ending June 30, 1981.

11

CONFIDENTIAL

HTA_STAY0008169

The 59.89 mile Las Americas Tollway from San Juan to Ponce is currently under construction with 55.17 miles completed as of June 30, 1977. Three barrier toll booths are in operation. One additional toll booth is planned for the tollway and is expected to be placed in operation by October 1977.

Also under construction is the 49.46 mile De Diego Tollway which extends from San Juan to Arecibo. A 6.86 mile section in the San Juan area and a 5.99 mile section in the Arecibo area have been completed and two toll booths are in operation. As additional sections are finished, two more toll booths will be eventually added.

The total estimated cost of the toll system included in the current five year priorities construction program is $15,600,000. The table below shows the current and projected construction status of the two tollways.

| | Construction Completed June 30, 1977 | Future Construction Under the Five Year Priorities Construction Program | | Total Length When Completed |
|---|---|---|---|---|
| | (miles) | (miles) | (completion date) | (miles) |
| Las Americas Tollway | 55.17 | 4.72 | January, 1978 | 59.89 |
| De Diego Tollway | 12.85 | 5.77 | March, 1985 | 49.46(1) |

(1) Completion anticipated by approximately 1990.

Other projects of the five year priorities construction program are the following:

(a) The completion of the Utuado Bypass and the construction of six new sections of PR-10 consisting of 16.4 miles.

(b) The completion of the 4.6 mile section of PR-3 from Rio Grande to Luquillo.

(c) The construction of a 9.4 mile section of PR-3 from Luquillo to Fajardo.

(d) The completion of certain programmed projects on Highway 2, and the widening of a 26.7 mile section of Highway 2 between Aguadilla to Arecibo.

(e) The completion of the Sabana Grande-Yauco section of PR-2.

## Maintenance

The Authority covenants in the Bond Resolution that it will cause an annual general evaluation to be made by the Traffic Engineers of the level of maintenance of the Traffic Facilities and that such evaluation will be filed with the Secretary of Transportation and Public Works and the Secretary of the Treasury. Pursuant to provisions of the Authority Act, the Authority entered into an agreement with the Secretary of Transportation and Public Works by which he agreed to pay, from general funds of the Commonwealth which are made available to him for such purpose, the costs of maintaining, repairing and operating all Traffic Facilities which are constructed by the Authority. The Secretary of Transportation and Public Works has covenanted in the resolution authorizing the issuance of the Series L Bonds to fulfill the obligations of said agreement. Moreover, the Authority covenants in the Bond Resolution that if and to the extent that maintenance of the Traffic Facilities is not adequate as set forth in the annual survey to be made by the Traffic Engineers, in accordance with the provisions of the Bond Resolution, the Authority will provide such maintenance costs from unencumbered funds then on deposit in the Construction Fund or from the revenues thereafter deposited to the credit of the Construction Fund.

In their most recent maintenance evaluation, the Traffic Engineers reported, among other things, that certain roadway segments were in need of major maintenance to correct drainage problems and protect subbases and pavements and that other segments were in unsafe condition for traffic operations. However, the Traffic Engineers concluded that "a substantial portion of the Puerto Rico roadway system is in fair condition."

12

CONFIDENTIAL

For the fiscal year ending June 30, 1978, the Legislature appropriated $14,900,000 for maintenance. The Traffic Engineers have concluded that the projected allocation of $78,200,000 for maintenance over the next five years is somewhat low for adequate maintenance. The Department of Transportation and Public Works has made and will continue to make studies to determine maintenance priorities and it is hopeful that it will obtain larger Commonwealth appropriations for maintenance than it has received in the current fiscal year. Its current plans call for maintenance appropriations to rise from $14,900,000 in fiscal 1978 to $16,500,000 in fiscal 1982. For the four years ended June 30, 1977, average annual maintenance appropriations amounted to $14,900,000. An annual review of overall maintenance levels and funding requirements will be initiated during August 1977.

## PRINCIPAL AND INTEREST REQUIREMENTS

The Principal and Interest Requirements for any fiscal year is defined in the Bond Resolution as the sum of the amounts required to pay (a) the interest on all bonds payable on January 1 in such fiscal year and July 1 in the following fiscal year, (b) the principal of the serial bonds which is payable on July 1 in the following fiscal year, and (c) the amortization requirements for the term bonds for such fiscal year.

| | Outstanding Bonds | $75,000,000 Series L Bonds | | | | |
|---|---|---|---|---|---|---|
| Year Ending June 30 | Principal and Interest Requirements | Serial Maturities | Amortization Requirements | Interest | Principal and Interest Requirements | Total Principal and Interest Requirements |
| | | | (in thousands) | | | |
| 1978 | $49,298 | — | — | $5,074 | $5,074 | $54,372 |
| 1979 | 49,482 | $ 500 | — | 5,074 | 5,574 | 55,056 |
| 1980 | 47,811 | 500 | — | 5,054 | 5,554 | 53,365 |
| 1981 | 49,239 | 500 | — | 5,031 | 5,531 | 54,770 |
| 1982 | 47,942 | 500 | — | 5,007 | 5,507 | 53,449 |
| 1983 | 48,334 | 1,000 | — | 4,982 | 5,982 | 54,316 |
| 1984 | 48,185 | 1,000 | — | 4,930 | 5,930 | 54,115 |
| 1985 | 48,024 | 1,000 | — | 4,876 | 5,876 | 53,900 |
| 1986 | 47,863 | 1,000 | — | 4,820 | 5,820 | 53,683 |
| 1987 | 45,095 | 1,500 | — | 4,762 | 6,262 | 51,357 |
| 1988 | 44,921 | 1,500 | — | 4,672 | 6,172 | 51,093 |
| 1989 | 44,529 | 1,500 | — | 4,581 | 6,081 | 50,610 |
| 1990 | 44,524 | 1,500 | — | 4,488 | 5,988 | 50,512 |
| 1991 | 44,523 | 1,500 | — | 4,393 | 5,893 | 50,416 |
| 1992 | 44,526 | 1,500 | — | 4,297 | 5,797 | 50,323 |
| 1993 | 44,521 | — | $1,125 | 4,200 | 5,325 | 49,846 |
| 1994 | 44,527 | — | 1,285 | 4,121 | 5,406 | 49,933 |
| 1995 | 44,528 | — | 1,465 | 4,031 | 5,496 | 50,024 |
| 1996 | 44,529 | — | 1,655 | 3,929 | 5,584 | 50,113 |
| 1997 | 44,530 | — | 1,860 | 3,813 | 5,673 | 50,203 |
| 1998 | 44,529 | — | 2,085 | 3,683 | 5,768 | 50,297 |
| 1999 | 44,524 | — | 2,320 | 3,537 | 5,857 | 50,381 |
| 2000 | 39,337 | — | 4,580 | 3,374 | 7,954 | 47,291 |
| 2001 | 39,336 | — | 4,855 | 3,054 | 7,909 | 47,245 |
| 2002 | 39,338 | — | 5,155 | 2,714 | 7,869 | 47,207 |
| 2003 | 39,338 | — | 5,480 | 2,353 | 7,833 | 47,171 |
| 2004 | 39,334 | — | 5,825 | 1,969 | 7,794 | 47,128 |
| 2005 | 39,340 | — | 6,200 | 1,562 | 7,762 | 47,102 |
| 2006 | — | — | 7,840 | 1,128 | 8,968 | 8,968 |
| 2007 | — | — | 8,270 | 579 | 8,849 | 8,849 |

13

HTA_STAY0008171

## SUMMARY OF CERTAIN PROVISIONS OF THE BOND RESOLUTION

The following statements are brief summaries of certain provisions of the Bond Resolution. Such statements do not purport to be complete and reference is made to the Bond Resolution, copies of which are available for examination at the office of the Fiscal Agent.

### Revenues

"Revenues" means all moneys received by the Authority on account of the gasoline and gas oil or diesel oil tax heretofore allocated to the Authority by the Excise Act, any tolls or other charges imposed by the Authority for the use of any of the Traffic Facilities, and the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may hereafter allocate to the Authority and expressly authorize the Authority to pledge to the payment of the principal of and interest on bonds or other obligations and which are pledged by the Authority to the payment of the principal of and interest on bonds or other obligations issued under the provisions of the Bond Resolution. (Section 101). The Revenues are pledged to the payment of the principal of and interest on all bonds issued under the Bond Resolution. (Section 601). The tax proceeds so pledged, however, are subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of Section 8 of Article VI of the Constitution of Puerto Rico if needed but only to the extent that the other available revenues of the Commonwealth referred to in said Section 8 are insufficient for such purpose. (Preamble).

"Traffic Facilities" shall mean any of the following facilities for which bonds or other obligations shall be issued by the Authority under the provisions of the Bond Resolution the cost of which facilities paid from the proceeds of such bonds or other obligations shall not have been reimbursed to the Authority from funds not encumbered by the Bond Resolution: (1) roads, avenues, streets, thoroughfares, speedways, bridges, tunnels, channels, stations, terminals, and any other land or water facilities necessary or desirable in connection with the movement of persons, freight, vehicles or vessels; (2) parking lots and structures and other facilities necessary or desirable in connection with the parking, loading or unloading of all kinds of vehicles and vessels; and (3) all property, rights, easements, and interests therein necessary or desirable for the construction, maintenance, control, operation or development of such traffic facilities. (Section 101).

### Sinking Fund

A special fund is created by the Bond Resolution and designated "Puerto Rico Highway Authority Highway Revenue Bonds Interest and Sinking Fund" (the "Sinking Fund"). Three separate accounts are created in the Sinking Fund and designated "Bond Service Account", "Redemption Account" and "Reserve Account". (Section 401).

The Authority covenants that all of the Revenues, and any other funds of the Commonwealth allocated to the Authority for the payment of principal of and interest on bonds of the Authority issued under the provisions of the Bond Resolution, which it receives will be deposited monthly with the Fiscal Agent to the credit of the following Accounts and Fund in the following order:

(1) To the Bond Service Account an amount equal to 1/6th of the amount of interest payable on the bonds of each series issued under the Bond Resolution on the interest payment date next succeeding and (beginning with the twelfth month preceding the first maturity of any serial bond of such series) an amount equal to 1/12th of the next maturing installment of principal of such serial bonds; provided, however, that the amount so deposited on account of the interest in each month after the delivery of the bonds of any series up to and including the month immediately preceding the first interest payment date thereafter of the bonds of such series shall be that amount which when multiplied by the number of such deposits will be equal to the amount of interest payable on such bonds on such first interest payment date less the amount of any accrued interest paid on such bonds and deposited to the credit of the Bond Service Account.

(2) To the Redemption Account, starting two months before the beginning of each fiscal year in which there is an Amortization Requirement (as defined in the Bond Resolution), an amount equal to 1/12th of the Amortization Requirement for such fiscal year for the term bonds of each series then outstanding plus an amount equal to 1/12th of the premium, if any, which would be payable on the

14

first redemption date in the following fiscal year on a like principal amount of bonds if such principal amount of bonds should be redeemed prior to their maturity from moneys in the Sinking Fund.

(3) To the Reserve Account, such amount as is required to make the amount deposited to the credit of said Account in the then current fiscal year at least equal to 20% of the maximum amount of the Principal and Interest Requirements (as defined in the Bond Resolution) for any fiscal year thereafter on account of all bonds issued under the provisions of the Bond Resolution and then outstanding; provided, however, that such deposits shall only be made to the extent necessary to make the amount then to the credit of the Reserve Account equal to such maximum amount of the Principal and Interest Requirements.

(4) Any balance remaining after making the deposits referred to in paragraphs (1), (2) and (3) above shall be deposited to the credit of the Construction Fund for use by the Authority for any of its authorized purposes. (Section 401).

The requirements specified in paragraphs (1), (2) and (3) above shall be cumulative. (Section 401).

The Fiscal Agent shall from time to time withdraw from the Bond Service Account sufficient moneys to pay the interest on all bonds and the principal of all serial bonds as the same become due and apply such moneys to such payments. (Section 402).

Moneys in the Redemption Account shall be applied to the retirement of bonds issued under the provisions of the Bond Resolution as follows:

(a) Subject to the provisions of paragraph (c) below, the Fiscal Agent shall endeavor to purchase bonds secured by the Bond Resolution and then outstanding, whether or not such bonds shall then be subject to redemption, at the most advantageous price obtainable with reasonable diligence, having regard to interest rate and price, such price not to exceed the principal of such bonds plus the amount of the premium, if any, which would be payable on the next redemption date to the holders of such bonds if such bonds should be called for redemption on such date from moneys in the Sinking Fund. The Fiscal Agent shall pay the interest accrued on such bonds to the date of delivery thereof from the Bond Service Account and the purchase price from the Redemption Account, but no such purchase shall be made within 45 days next preceding any interest payment date on which such bonds are subject to call for redemption except from moneys in excess of the amounts set aside or deposited for the redemption of bonds.

(b) Subject to the provisions of paragraph (c) below, the Fiscal Agent shall call for redemption on each interest payment date on which bonds are subject to redemption from moneys in the Sinking Fund such amount of bonds then subject to redemption as, with the redemption premium, if any, will exhaust the Redemption Account as nearly as may be; provided, however, that not less than $50,000 principal amount of bonds shall be called for redemption at any one time. Not less than 30 days before the redemption date the Fiscal Agent shall withdraw from the Bond Service Account and from the Redemption Account and set aside in separate accounts or deposit with the Paying Agents the respective amounts required for paying the interest on, and the principal and redemption premium of, the bonds so called for redemption.

(c) Moneys in the Redemption Account shall be applied to the purchase or redemption of bonds in the following order:

FIRST, the term bonds of each series, if any, issued under the provisions of Sections 207 (the Series A Bonds), 208 (additional bonds) or 209 (refunding bonds) of the Bond Resolution, in the order of their issuance, to the extent of the Amortization Requirement, if any, of the then current fiscal year for such term bonds and any deficiency in preceding fiscal years in the purchase or redemption of such term bonds under the provisions of this subdivision; provided, however, that if none of the term bonds of a series shall be subject to redemption from moneys in the Sinking Fund and if the Fiscal Agent shall at any time be unable to exhaust the moneys applicable to the bonds of any such series in the purchase of such bonds under the provisions of paragraph (a) above, such moneys or the balance of such moneys, as the case may be, shall be retained in the Redemption Account and, as soon as it is feasible, applied to the retirement of the bonds of such series;

15

CONFIDENTIAL

HTA_STAY0008173

SECOND, to the purchase of any bonds secured by the Bond Resolution and then outstanding whether or not such bonds shall then be subject to redemption, in accordance with the provisions of paragraph (a) above;

THIRD, term bonds of each series in proportion (as nearly as practicable) to the aggregate principal amount of the bonds of each such series originally issued; and

FOURTH, after the retirement of all term bonds, serial bonds issued under the provisions of the Bond Resolution in the inverse order of their maturities, and to the extent that serial bonds of different series mature on the same date, in proportion (as nearly as practicable) to the principal amount of each series maturing on such date. (Section 403).

All expenses in connection with such purchase or redemption shall be paid from the Construction Fund. (Section 403).

Moneys in the Reserve account shall be used for the purpose of paying interest on the bonds and maturing principal of serial bonds whenever and to the extent that the moneys held for the credit of the Bond Service Account shall be insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the Redemption Account pursuant to the requirements mentioned in paragraph (2) above whenever and to the extent that the Revenues are insufficient for such purpose. Excess moneys in the Reserve Account shall be transferred to the Construction Fund or the Redemption Account, as determined by the Authority. (Section 404).

**Redemption**

The bonds offered hereby are subject to redemption in whole and in part at the prices and according to the terms set forth on the cover of this Official Statement.

Notice of redemption will be given to all holders of bonds registered as to principal and interest by mail at their registered addresses; however, failure to mail any such notice shall not under the terms of the Bond Resolution affect the validity of the proceedings for such redemption. Notices to holders of coupon bonds will be given at least 30 days before the redemption date by publication once in a daily newspaper of general circulation in San Juan, Puerto Rico, and once in a daily newspaper of general circulation or in a financial journal published in New York City. (Section 302). [To assure receiving notice of redemption, holders of Series L Bonds should regularly read a newspaper in which such notices may be published or retain another to watch for such notices].

**Construction Fund**

Moneys in the Construction Fund may be used for any authorized purpose, including the payment of the cost of maintaining, repairing and operating the Traffic Facilities and the cost of necessary renewals and replacements of Traffic Facilities. (Sections 401, 604 and 605). Before any payment or withdrawal shall be made from moneys in the Construction Fund there shall be filed with the Fiscal Agent a certificate signed by a designated officer of the Authority setting forth the amount of money to be so disbursed and stating that such money will be used to pay the costs of construction or for other purposes permitted by the Bond Resolution. Upon receipt of such certificate the Fiscal Agent shall withdraw from the Construction Fund and deposit to the credit of a special checking account in its commercial department in the name of the Authority the amount so specified in such certificate. The Fiscal Agent shall also at any time at the written direction of the Authority transfer any part of the moneys in the Construction Fund to the credit of the Redemption Account. (Section 405).

**Issuance of Additional Bonds**

Section 208 of the Bond Resolution provides that additional bonds may be issued for the purposes of providing funds for completing payment of the cost of any Traffic Facilities or for paying all or any part of the cost of any additional Traffic Facilities, including the payment of any outstanding notes of the Authority which were issued to finance temporarily the costs of the Traffic Facilities for which such bonds are to be issued; provided, however, that the Revenues, excluding tolls or other charges, if any, imposed by the Authority for the use of any Traffic Facilities, received by the Authority in any 12 consecutive months of the 15 months ending not more than 30 days preceding the issuance of such bonds shall be not less than

16

CONFIDENTIAL

HTA_STAY0008174

150% of the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all bonds theretofore issued under the provisions of the Bond Resolution and then outstanding and the additional bonds then to be issued. (Section 208).

Section 209 of the Bond Resolution provides that refunding bonds may be issued for the purpose of providing funds for refunding at or prior to their maturity or maturities all of the outstanding Bonds of any series, including the payment of any redemption premium thereon and the interest which will accrue on such bonds to their earliest redemption date or maturity date or dates occurring prior thereto; provided, however, that the maximum amount of the Principal and Interest Requirements for any fiscal year thereafter on account of all bonds to be outstanding after the issuance of such refunding bonds and the redemption of the bonds to be refunded shall be less than the maximum amount of the Principal and Interest Requirements for any fiscal year thereafter on account of all of the Bonds outstanding prior to the issuance of such refunding bonds and the redemption of the bonds to be refunded. (Section 209).

Nothing in the Bond Resolution is to be construed as preventing the Authority from financing any facilities authorized by the Authority Act by the issuance of bonds or other obligations which are not secured under the provisions of the Bond Resolution. (Section 1001).

**Investment of Funds**

Moneys in the Construction Fund, the Bond Service Account, the Redemption Account and the Reserve Account shall, as nearly as may be practicable, be continuously invested and reinvested by the Fiscal Agent in direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States Government which shall mature, or which shall be subject to redemption by the holder thereof at the option of such holder:

(a) as to investments of moneys in the Construction Fund, not later than the respective dates set forth in a certificate filed with the Fiscal Agent when the moneys held for the credit of the Construction Fund will be required for the purposes intended,

(b) as to investments of moneys in the Bond Service Account and Redemption Account, not later than the respective dates when the moneys held for the credit of said Accounts will be required for the purposes intended, and

(c) as to investments of moneys in the Reserve Account, (i) approximately 25% in principal amount not later than the next interest payment date of bonds under the Bond Resolution, (ii) approximately 25% not later than 18 months after the date of such investment, (iii) approximately 25% not later than 5 years after the date of such investment, and (iv) the balance as specified by the Authority. (Section 502).

In lieu of such investments the Authority may enter into agreements with the Fiscal Agent for the moneys held for the credit of any or all of said Funds or Accounts to be held by the Fiscal Agent as interest-bearing time deposits or other similar arrangements. (Section 502).

**Modifications**

The Authority may adopt resolutions supplemental to the Bond Resolution without the consent of the bondholders to cure any ambiguity, formal defect or omission, or to correct any inconsistent provisions or errors in the Bond Resolution or any supplemental resolution, or to grant or confer upon the bondholders any additional rights, remedies, powers, authority or security, or to add to the conditions, limitations and restrictions on the issuance of bonds under the provisions of the Bond Resolution, or to add to the covenants and agreements of the Authority in the Bond Resolution or to surrender any right or power reserved to or conferred upon the Authority. (Section 801).

The holders of not less than two-thirds (⅔) in aggregate principal amount of the Bonds at the time outstanding shall have the right to consent to and approve the adoption of such resolution or resolutions supplemental to the Bond Resolution as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to or rescinding any of the terms and provisions contained in the Bond Resolution or in any supplemental resolution; provided, however, that nothing contained in the Bond Resolution shall permit, or be construed as permitting, (a) an extension of the maturity of the principal of or the interest on any Bond, or (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, or (c) the creation of a lien upon or a

17

pledge of Revenues other than the lien and pledge created by the Bond Resolution, or (d) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (e) a reduction in the aggregate principal amount of the Bonds required for consent to such supplemental resolution. (Section 802). No supplemental resolution may, however, change, amend or modify the rights or obligations of the Fiscal Agent or of any Paying Agent without the written consent of the Fiscal Agent or the Paying Agent affected thereby. (Section 804).

### Miscellaneous Covenants

#### Master Plan

The Authority covenants that the master plan for the construction of required Traffic Facilities in Puerto Rico will be supplemented periodically as necessary and that the five year priorities construction program will be updated each year to cover the Traffic Facilities to be constructed by the Authority in the ensuing five year period. (Section 603).

#### Costs of Maintenance, Repair and Operation of Traffic Facilities

The Authority covenants that, if and to the extent funds for the purpose of maintaining, repairing and operating all Traffic Facilities financed by the Authority in whole or in part by the issuance of bonds of the Authority under the provisions of the Bond Resolution are not provided by the Commonwealth, the Authority will pay such costs from unencumbered funds then on deposit in the Construction Fund or from the Revenues thereafter deposited to the credit of the Construction Fund pursuant to the Bond Resolution. (Section 604).

The Authority further covenants that it will cause an annual general evaluation to be made by the Traffic Engineers of the level of maintenance of said Traffic Facilities financed in whole or in part by the issuance of bonds under the provisions of the Bond Resolution, such evaluation to be directed towards surface and shoulder conditions, condition of all structures and signing on said Traffic Facilities. (Section 604).

#### Annual Report of Traffic Engineers

The Authority covenants that it will cause the Traffic Engineers to prepare a report each year promptly after the completion of their general evaluation of the level of maintenance of the Traffic Facilities referred to in the preceding paragraph, setting forth (i) their comments with respect to any supplements or revisions made by the Authority in the master plan or in the five year priorities construction program referred to above under "Master Plan" and their recommendations as to any additional supplements or revisions which should be made in such plan or in such priorities program, and (ii) their findings resulting from such general evaluation of the level of maintenance of such Traffic Facilities as to whether such Traffic Facilities have been maintained in good repair, working order and sound condition and their recommendations as to repairs, renewals or replacements which are needed. (Section 605).

If it appears from such report that repairs, renewals or replacements of any such Traffic Facilities are necessary the Authority shall promptly cause the same to be made and if and to the extent that funds for such purpose have not been made available by the Commonwealth, moneys on deposit to the credit of the Construction Fund which have not theretofore been encumbered for other purposes, and moneys which are thereafter deposited to the credit of said fund pursuant to the Bond Resolution shall first be applied for such purpose. (Section 605).

### NOTE PURCHASE AGREEMENT

On September 11, 1975, Government Development Bank, nine designated public agencies, including the Authority, and five major mainland banks and seven Puerto Rico banks entered into a note purchase agreement ("Note Purchase Agreement"), which provided a new interim financing arrangement for the agencies, replacing individually negotiated lines of credit. In addition to the Authority, the designated agencies are Aqueduct and Sewer Authority, Industrial Development Company, Ports Authority, Public Buildings Authority, Telephone Authority, University of Puerto Rico, Water Resources Authority and Urban Renewal and Housing Corporation.

18

Under the agreement, the banks have a revolving commitment to purchase from Government Development Bank notes issued by the designated agencies to Government Development Bank. The aggregate principal amount of such notes that may be outstanding in accordance with the banks' purchase commitment was initially $612,000,000, decreased to $512,000,000 on July 15, 1977, and will decrease periodically thereafter to $352,000,000 by July 15, 1979, or sooner as set forth below. As of June 30, 1977 there were $477,000,000 notes outstanding under the Note Purchase Agreement. All of the banks' purchase commitments expire on August 15, 1979, when the notes then outstanding become due and payable, subject to earlier termination and acceleration under certain circumstances, including the occurrence of one or more specified events of default on the part of any agency. The commitment of each of the banks is a specified proportion of the total commitment.

Notes purchased under the agreement will be guaranteed by the Commonwealth pursuant to Act No. 98, approved June 30, 1975. The amount of notes issued by each agency will be determined by Government Development Bank, but the banks shall not be obligated to purchase the notes of any agency if such purchase would cause the outstanding principal amount of notes of such agency purchased by the banks to exceed 33% of the banks' then existing total commitments, used and unused, under the agreement.

The notes will bear interest at the banks' respective prime rates from time to time, subject to increase to reflect any change in applicable Commonwealth tax legislation. In addition, the agencies are jointly and severally liable for a facility fee of one-half percent per annum on the total of the banks' commitments used and unused.

Net proceeds of sales by any agency of bond anticipation notes or bonds (except to the extent used to retire bond anticipation notes) must be applied in prepayment of such agency's notes.

The agreement also provides, among other things, for the optional termination or reduction of commitments by Government Development Bank, limits on new loans in any year based on aggregate bond sales in the preceding year, controls by Government Development Bank over capital expenditure programs of the designated agencies, restrictions on loans by Government Development Bank to the designated agencies in addition to the loans represented by notes purchased by the banks under the Note Purchase Agreement, and frequent and extensive reports by the designated agencies with respect to capital expenditures, budgets, financial operating results, audit reports, and related matters.

Implementing the agreement, the Authority, the other public agencies and Government Development Bank entered into agreements which provide that the Authority and the other public agencies shall abide by controls established by Government Development Bank with respect to their capital expenditure programs and their borrowings and other indebtedness. Such limitations may be amended with the approvals of banks holding 65% of the outstanding notes.

The public accounting firm of Ernst & Ernst has entered into a contract with Government Development Bank to design and implement a financial reporting system for the nine designated agencies. The system, designated Agency Reporting and Monitoring System (ARMS), will provide the Bank with summarized monthly financial and operating information on the agencies, thus improving the Bank's control over the agencies as required by the note purchase agreement.

## TAX EXEMPTION

Under the provisions of the Acts of Congress now in force, the Series L Bonds and the interest thereon are, in the opinion of Bond Counsel, exempt from Federal, State, Commonwealth of Puerto Rico and local taxation.

Bonds and the interest thereon of the Commonwealth of Puerto Rico, its municipalities, agencies and authorities are exempt by an Act of Congress of the United States from Federal, State, Commonwealth of Puerto Rico and local taxation. Act of March 2, 1917, ch. 145, §3, 39 Stat. 953, *as amended,* 48 U.S.C. §745 (1970) provides as follows:

" . . . all bonds issued by the Government of Puerto Rico, or by its authority, shall be exempt from taxation by the Government of the United States, or by the Government of Puerto Rico or of any political or municipal subdivision thereof, or by any State, Territory, or possession, or by any county, municipality, or other municipal subdivision of any State, Territory, or possession of the United States, or by the District of Columbia."

19

HTA_STAY0008177

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Series L Bonds from the Authority at an aggregate discount of $1,368,750 from the initial public offering prices set forth on the cover page. The Underwriters' obligations are subject to certain conditions precedent, and they will be obligated to purchase all such Series L Bonds if any such Series L Bonds are purchased. The Bonds may be offered and sold to certain dealers (including dealers depositing such funds into investment trusts) at prices lower than such public offering prices, and such public offering prices may be changed from time to time by the Underwriters. The Authority has agreed to indemnify, to the extent permitted by law, the Underwriters against certain liabilities, including liabilities under federal securities laws.

## ELIGIBILITY OF BONDS

The Series L Bonds will be eligible for deposit by banks in Puerto Rico to secure public funds and will be approved investments for insurance companies to qualify them to do business in Puerto Rico as required by law.

## LEGAL MATTERS

The proposed form of opinion of Brown, Wood, Ivey, Mitchell & Petty, One Liberty Plaza, New York New York 10006, is set forth in Appendix IV to this Official Statement. Certain legal matters will be passed upon for the Underwriters by Sullivan & Cromwell, 48 Wall Street, New York, New York 10005. In giving their opinion, Sullivan & Cromwell will rely as to all matters of Puerto Rico law, including the creation and powers of the Authority, upon the opinions of Brown, Wood, Ivey, Mitchell & Petty.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the bonds offered hereby.

## RATINGS

As noted on the cover page of this Official Statement, Moody's Investors Service, Inc. and Standard & Poor's Corporation have given the Series L Bonds ratings of Baa-1 and A, respectively. Such ratings reflect only the respective views of such organizations and an explanation of the significance of such ratings may be obtained only from the rating agency furnishing the same. There is no assurance that such ratings will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by either or both of such rating agencies, if in the judgment of either or both, circumstances so warrant. Any such downward revision or withdrawal of such ratings, or either of them, may have an adverse effect on the market prices of the Series L Bonds.

## MISCELLANEOUS

The foregoing references to and summaries of certain provisions of the Bond Resolution, the various acts and the Series L Bonds are made subject to all the detailed provisions thereof to which reference is hereby made for further information and do not purport to be complete statements of any or all of such provisions.

There are appended to this Official Statement the letter of the Traffic Engineers dated July 25, 1977, certain information concerning the Commonwealth of Puerto Rico, the financial statements of the Authority for the years ended June 30, 1976 and June 30, 1975, together with the independent accountants' report of Peat, Marwick, Mitchell & Co., the unaudited financial statements of the Authority for the eleven months ended May 31, 1976 and 1977 and the proposed form of opinion of Brown, Wood, Ivey, Mitchell & Petty, Bond Counsel.

PUERTO RICO HIGHWAY AUTHORITY

By _____

*Executive Director*
*Puerto Rico Highway Authority*

20

HTA_STAY0008178

APPENDIX I

# *Wilbur Smith and Associates*

CABLE WILSMITH
TELEX 57-3439

8675 EXECUTIVE CENTER DRIVE
SUITE 210
*Miami, Florida* **33166**
PHONE (305) 592-0637

July 25, 1977

Mr. Juan Jose Jimenez
Executive Director
Puerto Rico Highway Authority
Post Office Box 3909
San Juan, Puerto Rico 00936

Dear Sir:

In accordance with Section 605 of Bond Resolution 68-18, adopted June 13, 1968, our firm has made continuous reviews of the five year priorities construction program. The program has been adjusted to accomodate transportation needs and anticipated funding.

The current program represents a continuing effort to meet the transportation demands of Puerto Rico for the period extending to 1981-1982. It has been prepared after giving consideration to anticipated revenues from the gasoline tax, diesel oil tax and toll facilities. Also, it reflects the anticipated bond financing program of the Authority. The five year construction program prepared by the Highway Authority totals $577,800,000, and includes a balanced approach to the development of the total system.

Highway maintenance procedures, funding and administration responsibility will require careful study to insure proper levels of service.

We do not recommend any revision or deletions in the five year priorities construction program.

Respectfully submitted,

WILBUR SMITH AND ASSOCIATES

/s/   Robert E. Whiteside

I-1

CONFIDENTIAL

HTA_STAY0008179

[This page left blank intentionally.]

CONFIDENTIAL

APPENDIX II

# COMMONWEALTH OF PUERTO RICO

## GENERAL INFORMATION

### Geography and Population

Puerto Rico, the fourth largest of the Caribbean Islands, is located in the tropics, approximately 1,600 miles southeast of New York City and 1,000 miles east-southeast of Miami, Florida. It is approximately 100 miles long and 35 miles wide. The island's topography consists of coastal lowlands and a central mountainous region.

The population was estimated at 3,264,000 as of January 1977, up from 2,712,033 counted in the 1970 United States Census. The average annual population growth rate in the last six years was approximately 3%. The decades since the end of World War II have witnessed two highly significant population movements: within Puerto Rico, and between Puerto Rico and the United States mainland. With regard to internal migration, the general movement has been from rural to urban areas. As for external migration, in the first two decades following World War II, emigration of Puerto Ricans to the United States mainland was very heavy. Beginning in 1972, however, immigration has exceeded emigration in each year. Net immigration accounts for approximately 37% of the 1970-76 population growth. During the same period approximately 20% of immigration into Puerto Rico consisted of returning former emigrants and their children.

San Juan, on the north coast, is the capital of Puerto Rico and its major seaport, airport, and commercial center. In 1970, the population of San Juan was 463,242, and the San Juan Standard Metropolitan Statistical Area had 851,247 inhabitants. Other major municipalities and their 1970 populations are Ponce, 158,981, Bayamon, 156,192, and Carolina, 107,643. Bayamon and Carolina are included in the San Juan Standard Metropolitan Statistical Area.

### Relationship with the United States

Puerto Rico was discovered by Columbus in 1493, and the island was conquered and settled by the Spaniards shortly thereafter. It remained a Spanish possession for four centuries. The culture of Puerto Rico has remained primarily Hispanic even under United States sovereignty, but a considerable intermingling of Hispanic and United States cultures has occurred, particularly in the last three decades.

Puerto Rico came under United States sovereignty by the Treaty of Paris, signed on December 10, 1898, terminating the Spanish-American War. In 1900, the United States Congress provided for a civil government, which consisted of the Governor, Cabinet, Senate and Supreme Court, all appointed by the President of the United States, and a House of Delegates elected by the Puerto Rican electorate.

The Organic Act or Jones Act, adopted in 1917, granted United States citizenship to Puerto Ricans, as well as unrestricted suffrage for local purposes, and provided that members of both the Senate and House were to be elected by the people. The executive and judicial branches remained under control of the federal government through appointment by the President.

In 1946 the President for the first time appointed a Puerto Rican as Governor. In 1947, the Jones Act was amended to permit Puerto Ricans to elect their own Governor, who in turn was empowered to appoint his Cabinet and members of the Supreme Court.

In July 1950 the Congress of the United States enacted Public Law 600, which is "in the nature of a compact" and which became effective upon its acceptance by the electorate of Puerto Rico. It provided that those sections of the Organic Act which defined the political, economic and fiscal relationship between Puerto Rico and the United States should remain in full force and be known as the Puerto Rican Federal Relations Act. It authorized Puerto Rico to draft and approve its own constitution. The constitution was drafted by a freely elected constitutional convention, overwhelmingly approved in a special referendum and approved by Congress and the President, becoming effective upon proclamation of the Governor of Puerto Rico on July 25, 1952. Puerto Rico's relationship to the United States under the compact is referred to herein as commonwealth status.

Under the compact, the Commonwealth of Puerto Rico exercises virtually the same control over its internal affairs as do the fifty states. However, it differs from the states in its relationship with the federal

II-1

government. Puerto Ricans are citizens of the United States but do not vote in national elections, and they are represented in Congress solely by a Resident Commissioner, who has a voice but no vote in the House of Representatives. Most federal taxes, except those such as social security taxes which are imposed by mutual consent, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rican residents on income earned from local sources in Puerto Rico. Federal excise taxes on shipments of alcoholic beverages (chiefly rum) and tobacco products from Puerto Rico to the mainland are returned to the Commonwealth Treasury.

**Political Trends with Respect to the Relationship with the United States**

There have for many years been two major political viewpoints in Puerto Rico with respect to the island's relationship to the United States, one essentially favoring continuation of the existing commonwealth status, and the other favoring statehood. The following table shows, for the last five gubernatorial elections, the percentages of the total vote received by the gubernatorial candidates of the various parties and, where appropriate, the parties' preferences with respect to commonwealth status, statehood and independence. However, the electoral choices of Puerto Rico's voters are not made solely on the basis of preferences regarding the island's relationship with the United States.

|  | 1960 | 1964 | 1968 | 1972 | 1976 |
|---|---|---|---|---|---|
| Statehood |  |  |  |  |  |
| Statehood Republican Party(1) | 32.1% | 34.7% | 0.5% | — | — |
| New Progressive Party | — | — | 43.6 | 43.4% | 48.3% |
| Commonwealth |  |  |  |  |  |
| Popular Democratic Party | 58.2 | 59.2 | 40.7 | 50.7 | 45.3 |
| Peoples Party(1) | — | — | 11.7 | 0.3 | — |
| Independence parties | 3.1 | 2.8 | 3.5 | 5.4 | 6.4 |
| Christian Action Party(1) | 6.6 | 3.3 | — | — | — |
| Others | — | — | — | 0.2 | — |

(1) Now dissolved.

The election of November 2, 1976 resulted in control of the executive branch of the Commonwealth government and of both houses of the Commonwealth Legislature passing from the Popular Democratic Party to the New Progressive Party. The distribution of legislative seats by party is now as follows: Senate—New Progressive Party, 14 seats, Popular Democratic Party, 13 seats; House of Representatives—New Progressive Party, 33 seats, Popular Democratic Party, 18 seats.

Although the New Progressive Party is in favor of eventual statehood for Puerto Rico, the Governor has maintianed that status was not an issue in the 1976 election campaign and that the election results are not to be regarded as a mandate for statehood.

A plebiscite, held July 23, 1967, previously authorized by the Congress of the United States and the Legislature of Puerto Rico, reaffirmed the desire of the Puerto Rican people to maintain permanent and close ties with the United States. Of the 703,692 ballots cast (66.3% of all registered voters), 425,132 (60.4%) were for commonwealth status, 274,312 (39.0%) were for statehood, and 4,248 (0.6%) were for independence.

**Governmental Structure**

The Commonwealth Constitution, like the United States Constitution, provides for the separation of powers of the executive, legislative and judicial branches of government. The Governor is elected directly by the Puerto Rican people every four years. The Legislature is bicameral, consisting of a Senate and a House of Representatives, and is elected for four-year terms. Writs of error and appeals from judgments of the District Court of the United States for Puerto Rico may be taken to the United States Court of Appeals for the First Circuit and to the Supreme Court of the United States, and writs of error and appeals from judgments of the Supreme Court of Puerto Rico may be taken to the Supreme Court of the United States in the same manner and under the same terms and conditions that writs of error and appeals may be taken from state courts.

CONFIDENTIAL

Governmental responsibilities assumed by the Commonwealth are similar in nature to those of the various state governments but more extensive in scope. The only units of government having the right to levy ad valorem taxes are the Commonwealth and the municipalities, which consist of both rural and urban areas and constitute the only local political subdivisions. The Commonwealth assumes responsibility for local police and fire protection, education, public health and welfare programs, and economic development and supervises the fiscal affairs of the municipalities.

The administrative functions of the executive branch of government are handled by appropriate departments, each headed by a secretary appointed by the Governor, with the advice and consent of the Senate and also, in the case of the Secretary of State, of the House. The Secretary of State becomes Governor in the event of the incumbent's incapacity or death. Other secretaries head the following departments: Treasury, Justice, Education, Public Health, Commerce, Labor and Human Resources, Agriculture, Social Services, Consumer Affairs, Transportation and Public Works, Housing, Drug Addiction Services, and Natural Resources. Staff functions of the Office of the Governor are performed by the Bureau of the Budget, the Planning Board and the Office of Personnel, among others.

Governor Carlos Romero Barceló took office January 2, 1977. He was born in 1932, was graduated from Yale University in 1953, and received his law degree from the University of Puerto Rico in 1956. He was engaged in private law practice until 1968, when he was elected Mayor of San Juan, which office he held when he was elected Governor. While Mayor of San Juan he was President of the National League of Cities in 1975.

**Economic Trends**

At the end of World War II, Puerto Rico's economy was heavily dependent on the cultivation of sugar cane and tobacco and related manufacturing, including the production of rum. This economic base was too limited to support the growing population at a decent standard of living. Illiteracy was widespread, unemployment was very high, and public services were inadequate.

Since the late 1940's, the Commonwealth government has made a strong effort to develop the local economy, primarily by encouraging the development of manufacturing and the tourist trade and by expanding and modernizing the island's infrastructure—utilities, highways, sewers and sewage treatment plants, seaports and airports. The investment of mainland United States funds in new factories and tourist facilities was stimulated by selective tax exemption, low-interest loans, and other financial incentives. Infrastructure expansion and modernization were to a large extent financed by tax-exempt bonds and notes issued by the Commonwealth and its agencies and municipalities.

Economic development has been accompanied by an expansion of higher education. University and college enrollments rose from 24,000 in 1960 to over 100,000 in 1976, in large part as a result of the growth of the Commonwealth-supported University of Puerto Rico. During the same period, strong gains were registered in the number of motor vehicles, the availability of public water service, and the usage of electricity.

Despite the marked success of Puerto Rico's development efforts over an extended period of time, economic and social problems remain. Per capita income in Puerto Rico is still low in comparison with that of the United States. Transfer payments from the United States government under various social welfare programs (such as food stamps, social security and veterans benefits) contribute significantly to personal income. In the year ended June 30, 1975, total transfer payments (monetary income received by individuals without any service being rendered) were $1,548,800,000, or 22.3% of personal income. For the year ended June 30, 1976, such transfer payments were $2,118,800,000, or 27.6% of personal income. Unemployment is high by United States standards. As incomes, living standards, and expectations have risen over the years, the comparative advantage of the island over the mainland with respect to labor costs has tended to lessen. This tendency may be intensified by recent amendments to the United States minimum wage laws, which provide, among other things, for phased increases in minimum wage rates in Puerto Rico in order to reach mainland minimum levels to the extent economically feasible without substantial curtailment of employment. The United States Department of Labor estimates that approximately two-thirds of the nonsupervisory employees in the private sector covered by the minimum wage laws are already at or above the statutory minimum. Nonetheless, average wage rates in Puerto Rico are well below those prevailing on the mainland.

II-3

CONFIDENTIAL

HTA_STAY0008183

The economy of Puerto Rico is closely integrated with that of the mainland United States and has felt the impact of economic difficulties of the United States, most notably rising prices, particularly for oil, and the recent recession. Puerto Rico is highly dependent on oil for its energy requirements and raw materials for the important petrochemical industry. Virtually all oil consumed in Puerto Rico is imported from OPEC members, and sharp increases in OPEC oil prices have been very burdensome to the island's economy.

There were indications of moderate economic recovery beginning in 1975, particularly in the vital manufacturing sector. After a brief pause in the last half of 1976, manufacturing has exhibited renewed growth since January, 1977. However, a lagging construction sector has tended to subdue the performance of the overall economy. Based on data for nine months, the Planning Board estimated that net income in fiscal 1977 increased by 5% in nominal terms. Net income originating in the private manufacturing sector is estimated to have increased by approximately 13%, an improvement over the 11.6% increase of the previous fiscal year. On the other hand, net income in the construction sector is estimated to have declined 20% from the fiscal year ended June 30, 1976. For 1978, federally financed public works programs and single family home construction are expected to have a positive effect on the construction sector. Tourism experienced a very satisfactory winter season, in part because of an unusually cold winter in much of the United States, including Florida. For the January-March 1977 quarter, registrations in tourist hotels were 5.5% higher than in the same quarter of the previous year. For the fiscal year ended June 30, 1977, an increase of 7% in net income from this sector has been estimated.

### Economic Statistical Data

**(dollar amounts in current prices unless otherwise indicated)**

| | Years Ended June 30 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **1960** | **1965** | **1970** | **1972** | **1973** | **1974** | **1975** | **1976** | **1977(5)** |
| Gross product—$ millions | 1,676 | 2,764 | 4,622 | 5,675 | 6,206 | 6,706 | 7,147 | 7,493 | N.A. |
| Gross product—$ millions (1967 prices) | 2,092 | 2,962 | 4,033 | 4,507 | 4,770 | 4,856 | 4,823 | 4,878 | N.A. |
| Implicit price deflator for gross product(1) (1967 = 100) | 80.1 | 93.3 | 114.6 | 125.9 | 130.1 | 138.1 | 148.2 | 153.6 | N.A. |
| Net income—$ millions | 1,349 | 2,230 | 3,748 | 4,720 | 5,251 | 5,732 | 6,066 | 6,309 | N.A. |
| Personal income—$ millions | 1,374 | 2,223 | 3,796 | 4,872 | 5,452 | 6,007 | 6,857 | 7,682 | N.A. |
| Personal income per capita—$ | 587 | 866 | 1,398 | 1,726 | 1,873 | 2,008 | 2,230 | 2,422 | N.A. |
| Consumers price index(2)(1967 = 100) | 82.4 | 92.1 | 107.6 | 116.4 | 120.2 | 139.2 | 159.6 | 167.3 | 170.0 |
| Population—thousands(3) | 2,360 | 2,583 | 2,716 | 2,868 | 2,952 | 3,031 | 3,121 | 3,214 | 3,264 |
| Average labor force—thousands | 625 | 680 | 765 | 837 | 858 | 884 | 872 | 890 | 924 |
| Average employment—thousands | 543 | 604 | 686 | 737 | 757 | 775 | 738 | 718 | 739 |
| Average unemployment—thousands | 82 | 76 | 79 | 100 | 101 | 109 | 134 | 172 | 185 |
| Average unemployment—% | 13.1 | 11.2 | 10.3 | 12.0 | 11.8 | 12.3 | 15.4 | 19.3 | 19.9 |
| Merchandise exports—$ millions | 622 | 974 | 1,729 | 1,974 | 2,465 | 3,339 | 3,138 | 3,346 | N.A. |
| Merchandise imports—$ millions | 915 | 1,515 | 2,556 | 3,108 | 3,496 | 4,261 | 4,951 | 5,432 | N.A. |
| Commercial bank loans—$ millions | 417 | 958 | 1,943 | 2,590 | 3,087 | 3,627 | 4,038 | 4,346 | 4,808(6) |
| Commercial bank deposits—$ millions | 531 | 1,182 | 2,529 | 3,120 | 3,634 | 4,136 | 4,683 | 4,872 | 5,699(6) |
| Value of construction—$ millions | 227 | 501 | 994 | 1,288 | 1,111 | 1,275 | 1,489 | 1,203 | N.A. |
| Gross fixed investment—$ millions | 355 | 720 | 1,390 | 1,741 | 1,571 | 1,639 | 2,019 | 1,709 | N.A. |
| Nominal weekly wages(4)—$ | 25.30 | 37.60 | 58.70 | 67.38 | 72.85 | 75.28 | 81.13 | 84.25 | 90.45 |
| Number of motor vehicles—thousands | 172 | 306 | 584 | 651 | 660 | 716 | 774 | 814 | N.A. |
| Electricity generated—millions of kWh | 2,022 | 3,819 | 7,540 | 10,228 | 11,778 | 12,329 | 12,209 | 12,350 | 13,226(7) |
| Number of telephones—thousands | 83 | 194 | 319 | 369 | 406 | 449 | 471 | 505 | 549(6) |
| Water consumption—million cu. ft. | 3,139 | 5,070 | 6,608 | 7,770 | 8,313 | 8,970 | 9,744 | 10,009 | 10,163(7) |

NOTE: Figures shown above are subject to revision.

(1) Composite of individual deflators calculated for each component and sub-component of the gross product, indicating ratios of total current dollar value to total constant dollar value of the gross product.

(2) For wage earners' families, as estimated by the Puerto Rico Department of Labor.

(3) Estimates as of July 1 immediately following end of fiscal year shown, except for 1977 which is as of January 1.

(4) Average median weekly earnings for the first week of July, October, January, and April of each year.

(5) Average for twelve months ended May 1977.

(6) As of May 1977.

(7) Total for twelve months ended May 1977.

*Source:* Puerto Rico Planning Board, Department of the Treasury, Department of Labor, Water Resources Authority, Department of Transportation and Public Works, Puerto Rico Telephone Company and Aqueduct and Sewer Authority.

II-4

CONFIDENTIAL

## Gross Product

**(In millions at current prices unless otherwise indicated)**

| | Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | 1972 | 1973 | 1974 | 1975 | 1976 |
| Consumption | | | | | |
| Private | $4,622 | $5,090 | $5,539 | $6,258 | $7,125 |
| Public | 1,099 | 1,338 | 1,436 | 1,792 | 1,827 |
| Total consumption | 5,721 | 6,428 | 6,975 | 8,050 | 8,952 |
| Gross fixed investment | | | | | |
| Private | 1,104 | 987 | 916 | 925 | 915 |
| Public | 638 | 584 | 723 | 1,094 | 794 |
| Total gross fixed investment | 1,742 | 1,571 | 1,639 | 2,019 | 1,709 |
| Increase in Inventories | 84 | 195 | 167 | 150 | 264 |
| Total gross domestic investment | 1,826 | 1,766 | 1,806 | 2,169 | 1,973 |
| Sales to and purchases from the rest of the world | | | | | |
| Sales to the rest of the world | 2,782 | 3,421 | 4,380 | 4,388 | 4,743 |
| Purchases from the rest of the world | 4,654 | 5,409 | 6,455 | 7,460 | 8,175 |
| Net sales to (purchases from) the rest of the world | (1,872) | (1,988) | (2,075) | (3,072) | (3,432) |
| Gross product(1) | $5,675 | $6,206 | $6,706 | $7,147 | $7,493 |
| Gross product at 1967 prices | $4,507 | $4,770 | $4,856 | $4,823 | $4,878 |
| Annual percentage increase (decrease) in gross product at 1967 prices | 6.2% | 5.9% | 1.8% | (0.7)% | 1.1% |

(1) Gross product consists of total consumption plus total gross domestic investment plus sales to and minus purchases from the rest of the world.

*Source:* Puerto Rico Planning Board.

The following table shows sources of gross capital formation in each of the last five years ended June 30. Gross capital formation is equal to gross domestic investment, as shown in the last table above, plus (or minus) the net increase (or decrease) in Puerto Rican assets outside of the island.

## Sources of Gross Capital Formation

**(In millions at current prices)**

| | Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | 1972 | 1973 | 1974 | 1975 | 1976 |
| Public savings | $ 166 | $ 15 | $ (56) | $ (174) | $ 70 |
| Private savings(1) | (65) | (56) | (9) | (58) | (322) |
| Depreciation | 475 | 516 | 546 | 604 | 638 |
| Net external capital investment | 1,343 | 1,396 | 1,311 | 2,124 | 1,582 |
| Plus (minus): errors and omissions in the balance of payments | 13 | (13) | (13) | (18) | 16 |
| | $1,932 | $1,858 | $1,779 | $2,478 | $1,984 |

(1) Includes undistributed corporate profits and personal savings.

*Source:* Puerto Rico Planning Board.

II-5

CONFIDENTIAL

The following two tables reveal the long-term decline in the relative importance of agriculture and the increasing role of manufacturing and of the governmental, trade, and services sectors. The tables also show the sensitivity of manufacturing employment to the business cycle and the depressed condition of the construction industry in the last two years. The tourist industry, which is not shown as a separate sector, accounts for approximately 7% of gross product.

### Gross Product by Sector

(In millions at current prices)

| | Years Ended June 30 | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1960 | 1970 | 1972 | 1973 | 1974 | 1975 | 1976 |
| Agriculture, forestry and fisheries | $ 164 | $ 157 | $ 177 | $ 171 | $ 274 | $ 257 | $ 275 |
| Manufacturing | 366 | 1,169 | 1,545 | 1,872 | 2,090 | 2,143 | 2,434 |
| Construction and mining | 101 | 378 | 501 | 500 | 517 | 501 | 443 |
| Transportation and public utilities | 156 | 449 | 555 | 628 | 674 | 778 | 854 |
| Wholesale and retail trade | 318 | 970 | 1,225 | 1,357 | 1,382 | 1,453 | 1,648 |
| Finance, insurance, real estate | 198 | 660 | 828 | 880 | 980 | 1,028 | 1,077 |
| Government | 187 | 611 | 878 | 1,032 | 1,089 | 1,334 | 1,392 |
| Services | 141 | 517 | 610 | 688 | 771 | 834 | 926 |
| Less net payments abroad | (15) | (368) | (585) | (799) | (982) | (1,024) | (1,242) |
| Statistical discrepancy | 60 | 79 | (59) | (123) | (88) | (157) | (312) |
| Total(2) | $1,676 | $4,622 | $5,675 | $6,206 | $6,706 | $7,147 | $7,493 |

*Source:* Puerto Rico Planning Board.

### Employment by Sector

(In thousands of persons 14 years old and over. Annual figures are averages of monthly figures.)

| | Years Ended June 30 | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1960 | 1970 | 1972 | 1973 | 1974 | 1975 | 1976 |
| Agriculture, forestry and fisheries | 124 | 68 | 58 | 49 | 53 | 50 | 47 |
| Manufacturing | 81 | 132 | 141 | 142 | 147 | 137 | 133 |
| Construction | 45 | 76 | 79 | 80 | 79 | 69 | 53 |
| Transportation and public utilities | 40 | 45 | 49 | 50 | 54 | 49 | 46 |
| Wholesale and retail trade | 97 | 128 | 135 | 146 | 148 | 141 | 140 |
| Finance, insurance, real estate and mining | 7 | 13 | 16 | 18 | 18 | 18 | 19 |
| Services | 85 | 116 | 126 | 127 | 128 | 120 | 121 |
| Public administration(1) | 64 | 106 | 131 | 143 | 147 | 151 | 158 |
| Total(2) | 543 | 686 | 737 | 757 | 775 | 738 | 718 |

(1) Employees of Commonwealth (exclusive of public corporations), municipalities and Federal government.

(2) Aggregates of separate industries may not equal totals of all industries due to rounding.

*Source:* Puerto Rico Department of Labor.

The following table presents monthly statistics of employment and unemployment beginning in January 1976, both unadjusted and adjusted for seasonal influences. The table includes total manufacturing employment and manufacturing employment in factories promoted by the Puerto Rico Economic

II-6

HTA_STAY0008186

Development Administration by tax exemption and other incentives.  EDA-promoted factories are a particularly important component of the economy of Puerto Rico.

### Monthly Statistics of Employment and Unemployment

| | Labor Force (1) | | Employed (1) | | Unemployed (1) | | Unemployment Rate (2) | | Manufacturing Employment (1) | | EDA Employment(1) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Not Adjusted | Adjusted | Not Adjusted | Adjusted | Not Adjusted | Adjusted | Not Adjusted | Adjusted | Not Adjusted | Adjusted | Not Adjusted | Adjusted |
| **1976:** | | | | | | | | | | | | |
| January | 876 | 881 | 684 | 699 | 192 | 175 | 21.9 | 20.0 | 137.7 | 140.8 | 111.7 | 113.8 |
| February | 888 | 886 | 705 | 710 | 183 | 175 | 20.6 | 19.7 | 141.2 | 141.2 | 114.1 | 111.1 |
| March | 898 | 900 | 726 | 728 | 172 | 172 | 19.2 | 19.0 | 142.3 | 141.5 | 114.4 | 114.8 |
| April | 890 | 902 | 735 | 739 | 155 | 166 | 17.4 | 18.2 | 145.5 | 143.5 | 116.7 | 115.9 |
| May | 902 | 910 | 750 | 746 | 152 | 164 | 16.8 | 18.0 | 144.4 | 142.2 | 115.7 | 115.1 |
| June | 941 | 935 | 748 | 742 | 193 | 193 | 20.6 | 20.7 | 143.9 | 142.5 | 116.5 | 114.6 |
| July | 959 | 938 | 770 | 760 | 189 | 178 | 19.7 | 19.0 | 143.2 | 143.6 | 117.3 | 116.5 |
| August | 910 | 912 | 724 | 736 | 186 | 176 | 20.5 | 19.3 | 141.9 | 141.9 | 116.8 | 116.0 |
| September | 917 | 914 | 737 | 735 | 180 | 179 | 19.6 | 19.6 | 143.9 | 142.9 | 118.2 | 116.5 |
| October | 915 | 918 | 737 | 732 | 179 | 186 | 19.5 | 20.2 | 143.4 | 143.4 | 117.1 | 116.3 |
| November | 929 | 928 | 742 | 733 | 188 | 195 | 20.2 | 21.0 | 143.1 | 143.0 | 117.2 | 116.9 |
| December | 922 | 933 | 746 | 743 | 177 | 190 | 19.1 | 20.4 | 142.0 | 143.7 | 115.6 | 116.4 |
| **1977:** | | | | | | | | | | | | |
| January | 916 | 913 | 720 | 736 | 196 | 176 | 21.4 | 19.3 | 140.4 | 144.9 | 115.2 | 118.5 |
| February | 920 | 913 | 747 | 749 | 173 | 163 | 18.8 | 17.9 | 144.5 | 144.6 | 117.2 | 118.2 |
| March | 916 | 918 | 740 | 741 | 176 | 177 | 19.2 | 19.3 | 146.7 | 146.1 | 118.7 | 118.9 |
| April | 916 | 934 | 730 | 732 | 186 | 202 | 20.3 | 21.6 | 147.2 | 146.2 | 119.2 | 119.6 |
| May | 923 | 935 | 729 | 720 | 194 | 215 | 21.0 | 23.0 | 146.2 | 145.2 | 118.8 | 119.2 |
| June | 959 | 948 | 746 | 741 | 213 | 207 | 22.2 | 21.9 | N.A. | N.A. | N.A. | N.A. |

(1) Thousands of civilians 14 years of age and over.
(2) Unemployed as percent of labor force.
*Source:* Puerto Rico Department of Labor and Puerto Rico Planning Board.

### Tax and Other Development Incentives

Puerto Rico law provides that businesses of specified types may, for specified periods, be exempted by the Commonwealth from income taxes, property taxes, other municipal taxes, and taxes on dividends distributed to residents of Puerto Rico and to residents of foreign countries who are unable to credit such taxes against similar taxes or who do not have to pay such taxes.  Among the specified types of business eligible for exemption are manufacturing and hotel operation.  Normal exemption periods are from 10 to 30 years, with longer exemption periods granted to businesses located in the more undeveloped areas of the island.

Until recently, United States domestic corporations operating in Puerto Rico which met certain criteria set forth in Section 931 of the United States Internal Revenue Code were not subject to United States corporate income taxes with respect to income earned in Puerto Rico.  However, distributions of such income to parent corporations were taxable except upon liquidation of the corporations.  Consequently, many of those corporations chose to accumulate their profits while they were exempt from Puerto Rican taxes and to "repatriate" the accumulated profits, free of United States or Puerto Rican taxes, upon termination of the exemption periods by means of a liquidation of the corporation.

Substantial amounts of undistributed profits were accumulated in this manner, much of which was invested outside of Puerto Rico either in other U.S. possessions or in foreign countries.  The United States Tax Reform Act of 1976 makes Section 931 of the United States Internal Revenue Code no longer applicable to domestic corporations and adds a new Section 936.  Under Section 936, United States corporations, which meet the criteria of such Section are entitled to a tax credit against their United States corporate income taxes equal to the proportion of their total income which is derived from business activities or investments in United States possessions, including Puerto Rico but excluding the Virgin Islands.  The Act also provides that dividends received by United States parent corporations from corporations qualifying under Section 936 are entitled to the dividends received deduction.

II-7

CONFIDENTIAL

In 1976, amendments to the Income Tax Act of Puerto Rico imposed a 10% tax (the "Tollgate Tax") on dividends and profit shares derived solely from hotel, manufacturing or shipping activities within Puerto Rico or from "industrial development income" received by United States corporations or partnerships not engaged in business in Puerto Rico. United States corporations engaged in business in Puerto Rico are subject to the Puerto Rican corporation income tax on dividends or profit shares received from Puerto Rican corporations or partnerships, subject to a maximum rate of 45%. However, such corporations are entitled to exclude 85% of the amount of dividends or profit shares derived from "industrial development income", resulting in a maximum effective tax rate of approximately 7% on such income.

In June 1977, the Income Tax Act was further amended, with respect to the Tollgate Tax on dividends received by United States corporations to provide that, with respect to "industrial development income" earned in taxable years commencing before October 1, 1976, such corporations will have the option of paying a Tollgate Tax of 7% for any year in which they repatriate no more than 25% of such income remaining at the beginning of such year and they have at least an equal amount invested in Puerto Rico during such year. Further, United States corporations will have the option of repatriating 75% of such income earned in taxable years commencing after September 30, 1976, and paying a Tollgate Tax of only 7% if they commit themselves to invest the remaining 25% of such income in Puerto Rico for a period of more than eight years. Also, amounts invested in obligations of the Commonwealth or any of its instrumentalities or political subdivisions or in mortgages insured by Housing Bank and Finance Agency or in mortgages granted by Commonwealth pension funds ("Exempt Investments") can be repatriated by United States corporations free of any Tollgate Tax so long as such investments are held for more than eight years. The required holding period will be deemed not to have been interrupted if a qualifying investment is sold or held to maturity, if the holder has held the investment for more than five years and the proceeds are reinvested within 30 days in other such qualifying investments.

A United States corporation subject to Puerto Rican corporate income taxes on dividends or profit shares derived from "industrial development income" distributed by Puerto Rican corporations is entitled to a tax credit on its Puerto Rican corporate taxes for a portion of the amount of new investments in Puerto Rico and a tax credit equal to such dividends to the extent derived from Exempt Investments.

The Commonweath utilizes various incentives in addition to tax incentives to attract mainland firms to Puerto Rico. Such nontax incentives include, among others, the availability for leasing at reasonable rentals of industrial buildings constructed by Puerto Rico Industrial Development Company, a public corporation of the Commonwealth.

### Manufacturing

Manufacturing in Puerto Rico is now more diversified than at the inception of the industrial development program in the late 1940's. In the earlier years, the majority of new factories were devoted to labor intensive industries, such as textiles and apparel. More recently, industrial development has tended to be more capital intensive and more dependent on skilled labor. This shift in emphasis is perhaps best exemplified by the heavy investment of the oil refining, petrochemical and pharmaceutical industries in Puerto Rico over the last decade. In terms of employment, the leading manufacturing industries, in order of importance, are as follows: apparel, food products, professional and scientific instruments, chemicals (including pharmaceuticals), electrical machinery, stone, clay, and glass products, petroleum products, tobacco products, metal products, textiles, and leather products. The following table sets forth the contribution to gross product of Puerto Rico's manufacturing industries in the five years ended June 30, 1976.

CONFIDENTIAL

HTA_STAY0008188

### Gross Product by Manufacturing Industry

**(in millions at current prices)**

| | Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | 1972 | 1973 | 1974 | 1975 | 1976 |
| Apparel | $ 182 | $ 202 | $ 225 | $ 214 | $ 240 |
| Food products | 289 | 325 | 344 | 457 | 483 |
| Chemicals(1) | 285 | 377 | 487 | 535 | 706 |
| Stone, clay and glass products | 80 | 92 | 92 | 90 | 77 |
| Textiles | 50 | 52 | 51 | 45 | 43 |
| Metal products | 295 | 373 | 410 | 433 | 470 |
| Petroleum products | 66 | 120 | 158 | 128 | 151 |
| Tobacco products | 56 | 61 | 55 | 63 | 66 |
| Other | 242 | 270 | 268 | 178 | 198 |
| Total | $1,545 | $1,872 | $2,090 | $2,143 | $2,434 |

(1) Including petrochemicals and pharmaceuticals.

*Source:* Puerto Rico Planning Board.

Most of the island's manufacturing output is exported to the mainland United States, which is also its primary source of manufactured imports.

Among the many mainland and foreign companies having manufacturing facilities in Puerto Rico are Abbott Laboratories, Baxter Travenol Laboratories, Blue Bell, Bristol-Myers, Carborundum, Conagra, Del Monte, Digital Equipment, DuPont, Esmark, GTE Sylvania, Gulf Oil, Gulf & Western, Hanes, Heinz, Hercules, Hofmann-La Roche, Johnson & Johnson, Eli Lilly, Matsushita, Merck, Mitsui, PepsiCo, Pfizer, Phillips Petroleum, PPG, Ralston Purina, RCA, Searle, Smithkline, Squibb, Timex, Union Carbide, Warnaco, Warner-Lambert, and Westinghouse.

Commonwealth Oil Refining Company ("CORCO"), a petroleum refiner and petrochemical producer, is the major supplier of gasoline and residual fuel oil consumed in Puerto Rico and of feedstocks for the local petrochemical industry. Due in large part to increased crude oil prices, it has experienced financial difficulties in recent years. In May 1977, an agreement was reached among CORCO, its major suppliers and creditors, and other parties under which Ashland Oil, Inc. has an option to purchase the controlling interest in CORCO by November 3, 1977. In the meantime, Ashland will supply crude oil to CORCO and will maintain stocks of crude oil in Puerto Rico. The agreement provides, among other things, for the participation by Government Development Bank for Puerto Rico with certain commercial banks in a $36,800,000 revolving credit facility to CORCO, which share is $15,000,000, secured by accounts receivable, inventories, and a first mortgage on fixed assets. The agreement also provides that if Ashland exercises its option to purchase the controlling interest in CORCO, major creditors (including certain suppliers) will restructure their loans to CORCO so as to extend their maturities.

**Agriculture**

In the post-World War II period, there has been a substantial decline in the economic importance of agriculture in Puerto Rico, and it is estimated that approximately one-half of the island's food consumption is imported. However, agriculture is still an important source of primary employment and income. Sugar cane, from which refined sugar, molasses, and rum are derived, is by far the most important export-oriented crop, followed by tobacco.

To maximize the production of foodstuffs for local consumption and to stabilize sugar, coffee, and tobacco production, the Commonwealth has initiated a number of agricultural support programs. These include the improvement of transportation, warehousing, and processing facilities; the establishment of rural purchasing and urban distribution centers; a farm price guaranty program; and various programs designed to stimulate agricultural investment. In addition, the government has owned or leased and operated most of the sugar production facilities on the island since its acquisition from private enterprise in the early 1970's of 45% of the land on which sugar cane is grown and virtually all local milling and refining capacity.

II-9

CONFIDENTIAL

**Tourism**

Tourism accounts for approximately 7% of the island's gross product. The following table summarizes capacity, registrations, and occupancy rates for the five years ended June 30, 1976 and the 10-month periods ended April 1976 and 1977.

| Fiscal Year Ended June 30 | Average Capacity | Registrations | Occupancy Rate |
|---|---|---|---|
| | (no. of rooms) | (tourist hotels) | |
| 1972 | 7,653 | 652,271 | 67.3% |
| 1973 | 7,911 | 707,289 | 69.2 |
| 1974 | 7,702 | 751,097 | 69.6 |
| 1975 | 7,629 | 665,059 | 59.8 |
| 1976 | 7,352 | 623,201 | 57.6 |
| **Ten Months Ended April 30** | | | |
| 1976 | 7,266 | 520,545 | 58.6 |
| 1977 | 7,062 | 543,223 | 61.3 |

*Source:* Puerto Rico Planning Board.

In the winter of 1976-1977, the Puerto Rico tourist industry was the beneficiary of unusually cold weather in much of the United States, including Florida.

**Economic Program**

The present administration of the Commonwealth, which took office in January 1977, plans to extend Puerto Rico's development program into new areas. Attention will be concentrated on the development of service industries, especially those which complement the local manufacturing sector or which could serve areas outside of Puerto Rico, and alternative areas of agricultural development. These new industries are expected to expand employment opportunities, particularly at relatively high wage levels. The areas in which service industries are to be stimulated would include construction, engineering, architecture, finance, accounting, transportation, import-export, warehousing, medicine, laboratories, education, advertising, printing and film-making. Moreover, efforts to attract new manufacturing operations will be further intensified, with special attention to import substitution.

Recent changes in United States tax laws with respect to the taxation of income of Puerto Rican subsidiaries of mainland corporations could benefit Puerto Rico by enhancing the tax advantages of new investments by mainland corporations in both financial assets and physical plant in Puerto Rico. A substantial pool of liquid assets has already been accumulated in Puerto Rico by Puerto Rican subsidiaries of mainland corporations as a result of the tax changes. In June 1977, the Income Tax Act of Puerto Rico was amended, with respect to the tollgate tax on dividends paid by Puerto Rican subsidiaries to their mainland parents, with the objective of stimulating further investment in Puerto Rico. See "Tax and Other Development Incentives."

In April 1977, Government Development Bank created two subsidiaries, the Temporary Investment Fund of the Government Development Bank (the "Liquidity Fund") and the Fund for the Development of Puerto Rico (the "Development Fund"). The purpose of these subsidiaries is to expand the sources of financing available for the development of the private sector of the economy and to complement Government Development Bank's direct lending program in this area. The obligations of these subsidiaries will be payable solely from their assets.

The Liquidity Fund will issue tax-exempt certificates of indebtedness with a maturity of not more than one year to United States corporations meeting the criteria of Section 936 of the United States Internal Revenue Code ("936 Corporations") and invest the proceeds in direct obligations of the United States.

CONFIDENTIAL

The issuance of certificates of indebtedness to 936 Corporations shall be limited to a period of 36 months from the date of the first issuance of such indebtedness. The spread between the rate of return on the Liquidity Fund's investment portfolio and the rate paid on its certificates of indebtedness, net of operating expenses, will be used to finance the activities of the Development Fund. It is presently contemplated that the rate to be paid on the Liquidity Fund's certificates of indebtedness will be below the prevailing rate on certificates of deposit issued by commercial banks operating in Puerto Rico. Implementation of the Liquidity Fund's proposed program is subject to a favorable ruling from the United States Internal Revenue Service, which has been requested but not yet received.

The Development Fund was created to invest in the equity shares of developing private enterprises and to guarantee or make loans to such enterprises. Enterprises eligible for such investment and guaranties will be those whose operations, in the judgment of the Bank, will foster the economic development of Puerto Rico. The Development Fund was initially capitalized by a $1,000,000 contribution from Government Development Bank. Additional funds for its purposes are expected to be derived from its own earnings and also from net profits transferred from the Liquidity Fund.

A law enacted in June 1977 created a new agency called the Authority for the Financing of Industrial, Commercial and Environmental Control Facilities ("AFICA"). This agency will issue industrial revenue bonds to finance new business facilities in Puerto Rico, on a project by project basis, and will construct the facilities and lease them to private enterprise. Bonds issued by AFICA will be payable from rental payments. Neither the credit, taxing power nor funds of the Commonwealth will be committed to AFICA's program. It is expected that the Authority will issue substantial amounts of bonds to finance pollution control facilities.

The General Services Administration of the Commonwealth is authorized, under a law enacted in June 1977, to contract with private enterprise for the construction of buildings to be rented by the Commonwealth under long-term leases. Previously, the Commonwealth was prohibited from entering into leases with terms of more than five years. It is contemplated that long-term lease commitments from the Commonwealth will increase the ability of private companies to secure construction and mortgage financing from local commercial banks. The terms of any lease commitment in excess of five years must give the Commonwealth an option to purchase the land and buildings relating thereto.

## MAJOR PUBLIC CORPORATIONS

Various public corporations of the Commonwealth are responsible for important public utility services in Puerto Rico. Electric service is provided by the Water Resources Authority, and water and sewer service is provided by the Aqueduct and Sewer Authority. The providers of telephone services are the Telephone and Communications Authorities. The Commonwealth is presently exploring the sale to private enterprise of the facilities of the Telephone Authority. Major airport and seaport facilities are owned by the Ports Authority. All of the aforementioned public corporations have issued interim notes and revenue bonds that are payable entirely from revenues derived from operations.

Major highway construction is the responsibility of the Highway Authority. Revenue bonds issued by the Highway Authority are secured by certain taxes on gasoline, gas oil, and diesel oil and by tolls. The Industrial Development Company ("PRIDCO") constructs industrial and tourist facilities for lease to private firms, makes loans to business, and otherwise aids in the development of the economy of Puerto Rico. PRIDCO's capital expenditures are financed by Commonwealth appropriations, federal grants, retained earnings and other internally generated funds, and the issuance of interim notes and revenue bonds. Revenue bonds are payable from the gross revenues of certain designated properties of PRIDCO and, if required, from any other of its available funds.

The Urban Renewal and Housing Corporation carries out activities related to the provision of low cost housing for moderate income families, federally aided urban renewal programs, federally aided public housing for low income families, and urban renewal, housing and related programs financed by Commonwealth appropriations. The Corporation has issued interim notes and bonds to finance new low cost housing for moderate income families. The bonds are initially payable from mortgage repayments, rentals and other pledged revenues, and are additionally secured by the Commonwealth's guaranty. The

CONFIDENTIAL

HTA_STAY0008191

Housing Bank and Finance Agency makes direct mortgage loans to finance housing for families of low or moderate income, insures mortgages, and services mortgages originated by the Urban Renewal and Housing Corporation, among other activities. The Agency obtains funds from legislative appropriations, loans from the Urban Renewal and Housing Corporation, sales of mortgages, mortgage repayments and other sources.

The Public Buildings Authority constructs office, school, health, and other facilities for lease to Commonwealth departments and agencies. Bonds that have been issued by the Authority to finance such facilities (through retirement of interim notes or otherwise) are initially payable from lease payments, which are largely derived from Commonwealth appropriations, and are further secured by the Commonwealth's guaranty.

The Sugar Corporation, which was created in 1973 to consolidate the ownership and management of the Commonwealth's interests in the sugar industry, has also issued bonds guaranteed by the Commonwealth which are initially payable from moneys received from the sale of sugar properties and any unencumbered funds of the Sugar Corporation resulting from the operation of its sugar properties after payment of the expenses and current debts of operation of such properties. The Sugar Corporation also has substantial short-term debt issued to finance previous operating deficits and ongoing crop production requirements. Beginning in July 1977, the Commonwealth has made payments under its guaranty with respect to debt service on the Corporation's Commonwealth guaranteed bonds.

The Maritime Shipping Authority was created in 1974 to purchase the vessels and other properties of three shipping lines operating between Puerto Rico and United States Atlantic and Gulf ports. Operations are conducted by a private firm under a management contract which provides incentive compensation. The Authority's debt consists of borrowings from a commercial bank, which are expected to be funded ultimately by Commonwealth guaranteed bonds, and long-term debt issued to purchase vessels and related properties and secured by such assets. The Commonwealth is presently exploring the sale to private enterprise of the properties of the Authority.

The Municipal Finance Agency was created in 1973 as a municipal "bond bank" for Puerto Rico. The Agency is authorized to issue bonds the proceeds of which shall be applied to the purchase of general obligation bonds of Puerto Rican municipalities and the funding of a debt service reserve. Debt service on the Agency's bonds is payable from debt service payments on municipal bonds held by the Agency and from the reserve, including investment income thereof. The Commonwealth has agreed to pay such amounts to the reserve as may be necessary to maintain it at its required level, subject to appropriation by the Legislature, which appropriation is authorized but not legally required to be made.

The University of Puerto Rico, which has an enrollment of over 50,000, receives substantial annual appropriations from the Commonwealth and has issued bonds secured by university system revenues and interim notes to finance its capital improvement program.

Government Development Bank for Puerto Rico serves as fiscal agent and financial adviser to the Commonwealth and its municipalities and public corporations in connection with their bond issues and short-term borrowings, makes loans directly to public corporations, grants long-term loans to private firms when funds are not available from private sources, and performs certain central banking functions. It received an initial capital contribution from the Commonwealth and has since augmented its funds with retained earnings and the proceeds of its borrowings. Certain notes and other obligations of Government Development Bank are guaranteed by the Commonwealth.

II-12

CONFIDENTIAL

## INDEBTEDNESS OF THE COMMONWEALTH AND ITS
## MUNICIPALITIES AND PUBLIC AGENCIES

The following table presents a summary of the indebtedness of the Commonwealth and its municipalities and public corporations as of June 30, 1977.

| | |
|---|---|
| Commonwealth direct debt: | |
| General obligation bonds | $1,297,975,825 |
| Other direct debt | 152,000,000 |
| Subtotal | 1,449,975,825 |
| Municipal debt | 174,358,945 |
| Public corporation debt(1): | |
| Commonwealth guaranteed debt(2) | 961,065,000 |
| Nonguaranteed debt | 3,341,282,015 |
| Subtotal | 4,302,347,015 |
| Total debt | $5,926,681,785 |

(1) Excluding (i) $45,115,000 bonds of Municipal Finance Agency, which were issued to finance the purchase by Municipal Finance Agency of the same amount of municipal bonds; and (ii) all notes and bonds of Government Development Bank, totalling $302,500,000 which might be regarded as having been issued to finance indirectly the purchase by Government Development Bank of notes and bonds of the Commonwealth and its municipalities and public agencies.

(2) Any payments required to be made by the Commonwealth on debt guaranteed by it and debt service payments on general obligation bonds and notes of the Commonwealth, together have an equal claim on available Commonwealth revenues.

No deductions have been made in the above table for debt service reserves and funds available for current debt service payments, which aggregated $331,283,167 on June 30, 1977.

Of the debt listed in the above table, $482,509,589 was held by Government Development Bank on June 30, 1977, including $23,000,000 Commonwealth notes payable from previously uncollected taxes, $90,000 Commonwealth general obligation bonds, $5,094,750 municipal debt, and $454,324,839 public corporation debt.

### Debt Supported by Commonwealth Taxes

The following table lists the debt of the Commonwealth and its public corportions that may be regarded as supported by Commonwealth taxes (whether wholly or largely, directly or indirectly) as of June 30, 1977. The table does not include certain public corporation debt indirectly supported from Commonwealth taxes, the degree of tax support for which is difficult to ascertain.

| | |
|---|---|
| Commonwealth direct debt: | |
| General obligation bonds | $1,297,975,825 |
| Special obligation notes | 50,000,000 |
| Notes payable from previously uncollected taxes | 102,000,000 |
| Subtotal | 1,449,975,825 |
| Public corporation debt: | |
| Highway Authority(1) | 684,438,000 |
| Public Buildings Authority(1) | 334,808,040 |
| Sugar Corporation(2) | 93,000,000 |
| Subtotal | 1,112,246,040 |
| Total | $2,582,221,865 |

(1) Bonds and notes.
(2) Bonds.

II-13

CONFIDENTIAL

HTA_STAY0008193

No deductions have been made in the above table for debt service reserves and funds available for current debt service payments, which were as follows on June 30, 1977:

| | |
|---|---|
| General obligation bonds(1) ...................................... | $ 80,004,512 |
| Notes payable from previously uncollected taxes(1).. | 14,843,694 |
| Highway Authority bonds(2) ................................... | 78,118,062 |
| Public Buildings Authority bonds(2)........................... | 12,844,575 |
| Sugar Corporation bonds(2)....................................... | 5,328,784 |
| Total................................................................. | $191,139,627 |

(1) Debt service funds.
(2) Bond reserve and debt service funds.

## BUDGET

Appropriations in the Central Government Budget of the Commonwealth of Puerto Rico consist of the following:

(1) General Fund appropriations for recurrent ordinary operating expenses of the Central Government and for contributions to public corporations, municipalities, and private organizations. Such appropriations are made by a single annual law, known as the Joint Resolution of the General Budget.

(2) General Fund appropriations for special operating expenses and for capital expenditures. Such appropriations are authorized by separate laws for one or more years for special programs or activities, which may be permanent or transitory.

(3) Disbursements of Special Funds for operating purposes and for capital improvements. For the most part, such disbursements do not require annual legislative authorizations, because they are authorized by previous legislation or by the United States Congress. Federal grants constitute the major part of the resources of the Special Funds.

Section 7 of Article VI of the Constitution provides that "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

As a result of the energy crisis during the winter of 1973-74 and the continuing inflation and other economic difficulties in the United States, the Commonwealth experienced unanticipated decreases in revenues, and, while expenditures were reduced, it was not possible to achieve the reductions necessary to maintain a balanced budget for the fiscal year ended June 30, 1974. To fund the resulting unanticipated deficit in the Central Government Funds and to restore the surplus to a reasonable level, the Commonwealth issued $100,000,000 of Special Obligation Notes. In addition, a number of austerity measures were introduced, including a wage freeze for public employees; postponement of the implementation of several special projects; and imposition of increased excise taxes on gasoline, cigarettes, alcoholic beverages, and horse racing purses.

The impact of the economic problems referred to above continued in the fiscal year ended June 30, 1975. In June 1974, the Commonwealth adopted a budget designed to achieve balance in the fiscal year ended June 30, 1975 through the issuance of $115,000,000 of notes payable from previously uncollected taxes. The Attorney General rendered an opinion to the effect that uncollected taxes from prior fiscal years constitute a resource of the Commonwealth for the determination of compliance with Section 7 of Article VI of the Constitution.

During the fiscal year ended June 30, 1975, the Secretary of the Treasury determined that revenues in such year were likely to be significantly less than those anticipated in the original budget and that a deficit of approximately $200,000,000 would result if the budget were not revised. The measures undertaken to remedy the situation included, among others, the enactment of additional personal income taxes

II-14

HTA_STAY0008194

applicable to calendar years 1974 (retroactively), 1975 and 1976, the extension of excise taxes to many items not previously subject to such taxes, the postponement of contributions to Commonwealth employees' pension funds, and the postponement of certain expenditures. In addition, substantially higher Federal grants were received in that year than had been anticipated in the original budget, reflecting in part emergency employment programs enacted by the United States Congress in 1974 and 1975.

The budget for fiscal 1976 was in balance without any recourse to the issuance of notes for current expenses. Resources from sources other than balances from previous years and bond authorizations totaled $1,937,846,000, compared with $1,561,563,000, excluding note proceeds, for fiscal 1975. There was a sharp increase in revenues, attributable to higher Federal grants, increased collections of delinquent taxes as the result of a tax amnesty for a limited period, higher income tax revenues (reflecting increased in taxable income), the full year impact of the extension of the excise tax base in 1975, the full year effect of a tax on imported oil (net of exports to the United States) imposed April 1, 1975 at the initial rate of $1.00 per barrel and increased to $2.00 per barrel on April 1, 1976, and various new taxes. Current expenses in the fiscal 1976 budget totaled $1,893,578,000, compared with $1,694,670,000 in fiscal 1975.

The following table presents the budgetary resources and appropriations of the General Fund and the Special Funds of the Central Government of the Commonwealth for the five fiscal years ended June 30, 1976.

### Historical Budgetary Resources and Appropriations

(in thousands)

| Fiscal Year Ended June 30 | Resources | | | Appropriations | | | |
|---|---|---|---|---|---|---|---|
| | Revenues and Other Resources(1) | Bonds Author-ized(2) | Total | Current Expenses | Capital Improve-ments | Total | Year-End Balances(3) |
| **1972:** | | | | | | | |
| General Fund | $ 902,082 | $ 98,500 | $1,000,582 | $ 850,918 | $112,857 | $ 963,775 | $36,807 |
| Special Funds | 330,554 | —0— | 330,554 | 271,421 | 9,014 | 280,435 | 50,119 |
| Total | $1,232,636 | $ 98,500 | $1,331,136 | $1,122,339 | $121,871 | $1,244,210 | $86,926 |
| **1973:** | | | | | | | |
| General Fund | $1,021,030 | $175,095 | $1,196,125 | $1,008,723 | $186,978 | $1,195,701 | $ 424 |
| Special Funds | 387,673 | —0— | 387,673 | 295,108 | 12,187 | 307,295 | 80,378 |
| Total | $1,408,703 | $175,095 | $1,583,798 | $1,303,831 | $199,165 | $1,502,996 | $80,802 |
| **1974:** | | | | | | | |
| General Fund | $1,062,060 | $189,832 | $1,251,892 | $1,049,528 | $191,243 | $1,240,771 | $11,121 |
| Special Funds | 429,063 | —0— | 429,063 | 361,038 | 11,484 | 372,522 | 56,541 |
| Total | $1,491,123 | $189,832 | $1,680,955 | $1,410,566 | $202,727 | $1,613,293 | $67,662 |
| **1975:** | | | | | | | |
| General Fund | $1,227,270 | $225,000 | $1,452,270 | $1,225,728 | $225,000 | $1,450,728 | $ 1,542 |
| Special Funds | 516,955 | —0— | 516,955 | 468,942 | 5,360 | 474,302 | 42,653 |
| Total | $1,744,225 | $225,000 | $1,969,225 | $1,694,670 | $230,360 | $1,925,030 | $44,195 |
| **1976:** | | | | | | | |
| General Fund | $1,345,742 | $130,000 | $1,475,742 | $1,341,782 | $130,062 | $1,471,844 | $ 3,898 |
| Special Funds | 636,299 | —0— | 636,299 | 551,796 | 9,150 | 560,946 | 75,353 |
| Total | $1,982,041 | $130,000 | $2,112,041 | $1,893,578 | $139,212 | $2,032,790 | $79,251 |

(1) Other resources comprise year-end balances of preceding year and non-revenue receipts (exclusive of bonds authorized), including $100,000,000 note proceeds in fiscal year ended June 30, 1974 and $115,000,000 note proceeds in fiscal year ended June 30, 1975.

(2) Bonds authorized in each fiscal year are not necessarily equal to bonds issued in that year.

(3) Year-end balances comprise General Fund surplus available for appropriation and unexpended balances of Special Funds.

*Source:* Bureau of the Budget and Department of the Treasury.

CONFIDENTIAL

HTA_STAY0008195

A summary of the Commonwealth budget for the fiscal year ended June 30, 1977, as revised on July 1, 1977, is presented herein.  The fiscal 1977 budget does not anticipate any borrowing to provide for current expenses.  No provision is made in the budget for bond authorizations or appropriations for capital improvements financed by bond proceeds.  Current expenses in the revised fiscal 1977 budget amount to $2,030,666,000.  Anticipated resources in the revised fiscal 1977 budget, before application of beginning balances, amount to $2,129,598,000.  The fiscal 1977 revenue estimates reflect, among other things, the absence of any significant new tax measures, economic recovery at a gradual rate in most sectors of the Puerto Rican economy, and an increase of approximately $19,951,000 in Federal grants over 1976.  Actual resources and appropriations in fiscal 1977 could vary from budgeted amounts.

A summary of the Commonwealth budget for the fiscal year ending June 30, 1978, as adopted on July 1, 1977, is presented herein.  The fiscal 1978 budget does not anticipate any borrowing to provide for current expenses.  Appropriations total $2,306,613,000, including $2,202,074,000 for current expenses and $104,539,000 for capital improvements.  Estimated resources total $2,361,737,000, including beginning surplus and balances of $93,057,000, $100,000,000 of authorized bonds, and $2,168,680,000 of revenues and other receipts.  Actual resources and appropriations in fiscal 1978 could vary from budgeted amounts.

Fiscal 1978 budget revenue estimates reflect numerous assumptions and projections with regard to changes in tax laws, the economy of Puerto Rico, tax enforcement, and other relevant factors.  In the preparation of the estimates it has been assumed that there will be no significant increases in taxes and that certain taxes will lapse or be repealed or eased, as follows: a temporary special additional tax on personal income in 1974-76 will not be renewed, excise taxes on certain consumer necessities will be repealed, the personal income tax deduction per dependent will be increased from $600 to $800 over a three-year period, and the exemption from personal income taxation of interest on savings will be increased from $500 to $1,000.  Despite the foregoing tax measures, which it is estimated will provide annual tax relief in the amount of $55 million in the current year, total tax revenues are forecast to rise, largely as a result of projected increases in taxable income, more vigorous efforts to reduce tax evasion and to collect delinquent taxes, and substantially increased purchases of motor vehicles and appliances.  The estimated increase in taxable income in fiscal 1978 assumes, among other things, continuing growth in the United States economy and the expectation that the Federal government will provide substantial Federal funds for local public works projects.

Although the fiscal 1978 budget includes as a resource a general obligation bond authorization of $100,000,000, the Commonwealth will not issue any bonds under the authorization during the fiscal year ending June 30, 1978, with the possible exception of $10 million savings bonds which may be offered to investors in Puerto Rico.  However, it is not expected that the entire $100,000,000 capital expenditures to be financed by the authorized bonds will occur in fiscal 1978.  To the extent that such expenditures do occur prior to the issuance of bonds under the $100,000,000 authorization, such expenditures will be financed by bond anticipation notes or advances from available funds of the Commonwealth or a combination of such financing sources.

II-16

HTA_STAY0008196

**Central Government Budget**

**Fiscal Year Ended June 30, 1977**

**(in thousands)**

| | General Fund | Special Funds | Total |
|---|---|---|---|
| **Resources:** | | | |
| Revenues from internal sources: | | | |
| Property taxes | $ 52,000 | $ 41,300 | $ 93,300 |
| Personal income taxes | 451,500 | 11,000 | 462,500 |
| Business income taxes | 177,500 | 300 | 177,800 |
| Inheritance and gift taxes | 5,400 | 1,300 | 6,700 |
| Excise taxes: | | | |
| Alcoholic beverages | 107,100 | — | 107,100 |
| Petroleum import fees | 77,300 | — | 77,300 |
| 5 percent general tax | 83,500 | — | 83,500 |
| Motor vehicles and accessories | 90,000 | 200 | 90,200 |
| Cigarettes | 69,000 | — | 69,000 |
| Electric and gas appliances | 20,700 | — | 20,700 |
| Other | 37,600 | 7,559 | 45,159 |
| Licenses | 29,800 | — | 29,800 |
| Miscellaneous non-tax revenues: | | | |
| Contributions from Lottery Fund | 41,600 | — | 41,600 |
| Registration and document certification fees | 14,800 | — | 14,800 |
| Other | 16,000 | 29,000 | 45,000 |
| Total revenue from internal sources | 1,273,800 | 90,659 | 1,364,459 |
| Revenues from non-Commonwealth sources: | | | |
| Federal excise taxes on off-shore shipments | 110,400 | 23,000 | 133,400 |
| Federal grants | — | 480,788 | 480,788 |
| Customs | 56,700 | — | 56,700 |
| Total revenues from non-Commonwealth sources | 167,100 | 503,788 | 670,888 |
| Total revenues | 1,440,900 | 594,447 | 2,035,347 |
| Other: | | | |
| Sale of fixed assets and other non-revenue receipts | 15,000 | — | 15,000 |
| Balance from previous year | 3,898 | 75,353 | 79,251 |
| Bonds authorized | — | — | — |
| Total other sources | 18,898 | 75,353 | 94,251 |
| Total resources | $1,459,798 | $669,800 | $2,129,598 |
| **Appropriations:** | | | |
| Current expenses: | | | |
| Appropriations controlled by Bureau of the Budget | $ 86,630 | $ — | $ 86,630 |
| General government | 114,647 | 2,626 | 117,273 |
| Education | 428,185 | 186,021 | 614,206 |
| Health and welfare | 246,839 | 256,106 | 502,945 |
| Economic development | 161,747 | 15,238 | 176,985 |
| Public safety and protection | 165,964 | 59,907 | 225,871 |
| Transportation and communication | 34,233 | 4,289 | 38,522 |
| Housing | 10,117 | 1,587 | 11,704 |
| Contributions to municipalities and assistance to non-profit organizations | 98,264 | 270 | 98,534 |
| Special pension contributions | 6,098 | — | 6,098 |
| Debt service—bonds | 65,980 | 29,158 | 95,138 |
| Debt service—notes | — | 56,760 | 56,760 |
| Total appropriations—current expenses | 1,418,704 | 611,962 | 2,030,666 |
| Capital improvements | 2,408 | 3,467 | 5,875 |
| Subtotal | 1,421,112 | 615,429 | 2,036,541 |
| Year-end balance | 38,686 | 54,371 | 93,057 |
| Total appropriations and year-end balance | $1,459,798 | $669,800 | $2,129,594 |

---

*Source:* Department of the Treasury with respect to resources and Bureau of the Budget with respect to appropriations. As revised on July 1, 1977.

CONFIDENTIAL

HTA_STAY0008197

**Central Government Budget**

**Fiscal Year Ending June 30, 1978**

(in thousands)

| | General Fund | Special Funds | Total |
|---|---:|---:|---:|
| **Resources:** | | | |
| Revenues from internal sources: | | | |
| Property taxes ................................................ | $ 57,400 | $ 42,300 | $ 99,700 |
| Personal income taxes ................................... | 450,500 | 11,000 | 461,500 |
| Business income taxes ................................... | 206,700 | 300 | 207,000 |
| Inheritance and gift taxes ............................. | 8,000 | 1,300 | 9,300 |
| Excise taxes: | | | |
| Alcoholic beverages................................. | 113,000 | — | 113,000 |
| Petroleum import fees............................. | 92,000 | — | 92,000 |
| 5 percent general tax.............................. | 83,200 | — | 83,200 |
| Motor vehicles and accessories............. | 109,500 | 200 | 109,700 |
| Cigarettes ............................................... | 73,000 | — | 73,000 |
| Electric and gas appliances.................... | 36,500 | — | 36,500 |
| Other........................................................ | 45,900 | 7,910 | 53,810 |
| Licenses........................................................ | 33,200 | — | 33,200 |
| Miscellaneous non-tax revenues: | | | |
| Contributions from Lottery Fund ...................... | 39,100 | — | 39,100 |
| Registration and document certification fees...... | 15,000 | — | 15,000 |
| Other............................................................ | 17,000 | 28,853 | 45,853 |
| Total revenue from internal sources ............... | 1,380,000 | 91,863 | 1,471,863 |
| Revenues from non-Commonwealth sources: | | | |
| Federal excise taxes on off-shore shipments............... | 116,000 | 28,000 | 144,000 |
| Federal grants.............................................. | — | 471,817 | 471,817 |
| Customs......................................................... | 69,000 | — | 69,000 |
| Total revenues from non-Commonwealth sources ........... | 185,000 | 499,817 | 684,817 |
| Total revenues ............................................. | $1,565,000 | $591,680 | $2,156,680 |
| Other: | | | |
| Sale of fixed assets and other non-revenue receipts ... | 12,000 | — | 12,000 |
| Balance from previous year........................... | 38,686 | 54,371 | 93,057 |
| Bonds authorized .......................................... | 100,000 | — | 100,000 |
| Total other sources ...................................... | $ 150,686 | $ 54,371 | $ 205,057 |
| Total resources ............................................ | $1,715,686 | $646,051 | $2,361,737 |
| **Appropriations:** | | | |
| Current expenses: | | | |
| Appropriations controlled by Bureau of the Budget.. | 68,425 | — | 68,425 |
| General government........................................ | 109,918 | 1,510 | 111,428 |
| Education....................................................... | 514,704 | 179,859 | 694,563 |
| Health and welfare ....................................... | 315,647 | 250,142 | 565,789 |
| Economic development .................................. | 189,942 | 14,446 | 204,388 |
| Public safety and protection......................... | 204,786 | 50,325 | 255,111 |
| Transportation and communication ............. | 36,640 | 1,054 | 37,694 |
| Housing ......................................................... | 14,813 | 1,720 | 16,533 |
| Contributions to municipalities and assistance to non-profit organizations ............. | 89,028 | 270 | 89,298 |
| Special pension contributions...................... | 6,384 | — | 6,384 |
| Debt service—bonds ..................................... | 63,579 | 30,562 | 94,141 |
| Debt service—notes....................................... | — | 58,320 | 58,320 |
| Total appropriations—current expenses ......... | 1,613,866 | 588,208 | 2,202,074 |
| Capital Improvements ................................... | 101,140 | 3,399 | 104,539 |
| Subtotal......................................................... | 1,715,006 | 591,607 | 2,306,613 |
| Year-end balance ............................................. | 680 | 54,444 | 55,124 |
| Total appropriations and year-end balance ....................... | $1,715,686 | $646,051 | $2,361,737 |

*Source:* Department of the Treasury with respect to resources and Bureau of the Budget with respect to appropriations.  As reported on July 1, 1977.

II-18

## RECEIPTS AND DISBURSEMENTS

The Puerto Rico Department of the Treasury accounts for Commonwealth operations on a cash basis through various funds. The Commonwealth does not retain independent certified public accountants to conduct audits of its accounts. The Secretary of the Treasury has custody of the following major funds or groups of funds: (i) The General Fund, through which most general central governmental activities are financed. (ii) Special Funds, through which certain specified central governmental activities are financed; such activities include construction of capital improvements, payment of debt service on direct obligations of the Commonwealth, and many activities financed by Federal grants. (iii) Government Enterprise Funds, through which certain central governmental business-type activities, largely supported by user charges, are financed. (iv) Trust and Agency Funds, which consist largely of moneys held in trust by the central government for the benefit of other entities and individuals. Examples of trust and agency funds are governmental employees pension funds and contributions to the United States Social Security System.

The funds described above do not include funds of governmental entities with independent treasuries, consisting of the municipalities and of the independent public corporations, such as the authorities which operate the electric, water and sewer, and telephone utilities.

The General Fund and the Special Funds together comprise the Central Government Funds. The accompanying table presents a five-year summary of receipts, disbursements, and beginning and ending cash balances of the consolidated Central Government Funds.

Receipts and disbursements of the Central Government Funds, as shown in the table, may differ substantially from budgetary resources and appropriations for a number of reasons, including, among others, the following:

(i) Disbursements for current purposes in a particular fiscal year may include amounts appropriated for earlier periods but not previously disbursed and, conversely, may exclude amounts appropriated for such fiscal year but not expended until later periods.

(ii) Bonds are authorized by the Commonwealth in accordance with a four year capital improvement program. Since actual bond sales are determined by bond market conditions and other factors, the amount of bonds actually sold in any given year does not necessarily equal the amount of bond authorizations in the budget for that year. Similarly, capital improvements authorized in a given year's budget may require several years to complete, so that the amounts appropriated for capital improvements in the same year do not necessarily correspond to actual disbursements for capital improvements in that year. Such disbursements are frequently financed by advances from available funds which are later reimbursed from proceeds of bond sales.

(iii) Advances are made from the Central Government Funds to municipalities and to public corporations and other entities, pending reimbursement from later collections of municipal property taxes and other sources. Advances and reimbursements will not necessarily be equal in any given fiscal year. Such transactions are not included in the Central Government Budget.

(iv) Certain Federal grants are received directly by agencies and do not go through the Department of the Treasury. These grants, which are included in the Special Funds budget but do not appear in the accounts of the Department of the Treasury, are for the University of Puerto Rico, Agricultural Extension Services, and Agricultural Experimental Stations.

On April 14, 1977, the Commonwealth sold $300,000,000 of general obligation bonds. The issue was the largest in the history of Puerto Rico. Proceeds of the bonds were used to retire $150,000,000 bond anticipation notes, to reimburse the Commonwealth General Fund for approximately $136,832,000 in construction advances, to finance $6,543,000 of future capital improvements and to pay underwriting discount and financing expenses amounting to $6,625,000. The sale of this issue improved the liquidity of the Commonwealth.

II-19

HTA_STAY0008199

**Consolidated Receipts, Disbursements, and Cash Balances**

**Central Government Funds**

(in thousands)

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | 1972 | 1973 | 1974 | 1975 | 1976 |
| Beginning cash balance (1) | $ 178,500 | $ 189,935 | $ 53,152 | $ 103,873 | $ (41,845) |
| **Receipts:** | | | | | |
| Revenues from internal sources: | | | | | |
| Property taxes | 30,693 | 31,006 | 34,608 | 73,123 | 96,554 |
| Income taxes | 378,990 | 414,304 | 459,721 | 510,074 | 571,731 |
| Inheritance and gift taxes | 8,510 | 13,558 | 14,434 | 12,256 | 13,195 |
| Excise taxes | 244,995 | 277,511 | 260,808 | 301,050 | 468,635(6) |
| Licenses | 20,262 | 22,679 | 21,852 | 24,780 | 23,523 |
| Lottery | 32,192 | 31,710 | 32,278 | 33,028 | 36,611 |
| Miscellaneous non-tax revenues | 36,790 | 43,817 | 41,622 | 41,065 | 47,659 |
| Total revenues from internal sources (2) | 752,432 | 834,585 | 865,323 | 995,376 | 1,257,908 |
| Revenues from non-Commonwealth sources: | | | | | |
| Customs | 44,936 | 42,692 | 31,958 | 32,043 | 45,024 |
| Federal excise taxes | 102,459 | 108,055 | 95,022 | 114,558 | 138,078 |
| Federal grants | 243,346 | 276,033 | 271,812 | 347,291 | 420,562 |
| Petroleum import fees | — | — | — | 12,550 | — (6) |
| Total revenues from non-Commonwealth sources | 390,741 | 426,780 | 398,792 | 506,442 | 603,664 |
| Non-revenue receipts and restricted revenues: | | | | | |
| Bonds issued | 130,000 | 99,500 | 200,095 | 152,416 | — |
| Notes issued | — | — | 100,000 | 115,000 | 150,000(7) |
| Other | 16,439 | 16,004 | 37,073 | 22,267 | 33,235 |
| Total non-revenue receipts and restricted revenues | 146,439 | 115,504 | 337,168 | 289,683 | 183,235 |
| Reimbursement of advances (3) | 47,600 | 42,500 | 64,900 | 40,300 | 57,076 |
| Total receipts | $1,337,212 | $1,419,369 | $1,666,183 | $1,831,801 | $2,101,883 |
| Total receipts and beginning cash balance | $1,515,712 | $1,609,304 | $1,719,335 | $1,935,674 | $2,060,038 |
| **Disbursements:** | | | | | |
| General government | $ 75,300 | $ 97,600 | $ 82,707 | $ 104,076 | 114,404 |
| Public safety and protection | 154,200 | 178,900 | 179,916 · | 207,248 | 206,006 |
| Education | 381,000 | 382,000 | 360,309 | 360,876 | 353,005 |
| Health | 247,200(4) | 269,600(4) | 154,152 | 261,153 | 228,803 |
| Public welfare | (4) | (4) | 109,118 | 139,094 | 182,100 |
| Housing | — | — | 6,384 | 12,719 | 16,717 |
| Recreation | 10,800 | 13,700 | 8,668 | 10,307 | 12,147 |
| Economic development | 108,200 | 118,600 | 119,877 | 146,745 | 140,465 |
| Debt service on bonds | 57,900 | 65,500 | 78,770 | 87,051 | 96,144 |
| Debt service on notes | — | — | — | 18,200 | 32,521 |
| Contributions to government enterprises | 104,100 | 200,700 | 171,524 | 213,555 | 229,641 |
| Contributions to municipalities | 60,700 | 71,200 | 76,664 | 80,995 | 93,386 |
| Contributions to pension funds | 37,400 | 41,200 | 21,826 | 7,169 | 7,286 |
| Capital improvements | (5) | (5) | 166,960 | 220,976 | 151,484 |
| Advances (3) | 60,200 | 71,000 | 65,900 | 82,368 | 74,397 |
| Other | 28,700 | 45,600 | 12,786 | 26,606 | 61,701 |
| Discrepancy | 77 | 552 | (45) | (1,619) | — |
| Total disbursements | $1,325,777 | $1,556,152 | $1,615,462 | $1,977,519 | $2,000,207 |
| Ending cash balance (1) | $ 189,935 | $ 53,152 | $ 103,873 | $ (41,845) | $ 59,831 |

(1) Cash in banks, cash with disbursing officers, and securities.

(2) Excluding gasoline and gas and diesel oil taxes allocated to Highway Authority of $58,638,000 (1972), $65,322,000 (1973), $68,158,000 (1974), $72,299,000 (1975) and $94,714,000 (1976).

(3) Advances are made to municipalities in anticipation of reimbursement from property tax collections and to public corporations and other governmental and private agencies in anticipation of future reimbursement.

(4) Public welfare included in "health" category in fiscal years ended June 30, 1972 and 1973.

(5) Disbursements for capital improvements included in other categories in fiscal years ended June 30, 1972 and 1973. In those years, disbursements for capital improvements totaled $141,100,000 and $168,300,000, respectively.

(6) In fiscal year ended June 30, 1976, petroleum import fees, amounting to $92,737,000 in that year, are included in excise taxes. In the fiscal year ended June 30, 1975, petroleum import fees are shown as separate category under revenues from non-Commonwealth sources.

(7) Bond anticipation notes issued by the Secretary of the Treasury to Government Development Bank for Puerto Rico.

CONFIDENTIAL

HTA_STAY0008200

APPENDIX III

## PEAT, MARWICK, MITCHELL & CO.

### CERTIFIED PUBLIC ACCOUNTANTS
### G. P. O. BOX 4089
### SAN JUAN, PUERTO RICO 00936

HON. RAFAEL L. IGNACIO, *Secretary*
Department of Transportation and Public Works
Commonwealth of Puerto Rico:

We have examined the accompanying financial statements of the various funds and account groups of Puerto Rico Highway Authority for the years ended June 30, 1976 and 1975. Our examination was made in accordance with generally accepted auditing standards, and accordingly included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances.

In our opinion, the aforementioned financial statements present fairly the financial position of the various funds and account groups of Puerto Rico Highway Authority at June 30, 1976 and 1975, and the revenues, transfers, and expenditures of the General Revenue Fund and the changes in fund balances of the respective funds for the years then ended, in conformity with generally accepted accounting principles applied on a consistent basis.

*Peat, Marwick, Mitchell & Co.*

PEAT, MARWICK, MITCHELL & CO.

September 10, 1976

Stamp No. 014362 of the College of
CPA's of Puerto Rico was affixed to
original.

III-1

CONFIDENTIAL

## PUERTO RICO HIGHWAY AUTHORITY

### Capital Project Fund

**BALANCE SHEETS**

| | June 30 | | May 31 | |
|---|---|---|---|---|
| | **1976** | **1975** | **1977** | **1976** |
| | | | (Unaudited) | |

### A S S E T S

| | | | | |
|---|---|---|---|---|
| Cash | $ 7,226,613 | 10,025,686 | 8,364,727 | 3,937,268 |
| Certificates of deposit | 7,010,515 | 5,000,000 | 2,422,902 | 691,759 |
| Receivables: | | | | |
| Due from the Commonwealth Secretary of the Treasury | 5,702,716 | 2,007,984 | 3,633,999 | 9,587,009 |
| Federal aid reimbursements (note 4) | 615,137 | 1,553,087 | 2,202,328 | 2,678,035 |
| Other | 2,001,976 | 2,288,034 | 3,276,466 | 3,054,786 |
| Prepaid expenses | 525,282 | 193,067 | 970,784 | 889,929 |
| Advances to the Commonwealth Department of Transportation and Public Works | 269,984 | 210,334 | 437,826 | 210,334 |
| | $23,352,223 | 21,278,192 | 21,309,032 | 21,049,120 |

### L I A B I L I T I E S   A N D   F U N D   B A L A N C E  / ( D E F I C I T )

| | | | | |
|---|---|---|---|---|
| Liabilities: | | | | |
| Loans payable (note 4): | | | | |
| Commonwealth Secretary of the Treasury | $ 3,884,325 | 4,884,325 | 884,325 | 3,884,325 |
| Federal Highway Administration | 1,842,929 | — | — | — |
| Accounts payable | 5,255,128 | 7,927,664 | 1,788,341 | 246,512 |
| Amounts retained from contractors | 11,682,128 | 11,327,462 | 10,304,839 | 11,382,404 |
| Other liabilities (Note 4) | 1,830,735 | 2,181,220 | 4,173,241 | 2,590,987 |
| Total liabilities | 24,495,245 | 26,320,671 | 17,150,746 | 18,104,228 |
| Fund balance/(deficit) | (1,143,022) | (5,042,479) | 4,158,286 | 2,944,892 |
| Commitments and contingent liability (note 5) | | | | |
| | $23,352,223 | 21,278,192 | 21,309,032 | 21,049,120 |

See accompanying notes to financial statements.

III-2

CONFIDENTIAL

HTA_STAY0008202

## PUERTO RICO HIGHWAY AUTHORITY

### Debt Service Fund

**BALANCE SHEETS**

| | June 30 | | May 31 | |
|---|---|---|---|---|
| | 1976 | 1975 | 1977 | 1976 |
| | | | (Unaudited) | |

**A S S E T S**

| | | | | |
|---|---|---|---|---|
| Certificates of deposit | $28,161,112 | 18,189,522 | 50,576,141 | 43,559,438 |
| Cash with trustee | 23,209,864 | 24,653,560 | 122 | 3,437,206 |
| Investment in U. S. Treasury obligations, at cost, which approximates market | 14,911,987 | 9,633,116 | 22,929,218 | 14,911,986 |
| | $66,282,963 | 52,476,198 | 73,505,481 | 61,908,630 |

### L I A B I L I T I E S   A N D   F U N D   B A L A N C E

| | | | | |
|---|---|---|---|---|
| Liabilities: | | | | |
| Matured interest payable | $17,509,864 | 13,775,746 | 16,315,603 | 14,547,657 |
| Matured serial bonds (note 2) | 5,700,000 | 4,985,000 | 7,677,083 | 5,225,000 |
| Total liabilities | 23,209,864 | 18,760,746 | 23,992,686 | 19,772,657 |
| Fund balance | 43,073,099 | 33,715,452 | 49,512,795 | 42,135,973 |
| | $66,282,963 | 52,476,198 | 73,505,481 | 61,908,630 |

See accompanying notes to financial statements.

III-3

CONFIDENTIAL

HTA_STAY0008203

# PUERTO RICO HIGHWAY AUTHORITY

## STATEMENTS OF GENERAL FIXED ASSETS

| | June 30 | | May 31 | |
|---|---|---|---|---|
| | 1976 | 1975 | 1977 | 1976 |
| | | | (Unaudited) | |
| General fixed assets: | | | | |
| Traffic facilities completed | $ 597,058,413 | 522,019,521 | 620,120,100 | 593,566,539 |
| Traffic facilities under construction | 440,261,380 | 406,501,981 | 498,146,035 | 429,308,822 |
| Land | 1,692,544 | 1,692,544 | 1,692,544 | 1,692,544 |
| Machinery and equipment | 5,076,617 | 5,055,698 | 5,554,700 | 5,046,528 |
| Other | 966,015 | 966,015 | 966,015 | 966,015 |
| | $1,045,054,969 | 936,235,759 | 1,126,479,394 | 1,030,580,448 |
| Investment in traffic facilities and other fixed assets | $1,045,054,969 | 936,235,759 | 1,126,479,394 | 1,030,580,448 |

See accompanying notes to financial statements.

III-4

CONFIDENTIAL

# PUERTO RICO HIGHWAY AUTHORITY

## STATEMENTS OF GENERAL LONG-TERM DEBT

| | June 30 | | May 31 | |
|---|---|---|---|---|
| | **1976** | **1975** | **1977** | **1976** |
| | | | (Unaudited) | |
| Amount to be provided from sale of long-term bonds (note 3) .................. | $128,100,000 | 157,524,000 | 93,183,000 | 122,100,000 |
| Amounts to be provided from future revenues for the payment of: | | | | |
| Serial bonds ..................................... | 154,855,000 | 146,555,000 | 172,177,917 | 155,330,000 |
| Term bonds ..................................... | 352,300,000 | 281,300,000 | 389,800,000 | 352,300,000 |
| | $635,255,000 | 585,379,000 | 655,160,917 | 629,730,000 |
| Bond anticipation notes (note 3) .......... | 128,100,000 | 157,524,000 | 93,183,000 | 122,100,000 |
| Bonds payable (note 2): | | | | |
| Serial bonds ..................................... | 154,855,000 | 146,555,000 | 172,177,917 | 155,330,000 |
| Term bonds ..................................... | 352,300,000 | 281,300,000 | 389,800,000 | 352,300,000 |
| | $635,255,000 | 585,379,000 | 655,160,917 | 629,730,000 |

See accompanying notes to financial statements.

III-5

CONFIDENTIAL

## PUERTO RICO HIGHWAY AUTHORITY

### General Revenue Fund

#### STATEMENTS OF REVENUES, TRANSFERS, AND EXPENDITURES

|  | Years ended June 30 | | Eleven months ended May 31 | |
|---|---|---|---|---|
|  | 1976 | 1975 | 1977 | 1976 |
|  |  |  | (Unaudited) | |
| **Revenues ( note 2):** | | | | |
| Excise taxes: | | | | |
| Gasoline | $ 93,951,197 | 70,273,450 | 89,553,180 | 85,151,833 |
| Diesel oil | 1,427,241 | 1,843,526 | 1,207,174 | 1,470,040 |
| | 95,378,438 | 72,116,976 | 90,760,354 | 86,621,873 |
| Toll fares | 4,696,776 | 3,417,394 | 6,866,990 | 4,266,536 |
| Interest | 95,299 | 49,249 | 64,502 | 71,128 |
| Other | 30,766 | 16,768 | 64,312 | 161,435 |
| | 100,201,279 | 75,600,387 | 97,756,159 | 91,120,972 |
| **Transfers:** | | | | |
| Debt Service Fund ( note 2) | 44,644,538 | 37,853,174 | 44,542,157 | 41,207,332 |
| Capital Project Fund | 38,064,471 | 21,176,945 | 40,466,264 | 34,492,306 |
| | 82,709,009 | 59,030,119 | 85,008,421 | 75,699,638 |
| Amount available for expenditures | $ 17,492,270 | 16,570,268 | 12,747,737 | 15,421,334 |
| **Expenditures:** | | | | |
| Discount and bond issue expenses | 3,332,586 | 3,294,113 | 1,441,054 | 2,988,453 |
| Interest on bond anticipation notes | 10,402,604 | 8,207,618 | 8,692,384 | 8,967,527 |
| Toll highways administration | 3,602,485 | 3,782,518 | 2,030,749 | 3,417,040 |
| Maintenance of traffic facilities | 133,675 | 213,805 | 105,467 | 57,484 |
| Acquisition of operating equipment | 20,920 | 1,072,214 | 478,083 | (9,170) |
| Total expenditures | $ 17,492,270 | 16,570,268 | 12,747,737 | 15,421,334 |

See accompanying notes to financial statements.

III-6

**PUERTO RICO HIGHWAY AUTHORITY**

**Capital Project Fund**

STATEMENTS OF CHANGES IN FUND BALANCE/(DEFICIT)

| | Years ended June 30 | | Eleven months ended May 31 | |
|---|---|---|---|---|
| | **1976** | **1975** | **1977** | **1976** |
| | | | (Unaudited) | |
| Fund balance/(deficit) at beginning of period .... | $ (5,042,479) | (16,816,400) | (1,143,022) | (5,042,479) |
| Add: | | | | |
| Net increase in bond anticipation notes (note 3).................................................. | — | 57,524,000 | — | — |
| Transfer from General Revenue Fund .......... | 38,064,471 | 21,176,945 | 40,466,264 | 34,492,306 |
| Sale of bonds ................................................. | 85,000,000 | 70,000,000 | 62,500,000 | 85,000,000 |
| Contributions: | | | | |
| Federal Government ............................... | 19,841,326 | 12,997,834 | 12,887,491 | 17,426,973 |
| Commonwealth of Puerto Rico.............. | 289,900 | 1,000,000 | 3,680,895 | — |
| Municipalities and others ........................ | 556,050 | 154,573 | | 845,950 |
| | 143,751,747 | 162,853,352 | 119,534,650 | 137,765,229 |
| Deduct: | | | | |
| Provision for doubtful receivables ................. | 1,630,000 | — | | |
| Net decrease in bond anticipation notes (note 3)...................................................... | 29,424,000 | — | 34,917,000 | 35,424,000 |
| Expenditures for traffic facilities .................... | 108,798,290 | 151,079,431 | 79,316,342 | 94,353,858 |
| | 139,852,290 | 151,079,431 | 114,233,342 | 129,777,858 |
| Fund balance/(deficit) at end of period ............. | $ (1,143,022) | (5,042,479) | 4,158,286 | 2,944,892 |

See accompanying notes to financial statements.

III-7

CONFIDENTIAL

# PUERTO RICO HIGHWAY AUTHORITY

## Debt Service Fund

### STATEMENTS OF CHANGES IN FUND BALANCE

| | Years ended June 30, 1976 and 1975 | | | | Eleven Months Ended May 31, 1977 and 1976 | | | |
| | | | | | | Unaudited | | |
| | Total Debt Service Fund | Debt Service Account | Redemption Account | Reserve Account | Total Debt Service Fund | Debt Service Account | Redemption Account | Reserve Account |
|---|---|---|---|---|---|---|---|---|
| Fund balance at July 1, 1974 | $23,711,930 | — | — | 23,711,930 | — | — | — | — |
| Add: | | | | | | | | |
|   Transfer from the General Revenue Fund | 37,853,174 | 31,254,474 | — | 6,598,700 | — | — | — | — |
|   Investment income | 3,404,822 | — | — | 3,404,822 | — | — | — | — |
| Interest accrued at date of sale of bonds collected from bond holders | 1,282,018 | 1,282,018 | — | — | — | — | — | — |
| | 66,251,944 | 32,536,492 | — | 33,715,452 | — | — | — | — |
| Deduct: | | | | | | | | |
|   Interest on bonds outstanding | 27,551,492 | 27,551,492 | — | — | — | — | — | — |
|   Serial bonds maturing July 1, 1975 | 4,985,000 | 4,985,000 | — | — | — | — | — | — |
| | 32,536,492 | 32,536,492 | — | — | — | — | — | — |
| Fund balance at June 30, 1975 | 33,715,452 | — | — | 33,715,452 | 33,715,452 | — | — | 33,715,452 |
| Add: | | | | | | | | |
|   Transfer from the General Revenue Fund | 44,644,538 | 38,047,326 | — | 6,597,212 | 41,207,332 | 34,610,120 | — | 6,597,212 |
|   Investment income | 2,760,435 | — | — | 2,760,435 | 1,823,310 | — | — | 1,823,310 |
| Interest accrued at date of sale of bonds collected from bond holders | 1,092,151 | 1,092,151 | — | — | — | — | — | — |
| | 82,212,576 | 39,139,477 | — | 43,073,099 | 76,746,094 | 34,610,120 | — | 42,135,974 |
| Deduct: | | | | | | | | |
|   Interest on bonds outstanding | 33,439,477 | 33,439,477 | — | — | 29,385,120 | 29,385,120 | — | — |
|   Serial bonds maturing July 1, 1976 | 5,700,000 | 5,700,000 | — | — | 5,225,000 | 5,225,000 | — | — |
| | 39,139,477 | 39,139,477 | — | — | 34,610,120 | 34,610,120 | — | — |
| Fund balance at May 31, 1976 | — | — | — | — | 42,135,974 | — | — | 42,135,974 |
| Fund balance at June 30, 1976 | 43,073,099 | — | — | 43,073,099 | 43,073,099 | — | — | 43,073,099 |
| Add: | | | | | | | | |
|   Transfer from the General Revenue Fund | — | — | — | — | 44,542,157 | 40,436,253 | — | 4,105,904 |
|   Investment Income | — | — | — | — | 2,333,792 | — | — | 2,333,792 |
| | — | — | — | — | 89,949,048 | 40,436,253 | — | 49,512,795 |
| Deduct: | | | | | | | | |
|   Interest on bonds outstanding | — | — | — | — | 32,759,170 | 32,759,170 | — | — |
|   Serial bonds maturing July 1, 1977 | — | — | — | — | 7,677,083 | 7,677,083 | — | — |
| | — | — | — | — | 40,436,253 | 40,436,253 | — | — |
| Fund balance at May 31, 1977 | — | — | — | — | 49,512,795 | — | — | 49,512,795 |

See accompanying notes to financial statements.

III-8

CONFIDENTIAL

# PUERTO RICO HIGHWAY AUTHORITY

### NOTES TO FINANCIAL STATEMENTS

### (Information Pertaining to the Eleven Months Ended May 31, 1977
and 1976 is Unaudited)

(1) ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The Puerto Rico Highway Authority is a public corporation and instrumentality of the Commonwealth of Puerto Rico, created by Act No. 74 of June 23, 1965, as amended, to provide roads and other facilities for the movement of persons, vehicles, and vessels. The Legislature of Puerto Rico enacted legislation in 1972 transferring the powers originally exercised by the Board of Directors of the Authority to the Commonwealth Secretary of Transportation and Public Works. Since March 1976 the Authority and the Commonwealth Department of Transportation and Public Works have shared certain common activities in their administrative and operational functions. The Authority is exempt from the payment of any taxes on its revenues and properties.

The accounting policies followed by the Authority are based on generally accepted accounting principles adopted for governmental units. The following is a summary of the more significant of these policies.

*Funds and Account Groups*

The activities of the Authority are segregated into the following funds and groups of accounts:

The *General Revenue Fund* receives all operating revenues of the Authority which are first used to service the long-term debt and the remaining revenues, net of certain expenditures not related to the construction of traffic facilities, are transferred to the Capital Project Fund.

The *Capital Project Fund* receives contributions from the General Revenue Fund, proceeds from bond issues and bond anticipation notes, and contributions from Federal, Commonwealth and Municipal Governments and private enterprises to construct traffic facilities. The cost of traffic facilities is transferred to the General Fixed Assets Group of Accounts at year end.

The *Debt Service Fund* receives contributions from the General Revenue Fund to pay principal and interest on bonds.

The *General Fixed Assets Group of Accounts* reflects the cost of traffic facilities expended by the Capital Project Fund as well as the land, buildings and equipment used in the operations of the Authority acquired with resources of the General Revenue Fund. The cost of fixed assets is not depreciated.

The *General Long-Term Debt Group of Accounts* reflects the amount of bonds and bond anticipation notes outstanding which will be payable from future revenues of the Authority and from additional issuance of bonds.

*Revenue Recognition*

General Revenue Fund—The excise taxes on gasoline and diesel oil appropriated to the Authority by the Legislature of the Commonwealth of Puerto Rico are recognized as revenue when levied by the Commonwealth Secretary of the Treasury at the bulk stations of the respective suppliers. Toll charges and interest on investments are recognized when earned.

Debt Service Fund—Investment income is recognized when received.

*Contributions*

Federal Government

Federal appropriations are provided by the Federal Highway Administration, U.S. Department of Transportation, under provisions of Title 23, U.S.C. The Authority records the contributions as the related costs are billed to the Federal Highway Administration, regardless of the year of appropriations.

Commonwealth of Puerto Rico

Appropriations from the Legislature of the Commonwealth of Puerto Rico to acquire land for the construction of traffic facilities are recorded in the fiscal year as stated in the resolution of the Legislature.

CONFIDENTIAL

# PUERTO RICO HIGHWAY AUTHORITY

## NOTES TO FINANCIAL STATEMENTS—(Continued)

### (Information Pertaining to the Eleven Months Ended May 31, 1977 and 1976 is Unaudited)

**Municipalities and Other**

Contributions from municipalities and private enterprises who share in the cost of construction of certain traffic facilities are recorded when earned.

*Discount on Bonds and Bond Issue Expenses*

Discount on bonds and costs incurred in the issuance of bonds are recorded as expenses when incurred.

## (2) BONDS PAYABLE

The Authority adopted its Resolution No. 68-18, (Bond Resolution), authorizing the issuance of revenue bonds to obtain funds to accelerate the construction of traffic facilities.  Bonds issued and outstanding were as follows:

| | Issue date | Original amount | Maturing July 1, from-to | Interest rate | June 30, 1976 | June 30, 1975 | May 31, 1977 | May 31, 1976 |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | (Unaudited) | |
| **Term bonds:** | | | | | | | | |
| A | Jan. 1, 1968 | $ 20,000,000 | 1998 | 5.25% | $ 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 |
| B | Jan. 1, 1970 | 20,000,000 | 1998 | 7.00 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 |
| C | Jul. 1, 1970 | 25,000,000 | 1999 | 7.25 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 |
| D | Jan. 1, 1971 | 40,000,000 | 2001 | 6.75 | 40,000,000 | 40,000,000 | 40,000,000 | 40,000,000 |
| E | Jan. 1, 1972 | 39,000,000 | 2001 | 6.00 | 39,000,000 | 39,000,000 | 39,000,000 | 39,000,000 |
| F | Jul. 1, 1972 | 32,300,000 | 2002 | 5.90 | 32,300,000 | 32,300,000 | 32,300,000 | 32,300,000 |
| G | Jan. 1, 1973 | 45,000,000 | 2003 | 5.50 | 45,000,000 | 45,000,000 | 45,000,000 | 45,000,000 |
| H | Jul. 1, 1974 | 60,000,000 | 2005 | 8.00 | 60,000,000 | 60,000,000 | 60,000,000 | 60,000,000 |
| I | Jul. 1, 1975 | 7,600,000 | 1995 | 9.00 | 7,600,000 | — | 7,600,000 | 7,600,000 |
| I | Jul. 1, 1975 | 38,400,000 | 2005 | 9.37 | 38,400,000 | — | 38,400,000 | 38,400,000 |
| J | Jan. 1, 1976 | 10,000,000 | 1986 | 9.25 | 10,000,000 | — | 10,000,000 | 10,000,000 |
| J | Jan. 1, 1976 | 15,000,000 | 2005 | 10.00 | 15,000,000 | — | 15,000,000 | 15,000,000 |
| K | Jan. 1, 1977 | 37,500,000 | 1999 | 7.75 | — | — | 37,500,000 | — |
| Total term bonds | | $389,800,000 | | | 352,300,000 | 281,300,000 | 389,800,000 | 352,300,000 |
| **Serial bonds:** | | | | | | | | |
| A | Jan. 1, 1968 | 20,000,000 | 1974-1988 | 4.75-5.10 | 15,445,000 | 16,295,000 | 14,565,000 | 15,445,000 |
| B | Jan. 1, 1970 | 20,000,000 | 1974-1990 | 6.00-6.90 | 17,250,000 | 17,880,000 | 16,565,000 | 17,250,000 |
| C | Jul. 1, 1970 | 25,000,000 | 1974-1992 | 6.00-7.10 | 22,450,000 | 23,150,000 | 21,700,000 | 22,450,000 |
| D | Jan. 1, 1971 | 20,000,000 | 1974-1992 | 6.10-6.60 | 17,460,000 | 18,140,000 | 16,760,000 | 17,460,000 |
| E | Jan. 1, 1972 | 21,000,000 | 1974-1992 | 5.00-5.80 | 19,125,000 | 19,775,000 | 18,425,000 | 19,125,000 |
| F | Jul. 1, 1972 | 27,700,000 | 1974-1992 | 5.20-5.80 | 25,950,000 | 26,850,000 | 25,000,000 | 25,950,000 |
| G | Jan. 1, 1973 | 20,000,000 | 1974-1993 | 5.00-5.50 | 18,875,000 | 19,450,000 | 18,275,000 | 18,875,000 |
| H | Jul. 1, 1974 | 10,000,000 | 1976-1989 | 7.25-8.00 | 10,000,000 | 10,000,000 | 9,565,000 | 10,000,000 |
| I | Jul. 1, 1975 | 4,000,000 | 1977-1985 | 6.50-8.25 | 4,000,000 | — | 4,000,000 | 4,000,000 |
| J | Jan. 1, 1976 | 10,000,000 | 1977-1981 | 6.50-8.00 | 10,000,000 | — | 10,000,000 | 10,000,000 |
| K | Jan. 1, 1977 | 25,000,000 | 1978-1988 | 4.00-7.10 | — | — | 25,000,000 | — |
| Total serial bonds | | $202,700,000 | | | 160,555,000 | 151,540,000 | 179,855,000 | 160,555,000 |
| Less serial bonds payable one day after year end | | | | | 5,700,000 | 4,985,000 | 7,677,083 | 5,225,000 |
| Serial bonds payable thereafter | | | | | 154,855,000 | 146,555,000 | 172,177,917 | 155,330,000 |
| Total bonds payable | | | | | $507,155,000 | 427,855,000 | 561,977,917 | 507,630,000 |

III-10

CONFIDENTIAL

HTA_STAY0008210

## PUERTO RICO HIGHWAY AUTHORITY

### NOTES TO FINANCIAL STATEMENTS—(Continued)

### (Information Pertaining to the Eleven Months Ended May 31, 1977 and 1976 is Unaudited)

The bonds are secured by a pledge of the gross receipts of the gasoline and diesel oil excise taxes, the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may allocate and authorize the Authority to pledge, and which the Authority does pledge, and proceeds of any tolls or other charges which the Authority may impose for the use of any of its traffic facilities financed by bonds. The Bond Resolution requires that proceeds from bonds issued be used to retire bond anticipation notes and for the construction of traffic facilities. It further provides that receipts of pledged revenues be deposited with the Fiscal Agent to the credit of the following accounts in the following order:

(a) *To the Bond Service Account*—an amount equal to $\frac{1}{6}$th of the amount of interest payable on the bonds of each series issued under the Bond Resolution on the interest payment date next succeeding and (beginning with the twelfth month preceding the first maturity of any serial bonds of such series) an amount equal to $\frac{1}{12}$th of the next maturing installment of principal of such serial bonds; provided, however, that the amount so deposited on account of the interest in each month after the delivery of the bonds of any series up to and including the month immediately preceding the first interest payment date thereafter of the bonds of such series shall be that amount which when multiplied by the number of such deposits will be equal to the amount of interest payable on such bonds on such first interest payment date less the amount of any accrued interest paid on such bonds and deposited to the credit of the Bond Service Account.

(b) *To the Redemption Account*—starting two months before the beginning of each fiscal year in which there is an Amortization Requirement (as defined in the Bond Resolution), an amount equal to $\frac{1}{12}$th of the Amortization Requirement for such fiscal year for the term bonds of each series then outstanding plus an amount equal to $\frac{1}{12}$th of the premium, if any, which would be payable on the first redemption date in the following fiscal year on a like principal amount of bonds if such principal amount of bonds should be redeemed prior to their maturity from moneys in the Sinking Fund.

(c) *To the Reserve Account*—such amount as is required to make the amount deposited to the credit of said Account in the then current fiscal year at least equal to 20% of the maximum amount of the Principal and Interest Requirements (as defined in the Bond Resolution) for any fiscal year thereafter on account of all bonds issued under the provisions of the Bond Resolution and then outstanding; provided, however, that such deposits shall only be made to the extent necessary to make the amount then to the credit of the Reserve Account equal to such maximum amount of the Principal and Interest Requirements.

(d) Any balance remaining after making the deposits referred to in paragraphs (a), (b) and (c) above shall be deposited to the credit of the Construction Fund for use by the Authority for any of its authorized purposes.

The requirements specified in paragraphs (a), (b) and (c) above shall be cumulative.

In compliance with the terms of the Bond Resolution, the Authority deposited receipts with the Fiscal Agent as follows:

| | |
|---|---|
| Year ended June 30, 1976 | $97,326,699 |
| Year ended June 30, 1975 | 75,679,067 |
| Eleven months ended May 31, 1977 | 99,190,000 |
| Eleven months ended May 31, 1976 | 90,326,699 |

Additional bonds can be issued under the Bond Resolution provided that the aggregate principal and interest payment requirement of all issues for any fiscal year thereafter shall not exceed two-thirds of the

III-11

HTA_STAY0008211

**PUERTO RICO HIGHWAY AUTHORITY**

NOTES TO FINANCIAL STATEMENTS—(Continued)

**(Information Pertaining to the Eleven Months Ended May 31, 1977
and 1976 is Unaudited)**

gasoline and diesel oil excise taxes received by the Authority during any consecutive twelve-month period within the preceding fifteen months.

Retirement of serial bonds was as follows:

| Series | July 1, 1976 | July 1, 1975 | July 1, 1974 |
|---|---|---|---|
| A | $ 880,000 | 850,000 | 810,000 |
| B | 685,000 | 630,000 | 590,000 |
| C | 750,000 | 700,000 | 660,000 |
| D | 700,000 | 680,000 | 640,000 |
| E | 700,000 | 650,000 | 625,000 |
| F | 950,000 | 900,000 | 850,000 |
| G | 600,000 | 575,000 | 550,000 |
| | 435,000 | — | — |
| | $5,700,000 | 4,985,000 | 4,725,000 |

**(3) BOND ANTICIPATION NOTES**

On September 11, 1975, the Authority, together with eight other agencies and instrumentalities of the Commonwealth of Puerto Rico, and Government Development Bank for Puerto Rico entered into a Note Purchase Agreement with a group of twelve commercial banks. Under the terms of this agreement, Government Development Bank sells to the commercial banks, from time to time, demand promissory notes previously issued to it by either the Authority or any of the instrumentalities previously referred to.

The aggregate amount of the commercial banks' commitment is $612,000,000, decreased to $512,000,000 on July 15, 1977 and will decrease periodically thereafter to $352,000,000 by July 15, 1979. The balance outstanding at August 15, 1979, will become due and payable on said date. Under this agreement the maximum amount of notes to be sold to the banks by any one agency is limited to 33% of the commitment.

The notes bear interest at the banks' respective prime rates from time to time, subject to increase to reflect any change in applicable Commonwealth tax legislation. In addition, the nine agencies are jointly and severally liable for a facility fee of ½% per annum on the total of the banks' commitment, used and unused. These notes are guaranteed by the Commonwealth of Puerto Rico.

The agreement calls for minimum quarterly amortizations of principal from July 15, 1976, to July 15, 1979, plus additional reductions of 50% of the excess (if any) of net proceeds from the sale of bonds over the new loans made by Government Development Bank to the nine agencies during the same years. The agreement, however, precludes the reduction of the balance outstanding, through accelerated amortization to a balance lower than $352,000,000.

As a condition to the agreement, the Authority has covenanted, among other things, that as long as the agreement is in force, it would not create, incur or assume any indebtedness, exclusive of any obligations payable through other than bond issues, in excess of $2,000,000 per fiscal year in the aggregate, excluding normal supplier credit, without the approval of Government Development Bank and that it would abide fully with certain financial controls, which Government Development Bank is required to establish to monitor the Authority's (as well as the other eight agencies') capital investment activity.

III-12

CONFIDENTIAL

HTA_STAY0008212

# PUERTO RICO HIGHWAY AUTHORITY

### NOTES TO FINANCIAL STATEMENTS—(Continued)

### (Information Pertaining to the Eleven Months Ended May 31, 1977 and 1976 is Unaudited)

Outstanding Lines of Credit with Government Development Bank to be eventually funded with bonds were as follows:

| | Amount Outstanding | Interest Rate | Amount | Expiration Date |
|---|---|---|---|---|
| June 30, 1976 | $128,100,000 | 7.3% | 230,424,000 | August 15, 1979 |
| June 30, 1975 | 157,524,000 | 5.8 | 165,679,000 | October 1, 1975 |
| May 31, 1977 | 93,183,000 | 7.0 | 172,200,000 | August 15, 1979 |
| May 31, 1976 | 122,100,000 | 7.3 | 230,424,000 | August 15, 1979 |

The transactions affecting bond anticipation notes are summarized below:

| | Years ended June 30 | | Eleven months ended May 31 | |
|---|---|---|---|---|
| | 1976 | 1975 | 1977 | 1976 |
| Bond anticipation notes issued | $163,100,000 | 124,224,000 | — | 157,100,000 |
| Less bond anticipation notes paid | 192,524,000 | 66,700,000 | 34,917,000 | 192,524,000 |
| Net increase/(decrease) in bond anticipation notes | $(29,424,000) | 57,524,000 | (34,917,000) | (35,424,000) |

## (4) LOANS PAYABLE

The Authority is empowered to obtain loans without interest from the Commonwealth Secretary of the Treasury and the Federal Highway Administration to carry out its current construction program of projects with Federal aid. These loans are collateralized by the related Federal contributions to be received for each approved project.

On April 25, 1977, the Authority entered into a loan agreement with the Farmers Home Administration under which the Authority may borrow a maximum of $2,400,000 for a period of 40 years at 5%. As of May 31, 1977 $45,000 (classified as other liabilities) had been borrowed by the Authority. The notes will eventually be funded with bonds payable from gasoline and gas oil or diesel oil taxes.

## (5) COMMITMENTS AND CONTINGENT LIABILITY

### Commitments

The Authority had commitments related to the construction contract balance of uncompleted projects as follows:

| | |
|---|---|
| June 30, 1976 | $74,000,000 |
| June 30, 1975 | 96,000,000 |
| May 31, 1977 | 43,000,000 |
| May 31, 1976 | 76,000,000 |

Substantially all the employees of the Authority are covered under the Commonwealth of Puerto Rico Employees' Retirement System (System). The Authority contributes 6.75% of the participating employees' salaries to the System, of which 2.12% represents amortization of prior service costs. Pension costs for fiscal years ended June 30, 1976 and 1975 and the eleven months ended May 31, 1977 and 1976 are approximately as follows: $972,000, $974,000, $838,000 and $892,000, respectively.

III-13

# PUERTO RICO HIGHWAY AUTHORITY

### NOTES TO FINANCIAL STATEMENTS—(Concluded)

### (Information Pertaining to the Eleven Months Ended May 31, 1977 and 1976 is Unaudited)

It is not practical to determine the amount of vested benefits and pension fund assets relating to the Authority's portion of the System.

The Authority has a 30-year noncancellable lease for office space with the Puerto Rico Public Buildings Authority.  Rental payments under such lease are summarized as follows:

| Year | Amount |
| --- | --- |
| 1977 | $  932,700 |
| 1978 | 932,700 |
| 1979 | 932,700 |
| 1980 | 932,700 |
| 1981 | 932,700 |
| 1982-1986 | 4,663,500 |
| 1987-1991 | 4,663,500 |
| 1992-1996 | 4,663,500 |
| Thereafter | 6,528,900 |

*Contingent Liability*

The Authority is defendant or co-defendant in various lawsuits for alleged damages aggregating approximately $68,366,000 at June 30, 1976 and $99,417,000 at May 31, 1977.  Substantially all of these cases are in connection with construction projects.  The contractors are required, under the terms of the construction agreement, to carry adequate public liability insurance and to hold harmless the Authority from lawsuits brought on account of damages relating to the construction projects.  Therefore, any liability which may arise from such lawsuits would not be significant.

III-14

CONFIDENTIAL

APPENDIX IV

# BROWN, WOOD, IVEY, MITCHELL & PETTY

### ONE LIBERTY PLAZA, NEW YORK, N.Y. 10006

### 212-349-7500

JOSEPH W. ARMBRUST, JR.
GEORGE B. BOYLE
E. MICHAEL BRADLEY
WILLIAM E. CARTER
WILLIAM R. CARTER
RICHARD CON.WAY CASEY
PHILIP W. CLARK
KENNETH T. COYE
THOMAS D. CREAN
JOSEPH GUANDOLO
ROGER J. HAWKE
J. COURTNEY IVEY
CHARLES J. JOHNSON, JR.
RALPH L. JONES
GEORGE R. LASHNITS
F. LEE LIEBOLT, JR.
JAMES B. MAY
WALTER G. McNEILL

PETER J. MICHEL
HENRY F. MINNEROP
ROBERT L. MITCHELL
RICHARD S. PETTY
PAUL C. PRINGLE
JOHN A. QUISENBERRY
JOHN C. RICHARDSON
A. FRANCIS ROBINSON, JR.
RICHARD D. RUDDER
HOMER D. SCHAAF
NORMAN D. SLONAKER
THOMAS R. SMITH, JR.
EDWARD P. TOLLEY, JR.
SEDGWICK A. WARD
KAREL WESTERLING
HOWARD W. WHITAKER, JR.
MICHAEL G. WOLFSON

HENRY W. HAPPEL
OF COUNSEL

SAN FRANCISCO OFFICE
ALCOA BUILDING
ONE MARITIME PLAZA
SAN FRANCISCO, CALIF. 94111
TELEPHONE: 415-398-3909

TELEX: 127324
CABLE ADDRESS: BROWOOD

[PROPOSED FORM OF OPINION]

August    , 1977

Hon. Elmer Olivieri Cintron
Secretary of Transportation and
    Public Works of Puerto Rico
San Juan, Puerto Rico

Dear Sir:

We have examined Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended, creating the Puerto Rico Highway Authority (hereinafter sometimes called the "Authority"), as a body corporate and politic constituting a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, and the Excise Act of Puerto Rico (Act No. 2 of the Legislature of Puerto Rico, approved January 20, 1956, as amended), which allocated the proceeds of the sixteen cents tax per gallon imposed on gasoline and four cents of the tax per gallon on gas oil or diesel oil to the Authority for use for its corporate purposes.

We have also examined certified copies of the proceedings of the Authority, including Resolution No. 68-18, adopted on June 13, 1968, as amended (said Resolution No. 68-18, as amended, being hereinafter called the "Bond Resolution"), and other proofs submitted relative to the authorization, sale and issuance of

## $75,000,000

## PUERTO RICO HIGHWAY AUTHORITY

### HIGHWAY REVENUE BONDS (SERIES L)

**Dated July 1, 1977.**

**Denomination $5,000.**

**Numbered 1 to 15,000, inclusive.**

$15,000,000 of said bonds, consisting of bonds numbered 1 to 3,000, inclusive, are serial bonds maturing annually on July 1, in the order of their numbers, lowest numbers first, in the years and amounts and bearing interest, as follows:

| Amount | Year | Interest Rate | Amount | Year | Interest Rate |
|---|---|---|---|---|---|
| $ 500,000 | 1979 | 4    % | $1,000,000 | 1986 | 5.80% |
| 500,000 | 1980 | 4½ | 1,500,000 | 1987 | 6 |
| 500,000 | 1981 | 4¾ | 1,500,000 | 1988 | 6.10 |
| 500,000 | 1982 | 5 | 1,500,000 | 1989 | 6.20 |
| 1,000,000 | 1983 | 5.20 | 1,500,000 | 1990 | 6.30 |
| 1,000,000 | 1984 | 5.40 | 1,500,000 | 1991 | 6.40 |
| 1,000,000 | 1985 | 5.60 | 1,500,000 | 1992 | 6½ |

IV-1

CONFIDENTIAL

The remaining $60,000,000 bonds are term bonds numbered 3,001 to 15,000, inclusive, bearing interest at the rate of 7% per annum and maturing on July 1, 2007.

The interest to the maturity of the Series L Bonds is payable on the 1st days of January and July in each year, commencing January 1, 1978.

The Series L Bonds are registrable as to both principal and interest and if registered may be reconverted into coupon bonds.

Both the principal of and the interest on the Series L Bonds are payable in any coin or currency of the United States of America which, at the respective dates of payment thereof, is legal tender for the payment of public and private debts. The principal of and the interest on the Series L Bonds, unless registered, are payable at the principal corporate trust office of The Chase Manhattan Bank (National Association), in the Borough of Manhattan, City and State of New York, or at The Chase Manhattan Bank (National Association), in the Municipality of San Juan, Puerto Rico, or at the corporate trust offices of Bank of America National Trust and Savings Association, in the Cities of San Francisco and Los Angeles, California, at the option of the holder. The principal of registered bonds is payable at the principal corporate trust office of The Chase Manhattan Bank (National Association), in the Borough of Manhattan, City and State of New York. The interest on registered bonds is payable by check or draft mailed to the registered owner.

The Series L Bonds at the time outstanding may be redeemed prior to their respective maturities, at the option of the Authority, either (a) in whole on any date not earlier than July 1, 1987, from any moneys that may be made available for such purpose, or (b) in part in inverse order of maturity on any interest payment date not earlier than July 1, 1987 from moneys in the Sinking Fund, at the principal amount of the bonds to be redeemed, together with the interest accrued thereon to the date fixed for redemption, plus a premium of 3% of such principal amount if redeemed on or prior to June 30, 1990, 2% if redeemed thereafter and on or prior to June 30, 1993, 1% if redeemed thereafter and on or prior to June 30, 1996, and without premium if redeemed thereafter; provided, however, the term bonds will be subject to redemption in part beginning July 1, 1993 and each July 1 thereafter in the principal amount equal to the respective amortization requirements for said bonds as set forth in the resolution of the Authority authorizing the issuance of said bonds from moneys in the Sinking Fund at par plus accrued interest.

We have also examined one of said Series L Bonds as executed (bond numbered 1).

From such examination we are of the opinion that:

1. Said Act No. 74, as amended, and the Excise Act of Puerto Rico are valid.

2. Said proceedings have been validly and legally taken.

3. The Series L Bonds have been duly authorized and issued to pay the cost of constructing highways and other traffic facilities, including the payment of notes heretofore issued by the Authority for such purpose, and said bonds are valid and binding obligations of the Authority payable solely from the special fund created by the Bond Resolution and designated "Puerto Rico Highway Authority Highway Revenue Bonds Interest and Sinking Fund". The Authority has convenanted to deposit to the credit of said Sinking Fund a sufficient amount of the moneys received by the Authority from

(a) the gasoline and gas oil or diesel oil taxes heretofore allocated to the Authority by the Excise Act of Puerto Rico,

(b) any tolls or other charges imposed by the Authority for the use of any traffic facilities to the extent provided in the Bond Resolution, and

(c) the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority and expressly authorize the Authority to pledge to the payment of the principal of and the interest on bonds or other obligations issued by the Authority and which are pledged by the Authority to the payment of the principal of and the interest on bonds or other obligations issued under the provisions of the Bond Resolution,

IV-2

to pay the principal of and the interest on all bonds issued under the provisions of the Bond Resolution as the same shall become due and payable and to create and maintain a reserve therefor. The proceeds of the gasoline and gas oil or diesel oil taxes so allocated to the Authority by the Excise Act of Puerto Rico, and any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority are subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of, and to the extent provided by, Section 8 of Article VI of the Constitution of Puerto Rico if needed for such purpose. Said Sinking Fund is pledged to and charged with the payment of the principal of and the interest on all bonds issued by the Authority under the provisions of the Bond Resolution.

4. The Bond Resolution provides for the issuance, from time to time, under the conditions, limitations and restrictions therein set forth, of additional bonds for the purpose of paying all or a part of the cost of additional traffic facilities and for the purpose of refunding any bonds issued by the Authority under the provisions of the Bond Resolution.

5. Under the provisions of the Acts of Congress now in force, the bonds and the interest thereon are exempt from Federal, State, Commonwealth of Puerto Rico and local taxation.

Respectfully submitted,

[To be signed Brown, Wood, Ivey, Mitchell & Petty]

IV-3

CONFIDENTIAL

## CONTENTS

| | PAGE |
|---|---|
| Summary Statement | ii |
| Application of Proceeds | 1 |
| Security | 1 |
| Provisions Relating to Public Debt of the Commonwealth | 2 |
| The Authority | 4 |
| Resources Available to the Authority | 5 |
| Data on Motor Vehicle Registration, Gasoline Consumption and Highway User Taxes and Fees | 6 |
| Authority Indebtedness | 7 |
| Revenues and Debt Service Coverage | 8 |
| Commonwealth Highway System | 9 |
| Highway Map of Puerto Rico | 10 |
| Principal and Interest Requirements | 13 |
| Summary of Certain Provisions of the Bond Resolution | 14 |
| Note Purchase Agreement | 18 |
| Tax Exemption | 19 |
| Underwriting | 20 |
| Eligibility of Bonds | 20 |
| Legal Matters | 20 |
| Government Development Bank for Puerto Rico | 20 |
| Ratings | 20 |
| Miscellaneous | 20 |
| Appendix I | I-1 |
| Appendix II | II-1 |
| Appendix III | III-1 |
| Appendix IV | IV-1 |

No dealer, salesman or any other person has been authorized to give any information or to make any representation, other than those contained in this Official Statement, in connection with the offering contained herein, and, if given or made, such information or representation must not be relied upon as having been authorized by the Puerto Rico Highway Authority or the Underwriters. This Official Statement does not constitute an offer to sell the Series L Bonds to any person, or the solicitation of an offer from any person to buy the Series L Bonds, in any jurisdiction where such offer or such solicitation of an offer to buy would be unlawful. The delivery of this Official Statement at any time does not imply that the information herein is correct as of any time subsequent to its date.

# $75,000,000

# Puerto Rico Highway Authority

## Highway Revenue Bonds (Series L)



COMMONWEALTH OF PUERTO RICO
HIGHWAY AUTHORITY

## OFFICIAL STATEMENT

**The First Boston Corporation**

**Blyth Eastman Dillon & Co.**
Incorporated

**Merrill Lynch, Pierce, Fenner & Smith**
Incorporated

**Bache Halsey Stuart Shields**
Incorporated

**Kidder, Peabody & Co.**
Incorporated

**Banco Popular de Puerto Rico**

**Salomon Brothers**

**Weeden & Co.**
Incorporated

Dated August 10, 1977