# EXHIBIT 50

NEW ISSUE - BOOK-ENTRY ONLY

# $468,800,000
## PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY
## HOTEL OCCUPANCY TAX REVENUE BONDS, SERIES A

The Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds, Series A, are being issued by the Puerto Rico Convention Center District Authority pursuant to the provisions of a Trust Agreement and a Supplemental Trust Agreement dated March 24, 2006, between the Puerto Rico Convention Center District Authority and JPMorgan Chase Bank, N.A., as trustee. The net proceeds of the Bonds will be used to: (i) repay an interim financing used for the development and construction of a convention center, (ii) make deposits under the Trust Agreement to provide for completion of the convention center and its related infrastructure improvements and facilities and for the payment of interest on the Bonds due on July 1, 2006, (iii) fund a debt service reserve, and (iv) pay costs of issuance. See "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS."

- The Bonds are payable primarily from certain revenues pledged therefor and derived from a hotel occupancy tax imposed by the Commonwealth of Puerto Rico and collected by the Puerto Rico Tourism Company on substantially all hotel room rentals in the Commonwealth. **To the extent other Commonwealth of Puerto Rico revenues are insufficient to pay for the general obligation debts and other guaranteed debts of the Commonwealth, the hotel occupancy tax revenues are subject to being applied first to the payment of such Commonwealth debts and obligations before they may be applied to pay debt service on the Bonds. See page 21 under the sub-heading "Prior Payment of Full Faith and Credit Obligations of the Commonwealth."** For other investment considerations, see "INVESTMENT CONSIDERATIONS" beginning on page 26 of this Official Statement.

- The Bonds will be issued in denominations of $5,000 principal amount and multiples thereof.

- Interest on the Bonds will be payable semi-annually on January 1 and July 1, beginning on July 1, 2006, and will be calculated based on a 360-day year composed of twelve 30-day months. Interest will accrue from the date of issuance of the Bonds.

- The Bonds will be dated their date of delivery and issued as fully registered obligations in book-entry-only form and when issued will be registered in the name of Cede & Co., as nominee of The Depository Trust Company. Purchasers of the Bonds will not receive physical delivery of certificates representing their interest in the Bonds.

- Certain of the Bonds may be subject to optional redemption as described in page 7 of this Official Statement, the first possible date of redemption being July 1, 2016.

- The scheduled payment of principal and interest on certain of the Bonds when due will be guaranteed under insurance policies to be issued concurrently with the delivery of the Bonds by Ambac Assurance Corporation, CDC IXIS Financial Guaranty North America, Inc. and Financial Guaranty Insurance Company, as indicated on the inside cover page of this Official Statement.

- In the opinion of Bond Counsel, under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, interest on the Bonds will be excluded from gross income for purposes of federal income taxation and the Bonds and the interest thereon will be exempt from state, Commonwealth and local income taxation. However, see "TAX MATTERS" beginning on page 32 of this Official Statement for alternative minimum tax consequences with respect to interest on the Bonds, a description of certain rules that the Authority must comply with to preserve the exclusion from gross income of such interest and other tax considerations.

- It is expected that settlement for the Bonds will occur on or about March 24, 2006.

**The inside cover page contains information regarding the maturity schedules, interest rates and yields on the Bonds.**

**Neither the credit of the Commonwealth nor that of any of its government instrumentalities will be pledged for the payment of the Bonds. The Bonds are limited obligations of the Authority payable solely from the revenues received from certain hotel occupancy tax and from moneys held in the reserve account and other funds and accounts held under the Trust Agreement.**

### LEHMAN BROTHERS

| | |
|---|---|
| **BANC OF AMERICA SECURITIES LLC** | **MERRILL LYNCH & CO.** |
| **CITIGROUP** | **MORGAN STANLEY** |
| **GOLDMAN, SACHS & CO.** | **RAYMOND JAMES & ASSOCIATES, INC.** |
| **JP MORGAN** | **SAMUEL A. RAMIREZ & CO.** |

### WACHOVIA BANK, NATIONAL ASSOCIATION

March 15, 2006

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

### MATURITY AND PRICING SCHEDULE

**$468,800,000**
**Puerto Rico Convention Center District Authority**
**Hotel Occupancy Tax Revenue Bonds, Series A**

**$249,305,000 Serial Bonds**

| Maturity (July 1) | Principal Amount | Interest Rate | Yield | CUSIP NO. |
|---|---|---|---|---|
| 2007 | $ 3,000,000 | 4.000% | 3.650% | 745266AA4 |
| 2008 | 4,000,000 | 4.000% | 3.740% | 745266AB2 |
| 2009 | 6,000,000 | 4.000% | 3.820% | 745266AC0 |
| 2010 | 3,130,000 | 4.000% | 3.890% | 745266AD8 |
| 2010 | 5,510,000 | 5.000% | 3.890% | 745266AE6 |
| 2011 | 2,390,000 | 4.000% | 3.970% | 745266AF3 |
| 2011 | 6,650,000 | 5.000% | 3.970% | 745266AG1 |
| 2012 | 9,470,000 ± | 4.000% | 3.770% | 745266AH9 |
| 2013 | 6,465,000 ± | 4.000% | 3.870% | 745266AJ5 |
| 2013 | 3,380,000 ± | 5.000% | 3.870% | 745266AK2 |
| 2014 | 10,275,000 ± | 5.000% | 3.950% | 745266AL0 |
| 2015 | 10,790,000 ± | 5.000% | 4.000% | 745266AM8 |
| 2016 | 11,325,000 ± | 4.000% | 4.050% | 745266AN6 |
| 2017 | 11,780,000 § | 5.000% | 4.040% * | 745266AP1 |
| 2018 | 12,370,000 § | 5.000% | 4.070% * | 745266AQ9 |
| 2019 | 12,985,000 § | 5.000% | 4.110% * | 745266AR7 |
| 2020 | 13,635,000 § | 5.000% | 4.150% * | 745266AS5 |
| 2021 | 3,330,000 † | 4.125% | 4.170% | 745266AT3 |
| 2021 | 10,990,000 † | 5.000% | 4.170% * | 745266AU0 |
| 2022 | 15,005,000 † | 4.750% | 4.300% * | 745266AV8 |
| 2023 | 15,720,000 † | 5.000% | 4.220% * | 745266AW6 |
| 2024 | 16,505,000 † | 5.000% | 4.240% * | 745266AX4 |
| 2025 | 17,330,000 † | 5.000% | 4.260% * | 745266AY2 |
| 2026 | 4,255,000 † | 4.250% | 4.320% | 745266AZ9 |
| 2026 | 13,940,000 † | 5.000% | 4.270% * | 745266BA3 |
| 2027 | 19,075,000 ± | 5.000% | 4.340% * | 745266BB1 |

**$219,495,000 Term Bonds**

$86,320,000§ - 5.00% Term Bonds Due July 1, 2031 - Yield 4.35%* CUSIP NO. 745266BC9

$133,175,000± - 4.50% Term Bonds Due July 1, 2036 - Yield 4.65% CUSIP NO. 745266BD7

\* Priced to call on July 1, 2016.
§ Insured by Ambac Assurance Company.
± Insured by CDC IXIS Financial Guaranty North America, Inc.
† Insured by Financial Guaranty Insurance Company.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

No dealer, broker, sales representative or other person has been authorized by the Authority or the Underwriters to give any information or make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Authority or any Underwriter.  This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy.  There will not be any sale of the Bonds offered hereby by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

The information set forth herein has been furnished by the Authority and the Commonwealth and various other agencies or public corporations of the Commonwealth, and includes information obtained from other sources which are believed to be reliable.  The information and expressions of opinion contained herein are subject to change without notice, and the delivery of this Official Statement or any sale made hereunder shall not, under any circumstances, create any implication that there has been no change in the affairs of the Authority, the Commonwealth and various other public corporations or agencies of the Commonwealth since the date hereof.

The Underwriters have provided the following sentence and the next paragraph for inclusion in this Official Statement.  The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

**In connection with the offering of the Bonds, the Underwriters may over-allot or effect transactions which stabilize or maintain the market prices of the Bonds at levels above those which might otherwise prevail in the open market.  Such stabilizing, if commenced, may be discontinued at any time.**

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

[THIS PAGE INTENTIONALLY LEFT BLANK]

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................ 1
THE AUTHORITY ............................................................. 3
  The Enabling Act ......................................................... 3
  Organization of Board of Directors and Officers .... 3
THE CONVENTION CENTER ........................................ 4
  The Facilities ................................................................ 4
  The Convention Center Operator ............................ 4
  Project Budget; Construction Status .......................... 5
THE BONDS ..................................................................... 5
  General ........................................................................ 5
  Book-Entry-Only System ............................................ 5
  Transfers ...................................................................... 7
  Discontinuance of the Book-Entry-Only System ..... 7
  Redemption ................................................................ 7
    Optional Redemption .............................................. 7
    Mandatory Redemption ........................................... 7
  Amortization Requirements for Bonds ...................... 8
    Effect of Calling for Redemption ............................... 8
  Principal and Interest Requirements on the Bonds .. 9
BOND INSURANCE ...................................................... 10
  The Ambac Assurance Bond Insurance Policy ....... 10
  The CIFG Bond Insurance Policy ............................ 12
  The FGIC Bond Insurance Policy ............................ 14
  Certain Rights of the Bond Insurers ........................ 16
SOURCES AND USES OF FUNDS ................................ 17
HOTEL OCCUPANCY TAX ......................................... 17
  General ...................................................................... 17
  Levy of Hotel Occupancy Tax .................................. 17
  Payment of Hotel Occupancy Tax ........................... 18
  Collection Process for Hotel Occupancy Tax .......... 18
  Non-Impairment Provisions ..................................... 19
SECURITY AND SOURCES OF PAYMENT
  FOR THE BONDS ..................................................... 19
  Pledged Revenues and Sources of Payment ........... 19
  Flow of Funds ........................................................... 20
  Debt Service Reserve Fund ...................................... 21
  Requirements for Issuance of Additional Bonds ..... 21
  Limited Obligations .................................................. 21
  Prior Payment of Full Faith and Credit Obligations
  of the Commonwealth .............................................. 21
  Non-Impairment Provisions ..................................... 22
HISTORICAL HOTEL OCCUPANCY
  TAX INFORMATION ................................................. 23
  Historical Occupancy Data ...................................... 23
  Historical Hotel Occupancy Tax Revenues ............. 23
HOTEL OCCUPANCY TAX REVENUE
  REPORT ..................................................................... 24
  Hotel Occupancy Tax Revenue Projections ............ 24
PROJECTED DEBT SERVICE COVERAGE ................. 25
  Projected Debt Service Coverage ............................ 25
INVESTMENT CONSIDERATIONS ............................. 26
  General ...................................................................... 26
  Issues Facing the Puerto Rico Tourism Industry .... 26
  Concentration of Hotel Occupancy Tax Sources .... 26
  Marketing and Collection Efforts of the
    Tourism Company .................................................. 26
  Achievement of Projections ..................................... 26
  Limited Obligations; Subordination ......................... 27

Page

  Summary .................................................................... 27
RECENT DEVELOPMENTS RELATING
  TO THE COMMONWEALTH ................................... 27
  Recent Developments Relating to the
  Commonwealth's Fiscal Year 2006 Budget
  and Efforts to Resolve its Budgetary
  Structural Imbalance ................................................ 27
  House Joint Resolution and the Governor's
Executive Order ........................................................... 27
  Proposed Tax Reform .............................................. 28
  Proposed Fiscal Reform ........................................... 28
  Fiscal Year 2006 Budget .......................................... 29
  Projected Budget Deficit for Fiscal Year 2006 ....... 30
  Commonwealth's Budget Structural Imbalance ..... 30
  Other Fiscal Challenges ........................................... 31
  Recent Rating Action Involving the Commonwealth
and GDB ....................................................................... 31
UNDERWRITING .......................................................... 32
TAX MATTERS .............................................................. 32
  Discount Bonds ........................................................ 33
  Premium Bonds ........................................................ 34
LEGAL MATTERS .......................................................... 34
LEGAL INVESTMENT .................................................. 34
GOVERNMENT DEVELOPMENT BANK
  FOR PUERTO RICO ................................................. 34
RATINGS ........................................................................ 35
CONTINUING DISCLOSURE ...................................... 35
MISCELLANEOUS INFORMATION ........................... 38

## APPENDICES

APPENDIX A  -  Occupancy Tax Act (Act
                No. 272 of September 9,
                2003)
APPENDIX B  -  Hotel Occupancy Tax
                Projection Report
APPENDIX C  -  Financial Statements of the
                Authority
APPENDIX D  -  Summary of Trust Agreement
APPENDIX E  -  Assignment and Coordination
                Agreement
APPENDIX F  -  Pledge and Assignment
                Agreement
APPENDIX G  -  Form of Bond Counsel
                Opinion
APPENDIX H  -  Specimen of Ambac Assurance
                Corporation Bond Insurance
                Policy
APPENDIX I  -  Specimen of CDC IXIS
                Financial Guaranty North
                America, Inc. Bond Insurance
                Policy
APPENDIX J  -  Specimen of Financial
                Guaranty Insurance Company
                Bond Insurance Policy

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

[THIS PAGE INTENTIONALLY LEFT BLANK]

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

## INTRODUCTION

This Official Statement is provided to furnish information in connection with the issuance and sale by the Puerto Rico Convention Center District Authority (the "Authority") of its $468,800,000 initial principal amount of Hotel Occupancy Tax Revenue Bonds, Series A (the "Bonds"). The Authority is a corporation and governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"). The Authority was created for the purpose, among others, of planning, developing and operating a convention center located in San Juan, Puerto Rico, and related infrastructure improvements and facilities (the "Convention Center"). See "THE CONVENTION CENTER."

The Bonds will be issued pursuant to a trust agreement and a supplemental trust agreement (collectively the "Trust Agreement") between the Authority and JPMorgan Chase Bank, N.A., as trustee (the "Trustee"), as authorized by the act that created the Authority, Act No. 351 of September 2, 2000, as amended (the "Enabling Act").

The scheduled payment of principal of and interest on the Bonds maturing on July 1 in the years 2017 through 2020 and 2031 (the "Ambac Insured Bonds") will be insured by a municipal bond insurance policy (the "Ambac Bond Insurance Policy") to be issued by Ambac Assurance Corporation concurrently with the delivery of the Bonds. The scheduled payment of principal of and interest on the Bonds maturing on July 1 of the years 2012 through 2016, 2027 and 2036 (the "CIFG Insured Bonds") will be insured by a municipal bond insurance policy (the "CIFG Bond Insurance Policy") to be issued by CDC IXIS Financial Guaranty North America, Inc. concurrently with the delivery of the Bonds. The scheduled payment of principal of and interest on the Bonds maturing on July 1 of the years 2021 through 2026 (the "FGIC Insured Bonds," and together with the Ambac Insured Bonds and the CIFG Insured Bonds, the "Insured Bonds") will be insured by a municipal bond insurance policy (the "FGIC Bond Insurance Policy") to be issued by Financial Guaranty Insurance Company concurrently with the delivery of the Bonds. See inside cover page and "BOND INSURANCE."

Act No. 272 of September 9, 2003 (the "Occupancy Tax Act"), imposes a hotel occupancy tax (the "Hotel Occupancy Tax") on all persons who operate any accommodation or facility regularly used by paying guests on a daily, weekly or fractional basis. The accommodations covered by the Occupancy Tax Act include hotels, condohotels, all-inclusive hotels, motels, inns, short term rentals, guest houses, housing residences or complexes, apartment hotels, as well as recreational facilities operated by agencies and instrumentalities of the Commonwealth (collectively herein referred to as a "Hotel").

The Puerto Rico Tourism Company (the "Tourism Company"), a public corporation of the Commonwealth, is charged with assessing and collecting the Hotel Occupancy Tax. See "HOTEL OCCUPANCY TAX."

The Enabling Act and the Occupancy Tax Act authorize the Authority to pledge Hotel Occupancy Tax revenues to secure the payment of the Bonds. See APPENDIX A and "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS." The portion of the Hotel Occupancy Tax necessary to pay the Bonds, and other funds held by the Trustee under the Trust Agreement for payment of principal and interest on the Bonds, are referred to herein as the "Pledged Revenues." As required by the Occupancy Tax Act, the issuance of the Bonds by the Authority has been approved by the Government Development Bank for Puerto Rico ("GDB") and the Tourism Company.

The proceeds of the Bonds will be used to (i) repay an interim financing obtained by the Authority from GDB, an instrumentality and public corporation of the Commonwealth, which was used for the development and construction of the Convention Center, (ii) make the deposits set forth under the Trust Agreement to provide for completion of the Convention Center and its related infrastructure improvements and facilities and for payment of interest on the Bonds due on July 1, 2006, (iii) fund a debt service reserve, and (iv) pay costs of issuance. See "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS."

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**Neither the credit of the Commonwealth nor that of any of its government instrumentalities will be pledged for the payment of the Bonds. The Bonds are limited obligations of the Authority payable from the Pledged Revenues. There is no mortgage on or security interest encumbering the Convention Center or the revenues derived therefrom, or on the other assets and revenues of the Authority to secure the payment of the Bonds.**

**If Commonwealth revenues are insufficient to pay the general obligation debt of the Commonwealth and debt guaranteed by the Commonwealth, the Occupancy Tax Act provides that pursuant to the provisions of Section 8, Article VI of the Constitution of the Commonwealth, the Hotel Occupancy Tax revenues are subject to being applied first to the payment of such Commonwealth general obligation debt or such guaranteed debt before they may be applied to pay debt service on the Bonds. The Hotel Occupancy Tax revenues are not included in the Commonwealth's annual operating budget revenues.  See "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS - Prior Payment of Full Faith and Credit Obligations of the Commonwealth."**

This Official Statement includes the cover page, its appendices and the following documents, which have been filed with each nationally recognized municipal securities information repository ("NRMSIR") and are incorporated herein by reference:

(1)     The Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2004 (the "Commonwealth Annual Financial Report"), which includes the basic financial statements of the Commonwealth for the fiscal year ended June 30, 2004, together with the independent auditor's report thereon, dated April 8, 2005, of KPMG LLP, San Juan, Puerto Rico, certified public accountants. KPMG LLP did not audit the financial statements of the Puerto Rico Public Buildings Authority Capital Project Fund (a major fund) and certain activities, funds and component units separately identified in the auditor's opinion. Those financial statements were audited by other auditors whose reports have been furnished to KPMG LLP, and their opinion on the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors.

(2)     The Commonwealth's Financial Information and Operating Data Report dated as of December 1, 2005 (the "Commonwealth Report"), which includes important information about the Commonwealth, including information about its economy, historical revenues and expenditures of the Commonwealth's General Fund, the year-end results for the fiscal year 2005 budget, the fiscal year 2006 budget, and the debt of the Commonwealth's private sector.

Any appendix of an Official Statement of the Commonwealth or any appendix of an Official Statement of any instrumentality of the Commonwealth containing the same information as the Commonwealth Annual Financial Report, filed with each NRMSIR and the Municipal Securities Rulemaking Board ("MSRB") after the date hereof and prior to the termination of any offering of the Bonds, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any filing with each NRMSIR by the Authority of a document generally containing the same information set forth in its Continuing Disclosure Reports or financial statements, after the date hereof and prior to the termination of any offering of the Bonds, shall also be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document.

Any statement contained herein or in any of the above described documents incorporated herein by reference shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any other subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

A copy of the Commonwealth's Annual Financial Report, of the Commonwealth Report, and of the Financial Statements of the Authority included herein as APPENDIX C may be obtained by contacting a NRMSIR. The address of each NRMSIR is set forth in "CONTINUING DISCLOSURE." The address of the MSRB is 1900 Duke Street, Suite 600, Alexandria, Virginia 22314, telephone number (703) 797-6600.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of any of the documents incorporated herein by reference. Requests for such documents should be directed to Director-New York Office, Government Development Bank for Puerto Rico, 666 Fifth Avenue, 15th Floor, New York, New York 10103-1599, telephone number (212) 422-6420.

This Official Statement, including information incorporated in this Official Statement by reference, contains certain "forward-looking statements" concerning the Authority, the anticipated Pledged Revenues, and the Commonwealth's operations and financial condition. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. All forward-looking statements included in this Official Statement are based on information available to the Authority on the date hereof and the Authority assumes no obligations to update any such forward-looking statements.

These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Authority and the Commonwealth. Actual results may differ materially from those expressed or implied by these forward-looking statements. Readers should not place undue reliance on forward-looking statements. See "INVESTMENT CONSIDERATIONS."

## THE AUTHORITY

The information on the Authority's operations is provided for informational purposes only. Readers should not rely on such information to determine whether to purchase any Bonds since any funds generated by the Authority in the operation of the Convention Center or any of its other assets or facilities will not form part of the Pledged Revenues or be available to pay the principal and interest on the Bonds.

### The Enabling Act

In accordance with the provisions of the Enabling Act, the Authority, a public corporation and governmental instrumentality of the Commonwealth, was created to, among other things, plan, develop and operate the Convention Center. See "THE CONVENTION CENTER."

The Authority is located in San Juan, Puerto Rico. Its mailing address is PO Box 19269, San Juan, Puerto Rico 00910-1269, telephone (787) 722-3309.

### Organization of Board of Directors and Officers

The Authority is governed by a Board of Directors composed of the Secretary of Commerce and Economic Development, the Executive Director of the Tourism Company, the President of the GDB, and six additional members appointed by the Governor of Puerto Rico with the advice and consent of the Commonwealth's Senate. Of these six additional members, four must have experience in hotels, tourism, planning, advertising, engineering, real estate or convention centers, and two are to be representatives from the sports, artistic or cultural community. One of these six members will represent the workers of the Convention Center.

The Secretary of Commerce and Economic Development, the Executive Director of the Tourism Company and the President of the GDB shall each serve throughout their terms in such offices. The six members designated by the Governor of the Commonwealth shall each serve for a six-year term, except that the first

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

persons designated to such capacities shall serve, one for two years, two for three years, two for four years and one for six years.

The Secretary of Commerce and Economic Development serves as the Chair of the Board and the Executive Director of the Tourism Company as Vice-Chair of the Board.  There is currently one vacancy on the Board.

The following individuals are the current members of the Board:

| **Member** | **Occupation** |
| --- | --- |
| Jorge P. Silva Puras (Chair) | Secretary of Commerce and Economic Development *ex-oficio* |
| Terestella González-Denton (Vice Chair) | Executive Director Tourism Company *ex-oficio* |
| Alfredo Salazar | President of Government Development Bank *ex-oficio* |
| Juan Vaquer Castrodad | Executive Director of the Puerto Rico Land Administration |
| Francisco Arriví | Businessman |
| Alberto Bacó | Attorney-at-Law and Businessman |
| Miguel Vázquez Deynes | Businessman |
| Carmen Juncos | Executive |

An Executive Director appointed by the Board for a six-year term directs the day-to-day operations of the Authority.  The current Executive Director is Manuel Sánchez Biscombe.

## THE CONVENTION CENTER

### The Facilities

The Convention Center is located in the heart of San Juan on the Peninsula of Isla Grande, adjacent to Miramar, Condado and Old San Juan. The Convention Center is located on a 113-acre site comprising the "Convention Center District" owned, managed and operated by the Authority.  The Convention Center District is expected to encompass not only the Convention Center, but also a 500-room hotel and casino slated to open in 2009, an office building, a residential complex and various entertainment facilities (multi-screen cinema, restaurants, retail, etc.).  These facilities, currently under various stages of development, will be privately owned.

The 580,000 square-foot Convention Center is the largest facility of its kind in the Caribbean and the most technologically advanced in the Caribbean and Latin America.  The Convention Center boasts an Exhibit Hall measuring approximately 152,700 square feet, additional meeting space of approximately 36,200 square feet, the largest ballroom in the Caribbean measuring 39,500 square feet, and over 1,950 parking spaces adjacent to the Convention Center building.  The Convention Center has the ability to host groups consisting of a maximum of 10,000 delegates.

The Convention Center was inaugurated in November 2005.  Currently, the Convention Center has more than 70 events scheduled to take place through 2008.

### The Convention Center Operator

The Convention Center is managed by SMG Puerto Rico II, L.P., an affiliate of SMG. SMG is a joint venture in general partnership form, with Hyatt Hotel Company and ARAMARK Corporation as its two equal principals. SMG was founded in 1977 and is headquartered in Philadelphia. SMG is an experienced convention center management company, which services more then 180 venues throughout the United States, Canada and Europe.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**Project Budget; Construction Status**

The construction of the Convention Center building was completed, on budget, in November 2005. There are, however, certain items relating to the Convention Center, including surrounding infrastructure, public parks, decorative fountains, landscaping, and streetscapes, which remain under construction and which will be completed with Bond proceeds. The Authority anticipates that the remaining construction on such ancillary infrastructure should be entirely completed within 36 months and within the established budget.

## THE BONDS

**General**

The Bonds will be dated their delivery date. Interest on the Bonds (at their respective rates set forth on the inside cover page of this Official Statement) will be payable semi-annually to maturity on the 1st day of January and July, beginning July 1, 2006. The Bonds are subject to redemption at the times and at the prices set forth in "Redemption" below.

**Book-Entry-Only System**

*The following information has been obtained from The Depository Trust Company. Neither the Authority nor the Underwriters makes any representation or warranty with respect to the information contained in this Official Statement regarding The Depository Trust Company or its Book-Entry-Only System.*

The Depository Trust Company ("DTC"), New York, New York, will act as securities depository for the Bonds. The Bonds will be issued as fully registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully registered certificate will be issued for the Bonds in the aggregate principal amount of such issue and will be deposited with DTC.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 2 million issues of U.S. and non-U.S. equity, corporate and municipal debt issues, and money market instruments from over 85 countries that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation Government Securities Clearing Corporation, MBS Clearing Corporation, and Emerging Markets Clearing Corporation (NSCC, GSCC, MBSCC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through, or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has Standard & Poor Rating Services, a division of The McGraw-Hill Companies, Inc. "(S&P") highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

Purchases of Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of each Bond ("Beneficial Owner") is in turn recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in Bonds, except in the event that use of the book-entry system for the Bonds is discontinued, as discussed below.

To facilitate subsequent transfers, all Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. or such other name as may be requested by an authorized representative of DTC. The deposit of Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Bonds may wish to take certain steps to augment transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the security documents. For example, Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners, in the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of the notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor such other DTC nominee) will consent or vote with respect to the Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to Issuer as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, distributions, and dividend payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts, upon DTC's receipt of funds and corresponding detail information from Issuer or Agent on payable date, in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC (nor its nominee), Agent, or Issuer, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of Issuer or Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

6

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

DTC may discontinue providing its services as securities depository with respect to the Bonds at any time by giving reasonable notice to Issuer or Agent. Under such circumstances, in the event that a successor securities depository is not obtained, bond certificates are required to be printed and delivered.

The Authority may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, definitive Bonds will be printed and delivered to DTC.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Authority believes to be reliable, but the Authority takes no responsibility for the accuracy thereof.

**Transfers**

For every transfer and exchange of the Bonds, the Beneficial Owners may be charged a sum sufficient to cover any tax, fee or other charge that may be imposed in relation thereto.

**Discontinuance of the Book-Entry-Only System**

In the event that such book-entry only system is discontinued, the following provisions will apply: principal of and redemption premium, if any, on the Bonds shall be payable in lawful money of the United States of America at the corporate trust offices of the Trustee in New York, New York. Interest on the Bonds will be payable by check mailed to the respective addresses of the registered owners thereof as shown on the registration books of the Authority, maintained by the Trustee, as of the record date therefore. The Bonds will be issued only as registered Bonds without coupons in denominations of $5,000 or any multiple thereof. The transfer of the Bonds will be registrable and they may be exchanged at the corporate trust offices of the Trustee upon the payment of any taxes or other governmental charges as may be required with respect to such transfer or exchange.

**Redemption**

*Optional Redemption*. The Bonds maturing after July 1, 2016 may be redeemed, at the option of the Authority, upon not less than 30 days' prior notice by mail to DTC or, if the book-entry system is discontinued, to the registered owners thereof from any available moneys (other than moneys deposited in the Bond Payment Fund under the Trust Agreement required to pay principal and interest due in such fiscal year on Bonds that are not being redeemed) either in whole or in part, as directed by the Authority, on any date not earlier than July 1, 2016, at a redemption price equal to 100% of the par amount of Bonds so redeemed plus accrued interest to the date fixed for redemption.

*Mandatory Redemption*. The Bonds maturing on July 1, 2031 and 2036 are subject to redemption to the extent of the respective amortization requirements therefor set forth below (less the amount applied to the purchase of any such Bonds and otherwise subject to adjustment as described below), upon not less than 30 days' prior notice, from moneys in the Bond Payment Fund under the Trust Agreement, at a redemption price equal to the par amount of Bonds so redeemed plus accrued interest to the date fixed for redemption.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**Amortization Requirements for Bonds due July 1**

| Year | 2031 | 2036 |
|------|------|------|
| 2028 | $20,025,000 | |
| 2029 | 21,030,000 | |
| 2030 | 22,080,000 | |
| 2031 | 23,185,000 | |
| 2032 | | $24,345,000 |
| 2033 | | 25,440,000 |
| 2034 | | 26,585,000 |
| 2035 | | 27,780,000 |
| 2036 | | 29,025,000 |
| Average life (in years) | 23.83 | 28.36 |

*Effect of Calling for Redemption.* On the date so designated for redemption, notice having been given in the manner and under the conditions provided in the Trust Agreement, the Bonds or portions of Bonds so called for redemption will become and be due and payable at the redemption price of such Bonds or portions thereof to be redeemed on such date. If sufficient moneys or Government Obligations (as defined the Trust Agreement – see APPENDIX D) for payment of the redemption price are held by the Trustee in trust for the owners of the Bonds to be redeemed, interest on the corresponding Bonds so called for redemption will cease to accrue after the date fixed for redemption. Furthermore, such Bonds will cease to be entitled to any lien or security under the Trust Agreement, and the registered owners of such Bonds or portions thereof will have no rights in respect thereof except to receive payment of the redemption price thereof and the accrued interest (including the right to receive Bonds of the same series and maturity for any unredeemed portions of the Bonds).

For additional information on the Bonds, see "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS" and APPENDIX D.

[Remainder of Page Intentionally Left Blank]

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

### Principal and Interest Requirements on the Bonds

| Year Ending July 1 | Principal | Interest | Total Debt Service |
|---|---|---|---|
| 2006 | - | $ 5,986,452.67 | $ 5,986,452.67 |
| 2007 | $ 3,000,000.00 | 22,217,762.50 | 25,217,762.50 |
| 2008 | 4,000,000.00 | 22,097,762.50 | 26,097,762.50 |
| 2009 | 6,000,000.00 | 21,937,762.50 | 27,937,762.50 |
| 2010 | 8,640,000.00 | 21,697,762.50 | 30,337,762.50 |
| 2011 | 9,040,000.00 | 21,297,062.50 | 30,337,062.50 |
| 2012 | 9,470,000.00 | 20,868,962.50 | 30,338,962.50 |
| 2013 | 9,845,000.00 | 20,490,162.50 | 30,335,162.50 |
| 2014 | 10,275,000.00 | 20,062,562.50 | 30,337,562.50 |
| 2015 | 10,790,000.00 | 19,548,812.50 | 30,338,812.50 |
| 2016 | 11,325,000.00 | 19,009,312.50 | 30,334,312.50 |
| 2017 | 11,780,000.00 | 18,556,312.50 | 30,336,312.50 |
| 2018 | 12,370,000.00 | 17,967,312.50 | 30,337,312.50 |
| 2019 | 12,985,000.00 | 17,348,812.50 | 30,333,812.50 |
| 2020 | 13,635,000.00 | 16,699,562.50 | 30,334,562.50 |
| 2021 | 14,320,000.00 | 16,017,812.50 | 30,337,812.50 |
| 2022 | 15,005,000.00 | 15,330,950.00 | 30,335,950.00 |
| 2023 | 15,720,000.00 | 14,618,212.50 | 30,338,212.50 |
| 2024 | 16,505,000.00 | 13,832,212.50 | 30,337,212.50 |
| 2025 | 17,330,000.00 | 13,006,962.50 | 30,336,962.50 |
| 2026 | 18,195,000.00 | 12,140,462.50 | 30,335,462.50 |
| 2027 | 19,075,000.00 | 11,262,625.00 | 30,337,625.00 |
| 2028 | 20,025,000.00 | 10,308,875.00 | 30,333,875.00 |
| 2029 | 21,030,000.00 | 9,307,625.00 | 30,337,625.00 |
| 2030 | 22,080,000.00 | 8,256,125.00 | 30,336,125.00 |
| 2031 | 23,185,000.00 | 7,152,125.00 | 30,337,125.00 |
| 2032 | 24,345,000.00 | 5,992,875.00 | 30,337,875.00 |
| 2033 | 25,440,000.00 | 4,897,350.00 | 30,337,350.00 |
| 2034 | 26,585,000.00 | 3,752,550.00 | 30,337,550.00 |
| 2035 | 27,780,000.00 | 2,556,225.00 | 30,336,225.00 |
| 2036 | 29,025,000.00 | 1,306,125.00 | 30,331,125.00 |

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

# BOND INSURANCE

**The Ambac Assurance Bond Insurance Policy**

Ambac Assurance Corporation ("Ambac Assurance") has supplied the following information for inclusion in this Official Statement. No representation is made by the Authority or the Underwriters as to the accuracy or completeness of this information.

*Payment Pursuant to the Ambac Bond Insurance Policy.* Ambac Assurance has made a commitment to issue the Ambac Bond Insurance Policy relating to the Ambac Insured Bonds effective as of the date of issuance of the Ambac Insured Bonds. Under the terms of the Ambac Bond Insurance Policy, Ambac Assurance will pay to The Bank of New York, in New York, New York or any successor thereto (the "Insurance Trustee") that portion of the principal of and interest on the Ambac Insured Bonds which shall become due for payment but shall be unpaid by reason of nonpayment by the Authority (as such terms are defined in the Ambac Bond Insurance Policy). Ambac Assurance will make such payments to the Insurance Trustee on the later of the date on which such principal and interest becomes due for payment or within one business day following the date on which Ambac Assurance shall have received notice of nonpayment from the Trustee. The insurance will extend for the term of the Ambac Insured Bonds and, once issued, cannot be canceled by Ambac Assurance.

The Ambac Bond Insurance Policy will insure payment only on stated maturity dates and on mandatory sinking fund installment dates, in the case of principal, and on stated dates for payment, in the case of interest. If the Ambac Insured Bonds become subject to mandatory redemption and insufficient funds are available for redemption of all outstanding Ambac Insured Bonds, Ambac Assurance will remain obligated to pay principal of and interest on outstanding Ambac Insured Bonds on the originally scheduled interest and principal payment dates including mandatory sinking fund redemption dates. In the event of any acceleration of the principal of the Ambac Insured Bonds, the insured payments will be made at such times and in such amounts as would have been made had there not been an acceleration.

In the event the Trustee has notice that any payment of principal of or interest on an Ambac Insured Bond which has become due for payment and which is made to an owner of such Ambac Insured Bond by or on behalf of the Authority has been deemed a preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such registered owner will be entitled to payment from Ambac Assurance to the extent of such recovery if sufficient funds are not otherwise available.

The Ambac Bond Insurance Policy does not insure any risk other than Nonpayment, as defined in the Policy. Specifically, the Ambac Bond Insurance Policy does not cover:

1.  payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity.

2.  payment of any redemption, prepayment or acceleration premium.

3.  nonpayment of principal or interest caused by the insolvency or negligence of any Trustee, Paying Agent or Bond Registrar, if any.

If it becomes necessary to call upon the Ambac Bond Insurance Policy, payment of principal requires surrender of Ambac Insured Bonds to the Insurance Trustee together with an appropriate instrument of assignment so as to permit ownership of such Ambac Insured Bonds to be registered in the name of Ambac Assurance to the extent of the payment under the Ambac Bond Insurance Policy. Payment of interest pursuant to the Ambac Bond Insurance Policy requires proof of holder entitlement to interest payments and an appropriate assignment of the bondholder's right to payment to Ambac Assurance.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

Upon payment of the insurance benefits, Ambac Assurance will become the owner of the Ambac Insured Bond, appurtenant coupon, if any, or right to payment of principal or interest on such Ambac Insured Bond and will be fully subrogated to the surrendering bondholder's rights to payment.

*Ambac Assurance Corporation.* Ambac Assurance is a Wisconsin-domiciled stock insurance corporation regulated by the Office of the Commissioner of Insurance of the State of Wisconsin and licensed to do business in 50 states, the District of Columbia, the Territory of Guam, the Commonwealth of Puerto Rico and the U.S. Virgin Islands, with admitted assets of approximately $8,994,000,000 (unaudited) and statutory capital of approximately $5,649,000,000 (unaudited) as of December 31, 2005.  Statutory capital consists of Ambac Assurance's policyholders' surplus and statutory contingency reserve. Standard & Poor's Credit Markets Services, a Division of The McGraw-Hill Companies ("Standard & Poor's"), Moody's Investors Service ("Moody's") and Fitch Ratings ("Fitch") have each assigned a triple-A financial strength rating to Ambac Assurance.

Ambac Assurance has obtained a ruling from the United States Internal Revenue Service to the effect that the insuring of an Ambac Insured Bond by Ambac Assurance will not affect the treatment for federal income tax purposes of interest on such Ambac Insured Bond and that insurance proceeds representing maturing interest paid by Ambac Assurance under policy provisions substantially identical to those contained in its financial guaranty insurance policy shall be treated for federal income tax purposes in the same manner as if such payments were made by the Authority.

Ambac Assurance makes no representation regarding the Ambac Insured Bonds or the advisability of investing in the Ambac Insured Bonds and makes no representation regarding, nor has it participated in the preparation of, the Official Statement other than the information supplied by Ambac Assurance and presented under the heading "BOND INSURANCE."

*Available Information.*  The parent company of Ambac Assurance, Ambac Financial Group, Inc. (the "Company"), is subject to the informational requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and in accordance therewith files reports, proxy statements and other information with the Securities and Exchange Commission (the "SEC"). These reports, proxy statements and other information can be read and copied at the SEC's public reference room at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. The SEC maintains an internet site at http://www.sec.gov that contains reports, proxy and information statements and other information regarding companies that file electronically with the SEC, including the Company.  These reports, proxy statements and other information can also be read at the offices of the New York Stock Exchange, Inc. (the "NYSE"), 20 Broad Street, New York, New York 10005.

Copies of Ambac Assurance's financial statements prepared in accordance with statutory accounting standards are available from Ambac Assurance. The address of Ambac Assurance's administrative offices and its telephone number are One State Street Plaza, 19th Floor, New York, New York 10004 and (212) 668-0340.

*Incorporation of Certain Documents by Reference.* The following documents filed by the Company with the SEC (File No. 1-10777) are incorporated by reference in this Official Statement:

1. The Company's Annual Report on  Form 10-K for the fiscal year ended December 31, 2004 and  filed on March 15, 2005;

2. The Company's Current Report on Form 8-K dated April 5, 2005 and filed on April 11, 2005;

3. The Company's Current Report on Form 8-K dated and filed on April 20, 2005;

4. The Company's Current Report on Form 8-K dated May 3, 2005 and filed on May 5, 2005;

11

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

5.  The Company's Quarterly Report on Form 10-Q for the fiscal quarterly period ended March 31, 2005 and filed on May 10, 2005;

6.  The Company's Current Report on Form 8-K  dated and filed on July 20, 2005;

7.  The Company's Current Report on Form 8-K dated July 28, 2005 and filed on August 2, 2005;

8.  The Company's Quarterly Report on Form 10-Q for the fiscal quarterly period ended June 30, 2005 and filed on August 9, 2005;

9.  The information furnished and deemed to be filed under Item 2.02 contained in the Company's Current Report on Form 8-K dated and filed on October 19, 2005;

10.  The Company's Quarterly Report on Form 10-Q for the fiscal quarterly period ended September 30, 2005 and filed on November 9, 2005;

11.  The Company's Current Report on Form 8-K dated November 29, 2005 and filed on December 5, 2005;

12.  The Company's Current Report on Form 8-K dated and filed on January 25, 2006; and

13.  The Company's Current Report on Form 8-K dated January 23, 2006 and filed on January 27, 2006

All documents subsequently filed by the Company pursuant to the requirements of the Exchange Act after the date of this Official Statement will be available for inspection in the same manner as described above under the above sub-heading "Available Information."

**The CIFG Bond Insurance Policy**

CDC IXIS Financial Guaranty North America, Inc. ("CIFG") has supplied the following information for inclusion in this Official Statement.  No representation is made by the Authority or the Underwriters as to the accuracy or completeness of this information.

*General.*  CIFG is a monoline financial guaranty insurance company incorporated under the laws of the State of New York.  The address of the principal executive offices of CIFG is 825 Third Avenue, Sixth Floor, New York, New York 10022; its toll-free telephone number is (866) CIFG-212 and its general telephone number is (212) 909-3939.

CIFG is a member of the CIFG Group of financial guaranty companies, which also includes CIFG Europe, a French insurance company licensed to do business in the European Union, and CIFG Guaranty, a dedicated French reinsurance corporation.  In addition to its capital and surplus as set forth below, CIFG is supported by a net worth maintenance agreement from CIFG Guaranty, which provides that CIFG Guaranty will maintain CIFG's New York statutory capital and surplus at no less than $80 million, and may cede a substantial portion (not to exceed 90%) of its exposure on each transaction to CIFG Guaranty through a facultative reinsurance agreement.

Each of CIFG, CIFG Europe and CIFG Guaranty has received an insurer financial strength rating of "AAA" from Fitch, an insurer financial strength rating of "Aaa" from Moody's, and an insurer financial enhancement rating of "AAA" from Standard and Poor's, the highest rating assigned by each rating agency.  Each such rating should be evaluated independently.  The ratings reflect the respective rating agency's current assessment of each company's capacity to pay claims on a timely basis and are not recommendations to buy, sell or hold the CIFG Insured Bonds.  Such ratings may be subject to revision or withdrawal at any time.

12

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

CIFG is licensed and subject to regulation as a financial guaranty insurance corporation under the laws of the State of New York, its state of domicile, and is licensed to do business in 46 jurisdictions. CIFG is subject to Article 69 of the New York Insurance Law which, among other things, limits the business of such insurers to financial guaranty insurance and related lines, requires that such insurers maintain a minimum surplus to policyholders, establishes contingency, loss and unearned premium reserve requirements for such insurers, and limits the size of individual transactions and the volume of transactions that may be underwritten by such insurers. Other provisions of the New York Insurance Law applicable to non-life insurance companies such as CIFG regulate, among other things, permitted investments, payment of dividends, transactions with affiliates, mergers, consolidations, acquisitions or sales of assets and incurrence of liabilities for borrowings.

*Capitalization.* The following tables set forth the capitalization of CIFG on the basis of accounting principles generally accepted in the United States ("US GAAP") and statutory accounting practices prescribed or permitted by the New York State Insurance Department, respectively.

|  | US GAAP December 31, 2004 (in thousands of US dollars) |
| --- | --- |
| Total Assets | $ 246,767 |
| Total Liabilities | $ 117,368 |
| Shareholder's Equity | $ 129,399 |

|  | Statutory Accounting Practices December 31, 2004 (in thousands of US dollars) |
| --- | --- |
| Admitted Assets | $ 152,361 |
| Liabilities | $ 38,733 |
| Capital and Surplus | $ 113,628 |

The following table sets forth the capitalization of CIFG Guaranty based on US GAAP.

|  | US GAAP December 31, 2004 | |
| --- | --- | --- |
|  | (in thousands of euros) | (in thousands of US dollars) (1) |
| Assets | € 621,431 | $ 847,632 |
| Liabilities | € 107,816 | $ 147,061 |
| Shareholder's Equity | € 513,615 | $ 700,571 |

_____

(1)     The translation of euros into dollars is presented solely for the convenience of the reader, using the observed exchange rate at December 31, 2004 of $1.364 to €1.00.

For further information concerning CIFG and CIFG Guaranty, see the audited financial statements of both companies, including the respective notes thereto, prepared in accordance with US GAAP as of December 31, 2004 and 2003 and for each of the three years in the period ended December 31, 2004, and the unaudited interim financial statements of CIFG as of September 30, 2005 and for the nine-month period ended September 30, 2005, which are available on the CIFG Group's website at www.cifg.com. Copies of the most recent audited annual and unaudited interim financial statements of CIFG prepared in accordance with accounting principles prescribed or permitted by the New York State Insurance Department, are also available on the website and may be obtained, without charge, upon request to CIFG at its address above, Attention: Finance Department.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

Effective February 23, 2005, the Department of Insurance of the State of New York approved the change of CIFG's name to CIFG Assurance North America, Inc. Applications for approval of the name change are being filed with regulators in all other jurisdictions in which CIFG is licensed, including the Commonwealth of Puerto Rico, and in the event the name change is approved by the Commissioner of Insurance of the Commonwealth of Puerto Rico prior to the delivery date of the CIFG Bond Insurance Policy, the CIFG Bond Insurance Policy will be issued under the company's new name.

**The FGIC Bond Insurance Policy**

Financial Guaranty Insurance Company ("FGIC") has supplied the following information for inclusion in this Official Statement.  No representation is made by the Authority or the Underwriters as to the accuracy or completeness of this information.

*Payments under the FGIC Bond Insurance Policy.*  Concurrently with the issuance of the FGIC Insured Bonds, FGIC will issue the FGIC Bond Insurance Policy for the FGIC Insured Bonds.  The FGIC Bond Insurance Policy unconditionally guarantees the payment of that portion of the principal or accreted value (if applicable) of and interest on the FGIC Insured Bonds which has become due for payment, but shall be unpaid by reason of nonpayment by the Authority of the FGIC Insured Bonds.  FGIC will make such payments to U.S. Bank Trust National Association, or its successor as its agent (the "Fiscal Agent"), on the later of the date on which such principal, accreted value or interest (as applicable) is due or on the business day next following the day on which FGIC shall have received notice (in accordance with the terms of the FGIC Bond Insurance Policy) from an owner of FGIC Insured Bonds or the trustee or paying agent (if any) of the nonpayment of such amount by the Authority.  The Fiscal Agent will disburse such amount due on any FGIC Insured Bond to its owner upon receipt by the Fiscal Agent of evidence satisfactory to the Fiscal Agent of the owner's right to receive payment of the principal, accreted value or interest (as applicable) due for payment, and evidence, including any appropriate instruments of assignment, that all of such owner's rights to payment of such principal, accreted value or interest (as applicable) shall be vested in FGIC.  The term "nonpayment" in respect of a FGIC Insured Bond includes any payment of principal, accreted value or interest (as applicable) made to an owner of a FGIC Insured Bond which has been recovered from such owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

Once issued, the FGIC Bond Insurance Policy is non-cancelable by FGIC.  The FGIC Bond Insurance Policy covers failure to pay principal (or accreted value, if applicable) of the FGIC Insured Bonds on their stated maturity dates and their mandatory sinking fund redemption dates, and not on any other date on which the FGIC Insured Bonds may have been otherwise called for redemption, accelerated or advanced in maturity.  The FGIC Bond Insurance Policy also covers the failure to pay interest on the stated date for its payment.  In the event that payment of the FGIC Insured Bonds is accelerated, FGIC will only be obligated to pay principal (or accreted value, if applicable) and interest in the originally scheduled amounts on the originally scheduled payment dates.  Upon such payment, FGIC will become the owner of the FGIC Insured Bond, appurtenant coupon or right to payment of principal or interest on such FGIC Insured Bond and will be fully subrogated to all of the bondholder's rights thereunder.

The FGIC Bond Insurance Policy does not insure any risk other than Nonpayment by the Authority, as defined in the FGIC Bond Insurance Policy.  Specifically, the FGIC Bond Insurance Policy does not cover: (i) payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity; (ii) payment of any redemption, prepayment or acceleration premium; or (iii) nonpayment of principal (or accreted value, if applicable) or interest caused by the insolvency or negligence or any other act or omission of the trustee or paying agent, if any.

As a condition of its commitment to insure the FGIC Insured Bonds, FGIC may be granted certain rights under the Bond documentation.  The specific rights, if any, granted to FGIC in connection with its insurance

14

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

of the FGIC Insured Bonds may be set forth in the description of the principal legal documents appearing elsewhere in this Official Statement, and reference should be made thereto.

The FGIC Bond Insurance Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

*Financial Guaranty Insurance Company.* FGIC is a New York stock insurance corporation that writes financial guaranty insurance in respect of public finance and structured finance obligations and other financial obligations, including credit default swaps. FGIC is licensed to engage in the financial guaranty insurance business in all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands and the United Kingdom.

FGIC is a direct, wholly owned subsidiary of FGIC Corporation, a Delaware corporation. At December 31, 2005, the principal owners of FGIC Corporation and the approximate percentage of its outstanding common stock owned by each were as follows: The PMI Group, Inc. – 42%; affiliates of the Blackstone Group L.P. – 23%; and affiliates of the Cypress Group L.L.C. – 23%. Neither FGIC Corporation nor any of its stockholders or affiliates is obligated to pay any debts of FGIC or any claims under any insurance policy, including the FGIC Bond Insurance Policy, issued by FGIC.

FGIC is subject to the insurance laws and regulations of the State of New York, where FGIC is domiciled, including New York's comprehensive financial guaranty insurance law. That law, among other things, limits the business of each financial guaranty insurer to financial guaranty insurance (and related lines); requires that each financial guaranty insurer maintain a minimum surplus to policyholders; establishes limits on the aggregate net amount of exposure that may be retained in respect of a particular issuer or revenue source (known as single risk limits) and on the aggregate net amount of exposure that may be retained in respect of particular types of risk as compared to the policyholders' surplus (known as aggregate risk limits); and establishes contingency, loss and unearned premium reserve requirements. In addition, FGIC is also subject to the applicable insurance laws and regulations of all other jurisdictions in which it is licensed to transact insurance business. The insurance laws and regulations, as well as the level of supervisory authority that may be exercised by the various insurance regulators, vary by jurisdiction.

At December 31, 2005, FGIC had net admitted assets of approximately $3.504 billion, total liabilities of approximately $2.341 billion, and total capital and policyholders' surplus of approximately $1.163 billion, determined in accordance with statutory accounting practices ("SAP") prescribed or permitted by insurance regulatory authorities.

The audited consolidated financial statements of FGIC and subsidiaries, on the basis of US GAAP, as of December 31, 2005 and 2004, which have been filed with the Nationally Recognized Municipal Securities Information Repositories ("NRMSIRs"), are hereby included by specific reference in this Official Statement. Any statement contained herein under the heading - BOND INSURANCE - The FGIC Bond Insurance Policy" or in any documents included by specific reference herein, shall be modified or superseded to the extent required by any statement in any document subsequently filed by FGIC with such NRMSIRs, and shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement. All financial statements of FGIC (if any) included in documents filed by FGIC with the NRMSIRs subsequent to the date of this Official Statement and prior to the termination of the offering of the Bonds shall be deemed to be included by specific reference into this Official Statement and to be a part hereof from the respective dates of filing of such documents.

The New York State Insurance Department recognizes only SAP for determining and reporting the financial condition and results of operations of an insurance company, for determining its solvency under the New York Insurance Law, and for determining whether its financial condition warrants the payment of a dividend to its stockholders. Although FGIC prepares both US GAAP and SAP financial statements, no consideration is given by the New York State Insurance Department to financial statements prepared in accordance with

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

US GAAP in making such determinations. A discussion of the principal differences between SAP and US GAAP is contained in the notes to FGIC's SAP financial statements.

Copies of FGIC's most recently published US GAAP and SAP financial statements are available upon request to: Financial Guaranty Insurance Company, 125 Park Avenue, New York, NY 10017, Attention: Corporate Communications Department. FGIC's telephone number is (212) 312-3000.

*FGIC's Credit Ratings.* The financial strength of FGIC is rated "AAA" by Standard & Poor's, "Aaa" by Moody's, and "AAA" by Fitch. Each rating of FGIC should be evaluated independently. The ratings reflect the respective ratings agencies' current assessments of the insurance financial strength of FGIC. Any further explanation of any rating may be obtained only from the applicable rating agency. These ratings are not recommendations to buy, sell or hold the FGIC Insured Bonds, and are subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the FGIC Insured Bonds. FGIC does not guarantee the market price or investment value of the FGIC Insured Bonds nor does it guarantee that the ratings on the FGIC Insured Bonds will not be revised or withdrawn.

Neither FGIC nor any of its affiliates accepts any responsibility for the accuracy or completeness of the Official Statement or any information or disclosure that is provided to potential purchasers of the FGIC Insured Bonds, or omitted from such disclosure, other than with respect to the accuracy of information with respect to FGIC or the FGIC Bond Insurance Policy under the heading "BOND INSURANCE - The FGIC Bond Insurance Policy." In addition, FGIC makes no representation regarding the Bonds or the advisability of investing in the Bonds.

**Certain Rights of the Bond Insurers**

**As provided in the Trust Agreement and in insurance agreements to be entered into by the Authority and the Trustee for the benefit of each of Ambac Assurance, CIFG and FGIC concurrently with the delivery of their respective bond insurance policies, as long as Ambac Assurance, CIFG and FGIC shall not be in default on their obligations in their respective bond insurance policies, Ambac Assurance, CIFG and FGIC shall be deemed to be the owners of the Bonds insured by them in lieu of the registered or beneficial owners for purposes of, among other things (1) taking remedial actions under the Trust Agreement, and (2) the giving of consents to the execution of any supplemental agreements to the Trust Agreement.**

[Remainder of Page Intentionally Left Blank]

16

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

## SOURCES AND USES OF FUNDS

The Bonds are being issued to: (i) repay an interim financing obtained by the Authority from the GDB that was used for the development and construction of the Convention Center, (ii) make deposits under the Trust Agreement to provide for completion of the Convention Center and for the payment of interest on the Bonds due on July 1, 2006, (iii) fund the required debt service reserve, and (iv) pay costs of issuance.

The proceeds of the Bonds will be applied approximately as follows:

### Sources of Funds

| | | |
|---|---|---:|
| Principal Amount of the Bonds | $ | 468,800,000.00 |
| Original Issue Premium | | 14,001,389.80 |
| Total Sources | $ | 482,801,389.80 |

### Uses of Funds

| | | |
|---|---|---:|
| Deposit into Proceeds Fund [1] | $ | 435,220,520.64 |
| Deposit into Debt Service Reserve Fund | | 30,338,962.50 |
| Net underwriting discount, legal, printing and other financing expenses | | 17,241,906.66 |
| Total Uses | $ | 482,801,389.80 |

[1] Includes capitalized interest to July 1, 2006.

## HOTEL OCCUPANCY TAX

### General

The Commonwealth has imposed a hotel occupancy tax for several decades.  Before the Occupancy Tax Act was adopted, the tax was administered by the Commonwealth's Treasury Department. The Tourism Company began collecting and enforcing the Occupancy Tax Act in April 2004 with respect to the tax collected by the Hotels during March 2004.

### Levy of Hotel Occupancy Tax

The Tourism Company is authorized by the Occupancy Tax Act to assess, collect, audit and distribute the Hotel Occupancy Tax.  Its authority also includes, among others, the power to adopt regulations, impose penalties, conduct investigations and interventions, conduct audits and examine records and documents of all Hotels.

The Occupancy Tax Act establishes the following tax rates for the imposition of the Hotel Occupancy Tax in the specified classifications:

- 11%    casino Hotels
- 9%    all accommodations that are not specifically covered by any of the other classifications and that do not contain a casino
- 7%    Hotels authorized to operate as "paradores" designated as such by the Tourism Company, and short term rentals of less than 90 days
- 5%    all-inclusive accommodations (on the global – grouped rate) and recreational facilities owned and operated by an agency of the Commonwealth

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

In general, all revenues generated by the Hotels as a result of the rental of their facilities to paying guests are included for the tax computation.  Also included, is the value of the room given for free to a person, if the reason for such graciousness is to promote, or for the benefit of, the casino located at the Hotel. The Occupancy Tax Act exempts Hotel rooms from the tax when such rooms are occupied by artistic or technical personnel of movie companies when these are filming a product that will be shown in movie theaters, television or cable television, but only when the Tourism Company has provided a written certification to such effect.  Also exempt are the payments made by persons to acquire rights in condohotels or vacational clubs, and for the maintenance cost of such properties.

**Payment of Hotel Occupancy Tax**

By the 10th of each month, Hotels are required to file a return reflecting the amount of Hotel Occupancy Taxes collected during the immediately preceding month, together with the payment of such tax to the Tourism Company.  All Hotels are required to post a bond up to the limits that the Tourism Company considers reasonably necessary to guarantee the payment of the Hotel's room tax obligations and any surcharges, interest, penalties or administrative fines that may be imposed on the respective Hotel.

Currently:

- There are approximately 460 Hotels registered with the Tourism Company.
- The 55 largest Hotels in the Commonwealth (in terms of number of rooms) represented approximately 85% of the total Hotel Occupancy Tax collections in fiscal year 2004-2005.
- Casino hotels, which pay the highest tax rate (11%), represented approximately 62% of the total Hotel Occupancy Tax collections in fiscal year 2004-2005.

For the period from April 2004 (for amounts collected by the Hotels during the prior month) to November 2005, the Hotel Occupancy Taxes owed amounted to approximately $89.7 million.  Of this amount, 99.2% was actually collected.

**Collection Process for Hotel Occupancy Tax**

In order to verify the accuracy of the monthly filings and payments submitted by the Hotels, the Tourism Company performs reviews of the internal documents of certain Hotels.  During fiscal year 2004-2005, the Tourism Company reviewed more than 110 Hotels and contracted an independent auditing firm to review the 55 largest Hotels (representing approximately 85% of the Hotel Occupancy Tax revenue collections during such fiscal year).  In total, 165 or 36% of the registered Hotels were reviewed.  In addition to the reviews currently being performed, the Tourism Company plans to implement a system of audits to perform detailed examinations of the Hotels' guests' folios.  The Tourism Company estimates that these audit procedures will commence during the summer of 2006.

When a Hotel fails to file the monthly report or pay the applicable tax, the Tourism Company contacts the Hotel by phone and mail, requesting the filing of the return and payment of the tax.  If the Hotel still fails to file and pay the Hotel Occupancy Tax, the Tourism Company is authorized under the Occupancy Tax Act to take certain actions to enforce the collection of the tax, including:

- Estimate the tax and submit an invoice to the Hotel, including the amount of applicable penalties and interest.
- Revoke tax exemptions that may have been granted to the Hotel under Commonwealth laws.
- Revoke promotional endorsements.
- Impose a maximum fine of $500 for each day a return remains unfiled, up to a maximum aggregate fine of $25,000.
- Commence legal collection proceedings.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

The Tourism Company has an additional alternative for collection with respect to Hotels that operate slot machines in their casinos. Pursuant to the Commonwealth's gaming laws, the Tourism Company has the exclusive authority to collect and remove all the moneys (the "Slot Machine Proceeds") from slot machines operated in the Commonwealth. The Tourism Company collects the Slot Machine Proceeds, makes certain distributions and payments as required by law, and then returns the balance to the slot machine operators. The Occupancy Tax Act authorizes the Tourism Company to set-off any amounts due by a casino Hotel for the payment of Hotel Occupancy Taxes against the amounts required to be repaid to the casino Hotel in connection with the slot machine operations. Historically, Slot Machine Proceeds repayable to the casino Hotels have, on average, exceeded the Hotel Occupancy Taxes payable by such casino Hotels.

**Non-Impairment Provisions**

The Occupancy Tax Act provides that so long as any Bonds remain outstanding, the Commonwealth covenants that it will:

- Not reduce the Hotel Occupancy Tax and the applicable tax rates currently in effect.
- Ensure that each month, to the extent Hotel Occupancy Taxes are available in a fiscal year, 1/10th of the amount necessary to pay the principal and interest on the Bonds is deposited with the Trustee as provided in the Trust Agreement until the yearly required payments are satisfied.
- Not limit or alter the rights currently afforded to the Authority to pledge the Pledged Revenues and comply with its obligations to the owners of the Bonds.

See APPENDIX A.

## SECURITY AND SOURCES OF PAYMENT FOR THE BONDS

**Pledged Revenues and Sources of Payment**

The Bonds and any additional bonds hereafter issued are special limited obligations of the Authority that are equally and ratably secured by a lien on the Pledged Revenues. No additional bonds may be issued in the future that are secured by a lien on the Pledged Revenues that are senior in lien to the Bonds.

Pledged Revenues consist of (i) all Occupancy Tax Act revenues up to the amount necessary for the full payment of the principal and interest on the Bonds, together with the right of the Authority or GDB to receive such funds as set forth in the Occupancy Tax Act; (ii) all moneys from time to time held by the Trustee under the Trust Agreement and any fund or account other than the Rebate Fund, any Defeasance Escrow Account and any fund or account created by a supplemental trust agreement that is expressly excluded as part of the Pledged Revenues (see APPENDIX D); (iii) all rights, title and interest of the GDB in that certain Assignment and Coordination Agreement between the Tourism Company and GDB (the "Assignment Agreement") (see APPENDIX E); (iv) all rights, title and interest of the Trustee in that certain Pledge and Assignment Agreement between GDB, the Authority and the Trustee (the "Pledge Agreement") (see APPENDIX F); and (v) any and all other property, revenues or funds received by or specially granted, assigned or pledged to the Trustee for the benefit of the owners of the Bonds from whatever source.

The Pledged Revenues do not include any revenues derived by the Authority, including those derived from the operation of the Convention Center. The Authority is not pledging or granting any lien or security interest in any of its properties or revenues.

19

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**Flow of Funds**

The Occupancy Tax Act provides that once a year GDB is required to certify to the Tourism Company (the "GDB Certificate") the amount necessary, during the succeeding fiscal year and the first day of the second succeeding fiscal year, to :

      (i)     Pay the principal and interest due on the Bonds (including amortization requirements);
      (ii)    Pay any obligations in connection with any future bond-related financing agreements;
      (iii)   Replenish any Debt Service Reserve Fund deficiency; and
      (iv)   Pay any costs of issuance of the Bonds.

Items (i) to (iv) above are hereinafter collectively referred to as the "Required Payments."

In the Assignment Agreement, GDB has agreed to submit the GDB Certificate to the Tourism Company on or before May 30 of each calendar year.

The Occupancy Tax Act and the Assignment Agreement require the Tourism Company, on a monthly basis, to: (i) deposit all Hotel Occupancy Tax revenues received by it into a special holding fund that will be maintained by it separate and distinct from its other funds and accounts, (ii) transfer into a specific sub-account  (the "Hotel Occupancy Transfer Account"), 1/10th of the Required Payments and any deficiency in prior monthly deposits and (iii) transfer to GDB all moneys deposited into the Hotel Occupancy Transfer Account.  All moneys deposited to the Hotel Occupancy Transfer Account shall be pledged for the payment of the Bonds.

Pursuant to the provisions of the Pledge Agreement, the moneys transferred to GDB shall be held by GDB on behalf of the Authority for the benefit of the owners of the Bonds.  The Pledge Agreement provides that while such funds are on deposit with GDB, such funds shall be pledged for the payment of the Bonds. The GDB is required, upon receipt of the monthly transfers, to transfer the funds to the Trustee within three business days of their receipt. See APPENDIX F.

The Trust Agreement provides that the Trustee is required to deposit the funds received from GDB in the following order of priority:

      (i)     *First*, deposits shall be made into the "Bond Payment Fund" in an amount sufficient, together (in the case of interest only) with capitalized interest and accrued interest, to pay the amount of interest and principal payable as set forth in the GDB Certificate;

      (ii)    *Second*, to the extent applicable, deposits shall be made into one or more "Financial Agreements Funds" that may be established under supplemental trust agreements, in the event the Authority purchases or arranges for a "Credit Facility" or an "Interest Rate Exchange Agreement" (see APPENDIX D for a definition of such terms) with respect to the Bonds or any bonds issued in the future by the Authority under supplemental trust agreements;

      (iii)   *Third*, deposits shall be made into the "Debt Service Reserve Fund" up to the Reserve Fund Requirement (see below); and

      (iv)   *Fourth*, deposits shall be made into the "Rebate Fund" (see APPENDIX D for a definition of such term).

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**Debt Service Reserve Fund**

The Trust Agreement provides for the creation of the "Debt Service Reserve Fund" and requires that such fund contain, at all times, as a minimum, the "Reserve Fund Requirement." Upon the issuance of the Bonds, the initial Reserve Fund Requirement, until recomputed as provided in the Trust Agreement in the case of issuance of additional bonds, defeasance or redemption of Bonds, shall be the maximum amount of principal and interest due on the Bonds in any calendar year.

Amounts in the Debt Service Reserve Fund shall be used to pay principal and interest due on the Bonds at any time funds on deposit to the credit of the Bond Payment Fund are insufficient for such purposes, and may be used to make the final payments for the retirement or defeasance of the Bonds.

**Requirements for Issuance of Additional Bonds**

The Trust Agreement provides for the possible issuance by the Authority of additional bonds secured by the Hotel Occupancy Tax revenues ("Additional Bonds"). Additional Bonds may be issued to pay for costs authorized under the Occupancy Tax Act. See APPENDIX A.

Additional Bonds may be issued, if as of the date of their issuance: (i) there is no event of default under the Trust Agreement; (ii) all accumulations and deposits required to be made under the Trust Agreement are current; (iii) all assignments or deposits required to be made in accordance with the terms of the Occupancy Tax Act and the provisions of the Assignment Agreement and the Pledge Agreement are current; (v) a certificate has been delivered to the Trustee showing compliance with all applicable provisions of the Occupancy Tax Act; and (vi) Bond Counsel has delivered a written opinion in form and substance satisfactory to the Trustee with respect to the issuance of the Additional Bonds.

In addition, before Additional Bonds are issued, it shall be determined that Hotel Occupancy Tax revenues for any twelve (12) consecutive months of the twenty four (24) months immediately preceding the issuance of the Additional Bonds, were not less than 140% of the Maximum Annual Debt Service Requirement for all outstanding bonds, including the Additional Bonds proposed to be issued. The described calculation can take into account increases in Hotel Occupancy Tax rates available as of the date of calculation.

If Additional Bonds are to be used to refund previously issued bonds ("Refunding Bonds"), the requirements set forth above shall have been met or the Authority will provide a certificate stating that, following the issuance of the Refunding Bonds, the aggregate amount due in any fiscal year shall be no greater than immediately prior to the issuance of such Refunding Bonds. See APPENDIX D.

**Limited Obligations**

Neither the credit of the Commonwealth nor that or any of its government instrumentalities will be pledged for the payment of the Bonds. The Bonds are limited obligations of the Authority payable solely from the Pledged Revenues.

**Prior Payment of Full Faith and Credit Obligations of the Commonwealth**

The Constitution of the Commonwealth provides that public debt of the Commonwealth constitutes a first lien on available Commonwealth taxes and revenues.  Public debt includes bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged, and, according to opinions rendered by the Secretary of Justice of the Commonwealth, any payments which are required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public corporations. The Bonds do not constitute public debt of the Commonwealth.

21

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

Hotel Occupancy Tax revenues are available revenues under the Constitution. Accordingly, if needed, they may be applied first to the payment of debt service on the public debt of the Commonwealth. Under the Enabling Act, the Hotel Occupancy Tax Act and the Constitution of the Commonwealth, however, such revenues are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth are insufficient for such purpose. Investment earnings and monies in the Debt Service Reserve Fund are not considered available Commonwealth resources.

The Commonwealth has never applied taxes allocated to the various governmental authorities to the payment of its public debt; nor has the Commonwealth ever defaulted on the payment of principal of or interest on any of its public debt.

Under the provisions of Act No. 39 of the Legislature of Puerto Rico, approved May 13, 1976, as amended, the Secretary of the Treasury of Puerto Rico is obligated to fund annual debt service on general obligation bonds and notes of the Commonwealth by monthly deposits into the Special Fund for the Amortization of General Obligations Evidenced by Bonds and Promissory Notes (the "Commonwealth Redemption Fund"). As of the date of this Official Statement, the amount on deposit in the Commonwealth Redemption Fund complied with such requirement.

**Non-Impairment Provisions**

The Occupancy Tax provides that so long as any Bonds remain outstanding, the Commonwealth covenants that it will:

- Not reduce the Hotel Occupancy Tax and the applicable tax rates currently in effect.
- Ensure that each month, to the extent Hotel Occupancy Taxes are available in a fiscal year, $1/10^{th}$ of the amount necessary to pay the principal and interest on the Bonds is deposited with the Trustee as provided in the Trust Agreement until the yearly required payments are satisfied.
- Not limit or alter the rights currently afforded to the Authority to pledge the Pledged Revenues and comply with its obligations to the owners of the Bonds.

See APPENDIX A.

[Remainder of Page Intentionally Left Blank]

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

### HISTORICAL HOTEL OCCUPANCY TAX INFORMATION

The following table shows the historical yearly average occupancy, number of rooms and average daily room rate, as of January 2006, for Hotels that have 150 or more rooms:

### Historical Occupancy Data

| Fiscal Year Ended June 30 [1] | Average Occupancy [2] | Number of Rooms [3] | Average Daily Room Rate [2] |
|---|---|---|---|
| 1998 | 73.7% | 7,913 | $158 |
| 1999 | 77.5% | 6,858[4] | $160 |
| 2000 | 77.1% | 7,270 | $174 |
| 2001 | 73.2% | 7,426 | $179 |
| 2002 | 68.4% [5] | 7,599 | $170 |
| 2003 | 72.8% | 7,637 | $163 |
| 2004 | 78.9% | 7,583 | $164 |
| 2005 [6] | 77.3% | 8,024 | $176 |

*Source: Tourism Company*
[1] Beginning July 1 of the preceding calendar year.
[2] Results based on monthly surveys performed by Tourism Company.
[3] Registered rooms as of January 2006 totaled 20,286.
[4] Some Hotels suffered temporary closings due to the damage caused by Hurricane Georges.
[5] Primarily a result of the September 11, 2001 terrorist attacks that affected the global tourism industry.
[6] Preliminary figures.

The following table shows the monthly collections of the Hotel Occupancy Tax for the mentioned years:

### Historical Hotel Occupancy Tax Revenues

| Month | FY 2000-01 | FY 2001-02 [1] | FY 2002-03 | FY 2003-04 | FY 2004-05 | FY 2005-06 |
|---|---|---|---|---|---|---|
| July | $3,387,801 | $3,241,842 | $3,484,004 | $3,700,845 | $4,425,333 | $4,828,122 |
| August | 2,907,214 | 2,939,894 | 2,854,276 | 3,319,616 | 3,647,681 | 3,911,649 |
| September | 2,183,610 | 1,902,814 | 2,038,514 | 2,108,147 | 2,639,502 | 2,685,408 |
| October | 2,676,401 | 2,178,510 | 1,893,754 | 3,147,881 | 3,245,472 | 3,101,122 |
| November | 3,291,686 | 2,265,974 | 2,853,868 | 3,132,349 | 3,474,040 | 4,006,598 |
| December | 4,715,274 | 2,887,364 | 4,121,775 | 4,979,924 | 5,149,049 | 5,528,473 |
| January | 4,920,150 | 3,860,838 | 4,664,237 | 5,130,102 | 5,203,092 | 5,881,499 |
| February | 5,201,295 | 4,467,253 | 5,117,708 | 5,187,623 | 5,797,474 | - |
| March | 5,515,839 | 4,801,726 | 4,859,955 | 5,345,763 | 6,633,897 | - |
| April | 4,769,356 | 3,724,064 | 4,256,790 | 5,017,605 | 5,257,965 | - |
| May | 3,530,052 | 3,151,999 | 3,351,054 | 3,804,050 | 3,959,698 | - |
| June | 3,020,512 | 2,939,713 | 3,126,151 | 3,809,790 | 3,990,148 | - |
| | $46,119,190 | $38,361,990 | $42,622,088 | $48,683,705 | $53,423,351 | - |

*Source: Tourism Company*
[1] Primarily a result of the September 11, 2001 terrorist attacks that affected the global tourism industry.
   See APPENDIX B.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

# HOTEL OCCUPANCY TAX REVENUE REPORT

The Authority commissioned the Strategic Advisory Group ("SAG") of Atlanta, GA, to evaluate the Puerto Rico tourism industry and to forecast Hotel Occupancy Tax revenues. See Hotel Occupancy Tax Projection Report (the "Revenue Report") included herein as APPENDIX B.

APPENDIX B - "The Revenue Report" - should be read in its entirety for an understanding of the forecasts and the underlying assumptions contained therein.

In the opinion of the Tourism Company, the assumptions underlying the forecasts used by SAG are reasonable given the information available and circumstances existing as of the date of the Revenue Report. However, any forecast is subject to uncertainties and, inevitably, some assumptions used to develop the forecasts will not be realized and unanticipated events and circumstances will likely occur. Therefore, the actual results achieved are likely to vary from the forecasts, and the variations could be material. See "INVESTMENT CONSIDERATIONS."

## Hotel Occupancy Tax Revenue Projections

| Fiscal Year Ending June 30 [1] | Casino Hotels | Non-Casino Hotels | Total |
|---|---|---|---|
| 2006 | $33,228,000 | $21,725,000 | $56,013,000 |
| 2007 | 35,853,000 | 23,086,000 | 58,939,000 |
| 2008 | 37,733,000 | 24,759,000 | 62,492,000 |
| 2009 | 38,913,000 | 26,126,000 | 65,039,000 |
| 2010 | 40,120,000 | 27,818,000 | 67,938,000 |
| 2011 | 41,582,000 | 29,192,000 | 70,774,000 |
| 2012 | 42,702,000 | 30,904,000 | 73,606,000 |
| 2013 | 43,630,000 | 32,630,000 | 76,260,000 |
| 2014 | 44,573,000 | 34,019,000 | 78,592,000 |
| 2015 | 45,555,000 | 35,408,000 | 80,963,000 |

### Projected Average Annual Compound Growth:

| 2005-2015 | 3.2% | 5.8% | 4.2% |
|---|---|---|---|

*Source: Strategic Advisory Group* (See APPENDIX B - Figure 1).
[1] Begins July 1 of the preceding calendar year.
   Amounts are rounded.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

## PROJECTED DEBT SERVICE COVERAGE

Based on the Revenue Report's projections and the debt service requirements on the Bonds, the following table shows projected debt service coverage during each fiscal year of the forecast period. Debt service requirements for each fiscal year include the payment of principal and interest due on January 1 and July 1 of each such fiscal year.

### Projected Debt Service Coverage

| Fiscal Year Ending June 30[1] | Total Debt Service Requirements[2] | Projected Revenues from Hotel Occupancy Tax[3] | Projected Coverage |
|---|---|---|---|
| 2006 | $5,986,453[4] | $56,013,000 | 9.35x |
| 2007 | 25,217,763 | 58,939,000 | 2.33x |
| 2008 | 26,097,763 | 62,492,000 | 2.39x |
| 2009 | 27,937,763 | 65,039,000 | 2.32x |
| 2010 | 30,337,763 | 67,938,000 | 2.23x |
| 2011 | 30,337,063 | 70,774,000 | 2.33x |
| 2012 | 30,338,963 | 73,606,000 | 2.42x |
| 2013 | 30,335,163 | 76,260,000 | 2.51x |
| 2014 | 30,337,563 | 78,592,000 | 2.59x |
| 2015 | 30,338,813 | 80,963,000 | 2.66x |

[1] Begins July 1 of the preceding calendar year.

[2] July 1 debt service payment included in prior fiscal year's calculation of debt service.

[3] Derived from the information contained in Figure 1 in Appendix B – The Revenue Report. Projected revenues based on Puerto Rico's Fiscal Year ending June 30.

[4] Paid with capitalized interest.

[Remainder of Page Intentionally Left Blank]

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

## INVESTMENT CONSIDERATIONS

**General**

The projections included in this Official Statement are subject to uncertainties.  Some assumptions may not be realized and unanticipated events and circumstances may occur. Therefore, there are likely to be differences between the forecasted and actual results, and those differences may be material.

**Issues Facing the Puerto Rico Tourism Industry**

The collection of the Hotel Occupancy Tax is significantly dependent on the level of tourism in the Commonwealth. A number of factors, many of which are beyond the control of the Authority or the Tourism Company, could have an adverse impact on the tourism industry in the Commonwealth and, consequently, on the occupancy levels of hotels and on the projected Pledged Revenues.

The Commonwealth is primarily accessed by air. There is a limited number of airlines serving the Commonwealth. Any event affecting the airline industry, and in particular on those airlines serving the Commonwealth, could adversely impact the local tourism industry, including airline strikes, cessation of business of a particular airline or airlines, increased fuel costs, service reductions and ticket price increases.

Other factors that could adversely impact tourism and the possibility of achieving the projected Hotel Occupancy Taxes include, but are not limited to, prolonged economic downturns, competition from other tourist destinations, social or civil unrest and disturbances, health concerns and natural disasters. Threatened or actual events of terrorism would also adversely affect tourism.

**Concentration of Hotel Occupancy Tax Sources**

Currently, 55 Hotels generate approximately 85% of the Hotel Occupancy Tax revenues. Therefore, the closing of any one or more of these Hotels could adversely affect the collection of Hotel Occupancy Tax revenues.

**Marketing and Collection Efforts of the Tourism Company**

The promotional efforts of the Tourism Company have enhanced and expanded the tourism industry in the Commonwealth. Reductions to the Tourism Company's resources for the promotion of tourism could have a negative impact on the level of tourism in the Commonwealth and on the amount of available Hotel Occupancy Tax revenues.

Reductions in the Tourism Company's resources could also affect its ability to assess and collect the Hotel Occupancy Tax, and consequently the moneys available for the payment of principal and interest on the Bonds.

**Achievement of Projections**

As noted in the section captioned "HOTEL OCCUPANCY TAX – Hotel Occupancy Tax Revenue Report," any forecast is subject to uncertainties.  Although the Authority believes that the forecasts reflected in the Revenue Report are reasonable, there is no assurance that those forecasts will be achieved.  Inevitably, some assumptions used to develop the forecasts will not be realized, and unanticipated events and circumstances may occur.  Therefore, the actual results achieved during the forecast period will vary, and the variations may be material.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**Limited Obligations; Subordination**

The Bonds are not an obligation of the Commonwealth or any political subdivision thereof and the owners of the Bonds shall not have the right to demand payment of any Bond out of any funds raised or to be raised by the Commonwealth, by taxation or otherwise, other than the Pledged Revenues. There is no mortgage on or other security interest in the Convention Center, or the revenues derived therefrom, or on the other assets or revenues of the Authority to secure the payment of the Bonds.

In the event that the payment of the principal and interest on the Bonds becomes subordinate to the payment of the general debt of the Commonwealth as explained in "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS - Prior Payment of Full Faith and Credit Obligations of the Commonwealth," there may be insufficient funds to pay the monthly principal and interest due on the Bonds.

**Summary**

The foregoing is intended only as a summary of certain investment considerations relevant to an investment in the Bonds.  In order to allow potential investors to identify investment considerations and make an informed investment decision, potential investors should be thoroughly familiar with the entire Official Statement and the appendices hereto and should assess whatever additional financial and other information is necessary to make a decision to invest in the Bonds.

## RECENT DEVELOPMENTS RELATING TO THE COMMONWEALTH

*This section highlights certain important information about the Commonwealth's current fiscal situation.  This summary, however, does not purport to be complete and is qualified in its entirety by reference to the more detailed information and descriptions about the Commonwealth's fiscal situation included in the Commonwealth Report, which should be read in its entirety.*

The Bonds are not an obligation of the Commonwealth or any of its governmental instrumentalities. To the extent, however, that Hotel Occupancy Tax revenues may be used for the payment of general obligation debts and other guaranteed debts of the Commonwealth, the following information could be relevant. See "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS - Prior Payment of Full Faith and Credit Obligations of the Commonwealth."

**Recent Developments Relating to the Commonwealth's Fiscal Year 2006 Budget and Efforts to Resolve its Budgetary Structural Imbalance**

In response to General Fund deficits over the last few fiscal years and an anticipated deficit for fiscal year 2006, the Commonwealth has recently taken legislative and executive actions intended to eliminate such deficits through a comprehensive tax and fiscal spending reform. The combination of these actions, designed to increase recurring revenues and control government spending, is intended to eliminate the Commonwealth's structural budget deficit by fiscal year 2008.

The discussion below provides details as to the actions being taken by the Commonwealth to address its budget imbalance and other fiscal challenges it currently faces.

**House Joint Resolution and the Governor's Executive Order**

On November 21, 2005, as a result of a joint effort by the two principal political parties to address the Commonwealth's structural budget imbalance and its other fiscal difficulties, the Legislative Assembly approved, and the Governor signed, Joint Resolution No. 321 (the "Joint Resolution").  On the same day, the Governor issued an Executive Order implementing the fiscal measures defined in the Joint Resolution (the "Fiscal Reform Executive Order").  The Joint Resolution and the Fiscal Reform Executive Order impose

27

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

government-wide expenditure controls and set forth the basic principles and parameters that will govern the reform of the Commonwealth's tax system and fiscal policy and practices. The proposed tax reform is aimed at increasing revenues by expanding the tax base through the implementation of a broad-based tax on the retail sale of articles of use and consumption (the "Consumption Tax").

The Joint Resolution and the Fiscal Reform Executive Order come in the wake of expenditure controls previously implemented during fiscal year 2006 by the Governor, such as a reduction of appointed government positions, a limitation on the creation of new temporary employee positions, a hiring freeze, and a voluntary work week reduction program, as well as limitations on central government vehicle fleets and other expenses. If the proposed tax reform and expenditure controls are successfully implemented the structural imbalance could be corrected by the end of fiscal year 2008. There is no assurance, however, that the structural imbalance will be corrected by such date.

**Proposed Tax Reform**

Generally, the proposed tax reform will follow three basic principles: (i) broaden the tax base through the implementation of the Consumption Tax, (ii) reduce individual income tax rates, and (iii) simplify administration of the tax system.

The proposed tax reform will (i) replace the Commonwealth's current excise tax with the Consumption Tax, (ii) include compensatory income tax credits in order to address any regressive effect the proposed Consumption Tax may have, (iii) eliminate the marriage penalty, (iv) establish an earned income tax credit, (v) increase the deduction for charitable contributions, (vi) restructure the estate tax system, (vii) provide incentives for investments in technological infrastructure and research and development activities, and (viii) adopt additional measures to foster individual savings.

In November 2005, legislation with respect to the tax reform proposed by the Joint Resolution was introduced in the House of Representatives with a proposed effective date of July 1, 2006. Although the final structure of the tax reform, including the Consumption Tax, is under discussion, the Secretary of the Treasury expects that the tax reform will provide a net increase in the General Fund's annual revenues, after taking into consideration projected reductions in income taxes, in an amount sufficient to reduce and eventually eliminate the structural imbalance.

On January 16, 2006, the Governor presented his tax reform proposal to the Legislative Assembly. The Governor's principal proposals, which include the replacement of the Commonwealth's excise tax with a consumption tax, the elimination or reduction of many existing income tax deductions, and reductions in the existing income tax rates, are substantially similar to the principal proposals of the Joint Resolution. Executive and public hearings on the proposed tax reform have been ongoing for the past few weeks.

**Proposed Fiscal Reform**

The Joint Resolution includes a long-term plan to reduce and improve the management of the Commonwealth's public debt. Upon the elimination of the structural budget imbalance, which elimination must be certified to the Legislative Assembly and the Governor by the Secretary of the Treasury, the Director of the Office of Management and Budget ("OMB") and the President of GDB, the Commonwealth's operating budget will include an annual contribution to the public improvement fund equal to two percent (2%) of the total amount of the public improvement bonds authorized for that fiscal year. The annual contribution to the public improvement fund will increase by an additional two percent (2%) of the then current authorization for each fiscal year thereafter, up to a maximum of twenty percent (20%) of the current year's authorized public improvement bond issuance. This contribution is intended to reduce proportionally each year the amount of the Commonwealth's public improvement bond issues.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

The Joint Resolution and the Fiscal Reform Executive Order also set forth guiding principles and parameters and impose certain expenditure controls as part of fiscal reform. The Joint Resolution and the Fiscal Reform Executive Order restrict layoffs of government employees as a means to reduce government expenditures, and impose a hiring freeze in government until the structural budget deficit has been eliminated. Fiscal discipline will be promoted by requiring each central government agency to implement a seven-year expense reduction plan, adopting a new public policy that distinguishes between unnecessary and indispensable expenses, proposing to enact certain limitations on the use of the Budgetary Fund, and providing that the budget may only be balanced through the use of recurring revenues. The proposed fiscal reform also mandates the reduction of advertising and travel expenses, promotes the use of electronic communications and document delivery, caps the purchase price of each government vehicle, and limits other non-payroll expenditures. Furthermore, the Legislative Assembly must approve any borrowings by the Secretary of the Treasury in order to finance any Commonwealth budget deficit with debt securities that are not repaid during the same fiscal year in which they are issued.

In an effort to address other fiscal challenges faced by the Commonwealth, the Joint Resolution and the Fiscal Reform Executive Order promote the adoption of certain measures to alleviate the significant unfunded liabilities of the various government retirement systems. These measures include the transfer to the two main government retirement systems of Commonwealth assets and additional General Fund contributions from the revenues of the proposed tax reform in excess of the Commonwealth's current expenditures. Furthermore, the Joint Resolution and the Fiscal Reform Executive Order limit the implementation of early retirement programs for government employees by conditioning their implementation on receipt of an opinion from an independent actuary confirming that such early retirement program will not adversely affect the retirement systems.

On January 26, 2006, the Governor outlined his fiscal reform proposal, which imposes stricter controls on government expenditures and reinforces the savings measures implemented by the Fiscal Reform Executive Order. The Governor's fiscal reform proposal also includes various measures, the passage of which require approval by the Legislative Assembly.

The measures and efforts set forth in the Joint Resolution and the Fiscal Reform Executive Order and the Tax Reform proposal are broad in scope and have been designed to address and correct the Commonwealth's structural imbalance and other fiscal challenges that are described below.

**Fiscal Year 2006 Budget**

On March 16, 2005, the Governor of Puerto Rico, Aníbal Acevedo-Vilá, submitted to the Legislative Assembly of the Commonwealth a proposed balanced budget of revenues and expenditures for fiscal year 2006 providing for General Fund resources and expenditures of $9.684 billion, representing an increase of $465 million, or 5%, over estimated actual expenditures for fiscal year 2005 estimated at $9.219 billion. The proposed budget package included several new revenue raising measures sufficient to cover budgeted expenditures, most of which required legislative approval. However, as mentioned below, the Legislative Assembly did not approve the budget proposed by the Governor.

On June 30, 2005, the Legislative Assembly, which is controlled by the principal opposition political party, approved a budget resolution for fiscal year 2006 that provided for General Fund expenditures of $9.258 billion. Governor Acevedo-Vilá vetoed this budget resolution because the revenue measures contained therein, as estimated by the Secretary of Treasury, were insufficient to cover the budgeted expenditures as required by the Constitution. He did, however, sign into law certain revenue raising measures approved by the Legislative Assembly estimated to generate approximately $130 million in new revenues. Although the revenue-raising measures contained language conditioning their effectiveness on the approval by the Governor of the $9.258 billion budget resolution, according to the Secretary of Justice, these revenue-raising measures are enforceable regardless of such language. Although no legal action has been initiated thus far, no assurance can be given that the effectiveness of such revenue measures will not be challenged.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

As a result of the Governor's veto, and in accordance with the Commonwealth's Constitution, the budget for fiscal year 2005 (with certain adjustments) carried over and will continue in effect for fiscal year 2006, unless another budget for fiscal year 2006 is approved by the Legislative Assembly and the Governor.  At this time, it is not anticipated that a new budget for fiscal year 2006 will be approved prior to the end of the fiscal year, although it is possible that other appropriations for special purposes may be approved from time to time. For more details about the budget approval process for fiscal year 2006 and the content of the budget, see "2006 Budget Approval Process" under *Budget of the Commonwealth of Puerto Rico* in the Commonwealth Report.

On August 30, 2005, the Governor adopted Executive Order 2005-58 (the "Budget 2006 Executive Order"), in which he made certain additional adjustments to the budget in order to bring the total expenditures in line with the Secretary of Treasury's estimate of total revenues for fiscal year 2006 of $8.945 billion, as required by Commonwealth law. These adjustments included, among others, a $384 million reduction related to a portion of debt service for general obligation bonds due during fiscal year 2006 (the "Excluded Debt Service") which is being paid from a GDB line of credit already in place and may be paid ultimately from the proceeds of a Commonwealth bond issue.

**Projected Budget Deficit for Fiscal Year 2006**

Based on the spending rate experienced during the first two months of fiscal year 2006, total expenditures for the year are currently estimated to reach $9.464 billion. Without considering any additional revenues, certain additional expenditures currently estimated to total approximately $173 million (the "Additional Expenditures"), the Excluded Debt Service, or any other expenditures during fiscal year 2006, the difference between the aforementioned spending rate of $9.464 billion and estimated revenues of $8.945 billion is $519 million. In the event expenditures were to exceed revenues, the Commonwealth estimates it would have available $135 million from the Emergency Fund, the Budgetary Fund, and other non-recurring resources. The Governor has also suggested that, in the event additional revenues received during fiscal year 2006 are not sufficient to cover the Commonwealth's budget deficit for such fiscal year, a portion of such budget deficit may be financed with a loan from GDB, which loan would be subject to legislative approval.

On January 17, 2006, the Department of the Treasury filed with the Legislative Assembly a report updating the Commonwealth's revenue estimates for fiscal year 2006. According to this report, the Commonwealth's collections for the first six months of fiscal year 2006 have exceeded budgeted revenues by approximately $34 million. These $34 million have not been taken into consideration in the calculation of the budget deficit.

The Fiscal Reform Executive Order requires all central government agencies to operate within their assigned budgets for the remainder of fiscal year 2006. Accordingly, agencies must present a report to OMB outlining plans to avoid additional expenditures and finish the year within budget, no later than 30 days after the effectiveness of such Executive Order. The reports required by the Fiscal Reform Executive Order must also be presented to the Speaker of the House, and the respective Presidents of the Senate, the House Ways and Means Committee and the House Budget Committee, who may determine, based on such reports, whether any additional revenue measures are warranted. On January 17, 2006, the Secretary of the Treasury and the Director of OMB presented their respective reports to the Legislative Assembly.

Although the Commonwealth is using its best efforts in order to maximize revenues and reduce expenditures, there is no assurance that revenues will be greater than the budgeted $8.945 billion or that expenditures will not exceed the anticipated level of $9.464 billion.

**Commonwealth's Budget Structural Imbalance**

The budget imbalance in fiscal year 2006 comes in the wake of several recent years during which the Commonwealth had insufficient recurring revenues to cover its expenditures. For fiscal year 2005, the budget deficit of $366 million was in addition to a $550 million GDB loan that was included in the budget as part of

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

the original estimate of available resources. These budget imbalances have been covered in the past with loans from GDB, financing transactions (including long-term bond issues payable from the General Fund) and other non-recurring resources. During fiscal year 2005, the amount by which the Commonwealth's operating expenditures exceeded its recurring revenues (the so-called structural imbalance) was approximately $1 billion. The Commonwealth estimates that during fiscal year 2006, the structural imbalance will remain at approximately $1 billion. This amount represents the difference between expenditures of $9.464 billion (at the spending rate of the first five months of fiscal year 2006, excluding the Additional Expenditures), plus the Excluded Debt Service ($384 million), for a total of $9.848 billion, less recurring revenues of $8.845 billion (which excludes $100 million expected to be generated by an interest rate swap transaction). The Commonwealth expects to reduce this imbalance by financing the Excluded Debt Service ($384 million), withdrawing from reserve funds and utilizing other non-recurring resources (approximately $135 million), entering into an interest rate swap transaction ($100 million), implementing the Fiscal Reform Executive Order to reduce expenditures, and possibly financing a portion of the Commonwealth's fiscal year 2006 budget deficit with a loan from GDB in the event additional revenues received during fiscal year 2006 are not sufficient to cover such budget deficit.

In addition to the Additional Expenditures, estimated amounts required to cover maintenance expenses incurred by Public Buildings Authority ("PBA") (approximately $75 million) and subsidy and operational expenses incurred by the Agricultural Services and Development Administration ("ASDA") (approximately $75 million) may further increase the structural imbalance should the Commonwealth have to cover such cash flow shortfall for PBA and/or ASDA. Such estimated amounts for PBA, however, will be covered by a line of credit from GDB collateralized by real estate and accounts receivable, and payment to GDB is expected from the sale of such real estate and/or the collection of the receivables pledged to GDB. Similarly, the estimated amounts for ASDA will be covered by a line of credit from GDB collateralized by real estate. As discussed above, the Commonwealth has recently taken action to address this budgetary structural imbalance.

**Other Fiscal Challenges**

The Commonwealth faces other fiscal challenges besides its current budgetary issues.  The principal one involves resolving the increasing unfunded pension liability of the Employees Retirement System and the Teachers Retirement System.  The Commonwealth expects to reduce the unfunded liability of the Employees Retirement System based on proposed legislation which provides for increased employer and employee contributions and the issuance of up to $2 billion of pension obligation bonds, which would be payable from the Commonwealth's General Fund.  The Employees Retirement System and the Teachers Retirement System are also seeking reimbursement from the Commonwealth for certain special retirement benefits paid by them in prior fiscal years under legislation providing such retirement benefits.  Part of these claims by the Teachers Retirement System ($119 million) is not recognized by OMB as a Commonwealth liability and the difference is currently under inter-agency arbitration.  Other claims ($78 million for fiscal year 2005 and prior years and $43 million for fiscal year 2006) are under consideration by OMB to determine the final amount that the Commonwealth may owe to the Employees Retirement System.

**Recent Rating Action Involving the Commonwealth and GDB**

In May 2005, Moody's and Standard & Poor's each announced downgrades to the Commonwealth's general obligation debt rating. Moody's and Standard & Poor's lowered the ratings on the Commonwealth's general obligation debt to "Baa2" and "BBB," respectively. At that time, Standard & Poor's lowered GDB's long-term counterparty credit and CD rating to "BBB+."

On October 21, 2005, Standard & Poor's further lowered GDB's long-term counterparty credit and CD rating to "BBB" from "BBB+" and affirmed GDB's short-term counterparty rating of "A-2." Standard & Poor's lowered GDB's long-term counterparty rating in order to further align GDB's credit to that of the Commonwealth. The reasons cited for the alignment include the higher balance of public sector loans on

31

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

GDB's balance sheet, the Commonwealth's continued reliance on GDB loans, and GDB capital distributions to the Commonwealth in the form of dividends and other special appropriations.

The Commonwealth and GDB have each been assigned a negative ratings outlook. According to Standard & Poor's, the negative outlook reflects the negative outlook on Puerto Rico's general obligation debt ratings, the Commonwealth's anticipated 2006 budget imbalance and the higher balance of loans in the GDB's earning asset mix. Standard & Poor's also indicated that should financial stress at the Commonwealth level negatively impact GDB's financial profile by weakening its liquidity or capital position, its debt ratings could be lowered.

On February 24, 2006, Moody's placed the Commonwealth's "Baa2" general obligation rating on "watchlist." The "watchlist" action places the Commonwealth's "Baa2" general obligation rating under review for possible downgrade.  Moody's has indicated that the review is expected to be completed by mid-July 2006 or possibly earlier.  Other bonds issued by various Commonwealth agencies and whose credit is tied directly or indirectly to that of the Commonwealth were also placed on "watchlist."

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Bonds from the Authority at a discount of $3,094,920.88 from the initial public offering price of the Bonds. The obligations of the Underwriters are subject to certain conditions precedent.  Under a Contract of Purchase between the Underwriters and the Authority, the Underwriters will be obligated to purchase all of the Bonds, if any Bonds are purchased. The Contract of Purchase provides for indemnification of the Underwriters by the Authority, to the extent permitted by law, against certain civil liabilities. The Underwriters may offer to sell the Bonds to certain dealers (including dealers depositing the Bonds into unit investment trusts, certain of which may be sponsored or managed by the Underwriters, and others at prices lower than the initial public offering prices (or at yields greater than such yields), and such offering prices (or yields) may be changed, from time to time, by the Underwriters.

Lehman Brothers, the lead underwriter, previously entered into a written agreement with Santander Securities pursuant to which said entity has agreed to cooperate with Lehman Brothers in connection with Lehman Brothers' provision of underwriting and investment banking services to the Authority with respect to the Bonds. Pursuant to these arrangements, the existence of which have been disclosed to the Authority and GDB, Santander Securities will be entitled to receive a portion of Lehman Brothers' actual net profits, if any, in connection with the underwriting of the Bonds, as permitted by Rule G-38 of the Municipal Securities Rulemaking Board (the "MSRB").  In accordance with amendments to Rule G-38 of the MSRB that were enacted last year, the agreement between Lehman Brothers and Santander Securities was terminated by August 29, 2005.

Other similar agreements existed between some of the other underwriters and other Puerto Rico-based investment banks.  These agreements have been terminated as a result of the adoption of the amendments to Rule G-38, but payments may be made for work done prior to the termination of the agreement. In addition, other agreements exist between some of the underwriters and other Puerto-Rico based investment banks that are not subject to Rule G-38. The underwriters that have or had these agreements are Banc of America Securities LLC and Oriental Financial Services Corporation; JP Morgan Securities, Inc. and R-G Investments Corporation; Goldman, Sachs & Co. and FirstBank Puerto Rico; Merrill Lynch & Co. and  BBVA Capital Markets of Puerto Rico, Inc.; and Morgan Stanley & Co. Incorporated and Popular Securities, Inc.

## TAX MATTERS

The Code includes requirements regarding the use, expenditure and investment of bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, which the Authority must continue to meet after the issuance of the Bonds in order that interest on the Bonds be and

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

remain excluded from gross income for federal income tax purposes. The failure to meet these requirements may cause interest on the Bonds to be included in gross income for federal income tax purposes, retroactive to the date of issuance of the Bonds. The Authority has covenanted to comply, to the extent permitted by the Constitution and the laws of the Commonwealth, with the requirements of the Code in order to maintain the exclusion from gross income for federal income tax purposes of interest on the Bonds. Bond Counsel is not aware of any provision of the Constitution or laws of the Commonwealth that would prevent the Authority from complying with the requirements of the Code.

In the opinion of Bond Counsel, subject to continuing compliance by the Authority with the tax covenants and the requirements of the Code referred to above, under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, interest on the Bonds will be excluded from gross income for federal income tax purposes. In the further opinion of Bond Counsel, interest on the Bonds is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be includable in the computation of the alternative minimum tax on corporations imposed by the Code. No opinion is rendered by Bond Counsel on the effect of any action taken or not taken after the date of its opinion without its approval (except for such action or omission to act as otherwise provided for in the documents pertaining to the Bonds) or in reliance upon the advice of counsel other than Bond Counsel on the exclusion from gross income of the interest on the Bonds for federal income tax purposes. Bond Counsel is further of the opinion that, under the provisions of the Acts of Congress now in force, the Bonds and the interest thereon are exempt from state, Commonwealth and local income taxation.

Ownership of tax-exempt obligations may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations, certain corporations with excess passive income, individual recipients of Social Security or Railroad Retirements benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations, and taxpayers who may be eligible for the earned income tax credit. Ownership of tax-exempt obligations may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in Puerto Rico. Prospective purchasers of the Bonds should consult their tax advisors as to applicability and impact of any collateral consequences.

Legislation affecting municipal securities is constantly being considered by the United States Congress. There can be no assurance that legislation enacted after the date of issuance of the Bonds will not have an adverse effect on the tax-exempt status of the Bonds. Legislative or regulatory actions and proposals may also affect the economic value of tax exemption or the market prices of the Bonds.

**Discount Bonds**

The excess, if any, of the amount payable at maturity of any maturity of the Bonds over the issue price thereof constitutes original issue discount. The amount of original issue discount that has accrued and is properly allocable to an owner of any maturity of the Bonds with original issue discount (a "Discount Bond") will be excluded from gross income for federal income tax purposes to the same extent as interest on the Bonds.  In general, the issue price of a maturity of the Bonds is the first price at which a substantial amount of Bonds of that maturity was sold (excluding sales to bond houses, brokers or similar persons or organizations acting in the capacity of underwriters, placement agents, or wholesalers) and the amount of original issue discount accrues in accordance with a constant yield method based on the compounding of interest.  A purchaser's adjusted basis in a Discount Bond will be increased by the amount of such accruing discount for purposes of determining taxable gain or loss on the sale, redemption or other disposition of such Discount Bond for federal income tax purposes.

A portion of the original issue discount that accrues in each year to an owner of a Discount Bond that is a corporation will be included in the calculation of the corporation's federal alternative minimum tax liability. In addition, original issue discount that accrues in each year to an owner of a Discount Bond is included in

33

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

the calculation of the distribution requirements of certain regulated investment companies and may result in some of the collateral federal income tax consequences discussed herein. Consequently, an owner of a Discount Bond should be aware that the accrual of original issue discount in each year may result in an alternative minimum tax liability, additional distribution requirements or other collateral federal income tax consequences although the owner of such Discount Bond has not received cash attributable to such original issue discount in such year.

The accrual of original issue discount and its effect on the redemption, sale or other disposition of any maturity of a Discount Bond that is not purchased in the initial offering at the first price at which a substantial amount of Discount Bonds of that maturity is sold to the public may be determined according to rules that differ from those described above. An owner of a Discount Bond should consult his tax advisor with respect to the determination for federal income tax purposes of the amount of original issue discount with respect to such Discount Bond and with respect to state, Commonwealth and local tax consequences of owning and disposing of such Discount Bond.

**Premium Bonds**

The excess, if any, of the tax basis of a Bond to a purchaser (other than a purchaser who holds such Bond as inventory, stock in trade, or for sale to customers in the ordinary course of business) who purchases such Bond as part of the initial offering and at the initial offering price as set forth on the inside cover page over the amount payable at maturity of such Bond is "Bond Premium."  Bond Premium is amortized over the term of such Bond for federal income tax purposes (or in the case of a bond with Bond Premium callable prior to its stated maturity, the amortization period and yield may be required to be determined on a basis of a call date that results in the lowest yield on such bond). No deduction is allowed for such amortization of Bond Premium; however, United States Treasury regulations provide that Bond Premium is treated as an offset to qualified stated interest received on the Bond.  An owner of such Bond is required to decrease his adjusted basis in such Bond by the amount of amortizable Bond Premium attributable to each taxable year such Bond is held.  An owner of such Bond should consult his tax advisor with respect to the precise determination for federal income tax purposes of the treatment of Bond Premium upon sale, redemption or other disposition of such Bond and with respect to the state, Commonwealth and local tax consequences of owning and disposing of such Bond.

## LEGAL MATTERS

The authorization and issuance of the Bonds are subject to the approval of legality by Duane Morris LLP, New York, New York, Bond Counsel, whose proposed form of opinions is set forth in APPENDIX F hereto. Certain legal matters will be passed upon for the Underwriters by their counsel, Goldman Antonetti & Córdova, P.S.C., San Juan, Puerto Rico.

## LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in Puerto Rico to secure public funds and will be approved investments for insurance companies to qualify them to do business in Puerto Rico as required by law.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, GDB has acted as financial advisor to the Authority in connection with the Bonds. As financial advisor, GDB participated in the selection of the Underwriters of the Bonds.  The Underwriters have been selected by GDB to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations.  The Underwriters or its affiliates participate in other financial transactions with GDB.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

## RATINGS

The Insured Bonds have been assigned a rating of "AAA" by Standard & Poor's and "Aaa" by Moody's. The uninsured Bonds maturing on July 1 in 2007 through 2011 have been assigned ratings of "BBB+" with a "stable" outlook by Standard & Poor's, and "Baa2" on "watchlist" for possible downgrade by Moody's. In 2005, Moody's lowered its rating on the Commonwealth's outstanding general obligation bonds from "Baa1" to "Baa2." Standard & Poor's also lowered its rating on the Commonwealth's general obligation bonds in 2005 from "A-" to "BBB." On February 24, 2006, Moody's placed the Commonwealth's "Baa2" general obligation rating on "watchlist." The "watchlist" action places the Commonwealth's "Baa2" general obligation rating under review for possible downgrade. Moody's has indicated that the review is expected to be completed by mid-July 2006 or possibly earlier. Other bonds issued by various Commonwealth agencies and whose credit is tied directly or indirectly to that of the Commonwealth were also placed on "watchlist."

The ratings reflect only the respective opinions of such rating agencies. Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that such ratings will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by either or both of such rating agencies if, in the judgment of either or both, circumstances so warrant. Any such downward revision or withdrawal of such rating or ratings may have an adverse effect on the market prices of the Bonds.

## CONTINUING DISCLOSURE

In order to assist the Underwriters in complying with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC"), the Authority and the Commonwealth have agreed to provide certain updated financial information and operating data annually and timely notice of specified material events, for as long as any Bonds remain outstanding. This information will be available to securities brokers and others who subscribe to receive the information.

The Authority and the Commonwealth have specifically agreed that:

1.     The Authority and the Commonwealth will each file within 305 days after the end of each fiscal year, commencing with the fiscal year ending June 30, 2006, with each NRMSIR and with any Commonwealth state information depository ("SID"):

| In the case of the Commonwealth: | annual financial statements, prepared in accordance with U.S. generally accepted accounting principles and operating data generally consistent with the Commonwealth Report and the Commonwealth Annual Financial Report, both of which have been incorporated by reference herein; and |
|---|---|
| In the case of the Authority: | annual financial statements, prepared in accordance with U.S. generally accepted accounting principles generally containing the information set forth in APPENDIX C to this Official Statement. |

2.     Each of the Authority and the Commonwealth agree to also file, in a timely manner, with each NRMSIR or with the MSRB and with any SID, notice of any failure to comply with paragraph 1 above.

3.     The Authority has also agreed to file, within 305 days after the end of each fiscal year, commencing with the fiscal year ending June 30, 2006, with each NRMSIR and with any Commonwealth SID, a report updating the information contained in the tables found on page 15 of this Official Statement.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

4.      The Authority has also agreed to file, in a timely manner upon the occurrence of any of the following events with respect to the Bonds if, in the judgment of the Authority or the Commonwealth, respectively, such event is material:

a.   principal and interest payment delinquencies;
b.   non-payment related defaults;
c.   unscheduled draws on debt service reserves reflecting financial difficulties;
d.   unscheduled draws on credit enhancements reflecting financial difficulties;
e.   substitution of credit or liquidity providers, or their failure to perform;
f.   adverse opinions or events affecting the tax-exempt status of the Bonds;
g.   modifications to rights of the holders (including Beneficial Owners) of the Bonds;
h.   Bond calls;
i.   defeasances;
j.   release, substitution, or sale of property securing repayment of the Bonds; and
k.   rating changes.

With respect to the following events:

Events (d) and (e).  The Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Authority applies for or participates in obtaining the enhancement.

Event (f).  For information on the tax status of the Bonds, see "TAX MATTERS."

Event (h).  The Authority does not undertake to provide notice of mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if the terms, dates and amounts of redemption are set forth in detail in this Official Statement under "THE BONDS," the only open issue is which Bonds will be redeemed in the case of a partial redemption, notice of redemption is given to the owners of the bonds as required under the terms of the Bonds and the Trust Agreement, and public notice of the redemption is given pursuant to Securities Exchange Act of 1934 Release No. 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions of purchases of Bonds.

As of the date of this Official Statement, there is no Commonwealth SID. The nationally recognized municipal securities information repositories (NRMSIR) are: Bloomberg Municipal Repository, 100 Business Park Drive, Skillman, New Jersey 08558; Standard & Poor's Securities Evaluations Inc., 55 Water Street, 45th Floor, New York, New York 10041; FT Interactive Data, Attn. NRMSIR, 100 William Street, New York, New York 10038; DPC Data Inc., One Executive Drive, Fort Lee, New Jersey 07024; and, Thomson Financial - Munistatements, 395 Hudson Street, 3rd Floor, New York, New York  10014.

The Commonwealth expects to provide the information described in item (1) above by delivering the first bond official statement of the Commonwealth or of any instrumentality of the Commonwealth that includes its financial statements for the proceeding fiscal year and operating date generally containing the information set forth in the Commonwealth Report or, if no official statement is issued by the 305-day deadline, by delivering such report and the Commonwealth Annual Financial Report by such deadline.

The Commonwealth has made similar continuing disclosure covenant in connection with prior bond issuances, and has complied with all such covenants, except as hereinafter noted.  The Commonwealth's audited financial statements for the fiscal year ended June 30, 2002 were filed after the Commonwealth's filing deadline of May 1, 2003, because of delays in finalizing such financial statements resulting from the implementation of Governmental Accounting Standards Board Statement No. 34 ("GASB 34").  The Commonwealth's audited financial statements for the fiscal year ended June 30, 2003 were also filed after the Commonwealth's filing deadline of April 30, 2004, because of delays in finalizing the financial statements of certain of the Commonwealth's reporting units due to the implementation of GASB 34.  The

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

Commonwealth's audited financial statements for the fiscal year ended June 30, 2004 were also filed after the Commonwealth's filing deadline of May 1, 2005, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying ht submission of the Commonwealth's audited financial statements.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above whether or not, such other events are material with respect to the Bonds, but the Authority does not undertake to provide any such notice of the occurrence of any event, except those events, if material, listed above.

The Commonwealth and the Authority acknowledge that their respective undertakings pursuant to the Rule described above are intended to be for the benefit of the owners of the Bonds, and will be enforceable by any such owners (including Beneficial Owners); provided that the right to enforce the provisions of their respective undertakings shall be limited to a right to obtain specific enforcement of the Authority's or the Commonwealth's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Authority and the Commonwealth a written request to cure such breach, and the Authority or the Commonwealth, as applicable, shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan for the equal benefit of all Beneficial Owners of the outstanding Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of any of the Covenants at issue.  Notwithstanding the foregoing, no challenge to the adequacy of the information provided in accordance with the filings mentioned in paragraphs (1) or (2) above may be prosecuted by any beneficial owner except in compliance with the remedial and enforcement provisions contained in the Trust Agreement.  See APPENDIX D.

The Covenants may only be amended if:

(a)    the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority or the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of Beneficial Owners, as determined by parties unaffiliated with the Authority or the Commonwealth; or

(b)    all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Authority or the Commonwealth, as applicable, elects that the Covenants shall be deemed amended accordingly.

The Authority and the Commonwealth have further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

The covenants have been made in order to assist the Underwriters in complying with the Rule.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

## MISCELLANEOUS INFORMATION

The foregoing references to and summaries of certain provisions of the Trust Agreement, the various acts and the Bonds do not purport to be complete statements of any or all of such provisions and are made subject to all the detailed provisions thereof, to which reference is hereby made for further information. Copies of the foregoing documents are available from GDB, upon written request directed to: Government Development Bank for Puerto Rico, 666 Fifth Avenue, 15th Floor, New York, New York 10103-1599, Attention: Director-New York Office or Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940-2001, Attention: Public and Private Finance Director. Appended to and constituting a part of this Official Statement is the Occupancy Tax Act (APPENDIX A), the Hotel Occupancy Tax Projection Report (APPENDIX B), the Financial Statements of the Authority (APPENDIX C), a Summary of the Trust Agreement (APPENDIX D), the Assignment Agreement (APPENDIX D), the Pledge and Assignment Agreement (APPENDIX F), the proposed form of opinions of Duane Morris LLP, Bond Counsel (APPENDIX G), the Specimen of Ambac Assurance Corporation Bond Insurance Policy (APPENDIX H), the Specimen of CDC IXIS Financial Guaranty North America Bond Insurance Policy (APPENDIX I) and the Specimen of Financial Guaranty Insurance Company Bond Insurance Policy (APPENDIX J). The information set forth in, or incorporated by reference into, this Official Statement, except for information pertaining to DTC, was supplied by certain officials of the Authority, the Commonwealth or certain of the Commonwealth's other agencies or instrumentalities, in their respective official capacities. All such information is included in this Official Statement on the authority of such officials or the authority of such publications as public official documents.  The information pertaining to DTC was supplied by DTC.

This Official Statement will be filed with each NRMSIR and with the MSRB.

This Official Statement has been duly authorized, executed and delivered by the Authority and, as required by law, approved by the Tourism Company and GDB.

**PUERTO RICO CONVENTION CENTER
DISTRICT AUTHORITY**


By:   ___/s/ Manuel Sánchez Biscombe___
Executive Director

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**APPENDIX A**

*Following is a transcription of the English translation of Act No. 272 approved by the Legislature of the Commonwealth of Puerto Rico on September 9, 2003, as certified by the Puerto Rico State Department on February 9, 2006.*

**(No. 272)**

(Approved September 9, 2003)

### AN ACT

To transfer the responsibilities and obligations to impose, fix, determine, assess, collect, enforce, distribute, regulate, investigate and sanction the tax on the room occupancy rate from the Department of the Treasury to the Puerto Rico Tourism Company; to establish a new formula for the distribution of the funds collected on account of the room occupancy rate; to eliminate all sections in the Internal Revenue Code referring to the room occupancy rate that are inconsistent with the provisions of this Act; to amend subsection (b) of Section 8 of Act No. 78 of September 10, 1993, as amended; to amend subsections (b) and (c) of Section 9 of Act No. 78 of September 10, 1993, as amended; to amend subsection (b) of Section 3 of Act No. 221 of May 15, 1948, as amended; to add a subsection (q) to Section 5 of Act No. 10 of June 18, 1970, as amended.

### STATEMENT OF MOTIVES

Act No. 120 of October 31, 1994, as amended, known as the "Puerto Rico Internal Revenue Code of 1994" (the "Code"), provides for all matters concerning the tax on the room occupancy rate (the "Tax") imposed on hotels, condohotels, apartment hotels, all inclusive hotels, hostelries, guesthouses, inns, short-term rentals and motels (collectively, the "Lodgings"). Over the past years, the Tax has proven to be a stable and secure source of revenues. Notwithstanding the foregoing and considering the significant increase in available rooms, the revenues derived under this scheme have not significantly increased in these past years. It should be noted that in these past years, the revenues generated in the collection of the Tax has fluctuated as follows:

| | |
|---|---|
| 1996-97 | $30.8 Million |
| 1997-98 | $39.1 Million |
| 1998-99 | $40.7 Million |
| 1999-00 | $38.4 Million |
| 2000-01 | $46.5 Million |
| 2001-02 | $38.4 Million |

The Puerto Rico Tourism Company (the "Company") has taken upon itself the task to review the compliance by the Lodgings with the payment of the Tax. The scope of the review conducted by the Company has included a review of the compliance of the thirty-eight (38) largest hotels of Puerto Rico, as well as some inns, motels and small hostelries. The objective of these reviews was to examine the Tax payments made by the Lodgings during the past five (5) years. The Company also verified that the Department of the Treasury (the "Department") had recognized the Lodgings' Tax payments and included it in the transfers of the funds the Department is obligated to make for the Company's benefit.

The Tax payment review revealed that over the past years, there has been a confusion regarding the imposition, enforcement and collection of the Tax, specifically in the processing of the codes that identify the type of tax the hotelier was charged, in the data entry performed at collection centers, in the transmittal and transfer of funds in favor of the Company and with respect to tax evasion by some Lodgings. It has likewise

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

become evident that the supervision of the Tax does not constitute a priority within the Department's wide range of responsibilities and ministerial duties.

In order to continue with the development of the tourism industry in our Island, it is essential that the Company exercise a more prominent role in the collection and supervision of what represents one of its principal sources of revenue, so that it may continue with its ministerial role to promote Puerto Rico as the premier tourism destination in the Caribbean. It is incontrovertible that the room occupancy rate is the best way to achieve the reinvestment of revenues generated by the tourism industry in the development of this important sector of our economy.

It is well known that the tourism industry plays a significant role in the economic development of Puerto Rico.  The Commonwealth of Puerto Rico recognizes the need to continue strengthening this sector so that it may provide new revenue alternatives for our Island. The Puerto Rico Convention Center District Authority (the "Authority") was created because the government anticipated the need to articulate a strategy that would permit the development of a district composed of a convention center, hotels, office space, restaurants, retail commercial establishments and other commercial developments. One of the principal attractions of this District (the "District") would be the inauguration of a convention center that would accommodate conventions, exhibitions, fairs and conferences which would represent thousands of additional visitors participating in such events that, in turn, would result in a new boost to the Puerto Rican economy. However, the lack of adequate facilities suitable for this purpose had been a factor that for years limited the ability of the government and the Convention Bureau to materialize initiatives such as the District that were geared to identify new revenue sources from the tourism sector of our economy. To the extent that the Commonwealth of Puerto Rico stimulates the development of new markets, it will increase the feasibility of opening doors for new investors and promote the expansion of new employment sources that will, in turn, result in the betterment of our people's welfare.

Act No. 299 of September 1, 2000, introduced an amendment to the Code with the purpose of modifying the formula established for the distribution of the revenues obtained from Tax payments. The new formula was established in order to facilitate the distribution of a portion of the revenues received from the tourism industry on account of the Tax payments to the Authority in order to cover the construction and development costs of the Puerto Rico Convention Center and its infrastructure. However, the projected costs to finance the construction of the Convention Center demonstrate that the current distribution of the revenues collected from room occupancy rates is insufficient to cover the debt associated with its construction. Therefore, it is imperative to define a new formula for the distribution of the revenues collected on account of the Tax.

In addition to the stated above, another of the objectives of Act No. 299 was to protect the tourism industry by expressly defining and establishing what would be deemed rate subject to the room occupancy tax. This was done to prevent uncertainty among hoteliers as to when the obligation arises to charge their guests the tax on room occupancy rate; specifically in those cases where the room occupancy rate is not paid in cash, but in any other form of payment including, without limitation, the rendering of services of any kind or nature by the room occupants. This legislation recognizes and maintains such objective.

The Commonwealth of Puerto Rico recognizes that the Company, as the public instrumentality responsible for tourism development in Puerto Rico, is the entity that can more efficiently assign the moneys generated by the Tax. In an effort to complement the principal objective of Act No. 299, to strengthen tourism development in Puerto Rico, maximize the economic benefit that Puerto Rico receives from every tourist who visits the Island each year and generate new employment sources for Puerto Ricans, this measure proposes the transfer, from the Department to the Company, of the responsibilities and obligations to impose, fix, determine, assess, collect, enforce, distribute, regulate, investigate and sanction the Tax and the definition of a new formula for the distribution of the revenues collected on account of the Tax.

A-2

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

*BE IT ENACTED BY THE LEGISLATURE OF PUERTO RICO:*

**Section 1.-Title**

This Act shall be known as the "Commonwealth of Puerto Rico Room Occupancy Rate Tax Act" (the "Act").

**Section 2.-Definitions**

For purposes of this Act, the following terms shall be defined as follows:

(1)   **Entry -** means the Taxpayer Deficiency or Debt as determined by the Company once it has been registered in the Company's accounting system.

(2)   **Supplementary Short-Term Lodging** - means every building or part of a building leased for a period of less than ninety (90) days, devoted to the lodging of people by means of payment, which building or part thereof is not a hotel, condohotel, all-inclusive hotel, motel, inn, hostelry, guesthouse and/or apartment hotel. Said term shall include, without limitation, houses, apartments, cabins and villas.

(3)   **Compulsory Procedure** - means the procedure the Company may use to compel the payment of the Tax or the fulfillment of any other obligation including, without limitation, the filing of a civil action, the entry of an attachment order and/or the sale of the debtor Taxpayer's property.

(4)   **Audit -** means the procedure by which the Company shall have the power to inspect the accounting books and the procedures of a Lodging, such inspection to be carried out by a trained accountant, as defined in subsection (20) of this Section, in order to verify the precision and integrity of the same.

(5)   **Authority -** means the Puerto Rico Convention Center District Authority, a public corporation of the Commonwealth of Puerto Rico created by Act No. 351 of September 2, 2000, as amended, known as the "Puerto Rico Convention Center District Act."

(6)   **Bank** - means the Government Development Bank for Puerto Rico, a public corporation of the Commonwealth of Puerto Rico created by Act No. 17 of September 23, 1948, as amended.

(7)   **Guesthouse -** means every furnished building or part of a building, devoted to the lodging of persons for a fee, with or without meals, which building or part of a building is not a hotel, condohotel, motel or apartment hotel. The term guesthouse shall include, without limitation, a residential club, a furnished guesthouse, a boarding house or a private club.

(8)   **Room Occupancy Rate** - means the rate collected or charged by a Hotelier for the occupancy of any room of a Lodging, valued in terms of money, whether received in cash or otherwise, including, without limitation, all the income in cash, manager's check or credit. The definition of Room Occupancy Rate shall include, without limitation, the money received by the Lodging on account of Paid but Unused Rooms, Room Penalties and any other charge, rate or additional tax ("fees," "resort fees" and/or "taxes") that a Hotelier charges for a stay in a Lodging.

(9)   **Rate for Paid but Unused Room** - means the rate that shall be charged by a Hotelier when an occupant does not appear to claim his reservation to occupy the room.

(10)  **Center** - means the Puerto Rico Convention Center which shall be developed and operated in the real property owned or leased by the Authority, or by the people or entities designated by the Authority, and which shall be suitable for the following purposes and events: congresses, conventions, conferences, trade shows, exhibitions, meetings and other business, entertainment, public assemblies, social, cultural, historic and scientific events.

(11)  **Room Cost** - means a reasonable estimate of the operating costs of the occupied room.

A-3

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

(12)  **Company -** means the Puerto Rico Tourism Company, a public corporation of the Commonwealth of Puerto Rico created by Act No. 10 of June 18, 1970, as amended.

(13)  **Taxpayer** - means an Hotelier who is obligated to charge, retain and pay the Tax.

(14)  **Declaration** - means the Tax form that shall be completed and filed by the Taxpayer and includes any tax return, declaration, schedule or list, and any amendment or supplement to the same.

(15)  **Deficiency** - means a Debt, minus the amount paid by the Taxpayer.

(16)  **Debt** - means the Room Occupancy Rate multiplied by the percentage rate of the applicable Tax for the period of occupancy plus any fines, penalties, surcharges or interests owed by the Hotelier.

(17)  **Director** - means the Executive Director of the Puerto Rico Tourism Company.

(18)  **Mathematical or Clerical Error -** means:

    i.   an error in the addition, subtraction, multiplication or division that appears in the Declaration;

    ii.   an entry of an item that is inconsistent with another entry of the same item of a Declaration;

    iii.   any omission of information that must be included in the Declaration to evidence an entry in the same;

    iv.   an entry in the Declaration of a deduction or credit that exceeds the imposed or authorized statutory limit.

(19)  **Room** - means a room or lodging of any type in any part or section of a Lodging that is offered or is available for use or possession for any purpose.

(20)  **Hotelier** - means any natural or juridical person that operates Lodging in Puerto Rico including, without limitation, the owner, agent, proprietor, operator, lessee, mortgagor sublessee or the holder of the same. For purposes of this Act, the term agent shall include those individuals including, without limitation, real estate brokers that collect the rent on account of a Supplementary Short-Term Lodging for the lodging of guests.

(21)  **Lodging** - means every furnished building, commonly used and maintained open for the lodging of guests by means of payment of a rental rate, which derives its revenues from the rental of rooms, and that within its offerings provides rental rates computed daily, weekly, fractionally or by a global rent on account of an all-inclusive concept. The term Lodging shall also include hotels, condohotels, all-inclusive hotels, motels, inns, short-term rentals, hostelries, guesthouses, apartment hotels and recreational facilities operated by the agencies or instrumentalities of the Commonwealth of Puerto Rico.

(22)  **All-Inclusive Hotel** - means every furnished building, commonly used and maintained for the lodging of guests by means of payment of a rental rate, which derives its revenues from the rental of rooms and within its offerings, solely provides a global and grouped rental Rate, computed daily or weekly, based on the rental of rooms, the complementary services and the food and beverages.

(23)  **Tax -** means the Tax set forth in Section 24 of this Act, unless otherwise provided in this Act.

(24)  **Bureau** - means the Puerto Rico Convention Bureau, the principal nonprofit organization in Puerto Rico devoted primarily and officially to the promotion of Puerto Rico as a destination for the holding of meetings, conventions, congresses, commercial fairs, sporting events and every type of group event.

(25)  **Notification** - means the written communication sent by the Company to the Taxpayer informing a Deficiency or Debt on account of the Tax.

(26)  **Taxpayer Identification Number** - means the number the Company shall assign to the Lodging, and that must be used by said Lodging in the Declaration, as shall be established by this Act or the regulations approved hereunder.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

(27) **Occupancy** - means the period during which a guest uses or possesses, or has the right to use or possess, any room or rooms of a Lodging, or the right to use or possess the services and facilities appertaining to the use or possession of a room.

(28) **Guest** - means every person who, by means of payment of a Rate and by virtue of any lease, concession, permit, right of access, license or under any other agreement or otherwise, uses, possesses, has the right to use or possess a room.

(29) **Room Penalty** - means every Rate per room charged by a Lodging's Hotelier for the unused rooms in a contract that requires, as a condition to its perfection, the use of a minimum number of rooms.

(30) **Review** - means the procedure through which the Company shall have the power to examine the accounting books of a Lodging as defined in subsection (21) of this Section, the purpose of which is to verify the accuracy of the information the Taxpayer provided.

(31) **Rate** - means the rate charged by a Lodging in daily, weekly, fractional or monthly form, on account of the Room Occupancy Rate and/or any other charge on account of the occupancy of a room, based on a nominal amount expressed in dollars or a percentage rate. Said concept shall include the global and grouped rate charged by an All-Inclusive Hotel.

(32) **Daily Average Rate** - means the daily average of a room, measured during a one (1) month period.

(33) **Assessment** - means the procedure through which the Company may determine the amount owed by the Taxpayer for a Debt or Deficiency.

### Section 3.-General Powers of the Company

For purposes of the application and administration of this Act, and in addition to any other duties and powers established hereunder, the Company shall have the power to:

A. Determine, assess, impose, collect, enforce, regulate and distribute the Tax.

B. The Company shall have the power to enforce, regulate, investigate, intervene and sanction the persons subject to the provisions of this Act.

C. The Company shall have the power to impose administrative fines and other sanctions under this Act.

D. The Company shall have the power to conduct investigations and interventions; to require any type of information necessary for the adequate performance of its powers; to direct or petition the courts to order that activities or acts that attempt against the purposes of this Act be ceased; to impose and direct payment of costs, expenses and attorney fees, as well as the payment of costs and fees for other professional and consultative services incurred in the investigation, hearings and procedures conducted before the Company and to direct the performance of any act in compliance with the provisions of this Act.

E. Examine any records, documents, premises, real estate or any other material related with transactions, business, or activities subject to the tax including, without limitation, folios, accounting books, bank statements, income tax returns, room revenue reports and financial statements; provided, however, that for the Company to examine the income tax returns filed by the taxpayers with the Department of the Treasury, the Company must comply with the requirements established by the Secretary of the Treasury in the applicable regulations. Every person in charge of any establishment, premises, real estate or object subject to examination or investigation shall facilitate any examination the Company requires. When the owner or person in charge of an establishment, premises, real estate or object subject to examination or investigation is not present, this fact will not constitute sufficient cause to prevent said examination.

A-5

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

F.    Require and review the payment and adequacy of the bonds to be provided by the Taxpayers pursuant to the provisions of this Act and the regulations approved thereunder.

G.    Retain for a period of time as shall be necessary, any documents obtained or provided in accordance with this Act for use of the same in any investigation or proceeding that may affect the Company, pursuant to the provisions of this Act or the regulations approved thereunder.

H.    Certify Declarations, tax returns or other documents related to the administration and application of this Act.

I.    Draft, approve and adopt any rules and regulations necessary for the administration and application of this Act, pursuant to the provisions of Act No. 170 of August 12, 1988, as amended, known as the "Uniform Administrative Procedure Act."

J.    Delegate on any official, officer or employee of the Company those faculties and duties considered necessary and convenient to carry out any function or authority this Act confers.

K.    Appoint examining officials to conduct administrative hearings, who shall have the power to issue orders and resolutions. The functions and adjudicative procedures applicable to these examiners shall be established by the Company through regulation approved for said purposes.

### Section 4.-Organizational Structure

A.    The Executive Director of the Company may establish the internal organizational structure deemed adequate regarding the Tax on the Room Occupancy Rate and shall have discretion to designate the different work areas, as well as in the operation, quasi-legislative and adjudicative phases.

B.    The Executive Director of the Company may appoint the officers and employees deemed necessary for the faithful compliance of the provisions of this Act.

C.    In order to attain the objectives of this Act, the Company may subcontract the persons or services it deems necessary.

### Section 5.-Authority to Inspect

Authorized officials and employees of the Company are hereby authorized to intervene and/or summon to appear before the Company any person who violates any provision of this Act or the regulations approved thereunder.

### Section 6.-Authority to Initiate Legal Proceedings

The Puerto Rico Tourism Company shall be authorized to initiate any legal proceeding necessary for the collection of the Tax.

### Section 7.-Authority to Approve Regulations

The Company shall have the power to adopt the regulations that it deems necessary for the implementation of this Act, and the same shall have the force of law. Said regulations shall become effective upon compliance with the applicable provisions of Act No. 170 of August 12, 1988, as amended, known as the "Uniform Administrative Procedures Act."

### Section 8.-Authority to Require Bonds

The Company may require Taxpayers to file credible evidence that they have posted a bond to guarantee timely payment of the obligations imposed by this Act. The bond shall be required in the amount the Company deems reasonably necessary to guarantee payment of the Tax and whatever surcharges, interests, penalties, or administrative fines are imposed on such Tax as a result of violations to the provisions of this Act and/or its regulations.

A-6

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**Section 9.-Examination of accounts, registries, books, and premises**

The Company, through its officials and employees, shall have the right to inspect and review all the information, accounts, registries, entries, and documents related to the payments to be made by the Hoteliers with respect to the Tax and the distribution of such funds. The Company may enter and examine the premises and documents of any Taxpayer.  The Company shall also be able to require, access, and/or use any information or document in the possession of any instrumentality of the Commonwealth of Puerto Rico or political subdivision thereof.

**Section 10.-Audits**

The Company shall have the power to carry out audits to supervise compliance with this Act and the regulations approved thereunder related to the payments of the Room Occupancy Rate made by the Hoteliers.

**Section 11.-Reports**

The Company may require of every Taxpayer the filing of the audited financial reports it deems necessary in pursuing the purposes of this Act.

**Section 12.-General Investigative Powers**

A.  The Company shall have the power and authority to summon and interview witnesses, administer oaths, take statements or compel the presentation of books, papers, and documents that it deems necessary and pertinent, in any proceeding that it may hold for the purpose of exercising its powers and duties.

B.  The Company may order the Taxpayers to pay for the expenses, costs, and fees for professional and consulting services incurred in the investigations, studies, hearing, or any other proceeding held by the Company relating to the provisions of this Act.

C.  The Company may order any Taxpayer to pay any other expense caused by temerity that the Company is forced to incur due to noncompliance with or violation of this legislation.

**Section 13.-Complaints before the Company**

The Company, on its own initiative, or any person, government instrumentality, agency, business, or private enterprise that complains of some act or omission carried out or proposed to be carried out by a Taxpayer in violation of any provision of this Act, regulation, or order of the Company, may file a complaint before the Company through a written application. The Company shall establish the procedures for the filing of complaints through regulations approved to such effect.

**Section 14.-Adjudicative Proceedings**

In the exercise of the duties and powers imposed by this Act and conferred upon the Company, the Company may hold public hearings, summon witnesses, issue orders, resolutions, and decisions and perform any other function of a quasi-judicial character that may be necessary to implement the provisions of this Act.

The Company shall have the authority to hold adjudicative hearings to consider complaints against any Taxpayer, on its own behalf or by petition of an interested party as provided for in this Act, and may impose sanctions and/or fines in accordance with the regulations promulgated to these effects.

On its own behalf, or in representation of the person who initiated the claim or complaint, the Company shall have the authority to investigate, issue summonses, require documents that it deems pertinent, and settle claims when a Taxpayer has:

(1)  omitted to take an action required by some provision of this Act or of any regulation approved pursuant to the same; or

A-7

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

(2)     performed an action against that established in a provision contained in this Act or in any regulation approved hereunder.

### Section 15.-Due Process of Law

The Company shall establish, through regulations, the provisions to be followed in adjudicative proceedings.  Every Taxpayer is hereby conceded and guaranteed the due process of law pursuant to Act No. 170 of August 12, 1988, as amended, known as the "Uniform Administrative Procedures Act," in every appeal for administrative or judicial review of the orders and/or resolutions issued by the Company in the exercise of the powers conferred upon it by this Act.

### Section 16.-Contempt; Refusal to Act

If any person summoned to appear before the Company fails to obey such summons, or if upon appearing before the Company refuses to take an oath, furnish information, testify or answer any pertinent question, or present any pertinent document when so ordered by the Company, the Company may invoke the aid of the Court of First Instance to compel the appearance, testimony, and presentation of documents.

Any person who fails or refuses to appear and testify, neglects any legitimate request, or refuses to present books, papers, and documents, if it were within their power to do so, in compliance with a validly issued notice or summons by the Company, or any person who conducts himself in a disorderly or disrespectful manner before the Tourism Company or any of its officials or employees presiding over a hearing or investigation, shall be guilty of a misdemeanor, and, if convicted, punished by a maximum fine of five thousand (5,000) dollars, at the discretion of the sentencing court.

### Section 17.-Burden of Proof

When a hearing is held for a violation of any provision of this Act or any regulation or order from the Company, the burden of proof shall rest on the Taxpayer.

### Section 18.-Authority to Sanction, Impose, and Collect Fines

The Company is hereby authorized to impose sanctions and administrative fines for infractions to the provisions of this Act and to the regulations approved thereunder, committed by the Taxpayers; as well as the penalties contained in Sections 45, 46, 47, and 48 of this Act. The Company may establish, through regulations, the applicable sanctions which shall be proportionate to the infraction involved.

The Company may, when the provisions of this Act are infringed, impose the administrative fine, penalty, surcharge, or sanction that, in accordance with the Act or Regulation, corresponds or permanently suspend or revoke the promotional and tax benefits granted by the Company.

The infraction of any provision of this Act or of the regulations approved thereunder may entail the permanent revocation of such benefits, as the case may be, as well as the subsequent ineligibility of the Taxpayer to qualify for the promotional benefits and the tax benefits that the Company grants pursuant to Act No. 78 of September 10, 1993, as amended, known as "Puerto Rico Tourism Development Act of 1993."

An action against a Taxpayer in accordance with the provisions of this Act shall not prevent the Company from taking any other additional action authorized by this Act or the regulations approved thereunder.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**Section 19.-Criminal Penalties for Infractions**

Any Taxpayer who infringes any provision of this Act or its Regulation, omits, neglects, or refuses to obey, observe, or comply with any order, resolution, rule, or decision of the Company, fails to comply with a sentence from any court, incites, helps to infringe, omits, neglects, or fails to comply with the provisions of this Act, shall be guilty of a misdemeanor with a maximum fine of up to five thousand (5,000) dollars at the discretion of the sentencing court.

An action against a Taxpayer pursuant to the provisions of this Act shall not prevent the Company from taking any other additional action authorized by this Act or the regulations approved thereunder.

**Section 20.-Criminal Penalty for Noncompliance with the Payment of the Tax**

In those cases in which a person collects the Tax but fails to remit to the Company the corresponding payment with respect to the same within the period provided by this Act or the regulations approved thereunder, thus misappropriating public property or funds belonging to the Commonwealth of Puerto Rico or its public corporations, such person shall be guilty of the felony of aggravated misappropriation, punishable by imprisonment for a fixed term often (10) years.

An action against a Taxpayer pursuant to the provisions of this Act shall not prevent the Company, from taking any other additional action authorized by this Act or the regulations approved thereunder.

**Section 21.-Additional Penalty for Violation of Orders**

Every time a provision of this Act, rule, order, or decision of the Company, or a sentence from a court is violated shall constitute a separate and different offense.

**Section 22.-Judicial Action**

The Company shall refer to and petition the Secretary of the Department of Justice to initiate, on behalf of the Commonwealth of Puerto Rico, those criminal proceedings that may be necessary to punish the acts committed in violation of the provisions of this Act.

**Section 23.-Enumeration of Powers does not Imply a Limitation of the Same**

The enumeration of the powers conferred to the Company by virtue of this Act shall not be construed as a limitation of its powers for the effective pursuit of the objectives established in the same.

**Section 24.-Tax**

    A.    The Tax shall be a mathematical calculation resulting from the multiplication of the rate provided by subsection B of this Section by the Room Occupancy Rate, and the Period of occupation of the room.

    B.    The Company shall levy, charge, and collect a general Tax of nine percent (9%) over the Occupancy Rate. When dealing with Lodgings authorized by the Commissioner of Financial Institutions to operate casinos, the Tax shall be equal to eleven percent (11%). When dealing with Lodgings authorized by the Company to operate as Inns, the Tax shall be equal to seven percent (7%). Motels shall pay a tax of nine percent (9%) when such rates exceed five (5) dollars daily. In the case of an All-Inclusive Hotel, as defined in subsection (22) of Section 2, the Tax shall be equal to five percent (5%) of the global and grouped charge that guests are charged. In the case of Supplementary Short-Term Lodging, the Tax shall be equal to seven percent (7%). In the case of recreational facilities operated by agencies or instrumentalities of the Commonwealth of Puerto Rico, the Tax shall be equal to five percent (5%).

    C.    With the exception of the rates charged by an All-Inclusive Hotel, when the Room Occupancy Rates is grouped with the cost of meals or other services that are complementary to the room and that, in reality, should not be subject to payment of the Tax, the Company may use as its basis the total Room Occupancy Rate collected by the

A-9

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

Hotelier to determine the Tax to be paid. In case the Hotelier does not provide a trustworthy breakdown of the reasonable cost of each and every one of the services rendered, the Company may calculate and apply the same on the basis of the greater of the Average Rate, the Room Cost, or the cost of such services using as a basis the experience in the industry.

D.   The Tax shall be applicable when a Lodging provides a room free of charge to any player and/or any visitor to any casino for the benefit or promotion of such casino, regardless whether or not the Lodging directly bills the proprietor and/or owner of the gambling hall. The Company may calculate and apply the Occupancy Rate on the basis of the greater of the Average Rate, the Room Cost, or the cost of such services using as a basis the experience in the industry.

E.   Any agency or instrumentality of the Commonwealth of Puerto Rico that is a proprietor and operator of any Lodging shall not be exempt from the provisions of this Act.

F.   The Tax shall not be applicable to rooms occupied by members of the artistic or technical personnel of cinematography companies that use the facilities of a Lodging as a result of the production of a film project for distribution in movie theaters, television, or cable television systems. The exemption established herein shall be solely applicable when, at the time of liquidating charges billed with respect to the occupation of the room, the members of the artistic or technical personnel of cinematography companies present to the Hotelier a certification duly issued by the Company.

G.   The Tax levied in this Section shall not be applicable to the sums paid for the acquisition of timeshare rights or for the maintenance of properties covered by owners of timeshare or vacation club rights, constituted as a special type of property rights pursuant to Act No. 252 of December 26, 1995, as amended. For purposes of this subsection, lease contracts registered in the Property Registry shall not be considered a special type of property right.

H.   With the exception of Section 3 of this Act, no Hotelier may levy or charge its guests charges denominated as a "contribution," "right," "tax," or "rate" that would otherwise indicate or lead to the belief that such charge is established by the Commonwealth of Puerto Rico when the charge has not been levied nor will be charged by the Commonwealth of Puerto Rico. The Hotelier shall be responsible for breaking down such charges in paragraphs in the bills, separate and independent from the charge with respect to the Tax. The Company may impose such sanction it deems necessary including, without limitation, the imposition of penalties, administrative fines, the permanent suspension or revocation of the promotional benefits granted by the Company, or the suspension or revocation of the tax exemption decree granted by the Company in accordance with Act No. 78 of September 10, 1993, as amended, to any Hotelier who violates the provisions of this Section. If deemed proper, the Company may charge the Tax over these charges.

**Section 25.-  Obligation of Guest**

The Tax levied in Section 24 of this Act shall be paid by the Guest at the time of paying the Room Occupancy Rate to the Hotelier.

A-10

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**Section 26.-Tax Identification Number**

Every Lodging subject to the provisions of this Act shall apply for and obtain a Tax Identification Number from the Company, and for this purpose shall follow the procedures adopted by the Company through regulation approved to such effect.

**Section 27.-Responsibility of the Hotelier to Collect and Remit the Tax to the Company**

    A.    Every Hotelier shall be obligated to collect, withhold, and remit to the Company the Tax established by Section 24 of this Act.

    B.    Every Hotelier shall pay a bond to guarantee timely payment of the Tax and other surcharges, interests, penalties, or administrative fines imposed on it as a result of violations of the provisions of this Act and/or its regulations.

    C.    The payment of the bond as a guarantee of payment, shall be in the amount and pursuant to the terms established by the Company through regulation approved to such effect. Such bond shall be paid at the Company by means of a cash deposit, letter of credit, or through a company duly authorized to do business to post bonds pursuant to the laws of the Commonwealth of Puerto Rico.

    D.    The Hotelier's omission or noncompliance with the payment of the bond within the term required by the Company shall entail the imposition of administrative fines, surcharges, penalties, and the suspension or revocation of the promotional or tax benefits granted by the Company.

    E.    The Company may withhold from Lodgings that operate casinos, the proportion of the proceeds for slot machines that corresponds monthly to the concessionaire of a license to operate casinos under the "Games of Chance Act," for the sole purpose of liquidating any debt that the concessionaire has accumulated and is pending payment, with respect to the Tax.

**Section 28.-Term to Remit the Tax and the Declarations to the Company**

    A.    Term - Every Hotelier that, in accordance with Section 27 of this Act, is obligated to collect and withhold the Tax shall remit the total amount of Tax collected during the period between the first and last day of each month to the Company every month. This remittance shall be made no later than the tenth (10th) day of the month following the collection of such Tax.

    B.    Declaration - Every Hotelier shall be required to declare its revenues with respect to the Room Occupancy Rate using the Declaration provided by the Company for this purpose. The revenues with respect to Room Occupancy Rate shall be declared on a monthly basis on or before the tenth (10th) day of the month following the collection of such Tax. The Declaration shall accompany the monthly amount referred to in the previous Section.

    C.    Receipt - A Hotelier that makes a payment to the Company for Tax, or any penalties, fines, surcharges, or interests, shall have the right to petition the Company for a formal, written, or printed receipt for the amount corresponding to the payment.

**Section 29.-Manner in Which to Make a Payment of the Tax**

    A.    The Tax established by this Act shall be paid by means of postal or bank money order, check, cashier's check, cash, electronic transfer, or any other form of payment that the Company authorizes.

    B.    The Company, through regulation, shall establish the place and procedures applicable to the payment.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**Section 30.-Responsibility of the Hotelier**

If the Hotelier, in violation of the provisions of this Act, fails to make the required withholding, the Company shall have the power to charge the Hotelier the amount that should have been collected and withheld by it, as calculated through the mechanisms provided in this Act.

**Section 31.-Disposition of Funds**

For the 2003-2004 fiscal year and subsequent fiscal years, the Company shall distribute all funds collected from the Tax imposed under Section 24 of this Act, as follows:

A.    Before the beginning of each fiscal year, the Bank shall determine and certify to the Company and to the Authority, the amount necessary for the Authority to make, during such fiscal year and the first day of the following fiscal year: (i) full and timely payment, or the amortization of the principal and interest on the obligations incurred by the Authority with the Bank or the bonds, notes or other obligations issued, assumed or incurred by the Authority, pursuant to Act No. 142 of October 4, 2001, as amended, with the prior written authorization of the Company, to exclusively carry out the development and construction of a new convention center and its related infrastructure; (ii) full and timely payment of the obligations of the Authority under any Bond Related Financing Agreement, as this term is defined at the end of this subsection (A), entered into by the Authority with the prior written authorization of the Company; (iii) the deposits required to replenish any reserves established to ensure the payment of the principal and the interest on such bonds, notes and other obligations issued, assumed or incurred by the Authority, or obligations under any Bond Related Financing Agreement; and (iv) any other expenses incurred in connection with the issuance of such bonds, notes or other obligations assumed or incurred by the Authority, or with any other Bond Related Financing Agreement. The prior written approval of the Company shall specifically authorize the amortization schedule of the principal of the bonds, notes or other obligations to be issued, assumed or incurred by the Authority and the final terms and conditions of any Bond Related Financing Agreement to be entered into by the Authority. The sum determined and certified by the Bank, as indicated above, shall be deposited in a special account to be maintained by the Bank in the name of the Authority for the benefit of the bondholders, noteholders or the holders of other obligations of the Authority or for the benefit of the other contracting parties under any Bond Related Financing Agreement. The Bank shall transfer the amounts deposited in such special account to the trustees of the bondholders, noteholders or the holders of other obligations of the Authority or to the other contracting parties under any Bond Related Financing Agreement, in accordance with the written instructions provided to the Bank by the Authority.

Each fiscal year, the Company shall transfer to the Bank, for deposit in such special account, the sum established in the immediately preceding paragraph through monthly transfers, commencing on the month immediately succeeding the month in which this Act is enacted and on the first month of every succeeding fiscal year, of an amount equal to one tenth (1/10) of the amount determined and certified by the Bank as necessary for the payments to which the first part of this subsection refers; provided, however, that for the fiscal year in which this Act is enacted, the amount of each monthly transfer shall be a fraction, determined by dividing the number one (1) by the number of months remaining in such fiscal year after the month in which this Act is enacted, of the amount determined and certified by the bank as necessary for the payments to which the immediately preceding paragraph refers. Provided, further, that if in any given month of the fiscal year, the funds collected by reason of such Tax are not sufficient to comply with the monthly transfers provided herein, the Company shall

A-12

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

correct such a deficiency by transferring to the Bank, for deposit in such special account, the amount of such deficiency using to cover such deficiency, the excess of the Tax collected in subsequent months over the amount to be deposited monthly in such subsequent months in accordance with the first sentence of this paragraph. Each month, after making the transfer of monies to the Bank as provided in this subsection, the Company shall distribute any remaining amount as established in subsection (B) of this Section.

The Authority is hereby authorized, with the prior written consent of the Company, to pledge or otherwise encumber the revenues product of the fixed Tax collected which is to be deposited in a special account as required by the first paragraph of subsection (A) of this Section, as security for the payment of the principal and interest on the bonds, notes or other obligations issued, assumed or incurred by the Authority, as described in the first paragraph of subsection (A), or for the payment of its obligations under any Bond Related Financing Agreement, as described in said paragraph. Such a pledge or obligation shall be subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico. The product of the collection of the Tax shall be used solely for the payment of the interest and the amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, but only to the degree to which the other available resources to which reference is made in said Section are insufficient for such purposes. Otherwise, the product of said collection, in the amount necessary, shall be used solely for the payment of the principal and interest on the bonds, notes or other obligations and the obligations under any Bond Related Financing Agreement contemplated herein, and to comply with any stipulations agreed to with the bondholders, noteholders or holders of other obligations or the providers under Bond Related Financing Agreements.

In case the total product of the Tax presently assigned or to be assigned in the future to the Authority, in accordance with this subsection (A), is used to service payments of the public debt and applied to cover the deficiencies in the amounts needed to make such payments, the amounts of this Tax used to cover said deficiency shall be reimbursed to the Authority out of the first revenues received in the next fiscal year or subsequent fiscal years by the Commonwealth of Puerto Rico proceeding from any remaining portion of the Tax then in effect, subject to the provisions of Section 8 of Article VI, of the Constitution of the Commonwealth of Puerto Rico.

The Commonwealth of Puerto Rico hereby agrees and makes a commitment with any person, firm or corporation or with any agency of the United States of America or of any state or the Government of the Commonwealth of Puerto Rico, who subscribes or acquires bonds, notes or other obligations, or enters into Bond Related Financing Agreements for the payment of which the product of the Tax is pledged, as authorized by this Section, that it will: (i) not reduce such Tax and not decrease its rates, as fixed in Section 24 in effect as of the date of approval of this Act, (ii) not eliminate or reduce the Tax to an amount lower than that established in Section 24, or eliminate or reduce the rates of the Tax fixed in Section 24, (iii) make sure that the amounts that must be deposited in the special account as provided in this subsection (A), are deposited in such special account as provided in this Section, and (iv) not alter or limit the rights acquired hereby by the Authority to encumber or pledge the collections from the Tax required to be deposited in the special account according to the first paragraph of this subsection (A) and comply with the terms of any agreement entered into with, or for the benefit of, the bondholders, noteholders or holders of other obligations of the Authority or the

A-13

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

other subscribing parties under any Bond Related Financing Agreement, until such time as such bonds, notes or other obligations issued, assumed or incurred at any time, including the interest thereon and any obligation under any Bond Related Financing Agreement, have been paid in full. The Authority, as an agent of the Commonwealth of Puerto Rico, is hereby authorized to include the commitment and agreement with the Commonwealth of Puerto Rico, as set forth in this paragraph, in any contract with the bondholders, noteholders or the holders of other obligations of the Authority or any subscriber of a Bond Related Financing Agreement. For purposes of this subsection (A), a "Bond Related Financing Agreement" means any interest rate exchange agreement or similar agreement, any bond insurance policy, letter of credit or other credit enhancement, liquidity agreement or similar agreements, arrangements or contracts.

B.    The Company shall make monthly distributions of the excess over the amounts needed for each monthly transfer to the Bank as provided in subsection (A), of the Tax fixed in Section 24 of this Act, that is collected each fiscal year, in accordance with the following order of priority:

i.    Two (2) percent of the total Tax collected shall enter monthly into the general funds of the Company to cover expenses related to the operation, management and distribution of the Tax collected, or for any other use as determined by the Company.

ii.    Five (5) percent of the total Tax collected shall enter monthly into the General Fund of the Department of the Treasury. As of the year in which the Authority certifies to the Department of the Treasury and to the Company, the commencement of the operation of the Convention Center, and during the ten (10) subsequent years, this five percent (5%) shall be available to cover any deficit, if any, arising exclusively from the operations of the Convention Center in excess of the reserves of two million five hundred thousand (2,500,000) dollars to be maintained by the Company, as provided in paragraph (iv) of this subsection. Provided, however, that for each fiscal year and/or each time the Convention Center intent to propose a budget which exceeds the deficit of two million five hundred thousand (2,500,000) dollars, the budget of the Convention Center shall be presented jointly to the Board of Directors of the Authority, to the Board of Directors of the Company and to the Secretary of the Treasury or his delegate at a meeting held specifically for such a purpose. This five (5) percent shall be available during each fiscal year in a special reserve account maintained by the Company to cover any deficit in excess of the two million five hundred thousand (2,500,000) dollars, arising exclusively from the operation of the Convention Center. For each fiscal year, any surplus after covering such operational deficit, if any, shall be released from the special reserve and shall be available for use by the Department of the Treasury.

iii.    Nine (9) percent of the total Tax collected shall be covered monthly into the general funds of the Company to cover the expenses of the Convention Center Bureau. Provided, however, that after the fiscal year 2003-2004, the amount of the collections on account of the Tax to be remitted by the Company under this subsection shall not be less than four million five hundred thousand (4,500,000) dollars annually. The Company shall transfer to the Convention Center Bureau the corresponding amount in monthly installments of three hundred seventy-five thousand (375,000) dollars.  In case the amount deposited for any month is less than three hundred seventy-five thousand (375,000) dollars, the Company shall

A-14

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

correct such deficiency by depositing the funds that become available in subsequent months of the same fiscal year.

iv. Up to two million five hundred thousand (2,500,000) dollars shall be kept available during each fiscal year, in a special reserve account maintained by the Company, to cover any deficit arising exclusively from the operations of the Puerto Rico Convention Center. Provided, however, that for each fiscal year and/or each time that a modified budget is to be presented, the budget of the Convention Center shall be presented jointly to the Board of Directors of the Authority and to the Board of Directors of the Puerto Rico Tourism Company, at a meeting held specifically for such a purpose. For each fiscal year, any surplus after covering such operational deficit, if any, shall be released from the special reserve and shall be available for use by the Company. The Company shall maintain this amount in said reserve in monthly amounts of two hundred eight thousand three hundred thirty-three dollars and thirty-three cents ($208,333.33). This amount shall be reserved as of the year in which the Authority certifies in writing to the Company that the Convention Center has commenced operations, and for a period often (10) years.

In case the operational deficit of the Convention Center exceeds the amount of two million five hundred thousand (2,500,000) dollars to be reserved by the Company for such a purpose, said deficit shall be corrected through the five (5) percent given to the Department of the Treasury, as provided in paragraph (ii) of this subsection. Provided, however, that upon detection of any deficit arising exclusively from the operations of the Convention Center, and before utilizing the mechanism set forth in paragraphs (ii) and (iv) of Section 31, the Authority shall first utilize any excess in possession of the Authority and any surplus that on account of previous collections of the Tax, the Company shall transfer to the Authority, at the time of approval of this Act. The Authority, when requiring that the Company and/or the Department of the Treasury cover the deficit arising exclusively from the operations of the Convention Center, as provided in paragraph (ii) of this subsection, shall present clear justification of the causes and the reasons for this insufficiency, including, but not limited to, showing that any surplus of funds of the Authority were utilized, as provided in Section 4.01(6) of Act No. 351 of September 2, 2000, as amended, also known as the "Puerto Rico Convention Center District Act." The justification shall be presented and carefully examined by both Boards of Directors at a meeting specifically held for such a purpose.

v. The remainder available after the payments provided in subsections (B)(i), (B)(ii) and (B)(iv), will be assigned to the Company. The funds appropriated to the Company shall be used by the latter for promoting, marketing, developing and strengthening the tourism industry in Puerto Rico.

The Company shall submit to the Authority and to the Convention Center Bureau a monthly statement itemizing the collection on account of the Tax.

### Section 32.-Assessment Procedure

A. The Company shall have the power to initiate a proceeding to determine the Debt or Deficiency of a Taxpayer on account of the Tax or of any surcharges, administrative fees and penalties, and which should be paid to the Company.

A-15

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

    B.      The Assessment may be initiated by the Company, among other instances, when a Taxpayer has failed to make any monthly payment on account of the Tax, or to comply with its obligation to present the Declaration required by law, when there is a Deficiency in the payment made or when there is a Deficiency attributable to a Mathematical or Clerical Error of the Taxpayer.

    C.      The Company may conduct the Assessment by calculating the greater amount of the Average Rate, the Room Cost or the cost of such services on the basis the industry practice and multiplying it by the percentage of the Tax applicable to a Lodging and the occupancy period.

    D.      The Company shall notify the Taxpayer if, due to a Mathematical or Clerical Error evident from the face of the Declaration, it owes a Tax in excess of what is disclosed in such Declaration. Any notification under this Section shall specify the nature of the alleged error and the reasons for it.

    E.      A Taxpayer will not have a right to appear before the Company for a notification based on a Mathematical or Clerical Error.

### Section 33.-Notification

    A.      In the case that any Taxpayer has incurred a Debt or Deficiency with respect to the Tax imposed by this Act, the Company shall notify the Taxpayer of such Deficiency by certified mail with return receipt requested.

    B.      The Notification with respect to a Tax will be sufficient for purposes of this Act if mailed by certified mail with return receipt requested to the Taxpayer to its last known address, even when such Taxpayer had died or is legally handicapped, or in the case of a corporation or a partnership, even when they no longer have legal existence.

    C.      The Company shall have the right to make an Entry to commence a Distraint Procedure, and/or to present an action against the bond or surety given by the Taxpayer, if the Deficiency is not paid by the Taxpayer within the term allowed for in the notification to make the payment or appear before the Company.

    D.      If once the Company has commenced an action against the bond or surety, a portion of the Debt or Deficiency not covered by the bond or surety remains outstanding, any uncovered portion shall be paid by the Taxpayer upon request by the Company. The Taxpayer shall, in addition, pay the interest associated with such Deficiency, computed at ten percent annually from the date of the Entry to the date of total payment.

### Section 34.-Taxpayer's Rights Upon Notifications

    A.      Any Taxpayer who disagrees, in whole or in part, with the notified Deficiency, with the exception of those Taxpayers who are notified of a Deficiency based on a Mathematical or Clerical Error, may request an administrative hearing in accordance with the adjudicative procedures established by the Company through regulation approved to such effect. Provided, however, that the Taxpayer shall pay the portion of the Deficiency with which it agrees.

    B.      Any Taxpayer who disagrees with the Order or final Resolution of the Agency, may request review of the same, pursuant to the provisions of Act No. 170 of August 12, 1998, as amended, known as the "Uniform Administrative Procedure Act," and Act No. 1 of July 28, 1994, as amended, known as the "Puerto Rico Judiciary Act."

    C.      The Company shall not make an Entry, nor commence or conduct a Distraint Procedure, nor present an action against the bond or surety provided by the Taxpayer until the expiration of the term provided to the Taxpayer to appear before the Company or, if the Taxpayer appeared before the Company, until a Resolution or Order issued by the Company or by any court with jurisdiction becomes final.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**Section 35.-Jurisdiction and Powers of an Examining Official and the General Court of Justice**

The Examining Official or the General Court of Justice shall have the power to redetermine the correct amount of a Debt or Deficiency, even if the amount so determined is higher than the original amount of the Deficiency notified by the Company, and to determine the payment of any corresponding additional amount such as interests, as long as the Company establishes a claim to such effect at any time before the issuance of a Resolution or Order.

When considering a Debt or Deficiency with respect to any taxable year, the Examining Official or the General Court of Justice may consider such facts related to the Tax for other taxable years as may be necessary to correctly determine the amount of such Debt or Deficiency. However, in doing so, they shall not have the power to determine if a Tax for any other taxable year has been overpaid or underpaid.

**Section 36.-Entry, Administrative Collection, or Bond or Surety by reason of Tax in Jeopardy**

A. If the Company believes that the collection of a Debt or Deficiency is in jeopardy, the Company may, without prior notice to the Taxpayer, proceed immediately with the Entry, commence a Distraint Procedure, or present an action against the bond or surety provided by the Taxpayer, notwithstanding the provisions of Section 32 of this Act.

B. If the Company shall take action under subsection (A) of this Section, without prior notice to the Taxpayer, the Company shall, within the twenty (20) days following the date of such action, notify the Taxpayer of the Debt or Deficiency in accordance with, and subject to, the provisions of Section 33 of this Act.

C. If once the Company has commenced an action against the bond or surety, a portion of the Debt or Deficiency not covered by the bond or surety remains outstanding, any uncovered portion shall be paid by the Taxpayer upon request by the Company. The Taxpayer shall, in addition, pay the interests related to such Deficiency, computed at ten percent annually from the date of the Entry to the date of its payment in fill.

D. If under subsection (A) of this Section, the Company notified a Taxpayer after taking action in accordance with subsection (A) of this Section, the rights of the Taxpayer, as set forth in Section 33 of this Act, shall not be affected.

**Section 37.-Bankruptcy and Receivership**

A. Immediate Assessment - The adjudication in favor of a Taxpayer in a bankruptcy proceeding or the appointment of a trustee in a judicial proceeding, requires that any Deficiency in the determination of the Tax (and any related amount) determined by the Company for such Taxpayer be assessed immediately, notwithstanding the provisions of Sections 32 and 33 of this Act. In such cases, the trustee shall notify the Company in writing of the adjudication of the bankruptcy or the receivership. The term to conduct the assessment shall be suspended for the period commencing with the adjudication of the Bankruptcy, or since the beginning of the receivership, and extending for thirty (30) days following the date in which the trustee's notification was received by the Company. Claims for Deficiencies in the determination of the Tax (and any related amounts) may be presented, before the court in which the bankruptcy or receivership is being heard.

B. Unpaid Claims - Any portion of a claim allowed in a bankruptcy proceeding or receivership that is not paid, shall be paid by the Taxpayer, upon notification and request by the Company, after the determination of such proceeding, and may be collected by means of a Distraint Procedure within a period of ten (10) years after the termination of the bankruptcy proceeding or receivership.

**Section 38.-Statute of Limitations for Assessment**

Considering that the Hotelier becomes a collection agent for the Commonwealth of Puerto Rico, the Company shall not be subject to any statute of limitations to conduct an Assessment of a particular Debt or Deficiency.

A-17

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**Section 39.-Statute of Limitations for Collection**

    A.    If the Company shall have conducted an Assessment which reflects that a Taxpayer has a Deficiency or Debt, the Tax may be collected through a Distraint Procedure, provided that it is commenced: (a) within a period of ten (10) years following the date of the Assessment; or (b) before the expiration of any period, in excess of the ten (10) year period agreed in writing by the Company and the Taxpayers. The period agreed on in the manner described above may be extended by subsequent written agreements entered into before the expiration of the period previously agreed on.

    B.    Notwithstanding the provisions of Act No. 230 of July 23, 1974, as amended, also known as the "Commonwealth of Puerto Rico Accounting Act," the Company shall proceed to eliminate Taxpayers' records and shall be prescribed from collecting the debts imposed by this Act or prior Acts when ten (10) years have passed since the date of the Assessment or since the expiration of any period agreed on between the Company and the Taxpayer. Provided, that, any interruption of such period shall be taken into consideration, for purposes of the determination of the statute of limitations.

**Section 40.-Tolling the Statute of Limitations**

    The statute of limitations provided by Section 39 of this Act shall be interrupted with respect to any Debt or Deficiency, for the period during which the Company is impeded from commencing a Distraint Procedure and, in every case, if they appeal to any of the Courts of Puerto Rico, until the court's decision is final and firm and for the subsequent sixty (60) days.

**Section 41.**     **Credits for Tax Paid in Excess**

    A.    Credits - Every Taxpayer who believes he/she has wrongly paid or been charged a Debt or Deficiency with respect to the Tax, shall be able to request in writing to the Company that the payment paid in excess be credited to the future amounts to be paid with respect to the Tax. In relation to any payment in excess of that owed, the Company shall certify the excess to the Taxpayer as a credit for the following month's payment.

    B.    The Taxpayer shall request such credit within the term and in accordance with the procedures established by the Company through regulation approved to such effect.

    C.    The Company may, on its own initiative, determine that the Taxpayer has made an excess payment with respect to the Tax, and concede them a credit of any amount that in its judgment was paid wrongly or in excess of the amount owed. In relation to any payment in excess of that owed, the Company shall certify the excess to the Taxpayer as a credit for the next month's payment.

    D.    When the Company approves an application for credit, or when the Company itself determines that the Taxpayer has made a payment in excess of that owed, it shall investigate if the Taxpayer has any enforceable Debt or Deficiency pursuant to this Act, in which case the Company shall credit to such debt the amount that, as a credit, would have corresponded to the Taxpayer with respect to payments in excess of that owed.

    E.    If a claim for credit filed by a Taxpayer were denied in whole or in part by the Company, the Company shall notify the Taxpayer of its decision by certified mail with return receipt requested. The Taxpayer may appeal such denial following the adjudicative procedure that may be approved by the Company.

    F.    When the Company adjudicates or grants credits that do not correspond, the Company may reconsider the case and reinstate the Tax rejecting the credit and notifying the Taxpayer of a Debt or Deficiency in the form and pursuant to the procedure established in Section 32 of this Act.

    G.    The Company may adopt those regulations it deems necessary and convenient to comply with the procedures provided in this Section.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**Section 42.-Statute of Limitations**

A Taxpayer shall not have the right to apply nor obtain a credit unless the Taxpayer files an application for credit with the Company within the term of four (4) years from the date on which the Taxpayer presents a Declaration along with the corresponding payment or within the term of three (3) years from the date on which the Tax was paid, if a Declaration was not filed. In case the Taxpayer presents a Declaration prior to making the corresponding payment, said term of three (3) years shall begin on the date on which the payment was made.

**Section 43.-Payment in Excess Determined by an Examining Official or a Court with Jurisdiction**

If an Examining Official or a Court with jurisdiction were to determine that no Debt or Deficiency existed in the payment made by the Taxpayer; that a Taxpayer has made a payment in excess of the Tax corresponding to the taxable year in which the Company determined the Deficiency and/or that a Deficiency exists but the Taxpayer made a payment in excess of the Tax corresponding to the taxable year, the Examining Official or the Court shall have the power to determine the sum of the excess payment, which should be credited to the Taxpayer when the Court's decision becomes final and firm. The credit will be denied unless the Examining Official or the Court with Jurisdiction expressly determines in their decision that the Taxpayer filed an application for credit before the Puerto Rico Tourism Company:

1. within the term of four (4) years from the date in which the Taxpayer presented a Declaration along with the corresponding payment; or
2. within the term of three (3) years from the date in which the Tax was paid, if a Declaration was not filed; (or)
3. in case the Taxpayer presents a Declaration prior to making a corresponding payment, said term of three (3) years shall begin on the date on which payment was made.

**Section 44.-Statute of Limitations for Requesting Credits on the Taxes Paid for Exempt Room Occupancy Rates**

Any Taxpayer interested in receiving a credit for a Tax paid under any room occupancy rate exemption authorized by the provisions of this Act, shall submit a petition of credit supplemented by the appropriate documents within one hundred eighty (180) days following the date the Taxpayer paid the Tax.

**Section 45.-Penalties in general**

Any person obligated under this Act to retain and pay the Tax, submit a Declaration, preserve any evidence or document, or supply any information for the purpose of calculation, assessment or collection of any Tax, and voluntarily or involuntarily fails to comply with said obligation shall be subject to the penalties, charges, or fines as indicated in Sections 46, 47,48, and 49 of this Act.

**Section 46.-Additional Charges**

A. Interest - When the Taxpayer does not pay the Tax levied by this Act, on or before the due date for payment, the Company as part of the Tax, shall collect an interest on the unpaid amount, at a ten (10) percent annual rate, from the due date of the payment until the date of the final payment.

B. Charges - In every case where the imposition of interest applies pursuant to the preceding subsection A, the Company may additionally collect the following charges:

i. For a payment delay of thirty (30) days or less, the Taxpayer may be imposed a charge equivalent to five (5) percent of the principal;
ii. For a payment delay in excess of thirty (30) days, the Taxpayer may be levy a charge equivalent to ten (10) percent of the principal in addition to the allowed five (5) percent of subsection B(i).

A-19

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**Section 47.-Failure to submit the Declaration**

If any person fails to submit the Declaration required by this Act during the prescribed term, an additional fine in the amount of five hundred (500) dollars, for each infraction may be imposed on the Taxpayer, which shall be paid as part of the Tax, in addition to any other penalties, charges or interests that are levied pursuant to this Act. It shall be understood that every day the infraction endures shall be considered a separate violation up to a maximum of twenty five thousand (25,000) dollars.

**Section 48.-Administrative Fine for Submittal of False Documents**

Any Taxpayer who submits to the Company documents, which are not authentic or where the amounts represented are incorrect or false in relation with the received Room Occupancy Rate, may be subject to an administrative fine in the amount of five hundred (500) dollars for each infraction, in addition to the Tax and applicable charges and interest. Also, the Company may suspend or revoke the promotional and tax benefits granted by the Company. It shall be understood that every day the infraction endures shall be considered a separate violation up to a maximum of twenty five thousand (25,000) dollars.

In any situation where a Taxpayer demonstrates contempt in the performance or continuing performance of acts for which an administrative fine was imposed or contempt in the noncompliance with any order or resolution issued by the Company, at its discretion, may levy an administrative fine up to a maximum of one thousand (1,000) dollars for each infraction. Also, the Company may suspend or revoke the promotional and tax benefits granted by the Company. It shall be understood that every day that the infraction endures shall be considered a separate violation up to a maximum of fifty thousand (50,000) dollars.

**Section 49.-Administrative Fine for Submittal of False Documents**

A.  When a Taxpayer does not comply with its obligation to pay the Tax, any Debt, Deficiency or any interest, fine, charge or penalty levied by the Company, during three or more times (not necessarily consecutive) during the same fiscal year, the Company may suspend and/or revoke the Taxpayer's benefits granted under Act No. 78 of September 10, 1993, as amended.  It may also suspend or revoke any other tax and/or promotional benefit granted by the Company.

B.  Those Taxpayers to whom subsection A of this Section is applicable shall be granted and guaranteed due process pursuant to the provisions of this Act.

C.  Once the Debt has been satisfied, the Taxpayer to whom the tax benefits were revoked may initiate the process indicated in Act No. 78 of September 10, 1993, as amended, to request and enjoy tax benefits. The request will be processed pursuant to the procedures established by Act No. 78, *supra*, for the processing of new petitions. The Company shall have full discretion in the evaluation of said petition.

D.  When the tax benefits have been suspended for lack of payment of the Tax, the ten (10) year term renewable for an additional ten (10) year term provided by Act No. 78 of September 10, 1993, as amended, shall be understood to continue during the suspension term. The Company shall establish by regulation approved to such effect, the provisions that regulate the revocation or suspension of the tax benefits.

**Section 50.-Penalties typified as crime**

In relation with any activity in the exercise of this Act that involves any activity typified by the Commonwealth of Puerto Rico Penal Code including, without limitation, crimes against public service, public revenue and public faith, it shall be the Company's responsibility to refer said activity to the Secretary of the Department of Justice so he/she may conduct, in the name of the Commonwealth of Puerto Rico, the criminal proceedings that may be necessary to punish the committed acts.

A-20

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**Section 51.-Payment Commitment**

(a)    The Director is empowered to formalize with the Taxpayer a written payment agreement whereby the he/she (sic) can commit to waive any Tax due including, without limitation, civil or criminal penalties, interests, fines, or charges applicable to a specific situation pursuant to any Tax prior to its referral to the Department of Justice for the formulation of charges.

    1.    General Requirements — Any payment commitment pursuant to the provisions of this Section shall be authorized by the Director, or his/her authorized representative, who shall justify the reasons for the concession of the payment commitment and shall provide the following information:

        (a)    amount of Tax due;

        (b)    amount of interest, charges, fines, or additional penalties pursuant to the Tax due;

        (c)    amount to be actually paid, pursuant to terms of the payment commitment;

        (d)    financial analysis of the Taxpayer's situation that demonstrates that the Taxpayer has the payment capacity with respect to the present payment that shall be paid pursuant to the payment commitment; and

        (e)    any other document or evidence that shall be required by the Director, pursuant to any rule or regulation approved by him/her.

    2.    In the absence of Resources - If the Taxpayer does not posses and/or presents sufficient resources for the payment of the Tax and the applicable fines, charges, interests or penalties, the Director, or his/her authorized representative, shall evaluate and determine if the payment commitment is an appropriate method for the Debt or Deficiency collection, in the absence of resources to guarantee its collection.

**Section 52.-Confidentiality of the Declaration and other documents**

    A.    The Declaration submitted pursuant to the provisions of this Act is a public document. Notwithstanding, and except as provided in this Section, it may only be inspected by a third party pursuant to the rules and regulations adopted by the Company. The Company may require that, as a minimum inspection requirement, the petitioner be an interested party.

    B.    No Company official or employee shall divulge or provide under any circumstance, except as stated in this Act, the information provided by the Declaration, books, records, or other documents submitted by the Taxpayer, nor shall it permit the examination or inspection of them by a person that is not legally authorized.

**Section 53.-Requirement to preserve and provide documents**

    A.    The Company shall establish, by means of regulation, the norms for the conservation by the Hotelier of reports, dockets, records, declarations, statistics or any other document related to the Tax.

    B.    Any report, docket, record, declaration, statistic or any other document related to the Tax fixed pursuant to this Act or to the Room Occupancy Rate shall be preserved by the Hotelier for a term not less than ten (10) years beginning from the date of the Tax Assessment.

    C.    When such documents are being reviewed, audited, intervened with or examined by the Company at the time the ten (10) year period expires, the Taxpayer shall assure its preservation for the additional time necessary for the Company to finalize the review, audit, examination or intervention.

**Section 54.-Tax Collection**

    Within a term that shall not exceed the date of performance of the transfer provided in this Act, the Secretary of the Treasury shall review the registries at the Department of the Treasury, with regard to the Lodgings subject to the Tax, and shall apply or credit the deposits pending registration. Similarly, the Secretary of the Treasury shall adjust said registries in relation to any error detected during the process or

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

transaction related to the Tax collection that has not been accounted for. Once this has been accomplished, the Secretary of the Treasury shall transfer to the Company the Lodging registry related to the Tax, the registry of all account receivables and the complete files of all pending transactions, which, once they are processed, could change the accounts receivable. The Company shall carry out all acts necessary to conclude the collection process of the transactions pending payment.

### Section 55.-Transfer

Pursuant to this Act, all the powers, duties and obligations vested on the Department of the Treasury by law or regulation, in relation with the responsibility to impose, fix, sanction, determine, assess, collect, enforce, distribute, regulate and investigate the Tax shall be transferred to the Company.

Similarly, the Department of the Treasury shall transfer to the Company all programs, funds, files, archives and any others, related to the duties of assessing, determining, imposing, levying, collecting, investigating, enforcing and distributing the Tax that are necessary to achieve the purposes of this Act.

### Section 56.-Administrative Determinations, Final Agreements, and Agreements currently in effect pursuant to the Internal Revenue Code

No provision in this Act shall be interpreted as altering, modifying or invalidating any agreement, claim or contract granted by the Department of the Treasury under the Internal Revenue Code, in relation to any tax event occurring prior to this Act's effective date.

### Section 57.-Administrative Determinations effective under the Internal Revenue Code

The administrative determinations issued by the Secretary of the Treasury prior to the effectiveness of this Act related to the Tax shall not be applicable to future tax events that occur after this Act's effective date. Notwithstanding the above, the administrative determinations issued by the Secretary of the Treasury prior to this Act's effective date, and in relation with tax events that occurred prior to this Act's effective date, shall be final and firm even for periods, if any, after this new Act becomes effective.

### Section 58.-Final Agreements entered into under the Internal Revenue Code

The final agreements entered into by and between a Taxpayer and the Secretary of the Treasury prior to the effectiveness of this Act, and under the provisions of the Internal Revenue Code, shall not apply to future tax events occurring after this Act's effective date. Notwithstanding the above, the final agreements entered into by the Secretary of the Treasury prior to the effective date of this Act, and with regard to taxable events that occurred prior to this Act's effective date, shall be final and binding, even if they cover periods, if any, after this new Act becomes effective.

### Section 59.-Actions pending final resolution

Any action, proceeding, litigation or claim related to the imposition, assessment, levying, collection, enforcement, regulation, investigation, sanction, and distribution of the Tax pending before the Department of the Treasury or any court on this Act's effective date, shall continue to be processed by the Department of the Treasury until its final and firm determination under the applicable laws and regulations effective when said procedures, actions, litigations or claims were filed.

### Section 60.-Interpretations of Law

A.   The Company may issue administrative determinations to clarify and interpret provisions of this Act and the regulations approved pursuant there to (sic), in accordance with its purposes and objectives established herein and with the public policy of the Commonwealth of Puerto Rico.

B.   No provision in this Act shall be interpreted as a restriction or limitation to the general or inherent powers of the Company.

A-22

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**Section 61.-Personnel in charge of Compliance with this Act**
The Company, its officials, and employees shall be attentive to the compliance of the provisions of this Act.

**Section 62.-**By this Act, Section 2051 of Act No. 120 of October 31, 1994, as amended, is hereby eliminated.

**Section 63.-**Paragraph (6) is hereby eliminated and paragraphs (7), (8), (9), and (11) are respectively renumbered to (6), (7), (8), and (9) of Section 2084 of Act No. 120 of October 31, 1994, as amended.

**Section 64.-**Subsection (b) of Section 8 of Act No. 78 of September 10, 1993, as amended, is hereby amended to read as follows:

"Section 8.- Denial, revocation and limitation of benefits pursuant to this Act
(a)...
(b)   Basis and Procedures for Revocation.- The Director may impose fines, suspend and/or revoke the tax benefits granted… The amounts to be paid in those cases in which a fine is imposed in lieu of a suspension or revocation … The Director may determine that the suspension, revocation and/or fine in question shall be effective from the date the exempted business is found guilty of the violation upon which the determination is based, in the following cases:
(1)...
(5)   When the exempt business has failed to comply with the Tax payment related to the Room Occupancy Rate as provided by the 'Commonwealth of Puerto Rico Room Occupancy Rate Tax Act,' in three or more occurrences (not necessarily consecutive) during a fiscal year, in compliance the provisions of said Act."

**Section 65.-**Subsections (b) and (c) of Section 9 of Act No. 78 of September 10, 1993, as amended, are hereby amended to read as follows:

"Section 9.- Administration; Granting of benefits; penalties
(a)       …
(b)   During the effectiveness of this Act, all other fiscal laws, including, but without being limited to, the Puerto Rico Industrial Incentive Acts, Puerto Rico Tourist Incentive Act of 1983, Excise Tax Act of Puerto Rico, Income Tax Act, Puerto Rico Internal Revenue Code of 1994, as amended, Municipal License Act, and the laws regarding taxes on real and personal property, shall continue in effect with regard to exempted businesses (except when it is manifestly incompatible with this Act), including, but without being limited to, the obligation to file returns, submit reports, pay taxes, pay the Tax on the Room Occupancy Rate and the procedures related to assessment, levying and collection of levies and taxes.
        …
(c)   Any person, who has established or intends to establish an eligible business in Puerto Rico, may request the Director for a concession hereunder through the due filing of a petition. The approval of a concession under this chapter shall be conditioned to the presentation to the Director, by the eligible business of negative-debt certificates from the Departments of the Treasury and of Labor and Human Resources, the State Insurance Fund and the Municipal Revenues Collection Center (Spanish Acronym: C.R.I.M.). In addition, the petitioner shall prove that it has no balance due in relation to the Tax on the Room Occupancy Rate. The eligible business shall submit to the Director any additional document and/or permit that the Director may require by regulations. The exempted

A-23

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

businesses described in Section 6(a) of this Act, shall also file the accrediting certificate mentioned in Section 6(a)(3) of this Act.
…"

**Section 66.-**Subsection (b) of Section 3 of Act No. 221 of May 15, 1948, as amended, is hereby amended to read as follows:

"Section 3.- Games of chance in licensed gambling rooms, authorized
Qualifications for licenses
    (a)   …
    (b)   It is hereby provided that the slot machines authorized in Section 2 of this Act shall be located and operated by the Tourism Company or by a holder of a game of chance license authorized by law to operate in Puerto Rico. The holder of a games of chance license under this Section may install and operate, or allow the Tourism Company to operate machines in their gambling halls, in exchange for a share of the profits of the operator, as provided in Section 5 of this Act, and subject to the payment of the license fees established in Section 7 of this Act. The share of the profits corresponding to the holder of a license to operate a gambling hall shall be sent by the Tourism Company to the Secretary of the Treasury during the term that may be necessary to pay off any tax debt already assessed and due for collection at the internal revenue offices, which the holder of a license to operate a gambling hall may have pending. In addition, the share of the profits from the slot machines corresponding to the holder of a license to operate a gambling hall may be withheld by the Company to pay any debt that the operator has accumulated, and pending payment, in regards to the Tax on the Room Occupancy Rates.
…"

**Section 67.-**Subsection (q) of Sections 5 of Act No. 10 of June 18, 1970, as amended, is hereby added to read as follows:

"Section 5.-Rights, powers and duties
    The Company shall have and exercise the rights, duties, and powers, which may be necessary or convenient to promote, develop, and improve the tourist industry, including, but without limiting, the following:
    (a)   …
    (q)   Impose, determine, fix, assess, collect, enforce, distribute, regulate, investigate, intervene, and sanction the Tax on the Room Occupancy Rate."

**Section 68.-Severability of provisions**

Should any paragraph, subsection, Section or part of this Act is found to be unconstitutional by a competent court, a judgment thus pronounced shall not affect, prejudice, nor invalidate the remainder of this Act. The effect of said judgment shall be limited to the paragraph, subsection, section or part thereof that was thus declared to be unconstitutional.

**Section 69.-Effectiveness**

This Act shall take effect one hundred and eighty (180) days after its approval, except for the provisions of Section 31, which shall become effective as of July 1, 2003.

A-24

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**APPENDIX B**

# PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY

## Hotel Occupancy Tax Projection



### FINAL REPORT

February 2006

STRATEGIC ADVISORY GROUP LLC

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

February 17, 2006

Mr. Manuel Sanchez Biscombe, Executive Director
Puerto Rico Convention Center District Authority
Antigua Base Naval
Edificio W-9, Isla Grande
San Juan, Puerto Rico 00907

Dear Mr. Sanchez:

We have completed our engagement to prepare a projection of the Hotel Occupancy Tax ("HOT") receipts over the next ten-year period.

The data included in this report has been extracted from information supplied to us during discussions with representatives of the Puerto Rico Convention Center District Authority ("Authority") and various other primary and secondary sources.  We have utilized sources that are deemed to be reliable but cannot guarantee their accuracy.  Moreover, estimates and analyses regarding the project are based on trends and assumptions and, therefore, there will usually be differences between the projected and actual results because events and circumstances frequently do not occur as expected, and those differences may be material.

*Strategic Advisory Group*

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY

Hotel Occupancy Tax Projection

# TABLE OF CONTENTS

TAX REVENUE PROJECTION ........................................................................................... 1

INTRODUCTION ............................................................................................................. 3

OVERVIEW OF THE U.S. ECONOMY AND U.S. HOTEL INDUSTRY ................................... 4

OVERVIEW OF THE PUERTO RICO MARKET ................................................................... 8

OCCUPANCY TAX PROJECTION ASSUMPTIONS ............................................................ 20

    DESCRIPTION OF OCCUPANCY TAX ........................................................................ 20

    SOURCE OF HISTORICAL OCCUPANCY TAX COLLECTION DATA .............................. 20

    COLLECTION POLICIES .......................................................................................... 20

    AUDIT PROCEDURES ............................................................................................. 21

    CASINO HOTELS .................................................................................................. 21

        AVERAGE NUMBER OF ROOMS ........................................................................ 22

        OCCUPANCY .................................................................................................. 22

        OCCUPIED ROOM NIGHTS .............................................................................. 23

        AVERAGE DAILY RATE ................................................................................... 24

        GROSS SALES ............................................................................................... 24

        ADJUSTMENT ................................................................................................ 24

        OTHER HOTELS ............................................................................................. 27

FACTORS IMPACTING THE PROJECTIONS ...................................................................... 27

APPENDIX I .............................................................................................................. 29

STRATEGIC ADVISORY GROUP LLC

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

# TAX REVENUE PROJECTION

## San Juan Convention Center District Authority
## Tax Revenue Projection
## Figure 1

| Fiscal Year | Casino Hotels | Growth Rate | Other Hotels* | Growth Rate | Total | Growth Rate |
|---|---|---|---|---|---|---|
| **Historical** | | | | | | |
| 1998 | $27,026,000 | | $11,356,000 | | $38,382,000 | |
| 1999 | $31,176,000 | 15.4% | $10,786,000 | -5.0% | $41,962,000 | 9.3% |
| 2000 | $30,512,000 | -2.1% | $10,960,000 | 1.6% | $41,472,000 | -1.2% |
| 2001 | $33,300,000 | 9.1% | $12,820,000 | 17.0% | $46,120,000 | 11.2% |
| 2002 | $27,296,000 | -18.0% | $11,066,000 | -13.7% | $38,362,000 | -16.8% |
| 2003 | $29,185,000 | 6.9% | $13,437,000 | 21.4% | $42,622,000 | 11.1% |
| 2004 | $32,075,000 | 9.9% | $16,609,000 | 23.6% | $48,684,000 | 14.2% |
| 2005 | $33,270,000 | 3.7% | $20,206,000 | 21.7% | $53,476,000 | 9.8% |
| | | | | | | |
| **Projected** | | | | | | |
| 2006 | $34,288,000 | 3.1% | $21,725,000 | 7.5% | $56,013,000 | 4.7% |
| 2007 | $35,853,000 | 4.6% | $23,086,000 | 6.3% | $58,939,000 | 5.2% |
| 2008 | $37,733,000 | 5.2% | $24,759,000 | 7.2% | $62,492,000 | 6.0% |
| 2009 | $38,913,000 | 3.1% | $26,126,000 | 5.5% | $65,039,000 | 4.1% |
| 2010 | $40,120,000 | 3.1% | $27,818,000 | 6.5% | $67,938,000 | 4.5% |
| 2011 | $41,582,000 | 3.6% | $29,192,000 | 4.9% | $70,774,000 | 4.2% |
| 2012 | $42,702,000 | 2.7% | $30,904,000 | 5.9% | $73,606,000 | 4.0% |
| 2013 | $43,630,000 | 2.2% | $32,630,000 | 5.6% | $76,260,000 | 3.6% |
| 2014 | $44,573,000 | 2.2% | $34,019,000 | 4.3% | $78,592,000 | 3.1% |
| 2015 | $45,555,000 | 2.2% | $35,408,000 | 4.1% | $80,963,000 | 3.0% |
| | | | | | | |
| **Compound Annual Growth Rate:** | | | | | | |
| 1998 - 2005 | | 3.0% | | 8.6% | | 4.9% |
| 2002 - 2005 | | 6.8% | | 22.2% | | 11.7% |
| 2005 - 2015 | | 3.2% | | 5.8% | | 4.2% |

\* Also includes Casino Hotels that do not report to Smith Travel Research.

Source: Puerto Rico Department of Treasury; Strategic Advisory Group.

Amounts are rounded.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.



This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

## INTRODUCTION

Puerto Rico is a diverse cultural, tourist and economic market in the Caribbean region. With Gross Domestic Product growth in excess of the mainland U.S., helped by its status as a U.S. Commonwealth and tax and incentive policies to promote growth, Puerto Rico has become a diversified economic force in the hemisphere. Tourism is one of those important economic drivers. As the island's tourism infrastructure has matured, so too has its ability to host larger and larger group meetings. With a population of about four million and over 13,000 hotel rooms, group meetings are still largely hotel-based.

Taking a step in expanding its large group meeting infrastructure, the government invested in the development of a world-class convention center that can host the vast majority of conventions and tradeshows in the world.



The convention center opened in November 2005 and offers 152,700 square feet of exhibit space, a 39,000 square foot ballroom and 32,750 square feet of meeting space. A new 500-room convention headquarter hotel is currently in the advanced stages of development and is planned to be completed in fiscal year 2009.

To finance the long term debt for the construction of the convention center and related assets, the Puerto Convention Center District Authority is issuing revenue bonds backed by island-wide hotel tax revenues. The Strategic Advisory Group of Atlanta, GA was engaged to project the relevant tax revenue streams to provide prospective bond purchasers the information they will need in their decision process.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

## OVERVIEW OF THE U.S. ECONOMY AND U.S. HOTEL INDUSTRY

The U.S. economy is a demand driver of travelers to Puerto Rico. As presented in graphs later in the report, 77% of visitors to Puerto Rico originate from the U.S. Generally, the health of the Puerto Rico economy and hotel market will follow the U.S. market. As such, the following discussion of the broader U.S. economy and hotel market is considered relevant to the tax projection.

The following 40-year graph depicting the growth rate of total U.S. Gross Domestic Product ("GDP") and projected GDP illustrates that the long-term historical compound annual growth rate ("CAGR") is 3.2%. The broad U.S. economy experiences cycles of expansion followed by short periods of contraction. The recessionary periods at the beginning of each of the last three decades were followed by six to eight years of economic growth. Note that the downturn in the economy in 2001 was not as severe as the recessions of the early 1980's and early 1990's. Note also that growth has been in the 2 to 4+ percent range since the depths in 2001 (the year of the September 11 terrorist attacks). The Congressional Budget Office projects the GDP growth rate to be 3.7% in 2005 and 3.4% from 2006 through 2008, declining gradually to 2.5% by 2015, equating to a CAGR of 2.9% over the next 10 years.

U.S. lodging demand is highly correlated to U.S. total GDP. Note the strong correlation in the following graph. As such, GDP strength would appear to be a good indicator of hotel demand strength. PricewaterhouseCoopers projects hotel occupied room night demand growth to be 3.0% and 2.9% in 2006 and 2007, respectively, which maintains the correlation with GDP.



Source: U.S. Dept. of Commerce, Bureau of Economic Analysis; Smith Travel Research, Pricewaterhouse Coopers.
Note: Based on calendar year data.

As the following graph illustrates, the U.S. hotel industry experienced its most profitable period in history in the years following the recession of the early 1990's. The graph also illustrates that profits began to diminish (although still strong) from 2001 to 2003, but rebounded in 2004 and 2005. PricewaterhouseCoopers is projecting hotel profits to continue to increase in 2006 and 2007.



Source: U.S. Department of Commerce, Bureau of Economic Analysis, Congressional Budget Office.
Note: Calendar year data..

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection



It is important to place perspective around how the events of September 11, 2001 have changed the world. That event marked the official beginning of the "War on Terror" that has changed the global society. From a hospitality perspective, the international fly-in market into the U.S. appears to have been more affected by the events of September 11 than by the then slowing economy. The U.S. Department of Commerce has concluded that there was a 13% loss in international arrivals into the U.S. in 2001. The weakening global economy contributed to the slide, but September 11 caused a monthly decrease of almost 30% in international arrivals. October 2001 appears to have been the worst month at a 34% decline. November 2001 was down 29% versus the previous year. The following graph of hotel occupied room night demand illustrates that the dip in demand growth was short-lived and reached -3.4% at its worst level. Demand rebounded along with the broader economy in the months that followed and is now at a growth rate level consistent with historical levels.

**U.S. Hotel Supply and Demand**

This section provides and analysis of the performance of all U.S. hotels based on data provided by Smith Travel Research ("STR"). STR is the leading provider of hotel industry data and is relied upon within the industry for thorough and objective data.

The following graph presents the trend of U.S. hotel supply and demand growth since 1989.



In the years of expansion following the recession of the early 1990's, U.S. hotel room night demand grew in the range of two to three percent, culminating in four percent growth at the peak (2001). The onset of the most recent recession in mid-2001, combined with the impact of the events of September 11, 2001, caused a dramatic downturn in demand. Consistent with the broader economy, that period of negative growth was relatively short-lived. The industry has seen the return of two to four percent demand growth in 2004 and 2005. Demand growth is projected to be 3.0% in 2006.

Supply typically lags demand as investors and lenders want to see strong occupancies and rates for some time before new investments are initiated. As is often the case in real estate, supply additions can go on for too long in prosperous times, leading to over-supply. Supply growth fell to under one percent following the recession of the early 1990's, followed by new supply additions during the subsequent recovery and peaking around 1999.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

Seeing the dramatic drop in demand and a looming recession in 2001, new projects were postponed and lending criteria became very stringent. As a response to the dramatic drop in demand, hotels were forced to find ways to operate with greater efficiency, yielding more overall profit per room. Moreover, the capital markets have placed additional discipline to hotel lending, reducing loan to value ratios and thereby reducing the break-even operating point.

Supply growth for 2005 is under one percent at 0.4% growth. However, supply growth is projected to increase to 1.2% in 2006 as a result of strengthening demand and limited supply growth over the past several years.

It is also important to note that demand growth exceeded supply growth in 2003 and 2004. In 2005, demand growth is approximately three percent higher than supply growth. This strong demand growth with limited supply growth will help with overall industry recovery.

### U.S. Hotel Occupancy and Average Daily Rate ("ADR")

The relationship of supply and demand creates occupancy. Just as weak occupancy can force hoteliers to lower rates to fill rooms, so too will strong occupancy allow them to raise rates. The following graph presents the trend of U.S. hotel occupancy and ADR growth since 1989.



Occupancy declined sharply in early 2001 due to the decrease in demand sparked by the downturn in the economy, and later in 2001 due to the attacks of September 11. Restrained supply growth and the slow climb out of recession allowed occupancy growth to turn positive in 2003. Based on data through November, 2005 year end occupancy is projected to be 63.0%, a 2.8% growth rate from 2004 level of 61.3%.

Of all the performance measures in the hotel industry, it was the concern of the industry that ADR may be hardest hit after September 11, 2001 and would likely be the slowest to recover. The following graph focuses on ADR.



This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

ADR growth has been strong throughout the expansionary 1990's and was a primary component in the record profitability. After the recession, it was the industry's concern that ADR would not return to that previous trend line, but would rather return to a new, lower trend line. The graph illustrates that this effect seems to be taking place. Based on data through November, the long-term CAGR is projected to be 2.9%.

Note that in mid-2004 the occupancy growth rate experienced a slight downturn through mid-2005 after its peak in 2004. ADR however continued its climb over the last year. This divergence of higher rates is similar to the chart pattern beginning in mid-1993. That divergence was the beginning of a strong upward trend for ADR. Only time will tell if hoteliers will be able to command ever-stronger rates (at the potential cost of occupancy). Based on data through November, ADR growth in 2005 is projected to be 5.1%, which would support the divergence effect.

**Industry Outlook and Issues**

Based on a recent STR report, the industry outlook for the next several years is as follows:

- Supply growth remains benign
- Demand strength broadens
- Occupancy gains continue
- Increased profitability

There are also a variety of issues facing the industry. A summary list follows:

- Rising costs (energy, insurance, labor)
- Rising interest rates
- Currency exchange
- Airline problems
- Demand leakage (condo hotels, cruise, timeshare)

- Demand growth (unknown stage of cycle)
- Benign supply growth
- Terrorist threats
- Construction costs (interest rates, steel)

**Summary**

In summary, consistent with the long-term U.S. GDP CAGR, U.S. GDP growth is projected to be 3.4% through 2008 and a CAGR of 2.9% through 2015.

The U.S. hotel industry is expected to experience continued occupied room night demand growth of 3.0% in 2006, which is consistent with historical levels. Supply growth decreased over the past several years to a projected level of 0.4% in 2005, but is projected to grow at a 1.2% rate in 2006.

Occupancy has remained relatively stable since 1989, which experienced 64.3% occupancy. The occupancy rate in 2005 is projected to be 63%. Occupancy for 2006 is expected to increase to 64.2% due to strengthening demand and limited supply growth. The CAGR for ADR has been 2.9% since 1989, with growth rates in the 4%-6%-range since the lows of 2001. ADR is projected to grow 5.5% in 2006.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

## OVERVIEW OF THE PUERTO RICO MARKET

The strength and stability of the Puerto Rico hotel market is driven by a combination of location, political and economic factors.  Key factors are discussed below and their significance with respect to the following section related to the hotel tax projection itself is summarized at the end of the section.

### Geography and Climate

Puerto Rico is an island located between the Caribbean Sea and the Atlantic Ocean 1,000 miles east-southeast of the U.S. state of Florida.   The island is the fourth-largest in the Antilles chain that rings the Caribbean.  Its area is approximately 100 miles by 35 miles, equating to approximately 3,500 square miles.  The topography varies from coastal flatlands to mountainous central highlands.  Sandy beaches run along most coastal areas.  With northeasterly trade winds moderating its temperature, Puerto Rico's tropical climate is one of the most unvarying in the world.   The average annual temperature is 78ºF.

Puerto Rico's island setting with moderate tropical climate and scenic topography are primary reasons for its success in attracting tourists from around the world.

### Governance

Puerto Rico came under United States sovereignty pursuant to the Treaty of Paris, signed on December 10, 1898, which ended the Spanish-American War. Puerto Ricans have been citizens of the United States since 1917. In 1950, after a long evolution toward greater self-government for Puerto Rico, the Congress of the United States enacted Public Law 600, which is "in the nature of a compact" and which became effective upon its acceptance by the electorate of Puerto Rico. It provides that those sections of existing law which defined the political, economic, and fiscal relationship between Puerto

Rico and the United States would remain in full force. It also authorized the people of Puerto Rico to draft and adopt their own Constitution. The Constitution was drafted by a popularly elected constitutional convention, overwhelmingly approved in a special referendum by the people of Puerto Rico and approved by the United States Congress and the President of the United States, becoming effective upon proclamation of the Governor of Puerto Rico on July 25, 1952.

The United States and the Commonwealth of Puerto Rico share a common defense, market, and currency. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but no vote. Most federal taxes, except those such as Social Security taxes which are imposed by mutual consent, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries.

The Constitution of the Commonwealth provides for the separation of powers of the executive, legislative, and judicial branches of government. The Governor is elected every four years. The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms. The highest court within the local jurisdiction is the Supreme Court of Puerto Rico. Puerto Rico constitutes a District in the Federal Judiciary and has its own United States District Court. Decisions of this court may be appealed to the United States Court of Appeals for the First Circuit and from there to the Supreme Court of the United States.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

Puerto Rico's political structure and relationship with the U.S. provides it political stability and therefore a high measure of economic stability.

## Population

Puerto Rico's population has risen steadily over the past 50+ years and is approximately 3.9 million in 2005.  With about 1,000 people per square mile, Puerto Rico is one of the most densely populated islands in the world – higher than any of the 50 U.S. states.  In addition, approximately two million Puerto Ricans reside on the U.S. mainland.



Source: U.S. Census Bureau.

Puerto Rico population growth has slightly lagged the pace of the United States over the past decades. Puerto Rico's population CAGR from 1980 to 2000 was 0.9% compared with the U.S. rate of 1.1%. Puerto Rico's growth rates are estimated to slow at a greater pace than the mainland U.S.  From 2000 to 2020, Puerto Rico is estimated to experience a 0.3% population CAGR, while the U.S. rate is estimated to be 0.9%.

| Year | Puerto Rico Population | Total U.S. |
|------|------------------------|------------|
| 1950 | 2,218,000 | 152,271,000 |
| 1960 | 2,358,000 | 180,671,000 |
| 1970 | 2,722,000 | 205,052,000 |
| 1980 | 3,210,000 | 227,726,000 |
| 1990 | 3,537,000 | 250,132,000 |
| 2000 | 3,809,000 | 282,339,000 |
| 2010 | 3,985,000 | 309,163,000 |
| 2020 | 4,076,000 | 336,032,000 |

**Compound Annual Growth Rates:**

| | Puerto Rico Population | Total U.S. |
|------|------|------|
| 1950 - 1980 | *1.2%* | *1.4%* |
| 1980 - 2000 | *0.9%* | *1.1%* |
| 2000 - 2020 | *0.3%* | *0.9%* |

The largest urban area, San Juan, has an urban area population of approximately two million.  The following table presents the population of the five largest cities (city limits only):

| | City Population |
|------|------|
| San Juan | 434,000 |
| Bayamon | 224,000 |
| Ponce | 186,000 |
| Carolina | 186,000 |
| Caguas | 141,000 |

Population is relevant to the occupancy tax projections due to the fact that approximately one-third of the lodging registrations are comprised of local residents.  (Discussed later in the report.) Puerto Rico's population growth is also correlated with its economic growth.  Puerto Rico's GDP in the manufacturing; services; government; and transportation, communication and public utilities sectors have grown steadily from 2000 through 2004.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

## Language and Culture

While the island may be a U.S. Commonwealth, the culture is decidedly Spanish. About 88% of residents are of Hispanic heritage.

Puerto Rico is in the Eastern Time zone (but does not observe Daylight Savings Time). As such, the effects of time change are minimal for travelers from the U.S., which represent the largest group of travelers to Puerto Rico.

Both Spanish and English are official languages. English is a mandatory second language in schools and is widely used in business. English is the second most widely spoken language in the world and is the official language of more countries than any other language. Spanish is the fourth most spoken language in the world. As Puerto Rico strives to grow its business and tourism base, both primary drivers of hotel room night demand, its usage of the English and Spanish languages means there is little language barrier to overcome for most travelers.

## Economy

Puerto Rico has one of the most dynamic economies in the Caribbean region. The Government Development Bank for Puerto Rico states that Puerto Rico has changed from an agricultural economy, based primarily on sugar, tobacco, and coffee products, to a thriving modern industrial and services oriented economy. In 1940, agriculture represented 33.7 percent of total net income, while manufacturing represented 12.8 percent of the total. As the following table indicates, manufacturing and services are now the largest sectors of the economy, representing 43% and 38%, respectively, in 2004.

| Puerto Rico Gross Domestic Product - All Sectors | | | | | | |
|---|---|---|---|---|---|---|
| | *2000* | *2001* | *2002* | *2003* | *2004* | *CAGR* |
| Manufacturing | $24,079 | $29,037 | $31,243 | $32,501 | $34,078 | *9.1%* |
| Services | 24,920 | 26,615 | 26,913 | 28,688 | 30,505 | *5.2%* |
| Government | 5,478 | 5,992 | 6,303 | 7,006 | 7,389 | *7.8%* |
| Transportation, Communication, Public Utilities | 4,237 | 4,698 | 4,948 | 5,205 | 5,350 | *6.0%* |
| Agriculture, Forestry, Fisheries | 529 | 348 | 277 | 314 | 435 | *-4.8%* |
| Construction | 1,875 | 1,802 | 1,648 | 1,614 | 1,741 | *-1.8%* |
| Total | $61,118 | $68,492 | $71,332 | $75,328 | $79,498 | |

Amounts in millions; rounded.
Source: Puerto Rico Planning Board.

The manufacturing and services sectors of the economy are two primary drivers of the commercial component of hotel demand and have grown to the two largest sectors in Puerto Rico's economy.

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board estimates that in fiscal year 2004 manufacturing generated $34.1 billion, or 43.2%, of gross domestic product. During fiscal year 2005, payroll employment for the manufacturing sector was 117,242, a decrease of 1.1% compared with fiscal year 2004, with most of the job losses occurring in labor-intensive industries. Most of the island's manufacturing output is shipped to the United States mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. The United States minimum wage laws are applicable in Puerto Rico. As of June 2005, the average hourly manufacturing wage rate in Puerto Rico was 65.8% of the average mainland United States rate.

Manufacturing in Puerto Rico is now more diversified than during the earlier phases of its industrial development and includes several industries less prone to business cycles. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

investments over the last decade in the pharmaceutical, scientific instruments, computers and electrical products industries in Puerto Rico.

Since the 1950's, the government has successfully attracted and retained many high-technology capital-intensive manufacturers, including pharmaceutical, computer, electronic, and scientific and medical instrument manufacturers. Sixteen of the top 20 prescription drugs in the U.S. are produced in Puerto Rico.

The following table sets forth gross domestic product by manufacturing sector for the five fiscal years 2000-2004.

| Puerto Rico Gross Domestic Product - Manufacturing Sector | | | | | | |
|---|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004 | CAGR |
| Pharmaceuticals | $13,580 | $16,620 | $18,681 | $19,072 | $20,138 | 10.4% |
| Machinery and metal products | 5,655 | 7,666 | 8,105 | 8,760 | 8,958 | 12.2% |
| Food products | 1,912 | 1,974 | 2,092 | 2,289 | 2,332 | 5.1% |
| Other chemical & allied products | 777 | 765 | 578 | 496 | 475 | -11.6% |
| Apparel | 610 | 569 | 530 | 466 | 620 | 0.4% |
| Other | 1,543 | 1,444 | 1,258 | 1,418 | 1,555 | 0.2% |
| Total | $24,079 | $29,037 | $31,243 | $32,501 | $34,078 | |

Amounts in millions; rounded.
Source: Puerto Rico Planning Board.

Total employment in the manufacturing sector decreased by 25,691 from fiscal year 2000 to fiscal year 2005. This reduction in manufacturing employment was coupled with a significant increase in manufacturing productivity and investment as shown by the expansion in real manufacturing output and in the growth of exports. Most of the decrease in employment has been concentrated in labor intensive industries, particularly apparel, textiles, tuna canning, and leather products.

Puerto Rico's manufacturing growth continues as a result of the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Code, phases out the federal tax incentives during a ten-year period. To ensure that businesses are able to operate efficiently and profitably, the government of Puerto Rico has invested billions of dollars in the island's infrastructure, which features state-of-the-art communications technology and transportation and shipping systems. Puerto Rico's duty-free access to the United States, as well as its Caribbean location, which offers efficient overseas shipping routes to Asia, Central America, Europe and the U.S. mainland, are additional incentives to manufacturers, as are the highly skilled workforce and the island's sophisticated infrastructure.

Puerto Rico has experienced significant growth in the services sector, which includes finance, insurance, real estate, wholesale and retail trade, tourism and other services, in terms of both income and employment over the past decade, showing a favorable trend as compared with certain other industrialized economies. During the period between fiscal years 2000 and 2004, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 5.2%, while payroll employment in this sector increased at an average annual rate of 1.1%. It should also be noted that in the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 17% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. For example, in fiscal year 2003, the number of self-employed individuals was 180,464, out of which 46.0% were in the service sector and 10.5% were in the construction sector. The development of the services sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing, construction and agriculture. The services sector in Puerto Rico has a diversified base.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

The services sector ranks second to manufacturing in its contribution to gross domestic product, and it is the sector with the greatest employment. In fiscal year 2004, services generated $30.5 billion of gross domestic product, or 38.7% of the total. Services employment grew from 510,758 in fiscal year 2000 to 547,057 in fiscal year 2005 (representing 52.5% of total non-farm payroll employment). This represents a cumulative increase of 6% during such period. Wholesale and retail trade, finance, insurance and real estate experienced significant growth in fiscal years 2000 to 2004, as measured by gross domestic product. From fiscal year 2000 to 2004, gross domestic product increased in wholesale and retail trade from $8.3 billion to $9.6 billion, and in finance, insurance, and real estate from $10.0 billion to $13.0 billion. There are sixteen commercial banks and trust companies currently operating in Puerto Rico. Total assets of these institutions as of June 30, 2005 were $100.0 billion. As of June 30, 2005, there were approximately thirty-five international banking entities operating in Puerto Rico licensed to conduct offshore banking transactions with total assets of $72.8 billion.

The following table sets forth service sector gross domestic product for fiscal years 2000 to 2004.



Source: Puerto Rico Planning Board,  U.S. Department of Commerce, Bureau of Economic Analysis.
Note: Fiscal year data.

From a taxation perspective, residents of the Commonwealth pay no U.S. federal income tax on locally generated earnings, but Puerto Rico government income tax rates are set at levels that closely parallel federal-plus-state levies on the mainland.

The U.S. dollar is the legal tender.  As such, business transactions are not impacted by currency exchange issues with dollar denominated organizations, such as U.S. organizations.

In summary, Puerto Rico's economy has evolved from a largely agricultural base to a diversified manufacturing and services economy.  Growth in these key areas has averaged 9.1% and 5.2%, respectively, for the past five years.  The growth of these two sectors should continue to fuel growth in the commercial component of hotel demand.

| Puerto Rico Gross Domestic Product - Service Sector | | | | | |
|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004 | CAGR |
| Wholesale, retail trade | $8,340 | $8,338 | $8,623 | $9,005 | $9,582 | 3.5% |
| FIRE | 9,977 | 11,294 | 11,212 | 12,425 | 13,024 | 6.9% |
| Other services | 6,603 | 6,982 | 7,078 | 7,257 | 7,899 | 4.6% |
| Total | $24,920 | $26,615 | $26,913 | $28,688 | $30,505 | |

Amounts in millions; rounded.
Source: Puerto Rico Planning Board.

As illustrated in the following graph, Gross Domestic Product in Puerto Rico from 1990 to 2005 has grown at a CAGR of 2.4%, slightly below that of the U.S.

**Employment**

As the graph below depicts, the number of persons employed in Puerto Rico follows the general economy, whereby employment grows in expansionary times and flattens or decreases slightly during recessions.  Employment has increased at a CAGR of 1.4% between 1995 and 2004.  The CAGR

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

from 1995 to 2001, the height of the most recent expansionary period, was 1.8%. The unemployment rate has decreased over the last dozen years and is 11.5% in mid-2005.



Source: Government Development Bank for Puerto Rico; U.S. Dept. of Labor, Bureau of Labor Statistics.



Source: Dept. of Labor and Human Resources, Bureau of Labor Statistics.

The governmental sector comprises nearly 30% of Puerto Rico's employment. Manufacturing is the main private employer. Major industries in terms of employment include pharmaceuticals, clothing, food products and electronics. The following table illustrates Puerto Rico's employment distribution in 2004.

| | Employment (in thousands of persons) | Percent Change |
|---|---|---|
| 1995 | 912.4 | |
| 1996 | 945.7 | 3.6% |
| 1997 | 986.7 | 4.3% |
| 1998 | 990.7 | 0.4% |
| 1999 | 1,001.9 | 1.1% |
| 2000 | 1,014.7 | 1.3% |
| 2001 | 1,012.5 | -0.2% |
| 2002 | 984.4 | -2.8% |
| 2003 | 999.8 | 1.6% |
| 2004 | 1,032.6 | 3.3% |

**Average Annual Compound Growth:**

| | |
|---|---|
| 1995 - 2001 | 1.8% |
| 1995 - 2004 | 1.4% |

| | Employment (in thousands of persons) | Percent |
|---|---|---|
| Government | 303.1 | 29.4% |
| Trade, Utilities, Transpo. | 182.0 | 17.6% |
| Manufacturing | 118.6 | 11.5% |
| Professional & Business | 102.1 | 9.9% |
| Education & Health | 98.0 | 9.5% |
| Leisure & Hospitality | 70.5 | 6.8% |
| Construction | 69.1 | 6.7% |
| F.I.R.E. | 46.4 | 4.5% |
| Information | 22.1 | 2.1% |
| Other services | 20.6 | 2.0% |
| Total | 1,032.5 | 100.0% |

Source: Dept. of Labor and Human Resources,
Bureau of Labor Statistics.

**Enplanements**

The Luis Munoz Marin International Airport is a U.S. domestic airport, controlled by the Federal Aviation

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

Administration ("FAA") and supervised by the Transportation Security Administration ("TSA").

Puerto Rico is the most accessible island in the Caribbean. The dominant Caribbean carrier, American Airlines, uses San Juan as a major international hub. As such, there is easy access to American's U.S. domestic network. Within the Caribbean, smaller turboprop planes are used. American Eagle is the dominant intra-Caribbean carrier and uses San Juan as its hub. As of February 2006, the following U.S. mainland cities offer direct flights to San Juan:

| Non-Stop Flights from U.S. Cities | |
|---|---|
| Atlanta | Los Angeles |
| Baltimore | Miami |
| Boston | Minneapolis |
| Charlotte | New York |
| Chicago | Newark |
| Dallas | Orlando |
| Detroit | Philadelphia |
| Fort Lauderdale | Tampa |
| Hartford | Washington, DC |
| Houston | |

Source: Official Airline Guides, Inc.

As of June 2005, a total of 31 airlines, including charter airlines, utilize the Luis Munoz Marin International Airport, and are as follows:

| Airline | Total Passenger Movement (FY 2005)* |
|---|---|
| American | 5,118,300 |
| American Eagle | 1,613,100 |
| Delta | 833,600 |
| USAir | 654,000 |
| Continental | 566,900 |
| Jet Blue | 467,000 |
| American Trans Air | 285,400 |
| Spirit | 277,900 |
| United | 188,100 |
| Caribbean Sun | 166,100 |
| Iberia | 105,900 |
| Copa | 95,600 |
| Cape Air | 71,600 |
| Transmeridian Airways | 57,900 |
| Northwest | 46,800 |
| Pan Am | 36,900 |
| Air Canada | 17,000 |
| Sun Country | 11,500 |
| Liat | 11,200 |
| 12 Others | 52,900 |

* Includes enplanements and deplanements.
Source: Luis Munoz Marin International Airport.

Enplanements are the number of passengers boarding commercial carriers. Enplanement data measures the level of air travel to a certain destination (airport) and can be used as an indicator of visitor demand. This is a particularly important indicator in Puerto Rico as it relies on visitors traveling by plane. The following graph depicts enplanement growth at the Luis Munoz Marin International Airport. Enplanements have grown at a 4.3% CAGR over the last 20 years and are projected to increase at a slightly slower rate, 2.5%, over the next 15.

**STRATEGIC ADVISORY GROUP LLC**

14

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection



Source: Federal Aviation Administration.

| 2004 Hotel Registrations | |
|---|---|
| U.S. | 59.7% |
| Local | 31.7% |
| Caribbean | 2.5% |
| Others Not Specified | 2.0% |
| Europe | 1.5% |
| Latin America | 1.4% |
| Canada | 0.9% |
| Other International | 0.3% |
| Total | 100.0% |

Source: Puerto Rico Tourism Company.

Accessibility by air is a key factor for further growth in business and leisure travel to Puerto Rico. Historical and projected data indicates stability and continued growth in passenger traffic.

## Visitors

Visitation data was compiled from several sources. The Planning Board data indicates that the point of origin for 77.3% of visitors to Puerto Rico in 2004 was from the U.S. mainland. These visitors include hotel registrants, people arriving in Puerto Rico and boarding cruise ships and people arriving and staying in homes. Based on data from the Puerto Rico Tourism Company, 59.7% of 2004 hotel registrations were U.S. mainland visitors. Both sets of data demonstrate that the U.S. is the primary source of visitation to Puerto Rico.

Local residents represent the second largest source of demand for hotel registrations, comprising nearly one-third, 31.7%, of 2004 hotel registrations. Projections for 2005 indicate little change in the hotel registration data. Further, the PRTC estimates that the average hotel stay is 2.5 days.

Based on fiscal year 2005 projections, the following graph suggests the CAGR in total hotel registration from non-residents will be 5.7% from 1994 to 2005, and the CAGR for residents will be 4.7%. The data also suggests that during the previous recessionary period from 2001 and 2002 and the terrorist attacks in 2001, although non-resident hotel registrations decreased, resident hotel registrations continued to increase. The hotel registrations from local residents were not affected by either occurrence and remained stable.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection



Source: Puerto Rico Tourism Company.

In summary, visitation data indicates a consistent growth rate of 5% to 6% over the past 12 years.

## Destination Appeal

Puerto Rico is a top Caribbean destination because of its myriad of destination attributes.   Key reasons for its success include:

- Ease of accessibility with few travel inconveniences.   No passport or customs requirements for U.S. citizens, the largest source of visitation.

- Domestic airport; under FAA control and TSA supervision.

- English language; U.S. dollar currency.

- Near perfect weather.

- Hotels and resorts at all price/service levels, including golf and tennis.

- World-class beaches and water activities, such as surfing, fishing, kayaking, SCUBA diving, windsurfing, parasailing and more.

- Casino gaming.

- Shopping and nightlife.

- Attractions such as ancient Indian ceremonial parks, two of the oldest and most architecturally interesting Spanish Colonial churches, a 19th century coffee plantation, a pair of the largest and most complex fortresses built by the Spaniards in the New World, walking tour of Old San Juan, museums, Arecibo radio telescope, Bacardi Rum distillery, nature and adventure tours, festivals and ancient underground cave systems.

- The only rainforest in the U.S. National Park system.

- The new Coliseo De Puerto Rico, an 18,000-seat state-of-the-art multi-purpose coliseum hosting concerts, shows and sporting events.  The arena is configured for NHL hockey and NBA basketball.

Importantly, The Puerto Rico Convention Center will be part of a large-scale development, the Puerto Rico Convention Center District, combining retail, restaurants and entertainment - a destination within a destination and the largest of its kind in the Americas.



The 113 acre site for the Puerto Rico Convention Center District is positioned near the center of the San Juan metropolitan area on a former U.S. Navy base known as Isla Grande.  Adjacent areas of San Juan with visual and physical connections to the District include the Condado, the Isleta of San Juan

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

and the neighborhood of Miramar. The Rivas Dominici Regional Airport is located immediately to the northwest of the site.

This urban planning project was envisioned as a plan for urban revitalization, involving both private and public sectors and offering attractions and facilities for convention participants, business travelers and tourists as well as the local residents.

Highlights of the project include:

- Full service anchor hotel and casino.
- Retail and entertainment complex, including a cinema.
- Waterfront cafes, restaurants and walkways.
- Residential and office buildings.
- Serves as an exciting, vibrant and memorable gateway to Puerto Rico for cruise ships visitors.
- Connects Puerto Rico Convention Center District to Old San Juan.
- Promotes further development of the adjacent areas.
- Creates a mixed-used waterfront district.
- Creates a green space along the San Juan waterfront area.

The Puerto Rico Convention Center will be a new business and tourism destination planned as a lively area with attractions and activities for conventioneers, tourists and residents of Puerto Rico, featuring:

- Over 580,000 sq. ft. (53,882 sq. m.) on a 113-acre site.
- Exhibit hall - 152,700 sq. ft. (14,186 sq. m.).
- Meeting space - 36,200 sq. ft. (3,383 sq. m.) with 15 rooms on two levels that subdivide into 28 sections.
- Largest ballroom in the Caribbean - 39,500 sq. ft. (3,670 sq. m.).

- Over 1,950 parking spaces adjacent to the building.

An artist's rendering and model perspectives are provided below:







This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

The convention center was inaugurated in November 2005 and is shown below.



Adjacent available land allows for two contiguous expansions of the convention center. Currently, there are no detailed plans for such expansion.

While there are a number of hotels located nearby, a new convention center headquarter hotel is planned adjacent to the convention center. See artist's rendering below:



The $175 million hotel and entertainment complex will include a 500-room first class full-service hotel, a casino, a nightclub, structured parking, multi-screen

cinema and additional retail. Current plans are to open the hotel in fiscal year 2009.

The convention center will be marketed by the 40-year old Puerto Rico Convention Bureau. Based in San Juan, with offices in Chicago, Miami, New York, and Washington D.C., the Puerto Rico Convention Bureau provides sales consultation services to meeting planners in the corporate, incentive and association markets. Supplemental island-wide marketing will be provided by the Puerto Rico Tourism Company. SMG, the world's largest public assembly management company, will manage the convention center.

## SUMMARY

In summary, Puerto Rico is a stable and growing economy and tourist destination due to factors such as:

- Caribbean island setting and tropical climate;

- U.S. Commonwealth status;

- 3.9 million population with .3% CAGR to 2020;

- Both English and Spanish are official languages;

- U.S. dollar currency;

- Modern industrial and services-oriented economy, anchored by manufacturing and services;

- Positive GDP growth, highly correlated with U.S. GDP;

- Growing employment and shrinking unemployment;

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

- Ease of travel
  - the Caribbean's most accessible airport with direct flights from a variety of U.S. and other major cities on 31 airlines;
  - historical enplanement CAGR of 4.3% from 1985 to 2005, projected to be 2.5% CAGR to 2020;
  - No passport or customs requirements for U.S. citizens, the largest source of visitation;

- Historical visitation CAGR of 5% to 6% over the past decade, with 77% from the U.S. mainland;

- 60% of hotel registrations from U.S. travelers; 32% from local resident demand;

- World-class destination appeal;

- A new state-of-the-art convention center capable of hosting the vast majority of meetings and exhibitions, to be accompanied by a new convention center headquarter hotel in the future;

- Tourism marketing through the Puerto Rico Tourism Company and the Puerto Rico Convention Bureau.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

## OCCUPANCY TAX PROJECTION ASSUMPTIONS

This section of the report describes the specific assumptions regarding the Occupancy Tax projections, including:

- Description of the Occupancy Tax
- Source of Historical Occupancy Tax Collection Data
- Collection Policies
- Audit Procedures
- Casino Hotels:
  - Average Number of Rooms
  - Occupancy
  - Occupied Room Nights
  - Average Daily Rate
  - Gross Sales
  - Adjustment
- Other Hotels
- Factors Impacting the Projections

### Description of the Occupancy Tax

As imposed by Puerto Rico Law No. 272 of 2003, the Puerto Rico Tourism Company ("PRTC") levies and collects a general Occupancy Tax on hotel revenues from overnight stays at a rate that varies depending on the type of lodging.  The tax rates are listed below.

| Property Type | Tax Rate |
| --- | --- |
| Casino Hotels | 11% |
| Non-Casino Hotels and Motels | 9% |
| Inns | 7% |
| All-Inclusive Hotels | 5% |
| Supplementary Short-Term Lodging | 7% |
| Recreational Facilities | 5% |

Prior to 1997, tax rates were 9% for hotels with casinos and 7% for all other establishments.

### Source of Historical Occupancy Tax Collection Data

Prior to fiscal year 1998, the Department of Treasury recorded hotel tax collections in a manual system. Because of this, reliable data could not be provided prior to 1998.

Beginning in 1998 through March 2004, monthly data on a hotel-by-hotel basis was provided from the Department of Treasury's computerized collection system.

Beginning in March 2004, the PRTC became the collection agency for the Occupancy Tax.  The PRTC established and maintains its own computerized collection system from which monthly data on a hotel-by-hotel basis was provided.

Beginning with fiscal year 2000, the database collection information was able to be reconciled to annual audit information.

### Collection Policies

The Occupancy Tax is collected by the individual hotels and remitted to the PRTC no later than the 10th day of the month following the collection.

If the PRTC does not receive a return by the 15th, it sends the hotel a letter requesting the return.  If no return is filed by the 30th, the PRTC estimates the tax and sends a letter requesting specific payment.  If the hotel remains delinquent, several steps with the delinquent hotel may be taken including revocation of tax benefits and/or promotional benefits, claiming of the bonds or letters of credit, seizing available assets or filing legal claims for collection in court.  Also, if the hotelier operates a casino within the hotel, the PRTC reserves the right to withhold proceeds from the slot machines to pay for the outstanding Occupancy Tax payment.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

## Audit Procedures

When the PRTC assumed collection responsibilities, they began by reviewing 20 of the larger hotels' management reports generated from the hotels' internal accounting systems and compared the calculated collections to the corresponding tax return for the period from fiscal year 1997 through March 2004. This amount was also compared to the amount entered into the Department of Treasury's accounting system. Any discrepancies found were investigated and additional amounts were collected if required.

As an ongoing process, 20 of the larger hotels are reviewed each quarter. The review consists of comparing each individual hotel's management report to its tax return. In the early months of the PRTC collection era, this was the only review procedure that was performed since these hotels represented the vast majority of the collections. Once this procedure was established, a similar procedure was implemented for approximately 35 additional hotels. These quarterly review procedures are provided by a third-party accounting firm. These 55 hotels represent over 85% of the total tax revenues.

During fiscal year 2005 the Room Tax division reviewed 110 hotels in addition to the 55 hotels mentioned above, which were reviewed by the accounting firm Value Added, Inc. In total 165 or 36% of registered hotels were reviewed, representing approximately 85% of the dollars collected.

The PRTC indicated that the Room Tax Division will start performing audits, in addition to the reviews, by summer 2006. These audits are to be more detailed and include a detailed guest folio analysis.

## CASINO HOTELS

Tax collections were projected for Casino Hotels and Other Hotels separately. Casino Hotels represent approximately 62% of total tax collections in 2005

and accurate historical occupancy, average daily rate, and supply information was gathered from independent and reliable sources.

Figure 3 on page 24 details the historical and projected Casino Hotel performance data, which is discussed below. Historical hotel performance data was provided by STR. The STR data was compared to the data obtained from the PRTC. Differences in these data sets are discussed in the Taxable Sales section below.

The hotels included in the Casino Hotel analysis, with number of rooms and year opened, are listed below:

| Casino Hotel | City | Rooms | Year Opened |
|---|---|---|---|
| El Conquistador* | Fajardo | 751 | 1993 |
| Westin Rio Mar Beach Golf Resort & Spa | Rio Grande | 600 | 1996 |
| Condado Plaza & Casino | San Juan | 570 | 1964 |
| Marriott San Juan Resort & Stellaris Casino | San Juan | 525 | 1994 |
| Ritz-Carlton San Juan Hotel & Casino | Carolina | 416 | 1997 |
| Inter-Continental San Juan Resort & Casino | Isla Verde | 402 | 1965 |
| El San Juan Hotel | Carolina | 389 | 1968 |
| Embassy Suites San Juan Hotel & Casino | Carolina | 299 | 1997 |
| Hyatt Dorado Beach Resort & Country | Dorado | 262 | 1958 |
| Courtyard Isla Verde Beach Resort | Isla Verde | 260 | 2003 |
| Sheraton Hotel Old San Juan | San Juan | 240 | 1997 |
| Radisson Ambassador Plaza Hotel & Casino | San Juan | 233 | 1967 |
| Hilton International Ponce Hotel & Casino* | Ponce | 156 | 1992 |
| Holiday Inn Mayaguez & Tropical Casino | Mayaguez | 142 | 1992 |
| Four Points Caguas Real Hotel & Suites | Caguas | 126 | 2004 |
| Holiday Inn Ponce | Ponce | 116 | 1975 |
| Four Points Palmas Del Mar Resort | Humacao | 107 | 1977 |
| | | 5,594 | |

\* Excludes privately-owned residential condominiums that are available for rent as a hotel guest room on a part-time basis.

Source: Smith Travel Research.

In 2005, these Casino Hotels represented approximately 62% of the total Occupancy Tax collections. With respect to individual hotels, the top five Casino Hotels, in terms of total hotel tax collections, are as follows:

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

**Casino Hotel**

El Conquistador
Marriott San Juan Resort & Stellaris Casino
Ritz-Carlton San Juan Hotel & Casino
Westin Rio Mar Beach Golf Resort & Spa
Condado Plaza & Casino

Source: Puerto Rico Tourism Company.

Appendix I lists the 20 hotels that generate the most Occupancy Tax.  These hotels include both Casino Hotels and Other Hotels.  In fiscal year 2005, these 20 hotels generated approximately 75% of the total Occupancy Tax collected by the PRTC.

**Average Number of Rooms**

Prior to 1998, several major casino hotels were added to supply, including the 600-room Westin Rio Mar Beach Golf Resort & Spa (June 1996), the 299-room Embassy Suites San Juan Hotel & Casino (March 1997), the 416-room Ritz Carlton San Juan Hotel & Casino (June 1997), and the 240-room Wyndham Hotel Old San Juan (October 1997).

From 1999 to 2002, no significant supply additions or deletions occurred.

From 2003 to 2005, three casino properties were opened: the 260-room Courtyard Isla Verde Beach Resort (January 2003), the 126-room Sheraton Four Points Caguas Real Hotel & Suites (November 2004), and the 125-room Sheraton Four Points Candelero (May 2005).  (The Average Number of Rooms is reported in the table and the model incorporates new hotels based on the specific month the hotel is added to supply.)

Because of the limited additions to Casino Hotel supply, the CAGR in supply from fiscal years 1998 to 2005 was 1.0%.  From 2002 to 2005, the CAGR was 2.1%.

Based on information provided by the PRTC, Casino Hotels to be completed within the projection period include:

| Year | Rooms | Casino Hotel |
|------|-------|--------------|
| 2006 | 160 | Courtyard by Marriott (Antiguo Hospital) |
| 2007 | 228 | Condado Trio Hotel La Concha/Condado Beach |
| 2007 | 136 | Pichis (expansion) |
| 2009 | 500 | Sheraton Convention Center Hotel |

Source: Puerto Rico Tourism Company.

Based on these additions, the growth rate of supply ranges from approximately four to five percent each year from 2007 to 2010.  It is projected that no other casino hotels will get built in this time period.  Based on projected demand levels, it is projected an additional 200-room property will be opened by 2014.  Additions to supply are projected to be limited in out years of the projection.  While demand is projected to continue to grow at a modest pace, the known additions to supply should keep the growth rate of occupancy and average daily rate modest.

With the planned new hotels in the early years of the projection period, the CAGR of supply from 2005 to 2015 is projected to be 2.2%.

**Occupancy**

Occupancy is calculated by dividing the Occupied Room Nights by the Average Number of Casino Rooms.  Since 1998, the Casino Hotels have experienced occupancy in the mid-70% range, with a low of 70% (2002) and a high of 79% (2004).  The lower occupancy in 2002 was consistent with the overall U.S. hotel industry and primarily due to the terrorist attacks in September 2001 and the earlier onset of the recession.  The rebound in demand since 2002, coupled with modest supply growth, has fueled the gains in occupancy.

While Occupied Room Nights (discussed below) are projected to continue to grow at a modest pace, the

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

additions to supply are projected to have the effect of lowering occupancy to the lower 70% range.

The following graph illustrates seasonality by month for fiscal year 2005 for both ADR and occupancy. Demonstrating the seasonal nature of the Puerto Rico Casino Hotel market, both ADR and occupancy increase beginning in September and peak in March. ADR fluctuates from a low of nearly $150 to a high of approximately $250 per night. Occupancy fluctuates from a low of nearly 60% to a high of approximately 90%. Given such seasonality, hoteliers gain pricing power in peak months.



Source: Smith Travel Research.

**Occupied Room Nights**

Occupied Room Nights grew at a CAGR of 1.6% from 1998 to 2005. As discussed above, the terrorist attacks in September 2001 and the effects of the recession caused Occupied Room Nights to be at their lowest in fiscal year 2002. Consistent with the overall U.S. hotel market, demand rebounded in 2003 and 2004. Room demand in 2005 was slightly lower than 2004, driven by the Casino Hotels' focus on growing ADR at the expense of demand. Rates grew in 2005 by 5.7% (discussed below).

Core room demand in the Casino Hotels is driven predominantly by vacationers enjoying the many amenities Puerto Rico offers. Secondarily, demand is driven by in-house group events, i.e., events that are utilizing the hotel primarily for a meeting or conference.

Future growth in demand will be determined primarily by economic conditions and the addition of new demand drivers. While no specific attempt has been made to predict with accuracy the timing of the next major economic recession and expansion cycles, the concept of these cycles was contemplated as the projection was formulated. As such, the growth rate from 2005 through 2015 was projected to be somewhat consistent the historical rate.

There are also new or planned developments that will create new room night demand. Specifically, the identified new demand drivers are 1) the Puerto Rico Convention Center, and 2) new casino hotels.

Puerto Rico Convention Center - The Puerto Rico Convention Center is part of a large-scale development, the Puerto Rico Convention Center District, combining retail, restaurants and entertainment - a destination within a destination and the largest of its kind in the Americas.

The convention center, which opened in November 2005, features:

- Over 580,000 sq. ft. (53,882 sq. m.) on a 113-acre site.

- Exhibit hall - 152,700 sq. ft. (14,186 sq. m.).

- Meeting space - 36,200 sq. ft. (3,383 sq. m.) with 15 rooms on two levels that subdivide into 28 sections.

- Largest ballroom in the Caribbean - 39,500 sq. ft. (3,670 sq. m.).

- Over 1,950 parking spaces adjacent to the building.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

Two contiguous expansions of the convention center are also planned.

The Puerto Rico Convention Bureau is the entity responsible for marketing to and booking large convention groups in the center. Since the groups that utilize such a large facility often book many years in advance, it is anticipated that utilization will ramp up over the next several years, which is consistent with the bureau's stated room night goals. It is reported that upon stabilization, the convention center could contribute up to an additional 130,000 room nights to the market. For the purposes of this analysis, it is projected that the convention center will generate approximately 105,000 room nights, 60,000 room nights for the Casino Hotels and 45,000 for the Other Hotels.

New Large Hotels – Discussed above, there are several new large hotels that are planned to open over the next several years. Typically, a new hotel will generate new demand that had not been in the market before and will consume a portion of the existing demand in the market being accommodated by competitive hotels. The new demand is generated by the very existence of the hotel itself, since new facilities provide a venue for new groups that may not currently meet in that market. Furthermore, the hotel's reservation network may access new visitors and groups.

Within the Casino Hotels, the four hotels that are planned through 2008 are relatively small, ranging in size from 136 to 228 rooms. The new 500-room Convention Center Hotel will be a major property that will both support large groups meeting at the convention center and host in-house groups and tourists. It is slated to open during fiscal year 2009. The projection considers these potential new demand generators.

In the next ten years, demand for Casino Hotels is projected to grow at a CAGR of 1.5%.

**Average Daily Rate**

Average Daily Rate ("ADR") grew at a CAGR of 1.0% from 1998 to 2005, and 2.9% in the recovery years of 2002 through 2005. Demand and ADR typically demonstrate a positive correlation because as demand increases hoteliers can charge higher prices for rooms (assuming constant supply). Similar to the discussion related to demand above, the terrorist attacks in September 2001 and the effects of the recession caused ADR to drop significantly in fiscal year 2002. Consistent with broader economic activity, ADR has rebounded with it strongest gains in 2005.

There are a number of new Casino Hotel properties coming on line in the next five years. This increase in supply may limit the ability for ADR to grow much beyond inflation.

**Gross Sales**

Gross Sales is calculated on a monthly basis by multiplying ADR by the number of Occupied Room Nights. The historical CAGR of gross sales from 1998 to 2005 was 2.6%. The 2002 through 2005 CAGR of gross sales, reflecting the heart of the expansion cycle, was 8.1%. The CAGR from 2006 through 2015 is projected to be 3.2%.

**Adjustment**

Gross Sales is calculated based on the sample STR supply, demand and rate data. Taxable Sales are calculated by dividing Tax Collections by the Tax Rate. The difference between these two methods is identified in the "Adjustment" column in Figure 3. This adjustment recognizes the difference of the tax collection database and the sample survey information provided by STR.

The analysis indicates that the two methods are more consistent in the more recent years versus the earlier years of the historical period. The lesser degree of volatility in the later years is explained by enhanced accounting and enforcement procedures.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

Over the last three years, on average, the STR data is within 5% of the tax collection data.  This level of difference is lower than the average of the differences encountered in other similar analyses across the U.S.

For the purposes of this analysis, the average of the last three year's adjustment is utilized in the projection.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

## SAN JUAN CONVENTION CENTER DISTRICT AUTHORITY
## TAX REVENUE PROJECTION
## FIGURE 3 – CASINO HOTELS

| Fiscal Year | Average Number of Rooms | Growth Rate | Change in Rooms | Growth Rate | Occupancy | Occupied Room Nights | Growth Rate | Average Daily Rate | Growth Rate | Gross Sales | Growth Rate | Adjustment | Taxable Sales | Tax Rate | Tax Collections | Growth Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Historical** | | | | | | | | | | | | | | | | |
| 1998 | 5,153 | | +761 | | 73.3% | 1,379,000 | | $174.77 | | $241,003,000 | | | $245,691,000 | 11.0% | $27,026,000 | |
| 1999 | 5,165 | 0.2% | +12 | 1.4% | 77.7% | 1,465,000 | 6.2% | $181.98 | 4.1% | $266,602,000 | 10.6% | 6.3% | $283,418,000 | 11.0% | $31,176,000 | 15.4% |
| 2000 | 5,167 | 0.0% | +2 | 4.7% | 77.3% | 1,457,000 | -0.5% | $190.62 | 4.7% | $277,727,000 | 4.2% | -0.1% | $277,382,000 | 11.0% | $30,512,000 | -2.1% |
| 2001 | 5,185 | 0.3% | +18 | 4.4% | 74.3% | 1,406,000 | -3.5% | $191.37 | 0.4% | $269,067,000 | -3.1% | 12.5% | $302,727,000 | 11.0% | $33,300,000 | 9.1% |
| 2002 | 5,185 | 0.0% | +0 | 4.5% | 70.0% | 1,324,000 | -5.8% | $171.89 | -10.2% | $227,582,000 | -15.4% | 9.0% | $248,145,000 | 11.0% | $27,296,000 | -18.0% |
| 2003 | 5,315 | 2.5% | +130 | 4.3% | 74.6% | 1,448,000 | 9.4% | $174.28 | 1.4% | $252,354,000 | 10.9% | 5.1% | $265,318,000 | 11.0% | $29,185,000 | 6.9% |
| 2004 | 5,445 | 2.4% | +130 | | 79.3% | 1,576,000 | 8.8% | $177.17 | 1.7% | $279,219,000 | 10.6% | 4.4% | $291,591,000 | 11.0% | $32,075,000 | 9.9% |
| 2005 | 5,516 | 1.3% | +71 | | 76.3% | 1,536,000 | -2.5% | $187.21 | 5.7% | $287,561,000 | 3.0% | 5.2% | $302,455,000 | 11.0% | $33,270,000 | 3.7% |
| **Projected** | | | | | | | | | | | | | | | | |
| 2006 | 5,594 | 1.4% | +78 | | 75.5% | 1,541,000 | 0.3% | $192.83 | 3.0% | $297,152,000 | 3.3% | 4.9% | $311,712,000 | 11.0% | $34,288,000 | 3.1% |
| 2007 | 5,858 | 4.7% | +264 | | 73.5% | 1,572,000 | 2.0% | $197.65 | 2.5% | $310,708,000 | 4.6% | 4.9% | $325,933,000 | 11.0% | $35,853,000 | 4.6% |
| 2008 | 6,118 | 4.4% | +260 | | 72.6% | 1,622,000 | 3.2% | $201.60 | 2.0% | $327,002,000 | 5.2% | 4.9% | $343,025,000 | 11.0% | $37,733,000 | 5.2% |
| 2009 | 6,392 | 4.5% | +274 | | 70.6% | 1,648,000 | 1.6% | $204.63 | 1.5% | $337,228,000 | 3.1% | 4.9% | $353,752,000 | 11.0% | $38,913,000 | 3.1% |
| 2010 | 6,666 | 4.3% | +274 | | 68.8% | 1,674,000 | 1.6% | $207.70 | 1.5% | $347,686,000 | 3.1% | 4.9% | $364,723,000 | 11.0% | $40,120,000 | 3.1% |
| 2011 | 6,666 | 0.0% | +0 | | 69.9% | 1,701,000 | 1.6% | $211.85 | 2.0% | $360,360,000 | 3.6% | 4.9% | $378,018,000 | 11.0% | $41,582,000 | 3.6% |
| 2012 | 6,666 | 0.0% | +0 | | 70.7% | 1,721,000 | 1.2% | $215.03 | 1.5% | $370,066,000 | 2.7% | 4.9% | $388,199,000 | 11.0% | $42,702,000 | 2.7% |
| 2013 | 6,666 | 0.0% | +0 | | 71.6% | 1,741,000 | 1.2% | $217.18 | 1.0% | $378,110,000 | 2.2% | 4.9% | $396,637,000 | 11.0% | $43,630,000 | 2.2% |
| 2014 | 6,866 | 3.0% | +200 | | 70.3% | 1,761,000 | 1.1% | $219.35 | 1.0% | $386,278,000 | 2.2% | 4.9% | $405,206,000 | 11.0% | $44,573,000 | 2.2% |
| 2015 | 6,866 | 0.0% | +0 | | 71.1% | 1,782,000 | 1.2% | $221.55 | 1.0% | $394,794,000 | 2.2% | 4.9% | $414,139,000 | 11.0% | $45,555,000 | 2.2% |
| **Compound Annual Growth Rates:** | | | | | | | | | | | | | | | | |
| *1998 - 2005* | | 1.0% | | | | | 1.6% | | 1.0% | | 2.6% | | | | | 3.0% |
| *2002 - 2005* | | 2.1% | | | | | 5.1% | | 2.9% | | 8.1% | | | | | 6.8% |
| *2005 - 2015* | | 2.2% | | | | | 1.5% | | 1.7% | | 3.2% | | | | | 3.2% |

Source: Puerto Rico Department of Treasury; Strategic Advisory Group.

Amounts are rounded.

STRATEGIC ADVISORY GROUP LLC

26

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

## OTHER HOTELS

There are over 350 Other Hotels that are not represented in the Casino Hotels analysis. These hotels include additional smaller Casino Hotels, however, these Casino Hotels did not report to STR and therefore, no hotel-specific data could be obtained. The Other Hotels category represents approximately 38% of the total tax collections in 2005.

Reliable and detailed hotel performance data, such as that available through STR, was not available for a representative sample of hotels in the Other Hotels category. As such, the projection of Other Hotels is based on historical tax collections and other information obtained during the research.

As presented in Figure 1, Tax Collections for Other Hotels grew at a CAGR of 8.6% from 1998 through 2005. The CAGR from 2002 to 2005 was 22.2%, considerably higher than the long-term rate. Note that 1999 and 2002 experienced significant negative growth that offset the strong gains in the post-recession expansionary years.

There are three primary reasons for the strong gains in the 2002 to 2005 period. First, consistent with the U.S. hotel market, there were strong gains in overall hotel performance in these years due to the general recovery in the economy. Second, a number of new small hotels opened as a result of low interest rates and an improving economic outlook. Hotels in this class generally do not have the long development lead times of the larger properties, many of which have casinos as well. Third, properties were added to the tax database as a result of the enhanced audit and enforcement activities. This phenomenon should be a one-time effect.

Based on information provided by the PRTC, Other Hotels to be completed within the projection period include:

| Year | Rooms | Other Hotel |
|------|-------|-------------|
| 2006 | 314 | InterContinental Cayo Largo Resort & Golf |
| 2008 | 125 | Bahía Beach |
| 2008 | 200 | Condado Trio Hotel La Concha (Condo hotel) |
| 2008 | 216 | Condado Trio Hotel Vanderbilt (Condo hotel) |
| 2008 | 93 | Condado Trio Hotel Vanderbilt |
| 2008 | 720 | Costa del Sol (Condo hotel) |
| 2010 | 150 | Mandarin Oriental |

Source: Puerto Rico Tourism Company.

Over the next 10 years, the projected CAGR for Other Hotels is 5.8%. Less confidence was placed on the data relating to this set of hotels due to the lack of available detailed hotel performance data. Furthermore, the likelihood of continuing to add significant new tax collections via the audit and enforcement procedures appears low. As such, the projected growth rate of 5.8% is lower than the historical rate of 8.6%.

## FACTORS IMPACTING THE PROJECTIONS

There are several external factors that could impact the projection. The following lists the general economic assumptions utilized in the projection regarding these factors. It is assumed:

1. The U.S., Puerto Rico and world will not experience an extended economic recession.

2. Area public and private destination marketing organizations will continue and appropriately enhance their marketing efforts to promote meetings and tourism to the area.

3. There will be no further terrorist attacks that significantly influence the economy.

4. There will not be an expansion of the war on terrorism that impacts the travel and tourism industry.

**STRATEGIC ADVISORY GROUP LLC**

27

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

5. There will be no new worldwide political conflicts that significantly influence the economy.

6. No natural disasters will occur that significantly impact travel and tourism in the area.

7. No negative events that adversely affect travel to Puerto Rico on a sustained basis.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Hotel Occupancy Tax Projection

### SAN JUAN CONVENTION CENTER DISTRICT AUTHORITY
### TOP 20 OCCUPANCY TAXPAYERS
### Appendix I

| Hotel | FY 2005 Rank | Number of Rooms* |
|-------|------|------|
| El Conquistador | 1 | 912 |
| Marriott San Juan Resort & Stellaris Casino | 2 | 525 |
| Ritz-Carlton San Juan Hotel & Casino | 3 | 414 |
| Westin Rio Mar Beach Golf Resort & Spa | 4 | 600 |
| Caribe Hilton | 5 | 646 |
| Condado Plaza & Casino | 6 | 537 |
| El San Juan | 7 | 365 |
| Inter-Continental San Juan Resort & Casino | 8 | 400 |
| Hyatt Dorado Beach Resort & Country | 9 | 262 |
| Embassy Suites San Juan Hotel & Casino | 10 | 299 |
| Courtyard Isla Verde Beach Resort | 11 | 260 |
| Paradisus Puerto Rico | 12 | 486 |
| Sheraton Hotel Old San Juan | 13 | 240 |
| Radisson Ambassador Plaza Hotel & Casino | 14 | 233 |
| Embassy Suites - Dorado | 15 | 251 |
| Ponce Hilton | 16 | 253 |
| Hampton Inn | 17 | 200 |
| Hotel Pierre | 18 | 184 |
| Hotel Normandie | 19 | 175 |
| Martineau Bay Resort & Spa | 20 | 156 |

Note: These 20 hotels paid 75% of total collections for FY 2005.

* Includes privately-owned residential condominiums that are available for rent as a hotel guest room on a part-time basis.

Source: Puerto Rico Tourism Company.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**APPENDIX C**

# Puerto Rico Convention Center District Authority

Basic Financial Statements and
Other Supplementay Information
June 30, 2005



This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

**BASIC FINANCIAL STATEMENTS AND**
**OTHER SUPPLEMENTARY INFORMATION**
**June 30, 2005**

**TABLE OF CONTENTS**

|  | Section |
|---|---|
| Independent Auditors' Report | I |
| Management's Discussion and Analysis | II |
| Basic Financial Statements: | III |
|     Statement of Net Assets | |
|     Statement of Revenues, Expenses, and Changes in Net Assets | |
|     Statement of Cash Flows | |
|     Notes to Financial Statements | |
| Other Supplementary Information: | IV |
|     Schedule of Net Assets | |
|     Schedule of Revenues, Expenses, and Changes in Net Assets | |

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

# RSM ROC & Company

Certified Public Accountants & Consultants

To:    Board of Directors of the Puerto Rico
       Convention Center District Authority

RSM ROC & Company
PO Box 10528
San Juan, PR 00922-0528
787.751.6164 F 787.759.7479
www.rocpr.net

**INDEPENDENT AUDITORS' REPORT**

We have audited the accompanying basic financial statements of the Puerto Rico Convention Center District Authority (the Authority), a component unit of the Commonwealth of Puerto Rico, as of June 30, 2005, as listed in the table of content. These financial statements are the responsibility of the Authority's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Puerto Rico Convention Center District Authority as of June 30, 2005, and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

Management's discussion and analysis on Section II is not a required part of the basic financial statements but is supplementary information required by the Governmental Accounting Standards Board. We have applied certain limited procedures, which consisted principally of inquires of management regarding the methods of measurement and presentation of the required supplementary information. However, we did not audit the information and express no opinion on it.

Our audit was conducted for the purpose of forming an opinion on the basic financial statements taken as a whole. The other supplementary information presented in Section IV, is presented for purposes of additional analysis and is not a required part of the basic financial statements. This information is the responsibility of the Authority's management. Such information has been subjected to the auditing procedures applied in the audit of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

San Juan, Puerto Rico
September 30, 2005.

*RSM ROC & Company*

Stamp No. 2097286 was affixed
to the original of this report.

RSM ROC & Company is an independent member firm
of RSM International, an affiliation of independent
accounting and consulting firms.

C-3

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

**STATEMENT OF NET ASSETS**
**June 30, 2005**

**ASSETS**

**CURRENT ASSETS:**

| | | |
|---|---|---:|
| Cash | $ | 21,969,477 |
| Accounts receivable, net | | 5,044,392 |
| Prepaid expenses and other | | 975,946 |
| | | 27,989,815 |

| | |
|---|---:|
| **PROPERTY HELD FOR SALE** | 1,887,000 |
| **CAPITAL ASSETS, NET** | 587,059,786 |
| **DEPOSIT** | 775,000 |
| | $ 617,711,601 |

**LIABILITIES AND NET ASSETS**

**LIABILITIES**

**CURRENT LIABILITIES:**

| | | |
|---|---|---:|
| Lines of credit | $ | 434,402,052 |
| Accounts payable | | 34,319,698 |
| Accrued expenses and other | | 10,174,709 |
| | | 478,896,459 |

**NET ASSETS:**

| | |
|---|---:|
| Invested in capital assets, net of related debt | 139,452,106 |
| Unrestricted | (636,964) |
| | 138,815,142 |
| | $ 617,711,601 |

The accompanying notes are an integral part of this statement.

C-4

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

## PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY

**STATEMENT OF REVENUES, EXPENSES, AND CHANGES IN NET ASSETS**
**For the year ended June 30, 2005**

| | | |
|---|---|---:|
| **OPERATING REVENUES:** | | |
| Rental and services income | $ | 5,566,831 |
| Food, beverage and novelty income | | 4,223,437 |
| Advertising income | | 2,477,382 |
| | | 12,267,650 |
| **OPERATING DIRECT COSTS:** | | |
| Cost of food, beverage and novelty | | 2,026,669 |
| Services expenses | | 1,194,252 |
| | | 3,220,921 |
| | | 9,046,729 |
| **OPERATING AND ADMINISTRATIVE EXPENSES** | | 18,631,796 |
| **OPERATING LOSS** | | (9,585,067) |
| **NON-OPERATING INCOME:** | | |
| Room tax | | 8,002,494 |
| Interest income | | 183,876 |
| Other income | | 7,290 |
| | | 8,193,660 |
| **LOSS BEFORE TRANSFERS** | | (1,391,407) |
| **TRANSFERS IN** | | 81,687,137 |
| **NET INCREASE IN NET ASSETS** | | 80,295,730 |
| **NET ASSETS**, beginning of year | | 58,519,412 |
| **NET ASSETS**, end of year | $ | 138,815,142 |

The accompanying notes are an integral part of this statement.

C-5

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

## PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY

**STATEMENT OF CASH FLOWS**
**For the year ended June 30, 2005**

| | |
|---|---:|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | |
| Collections of rentals, advertising and events | $  12,601,668 |
| Payments to suppliers | (14,184,689) |
| Payments to employees | (1,520,271) |
| | |
| Net cash used in operating activities | (3,103,292) |
| | |
| **CASH FLOWS FROM NON-CAPITAL FINANCING ACTIVITIES:** | |
| Collections of room tax | 6,898,582 |
| Interest collected | 183,876 |
| Other | 7,290 |
| | |
| Net cash provided by non-capital financing activities | 7,089,748 |
| | |
| **CASH FLOWS FROM CAPITAL AND RELATED FINANCING ACTIVITIES:** | |
| Proceeds from lines of credit | 97,877,642 |
| Legislative appropriations for water fountain | 516,900 |
| | |
| Net cash provided by capital and related financing activities | 98,394,542 |
| | |
| **CASH FLOWS USED IN INVESTING ACTIVITIES:** | |
| Acquisition and development of capital assets | (101,049,324) |
| | |
| **NET INCREASE IN CASH** | 1,331,674 |
| | |
| **CASH,** beginning of year | 20,637,803 |
| | |
| **CASH,** end of year | $    21,969,477 |

Continues…

C-6

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

## PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY

**STATEMENT OF CASH FLOWS**
**For the year ended June 30, 2005 (continued)**

| | | |
|---|---:|---|
| **RECONCILIATION OF OPERATING LOSS TO NET CASH USED IN OPERATING ACTIVITIES** | | |
| Operating loss | $ (9,585,067) | |
| Adjustments to reconcile operating loss to net cash used in operating activities: | | |
| Depreciation | 4,087,798 | |
| Changes in assets and liabilities: | | |
| (Increase) decrease in: | | |
| Accounts receivable | (2,146,481) | |
| Prepaid expenses and other | 405,215 | |
| Increase in: | | |
| Accounts payable | 2,296,297 | |
| Accrued expenses and other | 1,838,946 | |
| Net cash used in operating activities | $ (3,103,292) | |
| | | |
| **NON-CASH TRANSACTIONS:** | | |
| Transfer of Coliseum of Puerto Rico: | | |
| Capital Asset | $ 214,768,556 | |
| Account receivable | $ 1,000,000 | |
| Line of credit | $ (131,050,563) | |
| Contract and retention payable | $ (6,047,756) | |
| Transfer of land by the Department of Transportation and Public Work, at fair market value | $ 2,500,000 | |
| Deposit in an escrow account by a prospective buyer of a land lot | $ 775,000 | |

The accompanying notes are an integral part of this statement.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

# PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY

**NOTES TO FINANCIAL STATEMENTS**
**June 30, 2005**

1)   **Organization and summary of significant accounting policies:**

A)   <u>Organization</u> - The Puerto Rico Convention Center District Authority (the "Authority"), is a component unit of the Commonwealth of Puerto Rico (the Commonwealth), created by Law No. 142 of October 4, 2001, and is responsible for developing, constructing, and operating the Puerto Rico Convention Center and the Puerto Rico Convention District.  Law No. 142 amends and supersedes Law No. 400 of September 9, 2000, which had been enacted to create the Puerto Rico Convention Center Authority and to develop the convention center, in an effort to promote congress and large groups meetings in Puerto Rico.  Law No. 142 also amends and supersedes Law No. 351 of September 2, 2000, which had created the World Trade Center District with the final objective to provide the necessary support to the Convention Center Authority. The new legislation conveyed the Puerto Rico Convention Center and the World Trade Center District into a single agency.

Under the provisions of Law No. 142, the Puerto Rico Tourism Company (PRTC) transferred to the Authority the net costs incurred during the development and design of the site that fosters the convention center and surrounding infrastructure, which as of the transfer date October 4, 2001 amounted to $3,600,000.

On August 3, 2004, the Commonwealth of Puerto Rico enacted Law 185 to amend Law 351 of September 2, 2000 and transferred the ownership of the Coliseum Jose Miguel Agrelot to the Authority, increased the composition of the Board of Directors and committed the Office of Management and Budget to allocate funds for the debt services and operation deficit, as applicable, among others.  Related to the transfer of the Coliseum, on September 21, 2004, Law 394 was enacted, amending Law No. 351, to transfer the ownership interest as well as other rights and obligations related to the development and operations of the Coliseum.

B)   <u>Summary of significant accounting policies</u> – The accounting and reporting policies of the Authority conform to accounting principles generally accepted in the United States of America, as applicable to governmental entities.  The activities of the Authority are accounted for as an enterprise fund.  Accordingly, the Authority follows the accrual basis of accounting.   Revenues are recognized when earned, regardless of when received, and expenses are recognized when incurred, regardless of when paid.  Following is a description of the most significant accounting policies:

<u>Basis of presentation</u> – The Authority's financial statements are presented as an enterprise fund and conform to the provisions of Governmental Accounting Standards Board Statement No. 34 (GASB 34) "Basic Financial Statements – and Management's Discussion and Analysis – for State and Local Governments". GASB 34 establishes standards for external financial reporting for all state and local governmental entities, which includes a statement of net assets, a statement of revenues, expenses and changes in net assets and a statement of cash flows.  It requires the classification of net assets into three components: invested in capital assets, net of related debt; restricted; and unrestricted. These classifications are defined as follows:

- <u>Invested in capital assets, net of related debt</u> – This component of net assets consists of capital assets, net of accumulated depreciation, costs to be recovered from future revenues, and unamortized debt expense reduced by the outstanding balance of any bonds, mortgages, notes, or other borrowings that are attributable to the acquisition, construction or improvement of those assets.  If there are significant unspent related debt proceeds at year end, the portion of the debt attributable to the unspent proceeds is not included in the calculation of invested in capital assets, net of related debt.  Rather, the portion of the debt is included in the same net assets component as the unspent proceeds.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

## PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY

**NOTES TO FINANCIAL STATEMENTS**
**June 30, 2005**

- <u>Restricted</u> – This component of net assets consists of constraints placed on net assets use through external constraints imposed by creditors (such as through covenants), contributors, or laws or regulations of other governments or constraints imposed by law through constitutional provision or enabling legislation.

- <u>Unrestricted</u> – This component of net assets consists of net assets that do not meet the definition of "restricted" or "invested in capital assets, net of related debt."

As permitted by Governmental Accounting Standard Board ("GASB") Statement No. 20, "Accounting and Financial Reporting for Proprietary Funds and other Governmental Entities that use Proprietary Fund Accounting", the Authority has elected to apply all Financial Accounting Standards Board ("FASB") Statements and Interpretations, issued after November 30, 1989 that does not conflict with those issued by GASB.

<u>Accounting estimates</u> – The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of financial statements and the reported amounts of revenues and expenses during the reported periods. Actual results could differ from those estimates.

<u>Allowance for doubtful accounts</u> – The allowance for doubtful accounts receivables is an amount that management believes will be adequate to absorb possible losses on existing receivables that may become uncollectible based on evaluations of the collectibility of the receivables. Because of uncertainties inherent in the estimation process, the related allowance may change in the future.

<u>Capital assets</u> – Consist of construction costs, related to the development of the Convention Center and adjacent District, Coliseum of Puerto Rico and office furniture and equipment. Land received as transferred is valued at fair market value. Capital assets, other than construction costs or land, are defined by the Authority as assets which have a cost of $1,000 or more at the date of acquisition and have an expected useful life of two or more years. Such assets are recorded at cost.

Construction costs include design and architectural, environmental studies and site improvements, capitalized interest, insurance, construction costs received in transfers and other capitalizable costs.

Depreciation expense is computed using the straight-line method over the estimated useful lives of the building (50 years) and furniture and equipment (ranging from 2 to 10 years). The capital assets under construction will be depreciated once they are placed in operations. At the time capital assets are sold or otherwise disposed of, the cost and related accumulated depreciation is removed from books and the resulting gain or loss, if any, is credited or charged to operations. Expenditures for repairs and maintenance, which do not extend the useful lives of the assets, are charged to operations in the years incurred.

<u>Accounting for the impairment or disposal of long-lived assets</u> – The Authority accounts for asset impairment under the provisions of Financial Accounting Standards Board Statement No. 144. This Statement requires that long-lived assets held and used in operations (capital assets) be tested for recoverability whenever events or changes in circumstances indicate that the carrying amount of the asset may not be recoverable. The circumstance exists if the carrying amount of the asset exceeds the sum of the undiscounted cash flow expected to result from the use and eventual disposition of the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds its fair value.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

# PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY

**NOTES TO FINANCIAL STATEMENTS**
**June 30, 2005**

Assets to be disposed of, other than by sale, continue to be classified as held and used (capital assets) until they are disposed of. Assets to be disposed of by sale are classified as held for sale in the period in which certain criteria are met and reported at the lower of the carrying amount or fair value. At the time such criteria are not longer met, such assets are reclassified as assets held and used in operations.

Compensated absences – Compensated absences, such as unpaid vacation and sick leave pay, are accrued when incurred using the pay or salary rates in effect at the statement of net assets' date.

Operating revenue and expenses – Entities that follow enterprise fund reporting distinguish operating revenue and expenses from non-operating items. Operating revenue and expenses generally result from providing services and producing and delivering goods in connection with the entity's principal ongoing operations. Revenue and expenses not meeting this definition are reported as non-operating revenue and expenses. Operating revenues and operating directs costs are related to the Coliseum of Puerto Rico. It is expected that the Authority will generate part of its operating revenue once the Puerto Rico Convention Center and the Puerto Rico Convention District commence operations.

Statements of cash flows – The accompanying statements of cash flows are presented in accordance with the provisions of GASB Statement No. 9, "Reporting Cash Flows of Proprietary and Nonexpendable Trust Funds and Governmental Entities that Use Proprietary Fund Accounting". The provisions of GASB 9 required that the direct method be used to present the inflows and outflows of the Authority.

Risk management - The Authority purchases commercial insurance to cover for casualty, theft, tort claims, and other losses through the Puerto Rico Treasury Department (the Treasury Department) negotiated under a blanket agreement and then charged to the Authority.

Non-exchange transactions – GASB Statement No. 33, "Accounting and Financial Reporting for Non-exchange Transactions", establishes accounting and financial reporting standards for non-exchange transactions involving financial or capital resources (for example, most taxes, grants, and private donations). In non-exchange transaction, a government gives (or receives) value without directly receiving (or giving) equal value in return. This is different from an exchange transaction, in which each party receives and gives up essentially equal values. Under the provisions of the GASB 33, the provider and the recipient should recognize the non-exchange transaction as an expense and revenue, respectively, when all eligibility requirements are satisfied.

The Authority accounts for room tax revenues and the transfer of land and the Coliseum of Puerto Rico pursuant to GASB 33.

Adoption of a new accounting principle – The Authority adopted the provisions of Government Accounting Standard No. 40, "Deposit and Investment Risk Disclosure - an amendment of GASB Statement No. 3". The statement addresses common deposit and investments risks related to credit risk, concentration of credit risk, interest rate risk and foreign currency risk. Among other disclosures, the statement requires certain disclosures applicable to deposits or investments having fair values that are highly sensitive to changes in interest rates.

C-10

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

# PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY

**NOTES TO FINANCIAL STATEMENTS**
**June 30, 2005**

Recently Issued accounting standards – The GASB has issued the following accounting standards that have effective dates after June 30, 2005:

- GASB Statement No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for Insurance Recoveries,* which is effective for fiscal years beginning after December 15, 2004.

- GASB Statement No. 43, *Financial Reporting for Postemployment Benefit Plans Other than Pension Plans,* which is effective for fiscal years beginning after December 15, 2004.

- GASB Statement No. 44, *Economic Condition Reporting: The Statistical Section—an amendment of NCGA Statement 1,* which is effective for statistical sections prepared for periods beginning after June 15, 2005.

- GASB Statement No. 45, *Accounting and Financial Reporting by Employers for Postemployment Benefits Other than Pensions,* which is effective for fiscal years beginning after December 15, 2006.

- GASB Statement No. 46, *Net Assets Restricted by Legislation, an Amendment of GASB Statement No. 34,* which is effective for fiscal years beginning after June 15, 2005.

The impact of these statements on the Authority basic financial statements has not yet been determined.

2) **Cash:**

The Authority's cash is mainly time deposits that is held in custody by two banking institutions, including $500,011 with the Government Development Bank for Puerto Rico ("GDB"). Deposits outside of the GDB are insured by Federal Depository Insurance Corporation up to $100,000, with the remaining balance collateralized with various financial instruments held by a trustee of the Treasury Department of the Commonwealth of Puerto Rico. Deposits held outside of GDB, amounting to approximately $21,500,000, are not subject to custodial credit risk, which is the risk that in the event of a bank failure, the Authority's deposit may not be returned to it. The amounts deposited in the GDB are subject to credit risk. The Authority does not have a policy for custodial risk.

3) **Accounts receivable:**

As of June 30, 2005, accounts receivable were as follows:

| Description | | Amount |
|---|---|---|
| Account receivable trade | $ | 2,123,385 |
| Room tax receivable | | 1,897,910 |
| Due from other governmental agency | | 1,000,000 |
| Other account receivable | | 23,097 |
| | $ | 5,044,392 |

4) **Capital assets:**

Capital assets are comprised of the cost incurred in the development of the Convention Center District (CCD), which will entail 113 acres of land positioned near the center of the San Juan metropolitan area and the Coliseum of Puerto Rico. It also includes furniture and equipment at the temporary office facilities near the Convention Center and Coliseum of Puerto Rico. The Board of Directors adopted a master plan that will call for developments of the Convention Center and surrounding infrastructure, residential and office buildings, hotels and casinos, a complex for retail and entertainment, restaurants and walkways, and others. The development strategy is a blend of public and private investment but ownership of the land will substantially remain with the Authority.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

# PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY

**NOTES TO FINANCIAL STATEMENTS**
**June 30, 2005**

As of June 30, 2005, capital assets were as follows:

| Description | Beginning Balance | Additions/ Transfers | Reductions | Ending Balance |
|---|---|---|---|---|
| Capital assets not being depreciated: | | | | |
| Land – Convention Center | $ 60,000,000 | $ 2,500,000 | $ (1,887,000) | $ 60,613,000 |
| Land – Coliseum | - | 26,542,101 | - | 26,542,101 |
| Construction in progress | 202,675,027 | 89,223,023 | - | 291,898,050 |
| | 262,675,027 | 118,265,124 | (1,887,000) | 379,053,151 |
| Capital assets being depreciated: | | | | |
| Building - Coliseum | - | 199,413,834 | - | 199,413,834 |
| Furniture and equipment | 256,780 | 12,501,796 | - | 12,758,576 |
| Vehicle | 31,795 | - | - | 31,795 |
| Less: accumulated depreciation | (109,772) | (4,087,798) | - | (4,197,570) |
| Total capital assets being depreciated, net | 178,803 | 207,827,832 | - | 208,006,635 |
| | $ 262,853,830 | $ 326,092,956 | $ (1,887,000) | $ 587,059,786 |

5) **Deposit:**

On March 10, 2005 the Authority, entered into a purchase and sale and development agreement ("Agreement") with Plaza CCD Development Corp. (the "Developer"), a non-related party. The agreement includes the selling of a parcel of land known as Block C, with an area of 2.5165 "cuerdas", subject to the construction of certain improvements by the Developer. The Developer agreed to the construction of the following: 1) up to a maximum of 114 residential units, 2) 50,000 square feet of retail and restaurant establishments, 3) 19,000 square feet of office space; and 4) a parking comprising not less than 278 parking spaces. The Authority and the Developer have set the purchase price for the project to be $7,750,000. As of June 30, 2005 the Developer had already deposited the sum of $775,000 in an escrow account with a mutually agreed upon third party and the balance of the purchase price, $6,975,000, shall be paid immediately upon the perfection of the Agreement.  As of June 30, 2005, the estimated cost of the property held for sale is $1,887,000 as presented in the Statement of Net Assets.

6) **Lines of credit :**

As of June 30, 2005, the Authority had negotiated three interim non-revolving lines of credit with GDB for the development and construction of the Convention Center and Coliseum.  The agreements are as follows:

<u>Convention Center</u>

As of June 30, 2005, the Authority had two interim non-revolving financing agreements with GDB amounting to $401,950,000 and $13,750,000, maturing on December 31, 2005.  Proceeds from the credit facilities are used to finance the costs associated with the development and construction of the Puerto Rico Convention Center, and to re-finance the amounts due to the Puerto Rico Tourism Company (the previous project owner).  Outstanding balances bear interest at 150 basis points over Commercial Paper Note, as defined in the financing.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

# PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY

**NOTES TO FINANCIAL STATEMENTS**
**June 30, 2005**

As of June 30, 2005, the effective interest rates under the above lines of credit were 4.19% and 4.74%, respectively.  Currently, interests on the loan have been repaid with the proceeds from hotel room taxes (see note 11), while the Authority expects to obtain the necessary funding from a bond issuance anticipated to occur during the next fiscal year.  As of June 30, 2005, the unused lines of credit amounted to $112,403,342 and $13,558,459, respectively.

Coliseum

On November 24, 2004, the Authority entered into a credit transfer agreement with GDB, pursuant to Law No. 359 of 2004, amounting to an aggregate of $230,000,000, maturing on December 31, 2005.   Proceeds from the credit facilities are used to finance the costs associated with the development and construction of the Coliseum of Puerto Rico Jose Miguel Agrelot.  Outstanding balances bear interest at 150 basis points over Commercial Paper Note, as defined in the financing.  As of June 30, 2005, the effective interest rate was 4.19%.   As of June 30, 2005, the unused line of credit amounted to $85,336,147.

As of June 30, 2005 the aggregate balance of the lines of credit is as follow.

| Description | Beginning Balance | Additions/ Transfer | Reductions | Ending Balance |
|---|---|---|---|---|
| Lines of credit – Convention Center | $  205,473,847 | $   84,264,352 | $           - | $   289,738,199 |
| Line of credit – Coliseum | - | 144,663,853 | - | 144,663,853 |
| | $  205,473,847 | $  228,928,205 | $           - | $   434,402,052 |

7)  **Accounts payable:**

As of June 30, 2005, accounts payable are as follows:

| Description | Amount |
|---|---|
| Accounts payable trade | $    4,284,108 |
| Contract payable | 12,958,662 |
| Retention payable | 7,851,579 |
| Due to other governmental agencies | 7,440,411 |
| Deposit payable | 1,784,938 |
| | $  34,319,698 |

8)  **Accrued expenses and other:**

As of June 30, 2005, accrued expenses and other are as follows:

| Description | Amount |
|---|---|
| Interest payable | $    6,947,950 |
| Deferred revenues | 1,231,821 |
| Other accrued expenses | 1,994,938 |
| | $  10,174,709 |

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

**NOTES TO FINANCIAL STATEMENTS**
**June 30, 2005**

9) **Operating and administrative expenses:**

For the year ended June 30, 2005, operating and administrative expenses were as follows:

| Description | Amount |
|---|---:|
| Professional and contracted services | $ 6,213,692 |
| Depreciation | 4,087,798 |
| Utilities | 2,484,465 |
| Salaries and related benefits | 1,623,945 |
| Advertising | 1,215,359 |
| Insurance | 1,061,263 |
| Repairs and maintenance | 768,301 |
| Security | 491,772 |
| Others | 685,201 |
| | $ 18,631,796 |

10) **Transaction with Puerto Rico Tourism Company:**

On July 8, 2002, the Authority entered into a $12,000 service agreement with the PRTC that would extend to June 30, 2005, with a monthly renewable option at $1,000.  Among the services to be provided by PRTC are, but not limited to, contracting, legal, human resources, financial counseling and others, as requested by the Authority.

11) **Hotel room tax revenue:**

Pursuant to Sections 2051 and 2084 of the 1994 Puerto Rico Internal Revenue Code, hotels are required to pay a 9% tax based on the proceeds related to the occupancy and distributed among different revenue accounts of the Puerto Rico Treasury Department general and special revenue funds pursuant to the provisions of Section 2084.

Law No. 299 of September 1, 2000, amended Sections 2051 and 2084 of the 1994 Puerto Rico Internal Revenue Code and established that proceeds received from room tax are to be collected by the Treasury Department and then transferred to the Puerto Rico Tourism Company ("PRTC") in order for PRTC to dispose of these moneys based on the provisions established in Law No. 299.

On September 9, 2003, the Governor of Puerto Rico signed Law No. 272, which among others, amended the provisions of Law No. 299 of room taxes.  The significant provisions amended included the following:

- Transfers the responsibility of imposing, collecting and administering the Puerto Rico room tax to the PRTC.

- Without limitation and based on the amount certified by the GDB as the required funding for the debt service related to the financing obtained to construct the Convention Center.

- The excess over the amount certified by GDB for the debt service will be distributed in priority order in the following manner:

    - Two percent (2%) of the total proceeds will be assigned to the Puerto Rico Tourism Company for administration of the funds.

C-14

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

## PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY

**NOTES TO FINANCIAL STATEMENTS**
**June 30, 2005**

- Five percent (5%) of the proceeds will be transferred to the Puerto Rico Treasury Department and will be deposited into the general fund. Once the commencement of the operations of the Convention Center are certified to Puerto Rico Department of Treasury by the PRTC and the Authority and for a period of ten years, the five percent (5%) will be deposited into a special account to cover any deficit from operation of the Authority in excess of $2,500,000. For each year that the funds in the special account are not used by the Authority, the Puerto Rico Department of Treasury will release and administer the funds.

- Nine percent (9%) of the proceeds will be used to fund the expenses incurred by the Puerto Rico Convention Bureau (an unrelated party).

- A special fund of $2,500,000 will be established to cover the operation deficit, if any, of the Convention Center upon the commencement of the operations during the first 10 years of operations, certified to Puerto Rico Department of Treasury by the PRTC and the Authority.

- Any excess on the funds collected will be assigned to the PRTC to promote, advertise and develop the tourism activities in Puerto Rico.

Currently, the Authority receives in room taxes the equivalent of the debt services certified by the Board of Directors of the Puerto Rico Tourism Company. For the years ended June 30, 2005, revenues from the room tax amounted to $8,002,494.

12) **Defined Contribution Plan:**

During the fiscal year ended June 30, 2004, the Authority approved and established the Puerto Rico Convention Center Retirement Plan Money Purchase Plan (the Plan), a contributory deferred money purchase plan covering all the employees of the Authority, with benefits for the employees effective January 1, 2003. All employees become vested, once they entered into the Plan, in accordance with the eligibility requirements. The Authority acts as the Plan Administrator and subject to certain limitations can amend the Plan. Contributions to the Plan have been determined to be equivalent to 9% of the employees' normal annual salary, as defined. Total contributions made by the Authority for the year ended June 30, 2005, amounted to approximately $100,000.

13) **Transfers in:**

| Description | Amount |
|---|---:|
| Coliseum of Puerto Rico transfer from AFICA | $ 78,670,237 |
| Land lot received from the Department of Transportation and Public Work | 2,500,000 |
| Legislative appropriations for water fountain | 516,900 |
| | $ 81,687,137 |

Transfer of Coliseum of Puerto Rico

On August 3, 2004, the Commonwealth of Puerto Rico enacted Law 185 to amend Law 351 of September 2, 2000 and transfer the ownership of the Coliseum Jose Miguel Agrelot to the Authority. See non-cash transactions in Statement of Cash Flows.

C-15

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

# PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY

**NOTES TO FINANCIAL STATEMENTS**
**June 30, 2005**

<u>Transfer of land lot</u>

On July 23, 2004, the Authority received a transfer of land from the Commonwealth of Puerto Rico through a fee simple deed.  The tract of land, previously known as "Antigua Cárcel Juvenil", comprises 2.5 "cuerdas" (approximately 9,925 square meters). The land was recorded at the appraisal value of $2,500,000.

<u>Funds for water fountain</u>

On August 5, 2004, the Commonwealth of Puerto Rico passed Senate Joint Resolution 3803 (RC 1090), which assigned to the Authority, from the Commonwealth of Puerto Rico Construction and Betterment Fund, $2 million for the construction of the emblematic water fountain for the Authority.  For the year ended June 30, 2005 the aggregated amount received was $516,000.

14) **Commitments:**

As of June 30, 2005, the Authority had the following commitments:

<u>Development and construction</u>

The Authority entered into various agreements for the purpose of developing, constructing, and operating the Puerto Rico Convention Center.  The material commitments for the remaining construction contracts as of June 30, 2005 are as follows:

| Description | Commitments | Expended to date | Outstanding |
|---|---|---|---|
| Site infrastructure design, permitting and environmental effort | $    17,806,000 | $    16,175,000 | $    1,631,000 |
| Convention Center detail design | 21,127,000 | 20,669,000 | 458,000 |
| Construction management | 29,147,000 | 27,348,000 | 1,799,000 |
| Convention Center and District construction | 236,114,000 | 203,741,000 | 32,373,000 |
| Indirect construction costs | 36,636,000 | 29,182,000 | 7,454,000 |
| | $    340,830,000 | $    297,115,000 | $    43,715,000 |

<u>Consulting and management</u>

As of June 30, 2005, the Authority had entered into various consulting services and management agreements with third parties for the pre-opening and management of the operations of the Convention Center and Coliseum. The agreements covered the daily operations, which includes scheduling of activities, and pricing of rental and advertising, and food and beverages, among others.  The contracts have several provisions that at the option of the Authority could extend the management period up to June 30, 2008.

C-16

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

# PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY

**NOTES TO FINANCIAL STATEMENTS**
**June 30, 2005**

The minimum future commitments assumed by the Authority amounts to approximately $2,541,000 as follows:

| June 30, | Base fees | Incentive fees | Total |
|---|---|---|---|
| 2006 | $ 611,000 | $ 446,000 | $ 1,057,000 |
| 2007 | 513,000 | 453,000 | 966,000 |
| 2008 | 259,000 | 259,000 | 518,000 |
| | $ 1,383,000 | $ 1,158,000 | $ 2,541,000 |

One of the agreements, include a clause to adjust the annual fees to reflect the consumer price index with a cap of up to 3% a year.  During the year ended June 30, 2005, the Authority paid in consulting and management fees related to these agreements approximately $362,500.

15) **Subsequent event:**

On August 31, 2005, the Authority, entered into a development ground lease agreement ("Agreement") with third party.  The agreement include the construction of a hotel with a minimum 500 guest rooms, a casino, meeting facilities, business and fitness center, among others.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

## SECTION IV


## Other Supplementary Information

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**
**SCHEDULE OF NET ASSETS**
**JUNE 30, 2005**

| | Convention Center and District | Coliseum | Total |
|---|---:|---:|---:|
| **Current assets:** | | | |
| Cash | $ 18,907,841 | $ 3,061,636 | $ 21,969,477 |
| Account receivable, net | 1,921,007 | 3,123,385 | 5,044,392 |
| Prepaid expenses and other | 269,819 | 706,127 | 975,946 |
| **Capital assets, net:** | | | |
| Land | 60,613,000 | 26,542,101 | 87,155,101 |
| Building | - | 196,442,834 | 196,442,834 |
| Construction in progress | 291,898,050 | - | 291,898,050 |
| Equipment and vehicles | 117,104 | 11,446,697 | 11,563,801 |
| | 352,628,154 | 234,431,632 | 587,059,786 |
| **Property held for sale** | 1,887,000 | - | 1,887,000 |
| **Deposit** | 775,000 | - | 775,000 |
| | $ 376,388,821 | $ 241,322,780 | $ 617,711,601 |
| **Current liabilities:** | | | |
| Lines of credit | $ 289,738,199 | $ 144,663,853 | $ 434,402,052 |
| Accounts payable | 1,721,176 | 10,003,343 | 11,724,519 |
| Contracts payable | 12,958,662 | - | 12,958,662 |
| Retention payable | 7,409,136 | 442,443 | 7,851,579 |
| Deposits payable | 1,056,759 | 728,179 | 1,784,938 |
| Deferred revenue | - | 1,231,821 | 1,231,821 |
| Interests payable | 1,009,276 | 5,938,674 | 6,947,950 |
| Accrued expenses | 873,877 | 1,121,061 | 1,994,938 |
| | 314,767,085 | 164,129,374 | 478,896,459 |
| **Net assets:** | | | |
| Invested in capital assets, net of related debt | 62,307,722 | 77,144,384 | 139,452,106 |
| Unrestricted | (685,986) | 49,022 | (636,964) |
| | 61,621,736 | 77,193,406 | 138,815,142 |
| | $ 376,388,821 | $ 241,322,780 | $ 617,711,601 |

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**
**SCHEDULE OF REVENUES, EXPENSES AND CHANGES IN NET ASSETS**
**FOR THE YEAR ENDED JUNE 30, 2005**

| | Convention Center and District | Coliseum | Total |
|---|---|---|---|
| **OPERATING REVENUES:** | | | |
| Rental and services income | $ - | $ 5,566,831 | $ 5,566,831 |
| Food, beverage and novelty income | - | 4,223,437 | 4,223,437 |
| Advertising income | - | 2,477,382 | 2,477,382 |
| | - | 12,267,650 | 12,267,650 |
| **OPERATING DIRECT COSTS:** | | | |
| Cost of food, beverage and novelty | - | 2,026,669 | 2,026,669 |
| Services expenses | - | 1,194,252 | 1,194,252 |
| | - | 3,220,921 | 3,220,921 |
| | - | 9,046,729 | 9,046,729 |
| **OPERATING AND ADMINISTRATIVE EXPENSES:** | | | |
| Professional and contracted services | 2,705,867 | 3,507,825 | 6,213,692 |
| Depreciation | 75,798 | 4,012,000 | 4,087,798 |
| Utilities | 332,734 | 2,151,731 | 2,484,465 |
| Salaries and related benefits | 1,623,945 | - | 1,623,945 |
| Advertising | 795,247 | 420,112 | 1,215,359 |
| Insurance | 19,982 | 1,041,281 | 1,061,263 |
| Repairs and maintenance | 10,741 | 757,560 | 768,301 |
| Security | 258,799 | 232,973 | 491,772 |
| General and administrative expenses | 98,976 | 586,225 | 685,201 |
| | 5,922,089 | 12,709,707 | 18,631,796 |
| **OPERATING LOSS** | (5,922,089) | (3,662,978) | (9,585,067) |
| **NON OPERATING INCOME:** | | | |
| Interest income | 183,876 | - | 183,876 |
| Room tax revenue | 8,002,494 | - | 8,002,494 |
| Other expenses | 7,290 | - | 7,290 |
| | 8,193,660 | - | 8,193,660 |
| **INCOME (LOSS) BEFORE TRANSFERS** | 2,271,571 | (3,662,978) | (1,391,407) |
| **TRANSFERS IN:** | | | |
| Transfer of Coliseum of Puerto Rico from AFICA | - | 78,670,237 | 78,670,237 |
| Land lot received from Department of Transportation and Public Work | 2,500,000 | - | 2,500,000 |
| Legislative appropriations for water fountain | 516,900 | - | 516,900 |
| | 3,016,900 | 78,670,237 | 81,687,137 |
| **NET INCREASE IN NET ASSETS** | $ 5,288,471 | $ 75,007,259 | $ 80,295,730 |

C-20

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

APPENDIX D

## SUMMARY OF CERTAIN PROVISIONS OF THE TRUST AGREEMENT

The following is a summary of certain provisions of the Trust Agreement. This summary is qualified in its entirety by reference to the document itself. All references in this summary to the "Trust Agreement" are deemed to refer to the Trust Agreement.

### Certain Definitions

The following terms shall, for purposes of this Summary, have the following meanings:

"*Accreted Value*" means any amount defined as such in a Supplemental Trust Agreement for purposes of determining the Redemption Price of, certain rights of the Owner of or certain other matters with respect to a Capital Appreciation Bond.

"*Accretion Date*" means any date defined as such in a Supplemental Trust Agreement for purposes of determining the Accreted Value or Maturity Value of a Capital Appreciation Bond.

"*Assignment Agreement*" means the Assignment Agreement dated March 24, 2006, between the Tourism Company and GDB, pursuant to which the Tourism Company has irrevocably assigned to GDB its rights, duties and powers with respect to the receipt of Hotel Occupancy Tax Funds for the benefit of the bondholders.

"*Additional Bonds*" shall mean one or more series of Bonds of the Issuer issued pursuant to the Trust Agreement other than the Series A Bonds issued on the date of the Trust Agreement pursuant to a first Supplemental Trust Agreement.

"*Authority*" means the Puerto Rico Convention Center District Authority.

"*Authority Act*" means Act No. 351 of the Legislature of Puerto Rico, approved September 2, 2000, as the same shall be amended from time to time or any successor legislation by which the Authority shall be created and from which it shall derive its powers.

"*Authority Representative*" means the Executive Director or any other officer or employee of the Authority authorized by law to act as an Authority Representative under the Trust Agreement or any Supplemental Trust Agreement.

"*Authorized Denomination*" means the denomination or denominations defined as such in a Supplemental Trust Agreement for purposes of determining the denominations of a Series of Bonds.

"*Bond Counsel*" means (a) as of the date of issuance of the first Series of Bonds, Duane Morris LLP, and (b) as of any other date, Duane Morris LLP or other attorneys selected by the Authority who have nationally recognized expertise in the issuance of municipal securities, the interest on which is excluded from gross income for federal income tax purposes.

"*Bond Payment Date*" means each date on which Bond Payments are due and includes, but is not limited to, the maturity date of any Bond; each Interest Payment Date on each Current Interest

D-1

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

Bond; and the mandatory sinking fund redemption dates of term Bonds that are subject to mandatory sinking fund redemption in accordance with a mandatory sinking fund redemption schedule set forth in a Supplemental Trust Agreement.

"*Bond Payment Fund*" means the special fund created by the Trust Agreement.

"*Bond Payments*" means (a) with respect to a Current Interest Bond, the interest due on such Bond on each Interest Payment Date and the principal and interest due on such Bond at maturity; (b) with respect to a Capital Appreciation Bond, the Maturity Value due on such Bond at maturity; and (c) with respect to term Bonds that are subject to mandatory sinking fund redemption in accordance with a schedule set forth in a Supplemental Trust Agreement, the principal and interest or the Accreted Value payable on such Bonds on the date on which they are subject to mandatory sinking fund redemption in accordance with such schedule. "Bond Payments" does not include the Redemption Price of any Bond.

For purposes of this definition:

(i)      Bond Payments due on any Interest Payment Date that are payable from accrued interest or capitalized interest held in the Bond Payment Fund or capitalized interest held in the Capitalized Interest Account of the Proceeds Fund will be excluded in determining the amount of Bond Payments due in the Fiscal Year in which such Interest Payment Date occurs for purposes of determining the annual Bond Payments for the certificate required under the Trust Agreement which provides that the Authority is in compliance with all applicable provisions of the Occupancy Tax Act.

(ii)     If any Bonds bear interest at an adjustable or variable interest rate such that the Bond Payments due in a Fiscal Year or on a Bond Payment Date cannot be determined with certainty on the date on which Hotel Occupancy Tax Funds are to be paid to the Trustee pursuant to the Pledge Agreement, or in determining the amount of Bond Payments becoming due during a Fiscal Year for purposes of preparing the certificate required under the Trust Agreement which provides that the Authority is in compliance with all applicable provisions of the Occupancy Tax Act, the amount of interest included in the Bond Payments due on such Bonds in such Fiscal Year or on such Bond Payment Date shall be based on the interest rate estimated by the Authority, or as stated in any Supplemental Trust Agreement relating thereto.

(iii)    If the Authority purchases or arranges for a Credit Facility or an Interest Rate Exchange Agreement with respect to any Bonds pursuant to the Trust Agreement, (A) moneys paid or payable to the provider of the Credit Facility to reimburse the provider for moneys paid by the provider that are used to make Bond Payments (as defined in the first two sentences of this definition) and (B) moneys paid or payable to the provider of the Interest Rate Exchange Agreement for moneys paid by the provider that are used to make Bond Payments (as defined in the first two sentences of this definition) may, but in each case if and to the extent provided in a Supplemental Trust Agreement or in a separate agreement between the Authority and the Credit Facility or Interest Rate Exchange Agreement provider entered into pursuant to the Trust Agreement, be treated as Bond Payments on the Bonds to which the Credit Facility or Interest Rate Exchange Agreement relates.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

"*Bonds*" means any bond or bonds, as the case may be, authenticated under, and issued pursuant to, the Trust Agreement.

"*Business Day*" means any day other than a Saturday, a Sunday or a day on which banks in New York, New York, San Juan, Puerto Rico or any city identified in a Supplemental Trust Agreement are authorized by law to remain closed.

"*Capital Appreciation Bond*" means a Bond on which no payments are due until maturity or redemption prior to maturity.

"*Code*" means the Internal Revenue Code of 1986, as amended, and regulations thereunder.

"*Commonwealth*" means the Commonwealth of Puerto Rico.

"*Constitution*" means the Constitution of the Commonwealth.

"*Construction Account*" means the Construction Account within the Proceeds Fund created by the Trust Agreement.

"*Construction Costs*" means all costs and expenses paid or incurred or to be paid or incurred (including the reimbursement of the Authority for any of such costs and expenses originally paid or incurred by the Authority) in connection with:

> (a)  the design of, acquisition of the site for, construction of, and improvements made as part of, the Construction Projects;

> (b)  financing costs, including, but not limited to, costs and expenses that the Authority deems necessary or advantageous in connection with the sale of the Bonds and the administration of the Bonds, the Trust Estate, the Trust Agreement and any Supplemental Trust Agreement, including, but not limited to, costs and expenses relating to the engagement of consultants, financial advisors, underwriters, bond insurers, letter of credit banks, rating agencies, attorneys, trustees, paying agents, registrars, other agents and other Persons in connection with the issuance of the Bonds, the Trust Estate, the Trust Agreement or any Supplemental Trust Agreement;

> (c)  payment of interest on the Bonds during the construction of any Construction Projects;

> (d)  the funding of the Debt Service Reserve Fund; and

> (e)  working capital on or before the completion of any Construction Projects.

"*Construction Project*" means a project which may be financed, in whole or in part, with Hotel Occupancy Tax Funds in accordance with the Occupancy Tax Act, the Authority Act and the Tourism Company Administrative Determination No. 05-01, dated May 4, 2005.

"*Credit Facility*" means any letter of credit, insurance, stand-by credit or liquidity agreement or other forms of credit ensuring timely payment of any Bonds, including the Bond Payments on or the Redemption Price or purchase price of such Bonds, that is entered into in accordance with the Trust

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

Agreement.  References to "Credit Facility" with respect to any Series of Bonds shall be ineffective when such Bonds are not supported by a Credit Facility.

"*Current Interest Bond*" means a Bond on which interest is payable on Interest Payment Dates prior to maturity or redemption prior to maturity.

"*Debt Service Reserve Fund*" means the special fund created by the Trust Agreement.

"*Defeasance Escrow Account*" means any trust account into which money and/or Defeasance Securities are deposited for the purpose of defeasing any Bonds in accordance with the Trust Agreement.

"*Defeasance Security*" means Government Obligations that, at the time they are deposited into a Defeasance Escrow Account either (i) cannot be redeemed prior to maturity at the option of any Person other than the owner thereof or (ii) the redemption date of which has been irrevocably fixed by an irrevocable exercise of an option to redeem on such date or an irrevocable covenant to exercise an option to redeem on such date (in which case the fixed redemption date shall be treated as the maturity date for purposes set forth in the Trust Agreement).

"*Earnings Account*" means the earnings account within the Proceeds Fund created by the Trust Agreement.

"*Event of Default*" means an event described in the Trust Agreement.

"*Executive Director*" means the Executive Director or any Assistant Executive Director of the Authority for the time being, or if there is no Executive Director or Assistant Executive Director, then any person designated by the Authority to perform the functions of the Authority.

"*Financial Agreements Fund*" means the special fund created by the Trust Agreement.

"*Fiscal Year*" means the period commencing on July 1st in each calendar year and ending on the last day of June of the next succeeding calendar year.

"*Government Obligations*" means (i) direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States Government, (ii) bonds, debentures or notes issued by any of the following Federal Agencies: Banks for Cooperatives, Federal Intermediate Credit Banks, Federal Home Loan Banks, Export-Import Bank of the United States, Government National Mortgage Association or Federal Land Banks, (iii) obligations issued or guaranteed by an agency of the United States of America or person controlled or supervised by and acting as an instrumentality of the United States of America pursuant to authority granted by the Congress, (iv) municipal obligations, the payment of the principal of and interest and redemption premium, if any on which are irrevocably secured by obligations described in clause (i) of this definition and which obligations are not subject to redemption prior to the date on which the proceeds attributable to the principal of the obligations are to be used and have been deposited in an escrow account which is irrevocably pledged to the payment of the principal of and interest and redemption premium, if any, on such municipal obligations, and (v) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clauses (i), (ii), (iii) and (iv) of this definition held by a bank (including the Trustee) or trust company as

D-4

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

custodian and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated.

*"GDB"* means Government Development Bank for Puerto Rico, a public corporation of the Commonwealth created by Act No. 17 of the Legislature of Puerto Rico, approved September 23, 1948, as the same shall be amended from time to time or any successor legislation by which the shall be created and from which it shall derive its powers.

*"GDB Certificate"* means the annual certificate delivered on or before May 30th of each Fiscal Year by GDB to the Authority, the Tourism Company and the Trustee, setting forth the total monthly amounts to be delivered by GDB to the Trustee to pay principal and interest due on the Bonds for the upcoming Fiscal Year.

*"Hotel Occupancy Tax"* means the tax set forth in Section 24 of the Occupancy Tax Act.

*"Hotel Occupancy Tax Funds"* means all Hotel Occupancy Tax Revenues that are deposited in the Transfer Account on and after the date of the Trust Agreement.

*"Hotel Occupancy Tax Revenues"* means all revenues derived by the Tourism Company from the Hotel Occupancy Tax, including all penalties, surcharges and interest thereon.

*"Interest Payment Date"* means any date defined as such in a Supplemental Trust Agreement for purposes of paying the interest on a Series of Current Interest Bonds.

*"Interest Rate Exchange Agreement"* means any interest rate exchange agreement authorized by law and entered into with respect to the Bonds or any portion of the Trust Estate that is entered into in accordance with the Trust Agreement.

*"Letter of Representations"* means the Letter of Representations between the Authority and The Depository Trust Company, New York, New York or any successor depository with respect to the book-entry registration system for the Bonds.

*"Loan"* means any loan as set forth in the Supplemental Trust Agreement made by GDB or any other entity to the Authority.

*"Loan Payment Account"* means the Loan Payment Account within the Proceeds Fund created by the Trust Agreement.

*"Maturity Value"* means any amount defined as such in a Supplemental Trust Agreement for purposes of determining the amount payable to the Owner of a Capital Appreciation Bond at the maturity of such Capital Appreciation Bond.

*"Maximum Annual Debt Service Requirement"* means the greatest total amount of principal and interest due on the Bonds in any Fiscal Year and on July 1st of the succeeding Fiscal Year.

*"Moody's"* means Moody's Investor Service and its successors.

*"New Money Bonds"* means Bonds issued for the purpose of funding the Proceeds Fund.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

"*Occupancy Tax Act*" means Act No. 272 of the Legislature of Puerto Rico, approved September 9, 2003, as amended and supplemented from time to time and any successor or replacement provision of law.

"*Operations Center*" means the operations center of the Trustee in Dallas, Texas or at such other location as the Trustee may designate from time to time by written notice to the Authority.

"*Original Principal Amount*" means any amount defined as such in a Supplemental Trust Agreement for purposes of determining certain rights of the Owner of, or certain other matters with respect to, a Capital Appreciation Bond.

"*Original Purchaser*" means the Person defined as such in a Supplemental Trust Agreement for purposes of purchasing a Series of Bonds from the Authority.

"*Outstanding*" means all Bonds that have been executed and delivered, except:

(a)     any Bond on which all Bond Payments due or to become due have been paid at maturity;

(b)     any Bond on which the Redemption Price due or to become due has been paid in accordance with the redemption provisions applicable to such Bond;

(c)     Bonds in lieu of which other Bonds have been executed and delivered pursuant to the provisions of the Trust Agreement or any Supplemental Trust Agreement relating to the transfer and exchange of Bonds or the replacement of mutilated, lost, stolen or destroyed Bonds;

(d)     Bonds that have been canceled by the Trustee or that have been surrendered to the Trustee for cancellation;

(e)     Bonds on which all Bond Payments or the Redemption Price is due and for which the Trustee holds moneys sufficient to pay the Bond Payments or Redemption Price for the benefit of the Owner thereof pursuant to the Trust Agreement; and

(f)     Bonds that have been defeased pursuant to the Trust Agreement.

"*Owner*" of a Bond means the registered owner of such Bond as shown in the registration records of the Trustee.

"*Permitted Investments*" means:

(a)     Government Obligations;

(b)     direct and general obligations of any state or territory of the United States of America to the payment of the principal of and interest on which the full faith and credit of such state or territory is pledged, provided that such obligations are rated, on the date of investment therein, in any of the three highest rating categories (without regard to any graduations, within any such category) by both Moody's or any successors thereto and S&P or any successors thereto;

D-6

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

(c) bankers' acceptances, certificates of deposit or time deposits of any bank or national banking association (including the Trustee), trust company or savings and loan association (including any investment in pools of such bankers' acceptances, certificates of deposit or time deposits), which to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation, are either (A) issued by a bank, trust company or savings and loan association having a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by such securities as are described in clauses (a) or (b) above and (i) below, having a market value at least equal to the principal amount of such bankers' acceptances, certificates of deposit or time deposits (or portion thereof not so insured); provided that the Trustee has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(d) any repurchase, reverse repurchase, forward purchase or investment agreement with any bank or trust company organized under the laws of any state of the United States or the Commonwealth or any national banking association (including the Trustee), insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any one or more of the securities described in clauses (a) and (b) above and (i) below, provided that the Trustee has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(e) obligations, whether or not insured, issued by any state or territory of the United States, or any political subdivision, agency or, instrumentality thereof which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's or any successors thereto and S&P or any successors thereto;

(f) participating shares in a mutual fund or investment pool for local government investment; provided that the investments of such mutual fund or investment pool are rated in one of the three highest rating categories (without regard to any graduations within any such category) by both Moody's or any successors thereto, and S&P or any successors thereto;

(g) (1) shares of stock in a corporation rated in the highest rating category by Moody's or any successors thereto and S&P or any successors thereto (without regard to graduations within such category) that (A) is a regulated investment company within the meaning of Section 851(a) of the Internal Revenue Code of 1986, as amended, and, meets the requirements of Section 852(a) of said Code for the calendar year; (B) invests all of its assets in obligations described in clauses (a) and (b) above; and (C) has at least 98% of (I) its gross income derived from interest on, or gain from the sale of or other disposition of, such obligations or (II) the weighted average of its assets is represented by investments in such obligations or (2) money market accounts of the Trustee or any state or federally chartered bank, banking associations, trust company or subsidiary trust company that is rated or whose parent state bank is rated in the highest short-term rating category or in one of the two highest long-term rating categories by Moody's or any successors thereto and S&P or any successors thereto (without regard to any gradations within such category);

D-7

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

(h)     any other obligations permitted under the laws of the Commonwealth which are rated, or which are issued by issuers which are rated, on the date of investment therein, in any of the three highest rating categories (without regard to any gradations within any such category) by both Moody's or any successors thereto and S&P or any successors thereto, or which are collateralized by Permitted Investments;

(i)     Commercial paper, rated "P-1" by Moody's or "A-1" by S&P, issued by a corporation or banking institution organized under the laws of the United States or any state or territory thereof; and

(j)     money market accounts of any state, Commonwealth or federally chartered bank, banking association, trust company or subsidiary trust company, including the Trustee, that is rated or whose parent bank is rated in the highest short-term rating category or in the highest long-term rating category by Moody's Investors Service or Standard & Poor's (without regard to any gradations within such category) or money market funds registered under the Investment Company Act of 1940, as amended, whose shares are registered under the Securities Act of 1933, as amended, and having a rating by Standard & Poor's of "AAAm-G" or "AAAm".

"*Person*" means any natural person, firm, corporation, partnership, limited liability company, state (including the Commonwealth), political subdivision of any state, other public body or other organization or association.

"*Pledge Account*" means the Pledge Account established under the Pledge Agreement.

"*Pledge Agreement*" means the Pledge and Assignment Agreement dated March 24, 2006, by and among GDB, the Trustee and the Authority, pursuant to which GDB will deposit Hotel Occupancy Tax Funds received from the Tourism Company into the Pledge Account, which Hotel Occupancy Tax Funds will be transferred by GDB to, and applied by, the Trustee in accordance with the terms of the Trust Agreement.

"*Principal Amount*" means (a) with respect to any Outstanding Current Interest Bond, the principal amount of such Bond; (b) with respect to any Outstanding Capital Appreciation Bond, the Accreted Value of such Bond as of the date on which the Bond is being determined; and (c) with respect to all the Outstanding Bonds together, the sum of the amounts determined pursuant to clauses (a) and (b).

"*Proceeds Fund*" means the special fund created by the Trust Agreement.

"*Program Costs*" means the costs and expenses set forth in items (b) and (c) included in the definition of Construction Costs.

"*Puerto Rico Convention Center*" means the Puerto Rico Convention Center which shall be developed and operated on the real property owned or leased by the Authority, or by the people or entities designated by the Authority, and which shall be suitable for the following purposes and events: congresses, conventions, conferences, trade shows, exhibitions, meetings and other business, entertainment, public assemblies, social, cultural, historic and scientific events.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

"*Rating Agency*" means, with respect to the Bonds, each nationally recognized securities rating service that has, at the request of the Authority, a rating then in effect for the unenhanced Bonds.

"*Rating Confirmation*" means, with respect to the Bonds, written evidence from a Rating Agency that no underlying Bond rating then in effect from such Rating Agency will be withdrawn, reduced or suspended solely as a result of an action to be taken under the Trust Agreement.

"*Rebate Fund*" means the special fund created by the Trust Agreement.

"*Record Date*" means (a) with respect to any Interest Payment Date that is the first day of a month, the fifteenth day of the month (whether or not a Business Day) preceding the month in which the Interest Payment Date occurs: (b) with respect to any Interest Payment Date that is the fifteenth day of a month, the first day of such month (whether or not a Business Day); and (c) with respect to any other Interest Payment Date, the date designated as the Record Date for such Interest Payment Date in a Supplemental Trust Agreement.

"*Redemption Price*" means the amount due on a Bond on the date on which it is redeemed prior to maturity pursuant to the redemption provisions applicable to such Bond.  Such term does not include the principal and interest or Accreted Value due on term Bonds on the dates such Bonds are to be redeemed in accordance with a mandatory sinking fund redemption schedule set forth in a Supplemental Trust Agreement.

"*Refunding Bonds*" means Bonds issued for the purpose of refunding, and proceeds of which are used to refund, New Money Bonds or other Refunding Bonds.

"*Reserve Account Credit Facility*" means any letter of credit, surety bond or insurance policy meeting the criteria set forth in a Supplemental Trust Agreement authorizing the issuance of a Series of Bonds.

"*Responsible Officer*" means any officer in the corporate trust department of the Trustee and any other person authorized by a writing signed by an officer of the Trustee to act as a Responsible Officer under the Trust Agreement or any Supplemental Trust Agreement.

"*Series*" means the Bonds designated as a separate series in a Supplemental Trust Agreement and any Bonds authenticated and delivered in lieu of or in substitution for such Bonds pursuant to the Trust Agreement or any Supplemental Trust Agreement.

"*Series Debt Service Reserve Requirement*" means for each Series of Bonds, the Series Debt Service Reserve Requirement as prescribed in the Supplemental Trust Agreement authorizing such Series of Bonds.

"*Supplemental Trust Agreement*" means any trust agreement supplementing or amending the Trust Agreement entered into pursuant to the Trust Agreement.

"*S&P*" means Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc., and its successors.

D-9

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

"*Special Record Date*" means a special date fixed to determine the names and addresses of Owners of Bonds for purposes of paying defaulted interest on Current Interest Bonds in accordance with the Trust Agreement.

"*Tax Certificate*" means with respect to each Series of Bonds on which the Authority intends the interest to be excluded from gross income for federal income tax purposes, (a) the arbitrage and use of proceeds certificate or other instrument that sets forth the Authority's expectations regarding the investment and use of proceeds of such Bonds and other matters relating to Bond Counsel's opinion regarding the federal income tax treatment of interest on such Bonds, including any instructions delivered by Bond Counsel in connection with such certificate, instrument or opinion; and (b) any amendment or modification of any such certificate, instrument or instructions that is accompanied by an opinion of Bond Counsel stating that the amendment or modification will not adversely affect the exclusion of interest on such Bonds from gross income for federal income tax purposes.

"*Tourism Company*" means the Puerto Rico Tourism Company, a public corporation of the Commonwealth.

"*Transfer Account*" means the Transfer Account established pursuant to the Assignment Agreement.

"*Trust Agreement*" means the Trust Agreement as amended or supplemented by any Supplemental Trust Agreements.

"*Trust Estate*" means the property granted to the Trustee the Granting Clauses the Trust Agreement.

"*Trustee*" means JPMorgan Chase Bank, N.A., acting in its capacity as trustee under the Trust Agreement, and any successor thereto appointed under the Trust Agreement.

## Application of Hotel Occupancy Tax Funds

For a description of the Application of the Hotel Occupancy Tax Funds, please see the Official Statement under the heading, "Flow of Funds."

## Bond Payment Fund

The Bond Payment Fund is created pursuant to the Trust Agreement, which shall be used to pay the Bond Payments on and Redemption Price, if any, of the Bonds. The Trustee shall create and maintain separate accounts identified by the appropriate Series designation within the Bond Payment Fund to account for the receipt of moneys to pay, and the payment of, the Bond Payments on and Redemption Price, if any, of each Series of Bonds, but such separate accounts shall not affect the rights of the Owners of the Bonds with respect to moneys in the Bond Payment Fund.

There shall be deposited into the appropriate account of Bond Payment Fund (i) all accrued interest received at the time of the issuance of any Bonds; (ii) any capitalized interest from the proceeds of a Series of Bonds unless deposited in the Proceeds Fund pursuant to a Supplemental Trust Agreement; (iii) to the extent necessary and as more fully set forth in the GDB Certificate, amounts to make the next Bond Payment including amounts paid to the Trustee pursuant to the

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

Trust Agreement from any Credit Facilities or Interest Rate Exchange Agreements; (iv) any moneys paid or caused to be paid by the Authority with respect to the Redemption Price of Bonds pursuant to the Trust Agreement: (v) any moneys transferred to the Bond Payment Fund from the Proceeds Fund pursuant the Trust Agreement; (vi) moneys deposited into the Bond Payment Fund pursuant to the Trust Agreement following an Event of Default; and (vii) all other moneys received by the Trustee accompanied by written directions from the Authority that such moneys are to be deposited into the Bond Payment Fund.

Moneys on deposit in the Bond Payment Fund shall be used solely for the payment of the Bond Payments on and Redemption Price of the Bonds.  Moneys on deposit in the Bond Payment Fund shall be used to make the following payments or for the following purposes:

(i)      Interest Component.  To pay interest due on the Bonds;

(ii)      Principal Payments.  To pay maturing principal payment or mandatory sinking fund redemption payments on the Bonds; and

(iii)      Redemption Price.  To pay the Redemption Price of the Bonds pursuant to redemption prior to maturity;

Moneys on deposit in the Bond Payment Fund shall be used solely for payments on a parity with Bond Payments; provided that (i) moneys representing accrued interest received at the time of the issuance of any Series of Bonds shall be used to pay the first interest payment due on such Bonds; (ii) moneys paid by the Authority with respect to the Redemption Price of Bonds in connection with an optional redemption of the Bonds under the Trust Agreement shall be used to pay the Redemption Price of the Bonds to be redeemed; (iii) moneys held in the Bond Payment Fund following an Event of Default shall be used in accordance with the terms of the Trust Agreement and (vi) moneys on deposit in the Bond Payment Fund may also be used for rebate payments in accordance with the Trust Agreement.

**Proceeds Fund**

The Proceeds Fund is created pursuant to the Trust Agreement.  The Trustee shall create and maintain separate sub-accounts identified as the Capitalized Interest Account, the Earnings Account, the Construction Account and the Loan Payment Account within the Proceeds Fund. The Trustee shall create and maintain separate sub-accounts identified by the appropriate Series designation within each account of the Proceeds Fund to account for the receipt and disbursement of proceeds of each Series of Bonds. There shall be deposited into the appropriate account of the Proceeds Fund, proceeds of each Series of Bonds as provided in the applicable Supplemental Trust Agreement.

Upon the written direction of an Authority Representative, any amounts on deposit in the Proceeds Fund shall be transferred to or upon the written order of the Authority for the payment of, or reimbursement for, costs of issuance relating to any Bonds.  So long as no Event of Default then exists, moneys held in the Proceeds Fund (including the Earnings Account, Construction Account and the Loan Payment Account) shall be disbursed to the Authority (or the payee indicated by the Authority) to pay Capitalized Interest, or Construction Costs or to reimburse such costs, upon receipt of a requisition signed by the Authority Representative in substantially the form

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

attached to the Trust Agreement.  Moneys held in the Proceeds Fund following such an Event of Default may be transferred at the written direction of the Authority Representative to the Bond Payment Fund.  In the event of a transfer pursuant to the preceding sentence followed by the transfer of sufficient amounts to the Trustee from Hotel Occupancy Tax Funds or other sources in excess of any amount necessary to make any Bond Payments then due, such excess amount up to the amount transferred from the Proceeds Fund to the Bond Payment Fund shall be transferred to the Proceeds Fund upon the written direction of the Authority Representative.  Upon the receipt by the Trustee of a certificate from the Authority Representative stating that all the Construction Projects have been completed and all required amounts have been deposited into the Rebate Fund, the remaining moneys in the Proceeds Fund, minus any amount estimated by the Authority Representative necessary to pay Construction Costs that have not yet been paid, shall be transferred by the Trustee to the Authority.  The Authority may use any such remaining moneys in the Proceeds Fund to (i) redeem any outstanding Bonds or (ii), subject to a tax opinion of Bond Counsel in form and substance satisfactory to the Trustee, pay any Construction Costs.

Capitalized Interest shall be transferred from the Proceeds Fund as set forth in the Supplemental Trust Agreement and the GDB Certificate.

Funds in the Loan Payment Account will be used to repay any Loans and to fund the payment of any Construction Costs, as more fully set forth in the Supplemental Trust Agreement.

**Financial Agreements Fund**

The Financial Agreements Fund is created with the Trustee.  The Trustee shall create and maintain separate accounts identified by the appropriate Series designation within the Financial Agreements Fund to account for the payment of any amounts due to the provider of any Credit Facility or any Interest Rate Exchange Agreement in accordance with the Trust Agreement and the Supplemental Trust Agreement creating the Credit Facility or the Interest Rate Exchange Agreement.

There shall be deposited into the appropriate account of the Financial Agreements Fund, amounts due as provided in the applicable Supplemental Trust Agreement.

Upon the written direction of an Authority Representative, any amounts on deposit in the Financial Agreements Fund shall be transferred to, or upon the order of, the Authority for the payment of, or reimbursement for, costs incurred by any provider of a Credit Facility or an Interest Rate Exchange Agreement.

**Debt Service Reserve Fund**

A special fund is created with the Trustee to be designated the Puerto Rico Convention Center District Authority Hotel Occupancy Revenue Bonds Debt Service Reserve Fund (the "Debt Service Reserve Fund").  Any Supplemental Trust Agreement may establish an account in the Debt Service Reserve Fund related to the Series of Bonds authorized thereby, identified by the appropriate Series designation, which shall be funded pursuant to the terms of such Supplement Trust Agreement.  The Series Debt Service Reserve Requirement shall be deposited in the account related to such Series of Bonds.  Amounts in each account in the Debt Service Reserve Fund shall be used to pay debt service on the related Series of Bonds on the date such debt service is due when

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

insufficient funds for that purpose are available in the Bond Payment Fund; provided, however, that all amounts in an account in the Debt Service Reserve Fund shall be used, together with other amounts available for such purpose, to provide for payment of the related Series of Bonds when the aggregate of such amounts is sufficient for such purpose. Amounts in each account of the Debt Service Reserve Fund shall be pledged to Owners of Bonds of the related Series.

In lieu of or in substitution for any moneys on deposit in an account in the Debt Service Reserve Fund, the Authority may, in the manner provided, and in compliance with the conditions set forth in, the Supplemental Trust Agreement authorizing such Series of Bonds, deposit or cause to be deposited with the Trustee such Reserve Account Credit Facility meeting the criteria set forth in such Supplemental Trust Agreement.

If after the transfer of moneys on deposit in the Debt Service Reserve Fund to the Bond Payment Fund, the amount left on deposit in any account in the Debt Service Reserve Fund shall be less than the applicable Series Debt Service Reserve Requirement, or, if after a draw under any Reserve Account Credit Facility on deposit in an account in the Debt Service Reserve Fund, the amount available to be paid thereunder shall be less than the applicable Series Debt Service Reserve Requirement, the Authority shall cause to be deposited in the appropriate account in the Debt Service Reserve Fund, Hotel Occupancy Tax Funds in an amount necessary to cause the amount of moneys on deposit therein, or the amount available to be paid under any Reserve Account Credit Facility, to be equal to the applicable Series Debt Service Reserve Requirement. Amounts so deposited in the Debt Service Reserve Fund may be used to make payments to any provider of a Reserve Account Credit Facility in order to reinstate such Reserve Account Credit Facility to the applicable Series Debt Service Reserve Requirement.

**Rebate Fund**

A special fund is created with the Trustee to be designated Puerto Rico Convention Center District Authority Hotel Occupancy Revenue Bonds Rebate Fund (the "Rebate Fund"). The Trustee shall create and maintain separate accounts identified by the appropriate Series designation within the Rebate Fund to account for rebate payments due on each Series of Bonds.

There shall be deposited into the appropriate account of the Rebate Fund moneys paid to the Trustee in connection with rebate payments made by GDB.

The Trustee at the written direction of and on behalf of the Authority shall use moneys in the Rebate Fund to make rebate payments to the United States in accordance with the Tax Certificates. If the amount on deposit in the Rebate Fund at any time is greater than the amount required under the Tax Certificates, the excess shall be transferred to the Bond Payment Fund, to the Proceeds Fund, the Debt Service Reserve Fund or to the Authority, as directed by an Authority Representative to the Trustee in writing, unless an Event of Default has occurred and is continuing, in which case the excess shall be transferred to the Bond Payment Fund.

The Trustee at the written direction of an Authority Representative shall invest the Rebate Fund in accordance with the Tax Certificates and shall deposit earnings from the investment of moneys in the Rebate Fund into the Rebate Fund immediately upon receipt thereof. Records with respect to the deposits to, payments from and administration of the Rebate Fund shall be retained by the Authority and the Trustee until six years after the final retirement of the Bonds.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

The Bond Payment Fund, the Debt Service Reserve Fund and, except for the Proceeds Fund and the Rebate Fund, any other fund or account created that is not expressly excluded from the Trust Estate shall be held by the Trustee, for the benefit of the Owners as specified in the Trust Agreement, subject to the terms of the Trust Agreement and any Supplemental Trust Agreement. The Proceeds Fund shall be held for the purposes specified therefor, including payments, if any, to the Bond Payment Fund as directed by the Authority Representative and the Rebate Fund shall be held by the Trustee for the purpose of making payments to the United States.  Any Defeasance Escrow Account shall be held for the benefit of the Owners of the Bonds to be paid therefrom as provided in the agreement governing such Defeasance Escrow Account.

**Investment of Moneys**

The Authority and the Trustee agree that all moneys held as part of any fund or account created under the Trust Agreement shall be deposited or invested and reinvested by the Trustee, at the written direction of an Authority Representative, in Permitted Investments.

Earnings and losses from the investment of moneys held in the Proceeds Fund or any account thereof shall be deposited into or charged against the Proceeds Fund, with any earnings being deposited into the Earnings Account thereof.

Earnings and losses from the investment of moneys held in any account in the Debt Service Reserve Fund shall be deposited into or charged against such account, with any earnings being transferred at the written direction of an Authority Representative.

Earnings and losses from the investment of moneys held in the Bond Payment Fund or any account thereof shall, except as otherwise provided by a Supplemental Trust Agreement, be deposited into or charged against the fund or account in which realized.

Earnings and losses from the investment of moneys held in any account of the Rebate Fund or any account thereof shall, except as otherwise provided in the Tax Certificates, be deposited into or shall be charged against the account in which realized.

Earnings and losses from the investment of moneys held in any Defeasance Escrow Account shall be deposited or charged as provided in the escrow agreement governing such account.

The Trustee shall, when and as directed in writing by an Authority Representative, sell and reduce to cash a sufficient amount of the investments held in any fund or account whenever the cash balance therein is insufficient to make any payment to be made therefrom.

In computing the amount in any fund or account for any purpose under the Trust Agreement, investments shall be valued by the Trustee at cost (exclusive of accrued interest) or par, whichever is less.

**Payment of Bond Payments**

The Authority covenants to pay, when due, solely from Hotel Occupancy Tax Funds paid to the Authority or the Trustee or other funds available in the Trust Estate, the Bond Payments.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**Rebate Payments**

The Authority shall deposit with the Trustee, to the extent permitted by law, from moneys not included in the Trust Estate or from moneys requisitioned from the Proceeds Fund, at the times and in the amounts required to make rebate payments due to the United States in accordance with the Tax Certificates.

**Other Payments by the Authority**

Nothing in the Trust Agreement shall be interpreted to restrict the Authority's right, to the extent permitted by law, to make any payment due to the Trustee in connection with Rebate Payments made by GDB or any other provision of the Trust Agreement or any provision of any Supplemental Trust Agreement from any Hotel Occupancy Tax Funds or any other available moneys.

**Credit Facilities and Interest Rate Exchange Agreements**

The Authority may purchase or arrange for a Credit Facility with respect to any Bonds and may agree to reimburse the provider of such Credit Facility for moneys paid by the provider that are used to make Bond Payments on such Bonds, which reimbursement may be made from any moneys in the Trust Estate that are available for the payment of Bond Payments on such Bonds on a parity with or on a basis subordinate to the payment of such Bond Payments.

To the extent permitted by law, the Authority may purchase or arrange for an Interest Rate Exchange Agreement with respect to any Bonds and may agree to make payments to the provider of such Interest Rate Exchange Agreement, which may be made from any moneys in the Trust Estate that are available for payment of Bond Payments on such Bonds on a parity with or on a basis subordinate to the payment of such Bond Payments.

All or any portion of the agreement between the Authority and the provider of any Credit Facility or Interest Rate Exchange Agreement or provisions to put into effect such an arrangement, may be included in any Supplemental Trust Agreement or in a separate agreement between or among the Authority, the Credit Facility or Interest Rate Exchange Agreement provider and/or the Trustee, and the Trustee is directed to agree to the provisions regarding such Credit Facility or Interest Rate Exchange Agreement contained in any Supplemental Trust Agreement or separate agreement agreed to by the Authority and the Credit Facility or Interest Rate Exchange Agreement provider.  Notwithstanding anything to the contrary contained in the Trust Agreement, the Trustee shall not be required to agree to or be bound by any provision that adversely affects its rights, duties, indemnities, privileges or obligations contained in the Trust Agreement or under any Supplemental Trust Agreement.

**Tax Covenant**

The Authority shall not take any action or omit to take any action with respect to the Bonds, the proceeds of the Bonds, the Trust Estate, the Construction Projects or any other funds or property of the Authority and, to the extent within its reasonable control, it will not permit any other Person to take any action or omit to take any action with respect to the Bonds, the Trust Estate, the Construction Projects or any other funds or property of the Authority if such action or omission would cause interest on any of the Bonds to be included in gross income for federal income tax

D-15

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

purposes or to be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations (except, with respect to corporations, as such interest is required to be taken into account in determining "adjusted net book earnings" for the purpose of computing the alternative minimum tax imposed on such corporations).  In furtherance of this covenant, the Authority agrees to comply with the procedures set forth in the Tax Certificate for each Series of Bonds.

**Defense of Trust Estate**

The Authority shall at all times, to the extent permitted by law, defend, preserve and protect its title to the Trust Estate, the grant of the Trust Estate to the Trustee and all the rights of the Owners under the Trust Agreement against all claims and demands of all Persons whomsoever; provided, however, that the pledge of Hotel Occupancy Tax Funds under the Trust Agreement is subject to the provisions of Section 8 of Article VI of the Constitution.

**Events of Default**

Any of the following shall constitute an "Event of Default" under the Trust Agreement:

(a)     Default in the payment of any portion of the Bond Payments on, or Redemption Price of, any Bond when due.

(b)     Failure by the Authority to observe and perform any covenant, condition or agreement on its part to be observed or performed under the Trust Agreement, other than as referred to in paragraph (a), for a period of sixty days after written notice specifying such failure and requesting that it be remedied is given to the Authority by the Trustee, unless the Trustee shall agree in writing to an extension of such time prior to its expiration; provided, however, if the failure stated in the notice can be wholly cured within a period of time not materially detrimental to the rights of the owners of Bonds but cannot be cured within the applicable sixty-day period, the Trustee will not unreasonably withhold its consent to an extension of such time if corrective action is instituted by the Authority within the applicable period and diligently pursued until the failure is corrected; and provided, further, that if by reason of force majeure the Authority is unable to carry out the agreements on its part contained in the Trust Agreement, the Authority shall not be deemed in default under this Summary paragraph during the continuance of such inability (but force majeure shall not excuse any other Event of Default).

(c)     Any breach of covenants described in the Assignment Agreement or the Pledge Agreement.

(d)     Any breach of covenants described in the Continuing Disclosure Agreement to be delivered by the Authority and the Commonwealth in connection with the issuance of the Bonds.

**Remedies Following an Event of Default**

(a)     Upon the occurrence of any Event of Default related to a default in the payment of any portion of the Bond Payments when due, (i) the Trustee shall, if and to the extent directed in writing by the Authority Representative, transfer all or any moneys held in

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

the Proceeds Fund to the Bond Payment Fund and (ii) any Owner of a Bond on which payment has not been paid when due shall have the right to institute any action permitted under Commonwealth law to enforce such payment as provided in the Trust Agreement, as supplemented.

(b)    Upon the occurrence of any Event of Default, the Trustee may, by mandamus or other action or proceeding or suit at law or in equity, enforce any of its rights under the Trust Agreement against the Authority and compel the Authority or GDB to perform or carry out its duties under the law and the agreements and covenants required to be performed by it contained in the Trust Agreement.

(c)    Upon the occurrence of any Event of Default, the Trustee may, by mandamus or other action or proceeding or suit at law or in equity, enforce any of its rights under the Pledge Agreement against the Authority or GDB and compel the Authority or GDB, as the case may be, to perform or carry out their respective duties under the law and the agreements and covenants required to be performed by either of them under the Pledge Agreement.

(d)Upon the occurrence of any Event of Default, the Trustee may, by mandamus or other action or proceeding or suit at law or in equity, enforce any of its rights under the Assignment Agreement against the Tourism Company or GDB and compel GDB or the Tourism Company to perform or carry out their respective duties under the law and the agreements and covenants required to be performed by it contained in the Assignment Agreement.

(e)    Upon the occurrence of any Event of Default, the Trustee may compel GDB to perform or carry out its duties under the law and the agreements and covenants required to be performed by it contained in the Assignment Agreement.

(f)    Upon the occurrence of any Event of Default, the Trustee may take whatever action at law or in equity may appear necessary or desirable to enforce the rights of the Owners and shall deposit any moneys received as a result of such action in the Bond Payment Fund.

(g)    No right or remedy is intended to be exclusive of any other right or remedy, but each and every such right or remedy shall be cumulative and in addition to any other remedy given under the Trust Agreement existing at law or in equity or by statute; provided, however, that neither the Trustee nor any Owners of Bonds shall have the right to declare all Bond Payments to be immediately due and payable.

(h)    A judgment requiring a payment of money entered against the Authority in connection with the Bonds and other obligations under the Trust Agreement may be satisfied only from the Trust Estate.

**Use of Moneys Received From Exercise of Remedies**

Moneys received by the Trustee resulting from the exercise of remedies following an Event of Default shall be deposited in the Bond Payment Fund and shall, together with other moneys in

D-17

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

the Bond Payment Fund and other moneys available for such purpose, be applied in the following order of priority:

> (a)  *First*, to the payment of the reasonable and proper fees and expenses of the Trustee, including reasonable attorney's fees.

> (b)  *Second*, to the payment of interest due on the Bonds, including interest on past due interest on any Bond at the interest rate borne by such Bond, compounded on each Interest Payment Date.  If more than one installment of interest is due on the Bonds, such installments shall be paid in the order in which they were due, with the first installment being paid first If the amount available is insufficient to pay all of any particular installment of interest due on the Bonds (including interest on the past due interest), the amount available shall be paid ratably, based on the ratio of the amount due on each such Bond to the amount due on all such Bonds.  For purposes of this Summary paragraph, the difference between the Original Principal Amount and the Accreted Value of a Capital Appreciation Bond shall be treated as interest, the Accretion Date for a Capital Appreciation Bond shall be treated as an Interest Payment Date and the interest rate determined by straight-line interpolation between Accretion Dates shall be treated as the interest rate on a Capital Appreciation Bond.

> (c)  *Third*, to the payment of principal due on the Bonds.  If principal is due that was to have been paid on more than one date, the amount due on the earliest dates shall be paid first.  If the amount available is insufficient to pay all the principal due on any particular date, the amount available shall be paid ratably, based on the ratio of the amount due on each such Bond to the amount due on all such Bonds.  For purposes of this Summary paragraph, the Original Principal Amount of a Capital Appreciation Bond shall be treated as principal.

**Owners of Majority in Aggregate Principal Amount of Bonds May Control Proceedings**

Notwithstanding any other provision of the Trust Agreement, the Owners of a majority in aggregate principal amount of Bonds shall always have the right, at any time, to the extent permitted by law, by an instrument or instruments in writing executed and delivered to the Trustee, to direct the time, method and place of conducting all proceedings to be taken in pursuit of remedies following an Event of Default or otherwise in connection with the enforcement of the terms of the Trust Agreement.  The Trustee is not liable for acts directed by a majority of bondholders or a credit provider.

**Limitations on Rights of Owners Acting Individually**

No Owner shall have any right to institute any suit, action or proceeding at law or in equity for the enforcement of any remedy under the Trust Agreement or for the enforcement of the terms of the Trust Agreement, unless an Event of Default under the Trust Agreement has occurred and the Owners of not less than a majority in aggregate principal amount of Bonds then Outstanding have made a written request to the Trustee, have offered the Trustee indemnity satisfactory to it against its costs, expenses and liabilities reasonably anticipated to be incurred, and have given the Trustee a reasonable opportunity, to take such action in its capacity as Trustee.  The purpose of the preceding sentence is to assure that no Owner or Owners shall have the right to affect, disturb or prejudice the lien of the Trust Agreement by his, her, its, or their action or to enforce any right

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

under the Trust Agreement except in the manner provided in the Trust Agreement and that all proceedings at law or in equity shall be instituted and maintained in the manner provided in the Trust Agreement and for the equal benefit of the Owners of all Outstanding Bonds.  Nothing contained in the Trust Agreement shall, however, affect or impair the right of any Owner to enforce the payment of the Bond Payments on or Redemption Price of any Bond at and after the date of such payment is due.

**Trustee May Enforce Rights Without Bonds**

All rights of action and claims under the Trust Agreement or any of the Outstanding Bonds may be enforced by the Trustee without the possession of any of the Bonds or the production thereof in any trial or proceedings relative thereto; any suit or proceeding instituted by the Trustee shall be brought in its name as Trustee, without the necessity of joining as plaintiffs or defendants any Owners; and any recovery of judgment shall be for the ratable benefit of the Owners, subject to the provisions of the Trust Agreement.

**Trustee to File Proofs of Claim in Receivership, Etc.**

In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceedings affecting the Trust Estate, the Trustee shall, to the extent permitted by law, be entitled to file such proofs of claim and other documents as may be necessary or advisable in order to have claims of the Trustee and of the Owners allowed in such proceedings for the entire amount due on the Bonds under the Trust Agreement, at the date of the institution of such proceedings and for any additional amounts which may become due by it after such date, without prejudice, however, to the right of any Owner to file a claim in its own behalf.

**Delay or Omission No Waiver**

No delay or omission of the Trustee or of any Owner to exercise any remedy, right or power accruing upon any Event of Default or otherwise shall exhaust or impair any such remedy, right or power or be construed to be a waiver of any such Event of Default, or acquiescence therein; and every remedy, right and power given by the Trust Agreement may be exercised from time to time and as often as may be deemed expedient.

**Discontinuance of Proceedings on Event of Default; Position of Parties Restored**

In case the Trustee or any Owner shall have proceeded to enforce any right under the Trust Agreement and such proceedings shall have been discontinued or abandoned for any reason, or shall have been determined adversely to the Trustee or such Owner, then and in every such case the Authority, the Trustee and the Owners shall be restored to their former positions and rights, and all rights, remedies and powers of the Trustee and the Owner shall continue as if no such proceedings had been taken.

**Waivers of Events of Default**

The Trustee may in its discretion waive any Event of Default and its consequences under the Trust Agreement, and notwithstanding anything else to the contrary contained in the Trust Agreement, shall do so upon the written request of the Owners of a majority in aggregate principal amount of Bonds then Outstanding; provided, however, that there shall not be waived without the

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

consent of the Owners of 100% of the Bonds any Event of Default in the payment of the Bond Payments and Redemption Price when due, unless, prior to such waiver, all such amounts (with interest on amounts past due on any Bond at the interest rate on such Bond or, in the case of a Capital Appreciation Bond, the interest rate determined by straight-line interpolation between Accretion Dates) and all expenses of the Trustee in connection with such Event of Default have been paid or provided for.  In case of any such waiver, then and in every such case the Authority, the Trustee and the Owners shall be restored to their former positions and rights under the Trust Agreement, but no such waiver shall extend to any subsequent or other Event of Default, or impair any right consequent thereon.

**Appointment of Trustee**

JPMorgan Chase Bank, N.A., is appointed as Trustee under the Trust Agreement.  The Trustee shall have only such duties and obligations as are expressly specified by the Trust Agreement, and no other duties or obligations of the Trustee shall be implied by, or read into, the Trust Agreement.

**Supplemental Trust Agreements Not Requiring Consent of Owners**

The Authority and the Trustee may, without the consent of, or notice to, the Owners, enter into a Supplemental Trust Agreement for any one or more or all of the following purposes:

(a)     to facilitate the receipt or use of Hotel Occupancy Tax Funds to pay Bond Payments;

(b)     to add additional covenants to the covenants and agreements of the Authority set forth in the Trust Agreement or to add to the limitations and restrictions to be observed by the Authority which are not contrary to or inconsistent with the Trust Agreement as theretofore in effect;

(c)     to add additional revenues, properties or collateral to the Trust Estate, subject to the Authority maintaining the prevailing rating of the Bonds by Moody's and S&P;

(d)     to cure any ambiguity, or to cure, correct or supplement any defect or omission or inconsistent provision contained in the Trust Agreement, provided such action shall not adversely affect the interest of the Owners;

(e)     to amend any existing provision of the Trust Agreement or to add additional provisions which, in the opinion of Bond Counsel, are necessary or advisable (i) to qualify, or to preserve the qualification of, the interest on any Bonds for exclusion from gross income for federal income tax purposes or for exclusion from federal alternative minimum tax calculations; (ii) to qualify, or to preserve the qualification of, any Bonds for exemption from taxation and assessment in the Commonwealth; or (iii) to qualify, or to preserve the qualification of, any Bonds for an exemption from registration or other limitations under the laws of any state or territory of the United States;

(f)     to amend any provision of the Trust Agreement relating to the Rebate Fund if in the opinion of Bond Counsel, such amendment does not adversely affect the exclusion of interest on any Bonds from gross income for federal income tax purposes;

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

(g)    to provide for or eliminate book-entry registration of any of the Bonds;

(h)    to obtain or maintain a rating of the Bonds by a nationally recognized securities rating agency;

(i)    to authorize the issuance of any Series of Bonds in accordance with the Trust Agreement;

(j)    to facilitate the provision of a Credit Facility or an Interest Rate Exchange Agreement;

(k)    to establish additional funds, accounts or sub-accounts necessary or useful in connection with any Supplemental Trust Agreement authorized without the consent of the Owners;

(l)    to make any amendment with Rating Confirmation from each Rating Agency then maintaining an uninsured, underlying rating on the Bonds, that such amendment will not, in itself, result in such uninsured, underlying rating on the Bonds following such amendment being lower than such rating on the Bonds immediately prior to such amendment;

(m)    to modify any of the provisions in any other respect whatever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of each Series Outstanding at the date of the execution of such Supplemental Trust Agreement shall cease to be Outstanding and (ii) such Supplemental Trust Agreement shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the execution of such Supplemental Trust Agreement and of Bonds issued in exchange therefor or in place thereof; or

(n)    for any other purpose, provided that Bond Counsel has delivered a written opinion stating that the provisions of the Supplemental Trust Agreement do not materially adversely affect the rights of the Owners of any Bonds.

**Supplemental Trust Agreements Requiring Consent of Owners**

Except as expressly provided for under the Trust Agreement, the Authority and the Trustee may not enter into a Supplemental Trust Agreement without the written consent of the Owners of not less than a majority in aggregate principal amount of Bonds then Outstanding; provided, however, that: no Supplemental Trust Agreement described below may be entered into without the written consent of the Owner of each Bond affected thereby for one or more of all of the following purposes:

(a)    a reduction of the interest rate, Bond Payments or Redemption Price payable on any Bond, a change in the maturity date of any Bond, a change in the Original Principal Amount of any Capital Appreciation Bond, a change in any Interest Payment Date for any Current Interest Bond or any Accretion Date for any Capital Appreciation Bond or a change in the redemption provisions applicable to any Bond;

D-21

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

(b)      the deprivation of an Owner to the lien on the Trust Estate granted in the Trust Agreement;

(c)      the creation of a priority right in the Trust Estate of another Bond over the right of the affected Bond, except as permitted in the Trust Agreement;

(d)      a reduction in the percentage of the aggregate principal amount of the Bonds required for consent to any Supplemental Trust Agreement;

**Conditions to Effectiveness of Supplemental Trust Agreements**

No Supplemental Trust Agreement shall be effective until (i) the Authority and the Trustee have received the written consent of the Tourism Company and GDB to enter into such Supplemental Trust Agreement, (ii) it has been duly executed and delivered by the Authority and the Trustee and (iii) Bond Counsel has delivered a written opinion to the effect that the Supplemental Trust Agreement complies with the provisions of the Trust Agreement and will not adversely affect the exclusion from gross income for federal income tax purposes of interest on, or the exemption from taxation and assessment in the Commonwealth of the income from, any Outstanding Bonds.

No Supplemental Trust Agreement entered into with the consent of the Owner shall be effective until, in addition to the conditions set forth in the preceding paragraph, (i) a notice has been mailed to the Owners of the Outstanding Bonds, at the addresses last shown on the registration records of the Trustee, which notice describes the nature of the proposed Supplemental Trust Agreement and states that copies of it are on file at the office of the Trustee for inspection by the Owners of Outstanding Bonds and (ii) Owners of the required percentage in aggregate principal amount of the Bonds have consented to the Supplemental Trust Agreement. *Notwithstanding anything set forth under this Summary heading or the Trust Agreement to the contrary, the consent of the Owner of any Series of additional Bonds to be issued under the Trust Agreement, shall be deemed irrevocably given if the Original Purchaser thereof, whether or not for sale, consents in writing to any modification or amendment and, if such Series of additional Bonds is expected to be resold, such modification or amendment, as well as such consent, is disclosed in the official statement or other offering document pursuant to which such Series of additional Bonds is sold.*

**Amendment of Assignment Agreement or Pledge Agreement**

No amendment, change or modification of the Pledge Agreement or the Assignment Agreement shall be effected without mailing of notice and written approval or consent of (i) the holders of not less than a majority in aggregate principal amount of the Bonds then Outstanding, (ii) GDB, and (iii) the Tourism Company.

**Discharge of Trust Agreement**

If 100% of the Bond Payments and Redemption Price due, or to become due, on all the Bonds and, all amounts payable to the United States, have been paid, or provision shall have been made for the payment thereof in accordance with the Trust Agreement terms summarized under the Summary heading "Defeasance of Bonds" below and the fees and expenses due to the Trustee and all other amounts payable under the Trust Agreement have been paid, or provision for such payment shall have been made in a manner satisfactory to the Trustee, then (a) the right, title and interest of the Trustee in and to the Trust Estate shall terminate and be discharged (referred to in the Trust Agreement as the "discharge" of the Trust Agreement); (b) the Trustee shall transfer and

D-22

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

convey to or upon the order of the Authority all property that was part of the Trust Estate, including but not limited to any moneys held in any fund or account under the Trust Agreement except any escrow account created in accordance with the Trust Agreement terms summarized under the Summary heading "Defeasance of Bonds" below (which escrow account shall continue to be held in accordance with the agreement governing the administration thereof); and (c) the Trustee shall execute any instrument requested by the Authority to evidence such discharge, transfer and conveyance.

Outstanding Bonds or Bond Payments or Redemption Price or any portions thereof for the payment or redemption of which money shall have been set aside and shall be held in trust by the Trustee shall at the respective maturity or redemption dates thereof be deemed to have been paid within the meaning and with the effect expressed in the preceding paragraph.

**Defeasance of Bonds**

(a)      All or any portion of the Outstanding Bonds or Bond Payments shall be deemed to have been paid (referred to in this Summary and in the Trust Agreement as "defeased") prior to their maturity or redemption if:

(i)      the defeased Bonds are to be redeemed prior to their maturity, an Authority Representative has irrevocably instructed the Trustee to give notice of redemption of such Bonds in accordance with the Trust Agreement and any applicable Supplemental Trust Agreement;

(ii)      there has been deposited in trust in a Defeasance Escrow Account either moneys in an amount which shall be sufficient, or Defeasance Securities, the principal of and the interest on which when due, and without any reinvestment thereof will provide moneys which, together with the moneys, if any, deposited into or held in the Defeasance Escrow Account, shall be sufficient to pay when due the Bond Payments or Redemption Price, as applicable, due and to become due on the defeased Bonds on and prior to the redemption date or maturity date thereof, as the case may be;

(iii)      the Authority shall have given the Trustee in a form satisfactory to it irrevocable instructions to mail, as soon as practicable, a notice to the Owners of such Bonds that the deposit required by (ii) above has been made with the Trustee and that said Bonds are deemed to have been paid in accordance with the Trust Agreement and stating the date on which money is to be available for the payment of the principal or Redemption Price; and

(iv)      a certified public accountant or other nationally recognized expert respecting verification of escrows has delivered a verification report verifying the deposit described in clause (ii) above.

(b)      The Defeasance Securities and moneys deposited in a Defeasance Escrow Account and the principal and interest payments on such Defeasance Securities shall not be withdrawn or used for any purpose other than, and shall be held in trust solely for, the payment of the Bond Payments on and Redemption Price of the defeased Bonds; provided, however, that (i) any moneys received from principal and interest payments on such

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

Defeasance Securities that are not required to pay the Bond Payments on or Redemption Price of the defeased Bonds on the date of receipt shall, to the extent practicable, be reinvested in Defeasance Securities maturing at the times and in amounts sufficient to pay when due the Bond Payments on and Redemption Price to become due on the defeased Bonds on or prior to the redemption date or maturity date thereof, as the case may be; and (ii) any moneys or Defeasance Securities may be withdrawn from a Defeasance Escrow Account if (A) the moneys and Defeasance Securities that are on deposit in the Defeasance Escrow Account, including any moneys or Defeasance Securities that are substituted for the moneys or Defeasance Securities that are withdrawn from the Defeasance Escrow Account, satisfy the conditions stated in clause (ii) above a verification report is delivered that complies with clause (iv) above and (C) an opinion of Bond Counsel is delivered to the effect that such withdrawal or substitution complies with the Trust Agreement and will not of itself adversely affect the federal tax status of interest on either the related Refunding Bonds or the Bonds being refunded.

(c)     Any Bonds that are defeased as provided in the Trust Agreement shall no longer be secured by or entitled to any right, title or interest in or to the Trust Estate, and the Bond Payments on and Redemption Price thereof shall be paid solely from the Defeasance Securities and money held in the Defeasance Escrow Account.

## Defeasance of Less than all Bonds of a Particular Series or Maturity

If less than all the Bonds of any particular Series, any particular maturity of any Series or any particular interest rate within a maturity of a Series are defeased, the Trustee shall institute or cause to be instituted a system to preserve the identity of the individual Bonds or portions thereof that are defeased, regardless of changes in Bond numbers attributable to transfers and exchanges of Bonds.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

APPENDIX E

## ASSIGNMENT AND COORDINATION AGREEMENT

THIS ASSIGNMENT and COORDINATION AGREEMENT (the "Assignment Agreement"), dated March 24, 2006, is by and between the PUERTO RICO TOURISM COMPANY (the "Tourism Company"), and GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO ("GDB"), acting herein for the benefit of the Owners of the Hotel Occupancy Tax Revenue Bonds (the "Bonds") issued by the Puerto Rico Convention Center District Authority (the "Authority") pursuant to the Trust Agreement dated March 24, 2006 (the "Trust Agreement") by and between the Authority and JPMORGAN CHASE BANK, N.A., as trustee under the Trust Agreement.

All capitalized terms used herein, unless otherwise defined herein, shall have the meaning given such terms in the Trust Agreement.

In consideration of the foregoing and pursuant to the Occupancy Tax Act, which imposes the Hotel Occupancy Tax, the Tourism Company and GDB hereby agree as follows:

Section 1.        The Tourism Company hereby creates a special fund called the Assignment and Coordination Agreement Holding Fund (the "Holding Fund").  All Hotel Occupancy Tax Revenues will be deposited, as collected, into the Holding Fund.

Section 2.        The Holding Fund shall contain two accounts identified as the Transfer Account and the Surplus Account.

Section 3.        On or before May 30th of each Fiscal Year, GDB will determine and certify to the Authority, the Tourism Company and the Trustee in writing (the "GDB Certificate") the amount necessary for the Authority to make, during the upcoming fiscal year and the first day of the second succeeding fiscal year (collectively, the "Required Payments"):

(a)  payments equal to the amount necessary (after taking into account any amounts then on deposit in the Bond Payment Fund and the Capitalized Interest Account of the Proceeds Fund available therefor) for the full and timely payment, or the amortization, of the principal and interest on the Bonds due on July 1st and January 1st  of the immediately succeeding fiscal year and July 1st of the second succeeding fiscal year (including any amounts due in connection with prior payments for which there were insufficient funds);

(b)  full and timely payment of the obligations of the Authority under any Credit Facilities or any Interest Rate Exchange Agreements, which in the future may be entered into by the Authority with the prior written authorization of the Tourism Company;

(c)  the deposits required to replenish the Debt Service Reserve Fund established under the Trust Agreement; and

(d)  any other expenses incurred in connection with (i) the issuance of the Bonds, or (ii) with any Credit Facilities or Interest Rate Exchange Agreements.

Section 4.        On a monthly basis, all Hotel Occupancy Tax Funds received by the Tourism Company shall be deposited into the Transfer Account until (i) 1/10 of the Required Payments has been met and (ii) any deficiencies in prior payment periods have been met, but in aggregate such amounts shall not exceed the total amount of Required Payments needed in any Fiscal Year.  Thereafter, and only when the Transfer Account contains all moneys necessary to pay the Bonds in accordance with the GDB Certificate,

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

the Tourism Company shall deposit any excess funds into the Surplus Account, which account shall be available to be utilized in accordance with Section 31(B) of the Occupancy Tax Act.

Section 5.     The Tourism Company hereby acknowledges, and agrees to comply with, its obligations under the Occupancy Tax Act to transfer to GDB the monthly amounts required under Section 31(A) of the Occupancy Tax Act, pursuant to the instructions contained in the GDB Certificate.

Section 6.     The Tourism Company hereby irrevocably pledges, assigns, transfers, conveys, grants and sets over to GDB all rights it may legally have in amounts deposited in the Transfer Account collected by the Tourism Company as required under the provisions of Section 31 of the Occupancy Tax Act up to the amounts certified by GDB in the GDB Certificate (including any amounts as may be necessary to pay any previously unpaid amounts).

Section 7.     The Tourism Company hereby expressly acknowledges and consents to GDB entering into that certain Pledge Agreement with the Authority and the Trustee of even date herewith (the "Pledge Agreement") under which the Hotel Occupancy Tax Funds transferred to GDB hereunder will be further pledged by the Authority and transferred from GDB to the Trustee for the benefit of the Owners of the Bonds.

Section 8.     The Tourism Company further agrees that at any time and from time to time, upon the written request of GDB, the Authority or the Trustee, the Tourism Company will promptly and duly execute and deliver any and all such further instruments and documents as GDB, the Authority or the Trustee may deem desirable in order to obtain the full benefits of this Assignment Agreement and all rights and powers herein granted.  The above to the contrary notwithstanding, the Tourism Company shall not be obligated to execute such further instruments and documents which it is not legally permitted to execute under the Occupancy Tax Act.

Section 9.     The Tourism Company shall immediately upon receipt of a Deficiency Notice (as such term is defined in Section 4 of the Pledge Agreement), but in no event later than 12:00 noon, New York time, on the third Business Day immediately following receipt of such Deficiency Notice, deposit sufficient funds from amounts held as Hotel Occupancy Tax Funds, to satisfy the requirements set forth in Section 3(b)(2) of the Pledge Agreement.

Section 10.     As required by Section 31 of the Occupancy Tax Act, the Tourism Company, pursuant to its Board of Directors' Resolution No. 06-47 hereby gives its prior written approval to (i) the form of Bonds as set forth in attachment 1 hereto (ii) the amortization schedule of the Bonds set forth as attachment 2 hereto, (iii) the Trust Agreement set forth as attachment 3 hereto and (iv) the Pledge Agreement set forth as attachment 4 hereto.

Section 11.     Notwithstanding anything herein to the contrary, the assignment, transfer and pledge of the Hotel Occupancy Tax Funds is made subject to the rights of the Commonwealth of Puerto Rico under Section 8 Article VI of the Constitution of the Commonwealth of Puerto Rico.

Section 12.     The Tourism Company acknowledges (and agrees to comply with) its obligations under the Occupancy Tax Act to:

(a)  enforce its right under the provisions of Section 33 of the Occupancy Tax Act to commence a distraint procedure, and/or to present an action against a bond or surety related to deficiencies with respect to taxes imposed by the Occupancy Tax Act;

(b)  enforce the provisions of Section 28 of the Occupancy Tax Act; and

E-2

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

(c)   submit to the Authority and to the Convention Center Bureau a monthly statement itemizing the collections on account of the Hotel Occupancy Tax

Section 13.   This Assignment Agreement shall be binding upon the Tourism Company and GDB and their successors and assigns and shall inure to the benefit of the Owners of the Bonds and parties to any Credit Facilities or Interest Rate Exchange Agreements.

Section 14.   This Assignment Agreement may not be modified, amended, or superseded, for as long as any Bonds remain outstanding under the Trust Agreement except in accordance with the provisions of Section 9.04 thereof.

Section 15.   The Owners of the Bonds, the parties to any Credit Facilities or Interest Rate Exchange Agreements, the Trustee and the Authority shall be deemed third party beneficiaries to this Assignment Agreement.  This Assignment and the right of the Tourism Company to pledge the Transfer Account shall be deemed an agreement made for the benefit of the Owners of the Bonds and the parties to any Credit Facilities or Interest Rate Exchange Agreements.

Section 16.   The laws of the Commonwealth shall be applied in the interpretation and enforcement of this Assignment Agreement.

Section 17.   Should any discrepancies between this Assignment Agreement and the Occupancy Tax Act arise, the provisions of the Occupancy Tax Act shall prevail.

IN WITNESS WHEREOF, the Tourism Company and GDB have duly executed this Assignment Agreement on the date above stated at San Juan, Puerto Rico.

PUERTO RICO TOURISM COMPANY

By: _____
Name:
Title:

GOVERNMENT DEVELOPMENT BANK OF PUERTO RICO

By: _____
Name:
Title:

E-3

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

[THIS PAGE INTENTIONALLY LEFT BLANK]

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

APPENDIX F

**PLEDGE AND ASSIGNMENT AGREEMENT**

THIS PLEDGE AND ASSIGNMENT AGREEMENT (this "Pledge Agreement"), dated March 24, 2006, by and among GOVERNMENT DEVELOPMENT BANK for PUERTO RICO ("GDB"), PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY (the "Authority"), and JPMORGAN CHASE BANK, N.A., as Trustee under the Trust Agreement (as hereinafter defined) (the "Trustee");

In consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

**Section 1.**    All capitalized terms used herein shall have the meanings set forth in the Trust Agreement, dated March 24, 2006 (the "Trust Agreement") by and between Authority and the Trustee, unless otherwise indicated.

**Section 2.**    (a)    In furtherance of the pledges set forth in the Assignment Agreement and the Occupancy Tax Act, GDB hereby creates and establishes a special and irrevocable account designated as the "Hotel Occupancy Tax Pledge Account" (the "Pledge Account") to be held in trust by GDB on behalf of the Authority for the benefit of the Owners of the Bonds, separate and apart from other funds of GDB.

(b)    Each of GDB and the Authority does hereby grant, bargain, convey, assign, mortgage and pledge a security interest to the Trustee, as trustee under the Trust Agreement and for the benefit of the Owners of the Bonds, free and clear of all prior or parity liens, pledges and security interests, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, to be used solely for the payment of the interest and the amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, but only to the degree to which the other available resources to which reference is made in said Section are insufficient for such purposes, (i) all Hotel Occupancy Tax Funds received from the Tourism Company, (ii) all moneys deposited in or required to be deposited in the Pledge Account pursuant to the provisions of this Pledge Agreement, and (iii) all right title and interest of GDB in the Assignment Agreement.

(c)    Each of GDB and the Authority hereby agrees that it will not grant, assign, or pledge, nor allow, permit or suffer to exist any prior or parity lien on or security interest in the items pledged pursuant to Section 2(b) above or any investments thereof or earnings thereon in favor of any creditor of GDB, the Authority or any other Person other than (1) the liens created by this Pledge Agreement and (2) the pledge set forth in Section 2(b) above.

**Section 3.**    (a)    GDB hereby agrees that, so long as there are any Bonds Outstanding under the Trust Agreement, to deposit or cause to be deposited into the Pledge Account, all Hotel Occupancy Tax Funds received from the Tourism Company as received but in no event later than 12:00 noon, New York time, on the next Business Day immediately following the Business Day on which such Hotel Occupancy Tax Funds are received by GDB.

(b)    Amounts deposited in the Pledge Account are to be held by GDB to provide for the following deposits (in order of priority):

(1)    GDB will make payments to the Commonwealth of Puerto Rico as set forth in Section 2(b) above when required in accordance with Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico;

F - 1

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

(2)     GDB shall on each calendar month no later than 12:00 noon, New York time on the third Business Day immediately following the Business Day on which Hotel Occupancy Tax Funds are received by it, transfer or cause to be transferred to the Trustee, all Hotel Occupancy Tax Funds then deposited to the Pledge Account. The Trustee shall immediately deposit such funds into the Accounts established in Sections 5.02, 5.04, 5.05 and 5.06 of the Trust Agreement (in the order of priority set forth in Section 5.01 of the Trust Agreement) as set forth in the GDB Certificate authorized in Section 3(b)(3) hereof.

(c)     The GDB Certificate, in the form attached hereto as Exhibit A, is hereby authorized.

**Section 4.**     In the event that, as of the close of business on the last Business Day of any calendar month, the aggregate of the monthly amounts transferred by the Tourism Company to GDB during the related Fiscal Year is less than the aggregate of the monthly amounts required to be transferred under the GDB Certificate for such period, GDB and the Trustee shall promptly and in any event no later than the next Business Day send a written notice of such deficiency (the "Deficiency Notice") and the amount thereof to the Authority, the Tourism Company and the Trustee which notice shall be sent by telecopier and be promptly confirmed via first class mail.

**Section 5.**     (a) GDB agrees with the Authority that it will comply with the direction to it set forth in Section 31 of the Occupancy Tax Act including without limitation the obligation to make the required certifications to the Company and the Authority as required by Subsection (a) of Section 31 of the Occupancy Tax Act.

(b)     GDB will diligently enforce its rights under the Assignment Agreement including its enforcement of the Hotel Occupancy Tax Funds transfer obligation of the Company

**Section 6.**     This Pledge Agreement, the Pledge Account and the security interest in the moneys in the items set forth in Section 2(b) hereof shall remain in full force and effect and shall not be terminated or revoked so long as there are any Bonds Outstanding under the terms of the Trust Agreement and any Supplemental Trust Agreement. Upon all Bonds having been paid or deemed paid, in accordance with Section 10.01 of the Trust Agreement, this Agreement shall terminate and any moneys remaining in the Pledge Account at the time of such termination shall be released to the Authority.

**Section 7.**     So long as GDB applies the moneys as provided herein, and complies fully with the terms of this Agreement, GDB shall not be liable for any deficiencies in the amounts necessary to pay the Bonds.

**Section 8.**     If any one or more of the covenants or agreements provided in this Pledge Agreement by or on behalf of GDB, the Authority or the Trustee to be performed should be determined by a court of competent jurisdiction to be contrary to law, such covenant or agreement shall be deemed and construed to be severable from the remaining covenants and agreements herein contained and shall in no way affect the validity of the remaining provisions of this Agreement.

**Section 9.**     If any section, paragraph, sentence, clause or provision of this Pledge Agreement shall for any reason be held to be invalid or unenforceable, the invalidity or unenforceability of such section, paragraph, sentence, clause or provision shall not affect any of the remaining provisions of this Pledge Agreement. GDB shall provide the Company, the Authority and the Trustee with written notice if any section, paragraph, sentence, clause or provision of the Pledge Agreement should be held to be invalid or unenforceable. Such written notices shall be mailed at the addresses set forth below:



F - 2

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**Section 10.**     All the covenants, promises and agreements contained in this Agreement by or on behalf of GDB, the Authority or the Trustee shall bind and inure to the benefit of their respective successors and assigns, whether so expressed or not.  Any successor trustee under the Trust Agreement and any Supplemental Trust Agreement without further act shall be successor Trustee hereunder unless GDB or the Authority has otherwise appointed a successor Trustee.  The predecessor Trustee shall pay over or transfer to the successor Trustee any moneys or Government Obligations at the time held by it or on its behalf.

**Section 11.**     Except insofar as the duties, powers and authority of the Authority and GDB, its officers and employees are governed by the laws of the Commonwealth of Puerto Rico, this Agreement shall be governed by the applicable law of New York; provided that the venue of any judicial action commenced by the parties other than the Trustees shall be in the Commonwealth of Puerto Rico.

**Section 12.**     This Agreement may be executed in several counterparts, all or any of which shall be regarded, for all purposes as one original, and shall constitute and be but one and the same instrument.

**Section 13.**     This Agreement may be amended, modified or supplemented only by written instrument executed by GDB, the Authority and the Trustee, and only in accordance with Section 9.04 of the Trust Agreement.

**Section 14.**     GDB and the Authority acknowledge and agree that the Agreement shall be part of the Trust Estate under the Trust Agreement, pledged to the Owners of the Bonds and any credit or liquidity provider or interest rate counter party secured under the Trust Agreement.

**Section 15.**     The laws of the Commonwealth shall be applied in the interpretation and enforcement of this Pledge Agreement.

**Section 16.**     Unless otherwise stated herein, any notice, demand, direction, request or other instrument authorized or required by this Pledge Agreement to be given to or filed with the Authority, GDB or Trustee shall be deemed to have been sufficiently given or filed for all purposes of this Pledge Agreement if sent by registered mail, return receipt requested to the respective addresses set forth in [_____], or to such other address as may hereinafter be provided by written notice given by the Authority, GDB or the Trustee to the other parties.

[Signature Page Follows]

F - 3

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**IN WITNESS WHEREOF**, the parties hereto have each caused the Pledge Agreement to be executed by their duly authorized officers or elected officials and GDB and the Authority have caused their respective seals to be hereunder affixed and attested as of the date first above written.

GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

SEAL
Attest:

By: _____
Name:
Title:

By: _____
Name:
Title:

PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY

Attest:

By: _____
Name:

By: _____
Name:
Title:

_____,
 as Trustee

By: _____
Name:
Title:

F - 4

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

[Form of]
**Government Development Bank for Puerto Rico Certificate**

The undersigned [Authorized Representative] of the Government Development Bank for Puerto Rico ("GDB"), a public corporation of the Commonwealth of Puerto Rico created by Act No. 17 of September 23, 1948, HEREBY CERTIFIES to the Puerto Rico Convention Center District Authority (the "Authority"), the Puerto Rico Tourism Company (the "Tourism Company") and JPMorgan Chase Bank, as Trustee (the "Trustee") under the Trust Agreement dated March 24, 2006 (the "Trust Agreement") between the Authority and the Trustee (all capitalized terms used but not defined herein shall have the respective meanings set forth in the Trust Agreement) the following.

This Certificate is issued in connection with the payments required for fiscal year ___-___ and the first day of the succeeding fiscal year.

1.   The following are the total sums necessary for the Authority to make the following payments, during the upcoming fiscal year and the first day of the second succeeding fiscal year:

(a)   Payments equal to the amount set forth below (after taking into account any amounts then on deposit in the Bond Payment Fund and the Capitalized Interest Account of the Proceeds Fund available therefor) for the full and timely payment, or the amortization, of the principal and interest on the Bonds due on July 1st and January 1st of the immediately succeeding fiscal year and July 1st of the second succeeding fiscal year (including any amounts due in connection with prior payments for which there were insufficient funds):

| | |
|---|---|
| Amount necessary for Principal and Interest | $_____ |
| | |
| Offsets due to amounts held in the Earnings Account of the Proceeds Fund (-) | |
| Offsets due to amounts held in the Bond Payment Fund (-) | |
| Offsets due to Capitalized Interest in the Proceeds Fund[1] (-) | |
| Shortfalls due to Hotel Occupancy Tax | |
| Funds used pursuant to the provisions of Section 8 Article VI of the Constitution (+) | |
| Other shortfalls from prior years(+) | |
| | |
| | $_____ |
| | |
| Total Amount due (the "Total Amount") | $ _____ |

---

[1] First year only

F - 5

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

The Total Amount will be paid in monthly installments as set forth below:

July                          $
August
September
October
November
December
January
February
March
April
May
June

(b) Full and timely payment of the obligations of the Authority under any Credit Facilities or any Interest Rate Exchange Agreements, which in the future may be entered into by the Authority with the prior written authorization of the Tourism Company;[*]

July                          $
August
September
October
November
December
January
February
March
April
May
June

(c)  The deposits required to replenish the Debt Service Reserve Fund established under the Trust Agreement;[*] and

July                          $
August
September
October
November
December
January
February
March
April
May
June

---

[*]      All amounts set forth in paragraph 1 will be adjusted upward to take into account any shortfalls occurring during the Fiscal Year.  This may include payments in May and June of such Fiscal Year together with future Fiscal Years

F - 6

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

(d)   Any other expenses incurred in connection with (i) the issuance of the Bonds, or (ii) with any Credit Facilities or Interest Rate Exchange Agreements.[*]

July
August
September
October
November
December
January
February
March
April
May
June

2.   The total amount due for all amounts set forth in paragraph 1 is $_____.

3.   Amounts set forth in paragraph 1 are in accordance with the provisions set forth in the Trust Agreement and the Assignment and Coordination Agreement, dated as of March 24, 2006, by and between the Tourism Company and GDB.

4.   GDB will deposit all Hotel Occupancy Tax Funds as set forth in this Certificate in accordance with the Pledge Agreement.

5.   The Trustee will deposit into the Bond Payment Fund promptly upon receipt but in no event later than the third Business Day after receipt thereof, beginning on the first month of the next suceeding Fiscal Year, an amount sufficient, together (in the case of interest only) with any capitalized interest and accrued interest as set forth in the Proceeds Fund, to pay the amount of interest and principal payable for the year in the amounts set forth below (such annual deposit being first satisfied with respect to interest on the Bonds and then with respect to principal on the Bonds):

| | Principal | Interest |
|---|---|---|
| July | | |
| August | | |
| September | | |
| October | | |
| November | | |
| December | | |
| January | | |
| February | | |
| March | | |
| April | | |
| May | | |
| June | | |

---

[*]   All amounts set forth in paragraph 1 will be adjusted upward to take into account any shortfalls occurring during the Fiscal Year.  This may include payments in May and June of such Fiscal Year together with future Fiscal Years

F - 7

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**IN WITNESS WHEREOF**, the undersigned has hereunto set [his][her] official signature and the corporate seal of Government Development Bank for Puerto Rico this May __, _____.

GOVERNMENT DEVELOPMENT
BANK FOR PUERTO RICO

By:_____
Name:
Title:

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**Duane**Morris®

FIRM and AFFILIATE OFFICES

NEW YORK
LONDON
LOS ANGELES
CHICAGO
HOUSTON
PHILADELPHIA
SAN DIEGO
SAN FRANCISCO
BOSTON
WASHINGTON, DC
LAS VEGAS
ATLANTA
MIAMI
PITTSBURGH
NEWARK
ALLENTOWN
WILMINGTON
HARRISBURG
PRINCETON
LAKE TAHOE

## APPENDIX G
## FORM OF BOND COUNSEL OPINION

*www.duanemorris.com*

March 24, 2006

PUERTO RICO CONVENTION CENTER
DISTRICT AUTHORITY
San Juan, Puerto Rico

**Re:   PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY**

Ladies and Gentlemen:

We have acted as Bond Counsel to the Puerto Rico Convention Center District Authority and in such capacity we have examined Act No. 351 of the Legislature of Puerto Rico, approved September 2, 2000, as amended (the "Act"), creating the Puerto Rico Convention Center District Authority (the "Authority"), a corporate body politic constituting a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth") and Act No. 272 of the Legislature of Puerto Rico, approved September 9, 2003, as amended (the "Hotel Occupancy Tax Act)," pursuant to which the Tax (as such term is defined in the Hotel Occupancy Tax Act) is collected from hotel taxpayers by the Puerto Rico Tourism Company, a public corporation of the Commonwealth (the "Tourism Company").

We have also examined certified copies of the proceedings of the Board of Directors of the Authority authorizing the execution and delivery of a Trust Agreement dated March 24, 2006, (the "Trust Agreement"), by and between the Authority and JPMorgan Chase Bank, N.A., as trustee (the "Trustee") and a Pledge and Assignment Agreement, dated March 24, 2006 (the "Pledge Agreement") by and among the Authority, the Trustee and Government Development Bank for Puerto Rico, a public corporation of the Commonwealth (the "GDB").

We have also examined other proofs submitted relative to the authorization, issuance and sale of the following-described bonds (the "Series A Bonds"):

### $468,800,000

## PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY HOTEL OCCUPANCY TAX REVENUE BONDS, SERIES A

Dated the date of delivery and maturing in such principal amounts, subject to redemption, and bearing interest at the rates set forth in a Supplemental Trust Agreement dated March 24, 2006 (the "Supplemental Trust Agreement"), by and between the Authority and the Trustee.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

DuaneMorris

March 24, 2006

We have also examined certified copies of the proceedings of the Tourism Company in connection with its authorization and delivery of the Assignment Agreement and of GDB in connection with its authorization and delivery of the Assignment Agreement and the Pledge Agreement.

We have also examined the opinions of (i) Annette Danner, general counsel to the Authority, in connection with the authorization and delivery of the Trust Agreement, Supplemental Trust Agreement, and the Pledge Agreement by the Authority, (ii) Pedro A. Padilla Torres, general counsel to Tourism Company, in connection with the authorization and delivery of the Assignment Agreement by the Tourism Company, (iii) and María de Lourdes Rodríguez, general counsel to GDB, in connection with the authorization and delivery of the Assignment Agreement and the Pledge Agreement by GDB.

The principal of and interest on the Series A Bonds and all other bonds issued by the Authority under the Trust Agreement are payable primarily from Hotel Occupancy Tax revenues, all as provided in the Trust Agreement.

We have also examined one of the Series A Bonds as executed and authenticated.

From such examination, we are of the opinion that:

1.      Said proceedings have been validly and legally taken.

2.      As authorized by the Act, the Hotel Occupancy Tax Act, and by said proceedings, the Trust Agreement, the Assignment Agreement and the Pledge Agreement have been duly executed and delivered and contain sufficient covenants and provisions in accordance with law with respect to the payments derived from the Tax, and application of all funds, the safeguarding of moneys on hand or on deposit and the rights and remedies of the Trustee and the holders of the Series A Bonds.

3.      The Series A Bonds have been duly authorized and issued to, among other things, (i) provide funds for the repayment of an interim financing obtained by the Authority from GDB, (ii) make a deposit in accordance with the Trust Agreement to pay for construction projects at the Puerto Rico Convention Center, (iii) fund the required debt service reserve, and (iv) pay certain costs of issuance of the Series A Bonds.

4.      The Series A Bonds are valid and binding obligations of the Authority, secured by, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth, the following items: (i) Hotel Occupancy Tax Funds, as defined in the Trust Agreement; (ii) all funds, accounts and all money from time to time held by the Trustee under the Trust Agreement or any Supplemental Trust Agreement; (iii) all right, title and interest of the Authority acquired by the Trustee for the benefit of the owners of the Series A Bonds (the "Owners") from GDB with respect to its rights under the Pledge Agreement, and any money from time to time held thereunder including the Pledge Account created thereunder; (iv) all right, title and interest of GDB acquired by the Trustee for the benefit of the Owners from GDB with respect to its rights under the Assignment Agreement, including the Transfer Account created thereunder, and any money from time to time held therein; and (v) any and all other property, revenues or funds from time to time granted, assigned or pledged as and for additional security under the Trust Agreement, by the Authority or anyone else, in favor of the Trustee, which is authorized to receive any and all such property at any and all times and to hold and apply the same subject to the terms of the Trust Agreement.

G-2

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

DuaneMorris

March 24, 2006

    5.      The Series A Bonds do not constitute a debt of the Commonwealth or of any of its municipalities or other political subdivisions, other than the Authority, and neither the Commonwealth nor any of such municipalities or other political subdivisions, other than the Authority, shall be liable thereon.

    6.      Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to compliance with the covenant referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), regarding use, expenditure and investment of bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Series A Bonds is excluded from gross income for federal income tax purposes, and (ii) the Series A Bonds and the interest thereof are exempt from state, Commonwealth and local income taxation.

    Interest on the Series A Bonds is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations by the Code.  Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code.  The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of the Series A Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is not included in gross income.  No opinion is rendered by the undersigned on the effect of any action taken or not taken after the date of this opinion without approval of the undersigned (except for such action or omission to act as otherwise provided for in the documents pertaining to the Series A Bonds) or in reliance upon the advice of counsel other than the undersigned on the exclusion from gross income of the interest on the Series A Bonds for federal income tax purposes.

    The Authority has covenanted to comply to the extent permitted by the Constitution and laws of the Commonwealth, with the requirements of the Code, so that interest on the Series A Bonds will remain excluded from gross income for purposes of federal income taxation on the date of issuance of the Series A Bonds.  We are not aware of any provision of the Constitution or laws of the Commonwealth which would prevent the Authority and said issuers from complying with the requirements of the Code.

            Sincerely,

G-3

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

[THIS PAGE INTENTIONALLY LEFT BLANK]

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**APPENDIX H**

# Ambac

Ambac Assurance Corporation
One State Street Plaza, 15th Floor
New York, New York 10004
Telephone: (212) 668-0340

## Financial Guaranty Insurance Policy

Obligor:

Policy Number:

Obligations:

Premium:

**Ambac Assurance Corporation (Ambac),** a Wisconsin stock insurance corporation, in consideration of the payment of the premium and subject to the terms of this Policy, hereby agrees to pay to The Bank of New York, as trustee, or its successor (the "Insurance Trustee"), for the benefit of the Holders, that portion of the principal of and interest on the above-described Obligations (the "Obligations") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor.

Ambac will make such payments to the Insurance Trustee within one (1) business day following written notice to Ambac of Nonpayment. Upon a Holder's presentation and surrender to the Insurance Trustee of such unpaid Obligations or related coupons, uncanceled and in bearer form and free of any adverse claim, the Insurance Trustee will disburse to the Holder the amount of principal and interest which is then Due for Payment but is unpaid. Upon such disbursement, Ambac shall become the owner of the surrendered Obligations and/or coupons and shall be fully subrogated to all of the Holders' rights to payment thereon.

In cases where the Obligations are issued in registered form, the Insurance Trustee shall disburse principal to a Holder only upon presentation and surrender to the Insurance Trustee of the unpaid Obligation, uncanceled and free of any adverse claim, together with an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee, duly executed by the Holder or such Holder's duly authorized representative, so as to permit ownership of such Obligation to be registered in the name of Ambac or its nominee.  The Insurance Trustee shall disburse interest to a Holder of a registered Obligation only upon presentation to the Insurance Trustee of proof that the claimant is the person entitled to the payment of interest on the Obligation and delivery to the Insurance Trustee of an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee, duly executed by the Holder or such Holder's duly authorized representative, transferring to Ambac all rights under such Obligation to receive the interest in respect of which the insurance disbursement was made. Ambac shall be subrogated to all of the Holders' rights to payment on registered Obligations to the extent of any insurance disbursements so made.

In the event that a trustee or paying agent for the Obligations has notice that any payment of principal of or interest on an Obligation which has become Due for Payment and which is made to a Holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from the Holder pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such Holder will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

As used herein, the term "Holder" means any person other than (i) the Obligor or (ii) any person whose obligations constitute the underlying security or source of payment for the Obligations who, at the time of Nonpayment, is the owner of an Obligation or of a coupon relating to an Obligation.  As used herein, "Due for Payment", when referring to the principal of Obligations, is when the scheduled maturity date or mandatory redemption date for the application of a required sinking fund installment has been reached and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity; and, when referring to interest on the Obligations, is when the scheduled date for payment of interest has been reached. As used herein, "Nonpayment" means the failure of the Obligor to have provided sufficient funds to the trustee or paying agent for payment in full of all principal of and interest on the Obligations which are Due for Payment.

This Policy is noncancelable.  The premium on this Policy is not refundable for any reason, including payment of the Obligations prior to maturity.  This Policy does not insure against loss of any prepayment or other acceleration payment which at any time may become due in respect of any Obligation, other than at the sole option of Ambac, nor against any risk other than Nonpayment.

In witness whereof, Ambac has caused this Policy to be affixed with a facsimile of its corporate seal and to be signed by its duly authorized officers in facsimile to become effective as its original seal and signatures and binding upon Ambac by virtue of the countersignature of its duly authorized representative.

President

Secretary

Effective Date:

Authorized Representative

THE BANK OF NEW YORK acknowledges that it has agreed to perform the duties of Insurance Trustee under this Policy.

Form No.: 2B-0012 (1/01)

Authorized Officer of Insurance Trustee

H-1

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

[THIS PAGE INTENTIONALLY LEFT BLANK]

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**APPENDIX I**



CDC IXIS Financial Guaranty North America, Inc.
825 Third Avenue, Sixth Floor
New York, NY 10022
For information, contact (212) 909-3939
Toll-free (866) 243-4212

# FINANCIAL GUARANTY INSURANCE POLICY

ISSUER:                                                                   Policy No.:  CIFG NA-#

CUSIP:                                                                    Effective Date:

OBLIGATIONS:

CDC IXIS FINANCIAL GUARANTY NORTH AMERICA, INC. ("CIFGNA"), for consideration received, hereby UNCONDITIONALLY AND IRREVOCABLY GUARANTEES to each Policyholder, subject only to the terms and conditions of this Policy (which includes each endorsement hereto), the full and complete payment by or on behalf of the Issuer of Regular Payments of principal of and interest on the Obligations.

For  the further protection of each Policyholder, CIFGNA irrevocably and unconditionally guarantees:

(1)   payment of any amount required to be paid under this Policy by CIFGNA following CIFGNA's receipt of notice and instruments of assignment as described in Endorsement No. 1 hereto and

(2)   payment of the amount of any distribution of principal of and interest on the Obligations made during the Term of this Policy to such Policyholder that is subsequently avoided in whole or in part as a preference payment under applicable law (such payment to be made by CIFGNA in accordance with Endorsement No. 1 hereto).

CIFGNA shall be subrogated to the rights of each Policyholder to receive payments under the Obligations to the extent of any payment by CIFGNA hereunder. Upon disbursement in respect of an Obligation, CIFGNA shall become the owner of the Obligation, appurtenant coupon, if any, and all rights to payment of principal thereof or interest thereon.

The following terms shall have the meanings specified below, subject to and including any modifications set forth in any endorsement hereto, for all purposes of this Policy. "Policyholder" means, if the Obligations are in book-entry form, the registered owner of any Obligation as indicated on the registration books maintained by or on behalf of the Issuer for such purpose or, if the Obligations are in bearer form, the holder of any Obligation; provided, however, that any trustee acting on behalf of and for the benefit of such registered owner or holder shall be deemed to be the Policyholder to the extent of such  trustee's authority. "Regular Payments" means payments of interest and principal which are agreed to be made during the Term of this Policy in accordance with the original terms of the Obligations when issued and without regard to any amendment or modification of such Obligations thereafter; payments which become due on an accelerated basis as a result of (a) a default by the Issuer or any other person, (b) an election by the Issuer to pay principal or other amounts on an accelerated basis or (c) any other cause, shall not constitute "Regular Payments" unless CIFGNA shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration.  "Term of this Policy" shall have the meaning set forth in Endorsement No. 1 hereto.

This Policy sets forth in full the undertaking of CIFGNA, and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto or to the Obligations, except a contemporaneous or subsequent agreement or instrument given by CIFGNA or to which CIFGNA has given its written consent, or by the merger, consolidation or dissolution of the Issuer. The premiums paid in respect of this Policy are nonrefundable for any reason whatsoever, including payment, or provision being made for payment, of the Obligations prior to maturity. This Policy may not be cancelled or revoked during the Term of this Policy, including for nonpayment of premium due to CIFGNA. Payments under this Policy may not be accelerated except at the sole option of CIFGNA.

In witness whereof, CDC IXIS FINANCIAL GUARANTY NORTH AMERICA, INC. has caused this Policy to be executed on its behalf by its Authorized Officer.

CDC IXIS FINANCIAL GUARANTY NORTH AMERICA, INC.

By _____
            Authorized Officer

FORM #CIFGNA Bonds-1 (7-03)                           I-1

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

[THIS PAGE INTENTIONALLY LEFT BLANK]

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**APPENDIX J**



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

## Municipal Bond
## New Issue Insurance Policy

| Issuer: | | Policy Number: | |
|---|---|---|---|
| | | Control Number: | 0010001 |
| Bonds: | | Premium: | |

Financial Guaranty Insurance Company ("Financial Guaranty"), a New York stock insurance company, in consideration of the payment of the premium and subject to the terms of this Policy, hereby unconditionally and irrevocably agrees to pay to U.S. Bank Trust National Association or its successor, as its agent (the "Fiscal Agent"), for the benefit of Bondholders, that portion of the principal and interest on the above-described debt obligations (the "Bonds") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

Financial Guaranty will make such payments to the Fiscal Agent on the date such principal or interest becomes Due for Payment or on the Business Day next following the day on which Financial Guaranty shall have received Notice of Nonpayment, whichever is later. The Fiscal Agent will disburse to the Bondholder the face amount of principal and interest which is then Due for Payment but is unpaid by reason of Nonpayment by the Issuer but only upon receipt by the Fiscal Agent, in form reasonably satisfactory to it, of (i) evidence of the Bondholder's right to receive payment of the principal or interest Due for Payment and (ii) evidence, including any appropriate instruments of assignment, that all of the Bondholder's rights to payment of such principal or interest Due for Payment shall thereupon vest in Financial Guaranty. Upon such disbursement, Financial Guaranty shall become the owner of the Bond, appurtenant coupon or right to payment of principal or interest on such Bond and shall be fully subrogated to all of the Bondholder's rights thereunder, including the Bondholder's right to payment thereof.

This Policy is non-cancellable for any reason. The premium on this Policy is not refundable for any reason, including the payment of the Bonds prior to their maturity. This Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Bond.

As used herein, the term "Bondholder" means, as to a particular Bond, the person other than the Issuer who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof. "Due for Payment" means, when referring to the principal of a Bond, the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity and means, when referring to interest on a Bond, the stated date for payment of interest. "Nonpayment" in respect of a Bond means the failure of the Issuer to have provided sufficient funds to the paying agent for payment in full of all

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.

Form 9000 (10/93)                                                                                                    Page 1 of 2



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
**T** 212·312·3000
**T** 800·352·0001

## Municipal Bond
## New Issue Insurance Policy

principal and interest Due for Payment on such Bond. "Notice" means telephonic or telegraphic notice, subsequently confirmed in writing, or written notice by registered or certified mail, from a Bondholder or a paying agent for the Bonds to Financial Guaranty. "Business Day" means any day other than a Saturday, Sunday or a day on which the Fiscal Agent is authorized by law to remain closed.

In Witness Whereof, Financial Guaranty has caused this Policy to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date:**                                      **Authorized Representative**

U.S. Bank Trust National Association, acknowledges that it has agreed to perform the duties of Fiscal Agent under this Policy.

**Authorized Officer**

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.

Form 9000 (10/93)                                                               Page 2 of 2

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

# Endorsement

## To Financial Guaranty Insurance Company
## Insurance Policy

| Policy Number: | | Control Number: | 0010001 |
| --- | --- | --- | --- |

It is further understood that the term "Nonpayment" in respect of a Bond includes any payment of principal or interest made to a Bondholder by or on behalf of the issuer of such Bond which has been recovered from such Bondholder pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

NOTHING HEREIN SHALL BE CONSTRUED TO WAIVE, ALTER, REDUCE OR AMEND COVERAGE IN ANY OTHER SECTION OF THE POLICY. IF FOUND CONTRARY TO THE POLICY LANGUAGE, THE TERMS OF THIS ENDORSEMENT SUPERSEDE THE POLICY LANGUAGE.

In Witness Whereof, Financial Guaranty has caused this Endorsement to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date:**                                    **Authorized Representative**

**Acknowledged as of the Effective Date written above:**

**Authorized Officer**
**U.S. Bank Trust National Association, as Fiscal Agent**

FGiC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.

Form E-0002 (10/93)                                                                                    Page 1 of 1

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

[THIS PAGE INTENTIONALLY LEFT BLANK]

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

[THIS PAGE INTENTIONALLY LEFT BLANK]

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

[THIS PAGE INTENTIONALLY LEFT BLANK]

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY • HOTEL OCCUPANCY TAX REVENUE BONDS, SERIES A

Recycled Paper - Printed by
IMAGEMASTER 800.452.5152

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.